```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -  -  -
 5
     IN RE:  NATIONAL         :   HON. DAN A.
 6   PRESCRIPTION OPIATE      :   POLSTER
     LITIGATION               :
 7                            :
     APPLIES TO ALL CASES     :   NO.
 8                            :   1:17-MD-2804
                              :
 9
            - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       -  -  -
12
                   July 19, 2018
13
                       -  -  -
14
15           Videotaped deposition of
     MICHAEL ORIENTE, taken pursuant to
16   notice, was held at the law offices of
     Weitz & Luxenberg, 700 Broadway, New York
17   New York, beginning at 9:01 a.m., on the
     above date, before Michelle L. Gray, a
18   Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
19   Realtime Reporter, and Notary Public.
20                     -  -  -
21
           GOLKOW LITIGATION SERVICES
22     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
23
24
```

```
 1     APPEARANCES:
 2

 3         LEVIN PAPANTONIO THOMAS
           MITCHELL RAFFERTY PROCTOR, P.A.
           BY:  MIKE PAPANTONIO, ESQUIRE
 4             ARCHIE C. LAMB, JR., ESQUIRE
           316 South Baylen Street
 5         Pensacola, Florida 32502
           (850) 435-7000
 6         mpapantonio@levinlaw.com
           alamb@levinlaw.com
 7
              - and -
 8

 9         WEISMAN KENNEDY & BERRIS CO LPA
           BY:  ERIC KENNEDY, ESQUIRE
               BRIAN ASQUITH, ESQUIRE
10         1600 Midland Building
           101 W. Prospect Avenue
11         Cleveland, Ohio 44115
           (216) 781-1111
12         ekennedy@weismanlaw.com
           basquith@weismanlaw.com
13
              - and -
14

15         NAPOLI SHKOLNIK, PLLC
           BY:  SHAYNA E. SACKS, ESQUIRE
           360 Lexington Avenue, 11th Floor
16         New York, New York 10017
           (212) 397-1000
17         Ssacks@napolilaw.com
18            - and -
19         GRAY & WHITE LAW
           BY:  MARK K. GRAY, ESQUIRE
20         713 East Market Street
           Louisville, Kentucky 40202
21         (502) 805-1800
           Mgray@grayandwhitelaw.com
22         Representing the Plaintiffs
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       APPEARANCES:  (Cont'd.)
 2
         COVINGTON & BURLING, LLP
 3       BY:  EMILY JOHNSON HENN, ESQUIRE
         333 Twin Dolphin Drive, Suite 766
 4       Redwood Shores, California 94065
         (650) 632-4715
 5       Ehenn@cov.com
 6          - and -
 7       COVINGTON & BURLING, LLP
         BY:  EMILY KVESELIS, ESQUIRE
 8       850 Tenth Street, NW
         Suite 586N
 9       Washington, D.C.  20001
         Ekveselis&cov.com
10       (202) 662-5110
         Representing the Defendant, McKesson
11       Corporation
12
         MARCUS & SHAPIRA, LLP
13       BY:  JAMES F. ROSENBERG, ESQUIRE
         One Oxford Centre, 35th Floor
14       Pittsburgh, Pennsylvania 15219
         (412) 338-4683
15       Rosenberg@marcus-shapira.com
         Representing the Defendant, HBC
16       Service Company
17
         REED SMITH, LLP
18       BY:  NEIL A. HLAWATSCH, ESQUIRE
         1717 Arch Street, Suite 3100
19       Philadelphia, Pennsylvania 19103
         (215) 851-8245
20       nhlawatsch@reedsmith.com
         Representing the Defendant,
21       Amerisource Bergen Drug Corporation
22
23
24
```

```
 1        APPEARANCES:  (Cont'd.)
 2
          JONES DAY
 3        BY:  LAURA JANE DURFEE, ESQUIRE
          2727 North Harwood Street
 4        Dallas, Texas 75201
          (214) 220-3939
 5        Ldurfee@jonesday.com
          Representing the Defendant, Walmart
 6
 7        MORGAN LEWIS & BOCKIUS, LLP
          BY:  CAROLYN A. SILANE, ESQUIRE
 8        101 Park Avenue
          New York, New York 10178
 9        (212) 309-6734
          Csilane@morganlewis.com
10        Representing the Defendant, Rite Aid
          of Maryland
11
12        PELINI CAMPBELL & WILLIAMS, LLC
          BY:  ERIC J. WILLIAMS, ESQ.
13        8040 Cleveland Avenue NW
          Suite 400
14        North Canton, Ohio 44720
          (330) 305-6400
15        ejwilliams@pelini-law.com
          Representing the Defendant,
16        Prescription Supply, Inc.
17
          DECHERT, LLP
18        BY:  DEBRA D. O'GORMAN, ESQUIRE
          1095 Avenue of the Americas
19        New York, New York 10036
          (212) 698-3500
20        Debra.ogorman@dechert.com
          Representing the Defendant, Purdue
21        Pharmaceuticals
22
23
24
```

```
 1        APPEARANCES:   (Cont'd.)
 2

          ZUCKERMAN SPAEDER LLP
 3        BY:   CONOR B. O'CROININ, ESQUIRE
          100 East Pratt Street, Suite 2440
 4        Baltimore, Maryland 21202
          (410) 949-1160
 5        Cocroinin@zuckerman.com
          Representing the Defendant, CVS
 6

 7        ARNOLD & PORTER KAYE SCHOLER, LLP
          BY:   ANGELA R. VICARI, ESQUIRE
 8        250 West 55th Street
          New York, New York 10019
 9        (212) 836-8214
          Angela.vicari@apks.com
10        Representing the Defendants, Endo
          Health Solutions; Endo
11        Pharmaceuticals, Inc.; Barr
          Pharmaceutical, Inc.; and Barr
12        Pharmaceutical Company, Inc.
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1        TELEPHONIC APPEARANCES:
 2

          SEEGER WEISS, LLP
 3        BY:  DAVID R. BUCHANAN, ESQUIRE
          77 Water Street
 4        New York, New York 10005
          (212) 584-0700
 5        Dbuchanan@seegerweiss.com
 6           - and -
 7        SPANGENBERG SHIBLEY & LIBER, LLP
          BY:  DUSTIN B. HERMAN, ESQUIRE
 8        1001 Lakeside Avenue East
          Suite 1700
 9        Cleveland, Ohio 44114
          (216) 696-3232
10        Dherman@spanglaw.com
11           - and -
12        WEISMAN KENNEDY & BERRIS CO LPA
          BY:  DANIEL P. GOETZ, ESQUIRE
13        1600 Midland Building
          101 W. Prospect Avenue
14        Cleveland, Ohio 44115
          (216) 781-1111
15        Dgoetz@weismanlaw.com
16           - and -
17        NAPOLI SHKOLNIK, PLLC
          BY:  JOSEPH L. CIACCIO, ESQUIRE
18        360 Lexington Avenue, 11th Floor
          New York, New York 10017
19        (212) 397-1000
          jciaccio@napolilaw.com
20
             - and -
21

          TAFT STETTINIUS & HOLLISTER, LLP
22        BY:  CHOU-IL LEE, ESQUIRE
          One Indiana Square
23        Indianapolis, Indiana 46204
          (317) 713-3519
24        Clee@taftlaw.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        TELEPHONIC APPEARANCES:   (Cont'd.)
 2
              - and -
 3

          GREENE KETCHUM, LLP
 4        PAUL T. FARRELL, JR., ESQUIRE
          419 11th Street
 5        Huntington, West Virginia 25701
          (304) 521-4778
 6        Paul@greeneketchum.com
 7           - and -
 8        GARSON JOHNSON, LLC
          BY:  JAMES A. DEROCHE, ESQUIRE
 9        101 West Prospect Avenue, Suite 1600
          Midland Building
10        Cleveland, Ohio 44115
          (216) 696-7009
11
              - and -
12

          LAW OFFICE OF LUKE D. MAHONEY
13        BY: LUKE DANIEL MAHONEY, ESQUIRE
          1200 Ontario St
14        Cleveland, Ohio 44113
          (216) 443-7800
15        Representing the Plaintiffs
16
17
18
19
20
21
22
23
24
```

```
 1          APPEARANCES:   (Cont'd.)
 2
 3          ROPES & GRAY, LLP
            BY:  JOSH GOLDSTEIN, ESQUIRE
 4          800 Boylston Street
            Boston, Massachusetts 02199
 5          (617) 951-7234
            Josh.goldstein@ropesgray.com
 6          Representing the Defendant,
            Mallinckrodt
 7
 8          WILLIAMS & CONNOLLY, LLP
            BY:  MATTHEW C. MONAHAN, ESQUIRE
 9          725 12th Street, NW
            Washington, D.C. 20005
10          (202) 434-5148
            Mmonahan@wc.com
11          Representing the Defendant, Cardinal
            Health
12
13          KIRKLAND & ELLIS, LLP
            BY:  KAITLYN COVERSTONE, ESQUIRE
14          300 North LaSalle Street
            Chicago, Illinois 60654
15          (312) 862-7184
            Kaitlyn.coverstone@kirkland.com
16          Representing the Defendant, Allergan
17
            MORGAN LEWIS BOCKIUS LLP
18          BY:  ZACHARY R. LAZAR, ESQUIRE
            77 West Wacker Drive
19          Chicago, Illinois 60601
            (312) 324-1492
20          Zachary.lazar@morganlewis.com
            Representing the Defendants, Teva
21          Pharmaceuticals, Inc. Cephalon Inc,
            Watson Laboratories, Actavis LLC,
22          Actavis Pharma, Inc.
23
24
```

```
 1        APPEARANCES:   (Cont'd.)
 2

          JACKSON KELLY, PLLC
 3        BY:  DOUGLAS J. CROUSE, ESQUIRE
          500 Lee Street East, Suite 1600
 4        Charleston, West Virginia 25301
          (304) 340-1347
 5        Dcrouse@jacksonkelly.com
          Representing the Defendant,
 6        Miami-Luken
 7
          ALSO PRESENT:
 8
 9

          VIDEOTAPE TECHNICIAN:
10
              Henry Marte
11
12        LITIGATION TECHNICIAN:
13            Evan Wolfe
14
          ALSO PRESENT:
15
          Carol Moore
16        Sarah Merced
          Sara Papantonio
17        Olivia Bergert
          (Levin Papantonio)
18
19        Donna Rozman
          (Weisman Kennedy)
20
21                  -  -  -
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                         -   -   -
2                       I N D E X
3                         -   -   -
4

     Testimony of:              MICHAEL ORIENTE
5
6           By Mr. Papantonio        25, 583
7           By Mr. Kennedy          321, 603
8           By Ms. Henn                 575
9           By Mr. O'Croinin            598
10
11
                          -   -   -
12
                     E X H I B I T S
13
                          -   -   -
14
15   NO.                 DESCRIPTION        PAGE
16   MCK-Oriente-515     GAO State          332
                         Monitoring Programs
17                       Provide Useful
                         Tool to Reduce
18                       Diversion
                         P1.1076
19
     MCK-Oriente-518     Memo for ASA       338
20                       Hutchinson
                         Subject, Review
21                       Of the DEA
                         Report No. I-2002-010
22                       P1.1086
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                         -   -   -
 4
 5    NO.                 DESCRIPTION       PAGE
 6    MCK-Oriente-519     Follow-Up Review 343
                          Of the DEA Efforts
 7                        To Control the
                          Diversion of
 8                        Controlled
                          Pharmaceuticals
 9                        July 2006
                          P1.1088
10
      MCK-Oriente-525     Threshold        436
11                        Change Form
                          12/30/09
12                        P1.1228
                          MCKMDL00368716-22
13
      MCK-Oriente-526     Threshold        437
14                        Change Form
                          12/30/09
15                        P1.1236
                          MCKMDL00381960-66
16
      MCK-Oriente-527     Threshold        437
17                        Change Form
                          12/30/09
18                        P1.1239
                          MCKMDL00382971-77
19
      MCK-Oriente-528     Threshold        437
20                        Change Form
                          12/30/09
21                        P1.1240
                          MCKMDL00383396-02
22
23
24
```

```
 1                         -  -  -
 2              E X H I B I T S  (Cont'd.)
 3                         -  -  -
 4
 5    NO.                 DESCRIPTION        PAGE
 6    MCK-Oriente-529     Threshold          437
                          Change Form
 7                        12/30/09
                          P1.1243
 8                        MCKMDL00385989-95
 9

      MCK-Oriente 535     CVS to Pay         550
10                        Penalty in
                          Methamphetamine
11                        Case
                          P1.5005.1
12

      MCK-Oriente-062     McKesson           314
13                        Operations Manual
                          P1.345
14                        MCKMDL000002509-539
15    MCK-Oriente-020     E-mail Thread      306
                          8/18/11
16                        Subject, McKesson
                          Marketing Opportunities
17                        Actavis Oxymorphone ER
                          P1.113
18                        ACTAVIS0623837-40
19    MCK-Oriente-322     DOJ,               292
                          Biopharmaceutical
20                        Company, Cephalon to
                          Pay 425 Million
21                        P1.1381
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2          E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5    NO.                 DESCRIPTION        PAGE
 6    MCK-Oriente-279     McKesson            283
                          Manufacturer
 7                        Marketing Contract
                          P1.1317
 8                        MCKMDL00353368-69
 9    MCK-Oriente-144     McKesson            278
                          Manufacturer
10                        Marketing Product
                          Promotional Agreement
11                        P1.1154
                          MCKMDL00353305-06
12
      MCK-Oriente-060     Death Map           584
13                        P1.324
14    MCK-Oriente-383     In the Matter        30
                          Of McKesson
15                        Corporation
                          P1.1428
16                        MCKMDL00409050-112
17    MCK-Oriente-503     US DOJ              569
                          CVS Pharmacy Inc.
18                        Pays 5 Million to
                          Settle
19                        P1.296
20    MCK-Oriente-504     US DOJ              568
                          US Reaches 8 Million
21                        Settlement
                          P1.297
22
      MCK-Oriente-506     US DOJ              568
23                        CVS to Pay 3.5
                          Million
24                        P1.300
```

```
 1                    -  -  -
 2          E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5    NO.                 DESCRIPTION        PAGE
 6    MCK-Oriente-507     US DOJ              566
                          Drug Diversion
 7                        Claims Against
                          CVS
 8                        P1.301
 9    MCK-Oriente-511     US DOJ              560
                          CVS to Pay
10                        11 Million
                          P1 .305
11
      MCK-Oriente-534     5 Things            554
12                        News Letter
                          DEA Moves Against
13                        Two Florida
                          Pharmacies
14                        P1.5004.1
15    MCK-Oriente-537     CVS DEA             570
                          Settlements
16                        Total Paid
                          130.6 Million
17                        P1.5007
18    MCK-Oriente-544     Giant Eagle         410
                          Threshold Change
19                        Form
                          P1.5014.1
20                        MCKMDL00364141-44
21    MCK-Oriente-545     PowerPoint          327
                          Lifestyle Drugs &
22                        Internet Pharmacies
                          P1.5015.1
23                        MCKMDL00403340-48
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2             E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5    NO.                 DESCRIPTION      PAGE
 6    MCK-Oriente-546     Threshold Change 401
                          Form
 7                        11/28/08
                          P1.5016
 8                        MCKMDL00000524
 9    MCK-Oriente-539     Establishing      509
                          Opioid Threshold
10                        P1.5009
11    MCK-Oriente-541     CSMP              378
                          P1.5011.1
12                        MCKMDL00144473-86
13    MCK-Oriente-542     ISMC CSMP         389
                          Outbound Calls
14                        SF Pilot Program
                          P1.5012.1
15                        MCKMDL00317004-10
16    MCK-Oriente-543     RNA Threshold     467
                          Change/Level 1
17                        Form
                          P1.5013.1
18                        MCKMDL00000497-512
19    MCK-Oriente-547     E-mail Thread     445
                          12/16/08
20                        Subject, Could you
                          Do Me a Favor
21                        P1.5017.1
                          MCKMDL00000515-18
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2           E X H I B I T S  (Cont'd.)
 3                    -   -   -
 4
 5    NO.                 DESCRIPTION      PAGE
 6    MCK-Oriente-548     Threshold Change 459
                          Forms
 7                        11/26/08
                          P1.5018.1
 8                        MCKMDL00000527-30
 9    MCK-Oriente-559     CSMP             510
                          Observation
10                        Level 1
                          Documentation Forms
11                        P1.5030.1
12    MCK-Oriente-562     Memo, 4/1/10     518
                          Subject, FY11
13                        Compensation Plan
                          P1.5035.1
14                        MCKMDL00346787
15    MCK-Oriente-563     Settlement &     506
                          Release Agreement
16                        P1.5036.1
                          MCKMDL00409289-99
17
      MCK-Oriente-567     E-mail Thread    536
18                        9/26/12
                          Subject, Good Day
19                        #1
                          P1.5040.1
20                        MCKMDL00409355-57
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -  -  -
 2             E X H I B I T S  (Cont'd.)
 3                       -  -  -
 4
 5   NO.                   DESCRIPTION        PAGE
 6   MCK-Oriente-564       E-mail Thread      490
                           5/31/11
 7                         Subject, High
                           Percentage
 8                         To Threshold
                           Customers
 9                         P1.5037
                           MCKMDL00409322
10
     MCK-Oriente-566       E-mail,            530
11                         2/28/12
                           Subject, CSMP
12                         Omit v Report
                           P1.5039
13                         MCKMDL00409326
14   MCK-Oriente-569       E-mail Thread      532
                           8/19/10
15                         Subject, Sales
                           Ride Along
16                         P1.5042.1
                           MCKMDL00409351-53
17
     MCK-Oriente-570       US DOJ Letter      498
18                         8/13/14
                           P1.5043.1
19                         MCKMDL00409224-246
20   MCK-Oriente-571       CSMP               526
                           Observation
21                         Level 1
                           Documentation
22                         Forms
                           P1.5044.1
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                        -  -  -
 4
 5    NO.                  DESCRIPTION        PAGE
 6    MCK-Oriente-572      Handwritten        365
                           Demonstrative
 7                         When Made Increase
                           In Threshold
 8
      MCK-Oriente-573      Handwritten        341
 9                         Demonstrative
                           McKesson Took Our
10                         Responsibilities
                           Very Seriously
11
      MCK-Oriente-574      Handwritten        548
12                         Demonstrative
                           CVS Performs
13                         Its Own
                           Due Diligence
14
      MCK-Oriente-V-1      Video 1            266
15
      MCK-Oriente-V-7      Video 7            182
16
      MCK-Oriente-V-8      Video 8            456
17
18                        -  -  -
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5    Direction to Witness Not to Answer

 6    PAGE    LINE
      None.

 7

 8    Request for Production of Documents

 9    PAGE    LINE
      None.

10

11    Stipulations

12    PAGE    LINE
      None.

13

14    Questions Marked

15    PAGE    LINE
      None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1        THE VIDEOGRAPHER:  We are

2    now on the record.  My name is

3    Henry Marte.  I am a videographer

4    for Golkow Litigation Services.

5        Today's date is July 19,

6    2018.  And the time is 9:01 a.m.

7        This videotaped deposition

8    is being held at 700 Broadway, New

9    York, New York in the matter of In

10    Re:  National Prescription Opiate

11    Litigation.

12        The deponent today is

13    Mr. Michael Oriente.

14        All appearances please

15    introduce themselves for the

16    record.

17        MR. PAPANTONIO:  Mike

18    Papantonio for the plaintiff.

19        You know what, let's just

20    get everybody in the room so

21    there's no --

22        MS. MOORE:  Okay.  Carol

23    Moore for the plaintiff.

24        MS. MERCED:  Sarah Merced

Highly Confidential - Subject to Further Confidentiality Review

1    for the plaintiff.

2            MR. WOLFE:  Evan Wolfe for

3    plaintiff.

4            MR. KENNEDY:  Eric Kennedy,

5    plaintiffs.

6            MS. ROZMAN:  Donna Rozman

7    for plaintiff.

8            MR. ASQUITH:  Brian Asquith

9    for plaintiff.

10           MR. GRAY:  Mark Gray,

11   plaintiffs.

12           MR. LAMB:  Archie Lamb for

13   the plaintiff.

14           MR. O'CROININ:  Conor

15   O'Croinin for defendant, CVS.

16           MR. HLAWATSCH:  Neil

17   Hlawtsch, defendant Amerisource

18   Bergen Corporation -- Amerisource

19   Bergen Drug Corporation and

20   Amerisource Bergen Corporation.

21           MR. WILLIAMS:  Eric Williams

22   for defendant Prescription Supply,

23   Inc.

24           MR. ROSENBERG:  James

```
 1              Rosenberg, HBC Services Company.
 2                   MS. DURFEE:   Laura Jane
 3              Durfee, Walmart.
 4                   MS. KVESELIS:   Emily
 5              Kveselis, McKesson.
 6                   MS. HENN:   Emily Henn on
 7              behalf of McKesson and the
 8              witness.
 9                   MR. ORIENTE:   Michael
10              Oriente, McKesson.
11                   MR. PAPANTONIO:   We get
12              everybody?
13                   Go ahead.
14                   MS. VICARI:   Angela Vicari
15              of Arnold and Porter, here for
16              Endo Health Solutions; Endo
17              Pharmaceuticals, Inc.; Barr
18              Pharmaceutical, Inc.; and Barr
19              Pharmaceutical Company, Inc.
20                   MR. SALTZ:   Adam Saltz for
21              the plaintiff.
22                   MR. GOLDSTEIN:   Josh
23              Goldstein, Ropes & Gray for
24              Mallinckrodt.
```

Highly Confidential - Subject to Further Confidentiality Review

1    MR. PAPANTONIO:  We have

2    people on the telephone.  If

3    you're on the phone, would you

4    identify yourself, please?

5        MS. SACKS:  Shayna Sacks --

6        MR. PAPANTONIO:  Oh, I'm

7    sorry.  Hang on.

8        MS. SACKS:  -- for the

9    plaintiff.  Sorry.

10       MR. PAPANTONIO:  Shayna?

11   Okay.  My apologies.

12       MS. SILANE:  Caroline Silane

13   for defendant, Rite Aid of

14   Maryland, Inc.

15       MR. MONAHAN:  Matthew

16   Monahan on behalf of defendant

17   Cardinal Health, Inc.

18       MS. PAPANTONIO:  Sara

19   Papantonio, plaintiff.

20       MS. BERGERT:  Olivia

21   Bergert, plaintiff.

22       MR. PAPANTONIO:  We've got

23   people coming in.

24       MS. O'GORMAN:  I represent

1       Purdue.

2                MR. PAPANTONIO:   Purdue.

3       And what is your name?

4                MS. O'GORMAN:   Debra

5       O'Gorman.

6                MR. PAPANTONIO:   Debra.   All

7       right.   So we got everybody in

8       here right now.

9                Okay.   On the telephone, who

10      do we have on the phone?

11               Nobody?   Okay.

12               MR. CROUSE:   Doug Crouse for

13      Miami-Luken.

14               MR. PAPANTONIO:   Okay.   Who

15      else?

16               MR. LAZAR:   Good morning.

17      This is Zach Lazar from Morgan

18      Lewis, on behalf of the Teva

19      defendants.

20               MR. PAPANTONIO:   Okay.

21      Anybody else?

22               MS. COVERSTONE:   Kaitlyn

23      Coverstone from Kirkland & Ellis,

24      on behalf of Allergan.

1          MR. PAPANTONIO:  All right.

2     Anybody else?

3          MR. FARRELL:  Paul Farrell

4     on behalf of plaintiffs.

5          MR. PAPANTONIO:  All right.

6     Anybody else?

7          All right.  With that, it

8     sounds we are about ready.  Just

9     swear the witness and we'll get

10    started.

11                -   -   -

12          ... MICHAEL ORIENTE, having

13    been first duly sworn, was

14    examined and testified as follows:

15                -   -   -

16              EXAMINATION

17                -   -   -

18  BY MR. PAPANTONIO:

19        Q.    Sir, state your name,

20  please?

21        A.    My name is Michael Oriente.

22        Q.    Mr. Oriente, you were one of

23  the directors of regulatory affairs for

24  McKesson; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Yes.

2     Q.     How many years did you do

3   that?

4     A.     I have been doing it since

5   late 2007 and continue to still do it

6   today.

7     Q.     And with that, sir, you were

8   expected to understand all of the

9   regulatory -- all of the regulatory

10  requirements that McKesson was supposed

11  to follow in the sale of opioids; is that

12  correct?

13    A.     I would monitor the

14  purchases for the sales of controlled

15  substances to our customers.

16    Q.     Let me ask the question

17  again.  You were expected to understand

18  all of the regulatory requirements that

19  McKesson was supposed to follow as it

20  sold narcotic drugs, opioids?

21          MS. HENN:  Objection to

22      form.

23          THE WITNESS:  Yes.

24  BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Is that a correct statement?

2      A.    Yes.

3      Q.    Okay.  Mr. Oriente, I

4  understand that you sometimes have a

5  problem hearing.  If you can't hear what

6  I'm saying, please interrupt me.  Say, "I

7  just didn't hear you.  Repeat the

8  question."  Okay?  And we'll do that as

9  we proceed here today.

10      A.    Okay.

11      Q.    All right.  So if management

12  at McKesson hid information from you

13  about how they were going about

14  distributing their drugs, that would

15  affect your ability as a regulator to do

16  your job, wouldn't it?

17           MS. HENN:  Objection to

18      form.

19           THE WITNESS:  I did -- I did

20      not know of any hidden

21      information.

22  BY MR. PAPANTONIO:

23      Q.    I didn't say that.  Listen

24  very carefully to the questions,

1  Mr. Oriente.

2          I asked you if McKesson

3  management hid information about how they

4  were going about distributing narcotic

5  drugs, that would affect your ability to

6  do your job as a regulator.  Is that yes

7  or no?

8          MS. HENN:  Objection to

9      form.

10          THE WITNESS:  It could if I

11      didn't have all the information,

12      yes.

13  BY MR. PAPANTONIO:

14      Q.   It could if you didn't have

15  all the information.  Why would it affect

16  you if you didn't have all the

17  information?

18          MS. HENN:  Objection to

19      form.

20          THE WITNESS:  I would -- I

21      would need to understand the full

22      amount that a customer was

23      purchasing.

24  BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Fair enough.  So the

2  more information you had about how

3  McKesson was going about distributing

4  narcotic drugs, the better you can

5  determine how to adjust your job in

6  regulatory; is that a correct statement?

7             MS. HENN:  Objection to

8        form.

9             THE WITNESS:  Could you

10        repeat the question?

11  BY MR. PAPANTONIO:

12    Q.    Yeah.  The more information

13  you had about how McKesson was

14  distributing their drugs, their narcotic

15  drugs, the better you could do as a

16  regulator in performing your job?

17             MS. HENN:  Objection to

18        form.

19             THE WITNESS:  Yes.  The more

20        information I had, the better

21        decision I could make.

22  BY MR. PAPANTONIO:

23    Q.    And, Mr. Oriente, if the

24  information about distribution of those

Highly Confidential - Subject to Further Confidentiality Review

1  narcotics is hidden from you as a

2  regulator, you're not able to adjust to

3  what you need to do as a regulator.  If

4  they're hiding information, you can't do

5  your job as a regulator.  Would you agree

6  with that?

7            MS. HENN:  Objection to

8       form.

9            THE WITNESS:  I would say

10      that I had all the information

11      that I needed to perform my job.

12      I was unaware of any information

13      not being shared with myself.

14  BY MR. PAPANTONIO:

15      Q.    All right.  Let's talk about

16  some of that information right now.

17            MR. PAPANTONIO:  Please put

18      up Document 1428, Evan.  Mr. --

19      huh?

20            MS. MOORE:  That's McKesson

21      Oriente 383.

22  BY MR. PAPANTONIO:

23      Q.    Okay.  As we're proceeding

24  here, Emily, what's going to happen is

1    she's going to read a number for

2    identification of the document into the

3    record because we're marking each one of

4    these as we go.

5              MR. PAPANTONIO:  Okay.  So,

6         Carol, if you would do that as you

7         proceed.

8              Did you hear what that

9         number was?  Okay.

10             MS. HENN:  So, Counsel, is

11        the document premarked?  Is that

12        what you're saying?

13             MR. PAPANTONIO:  Yes, it's

14        premarked, because that way we

15        can -- we're doing it by Oriente

16        exhibit as a deposition.  We're

17        going to be doing that as we go

18        forward.  I'm sure you are going

19        to be covering a lot of these

20        depos.

21             The idea is we're going to

22        be marking a document with an

23        exhibit for that deposition.

24             MS. HENN:  Is there any

1    reason not to start with McKesson

2    Oriente-1?

3         MR. PAPANTONIO:  Yeah, there

4    is.  There is.  And we'll explain

5    that as we go.  But this is easily

6    identified when you go back and

7    look at the record.  That's all

8    I'm saying.

9         MS. HENN:  Just for the

10   record, our preference would be to

11   do it in order to make it simpler.

12   You handed me two copies.  Which

13   one is for the witness?

14        MR. PAPANTONIO:  One is for

15   the witness, and one for you, and

16   one is for Emily next to you if

17   you'd like.

18        MS. HENN:  Do you have one

19   for -- additional copies?

20        MR. PAPANTONIO:  I don't

21   think we have that many.  You may

22   have to -- you may have to share.

23        MS. HENN:  I think the

24   protocol requires four copies --

Highly Confidential - Subject to Further Confidentiality Review

1    MR. PAPANTONIO:  I'm sure we

2    do have four copies.

3    MS. HENN:  -- so defendants

4    can have copies.

5    (Document marked for

6    identification as Exhibit

7    MCK-Oriente-383.)

8  BY MR. PAPANTONIO:

9    Q.    All right.  Let -- sir,

10  Mr. Oriente, as we're proceeding today

11  what I'm going to be doing is I'm going

12  to be putting documents up on the screen.

13  The screen will both be in front of you,

14  you'll be able to see the big screen up

15  here.

16    Either -- feel free to use

17  either one.

18    A.    All right.  Thank you.

19    Q.    Now, this document is titled

20  "In the Matter of McKesson Corporation."

21  Take a look at that.  Let's go -- let's

22  take a look at this document.

23    Have you seen this document?

24    A.    I have not.

1    Q.    Okay.  When did you first

2  get information -- when were you first

3  told by your company that you were going

4  to be appearing here in a deposition?

5    A.    I don't recall the exact

6  date.  It would have been a few weeks

7  back.

8    Q.    Would you say three weeks,

9  four weeks?  What would you say?

10    MS. HENN:  Objection to

11    form.

12    THE WITNESS:  I would take

13    an estimate of about four weeks.

14  BY MR. PAPANTONIO:

15    Q.    Okay.  In that time that you

16  knew that you were going to be coming

17  here for a deposition, did you have the

18  opportunity to review any documents?

19    A.    No.  I did not go back and

20  look at anything.

21    Q.    All right.  But this

22  document that we're looking at right now

23  called, "In the Matter of McKesson

24  Corporation," it says at the bottom, "DEA

Highly Confidential - Subject to Further Confidentiality Review

1    Diversion Group, Washington Division."

2            You've never seen this

3    document; is that a correct statement?

4        A.    That is correct.

5        Q.    All right.  Would you turn

6    to the next page of that document.  I

7    want to review this document with you.

8    And I want to ask you questions about

9    this document as far as your

10   understanding of your regulatory

11   responsibilities for this company.  Okay?

12           MS. HENN:  Counsel, just one

13       statement I'd like to make on the

14       record.

15           First of all, did we get the

16       Bates number of the document into

17       the record?

18           MR. PAPANTONIO:  No.  We're

19       going to -- here's what we're

20       going to do.  We're not going to

21       take the time to read Bates

22       numbers here, because we only have

23       so much time.  At the end of it we

24       will sit there and read the Bates

1       numbers as we go.  Okay.

2               MS. HENN:  Okay.  I would

3       just like to note that this

4       document is marked confidential,

5       and that pursuant to the protocol

6       entered by the court, the court

7       reporter shall clearly mark this

8       transcript prior to the expiration

9       of the 30-day period as highly

10      confidential subject to further

11      confidentiality review.  Thank

12      you.

13  BY MR. PAPANTONIO:

14      Q.   Well, Mr. Oriente, this was

15  so confidential that they didn't tell you

16  about it, did they?

17              MS. HENN:  Objection to

18      form.

19  BY MR. PAPANTONIO:

20      Q.   I mean, this is -- you heard

21  this is a confidential document.  And you

22  had been with the company -- how many --

23  how many years you've been with the

24  company?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    With McKesson total,

2  14 years.

3    Q.    And this is so confidential

4  that they didn't tell you about it and

5  you're one of the directors of regulatory

6  for McKesson; is that a correct

7  statement?

8         MS. HENN:  Objection to

9         form.

10         THE WITNESS:  I am one of

11         the directors of regulatory, yes.

12  BY MR. PAPANTONIO:

22    Q.    Well, sir, you -- Landover

23  was an area that you regulated, isn't it?

24         MS. HENN:  Objection to

```
 1              form.
 2                   THE WITNESS:  I was
 3              responsible for the Landover
 4              distribution center, yes.
 5   BY MR. PAPANTONIO:
 6         Q.    Tell the jury what the
 7   Landover distribution center is.
 8         A.    Landover distribution center
 9   was located in Landover, Maryland, and it
10   distributed controlled substances, Rx
11   product and OTC to McKesson customers in
12   that geographic area.
13         Q.    Tell me what the
14   geographic -- how many states did that
15   geographic area cover?
16         A.    The Landover distribution
17   center had customers in, of course,
18   Maryland, West Virginia, Delaware,
19   Washington D.C.  I believe that was the
20   general area that they serviced.
21         Q.    How many years were you the
22   director of regulatory there at Landover?
23                   MS. HENN:  Objection to
24              form.
```

1            THE WITNESS:  I'm not

2       exactly sure when the Landover

3       distribution center stopped

4       operating.  But I was there from

5       late 2007 to when it closed.

6  BY MR. PAPANTONIO:

7       Q.    And it closed in 2012,

8  didn't it?

9       A.    I am unaware of the exact

10  date that it closed.

11       Q.    All right.  We'll get to

12  that.

Highly Confidential - Subject to Further Confidentiality Review

3      Q.     And during that entire time,
4  you were there at Landover, weren't you?
5               MS. HENN:  Objection to
6          form.
7               THE WITNESS:  Yes.
8  BY MR. PAPANTONIO:
9      Q.     During the time 2008 through
10  2012, you were there and you were the
11  director -- you were the director of
12  regulatory; is that a correct statement?
13      A.     Yes.
14      Q.     And then it actually -- it
15  mentions right down underneath the next
16  line, it says, "Landover" -- do you see
17  where it says "Landover distribution
18  center"?  It gives DEA, and then it gives
19  a number.  That number, what is that
20  number, sir?
21      A.     I do not know what that
22  number stands for.
23      Q.     Okay.  And then it says,
24  "Landover is no longer in operation."

1          Do you see that?

2     A.     Yes.

3     Q.     Go to the next page please.

4          MS. HENN:  And I'll just

5     remind the witness he can take

6     whatever time he'd like to review

7     the document.

8  BY MR. PAPANTONIO:

9     Q.     Do you see the next page

10  there?  It says, "Civil liability."

11          Do you see that?

12     A.     Yes.  It's at the top of the

13  page.

14     Q.     In this confidential

15  document that you've never seen prior to

16  me putting it in front of you today, the

17  first thing it says is it talks about

18  what McKesson liability is.

19          Do you see, "McKesson

20  liability emanates from 21 U.S.C.

21  842(a)5."

22          Do you see that?

23     A.     Yes, I see it here.

24     Q.     You know what that is, don't

1    you, Mr. Oriente?

2              MS. HENN:  Objection to

3         form.

4    BY MR. PAPANTONIO:

5         Q.    You've seen that number

6    before, haven't you?

7         A.    I have not seen that number

8    before, no.

9         Q.    Before you went to -- before

10   you went to regulatory, nobody told you

11   about 21 U.S.C. 842.  Is that your

12   testimony here today?

13             MS. HENN:  Objection to

14        form.

15             THE WITNESS:  I am not

16        familiar with that specific

17        listing.

18   BY MR. PAPANTONIO:

19        Q.    Well, let's do -- let's look

20   at the next listing, 21 U.S.C. 823.  Had

21   anybody shown you that prior to the time

22   that you took over regulatory -- director

23   of regulatory at Landover?  Had anybody

24   showed you that?

1    A.    No one showed me that.  But

2  I am familiar that, you know, we had a

3  system in place to watch for diversion as

4  far as sales for size, frequency, and

5  pattern of orders.

6         Q.    Right.  And if you didn't do

7  that, you would be breaking the law,

8  wouldn't you?

9              MS. HENN:  Objection to

10       form.

11             THE WITNESS:  I can't say

12       that we'd be breaking the law.

13       That is the requirement to meet

14       that requirement.

15  BY MR. PAPANTONIO:

16       Q.    Well, if you didn't do that,

17  sir, the DEA would fine you, wouldn't

18  they?

19             MS. HENN:  Objection to

20       form.

21  BY MR. PAPANTONIO:

22       Q.    If you didn't do what 21

23  U.S.C. 823 told you to do, the DEA would

24  fine you, yes or no?

1          MS. HENN:  Objection to

2     form.

3          THE WITNESS:  I believe they

4     would have the ability to.  It's

5     not necessarily that they would.

6  BY MR. PAPANTONIO:

7     Q.    Well, not to comply with 21

8  U.S.C. 823 would be unlawful.  Can we

9  agree on that?

10     A.    We need to follow the

11  regulation.  That is correct.

12     Q.    And not to do it would be

13  considered unlawful, yes or no?

14          MS. HENN:  Objection to

15     form.

16          THE WITNESS:  We would need

17     to follow that, and I believe that

18     we would be out of compliance if

19     we did not.

20  BY MR. PAPANTONIO:

21     Q.    Well, you see it says,

22  "Failure to provide effective controls

23  against theft, diversion of controlled

24  substance in violation of 21 C.F.R.," and

1    then it gives you a section, right?

2              Are you familiar with 21

3    C.F.R. 1301?

4         A.    I don't know the exact

5    listing of 21 C.F.R. and that section.

6    But I do understand that we needed to

7    have a controlled substance in place, and

8    that is, you know, how we monitored the

9    sales of the controlled substances.

10        Q.    Well, you know one thing 21

11   U.S.C. 823 told you to do is that you

12   were supposed to provide suspicious order

13   reports to the DEA, weren't you?

14             MS. HENN:  Objection to

15        form.

16             THE WITNESS:  Yes, we would

17        report suspicious orders when we

18        deemed them suspicious.

19   BY MR. PAPANTONIO:

20        Q.    And if you deemed them

21   suspicious and you failed to report them,

22   that would be unlawful, wouldn't it?

23             MS. HENN:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1        THE WITNESS:  We would

2     report those that were deemed

3     suspicious, yes.

4  BY MR. PAPANTONIO:

5        Q.    And if you failed to do

6  that, that would be unlawful, correct?

7  Yes or no sir?

8        MS. HENN:  Objection.

9     Objection to form.

10        THE WITNESS:  If we did not

11     report a suspicious order that we

12     deemed suspicious, yes.

13  BY MR. PAPANTONIO:

14        Q.    All right.  And then it says

15  right -- the next one is C.F.R. 1301.

16  You've seen that before, haven't you?  In

17  your role as regulatory for Landover, you

18  were familiar with 21 C.F.R. 1301,

19  correct?

20        MS. HENN:  Objection to

21     form.

22        THE WITNESS:  I, again, do

23     not know the specific regulation

24     from -- from memory.  I know that

Highly Confidential - Subject to Further Confidentiality Review

1      we followed the 21 C.F.R.  But I

2      don't -- I cannot tell you what 21

3      C.F.R. Section 1301.71

4      specifically states.

5  BY MR. PAPANTONIO:

6      Q.    You did -- how many years

7  were you regulatory?

8          MS. HENN:  Objection to

9      form.

10         THE WITNESS:  Since late

11     2007 through today.

12  BY MR. PAPANTONIO:

13     Q.    You're still in regulatory

14  today, correct?

15     A.    That is correct.

16     Q.    And you understand, being in

17  regulatory, that you had a responsibility

18  to design and operate a system that would

19  disclose suspicious orders to the DEA

20  when you found them to be suspicious; is

21  that correct?

22         MS. HENN:  Objection to

23     form.

24         THE WITNESS:  That is

1      correct.

2   BY MR. PAPANTONIO:

3        Q.    And not to do that would be

4   breaking the law, wouldn't it?

5           MS. HENN:  Same objection.

6   BY MR. PAPANTONIO:

7        Q.    Correct?  It would be

8   breaking the law, wouldn't it,

9   Mr. Oriente?

10       A.    Not to report the suspicious

11  orders would not be following the

12  regulation.

13       Q.    Isn't -- but let's be clear.

14  Because we're going to be talking.  It

15  would be breaking the law that you're

16  supposed to follow under 21 U.S.C., yes

17  or no?

18           MS. HENN:  Objection to

19       form.

20           THE WITNESS:  We have a

21       requirement to follow that

22       requirement, and so we need to

23       follow the law.

24  BY MR. PAPANTONIO:

1          Q.     And if you don't, that's

2    called breaking the law, isn't it?  Can

3    we agree on that?

4                 MS. HENN:  Objection to

5          form.

6    BY MR. PAPANTONIO:

7          Q.     Because if there's something

8    in between, Mr. Oriente, this is your

9    time to tell everybody in this room, if

10   there's something that's different from

11   what I'm saying, break the law.  Is there

12   another term that you want to use as we

13   proceed here today?

14                 MS. HENN:  Objection to

15         form.

16                 THE WITNESS:  I would not

17         say that -- a different term.  It

18         would -- it would not be following

19         the law.

20   BY MR. PAPANTONIO:

21         Q.     Okay.  Okay.  I'm good with

22   that, Mr. Oriente.  We'll move on.

23                 Let's go to the next page.

24                 MS. HENN:  I'd also like to

1    ask the approximately three people

2    that joined the phone call since

3    we began to please identify

4    themselves for the record.

5         Anybody on the phone who's

6    not yet identified yourself, could

7    you please just identify yourself

8    for the record?

9         MR. GOETZ:  Dan Goetz from

10   Weisman Kennedy.

11        MS. COOK:  Renee Cook.

12        MR. HERMAN:  Dustin Herman

13   from Spangenberg, for the

14   plaintiffs.

15        MS. HENN:  Anybody else?

16        MR. DeROCHE:  James DeRoche

17   from Weisman Kennedy.

18        MS. HENN:  Anybody else?

19        Thank you.

20        MR. PAPANTONIO:  Thank you,

21   Emily, for catching that.  I

22   didn't hear the little beeps.

23 BY MR. PAPANTONIO:

24        Q.   All right.  Mr. Oriente,

1   let's go ahead to the next page.  Now, as

2   your lawyer told you, I don't want to

3   jump into this page without you taking a

4   look at it.  Take a minute and look at

5   it, because this is the first time you've

6   seen this confidential document.  I think

7   it was characterized as highly

8   confidential, right?

9              MS. HENN:  Objection to

10        form.

11   BY MR. PAPANTONIO:

12        Q.    It says, "McKesson is

13   subject" -- let's just look at Paragraph

14   2.  21 U.S.C. 842.

15              Do you see that?

16              Have you ever seen 21 U.S.C.

17   842?

18        A.    I have not.

19        Q.    Sir, let me preface

20   something.  Did you not attend -- did you

21   not attend seminars that the DEA actually

22   put on for directors of regulatory for

23   McKesson?  Do you ever remember attending

24   a seminar that talked to you about these

1    very things that you're supposed to be

2    doing as a regulator?

3              MS. HENN:  Objection to

4         form.

5              THE WITNESS:  I personally

6         did not attend the seminar.

7    BY MR. PAPANTONIO:

8         Q.    But you were a director.  Is

9    there any -- at Landover, correct?  You

10   were a director of regulatory?

11             MS. HENN:  Objection to

12        form.

13             THE WITNESS:  Landover was

14        one of my distribution centers

15        that I oversaw, yes.

16   BY MR. PAPANTONIO:

17        Q.    We're going to talk about

18   other distribution centers.  But right

19   now, we can establish that you were the

20   director at Landover; is that a correct

21   statement?

22             MS. HENN:  Objection to

23        form.

24             THE WITNESS:  For

1    regulatory, yes.

2    BY MR. PAPANTONIO:

3        Q.    All right.  And you never

4    attended any of the DEA seminars that

5    they put on for directors of regulatory

6    telling them what the laws were and what

7    your responsibilities were; is that a

8    correct statement?

9        A.    I did not attend.

10       Q.    All right.  So let's --

11   let's read this.  It says, "21 U.S.C.

12   provides that it's unlawful" -- they're

13   using that word too, unlawful --

14   "unlawful to refuse or negligently fail

15   to make, keep, furnish any record,

16   report, notification, declaration, order,

17   order form, statement, invoice,

18   information required under this section."

19            Do you see that?

20            MS. HENN:  Objection to

21        form.

22            THE WITNESS:  I see that

23        listed here.

24   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And the truth is, where it

2  says -- where it says it's unlawful to

3  refuse to fail to make this information

4  available to the DEA, that's exactly what

5  McKesson did, is they refused to give

6  information to the DEA about their

7  narcotic drugs that they were selling to

8  pharmacies, even when McKesson understood

9  that suspicious orders were taking place?

10          MS. HENN:   Objection to

11       form.

12          THE WITNESS:   I'm not --

13       not -- I am not aware of any

14       refusal to give information to DEA

15       when they requested it.

16  BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          Q.    Mr. Oriente, I'm not trying

22     to accuse you of anything you haven't

23     done here or -- there's no accusation

24     here.  I'm simply trying to find out what

1    information was shared with you so you

2    could do your job as a regulator at

3    Landover.  Do you understand that?

4         A.    Yes.

5         Q.    Okay.  So let's go -- let's

6    go to the next page.  The next page is

7    Page 3; is that right?  No.  Excuse me,

8    page -- next page over, 5.  It says

9    statute and regs --

10              MS. HENN:  Counsel, is there

11         a page number you're referring to?

12              MR. PAPANTONIO:  Yeah, if

13         you look at -- on the Bates stamp,

14         that five down there would be your

15         page number.

16              THE WITNESS:  The next one.

17              MR. PAPANTONIO:  The very

18         next page.

19    BY MR. PAPANTONIO:

20         Q.    At the top of it, it says,

21    "Statute and regs."

22              Do you see that?

23         A.    Yes.

24         Q.    It says, "The registrant

Highly Confidential - Subject to Further Confidentiality Review

1    shall design and operate a system to

2    disclose the registrant's suspicious

3    orders of controlled substances."

4              Do you see the term

5    "suspicious orders"?

6         A.    Yes.

7         Q.    Do you ever -- do you see

8    any mention about there being a

9    responsibility to report suspicious

10   customers?

11             MS. HENN:  Objection to

12        form.

13   BY MR. PAPANTONIO:

14        Q.    Is there anything -- is

15   there anything in that statute right

16   there that says you have the right not to

17   report suspicious orders, but to report

18   suspicious customers?

19             MS. HENN:  Counsel, you're

20        referring to the quote from the

21        regulation there on Page 5?

22             MR. PAPANTONIO:  Right.

23   BY MR. PAPANTONIO:

24        Q.    Do you see anything in there

Highly Confidential - Subject to Further Confidentiality Review

1    that says, "Oh, we don't -- McKesson

2    doesn't have to report suspicious orders.

3    We have the right to report suspicious

4    customers"?

5              Do you see anything in that

6    wording there?

7              MS. HENN:  Objection to

8         form.

9              THE WITNESS:  The statement

10        here says suspicious orders.

11   BY MR. PAPANTONIO:

12        Q.    Correct.  It doesn't say

13   suspicious customers, does it?

14        A.    Suspicious customers is not

15   listed here, no.

16        Q.    And that would -- so let's

17   go to the next page.

18              Statute and regulations.  It

19   says, "The registrant" -- that would be

20   McKesson, right?  You'd be a registrant

21   with the DEA?

22        A.    Yes.

23        Q.    All right.  Landover would

24   be a registrant with the DEA; is that

Highly Confidential - Subject to Further Confidentiality Review

1  correct?

2      A.    Yes.

3      Q.    "The registrant shall inform

4  the field division of the DEA in this

5  area of suspicious orders when discovered

6  by the registrant."

7            Do you see that?

8            MS. HENN:  Objection to

9      form.

10 BY MR. PAPANTONIO:

11     Q.    The registrant shall inform

12 the field division office of the DEA in

13 this area of suspicious orders when

14 discovered by the registrant."

15            Do you see that?

16     A.    Yes.  I see that.

17     Q.    Now, this says "when

18 discovered."  Do you see those two words,

19 "when discovered"?

20     A.    Yes.

21     Q.    This doesn't say you can do

22 it three months after you find it.  It

23 doesn't say you can -- you can report the

24 suspicious order four months after you

1   find it.  This says when it's discovered,

2   you have responsibility to tell the DEA

3   about the fact that you're finding a

4   suspicious order; is that correct?

5            MS. HENN:  Objection to

6       form.

7            THE WITNESS:  It's

8       underlined in this document, "when

9       discovered."

10  BY MR. PAPANTONIO:

11       Q.   All right.  And it goes on

12  to even tell you -- it even tells you

13  what a suspicious order is supposed to

14  look like.  It says -- it says,

15  "Suspicious orders include orders of

16  unusual size."

17            Do you see that?  Unusual

18  size.  You would agree with that.  That'd

19  be suspicious if it's an unusual size,

20  right?

21            MS. HENN:  Objection to

22       form.

23            THE WITNESS:  Yes.

24  BY MR. PAPANTONIO:

1      Q.    And you'd agree it would be

2   suspicious if it's -- if it's not a -- if

3   it's not a normal pattern.  You'd agree

4   with that, right?

5            MS. HENN:  Objection to

6        form.

7            THE WITNESS:  It says

8        "deviating substantially from a

9        normal pattern."

10  BY MR. PAPANTONIO:

11      Q.    Right.  You would agree that

12  would be suspicious, correct?

13      A.    Deviating substantially,

14  yes.

15      Q.    And you would agree that

16  unusual frequency of an order would be

17  suspicious, correct?

18            MS. HENN:  Objection to

19        form.

20            THE WITNESS:  Yes.  Orders

21        of unusual frequency, size and

22        pattern.  Those are the three.

23  BY MR. PAPANTONIO:

24      Q.    Let's go to the next page.

Highly Confidential - Subject to Further Confidentiality Review

1    Civil liability at the top of it.

2                Do you see that?

3                It says, "Civil liability."

4    It says, "A registrant who violates 842

5    is" -- "842(a)5 is subject to a civil

6    penalty of $10,000 per occurrence."

7                Did you know that every time

8    you violated one of these statutes that

9    were you subject to a civic penalty of up

10   to $10,000 every time you did it?

11               MS. HENN:  Objection to

12          form.

13               THE WITNESS:  I was aware

14          that there was a penalty for each

15          occurrence, yes.

16   BY MR. PAPANTONIO:

17          Q.    Did you know it was $10,000?

18          A.    I wasn't exactly sure of the

19   monetary fine.

Highly Confidential - Subject to Further Confidentiality Review

5    Q.    And when -- do you see this,

6  sir, the word, sir, "when discovered"?

7  Do you see those words in that statement,

8  "when discovered"?  Do you see anything

9  in there that tells you that you're able

10  to report a suspicious order four months

11  after you get the suspicious order?  Is

12  there anything in that statute that says

13  that?

14    A.    The statute says "when

15  discovered."

16    Q.    So you'd agree that if you

17  break this law, this is not -- this is a

18  serious violation, isn't it?  $10,000

19  fine is a pretty serious violation, isn't

20  it?

21        MS. HENN:  Objection to

22      form.

23        THE WITNESS:  I really can't

24      say if that's a serious --

1  BY MR. PAPANTONIO:

2      Q.    Well, I mean, for most

3  people on the jury watching this,

4  $10,000, if they have to pay $10,000,

5  that's pretty serious, isn't it?

6              MS. HENN:  Objection to

7         form.

8              THE WITNESS:  It's a high

9         dollar amount, absolutely.

10  BY MR. PAPANTONIO:

11      Q.    Well, yeah.  Is it an -- is

12  it an amount of money that got your

13  attention, as far as not being willing to

14  violate this statute?  Does $10,000 per

15  violation get your attention?

16              MS. HENN:  Objection to

17         form.

18              THE WITNESS:  That would not

19         make my determination on, you

20         know, getting my attention.

21              Any fine would get my

22         attention.

23  BY MR. PAPANTONIO:

24      Q.    Okay.  Certainly a $10,000

1  fine would get your attention, wouldn't

2  it?

3          A.    It would.

4          Q.    And we've also -- and we've

5  also established that, again, in defense

6  of you, you haven't seen this document

7  prior to today, correct?

8          A.    That is correct.

9          Q.    All right.  The next page,

10  it says, "2008 settlement terms."

11          Do you see that?

12          A.    Yes.

13          Q.    Now, it says, "In 2008

14  McKesson entered into a settlement

15  agreement resolving claims under 21

16  U.S.C. 842(a)5 and C."

17          Now, did you -- did you know

18  prior to coming here today to testify

19  that before this document -- well, did

20  you know that in 2008 the DEA and the DOJ

21  caught you engaged in break -- caught

22  McKesson engaged in breaking the law?

23          MS. HENN:  Objection to

24      form.

```
 1    BY MR. PAPANTONIO:

 2         Q.    Did you know that prior to

 3    coming here today?

 4              MS. HENN:  Objection to

 5         form.

 6              THE WITNESS:  I knew in 2008

 7         that McKesson paid a settlement

 8         fine, yes.

 9    BY MR. PAPANTONIO:

10         Q.    And did you know that they

11    agreed that they had broken the law?

12              MS. HENN:  Objection to

13         form.

14    BY MR. PAPANTONIO:

15         Q.    That your company admitted

16    that they knowingly broke the law dealing

17    with narcotic drugs?

18              MS. HENN:  Objection.

19    BY MR. PAPANTONIO:

20         Q.    Did you know that prior to

21    coming here today?

22              MS. HENN:  Objection to

23         form.

24              THE WITNESS:  I did not know
```

Highly Confidential - Subject to Further Confidentiality Review

1       that.  I know they paid the fine.

2       But I didn't know about the

3       agreement that they broke the law.

4    BY MR. PAPANTONIO:

5       Q.   Well, you were with them in

6    2008, weren't you?

7       A.   Yes.

8       Q.   And so nobody gave you the

9    details of them admitting that they broke

10   the law --

11      MS. HENN:  Objection.

12   BY MR. PAPANTONIO:

13      Q.   -- in dealing with

14   narcotics?

15      MS. HENN:  Objection to

16      form.

17      THE WITNESS:  I understood

18      that a fine was paid.  And that

19      was my understanding.

20   BY MR. PAPANTONIO:

21      Q.   All right.  Did anybody talk

22   to you about the things they had done

23   wrong prior to 2008?  Did anybody tell

24   you, we did this wrong, we did that

1  wrong?  Did anybody give you a list of

2  all the things that McKesson had done to

3  break the law and be fined in this 2008

4  settlement?

5              MS. HENN:  Objection to

6        form.

7              THE WITNESS:  I understood

8        that it was for not reporting what

9        was deemed suspicious orders by

10       DEA.

11  BY MR. PAPANTONIO:

12       Q.    Well, did you take the time

13  to take a look at what they had done to

14  where the DEA said, "You broke the law,

15  McKesson," and then McKesson admits,

16  "Yeah, we broke the law"?  Did you take a

17  look to see what they did to break the

18  law?

19              MS. HENN:  Objection to

20       form.

21              THE WITNESS:  Again, I was

22       not aware that we had broken the

23       law.  I know that there was an

24       agreement to settle and that the

Highly Confidential - Subject to Further Confidentiality Review

1    fine was paid.

2  BY MR. PAPANTONIO:

3      Q.    Well, you paid a $13 million

4  fine for that one thing in 2008, didn't

5  you?

6            MS. HENN:  Objection to

7      form.

8  BY MR. PAPANTONIO:

9      Q.    Did you know that?

10           MS. HENN:  Objection to

11     form.

12  BY MR. PAPANTONIO:

13     Q.    $13 million.

14           MS. HENN:  Same objection.

15           THE WITNESS:  I knew that

16     the fine was paid.  And I knew

17     there was settlement and an

18     agreement.  But I did not know

19     that there was, you know, the

20     amount -- the amount that was

21     paid, it was a settlement.  I did

22     not know that there was wrongdoing

23     admitted.

24  BY MR. PAPANTONIO:

1          Q.    Okay.  Nobody told you that

2    McKesson admitted that they broke the

3    law?  Prior to you coming here today,

4    that's the first time you've heard that;

5    is that correct?

6                MS. HENN:  Objection to

7          form.

8                THE WITNESS:  I understood

9          that we paid a settlement.  That

10         is -- and I thought there was an

11         agreement that the settlement --

12   BY MR. PAPANTONIO:

13         Q.    Well, you just --

14               MS. HENN:  Counsel, could

15         you please --

16   BY MR. PAPANTONIO:

17         Q.    Go ahead go ahead.

18               MS. HENN:  -- let him finish

19         his answers.  Thank you.

20   BY MR. PAPANTONIO:

21         Q.    Go ahead.

22         A.    The settlement would be paid

23   and that McKesson would make changes but

24   not that there was, you know, guilt and

1    admittance of not reporting the errors --

2         Q.    So --

3         A.    -- the way I understood it.

4         Q.    So you understood that

5    McKesson, just out of -- just paid

6    $13 million?  For what, you don't know

7    what it is, correct?

8              MS. HENN:  Objection to

9         form.

10             THE WITNESS:  No.

11   BY MR. PAPANTONIO:

12        Q.    Is that right?

13        A.    No, that is not correct.

14             What I understood was that

15   McKesson paid a settlement fine for not

16   reporting what the DEA deemed as

17   suspicious orders.

18        Q.    Well, it was more than that,

19   wasn't it, sir?  You know that it

20   involved more than just suspicious

21   orders, don't you?

22        A.    I do not know that.

23        Q.    Is that the first time

24   you've heard it?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HENN:  Objection to

2      form.

3          THE WITNESS:  You're saying

4      that it involved more?

5  BY MR. PAPANTONIO:

6      Q.    Yes.

7      A.    I don't know what more

8  you're referring to.

9      Q.    Because you never took the

10 time to look at the settlement, did you?

11         MS. HENN:  Objection to

12     form.

13         THE WITNESS:  It was not my

14     responsibility to look at the

15     settlement.

16 BY MR. PAPANTONIO:

17     Q.    Sir, it was your

18 responsibility to be a regulator for

19 McKesson that was selling narcotics to

20 the American public.  That was your job,

21 wasn't it?

22         MS. HENN:  Objection to

23     form.

Highly Confidential - Subject to Further Confidentiality Review



10    BY MR. PAPANTONIO:

11          Q.     And in that responsibility,

12   we've already, within the last half hour,

13   established that nobody has even shown

14   you this document that we're looking at

15   called "In the Matter of McKesson

16   Corporation," nobody showed that to you,

17   right?

18          A.     I have not seen this

19   document.

Highly Confidential - Subject to Further Confidentiality Review



10    BY MR. PAPANTONIO:

11        Q.    And if you don't do that, it

12    is unlawful, correct?

13            MS. HENN:  Objection to

14        form.

15    BY MR. PAPANTONIO:

16        Q.    It's breaking the law.  If

17    you don't do what you just described, you

18    are breaking the law of the United

19    States, correct?

20            MS. HENN:  Objection to

21        form.

22            THE WITNESS:  In order to

23        meet the requirement, you need to

24        do that.

1    BY MR. PAPANTONIO:

2          Q.    All right.  And then so you

3    said -- I think you just mentioned that

4    in 2008 it's your understanding that

5    McKesson settled with the Department of

6    Justice and agreed to do what?  Do you

7    know what they agreed to do?

8          A.    From the way I understood

9    it, McKesson would report suspicious

10   orders on a more ongoing basis to

11   determine if customers were purchasing in

12   the correct amount for their size

13   business.

14         Q.    Sir, you see the second

15   paragraph, okay.  Look, you can read

16   this.  It says, "McKesson agreed to

17   implement a program designed to detect

18   and prevent diversion of controlled

19   substances."

20              Do you see where it says

21   that?

22              MS. HENN:  Objection to

23        form.

24              And, Counsel, I'd appreciate

1          it if you would treat the witness

2          a little more respectfully.

3    BY MR. PAPANTONIO:

4          Q.     Do you see that, sir?

5          A.     Yes, the second bullet says

6    that.

7                 MR. PAPANTONIO:  I'm trying

8          to speak up.

9    BY MR. PAPANTONIO:

10         Q.     All right.  And can you hear

11   me okay, Mr. Oriente?

12         A.     Yes, I can.  Thanks.

13         Q.     So McKesson agreed to

14   implement a program designed to detect

15   and prevent diversion of controlled

16   substances.

17                Now, if I got it right, you

18   were supposed to already be doing that

19   prior to 2008, weren't you?  Weren't

20   you --

21                MS. HENN:  Objection to

22         form.

23                MR. PAPANTONIO:  Emily,

24         would you let me finish?

1          MS. HENN:  I refer to you as

2     counsel --

3          MR. PAPANTONIO:  Oh,

4     counsel.

5          MS. HENN:  -- and I would

6     prefer that you refer to me --

7          MR. PAPANTONIO:  Okay.

8     However you want me to --

9          MS. HENN:  -- with respect,

10    not by my first name.

11         MR. PAPANTONIO:  I'm sorry.

12    Tell me your last name.

13         MS. HENN:  My last name is

14    Henn.  But counsel will be --

15         MR. PAPANTONIO:  Henn.  So

16    I'll call you Ms. Henn.  Is that

17    okay?

18         MS. HENN:  Yes.

19         MR. PAPANTONIO:  All right,

20    Ms. Henn.

21  BY MR. PAPANTONIO:

22       Q.   So let me be clear about

23  something.  You know that you were

24  supposed to implement a program designed

Highly Confidential - Subject to Further Confidentiality Review

1    to detect and prevent diversion of

2    controlled substances long before 2008,

3    right?  You know that?

4         A.    We had a program prior to

5    2008.

6         Q.    This says, "McKesson agreed

7    to implement a program designed to detect

8    and prevent diversion of controlled

9    substance."

10         That's what you agreed to in

11   2008, correct?

12         MS. HENN:  Objection to

13         form.

14         THE WITNESS:  It is in this

15         document.  When you say "you

16         agreed to," it is not me, because

Highly Confidential - Subject to Further Confidentiality Review



24    BY MR. PAPANTONIO:

1    Q.    And your prior system was so

2  bad that the DEA and the Department of

3  Justice actually fined you $13 million

4  because you were not reporting suspicious

5  orders, correct?

6            MS. HENN:  Objection to

7       form.

8            THE WITNESS:  I would not

9       say that it was a bad system.  We

10      were fined for not reporting what

11      DEA deemed as suspicious orders.

12  BY MR. PAPANTONIO:

13     Q.    Well, I mean, you weren't

14  doing your job?

15           MS. HENN:  Counsel.

16  BY MR. PAPANTONIO:

17     Q.    You were breaking the law,

18  correct?

19           MS. HENN:  Mr. Oriente, did

20      you finish your last answer?

21           THE WITNESS:  I was going to

22      add more, that the determination

23      of a suspicious order is when the

24      wholesaler has an order, they look

1          at pattern of ordering, size,

2          frequency, quantity.  And then a

3          determination, is that order

4          suspicious or not.

5     BY MR. PAPANTONIO:

6          Q.    Okay.

7          A.    If we don't report that

8     order as suspicious because we felt that

9     that particular customer has followed

10    that pattern of ordering previously, then

11    that may be why that order was not

12    reported.

13         Q.    Well, we know this much.

14    Prior to 2008, that system that you just

15    described, it wasn't working, was it?

16    Because the DEA and the DOJ hit you for a

17    $13 million fine for not reporting

18    suspicious orders.  We know that much,

19    correct?

20              MS. HENN:  Objection to

21         form.

22              THE WITNESS:  That did occur

23         in 2008.

24    BY MR. PAPANTONIO:



24              MS. HENN:   Objection to

Highly Confidential - Subject to Further Confidentiality Review

1    form.

2            THE WITNESS:  Could you

3        repeat the question?

4    BY MR. PAPANTONIO:

5        Q.    Yeah, I'll be glad to.

6    Prior to coming here today -- you had --

7    three weeks ago, you knew you were coming

8    here today, right?

9        A.    Yes.

10       Q.    Did anybody from McKesson --

11   I'm not interested in what you said to

12   your lawyers.  I'm interested in what

13   McKesson -- did anyone at McKesson sit

14   down with you and go over the list of

15   things that they did to violate the 2008

16   agreement where you were found -- your

17   company was found to have engaged in

18   unlawful contact -- conduct and fined

19   $13 million?

20           MS. HENN:  Objection to

21       form.

22           THE WITNESS:  Since the

23       three weeks back or ever?

24   BY MR. PAPANTONIO:

1    Q.    How about -- let's go with

2  ever, Mr. Oriente.  Let's go with ever.

3            Did McKesson -- anybody from

4  McKesson sit down with you and say,

5  "Listen, we have an agreement.  We paid

6  our $13 million, and as of 2008 we now

7  have an agreement.  And the agreement

8  says that we're supposed to do A, B, and

9  C."

10            Has anybody shared that

11  agreement with you?

12            MS. HENN:  Objection to

13        form.

14            THE WITNESS:  The -- what

15        was shared with me, was that we

16        would be sharing suspicious orders

17        on a more frequent basis.

18  BY MR. PAPANTONIO:

19    Q.    All right.  So in other

20  words, okay, if you didn't do that, if

21  you didn't follow that agreement, where

22  you were fined $13 million, you would be

23  engaged in unlawful conduct, yes or no?

24            MS. HENN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1           form.

2                    THE WITNESS:  Since the 2008

3           agreement, McKesson agreed to

4           report suspicious orders on a more

5           regular basis.

6    BY MR. PAPANTONIO:

7           Q.    And if you didn't do that,

8    you would be engaged in unlawful conduct,

9    correct?

10                   MS. HENN:  Objection to

11          form.

12                   THE WITNESS:  That would be

13          correct.

14   BY MR. PAPANTONIO:

15          Q.    You would be breaking the

16   law, just breaking the law; is that

17   correct?

18                   MS. HENN:  Objection to

19          form.

20   BY MR. PAPANTONIO:

21          Q.    Yes?

22          A.    We would be out of

23   compliance.

24          Q.    You would be breaking the

1    law, Mr. Oriente, yes or no?

2              MS. HENN:  Objection to

3        form.

4              THE WITNESS:  As the way

5        it's written, yes.

6    BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

9          And, sir, you would agree

10    that the reason that you report this kind

11    of information to the DEA of suspicious

12    orders is because they have -- you have

13    to be part of the policing in the -- in

14    the sale of narcotics.  That's what a

15    distributor is.  You have to be part of

16    the policing to keep narcotics running --

17    you know, running in a way they are

18    supposed to run, correct?

19          MS. HENN:  Objection to

20      form.

21          THE WITNESS:  We are

22      responsible as a distributor to

23      have a program in place that would

24      monitor controlled substance

1    sales.

2    BY MR. PAPANTONIO:

3         Q.    In fact, you were actually

4    part of the policing of the drug sales,

5    correct?  Your organization, McKesson, or

6    any distributor is part of that policing

7    process, aren't you?

8              MS. HENN:  Objection to

9         form.

10             THE WITNESS:  Part of our

11        requirement as a distributor and

12        registrant is to have a monitoring

13        program in place, yes.

14   BY MR. PAPANTONIO:

15        Q.    And certainly, on July 15th,

16   2011, you were aware that there was also

17   a drug crisis that was taking place, an

18   opioid drug crisis taking place in

19   America.  You knew that, didn't you?

20        A.    I knew that there was high

21   opioid problem, yes.

22        Q.    And you were supposed to

23   report this information because you

24   wanted to make sure there was no criminal

Highly Confidential - Subject to Further Confidentiality Review

1   use of drugs, correct?

2                   MS. HENN:   Objection to

3           form.

7   BY MR. PAPANTONIO:

8           Q.   No, no particular case.  As

9   a broad statement, the reasons that you

10  were supposed to report suspicious orders

11  is because one thing you wanted to try to

12  prevent was the criminal use of drugs,

13  correct?

14          A.   If -- if we deemed an order

15  suspicious and -- and we would report it

16  to prevent diversion.

17          Q.   And that is criminal use of

18  drugs, correct?  That's one diversion is

19  criminal use of drugs?

20          A.   For nonmedical purpose, yes.

21          Q.   And you clearly knew in 2011

22  that there was already, as you said, you

23  already understood there was an opioid

24  drug crisis in America, correct?

Highly Confidential - Subject to Further Confidentiality Review

1           MS. HENN:  Objection to

2      form.

3  BY MR. PAPANTONIO:

4      Q.    You knew that?

5      A.    Yes.

6      Q.    And you knew that there was

7  actually -- that there was occurrences

8  that were even characterized as the oxy

9  express.  Have you ever heard of the oxy

10 express?

11          MS. HENN:  Objection to

12     form.

13          THE WITNESS:  I have heard

14     of the oxy express.  I believe

15     that was a problem in Florida

16     coming up the east coast.

17 BY MR. PAPANTONIO:

18     Q.    Well, as a matter of fact,

19 it came up right into the area that you

20 were part of a distributor, right in your

21 part of the country.  The oxy express

22 came right up to where you were a

23 distributor.  So where -- excuse me,

24 where you were a regulator for the

1  distribution of McKesson narcotics.  You

2  knew that, right?

3              MS. HENN:  Objection to

4        form.

5  BY MR. PAPANTONIO:

6        Q.   I'm going to -- let me

7  repeat the question, because I want to be

8  clear about this.

9              You knew in 2011 that the

10 oxy express ran right through the very

11 territory where you were working as a

12 regulator for the sale in regard to the

13 sale of narcotic drugs for McKesson.  You

14 knew that, didn't you?

15             MS. HENN:  Objection to

16       form.

17             THE WITNESS:  I didn't know

18       that it was specifically at any

19       one pharmacy.  I knew that it was

20       along the east coast.

21 BY MR. PAPANTONIO:

22       Q.   You didn't know where it

23 ended?

24             MS. HENN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1           form.

2                   THE WITNESS:  From my

3           understanding it went all the way

4           up to Boston.

5    BY MR. PAPANTONIO:

6           Q.    And you -- so it covered the

7    very territory -- some of the very

8    territory you worked, the oxy express?

9                   MS. HENN:  Objection to

10          form.

11   BY MR. PAPANTONIO:

12          Q.    Right?

13          A.    The oxycodone problem was

14   along the entire east coast.

15          Q.    And the only way the oxy

16   express could work is there was a glut of

17   opioids out there -- for the oxy express

18   to work, there had to be extra drugs out

19   on the market, correct?

20                  MS. HENN:  Objection to

21          form.

22   BY MR. PAPANTONIO:

23          Q.    Have you ever heard that,

24   that the oxy express could not operate

Highly Confidential - Subject to Further Confidentiality Review

1    unless there was a glut of opioids out in

2    the market?

3          A.    I have not heard that

4    before, no.

20          Q.    And you, sir, were working

21   as a regulator between 2008 and

22   July 2011.  That was your job as a

23   regulator, right?

24          MS. HENN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  Yes, that was

3          part of my job.

4     BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



16    Q.    Your company was fined

17   $13 million for breaking the law in 2008,

18   right?  And then your company, McKesson,

19   agreed to say, oh, we're going to do

20   better.  Isn't that what you told me a

21   few minutes ago?  We're going to do

22   better?

23           MS. HENN:  Objection to

24       form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  What I -- what

2     I said was we had enhanced the

3     program to identify suspicious

4     orders, yes.

5     BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    Q.    Okay.  Where is it -- you

14  tell me anywhere, in everything that

15  we've just reviewed so far, that it says

16  that you can monitor and not report a

17  suspicious order?

18          MS. HENN:   Objection.

19  BY MR. PAPANTONIO:

20    Q.    You tell me where I'm

21  supposed to find that law.  I'll go to it

22  right now.  We'll talk about it.  Where

23  is the law that says all you have to do

24  is monitor and not report suspicious

Highly Confidential - Subject to Further Confidentiality Review

1  orders?

2          MS. HENN:  Objection to

3      form.

4          THE WITNESS:  We have to --

5      we have to report suspicious

6      orders if identified as

7      suspicious.

8  BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24     BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you have any independent

2 knowledge, sir, about the DEA taking it

3 on themselves to phony -- phony up

4 information and lie about what we're

5 reporting right here?

6              MS. HENN:   Objection to

7        form.

8              THE WITNESS:   No, I would

9        not believe that.

10 BY MR. PAPANTONIO:

20    Q.    All right.   That's good.

21              MS. HENN:   Counsel, there

22 have been additional beeps.

23 You've heard them.   Can we ask

24 anyone on the phone who's not yet

Highly Confidential - Subject to Further Confidentiality Review

1    noted their appearance and is

2    listening in to please do so now.

3           Is there anyone on the phone

4    who has not yet noted their

5    appearance?

6           MR. PAPANTONIO:  All right.

7           THE WITNESS:  Must not be.

8           MR. PAPANTONIO:  I guess

9    not.

10   BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review

5          Now, first of all, tell the

6    jury what is -- at this point, they've

7    probably heard this already, but tell

8    them what a CSMP is?

9          A.    CSMP is an acronym for

10   controlled substance monitoring program.

11         Q.    And that was your

12   responsibility to run a controlled

13   substance monitoring program at McKesson,

14   right?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22      Q.    Right.  As a matter of fact,

23 sir, you actually had salespeople on the

24 ground working in different areas of the

1  country that lived right in the very city

2  where there were pill mills, right?  You

3  had McKesson employees -- if a city had a

4  pill mill, they lived right in that city,

5  didn't they?

6          MS. HENN:  Objection to

7      form.

8          THE WITNESS:  I'm unaware of

9      where McKesson employees live.

10     I -- you know, we have people that

11     live all over the country.

12  BY MR. PAPANTONIO:

13     Q.    Right.

14     A.    So specifically to where

15  they live, I do not know.

Highly Confidential - Subject to Further Confidentiality Review



20    MS. HENN:  Counsel, we've

21  been going over an hour.  I've

22  been waiting for a break.  But I

23  haven't really come to a natural

24  one.  I'd like to take a

Highly Confidential - Subject to Further Confidentiality Review

1          ten-minute break.

2                    MR. PAPANTONIO:  Sure.

3                    MS. HENN:  Thank you.

4                    THE VIDEOGRAPHER:  Off the

5          record, right?  All right.  Stand

6          by, please.  The time is

7          10:20 a.m.  Going off the record.

8                    (Short break.)

9                    THE VIDEOGRAPHER:  We are

10         back on the record.  The time is

11         10:32 a.m.

12    BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    Q.    Where is it that you get the

14  right to report a customer?  Where does

15  that come from?  There's nothing in the

16  statute that says all you have to do is

17  report a customer.  If it's there, please

18  show it to me.

19         MS. HENN:  Objection to

20      form.

21  BY MR. PAPANTONIO:

22    Q.    Please show me in the U.S.

23  21 statute anywhere where it says, "Hey,

24  all you have to do is report a suspicious

1    customer.  You don't have to report

2    suspicious orders."  How about showing

3    that to me, so we can proceed with that.

4                    MS. HENN:  Objection to

5           form.

6                    THE WITNESS:  I don't see it

7           in the document anywhere.

8    BY MR. PAPANTONIO:

9           Q.    It's not there?

10          A.    So it's not there.

11          Q.    Yeah, it's not there.  You

12   just made that up just now, didn't you?

13          A.    No, I didn't make it up.  We

14   reported a suspicious customer to DEA.

15          Q.    But you did not report

16   suspicious orders to the DEA; is that

17   correct?

18                    MS. HENN:  Objection to

19          form.

20   BY MR. PAPANTONIO:

21          Q.    Right?  You did not?

22          A.    Not specific orders.

23          Q.    And you understand that the

24   DEA was not -- the DEA was investigating

Highly Confidential - Subject to Further Confidentiality Review

1  ▬▬▬▬▬▬▬▬▬▬  ▬▬▬

2  understand that, right?  This thing that

3  we're covering right now is where the DEA

4  was trying to determine whether or not

5  your company engaged in unlawful conduct

6  by selling narcotics in the United

7  States.  Yes or no, do you know that?

8          MS. HENN:  Objection to

9      form.

10          THE WITNESS:  When the DEA

11      asked for the list of top 20

12      customers and asked for specific

13      records on certain pharmacies, I

14      was not aware that we were being

15      investigated, no.

16  BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

15  BY MR. PAPANTONIO:

16       Q.    Let's go to the next page.

17             The next page is -- it is --

18  we are on 13.  It says on January 13th --

19  on January 13 --

20             MS. HENN:  Counsel can we

21       pause for a second until the

22       disruption is over.

23             (Brief interruption.)

24  BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MS. HENN:  Counsel, just one

13     thing.

14          For those on the phone,

15     we're getting a fair amount of

16     noise.  And we would appreciate it

17     if you could all make sure that

18     you're on mute.  Thank you.

19  BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review



22          MS. HENN:  And I'm just

23     going to note, there's a lot of

24     talking over each other, which

Highly Confidential - Subject to Further Confidentiality Review

1    makes the court reporter's job

2    really difficult.

3          So I'm going to ask that you

4    allow counsel to finish his

5    answer, he allows you to finish

6    your answer, and just try not to

7    talk over each other.

8          THE WITNESS:  Okay.

9          MS. HENN:  Thank you.

10   BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21    BY MR. PAPANTONIO:

22           Q.    And that break -- that is

23    breaking the law when a suspicious order

24    is not reported when they're discovered,

Highly Confidential - Subject to Further Confidentiality Review

1    that break -- that's unlawful, correct?

2              MS. HENN:  Objection to

3         form.

4              THE WITNESS:  The

5         requirement is you report it when

6         discovered.

7    BY MR. PAPANTONIO:

8         Q.    Not three months later?  Not

9    four months later, correct?

10        A.    Not later, yes.

24             Q.    And that's a violation that

Highly Confidential - Subject to Further Confidentiality Review

1    is -- that is -- actually is a violation

2    that's unlawful where it comes to selling

3    the kind of narcotics that you were

4    distributing here in the United States,

5    correct?

6              MS. HENN:  Objection to

7         form.

8    BY MR. PAPANTONIO:

9         Q.    It's unlawful?

10        A.    Yes.

11        Q.    And you know it's unlawful

12   as we sit here today, correct?

13             MS. HENN:  Objection to

14        form.

15             THE WITNESS:  Yes.

16   BY MR. PAPANTONIO:

17        Q.    And you knew it was unlawful

18   when you were working as director of

19   regulatory.  You knew it was unlawful not

20   to report when a suspicious order is

21   discovered, you knew it was unlawful not

22   to report it, right?

23        A.    When it's discovered as

24   suspicious, yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And you knew that if the DEA

2   found out that you had a pharmacy that

3   was engaged in suspicious orders, that

4   the DEA could close them down.  You

5   actually had that happen to you, didn't

6   you, the DEA closing down pharmacies that

7   you were in charge of?

8      A.    I believe that has happened.

9   I can't recall exactly which ones they

10  closed before we stopped shipment.

11     Q.    Well, sir, you -- let me do

12  this -- let me get this right.

13     A.    Yeah.

14     Q.    You're telling us right now

15  you don't have any memory of the DEA

16  closing pharmacies that you, Mr. Oriente,

17  was involved with.  Is that your

18  testimony here today?

19          MS. HENN:  Objection to

20     form.

21          THE WITNESS:  No.  That is

Highly Confidential - Subject to Further Confidentiality Review

7    BY MR. PAPANTONIO:

8         Q.    Sir, you're aware of -- if

9    you take a customer off of line, a

10   customer that's selling McKesson product,

11   and you close that pharmacy, McKesson

12   loses business, right?

13              MS. HENN:  Objection to

14        form.

15              THE WITNESS:  Yeah.

16        McKesson would stop doing business

17        with that customer.

18   BY MR. PAPANTONIO:

19        Q.    And if you lose business,

20   you lose money, don't you?

21        A.    That was never my

22   determining factor.

23        Q.    That's not my question.

24              If you close a pharmacy,

Highly Confidential - Subject to Further Confidentiality Review

1  McKesson loses money, don't they?

2       A.    McKesson would lose money,

3  yes.

4       Q.    Yeah.  And as a matter of

5  fact, one reason that the DEA would close

6  a pharmacy down is because of suspicious

7  orders, right?

8       A.    That would be right.

18  BY MR. PAPANTONIO:

19       Q.    Well, you know why -- you

20  know that one of the major reasons the

21  DEA will close down a pharmacy is because

22  of suspicious orders, right?

23            MS. HENN:  Objection to

24       form.

Highly Confidential - Subject to Further Confidentiality Review

 1          THE WITNESS:  If they deemed

 2      there was diversion going on, they

 3      would, yes.

 4  BY MR. PAPANTONIO:

 5      Q.    And if you don't report

 6  suspicious orders, the DEA doesn't know

 7  about it, and they don't know to close

 8  down the pharmacy, right?

 9          MS. HENN:  Objection to

10      form.

11          THE WITNESS:  Well --

12  BY MR. PAPANTONIO:

13      Q.    True?

14      A.    If we don't report a

15  suspicious order, because we haven't

16  identified it as a suspicious order.

17      Q.    Right.  And if you don't

18  report a suspicious order, DEA has no

19  reason to go close down a pharmacy,

20  right?

21          MS. HENN:  Objection to

22      form.

23          THE WITNESS:  No, I can't

24      speak for DEA.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PAPANTONIO:

2         Q.    Well, for four years we know

3    that you didn't do that, and you know

4    that during your four years your company

5    was selling narcotics -- McKesson selling

6    narcotics to pharmacies all over the

7    country, right?

8         A.    Yes --

9              MS. HENN:  Objection to

10        form.

11             THE WITNESS:  -- we had

12        customers throughout all 50

13        states.

14   BY MR. PAPANTONIO:

15        Q.    And if you reported

16   suspicious orders, that would put the DEA

17   on notice that there might be a problem

18   with one of your customers, right?

19        A.    That is a correct statement.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    once the DEA got involved, our

21    corporate offices handled those.

22    They would -- they would have the

23    interaction.  It would have been

24    my boss, Don Walker, who would

1    have handled that.

2    BY MR. PAPANTONIO:

3         Q.    They didn't tell you what

4    happened, did they?

5         A.    They did not make --

6              MS. HENN:  Objection to

7         form.

8              THE WITNESS:  They did not

9         make me aware, no.

10   BY MR. PAPANTONIO:

11        Q.    They didn't even tell you

12   what happened at the end of this

13   investigation, did they?

14             MS. HENN:  Objection to

15        form.

16             THE WITNESS:  They did not.

17   BY MR. PAPANTONIO:

18        Q.    They didn't tell you the

19   fines.  They didn't tell you what the DEA

20   found.  They didn't tell you anything,

21   did they?

22        A.    I knew of the fine, but I --

23   and I knew of the findings, but I did not

24   know of the, you know, the guilty verdict

1    that you mentioned earlier.



Highly Confidential - Subject to Further Confidentiality Review



22      Q.    But you can agree that if

23  you held suspicious orders and did not

24  report the suspicious orders as they were

1    discovered, that is a violation -- a

2    violation of the law, 22 times here,

3    right?

4              MS. HENN:  Objection to

5         form.

6              THE WITNESS:  In seeing

7         this, I'm wondering who determined

8         that they were suspicious.

9    BY MR. PAPANTONIO:

10        Q.    You answer my questions.

11   Don't ask me questions.  I'm asking

12   you --

13        A.    No, that wasn't -- I didn't

14   ask a question.  I said -- I said --

15        Q.    Well --

16             MS. HENN:  Counsel --

17             THE WITNESS:  I said I'm

18        wondering who.  It's not a

19        question.  It's a statement.  I

20        wonder who deemed them suspicious.

21   BY MR. PAPANTONIO:

22        Q.    Well, do you think there's

23   somebody working for McKesson who maybe

24   doesn't know what a suspicious order is,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that told the DEA that you had 22
 2    suspicious orders after you had already
 3    discontinued doing business with this
 4    pharmacy?
 5              MS. HENN:  Objection to
 6         form.
 7    BY MR. PAPANTONIO:
 8         Q.    Is there somebody who you
 9    could give me a name about, that did
10    that, that maybe misled the DEA?
11              MS. HENN:  Objection to
12         form.
13              THE WITNESS:  No.  I don't
14         have anyone.  I'm just trying to
15         determine, you know, what -- what
16         determination was made in March of
17         2012 that those 22 were deemed
18         suspicious.  That's all I'm
19         asking.
20    BY MR. PAPANTONIO:
21         Q.    And the next thing that
22    maybe you're asking is -- because I'm
23    asking it -- is, do you believe that the
24    DEA is lying about what they're saying in
```

Highly Confidential - Subject to Further Confidentiality Review

1    this investigation report?

2         A.    No, I do not believe that

3    the DEA is lying.

21        Q.    All right.  And then let's

22   go to the next page.  That's Page 18.

23   Sir, when you have questions about who

24   did what and why they did it, you're

Highly Confidential - Subject to Further Confidentiality Review

1     going to have to ask your lawyer, because

2     right now this is DEA report.  This is

3     their investigation.

4           A.     Understood.

5           Q.     This is not my

6     investigation.

7                  MS. HENN:  And, Counsel, I

8           would ask you not to instruct my

9           witness how to respond to your

10          questions.

11                 MR. PAPANTONIO:  Well, he

12          obviously --

13                 MS. HENN:  He will

14          respond --

15                 MR. PAPANTONIO:  He needs to

16          ask questions --

17                 MS. HENN:  -- as best he

18          can.

19                 MR. PAPANTONIO:  -- to

20          somebody other than me.

21    BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



9      Q.      Do you know of any other

10 settlement agreement that they entered

11 into besides 2008?

12      A.      I believe there was one in

13 2013.

14      Q.      Okay.  So they entered into

15 a settlement agreement in 2013.  They

16 entered into a settlement agreement in

17 2008.  And they entered into settlement

18 agreements because they were breaking the

19 law, correct?

20          MS. HENN:  Objection to

21      form.

22          THE WITNESS:  I don't know

23      exactly why they settled.  That

24      was -- I was not involved with the

Highly Confidential - Subject to Further Confidentiality Review

1       settlement.

2   BY MR. PAPANTONIO:

3           Q.    But you know they were

4   breaking the law, don't you?

5               MS. HENN:  Objection to

6           form.

7               THE WITNESS:  You mentioned

8           that earlier today in the 2008

9           case.

10  BY MR. PAPANTONIO:

11          Q.    Yeah.

12          A.    As I stated earlier, I

13  thought they had a settlement and simply

14  paid a civil fine.

15          Q.    Okay.  So we had -- so far

16  we have 2008, 2013, where they enter into

17  a settlement with the DEA.  And what they

18  say in the settlement, we're going to get

19  it right this time, right?  We're going

20  to do right.  That's what they say,

21  right?

22              MS. HENN:  Objection to

23          form.

24              THE WITNESS:  We're going to

1    make changes, yes.

2    BY MR. PAPANTONIO:

3        Q.    Okay.  How many narcotics do

4    you think McKesson sold between 2008 and

5    2013?  Do you have a swag number of how

6    many millions of narcotic pills that

7    McKesson put on the street in America

8    between 2008 and 2013?

9            MS. HENN:  Objection to

10           form.

11           THE WITNESS:  I don't have

12           that total number, no.

13   BY MR. PAPANTONIO:

14       Q.    Do you have any idea how

15   many narcotic pills McKesson was selling

16   every year?

17       A.    I do not have that total

18   number, no.

19       Q.    We're going to look at it in

20   a minute.  I just want to know -- it's

21   right here in this report.  I want to

22   know if you have any memory.

23       A.    No, I never seen that

24   number.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Because nobody ever

2    showed this to you.  And you were the

3    director of regulatory at Landover, one

4    of the biggest distribution sites

5    McKesson owned, right?

6          A.    I don't know how Landover

7    compared to the other 20 something

8    distribution centers that we have.

9          Q.    So let's see what the DEA

10   says on this page.  And again, this is

11   your opportunity to tell me that you

12   believe the DEA was lying.  If you want

13   to say that on the record, I'll be glad

14   to take it.  But let's look at what it

15   says.

16          A.    I've said more than twice

17   that I don't believe the DEA is lying.

Highly Confidential - Subject to Further Confidentiality Review

4        Q.    You understand that's not my

5   words.  That's the Department of Justice,

6   the DEA, the U.S. government.

7        A.    Mm-hmm.

8        Q.    And they gave you the right

9   to sell these -- the U.S. government

10  gives the distributor, McKesson, the

11  right to do this if they follow the law,

12  correct?

13       A.    That is correct.  That's

14  stipulation of being a registrant.

15       Q.    And right now, in America,

16  McKesson, Amerisource, and Cardinal are

17  the three biggest narcotic distributors

18  in the country, correct?

19       A.    Yes, that is correct.

20       Q.    And so those three people

21  were given a special right to sell

22  narcotics to the American public, and all

23  the government asked you to do was report

24  when you see suspicious orders, right?

Highly Confidential - Subject to Further Confidentiality Review

1    Correct?

2         A.    That's part of the

3    stipulation, yes.

14        Q.    Do you feel -- sir, would

15   you like to have seen this before you

16   came in here to testify about what you

17   know about diversion and the sale of

18   narcotic drugs by McKesson throughout the

19   United States?  Is this something that

20   would have helped up testify here today?

21             MS. HENN:  Objection to

22        form.

23             THE WITNESS:  I don't

24        believe it would have helped me

Highly Confidential - Subject to Further Confidentiality Review

1        testify here today, no.

2    BY MR. PAPANTONIO:

3        Q.    Okay.  Because you knew all

4    this before you came here, didn't you?

5        A.    No, sir.  That's not a true

6    statement.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20        Q.    Well, who is corporate -- is

21   Mr. -- what's -- Hammergren, is he

22   corporate office?

23        A.    My boss would have been Don

24   Walker.

1    Q.    Well, is Mr. Hammergren, is

2    he -- do you consider him corporate?

3                MR. PAPANTONIO:  Give me the

4         video.  Are you ready for a video

5         on this something?  Give me

6         Video 7.

7                (Document marked for

8         identification as Exhibit

9         MCK-Oriente-Video-7.)

10   BY MR. PAPANTONIO:

11        Q.    Do you know Mr. Hammergren

12   is?

13        A.    Yes.

14        Q.    Have you ever walked up and

15   shaken his hand?

16        A.    I met him one time.

17        Q.    Did you watch him when he

18   swore before the -- when he raised his

19   right hand and swore to the congressional

20   hearing and testified?  Did you watch him

21   testify?

22        A.    I saw it on television.

23                MR. PAPANTONIO:  Okay.

24         Could you -- are you able to show

1    that video.  Let me give a copy

2    of -- give me -- the hard copies

3    to counsel.

4  BY MR. PAPANTONIO:

5        Q.    Let's watch this video.  And

6  I want to ask you whether you saw this.

7            MS. HENN:  You mentioned

8        hard copies.

9            MR. PAPANTONIO:  Yeah, we

10       got -- we got hard copies of

11       transcripts.

12           MR. PAPANTONIO:  So go ahead

13       and play this.

14           MS. HENN:  Do you want the

15       witness to have a hard copy?

16           MR. PAPANTONIO:  No, I

17       don't.  I want him to watch this

18       video as a guy running his company

19       who testified in front of Congress

20       under the threat of perjury.

21       That's what I want.  Show this

22       video, please.

23           (Video playback.)

24           MR. HAMMERGREN:  We have a

1       role to play, Congressman,

2       certainly.  And in your example

3       one of the most important roles we

4       play is to make sure we find

5       suspicious customers and

6       suspicious orders and cut off the

7       supply to those customers.

8               (End of video playback.)

9    BY MR. PAPANTONIO:

10          Q.    Did you hear that testimony?

11          A.    I did hear it, yes.

12          Q.    Okay.  Will you tell

13   everybody -- tell the jury where it is

14   that Mr. Hammergren, the CEO of your

15   company, ever was told that it was okay

16   to report suspicious customers instead of

17   suspicious orders.

18              Please tell me, if you

19   can -- in your experience in regulatory,

20   would you please tell me any place that

21   you can identify that Mr. Hammergren

22   would be led to believe that it was okay

23   to report suspicious orders?

24              MS. HENN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1        form.

2              THE WITNESS:  You just said

3        two different things you said

4        suspicious customers --

5   BY MR. PAPANTONIO:

6        Q.    Suspicious customers.

7        A.    -- and suspicious orders.

8   Okay.  So you want to --

9              MS. HENN:  Objection to

10        form.

11             MR. PAPANTONIO:  Yeah, let's

12        play it again.  I want to make

13        sure we get this.  Play it again,

14        please.

15             (Video playback.)

16             MR. HAMMERGREN:  We have a

17        role to play, Congressman,

18        certainly.  And in your example

19        one of the most important roles we

20        play is to make sure we find

21        suspicious customers and

22        suspicious orders and cut off the

23        supply to those customers.

24             (End of video playback.)

1   BY MR. PAPANTONIO:

2       Q.    So he says that one of the

3   most important roles you play is to

4   report suspicious orders.

5           That's what he just said,

6   right?

7       A.    Well, he said suspicious

8   customers and suspicious orders.

9       Q.    And you know there's nothing

10  in the -- there is -- at no time did the

11  DEA tell you that it was okay to report

12  suspicious customers?

13          MS. HENN:  Objection.

14  BY MR. PAPANTONIO:

15      Q.    You know that that's

16  something that you made up?

17          MS. HENN:  Objection to

18      form.

19  BY MR. PAPANTONIO:

20      Q.    Suspicious customers?

21      A.    Suspicious customers is not

22  in the regulation.

23      Q.    Right.  And you know that

24  Mr. Hammergren raised his right hand and

Highly Confidential - Subject to Further Confidentiality Review

1    testified in front of Congress, telling

2    Congress that it was okay just to report

3    suspicious customers rather than

4    suspicious orders.  That's what he just

5    said?

6              MS. HENN:  Objection to

7         form.

8              THE WITNESS:  I believe he

9         said -- and I believe in his

10        statement he said suspicious

11        customers and suspicious orders.

12   BY MR. PAPANTONIO:

13        Q.    Okay.  So let's --

14        A.    Not or.

21        Q.    And you just had the

22   president, the CEO of McKesson, the

23   highest guy in the entire food chain,

24   saying, "You know what?  We think that's

Highly Confidential - Subject to Further Confidentiality Review

1   our highest responsibility, to report

2   suspicious orders."  That's what he just

3   said, right?

4                MS. HENN:  Objection to

5        form.

6                THE WITNESS:  He said

7        that -- was it this year 2018?

8        And this is referring to what

9        20-something.

10  BY MR. PAPANTONIO:

11       Q.    Is something different?

12       A.    No.  What I'm saying is, in

13  his statement -- can we play it again?

14       Q.    Yes, sir.  Before we play

15  it, let me ask if you know this.  Do you

16  know that he raised his right hand --

17       A.    Okay.

18       Q.    -- and swore before Congress

19  about what he was going to testify to?

20  Did you know that?

21       A.    Yeah, I watched it on

22  television at home.

23       Q.    You watched the whole thing?

24       A.    Right.  Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Let's watch it again

2    here.

3                (Video playback.)

4                MR. HAMMERGREN:  We have a

5         role to play, Congressman,

6         certainly.  And in your example

7         one of the most important roles we

8         play is to make sure we find

9         suspicious customers and

10        suspicious orders and cut off the

11        supply to those customers.

12               (End of video playback.)

13   BY MR. PAPANTONIO:

14   Q.    So the most important thing

15   is suspicious orders?

16   A.    And suspicious customers and

17   cut off the supply.

18   Q.    And you're not able to tell

19   me anywhere in the regulatory anywhere

20   where it says, you know what, all we have

21   to do is report suspicious customers or

22   suspicious orders?

23               MS. HENN:  Objection.

24   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You're not aware of that

2   anywhere, right?

3           MS. HENN:  Objection to

4       form.

5           THE WITNESS:  It says we

6       need to report suspicious orders.

7   BY MR. PAPANTONIO:

8       Q.    Orders.  Not suspicious

9   customers, right?

10      A.    That is correct.

11      Q.    So he's making that up right

12  there, isn't he?

13          MS. HENN:  Objection to

14      form.

15          THE WITNESS:  I can't speak

16      for him.

17  BY MR. PAPANTONIO:

18      Q.    Well, he's misleading

19  Congress, and he swore under oath to tell

20  the truth, right?

21          MS. HENN:  Objection to

22      form.

23  BY MR. PAPANTONIO:

24      Q.    Yes?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    He was before Congress, yes.

2    But I can't speak for Mr. Hammergren.

3              MR. PAPANTONIO:  Let's go

4         back to this document.  We have

5         more videos we'll listen to.

6    BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16    Q.    Let's go to -- and by the

17  way, you were the number one guy in

18  Landover for regulatory, right?

19    A.    I was responsible to monitor

20  what was being purchased.  The suspicious

21  order reporting was done from McKesson's

22  corporate office.

23    Q.    And the corporate office,

24  was that a bunch -- were those lawyers

Highly Confidential - Subject to Further Confidentiality Review

1   sitting around determining what ought to

2   go to the DEA or not go to the DEA?  Were

3   those lawyers who made that

4   determination?

5        A.    I don't know that.  I don't

6   know who made the determination.

7        Q.    Because I thought earlier in

8   this -- in this discussion you told me

9   that it was sent to the lawyers.

10       A.    When a request for DEA

11  information from a subpoena or top

12  customers, when a request came in for

13  information, that went to our law

14  department.

15            If it was the suspicious

16  orders, I'm not sure if that was Don

17  Walker sending that in or -- or someone

18  in our law department.

Highly Confidential - Subject to Further Confidentiality Review

1      MS. HENN:  Objection.  I

2  think you're asking him what a

3  lawyer told him.

4      MR. PAPANTONIO:  Let me --

5  I'm --

6      MS. HENN:  I'm going to

7  instruct -- can I finish?

8      MR. PAPANTONIO:  Yeah, go

9  ahead.  Instruct him.

10      MS. HENN:  I'm going to

11  instruct the witness not to answer

12  questions about what lawyers did

13  or didn't say to him.  That's not

14  a proper question.

15  BY MR. PAPANTONIO:





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          Sir, that's where you were

17   in charge.  You were in charge of

18   regulatory at Landowner -- Landover,

19   right?

20          A.    Yes, I was responsible for

21   Landover.

22          Q.    That's your responsibility,

23   correct?

24          A.    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Is there anybody there -- is

2    there anybody there in regulatory that

3    had a higher responsibility there at

4    Landover than you?

5          A.     No.

6          Q.     Okay.  So we are talking to

7    the right guy where it becomes

8    responsibility about regulatory, aren't

9    we?

10         A.     For Landover, yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



8    BY MR. PAPANTONIO:

9         Q.    I'm sorry.  Hydrocodone.  So

10   we start off with oxycodone was the

11   analysis.  For example -- hey, I meant to

12   ask you, is oxycodone addictive?

13        A.    I'm not a doctor.  But from

14   what I've read, it is addictive.

15        Q.    Yeah.  And you know that the

16   people that you're buying from are

17   Purdue, right, Purdue Pharmacy?

18        A.    Purdue is one of the

19   manufacturers that we sold, yes.

20        Q.    And you know that while you

21   were selling this product, you were aware

22   that Purdue had been fined multi-million

23   dollars for lying about the addictive

24   nature of oxycodone.  You know that,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2              MS. O'GORMAN:   Object to

3         form.

4    BY MR. PAPANTONIO:

5         Q.    Did you not know that?

6         A.    I knew that Purdue had

7    lawsuits against it regarding its

8    marketing practices.

9         Q.    Right.

10        A.    I don't follow that

11   particularly closely to see, you know,

12   whether they were found guilty and paid

13   fines.  I'm busy with my McKesson

14   responsibilities.

15        Q.    Sir, you're buying narcotic

16   drugs from Purdue, correct?  We can agree

17   to that, as you just said.  You know

18   that --

19        A.    McKesson does, yes.

20        Q.    And yours --

21        A.    We deal with multiple

22   wholesale manufacturers.

23        Q.    And second of all, you're

24   aware as you are buying those narcotic

Highly Confidential - Subject to Further Confidentiality Review

1  drugs, that Purdue had been sued for --

2  for lying about the addictive nature of

3  the drugs that you're distributing for

4  them, right.

5          MS. O'GORMAN:  Object to

6      form.

7  BY MR. PAPANTONIO:

8      Q.    You know that?

9      A.    As I said, I was aware that

10  they were being sued, yes.

11      Q.    And you know that it had to

12  do with the fact that they were lying to

13  the American public about the addictive

14  nature of their drugs that they were

15  selling to you.

16          MS. O'GORMAN:  Objection.

17  BY MR. PAPANTONIO:

18      Q.    Right?

19      A.    Again, I know there was

20  legal matters against Purdue.  I didn't

21  really follow them to know whether or

22  not, you know, they were paid fines in

23  that case.

24      Q.    Sir, you knew when you were

1    distributing their drugs as their

2    distributor, you clearly understood that

3    they had been fined for lying about the

4    addictive nature of their drugs,

5    OxyContin and oxycodone.  You knew that

6    didn't you?

7                 MS. O'GORMAN:  Objection to

8         form.

9                 THE WITNESS:  I would say

10        that I learned of it.

11   BY MR. PAPANTONIO:

12        Q.    All right.  And is it --

13   sir, as somebody that's involved with

14   actually regulatory matters, that's

15   pretty important to know that the people

16   that you're buying -- the people you're

17   buying narcotics from are out there

18   telling the American public, that, "Hey,

19   this stuff just ain't that addictive."

20   That's pretty information, isn't it?

21        A.    That's important, yes.

22        Q.    Yeah, and you knew that the

23   full time that you were a distributor

24   with this company, didn't you?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HENN:  Objection to

2     form.

3          THE WITNESS:  Not the

4     full-time, no.  I said I learned

5     of it.

6          MS. HENN:  Counsel, we've

7     been going another hour.  So I

8     would suggest another ten-minute

9     break.

10          MR. PAPANTONIO:  That's

11     fine.  If you'd like to, Ms. Henn,

12     we'll take a ten-minute break.

13          THE VIDEOGRAPHER:  The time

14     is 11:35 a.m.  Going off the

15     record.

16          (Short break.)

17          THE VIDEOGRAPHER:  We are

18     back on the record.  The time is

19     11:46 a.m.

20     BY MR. PAPANTONIO:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



21    Q.    And you understand one

22  reason you were given that McKesson was

23  given the right to actually sell this

24  drug is that you were supposed to police

1    these type of problems, McKesson was?

2            MS. HENN:   Objection to

3        form.

4    BY MR. PAPANTONIO:

5        Q.    Right?

6        A.    We are responsible to have a

7    controlled substance monitoring program

8    in place, yes.

Highly Confidential - Subject to Further Confidentiality Review



19    Q.    Was there some big

20  catastrophe where people were injured or

21  anything like that that happened between

22  2007 and 2011?

23    A.    I don't believe there was.

24    Q.    Was there -- was there

Highly Confidential - Subject to Further Confidentiality Review

1    71 percent increase in population there

2    in Maryland?

3            A.    I don't know what the

4    population change was.



Highly Confidential - Subject to Further Confidentiality Review



19      Q.      And which of those two

20   drugs, oxycodone or hydrocodone, have the

21   biggest impact?   Which one is the

22   stronger narcotic?

23      A.      Oxycodone.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22    Q.    And oxycodone was a Purdue

23  product; is that right?

24    A.    I don't believe so.

1    Oxycodone is the generic.  Purdue product

2    is OxyContin.

3            Q.    OxyContin, right.  And

4    that's -- OxyContin is the one that

5    Purdue lied about as far as -- as far as

6    its addictive nature, correct?

7                    MS. HENN:  Objection to

8            form.

9                    MS. O'GORMAN:  Same

10           objection.

11                   THE WITNESS:  I'm not --

12           not -- I can't speak for what

13           Purdue said or did.

14   BY MR. PAPANTONIO:

15           Q.    Sir, you don't think you

16   have a responsibility selling narcotics

17   during a period of time where there is an

18   opioid crisis going on in the United

19   States, and you're buying from a company

20   that has been hit for -- has been fined

21   for lying about the qualities of their

22   product.  That's not important to you as

23   a regulator?

24                   MS. O'GORMAN:  Objection.

1    THE WITNESS:  No, I didn't

2    say that.  I take my job very

3    seriously.  I take my

4    responsibility very seriously.

5        I said that I could not

6    speak for what Purdue did or

7    didn't do or said or didn't say.

8        Obviously if any controlled

9    substance has an addictive policy,

10   DEA schedules them two through

11   five, the lower the number the

12   more addictive.

13       So whether it's a Schedule

14   II drug through a Schedule V drug,

15   they all have benefits when used

16   appropriately, and they all have,

17   you know, problems where they can

18   be abused.

19       So I knew that a Schedule II

20   drug obviously has a potential for

21   more abuse than a Schedule V drug.

22       So yes, I was aware of the

23   potential, if not taken, you know,

24   for medical purposes, that they

1    could be abused.

2    BY MR. PAPANTONIO:

3        Q.    In other words, you wouldn't

4    go out and buy narcotics from Pablo

5    Escobar without understanding Pablo

6    Escobar and the cartel is selling you,

7    right?  You want to know what they are

8    selling you, true?

9            MS. HENN:  Objection to

10           form.

11           THE WITNESS:  Sir, I

12           won't -- I won't speculate on

13           that.

14   BY MR. PAPANTONIO:

15       Q.    Yeah.  Well, if you've got a

16   company that's manufacturing a product

17   and they're lying about how addictive the

18   product is, that's a problem you want to

19   know about, right?

20           MS. HENN:  Objection to

21           form.

22   BY MR. PAPANTONIO:

23       Q.    Because you're selling a lot

24   of drugs.

Highly Confidential - Subject to Further Confidentiality Review

 1          MS. O'GORMAN:  Same

 2     objection.

 3          THE WITNESS:  I was

 4     responsible for monitoring what

 5     stores are purchasing.  And that I

 6     did.

 7          As far as if the customer --

 8     the manufacturer and the

 9     truthfulness of what they're

10     portraying, I did not get involved

11     with that, because the -- the

12     product has a medical purpose if

13     used correctly for medical

14     reasons.

15     BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review



12  Q.   Right.  And as you're

13  selling that -- as you're selling that

14  product, your sales are going up, right?

15  As they are selling more drugs, your

16  sales are going up, correct?

17  A.   Sales would have increased.

18  But as I said, I don't get involved with

19  the dollars and cents.  I'm looking at

20  their overall Rx business and then the

21  amount of controls to non-controls that

22  they are doing.  I did not look at

23  dollars.  I looked at dosages.

24  Q.   Okay.  But you're on

1    incentive -- you had an incentive program

2    that salespeople were actually making

3    more money if they sell more drugs,

4    right?

5              MS. HENN:  Objection to

6         form.

7              THE WITNESS:  When you said

8         "you," I am not on an incentive

9         program.

10             The salespeople are

11        compensated on total sales of a

12        pharmacy, not just the controlled

13        substances.

14   BY MR. PAPANTONIO:

15        Q.    If they say more product,

16   they make more money, yes or no,

17   salespeople?

18        A.    Salespeople are on

19   commission, yes.

20        Q.    And if you were CEO, the

21   fellow we saw raise his right hand and

22   testify in front of Congress, if he has

23   the company selling more drugs, he's

24   making more money, right?

1        A.     It would -- it would appear

2   that total -- total sales of the company

3   would be, you know, included.

4              Again the controlled

5   substances are a very small part of our

6   total sales.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2      Q.    You had a marketing program.

3   McKesson had a marketing program, didn't

4   they, where they actually -- they

5   actually had marketing programs to

6   increase the sales of these drugs, all

7   over the country, correct?

8           MS. HENN:  Objection to

9       form.

10          THE WITNESS:  I am not

11      familiar with our marketing side

12      of the business.  I don't get

13      involved with marketing.  I was in

14      regulatory.  So I'm not familiar

15      with what sales programs there

16      were out there.

17   BY MR. PAPANTONIO:

18      Q.    So nobody ever told you, as

19   you were trying to do your job in

20   regulatory and control the flow of drugs,

21   nobody told you that, hey, we're out

22   there actually marketing drugs.  We're

23   helping sell -- we're helping -- we're

24   helping push more pills.  Nobody ever

1    told you that, did they?

2              MS. HENN:  Objection to

3         form.

4              THE WITNESS:  McKesson would

5         be in the sales department they

6         would be selling all products.

7         Controlled substances, Rx, OTC.

8              But as I said, I'm not aware

9         of specific sales programs to

10        increase sales of controlled

11        substances.

12   BY MR. PAPANTONIO:

13        Q.    Give me --

14             MR. PAPANTONIO:  What number

15        is that?  Video 1.  Let's take a

16        look at.  No, wait I want -- yeah,

17        Video Number 1.  Video Number 1.

18        Yeah, Video Number 1 if you could

19        tee it up.

20             (Document marked for

21        identification as Exhibit

22        MCK-Oriente-Video-1.)

23   BY MR. PAPANTONIO:

24        Q.    You say you watched the

1  entire -- did you watch the entire

2  congressional hearing with your boss

3  testifying in front of the congressional

4  hearing after he'd sworn to tell the

5  truth?

6       A.    I was not at the TV the

7  entire time, no.

8       Q.    All right.  Let's see if you

9  were at the TV during this time.  Let's

10 play this.

11           MR. PAPANTONIO:  You've got

12      to turn it up.  Start again and

13      turn it up.

14           (Video playback.)

15           MR. HAMMERGREN:  As a

16      distributor, we don't manufacture

17      prescription drugs.  We don't

18      market them to doctors or

19      patients, nor do we market any

20      particular category of drugs such

21      as opioids to pharmacists.

22           Distributors respond to

23      pharmacy orders which are based on

24      doctors' prescriptions.

1    (End of video playback.)

2    BY MR. PAPANTONIO:

3        Q.    Wow, one of y'all are lying

4    here.  He just said that they don't

5    market drugs.  Isn't that what he just

6    said?  And you just said they do, which

7    is it?

8            MS. HENN:  Objection to

9        form, Counsel.

10   BY MR. PAPANTONIO:

11       Q.    I'm just curious.  Is he

12   lying about -- when he's testifying in

13   front of Congress, swore to tell the

14   truth, is he telling the truth when he

15   tells the entire congressional meeting

16   there that McKesson doesn't market drugs?

17           Let's play it again I want

18   to make sure we get this right.

19           MR. PAPANTONIO:  Play it

20       again, please.

21           (Video playback.)

22           MR. HAMMERGREN:  As a

23       distributor, we don't manufacture

24       prescription drugs.  We don't

Highly Confidential - Subject to Further Confidentiality Review

1           market them to doctors or

2           patients, nor do we market any

3           particular category of drugs, such

4           as opioids, to pharmacists.

5                 Distributors respond to

6           pharmacy orders which are based on

7           doctors' prescriptions.

8                 (End of video playback.)

9     BY MR. PAPANTONIO:

10          Q.    Did you know that he said

11    that in front in front of Congress?

12          A.    No, I did not.

13          Q.    Okay.  If he said that, he's

14    not telling the truth.  He's committing

15    perjury, isn't he?

16                MS. HENN:  Objection to

17          form.

18                THE WITNESS:  I'm not going

19          to say if he is or isn't.

20    BY MR. PAPANTONIO:

21          Q.    Okay.  If he's raising his

22    right-hand and swearing to Congress that

23    he's telling the truth, and he's lying,

24    he's committing perjury, isn't he?

1        A.    What he --

2              MS. HENN:  Objection to

3        form.

4              THE WITNESS:  What I believe

5        he's saying there is that we sell

6        what pharmacies order.

7    BY MR. PAPANTONIO:

8        Q.   No, sir.  No, sir.  He

9    says --

10             MR. PAPANTONIO:  Play it

11       again.  Play it again.

12             (Video playback.)

13             MR. HAMMERGREN:  As a

14       distributor, we don't manufacture

15       prescription drugs.  We don't

16       market them to doctors or

17       patients, nor do we market any

18       particular category of drugs such

19       as opioids to pharmacists.

20             Distributors respond to

21       pharmacy orders, which are based

22       on doctors' prescriptions.

23             (End of video playback.)

24   BY MR. PAPANTONIO:

1    Q.    Wow.  That's just not true,

2    is it?  What he just -- what he just said

3    in front of Congress, the very highest

4    man, very highest person in McKesson

5    drugs just lied to Congress, didn't he?

6              MS. HENN:  Objection to

7         form.

8              THE WITNESS:  I can't say

9         that he did.  If you want me to --

10        and know what he's saying, then

11        he's saying that a doctor writes a

12        prescription.  A pharmacy orders

13        product to fill that prescription.

14        And then we fill -- we send an

15        order to a pharmacy after they

16        order it.

17             MR. PAPANTONIO:  All right.

18        We'll -- we're going to explore

19        this a little bit more after

20        lunch.  Okay.  We'll take a lunch

21        break, and we'll come back and

22        pick up with this.  Okay.

23             THE VIDEOGRAPHER:  All

24        right.  Stand by, please.  The

Highly Confidential - Subject to Further Confidentiality Review

```
 1              time is 12:24 p.m.  Off the

 2              record.

 3                      -  -  -

 4                  (Lunch break.)

 5                      -  -  -

 6              THE VIDEOGRAPHER:  We are

 7              back on the record.  The time is

 8              1:09 p.m.

 9                      -  -  -

10              EXAMINATION (Cont'd.)

11                      -  -  -

12    BY MR. PAPANTONIO:

13         Q.    Sir, when we took a lunch

14    break, we were talking about the

15    marketing that McKesson does.  And in

16    fact, marketing, by marketing, you

17    increase sales, correct?  Isn't that the

18    idea of marketing?

19              MS. HENN:  Objection to

20         form.

21              THE WITNESS:  Well, I --

22         marketing is not necessarily a

23         correlation to increasing sales.

24         I see it more of advertising.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PAPANTONIO:

2         Q.    Okay.  So you were

3    advertising narcotics?

4              MS. HENN:  Objection to

5         form.

6              THE WITNESS:  Not myself.

7    BY MR. PAPANTONIO:

8         Q.    But McKesson?

9         A.    I don't --

10             MS. HENN:  Objection to

11        form.

12             THE WITNESS:  I don't know

13        that they were.  I know they do

14        sales so by saying marketing and

15        sales as one, I'm not aware of

16        them marketing controls and

17        pushing controls.

18             If a pharmacy isn't going to

19        be able to fill a prescription,

20        they are not going to buy

21        something simply to buy it and put

22        it on their shelf.

23   BY MR. PAPANTONIO:

24        Q.    Sir, let me cut right to it,

1    okay.

2                You as a regulator, as you

3    sit here today, had no idea that your

4    company was out marketing narcotics.  Is

5    that a yes or a no?

6                MS. HENN:  Objection to

7           form.

8                THE WITNESS:  As I stated,

9           McKesson is selling products that

10          a pharmacy needs to fill

11          prescriptions.

12   BY MR. PAPANTONIO:

13          Q.    Narcotics is one of them?

14          A.    Yes.

15          Q.    Correct?

16                Okay.  You did know that

17   they were marketing narcotics then,

18   correct?

19                MS. HENN:  Objection to

20          form.

21   BY MR. PAPANTONIO:

22          Q.    I want to be clear on this,

23   because I'm getting ready to go through

24   some documents here.  And I want to be

Highly Confidential - Subject to Further Confidentiality Review

1    clear, you knew that McKesson was

2    marketing narcotics, yes or no?

3                    MS. HENN:  Objection to

4            form.

5                    THE WITNESS:  Yes, McKesson

6            is selling narcotics.

7    BY MR. PAPANTONIO:

8            Q.    Okay.  And for example --

9                    MR. PAPANTONIO:  1154, would

10           you put up 1154.

11   BY MR. PAPANTONIO:

12           Q.    You knew, sir, didn't you,

13   that McKesson -- let me -- before I ask

14   this question.

15                   If you see upticks in

16   sales -- for example, we went through a

17   few of the pharmacies that you were in

18   charge with, right?  And there is a lot

19   of factors that affect upticks in sales.

20   You would agree with that?

21           A.    Yes.

22           Q.    I think you explained a few.

23           A.    Yes, there are some.

24           Q.    And -- and if you don't know

1    that your company is marketing, you have

2    no way to keep up with why there are so

3    many sales at a particular pharmacy, you

4    kind of have to know a correlation, don't

5    you?

6                MS. HENN:  Objection to

7         form.

8                THE WITNESS:  In the

9         regulatory area, we would request

10        information from the pharmacy that

11        would explain why their increase

12        in business.

13   BY MR. PAPANTONIO:

14        Q.    All right.  And you knew

15   that -- or maybe you didn't know.  But do

16   you have any opinion as far as your

17   experience as a regulator, that marketing

18   increases sales?

19                MS. HENN:  Objection to

20        form.

21                THE WITNESS:  I would say

22        not in the case for controlled

23        substances, because a prescription

24        has to be written by a doctor in

1    order for that increase in sales

2    to take place.

3  BY MR. PAPANTONIO:

4         Q.    When -- after your

5  president, Mr. Hammergren, CEO, testified

6  that your company didn't do any

7  marketing, do you remember any e-mails

8  flying around -- flying around at

9  McKesson saying he just -- he just

10  committed perjury?

11            MS. HENN:  Objection to

12       form.

13  BY MR. PAPANTONIO:

14         Q.    Was there any kind of

15  e-mails like that that were flying around

16  the McKesson headquarters?

17            MS. HENN:  Objection to

18       form.

19            THE WITNESS:  I did not see

20       any e-mails pertaining to that,

21       no.

22  BY MR. PAPANTONIO:

23         Q.    But it wasn't true.  What he

24  said was not true.  You agreed to that

1    already, I think?

2              MS. HENN:  Objection to

3         form.

4              THE WITNESS:  I don't know

5         what his definition of

6         marketing -- what he was referring

7         to on that.

8    BY MR. PAPANTONIO:

9         Q.    Yeah.  Well, as a matter of

10   fact, sir, you were marketing with

11   Purdue.  You had --

12             MR. PAPANTONIO:  1154.

13        Could you put up 1154.

14             MS. MOORE:  It's MCK Oriente

15        144.

16             MS. HENN:  Do you want 1154,

17        or would you like him to see 144?

18             MR. PAPANTONIO:  1154.  The

19        number she is giving is just for

20        identification.

21             (Document marked for

22        identification as Exhibit

23        MCK-Oriente-144.)

24   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You've seen -- have you ever

2    seen this document --

3              MS. HENN:  Wait, wait.

4              Counsel, I just want to make

5         sure we're clear.  The witness has

6         been handed a document that's

7         labeled and marked McKesson

8         Oriente 144.  So we need to make

9         sure that the record's clear about

10        that.  I don't know what number

11        you're using, but that's what he

12        has.

13             MS. O'GORMAN:  Can I have a

14        copy of that document.

15             MS. HENN:  And we're --

16             MR. PAPANTONIO:  So --

17             MS. HENN:  And we need

18        another copy of the document.

19             MR. PAPANTONIO:  Yeah.

20   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review



17    BY MR. PAPANTONIO:

18          Q.    Do you know what loyal --

19    what the term "loyalty script" is?  Have

20    you ever heard that?

21          A.    No, I have not.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

4        Q.     And apparently your CEO, the

5   highest man in this company, must have

6   been unaware of it too, because he told

7   Congress there was no such thing as

8   marketing between -- for McKesson

9   marketing?

10              MS. HENN:   Objection to

11        form.

12   BY MR. PAPANTONIO:

13        Q.     That's what we -- that's

14   what we listened to on the video, didn't

15   we?

16              MS. HENN:   Objection to

17        form.

18   BY MR. PAPANTONIO:

19        Q.     Right?

20        A.     I don't know what he was

21   exactly referring to, sir.

22        Q.     Well, you knew that you were

23   marketing -- do you know what Teva is?

24   Have you ever heard the company Teva?

1          A.    Teva Pharmaceutical, they're

2    another manufacturer.

3          Q.    Okay.  And you had -- nobody

4    told you that --

5                MR. PAPANTONIO:  Would you

6          put up 1317, please.

7                MS. HENN:  Could we get a

8          copy for the witness, please?

9                MR. PAPANTONIO:  We're

10         getting a copy right now.  1317.

11         Carol give the identification on

12         this.

13               MS. MOORE:  MCK Oriente 279.

14               (Document marked for

15         identification as Exhibit

16         MCK-Oriente-279.)

17   BY MR. PAPANTONIO:

18         Q.    Tell the jury what Fentanyl

19   is.

20               MS. HENN:  Counsel, can you

21         wait until the witness has the

22         document, please?  Thank you.

23               MR. PAPANTONIO:  Well, he

24         doesn't have to have the document

Highly Confidential - Subject to Further Confidentiality Review

1      in order to answer this question.

2  BY MR. PAPANTONIO:

3      Q.    Tell the jury what fentanyl

4  is.

5          MS. HENN:  Do you want him

6      to look at it?

7          MR. PAPANTONIO:  I do want

8      him to look at it.  I'm not asking

9      about the document.

10          MS. HENN:  I just want to

11      make sure he's doing one thing at

12      a time.  If you have a question or

13      you'd like --

14  BY MR. PAPANTONIO:

15      Q.    This is a clear question.

16  Tell the jury what fentanyl is.

17      A.    Fentanyl is a controlled

18  substance used to control pain.

19      Q.    And tell us about the

20  potency of fentanyl, as you understand

21  it?

22      A.    It's highly potent and

23  usually is administered in a patch.

24      Q.    Is it -- would you agree

Highly Confidential - Subject to Further Confidentiality Review

1    that it is the most potent narcotic on

2    the market?

3            A.    I'm not a pharmacist, but I

4    know it's one of the higher potency --

5    excuse me -- potency controlled

6    substances, yes.

7            Q.    Again, we heard that your

8    CEO say that you don't market, McKesson

tell the jury what Actiq and Fentora is.

13

14            MS. HENN:  Objection to

15        form.

16            THE WITNESS:  I know Actiq.

17        Fentora I'm not 100 percent clear

18        or familiar with that specific

19        brand.

20            The Actiq, I believe, is

21        like a lollypop dispenser type for

22        fentanyl.

23   BY MR. PAPANTONIO:

24            Q.    So you've got a fentanyl

1   lollipop that you would agree is the most

2   potent narcotic ever sold in America.

3   You would agree with that, wouldn't you?

4         A.    Not necessarily, sir.  I'm

5   not a pharmacist.  I can't say that it's

6   more or less potent than another drug.

7         Q.    Have you ever seen the

8   comparison between how potent fentanyl is

9   compared to other narcotics?

10              MS. HENN:  Objection to

11        form.

12              THE WITNESS:  No.  No.

13  BY MR. PAPANTONIO:

14        Q.    I'll put this up in a

15  minute.  Have you ever seen that?

16              MS. HENN:  Are you going to

17        hand him --

18              MR. PAPANTONIO:  I'm going

19        to in just a second.

20  BY MR. PAPANTONIO:

21        Q.    Have you ever seen that?

22              MS. HENN:  What are you

23        referring to, Counsel?

24  BY MR. PAPANTONIO:

1    Q.    I'm looking at a picture

2  that makes a comparison between heroin

3  and fentanyl.

4           Have you ever seen any kind

5  of comparisons between fentanyl and

6  heroin?  Ever seen any comparisons

7  between fentanyl and heroin?

8    A.    Not that specific one.  But

9  yes, that fentanyl is one of the

10  stronger, you know, drugs.

11    Q.    Okay.  And so when your CEO

12  was testifying before Congress and said

13  we don't market, he didn't mention

18  discussion that we saw on the screen, did

19  you?

20           MS. HENN:  Objection to

21       form.

22           THE WITNESS:  I did not hear

23       that on -- on video, no.

24  BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    When you -- what was your
2    involvement with Fentora and Actiq, the
3    fentanyl products?
4                MS. HENN:  Objection to
5          form.
6                THE WITNESS:  Fentanyl is
7          one of the base codes under --
8          there are 82 different base codes
9          that we monitor.
10               They were under the fentanyl
11         base code.  They would have had a
12         monthly threshold amount.  So it
13         was one of 82 products that we --
14         or, excuse me -- 82 base codes
15         that we looked at on a daily
16         basis.
17   BY MR. PAPANTONIO:
18       Q.    Okay.  We already heard that
19   you were aware of the Department of
20   Justice going after Purdue and making
21   them pay a fine for the way they sold
22   their product, correct?
23               MS. HENN:  Objection to
24         form.

1    BY MR. PAPANTONIO:

2         Q.    We already heard that

3    earlier, right?

4              MS. HENN:  Objection to

5         form.

6              MS. O'GORMAN:  Same

7         objection.

8    BY MR. PAPANTONIO:

9         Q.    Earlier in the deposition,

10   we talked about that.

11             Do you remember that?

12        A.    Yes, I do.

13        Q.    Okay.  And you were aware of

14   it, correct?

15             MS. HENN:  Objection to

16        form.

17             MS. O'GORMAN:  Same

18        objection.

19             THE WITNESS:  I was aware

20        that there was a lawsuit against

21        Purdue for their advertising

22        practices.

23   BY MR. PAPANTONIO:

24        Q.    So you decide, even though

1   there was a lawsuit against Purdue for

2   advertising in a way that misled the

3   public about the addictive nature of

4   their products, you were aware that

5   McKesson chose to do business with them

6   anyway, true?

7               MS. HENN:  Objection to

8        form.

9               MS. O'GORMAN:  Objection to

10       form.

11              THE WITNESS:  McKesson did

12       business with Purdue to sell a

13       product that, you know, when used

14       in the correct or medical

15       purposes, is beneficial to

16       fighting pain.  That, I knew.

17  BY MR. PAPANTONIO:

18       Q.    And you know enough to know

19  that if you don't tell the truth about

20  the qualities of your product, if you lie

21  about the qualities of your product when

22  consumers are buying that product, that

23  can cause real harm.  You're aware of

24  that, aren't you, as -- in your business

1    for this many years?

2              MS. HENN:  Objection to

3         form.

4              THE WITNESS:  If -- if the

5         person taking the product does not

6         have all the truthful information,

7         it could be detrimental.

8    BY MR. PAPANTONIO:

9         Q.    And you know that the

10   people, the very people that you were

11   buying products from, which was Purdue,

12   was not giving truthful information to

13   doctors and to patients.  You know that

14   now, correct?

15             MS. O'GORMAN:  Objection.

16             MS. HENN:  Objection to

17        form.

18             THE WITNESS:  I know that

19        now.  When I learned of it, it was

20        still ongoing.

21   BY MR. PAPANTONIO:

22        Q.    When did you learn about it,

23   sir?

24        A.    I don't remember the exact

1    date, sir.

2         Q.    And so now we're talking

3    about another company, not Purdue.  We're

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬   ▬▬▬▬▬

7    are aware, sir, aren't you that the

8    Department of Justice actually brought

9    criminal charges against them for also

10   not telling the truth about information

11   of their product.  Did you know that?

12              MS. HENN:  Objection to

13        form.

14              THE WITNESS:  No, I did not.

15        I did not know Teva had --

16   BY MR. PAPANTONIO:

17        Q.    Okay.  Had you ever -- let

18   me just -- let me see if this ever -- you

19   ever remember this knocking around the

20   office.  13 -- excuse me, 1381.

21              MS. MOORE:  MCK Oriente 322.

22              (Document marked for

23        identification as Exhibit

24        MCK-Oriente-322.)

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. PAPANTONIO:

2        Q.    Do you see where it says up

3   in the left-hand corner there, sir -- I

4   know this is not your document.  Here's

5   what I'm interested in.  You had a system

6   at McKesson where information was sent

7   around about issues involving narcotics

8   that involved other companies besides

9   your own, correct?

10            MS. HENN:  Objection to

11        form.

12            THE WITNESS:  I'm not

13        familiar with this.  You said

14        there's a system.

15   BY MR. PAPANTONIO:

16        Q.    Yeah.  I mean, you had an --

17   you had an entire system that kept you

18   informed about what was happening in

19   the -- in the drug business, right?

20            MS. HENN:  Objection to

21        form.

22            THE WITNESS:  No, not to my

23        knowledge.

24   BY MR. PAPANTONIO:

1    Q.    Had you ever heard of Rx

2  News?

3    A.    That's not a McKesson

4  system, is it?

5    Q.    It's a system that you were

6  a member of, McKesson -- Rx News.  Do you

7  know you were a member that?

8         MS. HENN:  Objection to

9         form.

10         THE WITNESS:  Was I on that

11         e-mail distribution?

12  BY MR. PAPANTONIO:

13    Q.    Yeah.  Did you know that?  I

14  don't want to speak for you.  Do you have

15  any memory of getting news from Rx News?

16         MS. HENN:  Objection to

17         form.

18         THE WITNESS:  I don't have a

19         recollection of getting news from

20         Rx News.

21  BY MR. PAPANTONIO:

22    Q.    And so is it your testimony

23  that when something would happen with

24  another company, when they've involved

1    themselves in criminal conduct, when

2    they've been -- they've been hit by the

3    DOJ for doing something illegal, that you

4    had no way of knowing that?  Is that your

5    testimony?

6                    MS. HENN:  Objection to

7            form.

8                    THE WITNESS:  I don't recall

9            getting updates via Rx News.

10   BY MR. PAPANTONIO:

11        Q.    Isn't that important

12   information for you to know as a

13   regulator?  I mean, you're in -- you're

14   in regulatory.  You're selling narcotics

15   all over the country.  And you're buying

16   those products from people that you don't

17   know anything about?

18                    MS. HENN:  Objection to

19            form.

20   BY MR. PAPANTONIO:

21        Q.    Is that what you're telling

22   me?

23                    MS. HENN:  Objection to

24            form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  The decision

2         to do business at that level would

3         not have been my responsibility.

4         My responsibility was to monitor

5         what the customers purchased, not

6         to determine if McKesson would use

7         a wholesaler -- excuse me, a

8         manufacturer or not.

9    BY MR. PAPANTONIO:

10        Q.    Well, you don't want to do

11   business with a manufacturer that is

12   guilty of criminal conduct, do you?

13             MS. HENN:  Objection to

14        form.

15   BY MR. PAPANTONIO:

16        Q.    Or is that okay with you?

17        A.    That decision was not left

18   up to me, sir.

19             I -- again, I would monitor

20   what our customers purchased.  But

21   whether or not McKesson did business with

22   a manufacturer was above my level.

23        Q.    Wouldn't you want to know as

24   a regulator, sir, that's working every

Highly Confidential - Subject to Further Confidentiality Review

1   day to try to regulate the amount of

2   narcotics that are being spread out all

3   over this country, wouldn't you know --

4   wouldn't you want to know if you're doing

5   business with a criminal?

6           MS. HENN:  Objection to

7       form.

8   BY MR. PAPANTONIO:

9       Q.   Buying products from a

10  criminal, is that important to you?

11          MS. HENN:  Same objection.

12          THE WITNESS:  It's important

13      to me.  It was handled at a higher

14      level than myself.

15  BY MR. PAPANTONIO:

16      Q.   Okay.  Let me ask you.

17  You've been in regulatory how many years?

18      A.   11 years, sir.

19      Q.   11 years.  And after

20  11 years of experience, you would have to

21  agree with me, sir, wouldn't you, that it

22  is pretty important to know that the

23  people that you're doing business with

24  have been hit for criminal conduct.

1    That's pretty important information to

2    you, isn't it?

3                    MS. HENN:  Objection to

4            form.

5                    THE WITNESS:  The

6            information would be good to know.

7            The decision on whether or not to

8            do business with that company

9            would not be under my

10           responsibility to continue or to

11           cease.

12   BY MR. PAPANTONIO:

13           Q.    Yeah, you -- but -- and

14   you --

15                 This is the first time that

16   you've seen this document.  The left-hand

17   corner it says Department of Justice, and

18   it talks about Teva has to pay

19   $425 million for what they call criminal

20   information plea.  Did you know that?

21                    MS. HENN:  Counsel, is this

22           about Teva?  I don't see anything

23           about Teva.

24   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sir, you know what Cephalon

2  is.  Counsel may not be.  You know who

3  Cephalon.  Cephalon is Teva, isn't it?

4    A.    I do not know that for sure,

5  sir.

6    Q.    Sir, how much information

7  were you given day to day about all the

8  people that you were buying drugs from

9  and then distributing in the company,

10  like Purdue or Teva or Cephalon?  How

11  much information were you given by people

12  in management that said we have a

13  relationship with somebody who has been

14  hit and fined for criminal conduct?

15          MS. HENN:  Objection to

16       form.

17  BY MR. PAPANTONIO:

18    Q.    Who is it that would tell

19  you that?

20          MS. O'GORMAN:  Objection.

21          THE WITNESS:  We -- in the

22       regulatory that I was responsible

23       for was for what our customers

24       were purchasing, not for the

1          actions of our -- of our

2          manufacturers that we were buying

3          from.

4    BY MR. PAPANTONIO:

5          Q.    Sir, so you felt like --

6    your testimony here today is you felt

7    like you had no responsibility to

8    understand where all these narcotics were

9    coming from that was being distributed

10   through your distribution operation in

11   Landover.  Is that what you're telling

12   me?

13              MS. HENN:  Objection to

14         form.

15              THE WITNESS:  No, sir.

16         That's not what I'm telling you.

17              What I'm saying is my

18         responsibility was in what was

19         being sold by McKesson to these

20         licensed pharmacies and to watch

21         what products they were

22         purchasing.

23              It was not my responsibility

24         to follow what lawsuits or actions

Highly Confidential - Subject to Further Confidentiality Review

1  were going against manufacturers.

2  BY MR. PAPANTONIO:

3  Q.    The jury is going to hear,

4  sir, about how potent fentanyl is, right.

5  How would you describe the potency of

6  fentanyl?

7  A.    Again, sir, I'm not a

8  pharmacist.  So a potency of fentanyl

9  versus other products, I don't have that

10  scientific knowledge.

11  Q.    You know by the time -- by

12  the time that 2011 rolled around, you

13  knew that on the street people were

14  taking all three of your drugs that

15  McKesson distributed, and they were

16  mixing it in cocktails.  You'd heard

17  about that, correct?

18          MS. HENN:  Objection to

19      form.

20          THE WITNESS:  That, I was

21      aware.

22  BY MR. PAPANTONIO:

23  Q.    You were aware of that.

24  When did you become aware of that?

1          A.     The exact time frame, I

2    don't know.

3          Q.     When did you become aware of

4    the number of people who were dying every

5    day from overdoses from narcotics, opioid

6    narcotics?

7                 MS. HENN:  Objection to

8          form.

9                 THE WITNESS:  That would

10         have been early on, say 2008.

11   BY MR. PAPANTONIO:

12         Q.     You knew in 2000 though --

13   no.  You weren't there in 2000?

14         A.     No, sir.

15         Q.     Yeah, okay.  2008 is the

16   first time that you heard that A, there's

17   a crisis, an opioid crisis.  You agree?

18         A.     About that, yes, sir.

19         Q.     2008 is the first time that

20   you heard that more than 100 people were

21   dying every day from opioid overdoses,

22   correct?

23                MS. HENN:  Objection to

24         form.

1        THE WITNESS:  About that

2   time, yes.

3   BY MR. PAPANTONIO:

4        Q.    And as you were hearing that

5   information, you were watching the sales

6   tick up higher and higher for every

7   pharmacy that was under your control at

8   Landover.  Is that a correct statement?

9        A.    No, sir, it's not.

10        MS. HENN:  Objection to

11   form.

12        THE WITNESS:  It wasn't

13   every pharmacy.

14   BY MR. PAPANTONIO:

15        Q.    Well, how many pharmacies

16   was it?

17        A.    I don't have that exact

18   amount.  There were hundreds of

19   customers, sir, so I wouldn't know

20   exactly how many increased versus did not

21   increase.

22        Q.    Well, during the time that

23   you had learned that people, more than --

24   I think it's 116 people.  Tell me if you

Highly Confidential - Subject to Further Confidentiality Review

1    have a different number.  That 116 people

2    were dying.  I think that number rises

3    around 2007, as you said.



24   BY MR. PAPANTONIO:

1    Q.    So let me take you back to

2  marketing again, because marketing is,

3  whether you agree or not -- I'm not --

4  it's still not clear to me whether you

5  agree that if you market a product,

6  you're going to sell more product.  At

7  this point you have no opinion on that,

8  right?

9              MS. HENN:  Objection to

10         form.

11              THE WITNESS:  Again, you

12         cannot sell something to a

13         pharmacy if they're not going to

14         use it to fill a prescription.

15  BY MR. PAPANTONIO:

16    Q.    Tell us what Actavis is.

17    A.    I believe it's pronounced

18  Actavis.

19    Q.    Tell us what Actavis is.

20    A.    I'm not sure if it's another

21  company, I believe.

22    Q.    Well, let's take a look at

23  it.

24              MR. PAPANTONIO:  Would you

1          give us Document 113, please.

2   BY MR. PAPANTONIO:

3          Q.    Because I'm still on this

4   topic dealing your CEO testifying in

5   front of Congress saying that your

6   company did not market, okay.  I'm still

7   on this topic.  Stay with me here.

8          A.    I'm with you.

9          Q.    All right.  Do you see this

10  document right here?

11              MS. HENN:  So the document.

12              MR. PAPANTONIO:  Carol, give

13       them the number.

14              MS. MOORE:  MCK Oriente 20.

15              MS. HENN:  Thank you.

16              (Document marked for

17       identification as Exhibit

18       MCK-Oriente-020.)

19  BY MR. PAPANTONIO:

20         Q.    So this document, if you

21  will look, first of all, tell me, who is

22  John Hansen?  Do you know?

23         A.    I do not know who John

24  Hansen is.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You see the -- you see Page

2  2 of this document right here.

3            MS. HENN:  Just to remind

4        the witness, you can take your

5        time to read the document.

6  BY MR. PAPANTONIO:

7    Q.    Well, I want you to read it,

8  because nobody is showing it to you

9  before you came in here today, did you?

10   A.    No, I've never seen this.

11   Q.    Yeah, this is -- this is a

12 McKesson document, right?

13   A.    I don't know.  Is it?

14   Q.    Well, let's take a look at

15 the top of it.  It says, at the top of

16 this page on Page 2 --

17           MR. PAPANTONIO:  How about

18       blowing that up for me.

19 BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

6          Do you see that?

7          MS. HENN:  Let's give the

8     witness a chance to read it,

9     please.

10          MR. PAPANTONIO:  Sir, are

11    you a little --

12          MS. HENN:  Just let --

13          MR. PAPANTONIO:  No, no.

14    I'm going to ask questions.

15    He's -- you're welcome to read

16    anything you want.  I'm amazed

17    that these documents haven't been

18    shown to this witness.  So don't

19    waste my time here.  Now,

20    here's --

21          MS. HENN:  Counsel, I'd just

22    like to again reiterate --

23          MR. PAPANTONIO:  That's

24    fine.

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HENN:  -- as you agreed,

2      that if the witness needs to read

3      the document to answer your

4      questions, you need to give him

5      time to do that.

6          MR. PAPANTONIO:  I'm fine

7      with that.  And I am appalled that

8      you never -- or anybody with

9      McKesson never showed him this

10     document before you put him in

11     that chair to be cross-examined.

12     I'm appalled.

13         MS. HENN:  Noted.

14 BY MR. PAPANTONIO:

15     Q.    So with that, read the

16 document.  Do you see it?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6          What I was involved in is

7     the threshold amount that a

8     customer could order.  So with a

9     threshold amount remaining the

10    same, the customer could not get

11    any more product unless I made a

12    threshold adjustment.

13         So, you know, they would

14    have had to have business increase

15    to justify that.

16         The amount that a pharmacy

17    could purchase was not just

18    increased based on any marketing

19    that was done.  We looked at

20    different factors than -- than the

21    marketing.

22  BY MR. PAPANTONIO:

23    Q.    So why would the CEO of

24  McKesson get up and lie to Congress about

Highly Confidential - Subject to Further Confidentiality Review

1    marketing if it's not important?  Why

2    would he do that?  Do you know?

3              MS. HENN:  Objection to

4         form.

5              THE WITNESS:  I'm not aware

6         of what Mr. Hammergren's testimony

7         was based on.

8    BY MR. PAPANTONIO:

9         Q.    It was based on a lie,

10   wasn't it?

11             MS. HENN:  Objection to

12        form.

13             THE WITNESS:  I don't agree

14        with that.

15   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

2          Did I just read that right,

3  or is there anything that you want to add

4  to it before we move on?

5          A.    You read that right.  As I

6  stated earlier, being in regulatory and

7  looking at different factors that go into

8  threshold setting, I'm not familiar with

9  what they would be referring to

10  regarding, you know, marketing and sales

11  and things of that nature here.

12          So, again, the threshold

13  that I was responsible for and what I

14  would look at would not be affected by if

15  they were doing this -- these promotions.

16          Q.    In other words, promotions

17  don't make any difference to sales of

18  McKesson.  Is that what you're telling

19  me?

20          MS. HENN:  Objection to

21          form.

22          THE WITNESS:  No, what I

23          said was promotion -- these

24          promotions would not have an

Highly Confidential - Subject to Further Confidentiality Review

1    effect on a customer being able to

2    order more product.

3             MR. PAPANTONIO:  Look, I'm

4    going to close and I'm going to

5    let my partner take over from

6    here, Mr. Kennedy.

7    BY MR. PAPANTONIO:

8        Q.    But I want to ask you

9    something.  If you're -- if you are in

10   the position of having to tell the DEA

11   about suspicious orders, that's something

12   that you take very seriously, right?

13       A.    Yes, sir, I do.

14       Q.    And the term "suspicious

15   orders" is pretty clear.  If an order is

16   suspicious, you -- you need to report it,

17   correct?  We've established that.

18             MS. HENN:  Objection to

19   form.

20             THE WITNESS:  That is

21   correct.

22             MR. PAPANTONIO:  Okay.

23   Would you please show him

24   Document 345, please.

1           MS. MOORE:  MCK Oriente 62.

2           (Document marked for

3      identification as Exhibit

4      MCK-Oriente-062.)

5  BY MR. PAPANTONIO:

6           Q.   Sir, take a minute and look

7  at this.  Do you see where it says

8  McKesson operations manual.  Have you

9  ever seen this before?

10          A.   Yes, sir.

11          Q.   When have you seen it?

12          A.   I wouldn't remember the

13 exact date.  It would have been when it

14 was established and -- and sent out to

15 us.

16          Q.   So you are familiar with the

17 document, right?

18          A.   Yes.

19          Q.   You're familiar -- you were

20 familiar with the document before you

21 came in here to testify today, correct?

22          A.   I've seen this document

23 prior.  It's a few years old.

24          Q.   How about -- how about

1    turning over to .23, Page 23.  It's at

2    the top right-hand corner.  Oh, excuse

3    me.  No.  20 -- yeah, Page 23.  It's at

4    the top right-hand corner.

5         A.    Okay.

6         Q.    Are you there?

7         A.    Yes, sir.

8              MR. PAPANTONIO:  Would you

9         please blow up that paragraph that

10        says "customer communications" for

11        me, Evan.

12    BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5          Q.    Sir, we're going to have my

6    partner Eric Kennedy talk to you about

7    what you did and didn't do.  Give us a

8    minute.  We're going to change positions;

9    okay?

10         A.    All right.

11               MR. PAPANTONIO:  Take a

12    break for five minutes.

13               THE VIDEOGRAPHER:  All

14    right.  Take off your microphone.

15               MR. PAPANTONIO:  Yep.

16               THE VIDEOGRAPHER:  The time

17    is 1:43 p.m.  Going off the

18    record.

19               (Short break.)

20               THE VIDEOGRAPHER:  We are

21    back on the record.  The time is

22    1:49 p.m.

23                    -  -  -

24               EXAMINATION

1                         -  -  -

2    BY MR. KENNEDY:

3         Q.    Mr. Oriente, my name is Eric

4    Kennedy, I also represent the plaintiffs

5    in this case.  All right?

6         A.    Mm-hmm.

7         Q.    And I'm going to ask you a

8    few questions.  I'm going to try not to

9    be repetitious of -- of what you've

10   already answered.

11              All right?

12        A.    Okay.  Thank you.

13        Q.    Let me start by asking

14   this -- this relatively simple question.

15              From -- from everything that

16   you've heard this morning, from

17   everything that you have answered this

18   morning, can we agree that McKesson

19   played some role in causing the opioid

20   crisis that we have in this country?

21              MS. HENN:  Objection to

22        form.

23              THE WITNESS:  I would say

24        that we did our due diligence to

1      the best of our ability with the

2      information we had and made sure

3      that what we were distributing to

4      pharmacies was going towards

5      medical purposes and that they

6      were going towards filling

7      prescriptions that were written by

8      doctors.

9           And in -- if and when we

10      determined they weren't, we took

11      action to not ship additional

12      product, as demonstrated by the

13      pharmacies that -- that I closed.

14  BY MR. KENNEDY:

15      Q.    So is the answer to my

16  question "yes"?

17           MS. HENN:   Objection to

18      form.

19  BY MR. KENNEDY:

20      Q.    Is the answer to my question

21  "yes"?

22      A.    I would say no, it isn't a

23  yes.

24      Q.    So it's your position, just

1   when we start off, I want to understand

2   your position from everything that we

3   have heard, McKesson played zero role in

4   causing the opioid crisis that we have in

5   America today?

6                MS. HENN:  Objection to

7        form.

8   BY MR. KENNEDY:

9        Q.    Is that correct?  And that's

10  a clear yes or no.

11       A.    I don't believe we caused

12  it.

13       Q.    I didn't say that.  Did you

14  play a role --

15                MS. HENN:  Counsel.

16  BY MR. KENNEDY:

17       Q.    My question is very simple.

18  Would you agree that McKesson played a

19  role, they didn't cause it all, but

20  played a role in the crisis that we have

21  in America today as it relates to

22  prescription opioids?

23                MS. HENN:  And, Counsel, I

24        would just ask that you let the

1    witness finish his answers.

2             MR. KENNEDY:  I'm sorry.

3             THE WITNESS:  We did play a

4    role as a distributor, yes.

5             MR. KENNEDY:  That's all I'm

6    asking.

7             MS. HENN:  Are you done with

8    your answer?

9             THE WITNESS:  Yes, I am.

10   Thank you.

11   BY MR. KENNEDY:

12            Q.    Now, let me ask you -- I

13   want to -- there may be some things that

14   we can very easily agree upon.  All

15   right?  Because I want to ask you about

16   what McKesson knew or should have known

17   what was going on in America as we

18   continue to discuss what they did and

19   didn't do.  All right?

20            A.    All right.

21            Q.    Late '90s, early 2000s, we

22   have an opioid crisis in the United

23   States of America.  True?

24            A.    I'm not familiar that far

1    back, because I wasn't in regulatory in

2    the late '90s.

3         Q.    Well, let me ask you this,

4    sir.  You've been in the pharmacy

5    industry since 1999, have you not?

6         A.    I worked for Eckerd Drug at

7    that time, yes.

8         Q.    And they are in the pharmacy

9    industry, are they not?

10        A.    Yes.

11        Q.    And then you came to

12   McKesson in '04, correct?

13        A.    That is correct.

14        Q.    And into regulatory in '07,

15   correct?

16        A.    That is correct.

17        Q.    You read newspapers in the

18   2000s, did you not?

19        A.    I was not aware that there

20   was the epidemic that existed when I

21   moved into regulatory in '07.

22        Q.    You knew that by 2001,

23   4.8 million Americans had reported in the

24   media and to the CDC, 4.8 million

1    admitted to abusing prescription opioids

2    by 2001?

3                    MS. HENN:  Objection to

4           form.

5    BY MR. KENNEDY:

6           Q.    You didn't understand that?

7           A.    It wasn't that I didn't

8    understand that.  I wasn't aware that

9    that was the number at 2001, sir.

10          Q.    By 2007, when you went into

11   regulatory, McKesson was already

12   admitting internally, were they not, they

13   were already admitting internally that

14   opioids, prescription opioids that you

15   were selling, were killing more Americans

16   than cocaine and heroin combined, true?

17                   MS. HENN:  Objection to

18          form.

19                   THE WITNESS:  I don't know

20          that McKesson was admitting that.

21          I have -- I heard it in the

22          newspapers and such and on the

23          news.  But I did not hear it

24          internally with McKesson

Highly Confidential - Subject to Further Confidentiality Review

1    correspondence.

2         MR. KENNEDY:  Would you give

3    me 5015, please.

4         Exhibit -- McKesson exhibit,

5    I'm sorry, 545.

6         MS. ROZMAN:  No, it's MCK

7    Oriente 545.  I'm sorry.

8         MS. HENN:  And just for the

9    record, I'd note that these

10   documents have highlighting, is

11   that --

12        MR. KENNEDY:  Yes,

13   highlighting is all by me and

14   there will be writing and it's all

15   by me.

16        MS. HENN:  Thank you.

17        (Document marked for

18   identification as Exhibit

19   MCK-Oriente-545.)

20   BY MR. KENNEDY:

21        Q.   McKesson document, sir, is

22   McKesson up in the right-hand corner?

23        A.   Yes.

24        Q.   It looks like it's a

Highly Confidential - Subject to Further Confidentiality Review

1   national operations conference from 2007,

2   true?  A national conference?

3         A.    Yes, sir.

4         Q.    And who is Don Walker?

5         A.    Don Walker was the senior

6   vice president in distribution

7   operations.

8         Q.    Did you work in operations?

9         A.    I did from '04 through late

10  '07.

11        Q.    Go to Page .3, if you would.

12  This is a McKesson document.

13              Are they telling all folks,

14  at this national conference, "Opioid

15  painkillers kill more than cocaine and

16  heroin combined," on .3?

17        A.    Yes, that's highlighted

18  here.

19        Q.    So McKesson knows it, and

20  they are telling their folks internally

21  by 2007, true?

22        A.    Yes.  That's noted here.

23        Q.    And certainly, sir, given

24  the fact that you work in the pharmacy

1  industry since 1999, you knew and

2  understood that the opioid crisis in

3  America was addicting and killing more

4  Americans every single year, '01, '02,

5  '04, '05, right up to the time that you

6  moved into regulatory, sir, correct?

7            MS. HENN:  Objection to

8        form.

9            THE WITNESS:  I see it here.

10       I didn't recall it previously that

11       that statement was made.

12  BY MR. KENNEDY:

13       Q.    As someone in the industry,

14  sir, since 1999, McKesson since '04, you

15  did not understand that the crisis was

16  getting worse every year?

17            MS. HENN:  Objection to

18       form.

19            THE WITNESS:  I did know

20       that the crisis was increasing.  I

21       just don't recall having seen it

22       in a document that you're

23       presenting here.

24  BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Let's talk about diversion.

2     Tell us what diversion is.

3          A.     Diversion would be the

4     misuse of controlled substances for

5     nonmedical purposes.

6          Q.     A lot of diversion occurs at

7     the pharmacy level, true?

8          A.     There -- I can't say what

9     percent occurs at the pharmacy level.

10    There is internal diversion and theft as

11    well as, you know, external diversion

12    where scripts are filled for nonmedical

13    reasons.

14         Q.     And McKesson certainly knew,

15    understood, as you did, as early as 2002

16    that diversion, the movement of opioids,

17    of narcotics into illegal markets was

18    occurring in the United States, they

19    understood that, did they not?

20              MS. HENN:  Objection to

21         form.

22              THE WITNESS:  I can't speak

23         for all of McKesson.  But I would

24         say that in that time frame, yes,

1    we were aware that there --

2    certainly there was some diversion

3    going on.

4  BY MR. KENNEDY:

5    Q.    It was a significant problem

6  in America.  It wasn't some going on.  It

7  was a big problem in America that was

8  contributing to the crisis, was it not?

9          MS. HENN:  Objection to

10   form.

11          THE WITNESS:  There was

12   diversion going on, sir.  I didn't

13   measure the amount of total

14   diversion going on.

15          MR. KENNEDY:  Give me 1076

16   please.

17          MS. ROZMAN:  This is MCK

18   Oriente 515.

19          (Document marked for

20   identification as Exhibit

21   MCK-Oriente-515.)

22  BY MR. KENNEDY:

23    Q.    Sir, you've -- you've heard

24  of the -- the General Accounting Office

Highly Confidential - Subject to Further Confidentiality Review

1    of the United States government, have you

2    not?

3            A.    Yes, I've heard of the GAO.

4            Q.    This is a May 2002 report,

5    titled "Prescription Drugs:  State

6    Monitoring Programs Provide Useful Tool

7    to Reduce Diversion."  Do you see that?

8            A.    Are you referring to the

9    highlighted paragraph on Page 2?

10           Q.    I'm referring to the title

11   of it, sir.

12           A.    Okay.

13           Q.    That's what it's titled,

14   "Prescription Drugs"?

15           A.    Yes.

16           Q.    If you look at the next page

17   which is .6, do you see the highlighted

18   portion?  And this is 2002.  "The

19   diversion and abuse of prescription drugs

20   are associated with incalculable costs to

21   society in terms of addiction, overdose,

22   death, and related criminal activities."

23   Did I read that right?  Sir?

24           A.    Yes.

1    Q.    And it continues, "DEA has

2    stated that the diversion and abuse of

3    legitimately produced controlled

4    pharmaceuticals constitutes a

5    multibillion-dollar illicit market

6    nationwide."  Do you see that?

7    A.    Yes.

8    Q.    And if your company McKesson

9    is the largest distributor of these

10   narcotics in the country, they certainly

11   should know about what's going on with

12   diversion of the drugs that they are

13   selling to pharmacies, can we agree with

14   that?

15          MS. HENN:  Objection to

16       form.

17   BY MR. KENNEDY:

18   Q.    Can we agree with that, sir?

19          MS. HENN:  Objection to

20       form.

21          THE WITNESS:  Yes, they...

22   BY MR. KENNEDY:

23   Q.    They should know that?

24   A.    They should know about the

Highly Confidential - Subject to Further Confidentiality Review

1  diversion.  This document was from I

2  believe '02.

3          Q.    Yes, sir.

4          A.    I was not at McKesson at the

5  time.

6          Q.    But you're part of the

7  industry.

8          A.    When --

9          Q.    Are you denying the fact

10  that McKesson is the largest distributor

11  of opioids in this country, are you

12  denying the fact that they ought to know

13  about the extent of diversion, sir?

14              MS. HENN:  Objection to

15          form.

16              THE WITNESS:  No, I did not

17          say that they should not know

18          about it.  I'm just stating that

19          in '02 when this document came out

20          I did not work for McKesson.

21  BY MR. KENNEDY:

22          Q.    Can you agree with me, sir,

23  as part of this industry, and someone who

24  has dealt with the DEA his entire career,

¹ can you agree that by the -- by the early

² 2000s, it had become evident that the DEA

³ by itself could not monitor and prevent

⁴ diversion of narcotics into our

⁵ communities.  They couldn't do it by

⁶ themselves.  Correct?

⁷                    MS. HENN:  Objection to

⁸          form.

⁹                    THE WITNESS:  I don't know

¹⁰          what they can and couldn't do.

¹¹               I know that the requirement

¹²          was for a distributor to have a

¹³          program in place to monitor --

¹⁴          monitor and detect suspicious

¹⁵          ordering.

¹⁶                    MR. KENNEDY:  Give me 1086.

¹⁷ BY MR. KENNEDY:

¹⁸          Q.    I'm asking about the DEA and

¹⁹ their abilities and -- and what McKesson

²⁰ knew and understand about the DEA's

²¹ ability to handle the problem by

²² themselves.  All right?  And it was known

²³ by the early 2000s that the DEA by

²⁴ themselves could not prevent the

Highly Confidential - Subject to Further Confidentiality Review

1   diversion of narcotics into our

2   communities.  It was known, was it not?

3            MS. HENN:  Objection to

4       form.

5            THE WITNESS:  Sir, I -- I

6       could not say whether the -- what

7       resources the DEA has for them to

8       do their ability.

9            So I really can't comment

10      whether they could do it alone or

11      not, sir.  I know our requirement

12      is to have a system in place to

13      report --

14  BY MR. KENNEDY:

15      Q.   We'll talk about that.  I

16  just want to ask about --

17           MS. HENN:  Counsel, let's

18      let him answer the question

19      please.

20           MR. KENNEDY:  Go ahead.

21           MS. ROZMAN:  This is Exhibit

22      MCK Oriente 518.

23           MS. HENN:  Did you have any

24      more you wanted to add?

1          THE WITNESS:  No.

2          MS. HENN:  All right.  So

3     I'm handing the witness MCK

4     Oriente 518.

5          (Document marked for

6     identification as Exhibit

7     MCK-Oriente-518.)

8  BY MR. KENNEDY:

9     Q.    See this -- this stated

10 memorandum for ASA Hutchinson,

11 administrator, Drug Enforcement

12 Administration.  Do you see that?

13     A.    Yes.

14     Q.    And it's from the Inspector

15 General.  Have you ever heard of the

16 Inspector General of the United States of

17 America?

18     A.    Yes, I have.

19     Q.    "Subject, review of Drug

20 Enforcement Administration's

21 investigations of the diversion of

22 controlled pharmaceuticals.  Report

23 number I-2002-010."  Do you see that,

24 sir?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes, that's in the subject

2     line.

3          Q.     Does the first title state,

4     "Attached is the final report covering

5     our review of the Drug Enforcement

6     Administration's, DEA, efforts to

7     investigate cases of controlled

8     pharmaceutical diversion"?  Does it state

9     that, sir?

10          A.     It does.

11          Q.     If you'll go to --

12               MS. HENN:  Counsel, does

13          this document have a date?

14               MR. KENNEDY:  This is from

15          2002.

16               MS. HENN:  Thank you.

17     BY MR. KENNEDY:

18          Q.     And if you'll go, sir, to

19     .4.

20          A.     10 percent is all they are

21     diverting.

22          Q.     Are you on .4?  It's up on

23     the screen.

24          A.     Yeah, I'm looking at the

1    document here.  Where is that on this

2    document?

3              Q.    It's on .4, Page .4 up in

4    the right corner, right upper corner,

5    sir.

6              A.    Okay.

7              MS. HENN:  And you can take

8         your time to review it.

9    BY MR. KENNEDY:

10             Q.    Does the Inspector General

11   state here in 2002, "Our review found

12   that DEA's enforcement efforts have not

13   adequately addressed the problem of

14   controlled pharmaceutical diversion"?

15   Does it state that, sir?

16             A.    It does.

17             Q.    "Despite the widespread

18   problem of pharmaceutical abuse, the DEA

19   has dedicated only 10 percent of its

20   field investigator positions to diversion

21   investigations," sir.  Do you see that?

22             A.    Yes.  It says only

23   10 percent.

24             Q.    McKesson is the largest

1    distributor of pharmaceuticals,

2    controlled substances in the country.

3    Shouldn't they understand the abilities,

4    inabilities of the DEA in fighting this

5    problem of diversion?  Shouldn't they

6    understand that?

7                  MS. HENN:  Objection to

8           form.

9                  THE WITNESS:  Sir, I'm --

10          I'm not, you know, in a position

11          to determine what abilities the

12          DEA has.

13                 As far as McKesson, we took

14          our responsibilities, you know,

15          seriously as a distributor and we

16          had our programs in place.

17                 And to -- here I'm reading

18          that the DEA only used 10 percent

19          of its field investigators to look

20          at the problem, and that the

21          overall investigators decreased

22          3 percent during this problem.

23   BY MR. KENNEDY:

24          Q.    Do you have --

1          A.    So for me to say what the

2     DEA should be doing is not in -- is

3     really not my place, sir.

4          Q.    I'm just -- I'm just asking

5     you what the largest distributor in the

6     world should understand about the

7     limitations of the DEA.  All right?

8          A.    Mm-hmm.

9          Q.    But you said something, and

10    I'm going to write it down.

11          I started to write it down.

12    Because we're going to talk about this in

13    a minute.

14          You just said that McKesson

15    took our -- quote, "took our

16    responsibilities very seriously."

17          Is that what you just told

18    me?

19          MS. HENN:  Objection to

20     form.

21    BY MR. KENNEDY:

22          Q.    "McKesson took our

23    responsibilities very seriously."  Is

24    that what you just told me?

1        A.    I believe that's what I

2   said, yes.

3        Q.    We'll come back to that, all

4   right.

5              The United States of America

6   was so concerned about this crisis and

7   about the DEA's ability, they did another

8   follow-up study in 2006.

9              Can we agree that if the

10  federal government is reporting a study

11  with respect to the DEA's ability to

12  fight diversion, McKesson as the largest

13  distributor of these narcotics should

14  know and understand that, sir?

15              MS. HENN:  Objection to

16        form.

17              THE WITNESS:  Sir, it --

18  BY MR. KENNEDY:

19        Q.    I'm just -- can you agree

20  they should know that?

21              MS. HENN:  Objection to

22        form.

23              THE WITNESS:  I believe

24        McKesson should know what is going

1    on in the -- in the industry

2    that -- that we're regulated in.

3    BY MR. KENNEDY:

4        Q.    And they are being regulated

5    by the DEA, right?

6        A.    That is correct.

7            MR. KENNEDY:  Give me 1088,

8        please.

9            MS. HENN:  I'm sorry, did

10       you --

11           THE WITNESS:  I said one of

12       the agencies that regulates us.

13       We also have FDA.

14           MS. ROZMAN:  This is MCK

15       Oriente Exhibit 519.

16           THE WITNESS:  Thank you.

17            (Document marked for

18       identification as Exhibit

19       MCK-Oriente-519.)

20   BY MR. KENNEDY:

21       Q.    Does it say up here on the

22   left of the cover page, "U.S. Department

23   of Justice, Office of the Inspector

24   General, Evaluation and Inspections

Highly Confidential - Subject to Further Confidentiality Review

1  Division."  Is that what it states?

2        A.    It does say that.

3        Q.    Is the title of this report,

4  "Follow-up of the Drug Enforcement

5  Administration's efforts to control the

6  diversion of controlled pharmaceuticals"?

7  Does it state that, sir, is that the

8  title of this program?

9        A.    Yes, it is.

10       Q.    And this is July of 2006.

11  Would that be correct?

12       A.    That's what's stated here,

13  yes.

14       Q.    And if you go to Page .5 in

15  the upper right-hand corner.  Now, this

16  is the follow-up of the DEA by the

17  federal government.

18             And this follow-up in '06,

19  they state, "Despite these positive

20  actions, we identified several continuing

21  concerns.  We found that although the

22  need for special agent assistance in

23  diversion investigations had increased

24  significantly since our previous review,

1    the time spent by special agents

2    assisting diversion investigations still

3    constitutes a small share of their total

4    investigative effort."

5            Do they state that, sir?

6        A.    Yes, that's written here.

7        Q.    They continue to state:  "In

8    addition, we've found that the DEA still

9    had not resolved the complicated issue of

10   providing law enforcement authority for

11   diversion investigators, although it is

12   actively pursuing this matter.  Further,

13   we found that few DEA special agents had

14   received diversion control training

15   beyond the two-hour module provided

16   during basic agent training."

17           And finally:  "In addition,

18   the support provided by intelligence

19   analysts to diversion groups in the field

20   has continued to be limited, and

21   intelligence analysts still received

22   minimal diversion control training."

23           Tell me, '06, you're working

24   at McKesson.  Who read this report at

1   McKesson to understand the limitations of

2   the DEA in assisting and controlling the

3   flow of narcotics to pharmacies?

4                MS. HENN:  Objection to

5           form.

6   BY MR. KENNEDY:

7           Q.    Who?

8                MS. HENN:  Same objection.

9                THE WITNESS:  I cannot tell

10          you who read this report.  I know

11          that I did not.

12  BY MR. KENNEDY:

13          Q.    And at this point in time,

14  you understand, you've been in the

15  industry since '99.  What do we have,

16  40-, 50-, 60,000 pharmacies in the United

17  States at this time, correct, in '06?

18               MS. HENN:  Objection to

19          form.

20               THE WITNESS:  I don't know

21          the exact amount of pharmacies in

22          the United States in '06, sir.

23  BY MR. KENNEDY:

24          Q.    Certainly McKesson knew and

Highly Confidential - Subject to Further Confidentiality Review

1    understand that the DEA alone could not

2    monitor 40-, 50-, 60,000 pharmacies,

3    true?

4              MS. HENN:  Objection to

5         form.

6              THE WITNESS:  I'm sorry.  I

7         can't comment on what the DEA's

8         abilities are.

9    BY MR. KENNEDY:

10        Q.    You talked a lot with

11   Mr. Papantonio.  You talked a lot about

12   suspicious orders.  Do you remember all

13   that discussion?

14        A.    Yes.

15        Q.    And I think you agreed with

16   him that -- that legally, the law

17   requires that McKesson, number one,

18   identify suspicious orders from

19   pharmacies, correct?

20        A.    Yes.

21        Q.    And number two, I think you

22   agreed that the law requires that

23   McKesson, when it identifies a suspicious

24   order, that they report that to the DEA,

Highly Confidential - Subject to Further Confidentiality Review

1  correct?

2      A.    Yes, sir.

3      Q.    And when this new program,

4  this enhanced program came in in 2008,

5  can we agree that McKesson knew and

6  understood not only did they have to

7  recognize suspicious orders, not only is

8  it their lawful duty to report those to

9  the DEA, but they knew and understood

10  that the DEA expected them to not ship

11  suspicious orders?

12      A.    Yes.  Once an order was

13  identified as suspicious, it should not

14  be shipped.

15      Q.    Sir, I'm going to ask you

16  some questions now about -- that maybe

17  will explain some -- some things.

18          We talked about a lot of

19  suspicious orders that you didn't report

20  to the DEA this morning, correct?

21          MS. HENN:  Objection to

22      form.

23  BY MR. KENNEDY:

24      Q.    Correct, sir?

1        A.      They -- they were noted in

2    the report.  I'm -- I'm not familiar with

3    which ones the DEA is saying suspicious

4    that I did not report.

5        Q.      I understand.  But you --

6    you weren't questioning the accuracy of

7    those DEA reports this morning, they

8    weren't making that stuff up, right?

9        A.      I don't believe they were,

10   no.

11       Q.      And I want to take a look,

12   maybe with a little bit of detail, as to

13   why that happened.  All right?

14       A.      Yes.

15       Q.      As I ask you questions

16   though, and as we talk about what

17   McKesson did and didn't do, as we talk

18   about the decisions that McKesson has

19   made along the way, can we agree that

20   it's important to evaluate McKesson's

21   decisions within the framework of what

22   was going on in America at the time, can

23   we agree to that?

24               MS. HENN:  Objection to

```
 1              form.

 2                   THE WITNESS:  You're saying

 3              looking back at it now?

 4    BY MR. KENNEDY:

 5         Q.    That's what we're going to

 6    do.  We're going to -- we're going to

 7    look back at that new program in '08, and

 8    when we look at the decisions that

 9    McKesson made along the way, it's

10    important to look at those decisions

11    within the context of what was going on

12    in America; number one, a crisis, number

13    two, diversion, and number three, a DEA

14    that needed help.  All right?

15                   MS. HENN:  Objection to

16              form.

17    BY MR. KENNEDY:

18         Q.    Can we do that?

19                   MS. HENN:  Same objection.

20                   THE WITNESS:  Okay.

21    BY MR. KENNEDY:

22         Q.    And let's look at the

23    controlled substances monitoring program

24    that came into effect at McKesson in
```

Highly Confidential - Subject to Further Confidentiality Review

1    2008.  All right.  That's where I want to

2    focus maybe the rest of the afternoon.

3    All right?

4         A.    Mm-hmm.

5         Q.    You were a director of

6    regulatory affairs when this new program

7    came into place, true?

8         A.    Yes.

9         Q.    A national program, true?

10        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5          Q.     All righty.

6                 MR. KENNEDY:  Now, can I

7          have the Elmo for a second,

8          please.

9    BY MR. KENNEDY:

10         Q.     I want to go back to your

11   statement here, sir.

12                "McKesson took our

13   responsibilities very seriously."  That's

14   your statement, sir?

15         A.     Right, sir.

16         Q.     And do you know that the

17   president/CEO of McKesson, you talked

18   about earlier, he testified on May 18th

19   of this year in front of Congress.

20   You've seen some clips of that?

21         A.     Yes, I did.

22         Q.     And do you know -- and you

23   watched it.  Do you remember him saying,

24   just like you just said, he said that

1    McKesson took its responsibilities with

2    respect to monitoring controlled

3    substances, they took that responsibility

4    back in '08 very seriously.  Do you

5    remember that?

6            A.    I remember hearing that,

7    yes.

8            Q.    And that is what you've told

9    us here today?

10           A.    I did say that, yes.

11           Q.    All right.  Now, when

12   somebody, when a customer would want

13   to -- let's talk a little bit about how

14   serious y'all took this.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2      Q.      Thank you.

3            MS. HENN:  And I'll just

4      remind the witness that he is

5      entitled to give his answer to the

6      question.

7            MR. KENNEDY:  He's entitled

8      to answer my question.

9            MS. HENN:  Right.

10           MR. KENNEDY:  Not the

11     question he wants to answer.

12           MS. HENN:  Well, we can --

13           MR. KENNEDY:  That's what

14     he's entitled to.  And nothing

15     more.

16           MS. HENN:  And we can

17     disagree about whether you are

18     allowing him to do that.

19     BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22    BY MR. KENNEDY:

23         Q.    You were the head of

24    regulatory, weren't you?

1     A.    Yes, sir.

2           MR. KENNEDY:  Give me 5012

3     please.

4     BY MR. KENNEDY:



18    Q.    And what does RSM stand for?

19    A.    Retail sales manager.

Highly Confidential - Subject to Further Confidentiality Review



21          What is ISMC?  That is

22     independent/small/medium-size customers,

23     right?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14        Q.     Sir, what we've got here,

15   we've got a system.  Again, you told us

16   you were taking this very seriously.

17   You've got a system whereby, number one,

18   let's say a pharmacy is getting low on

19   OxyContin, oxycodone, dangerous drug,

20   right?

21        A.     Strong painkiller.

22        Q.     In the middle of the

23   epidemic, right?

24        A.     That is correct.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8      Q.    You know what, these

9  thresholds that we are talking about

10  here, if we can go back a second, to 5009

11  I think.

12            MS. HENN:  And, Counsel, the

13       deposition protocol requires

14       demonstratives to be entered as

15       exhibits, just to make sure we

16       take back --

17            MR. KENNEDY:  5009 is

18       Exhibit 539.

19            MS. ROZMAN:  This is that

20       one.

21            MS. HENN:  I'm talking about

22       the Elmo demonstratives.

23            MS. ROZMAN:  Oh, I'm sorry.

24            MS. HENN:  Those need to be

Highly Confidential - Subject to Further Confidentiality Review

1          labeled as exhibits at some point.

2  BY MR. KENNEDY:

3          Q.    I want to go back a second

4  here, because we -- we just need to be

5  reminded of this as we go forward.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15        Q.      You know him, right?

16        A.      I worked with Dave, yes.

17        Q.      He is a good guy?

18        A.      That's a commentary, sir.  I

19   mean Dave was --

20        Q.      Well, do you like him, a

21   competent guy, he did a good job for

22   McKesson?

23               MS. HENN:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I believe he

2     did, sir.

3 BY MR. KENNEDY:

4          Q.    And he's -- he's going to

5 follow the rules in the approach that

6 McKesson is taking with respect to these

7 things, isn't he?

8          A.    He would in his

9 interpretation of the program, sir.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



<sup>10</sup>        Q.    Let's continue on.  Let's

<sup>11</sup>  how serious we are all taking this,

<sup>12</sup>  what's going on.

<sup>13</sup>        MS. HENN:  Counsel, it's

<sup>14</sup>        been about an hour since you got

<sup>15</sup>        started.  So I'd ask if it's an

<sup>16</sup>        okay time to take a ten-minute

<sup>17</sup>        break?

<sup>18</sup>        MR. KENNEDY:  Sure.

<sup>19</sup>        THE VIDEOGRAPHER:  Stand by

<sup>20</sup>        please.  The time is 2:57 p.m. Off

<sup>21</sup>        the record.

<sup>22</sup>        (Short break.)

<sup>23</sup>        THE VIDEOGRAPHER:  We are

<sup>24</sup>        back on the record.  The time is

Highly Confidential - Subject to Further Confidentiality Review

1          3:12 p.m.

2                  MR. KENNEDY:  We all set?

3                  THE VIDEOGRAPHER:  All set.

4    BY MR. KENNEDY:

5          Q.    All right, Mr. Oriente, I

6    want to continue to talk about threshold

7    change requests.

8                  Let me show you 5014.

9                  MS. ROZMAN:  Which is MCK

10         Oriente 544.

11           (Document marked for

12         identification as Exhibit

13         MCK-Oriente-544.)

14    BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

5    BY MR. KENNEDY:

6        Q.    All the red handwriting is

7    mine, all right?

8             And if -- if this --

9    attached to this threshold change

10   request, I'm going to start by talking

11   about the e-mails leading up to that

12   threshold change request.  All right.

13            And I put numbers on these,

14   one, two, three, four, five.  And that's

15   so we can follow it through

16   chronologically.  All right.

17            So if you'll go to Page .4.

18            MS. HENN:  And you can take

19        your time reading the whole

20        document if you need to.

21            THE WITNESS:  Okay.

22   BY MR. KENNEDY:

23        Q.    We're going to read the

24   entire document, sir.  All right.  You

Highly Confidential - Subject to Further Confidentiality Review

1    all set?

2           A.    Almost.  Okay.  Thank you.

3           Q.    All right.  E-mail Number 1.

4    Let's start with the first e-mail that's

5    written.  Number 1.  Do you see that on

6    Page .4?

7           A.    Yes, sir.

8           Q.    Now, down at the bottom, on

9    .4, we have an e-mail from Dave Gustin,

10   correct?

11          A.    Yes.  He's the --

12          Q.    And he is -- he is a

13   director of regulatory affairs just like

14   you, true?

15          A.    Yes.  He handled the

16   Northeast region.

17          Q.    And you are in the Northeast

18   region?

19          A.    I'm sorry, I misspoke.  He

20   was in the North Central.  Thank you.

21          Q.    All right.  North Central?

22          A.    Yeah.  Thank you.

Highly Confidential - Subject to Further Confidentiality Review



9      Q.     Who is Snider?

10     A.     Blaine Snider is the DC

11  manager at the New Castle distribution

12  center.

16     Q.     Catton.  And he's in sales,

17  true?

18     A.     Yes, he was vice president

19  of sales.

20     Q.     And the subject on this is

21  New Castle CSMP report.  New Castle is in

22  your region, true?

23     A.     Yes.

24     Q.     And New Castle is what

Highly Confidential - Subject to Further Confidentiality Review

1  services Cayahouga County, Cleveland,

2  Ohio, Summit County, Akron, Ohio, true?

3       A.    They handle all the -- this

4  one regarded Giant -- Giant Eagle.  So

5  they would handle all the Giant Eagle

6  stores.

7       Q.    In that area that I just

8  mentioned, that geographic area?

9       A.    I believe so, yes.

10      Q.    All right.  So the answer to

11  my question is yes, right?

12      A.    Yes.

19      Q.    And so --

20            MS. HENN:  Counsel, just a

21      note.  It looks like this is a

22      reply to a prior e-mail.  Do we

23      not have that e-mail?

24            MR. KENNEDY:  We do not

Highly Confidential - Subject to Further Confidentiality Review

1       have.  You folks didn't produce

2       it.

3               MS. HENN:  Okay.

4   BY MR. KENNEDY:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          Four months later, Diane

16   Martin -- who is Diane Martin?

17          A.    She worked in the

18   distribution center.  I'm not sure what

19   her position was.

20          Q.    She sends an e-mail now on

21   September 22, 2008, correct?

22          A.    Yes.

23          Q.    She sends it to Gustin.  She

24   sends it to Catton in sales.  She sends

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



4        Q.    And hydrocodone is at the

5  center of the opioid crisis that's going

6  on in '08, correct?

7        A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22          Q.    Now, let's -- I'm going to

23   show you some more -- more threshold

24   change requests.  This is a series of

1    different exhibits.

2              And we're not going to use

3    the screen on this one.

4              MR. KENNEDY:  This is a

5         package of different exhibits.

6              MS. ROZMAN:  Collectively we

7         have MCK Oriente 525, 526, 527,

8         528, and 529.

9              (Document marked for

10        identification as Exhibit

11        MCK-Oriente-525.)

12             (Document marked for

13        identification as Exhibit

14        MCK-Oriente-526.)

15             (Document marked for

16        identification as Exhibit

17        MCK-Oriente-527.)

18             (Document marked for

19        identification as Exhibit

20        MCK-Oriente-528.)

21             (Document marked for

22        identification as Exhibit

23        MCK-Oriente-529.)

24   BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

7          Q.     Do you know who Mr. Boggs

8   is?

9          A.     Yes.

10          Q.     Dave Boggs?  Is he above you

11   in the chain, he's a senior regulatory

12   affairs?

13          A.     Not -- not Dave Boggs.

14          Q.     Dave Boggs, what is it?

15          A.     Gary Boggs.

16          Q.     I'm sorry.  Gary Boggs.  He

17   is up above you --

18          A.     Yes.

19          Q.     In fact, he is a senior

20   regulatory --

21          A.     Yes, he is a senior director

22   over the eastern half of the country.

23          Q.     Do you know that he gave

24   testimony on behalf of McKesson on

1   May 23, 2018, so a month ago about?

2        A.    I knew that he did.  Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23      Q.      Let me show you another

24  exhibit, another threshold change

1    request.  All right.

2              MR. KENNEDY:  5017.  This

3    one we'll bring up please.

4              MS. ROZMAN:  This is MCK

5         Oriente 547.

6              (Document marked for

7         identification as Exhibit

8         MCK-Oriente-547.)

9    BY MR. KENNEDY:

10        Q.   And I put numbers on this so

11   we could -- we can follow through in the

12   right order, in the right order of these

13   e-mails.

14             First e-mail chronologically

15   is on the first page.  Now, Dave Gustin,

16   we know Dave Gustin, he is a director of

17   regulatory affairs like you, correct?

18        A.   Yes.

19        Q.   And he is in charge of the

20   entire region?

21        A.   He was in charge of the

22   North Central.  He I believe has since

23   retired.

24        Q.   And you wouldn't expect him

Highly Confidential - Subject to Further Confidentiality Review

1    to be doing things that weren't

2    consistent with the policies of this

3    company, would you?  You wouldn't expect

4    Dave to be doing that, he is a good guy,

5    a good employee.  He is going to -- he is

6    going to follow what McKesson does, won't

7    he?

8         A.    He should -- he should

9    follow the proper procedure, yes.

10        Q.    So Dave Gustin, on

11   December 16, 2008, he sends an e-mail to

12   Michael Bishop.  Do you see that?

13        A.    Yes.

14        Q.    Do you know who Michael

15   Bishop is?

16        A.    Michael Bishop was a

17   regulatory affairs manager.  But at this

18   time he was in the -- in 2008 when this

19   was written, he was in the retail

20   national accounts team.

21        Q.    And what's that?  Does that

22   make him sales?

23        A.    He would have been involved

24   with customer support and sales.

1    Q.    So now we got a -- again, we

2  got a regulatory guy writing an e-mail to

3  sales.  And the subject is could you do

4  me a favor.  Do you see that?

5    A.    Yes.

6    Q.    And he e-mails to Bishop,

7  and he says, "Are you in" -- "are you in

8  today?"  Correct?

9    A.    Yes.

10    Q.    Now, we turn the page.  And

11  it's the same day.  We look at the next

12  e-mail, it's at the top of the page.  And

13  Gustin sends a second e-mail to Bishop on

14  the same day, same subject, could you do

15  me a favor.  Right?

16    A.    Yeah.  Same subject on the

17  e-mail.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          Q.     Not typical?  Go up to the

22    next e-mail, please.  Go up to the next

23    e-mail.

24          A.     Number 7?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Number 7.  We've got Gustin

2    now sending another e-mail.  And it's --

3    it's to a different group of people.  And

4    he's sending it to you also, is he not?

5    A.    Yes.  I'm on -- I'm on

6    the --

7    Q.    December 17th?

8    A.    I'm cc'd.

9    Q.    Okay.  And again, could you

10   do me a favor.  This one isn't -- this is

11   different.  This is not to Bishop.  Now,

12   this is to a different group of people

13   saying, can you do me a favor, right?

14        MS. HENN:  Objection to

15        form.

16   BY MR. KENNEDY:

17   Q.    Right?

18   A.    Well, I'm -- I'm reading it,

19   sir.

20   Q.    I'll -- we'll -- you want

21   to -- we'll go through it.  I'm going to

22   go through it.

23   A.    Yeah, but you asked me a

24   question that I can't answer until I read

Highly Confidential - Subject to Further Confidentiality Review

1    it.

2         Q.    I'm saying, was this to a

3    different group of people?

4              MS. HENN:  Counsel, if you

5         give him a moment he'll answer

6         your question.

7    BY MR. KENNEDY:

8         Q.    Was this to a different

9    group of people?

10        A.    It -- this one is sent to

11   the pharmacy group DC managers.  DCM.

12        Q.    And it's sent to you?

13        A.    I'm cc'd along with the

14   other directors, Tracy and Bill.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8    BY MR. KENNEDY:

9         Q.    You know what, you told us

10   how serious you took this program

11   considering we had a crisis going on in

12   this country.  And so did the president

13   and CEO of your company when he testified

14   in front of Congress.  Let's take a look

15   at that, sir, because I might want to ask

16   you.

17              MR. KENNEDY:  If you can

18         give us 8, please.

19              (Document marked for

20         identification as Exhibit

21         MCK-Oriente-Video-8.)

22              (Video playback.)

23              REP. CASTOR:

24         Mr. Hammergren, your company

1  McKesson distributed over

2  1.8 million opioid pills each year

3  in 20 -- 2006 and 2007 to Family

4  Discount Pharmacy.  That's an

5  average of about 5,000 pills per

6  day in this rural small town.

7        Based upon figures cited by

8  DEA, McKesson shipped Family

9  Discount approximately six times

10  the amount of hydrocodone that an

11  average pharmacy in west -- in

12  rural West virginia would have

13  received during those years.

14        So similar question to you,

15  McKesson delivered millions of

16  pills to the single pharmacy.

17  Clearly that's not reasonable and

18  you should have -- you should have

19  flagged that and stopped that

20  right away.  Why didn't you?

21        MR. HAMMERGREN:  We did

22  terminate the relationship with

23  that pharmacy, and like

24  Mr. Barrett, I -- I would have

Highly Confidential - Subject to Further Confidentiality Review

1    liked to have made a decision

2    faster.

3        REP. CASTOR:  Don't you take

4    responsibility for what was

5    happening back then?  Was it that

6    the -- the profit motive was --

7    simply overcame the -- you saw

8    that paying the penalties on your

9    settlement agreements was a cost

10   worth paying because you were

11   making so much money?

12       MR. HAMMERGREN:

13   Congresswoman, we take all these

14   matters very seriously.  Any

15   settlement with a regulator we

16   take very seriously.  Our systems

17   have evolved and we continue to

18   invest heavily to make sure that

19   situations like that don't happen

20   again.

21       REP. CASTOR:  I think this

22   was the opposite of due diligence

23   that was required under the law

24   and we're going to be looking for

1        greater accountability.  Thank

2        you, and I go back.

3              (Video playback ended.)

4   BY MR. KENNEDY:

5        Q.    You heard him talk about

6   taking the settlement very seriously,

7   didn't you?

8        A.    Yes.

9        Q.    Let's look at another

10  threshold change request if we could.

11  This is 5018.

12              MS. ROZMAN:  MCK Oriente

13        548.

14              (Document marked for

15        identification as Exhibit

16        MCK-Oriente-548.)

17  BY MR. KENNEDY:

18        Q.    Is this another threshold

19  change request, sir?

20        A.    Yes, it is.

21        Q.    And this one, this one is

22  dated 11/26/08, is it not?

23        A.    Yes, it is.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14    BY MR. KENNEDY:

15         Q.    Sir, let me ask -- let me

16    ask you this.

17         A.    Yes.

18         Q.    At this point in time,

19    you're doing business with hundreds of

20    CVSs, right, hundreds of CVSs?

21         A.    Yes.

22         Q.    Who is Don Walker?

23         A.    Don Walker was a senior vice

24    president distribution operations who we

Highly Confidential - Subject to Further Confidentiality Review

1    reported into.

2          Q.    He was a -- he is a national

3    guy, right?

4          A.    Yes, sir.

5          Q.    He makes agreements with

6    CVS, he's making national agreements,

7    right?

8          A.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

3  BY MR. KENNEDY:

4      Q.    This is all very serious

5  because there was an opioid crisis going

6  on, correct?

7      A.    Yes, sir.

8      Q.    Is that right?

9      A.    Yes, sir.

10      Q.    And diversion from

11  pharmacies like CVS was going on, was it

12  not?

13      A.    During this period, I don't

14  know when the CVS had their issues in

15  Florida at two stores.  But yes, there

16  was -- there was an opioid crisis in '08.

17      Q.    Let's look at -- let's

18  continue with CVS.  Let's look at another

19  threshold change request.

20          This is 5013.

21          MS. ROZMAN:  MCK Oriente

22      543.

23          (Document marked for

24      identification as Exhibit

1       MCK-Oriente-543.)

2    BY MR. KENNEDY:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          MR. KENNEDY:  What -- give

20      me 5037, please.

21          MS. ROZMAN:  MCK Oriente

22      564.

23          (Document marked for

24      identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1        MCK-Oriente-564.)

2    BY MR. KENNEDY:

3        Q.    Sir, this exhibit is -- this

4    is an e-mail from Tom McDonald dated May

5    31, 2011.  Do you see that?

6        A.    Yes.

7        Q.    And it's to a whole group of

8    McKesson people.  Do you recognize any of

9    those people?

10        A.    Let me -- just give me a

11    minute to read this.  I recognize some as

12    DC, distribution center managers or

13    directors --

14        Q.    Does it state there --

15        A.    -- of operations.

23        Q.    And does he --

24        A.    Can I have a minute to read

Highly Confidential - Subject to Further Confidentiality Review

1    this?

2              MS. HENN:  Yes, you may.

3    BY MR. KENNEDY:

4         Q.    Well, I'm going to read it

5    through with you.  We're going to read

6    every single word.  We can do that

7    together or you can read it and then

8    we'll read it together.  But I'm going to

9    read every word of it.  All right.

10             A.    Sure, go ahead.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



2          MR. KENNEDY:  Give me 5043

3     please.

4          MS. ROZMAN:  Which is MCK

5     Oriente 570.

6          (Document marked for

7     identification as Exhibit

8     MCK-Oriente-570.)

9  BY MR. KENNEDY:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          MS. HENN:  Objection to

15     form.  And I'd just like to note

16     to the people on the phone,

17     there's somebody without their

18     mute button on, and if everyone

19     could just make sure you are on

20     mute, we would appreciate it.

21  BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15      MR. KENNEDY:  Now, give me

16  5036.

17  BY MR. KENNEDY:

18      Q.   I'm going to look at what

19  McKesson agreed to in the DEA 2008

20  settlement agreement with respect to

21  reviewing customers that ordered over

22  their threshold.  All right?

23      MS. ROZMAN:  That's MCK

24  Oriente 563.

Highly Confidential - Subject to Further Confidentiality Review

```
1              (Document marked for
2         identification as Exhibit
3         MCK-Oriente-563.)
4              MS. HENN:  And we will need
5         a break relatively soon if there
6         is a good spot to stop.
7  BY MR. KENNEDY:
8         Q.    Do you see that, Page 1?
9         A.    Mm-hmm.
10        Q.    This is the settlement
11 agreement between the Department of
12 Justice and the DEA and McKesson.  True?
13        A.    Yes.  Yes.
14        Q.    All right.  And this says,
15 "This agreement is applicable to all of
16 McKesson's distribution centers," right,
17 when it says, "DEA registered
18 facilities."  True?
19        A.    Yes.
20        Q.    If you go to Page .3.  See
21 where it says terms and conditions?
22        A.    Yes, sir.
23        Q.    And it says obligations of
24 McKesson?
```

1      A.    Yes.

2      Q.    And this is what McKesson

3   agreed to with the United States

4   government, right?

5      A.    Yes.

6      Q.    And this is after the

7   payment of a $13 million fine, true?

8      A.    Yes.

9      Q.    And it states under McKesson

10  obligations, "A, McKesson agrees to

11  maintain a compliance program designed to

12  detect and prevent diversion of

13  controlled substances as required under

14  the CSA and applicable DEA regulations.

15          "This program shall include

16  procedures to review orders for

17  controlled substances."

18          This is the important part:

19  "Orders that exceed established

20  thresholds and criteria will be reviewed

21  by a McKesson employee trained to detect

22  suspicious orders for the purposes of

23  determining whether, I, such orders

24  should not be filled and reported to the

1    DEA, or II, based upon a detailed review,

2    the order is for a legitimate purpose and

3    the controlled substances are not likely

4    to be diverted into other than legitimate

5    medical, scientific or industrial

6    channels."

7              Do you see that?

8         A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          MS. ROZMAN:  This is MCK

18     Oriente 559.

19          (Document marked for

20     identification as Exhibit

21     MCK-Oriente-559.)

22     BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



22          Q.     He is a part of sales,

23    right?

24          A.     He's an account manager,

Highly Confidential - Subject to Further Confidentiality Review

1   yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6    BY MR. KENNEDY:

24    BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



11          MR. KENNEDY:  5035, please.

12          THE WITNESS:  It has no

13     determination on my decision when

14     I made them working on my

15     customers in the Northeast in

16     regulatory.

17          MS. HENN:  Counsel, is this

18     a good time for a break?  We've

19     been going about an hour and

20     20 minutes.

21          I'm going to just ask for a

22     break.  Thank you.

23          MR. KENNEDY:  Yeah, that's

24     fine.

1    THE VIDEOGRAPHER:  Stand by

2    please.  Remove your microphones.

3    The time is 5:40 p.m.  Off the

4    record.

5         (Short break.)

6    THE VIDEOGRAPHER:  We are

7    back on the record.  The time is

8    4:56 p.m.

9  BY MR. KENNEDY:

10    Q.    All right, Mr. Oriente.  We

11  just asked to take a look at 5035 if we

12  could.

13    MS. ROZMAN:  Which is MCK

14    Oriente 562.

15         (Document marked for

16    identification as Exhibit

17    MCK-Oriente-562.)

18    MS. HENN:  562 you said?

19    MS. ROZMAN:  Yeah.  Here --

20    MS. HENN:  Oh, this is new?

21    MS. ROZMAN:  Yeah.

22    THE WITNESS:  Thank you.

23  BY MR. KENNEDY:

24    Q.    And you had indicated that

Highly Confidential - Subject to Further Confidentiality Review

1    you didn't really know and understand how

2    the salespeople were compensated at

3    McKesson, is that right?

4          A.     That is correct.  I didn't

5    get involved with compensation plans for

6    sales.

7          Q.     Here is a memo to U.S.

8    pharmaceutical retail sales team.  Do you

9    see that?

10         A.     Yes.

11         Q.     Dated April 1, 2010?

12         A.     Yes.

13         Q.     Talking about the

14   compensation plan.  Do you see that?

15         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MR. KENNEDY:  Can you read

13     back the question.

14  BY MR. KENNEDY:

15          Q.    I want you to listen to the

16  question and I want you to try to answer

17  my question as opposed to giving speeches

18  about what you want to talk about.  Is

19  that agreeable?

20          MS. HENN:  Counsel.

21  BY MR. KENNEDY:

22          Q.    So I'm going to read back

23  the question and you try to answer it

24  again.

Highly Confidential - Subject to Further Confidentiality Review

1     MR. KENNEDY:  Go ahead,

2  please.

3     (Whereupon, the court

4     reporter read back the requested

5     portion of testimony.)

6  BY MR. KENNEDY:

7     Q.    Do you agree with that

8  statement, sir?

9     A.    Yes.

10     Q.    Go back for a second.  I

11  want to still talk about these Level 1

12  reviews if we could.

13     MR. KENNEDY:  Go back to

14  5036.  I want to --

15     MS. HENN:  5036?

16     MR. KENNEDY:  Yes, 5036

17     which is Exhibit 563.

18  BY MR. KENNEDY:

19     Q.    This is the agreement that

20  you made with the FDA.  Again, I think

21  it's Page 12.

22     MS. HENN:  DEA, counsel.

23  BY MR. KENNEDY:

24     Q.    Yeah.  This is the agreement

1    with the DEA in 2008.  And we're back to

2    the obligations.

3                   It's right up on the board

4    if...

5                   MS. HENN:  Do you have the

6         document?

7                   THE WITNESS:  Yeah, but

8         it's page -- 563 --

9                   MR. KENNEDY:  I'm sorry,

10        Page 3.

11                  THE WITNESS:  -- only has 11

12        pages, so it can't be on Page 12.

13                  MS. HENN:  Page 3.

14                  THE WITNESS:  Okay.  Thank

15        you.

16   BY MR. KENNEDY:

17        Q.    Page 3.

18        A.    Okay.

19        Q.    This is the agreement again.

20   This is your -- McKesson's agreement with

21   the DEA in 2008 after paying the

22   $13 million fine.  This is what they

23   agreed with respect to reviewing folks

24   that went over the thresholds.

1    The red line, orders that

2  exceed thresholds, it says, "Establish

3  thresholds and criteria, will be reviewed

4  by a McKesson trained to detect

5  suspicious orders for the purposes of

6  determining whether, I, such orders

7  should be not filled and reported to the

8  DEA, or II, based upon a detailed review

9  the order is for a legitimate purpose and

10  the controlled substances are not likely

11  to be diverted into other than legitimate

12  scientific or industrial channels."

13    Now, from what you've told

14  me, and from what the CEO from your

15  company told Congress, you took this

16  seriously, right, this is important.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21     Q.     And it was for oxycodone.

22  That drug is in the middle of this

23  crisis, is it not, sir?

24     A.     Oxycodone is one of the

Highly Confidential - Subject to Further Confidentiality Review

1    drugs in this crisis, yes.

2            Q.    Not just one of them, sir.

3    It's in the middle of the crisis.  Right?

4            A.    Well, I mean it -- I can't

5    say that oxycodone was any worse than

6    hydrocodone.  They were -- You know, it

7    depends on the area of the country.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20        Q.    Let's change -- let me --

21   let me ask you how serious these

22   investigations were at McKesson.

23             MR. KENNEDY:  Give me 5039.

24             MS. ROZMAN:  Identified as

1          MCK Oriente 566.

2                    (Document marked for

3          identification as Exhibit

4          MCK-Oriente-566.)

5    BY MR. KENNEDY:

6          Q.    This is an e-mail from Jake

7    Kramer.  Who is Jake Kramer?

8          A.    Jake Kramer was the

9    distribution manager in Denver

10   distribution center.

11         Q.    He's sending an e-mail on

12   February 28, 2012 to Robert Perrich,

13   true?

14         A.    Yes.  I don't know what

15   position Robert Perrich held or holds.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16    MR. KENNEDY:  Let's go to

17    5042.

18    MS. ROZMAN:  MCK Oriente

19    569.

20    (Document marked for

21    identification as Exhibit

22    MCK-Oriente-569.)

23 BY MR. KENNEDY:

24    Q.  Sir, this is an e-mail from

1    Jake Kramer.  And Jake Kramer again is

2    who?

3         A.    Jake Kramer was the

4    distribution center manager in the Denver

5    distribution center.

6         Q.    This is August 19, 2010.  Do

7    you see that?

8         A.    Yes.

9         Q.    To John Schultz, right?  Do

10   you know who John Schultz is?

11        A.    I don't.

12        Q.    What about cc'd to

13   Saltzgaber?

14        A.    I don't know Kirk either.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23    MR. KENNEDY:  Give me 5040

24    please.

Highly Confidential - Subject to Further Confidentiality Review

1          MS. ROZMAN:  Identified as

2      MCK Oriente 567.

3          (Document marked for

4      identification as Exhibit

5      MCK-Oriente-567.)

6   BY MR. KENNEDY:

7      Q.    This e-mail string --

8          MS. HENN:  Hang on.  Sorry,

9      I haven't gotten it to him yet,

10     Counsel.

11         THE WITNESS:  Thank you.

12  BY MR. KENNEDY:

13     Q.    Do you see the e-mail, it

14  starts at the bottom.  The first e-mail

15  is from Tom McDonald to Jake Kramer.  Who

16  is Tom McDonald?

17     A.    Tom McDonald is the director

18  of regulatory affairs, was the director

19  of regulatory affairs in the West region.

20  He now has responsibility for the SoCal

21  distribution center and Sacramento

22  distribution center.  Two DCs only in the

23  West now.



6    BY MR. KENNEDY:

7         Q.    So yeah, let's go back, now

8    that you bring up this 2013.

9              2008, McKesson gets fined

10   $13 million for not reporting suspicious

11   orders, correct?

12        A.    Yes.

13        Q.    Now, they say we're going to

14   change things around here.  We're

15   changing it, we're putting in a new

16   program.

17             And five years later, in

18   2013, now you're shutting programs down,

19   correct, now you're shutting folks down

20   and you're getting shut down in 2013.

21             MS. HENN:  Objection to

22        form.

23             THE WITNESS:  I'm not aware

24        where we were shut down as far --

Highly Confidential - Subject to Further Confidentiality Review

1          I mean in my distribution centers

2          in the Northeast I believe we had

3          certain DCs that could not ship

4          controls, yes.

5     BY MR. KENNEDY:

6          Q.    And were you sanctioned

7     again in 2013?

8          A.    Yes.

9          Q.    So 2008, we're going to turn

10    over a new leaf and put in a new program.

11    And so you were sanctioned, you got a

12    problem again in 2013.  And then in 2017,

13    sir, you pay a $150 million fine for once

14    again not reporting suspicious orders.

15    Is that true?

16          MS. HENN:  Objection to

17          form.

18          THE WITNESS:  I don't know

19          the exact year that it was paid.

20          But yes, I know we paid a fine of

21          about $150 million.

22    BY MR. KENNEDY:

23          Q.    So '08 we're going to do it

24    right.  Then in 2013 you are still not

1  doing it right.  And then in 2017,

2  $150 million fine because you're still

3  not doing it right.  And now we are in

4  2018.  Is that the sequence of your

5  interactions with the DEA with respect to

6  their actions and their sanctions and

7  your fines, sir?

8           MS. HENN:  Objection to

9      form.

10          THE WITNESS:  I believe

11     there were two fines paid by

12     McKesson.  So what you're

13     referring to I believe was in '08,

14     and then the second one was paid

15     in 2017 that -- that I'm

16     referencing.  I don't know of

17     three.  You mentioned '8, '13 and

18     '17.

19 BY MR. KENNEDY:

20     Q.    I want to talk a little bit

21 about these regional national accounts.

22 Those are the big customers, right?

23     A.    Yes.  Yes.

24     Q.    Those are the ones where

1  McKesson makes its most money?

2        A.    Again, sir, I'm not in sales

3  so I don't know where we're making more

4  profit, whether it's an independent or

5  retail national accounts.  I don't look

6  at the dollars and cents.

7        Q.    The majority of your

8  customers, if we look at individual

9  pharmacies, are the majority of them part

10 and parcel of regional national accounts,

11 the big chains?

12              MS. HENN:  Objection to

13       form.

14 BY MR. KENNEDY:

15       Q.    Would that -- would that be

16 true?

17       A.    Could you repeat the

18 question?

19       Q.    Are the majority of your

20 pharmacies part of regional national

21 accounts, the big chain pharmacies?

22              MS. HENN:  Objection to

23       form.

24              THE WITNESS:  I don't know

Highly Confidential - Subject to Further Confidentiality Review

1          the amount of the small

2          independent customers.  I know in

3          the retail national accounts we

4          have close to 20,000 registrants.

5     BY MR. KENNEDY:

6          Q.    20,000.  When you entered

7     into this settlement in 2008 with the DEA

8     and the Department of Justice, and you

9     instituted this new program, in addition

10    to identifying suspicious orders, you

11    told the DEA that you would institute a

12    program of knowing your customer.  True?

13         A.    Yes.

14         Q.    In fact, if we look at the

15    program that was put together, you

16    emphasize, we're going to -- we're

17    looking at suspicious orders with

18    thresholds.  But in order to prevent

19    diversion, to control the flow of opioids

20    into the country, we're going to know our

21    customer, right?

22         A.    That was part of it, yes,

23    sir.

24              MR. KENNEDY:  We want to

Highly Confidential - Subject to Further Confidentiality Review

1    look at 512.  Is that one of --

2              MS. ROZMAN:  Well, it's

3    Exhibit 62 now.

4              MR. KENNEDY:  62.  Look at

5    62, and it's 345.

6              MS. HENN:  I'm sorry, which?

7              THE WITNESS:  62, this one.

8              MS. ROZMAN:  It's

9    Exhibit 62.

10             MS. HENN:  562?

11             MR. KENNEDY:  Yeah, and it's

12   our P-345.  This is the first --

13             THE WITNESS:  Is this the

14   one?

15             MS. ROZMAN:  No, no.  It's

16   Exhibit 62.

17             MR. KENNEDY:  You can just

18   look up if you want.

19             THE WITNESS:  Oh, oh.  It's

20   that one.

21   BY MR. KENNEDY:

22        Q.    We're just going to read the

23   first page.  It's up on the screen.

24             MS. HENN:  Just a second,

Highly Confidential - Subject to Further Confidentiality Review

1    we'll get it.

2              THE WITNESS:  Yeah, 62.

3    BY MR. KENNEDY:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12        Q.     But if a big chain like CVS

13    breaches their threshold, the call went

14    to their corporate headquarters, their

15    regulatory department, their oversight

16    department.  Correct?

17        A.     Yes, I believe that's how it

18    worked.

19        Q.     So if a CVS store in Idaho

20    places an order above their threshold,

21    you are calling Providence, Rhode Island.

22    You are calling the corporate office with

23    respect to that Level 1 --

24             MS. HENN:  Objection to

1          form.

2    BY MR. KENNEDY:

3          Q.    -- to find out what's going

4    on in Idaho, correct?

5                MS. HENN:  Objection to

6          form.

7                THE WITNESS:  Right.

8          Because they had -- they perform

9          their own due diligence internal

10         regulatory review.

11   BY MR. KENNEDY:

12         Q.    Okay.  I'm going to write

13   that down.  I got a paper.

14               MS. ROZMAN:  We're going to

15         mark as MCK Oriente 574.

16               MR. KENNEDY:  I'm going to

17         put that up please.

18               (Document marked for

19         identification as Exhibit

20         MCK-Oriente-574.)

21   BY MR. KENNEDY:

22         Q.    So these national chains,

23   the big customers, the CVS, they do their

24   own due diligence, they've got their own

1    regulatory department, correct?

2         A.    Yes.

3         Q.    And CVS, now that's a

4    customer that you're doing over

5    $10 billion worth of business with,

6    right?

7              MS. HENN:  Objection to

8         form.

9              THE WITNESS:  Again, sir, I

10        don't know the exact dollar amount

11        that McKesson does with each

12        chain.

13   BY MR. KENNEDY:

14        Q.    Let me ask you, sir, real

15   simple question.

16            If you're going to rely upon

17   somebody like CVS to do the due

18   diligence, you want to make sure they are

19   doing a good job, don't you?

20        A.    We want to make sure they

21   are following the requirements

22   established for them, yes.

23        Q.    I mean that's -- you've got

24   to make sure.

1        A.    Yeah, we -- yes.

2        Q.    Sir, in 2010, do you

3    understand CVS paid a $77 million penalty

4    in California, do you know that?

5        A.    In California, I was not

6    aware.  I knew they did in Florida have

7    some stores.  But I wasn't aware of

8    California.

9             MR. KENNEDY:  505, please.

10        5005.

11             MS. ROZMAN:  Identified as

12        MCK --

13             MR. KENNEDY:  5 -- yeah,

14        5005.

15             MS. ROZMAN:  MCK Oriente

16        535.

17             (Document marked for

18        identification as Exhibit

19        MCK-Oriente-535.)

20    BY MR. KENNEDY:

21        Q.    Here's -- this is from the

22    New York Times.  "CVS to pay penalty in

23    methamphetamine case," 2010, New York

24    Times.

1              Folks at McKesson get the

2    New York Times, right?

3         A.    Sir, I don't know what

4    newspapers they do get.  I know I have

5    not seen this before.

6         Q.    Well, "CVS Caremark has

7    agreed to pay $77.6 million to settle an

8    investigation that its drug stores

9    allowed widespread sales of cough

10   medicines used to manufacture the

11   stimulant methamphetamine."  That's a

12   street drug, right, highly addictive,

13   kills people.  Is that right?  You know

14   what methamphetamine is.

15        A.    Yes.

16              MS. HENN:  Objection to

17        form.

18              THE WITNESS:  Yes, it's made

19        from cough medicines.

20   BY MR. KENNEDY:

21        Q.    So CVS Pharmacy, a

22   subsidiary, acknowledged that it had sold

23   pseudoephedrine to criminals who used it

24   to make meth.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yeah, that's highlighted

2     here in Paragraph 2.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2    BY MR. KENNEDY:

3        Q.    But look at -- you have the

4    duty to know your customer.  And if your

5    customer pays a $77.6 million fine,

6    McKesson ought to know about that, they

7    have the duty to know their customer.

8    And this is their biggest customer,

9    right?

10            MS. HENN:  Objection to

11        form.

12    BY MR. KENNEDY:

13        Q.    Yes?

14        A.    This may -- this may have

15    been known by McKesson, sir.  It was not

16    known by me, being responsible for the

17    Northeast region that in California they

18    paid this fine.

19            MR. KENNEDY:  Give me 5004,

20        please.

21            MS. ROZMAN:  Identified as

22        MCK Oriente 534.

23            (Document marked for

24        identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

1          MCK-Oriente-534.)

2     BY MR. KENNEDY:

16          Q.    Sir, are they CVS stores?

17          A.    Excuse me?

18          Q.    Are they CVS stores?

19                MS. HENN:  Objection to

20     form.

21                THE WITNESS:  The -- the two

22     stores in this article?

23     BY MR. KENNEDY:

24          Q.    Yes.

1          A.     Yes, they are.

2          Q.     Thank you.  Now, does it

3    state here, "Story highlights.  The DEA

4    says two pharmacies ordered more than

5    3 million oxycodone units in a year.  A

6    typical pharmacy orders 69,000 units a

7    year."  And they ordered 3 million.  Do

8    you see that?  Did I read that right?

9          A.     Yes.

10          Q.     And then it states, "Agents

11   from the Drug Enforcement Administration

12   raided two CVS pharmacies in Central

13   Florida over the weekend, removing

14   controlled substances and suspending the

15   stores' ability to handle or distribute

16   drugs such as painkillers, oxycodone and

17   hydrocodone."

18          Did I read that right?

19          A.     Yes.

20          Q.     And sir, can we agree that

21   if McKesson has the duty to know its

22   customers, they certainly should have

23   known about this, right?

24          A.     We did know about -- we

1   heard about this.  Are these two

2   customers with McKesson in Florida?

3           Q.    Did you know about this with

4   respect to McKesson, sir?  Did you know

5   about this --

6           A.    I heard --

7           Q.    Did you hear about this?

8           A.    I heard about this, yes.

9           Q.    All right.  And let me ask

10  you this, sir.

11          A.    And again --

12          MS. HENN:  Counsel.

13  Counsel --

14          THE WITNESS:  Can I finish,

15      please?

16  BY MR. KENNEDY:

17          Q.    I just asked you if you

18  heard about it and the answer was yes.

19          MS. HENN:  Counsel, he had

20      something else to say.

21          MR. KENNEDY:  But he can't

22      give speeches.  You have to answer

23      my questions.

24          MS. HENN:  He's not giving

1      speeches.  He's trying to answer.

2  BY MR. KENNEDY:

3      Q.    My -- my question is very

4  simple.  Did you hear about this?

5           MS. HENN:  Asked and

6      answered.

7           THE WITNESS:  I heard about

8      the two stores in Florida, yes.

9  BY MR. KENNEDY:

10     Q.    And my question to you now

11 is, at this point in time, in 2012, after

12 finding out this, did you folks sit down

13 and say maybe we shouldn't be letting CVS

14 monitor themselves out of their corporate

15 headquarters in Rhode Island, maybe we

16 should monitor them when they exceed

17 their threshold?

18          MS. HENN:  Objection.

19 BY MR. KENNEDY:

20     Q.    Did anybody sit down and

21 have that kind of meeting in 2012?

22          MS. HENN:  Objection to

23     form.

24 BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did you go to such a
2    meeting?
3    A.    That -- I did not go to such
4    a meeting.  That type of meeting would
5    have been handled by our senior vice
6    president Don Walker.
7    Q.    Did anybody come to you and
8    say this meeting occurred, even if you
9    didn't go to it?
10   A.    I don't recall if one did
11   occur.
12   Q.    And if you can give me --
13   this resulted in a $22 million fine.  Do
14   you understand that, to CVS, a
15   $22 million fine?
16   A.    Yes, I am aware.
17   Q.    So at this point CVS has
18   paid $150 million in 2010, and now
19   another $22 million in 2012.  Right?  And
20   they are your biggest customer, they are
21   the biggest customer of McKesson, are
22   they not?
23        MS. HENN:  Objection to
24        form.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  I do not know

2           who our largest customer is, sir.

3    BY MR. KENNEDY:

4           Q.    By 2012, you're doing

5    $19 billion worth of business with CVS.

6    You didn't know that?

7                    MS. HENN:  Objection to

8           form.

9                    THE WITNESS:  No, sir.  I

10          don't look at dollars with

11          customers.  I am not in sales.

12   BY MR. KENNEDY:

13          Q.    Let's go to -- let's go to

14   2013.

15                   MR. KENNEDY:  If you can

16          give me 305, please.

17                   MS. ROZMAN:  Identified MCK

18          Oriente 511.

19              (Document marked for

20          identification as Exhibit

21          MCK-Oriente-511.)

22   BY MR. KENNEDY:

23          Q.    Now, this is -- this is a

24   publication by the United States

1  Attorney's Office.  Do you see that?

2         A.    Yes.

3         Q.    And the date is April 3,

4  2013.  Correct?

5         A.    Yes.

6         Q.    You see -- the headline is

7  "CVS to pay 11 million to settle civil

8  penalty claims involving violations of

9  the Controlled Substances Act."

10              And then it states, "The

11  United States has alleged that from

12  October 6, 2005, to October 5th of 2011,

13  CVS pharmacy stores in Oklahoma and

14  elsewhere violated the Controlled

15  Substances Act and the recordkeeping

16  regulations by creating, entering, and

17  maintaining invalid dummy DEA

18  registration numbers or numbers other

19  than the valid DEA registration number of

20  the prescribing practitioner on

21  dispensing records, which were at times

22  provided to state prescription drug

23  monitoring programs."

24              Did I read that right?

1    A.    That is what is written

2  here.

3    Q.    And these CVS stores in

4  several states, Oklahoma and elsewhere

5  were filling prescriptions for certain

6  prescribers whose DEA registration

7  numbers were not current or valid.  Did

8  you see that?

9    A.    Yes.

10    Q.    And in knowing your customer

11  as was your obligation, McKesson should

12  have known about this $11 million fine,

13  right?

14          MS. HENN:  Objection to

15      form.

16  BY MR. KENNEDY:

17    Q.    Is that right?  They should

18  have known about it.  They had the duty

19  to know their customers.  And this is an

20  $11 million fine.  They should have known

21  about this.  True?

22          MS. HENN:  Objection to

23      form.

24          THE WITNESS:  They --

Highly Confidential - Subject to Further Confidentiality Review

1           McKesson may have known about

2           this.  I can't say.

3    BY MR. KENNEDY:

4           Q.    Well, I'm not talking about

5    whether they did or they didn't.

6                 MS. HENN:  Counsel, please.

7    BY MR. KENNEDY:

8           Q.    My question is real simple:

9    Should they?

10                MS. HENN:  Let him finish

11          his sentences.

12                MR. KENNEDY:  But I want him

13          to answer my question.

14   BY MR. KENNEDY:

15          Q.    Go ahead.

16                MS. HENN:  I know it's late

17          in the day, but it's basic --

18   BY MR. KENNEDY:

19          Q.    Here's my question.  I'm --

20   we'll start all over.

21                Would you agree that

22   pursuant to McKesson's obligation to know

23   their customer, they should have known

24   about this $11 million fine in Oklahoma?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. HENN:  Objection to

2      form.

3          THE WITNESS:  I -- I can't

4      say that McKesson didn't know

5      about this.  At a -- at a higher

6      level than me they may have been

7      aware of this.

8  BY MR. KENNEDY:

9      Q.    And they should have been,

10 correct?

11         MS. HENN:  Objection to

12     form.

13         THE WITNESS:  They --

14 BY MR. KENNEDY:

15     Q.    They should have been.

16     A.    They should have and could

17 have.  I do not know if, you know, the --

18 the vice president that I reported into

19 knew about this.  I'm sure that he may

20 have.  But for me to be in the Northeast

21 region and to know about Oklahoma, I'm

22 not -- I'm not going to be aware of that.

23     Q.    I'm going to ask you.  It's

24 2013.  Now, did -- did anybody above you

1    say look it, you are a director of

2    regulatory affairs for one of our

3    regions.  How many folks had your job,

4    your similar job in the country?

5            A.    Four.

Highly Confidential - Subject to Further Confidentiality Review

2                MR. KENNEDY:  Give me 301,

3        please.  Now it's 2015.

4                MS. ROZMAN:  MCK Oriente

5        507.

6                (Document marked for

7        identification as Exhibit

8        MCK-Oriente-507.)

9    BY MR. KENNEDY:

10       Q.    Now, it's 2015, sir.  2015.

11   Now we've got a -- we've got a

12   publication here again by the United

13   States Attorney's Office, do we not?

14       A.    Yes.

15       Q.    And this, this headline, and

16   this is from August 10, 2015, correct?

17       A.    Yes.

18       Q.    And the quote is, or excuse

19   me, the headline is "Drug diversion

20   claims against CVS Health Corp. resolved

21   with $450,000 civil settlement."  Do you

22   see that?

23       A.    Yes.

24       Q.    And then it says, the first

1  paragraph, "Pharmacy chain CVS Health

2  Corp. has agreed to pay $450,000 to

3  resolve the United States' allegations

4  that several of its Rhode Island stores

5  violated the federal Controlled

6  Substances Act by filling invalid

7  prescriptions and maintaining deficient

8  records."  Do you see that?

9      A.    Yes.

10      Q.    Let me ask you, who in the

11  regulatory department was in charge of

12  CVS?

13      A.    In August of 2015 I believe

14  it may have been Tom McDonald.

15      Q.    And who was in charge in

16  2012?

17      A.    I'm not certain if it was me

18  or Tom.

19      Q.    And who was in charge in

20  2010?

21      A.    I'm not certain if it was me

22  or Tom.  We switched accounts sometime

23  during that time frame.

24          MR. KENNEDY:  Give me 297

Highly Confidential - Subject to Further Confidentiality Review

1          please.

2                    MS. ROZMAN:  Identified as

3          MCK Oriente 504.

4                    (Document marked for

5          identification as Exhibit

6          MCK-Oriente-504.)

7     BY MR. KENNEDY:

8          Q.    Another publication by the

9     United States Attorney's Office.  Do you

10    see here McKesson, excuse me, CVS is

11    paying an $8 million fine to settle

12    allegations for unlawful distribution of

13    controlled substances.  Do you see that?

14         A.    Yes.

15                   MR. KENNEDY:  Give me 300,

16         please.

17                   MS. ROZMAN:  MCK Oriente

18         506.

19                   (Document marked for

20         identification as Exhibit

21         MCK-Oriente-506.)

22    BY MR. KENNEDY:

23         Q.    Now, it's 2016.  Publication

24    by the United States Attorney's Office,

1  District of Massachusetts.  Headline,

2  "CVS to pay $3.5 million to resolve

3  allegations that pharmacists filled fake

4  prescriptions."  Do you see that, sir?

5         A.    Yes.

6         Q.    And you're in charge of CVS

7  by this time, aren't you?

8         A.    2016, yes.

9         Q.    So you knew about this,

10  right, because you've got a duty to know

11  your customer.  You knew about this,

12  right?

13        A.    I don't recall if I saw this

14  precise document.

15              MR. KENNEDY:  Give me 296,

16        please.

17              MS. ROZMAN:  McKesson -- MCK

18        Oriente 503.

19              (Document marked for

20        identification as Exhibit

21        MCK-Oriente-503.)

22  BY MR. KENNEDY:

23        Q.    Now, it's 2017.  We have

24  another publication by the United States

Highly Confidential - Subject to Further Confidentiality Review

1    Attorney's Office, Eastern District of

2    California.  Correct?  Do you see that?

3            A.    Yes.

4            Q.    And the headline reads, "CVS

5    Pharmacy pays $5 million to settle

6    alleged allegations of the Controlled

7    Substances Act."  Do you see that, sir?

8            A.    Yes.

9                  MR. KENNEDY:  Give me 5007

10           please.

11                 MS. ROZMAN:  MCK Oriente

12           537.

13                 (Document marked for

14           identification as Exhibit

15           MCK-Oriente-537.)

16                 MS. HENN:  And Counsel, just

17           to note, I believe we have about

18           five minutes left.

19   BY MR. KENNEDY:

20           Q.    Mr. Oriente, this is a chart

21   that we created of CVS, DEA, Department

22   of Justice settlements between 2010 and

23   2016 that we've been talking about.

24                 In a six-year period, CVS

1    paid $130.6 million worth of fines for

2    violating the Controlled Substances Act

3    at the pharmacy level.  Do you see this,

4    sir?

5            A.    Yes, I see that.

6            Q.    And let me ask you, at any

7    single point in time, did anybody, did

8    anybody above you, around you, say we

9    need to have a meeting because maybe,

10   maybe we shouldn't be letting CVS

11   corporate monitor themselves?

12              MS. HENN:  Objection to

13         form.

14   BY MR. KENNEDY:

15         Q.    Did anybody ever hold that

16   meeting, sir?

17              MS. HENN:  Objection to

18         form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2          MR. KENNEDY:  Thank you.  I

3     got nothing further.

4          MS. HENN:  I'm going to have

5     some questions so I suggest we go

6     off the record.

7          THE VIDEOGRAPHER:  Stand by

8     please.  The time is 5:42 p.m.

9     Going off the record.

10          (Short break.)

11          THE VIDEOGRAPHER:  We are

12     back on the record.  The time is

13     5:54 p.m.

14               -  -  -

15               EXAMINATION

16               -  -  -

17 BY MS. HENN:

18     Q.    Mr. Oriente, you testified

19 earlier today that you joined McKesson in

20 2004, is that correct?

21     A.    Yes.  2004.

22     Q.    And before joining McKesson

23 you worked as the director of operations

24 and distribution at Eckerd?

1    A.    Yes.

2    Q.    When you joined McKesson you

3 were the director of operations for the

4 Delran, New Jersey, distribution center,

5 is that correct?

6    A.    That is correct.

7    Q.    And in 2007 you became

8 director of regulatory affairs overseeing

9 a number of distribution centers?

10    A.    Yes.  The Northeast region.

11    Q.    Why did you move into

12 regulatory affairs?

13    A.    Part of the responsibility

14 of the director of operations is to be

15 required to monitor and oversee the

16 maintaining of records in the controlled

17 substance.  So besides having total

18 responsibility for the distribution

19 center, the DEA requirements are also

20 part of that.

21        We were given the lifestyle

22 drug monitoring program to oversee as

23 part of our overall responsibilities.

24 And I found it very interesting to

1  monitor and look at what customers were

2  purchasing and the analytics that went

3  into it.

4          So when the newly created

5  positions were rolled out, I was

6  interested in moving into the regulatory

7  department.  It was a little more

8  analytical than -- than running the

9  distribution center.

10      Q.    And you said you found it

11  interesting to see how pharmacies were

12  purchasing.  Why did you find that

13  interesting?

14      A.    I found that interesting to

15  do the research and to look at how they

16  were ordering controls versus

17  non-controls, the type of business that

18  they had.  More interactions with

19  customers.  And also just -- it was such

20  an important topic at that time, I felt

21  it was definitely something I wanted to

22  get involved with.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

4        Q.    Could you describe the

5    relationship you've had with the DEA over

6    the course of your career in McKesson

7    regulatory affairs?

8        A.    Yes.  I felt that my

9    relationship with DEA was very good.

10   When I started in '07 in regulatory, our

11   Delran distribution center was always one

12   where the DEA paid compliments to when

13   they came in to do their cyclical audits.

14   Our recordkeeping was always good.  Our

15   inventory was good.  So the local DEA

16   office over my distribution center was

17   always satisfied with what we were doing.

18            When I went into regulatory

19   I dealt with the Washington D.C. office

20   that oversaw Landover.  I dealt with the

21   New York office, as well as the New

22   Jersey office and the Pittsburgh office

23   of DEA, and the Rocky Hill office.  And

24   would have conversations with different

1    DEA agents when we were either calling to

2    report a customer or sending them a

3    letter notifying them that we cut

4    customers off.

5          Q.    And what happened when you

6    communicated to DEA in those instances

7    about a pharmacy?

8          A.    DEA would basically say

9    thank you for the information.  And then

10   that was really the end of it.  It was

11   not a two-way communication.  We would

12   give them the information of a

13   particular -- either a pharmacy or maybe

14   a doctor that we saw a lot of activity

15   on.

16              They would again thank us

17   for the information.  That was pretty

18   much the end of what we heard unless we

19   heard about it in the news later on if

20   there was additional action taken.  But

21   we were never, you know, communicated

22   back on, on anything that we submitted.

23         Q.    Tell me your mission and

24   responsibilities in McKesson's regulatory

Highly Confidential - Subject to Further Confidentiality Review

1    affairs group.  How do they compare with

2    the mission and responsibilities of

3    McKesson's sales group?

19          Sales, of course, would

20   be -- I can just surmise they are looking

21   to increase sales for their customer.

22   But what I liked is that we had final

23   say.  So if I didn't feel that a customer

24   warranted an increase, I would not make

Highly Confidential - Subject to Further Confidentiality Review

1    that increase.

2         Q.    How would you describe

3    McKesson's culture in the area of

4    compliance and regulatory affairs?

5         A.    I would say that McKesson

6    has a corporate culture, they call it

7    ICARE, I-C-A-R-E.  It's integrity,

8    customer focused, and then

9    accountability, respect and excellence.

10   I find that McKesson is a very -- they

11   look at accountability and respect and

12   excellence of the job that we do.

13             As I mentioned earlier, I

14   take -- took my job, take my job very

15   seriously.  I know that I play an

16   important role in the monitoring of sales

17   of controlled substances.  I take that

18   responsibility very personally.

19             I think that McKesson has a

20   very high ethics group when it comes to

21   integrity in what we do.

22             MS. HENN:  I have no further

23        questions.

24             MR. PAPANTONIO:  Sir, I've

1    got a few questions.

2         Would you please put up

3    Document Number 324.

4              -   -   -

5         EXAMINATION

6              -   -   -

7  BY MR. PAPANTONIO:

8         Q.    I want to ask you about,

9  sir, while you were evolving to where you

10  say you've been evolving.  Is that what

11  you said?

12         MS. HENN:  Objection to

13    form.

14         THE WITNESS:  I -- I believe

15    I said that our program is

16    continuously improving.

17  BY MR. PAPANTONIO:

18         Q.    Okay.  Let's look at --

19  let's look at how many people have been

20  dying across the United States while

21  you've been evolving.  Let's take a look

22  at that.

23         MR. PAPANTONIO:  324 please.

24         (Document marked for

1          identification as Exhibit

2          MCK-Oriente-060.)

3    BY MR. PAPANTONIO:

4          Q.    Now, sir, I'm wondering, you

5    have surely seen the -- what I call the

6    death map.  Have you seen the death map?

7          A.    Not that exact document, no.

8          Q.    You've not seen -- you've

9    not seen this?

10         A.    Not the death map, no.

11         Q.    Is that right?  Why don't

12   you take a look at what I call the death

13   map.  Okay.

14              MS. HENN:  Counsel, do you

15         have copies?

16              MR. PAPANTONIO:  Give --

17         give a copy to the lawyers,

18         please.

19   BY MR. PAPANTONIO:

20         Q.    Now, let's look at this

21   death map.  Take a look at it.  And tell

22   me, is this the first time you've seen

23   this.

24              MS. MOORE:  That's McKesson

Highly Confidential - Subject to Further Confidentiality Review

1        Oriente 60.

2              THE WITNESS:  No, I have

3    not --

4    BY MR. PAPANTONIO:

5        Q.    Have you ever seen the death

6    map?

7        A.    No, I've not seen the death

8    map.

9        Q.    Before you came in here to

10   testify, nobody showed you the death map,

11   did they?

12       A.    No.

13       Q.    Well, let's do this realtime

14   on the death map.  Do you see, do you see

15   down on the death map, if you'll take a

16   look at the first -- the first very part

17   of the death map, do you see where it

18   has, do you see this area, this grey all

19   the way to, it looks like a light brown.

20   Do you see that right there?

21       A.    What -- what number are you

22   referring to, 10?

23       Q.    I'm referring to 1999.  Do

24   you see up in the corner, sir?  You may

Highly Confidential - Subject to Further Confidentiality Review

1    want to look up here --

2         A.    You said grey, but I --

3    there's a couple of shades here and I

4    want to make sure I'm looking at the same

5    one you are.

6         Q.    Okay.

7         A.    So there's a number to the

8    right of it.  Is that the 10?

9         Q.    Yeah.

10         A.    Okay.

11         Q.    Yeah, that's it.

12         A.    Thank you.

13         Q.    So, so this is the number of

14    deaths that started as you were evolving

15    as a company and trying to figure out how

16    to evolve.  Let's talk about the

17    evolution of death.

18              1999.  Turn to the next

19    page.  Do you see that area around West

20    Virginia?  Can -- do you know where West

21    Virginia is on a map?

22         A.    Yes, sir, right in this

23    area.

24         Q.    Do you know where Ohio is on

Highly Confidential - Subject to Further Confidentiality Review

1    a map?

2           A.    Up here.

3           Q.    And what -- tell me what

4    color that is.

5           A.    Color for which state?

6           Q.    Either one.  West Virginia

7    or --

8           A.    Ohio is in the blue shades.

9    West Virginia is in the tan shades.

10          Q.    Okay.  Let's talk about the

11   tan shades then, since we've got a lot to

12   talk about on the evolution of the death

13   map.

14                This is 1999 is where the

15   death map starts, correct?

16          A.    Yes.

17          Q.    And then the death map goes

18   to 20, goes to 2000, correct?

19          A.    Yes.

20          Q.    Does that -- does that tan

21   shade get better, that area you're

22   supposed to be in charge of, does that

23   get bigger?

24                MS. HENN:  Objection to

1              form.

2    BY MR. PAPANTONIO:

3          Q.    Take a look at it.  If it

4    doesn't, tell me it doesn't.  We'll let

5    the jury decide.

6                Does it get bigger in 2000,

7    the death map?

8                MS. HENN:  Objection to

9          form.

10   BY MR. PAPANTONIO:

11         Q.    Does it get bigger, sir?

12         A.    It looks to stay almost the

13   same.

14         Q.    Okay.  Well, let's move on.

15   Let's look at -- okay.  Let's focus just

16   on tan.  How about we do that.

17                Now, how about let's go to

18   2001.  Does 2001 on the death map, is

19   that area bigger or smaller than 19 --

20   the 1999, on the death map?

21         A.    It's increased somewhat.

22         Q.    Increased.  Okay.  Let's

23   look at 2002.  This is the area that you

24   were in charge of, correct?

1          MS. HENN:  Objection to

2     form.

3          THE WITNESS:  Not the full

4     area of West Virginia, no.

5 BY MR. PAPANTONIO:

6     Q.   Well, do you see the West

7 Virginia area, 2002, take a look at it.

8     A.   I see the West Virginia area

9 in 2002.  I did not have the entire state

10 of West Virginia.

11     Q.   Well, we can look at that

12 and tell West Virginia has now moved from

13 just tan, they've gone all the way down

14 to, they've got all the way to brown.

15 Tell me what the deaths are for brown,

16 what does that represent, 30 deaths?

17          MS. HENN:  Objection to

18     form.

19 BY MR. PAPANTONIO:

20     Q.   30 deaths per 100,000

21 people?

22     A.   To this rig chart.  30 plus.

23     Q.   Yeah, so 30 plus people in

24 2001 in that, in West Virginia.  Correct?

1    Let's go to 2002 --

2             A.    Per 100, per 100,000.

3             Q.    Per 100,000 people.

4                   Now let's go to 2003 on the

5    death map.  Do you see that big brown

6    spot, that big blotch there?  That's West

7    Virginia, isn't it?

8                   Can you see it better now if

9    you look up on the screen?

10            A.    No, I can see it from here.

11            Q.    All right.  Now, what do we

12   see there, we see brown, we see red, we

13   see orange?

14            A.    Mm-hmm.

15            Q.    So colors are changing as

16   you're trying to evolve and try to figure

17   out how to do better after being fined

18   $13 million.  How to do better after

19   you've been fined $150 million.  How to

20   do better after you have been -- after

21   the DOJ and the DEA has investigated you.

22   Right?  As you are evolving, that's part

23   of the evolution, correct?

24                  MS. HENN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                  THE WITNESS:  Part of our

3          evolution was to have enhanced

4          reports that are system generated

5          and have systems assist us in the

6          reviews instead of a manual

7          process.  That's part of the

8          evolution.

9    BY MR. PAPANTONIO:

10         Q.   Let's see how that works.

11                 MS. HENN:  And, Counsel,

12         just -- just to let you know, you

13         have two more minutes.

14   BY MR. PAPANTONIO:

15         Q.   Okay.  Then let's do this.

16   Let's go -- since I've been told I have

17   two minutes, let's go to Number 18.  Just

18   pull over to Page 18.  We'll just

19   compare.

20                 MR. PAPANTONIO:  Would you

21         please put up -- would you put up

22         1999 compared to 2013 since I've

23         been told I only have how many

24         more minutes?  Two minutes.  How

Highly Confidential - Subject to Further Confidentiality Review

1      about putting them side by side.

2  BY MR. PAPANTONIO:

3      Q.    Look up here on the screen,

4  sir.

5      A.    I am.

6           MR. PAPANTONIO:  Would you

7      put the next one up on the screen

8      for me, please.

9  BY MR. PAPANTONIO:

10     Q.    Wow.  A lot of brown there,

11 huh?  What does the -- what does the dark

12 brown mean?  It means more than 30 deaths

13 per 100,000, correct?

14     A.    Yes.

15     Q.    And the tan, what does that

16 mean?

17     A.    16 to 17.  Or 14 or 15.

18     Q.    So do you realize what we're

19 doing here, we're comparing what started

20 in 1999 when you were selling pills to

21 pharmacies, when McKesson was selling

22 narcotics to pharmacies, the first map we

23 see as far as people dying is the one on

24 the left.  Do you understand that?

1    A.    Yes.

2         Q.    And the one on the right is

3    what happened as late as, what's the year

4    on that, 2013?

5              MS. MOORE:   2016.

6    BY MR. PAPANTONIO:

7         Q.    2016.

8              That map is bright red with

9    dead people, isn't it, sir?

10             MS. HENN:  Objection to

11        form.

12   BY MR. PAPANTONIO:

13        Q.    It is bright red with dead

14   people?

15             MS. HENN:  Objection to

16        form.

17   BY MR. PAPANTONIO:

18        Q.    Wouldn't you agree with

19   that?

20             Sir, do you understand that

21   is children, mothers, fathers, uncles,

22   sisters and brothers.  That's a

23   statistic.  But what that statistic

24   means, and those are family members dying

Highly Confidential - Subject to Further Confidentiality Review

 1    because your company participated with

 2    CVS and Purdue and Teva and all these --

 3    Cardinal, and participated in expanding

 4    the death map from what we see on the

 5    left to what we see on the right.  Are

 6    you proud of that, sir?

 7                 MS. HENN:  Objection to

 8         form.

 9    BY MR. PAPANTONIO:

10         Q.    Are you proud of that?

11                 MS. HENN:  Objection to

12         form.

13                 THE WITNESS:  The epidemic

14         is not something that I am proud

15         occurred.  I do my job to try to

16         limit that.

17    BY MR. PAPANTONIO:

18         Q.    Yeah.  Well, didn't you tell

19    me McKesson has an ICARE culture.  Isn't

20    that what you said?  It's ICARE culture.

21    And I think you said it's integrity,

22    accountability, excellence --

23                 MS. HENN:  Counsel, we've

24         reached the end so I'd just ask

1    you to ask your last question.

2              MR. PAPANTONIO:  I'm going

3         to ask the last question.

4    BY MR. PAPANTONIO:

5         Q.    Isn't that what you told me,

6    on direct, isn't that what you said, the

7    ICARE program?

8         A.    That is what I said.

9         Q.    If we make a -- if we

10   look at --

11             MS. HENN:  All right.

12        Counsel, we're done.

13   BY MR. PAPANTONIO:

14        Q.    -- if you look at that map,

15   the ICARE policy is a disaster, isn't it?

16             MS. HENN:  I'd like to go

17        off the record now, sir.

18   BY MR. PAPANTONIO:

19        Q.    If we look at that map, the

20   ICARE policy is a disaster.  Yes or no?

21             MS. HENN:  Counsel, before

22        we went on the record again, you

23        agreed as the court ordered that

24        we would abide by the protocol --

```
 1                    MR. PAPANTONIO:  I'm going

 2           to ask this question.  You can

 3           bring it up to the judge.  I want

 4           to ask this question since you

 5           have this man here.

 6                    MS. HENN:  Counsel.

 7    BY MR. PAPANTONIO:

 8           Q.    You said you had an ICARE

 9    program.  Yes or no?

10                    MS. HENN:  And I'm going to

11           tell you that this needs to be the

12           last question.

13                    MR. PAPANTONIO:  Do you want

14           to instruct him -- okay --

15                    MS. HENN:  I'm not

16           instructing him not to answer.

17                    MR. PAPANTONIO:  Okay.  This

18           is my last question.

19                    MS. HENN:  Thank you, sir.

20    BY MR. PAPANTONIO:

21           Q.    You said you had an ICARE

22    program, right, that involved integrity,

23    it involved accountability, it involved

24    high ethics, it involved excellence.
```

Highly Confidential - Subject to Further Confidentiality Review

1            Look at these two maps and

2    you tell me whether all that ICARE

3    program was working between 1999 and

4    2016?

5        A.    The ICARE principle that we

6    follow at McKesson, it covers all of

7    McKesson.  The fact that West Virginia

8    deaths increased over these years, we did

9    our monitoring, and it isn't just in West

10   Virginia, the epidemic was widespread.

11       Q.    Okay.

12       A.    And we did what we could to

13   monitor and deter that from occurring.

14       Q.    Because like your --

15            MS. HENN:  Counsel.

16   BY MR. PAPANTONIO:

17       Q.    Because like your CEO said,

18   you took it seriously.

19            MS. HENN:  Counsel.

20            MR. PAPANTONIO:  I don't

21       have any further questions.

22            MS. HENN:  Thank you, sir.

23            THE VIDEOGRAPHER:  Stand by

24       please.  The time is 6:10 p.m.

1    This marks the end of today's

2    deposition.  Off the record.

3         MR. O'CROININ:  I do

4    actually have a couple questions

5    though.

6         (Brief pause.)

7         THE VIDEOGRAPHER:  It's not

8    the end of today's deposition, but

9    we are going off the record.  The

10   time is 6:10 p.m.

11        (Brief pause.)

12        THE VIDEOGRAPHER:  The time

13   is 6:11 p.m.  Back on the record.

14              -  -  -

15            EXAMINATION

16              -  -  -

17   BY MR. O'CROININ:

18        Q.    I'm Conor O'Croinin, I

19   represent the CVS entities in this case.

20        A.    Okay.

21        Q.    And we have never met, have

22   we?

23        A.    No, we have not.

24        Q.    I know it's been a long day.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11          MR. PAPANTONIO:  Objection,

12     leading the witness.  Ask a

13     question that's not leading.

14     Counsel, you have him on direct

15     right now.

16          MS. HENN:  Counsel, there

17     are no speaking objections.

18          MR. PAPANTONIO:  Objection

19     to form.  Okay.  We'll do it --

20     we'll -- your question needs

21     improving.

22     BY MR. O'CROININ:

Highly Confidential - Subject to Further Confidentiality Review



18    Q.    Are you aware of how many

19  stores CVS has in the U.S.?

20    A.    I would be guessing.  I know

21  it's in the thousands.  I'm also not sure

22  exactly how many McKesson has versus some

23  of the other wholesalers.

24    Q.    Does 10,000 sound right to

1    you?

2          A.    I'm not -- not sure if it's

3    that many.  Yeah.

4          Q.    But you think it's in the

5    thousands?

6          A.    Oh yes.

7          Q.    And Mr. Kennedy went through

8    a number of press releases and articles

9    concerning fines that CVS paid in

10   connection with specific CVS stores.  Do

11   you remember that line of questioning?

12         A.    Yes.

13         Q.    Do you know whether the vast

14   majority of CVS's stores have never been

15   implicated in any kind of investigation

16   or paid a fine?

17               MR. PAPANTONIO:  Objection.

18         Form.

19               THE WITNESS:  I would say

20         that with the number of total

21         stores that CVS has, the number

22         that was listed is a very small

23         percentage.

24               MR. O'CROININ:  All right.

Highly Confidential - Subject to Further Confidentiality Review

1    That's all I have.

2              MR. KENNEDY:  Yeah, let

3    me -- I'm going to ask you -- let

4    me ask you a few questions in

5    follow-up to the CVS questioning.

6              If you can pull up 5007

7    please.

8              MS. HENN:  Do you by chance

9    have a copy for me?

10             MR. KENNEDY:  Of?

11             MS. HENN:  The exhibit.

12   I'll just look here.

13                  -  -  -

14                EXAMINATION

15                  -  -  -

16   BY MR. KENNEDY:

17        Q.    Mr. Oriente, did you just

18   tell us that you thought CVS was doing a

19   very good job?

20        A.    No, I did not say that,

21   that -- that I recollect.

22             I said that the amount of

23   stores that were fined here in comparison

24   to the total number of stores would be a

1  small amount, small percentage.

2      Q.    Okay.  So you didn't mean to

3  say that getting fined $77 million in

4  2010, and then 11 in '13, another

5  $350,000 in '13, and a $1.9 million fine

6  in '14, and $22 million in '15, and

7  $450,000 in '15, and 8 million and 3.5

8  million, another 5.

9          You're not saying a total of

10  $130.6 million worth of fines over six

11  years is a good job, are you?

12          MS. HENN:  Objection to

13      form.

14  BY MR. KENNEDY:

15      Q.    You don't mean to tell us

16  that, do you?

17          MS. HENN:  Objection to

18      form.

19          THE WITNESS:  I don't

20      believe that's what I said.  I

21      said the number of stores --

22  BY MR. KENNEDY:

23      Q.    My question is simple.

24          MS. HENN:  Counsel, please

Highly Confidential - Subject to Further Confidentiality Review

1       let him finish his answer.

2   BY MR. KENNEDY:

3       Q.    You don't mean to say that,

4   do you?  That they're doing a good job

5   here with $130 million worth of fines?

6              MS. HENN:  Objection to

7         form.

8              THE WITNESS:  I don't

9         believe I commented on whether

10        they were doing a good job.  I

11        believe my comment was a small

12        percentage of the stores had

13        problems.

14  BY MR. KENNEDY:

15      Q.    Let me ask you right now.

16  Do you think CVS was doing a good job

17  with $130 million worth of fines over six

18  years?  Do you think that's a good job in

19  monitoring the flow of narcotics into our

20  communities.  Do you think that is a good

21  job?

22             MS. HENN:  Objection to

23        form.

24             THE WITNESS:  I think based

Highly Confidential - Subject to Further Confidentiality Review

1    off of the fines they could have

2    done a better job, yes.

3        MR. KENNEDY:  I've got

4    nothing further.

5        MS. HENN:  Thank you.  But I

6    want to reserve signature.  I

7    think I mentioned earlier the

8    whole transcript should be marked

9    highly confidential pending

10   review.

11       THE VIDEOGRAPHER:  This

12   marks the end of today's

13   deposition.  The time is 6:18 p.m.

14       (Excused.)

15       (Deposition concluded at

16   approximately 6:18 p.m.)

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5            I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

            It was requested before
8  completion of the deposition that the
   witness, MICHAEL ORIENTE, have the
9  opportunity to read and sign the
   deposition transcript.

10

11

12       _____

         MICHELLE L. GRAY,
13       A Registered Professional
         Reporter, Certified Shorthand
14       Reporter, Certified Realtime
         Reporter and Notary Public
15       Dated:  July 24, 2018

16

17

18            (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1     INSTRUCTIONS TO WITNESS

2

3          Please read your deposition

4     over carefully and make any necessary

5     corrections.  You should state the reason

6     in the appropriate space on the errata

7     sheet for any corrections that are made.

8               After doing so, please sign

9     the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    –   –   –   –   –   –

                           E R R A T A

 2                    –   –   –   –   –   –

 3

 4        PAGE   LINE   CHANGE

 5       _____  _____   _____

 6          REASON: _____

 7       _____  _____   _____

 8          REASON: _____

 9       _____  _____   _____

10          REASON: _____

11       _____  _____   _____

12          REASON: _____

13       _____  _____   _____

14          REASON: _____

15       _____  _____   _____

16          REASON: _____

17       _____  _____   _____

18          REASON: _____

19       _____  _____   _____

20          REASON: _____

21       _____  _____   _____

22          REASON: _____

23       _____  _____   _____

24          REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2            ACKNOWLEDGMENT OF DEPONENT

3

4            I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 611, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16   MICHAEL ORIENTE                    DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```