Highly Confidential - Subject to Further Confidentiality Review

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                      -   -   -
 5
        IN RE:  NATIONAL          :    MDL NO. 2804
 6      PRESCRIPTION OPIATE       :
        LITIGATION                :
 7                                :
        ------------------------------------------------
 8      THIS DOCUMENT RELATES TO  :   CASE NO.
        ALL CASES                 :   1:17-MD-2804
 9                                :
                                  :   Hon. Dan A.
10                                :   Polster
11                      -   -   -
12                  January 22, 2019
13                      -   -   -
14         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
15
16              Videotaped deposition of ANDREW
        PALMER, RPh taken pursuant to notice, was held at
17      the law offices of Morgan, Lewis & Bockius LLP,
        1701 Market Street, Philadelphia, Pennsylvania,
18      beginning at 9:40 a.m., on the above date, before
        Ann Marie Mitchell, a Federally Approved
19      Certified Realtime Reporter, Registered Diplomate
        Reporter, Registered Merit Reporter and Notary
20      Public.
21                      -   -   -
22
                GOLKOW LITIGATION SERVICES
23            877.370.3377 ph| 917.591.5672
                   deps@golkow.com
24
```

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY:  W. SCOTT SIMMER, ESQUIRE
BY:  GRETCHEN KEARNEY
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
ssimmer@baronbudd.com
gkearney@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY:  JOHN P. LAVELLE, JR., ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-5000
john.lavelle@morganlewis.com
Representing Teva

MORGAN, LEWIS & BOCKIUS LLP
BY:  MATTHEW R. LADD, ESQUIRE
BY:  KELLY A. MOORE, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6000
matthew.ladd@morganlewis.com
kelly.moore@morganlewis.com
Representing Teva

COVINGTON & BURLING, LLP
BY:  LAUREN C. DORRIS, ESQUIRE
One City Center
Washington, DC 20001
(202) 662-5272
ldorris@cov.com
Representing McKesson

Page 3

APPEARANCES (cont.'d):

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY:  MICHAEL A. MORSE, ESQUIRE
1818 Market Street
Philadelphia, Pennsylvania 19103
(215) 320-6200
mam@pietragallo.com
Representing Cardinal Health

APPEARANCES VIA TELEPHONE/STREAM:

BARON & BUDD, P.C.
BY:  WILLIAM POWERS, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
wpowers@baronbudd.com
Representing the Plaintiffs

MARCUS & SHAPIRA LLP
BY:  RICHARD I. HALPERN, ESQUIRE
301 Grant Street, 35th Floor
One Oxford Centre
Pittsburgh, Pennsylvania 15219
(412) 471-3490
halpern@marcus-shapira.com
Representing HBC Service Company

Page 4

APPEARANCES VIA TELEPHONE/STREAM (cont.'d):

REED SMITH LLP
BY:  SAMANTHA L. ROCCHINO, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
srocchino@reedsmith.com
Representing AmerisourceBergen Drug
Corporation

JONES DAY
BY:  MIRIAM LIABO, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
mliabo@jonesday.com
Representing Walmart

ARNOLD & PORTER KAYE SCHOLER LLP
BY:  HEATHER A. HOSMER, ESQUIRE
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
heather.hosmer@arnoldporter.com
Representing Endo Health Solutions Inc.,
Endo Pharmaceuticals Inc., Par
Pharmaceutical, Inc. and Par Pharmaceutical
Companies, Inc.

VIDEOGRAPHER:
    DEVYN MULHOLLAND
ALSO PRESENT:
    ZACH HONE
    Precision Trial Solutions
            - - -

Page 5

                - - -
            I N D E X
                - - -

Testimony of:  ANDREW PALMER, RPh
By Mr. Simmer                    13, 324
By Mr. Lavelle                   291

                - - -
            E X H I B I T S
                - - -

NO.             DESCRIPTION            PAGE

Rite Aid-    Resume of Andrew Palmer,        22
Palmer-1     Rph, CIPP-US, LPC, CCEP
Rite Aid-    Organizational Chart,           47
Palmer-2     Corporate Loss Prevention
             Department (9575), Bates
             stamped
             Rite_Aid_OMDL_0044554, 2
             pages

Rite Aid-    Annual Performance Review       93
Palmer-3     FY 2011, Bates stamped
             Rite_Aid_OMDL_0050666
             through
             Rite_Aid_OMDL_0050674

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1  Rite Aid-  PowerPoint, "Division 2    115
2  Palmer-4   Region 22 & Group 51
          Regulatory Compliance
3         November 2010," Bates
          stamped
4         Rite_Aid_OMDL_0032890
          through
5         Rite_Aid_OMDL_0033115

6  Rite Aid-  Email dated 2008-02-19,   148
   Palmer-5   Bates stamped
7         Rite_Aid_OMDL_0046594 and
          Rite_Aid_OMDL_0046595
8  Rite Aid-  Department of Justice News   164
9  Palmer-6   Release, "Rite Aid
          Corporation and
10        Subsidiaries Agree to Pay
          $5 Million in Civil
11        Penalties to Resolve
          Violations in Eight States
12        of the Controlled
          Substances Act," 2 pages
13 Rite Aid-  Article from the Lexington   167
14 Palmer-7   Herald Leader entitled
          "Rite Aid Pharmacy deemed
15        central to multi-state
          drug probe,"  3 pages
16 Rite Aid-  PowerPoint, "Government   179
17 Palmer-8   Affairs DEA Compliance,"
          Bates stamped
18        Rite_Aid_OMDL_0039845
          through
19        Rite_Aid_OMDL_0039923

20 Rite Aid-  Email chain, top one dated   206
   Palmer-9   October 02, 2008, Bates
21        stamped
          McKesson_MDL_00628212, 2
22        pages

23 Rite Aid-  Email chain, top one dated   215
   Palmer-10  08 Dec 2008, Bates stamped
24        MCKMDL00628110 and
          MCKMDL00628111

Page 7

1  Rite Aid-  Email chain, top one dated   218
2  Palmer-11  Feb 16 06, Bates stamped
          MCKMDL00536012 and
3         MCKMDL00536013

4  Rite Aid-  Email chain, top one dated   220
   Palmer-12  19 Aug 2009, Bates stamped
5         MCKMDL00627813 through
          MCKMDL00627814
6  Rite Aid-  Email chain, top one dated   230
7  Palmer-13  19 Aug 2009, 4 pages

8  Rite Aid-  Email chain, top one dated   231
   Palmer-14  25 Oct 2010, Bates stamped
9         MCKMDL00629074 and
          MCKMDL00629075
10 Rite Aid-  Email chain, top one dated   239
11 Palmer-15  30 Nov 2010, Bates stamped
          MCKMDL00628996 and
12        MCKMDL00628997

13 Rite Aid-  Email chain, top one dated   247
14 Palmer-16  25 Mar 2011, Bates stamped
          MCKMDL00629858 and 629859

15 Rite Aid-  Email chain, top one dated   252
16 Palmer-17  31 Mar 2011, Bates stamped
          MCKMDL00627679

17 Rite Aid-  Email dated December 03,   258
18 Palmer-18  2008, Bates stamped
          MCKMDL00628183

19 Rite Aid-  Email chain, top one dated   276
20 Palmer-19  2011-01-17, Bates stamped
          Rite_Aid_OMDL_0050633

21 Rite Aid-  PowerPoint, "Anatomy of a   303
22 Palmer-20  Pharmacy Case Presented by
          Director Pharmacy Loss
          Prevention Andy Palmer,"
23        Bates stamped
          Rite_Aid_OMDL_0037816
24        through
          Rite_Aid_OMDL_0037851

Page 8

1
2
3

- - -

4

PREVIOUSLY MARKED EXHIBITS USED

5

- - -

6

7   Novack-7
    Novack-8
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 9

1         - - -
2  DEPOSITION SUPPORT INDEX
3         - - -
4
   Direction to Witness Not to Answer
5
6     Page Line
7      18   9
       19  18
       20  15
8      85  14
       103  1
9      104  8
       104  19
10     110  6
       110  19
11     111  6
       111  23
12     289  7
13
14
15 Request for Production of Documents
16      Page Line
17
18
19
20     Stipulations
21      Page Line
22
23
24

Page 10

1    Certified Questions and Answers
2           Page Line
3           110  2
4
5  BY MR. SIMMER:
6       Q.    As far as you recall, however,
7  you don't recall ever that any of these
8  committees discuss a specific instance of --
9  concerning a suspicious order.  Right?
10         MR. LAVELLE:  Objection to the
11     form of the question.  And I also object
12     and direct the witness not to answer to
13     the extent it would disclose the
14     substance of attorney-client
15     communications.
16         THE WITNESS:  Yeah.  At the
17     advice of counsel, I'm not going to
18     answer that question.
19  BY MR. SIMMER:
20      Q.    It was a yes or no question.  I
21  didn't ask you to divulge any attorney-client
22  communications.  You can answer.
23         MR. LAVELLE:  Again, I direct the
24     witness not to answer.  It was a yes or

Page 11

1  no question seeking the substance of a
2  communication.  So, yes, it does invade
3  the attorney-client privilege
4  potentially.
5         MR. SIMMER:  How in the world
6     does that involve an attorney-client
7     communication?  You've established no
8     predicate whatsoever for the objection.
9         You can answer.
10         MR. LAVELLE:  No, you can't.
11     Direct the witness not to answer.
12         THE WITNESS:  I don't even know
13     what predicate means.
14         MR. SIMMER:  He hasn't even
15     established that there was any kind of
16     attorney-client communication going on
17     with regard to suspicious order
18     monitoring for these committees.
19         THE WITNESS:  Yeah --
20         MR. LAVELLE:  Wait until he asks
21     a question that is directed to you.  He's
22     just arguing with me.
23  BY MR. SIMMER:
24      Q.    Did the committees ever deal with

Page 12

1  suspicious orders that you recall, these three
2  committees?
3         MR. LAVELLE:  Again, objection to
4     the extent you would have to disclose
5     attorney-client communications to answer
6     this question, which is seeking the
7     substance of discussions that occurred,
8     including the pharmacy compliance
9     committee.  I direct the witness not to
10     answer the question.
11         THE WITNESS:  At the advice of
12     counsel, I will not answer the question.
13
14         - - -
15  (End of certified questions and answers.)
16         - - -
17
18
19
20
21
22
23
24

Page 13

1         THE VIDEOGRAPHER:  We are now on
2  the record.  My name is Devyn Mulholland.
3  I'm a videographer for Golkow Litigation
4  Services.  Today's date is January 22,
5  2019.  The time is 9:40 a.m.  This video
6  deposition is being held in Philadelphia,
7  Pennsylvania, in the matter of National
8  Prescription Opiate Litigation.  The
9  deponent is Andrew Palmer.  Counsel will
10  be noted on the stenographic record.
11      The court reporter is Ann Marie
12  Mitchell, who will now swear in the
13  witness.
14         - - -
15      ANDREW PALMER, RPh, after having
16  been duly sworn, was examined and
17  testified as follows:
18         - - -
19      EXAMINATION
20         - - -
21  BY MR. SIMMER:
22      Q.    Good morning, sir.  My name is
23  Scott Simmer on behalf of the plaintiffs in this
24  case.

Page 14

1 Have you ever been deposed
2 before?
3 A. I've done grand jury testimony
4 before. I don't know if that's the same thing.
5 Q. Okay. Well, let's go over some
6 ground rules, just to make sure that we
7 understand how we have to proceed today.
8 I'm going to be asking a series
9 of questions. You're going to answer. The court
10 reporter is taking down word for word what each
11 of us says. That's -- it's important that we
12 don't talk over each other.
13 A. Okay.
14 Q. So -- and you have to answer
15 verbally, not nodding your head.
16 Do you understand?
17 A. Yes.
18 Q. Please wait before you answer to
19 ensure I'm done before answering the question.
20 Is that fair?
21 A. Yes.
22 Q. And answer fully and accurately
23 and verbally, as I said.
24 Do you understand?

Page 15

1 A. Yes.
2 Q. And if you don't understand a
3 question, please say so and I'll attempt to
4 rephrase. Otherwise, I'm going to assume you
5 understand my questions. Okay?
6 A. Yes.
7 Q. And you understand you're going
8 to -- you need to answer truthfully, too.
9 Correct?
10 A. Yes.
11 Q. Okay. You can request a break at
12 any time. I just ask that if a question is
13 pending, you answer before we take our break.
14 Is that okay?
15 A. Okay.
16 Q. And from time to time, one of the
17 attorneys may lodge an objection. Unless you're
18 instructed not to answer, you do need to answer
19 the question.
20 A. Okay.
21 Q. Do you understand? Okay.
22 Is there any reason why you
23 cannot testify truthfully and accurately today?
24 A. No.

Page 16

1 Q. What's your understanding of why
2 you are here today?
3 A. My understanding, I'm here to
4 provide testimony regarding national type of
5 litigation involving opioids.
6 Q. Have you ever reviewed any of the
7 pleadings in this case?
8 A. No.
9 Q. How did you develop your
10 understanding of what this case is about?
11 A. General understanding from
12 counsel and, you know, our legal department at
13 Rite Aid.
14 Q. So who have you spoken to about
15 this case?
16 A. I've spoken to counsel.
17 Q. And you're pointing to whom?
18 A. To John and Kelly and other John,
19 who is not here, and Matt.
20 Q. You said you spoke to in-house
21 counsel as well?
22 A. Yes.
23 Q. And who is that?
24 A. Jim Comitale is our general

Page 17

1 counsel. You know, this is a general topic in
2 some of our --
3 MR. LAVELLE: Object. Direct the
4 witness not to disclose the substance of
5 any communications. And I don't think
6 counsel has asked you for that. He just
7 asked you the names of people.
8 THE WITNESS: There you go.
9 BY MR. SIMMER:
10 Q. When did you meet with them?
11 A. I met with Kelly and Matt
12 yesterday. And with John and John Malloy -- I
13 can't remember when that was. Earlier than that.
14 I believe that was last week.
15 Q. How long have you met with
16 counsel?
17 A. Each meeting was probably
18 approximately five hours.
19 Q. Did they show you documents?
20 A. They did.
21 Q. And what's the approximate number
22 of documents you looked at?
23 A. Gosh. Maybe approximately 30.
24 Q. And what types of documents were

Page 18

1  they?
2      A.    There were some email documents,
3  some presentations, some forms, things of that
4  nature.
5      Q.    Okay.  And you said you'd been
6  involved in a grand jury before?
7      A.    Yes.
8      Q.    What was that about?
9          MR. LAVELLE:  Objection.  Direct
10         the witness not to answer.  I think this
11         is protected grand jury information.
12  BY MR. SIMMER:
13     Q.    Is this a case that's still under
14  seal, as far as you know?
15     A.    I would not know the answer to
16  that.
17     Q.    Nothing about the grand jury --
18  in the grand jury process has been made public
19  that you know of?
20     A.    I don't know.
21     Q.    Was this as a witness in the
22  grand jury you gave testimony?
23     A.    I'm not entirely sure I
24  understand that either.  I was asked to go and I

Page 19

1  went.
2      Q.    When was this?
3      A.    Approximately a year ago, I
4  believe.
5      Q.    Where was it?
6      A.    It was in West Virginia.
7      Q.    Other than the grand jury
8  testimony, have you given testimony in any other
9  matter?
10     A.    No.
11     Q.    Have you been involved in
12  litigation of any kind before?
13     A.    No.
14     Q.    In conjunction with your
15  testimony today, did your counsel ask you to
16  provide copy of your documents that were on your
17  computer?
18         MR. LAVELLE:  Objection.  Direct
19         the witness not to answer to the extent
20         it would disclose the substance of
21         attorney-client communications.
22  BY MR. SIMMER:
23     Q.    I asked you a yes or no question.
24  I'm not asking for the substance.

Page 20

1          Did they ask you to provide the
2  documents on your computer?
3          MR. LAVELLE:  Same objection.
4  BY MR. SIMMER:
5      Q.    You can answer.
6      A.    At an earlier point I believe
7  they did a diligence type of...
8      Q.    What types of things did they get
9  from you?
10     A.    I believe that would be things
11  like email.
12     Q.    Okay.  Did they ask for any
13  documents that you stored on the hard drive of
14  your computer?
15         MR. LAVELLE:  Again, object, the
16         witness not to answer to the extent it
17         would disclose the substance of
18         attorney-client communications.
19  BY MR. SIMMER:
20     Q.    Did you provide a hard copy or
21  documents that were stored on the hard drive of
22  your computer?
23     A.    I don't know what -- that's a
24  diligence IT-type process.  I honestly don't

Page 21

1  know.
2      Q.    Did you provide copies of any
3  hard copy documents you had in your possession?
4      A.    No, no.
5      Q.    So documents that you created for
6  the company, where do you store those documents?
7      A.    Well, there's email, which would
8  be -- you know, we use Outlook for our email, so,
9  you know, there's your inbox or -- would be where
10  emails would be available.  You know, archive
11  inbox, emails would be available.  And then at
12  Rite Aid we have a shared drive where documents
13  can be available.  Or your -- just your normal
14  like -- what do they call, like a C drive.
15     Q.    Okay.  The C drive is what kind
16  of -- what documents are stored on the C drive?
17     A.    Whatever an individual puts on
18  there.  Same with the shared drive or anything
19  else.
20     Q.    Okay.  And did that -- and where
21  you stored documents, did that change as you went
22  through your different jobs at the company?
23     A.    Not in general, no, no.
24     Q.    So the shared drive was something

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 that was common to all employees for Rite Aid
2 that could put documents on there?
3     A.   Yes, I believe so.
4     Q.   Okay.  And is that all employees
5 that worked in the corporate headquarters.
6 Correct?
7         MR. LAVELLE:  Object.  Object to
8     form.
9         THE WITNESS:  I believe all
10     employees that work in the corporate
11     headquarters would have access to a
12     shared drive.
13 BY MR. SIMMER:
14     Q.   I want to go over some of your
15 background.
16         - - -
17       (Deposition Exhibit No. Rite
18     Aid-Palmer-1, Resume of Andrew Palmer,
19     Rph, CIPP-US, LPC, CCEP, was marked for
20     identification.)
21         - - -
22 BY MR. SIMMER:
23     Q.   I'll hand you what we've marked
24 as Palmer Exhibit Number 1.

Page 23

1     A.   Yep.
2     Q.   I'll identify it for the record
3 as your resume that -- I think this is something
4 we got off of LinkedIn.
5     Would you take a little moment to
6 look at that?
7         MR. LAVELLE:  While the witness
8     is reviewing, I'll just note that the
9     realtime is not working over here on this
10     side, so when we have a break, we'll need
11     to address that.
12         MR. SIMMER:  Can we go off the
13     record for a moment and see if we can get
14     that up?
15         THE VIDEOGRAPHER:  Off the record
16     at 9:50 a.m.
17         - - -
18     (A discussion off the record
19     occurred.)
20         - - -
21         THE VIDEOGRAPHER:  We are back on
22     the record at 9:50 a.m.
23 BY MR. SIMMER:
24     Q.   This appear to be the -- your

Page 24

1 resume that you prepared and I guess then stored
2 on LinkedIn?
3     A.   This is not a resume, but this is
4 a LinkedIn profile.
5     Q.   Very good.
6     Can we start with your
7 educational background, if you turn to the second
8 page of this.
9     A.   Uh-huh.
10     Q.   It says that you went to the
11 University of Cincinnati; is that correct?
12     A.   That is correct.
13     Q.   And you have a BS in pharmacy
14 that you received from the University of
15 Cincinnati?
16     A.   That is correct.
17     Q.   Any other college education
18 beyond that?
19     A.   No.
20     Q.   I think you said before we got
21 started that you have an RPh?
22     A.   Yes.  RPh stands for registered
23 pharmacist.
24     Q.   Okay.  And that's -- it's simply

Page 25

1 the licensure that you received, not an
2 indication of your degree.  Right?
3         MR. LAVELLE:  Object to form.
4         THE WITNESS:  Yes.  To be a
5     registered pharmacist, you have to be
6     licensed.
7 BY MR. SIMMER:
8     Q.   Where are you licensed as a
9 pharmacist?
10     A.   I hold licenses in Ohio, Kentucky
11 and Pennsylvania.
12     Q.   So -- and your resume or your,
13 excuse me, your profile indicates that you
14 graduated in 1989; is that correct?
15     A.   That is correct.
16     Q.   What was your first job
17 post-graduation?
18     A.   My first job post-graduation was
19 for a company called SupeRX.  They're no longer
20 in existence.  They were bought up a long, long
21 time ago.  But I was a staff pharmacist for
22 SupeRX Drugs in the Cincinnati, Ohio area.
23     Q.   How long did you hold that job?
24     A.   I don't recall the exact time,

Page 26

1 but at some point I transferred from the Ohio
2 area across the river. Cincinnati's right on the
3 river with Kentucky. I was asked to take on a
4 pharmacy manager role at a location in Kentucky,
5 across the river. So I reciprocated licensure
6 into Kentucky and opened up a new store as the
7 pharmacy manager for the Kentucky location.
8    Q.    Again for SupeRX?
9    A.    For SupeRX, yes, correct.
10    Q.    Just -- can we make sure we spell
11 SupeRX correctly? Could you spell it for the
12 record, please?
13    A.    Yes. S-U-P-E-R-X.
14    Q.    How long did you hold this
15 position as pharmacy manager?
16    A.    Let's see. Well, SupeRX was
17 eventually purchased by Revco. So I was the
18 pharmacy manager at that location for SupeRX for
19 a period of probably a year or a little more.
20 And then Revco eventually purchased the company
21 SupeRX. So then I was the same position, same
22 location, just with Revco versus SupeRX. And
23 then eventually I left Revco.
24    Q.    And what year did you leave

Page 27

1 Revco?
2    A.    I'm trying to think. It was
3 around the time of my second kid, so -- I do know
4 what year that was. I would say 1997 or maybe
5 late 1996 I left Revco.
6    Q.    And the pharmacies that you
7 worked for for SupeRX and then later for Revco,
8 is it correct that those pharmacies dispensed
9 controlled substances?
10    A.    That is correct.
11    Q.    You say you left Revco in 1997.
12       What was your next position?
13    A.    Well, 1996 or 1997, I'm not
14 100 percent certain.
15       But my next position was a staff
16 pharmacist for Rite Aid.
17    Q.    Where was that?
18    A.    Initially I was kind of a -- the
19 term that's frequently used in the industry is
20 floater person for Rite Aid. So I was not
21 necessarily permanently assigned to a single
22 location. It was, you know, fairly common to
23 kind of get initially hired on as a floater. And
24 then when there was a permanent opening, you

Page 28

1 would get a permanent opening.
2       So initially I worked in multiple
3 locations.
4    Q.    Was there a region of the country
5 where you served as a floater?
6    A.    Yes. Northern Kentucky.
7    Q.    So you were still living in the
8 same location where you had been?
9    A.    Yes.
10    Q.    How long did you hold this
11 position as a staff pharmacist?
12    A.    I was promoted to pharmacy
13 manager at a particular Rite Aid location,
14 probably about a year or a little under a year
15 after coming to work for Rite Aid.
16    Q.    So what, 1998, do you think?
17       MR. LAVELLE:  Object to form.
18       THE WITNESS:  I think early 1998
19 is probably correct.
20 BY MR. SIMMER:
21    Q.    What were your responsibilities
22 as a manager?
23    A.    I was the pharmacy manager at a
24 location in Falmouth, Kentucky initially. And as

Page 29

1 a pharmacy manager, responsibilities include
2 things like, you know, scheduling your staff, you
3 know, ordering product, ensuring that
4 prescriptions are filled accurately and
5 correctly. You know, and -- you know, providing
6 patient counseling and, you know, basically just
7 ensuring quality patient care to the community
8 that you -- you're responsible for.
9    Q.    I believe that Rite Aid tracks or
10 keeps track of its pharmacies with a four-digit
11 number.
12       Do you know what the four-digit
13 number was for this Falmouth, Kentucky Rite Aid
14 pharmacy that you -- where you were manager?
15    A.    I do not. And it doesn't exist.
16 It hasn't existed for a long time.
17    Q.    That particular pharmacy doesn't
18 exist anymore?
19    A.    It was sold to CVS. All of the
20 Northern Kentucky pharmacies were sold to CVS at
21 some point in time.
22       And just to be clear, I believe
23 at least today the store numbers are actually
24 five-digit numbers.

Page 30

1  Q.   Are they?  Okay.
2       How long did you have that job as
3  the manager of the Falmouth, Kentucky pharmacy?
4     A.   I would say a little under a
5  year.
6     Q.   What was your next -- before I
7  move to that.
8     A.   Uh-huh.
9     Q.   Did you dispense controlled
10 substances from that pharmacy?
11    A.   Yes.
12    Q.   What was your next position after
13 your manager position at the Falmouth, Kentucky
14 Rite Aid pharmacy?
15    A.   That's a little hard to describe,
16 because at that point in time, I was kind of
17 identified as somebody that, you know, both had
18 an interest in as well as was recognized as a
19 potential candidate for a higher-level position.
20 So I did a lot of things for the region in
21 preparation for that.  So I -- at that point, I
22 still filled in more like a floater
23 pharmacist-type concept, if I was needed.  But I
24 also did additional responsibilities like

Page 31

1  conducting, you know, training sessions in the
2  region, like I actually spent some time learning
3  and working as a front end store manager.  And I
4  did a lot of, you know, training, regional-type
5  training.  And basically activities designed to
6  prepare me for a potential district level role.
7     Q.   What region was this?
8     A.   This would be Kentucky, although
9  there were stores in Kentucky, Tennessee, the
10 region had some stores in Indiana.  I don't
11 recall if there were a couple in Ohio, but the
12 easiest way to describe that region would be the
13 Kentucky region.  That's how I would describe it.
14    Q.   You said you did some training in
15 the region.
16       What kind of training was this?
17    A.   I did some training on the
18 computer system.  So, for instance, new
19 technicians, you know, I would teach them the
20 basics of how to, you know, do things on the --
21 on the computer.
22       I did some training on
23 nutritional supplements at one point in time.
24       And at that time we had a

Page 32

1  technician training program that was in its
2  infancy.  And so I would travel throughout the
3  region and conduct technician training sessions.
4     Q.   You said you also received
5  training yourself to enhance your skills; is that
6  right?
7       MR. LAVELLE:  Object to form.
8       THE WITNESS:  I don't believe I
9     said that.
10 BY MR. SIMMER:
11    Q.   I'm sorry.
12       I think you talked about how you
13 received skills to work in the front end store;
14 is that right?
15       MR. LAVELLE:  Object to form.
16       THE WITNESS:  As part of my
17    development, in preparation to possibly
18    be a district manager, I spent some time
19    learning the front end of the store.
20 BY MR. SIMMER:
21    Q.   During this time before you
22 became a district manager, did you receive any
23 training in the handling of controlled
24 substances?

Page 33

1     A.   Not as part of that, no.
2     Q.   Had you received any training
3  prior to this time in the handling of controlled
4  substances?
5     A.   As a pharmacist, you know,
6  pharmacy -- what you learn in pharmacy school.
7     Q.   What kind of coursework did you
8  have in pharmacy school on the handling of
9  controlled substances?
10    A.   Yeah, I don't recall.  That's a
11 long time ago.
12    Q.   So after this position, I'm not
13 sure there was a title for it, but after this
14 position, what was your next position you had
15 with Rite Aid?
16    A.   Pharmacy district manager.
17    Q.   And is that what's reflected on
18 your profile on page 2, pharmacy district
19 manager, March 2000?
20    A.   Yes.  But I would like to
21 clarify.
22       I believe the initial title was
23 pharmacy development manager.  It's always been
24 referred to as PDM, but I believe when I took the

Page 34

1 job it was called pharmacy development manager.
2 And then later on, it became pharmacy district
3 manager. But it's the same job with the same --
4 an acronym, but just to...
5 　　Q.　And is the date on your profile
6 accurate, it was March 2000?
7 　　A.　Yes.
8 　　Q.　And was this in the same area
9 where you had been working already in Kentucky?
10 　　A.　It was, although I primarily, as
11 a pharmacy district manager, had the more eastern
12 part of Kentucky. So as pharmacy district
13 manager initially, my area was the eastern, I
14 would say third of the state.
15 　　Q.　And what were your
16 responsibilities as pharmacy district manager?
17 　　A.　So as pharmacy district manager,
18 you would be responsible for staffing your
19 stores. You would be responsible for ensuring
20 that the stores are open all of the scheduled
21 hours; for ensuring that, you know, vacations are
22 covered; for ensuring that, you know, your
23 associates are, you know, being taken care of.
24 　　　　Recruiting was a big part of the

Page 35

1 job back then. So you would work with the school
2 of pharmacy. I actually, you know, worked very
3 closely with the students, you know, at the
4 school and things like that. You would also
5 recruit existing pharmacists that were already
6 working at other locations, be responsible for,
7 you know, the overall, you know, administrative
8 aspect of running multi-unit locations.
9 　　　　There was also a district
10 manager. So at that point in time, there was a
11 district manager and a pharmacy district manager.
12 　　Q.　What's the difference between the
13 two positions?
14 　　A.　The district manager at Rite Aid
15 at that point in time had the overall
16 responsibility for the stores. And the pharmacy
17 district manager was more specific to, you know,
18 the pharmacy piece, the recruitment piece, the
19 staffing piece, the scheduling piece. You know,
20 that arrangement, you know, sort of shifts and
21 changes throughout the years and throughout the
22 industry. But that's how it was at that point in
23 time.
24 　　Q.　Just to be clear, what

Page 36

1 arrangement are you talking about changed over
2 time?
3 　　A.　District level leadership at
4 retail pharmacy locations.
5 　　Q.　Do you mean who held the
6 positions or is it something different?
7 　　　　MR. LAVELLE: Object to form.
8 　　　　THE WITNESS: No. I would say
9 organizational structure.
10 BY MR. SIMMER:
11 　　Q.　So the positions themselves
12 changed; is that right?
13 　　A.　The positions and
14 responsibilities, yes.
15 　　Q.　As pharmacy district manager, did
16 you have oversight responsibility for controlled
17 substances?
18 　　A.　I would say that the pharmacy
19 manager had oversight regarding the dispensing of
20 controlled substances in the store locations, but
21 there were certain activities that I think would
22 fall into that bucket.
23 　　Q.　And what were those activities?
24 　　A.　One example I could provide is

Page 37

1 back then, we had a report, a paper report called
2 the Above Average report. And as a pharmacy
3 district manager, it would be our responsibility
4 to follow up on those and respond back.
5 　　Q.　What information was captured in
6 the Above Average report?
7 　　A.　The report, as I remember it
8 being constructed, would have like a store number
9 and a particular kind of prescription at that
10 store where, you know, the ordered amount
11 compared to -- I'm not sure how it worked exactly
12 at that time, but like the dispensed amount, you
13 know, was something that they wanted to be looked
14 into.
15 　　Q.　Was this true for all drugs that
16 were ordered by the stores or just a certain
17 subset of the drugs ordered by the stores?
18 　　　　MR. LAVELLE: Object to form.
19 　　　　THE WITNESS: Yeah, I really
20 can't answer that, cause I don't -- I
21 mean, at that point in time, I received,
22 you know, a report, and I had a job to
23 do, which was to respond back on the
24 report. So I can't 100 percent say how

Page 38

1  it was constructed.
2  BY MR. SIMMER:
3      Q.    What kind of training did you
4  receive in order to perform your job as a
5  pharmacy district manager?
6      A.    One of the things that they did
7  back then was they would take a pharmacy district
8  manager -- new pharmacy district manager and have
9  you spend some time with an existing pharmacy
10  district manager, or they were called pharmacy
11  development managers at that time. So one of the
12  things that they did training-wise is you would
13  spend I believe about a week, like with --
14  traveling with another experienced pharmacy
15  development manager to learn the ropes, so to
16  speak.
17         At that time, they also brought
18  you up to corporate for a few days, where
19  different like corporate people that had
20  knowledge of different aspects of the business
21  would spent some time with you as well.
22         So I would say it was a
23  combination of some sort of corporate class-like
24  training with what I would describe more as, you

Page 39

1  know, real world training done with a -- with an
2  experienced buddy.
3      Q.    Did you receive training in how
4  to handle controlled substances?
5      A.    I don't recall anything specific
6  to controlled substances. Like I said, a lot of
7  it, you know, was traveling with your experienced
8  pharmacy development manager. So I'm sure that
9  the things that, you know, you spent time on
10  together probably depended a little bit on what
11  that person had going on at that point in time.
12  But I don't recall anything specific.
13      Q.    Is it correct that during this
14  time period that Rite Aid had a threshold system
15  for limiting the amount of controlled substances
16  that pharmacies could order?
17         MR. LAVELLE: Object to form.
18         THE WITNESS: I don't know at
19  that point in time if they did or did
20  not.
21  BY MR. SIMMER:
22      Q.    Did you have any supervisory
23  authority over approving threshold increases for
24  the pharmacies that you managed?

Page 40

1      A.    At that point in time, no, not
2  that I'm aware of.
3      Q.    Do you know who had that
4  responsibility to approve threshold increases?
5      A.    No, not at that time.
6      Q.    How many pharmacies were you
7  overseeing as pharmacy district manager?
8      A.    It varied over the course of this
9  time frame. So I would say on the low end, 25.
10  On the high end, maybe 45. There were some
11  times, for instance, during that time period
12  where -- like if there was a vacancy in a
13  neighboring area that a different pharmacy
14  development or district manager served, you know,
15  they would divide it up and like the other two
16  neighbors would cover parts of it until they
17  hired someone in. So I think the range, I would
18  say, is 25 to 45.
19      Q.    And just to make sure we cover
20  that -- and maybe it was a well-defined area, but
21  what was the approximate area or geographic area
22  that you covered while you were a pharmacy
23  district manager?
24      A.    So initially the approximate area

Page 41

1  I covered was Eastern Kentucky. Like I said,
2  that would be sort of the, you know, third of the
3  state over this way. Pikeville, Prestonsburg,
4  Paintsville, that part of the state.
5         I still lived in Northern
6  Kentucky, so that was not particularly convenient
7  for me, but, you know, you have to make
8  sacrifices to, you know -- like that to get the
9  job.
10         So, you know, it was always kind
11  of an understanding that if something closer
12  opened up, that I would be able to put in and get
13  that. So at some point during this time frame, I
14  went from having Eastern Kentucky to what I would
15  describe as South Central Kentucky. So South
16  Central Kentucky would be like Richmond,
17  Lexington, Berea. Less eastern and more middle
18  of the state.
19      Q.    And approximately when did you
20  assume responsibilities for South Central
21  Kentucky?
22      A.    I would say about the midpoint of
23  that three-year time frame. So I'm guessing late
24  2001, maybe early 2002. I don't recall the exact

Page 42

1 point in time.
2     Q.    And did you manage those South
3 Central Kentucky pharmacies until you left this
4 position in April 2003?
5     A.    That's correct.  At the time that
6 I came up to corporate, I was managing the more
7 south central area at that time.
8     Q.    The next position on your profile
9 you state is the senior manager, third-party
10 operations.
11         Can you tell us what that
12 position entailed?
13     A.    Okay.  So third-party operations
14 basically pertains to claims -- to pharmacy
15 claims.  So there's various components to that.
16 There's processing of the claims, there's the
17 adjudication process.  There is the plan setup in
18 order for all that to occur in the stores.  And
19 there also was a third-party call center.  So
20 those were the types of activities.
21     Q.    Do I understand it correctly that
22 this third-party operations position was about
23 the payment of claims?
24         MR. LAVELLE:  Object to form.

Page 43

1         THE WITNESS:  I would say it's
2     more than that.  It's also the
3     infrastructure and support to enable
4     those things to occur.
5 BY MR. SIMMER:
6     Q.    The title of the position, it
7 says here, senior manager.
8         Were you always the senior
9 manager of third-party operations during this
10 time period?
11     A.    April 2003 to January 2007, yes.
12     Q.    Okay.  And did you still live in
13 Northern Kentucky at this time?
14     A.    No, no, no.  This is -- this
15 position is a corporate position.  So to do this
16 position, I had to move from Kentucky to
17 Pennsylvania.
18     Q.    Okay.  What responsibility did
19 you have with regard to controlled substances in
20 this position?
21     A.    Really none.
22     Q.    The next position you have on
23 your profile is as director, pharmacy loss
24 prevention in January 2007 and through August

Page 44

1 2010.
2         Was this still on the corporate
3 headquarters?
4     A.    Yes.
5     Q.    And what were your
6 responsibilities?
7     A.    With the director of pharmacy
8 loss prevention position, my responsibilities
9 basically revolved around pharmacy shrink,
10 controlling pharmacy shrink, improving pharmacy
11 shrink, developing programs and techniques to
12 improve.
13     Q.    And what do you mean by "pharmacy
14 shrink"?
15     A.    Okay.  "Shrink" is sort of a
16 retail industry term that basically means a loss
17 of inventory, a comparison of book to physical
18 inventory, a shortage.
19     Q.    So this was a responsibility for
20 every pharmacy that Rite Aid owned nationally?
21     A.    Yes.  This was a corporate
22 position.  So this was not the kind of position
23 that was like the pharmacy district manager role.
24 It wasn't a specific, you know, region or part of

Page 45

1 the country.  This was a corporate position.
2     Q.    How were you trained to perform
3 your new job?
4     A.    A lot of this one was learn as
5 you go.  I did have one predecessor.  This was a
6 relatively new position.  But I did have one
7 predecessor that spent some time with me to, you
8 know, sort of teach a little bit.
9         There also was a senior director
10 of, for lack of a better term, regular loss
11 prevention, who was a very, very veteran person
12 who also spent some time.  But being a relatively
13 new position, a lot of it was, you know, create
14 and learn on your own.
15     Q.    So are you saying that you
16 created the job description yourself?
17         MR. LAVELLE:  Object to form.
18         THE WITNESS:  No.  As I stated
19     before, I did have one predecessor, so
20     the job description would have existed
21     before I arrived.
22 BY MR. SIMMER:
23     Q.    Did the job change when you took
24 over?

Page 46

1    A.    I would think with any corporate
2  job, part of your job is to change the position.
3  So yes.  I mean, I implemented programs and
4  procedures that certainly didn't exist when I
5  took the role.  I think that's true of any role
6  at that sort of level.
7    Q.    Who was your predecessor?
8    A.    My predecessor in this role was
9  Tammy Royer.  She was the first director of
10 pharmacy loss prevention.
11   Q.    Could you spell her last name,
12 please?
13   A.    Yes.  R-O-Y-E-R.
14   Q.    You said you received some
15 training from her?
16   A.    Tammy sat down with me on a
17 couple of occasions and, you know, provided the
18 kind of, okay, here's your desk, here's your
19 office, here's -- here's what I do, you know,
20 today in my role.  She actually had already left
21 the role for another position at that point, so
22 she was kind enough to, you know, come back and
23 spend some time with me to sort of show me the
24 ropes, so to speak.

Page 47

1    Q.    You said there was another
2  individual that handled loss prevention in
3  another part of the company that also gave you
4  training.
5          Who was that?
6    A.    So Cathy Langley.  And again, I
7  think in that case, you know, I would say less
8  training but, you know, certainly mentoring,
9  advising, you know.  It's hard to say where
10 training and mentoring and guiding come to play.
11 But certainly Cathy was a valuable mentor.
12   Q.    Let me hand you what we've marked
13 as Palmer Exhibit 2.
14          - - -
15          (Deposition Exhibit No. Rite
16      Aid-Palmer-2, Organizational Chart,
17      Corporate Loss Prevention Department
18      (9575), Bates stamped
19      Rite_Aid_OMDL_0044554, 2 pages, was
20      marked for identification.)
21          - - -
22 BY MR. SIMMER:
23   Q.    Take a look at that.  And while
24 you're doing that I'll identify it for the record

Page 48

1  as a two-page document, Bates ending
2  Rite_Aid_OMDL_0044554.  And the second page is
3  cut off, so...
4          MR. LAVELLE:  I'll just note for
5  the record that the copies that have been
6  marked, the Bates numbers don't appear on
7  them.  It's obscured.  As well as the
8  confidentiality.
9          MR. SIMMER:  John, what I would
10 suggest is, as we did in the prior
11 deposition where we had this issue, we'll
12 replace this document with one with a
13 Bates numbering on it.
14         MR. LAVELLE:  As long as we are
15 consulted and can agree on that, that's
16 fine.
17         MR. SIMMER:  That's exactly what
18 we did last time, so we'll do the same
19 thing this time.
20         MR. LAVELLE:  Okay.  Very good.
21         MR. SIMMER:  Is that okay?
22         MR. LAVELLE:  Absolutely.  Thank
23 you.
24 BY MR. SIMMER:

Page 49

1    Q.    Do you recognize this document?
2    A.    I do not specifically.
3    Q.    In the lower left-hand corner, do
4  you see where it says "January 2010"?
5    A.    I do see that.
6    Q.    And you see that at the top of
7  the document, "Corporate Loss Prevention
8  Department."
9          Do you see that?
10   A.    I do see that.
11   Q.    Was that the department you
12 worked at?
13   A.    Yes.
14   Q.    And do you see right below that,
15 it says, "28 Filled Positions, 2 Open Positions,
16 3 Vendor-Paid Positions"?
17         Do you see that?
18   A.    I do.
19   Q.    Do you have an idea what that's
20 representing?
21   A.    What this clearly represents is
22 an org chart.  So -- and obviously, I recognize
23 it as an org chart.
24   Q.    Okay.  Do you see your name

Page 50

1 over -- I guess across the middle there as the
2 Director, Pharmacy LP?
3      A.    I do.
4      Q.    And that's loss prevention, I
5 take it. Right?
6           MR. LAVELLE: Object to form.
7           THE WITNESS: Not everyone has an
8      LP, but I -- I believe LP would certainly
9      be loss prevention.
10 BY MR. SIMMER:
11     Q.    Were you the only pharmacist that
12 worked in loss prevention at this time?
13     A.    Yes.
14     Q.    Is there a reason that they had a
15 pharmacist fill this position that you're aware
16 of?
17          MR. LAVELLE: Object to form.
18          THE WITNESS: I can't
19     specifically speak to why Chuck
20     specifically wanted me for this position.
21 BY MR. SIMMER:
22     Q.    And you're referring to Chuck
23 Kibler?
24     A.    Yes.

Page 51

1      Q.    And that was your supervisor.
2 Correct?
3      A.    Yes.
4      Q.    And was he your supervisor during
5 the entire time you were working in loss
6 prevention?
7      A.    No.
8      Q.    Who else was your supervisor
9 besides Mr. Kibler?
10     A.    Bob Oberosler.
11     Q.    Could you please spell his name?
12     A.    Yeah. Let me...
13 O-B-E-R-O-S-L-E-R. Yes.
14     Q.    So the entirety of your position
15 was dealing with shrink; is that right?
16     A.    Pharmacy -- specifically pharmacy
17 shrink, pharmacy losses, that was the main focus
18 of the position.
19     Q.    Did you have any responsibilities
20 for approving increases in pharmacy thresholds?
21     A.    Yes.
22     Q.    And what were those
23 responsibilities?
24     A.    At some point during this time

Page 52

1 frame -- and I believe it would have been in
2 2008 -- a new process was implemented by
3 McKesson. And I was selected to be a part of
4 that process, which involved DSD McKesson
5 thresholds. So part of the time, yes.
6      Q.    And what is DSD?
7      A.    DSD stands for direct store
8 delivery. So DSD means suppliers that are not
9 internal. It's not -- we have our own warehouses
10 and distribution centers that provide some of the
11 products that are in the stores. The products
12 that are in the stores that do not come from that
13 internal warehousing would be products that come
14 from direct store delivery vendors.
15     Q.    And what was your responsibility
16 for this new threshold system that McKesson
17 developed?
18     A.    My responsibility was really to
19 serve as a contact point and liaison between the
20 stores and field and representatives at McKesson.
21     Q.    And tell us exactly what you did
22 as a contact point and/or liaison.
23     A.    Sure. So the way the process
24 would work is if a store had been blocked on an

Page 53

1 order of a particular base code from McKesson,
2 the process was designed to where the store would
3 have to contact their pharmacy district manager.
4 And then the pharmacy district manager, after
5 evaluating the situation, if they deemed some
6 sort of an increase was needed, they were to send
7 that information, the store number, the base code
8 involved, the business reason driving a need for
9 an increase, and the percentage that they thought
10 was needed, they would send that to me. And then
11 I would also evaluate that. And if deemed
12 appropriate, I would forward those requests on to
13 the McKesson representatives.
14     Q.    What were the criteria for
15 determine (sic) whether a store actually needed a
16 threshold increase?
17     A.    Are you saying what are the
18 business reasons in the process I described?
19     Q.    Well, you talked -- you said a
20 moment ago that the pharmacy district manager
21 would determine if they -- if he or she deemed
22 that it was -- the increase was needed. I am
23 just trying to establish what you mean by needed.
24     A.    I don't think those were my exact

Page 54

1  words, but let me -- I think I can still answer
2  the question, though.
3         So if a particular store was
4  blocked on a particular base code and the store
5  sends an email or calls their PDM and says, hey,
6  you know, something's wrong here, I just tried to
7  order this product and I have got a notation that
8  I can't order it, that I'm being blocked.
9         The pharmacy district manager
10 then would basically determine or gauge, okay,
11 what -- you know, why is this being blocked.
12 Hopefully they're familiar with the program.  If
13 not, they would probably call out and ask.
14        And then they would, you know,
15 take a look at or inquire of the pharmacist or
16 the store, you know, okay, you know, what's --
17 what's driving this need?  Did you have a, you
18 know, a recent pour over, you know, they could
19 evaluate whether, you know, there's significant
20 organic growth.
21        That's why I was talking about
22 the business reasons, part of this.  There's a
23 number of different business reasons that
24 would -- would drive those things.

Page 55

1     Q.    You used the term "pour over."
2        What do you mean by that?
3     A.    Okay.  So a pour over is kind of
4  an industry accepted term.  And basically what a
5  pour over is is when an existing pharmacy closes
6  down or is going to go out of business, whether
7  it's a chain or an independent, for obvious
8  reasons, it can't just like close and shutter its
9  doors and the people that, you know, have
10 prescriptions there are basically stuck with
11 nowhere to go.
12        So what happens is those existing
13 prescriptions, those -- those files, those
14 patient records basically get acquired by another
15 pharmacy.  So a pour over is where one pharmacy
16 is basically acquiring the business, the pharmacy
17 business of an existing pharmacy that is closing
18 down.
19    Q.    And what are some of the things
20 that would drive significant growth in the
21 prescriptions that a pharmacy would be
22 experiencing?
23    A.    There's a number of them.  I
24 would say there's -- organic growth would be one

Page 56

1  example.  So, for instance, when I first moved
2  into the town I grew up in, it was one square
3  mile, with a very small population.  Ten years
4  later, it's gigantic with a huge -- you know,
5  much, much larger population.  New businesses,
6  new providers.  You know, if a new hospital opens
7  up next to the pharmacy or an existing hospital
8  now opens a cancer unit.
9         We talked about pour overs and
10 file buys.  That's a -- that's certainly a big
11 one.  Reasons like that.
12    Q.    You mentioned another name or
13 another term, "file buy."  What is that?  And
14 that's B-U-Y?
15    A.    It is.  And actually, file buy is
16 really just another name for a pour over.  I
17 shouldn't have caused confusion there, because
18 that's really the same thing.  It's just -- some
19 people call it file buy, some people call it a
20 pour over.
21    Q.    So a file buy, in this instance,
22 would be one pharmacy buying the business from
23 another pharmacy; is that right?
24    A.    Yes.  It's the same thing I

Page 57

1  described earlier.
2     Q.    So in the process that you
3  outlined, if the pharmacy district manager finds
4  out that one of the pharmacies he or she is
5  managing has a need to increase its threshold,
6  the process first is that they contact that
7  pharmacy and understand what the reason is for
8  that threshold increase; is that right?
9         MR. LAVELLE:  Object to form.
10        THE WITNESS:  That's generally
11     correct, because they're going to have to
12     provide that reason when they respond.
13 BY MR. SIMMER:
14    Q.    As part of doing that due
15 diligence to determine whether to increase the
16 threshold, do I have it right that the district
17 manager would need to go look at the dispensing
18 data from the pharmacy?
19    A.    I don't think that's correct in
20 all cases, no.  Certainly in some maybe, but not
21 in all cases.
22    Q.    Is there any part of the process
23 along the way to get it sent up to McKesson that
24 there's an examination of the prescribing data to

Page 58

1 determine what's driving the need?
2     A.    I would say dispensing data.  But
3 again, not in every instance.  Every instance is
4 unique.  So, for example, if one of our locations
5 was broken into at night and a significant
6 quantity of the drugs were stolen in a nighttime
7 break-in, I don't -- and they were getting
8 blocked by McKesson on getting product in to take
9 care of their customers, I don't know in that
10 case as an example there would be a need to, you
11 know, necessarily dive into prescriber data, as
12 you described it.  You know what happened that's
13 driving the increase.
14     Q.    So for the pharmacy district
15 manager then to come to you and say that one of
16 my pharmacies needs an increase, is that all
17 handled via email or is there some other way that
18 that request is handled?
19          MR. LAVELLE:  Object to form.
20          THE WITNESS:  Email is generally
21     how that was handled, yes.
22 BY MR. SIMMER:
23     Q.    And once you get that information
24 from a pharmacy district manager -- strike that.

Page 59

1          Once you got that information
2 from a district manager, pharmacy district
3 manager, what did you then do to examine that
4 request?
5     A.    As we stated before, every
6 situation is unique.  So it's going to depend on
7 each situation, but I can give you examples.
8          So I might call the pharmacy
9 district manager if there -- what they put on
10 email isn't enough information, reach out to the
11 pharmacy district manager and say, okay, you put
12 down, you know, business increase or something a
13 little more ambiguous.  I might call and say,
14 okay, can you give me more information.
15          You know, I might go to sources
16 of data information.  So, for example, if the
17 pharmacy district manager indicated that their
18 overall book of business was increasing by a
19 certain amount, I could go into the system and
20 see or not see that in fact, you know, they were
21 up or down approximately that amount.
22          If their indication was that
23 there had been a break-in or a burglary,
24 certainly working in loss prevention I could

Page 60

1 confirm if that was in fact true, if there had
2 been a break-in.
3          And similarly, if they indicated
4 that there was a pour over, I could confirm that
5 there was in fact a recent pour over or not,
6 so -- but it varied situation by situation.
7     Q.    What were the sources of data
8 that you referred to?
9     A.    Well, in the example I gave you,
10 the source of data would be like their script
11 count, sales data, script count.
12     Q.    What is the name of the database
13 where that sales data is housed?
14          MR. LAVELLE:  Object to form.
15          THE WITNESS:  So we have a
16     mainframe system, so I don't want to try
17     and get too techy here, but we sort of
18     have a proprietary mainframe system.
19     There's different ways that you can
20     access the data in that system.  Today,
21     for example, most of that access is
22     through portal applications.  If you go
23     back to like my third-party days, most of
24     that would have been through what we

Page 61

1 called green screen applications.
2          But at the end of the day, you
3 know, there's a proprietary mainframe
4 system.  And there's different ways that
5 you can access data within that system.
6 BY MR. SIMMER:
7     Q.    Now, your first position I think
8 we established was as a director of pharmacy loss
9 prevention.
10          And that was until August 2010;
11 is that correct?
12          MR. LAVELLE:  Object to form.
13          THE WITNESS:  That's correct.
14 BY MR. SIMMER:
15     Q.    And what was your next position
16 after that?
17     A.    My next position was senior
18 director, pharmacy loss prevention.
19     Q.    Were your duties different than
20 your former position?
21     A.    Not substantively, no.
22     Q.    This was a promotion.  Correct?
23     A.    It was.
24     Q.    And did you take on additional

Page 62

1 responsibilities?
2    A.    Not substantively.
3    Q.    Did you receive any different
4 training in order to perform your position as a
5 senior director, pharmacy loss provision --
6 excuse me, prevention?
7    A.    No.
8    Q.    I think you said your supervisor
9 had been Mr. Kibler.
10        Did the supervisor change at some
11 point in time while you were a senior director?
12    A.    I can't -- Bob O came to the
13 organization right around that time frame.  I
14 honestly can't remember whether it was Chuck or
15 Bob that was there at that time.  It was close.
16    Q.    Bob O is Bob Oberosler?
17    A.    Yes.  He frequently goes by Bob
18 O.
19    Q.    Just so we have an accurate
20 spelling, can you spell his last name, please?
21    A.    I believe I already did.  I can
22 spell it again, though.
23    Q.    Yes, you could, please.
24    A.    Okay.

Page 63

1    Q.    I don't recall that you did.
2    A.    Okay.  O-B-E-R-O-S-L-E-R.
3    Q.    And you held that position as
4 senior director until April 2011.  Correct?
5    A.    That's correct.
6    Q.    And what was your next position
7 after that?
8    A.    My next position was vice
9 president, compliance monitoring and privacy
10 officer.
11    Q.    And what were your
12 responsibilities?
13    A.    Probably the biggest
14 responsibility was to serve as the HIPAA privacy
15 officer for Rite Aid.  Some additional
16 responsibilities were to serve as the USA Patriot
17 Act compliance officer for Rite Aid.  And then
18 the third areas of responsibility was around some
19 regulatory compliance monitoring, including
20 involvement in our store-level compliance
21 program.
22    Q.    Did you have any responsibility
23 for controlled substances and controlled
24 substances monitoring in this position?

Page 64

1        MR. LAVELLE:  Object to form.
2        THE WITNESS:  To some degree.
3 For instance, we -- we have a controlled
4 substance checklist that we utilize in
5 stores and in the field.  And, you know,
6 certainly as a -- the pharmacist, or one
7 of them in the department, when revisions
8 to that checklist were done, they would
9 consult me as a subject matter expert,
10 for example, to help.
11        The checklist I believe was
12 already in existence when I got there,
13 but to help improve and enhance it.
14 BY MR. SIMMER:
15    Q.    And what part of that checklist
16 had to do with controlled substances?
17    A.    Well, the whole -- really the
18 whole checklist.  It's a -- it's a controlled
19 substance DEA checklist.
20    Q.    And that was the title of the
21 document, a controlled substance checklist?
22    A.    I wouldn't want to speak to the
23 exact phrasing of the title without it being in
24 front of me, but substantively, that's correct.

Page 65

1    Q.    How was this checklist used?
2    A.    So at Rite Aid, there's a couple
3 of different ways in which -- and this isn't the
4 only checklist.  We have some other checklists.
5 This is the one that relates to controlled
6 substances, which is what you asked about.
7        So the way this would be used is
8 we have a controlled self-assessment program out
9 in the stores, where pharmacy managers would
10 complete this checklist.  And then we also ask
11 our field leaders to periodically complete this
12 checklist on their stores.  And then also our own
13 compliance team would complete these checklists
14 on a periodic basis as well.  We refer to that as
15 three lines of defense.
16        First line of defense being the
17 store's self-assessment.  Second line of defense
18 being the field leaders conducting an assessment
19 of their stores.  And the third line being the
20 independent compliance folks conducting those
21 assessments.
22    Q.    In this new position as a VP
23 compliance monitoring, you have responsibilities
24 for that controlled substances checklist.

Page 66

1  Correct?
2          MR. LAVELLE:  Object to form.
3          THE WITNESS:  I wouldn't say
4  responsibilities for the checklist.
5  So -- and the individuals who conducted
6  those checklists at that point in time
7  didn't report directly to me.  I would
8  say I served as the department's sort of
9  a -- you know, a -- a pharmacist that
10 could help with questions around the
11 checklist, help in developing the
12 checklist, improving the checklist,
13 things of that nature, subject matter
14 guide.
15 BY MR. SIMMER:
16    Q.    What did you draw upon in order
17 to perform your responsibilities as a subject
18 matter guide with regard to this controlled
19 substance checklist?
20          MR. LAVELLE:  Object to form.
21          THE WITNESS:  Internal knowledge,
22 experience.  Sometimes I might have to
23 consult a reference or a more
24 knowledgeable subject matter expert, if I

Page 67

1  was looking at the checklist and had a
2  question.  But, you know, sort of a
3  combination of those -- those things.
4          And there were certainly other
5  individuals that also helped in that
6  process.
7  BY MR. SIMMER:
8     Q.    And who are they?
9     A.    I would say the -- one of the
10 main ones would be Janet Hart.
11    Q.    And what was her role?
12    A.    Janet Hart works in our
13 government affairs.  I think today it's called
14 regulatory affairs department.
15    Q.    Am I correct her last name is
16 spelled H-A-R-T?
17    A.    You are correct.
18          MR. LAVELLE:  Counsel, we've been
19 going for over an hour.  When we get to a
20 convenient place, can we take a break?
21          MR. SIMMER:  This would be a good
22 time.
23          MR. LAVELLE:  Thank you.
24          THE VIDEOGRAPHER:  Off the record

Page 68

1  at 10:48 a.m.
2                 - - -
3          (A recess was taken from
4  10:48 a.m. to 11:09 a.m.)
5                 - - -
6          THE VIDEOGRAPHER:  We're back on
7  the record at 11:09 a.m.
8          MR. LAVELLE:  Just note on the
9  record that counsel had an opportunity to
10 confer off the record.  We understand
11 that there was a production issue with
12 the documents that plaintiffs intend to
13 use as exhibits.  And I think our
14 agreement is that we'll just note the
15 Bates numbers on the record.  I'm going
16 to have a standing objection to all of
17 them, but we will eventually confer and
18 substitute in as the ones that will be
19 bound with the original of the
20 transcript, documents that we agree are
21 fully as they were originally produced,
22 including Bates numbers and
23 confidentiality; is that correct?
24          MR. SIMMER:  That's correct.

Page 69

1          And you're going to have that as
2  a standing objection; is that right,
3  John?
4          MR. LAVELLE:  Yes.  Thank you,
5  Mr. Simmer.
6  BY MR. SIMMER:
7     Q.    Before our break, sir, you talked
8  about the fact that the pharmacy district
9  managers reviewed the Above Average log; is that
10 right?
11    A.    Yes.
12    Q.    And that's one of the things that
13 you did as a pharmacy district manager.  Right?
14    A.    At that point in time, yes.
15    Q.    And how often did you review that
16 Above Average log?
17    A.    That was a monthly report.
18    Q.    So that's a monthly report after
19 the fact.
20          In other words, the prescriptions
21 have already been filled.  Right?
22          MR. LAVELLE:  Object to form.
23          THE WITNESS:  That was a monthly
24 report at that -- at that time, that was

Page 70

1 a monthly report after the prescriptions
2 were filled.
3 BY MR. SIMMER:
4    Q.    Okay.  And you said you did
5 follow-up after you looked at the log; is that
6 correct?
7    A.    The report, yes.
8    Q.    And what kind of follow-up did
9 you do with pharmacies about the Above Average
10 log?
11    A.    As a pharmacy district manager, I
12 would confirm what quantity was on hand at the
13 pharmacy in order to determine if any product was
14 missing.
15    Q.    So you're simply looking for
16 shrinkage; is that right?
17    A.    You're looking for loss, yes.
18    Q.    Nothing further in terms of your
19 review of the Above Average log other than
20 looking for missing stock; is that right?
21       MR. LAVELLE:  Object to form.
22       THE WITNESS:  That's correct.
23 BY MR. SIMMER:
24    Q.    Also before our break you talked

Page 71

1 about what you called at Rite Aid the three lines
2 of defense.
3       Do you remember that?
4    A.    Yes.
5    Q.    And that has to do with I think
6 also suspicious order monitoring is correct.
7 Right?
8       MR. LAVELLE:  Object to form.
9       THE WITNESS:  Yeah, I'm not sure
10    I understand.
11 BY MR. SIMMER:
12    Q.    So what are the lines of defense
13 that are actually protecting here?
14       MR. LAVELLE:  Object to form.
15       THE WITNESS:  Three lines of
16    defense is an IIA concept that we
17    integrated specifically into specific
18    things like the control -- like the
19    review process.
20 BY MR. SIMMER:
21    Q.    Was it also to monitor controlled
22 substances?
23    A.    Again, the three lines of defense
24 is an IIA concept.  I'm not sure what you mean by

Page 72

1 was it used.  It's not used for anything.
2    Q.    What is IIA?
3    A.    The International -- Internal --
4 Association of Internal Auditors or the Internal
5 Audit Association.
6    Q.    So I'm just trying to understand.
7       These lines of defense you're
8 talking about, did it have anything to do with
9 monitoring controlled substances?
10    A.    As described previously, we
11 applied that concept to our controlled substance
12 reviews.
13    Q.    I think you testified earlier
14 that the stores themselves were the first line of
15 defense.  Right?
16    A.    The controlled self-assessments,
17 yes.
18    Q.    That wasn't my question.
19       My question was whether the
20 stores were themselves the first line of defense.
21       MR. LAVELLE:  Object to form.
22       THE WITNESS:  The stores do the
23    controlled self-assessments, so yes.
24 BY MR. SIMMER:

Page 73

1    Q.    Okay.  So you -- the second time
2 now you've changed my question.
3       So you're saying the
4 self-assessment is the first line of defense.
5 Right?
6       MR. LAVELLE:  Object to form.
7       THE WITNESS:  That the stores --
8    that the stores perform.
9 BY MR. SIMMER:
10    Q.    Is there any other things that
11 the stores themselves are doing that you would
12 deem to be a first line of defense?
13    A.    I can't, you know, apply a
14 concept like that to other -- other things, as
15 you're asking.
16    Q.    Was this first line of defense
17 for the stores in place back when you were
18 pharmacy district manager?
19    A.    No.
20    Q.    When did it go into place?
21    A.    I don't recall exactly.
22    Q.    So back when we were looking at
23 your resume, Exhibit 1, we had talked about
24 your -- the position you held as vice president

Page 74

1 of compliance monitoring, privacy officer.
2         It's right that you held that
3 position until February of last year. Right?
4         MR. LAVELLE: Object to form.
5         THE WITNESS: That's correct. I
6     would like to clarify, you keep referring
7     to this as my resume. This is not my
8     resume.
9 BY MR. SIMMER:
10     Q.    I apologize. You did refer to it
11 as a profile.
12         Your profile says that that was a
13 position you held until February of last year.
14 Right?
15     A.    Yes.
16     Q.    And what was your next position?
17     A.    My next position was the group
18 vice president, compliance, privacy and internal
19 assurance services.
20     Q.    And did you have different duties
21 in this position?
22     A.    Yes.
23     Q.    And could you describe what your
24 responsibilities are?

Page 75

1     A.    My responsibilities in this role
2 are oversight of compliance, privacy and internal
3 assurance services activities.
4     Q.    So oversight of compliance, what
5 is that?
6     A.    In this role, I serve as the
7 chief compliance person at Rite Aid Corporation,
8 so oversight of the compliance program.
9     Q.    Who do you report to?
10     A.    I report to general counsel.
11     Q.    You also said you had privacy
12 responsibilities.
13         What are those?
14     A.    The privacy responsibilities are
15 the privacy officer, you know, the HIPAA privacy
16 officer. That's actually -- that one carried
17 over from the other role. I was the privacy
18 officer before and after.
19     Q.    And you also say that you have
20 responsibility for internal assurance. Correct?
21     A.    Correct.
22     Q.    And what did that involve?
23     A.    Internal assurance services
24 involves internal audit. And we have a fraud and

Page 76

1 ethics component as well.
2     Q.    And this is a position you hold
3 today. Correct?
4     A.    That is the position I hold
5 today.
6     Q.    And you're still working for Rite
7 Aid Corporation?
8     A.    I work for Rite Aid Headquarters
9 Corporation, not Rite Aid Corporation.
10     Q.    Okay. Then with that correction,
11 you still are working for Rite Aid Headquarters
12 Corporation?
13     A.    Yes.
14     Q.    On the left-hand column of your
15 profile, it talks about different certifications
16 that you hold.
17         Do you see that?
18     A.    Yes.
19     Q.    Can you tell us what the CIIP/US
20 is?
21         MR. LAVELLE: Object to form.
22         THE WITNESS: Yes.
23 BY MR. SIMMER:
24     Q.    What is that?

Page 77

1     A.    CIPP-US stands for Certified
2 Information Privacy Professional United States.
3     Q.    And what organization did you
4 receive that certification from?
5     A.    That is the IAPP, International
6 Association of Privacy Professionals.
7     Q.    And this -- when you list it as a
8 certification, that's an actual certification
9 you've received from that organization. Correct?
10     A.    Yes.
11     Q.    Did you take an examination in
12 order to receive that certification?
13     A.    Yes.
14     Q.    And what was involved in taking
15 that examination?
16     A.    You mean like how did I take the
17 examination?
18     Q.    Did you have to take coursework?
19 Did you -- you know, just trying to understand
20 what it took to take that examination, to prepare
21 for it.
22         MR. LAVELLE: Object to form.
23         THE WITNESS: Okay. The -- for
24     the certification, it's self-preparatory.

Page 78

1    So, for example, you can get books to
2  study for the examination.  You can take
3  practice tests to prepare for the
4  examination.  And then you have to go
5  take the test.
6  BY MR. SIMMER:
7    Q.    Did any part of this CIPP-US
8  involve controlled substances?
9    A.    No.
10    Q.    The second certification you list
11  here is CCEP.
12          Do you see that?
13    A.    Yes.
14    Q.    And what organization did you
15  receive that certification from?
16    A.    The SCCE, Society for Corporate
17  Compliance and Ethics.
18    Q.    And when did you receive this
19  CCEP certification?
20    A.    I don't recall exactly.
21    Q.    Can you describe what this
22  certification is?
23    A.    CCEP stands for Certified
24  Compliance and Ethics Professional.

Page 79

1    Q.    Similar to the prior
2  certification we just talked about a moment ago,
3  was there an exam you had to take in order to get
4  this certification?
5    A.    Yes.
6    Q.    And you had to go through a
7  period of self-study before you took the exam?
8    A.    Yes.  And with this one, I
9  attended a preparatory session as -- as well,
10  where the exam was given at the end of it.
11    Q.    When did you get this
12  certification?
13    A.    I don't recall.
14    Q.    Now, but I think you'd agree that
15  the corporation's compliance function could help
16  mitigate compliance-related risk for the
17  corporation.  Right?
18          MR. LAVELLE:  Object to form.
19          THE WITNESS:  It could.
20  BY MR. SIMMER:
21    Q.    In fact, we looked at the
22  society's website, and they say that this CCEP
23  professional is someone with knowledge of
24  relevant regulations and expertise in compliance

Page 80

1  processes.
2          Is that an accurate statement?
3          MR. LAVELLE:  Object to form.
4          THE WITNESS:  Can you repeat
5    that?
6  BY MR. SIMMER:
7    Q.    We looked at the society's
8  website and they describe this CCEP certification
9  and the persons who receive it as being people
10  who have knowledge of relevant regulations and
11  expertise in compliance processes.
12          Is that accurate?
13          MR. LAVELLE:  Object to form.
14          THE WITNESS:  I think with
15    regards to compliance processes, yes.
16  BY MR. SIMMER:
17    Q.    So you wouldn't say that the
18  knowledge of relevant regulations is something
19  that's included in the CCEP certification you
20  received?
21    A.    I'm not sure how they can say
22  that when it comes to the fact that there's, you
23  know, CCEPs in hundreds of different industries.
24  It's more general compliance, like they said,

Page 81

1  processes.
2    Q.    So as part of receiving this
3  certification, you didn't receive any specific
4  training in relevant regulations to the pharmacy
5  industry; is that right?
6    A.    No.  Well, I'm sorry.
7          The way you phrased the answer
8  to -- can you repeat the question?  Because I'm
9  not -- just rephrase it for me, so I make sure
10  I've got that right.
11          I said no, but I think it's yes.
12    Q.    So as part of receiving this
13  certification, you didn't receive any specific
14  training in relevant regulations to the pharmacy
15  industry; is that right?
16    A.    That is correct.
17    Q.    Also in the society's website
18  they describe this certification as giving the
19  person skills sufficient to assist the
20  organization in understanding and addressing
21  legal obligations; is that correct?
22          MR. LAVELLE:  Object to form.
23          THE WITNESS:  You're asking me to
24    speak towards what they're saying?

Page 82

BY MR. SIMMER:

Q.   Yes, sir.

A.   There was no legal component. I'm not an attorney. They're not attorneys. So I don't know that I agree with that.

Q.   So this certification you received did not give you training in terms of the legal obligations that a company has; is that correct?

A.   Not specifically -- no, not specifically obligations.

Q.   They also describe this certification as giving the individual the skills of promoting organizational integrity through the operation of effective compliance programs.

Is that a correct statement in terms of your understanding of this certification?

MR. LAVELLE:  Object to form.

THE WITNESS:  I would agree with that one.

BY MR. SIMMER:

Q.   Now, then, as a compliance professional, it's fair to say, isn't it, that

Page 83

sometimes you have to tell Rite Aid things they don't want to hear?

MR. LAVELLE:  Object to form.

THE WITNESS:  Compliance officers sometimes have to tell the organizations they're employed by things they don't want to hear.

BY MR. SIMMER:

Q.   Not just generally compliance officers, you yourself as a compliance professional have had to tell Rite Aid things they did not want to hear.  Right?

MR. LAVELLE:  Object to form.

THE WITNESS:  I don't know.  Rite Aid is not a person, so I don't know how you could say things that Rite Aid does not want to hear.  That appears speculative.

BY MR. SIMMER:

Q.   Fair point.

So have there been times when you as a compliance professional had to tell others working at Rite Aid things they didn't want to hear?

Page 84

A.   I don't know what they did or did not want to hear.  However, as a compliance officer, certainly I've had to provide my opinion to the business where that may or may not be the position the business would agree with.

Q.   Sometimes those opinions means the company would lose money; isn't that correct?

A.   I think that's somewhat speculative as well.  I don't -- you're asking to predict the future with regards to, say, something that did not occur.

Q.   So when you're giving your opinions to the individuals at Rite Aid about compliance, it's your testimony that that would not result sometimes in them losing money that they otherwise would make?

MR. LAVELLE:  Object to form.

THE WITNESS:  I think -- I think the keyword is "sometimes," probably sometimes.

BY MR. SIMMER:

Q.   Tell the jury if you ever told Rite Aid something that it didn't necessarily want to hear about compliance.

Page 85

A.   Again, the way you're phrasing the question, to tell Rite Aid something they did not want to hear?  Rite Aid is not a person.  And I don't know -- that would be like me asking you what you do or do not want to hear.  I don't know what you do or do not want to hear.

Q.   Well, let me rephrase the question.

Tell the jury if you ever told individuals at Rite Aid as -- when you were in your position as a compliance professional, have you ever told individuals at Rite Aid something that they didn't want to hear about compliance?

MR. LAVELLE:  Object to form. Direct the witness not to answer to the extent it would disclose attorney-client communications.

BY MR. SIMMER:

Q.   You can answer.

A.   At the advice of counsel, I choose not to answer.

Q.   So you're saying everything you did as -- in your position in compliance is always protected by attorney-client privilege.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Is that your position?
2    A.    No.
3    Q.    For example, on your position in
4 loss prevention, did you report to the general
5 counsel then?
6    A.    No.
7    Q.    So were there situations when
8 you're working in loss prevention that you told
9 individuals something they didn't want to hear
10 about compliance?
11    MR. LAVELLE:  Object to form.
12    THE WITNESS:  Again, if we could
13    not use the "did" or "did not want to
14    hear."
15    But what I will say is, you know,
16    in various roles at Rite Aid, being
17    risk-minded and compliance-minded,
18    whether it be privacy or anything else,
19    sometimes the business has an idea or an
20    initiative, and in various roles I have
21    had, I would provide them advice or
22    guidance or my opinion that there are
23    risks associated with those initiatives
24    as it relates to compliance.  I think

Page 87

1    that's what you're asking.
2 BY MR. SIMMER:
3    Q.    So it's your testimony that what
4 you did in your lo -- role on loss prevention was
5 to identify risks for the company.  Correct?
6    A.    That's part of -- part of, you
7 know, a role or the roles that I've played with
8 the company.  Correct.
9    Q.    Is that also true in the
10 positions you've held after you left the loss
11 prevention department?
12    MR. LAVELLE:  Object to form.
13    THE WITNESS:  That is -- that is
14    correct.
15 BY MR. SIMMER:
16    Q.    So in loss prevention, for
17 example, you had to look at drug threshold
18 increases, didn't you?
19    A.    To clarify, I was involved in the
20 McKesson threshold increase process.  I would not
21 say drug threshold process.
22    Q.    Thank you for that correction.
23    So -- but is it correct then that
24 you were involved in the McKesson threshold

Page 88

1 increase process as a compliance professional.
2 Right?
3    MR. LAVELLE:  Object to form.
4    THE WITNESS:  As the director of
5    pharmacy loss prevention, yes.
6 BY MR. SIMMER:
7    Q.    And there were times when you had
8 to tell pharmacies they couldn't receive a
9 particular increase that they were requesting
10 from McKesson.  Right?
11    MR. LAVELLE:  Object to form.
12    THE WITNESS:  I did not
13    communicate directly with the pharmacies.
14 BY MR. SIMMER:
15    Q.    So who did you communicate with?
16    A.    The pharmacy district managers
17 and representatives at McKesson.
18    Q.    So there were times when you had
19 to communicate to those individuals that they
20 could not receive threshold increases from
21 McKesson.  Correct?
22    A.    There were times where either I
23 had to deny a request or ask for further
24 clarification, yes.

Page 89

1    Q.    So tell us what instances you
2 denied the threshold increase request?
3    A.    I don't recall specific instances
4 at specific store locations.
5    Q.    How many times would you say
6 during your years working in loss prevention that
7 you actually denied a threshold increase request?
8    A.    I don't recall how many times.
9    Q.    100?
10    A.    No.
11    Q.    50?
12    A.    Again, I don't recall, you know,
13 how many times, you know, I would have not
14 forwarded a request on to McKesson from a
15 pharmacy district manager.
16    Q.    But you're comfortable in
17 testifying that you did at least on occasion deny
18 a request.  Right?
19    A.    I am comfortable.
20    Q.    And what are the reasons that you
21 denied those requests?
22    A.    One example would be the
23 threshold amount being requested appeared
24 unreasonable.  And after further discussion with

Page 90

1  the pharmacy district manager, they agreed that
2  the request was not the right percentage, for
3  example.
4      Q.   In that kind of instance, would
5  you lower the percentage instead of denying it
6  outright?
7          MR. LAVELLE:  Object to form.
8          THE WITNESS:  Again, I'm not
9      denying the request.  In an instant like
10     that, I would probably call the pharmacy
11     district manager.  We would have the
12     discussion.  At that point in time, the
13     pharmacy district manager may, you know,
14     withdraw the request or more likely would
15     send a new email with a different, more
16     reasonable amount.
17 BY MR. SIMMER:
18     Q.   And there were times as well that
19 you approved these increases.  Isn't that
20 correct?
21     A.   There were times when I forwarded
22 these requests to McKesson.  Only McKesson can
23 approve the increases.  But yes, there were times
24 I forwarded the requests from the district

Page 91

1  manager on to McKesson for approval.
2      Q.   Now, in your job in loss
3  prevention, were you identifying risks to the
4  company as well at that point?
5      A.   It is my belief that every
6  employee should be identifying risks to the
7  company.
8      Q.   So when you received threshold
9  requests from the pharmacy district managers, you
10 were analyzing those for potential risks to the
11 company.  Isn't that fair?
12     A.   I don't know that that's
13 accurate.  At least not in every instance, no.
14     Q.   So there are instances where you
15 didn't look at it for potential risks to the
16 company?
17     A.   Yeah.  I'm not sure I really
18 understand the question.
19     Q.   Well, you just said a moment ago
20 that everything every employee does at Rite Aid
21 is looking at potential risks to the company.
22 Right?
23         MR. LAVELLE:  Object to form.
24         THE WITNESS:  They should.

Page 92

1  BY MR. SIMMER:
2      Q.   And so I'm simply asking, in
3  those instances where you were looking at
4  threshold increase requests that were sent to you
5  by the pharmacy district manager, did you in
6  every instance look at those with an eye toward
7  potential risks to the company?
8          MR. LAVELLE:  Object to form.
9          THE WITNESS:  No.  Because in
10     some instances, the pharmacy district
11     manager simply misunderstood the process.
12 BY MR. SIMMER:
13     Q.   And that did not involve an
14 assessment by you of potential risks to the
15 company?
16     A.   Would I conduct a risk assessment
17 on every single request that was made?  No.
18     Q.   So if the pharmacy district
19 manager simply didn't understand the process,
20 what would happen in that instance?
21     A.   As I described previously, there
22 would be a conversation with the pharmacy
23 district manager who would basically say
24 something to the effect of, okay, I didn't

Page 93

1  understand.
2              -  -  -
3          (Deposition Exhibit No. Rite
4      Aid-Palmer-3, Annual Performance Review
5      FY 2011, Bates stamped
6      Rite_Aid_OMDL_0050666 through
7      Rite_Aid_OMDL_0050674, was marked for
8      identification.)
9              -  -  -
10 BY MR. SIMMER:
11     Q.   Hand you what we've marked as
12 Palmer Exhibit Number 3, if you would take a look
13 at that.  I'll identify it for the record.  And
14 again the Bates number is cut off, unfortunately,
15 so this is Rite_Aid_OMDL_0050666 through
16 Rite_Aid_ OMDL_0050674.
17         It's a multi-page document.  I'm
18 only going to ask you questions about the very
19 first page of the document.  Feel free to look at
20 the entire document if you'd like.
21     A.   (Reviewing document.)
22         Okay.
23     Q.   And you've seen this before, I
24 take it?



Page 94

1    A.    Yes.
2    Q.    When was the last time you saw
3  this?
4    A.    This is a performance review.  I
5  believe this is one of the performance reviews
6  that I saw during depo prep.
7    Q.    So you've seen this recently.
8  Right?
9    A.    Yes, I believe so.





Page 102

Page 104

6    Q.    And how do the members get these
7  subjects that they're interested in?
8         MR. LAVELLE:  Objection.  Again,
9  I'll direct the witness not to answer to
10  the extent it would disclose the
11  substance of attorney-client
12  communications.
13         THE WITNESS:  At the advice of
14  counsel, I will not answer the question.
15  BY MR. SIMMER:
16    Q.    So the subjects that we're
17  talking about came from legal counsel; is that
18  correct?
19         MR. LAVELLE:  Same objection,
20  same direction not to answer to the
21  extent it would disclose the substance of
22  attorney-client communications.
23  BY MR. SIMMER:
24    Q.    I'm only asking for a yes or no

Page 103

Page 105

1  answer on this, I'm not asking for any
2  attorney-client communication.
3         Did the subjects that the members
4  of the subcommittee came up with come from
5  counsel for the company?
6    A.    At the advice of counsel, I'm not
7  going to answer that question.
8    Q.    It's a yes or no question.  You
9  can answer.  That's not violating any privilege.
10  It's a yes or no.
11    A.    Can you repeat it one more time
12  then?



Page 110

BY MR. SIMMER:

Q.   As far as you recall, however, you don't recall ever that any of these committees discuss a specific instance of -- concerning a suspicious order.  Right?

MR. LAVELLE:  Objection to the form of the question.  And I also object and direct the witness not to answer to the extent it would disclose the substance of attorney-client communications.

THE WITNESS:  Yeah.  At the advice of counsel, I'm not going to answer that question.

BY MR. SIMMER:

Q.   It was a yes or no question.  I didn't ask you to divulge any attorney-client communications.  You can answer.

MR. LAVELLE:  Again, I direct the witness not to answer.  It was a yes or no question seeking the substance of a communication.  So, yes, it does invade the attorney-client privilege potentially.

Page 111

MR. SIMMER:  How in the world does that involve an attorney-client communication?  You've established no predicate whatsoever for the objection.  You can answer.

MR. LAVELLE:  No, you can't.  Direct the witness not to answer.

THE WITNESS:  I don't even know what predicate means.

MR. SIMMER:  He hasn't even established that there was any kind of attorney-client communication going on with regard to suspicious order monitoring for these committees.

THE WITNESS:  Yeah --

MR. LAVELLE:  Wait until he asks a question that is directed to you.  He's just arguing with me.

BY MR. SIMMER:

Q.   Did the committees ever deal with suspicious orders that you recall, these three committees?

MR. LAVELLE:  Again, objection to the extent you would have to disclose

Page 112

attorney-client communications to answer this question, which is seeking the substance of discussions that occurred, including the pharmacy compliance committee.  I direct the witness not to answer the question.

THE WITNESS:  At the advice of counsel, I will not answer the question.

MR. SIMMER:  Madam Court Reporter, I'd like to certify that last series of questions and answers and we'll take this to the special master.

BY MR. SIMMER:

Page 113



Page 114



Page 116

---

Page 115

---

Page 117

---

**Page 116**

1  Rite_Aid_OMDL_0032890 through
2  Rite_Aid_OMDL_0033115, was marked for
3  identification.)
4           - - -
5  BY MR. SIMMER:
6      Q.   I'm going to hand you a massive
7  exhibit.
8           MR. LAVELLE:  Why don't you put
9  those next to the court reporter so she's
10  got them.
11  BY MR. SIMMER:
12      Q.   What we've marked as Palmer
13  Exhibit Number 4.  And lo and behold, the Bates
14  numbers are on this document.
15      A.   Good.
16      Q.   Take a moment.  I don't -- suit
17  yourself, but I'm only going to ask questions
18  about certain portions of this document.  I'll
19  identify it for the record as
20  Rite_Aid_OMDL_0032890 through 0033115.
21      A.   Okay.
22      Q.   Have you seen this before?
23      A.   Yes.  I recognize this.
24      Q.   When did you last see it?

**Page 117**

1      A.   I believe I saw some of this
2  during depo prep.  I don't -- this is huge.  I
3  don't know that I saw all of it.
4      Q.   Is this the kind of presentation
5  that you were describing in the document we were
6  just looking at?
7      A.   Yes, it is.
8      Q.   So this would be the road show
9  presentation that you gave to field management?
10      A.   Well, this would be one example
11  of a road show presentation that a bunch of
12  different people gave to field management.  I
13  certainly did not present on this entire
14  document.

**Page 115**

20           - - -
21      (Deposition Exhibit No. Rite
22  Aid-Palmer-4, PowerPoint, "Division 2
23  Region 22 & Group 51 Regulatory
24  Compliance November 2010," Bates stamped

Highly Confidential - Subject to Further Confidentiality Review









Page 130

███
███████
████████████
██████████
████████████
███████████████
██████████████
████████
██████
███████
████████████

15        MR. LAVELLE:  Object to form.
16        THE WITNESS:  So the way it would
17    work is when a store places an order and
18    all or part of that order hits the base
19    code limit, they would receive a message
20    on the invoice.
21        So the way in which the store
22    would be informed would be right here.
23 BY MR. SIMMER:
24    Q.    So there are instances where all

Page 131

1 of the order was denied.  Right?
2    A.    Yes.
3    Q.    And there were instances where
4 part of the order was denied.  Right?
5    A.    I believe that to be correct.
6    Q.    So how do I know which is which?
7 I mean, is it always all or is it always part?
8        MR. LAVELLE:  Object to form.
9 BY MR. SIMMER:
10    Q.    Just trying to understand.
11    A.    You would know what you ordered
12 and you would know what you received, so it
13 wouldn't be a difficult mathematical calculation
14 to ascertain that.
15    Q.    So instances where McKesson
16 denied all of the order, what would go into that
17 decision, as you understand it?
18        MS. DORRIS:  Object to form.
19        MR. LAVELLE:  Also object to
20    form.
21        THE WITNESS:  Yeah, I'm only --
22        MR. SIMMER:  Only one of you gets
23    to object on that.  The CMO says one
24    objector only.  So once one objects, all

Page 132

1    of you object.  You don't need to do a
2    piling on here, so...
3        MR. LAVELLE:  Well, it's a bad
4    question, but go on.
5        MR. SIMMER:  You want to be the
6    questioner, John?
7        MR. LAVELLE:  I will be later
8    today.
9        THE WITNESS:  Can you repeat the
10    question?
11 BY MR. SIMMER:
12    Q.    I'm trying to understand a
13 circumstance when McKesson denied all of the
14 order, what's your understanding about why they
15 made that decision to deny all of the order?
16        MS. DORRIS:  Object to form.
17        THE WITNESS:  It would have to do
18    with how much of the threshold was left.
19    So, for example, if the previous order
20    used up all of the monthly threshold,
21    then the subsequent order all would be
22    denied.  If the previous order didn't use
23    up all of the order, and the second order
24    in its entirety took it over the limit,

Page 133

1    then in that case, part of the order
2    would be denied.  It's a math thing.
3 BY MR. SIMMER:
4    Q.    So in that instance, your
5 understanding is that McKesson would fill up to
6 the threshold and then that's all that would be
7 shipped.  Right?
8        MS. DORRIS:  Object to form.
9        THE WITNESS:  And the message
10    would invoke.
11 BY MR. SIMMER:
███████████
██████████████
███████████████
█████████████
████████████████
████████████████
██████
████████
███████████
████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 142

18    MR. LAVELLE:  Counsel, if we're
19  ready to move to another document, it's
20  about 12:30.  This might be a good time
21  for a lunch break?
22    MR. SIMMER:  Can we go about 10
23  more minutes?  Do you have a problem with
24  that?

Page 143

1    MR. LAVELLE:  It's okay by me.
2  What do you -- what are your
3  thoughts?  Are you okay?  Do you need a
4  break?  Can you go another 10 minutes?
5    THE WITNESS:  I can go another 10
6  minutes.
7    MR. LAVELLE:  Okay.
8  BY MR. SIMMER:
9    Q.    Do you understand what the term
10  "diversion" means?
11    A.    I believe I do.
12    Q.    Can you tell us in your own words
13  what diversion means?
14    A.    Diversion would mean deviation
15  from an established path.
16    Q.    And based on your knowledge and
17  experience, you would agree with me that Rite Aid
18  had an obligation to prevent diversion.  Right?
19    MR. LAVELLE:  Object to form.
20    THE WITNESS:  I believe that Rite
21  Aid did have policies, procedures,
22  processes to prevent drug diversion.
23  BY MR. SIMMER:
24    Q.    Wasn't quite my question.

Page 144

1    I want to make sure I understand
2  that you would agree with me that Rite Aid had an
3  obligation to prevent diversion.
4    MR. LAVELLE:  Object to form.
5    THE WITNESS:  Okay.  Your
6  question is in regard to diversion in
7  general, which is simply the deviation
8  from a known or established path.  I'm
9  assuming that what you probably mean is
10  drug diversion.
11  BY MR. SIMMER:
12    Q.    Yes.  Drug diversion.
13    Did Rite Aid have an obligation
14  to prevent drug diversion?
15    MR. LAVELLE:  Object to form.
16    THE WITNESS:  I believe so.
17  BY MR. SIMMER:
18    Q.    Based on your experience working
19  with the company, you're familiar with the
20  concept of a suspicious order in the context of
21  controlled substance distribution, aren't you?
22    A.    The general concept, yes.
23    Q.    And what in your words does it
24  mean?

Page 145

1    A.    A suspicious order would be a
2  highly unusual order.
3    Q.    And you would agree with me that
4  Rite Aid had an obligation to report any
5  suspicious orders to the DEA.  Right?
6    MR. LAVELLE:  Object to form.
7    THE WITNESS:  I'm not 100 percent
8  familiar with the exact DEA requirement.
9  My understanding is distribution centers
10  have an obligation to report suspicious
11  orders.
12  BY MR. SIMMER:
13    Q.    Not the company itself.  Right?
14    MR. LAVELLE:  Object to form.
15    THE WITNESS:  Again, I'm not -- I
16  don't know that I can answer that
17  question.  That's not really...
18  BY MR. SIMMER:
19    Q.    Do you have an understanding of
20  what specific departments of the company had the
21  obligation to report suspicious orders to the
22  DEA?
23    MR. LAVELLE:  Object to form.
24    THE WITNESS:  I believe

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  distribution centers would have an
2  obligation to report suspicious orders.
3  BY MR. SIMMER:
4      Q.    You would agree with me that Rite
5  Aid had an obligation not to ship any suspicious
6  orders.  Right?
7          MR. LAVELLE:  Object to form.
8          THE WITNESS:  I can't answer
9  that.
10 BY MR. SIMMER:
11     Q.    You don't know the answer to that
12 question?
13     A.    I don't know the answer to that
14 question.
15     Q.    Do you know what the red flags of
16 diversion are?
17     A.    I know of the concept for red
18 flags as it relates to diversion.
19     Q.    And what's your understanding of
20 the concept of the red flags of diversion?
21     A.    That red flags represent
22 indicators that may indicate a deviation from the
23 path or a possible deviation from the path.
24         MR. SIMMER:  We can take our

Page 147

1  break for lunch.
2          MR. LAVELLE:  Okay.
3          THE VIDEOGRAPHER:  Off the record
4  at 12:31 p.m.
5              - - -
6          (A luncheon recess was taken from
7  12:31 p.m. to 1:12 p.m.)
8              - - -
9          THE VIDEOGRAPHER:  We're back on
10 the record at 1:12 p.m.
11 BY MR. SIMMER:
12     Q.    Mr. Palmer, are you familiar with
13 Rite Aid's suspicious order monitoring program?
14     A.    No, not really.
15     Q.    Have you ever had any role in,
16 you know, development or just -- of a suspicious
17 order monitoring program of any kind?
18         MR. LAVELLE:  Object to form.
19         THE WITNESS:  My understanding is
20 the suspicious order monitoring program
21 is -- relates to the distribution
22 centers.  I've not really had much
23 involvement in the distribution centers.
24 BY MR. SIMMER:

Page 148

1      Q.    Hand you what we've marked as
2  Palmer Exhibit Number 5.
3              - - -
4          (Deposition Exhibit No. Rite
5  Aid-Palmer-5, Email dated 2008-02-19,
6  Bates stamped Rite_Aid_OMDL_0046594 and
7  Rite_Aid_OMDL_0046595, was marked for
8  identification.)
9              - - -
10 BY MR. SIMMER:
11     Q.    While you're looking at that,
12 I'll identify it for the record as
13 Rite_Aid_OMDL_0046594 through 46595.
14     A.    Okay.
15     Q.    Have you seen this document
16 before?
17     A.    Not that I recollect.





Page 150

Page 152

Page 151

Page 153



Highly Confidential - Subject to Further Confidentiality Review

Page 158



11 And you referred to that a moment
12 ago I think as KPI; is that right?
13 A. Yes. KPI is short for key
14 performance indicator.
15 Q. Tell us in your own words what
16 key performance indicators means.
17 A. So a key performance indicator
18 would be a particular attribute or action or
19 activity that could be pulled into NaviStor or
20 NaviScript that would be useful in terms of
21 detecting theft, detecting procedural abuses,
22 detecting policy violations of different sorts or
23 nature, so...
24 Q. I think we understand what you

Page 159

1 mean by a theft, but why don't you go ahead and
2 say it again, what you mean when you reference
3 theft.
4 What is that?
5 MR. LAVELLE: Object to form.
6 THE WITNESS: So theft would be a
7 loss of product or inventory that would
8 result in shrink. So when you -- when
9 the books say you have this amount or
10 dollar amount, and the physical inventory
11 reveals that you don't, the difference
12 between the two is shrink.
13 BY MR. SIMMER:
14 Q. You also say that the key
15 performance indicators would be used to detect
16 procedural abuses.
17 What do you mean by that?
18 A. An example -- a procedural abuse
19 would be where something, you know, might be
20 allowable to a certain degree, but, you know, you
21 can see from the KPI that it's being used more
22 than it should be. Coupon abuse would be an
23 example.
24 Q. Finally you said that they could

Page 160

1 be -- these key performance indicators could be
2 used to detect policy violations of different
3 sorts or nature.
4 And what do you mean by that?
5 A. So there are lots of policies
6 relative to things you can or cannot do at the
7 cash register, price modifies, voids, things like
8 that.
9 So, you know, an example there
10 would be -- let's say you had a cashier that was
11 sweethearting merchandise to a customer, meaning
12 basically not charging them for it. They could
13 be doing that by voiding certain items in the
14 transaction. And utilizing NaviStor, you could
15 see that maybe you had a particular cashier at a
16 particular store voiding lots of merchandise,
17 which would allow you to look into that and say,
18 okay, we might have an issue here.
19 Q. Now, in the context of the DEA's
20 concerns about controlled drug diversion, how
21 were these key performance indicators used?
22 A. So that's really NaviScript. And
23 it evolved. So NaviScript got better and better
24 and better as we added more KPIs and, you know,

Page 161

1 improved it.
2 But key performance indicators,
3 like cycle counts down, order adjustments, DSD
4 orders through telestock, you know, these are all
5 examples of KPIs that could be indicative of drug
6 losses at a store.
7 Q. Again, I think you're talking
8 about shrinkage, though. Right?
9 MR. LAVELLE: Object to form.
10 THE WITNESS: It is shrinkage,
11 but it's certainly also drug diversion,
12 which is what you asked.
13 BY MR. SIMMER:
14 Q. Well, let me go through that and
15 make sure I understand.
16 You said cycle counts down.
17 How does that key performance
18 indicator indicate potential diversion?
19 A. Okay. So in the pharmacy like
20 the front end, there is an inventory -- PI, a
21 perpetual inventory system. So the system should
22 know exactly how much of a given product -- and
23 this is true in the front end or the pharmacy --
24 how much of a given product that store has. So a

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 thief could, for example, realize that if the
2 thief stole X number of product off the shelf,
3 that now is going to indicate that there's -- you
4 know, there's only one there instead of three,
5 which means, you know, product is not going to
6 come in, inventory is not going to be accurate.
7 So in order to potentially try to
8 hide or mask their theft, what they might do is
9 cycle count the product down to where now the
10 system says there's one on the shelf, even though
11 you just stole two. So...
12 Q. In that instance, this -- you're
13 concerned about a Rite Aid employee actually
14 altering the system to make that cycle count
15 down. Am I right?
16 A. Yes. That would be indicative of
17 internal theft.
18 Q. You also mentioned order
19 adjustments as being a key performance indicator
20 of diversion.
21 Tell us what you mean by that.
22 A. So the way the inventory
23 replenishment system would work is the system
24 would basically use your usage and the on-hand

Page 163

1 numbers to determine what the order should be.
2 So in the old days of pharmacy,
3 you would have to basically walk the shelves and,
4 you know, I want two of this, I want one of this.
5 With a replenishment system, the
6 system knows what you dispensed, it knows what
7 you transferred, returned, those things we talked
8 about. And it knows what you're supposed to have
9 on hand.
10 So the system builds the order
11 for you. And, you know, that's -- that's sort of
12 a suggested order. But both in the front end and
13 the pharmacy, you have the ability to adjust
14 orders.
15 So a good example -- a good front
16 end example would be, I know that in an upcoming
17 ad, Tylenol PM is on sale. And the system only
18 wants to sell me -- you know, give me four of
19 these, but, you know, I know that I'll have
20 customers wanting Tylenol PM, so I'm going to
21 adjust it from 4 to 10, or something like that.
22 Similar in the pharmacy, the
23 order is going to be generated. The pharmacist
24 would have the chance to adjust that order up or

Page 164

1 down. And an adjustment up or adjustments up
2 could be -- could be indicative of internal
3 theft.
4 Q. Again, this is an indication of
5 internal theft only. Right?
6 A. Yes.
7 Q. It would not be indicative of any
8 inappropriate prescribing, for example. Right?
9 A. Neither of those two KPIs would
10 be indicative of that.
11 Q. Were there any KPIs that the
12 company used to identify inappropriate
13 prescribing?
14 A. I can't see -- again, I wasn't in
15 this department the entire time, but I cannot see
16 how any NaviStor or NaviScript KPI would be able
17 to do that.
18 - - -
19 (Deposition Exhibit No. Rite
20 Aid-Palmer-6, Department of Justice News
21 Release, "Rite Aid Corporation and
22 Subsidiaries Agree to Pay $5 Million in
23 Civil Penalties to Resolve Violations in
24 Eight States of the Controlled Substances

Page 165

1 Act," 2 pages, was marked for
2 identification.)
3 - - -
4 BY MR. SIMMER:
5 Q. I'll hand you what we've marked
6 as Palmer Exhibit Number 6. Take a moment to
7 review that.
8 A. (Reviewing document.)
9 Q. While he's looking at it, I'll
10 identify it for the record as a press release
11 from the Department of Justice dated Monday,
12 January 12, 2009.
13 A. Okay.
14 Q. Do you recall having seen this
15 press release?
16 A. I have, yes.
17 Q. And this is in reference a
18 settlement that Rite Aid entered into -- excuse
19 me, Rite Aid Corporation and its subsidiaries
20 entered into for $5 million.
21 Do you see that?
22 A. Yes.
23 Q. And this settlement actually
24 occurred while you worked in loss prevention.

Page 166

1 Right?
2          MR. LAVELLE:  Object to the form.
3          THE WITNESS:  The settlement
4     occurred?
5 BY MR. SIMMER:
6     Q.    Yes, sir.
7     A.    That does not mean that the
8 activities involved in the settlement occurred.
9     Q.    That's right.
10          The settlement itself occurred
11 while you were working in loss prevention.
12 Right?
13     A.    The settlement itself.
14     Q.    Okay.  If you look at the third
15 paragraph, do you see where it says, "According
16 to information contained in the agreement, the
17 DEA conducted an investigation of 53 separate
18 Rite Aid locations starting in 2004.  The
19 investigation revealed a pattern of violations of
20 the CSA"?
21          Do you see that?
22     A.    Yes.
23     Q.    And do you see that first bullet,
24 "At pharmacies in Kentucky and New York, Rite Aid

Page 167

1 knowingly filled prescriptions for controlled
2 substances that were not issued for a legitimate
3 medical purpose pursuant to a valid
4 physician-patient relationship"?
5          Do you see that?
6     A.    Yes.
7     Q.    Do you have an understanding what
8 was involved in that particular portion of this
9 settlement?
10     A.    Not all of it, no.
11     Q.    You were a district manager, I
12 think you said, of pharmacies in Kentucky?
13     A.    Yes.
14     Q.    Were you a district manager of
15 the Lexington Rite Aid pharmacies?
16     A.    Yes.
17               - - -
18          (Deposition Exhibit No. Rite
19     Aid-Palmer-7, Article from the Lexington
20     Herald Leader entitled "Rite Aid Pharmacy
21     deemed central to multi-state drug
22     probe," 3 pages, was marked for
23     identification.)
24               - - -

Page 168

1 BY MR. SIMMER:
2     Q.    Hand you what we've marked as
3 Palmer Exhibit Number 7.
4     A.    Uh-huh.
5     Q.    Take a look at that.  And I'll
6 identify it for the record as an article from the
7 Lexington Herald Leader dated January 14, 2009.
8 The headline is "Rite Aid pharmacy deemed central
9 to multi-state drug probe."
10     A.    Yes.
11     Q.    Are you familiar with the fact
12 that the Rite Aid pharmacy in Lexington, Kentucky
13 was central to this settlement in 2009?
14          MR. LAVELLE:  Object to form.
15          THE WITNESS:  When you say
16     "central," no, I don't know if it was
17     central.  And to be clear on my response
18     before, this says, "at pharmacies."  I
19     would note that that's plural.
20          So when you asked before about me
21     being familiar with these issues, I am
22     familiar with this one store.  I have no
23     idea what -- you know.
24 BY MR. SIMMER:

Page 169

1     Q.    Okay.  Well, let's look at the
2 news article itself.
3          Do you see in the first paragraph
4 where it says, "A Rite Aid Corp. store in
5 Lexington is responsible for more than
6 three-quarters of the prescription-drug
7 violations in a multi-state federal
8 investigation"?
9          Do you see that?
10     A.    Yes.
11     Q.    Is that something you were aware
12 of, that this Lexington store was responsible for
13 three-quarters of the violations in this
14 particular settlement?
15          MR. LAVELLE:  Object to form.
16          THE WITNESS:  I am familiar with
17     the Lexington store and the allegations
18     around the Lexington store.
19          Three-quarters, one-half, one-fifth,
20     one-eighth, no.
21 BY MR. SIMMER:
22     Q.    Any reason to dispute the
23 accuracy of that statement in this news article?
24          MR. LAVELLE:  Object to form.

Page 170

1 THE WITNESS: No.
2 BY MR. SIMMER:
3 Q. Look further on into the article.
4 It would be the fourth paragraph.
5 Do you see where it says, "The
6 investigation revealed 16,000 violations in
7 Kentucky and seven other states"?
8 Do you see that?
9 A. Yes.
10 Q. And look in the next paragraph.
11 "About 12,600 of the violations came from one
12 Lexington Rite Aid from 2001 to August 2005,
13 according to a Department of Justice news
14 release. The store moved from 393 Waller Avenue
15 to 1335 South Broadway."
16 Do you see that?
17 A. Yes.
18 Q. Did I read that correctly?
19 A. You did.
20 Q. And that was a store over which
21 you had managerial responsibility. Right?
22 A. For a period of time, yes.
23 Q. What period of time during the
24 time period that became an issue in this

Page 171

1 settlement were you the district manager of this
2 Lexington store?
3 A. Well, going off of this 2001 to
4 August of 2005, probably 2000 -- parts of 2002
5 till 2003.
6 Q. So are we talking at least a year
7 that you were the manager over this store?
8 A. Probably about a year.
9 Q. So as manager of the store, would
10 it be fair to say that the buck stopped with you
11 if something went wrong with one of the stores
12 you were managing?
13 MR. LAVELLE: Object to form.
14 THE WITNESS: I would not say
15 that. And I would also point out that
16 the settlement also clearly states that
17 this is neither an admission of liability
18 nor a concession by Rite Aid.
19 BY MR. SIMMER:
20 Q. So you're saying this did not
21 happen; is that right?
22 MR. LAVELLE: Object to form.
23 THE WITNESS: You're saying what
24 did not happen.

Page 172

1 BY MR. SIMMER:
2 Q. You're saying that because the
3 company didn't admit any liability, there's a
4 potential nothing happened at all at this
5 Lexington store that you managed. Right?
6 MR. LAVELLE: Object to form.
7 THE WITNESS: I would say that
8 this location was one of the Lexington
9 locations I supervised for a period of
10 time. I would say that there was issues
11 that later came to light around this
12 particular diet clinic and this
13 particular product, which I also would
14 point out is not an opioid. So I'd like
15 to make that clear, since this is opioid
16 litigation.
17 BY MR. SIMMER:
18 Q. It's a controlled drug, though.
19 Right?
20 A. It is a controlled drug.
21 Q. Any dispute about that, that this
22 was a controlled substance under your watch.
23 Right?
24 MR. LAVELLE: Object to form.

Page 173

1 THE WITNESS: It's a controlled
2 substance.
3 BY MR. SIMMER:
4 Q. Did the company penalize you in
5 any way as the district manager for violations at
6 this Lexington store?
7 A. No.
8 Q. Never came up again that you were
9 in any way responsible for what happened at the
10 Lexington store?
11 A. No.
12 Q. What had you done to actually
13 make sure that this Lexington store was complying
14 with the law?
15 MR. LAVELLE: Object to form.
16 THE WITNESS: I can tell you in
17 at least one instance I was in this
18 Lexington store when the state board
19 investigator visited the store and was
20 perfectly okay with the process that they
21 were following in that location.
22 So I had no reason to believe
23 that there was anything going on at this
24 location that in any way could be

Page 174

1 improper.
2 BY MR. SIMMER:
3 Q. Turn to the second page of this,
4 if you would.
5 Last full paragraph on the page.
6 And it's somewhat cut off, but I can read a
7 portion of it.
8 Do you see where it says, "'The
9 fact that so many prescriptions came from one
10 office and that the Rite Aid store checked with
11 the corporation about obtaining more phentermine
12 were red flags that should have been heeded,'
13 said Robin Gwinn, an assistant U.S. attorney"?
14 Do you see that?
15 A. I do, I do.
16 Q. Do you agree with that statement,
17 that these were red flags of diversion?
18 MR. LAVELLE: Object to form.
19 THE WITNESS: Not necessarily.
20 BY MR. SIMMER:
21 Q. You don't agree with that
22 statement.
23 Why not?
24 MR. LAVELLE: Object to form.

Page 175

1 THE WITNESS: The fact that the
2 location was next to the clinic and that
3 the clinic patients chose to go to the
4 closest available pharmacy? Would you go
5 to the closest available pharmacy?
6 BY MR. SIMMER:
7 Q. I'm asking you the questions,
8 sir. You're not asking questions today.
9 A. I answered -- I answered the
10 question. Not necessarily.
11 Q. Okay. So the company paid
12 $5 million, didn't they?
13 A. The company paid $5 million for
14 issues involving 53 different locations, I
15 believe.
16 Q. Three-quarters of it related to
17 the Lexington pharmacy that you were the manager
18 of. Right?
19 MR. LAVELLE: Object to form.
20 Objection, asked and answered.
21 THE WITNESS: I do not agree that
22 three-quarters of what was settled here
23 was relative to this issue. It's
24 possible that three-quarters of the

Page 176

1 prescriptions, but no, I do not agree
2 with that.
3 BY MR. SIMMER:
4 Q. So this news article is wrong.
5 Right?
6 MR. LAVELLE: Object to form.
7 THE WITNESS: It's not
8 necessarily wrong. It's not saying what
9 you're implying it's saying.
10 BY MR. SIMMER:
11 Q. So in that opening sentence where
12 it says, "A Rite Aid...store in Lexington is
13 responsible for more than three-quarters of the
14 prescription-drug violations in a multi-state
15 federal investigation," you don't think that
16 that's a correct statement, do you?
17 A. Let me ex --
18 MR. LAVELLE: Object to form.
19 Objection, asked and answered.
20 THE WITNESS: No. I -- I would
21 put it this way. All this is saying is
22 that three-quarters of the individual
23 violations occurred in that particular
24 location.

Page 177

1 That doesn't address the level of
2 the violations. That doesn't address
3 anything else.
4 So I do not believe that that was
5 the significant driving issue here.
6 BY MR. SIMMER:
7 Q. At the time this investigation
8 was going on, did the company take you aside and
9 say, Mr. Palmer, you were the district manager
10 over this store, tell us what happened at this
11 store?
12 MR. LAVELLE: Object to form.
13 THE WITNESS: No, not that I
14 recall.
15 BY MR. SIMMER:
16 Q. You never helped the company, you
17 know, understand the nature of the violations
18 that happened in Lexington?
19 MR. LAVELLE: Object to form.
20 THE WITNESS: Not that I recall.
21 There were other individuals that would
22 have been much more knowledgeable.
23 BY MR. SIMMER:
24 Q. But you were the district manager

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 in charge of that store for at least a year, I
2 think we said. Right?
3         MR. LAVELLE: Object to the form.
4     Objection, asked and answered.
5 BY MR. SIMMER:
6     Q.    Right?
7     A.    I was a pharmacy district manager
8 for this location for a portion of the time
9 involved here.
10     Q.    And you feel no responsibility at
11 all for what happened at that store in Lexington.
12     Isn't that right?
13         MR. LAVELLE: Object to form.
14         THE WITNESS: I do not.
15 BY MR. SIMMER:
16     Q.    Had nothing to do with you.
17 Right?
18         MR. LAVELLE: Object to form.
19         THE WITNESS: I don't understand
20     what you're asking.
21 BY MR. SIMMER:
22     Q.    You were the district manager in
23 charge of this store, but you're saying I had no
24 responsibility for what happened there. Right?

Page 179

1         MR. LAVELLE: Object to form.
2     Objection, asked and answered.
3         THE WITNESS: If I didn't know at
4     the time I was the district manager that
5     there were issues that would surface
6     years down the road as an issue, how
7     could I be responsible for it?
8             - - -
9         (Deposition Exhibit No. Rite
10     Aid-Palmer-8, PowerPoint, "Government
11     Affairs DEA Compliance," Bates stamped
12     Rite_Aid_OMDL_0039845 through
13     Rite_Aid_OMDL_0039923, was marked for
14     identification.)
15             - - -
16 BY MR. SIMMER:
17     Q.    I'm going to hand you what we
18 have marked as Palmer Exhibit Number 8. And
19 again I apologize, the Bates number is cut off on
20 the bottom of this.
21     A.    Yep.
22     Q.    For the record, and we'll replace
23 this with the proper Bates number on this, but
24 I'll identify the record as a presentation

Page 180

1 entitled "Government Affairs DEA Compliance,"
2 Bates number Rite_Aid_OMDL_0039845 to 0039923.
3     A.    (Reviewing document.)
4         Okay.
5     Q.    Have you looked -- seen this
6 document before?
7     A.    Yes.
8     Q.    When is the last time you saw it?
9     A.    During depo preparation.
10     Q.    And is it a document that you had
11 a hand in preparing?
12     A.    It looks like a portion of it,
13 yes.
14     Q.    Can you tell us what this
15 document is?
16     A.    This appears to be another one of
17 the regulatory road show presentations.



Page 181





Page 186

Page 188

Page 187

Page 189





Page 194

6    Q.    So following this 2009
7  settlement, do you know if there was any effort
8  by the company to go out and conduct training of
9  pharmacists to assist them in how to monitor the
10 red flags of diversion?
11    A.    I know that there were a number
12 of actions taken as a result of the settlement.
13 I was not directly involved in the settlement,
14 so, you know, I obviously just read it right now
15 and I do remember that some things were put in
16 place, but I don't know that I can recall right
17 here, right now what all of those things were.
18    Q.    So you don't know sitting here
19 today whether there was any training of
20 pharmacists to assist them in monitoring the red
21 flags of diversion.  Right?
22    A.    At this point in time, no.
23 Eventually the company, you know, did implement,
24 you know, a red flag process and red flag

Page 195

1  training and those types of actions.
2    Q.    So you do recall that eventually
3  the company did implement something, but not as a
4  result of this 2009 settlement?
5         MR. LAVELLE:  Object to form.
6         THE WITNESS:  The first part was
7      correct.  The second part I don't know
8      the answer to.
9  BY MR. SIMMER:
10    Q.    So you believe, however, that
11 there was some kind of a process implemented to
12 train pharmacists on the red flags of diversion.
13 Right?
14    A.    There is a red flag process
15 today, yes.
16    Q.    And when did that go into place?
17    A.    I don't know exactly.  I don't
18 know.  There's probably other people that can
19 better answer that.
20    Q.    So following the 2009 settlement,
21 do you know if there was any effort to train
22 pharmacists how to identify forged prescriptions?
23    A.    I don't know the answer to that.
24    Q.    Following the 2009 settlement, do

Page 196

1  you know if the company endeavored to train
2  pharmacists on how to identify altered
3  prescriptions?
4    A.    I don't know that, and I'm not
5  even sure how you would do that.
6    Q.    Any effort by the company
7  following the 2009 settlement to identify
8  overprescribing by a pill mill?
9    A.    Repeat the question?
10    Q.    Was there any training of
11 pharmacists about how to identify overprescribing
12 by a pill mill physician?
13         MR. LAVELLE:  Objection to the
14      form of the question.  It's a different
15      question than was asked.
16         THE WITNESS:  Yeah.  I don't know
17      the answer, and I don't even know that
18      pill mill is a defined term.
19         What's your definition of "pill
20      mill"?
21 BY MR. SIMMER:
22    Q.    You don't know what that term
23 means?
24    A.    I have an idea of what some

Page 197

1  people think that means, but I don't believe
2  that's a defined term.
3    Q.    What's your understanding the
4  term means?
5    A.    I think certain individuals in
6  the media and the press use that term generically
7  to prescribe (sic) a medical practitioner that is
8  overprescribing, would be my definition.
9    Q.    You don't agree with that
10 definition?
11    A.    Oh, I didn't say I did or don't
12 agree with it.
13    Q.    That's just your understanding
14 how the term is used.  Right?
15    A.    That's my understanding from --
16 yes.
17    Q.    Did the company do any training
18 of any kind about how to identify overprescribing
19 by a physician?
20    A.    That would be part of that red
21 flags process that we talked about earlier.
22    Q.    And you think the company has
23 implemented at some point.  Right?
24    A.    Yes.

Page 198

1    Q.    But you don't know when it
2  happened. Right?
3        A.    It's been more than a few years,
4  but I -- I could not tell you whether it was 2012
5  or 2013 or exactly. But there -- I'm sure there
6  are others who can answer that.
7        Q.    And who would we talk to about
8  that?
9        A.    I'd suggest Janet Hart.
10       Q.    And you're just guessing about
11 the years when it was put in place. Right?
12       A.    I believe it was around 2012, but
13 again, I don't want to affirmatively state that.
14       Q.    So the efforts to go out and
15 train Rite Aid pharmacists about the red flags of
16 diversion, did that emanate from any of your
17 compliance responsibilities that you undertook
18 for the company?
19       MR. LAVELLE: Object to form.
20       THE WITNESS: Yeah. I'm not sure
21    what you mean by the word "emanate" in
22    that context.
23 BY MR. SIMMER:
24       Q.    Were you in any way responsible

Page 199

1  for this effort to train the Rite Aid pharmacists
2  about the red flags of diversion?
3        A.    Not responsible for training them
4  on the red flag process for diversion, no.
5        Q.    So in your compliance role after
6  you left loss prevention, you're saying that
7  this -- the training of pharmacists about red
8  flags, you had no responsibility for that?
9        A.    No responsibility --
10       MR. LAVELLE: Object to form.
11    Objection, asked and answered.
12       THE WITNESS: No responsibility
13    for training.
14 BY MR. SIMMER:
15       Q.    Following the 2009 settlement, do
16 you know whether the company endeavored to train
17 its pharmacists what they were to do if they
18 suspected that physicians were bad actors?
19       MR. LAVELLE: Object to form.
20       THE WITNESS: Can you repeat that
21    question for me?
22 BY MR. SIMMER:
23       Q.    Following the 2009 settlement, do
24 you know whether the company endeavored to train

Page 200

1  its pharmacists what they were to do if they
2  suspected that physicians were bad actors?
3        MR. LAVELLE: Same objection.
4        THE WITNESS: At some point in
5    time, yes, there was a process
6    implemented that appears to fit that
7    description. I don't know when that was
8    implemented.
9  BY MR. SIMMER:
10       Q.    But am I right that it wasn't as
11 a result of this 2009 settlement?
12       A.    I can't speak to as whether
13 things were as a result of.
14       Q.    I think you referenced it earlier
15 about the diet clinic -- excuse me, the weight
16 loss clinic that was involved with the
17 overprescribing at the Lexington pharmacy.
18 Right?
19       A.    Yeah. I don't believe the
20 issue -- overprescribing is your term. But
21 I'm -- I am familiar with the Lexington store and
22 the diet clinic.
23       Q.    And what's your understanding the
24 allegations were with regard to that weight loss

Page 201

1  clinic?
2        MR. LAVELLE: Object to form.
3    Objection, asked and answered.
4        THE WITNESS: I don't even -- I
5    don't know what all of the allegations
6    were. From reading articles, I
7    understand that part of the issue was
8    with whether the prescriber was on site
9    while the prescriptions were being
10   prescribed, which, you know, goes back to
11   my response before, being a -- briefly
12   being the district manager for that
13   location, I don't know how I would know
14   that.
15 BY MR. SIMMER:
16       Q.    You don't have an understanding
17 that there are allegations of improper
18 prescribing of phentermine?
19       MR. LAVELLE: Object to form.
20   Objection, asked and answered.
21       THE WITNESS: Yeah, I believe
22   I've just answered that.
23 BY MR. SIMMER:
24       Q.    Following the 2009 settlement,

Page 202

1 was there any effort by -- to train Rite Aid
2 pharmacists that they were to report bad actor
3 doctors to the DEA?
4 　　　　MR. LAVELLE:  Object to form.
5 Objection, asked and answered.
6 　　　　THE WITNESS:  There is a process
7 　　today around reporting prescribers of
8 　　suspicious activity, but I can't address
9 　　the rest of that.
10 BY MR. SIMMER:
11 　　Q.　 So sitting here today, you don't
12 know whether there was any specific training of
13 Rite Aid pharmacists about reporting bad actor
14 doctors to the DEA?
15 　　　　MR. LAVELLE:  Object to form.
16 Objection, asked and answered.
17 　　　　THE WITNESS:  Yeah.  I don't
18 　　know.
19 　　　　MR. LAVELLE:  Before we do a new
20 　　document, can we take a break?
21 　　　　MR. SIMMER:  That's fine.
22 　　　　THE VIDEOGRAPHER:  Off the record
23 　　at 2:13 p.m.
24 　　　　　　　- - -

Page 203

1 　　　　(A recess was taken from
2 　　2:13 p.m. to 2:32 p.m.)
3 　　　　　　　- - -
4 　　　　THE VIDEOGRAPHER:  We're back on
5 　　the record at 2:32 p.m.
6 BY MR. SIMMER:
7 　　Q.　 Sir, are you familiar with a --
8 McKesson forms that are called threshold change
9 request forms?
10 　　A.　 Yes.
11 　　Q.　 There's also an acronym it goes
12 by, TCR.
13 　　　　Are you familiar with that?
14 　　A.　 I believe I've heard that term.
15 　　Q.　 And when you requested a change
16 to McKesson up through the threshold change
17 process we've been talking about, what role did
18 you have in the completion of the TCR?
19 　　A.　 I believe the TCR forms that
20 you're referencing to are strictly a McKesson
21 internal form, so none.
22 　　Q.　 So it's their form simply to
23 document what's happening with the change
24 request; is that right?

Page 204

1 　　A.　 I don't know.
2 　　Q.　 Okay.  From time to time, did you
3 actually receive copies of the forms, however?
4 　　　　MR. LAVELLE:  Object to form.
5 　　　　THE WITNESS:  I don't recall.  I
6 　　saw that form in my deposition prep.
7 　　Prior to that, I actually don't remember
8 　　those forms.
9 　　　　MR. SIMMER:  Before we -- this is
10 　　a Rite Aid document.  And I know you
11 　　wanted to lodge an objection for the
12 　　record.
13 　　　　MS. DORRIS:  I'm sorry.  It's a
14 　　Rite Aid document or McKesson?
15 　　　　MR. SIMMER:  I'm sorry, McKesson
16 　　document, excuse me.
17 　　　　MS. DORRIS:  Okay, yeah.  In that
18 　　case --
19 　　　　MR. SIMMER:  This is
20 　　McKesson_MDL_00628212.  Before I hand it
21 　　to the witness, you wanted to go ahead
22 　　and lodge your objection.
23 　　　　MS. DORRIS:  Yeah.  I'd like to
24 　　make a standing objection that none of

Page 205

1 the McKesson documents being used today
2 were provided to McKesson in advance.
3 McKesson has previously tried to
4 accommodate plaintiffs, but we object to
5 the continued violation of the protective
6 order.  And if it continues to occur, we
7 reserve our right to seek relief,
8 including having this testimony
9 stricken -- McKesson reserves its right
10 to seek relief, including having the
11 testimony stricken.
12 　　　　MR. SIMMER:  Again, as stated in
13 the CMO 2, paragraph 33, the only time
14 written permission is required is if
15 confidential information is being used
16 solely for the purpose of the litigation.
17 And then it lists certain exceptions to
18 that written requirement, including H,
19 that any individual who authored,
20 prepared or previously reviewed or
21 received the information as an exception
22 to the written requirement.
23 　　　　We did give them to you in
24 advance, too, so...

Page 206

1      MS. DORRIS:  I would say that's
2  not McKesson's understanding of the
3  protective order.
4      And do you mean, was it the
5  advance notice over the lunch break?
6      MR. SIMMER:  The advance notice
7  is only required is if the witness is not
8  someone who has already been copied on or
9  received the information.
10     MS. DORRIS:  That's not
11 McKesson's understanding.
12     MR. SIMMER:  Objection noted.
13         - - -
14     (Deposition Exhibit No. Rite
15 Aid-Palmer-9, Email chain, top one dated
16 October 02, 2008, Bates stamped
17 McKesson_MDL_00628212, 2 pages, was
18 marked for identification.)
19         - - -
20 BY MR. SIMMER:
21     Q.   So we're handing you what we've
22 marked as Rite Aid-Palmer Exhibit Number 9.
23     MS. DORRIS:  I'd also like to
24 make a standing objection to the extent

Page 207

1  that these McKesson exhibits do not have
2  Bates numbers or confidentiality
3  designations.  We're going to make the
4  standing objection that Rite Aid's
5  counsel made in regards to replacing
6  them.
7      MR. SIMMER:  Very good.  And
8  we're going to be swapping in the ones
9  with the Bates number.  I'll identify it
10 for the record as MCKMDL00628212 through
11 628213.
12     MR. LAVELLE:  I think my previous
13 statement was clear, but my standing
14 objection also relates to the McKesson
15 documents being used without Bates
16 numbers and confidentiality.
17 BY MR. SIMMER:
18     Q.   Have you had a chance to review
19 this document?
20     A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review





Page 214

24     Q.    Hand you what we've marked as

Page 216

Page 215

 1   Palmer Exhibit 10.  I'll identify it for the
 2   record as MCKMDL00628110.
 3             - - -
 4       (Deposition Exhibit No. Rite
 5    Aid-Palmer-10, Email chain, top one dated
 6    08 Dec 2008, Bates stamped MCKMDL00628110
 7    and MCKMDL00628111, was marked for
 8    identification.)
 9             - - -
10   BY MR. SIMMER:
11       Q.    And it's a multi-page exhibit.
12   The last page is 628111.

Page 217

Highly Confidential - Subject to Further Confidentiality Review



Page 218

8          - - -
9          (Deposition Exhibit No. Rite
10    Aid-Palmer-11, Email chain, top one dated
11    Feb 16 06, Bates stamped MCKMDL00536012
12    and MCKMDL00536013, was marked for
13    identification.)
14         - - -
15    BY MR. SIMMER:
16    Q.    Hand you what we've marked as
17    Palmer Exhibit Number 11.  I'll identify it for
18    the record as document MCKMDL00536012 through
19    536013.
20         And I'll represent the redactions
21    were the portion of the email string on which Mr.
22    Palmer was not a party.
23    A.    Yes.

Page 220

11         - - -
12         (Deposition Exhibit No. Rite
13    Aid-Palmer-12, Email chain, top one dated
14    19 Aug 2009, Bates stamped MCKMDL00627812
15    through MCKMDL00627814, was marked for
16    identification.)
17         - - -
18    BY MR. SIMMER:
19    Q.    Hand you what we've marked as
20    Rite Aid-Palmer Exhibit 12.  Identify for the
21    record as MCKMDL00627812 through 00627813 --
22    excuse me, strike that.
23         To 627814.
24    A.    (Reviewing document.)

Page 219

Page 221

1         Okay.
2         Q.    I direct your attention to the
3    email that starts this string on the second page
4    of the exhibit that's 627813.

Highly Confidential - Subject to Further Confidentiality Review



Page 222

Page 224

Page 223

Page 225

Highly Confidential - Subject to Further Confidentiality Review





Page 230

Page 232

```
 1      Q.   I hand you what we've marked as
 2   Palmer Exhibit 14.  I'll identify it for the
 3   record as MCKMDL00629074 through 629075.
 4      A.   (Reviewing document.)
 5           Okay.
```

```
 7      Q.   Hand you what we've marked as
 8   Palmer Exhibit 13.
 9                - - -
10           (Deposition Exhibit No. Rite
11   Aid-Palmer-13, Email chain, top one dated
12   19 Aug 2009, 4 pages, was marked for
13   identification.)
14                - - -
15   BY MR. SIMMER:
```

Page 231

Page 233

```
17                - - -
18           (Deposition Exhibit No. Rite
19   Aid-Palmer-14, Email chain, top one dated
20   25 Oct 2010, Bates stamped MCKMDL00629074
21   and MCKMDL00629075, was marked for
22   identification.)
23                - - -
24   BY MR. SIMMER:
```





Page 238

Page 240

Page 239

```
 9              - - -
10          (Deposition Exhibit No. Rite
11      Aid-Palmer-15, Email chain, top one dated
12      30 Nov 2010, Bates stamped MCKMDL00628996
13      and MCKMDL00628997, was marked for
14      identification.)
15              - - -
16  BY MR. SIMMER:
17      Q.   I hand you what we've marked as
18  Palmer Exhibit 15.  Take a moment to review it.
19  I'll identify it for the record as MCKMDL00628996
20  through 628997.
```

Page 241





Page 246

23        - - -
24        (Deposition Exhibit No. Rite

Page 247

1        Aid-Palmer-16, Email chain, top one dated
2        25 Mar 2011, Bates stamped MCKMDL00629858
3        and 629859, was marked for
4        identification.)
5             - - -
6   BY MR. SIMMER:
7        Q.    Hand you what we've marked as
8   Palmer Exhibit 16.  We'll identify it for the
9   record as Bates MCKMDL00629858 through 629859.
10        A.    Okay.

Page 248

Page 249



Page 250

Page 252

11  BY MR. SIMMER:
12      Q.    Hand you what we've marked as
13  Palmer Exhibit Number 17.
14              -  -  -
15          (Deposition Exhibit No. Rite
16      Aid-Palmer-17, Email chain, top one dated
17      31 Mar 2011, Bates stamped
18      MCKMDL00627679, was marked for
19      identification.)
20              -  -  -
21  BY MR. SIMMER:
22      Q.    I'll identify it for the record
23  as MCKMDL00627679.
24      A.    Okay.

Page 251

Page 253

Page 254



Page 255

17    MR. SIMMER:  Can we take a short
18    break?
19    MR. LAVELLE:  Yeah.
20    THE WITNESS:  We can.
21    THE VIDEOGRAPHER:  Off the record
22    at 3:32 p.m.
23    - - -
24    (A recess was taken from

Page 256

1    3:32 p.m. to 3:56 p.m.)
2    - - -
3    THE VIDEOGRAPHER:  We're back on
4    the record at 3:56 p.m.
5    BY MR. SIMMER:
6    Q.    Sir, we went through a series of
7    exhibits looking at threshold increases across a
8    number of Rite Aid stores before we took our
9    break.  Right?
10    A.    Yes.
11    Q.    Is it fair to say that in
12    approving those threshold increases, you
13    satisfied yourself that nothing about them was in
14    any way related to the opioids epidemic happening
15    in America at the time?
16    A.    I had no reason --
17    MR. LAVELLE:  Object to form.
18    THE WITNESS:  -- to believe so.
19    No reason to believe so.
20    BY MR. SIMMER:
21    Q.    Okay.  Did you do anything to
22    investigate to make sure that that was not
23    anything that was driving the utilization, the
24    increase?

Page 257

1    MR. LAVELLE:  Object to form.
2    THE WITNESS:  The particular
3    increases that we were discussing
4    previous to the break, there was an
5    industry-wide issue, paradigm shift that
6    we believed was driving those increases.
7    BY MR. SIMMER:
8    Q.    Nothing related to the epidemic.
9    Right?
10    A.    Not that I would necessarily
11    believe is directly related to -- to...
12    Q.    Again, just to clarify, what did
13    you actually do to confirm that that wasn't in
14    any way a driving force behind these increases?
15    A.    If -- if the increases was the
16    first-time increase after the industry changes
17    that we talked about, the recall and the shift to
18    short-acting product, then the -- you know, the
19    assumption was that that was the driver for those
20    increases.
21    There are also points in those
22    things where the reiteration is, had the increase
23    already been done, so if subsequent increases
24    would have come in, those would have been handled



Page 258

1　differently.
2　　　　- - -
3　　　　(Deposition Exhibit No. Rite
4　　　Aid-Palmer-18, Email dated December 03,
5　　　2008, Bates stamped MCKMDL00628183, was
6　　　marked for identification.)
7　　　　- - -
8　BY MR. SIMMER:
9　　　Q.　Hand you what we've marked as
10　Palmer-18.  I'll identify it for the record as
11　MCKMDL00628183.
12　　　A.　Okay.

Page 260

Page 259

Page 261

Page 262



23    Q.    Hand you what we've previously
24 marked as Novack Exhibit 8. I'll identify it for

Page 263

1 the record as a press release from the Department
2 of Justice dated October 20, 2014, the title of
3 which says, "Akron Doctor Pleads Guilty to
4 Illegally Prescribing Painkillers."
5        Do you see that?
6    A.    Yes.
7    Q.    Are you familiar with Dr. Adolph
8 Harper?
9    A.    No.
10    Q.    Never heard the name before?
11    A.    Not that I recall.
12    Q.    Are you familiar with the pain
13 clinic that he ran in Akron, Ohio?
14    A.    Not that I recall.
15    Q.    Familiar with the fact that he
16 was a gynecologist?
17    A.    No.
18    Q.    Familiar with the fact that his
19 patients filled prescriptions at pharmacy 3151?
20    A.    No.
21    Q.    Take a look at the first
22 paragraph.
23        Do you see where it says, "An
24 Akron physician pleaded guilty to illegally

Page 264

1 prescribing hundreds of thousands of doses of
2 painkillers and other pills to customers for no
3 legitimate medical purpose, even after he learned
4 some customers had died from overdose-related
5 deaths, law enforcement officials said"?
6        Do you see that?
7        MR. LAVELLE:  Object to form.
8        THE WITNESS:  Yes.
9 BY MR. SIMMER:
10    Q.    Ever heard of that before?
11    A.    No.
12    Q.    Look at the fifth paragraph.  Do
13 you see where it says, "Together" -- and that's
14 in reference to Dr. Harper and several others --
15 "they distributed hundreds of thousands of doses
16 of prescription medications -- including
17 OxyContin, Percocet, Roxicet, Opana and others --
18 from Adolph Harper's medical offices in Akron
19 between 2009 and 2012, according to...
20 documents" -- excuse me -- "according to court
21 documents"?
22        Do you see that?
23        MR. LAVELLE:  Object to form.
24        THE WITNESS:  I do.  That's not

Page 265

1        what it says, though.
2 BY MR. SIMMER:
3    Q.    It doesn't say that?
4    A.    You said from Adolph Harper's
5 medical officers -- or you said offices.  The
6 word here is "officers."
7    Q.    Thank you for that correction.  I
8 think that may be a typo in the actual press
9 release.  I don't think it means officers, but
10 with that correction.
11        Have you heard of this before,
12 that between 2009 and 2012, that these
13 individuals were illegally filling -- or writing
14 prescriptions for OxyContin, Percocet, Roxicet,
15 Opana and others?
16    A.    No, I'm not familiar with this.
17        I also would point out, and maybe
18 this is an error as well, but it says they were
19 distributed -- the doses were distributed from
20 Adolph Harper's -- assuming you are correct,
21 offices.  So they're saying that these were
22 distributed from his offices, they were handed
23 out at his office, is that what they're saying?
24    Q.    I think they're actually

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1 referring to the prescriptions themselves, not
2 the drug.
3       A.    So it's inaccurate.
4           MR. LAVELLE:  Objection to the
5 form.  Objection.
6 BY MR. SIMMER:
7       Q.    I don't know whether it's
8 inaccurate.
9           Let's look at the indictment and
10 see what the indictment said.  I'll hand you what
11 we've previously marked as Novack Rite Aid
12 Exhibit 7.
13      A.    So I don't need this one?
14          MR. LAVELLE:  No.
15 BY MR. SIMMER:
16      Q.    I'll identify it for the record
17 as a pleading dated March 25, 2014 from the
18 Northern District of Ohio, Eastern Division,
19 captioned United States of America, Plaintiff,
20 vs. Adolph Harper, Jr., Adria Harper, Patricia
21 Laughman and Tequilla Berry, Defendants.
22 Indictment Case Number 5:14CR096.
23          Do you see that?
24      A.    Yes.

Page 267

1       Q.    Do you see in the very first
2 paragraph, where it says, and I'll quote, "From
3 on or about September 1, 2009, and continuing
4 through on or about May 18, 2012, the defendants
5 ADOLPH HARPER, JR., ADRIA HARPER, PATRICIA
6 LAUGHMAN, TEQUILLA BERRY and others
7 (collectively, the 'HARPER DRUG TRAFFICKING
8 ORGANIZATION' or 'HARPER DTO') agreed to
9 illegally distribute hundreds of thousands of
10 doses of prescription painkillers to customers
11 located in the Northern District of Ohio and
12 elsewhere"?
13          Do you see that?
14          MR. LAVELLE:  Object to form.
15          THE WITNESS:  Yes, I see that.
16 BY MR. SIMMER:
17      Q.    Direct your attention to
18 paragraph 21 on page 8.
19          Do you see where it says, and
20 I'll quote, "Beginning at least on or about
21 September 1, 2009, and continuing through on or
22 about May 18, 2012, the exact dates to the Grand
23 Jury unknown, in the Northern District of Ohio,
24 Eastern Division, ADOLPH HARPER, JR., ADRIA

Page 268

1 HARPER, PATRICIA LAUGHMAN and Tequilla Berry, the
2 defendants herein, and others known and unknown
3 to the Grand Jury, did unlawfully, knowingly and
4 intentionally combine, conspire, confederate and
5 agree together and with each other, and with
6 diverse others known and unknown to the Grand
7 Jury to knowingly and intentionally distribute
8 and dispense oxycodone, oxymorphone, methadone,
9 amphetamines, Schedule II controlled substances;
10 buprenorphine and hydrocodone, Schedule III
11 controlled substances, and alprazolam and
12 zolpidem, Schedule IV controlled substances,
13 outside the usual course of professional practice
14 and not for a legitimate medical purpose,
15 contrary to and in violation of Title 21, United
16 States Code sections 841(a)(1), (b)(1)(C),
17 (b)(1)(E), (b)(2) and 846"?
18          Do you see that?
19          MR. LAVELLE:  Object to form.
20          THE WITNESS:  Yes.
21 BY MR. SIMMER:
22      Q.    Did you ever hear of that before?
23          MR. LAVELLE:  Object to form.
24          THE WITNESS:  Not that I recall.

Page 269

1 BY MR. SIMMER:
2       Q.    Look at paragraph 24.  Do you see
3 where it says, and I'll quote, "It was further
4 part of the conspiracy that ADOLPH HARPER, JR.
5 pre-signed blank prescription forms, and ADRIA
6 HARPER, LAUGHMAN, and BERRY completed
7 prescription information for customers and
8 distributed 'prescriptions' to the customers,
9 anticipating that the customers would fill the
10 'prescriptions' at a pharmacy and receive
11 controlled substances"?
12          You see that?
13          MR. LAVELLE:  Object to form.
14          THE WITNESS:  Yes.
15 BY MR. SIMMER:
16      Q.    Look at paragraph 27.  "It was
17 further part of the conspiracy that ADOLPH
18 HARPER, JR., continued to distribute
19 'prescriptions' for controlled substances after
20 he learned that some of his customers had died
21 from overdose-related deaths."
22          See that?
23          MR. LAVELLE:  Object to form.
24          THE WITNESS:  Yes.

Page 270

1    MR. LAVELLE: Move to strike this
2    entire reading of a document that the
3    witness has said he has no familiarity
4    with. Counsel is just reading paragraphs
5    of a document that the witness knows
6    nothing about. It's a total waste of
7    time and I move to strike it.
8        MR. SIMMER: Objection noted.
9  BY MR. SIMMER:
10   Q.   Look at paragraph 29.
11       "It was further part of the
12 conspiracy that ADOLPH HARPER, JR., distributed,
13 'prescriptions' to customers after conducting a
14 cursory examination of the customer and often
15 without examining the customer."
16       See that?
17       MR. LAVELLE: Object to form.
18       THE WITNESS: Yes.
19 BY MR. SIMMER:
20   Q.   Look at paragraph 31.
21       "It was further part of the
22 conspiracy that the HARPER DTO posted...ADOLPH
23 HARPER, JR.'S 'medical' office a list of
24 pharmacies that were likely to fill ADOLPH HARPER

Page 271

1  JR.'s customers' 'prescriptions.'"
2        Do you see that?
3        MR. LAVELLE: Object to form.
4        THE WITNESS: Yes.
5  BY MR. SIMMER:
6    Q.   In conducting the investigation
7  and approving the threshold increase that we just
8  looked at for pharmacy 3151, did you do anything
9  to validate what the pain pharmacy -- excuse me,
10 the pain practice was that was driving the
11 increase?
12       MR. LAVELLE: Objection, asked
13       and answered.
14       THE WITNESS: In the 2008 case,
15       no.
16 BY MR. SIMMER:
17   Q.   Is it fair to say that had you
18 known that the increase was being driven by Dr.
19 Harper, you would not have approved this
20 threshold increase?
21       MR. LAVELLE: Object to form.
22       THE WITNESS: Yeah. I don't
23       understand what you're asking. It
24       appears to be very speculative.

Page 272

1  BY MR. SIMMER:
2    Q.   So you're saying if you had known
3  that Dr. Harper's pain clinic that was driving
4  this increase in prescriptions from 30 --
5  pharmacy 3151, you would have done nothing at
6  all?
7        MR. LAVELLE: Object to form.
8        THE WITNESS: If I would have
9        known that Dr. Harper was prescribing for
10       illegitimate medical purposes, then no.
11       And that was driving the increases, then
12       no, I would not have approved the
13       increase.
14       But your question was simply if
15       it was Dr. Clinic's -- Harper's clinic
16       prescribing them, would you have approved
17       the increase.
18 BY MR. SIMMER:
19   Q.   So you are agreeing with me that
20 if you had known that Dr. Harper was prescribing
21 for illegitimate medical purposes, that you would
22 not have approved this threshold increase.
23 Right?
24       MR. LAVELLE: Object to form.

Page 273

1        THE WITNESS: If I would have
2        known that the increase was due to
3        illegitimate prescriptions, I would not
4        have approved the increase.
5  BY MR. SIMMER:
6    Q.   Can you pull back Exhibit 5,
7  please. We looked at it earlier today. I think
8  that was --
9        MR. LAVELLE: Here. I can help
10       you.
11       THE WITNESS: Okay. How do I
12       know what's what?
13       MR. LAVELLE: Each of these has a
14       number on it, so we just have to look for
15       Exhibit 5.
16       5 is this document.
17       THE WITNESS: Okay.
18       MR. LAVELLE: Get these other
19       ones out of your way.
20 BY MR. SIMMER:
21   Q.   When you testified with regard to
22 questions I asked you about Exhibit 5, you
23 referred to the system in this exhibit as the
24 inventory replenishment system.



Page 274

1    Do you remember that?

2    A.   I believe I referred to it as

3 more than just that.  I think the explanation was

4 more extensive, proprietary system that includes

5 replenishment and dispensing.  I have to go back

6 and look, but I think my answer was a little more

7 expansive than you're --

8    Q.   Well, I'm just trying to clarify,

9 just the inventory replenishment system sometimes

10 is referred to as the auto replenishment system.

11 Am I right?

12    A.   That is correct, yes.  Yes.

13    Q.   And am I right that this is part

14 of the system that Rite Aid uses to monitor

15 diversion.  Right?

16    A.   I would say yes.  It is one of

17 the systems that could detect potential

18 diversion, yes.

19    Q.   And I'm also right that this is a

20 system that's part of Rite Aid's efforts to

21 monitor for suspicious orders.  Right?

22    A.   Again, as I've said multiple

23 times throughout, my understanding of suspicious

24 orders is that that's a distribution center

Page 275

1 thing.  And I've clarified several times that,

2 you know, my understanding of suspicious order

3 monitoring is relative to distribution centers.

4 I think I've clarified that a couple times.

5    Q.   I'm just trying to get a clear

6 record here.

7    The auto replenishment system, or

8 what you I think referred to as the inventory

9 replenishment system, that's one of the things

10 that Rite Aid uses to monitor suspicious orders;

11 is that right?

12    A.   I think you're changing monitor

13 for diversion to monitor for suspicious orders.

14 I think you're switching those words up in your

15 various questions.

16    As it states here, these are

17 tools to monitor controlled substance purchases

18 relative to diversion.

19    Q.   And just to get a clear record,

20 and I apologize if I'm asking a question that you

21 feel you've answered.

22    But you're saying that it had --

23 as far as you know, it did not have any part in

24 the company's efforts to monitor for suspicious

Page 276

1 orders.  Right?

2    MR. LAVELLE:  Object to form.

3 Objection, asked and answered.

4    THE WITNESS:  I don't know the

5 answer to that.

6 BY MR. SIMMER:

7    Q.   Hand you what we've marked as

8 Palmer Exhibit 19.

9    - - -

10    (Deposition Exhibit No. Rite

11    Aid-Palmer-19, Email chain, top one dated

12    2011-01-17, Bates stamped

13    Rite_Aid_OMDL_0050633, was marked for

14    identification.)

15    - - -

16 BY MR. SIMMER:

17    Q.   I'll identify for the record as a

18 one-page document, Rite_Aid_OMDL_0050633.

19    A.   Okay.

Page 277

24    Q.   So you left loss -- or strike

Page 278

1 that.

2         You left the loss prevention
3 department in April of 2011; is that right?

4     A.    That's correct.

5     Q.    Who replaced you in that
6 position?

7     A.    Sophia Novack, but her name was
8 not Sophia Novack at that time.

9     Q.    It was Sophia Lai, L-A-I.  Right?

10    A.    Yes.

11    Q.    Did she begin immediately after
12 you left the position?

13    A.    No.

14    Q.    Was there a period of time when
15 the position was vacant?

16    A.    Yes.

17    Q.    So who continued then to fulfill
18 the functions that you had been in terms of the
19 approval of threshold requests, threshold
20 increase requests?

21    A.    I don't recall.

22    Q.    No one?

23    A.    I don't know that the answer is
24 no one.  I mean, at some point, I know -- like I

Page 279

1 think Janet Hart does these today.  But off
2 memory from seven years ago during a time when I
3 was transitioning into a new role and before
4 Sophia came there, I don't recall.

5     Q.    Did you do anything during
6 that -- the interval while the position was
7 vacant to continue any of your responsibilities
8 as you had been in loss prevention?

9     A.    I would say -- I would say yes.
10 The team -- as an example, the team that reported
11 to me in that group would sometimes come down to
12 my new office and ask for, you know, help,
13 assistance, guidance.  So it -- you know,
14 certainly to some degree, yes.  Still helping out
15 in that role, still being involved to -- I just
16 don't recall if specifically how we handled the
17 gap with regards to that specific item.

18    Q.    So you were physically located in
19 a different office; is that right?

20    A.    Yes, yes.

21    Q.    And a different floor location?

22    A.    No.  Actually, opposite ends of
23 the same building.

24    Q.    And you recall that the people

Page 280

1 that you had supervised came periodically to ask
2 you questions; is that right?

3     A.    Yes.

4     Q.    Did Ms. Lai come to you for any
5 kind of training or assistance in learning her
6 new job?

7         MR. LAVELLE:  Object to form.

8         THE WITNESS:  Yes.  When Ms. Lai
9     started, I provided her, you know, some
10    guidance, gave her some tools, introduced
11    her to the team, things like that.

12 BY MR. SIMMER:

13    Q.    What kinds of things did you give
14 her guidance on?

15    A.    Really everything, you know,
16 relative to the role.  So administrative guidance
17 on, you know, again, the team members and their
18 strengths.  I gave her some -- you know, a number
19 of different documents, you know, that were
20 things that we used and told her if she had
21 questions, you know, after looking them over, to
22 come see me, I'm down the -- you know, again, her
23 office was my old office.  So encouraged her to,
24 you know, come down to the other side and ask

Page 281

1 those questions.

2     Q.    You said you gave her some tools.
3         What were those?

4     A.    I don't recall all of them, but
5 in the course of my role, I had put together, you
6 know, different decks and, you know, tools and
7 spreadsheets to, you know, help in the role.  And
8 I provided some of those to her.

9     Q.    Did you train her in the process
10 to get thresholds increased?

11    A.    I don't recall, but I believe so.

12    Q.    One area that we didn't really
13 cover sufficiently early on is, as part of your
14 training over time in loss prevention and
15 compliance generally, did you get any outside
16 training from any third parties?

17    A.    Yes.

18    Q.    What third parties?

19    A.    I mean, we're required to have --
20 I'm required to have continuing education, both
21 for my licenses and for all those certifications.
22 So I could not list, you know, for example, every
23 training program I took for the past 15 years.

24    Q.    Did you attend any third-party

Page 282

1 courses or training sessions with regard to
2 controlled substances?
3          MR. LAVELLE:  Object to form.
4          THE WITNESS:  Can you better
5      define training program?
6 BY MR. SIMMER:
7      Q.    Well, I'll you give you an
8 example.
9          Did you train -- or attend any
10 Buzzeo conferences?
11      A.    I did not personally attend
12 Buzzeo conferences that I can recall.
13      Q.    You know what I mean by the
14 Buzzeo conferences?
15      A.    I do.  I am familiar with Buzzeo.
16      Q.    And that Buzzeo offered
17 conferences and training on controlled
18 substances?
19      A.    I am familiar with that.
20      Q.    And your testimony is that you
21 attended none of his conferences?
22      A.    I don't recall attending his
23 conferences.  I may have attended one.
24          But what I was referring to

Page 283

1 earlier with the question clarification on
2 training was during those regulatory road shows,
3 for example, Janet would sometimes have a
4 representative from the DEA come out to actually
5 present or teach at the road show.  So I was
6 trying to clarify whether that constitutes
7 training.
8      Q.    Do you remember what individuals
9 from the DEA came and presented along with you?
10      A.    I do not.
11      Q.    What did they present during
12 those road shows?
13      A.    I could not -- I would not recall
14 all of the topics.  I recall one where they were
15 talking about suspected loss forms and 106s.
16      Q.    That's that same kind of a DEA
17 form we looked at earlier, that the forms are
18 filled out after a suspected theft or a loss in a
19 store?
20      A.    Yes.
21          MR. LAVELLE:  Object to form.
22 BY MR. SIMMER:
23      Q.    Did they give any presentations
24 on suspicious order monitoring that you recall?

Page 284

1      A.    Not that I recall.
2      Q.    A little unclear.
3          You said that you did not recall
4 attending a Buzzeo conference, but then you said,
5 I think I may have attended one of the
6 conferences.
7          Did I have that right?
8      A.    You do, because I don't
9 specifically remembering a Buzzeo conference, but
10 in thinking through it, I don't know what other
11 way I would know or be familiar with Buzzeo.  So
12 I think it's possible that I may have attended
13 one.  I can't affirmatively state that, but it's
14 possible.
15      Q.    Any idea what approximate time
16 frame when you would have attended the Buzzeo
17 conference?
18      A.    No.
19      Q.    And just for the record, I want
20 to make sure I'm spelling it correctly and see if
21 you agree on this.
22          It's B-U-Z-Z-E-O; is that
23 correct?
24      A.    I believe that's correct, yes.

Page 285

1      Q.    Okay.  Any other third-party
2 training on controlled substances that you recall
3 having received?
4      A.    That's very broad.  But, you
5 know, again, with 15 hours of continuing
6 education required every single year and being a
7 practicing pharmacist for 20-some-odd years, I
8 can almost guarantee you that some of those
9 continuing education programs had something to do
10 with controlled substances.  That's a very broad
11 question.
12      Q.    But you have no specific
13 recollection of what those training courses were?
14      A.    No.  I'd have to go back and
15 look.
16      Q.    Where would you look?
17      A.    At least in recent time frame, I
18 have some of my continuing education, you know,
19 that I've taken.
20          You have to produce those to the
21 board on a periodic basis, so you have to
22 maintain your continuing -- much like I'm sure
23 attorneys have a similar process, I would assume.
24      Q.    You have to produce those to the

Page 286

1 Board of Pharmacy?
2      A.   You do.  It's not so matter much
3 of producing in today's environment.  It's all
4 electronic now.  So the way it works today is,
5 you know, you take the courses and you register
6 with a system that basically records those
7 courses.  And then you -- when you do your
8 licensure examination, you attest to the fact
9 that you've taken the courses.  And then if they
10 were to want to look to see if you have completed
11 the requirements, they can actually go out and if
12 they would want to and check that, is my
13 understanding of how it works, but...
14      Q.   You mentioned that you were
15 actually licensed in three different states; is
16 that right?
17      A.   That's correct.
18      Q.   And the procedure you've just
19 described, is that true in all three states?
20      A.   All three states require
21 continuing education, yes.
22      Q.   So if we wanted to get copies of
23 what it is that you're referencing as the -- I
24 guess, continuing education materials you

Page 287

1 provided to these Boards of Pharmacy, do you have
2 copies of what you submitted to each of these
3 three Boards of Pharmacy?
4      MR. LAVELLE:  Object to form.
5      THE WITNESS:  I would have a list
6      of courses, is potentially what I would
7      have on a, you know, NABP-type website.
8 BY MR. SIMMER:
9      Q.   That's the national boards --
10 National Association of Boards of Pharmacy, NABP.
11 Right?
12      A.   That's correct.
13      Q.   And you have -- I'm not sure what
14 you mean by NABP website.
15      Is that someplace where you
16 submitted this information or what is -- what's
17 the reference to the website?
18      MR. LAVELLE:  Object to form.
19      THE WITNESS:  NABP, over the past
20      few years, has developed a process where,
21      again, you can -- when you take your
22      continuing education, it can be
23      automatically loaded to an NABP, you
24      know, website.  The old process back in

Page 288

1 the day was you would take paper courses
2 or you would print out courses and you
3 would have to maintain a stack of your
4 continuing education courses.
5      You know, again, I believe that's
6 very similar to what attorneys have to do
7 with regards to their continuing
8 education.
9 BY MR. SIMMER:
10      Q.   During your continuing education
11 courses, you take examinations?
12      A.   Yes.
13      Q.   And those examinations, any of
14 them include information about controlled
15 substances?
16      A.   I don't know the answer to that.
17      Q.   So are these records you're
18 talking about that you either submitted through
19 NABP or ones that were the old way that were
20 submitted, I guess, paper courses I think you
21 talked about, is that information that you
22 provided to your counsel?
23      A.   Provided to my counsel?
24      Q.   The counsel sitting next to you

Page 289

1 today.
2      MR. LAVELLE:  Object to form.
3      THE WITNESS:  No.
4 BY MR. SIMMER:
5      Q.   Did they ask you for that
6 information?
7      MR. LAVELLE:  Object to form.
8      Direct the witness not to answer on the
9      grounds that it seeks attorney-client
10      communications.
11      MR. SIMMER:  I'm going to request
12      that you actually get that information
13      from the witness.  We need to determine
14      whether this is information that's
15      relevant to everything he's been talking
16      about about his expertise today.  So I'm
17      going to ask that you get copies of that
18      and we can determine whether that's
19      subject to a further inquiry, so...
20      MR. LAVELLE:  Mr. Simmer, you can
21      put any requests you have in writing.
22      We'll take a look at it.  We'll consider
23      it after the deposition.
24      MR. SIMMER:  We can go off the

Page 290

```
1   record.
2          THE VIDEOGRAPHER:  Off the record
3   at 4:33 p.m.
4              - - -
5          (A recess was taken from
6   4:33 p.m. to 4:56 p.m.)
7              - - -
8          THE VIDEOGRAPHER:  We're back on
9   the record at 4:56 p.m.
10         MR. SIMMER:  I have no further
11  questions.
12         I would say that if -- depending
13  on what documents are in this continuing
14  education production, we may still
15  reserve the right to come back and ask
16  the witness some additional questions.
17         MR. LAVELLE:  We're going to go
18  off the record briefly while we switch
19  places here.
20         THE VIDEOGRAPHER:  Off the record
21  at 4:56 p.m.
22             - - -
23         (A discussion off the record
24  occurred.)
```

Page 291

```
1              - - -
2          THE VIDEOGRAPHER:  We're back on
3   the record at 4:57 p.m.
4              - - -
5          EXAMINATION
6              - - -
7   BY MR. LAVELLE:
8      Q.    Good afternoon, Mr. Palmer.  This
9   is John Lavelle representing Rite Aid, and I have
10  just a few questions for you.
11         I would like to ask you first to
12  put in front of yourself what was marked earlier
13  today in questioning by counsel for plaintiffs as
14  Palmer-4.
15         Do you have that in front of you,
16  sir?
17     A.    Exhibit Number 4?
18     Q.    Yes.
19     A.    Yes.
20     Q.    And I'd like to ask you to turn
21  to what's numbered page 141.  And the Bates
22  number is Rite_Aid_OMDL_0033030.
23         Just let me know when you have
24  that in front of you, sir.
```

Page 292

```
1      A.    Page 141?
2      Q.    Yes.
3      A.    I have it.
4      Q.    And it has controlled drug portal
5   application on it?
6      A.    Yes.
7      Q.    All right.  Mr. Palmer, I'd like
8   to ask you to just take a look at the section of
9   the PowerPoint here of pages 141 through 146 and
10  ask you whether you recognize it.
11     A.    Yes.
12     Q.    Did you prepare this portion of
13  the PowerPoint?
14     A.    Yes.  This looks like my
15  PowerPoint.
16     Q.    Do you recall you were asked
17  questions by plaintiff's counsel earlier today
18  about this PowerPoint and its use?  Do you recall
19  being asked about that earlier today?
20     A.    Yes.
21     Q.    All right.  Do you remember what
22  you used the PowerPoint section pages 141 through
23  146 for?
24         MR. SIMMER:  Object to form.
```

Page 293

```
1          THE WITNESS:  This would have
2   been part of the regulatory road show
3   presentations I described earlier, for
4   where a multi-functional team presented
5   to field leaders on various topics to
6   educate, reinforce and elevate their
7   knowledge with regards to certain
8   compliance-related tools or activities.
9   BY MR. LAVELLE:
```





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 302



23     MR. LAVELLE: All right. I'd
24 like to mark an exhibit.

Page 303

1          We're up to 20; is that right?
2          COURT REPORTER: Yes.
3               - - -
4          (Deposition Exhibit No. Rite
5     Aid-Palmer-20, PowerPoint, "Anatomy of a
6     Pharmacy Case Presented by Director
7     Pharmacy Loss Prevention Andy Palmer,"
8     Bates stamped Rite_Aid_OMDL_0037816
9     through Rite_Aid_OMDL_0037851, was marked
10    for identification.)
11              - - -
12 BY MR. LAVELLE:
13        Q.    Mr. Palmer, we've put in front of
14 you what we've labeled for identification as
15 Exhibit Palmer-20. Please take a look at that
16 and let me know when you're ready to ask --
17 answer some questions about it.
18        A.    Yeah, I'm ready.
19        Q.    Okay. Mr. Palmer, do you
20 recognize the document we've marked for
21 identification as Palmer-20?
22        A.    Yes.
23        Q.    What is it?
24        A.    This was a presentation I put

Page 304

1 together for field teams, specifically the loss
2 prevention, district managers and regional
3 managers on a specific case, but really designed
4 to help educate them on, you know, how to -- to
5 properly conduct these sorts of investigations.
6        Q.    Is this a PowerPoint that you
7 used in presentations?
8               MR. SIMMER: Object to form.
9               THE WITNESS: Yes.
10 BY MR. LAVELLE:
11        Q.    To whom did you make those
12 presentations?
13        A.    To the loss prevention teams.
14        Q.    And why did you make this
15 presentation to the loss prevention teams?
16        A.    Because it illustrates the best
17 practices and how a well done or well executed
18 pharmacy loss prevention case is conducted.
19        Q.    Are you familiar with the facts
20 in the case that is described in this document?
21               MR. SIMMER: Object to form.
22               THE WITNESS: I am familiar.
23 BY MR. LAVELLE:
24        Q.    How are you familiar with those

Page 305

1 facts?
2        A.    Again, from putting together and
3 presenting on this presentation.
4        Q.    All right. Let's turn to the
5 second page of the PowerPoint.
6               Can you read for the members of
7 the jury what you have on this page?
8        A.    The store, store 1924 in Akron,
9 Ohio, a date range, and then some of the involved
10 parties, LPM Brian Stimmel, PDM Patty Mendenhall,
11 division 2 data miner Cathy Krug and a graphic of
12 the state of Ohio.
13        Q.    So the date range you have here,
14 when was this investigation conducted?
15        A.    This investigation was conducted
16 in 2007.
17        Q.    How did this investigation start?
18        A.    The next page of the
19 presentation, "Phase 1 -- Initial Detection,"
20 indicates that "Data miner Cathy Krug comes
21 across store 1924 during a routine review of
22 Division 2 NaviScript KPI's." And "The data
23 indicates possible inventory issues at this
24 location involving controlled substances."

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  Q.   Turn to the next page, I think is
2  the fourth page of this PowerPoint, Bates
3  Rite_Aid_OMDL_0037819.
4       Do you have that in front of you?
5  A.   Yes.
6  Q.   And it says, "Naviscript Data -
7  1924."
8  A.   Yes.
9  Q.   What is on this page?
10 A.   The first bullet is one of our
11 key performance indicators, "Cycle count down
12 HT," which stands for high theft, "- CS," which
13 stands for controlled substances, "% cycle count
14 down," and then in red a percent, "37.93%."
15      Next bullet, "5th highest in
16 division."
17      Next bullet, "2nd highest in
18 region."
19      Fourth bullet, another KPI, "DC
20 orders adjusted quantity HT-CS % DC Orders
21 adjusted," again in red a percentage, "17.95%."
22      And the following bullets are
23 similar, 19th highest in division, fourth highest
24 in region.

Page 307

1  Q.   Then you have two pages of what
2  appear to be screenshots from a computer; is that
3  right?
4       MR. SIMMER:  Object to form.
5       THE WITNESS:  These are
6  screenshots from the Navi -- Navi system.
7  BY MR. LAVELLE:
8  Q.   And what do these show?
9  A.   They show the same data
10 referenced on the same -- previous page.  So, for
11 example, 1924 is highlighted in black.  And the
12 37.93 percent has a red arrow going to it.  And
13 the KPI is cycle count down HT-CS, as indicated
14 in yellow up in the upper right.
15      And the corresponding next page
16 similarly has store 1924 highlighted in black,
17 the arrow pointing to the aforementioned
18 17.95 percent.  And the KPI referenced up above,
19 DC orders adjust HT-CS.
20 Q.   All right.  Once this is
21 identified, what happened next in the
22 investigation?
23 A.   So once Cathy Krug identifies
24 these, you know, sort of initial flags, there

Page 308

1  would be further research done to try and
2  determine if those KPIs are indicative of actual
3  losses.
4  Q.   If you can turn to the page of
5  the PowerPoint -- it's at Rite_Aid_OMDL_0037624
6  (sic).  It's captioned "Phase 2 -- Detailed
7  Research."
8  A.   Uh-huh.
9  Q.   You need to answer audibly, yes,
10 no, I don't know.
11 A.   Yes.
12 Q.   Okay.
13      MR. SIMMER:  John, what page are
14 you on again?
15      MR. LAVELLE:  It's
16 Rite_Aid_OMDL_0037824.
17 BY MR. LAVELLE:
18 Q.   Do you have that in front of you,
19 Mr. Palmer?
20 A.   Yes.
21 Q.   So what is the detailed research
22 that is described on this page of your
23 PowerPoint?
24 A.   So "Cathy," the data miner,

Page 309

1  "utilizes filtering and sorting functionalities
2  within NaviScript to research the" aforementioned
3  "cycle counts and DC order adjustments in greater
4  detail."
5       And then the next bullet
6  indicates that "A pattern indicates particular
7  drugs as issues and a particular ID being
8  associated with" those particular activities.
9  Q.   What do you mean by that, a
10 particular ID associated with the majority of the
11 activity?
12 A.   Within our system, when actions
13 are taken within the system, those events are
14 logged and the ID, meaning -- everyone that uses
15 the system has a unique assigned user ID.  That
16 ID basically tells you who performed a particular
17 activity.  And that's what that's referring to.
18 Q.   Right.  If you could turn to the
19 following page of this PowerPoint, it's
20 Rite_Aid_OMDL_0037825.
21      Are you able to find on that page
22 the particular ID that's associated with the
23 majority of the activity that was referenced on
24 that previous page of the PowerPoint?

Page 310

1    MR. SIMMER: Object to form.
2    THE WITNESS: Yeah. That would
3  be under the "User" column. And the ID
4  is RXPHFK.
5  BY MR. LAVELLE:
6    Q.   What does that ID tell you about
7  the identity of the user?
8    A.   Well, the RXP indicates they're a
9  pharmacist. So RXP is the prefix of a
10 pharmacist. And the HFK, in the general
11 convention for assigning IDs, represents the
12 individual -- the initials of the user. So this
13 is a pharmacist with initials HFK.
14   Q.   Do you know who that pharmacist
15 is?
16   A.   In this particular case, that was
17 a Henry or Hank Kusik (ph) I believe.
18   Q.   What happened next in this
19 investigation?
20   A.   Once we were able to narrow down
21 to a pattern involving particular drugs and a
22 particular user ID, which is what these next few
23 pages show, the next step was detailed research
24 by Cathy, the data miner, to try and determine as

Page 311

1  to the best of her ability using data from the
2  replenishment system, as well as Navi, what
3  exactly might be missing and the quantity that
4  might be missing.
5    Q.   Is that what's described in phase
6  3 under Bates number Rite_Aid_OMDL_0037831?
7    MR. SIMMER: Object to form.
8    THE WITNESS: That's described in
9  phase 2, OMDL_0037829 and OMDOL_0037830
10 (sic).
11 BY MR. LAVELLE:
12   Q.   Okay. Thank you.
13   A.   The spreadsheet.
14   Q.   Thank you. Sorry for the
15 confusion.
16   All right. Let's go to phase 3
17 of your investigation as described in this
18 PowerPoint.
19   What happened during phase 3?
20   A.   So in phase 3, Cathy opens up a
21 case in the case management system, which was
22 NaviCase at that time, for store 1924, based upon
23 the research and also notifies loss prevention
24 manager Stimmel. The case provides detailed

Page 312

1  information regarding the potential losses and
2  the ID associated with the concerning activities.
3  The case also provides instruction to the LPM to
4  work with the PDM to request DUR, which stands
5  for drug utilization reports, from Janet Hart.
6    Q.   And what is going to be done with
7  those drug utilization review reports?
8    A.   Drug utilization review reports
9  are used to determine if you have losses and the
10 exact amount of those losses. It's part of a
11 reconciliation process.
12   Q.   All right. Let's move on to
13 phase 4 of the investigation, as described in
14 this PowerPoint.
15   What happened in phase 4 of the
16 investigation?
17   A.   Phase 4, in phase 4, the DUR
18 reports were ordered from Janet for a period of
19 May 1, 2006 to May 1, 2007, after review and
20 discussion of the case. May 1 is the time of
21 year when we do our annual controlled substance
22 counts. So you have a known count at a given
23 point in time. Another known count at another
24 given point in time. And the DUR reports from

Page 313

1  Janet detailing all the ins and outs in between,
2  which would enable them to determine if drugs are
3  missing and how much.
4    Q.   Was it possible to confirm losses
5  from the review of the DUR reports and the
6  reconciliations?
7    MR. SIMMER: Object to form.
8    THE WITNESS: Absolutely.
9  BY MR. LAVELLE:
10   Q.   And that's -- is that described
11 in this PowerPoint anywhere?
12   MR. SIMMER: Object to form.
13   THE WITNESS: The reconciliation
14 process itself isn't described in this
15 presentation, but I think, you know, what
16 I've described is the process. You take
17 the starting point count and you put all
18 the ins -- ins and outs in there, and
19 then that gives you the ending count you
20 should have. And then you compare that
21 to what is actually on the shelf at that
22 point in time. And the difference is the
23 drugs that you're missing.
24 BY MR. LAVELLE:

Page 314

1    Q.   All right.  So at this point of
2 the investigation, you've confirmed losses; is
3 that right?
4         MR. SIMMER:  Object to form.
5         THE WITNESS:  At this point in
6    the investigation, losses have been
7    confirmed.
8 BY MR. LAVELLE:
9    Q.   Are authorities notified at this
10 point?
11        MR. SIMMER:  Object to form.
12        THE WITNESS:  So at the point
13   that losses are confirmed, then, yes, a
14   number of authorities would be informed
15   at this point.
16 BY MR. LAVELLE:
17   Q.   And who is informed?  Which
18 authorities?
19   A.   A suspected loss form would be
20 filed with the DEA, and also the state Board of
21 Pharmacy would be notified.
22        MR. SIMMER:  Object.
23 BY MR. LAVELLE:
24   Q.   All right.  And is that what

Page 315

1 happened here, the DEA -- was the DEA notified?
2    A.   On the -- yes.  On the next page,
3 "5/28/2007 -- Suspected loss form submitted by
4 PDM."
5         And then the fourth bullet down,
6 "State board notified for cooperative effort."
7    Q.   What happened next in this
8 investigation, after notifying the DEA and the
9 state board?
10   A.   Well, that same slide indicates
11 that the camera -- cameras' locations were looked
12 at.  And it was determined that six cameras were
13 in existence covering most of the pharmacy.
14 Also, covert counts were being conducted
15 pre-opening every day by the LPM and the PDM.
16   Q.   All right.  What happens next in
17 this investigation?
18   A.   So the pre-opening counts, which
19 were done with the state board agent present,
20 indicated an additional loss of 54 hydrocodone
21 APAP5/500 occurred since the 28th.  In addition,
22 a review of will call revealed three prescription
23 vials with product missing from the bottles.  The
24 paperwork was present, but the bottles did not

Page 316

1 have any -- the bottles with medication were
2 missing.  It was also noted that all three were
3 for the same patient and the same drug.
4    Q.   All right.  Was there an effort
5 made to use video surveillance to assist in this
6 investigation?
7         MR. SIMMER:  Object to form.
8         THE WITNESS:  Yes.
9 BY MR. LAVELLE:
10   Q.   And what was done in using video
11 surveillance?
12   A.   So in this case, once -- the
13 general process is once the covert counts
14 determine losses, would be to pull the video and
15 examine the video, looking for concealment on
16 video.  In this case, LPM Stimmel pulls the video
17 and the video does not show any concealment but
18 does show some suspicious behavior from the very
19 pharmacist whose IDs were associated with the
20 activities.
21        The behavior included the RPH
22 removing will-call bags hidden under checkout and
23 placing pharmacy containers into a pharmacy bag,
24 but yet placing the paperwork into will-call.

Page 317

1    Q.   All right.  What happens next?
2    A.   So LPM Stimmel and PDM Mendenhall
3 learned that the suspect is close friends with
4 the patient whose prescriptions were being
5 tampered with.  They also learned that this
6 patient may have a history of drug abuse.
7         LPM Stimmel also contacted
8 director of pharmacy loss prevention Andy Palmer
9 with a request to review the patient profile
10 associated with the activity.  Palmer grants that
11 permission as being pursuant to an active
12 investigation.  A review of the profiles reveal
13 that the suspect's friend is on all of the same
14 medications that happen to be missing from this
15 location.
16        MR. SIMMER:  I'll note for the
17   record the witness is simply just reading
18   from the slide and not actually
19   testifying at this point.
20 BY MR. LAVELLE:
21   Q.   Mr. Palmer, what happened next in
22 the investigation?
23   A.   Additional cameras were added to
24 try and better capture the activity within the

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  will call area and by the pharmacy door and also
2  get a view of the hydrocodone.  So additional
3  cameras were added.
4      Q.    And you describe that in your
5  PowerPoint here?
6      A.    Yes.
7      Q.    And that's on the page that's
8  Bates stamped Rite-Aid_OMDL_0037840?
9      A.    That's correct.
10         MR. SIMMER:  Object to form.
11  BY MR. LAVELLE:
12      Q.    All right.  Turn, please, to
13  Rite_Aid_ OMDL_0037842.
14         Do you see that?
15      A.    Yes.
16      Q.    All right.  And what's described
17  on this page of the "Phase 4 - Investigation"
18  PowerPoint?
19      A.    The continuing process to take
20  pre-opening covert counts.  And that those
21  pre-opening covert counts continue to reveal
22  additional losses.
23      Q.    At some point, does this
24  investigation find any evidence on video of

Page 319

1  activity by the pharmacist?
2         MR. SIMMER:  Object to form.
3         THE WITNESS:  Yes.  The
4      suspicious activity was identified on
5      video.  And what it really revealed was
6      that the suspect was utilizing a very
7      unique methodology to divert the drug
8      products.
9  BY MR. LAVELLE:
10      Q.    And what was that unique
11  methodology?
12      A.    Basically printing out labels
13  from existing filled prescriptions and then
14  basically taking those -- those bottles, which
15  were really nothing more than documents related
16  to a previous dispensing, and basically setting
17  those aside.  And then when his suspect
18  accomplice came in, effectively handing those
19  products off.
20      Q.    Is that described in this
21  PowerPoint at Rite_Aid_OMDL_0037844?
22      A.    Yes.  That --
23         MR. SIMMER:  Object to form.
24         THE WITNESS:  Yes.  That provides

Page 320

1  the explanation of how the CCT footage,
2  you know, enabled us to see this very,
3  very suspect activity involving printing
4  out the monographs and the labels.
5  BY MR. LAVELLE:
6      Q.    Did the team provide this
7  additional information to the state board?
8         MR. SIMMER:  Object to form.
9         THE WITNESS:  Yes.
10  BY MR. LAVELLE:
11      Q.    And what happened as a result of
12  providing that information to the state board?
13      A.    We work very closely with the
14  state board, especially in Ohio.  And in this
15  case, as in, you know, in general in our
16  investigations and especially in Ohio, it's a
17  cooperative effort between the state board and
18  the Rite Aid investigator in regards to, again,
19  the entire investigative process, including
20  ultimately the interview process.
21      Q.    Turn to Rite_Aid_OMDL_0037848.
22  It's the slide that is captioned "Phase 5 -
23  Resolution."
24         Do you have that in front of you,

Page 321

1  Mr. Palmer?
2      A.    Yes.
3      Q.    What happened in terms of the
4  resolution of this investigation?
5      A.    The interview occurred.  And
6  again, that was done with both our investigator
7  and the state board agent present.  When
8  confronted with the evidence, there was an
9  admission obtained to the theft of controlled
10  substances by printing extra labels on his
11  accomplice's medication and then filling in
12  labeling those with drugs and then handing them
13  off.  A statement was signed.  A civil demand
14  report was issued.  And the suspect was removed
15  from the location, terminated and an arrest
16  warrant was issued.
17      Q.    Was all of this reported to the
18  DEA as well?
19         MR. SIMMER:  Object to form.
20         THE WITNESS:  All of the losses
21      would have been reported to the DEA on a
22      Form 106 form submitted by Janet Hart to
23      the DEA.
24  BY MR. LAVELLE:

Page 322

1    Q.    And if you turn to
2  Rite_Aid_OMDL_0037849.
3          Do you have that in front of you?
4    A.    Yes.
5    Q.    "Phase 6 - Final Documentation."
6    A.    Yes.
7    Q.    What do you have written there in
8  the first bullet point?
9    A.    "A Form 106 is prepared by the
10  PDM, approved by Janet Hart and submitted to the
11  DEA as loss due to employee theft."
12    Q.    So --
13          MR. SIMMER: I note for the
14  record the witness just read this. I'm
15  not sure that's testimony, so...
16  BY MR. LAVELLE:
17    Q.    All right. Is that what
18  happened? Is that an accurate description of
19  what happened?
20    A.    It is an accurate description.
21    Q.    We've just reviewed a detailed
22  PowerPoint that you presented.
23          Is everything that we just went
24  over accurate to the best of your knowledge and

Page 323

1  recollection?
2    A.    Yes.
3    Q.    And why did you prepare and
4  present this PowerPoint to people at Rite Aid?
5          MR. SIMMER: Objection, asked and
6  answered.
7          THE WITNESS: I think it
8  represented a sort of textbook execution
9  of a loss investigation that could have
10  been a very difficult loss prevention
11  investigation due to the very unique
12  methodology that ultimately the
13  individual utilized to steal these drugs.
14  And, you know, the idea really was to
15  take this very well done pharmacy loss
16  investigation and use it to help other
17  loss prevention managers understand,
18  this -- this is how you do this. This is
19  how it's done.
20          MR. LAVELLE: Thank you, Mr.
21  Palmer. No further questions.
22          THE VIDEOGRAPHER: Off the record
23  at 5:33 p.m.
24          - - -

Page 324

1          (A recess was taken from
2  5:33 p.m. to 5:44 p.m.)
3          - - -
4          THE VIDEOGRAPHER: We're back on
5  the record at 5:44 p.m.
6          - - -
7          EXAMINATION
8          - - -
9  BY MR. SIMMER:
10    Q.    Sir, you were asked some
11  questions a moment ago about -- I think this is
12  Exhibit 4, the very large document. And you were
13  asked questions about Rite_Aid_OMDL0033034. This
14  is the Above Average report.
15    A.    I'm there.
16    Q.    And you talked about how there
17  was -- this report is used to identify
18  exceptions. Right?
19    A.    Yes.
20    Q.    Is there anything in the
21  exceptions that are listed here that would have
22  identified suspicious orders?
23    A.    Again, I think it goes to the
24  definition of suspicious order. In cases -- in

Page 325

1  certain cases, this could identify theft or
2  losses. And those orders, relative to the
3  diversion, you know -- it could detect diversion.
4  Let's put it that way.
5    Q.    If -- and by diversion, what
6  you're referring to is potential theft. Right?
7    A.    Yes.
8    Q.    Anything beyond theft this Above
9  Average report really couldn't identify.
10          Isn't that right?
11          MR. LAVELLE: Object to form.
12          THE WITNESS: Can you give an
13  example?
14  BY MR. SIMMER:
15    Q.    Inappropriate prescribing. It
16  doesn't identify anything about that, does it?
17    A.    This would not identify that.
18    Q.    So the Dr. Harper situation we
19  talked about earlier today, the Above Average
20  report wouldn't help anybody identify that
21  situation, would it?
22          MR. LAVELLE: Object to form.
23          THE WITNESS: No, I don't believe
24  so.

Page 326

BY MR. SIMMER:

Q. Could we pull up then Exhibit 20 that you were just asked some questions about.

Now, the whole subject matter of what you're talking about here, this is a, what you would say, a pharmacy case.

This, as we -- I think you went through with counsel just a moment ago, this involved a theft from one of your pharmacies. Right?

A. Yes.

Q. And in doing that investigation about theft from one of your pharmacies, the investigators would have had access to prescribing data. Right?

A. Can you clarify what you mean by prescribing data?

Q. So they would have looked at the prescriptions that would been filled in this pharmacy. Right?

A. Not necessarily.

Q. They don't review the prescribing data at all?

A. You're speaking relative to this

Page 327

case, and I think we walked through this case extremely thoroughly. I don't see any reference or no -- nor do I see any relevance to -- the individual was stealing drugs through the process described here.

Q. Could you look at 373839, please.

A. I think you mean 37839, is that what you mean?

Q. Yes. 37839.

MR. LAVELLE: 37839.

THE WITNESS: Yes.

BY MR. SIMMER:

Q. You see in the middle of the page -- and this is a slide you created. Right?

A. Yes.

Q. Do you see right in the middle of the page where you say, "LPM Stimmel contacts Director" of "Pharmacy LP Andy Palmer"?

That's you. Right?

A. Yes.

Q. It says, "With a request to review the patient profiles associated with activity."

Do you see that?

Page 328

A. Yes.

Q. What other information would be included in a patient profile other than the prescriptions that had been filled for that particular patient?

A. The patient profile would have a number of different pieces of information, drug, drug name, quantity, refill number, original prescription, refill number, prescriber name. All those kinds of things.

Q. And that's prescribing data, is it not?

MR. LAVELLE: Object to form.

THE WITNESS: It is prescribing data, but it's not relevant to this particular investigation.

BY MR. SIMMER:

Q. It says that you gave access to this patient's profile. And you just went over what kind of information is in the profile, and that included the prescribing data, did it not?

A. It also includes a whole bunch of other things that -- when you're conducting an investigation and when you're requesting, you

Page 329

know, something like a patient profile, you're requesting it specifically to look at specific things. There are probably other pieces of information in there, too.

If you think that information is relevant to this particular investigation, I'd be interested to know why.

Q. These are your words you put on this page. Right?

A. Yes. The patient profile.

Q. The patient profile.

And I think you just said it includes the prescribing data. Right?

A. It would include the name of the prescriber. Correct.

Q. And you talked about the names of the drugs. Right?

A. Yes. Names of the medication.

Q. The package size. Right?

A. Refill number, package size.

Q. Dosage?

A. Dosage form, yes. All kinds of information.

Q. So all that prescribing data is

Page 330

1  at the investigator's fingertips in conducting
2  this information. Right?
3           MR. LAVELLE: Object to form.
4  BY MR. SIMMER:
5       Q.   Strike that.
6           All of that prescribing data is
7  at this investigator's fingertips in conducting
8  this investigation. Right?
9           MR. LAVELLE: Object to form.
10          THE WITNESS: The information
11      that is included in the requested patient
12      profiles would be available to the
13      investigator.
14 BY MR. SIMMER:
15      Q.   So the subject of this
16 investigation was, again, a theft, was it not?
17          MR. LAVELLE: Objection, asked
18      and answered.
19          THE WITNESS: Yes.
20 BY MR. SIMMER:
21      Q.   We had a situation of a product
22 loss involving a Rite Aid employee. Right?
23      A.   Yes.
24      Q.   Nothing about this investigation

Page 331

1  identified any red flags of diversion other than
2  the theft. Right?
3           MR. LAVELLE: Object to form.
4           THE WITNESS: The diversion
5      detected was theft.
6  BY MR. SIMMER:
7       Q.   Did this investigation identify
8  any inappropriate prescribing, for example?
9       A.   That was not the purpose of the
10 investigation, nor would it identify that.
11      Q.   There's no way for the company to
12 identify using the tools you just went through,
13 is there?
14          MR. LAVELLE: Object to form.
15          THE WITNESS: I don't know --
16      when you refer to tools, I assume you're
17      referring to, you know, NaviScript in a
18      more totalitarian perspective, as opposed
19      to the specific KPIs referenced here.
20 BY MR. SIMMER:
21      Q.   So the KPIs that we talked
22 about -- and I even asked you questions about
23 that in the prior examination. I said, are those
24 KPIs, could they be used to identify

Page 332

1  inappropriate prescribing? Do you remember we
2  talked about that earlier?
3       A.   The KPIs involved here would not
4  be used to identify inappropriate prescribing.
5  That's correct.
6       Q.   Could they be used to identify
7  suspicious orders?
8       A.   Again, when it comes to
9  suspicious orders, as we've talked about before,
10 I'm not clear on what your definition of
11 suspicious order is. It's my understanding it's
12 more related to the distribution centers.
13 However, certainly these order adjustments, which
14 is part of ordering, and these cycle count down,
15 which is part of ordering, ultimately could be
16 and were indicative of diversion. So I would say
17 diversion, yes.
18      Q.   Diversion, if you define it as
19 only theft of drugs by a Rite Aid employee.
20 Right?
21          MR. LAVELLE: Object to form.
22          THE WITNESS: Well, in this case,
23      I would point out that there also was an
24      external individual involved in this

Page 333

1      particular theft or fraud, scam, so...
2  BY MR. SIMMER:
3       Q.   Would this kind of investigation
4  have identified the kind of inappropriate
5  prescribing that Dr. Adolph Harper was engaged
6  in, for example?
7       A.   This type of investigation would
8  not.
9       Q.   Okay. Could you turn to Bates
10 37820, please.
11      A.   Uh-huh. Yes.
12      Q.   And just tell us generally, what
13 is the information that's on this particular
14 slide?
15          MR. LAVELLE: Object to form.
16          THE WITNESS: 7820. Right?
17 BY MR. SIMMER:
18      Q.   Yes, sir.
19      A.   This is a screenshot from the
20 Navi product sorted -- looks like in this case
21 sorted by division and filtered, ranking the
22 cycle count down adjustments on a percentage
23 basis for the locations in the division.
24      Q.   Okay. Do you know if there was

Page 334

1  an investigation done of store 4436?
2      A.    There would have been additional
3  analysis done by Cathy on the other stores that
4  are above store 1924, yes.
5      Q.    You know that for a fact, that
6  she did in fact analyze store 4436. Right?
7          MR. LAVELLE: Object to form.
8          THE WITNESS: I cannot say that I
9      know for a fact, but that would be part
10     of the data miner's job and process. It
11     wouldn't be a good data miner activity to
12     somehow or other pick, you know, a store
13     number 6 on the list and not
14     correspondingly also do that additional
15     detail research into the stores ranked
16     higher.
17 BY MR. SIMMER:
18     Q.    What about stores that show up on
19 this report generally, would they all be ones the
20 data miner would look at as well?
21     A.    I would note that this is the
22 entire division. So this is -- this is -- the
23 screenshot is cut off, but, you know, a typical
24 division would have -- division 2 at that time

Page 335

1  might have well over a thousand stores.
2          So the data miners, you know,
3  would look at the stores that had the higher
4  number of exceptions and then drill down into
5  those for more detail.
6      Q.    Okay. Take a look down the list
7  and there's a pharmacy that we talked about
8  earlier today.
9          You see 3151?
10     A.    Yes.
11     Q.    Do you know whether your data
12 miner would have done an investigation of
13 pharmacy 3151?
14         MR. LAVELLE: Object to form.
15         THE WITNESS: I think you mean
16     would the data miner have done any more
17     detailed analysis?
18 BY MR. SIMMER:
19     Q.    Yes, sir.
20     A.    Okay. I do not.
21     Q.    So out of this whole haystack,
22 they picked 1924 to do a further investigation.
23 Right?
24         MR. LAVELLE: Object to form.

Page 336

1          THE WITNESS: What you don't know
2      here is, again, what she saw in the
3      detail. For example, these are
4      percentages. Okay? So, for example,
5      store 4436 may have had one cycle count
6      down. You know, you have to go a little
7      bit further into these things. It's not
8      telling you how many counts down. It's
9      not telling you whether there were
10     offsetting counts up.
11         So as a data miner, what this
12     screen is sort of demonstrating is here's
13     a starting point. You know, and each of
14     the data miners, you know, approached
15     these things, you know, with their -- a
16     little bit of their own flair or flavor.
17     So I can't speak to exactly what Cathy
18     Krug's approach is in her data mining
19     back in 2007, but she certainly would
20     have also drilled into the stores above
21     1924.
22 BY MR. SIMMER:
23     Q.    And would this investigation have
24 identified a situation like the Dr. Harper

Page 337

1  situation, inappropriate prescribing that we
2  talked about earlier today?
3      A.    This type of investigation would
4  not identify that.
5          MR. SIMMER: No further
6      questions.
7          MR. LAVELLE: Nothing further
8      based on that redirect.
9          The witness reserves -- I'm
10     sorry, the witness reserves the right to
11     read and sign.
12         THE VIDEOGRAPHER: This concludes
13     today's deposition. The time is
14     5:58 p.m. We are off the record.
15         (Witness excused.)
16         (Deposition concluded at
17     approximately 5:58 p.m.)
18
19
20
21
22
23
24

Page 338

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, ANDY PALMER, RPh, have the opportunity to read and sign the deposition transcript.

_____
ANN MARIE MITCHELL, a Federally Approved Certified Realtime Reporter, Registered Diplomate Reporter, Registered Merit Reporter and Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 339

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 340

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____
____  ____  _____
      REASON: _____

Page 341

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 341, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
ANDREW PALMER, RPh          DATE

Subscribed and sworn to before me this _____ day of _____, 20____.
My commission expires:_____

_____
Notary Public