## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION |MDL No. 2804
                      |
OPIATE LITIGATION     |Case No. 1:17-MD-2804
                      |
                |Hon. Dan A. Polster
APPLIES TO ALL CASES   |

- - -

Friday, May 31, 2019

- - -

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

VIDEOTAPED DEPOSITION of MELANIE ROSENBLATT,
M.D., held at Morgan Lewis & Bockius LLP, 200 South
Biscayne Boulevard, Suite 5300, Miami, Florida,
commencing at 9:26 a.m., on the above date,
before Susan D. Wasilewski, Registered
Professional Reporter, Certified Realtime
Reporter and Certified Realtime Captioner.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## Page 2

1  APPEARANCES:
2  Counsel for Plaintiffs:
3    CRUEGER DICKINSON LLC
    BY:  ERIN DICKINSON, ESQUIRE
4      ekd@cruegerdickinson.com
    KRISTA BAISCH, ESQUIRE
5      kkb@cruegerdickinson.com
    4532 North Oakland Avenue
6      Whitefish Bay, Wisconsin 53211
    Phone: (414) 210-3868
7
8
    Counsel for Teva Pharmaceuticals USA, Inc.,
9    Cephalon, Inc., Watson Laboratories, Inc., and
    Actavis LLC:
10
    MORGAN LEWIS & BOCKIUS LLP
11     BY:  MELISSA M. COATES, ESQUIRE
    melissa.coates@morganlewis.com
12     MARTHA A. LEIBELL, ESQUIRE
    martha.leibell@morganlewis.com
13     200 South Biscayne Boulevard, Suite 5300
    Miami, Florida 33131
14     Phone:  (305) 415-3000
15
16
17   APPEARANCES VIA TELEPHONE AND STREAM:
18   Counsel for Purdue Pharma L.P., Purdue Pharma Inc.,
    and The Purdue Frederick Company:
19
    DECHERT LLP
20     BY:  DANIEL GOLDBERG-GRADESS, ESQUIRE
    daniel.goldberg-gradess@dechert.com
21     Three Bryant Park
    1095 Avenue of the Americas
22     New York, New York 10036-6797
    Phone:  (212) 698-3500
23
24
25

## Page 3

1  APPEARANCES VIA TELEPHONE AND STREAM:
2  Counsel for AmerisourceBergen Corporation and
    AmerisourceBergen Drug Corporation:
3
    REED SMITH LLP
4      BY:  LUKE PORTER, ESQUIRE
    lporter@reedsmith.com
5      101 Second Street, Suite 1800
    San Francisco, California 94105
6      Phone:  (415) 543-8700
7
8  Counsel for Johnson & Johnson and the Janssen
    Pharmaceuticals Defendants:
9
    O'MELVENY & MYERS LLP
10     BY:  CAMERON BAGHAI, ESQUIRE
    cbaghai@omm.com
11     610 Newport Center Drive, 17th Floor
    Newport Beach, California 92660
12     Phone:  (949) 823-6900
13
14   Counsel for Allergan Finance, LLC:
15     KIRKLAND & ELLIS LLP
    BY:  KAITLYN COVERSTONE, ESQUIRE
16     kaitlyn.coverstone@kirkland.com
    300 North LaSalle Street
17     Chicago, Illinois 60654
    Phone:  (312) 862-3247
18
19
20   Counsel for West Virginia Board of Pharmacy:
21     BAILEY & WYANT, PLLC
    BY:  JOHN FULLER, ESQUIRE
    jfuller@baileywyant.com
22     500 Virginia Street East, Suite 600
    Charleston, West Virginia 25301
23     Phone:  (304) 345-4222
24   ALSO PRESENT:
25     JEFF FLEMING, Videographer

## Page 4

- - -
     I N D E X
- - -

Testimony of:  MELANIE ROSENBLATT, M.D.     PAGE
  DIRECT EXAMINATION BY MS. DICKINSON....... 7
  CROSS-EXAMINATION BY MS. COATES............ 250
  REDIRECT EXAMINATION BY MS. DICKINSON....... 252

E X H I B I T S
(Attached to transcript)
ROSENBLATT DEPOSITION EXHIBITS     PAGE
Exhibit 1  Plaintiffs' Notice of Oral    9
    Videotaped Expert Deposition of
    Melanie Rosenblatt
Exhibit 2  Expert Report of Melanie H.    26
    Rosenblatt, M.D.
    May 10, 2019
Exhibit 3  Curriculum Vitae    22
    Melanie Rosenblatt, MD

Exhibit 4  Appendix A - Curriculum Vitae    23

Exhibit 5  Appendix B - Materials Considered    26

Exhibit 6  Pain Management Strategies Invoice    12
    April 2019 - Redacted
Exhibit 7  Pain Management Strategies Invoice    228
    April 2019

Page 5

--- 

1  THE VIDEOGRAPHER:  We are now on the record.
2  My name is Jeff Fleming.  I'm a videographer for
3  Golkow Litigation Services.
4  Today's date is May 31, 2019.  The time is
5  9:26 a.m.
6  This video deposition is being held in
7  Miami, Florida, in the matter of National
8  Prescription Opiate Litigation for the United
9  States District Court for the Northern District
10  of Ohio, Eastern Division.
11  The deponent is Melanie Rosenblatt, MD.
12  Will Counsel please identify themselves for
13  the record?
14  MS. DICKINSON:  Erin Dickinson and Krista
15  Baisch for the plaintiffs.
16  MS. COATES:  Melissa Coates for the Teva
17  defendants.
18  MS. LEIBELL:  Martha Leibell, Morgan Lewis,
19  for the Teva and Actavis defendants.
20  MR. GOLDBERG-GRADESS:  Daniel
21  Goldberg-Gradess from Dechert for Purdue.
22  THE COURT REPORTER:  I missed that name.
23  I'm sorry.
24  MR. GOLDBERG-GRADESS:  Daniel

Page 6

1  Goldberg-Gradess from Dechert for Purdue.
2  THE COURT REPORTER:  Thank you.
3  MS. DICKINSON:  Anyone else on --
4  MR. BAGHAI:  Cameron Baghai -- Cameron
5  Baghai from O'Melveny & Myers for the Johnson &
6  Johnson defendants.
7  MR. PORTER:  Luke Porter with Reed Smith on
8  behalf of AmerisourceBergen.
9  THE VIDEOGRAPHER:  Thank you.
10  The court reporter is Susan Wasilewski and
11  will now swear in the witness.
12  THE COURT REPORTER:  Would you raise your
13  right hand?  Do you solemnly --
14  MS. COVERSTONE:  You've got one more on the
15  phone.
16  This is Kaitlyn Coverstone from
17  Kirkland & Ellis for Allergan.
18  THE COURT REPORTER:  Would you raise your
19  right hand?
20  Do you solemnly swear or affirm the
21  testimony you're about to give will be the truth,
22  the whole truth, and nothing but the truth?
23  THE WITNESS:  I do.
24  THE COURT REPORTER:  Thank you.
25  MELANIE ROSENBLATT, M.D., called as a witness

Page 7

1  by the Plaintiffs, having been duly sworn, testified
2  as follows:
3  DIRECT EXAMINATION
4  BY MS. DICKINSON:
5  Q.  Good morning, Dr. Rosenblatt.  My name is
6  Erin Dickinson.
7  A.  Good morning.
8  Q.  We met just a few minutes ago, correct?
9  A.  Correct.
10  Q.  Okay.  Can you state your full name for the
11  record?
12  A.  Melanie Rosenblatt.
13  Q.  Okay.  Dr. Rosenblatt, have you ever been
14  known by any other name?
15  A.  Yes.  I was married briefly.  My last name
16  at that time was Wulk.  My full name was Melanie
17  Rosenblatt Wulk, W-u-l-k.
18  Q.  W-e-l-k?
19  A.  u-l-k.
20  Q.  u-l-k.  Okay.  And during what years were
21  you known as Melanie Wulk?
22  A.  From approximately 1994 to 1996, '97.
23  Q.  Fair to say those were the years you were
24  married?
25  A.  Yeah.  I try to forget them.

Page 8

1  Q.  I can -- have you -- did you have a maiden
2  name, or is Rosenblatt your maiden name?
3  A.  Rosenblatt is my name --
4  Q.  Okay.
5  A.  -- maiden name.
6  Q.  Are you currently married?
7  A.  No.
8  Q.  Could you state your home address, please?
9
10
11  Q.  And how long have you been at that address?
12  A.  Approximately four years.
13  Q.  Okay.  And could you confirm your current
14  business address, please?
15  A.  Yes.  450 West Hillsborough Boulevard,
16  Deerfield Beach, Florida 33411.
17  Q.  Okay.  Dr. Rosenblatt, is there an opioid
18  epidemic in the United States?
19  A.  I believe there is, yes.
20  Q.  Is there an opioid epidemic in Broward
21  County?
22  A.  I believe there is, yes.
23  Q.  When you refer to the -- an opioid epidemic,
24  generally what do you mean by that?
25  A.  Generally, that -- there is a lot that goes

Page 9

1    into that, but generally there is a lot of opioid
2    misuse, opioid abuse, opioid diversion, opioid
3    overdose and deaths, both -- from multiple channels,
4    including illicit substances.
5        Q. And that epidemic has had effect on both
6    people throughout the United States and the
7    communities they live in; is that fair?
8        A. That's what I understand.
9        Q. Okay. And you understand that I represent
10   some of those communities in this case, correct?
11       A. Yes, correct.
12       Q. You are here testifying in the National
13   Prescription Opioid Litigation which is MDL2804. Do
14   you understand that?
15       A. I understand that.
16       Q. Okay. And you are here testifying for the
17   Teva defendants; is that correct?
18       A. That's correct.
19       Q. We'll go through who those are in just a
20   minute because I think it's going to be important
21   not to have to say the entities all over and over
22   again, but we'll get to that in just a minute.
23           (Rosenblatt Exhibit 1 was marked for
24   identification.)
25   BY MS. DICKINSON:

Page 10

1        Q. I'm going to hand you what's been marked as
2    Exhibit 1, and I will represent to you that
3    Exhibit 1 is the notice of your deposition.
4            Have you ever seen this document before?
5        A. Yes, I have.
6        Q. Okay. When were you provided with this
7    document for the first time?
8        A. I don't recall when I saw it for the first
9    time, but I know that I've seen it in the last day
10   or so.
11       Q. Okay. And if you would turn the page, there
12   is an Exhibit A on the document. I think it's the
13   third page.
14           Do you see that?
15       A. Yes, I do.
16       Q. Okay. And there are materials requested in
17   Exhibit A. Do you see that?
18       A. Yes, I do.
19       Q. Were you asked by Counsel to bring any
20   materials responsive to those requests?
21       A. I was not --
22           MS. COATES: Object to form.
23       I was not asked to bring any materials for
24   today.
25       Q. You did bring some materials, or at least

Page 11

1    your counsel did today. I'll just go through,
2    actually, the request, then.
3            Request 1 asks for all documents or
4    materials that you've reviewed since the date of
5    your report, which was May 10th, in the case.
6            Have you reviewed any documents or materials
7    in the case since May 10th?
8        A. Yes, I have.
9        Q. Okay. What were those materials?
10       A. Some defendant expert reports.
11       Q. Okay. Can you tell me which ones?
12       A. I don't know if I'll get it right.
13   Dr. Michna and Leila, Leila.
14       Q. Dr. Michna and Dr. Leila are defense
15   experts; is that right?
16       A. That's right.
17       Q. Who provided those to you?
18       A. My attorneys yesterday.
19       Q. Okay. Yesterday?
20       A. Yesterday.
21       Q. Have you had a chance to read them?
22       A. No. I've had a chance to glance at them.
23       Q. Did you ask for those particular reports?
24       A. I don't remember if I specifically asked but
25   they came up in conversation, and I was curious to

Page 12

1    see them.
2        Q. Okay. Did you ask to see any of the other
3    70 some-odd defense expert reports in the case?
4        A. No, I have not.
5        Q. And you have not been provided with any of
6    those others; is that right?
7        A. I believe that's right.
8        Q. Okay. Did you review any documents or
9    materials in preparation for your testimony today?
10       A. I reviewed my report and some of the items
11   that are already accounted for in my report.
12       Q. Okay. Outside of the items that are listed
13   in either your report or the appendices, did you
14   review any additional documents in preparation for
15   your testimony today?
16       A. No.
17       Q. Have you had a chance to -- I may have asked
18   this a second ago. Have you had a chance to read
19   the defense expert reports you were given yesterday?
20       A. I have not.
21       Q. Okay. And I think we're going to get to
22   questions about this one a little later, but you
23   also -- your counsel also produced to us today what
24   has been marked as Exhibit 6.
25           (Rosenblatt Exhibit 6 was `marked for

Page 13

1    identification.)
2    BY MS. DICKINSON:
3        Q.  Do you see that?
4        A.  I do.
5        Q.  Okay.  And Exhibit 6 appears to be your
6    invoice, or at least one of them, for this case; is
7    that correct?
8        A.  That's correct.
9        Q.  Okay.  And we'll get to the portion where
10   there is a big black box, but I just want to ask you
11   a couple questions about this.
12           This invoice is dated, it looks like,
13   May 8th, 2019.  Do you see that?
14       A.  Yes, I do.
15       Q.  Okay.  And who is Brian Ercole?
16       A.  Brian Ercole is the attorney for Morgan
17   Lewis.
18       Q.  And the invoice has -- it is an invoice for
19   April 2019.  Do you see that?
20       A.  I do.
21       Q.  Is this an accurate copy, other than
22   the black box that I'm sure you didn't put there, of
23   your invoice for April 2019?
24       A.  There are actually additional dates at the
25   end of April that are not reflected in this invoice.

Page 14

1        Q.  Okay.  How many additional dates are not
2    reflected in this invoice?
3        A.  Offhand -- I mean, there's only a few days
4    left in April, so I'd have to look at my internal
5    notes, but I believe there are additional hours for
6    April 26th, 27th, 28th.
7        Q.  Okay.  And other than the additional hours
8    that you may have spent on the 26th, 27th, and 28th,
9    does this look like an accurate invoice to you for
10   the time you spent in April on this litigation?
11       A.  Yes.
12       Q.  Okay.  Is this your only invoice that had
13   been submitted to counsel in this litigation?
14       A.  Yes.
15       Q.  Okay.  So there are no previous invoices for
16   time spent prior to April 11th, 2019; is that right?
17       A.  For the purposes of this report and this
18   case, that's correct.
19       Q.  Okay.  When was the date that you were hired
20   to work as an expert in this case?
21       A.  I was hired prior to this case to work as an
22   expert for the Oklahoma case, or I was hired to work
23   as an expert not case-specific, I think is more
24   accurate, and that was in November 2018.
25       Q.  And we'll get to that in a minute.  Were you

Page 15

1    ever, at any point in time, hired specifically for
2    this case, MDL2804?
3        A.  I don't recall specifically.  I believe it's
4    part of my overall agreement, my work agreement.
5        Q.  Okay.  Is it fair to say that the first time
6    you billed in this case was April 11th of 2019?
7        A.  I believe so.  I'd have to look at March's
8    invoice to be certain.  Those last dates in March
9    had nothing to do with this case, but I'm fairly
10   certain that April is the beginning of this case.
11       Q.  Okay.  And for the purposes of today, the
12   time you spent on this case, other than the last few
13   days in April, would all be included on this
14   invoice; is that fair?
15       A.  No.  There are additional dates in May that
16   I've spent on this case that I have not yet
17   submitted an invoice for.
18       Q.  Fair.  Let's -- let's take it this way.  So
19   actually, let's -- let's do that.
20           Do you have an invoice in -- for May that
21   you have generated yet?
22       A.  Not yet.
23       Q.  Okay.  How many dates in May do you think
24   you worked on this case?
25       A.  Offhand, I don't know.

Page 16

1        Q.  Okay.  Have you done any work on the case
2    since the report was produced on May 10th?
3        A.  Yes.
4        Q.  Okay.  How much time do you think you've
5    spent since the report was produced on May 10th?
6        A.  I don't know.
7        Q.  Do you have any estimate?  Was it a day or
8    two?  I mean, I just -- I'm trying to get an idea.
9        A.  Yeah.  In total, I probably spent about
10   40 hours in the month of May, 30 or 40 hours.  Most
11   of that was -- a significant portion of that was
12   preparing the report, but also reviewing my report
13   was important to me, even after it was created.
14       Q.  So your testimony is you may have spent some
15   additional time after the report was created
16   reviewing the report to make sure it was accurate?
17       A.  Not to make sure it was accurate, just to
18   remain comfortable in the multiple details of the
19   report and to continue to review some of the
20   sources.  I review and I reereview and I review again
21   and continue to -- I continue to review some of
22   those reports.
23       Q.  Okay.  How much of the 30 to 40 hours that
24   you spent in May would be allocated to the time
25   before the report was due?

Page 17

1    A.  I don't recall.
2    Q.  Can you give me an estimate?
3    A.  I really can't.  I spend a few hours at a
4  time, days when I have time, at my free time, at the
5  end of my office hours.  So it can be anywhere from
6  an hour to two, three, four hours, depending on my
7  day-to-day schedule.
8    Q.  Okay.  How many -- I don't want to
9  misrepresent what's on this invoice.  I'm -- I'm
10  just going to count up roughly how many hours I see
11  on it.
12        Let's see.  I count -- on the invoice, I see
13  about 15 hours and 45 minutes.  That's on this April
14  invoice.
15        Does that seem right to you?
16    A.  That seems right.
17    Q.  Okay.  And then, I think you said you have
18  an additional two or three days in April that you
19  may have worked on the report.  On those three days,
20  do you have an estimate of roughly how many hours
21  you may have worked?
22    A.  I think there is an additional six or eight
23  or maybe 10 hours in the end of April.
24    Q.  So maybe six to 10 hours in the end of
25  April.  And in the first 10 days of May, before the

Page 18

1  report, can you give me a similar estimate as to how
2  many hours you may have spent leading up to the
3  report?
4        MS. COATES:  Objection; asked and answered.
5    A.  Without having my invoice in front of me,
6  I'm really not certain.  I don't -- I don't want to
7  be specific about the dates and get them wrong about
8  the dates and the hours spent, but I spent several
9  hours on several days prior to the submission of the
10  report.
11    Q.  If you had to generate an interim invoice
12  for late April and into May, could you do that?
13    A.  Yes.
14    Q.  Could you do that easily?
15    A.  It depends on what you mean by "easily."
16    Q.  Could you do that in the next -- could your
17  staff or someone pull that while we're sitting here
18  today?
19    A.  No, my staff couldn't do that.  I have
20  internal notes on my iPhone.
21    Q.  Is it something you could pull up on your
22  iPhone while we're sitting here?
23    A.  Yes.
24    Q.  Okay.  When we take a break, I may ask you
25  to do that just so we don't have to come back and

Page 19

1  ask you.  All I'm really trying to get is a sense of
2  how many hours you spent leading up to the report.
3  The best we can get that accurate testimony, that
4  would be very helpful, but let's continue on and
5  then maybe we can address it at a break.
6    A.  Okay.
7    Q.  Okay?  Have you ever been deposed before?
8    A.  Yes.
9    Q.  Okay.  In what instances?
10    A.  Most recently in the Oklahoma case.  That's
11  on my CV and --
12    Q.  Any other times you've been deposed?
13    A.  As -- yes, but as a -- as a fact witness, I
14  think is what it's called, on patients in whom I had
15  some involvement in their case.
16    Q.  How many times were you deposed as a fact
17  witness?
18    A.  I'd be guessing.  Maybe four or five times.
19    Q.  When was the last time you were deposed as a
20  fact witness?
21    A.  About a month ago.
22    Q.  And what kind of case was that?
23    A.  It was a physician who I had treated as a
24  patient who fell in the hospital cafeteria and I was
25  an expert for -- I was a fact witness for my

Page 20

1  patient, who is suing the hospital.
2    Q.  Okay.  Was that an injury case, a personal
3  injury case?
4    A.  I guess so.  He was a chronic pain patient
5  who had a worsening of his pain since that incident.
6    Q.  And that chronic pain patient was suing the
7  hospital over a fall injury?
8    A.  That's correct.
9    Q.  Okay.  Before that deposition about a month
10  ago, when was the last time you were deposed?
11    A.  Probably about a year ago.
12    Q.  What kind of case was that?
13    A.  A patient who came to me for pain from an
14  injury from an incident at the beauty salon where
15  she had a bikini wax and they tore off her skin.
16    Q.  And were you being sued in that litigation?
17    A.  No.
18    Q.  Were you again a treating physician?
19    A.  I was, yes.
20    Q.  Okay.  Prior to that time, one year ago when
21  you were deposed, when were you deposed before that
22  last?
23    A.  I don't remember.
24    Q.  Is it safe to say that -- or actually, I'll
25  ask you.  Other than these two depositions we've

Page 21

1    talked about which -- where you were a fact witness,
2    and in the Oklahoma case, have you been deposed in
3    the last five years in any case?
4        A.  I've -- it's possible.  I don't remember.
5        Q.  Okay.
6        A.  But it would be similar, you know, fact
7    witness patients.
8        Q.  Okay.  And you don't remember any of the
9    details of those other depositions?
10       A.  I don't remember.  If my office tells me,
11   you know, the names and the dates, I'm sure it will
12   come back like that, but sitting here right now
13   today, I don't recall.
14       Q.  Okay.  Since you've been deposed before, I
15   don't think we need to talk too much about the
16   ground rules of the deposition.
17           You're doing a nice job of not talking over
18   me.  This lovely lady has to take down everything
19   we're saying, so we'll try not to talk over each
20   other.  If we do, usually she will remind us.  Okay?
21           To the extent that I ask you a question that
22   requires a "yes" or "no," please answer with "yeses"
23   or "nos," not "ung-ughs" and "uh-huhs," because they
24   look the same on -- when she's taking them down on
25   the transcript.  Does that make sense?

Page 22

1        A.  That makes sense.
2        Q.  Okay.  If, at any time, you don't understand
3    my question, please ask me to rephrase it because I
4    want you to have understood my question.  Okay?
5        A.  Okay.
6        Q.  Can we make that agreement?  Okay.
7           Otherwise, I think you're doing a very nice
8    job of allowing time for her to take it down so
9    we'll -- we'll try to keep that up for the rest of
10   the day.  Okay?
11       A.  Okay.
12       Q.  You understand that you're under oath and
13   everything you say today must be truthful and
14   accurate, correct?
15       A.  Correct.
16       Q.  Okay.  The last item that we didn't get
17   to -- here, it is -- on Exhibit A to your deposition
18   what -- is what I'm going to mark as Exhibit 3 and
19   hand that to you, if I could.
20           (Rosenblatt Exhibit 3 was marked for
21   identification.)
22   BY MS. DICKINSON:
23       Q.  Tell me what Exhibit 3 is.
24       A.  This is the most recent updated copy of my
25   CV.

Page 23

1        Q.  Okay.  And when did you update your CV?
2        A.  Yesterday.
3        Q.  Okay.  Why did you update your CV yesterday?
4        A.  There needed to be some updates.  It hadn't
5    been updated in several months, if not longer, and I
6    wanted it to be picture perfect accurate for today.
7        Q.  Okay.  Great.  Fair enough.
8           (Rosenblatt Exhibit 4 was marked for
9    identification.)
10   BY MS. DICKINSON:
11       Q.  We are going to mark -- actually, we've
12   marked as Exhibit 4 to your report what was the CV
13   that was attached as Appendix A to the report that
14   was produced on May 10th.  So I'm going to hand you
15   that really quickly.
16       A.  Yes.
17       Q.  Does that CV look like -- the Appendix A, a
18   true and correct copy of what was attached to your
19   expert report in this case?
20       A.  Yes, it does.
21       Q.  Okay.  Could you tell me, on Exhibit 3, what
22   changes were generally made?
23       A.  My address.  My office moved April 1st, so
24   that was one change.
25       Q.  Okay.

Page 24

1        A.  There are two additional surgery centers
2    where I now do my surgical cases.
3        Q.  Where do those fall on this -- on Exhibit --
4    what we've marked as Exhibit 3?
5        A.  On Exhibit 3, they fall on the second page,
6    Lake Worth Surgical Center and Boca Raton Outpatient
7    Surgery & Laser Center.
8        Q.  Okay.  Any other additions?
9        A.  Publications, there were some additional
10   publications that were not included in my prior
11   version of my CV.
12       Q.  Tell me which ones.
13       A.  On the Newsmax Health Blog, on the prior
14   version of my CV there were only two and there were
15   several more added; and another article in Pain
16   Management that I published about the opioid
17   withdrawal syndrome.
18       Q.  Is that the one that's listed at the bottom
19   of the page?
20       A.  That's correct.
21       Q.  Okay.
22       A.  And then on the following page, another
23   article that's available online, not yet in print,
24   it will be next week, "Three Years Down the Road."
25       Q.  And where is that?

## Page 25

1    A. On the top of the next page.
2    Q. Is that the one entitled --
3    A. Advances --
4    Q. -- Advances in Medicine?
5    A. Correct.
6    Q. Anything else?
7    A. In addition, there is some additional
8    lectures I've given, added "US WorldMeds Conference"
9    on the bottom, almost to the bottom of the next
10   page.
11   Q. Okay.
12   A. As well as the Nevro Conference, the recent
13   cadaver course in Orlando.
14   Q. Where is that?
15   A. Above that.
16   Q. Oh, I'm sorry. The one just above it?
17   A. Yeah.
18   Q. Okay.
19   A. I think that's it.
20   Q. Okay.
21   A. Oh, and there was -- on the very last page,
22   my board certification was listed incorrectly, a
23   miscommunication between myself and my office
24   manager. Where it says "Board Certified in
25   Addiction Medicine" and then "Board Certified in

## Page 26

1    Preventive Medicine," I am not board certified in
2    preventive medicine, and that's been corrected on my
3    new CV.
4        I'm board certified in addiction medicine
5    through the American Board of Preventive Medicine.
6    That's the new --
7    Q. That was actually going to be one of my
8    questions today. That helps. Okay.
9        (Rosenblatt Exhibit 2 and Exhibit 5 were
10   marked for identification.)
11   BY MS. DICKINSON:
12   Q. Okay. I'm going to hand you -- I'm going to
13   hand you what has been marked as Exhibit 2 and
14   Exhibit 5, if I could.
15       Exhibit 2 appears to be a copy of your
16   expert report that was submitted to plaintiffs on
17   May 10th, 2019. Is that accurate?
18   A. That's accurate.
19   Q. Okay. And when your report was originally
20   submitted, there were two appendices to that report,
21   Exhibit -- or Appendix A and Appendix B; is that
22   right?
23   A. That's right.
24   Q. Okay. And originally, Appendix A was what
25   we've marked as Exhibit 4; is that right?

## Page 27

1    A. That's right.
2    Q. And now Exhibit 3 is an updated version of
3    Appendix A; is that correct?
4    A. I don't see Appendix A, but I -- it's not
5    here, but yes.
6    Q. So just to -- I'm just trying to make the
7    record clear.
8    A. Yes.
9    Q. Appendix A was originally your curriculum
10   vitae --
11   A. Yes.
12   Q. -- is that fair?
13   A. Yes.
14   Q. Today, you have produced an updated version
15   of that curriculum vitae?
16   A. Correct.
17   Q. Okay. Appendix B to your report, the
18   "Materials Considered" list, that -- has that
19   changed or been updated in any way?
20   A. It has not.
21   Q. Okay. And Appendix B has been marked
22   separately as Exhibit 5?
23   A. 5, yes.
24   Q. Let's try to clear this -- or clean this up
25   a little bit.

## Page 28

1        And Exhibit 2 is your expert report in this
2    case. Has that been changed or amended in any way
3    since this version was produced on May 10th?
4    A. It has not.
5    Q. Okay. Okay. Dr. Rosenblatt, have you ever
6    served as an expert witness before?
7    A. Yes.
8    Q. Okay. On -- in -- on what occasions?
9    A. In the Oklahoma case.
10   Q. Okay. Is that the only time you have served
11   as an expert witness before?
12   A. Yes.
13   Q. When were you retained in -- and when we say
14   "the Oklahoma case," what are you referring to?
15   A. I'm referring to the State of Oklahoma vs.
16   Purdue Pharma, et al., in the state of Oklahoma,
17   March 28th, 2019.
18   Q. Okay. And is that a piece of litigation on
19   behalf of the State of Oklahoma related to opioids?
20   A. Yes, it is.
21   Q. In that case, the State of Oklahoma sued
22   several manufacturers of prescription opioids; is
23   that right?
24   A. That's right.
25   Q. Okay. And you were, in that case, also

Page 29

1    testifying on behalf of the Teva defendants,
2    correct?
3        A.  That's correct.
4        Q.  Okay.  Can we turn to Exhibit 2, page 2, I
5    guess it is, at the bottom where there is a footnote
6    about the Teva defendants?
7        A.  Yes.
8        Q.  Okay.  For the record, I'm going to read
9    into the record what it says in the footnote, just
10   so we're clear about what we're talking about today.
11          There is a Footnote 2 to your report, which
12   is Exhibit 2 at page 2 -- that's a lot of 2s -- that
13   says:  "Teva USA and Cephalon are referred to as the
14   'Teva Defendants.'"
15          Do you see that?
16       A.  Yes, I do.
17       Q.  Okay.  Then it goes on to say:  "Actavis
18   Pharma, Actavis LLC, Watson, Warner Chilcott
19   Company, LLC, Actavis South Atlantic LLC, Actavis
20   Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis
21   Totowa LLC, Actavis Kadian LLC, Actavis Laboratories
22   UT, Inc., frequently known as Watson Laboratories,
23   Inc.-Salt Lake City, and Actavis Laboratories
24   Florida, Inc., frequently known as Watson
25   Laboratories, Inc.-Florida, are referred to as the

Page 30

1    'Actavis Generic Defendants.'"
2        Do you understand?
3        A.  I understand.
4        Q.  Okay.  Is -- have I read that accurately?
5        A.  Yes, you have.
6        Q.  Then it says:  "In addition, I understand
7    that Teva Pharmaceutical Industries, Ltd. ('Teva
8    Ltd.') has been named as a defendant in this case
9    based on the conduct of the Teva and Actavis Generic
10   Defendants, but contests personal jurisdiction."
11          Have I read that correctly?
12       A.  Yes.
13       Q.  "Accordingly, the opinions stated herein as
14   to the Teva and Actavis Generic Defendants also
15   apply to Teva Ltd."
16          Have I read that correctly?
17       A.  Yes, you have.
18       Q.  Was Footnote 2 provided to you by counsel in
19   this case?
20       A.  It was -- it was provided to me by the --
21   from the Analysis Group.
22       Q.  Who is the Analysis Group?
23       A.  The Analysis Group is a consulting group.
24       Q.  What does the Analysis Group do?
25       A.  They help with the research and citations

Page 31

1    and footnotes and helped me generate my report.
2        Q.  Okay.  Is it fair to say that the Analysis
3    Group is a consulting group that assisted with
4    research or items with respect to the writing of
5    your report?
6        A.  Yes.
7        MS. COATES:  Object to form.
8        Q.  You -- are you working for the Analysis
9    Group or through the Analysis Group?
10       A.  I am not.
11       Q.  Okay.  When was this footnote provided to
12   you by the Analysis Group?
13       A.  I'm not sure of the specific time or date.
14       Q.  And who do you understand you are testifying
15   on behalf of?  Is it Teva USA and Cephalon only, or
16   is it the other entities mentioned in this footnote?
17       MS. COATES:  Object to form.
18       A.  As I understand it, it's all of Teva USA and
19   its related entities.
20       Q.  Okay.  And when you say the "related
21   entities," are you offering testimony on behalf of
22   all the other entities that are mentioned in the
23   footnote?
24       A.  I'm not sure.
25       MS. COATES:  Object to form.

Page 32

1        Q.  Who hired you in this case?
2        A.  I was retained by Morgan Lewis.
3        Q.  Okay.  And do you have a retainer letter?
4        A.  I have an agreement.
5        Q.  Okay.  Do you have a retainer agreement?
6        A.  I don't know that it's called a "retainer."
7    I have a -- I think a consulting agreement.
8        Q.  Okay.  And in the consulting agreement, does
9    it says which defendants you are offering testimony
10   on behalf of?
11       A.  I understand I'm offering testimony on
12   behalf of Teva and the Actavis groups, the Watson
13   groups, Cephalon.  And that's what I understand.
14       Q.  Can we today refer to all those groups just
15   as the Teva defendants?
16          Does that make sense to you?
17       A.  I think that's a good idea.
18       Q.  It would be nice not to have to list those
19   in every question.
20          If, at some point in the day, when I say
21   "the Teva defendants" and your answer requires you
22   to break out a particular part of that group, please
23   do so.  Okay?
24       A.  Okay.
25       Q.  If not, I'm assuming that your answer does

Page 33

1   not necessitate you to break out a particular part
2   of that group.  Is that okay?
3       A.  Okay.
4       Q.  All right.  So when I say "Teva" or "the
5   Teva defendants," I am referring to all the
6   defendants you are offering testimony on behalf of.
7       Okay?
8       A.  Okay.
9       Q.  All right.  In the State of Oklahoma case,
10  were you offering testimony on behalf of the same
11  group of defendants which we're calling "the Teva
12  defendants"?
13          MS. COATES:  Object to form.
14      A.  Yes.
15      Q.  And were you also hired by the Morgan &
16  Lewis law firm?
17          MS. COATES:  Object to form.
18      A.  Yes.
19      Q.  Is it fair to say that you are dealing with
20  the same attorneys in this case that you were
21  dealing with in the State of Oklahoma case as far as
22  the attorneys who hired you?
23      A.  Yes.
24      Q.  And who are those specific attorneys at
25  Morgan & Lewis that hired you?

Page 34

1           MS. COATES:  Object to form.
2       A.  Specifically, I was hired by Morgan Lewis
3   through Brian Ercole.
4       Q.  Okay.  And in the State of Oklahoma case,
5   the State of Oklahoma was suing other manufacturers
6   of opioids besides Teva, correct?
7       A.  That's correct.
8       Q.  And it's been in the news.  I understand
9   that Teva just settled that case and agreed to pay
10  roughly $75 million.  Is that your understanding?
11          MS. COATES:  Object to form.
12      A.  I read about the settlement.
13      Q.  Did the -- did the lawyers contact you and
14  tell you you didn't need to provide testimony in the
15  trial?
16      A.  Yeah.
17      Q.  Okay.  And prior to the settlement, had you
18  been asked to testify in the trial in the State of
19  Oklahoma case?
20      A.  Yes.
21      Q.  Okay.  Do you have any idea when that
22  testimony was going to be?
23          MS. COATES:  Object to form.
24      A.  I believe it was going to be sometime this
25  summer, I believe sometime in July.

Page 35

1       Q.  Were you going to address in the trial, in
2   your testimony, virtually the same issues that are
3   in your report that's been marked as Exhibit 2; is
4   that fair?
5           MS. COATES:  Object to form.
6       A.  No.  There was some different content in the
7   Oklahoma case.
8       Q.  Generally, what was different about the
9   testimony you were offering in the Oklahoma case?
10      A.  Specifically in the Oklahoma case, I was
11  asked to review Medicaid claims data and a specific
12  plaintiff's testimony about the medical necessity
13  and medical -- lack of medical necessity on certain
14  prescriptions for Actiq and Fentora.
15      Q.  Which specific plaintiff's testimony did you
16  review?
17      A.  Dr. Beaman.
18      Q.  Who is Dr. Beaman?
19      A.  I don't recall his qualifications.
20      Q.  Was -- did Dr. Beaman work for the
21  government?
22      A.  I don't recall.
23      Q.  Okay.  Was Dr. Beaman an expert witness?
24      A.  I believe he was an expert for the State,
25  yes.

Page 36

1       Q.  Do you recall his specialty, generally?
2       A.  I don't.
3       Q.  Did you offer a report in that case?
4       A.  I did not.
5       Q.  Did you give a deposition?
6       A.  I did.
7       Q.  Do you have a copy of your deposition
8   testimony from that case?
9       A.  I have seen it.
10      Q.  Have you retained a copy?
11      A.  I think so.
12      Q.  Do you know roughly when that deposition was
13  taken?
14      A.  It would be the end of March, I believe.
15      Q.  In that case, you mentioned that your
16  testimony was going to cover Actiq and Fentora; is
17  that accurate?
18      A.  Yes.
19      Q.  In that case, were you going to address
20  Teva's sales and marketing of any generic drugs, not
21  Actiq and Fentora?
22          MS. COATES:  Form.
23      Q.  Can you repeat the question?
24      Q.  Right.  In that case, were you asked to
25  address Teva's sales and marketing of any generic

## Page 37

1    opioid medications, not Actiq and Fentora?
2         A.  No.
3         Q.  In this case, have you been asked to address
4    any of Teva's generic sales or marketing?
5         A.  No.
6         Q.  How much have you been paid to date for your
7    testimony in the Oklahoma case?
8         A.  I'm not sure.  I'd be guessing.  I think it
9    was around $9,000.
10        Q.  Roughly the same as the amount on Exhibit 6
11   that you have billed in this case?
12        A.  I think so.  Again, I'd have to see the
13   prior invoice.  I don't recall.
14        Q.  Do you have any outstanding invoices for the
15   State of Oklahoma case?
16        A.  Yes.  I believe March is still outstanding.
17        Q.  And do you have any idea, roughly, in March
18   what your invoice will be?
19        A.  That's the one I was referring to, I think
20   was about 9,000.  Actually, March, I think, was a
21   little bit more.  I think that was $18,000.
22        Q.  Okay.  So total, your invoices for the State
23   of Oklahoma case may total about $27,000, if my math
24   is correct?
25        A.  I think less.  I think February was less,

## Page 38

1    but again, I don't have them in front of me.
2         Q.  Okay.  Is it fair to say that your total
3    invoices for that case are somewhere between $18,000
4    and $27,000?
5         A.  Yes.
6         Q.  Okay.  Which lawyers were working with you
7    on the Oklahoma case testimony?
8         A.  Mostly Brian Ercole but also with Melissa
9    Coates and Martha Leibell.
10        Q.  The same -- two of those lawyers are sitting
11   here in this room, correct?
12        A.  Correct.
13        Q.  Okay.  And Brian was in the room earlier?
14        A.  Earlier he was in the room, yes.
15        Q.  Okay.  At the Morgan & Lewis firm, did you
16   have contact with any other attorneys, other than
17   the three we just talked about?
18        MS. COATES:  Object to form.
19        A.  I met with one of the senior partners, Steve
20   Reed.
21        Q.  And on how many occasions?
22        A.  One prior to my engagement.
23        Q.  Okay.  When was the first time that you were
24   contacted about serving as an expert in any
25   opioid-related case?

## Page 39

1         A.  October 2018.
2         Q.  Okay.  And by who?
3         A.  By Brian Ercole.
4         Q.  Okay.  Did you know -- I'm sorry.
5             What is Brian's last name?  I'm not going to
6    pronounce it well.
7         A.  E-r-c-o-l-e.
8         Q.  Ercole.  Okay.  Did you know Brian Ercole
9    prior to being contacted in October of 2018?
10        A.  No, I did not.
11        Q.  Did you know anyone at the Morgan & Lewis
12   firm prior to being contacted in October of 2018?
13        A.  No, I did not.
14        Q.  Okay.  Do you know how Brian Ercole got your
15   name as a potential expert witness?
16        A.  Yes, from a physician colleague of mine.
17        Q.  Okay.  And who is that?
18        A.  Dr. Joseph Pergolizzi.
19        Q.  Is Dr. Pergolizzi your business partner?
20        A.  Yes, he is.
21        Q.  How long has he been your business partner?
22        A.  We formed a company in 2016 called Melrose
23   Pain Solutions.
24        Q.  We're going to get into that a little bit
25   more later, but can you tell me what -- generally

## Page 40

1    what Melrose Pain Solutions does?
2         A.  Melrose Pain Solutions is a consulting
3    company that goes into hospitals and helps them
4    identify and treat complex patients with complex
5    pain problems.
6         Q.  Did Dr. -- had you ever been in business
7    with Dr. Pergolizzi before?
8         A.  No.
9         Q.  Okay.  Did Dr. Pergolizzi tell you that a
10   law firm would be contacting you about potential
11   testifying?
12        A.  Yes.
13        Q.  Okay.  And what did he say about that?
14        A.  He asked me if I would be interested and
15   asked if it was okay if he passed my name along.
16        Q.  Okay.  And do you know -- had Dr. Pergolizzi
17   been contacted as potentially testifying?
18        A.  That, I don't know.
19        Q.  Okay.  Do you know how Dr. Pergolizzi got in
20   contact with the Morgan Lewis firm?
21        A.  No, I do not.
22        MS. COATES:  Objection; calls for
23   speculation.
24        Q.  Do you know why Dr. Pergolizzi was not asked
25   to be a testifying witness?

Page 41

1          MS. COATES:  Objection.
2     A.  I don't know.
3     Q.  Okay.  Did Dr. Pergolizzi tell you any more
4  than, I am going -- a group of lawyers is going to
5  be calling you?
6     A.  No.
7     Q.  Did you ask him any questions about what
8  that was all about?
9     A.  As I recall, he told me it was about opioid
10  litigation and he thought that it would be something
11  I would be very interested in.
12     Q.  What was your response when he told you
13  that?
14     A.  I'm very interested in participating in
15  that.
16     Q.  Why was that your response?
17     A.  Because I'm -- I'm very passionate about
18  this topic, and the problems of opioid misuse,
19  abuse, and diversion have been a -- particularly,
20  that -- that's why Melrose Pain Solutions came to
21  be, to help hospitals understand and appropriately
22  treat these complex patients when they enter a
23  hospital system.
24     Q.  And you're testifying for the defendants in
25  this case?

Page 42

1     A.  That's correct.
2     Q.  Okay.  And I guess I always like to ask
3  people this:  Why did you feel it was important to
4  testify for the defendants in the opioid litigation?
5          MS. COATES:  Objection; form.
6     A.  I think insofar as this case is about false
7  claims and alleged inappropriate marketing, I feel
8  that there was not inappropriate marketing and that
9  marketing does not impact my decision to prescribe
10  opioids, and, yet, I also feel it's important to
11  maintain the ability to prescribe opioids for
12  appropriate patient.
13     Q.  Did you look at the marketing for any of the
14  other defendants other than the Teva defendants?
15          MS. COATES:  Objection; outside the scope.
16     A.  For the purposes of this case, I have not,
17  no.
18     Q.  Outside of the Oklahoma litigation and --
19  actually, strike that.
20          For the purpose of either the Oklahoma
21  litigation or this litigation, have you reviewed the
22  marketing materials for any of the other defendants,
23  other than the Teva defendants?
24          MS. COATES:  Objection; outside the scope.
25     A.  I have not.

Page 43

1     Q.  Have you been asked to?
2     A.  I have not.
3     Q.  Have you asked anyone to review any other
4  marketing materials for any other defendant in this
5  case?
6     A.  I have not.
7     Q.  Mr. Ercole called you in October of 2018.
8  What did he tell you in that first conversation?
9          MS. COATES:  And I'll just remind you
10  that -- do not reveal the content of the
11  conversations that you've had with counsel since
12  you've been retained.
13     Q.  So I'm asking before you were retained.  So
14  you can talk about these conversations.
15          I assume when Mr. Ercole first called you,
16  you were not retained, correct?
17     A.  Correct.
18     Q.  Okay.  In that first conversation, when
19  Mr. Ercole called you, what did he tell you?
20     A.  We talked a little bit about -- I don't
21  recall specifically, just that he asked if I would
22  be interested in working with Teva in this case, and
23  I expressed my interest to do so.  We arranged for
24  me to meet with Steve Reed up in Philadelphia, which
25  I then did, and we talked not specifically about the

Page 44

1  case but specifically about pain management and
2  opioid management and other alternatives of pain
3  management.
4          I don't really remember the details.  I
5  spent about a half a day in Philadelphia.  Then I --
6  we came to an agreement on the consulting
7  arrangement.
8     Q.  Okay.  How long was the conversation with
9  Mr. Ercole?  I assume it was on the telephone; is
10  that correct?
11     A.  Telephone and e-mail.
12     Q.  Okay.  How long was the conversation on the
13  telephone with Mr. Ercole when you first talked to
14  him?
15     A.  I don't recall, but I would imagine a few
16  minutes.  I don't remember any lengthy, lengthy
17  conversation.
18     Q.  Were you provided any materials by
19  Mr. Ercole via e-mail in between the time you talked
20  to Mr. Ercole and the time you met with Mr. Reed?
21     A.  No.
22     Q.  Okay.  How soon after the first conversation
23  with Mr. Ercole did you meet with Mr. Reed?
24     A.  I don't recall specifically but within a
25  couple of weeks.

1      Q.  Is it fair to say that the first
2  conversations, other than the initial conversation
3  with Mr. Ercole, the conversations over e-mail were
4  about the logistics of that meeting with Mr. Reed?
5      A.  I think so, yeah.
6      Q.  And I think you said you met for about half
7  a day with Mr. Reed in Philadelphia.  Would that
8  roughly be in early November of 2018?
9      A.  Roughly.
10     Q.  Okay.  Were there any other attorneys
11  present at that meeting?
12     A.  No.
13     Q.  What did Mr. Reed tell you about the opioid
14  cases?
15     A.  I don't recall specifically.
16     Q.  Do you recall in general?
17     A.  Not really.  We -- mostly he asked me a lot
18  of questions about myself and my practice and my
19  background and my -- my experience.
20     Q.  Did he tell you which defendants he
21  represented?
22     A.  I don't think I knew at that time.  I don't
23  think I knew until I saw the -- the -- oh, I'm
24  sorry, which?
25     Q.  Did Mr. Reed tell you which defendants he

1  represented?
2      A.  I understood at that time that it was Teva.
3      Q.  Okay.  Did Mr. Reed, at that time in that
4  half a day, tell you anything about Teva's positions
5  it was taking in the case or anything about the
6  case?
7      A.  No.
8      Q.  He didn't give you any understanding of what
9  the case was about?
10     A.  I mean, I don't recall the details of what
11  he said about Teva.  And I don't know what was
12  conveyed to me before and after I was retained.
13     Q.  Okay.  I'm just trying to get at what was
14  conveyed to you about the case and what the case was
15  about before you were retained.
16     A.  From what I -- what I understood and I think
17  was my understanding at the time, was that it was
18  about marketing to physicians causing physician --
19  allegedly causing physicians to overprescribe.
20     Q.  What were you told about the marketing to
21  physicians that was at issue in the case?
22     A.  My recollection is that it was off-label
23  marketing and false marketing, alleged false
24  marketing.
25     Q.  Were you given any materials prior to

1  signing your retainer or your engagement letter in
2  the case?
3      A.  No.
4      Q.  No case materials?
5      A.  No.
6      Q.  Okay.  Were you given the complaint?
7      A.  No.
8      Q.  So you signed your retainer letter not
9  having seen the allegations of the complaint?
10     A.  I believe so, yes.
11     Q.  Did you have any other meetings prior to
12  signing your engagement letter other than the
13  telephone meeting with Mr. Ercole and the half a day
14  with Mr. Reed?
15     A.  No.
16     Q.  Do you know how soon after you met with
17  Mr. Reed you came to an agreement with the Teva
18  defendants to serve as an expert witness?
19     A.  I believe within a few days.
20     Q.  Okay.  How were you able to determine that
21  you could effectively serve as an expert witness for
22  Teva if you hadn't reviewed the allegations of the
23  complaint?
24     A.  So my understanding is they -- that's based
25  on my experience, my background, my extensive

1  experience treating patients with both chronic pain
2  and chronic noncancer pain, that that is what
3  qualified me to work with them.
4      Q.  How did you know you would be supportive of
5  the Teva defendants before reviewing any of the
6  documents from the case?
7      A.  I -- my understanding, again, was I was
8  going to be asked to explain how physicians
9  prescribe opioids, how we treat chronic pain, cancer
10  and noncancer pain, how I feel as a physician I've
11  been affected by marketing.
12     Q.  Without reviewing the marketing, I guess my
13  question is how did you know you'd be supportive of
14  Teva's defenses with respect to its marketing before
15  you ever reviewed it?
16     A.  So prior to reviewing any of the material, I
17  didn't know what Teva's defenses specifically were,
18  and I had not reviewed the specific material, but
19  overall, the company Teva, I felt very comfortable
20  with my experience, my personal experience with the
21  company, with the company representatives, and with
22  the medications Actiq and Fentora insofar as it
23  applied to my practice.
24     Q.  You talked about coming to an agreement with
25  Mr. Reed and the Morgan Lewis firm about serving as

1    an expert witness for Teva; is that right?
2          MS. COATES:  Objection --
3       Q.  Was that agreement in writing?
4          MS. COATES:  -- mischaracterization.
5       A.  I have an engagement letter and a contract.
6       Q.  Okay.  Are those two separate documents?
7       A.  I'm not sure.
8       Q.  Okay.  Do you have copies of those two
9    documents, or one document?
10      A.  Yes.
11      Q.  Okay.  Have you -- okay.
12          What generally is that agreement that was
13   made?
14      A.  So I recall an engagement letter which
15   specifically speaks to the -- my hourly
16   compensation, and then I also recall having Teva's
17   billing practices, I guess, which is general about
18   what their policy is.
19      Q.  What are generally the terms of your
20   engagement with Teva in this case?
21      A.  That I will be compensated on an hourly
22   rate.
23      Q.  And what's the hourly rate?
24      A.  $600 an hour.
25      Q.  Okay.  And is -- does that hourly rate of

1    $600 an hour change for your deposition testimony
2    time?
3       A.  No, it doesn't.
4       Q.  Would it change for trial time?
5       A.  It does not.
6       Q.  Okay.  And when you entered into the
7    engagement to serve as an expert witness for Teva,
8    was that specific to any one case?
9       A.  I don't believe so, no.
10      Q.  Okay.  So the engagement is an engagement
11   generally to provide testimony in any number of
12   cases that might arise where Teva is a defendant
13   regarding opioids; is that fair?
14      A.  I think so.
15      Q.  Okay.  You understand that there are over
16   1,000 cases in the multidistrict litigation?
17      A.  I don't believe I knew that at the time.
18      Q.  Do you understand that today?
19      A.  I -- yes.
20      Q.  Have -- is it your understanding your
21   agreement with Teva could cover testifying in any
22   number of those thousand cases?
23      A.  Yes, that's my understanding.
24      Q.  And is your retainer agreement with Teva, or
25   is it with the Morgan Lewis firm, I guess?

1       A.  I believe it's with the Morgan Lewis firm on
2    behalf of Teva.
3       Q.  And do you know who signed the retainer on
4    behalf of Morgan Lewis?
5       A.  I think it was Brian Ercole.
6       Q.  Your rate of $600 an hour, did you negotiate
7    that with the Morgan Lewis firm?
8       A.  Yes.
9       Q.  Okay.  Did you start at a higher rate?
10      A.  I started at a more complex rate of
11   different -- my fee schedule has always been really
12   more for expert -- for consulting agreements, for
13   experts for consulting agreements, but really based
14   on patients.  So there would be records review -- it
15   was a more complicated fee schedule, separating out
16   records review from phone calls from in-person
17   meetings from court testimony and deposition
18   testimony.
19          And Brian -- we negotiated that it would be
20   much simpler to have just one set hourly fee
21   schedule.
22      Q.  Okay.  In your typical hourly -- or in your
23   typical fee schedule for expert witness work, were
24   there some rates that were higher than $600 an hour?
25      A.  Not specifically on an hourly basis but, for

1    example, in my fee schedule, there would be a set
2    fee for me going to court with a minimum number of
3    hours in a day.  I don't recall specifically what
4    that is.  And it's changed over the years.
5       Q.  Where would I get a copy of your fee
6    schedule?  Do you retain one?
7       A.  My office manager has that.
8       Q.  How long have you had a fee schedule for
9    expert witness work?
10      A.  The fee schedule, to be clear, is not for
11   expert witness work.  It's my fee schedule.
12      Q.  Fair.  Okay.  That actually makes a little
13   more sense now.
14          We were talking about a fee schedule that
15   you had sent, I believe, to Mr. Reed; is that
16   correct?
17      A.  To Mr. Ercole.
18      Q.  Okay.  Sorry.  To Mr. -- I'm saying his name
19   wrong.  What is his last name?
20          How do you pronounce it?
21      A.  Ercole or Ercole.
22      Q.  Ercole.  Okay.  I'm going to say Ercole, and
23   we're going to go with that.
24          MS. COATES:  I pronounce it Ercole, but --
25          MS. DICKINSON:  Okay.

Page 53

1    Q.  I'm going with --
2    A.  And I've asked him, he says either is fine.
3    Q.  That's really funny.  Sorry, we got off
4  track a little bit there.
5        You sent a fee schedule to Mr. Ercole, and
6  is that the fee schedule for your general
7  professional services, not just expert witness work?
8    A.  That's fair, yes.
9    Q.  Okay.  And that's the fee schedule we were
10 just talking about that had different components of
11 what you charge for your time in doing certain
12 activities; is that fair?
13   A.  That's fair.
14   Q.  Okay.  And you use that for your activities
15 as a doctor?
16   A.  Yes.
17   Q.  Okay.  Did you have a fee schedule that
18 was -- that related solely to expert witness work?
19   A.  I do not.
20   Q.  Okay.  Had you ever served as an expert
21 before the State of Oklahoma case?
22   A.  We did cover this already.  No, only for my
23 patients.
24   Q.  Fair enough.  We talked about when you were
25 a fact witness --

Page 54

1    A.  Right.
2    Q.  -- at depositions?
3    A.  Right.
4    Q.  You had never been a paid expert before the
5  Teva defendants hired you in these -- in the
6  agreement we've just been talking about; is that
7  fair?
8        MS. COATES:  Asked and answered.
9    A.  Well, I have been paid for the prior work
10 I've done.
11   Q.  Fair.  Okay.
12       The depositions you talked about that you
13 gave as a fact witness, were you paid for your time?
14   A.  Yes, I was.
15   Q.  Okay.  Were you paid for the time in
16 deposition?
17   A.  Yes, I was.
18   Q.  Okay.  Were you paid for any other work done
19 in those cases?
20   A.  Yes, not just deposition but in review of
21 records and phone calls with the attorney.
22   Q.  Okay.  Do you know what hourly rate you
23 charged in those cases?
24   A.  I don't recall.  I do recall that for the
25 deposition, it was $1500.

Page 55

1    Q.  $1500 an hour?
2    A.  $750 an hour with a two-hour minimum.
3    Q.  And was that true for each of the four to
4  five depositions you had given in the past?
5    A.  Yes.
6    Q.  Okay.
7    A.  And my fee for deposition is higher than my
8  fee for reviewing records in my pajamas.
9    Q.  What is your rate for reviewing records in
10 your pajamas for those type of cases?
11   A.  I don't recall, because I know it's changed
12 over the years, but I think it was five, $500 or
13 $550 an hour.
14   Q.  And those rates would have been set out on
15 this fee schedule you sent to Mr. Ercole; is that
16 fair?
17   A.  Yes.
18   Q.  Okay.  And after you sent the fee schedule
19 to Mr. Ercole, how did the Morgan Lewis firm
20 communicate that your rate would be $600 an hour?
21   A.  It was through -- I was on a phone call with
22 Mr. Ercole.
23   Q.  Okay.  And what was that discussion in that
24 phone call?
25   A.  He -- I -- my recollection is he said it was

Page 56

1  complicated and could we just keep it simple at $600
2  an hour, and I agreed.
3    Q.  Do any of your staff work on your engagement
4  with Teva with respect to the opioid litigation?
5    A.  Specifically what do you mean?
6    Q.  Does anyone on your staff do any work under
7  your engagement for the Teva defendants?
8    A.  Other than prepare my invoice, no.
9    Q.  Who does prepare your invoices?
10   A.  My office manager.
11   Q.  Who is that?
12   A.  Susan Jasinski, J-a-s-i-n-s-k-i.
13   Q.  Your office manager, she hasn't been paid
14 independently by Teva for anything in this case; is
15 that right?
16   A.  That's right.
17   Q.  You mentioned the Analysis Group.
18       When was the first time that you were in
19 contact with the Analysis Group?
20   A.  I don't recall the date specifically, but it
21 was in connection with the Oklahoma case.
22   Q.  Okay.  Fair to say it was sometime after
23 November of 2018?
24   A.  That would be fair.
25   Q.  Do you know roughly how many months after

1  November 2018 was the first time you were in
2  connection with the Analysis Group?
3      A.  I think -- I think -- I think it was in
4  February.
5      Q.  And what were you generally in connection
6  with the Analysis Group about in February?
7      A.  We had discussions in preparing what would
8  be in my declarations for the Oklahoma case.
9      Q.  Okay.  I asked you a little while ago did
10  you submit a report in the Oklahoma case.  I may not
11  have used the correct language.
12      Did you submit a written declaration?
13      A.  I did not sub-- well, it wasn't submitted
14  by me.  It was submitted by counsel.
15      Q.  Fair enough.  Did you submit the declaration
16  to the Morgan Lewis firm in the Oklahoma case?
17      A.  Yes.
18      Q.  And when was that declaration done?
19      A.  I don't recall the date.  It was sometime in
20  February or March.
21      Q.  Just to get the time line correct, you were
22  hired in roughly 2018.  You submitted a declaration
23  in the State of Oklahoma case in roughly February or
24  March of 2019.  You were deposed in March of 2019.
25      Is that time line accurate so far?

1      A.  Yes.
2      Q.  Okay.  And you submitted your report in this
3  case in May -- on May 10th of 2019; is that right?
4      A.  That's right.
5      Q.  Okay.  For the February or March 2019
6  declaration, the first time you had connection with
7  the Analysis Group was in February 2019; is that
8  correct?
9      A.  I don't remember specifically when.  I don't
10  recall if I met -- if I spoke with them in January
11  but it was in preparation for the Oklahoma case.
12      Q.  Okay.  What was the Analysis Group going to
13  do with respect to your declaration in that case?
14      A.  Help me form -- help me form an outline,
15  help me get access to the data, the specific
16  Medicaid data in the Oklahoma case, provide -- we
17  had a ShareFile where they provided me the reports
18  that I was asked to review, specifically
19  Dr. Beaman's testimony, Dr. Beaman's declaration.
20      Q.  Who were you working with specifically at
21  the Analysis Group?
22      A.  A gentleman by the name of Mihran, and I
23  can't pronounce his last name, Yenikomshian, or
24  something.  It's difficult to pronounce.  It starts
25  with a Y-e-n [sic].  His first name is Mihran,

1  M-i-h-r-a-n.
2      Q.  N --
3      A.  M as in Mary --
4      Q.  M as in Mary, y- --
5      A.  I --
6      Q.  Man, I'm really butchering this.  Can you
7  spell it again?
8      A.  M-i-h-r-a-n.
9      Q.  Okay.  And your best guess at the last name?
10      A.  Yenikomshian.
11      Q.  Yenikomshian?
12      A.  Yenikomshian.
13      Q.  Okay.  I'm going to call him Dr. Mihran.  Is
14  that okay?
15      A.  Mihran.
16      Q.  Is he a doctor?
17      A.  I don't think so.
18      Q.  Okay.  Is he a PhD?
19      A.  I don't think so.
20      Q.  Okay.  Then let's just call him Mihran.
21      A.  Okay.
22      Q.  Does that make sense?
23      A.  Yes.
24      Q.  Okay.  How many times in the course of
25  getting your declaration ready for the Oklahoma case

1  did you talk to Mihran?
2      A.  I don't recall.  We had just a handful of
3  phone calls, but we did most of our communication
4  through our live, online product.
5      Q.  Was Mihran working on the draft of that
6  declaration with you?
7      A.  He was working with me on the draft, yes.
8      Q.  Okay.  Who did the actual drafting of the
9  declaration?
10      A.  We did it together.
11      Q.  When you say you "did it together," what
12  does that mean?
13      A.  It means -- well, we spoke, we talked about
14  the content.  We wrote it, really, together.  I
15  mean, it was presented initially as an outline of,
16  you know, Dr. Beaman and the Medicaid data.  And
17  through our conversations, at my direction, they --
18  he would help me with the draft.
19      Q.  Okay.  Was Mihran also disclosed as an
20  expert in the Oklahoma case?
21      A.  No.
22      Q.  Did you disclose Mihran in your declaration
23  as someone you relied on for assistance?
24      A.  Yes, I did.
25      Q.  Okay.  Did the Analysis Group assist in your

Page 61

1  report that we've marked as Exhibit 2 and the
2  appendices thereto in this case?
3      A.  Yes.
4      Q.  Okay.  When was the first time you talked
5  with the Analysis Group about this case?
6      A.  I don't recall specifically, but it would
7  have been after we finished with the Oklahoma case,
8  after my deposition.
9      Q.  Okay.  So sometime after March of 2019?
10     A.  Yeah, sometime after late March of 2019.
11     Q.  Okay.  Is your best estimate that you
12 probably talked to the Analysis Group for the first
13 time about this case in April, given your invoices
14 start on April 11th?
15     A.  I think so.
16     Q.  Would there be detail, if we could see it,
17 on Exhibit 6 that talked -- or showed how many times
18 you talked to the Analysis Group?
19     A.  No.
20     Q.  How many times with respect to this case did
21 you talk to the Analysis Group?
22     A.  You asked me if there would be detail on how
23 many times I talked to the Analysis Group on this
24 case?
25     Q.  Yes.

Page 62

1      A.  On the invoice, you --
2      Q.  Yeah.
3      A.  I don't know.  Some -- some of my invoice
4  would say "review," some would say "phone call with
5  AG," somebody would say -- some of them would say
6  "conference" or maybe "web conference with AG," but
7  I don't know that every time I made an entry in my
8  invoice, it would be specific on the specific
9  activities surrounding that entry.
10     Q.  Fair enough.  That actually wasn't my
11 question, just would we be able to find on this
12 invoice, you know, which time entries you -- during
13 which you talked to the Analysis Group, in general?
14     A.  That's what I was trying to answer, is it
15 may or may not say "AG."  I know -- I know it
16 said -- I don't know if it made it -- if it
17 translated from my notes to that invoice when it was
18 with -- with AG or just it says "review."
19     Q.  Do you know how many times after -- or in
20 April of 2019 and prior to your report in May -- on
21 May 10th you talked to the Analysis Group?
22     A.  No, I don't know how many times I talked to
23 them.
24     Q.  Was it less than five?
25     A.  No.

Page 63

1      Q.  Was it less than 10?
2      A.  Again, I don't know how many times would be
3  considered talking to them and having a live webinar
4  with them and going over ShareFiles versus having
5  just phone calls, and I -- no, I don't know how many
6  times that would be.
7      Q.  Okay.  How did you work with the Analysis
8  Group in your report that we marked as Exhibit 2 on
9  this case?
10     A.  Most of our work was through the ShareFile.
11 They would -- we would have a live draft, and then I
12 would write extensive comments and revisions and
13 send it to them, and they would have extensive
14 comments and revisions and send it back to me.  And
15 that -- that went back and forth quite a bit.
16     Q.  What did --
17     A.  That was how most of the majority of our
18 work was done.
19     Q.  I'm sorry.  I talked over you a little bit.
20     What did the ShareFile contain with the
21 Analysis Group?
22     A.  All of the background documentation that's
23 in my Appendix B, all the materials considered, the
24 other expert reports, the depositions, and all of my
25 citations and the footnotes.

Page 64

1      Q.  Did it contain -- I'm sorry.  Actually,
2  was there -- is there any background documentation,
3  publications, or other documents in the ShareFile
4  that are not listed on Exhibit B?
5      A.  No.
6      MS. COATES:  Objection to form.
7      A.  I don't believe so.
8      Q.  Okay.  Did the ShareFile with the Analysis
9  Group contain a working draft of your report?
10     A.  Yes, it did.
11     Q.  Okay.  Is it fair to say that members of the
12 Analysis Group sometimes did a first draft of
13 portions of that report?
14     MS. COATES:  Objection to form.
15     A.  I don't know about that because, you know, a
16 lot of it would be verbal.  So per our discussions,
17 they would then maybe lay out the typeset, but it
18 was really at my -- at my direction, and they were
19 my opinions.
20     Q.  And were you still working with Mihran at
21 the Analysis Group when you were authoring the
22 report in this case?
23     A.  Yes.
24     Q.  Were you working with anybody else at the
25 Analysis Group?

Page 65

1      A.  I was working primarily with Mihran.  He has
2  a team, and there were other people frequently on
3  the call.
4      Q.  Who else were you working with?
5      A.  I don't recall any of their names.
6      Q.  Is it fair to characterize the process of
7  authoring the report with the Analysis Group as a
8  collaborative process between you and the Analysis
9  Group?
10     A.  Yes.
11         MS. DICKINSON:  I think we've been going
12     well over an hour.  I thought we'd take a quick
13     break.  We'll try to keep this moving as fast as
14     possible, if you're okay, like, five-ish minutes.
15         THE WITNESS:  Sure.
16         MS. DICKINSON:  Okay.
17         THE VIDEOGRAPHER:  Off the record, 10:33 a.m.
18         (Recess from 10:33 a.m. until 11:03 a.m.)
19         THE VIDEOGRAPHER:  On the record, 11:03 a.m.
20  BY MS. DICKINSON:
21     Q.  Dr. Rosenblatt, we're on the record after a
22  short break.
23         Just to clear one -- or a couple quick
24  things up before we go into the next group of
25  questions, Exhibit 2, we marked as your expert

Page 66

1  report in this case; is that right?
2      A.  Yes.
3      Q.  Are all of the opinions that you intend to
4  express as of today summarized in that report?
5      A.  Yes.
6      Q.  Okay.  In other words, you don't have other
7  expert opinions that were not disclosed in the
8  record; is that right?
9      A.  For today, that's right.
10     Q.  Okay.  Do you plan to render any additional
11  opinions prior to trial that you're aware of today?
12     A.  Not that I'm aware of today.
13     Q.  Okay.  Does your report and the appendices
14  contain all the bases for your opinions in this
15  case?
16     A.  Yes.
17     Q.  Okay.  Are there any -- I think I asked you
18  this earlier.  There are no corrections to the
19  report you need to make today?
20     A.  That's correct.
21     Q.  And there aren't any corrections or
22  amendments that you're aware of that you'll be
23  making prior to trial?
24     A.  Right.
25     Q.  All right.  We were talking, just --

Page 67

1  Counsel, off the record, let me know that when we
2  were talking about the Oklahoma case that you are
3  serving at -- or were serving as an expert witness
4  in for the Teva defendants, you didn't do a
5  declaration that you signed; is that right?
6      A.  Right.
7      Q.  It was what's called a disclosure that the
8  attorneys in that case signed; is that right?
9      A.  That's correct.
10     Q.  Okay.  We're going to get into Exhibit 3,
11  which is your CV, coming up here, if you want to
12  find that.
13         I have some questions -- some sort of
14  preliminary questions before we get into the page by
15  page of the CV, but that's the next document we're
16  going to talk about.
17         Prior to being hired by Teva as an expert
18  witness in the opioid cases, had you ever worked
19  with Teva before?
20     A.  Yes.
21     Q.  Okay.  When did you start working with Teva?
22     A.  It was in 2015, I believe, and it was when I
23  did the "Pain Matters" documentary on the Discovery
24  Channel.
25     Q.  Okay.  Prior to 2015, had you ever worked

Page 68

1  with Teva before in any capacity?
2      A.  I don't think so.
3      Q.  Okay.  Had you ever worked with any of the
4  other Teva defendants that we looked at in
5  Footnote 2?
6      A.  I don't think so.
7      Q.  Okay.  So 2015 was the first time that your
8  relationship with Teva started; is that fair?
9      A.  I believe so.
10     Q.  Okay.  Let's talk about the documentary that
11  you just mentioned.  It was called "Pain Matters"?
12     A.  Yes.
13     Q.  Okay.  When was the first time that you were
14  contacted with any -- or from anyone at the Teva
15  defendants about that documentary?
16     A.  I recall it was sometime in early 2014 --
17  early 2015.  I don't remember exactly when, but I
18  was contacted by a gentleman by the name of
19  Jonathan.  I can't remember his last name.  And it
20  was a phone call communication.  He was from the
21  Discovery Channel.  He actually called and left a
22  message.  I returned his call.
23         I thought it was just a solicitous call
24  asking me to give money to do an online promotional
25  video, or something.  But through our conversation,

Page 69

1    it became pretty clear that this sounded like it was
2    something very important if he was planning on doing
3    a documentary about chronic pain and the impact it
4    has on patients' lives and their caregivers.
5        So I agreed to do that, and then there was
6    some months that elapsed.  And I did -- I did not
7    know other than it was for the Discovery Channel.
8        Q.   Okay.  So your first contract -- or contact
9    with -- was with the Discovery Channel.
10       A.   Yes.
11       Q.   Did you have -- did you come to learn that
12   Teva was involved in that project initially?
13       A.   At some point, I came to learn that.  I
14   don't remember if that was before or after shooting
15   the actual documentary.
16       Q.   What was their involvement?
17       A.   Teva, I came to learn, sponsored it.
18       Q.   Okay.  And when you say "sponsored," does
19   that mean funded it?
20       A.   Yes.
21       Q.   Okay.  And do you know if you knew that
22   before the documentary?
23       A.   I don't -- I don't recall when I became
24   aware of that.
25       Q.   Do you know if any other pharmaceutical

Page 70

1    defendants or pharmaceutical companies funded that
2    documentary?
3        A.   No, that was just Teva.
4        Q.   In the course of working on the documentary,
5    did you have any contact with anyone from the Teva
6    defendants?
7        A.   No.
8        Q.   And when was the documentary filmed?
9        A.   In 2015, I think in June.
10       Q.   Did you -- have you -- at any time, other
11   than the agreement we talked about with respect to
12   the opioid cases, did you ever enter into any
13   agreements with any of the Teva defendants?
14       A.   No.
15       Q.   You didn't enter into any speaker
16   arrangements with the Teva defendants?
17       A.   Oh, let me clarify.  So an agree -- an
18   arrangement.  After that film -- after that
19   documentary came out, Teva did ask me to be a part
20   of the presentation of the film at multiple
21   locations and at multiple instances.  So at some of
22   the Legislative Congress that I have listed on my
23   CV, and I recall at a pain conference.  The film or
24   a portion of the film would be presented, and they
25   had me representing the film and available for Q and

Page 71

1    A about the film.
2        Q.   Okay.  Did you ever enter any -- enter into
3    any written agreements with Teva about speaking
4    arrangements?
5        A.   I believe that would have been in some kind
6    of a consult -- consultation agreement.
7        Q.   And do you know when was the first time you
8    entered into a consultation agreement with Teva?
9        A.   I believe it was after the "Pain Matters"
10   film, sometime in 2015.
11       Q.   After the "Pain Matters" film in 2015 and
12   between that time and the time you were hired
13   regarding the opioid litigation, can we talk about
14   your involvement with Teva?
15       Could you give me a summary of that?
16       MS. COATES:  Objection to form.
17       A.   Yeah.  I'm sorry, but can you repeat that
18   question?
19       Q.   It's -- I was trying to get it out a little
20   quicker.  I can do this in a little bit longer way.
21       So in 2015, the "Pain Matters" documentary
22   was filmed in June 2015, you said that you entered
23   into some agreements with Teva to -- for some
24   speaking engagements after that time; is that
25   correct?

Page 72

1        A.   Yes.
2        Q.   Okay.  Who did you have contact with at Teva
3    about those speaking agreements?
4        A.   I don't remember.
5        Q.   How many occasions did you talk to Teva in
6    the negotiation of the speaking agreements?
7        A.   I don't remember, really, any conversations
8    in negotiating the agreement other than it being
9    provided to me.
10       Q.   At the conferences you spoke at -- and we'll
11   talk about them specifically when we get to your CV,
12   but at the conferences you spoke at, did you have
13   any contact with anyone from Teva with respect to
14   those conferences?
15       A.   I remember having some contact with Teva.  I
16   forget -- I forget who it was with.
17       Q.   How many times did you have contact with
18   someone from Teva with respect to the conferences?
19       A.   Several times.
20       Q.   Okay.  Do you know the department or
21   division that person was in?
22       A.   I don't recall.
23       Q.   Okay.  Other than speaking on the
24   documentary "Pain Matters," did you do any other
25   speaking on behalf or with respect to any of the

## Page 73

1    Teva defendants?
2        A.  No, I don't think so.
3        Q.  Do you know how many times you spoke
4    pursuant to the -- the speaking agreement you did
5    have with Teva?
6        A.  I don't recall specifically, but I would
7    imagine it was less than ten.
8        Q.  Did anyone -- did you or anyone on your
9    behalf distribute that documentary to anyone else?
10       A.  Yes.  I still have copies in the form of a
11   CD in my office and I give it to patients on
12   occasion, and I use it sometimes in my office in the
13   waiting room.
14       Q.  Do you use that documentary in marketing?
15       A.  No.  Well, yes, no.  I have, at times, had
16   it in my waiting room and I have, at times, had it
17   on my computers in the exam rooms playing, but from
18   a technical perspective, we weren't all that good at
19   having that play consistently, although I -- I'm
20   very proud of the documentary, as it stands.
21       Q.  Do you have any idea, roughly, how many
22   copies you've given out or someone has given out on
23   your behalf over time of that documentary?
24           MS. COATES:  Objection; calls for
25       speculation.

## Page 74

1        A.  A few, probably, you know, less than 15, 20,
2    but mostly to family and friends.
3        Q.  Have you -- other than the Teva agreement we
4    just talked about, have you ever entered into any
5    other agreements with other pharmaceutical
6    companies?
7        A.  Yes.
8        Q.  Okay.  Who are those?
9        A.  Most are listed on my CV, most that I can
10   recall, and they were mostly in the form of speaking
11   agreements.
12       Q.  When you said "most are listed" on your CV,
13   could you take a look and tell me whether all are
14   listed on your CV?
15       A.  All that I can recall are listed on my CV.
16   There may have been some occasions prior to 2010
17   that I wasn't regularly updating my CV, and I can't
18   possibly recall everything that I've ever done.
19   I've done the best I can and -- along with my
20   assistant, my office manager, who is doing the best
21   she can as well.
22       Q.  Totally understood.
23           To the best of your recollection, the
24   pharmaceutical companies for which you've had
25   relationships with are listed in Exhibit 3?

## Page 75

1        A.  Yes.
2        Q.  Okay.  We can go through those.
3            Did you ever apply to be a speaker with
4    other pharmaceutical companies that are not listed
5    on your CV?
6            MS. COATES:  Objection; form.
7        A.  It's not really the way it works.  I don't
8    recall any specific applications, so no.
9        Q.  Did you ever discuss with other
10   pharmaceutical companies that are not listed on your
11   CV speaking arrangements?
12       A.  Speaking arrangements specifically?  No.
13       Q.  Did you ever discuss with other
14   pharmaceutical companies that are not listed on your
15   CV working with them in any way?
16           MS. COATES:  Object to the form.
17       A.  You know, I can't recall specifically, but I
18   know many reps have suggested that perhaps I could
19   become a speaker for their company in the future,
20   but no, nothing formal.
21       Q.  Okay.
22       A.  And nothing specifically that I can recall.
23       Q.  And when you say "reps," which -- does that
24   mean sales representatives?
25       A.  Yes.

## Page 76

1        Q.  Okay.  And we'll talk about that a little
2    bit later, but those are sales representatives that
3    were meeting with you as a physician who was
4    prescribing; is that fair?
5        A.  That's fair.
6        Q.  Okay.  Do you know if the sales
7    representatives that you've talked about potential
8    speaking arrangements include sales representatives
9    from Purdue Pharma?
10       A.  I don't recall.  It's possible.  I mean, I
11   write a lot of opioids.  Butrans patch produced by
12   Purdue is a medication I'm very comfortable and a
13   proponent of and I would be more than happy to speak
14   on behalf of Butrans patch but I don't recall
15   specifically having a conversation or being asked.
16       Q.  Is it fair to say that over your time as a
17   pain management specialist, that you have met with a
18   number of sales reps from Purdue Pharma?
19       A.  Yes.
20       Q.  Do you know how -- this is going to be a
21   tough question because you've worked for a number of
22   years, but do you know how many times you've done
23   that?
24           MS. COATES:  Objection; calls for
25       speculation.

1      A.  How many times I've done what?
2      Q.  Met with sales representatives from Purdue
3   Pharma.
4      A.  I would have no idea.
5      Q.  Was that a regular occurrence?
6         MS. COATES:  Objection; vague.
7      A.  At times, yes; at times, no.
8      Q.  Okay.  We'll do it -- I think what we'll do
9   is when we go through your work history, I'll just
10  ask you about whether you met with sales reps in
11  that particular job, and we'll see if we can break
12  it down that way.  Does that seem better?
13     A.  Sure.
14     Q.  Okay.  Over time, you talked about that
15  various sales representatives have suggested that
16  potentially you could become a speaker.
17        Do you know if any of those sales
18  representatives represented Endo?
19     A.  I don't know.
20        MS. COATES:  Objection.
21     Q.  Okay.  Same question for -- do you know if
22  any of the sales representatives that suggested you
23  might become a speaker represented Insys?
24     A.  No.
25     Q.  You said that pretty emphatically.

1         Does that mean you never met with any sales
2   representatives from Insys?
3      A.  I -- I recall vaguely, maybe, an Insys rep
4   coming, but it was not a product I prescribed.
5      Q.  Is it fair to say that if you met with sales
6   representatives from Insys, it was not a regular
7   occurrence?
8      A.  That would be fair to say.
9      Q.  Do you recall meeting with any sales
10  representatives from Allergan that suggested you
11  might become a speaker?
12     A.  I don't recall.
13     Q.  Do you recall whether you met with any sales
14  representatives from Mallinckrodt who suggested you
15  might become a speaker?
16     A.  Not that I -- not that I recall.
17     Q.  Okay.  Same question with respect to Johnson
18  & Johnson or Janssen.
19     A.  Not that I recall.
20     Q.  Okay.  Let's take a look at Exhibit 3.
21        Exhibit 3, again, for the record, is the
22  updated copy of your CV, which we discussed a few
23  additions had been made to the original exhibit for.
24        So we're going to take a look at the most
25  updated version as we go, right?  We're not going to

1   go back to Exhibit 4.
2         Where were you born?
3      A.  Brooklyn, New York.
4      Q.  Okay.  Did you grow up in New York?
5      A.  Yes.
6      Q.  Okay.  When did you leave New York?
7      A.  1995.
8      Q.  Okay.  And where did you go to college?
9      A.  State University of New York at Stony Brook.
10     Q.  Where did you go to med school?
11     A.  Same place.
12     Q.  Okay.  Why did you decide to go to med
13  school?
14     A.  I wanted to become a doctor.
15     Q.  Did you want to become a certain kind of
16  doctor at that time?
17     A.  No.
18     Q.  Did you apply to other medical schools?
19     A.  Yes.
20     Q.  Did -- were you accepted at all the schools
21  you applied to?
22     A.  I was accepted at several.
23     Q.  Were you rejected at any of them?
24     A.  Yes.
25     Q.  Which ones?

1      A.  Harvard.  I don't remember where else.
2      Q.  Okay.
3      A.  I got in -- I got into Downstate.
4      Q.  Many of us -- many of us were rejected by
5   Harvard.
6      A.  I just remember that one specifically.
7      Q.  How did you decide on going to Stony Brook
8   medical school?
9      A.  It was a financial decision.
10     Q.  By "financial decision," does that mean it
11  was more affordable?
12     A.  $5,000 a year was tuition at Stony Brook at
13  that time.
14     Q.  Wow.  Okay.
15     A.  So, yes, it was more affordable.  It was
16  also a long time ago.
17     Q.  When you were in medical school, did you
18  have any profess- -- particular professors who
19  served as mentors to you?
20     A.  There were many.
21     Q.  Okay.  Can you think of any that served as
22  mentors to you in the field of pain management?
23     A.  No.
24     Q.  Did you have a particular focus on pain
25  management when you were in medical school?

Page 81

1    A.  No.
2    Q.  Did you have a particular focus on
3  anesthesia when you were in medical school?
4    A.  No.
5    Q.  Did you have any particular focus, or did
6  you just go to general medical school?
7    A.  During medical school I became very
8  interested at some point in my second and third year
9  in OB-GYN, and that's what I went into.  That's
10  where I matched.
11    Q.  Did anyone in medical school teach you about
12  the proper use for opioids?
13    A.  I don't recall specifically much education
14  around using opioids in medical school.
15    Q.  Did -- when you say you don't recall much,
16  do you recall whether you were taught in medical
17  school whether opioids were safe and effective for
18  long-term use?
19    MS. COATES:  Objection; form.
20    A.  We learned about opioids in pharmacology.
21    Q.  What did you learn in pharmacology?
22    A.  Seriously, I don't remember pharmacology
23  from medical school, but we learned classes of
24  medication and that opioids were, in general,
25  scheduled drugs and subject to misuse, abuse, and

Page 82

1  diversion.
2    Q.  Were you taught in medical school that
3  opioids were safe and effective to treat chronic
4  pain?
5    A.  No.
6    MS. COATES:  Form.
7    A.  Not that I recall specifically.
8    Q.  Anyone in medical school teach -- or did you
9  have any training in medical school about how to
10  treat addiction?
11    A.  Not -- I don't recall any specific
12  treatments being taught in medical school.
13    Q.  Any courses on how to identify someone in
14  addiction during medical -- I'm sorry.  Strike that.
15    Any courses in how to identify someone with
16  addiction that you took in medical school?
17    A.  You know, in our behavioral lectures and
18  psychology and psychiatry lectures, I'm certain that
19  we learned something -- some content around
20  addiction.
21    Q.  Okay.  Specifically, did anyone teach you in
22  medical school how to identify someone with an
23  opioid addiction?
24    A.  I can't remember being taught anything
25  specifically around that.

Page 83

1    Q.  Okay.  Your CV says that you -- that you
2  went from -- it looks like.  I just want to make
3  sure this is accurate -- that you went from medical
4  school to an internship; is that fair?
5    A.  Yes.
6    Q.  Where did you do your internship?
7    A.  In East Meadow at Nassau County Medical
8  Center.
9    Q.  Okay.  And that was in obstetrics and
10  gynecology?
11    A.  Yes.
12    Q.  Did you want to be an obstetrician?
13    A.  Yes.
14    Q.  Okay.  I don't know that I understand the
15  difference of why you would go into an internship
16  versus right into a residency.
17    Can you explain that to me?
18    A.  An internship is the first year of
19  residency.  So I went into an OB-GYN residency.
20    Q.  Got it.  And that was at Nassau County
21  Medical Center.  Did you train under anyone in the
22  internship at Nassau County Medical Center?
23    A.  Yes.
24    MS. COATES:  Objection to form.
25    Q.  Who was that?

Page 84

1    A.  The chairman of the department was a
2  Dr. Victor Halitski.  I don't remember any of the
3  physicians' names.
4    Q.  Did you keep in contact with Dr. Halitski?
5    A.  Briefly, after that, and then he was retired
6  shortly after that.
7    Q.  Was all of your work during that internship
8  done in the hospital setting?
9    A.  Yes.
10    Q.  Did you administer opioid medications in
11  that -- during that internship?
12    A.  Yes.
13    Q.  What types?
14    A.  Mostly Stadol was the drug of choice at the
15  time.  It was a -- it was an agonist-antagonist that
16  was widely -- widely used for labor and delivery.
17    Q.  Were the opioids you administered always in
18  a labor or delivery setting?  Is that fair?
19    A.  Yes.
20    Q.  So only in an acute situation?
21    A.  Yes.
22    Q.  Okay.  Were you taught anything in your
23  internship about the appropriate use of opioids for
24  chronic pain situations?
25    A.  No.

Page 85

1    Q.  Okay.  Where did you do your residency?
2    A.  In Syracuse.
3    Q.  Okay.
4    A.  St. Joseph's Hospital Health Cent -- Health
5    Sciences Center.
6    Q.  Why the change?
7    A.  Sometime during my first year of OB-GYN, I
8    decided that I no longer wanted to be an OB-GYN
9    physician.
10   Q.  Why?
11   A.  Lifestyle, burnout.  I looked at the people
12   ahead of me and the potential employment
13   opportunities and I thought that they mostly looked
14   miserable and I decided I wanted to have a better
15   life, so I switched to anesthesia, which is
16   something I had had significant exposure to, being
17   in OB-GYN and doing a lot of surgical procedures,
18   working alongside of anesthesiologists, I thought
19   that that would be a better choice.
20   Q.  Is it fair to say that in 1992, you switched
21   your focus to becoming an anesthesiologist?
22   A.  Yes.
23   Q.  Okay.  Did you have to apply for residency?
24   A.  Yes.
25   Q.  Okay.  And did you apply to other locations

Page 86

1    other than at St. Joseph's?
2    A.  Yes.
3    Q.  Did you apply anywhere outside of the state
4    of New York?
5    A.  Yes.
6    Q.  Okay.  Generally where -- what other
7    locations did you apply to?
8    A.  I don't remember.
9    Q.  That's fair.  Were there any locations that
10   you applied to that you were not selected to enter
11   the residency program at?
12   A.  Well, that -- well, in general, the
13   residency is a match program, so for the OB-GYN,
14   that's where I matched.  And for anesthesia, that
15   was a spot that became available that I became aware
16   of and I contacted the chairman directly and had an
17   interview and was offered a position there and my
18   boyfriend at the time was there, so that was where I
19   wanted to be.
20   Q.  What city were you in at St. Joseph's?
21       Is that still Syracuse?
22   A.  Syracuse.
23   Q.  Okay.  So you stayed in Syracuse?
24   A.  Yes, for three years.
25   Q.  Got it.  Is that how you decided on

Page 87

1    St. Joseph's, was you wanted to remain in Syracuse?
2    A.  I wasn't in Syracuse.  I was in East Meadow
3    for OB-GYN.
4    Q.  Fair.  I'm sorry.  I jumped a whole
5    position.
6        Okay.  What was the reason -- was one of the
7    reasons to select St. Joseph's that you wanted to
8    return to Syracuse?
9    A.  Not return.  I'd never been to Syracuse
10   before.
11   Q.  Okay.  I misunderstood.  I guess I
12   misunderstood where Stony Brook is.
13       Where is that?
14   A.  Eastern Long Island.
15   Q.  Ah, okay.  All right.  Got it.
16       Okay.  Why did you want to do your residency
17   in Syracuse?
18   A.  I had -- my boyfriend at the time was there,
19   my best friend was there.  I liked Syracuse, and I
20   didn't know any better.
21   Q.  Do you still like it?
22   A.  Can't stand it.
23   Q.  How long did you stay in Syracuse?
24   A.  Three long years.
25   Q.  Okay.  Just during residency?

Page 88

1    A.  Yes.
2    Q.  Okay.  Who was the department chair that you
3    contacted when you wanted to start in anesthesia at
4    St. Joseph's?
5    A.  Dr. Tony Ascioti, A-s-c-i-o-t-i.
6    Q.  And did you train under Tony Ascioti?
7    A.  Yes.
8    Q.  Okay.  Do you still keep -- did you keep in
9    contact with Tony Ascioti after residency?
10   A.  Yes.
11   Q.  For how long?
12   A.  Many years.
13   Q.  Was Dr. Ascioti a mentor to you?
14   A.  Yes.
15   Q.  In the field of anesthesia?
16   A.  Yes.
17   Q.  Was your residency training focused on
18   administering anesthesia in a hospital setting?
19   A.  "Focused"?  I mean, that was a very large
20   component of it, yes.
21   Q.  When you say "very large," was it
22   90 percent, or something?
23   A.  You know, we had rotations through the
24   outpatient surgery clinic as well, the outpatient
25   surgery center, so primarily hospital-based, but

Page 89

```
 1    also outpatient surgery center.
 2       Q.  I see.  That makes sense.  Okay.
 3          So was your training generally focused on
 4    administering anesthesia either during surgery or
 5    just postsurgery?  Is that fair?
 6       A.  Fair.
 7       Q.  Okay.  Would it also be fair to say that if
 8    you administered opioids during your residency
 9    training, that that was also in an acute setting?
10          MS. COATES:  Objection to form.
11       A.  Well, no, not necessarily.  There was
12    also -- they had a pain clinic, so I spent time
13    rotating through the pain clinic as well.  I don't
14    remember at what point in my anesthesia training I
15    first started rotating through the pain clinic, but
16    it was a big part of that practice.
17          So the practice that I was a resident for
18    was a large anesthesia group that had a critical
19    care component and a large chronic pain component.
20    That was one of the reasons I was interested in
21    joining them.
22       Q.  I see.  Okay.  And when you say "the pain
23    clinic," what was the pain clinic called?
24       A.  I don't remember.  I think it might have
25    been called "The Pain Center," but I'm not sure.
```

Page 90

```
 1       Q.  Affiliated with St. Joseph's?
 2       A.  Yes, affiliated with the anesthesia group.
 3       Q.  What was the name of the anesthesia group
 4    that you were a resident in?
 5       A.  I don't remember.  I don't remember.
 6       Q.  Was Dr. Ascioti heading that group?
 7       A.  Dr. Ascioti was the chair of the department,
 8    and the head of the group, I think, was an internal
 9    thing that would change.  And the head of the pain
10    team, the head of the pain department or the pain
11    center was Dr. Robert Tiso, T-i-s-o, and Dr. Joseph
12    Catania, C-a-t-a-n-i-a.
13       Q.  I'm sorry.  Give me the first name you gave
14    me that was the head of the pain group.
15       A.  Robert -- Robert Tiso and Joseph Catania.
16       Q.  So did the head of the pain group change
17    from Dr. Tiso to Dr. Catania at some point when you
18    were in residency?  Is that --
19       A.  No, it was the two of them.
20       Q.  Okay.  So they co-led the pain group that
21    you were --
22       A.  Perhaps.  The internal dynamics were not my
23    business.
24       Q.  Okay.  Did you work directly with Dr. Tiso
25    and Dr. Catania?
```

Page 91

```
 1       A.  Yes.
 2       Q.  Is -- were they essentially teaching you
 3    with respect to pain management?
 4       A.  Yes.
 5       Q.  Was there anyone else that you would say did
 6    regular teaching of you during residency with
 7    respect to pain management?
 8       A.  I mean, all of them, to some extent or
 9    another, yes.
10       Q.  How many physicians were in that group,
11    roughly?
12       A.  I -- more than 15 and less than 20.
13       Q.  What were you taught in residency about the
14    appropriate use of opioids for chronic pain?
15       A.  Can you be more specific?
16       Q.  Did you get taught anything in residency
17    about when it was appropriate to use opioids for
18    chronic pain?
19       A.  Yes.
20       Q.  What was that teaching?
21       A.  That's really kind of difficult to
22    generalize, but I was taught a lot about opioids.
23    The focus of the training, however, was on
24    nonopioids and other ways to manage pain and
25    interventional techniques and the spinal cord
```

Page 92

```
 1    stimulator implants, the various epidurals, how to
 2    use a C-arm.  It's a lot to learn in a short period
 3    of time.
 4       Q.  Were you taught about the safety or efficacy
 5    for using prescription opioids for longer than three
 6    months?
 7          MS. COATES:  Objection; form.
 8       A.  I don't recall being instructed on any
 9    length of time.  We were generally taught that
10    opioids were not first-line therapy.  Having said
11    that, I do recall using a lot of opioids.  I
12    remember some very, very sick and very sad cases of
13    some very complex pain syndromes.
14       Q.  Do you remember who was your primary teacher
15    about the safety or efficacy of using opioids for
16    chronic pain conditions?
17       A.  That would be Dr. --
18          MS. COATES:  Objection to form.
19       A.  -- Dr. Tiso and Dr. Catania.
20       Q.  Okay.  Let's look at Exhibit 3.
21          If we could, we're going to try to briefly
22    go through your work history.  I know this is a
23    little bit tedious, but I just need to get an idea
24    of, sort of, what you were doing at different
25    positions.  And we're going to try to go through it
```

Page 93

```
 1    as quickly as we can.
 2         You have a number of positions on here, but
 3    I think we can do it efficiently.
 4         Let's actually start post medical school.
 5    Does that -- that's probably an okay way to do this,
 6    I think.
 7         What was your first job out of residency?
 8    A.  That would be on the bottom of the second
 9    page:  Anesthesiologist for the North Broward
10    Hospital District, APA/Anesco from 1995 to 2000.
11    Q.  Okay.  And were you salaried at that
12    position?
13    A.  Yes.
14    Q.  Do you know roughly how much you made?
15    A.  $90,000 a year to start, and then I think
16    one twenty.
17    Q.  When did it shift to one twenty?
18    A.  When -- when -- when they technically
19    switched me from a part-time to a full-time
20    position, which was technically, actually, the same
21    number of hours.
22    Q.  Always is.
23    A.  But it became -- it just became a more
24    secure position at that time.
25    Q.  So did you start as a part-time
```

Page 94

```
 1    anesthesiologist?
 2    A.  When I was offered the contract, it was as a
 3    part-time anesthesiologist, which meant working,
 4    like, two weekends a month and five days a week and
 5    until all the cases were done.  It was -- it was an
 6    amusing time, but at that time, in 1995, jobs in
 7    anesthesia were really scarce and really hard to
 8    come by.  So I felt lucky to have a position, and I
 9    felt confident that starting there, they would, in
10    short time, offer me a full-time partnership tract,
11    which is what I wanted.
12    Q.  Okay.  Why were jobs scarce in anesthesia at
13    that time?
14    A.  It was supply and demand.  There were a lot
15    of -- a lot of anesthesiologists around.  There were
16    a lot of anesthesia training programs, and
17    anesthesia had been the hot job, I think, for a
18    while.  And shortly after that time, many residency
19    programs closed, resident -- residency training
20    programs in anesthesiology closed.
21    Q.  Did a lot of anesthesiologists eventually go
22    into pain managements?  Is that fairly common, in
23    your experience?
24    A.  It's not uncommon.
25    Q.  And in that first job, you were working in
```

Page 95

```
 1    the hospital setting at North Broward; is that
 2    right?
 3    A.  Yes.
 4    Q.  Were you giving -- mainly giving anesthesia
 5    for surgeries in that job?
 6    A.  Mainly.  I was also filling in for their
 7    pain physician who was the chairman of the
 8    anesthesia group at the time.  His name was John
 9    Zelisko, Z-e-l-i-s-k-o.  And so I would basically be
10    his backup pain doctor.
11    Q.  Okay.  Was there only one pain physician at
12    North Broward at that time, Dr. Zelisko?
13    A.  He was the only pain physician in the
14    anesthesia group.  There was another pain physician
15    that was not part of the anesthesia group.
16    Q.  Okay.  How much of your time during that
17    first job were you spending filling in for
18    Dr. Zelisko versus giving anesthesia for surgeries?
19    A.  Only occasionally.
20    Q.  When you say "occasionally," would that be,
21    like, once a month, or something?
22    A.  I would say it would be several times a
23    month, but only in short increments.
24    Q.  Okay.  Were you treating patients only in
25    the hospital during that job, or were you treating
```

Page 96

```
 1    patients on an outpatient basis?
 2    A.  Both.  We had an outpatient pain clinic that
 3    was run by the hospital but staffed by our
 4    anesthesia group, predominantly Dr. Zelisko.
 5    Q.  Okay.  And the outpatient pain clinic was
 6    affiliated with North Broward?
 7    A.  Yes.
 8    Q.  Okay.  And when you talked about
 9    occasionally filling in for Dr. Zelisko, was that in
10    the outpatient pain clinic?
11    A.  Yes.
12    Q.  Okay.  In this position, your first job as
13    an anesthesiologist at North Broward, who did you
14    work under?  Like, was there a chair of the
15    department of anesthesia or pain management or
16    something like that?
17    A.  That would be Dr. Zelisko.
18    Q.  Did -- was there a different chair for
19    anesthesia versus pain management?
20    A.  No.
21    Q.  So Dr. Zelisko was the chair of anesthesia?
22    A.  That's what I recall, yes.
23    Q.  Did Dr. Zelisko give you any additional
24    training on the appropriate use of opioids for
25    chronic pain?
```

Page 97

1     A.  No.
2     Q.  During this position at North Broward, did
3  you have any interaction with pharmaceutical sales
4  representatives?
5        MS. COATES:  Objection; form.
6     A.  I don't recall.
7     Q.  Possible, you just don't remember?
8     A.  Yeah, possible, but I think it would have
9  been -- would have been along the lines of
10  inhalational anesthetic agents and -- I don't -- I
11  don't recall.
12     Q.  That's what I was going to ask you.
13        Do you recall having any interactions with
14  pharmaceutical sales representatives regarding
15  prescription opioids?
16     A.  Not that I recall.
17     Q.  Okay.  Your CV lists that in 1997 you also
18  took a teaching position; is that correct?
19        It looks like clinical instructor,
20  department of surgery, at Nova Southeastern
21  University?
22     A.  Yes, but that wasn't at Nova.  That was
23  still at the hospital where I would instruct their
24  students.
25     Q.  Okay.  I'm just -- okay.

Page 98

1     Tell me what you did in the position of
2  clinical instructor in the department of surgery for
3  Nova Southeastern.
4     A.  The Nova medical students would come and
5  rotate through our department.
6     Q.  Understood.
7        How many medical students did you, kind of,
8  have at any given time rotating with your
9  department?
10     A.  Only one at a time, and only a handful in
11  total.
12     Q.  Did you instruct those students that rotated
13  through your department on the appropriate use of
14  opioids for chronic pain?
15        MS. COATES:  Objection; form.
16     A.  My recollection is they were rotating
17  through to learn anesthesia and the mechanics of
18  anesthesia.
19     Q.  So your teaching was more on the anesthesia
20  front rather than pain management?
21     A.  Right, and specifically for airway
22  management.
23     Q.  I notice -- I think I noticed on your CV
24  that there appears to be a gap from the year 2000 to
25  the year 2002 where I didn't see any work history

Page 99

1  located, but it might just be a mistake.
2        During that time period, were you employed?
3     A.  Yeah.  And you're right.  I think I left it
4  off.
5     Q.  So where were you -- it looks like you
6  worked at North Broward until 2000.
7        Where did you go in the year 2000?
8     A.  So -- yeah, I left that off.  It was a
9  sub- -- subconscious omission.
10     Q.  Okay.
11     A.  I was offered a job in a nearby town, in
12  Delray Beach, to work for a physician by the name of
13  Dr. Scott Berger, B-e-r-g-e-r.  And he hired me to
14  do both pain and anesthesia.
15     Q.  Okay.
16     A.  I think it is there.  Wait.  I can't even
17  remember the name of the surgery center now.  It was
18  Delray Outpatient Surgery and Laser Center, and it
19  was Boca Eye Associates.
20     Q.  And do you see that on your CV, or are you
21  reading from --
22     A.  I don't.  I don't see it.
23     Q.  Why did you leave North Broward in 2000?
24     A.  North Broward had been -- the group that I
25  worked for, APA, Anesthesia Professional Associates,

Page 100

1  was taken over by a group called Anesco, and the new
2  management was -- just had a different style, and I
3  wasn't happy working with the new management.  That
4  was six months.
5        And I met this other physician and an
6  opportunity to do what I really wanted to do, which
7  was really have a more full-time pain practice.
8     Q.  What was it about the new management style
9  that you didn't like?
10     A.  Specifically, they had promised to provide
11  me with more support staff around my pain practice
12  and to really help make that more substantial, and
13  they failed to do so.
14     Q.  Why did you want to get more into the pain
15  management field in 2000?
16     A.  I really enjoyed the outpatient chronic pain
17  management more than I enjoyed the inpatient
18  anesthesia.
19     Q.  Was any part of your decision to shift your
20  focus into pain management financial?
21        MS. COATES:  Objection to form.
22     A.  No, but it was in lifestyle.  So in
23  anesthesia -- I had a little girl and I was working
24  nights and weekends, and I could never get off for
25  dinner.  And the whole reason to leave OB-GYN to go

Page 101

1    into anesthesia was to have a more manageable
2    lifestyle sort of hit me flat in the face doing
3    trauma anesthesia.
4        Q.  Understood.
5        A.  So at that new job with Dr. Berger, it was
6    outpatient anesthesia, clinic, outpatient
7    anesthesia, outpatient surgery center.  So
8    outpatient meant whenever the surgeries were done, I
9    can go home, which turned out it wasn't as early as
10   you might think in some cases, and I got -- had the
11   opportunity to start a pain center mirroring his
12   pain practice at the Delray Outpatient Surgery and
13   Laser Center.  I was beginning at a pain center at
14   the Boca Eye Associates.
15       Q.  Are you saying "eye associates"?
16       A.  Eye, e-y-e, yes.  Yes.
17       Q.  In the practice with Dr. Berger, the
18   outpatient surgery practice, were you generally
19   administering anesthesia for outpatient surgeries?
20       A.  Yes.
21       Q.  Okay.  Was that the vast majority of your
22   time when you were working there?
23       A.  No.  The vast majority of my time was
24   building a pain practice at the second surgery
25   center that he had just gotten the contract at to

Page 102

1    provide anesthesia and pain services at.
2        So that was called Boca Eye Associates.
3    They had an outpatient surgery center where they did
4    all the eye surgery, and I did a pain -- I opened --
5    I started a pain practice there.
6        Q.  Was that pain practice specifically focused
7    on post eye surgery patients or all parents with
8    pain?
9        A.  Not at all.  It was all --
10       MS. COATES:  Objection to form.
11       A.  It was on all patients in pain.
12       Q.  Okay.  And you -- how much of your time in
13   the time period wherever you worked with Dr. Berger,
14   from 2000 to 2002, was spent on working with pain
15   management patients versus administering anesthesia
16   for surgery?
17       A.  I'd say it was about 50-50.
18       Q.  How did you come to work with Dr. Berger?
19       A.  He contacted me to see if I would be
20   interested in working for him.
21       Q.  Had you known him before?
22       A.  No.
23       Q.  What did he tell you about the position when
24   he contacted you?
25       A.  Great hours, better lifestyle, opportunities

Page 103

1    to start your own pain practice.
2        Q.  Was it fair to say that Dr. Berger was
3    envisioning expanding his practice to having a pain
4    management practice and he wanted you to come work
5    in that practice?
6        A.  No.  He already had a very busy pain
7    practice.
8        Q.  Okay.  Understood.  Now, I'm understanding,
9    at least.
10       Is it fair to say that Dr. Berger had a busy
11   pain practice and needed another physician to work
12   part in that pain practice and part in the surgery
13   center?
14       MS. COATES:  Objection to form; calls for
15   speculation.
16       A.  No.  He actually needed an anesthesiologist
17   to help staff his surgery center, and his vision was
18   to open a second location to do the same, both
19   anesthesia and pain.
20       Q.  And did you primarily work in that second
21   location?
22       A.  No.  I worked in both.
23       Q.  How much of your time was split between the
24   two locations?
25       A.  It's hard to remember.  I'd say about 50-50.

Page 104

1        Q.  Okay.  During the time that you worked for
2    Dr. Berger, did you have any interaction with
3    pharmaceutical sales representatives for
4    prescription opioids?
5        A.  Yes.
6        Q.  Okay.  Which companies?
7        A.  I don't remember.
8        Q.  Did you have interactions with Purdue Pharma
9    sales representatives?
10       A.  I don't remember.
11       Q.  Okay.  Did you have interactions with Endo
12   sales representatives?
13       A.  I don't remember any of the representatives
14   or companies or products specifically.
15       Q.  Okay.  Were all of those interactions in
16   your office?
17       A.  Yes.
18       Q.  Were any of those interactions going to
19   lunches or dinners or anything outside the office?
20       A.  So I take that back.  All of my
21   interactions, I'm certain at some point I went to
22   some pharmaceutical dinners during that period of
23   time, but I don't recall specifically.
24       Q.  When you went to some pharmaceutical dinners
25   were those pharmaceutical companies that were

Page 105

1  selling prescription opioids?
2      A.  Probably, but I don't recall specifically
3  when I went to dinner programs, which dinner
4  programs I went to, when they came to the office,
5  when they brought us lunch.  I don't recall any of
6  the details.
7      Q.  Fair enough.  It was a long time ago.  I'm
8  just trying to get a sense of the general activities
9  that the pharmaceutical sales reps were doing with
10  the doctors like yourself.
11      So let's just talk in general, if you don't
12  remember the specifics.
13      A.  Okay.
14      Q.  In general, one of the things -- one of your
15  interactions with pharmaceutical sales
16  representatives for prescription opioids would be
17  going to dinners; is that fair?
18      A.  Yes.
19      MS. COATES:  Objection; asked and answered.
20      Q.  Do you know how often that would occur on
21  maybe a monthly basis?
22      MS. COATES:  Objection; calls for
23  speculation.
24      A.  I don't think I would go to a program
25  monthly.  I think I would go every once in a while,

Page 106

1  every couple or few months.
2      Q.  Was this a -- what were the programs that
3  were being offered at these dinners?
4      I'm just trying to get a sense of what was
5  happening.  Were you going to dinner with one
6  person, or was there a speaker -- speaker program,
7  or what was the program that you're mentioning?
8      A.  When I would call --
9      MS. COATES:  Objection.
10      A.  -- programs, as I mentioned, they would be a
11  format of a lecture presentation, a PowerPoint
12  presentation given by a physician representing the
13  product and the company for a group of attendees
14  that were primarily physicians or healthcare
15  providers.
16      Q.  And those were on the subject of opioid
17  medications at times?
18      A.  At times.
19      Q.  Okay.  And who provided the dinner?
20      A.  Who paid for the dinner?
21      Q.  Right.
22      A.  I would imagine that the pharmaceutical
23  companies, but I don't recall specifically what
24  programs I may have gone to in what years.
25      Q.  Do you remember any of the drugs that were

Page 107

1  being talked about at those programs?
2      A.  Back in 2000, 2002?  I really don't recall.
3      Q.  Since 2000 to present, have you gone to
4  similar dinners?
5      A.  Yes.
6      Q.  How regularly over that time period have you
7  gone to those type of dinners?
8      A.  Infrequently, but as my schedule permits and
9  family and children and other commitments.  So I'd
10  say every once in a while I'd go to a dinner
11  program, probably not more than two or three a year.
12      Q.  Has the two or three a year been consistent
13  over the time period from 2000 to 2018?
14      A.  No, I think I used to go to more.
15      Q.  What time period were you -- were you going
16  to a little more than that?
17      A.  I really don't remember.
18      Q.  Would you say the early 2000s?
19      A.  Yeah.
20      Q.  You mentioned one of the other interactions
21  with pharmaceutical sales representatives was that
22  they might bring food or something into the office.
23      A.  Yes.
24      Q.  Okay.  And was that happening during the
25  2000 to 2002 time frame?

Page 108

1      A.  Yes.
2      Q.  Was that also happening from the 2000 to
3  present time frame?
4      A.  Yes.
5      Q.  Okay.  How often was that happening?
6      A.  It's hard for me to sort it out because we
7  would get lunches and visits from not only
8  pharmaceutical reps of opioid and nonopioid products
9  but also equipment reps and device reps.
10      So anesthesia, there are anesthesia-related
11  activities, and specifically the ones I would have
12  significant recall on would be the device
13  companies -- so Medtronics, St. Jude -- companies
14  that I would want to learn more of the nuances.  And
15  they would come out with new batteries and new sizes
16  and new anchors and things that were really very
17  relevant to how I practice medicine.
18      Q.  And one of the groups that would come and
19  present and bring lunch were pharmaceutical sales
20  reps that represented companies that sold
21  prescription opioids?
22      MS. COATES:  Objection; asked and answered.
23      A.  Well, specifically back in that period of
24  time, 2000 to 2002, I think -- but I'm not sure --
25  that we would not have gotten any lunch or

Page 109

1    presentations from opioid manufacturers because
2    Dr. Berger did not prescribe opioids.  So I don't
3    think that that was part of our practice.
4        Q.   Why did Dr. Berger not prescribe opioids?
5        A.   That was his practice.
6        Q.   Do you know why?
7            MS. COATES:  Objection; calls for
8    speculation.
9        A.   Yeah, I don't know why.
10       Q.   You never talked about that with him?
11       A.   He -- it was just something that he didn't
12   do.
13       Q.   Did he ever tell you why?
14       A.   This wasn't the way he saw the practice.
15   This was an interventional pain practice.
16       Q.   What do you mean by "interventional pain
17   practice"?
18       A.   Epidurals, nerve blocks, spinal cord
19   stimulators.
20       Q.   Was that your practice while you were
21   working with Dr. Berger as well, not to prescribe
22   opioids?
23       A.   I think so, yes.
24       Q.   Did you and Dr. Berger ever discuss that as
25   that would be the practice of the clinics that you

Page 110

1    were running?
2        A.   I don't recall the conversation
3    specifically, and this is a long time ago, but that
4    was the practice.
5        Q.   And did you follow that practice during the
6    2000 to 2002 time frame?
7        A.   At the time, yes.
8        Q.   Do you recall, during the 2000 to 2002 time
9    frame, whether you ever met with any sales
10   representatives from Purdue?
11       A.   I don't recall.  Again, I don't think they
12   would have come into -- I don't think they would
13   have been allowed to come into the clinic.  I don't
14   think that that was Dr. Berger's practice.  I may
15   have gone to dinner programs, but I don't recall
16   back in 2000, 2002.
17       Q.   Okay.
18       A.   I can speak freely and easily later after
19   that time, when I opened my own private practice in
20   2002.
21       Q.   I think we'll talk about that next, just to
22   take it in increments.
23       A.   Okay.
24       Q.   I'm just trying to figure out the certain
25   time periods.

Page 111

1        Do you recall during that time period any
2    other specific manufacturers of opioids coming in
3    and bringing lunches?
4        A.   I do not.
5        Q.   Okay.  And probably because it was
6    Dr. Berger's practice not to interact with those
7    folks; is that accurate?
8        A.   That would be true.
9        Q.   Okay.  Did Dr. Berger have a policy not to
10   interact with pharmaceutical sales reps who sold
11   prescription opioids?
12           MS. COATES:  Objection.
13       A.   No, I don't believe so.
14       Q.   Did he ever tell you that you should not do
15   that as well?
16       A.   No.
17       Q.   Other than lunchtime presentations and the
18   dinners we talked about, during the 2000 to 2002
19   time frame, did you ever interact with
20   pharmaceutical sales representatives selling
21   prescription opioids in other situations?
22           MS. COATES:  Objection; form.
23       A.   Not that I recall.
24       Q.   Okay.  Let's talk about 2002.  Okay?
25       Did you leave Dr. Berger's practice?

Page 112

1        A.   Yes.
2        Q.   Why?
3        A.   We -- I didn't feel that I was being treated
4    fairly as a partner.
5        Q.   In what way?
6        A.   I just -- he -- I wanted to become a partner
7    in the practice in which I worked, and he -- that
8    wasn't available.  He wasn't offering that.
9        Q.   Did -- do you mean an equity partner?
10       A.   Yes.
11       Q.   And so -- I was going to ask that question a
12   minute ago.
13       You were not an equity partner with
14   Dr. Berger; is that --
15       A.   I was not.
16       Q.   Okay.  Were you being paid a salary?
17       A.   I was being paid a salary.
18       Q.   What were you being paid?
19       A.   $120,000 a year.
20       Q.   Okay.  Do you have any idea, during that
21   time period, what Dr. Berger was being paid?
22       A.   I don't -- well, he wasn't being paid, he
23   was making.  So he owned -- he owned a portion of
24   the surgery center, he owned the practice.
25       Q.   Did he have other partners?

1      A.  I believe he had never had a partner.  He
2  did have another physician with him that joined him
3  when I left.
4      Q.  Okay.
5      A.  No, no, that -- he had another physician
6  that left him when I joined.
7      Q.  Did you have any -- did you have a good
8  relationship with Dr. Berger?
9      A.  We had a fair relationship.  He wasn't happy
10  when I left.  I think he was irritated when I left.
11      Q.  Did you have any continuing involvement with
12  Dr. Berger after you left?
13      A.  No.
14      Q.  Did you leave on good terms?
15      A.  Yeah, I'd say so.
16      Q.  I take it you weren't terminated?
17      A.  No.
18      Q.  I have to ask.
19      Okay.  So that was in 2002 you left to start
20  Pain Management Strategies; is that right?
21      A.  Yes.
22      Q.  Okay.  What is Pain Management Strategies?
23      A.  Pain Management Strategies is my -- my
24  practice.
25      Q.  Okay.  And that has been your practice since

1  2002?
2      A.  Yes.
3      Q.  Okay.  And where, in 2002, was Pain
4  Management Strategies located?
5      A.  On 1 W Sample Road in a suite number I don't
6  recall, upstairs where I subleased space two half
7  days a week from Dr. Samuels.
8      Q.  Was Pain Management Strategies, Inc.,
9  located there until recently?
10      A.  Pain Management Strategies, Inc., relocated
11  in the same building a couple of times.  So when I
12  first started in 2002, I was subleasing space from
13  Dr. Jeff Samuels two half days a week.  And then,
14  when space became available in that building, I took
15  on Suite 104, so 1 W Sample Road, Suite 104.  And I
16  was in that space for many years.  I expanded to the
17  space next door, to 106.  And then the ownership of
18  the building changed and then my 104 lease was not
19  renewed in October of 2018, so I moved all of my
20  office into 106, which was too small for my entire
21  practice and it was a temporary measure and then I
22  moved into my new space on Hillsborough Boulevard
23  April 1st of this year.
24      Q.  Of this year?
25      A.  Yes.

1      Q.  Okay.  That's what I was going to ask.
2      So generally, you were located at the
3  1 Sample Road address, different suites, from 2002
4  to this year, 2019?
5      A.  Yes.
6      Q.  And your space on Hillsborough Boulevard, is
7  that a larger space?
8      A.  Yes.
9      Q.  Okay.  Why did you move to that space,
10  because it was larger?
11      A.  Because they had terminated my 104 lease so
12  I couldn't possibly survive my practice in
13  900 square feet that was 106.
14      Q.  Did you need a bigger space?
15      A.  I needed more space than 106.  I was fine in
16  the 104 and 106 combined.
17      Q.  Okay.  What does Pain -- what has Pain
18  Management Strategies -- what do they generally do?
19  What does that practice do?
20      A.  Interventional pain management and
21  medication management primarily.
22      Q.  What do you mean by "interventional pain
23  management"?
24      A.  Anything that basically involves a needle or
25  cutting, so epidurals, nerve blocks, trigger point

1  injections, facet joint injections, transforaminals,
2  occipital nerve blocks, peripheral nerve blocks,
3  carpal tunnel syndrome, joint injections:  Hips,
4  shoulders, knees.
5      Q.  What do you mean by "medication pain
6  management"?
7      A.  Medication management is any medication that
8  I prescribe to help with somebody's pain, so both
9  opioid and -- opioid and nonopioid pain medications.
10      Q.  And has Pain Management Strategies always
11  performed both interventional pain management and
12  medication pain management?
13      A.  Yes.
14      Q.  What portion of Pain Management Strategies'
15  pain management work is interventional versus
16  medication?
17      A.  I don't know how to decipher that number
18  because the majority of patients have both.
19      Q.  When you say "the majority," is it the vast
20  majority?
21      A.  I don't know --
22      MS. COATES:  Objection to form.
23      A.  I don't know what "vast" means or even what
24  "majority" means, but a significant number of
25  patients have -- are appropriate for both

Page 117

1    interventional and noninterventional pain management
2    techniques.
3        Q.   What is your -- what was your role when you
4    started Pain Management Strategies, at Pain
5    Management Strategies?
6        A.   I own the company.  I'm a physician, medical
7    director.
8        Q.   Do you have any other physicians that have
9    worked with you since starting Pain Management
10   Strategies?
11       A.   Yes.
12       Q.   Who?
13       A.   Dr. Paul Roa, I hired in, I think, 2016.
14       Q.   Any other physicians that have worked at
15   Pain Management Strategies?
16       A.   No.
17       Q.   Any other medical professionals such as a
18   nurse practitioner or someone else in the medical
19   profession?
20       A.   Yes.  I currently have two full-time nurse
21   practitioners.  I have had other nurse practitioners
22   and physician assistants in the past.
23       Q.   What was -- since 2002 to present, what was
24   the greatest number of either physician's assistants
25   or nurse practitioners that you had working in any

Page 118

1    given year at Pain Management Strategies?
2        MS. COATES:  Objection; form.
3        A.   Generally, one, one at a time.  So I've
4    had -- you know, I've had one PA.  When they would
5    leave, I would replace them.  When I had that
6    physician, I had one nurse practitioner.  When that
7    physician left, I hired a second nurse practitioner.
8    So I currently have two nurse practitioners, which
9    is the most I've ever had at one time.
10       Q.   Are all of those professionals, nurse
11   practitioners and physician's assistants, able to
12   write prescriptions?
13       A.   No.
14       MS. COATES:  Objection.
15       Q.   Are any of those able to write
16   prescriptions?
17       A.   Yes.
18       Q.   Who?
19       A.   The nurse -- in the state of Florida, nurse
20   practitioners recently became able to prescribe
21   controlled substances.  One of my nurse
22   practitioners has her own DEA license, the other
23   does not.
24       Q.   Can you give me a sense -- I don't want to
25   belabor this too much.  I just want to get a sense

Page 119

1    how large your patient population has been from 2002
2    to present.  Can you give me the evolution of
3    generally how large it has been at Pain Management
4    Strategies?
5        MS. COATES:  Objection; form.
6        A.   Back in 2002 when I started, I did both and
7    I still do both inpatient and outpatient pain
8    management.  So my inpatient census, I would
9    consider separate from my office practice.
10       So in my office in 2002 when I started, I
11   remember, you know, four or five patients in the
12   office would be a busy day, but that was, I think,
13   expected in a brand-new practice.  And I currently,
14   in my office, see probably about 30 patients a day
15   and, in total, maybe more than that.  In addition,
16   probably another 10 to 15 procedures a day in my
17   office.
18       Q.   What kind of procedures are you doing in the
19   office?
20       A.   Epidurals, nerve blocks, trial spinal cord
21   stimulators, peripheral nerve blocks, joint
22   injections, facet nerve injections, facet
23   radiofrequency ablations, occipital nerve blocks,
24   carpal tunnel injections, hips, joints.
25       Q.   How long has it been true that your practice

Page 120

1    is kind of the 30-patient-a-day range rather than
2    the four or five a day when you first started?
3        A.   For a significant number of years.
4        Q.   Would it be fair to say that it took you a
5    couple of years to ramp up to a number of patients
6    but that 30 or so a day has been common since, let's
7    say, 2004 or '5-ish?
8        MS. COATES:  Objection to form.
9        A.   Yes.
10       Q.   And I'm just trying to get a sense of it.
11   Since about 2004 or '5, were you still doing 10 to
12   15 procedures, roughly, a day in that time frame to
13   present?
14       A.   Probably less, but, you know, it's been --
15   back -- back initially, I didn't have a C-arm in my
16   office.  And a C-arm is a -- is basically x-ray
17   equipment, continuous x-ray equipment called a C-arm
18   or fluoroscopy.
19       So before having that in my office, I would
20   schedule one day a week in the hospital to do my
21   procedures in the endoscopy suite.
22       Q.   You mentioned that some of your practice for
23   Pain Management Strategies was in the hospital.  Is
24   that what's listed here as Broward Health North
25   Hospital?

Page 121

1    A.  Yes.
2    Q.  Okay.  Can you just tell me which -- you
3  know, since you started in 2002, how much of your
4  time is spent at the hospital setting versus how
5  much of your time is spent in the clinic?
6    A.  So back in 2002, more of my time was spent
7  in the hospital because I didn't have that many
8  patients in the office.
9    Q.  Okay.
10    A.  But the office, understand, is on the
11  premises of the hospital.  So it's very easy to go
12  back and forth and very difficult for me to answer
13  your question for that reason.
14    Q.  I understand.
15      Okay.  So the clinic is located near or on
16  the premises at Broward Health North?
17    A.  Yes.
18    Q.  Okay.  Has that always been true until this
19  most recent move in 2019?
20    A.  Yes.
21    Q.  The most recent move in 2019, is that at or
22  on the premises of the hospital?
23    A.  No.
24    Q.  Okay.  I'm just trying to get a sense of the
25  practice at Pain Management Strategies.

Page 122

1      How much of that practice is treating
2  chronic pain patients versus treating acute pain
3  patients?
4    A.  So at the practice, it's predominantly
5  chronic pain.  But understand, at the same time, I
6  have a large inpatient practice where I have a -- I
7  get consulted to see pain patients in the hospital.
8    Q.  So can you help me understand how much of
9  your time is spent seeing patients in the hospital,
10  as you've just described that you consult on, versus
11  the chronic pain patients that you see in the
12  clinic?
13    A.  Yes.  Quite specifically, I start my day at
14  6:00 a.m. at the hospitals.  Actually, there's three
15  hospitals.  And then, usually by 9:00 or 9:30, I'm
16  in my office, and I work until about 3:00.
17    Q.  In your -- in clinic practice, what rough
18  percentage of your patient population are chronic
19  pain patients?
20    A.  I'd say more than 90, 95 percent.
21    Q.  Okay.  And of those chronic pain patients,
22  how many of those are on opioid medications?
23    A.  I'd -- if I had to guess, I'd say about
24  half.
25    Q.  Has that always been the case from 2002 to

Page 123

1  present?
2    A.  Yeah.
3    Q.  Okay.  It was not the case, then, that in
4  2002, let's say, to 2007 or '8, that you had -- more
5  than 50 percent on prescription opioids?
6    A.  No.
7    Q.  So your practice with respect to prescribing
8  prescription opioids to your chronic pain population
9  has not changed since 2002 to present?
10    A.  No, not really.
11    Q.  Did you ever see any need to change your
12  practice from -- regarding prescribing opioid
13  medications to chronic pain patients from the time
14  period 2002 to present?
15    A.  Not really.
16    Q.  Are you -- have you always been the sole
17  owner of Pain Management Strategies?
18    A.  Yes.
19    Q.  Do you have any investors?
20    A.  No.
21    Q.  Has anyone outside of yourself contributed
22  to paying for any of the expenses at Pain Management
23  Strategies?
24    A.  No.
25    Q.  When you had your office moved to the new

Page 124

1  location, did anyone else contribute to either the
2  purchase or the renting of that space?
3    A.  No.
4    Q.  I'll just go to -- oh, I know what I needed
5  to ask you.
6      So during the time that you were at Pain
7  Management Strategies, we're talking now from 2002
8  to the present, I do want to talk about the
9  interaction with the pharmaceutical sales
10  representatives.  I think you mentioned earlier that
11  that was the time period where you would have had
12  interaction with pharmaceutical representatives?
13    A.  Yes.
14    Q.  Okay.  Let's talk about -- so during that
15  time period did you have interaction with
16  pharmaceutical sales representatives who were
17  selling opioid medications?
18    A.  Yes.
19    Q.  Okay.  What companies do you remember?
20    A.  Offhand, the ones that are listed on my CV
21  and I'm certain many others but I don't have
22  specific recollection of the interactions.
23    Q.  When you say the ones that are listed on
24  your CV, where are we talking about?
25    A.  The -- under the -- where I was a speaker.

Page 125

1    Q.   Okay.
2    A.   So Depomed, Daiichi, BioDelivery Sciences,
3    US WorldMeds, Collegium, Pfizer, Alpharma.
4    Q.   What were the types of interactions you had
5    with those companies that are listed on your CV
6    while you were working at Pain Management
7    Strategies?
8    A.   So these companies listed on my CV I was
9    part of their speaker program.
10    Q.   Okay.  Other than being part of a speaker
11    program, which we'll talk about a little later, did
12    you have other interactions with pharmaceutical
13    sales representatives?
14        MS. COATES:  Objection; form.
15    A.   Well, certainly the companies that I was a
16    speaker for, I would have had interactions with them
17    in my office.
18    Q.   Okay.  My question was a little different.
19    Outside of the ones we just mentioned that are on
20    this speaker series, did you have interactions with
21    other representatives, sales representatives, from
22    pharmaceutical companies that were selling
23    prescription opioids?
24    A.   Yes.
25    Q.   Okay.  Which companies?

Page 126

1    A.   I don't remember.
2    Q.   Do you remember interacting with any sales
3    representatives in the time period 2002 to present
4    from Purdue?
5    A.   Yes.
6    Q.   Okay.  How often?
7    A.   A handful of times.
8    Q.   Always in your office?
9    A.   More recently, I think, I went to a dinner
10    program for Butrans patch.  I don't remember going
11    to any dinner programs back in the early 2000s.
12    Mostly my practice.
13    Q.   Do you remember interacting with any sales
14    representatives from Purdue about OxyContin?
15    A.   Yes.
16    Q.   In what time period?
17    A.   In the early 2000s.
18    Q.   In your office?
19    A.   Yes.
20    Q.   Always?
21    A.   I don't recall specifically outside of my
22    office.
23    Q.   Do you recall any instance in which you were
24    taken to lunch or dinner by representatives from
25    Purdue Pharma?

Page 127

1    A.   No, I've never been, that I recall, taken to
2    lunch outside of a formal program presentation.
3    Q.   Okay.  Do you recall being taken to lunch or
4    dinner outside of a formal dinner presentation by
5    representatives from any of the companies selling
6    prescription opioids?
7    A.   No.
8    Q.   Okay.  Do -- when you had interactions with
9    Purdue sales representatives, did they come into
10    your office and bring lunch, dinner, food, anything
11    like that?
12    A.   I don't remember if they brought food but I
13    do remember them coming by, drop off product
14    information, answer any questions I might have.
15    Q.   I was just going to ask, when they came by,
16    what did they do?
17    A.   They would ask if I had any questions, they
18    would, you know, try to get as much face time with
19    me as possible, and give me some product
20    information.
21    Q.   Did you know or do you know any of the sales
22    representatives from Purdue Pharma?
23    A.   No.
24    Q.   You can't remember any of the names?
25    A.   I can't remember.

Page 128

1    Q.   Okay.  What about Endo, do you remember from
2    the time period 2002 to the present, sales
3    representatives from Endo that were selling
4    prescription opioids, being in your office?
5    A.   I don't recall what products they sell, so I
6    would remember it by product more than by company.
7    Q.   Do you remember anyone selling Opana?
8    A.   Yes.
9    Q.   And were the interactions with the
10    representatives selling Opana the same as you just
11    described, where sales representatives came into
12    your office and dropped off materials, or were those
13    interactions different?
14        MS. COATES:  Objection; form.
15    A.   I think I had a lunch with Opana.  I think I
16    even was on a webinar of some kind, and it might
17    have been speaker training, but I don't recall, but
18    it was something educational in the form of a web
19    presentation that I did at home in the evening.
20    Q.   Okay.  Did representatives selling Opana
21    ever come into your office and bring food or lunch
22    or anything like that?
23    A.   I think so.
24    Q.   How many times, roughly?
25    A.   I don't recall.  A few.

Page 129

1    Q.  And what time period was that in?
2    A.  I don't recall.
3    Q.  Early 2000s or much more closer to present?
4    A.  I don't know.
5    Q.  Okay.
6    A.  When was Opana released?
7    Q.  What about representatives from
8  Mallinckrodt, did you ever meet any sales
9  representatives from Mallinckrodt?
10    A.  Again, what drug would that be?
11    Q.  That's a good question.  I can't remember
12  all the names.  I'll have to pull them.  Do you
13  remember meeting anyone from the company
14  Mallinckrodt?
15    A.  Again, I'm better with drug names than
16  company names.
17    Q.  Okay.  Over time, we talked about one time
18  when you might have attended a lunch program with
19  Endo.  Were there other pharmaceutical sales
20  representatives that took you to lunch outside the
21  office?
22         MS. COATES:  Objection; asked and answered.
23    A.  I don't recall any meals outside of formal
24  PowerPoint programs.
25    Q.  Got it.  What is your current income from

Page 130

1  Pain Management Strategies, what was last year's
2  income?
3    A.  You mean my -- on my tax return specifically
4  from the practice?
5    Q.  Yes.
6    A.  Boy.  I don't know how my accountant would
7  break that up, but I know my total income was
8  about -- from all sources, was about $800,000.
9    Q.  Okay.  Of the $800,000, what were the
10  various sources of income last year?
11    A.  Speaker programs and whatnot were about
12  $50,000 of that, maybe $70,000, I don't recall.  And
13  the rest would be basically through my practice.
14    Q.  And does that practice currently consist of
15  your work at Pain Management Strategies and also
16  obviously at Broward Health North until recently?
17    A.  Yeah.  It's all through Pain Management
18  Strategies.
19    Q.  Okay.  Do you work for any other entities
20  other than Pain Management Strategies currently?
21    A.  Technically, yes, because part of my
22  practice is divided into South Florida Pain and
23  Wellness, which is a portion of my practice that
24  doesn't participate with insurance, so it's separate
25  but it all falls under Pain Management Strategies.

Page 131

1    Q.  What is South Florida Pain and Wellness?
2    A.  It's another company, entity that I own.
3  It's an LLC that operates out of the same office.
4  So for my noninsurance practice, for my -- the
5  services that my practice offers that wouldn't be
6  covered under insurance, such as medical marijuana,
7  ketamine infusions, weight loss, bioidentical
8  hormones.
9    Q.  When did South Florida Pain and Wellness
10  come into existence?
11    A.  It came into existence, I created it -- I'm
12  not sure of the date but a couple years ago.  It
13  only started really functioning a few months ago as
14  a separate entity.
15    Q.  Why did you start that as a separate entity?
16    A.  My consultant advised me that it was better
17  to keep my insurance practice separate from all the
18  other services that we offer that aren't involved
19  with insurance.
20    Q.  Do you prescribe opioids in your practice
21  for South Florida Pain and Wellness?
22    A.  The only medication that South Florida Pain
23  and Wellness would be prescribed under a patient
24  being seen by South Florida Pain and Wellness would
25  be Suboxone.

Page 132

1    Q.  And what is Suboxone?
2    A.  It's Buprenorphine with Naloxone and it's
3  medication -- it's a treatment for opioid abuse
4  disorder, opioid withdrawal, opioid dependence.
5    Q.  How many patients do you have on Suboxone
6  currently?
7    A.  I would be guessing, probably about 80, 80
8  to 100.
9    Q.  And how long have you been treating patients
10  using MAT?
11    A.  Since about --
12         MS. COATES:  Object to form.
13    A.  -- 2004.
14    Q.  So are all of your MAT patients being seen
15  through South Florida Pain and Wellness?
16    A.  Yes.
17    Q.  How many patients are seen -- are currently
18  in the patient population at South Florida Pain and
19  Wellness?
20    A.  In addition to the MAT patients, there is
21  bioidentical hormone replacement which is a pellet
22  that goes under the skin and helps people with
23  hormone deficiencies, so that's growing a new,
24  probably about 40 or 50 patients for that.  Ketamine
25  infusion is something we just started offering, so

1    that's brand-new.
2        Q.  How many patients do you have on ketamine
3    infusion?
4        A.  Two.
5        Q.  What other services are you offering at
6    South Florida Pain and Wellness?
7        A.  Weight loss.
8        Q.  How many patients are you treating in the
9    weight loss portion of that practice?
10       A.  That's overlapping with the bioidentical
11   hormones.
12       Q.  So 40 to 50?
13       A.  Something like that, yeah.
14       Q.  You mentioned medical marijuana, how long
15   have you been administering medical marijuana?
16       A.  I can't recall exactly when I got my license
17   or got registered as a medical marijuana prescriber,
18   but about a year.
19       Q.  How many patients do you have on medical
20   marijuana?
21       A.  I'm not sure.  I'd say -- be guessing, maybe
22   about 30 or 40.
23       Q.  Are there other parts of the practice that
24   we have not discussed that you're performing at
25   South Florida Pain and Wellness?

1        A.  Not that I can think of offhand.
2        Q.  Okay.  And none of your patients at South
3    Florida Pain and Wellness are being prescribed
4    prescription opioids, other than Suboxone?
5        MS. COATES:  Objection; form.
6        A.  No, that's not true.  There might be
7    patients who are Pain Management Strategies that
8    decide to have weight loss or bioidentical hormones
9    or ketamine infusion.  So there is some patients
10   that would be in both practices.
11       Q.  How many patients in your South Florida Pain
12   and Wellness practice do you think are on
13   prescription opioids?
14       A.  I'd say less than 20 percent.  Excluding
15   Suboxone.
16       Q.  Fair.
17       MS. COATES:  I don't know if you're at a
18   good stopping point but lunch is ready whenever.
19       MS. DICKINSON:  I know.  I was going to try
20   to get through this portion and we can stop.  I
21   think it makes sense.  It's not going to be quite
22   as tedious, I think, after that.
23   BY MS. DICKINSON:
24       Q.  Okay.  We talked about -- we were talking
25   about interaction with pharmaceutical sales

1    representatives and you said that it was a little
2    easier if I used the names of the drug rather than
3    the companies.  Do you remember that?
4        A.  Yes.
5        Q.  Okay.  I am going to try to do a few of
6    those.  I think we talked about Purdue, already, and
7    OxyContin and Butrans.
8        A.  Yes.
9        Q.  During the time that you've run Pain
10   Management Strategies, did you meet with
11   pharmaceutical sales representatives that were
12   selling Actiq or Fentora?
13       A.  I think so.
14       Q.  How often?
15       A.  Not often.
16       Q.  Okay.  Did you meet with pharmaceutical
17   sales reps that were selling Durasesic?
18       A.  I think so.
19       Q.  Okay.  How often?
20       A.  Not often.
21       Q.  Okay.  When you say not often, what do you
22   mean by that?
23       A.  One to three times, three or four times.
24       Q.  One to three times per year?
25       A.  No, total.

1        Q.  Okay.  Did you -- during the time you've run
2    Pain Management Strategies, did you meet with sales
3    representatives who were selling Nucynta?
4        A.  Yes.
5        Q.  How often did you meet with sales
6    representatives that were selling Nucynta?
7        A.  So sales representatives selling Nucynta was
8    actually on my CV under Depomed.
9        Q.  Okay.
10       A.  And fairly often, to answer your question,
11   several times a month.
12       Q.  Okay.  And were those all in the office,
13   these meetings?
14       A.  The meetings with the sales rep in my office
15   occurred as well as dinner programs that I was
16   giving the presentation.
17       Q.  Okay.
18       A.  And the rep would be there as well.
19       Q.  The dinner presentations, are they the same
20   presentations that are listed on your CV here?
21       A.  Yes.
22       Q.  Okay.  We're going to get to that in a
23   little bit but other than the dinner presentations
24   listed on your CV, were all the meetings with the
25   sales representatives otherwise in your office?

Page 137

1    A.  Yes.
2    Q.  Okay.  And how often were sales
3  representatives in your office?
4    A.  Several times a month for a period of time.
5    Q.  What period of time?
6    A.  I don't recall.  I'd have to look at my CV.
7    Q.  Well, would it be safe to say that it was
8  probably from 2008, maybe, to present, when Nucynta
9  went on the market?
10    A.  No, I would say it was more around -- later,
11  2016, 2017, because that's when I did those
12  lectures.
13    Q.  Okay.  And what was it about the fact that
14  you were doing lectures, regarding Nucynta, that
15  would make the sales reps be in your office more?  I
16  don't understand, I guess.
17    A.  That's just when I would have absolute
18  recollection of having activity with the company.
19    Q.  And Nucynta is sold by Johnson & Johnson?
20    A.  At the time it was sold by Depomed, when I
21  did work with them.
22    Q.  Okay.  What relationship does Depomed have
23  with Janssen or Johnson & Johnson?
24    A.  I think Depomed sold to Janssen or Johnson &
25  Johnson.

Page 138

1    Q.  Do you know when?
2    A.  I don't know.
3    Q.  At the time you were interacting with
4  representatives over Nucynta, were they always
5  representatives for Depomed?
6    A.  Yes.
7    Q.  Okay.  During the time you ran Pain
8  Management Strategies did you have any interactions
9  with sales representatives selling Subsys?
10    A.  I think so.
11    Q.  Okay.  How often?
12    A.  Maybe once.
13    Q.  Okay.
14    A.  Again, you know, a lot of reps would come
15  into my office and leave behind material.  I didn't
16  always have the time to meet with them myself.
17    Q.  Okay.  Understood.  At times did you meet
18  with them yourself?
19    A.  With Subsys, I don't recall.
20    Q.  With other products did you meet with them?
21    A.  Oh, yes.
22    Q.  Okay.  Did you meet with representatives
23  that were selling Exalgo?
24    A.  I think so.
25    Q.  Okay.  Do you remember how often?

Page 139

1    A.  Once or twice.
2    Q.  Okay.  Did you meet with representatives
3  that were selling Roxicodone?
4    A.  I don't think so.
5    Q.  Did you meet with representatives that were
6  selling -- I'm not sure I'm going to pronounce this
7  right but Xartemis, is that right?
8    A.  Yes and no.
9    Q.  Yes, that's right and no you didn't meet
10  with them?
11    A.  Correct.
12    Q.  Did you meet with representatives selling
13  Methadose?
14    A.  No.
15    Q.  Did you meet with representatives who were
16  selling Kadian?
17    A.  Yes.
18    Q.  Okay.  How often?
19    A.  Often, and you know, several times a month
20  for a period of time back in around 2005, 2006.
21    Q.  And were all of those, outside of those that
22  are listed in your CV, in your office?
23    A.  Yes.  The specific lectures are not listed
24  on my CV.
25    Q.  Okay.

Page 140

1    A.  Other than the national sales meeting in
2  2005, I did many dinner programs for Alpharma for
3  the drug Kadian many times.  I don't recall how
4  many.
5    Q.  Let me -- since it's not in your CV, I kind
6  of have to ask.  When was the first time you had a
7  relationship with Alpharma where you were giving
8  lectures?
9    A.  It's in my CV from 2004 to 2006.
10    Q.  Okay.  And was that the only time period
11  that you were giving dinner lectures on behalf of
12  Alpharma?
13    A.  Yes.
14    Q.  Okay.  Then -- and you think that the time
15  period where you were meeting with sales
16  representatives for Kadian was that same time period
17  or was it a longer time period?
18    A.  It was that same time period.
19    Q.  Okay.  And I think you said you were meeting
20  with representatives quite often.  How often?
21    A.  I would say a few times a month in my
22  office.
23    Q.  Okay.  During those few times a month, what
24  kinds of things were being discussed?
25    A.  I don't recall.

Page 141

1    Q.  Were they meetings in which the sales
2    representatives were trying to convince you to sell
3    Kadian, is that fair?
4    A.  I don't think I would frame it quite that
5    way.  I think they were coming to to have an
6    interaction, you know, to have a face to face time
7    with me to be available to answer my questions, to
8    show me new materials, perhaps.
9    Q.  Do you know the names of any of those sales
10   representative?
11   A.  The name of my sales rep's first name was
12   Michael.  I don't remember his last name.
13   Q.  Did you keep in contact with Michael after
14   the 2006 timeframe?
15   A.  For some time, yeah.
16   Q.  Do you still?
17   A.  No.
18   Q.  You don't know what his last name is?
19   A.  No.
20   Q.  Do you know when the last time you saw him
21   was?
22   A.  Many, many years ago.  He was pretty sick.
23   He had cystic fibrosis.
24   Q.  Okay.  During the time period dealing with
25   Pain Management Strategies were there sales

Page 142

1    representatives in your office who were selling
2    Norco?
3    A.  Not that I recall.
4    Q.  Okay.  You mentioned Butrans.  During the
5    time that you were -- that you have owned Pain
6    Management Strategies, did you interact with
7    representatives selling Butrans?
8    A.  Yes.
9    Q.  Okay.  How often?
10   A.  I would say for a while maybe monthly.
11   Q.  Same representative?
12   A.  I don't remember who the rep was but I think
13   so.
14   Q.  Okay.  What about Hysingla?
15   A.  I briefly remember meeting, maybe having
16   lunch with a Hysingla rep, but not is a regular
17   occurrence, maybe once or twice.
18   Q.  What about Targiniq?
19   A.  No.
20   Q.  What about Dilaudid?
21   A.  No.  I take that back, there was a drug
22   called Palladone, I don't know who made it.
23   Q.  Okay.  I was actually going to ask about
24   that.  Did you ever have any meetings with sales
25   representative selling Palladone?

Page 143

1    A.  Yes.
2    Q.  When?
3    A.  I don't remember the year and maybe once or
4    twice in my office.
5    Q.  Okay.  Were those Purdue reps?
6    A.  I don't -- I don't know.
7    MS. DICKINSON:  I can round some of this out
8    quickly and then maybe we can take a break.
9    Q.  So I wanted to go to your CV, during the
10   time you owned Pain Management Strategies, so there
11   are a number of, it looks like, surgical centers
12   that you worked at listed on your CV.  Can we just
13   go through and you can tell me for each one what you
14   were doing there during that time and how much time
15   you spent there?  That's just what I wanted --
16   A.  I can make it real easy for you, there is
17   basically surgical procedures that I do.  There is
18   variations on them.  One is intrathecal pump
19   implants, which includes putting intraspinal
20   catheters, so there might be a catheter revision or
21   removal or replacement, or a pump replacement or
22   removal, or replacement.  And for a spinal cord
23   stimulator, same thing, there is two wires
24   basically, the two electrodes and a battery, so
25   there may be battery revision but it's all around

Page 144

1    the spinal cord stimulator surgery, I've done them
2    at North Broward, Broward Health North, I've done
3    them at Holy Cross, I've done them at Imperial
4    Point, I've done them at all the surgical centers
5    I've worked at, and my reasons for changing surgical
6    centers are varied.
7    Q.  Okay.  So I understand it, I'll just run
8    through them.  Those two procedures that you're
9    talking about, is that all you were doing at
10   Physicians Outpatient Surgery Center?
11   A.  Yes.
12   Q.  Is that all you were doing at Park Creek
13   Surgical Center?
14   A.  Yes.
15   Q.  Okay.  Is that all you were doing at Holy
16   Cross?
17   A.  Yes.
18   Q.  Okay.  Is -- is that all you were doing at
19   Imperial Point Medical Center?
20   A.  Yes.
21   Q.  So -- just so I understand, for some places
22   like Holy Cross, you have the title of Medical
23   Director of Acute Pain Management?
24   A.  Yes.
25   Q.  Do you do anything else other than those two

1    procedures under that title for Holy Cross?
2        A.  I don't do the procedures under that title.
3    For that title I give lectures to the staff, to the
4    nurses, to the residents and I'm available to the
5    emergency room physicians, but basically it's around
6    inservices and education around pain management.
7        Q.  Okay.  I may have to run through those just
8    a little bit then.  Okay.  You have on your CV that
9    you were Director of Anesthesia at Atlantic Surgical
10    Center?
11        A.  Yes.
12        Q.  From 2002 to 2004, what did you do in that
13    capacity?
14        A.  I was providing anesthesia for the
15    outpatient surgeries that were going on there.  It
16    was really an opportunity in the early days of my
17    practice to earn some additional revenue.
18        Q.  Okay.
19        A.  Basically, moonlighting anesthesia.
20        Q.  I was just going to ask that.  Who did you
21    work under there?
22        A.  The owner of the facility, but I was the
23    only anesthesiologist.
24        Q.  Who was the owner?
25        A.  John Bebe.  B-e-b-e.

1        Q.  And was that -- was John Bebe a doctor?
2        A.  No.
3        Q.  Were there other doctors working at the
4    Atlantic Surgical Center?
5        A.  Surgeons, yes.
6        Q.  Okay.  And I think you said you were the
7    only anesthesiologist?
8        A.  At that time, yeah.
9        Q.  At that time.  Did you stay in contact with
10    any of the, either, the doctors or Mr. Bebe after
11    the time you worked there?
12        A.  Yes, one of the doctors I worked with there
13    as a neurosurgeon, his name was Dr. Steven Gelbard,
14    G-e-l-b-a-r-d, and I still keep in contact with him
15    from time to time.
16        Q.  Okay.  Was there a reason you left Atlantic
17    Surgery Center as the Director of Anesthesia?
18        A.  Because I stopped doing anesthesia.
19        Q.  Did you stop doing anesthesia, period, in
20    2004?
21        A.  No.  After 2004 I had some post leaving
22    anesthesia regrets, I don't know what to call it,
23    and I started moonlighting at Park Creek Surgical
24    Center, where I had privileges as a surgeon.  So I
25    worked for the anesthesia group a handful of times

1    moonlighting as anesthesia again, to keep -- to keep
2    my skills up to par.
3        And then after a while I realized I was just
4    too busy and I wasn't as good as I wanted to be to
5    continue to practice anesthesia.
6        Q.  When was the last time you gave anesthesia?
7        A.  I don't remember.
8        Q.  Was it --
9        A.  I'm going to say maybe 2010.
10        Q.  Physicians Outpatient Surgery Center, is it
11    fair to say that you were just performing those two
12    procedures that we talked about at that location?
13        A.  Yes.
14        Q.  Okay.  How much of your time during the 2008
15    to present time period was spent at that location?
16        A.  Probably five or six hours a month.
17        Q.  Park Creek Surgical Center, in addition to
18    sort of moonlighting with anesthesia, were you also
19    performing those two procedures at that location?
20        A.  Yes.
21        Q.  Were you doing anything else?
22        A.  No.
23        Q.  Okay.  Was there a reason that you no longer
24    performed those procedures at Park Creek Surgical
25    Center?

1        A.  I once terminated, if that's -- it became
2    difficult for my schedule to go to a place so far
3    away.
4        Q.  Where is Coconut Creek, Florida?
5        A.  Where is it?  It is west of my practice
6    about a 20-minute drive.
7        Q.  Okay.  We talked briefly about you taking
8    the position as Medical Director of Acute Pain
9    Management for Holy Cross Hospital and it looks like
10    from your CV you started in 2014?
11        A.  Yes.
12        Q.  What do you do as Medical Director of Acute
13    Pain Management?
14        A.  Teach their staff about pain management.
15        Q.  How often do you do that?
16        A.  It varies, upon request, but I've done grand
17    rounds, I've done inservices, I've done formal and
18    informal lectures and teaching the nurses and
19    physicians and residents.
20        Q.  How often a year do you do that?
21        A.  I'd say three or four times a month.
22        Q.  What topics do you speak on?
23        A.  I gave a talk on the CDC guidelines when
24    they came out, I gave a talk on managing complex
25    pain patients in the hospital setting, and the

Page 149

1 majority of the talks have been about, like,
2 specific inservices about not for the healthcare
3 providers to -- if there is a pain consult pending
4 to hold the long-acting opioids before the consult
5 is started and specifically what I mean is if the
6 patient is given a long-acting medication just
7 before I get to them, it kind of sets the tone for
8 what needs to happen going forward.  So I was trying
9 to get the staff to not commit to a pathway and a
10 decision process until I would get there.
11     Q.  I'm not sure I understand that.  What is you
12 basic message on long-acting opioid medications that
13 you are giving in those talks?
14         MS. COATES:  Objection; form.
15     A.  So basically, long-acting opioids may or may
16 not be appropriate, but once given, can't be taken
17 away.  So if they give it to the patient before I've
18 had a chance to see them, it kind of ties my hands.
19     Q.  Okay.  So what is your instruction to the
20 staff when you're giving those talks?
21     A.  To try to stick with short-acting opioids,
22 if any, until I can get to see the patient, or to
23 please call me for further instruction until I can
24 get to see the patient.
25     Q.  What is the problem with giving long-acting

Page 150

1 opioid medications before you get there that they
2 can't be taken off them once they're on?
3         MS. COATES:  Objection; mischaracterization.
4     A.  So a long-acting medicine takes a long
5 period of time, depending on the drug, to -- for its
6 effect to wear off.  So, for example, if somebody is
7 given a dose of methadone at 9:00 o'clock at night
8 and I come to see them at 7:00 o'clock in the
9 morning and I want to change their regimen for
10 whatever reason, that methadone is going to be on
11 board for 72 hours.
12     Q.  Is part of the talks talking about the
13 addictiveness of those long-acting medications?
14     A.  Well --
15         MS. COATES:  Objection; form.
16     A.  Not in that context, no, but a lot of my
17 talk is about addiction in the hospitals and how to
18 recognize signs of addiction when patients come in
19 and how to treat the so-called drug seeking behavior
20 and what to do and what's the best strategy in the
21 short-term to handle that patient at that moment.
22     Q.  When you are talking about addiction, are
23 you generally talking about addiction to opioid
24 medications?
25     A.  Generally in the context of my talks we're

Page 151

1 talking particularly about opioids and when it's
2 appropriate to start, like you said MAT.  So if I
3 wanted to start a patient on Suboxone and they are a
4 heroin addict, let's say, and they are in the
5 methadone program and they get a dose of methadone,
6 I now can't start the Suboxone for at least three
7 days.  So that becomes a length of stay issue, a
8 patient management issue, and then the patient is
9 going to be pretty unhappy for a few days.  So there
10 is better ways to manage that patient than to give
11 them methadone before I get to see them.
12     Q.  I was just trying to get at when you are
13 talking about these addiction issues that you are
14 talking about, are they generally with respect to
15 opioid medications versus addiction to alcohol or
16 cocaine or something else.
17     A.  We talk about all those addictions, and
18 there are management issues with alcohol addiction
19 in the hospital.  We don't really manage cocaine
20 addiction at all other than recognizing that it
21 stays in your system for three days.
22     Q.  I was just asking with respect to the talks
23 you've given.  Are they generally about managing
24 opioid medications versus some other medications
25 that might be addictive or some other drugs that

Page 152

1 might be addictive?
2         MS. COATES:  Object to form.
3     A.  Well, you asked about managing addiction, so
4 we don't -- again, we wouldn't manage any -- we
5 wouldn't manage any cocaine addiction other than to
6 recognize it and how important it is to address it,
7 understand it, diagnose it.  So yes, I talk about
8 many addictions, including alcohol and cocaine,
9 insofar as how to interpret a urine toxicology
10 result, and how to manage a patient who has got
11 cocaine in their urine would be different than
12 somebody who doesn't have cocaine in their urine.
13     Q.  Has opioids been the vast majority of the
14 focus of the talks you've given about addiction?
15     A.  Yes.
16     Q.  Where can I find -- are those talks
17 videotaped?
18     A.  No.
19     Q.  Do you have written materials?
20     A.  For the talks I gave at Holy Cross?  I think
21 I have a PowerPoint presentation, and I do have
22 videos that -- lectures or videos that you can find
23 on YouTube, but not related to my activities at Holy
24 Cross Hospital.
25     Q.  Do you have PowerPoints or written materials

Page 153

1  on any of the lectures you've given at Holy Cross?
2      A.  I'm not sure.
3      Q.  Do you have a file or something you keep
4  those materials in?
5      A.  I wish I were that organized.
6      Q.  Do you have a computer you might keep those
7  on?
8      A.  I think the lecture I've given on managing
9  complex patients in a hospital setting is on my
10  computer.
11      Q.  Do you hand out written materials at those
12  lectures?
13      A.  No.
14      Q.  Okay.  You said you had other lectures that
15  were videotaped and might be on YouTube.  Where were
16  those other lectures given?
17      A.  One interview was -- it was actually an
18  interview, not a lecture, given to Newsmax Health in
19  my office.  There is a lecture I know is on YouTube
20  that I gave at North Broward Medical Center on
21  addiction.
22      Q.  Okay.  You have on your CV that from 2016 to
23  present you worked at Melrose Pain Solutions as a
24  founding partner.  What is Melrose Pain Solutions?
25      A.  Melrose Pain Solutions is a company that I

Page 154

1  created with my partner, Dr. Joseph Pergolizzi and
2  Liana McCormick, that is a protocol designed for
3  managing complex patients in a hospital setting,
4  that takes -- the protocol takes us through when
5  patients first present to the hospital, what their
6  presenting symptoms and diagnoses are, and how to
7  manage that patient depending on the patient's
8  individual circumstances.
9      MS. DICKINSON:  Okay.  We probably should
10  take a break.
11      THE VIDEOGRAPHER:  Off the record, 12:38 p.m.
12      (Recess from 12:38 p.m. until 1:23 p.m.)
13      THE VIDEOGRAPHER:  On the record, 1:23 p.m.
14  BY MS. DICKINSON:
15      Q.  Dr. Rosenblatt, we're back on the record
16  after lunch.  Okay.  Right before lunch -- I just
17  wanted to clean up a few things we were talking
18  about right before lunch and then I think we'll move
19  on to a little bit of a different part of your CV.
20      I had asked you but we -- actually, I got
21  off track.  We talked about your income in 2018, so
22  last year's income, and I think you had given me the
23  number was roughly $800,000.  Is that accurate?
24      A.  Yes.
25      Q.  Okay.  And I think the testimony you gave

Page 155

1  was that 50 to 70,000 of it was likely from being --
2  as a paid speaker; is that right?
3      A.  Yeah.  Well, for all of my speaking
4  engagements, yes, which is not all pharma, but yes.
5      Q.  Fair.  We'll just break it down into little
6  parts.
7      A.  Right.
8      Q.  50 to $70,000 of it was for your speaking
9  engagements, roughly, right?
10      A.  Right, which, again, is not all pharma.  A
11  lot of that is device and the cadaver courses and
12  teaching that I do around the surgeries.
13      Q.  What portion of the 50 to 70,000 was either
14  pharmaceutical or device companies speaking?
15      A.  Pretty much all of that was my consulting
16  fees outside of my practice.
17      Q.  Okay.  Fair.  Does that include consulting
18  fees for the legal work you've been doing with the
19  opioid litigation?
20      A.  No.  In 2018?  I don't think I did any in
21  2018.
22      Q.  Okay.  The other, roughly, let's just call
23  it $650,000, was that all from Pain Management
24  Strategies?
25      MS. COATES:  Objection to form.

Page 156

1      A.  Well, Pain Management Strategies and South
2  -- South Florida Pain and Wellness.
3      Q.  Okay.
4      A.  But yes, I think, as my accountant would
5  explain, is that all of that income funnels to Pain
6  Management Strategies.
7      Q.  Okay.  I was going to ask.  Do you get paid
8  separately from South Florida Pain and Wellness, for
9  example?
10      A.  No.
11      Q.  Do you know what portion of the roughly, you
12  know, 650 to $630,000, what portion of that income
13  is generated from Pain Management Strategies'
14  clinical practice?
15      MS. COATES:  Objection; mischaracterization.
16      A.  That would all be clinical practice.
17      Q.  Okay.  I'm just trying to figure out what
18  portion of your income in 2018 came out of the South
19  Florida Pain and Wellness bucket versus the other
20  bucket which lies under Pain Management Strategies?
21      A.  So I'm pretty sure it's all in one bucket
22  and I don't have it separated out.
23      Q.  Do you have any idea, if you had to gauge
24  the revenue that's coming out of South Florida Pain
25  and Wellness for 2018, what that was?

Page 157

1    A.  Yeah, I'd guess it's about $100,000.
2    Q.  Okay.  And the rest is for some combination
3  of your clinical practice in the pain clinic and
4  then in the hospital?
5    A.  Yes.
6    Q.  Okay.  When did you stop working in the
7  hospital setting?
8    A.  I still work in the hospital.
9    Q.  I thought on your CV that you had
10  stopped in 2017 at North Broward Hospital.
11    A.  I was no longer the medical director of pain
12  management.
13    Q.  Okay.  Are you still seeing patients at
14  North Broward Hospital?
15    A.  Yes, I am.
16    Q.  Okay.  Why did you step down as the medical
17  director of pain management at North Broward?
18    A.  They eliminated the position of the majority
19  of the medical directors as part of their corporate
20  integrity agreement.
21    Q.  Okay.  And that was in 2017?
22    A.  Yes.
23    Q.  Okay.  So we were talking about your income
24  in 2018.  If we go backwards from there, was your
25  income in 2017 roughly the same?

Page 158

1    A.  Yes.
2    Q.  Okay.  Was it sort of attributable, roughly,
3  the same way in terms of speaking arrangements,
4  money coming from South Florida Pain and Wellness
5  and your clinical practice?
6    A.  More or less.  I mean --
7    Q.  During the time period from 2002 to 2018
8  when you had had Pain Management Strategies, has
9  your income changed during that time period?
10    A.  I'd say my income has gone up every year.
11    Q.  Okay.  Can you walk me through, just
12  roughly, where it started?  Let's start in 2002,
13  sort of the year you opened Pain Management
14  Strategies?
15    A.  Sort of zero.
16    Q.  Fair.  Your opening year, did you make any
17  income in 2002?
18    A.  I recall specifically it took me six months
19  before I received a paycheck.  My overhead was very
20  low.  I was in the red insofar as I had accrued
21  significant credit card debt to pay all my bills.
22  But started making money in the first year.  I don't
23  think my income was very much by the end of the
24  year.
25    Q.  I was going to ask what was the first year

Page 159

1  that you made income.  Is that 2003?
2    A.  Probably.
3    Q.  And what was your rough income?
4    A.  I honestly don't remember.
5    Q.  Was it anywhere near $800,000?
6    A.  No.
7    Q.  Okay.  What year was the first year that
8  your income approached $800,000?
9    A.  I'd say in the last few years, last four or
10  five years.
11    Q.  What do you attribute to the rise in your
12  income?
13    A.  Excellent management.
14    Q.  Okay.  Do you attribute anything else?
15    A.  I've had an increased volume, I have two
16  offices.  I managed my billing department better,
17  managed my contracts better.  I get paid a little
18  bit more from the contracts as a result of better
19  contract negotiating, I have more volume.  I have
20  better payers, a better payer mix.  It's been a
21  gradual process of managing my practice to make it
22  more financially profitable.
23    Q.  Okay.  When you say you have increased
24  volume, what -- what was the reason for the
25  increased volume?

Page 160

1    A.  Better management, better management of my
2  time, having a full-time nurse practitioner enables
3  me to see more patients in the office and enables me
4  to get out of the hospitals quicker.
5    Q.  Is it fair to say that with increased volume
6  of patients in your pain practice, it comes to
7  increased income; is that fair?
8    A.  Yeah.
9    Q.  When was the first time in a year you made
10  as much as $500,000, when you were running Pain
11  Management Strategies?
12    A.  I don't recall specifically but I'd say
13  probably 2013, 2014.
14    Q.  And so from right around 2013 or 14 to
15  present, your annual income has roughly raised about
16  $300,000, is that fair?
17    A.  I'm not really sure.  You're boxing me to
18  numbers I can't really commit to for sure without
19  having any tax returns in front of me.
20    Q.  Is that at all accurate, or am I totally
21  off-base?
22    A.  I think my income has clearly risen and I
23  think in 2013 and 2014, I was applying for a
24  mortgage and I think my income was around then.
25    Q.  Do you advertise for Pain Management

Page 161

1  Strategies or Melrose Pain Solutions?
2      A.  No.
3      Q.  Okay.  Do you have a web presence?
4      A.  I have a website.
5      Q.  Okay.  Do you pay for SEO or anything like
6  that?
7      A.  I just started to, about two months ago.
8      Q.  What's the purpose of paying for SEO?
9      A.  It's part of -- I'm not entirely sure.  Not
10  my area of expertise, clearly, but I hired a company
11  called Patient Pop that is helping primarily manage
12  my online reputation.  That is the reason I
13  primarily hired them.  I have a lot of negative
14  reviews, a lot of very angry, hostile reviews, so to
15  try to address that situation, Patient Pop has a
16  platform where they ask all of my patients for a
17  review upon leaving the office, you know, completing
18  a visit, for whom we have e-mail addresses, they
19  send a request for how you rate your visit or
20  something like that.  And if they are negative they
21  get funneled to my office to be addressed, if they
22  are positive, they get posted on Google or something
23  like that.  So that was the primary purpose.  I
24  understand they also have some SEO, and I did
25  recently shoot them an e-mail.  I wanted to add

Page 162

1  ketamine as one of my key words to basically
2  advertise the ketamine process.
3      Q.  Is one of the purposes of SEO so if someone
4  types in pain management in this area they can find
5  you as a pain management doctor?
6      A.  Yes.
7      Q.  We started to talk about South Florida Pain
8  and Wellness.  Can you tell me again what South
9  Florida Pain and Wellness was formed to do?
10      A.  South Florida Pain and Wellness is a part of
11  my practice that bills patients who are seeing -- or
12  are having a noninsurance covered service.
13      Q.  Fair.  I'm sorry.  I asked you about the
14  wrong entity.  We were starting to talk about
15  Melrose Pain Solutions.
16      A.  Okay.
17      Q.  Melrose Pain Solutions -- oh, actually.  Can
18  you go back for a second.  South Florida Pain and
19  Wellness, is that on your current CV?
20      A.  Yes.
21      Q.  Where is that on Exhibit 4?
22      A.  Pain Management Strategies Inc and South
23  Florida Pain and Wellness is listed directly
24  underneath it under Practice and Employment History
25  on the first page.

Page 163

1      Q.  I see.  Okay.  Okay.  Let's talk about
2  Melrose Pain Solutions, that was founded in 2016; is
3  that right?
4      A.  Yes.
5      Q.  And were you -- did you found that with a
6  partner?
7      A.  Yes, two partners, actually, Dr. Joseph
8  Pergolizzi and Liana McCormick.
9      Q.  Okay tell me again, briefly, what does
10  Melrose Pain Solutions do?
11      A.  Melrose Pain Solutions is a consulting
12  company that goes into hospitals to teach their
13  providers how to manage complex patients with
14  complex pain syndromes in a protocol on basically
15  what to do next when you have this type of patient.
16      Q.  Okay.  Are -- who are the partners?
17      A.  Dr. Joseph Pergolizzi and Liana McCormick.
18      Q.  And have those two doctors always been your
19  partners at Melrose Pain Solutions?
20      A.  Yes.
21      Q.  Okay.  Are you all equal partners?
22      A.  No, Dr. Pergolizzi and I share two-thirds of
23  it and Liana has one-third.
24      Q.  Okay.  Did you know Dr. Pergolizzi before --
25      A.  That doesn't work.  Dr. Pergolizzi and I

Page 164

1  share half.  No.  Dr. Pergolizzi and I share
2  three -- I don't remember.  If he and I actually
3  shared two-thirds we would be one-third partners and
4  he and I share a greater portion than she does.  I
5  don't remember.
6      Q.  Okay.  You and Dr. --
7      A.  Dr. Pergolizzi and I share 70 percent and
8  she has 30 percent.
9      Q.  Okay.  And as between the 70 percent, do you
10  and Dr. Pergolizzi share that 70 percent equally?
11      A.  Yes.
12      Q.  Did you know Dr. Pergolizzi before you
13  founded Melrose Pain Solutions?
14      A.  Yes.
15      Q.  How?
16      A.  I knew him as a national speaker and KOL
17  that I met at many advisory boards and national pain
18  meetings.
19      Q.  Okay.  Where did you first meet him?
20      A.  I don't remember, many years ago.
21      Q.  Who was he a KOL for?
22      A.  I don't recall.  I mean, he's a KOL for
23  many, many companies, but I met him, really, at the
24  national meetings.
25      Q.  What types of national meetings are we

1    talking about?
2        A.  I don't remember.  PAINWeek, American
3    Academy of Pain Medicine, some meetings.
4        Q.  Okay.  How often, before you went into
5    business with Dr. Pergolizzi, would you see him at
6    pain meetings?
7        A.  I had met him probably half a dozen times.
8        Q.  Okay.  How did it -- how did you come to go
9    into business with Dr. Pergolizzi?
10       A.  Dr. Pergolizzi called me because he wanted
11   to hear more about my approach to managing complex
12   patients in the hospital setting.
13       Q.  When was that?
14       A.  Just prior to us forming the business.  It
15   was a matter of a few months until we formed the
16   business.  I don't remember the month or if it was
17   early or late '16 or '15, I don't recall.
18       Q.  Whose idea was it to start Melrose Pain
19   Solutions?
20       A.  Dr. Pergolizzi.
21       Q.  Was it fair to say he had already conceived
22   of the notion of starting this company but wanted
23   you to join him possibly?
24       A.  No.
25       Q.  Okay.

1        A.  He had heard the idea from me and he thought
2    the idea was brilliant and he being more of an
3    entrepreneurial spirit, was kind of coaching me on
4    how to monetize my concept, my ideas.
5        Q.  Where had he heard the idea that went into
6    Melrose Pain Solutions from you?
7        A.  From me at an advisory meeting.
8        Q.  What advisory meeting?
9        A.  I don't recall.
10       Q.  When you say an advisory meeting, I don't
11   know what that is, that's why I'm asking.
12       A.  An advisory board sponsored -- put on by the
13   pharmaceutical companies is where I would encounter
14   him many times.  So in some of the discussions
15   amongst the physicians in -- on a table like this
16   talking about whatever pharmaceutical company would
17   be having us there, to get our ideas on either how
18   to launch or market or how to name a product or how
19   to message a product.  They would seek our input.
20           And we would not only participate in that,
21   but in the exchange of ideas, on my part was always
22   how medications get abused in the real world and
23   what I see in the hospital setting and what my
24   concerns are and how I manage these patients in the
25   hospital.

1        Q.  During what time period were you serving on
2    these advisory boards for pharmaceutical companies?
3        A.  Throughout the years.
4        Q.  Just what general time period, when did that
5    start?
6        A.  I don't remember the first one I did, and
7    the most recent one I did was for US WorldMeds last
8    year.
9        Q.  Can you give me a rough estimate?  Was it
10   2000 or was it 2010 the first time?
11       A.  I think the first time I ever spoke was
12   2004, so sometime after that, 2005, '06, '07, '08.
13   I don't remember when I first heard the term
14   advisory board.
15       Q.  What companies have you worked on an
16   advisory board for?
17       A.  I honestly don't remember.  I do remember
18   US WorldMeds because it was very recent.  I don't
19   remember.
20       Q.  You testified just a few minutes ago that
21   you would see Dr. Pergolizzi regularly at these
22   advisory boards.  Is that accurate?
23       A.  I believe I said half a dozen times.
24       Q.  Okay.
25       A.  That I've met him in total prior to going

1    into business with him, some of which was at ad
2    boards, advisory boards, some of which was at
3    national meetings.
4        Q.  I'm unfamiliar with what an ad board is, I'm
5    sorry, can you tell me a little bit more about -- do
6    people get invited to those?  What is it?
7        A.  So as a physician I would be invited to an
8    advisory board and it is often a -- before a product
9    was marketed and some of the advisory boards I went
10   to, the products never even made it to market, which
11   is why I'm struggling to remember what it was, to
12   get input from the physicians on either where this
13   might fit into our practice, where we see this
14   product fitting in and some -- I did go to an
15   advisory board for Collegium -- how to best message
16   their products, which picture would resonate better,
17   or what words might work better and that would be an
18   opportunity.
19       Q.  Was the purpose of the advisory board a
20   pharmaceutical company who was either going to put a
21   product on the market or had a product on the market
22   was seeking your advice, is that fair?
23       A.  Yes.
24       Q.  Okay.  How often did you sit on an advisory
25   board, I mean per year?

Page 169

1    A.  I'd say I've done maybe five or six advisory
2  boards.
3    Q.  Okay.  Were those all for pharmaceutical
4  companies?
5    A.  Yes.
6    Q.  Okay.  Were any of those opioid
7  manufacturers?
8    A.  Yes.
9    Q.  Okay.  Who?  Which opioid manufacturers did
10  you serve on an advisory board for?
11    A.  I specifically remember serving on an
12  advisory board for Collegium.
13    Q.  Okay.  What product was Collegium doing an
14  advisory board about?
15    A.  Xtampza.
16    Q.  Did you have any further involvement with
17  Collegium regarding its Xtampza product after the
18  advisory board?
19    A.  Yes, I was on the speaker bureau.
20    Q.  Okay.  I think we are going to get to that
21  in just a minute.  Other than the speakers bureau,
22  did you have any other involvement with the Xtampza
23  product and Collegium?
24    A.  By involvement what do you mean?
25    Q.  Any.  I'm just asking what your involvement

Page 170

1  was with that product?
2    A.  With the product?  It's a product that I
3  prescribe.
4    Q.  Okay.  Other than prescribing it, and being
5  on a speakers series about Xtampza -- can you spell
6  that?  I am sorry.  I think this is going to be a
7  hard one for her?
8    A.  X-t-a-m-p-z-a.
9    Q.  Other than being on the speaker series for a
10  pharmaceutical company that was manufacturing
11  Xtampza and prescribing it yourself, did you have
12  any other involvement with the manufacturer of the
13  Xtampza product?
14    A.  No.
15    Q.  What is Xtampza?
16    A.  It's a long-acting abuse-deterrent
17  formulation of oxycodone.
18    Q.  Who makes Xtampza?
19    A.  Collegium.
20    Q.  And when did you first get on the speaker
21  bureau for Xtampza?
22    A.  2016.
23    Q.  Were you paid for your time in serving on
24  advisory boards?
25    A.  Yes.

Page 171

1    Q.  How much?
2    A.  My recollection is around $3,000.
3    Q.  And who was paying you, the pharmaceutical
4  company?
5    A.  Yeah.  There was usually a third party from
6  whom managed the program or the conference and the
7  check would be from some other third party company.
8    Q.  Okay.  Do you remember any of the names of
9  the third parties that paid you?
10    A.  I think Health Logics was one.  I can't
11  remember the names.
12    Q.  Okay.  Dr. Pergolizzi first contacted you
13  about opening -- or your ideas that led to Melrose
14  Pain Solutions in 2015.
15    A.  Yes.
16    Q.  Is that right?
17    A.  Yes.
18    Q.  How did you guys decide to go into business
19  together from that point?
20    A.  Well, after I spent half a day explaining to
21  him what exactly I do in the hospital setting, after
22  he had heard me mention it many times over the
23  years, he thought it was very fascinating, because
24  most of the experts in the field don't have that
25  same kind of captive population of patients that I

Page 172

1  have because the patients in the hospital aren't
2  coming to my pain clinic seeking treatment and most
3  of the doctors that I've met, national and local
4  level, who treat chronic pain, their patients are
5  coming to them voluntarily, so having a captive
6  audience, he found it fascinating how I've managed
7  to come up with a protocol that basically is
8  consistent and reproducible and saves the hospital
9  money and saves patients' lives and gets patients
10  into treatment sooner and really it is very
11  innovative and forward thinking and should be the
12  way all hospitals manage complex pain in a hospital
13  setting.
14        And after he heard me explain it to him over
15  a period of four to six hours, he just asked me
16  questions and we talked all day long and when we
17  finished talking and he was finished asking me some
18  questions, he gave me some advice.  The first advice
19  he gave me was to stop talking about it.  Because I
20  was giving it away for free, I was sounding the
21  alarms and screaming this to anybody who would
22  listen.  Stop talking and that we could form a
23  company and that we can patent this protocol, I had
24  no idea what he was talking about because that's not
25  my area of expertise.

1    Q.  Did you come to patent the protocol?

2    A.  We did.

3    Q.  When was that?

4    A.  I believe it's still patent pending in 2017.

5    Q.  When did you apply for the patent?

6    A.  I don't remember, around 2016 or '17.

7    Q.  Do you know what the title of the patent is?

8    A.  I'm not sure it's different than my company.

9  I don't know.

10    Q.  Typically in a patent the invention has a

11  description, a descriptive title, not just the name

12  of the company.

13    A.  It would likely be Managing Complex Patients

14  in a Hospital Setting but I'm not sure.

15    Q.  What is the nature of the protocol?

16    MS. COATES:  Objection; form.

17    A.  To identify complicated pain patients,

18  whether they are coming in for elective surgery or

19  through the emergency room with a variety of pain

20  presentations and to -- based on certain

21  presentations they have, to decide what their next

22  steps will be in treatment.  For example, like I

23  told you earlier on, to not give methadone to a

24  patient the night before if we wanted to start them

25  on Suboxone, to identify that earlier in the

1  process.

2    Q.  What do you mean by complicated pain

3  patients?

4    A.  So somebody coming in simply with a ruptured

5  appendix and is not opioid dependent would be very

6  easy to manage.  We would give them postoperative

7  pain medicine, they would do very well, and it would

8  be very simple and straightforward.

9    That same patient coming in on very high

10  doses of opioids prescribed as an outpatient would

11  be very difficult to manage on the hospital side and

12  postoperatively because of that, as an example of

13  complicated presentation.

14    If a patient comes in on methadone because

15  they are an IV drug addict and they go to the

16  methadone clinic and they are shooting up and they

17  show up with an abscess in their arm, that patient

18  would be very difficult to manage their pain during

19  their hospitalization.

20    Another example, a sickle cell patient who

21  comes to the hospital every week and gets IV drugs

22  in the hospital for a week and then leaves for a day

23  and comes back to another hospital with the same

24  presentation to have the same course for another

25  week, complicated patient as well.

1    Q.  Okay.  Is the protocol committed to paper

2  somewhere?

3    A.  Yes.

4    Q.  Where?

5    A.  At the US Patent Office, and in my files.

6    Q.  Do you know what the patent number or

7  application number is or could you tell me if you

8  had to look?

9    A.  I could get that but not today.

10    Q.  Right.  Do you know what the novelty of the

11  invention you're claiming is at the patent office?

12    MS. COATES:  Objection; form.

13    A.  Not really sure what novelty means.  What I

14  do know is this.  If you have chest pain or having a

15  heart attack and go to any hospital in the United

16  States, you will be treated 100 percent the same

17  way.  You will get oxygen, nitroglycerin, baby

18  aspirin.  But if you come in with an IV abscess and

19  you're a known IV heroin user, you might be given

20  Advil or you might be given IV Dilaudid for six

21  consecutive days, it totally depends on what

22  hospital, what town, what physician, what shift.

23  Even in the same hospital, from shift to shift it

24  can be different.

25    So there is no accepted management on such a

1  presentation and I've asked physicians from across

2  the country what would they do in any given

3  circumstance and they are always different.  I ask

4  10 doctors, I will get 10 different answers.

5    Q.  Is it fair to say the invention -- I'm

6  trying to get what the invention being described

7  is -- is it standardization of how you would treat

8  complicated pain patients?

9    A.  Yes.

10    Q.  Okay.  What form does that take?  Is it a

11  computer module or is it a --  I guess I'm not

12  understanding how physicians implement what you

13  invented?

14    MS. COATES:  Objection to form.

15    A.  Right.  We haven't figured that out

16  ourselves, ideally we would like to have a

17  computerized model but computer programers are

18  expensive and we're not at that point.  At the

19  moment it is something that's teachable and

20  coachable as I have trained numerous nurse

21  practitioners and PAs in this protocol over the

22  years.

23    Q.  Do you have a PowerPoint that you train

24  with?

25    A.  No.

1    Q.  Do you have anything written that gives
2  instructions to the folks you are training?
3    A.  Formalized, not yet, that's something we're
4  working on.
5    Q.  Okay.  Do you have anything in draft form?
6    A.  In outline form, roughly.
7    Q.  I'm just trying to understand when you go
8  around and train folks, do you just do it orally or
9  do you give them anything?
10    A.  So we haven't -- we haven't yet sold it to
11  an entity or a hospital, so when that does happen,
12  we have some upcoming inquiries.  The first part of
13  that process is understanding the specifics of the
14  hospital that is going to be implementing this, and
15  every hospital is different.  So the needs of any
16  hospital from one to another will be different.  So
17  I will be going up to Clewiston, the end of June, to
18  survey this hospital that is interested in
19  implementing Melrose Pain Solutions.  They have
20  their own unique set of circumstances which I can't
21  discuss just yet.
22    Q.  Totally fair.  I don't need to get into
23  that.
24      Are you waiting until the patent is approved
25  to go up and sell these services or are you not

1  waiting for that?
2    A.  We're not waiting for that.  As a method
3  patent, I think it would be very hard to enforce and
4  maintain intellectual property, but it's something
5  that we're passionate about and we're going to move
6  forward.
7    Q.  I used to litigate patents, I understand.
8      Okay.  Do you know how much you intend to
9  charge for the services of Melrose Pain Solutions?
10    A.  No, because that would really depend on the
11  scope of services provided.
12    Q.  Do you know when you intend to start
13  charging for those service -- consulting services
14  for the first time.
15    A.  In Clewiston I'm going to be charging for my
16  time, which is my fee schedule.
17    Q.  Do you know if Dr. Pergolizzi has ever
18  charged for his time that he's spending on behalf of
19  Melrose Pain Solutions?
20    A.  Not yet.
21    Q.  Has Melrose Pain Solutions made any income
22  to date?
23    A.  Yes.
24    Q.  Okay.  What kind?
25    A.  We had a contract in Arizona where we helped

1  a pain clinic with their meaningful use data and to
2  meet those benchmarks in the MIPs.
3    Q.  What pain clinic?
4    A.  I forget the name of it.  It was an Arizona
5  pain clinic.
6    Q.  What city?
7    A.  I don't remember.
8    Q.  Could you find that out if you had to?
9    A.  I could.
10    Q.  How long did you work for them?
11    MS. COATES:  Objection to form.
12    A.  We didn't work for them.  We worked to put
13  together the data to apply for the meaningful use
14  reimbursement, which they did get.  We worked with a
15  healthcare economist and provided them data on their
16  clinic that they were using to submit to insurance
17  companies to get better reimbursement on their
18  contracts and we helped them meet their meaningful
19  use data points.
20    Q.  How much were you paid for that?
21    A.  About $20,000.
22    Q.  Okay.  How did you come to be in business
23  with Dr. McCormick?
24    A.  Liana McCormick is not a doctor, she's a
25  healthcare marketer.  She was a contact of

1  Dr. Pergolizzi's and she and I worked tirelessly to
2  come up with the protocol.  Yeah, the protocol was
3  mine, but to get all that I do into a -- into
4  basically a decision tree format is something she
5  helped me work on.
6    Q.  Is that the format of the protocol now,
7  decision tree format?
8    A.  Yes.
9    Q.  Do you have a copy of that decision tree?
10    A.  Yes.
11    Q.  How did you come to know Ms. McCormick?
12    A.  Through an introduction from Dr. Pergolizzi.
13    MS. COATES:  Objection to form.
14    Q.  How did Dr. Pergolizzi know her?
15    A.  They've had a long-standing relationship
16  through multiple projects they worked on in the
17  past.
18    Q.  Has she worked in marketing with
19  Dr. Pergolizzi before?
20    MS. COATES:  Objection to form.
21    A.  I'm not sure.
22    Q.  And what is Ms. McCormick's role for Melrose
23  Pain Solutions?
24    A.  She's sort of the glue.  I basically data
25  dump on her and call her with all my ideas and she

Page 181

1  puts it into useful format.  Her background is in
2  marketing.
3      Q.  Okay.  And is her future role or continuing
4  role to be marketing the Melrose Pain Solutions
5  product once it's developed?
6      A.  Well, I would say no.  She's really a viable
7  part of our project insofar as she can -- I don't
8  think marketing is in so much -- although when the
9  times comes, I hope so, but in helping us create --
10 helping us create -- yeah, the decision tree, the
11 patent.
12     She keeps us organized with filing of the
13 patents and the taxes and all of the other paperwork
14 and e-mails, and she really coordinates.  She's more
15 of like our CEO.
16     Q.  Understood.  Fair.  On your CV, you listed a
17 couple more things that I wanted to ask you about.
18 You have that you are an "affiliate faculty member"
19 at the University of Miami that started in August
20 2016.
21     A.  Yes.
22     Q.  What do you teach for the University of
23 Miami?
24     A.  So I am an instructor for the internal
25 medicine residents at Holy Cross Hospital.  And they

Page 182

1  are University of Miami residents, and their site is
2  at Holy Cross Hospital.
3      So the residents that elect to do a rotation
4  through my practice, do so, usually one at a time,
5  sometimes two at a time and they spend the day with
6  me on hospital rounds and in my clinic.
7      Q.  How often do -- are you teaching a resident
8  through that program?
9      A.  When I have a resident, they're usually with
10 me for two weeks continuously, and I've had, I mean,
11 five or six residents rotate through my team.  It's
12 like -- each year is a little different when one
13 resident does it and they pass on the information
14 and if it's early or late in the year.  So the new
15 group of residents starts in July, so I hope to be
16 having some more.
17     Q.  Okay.  You don't teach any classes on campus
18 at Miami; is that fair?
19     A.  No.  I'd like to, and I'm trying to find
20 time in my schedule to put that together.  And I
21 think that would be an awesome thing to do.  I look
22 forward to that.
23     Q.  You have on your CV, also, a "Monitor for
24 the Florida Board of Medicine Probationers
25 Committee/Affiliated Monitors."

Page 183

1      A.  Yes.
2      Q.  "On-site visits to physician offices."  And
3  that was from July 2010 to August 2012.
4      What were you doing there?
5      A.  So Affiliated Monitors is a company out of
6  Boston that approached me and asked if I would be
7  interested in working with them for physicians or
8  for the board of medicine but to help physicians who
9  have lost their license to, as part of their board
10 order, in order to get reinstated, they had to be
11 monitored, and so the monitor had to be qualified in
12 their specialty, and so I got hired to be the
13 monitor.  I was a monitor for two physicians, not at
14 the same time.
15     Q.  So you have monitored two physicians through
16 that program?
17     A.  That's correct.
18     Q.  Which physicians?
19     A.  I mean, their -- their names, I don't think
20 are relative, not that I could remember them or
21 spell them right, but one was an OB-GYN who was
22 working in a -- in a pain clinic, and another was a
23 physician who was working in a weight loss clinic.
24     Q.  And both of those physicians had lost their
25 medical license?

Page 184

1      A.  Yes.
2      Q.  You don't remember either of their names?
3      A.  One name was -- his first name was Moulton,
4  M-o-u-l-t-o-n, and his last name was Keene or Koen.
5  I don't remember the spelling, but maybe K-e-e-n-e
6  or K-e-o-n-e.
7      And the other one, I don't remember his
8  name.
9      Q.  Were both of those physicians located here
10 in the Miami area?
11     A.  Here in Florida.
12     Q.  Where were they located?
13     A.  The OB-GYN was in Fort Lauderdale.  I think
14 they were both in Fort Lauderdale.
15     Q.  How often did you monitor them in their
16 office?
17     A.  The Moulton Keane, about five or six times.
18     Q.  I guess I'm confused.  If they were -- if
19 they lost their license, what were they doing in the
20 office?
21     A.  So it was part of their reinstatement for
22 them to have ongoing monitoring --
23     Q.  Okay.
24     A.  -- for a period of time.
25     Q.  Understood.  Both physicians had been

Page 185

1  reinstated?
2      A. Yes. Yes.
3      Q. And you were monitoring them after
4  reinstatement?
5      A. That's correct.
6      Q. Okay. What was your -- did you have the
7  power or ability to recommend continued
8  reinstatement?
9      A. Yes.
10     Q. Okay. Did you recommend continued
11 reinstatement?
12     A. Yes.
13     Q. What were you monitoring with respect to
14 both of those physicians?
15     A. With -- I was monitoring with respect to
16 compliance with their Board order.
17     Q. Did the monitoring that you were doing have
18 anything to do with opioid prescribing?
19     A. For one, yes; for the other, no.
20     Q. For which one was it "yes"?
21     A. For Moulton Keane.
22     Q. Had he lost his license as a result of
23 opioid prescribing?
24     A. Yes.
25     Q. Okay. And he had been reinstated?

Page 186

1      A. Yes.
2      Q. And you recommended they continue with
3  reinstatement?
4      A. As part of his continued -- continued
5  reinstatement, there were certain parameters that he
6  had to be continuing and what he needed to be doing,
7  and I was monitoring him for -- Affiliated Monitors
8  would give me a checklist to review the charts and
9  to put together a report of the chart review.
10     Q. Okay. If you have a really busy schedule,
11 why did you do this job?
12     A. I'm not doing it anymore. That was then and
13 it -- to me, it's -- it's really important work and
14 part of -- part of our climate with, you know -- I
15 just think it's really important for me to
16 understand what's going on, just locally and
17 nationally.
18        Like, I used to really enjoy going to other
19 states -- and I still do -- to give lectures to hear
20 from the physicians at the lecture what's going on
21 in their part of the world, because at that time,
22 South Florida, we were being -- we had a lot of pill
23 mills down here and things were really kind of crazy
24 and out of control, and I wanted to be part of the
25 solution.

Page 187

1      Q. Did those pill mills contribute to the
2  opioid epidemic, in your mind?
3          MS. COATES: Objection; form.
4      A. I think that's a complicated answer. I'm
5  not an epidemiologist. I don't know what
6  contributed to the opioid crisis, but I do know that
7  we've had a lot of -- we had a lot of pill mills, we
8  had a lot of problems surrounding the pill mills
9  that I was seeing on the inpatient side as well.
10     Q. I'm just asking you in your experience, do
11 you think the pill mills in South Florida
12 contributed to the opioid crisis here in Florida?
13         MS. COATES: Same objection.
14     A. I think the pill mills created a problem
15 with the patients with whom they treated. I don't
16 know about the overarching principles of what was
17 going on in the community. We were seeing at the
18 same time a lot of Flakka abuse, which is not an
19 opioid, and I think pill mills were a problem, and I
20 think that a lot of collective work to kind of rein
21 that in, and my work with Affiliated Monitors I saw
22 as part of that, to make sure that physicians were
23 being educated.
24        And in particular, the physician I was
25 working with, he was back out in the world

Page 188

1  practicing medicine, particularly pain medicine. I
2  wanted to make sure that -- my role was to make sure
3  that he was now practicing in a more compliant way.
4      Q. Did you feel like you were able to determine
5  that on the few times you spent with him?
6      A. On the --
7          MS. COATES: Objection; mischaracterization.
8      A. -- the few times I spent with him and the
9  extensive chart reviews I did, yes, he had -- he had
10 changed his practice and improved his -- improved
11 his practice of practicing medicine.
12     Q. How many of his charts did you have to
13 review?
14     A. I don't recall at each site visit. I think
15 I had to recall -- review eight or 10 at each visit.
16     Q. And how many visits with -- or did you have
17 with him?
18     A. I don't recall specifically, but maybe five
19 or six.
20     Q. You listed on your CV that you are
21 doing consult -- or you are currently doing
22 consulting work for the Drug Enforcement Agency?
23     A. Yes.
24     Q. And that started in 2015?
25     A. Yes, if not sooner. It's -- it's been

Page 189

```
 1    informal. I've been working with them a lot. And
 2    more recently, there's -- we're working on formalizing
 3    a contract. They want me to review a current pain
 4    clinic, and they want me to review hidden camera
 5    footage and review a bunch of charts.
 6          And what I find particularly interesting,
 7    from the DEA's perspective, is how difficult it is
 8    to find the problems in the doctor/patient
 9    relationship. It's very hard to penetrate that
10    relationship to see what is appropriate and not
11    appropriate.
12       Q.  What is the nature of what you've been doing
13    for the DEA? Is it always -- when you were hired in
14    2015, what were you hired to do?
15       A.  So I was never formally hired. I worked
16    with them. I'm about to be formally hired because
17    we're actually working on a contract currently that
18    we have not finalized.
19       Q.  Okay.
20       A.  Things happen slow.
21       Q.  Okay? So from 2015 to now, what -- how much
22    interaction did you have with the DEA in this
23    consulting relationship?
24       A.  Several visits, several phone calls, and
25    still ongoing phone calls, when they would call me
```

Page 190

```
 1    about a physician they had particular concerns about
 2    or would ask me if a particular physician -- if I
 3    see a lot of that physician's patients overdosed in
 4    the hospitals.
 5          And on the flip side, I would talk to the
 6    DEA agents about physicians that I saw patterns with
 7    of frequent patient admissions, with being
 8    prescribed in high doses and high quantities of pain
 9    medications from certain physicians. So I have, you
10    know, an informal list, if you will, of physicians
11    in my community that are potential problems.
12       Q.  How many times in the years 2015 to the
13    present did you interact with the DEA on those sorts
14    of issues?
15       A.  Probably 15, 20 times.
16       Q.  Who did you interact with?
17       A.  I'd have to check my e-mail to get their
18    names.
19       Q.  Do you remember any of them?
20       A.  I don't remember their names offhand.
21       Q.  How did you first come to interact with
22    someone at the DEA about these types of issues?
23       A.  Someone from the DEA contacted me because
24    they had seen me do a town hall presentation.
25       Q.  You mentioned a current contract that you're
```

Page 191

```
 1    negotiating with the DEA.
 2          What does that contract do?
 3       A.  It enables me to get paid for consulting
 4    services, to be able to formally review this
 5    clinic's information.
 6       Q.  And will you be paid for that arrangement?
 7       A.  Yes, I will.
 8       Q.  How much?
 9       A.  I don't know yet.
10       Q.  Okay.
11       A.  But I also had to have security clearance,
12    and I was recently fingerprinted and, you know,
13    going through that process.
14       Q.  Who are you working with at the DEA on that
15    contract?
16       A.  I can't remember his name. His first name
17    is William, I think.
18       Q.  Where is he located?
19       A.  Or Shawn.
20          I'm not sure.
21       Q.  How did he come to contact you?
22       A.  He got my name from another DEA agent who
23    had called me in the past.
24       Q.  I want to understand your experience in
25    addiction medicine a little bit better.
```

Page 192

```
 1          You didn't -- from your CV, you didn't do a
 2    residency in addiction medicine; is that correct?
 3       A.  Correct. A residency in addiction medicine
 4    wasn't offered back then.
 5       Q.  Understood. I'm just trying to understand
 6    the bounds of your experience.
 7       A.  Yes.
 8       Q.  You don't, from what I can tell from your
 9    CV -- but tell me if I'm wrong -- you don't run an
10    addiction medicine clinic, right?
11          MS. COATES: Objection; form.
12       A.  I -- I think I do. My South Florida Pain &
13    Wellness has a Suboxone clinic, basically.
14       Q.  Okay. And how many patients do you have on
15    Suboxone in that clinic?
16          MS. COATES: Asked and answered.
17       A.  Currently, I'm not sure. I haven't done a
18    recent count. It's hard to -- hard to keep current
19    with that, but I'd say somewhere between 80 to 100
20    patients.
21       Q.  And how long have you been running the
22    Suboxone clinic at South Florida Pain --
23       A.  I've been prescribing Suboxone since around
24    2005.
25       Q.  I'm asking out of South Florida Pain &
```

Page 193

1    Wellness, how long have you been running that
2    Suboxone clinic?
3        A.  So I've been prescribing Suboxone through my
4    pain management practice since about 2005.
5        Q.  I'm sorry, remind me again when South
6    Florida Pain & Wellness opened.
7        A.  About a year ago, but it was just a transfer
8    of my same practice to a different portion of my
9    practice.
10       Q.  I see.  How -- since 2005, have you always
11   had roughly 70 to 80 patients on Suboxone at any
12   given time?
13       A.  No, I started with just a few.
14       Q.  I'm just trying to understand over the years
15   how much of your practice has been treating patients
16   with Suboxone or administering any other MAT.  Okay?
17          You have told me that in the year since
18   South Florida Pain & Wellness has been open, it's
19   about 70 to 80 patients.  Okay?
20          I'm trying to understand before that, what
21   your patient population looked like that was on any
22   form of MAT.
23       MS. COATES:  Objection; form.
24       A.  So I'd -- I'd say I've treated, you know,
25   70 to 80 patients a month, probably been at that

Page 194

1    number for several years.
2        Q.  Okay.
3        A.  I would say certainly in 2015, I was
4    prescribing a lot of Suboxone.  I think I've always
5    been right about that 100 number, a little bit more.
6    I do have the data waiver to treat 250 patients.
7           And in 2008 to '12, it was probably less
8    than 80 patients, but it was a significant portion
9    of my practice.
10       Q.  When you say it was a significant portion of
11   your practice, how much of your practice was of an
12   addicted population between 2008 and 2012?
13       A.  I don't know that I can --
14       MS. COATES:  Objection.
15       A.  -- answer those specific numbers.  I mean,
16   there's -- a big part of my practice is the
17   inpatient patients, and so the inpatient population,
18   I would see a higher proportion of patients with
19   addiction, and some of those patients who were
20   started on Suboxone in the hospital would follow up
21   in my office as a continued medication-assisted
22   treatment with Suboxone.
23       Q.  Okay.  I really am just trying to understand
24   your experience with addiction medicine.
25          So let's try to do it this way:  Other than

Page 195

1    treating patients with Suboxone, have you -- do you
2    treat other patients with addiction?
3        A.  Yes.
4        Q.  Okay.  What kinds?
5        A.  Alcohol, tobacco, cocaine.
6        Q.  How much of your practice from 2002 to
7    present has been treating patients with addiction to
8    those other drugs?
9        MS. COATES:  Objection; form.
10       A.  So patients with addiction cross over to
11   patients with pain.  And in the hospital setting,
12   I'd say a significant portion of the hospital
13   admissions I would see had some kind of an addiction
14   associated with their separate reason for being
15   hospitalized.
16          So, for example, a motorcycle trauma may be
17   an alcoholic, and so managing their pain in the
18   setting of alcoholism is much more complicated than
19   managing their pain of just a trauma without
20   alcoholism.
21          So some of the reasons -- and this also
22   spills over to Melrose.  What would make a
23   hospitalized patient more complicated would be with
24   a -- with an addiction problem overlying their
25   current medical illness.

Page 196

1        Q.  Other than in the hospital -- in your
2    clinical setting, so on your outpatient clinical
3    setting, how much of your outpatient practice is
4    treating patients with addiction?
5        A.  I'd say maybe 10 percent.
6        Q.  And has that -- has that been true since you
7    started prescribing Suboxone in 2005?
8        A.  Well, when I started prescribing, that would
9    have been a smaller number of patients.  And with
10   time, as my practice has grown, so have my patients
11   across all areas of treatment.
12       Q.  Is addiction to opioids a condition you see
13   regularly in your chronic pain population?
14       MS. COATES:  Objection; form.
15       A.  What do you mean by "regularly"?
16       Q.  I'm just asking you, is that something you
17   see on a regular basis?
18       A.  Addiction to opioids?
19       Q.  Uh-huh.
20       A.  In my practice?  No.  I'd say that's more
21   the exception than the rule.  I mean, I meet a lot
22   of people, especially in my hospital practice, who
23   are addicted to opioids.  And in my pain practice,
24   I'd say no.
25       Q.  So what about the 70 to 80 patients a month

1    you're treating with Suboxone, would you say that
2    those folks are addicted to opioids?
3        A.   Those -- those aren't patients I would
4    consider part of my pain practice.  That's my South
5    Florida Pain & Wellness addiction practice.
6        So I'm sorry, I thought you meant in my
7    chronic pain patients.  Those are not the same group
8    as my Suboxone patients.
9        Q.   Okay.  I asked in your clinical practice,
10   and I thought that South Florida Pain & Wellness was
11   a clinical practice.
12       A.   Okay.  I thought you asked in my pain
13   practice, so my misunderstanding.
14       Q.   Just in your practice, a hundred percent of
15   your practice --
16       A.   Okay.
17       Q.   -- is addiction to opioids something that
18   you regularly encounter?
19       A.   Yes.
20       Q.   Do you hold yourself out as a specialist in
21   addiction medicine?
22       A.   Yes.
23       Q.   How long have you been a specialist in
24   addiction medicine, would you say?
25       A.   Well, I got my board certification in

1    addiction medicine in 2010, so I would say that's a
2    good marker.
3        Q.   Why did you get your board certification for
4    addiction medicine?
5        A.   I wanted to learn more, as much as possible,
6    about addiction medicine because I was treating so
7    many patients, not only with opioids and opioid
8    addiction, but with other addictions as well.
9        Q.   Was one of the primary reasons you got board
10   certified in addiction because you were seeing so
11   many patients with opioid addiction?
12       MS. COATES:  Objection.
13       A.   Yes.
14       Q.   What process do you have to go to to get
15   board certified in addiction medicine?
16       A.   CMEs, conferences, testing, a board exam,
17   quite -- quite a rigorous board exam, and I forget
18   how many hours of CME training, but extensive online
19   training, a full week-long conference.
20       Q.   Who gives your certification?
21       A.   It was given, the first time I took it,
22   through the American Society of Addiction Medicine,
23   known as ASAM.
24       And then just recently it became offered,
25   and the new certifying board is the American Board

1    of Preventive Medicine.  And the first time that was
2    offered was October of 2018, and I wanted to take it
3    and get it out of the way so I wouldn't have to
4    think about it for another 10 years.
5        Q.   What is preventative medicine?
6        A.   It -- you know, it doesn't really make
7    sense.  I've read about why it's being offered
8    through Preventative Medicine, but I guess addiction
9    is something you would want to prevent.  I don't
10   know why the preventative board is -- Preventative
11   Medicine is offering it instead of the American
12   Society of Addiction Medicine, which makes more
13   sense to me.
14       But it's going to be a residency.  To your
15   point earlier, did I do a residency, it's going to
16   be offered as a residency.  I think it already
17   currently is, although I'm not certain.
18       Q.   You said you guess addiction is something
19   you want to prevent.  Isn't addiction something you
20   want to prevent?
21       A.   Yes, but you can't -- you can't
22   affirmatively treat somebody to prevent addiction,
23   right?
24       Q.   What do you mean by that?
25       A.   I don't know.

1        Q.   That's okay.
2        A.   Yeah, yeah.
3        Q.   I'm just curious, what do you mean?
4        A.   Yeah.  No.  I mean, when you go through a
5    training to -- you can't treat something that
6    doesn't exist, so you --
7        Q.   Understood.
8        A.   In preventing something, I would think that
9    would be much more global action, to prevent
10   something, not to specialize in preventing.  It's
11   like to be a specialist in not smoking, what are you
12   going to do?  Just don't smoke, right?
13       Q.   Right.
14       A.   It's just -- so I'm not really clear why
15   it's through the Preventive Board of Medicine, but
16   it will be a residency.
17       And one of the reasons I also wanted to get
18   the boards early on is there is a finite period of
19   time in which I'm grandfathered in -- or
20   grandmothered in, as I like to say -- to not having
21   to take the residency and be board certified.  After
22   a certain time, that door will close; and in order
23   to be board certified in addiction medicine, you
24   will have to take -- you will have to do a
25   residency.

Page 201

1      Q.  And you didn't have to do a residency, you
2    were grandfathered in?
3      A.  Grandmothered in, yes.
4      Q.  Grandmothered in.  I love it.
5          Okay.  On your CV, you have a couple of
6    professional associations that you belong to.  Do
7    you see that?
8      A.  Yes.
9      Q.  Can you turn to that part?
10     A.  Yes.
11     Q.  You list the American Society of
12   Anesthesiologists.  How long have you been a member
13   of that professional association?
14     A.  Since 1992, I think.
15     Q.  Have you ever taken a leadership role in
16   that organization?
17     A.  No.
18     Q.  Okay.  Have you ever served on the board of
19   that organization?
20     A.  No.
21     Q.  Are you currently a member of that
22   organization?
23     A.  I think so.  I'm not sure if I paid my dues
24   on time, but it's my intention that I am.
25     Q.  The Florida Society of Anesthesiologists,

Page 202

1    how long have you been a member of that
2    organization?
3      A.  I think since around 1995.
4      Q.  Okay.  And are you currently a member of
5    that organization?
6      A.  I think so.  I'm not sure.
7      Q.  Okay.  Have you ever served in a leadership
8    role in that organization?
9      A.  No.
10     Q.  Okay.  The society for pain management --
11   Pain Practice Management, what is that?
12     A.  That's a society that I joined.  A lot of
13   their information and support is around billing
14   practices.  So the SPPM offers lots of courses on
15   billing practices and coding and that sort of thing.
16     Q.  Okay.  And when did you join that
17   organization?
18     A.  I don't remember.  Sometime in early 2000.
19     Q.  Okay.  Have you been on the board there?
20     A.  No.
21     Q.  Have you ever been in a leadership role
22   there?
23     A.  No.
24     Q.  How often do you participate with that
25   organization?

Page 203

1      A.  I read their -- I read their e-mails and
2    stuff that comes across my desk.
3      Q.  Do you ever go to meetings?
4      A.  I have, but not in a very long time, not in
5    many, many years.
6      Q.  Okay.  The American Academy of Pain
7    Management, how long have you been a member of that
8    organization?
9      A.  I think since about 2009.
10     Q.  Okay.  And have you ever served in a
11   leadership role of that organization?
12     A.  No.
13     Q.  Have you ever been on the board of that
14   organization?
15     A.  No.
16     Q.  Do you know any other doctors or others that
17   are members of that organization?
18     A.  Yes.
19     Q.  Who?
20     A.  Many.
21     Q.  Have you ever gone to meetings for that
22   organization?
23     A.  Yes.
24     Q.  Okay.  How -- how many times a year do you
25   go to a meeting for that organization?

Page 204

1      A.  I think I've gone to two or maybe three
2    total.
3      Q.  When was the last time?
4      A.  When it was in Fort Lauderdale five or six
5    years ago.
6      Q.  And the time before that was obviously
7    before five or six years ago?
8      A.  Yes.
9      Q.  Okay.  The American Society of Addiction
10   Medicine, how long have you been a member of that?
11     A.  Since about 2010.
12     Q.  Okay.  And again, have you served in a
13   leadership role in that organization?
14     A.  No.
15     Q.  Have you taken an active role in that
16   organization?
17     A.  No.
18     Q.  Okay.  Have you gone to meetings of that
19   organization?
20     A.  Yes.
21     Q.  Okay.  Which -- how many times?
22     A.  Once.
23     Q.  Where was that?
24     A.  I think in Texas.
25     Q.  Do you know Michael Miller?

## Page 205

1     A.  No.

2     Q.  The Florida Academy of Pain Medicine, how

3 long have you been a member of that?

4     A.  I think since 2012, maybe.

5     Q.  Okay.  And what is the Florida Academy of

6 Pain Medicine?

7     A.  It's a local meeting, obviously a Florida

8 academy.  They do a lot of the legislative actions

9 around pain management in Florida.

10     Q.  How often do you attend meetings of that

11 association?

12     A.  I never have.

13     Q.  Okay.  What is -- can you briefly describe

14 what your participation in it is?

15     A.  I pay my dues, and I receive their e-mails

16 and sent information.

17     Q.  Are there any other professional

18 associations that you are -- you have been a member

19 of that you have not listed on your CV?

20     A.  Not that I can recall.

21     Q.  Okay.  Really quickly, let's turn to the

22 "Key Speaker" section, if we could.  We covered some

23 of this a little earlier, so I don't think we're

24 going to have to do too much on this.

25       You list a number of companies that you have

## Page 206

1 served as a key speaker for in your CV, correct?

2     A.  Yes.

3     Q.  Are all of the companies that you have

4 served as a key speaker for listed in your CV?

5     A.  I think so.

6     Q.  To the best of your knowledge?

7     A.  Yes.

8     Q.  And --

9     A.  I try.

10     Q.  And are they generally listed here on your

11 CV in chronological order?  It looks like it.

12     A.  Yes.

13     Q.  Okay.  What is a key speaker or a key

14 opinion leader?

15     A.  So a key opinion leader is a term that's

16 been given to us, I think, from the pharmaceutical

17 industry.  And frankly, I'm not really sure where I

18 first learned about it, but they are thought

19 leaders, basically, in the field who are experienced

20 and knowledgeable and bring value to the pain

21 community.

22     Q.  And the key opinion leaders get compensated

23 by the pharmaceutical companies to come and speak;

24 is that correct?

25     A.  Correct.

## Page 207

1     Q.  Okay.  And you have served as one of those

2 key opinion leaders that have been compensated by

3 the pharmaceutical companies to come and speak?

4     A.  That's correct.

5     Q.  Okay.  And let's just go through it quickly

6 so I understand.  So the first time you served as a

7 key opinion leader was for Alpha Pharma in 2004 to

8 2006?

9     A.  Yes.

10     Q.  I think we talked about that earlier; is

11 that right?

12     A.  Yes.

13     Q.  And Alpha Pharma -- Alpha Pharma

14 manufactured an opioid product?

15     A.  Yes.

16     Q.  Okay.  And did you have a contract to serve

17 as a key opinion leader for Alpha Pharma?

18     A.  I don't think the contract spelled it out

19 that way.

20       MS. COATES:  Objection.

21     A.  I think I had a contract to participate as a

22 consultant.

23     Q.  Okay.  And generally, how were you paid for

24 that consulting arrangement?

25     A.  To the best of my recollection, I was paid

## Page 208

1 $750 per lecture.

2     Q.  Okay.  And did you give numerous lectures?

3     A.  Yes.

4     Q.  How many, in that time period?

5     A.  I don't remember.

6     Q.  Less than 20?

7     A.  Yes.

8     Q.  More than 10?

9     A.  Maybe.

10     Q.  Okay.  It also lists a "National Sales

11 Meeting."  Did you attend a national sales meeting

12 for Alpha Pharma in 2005?

13     A.  Yes.  I was their speaker for the national

14 sales meeting.

15     Q.  Okay.  What did -- what topic did you speak

16 on?

17     A.  I -- I don't recall specifically.  I would

18 imagine it was to present the new sales slide deck.

19     Q.  Sales for what product?

20     A.  Kadian.

21     Q.  Okay.  Who drafted the slide deck for that

22 presentation?

23     A.  As far as I know, it was internal from the

24 Alpharma team.

25     Q.  Generally, when you serve as a key opinion

## Page 209

1  leader and you're talking about a product, is the
2  slide deck or presentation drafted by the
3  pharmaceutical company?
4      A.  Yes.
5      Q.  Okay.  Is it always?
6      A.  All of the ones that I have given are, yes.
7      Q.  Okay.  You don't participate in the writing
8  of the content, correct?
9      A.  Correct.
10      Q.  Okay.  Where was that national sales meeting
11  in 2005 where you were speaking about Kadian?
12      A.  I don't remember.
13      Q.  Did you -- did the pharmaceutical company
14  pay for your travel to that national sales meeting?
15      A.  Yes.
16      Q.  Did the pharmaceutical company, Alpha
17  Pharma, pay for your travel to any of these
18  lectures?
19      A.  Yes.
20      Q.  While you were at the national sales
21  meeting, did they pay for your meals and hotel room?
22      A.  Yes.
23      Q.  Let's take Medtronic.  You served as a key
24  opinion leader for Medtronic from 2005 to 2008; is
25  that right?

## Page 210

1      A.  Yes.  I was a trainer for Medtronic.
2      Q.  Okay.  And you were training them on -- can
3  you pronounce this for me?
4      A.  Yeah.  Surgical implantation of intrathecal
5  baclofen pumps.
6      Q.  Okay.  And this was a device -- was the
7  device a device to administer opioid medications?
8      A.  It was a device to administer intrathecal
9  medications.
10      Q.  What is an "intrathecal medication"?
11      A.  "Intrathecal" means in the spine.  So I was
12  training their surgeons on the baclofen pump, which
13  is a different team.  Intrathecal baclofen being not
14  an opioid, but baclofen is used for spasticity.
15      Q.  Can intrathecal pumps be used to administer
16  opioids?
17      A.  Yes.  It's approved for morphine.
18      Q.  Okay.  And how many of the training sessions
19  did you engage in as a KOL for Medtronic?
20      A.  Well, the one I have listed here was
21  specifically for a pediatric spine surgeon in Palm
22  Beach, Palm Beach County somewhere.  I've done some
23  other trainings with them, but I don't remember the
24  specific details.
25      Q.  Were you being paid for those trainings?

## Page 211

1      A.  Yes.
2      Q.  At $750 a training, or what?
3      A.  I don't remember, and I don't remember what
4  other trainings I did, I -- I'm just pretty sure I
5  did for Medtronic.  But for the intrathecal baclofen
6  training, I was paid for the day.  I don't remember
7  how much.
8      Q.  Oh, I'm sorry.  Was it just one day?
9      A.  Yes.
10      Q.  Okay.  During the time period 2000 to 2008,
11  you did that one time?
12      A.  I don't remember what else I did for them.
13  I just don't remember.
14      Q.  Okay.  I'm going to jump to the "Collegium
15  Conferences."  Do you see that in your CV?
16      A.  Yes.
17      Q.  Okay.  What product did Collegium make?
18      A.  Xtampza.
19      Q.  Okay.  That's what we talked about before.
20  That is on opioid product?
21      A.  Yes.
22      Q.  And when was the first time you started
23  working for Collegium regarding its Xtampza product?
24      A.  2016.
25      Q.  Okay.  And do you still work for them today?

## Page 212

1      A.  Yes.
2      Q.  And were you paid for your work as a key
3  opinion leader for Collegium regarding its opioid
4  product Xtampza?
5      A.  Yes.
6      Q.  Okay.  What were you -- how were you
7  compensated?
8      A.  I think it was 1250, $1,250 for a local
9  lecture and more for -- depending on how far I had
10  to travel.  I was compensated more for further away
11  lectures.
12      Q.  You list 11, it looks like, speaking
13  engagements on your curriculum vitae.  Are all -- is
14  that a complete list of all of the speaking
15  engagements that you were involved with with
16  respect -- for Collegium?
17      MS. COATES:  Objection; form.
18      A.  I think so, insofar as my assistant keeps
19  track of them, not me.
20      Q.  To the best of your knowledge?
21      A.  Yes.
22      Q.  Okay.  Several of these are virtual WebExes.
23  Again, was the content -- is it fair to say the
24  content of all of these was similar to where we
25  talked about before with Kadian, where you were

## Page 213

1   given a slide deck with respect to Xtampza and you
2   were presenting on the company's slide deck?
3       A.  Yes.
4       Q.  Okay.
5           MS. COATES:  Objection to form.
6       Q.  And when you had to fly to speak in
7   locations like Chicago or Dallas or Denver, was the
8   company paying for your travel expenses?
9       A.  Yes.
10      Q.  When you would go to speak, was the company
11  paying for your hotel room?
12      A.  Yes.
13      Q.  Was the company paying for your meals and
14  expenses?
15      A.  Yes.
16      Q.  During these conferences, would you attend
17  dinners with company representatives?
18      A.  No.  During these -- it's not a conference.
19  It's a speaking program.
20          So I would fly.  I would land at the
21  destination.  I would take an Uber or a taxi or
22  sometimes get picked up by the rep to the dinner
23  program.  After the dinner program, I would be
24  brought to my hotel.  I would sleep, get an early
25  flight out at 6:00 a.m. and be back.

## Page 214

1       Q.  Was that always the schedule you kept when
2   you attended one of these conferences?
3       A.  Yeah, more or less.  I mean, there was never
4   any leisure time associated around that.  There was
5   no reason for me to be in that particular location
6   other than to give a lecture and leave.  If I could,
7   I would come back the same night.
8       Q.  Were all of these lectures at a dinner
9   meeting for Collegium?
10      A.  Except for the virtual WebExes, yes.
11      Q.  Okay.
12      A.  Now, one of them, I gave one lecture as a
13  breakfast.
14      Q.  And when it says "Collegium Conferences,"
15  what type of conferences were those?
16      A.  They were primarily dinner lectures.
17      Q.  Okay.  Let's go to Pfizer, "Pfizer
18  Conferences."
19          And you have a list where -- did you serve
20  as a key opinion leader for Pfizer?
21      A.  Yes.
22          MS. COATES:  Objection to form.
23      Q.  Were you a paid key opinion leader for
24  Pfizer?
25      A.  Yes.

## Page 215

1       Q.  What product was that regarding?
2       A.  Celebrex and Lyrica --
3       Q.  Are either --
4       A.  -- and Embeda.
5       Q.  Are either -- any of these opioid products?
6       A.  Embeda is an opioid product.
7       Q.  When did you start speaking regarding
8   Embeda?
9       A.  I don't recall.
10      Q.  Fair to say 2016?
11      A.  Yes.
12      Q.  And did you speak about Embeda at Pain Week
13  in Las Vegas?
14      A.  I don't think so.
15      Q.  I see that on your CV, that's why I'm
16  asking.
17      A.  Yeah, I'm confused on the dates on the
18  Pfizer presentations.
19      Q.  Did you speak about Embeda at a Pain Week
20  conference?
21      A.  No.  At Pain Week, I didn't speak about a
22  product.
23      Q.  What is Pain Week?
24      A.  Pain Week is a conference given in Vegas
25  every year that is really primarily not sponsored.

## Page 216

1   I mean, I don't recall any drug-specific lectures
2   given there.
3       Q.  What is it, though?  What is Pain Week?
4       A.  It's a conference that -- they have all
5   kinds of pain treatments, including -- they've got
6   psychologists there and physical therapists.  It's
7   sort of for a broader audience than just pain
8   physicians.
9       Q.  Do you attend Pain Week every year?
10      A.  No.
11      Q.  How many times have you attended Pain Week?
12      A.  Once.
13      Q.  And when was that?
14      A.  In September 2016.
15      Q.  Okay.  Did you speak at Pain Week, you just
16  don't think you spoke about Embeda?
17      A.  No, I don't think I spoke at Pain Week.  I
18  think that -- this is misplaced in my CV and a
19  formatting error, I think.
20      Q.  When you were doing work as a key opinion
21  leader for Pfizer, when you traveled to speak, did
22  Pfizer pay for the cost of your travel?
23      A.  Yes.
24      Q.  Did Pfizer pay for your meals?
25      A.  Yes.

Page 217

1    Q.  Okay.  Did Pfizer pay for your hotel room,
2  if one was necessary?
3    A.  I think for Pfizer I spoke only locally and
4  that was Vero, Palm Beach, and West Palm, so that
5  wouldn't have required a hotel.  It would have been
6  me driving there and back the same night.
7    Q.  Okay.  Let's move on to Depomed.  What --
8  did you serve as a key opinion leader for Depomed?
9    A.  Yes.
10    Q.  Okay.  And did that start in 2017?
11    A.  Yes.
12    Q.  And did you serve as a paid key opinion
13  leader?
14    A.  Yes.
15    Q.  What product does Depomed make?
16    A.  Nucynta.
17    Q.  Okay.  And Nucynta is an opioid product?
18    A.  Yes.
19    Q.  Okay.  And on your CV, you've listed some
20  speaking engagements that you conducted for Depomed.
21      Was that on the Nucynta product?
22    A.  Yes.
23    Q.  And it looks like there were -- one, two,
24  three, four -- five of them; is that right?
25    A.  Yes.

Page 218

1    Q.  And they were in Fort Worth, West Palm,
2  Tampa, Boca Raton, and Naples; is that right?
3    A.  Yes.
4    Q.  And when you were speaking in those
5  locations about Nucynta, were you similarly provided
6  the materials from Depomed that you were going to
7  present?
8    A.  Yes.
9    Q.  And when you traveled to those conferences
10  to speak on behalf of Depomed, were they paying for
11  the travel?
12    A.  Yes, for Texas, yes.  The others were local.
13    Q.  Okay.  And when you spoke on behalf of
14  Depomed, were they paying for your meals?
15    A.  Yeah -- well, yes.  It was part of the
16  dinner presentation.  Sometimes I wouldn't eat
17  dinner.
18    Q.  Were these, likewise, all dinner
19  presentations to other doctors?
20    A.  Yes.
21    Q.  Okay.  Let's move on.
22      I'm sorry, what is the next company on this
23  list?
24    A.  Daiichi.
25    Q.  Daiichi-Sankyo?

Page 219

1    A.  Yes.
2    Q.  What -- what product does Daiichi-Sankyo
3  make?
4    A.  MorphaBond.
5    Q.  What is that?
6    A.  A long-acting morphine abuse-deterrent
7  formula.
8    Q.  Is that an opioid?
9    A.  Yes.
10    Q.  Okay.  And did you serve as a key opinion
11  leader for the opioid manufacturer, Daiichi-Sankyo?
12    A.  Yes.
13    Q.  In 2017 and '18?
14    A.  Yes.
15    Q.  Are you still serving as a key opinion
16  leader for that company?
17    A.  I'm not sure.  Most of these companies no
18  longer are offering dinner programs.
19    Q.  Okay.  And did you serve as a paid key
20  opinion leader for Daiichi-Sankyo?
21    A.  Yes.
22    Q.  Is this a list, to the best of your
23  knowledge, of the presentations you gave for
24  Daiichi-Sankyo?
25    A.  Yes.

Page 220

1    Q.  Okay.  I'm going to ask the same question.
2  If you traveled to locations like Birmingham or
3  Indiana or Kentucky, like I see here, did
4  Daiichi-Sankyo pay for your travel?
5    A.  Yes.
6    Q.  Did Daiichi-Sankyo pay for your meals and
7  expenses while you were traveling to these various
8  conferences?
9    A.  Yes.
10    Q.  Okay.  And did Daiichi-Sankyo provide you
11  with the materials regarding the opioid product that
12  you were speaking about?
13    A.  Yes.
14    Q.  BioDelivery Sciences, Inc., what is that?
15    A.  They manufacture Belbuca.
16    Q.  Is Belbuca an opioid product?
17    A.  Yes.
18    Q.  And you served as a paid key opinion leader
19  for BioDelivery Sciences, Inc.?
20    A.  Yes.
21    Q.  Okay.  And do you have a contract with them?
22    A.  Yes.
23    Q.  Okay.  And how much are you making under
24  that contract?
25    A.  I don't recall.

Page 221

1      Q.  For all of these speaker arrangements, are
2   you generally working on your 750-dollar-an-hour
3   rate?
4      A.  No.
5      Q.  Okay.  Can you give me the range of what
6   you're paid as a key opinion leader?
7      A.  Yes.  $750 was Kadian, that's what I was
8   paid.  And again, these -- these numbers are
9   individual and unique to the company.  They all have
10  their own set fee schedule based on the physician's
11  experience, based on their number of publications.
12  And they have their own internal way of deciding
13  their fee schedule.  It's got nothing to do with my
14  fee schedule.
15      So Alpharma, I made less but that was a long
16  time ago.  Most of them pay more now and I would say
17  most of my -- most of the speaking I've done in the
18  last couple of years has ranged from $1,000 for a
19  dinner lecture to -- I think for Daiichi, when I
20  travel the furthest distance, which I think is
21  greater than 2500 miles, or something like that, I
22  get $4700, I think.
23      Q.  Okay.  And is that each time you travel for
24  Daiichi?
25      A.  No.  Again, it's dependent on the distance I

Page 222

1   travel.  So in general, the ones that are really far
2   away, it basically takes almost two days out of my
3   practice.
4      Q.  So your -- for your key opinion leader
5   services, you're -- what you charge ranges somewhere
6   from $750 to $4500 on the high end?
7      A.  It's not what I charge.  It's what they pay.
8      Q.  Fair.  So what these pharmaceutical
9   companies pay you for your key opinion leader
10  services ranges from $750 an hour to $4500?
11      MS. COATES:  Objection to form.
12      A.  It's not an hourly rate.
13      Q.  My fault.
14      A.  Right.
15      Q.  What you are paid for your --
16      A.  So currently --
17      Q.  -- speaking engagements --
18      A.  -- all of my contracts, my lowest speaking
19  contract that I recall at the moment is $1,000 for a
20  lecture.  For a lecture, it's a one-time fee.  And
21  up to -- for Daiichi I've been paid -- is at the
22  highest range of what I've been paid, is more for
23  the out-of -- out-of-state programs.
24      Q.  Understood.  Do you get paid for your hourly
25  rate for the time other than for the lecture?

Page 223

1      A.  No.  There is no hourly structure.
2      Q.  Okay.  Do you get paid for anything else
3   outside of the lecture fee?
4      A.  No.
5      Q.  All right.  Let's go to the Nevro
6   conference.  What does Nevro make?
7      A.  Nevro is a device manufacturer.  They make a
8   spinal cord stimulator.
9      Q.  Okay.  And you've worked as a paid key
10  opinion leader for Nevro?
11      A.  Yes.
12      Q.  You list a number of conferences you've
13  spoken at.  Are these all of the conferences for
14  Nevro that you've spoken at as far as you know?
15      A.  Yes, I think there was another conference in
16  San Francisco that's not listed.
17      Q.  Okay.  And when Nevro flies you to a
18  conference, do they pay for that?
19      A.  Yes.
20      Q.  When you fly to a conference to speak on
21  behalf of Nevro, do they pay for your meals?
22      A.  Yes.
23      Q.  Okay.  Let's move on to US WorldMeds
24  conference.  What is -- what product does US
25  WorldMeds make?

Page 224

1      A.  Lucemyra.
2      Q.  What's that?
3      A.  It's an alpha 2 agonist that helps mitigate
4   the withdrawal symptoms when somebody stops --
5   abruptly stops an opioid.
6      Q.  Is that an addiction treatment product?
7      A.  An addiction treatment product?  Insofar as
8   it helps mitigate the symptoms of withdrawal, yes.
9      Q.  Is that an opioid?
10      A.  No.
11      Q.  Okay.  And you have been a paid key opinion
12  leader for US WorldMeds, it looks like, since 2019;
13  is that correct?
14      A.  2018, I was on their advisory board.
15      Q.  So since 2018?
16      A.  Yes.
17      Q.  Do you have a contract with them?
18      A.  Yes.
19      Q.  How much are you paid by US WorldMeds?
20      A.  I'm not sure and I'm giving a lecture for
21  them in June.
22      Q.  Okay.  And when you fly to a lecture do they
23  pay for your travel?
24      A.  Yes.
25      Q.  Do they pay for your meals?

Page 225

1    A.  Yes.
2    Q.  Okay.  How did you first get involved in
3  being a key opinion leader?
4    A.  The first time I was a key opinion leader or
5  a speaker was for Alpharma, and I don't -- I can't
6  say how they chose me.  I just know over the years
7  I've been asked to be a speaker and the term key
8  opinion leader is not one I picked for myself but
9  one that I'm aware of that I am.
10    Q.  Have you ever served as a key opinion leader
11  for any of the Teva defendants?
12    A.  Well, I was paid for the program surrounding
13  my Pain Matters film.
14    Q.  Okay.  Did you ever serve as a key opinion
15  leader lecturing on Actiq or Fentora?
16    A.  I don't think so.
17    Q.  All right.  We handed you a lot earlier
18  what's -- I'm not sure what Exhibit number we marked
19  your Appendix B or materials considered list.
20    A.  Yes.
21    Q.  What Exhibit number?
22    A.  Five.
23    Q.  Okay.  We've marked as Exhibit 5 to your
24  deposition what was attached to your report as
25  Appendix B.  Do you see that?

Page 226

1    A.  Yes.
2    Q.  And that was a -- is that a complete list of
3  the materials you considered in this case?
4    A.  Yes.
5    Q.  Okay.  I think you mentioned earlier today
6  you have considered two more depositions of defense
7  experts.  Have you been provided with any other
8  materials since Appendix B was generated?
9        MS. COATES:  Objection; mischaracterization.
10    A.  No, and those were not considered in the
11  preparation of this report as I only saw them
12  recently.
13    Q.  Totally fair.  So all of the materials that
14  you considered in the preparation of the report went
15  onto this list; is that right?
16    A.  That's right.
17    Q.  Okay.  And you have since considered but it
18  didn't go into the preparation of the report, two
19  other depositions of the defense experts?
20    A.  I've seen them.
21    Q.  I forgot.  You didn't yet read them?
22    A.  Right.
23    Q.  You have them in your possession?
24    A.  Yes.
25    Q.  Okay.

Page 227

1    A.  I've glanced through them.  I've read some
2  of them.
3    Q.  I was going to ask that.  Do you think you
4  need to review any additional materials before
5  offering your trial testimony in this case?
6    A.  No.
7    Q.  Okay.  Have you asked for any additional
8  materials from the law firm you're working with?
9    A.  No.
10    Q.  Do you maintain -- I think we talked about
11  the share file earlier.  Do you maintain any other
12  files on this case?
13    A.  No.
14    Q.  Did you receive a copy of everything in
15  Appendix B?
16    A.  Yes.
17    Q.  Okay.  A hard copy or electronic copy?
18    A.  Electronic copy.
19    Q.  When did you receive the materials listed in
20  Exhibit B -- or I'm sorry, Exhibit 5?
21    A.  Specifically, I don't recall, they are part
22  of the share file and I received them sometime prior
23  to the generation of this report and sometime after
24  the Oklahoma deposition.
25    Q.  Would you have received the materials that

Page 228

1  are listed in Appendix B sometime after you started
2  your work in this case on April 11th of 2019?
3    A.  I started my work on this case prior to
4  April 11th, so the end of April on the invoices you
5  have, that invoice is not complete that ends with
6  April 25th, the deposition.  I'm sorry, not the
7  deposition.
8        (Rosenblatt Exhibit 7 was marked for
9  identification.)
10  BY MS. DICKINSON:
11    Q.  I'm going to hand you what's been marked as
12  Exhibit 7.
13    A.  Okay.
14    Q.  So Exhibit 7 -- we had discussed, I think it
15  was Exhibit 6 this morning, that had your billing
16  detail blocked out.  Do you remember that?
17    A.  Yes, yes, yes.  Okay.  So the end of March,
18  I don't know if we have that invoice, was the
19  deposition but that there may have been entries or
20  invoice generation after the deposition and before
21  this date, but April 11th sounds about right.
22    Q.  I'm trying to understand where your work on
23  the Oklahoma case stopped and your work on this case
24  began.  Is it fair to say that your work on this
25  case began the first time entry you have is April

Page 229

1   11th?
2       A.  I think so.
3       Q.  Okay.  So since April 11, is it your
4   testimony that you've reviewed everything in this
5   materials considered list?
6       A.  Since -- yeah.
7       Q.  And if I wanted to find out how much time
8   you've spent reviewing these materials, can I find
9   all of that time on this invoice and the additional
10  time since the invoice?
11      A.  Yes, however, there were materials I
12  reviewed for the Oklahoma case that do overlap with
13  this case.
14      Q.  Okay.  Did you rereview those materials when
15  you were generating your report?
16      A.  I'd say probably to some extent, but for
17  example, of the marketing materials I reviewed, I
18  reviewed hundreds of marketing materials for the
19  Oklahoma case.  I didn't rereview hundreds of
20  marketing materials in preparation for this.
21      Q.  Okay.  Were the marketing materials listed
22  on Appendix B that you reviewed, in the Oklahoma
23  case?
24      A.  Yes.
25      Q.  Who provided you with the materials that are

Page 230

1   listed in Appendix B?
2       A.  The Analysis Group.
3       Q.  Did the Analysis Group provide each and
4   every one of the materials that are listed in
5   Appendix B?
6       A.  Yes.
7       Q.  Okay.  Who made the decision about which
8   materials were going -- you were going to review?
9       A.  It was a collaborative effort as we had
10  discussions about the content of my report or what
11  my report should contain.  We would talk about -- I
12  would reference without knowing the specific
13  citations certain articles and certain concepts that
14  I wanted included.
15      Q.  Did you have access to the electronic
16  database in the multidistrict litigation that's on
17  Relativity?
18      A.  No, I don't think so.
19      Q.  Did you ask anyone to perform electronic
20  searches for documents in either this case or the
21  Oklahoma case?
22      A.  I'm not sure what you mean.
23      Q.  There are -- I'll represent to you about 30
24  million pages of documents on an electronic
25  database.  Did you have anyone search that database

Page 231

1   on your behalf for relevant documents?
2       A.  I'm not sure what database you're referring
3   to.
4       Q.  It's called Relativity.
5       A.  No.
6       Q.  Who is Andrew Boyer?
7       A.  I'd have to refresh my memory on his
8   particular -- the court documents and deposition.
9       Q.  Did you read his deposition?
10      A.  I did.
11      Q.  Okay.  Do you know who he is at all?
12      A.  I don't recall.
13      Q.  Do you know where he works?
14      A.  I think it's Stanford.
15      Q.  Is he an expert witness?
16      A.  He is an expert for the defense, I believe.
17      Q.  Which defendant?
18      A.  I'm not sure.
19      Q.  Do you know what subject he was testifying
20  about?
21      MS. COATES:  If you need to refer to your
22  report to see where you cite his testimony, you
23  are welcome to do that.
24      A.  Yeah.
25      Q.  I don't want to belabor this point.  Sitting

Page 232

1   here today do you have a recollection of what Andrew
2   Boyer was testifying about?
3       A.  I'd have to refresh my memory.
4       Q.  Who is Christine Baeder?
5       A.  Also a defense expert but I'd have to
6   review, look back to see.
7       Q.  Sitting here today, do you remember what
8   Christine Baeder was testifying about?
9       A.  I don't want to misrepresent and remember
10  wrong, so I'd like to refer to my report for that.
11  I think it was --
12      Q.  While you're looking, can I ask you, did you
13  read her deposition?
14      A.  Yes, I did.
15      Q.  Cover to cover?
16      A.  Yes, I did.
17      MS. COATES:  Erin, we have an electronic
18  version we could search.
19      MS. DICKINSON:  No, it's fine.  Let's move
20  on.
21      MS. COATES:  If you'd like me to --
22      MS. DICKINSON:  It's okay.
23      A.  I found the reference.  83, 84, generic
24  opioid medications, the head of Teva USA's generic
25  segment: I testified that Teva USA does not promote

Page 233

1  generic medications to the physicians because the
2  decision-maker in generic procurement is not the
3  physician. It's the officer at a corporate retail
4  chain.
5      That was from the deposition of Christine
6  Baeder.
7      Q. Do you remember anything else about what
8  Ms. Baeder testified about?
9      A. Not specifically, but again, my
10  understanding is that generics were not marketed by
11  Teva.
12      Q. And where did you get that understanding?
13      A. From the deposition.
14      Q. From which deposition?
15      A. From this -- in my disclosure -- in my
16  report on Appendix B.
17      Q. Okay. There are a number of depositions
18  listed, where did you get that?
19      A. Of Christine Baeder.
20      Q. Okay.
21      A. And it's referenced in Footnote 84.
22      Q. So you got your understanding that generics
23  weren't marketed by reading a single deposition of
24  someone that worked at Teva?
25      A. It's my general understanding that generics

Page 234

1  are not marketed, but this is a citation to
2  reference that.
3      Q. I'm just trying to understand the bases for
4  that belief. That's this deposition?
5      A. No.
6      MS. COATES: Objection to form.
7      A. My understanding and my experience is that
8  I've not been marketed generic medications ever.
9      Q. Okay. So you're talking about your personal
10  experience, but you haven't reviewed other documents
11  in this case about generic marketing, correct? I
12  think you answered that five hours ago.
13      A. I've reviewed hundreds of documents on
14  marketing of Actiq and Fentora.
15      Q. And those are not generic products, right?
16      A. That's right.
17      Q. You have not reviewed documents about Teva,
18  the Teva defendant's generic products, right?
19      A. That's correct.
20      Q. Okay. All right. You list a number of
21  depositions on this materials considered list. Who
22  decided which depositions you would review?
23      A. These are the depositions I was provided
24  that were relevant to my opinions as discussed with
25  the Analysis Group.

Page 235

1      Q. Okay. Did you say I want certain kinds of
2  witnesses' depositions or did the Analysis Group
3  decide what would be relevant to your opinions?
4      MS. COATES: Objection to form.
5      A. Well, for example, when we would discuss the
6  marketing of Actiq and Fentora and we would discuss
7  how generics were marketed or if they were marketed,
8  and my experience is that they are not marketed,
9  this provided a good footnote, a good reference to
10  Teva's position that they were not marketing their
11  generic drugs.
12      Q. So did you write opinions and then someone
13  found support for them, is that how it worked?
14      MS. COATES: Objection to form.
15      A. We discussed the opinions and then found
16  supporting documentation for them.
17      Q. Okay. It wasn't the reverse, where you
18  reviewed a bunch of depositions that were provided
19  to you and then you wrote the opinion; is that
20  right?
21      MS. COATES: Objection; mischaracterization.
22      A. That's right.
23      Q. Okay. And the people that found the support
24  were the Analysis Group?
25      A. Yes.

Page 236

1      Q. Okay. Did the lawyers give you any of the
2  materials on your materials considered list?
3      A. No. The materials I received were all from
4  the Analysis Group.
5      Q. Do you have any idea how the lawyers in this
6  case worked with the Analysis Group?
7      A. No, I do not.
8      Q. Okay. Did you ask to review any other
9  depositions of the Teva witnesses other than those
10  listed on this list?
11      A. No, I did not.
12      Q. Did you read each and every deposition
13  listed on this list?
14      A. Yes, I did.
15      Q. Did you -- how much time did you spend
16  reading depositions?
17      A. Hours.
18      Q. How many?
19      A. I don't know specifically which time I spent
20  on which products' depositions and other documents.
21  I couldn't possibly break it down.
22      Q. You have no idea how much time you spent
23  reading the depositions that are listed here cover
24  to cover?
25      A. I can give you an idea of how much time I

1    spent reading all the materials considered but I
2    couldn't break it down for.
3        Q.   Okay.  Where do you find the time that
4    you've billed for reading the depositions that we've
5    marked as Exhibit 7?
6        MS. COATES:  Sorry to interrupt, but before
7    we go into the contents of Exhibit 7, we would
8    like, for the record, I know we had a call with
9    Special Master Cohen earlier this morning and he
10   ordered that we provide this information
11   unredacted, and if we could agree with counsel to
12   do so and to kind of speed things along and allow
13   this deposition to go forward, we agreed to do
14   that but we still believe that these are
15   communications between the witness and counsel
16   and they are not required by the rules or CMO
17   that they are constitute protected privilege
18   communications and that they were not properly
19   requested through Exhibit A -- or Appendix A to
20   the deposition notice and that Cohen has allowed
21   this issue to be briefed by e-mail this
22   afternoon.
23       MS. DICKINSON:  And for the record, Counsel,
24   could you tell me which specific part of
25   Exhibit 7 you are claiming is privileged?

1        MS. COATES:  Just the characterization of
2    the time that she has worked.
3        MS. DICKINSON:  I'm sorry.  What
4    characterization, she only has entries that say
5    three hour review or phone call.  What
6    characterization?
7        MS. COATES:  So my understanding is that
8    this particular invoice was put together by her
9    assistant and the characterizations are maybe not
10   very -- do not provide detailed information, but
11   this is a way that she communicates with us and
12   the request in appendix A is only
13   requesting an itemization of time and
14   compensation, and so we're going to withhold, or
15   stick to our position, that this kind of detail
16   is not discoverable and the rules and --
17       MS. DICKINSON:  I just want to make clear
18   for the record because we're going to obviously
19   have this issue again and again.  What portion of
20   what's on Exhibit 7 do you actually think is
21   privileged or in any way discloses something
22   privileged or work product?
23       MS. COATES:  Description of the work
24   performed.
25       MS. DICKINSON:  So phone call is privileged,

1    with no detail about the phone call, who it was
2    with or what it was about?
3        MS. COATES:  I think that it could have
4    contained more information.
5        MS. LEIBELL:  We also don't need to argue
6    about this --
7        MS. DICKINSON:  Well, actually, I think you
8    do need to put it on the record.  So what part of
9    that phone call, 15 minutes, is privileged?
10       MS. COATES:  It's a communication about the
11   work that she's done.  That's our position and
12   we're --
13       MS. LEIBELL:  And we're providing Special
14   Master Cohen with a written response to the call
15   we had earlier this morning, so we would prefer
16   to let you continue with the deposition and save
17   this for Special Master Cohen later.  We just
18   want to --
19       MS. DICKINSON:  Well, I prefer to make my
20   record because I'm going to have to give it to
21   him.
22       So what part of one hour review is
23   privileged or confidential in any way?
24       MS. COATES:  Again, I think that we are
25   reserving our right that this information is not

1    required under the rules and is not available and
2    that there could be content in there and --
3        MS. DICKINSON:  But is there, I guess is my
4    question?  We don't have to guess whether there
5    could be.  We see it.
6        MS. COATES:  On this invoice at this time,
7    no.
8        MS. DICKINSON:  Okay.  And for the record,
9    Exhibit 6 was what was produced to us this
10   morning as -- with the content blacked out and
11   counsel's claim was that it was blacked out
12   because it was work product privileged or
13   attorney-client privileged.
14       What has been produced as Exhibit 7,
15   Counsel, for the record, is that what was
16   underneath the blacked-out portion?
17       MS. COATES:  For the record, it was not just
18   our -- our position was that communications from
19   the witness, including an invoice, is privileged
20   information.  It was not -- but our position with
21   respect to this is that it was not what Special
22   Master Cohen ordered or what was asked for.  What
23   was asked for was an itemization of time and
24   compensation paid, including invoices.
25       MS. DICKINSON:  I'm just trying to

Page 241

1   understand.  Is what I'm seeing on Exhibit 7 --
2       MS. COATES:  Yes.
3       MS. DICKINSON:  -- what was blocked out?
4       MS. COATES:  Yes.
5       MS. DICKINSON:  So your firm didn't, for
6   example, write those descriptions?
7       MS. COATES:  No.
8       MS. DICKINSON:  Okay.
9   BY MS. DICKINSON:
10      Q.  Dr. Rosenblatt, on Exhibit 7 I'm looking at
11  the time detail that we see here.  There are -- one,
12  two, three, four, five, six, seven, eight -- nine
13  time entries for your April invoice.  Do you see
14  that?
15      A.  Yes.
16      Q.  Okay.  What was the 15-minute phone call on
17  April 11th about?
18      MS. COATES:  Objection.
19      A.  Insofar as it was related to the content of
20  this matter, I can discuss that?
21      Q.  Was that your first phone call with
22  Mr. Ercole that we talked about hours ago?
23      A.  No.
24      Q.  Okay.  Was that a phone call with counsel?
25      A.  I think it was a call with Mihran.

Page 242

1       Q.  Okay.  With the Analysis Group?
2       A.  Yes.
3       Q.  Okay.  On April 12 you list one hour review.
4   What were you reviewing?
5       MS. COATES:  Objection to form.
6       A.  Well, what I want to say for the record is
7   "review" is not my term.  It was really hours that I
8   gave to my assistant, my office manager, to tell her
9   that I spent an hour -- I would call her or text her
10  that I spent 50 minutes on the phone, that I spent
11  an hour doing work and she just used the word
12  review.  So the hours listed on this particular
13  invoice that say review was really her
14  interpretation of what I told her that I did.
15      Q.  Okay.
16      A.  So it was really just hours spent and
17  whether it was review or preparation or critiquing
18  or rewriting or writing or outlining or searching,
19  it was really just my time spent.
20      Q.  And I think we talked about, a little
21  earlier today, there were about 15 hours on this
22  invoice; is that correct?
23      A.  Yes.
24      Q.  Okay.  What percentage of these 15 hours
25  were spent reviewing materials?

Page 243

1       A.  I don't know.  I'd say a significant
2   portion.  I mean I -- I can't tell you how to
3   account for when I sit down for three hours what I
4   do.  We have a share work file which includes a live
5   document which would be my report in progress and
6   then ongoing reviews of additional documentation,
7   additional citations, additional expert reports, and
8   it was a live -- live product in works.
9       Q.  I'm just trying to get a sense of -- there's
10  a lot of material listed on here, how many hours do
11  you think you spent reviewing these materials?
12      MS. COATES:  Objection to form.
13      A.  I don't want to box myself into the corner
14  of the total hours spent so I am not sure without
15  the rest of my invoices in front of me.  So April
16  was the beginning and May was a lot of, you know,
17  hard -- much more time in May spent with writing and
18  rewriting and wordsmithing the final -- the final
19  report.
20      Q.  Okay.  There's some depositions of
21  plaintiffs' experts and some reports from
22  plaintiffs' experts listed.
23      A.  Yes.  Yes.
24      Q.  Who determined which reports and depositions
25  you were sent?

Page 244

1       A.  I don't know who made that decision, I just
2   know what appeared on my share file I would
3   vigorously review.
4       Q.  If it appeared on your -- you didn't make
5   that decision, right?
6       A.  Correct.
7       Q.  Okay.  Did you ask for any depositions or
8   reports of any of the other plaintiffs' experts?
9       A.  Not that I recall specifically.
10      Q.  Did you read the entirety of each deposition
11  or just parts?
12      A.  I read really the entirety.  I don't
13  remember all of it.  I read a lot of things until I
14  was bleary-eyed, but yes, I read, if not glanced
15  over or focused on portions, but I read the entirety
16  of the reports.
17      Q.  Did you read all the attachments to the
18  expert reports you were provided?
19      MS. COATES:  Objection, form.
20      A.  I read whatever was in my share file, which
21  I believe is all of the articles included here, yes.
22      Q.  I'm talking about the expert reports that
23  you were given, were you also given the attachments
24  or appendices to those reports or just the report
25  itself?

1    A.  I don't think I received attachments to the
2   reports of the experts.
3    Q.  Okay.  You list on your materials considered
4   list five sets of Bates stamped documents.  Do you
5   see that?
6    A.  Yes.
7    Q.  Were those sets all of the case documents
8   that you were given?
9      MS. COATES:  Objection; form.
10    A.  I'm not sure what case documents means.
11   This is marketing material, this is marketing
12   material that I was given and this is -- this
13   actually is marketing material that I've seen.
14    Q.  I'm just trying to figure out, are these
15   Bates stamped documents the defendants' documents,
16   the universe of the defendants' documents that you
17   looked at?
18    A.  I'm not sure.
19    Q.  Where else would I be able to tell what
20   other defendants' documents you looked at?
21      MS. COATES:  Objection; form.
22    A.  Well, under the public documents are all --
23   I'm not sure which documents I reviewed are Bates
24   stamped and public documents.  I reviewed all of the
25   documents and there are, like I said, hundreds of

1   marketing materials.  I'm not sure how they are
2   accounted for in this appendix.
3    Q.  Who chose the documents, the defendants'
4   documents that were on this list?
5      MS. COATES:  Objection; to form.
6    A.  I'm not sure.
7    Q.  It was not you, correct?
8    A.  It was not me.
9    Q.  Okay.  Did you ask the Analysis Group for
10   certain types of documents or did they just provide
11   what they thought would be relevant to you?
12    A.  We discussed what would be important
13   documents in supporting the points we were making in
14   my report.
15    Q.  Okay.  Let's move on to the public document
16   section.  There are what, by my count, nine pages of
17   publications listed.  Is that correct?
18    A.  That's correct.
19    Q.  Okay.  Did you select these publications to
20   review?
21    A.  No, I did not.
22    Q.  Okay.  Who did?
23    A.  They were provided to me by the Analysis
24   Group.
25    Q.  Okay.  Did you read all of these

1   publications on these nine pages?
2    A.  I looked at all of them.  Many of them I've
3   seen in the past.
4    Q.  How many of them had you seen in the past?
5    A.  A fair number of them.
6    Q.  What do you mean by a fair number?
7    A.  I don't know, a dozen or so of them.
8    Q.  On the nine pages you think you had seen
9   about a dozen of those in the past?
10    A.  Yes.
11    Q.  When you said you looked at them, what does
12   that mean?
13    A.  I skimmed through some of them, read through
14   some of them, combed through some of them.
15    Q.  How do I tell which ones you read through,
16   skimmed or combed through?
17      MS. COATES:  Objection; form.
18    A.  I don't know.
19    Q.  How much time did you spend reading the
20   publications that are on this list?
21    A.  Several hours.
22    Q.  Several hours on the nine pages of
23   publications?
24    A.  Yes.
25    Q.  You cite a document from the American

1   Chronic Pain Association, have you ever been a
2   member of the American Chronic Pain Association?
3    A.  No.
4    Q.  Have you ever spoken at any of their events?
5    A.  No.
6    Q.  Have you ever been to any of their events?
7    A.  No.
8    Q.  And you didn't pick that American Chronic
9   Pain Publication, correct?
10    A.  Correct.
11    Q.  You cite a document from the American Pain
12   Foundation.  Have you ever been a member of the
13   American Pain Foundation?
14    A.  No.
15    Q.  Have you ever spoken at one of their events?
16    A.  No.
17    Q.  Are you familiar with the organization?
18    A.  Yes.
19    Q.  Okay.  Who are the American Pain Foundation?
20    A.  I'm not sure.
21    Q.  Have you had any involvement with the
22   American Pain Foundation?
23    A.  Not that I recall.
24    Q.  Have you taken notes on any of the documents
25   you looked at in the case?

Page 249

1   A.  No.
2   Q.  Okay.  Have you had, other than the Analysis
3   Group, have you had any meetings with any of the
4   other defense experts in the case?
5   A.  No.
6   Q.  Okay.  Do you plan to be at trial in
7   October?
8   A.  Yes.
9   Q.  We can take a short break.
10      MS. DICKINSON:  Are you asking any
11  questions?
12      MS. COATES:  I'd like to just review my
13  notes a little and see if I have any.
14      MS. DICKINSON:  I want to make sure I can
15  still make the flight, but if you're planning on
16  asking a whole bunch of questions I might have to
17  change.
18      MS. COATES:  No, it won't be a whole bunch.
19      MS. DICKINSON:  Let's just take -- can we
20  take a one minute break, literally.
21      MS. COATES:  I'd just like to use the
22  restroom.
23      THE VIDEOGRAPHER:  Off the record, 3:07 p.m.
24      (Recess from 3:07 p.m. until 3:57 p.m.)
25      THE VIDEOGRAPHER:  On the record, 3:57 p.m.

Page 250

1       MS. COATES:  Have you passed the witness?
2       MS. DICKINSON:  That probably depends on
3   what you ask, but for now I have.
4       MS. COATES:  Thank you very much.
5           CROSS-EXAMINATION
6   BY MS. COATES:
7   Q.  Dr. Rosenblatt, I just have a few questions.
8   You testified earlier that when you served on a
9   speakers bureau -- you need to look at the camera
10  still -- for various pharmaceutical manufacturers,
11  you were provided the materials that you presented;
12  is that correct?
13  A.  That's correct.
14  Q.  Did you ever present anything that you
15  disagreed with in your medical training?
16  A.  No, I did not.
17  Q.  And what is your basis for the understanding
18  of your -- whether or not pharmaceutical
19  manufacturers promote generic medicines?
20  A.  My understanding is that pharmaceutical
21  manufacturers do not promote generic medications.
22  Q.  What is the basis for that understanding?
23  A.  My -- the basis for my understanding is
24  based on my clinical experience, my personal
25  experience working in this field for over two

Page 251

1   decades.  I do not recall ever being promoted a
2   generic medication.
3   Q.  And then what is your basis -- what is the
4   basis for your understanding that the Teva
5   defendants didn't promote their generic medicines?
6   A.  My understanding is the generic -- the
7   medications were not promoted by Teva because it was
8   not something that the companies do and that was
9   based on not only my prior experience but the review
10  of the testimony of the deposition from the Teva
11  employees.
12  Q.  I'm sorry.  And I wanted to go back to the
13  promotional materials, the slide decks that you
14  presented as part of the speaker programs.  Were
15  those slide decks consistent with the FDA labels for
16  the products that you were promoting?
17  A.  Yes.
18      MS. DICKINSON:  Objection to form.
19  A.  So yeah, speaker programs, we were trained
20  on slide decks and slide decks were approved by the
21  companies and as I understand, you know, approved by
22  the FDA or consistent with the FDA labeling.
23  Q.  And you also testified earlier that Analysis
24  Group supported you in the preparation of this
25  report.  Is that correct?

Page 252

1   A.  Yes, they did.
2   Q.  Whose report is this?
3   A.  This is my report.
4   Q.  And whose opinions are in this report?
5   A.  These are my opinions.
6       MS. COATES:  Thank you, Dr. Rosenblatt.  I
7   don't have any further questions.
8           REDIRECT EXAMINATION
9   BY MS. DICKINSON:
10  Q.  Just a quick question on something Counsel
11  just asked you.  I think you just testified that the
12  slide decks were approved by the FDA.  Do you have
13  any knowledge that any of the slide decks were
14  actually looked at by the FDA or approved?
15  A.  As I understand, all of the marketing
16  materials --
17      MS. COATES:  Object to form.
18  A.  All the marketing material are approved by
19  the FDA.
20  Q.  Do you have any knowledge of the FDA
21  actually looking at the slide decks that you spoke
22  from as a key opinion leader?
23      MS. COATES:  Object to form.
24  A.  My understanding is the FDA approved all the
25  marketing materials.

Page 253

1    Q.  That's not my question.  My question is the
2  slide decks that you spoke from as a key opinion
3  leader for pharmaceutical companies, do you have any
4  personal knowledge that anyone at the FDA reviewed
5  those slide decks?
6        MS. COATES:  Object to form.
7    A.  I don't have any personal knowledge of the
8  FDA's specific activities.  It's my understanding
9  that the slide decks are promotional in nature and
10  they are marketing materials.
11    Q.  How -- between the Oklahoma case and this
12  case, how much have you been paid in total?
13    A.  In total, so far, I think we already covered
14  this.
15    Q.  I don't think so.
16    A.  I haven't been paid yet for my activities of
17  March, or April or May.
18    Q.  Bad question.  If you took all of the
19  outstanding amounts that have been billed to date,
20  what is the total of your bills in this case and the
21  Oklahoma case?
22        MS. COATES:  Object to form.
23    A.  I'm not sure.  I haven't yet supplied my May
24  invoice and for the subtotal of January, February,
25  March and April, I'd be guessing it's somewhere

Page 254

1  around $40, $30, $40,000.
2    Q.  Okay.  And beyond the invoices that you've
3  been paid for 30, $40,000, do you know how much you
4  have outstanding in outstanding bills?
5    A.  Let me clarify.  I have not been paid
6  $30,000 or $40,000.  You asked me of the outstanding
7  invoices, that would include everything that's
8  outstanding.
9    Q.  You believe that the total amounts you've
10  billed in this case are somewhere in the
11  neighborhood of 30 to $40,000?
12        MS. COATES:  Object to form.
13    A.  I haven't seen the actual updated invoices,
14  but I know I saw an $18,000 invoice.  I think that
15  was for March or April, I'm not really sure.
16    Q.  How much have you been paid total in the
17  State of Oklahoma case?
18    A.  I've only been paid for January and
19  February.  I haven't been paid since February, so
20  I'm not sure the totals of those months.  I think
21  I've been paid $15,000 to date.
22    Q.  And do you know how much outstanding
23  invoices you have -- in outstanding invoices you
24  have for the State of Oklahoma case?
25    A.  I'm not sure because I haven't completed

Page 255

1  that task.  I prefer to have it in front of me to
2  speak to it but approximately $30,000.
3    Q.  So in the State of Oklahoma case, you will
4  be paid roughly $45,000, is that about accurate?
5        MS. COATES:  Objection to form.
6    A.  I'm not sure.  It would be my invoices from
7  January and February and March.  So I think that
8  would be -- I'm not really sure.  I think it would
9  be less than $30,000.
10    Q.  And in this case, I think your testimony has
11  been you -- so far, between outstanding invoices and
12  bills that have been paid, the amount is somewhere
13  between $27,000, I think, and $35,000; is that true?
14        MS. COATES:  Object to form.
15    A.  I'm not sure and I don't believe I've been
16  paid yet for my work on this case.  I believe they
17  are all outstanding.
18    Q.  Taking -- putting aside if you don't get
19  paid, I'm just trying to understand, if all your
20  bills are paid in full, what is the total amount
21  that will be paid to you for your time to date?
22    A.  For this case?
23    Q.  Yes.
24    A.  It would be April and May invoices.
25    Q.  Okay.  We looked at April and April was in

Page 256

1  the neighborhood of $9,000, correct?
2    A.  Yeah, I think so.  Yes.
3    Q.  And what is the total you believe you have
4  outstanding in this case beyond April?
5    A.  In May, I think I have about 30 hours.
6    Q.  Okay.  30 hours at $7 -- $600 an hour?
7    A.  Yes.
8    Q.  Okay.  So how much is that?
9    A.  $18,000.
10    Q.  Okay.  So nine plus 18 is roughly $27,000;
11  is that correct?
12    A.  Again, I'm estimating.  I haven't looked at
13  the -- counted my hours, especially, including
14  today.
15    Q.  And you plan to do more work in the case,
16  correct?
17    A.  Yes.
18        MS. DICKINSON:  All right.  That's all I
19  have.
20        MS. COATES:  No further questions.
21        THE VIDEOGRAPHER:  Off the record, 4:05 p.m.
22        (Whereupon, the deposition concluded at
23  4:05 p.m.)
24
25

## Page 257

1        C E R T I F I C A T E

2        I, SUSAN D. WASILEWSKI, Registered

3    Professional Reporter, Certified Realtime Reporter

4    and Certified Realtime Captioner, do hereby certify

5    that, pursuant to notice, the deposition of MELANIE

6    ROSENBLATT, M.D., was duly taken on Friday, May 31,

7    2019, at 9:26 a.m. before me.

8        The said MELANIE ROSENBLATT, M.D., was duly

9    sworn by me according to law to tell the truth, the whole

10   truth and nothing but the truth and thereupon did

11   testify as set forth in the above transcript of

12   testimony.  The testimony was taken down

13   stenographically by me.  I do further certify that

14   the above deposition is full, complete, and a true

15   record of all the testimony given by the said

16   witness, and that a review of the transcript was

17   requested.

18

19   _____

20   Susan D. Wasilewski, RPR, CRR, CCP

21   (The foregoing certification of this transcript does

22   not apply to any reproduction of the same by any

23   means, unless under the direct control and/or

24   supervision of the certifying reporter.)

25

## Page 258

INSTRUCTIONS TO WITNESS

1

2

3

4        Please read your deposition over carefully

5    and make any necessary corrections.  You should

6    state the reason in the appropriate space on the

7    errata sheet for any corrections that are made.

8

9        After doing so, please sign the errata sheet

10   and date it.  It will be attached to your

11   deposition.

12

13       It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

25

## Page 259

1            - - - - - -

2          E R R A T A

3            - - - - - -

4    PAGE  LINE  CHANGE

5    ____  ____  _____

6        REASON: _____

7    ____  ____  _____

8        REASON: _____

9    ____  ____  _____

10       REASON: _____

11   ____  ____  _____

12       REASON: _____

13   ____  ____  _____

14       REASON: _____

15   ____  ____  _____

16       REASON: _____

17   ____  ____  _____

18       REASON: _____

19   ____  ____  _____

20       REASON: _____

21   ____  ____  _____

22       REASON: _____

23   ____  ____  _____

24       REASON: _____

25

## Page 260

1        ACKNOWLEDGMENT OF DEPONENT

2

3        I, _____, do hereby

4    acknowledge that I have read the foregoing pages, 1

5    through 259, and that the same is a correct

6    transcription of the answers given by me to the

7    questions therein propounded, except for the

8    corrections or changes in form or substance, if any,

9    noted in the attached Errata Sheet.

10

11

12   _____     _____

13   MELANIE ROSENBLATT, M.D.                DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   _____ day of _____, 20___.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24

25

Page 261

1              LAWYER'S NOTES
2      PAGE  LINE
3      _____ _____ _____
4      _____ _____ _____
5      _____ _____ _____
6      _____ _____ _____
7      _____ _____ _____
8      _____ _____ _____
9      _____ _____ _____
10     _____ _____ _____
11     _____ _____ _____
12     _____ _____ _____
13     _____ _____ _____
14     _____ _____ _____
15     _____ _____ _____
16     _____ _____ _____
17     _____ _____ _____
18     _____ _____ _____
19     _____ _____ _____
20     _____ _____ _____
21     _____ _____ _____
22     _____ _____ _____
23     _____ _____ _____
24     _____ _____ _____
25