```
 1           IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4
 5   -----------------------------x
 6   IN RE: NATIONAL PRESCRIPTION ) MDL No. 2804
 7   LITIGATION                   ) Case No. 17-md-2804
 8   This document relates to:    ) Hon. Dan A. Polster
 9   All Cases                    )
10   -----------------------------x
11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
13    VIDEOTAPED DEPOSITION OF RICHARD SACKLER, M.D.
14                STAMFORD, CONNECTICUT
15              THURSDAY, MARCH 7, 2019
16                    10:09 A.M.
17
18
19
20
21
22
23
24   Reported by: Leslie A. Todd
```

```
 1       Deposition of RICHARD SACKLER, M.D., held at
 2   the offices of:
 3
 4
 5
 6
 7             WIGGIN AND DANA, LLP
 8             281 Tresser Boulevard
 9             Two Stamford Plaza
10             Stamford, Connecticut 06901
11             (203) 363-7600
12
13
14       This deposition was taken before Special
15   Master David R. Cohen.
16
17
18
19
20
21
22
23
24
```

```
 1            A P P E A R A N C E S
 2
 3   ON BEHALF OF PLAINTIFFS:
 4       LINDA SINGER, ESQUIRE
 5       JOSEPH F. RICE, ESQUIRE
 6       LISA M. SALTZBURG, ESQUIRE
 7       KAITLYN EEKHOFF (Remote streaming)
 8       MOTLEY RICE, LLC
 9       401 9th Street, Northwest
10       Suite 1001
11       Washington, D.C. 20004
12       (202) 386-9626
13
14       PAUL J. HANLY, JR., ESQUIRE
15       JAYNE CONROY, ESQUIRE
16       LAURA FITZPATRICK, ESQUIRE
17       JO ANNA POLLOCK, ESQUIRE (Remote streaming)
18       SANFORD SMOKLER, ESQUIRE (Remote streaming)
19       SIMMONS HANLY CONROY, LLC
20       112 Madison Avenue
21       New York, New York 10016-7416
22       (212) 784-6401
23
24
```

```
 1   APPEARANCES (Continued):
 2
 3       HUNTER J. SHKOLNIK, ESQUIRE
 4       JOSEPH CIACCIO, ESQUIRE (Remote streaming)
 5       SALVATORE BADALA, ESQUIRE (Remote streaming)
 6       NAPOLI LAW
 7       360 Lexington Avenue, 11th Floor
 8       New York, New York 10017
 9       (212) 397-1000
10
11       JEFF GADDY, ESQUIRE (Remote streaming)
12       LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY &
13          PROCTOR, P.A.
14       316 South Baylen Street
15       Pensacola, Florida 32502
16       (850) 435-7163
17
18       DEREK W. LOESER, ESQUIRE (Remote streaming)
19       DAVID KO, ESQUIRE (Remote streaming)
20       DEAN N. KAWAMOTO, ESQUIRE (Remote streaming)
21       KELLER ROHRBACK LLP
22       1201 Third Avenue, Suite 3200
23       Seattle, Washington 98101
24       (206) 623-1900
```

```
 1    APPEARANCES (Continued):
 2
 3        TIFFANY ELLIS, ESQUIRE (Remote streaming)
 4        WEITZ & LUXENBERG, P.C.
 5        700 Broadway
 6        New York, New York 10003
 7        (212) 558-5500
 8
 9    ON BEHALF OF THE STATE OF WASHINGTON:
10        LAURA K. CLINTON, ESQUIRE
11        Assistant Attorney General of Washington
12        800 5th Avenue
13        Suite 2000, Mailstop TB-14
14        Seattle, Washington 98104-3188
15        (206) 233-3383
16
17    ON BEHALF OF THE WITNESS:
18        DAVID BERNICK, ESQUIRE
19        BENJAMIN L. WEINTRAUB, ESQUIRE
20        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
21        1285 Avenue of the Americas
22        New York, New York 10019-6064
23        (212) 373-3897
24
```

```
 1    APPEARANCES (Continued):
 2
 3        MARA LEVENTHAL, ESQUIRE
 4        JOSEPH HAGE AARONSON LLC
 5        485 Lexington Avenue, 30th Floor
 6        New York, New York 10017
 7        (212) 407-1218
 8
 9    ON BEHALF OF PURDUE PHARMA L.P.:
10        MARK S. CHEFFO, ESQUIRE
11        DECHERT, LLP
12        Three Bryant Park
13        1095 Avenue of the Americas
14        New York, New York 10036-6797
15        (212) 698-3814
16
17    ON BEHALF OF AMERISOURCEBERGEN:
18        M. PATRICK YINGLING, ESQUIRE
19        (Remote streaming)
20        REED SMITH, LLP
21        10 South Wacker Drive, 40th Floor
22        Chicago, Illinois 60606-7507
23        (312) 207-2834
24
```

```
 1    APPEARANCES (Continued):
 2
 3    ON BEHALF OF HBC COMPANY:
 4        ROBERT BARNES, ESQUIRE (Remote streaming)
 5        MARCUS & SHAPIRA, LLP
 6        One Oxford Centre, 35th Floor
 7        Pittsburgh, Pennsylvania 15219
 8        (412) 471-3490
 9
10    ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:
11        TORRYN TAYLOR, ESQUIRE (Remote streaming)
12        JUSTIN MANN, ESQUIRE (Remote streaming)
13        ROPES & GRAY, LLP
14        Three Embarcadero Center
15        San Francisco, California 94111-4006
16        (415) 315-6300
17
18    ON BEHALF OF JANSSEN PHARMACEUTICALS:
19        JEFFREY M. WHITESELL, ESQUIRE (Remote
20        Streaming)
21        TUCKER ELLIS, LLP
22        950 Main Street, Suite 1100
23        Cleveland, Ohio 44113
24        (216) 696-4889
```

```
 1    APPEARANCES (Continued):
 2
 3    ON BEHALF OF DEFENDANT McKESSON CORPORATION:
 4        ALEXANDRA J. WIDAS, ESQUIRE
 5        COVINGTON & BURLING LLP
 6        One CityCenter
 7        850 Tenth Street, Northwest
 8        Washington, D.C. 20001-4956
 9        (202) 662-5877
10
11    ON BEHALF OF DEFENDANT ON BEHALF OF ENDO HEALTH
12        SOLUTIONS INC., ENDO PHARMACEUTICALS INC., PAR
13        PHARMACEUTICAL, INC. AND PAR PHARMACEUTICAL
14        COMPANIES, INC.:
15        JOSHUA M. DAVIS, ESQUIRE
16        ARNOLD & PORTER KAYE SCHOLER LLP
17        601 Massachusetts Avenue, Northwest
18        Washington, D.C. 20001-3743
19        (202) 942-5743
20
21
22
23
24
```

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF DEFENDANT WALMART:

 4       EDWARD M. CARTER, ESQUIRE (Remote streaming)

 5       JONES DAY

 6       325 John H. McConnell Boulevard, Suite 600

 7       Columbus, Ohio 43215-2673

 8       (614) 469-3939

 9

10   ON BEHALF OF DISCOUNT DRUG MART:

11       ERIC WEISS, ESQUIRE (Remote Streaming)

12       CAVITCH, FAMILO & DURKIN

13       1300 East 9th Street, 20th Floor

14       Cleveland, Ohio 44114

15       (216) 621-7860

16

17   ON BEHALF OF CARDINAL HEALTH:

18       MIRANDA PETERSEN, ESQUIRE (Remote streaming)

19       WILLIAMS & CONNOLLY LLP

20       725 Twelfth Street, N.W.

21       Washington, D.C. 20005

22       (202) 434-5107

23

24
```

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF TEVA PHARMACEUTICALS:

 4       WENDY WEST FEINSTEIN, ESQUIRE (Remote

 5       Streaming)

 6       MORGAN LEWIS & BOCKIUS, LLP

 7       One Oxford Centre, 32nd Floor

 8       Pittsburgh, Pennsylvania 15219-6401

 9       (412) 560-7455

10

11   ON BEHALF OF CVS HEALTH:

12       DANIEL MOYLAN, ESQUIRE (Remote streaming)

13       ZUCKERMAN SPAEDER, LLP

14       100 East Pratt Street, Suite 2440

15       Baltimore, Maryland 21202-1031

16       (410) 332-0444

17

18   ON BEHALF OF JANSSEN PHARMACEUTICALS AND JOHNSON &

19   JOHNSON:

20       RYAN SNYDER, ESQUIRE (Remote streaming)

21       O'MELVENY & MYERS, LLP

22       1999 Avenue of the Stars, 8th Floor

23       Los Angeles, California 90067

24       (310) 246-6705
```

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF ABBOTT LABORATORIES AND ABBOTT

 4   LABORATORIES, INC.:

 5       JOHN A. McCAULEY, ESQUIRE (Remote streaming)

 6       VENABLE LLP

 7       750 East Pratt Street, Suite 900

 8       Baltimore, Maryland 21202

 9       (410) 244-7400

10

11   ON BEHALF OF WEST VIRGINIA BOARD OF PHARMACY:

12       JUSTIN TAYLOR, ESQUIRE (Remote streaming)

13       BAILEY & WYANT, PLLC

14       500 Virginia Street East, Suite 600

15       Charleston, West Virginia 25301

16       (304) 345-4222

17

18   ALSO PRESENT:

19       JENNA N. FORSTER (Paralegal, Motley Rice LLC)

20       KEVIN REARDON (Remote streaming)

21       DAVID EGILMAN (Remote streaming)

22       EMMA KABOLI (Paralegal, Baron & Budd)

23           (Remote streaming)

24
```

```
 1   ALSO PRESENT (Continued):

 2

 3       GRETCHEN KEARNEY (Paralegal, Baron & Budd)

 4           (Remote streaming)

 5       JONATHAN JAFFE (Consultant) (Remote streaming)

 6       GINA VELDMAN (Trial technician)

 7       DAVID LANE (Videographer)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

## CONTENTS

EXAMINATION OF RICHARD SACKLER, M.D.    PAGE

By Ms. Singer                                    20

### EXHIBITS

(Attached to transcript)

SACKLER-PURDUE DEPOSITION EXHIBITS       PAGE

No. 1    Notice of Deposition of Richard
         Sackler, Purdue Pharma              26

No. 2    Document entitled, "Richard Sackler -
         'You've Got Mail'" - E-mail addresses
         used by Richard Sackler             28

No. 3    Forbes article entitled "The
         OxyContin Clan: The $14 Billion
         Newcomer To Forbes 2015 List of
         Richest U.S. Families"              39

No. 4    Forbes article entitled "The
         OxyContin Clan: The $14 Billion
         Newcomer to Forbes 2015 List of
         Richest U.S. Families"              43

No. 5    E-mail re Electronic Copy of my
         Memorandum                          57

### EXHIBITS CONTINUED

(Attached to transcript)

SACKLER-PURDUE DEPOSITION EXHIBITS       PAGE

No. 6    Document entitled "CEO
         Considerations," Bates P3037986 to
         3037991                             72

No. 7    Esquire article entitled "The
         Secretive Family Making Billions
         From the Opioid Crisis"             88

No. 8    E-mail re Your vacation, Bates
         PPLPC039000000157                   93

No. 9    E-mail string re Copy of Butrans
         Weekly Report 2-24-12-RS.xlsm       97

No. 10   E-mail re Daily Sales,
         Bates PDD1706189727 to 1706189728  105

No. 11   E-mail string re Daily Sales,
         Bates PPLPC039000000244            113

No. 12   Document entitled "What do we want
         to be when we grow up," Bates
         PDD9316715786 to 9316715787        114

No. 13   E-mail string re McKesson program,
         Bates PPLPC012000174127            118

### EXHIBITS CONTINUED

(Attached to transcript)

SACKLER-PURDUE DEPOSITION EXHIBITS       PAGE

No. 14   E-mail string re OxyContin RX data
         with Kg graphs, Bates PPLPC
         012000174202 to 012000174206      124

No. 15   E-mail re Meetings Monday next,
         Bates PPLPC012000234970 to
         012000234971                      134

No. 16   E-mail string re Week Ending
         2/4/11 - Butrans Rxs, Bates
         PPLPC012000311654 to
         012000311655                      138

No. 17   E-mail string re Butrans Weekly
         Report re week ending March 4,
         2011                              140

No. 18   (Exhibit number not used)

No. 19   E-mail string re Sevredol 10mg and
         20mg tabs/Oxy and MsContin Prices,
         Bates PKY183279015 to 183279016   148

No. 20   E-mail string re Overview of
         Mock FDA Meeting of January 14,
         2009, Bates PDD9316101837 to
         931611840                         150

### EXHIBITS CONTINUED

(Attached to transcript)

SACKLER-PURDUE DEPOSITION EXHIBITS       PAGE

No. 21   E-mail string re Press release or
         similar promotion, Bates P18327 to
         P092442                           152

No. 22   E-mail string re mtg at aps, Bates
         PPLPC04500004928 to 045000004933  156

No. 23   (Exhibit number not used)

No. 24   Letter to James M. Conover
         from the DEA, Bates No. PPLPC
         016000028745 to 16000029773       158

No. 25   E-mail re Is this an opening to
         describing the agent?
         Bates PDD8801123847               165

No. 26   Transcript of deposition of
         Richard Sackler, M.D., August 28,
         2015, Bates PPLP004030482 to
         004030972                         171

No. 27   The New York Times article entitled
         "Origins of an Epidemic: Purdue
         Pharma Knew Its Opioids Were Widely
         Abused"                           179

**Page 17**

```
1        E X H I B I T S   C O N T I N U E D
2              (Attached to transcript)
3   SACKLER-PURDUE DEPOSITION EXHIBITS        PAGE
4   No. 28    Document entitled "Drug-Seeking
5             Behavior," Appendix 16.1.9.10      201
6   No. 29    E-mail re Oxycontin Package Insert,
7             Bates PPLPC013000015564            206
8   No. 30    Document entitled "The Purdue
9             Research Center 1996" Bates
10            PKY180673220 to 180673437          209
11  No. 31    Transcript of Deposition of Richard
12            Sackler, M.D., July 25, 2002, Bates
13            PKY181115550 to 181115702          213
14  No. 32    E-mail string re OxyContin Label
15            Review, Bates PKY180698571 to
16            180698572                          215
17  No. 33    Teamlink article entitled
18            "OxyContin: The Most Significant
19            Launch in Purdue History"          220
20
21
22
23
24
```

**Page 18**

```
1              P R O C E E D I N G S
2              --------------------
3        THE VIDEOGRAPHER:  We're now on the
4   record.  My name is David Lane, videographer for
5   Golkow Litigation Services.  Today's date is
6   March 7th, 2019.  Our time is 10:09 a.m.
7        This deposition is taking place in
8   Stamford, Connecticut, in the matter of National
9   Prescription Opioid Litigation, MDL.
10       Our deponent today is Dr. Richard
11  Sackler.
12       Our counsel will be noted on the
13  stenographic record.
14       The court reporter is Leslie Todd, who
15  will now swear in the witness.
16       RICHARD SACKLER, M.D.,
17       and having been first duly sworn,
18       was examined and testified as follows:
19       THE VIDEOGRAPHER:  Please begin.
20       MR. BERNICK:  If I could just make a
21  very short statement for the record.
22       This is David Bernick, and I represent
23  Dr. Richard Sackler.  I just wanted to make it
24  clear that the appearance of Dr. Sackler here
```

**Page 19**

```
1   today is on a voluntary basis.  There's been no
2   subpoena.  This appearance is not a waiver of any
3   objections to the deposition or to the -- to the
4   deposition itself or to any claims that have been
5   or may be made against him in the future.  All the
6   defenses to those claims are preserved.
7        Dr. Sackler also suffers from certain
8   medical impairments that affect his ability to
9   testify.  And maybe counsel will be eliciting
10  those in the course of her questioning, but if
11  not, we will elicit them at the conclusion of the
12  deposition to make clear what those impairments
13  are.
14       That's it.
15       MS. SINGER:  Okay.  And just to be
16  clear, Counsel, there was a deposition notice
17  directing Dr. Sackler to appear today.
18       Do you disagree with that?
19       MR. BERNICK:  No, but he's appearing
20  here voluntarily.  There's no subpoena.  And we're
21  just not waiving -- I understand the rules, I
22  understand the nationwide service, but I'm just
23  saying that in connection with this deposition, to
24  the extent that it's used by others, we are
```

**Page 20**

```
1   preserving all of his objections, and including to
2   what happens during the course of the deposition.
3        MS. SINGER:  Okay.
4              DIRECT EXAMINATION
5   BY MS. SINGER:
6        Q    All right.  Dr. Sackler, I'm Linda
7   Singer.  We met earlier.
8        A    Good morning.
9        Q    Good morning.
10            You've been deposed before, correct?
11       A    Yes.
12       Q    And once in litigation brought by the
13  Attorney General of Connecticut, correct?
14       A    I may have missed some of the words.
15  Could you repeat --
16       Q    Sure.
17       A    -- your question?
18       Q    Sure.
19            Once in litigation brought by the
20  Commonwealth of Kentucky, the Attorney General of
21  Kentucky; is that right?
22       A    I gave a deposition in Kentucky.  I
23  don't recall giving a deposition in Connecticut.
24       Q    In -- okay.  In Kentucky, correct?
```

**Page 21**

```
1    A    Kentucky I recall.
2    Q    Okay.
3         THE VIDEOGRAPHER:  Off the record.
4  10:11 a.m.
5         (Brief pause in proceedings.)
6         THE VIDEOGRAPHER:  We're back on the
7  record, 10:13 a.m.
8  BY MS. SINGER:
9    Q    All right, Dr. Sackler, we had just
10 mentioned that you were deposed previously in
11 Kentucky, correct?
12   A    I recall such a deposition.
13   Q    Okay.  And do you also recall sitting
14 for a deposition in litigation between Purdue and
15 Endo Pharmaceuticals?
16   A    I don't recall.  This was -- was this a
17 patent --
18   Q    It was, yes.
19   A    -- dispute?  Okay.
20        I recall giving a deposition in one, two
21 or three patents.  I'm not sure about Endo.
22   Q    Okay.
23   A    I don't have a clear recollection of
24 what the company was.
```

**Page 22**

```
1    Q    And other than those two depositions, do
2  you recall sitting for any other depositions or
3  testimony?
4    A    I have a vague recollection of another
5  patent suit where I gave a deposition.  But it's
6  very vague and I could be in error.
7    Q    And since you've been deposed before, I
8  won't spend much time on the rules.  Certainly if
9  you don't understand a question I'm asking, as you
10 did before, please ask me to rephrase it.
11        If you need a break, let us know and
12 we'll stop.
13        Is there any reason that your testimony
14 today would not be accurate and complete?
15   A    Several years ago I had two events that
16 resulted in three strokes.  I seemed to recover in
17 two or three hours, and so I was given no
18 procedure or medicine to resolve this.  The
19 diagnosis was TIA.  But when they did the MRI
20 scan, they found in the first instance, the first
21 event, two strokes on the right side.
22        And in the second event, not
23 surprisingly, they found one temporal lobe lesion
24 which was right in the speech center, and
```

**Page 23**

```
1  explained why I could not communicate with speech
2  for about three or four hours.  Since then, my
3  memory has become much more spotty than it was
4  prior to these events.  And if -- I think the
5  court or you should be aware of that.
6         I have some other medical problems that
7  might affect my testimony today.  I am actively
8  bleeding from lesions in my intestines.  And that
9  has caused anemia.  And that may require that I
10 ask for a break simply to deal with the bleeding.
11        As you noted, I wear hearing aids.  My
12 hearing is, even with the hearing aids, not
13 perfect.  So as I did earlier, I may ask you for
14 clarification.
15        After the stroke, my neurologist gave me
16 a screening test, which to my surprise, I did
17 poorly on, particularly in short-term memory.  And
18 she recommended that I get neuropsych testing,
19 which I did, and --
20   Q    And neuropsych, to be clear, is -- is
21 neurological testing, correct?
22   A    It's -- it's really neurological
23 testing.  They have a -- I don't remember the
24 first test.  I just had a second test recently,
```

**Page 24**

```
1  and there were some -- there was a depression
2  inventory and -- I don't remember, but it was
3  essentially neurologic.  It was tasks, challenges.
4  Here's a picture, now draw the picture.  Things
5  like that.  And two -- and I believe that
6  comparing the two tests, there was some
7  deterioration.
8    Q    And you said, Dr. Sackler, that that was
9  in your short-term memory, correct?
10   A    No, also long term.  The -- the
11 inventory that was done, the simple inventory, I
12 did terribly on the short-term memory.  They
13 ask -- they name five objects; they said, I'm
14 going to ask you to name them later in the exam.
15 And I only got one out of five.  I was kind of
16 shocked.
17        And so that was why she thought maybe I
18 should get a much more comprehensive test, more to
19 document the status quo, but more -- more
20 significantly, comparing tests down the road gives
21 you a trajectory of change, rate of change, and
22 identifies anything that might be new in the
23 result.  And that applies not -- to essentially
24 all image testing.
```

**Page 25**

1  Q   Okay.  So if I ask you a question to
2  which you don't recall the answer, please indicate
3  that.
4  A   Okay.
5  Q   Agreed?
6  A   Agreed.
7  Q   Okay.
8  A   Thank you.
9  Q   Okay.  All right.  Now, you're
10 represented here today by your personal counsel,
11 Mr. Bernick; is that correct?
12 A   I am well represented.
13 Q   And did you also prepare for this
14 deposition with counsel for Purdue?
15 A   Some preparations included counsel for
16 Purdue.
17 Q   And can you recall roughly how much time
18 you spent preparing for this deposition with
19 counsel?
20 A   I don't -- I could estimate it.  Forty
21 to 50 hours.
22 Q   And during your preparation, did you
23 review any documents to help -- to help you
24 prepare?

Golkow Litigation Services                    Page 25

**Page 26**

1  A   Yes.
2  Q   And other than documents provided by
3  your counsel, do you recall what you reviewed?
4  A   Other?
5  Q   Yes.
6  A   I think everything was prepared by my
7  counsel.
8  Q   So there's nothing you looked at
9  independently of that.
10 A   I'm sure -- I don't remember, but I
11 don't think I did.
12 Q   And --
13 A   You mean go into old files or ask other
14 people to --
15 Q   Exactly.
16 A   Okay.  No, I didn't do that.
17     (Sackler Exhibit No. 1 was marked
18     for identification.)
19 BY MS. SINGER:
20 Q   Okay.  And I'm going to show you what I
21 marked as Exhibit 1.
22     And Exhibit 1 is a notice of deposition
23 for Richard Sackler.  Have you seen this document?
24 A   When was it sent?  I don't see a date on

Golkow Litigation Services                    Page 26

1  it.  So...
2  Q   February 15th.
3  A   I have not seen this document.
4     THE WITNESS:  Did you want --
5     MR. BERNICK:  Just keep them right here,
6  and if she wants to ask you more, she will, and
7  maybe --
8     THE WITNESS:  Good.
9     MR. BERNICK:  -- she won't.
10 BY MS. SINGER:
11 Q   Now, are you aware that Purdue and your
12 counsel produced documents in connection with your
13 deposition -- provided to plaintiffs -- certain
14 documents?
15 A   I'm aware we were asked to produce
16 documents.
17 Q   And that includes documents from your
18 e-mail accounts, correct?
19 A   Yes.
20 Q   Now, I know that you used numerous
21 e-mail addresses over the years; is that right?
22 So let's --
23 A   Well, I -- yes, it is correct, I have
24 used numerous, but not at the same time.

Golkow Litigation Services                    Page 27

1  Q   Okay.  So Exhibit 2 --
2     (Sackler Exhibit No. 2 was marked
3     for identification.)
4  BY MS. SINGER:
5  Q   -- is a slide we prepared.
6     So, Dr. Sackler, this is a list of
7  e-mail addresses we found.  Are those all e-mail
8  addresses that you used?  I think there are more
9  than 20 of them.
10 A   No, I --
11    MR. BERNICK:  At this point I have an
12 objection to the question.  I don't think there's
13 foundation for this particular document.  That
14 should be established for this witness.
15 BY MS. SINGER:
16 Q   Can you go ahead and tell me, have --
17 are those all e-mail addresses that seem familiar
18 from your use?
19 A   Some do.  Not all.
20 Q   Okay.  But you have used 15 or 20 e-mail
21 addresses, correct, including ███████████
22 ████████████████? Those are all your
23 e-mail addresses, correct?
24    MR. BERNICK:  Objection to form, lack of

Golkow Litigation Services                    Page 28

**Page 29**

```
 1   foundation.
 2           THE WITNESS:  Should I respond?
 3           MR. BERNICK:  Go ahead.  Yes.
 4           THE WITNESS:  Oh, okay.
 5   I have not -- I do not recognize all of
 6   these addresses.  And of those that I do -- so I
 7   don't think I ever used, for example, the American
 8   Pain Foundation e-mail.  And I just don't
 9   recognize it, and it doesn't look like mine.
10   And -- would you like me to go through and tell
11   you the ones I have used?
12           MR. BERNICK:  Well, let's just -- she's
13   going to ask you questions.
14           THE WITNESS:  Oh, I'm sorry.
15           MR. BERNICK:  She's extremely capable,
16   so you have to wait for the questions.
17           THE WITNESS:  Sorry.
18           MR. BERNICK:  And then you will answer
19   them.
20   BY MS. SINGER:
21       Q   I -- I always appreciate the help.
22           So why don't you just read through the
23   first column.  Is there anything there that is not
24   an e-mail -- other than the American Pain
```

**Page 30**

```
 1   Foundation, anything there that's an e-mail
 2   address you didn't use?
 3       A   All the pharma addresses are different
 4   names for the same e-mail account, and thus, when
 5   you look at those, the contents of the account,
 6   you're seeing everything that either I received or
 7   I sent.  Some I used more, some for a brief time,
 8   and some never used at all.  I reserved a lot of
 9   names that -- for possible use and never used
10   them.
11       Q   So can you recall from this slide which
12   e-mail addresses you didn't use, other than the
13   Pain Foundation?
14       A   Well, I -- I'd rather -- American Pain
15   Foundation doesn't ring a bell at all.  I don't
16   remember whether I used Dr. Richard Sackler, but
17   again, I say it would have gone into the master
18   account, which was ████████████████████
19   ███████.  So you've seen it and you could do the
20   count too.  I'm not objecting to try my best.
21           ████████████████████████
22   ████████████████████████ --
23           MR. BERNICK:  Excuse me.  Were you done
24   with your answer?  Dr. Sackler, were you done --
```

**Page 31**

```
 1           THE WITNESS:  Yes.  Yeah, I don't -- I
 2   don't remember it.  I don't remember ███.
 3   BY MS. SINGER:
 4       Q   ████████████████████
 5       A   No.
 6       Q   Okay.
 7       A   That was -- that actually is my former
 8   wife's birthday.  But it -- I just don't
 9   remember --
10       Q   Okay.
11       A   -- remember it.
12           ███, I don't remember if I used it, but
13   I do remember I had it.
14           ████████████, definitely was used a lot.
15   I like short addresses.
16           ████, I don't remember using.  ████████
17   I used, yes.
18           ████████████████, I don't
19   remember ever using it.
20       Q   Okay.  So we don't have to go through
21   the second column.  But why so many e-mail
22   addresses?
23           MR. BERNICK:  Objection to the form of
24   the question.
```

**Page 32**

```
 1           THE WITNESS:  I got e-mail addresses
 2   that I thought I might use, and the most common
 3   reason that I got more was, by the time I needed a
 4   different address for some purpose, I had
 5   forgotten most of the ones that had already been
 6   assigned to me.
 7           And so I just called IT and said, Give
 8   me another, they called it, aliases, also known
 9   as, I guess, but they just are a different way for
10   you or anybody else to write and to -- and sending
11   me something, you can write ████████████, and it
12   would go into the Sackler R account with
13   everything else.
14   BY MS. SINGER:
15       Q   And did you use these e-mail addresses
16   for different purposes?
17           MR. BERNICK:  Objection to the form.
18           THE WITNESS:  I don't think I did,
19   except maybe the ████████████████, which
20   principally I used for subscriptions to things.
21   BY MS. SINGER:
22       Q   Okay.  Now, you are a member of the
23   family that founded Purdue, correct?
24       A   I am.
```

```
 1      Q    And it was your father Raymond --
 2      A    Yes.
 3      Q    -- and your brothers Mortimer and --
 4  and --
 5      A    His brothers.  His brothers.
 6      Q    I'm sorry.  Yes.  Sorry, I don't mean to
 7  age you.
 8      A    No.
 9      Q    His brothers, Mortimer and Andrew, who
10  first bought Purdue; is that correct?  Mortimer
11  and Arthur.
12      A    Mortimer, Arthur and Raymond bought
13  Purdue in 1952, I think.
14      Q    And do you know how much the family paid
15  to acquire Purdue?
16      A    I actually do.
17      Q    How much?
18      A    $50,000.
19      Q    And when your family bought Purdue in
20  1952, did it make opioids?
21           MR. BERNICK:  If I could have an
22  objection to form based on the name that you're
23  using for Purdue.  So I have an objection to the
24  form of the question because of just using the
```

```
 1  word "Purdue."
 2           MS. SINGER:  Okay.
 3  BY MS. SINGER:
 4      Q    What was the name of the entity your
 5  family bought?
 6      A    The Purdue Frederick Company.
 7      Q    Okay.  And when your family bought the
 8  Purdue Frederick Company in 1952, did it make
 9  opioids?
10      A    I was seven years old in 1952.  It is --
11  I don't believe it did, but I can't be sure there
12  wasn't some -- it was a very small company in
13  terms of sales.  The story I heard was $22,000 a
14  year turnover.  And their principal product was
15  an -- I don't know what to call it -- a tonic that
16  had been made since the 1920s, but still had some
17  residual sales.  And they manufactured it in a
18  building in Greenwich Village.  And there are lots
19  of colorful stories about that building.
20      Q    All right.  We'll save those for another
21  day.
22           Now, were you with Purdue when it
23  launched its first opioid?
24      A    I was.  Oh, you know, let me just think.
```

```
 1  I don't know all the products that Purdue launched
 2  after they -- the brothers, the three brothers
 3  acquired.  So I can't be sure there was no
 4  other opioid.  I don't recall it, however.  And if
 5  you're asking what -- I'd like to answer, I was
 6  working with Purdue when MS Contin was launched.
 7      Q    Do you remember what year that was?
 8      A    I have a recollection that it was around
 9  1984.
10      Q    Now, your uncle, Arthur Sackler, had a
11  career in medical marketing, did he not?
12      A    He had several careers.
13      Q    And did one of them include medical
14  marketing?
15      A    I wouldn't have called it marketing,
16  because his businesses were focused -- am I
17  speaking loudly enough for everyone?
18      Q    Sure.
19           MS. SINGER:  For people who are on the
20  phone, if you're typing, everybody on the phone,
21  please mute your lines.
22  BY MS. SINGER:
23      Q    And yes, Dr. Sackler, you're speaking
24  loud enough.
```

```
 1           MS. SINGER:  Can everyone in the room
 2  here?
 3           THE WITNESS:  Oh.
 4           MR. BERNICK:  Yeah, that's -- just --
 5  just --
 6           MS. SINGER:  Speak to the bleachers.
 7           MR. BERNICK:  Just do your best.  Do
 8  your best.
 9           THE WITNESS:  I have a quiet voice.  I'm
10  sorry.  Always have.  Okay.
11  BY MS. SINGER:
12      Q    So you were -- I had asked --
13      A    Yes.  He -- he had entered -- touched
14  upon medical marketing when he was a student in
15  medical school in New York, and to earn extra
16  money for the family, everybody worked, my father,
17  and my uncle -- both uncles.  He started doing
18  freelance copyrighting for -- I know only one
19  agency because he ultimately bought it, William
20  Douglas McAdams.
21      Q    And he -- he innovated this idea of
22  direct marketing to doctors.  Did he not?
23           MR. BERNICK:  Objection to form.  And
24  lack of foundation.
```

```
 1        THE WITNESS:  I think that's an
 2   apocryphal statement.  He didn't innovate direct
 3   marketing to doctors.
 4   BY MS. SINGER:
 5        Q    Okay.
 6        A    I mean, to my knowledge of the industry
 7   is that goes back a century at least.
 8        Q    He was ultimately -- I think there's a
 9   Medical Marketing Hall of Fame.  Are you familiar
10   with that?
11        A    Vaguely.
12        Q    Not a big awards banquet, but -- so
13   we'll leave that topic for a minute.
14             As part of his career in marketing, he
15   did engage in direct marketing to doctors, did he
16   not?
17        A    He didn't himself, to my knowledge,
18   engage in direct marketing, either personally, nor
19   did he own a company -- of which there are many
20   now who build sales forces and basically rent them
21   out -- he didn't do that.  But his clients did
22   engage in salesmen selling.
23        Q    And what --
24        A    Actually, he wasn't fond, at least in
```

```
 1   the '50s and '60s when I heard a discussion, of
 2   using salesmen.  He felt they were used too much,
 3   and that advertising and direct mail would be much
 4   more effective because it's so much more
 5   efficient.
 6        Q    And one of the drugs he was involved in
 7   promoting was Valium, correct?
 8        MR. BERNICK:  Objection.  Lack of
 9   foundation.  Again, you're talking about Arthur
10   Sackler?
11        MS. SINGER:  That's correct.
12        MR. BERNICK:  Still objection, lack of
13   foundation, and there's also no time period.
14        THE WITNESS:  I believe -- I've heard
15   that statement before, and I have no contrary
16   information.  But I was not involved in his
17   business, and I can't tell you any -- I can tell
18   you that I've heard it before, and it may be true.
19   Roche -- Hoffmann-La Roche was an important client
20   for him, and it wouldn't be surprising if Valium
21   was one of their products that they had assigned
22   to William Douglas McAdams.
23   BY MS. SINGER:
24        Q    And do you know if Arthur Sackler was
```

```
 1   involved in founding IMS?
 2        A    Four people founded IMS.  He was one of
 3   the four.
 4        Q    And IMS is a company that collects
 5   information on prescription drug sales, is that
 6   right, and marketing?
 7        A    At that time it published -- it did
 8   surveys and published results of those surveys for
 9   anybody who wanted to buy them.  I don't know how
10   many people other than pharmaceutical companies
11   bought them, but I'm sure there were many.
12        Q    And did Purdue use IMS data in its own
13   marketing?
14        MR. BERNICK:  Objection to form, the
15   company.  Also lack of time frame, lack of
16   foundation.
17        THE WITNESS:  For some tasks or some
18   marketing objectives, IMS was -- and many other
19   sources was -- was a source of information.  But I
20   can't tell when it started.
21        MS. SINGER:  Let's go to the --
22             (Sackler Exhibit No. 3 was marked
23                  for identification.)
24   BY MS. SINGER:
```

```
 1        Q    All right.  I want to show you
 2   Exhibit 3.
 3             And Exhibit 3 is a Forbes magazine
 4   article, "The OxyContin Clan:  The $14 Billion
 5   Newcomer to Forbes 2015 List of Richest U.S.
 6   Families."
 7        A    I see that.
 8        Q    Dr. Sackler, have you seen this article
 9   before?
10        A    I did.
11        Q    And is the --
12        A    That's a "yes."
13        Q    Understood.
14             And that picture on the front of the
15   article, is that your father and mother?
16        A    It is my father and mother.  I think
17   this was taken at an awards ceremony in Europe.
18   And I think it's a nice picture of the two of
19   them.  One of the best at this -- when they were
20   this age.  I'm glad they picked a really nice
21   picture.
22        Q    Now, let's turn to the article itself.
23        A    Okay.
24        Q    It starts by saying:  "The richest
```

1  newcomer to Forbes 2015 list of America's richest
2  families comes in at a stunning $14 billion.  The
3  Sackler family, which owns Stamford,
4  Connecticut-based Purdue Pharma, flew under the
5  radar when Forbes launched its initial list of
6  wealthiest families in July 2014, but this year
7  they cracked the top 20, edging out storied
8  families like the Bushes, Mellons and
9  Rockefellers."
10           To your knowledge, are the Sacklers
11  worth $14 billion?
12           MR. BERNICK:  Is the question now today?
13           MS. SINGER:  Yes.
14           MR. BERNICK:  Object to form of the
15  question, and also foundation.
16           THE WITNESS:  I -- I don't know the
17  answer.  I just don't know.  I -- my view is that
18  this is likely to be considerably higher than the
19  number today.  But I can't tell you for sure.
20  BY MS. SINGER:
21      Q   Do you have any reason to believe that
22  this was inaccurate when published in 2015?
23           MR. BERNICK:  Object to the form of the
24  question and foundation.

1           THE WITNESS:  I thought then it was
2  high, but again, the family has never, to my
3  knowledge, sat down and did an inventory of assets
4  or go through everybody's official balance sheet
5  and try to figure it out.
6           And private companies, my understanding
7  is, wouldn't appear on balance sheets.  So one
8  would have to estimate the value of the companies.
9  I think they are normally put in the balance sheet
10  at basis.
11           MR. BERNICK:  I -- I have a question at
12  this point.  I'm getting -- I have an exhibit
13  here.  This is Exhibit 3, but what appears on the
14  screen is not Exhibit 3.
15           THE WITNESS:  Oh.
16           MS. SINGER:  I'll show you the slide.
17           MR. BERNICK:  And -- and I have an
18  objection to the use of these slides, which are
19  excerpts from documents and they're formatted in a
20  certain way.  There's no foundation for asking --
21  you've established that the witness saw Exhibit 3.
22  There's no foundation that the witness saw your
23  rendition of parts of Exhibit 3 at any time
24  before.

1           And I don't think that that's a proper
2  examination.  I don't think these documents should
3  be shown to the witness unless they're actually
4  marked as exhibits, and then when they're marked,
5  they can be shown in that form.  This is not --
6           MS. SINGER:  I'm happy to mark it as an
7  exhibit.
8           MR. BERNICK:  This is not a media
9  process.  This is a deposition.
10           MS. SINGER:  So I hear your objection.
11  I don't think you need to testify to it,
12  Mr. Bernick.  We're happy to -- to mark this as an
13  exhibit, and it's meant as an aid to focus on.
14           MR. BERNICK:  Well, then, you have -- I
15  still have an objection to foundation.
16           (Sackler Exhibit No. 4 was marked
17           for identification.)
18  BY MS. SINGER:
19      Q   And this is Exhibit No. 4, and it is a
20  pull-out of the Forbes article.
21           MS. SINGER:  Your objection is noted.
22  BY MS. SINGER:
23      Q   Did you --
24           MR. BERNICK:  Well, just to be clear --

1  excuse me.  Now that Exhibit 4 has been marked, I
2  have an objection on the grounds of foundation and
3  form.  And I'm not sure that it even complies with
4  deposition protocol.
5           We also have an objection to -- although
6  I know that objections on relevance are reserved,
7  we have an objection to the relevance of family
8  wealth.  This is Dr. Sackler who is testifying
9  here.  But I'll permit him to answer that
10  question.
11  BY MS. SINGER:
12      Q   Dr. Sackler, at the time this article
13  came out, did the Sackler family object to --
14      A   This is The Times article?
15      Q   The Forbes article.
16      A   I misheard you.  I -- my apologies.
17      Q   I may have misspoken.
18           At the time the Forbes article came
19  out --
20      A   Ah.
21      Q   -- did the Sackler family in any way
22  note an objection to Ford -- to Forbes that they
23  believed that the figure was inaccurate?
24           MR. BERNICK:  Objection.  Lack of

1  foundation and form.  As well as the relevance
2  objection I just made.
3       THE WITNESS:  I don't have a memory of
4  such an action.  Although it may -- I believe that
5  something like that happened, but my memory is
6  foggy.  I did not personally pick up the phone and
7  call, but that might have come out of the law
8  department --
9  BY MS. SINGER:
10      Q    Okay.  And that's the last one.
11      A    -- out of the law department -- out of
12  the law department of Purdue or one of our outside
13  lawyers.  I don't think any executives were tasked
14  with doing this.  But I'm just -- I have an
15  impression, but I have no clear memory.
16      Q    Okay.  Going to page 2 of the Forbes
17  article that is Exhibit 3, it indicates that
18  Purdue is a hundred percent owned by the Sacklers.
19  Is that accurate?
20      MR. BERNICK:  Excuse me.  As of this
21  point in time?
22      MS. SINGER:  Yes.
23      THE WITNESS:  At this point in time?
24  Sorry?

---

1       MS. SINGER:  Yes.
2       MR. BERNICK:  Yes.
3       THE WITNESS:  Okay.  That is my
4  understanding.
5  BY MS. SINGER:
6       Q    Okay.  And --
7       A    Yes.
8       Q    -- is it still 100 percent owned by the
9  Sacklers?
10      A    That is my understanding.
11      Q    And then the article goes on to say in
12  the same line:  "Has generated estimated sales of
13  more than $35 billion since releasing its
14  time-released, supposedly addiction-proof version
15  of the painkiller oxycodone back in 1995."
16      Is it true Dr. Sackler that as of 19 --
17  I'm sorry, 2015 when this was published that
18  Purdue had generated estimated sales of more than
19  $35 billion?
20      MR. BERNICK:  First of all, again, this
21  is Purdue.  We have an objection to form that I
22  think can be easily resolved.  And then there is
23  an objection, lack of foundation.
24      Answer if you can.

---

1       THE WITNESS:  I'm thinking about the
2  question.
3       I don't remember what our accounting --
4  what our internal count was, and therefore, I
5  can't tell that this is or is not accurate.
6  BY MS. SINGER:
7       Q    What percent of Purdue -- of Purdue do
8  you own, Dr. Sackler?
9       MR. BERNICK:  Again, objection to form
10  on Purdue.  There are numerous entities that have
11  the Purdue name.  It would just be -- stop my
12  objections if you could just specify --
13      MS. SINGER:  Sure.
14      MR. BERNICK:  -- what entity.  It makes
15  a difference.
16  BY MS. SINGER:
17      Q    So we talked earlier about Purdue
18  Frederick, correct?
19      A    Right.
20      Q    And there is also Purdue Pharma Inc.,
21  correct?
22      A    Yes.
23      Q    When -- when we talk about the Purdue
24  entity that manufactures prescription drugs,

---

1  including opioids, which entity is that?
2       A    Could you repeat that -- just that last
3  sentence --
4       Q    Sure.  Which --
5       A    -- of the inquiry?
6       Q    Which Purdue entity manufactures
7  prescription drugs, including opioids?
8       MR. BERNICK:  Objection to form.
9       THE WITNESS:  I don't know today which
10  entity manufactures the -- the medicine you're
11  calling, and I would, just to elaborate for
12  clarity, point out there are other companies,
13  particularly in Canada that are called Purdue
14  Pharma as well.  So for avoidance of doubt, you
15  might want to try to, if you can, think about that
16  and focus on the -- I assume it's the U.S.
17  business that you're interested in, just say
18  whatever, Purdue Pharma in the U.S.
19      MR. BERNICK:  Okay.  She's going to ask
20  you the questions, Dr. Sackler.
21      MS. SINGER:  I'm getting lots of help.
22      MR. BERNICK:  I know you're getting a
23  little help, which is fine.  It helps move things
24  along.

```
 1   BY MS. SINGER:
 2        Q    So in the United States, Purdue
 3   manufactures prescription opioids, correct?
 4             MR. BERNICK:  It's the same -- it's the
 5   same problem with Purdue.
 6             Go ahead and answer if you can.
 7   BY MS. SINGER:
 8        Q    Tell me the entity that manufactures
 9   opioids --
10        A    I --
11        Q    -- in the United States.
12        A    I -- okay.  I do not know today's names.
13   It may have changed.
14        Q    As of your last knowledge.
15        A    My last knowledge goes back quite a
16   while, and it was manufactured by PF Laboratories.
17   Not Purdue Pharma, to my knowledge.  And
18   PF Laboratories has two factories in -- or had
19   two factories in North Carolina to manufacture
20   the -- the product.
21        Q    Okay.  And what other Purdue entities
22   are involved in the manufacture and marketing of
23   opioids in the United States?  As of your last
24   knowledge.
```

```
 1        A    I -- Rhodes Pharmaceutical has --
 2   manufactures the raw material for many years, and
 3   started marketing generic opioids more recently.
 4   But I am not clear on whether it is independent
 5   with a different chain of ownership or is somehow
 6   connected to Purdue.  There are others who could
 7   give you a clearer answer.
 8        Q    And other than Rhodes, are there other
 9   entities?
10        A    That manufacture?
11        Q    And market opioids in the United States.
12        A    None come to mind.  I don't -- I can't
13   say there isn't, but my impression is there isn't.
14   It's Rhodes or it's PF Labs.
15             MR. BERNICK:  Can I -- can I help a
16   little?  I think he understood the question to be
17   just manufacturing still.
18             MS. SINGER:  And --
19             THE WITNESS:  That was what I thought
20   you were talking about.
21   BY MS. SINGER:
22        Q    So manufacture and market.
23             MR. BERNICK:  See, now she's asking
24   about entities that do both -- one or the other or
```

```
 1   both.
 2             Right?
 3             MS. SINGER:  Mm-hmm.
 4             THE WITNESS:  I think the marketing is
 5   done by Rhodes Pharma in the case of Rhodes.  In
 6   the case of Purdue, it's done by Purdue Pharma LP,
 7   to market it.
 8   BY MS. SINGER:
 9        Q    Okay.
10        A    But if you just repeat the question, it
11   will help me see if there's anything else, any --
12        Q    So I was asking you to name the Purdue
13   entities broadly that are involved --
14        A    In the U.S., right?
15        Q    -- in the United States --
16        A    Right.
17        Q    -- in making, marketing or selling
18   opioids.
19        A    The -- we don't market opioids -- well,
20   I -- wait.  I'm not sure whether we do or not.  I
21   know we don't market OxyContin anymore.  That
22   changed months ago, many months ago.
23             Selling, again would be Purdue Pharma.
24   I don't know of any other entity.
```

```
 1             And manufacturing, the name I recognize
 2   is PF Lab -- Laboratories.
 3        Q    Okay.  So what --
 4        A    You realize I'm not on the board and so
 5   I'm not following this.  And given the pressure on
 6   the business, things have -- things might change
 7   or have already changed, and I haven't kept up
 8   with it.
 9        Q    So let's start with Purdue Pharma LP.
10   Is that wholly owned by the Sackler family?
11        A    To my knowledge, it is.
12
```







```
 1          MS. SINGER:  Okay.  We'll take a break.
 2          MR. BERNICK:  Great.  Thanks so much.
 3          THE VIDEOGRAPHER:  Going off the record
 4     at 11:00 a.m.
 5          (Recess.)
 6          THE VIDEOGRAPHER:  Back on the record at
 7     11:16 a.m.
 8          THE WITNESS:  Happy day.
 9     BY MS. SINGER:
10          Q    Dr. Sackler, you're named as -- as a
11     defendant personally in litigation that has been
12     filed recently over the marketing and distribution
13     of opioids, correct?
14          A    I -- I have heard that it's over
15     marketing and -- overmarketing of opioids, but I
16     have not read the complaints thoroughly.
17          Q    And do you know how many lawsuits you
18     have been named in?
19          A    I do not.
20
```







10    BY MS. SINGER:

11        Q    Have you taken any measures to protect

12    your assets from judgment?

13            MR. BERNICK:  Just -- she's now -- she's

14    now -- it's okay.  He's still looking at the -- at

15    the memo.

16    BY MS. SINGER:

17        Q    I'm asking you generally.

18        A    I have to think about that.

19            We --

20            MR. BERNICK:  And let me say if you have

21    information that comes from a discussion with

22    counsel, that's not what she's asking about.  It

23    has to be outside that.

24            THE WITNESS:  Oh.  That was why I was

1     thinking about it, because I can't think of any --

2     we have talked to counsel about that --

3            MR. BERNICK:  Well --

4     BY MS. SINGER:

5         Q    Have you taken any steps over the years

6     to prevent your assets from being available to

7     judgments against you?

8         A    Personal assets.  None that --

9         Q    Or trust assets.

10        A    None that I can recall.

11        Q    Okay.  Go to 630.

12            MR. BERNICK:  Move to strike the

13    witness's prior response because it discloses --

14    it may disclose information received during the

15    course of discussions with counsel.  On its face

16    it did.  And the fact that that was stated is not

17    a waiver of any privilege that would be applicable

18    to the substance of any aspect of what the witness

19    has referred to.

20    BY MS. SINGER:

21        Q    In referring to counsel, Dr. Sackler,

22    who you consulted with about assets, who was that?

23            MR. BERNICK:  You can -- you can just

24    refer to the name of the lawyer if you -- if you

```
 1    recall.
 2              THE WITNESS:  Again, the question is my
 3    assets?
 4    BY MS. SINGER:
 5         Q    Your assets --
 6         A    Personal assets?
 7         Q    -- or trust assets for which you are the
 8    beneficiary.
 9              MR. BERNICK:  Again, the question just
10    asks for the name of the lawyer, if you can recall
11    it.
12              THE WITNESS:  Some years ago, we --
13              MR. BERNICK:  No, no.  No, no.
14              THE WITNESS:  What?
15              MR. BERNICK:  You have to --
16              THE WITNESS:  No.
17              MR. BERNICK:  Counsel is asking you for
18    the name of a lawyer.
19              THE WITNESS:  Okay.
20              MR. BERNICK:  Just the name of a lawyer.
21              THE WITNESS:  I'm trying to think if
22    there were one or two.
23              MR. BERNICK:  Okay.  Well, you can think
24    about whether --
```

```
 1    BY MS. SINGER:
 2         Q    Any names you recall.
 3         A    Michael Pecker.
 4         Q    Anyone else?
 5         A    And I can't remember the -- right now
 6    the name of the -- of another one which --
 7              MR. BERNICK:  Well --
 8              THE WITNESS:  -- preceded this period.
 9    BY MS. SINGER:
10         Q    Okay.  So there's someone else who you
11    consulted prior to 2007, but you don't recall
12    that -- that lawyer's name?
13         A    Let me be clearer --
14              MR. BERNICK:  Well, it's very important
15    that you not disclose --
16              THE WITNESS:  Okay.
17              MR. BERNICK:  -- any of the substance of
18    what you talked about with counsel on any
19    subject --
20              THE WITNESS:  Okay.
21              MR. BERNICK:  -- including this subject.
22              THE WITNESS:  Okay.
23              MR. BERNICK:  So if you remember a name,
24    you can provide a name.
```

```
 1              THE WITNESS:  Okay.
 2              MR. BERNICK:  But you can't talk about
 3    anything else.  I instruct you not to --
 4              THE WITNESS:  Well, that's what you're
 5    looking for?
 6              MR. BERNICK:  It doesn't --
 7    BY MS. SINGER:
 8         Q    The question asks for the name of
 9    counsel.
10         A    Right, I -- it will probably -- this is
11    an example of my spotty memory.  It may come to me
12    in a few minutes or a few hours, but I can't put
13    my finger on the name now.
14         Q    Okay.  And we were talking about
15    sheltering your personal assets or trust assets.
16    Are there any other steps you have taken to -- to
17    prevent -- to protect other assets of the family
18    or Purdue Pharma from judgment?
19              MR. BERNICK:  The witness is instructed
20    not to answer that question because -- excuse me,
21    because it builds on the answer that he gave that
22    may have disclosed privileged information.  Your
23    question assumes that.  He's instructed not to
24    answer that question.
```

```
 1              MS. SINGER:  I'm not sure -- i'm asking
 2    for steps that he took, not advice of counsel.
 3              MR. BERNICK:  Well, but it builds on
 4    the --
 5              SPECIAL MASTER COHEN:  The question is
 6    overruled.  The witness will answer the question.
 7              MR. BERNICK:  Well, the -- then we're
 8    going to take an appeal of that, Your Honor.
 9              SPECIAL MASTER COHEN:  He can answer.
10              MR. BERNICK:  So -- no, I -- I object to
11    that.  I'm instructing the witness not to answer
12    that question.
13              THE WITNESS:  Could you restate the
14    question, please?
15    BY MS. SINGER:
16         Q    Yes.
17         A    If I -- as it seems, I have to answer
18    it.
19              MR. BERNICK:  No, you don't have to
20    answer.  He is instructed not to answer the
21    question.
22              SPECIAL MASTER COHEN:  Sir?
23              MR. BERNICK:  Yes.
24              SPECIAL MASTER COHEN:  The question,
```

1  which we can reread, does not ask for the content
2  of any attorney-client communication.
3          MR. BERNICK:  Well, we can have the
4  question reread.
5          SPECIAL MASTER COHEN:  In fact, it's
6  asking for a yes-or-no answer.
7          MR. BERNICK:  I'm happy to have the
8  question reread.  But the question incorporates a
9  statement or testimony that he gave that did
10 reflect on its face privileged information.
11         Counsel actually has an obligation not
12 to -- not to cause or solicit the provision of
13 further privileged information or to use it in any
14 way, shape or form.  That's an obligation under
15 the Professional Rules of Responsibility.
16         So the witness is instructed not to
17 answer that question.
18         MS. SINGER:  I've not solicited any
19 privileged information.  I believe there's a
20 ruling instructing him to answer.
21         SPECIAL MASTER COHEN:  Why don't you ask
22 the question again so we can all be on the same
23 page.
24 BY MS. SINGER:

1      Q    Are there any other steps you have taken
2  to protect other assets of the family or Purdue
3  Pharma from judgment?
4          MR. BERNICK:  Okay.  Again, I instruct
5  the witness not to answer the question.  She said
6  "other steps."  That referred back to the prior
7  testimony, and the prior testimony disclosed on
8  its face privileged information.
9          Counsel is obliged not to solicit in any
10 way, shape or form any information that might be
11 privileged or to use it.  It's like using a
12 privileged document that's been --
13         SPECIAL MASTER COHEN:  Mr. Bernick.
14         MR. BERNICK:  That -- that's my
15 position.
16         SPECIAL MASTER COHEN:  What is the prior
17 testimony that you're referring to?  Because I'm
18 just not understanding what you're saying.
19         MR. BERNICK:  Okay.  We can -- we can
20 scroll back.  I appreciate that, Your Honor.
21 We'll scroll back.
22         (Pause in the proceedings.)
23         MR. BERNICK:  Yes, it's at 11:21 and 6
24 seconds.

1          (A discussion was held off the record.)
2          THE COURT:  So where -- can you point me
3  to the witness's statement that you think is --
4  includes attorney-client privileged information?
5          MR. BERNICK:  Right there.  So if you go
6  right back, it says, And let me say -- I say, "And
7  let me say" --
8          MS. SINGER:  The witness didn't reveal
9  anything.  There is no disclosure here.
10         MR. BERNICK:  Beginning at 11:20 --
11 11:20:25:  "Have you taken any measures to protect
12 your assets from judgment?"
13         "I have to think about that."  And let
14 me say -- I then say:  "And let me -- if you
15 have any" --
16         SPECIAL MASTER COHEN:  I understand.
17 I'm with you.
18         MR. BERNICK:  Then he goes on to say --
19         SPECIAL MASTER COHEN:  Just keep
20 scrolling.  I want to show me where it is that
21 you believe that he has said anything that was
22 attorney-client privileged.
23         MR. BERNICK:  Right there.  "We have
24 talked to counsel about that," and the "that"

1  that he was referring to is a discussion about the
2  subject matter, which is taking measures to
3  protect assets from judgment.  That subject matter
4  is privileged.
5          SPECIAL MASTER COHEN:  The fact of a
6  conversation between an attorney and a client is
7  itself not privileged, and the rule clearly says
8  that counsel is allowed to examine the witness to
9  obtain information to test the privilege.
10         But in any event, what has happened so
11 far has not been a divulging or revealing of
12 anything that was attorney-client privileged.
13         Ms. Singer can continue to ask questions
14 that don't ask for attorney-client privileged
15 information, including, for example:  Have you,
16 Mr. Sackler, yourself taken any steps to protect
17 assets, whether personal or trust?
18         Now, let me make clear --
19         MR. BERNICK:  I didn't object to that
20 question.
21         SPECIAL MASTER COHEN:  Well, I -- you
22 can make an objection.  You can direct him not to
23 answer.  I'm here as the court to rule on that.
24         MR. BERNICK:  And then we'll take --

**Page 69**

1    take an appeal to Judge Fulton.

2           SPECIAL MASTER COHEN:  If you stand on

3    that and you're overruled, we're all going to get

4    back together with Mr. Sackler somewhere to do

5    that.

6           MR. BERNICK:  We're prepared for

7    purposes of protecting the privilege to do

8    whatever is necessary.

9           SPECIAL MASTER COHEN:  Okay.  And I'm

10   telling you that I don't think --

11          MR. BERNICK:  Okay.  Then that's fine.

12          SPECIAL MASTER COHEN:  -- you're

13   anywhere near close to an incursion on your

14   attorney-client privilege.

15          MR. BERNICK:  So if there's a new

16   question about whether he took -- it's up to you,

17   Ms. Singer, what you want to pursue at this point.

18   I've instructed the witness not to

19   answer that question.  I stand on the instruction,

20   and I'm instructing you again not to answer the

21   pending question.

22          MS. SINGER:  All right.  To be clear for

23   the record, Mr. Bernick, you are directing

24   Dr. Sackler not to answer the question as to

---

**Page 70**

1    whether he has taken any steps to protect assets,

2    whether personal or trust, from judgment?

3          MR. BERNICK:  That question, that

4    whether he personally has done so, taken the

5    steps, that question I would not object to.

6    BY MS. SINGER:

7       Q    Okay.  That is the question.

8       A    Just -- there have been so many -- just

9    please rephrase it, or would you -- I just want to

10   hear it --

11       Q    Mm-hmm.

12       A    -- to be sure I understand it.

13       Q    Have you taken any steps to protect

14   assets, whether personal or trust, from a judgment

15   against -- for -- from judgment?

16          MR. BERNICK:  You personally.

17          THE WITNESS:  Yeah, I did hear that.

18   None that I can recall.

19   BY MS. SINGER:

20       Q    And have you discussed with members of

21   your family taking steps to protect their assets

22   or trust assets from judgment?

23          MR. BERNICK:  I object -- object.  It's

24   not clear.  I instruct you not to answer that

---

**Page 71**

1    question to the extent that it relates to or

2    involves discussions or information received from

3    counsel.

4    BY MS. SINGER:

5       Q    So the question asked for discussions

6    with family members.

7          MR. BERNICK:  Yes, my instruction

8    stands.

9          THE WITNESS:  I don't -- I'm a little

10   unclear what I should do, answer or not.

11          MR. BERNICK:  Well, the question is if

12   you can answer that, and it doesn't relate to

13   discussions that come from or pertain to

14   discussions that you've had with counsel, you can

15   do it.

16          But if any discussion, any discussions

17   that you had with members of your family were in

18   connection with discussions that you've had with

19   counsel, not assuming that there were any, but if

20   there are, you are not permitted -- I'm

21   instructing you not to answer the question with

22   respect to those matters.

23          THE WITNESS:  All right.  So since you

24   lost the question, short-term memory, would you

---

**Page 72**

1    just reread it.  That took very little time.

2    BY MS. SINGER:

3       Q    Have you had conversations with members

4    of your family about taking steps to protect their

5    assets --

6          MR. BERNICK:  Again --

7    BY MS. SINGER:

8       Q    -- personal or trust, from judgment?

9          MR. BERNICK:  Again, if any of those --

10          MS. SINGER:  We are going to lose the

11   question again.

12          MR. BERNICK:  If any of those -- any of

13   those discussions involved related to matters that

14   you had discussed or they had discussed with

15   counsel, you are not to testify to those

16   discussions.  That is, discussions with your

17   family members, if there were any.

18          THE WITNESS:  None that I can recall.

19          (Sackler Exhibit No. 6 was marked

20          for identification.)

21   BY MS. SINGER:

22







6   BY MS. SINGER:

7       Q    Okay.  Moving on from that document.

8            Dr. Sackler, you went to medical school

9   at NYU, did you not?

10      A    For two years.

11      Q    And did not complete --

12      A    No.

13      Q    -- med school?

14      A    I started medical school at the State

15  University of New York in Buffalo, completed two

16  years, and transferred to NYU.

17      Q    Okay.  And did you get your medical

18  degree from --

19      A    I did.

20      Q    -- from NYU?

21           Have you ever practiced medicine?

22      A    Only in my training or my internship.

23      Q    When did you first learn that opioids

24  were addictive?

```
 1    A    I cannot remember.
 2    Q    Have you known since your medical
 3 training that opioids are addictive?
 4    A    Yes.
 5    Q    And when you were in medical school,
 6 what was medical practice with regard to opioids?
 7    A    My recollection and training that I got
 8 was somewhat unusual.  There was a lot of training
 9 or explanation of when you shouldn't use opioids,
10 what is the harm that can come from opioids, and
11 so on.  But it -- you would have thought the
12 training would have included how to use them.  I
13 don't remember anything like that.
14    Q    And why do you say that's unusual?
15    A    Because it was a missing part of the
16 curriculum, and an important missing part.
17    Q    And after medical school, did you go
18 straight to work at Purdue Pharma?
19    A    I did for two years.
20    Q    When did you join the board of Purdue
21 Pharma?
22    A    I don't remember.
23    MR. BERNICK:  It -- again, Purdue
24 Pharma, there are two Purdue Pharmas.
```
Golkow Litigation Services                       Page 77

```
 1    THE WITNESS:  Oh, I -- I am sorry.
 2    MR. BERNICK:  So I'm not saying it to
 3 you.  I'm saying this to counsel.
 4    So for purposes of clarity, it would be
 5 appreciated if that could be incorporated into the
 6 question.
 7 BY MS. SINGER:
 8    Q    Do you recall joining the board of
 9 either Purdue entity?
10    A    I joined the board of Purdue Frederick
11 first.
12    Q    Do you remember when that was?
13    A    The development of a board in which --
14 there was always a board, and the founders and the
15 CEOs -- co-CEOs worked within the context of that
16 board, and gradually they introduced, as observers
17 in many cases and eventually members, other
18 people.
19    Q    Okay.  So do you remember when you
20 joined the board of Purdue Frederick?
21    A    I do not.
22    Q    Do you remember -- did you join the
23 board of Purdue Pharma at some point?
24    A    My recollection is at inception when
```
Golkow Litigation Services                       Page 78

```
 1 Purdue Pharma was organized.
 2    Q    And you also had various staff functions
 3 at Purdue Pharma; is that correct?
 4    A    That is correct.  After it was
 5 organized, I had staff functions.
 6    Q    And what year was Purdue Pharma
 7 organized?
 8    A    I don't recall precisely.
 9    Q    Okay.  And was your first job at Purdue
10 as an assistant to your father Raymond?
11    A    I don't recall, but -- but it doesn't do
12 violence to any contrary memory.
13    Q    And did you serve as vice president for
14 the medical department at Purdue Pharma?
15    A    For a brief time.
16    Q    And do you remember when that was?
17    A    Early '80s.
18    Q    And as vice president of the medical
19 department, did you have a role in product
20 development?
21    A    I did.
22    Q    And what about clinical research?
23    A    I did.
24    Q    And who reported to you directly?
```
Golkow Litigation Services                       Page 79

```
 1    A    I don't remember.
 2    Q    And did you subsequently become director
 3 of sales and marketing?
 4    A    Again, for a brief period.
 5    Q    Okay.  And do you remember when that
 6 was?
 7    A    I believe that was around 1983 or '84.
 8    Q    And do you know how long you served in
 9 that role?
10    A    I was assigned in a sense as the act- --
11 in a real sense as the acting, and part of my
12 assignment was to identify candidates for that
13 position and bring them forward to the CEOs.
14    Q    And was a candidate selected?
15    A    Yes.
16    Q    And who was that?
17    A    Well, this is a -- this is a memory
18 test, but luckily I did hit the right synapse -- a
19 man named Michael Fleming.
20    Q    Fleming or Friedman?
21    A    No, it wasn't Friedman.  It was
22 Michael --
23    Q    Fleming.
24    A    -- Fleming.
```
Golkow Litigation Services                       Page 80

```
1    Q    Okay.
2    A    I'm not so sure of his first name.  I'm
3  quite confident that was his last name.
4    Q    Okay.  And after serving as director of
5  sales and marketing, did you become president of
6  Purdue Pharma?
7    A    Much later.
8    Q    And what did you do -- were you on staff
9  in the interim?
10   A    I was a staff assistant facilitator to
11 Mortimer and Raymond, and was expected to focus on
12 R&D, medical, and marketing and sales.  And R&D,
13 medical -- I'm trying to remember.  It will come
14 to me.  There may have been one other function.
15 It was not the whole company.
16   Q    Okay.  And those were the roles you
17 served in until you became president of Purdue
18 Pharma; is that correct?
19   A    It didn't change much.
20   Q    Your duties didn't change much when you
21 became president?
22   A    That's correct.
23   Q    Okay.  And you became president in 1999.
24 Does that sound right?
```

```
1    A    Very, very -- at the end -- at Christmas
2  break time, yes.  So I would think a more accurate
3  functional position was the beginning of 2000.
4    Q    Okay.  And as president of Purdue
5  Pharma, were you basically the chief operating
6  officer of the company?
7    A    I never held that title, and the answer
8  to that would be, no, I was not.
9    Q    What was your responsibility as
10 president of Purdue Pharma?
11   A    To contribute to the success of the
12 business, particularly in R&D, medical -- I now
13 remember -- corporate development, that is
14 acquisitions and licenses, and marketing and
15 sales.
16   Q    And so you were functionally the chief
17 executive responsible for those functions,
18 correct?
19   A    I wasn't, no.  The chief -- I never held
20 the chief executive title or the role.
21   Q    So how did you interact with the person
22 who held that role?
23   A    The founders, ever since they went into
24 business in Purdue Frederick, were co-chief
```

```
1  executive officers.  Mortimer was chairman of the
2  board.  Raymond was managing other functions.  But
3  I don't have a clear notion of the history.
4    Q    And -- and at some point Raymond left
5  the company, correct?
6    A    No.
7    Q    No?
8    A    No.
9    Q    Stayed until he passed away?
10   A    He did.  He worked the day before he was
11 stricken ill.
12   Q    And so you were their assistant in
13 carrying out those functions, correct, and those
14 functions you described, marketing, R&D and
15 business development?
16   A    Until they gave up the CEO position when
17 I left, when I resigned as a -- as an executive in
18 the business.
19   Q    And when was that?
20   A    When Michael Friedman was appointed, and
21 it was early in 2003, I believe.
22   Q    And you remained on the board of Purdue
23 Pharma at that point?
24   A    I did.
```

```
1    Q    As well as on the board of Purdue
2  Frederick, correct?
3    A    I believe -- yes, I believe so.
4    Q    And have you since resigned from the
5  board of Purdue Pharma?
6    A    I've resigned from what -- from Purdue
7  Pharma and any other related boards, yes.
8    Q    And that was in July of 2018; is that
9  correct?
10   A    That sounds -- I don't remember the
11 month.  I -- two -- the middle of 2018.
12   Q    And did you resign for liability
13 reasons?
14   A    No.
15   Q
```









5  BY MS. SINGER:

6      Q    Do you know which members of the Sackler

7  family remain on the Purdue Pharma board?

8      A    It's either one or zero.

9      Q    Is it fair to say that you were actively

10  involved in Purdue's manage -- management both as

11  a member of the staff and board member?

12      A    At what time?

13      Q    Throughout your tenure as a board member

14  and staff person.

15      MR. BERNICK:  Objection to the form of

16  the question.

17      THE WITNESS:  Should I answer it?  Okay.

18      MR. BERNICK:  Yes.

19      THE WITNESS:  Okay.  I was an active

20  executive until 2003.  After that, I was just a

21  board member.  And although I asked for

22  information, it was in the role of being a board

23  member.

24  BY MS. SINGER:

1      Q    So you were not just a board member, you

2  were an active board member, correct?

3      MR. BERNICK:  Objection to the form of

4  the question.

5      THE WITNESS:  I don't -- was I an active

6  board member?  I think there were many active

7  board members.  I was -- maybe I was with -- you

8  know, in that group.

9  BY MS. SINGER:

10      Q    Okay.  Well, let's -- let's turn to

11  that.  So -- start with that.

12      (Sackler Exhibit No. 7 was marked

13      for identification.)

14  BY MS. SINGER:

15      Q    Okay.  I'm showing you Exhibit 7.

16      MR. BERNICK:  It's about five to 12:00.

17      THE WITNESS:  Okay.  Yeah, I would like

18  to break.

19  BY MS. SINGER:

20      Q    So Exhibit 7 is an Esquire article,

21  perhaps a less good picture.  "The Secretive

22  Family Making Billions from the Opioid Crisis."

23      Have you seen this article?

24      A    No, I have not seen this article.

```
1       Q    You have not seen the Esquire article
2   about the Sackler family?
3            MR. BERNICK:  Exhibit 7.
4            THE WITNESS:  Okay.
5            MR. BERNICK:  She's asking --
6   BY MS. SINGER:
7       Q    Have you never seen this article before?
8       A    Is the date 2/28/2019?
9       Q    No.  The article ran October 16, 2017.
10      A    Ah, low contrast.  I --
11           MR. BERNICK:  Well, wait.  If you want
12  to read this, read, and then ask -- answer her
13  question.  I don't want you doing both at the same
14  time.
15           THE WITNESS:  She asked me if I've seen
16  it.
17           MR. BERNICK:  Yes.
18           MS. SINGER:  Yes.
19           THE WITNESS:  I don't remember whether I
20  saw it or not.
21  BY MS. SINGER:
22      Q    Okay.  So at page -- okay.  Let's turn
23  to page 19.
24           Tell me when you're there.
```

```
1       A    There it is.
2            MR. BERNICK:  Yeah.
3   BY MS. SINGER:
4       Q    It says:  "Richard also had an appetite
5   for micromanagement."  Quote, 'I remember one time
6   he mailed out a rambling sales bulletin,' said
7   Shelby Sherman, a Purdue sales rep from 1974 to
8   1998, 'and right in the middle he put in:  If
9   you're reading this, then you must call my
10  secretary at this number and give her the secret
11  password.  He wanted to check and see if the reps
12  were reading this shit.  We called it 'Playin
13  Passwords.'"
14           Do you recall sending -- did you send
15  e-mails with hidden passwords to see if the sales
16  reps were reading them?
17           MR. BERNICK:  Move to strike the -- the
18  statement about the article.  Lack of foundation.
19  And as to the question, I object on grounds of
20  form.
21           THE WITNESS:  I do remember doing
22  something that -- I don't remember "secret
23  passwords," using that term.  But I did during the
24  brief period after the -- brief period I was
```

```
1   acting at marketing and sales, I did write
2   bulletins, and I have a recollection I did the --
3   I -- I did this once.
4   BY MS. SINGER:
5       Q    For what reason?
6       A    I had written it very late at night, and
7   I was wondering -- it just came to me, Gee, it
8   would be interesting if people are going to read
9   this far.  It was pretty long, as I remember it.
10  And so I was just curious.  There was no purpose
11  other than, Look, if nobody is reading this
12  far, maybe I should do something to either shorten
13  it or make it more interesting.
14      Q    And then the article goes --
15           MR. BERNICK:  Wait.  I'm sorry.  Were
16  you done?
17           THE WITNESS:  Make it more interesting.
18  That's all.
19  BY MS. SINGER:
20      Q    The article goes on:  "According to
21  Sherman, Richard stated -- Richard started taking
22  a more prominent role in the company during the
23  early 1980s."  Quote, 'The shift was abrupt,' he
24  said.  'Raymond was just so nice and so down to
```

```
1   earth and calm'" --
2       A    I'm sorry.  Where are you reading?  I'm
3   having --
4       Q    The next sentence.
5       A    I'm having trouble.  Thank you.  I'm
6   having trouble hearing you.  I have to change my
7   batteries.  Why don't you start --
8       Q    So I'll read it again.  "According to
9   Sherman, Richard started taking a more prominent
10  role in the company during the 1980s.  'The shift
11  was abrupt,' he said.  'Raymond was just so nice
12  and down to earth and calm and gentle.  When
13  Richard came in, things got a lot harder.  Richard
14  wanted Purdue to be big, I mean really big.'"
15           You did want Purdue to be really big,
16  right?
17           MR. BERNICK:  Hang on.  Move to strike
18  the statement from the article.  Lack of
19  foundation.  And as the question that was posed,
20  object on grounds of form.
21           THE WITNESS:  I wanted us to bring the
22  benefits of our products to patients whose doctors
23  felt would benefit from them.  I don't ever -- I
24  don't recall that being big was ever a motivation
```

```
 1   of mine.
 2          MR. BERNICK:  Linda, if -- we're now a
 3   little bit after noon.  Whenever you get a chance
 4   to get --
 5          MS. SINGER:  Okay.  We'll finish this
 6   line.
 7   BY MS. SINGER:
 8      Q    Your e-mails -- well, strike that.
 9          Let's turn to another -- Exhibit 8.
10          (Sackler Exhibit No. 8 was marked
11                  for identification.)
12   BY MS. SINGER:
13      Q    Do you recognize Exhibit 8?
14          MR. BERNICK:  I'm just tapping it.  I'm
15   not -- it's not for you.  It's I don't want the
16   sticky to come off.
17          THE WITNESS:  Oh, okay.
18   BY MS. SINGER:
19      Q    Exhibit 8 is an e-mail from you,
20   Dr. Sackler --
21      A    Yes.
22      Q    -- to Michael Friedman dated 12/23/96,
23   subject line:  "Your vacation."
24          Does this e-mail seem familiar to you?
```

```
 1      A    Not what I've read so far.  I don't
 2   remember --
 3          MR. BERNICK:  Just -- just read it then
 4   so that she can ask you questions.
 5          THE WITNESS:  Okay.  Okay.
 6          MR. BERNICK:  You want to to --
 7   BY MS. SINGER:
 8      Q    Let me read it and see if it refreshes
 9   your recollection.
10          So Michael Friedman was at this point
11   CEO of Purdue Pharma; is that correct, 1996?
12      A    Yes.  I was just --
13      Q    And he says --
14      A    Wait -- no, he was not CEO.
15      Q    What was his role?
16      A    I'm sorry.  I miss -- I misprocessed.
17          He was a vice president at this time.
18   I'm trying to think when he joined.  Is there
19   any con-- -- job content in here that would help me
20   or not?
21      Q    Well, why don't I read it and we'll see
22   if it --
23      A    Sure.
24      Q    -- refreshes your recollection.
```

```
 1      A    Okay.  All right.
 2      Q    It says:  "You need a vacation, and I
 3   need a vacation from your e-mail."  This is
 4   Michael Friedman writing.  "Today you sent
 5   messages that," colon, "announced your personal
 6   disappointment with the Abbott arrangement,
 7   expressed your fears that we would be embarrassed
 8   by the way we have handled Nakahata, and we will
 9   not communicate to the organization that you think
10   our forecast for OxyContin is a silly number, and
11   it is not.  I completely disagree with your views
12   on each of these matters.  In addition to these
13   insults and backhanded compliments, you sent me a
14   barrage of trivial follow-up messages."
15          Does that refresh your recollection
16   about this communication?
17      A    No.
18      Q    Did you have concerns about Michael
19   Friedman's work?
20          MR. BERNICK:  Objection.  Form.  What
21   time?
22   BY MS. SINGER:
23      Q    The time of this e-mail.
24      A    No.  I had -- I was aware of nothing
```

```
 1   that would have given me concerns.
 2      Q    So what he's --
 3      A    I can't remember anything that would
 4   have given me concern, but I don't think I had any
 5   concerns.
 6      Q    Did he report to you during this time
 7   period?
 8      A    '96.  He didn't report to me officially,
 9   but I had enormous respect for his intelligence,
10   his knowledge, his creativity, and his management
11   skills.  In fact, he taught me a lot that improved
12   my management skills, but he had a kind of a rough
13   way of doing it, such as in this.  Basically,
14   you're wasting your time kind of -- I just
15   paraphrased it, as I just glanced at that.  This
16   is not an attempt to parse it.
17          "Richard, you're wasting your time," and
18   so on, and really, you know, just lay off, you're
19   sending too many -- too much to me, I assume he's
20   saying.
21      Q    And that was a fairly common theme --
22      A    Yeah.
23      Q    -- in your interactions with staff, was
24   it not?
```

**Page 97**

```
 1        MR. BERNICK:  Objection to --
 2        THE WITNESS:  Sorry.
 3        MR. BERNICK:  Objection to form, time.
 4        THE WITNESS:  I wouldn't call it a
 5 theme, but I would say that he was not shy to tell
 6 me when he thought I was doing something that I
 7 shouldn't do, and I listened to him over time.
 8 But I did listen to him.
 9 BY MS. SINGER:
10     Q    But it wasn't just Michael Friedman who
11 expressed concerns about your micromanagement, was
12 it?
13        MR. BERNICK:  Objection to form, time.
14        THE WITNESS:  I don't remember -- I just
15 don't remember whether there were objections,
16 stated objections.
17        MS. SINGER:  Well, excuse me a minute.
18        (Sackler Exhibit No. 9 was marked
19             for identification.)
20 BY MS. SINGER:
21     Q    Okay.  Exhibit 9.  Perhaps this will
22 remind you of other objections.  It's an e-mail
23 chain that starts from John Stewart.  I'm sorry,
24 to John Stewart from Russell Gasdia, March 8th,
```

**Page 98**

```
 1 2012.
 2        Do you recall this e-mail?
 3     A    Yes.
 4     Q    And it says in an e-mail from Russell
 5 Gasdia -- and who was Russell Gasdia?
 6     A    Russell Gasdia -- what's the date here?
 7 3/8/2012.  My best recollection, it may be
 8 imperfect, was that he was head of sales or he was
 9 head of marketing and sales, but I don't remember
10 which.
11     Q    Okay.  And at the bottom of the top --
12 the bottom of the first page is an e-mail from
13 you.
14     A    Mm-hmm.
15     Q    And it says -- perhaps you can read it,
16 Dr. Sackler.  "This is bad."
17     A    Yes.
18     Q    So I won't ask you to read it.  "This is
19 bad."
20        And you're talking here about Butrans
21 sale; is that -- sales; is that correct?
22     A    That is correct.
23     Q    And then Russell Gasdia forwards your
24 comment, "This is bad," to John Stewart, correct,
```

**Page 99**

```
 1 in the e-mail above it?
 2     A    Yes.
 3     Q    And Russ says:  "This is taking a lot of
 4 David's energy."
 5        Do you know who David is?
 6     A    I don't know.
 7     Q    Could it be David Rosen?
 8     A    It might have been, but I don't --
 9     Q    "This is taking a lot" --
10     A    Is he named in the e-mail?  I mean is it
11 clear if you read the whole e-mail?
12     Q    So you can -- you're --
13     A    I said it could have been, but I don't
14 remember just from this phrase.
15     Q    Right.  If you look at the bottom of the
16 chain again where you send the e-mail, you sent it
17 to David Rosen.
18     A    Okay.  That's reasonable then.
19     Q    Okay.  So, "This is taking a lot of
20 David's" --
21     A    It's an inference, but it's a reasonable
22 inference.
23     Q    "This is taking a lot of David's energy,
24 almost every day.  I can assure you that Mike and
```

**Page 100**

```
 1 Windell are fully focused on improving these
 2 results.  It isn't constructive to spend too much
 3 time on this as opposed to expending energy within
 4 my department of identifying the problem,
 5 developing the solutions and gaining
 6 implementation."
 7     A    Yes.
 8     Q    "Anything you can do to reduce the
 9 direct contact of Richard into the organization is
10 appreciated.  I realize he has a right to know and
11 is highly analytical, but diving into the
12 organization isn't always productive."
13        Do you recall hearing concerns from John
14 Stewart or other staff about you diving into the
15 organizational details?
16        MR. BERNICK:  Move to -- move to strike
17 the prefatory statement.  And as to the question
18 itself, I don't have an objection to the question
19 itself.
20        THE WITNESS:  Could you just restate the
21 question?  I kind of get lost quickly.
22 BY MS. SINGER:
23     Q    Do you have a recollection of John
24 Stewart raising concerns with you about diving
```

1  into the organization excessively?

2      A    I do not.

3      Q    And then John goes on, at the top of the

4  chain, John Stewart:  "I work on this virtually

5  every day.  Some with more success than others.

6  You are right about the ultimate solution.  In the

7  meantime, when RSS" --

8           Which I presume is you?

9      A    If he said RSS, yes, that almost

10 certainly was me, unless he mistyped it.

11     Q    -- "when RSS does ask for data, I find

12 it best to just give it to him, but at the same

13 time repeat what I/we feel."

14          And again, you don't recall this being

15 raised with you?

16     A    Pardon?

17     Q    Do you recall this being raised from you

18 as something that John Stewart worked with you on

19 virtually every day?

20     A    No, I don't -- that's an exaggeration,

21 but at that time John Stewart was ignoring what I

22 felt was clear evidence that the launch didn't do

23 and wouldn't do what we had hoped for.  It was

24 going to fall short by a lot.

1      Q    In terms of its sales?

2      A    In terms of its sales, and at that time

3  we had already introduced the product in multiple

4  countries, most of which embraced it.  And it was

5  an extremely success -- by that time, it was an

6  extremely successful product in a dozen countries,

7  and I was very hopeful when we launched it here,

8  but it wasn't successful at all in the United

9  States.

10          And my recollection is I'd go to John

11 and say, If we don't make some substantial

12 changes, we ought to reduce the investment behind

13 it.  And he just kept saying the same thing, It's

14 too early, it's too early, it's too early.  So

15 that discussion didn't take place every day.

16 Periodically.  It was unusual in that --

17 unusual -- well, no, I -- my memory could be

18 faulty here.  I don't think I want to follow that

19 theme.

20          He just didn't agree, and I was trying

21 to persuade him that we either had to change

22 the -- so we had to change some things that were

23 significant, he had to change -- he had to change

24 or organize people to propose changes, or just

1  dramatically reduce the promotional spend.

2      Q    And this -- this was an issue of real

3  concern for you.  Right?

4      A    I was -- no, real disappointment.  Not

5  concern.  I was disappointed because we had hoped

6  to -- that this product in the United States would

7  accomplish not only sales but would displace

8  OxyContin sales and morphine sales, not just

9  necessarily ours, with a safer, much safer dosage

10 form and a much safer molecule than any of the

11 other strong opioids.

12          MS. SINGER:  So you had asked for a

13 break?

14          MR. BERNICK:  Yes, sure.

15          THE WITNESS:  That would be good for me.

16 Thank you.

17          THE VIDEOGRAPHER:  Going off the record

18 at 12:13 p.m.

19          (Lunch recess.)

20          THE VIDEOGRAPHER:  Back on the record at

21 12:57 p.m.

22 BY MS. SINGER:

23     Q    All right.  Dr. Sackler, before the

24 break you were talking about the fact that you

1  weren't actively involved in the day-to-day

2  management of Purdue Pharma.

3          Is that a correct characterization of

4  your testimony?

5          MR. BERNICK:  Objection to form.

6          THE WITNESS:  Would you put some time

7  bracket around that?

8  BY MS. SINGER:

9      Q    So let's say first from 2003 forward.

10     A    From three to four?

11     Q    From 2003 forward, meaning --

12     A    Oh, forward.  Forward.  I'm sorry.

13     Q    That's okay.

14     A    I should have changed the batteries.  My

15 apologies.

16          Yes.  That's true.

17     Q    Okay.  Now, you were actively involved

18 in -- in questioning and directing sales fore- --

19 sales forecasts.  Is that true?

20     A    No.

21     Q    Okay.  Let's go to 7 --

22     A    Oh, correction.  Re- -- may I readdress

23 that?  Because you included two things.

24 Correcting sales forecasts and --

```
1    Q    Questioning and directing.

2    A    Questioning, yes, I did do that from

3   time to time.  Directing sales forecasts, no.

4   Never -- I have no recollection of doing that.

5    Q    Okay.  Exhibit No. 10.

6         (Sackler Exhibit No. 10 was marked

7          for identification.)

8   BY MS. SINGER:

9    Q    Exhibit 10 is an e-mail from you to JDS

10  dated August 3rd, 1999.  And the subject line is

11  "Daily sales."

12        Do you recall this e-mail?

13   A    So far, no.  I haven't read it through.

14   Q    Okay.  Would JDS be John Stewart?

15   A    No.

16   Q    Who would it be?

17   A    JDS would be --

18   Q    Jonathan Sackler?

19   A    Yes.  Another board member.

20   Q    Okay.  So this e-mail, if you turn to

21  Bates number 728, the second page, involves daily

22  sales distributions.  Correct?

23   A    Daily sales what?

24   Q    Distributions.
```

```
1         MR. BERNICK:  You have to turn the page,

2   Dr. Sackler.

3         THE WITNESS:  Oh, sorry.

4   BY MS. SINGER:

5    Q    Is that correct?

6         Certainly the subject line reads "Daily

7   sales."

8    A    That's what it says.

9    Q    Okay.

10   A    I'm trying to remember this.  I don't

11  think I recall this.

12   Q    Okay.  Let's go back to the first page.

13  Do you see the bottom of the e-mail chain, Michael

14  Friedman --

15   A    Yes.

16   Q    -- e-mails you and says:  "This is

17  good."  Do you see what I'm referring to?

18   A    Yes.

19   Q    Okay.  And then up above that, you

20  respond to Michael Friedman and you say:  "Ah, not

21  so great.  After all, if we are able to do 900

22  million this year, we should be running in 7 --

23  75M," meaning million, "a month.  So it looks like

24  this month could be 80 or 90 million.  Bah,
```

```
1   humbug.  Yawn.  Where was I?"

2         See where I've read?

3    A    Yes.

4    Q    And is that an accurate --

5    A    Reading?

6    Q    Yes.

7    A    But it was -- it was -- in a sense I

8   was -- I was responding, and it was sarcastic.

9   That you can't read in it.  But he took it as a

10  criticism.

11        But I'm quite sure with that result, I'm

12  -- I'm -- I believe -- I believe my memory is that

13  with this result and at that time, I didn't have

14  any -- any serious reservation -- certainly not

15  with this result.  It was a sarcastic, humorous

16  comment.

17   Q    Well, then Michael Friedman goes on to

18  say:  "Like my wife, you take me for granted."

19   A    Maybe I -- I took that to mean that he

20  was joking back with me.  He was sharing a

21  different joke.

22   Q    And then you say, "Gentle reminder," as

23  if to suggest you want to do better.  Is that not

24  right?
```

```
1    A    I don't recall.

2    Q    You --

3    A    But I stand by what I did say.  It looks

4   like -- similar to a verbal exchange where

5   somebody says, Ah, not so great, and he comes

6   back, You will miss me when I'm gone.  You're like

7   my wife.  Yeah, I -- that's how I read it.

8    Q    Okay.  Well, there are lots of other

9   e-mails in which you raised questions and concerns

10  about sales performance and forecasts.

11        Do you recall those communications?

12        MR. BERNICK:  Objection.  Time.

13        THE WITNESS:  No, I -- there were

14  communications about all kinds of things, and I

15  don't recall any one.

16  BY MS. SINGER:

17   Q    Okay.  Well, there certainly was a drum

18  beat of them, Dr. Sackler.

19        Not focusing on any one in particular,

20  but here's one, an e-mail from you to Ed Mahony

21  dated January 31st, 1997.  So this is even earlier

22  in your tenure.

23        MR. BERNICK:  Move to strike.  I'm

24  sorry, there's not a question.
```

BY MS. SINGER:

1   Q   Can you see on the bottom of the first

2   page, this is another daily sales report,

3   according to the subject, correct?

4       MR. BERNICK:  That -- move to strike the

5   prefatory statement.  No objection to the

6   question.

7   BY MS. SINGER:

8   Q   Are you with me?

9   A   Could you re -- could you restate --

10  Q   I'm just saying this refers to daily

11  sales, correct?

12  A   This appears to.

13  Q   Okay.  And then you send an e-mail --

14  A   Actually, the -- just a small

15  correction.  My comment is a question, a factual

16  question.  "Any chance" -- I was asking Ed.

17  Q   So I haven't asked you a question?

18  A   Sorry.

19      MR. BERNICK:  So wait for her to ask you

20  a question.

21      THE WITNESS:  Okay.

22  BY MS. SINGER:

23  Q   So daily sales.  You say:  "Any chance

---

1   we presumably can top 9,000 sales this month?

2   10,000?  Whatever.  It would be a great sales

3   motivator for the SF" --

4       Which I presume means sales force?

5   A   Yes.

6   Q   -- "to have the absolute biggest number

7   for Oxy for the first month of 1997.  Please

8   consider what can be done."

9       Have I read that accurately?

10  A   I believe you've read every word

11  accurately.

12  Q   And that was not a question.  It was a

13  direction to do --

14  A   No.

15  Q   -- what they could.

16  A   No.  It starts, "Any chance."

17  Q   And then ends, "Please consider what can

18  be done."  And then --

19  A   And that's a question too.  I'm sorry to

20  interrupt you, but that was a question.  I didn't

21  know -- I had nothing in mind, and I was just

22  saying, Is there anything you can do by reference

23  to --

24  Q   Increase sales.

---

1   A   He was not on the sales force.  He was a

2   CFO.  And he at one time -- maybe then, I don't

3   recall -- ran the order processing systems and the

4   sales desk and so forth.

5       I was just asking, any ideas?  Because,

6   as I said, it would be a great motivator.

7   Q   And then you say:  "Not just a question,

8   but whoever reads this first, conference call the

9   others.  I would even stay open an extra hour to

10  make wonders happen."  Correct?

11      MR. BERNICK:  Objection to form.

12  BY MS. SINGER:

13  Q   Have I read that correctly?

14  A   Can you point out -- point this out?

15  Q   The last paragraph where you've written

16  in all caps.

17  A   The last paragraph.

18  Q   So on the first page in the middle, the

19  second paragraph.

20  A   Oh, there.  Okay.  I see.  The same

21  place.

22  Q   Okay.  And then at the top, in the

23  middle of the first chain, you even say:  "What

24  would be involved in getting the DEA down to the

---

1   factory today?  Is that necessary?  How much is in

2   the system yet to be input?"

3       Have I read that correctly?

4       MR. BERNICK:  Are you with her?

5       THE WITNESS:  I have to read it again

6   because I don't get --

7       MR. BERNICK:  She's now up --

8       THE WITNESS:  Right.

9       MR. BERNICK:  -- to, if I'm right, this

10  one up at the top.

11      MS. SINGER:  Mm-hmm.

12      MR. BERNICK:  Yeah, you were looking at

13  this one up here.

14  BY MS. SINGER:

15  Q   And so here you're asking him whether

16  you could even get the DEA down to push more

17  orders out of the factory, correct?

18  A   I don't remember what this referred to

19  at all.

20  Q   Okay.  It doesn't show a lot of patience

21  for increasing sales numbers, does it,

22  Dr. Sackler?

23      MR. BERNICK:  Objection to form.

24      THE WITNESS:  I -- when -- one of

```
 1   techniques was to try to stimulate out of the box
 2   or new -- new thinking.  And these questions were
 3   not directions.  They were indicative of -- in all
 4   statements, indicative of the fact that I was
 5   trying to stimulate him.  Not to just say, No,
 6   there's nothing I can do, but to think about it.
 7   BY MS. SINGER:
 8        Q    But, Dr. Sackler, you're sending this
 9   e-mail as an owner of this company with detailed
10   questions and directions about factory orders and
11   sales projections.
12             You think that's really just about
13   stimulating questions?
14        · MR. BERNICK:  Objection.  Lack of
15   foundation.
16             THE WITNESS:  That was -- that was my
17   technique, and that's what it was about.  I --
18             (Sackler Exhibit No. 11 was marked
19             for identification.)
20             MS. SINGER:  Okay.  Let's go to
21   Exhibit 12.
22             MR. BERNICK:  Did you want -- did you
23   finish your answer?
24             THE WITNESS:  Pardon?  Yeah.
```

```
 1   BY MS. SINGER:
 2        Q    Exhibit 12.
 3             (Sackler Exhibit No. 12 was marked
 4             for identification.)
 5   BY MS. SINGER:
 6        Q    Do you recognize this document titled
 7   "What do we want to be when we grow up?"
 8        A    I don't remember it.
 9        Q    So if you go to the third page, it's
10   signed, "Richard Sackler, November 23, 1999."
11             Do you see where I'm reading?
12        A    Okay.
13        Q    Is this a document you wrote?
14        A    It looks that way.
15        Q    Okay.  And if you look at the second
16   page -- I'm sorry, turn back to the first page.
17        A    First page?
18        Q    First page, at the very --
19        A    Third page --
20        Q    No, I'm sorry, first.  First page.
21        A    I'm sorry.  Yes.
22        Q    "What I am thinking about here is that
23   this may be a very" --
24        A    I'm sorry.  Oh, here it is.
```

```
 1        Q    Yep.
 2             -- "a very --
 3        A    The penultimate sentence.  Okay.
 4        Q    "What I am thinking about here is that
 5   this may be a very special time of opportunity,
 6   and that if we make the best of our opportunities
 7   now, we will achieve our 10-in-10 goal in the 2007
 8   or 2008 time period or even go beyond this
 9   daunting vision."
10             Is that what you wrote in this document?
11        A    That's what it says here.
12        Q    And had you set a goal for Purdue to
13   reach 10 billion of sales in 10 years -- $10
14   billion of sales in 10 years?
15        A    I don't remember.  I don't remember.
16        Q    Okay.
17        A    I hadn't set it.  And whether it had
18   been articulated by anybody, I don't recall.
19        Q    Okay.  Except here in this memo you
20   wrote --
21        A    Well, I guess you've searched for it
22   elsewhere.  You're sharing that information?
23             MR. BERNICK:  That's not up to --
24             THE WITNESS:  Oh.
```

```
 1             MR. BERNICK:  It's up to you to answer
 2   the questions.
 3             THE WITNESS:  Okay.  I just don't know
 4   who came up with the 10-in-10 goal or if it in
 5   fact was articulated or what this refers to.
 6   BY MS. SINGER:
 7        Q    But here you are --
 8        A    It could have -- could have also been --
 9   I can't even interpret it as 10 billion.  It could
10   have been improving our relative size in the
11   ranking, rank size, by 10.
12             I just don't remember.
13        Q    The rank of what?
14        A    Pardon?
15        Q    The sizing --
16        A    The ranking, IMS publishes a ranking of
17   pharmaceutical companies by size.  We were about
18   30 or something.  I don't -- I don't remember.
19        Q    It doesn't seem like you would want to
20   be --
21        A    We were nowhere near ten.
22        Q    It doesn't sound like you'd want to be
23   10 in 10, though.
24        A    Pardon?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q    Sounds like a pretty bad number, 10
 2  in 10.
 3           MR. BERNICK:  Objection to form.
 4           THE WITNESS:  I -- I don't understand
 5  you.  Is there a question there?  You had --
 6  BY MS. SINGER:
 7      Q    Yes.  You had said maybe you were
 8  expressing a desire to -- to be ten in the
 9  rankings, but it doesn't seem like you would
10  aspire to be ten out of ten in a ranking.
11      A    Oh.  Oh, oh, I see your point.  No.
12  Going up ten in the ranking scale in ten years.
13      Q    Either way, Dr. Sackler, it seems what
14  you're driving at here is increasing Purdue sales.
15  Is that not right?
16      A    May I read the rest of it?  Because I
17  don't remember this.  I don't -- I can't agree
18  with you that it is clear that that is what I
19  meant.  But if I read it, maybe I will.
20           (Peruses document.)
21      Q    All right, Dr. Sackler, anything more
22  you want to say about this one?  Otherwise, we'll
23  just leave it.
24      A    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q    Okay.  So let's move to exhibit -- I'm
 2  sorry.
 3           Before we do, beyond the big picture
 4  sales items, you were also involved in details
 5  regarding how to improve Purdue sales; is that
 6  right?
 7           MR. BERNICK:  Objection to form.  Time
 8  period.
 9           THE WITNESS:  I don't recall those
10  instances, but it's possible.
11  BY MS. SINGER:
12      Q    Do you recall being involved in asking
13  questions and making directions about the use of
14  co-payment cards or payment assistance cards to
15  increase Purdue's sales?
16      A    I don't remember that.
17
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review

16    Q    And sales forecasts were also used in
17   seeking quota from the DEA, was it not?
18    A    I don't know that.  That's a procedure
19   that I was not -- I can't relate that I was ever
20   involved in, except the first allocation for
21   MS Contin, morphine.  Because the DEA set our
22   allocation so low that we could only make one
23   strength, not both.  So we -- I did get involved
24   in getting information from Europe about what they

1   thought -- what they would do in that
2   circumstance.
3



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

**Page 137**



```
10      Q   Do you think --
11      A   Yeah.
12      Q   Do you think you were considered
13 aggressive or difficult to please in sales
14 forecasts?
15      MR. BERNICK:  Objection -- objection to
16 form.  Lack of time frame.
17      THE WITNESS:  Should I answer it?
18      MR. BERNICK:  Oh, absolutely.
19      THE WITNESS:  Could you repeat the
20 question, please?
21      MR. BERNICK:  Sorry.
22 BY MS. SINGER:
23      Q   Do you think you were considered
24 aggressive or difficult to please on sales
```

---

**Page 138**

```
1 fore- -- forecasts?
2      A   I wasn't consistently aggressive.  I
3 don't know what other people considered.
4      Q   Okay.
5      A   But I wasn't consistently aggressive.
6 Again, I remind you of Norspan.  I felt that
7 management was not facing the probability that I
8 saw that we would fall very short of our long-term
9 goals.  So we either had to make a change in
10 how -- in those goals, and then act accordingly,
11 or we had to make a change that would bring us
12 closer to those goals.  So there I wasn't
13 aggressive.  I was the opposite.
14      But in one sense, I was aggressive.  I
15 pressed points forward.  And I -- in the case of
16 forecasts, I felt that there was -- and not all
17 forecasts, some forecasts -- I felt they could
18 have been -- if I had done them, I would have done
19 them differently, as higher or lower.  And that's
20 very important for obvious reasons.
21      Q   But you felt they could have been
22 higher, right?
23      A   No.  I gave you an example of Norspan.
24      (Sackler Exhibit No. 16 was marked
```

---

**Page 139**

```
1      for identification.)
2 BY MS. SINGER:
3      Q   Well, let's look at Exhibit 16.
4      So this is an e-mail from you,
5 Dr. Sackler, again to Russell Gasdia about the
6 Butrans forecasts dated February 15th, 2011.
7 Correct?
8      And here you're saying -- I'm sorry.
9 Are you with me?  Do you agree that's the e-mail?
10     A   That's the date.
11     Q   Okay.  And you say:  "Thank you.  I had
12 hoped for better results, but it is only a week."
13     Is that what you wrote there?
14     A   I did.  I said, "Thank you."
15     Q   And "I had hoped" --
16     A   My comment, "I had hoped for better
17 results" was just a remark.  No demand.  No
18 suggestion to do anything.  I had hoped it would
19 be better.  But maybe I was wrong.  I was wrong.
20     Q   So Exhibit 16 --
21     A   So is this -- I'm trying to locate this
22 in timing.  If I may.
23     Q   Excuse me?
24     A   I'm trying to remember when Norspan was
```

---

**Page 140**

```
1 launched.  I can't recall the date.  This would
2 seem to imply it was a new launch, but I don't
3 remember.
4      Q   Okay.
5      A   First of June -- okay.
6      (Sackler Exhibit No. 17 was marked
7      for identification.)
8 BY MS. SINGER:
9      Q   All right.  Let's go to Exhibit 17.  Is
10 another e-mail from you to Russell Gasdia.  This
11 is March 16th, 2011.
12     A   Yes.
13     Q   So here again, you're not just
14 expressing your hope, but you're asking, "What
15 else more can we do to energize the sales and grow
16 at a faster rate?"
17     MR. BERNICK:  I'm sorry.
18 BY MS. SINGER:
19     Q   Is that not your e-mail?
20     MR. BERNICK:  I was in the wrong place.
21 I'm sorry.
22     THE WITNESS:  I'm sorry.
23     MR. BERNICK:  She's up -- she's up at
24 the top here.
```

```
 1          THE WITNESS:  Oh.  Okay.  Thank you.
 2      Well, that was a positive way.  I could
 3  have said, We're falling short consistently on our
 4  own plan.  I could have said, What can we do?  So
 5  I wrote it in a positive -- in what I thought
 6  would be a more positive sense.
 7  BY MS. SINGER:
 8      Q    But, again, looking for more growth.
 9      Let's -- let's --
10      A    Because I saw very early that we were
11  missing way below the goal, and I wanted -- I had
12  hoped that Russ would help John Stewart process
13  that.  It never worked out.  Whether he tried or
14  not, I don't know.
15      Q    And what you hoped they would do is
16  increase sales.  Correct?
17      A    Either increase sales or reduce
18  expenditure.
19      Q    And seeing an e-mail where you're asking
20  them to reduce expenditures.  Are you aware of
21  that --
22      A    Pardon?
23      Q    -- an occasion where you did that?
24      A    I don't remember.
```

```
 1      Q    Okay.  But --
 2      A    But as I said, I tried to express my
 3  view in the most positive way possible.
 4      Q    And you were so actively involved in the
 5  sales operations that you actually went out and
 6  did a ride-along yourself with sales reps, did you
 7  not?
 8          MR. BERNICK:  Objection.
 9          THE WITNESS:  I don't --
10          MR. BERNICK:  Excuse me.  Objection to
11  the form of the question.
12          THE WITNESS:  Okay.  But I should answer
13  it?
14          MR. BERNICK:  Of course.
15          THE WITNESS:  I don't remember that I
16  did.  In fact, I think I -- I think from the
17  correspondence I have seen, you may have more that
18  point to my actually doing a ride-along.  So if
19  you do, then my memory is faulty.  But my
20  recollection having --
21      Well, am I allowed to talk about --
22          MR. BERNICK:  No.
23          THE WITNESS:  No?  Okay.
24          MR. BERNICK:  You can talk about what
```

```
 1  your recollection is, but --
 2          THE WITNESS:  Okay.  My recollection is
 3  I did no ride-alongs in the -- from the time I was
 4  president until this period or after.  I hadn't
 5  done ride-alongs in many, many years by this time.
 6  BY MS. SINGER:
 7      Q    But you did do ride-alongs early on,
 8  according to your recollection?
 9      A    When Michael started helping me as
10  acting head of marketing and sales until I was
11  able to replace a person who had been the head of
12  marketing and sales for a long time, one of the
13  things that he had in the action plan was that
14  many people, both in the sales force and outside
15  it, should do some ride-alongs.  I remember that.
16      And he explained to me, although I can't
17  recreate it, that I should do -- do one or two or
18  three a year.  I don't remember what he -- if he
19  specified a number.  I recall doing one for sure,
20  maybe two.
21      They take a lot of time and a lot of
22  energy, and I found it very interesting, very
23  helpful.  And it stimulated many ideas that I
24  could go back to people and say, What do you think
```

```
 1  about these -- these ideas?  And are any of them
 2  look worthy of pursuing?
 3      I had -- I don't recollect that I did
 4  one after that very brief period or I did one or
 5  two.  And for whatever reason, I think there is
 6  one request to set it up, which was rebuked or
 7  rebuffed by Russ Gasdia or John Stewart or both,
 8  and I didn't go.
 9      Q    Then the request was from you, correct?
10      A    Yes.
11      Q    You wanted to do ride-alongs.
12      A    No, I wanted to do one.  I didn't
13  request many.
14      Q    Okay.  And do you recall --
15      A    But I said I'd like to do it.  I don't
16  remember what or why or what would the focus be, I
17  don't remember.  But I do -- I'm quite sure, not
18  perfectly sure, but my recollection is I didn't do
19  any because of the reaction.
20      I was a board member.  I wanted to
21  accumulate information.  There was a strong
22  negative reaction to my seeing what was going on
23  in the field, whenever that was, 2008, two -- and
24  I didn't press it.  I let management steer me.  If
```

**Page 145**

```
1   they rejected my ideas, I didn't insist that they
2   do them.
3       Q    Certainly not consistent with the
4   earlier e-mails where Michael Friedman was saying
5   he worked on it every day, reducing your
6   engagement in the operation.
7            MR. BERNICK:  Objection to form.
8            THE WITNESS:  I didn't hear what Michael
9   Friedman said.
10  BY MS. SINGER:
11      Q    That he was working every day to reduce
12  your engagement in the day-to-day operations --
13      A    Oh, okay.
14      Q    -- of Purdue.
15           MR. BERNICK:  Objection to form.
16  BY MS. SINGER:
17      Q    How do you square that?
18           MR. BERNICK:  Objection to the form of
19  the question.
20           THE WITNESS:  He didn't have to really
21  work.  He just had to -- and he didn't usually.
22  He just had -- he picked up the phone and said, I
23  don't think you should do this, or I think you're
24  out of line, or he's right.  And I'd say that,
```

**Page 146**

```
1   which you've seen.  And I did not press any point.
2   I would discuss it with him if -- if I --
3   certainly if I didn't think he would explain why.
4   But I never insisted, ever, that I can recall.
5            MR. BERNICK:  Are we getting to a good
6   point or --
7            MS. SINGER:  Yeah, let me ask one last
8   question on this.
9   BY MS. SINGER:
10      Q    So you talked about your early
11  ride-alongs.  What was the -- or ride-along, one
12  or two, however many you did.
13      A    One or two.
14      Q    What was the sales message Purdue was
15  given -- was giving that you saw about the risks
16  and benefits of OxyContin?
17           MR. BERNICK:  Objection.
18           THE WITNESS:  That was long before
19  OxyContin.
20  BY MS. SINGER:
21      Q    So which drug was it?
22      A    At -- my recollection is we were selling
23  several drugs, but I can't remember which ones.  I
24  remember I had ideas from Betadine and Senokot,
```

**Page 147**

```
1   and whatever prescription drug our sales force was
2   then focusing -- or drugs focusing on, and I had a
3   lot of ideas I had never heard, and I shared them
4   with the appropriate managers.  And I don't
5   remember.  My impression is a few of them were
6   agreed to to try.  A lot of them were product
7   development ideas.
8       Q    And were other marketing ideas?
9       A    I don't remember.
10           MS. SINGER:  Okay.  All right.  We can
11  take a break now.
12           MR. BERNICK:  Thank you.
13           THE VIDEOGRAPHER:  Going off the record
14  at 1:46 p.m.
15           (Recess.)
16           THE VIDEOGRAPHER:  So we're back on the
17  record at 2:02 p.m.
18  BY MS. SINGER:
19      Q    So, Dr. Sackler, we were talking about
20  some of the ways you were involved as a -- as a
21  board member.  I want to return to some of the
22  things you did personally in -- in the operations
23  of Purdue Pharma.
24           So you were personally involved in
```

**Page 148**

```
1   setting the pricing of OxyContin, correct?
2       A    Sorry, I didn't hear.  There was --
3       Q    You were personally involved --
4       A    Okay.
5       Q    -- in setting the price of OxyContin,
6   correct?
7       A    I was told what the marketing and sales
8   department was going to propose to the board.
9            (Sackler Exhibit No. 19 was marked
10              for identification.)
11  BY MS. SINGER:
12      Q    So Exhibit 19.
13           MR. WEINTRAUB:  Did you have an 18?
14           MS. SINGER:  Excuse me?
15           MR. WEINTRAUB:  Did you have an
16  Exhibit 18?
17           MS. SINGER:  No, we skipped 18, just to
18  keep things interesting.
19  BY MS. SINGER:
20      Q    So Exhibit 19 is an e-mail from you to
21  you.  But here it directs -- I'm sorry, it covers:
22  "The U.S. book price for OxyContin is slightly
23  below that of MS Contin.  This is the comparison
24  on the graphs.  We made this decision to encourage
```

```
 1    substitution of MS Contin and to obtain managed
 2    care formulary approvals."
 3              Have I read that accurately?
 4         A    I'm a little hung up.
 5         Q    Excuse me?
 6         A    I -- just a second.  This seems to
 7    indicate I wrote myself and no one else an e-mail.
 8    Is that correct?
 9         Q    That's what it shows.  It could have
10    been --
11         A    I don't think I wrote these -- this.  It
12    was signed MF.  From -- it says on top, "From
13    Richard Sackler to Richard Sackler."
14         Q    You can e-mail yourself to remind
15    yourself of things --
16         A    I know it's possible.  I just don't do
17    that.  I can't remember if I've ever done that.  I
18    just can't remember.
19         Q    But do you remember --
20         A    And it's signed MF.  So I don't think
21    this is an accurate --
22         Q    Okay.  Do you --
23         A    -- printing.
24         Q    Do you remember apart from this e-mail,
```

```
 1    Dr. Sackler, that you were involved in discussions
 2    about the pricing of OxyContin?
 3         A    I think I -- I think I agreed that
 4    marketing, probably Michael Friedman, told me
 5    about a price he wanted to have the board approve.
 6    He explained it to me.
 7         Q    And were you involved in preparations
 8    for meetings with the FDA?
 9         A    No, I was not.
10              (Sackler Exhibit No. 20 was marked
11              for identification.)
12    BY MS. SINGER:
13         Q    Take a look at Exhibit 20, please.
14         A    Thank you.
15         Q    And this is an e-mail from you to
16    Marianna Sackler dated January 17th, 2009, yes?
17         A    Yes.
18         Q    And is this not an e-mail raising
19    suggestions from you in preparation for a meeting
20    between Purdue and the FDA?
21         A    I'd have to read it.  She was an
22    assistant to people in the medical department at
23    this time.  And I certainly didn't make -- she --
24    she would have no place, and -- and I never
```

```
 1    attended any meeting that she attended.  I -- I
 2    will have to read this too --
 3         Q    Does it not start with --
 4         A    -- what I meant, but --
 5         Q    "Here are my thoughts about the FDA
 6    meeting next week and the planning for this
 7    meeting."
 8              MR. BERNICK:  Wait.  Where --
 9              MS. SINGER:  I'm at the very first line
10    of this e-mail.
11              THE WITNESS:  Right.  But it's
12    addressed --
13    BY MS. SINGER:
14         Q    And then it goes through --
15         A    -- to an entry level administrator.
16         Q    Who's a Sackler.
17         A    Not to a decision maker.  So I was very
18    excited that she was working so hard.  And I --
19    may I read this?  Because I think it's going to --
20    I believe it will show that I was just trying to
21    teach her what -- you know, some things.  But
22    without reading it, I can't be confident.  She was
23    in that job for a year or less than a year.  I
24    don't remember.
```

```
 1         Q    So here you are saying to her:  "The
 2    preparation for the meeting at the agency is at a
 3    very high level of sophistication" --
 4         A    That's what she says.
 5         Q    "Preparing for every" --
 6         A    Oh.
 7         Q    It's an e-mail from you.
 8         A    Oh, it says, "The preparation" --
 9         Q    "Preparing for every eventuality we can
10    imagine will pay big dividends."
11              But we can move on from that.
12         A    Yeah, I -- I don't think -- I'm sure I
13    did not convey my ideas to any decision maker
14    through her.
15         Q    Okay.
16              MR. BERNICK:  So just --
17    BY MS. SINGER:
18         Q    Were you involved in planning for press
19    releases and press responses too, Dr. Sackler?
20         A    Not that I can recall.
21              (Sackler Exhibit No. 21 was marked
22              for identification.)
23    BY MS. SINGER:
24         Q    Okay.  Let's go to Exhibit 21.
```

1    Is this an e-mail from you to Michael
2  Friedman regarding a press release or similar
3  promotion dated September 4, 1996?
4    And if you look at the bottom page, you
5  want to signal the licensing market for the
6  product around the world.
7    A    I'm sorry.  You're going just a little
8  too fast.
9    MR. BERNICK:  Yeah, I -- Counsel, may I
10  just ask that the witness this time just be given
11  the opportunity to review the document first?
12  Because these are -- these are lengthy -- these
13  are chains, and he -- last time he didn't get to
14  read the whole document.  So I think he should be
15  able to just read the document first.
16    MS. SINGER:  Happy to do that.  We'll
17  just have to deal with the time.
18    MR. BERNICK:  I -- I -- I get it.  I
19  would like to have this expedited.  But I'm just
20  concerned.  So if you -- is there a particular
21  part that you can focus on, and maybe you can take
22  that out of context?
23    MS. SINGER:  Mm-hmm.
24  BY MS. SINGER:

1    Q    So is it not -- if you go to the very
2  bottom of the chain, Dr. Sackler, an e-mail from
3  you, August 23rd, '96, saying:  "I think it's
4  noteworthy to release information on OxyContin
5  tablets" --
6    A    Yeah.
7    Q    -- "its use and success in the market,
8  and the tremendous reception it received in
9  Vancouver.  The objectives of this release would
10  be," and you go on to list them, and ask whether
11  we should do single or multiple press releases at
12  the end.
13    Is that not you weighing in on Purdue
14  issuing a press release?
15    A    I was told about or read a press release
16  I didn't prepare because I never -- I have no
17  recollection of ever preparing one.
18    Q    Did you direct one to be prepared?
19    A    This -- not to the company, but to --
20  this is I think privileged.  I did direct --
21    MR. BERNICK:  That -- thank you.
22    THE WITNESS:  Okay.
23    MR. BERNICK:  So -- so maybe you --
24  BY MS. SINGER:

1    Q    So your testimony is you weren't
2  involved in advising or directing the company on
3  the subject of press releases --
4    A    It wasn't the company.  Right.
5    Q    -- or press responses?
6    A    But I --
7    Q    Okay.
8    A    -- think I can say -- so the answer, I
9  was not involved in preparing press releases for
10  the company.
11    Q    Or directing that they be prepared?
12    A    Or -- well, hoping they would be
13  prepared when I was on the board, and this is a
14  longstanding issue that went back years.  And
15  we -- it was -- the board was at times of the view
16  that we should have more press coverage, in a very
17  general sense.  We should get our story out.  But
18  it was -- if it was directive, it was almost
19  uniformly ignored by management.
20    Q    And were you involved in facilitating
21  the relationships between Purdue and various
22  professional associations, like the American
23  Academy of Pain Management or the American Pain
24  Society, or was that something you also left to

1  staff?
2    MR. BERNICK:  Objection to form.  Lack
3  of time frame.
4    THE WITNESS:  I was not involved in
5  that.
6    (Sackler Exhibit No. 22 was marked
7    for identification.)
8  BY MS. SINGER:
9    Q    Okay.  Let's go to Exhibit 22.
10    So this is an e-mail from you to Paul
11  Goldenheim, correct?
12    A    Yes.
13    Q    And its subject line is "Meeting at
14  APS."
15    A    Meeting at -- I'm sorry.  Meeting at --
16  yes.
17    Q    And it's dated 4/13/2001, correct?
18    A    Yes.
19    Q    And if you look in the middle, there's
20  an e-mail from Paul Goldenheim to you.  Do you see
21  where I am in the middle of the page?
22    A    I see that.  Starting "Not true."
23    Q    That's right.
24    A    I don't know what he's referring to,

1   but, yeah, I'm sure you will tell me.

2      Q   And he says: "Could you please just do

3   this?  You are the president, not the person who

4   sets up meetings.  Wires are getting crossed.

5   David reports to Robert.  Robert reports to me.

6   You are giving one set of instructions.  I am

7   giving another.  Tell me what you want and I will

8   implement."

9         Are you not there directing the staff --

10     A   I am --

11     Q   -- on a meeting with the American Pain

12   Society?

13     A   I -- it was not my intention to direct

14   the staff.

15     Q   And are they not asking you to please

16   get out of their way?

17     A   They find me a pain in the ass, yes.

18         Sorry for the vulgarity.

19     Q   No.  I just wonder if OxyContin works

20   for that.

21         All right.  Let's move on from --

22     A   Can I --

23        MR. BERNICK:  No, there is no

24   question -- well, if you know --

---

1       THE WITNESS:  I have no idea what this

2   was about.  I mean, I can't read that and

3   understand.  So -- okay.

4   BY MS. SINGER:

5     Q   Let's shift -- let's shift to the launch

6   of OxyContin.

7     A   Yes.

8     Q   Were you involved in the approval of the

9   package insert or label for the initial OxyContin?

10     A   No, I don't think I saw anything of the

11   label or knew anything about the label until it

12   was approved by the FDA.  That's my recollection.

13     Q   Okay.  Can we go --

14        (Counsel conferring.)

15        (Sackler Exhibit No. 24 was marked

16        for identification.)

17   BY MS. SINGER:

18     Q   All right.  We're skipping Exhibit 23.

19   This is going to be 24.

20        And do you recognize Exhibit 24 to be

21   the FDA's approval of the original label for

22   OxyContin?

23     A   I think -- reading the first paragraph

24   sounds as if it's approval of the drug and the

---

1   label.  But --

2     Q   Okay.

3     A   Is that correct?

4     Q   You said both the drug and the label?

5     A   I think so.

6     Q   Okay.

7     A   And everything else in the --

8        MR. BERNICK:  Wait.

9        THE WITNESS:  It was approval of the

10   NDA.  That's a huge document.  So it really

11   involves approval of hundreds --

12        MR. BERNICK:  So, Dr. Sackler, if you

13   could just --

14        THE WITNESS:  Okay.

15        MR. BERNICK:  -- wait for the question.

16        THE WITNESS:  Sorry.

17        MR. BERNICK:  She will ask another

18   question.

19   BY MS. SINGER:

20     Q   So if you go --

21     A   Well, I had to amend it.  It's approval

22   of the NDA, yes.

23     Q   Okay.  And if you go to Bates

24   number 753.

---

1     A   Oh, sorry.  You're asking me to turn the

2   page.  Okay.

3        MR. BERNICK:  You see it's the last

4   three digits, right?

5        THE WITNESS:  Yes.

6   BY MS. SINGER:

7     Q   Do you recognize page 753 to be the

8   start of the package insert for OxyContin?

9     A   This -- what you're saying, I have no

10   difference with, but I'd like to point out -- no,

11   there is no need.  This probably is the start.

12        The sequence of elements in the NDA --

13   in the label of drugs in general undergoes changes

14   over time.  So I don't remember if at this time

15   this was the sequence.  But if you say so, I have

16   no reason to differ.

17     Q   Okay.  So let's turn to page 757.

18     A   Good.

19     Q   Do you see the section headed "Clinical

20   Trials"?  At the very bottom of the page.

21     A   Oh.  Oh.  No, it says "Dosage and

22   Administration" here.

23     Q   757.

24     A   Oh, am I on the wrong --

```
 1         MR. BERNICK:  You're on 67.
 2         THE WITNESS:  Oh, I'm sorry.
 3         MR. BERNICK:  So let's go back --
 4         THE WITNESS:  Please excuse me.
 5         MR. BERNICK:  That's all right.
 6         THE WITNESS:  Maybe if we had more light
 7    here, I would read it a little better.  This is
 8    pretty small.
 9    BY MS. SINGER:
10         Q    All right.
11         A    Okay.
12         Q    "Clinical Trials"?
13         A    I had heard 767.  Yes.
14         Q    Do you see the sentence that begins:
15    "Efficacy comparable -- or comparable to other
16    forms of oxycodone was demonstrated in clinical
17    studies using pharmacokinetic, pharmacodynamic and
18    efficacy outcomes."
19         A    I see that.
20         Q    And does that say that OxyContin showed
21    comparable effectiveness to other oral oxycodones,
22    other pills?
23         MR. CHEFFO:  Objection.
24         THE WITNESS:  It does say:  "Efficacy is
```

```
 1    comparable" --
 2    BY MS. SINGER:
 3         Q    Not --
 4         A    -- "to other forms of oral oxycodone."
 5         Q    It doesn't say the efficacy is better
 6    than other forms of oxycodone.  Correct?
 7         A    That's correct.
 8         Q    And on page 759, so flipping one page.
 9         A    Proven better.  That's correct.  I just
10    want to -- it was proven to be similar or the
11    same.
12         Q    Okay.
13         A    Seven --
14         Q    Indications --
15         A    Okay.  What --
16         Q    759, just turn one page.
17         A    59.  Okay.  Thank you.
18         Q    Indications and Usage.
19         A    I'm sorry.
20         THE WITNESS:  You guys have to remind me
21    to change my battery.
22         759.  Where should I go?  I didn't hear
23    you.
24    BY MS. SINGER:
```

```
 1         Q    Indications and Usage.
 2         MR. BERNICK:  Indications and Usage.
 3    Here.
 4         THE WITNESS:  Indications.  Yes.
 5    BY MS. SINGER:
 6         Q    And the indication for OxyContin was:
 7    "For the management of moderate to severe pain
 8    where use of an opioid analgesic is appropriate
 9    for more than a few days."  Correct?
10         A    Yes.
11         Q    And the label doesn't give any specific
12    pain conditions for which OxyContin is
13    specifically approved, correct?
14         MR. CHEFFO:  Objection.
15         THE WITNESS:  If -- if it had given --
16    yes, it doesn't say -- I agree with what you're
17    saying.
18    BY MS. SINGER:
19         Q    Okay.  And then turn to 766, please,
20    under Drug Abuse and Dependence.
21         A    Yes.
22         Q    Do you see the last sentence of the
23    first paragraph:  "Delayed absorption as provided
24    by OxyContin tablets is believed to reduce the
```

```
 1    abuse liability of the drug -- of a drug."
 2         A    Yes.  I see that.
 3         Q    Now, you were -- let's see.  I'm sorry.
 4         A    Yeah.
 5         Q    What -- what studies did Purdue
 6    undertake to demonstrate that delayed absorption
 7    reduced the abuse liability of OxyContin?
 8         MR. BERNICK:  Objection.  Lack of
 9    foundation.
10    BY MS. SINGER:
11         Q    What studies, if any.
12         MR. BERNICK:  Same -- same objection.
13         THE WITNESS:  I don't --
14         MR. BERNICK:  Lack of foundation.
15    Go ahead.
16         THE WITNESS:  I'm sorry.
17         I don't recall if Purdue did any studies
18    to demonstrate this.
19    BY MS. SINGER:
20         Q    Okay.  Let's go --
21         A    Or was -- but they surely were not asked
22    to do it.
23         Q    But it was your label.
24         A    It was our --
```

```
 1              MR. BERNICK:  Objection.
 2              THE WITNESS:  Yes, it was Purdue's
 3    label.  But I was not involved in that sentence at
 4    all, and so I can't tell you whether it was the
 5    FDA that put it forward or Purdue.  I don't know.
 6    BY MS. SINGER:
 7         Q    So I'm not asking about the origin.
 8    Simply that whether or not Purdue had conducted
 9    studies to support that assertion in its own label
10    for its drug.
11              MR. BERNICK:  Again, lack of foundation.
12    It's also been asked and answered.
13              THE WITNESS:  Yeah.
14    BY MS. SINGER:
15         Q    So let's go to Exhibit --
16         A    Is there -- is there a question there?
17    No question.  It's a declaratory statement.  Okay.
18         Q    That's grammatically correct.
19              (Sackler Exhibit No. 25 was marked
20              for identification.)
21    BY MS. SINGER:
22         Q    Exhibit 25 is an e-mail from Paul
23    Goldenheim to you, correct?
24              MR. BERNICK:  If you'd give me the page.
```

```
 1              THE WITNESS:  That's what it looks like.
 2    BY MS. SINGER:
 3         Q    March 15th, 1997 is its date.
 4         A    I'm sorry, I didn't --
 5         Q    Its date is March 15th --
 6         A    Yes.
 7         Q    -- 1997.
 8              THE WITNESS:  Would it -- could we just
 9    go off the video so I can change the batteries?  I
10    think they've died.
11              MS. SINGER:  Of course.
12              THE VIDEOGRAPHER:  Going off the video
13    record, 2:24 p.m.
14              (Recess.)
15              MR. BERNICK:  So I understand that this
16    document, which is -- which one is it, 25 now?
17              MS. SINGER:  Mm-hmm.
18              MR. BERNICK:  -- was also -- this is
19    Sackler 7, it's marked Sackler 7.  It's in the
20    Kentucky deposition.  It was the subject of
21    examination at page 48.
22              So I'm told that there's no agreement,
23    that they can't go back over exhibits from the
24    Kentucky deposition, which is fine.  But this now
```

```
 1    is, of course, counting against their time.  And I
 2    would think that there might be a better way to
 3    use time than to go back over the same subjects
 4    that were covered in the prior deposition.
 5              All we're going to do is object that
 6    it's duplicative, and we'll see what happens to
 7    the time.
 8              MS. SINGER:  I don't think there is any
 9    basis in law to object to --
10              MR. BERNICK:  Cumulative.  Sure, there
11    is.
12              MS. SINGER:  -- duplication to the prior
13    deposition, and I appreciate that you think it's
14    not the best use of our time, but we'll go forward
15    with the questioning that -- that we think is
16    appropriate and relevant.
17              MR. BERNICK:  So I -- I think it is
18    cumulative.  There's been prior testimony on this
19    subject.  It pertains to a period of time that
20    predated the first deposition.  They can use the
21    first deposition, so I think it's duplicative.  I
22    object.
23              MS. SINGER:  Do you want to do anything
24    with that?
```

```
 1              SPECIAL MASTER COHEN:  No.
 2              MS. SINGER:  Okay.
 3              (Recess.)
 4              THE VIDEOGRAPHER:  We're back on the
 5    video record at 2:34 p.m.
 6    BY MS. SINGER:
 7         Q    All right.  Returning to Exhibit 25,
 8    which is an e-mail from Paul Goldenheim to you --
 9         A    Right.
10         Q    -- March 15th, 1997.  Why don't you take
11    a minute and look at it, please.  Tell me when
12    you're ready.
13         A    (Peruses document.)
14              I think it would be helpful if you gave
15    me a question, I might be able to answer it
16    without -- okay.  This is not very long.  I'll
17    just finish reading it.
18              (Peruses document.)  Okay.
19         Q    Ready?
20         A    Yes.
21         Q    Okay.  So this e-mail involves the
22    question of whether OxyContin should be classified
23    as a controlled drug in Germany, correct?
24         A    No.
```

1    Q.    Okay.

2    A.    That's not how I read it.

3    Q.    So go ahead.

4    A.    It's slightly different.  This is an

5 e-mail, it looks like, sent by Ian Claydon to a

6 lot of people, and what it says is the BfArM was

7 asked -- BfArM is the German equivalent of the

8 FDA -- asked whether OxyContin would be classed as

9 a controlled drug or whether it would be possible

10 to obtain a relaxed status because of the

11 difficulty in extracting OxyContin from the

12 matrix.

13    Q.    Okay.  And it's actually, though, an

14 e-mail from you.  Is it not?

15    A.    What I just read appears to be from

16 Clay- --

17    Q.    From Dr. Richard Sackler to Ian Claydon.

18    A.    Oh, you are correct.  Okay.  So I was

19 relating what I had heard.

20    Q.    Okay.  And then --

21    MR. BERNICK:  So maybe -- what -- have

22 you read through the whole thing, Dr. Sackler?

23    THE WITNESS:  I did, but I may have

24 misread it.  Look, I misread who sent it.  So,

---

1 thank you.

2    BY MS. SINGER:

3    Q.    Okay.  So at the top of the e-mail, it's

4 from Paul Goldenheim to you.

5    A.    Right.

6    Q.    And Paul Goldenheim says:  "We do not

7 have any abuse liability studies."  Is that --

8    A.    That's what he says here.

9    Q.    Okay.  Do you have any reason to believe

10 that that's not accurate?

11    A.    No.

12    Q.    Okay.  You didn't have, at the time that

13 OxyContin was launched, a pharmacovigilance

14 program set up, did you?

15    A.    I don't know.

16    Q.    Okay.  Let's go to the transcript.

17    A.    I don't know when or I don't -- I'm not

18 even clear what pharmacovigilance is, but I -- I

19 don't know.

20    MS. SINGER:  Do you have copies of it?

21 Okay.

22    So I'm going to give you in two pieces

23 what we will mark as Exhibit 26, which is the

24 transcript --

---

1    You can hold on to that.

2    (Sackler Exhibit No. 26 was marked

3    for identification.)

4    BY MS. SINGER:

5    Q.    -- the transcript of your deposition in

6 the Kentucky litigation.  And I've left it open to

7 the page.

8    MR. BERNICK:  Linda, it was 60, 61?

9    THE WITNESS:  Oh, I see.

10    MR. BERNICK:  60, 61?

11    MS. SINGER:  Yes, 61.

12    BY MS. SINGER:

13    Q.    And, Dr. Sackler, do you see the

14 question:  "Do you think it would have been a good

15 idea before putting OxyContin controlled release

16 on the market to have an abuse monitoring system

17 and database from which to tell if it was being

18 diverted or abused?"

19    And you respond:  "Absolutely, yes."

20    MR. BERNICK:  Hang on.  So if -- he was

21 looking at the other page when you asked the

22 question.

23    THE WITNESS:  Sorry.

24    MR. BERNICK:  Maybe if he can just have

---

1 an opportunity to read the few questions before

2 that and then up through that question.  Is that

3 all right?

4    MS. SINGER:  Mm-hmm.

5    THE WITNESS:  (Peruses document.)

6    BY MS. SINGER:

7    Q.    So if you start at page 60 --

8    A.    That's page -- it looks like 16 and 27,

9 but okay.

10    MR. BERNICK:  No, it's --

11    THE WITNESS:  If you tell me it's 60, I

12 know you're --

13    MR. BERNICK:  Yeah, it's 60.

14    THE WITNESS:  -- a better reader than I

15 am.

16    BY MS. SINGER:

17    Q.    Line 22:  "Were you aware that you all

18 put this on the market, OxyContin CR, and did not

19 have a postmarketing abuse monitoring system or

20 database from which you could tell whether abuse

21 or diversion was occurring?"

22    And you answered:  "I was not aware of

23 that.  I don't believe it was a requirement at the

24 time.  I'm sure we would have fulfilled all of the

```
 1   FDA requirements they asked us."
 2            Is that your testimony then?
 3       A    That's what --
 4       Q    And do you have --
 5       A    -- the transcript shows.
 6       Q    And do you have reason to believe that
 7   that is not how you testified?
 8       A    No.  I have no reason to think this is
 9   an error.
10       Q    And then the next question:  "Do you
11   think it would have been a good idea before
12   putting OxyContin controlled released on the
13   market to have an abuse monitoring system and
14   database from which to tell if it was being
15   diverted or abused?"
16            And you answered:  "Absolutely, yes."
17            Was that your testimony then?
18       A    That's what it says.
19       Q    And do you have any reason to believe
20   that that is not accurate?
21       A    I have no reason to believe that it's a
22   faulty transcript.
23       Q    Okay.  Now, OxyContin was promoted as
24   providing --
```

```
 1       A    Is this finished?
 2       Q    It is for now.  We may come back to it.
 3       A    Okay.
 4       Q    OxyContin was promoted as providing an
 5   onset of action within one hour.  Is that correct?
 6            MR. BERNICK:  Objection to form.  Time
 7   frame.
 8            THE WITNESS:  I don't know whether it
 9   was promoted with that feature, it said or
10   emphasized or anything.  I don't remember.
11   BY MS. SINGER:
12       Q    Okay.  Do you know if it is in fact true
13   clinically that a patient will start to feel the
14   effects of OxyContin within an hour?
15            MR. BERNICK:  Objection.  Again, time
16   frame and also foundation.
17            THE WITNESS:  I'm sorry.  I did hear
18   you, but I -- I -- the interruption may mean I
19   lost your -- the thrust of your question.
20   BY MS. SINGER:
21       Q    I have the same reaction.
22            Patients will start to feel the effect
23   of OxyContin within an hour; is that correct?
24       A    I believe that that was consistent with
```

```
 1   the clinical trial results.
 2       Q    And that is faster than MS Contin took
 3   action; is that correct?
 4            MR. BERNICK:  Objection.  Lack of
 5   foundation.
 6            THE WITNESS:  I don't recall or I didn't
 7   know if that was the case.
 8   BY MS. SINGER:
 9       Q    Okay.
10       A    I can't -- I can't agree or disagree.  I
11   just don't know.
12       Q    Okay.  So you don't know the onset of
13   action for MS Contin?  Is that correct?
14       A    That's correct.
15       Q    And do you know whether there was a
16   claim that delayed absorption reduced the abuse
17   liability of MS Contin?
18            MR. BERNICK:  Objection.  Lack of
19   foundation.
20            THE WITNESS:  I don't recall that.
21   BY MS. SINGER:
22       Q    So I want to talk about -- scratch that.
23            10 milligrams of OxyContin taken every
24   10 hours --
```

```
 1       A    12 hours.
 2       Q    -- 12 hours -- thank you -- is the same
 3   as a patient taking a 4.5 milligram Percocet every
 4   six hours.  I can draw it out if that makes it
 5   easier for you.
 6       A    No, no.  I -- I remember it in the
 7   package insert, actually.
 8            MR. BERNICK:  Well -- okay.
 9            THE WITNESS:  So I didn't think it was
10   4.5.  I thought it was 5.0.  But aside from that
11   memory glitch between you and me, unless you're
12   reading it, I -- I remember the package insert
13   explicitly said that.
14   BY MS. SINGER:
15       Q    Okay.  So that means that one OxyContin
16   has twice as much oxycodone as one Percocet.
17            MR. CHEFFO:  Objection.
18            THE WITNESS:  That is -- well, let me be
19   a little more precise.  I don't know when Percocet
20   started marketing higher strength oxycodone.  If
21   the only strength Percocet was, as I remember it,
22   325 of APAP and 5 milligrams of oxycodone, then
23   you're right, it's twice as high as a Percocet.
24   But if they had higher strengths out, then one
```

1    would have to, you know, recognize that all

2    Percocet wasn't equal.

3              Was that too complicated or --

4    BY MS. SINGER:

5         Q    So I'm going to try to reduce it with my

6    terrible writing or drawing.

7              Is what I've just put up on the screen

8    accurate, whether it's 4.5 milligrams or 5

9    milligrams?

10        A    Well, whether it's 4.5 or 5 --

11             MR. BERNICK:  Excuse me.  I have an

12   objection based upon, A, foundation, and, B, form.

13             Sorry.  Go ahead.

14             THE WITNESS:  But she said --

15   BY MS. SINGER:

16        Q    He's going to object --

17        A    Ignore --

18        Q    -- to my drawing next, so --

19        A    Oh, okay.

20             MR. BERNICK:  No, I thought the drawing

21   was fine.  It's just --

22             THE WITNESS:  Can I point out you wrote

23   20 milligrams of OxyContin every 12 hours?  I

24   don't think that was your intention, right?  I'm

1    just guessing.  I don't know what --

2    BY MS. SINGER:

3         Q    No, I --

4         A    I withdraw that answer.  Because --

5    okay.  Let me now do the calculation.  I thought

6    you were going to say 10 milligrams every 12

7    hours.

8         Q    That's right.

9              MR. BERNICK:  Uh-huh.

10             THE WITNESS:  Wow, I'm glad we're on the

11   same page now.

12   BY MS. SINGER:

13        Q    Glad your memory is clearly sharp enough

14   to keep me on my toes here.

15        A    No.  No.  I was looking carefully at

16   what you wrote.

17        Q    So is that an accurate illustration --

18        A    Okay, what is -- what we now depicted the

19   4.5 or 5 milligrams of oxycodone in Percocet is

20   equal to 10 milligrams every 12 hours of

21   OxyContin -- oxycodone.  Is that your statement?

22   Because I can agree with that statement.

23             You've ignored that Tylenol, in the mind

24   of many physicians, added some additional

1    analgesic performance --

2         Q    So I'm just talking --

3         A    -- but I -- I think this is what our

4    clinical trial, as I seem to recall, showed.

5         Q    The oxycodone, taking aside any other

6    analgesic properties, is equivalent --

7         A    Right.  Yes, 5 milligrams every six

8    hours, I think we found was equivalent --

9    bioequivalent and also I believe clinically

10   equivalent.

11        Q    So one OxyContin 10 milligram is going

12   to have more active opioid, more active oxycodone

13   than one Percocet that is 4.5 or 5 milligrams.

14   Correct?

15        A    On its face, it -- it does.

16        Q    Okay.

17        A    Yes.  Each tablet.  Just comparing

18   tablets, yes.

19        Q    Has it --

20        A    Yes.

21        Q    Okay.

22        A    We agree.

23             (Sackler Exhibit No. 27 was marked

24             for identification.)

1    BY MS. SINGER:

2         Q    So let's go to Exhibit 27 is a New York

3    Times article, "Origins of an Epidemic:  Purdue

4    Pharma Knew Its Opioids Were Widely Abused."  It's

5    dated May 29th, 2018.

6         A    Yes.

7         Q    And I want to direct your attention

8    to --

9              (Counsel conferring.)

10             MS. SINGER:  Can we go off the record

11   for one second, please?

12             THE VIDEOGRAPHER:  Going off the record

13   at 2:49 p.m.

14             (Pause in the proceedings.)

15             THE VIDEOGRAPHER:  We're back on the

16   record at 2:53 p.m.

17             MS. SINGER:  Actually, let's withdraw

18   that 27 since I'm not using it.  I will --

19             THE WITNESS:  This one, this is 27?

20             MS. SINGER:  Yes.

21             MR. BERNICK:  But it's already part of

22   the record anyhow, so you may as well -- there's a

23   reference to it in the record.  You may as well

24   just leave it there.  It's up to you, but --

```
1      MS. SINGER:  It's fine.  I don't object
2  to it.
3           Okay.  Let's move on.
4           (A discussion was held off the record.)
5  BY MS. SINGER:
6      Q   So let's look on the screen.  We'll give
7  you all --
8      A   It's too small.
9           MS. SINGER:  Can you go to the front
10 page first, Gina, please.
11 BY MS. SINGER:
12     Q   So Purdue knew its opioids were widely
13 abused in the late 1990s.  It is a New York
14 magazine article dated May 29th, 2018.
15          And if we can flip down to the
16 highlighted language.
17          MS. SINGER:  Is that not the same?
18 BY MS. SINGER:
19     Q   "The speculation that a slow release
20 formula would make OxyContin unappealing to drug
21 abusers was irrational.  Making a long duration
22 painkiller meant concentrating more narcotic into
23 each individual pill, and since opioid addicts do
24 not typically use pills as directed but rather
```

```
1  crush them up for snorting or injecting,
2  Purdue's," quote, "innovative," close quote,
3  "opioid was actually more appealing as a street
4  drug than any of its rivals."
5           Do you see what I just read --
6      A   I see.
7      Q   -- Dr. Sackler?
8      A   I do.
9      Q   Did Purdue have any evidence that this
10 was wrong?
11          MR. BERNICK:  Objection.  First of all,
12 lack of foundation, but second of all, to form.
13 And third of all, it actually calls for an expert
14 view.
15          Go ahead.
16          THE WITNESS:  But I should answer the
17 question?
18          MR. BERNICK:  Yes, if you can.
19          THE WITNESS:  Okay.  Could you repeat
20 the question?
21 BY MS. SINGER:
22     Q   Did Purdue have any evidence that this
23 quotation that OxyContin, because it had more
24 oxycodone in it, would be more appealing --
```

```
1           MR. BERNICK:  Objection to the form of
2  the question.
3  BY MS. SINGER:
4      Q   -- to addicts --
5           MR. BERNICK:  It's not a quotation.
6  Object to the form of the question.  The other
7  objections as well.
8           THE WITNESS:  I -- I don't know -- in
9  direct answer to your question, I don't know what
10 evidence the FDA relied on.  I don't know who
11 suggested putting that sentence -- that sentence
12 in there that you're -- you've drawn my attention
13 to.
14          I think that's an answer to your
15 question.  I don't know.
16 BY MS. SINGER:
17     Q   So I'm not asking you what evidence the
18 FDA had.  What I'd like to know is whether Purdue
19 had any reason to believe that this was untrue.
20          MR. BERNICK:  Objection to the form --
21          MR. CHEFFO:  Oojection.
22          MR. BERNICK:  -- of the question.  Lack
23 of foundation.
24          THE WITNESS:  That it was untrue or
```

```
1  true?
2  BY MS. SINGER:
3      Q   Untrue.
4      A   Not that I can recall.  And we had been
5  selling slow release morphine for years, and its
6  abuse potential didn't call for speculation.  It
7  was factual.  But both -- it was a fact.  I mean,
8  that it might or might not -- I don't know what
9  the facts were, what it showed, but when I saw
10 this, I assumed that it was general knowledge --
11 that was my assumption -- on the part of the
12 narcotic experts for using narcotics to treat
13 pain.
14     Q   What was general knowledge?
15     A   The general belief that slower
16 absorption might reduce the attractiveness of a
17 narcotic, any narcotic.
18     Q   But isn't it --
19     A   But I can't really tell you because I
20 didn't write it, and I don't recall.
21          MR. BERNICK:  It -- okay.
22 BY MS. SINGER:
23     Q   Isn't it only common sense that if you
24 put more oxycodone in a pill that that pill is
```

```
 1   going to be more attractive to abusers?
 2        A    You have to make an assumption that the
 3   abuser will not only find it attractive but would
 4   find a way of accessing the oxycodone by
 5   deconstructing, destroying the delivery system.
 6             I don't have any recollection at all.  I
 7   don't think I even knew, but I can't remember
 8   whether I -- whether -- I can't remember.  But
 9   you -- at the time because of the experience with
10   MS Contin, this didn't seem like it was a
11   speculation.  It seemed like experience had
12   pointed in that direction.
13   BY MS. SINGER:
14        Q    And so is it your testimony that there
15   wasn't a history of abuse with MS Contin?
16        A    Not that the board knew about.  Not that
17   I knew about.
18        Q    Okay.  And would that have been
19   significant to know about?
20             MR. BERNICK:  Objection to the form of
21   the question.
22             THE WITNESS:  It depends how much abuse.
23   If it were a lot of abuse, yes, it would have
24   been.  If it were isolated and a small numbers of
```

```
 1   abusers, it might not have changed it.  But that's
 2   all speculation.
 3   BY MS. SINGER:
 4        Q    And didn't Purdue have an obligation to
 5   know before it launched OxyContin with a label on
 6   delayed absorption potentially reducing abuse
 7   to know whether that was really true?
 8        A    That is a legal and regulatory question
 9   and medical question that I'm not informed enough
10   to respond to.  I just don't know.
11        Q    I'm asking you as an owner and board
12   member of this company, whether you had an
13   obligation before putting a narcotic on the market
14   that you said was less likely to be abused to know
15   whether that was true?
16             MR. BERNICK:  Objection.  Asked and
17   answered.
18             THE WITNESS:  I think in retrospect, you
19   could -- every misfortune in life, you're asking a
20   question, if you knew what would happen, what
21   would you -- wouldn't you have done something to
22   prevent it?  The answer is:  Of course.  But we
23   didn't expect any such event.
24   BY MS. SINGER:
```

```
 1        Q    But you put affirmative language in the
 2   label saying that this drug was less likely to be
 3   abused.  Didn't you have an obligation to know
 4   that -- not in hindsight, but to know then whether
 5   that was true?
 6        A    I think I --
 7             MR. BERNICK:  Hang on.
 8             THE WITNESS:  -- I answered the
 9   question.
10             MR. BERNICK:  Hang on.  Object.  Move to
11   strike the prefatory statement.
12             Go ahead.
13             THE WITNESS:  Oh, right.  Okay.
14             I'm not an owner -- well, maybe I am.
15   Forget that.  I don't want to quibble.
16             In retrospect, everything looks
17   different.  In prospect, I was not running or
18   designing the program.  And the FDA approved this.
19   May have even suggestec that language.  I don't
20   know.  But they suggested a lot of language as
21   they do in typically every label.
22             So I don't -- I can't tell you
23   whether -- obviously the FDA didn't feel it was
24   necessary.  They wouldn't have approved it.
```

```
 1   BY MS. SINGER:
 2        Q    But it was your label, Dr. Sackler.
 3             MR. BERNICK:  Objection to the form of
 4   the question.  And it's also not a question.
 5   BY MS. SINGER:
 6        Q    Wasn't it your label?  Wasn't it your
 7   responsibility?
 8             MR. BERNICK:  Asked and answered three
 9   times.
10             THE WITNESS:  Our -- no, it was not.  It
11   was not.  You're picking one possible thing out of
12   a million.  Are a million things our
13   responsibility?  Maybe, but I don't think so.
14   That becomes impractical for ever completing
15   research on a drug.  You're always learning new
16   things.  So I don't -- I don't --
17   BY MS. SINGER:
18        Q    But this is -- this is something you
19   didn't bother to learn, Dr. Sackler, but you said
20   it anyway.
21             MR. BERNICK:  Objection to the form.
22   This is now asked and answered four times.
23             Your Honor, we would ask for a ruling,
24   that this is -- it's already been asked and
```

1    answered.

2            SPECIAL MASTER COHEN:  Well, the last

3    thing that was said was not a question.

4    BY MS. SINGER:

5        Q    So, Dr. Sackler, putting aside a million

6    things, focusing on the one language where Purdue

7    affirmatively asserted that delayed absorption

8    might make this drug less likely to be abused, did

9    you have a responsibility as the manufacturer/

10   distributor of that drug, to check before you said

11   it?

12           MR. BERNICK:  A, it's been asked and

13   answered.  B, that statement there is not the

14   label.

15           THE WITNESS:  I'm sorry, I --

16           MR. BERNICK:  There's a lack of

17   foundation for that question.

18           THE WITNESS:  Do I answer it?

19           MR. BERNICK:  Yeah.

20           MS. SINGER:  Mm-hmm.

21           MR. BERNICK:  You have to.

22           THE WITNESS:  We -- as I said -- I said

23   before, in hindsight, you can isolate the one

24   question that many people would wish was asked.

---

1    The FDA might have wished it.  We might have

2    wished it.  But it's speculative.  We didn't think

3    that the drug would be an object of abuse at that

4    time when the FDA approved it -- approved the

5    label, approved the drug.

6            We did not have a responsibility to do

7    it because it would have required foreknowledge

8    that was contrary, at least contrary to the

9    board's knowledge and to mine.

10   BY MS. SINGER:

11       Q    So -- I want to be clear that what we're

12   talking about is an affirmative statement in the

13   label.  And your position is that you didn't have

14   an obligation to make sure that that affirmative

15   statement that this drug was less likely to be

16   abused was true?

17           MR. BERNICK:  Again, I object.  That is

18   not what the label says.  And this has been asked

19   and answered, and it's lack of --

20           MS. SINGER:  It has actually never been

21   answered.

22           MR. BERNICK:  Well, this -- Your Honor,

23   I would ask for a ruling at this point.  I think

24   that this is badgering the witness.  He's an

---

1    elderly man.  He's been very patient.  But this is

2    trying to get something out that has been asked

3    and answered -- and not just with -- he's

4    explained the same explanation five different

5    times.

6            MS. SINGER:  No, he's actually --

7            MR. BERNICK:  And this is not even the

8    statement of what's in the label.  It's not.

9            MS. SINGER:  He has not answered it.

10           SPECIAL MASTER COHEN:  If we were

11   sitting in court, I would suggest that you made

12   your point and you should move on.

13           MR. BERNICK:  Thank you.

14   BY MS. SINGER:

15       Q    So, Dr. Sackler, this wasn't the only

16   reference to abuse and addiction in OxyContin's

17   1995 label.

18           I want to direct you to page 365 -- I'm

19   sorry, Bates number --

20       A    Where do I see --

21       Q    Sorry, same page.

22       A    Oh, look at the bottom right?

23           MR. BERNICK:  No, wait.  She'll tell

24   you.

---

1            THE WITNESS:  Okay.  Okay.

2    BY MS. SINGER:

3        Q    No, same page, page 766.

4        A    Of this one.  Okay.

5        Q    Yep.  So we're on the same as before.

6        A    Yes.

7        Q    And it says:  "Iatrogenic -- iatrogenic

8    addiction to opioids legitimately used in the

9    management of pain is very rare."

10           Do you see where I'm reading?.

11       A    Yes, I see where you're reading.  I do.

12       Q    Okay.  Now, you've acknowledged in the

13   past that Purdue didn't perform studies on the

14   rates of iatrogenic addiction prior to OxyContin's

15   approval, correct?

16       A    That --

17           MR. BERNICK:  Objection.  If there's

18   prior testimony, can we just have the page?

19   Assuming it's in Kentucky.

20           MS. SINGER:  I'm sorry.

21           MR. BERNICK:  If you're confronting him

22   with prior testimony, I believe the rule says that

23   you should show him, at least have the opportunity

24   for him to look at what the prior testimony was.

**Page 193**

```
1    And I don't -- if you'd just give us a page number
2    from Kentucky.
3           MS. SINGER:  So these speaking
4    objections, Mr. Bernick, are just completely
5    inappropriate.  They're coaching the witness and
6    wasting time, and I would ask that you either stop
7    it or we can get a ruling.
8           Special Master Cohen, please --
9           MR. BERNICK:  That's --
10          MS. SINGER:  -- to ask him to stop doing
11   this.
12          MR. BERNICK:  That is fine.  There is a
13   rule of completeness under the rules.  It has to
14   be done at the time the question is asked.
15   Otherwise, it's not -- it's not usable.  It's hard
16   to state in one word.
17          SPECIAL MASTER COHEN:  Right, but it's
18   probably easy enough to state in twelve.
19          MR. BERNICK:  Well, that's -- I take
20   that point, Your Honor.
21          SPECIAL MASTER COHEN:  Why don't we get
22   back to it.
23   BY MS. SINGER:
24   Q    So I will ask the question again, to
```

**Page 194**

```
1    point you back to it, Dr. Sackler.
2           Purdue didn't perform studies on the
3    rates of iatrogenic addiction prior to the
4    approval of OxyContin, correct?
5    A    This was not part of the approved plan
6    for studies that would lead, if successful, to
7    approval.  Not every possibility in any drug
8    application is covered with studies.  There is a
9    baseline of experience and literature that forms
10   an important part at the time a drug is approved.
11   And clearly, the FDA didn't see this as a
12   deficiency in the application, and we didn't
13   either.
14          I can't tell you how many references
15   supported this.  I was not -- I have no knowledge
16   about whether this was a close point.  It is my
17   impression that at that time narcotic approvals
18   did not require or didn't usually have even -- but
19   I'm guessing here -- I just don't know that any
20   had abuse studies.
21          With the fullness of time, maybe that
22   would have been a good idea.  Maybe it would have
23   prevented some -- some misfortune.  But that's
24   speculative.  I don't know.
```

**Page 195**

```
1    BY MS. SINGER:
2    Q    So when you put these two statements,
3    "delayed absorption makes abuse rare" and
4    "iatrogenic addiction is very rare," neither of
5    which were supported by studies, my question to
6    you was, you know, was this just a wait and see,
7    we'll put the drug out there and see what happens
8    to people?
9           MR. BERNICK:  I -- objection.
10   Misstatement of the label.  And I object to form.
11          THE WITNESS:  So should I answer?
12          MR. BERNICK:  Yes.
13          THE WITNESS:  Could you restate the
14   question?  I'm sorry.
15   BY MS. SINGER:
16   Q    Was Purdue just, absent the science to
17   support these two statements, absent specific
18   studies to support these statements, just taking
19   the attitude that it would wait and see what would
20   happen to the American people when this drug was
21   launched?
22          MR. BERNICK:  Objection to form.
23          THE WITNESS:  Not -- I don't believe --
24   I'm not aware of any evidence that waiting to see
```

**Page 196**

```
1    what happened was the operative notion.
2    BY MS. SINGER:
3    Q    But --
4    A    Can I finish my --
5    Q    Mm-hmm.
6    A    Also my recollection is that there were
7    studies about iatrogenic, but not conducted by
8    Purdue.  There were studies in the literature, but
9    I'm not certain.  I'm not an expert any more in
10   the literature, and my memory could be faulty.
11   But my recollection is that there were studies.
12   And if that recollection has some substance, that
13   could explain a lot.
14          MR. BERNICK:  It's I think around 3:15.
15   I don't know where we are on the clock for today,
16   but if I could ask --
17          THE VIDEOGRAPHER:  Three hours and 32
18   minutes.
19          MR. BERNICK:  So that leaves us about
20   halfway through.
21          MS. SINGER:  Well, I think we're going
22   to have some issues with that.
23          MR. BERNICK:  I -- I understand that
24   there might be, but I guess the question is -- we
```

```
1    should clearly take a break now because the doctor
2    has been going for a while, and then maybe we can
3    figure out --
4              SPECIAL MASTER COHEN:  I suggest we take
5    a break, and then we convene and go as long as we
6    can today, as long as Dr. Sackler is able to.
7              MR. BERNICK:  Okay.  That's fine.
8    Let's -- let's do that.  But if I could just bend
9    your and Linda's ear for a minute during the
10   break.
11             MS. SINGER:  So I -- can I do one more
12   question to finish up this line, please?
13             MR. BERNICK:  As long as it's not the
14   same --
15             THE WITNESS:  Okay.  Please let her ask
16   the question.  I shouldn't disagree with my
17   counsel.
18             MR. BERNICK:  I was kidding.  I was
19   kidding.
20             THE WITNESS:  Oh, okay.  See, you were
21   being sarcastic.
22             MR. BERNICK:  I was.
23             THE WITNESS:  Just like I try to be.
24             MR. BERNICK:  I was trying to be witty,
```

```
1    in vain.  Sorry.
2              MS. SINGER:  That's okay.  We can take
3    the break.
4              MR. BERNICK:  Thank you.
5              THE VIDEOGRAPHER:  Going off the record
6    at 3:13 p.m.
7              (Recess.)
8              THE VIDEOGRAPHER:  We're back on the
9    record at 3:29 p.m.
10   BY MS. SINGER:
11        Q    Dr. Sackler, at what point did you
12   learn -- I'm sorry.
13             At some point did you learn that delayed
14   absorption did not reduce the abuse liability of
15   OxyContin?
16             MR. BERNICK:  Excuse me.  Objection.
17   Assumes facts.
18             THE WITNESS:  When did I learn that
19   abuse -- that -- repeat it again.  I didn't catch
20   the --
21   BY MS. SINGER:
22        Q    At some point did you learn that delayed
23   absorption did not reduce the abuse liability of
24   OxyContin?
```

```
1         A    I don't think there is any evidence that
2    shows that.  That would be a difficult trial to
3    run.  I -- I don't know offhand how I would -- I
4    certainly couldn't figure it out.
5         Q    So --
6         A    If I had to design a trial.
7         Q    So is it your testimony that you're
8    still not sure whether delayed absorption reduces
9    the abuse liability of OxyContin?
10        A    I'm still not sure?
11        Q    Yes.
12        A    No.  I believed it was established in
13   trials at the time the product was introduced.  I
14   don't know that it's not true.  But certainly I'm
15   less -- I'm not sanguine about it.  That's the --
16   after the fact:  If you knew the future, you might
17   have behaved differently.
18        Q    And at some point did you learn that
19   iatrogenic addiction to OxyContin is not very
20   rare?
21        A    I didn't learn it.  But the FDA and
22   Purdue agreed that the modifier "very" should be
23   removed.  But I don't know any more than that.  Of
24   course, we observed whatever it is -- within human
```

```
1    capabilities we -- I don't think we objected to
2    removing it.  But I don't know.
3         Q    And you talked about the -- the evidence
4    that existed about abuse liability and addiction
5    prior to OxyContin was launched.
6              Are you aware that during the clinical
7    studies for OxyContin that there were cases of
8    drug-seeking and drug-craving behavior?
9              MR. CHEFFO:  Objection.
10             MR. BERNICK:  Objection.  Lack of
11   foundation.  And assumes facts.
12             THE WITNESS:  Should I answer it?
13             MR. BERNICK:  Yes.
14             THE WITNESS:  Okay.  Just repeat the --
15   I'm sorry for asking, but I've been told I really
16   ought to be sure I understand the question.
17   Unfortunately, this kind of interrupts it a little
18   bit.  But just repeat it or rephrase it.
19   BY MS. SINGER:
20        Q    Are you aware that there was evidence of
21   drug -- drug seeking or drug craving during the
22   clinical trials for OxyContin?
23             MR. CHEFFO:  Objection.
24             THE WITNESS:  I don't recall.
```

```
 1                (Sackler Exhibit No. 28 was marked
 2                for identification.)
 3   BY MS. SINGER:
 4        Q    I show you Exhibit 28, which is a
 5   clinical study report titled "Drug-Seeking
 6   Behavior."
 7             And I will direct you to Bates number --
 8   where is it?
 9             So on the second page of the document --
10        A    Second?  You said second?
11        Q    Yep.
12        A    Okay.  Oh, yeah, this is the second
13   page.
14        Q    "Of the 233 subjects who enrolled who
15   enrolled in the clinical trial, 13 subjects were
16   indicated by the investigators as having signs of
17   drug-seeking behavior on the case report form."
18        A    I see that.
19        Q    So does that refresh your recollection
20   as to whether there was evidence that OxyContin
21   was subject to abuse?
22             MR. CHEFFO:  Objection.
23             MR. BERNICK:  Yeah, objection.
24             THE WITNESS:  I -- no, it doesn't
```

```
 1   refresh my recollection.  I don't remember this.
 2   BY MS. SINGER:
 3        Q    Okay.  It seems like an important thing
 4   for you to have known, Dr. Sackler, does it not?
 5             MR. BERNICK:  Object to the form of the
 6   question.
 7             THE WITNESS:  At the very least, you --
 8   I'd like the privilege of studying the document
 9   because there's probably more about this in this
10   document.  I'd like to see what the document says.
11   BY MS. SINGER:
12        Q    Okay.
13        A    Do you want me to read it?
14        Q    If you feel you need to do that, in
15   light of your testimony that there was no evidence
16   that OxyContin -- that would have required Purdue
17   to undertake studies.
18             MR. BERNICK:  Objection.  Misstates
19   testimony.  Objection to form.
20             THE WITNESS:  Okay.  This is very small
21   too.  Can I ask whether somebody can make a larger
22   copy?  My -- this is like seven point --
23             MR. BERNICK:  Can you put it on the
24   screen?
```

```
 1             THE WITNESS:  Yeah, that would be good.
 2   Seven-point type or something.  It's really --
 3   BY MS. SINGER:
 4        Q    I have no control over the size --
 5        A    I know.  I know.
 6        Q    -- of scientific study font.
 7             GINA VELDMAN:  He wants that paragraph
 8   blown up?
 9             MR. BERNICK:  Yeah, maybe.  That would
10   be --
11             THE WITNESS:  Well, certainly you start
12   at the top, but -- but as I said, I really have to
13   see what else this report says.  I don't think
14   I'll remember it, but I -- I wasn't asked to
15   remember it.  I was -- right?  I was asked to read
16   it, and say --
17             MR. BERNICK:  Okay.  So I tell you
18   what --
19             THE WITNESS:  Okay.
20             MR. BERNICK:  If you -- it's blown up --
21   it this helps, Dr. Sackler.
22             THE WITNESS:  Oh.  I see --
23             MR. BERNICK:  If you can read it, this
24   is the first paragraph.
```

```
 1             THE WITNESS:  Okay.
 2             MR. BERNICK:  Maybe if you still need to
 3   look at more --
 4             THE WITNESS:  Okay.
 5             MR. BERNICK:  -- we can deal with that.
 6             THE WITNESS:  13 subjects.
 7             MR. BERNICK:  But let -- this is -- I'm
 8   interrupting her.  So do you want -- do you want
 9   him to read it?
10             MS. SINGER:  No.
11   BY MS. SINGER:
12        Q    I think, Dr. Sackler, we made the point
13   of the top line finding of this study.  If there's
14   more that your counsel wants to ask you about
15   tomorrow, I'm sure they will.
16        A    Good.  That's fair enough.
17             MR. BERNICK:  Okay.
18             THE WITNESS:  So you're finished with
19   this document?
20   BY MS. SINGER:
21        Q    I am finished.
22             Do you believe that patients ought to be
23   informed that there is a risk that they would
24   become addicted to OxyContin prescribed to them by
```

Highly Confidential - Subject to Further Confidentiality Review

1    their doctor?

2         A    In every case or in most cases or in a

3    few cases?  Could you quantify it?  For example,

4    somebody who is demented and won't understand that

5    wouldn't necessarily be informed.

6         Q    So, but --

7         A    Maybe a caregiver would, but --

8         Q    So let's put aside people who are

9    incompetent about their care.

10        A    Okay.  And too young to make their own

11   decisions, and so on.

12        Q    Same point.

13             Does a competent patient deserve to know

14   that they may become addicted to OxyContin

15   prescribed by their doctor?

16        A    Everything else being equal --

17   everything else being equal, this would be

18   desirable.

19        Q    All right.  Let's turn to 15564.

20             Were you pleased with the label for

21   OxyContin?

22        A    I was very pleased with the label for

23   OxyContin.  I was -- I thought the people who had

24   worked on it had done something which was not

---

Highly Confidential - Subject to Further Confidentiality Review

1    common then, which was to write a textbook chapter

2    in the label, and I thought it laid out the

3    emphasis such as was known then, on what was

4    important.

5             Abuse and diversion appeared, I don't

6    remember, two, three, four times.  The importance

7    of treating pain was well laid out.  The

8    management plan, how should a doctor actually

9    start the drug, adjust the drug, make certain the

10   patient still needs it.  I thought it was an

11   excellent label within the limits of my knowledge.

12   So I was pleased with it.

13             (Sackler Exhibit No. 29 was marked

14             for identification.)

15   BY MS. SINGER:

16        Q    So Exhibit 29, which is an e-mail from

17   you to Paul Goldenheim and others from August 25th

18   of 1995, I think here you're expressing your

19   pleasure.  You called it an A for our team,

20   correct?  At the top of the page.

21        A    I should have said "the team," but --

22   because I knew that the FDA played an important

23   role in this as well.  But aside from that little

24   refinement.

---

Highly Confidential - Subject to Further Confidentiality Review

1         Q    Okay.  And then at the bottom of the

2    page, it notes that:  "MF and RSS have seen his

3    comments."

4             RSS is presumably you, correct?

5         A    Yes.

6         Q    Okay.  And you had seen the comments

7    from Curtis Wright, the medical reviewer, correct?

8         A    I don't remember if I saw Curtis

9    Wright's comments.

10        Q    Okay.  But that is what it says here,

11   correct?

12        A    Dr. -- where does it say that?

13        Q    "MF and RSS have seen his comments," the

14   top of the bottom paragraph.

15        A    Oh, MF.  I heard MS.  Okay.  Sorry.  I

16   have seen, and the "his" refers to --

17        Q    Dr. Wright at the top of the e-mail

18   chain.  "Dr. Wright called today to finalize the

19   package insert."

20        A    Right.  I see that.

21        Q    Okay.  And then --

22        A    It seems that that's the reference.  I

23   would have to read the whole thing to be sure,

24   but --

---

Highly Confidential - Subject to Further Confidentiality Review

1         Q    Okay.  And then it says:  "I think I can

2    speak for the three of us when I say we got most

3    of what we wanted in the PI."

4         A    I -- that's what I said.

5         Q    It's exactly what Dr. Reder said -- I'm

6    sorry.  At the bottom of the e-mail referring to

7    you and Michael Friedman, correct?

8         A    Okay.  I'm sorry.  You're -- you want me

9    to attend to the last paragraph, right?

10        Q    Mm-hmm.

11        A    Which starts:  "MS -- MF and RSS have

12   seen" -- I accept -- I don't know that his -- I

13   don't want to parse it, but for purposes of speed,

14   let's assume it is Curtis Wright.

15             "I think I can speak for the three of us

16   when I say we got most of what we wanted.  Have a

17   happy weekend.  The document will be Word

18   processed and circulated on Monday."  Yes.

19        MR. BERNICK:  Just for the --

20   BY MS. SINGER:

21        Q    And that reflects your sentiments,

22   correct?

23        MR. BERNICK:  I'm sorry.  Just so the

24   record reflects that Dr. Sackler was actually

1  reading from the document himself.

2          MS. SINGER:  That's correct.

3          MR. BERNICK:  Thank you.

4          THE WITNESS:  I don't recall -- I don't

5  recall that we had a specific plan for the label.

6  If there was, I didn't -- I don't think I saw it

7  in advance of working with the FDA on it.  I

8  wasn't on the team that did.  I didn't -- I don't

9  recall any correspondence, but maybe I got

10  something.

11  BY MS. SINGER:

12      Q  Okay.  But you knew again --

13      A  Well, no, no, I --

14      Q  -- it was a good label as far as you

15  were concerned?

16      A  Yeah, I think -- for the -- for most or

17  all of the reasons I just stated about why I was

18  pleased with it.  I thought it was extremely

19  useful for doctors, and I hoped that they read it

20  and reread it until they were really familiar with

21  the drug.  So I thought it would make -- it would

22  improve their management of pain.

23          (Sackler Exhibit No. 30 was marked

24          for identification.)

1  BY MS. SINGER:

2      Q  So this is Exhibit 30.  Are you familiar

3  with the Purdue Research Center?

4      A  I'm familiar that there was a period of

5  time that we used that term.  Yes.

6      Q  And you used that term for what?  What

7  was the entity?

8      A  For the constellation of people in labs,

9  in clinical research, in regulatory affairs, and

10  so forth.

11      Q  And this document is the 1996 Executive

12  Summary for the Purdue Research Center.  If you

13  look at the top of the third page, so Bates

14  number 3222.

15      A  Okay.  Yes.

16      Q  Okay.  And I'm going to read from the

17  last paragraph.

18      "The evolution of the package insert

19  from its original draft over four years ago was a

20  particularly interesting and informative process.

21  Dr. Curtis Wright, the FDA medical reviewer, upon

22  first reviewing it, stated that he had never seen

23  a package insert with as much promotional and

24  marketing material in it as ours.  Clearly our

1  package insert team, representing medical,

2  scientific communications, pharmacokinetics and

3  drug metabolism and marketing, did its job

4  skillfully.  Dr. Wright even told us that all of

5  this promotional material would disappear.  It did

6  not.

7      "In fact, the package insert contains

8  all of the major elements of our long-range

9  marketing platform for this drug and proved most

10  valuable when it came time to negotiate

11  promotional copy with the Division of Drug

12  Marketing, Advertising and Compliance, DDMAC.  We

13  argued extensively with DDMAC in January through

14  March of this year.  The result of these," quote,

15  "discussions was a tremendous set of promotional

16  claim rich copy, and the consequence, about 50

17  million in sales -- $50 million in sales -- in the

18  first year, more than 37,000 prescriptions per

19  munch -- per month, and a market share approaching

20  13 percent, that is quite a beginning."

21      I read that accurately?

22      A  You -- I've read it the same way.  Good

23  reading.

24      Q  And so to your point that you were

1  pleased with the package insert because it gave

2  doctors good information --

3      A  Yes.

4      Q  -- isn't it the case in fact that it

5  was also the promotional launching pad for

6  OxyContin?

7      A  I don't know when I came to the

8  understanding that all claims had to be in the

9  package insert or else -- or sanctioned by the FDA

10  if you departed from the package insert -- not in

11  material but in what the author of whatever

12  material was -- thought was consistent with the

13  package insert.  I don't remember.  But we wanted

14  a package insert that was very comprehensive and

15  complete.  I don't remember this document.  I

16  don't remember Curtis Wright's statement.  I just

17  can't say what Curtis meant.

18      I was referring not to marketing or

19  promotion as is here.  I was referring to how do

20  you properly use OxyContin in general, and in

21  fact, any strong opioid where it is indicated, how

22  do you start, how do you adjust, how do you decide

23  you don't want to continue it, and on and on and

24  on.  I thought doctors would become at a minimum

```
1   well refreshed in what they knew, and probably in
2   many cases would learn some things that would be
3   useful.
4        So, I can't -- I can't comment on Curtis
5   Wright's -- on the comment of Curtis Wright that
6   said he's never seen such...
7        Q   But can't you comment on Purdue's
8   celebration of this label as a selling instrument
9   for OxyContin?
10       A   I really just didn't think of it that
11  way.
12       Q   So let's go to --
13       A   Everybody here would learn a lot if they
14  read that package insert or the subsequent ones.
15            (Sackler Exhibit No. 31 was marked
16            for identification.)
17  BY MS. SINGER:
18       Q   So showing you --
19            MR. BERNICK:  Wait for counsel to ask
20  you a question.
21  BY MS. SINGER:
22       Q   -- Exhibit 31.
23            Dr. Sackler, this is your testimony in
24  that Endo Pharmaceuticals patent litigation we
```

```
1   talked about earlier.
2        And I want to direct you to page --
3   Bates number 560.
4            MR. BERNICK:  Five --
5            MS. SINGER:  Five six zero.
6            MR. BERNICK:  560.
7            THE WITNESS:  Oh.  Okay.  Sorry.  Yeah,
8   I was looking for four digits.  560.  Okay, I
9   think I found it.  Yes.
10            Do I have it?  I think so.
11  BY MS. SINGER:
12       Q   No, that's not right.
13       A   I'm reading this.  PKY, is that the
14  wrong --
15            MR. BERNICK:  Hang on, hang on.  Linda,
16  which --
17            MS. SINGER:  I know, I'm sorry.  I'm
18  trying to track down the reference.
19            MR. BERNICK:  It's a different page.
20  Don't worry about it.
21            THE WITNESS:  I'm sorry?
22            MR. BERNICK:  I said it's a different
23  page.  Don't worry about it.
24            THE WITNESS:  Oh.  Oh, okay.
```

```
1   BY MS. SINGER:
2        Q   All right.  We'll come back to that in a
3   minute.
4        A   Okay.
5        Q   Dr. Sackler, you testified earlier that
6   you weren't involved in the language of the
7   packet -- package insert or the label, correct?
8        A   That's my recollection, yes.
9            MR. BERNICK:  Okay.  If --
10            MS. SINGER:  Can I see 571, please.
11            MR. BERNICK:  Note my objection.  I
12  believe that misstates testimony.
13            (Sackler Exhibit No. 32 was marked
14            for identification.)
15  BY MS. SINGER:
16       Q   All right.  I'm showing you Exhibit 32.
17            I want you -- so this is an e-mail
18  between Robert Reder and Agi Frimmel.
19            Have I said that correctly?
20       A   I -- I'm looking for the name to see
21  if -- I don't recognize it the way you said it.
22  Oh, Agi.
23       Q   Mm-hmm.
24       A   I don't -- I don't remember her.
```

```
1        Q   Okay.  I want to direct you down halfway
2   through the chain to the e-mail from Mark Alonzo.
3        A   Mark Alfonse -- Alfonso.  Don't worry.
4        Q   Thank you.
5        A   It's -- I'm getting tired too.  Okay.
6        Q   And it says in the middle of that
7   chain --
8        A   Right, "Roger" -- starting "Roger, thank
9   you"?
10       Q   Yep.
11       A   Okay.
12       Q   Do you want to finish reading that
13  paragraph, "Colleagues" --
14       A   You want me to read it or --
15       Q   Sure, go ahead.
16       A   -- just to myself?
17            No, I -- I can read it to myself.  I
18  don't have to read it out --
19       Q   So it says:  "Colleagues, Michael
20  Friedman and I are not in support of this PI" --
21  or package insert -- "change.  Michael has
22  indicated that Dr. Richard is not in support of
23  this change, and that any OxyContin PI change will
24  require Dr. Richard's approval.  I would suggest
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1    that we don't meet until this issue has been
 2    discussed with Dr. Richard."
 3             Isn't it true, Dr. Sackler, that you
 4    were involved in the language --
 5        A    No, I --
 6        Q    -- of the package insert?
 7        A    I -- I don't remember what this refers
 8    to.  It is a possibility, but an unlikely one,
 9    that I was involved in some change here.  But I
10    was not involved in -- Mark is wrong.  I was not
11    involved in approving changes or suggesting
12    changes.  I just didn't do that.  I didn't -- I
13    never had -- no, I didn't do it.  I stand by that.
14    I have no recollection in general --
15        Q    Okay.
16        A    -- of being involved in package inserts.
17
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 7             MS. SINGER:  Okay.  And then we'll just
 8    do one more thing, and maybe we'll call it a day
 9    for today.
10             MR. BERNICK:  Okay.
11    BY MS. SINGER:
12        Q    At that national sales meeting, you gave
13    a speech.  Do you recall giving a speech about the
14    launch of OxyContin to the national sales force?
15        A    I have recollections of that --
16        Q    Okay.
17        A    -- event.
18             (Sackler Exhibit No. 33 was marked
19             for identification.)
20    BY MS. SINGER:
21        Q    I'm showing you Exhibit 33.
22             Do you recognize this Teamlink document
23    with the headline "OxyContin:  The most
24    significant launch in Purdue history"?
```

```
 1      A    I don't remember.  I know -- I remember
 2  Teamlink.  I don't -- didn't remember the
 3  headline.
 4      Q    Okay.  And Teamlink was the magazine
 5  Purdue provided to its sales force, correct?
 6      A    I don't recall whether it was the sales
 7  force -- all of it, any of it, I don't remember.
 8  They came to me, and they said people wanted to
 9  read it.  I -- I don't recall more than finding,
10  locating my written speech.  I don't think they
11  had a copy of it actually, so they couldn't take a
12  transcript.
13      Q    But you provided them with that copy.
14      A    I did.  I provided them with what I had
15  that would either be close to it or that I -- that
16  I delivered.
17      Q    And if you turn to the second page.
18      A    Yes.
19      Q    The third column.
20      A    Yes.
21      Q    You're talking about the package insert
22  process in the second to last paragraph:
23  "Whenever you read any part of the package insert,
24  you should remember the hundred of hours of work
```

```
 1  that went into each section, paragraph, sometimes
 2  each phrase and word."
 3           Do you see where I'm reading?
 4      A    I don't, but okay.  If you can help me
 5  locate it.
 6           MR. BERNICK:  There you go.
 7           THE WITNESS:  Thank you.  Makes it
 8  easier for me.  Thank you.
 9  BY MS. SINGER:
10      Q    So does that reflect your --
11      A    Whenever you read any part -- I don't --
12           MR. BERNICK:  Just read it yourself, and
13  then go down to the end of the last line.
14           THE WITNESS:  Okay.  (Peruses document.)
15  BY MS. SINGER:
16      Q    And you say:  "The team never lost their
17  temper, never ceased to support the effort in each
18  other -- and each other, and every time made the
19  label better, stronger, a more potent selling
20  instrument, and we have the most powerful selling
21  package insert in the category and in the
22  industry."
23           Have I read that accurately?
24      A    I believe you did.
```

```
 1      Q    And that reflects the speech you gave?
 2      A    It reflects probably -- I can't swear to
 3  it, but it probably reflects the speech I gave.
 4           MS. SINGER:  Okay.  I think we can call
 5  it a day.
 6           MR. BERNICK:  Sure.  Great.  Thank you.
 7           THE WITNESS:  Do you have any more
 8  questions about it?
 9           MS. SINGER:  Not at the moment.
10           THE VIDEOGRAPHER:  Going off the record
11  at 3:58 p.m.
12           (Whereupon, the deposition of
13           RICHARD SACKLER, M.D. was
14           adjourned at 3:58 p.m.)
15
16
17
18
19
20
21
22
23
24
```

```
 1       CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
 2       The undersigned Certified Shorthand Reporter
 3  does hereby certify:
 4       That the foregoing proceeding was taken before
 5  me at the time and place therein set forth, at
 6  which time the witness was duly sworn; That the
 7  testimony of the witness and all objections made
 8  at the time of the examination were recorded
 9  stenographically by me and were thereafter
10  transcribed, said transcript being a true and
11  correct copy of my shorthand notes thereof; That
12  the dismantling of the original transcript will
13  void the reporter's certificate.
14       In witness thereof, I have subscribed my name
15  this date:  March 12, 2019.
16
17            Leslie A. Todd
18            LESLIE A. TODD, CSR, RPR
19            Certificate No. 5129
20  (The foregoing certification of
21  this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            INSTRUCTIONS TO WITNESS
 2       Please read your deposition over carefully and
 3   make any necessary corrections. You should state
 4   the reason in the appropriate space on the errata
 5   sheet for any corrections that are made.
 6       After doing so, please sign the errata sheet
 7   and date it.
 8       You are signing same subject to the changes
 9   you have noted on the errata sheet, which will be
10   attached to your deposition.  It is imperative
11   that you return the original errata sheet to the
12   deposing attorney within thirty (30) days of
13   receipt of the deposition transcript by you. If
14   you fail to do so, the deposition transcript may
15   be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            - - - - -
 2            E R R A T A
 3            - - - - -
 4   PAGE LINE CHANGE
 5   ____ ____ _____
 6   REASON: _____
 7   ____ ____ _____
 8   REASON: _____
 9   ____ ____ _____
10   REASON: _____
11   ____ ____ _____
12   REASON: _____
13   ____ ____ _____
14   REASON: _____
15   ____ ____ _____
16   REASON: _____
17   ____ ____ _____
18   REASON: _____
19   ____ ____ _____
20   REASON: _____
21   ____ ____ _____
22   REASON: _____
23   ____ ____ _____
24   REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         ACKNOWLEDGMENT OF DEPONENT
 2       I, _____, do hereby
 3   certify that I have read the foregoing pages, and
 4   that the same is a correct transcription of the
 5   answers given by me to the questions therein
 6   propounded, except for the corrections or changes
 7   in form or substance, if any, noted in the
 8   attached Errata Sheet.
 9
10   _____
11   RICHARD SACKLER, M.D.              DATE
12
13
14   Subscribed and sworn to
15   before me this
16   _____ day of_____,20___.
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24
```