1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF OHIO
3   EASTERN DIVISION
4
5   -----------------------------x
6   IN RE: NATIONAL PRESCRIPTION ) MDL No. 2804
7   LITIGATION                   ) Case No. 17-md-2804
8   This document relates to:    ) Hon. Dan A. Polster
9   All Cases                    )
10  -----------------------------x
11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
            CONFIDENTIALITY REVIEW
12          V O L U M E   I I
13  VIDEOTAPED DEPOSITION OF RICHARD SACKLER, M.D.
14          STAMFORD, CONNECTICUT
15          FRIDAY, MARCH 8, 2019
16              9:37 A.M.
17
18
19
20
21
22
23
24  Reported by: Leslie A. Todd

---

1   Deposition of RICHARD SACKLER, M.D., held at
2   the offices of:
3
4
5
6
7           WIGGIN AND DANA, LLP
8           281 Tresser Boulevard
9           Two Stamford Plaza
10          Stamford, Connecticut 06901
11          (203) 363-7600
12
13
14      This deposition was taken before Special
15  Master David R. Cohen.
16
17
18
19
20
21
22
23
24

---

1           A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFFS:
4       LINDA SINGER, ESQUIRE
5       JOSEPH F. RICE, ESQUIRE
6       LISA M. SALTZBURG, ESQUIRE
7       KAITLYN EEKHOFF (Remote streaming)
8       MOTLEY RICE, LLC
9       401 9th Street, Northwest
10      Suite 1001
11      Washington, D.C. 20004
12      (202) 386-9626
13
14      PAUL J. HANLY, JR., ESQUIRE
15      JAYNE CONROY, ESQUIRE
16      LAURA FITZPATRICK, ESQUIRE
17      JO ANNA POLLOCK, ESQUIRE (Remote streaming)
18      SANFORD SMOKLER, ESQUIRE (Remote streaming)
19      SIMMONS HANLY CONROY, LLC
20      112 Madison Avenue
21      New York, New York 10016-7416
22      (212) 784-6401
23
24

---

1   APPEARANCES (Continued):
2
3       HUNTER J. SHKOLNIK, ESQUIRE
4       JOSEPH CIACCIO, ESQUIRE (Remote streaming)
5       SALVATORE BADALA, ESQUIRE (Remote streaming)
6       NAPOLI LAW
7       360 Lexington Avenue, 11th Floor
8       New York, New York 10017
9       (212) 397-1000
10
11      JEFF GADDY, ESQUIRE (Remote streaming)
12      LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY &
13          PROCTOR, P.A.
14      316 South Baylen Street
15      Pensacola, Florida 32502
16      (850) 435-7163
17
18      DEREK W. LOESER, ESQUIRE (Remote streaming)
19      DAVID KO, ESQUIRE (Remote streaming)
20      DEAN N. KAWAMOTO, ESQUIRE (Remote streaming)
21      KELLER ROHRBACK LLP
22      1201 Third Avenue, Suite 3200
23      Seattle, Washington 98101
24      (206) 623-1900

```
1    APPEARANCES (Continued):
2
3        TIFFANY ELLIS, ESQUIRE (Remote streaming)
4        WEITZ & LUXENBERG, P.C.
5        700 Broadway
6        New York, New York 10003
7        (212) 558-5500
8
9    ON BEHALF OF THE STATE OF WASHINGTON:
10       LAURA K. CLINTON, ESQUIRE
11       Assistant Attorney General of Washington
12       800 5th Avenue
13       Suite 2000, Mailstop TB-14
14       Seattle, Washington 98104-3188
15       (206) 233-3383
16
17   ON BEHALF OF THE WITNESS:
18       DAVID BERNICK, ESQUIRE
19       BENJAMIN L. WEINTRAUB, ESQUIRE
20       PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
21       1285 Avenue of the Americas
22       New York, New York 10019-6064
23       (212) 373-3897
24
```

```
1    APPEARANCES (Continued):
2
3        MARA LEVENTHAL, ESQUIRE
4        JOSEPH HAGE AARONSON LLC
5        485 Lexington Avenue, 30th Floor
6        New York, New York 10017
7        (212) 407-1218
8
9    ON BEHALF OF PURDUE PHARMA L.P.:
10       MARK S. CHEFFO, ESQUIRE
11       DECHERT, LLP
12       Three Bryant Park
13       1095 Avenue of the Americas
14       New York, New York 10036-6797
15       (212) 698-3814
16
17   ON BEHALF OF AMERISOURCEBERGEN:
18       M. PATRICK YINGLING, ESQUIRE
19       (Remote streaming)
20       REED SMITH, LLP
21       10 South Wacker Drive, 40th Floor
22       Chicago, Illinois 60606-7507
23       (312) 207-2834
24
```

```
1    APPEARANCES (Continued):
2
3    ON BEHALF OF HBC COMPANY:
4        ROBERT BARNES, ESQUIRE (Remote streaming)
5        MARCUS & SHAPIRA, LLP
6        One Oxford Centre, 35th Floor
7        Pittsburgh, Pennsylvania 15219
8        (412) 471-3490
9
10   ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:
11       TORRYN TAYLOR, ESQUIRE (Remote streaming)
12       JUSTIN MANN, ESQUIRE (Remote streaming)
13       ROPES & GRAY, LLP
14       Three Embarcadero Center
15       San Francisco, California 94111-4006
16       (415) 315-6300
17
18   ON BEHALF OF JANSSEN PHARMACEUTICALS:
19       JEFFREY M. WHITESELL, ESQUIRE (Remote
20       Streaming)
21       TUCKER ELLIS, LLP
22       950 Main Street, Suite 1100
23       Cleveland, Ohio 44113
24       (216) 696-4889
```

```
1    APPEARANCES (Continued):
2
3    ON BEHALF OF DEFENDANT McKESSON CORPORATION:
4        ALEXANDRA J. WIDAS, ESQUIRE
5        COVINGTON & BURLING LLP
6        One CityCenter
7        850 Tenth Street, Northwest
8        Washington, D.C. 20001-4956
9        (202) 662-5977
10
11   ON BEHALF OF DEFENDANT ON BEHALF OF ENDO HEALTH
12   SOLUTIONS INC., ENDO PHARMACEUTICALS INC., PAR
13   PHARMACEUTICAL, INC. AND PAR PHARMACEUTICAL
14   COMPANIES, INC.:
15       JOSHUA M. DAVIS, ESQUIRE
16       ARNOLD & PORTER KAYE SCHOLER LLP
17       601 Massachusetts Avenue, Northwest
18       Washington, D.C. 20001-3743
19       (202) 942-5743
20
21
22
23
24
```

```
1    APPEARANCES (Continued):

2

3    ON BEHALF OF DEFENDANT WALMART:

4        EDWARD M. CARTER, ESQUIRE (Remote streaming)

5        JONES DAY

6        325 John H. McConnell Boulevard, Suite 600

7        Columbus, Ohio 43215-2673

8        (614) 469-3939

9

10   ON BEHALF OF DISCOUNT DRUG MART:

11       ERIC WEISS, ESQUIRE (Remote Streaming)

12       CAVITCH, FAMILO & DURKIN

13       1300 East 9th Street, 20th Floor

14       Cleveland, Ohio 44114

15       (216) 621-7860

16

17   ON BEHALF OF CARDINAL HEALTH:

18       MIRANDA PETERSEN, ESQUIRE (Remote streaming)

19       WILLIAMS & CONNOLLY LLP

20       725 Twelfth Street, N.W.

21       Washington, D.C. 20005

22       (202) 434-5107

23

24
```

```
1    APPEARANCES (Continued):

2

3    ON BEHALF OF TEVA PHARMACEUTICALS:

4        WENDY WEST FEINSTEIN, ESQUIRE (Remote

5            Streaming)

6        MORGAN LEWIS & BOCKIUS, LLP

7        One Oxford Centre, 32nd Floor

8        Pittsburgh, Pennsylvania 15219-6401

9        (412) 560-7455

10

11   ON BEHALF OF CVS HEALTH:

12       DANIEL MOYLAN, ESQUIRE (Remote streaming)

13       ZUCKERMAN SPAEDER, LLP

14       100 East Pratt Street, Suite 2440

15       Baltimore, Maryland 21202-1031

16       (410) 332-0444

17

18   ON BEHALF OF JANSSEN PHARMACEUTICALS AND JOHNSON &

19       JOHNSON:

20       RYAN SNYDER, ESQUIRE (Remote streaming)

21       O'MELVENY & MYERS, LLP

22       1999 Avenue of the Stars, 8th Floor

23       Los Angeles, California 90067

24       (310) 246-6705
```

```
1    APPEARANCES (Continued):

2

3    ON BEHALF OF ABBOTT LABORATORIES AND ABBOTT

4    LABORATORIES, INC.:

5        JOHN A. MCCAULEY, ESQUIRE (Remote streaming)

6        VENABLE LLP

7        750 East Pratt Street, Suite 900

8        Baltimore, Maryland 21202

9        (410) 244-7400

10

11   ON BEHALF OF WEST VIRGINIA BOARD OF PHARMACY:

12       JUSTIN TAYLOR, ESQUIRE (Remote streaming)

13       BAILEY & WYANT, PLLC

14       500 Virginia Street East, Suite 600

15       Charleston, West Virginia 25301

16       (304) 345-4222

17

18   ALSO PRESENT:

19       JENNA N. FORSTER (Paralegal, Motley Rice LLC)

20       KEVIN REARDON (Remote streaming)

21       DAVID EGILMAN (Remote streaming)

22       EMMA KABOLI (Paralegal, Baron & Budd)

23           (Remote streaming)

24
```

```
1    ALSO PRESENT (Continued):

2

3        GRETCHEN KEARNEY (Paralegal, Baron & Budd)

4            (Remote streaming)

5        JONATHAN JAFFE (Consultant) (Remote streaming)

6        GINA VELDMAN (Trial technician)

7        DAVID LANE (Videographer)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

## Page 240

```
 1                   C O N T E N T S
 2  EXAMINATION OF RICHARD SACKLER, M.D.        PAGE
 3      By Ms. Singer                            245
 4      By Mr. Hanly                        382, 445
 5      By Mr. Bernick                           424
 6
 7                   E X H I B I T S
 8            (Attached to transcript)
 9  SACKLER-PURDUE DEPOSITION EXHIBITS          PAGE
10  No. 34   E-mail string re Rural Area
11           Prescription Abuse, Bates PPLPC
12           018000008751 to 018000008752       246
13  No. 35   E-mail string re OXYCONTIN, Bates
14           PDD1706142047 to 1706142050         250
15  No. 36   Article from National Drug
16           Intelligence Center, OxyContin
17           Diversion and Abuse, January 2001   255
18  No. 37   E-mail string re Another "snorting
19           Oxy" message from Deja.com, Bates
20           PKY181018182                        258
21  No. 38   Letter to Medical Rehab Asso Inc.
22           from U.S. Department of Justice,
23           dated February 18, 2000, Bates
24           PKY18125/020 to 181257/021          265
```

## Page 241

```
 1            E X H I B I T S   C O N T I N U E D
 2            (Attached to transcript)
 3  SACKLER-PURDUE DEPOSITION EXHIBITS          PAGE
 4  No. 39   (Exhibit number not used.)
 5  No. 40   PowerPoint presentation entitled
 6           "Untreated pain is America's silent
 7           epidemic," Neil Irick, M.D., Bates
 8           PDD1701049451 to 1701049468         285
 9  No. 41   E-mail string re Another hit out of
10           Cincinnati on OxyContin thief, Bates
11           PPLPC042000001549 to 042000001550   268
12  No. 42   Document entitled "Protecting
13           Patients' Rights to Proper Pain
14  *        Management – New England
15           Initiative," Robin Hogen, Bates
16           PKY180277573 to 180277584           272
17  No. 43   E-mail string re Gadsden, Alabama
18           Hot Spot, Bates PKY182793862 to
19           182793864                           288
20  No. 44   Federal News Service, Capital Hill
21           Hearing, May 17, 2001, Bates
22           PDD1701611080 to 1701611082         293
23
24
```

## Page 242

```
 1            E X H I B I T S   C O N T I N U E D
 2            (Attached to transcript)
 3  SACKLER DEPOSITION EXHIBITS                 PAGE
 4  No. 45   E-mail re I suggest that we
 5           consider sending the following via
 6           E-mail, fax and regular mail
 7           Thursday                            301
 8  No. 46   Document headed "I suggest that we
 9           consider sending the following via
10           e-mail fax and regular mail
11           Thursday," Bates PPLPC04500000399   310
12  No. 47   E-mail string re I suggest that we
13           consider sending the following via
14           E-mail, fax and regular mail
15           Thursday, Bates PPLPC045000005398   316
16  No. 48   E-mail string re Potential Action
17           by the DFA to Limit Oxycodone
18           Supply                              317
19  No. 49   Telefax communication to Richard
20           Sackler from Richard Blumenthal,
21           dated 7/31/01, Bates PKY180196030
22           to 180196035                        319
23
24
```

## Page 243

```
 1            E X H I B I T S   C O N T I N U E D
 2            (Attached to transcript)
 3  SACKLER DEPOSITION EXHIBITS                 PAGE
 4  No. 50   The patient bill of rights for
 5           pain management, Bates PKY180115743
 6           to 180115754                        338
 7  No. 51   SAMHSA, Treatment Episode Data Set
 8           (TEDS), data received through
 9           11.03.10                            345
10  No. 52   E-mail re News                      356
11  No. 53   E-mail string re Unique Valentine
12           gift ideas from Chaang, Bates
13           PDD8801133516 to 8801133517         365
14  No. 54   E-mail string re How are you doing? 366
15  No. 55   United States Patent 9,101,625      372
16  No. 56   Agreed Statement of Facts, Bates
17           PDD1712900035 to 1712900053         376
18  No. 57   Infoplease web pages, 3/4/2019, on
19           Major Blizzards in the U.S.         384
20  No. 58   E-mail re oxypblms.doc, Bates
21           PDD1701789804 to 1701789805         395
22  No. 59   E-mail string re OxyContin Team
23           Meeting – Minutes, Bates
24           PDD175517G815                       402
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         E X H I B I T S   C O N T I N U E D

2              (Attached to transcript)

3   SACKLER-PURDUE DEPOSITION EXHIBITS          PAGE

4   No. 60   Phase IV OxyContin Tablets Team

5            Meeting Minutes - June 13, 1997      409

6   No. 61   United States Patent No. 7,191,219   415

7   No. 62   E-mail re CEO Considerations v4a,

8            Bates PDD9316300629 to 9316300635    421

9   No. 63   Package Insert for OxyContin

10           (Oxycodone HCl Controlled-Release)

11           Tablets, 10 mg, 20 mg, 40 mg, 80 mg,

12           160 mg                               436
```

```
13

14

15

16

17

18

19

20

21

22

23

24
```

---

```
1          P R O C E E D I N G S
           ---------------------
2

3         THE VIDEOGRAPHER:  We're now on the

4   record.  My name is David Lane, videographer for

5   Golkow Litigation Services.  Today's date is

6   March 8, 2019.  Our time is 9:37 a.m.

7         This deposition is taking place in

8   Stamford, Connecticut, in the matter of National

9   Opiate Litigation MDL.

10        Our deponent today is Dr. Richard

11  Sackler.

12        Counsel will be noted on the

13  stenographic record.  The court reporter today is

14  Leslie Todd.

15        Dr. Sackler, I just want to remind you

16  you're still under oath.

17        THE WITNESS:  Okay, thank you.

18        THE VIDEOGRAPHER:  We can begin.

19             RESUMED EXAMINATION

20  BY MS. SINGER:

21     Q   All right.  Dr. Sackler, yesterday you

22  testified that you weren't aware of any history of

23  abuse with MS Contin; is that correct?

24     A   None that I remember.
```

---

```
1      Q   So I'd like to --

2      A   Oh, until -- until years after -- opi --

3   OxyContin, I became aware of, and -- yes, I was --

4      Q   Okay.  So I was asking about MS Contin.

5      A   I don't remember.

6      Q   Okay.  So I want to show you what we're

7   marking as Exhibit 34.

8             (Sackler Exhibit No. 34 was marked

9             for identification.)

10  BY MS. SINGER:

11     Q   And I will direct you -- this is an

12  e-mail from Mark Alonfso -- I'm sorry, to Mark

13  Alfonso from Robin Hogen dated June 19, 2000.

14        Are you familiar with Mark Alfonso?  I

15  think we talked about him yesterday.

16     A   Yes.

17     Q   Okay.  And Robin -- Robin Hogen?

18     A   He was involved in public affairs,

19  public relations.

20     Q   Okay.  So I'm going to read this and ask

21  if it refreshes your recollection.  Right in the

22  middle of the e-mail.

23        "Eventually these stories will appear in

24  every state and in many counties.  When I was a
```

---

```
1   manager in the Midwest, I had everything from

2   Altoona, Pennsylvania, to North Dakota, and from

3   Canada to Texas.  I recall that I received this

4   type of news on MS Contin all the time and from

5   everywhere.  Some pharmacies would not even stock

6   MS Contin for fear that they would be robbed.  In

7   Wisconsin, Minnesota and Oklahoma, we had

8   physicians indicted for prescribing too much

9   OxyContin."

10        Do you see what I just read?

11     A   I did.

12     Q   And does that refresh your recollection

13  as to whether there was in fact abuse of

14  MS Contin?

15        MR. BERNICK:  Objection.  Lack of

16  foundation.

17        THE WITNESS:  No, it does not refresh --

18  BY MS. SINGER:

19     Q   Okay.  Do you recall --

20     A   -- my recollection.

21     Q   -- whether in 1999 Howard Udell sent you

22  and other members of the Sackler family a memo,

23  "MS Contin Abuse"?

24     A   No, I don't recall that.
```

| | |
|---|---|
| 1 | Q  Do you recall articles from Vancouver |
| 2 | newspapers about the abuse and diversion of |
| 3 | MS Contin? |
| 4 | A  No. |
| 5 | Q  And I'm sorry, let's go back to |
| 6 | Exhibit 34 for a minute. |
| 7 | A  Yes. |
| 8 | Q  Okay.  So Mark Alfonso responds to Robin |
| 9 | Hogen's -- I'm sorry, Robin Hogen abuse, and at the top of |
| 10 | the description of MS Contin abuse, and at the top of |
| 11 | the e-mail chain, he says:  "I agree, and I think |
| 12 | we're getting ready to respond to these tough |
| 13 | questions through media training." |
| 14 | Do you see what I've read? |
| 15 | A  No, I -- I don't see it. |
| 16 | Q  The very top of the page. |
| 17 | A  Oh, the top.  I'm sorry, I -- my hearing |
| 18 | failed again. |
| 19 | Q  "Getting ready to respond to these tough |
| 20 | questions through the media training that we've |
| 21 | been championing." |
| 22 | Do you see what I've read? |
| 23 | A  I see. |
| 24 | Q  And do you think that's the appropriate |

| | |
|---|---|
| 1 | response to stories of abuse of your products? |
| 2 | MR. BERNICK:  Objection.  Lack of |
| 3 | foundation. |
| 4 | THE WITNESS:  I don't recall this.  I |
| 5 | don't think I saw this e-mail.  I certainly don't |
| 6 | recall it.  I'm not on the e-mail.  I think your |
| 7 | question was, is this an appropriate response |
| 8 | to -- I don't remember the word you used. |
| 9 | BY MS. SINGER: |
| 10 | Q  To abuse of your products. |
| 11 | A  It is -- it is part of an appropriate |
| 12 | response. |
| 13 | Q  But not the full thing. |
| 14 | Never mind.  Withdrawn.  Let's move on. |
| 15 | So let's turn to -- sorry. |
| 16 | Putting aside what Purdue didn't do |
| 17 | before it launched OxyContin, which we talked |
| 18 | about yesterday, I want to talk about what you and |
| 19 | Purdue did once OxyContin was on the market. |
| 20 | When did you first learn that OxyContin |
| 21 | was being abused? |
| 22 | MR. BERNICK:  Move to strike the |
| 23 | prefatory statement. |
| 24 | THE WITNESS:  My earliest recollection |

| | |
|---|---|
| 1 | is the newspaper article that was circulated to |
| 2 | various people in 2000 -- I think it was from May |
| 3 | 2000, 2001.  But it was a very comprehensive |
| 4 | article, and it was -- it got a lot of attention |
| 5 | from a lot of people. |
| 6 | BY MS. SINGER: |
| 7 | Q  Okay.  And you said that was 2000 or |
| 8 | 2001, correct? |
| 9 | A  It's -- yes.  My recollection is not |
| 10 | absolutely clear.  It's -- but I think it was |
| 11 | 2000, but I could be wrong.  Could have been 2001. |
| 12 | Q  Okay.  Let's turn to the next one, |
| 13 | please. |
| 14 | (Sackler Exhibit No. 35 was marked |
| 15 | for identification.) |
| 16 | BY MS. SINGER: |
| 17 | Q  So Exhibit 35.  Dr. Sackler, this is an |
| 18 | e-mail from you to Dr. Robert Kaiko and others |
| 19 | dated March 11, 1997.  Correct? |
| 20 | A  I'm looking for the date. |
| 21 | Q  At the very top. |
| 22 | A  Do you want me to attend to just the |
| 23 | top? |
| 24 | Q  So right now I'm just asking if this is |

| | |
|---|---|
| 1 | an e-mail from you to Dr. Robert Kaiko. |
| 2 | A  It looks that way. |
| 3 | Q  Okay.  And if you look down -- this is a |
| 4 | subject we were discussing yesterday about the |
| 5 | question of -- as to whether to seek |
| 6 | non-controlled status for OxyContin in Germany. |
| 7 | Correct? |
| 8 | A  I don't -- I would have to read more of |
| 9 | it. |
| 10 | Q  Go ahead. |
| 11 | A  Because it's not clear from what I wrote |
| 12 | what it was about.  You're talking about the whole |
| 13 | string? |
| 14 | Q  So why don't we look at page 3. |
| 15 | A  Okay.  Thank you. |
| 16 | Q  Paragraph C at the top of the page:  "If |
| 17 | OxyContin is uncontrolled in Germany, it is highly |
| 18 | likely that it will eventually be abused there and |
| 19 | then controlled." |
| 20 | So you can see one of the topics, |
| 21 | correct, is whether OxyContin should be controlled |
| 22 | in Germany? |
| 23 | A  I do see it. |
| 24 | Q  Okay.  Turn to the previous page, |

```
 1    please, page 2.  This is a segment of the e-mail
 2    from Dr. Robert Kaiko --
 3         A    Sorry.
 4         Q    -- on April 27th, '97.  Okay?
 5         A    I'm on the wrong page.  Sorry.
 6         Q    You see in the middle of the page?  If
 7    you look at paragraph B.  Do you see where I am?
 8         A    I don't -- are you at the bottom --
 9              MR. BERNICK:  Yes.
10              THE WITNESS:  -- e-mail?
11    BY MS. SINGER:
12         Q    Paragraph B.
13         A    B.  I heard C.  I'm sorry.
14         Q    That's okay.
15              Dr. Kaiko writes to you:  "I don't
16    believe we have a sufficiently strong case to
17    argue that OxyContin has minimal/or no abuse
18    liability.  In the U.S., oxycodone-containing
19    products were once less controlled than now.
20    Abuse resulted in greater controls."
21              He goes on:  "Oxycodone-containing
22    products are still among the most abused opioids
23    in the U.S.  This information is available to
24    BIArM."  However you say that.
```

```
 1         Q    Do you see what I've just read?
 2         A    I -- I'll have to read it again, if I
 3    may.
 4              (Peruses document.)  I do.
 5         Q    So, Dr. Sackler, is that what Dr. Kaiko
 6    wrote to you in February of 1997?
 7         A    It appears to be.
 8         Q    And he goes on to write at the bottom of
 9    the page:  "Our dossier acknowledges a small
10    handful of patients," turning the page, "in our
11    research program who were suspect in terms of
12    their drug accountability.  We do not have a
13    postmarketing abuse monitoring system and database
14    from which we could conclude that diversion/abuse
15    is not occurring."
16              Have I read that accurately?
17         A    You -- you -- it looks like you read it
18    perfectly.
19         Q    And if you go to the first page of this
20    e-mail -- I'm sorry, the second page of the
21    e-mail --
22         A    Oh, second page.  I'm sorry.
23         Q    -- where you're talking.  You write:
24    "This is the first time I have heard of this
```

```
 1    idea."
 2              Do you see where I am?
 3         A    Mm-hmm.
 4         Q    And would you agree that "this idea" is
 5    the idea of seeking uncontrolled status for
 6    OxyContin in Germany?
 7              MR. BERNICK:  Are you -- you got it?
 8    It's right here.
 9              THE WITNESS:  I -- my recollection --
10    that's what I say, yes.  Okay.
11    BY MS. SINGER:
12         Q    And you ask:  "What makes us believe
13    that we can accomplish -- accomplish it?  Walter,
14    how substantially would it improve your sales?
15    Please give us a five-year projection with control
16    and without."
17              Is that what you wrote?
18         A    I did.
19         Q    And at the top of this chain, back to
20    the first page, Dr. Sackler, did you write:  "When
21    we are next together, we should talk about how
22    this idea was raised and why it failed to be
23    realized.  I thought it was a good idea if it
24    could be done."
```

```
 1              Is that what you said?
 2         A    That's what I said, yes.
 3              (Sackler Exhibit No. 36 was marked
 4              for identification.)
 5    BY MS. SINGER:
 6         Q    Okay.  So I want to turn to Exhibit 36.
 7              Exhibit 36 is a government publication.
 8    Are you familiar with the National Drug
 9    Intelligence Center?
10         A    I don't recall the National Drug
11    Intelligence Center.
12         Q    It is -- let me keep going.  It is --
13    let's look at this bulletin.  If you look towards
14    the middle of the page above the pull-out box, do
15    you see "However, 1998 DAWN ME data"?
16         A    I see this.
17         Q    Okay.  Let me read it to you.  "However,
18    1998 DAWN ME data" --
19              Do you know what DAWN data is?
20         A    I believe that this is -- I don't really
21    know what it is, but I've heard the expression.
22         Q    Does it sound right that it's the Drug
23    Abuse Warning Network?
24         A    It could be.  I don't have a
```

1   recollection of what --

2     Q   And would you --

3     A   -- the abbreviation stands for.

4     Q   Okay.  Would you agree that MA -- ME is

5  likely medical examiner?

6        Well, you know, frankly, it doesn't

7  matter.  We'll skip that.

8        "DAWN ME data reported a 93 percent

9  increase in oxycodone mentions between 1997 and

10  1998, and the number of oxycodone-related DAWN ED

11  mentions increased 32.4 percent from 1997,"

12  parens, "4,857," to 1999 (6,429)."

13        Do you see what I've just read?

14     A   I do.

15     Q   And does that reflect the fact that in

16  '97 and '98, there was an increase in reports of

17  oxycodone drug abuse events?

18        MR. BERNICK:  Objection.  Lack of

19  foundation.

20        THE WITNESS:  This is what is written on

21  this document.

22  BY MS. SINGER:

23     Q   Okay.  And let's turn the page to

24  page 2, please.

1        If you look at the bottom of the second

2  paragraph, do you see "The alcohol and drug

3  treatment staff"?

4     A   Which paragraph?  The second.

5     Q   The first paragraph on the second page.

6     A   First.  Okay.  Thank you.

7     Q   "The alcohol and drug treatment staff,"

8  do you see where I am?

9     A   No, I'm not up to you -- oh, I found it

10  now.  Thank you.

11     Q   Okay.  The drug and -- "The alcohol and

12  drug treatment staff at the Mountain Comprehensive

13  Care Center, Prestonsburg, Kentucky, reports

14  individuals who have never injected drugs are

15  using OxyContin intravenous -- intravenously, and

16  they have never seen a drug proliferate like

17  OxyContin has since May 2000.  The staff at the

18  center has over 90 cumulative years experience

19  conducting drug evaluations."

20        Have I read that accurately?

21     A   You read what I read, yes.

22     Q   Okay.  And were you --

23     A   I should have just said yes.  I'm sorry.

24     Q   -- aware of these reports, Dr. Sackler?

1     A   I have no recollection of this document.

2        (Sackler Exhibit No. 37 was marked

3        for identification.)

4  BY MS. SINGER:

5     Q   Let's go to Exhibit 37.  Exhibit 37 is

6  an e-mail from Michael Friedman to RSS and PDG.

7        Do you see at the top of the page?

8     A   I do.

9     Q   And that e-mail is dated September 21st,

10  1999, correct?

11     A   The top part of the thread, yes.

12     Q   Okay.  And if you look down the page,

13  you've been forwarded an e-mail by Mark Alfonso,

14  correct?

15     A   Looking -- did you say I had been

16  forwarded an e-mail?

17     Q   Yep.  I'm sorry.  Mark Alfonso sends it

18  to Michael Friedman, but we can skip to the bottom

19  of the page, and I want you to follow the document.

20     A   Well, I -- I'm not -- I think you said

21  it was forwarded to me, but I don't see my name

22  here.

23     Q   Okay.  But you are a recipient at the

24  top of the e-mail chain.

1     A   Ah.  I see.

2     Q   Okay.  So let's look at the message that

3  was sent on to you.

4        "BIGDOG wrote in message ... Can I get

5  them to release by chewing or dissolving?

6        "Yes, chew them with your front teeth.

7  Don't get any in your molars because some may be

8  stuck there (waste not want not).  Chew them as

9  thoroughly as you can.  Even though chewed

10  thoroughly, some of the time release effect will

11  still be present.  This is unavoidable as far as I

12  know.  I'd be interested to find out how these are

13  made time release."

14        It goes on to say:  "The best ones for

15  snorting are the 40-milligram ones cuz you're not

16  snorting lots of filler.  1/4 of a 40-milligram

17  oxy is equal to the oxy in two percs.  If you eat

18  some (well chewed, wash down with a beer) and wait

19  20 minutes and the snort some, you'll feel the

20  rush."

21        Do you see what I just read?

22     A   I -- yes, I do.

23     Q   Okay.  And that was in a message

24  forwarded to you in 1999, correct?

| | |
|---|---|
| 1 | A It appears to be. |
| 2 | Q And I want to return, I'm sorry, back to |
| 3 | exhibit -- what was the last number? |
| 4 | A Pardon? |
| 5 | MS. VELDMAN: 37. |
| 6 | BY MS. SINGER: |
| 7 | Q 37, the last one I showed you from the |
| 8 | National Drug Intelligence Center. So the last |
| 9 | exhibit. I'm sorry. |
| 10 | A Oh. Oh, the prior. |
| 11 | MR. BERNICK: It's 36. |
| 12 | MS. SINGER: 36. Thank you. |
| 13 | THE WITNESS: Okay. Okay. |
| 14 | BY MS. SINGER: |
| 15 | Q By the way, the title of this document |
| 16 | is "OxyContin Diversion and Abuse," is it not? |
| 17 | A Am I on the right article? |
| 18 | Q You are. |
| 19 | A Thank you. |
| 20 | MR. BERNICK: Right at the top. |
| 21 | THE WITNESS: Okay. It -- |
| 22 | BY MS. SINGER: |
| 23 | Q Have I read the title? |
| 24 | A -- appears to be. |

| | |
|---|---|
| 1 | Q And it's January 2001? |
| 2 | A Yes. |
| 3 | Q And I skipped over one paragraph I just |
| 4 | wanted to ask you about. Right above the box with |
| 5 | the strengths and licit and illicit prices, do you |
| 6 | see the line that starts "Unfortunately"? |
| 7 | "Unfortunately" -- |
| 8 | A I'm a slow reader, and I don't yet see |
| 9 | it. Would you give me -- |
| 10 | Q Okay. |
| 11 | A The word "Unfortunately" is in the first |
| 12 | paragraph, correct. |
| 13 | Q The last -- the first paragraph above |
| 14 | the table. |
| 15 | A Oh. Okay. Got it. |
| 16 | MR. BERNICK: Wait, wait, wait. |
| 17 | THE WITNESS: I don't see it. |
| 18 | MR. BERNICK: The first paragraph above |
| 19 | the table. There's a table on the second page. |
| 20 | MS. SINGER: That's what -- |
| 21 | THE WITNESS: Ah, I'm on the wrong page. |
| 22 | MS. SINGER: Sorry. |
| 23 | MR. BERNICK: You were looking at the |
| 24 | first page. |

| | |
|---|---|
| 1 | THE WITNESS: I'm sorry. |
| 2 | BY MS. SINGER: |
| 3 | Q "Unfortunately, many OxyContin |
| 4 | abusers" -- |
| 5 | A Let me find it. You're a fast reader. |
| 6 | Good, "unfortunately." |
| 7 | Q -- "many OxyContin abusers whose health |
| 8 | insurance will no longer pay for prescriptions and |
| 9 | who cannot afford the high street-level prices are |
| 10 | attracted to heroin. For example, in West |
| 11 | Virginia, the availability of lower cost heroin is |
| 12 | attracting many OxyContin abusers who have never |
| 13 | used heroin." |
| 14 | Have I read that correctly? |
| 15 | A You -- you read what it says. |
| 16 | Q And were you aware in the late 1990s |
| 17 | that users of OxyContin were transitioning to |
| 18 | heroin? |
| 19 | A They weren't -- it doesn't imply that |
| 20 | they were patients. The implication is they were |
| 21 | abusers. |
| 22 | Q They were OxyContin abusers -- |
| 23 | A Yes. |
| 24 | Q -- who had never used heroin -- |

| | |
|---|---|
| 1 | A Yes. |
| 2 | Q -- and were using heroin. |
| 3 | A I wasn't aware of that. |
| 4 | Q Okay. Were you aware, Dr. Sackler, that |
| 5 | sales representatives for Purdue Pharma used the |
| 6 | words, quote, "street value," "crush" or "snort" |
| 7 | more than a hundred times in call notes from 1997 |
| 8 | to 1999? |
| 9 | MR. BERNICK: Objection. Lack of |
| 10 | foundation. Assumes facts. |
| 11 | THE WITNESS: I'm trying my best. Ask |
| 12 | the question once more, please. |
| 13 | BY MS. SINGER: |
| 14 | Q Were you aware that Purdue sales |
| 15 | representatives used the word "street value," |
| 16 | "crush" or "snort" more than a hundred times in |
| 17 | call notes from 1997 to 1999? |
| 18 | MR. BERNICK: Same objections. |
| 19 | THE WITNESS: I wasn't -- I don't |
| 20 | recall, but I don't think -- I don't think I was |
| 21 | aware of it. No, I'm quite sure I wasn't. |
| 22 | BY MS. SINGER: |
| 23 | Q Were you reviewing call notes during |
| 24 | this period for evidence of abuse, addiction or |

1    diversion of OxyContin.

2        A    Who's the "you"?

3        Q    You.

4        A    No, not me.

5        Q    You, who were reviewing sales forecasts

6    in such detail, weren't looking for evidence that

7    your product was being abused or diverted?

8            MR. BERNICK:    Move -- move to strike the

9    prefatory statement.

10   BY MS. SINGER:

11       Q    Is that correct?

12       A    That is correct, I did not read call

13   notes.

14       Q    Okay.  Let's turn to -- do you recall

15   that a U.S. Attorney in Maine, Jay McCloskey, sent

16   a letter to doctors in February 2000 about

17   OxyContin abuse in Maine?

18       A    I -- I'm aware of it now.  I'm not --

19   yes, I think the board was told that he had.

20       Q    Okay.

21           MR. SHKOLNIK:    Before you ask the next

22   question, I'm not sure if the transcript is

23   showing up right, but there's not breaks between

24   questions and answers, and some of them are

1    blending.  I don't know if that's something you

2    can fix later.

3            THE WITNESS:    Are you speaking with me,

4    sir?

5            MR. BERNICK:    No, no.

6            (A discussion was held off the record.)

7            (Sackler Exhibit No. 38 was marked

8            for identification.)

9    BY MS. SINGER:

10       Q    So I'm going to show you Exhibit 38.

11       A    Okay.

12       Q    Exhibit 38 is a letter from the U.S.

13   Department of Justice, United States Attorney,

14   District of Maine, dated February 18, 2000.

15   Correct?

16       A    February 18th, yes.

17       Q    And have you seen this letter before?

18       A    I do not recall seeing this.

19       Q    If you turn the page, it's signed by Jay

20   McCloskey, United States Attorney, is it not?

21       A    It is.

22       Q    Okay.  And on the first page, let me

23   know if I'm reading this correctly, please.

24           "I'm seeking the assistance of the

1    healthcare community in combatting an increasingly

2    serious problem in Maine.  I am referring to the

3    abuse and misuse of oxycodone, frequently

4    prescribed for valid medical reasons and dispensed

5    under the brand name of OxyContin.  There is a

6    significant abuse of a variety of drugs, but it

7    appears that oxycodone, and in particular

8    OxyContin, has become the pharmaceutical drug of

9    choice on the streets."

10           Have I read that correctly?

11       A    You read what he wrote.

12       Q    And were you aware of the U.S.

13   Attorney's concern back in February 2000?

14       A    I don't remember the -- the month and

15   day, but this was brought to my attention by the

16   law department.

17       Q    At Purdue.

18       A    At Purdue.

19       Q    And do you see the note, the handwritten

20   note on the top of this letter?

21       A    Yes.

22       Q    It reads:  "Mark, need a strategy to

23   contain this.  Robin."

24           Have you seen that before?

1        A    No, I don't recall seeing that.

2        Q    Does it surprise you that the response

3    to this letter was a strategy to contain this?

4            MR. BERNICK:    Objection.  Lack of

5    foundation.  Also to form.

6            THE WITNESS:    I read it differently.

7    It's ambiguous.  I read it that "this" refers to

8    abuse and diversion.

9    BY MS. SINGER:

10       Q    Okay.  What do you think -- at this

11   point, shouldn't Purdue have taken aggressive

12   action to address the problem of OxyContin abuse

13   and misuse in Maine?

14           MR. BERNICK:    Objection to form.  "At

15   this point," time.

16   BY MS. SINGER:

17       Q    At the time you received this letter

18   from the United States Attorney of Maine,

19   shouldn't Purdue have taken aggressive action to

20   address the serious problem of OxyContin abuse in

21   Maine?

22           MR. BERNICK:    Objection.  Lack of

23   foundation and assumes facts.

24           THE WITNESS:    I don't remember whether

```
 1    this preceded or followed the art- -- the
 2    newspaper article.  And so I can't exactly locate
 3    it in time.  But very soon a task force was
 4    formed -- was suggested and formed, and it began a
 5    process that continues to this day of dozens of
 6    interventions to try and ultimately successfully
 7    to curb the abuse of OxyContin.
 8    BY MS. SINGER:
 9         Q    Okay.  We're going to come back to this.
10    We're having another document issue.
11         A    Okay.
12         Q    So let's move on.
13              MR. BERNICK:  I think she's doing a
14    great job.
15              MS. SINGER:  She is.
16              Let's go to 70317.
17              (Counsel conferring.)
18              (Sackler Exhibit No. 41 was marked
19              for identification.)
20    BY MS. SINGER:
21         Q    All right.  Exhibit 41.
22              Are you aware that by -- certainly by
23    early 2000, OxyContin abuse was happening around
24    the country?
```

```
 1         A    I don't --
 2              MR. BERNICK:  Objection.
 3              Go ahead.
 4              THE WITNESS:  I'm sorry.
 5              MR. BERNICK:  I said objection.  Lack of
 6    foundation.
 7              THE WITNESS:  I don't recall when it had
 8    spread around the country.  So I can't locate that
 9    time.  I don't remember.
10    BY MS. SINGER:
11         Q    Okay.  Well, let's see if this e-mail
12    refreshes your recollection.  It's an e-mail to
13    you, correct, Dr. Sackler?  At the very top of the
14    page.
15         A    Oh, yes.
16         Q    An e-mail to you dated May 10th, 2000,
17    correct?
18         A    Yes.
19         Q    From Michael Friedman, correct?
20         A    Yes.
21         Q    And its subject line is "Another hit out
22    of Cincinnati on OxyContin thief."
23         A    I'm looking for the subject line.
24         Q    It's the subject right at the top.
```

```
 1         A    I'm sorry.  Oh, it's not -- it's at the
 2    bottom of the top block.  Okay.
 3         Q    That's right.
 4         A    "Another hit out of Cincinnati" --
 5         Q    So let's go to the bottom of the page.
 6    I'm going to read aloud.
 7         A    Yes.
 8         Q    Please follow with me and tell me if I'm
 9    reading this correctly.
10         A    From --
11         Q    "It seems that most of the negative news
12    regarding OxyContin tablets are out of -- out this
13    region of the country."
14              MR. BERNICK:  Bang on.  I'm sorry.  I'm
15    just trying to get the witness on the same page as
16    you, because he's flipping it around.
17              She is just reading down from this here.
18              THE WITNESS:  Okay.  Thank you.
19    BY MS. SINGER:
20         Q    I'll start again.  "It seems that most
21    of all the negative news regarding OxyContin
22    tablets are out this region of the country.  We
23    had the story out of Maine and the one from
24    Florida, but they are isolated.  The Ohio
```

```
 1    situation is almost every month.  Another hit out
 2    of Cincinnati on OxyContin thief.  Yesterday he
 3    robbed a Walgreens in Mount Carmel in Ohio.  The
 4    article mentions OxyContin by name."
 5              Have I read that accurately?
 6         A    Yes.
 7         Q    And, Dr. Sackler, back to the top of the
 8    first page, you responded to this.  And you said:
 9    "I hate this.  This will feed on itself.  Doesn't
10    this guy rob Dilaudid and other opioids?"
11         A    I see that.
12         Q    That was your response to this report of
13    abuse and diversion?
14         A    I don't remember my response as distinct
15    from the company's response.  So the answer to
16    what the company did was probably, but I don't
17    recall the date to launch many programs, both to
18    investigate, but more important to come up with
19    programs that were unprecedented to try to stop
20    OxyContin abuse.  I hate the abuse, even though it
21    was recognized by the FDA to be a risk and called
22    out in the package insert.
23         Q    So, Dr. Sackler, you talked about
24    Purdue's response and your response to the problem
```

1  of abuse.

2      So let's turn back to the document I was

3  looking for before.

4      A   Oh.

5      (Sackler Exhibit No. 42 was marked

6      for identification.)

7  BY MS. SINGER:

8      Q   Exhibit 42.  This is a PowerPoint called

9  "Protecting Patients' Rights to Proper Pain

10  Management - New England Initiative.  Strategic

11  and Tactical Plan for Supporting OxyContin in

12  Maine."

13      A   I'm reading along with you.

14      Q   Okay.  And it's by Robin Hogen, who we

15  talked about earlier, correct?

16      A   Yes, it is.

17      Q   And it's dated 8/25/2000, correct?  Very

18  small type.

19      A   Mm-hmm.  Sorry.  I'm looking for the

20  date.  On this page?

21      Q   Mm-hmm.  It's okay, don't worry about

22  the date.

23      A   Oh, yes, it was.

24      Q   It's microscopic.

1      A   I see it.  I can't read it, but I see

2  it.

3      Q   So here it describes the goals and

4  objectives, which are not to prevent diversion and

5  crime and death, but to sustain and increase

6  OxyContin prescriptions.  Correct?

7      MR. BERNICK:  Objection.  Move to strike

8  the prefatory statement.

9      THE WITNESS:  I'd have to read through

10  the whole document.  Is --

11  BY MS. SINGER:

12      Q   Excuse me?

13      A   I'd like to scan through the whole

14  document.

15      Q   Well, we can read through it together.

16      A   Oh, okay.

17      Q   We will read the whole thing.

18      A   Okay.  The whole document?

19      A   We are.

20      A   Okay.

21      Q   So have I read the first bullet

22  correctly?

23      "Sustain and increase OxyContin

24  prescriptions" --

1      A   Yes.

2      Q   -- "is the goal and objective" --

3      A   Yes.

4      Q   -- "of Purdue's plan."

5      A   Okay.  I --

6      Q   "Increase proactive treatment of pain."

7  Correct?

8      A   The goal and objective, as stated in

9  this document, I believe was already at a time

10  when the company was implementing plans to deal

11  with abuse and -- and addiction, misuse,

12  diversion, and so forth.

13      Q   Okay.  Well, let's see what the document

14  says.

15      A   But this document doesn't necessarily

16  say everything that's being done.

17      Q   No document ever does.

18      A   Right.

19      Q   Second bullet:  "Position OxyContin

20  as" --

21      MR. BERNICK:  And I would also move to

22  strike the statement of counsel.

23  BY MS. SINGER:

24      Q   "Position OxyContin as safe and

1  effective therapy."  Is that the second bullet?

2      A   Yes.

3      Q   "Diffuse concerns about

4  OxyContin/opioids stemming from high profile news

5  coverage and abuse."  Correct?

6      A   That's what it says.

7      Q   It goes on, "Today's situation."  I'm on

8  page 2.  "Increased media exposure of diversion

9  and abuse of OxyContin in Maine.  Numerous

10  physician inquiries about Purdue's plans to

11  address abuse issues.  Evidence of patient concern

12  and reticence to use drug."

13      Have I read that accurately?

14      A   You -- I agree you've read it

15  accurately.

16      Q   And that was a situation to which Purdue

17  was responding, correct?

18      A   This was a piece of the response.

19      Q   I didn't ask about the response, but the

20  assessment of the situation, correct?

21      A   I'm sorry?

22      Q   This was the situation to which Purdue

23  was responding.

24      MR. BERNICK:  Objection.  Lack of

1 foundation.

2 　　　THE WITNESS: The -- as I read it, it --

3 this was not a complete survey of all that was

4 being done. It was a particular subpart of a

5 program.

6 BY MS. SINGER:

7 　　　Q　Okay.

8 　　　A　I don't -- I mean, it's clear it's

9 incomplete. Okay. To me it's clear.

10 　　　Q　It -- it is interesting, Dr. Sackler,

11 what you remember clearly and what you don't, but

12 let's focus on what's on this paper.

13 　　　MR. BERNICK: Your Honor, I move to

14 strike. There's now a pattern of making these

15 statements by counsel that are not questions. I

16 move to strike them to preserve the record, but I

17 really think that it takes up time

18 unnecessarily --

19 　　　MS. SINGER: So --

20 　　　MR. BERNICK: -- and it's confusing to

21 the witness, and I would like the counsel to be

22 instructed to avoid prefatory statements that are

23 not the question itself.

24 　　　MS. SINGER: So do unresponsive answers,

1 but I'll move on.

2 　　　MR. BERNICK: Well, then, you can move

3 to strike the answer as nonresponsive.

4 BY MS. SINGER:

5 　　　Q　Then it goes on, slide 4, "How did we

6 get here?" Are you with me?

7 　　　A　I am.

8 　　　Q　"U.S. Attorney sent letter to healthcare

9 providers in Maine warning of OxyContin abuse,

10 February 18th." Correct?

11 　　　A　That's what it says.

12 　　　Q　"U.S. Attorney and local law enforcement

13 have publicized increase in abuse of OxyContin.

14 News reports contain inflammatory and unbalanced

15 language, April 2000 to present."

16 　　　A　That's what it says.

17 　　　Q　And then it goes on to show a headline

18 from the Bangor Daily News on the next page.

19 　　　A　Yes.

20 　　　Q　"Most stories have a minimum of balance

21 but contain inflammatory statements: Highly

22 addictive, heroin-like, dangerous drugs."

23 　　　Is that what it says?

24 　　　A　It does.

1 　　　Q　Are any of those adjectives untrue?

2 　　　MR. BERNICK: Objection. Lack of

3 found -- lack of foundation. And form.

4 BY MS. SINGER:

5 　　　Q　Are they true as they apply to

6 OxyContin?

7 　　　A　I don't recall the adjective "highly" in

8 the package insert.

9 　　　I don't recall the FDA saying before

10 this time, and I don't recall it after this time

11 either, "heroin-like."

12 　　　And the final thing is "dangerous drug,"

13 I don't recall that in the package insert either.

14 　　　Q　So, Dr. Sackler, I'm asking you --

15 　　　MR. BERNICK: I'm sorry. Are you done?

16 Dr. Sackler? It's --

17 　　　THE WITNESS: We -- so to the extent

18 that this statement -- two parts -- goes ahead of

19 or makes implications for readers that are not in

20 the package insert, it is not true -- necessarily

21 true. The truth of the drug is in the package

22 insert, which is decided by the FDA.

23 BY MS. SINGER:

24 　　　Q　So appreciating that response, I'm

1 asking you, Dr. Sackler, as an owner --

2 　　　A　Yes.

3 　　　Q　-- and executive of Purdue Pharma, not

4 whether you market the drugs this way, but whether

5 it is true or false that OxyContin is highly

6 addictive?

7 　　　MR. BERNICK: Objection to form.

8 　　　THE WITNESS: In isolation, it is not a

9 statement that informs fairly, because there's no

10 comparison. Lots of drugs are highly addictive.

11 BY MS. SINGER:

12 　　　Q　And is --

13 　　　A　So, unless you compare it to some other

14 drugs, I can't really subscribe to the words in

15 this newspaper article, as I've explained.

16 　　　Q　Is OxyContin like heroin in its chemical

17 composition?

18 　　　MR. BERNICK: Objection. Lack of --

19 BY MS. SINGER:

20 　　　And its impact?

21 　　　MR. BERNICK: Objection to form and

22 foundation.

23 　　　THE WITNESS: I was trying to -- I was

24 trained as a chemist, and I wouldn't call it

1 "like." The package insert does say that it is a
2 new agonist, and that for doctors would tell them
3 a lot of information.
4 BY MS. SINGER:
5     Q   Mm-hmm. So as a chemist, is OxyContin
6 similar in chemical composition to heroin?
7       MR. BERNICK: Objection. Now it's
8 asking for expert testimony.
9       Your Honor, I think this goes beyond the
10 scope. This is a fact deposition.
11       SPECIAL MASTER COHEN: He can answer if
12 he knows.
13       THE WITNESS: It's relative in -- no,
14 I -- I don't think it's heroin-like. Its
15 pharmacokinetics are different. The active
16 ingredient is very different.
17 BY MS. SINGER:
18     Q   And is it a danger- -- is OxyContin a
19 dangerous drug?
20     A   I wouldn't -- again, that's a relative
21 question. When it's used for pain patients, I
22 believe that -- appropriately used by a doctor,
23 who follows the directions, I believe the opioids
24 on the market would not be properly characterized

---

1 as dangerous drugs.
2       It's -- there's much more information
3 that you need to say it is or it isn't. There's a
4 context also. And the context in this case is, is
5 it more dangerous, less dangerous, so on and so
6 forth. And I don't know -- I -- I don't remember
7 this article.
8     Q   Okay. And --
9     A   All right.
10     Q   -- you're not comfortable --
11       MR. BERNICK: I'm sorry. You -- I
12 believe you -- you interrupted the witness.
13 BY MS. SINGER:
14     Q   I'm sorry, Dr. Sackler, were you not
15 finished?
16       THE WITNESS: Can you just read back to
17 me where I stopped?
18       (Whereupon, the requested record
19       was read.)
20       THE WITNESS: And so I cannot testify
21 that it didn't have a lot more information than is
22 in this little box. But it depends if it
23 explained how -- what the article says. I don't
24 remember it, and it's not shown here.

---

1 BY MS. SINGER:
2     Q   Right. No, and I'm not asking about the
3 article or Purdue's PowerPoint on it. I'm asking
4 you whether you are prepared to say or not that
5 OxyContin is a dangerous drug.
6       MR. BERNICK: Objection. Asked and
7 answered specifically.
8       Your Honor, I'd like a ruling on that if
9 you could.
10       SPECIAL MASTER COHEN: I think it was
11 elliptical. You can answer.
12       THE WITNESS: I don't even know what
13 that means. Could you explain it to me?
14       SPECIAL MASTER COHEN: It means you
15 should answer the question.
16       MR. BERNICK: Do you remember the
17 question?
18       THE WITNESS: Well, I think I do: Is it
19 a dangerous drug in my opinion?
20       Many drugs, including OxyContin, have
21 potential for causing harm. What the FDA does is
22 it approves some, doesn't approve others, where it
23 believes that it has been shown or the FDA knows
24 that the therapeutic benefits in the country, when

---

1 properly used according to the package insert, is
2 acceptable given whatever risks are called out in
3 the -- in the package insert. And I would submit
4 that I don't believe that it's a dangerous drug
5 for patients.
6 BY MS. SINGER:
7     Q   Okay. Let's move on to the next slide,
8 "Strategies for Fair Balance." Same page.
9       First bullet: "Assess extent of the
10 diversion and abuse problem and impact on
11 prescribing/dispensing/use." Correct?
12     A   That's what it says. I was just trying
13 to absorb it when I read it. Sorry. You didn't
14 ask me to understand it. You just asked --
15     Q   I did not.
16     A   No. So -- okay.
17     Q   All right. Let's turn to page 6, which
18 is Bates number 578.
19     A   Yes.
20     Q   So you can see the slide, "Preparation:
21 Materials Development." It's the second slide.
22     A   Oh, you want me to look at the second
23 slide?
24     Q   Yes, please.

```
 1        A    I understand.  Yes.
 2        Q    "Develop materials to support outreach
 3   efforts."
 4             Do you see where I'm reading?
 5        A    Yes.
 6        Q    And it goes on down the page:  "Key
 7   messages:  To provide fair balance on issues.
 8   Truth About Pain Management press kit."
 9             Do you see where I am?
10        A    I do.
11        Q    Do you -- are you familiar with the
12   Truth About Management press kit?
13        A    I don't recall.
14        Q    Are you aware whether Purdue
15   disseminated a publication called "The Truth About
16   Pain Management"?
17        A    No, I don't remember that.
18        Q    Okay.  Let's see if it refreshes your
19   recollection.
20        A    Are we finished with this?
21        Q    I think so.  I think so.
22        A    I'm turning them over so you don't have
23   to do what you did yesterday.
24             MR. BERNICK:  Okay.
```

```
 1             MS. SINGER:  40.
 2             (Sackler Exhibit No. 40 was marked
 3             for identification.)
 4   BY MS. SINGER:
 5        Q    Do you see this document titled "The
 6   Truth About Pain Management.  Untreated Pain is
 7   America's Silent Epidemic"?
 8        A    Yes.
 9        Q    And if you turn the page to the second
10   page, do you see the logo for Partners Against
11   Pain?
12        A    On the left-side bottom, yes.
13        Q    And are you familiar with Partners
14   Against Pain?
15        A    I -- I was aware that we had a program
16   called Partners Against Pain, yes.  So -- but was
17   I familiar with it?  Did I make -- did I see it
18   and tell people you should add anything or change
19   any text, I have no recollection of that.  So
20   "familiar" is a relative term.  I was aware that
21   there was a program with this entitled "Partners
22   Against Pain."
23        Q    And it was a program of Purdue Pharma,
24   correct?
```

```
 1        A    I can't -- Purdue Pharma, but there may
 2   have been other entities involved.  I do not
 3   remember.
 4        Q    Okay.  Let's turn to Bates number 321,
 5   please.
 6             MR. BERNICK:  Linda, in a few minutes,
 7   could we take his break?
 8             THE WITNESS:  Yeah.  I --
 9   BY MS. SINGER:
10        Q    It's the page that begins "Aren't Pain
11   Medications Addictive?"
12        A    Okay, I'm not on your page.  I'm sorry.
13   I forgot where I should look.
14             MR. BERNICK:  321.
15             THE WITNESS:  Oh.
16             MR. BERNICK:  At the top.  You got it
17   right to begin with.
18   BY MS. SINGER:
19        Q    Do you see where I am, the very top of
20   that page, "Aren't Pain Medications Addictive?"
21        A    I do.
22        Q    And if you can read along with me.
23   "Drug addiction means using a drug to get high
24   rather than to relieve pain.  You are taking the
```

```
 1   pain medication for medical purpose.  The medical
 2   purpose is clear, and the effects are beneficial,
 3   not harmful.  True addiction rarely occurs when
 4   opioids are used properly under medical
 5   supervision to relieve pain."
 6             Have I read that accurately?
 7        A    You did.
 8        Q    And that was what -- one of the pieces
 9   that Purdue distributed in Maine, correct?
10        A    I don't remember.
11        Q    Okay.
12             MS. SINGER:  All right.  We can go ahead
13   and take a break.
14             MR. BERNICK:  Thank you.
15             THE VIDEOGRAPHER:  Going off the record
16   at 10:26 a.m.
17             (Recess.)
18             THE VIDEOGRAPHER:  Back on the record at
19   10:42 a.m.
20   BY MS. SINGER:
21        Q    So, Dr. Sackler, do you remember in 2001
22   receiving an e-mail from a sales representative in
23   Gadsden, Alabama, about abuse of OxyContin there?
24        A    I don't recall.
```

```
 1              (Sackler Exhibit No. 43 was marked
 2              for identification.)
 3  BY MS. SINGER:
 4       Q    I'm showing you Exhibit 43.
 5            So this is an e-mail at the top of the
 6  chain from Russell Gasdia to a number of Purdue
 7  employees dated February 1st, 2001.
 8            If you look down towards the bottom of
 9  the page, Dr. Sackler, do you see your e-mail
10  address in the "to" line, hru; pdg; rss?
11       A    I do.
12       Q    Okay.  And if you look at the third page
13  of this document.
14       A    Oh, third -- you don't want me to read
15  this?
16       Q    No.
17       A    Okay.  So --
18       Q    So here the sales rep is describing, if
19  you look at the first full paragraph on page 3, an
20  awareness meeting at Gadsden High School.
21       A    Okay.
22       Q    See in the first sentence?
23       A    I'm sorry.  What's -- at the bottom?
24       Q    The top, the first full paragraph.
```

```
 1       A    Oh, the first one, James Lang?
 2       Q    No, on the third page.  Next page.
 3       A    Oh, I'm sorry.
 4            MR. BERNICK:  Third page.  Third full,
 5  "Such an awareness."  Right?
 6            THE WITNESS:  I'm sorry.  I want to read
 7  it.
 8            MR. BERNICK:  "Such an awareness,"
 9  Linda?
10            MS. SINGER:  Yes.
11            MR. BERNICK:  Yeah.
12            THE WITNESS:  Okay.
13  BY MS. SINGER:
14       Q    So an awareness meeting was held on
15  January 22nd at Gadsden High School.  Do you see
16  that?
17       A    I see that.
18       Q    And if you go to the middle of the
19  paragraph:  "Statements were made that OxyContin
20  sales were at the expense of dead children, and
21  the only difference between heroin and OxyContin
22  is that you can get OxyContin from a doctor."
23            Have I read that correctly?
24       A    I'm trying to find it.  I'm -- I'm a
```

```
 1  little slow.
 2            MR. BERNICK:  She's got it on the screen
 3  there --
 4            THE WITNESS:  Oh, good.
 5            MR. BERNICK:  -- if that helps you out.
 6            THE WITNESS:  Thank you.  That does help
 7  out.
 8            MR. BERNICK:  Okay.  There you go, right
 9  here (indicating).  Or you can actually --
10            THE WITNESS:  I can see it, yeah.
11            MR. BERNICK:  -- read it on the screen.
12            THE WITNESS:  This is clear enough.  I
13  can read it.  "Statements were made that
14  OxyContin" -- okay.
15  BY MS. SINGER:
16       Q    I've read that accurately?
17            MR. BERNICK:  Well --
18            THE WITNESS:  You read it accurately.  I
19  read it the same.  Yes.
20  BY MS. SINGER:
21       Q    And then turning to the first page,
22  Russell Gasdia, who was your head of sales; is
23  that correct?
24       A    I don't remember what his title was at
```

```
 1  that time.
 2       Q    But he --
 3       A    But he -- he was in the -- in the sales
 4  department and --
 5       Q    So he forwards this on to regional
 6  managers:  "Effective immediately:  Please
 7  instruct your managers and representatives to send
 8  all correspondence regarding hotspots through
 9  sales management, not to Dr. Haddox, Robin Hogen
10  or Jim Heins."  Correct?
11            MR. BERNICK:  That -- well, for the
12  sake --
13            THE WITNESS:  Yeah, let me just read.
14            MR. BERNICK:  For the sake
15  of completeness.
16            THE WITNESS:  I'm -- I'm getting to it.
17  Please, sir.
18            MS. SINGER:  So if you want to redirect
19  on any of this stuff, please go ahead.
20            MR. BERNICK:  Well, but you're -- the
21  rule of completeness generally means that if you
22  have a piece of a document and it omits a
23  significant sentence --
24            MS. SINGER:  So I really don't need you
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1    to instruct me on the law.
 2          MR. BERNICK:  Well, then, I have an
 3    objection --
 4          MS. SINGER:  Let the examination
 5    proceed.
 6          MR. BERNICK:  -- to the form of the
 7    question.
 8          THE WITNESS:  Okay.
 9    BY MS. SINGER:
10       Q    Have I read that accurately,
11    Dr. Sackler?
12       A    You read that -- that one sentence
13    accurately.
14       Q    So Purdue's response to an e-mail about
15    children who are dying from overdoses in Gadsden,
16    Alabama, was to send correspondence to sales
17    management, not to the scientific or government
18    affairs personnel.
19          MR. BERNICK:  Objection to form.
20          THE WITNESS:  Let me check the date.  By
21    this time, by February 1, 2001, my recollection is
22    that there were several, if not many, and perhaps
23    many, programs that were either in planning, that
24    is exactly how are we going to do this program,
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1    but more commonly in operation to curb the misuse
 2    of not only OxyContin but other drug --
 3    prescription drugs.
 4    BY MS. SINGER:
 5       Q    Through your sales department?
 6          MR. BERNICK:  Objection to the form of
 7    the question.
 8          THE WITNESS:  I -- I don't -- through
 9    the sales department?  I -- I don't have a clear
10    recollection.
11    BY MS. SINGER:
12       Q    Okay.
13       A    But --
14       Q    In May 2001, the issue of OxyContin
15    abuse came up at a May Congressional hearing at
16    which the DEA, Drug Enforcement Administration
17    Administrator Donnie Marshal testified.
18          Do you recall that hearing?
19       A    No.
20          (Sackler Exhibit No. 44 was marked
21          for identification.)
22    BY MS. SINGER:
23       Q    I'm showing you Exhibit 44.
24       A    Thank you.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1       Q    So if you look at this document,
 2    copyrighted May 17th, 2001, Section Capitol Hill
 3    Hearing.  Do you see that at the top?
 4       A    It --
 5       Q    And, Dr. Sackler, if you follow on the
 6    screen --
 7       A    No, no.
 8       Q    -- it may be easier for you.
 9       A    Well, I was going to say I think the
10    copyright is 2001, but the date is also --
11       Q    Fair enough.
12          MR. BERNICK:  I -- I object to the
13    instruction to follow on the screen.
14          MS. SINGER:  However the witness wants
15    to do it.
16          MR. BERNICK:  You're just picking out
17    things to highlight, and it suggests that that's
18    all he should read.
19          MS. SINGER:  So, Mr. Bernick, I'm asking
20    you again to stop the speaking objections.  It's
21    improper.
22          MR. BERNICK:  I object.  I think what
23    you're doing is improper.
24    BY MS. SINGER:
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1       Q    Dr. Sackler?
 2       A    Yes.
 3       Q    The witness here is Donnie Marshall,
 4    Administrator of the Drug Enforcement
 5    Administration; is that correct?
 6       A    Okay.  I haven't gotten to Donnie
 7    Marshall's name.
 8       Q    Under "Witness."
 9       A    Witness.  Oh, I see that, in the
10    heading.  Okay.  I was reading body copy.
11          Administrator, Drug -- yes, that's what
12    it says.
13       Q    All right.  Let's turn to the third
14    page, please.
15       A    I'm on -- this --
16       Q    It starts with "Number one."
17       A    I'm sorry?
18       Q    It starts with "Number one."
19       A    The first -- oh, you mean the beginning
20    of the thread?
21       Q    No, no, no.  I'm sorry.  Page 3, which
22    says at the top "Number one."
23       A    Yes.  Thank you.
24       Q    Okay.  Please follow along as I read.
```

1    "Number one, we're asking the company
2    do -- we're asking the company to do a more
3    balanced approach in their marketing of this drug.
4    We're asking them to educate doctors and patients
5    about the dangers of this drug.  We're asking them
6    not to advertise in such a way that gives a
7    physician, for instance, that's not well trained
8    in pain management, that gives that physician the
9    impression that this might be the painkiller of
10   first resort, rather than the painkiller of last
11   resort."
12          Have I read that correctly?
13   A      You read --
14   Q      And this is --
15   A      -- correctly.  Yes.
16   Q      Sorry.
17   A      You did.
18   Q      And just to put it in context, if we can
19   go back to page 2.
20   A      Yes.
21   Q      "We began to see this problem, I
22   think" -- under the first full paragraph.
23   A      I see it.
24   Q      -- "as a result of some developments

1    that began about four or five years ago, and what
2    we saw about four or five years ago, in 1996,
3    thereabouts, was the AMA and a number of pain
4    management groups that made the case and contended
5    that we were undertreating pain in this country or
6    that we were not effectively treating pain in this
7    country.  It was about that same time -- same time
8    that the manufacturer of OxyContin introduced
9    their product, and it's a time-released product
10   that comes in," and he goes on to describe the
11   doses.
12   A      Right.
13   Q      Okay.  So let's return to Administrator
14   Marshall's testimony on page 3.
15          MR. BERNICK:  I move to strike that
16   whole statement, which was a statement of counsel.
17          THE WITNESS:  I'm sorry.
18   BY MS. SINGER:
19   Q      Page 3.
20          MR. BERNICK:  And, Your Honor, it was
21   purely a statement of counsel.
22          SPECIAL MASTER COHEN:  All of that goes
23   to admissibility, which will be decided at a later
24   time.

1    BY MS. SINGER:
2    Q      Reading from the document at page 3.
3    A      Which paragraph?
4    Q      Second paragraph.
5    A      Okay.
6    Q      "We're asking them and others perhaps to
7    come up with what we refer to as restricted
8    distribution.  In other words, recommend that
9    doctors only prescribe and pharmacists only
10   distribute this for certain types of pain so that
11   the kidney stone patient may get a different
12   version of it, but the terminal cancer patient may
13   well get the 160 milligram oxycodol."
14   A      Oxycodol.
15   Q      I know.
16   A      Okay.
17   Q      And he goes on -- have I read this
18   accurately so far?
19   A      You've read it accurately.  And you
20   pointed out that oxycodol is a mistake in the
21   transcript or what he -- or he made a mistake.
22   Q      "We're asking that we consider
23   accreditation of doctors in pain management that
24   may prescribe this.  We're asking the industry to

1    look at the reformulation of this to take measures
2    that makes it more difficult to crush this up and
3    get all of the dosage at once.  Frankly, the
4    manufacturer of this, they have met us on some of
5    these issues.  On others, they have not met us."
6           Still accurate?
7           MR. BERNICK:  Object to form --
8           THE WITNESS:  You're reading accurately.
9    BY MS. SINGER:
10   Q      Thank you.
11          "And I have to tell you, sir, that we
12   need more cooperation from that company.  If we
13   can't find some more middle ground in this area, I
14   am seriously considering rolling back the quotas
15   that DEA sets, and rolling these -- rolling back
16   these quotas to the 1996 level until we do find
17   ways to control this.  That's a drastic step, and
18   it would be a very controversial step, because
19   there is a need -- there is the need for this
20   drug out there, but I am seriously considering
21   this."
22          Is that correct?
23   A      That's --
24          MR. BERNICK:  Object -- excuse me.

```
 1        THE WITNESS:  I'm sorry.
 2   BY MS. SINGER:
 3        Q    I'm sorry.  Have I read that accurately,
 4   Dr. Sackler?
 5        A    You have read it accurately.
 6        Q    Now, Purdue's response to this
 7   testimony, this request for change was not to
 8   make -- I'm sorry.
 9             Purdue's response to this request for
10   change was to seek to stop the rollback of the
11   quota; is that correct?
12        A    I don't --
13             MR. BERNICK:  Object -- objection.  Lack
14   of foundation.
15             Go ahead.
16             THE WITNESS:  I don't recall.  But I
17   don't think it's complete.  It was -- if it's
18   true, and I don't remember it, it was -- you know,
19   I really don't -- I don't recall if we did that.
20   BY MS. SINGER:
21        Q    Okay.
22        A    I don't recall whether they rolled back
23   the quota.
24        Q    Okay.
```

```
 1        A    Okay.
 2             (Sackler Exhibit No. 45 was marked
 3             for identification.)
 4   BY MS. SINGER:
 5        Q    I'm showing you Exhibit 45.
 6             Dr. Sackler, do you recognize this as an
 7   e-mail from you to Merle Spiegel on May 29, 2001?
 8        A    I -- it looks that way.
 9        Q    Okay.  And your e-mail states:  "Here
10   are my changes.  I look forward to discussing
11   them."  Correct?
12        A    I'm sorry.  And where did I say that?
13   I'm sorry.
14        Q    On the first page, the cover page.  Sir,
15   on the very page.  Turn back.
16        A    Okay.  Oh, I'm sorry.
17        Q    That's okay.
18        A    Yes.
19        Q    "Here are my changes.  I look forward to
20   discussing them."
21             And the subject line is "Quota letters
22   3.doc."  I'm sorry, that's the attachment.
23             The subject line is:  "I suggest that we
24   consider sending the following via e-mail, fax and
```

```
 1   regular mail Tuesday."  Correct?
 2        A    These were proposed changes that needed
 3   to be discussed.
 4        Q    Okay.  And so now turn to the next --
 5        A    At least that's what it says.  Okay.
 6        Q    Turning now to the next page, the
 7   heading is "1 - To all patients currently
 8   receiving OxyContin" --
 9        A    I'm sorry.
10        Q    -- "Tablets free of charge under our
11   Individual Patient Assistance Program, and to
12   their physicians."
13             Are you with me?
14        A    No.  I -- which paragraph should --
15        Q    The very first paragraph above the
16   "Dear."
17        A    (Reading to himself.)  Okay.
18        Q    Okay.  And then in the second paragraph:
19   "In testimony before a Congressional committee" --
20             MR. BERNICK:  I don't -- I don't think
21   that Dr. Sackler is at the right place.
22             THE WITNESS:  Yeah.
23             MR. BERNICK:  You said it's above the
24   "Dear."  It's right here is where she is talking
```

```
 1   about, right?
 2             MS. SINGER:  So, first, we read:  "To
 3   all patients currently" --
 4             MR. BERNICK:  Right.
 5             MS. SINGER:  -- "receiving OxyContin
 6   tablets."
 7             MR. BERNICK:  Right.
 8             MS. SINGER:  Now we're moving down below
 9   "Dear."  "In testimony before a Congressional
10   committee."
11             THE WITNESS:  Okay.  Hang on; slow down.
12   I'm not on "To all patients receiving OxyContin."
13   I'm on the wrong page, I guess.  What page?
14             MR. BERNICK:  Yeah, you -- no, you're --
15   it's "In testimony" -- no, you're back on the
16   wrong page.
17             THE WITNESS:  Sorry.
18             MR. BERNICK:  There you go.  So you've
19   got to need -- read this here that she said, and
20   then read that one.
21             THE WITNESS:  Oh, okay.  Thank you.
22             Okay.  And you're going to the second
23   paragraph of the "Dear" whoever.
24   BY MS. SINGER:
```

```
 1       Q     Right.  "In testimony before a
 2   Congressional committee on May 17, Donnie R.
 3   Marshall, Administrator of the Drug Enforcement
 4   Administration, said that in an effort to combat
 5   the abuse and diversion of OxyContin tablets, the
 6   DEA is seriously considering rolling back the
 7   oxycodone quotas that DEA sets and rolling back
 8   those quotas to the 1996 levels."
 9             Have I read that accurately?
10       A     I think you did.
11       Q     Okay.  And in the first numbered
12   paragraph, it says:  "In 1996, the amount of
13   oxycodone allocated to Purdue allowed" --
14       A     The first page?  I'm sorry.
15       Q     Still on the first page, first numbered
16   paragraph.
17       A     Oh, on this --
18       Q     Yep.  "In 1996, the amount of
19   oxycodone" --
20       A     Right.
21       Q     -- "allocated to Purdue allowed us to
22   supply enough OxyContin to fill approximately
23   290,000 prescriptions per year."
24             Have I read that correctly?
```

```
 1       A     You did.
 2       Q     In two -- paragraph 2:  "In 2000, the
 3   amount of oxycodone allocated to Purdue allowed us
 4   to supply enough OxyContin to fill approximately
 5   5.4 million prescriptions per year."
 6             Is that -- is that an accurate
 7   reflection of what's written there?
 8       A     You've read it correctly.
 9       Q     In paragraph 3:  "If the quota were
10   reduced, as suggested by Mr. Marshall, we would
11   not be able to supply even 95 percent of" -- I'm
12   sorry -- "supply 95 percent of the demand for
13   OxyContin.  Nineteen of every twenty patients
14   would be unable to fill their doctor's
15   prescription."
16             Have I read that accurately?
17       A     You did.
18       Q     And when you turn the page of this
19   letter --
20       A     Okay.  This draft -- I think it was a
21   draft.
22       Q     Fair enough.
23             Second paragraph:  "If the DEA were
24   to" --
```

```
 1       A     Yes.
 2       Q     Tell me if you're with me.
 3       A     I am.
 4       Q     -- "were to impose even a small
 5   restriction on Purdue's quota for oxycodone, the
 6   war on drugs would turn into a war on people in
 7   pain.  A severe shortage of supply would mean that
 8   nearly all patients in pain, including those in
 9   financial need who we have proudly served, would
10   be unable to fix their -- fill their prescriptions
11   for OxyContin tablets.  You can do something about
12   this.  Write to the DEA and the members of
13   Congress who represent you in Washington."
14             Have I read that accurately?
15       A     You did.
16       Q     Do you recall this letter?
17             MR. BERNICK:  Objection to the form.
18   BY MS. SINGER:
19       Q     That produced -- do you recall this
20   letter?
21             MR. BERNICK:  Objection to the form of
22   the question.
23             THE WITNESS:  I -- I do not recall this.
24   BY MS. SINGER:
```

```
 1       Q     On the cover page of the e-mail, you
 2   indicate:  "Here are my changes."
 3       A     Wait a minute.  I'd like to just -- I
 4   would call it a draft at this point.
 5       Q     Okay.
 6       A     Okay.
 7       Q     On the first page, you indicate:  "Here
 8   are my changes," correct, of the cover letter?
 9       A     I did.
10       Q     And the letter -- the draft letter has
11   redlines, correct, indicating edits to the letter?
12       A     If -- I'm used to seeing it in color on
13   a screen, but if you say it's redlined, fine.
14       Q     Do you have any reason to believe those
15   aren't your changes to the draft?
16       A     They appear to be my proposed changes to
17   the draft.
18       Q     Okay.  Then turning to the next page
19   that has --
20       A     That had -- that had to be discussed
21   according to the first paragraph, that we should
22   discuss.  It was -- it was ideas.
23       Q     Page 2.
24       A     Okay.
```

```
 1      Q    I'm sorry.  Number 2 is a letter to
 2  Senator -- draft letter to Senator Jesse Helms and
 3  John Edwards of North Carolina, and then the
 4  Congressmen and the Governor of North Carolina,
 5  correct?
 6      A    That's what it says.
 7      Q    And by the way, the letter is -- the
 8  draft letter on page -- two pages over is signed
 9  by James Sullivan, Vice President, Manufacturing,
10  Wilson.
11           Is that a Purdue employee?
12      A    He was then.
13      Q    Okay.  And then turn the page, please,
14  number 3, to Senators Dodd and Lieberman and the
15  Honorable Christopher Shays.
16           Do you see those names?
17      A    I do.
18      Q    And that's the Senate and Congressional
19  delegation from the State of Connecticut where
20  Purdue is based, correct?
21      A    Yes.
22      Q    And then letter 4, turning the page, is
23  to Senators Torricelli and Corzine of New Jersey,
24  and Marge --
```

```
 1      A    I'm sorry.  Bullet 4 or number 4?
 2      Q    Page -- I'm sorry, letter number 4 --
 3      A    Right.  Okay.
 4      Q    -- to Senator Torricelli, and that lists
 5  the Congressional delegation from New Jersey,
 6  correct?
 7      A    That is -- I -- I don't recognize Marge
 8  Roukema.  Torricelli, I don't remember his dates
 9  of service, but I recognize that the name does
10  associate with a senator.
11      Q    And by the way, it lists in
12  parentheses --
13      A    Pardon?
14      Q    -- Totowa.  After Congresswoman
15  Roukema's name, it lists Totowa in parentheses.
16      A    Totowa.  Yes, I see Totowa and I see
17  Princeton/Cranbury.
18      Q    And Totowa, is that where Purdue had a
19  manufacturing facility or an office?
20      A    Manufacturing, yes.
21      Q    Okay.  And then turning to letter
22  number 5 is directed to Senator Schumer and
23  Clinton of New York and the Honorable Sue Kelly,
24  the congresswoman representing Ardsley.
```

```
 1           Did Purdue also have a facility there?
 2      A    I don't recall a facility in Ardsley or
 3  in New York City.
 4      Q    Okay.  Let's turn to number 8, please.
 5  And this one is to 2,000 pain physicians.
 6      A    Okay.
 7      Q    Do you know if these letters were
 8  ultimately sent, Dr. Sackler?
 9      A    I have no recollection of the letters,
10  and no recollection -- I have no memory of whether
11  these were sent or not.
12           (Sackler Exhibit No. 46 was marked
13           for identification.)
14  BY MS. SINGER:
15      Q    Let's go to Exhibit 46, please.
16           Now, do you recognize this as a version
17  of at least a similar letter about the DEA quota?
18      A    I'd have to read it.  How much of it do
19  you want me -- are you asking me to read?  I don't
20  recognize it instantly.
21      Q    Is paragraph 1, "To all patients
22  currently receiving OxyContin Tablets under our
23  Individual Patient Assistance Program free of
24  charge because they cannot afford the drug and do
```

```
 1  not have insurance coverage, and to their
 2  physicians"?
 3      A    Okay.  That's what it says.
 4      Q    And was that what we saw previously?
 5      A    I'm sorry?
 6      Q    Was that what we saw previously --
 7      A    I don't --
 8      Q    -- in the last set of letters?
 9      A    I don't recall a letter to patients
10  receiving the drug without having to pay for it
11  and their physicians.  But...
12      Q    Do you see a comment box on this letter
13  with --
14      A    Yes.
15      Q    -- RSS1?
16      A    Yes.
17      Q    And do you believe that those reflects
18  your edits to this letter?
19      A    It says that.
20      Q    And on page 3 of this letter, do you see
21  the paragraph that says --
22      A    Page 3.  I'm sorry.  I just wanted to
23  finish reading that comment just to know what the
24  subject was to understand future questions better.
```

1    Q    Do you see the paragraph --

2    A    Okay. I'm now on page 3.

3    Q    "In such event, the Wilson plant, which

4 only recently received its DEA license to

5 manufacture OxyContin tablets, would be closed

6 immediately."

7         Do you see that paragraph?

8    A    I see that, yes. That was a comment --

9 I wrote a comment to it. But I haven't read that

10 yet.

11    Q    Okay. And then in the next paragraph,

12 there's added language underlined: "And since the

13 available data indicates the amount of abuse and

14 diversion is less than one percent of the product

15 prescribed, any DEA produced shortage in product

16 will hurt 99 patients in pain for each abuser who

17 is deprived of OxyContin tablets."

18         Do you recall writing that, Dr. Sackler?

19    A    No.

20    Q    Do you know the basis for that

21 statement?

22    A    I don't recall writing it, and I don't

23 recall what the basis -- you're asking about the

24 one percent?

---

1    Q    That's right.

2    A    I don't recall what that basis was.

3    Q    And do you know sitting here right now

4 whether there's any basis for that statistic?

5    A    I don't recall all the possible bases

6 for this statistic.

7    Q    Do you recall any possible bases for

8 this statistic?

9         MR. BERNICK: Objection. Lack of

10 foundation, assumes facts.

11         THE WITNESS: Okay. What's -- what --

12 remind me, what was the date of this document?

13 BY MS. SINGER:

14    Q    This version is undated.

15    A    Uh-huh.

16    Q    But the --

17    A    Is it part of the series?

18         MR. BERNICK: Let's see.

19         THE WITNESS: So let's see what the date

20 is.

21         MR. BERNICK: Is that not on his -- just

22 wait for her to give you a question.

23         THE WITNESS: Okay. I'm sorry.

24 BY MS. SINGER:

---

1    Q    What I'm trying to --

2         THE WITNESS: I'm trying to answer --

3         MR. BERNICK: I know, but just wait --

4 wait for the question.

5 BY MS. SINGER:

6    Q    I want to turn you to the comment on the

7 last page of this letter.

8    A    Not the comment on the first page?

9    Q    Right. On the last page, RSS5.

10    A    I'm sorry. Okay. Are you talking about

11 paragraph 5, similar letters --

12    Q    No, your comment number 5, which is the

13 second comment on that page.

14    A    Okay.

15    Q    Okay?

16    A    I don't see the five, but, okay, that's

17 my eye -- eye problem.

18    Q    And it refers to the text --

19    A    Again --

20    Q    -- sorry -- "A reduction in OxyContin

21 sales as a result of a precipitous reduction in

22 quota would likely result in staff reductions."

23         Do you see that sentence in the body of

24 the letter?

---

1    A    Yes.

2    Q    And your comment to that is again: "If

3 this becomes public, do we think that our

4 employees will understand that we don't expect the

5 reduction in quota to happen? Wouldn't it be

6 better to make the point verbally over the

7 telephone rather than in a letter, which may be

8 leaked intentionally or unintentionally? I'm sure

9 that between the three of us, we can get virtually

10 every senator and congressman we want to talk to

11 on the phone in the next 72 hours."

12         Have I read that correctly?

13    A    Yes. You did.

14    Q    Okay.

15         MR. CHEFFO: Hold on one second. I

16 think we just want to figure out, this isn't

17 Bates-stamped, but it looks like the one on the

18 screen is. So --

19         MS. SINGER: Is the Bates number?

20         MR. CHEFFO: I think the one on the

21 screen, there is one, but I just -- for the

22 record, this is a -- I can't see it -- he has one

23 without a Bates stamp on it.

24         MS. SINGER: Okay. I'm sorry about

1    that.  So the --

2            MR. CHEFFO:  No, no, I'm just pointing

3    it out for the record, so you may want to replace

4    it with one that has it.

5            MS. SINGER:  Yeah.  Okay.  And for the

6    record, the Bates number is PPLPC0 or

7    CO4500000399.

8            MR. CHEFFO:  Okay.  Thank you.

9            (Sackler Exhibit No. 47 was marked

10           for identification.)

11   BY MS. SINGER:

12       Q    So I know you need a break.  Let me get

13   one more question, and we can do it.

14       So Exhibit 47, also with a cut-off Bates

15   number that I'll read.

16           This is PPLPC045000005398.

17           Do you recognize this, Dr. Sackler, as

18   an e-mail from you to JDS?

19       A    It appears to be an e-mail from me to

20   John.  Yes.  I don't remember it, to answer your

21   question.

22       Q    And it's dated May 28th, 2001, correct?

23       A    Yes.

24       Q    And at the bottom of the e-mail chain,

---

1    also from you, under 8 -- do you see the number 8?

2        A    Yes.

3        Q    "A version of this letter should go to

4    pain physicians as well.  This is a clear attack

5    on the pain movement.  There can be no other

6    interpretation."

7            Have I read that accurately?

8        A    You did.

9        Q    And then at the top you forward it to

10   JDS and say:  "FYI, we are in the middle of a real

11   fight."

12           Have I read that correctly?

13       A    That's what it says.

14           (Sackler Exhibit No. 48 was marked

15           for identification.)

16   BY MS. SINGER:

17       Q    Dr. Sackler, this is Exhibit No. --

18           MS. SINGER:  Sorry.  What's the number

19   on that?  Mr. Bernick, do you see the exhibit

20   number?

21           MR. BERNICK:  Yeah, it's 48.

22           MS. SINGER:  Thank you.

23   BY MS. SINGER:

24       Q    Exhibit No. 48, an e-mail to Robert

---

1    Reder from Chris Neumann.

2        A    Wait just a second.

3        Q    With the subject --

4        A    Robert Reder.  Yes, I see that.

5        Q    Okay.  Subject is --

6        A    I see the name Chris Neumann, yes.

7        Q    "Subject:  Potential action by the DEA

8    to limit oxycodone supply."

9        A    That's what it says.

10       Q    "And here's the letter which sales --

11   sales administration sent out to greater than

12   2,000," quote, "thought leaders from their

13   database last Friday."

14           Correct?

15       A    I'm trying to find --

16       Q    The very first text in the letter.

17       A    Oh, from -- from Robert Reder.  "Here's

18   the letter which sales" -- okay.  That's what it

19   says.

20       Q    Do you know whether DEA ultimately

21   reduced the quota for OxyContin in 2001?

22       A    I don't remember if they did reduce it

23   or not.  They certainly didn't reduce -- I would

24   have remembered if they had reduced it by 95

---

1    percent.  So -- but I'm just inferring here.  I

2    don't recall if they did anything or if they

3    dropped it.

4            MS. SINGER:  Okay.  We can take a break.

5            MR. BERNICK:  Great.  Thank you.

6            THE VIDEOGRAPHER:  Going off the record

7    at 11:13.

8            (Pause in the proceedings.)

9            THE VIDEOGRAPHER:  We're back on the

10   record at 11:13 a.m.

11   BY MS. SINGER:

12       Q    Do you recall a letter from the

13   Connecticut Attorney General, Richard Blumenthal,

14   to you in July of 2001?

15       A    I don't recall that -- or a letter, I --

16       Q    Okay.

17           (Sackler Exhibit No. 49 was marked

18           for identification.)

19   BY MS. SINGER:

20       Q    This is Exhibit 49.  It is a fax cover

21   sheet addressed to Richard Sackler, M.D.; is that

22   correct?

23       A    Yes.

24       Q    And it's from Richard Blumenthal; is

```
 1   that correct?
 2        A    That's what it says, yes.
 3        Q    Okay.  And seeing this letter now, do
 4   you have any recollection -- you don't have to
 5   read it at this moment, but does the physical
 6   letter --
 7        A    I don't have a recollection of receiving
 8   the letter.  I have a recollection that we engaged
 9   a General Blumenthal -- I think I've addressed him
10   correctly -- through compliance and through a
11   number of departments to address his concerns.
12        Q    So reading this letter, if you can
13   follow along with me, it's dated July 31st,
14   2001 --
15        A    When I said "we," by the way, I was
16   unclear.  Purdue did that.
17        Q    It's a letter addressed to you, correct,
18   Dr. Sackler?
19        A    That is correct.
20        Q    Dated July 31st, and the letter is
21   signed on the last page by Richard Blumenthal,
22   correct?
23        A    That's what it says.
24        Q    Okay.  And on the first page, the letter
```

```
 1   reads:  "Once confined largely to a few eastern
 2   states and the Appalachian region, such problems
 3   have now spread across the country" --
 4             I'm sorry, let me go back to the
 5   previous paragraph.
 6             "As I have discussed with you and other
 7   Purdue officials, this extraordinarily powerful
 8   medicine," and that refers -- you know what,
 9   sorry, let's start at the very beginning.
10             "Dr. Sackler, I have been increasingly
11   dismayed and alarmed about the problems and
12   escalating abuse of OxyContin."
13             Are you with me?
14        A    Yes, I am.
15        Q    "As I have discussed with you and other
16   Purdue officials, this extraordinarily powerful
17   medicine promises tremendous benefits to people
18   who suffer from severe chronic pain, but it also
19   has led to widespread misuse, diversion, criminal
20   wrongdoing and related problems.  As you observed
21   in your July 18th precautionary letter, OxyContin
22   is a synthetic narcotic with an" --
23        A    Just a second.  I just lost you there.
24   Oh, there it is.  Okay.  Thank you.
```

```
 1        Q    -- "with an abuse liability similar to
 2   morphine.  Addiction is a real, present and
 3   growing danger."
 4             Have I read that accurately?
 5        A    You read what he wrote.
 6        Q    "Once confined largely to a few eastern
 7   states and the Appalachian region, such problems
 8   have now spread across the country.  Once limited
 9   to rural areas, abuse has migrated to the cities.
10   It is the drug of choice for the middle class and
11   middle-aged, along with teenagers and young
12   adults."
13             Do you recall receiving that language
14   from Attorney General Blumenthal?
15        A    I don't recall receiving that language.
16        Q    The letter goes on:  "Connecticut,
17   unfortunately, has not been spared problems
18   relating to improper use and criminal diversion of
19   the prescription drug" --
20        A    I'm sorry.  Oh, here.
21        Q    Bottom paragraph.
22        A    Go ahead.
23        Q    Then turning the page, the top of the
24   next page --
```

```
 1             MR. BERNICK:  That's --
 2             THE WITNESS:  Turn on page 3?
 3             MR. BERNICK:  I think if -- it's
 4   transcribed that he said, "I'm sorry."  The
 5   witness said, "I'm sorry."  I think that there was
 6   more to that.  If you would just make a note and
 7   check your recording, that would be great.  Thank
 8   you.  Sorry.
 9   BY MS. SINGER:
10        Q    "The serious, almost epidemic dimensions
11   of these problems are reflected in overdose deaths
12   attributed in whole or in part to OxyContin,
13   pharmacy robberies and other criminal wrongdoing
14   related to the prescription drug, and growing
15   addiction to OxyContin, whether -- whether
16   acquired illegally or prescribed."
17             Have I read that accurately?
18        A    You read it accurately.
19        Q    Then skipping down.  "A number of
20   supposed anti-abuse steps" --
21             Do you see where I am?
22        A    Yes.
23        Q    "A number of supposed anti-abuse steps
24   have been publicly touted in recent weeks,
```

```
 1   tamperproof prescription pads, for example, or
 2   educational programs for children about general
 3   prescription drug dangers.  These programs fail to
 4   address the fundamental and serious risks inherent
 5   in the drug itself, particularly its extraordinary
 6   potency and exploding availability.  Each
 7   addresses only a small source of the abuse
 8   problem.  The educational effort, for instance,
 9   deals generally with a broad array of prescription
10   drugs in only the very youngest age group,
11   ignoring the steep pitfalls of addiction and
12   misuse among adults."
13             Have I read that accurately?
14        A    You have.
15        Q    Then continuing down:  "Very bluntly,
16   initiatives must move beyond cosmetic and symbolic
17   steps to deal directly" --
18        A    Now, okay, you're moving down, but --
19   "very bluntly" -- ah, that helps me locate it.
20        Q    "Very bluntly, initiatives must move
21   beyond cosmetic and symbolic steps to deal
22   directly with alarming and growing diversion,
23   abuse, fraud, robbery, and other law-breaking
24   spawned by the present system of distribution.
```

```
 1   Purdue Pharma must overhaul and reform its
 2   marketing practices, eliminating the videos and
 3   other promotional materials aimed at persuading
 4   patients to pressure doctors into prescribing the
 5   prescription drug.  Real reform will signal that
 6   the company is sincere, as it seems to be."
 7             Have I read that accurately?
 8        A    You read the words accurately, yes.
 9        Q    So Attorney General Blumenthal goes on
10   to recommend a series of steps.
11             Do you recall --
12        A    Okay.  I --
13        Q    -- his recommendations to Purdue Pharma?
14        A    Is it on this page or should I turn
15   forward?
16        Q    You can turn the page.
17        A    Okay.
18        Q    They're under numbered headings.
19        A    Yes.  Okay.  Starting with "Centralized
20   pharmacies."
21        Q    That's correct.  So the steps Attorney
22   General Blumenthal recommended was -- first was
23   limiting availability of OxyContin to centralized
24   pharmacies.
```

```
 1             You see where I've read?
 2        A    Yes.
 3        Q    And he says:  "Initially suggested by
 4   the Drug Enforcement Administration is a viable
 5   concept to stop the spread of armed robberies of
 6   drugstores."
 7             Did Purdue take steps to limit the
 8   distribution of OxyContin to centralized
 9   pharmacies in or after 2001?
10             MR. BERNICK:  Objection.  Lack of
11   foundation.
12             THE WITNESS:  I do not recall.
13   BY MS. SINGER:
14        Q    You do not recall whether you took that
15   step?
16        A    Whether we restricted to central --
17   centralized pharmacies.
18        Q    Okay.  So what I'm going to do,
19   Dr. Sackler, is start creating a list.
20             So, centralized pharmacies is the first
21   suggestion.  Second --
22             MR. BERNICK:  Excuse me.  I -- I object.
23   This is just a display of counsel's
24   characterization.  The whole graphic is a
```

```
 1   characterization.  And I think it's inappropriate
 2   under these circumstances because he's looking at
 3   it, and he's essentially responding to it, and all
 4   of your stop signs, and -- so I have an objection
 5   to form of the question, because it's tainted by
 6   your particular display, which is argumentative.
 7   And lacks foundation.
 8             MS. SINGER:  Do you want to rule on it,
 9   Special Master Cohen?
10             SPECIAL MASTER COHEN:  You are taking
11   the chance on whether this is ever admissible.
12   You can ask him the question.
13             MS. SINGER:  Okay.  I'll do -- I'll do
14   the exhibit later.
15   BY MS. SINGER:
16        Q    Let's keep going through the list.
17             "Restricting sales to physicians with
18   specialized need and expertise to prescribe the
19   drug."
20             Do you see that as Attorney General
21   Blumenthal's second suggestion to you,
22   Dr. Sackler?
23        A    I read the words, yes.
24        Q    And do you recall whether Purdue ever
```

1  made an effort to restrict the sales of OxyContin

2  to physicians with specialized needs and expertise

3  to prescribe the drug?

4        MR. BERNICK:  Object to the form.

5        THE WITNESS:  I don't believe we sold

6  the drug to any physician directly.

7  BY MS. SINGER:

8        Q    And did you make any other effort --

9  well, we'll get to that in the next one.  Strike

10  that.

11        Number 3 is:  "Instituting a physician

12  certification program."  And it explains:  "A

13  company-sponsored training program to teach

14  physicians about the proper use of OxyContin,

15  including its attendant dangers and benefits would

16  help provide expertise.  I am not advocating more

17  seminars in Florida or Arizona to encourage more

18  OxyContin prescriptions, but rather local

19  workshops to train these physicians about the

20  limited circumstances where such prescriptions are

21  appropriate.  Following this training, the company

22  could issue a certificate to the physician that

23  attests to attendance at the training and

24  acknowledgment of OxyContin's risks.  Purdue

1  Pharma could require such certification prior to

2  selling the pharmaceutical to any physician."

3        Have I read that accurately?

4        A    You did.

5        Q    And did Purdue Pharma put in a program

6  like that?

7        A    This is a somewhat confused or confusing

8  paragraph.  So it's difficult for me to

9  understand, because I don't understand exactly

10  what General Blumenthal was getting at here.  I

11  can't really rummage my memory.

12        Q    Do you recall whether Purdue ever put in

13  place a program that would require physicians

14  prescribing OxyContin to go through any sort of

15  mandatory training before they could prescribe

16  this drug?

17        A    I don't recall, and I don't think that

18  there was any way that Purdue could have -- I

19  don't imagine there is any way that this was

20  recognized by the industry as something that was

21  doable with only -- without -- A, without the FDA;

22  and, B, only -- I can only think of one drug that

23  had a certification program and that was requested

24  by the FDA.  It was a drug for acne.  Accutane, if

1  I remember correctly.  And at one time, such a

2  program was in place because the hazard was that a

3  pregnant woman would have a seriously deformed

4  baby.  And the FDA worked out with the

5  manufacturer something that sounds like this.

6        Q    And did Purdue Pharma ever recommend a

7  program like this because of the risks of

8  addiction, abuse and diversion of OxyContin?

9        A    I don't know.

10        Q    And do you recall --

11        A    I don't recall actually.  Maybe I knew.

12  But I don't recall it.

13        Q    And then under paragraph number 4,

14  Attorney General Blumenthal in the middle of that

15  paragraph says:  "The general consensus among

16  experts is that these powerful drugs should be the

17  treatment of last resort for chronic pain.  As you

18  well know, pain management is more than simply

19  prescribing a pill.  Purdue Pharma should adopt a

20  plan that incorporates this approach to pain

21  management and requires a physician's acceptance

22  of such a contract."

23        Did Purdue Pharma ever promote the idea

24  that OxyContin was a treatment of last resort for

1  chronic pain?

2        MR. BERNICK:  Yeah, I -- I object to the

3  form of the question because you -- you --

4        MS. SINGER:  Mr. Bernick, please stop

5  the speaking objections.

6        MR. BERNICK:  Objection.

7        MS. SINGER:  Special Master Cohen.

8        SPECIAL MASTER COHEN:  What is the

9  objection to the question?

10        THE WITNESS:  So could you repeat the

11  question, please?

12  BY MS. SINGER:

13        Q    Here we go again.

14        Did Purdue Pharma put in place a program

15  that made clear to doctors that OxyContin was a

16  treatment of last resort for chronic pain?

17        MR. CHEFFO:  Object to the form.

18        THE WITNESS:  I don't recall.

19  BY MS. SINGER:

20        Q    And then the last suggestion:

21  "Treatment and rehabilitation programs.

22  Recognizing the powerful addiction dangers of

23  OxyContin, the company must devote resources to

24  treatment and rehabilitation programs,

1  particularly among population groups most
2  affected.  The company has a responsibility, legal
3  and moral, to individually -- individuals who are
4  addicted, whether they acquired the drug
5  legitimately or illicitly."
6        Do you agree with that statement,
7  Dr. Sackler?
8     A    No, I don't today agree with that
9  statement.
10    Q    "Regardless of the source of the drug,
11 they and their families must now cope with the
12 addiction, and their communities must provide for
13 their care."
14       Do you agree with that statement?
15    A    I don't recall that statement.
16    Q    Do you agree that that is the
17 appropriate -- that that is the consequence of
18 OxyContin prescriptions?
19       MR. BERNICK:  Objection to the form of
20 the question, lack of foundation.
21       THE WITNESS:  I don't agree with the
22 statement, because it's not consistent with my
23 understanding of the risk of addiction for
24 patients.  Notice here it says patients here.

1        I think it's -- at that time I think it
2  was rare and was very adequately described, if I
3  remember right, multiple times in the package
4  insert that the FDA --
5  BY MS. SINGER:
6     Q    Do you --
7     A    -- worked with us to change.
8     Q    Do you know in what year Purdue
9  ultimately disclosed the risk of iatrogenic
10 addiction to OxyContin in its package insert?
11       MR. BERNICK:  Objection to form, lack of
12 foundation.
13       THE WITNESS:  I don't recall a year.  Or
14 if that happened in fact.
15 BY MS. SINGER:
16    Q    And do you know at what time Purdue knew
17 about the risk of iatrogenic addiction to
18 OxyContin?
19    A    We -- we knew that iatrogenic addiction
20 was a known risk for all opioids.  And it was --
21 but it was not, and I don't think it is -- I think
22 it is uncommon when patients are being -- the
23 right patients are being managed by a physician.
24    Q    So Purdue always knew of the risk of

1  iatrogenic addiction, correct?
2     A    I believe there was a time that we said,
3  with the approval of the FDA -- or they suggested
4  we say, I don't know, that it was very rare.  That
5  was changed to some other words that were not
6  quite very rare.  They were different.
7        But I think when properly used, opioids,
8  all of them, carry a relatively small risk of the
9  iatrogenic addiction.
10    Q    And again --
11    A    Meaning -- meaning real patients -- let
12 me just expand -- real patients really in pain
13 that has not been adequately managed with other
14 medications, and a doctor decides, I'll have to
15 start an opioid.  And there were many to choose
16 from.
17    Q    And that is your belief today about the
18 risk of addiction to OxyContin?
19    A    That is my belief, yes.
20    Q    And that has always been your belief,
21 correct?
22       MR. BERNICK:  Objection to the form of
23 the question, lack of foundation.
24       THE WITNESS:  I can't remember if I --

1  if it was always, every day, every week, but my
2  belief is what I just stated.
3  BY MS. SINGER:
4     Q    And when -- withdrawn.
5        The last thing that Attorney General
6  Blumenthal recommends in his letters is that
7  Purdue devote a percentage of its revenue from
8  OxyContin sales to addiction treatment and
9  rehabilitation.
10       I take it that Purdue Pharma has never
11 dedicated any percent of its revenues from
12 OxyContin to addiction treatment or
13 rehabilitation; is that correct?
14       MR. BERNICK:  Objection.  Lack of
15 foundation.
16       THE WITNESS:  I don't know that I can
17 agree with that because I'm not certain it is
18 correct.
19 BY MS. SINGER:
20    Q    Do you know -- do you recall Purdue ever
21 making a contribution to deal with addiction
22 treatment?
23       MR. BERNICK:  Lack -- objection.  Lack
24 of foundation.

1         THE WITNESS:  I don't have a clue --

2  it's a very sweeping question, never.  I don't --

3  my impression is that's probably not correct.  But

4  if you were to press me and say describe when and

5  where and -- I don't know.

6  BY MS. SINGER:

7     Q  So going back to the risk of addiction,

8  if you turn to page -- it's Bates number 034, or

9  page 4, of Attorney General Blumenthal's, he has a

10  bottom paragraph:  "Finally, three other

11  points" --

12     A  Oh, sorry, let me -- page 3.  And the

13  bottom paragraph?

14     Q  Mm-hmm.

15     A  And are you at the beginning of the

16  paragraph or in the body?  Finally -- whoops, I

17  must be on the wrong page.  It says page 3 here.

18     Q  Page 4.

19     A  I'm sorry.  I apologize.  I thought you

20  said 3.

21     Q  And he refers in the middle of that last

22  paragraph to a publication, the "Patient Bill of

23  Rights for Pain Management."

24     Are you familiar with that publication?

---

1     A  I don't recall it.

2     Q  And he says:  "Specifically, I am

3  disturbed by the site's statement that addiction

4  from prescribed opioids is rare in patients

5  without a history of drug/alcohol abuse, if

6  prescribed under a physician's care.  This

7  statement is simply not true, and I have received

8  letters and phone calls from patients attesting to

9  the fact that they or family members became

10  addicted to OxyContin after it was prescribed by

11  their physician.  It must be changed."

12     Have I read that accurately?

13     A  Pardon?

14     Q  Have I read what -- what Attorney

15  General Blumenthal wrote accurately?

16     A  I'm sorry, I -- I was thinking -- I was

17  getting ahead of myself.  I'm thinking what do I

18  remember about this.  Okay.

19     I'm sorry.  Now I'm on the wrong

20  paragraph.  Which one do you want -- were you

21  reading from -- one, two or three?

22     Q  It's the final paragraph starting

23  "Specifically, I am disturbed by the site's

24  statement" --

---

1     A  Okay.  I must be on the wrong page, I

2  think.  Right?  Oh, I'm sorry.  Okay.

3     Thank you.  Yes, now I am on -- on the

4  right paragraph.

5     Q  Okay.  And do you see that Attorney

6  General Blumenthal is objecting to the

7  truthfulness of the statement that addiction from

8  prescribed opioids is rare in patients without a

9  history of drug and alcohol abuse?

10     A  I'm in the wrong paragraph.  I'm really

11  sorry.  Finally -- yeah, where is it?  It's in the

12  body of the text?

13     MR. BERNICK:  It's right there.

14     THE WITNESS:  Okay.  I finally found it.

15  "Specifically" -- okay.

16     (Peruses document.)  Okay, now I've read

17  it.

18  BY MS. SINGER:

19     Q  And I -- that is what he had written in

20  the letter.

21     A  That is what the letter says, yes.

22     (Sackler Exhibit No. 50 was marked

23     for identification.)

24  BY MS. SINGER:

---

1     Q  And do you recognize Exhibit 50?

2     A  I -- yeah, I'm sorry.

3     Q  Do you recognize Exhibit 50?  It is

4  "Patient Bill of Rights for Pain Management."

5     A  (Peruses document.)

6     Q  Do you recognize it, Dr. Sackler?

7     A  I don't recall --

8     Q  If you turn --

9     A  -- the first two pages.

10     Q  If you turn to the last page, do you see

11  Purdue Pharma -- Purdue's logo on the last page?

12     "Now that you know"?

13     Q  Excuse me.

14     A  Is the last page "Now that you know"?

15     Q  The very back cover.

16     A  Thank you.  Yes.  Of the letter, last --

17     Q  Of the --

18     A  Oh, I'm sorry.

19     Q  That's okay.

20     A  This was stapled with Richard

21  Blumenthal's letter.  Not -- so it's the page that

22  starts "Now that you know"?

23     Q  Yep.  And you see Purdue Pharma's logo,

24  correct?

1    A    Yes.

2    Q    And on Bates number 5 -- 751.

3         "Question:  Is addiction a problem in

4    patients who take opioids?  Addiction is rare in

5    patients without a history of drug and alcohol

6    abuse when taking an opioid under a doctor's

7    care."

8    A    I'm sorry.  Could you repeat the page

9    number?

10   Q    You know what, I -- I withdraw it.

11   A    Okay.  Okay.

12   Q    I want to turn you to one last line in

13   Attorney General Blumenthal's letter, on the last

14   page of the letter, page 5.

15   A    Page 5.  His fax page 5 or --

16   Q    Yes.

17   A    Okay.  Five.

18   Q    "In short" -- bottom of the second

19   paragraph.

20   A    Okay.

21   Q    -- "it is time for Purdue Pharma to

22   change its practices, not just its public

23   relations strategy."

24   A    "It is time" -- I'm -- I'm sorry, I

---

1    can't find this paragraph.  Maybe I'm on the wrong

2    page again.

3         Okay.  Thank you.  You --

4    Q    "In short, it is time for Purdue Pharma

5    to change its practices, not just its public

6    relations strategy."

7         Is that what Attorney General Blumenthal

8    wrote to you?

9    A    That's what it says, yes.

10   Q    So I want to go back, Dr. Sackler, to

11   some of the things we've covered today.  So we

12   talked about the abuse outbreak in -- the

13   OxyContin abuse outbreak in Maine.  Correct?

14   A    Yes --

15   Q    And we went through --

16   A    -- we touched on that --

17        MR. BERNICK:  Just wait.

18   BY MS. SINGER:

19   Q    -- the PowerPoint that laid out Purdue's

20   response?

21   A    I don't think I agree that it was the

22   whole response.  I --

23   Q    Do you have any recollection of specific

24   steps that Purdue took in Maine beyond what was

---

1    outlined in that PowerPoint?

2         MR. BERNICK:  Object -- objection.

3    Asked and answered.

4         THE WITNESS:  Let me think.

5         MR. BERNICK:  Go ahead.

6         THE WITNESS:  Do I have a specific

7    memory of what we did in Maine?  That's the

8    question, correct?

9         I -- I know we did dozens of

10   interventions and programs and activities that

11   were -- most of which were unprecedented and were

12   ahead of any regulator's request.  But I don't

13   have a specific memory about what -- which ones

14   were implemented in Maine or when they started.

15   So I can't say -- I have to say I don't recall.

16   BY MS. SINGER:

17   Q    So, Dr. Sackler, you testified yesterday

18   that you used your -- your requests for data and

19   your suggestions to prompt your staff to think

20   about things differently.  Correct?

21   A    When I -- yes, I -- that's correct, I

22   did that, and I would inquire about or propose

23   possible areas of innovation or ideas in the hope

24   that it would elicit from many people in the

---

1    company their ideas, yes.

2         MR. BERNICK:  Linda, we're just -- just

3    we're over an hour now, I think.

4         THE WITNESS:  Yeah, I --

5         MS. SINGER:  Okay.  I'll finish this

6    line of questioning.

7    BY MS. SINGER:

8    Q    Dr. Sackler, do you recall sending

9    e-mails to your staff to elicit areas of

10   innovation or ideas about abuse and overdose to

11   OxyContin?

12   A    I don't recall.

13   Q    And do you recall requests for meetings

14   or urgent actions to reduce abuse by certain

15   percentages or to show results in reducing the

16   abuse and overdoses from OxyContin?

17        MR. BERNICK:  Objection to form.

18        THE WITNESS:  Could you just restate the

19   question?

20   BY MS. SINGER:

21   Q    Do you recall sending requests for

22   meetings or urgent action to reduce abuse by

23   certain percentages or to show results in reducing

24   the abuse and overdoses from OxyContin?

1     MR. BERNICK:  Same objection.

2          Go ahead.

3     BY MS. SINGER:

4          Q    And your answer?

5          A    The answer is that there were many, many

6     dozens of meetings where that was the subject.  I

7     don't recall what I contributed or whether I asked

8     for the meeting about actions.

9          Q    Where is the record, Dr. Sackler, of

10    leadership you provided to Purdue's staff to

11    address the kids in Gadsden, Alabama, or in Summit

12    County or in Cuyahoga County, Ohio, who were dying

13    from OxyContin?

14         MR. BERNICK:  Objection to form.

15         THE WITNESS:  Okay.  Could you just

16    restate it?  I want to answer you precisely.

17    BY MS. SINGER:

18         Q    Yeah, I'm looking for the e-mails and

19    the questions and the record you built in leading

20    your staff to address the kids in Gadsden,

21    Alabama, and Cuyahoga County and Summit County,

22    Ohio, who were dying from OxyContin.

23         MR. BERNICK:  Objection to form.

24         THE WITNESS:  I don't -- I don't recall

1     what I wrote or whether I asked -- made a specific

2     suggestion in writing.  There were -- as I said,

3     there were many, many meetings in which this was

4     the subject that I attended.  I don't know who

5     can -- I don't recall all of the meetings.  I

6     don't recall any specific meeting that I invited

7     people to.  There well may be in the record such

8     meetings, but I can't recall.  This was 20 years

9     ago.

10    BY MS. SINGER:

11         Q    Let me ask you another set of questions

12    about that.  And then we can take a break.

13         (Sackler Exhibit No. 51 was marked

14              for identification.)

15    BY MS. SINGER:

16         Q    So, Dr. Sackler, I'm going to show you a

17    set of slides from SAMHSA, the Substance Abuse and

18    Mental Health Services Administration, the

19    Treatment Episode Data Set.

20         Are you familiar with SAMHSA TEDS data?

21         A    I don't recall if in 1999 I knew that.

22    But we had quite a number of people who were very

23    knowledgeable and who were either assigned to the

24    team to deal with -- but I don't remember knowing

1     about the opioid --

2          MR. BERNICK:  He's -- objection to --

3          MS. SINGER:  Let him finish his answer,

4     please.

5     BY MS. SINGER:

6          Q    You don't recall knowing about?

7          MR. BERNICK:  I'm sorry, I interrupted.

8     Go ahead.

9          THE WITNESS:  Okay.  Let me -- I have --

10    my recollection is the first time I heard and it

11    registered to me that there was a problem was the

12    Bangor, Maine article.  That I have a recollection

13    of, because it was -- it was new to me, and it was

14    serious.  After we -- we immediately looked for

15    verification.  The report was -- the article --

16    this is -- this is a real problem in Bangor.

17    BY MS. SINGER:

18         Q    So I'm asking you -- we saw all of those

19    e-mails yesterday about you asking for data on

20    sales force -- sales forecasts -- did you ever

21    e-mail your staff for data on abuse rates for

22    OxyContin?

23         A    I don't recall that.

24         Q    Did you ever e-mail your staff for data

1     on OxyContin overdose rates?

2          A    I don't recall that either.

3          Q    Do you ever recall asking your staff for

4     account or distribution of fatalities related to

5     OxyContin?

6          A    I -- I don't recall that.

7          Q    So I want to take a look at the SAMHSA

8     TEDS data.  I know you haven't seen it, but you

9     can look at it on the screen as well, Dr. Sackler,

10    in front of you.  So there --

11         A    This is quite clear.  Thank you.

12         Q    Okay.  So if you look at 1999, it tracks

13    primary non-heroin opioid -- opiates, synthetics

14    admission rates.  So these were admission to

15    addiction treatment programs.  I'm not asking you

16    to attest to the veracity of the data.

17         MR. BERNICK:  I move to strike the

18    statement of counsel.

19    BY MS. SINGER:

20         Q    So when you look here, red and dark red

21    is the greatest intensity of admission rates to

22    addiction treatment programs.

23         MR. BERNICK:  Your Honor, I'm going to

24    move to strike, and -- and I object to further

1  questioning on these slides.  This is simply -- I
2  have no idea what it is.  The witness --
3      SPECIAL MASTER COHEN:  Overruled.  She
4  is setting a predicate for her question.
5      Go ahead.
6  BY MS. SINGER:
7      Q    And the light colors are less intense
8  rates of admission.
9      So, Dr. Sackler, looking at this
10  chart --
11     A    I'm sorry.  You said the light --
12     Q    The light colors --
13     A    -- the lightest color.
14     Q    Are less, are fewer addiction --
15     A    Fewer.  I can't figure out what the
16  numbers are.  It's just somebody's opinion of what
17  is fewer, you know, where -- where to draw the
18  line, but I don't see where they do it.
19     Q    There's the key at the bottom that tells
20  you dark red --
21     A    It's.
22     Q    -- is 45 or more admissions per 100,000
23  people.
24     A    I didn't see the word "admissions."  I'm

1  sorry.
2      Q    That's okay.
3      A    I didn't know whether 45 -- what it
4  meant, what the units were.
5      Q    All right.  So you can see in 1999,
6  there's some red states.
7      A    Yes, I see that.
8      Q    Maine, for instance, where we talked
9  about Bangor is a dark red state.
10     A    Yes.
11         MR. BERNICK:  So I -- I'm going to
12  have -- should I just object to each one or --
13         SPECIAL MASTER COHEN:  You'll have a
14  continuing objection to this line of
15  questioning.
16         MR. BERNICK:  A continuing objection to
17  this use of information under these circumstances.
18  Lack of foundation and form.
19         Thank you, Your Honor.
20  BY MS. SINGER:
21     Q    In this slide, Dr. Sackler --
22     A    Yes.
23     Q    -- is there something that Purdue had --
24  should have done as these -- as this group of

1  states went red to change its marketing or
2  distribution of OxyContin or other opioids?
3         MR. BERNICK:  Same objections.  Form,
4  lack of foundation.
5         MS. SINGER:  You have a continuing
6  objection, Mr. Bernick.
7  BY MS. SINGER:
8      Q    Please go ahead, Dr. Sackler.
9      A    Could you repeat the question?  Is there
10  something --
11     Q    What should Purdue have done, seeing
12  this map of the country and this data about
13  addiction treatment admissions?
14         MR. BERNICK:  Well --
15         THE WITNESS:  You're asking for my
16  opinion or the company?
17         MR. BERNICK:  Excuse me.  Objection.
18  Assumes facts, "seeing this map of the country."
19  BY MS. SINGER:
20     Q    Is there something Purdue --
21     A    You're asking a hypothetical or a fact?
22     Q    I am saying --
23     A    If it's a hypothetical, I don't
24  under- -- I can't answer your question accurately

1  because I don't -- you're saying should we have
2  done something with -- this is kind of out of
3  context -- non-heroin opiates.  It doesn't say
4  OxyContin.  So I assume it's all opiates, and I
5  don't think that it's pointed to any particular
6  opiate.
7      Q    Okay.  So is there anything different
8  that Purdue -- Purdue should have done with its
9  marketing or distribution of OxyContin based on
10  this data?
11         MR. BERNICK:  Same thing.  Assumes
12  facts, no foundation.
13         MS. SINGER:  Special Master Cohen, I
14  think there's been a continuing --
15         SPECIAL MASTER COHEN:  It's fine.  Go
16  ahead.
17         THE WITNESS:  The answer is I don't
18  think this was interpretable as being any
19  particular opioid, not this map.
20  BY MS. SINGER:
21     Q    Okay.  So let's go to the next slide.
22  You can turn your page, please.
23         2001, Dr. Sackler, additional states are
24  going red with increased addiction treatment

```
 1   admissions.  Is there something different that
 2   Purdue should have done in its marketing or
 3   distribution of opioids in 2001?
 4          MR. BERNICK:  Move to strike the
 5   prefatory statement, lack of foundation, and form.
 6          THE WITNESS:  I would assume -- on this
 7   basis of this map alone, I don't think so.  But I
 8   would think that after Bangor, Maine, we were
 9   doing things to -- not because of this data, but
10   doing things because of -- of a belief that
11   OxyContin was a rising source of abuse.  This just
12   doesn't say OxyContin.
13          It includes fentanyl, which has gone on
14   to be a scourge.  And fentanyl was abused, if I
15   recall correctly, simultaneously with the abuse of
16   OxyContin, although the means of abuse that was
17   explained was somewhat different.  But it was IV
18   abuse or chewing fentanyl and absorbing it in the
19   mouth.  That's my recollection.
20   BY MS. SINGER:
21       Q   So let's go to the next slide, please.
22   You can turn your page.
23       A   Sure.
24       Q   2003, you can see more red states and
```

```
 1   darker red states.
 2          At that point, Dr. Sackler, in addition
 3   to whatever Purdue was doing, is there something
 4   more or different you should have done with the
 5   marketing and distribution of your opioids in
 6   2003?
 7          MR. BERNICK:  Again, move to strike the
 8   prefatory statement, the use of the slide, based
 9   on found-- foundation and form.
10          THE WITNESS:  What we -- I -- I think
11   this is uninterpretable.  You don't know which
12   opioids.  It doesn't say it's OxyContin.  It's --
13   my best guess is it's all non-heroin opiates, as
14   it says here, and that is uninterpretable in terms
15   of what opioid is being abused.
16          As a matter of fact, my recollection is
17   the most abused opioid was oxy -- oxycodone -- not
18   oxycodone.  Sorry.  That was a mis- --
19   hydrocodone, Vicodin, and its many generics.
20   BY MS. SINGER:
21       Q   So --
22       A   So it could have been this.  That could
23   have been Vicodin.  I don't recall that -- I don't
24   recall this chart.
```

```
 1          But your question is a hypothetical,
 2   should we have done something, and I guess the
 3   best thing to do would be to ask for clarification
 4   or seek clarification from other sources of data.
 5   So...
 6       Q   And that's what Purdue should have done.
 7       A   If -- if it had seen that, and it had
 8   said, Well, we'll see if SAMHSA will gave us a
 9   breakdown, maybe.  That's hypothetical.  So...
10       Q   Okay.  So let's keep going.  2005 -- I'm
11   sorry.  2000 -- 2005.
12       A   '05 -- '05, yeah.
13       Q   You can skip to 2007.  2007,
14   Dr. Sackler, I think virtually the whole country
15   is red.  Should Purdue have been doing something
16   more or different at this point?
17       A   We were doing --
18          MR. BERNICK:  Excuse me.  Object to
19   form.  Object to use of the slide based upon lack
20   of foundation.  Move to strike counsel's prefatory
21   statement.
22          THE WITNESS:  For seven years we were
23   doing lots of things.  Is your question should we
24   have added to what we were doing more?  We had
```

```
 1   people who were devoted to dealing with the --
 2   with the abuse of OxyContin, and by indirection,
 3   with the abuse of all opioids -- opiates.
 4          I don't know if we should have done
 5   more.  Obviously you can always add on another
 6   project, but that doesn't mean that you haven't --
 7   that anything you think of should have been done.
 8   I -- I'm just not knowledgeable enough or -- and
 9   my memory is not that clear.  But I do recall that
10   we had a dedicated team of professionals working
11   on this at that point for, my recollection is,
12   seven years.
13   BY MS. SINGER:
14       Q   And then 2009, does your answer change?
15       A   I turned it -- I'm sorry?
16       Q   2009, does that change anything about
17   what you've said previously about what Purdue
18   should have done?
19       A   No.  It still says non-heroin opioids --
20   opiates.  It doesn't help me.
21       Q   Okay.
22       A   And -- and -- and your open-ended
23   opinion question is -- it presumes I'm now
24   familiar with all the things we did do, and I'm
```

```
 1   not -- I wasn't an expert on our programs, had we
 2   covered every reasonable source of OxyContin's
 3   abuse, and we were doing lots and lots of things.
 4              (Sackler Exhibit No. 52 was marked
 5              for identification.)
 6   BY MS. SINGER:
 7        Q    Okay.  Let's move to Exhibit 52.
 8        A    Oh.  Okay.
 9             MR. BERNICK:  Can we --
10             MS. SINGER:  Then we can do a break.
11             THE WITNESS:  Pardon?  Are we breaking?
12             MS. SINGER:  We'll do one last document,
13   and then you can take a break.
14             THE WITNESS:  Thank you.  Is there going
15   to be a lunch break, Counselor?
16             SPECIAL MASTER COHEN:  Yes.
17             MS. SINGER:  Whatever.
18             THE WITNESS:  Pardon?
19             MR. BERNICK:  The answer -- the answer
20   is yes.
21             THE WITNESS:  Okay.  Okay.  I was just
22   finding out.
23   BY MS. SINGER:
24        Q    Dr. Sackler, did you get concerns from
```

```
 1   friends about the nature of what you and Purdue
 2   were doing in distributing OxyContin?
 3        A    I don't understand it.  Could you
 4   rephrase it?  Concern from friends.
 5        Q    Did friends express concern to you about
 6   the impact of OxyContin?
 7        A    I don't think -- I think this was --
 8        Q    So I'm not asking you about the
 9   document.  It's just a general question.
10        A    I don't recall.
11        Q    And I've shown you Exhibit 50.  Do you
12   recall ████████?
13        A    I do.
14        Q    And who is he?
15        A    He was a friend I talked to
16   occasionally.  He wasn't a close friend.  And he
17   was just -- for your information, at that time he
18   was working as an anesthesiologist, it says, in
19   █████.  I wouldn't have remembered that.
20        Q    Okay.  So he sent you an e-mail at your
21   ████████ e-mail address.
22        A    Right.
23        Q    Is that correct?
24        A    I didn't look -- notice the -- I don't
```

```
 1   like the word "alias."  The alternative address
 2   that went into my mailbox, yes.
 3        Q    Okay.  And this is January 19th, 2002.
 4   Correct?
 5        A    That's correct.
 6        Q    And he writes in the middle of the page:
 7   "Nothing has changed much here in ████████."
 8             Is that -- do you know where he lives or
 9   worked?
10        A    That is -- that reminded me that that
11   was where he practiced or lived or both.  I don't
12   recall.
13        Q    Okay.  In what state, do you know?
14        A    Illinois.
15        Q    Okay.  "Some items of interest include a
16   $12,000 remodeling project at the local pharmacy
17   where I got my meds.  Since this was apparently
18   not necessary coming after another recent remodel,
19   I asked them about it.  The reason, OxyContin, and
20   the need for new increased security measures.
21   Last month I got some news from ████████ youngest
22   daughter who attends" --
23        A    Let's see.  Oh, right.  Got it.
24        Q    -- "who attends an exclusive private
```

```
 1   high school.  Somebody tried to sell her OxyContin
 2   in the halls of the school.  I asked her what she
 3   shows about -- what she knew about OxyContin.  I
 4   never discussed your company, et cetera, in her
 5   presence.  Her reply:  'It's a designer drug, and
 6   sort of like heroin.'  I hate to say this, but you
 7   could become the Pablo Escobar of the new
 8   millennium."
 9             Have I read that accurately?
10        A    You did read the words --
11        Q    And getting concerns like this from a
12   friend in 2002 about a pharmacy taking security
13   measures and a -- and a high school student being
14   sold OxyContin, did that make you think you should
15   change anything?
16        A    An N of 1?  I was trained as a physician
17   and as a -- and in my statistics, an N of 1 is
18   called the index case, and it might alert you to
19   look for more, or be responsive to more.  But I was
20   trained not to chase what could be random events.
21             In this case -- so the answer to your
22   question is I don't think an N of 1 -- in this
23   case, I was -- I believe there were programs in
24   place to help pharmacies better their security,
```

1  and the -- the company was paying some of the
2  costs or all of the costs.  I don't remember.
3       So the pharmacy piece, no.  I think that
4  was -- my best recollection is that we started
5  addressing that before.  I could be wrong.  But
6  that's what I think I recollect.
7       The last month, I got -- now, let me
8  just reread what she -- he reported from his
9  daughter.
10      (Peruses document.)
11      I was very sad to see this.  But by this
12 time we knew -- that's why we put in programs
13 aimed at high school students.  We knew that there
14 was a risk that they'd be presented with
15 OxyContin, illegally presented with OxyContin.
16 And we had programs in place, I believe -- my
17 recollection is vague -- to try to mitigate this.
18      And -- okay.  The only thing here that
19 departs from my understanding, that she thought it
20 was an illicit designer drug, sort of like heroin.
21 I don't remember if I had ever seen that confusion
22 before.  I don't think it makes a difference.  She
23 thought, I guess, it was illicitly produced.
24      Q   So, Dr. Sackler, as you sit here now

---

1  today, with all of the programs Purdue did, do you
2  believe that Purdue did everything it should have
3  and could have to stop the addiction, abuse and
4  overdose to OxyContin?
5       A   Everything it should have?
6       Q   And could have done.
7       A   Different question.  So let me parse
8  it --
9       Q   Fair enough.  Did you do everything you
10 should have?
11      A   I believe we exceeded any reasonable
12 expectation framed by the history of what over the
13 years pharmaceutical companies have done to curb
14 drug abuse.  I think we went way beyond.
15      The "should have," as I've testified
16 before, with hindsight, every -- everything can be
17 improved.  But, unfortunately, none of us are
18 given a clear vision of the future, nor even
19 knowledge or conviction of the future.
20      Q   But, Dr. Sackler, it's not -- I mean
21 what we've talked about today is the requests and
22 suggestions from the DEA Administrator and the
23 Attorney General of Connecticut who laid out very
24 specific questions as the time -- at the time this

---

1  crisis was unfolding, not in hindsight.  But yet
2  you didn't -- you didn't take those steps, even
3  those that were suggested to you at the time.
4  Isn't that right?
5       A   I --
6       MR. BERNICK:  Objection to form --
7       THE WITNESS:  I don't know --
8       MR. BERNICK:  Foundation, assumes facts.
9       THE WITNESS:  I don't recall if that
10 broad statement is correct.  I -- let me explain.
11 DEA -- I didn't recognize the name, and DEA
12 administrator just tells me it's somebody who's an
13 administrator in the DEA.  Finally, we were
14 working with the DEA intensively, and I don't
15 know, but perhaps other people in the DEA gave us
16 some guidance about this testimony.  I just don't
17 know.  So, I have no recollection of that hearing
18 or the testimony.
19      And in -- in terms of Blumen- -- Dr. --
20 I shouldn't -- General Blumenthal, now Senator
21 Blumenthal, I don't have a judgment of whether we
22 should have or whether we were taking other steps
23 that would cover those issues.  I just don't
24 remember.  I don't remember if we followed any of

---

1  these or adapted them.  I don't -- I don't recall.
2  BY MS. SINGER:
3       Q   Would you agree at least that it was
4  Purdue's responsibility to take a serious look at
5  those suggestions?
6       A   I believe -- my -- we had an entire
7  professional group, compliance people, attorneys,
8  regulatory people, medical people, and
9  pharmaceutical research people, and I believe they
10 looked at those suggestions.
11      Q   And --
12      A   I -- I'm confident they did, because you
13 wouldn't ignore -- although I didn't know the
14 administrator's role and what position he had, you
15 certainly know that an Attorney General's -- and
16 I'm sure we engaged him in discussions, but I have
17 no recollection of where it led.
18      Q   And so I think you were starting to say
19 that -- that the staff you had would not have
20 ignored suggestions from the DEA or the Attorney
21 General.  Correct?
22      A   I -- we wouldn't have ignored them, but
23 it may have been contradictory in the DEA to
24 discussions we were having.  I don't know.  And if

1  they were contradictory, and if the people we were
2  working with were senior to him, I think it's less
3  likely we would have -- we might have even been
4  told, Ignore it, this is his hobby or something.
5  I don't know.  I have no recollection.
6          So I can't agree with your hypothetical.
7  I know we -- I recall we did have discussions.  I
8  didn't, but the team did, a lot of discussions
9  with General Blumenthal.
10         MS. SINGER:  Okay.  Thank you.  We can
11 take a break.
12         THE VIDEOGRAPHER:  Going off the record
13 at 12:07 p.m.
14         (Lunch recess.)
15         THE VIDEOGRAPHER:  We're back on the
16 record at 12:50 p.m.
17 BY MS. SINGER:
18    Q    Dr. Sackler, is it fair to say that you
19 have a great deal of contempt for people who abuse
20 or become addicted to opioids?
21    A    Quite the contrary.  I have thought for
22 a very long time that people who are addicted to
23 any -- any substance, whether it's alcohol or
24 opiates, their -- their lives are damaged by the

---

1  addiction itself, and they often become addicted
2  because they're in miserable circumstances.  And
3  that's my thought.  And I feel bad that there are
4  lots of miserable and/or depressed people.
5          (Sackler Exhibit No. 53 was marked
6          for identification.)
7  BY MS. SINGER:
8     Q    Let me show you Exhibit 53.
9          This is an e-mail from you to
10 ████████ and ████████ correct?
11    A    That is ████████ was his -- as
12 far as I know, his solely owned company.
13    Q    And this is the same ████████ with
14 whom you were e-mailing earlier about the Pablo
15 Escobar comparison.
16    A    I don't --
17         MR. BERNICK:  Object -- objection to the
18 form of the question.
19 BY MS. SINGER:
20    Q    He's the same ████████ you were
21 e-mailing with before.  Correct?
22    A    Same one, yes.
23    Q    Okay.  So here there's an e-mail to you
24 about -- I'm sorry.  Let's start at the top of the

---

1  chain.
2          The e-mail from you on February 1st,
3  2001, you write:  "Dear ████, thank you so much for
4  your analysis and support.  I agree 100 percent,
5  but we will have to mobilize the millions that
6  have serious pain and need our product.  This we
7  will try to do.  Meanwhile, we have to hammer on
8  the abusers in every way possible.  They are the
9  culprits and the problem.  They are the reck-- --
10 they are reckless criminals."
11         Have I read accurately what you wrote --
12    A    You have read --
13    Q    -- in February 2001?
14    A    You have read it accurately.
15         (Sackler Exhibit No. 54 was marked
16         for identification.)
17 BY MS. SINGER:
18    Q    And then let's go to Exhibit 54.
19    A    I'm sorry.
20    Q    A new exhibit, Dr. Sackler.
21    A    No more questions about this?
22    Q    No.
23    A    54.  Okay.
24    Q    Now, this is an e-mail chain between

---

1  you, Dr. Sackler, and ████████.  Is that
2  correct?
3     A    Mm-hmm.
4     Q    And it's also dated in 2001, correct?
5     A    The end of the chain timewise was 2001.
6  I haven't spotted it in everything else, but --
7     Q    Okay.  The whole e-mail is 2001,
8  correct?
9     A    Yes.
10    Q    And let's go to page 2 of this e-mail.
11 It's an e-mail from you t ████████, and you
12 say towards the bottom of the page:  "I would like
13 to try an argument on you.  I believe that the
14 media has nefariously cast the criminal drug
15 abuser" --
16    A    I'm sorry.  Is this what I wrote or what
17 he --
18    Q    It's what you wrote.
19    A    Okay.
20    Q    "I believe the" --
21         MR. BERNICK:  Wait, wait, wait.  He's in
22 a different -- she's in a different place.
23         THE WITNESS:  Oh, okay.  Sorry.  Oh,
24 okay, something from me.  So it could be this.

1 Oh, I see it. Thank you.

2 BY MS. SINGER:

3 Q Sure. "I believe that the media has

4 nefariously cast the criminal drug abuser as a

5 victim instead of victimizer. They are criminals,

6 and they engage in it with full criminal intent.

7 Why should they be entitled to our sympathies?"

8 Have I accurately read what you wrote in

9 2001?

10 A Mm-hmm.

11 MR. BERNICK: Respond orally.

12 THE WITNESS: You read it -- you read it

13 correctly.

14 BY MS. SINGER:

15 Q And then in the first page,

16 ▮▮▮▮▮▮▮ refers to you. Right under his

17 signature, he says -- I'm sorry, right above his

18 signature: "We differ mightily on this subject.

19 I'm surprised. I don't like drug abusers, but

20 their," quote, "full criminal intent," close

21 quote, "is driven not by greed or hatred but by a

22 powerful addiction. I bet any sum of money the

23 vast majority of abusers don't want to be

24 addicts."

---

1 Have I accurately read what he wrote to

2 you?

3 A I have to -- okay. Okay.

4 Q Do you see where I'm reading,

5 Dr. Sackler?

6 A I'm -- I'm just rereading it. Okay.

7 It's very short, so --

8 Q Yes. So have I accurately read what he

9 wrote to you?

10 A We -- oh, the last paragraph.

11 Q Yes.

12 A I was reading the whole thing.

13 (Peruses document.)

14 Q Are you caught up?

15 A Yes.

16 Q Okay.

17 A You read it correctly.

18 Q And then at the top, you write back to

19 him, above your signature line: "Don't make the

20 bet. When we talk I'll tell you something that

21 will totally revise your belief that addicts don't

22 want to be addicted. It's factually untrue. They

23 get themselves addicted over and over again."

24 Have I accurately read what you wrote

---

1 there?

2 A You did.

3 Q Now, despite the lack of compassion in

4 these e-mails, you have actually sought to make

5 money off of treating addiction; is that correct?

6 MR. BERNICK: Objection. Move to strike

7 the prefatory statement.

8 THE WITNESS: Could you --

9 MR. BERNICK: A motion -- Your Honor, I

10 would like to ask you to rule on that motion.

11 SPECIAL MASTER COHEN: I'm not going to

12 strike it, but I would urge counsel to just ask a

13 question. The --

14 BY MS. SINGER:

15 Q Dr. Sack --

16 SPECIAL MASTER COHEN: -- jury

17 eventually will be making its own conclusion

18 regarding the evidence.

19 BY MS. SINGER:

20 Q Dr. Sackler, you do hold patents for

21 opioid addiction treatment drugs. Is that not

22 true?

23 A I have participated in -- I don't -- the

24 only one I remember is the buprenorphine patent

---

1 that came under scrutiny. It was filed in, I

2 think, 2000 -- somewhere in the early 2000s, about

3 10 years or more before it issued. So I didn't --

4 when I first saw it, I didn't remember it, but I

5 did read about it.

6 Q Okay.

7 A And at that time the company was -- came

8 up with a project, and my contribution was the

9 idea of the fast-dissolving wafer, and I shared it

10 as I -- as was something I did many times. And

11 the company liked the idea, but -- but I have

12 extolled after this surfaced in the media, to the

13 fact we didn't -- the company did not develop it.

14 MR. BERNICK: What?

15 THE VIDEOGRAPHER: There's nothing up.

16 MR. BERNICK: No?

17 MS. SINGER: I'm sorry?

18 THE VIDEOGRAPHER: I'm saying there is

19 nothing up.

20 MS. SINGER: Okay.

21 THE WITNESS: Okay.

22 MR. BERNICK: I'm talking about the

23 live --

24 MS. SINGER: Do we need to go off the

1 record, because we're burning time?

2          MR. BERNICK:  Oh, I'm sorry.

3          MS. SINGER:  That's okay.

4          MR. BERNICK:  Sorry.

5          (Sackler Exhibit No. 55 was marked

6          for identification.)

7 BY MS. SINGER:

8      Q    Then I'm going to show you Exhibit 55,

9 Dr. Sackler.

10         Do you recognize this as a patent you

11 hold for buprenorphine?

12     A    I don't hold it.

13     Q    I'm sorry, you're right.  You're one of

14 the inventors?

15     A    I'm one of the inventors.  One of the --

16 one, two, three, four, five -- six, yes.

17     Q    Okay.  And let's turn to page 625 B2.

18     A    Here, 625?

19     Q    Yep.

20     A    Oh, I found that in the top.

21     Q    It's column number 1.

22     A    Yeah, B2.  Yes.

23     Q    Okay.  Column 1.  Do you see "Background

24 of the invention"?  So 625 B2.

1      A    Background -- I'm a slow reader.  I'm

2 sorry.

3      Q    That's okay.

4      A    On this column, I don't see it.  So I

5 need some help.  What is the background?

6      Q    Do you see -- I'm on this page.

7      A    On the right side?  Oh, I was on the --

8      Q    On this page.

9      A    Oh, okay.  This page.  This page

10 (indicating)?

11         MR. BERNICK:  Over -- yeah, whatever.

12 BY MS. SINGER:

13     Q    No, one more.

14     A    Thank you.

15     Q    Here, I'm going to give it to you and

16 point in the right direction.

17     A    Mm-hmm.  Thank you.

18     Q    This page.

19     A    That page.  Okay.  Okay, thank you.

20     Q    You get.

21         Under the column, "Background of the

22 invention" --

23     A    Yes.

24     Q    -- third paragraph:  "While opioids have

1 always been known" -- do you see where I am?

2      A    Mm-hmm.

3      Q    "While opioids have always been known to

4 be useful in pain treatment, they also display an

5 addictive potential in view of their euphorigenic

6 activity.  Thus, if opioids are taken by healthy

7 human subjects with a drug-seeking behavior, they

8 may lead to psychological as well as physical

9 dependence."

10         Have I read that accurately?

11     A    I think you have.

12     Q    Okay.  We'll move on from that one.

13         Do you recall who currently holds these

14 patents -- I'm sorry, this patent?

15     A    A company, but I don't know which

16 company holds it.

17     Q    And -- never mind.  Let's turn now to --

18 sorry.  Withdrawn too.

19         Now, you said earlier that Purdue did

20 everything it should have to address abuse of its

21 opioid products.

22         Have I characterized that correctly?

23 Perhaps more than it should have.

24     A    I think that's close to what I tried to

1 communicate, yes.

2      Q    Isn't it a fact, Dr. Sackler, that in

3 2007, Purdue Frederick pled guilty for unlawful

4 marketing that encouraged the overuse and misuse

5 of OxyContin?

6          MR. BERNICK:  Objection to the

7 characterization, assumes facts, and lack of

8 foundation.

9          THE WITNESS:  I -- just refresh the

10 question, please, or -- or --

11 BY MS. SINGER:

12     Q    Isn't it a fact, Dr. Sackler, that in

13 2007, Purdue Frederick pled guilty for unlawful

14 marketing that encouraged the overuse and misuse

15 of OxyContin?

16     A    I --

17         MR. BERNICK:  Lack of foundation,

18 assumes facts.

19         THE WITNESS:  The -- I don't remember

20 the plea well enough.  I remember that we pleaded

21 guilty -- the company pleaded guilty.  I remember

22 that there were departures on the part of some

23 salespeople from the package insert that we

24 accepted was wrong and sanctionable.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            I don't remember, I'm sorry, the last
 2   phrase you appended to it.  That I don't recall.
 3   BY MS. SINGER:
 4       Q    Okay.  Isn't it a fact, Dr. Sackler,
 5   that the company paid $600 million for its
 6   violations of the law?
 7       A    I don't remember the precise amount, but
 8   I don't contradict what you've said.  It could
 9   have been that.
10       Q    And that the CEO, general counsel and
11   chief scientific officer personally pled guilty as
12   well?
13       A    Yes.
14       Q    And are you familiar with the Agreed
15   Statement of Facts that Purdue -- Purdue signed in
16   the course of this plea?
17       A    I am -- I wouldn't use the word
18   "familiar."  I haven't committed it to memory.
19   But if you have some questions on it, I'll answer
20   that.
21            (Sackler Exhibit No. 56 was marked
22            for identification.)
23   BY MS. SINGER:
24       Q    So I'm going to show you -- I'm sorry,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   did I cut you off?
 2       A    No, no.  That's fine.
 3       Q    -- Exhibit 56.
 4            Do you recognize 56 to be the Agreed
 5   Statement of Facts?
 6       A    I don't have, as I said, a clear
 7   recollection, but I will accept that if you tell
 8   me it is, I have no reason to contradict you.
 9       Q    Okay.  Let's turn to page 4 --
10       A    Four.
11       Q    -- which is Bates number 038.
12       A    Okay.
13       Q    Paragraph 14.
14       A    Yes, I'm there with you.
15       Q    The first sentence of that paragraph.
16   Isn't it a fact that the NDA, the new drug
17   application, did not claim that OxyContin was
18   safer or more effective than immediate release
19   oxycodone or other pain medications, and Purdue
20   did not have and did not provide the FDA with any
21   clinical studies demonstrating that OxyContin was
22   less addictive, less subject to abuse and
23   diversion, or less likely to cause tolerance and
24   withdrawal than other pain medications?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A    Now, your question, the operative word
 2   of your question is -- is it true that this is
 3   true?
 4       Q    That that's what Purdue Frederick did.
 5       A    I can't testify that Purdue Frederick
 6   did this, but I certainly understand that that is
 7   what they -- this was included in the -- in the
 8   agreement, and we were told that we can't really
 9   deny it.  But I have no reason to deny it because
10   I don't have a detailed understanding of who did
11   what.  So --
12       Q    And did --
13       A    -- the answer to your question, which is
14   what you're looking for, is I will take this as
15   true.  I don't remember it well enough to validate
16   that answer, but I -- given what I just said,
17   let's move on.  Yes, that's --
18       Q    Let's move on?
19       A    Well, let's -- well, let's move on.  I'm
20   not -- I'm trying to be helpful to you, as helpful
21   as I can be --
22       Q    I appreciate that.
23       A    -- and be precise.
24
```

Highly Confidential - Subject to Further Confidentiality Review



```
22   BY MS. SINGER:
23       Q    Let's move to paragraph 19.
24            MR. BERNICK:  It was disclosed without
```

1    the corporate or individual intent to waive.

2    BY MS. SINGER:

3        Q    Paragraph 19, Dr. Sackler, on the next

4    page, "Misbranding of OxyContin."

5        A    Yes.

6        Q    I'm sorry.  Let's move to paragraph 20

7    on the following page.  Page number 6 of 16, Bates

8    number 040.

9        A    Yes.

10       Q    Isn't it true that Purdue trained sales

11   representatives and told some healthcare providers

12   that it was more difficult to extract the

13   oxycodone from an OxyContin tablet for the purpose

14   of intravenous abuse, although Purdue's own study

15   showed that a drug abuser could extract

16   approximately 68 percent of the oxycodone from a

17   single 10 milligram OxyContin tablet by crushing

18   the tablet, stirring it in water, and drawing the

19   solution through cotton into a syringe?

20           MR. BERNICK:  Objection.  Lack of

21   foundation.

22   BY MS. SINGER:

23       Q    Did you acknowledge that as true,

24   Dr. Sackler?

---

1        A    I was told, as I said --

2            MR. BERNICK:  No.

3            MR. CHEFFO:  I'm going to --

4            THE WITNESS:  Okay.

5            MR. BERNICK:  Yeah, this is --

6            THE WITNESS:  I can't --

7            MR. BERNICK:  You can't talk about what

8    was --

9            THE WITNESS:  Okay.  I don't know the

10   answer -- I can't validate that this is true or

11   not true.  I have no reason -- I don't have -- I

12   shouldn't say no reason.  I don't have a reason

13   that would cause me to contradict this.

14   BY MS. SINGER:

15       Q    Okay.  And do you have reason to

16   contradict that Purdue told sales representatives

17   they could tell healthcare providers that

18   OxyContin potentially creates less chance for

19   addiction than immediate release opioids?

20       A    I -- this entire document I did not

21   validate, so I don't know if it's true or not, but

22   I can't -- I have -- I don't have contrary

23   knowledge either.

24       Q    And, Dr. Sackler, do you not recall

---

1    whether Purdue told doctors that OxyContin didn't

2    cause a buzz or euphoria at paragraph 8?

3            MR. BERNICK:  Objection.  Lack of

4    foundation.

5    BY MS. SINGER:

6        Q    Or that it could be used to weed out

7    addicts and drug seekers?

8            MR. BERNICK:  Same objection.

9    BY MS. SINGER:

10       Q    Did Purdue acknowledge that to be true

11   in this statement of facts?

12       A    Purdue acknowledged this to be true.

13           MS. SINGER:  All right.  Can we go off

14   the record.  We're going to change questioners.

15           THE VIDEOGRAPHER:  Going off the

16   record --

17           THE WITNESS:  I'll miss you.

18           THE VIDEOGRAPHER:  -- at 1:10 p.m.

19           (Recess.)

20           THE VIDEOGRAPHER:  We are back on the

21   record at 1:14 p.m.

22                   EXAMINATION

23   BY MR. HANLY:

24       Q    Good afternoon.

---

1        A    Good afternoon.

2        Q    Dr. Sackler, you have resided in the

3    Northeast for the majority of your professional

4    career.  True?

5        A    Yes.

6        Q    In the Connecticut area, true?

7        A    Probably more in Connecticut than New

8    York, which I also resided in for a long time.

9        Q    Okay.  So as a resident of the Northeast

10   for that period of time, you, fortunately or

11   unfortunately, had experience from time to time

12   with winter blizzards.  True?

13       A    Yes.

14       Q    And we can all agree, can we not, that,

15   generally speaking, blizzards kill people,

16   animals?

17       A    I'm sorry.  Kill people?

18       Q    Yes.

19       A    I don't know if blizzards kill people.

20   I think that would be unusual, but I don't know it

21   to be the case.

22       Q    All right.  Let's mark as the next

23   exhibit --

24           MR. HANLY:  What number are we on?

```
 1        MS. CONROY:  57.
 2        (Sackler Exhibit No. 57 was marked
 3        for identification.)
 4        MR. HANLY:  No, Mr. Bernick has the
 5   exhibit.
 6        THE WITNESS:  Oh.
 7        MR. BERNICK:  He just gave us an extra
 8   copy.
 9        THE WITNESS:  Okay.
10   BY MR. HANLY:
11        Q    So Exhibit 57, for the record, is just a
12   printout that we created when we typed in to
13   Google the words "blizzard" and "kill."
14        And if you look on the second page, do
15   you see a list there by date of various blizzards,
16   stories about various blizzards that have
17   occurred?
18        MR. BERNICK:  Move to strike the
19   prefatory statement by counsel.
20   BY MR. HANLY:
21        Q    Do you see that list there, Doctor?
22        A    I see a list.
23        Q    Right.  And -- and each one of the
24   summaries starting in 1888 and ending in 2011
```

```
 1   indicates that in those blizzards folks were
 2   killed.  True?
 3        A    I'd have to read through it because I've
 4   never thought of that.  But you're asking --
 5        MR. BERNICK:  Just take -- just take
 6   your time, unless he wants to point you to
 7   something.
 8   BY MR. HANLY:
 9        Q    Well, let's -- let's look at 1996.  Do
10   you see 1996, sort of two-thirds of the way down
11   the page?
12        A    I haven't gotten to it yet.
13        Ah, yes, I do.  This is not
14   chronological.  I assumed it was.
15        Q    Yes.  And you see there it states:
16   "January 6 to 8, eastern U.S., heavy snow," et
17   cetera, and then it states 187 were killed in the
18   blizzard?
19        A    That's what it reads.
20        Q    Do you recall the Blizzard of 1996, sir?
21        A    I did.
22        Q    You were in this part of the country at
23   that time?
24        A    I was in the New York area.  Yes.
```

```
 1        Q    And you were the president of Purdue
 2   Pharma Inc. at that time?
 3        MR. BERNICK:  Objection.  Lack of
 4   foundation.
 5   BY MR. HANLY:
 6        Q    True?
 7        A    1996, I don't think so.
 8        Q    Okay.  By the way, Purdue Pharma Inc.,
 9   that's the general partner of Purdue Pharma LP,
10   true?
11        A    That's my understanding, yes.
12        Q    And Purdue Pharma Inc. had a board of
13   directors, true?
14        A    It did.
15        Q    And you sat on that board, true?
16        A    Yes.
17        Q    Now, at some point in 1996 -- withdrawn.
18        OxyContin was approved by the FDA on
19   December the 12th, 1995.  True?
20        A    I can't remember the exact date, but
21   that's approximate -- to my memory, that is
22   approximately correct.
23        Q    And a few weeks after that, there
24   occurred the Blizzard of 1996 in the early days of
```

```
 1   January 1996, true?
 2        A    Well, that's what it says here, January
 3   6 to 8.  I don't remember the days.
 4        Q    Okay.  Now, you used the Blizzard of
 5   1996 in a kind of allegorical speech that you gave
 6   to Purdue employees later in 1996, true?
 7        MR. BERNICK:  Objection to the form of
 8   the question.
 9        THE WITNESS:  I don't remember the date,
10   but that's a matter of record.
11        MR. HANLY:  Okay.  David, could you put
12   Exhibit 33 in front of him, which is the one
13   you've got right there?
14        MR. BERNICK:  Absolutely.
15        There you go.
16        THE WITNESS:  Okay.
17   BY MR. HANLY:
18        Q    Now, Exhibit 33, Doctor, is the text of
19   a speech that you apparently gave at the national
20   launch meeting.
21        That would have been the national launch
22   meeting for OxyContin, true?
23        MR. BERNICK:  The copy that's on the
24   screen doesn't match the exhibit.
```

1    THE WITNESS:  It matches this.  Oh, it
2  doesn't?  Okay.  It looks similar.
3    MR. BERNICK:  It's got handwriting on
4  it.
5    MR. HANLY:  Which one?
6    MR. BERNICK:  On the screen.
7    THE WITNESS:  Oh.  Does it?
8    MS. CONROY:  It has handwriting.
9    MR. HANLY:  Okay.  Well, let me see
10  the -- may I see the witness's?
11    Okay.  Well, we'll just substitute --
12    MR. BERNICK:  Well, why don't you use a
13  clean copy.  I think I got a clean copy for you if
14  you want to use it.
15    MR. HANLY:  Okay.  Thank you.
16    MS. CONROY:  These are Purdue's
17  writing --
18    MR. HANLY:  Yeah.  All right, that's
19  fine.
20  BY MR. HANLY:
21    Q    Now, do you see that the first two pages
22  of the document appear to be the text of a speech
23  that you gave?
24    A    Yes.

1    Q    All right.  And this begins:  "For
2  millennia, humans knew that great changes in the
3  fortunes of civilizations and enterprises are
4  heralded by cataclysms in geology and weather.
5  Eclipses, earthquakes, volcanos, hurricanes and
6  blizzards have each preceded such change --
7  changes, and each upheaval has had its
8  significance and meaning."
9    Did I read that correctly?
10    A    You did.
11    Q    And that was a part of your speech,
12  true?
13    A    Yes.
14    Q    All right.  And then it goes on, if you
15  skip down over the next paragraph to the paragraph
16  that begins "The Blizzard of '96."
17    A    All right.
18    Q    Reads:  "The Blizzard of '96, coming
19  less than four years before the change of the
20  millennium, is without doubt an omen of change."
21    Did I read that correctly?
22    A    You read what it says here.
23    Q    All right.  Now, if you turn to the
24  second page of exhibit -- of this exhibit -- do

1  you have the second page there?
2    A    (Indicating.)
3    Q    Yeah, okay.  So in the center you see
4  there's a black box with text in it.  Right?
5    A    Yes.
6    Q    Okay.  Now, what I'm interested in,
7  Doctor, is to the right of the black box, about
8  halfway down, do you see the paragraph that begins
9  "The significance of the Blizzard of '96"?
10    A    Yes.
11    Q    All right.  So I'm going to read that.
12  It says:  "The significance of the Blizzard of '96
13  is that the launch of OxyContin tablets will be
14  followed by a blizzard of prescriptions that will
15  bury the competition."
16    A    I don't see that, but --
17    Q    You don't see that?
18    MR. BERNICK:  You're not --
19    THE WITNESS:  Oh, here?
20    MR. BERNICK:  No.  No.  It's over on
21  the --
22    THE WITNESS:  On that side.  Oh, okay.
23    MR. BERNICK:  On that side, right there.
24    THE WITNESS:  Yes.  Okay.

1  BY MR. HANLY:
2    Q    Let me start -- let me start again.
3    A    Okay.
4    Q    Do you see the --
5    A    Yes, I do see -- now I see it.
6    Q    "The significance," do you see that?
7    A    "The significance of the Blizzard of
8  '96."
9    Q    All right.  So continuing --
10    A    Yes.
11    Q    -- in that paragraph, it reads in part:
12  "The launch of OxyContin tablets will be followed
13  by a blizzard of prescriptions that will bury the
14  competition.  The prescription blizzard will be so
15  deep, dense and white that you will never see
16  their white flag.  Commerce in competitive
17  products will come to a halt.  On advice of the
18  law department, let me amend that.  Commerce in
19  competitive products will come to a virtual halt."
20    Did I read that correctly?
21    A    You read it correctly.
22    Q    And that was a part of your speech, was
23  it not?
24    A    Yes.  It was in the speech.  This was --

Highly Confidential - Subject to Further Confidentiality Review

1    I'd like to add, this was an after-dinner speech.
2    And the Blizzard of '96 -- I can't remember when
3    we actually met, and I was surprised it was that
4    early, but maybe it was -- was memorable because I
5    and some other executives were on planes, more
6    than one, flying to this meeting.  When we arrived
7    at the airport, the plane -- all our flights were
8    delayed.  We waited hours and hours, and
9    eventually they closed the airports in New York.
10   I don't remember the date.
11       Q    Okay.  But you do recall giving a speech
12   in Arizona?
13       A    Yes.
14       Q    And you don't deny that you spoke these
15   words that I just read, true?
16       A    That is correct.
17       Q    Okay.  Now --
18       A    But -- but it was an after-dinner
19   speech.
20       Q    Right, you already made that point,
21   Doctor.
22       A    Right.
23       Q    So I'd like to move on.
24            Now, after the Blizzard of 1996, which I

Highly Confidential - Subject to Further Confidentiality Review

1    represent to you was in the early days of January
2    1996, there was indeed a blizzard of prescriptions
3    written for OxyContin.  Isn't that true?
4            MR. BERNICK:  Object to form.
5            THE WITNESS:  I would not describe it
6    that way.
7    BY MR. HANLY:
8        Q    The number of prescriptions for
9    OxyContin increased throughout the year 1996.
10   True?
11       A    It was a successful product launch.  I
12   don't remember whether they increased throughout
13   the year.  I don't have the numbers in front of me
14   or in my mind.
15       Q    Did you ever make any computation or
16   attempt to determine the number of deaths
17   resulting from the blizzard of prescriptions of
18   OxyContin in the year 1996 or thereafter?
19           MR. BERNICK:  Objection.  Assumes facts.
20           MR. CHEFFO:  Objection.
21           THE WITNESS:  I don't recall.
22   BY MR. HANLY:
23       Q    Could we agree, Doctor, that the
24   relationship between morphine and oxycodone -- I'm

Highly Confidential - Subject to Further Confidentiality Review

1    finished with that.
2        A    Oh.
3        Q    Let me start again.
4            Can we agree that the potency
5    relationship between morphine and oxycodone is
6    believed -- generally accepted to be a 2-to-1
7    ratio such that oxycodone is twice as powerful as
8    morphine?
9        A    We believe, and I still believe, that it
10   is approximately, on average, twice as potent as
11   morphine.
12       Q    And you and your company were in the
13   year 1996 engaged in a scheme to persuade
14   physicians that indeed morphine was more powerful
15   than oxycodone.  True?
16           MR. CHEFFO:  Object to form.
17           THE WITNESS:  Untrue.
18           MR. HANLY:  Let's mark as the next
19   exhibit --
20           THE WITNESS:  I wish I could ask you
21   questions.
22           MR. BERNICK:  No, no, no.
23           THE WITNESS:  I'm trying to lighten --
24           MR. BERNICK:  You can ask him all you

Highly Confidential - Subject to Further Confidentiality Review

1    want after the deposition is over.
2            THE WITNESS:  -- to lighten the -- no, I
3    wasn't going to --
4            MR. BERNICK:  No, no, no, let's save it.
5            THE WITNESS:  Okay.  I would be happy to
6    do that if you want.
7            (Sackler Exhibit No. 58 was marked
8            for identification.)
9    BY MR. HANLY:
10       Q    All right.  Now, Doctor, I've placed
11   before you a two-page document that appears to be
12   an e-mail from you at the top.  Do you see that?
13       A    Yes.
14       Q    To Michael Friedman.  And below that is
15   a rather long e-mail from Michael Friedman.
16       A    Yes.
17       Q    Do you see that?
18       A    Yes.
19       Q    Okay.  Now, directing your attention to
20   the second paragraph in the Michael Friedman
21   e-mail, it reads as follows -- are you on that --
22   are you with me there?
23       A    Yes.
24       Q    Do you see the words "We are well

1    aware"?

2        A    Yep.

3        Q    Okay.  So there it reads:  "We are well

4    aware of the view, held by many physicians, that

5    oxycodone is weaker than morphine."

6            Did I read that correctly?

7        A    You did.

8        Q    Now, you and I can agree, can we not,

9    Doctor, that that statement, "oxycodone is weaker

10   than morphine," that part of the statement is

11   scientifically false?  We just -- we just agreed

12   on that, right?

13       MR. BERNICK:  Objection to the form of

14   the question.

15   BY MR. HANLY:

16       Q    That oxycodone is in fact twice as

17   powerful as morphine.  Right?

18       A    It is -- of course, we agree that when

19   you switch a patient from morphine to oxycodone,

20   you will cut the dose milligram in half.

21           I didn't read carefully enough, because

22   when he said weaker, I was thinking of the

23   associations and the profile -- relative profiles

24   of morphine and oxycodone.  And I wish I had made

1    that clearer in my response, which was very brief

2    and was just -- I wish I just said, Michael, this

3    is your call.

4        Q    It seems to me, Doctor, and correct me

5    if I'm wrong, that you're quite familiar with this

6    document.  Is that because it's a document you

7    reviewed in -- in preparation for your testimony

8    here today?

9        THE WITNESS:  Am I supposed to answer

10   that?

11       I have reason that it was familiar,

12   because I testified on this document in Kentucky.

13       MR. BERNICK:  So, I think he's answered

14   your question.

15       THE WITNESS:  That's why it's familiar.

16   BY MR. HANLY:

17       Q    Well, you said, "I have reason that" --

18   ah -- "because I testified in Kentucky."

19       A    Right.  Not that long ago.

20       Q    Okay.  In any case, what we were looking

21   at was Mr. Friedman's e-mail to you in which he

22   says:  "We are well aware of the view, held by

23   many physicians, that oxycodone is weaker than

24   morphine.  We all know that this is the result of

1    their association of oxycodone with less serious

2    pain syndromes."

3            And then at the end of that paragraph,

4    the last sentence reads:  "This personality,"

5    un -- quote/unquote, "'personality' of oxycodone

6    is an integral part of the," quote,

7    "'personality,'" unquote, "of OxyContin."

8            Did I read that correctly?

9        A    You did.

10       Q    Okay.  Now, further on down -- let's

11   see, this would be the -- one, two, three --

12   fourth paragraph, you say -- Mr. Friedman says:

13   "Our pricing of the product was geared toward the

14   non-malignant market.  We knew that if we priced

15   low per milligram for the high-dose cancer

16   patient, we would be priced way too low (per

17   milligram) for the," quote, "'standard,'" unquote,

18   "non-malignant pain patient, where we really

19   wanted to make a market.  We feared that the,"

20   quote, "'cancer pain experts,'" unquote, "would

21   object to the 2:1 ratio and resulting cost of

22   therapy for high dose patients, however, we had no

23   choice, given our chosen position for OxyContin.

24   In any case, we are developing a hydromorphone OD

1    for the high dose patient."

2            Did I read that correctly?

3        A    Yes.  You read what is -- what is

4    written on this page correctly.

5        Q    Right.  And then in the next paragraph,

6    the last full paragraph on that page, the second

7    sentence reads:  "Doctors use the drug in

8    non-malignant pain because it is effective and

9    the," quote, "'personality,'" unquote, "of

10   OxyContin is less threatening to them, and their

11   patients, than that of the morphine alternatives."

12           Did I read that correctly?

13       A    You did.

14       Q    And then further down in that paragraph,

15   do you see a sentence that begins "While we

16   might"?

17       A    Yes.

18       Q    So that reads:  "While we might wish to

19   see more of this product sold for cancer pain, it

20   would be extremely dangerous, at this early stage

21   in the life of this product, to tamper with this,"

22   quote, "'personality,'" unquote, "to make

23   physicians think the drug is stronger or equal to

24   morphine."

**Page 400**

```
 1    A    Yes --
 2    Q    Right?
 3    A    -- I see that.  No, I don't agree with
 4  it, but --
 5    Q    Well, we'll get to that, Doctor.
 6    A    Okay.
 7    Q    And the last sentence on that paragraph
 8  says:  "We are better off expanding use of
 9  OxyContin in the non-malignant pain states and
10  waiting for hydromorphone OD in 1999 to relaunch
11  into cancers -- cancer pain."
12         Did I read that correctly?
13    A    I believe you did.
14    Q    Right.  And then if you turn to the next
15  page, top of the page, it reads, does it not:
16  "For the time being I" -- that's Michael
17  Friedman -- "do not plan to try to change the,"
18  quote, "'personality,'" unquote, "of OxyContin.
19  We will continue to FOCUS," all caps, "on
20  expanding the non-malignant pain usage.  In this
21  group of patients, morphine is not an alternative
22  and the price is correct."
23         Did I read that correctly?
24    A    You read what is here on the page.
```

**Page 401**

```
 1    Q    Right.  And you already told me you
 2  already looked at your response, which is at the
 3  top of the first page:  "I agree with you.  Is
 4  there general agreement or are there some
 5  holdouts?"
 6         That was your response in 1997 to this
 7  e-mail, true?
 8    A    But you're misinterpreting it.
 9    Q    Well, I didn't ask you about --
10    A    Yes, that is -- okay, fine.
11    Q    -- my intention.
12    A    Fine.  That are the words I used.
13    Q    Right.
14    A    Yes.
15    Q    And that -- that's what you told
16  Mr. Friedman -- by the way, was Mr. Friedman the
17  CEO in 1997?
18    A    No.
19    Q    He was in what position at Purdue
20  Pharma?
21    A    He was head of marketing and sales, I
22  believe, at that point.  And also head of
23  corporate development.
24    Q    Okay.  Let's mark as the next exhibit --
```

**Page 402**

```
 1         (Sackler Exhibit No. 59 was marked
 2          for identification.)
 3  BY MR. HANLY:
 4    Q    -- another e-mail chain.
 5         I'm finished with that, Doctor.  Thank
 6  you very much.
 7         MR. HANLY:  David, would you put the
 8  exhibit before the witness?
 9         MR. BERNICK:  Oh, yes.  Sorry.
10  BY MR. HANLY:
11    Q    Now, here is an e-mail chain a little
12  later in 1997, June 12th, between you, Dr. Richard
13  Sackler, and Michael Friedman.
14         Do you see that, Doctor?
15    A    Yes.
16    Q    Okay.  Now, the big e-mail on that page
17  appears to be written by someone named Michael
18  Cullen.
19         Do you see that?  Do you see the top --
20    A    Yes.
21    Q    -- of the big e-mail?  Okay.
22         And that e-mail reads or in part reads:
23  "In recent team meetings, we have discussed the
24  issue that OxyContin is perceived by some
```

**Page 403**

```
 1  physicians, particularly oncologists, as not being
 2  as strong as MS Contin."
 3         By the way, MS Contin is morphine
 4  sulfate continuous, correct?
 5    A    Yes.
 6    Q    "Although this perception has had some
 7  effect with patients switching to MS Contin" --
 8  sorry -- "physicians switching to MS Contin with
 9  more severe cancer pain patients, it has actually
10  had a positive effect with physicians' use in
11  non-cancer pain."
12         Continuing:  "Since oxycodone is
13  perceived" --
14    A    Just a quick question.  I want to see
15  the sequence here.  5/28.  6/12.  Okay.
16    Q    So a month later, right?
17    A    Whatever.  Two weeks.  I don't know.  I
18  didn't --
19    Q    Sorry, a few days.
20    A    I didn't calculate it.  I saw it was
21  meaningfully later, so it was in sequence, yes.
22    Q    Okay.  So I read the first paragraph of
23  Cullen's e-mail.
24    A    Yes.
```

1  Q    I want to continue, please.  It reads:
2  "Since oxycodone is perceived as being a 'weaker'
3  opioid than morphine," -- "weaker" in
4  quotations -- "it has resulted -- resulted in
5  OxyContin being used much earlier for non-cancer
6  pain.  Physicians are positioning this product
7  where Percocet, hydrocodone and Tylenol with
8  codeine have been traditionally used."
9       Did I read that correctly?
10      A    You did.
11      Q    Okay.  And then the next paragraph
12 reads:  "Since the non-cancer pain market is much
13 greater than the cancer pain market, it is
14 important that we allow this product to be
15 positioned where it currently is in the
16 physician's mind.  If we stress the," quote,
17 "'Power of OxyContin,'" unquote, "versus morphine,
18 it may help us in the smaller cancer pain market,
19 but hurts us in the larger potential non-cancer
20 pain market.  Some physicians may start
21 positioning this product where it -- where
22 morphine is used and wait until pain is severe
23 before using it."
24      Did I read that correctly?

1  A    Can I just -- I think you read it
2  correctly, but I'm not sure I am -- can -- are you
3  going to ask me what this means --
4       Q    No.
5       A    -- or not?  You're just reading from the
6  e-mail.  Okay.
7       Q    Well, and I'm establishing, Doctor, am
8  I not, that you -- this was an e-mail chain that
9  you received and apparently are familiar with,
10 true?
11      MR. BERNICK:  Objection to form.  Move
12 to strike the prefatory statement.
13      THE WITNESS:  I -- I'm not certain what
14 your purpose was or what you've done.
15 BY MR. HANLY:
16      Q    Can you listen to my question, Doctor?
17      MR. BERNICK:  I'm sorry.  Please don't
18 interrupt him.
19      THE WITNESS:  I'm sorry.  I apologize if
20 I didn't listen to your question, so...
21 BY MR. HANLY:
22      Q    Okay.  So, my question is, did I read
23 that paragraph correctly?  The paragraph that
24 begins "Since the non-cancer pain market is much

1  greater than the cancer pain," I read that into
2  the record.
3       A    Yes.  Okay.
4       Q    Okay?
5       A    I think you did, yes.
6       Q    All right.
7       A    I don't remember exactly the words you
8  used, but you haven't made a mistake yet.  That's
9  fine.
10      Q    And the second to last paragraph in that
11 big e-mail reads, does it not:  "It is important
12 that we be careful not to change the perception of
13 physicians toward oxycodone when developing
14 promotional pieces, symposia, review articles,
15 studies, etc."
16      Did I read that correctly?
17      A    Yes.
18      Q    Promotional pieces, those are -- those
19 are marketing pieces, right?
20      A    Yes.  That --
21      Q    Okay.
22      A    -- conform to the package insert or
23 should always conform to it, I --
24      Q    Should do so, correct?

1  A    Yes.  And I can't -- I don't remember
2  this marketing brochure, so I can't comment on it.
3       Q    Okay.  Now --
4       A    Without seeing it.  Okay.
5       Q    Now -- now, you responded, and your
6  response is right there on the first page at the
7  very top.
8       A    Right.
9       Q    Right?
10      To Mr. Friedman, you said:  "I think you
11 have this issue well in hand.  If there are
12 developments, please let me know."
13      Did I read that correctly?
14      A    Yes.
15      Q    And that's what you told Mr. Friedman in
16 response to Mr. Cullen's e-mail back in June of
17 1997, true?
18      A    That's what I wrote, but there -- this
19 is -- this whole thing is taken out of context.
20      Q    Mm-hmm.
21      A    One of the contexts I recall is that I
22 had noted that doctors, although oxycodone and,
23 thus, OxyContin was on what was then called -- I
24 don't know what it's called today -- the WHO pain

```
 1    letter, in position 2, it sounds like that was
 2    what Michael Cullen was referring to, and probably
 3    I think Michael Friedman, too, was on step 2 and
 4    step 3.  It was for moderate pain and severe pain.
 5        I had raised the question, What can we
 6    do to -- well, why aren't we selling more to
 7    oncologists?  And this whole -- I believe, if I'm
 8    remembering correctly, I had written that to
 9    people -- a person or it may have been forwarded
10    to other people, I may have written it to other
11    people, and I started, to some extent, this --
12    asking what should we do, and I -- my recollection
13    is this was what flowed.
14        Q    You have no idea --
15             MR. BERNICK:  Excuse me.  I think you
16    interrupted him.
17    BY MR. HANLY:
18        Q    Were you finished with your answer, sir?
19        A    Can you read back what my answer was?
20        Q    Yes, I can read it.  At the end you
21    said:  "I may have written it to other people, and
22    I started, to some extent, this -- asking what
23    should we do, and I -- my recollection is this was
24    what flowed."
```

```
 1             Was that --
 2        A    Out of my question -- yes, out of my
 3    question about why were our sales proportionately
 4    weaker than I expected.
 5             MR. HANLY:  All right.  Let's mark as
 6    the next exhibit, please.
 7             (Sackler Exhibit No. 60 was marked
 8             for identification.)
 9    BY MR. HANLY:
10        Q    I'm finished with that document, Doctor.
11        A    So the important thing -- let me just
12    finish.  The important thing is the context in
13    which I wrote was the word that Michael Friedman
14    used, which is the well known negative
15    associations with morphine.
16             I'm finished.
17        Q    Marked as the next exhibit a document
18    entitled "Phase IV" --
19             MR. HANLY:  Would you place that before
20    the witness, please, David?
21             MR. BERNICK:  Okay.
22             MR. HANLY:  What?
23             MS. CONWAY:  60.
24             MR. HANLY:  60 what?
```

```
 1             MS. CONWAY:  Exhibit 60.
 2    BY MR. HANLY:
 3        Q    Oh, Exhibit 60.  "Phase IV OxyContin
 4    Tablets Team."
 5             The Phase IV OxyContin Tablets Team,
 6    Doctor, was a group within Purdue engaged in
 7    marketing activities with respect to OxyContin,
 8    true?
 9        A    It's a reasonable guess, but I don't
10    recall.
11        Q    Okay.  Now, if you look there at the
12    top, it indicates a number of people, and one of
13    the people there is M. Cullen.
14             Do you see that?
15        A    I do.
16        Q    Okay.  And this document has a heading
17    on the first page, "Marketing and Sales Update."
18    Do you see that?
19        A    I do.
20        Q    And it reads, does it not:  "Mike Cullen
21    discussed in detail Marketing's position of
22    OxyContin.  He explained that we want to expand
23    extensively in the non-cancer market segment while
24    promoting OxyContin as," quote, "'the one to start
```

```
 1    with,'" unquote, "in cancer pain (instead of
 2    Percocet, Vicodin, etc.) and" --
 3        A    Step -- step -- I'm sorry to interrupt
 4    you, but that's step 2.
 5        Q    Yes.
 6        A    Okay.
 7        Q    If you'd let me ask the question,
 8    Doctor --
 9        A    Certainly.
10        Q    -- we can move quickly through this.
11        A    I am sorry for the interruption.
12        Q    I'm going to start again.
13             "Mike Cullen discussed in detail
14    Marketing's positioning of OxyContin.  He
15    explained that we want to expand extensively in
16    the non-cancer market segment while promoting
17    OxyContin as," quote, "'the one to start with,'"
18    unquote, "in cancer pain (instead of Percocet,
19    Vicodin, etc.) and," quote, "'the one to stay
20    with,'" unquote, "through proper titration."
21             Next paragraph:  "We can show that we
22    are as," quote, "'effective,'" unquote, "as
23    morphine, but do not want to say OxyContin is as,"
24    quote, "'powerful,'" unquote, "as morphine.  Words
```

**Page 412**

1  such as," quote, "'powerful,'" unquote, "may make

2  some people think the drug is dangerous and should

3  be reserved for the more severe pain.  This could

4  have a negative effect in the much larger

5  non-cancer pain market.  Mike reminded the team

6  that we should keep this positioning in mind as we

7  develop future marketing programs, symposia,

8  clinical study, manuscripts, and any other items

9  that discuss the use of OxyContin."

10         Did I read that correctly?

11     A   You did.

12     Q   And there's a reference there to

13  "marketing programs," right?  Do you see that?

14     A   I'm -- I'm looking for "marketing

15  programs."

16     Q   Second to last sentence.

17     A   Sentence?

18     Q   Yes, sir.

19     A   Okay.  Thank you.

20     Q   Or the last sentence on the second

21  paragraph.  I --

22     A   Oh, the last sentence.

23     Q   Yes, sir.

24     A   Okay.  (Peruses document.)  Okay.

---

**Page 413**

1     Q   All right.  So I -- I read that all

2  correctly, did I not?

3     A   I think you did.

4     Q   Now, marketing -- the marketing

5  activities of Purdue Pharma LP, between the launch

6  in early 1996 over the next five years, was in

7  part an attempt to influence the prescribing

8  habits of physicians.  True?

9         MR. BERNICK:  Objection to form.  Lack

10  of foundation.

11         THE WITNESS:  To affect it.  I think

12  that's a fair statement.  It's not one I'm used

13  to, but I think that's fair.

14  BY MR. HANLY:

15     Q   Because at the end of the day, Doctor,

16  sales of OxyContin are a function of the extent to

17  which a physician is willing to prescribe the

18  drug.  True?

19     A   To which he prescribes it.

20     Q   True.

21     A   Okay.

22         MR. HANLY:  How much time have I got

23  left?

24         MR. BERNICK:  15.

---

**Page 414**

1         MR. HANLY:  Linda, do you want to come

2  back or -- do you have something?  I'm not done,

3  but --

4         MS. SINGER:  Oh, no, no, no.  Finish.

5         MR. HANLY:  Okay.  All right.

6  BY MR. HANLY:

7     Q   Now, Doctor, my colleague, Ms. Singer,

8  was asking you a few questions about patents.

9         Do you recall that?

10     A   I do.  I recall that she asked me a few

11  questions about that.

12     Q   And you're the inventor on a number of

13  patents; is that correct?

14     A   I am an inventor on a number of patents.

15     Q   Right.  And the inventor in the United

16  States of a patent is not necessarily the owner or

17  holder.  True?

18     A   Correct.

19     Q   Now, at some point in time, Purdue

20  acquired the patent for a self-destructing e-mail

21  and messaging system.  True?

22     A   I haven't thought about this in a long

23  time.  I don't -- I don't -- I didn't know that

24  the patent ever issued.  I heard about an

---

**Page 415**

1  application, but I -- this was not -- not my idea,

2  if I recall correctly.  And I thought it was

3  interesting, but nothing came of it commercially.

4     Q   Well, would it surprise you to know that

5  the patent did issue, sir?

6     A   I didn't know that.  So...

7         MR. HANLY:  Let's mark as the next

8  exhibit a document from the United States Patent

9  and Trademark Office.

10         (Sackler Exhibit No. 61 was marked

11         for identification.)

12         MR. HANLY:  Would you place that before

13  the witness, David.  Thank you.

14  BY MR. HANLY:

15     Q   Now, I placed before you, Doctor, a

16  document that we got from the U.S. Patent and

17  Trademark Office.  And do you see the title on the

18  upper left, "Self-Destructing Document and E-Mail

19  Messaging System"?

20     A   Yes.

21     Q   And you see the inventors -- do you see

22  the list of the inventors?

23     A   No, I thought it was just -- oh, Udell

24  and et al.

```
1      Q    Right.
2      A    Let me look at the list.
3      Q    Howard Udell was the general counsel of
4  Purdue Pharma LP, true?
5      A    Yes.
6      Q    Stuart D. Baker was a lawyer, a partner
7  at a firm called Chadbourne Parke, true?
8      A    Yes.
9      Q    And a member of the board of directors
10 of various Purdue entities over a period of some
11 two decades, true?
12     A    Let me think.  I don't know whether he
13 was a member or not.
14     Q    But you -- you do know Stuart D. Baker.
15     A    I do.
16     Q    He was outside counsel to the Purdue
17 companies for many years, true?
18     A    One of them, yes.
19     Q    The other two and three individuals, you
20 don't know those folks, do you, Cary Kappel,
21 William Ries, or Greg Sherman?
22     A    I don't know the individuals.
23     Q    Right.  Now, if you look at the
24 abstract, which is on the right-hand side of the
```

```
1  page, it reads, does it not:  "A self-destruction
2  document or e-mail" -- it says massaging, but I
3  think it means -- "messaging system is provided
4  that automatically destroys documents or e-mail
5  messages at a predetermined time by attaching a
6  virus to the document or e-mail message.  A virus
7  in the form of a Trojan horse is attached to file,
8  such as an e-mail message or document, when it is
9  created.  The virus contains a portion of
10 executable code or an executable program which
11 instructs the computer to overwrite and/or delete
12 the file to which the virus is attached at a
13 desired time.  Since the virus is attached to the
14 file, it will travel with the file even when the
15 file is copied, forwarded, or saved to disks or
16 tape drives."
17         Did I read that correctly?
18     A    You did.
19     Q    And this is a patent that after its
20 issuance was assigned to Purdue Pharma, true?
21     A    I didn't know that, but that's what it
22 says.  If it says that, that's what it says.
23     Q    Well, do you doubt that, sir?
24     A    I -- okay.  The question is, do I doubt
```

```
1  that this --
2      Q    Do you doubt that it was assigned?
3      A    I didn't -- I don't know if it was
4  assigned.
5      Q    Okay.  You wouldn't be surprised to
6  learn it was -- it was assigned, though, would
7  you?
8           MR. CHEFFO:  Object to form.
9           THE WITNESS:  No.
10          I'm sorry.  I should have waited.
11          (Counsel conferring.)
12 BY MR. HANLY:
13     Q    Now, Doctor, I'm finished with --
14     A    This?
15     Q    -- with the patent document.
16     A    Okay.
17          MR. BERNICK:  Here's his -- go ahead.
18 BY MR. HANLY:
19
```





```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10              (Counsel conferring.)
11    BY MR. HANLY:
12        Q    Did Howard Udell receive a bonus in the
13    year 2007, the year of the criminal conviction of
14    your company and Mr. Udell?
15        A    I don't recall.
16        Q    Did Michael Friedman receive a bonus in
17    the year 2007, the year in which your company and
18    Mr. Friedman were criminally convicted of criminal
19    misbranding?
20        A    Pleaded guilty.
21        Q    Yes, sir.
22        A    I don't recall.
23        Q    Was Paul Goldenheim given a bonus in the
24    year 2007, the year in which your company -- or to
```

```
 1    be precise, Purdue Frederick Company pleaded
 2    guilty as -- along with Dr. Goldenheim?
 3        A    I don't recall.
 4        Q    You don't remember voting on bonuses --
 5    seven-figure bonuses for each of those
 6    individuals, sir?
 7        A    I don't -- I re- -- if there were
 8    bonuses, the board probably would have agreed to
 9    them, yes, voted on them.  But I don't recall if
10    there were bonuses.
11
```



```
15              MR. BERNICK:  Object to the question on
16    grounds of foundation, and also time.
17              (Sackler Exhibit No. 62 was marked
18              for identification.)
19    BY MR. HANLY:
20
```



```
 1
```



```
 1
15        Q    And you don't know as you sit here today
16    how much money, if any, Michael Friedman received
17    as a bonus following the criminal conviction of
18    him, Howard Udell and Paul Goldenheim, true?
19        A    I don't recall that.
20              MR. HANLY:  Thank you, Doctor.  That's
21    all I have.
22              THE VIDEOGRAPHER:  Going off the record.
23    The time is 1:59 p.m.
24              (Recess.)
```

```
 1        THE VIDEOGRAPHER:  We're back on the
 2   record at 2:12 p.m.
 3              EXAMINATION
 4   BY MR. BERNICK:
 5        Q    Good afternoon, Dr. Sackler.  We're
 6   getting towards the end.  I just have a few
 7   questions, and then my colleagues for the
 8   plaintiffs will have some further follow-up
 9   questions.
10              I want to begin by talking about --
11   asking you about a couple of the exhibits that you
12   were shown, and I'll just put them up on the
13   screen here in the interest of time.  I too have
14   highlighted them.
15              So this is Exhibit 58, which you may
16   recall.  You can see that.  Can you just --
17        A    I don't know -- okay.
18              Can you just do the top so I can try to
19   relate it to the document?
20        Q    So it's larger --
21        A    No, no, this is --
22        Q    There we go.  There we go.
23              This is dated -- or this portion of it
24   is dated May 28th of 1997, and the author
```

```
 1   Mr. Friedman writes to you, and one of the
 2   paragraphs that was cited says, quote:  We are
 3   well aware of the view, held by many physicians,
 4   that oxycodone is weaker than morphine.
 5              Do you see that?
 6        A    Yes.
 7        Q    And then on Exhibit 60, which was dated
 8   June 13 of 1997, and this relates to a marketing
 9   and sales update in Mr. Cullen's remarks, it says:
10   "We can show that we are as," quote,
11   "'effective,'" close quote, "as morphine, but do
12   not want to say OxyContin is as powerful as
13   morphine."
14              Do you see that?
15        A    Yes.
16        Q    Okay.  Now, you had talked in your
17   answers to those questions about potency.  Was the
18   potency of OxyContin as compared to oxy -- to
19   morphine, was that potency addressed in the
20   labeling for OxyContin, if you recall?
21        A    I believe it was expressed several
22   times, but I can't tell you the count.
23        Q    Okay.
24        A    I remember -- should I go on or just
```

```
 1   stop?
 2        Q    No, that's -- that's fine.
 3        A    I remember clearly that we asserted the
 4   proposition with evidence that it was twice as
 5   strong -- and the evidence I think was in the
 6   package insert, some of it, anyhow -- that it was
 7   twice as strong, had two times the potency of
 8   morphine.  And I --
 9        Q    I want to show you --
10        A    I just want to finish.
11              I remember no one saying that's wrong,
12   except some people who were operating under an
13   earlier conception that had gotten published, it
14   wasn't two times stronger; it was one or
15   one-and-a-half times stronger.
16        Q    Okay.  I want to show --
17        A    We -- yeah.
18        Q    I want to show you Exhibit 24, which is
19   the original package -- package insert for
20   OxyContin.
21        A    Yes.
22        Q    Are you familiar with the original
23   package insert from OxyContin?
24        A    I know there was an original package
```

```
 1   insert.  "Familiar," could you just be a little
 2   more specific?
 3        Q    From your point of view during your time
 4   at -- while you were working at Purdue, what, if
 5   anything, was the role of the package insert when
 6   it came to communicating with doctors?
 7        A    The package insert was like the bible.
 8   It was the document that the FDA had worked very
 9   hard on to be complete, and they had to agree with
10   every assertion in it.  And if they didn't agree,
11   they would take it out.
12        Q    I'm going to show you in Exhibit 24 at
13   the pages ending 842, the table called Table 1:
14   "Multiple population factors for converting the
15   daily dose of prior opioids to the daily dose of
16   oral oxycodone."
17              Do you see that?
18        A    Yes, I see that.
19        Q    And do you see for oxycodone, it's 1,
20   under the first column?
21        A    Right.
22        Q    And if we flip over the page, do you see
23   where morphine is listed then as 0.5?
24              What, if any, relationship does that
```

1 statement in the label, that information in the

2 label, have to your testimony about what Purdue

3 told doctors about the potency of morphine versus

4 OxyContin?

5     MR. HANLY:  Objection to the form.

6 BY MR. BERNICK:

7     Q    Go ahead.

8     A    It's consistent with what I recall to be

9 another part of the label, which said the

10 conversion ratio or the relative potency was twice

11 as potent as morphine.  And this -- the way I read

12 this says the same thing, but -- well, that's my

13 answer.

14     Q    Are you aware of any statement that

15 Purdue, to your knowledge, made in -- made to

16 doctors which said that the -- that the

17 relationship of potency between OxyContin and

18 morphine is anything other than 2 to 1?

19     A    I'm not aware of that.

20     Q    You were also asked questions about a

21 DEA -- some testimony by the DEA.  Do you recall

22 that?

23     A    I recall the subject came up.

24     Q    Well, actually, I forgot one more thing

---

1 on the label.

2     A    Oh, okay.

3     Q    You were asked questions about

4 OxyContin, the positioning of OxyContin in

5 relationship to MS Contin.  Do you recall that?

6     A    I think I recall, yeah.

7     Q    So we're now back again at the time of

8 these earlier e-mails.

9     A    Yes.

10    Q    MS Contin was a drug.  What kind of drug

11 was MS Contin?

12    A    It was morphine sulfate, extended

13 release or controlled release.  The terms

14 underwent changes over the years.

15    Q    Okay.

16    A    The FDA prescribed those changes.  We

17 didn't change them.

18    Q    Now, OxyContin -- in OxyContin, was the

19 active ingredient morphine or was it something

20 else?

21    A    It was morphine sulfate.

22    Q    No, for OxyContin.

23    A    Oh, I'm sorry.  I think the active

24 ingredient was oxycodone hydrochloride.  I think

---

1 the salt was hydrochloride.

2     Q    And if you know, what was the

3 rationale -- if you already had MS Contin out

4 there with morphine, what was the rationale for

5 using oxycodone as the active ingredient in

6 OxyContin?

7     A    I can think of two things.  One was that

8 the market from the early '90s or before, really

9 in the '80s, was expanding, and the market for

10 strong opioids was expanding because of a variety

11 of factors.  The most important being the

12 increasing number of doctors who were aware that

13 the opinion -- most of the opinion, as I can't say

14 every single one -- felt that doctors could do a

15 lot better treating patients with opioids when

16 necessary, rather than withholding opioids and

17 allowing them to suffer.

18         The second I've already alluded to --

19 well, no, there's a third.

20         We had learned at some point in time

21 that just because one opioid doesn't work or has

22 an unacceptable side effect doesn't mean that all

23 of them will.  And that the right strategy to use

24 is to treat each drug as related but not

---

1 necessarily the same.  And they actually aren't.

2 There's a lot of individual response.

3         And the third thing I've already

4 mentioned was the WHO analgesic ladder -- I think

5 I've described that properly -- which was getting

6 much more widely known in the United States.

7     Q    Okay.  MS Contin, I think you've already

8 testified, was a drug that was often used by

9 oncologists.

10         MR. HANLY:  Objection to the form.

11         THE WITNESS:  I -- if that's what I

12 testified -- I'm just hesitating now, not because

13 it's not true, but because -- I'm trying to think

14 if I can figure out any statistic or something,

15 but I can't recall that.

16 BY MR. BERNICK:

17    Q    Oh, no, don't worry about that.

18         My question really is, was the market

19 for the -- the intended market for oxy --

20 OxyContin, did that also include patients who had

21 moderate to severe pain but were not suffering

22 from cancer?

23    A    Yes.

24    Q    Okay.

1    A    And by the way, MS Contin had the

2    same -- similar no limitation.

3    Q    Go back to Exhibit 20 --

4    A    In the label.

5    Q    Go back to Exhibit 24, and take you to

6    Indications and Usage.

7         It says: "OxyContin tablets are a

8    controlled release oral formulation of oxycodone

9    hydrochloride indicated for the management of

10   moderate to severe pain where use of an opioid

11   analgesic is appropriate for more than a few

12   days."

13        Do you see that on the screen?

14   A    Yes.

15   Q    Is that indication limited to patients

16   with -- who suffer from cancer, or does it also

17   include patients who have the same degree of pain

18   but don't have cancer?

19        MR. HANLY:  Objection to the form.

20        THE WITNESS:  It was understood by

21   everyone that the -- that narcotics were not

22   limited to cancer pain.

23   BY MR. BERNICK:

24   Q    Thank you.

1         Let's now go forward in time to --

2    A    I should have -- I should have asserted

3    the positive, but --

4    Q    Let's now go forward in time to July of

5    2001, and the letter that was written by

6    then-Attorney General Blumenthal.

7         Do you recall that?  This is the cover

8    page, this is the letter, Exhibit 49.

9    A    What I was shown today?

10   Q    Yes.  We're going to go back to that.

11   July 31, 2001, do you see that?

12   A    Yes.

13   Q    Now, Counsel showed you on page -- the

14   page Bates number ending 034, which is page 4 of

15   the letter, he -- the Attorney General writes:

16   "Specifically, I am disturbed by the site's

17   statement that addiction from prescribed opioids

18   is," quote, "'rare in patients without a history

19   of drug/alcohol abuse' if prescribed under a

20   patient's care.  This simply is not true."

21        Do you see that?

22        MR. HANLY:  Objection.  I think you

23   meant to say "physician's care."

24        MR. BERNICK:  What did I say?

1         MR. HANLY:  "Patient."

2         MR. BERNICK:  Okay.

3         THE WITNESS:  Thank you for the

4    correction.

5    BY MR. BERNICK:

6    Q    I will read it again.  "I am disturbed

7    by the site's statement that addiction from

8    prescribed opioids is," quote, "'rare in patients

9    without a history of drug/alcohol abuse' if

10   prescribed under a physician's care."

11        Do you see that?

12   A    I do.

13   Q    Now, I want to focus on the -- the

14   statement that says "rare" -- "addiction to --

15   from prescribed opioids is rare in patients

16   without a history," and go back to the original

17   label package insert, Exhibit 24, and to a page --

18   a page ending with 838.

19        It says: "Drug addiction," paren, "drug

20   dependence, psychological dependence," close

21   paren, "is characterized by a preoccupation with

22   the procurement, hoarding, and abuse of drugs for

23   nonmed- -- medicinal purposes.  Dependence is

24   treatable utilizing a multidisciplinary approach,

1    but relapse is common.  Iatrogenic addiction to

2    opioids legitimately used in the management of

3    pain is every -- is very rare."

4         Was that your understanding of what the

5    FDA was telling doctors or telling Purdue and

6    Purdue telling doctors in the label?

7         MR. HANLY:  Objection to the form.

8         THE WITNESS:  Can I answer it?

9         MR. WEINTRAUB:  Yes.

10        THE WITNESS:  I'm sorry.  Putting a

11   little levity in here.

12        That is my understanding.  Yes.

13   BY MR. BERNICK:

14   Q    From your point of view, was it false,

15   as Attorney General Blumenthal said, that

16   addiction from prescribed opioids is rare in

17   patients without history --

18        MR. HANLY:  Object --

19   BY MR. BERNICK:

20   Q    -- if prescribed and used under a

21   patient's care?

22        MR. HANLY:  Under a physician's care.

23        MR. BERNICK:  Physician's care.

24        MR. HANLY:  Objection to the form,

```
 1    including my own correction.
 2              THE WITNESS:  Thank you.
 3              Okay.  What was the question?  I'm
 4    sorry.
 5    BY MR. BERNICK:
 6        Q    Well, in your own view, was it false to
 7    say that --
 8        A    Was the Attorney General making --
 9        Q    Yes.
10        A    I would rather characterize it as
11    erroneous or ignorant.  I don't believe that he
12    had studied the package insert.  And I don't know
13    that.  When I saw that today, I looked at it and I
14    thought, well, he probably just didn't know.  Or
15    it's an unquantified statement, and his idea of
16    what was very rare was different than the FDA's.
17        Q    I want to show you --
18              MR. HANLY:  Objection.  Move to strike.
19    BY MR. BERNICK:
20        Q    I want to show you now the -- another
21    package insert.  If we can have that marked as --
22              MR. BERNICK:  Is that already marked?
23              (Sackler Exhibit No. 63 was marked
24              for identification.)
```

```
 1    BY MR. BERNICK:
 2        Q    If you could take a look at Exhibit 63,
 3    Dr. Sackler.  Do you recognize that as the boxed
 4    warning label that came on the package insert in
 5    about July of 2001?
 6        A    Yes.  It looks correct.
 7        Q    If we take a look at the last page --
 8        A    Oh, last page.
 9        Q    -- of the document, which says -- do you
10    see it says July 18, 2001?
11        A    Yes.
12        Q    So that would be roughly almost two
13    weeks, about ten days before the Attorney General
14    Blumenthal wrote his letter?
15        A    I didn't look at his date, but if --
16        Q    If we take a look --
17        A    -- you studied it, yes.
18        Q    If we take a look at -- and I'll just
19    put it up on the screen.
20              MR. BERNICK:  If you could flip -- if
21    you could help him flip.
22    BY MR. BERNICK:
23        Q    Do you see where this package insert
24    that came out before the letter from Attorney
```

```
 1    General Blumenthal wrote, do you see where it says
 2    in the package insert itself:  "Concerns about
 3    abuse, addiction, and diversion should not prevent
 4    the proper management of pain.  The development of
 5    addiction to opioid analgesics in properly managed
 6    patients with pain has been reported to be rare."
 7              Was that your understanding of what the
 8    current label said as of the time of
 9    Mr. Blumenthal's letter?
10        A    Yes.
11        Q    You were shown an exhibit --
12              This is the DEA deal.  What's the DEA
13    letter?  Do you remember?  We'll figure it out
14    here.
15              You were shown an exhibit that related
16    to the testimony of the DEA before Congress -- and
17    we could use it here -- on May 17 of 2001.  Do you
18    see that?
19        A    Yes.
20        Q    And do you remember this is the exhibit
21    where counsel pointed out that the DEA was asking
22    industry to look at the reformulation, et cetera.
23    Do you remember that?
24        A    Yes.
```

```
 1              MR. WEINTRAUB:  It's Exhibit 44.
 2    BY MR. BERNICK:
 3        Q    Could you tell -- could you tell us
 4    whether in fact following or during -- during
 5    years following the DEA's testimony in 2001, could
 6    you tell us whether in fact Purdue did work on
 7    a -- a different formulation of OxyContin in order
 8    to try to address abuse?
 9              MR. HANLY:  Objection to the form.
10              THE WITNESS:  I was aware of many
11    efforts, including this one, to reformulate
12    OxyContin and make it less abusable.
13    BY MR. BERNICK:
14        Q    Ultimately did a time come when Purdue
15    became the first company to come out with a
16    formulation that had tamper-resistant properties?
17              MR. HANLY:  Objection to the form.
18              THE WITNESS:  I believe -- yes, it -- it
19    did.  And -- yes.  No, no -- no buts about it,
20    yes.
21    BY MR. BERNICK:
22        Q    Do you know roughly how much that
23    development cost?
24        A    I -- roughly, it's probably -- I don't
```

1 know precisely. It's probably cost us more than a
2 billion dollars, both in development and in
3 increased costs, because we had to license
4 technology to make that work. Other technology we
5 were inventing.
6        Q    At the end of the letter that -- that
7 Mr. -- that Attorney General Blumenthal wrote,
8 counsel earlier recited or directed your attention
9 to the following statement, where it says:
10 "Recognizing its perils as well as promise, Purdue
11 has a moral, ethical and legal responsibility to
12 take effective, meaningful steps to rectify the
13 problems."
14        Do you see that?
15        A    Yes.
16        Q    In your own view, just tell us,
17 Dr. Sackler, tell us whether or not you believe
18 that after the opioid crisis emerged in 2001,
19 whether you believed that Purdue Pharma was
20 responsible in the steps that it took to address
21 abuse and diversion.
22        MR. HANLY:  Objection to the form.
23 BY MR. BERNICK:
24        Q    Just tell us what your view was as to

1 whether --
2        A    My --
3        Q    -- it was responsible.
4        A    My view was that we pioneered and --
5 "pioneered" meaning nobody had ever done things we
6 did in dozens of programs -- and we supported
7 other programs that had been pioneered either for
8 opioids or other abusive drugs.
9        Q    What about the role -- how did the
10 company look at the FDA -- what was -- what, if
11 any, role did the FDA's own actions play in the
12 company's activities with respect to abuse and
13 diversion?
14        MR. HANLY:  Objection to the form.
15        THE WITNESS:  My understanding was that
16 our scientific and medical people collaborated
17 with the FDA.  We shared with them what we were
18 trying to do.  I don't know whether they made
19 additional suggestions or not, but we took this
20 extremely seriously.
21 BY MR. BERNICK:
22        Q    What about collaboration with the DEA,
23 are you familiar with whether -- you may not be,
24 but are you familiar with collaboration with the

1 DEA?
2        A    One thing comes to mind.  While it
3 appeared that this problem was very scattered and
4 not too numerous, our epidemiology or statistical
5 people came up with a model to predict the highest
6 100 counties at risk of this problem emerging, and
7 that was presented to the DEA to strong,
8 positive -- or I seem to remember that they
9 indicated they had never seen anything like this,
10 had never tried to do it, and they asked us to
11 give them a model, and we did.
12        Q    Now, finally, Dr. Sackler, I want to go
13 back to Exhibits 53 and 54.  These are e-mails
14 that -- or e-mail chains that involved you in
15 2001 -- actually, in February and July of 2001.
16        The one in 53 talks about the -- the
17 abusers, the drug abusers, and that they're the
18 problem, they're reckless criminals.
19        Another was Exhibit 54, where you wrote
20 that -- that abusers -- that addicts get
21 themselves addicted over and over again.
22        Do you see that?
23        A    Yes.
24        Q    And we're now here many, many years

1 later, and now looking back over these e-mails,
2 what do you say about the understanding that --
3 that those e-mails, what do you say about them and
4 the understanding that you've come to have about
5 the impact of addiction?
6        MR. HANLY:  Objection to the form.
7        THE WITNESS:  Of course, my -- I've
8 gotten a lot more information about addiction in
9 general and opiate -- or opioid addiction in
10 particular, and of course, my views have evolved
11 and changed.
12        At that time I was very concerned that
13 the balance that had been struck by the FDA
14 between the benefits and the risks of strong
15 opioids might be upset, perhaps with terrible
16 consequence for patients and for doctors who
17 wanted to treat them.
18        I probably was quite emotional when I
19 wrote e-mails at the time.  But in the case of
20 Tom Gruber, I think these two e-mails were un- --
21 they were spontaneously sent to me unprompted, as
22 is clear from reading the fact that it came from
23 Dr. Gruber and from Jay Wettlaufer, who is not a
24 physician or knowledgeable.  And I really didn't

**Page 444**

```
 1   want to engage in dialogue about this because it
 2   was so upsetting.
 3          So -- I overstated my agreement or my
 4   disagreement with each, with Lonnie D., not a
 5   professional -- both of them were not
 6   professional.  I said, I agree with you.  I didn't
 7   agree with her, but I just didn't want to engage.
 8   It was just too painful.
 9   BY MR. BERNICK:
10       Q    When you say that the balance of
11   benefits and risks was at stake in some fashion,
12   what benefits in particular were you focused on?
13       A    The fact that then and today opioids --
14   opiates -- opioids are the most effective
15   treatment available for pain.  They're not a first
16   resort.  They shouldn't -- clearly if Tylenol
17   works, you should never use an opioid.  But,
18   unfortunately, my understanding was there were 10
19   or 20 million people truly suffering with chronic
20   pain, and we were making an inroad.  Not alone --
21   J&J had a very effective product, and they were
22   helping in this effort, and their product was very
23   successful.
24          MR. BERNICK:  Thank you, Dr. Sackler.
```

**Page 445**

```
 1   That's all I have.
 2          THE VIDEOGRAPHER:  Going off the record
 3   at 2:38 p.m.
 4          (Recess.)
 5          THE VIDEOGRAPHER:  Back on the record at
 6   2:50 p.m.
 7          FURTHER EXAMINATION
 8   BY MR. HANLY:
 9       Q    Dr. Sackler, Mr. Bernick asked you in
10   his direct examination some questions about the
11   subject matter you and I were discussing, the
12   relative potency of morphine as opposed to
13   oxycodone.
14          Do you recall that, sir?
15       A    I do.
16       Q    All right.  Now, you have before you
17   Exhibit 56.  Do you not?  Something called an
18   "Agreed Statement of Facts."
19       A    Yes.  I do.
20       Q    And if you would turn to the --
21   page 15 -- 16 of 16, there's a whole bunch of
22   signatures.  That's it.
23       A    Yes.
24       Q    Okay.  And so on behalf of the company,
```

**Page 446**

```
 1   Ms. Abrams, who was your general counsel, signed
 2   this document.  Right?
 3       A    I don't recall if she was the general
 4   counsel when she signed it, but --
 5       Q    Well, she was a director of Purdue
 6   Frederick, it says that.
 7       A    If that's so, then that's what she was.
 8       Q    Okay.  And then Michael Friedman signed
 9   it himself.  Do you see that?
10       A    The same -- same --
11       A    Okay, I'll find it.
12       Q    Same area, under Ms. --
13       A    Abrams.  Oh, here.  Yes.  I couldn't
14   read the signature, but --
15       Q    Right.  And -- and then below
16   Mr. Friedman is -- is Howard Udell.
17       A    Yes.
18       Q    And Howard Udell was general counsel,
19   in-house counsel --
20       A    Yes.
21       Q    -- to the Purdue companies, true?
22       A    Yes.
23       Q    And we've already established he pleaded
24   guilty to a federal misdemeanor in connection with
```

**Page 447**

```
 1   the marketing of OxyContin, right?
 2       A    I don't recall precisely what he pleaded
 3   guilty to.  I do recall he pleaded guilty.
 4       Q    Okay.  And also -- withdrawn.
 5          Now, turn back, please, to page 9 of 16
 6   in this document.  I'm going to direct your
 7   attention to paragraph 29.  When you get to 9 of
 8   16 --
 9       A    I will.  Thank you.  29.
10       Q    All right.  Do you see that at the
11   bottom, paragraph 29, sir?
12       A    Yes.
13       Q    And it reads, does it not:  "In or about
14   May 1997, certain Purdue supervisors and employees
15   stated that while they were well aware of the
16   incorrect view held by many physicians that
17   oxycodone was weaker than morphine, they didn't
18   want -- they did not want to do anything, quote,
19   "'to make physicians think that oxycodone was
20   stronger or equal to morphine,'" unquote, "or,"
21   quote -- "or to," quote, "'take any steps in the
22   form of promotional materials, symposia,
23   clinicals, publications, conventions or
24   communications with the field force that would
```

```
 1   affect the unique position that OxyContin had in
 2   many physicians' mind (sic),'" unquote.
 3        Do you see that?
 4        A    Yes.
 5        Q    And that in fact is -- the gist of that
 6   is actually reflected in the e-mail exchange that
 7   I showed you a little while ago, right?
 8        A    It wasn't what I thought -- yes, that --
 9   that's -- I can't tell you what was in their mind,
10   and I can't -- and I do believe that we agreed and
11   had -- to the best of my knowledge, have lived up
12   to that agreement not to contest that statement
13   with -- within the agreement.
14        Q    So this was an Agreed Statement of Facts
15   that your company's representatives signed in
16   connection with the company's felony conviction,
17   true?
18        A    Okay.  Let me just parse that out.
19             This is an Agreed Statement of Facts,
20   yes.
21        Q    That your company --
22        A    That the company signed, yes.
23        Q    In connection with a federal felony
24   conviction.
```

```
 1        A    I thought you said a misdemeanor last
 2   time.
 3        Q    The individuals pled to a misdemeanor --
 4        A    Oh.
 5        Q    -- to misdemeanors --
 6        A    Okay.
 7        Q    -- and the company pled to a felony.
 8        A    I was unaware of the distinction, but
 9   okay.
10        Q    Now, you -- I'm finished with that
11   document.  Thank you, sir.
12        A    Oh.
13        Q    Mr. Bernick asked you some questions --
14   you can just leave it there, sir.  Thank you --
15   asked you some questions about the introduction of
16   OxyContin to the -- to the market.  True?  Do you
17   recall that?
18        A    Yeah, I think -- correct, yes.
19        Q    All right.
20        A    I'm not -- I'm a little bit full of
21   recollection, so...
22        Q    Okay.  Isn't it true, sir, that the
23   principal impetus for the introduction to the
24   marketplace of OxyContin was the fact that the
```

```
 1   patent on MS Contin was expiring?
 2        A    No, I don't recall it that way.
 3        Q    Do you recall that the expir- -- that
 4   the pending expiration of the MS Contin patent had
 5   anything to do with the development of OxyContin?
 6        A    My recollection is -- my recollection
 7   is -- I'll try to speak clearly -- is that the
 8   project started in the late '80s.  I don't recall
 9   what you say that -- that the patent -- I
10   recalled -- well, I testified as to what my
11   recollection is, and it was several things.  Okay.
12        Q    Do you, as you sit here today, recollect
13   when the patent on MS Contin expired?
14        A    Actually, I do not.  I think there were
15   several patents, but I don't -- I haven't looked
16   at that in a long time.
17        Q    You spoke to Mr. Bernick about the
18   reformulation of OxyContin, the so-called
19   tamper-resistant version.
20        A    Yes.
21        Q    And that was introduced into the market
22   in 2010.  True?
23        A    That rings a bell.  I think it's
24   correct, yes.
```

```
 1        Q    And between 1999 and 2010, did Purdue
 2   ever consider the cessation of promotion of
 3   OxyContin as the incidence of abuse was becoming
 4   more evident?
 5             MR. BERNICK:  Objection.  Lack of
 6   foundation.
 7             THE WITNESS:  Okay.  But I answer,
 8   right?  Right.
 9             Okay.  The operative word is do I
10   recollect or is it -- did Purdue -- just rephrase
11   it, please.
12   BY MR. HANLY:
13        Q    To your knowledge, did Purdue ever
14   consider the cessation of promotion of OxyContin
15   as the incidence of abuse was becoming more
16   evident?
17             MR. BERNICK:  Again, object.  Lack of
18   foundation.
19             THE WITNESS:  I think we did not
20   consider ceasing promotion, but we took actions,
21   such as withdrawing the product from Mexico when
22   we did an investigation and concluded that Mexico
23   might be a route or an access point for abusers to
24   acquire the product.  I think we changed the
```

1    indicia on both Canada and Mexico.

2         We took several more actions, but I

3    can't instantly recall them.

4    BY MR. HANLY:

5         Q    Between 1999 and 2010, sir, did you

6    cease the promotion of OxyContin for dental

7    procedures?

8         A    I -- my recollection is we never

9    promoted it for dental procedures.

10        Q    That's your recollection?

11        A    That's my recollection.

12             But I -- it's been a long, long time.

13   So -- but my recollection is we never promoted it

14   for dental procedures.

15        Q    Well, wasn't one of the impetus for the

16   reformulation in 2010 the extension of the patent

17   period?

18        A    No, not that I recollect.  The -- the

19   impetus was to make a product that we would hope

20   was less abusable, and as studies were done with

21   the introduction, it turned out, my understanding

22   is, that it was substantially less abused after

23   that.

24             MR. HANLY:  David, do you have the --

1    the July 2001 copy of the PI --

2             THE WITNESS:  Teamlink?

3             MR. BERNICK:  Yeah.  I'll show --

4             THE WITNESS:  Yeah.  Sorry.

5             MR. BERNICK:  You want to show it to

6    him.

7             MR. HANLY:  Well, let me just take a

8    look at --

9             MR. BERNICK:  I thought you would have

10   had that memorized.

11            THE WITNESS:  Yeah.

12            MR. BERNICK:  How many -- how long has

13   this been?

14            THE VIDEOGRAPHER:  10 minutes.

15   BY MR. HANLY:

16        Q    Doctor --

17            MS. CONROY:  He has to switch it over.

18            MR. HANLY:  Oh.  Okay.

19   BY MR. HANLY:

20        Q    This is actually -- here, let me put

21   this in front of you, Doctor.

22            This does not have page numbers on it,

23   but I have opened to the page in the July 18, 2001

24   package insert, which contains the section that

1    Mr. Bernick was asking you about, and indeed, he

2    highlighted a portion of this section.

3             It's the very top of the page.

4         A    Oh.

5         Q    Do you see he -- he highlighted the

6    following:  "Concerns about abuse, addiction and

7    diversion should not prevent the proper management

8    of pain.  The development of addiction to opioid

9    analgesics in properly managed patients with pain

10   has been reported to be rare," and he stopped

11   there.  Right?

12        A    I don't recall, but if you say -- the

13   record will show where he stopped.

14        Q    Okay.  And -- but the last sentence of

15   the paragraph, which Mr. Bernick omitted in his

16   examination of you, reads:  "However, data are not

17   available to establish the true incidence of

18   addiction in chronic pain patients."

19             Did I read that correctly?

20            MR. BERNICK:  Objection.  I move to

21   strike the prefatory statement.

22            THE WITNESS:  Yes, you read it

23   correctly.

24   BY MR. HANLY:

1         Q    Okay.  And do you recall whether in or

2    around July of 2001, you believed that that

3    statement was true; that is, data were not then

4    available to establish the true incidence of

5    addiction in chronic pain patients?

6         A    I didn't focus on it as you're asking me

7    to do so now, but I -- had I done so -- well, I

8    don't have to say the hypothetical, I guess.

9             But I would -- I would have asked

10   myself, I think there is data, but I would read

11   that to be insufficient data to establish it.

12   There was data, I'm virtually sure, but I can't

13   cite it for you from memory.  I'm --

14        Q    So you --

15        A    I'm -- So I suspect there was real data,

16   but -- that's how I would read it had I focused on

17   it.

18        Q    So you -- sorry.  So you agree -- you

19   agreed in Mr. Bernick's examination to the truth

20   of every statement in the PI that he showed you,

21   but when I show you this statement, you tell me

22   that you think that it's wrong?

23            MR. BERNICK:  Objection.  Argumentative.

24   I also think that this now is not really proper at

```
1    this point given the time that it's taken.
2           THE WITNESS:  I didn't say --
3           MR. BERNICK:  I --
4           THE WITNESS:  I'm sorry.
5           SPECIAL MASTER COHEN:  You can answer.
6           MR. BERNICK:  What?
7           SPECIAL MASTER COHEN:  There is a
8    pending question.  He can answer.
9           THE WITNESS:  I didn't say -- didn't
10   intend to imply this is categorically untrue.
11          What I said is, I added a bracket,
12   sufficient data in the mind -- clearly in the
13   minds of the -- of the people working on this
14   package insert.
15          But -- that's it.  That's what I can
16   say.
17   BY MR. HANLY:
18      Q   But you are -- this is my last question,
19   sir.
20          You are aware, are you not, of marketing
21   materials generated and disseminated between 1999
22   and 2010 by your company that stated in no
23   uncertain terms that there was virtually no risk
24   of addiction to OxyContin on the part of patients
```

```
1    prescribed the drug?
2       A   I --
3           MR. BERNICK:  Hang -- hang on.  Object
4    to form.  It is a reiteration of -- of a lot of
5    the cross, and it's not tied to my examination.
6           THE WITNESS:  Okay.  Can you restate the
7    question?  Since the last one.  I want to be sure
8    I --
9           MR. HANLY:  Sure thing.
10          THE WITNESS:  -- heard it right.
11   BY MR. HANLY:
12      Q   You are aware, are you not, of marketing
13   materials generated and disseminated between 1999
14   and 2010 by your company that stated in no
15   uncertain terms that there was virtually no risk
16   of addiction to OxyContin on the part of patients
17   prescribed the drug?
18          MR. CHEFFO:  Objection.
19          MR. BERNICK:  Objection.  Lack of
20   foundation.  Form.
21          Again, this is out of time.
22          MR. HANLY:  I'm just --
23          MR. BERNICK:  Subject to Your Honor's
24   determination.
```

```
1           SPECIAL MASTER COHEN:  The question was
2    asked twice.  He can answer.  It's a yes-or-no
3    question.
4           THE WITNESS:  I have no recollection of
5    any brochure that did that, did what you put
6    forward as a proposition, to be -- trying to be
7    clear.
8           MR. HANLY:  I think we're done.
9           SPECIAL MASTER COHEN:  We are.
10          MR. BERNICK:  Okay.
11          THE VIDEOGRAPHER:  This ends today's
12   deposition.  We're going off the record.  The time
13   is 3:06 p.m.
14          (Whereupon, the deposition of
15          RICHARD SACKLER, M.D. was
16          concluded at 3:06 p.m.)
17
18
19
20
21
22
23
24
```

```
1           CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2           The undersigned Certified Shorthand Reporter
3    does hereby certify:
4           That the foregoing proceeding was taken before
5    me at the time and place therein set forth, at
6    which time the witness was duly sworn; That the
7    testimony of the witness and all objections made
8    at the time of the examination were recorded
9    stenographically by me and were thereafter
10   transcribed, said transcript being a true and
11   correct copy of my shorthand notes thereof; That
12   the dismantling of the original transcript will
13   void the reporter's certificate.
14          In witness thereof, I have subscribed my name
15   this date:  March 12, 2019.
16
17          _Leslie A. Todd_
18          LESLIE A. TODD, CSR, RPR
19          Certificate No. 5129
20   (The foregoing certification of
21   this transcript does not apply to any
22   reproduction of the same by any means,
23   unless under the direct control and/or
24   supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          INSTRUCTIONS TO WITNESS
 2       Please read your deposition over carefully and
 3  make any necessary corrections. You should state
 4  the reason in the appropriate space on the errata
 5  sheet for any corrections that are made.
 6       After doing so, please sign the errata sheet
 7  and date it.
 8       You are signing same subject to the changes
 9  you have noted on the errata sheet, which will be
10  attached to your deposition.  It is imperative
11  that you return the original errata sheet to the
12  depositing attorney within thirty (30) days of
13  receipt of the deposition transcript by you. If
14  you fail to do so, the deposition transcript may
15  be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          - - - - -
 2          E R R A T A
 3          - - - - -
 4  PAGE LINE CHANGE
 5  ____ ____ _____
 6  REASON: _____
 7  ____ ____ _____
 8  REASON: _____
 9  ____ ____ _____
10  REASON: _____
11  ____ ____ _____
12  REASON: _____
13  ____ ____ _____
14  REASON: _____
15  ____ ____ _____
16  REASON: _____
17  ____ ____ _____
18  REASON: _____
19  ____ ____ _____
20  REASON: _____
21  ____ ____ _____
22  REASON: _____
23  ____ ____ _____
24  REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2       I,_____, do hereby
 3  certify that I have read the foregoing pages, and
 4  that the same is a correct transcription of the
 5  answers given by me to the questions therein
 6  propounded, except for the corrections or changes
 7  in form or substance, if any, noted in the
 8  attached Errata Sheet.
 9
10  _____
11  RICHARD SACKLER, M.D.               DATE
12
13
14  Subscribed and sworn to
15  before me this
16  _____day of_____,20___.
17  My commission expires:_____
18  _____
19  Notary Public
20
21
22
23
24
```