```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

      *************************

 4

      IN RE:  NATIONAL          MDL No. 2804

 5    PRESCRIPTION OPIATE

      LITIGATION               Case No.

 6                             1:17-MD-2804

      ************************

 7

      THIS DOCUMENT RELATES TO    Hon. Dan A. Polster

 8    ALL CASES

 9    *************************

10

11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12              CONFIDENTIALITY REVIEW

13       VIDEOTAPED DEPOSITION OF CRAIG SCHIAVO

14

15            Thursday, January 17th, 2019

16                   8:06 a.m.

17

18       Held At:

19            Omni Hotel

20            One West Exchange Street

21            Providence, Rhode Island

22

23    REPORTED BY:

24    Maureen O'Connor Pollard, RMR, CLR, CSR
```

```
 1   APPEARANCES:
 2
     FOR THE PLAINTIFFS:
 3
         MICHAEL E. ELSNER, ESQ.
 4       KAITLYN EEKHOFF
             MOTLEY RICE LLC
 5           28 Bridgeside Boulevard
             Mt. Pleasant, South Carolina 29464
 6           843-216-9250
             melsner@motleyrice.com
 7
                 -and-
 8
         JAMES A. DeROCHE, ESQ., of Counsel
 9           WEISMAN, KENNEDY & BERRIS CO., LPA
             101 W. Prospect Avenue
10           Cleveland, Ohio 44115
             800-747-9330
11           lderoche@garson.com
12
13   FOR McKESSON CORPORATION:
14       CHRISTOPHER N. DAWSON, ESQ.
             WHELAN, CORRENTE, FLANDERS, KINDER
15           & SIKET LLP
             100 Westminster Street, Suite 710
16           Providence, Rhode Island 02903
             401-270-4500
17           cdawson@whelancorrente.com
18
19   FOR AMERISOURCEBERGEN DRUG CORPORATION:
20       ANDREW SCHOCK, ESQ. (Remotely)
             JACKSON KELLY PLLC
21           500 Lee Street East, Suite 1600
             Charleston, West Virginia 25301
22           304-340-1146
             anschock@jacksonkelly.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):
 2   FOR WALMART:
 3       PAMELA YAACOUB, ESQ. (Remotely)
              JONES DAY
 4            77 West Wacker
              Chicago, Illinois 60601
 5            312-782-3939
              pyaacoub@jonesday.com
 6
 7   FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.:
 8       ALEXANDRA W. MILLER, ESQ.
              ZUCKERMAN SPAEDER LLP
 9            1800 M Street NW, Suite 1000
              Washington, DC 20036-5807
10            202-778-1800
              smiller@zuckerman.com
11
12   FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
     SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
13   INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
14       DAVID KOUBA, ESQ. (Remotely)
              ARNOLD & PORTER KAYE SCHOLER, LLP
15            601 Massachusetts Avenue, NW
              Washington, DC 20001-3743
16            202-942-5000
              david.kouba@arnoldporter.com
17
18   FOR HENRY SCHEIN, INC., and HENRY SCHEIN MEDICAL
     SYSTEMS, INC.:
19

         BRANDAN MONTMINY, ESQ.
20            LOCKE LORD LLP
              2200 Ross Avenue, Suite 2800
21            Dallas, Texas 75201
              214-740-8445
22            brandan.montminy@lockelord.com
23

     VIDEOGRAPHER:  Robert Sweig
24   TRIAL TECHNICIAN:  Gina Veldman
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX
 2    EXAMINATION                              PAGE
 3    CRAIG SCHIAVO
 4     BY MR. ELSNER                            8
 5     BY MS. MILLER                          386
 6
 7
 8           E X H I B I T S
 9    NO.          DESCRIPTION                 PAGE
10    CVS-Schiavo-1     Craig Schiavo's LinkedIn
                        profile......................  18
11
      CVS-Schiavo-2     E-mail chain with
12                      attachment, Bates
                        his-MDL-00495778 through
13                      5785.........................  35
14    CVS-Schiavo-3     PowerPoint, The Challenge to
                        "Know Your Customer," and
15                      Best Practices, November
                        2010.........................  42
16
      CVS-Schiavo-4     12/27/07 letter from the
17                      DEA, Bates
                        CVS-MDLT1-000013535 and 3536..  51
18
      CVS-Schiavo-5     9/27.06 letter from the FDA,
19                      Bates CVS-MDLT1-000010552
                        through 555..................  53
20
      CVS-Schiavo-6     10-20-09 e-mail with
21                      attached PowerPoint, Bates
                        his-MDL-00231976 and 1977.....  80
22
      CVS-Schiavo-7     1/24/13 e-mail, Bates
23                      CVS-MDLT1-000057796 and 7797..  113
24
```

```
 1
     CVS-Schiavo-8     DEA PowerPoint, Drug Trends,
 2                     Long Island, New York,
                       September 2012............... 134
 3
     CVS-Schiavo-9     Craig Schiavo's Year-End
 4                     Review, 2012, Bates
                       CVS-MDLT1-000120596 through
 5                     606......................... 147
 6   CVS-Schiavo-10    E-mail chain with
                       attachment, Bates
 7                     CVS-MDLT1-000083064 through
                       3069........................ 151
 8
     CVS-Schiavo-11    12/13/12 e-mail with
 9                     attachment, Bates
                       CVS-MDLT1-000078045 through
10                     8047........................ 178
11   CVS-Schiavo-12    E-mail chain with
                       attachment, Bates
12                     CVS-MDLT1-000025365 through
                       5369........................ 190
13
     CVS-Schiavo-13    Craig Schiavo's Year-End
14                     Review - 2013, Bates
                       CVS-MDLT1-000120580 through
15                     588......................... 223
16   CVS-Schiavo-14    Craig Schiavo's Mid-Year
                       Review - 2013, Bates
17                     CVS-MDLT1-000120589 through
                       595......................... 229
18
     CVS-Schiavo-15    1/22/13 e-mail with
19                     attachment, Bates
                       CVS-MDLT1-000103327 and 3328.. 236
20
     CVS-Schiavo-16    E-mail chain with
21                     attachment, Bates
                       CVS-MDLT1-000078060 through
22                     8069........................ 250
     CVS-Schiavo-17    DEA Government's Prehearing
23                     Statement, Bates
                       CAH_MDL_PRIORPROD_DEA12_
24                     00000001 through 54.......... 278
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

    CVS-Schiavo-18    Craig Schiavo's Year-End
 2                    Review - 2014, Bates
                      CVS-MDLT1-000120573 through
 3                    579......................... 288
 4  CVS-Schiavo-19    11/26/12 e-mail with
                      attached SOM End State
 5                    Enhancement Solution, Bates
                      CVS-MDLT1-000058034 through
 6                    8037......................... 307
 7  CVS-Schiavo-20    12/19/12 e-mail with
                      attachment, Bates
 8                    CVS-MDLT1-000111913 through
                      1917......................... 309
 9
    CVS-Schiavo-21    12/12/12 e-mail with
10                    attachment, Bates
                      CVS-MDLT1-000103373 through
11                    3380......................... 327
12  CVS-Schiavo-22    2/4/13 Memo, Bates
                      CVS-MDLT1-000028143 through
13                    8147......................... 340
14  CVS-Schiavo-23    E-mail chain, Bates
                      CVS-MDLT1-000076114 through
15                    6117......................... 349
16  CVS-Schiavo-24    E-mail chain, Bates
                      CVS-MDLT1-000078127 through
17                    8129......................... 356
18  CVS-Schiavo-25    E-mail chain, Bates
                      CVS-MDLT1-000077942 through
19                    7945......................... 358
20  CVS-Schiavo-26    E-mail chain, Bates
                      CVS-MDLT1-000078116 through
21                    8119......................... 368
22  CVS-Schiavo-27    6/19/14 e-mail with
                      attachment, Bates
23                    CVS-MDLT1-000103344 through
                      3372......................... 371
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

     CVS-Schiavo-28   6/17/14 e-mail with

 2                    attachment, Bates

                      CVS-MDLT1-000103342 and 3343..   374

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                P R O C E E D I N G S

2

3                THE VIDEOGRAPHER:  We are now on the

4    record.  My name is Robert Sweig, and I'm a

5    videographer for Golkow Litigation Services.

6                Today's date is January 17, 2019, and

7    the time is 8:06 a.m.

8                This video deposition is being held in

9    Providence, Rhode Island in the matter of In Re

10   National Prescription Opiate Litigation pending

11   before the United States District Court for the

12   Northern District of Ohio, Eastern Division.

13               The deponent is Craig Schiavo.

14               Counsel appearances will be as noted

15   on the stenographic record.

16               The court reporter is Maureen Pollard

17   who will now swear in our witness.

18

19               CRAIG SCHIAVO,

20   having been duly sworn, was examined and

21   testified as follows:

22               EXAMINATION

23   BY MR. ELSNER:

24        Q.   Good morning.
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Good morning.

2     Q.    My name is Mike Elsner, and I'm from

3   the law firm of Motley Rice, and I represent the

4   plaintiffs in these actions.

5           Can you please tell us your name?

6     A.    My name is Craig Schiavo.

7     Q.    When were you born?

8     A.    ████████████████████

9     Q.    So how old are you?

10    A.    36.

11    Q.    36.

12          And where do you live?

13    A.    Medway, Massachusetts.

14    Q.    And you graduated from Lasalle

15  University, is that right?

16    A.    That's right.

17    Q.    And that's in Philadelphia?

18    A.    That's in Philadelphia.

19    Q.    In 2004?

20    A.    Yes.

21    Q.    Okay.  Did you graduate with a degree?

22    A.    Yes.

23    Q.    What is the degree?

24    A.    My major was business management.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  Did you take any courses in

2  pharmaceuticals or pharmacy?

3      A.   Not that I recall.

4      Q.   Before joining Henry Schein, did you

5  have any coursework or take any studies in DA

6  regulations?

7      A.   Not that I recall.

8      Q.   Okay.  When did you join Henry Schein?

9  Was that your first job out of college?

10     A.   I joined Henry Schein in June of 2004,

11  and that was my first full-time job out of

12  college.

13     Q.   Okay.  And what were you hired to do?

14     A.   When I started in 2004, I was doing

15  product recalls.

16     Q.   And what did that involve?

17     A.   We would receive recalls or

18  withdrawals from manufacturers or distributors,

19  and my responsibility was to coordinate the --

20  making sure that our distribution centers put a

21  block on the product, and then if required

22  whatever notifications needed to go to either

23  our customers, or just coordinate the recall.

24     Q.   Okay.  And Henry Schein is a wholesale

Highly Confidential – Subject to Further Confidentiality Review

 1   distributor of medical products and drugs, is

 2   that right?

 3        A.   That's part of their services, yes.

 4        Q.   What else do they do?

 5        A.   They distribute a lot of things.

 6        Q.   Okay.  But they do distribute

 7   controlled substances, is that right?

 8        A.   At the time that I worked there, yes.

 9        Q.   Okay.  And did that include Schedule

10   II narcotics as well as Schedule III narcotics?

11             MS. MILLER:  Object to form.

12        A.   Yes.

13   BY MR. ELSNER:

14        Q.   And can you give us a description of

15   Henry Schein's customer base as it related to

16   the sale of controlled substances?

17        A.   We distributed mainly to the

18   office-based practitioner from what I remember.

19        Q.   Okay.  So that would include medical

20   doctors in their offices, is that right?

21        A.   Yes.

22        Q.   And dentists?

23        A.   I believe we distributed to dentists,

24   yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   And veterinary clinics?

2        A.   For -- I don't think so the whole time

3   that I worked there, but at some point they did.

4        Q.   Okay.  Did it include retail

5   pharmacies?

6        A.   For most of the time that I was there,

7   no.  At the very end of my time with Henry

8   Schein I vaguely remember going or dealing with

9   a pharmacy, a few pharmacies.

10       Q.   And would these be large retail

11  pharmacy chains like CVS or Walgreen's, or are

12  we talking about smaller pharmacies?

13       A.   To the best of my recollection, I

14  think it was just smaller pharmacies.

15       Q.   Okay.  And how long did you perform

16  your job for Henry Schein in product recalls?

17  You started in June, 2004, and when did that

18  position end, and what was your next position

19  there?

20       A.   I don't remember exactly how long I

21  was in the role.  It might have been a couple

22  years, two, two and a half years.  And then

23  after that my role was dealing with inspections

24  and controlled substances and suspicious order
```

1    monitoring.

2        Q.   Did you begin that roughly in 2007?

3    Does that sound about right?

4        A.   I don't recall.

5        Q.   Okay.  How was it that you

6    transitioned from product recalls into

7    regulatory specialist related to DEA compliance?

8            MS. MILLER:  Object to form.

9        A.   Can you just repeat the question?

10   BY MR. ELSNER:

11       Q.   Yes.  Well, let me ask it a different

12   way.

13           What was your title after you moved

14   from recall coordinator?  What was your next

15   title at Henry Schein?

16       A.   I don't remember the specific title.

17       Q.   Okay.  But what were you responsible

18   for in your new position?

19       A.   I think I was still supporting

20   recalls.  And then when I first started the role

21   I don't remember exactly what my

22   responsibilities were.

23       Q.   Did it include any responsibilities

24   for DEA compliance with respect to controlled

1    substances?

2        A.    When I first transitioned into the

3    role, I don't know what my responsibilities

4    were, but it was learning the new role, and part

5    of that was around controlled substances and

6    inspections in our distribution centers.

7        Q.    And as you evolved into that role

8    after the training period, then what were your

9    general responsibilities in that position?

10       A.    Continued to be government

11   inspections, training of some employees, and

12   then compliance with controlled substances and

13   suspicious order monitoring.

14       Q.    How many -- did you have employees

15   that worked for you in that position?

16       A.    I had no direct reports.

17       Q.    Okay.  How large was the team that

18   dealt with compliance related to controlled

19   substances at Henry Schein in that period?

20       A.    I'm not sure -- I mean, a lot of

21   people had a part in the process.  I don't know

22   how many.

23       Q.    Were you involved in establishing

24   Henry Schein's suspicious order monitoring

Highly Confidential - Subject to Further Confidentiality Review

1    program for controlled substances?

2              MR. MONTMINY:  Objection.  Form,

3    outside the scope.

4         A.   I was part of a team that worked on

5    suspicious order monitoring.

6    BY MR. ELSNER:

7         Q.   How many people were in that team?

8         A.   Again, I don't recall how many.  There

9    was a team of people.  I can't remember

10   everyone.

11        Q.   Less than ten?  Less than five?

12   What's your best estimate?

13        A.   Again, I don't recall.  It wasn't just

14   compliance.  There were other departments that

15   were participating.  I can't even give a good

16   guess on how many people.

17        Q.   When did Henry Schein develop its

18   suspicious order monitoring system initially?

19             MR. MONTMINY:  Objection to form.

20        A.   I'm not sure.

21   BY MR. ELSNER:

22        Q.   Was it in place in 2007 when you

23   transitioned into that position, or was it

24   something that you developed in that position?

```
 1              MR. MONTMINY:  Objection.  Form, asked

 2   and answered.

 3       A.   I don't recall what the system was

 4   prior to me going to that role.

 5   BY MR. ELSNER:

 6       Q.   Did it exist?

 7       A.   I don't recall.

 8       Q.   At some point in time you became a

 9   senior regulatory specialist at Henry Schein, is

10   that right?

11       A.   I believe so.

12       Q.   Okay.  And was that in 2012?

13       A.   I don't recall when that happened.

14       Q.   Was it shortly before you left Henry

15   Schein?

16       A.   I'm not sure what you mean by

17   "shortly," but I don't remember exactly when I

18   went into that role, or got that title.

19       Q.   How long did you serve in that role?

20       A.   Again, I don't remember when I -- I

21   think that was a promotion.  I don't remember

22   when that happened.

23       Q.   Did your responsibilities change in

24   any way?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't remember.

 2        Q.    Did you have direct reports?

 3        A.    I don't believe I ever had direct

 4   reports at Henry Schein.

 5        Q.    I want to show you something on the

 6   screen, I didn't print it for you, but it might

 7   help your recollection with some of the dates,

 8   if that's okay.

 9        A.    Sure.

10              MS. MILLER:  Mike, do you have hard

11   copies?

12              MR. ELSNER:  I'll have hard copies of

13   most everything else, but not this.  This is his

14   LinkedIn page.  I'm going to show it to him and

15   see if it helps him remember some of the dates.

16              MS. MILLER:  Craig, are you able to --

17              MR. ELSNER:  There's a screen, but

18   it's not there yet.

19              Can we just go off the record for a

20   quick minute while we get this?  Sorry.

21              THE VIDEOGRAPHER:  We're going off the

22   record at 8:17 a.m.

23              (Pause.)

24              THE VIDEOGRAPHER:  We're back on the
```

 1    record at 8:18 a.m.

 2              (Whereupon, CVS-Schiavo-1 was marked

 3              for identification.)

 4    BY MR. ELSNER:

 5        Q.   Mr. Schiavo, we've placed before you

 6    what we're going to mark as Exhibit 1.  Is this

 7    a copy of your LinkedIn page?

 8        A.   It looks to be my LinkedIn page.

 9        Q.   That's your picture?

10        A.   That is my picture.

11        Q.   Okay.  Did you draft -- did you create

12    your own LinkedIn page?

13        A.   Yes.

14        Q.   Okay.  Let's move down to the portion

15    that deals with your work experience at Henry

16    Schein.  I think it starts on the bottom of the

17    first page there.  It says that you worked there

18    for roughly eight years.  Is that accurate?

19        A.   That seems about right.

20        Q.   Okay.  When did you create your

21    LinkedIn page?

22        A.   I don't remember when I created it.

23        Q.   It says here that your work for Henry

24    Schein was in Greenville, South Carolina.  Is

Highly Confidential - Subject to Further Confidentiality Review

1   that where you were working when you worked for

2   them?

3        A.   Part of the time that I worked for

4   them it was in Greenville.

5        Q.   What period of time did you spend in

6   Greenville?

7        A.   It was my last year with the company.

8        Q.   Your last year.

9             Where were you before that?

10       A.   I was in Melville, Long Island.

11       Q.   In New York?

12       A.   In New York.

13       Q.   Okay.  What year did you move to

14   Greenville?

15       A.   I believe it was 2011.

16       Q.   Okay.  On the second page of your

17   LinkedIn page it lists -- the top of the second

18   page, it says "Senior Regulatory Specialist -

19   DEA Compliance," and it's listed there from June

20   of 2004 to August of 2012, if I can read that

21   correctly.  Is that accurate?

22       A.   That's what it says there.  I started

23   in June of 2004.  I wasn't handling anything

24   with DEA compliance that I recall in 2004.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  The first time you started

2   handling DEA compliance, was that 2007?

3      A.   I don't remember the exact year.

4      Q.   If we go back to the first page, I'm

5   sorry we're fumbling through this a little bit,

6   there's a summary of your work experience, and

7   it lists on the bottom that you were a

8   regulatory associate from 2004 to 2007.  Does

9   that sound right?

10      A.   That seems about right.  I don't

11   specifically recall those dates, but...

12      Q.   When you drafted your LinkedIn page,

13   did you make an effort to make sure it was

14   accurate?

15           MS. MILLER:  Object to form.

16      A.   I don't recall doing anything to

17   intentionally not be accurate, but I don't spend

18   much time on LinkedIn or use LinkedIn very

19   often.

20   BY MR. ELSNER:

21      Q.   Okay.  Above that you listed

22   "Regulatory Specialist - DEA Compliance" from

23   2007 to 2012.  Does that -- is that accurate?

24      A.   That's what it says there.  Again, I

 1    don't specifically recall the dates where I

 2    started the position, but that's what it says.

 3         Q.   Okay.  And then in 2012 you were a

 4    senior regulatory specialist for DEA compliance,

 5    is that right?

 6         A.   I know in 2012 I was a senior

 7    regulatory specialist.

 8         Q.   Okay.  And Henry Schein hired the

 9    Buzzeo Group as consultants to work on the

10    suspicious order monitoring program for

11    controlled substances, is that right?

12              MR. MONTMINY:  Objection.  Outside the

13    scope.

14         A.   I don't recall exactly why we hired

15    Buzzeo, if it was there specifically for SOM or

16    just general compliance.

17    BY MR. ELSNER:

18         Q.   Do you know when Henry Schein hired

19    Buzzeo?

20         A.   I don't recall.

21         Q.   Do you know what Buzzeo -- what was

22    your understanding of what work Buzzeo was doing

23    for Henry Schein?

24              MR. MONTMINY:  Objection.  Outside the

Highly Confidential - Subject to Further Confidentiality Review

1    scope.

2        A.   We worked with Buzzeo on general DEA

3    compliance issues, as I remember it.

4    BY MR. ELSNER:

5        Q.   Such as what?

6        A.   Inspections, SOM, anything that had to

7    do with DEA compliance.

8        Q.   Who specifically at Buzzeo did you

9    work with?

10       A.   There were a number of people.  I

11   can't recall everyone that I worked with at

12   Buzzeo.

13       Q.   You said that Buzzeo did work for

14   Henry Schein on their SOM program.  What type of

15   work did they do?

16            MR. MONTMINY:  Objection.  Outside the

17   scope.

18       A.   So I recall working with Buzzeo on --

19   I mean, I used to speak to Buzzeo for guidance

20   on lots of topics, not specific to SOM, but they

21   helped us develop the newer system, I guess,

22   that I was a part of.  That was part of the role

23   that they played.

24   BY MR. ELSNER:

1     Q.    The newer system is a newer suspicious

2    order monitoring system for controlled

3    substances, is that what you mean?

4     A.    Yeah, it was either the newer or

5    enhanced system that was being worked on.

6     Q.    Were they -- what was --

7     A.    The enhanced system.

8     Q.    The enhanced system.

9          Did Buzzeo assist Henry Schein in

10    developing an algorithm for its suspicious order

11    monitoring program?

12          MR. MONTMINY:  Objection.  Outside the

13    scope.

14     A.    I believe so.

15    BY MR. ELSNER:

16     Q.    And did Buzzeo create training

17    materials and train employees at Henry Schein on

18    the suspicious order monitoring system?

19     A.    What exactly do you mean by

20    "training"?

21     Q.    Well, did they develop training

22    materials for Henry Schein to train their

23    employees on the suspicious order monitoring

24    system for controlled substances?

 1        A.    I don't recall any specific

 2   documentation or training materials.

 3        Q.    Did they come into Henry Schein and

 4   offer training, seminars, or sessions with

 5   employees at Henry Schein?

 6              MR. MONTMINY:  Objection.  Outside the

 7   scope.

 8        A.    I recall at least one training.

 9   BY MR. ELSNER:

10        Q.    Who did the training, do you recall?

11        A.    I don't recall who it was.

12        Q.    What work were you doing on the

13   suspicious order monitoring system at Henry

14   Schein for controlled substances?

15        A.    At which point are you referring to?

16        Q.    Walk me through from 2007 to 2012.

17        A.    I know in 2007, if that's when I

18   transitioned based on my LinkedIn page, I was

19   probably just learning.  And then by the end in

20   2012, my role was again -- specifically to SOM?

21        Q.    Yes.

22        A.    I was conducting site visits on

23   customers and reviewing orders that were flagged

24   by the SOM system.

```
 1        Q.   So as I understand it, the suspicious

 2   order monitoring system would use an algorithm

 3   to identify potentially suspicious orders, is

 4   that generally accurate?

 5             MS. MILLER:  Object to form.

 6        A.   The suspicious order monitoring system

 7   was a piece of the process used to identify

 8   orders of interest, but that wasn't the only way

 9   to identify orders.

10   BY MR. ELSNER:

11        Q.   And once orders were identified of

12   interest, did you have responsibility for

13   reviewing those orders to determine whether they

14   were potentially suspicious of diversion or not?

15             MS. MILLER:  Object to form.

16        A.   That was part of my responsibilities.

17   BY MR. ELSNER:

18        Q.   What would you do to do that when you

19   worked at Henry Schein?

20        A.   It all depended on the order.  There

21   were tons of approaches to take to review an

22   order.

23        Q.   Do you know what the criteria that

24   Henry Schein was using at that time, what its
```

1    algorithm was pulling orders for to determine

2    whether they should be -- whether they should

3    have an enhanced review?

4              MR. MONTMINY:  Objection.  Form,

5    outside the scope.

6         A.   The specific logic used by the

7    algorithm, I didn't know that.  I knew at a high

8    level the system was looking for orders of

9    unusual size, buying pattern, or frequency.

10   BY MR. ELSNER:

11        Q.   When they identified those orders,

12   what were the tools that you used to determine

13   whether an order was -- should be further

14   investigated?

15             MS. MILLER:  Object to form.

16        A.   There is no limitation on what I could

17   use.  Whatever information that was available to

18   me or that I could use, I did.

19   BY MR. ELSNER:

20        Q.   What information was available to you?

21   Were there databases that you could pull upon,

22   or was there order history you could review?

23   What were the items you could look at to

24   determine whether a particular order was worthy

1   of enhanced investigation?

2          MR. MONTMINY:  Objection.  Form,

3   outside the scope.

4      A.   I can't remember everything that I

5   used.  Some of the things you mentioned were

6   data sources that we used.  It also included

7   phone calls or site visits or internet searches.

8   I mean, there were -- any resource that I could

9   use, I would -- was available.

10  BY MR. ELSNER:

11     Q.   Did you have databases that you could

12  pull upon, outside databases that you could pull

13  upon to search for information about particular

14  physicians?

15         MS. MILLER:  Object to form.

16     A.   I'm not sure what you're referring to

17  by outside databases.

18  BY MR. ELSNER:

19     Q.   Well, you mentioned that you could

20  access information on the internet about people,

21  and you do research and internet searches.  So

22  what type of searches are we talking about?

23     A.   There were lots of searches.  One

24  example would be if it was a doctor's office, I

1    would just Google the doctor office name.

2        Q.   Okay.  Anything else?

3        A.   There are lots of things.  Anything

4    that I would see or could research, I would do.

5        Q.   I appreciate there are lots of things,

6    but I need to get a more specific sense of what

7    you actually did.

8             So did you look to determine whether

9    they had a valid DEA license?

10            MS. MILLER:  Object to form.

11       A.   That specifically was not my role.

12   BY MR. ELSNER:

13       Q.   Okay.  Did you look to see whether

14   they had a criminal background, or a criminal

15   history?

16            MS. MILLER:  Object to form.

17       A.   I don't recall ever specifically

18   looking for that.

19   BY MR. ELSNER:

20       Q.   What determined whether you would make

21   a site visit to a particular doctor's office or

22   dentist's office or something else like that?

23            MS. MILLER:  Object to form.

24       A.   I don't think there was one criteria

1    that when I saw it I said, this needs a site

2    visit.

3    BY MR. ELSNER:

4        Q.   Well, you didn't visit every doctor's

5    office that was identified by the suspicious

6    order monitoring system, right?

7        A.   I don't believe so.

8        Q.   Okay.  So what were among the criteria

9    you would use to determine whether you were

10   going to conduct a site visit?

11           MR. MONTMINY:  Object to form.

12   Outside the scope.

13       A.   There's lots of situations that would

14   cause me to do a site -- there is not one or

15   two, but there were lots.

16   BY MR. ELSNER:

17       Q.   Well, give us some examples.

18       A.   If there was -- if I felt that an

19   order was significantly higher than someone's

20   previous order.

21       Q.   What would make it significantly

22   higher?

23       A.   I don't know.  Determination at the

24   time.

1    Q.   How far back in the order history

2  would you look to determine whether this

3  particular order was significantly higher than

4  prior orders?

5         MR. MONTMINY:  Objection.  Form,

6  outside the scope.

7    A.   I don't recall it.  I'm sure it was

8  different for every situation.

9  BY MR. ELSNER:

10   Q.   Was there a particular database at

11 Henry Schein that contained that information?

12   A.   We had a data warehouse.

13   Q.   What data was contained in the data

14 warehouse that you used to conduct your

15 suspicious order monitoring review?

16        MR. MONTMINY:  Objection.  Form.

17   A.   I don't recall everything that I

18 pulled out of there.  I know order history was

19 one.

20 BY MR. ELSNER:

21   Q.   What else?

22   A.   I don't recall what else was in there.

23   Q.   Did you ever seek from a physician's

24 office information about their patients?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. MONTMINY:  Objection.  Form,

2    outside the scope.

3        A.   I'm not sure what you mean by

4    information on patients.

5    BY MR. ELSNER:

6        Q.   Well, did you determine what kind of

7    physician the doctor was and what kind of

8    patients the physician was providing services

9    to?

10          MR. MONTMINY:  Objection.  Form,

11   outside the scope.

12       A.   Part of when I spoke to a physician I

13   would ask what their practice was, and typically

14   I get a high level what are your visits like

15   with patients.  I never got to details.

16   BY MR. ELSNER:

17       Q.   When you say high level what were your

18   visits like with patients, you'd ask them how

19   long they'd spend with a patient?

20          MS. MILLER:  Object to form.

21       A.   Not specifically.  Every conversation

22   with a doctor was different.  But I'd ask how

23   many patients you'd seen, as an example, but

24   every conversation was different.

```
 1   BY MR. ELSNER:

 2       Q.   How long do those calls generally

 3   last?

 4            MR. MONTMINY:  Objection.  Form,

 5   outside the scope.

 6       A.   Every call was a different length.

 7   BY MR. ELSNER:

 8       Q.   Every call was unique and completely

 9   different?  You never asked the same question,

10   you never had a set of questions that you were

11   sure to follow up with with each physician?

12            MR. MONTMINY:  Objection.  Form.

13       A.   I believe there are guidelines that I

14   used, but every call was unique.

15   BY MR. ELSNER:

16       Q.   So other than how many patients the

17   doctor had seen, what else would you ask?

18            MR. MONTMINY:  Objection.  Form,

19   outside the scope.

20       A.   It all depends on why I was following

21   up on the order.

22   BY MR. ELSNER:

23       Q.   Did you ever ask for dispensing

24   history from a physician's office?
```

```
 1                  MR. MONTMINY:  Objection.  Form.

 2        A.   I don't recall.

 3   BY MR. ELSNER:

 4        Q.   Did you ever ask whether that

 5   physician was ordering controlled substances

 6   from other wholesale distributors?

 7                  MR. MONTMINY:  Objection.  Form.

 8        A.   I might have.  I don't specifically

 9   remember.

10   BY MR. ELSNER:

11        Q.   What else do you remember about what

12   you'd ask physicians for.

13                  MR. MONTMINY:  Objection.  Form.

14        A.   Again, it all depended on why I was

15   conducting the order.

16   BY MR. ELSNER:

17        Q.   When you were going to do a site

18   visit, what was it that you were looking for?

19                  MR. MONTMINY:  Objection.  Form.

20        A.   It all depends on why I decided to do

21   the site visit.

22   BY MR. ELSNER:

23        Q.   Give me an example, any example.

24        A.   At a high level I was looking to see
```

1    that they were a legitimate physician.

2        Q.    How did you do that?

3              MS. MILLER:  Object to form.

4        A.    Doing a site visit and speaking with

5    the doctor or, like I said, Google searches and

6    reviews.  I mean, there was tons of resources.

7    BY MR. ELSNER:

8        Q.    Did you look at dispensing history

9    from those physicians' offices?  When you

10   conducted a site visit, would you ask to see

11   their dispensing records?

12             MR. MONTMINY:  Object to form.

13   Outside the scope.

14       A.    I don't recall ever asking to see

15   dispensing records.

16   BY MR. ELSNER:

17       Q.    There came a time when you -- strike

18   that.

19             Buzzeo had annual conferences for

20   controlled substances, is that right?

21       A.    I believe they were annual.

22       Q.    And you attended some of those?

23       A.    Yes.

24       Q.    How many of them did you attend?

```
1          A.   I don't recall.

2          Q.   More than one?

3          A.   I attended more than one.

4          Q.   How many?

5               MS. MILLER:  Object to form.

6   BY MR. ELSNER:

7          Q.   Five?

8               MS. MILLER:  Object to form.

9          A.   I don't recall the exact number.

10  BY MR. ELSNER:

11         Q.   They had a conference at the Crystal

12  Gateway Marriott in Arlington, Virginia in

13  October of 2008.  That was the sixth one.  Did

14  you attend that one in 2008?

15              MS. MILLER:  Object to form.

16         A.   I don't specifically remember the

17  year, but it's possible.

18              MR. ELSNER:  We'll mark this document

19  as Exhibit 2.

20              (Whereupon, CVS-Schiavo-2 was marked

21              for identification.)

22  BY MR. ELSNER:

23         Q.   This is MR 98.

24              MS. MILLER:  One copy is for me.  You
```

```
 1    keep that one.

 2               MR. MONTMINY:  Do you have an extra

 3    copy of that?

 4    BY MR. ELSNER:

 5       Q.   Mr. Schiavo, I placed before you a

 6    series of e-mails.  And if you start on the

 7    bottom e-mail on the first page, which is

 8    495778, you are among the recipients of this

 9    e-mail from Leslie Lowry.  Do you see your name

10    there?

11       A.   Yes.

12       Q.   And this relates to the "8th Annual CS

13    Conference - Agenda & Speaker Information," is

14    that right?

15       A.   That's what the subject says.

16       Q.   Do you know who Leslie Lowry is?

17       A.   I don't remember exactly what her role

18    was.  I do remember having conversations and

19    talking with her.

20       Q.   And she's with the Buzzeo Group, is

21    that right?

22       A.   She -- at that time it looks like they

23    were Cegedim, but...

24       Q.   Previously they were the Buzzeo Group,
```

1    they changed names?

2         A.   As I understand it, yes.

3         Q.   And it attaches an agenda to the 8th

4    Annual Controlled Substances Conference, is that

5    right?

6         A.   That's what it says.

7         Q.   Okay.  And if you look at the

8    conference schedule, you're listed as a speaker

9    at this conference, is that right?

10        A.   Which page are we looking at?

11        Q.   If we start toward the back, 495784.

12        A.   It has me listed as a speaker.

13        Q.   Okay.  And then there you're listed --

14   your title on this is "Regulatory Specialist/DEA

15   Compliance, Henry Schein," correct?

16        A.   That's what it says.

17        Q.   Was that accurate?

18        A.   I don't have reason to believe it

19   wasn't accurate.

20        Q.   Okay.  And it appears that you're on

21   two back-to-back panels, one from 4 to 4:45, and

22   then on the second panel on SOM compliance,

23   you're listed at the top of the following page

24   at 495785, is that right?

```
 1        A.   I see that.

 2        Q.   Did you speak at this conference?

 3        A.   I don't remember it to be the 8th, but

 4   I did speak at a Buzzeo conference, yes.

 5        Q.   Did you do it one time, or did you do

 6   it more than once?

 7        A.   I remember speaking at one Buzzeo

 8   conference.

 9        Q.   Could it have been more?

10        MS. MILLER:  Object to form.

11        A.   When you say "speak," you mean

12   present?

13   BY MR. ELSNER:

14        Q.   Well, let's start with present.  Did

15   you present at more than one conference?

16        A.   I don't believe I presented at more

17   than one conference.

18        Q.   Did you otherwise speak at more than

19   one conference?

20        A.   While at the conference I've had

21   conversation with colleagues.

22        Q.   I meant in a public way.

23        A.   No.

24        Q.   Was there a reason that you asked me
```

1    whether you -- you seem to define my term of

2    presentation to speak or not, so was there a

3    reason that you did that?

4              MS. MILLER:  Object to form.

5        A.   I just want to make sure I answered

6    your question.

7    BY MR. ELSNER:

8        Q.   And I want to make sure I've exhausted

9    your participation in these conferences.  Did

10   you -- other than speak at this particular

11   conference, did you otherwise participate in the

12   conference in any other way than as an observer,

13   if you attended others?

14             MS. MILLER:  Object to form.

15       A.   Aside from speaking at this one

16   conference, that was the only time I can recall

17   being asked to contribute anything to the

18   conference.

19   BY MR. ELSNER:

20       Q.   Who asked you to speak?

21       A.   I don't remember who originally asked

22   me to speak.

23       Q.   Do you know why they asked you to

24   speak?  What did they tell you?

1           MS. MILLER:  Object to form.

2      A.   I don't remember the specific

3  conversation where they asked me to speak.

4  BY MR. ELSNER:

5      Q.   This is the 8th Annual Controlled

6  Substance Conference.  Had you attended any

7  conferences before this conference where you

8  were asked to speak?

9           MS. MILLER:  Object to form.

10     A.   Not that I recall.

11  BY MR. ELSNER:

12     Q.   So they asked you to speak at the very

13  first conference you attended, is that your

14  testimony?

15          MS. MILLER:  Object to form.

16     A.   That's not my testimony.  I don't

17  recall if this was the first one that I went to.

18  BY MR. ELSNER:

19     Q.   Did you have a -- when you attended

20  these conferences, did you keep any of the

21  materials from the conferences you attended?

22          MS. MILLER:  Object to form.

23     A.   Did I keep them for -- I'm sure I

24  brought materials home with me.

```
 1   BY MR. ELSNER:

 2        Q.   What would you do with them when you

 3   brought them home?

 4             MS. MILLER:  Object to form.

 5   BY MR. ELSNER:

 6        Q.   Did you save them at your office?

 7   Would you save them at home?  What would you do

 8   with them?

 9        A.   I don't recall.

10             MS. MILLER:  Object to form.

11   BY MR. ELSNER:

12        Q.   Do you have a file of all these

13   materials at your office or at home?

14             MS. MILLER:  Object to form.

15        A.   Are you asking presently, or at the

16   time of the conference?

17   BY MR. ELSNER:

18        Q.   Let's say at the time of the

19   conferences when you were at Henry Schein, did

20   you keep a file of the conferences that you

21   attended at your office or at home?

22             MS. MILLER:  Object to form.

23        A.   I don't recall.

24   BY MR. ELSNER:
```

```
1         Q.   What about today, do you have a file

2    of the conferences that you attend or the

3    conferences that you've spoken at either at your

4    office or at your home?

5              MS. MILLER:  Object to form.

6         A.   I know I have a copy of a

7    presentation.  I don't recall having any other

8    documentation from previous conferences.

9    BY MR. ELSNER:

10        Q.   So when I speak at a conference, a lot

11   of times I'll write out what I'm going to say

12   and sometimes I'll prepare a PowerPoint and I

13   have one of each.  Did you do the same thing, or

14   do you just have a copy of the PowerPoint?

15             MS. MILLER:  Object to form.

16        A.   I honestly don't recall how I prepared

17   or what I prepared for speaking.

18   BY MR. ELSNER:

19        Q.   Let me show you what we've marked as

20   Exhibit 3.

21             (Whereupon, CVS-Schiavo-3 was marked

22             for identification.)

23   BY MR. ELSNER:

24        Q.   This is a copy of a PowerPoint
```

1    presentation.  Do you see on the top left-hand

2    side it says "8th Annual Controlled Substance

3    Conference"?  Did I read that correctly?

4         A.   I see that.

5         Q.   And the title of the PowerPoint is

6    "The Challenge to 'Know Your Customer' and Best

7    Practices."  Did I read that right?

8         A.   You read that right.

9         Q.   Okay.  And then it lists "Craig

10   Schiavo, Regulatory Specialist/DEA Compliance,

11   Henry Schein, November 2010."  Did I read that

12   right?

13        A.   You read that correctly.

14        Q.   Did you create this PowerPoint

15   presentation?

16             MR. MONTMINY:  Objection.  Form.

17             Counsel, could I ask, there's no Bates

18   numbers on this document, do you know where this

19   came from?

20             MR. ELSNER:  Yes, we'll get you the

21   Bates number.

22             MS. MILLER:  So this wasn't

23   produced --

24             MR. ELSNER:  It was produced by Henry

Highly Confidential - Subject to Further Confidentiality Review

1    Schein, and it was produced in native, so we'll

2    get you the Bates number for that.

3         A.   I'm sorry, can you just repeat the

4    question?

5    BY MR. ELSNER:

6         Q.   I asked if you created this PowerPoint

7    presentation.

8         A.   Can I look through it?

9         Q.   Sure.

10             (Witness reviewing document.)

11        A.   I recall giving input on it.

12        Q.   What input?  Did you assist in

13   providing the information to someone to create

14   the slides?

15        A.   At some point I might have.

16        Q.   Well, is this the PowerPoint you used

17   for your presentation at this conference?

18             MR. MONTMINY:  Objection.  Form.

19        A.   I'm not sure if this is the exact

20   presentation.

21   BY MR. ELSNER:

22        Q.   Does it look like it is?

23             MR. MONTMINY:  Objection.  Form.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Do you have reason to believe that

2  it's not?

3           MR. MONTMINY:  Objection.  Form.

4      A.   I don't have reason to believe that

5  it's not, but I don't remember this whole

6  presentation.

7  BY MR. ELSNER:

8      Q.   If you turn to Page 3 of the

9  presentation, there's an overview of Henry

10  Schein.  It says "Henry Schein - Over 75 Years

11  of Quality Service."  Do you see that?  Did I

12  read that correctly?

13     A.   You read that correctly.

14     Q.   Okay.  And the second bullet -- or the

15  first bullet, it says that "Henry Schein is the

16  largest distributor of healthcare products and

17  services to office-based practitioners."  Did I

18  read that correctly?

19     A.   You read that correctly.

20     Q.   Was that true --

21          MR. MONTMINY:  Object to form.

22  BY MR. ELSNER:

23     Q.   -- at the time?

24     A.   It says it there.

```
1        Q.   You didn't intend to put misleading

2   information in the PowerPoint, right?

3             MR. MONTMINY:  Object to form.

4             MS. MILLER:  Object.

5   BY MR. ELSNER:

6        Q.   Correct?

7        A.   I don't think I would put misleading.

8        Q.   In the second bullet it says that

9   Henry Schein has 700,000 customers worldwide and

10  386,000 domestic customers, is that right?

11            MR. MONTMINY:  Objection.  Form.

12       A.   I don't recall those numbers.

13  BY MR. ELSNER:

14       Q.   That's the presentation that you gave

15  at this conference, though, is that right?

16            MR. MONTMINY:  Objection.  Form.

17       A.   That's what it says in the deck.

18  BY MR. ELSNER:

19       Q.   It then says that "Customers include

20  dental practices and laboratories, physician

21  practices, and animal health clinics."  Is that

22  right?

23            MS. MILLER:  Object to form.

24       A.   That's what it says.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ELSNER:

2        Q.   Is that consistent with your

3    understanding of Henry Schein's customer base?

4            MR. MONTMINY:  Objection.  Form,

5    outside the scope.

6        A.   I do recall those being part of the

7    customer base.

8    BY MR. ELSNER:

9        Q.   If you turn to the next page, the top,

10   the heading on the top is "Why Due Diligence Is

11   Required," is that right?

12       A.   That's what it says.

13       Q.   And it refers to the December, 2007

14   letter from the DEA, is that right?

15       A.   That's what it says.

16       Q.   This is a reference to the letter that

17   was authored by Joseph Rannazzisi to all

18   manufacturers and distributors of controlled

19   substances, is that right?

20           MS. MILLER:  Object to form.

21       A.   As I recall, that's the letter.

22   BY MR. ELSNER:

23       Q.   Okay.  And you had seen that letter,

24   obviously, before with your work at Henry

1    Schein, is that right?

2            MS. MILLER:  Object to form.

3        A.    I had seen that letter while at Henry

4    Schein.

5    BY MR. ELSNER:

6        Q.    Okay.  And that letter refers to, and

7    in your first bullet you quote, to "Design and

8    operate a system to disclose to the registrant

9    suspicious orders of controlled substances," and

10   then there's a citation.  You understand that to

11   be a citation to the Controlled Substances Act,

12   is that right?

13           MR. MONTMINY:  Object to form.

14           MS. MILLER:  Object to form.

15       A.    I know that's straight out of the CFR.

16   BY MR. ELSNER:

17       Q.    Do you understand that that's part of

18   the Controlled Substances Act?

19           MS. MILLER:  Object to form.

20       A.    I know the CFR has regulations from

21   the DEA.

22   BY MR. ELSNER:

23       Q.    Did you know that the Controlled

24   Substances Act had been in place since 1970?

1          MS. MILLER:  Object to form.

2     A.   I didn't know the exact date.

3  BY MR. ELSNER:

4     Q.   At the last bullet on this page, it

5  states "Suspicious orders include orders of

6  unusual size, orders deviating substantially

7  from a normal pattern, and orders of an unusual

8  frequency."  Did I read that correctly?

9          MR. MONTMINY:  Objection.  Form.

10    A.   You read that correctly.

11 BY MR. ELSNER:

12    Q.   Okay.  And this is also a quote from

13 the letter, the 2007 letter from the DEA

14 relating to reporting suspicious orders of

15 controlled substances, is that right?

16         MS. MILLER:  Object to form.

17    A.   Can you just repeat the question?

18 BY MR. ELSNER:

19    Q.   This is a quote from the December,

20 2007 letter from the DEA, is that right?

21         MS. MILLER:  Object to form.

22    A.   I see the quotes around it.  I don't

23 know if that's exactly from the letter.

24 BY MR. ELSNER:

1      Q.   And the heading of this slide is the

2  December, 2007 letter from the DEA?

3      A.   That's what it says.

4      Q.   Do you understand that to be a quote

5  from the DEA letter?

6           MS. MILLER:  Object to form.

7      A.   I see what the title says.  I see the

8  quote.  I can't remember if I pulled that

9  directly out of the letter.

10  BY MR. ELSNER:

11     Q.   Well, you're familiar with the letter,

12  right?  You know that's what's in the letter

13  from the DEA in December of 2007?  You've seen

14  it before?

15          MS. MILLER:  Object to form.

16     A.   I read the letter.  I haven't read

17  that letter in a long time, I can't remember

18  every word in the letter, or every quote in the

19  letter.

20  BY MR. ELSNER:

21     Q.   That was a pretty important part of

22  the letter, though, from the DEA in December of

23  2007, wasn't it?

24          MS. MILLER:  Object to form.

```
 1                MR. MONTMINY:  Objection.

 2        A.   It was part of the letter.

 3   BY MR. ELSNER:

 4        Q.   Here's the Exhibit 4 which is the

 5   December 27, 2007 letter from the DEA.

 6                (Whereupon, CVS-Schiavo-4 was marked

 7                for identification.)

 8   BY MR. ELSNER:

 9        Q.   This is the letter that was sent to

10   every manufacturer and distributor of controlled

11   substances, is that right?

12                MS. MILLER:  Object to form.

13        A.   That's how I understood the letter.  I

14   don't know if I can confirm that was --

15   BY MR. ELSNER:

16        Q.   Is that what it says in the first

17   letter of the -- the first sentence of the

18   letter?  It says "This letter is being sent to

19   every entity in the United States registered

20   with the Drug Enforcement" Agency -- sorry --

21   "Administration to manufacture or distribute

22   controlled substances."  Is that what it says?

23        A.   That is what it says in the letter.

24        Q.   The next sentence says "The purpose of
```

1    this letter is to reiterate the responsibilities

2    of controlled substance manufacturers and

3    distributors to inform DEA of suspicious orders

4    in accordance with 21 CFR 1301.74," is that

5    right?

6                MS. MILLER:  Object to form.

7    BY MR. ELSNER:

8        Q.    Is that what it says?

9        A.    That's what it says.

10       Q.    Okay.  And that's what you put in the

11   very first bullet in your presentation on

12   Page 4?

13               MR. MONTMINY:  Objection.  Form.

14       A.    That looks to be what I put.

15   BY MR. ELSNER:

16       Q.    Okay.  And if you look at the last

17   bullet on your presentation on Page 4,

18   "Suspicious orders include orders of unusual

19   size, orders deviating substantially from a

20   normal pattern, and orders of unusual

21   frequency."  Is that what you wrote?

22               MR. MONTMINY:  Object to form.

23               MS. MILLER:  Objection.  Form.

24       A.    That's what it says here.

 1   BY MR. ELSNER:

 2        Q.   And if you go to the last paragraph of

 3   the DEA letter from December 27, 2007 in the

 4   first line, the last paragraph there.  Do you

 5   see where I am, beginning "The regulation

 6   specifically states"?  Are you with me?

 7        A.   I'm with you.

 8        Q.   It says "The regulation specifically

 9   states that suspicious orders include orders of

10   unusual size, orders deviating substantially

11   from a normal pattern, and orders of unusual

12   frequency."  Is that what it says?

13        A.   That's what it says.

14        Q.   Okay.  And that's what's quoted on

15   Page 4 of your presentation?

16             MS. MILLER:  Object to form.

17        A.   That looks to align.

18   BY MR. ELSNER:

19        Q.   Turn to Page 5 of your presentation.

20   ████████████████████████████████████████████

   ██        ████████████████████████████████████

   ██           ███████████████████████████

   ██   ██████████████████

   ██      ███    ██████████████████









Highly Confidential - Subject to Further Confidentiality Review









1 ███████████████████████████████████

█ ███████████████████████.

3 BY MR. ELSNER:

4    Q.  If you turn back to your presentation,

5 which is Exhibit 3, the PowerPoint presentation.

6 It has in the next -- on Page 5 there's a title

7 that says October 2009 Meeting with the DEA.  Do

8 you see that?

9    A.  On Page 5.

10    Q.  The heading.

11    A.  I see that.

12    Q.  Okay.  Did I read that accurately?

13    A.  "October 2009 meeting with DEA."

14    Q.  And this refers to a meeting that

15 Henry Schein had with the DEA in New York, is

16 that right?

17    MR. MONTMINY:  Objection.  Form.

18    A.  I don't remember exactly when that

19 meeting took place, but I know that we had a

20 meeting with the DEA.

21 BY MR. ELSNER:

22    Q.  Did you attend that meeting?

23    A.  I attended that meeting.

24    Q.  That was in Long Island?

1      A.   Yes, that was on Long Island.

2      Q.   And in the first bullet here, you --

3 it states "Reiterated what was documented in the

4 December 2007 letter."  That refers to the DEA

5 letter of December of 2007 that we were

6 discussing, is that right?

7           MS. MILLER:  Object to form.

8      A.   Although I don't specifically recall

9 that, it makes sense that that's what it's

10 referring to.

11 BY MR. ELSNER:

12     Q.   Okay.  And then next it says "Advised

13 what was expected of HSI as a distributor of

14 controlled substances."  This is the DEA

15 advising Henry Schein as to what is expected as

16 a distributor of controlled substances.  Was

17 that part of the discussion?

18     A.    I don't exactly remember the full

19 conversation with the DEA, but that's what it

20 says there.

21     Q.   Okay.  It says here that there was a

22 binder provided by the DEA which contained

23 regulations, case studies, and ARCOS

24 information.  Did the DEA provide Henry Schein

1    with these materials in the DEA meeting?

2              MR. MONTMINY:  Objection to form.

3    Outside the scope.

4         A.    I remember getting a binder during

5    that meeting, or binders being provided.

6    BY MR. ELSNER:

7         Q.    Where did you keep those at Henry

8    Schein, if you kept them?

9              MR. MONTMINY:  Objection.  Form,

10   outside the scope.

11        A.    I don't remember where those were

12   maintained.

13   BY MR. ELSNER:

14        Q.    Did you maintain them, or did somebody

15   else that attended the meeting take them with

16   them?

17             MR. MONTMINY:  Objection.  Form,

18   outside the scope.

19        A.    I really don't recall.

20   BY MR. ELSNER:

21        Q.    Who else was there from Henry Schein

22   other than you?

23             MR. MONTMINY:  Objection.  Form,

24   outside the scope.

1        A.    The only other individuals I

2    specifically recall being there were Len David

3    and Sergio Tejeda.

4        Q.    Who is Sergio Tejeda?

5             MR. MONTMINY:  Objection to form.

6        A.    He was my manager at the time.

7    BY MR. ELSNER:

8        Q.    In the last -- do you recall what was

9    in the binder other than what's listed here?

10       A.    I don't recall all this being listed

11   being in the binder.  I see it says it there.  I

12   don't recall -- if this was it, I don't recall

13   what else was in there.

14       Q.    In the last bullet it says "Put HSI on

15   notice."  Is that what it says?

16       A.    That is what it says.

17       Q.    And that was to put Henry Schein on

18   notice of its obligations with respect to the

19   distribution of controlled substances, is that

20   right?

21             MR. MONTMINY:  Objection.  Form.

22       A.    I'm not exactly sure what I meant by

23   that.

24   BY MR. ELSNER:

1      Q.   You're not sure what you meant by "Put

2   HSI on notice"?  Is there anything else they

3   could have put you on notice about that came up

4   in that meeting?

5           MS. MILLER:  Object to form.

6           MR. MONTMINY:  Object to form.

7      A.   I don't recall.

8   BY MR. ELSNER:

9      Q.   But that's what you wrote, is that

10  right?

11          MR. MONTMINY:  Object to form.

12     A.   Again, I don't know if I wrote that,

13  but that's what it says in here.

14  BY MR. ELSNER:

15     Q.   That's in the presentation you gave,

16  is that right?

17          MS. MILLER:  Object to form.

18          MR. MONTMINY:  Object to form.

19     A.   I don't know if this is the exact

20  presentation I gave, but that is in this

21  presentation that we're reviewing.

22  BY MR. ELSNER:

23     Q.   You have no reason to believe that

24  it's not in the presentation that you gave to

1    everyone that attended this conference, is that

2    right?

3                MR. MONTMINY:  Objection.  Form.

4        A.   If you're saying that's what this is,

5    I don't have reason to believe that it isn't,

6    but I don't recall this being the exact

7    presentation.

8    BY MR. ELSNER:

9        Q.   If you turn to the -- let me ask one

10   other question.

11               Who asked for the meeting?  Did Henry

12   Schein ask for the meeting with the DEA, or did

13   the DEA ask to meet with Henry Schein?

14               MR. MONTMINY:  Objection.  Form,

15   outside the scope.

16       A.   I believe the DEA asked for this

17   meeting.

18   BY MR. ELSNER:

19       Q.   Okay.  Do you understand why the DEA

20   asked for the meeting?

21               MS. MILLER:  Object to form.

22       A.   I don't know if I ever knew the exact

23   reason why.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   If you turn to the next page of the

2  PowerPoint, this is "HSI SOM Implementation

3  Challenges."  Is that what the heading says?

4    A.   That is what the heading says.

5    Q.   Okay.  One of the challenges that

6  Henry Schein faced from a suspicious order

7  monitoring point of view was the amount of

8  customers that they had, which is listed in the

9  second bullet, right?  It says "Amount of

10  customers (386,000 total/36,300 purchase

11  controls)."

12         What does purchase controls refer to?

13         MR. MONTMINY:  Objection.  Form,

14  compound.

15    A.   I'm not exactly sure.

16  BY MR. ELSNER:

17    Q.   One of the challenges that Henry

18  Schein faced in its suspicious order monitoring

19  program was the number of customers that it had,

20  is that correct?

21         MR. MONTMINY:  Objection.  Form,

22  outside the scope.

23    A.   It's documented there as a challenge.

24  BY MR. ELSNER:

```
 1        Q.   And it says it had a "Vast/complicated

 2   customer base (Dental/Mental/Vet)," right?

 3             MS. MILLER:  Object to form.

 4             MR. MONTMINY:  Objection.  Form.

 5        A.   That is what it says.

 6   BY MR. ELSNER:

 7        Q.   In the fourth bullet, one of the

 8   challenges in the SOM implementation at Henry

 9   Schein was a "Lack of resources."  Is that what

10   it says?

11             MR. MONTMINY:  Objection.  Form.

12        A.   That is what it says.

13   BY MR. ELSNER:

14        Q.   Lack of resources to do due diligence

15   on new accounts, correct?

16             MR. MONTMINY:  Objection.  Form.

17        A.   That's what it says.

18   BY MR. ELSNER:

19        Q.   To review pending accounts, is that

20   right?

21             MR. MONTMINY:  Objection.  Form,

22   outside the scope.

23        A.   That's what it says.

24   BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And a lack of resources for site

2   visits, correct?

3           MR. MONTMINY:  Objection.  Form,

4   outside the scope.

5      A.   That is what it says.

6   BY MR. ELSNER:

7      Q.   Okay.  One of the other implementation

8   challenges for the SOM program under

9   "Sales/Field Sales Representatives" in the

10  second bullet says a "Conflict of interest?"

11          What are you referring to there?

12          MR. MONTMINY:  Objection.  Form,

13  outside the scope.

14     A.   I don't know exactly what I meant when

15  I put that.

16  BY MR. ELSNER:

17     Q.   Was there a conflict of interest

18  between those who were trying to sell products

19  and obtain new customers for controlled

20  substances versus compliance?

21          MR. MONTMINY:  Objection.  Form,

22  outside the scope.

23     A.   I guess there could be, but I guess --

24  I think that depends on the person, but again I

1    don't know exactly what I was referring to here.

2    BY MR. ELSNER:

3        Q.   Is that a potential conflict of

4    interest that could exist within a company

5    related to the monitoring for suspicious orders

6    of controlled substances?

7             MR. MONTMINY:  Objection.  Form.

8        A.   I don't know.  I know specifically at

9    Henry Schein that was not a concern of mine.

10   BY MR. ELSNER:

11       Q.   But you wrote "Sales/Field

12   Representatives Conflict of Interest."  Is that

13   what you wrote?

14            MR. MONTMINY:  Object to form.

15       A.   That's what this document says.

16   BY MR. ELSNER:

17       Q.   It also says one of the implementation

18   challenges is "Cooperation from customers,"

19   correct?

20            MR. MONTMINY:  Objection.  Form.

21       A.   That's what it says.

22   BY MR. ELSNER:

23       Q.   What did you mean by that?

24            MS. MILLER:  Objection.  Form.

```
 1        A.   Again, I don't know exactly what I

 2   meant when I put this together.

 3   BY MR. ELSNER:

 4        Q.   Well, did you have any difficulties in

 5   the Henry Schein customers that you were

 6   interacting with to obtain information from them

 7   in order that you can conduct your due

 8   diligence?

 9             MR. MONTMINY:  Objection.  Form.

10        A.   I can't remember any specific

11   examples, but every interaction with the

12   prescriber was different.  Some were easier to

13   work with than others.

14   BY MR. ELSNER:

15        Q.   You don't recall a single instance

16   where there was a client at Henry Schein where

17   you had requested information and they were not

18   cooperating fully with your request for the

19   information?

20             MR. MONTMINY:  Objection.  Form.

21        A.   I can't recall a time where we had a

22   customer who -- I mean, I recall there being

23   difficult conversations with customers.  I don't

24   recall any situations where I couldn't get what
```

Highly Confidential - Subject to Further Confidentiality Review

1    I needed to conduct due diligence.

2    BY MR. ELSNER:

3        Q.   Do you recall conversations with

4    clients that were angry or frustrated that Henry

5    Schein had not distributed or sold a controlled

6    substance to them?

7              MR. MONTMINY:  Objection.  Form,

8    outside the scope.

9        A.   I don't remember any specific

10   conversations.

11   BY MR. ELSNER:

12       Q.   Do you recall that there were

13   physicians that Henry Schein was distributing

14   drugs to, some of whom were self-medicating?

15             MR. MONTMINY:  Objection.  Form,

16   outside the scope.

17       A.   I don't recall any specific prescriber

18   that we knew that was self-medicating that we

19   would distribute to.  I believe -- sorry.

20   BY MR. ELSNER:

21       Q.   Sorry, I didn't mean to interrupt.  I

22   thought you were done.

23       A.   I believe our process or our policy

24   was not to distribute to self-medicating.

```
 1       Q.   Why?

 2            MR. MONTMINY:  Objection.  Form,

 3   outside the scope.

 4       A.   That was our policy.  I don't think I

 5   wrote the policy.

 6   BY MR. ELSNER:

 7       Q.   It's because the drugs are highly

 8   addictive, right?

 9            MR. MONTMINY:  Objection.  Form,

10   argumentative.

11       A.   Not necessarily.

12   BY MR. ELSNER:

13       Q.   You don't understand a controlled

14   substance to be potentially highly addictive?

15            MS. MILLER:  Object to form.

16            MR. MONTMINY:  Object to form.

17       A.   I know that some controlled substances

18   can be addictive.

19   BY MR. ELSNER:

20       Q.   If you turn to the next page in your

21   presentation under "Henry Schein's Suspicious

22   Order Monitoring" on Page 7.  Do you see where

23   I'm at?

24            MR. MONTMINY:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I see where you're at.

 2   BY MR. ELSNER:

 3        Q.    And there's a title there about

 4   "Active Ingredients," is that right?

 5        A.    I see that.

 6        Q.    It says "All quantities and values

 7   calculated and used in this system are at the

 8   active ingredient level."  What does that mean?

 9        A.    I believe that's looking at both brand

10   name and generic drugs if they had the same

11   active ingredient.

12        Q.    So Henry Schein had a -- as a

13   component of its suspicious order monitoring

14   program was measuring drugs it was selling by

15   active ingredient, is that right?

16             MS. MILLER:  Object to form.

17        A.    Can you just ask that one more time,

18   please?

19   BY MR. ELSNER:

20        Q.    So Henry Schein had as a component of

21   its suspicious order monitoring program a system

22   to measure drugs it was selling by active

23   ingredient?

24             MR. MONTMINY:  Object to form.
```

1  Outside the scope.

2      A.   Drugs that were ordered, we took

3  active ingredient into account.

4  BY MR. ELSNER:

5      Q.   So that you understood that if

6  somebody ordered two different drugs' names, but

7  they had the same active ingredient, you could

8  calculate those two together to understand the

9  total amount of that substance they were

10  ordering, isn't that the purpose?

11          MS. MILLER:  Object to form.

12          MR. MONTMINY:  Objection.  Form.

13      A.   I don't recall what the exact purpose

14  is, but it was to see for that active ingredient

15  how much was being ordered.

16  BY MR. ELSNER:

17      Q.   And the only way to do that is to

18  measure by active ingredient, you couldn't do it

19  by drug name, correct?

20          MR. MONTMINY:  Object to form.

21          MS. MILLER:  Object to form.

22      A.   I don't know that to be the case.

23  BY MR. ELSNER:

24      Q.   When did Henry Schein have a system in

1    place -- you gave this presentation in November

2    of 2010.  When did Henry Schein have a system in

3    place to calculate drugs by active ingredient as

4    a component of its suspicious order monitoring

5    system?

6              MS. MILLER:  Object to form.

7              MR. MONTMINY:  Objection to form.

8    Outside the scope.

9         A.   I don't recall when that happened.

10   BY MR. ELSNER:

11        Q.   Well, it was in place in 2010, right?

12             MS. MILLER:  Object to form.

13        A.   I don't recall.

14   BY MR. ELSNER:

15        Q.   That's what this presentation says,

16   right?

17             MS. MILLER:  Object to form.

18        A.   It looks like that's what this is

19   indicating.

20   BY MR. ELSNER:

21        Q.   Do you know whether it was in the new

22   system that Henry Schein created or whether it

23   was in the existing system that Henry Schein

24   created when you arrived and took over these

1    roles?

2            MR. MONTMINY:  Objection.  Form,

3    outside the scope.

4        A.   I don't recall what -- prior to me

5    getting involved in this, I don't recall what

6    the old system had or used, but that was a

7    component of the new enhanced system that we

8    had.

9    BY MR. ELSNER:

10       Q.   It was a component of the newer

11   enhanced system.  And when did that come into

12   place?

13           MR. MONTMINY:  Objection.  Form,

14   outside the scope.

15       A.   I don't recall.

16   BY MR. ELSNER:

17       Q.   Well, was the enhanced system the

18   system that you were working on when you moved

19   into a new role at Henry Schein related to DEA

20   regulations in 2007?

21           MR. MONTMINY:  Objection.  Form,

22   outside the scope.

23       A.   I'm not sure I understand the

24   question.

1    BY MR. ELSNER:

2        Q.   I'm trying to understand the time

3    frame.  You said that there was a SOM system,

4    and then at Henry Schein there was an enhanced

5    SOM system.  So I'm trying to understand the

6    time frame of when you were working on the

7    enhanced SOM system.  That's part of what you

8    were working on, is that right?

9            MR. MONTMINY:  Object to form.

10           MS. MILLER:  Object to form.

11       A.   At some point during my role we worked

12   on enhancing our SOM system.

13   BY MR. ELSNER:

14       Q.   But at some time when, 2007, '8, '9?

15       A.   I really don't recall.

16       Q.   That's part of what you were working

17   on was the enhanced system, though, when you

18   moved into that position in 2007, is that right?

19           MR. MONTMINY:  Objection.  Form.

20       A.   I don't recall what I was doing when I

21   went into that position.

22   BY MR. ELSNER:

23       Q.   Well, what's your best memory of what

24   system was in place when you moved into that

1    position in 2007 and when you were working on

2    the enhanced system?

3              MR. MONTMINY:  Objection.  Form.

4         A.   I really don't recall much about the

5    old system, and I don't remember.

6    BY MR. ELSNER:

7         Q.   Did you work on the enhanced system?

8         A.   I was part of a team that worked on

9    the enhanced system.

10        Q.   Okay.  What's your best estimate of

11   when you were doing that work?

12             MR. MONTMINY:  Objection.  Form.

13        A.   I don't remember.  Sometime when I

14   started the role.

15   BY MR. ELSNER:

16        Q.   When you gave this presentation in

17   November of 2010, was the enhanced system fully

18   active or not?

19             MR. MONTMINY:  Objection.  Form.

20        A.   I don't recall.

21             MR. ELSNER:  I'm going to mark this

22   next document as Exhibit 6.

23             (Whereupon, CVS-Schiavo-6 was marked

24             for identification.)

```
 1   BY MR. ELSNER:

 2       Q.   This is MR 268.  Do you see the first

 3   page is a cover e-mail from you to three

 4   individuals?  Who are the three individuals that

 5   you sent this e-mail to?

 6       A.   Len David, Mike DiBello, and Sergio

 7   Tejeda.

 8       Q.   Who are they?

 9       A.   Sergio was my manager at the time.

10   Mike was -- I believe he was the director in

11   compliance who Sergio reported up to.  And I

12   believe at the time Len David was our chief

13   compliance officer who Mike reported up to.

14       Q.   This e-mail is dated October 20, 2009,

15   is that right?

16       A.   That's what it says.

17       Q.   The subject of the e-mail is "DEA

18   Meeting 10-21-09," is that right?

19       A.   That's what it says.

20       Q.   And it says "Len."  This is you

21   writing.  "Len, Attached please find the handout

22   we prepared for tomorrow's meeting with the

23   DEA."  Is that right?

24       A.   I don't recall writing this e-mail,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   but that's what it says.

 2        Q.   Okay.  And it's sent by you to these

 3   individuals, correct?

 4        A.   It appears to be.

 5        Q.   And it attaches -- you see an

 6   attachment, "DEA Meeting 10-21-09" on the little

 7   image there on the first page, is that right?

 8        A.   Yes.  I see that.

 9        Q.   It attaches a PowerPoint presentation

10   dated October 21, 2009, is that right?

11        A.   That's what it says.

12        Q.   And this is the PowerPoint

13   presentation you sent to the group?

14        A.   If this is that attachment, then it

15   appears to be what I must have sent.

16        Q.   Did you create this PowerPoint

17   presentation?

18        A.   I don't recall this PowerPoint,

19   looking at the cover page.

20        Q.   On the second page there's an overview

21   of Henry Schein's business, is that right?

22        A.   That's what it appears to be.

23        Q.   And if you turn to the third page of

24   the PowerPoint, it lists under "Active
```

1    Ingredients" -- do you see where I'm at?

2         A.   Yes.

3         Q.   Okay.  It says something strikingly

4    similar, "All quantities and values calculated

5    and used in this system are at the active

6    ingredient level," is that right?

7              MR. MONTMINY:  Object to form.

8         A.   That's what it says.  So I don't

9    remember putting this document together, I don't

10   remember if there was input from our legal team,

11   so I would like to talk to my lawyer to see what

12   I can discuss or -- I don't remember this

13   document or the reason it being put together.

14   BY MR. ELSNER:

15        Q.   Well, that's what's written in the

16   PowerPoint presentation, right, that under

17   Active Ingredients it says "All quantities and

18   values calculated and used in this system are at

19   the active ingredient level"?  Is that what it

20   says?

21             MS. MILLER:  Mike, let's take a break.

22   He's asked to confer.  He's asked to confer

23   about privilege issues.

24             MR. ELSNER:  All right.  We'll go off

Highly Confidential - Subject to Further Confidentiality Review

1    the record.  I generally do not -- the

2    conversation needs to be limited to privilege

3    issues and not a conversation about the

4    document.

5            MS. MILLER:  Understood.  Understood.

6            THE VIDEOGRAPHER:  We're going off the

7    record at 9:29 a.m.

8            (Whereupon, a recess was taken.)

9            THE VIDEOGRAPHER:  We're back on the

10   record at 9:42 a.m.

11   BY MR. ELSNER:

12       Q.   Mr. Schiavo, before we broke I was

13   showing you the DEA PowerPoint presentation, and

14   we were looking at -- and the date of this is

15   October 21, 2009, and we were looking at the

16   third page under Henry -- the topic heading of

17   that page is "Henry Schein, Inc.'s Suspicious

18   Order Monitoring."

19            Do you see that?

20       A.   I see that.

21       Q.   Okay.  And there's a topic here, it

22   says "Active ingredients," and it reads "All

23   quantities and values calculated and used in

24   this system are at the active ingredient level."

Highly Confidential - Subject to Further Confidentiality Review

1    Did I read that correctly?

2        A.    That is what it says.

3        Q.    Okay.  So it's true, is it not, that

4    as of October of 2009 Henry Schein had a

5    suspicious order monitoring system in place that

6    tracked drugs by active ingredient?

7              MS. MILLER:  Object to form.

8        A.    That's the date of this presentation.

9    That's what it says.  I don't remember exactly

10   when we started doing that, but that's what it

11   says.

12   BY MR. ELSNER:

13       Q.    Okay.  Meeting with the DEA was an

14   important event, right?

15             MR. MONTMINY:  Objection to form.

16       A.    We met with the DEA, they asked.

17   BY MR. ELSNER:

18       Q.    But you recognize that to be an

19   important event?

20             MS. MILLER:  Object to form.

21       A.    I'm not sure what you mean by

22   important, but --

23   BY MR. ELSNER:

24       Q.    Well, the DEA regulated Henry Schein's

1    distribution of controlled substances, correct?

2        A.   Henry Schein was a DEA registrant, and

3    there are certain regulations that as a

4    registrant we needed to follow.

5        Q.   And if you don't follow those

6    regulations, one of the things that the DEA can

7    do is remove your license to sell those drugs,

8    correct?

9            MS. MILLER:  Object to form.

10       A.   We have a DEA registration.  I know

11   there's penalties if you don't comply with

12   certain regulations.

13   BY MR. ELSNER:

14       Q.   And one of those penalties could be

15   suspending or removing the registrant's license,

16   correct?

17           MS. MILLER:  Object to form.

18       A.   I guess there's various degrees of

19   penalties.

20   BY MR. ELSNER:

21       Q.   But you understood those to be

22   included among them, correct?

23           MR. MONTMINY:  Objection to form.

24       A.   I mean, it's a DEA registration, so...

Highly Confidential - Subject to Further Confidentiality Review

 1   BY MR. ELSNER:

 2        Q.   Well, do you know or don't know

 3   whether the DEA could revoke someone's license?

 4             MS. MILLER:  Object to form.

 5        A.   It's a DEA license.  That could be one

 6   of the penalties.

 7   BY MR. ELSNER:

 8        Q.   Do you know, or are you just guessing?

 9             MS. MILLER:  Object to form.

10        A.   I know that if you don't follow

11   certain DEA regulations there's various degrees

12   of penalties.

13   BY MR. ELSNER:

14        Q.   And it would be important for you,

15   wouldn't it, in meeting with the DEA that the

16   information that you told them was accurate,

17   right?

18             MR. MONTMINY:  Objection to form.

19        A.   I don't ever recall putting anything

20   together with the intent of being inaccurate.

21   BY MR. ELSNER:

22        Q.   Because -- and you were careful,

23   weren't you?

24             MS. MILLER:  Object to form.

1        A.    I try to be careful.  But in terms of

2   this document, I don't remember putting it

3   together.

4   BY MR. ELSNER:

5        Q.    And the document says that as of this

6   date in October of 2009 that Henry Schein had a

7   suspicious order monitoring system in place that

8   calculated quantities and values using the

9   active ingredient level, correct?

10            MR. MONTMINY:  Objection.  Form.

11       A.    I see that it says that.

12   BY MR. ELSNER:

13       Q.    Okay.  And you understand that Henry

14   Schein did have such a system in place, is that

15   right?

16            MR. MONTMINY:  Objection.  Form.

17       A.    I understand at some point that was an

18   aspect of the system.

19   BY MR. ELSNER:

20       Q.    And you have no reason to believe that

21   this is inaccurate, that you told the DEA

22   something that was not actually truthful, is

23   that right?

24            MR. MONTMINY:  Objection.  Form.

```
 1        A.    I don't recall nor do I -- would I

 2   intend to be inaccurate to the DEA, but

 3   specifically to this, I don't remember putting

 4   this together, I don't specifically know exactly

 5   what it was referring to, so...

 6   BY MR. ELSNER:

 7        Q.    Here's what I'm trying to understand,

 8   because given the way that your answers are to

 9   me, it sounds like maybe you were telling the

10   DEA one thing that actually wasn't happening in

11   place at Henry Schein, is that true?

12              MR. MONTMINY:  Objection to form.

13   BY MR. ELSNER:

14        Q.    Or is it that you really, truthfully

15   try to make the information you told the DEA as

16   accurate as possible?

17              MR. MONTMINY:  Objection.  Form.

18        A.    Speaking for me personally, I would

19   not try to be inaccurate.

20   BY MR. ELSNER:

21        Q.    Okay.  You would try to be truthful to

22   the DEA, right?

23        A.    I can speak for myself, yes, I would

24   try to be truthful.
```

1      Q.   Okay.  So if you turn two pages later

2   to the same DEA presentation, it says "Henry

3   Schein, Inc.'s Suspicious Order Monitoring" on

4   the top.

5           Do you see that?

6      A.   I see that.

7      Q.   Okay.  And among the factors that the

8   model looks at at the end, it reads "The types

9   of indicators that the model will be looking for

10  are the customers monthly activity compared to

11  his:  Six month average, Twelve month average,

12  Twelve month maximum, Twenty-four month maximum,

13  and Other various trending factors."  Did I read

14  that correctly?

15     A.   That is what it says.

16     Q.   Okay.  So is it true that Henry Schein

17  had a system in place that you were monitoring a

18  customer's monthly purchases of controlled

19  substances based on the prior 6-month and prior

20  12-month average?

21          MR. MONTMINY:  Objection.  Form.

22     A.   At the time of this meeting, I cannot

23  remember exactly what the system was.

24  BY MR. ELSNER:

```
 1        Q.   But this is what was written and

 2   presented to the DEA, correct?

 3             MR. MONTMINY:  Objection.  Form.

 4        A.   Based on that cover e-mail, this looks

 5   like what was reviewed with the DEA.

 6   BY MR. ELSNER:

 7        Q.   And you wouldn't try to tell the DEA

 8   something that was untrue, right?

 9        A.   I would not intend to be untrue to the

10   DEA.

11        Q.   Okay.  So then it also says that the

12   system is looking at 12-month maximums and

13   24-month maximums, is that right?

14             MR. MONTMINY:  Objection.  Form.

15        A.   That's what it says.

16   BY MR. ELSNER:

17        Q.   Okay.  And then it says "Other various

18   trending factors."  What does other various

19   trending factors mean?

20        A.   I don't recall what that's referring

21   to.

22        Q.   Who at Henry Schein set the 12-month

23   max and the 24-month max?

24             MR. MONTMINY:  Objection.  Form,
```

1   outside the scope.

2          MR. ELSNER:  Can you explain that

3   objection?  Because I don't understand it.

4          MR. MONTMINY:  Sure.  We can have a

5   running objection if you want, but essentially

6   he's here to speak in his personal capacity.

7   There was no notice provided to Schein that he

8   was a former employee and no opportunity to

9   prepare for this, and as of yet you haven't

10  asked a single question about CVS.

11         MR. ELSNER:  Well, under the protocol

12  I don't need to separately notice it.  I do need

13  to notify you if I intend to use a document he

14  hasn't seen before, which I haven't.  And I

15  think this is all fair game.  So I'm happy to

16  let you have a continuing objection to the use,

17  but I don't think we need to interrupt the

18  deposition with the same scope objections

19  throughout.

20         MR. MONTMINY:  Okay.

21  BY MR. ELSNER:

22      Q.  Can we go back to my question?  I

23  asked you if you could explain to me what the

24  other various trending factors means.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't recall what that's referring

 2   to.

 3        Q.   Okay.  And then I also asked who at

 4   Henry Schein, to your knowledge, set the

 5   12-month max and the 24-month maximums?

 6        A.   I don't recall who set that.

 7        Q.   Do you know what those maximums were?

 8        A.   I don't recall how that worked.

 9        Q.   You said that the suspicious order

10   monitoring system was only one component of the

11   due diligence program at Henry Schein.  What

12   were the others for controlled substances?

13        A.   I mean, at a high level it was -- we

14   had an algorithm, or algorithms, and we had a

15   due diligence process.  Those were two main

16   parts.

17        Q.   And the algorithm is a component of

18   the suspicious order monitoring system, right?

19        A.   The algorithm or algorithms were part

20   of the process.

21        Q.   Okay.  And then so the other component

22   to that is due diligence based on orders that

23   were flagged or triggered by the suspicious

24   order monitoring system, correct?
```

1          MR. MONTMINY:  Objection.  Form.

2     A.    That was part of the process.

3   BY MR. ELSNER:

4     Q.    If you go two pages further under

5   "Standard Operating Procedures/Policies," it

6   says "Henry Schein Has Implemented and Enhanced

7   Many of Our Policies and Procedures," and then

8   it lists some things, including "Suspicious

9   Order Monitoring Policy."

10          Does this refresh your recollection

11  that as of 2009 the enhanced system had been put

12  into place at Henry Schein with respect to

13  suspicious order monitoring?

14     A.    At the time of this meeting, I don't

15  recall what was in place.

16     Q.    Is that what's written in the

17  presentation?

18          MR. MONTMINY:  Object to form.

19     A.    It says that "Henry Schein Has

20  Implemented and Enhanced Many of Our Policies

21  and Procedures."

22  BY MR. ELSNER:

23     Q.    Including the suspicious order

24  monitoring program, correct?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    That is one of the sub-bullets.

2       Q.    And then if you go two pages further,

3   there's a "New Account Setup" page, and there's

4   a list of items that you -- one page forward.

5   Do you see where I'm at?

6       A.    Okay.

7       Q.    And this is the due diligence done for

8   new account setups at Henry Schein as of 2009,

9   is that right?

10      A.    Again, at this time I don't exactly

11  recall what the processes were.

12      Q.    But that's what's in the presentation

13  that you gave to the DEA?

14      A.    That is what's --

15            MR. MONTMINY:  Object to form.

16      A.    That is what's in this presentation.

17  BY MR. ELSNER:

18      Q.    Okay.  And it included a customer

19  questionnaire for every customer ordering

20  controlled substances, is that right?

21      A.    I see that's what it says there.

22      Q.    And did you work with that customer

23  questionnaire for customers while at Henry

24  Schein?

```
1        A.   I knew of a customer questionnaire.

2        Q.   Did you use it?

3        A.   Specifically the one that it's

4   referring to, I don't know.  I know we had a

5   customer questionnaire that we used to guide due

6   diligence.

7        Q.   Did you use it, the customer

8   questionnaire?

9             MR. MONTMINY:  Objection.  Form, asked

10  and answered.

11       A.   At this time?

12  BY MR. ELSNER:

13       Q.   At any time.

14            MR. MONTMINY:  Same objection.

15       A.   At my time at Henry Schein, I had used

16  a customer questionnaire to -- as a guideline

17  for due diligence.

18  BY MR. ELSNER:

19       Q.   And you would send that questionnaire

20  out to doctors and others that were ordering

21  controlled substances, is that right?

22       A.   Potentially.

23       Q.   And you'd review those responses?

24       A.   Either myself or someone else on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   team would review responses.

 2       Q.   And on the last page under "Pain

 3   Management Clinics - Due Diligence Process," the

 4   third bullet, it reads "Mandatory full

 5   regulatory audit is required for final approval"

 6   to receive controlled substances, is that right?

 7       A.   That's what it says.

 8       Q.   Okay.  And included "Inventory

 9   controls, Security systems/protocols, Interview

10   with the doctor or owner, and a Comprehensive

11   audit report including pictures of the facility

12   and background information," is that right?

13            MR. MONTMINY:  Object to form.

14       A.   That is what it says.

15   BY MR. ELSNER:

16       Q.   Were you involved in this process at

17   Henry Schein to collect the information for this

18   mandatory full regulatory audit?

19       A.   Specifically at this time I don't

20   fully recall what my role is or was with doing

21   that.

22       Q.   What about later on at Henry Schein?

23       A.   At some point while I worked at Henry

24   Schein that was part of my responsibilities, to
```

 1    do due diligence.

 2         Q.   And this was a component of Henry

 3    Schein's know your customer policies, is that

 4    right?

 5              MR. MONTMINY:  Object to form.

 6    BY MR. ELSNER:

 7         Q.   To collect this information?

 8              MS. MILLER:  Object to form.

 9              MR. MONTMINY:  I'd like to re-assert

10    my objection and make it clear that this witness

11    does not represent Henry Schein in this

12    deposition.

13              MR. ELSNER:  You can object.  Speaking

14    objections are not permitted.

15    BY MR. ELSNER:

16         Q.   Go ahead.

17         A.   Can you just repeat the question?

18         Q.   I had asked whether these -- reviewing

19    these questionnaires and reviewing the

20    information in the mandatory regulatory audits

21    is the know your customer information that was

22    collected at Henry Schein.

23              MR. MONTMINY:  Objection.  Form.

24         A.   I know at some part -- at some point

1   these do look like pieces of information that we

2   might look at for customers if doing due

3   diligence.

4   BY MR. ELSNER:

5       Q.   If you turn back to the PowerPoint

6   presentation that you gave at the conference, on

7   Page 10 under the --

8           MR. MONTMINY:  Object to the form of

9   that statement.

10  BY MR. ELSNER:

11      Q.   Page 10 under "The Pend Process."  Do

12  you see where I'm at?

13      A.   Page 10, "The Pend Process."

14      Q.   Under "Know Your Customer" in the

15  middle, do you see where I am?

16      A.   I see where you are.

17      Q.   It says "questionnaire is sent to

18  account.  Once received back and we are still

19  not comfortable releasing the order, a more

20  extensive questionnaire is sent out.  If still

21  not comfortable, a phone interview or site visit

22  will be scheduled if necessary."  Those are the

23  components in part of the know your customer

24  process at Henry Schein, is that correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MONTMINY:  Object to form.

 2      A.   I see that written there.  In

 3  reference to know your customer policy, I don't

 4  recall a know your customer policy that we had.

 5  BY MR. ELSNER:

 6      Q.   But that's what's written here?

 7      A.   "'Know Your Customer' questionnaire is

 8  sent to account" I see is what is written there.

 9      Q.   Did Henry Schein have a know your

10  customer policy in 2010?

11              MR. MONTMINY:  Objection.  Form.

12      A.   I don't recall.

13  BY MR. ELSNER:

14      Q.   If you turn to Page 13 of the

15  PowerPoint presentation for the Buzzeo

16  conference, under -- the topic there is

17  "Questionnaires," is that right?

18      A.   Questionnaires, yes.

19      Q.   Okay.  And there are "3 categories of

20  questionnaires developed," it reads.  "Know your

21  customer" is one, correct?

22      A.   I see that.

23      Q.   "Self Assessment Questionnaire" and

24  "Extensive Site Visit Questionnaire," is that
```

 1    right?

 2              MS. MILLER:  Object to form.

 3        A.    I see where that's written.

 4    BY MR. ELSNER:

 5        Q.    And it lists some sample questions at

 6    the bottom of the PowerPoint presentation,

 7    correct?

 8        A.    I see that.

 9        Q.    It includes "Do you accept medical

10    insurance?"  And "What percentage pay insurance"

11    versus pay in cash?  Is that one of the sample

12    questions?

13        A.    "Cash, credit," yes.

14        Q.    Okay.  And "Do you dispense...to

15    out-of-state patients" is another inquiry,

16    correct?

17        A.    I see that as one of the questions

18    listed.

19        Q.    All right.  On Page 14, the next page,

20    it refers to site visits.  Do you see that?

21        A.    "Site visits consist of."  I see that.

22        Q.    Okay.  And they're "Conducted on 'high

23    risk' accounts and accounts that we are not

24    comfortable with after initial due diligence,"

1    is that right?

2            MS. MILLER:  Object to form.

3        A.   I don't know if it was always the case

4    for just high-risk accounts, but I see where it

5    says here on high-risk accounts.

6    BY MR. ELSNER:

7        Q.   Was it sometimes for other accounts,

8    not high-risk accounts?

9        A.   I don't remember all the instances we

10   did site visits.

11       Q.   The process, under item 2, could take

12   anywhere from 6 to 8 weeks to complete, is that

13   right?

14           MS. MILLER:  Object to form.

15       A.   I don't remember the exact time frame

16   it took to complete.

17   BY MR. ELSNER:

18       Q.   That's what it says here, though,

19   right?

20       A.   It says "Initially, the process could

21   took anywhere from six to eight weeks to

22   complete."

23       Q.   Okay.  And on the bottom it says,

24   "Site visits consist of," and it lists a number

```
1    of things, including observing patients in the

2    waiting room.  Is that one?

3              MR. MONTMINY:  Objection.  Form.

4         A.   That's what it says.

5    BY MR. ELSNER:

6         Q.   Cars in the parking lot?

7         A.   That is what it says.

8         Q.   What were you looking for for cars in

9    the parking lot, what kind of cars?

10             MR. MONTMINY:  Object to form.

11        A.   Could be anything from was it a full

12   parking lot to out of state license plates.

13   BY MR. ELSNER:

14        Q.   Because out of state license plates

15   may be an indicator of diversion, is that right?

16             MS. MILLER:  Object to form.

17        A.   No, not necessarily.

18   BY MR. ELSNER:

19        Q.   It could be a red flag?

20             MS. MILLER:  Object to form.

21        A.   It was one of the things that we

22   looked at.  Could be nothing.

23   BY MR. ELSNER:

24        Q.   Could be nothing, could be something,
```

```
 1    right?

 2            MS. MILLER:  Object to form.

 3    BY MR. ELSNER:

 4        Q.   Yes, no?

 5        A.   I can't say.  It's case-by-case.

 6        Q.   It's on the criteria that you listed,

 7    is that right?

 8            MS. MILLER:  Object to form.

 9        A.   It's listed as one of the elements we

10    looked at.

11    BY MR. ELSNER:

12        Q.   Okay.  "Inventory reconciliations."

13    What's that?

14        A.   I don't recall exactly what that is,

15    but some kind of inventory review.

16        Q.   Inventory of what, the controlled

17    substances they had on hand?

18            MR. MONTMINY:  Objection to form.

19        A.   I think just inventory in general.

20    BY MR. ELSNER:

21        Q.   The site visit also consisted of

22    security controls, is that right?

23            MR. MONTMINY:  Objection.  Form.

24        A.   That's what it says.
```

```
 1   BY MR. ELSNER:

 2        Q.   Pictures?

 3             MR. MONTMINY:  Same objection.

 4        A.   It says that there.

 5   BY MR. ELSNER:

 6        Q.   Observing the surrounding

 7   neighborhood?

 8             MR. MONTMINY:  Object to form.

 9        A.   That's what it says.

10   BY MR. ELSNER:

11        Q.   And "Recordkeeping/Protocols"?

12             MR. MONTMINY:  Object to form.

13   BY MR. ELSNER:

14        Q.   Correct?

15             MS. MILLER:  Object to form.

16        A.   That's what it says.

17   BY MR. ELSNER:

18        Q.   These were in elements of the know

19   your customer or site visit review.  They were

20   part of the presentation that you gave in this

21   conference, correct?

22             MR. MONTMINY:  Objection.  Form.

23        A.   That is what it says in this document.

24   BY MR. ELSNER:
```

```
 1        Q.   You said you had a copy of this

 2   document.  Where do you maintain a copy of this

 3   presentation?

 4             MR. MONTMINY:  Objection.  Form.

 5        A.   I don't know.

 6   BY MR. ELSNER:

 7        Q.   Was it home, or is it at work?

 8             MR. MONTMINY:  Objection.  Form.

 9        A.   I don't recall.  I haven't seen this

10   in a long time.

11   BY MR. ELSNER:

12        Q.   Do you recall telling me in the

13   beginning that you had a copy of this

14   presentation?

15             MR. MONTMINY:  Objection.  Form.

16        A.   I recall saying I might have a copy.

17   BY MR. ELSNER:

18        Q.   If you had a copy, where would it be?

19             MS. MILLER:  Object to form.

20             MR. MONTMINY:  Object to form.

21        A.   I don't know.

22             MR. ELSNER:  I'd ask that counsel

23   speak with the witness and see if they can

24   locate a copy of the presentation.  If they can,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    if they produce it to us.

 2              MS. MILLER:  We can discuss it off the

 3    record.

 4    BY MR. ELSNER:

 5         Q.   When did you join CVS?

 6         A.   2012.

 7         Q.   And what were you hired at CVS to do?

 8              MS. MILLER:  Object to form.

 9    BY MR. ELSNER:

10         Q.   As you understand it.

11         A.   I know some of my early projects were

12    working on a compliance review program as well

13    as some pharmacy initiatives that the company

14    was working on.

15         Q.   Your title was senior compliance

16    manager when you were hired in August of 2012,

17    is that right?

18         A.   That sounds right.

19         Q.   Did you replace someone when you were

20    hired by CVS, or was this a new position?

21              MS. MILLER:  Object to form.

22         A.   I believe the position that I was

23    going into, I don't believe I was replacing

24    someone in that position.
```

1    BY MR. ELSNER:

2        Q.    Okay.  Why did you decide to leave

3    Henry Schein for CVS?

4        A.    I don't recall all the reasons, but I

5    thought it was a good opportunity.

6        Q.    Tell me about the process.  Did you

7    see an advertisement and apply to it, or did you

8    send out a resume to CVS?  How was it that you

9    came to be hired by CVS, as you understand it?

10            MS. MILLER:  Object to form.

11       A.    I believe I was contacted by CVS, and

12   had conversations through them reaching out.

13   BY MR. ELSNER:

14       Q.    Who was it that contacted you from

15   CVS?

16       A.    I don't remember exactly who it was.

17   It was someone from the talent acquisitions

18   department.

19       Q.    And did they meet you at a conference,

20   or did they cold call you?

21            MS. MILLER:  Object to form.

22       A.    I'm not sure what caused them to reach

23   out.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.   Were you working at Henry Schein at

 2  the time?

 3      A.   Yes.

 4      Q.   Had you met anyone from CVS as part of

 5  your work in the area of compliance for Henry

 6  Schein?

 7           MS. MILLER:  Object to form.

 8      A.   Not that I recall.

 9  BY MR. ELSNER:

10      Q.   Did they tell you that they were

11  looking to fill a particular position at CVS?

12           MS. MILLER:  Object to form.

13      A.   I believe they called me about a

14  specific position.

15  BY MR. ELSNER:

16      Q.   What was your understanding of the

17  position that they called you about?

18           MS. MILLER:  Object to form.

19      A.   I don't recall.

20  BY MR. ELSNER:

21      Q.   At the time you were in Greenville,

22  South Carolina, is that right?

23      A.   Yes, I believe so.

24      Q.   Were you hired by CVS Pharmacy or CVS

1    Health?  What entity of CVS hired you?

2              MS. MILLER:  Object to form.

3         A.   I don't recall.  It was CVS.

4    BY MR. ELSNER:

5         Q.   Who was your supervisor at CVS when

6    you were hired in August of 2012?

7         A.   It was Tom Bourque.

8         Q.   What was Tom Bourque's position?

9         A.   At the time I believe he was the

10   director of regulatory compliance.

11        Q.   Did he interview you for the position?

12        A.   Yes.

13        Q.   Did anyone else participate in the

14   interview process?

15        A.   Yes.

16        Q.   Who else?

17        A.   I can recall meeting with talent

18   acquisition, and then other members of the, at

19   the time, the regulatory compliance team.

20        Q.   What are their names?

21        A.   Aside from Tom, I remember Karen

22   DiStefano.

23        Q.   Any others?

24        A.   And Susan Delmonico.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    What is Susan Delmonico's position?

2      A.    At the time of the interview?

3      Q.    Yes.

4      A.    I don't exactly recall what her role

5   was.

6      Q.    Did you have any people who reported

7   to you when you were hired by CVS in August of

8   2012?

9      A.    There was one person.

10      Q.    Who was that?

11      A.    Cassandra Castro.

12      Q.    And what was her title and what were

13   her job responsibilities?

14            MS. MILLER:  Object to form.

15      A.    At that time I don't recall.

16   BY MR. ELSNER:

17      Q.    What was she doing for you under your

18   supervision?

19      A.    I think at the time I was hired, I

20   think she was also learning the company as I

21   was.  And then I know one of her big

22   responsibilities was the regulatory review

23   program.

24      Q.    Was anyone who was involved in the

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring system other than

2    Tom Bourque involved in any of -- let me strike

3    that.



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

16     Q.    Are you on any kind of medication that

17  would impair your ability to remember?  Did you

18  take any kind of medication today that would

19  impact your memory?

20          MS. MILLER:  I'm going to object to

21  that question.  That's an improper questioning

22  of the witness.

23          MR. ELSNER:  It's not.  I need to

24  know.  That's a standard deposition question at

Highly Confidential - Subject to Further Confidentiality Review

 1    every deposition.

 2    BY MR. ELSNER:

 3         Q.   Are you on any medications today?

 4              MS. MILLER:  I object.  It's an

 5    inappropriate question.

 6    BY MR. ELSNER:

 7         Q.   You can answer.  She's raised an

 8    objection.

 9         A.   I'm not on any medication.

10         Q.   Thank you.

11              Would you agree with me that there's

12    an opioid crisis in the United States?

13              MS. MILLER:  Object to form.

14         A.   I know that there are people who abuse

15    drugs.

16    BY MR. ELSNER:

17         Q.   Do you understand that the number of

18    people that -- well, do you know that there are

19    people who abuse prescription drugs including

20    opioids?

21              MS. MILLER:  Object to form.

22         A.   I am aware there are people who have

23    used opioids that have led in an overdose.  I am

24    aware of that.

1    BY MR. ELSNER:

2        Q.    Are you aware that the DEA and certain

3    government officials have referred to this

4    overdose that people are acquiring from opioids

5    as an epidemic?

6            MS. MILLER:  Object to form.

7        A.    I am not aware that I've heard the

8    term epidemic.  I'm not aware that that is

9    specifically to prescription medications.

10   BY MR. ELSNER:

11       Q.    So you're not aware of whether there's

12   an opioid epidemic in the United States today?

13           MS. MILLER:  Object to form.

14       A.    I think, like I said, I'm aware that

15   there are people who abuse drugs.

16   BY MR. ELSNER:

17       Q.    Well, certainly there are people who

18   abuse drugs.  I'm asking a much more different

19   and targeted question.

20           Are you aware that the number of

21   people that have abused opioids has risen to the

22   point of reaching an epidemic proportion in the

23   United States?

24           MS. MILLER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. DAWSON:  Objection.

 2       A.   Well, you keep using the term

 3  "epidemic."  I am aware that there are people

 4  who abuse prescription medications, illicit

 5  drugs such as heroin.  I'm aware that people

 6  have overdosed on drugs.

 7  BY MR. ELSNER:

 8       Q.   And you understand that's a huge

 9  problem in the United States?

10              MS. MILLER:  Object to form.

11  BY MR. ELSNER:

12       Q.   Do you agree with that or disagree

13  with that?

14              MS. MILLER:  Object to form.

15       A.   I would agree that any time that

16  someone passes away that it's not something I'd

17  want to see.

18  BY MR. ELSNER:

19       Q.   Well, for sure.

20              But do you agree that it's a huge

21  problem?

22              MS. MILLER:  Object to form.

23       A.   I'm not sure what you mean by "a huge

24  problem."  I'm aware that people overdose on
```

Highly Confidential - Subject to Further Confidentiality Review

1  drugs with prescription, illicit, fentanyl-laced

2  products.

3  BY MR. ELSNER:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16    BY MR. ELSNER:

17         Q.    Have you ever read anything about

18    opioid abuse problem in the United States?

19              MS. MILLER:  Object to form.

20         A.    I can't specifically recall anything,

21    but I've read about articles or about people

22    overdosing.

23    BY MR. ELSNER:

24         Q.    In what kind of publications?

```
 1        A.   I've seen it on the news, online,

 2   newspaper.

 3        Q.   Do you get a newspaper at your house,

 4   or do you read online newspapers?

 5        A.   I mean, I obtain news through

 6   different sources.

 7        Q.   I'm trying to understand the sources.

 8             Do you get the New York Times or the

 9   Boston Globe, or do you get any local paper to

10   your home?

11        A.   I believe I might get the Town of

12   Medway news or something.

13        Q.   Okay.  What's your best recollection

14   of any publication that you've read an article

15   about the opioid overdoses in the United States?

16             MS. MILLER:  Object to form.

17        A.   I can't remember a specific article

18   that I've read.

19   BY MR. ELSNER:

20        Q.   Have you written any -- have you read

21   any books about opioid abuse?

22             MR. MONTMINY:  Object to form.

23        A.   Not that I recall.

24   BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Seen any movies about it?

2           MS. MILLER:  Object to form.

3      A.   I have seen movies in which characters

4  have overdosed on medications or drugs.

5  BY MR. ELSNER:

6      Q.   Opioids?

7           MS. MILLER:  Object to form.

8      A.   Specifically, I don't recall a

9  specific movie that comes to mind.  But I've

10  seen movies where part of the plot are people

11  die of drug overdoses.

12  BY MR. ELSNER:

13     Q.   Do you understand that more people

14  died of a drug overdose from a prescription drug

15  than died in a car accident in recent years?

16          MS. MILLER:  Object to form.

17     A.   I don't believe I'd heard that before.

18  BY MR. ELSNER:

19     Q.   Did you know that overdose from

20  prescription drugs has been the leading cause of

21  death in the United States?

22          MS. MILLER:  Object to form.

23     A.   I don't believe I specifically knew

24  that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ELSNER:

 2         Q.   I'm going to show you what we marked

 3    as Exhibit 8.

 4              (Whereupon, CVS-Schiavo-8 was marked

 5              for identification.)

 6    BY MR. ELSNER:

 7         Q.   This is the PowerPoint presentation

 8    from the DEA.  This is MR 3.  This is from

 9    September of 2012 in Long Island, New York.

10    This is the conference that you attended, the

11    DEA conference that you attended.  And this

12    presentation was put together by Joseph

13    Rannazzisi who is the deputy assistant

14    administrator of the DEA.

15              Do you see that on the first page?

16              MR. MONTMINY:  Object to form.

17         A.   I see that.

18    BY MR. ELSNER:

19         Q.   I want you to turn to the fourth page

20    of the document, and it says "Commonly Abused

21    Controlled Pharmaceuticals."

22              Do you see that?

23         A.   I see where it says that.

24         Q.   And you're aware, are you not, that
```

1    hydrocodone was one of the commonly abused

2    pharmaceuticals?

3                MS. MILLER:  Object to form.

4         A.   I am aware that hydrocodone is one of

5    the drugs that someone can abuse.

6    BY MR. ELSNER:

7         Q.   Are you aware that it's a commonly

8    abused controlled substance?

9                MS. MILLER:  Object to form.

10        A.   I don't know what you mean by common,

11   but I'm aware that it can be abused.

12   BY MR. ELSNER:

13        Q.   As well as OxyContin and oxycodone,

14   would you agree?

15                MS. MILLER:  Object to form.

16        A.   I am aware that those are drugs that

17   can be abused.

18   BY MR. ELSNER:

19        Q.   Okay.  I'm going to have you turn --

20                MR. ELSNER:  Can we go off the record

21   for about 15 seconds?

22                THE VIDEOGRAPHER:  We're going off the

23   record at 10:38 a.m.

24                (Whereupon, a recess was taken.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  We're back on the

 2    record at 10:55 a.m.

 3    BY MR. ELSNER:

 4         Q.   Mr. Schiavo, I'm going to ask you to

 5    go to the next tab which you now have in front

 6    of me from this PowerPoint that the DEA

 7    presented at the conference you attended, and it

 8    describes the "Economic Impact - the Cascading

 9    Effect."  That's the title of the slide, is that

10    correct?

11              MS. MILLER:  Object to form.

12         A.   That is what the slide says.

13    BY MR. ELSNER:

14         Q.   It says that in 2006 the estimated

15    cost in the United States from non-medical use

16    of prescription opioids was $53.4 billion.  Did

17    I read that correctly?

18         A.   I see where it says that.

19         Q.   And it lists five drugs on the bottom

20    which account for two-thirds of the economic

21    burden.

22              Do you see that?

23         A.   I don't see where it says that they

24    account for two-thirds, but I see drugs listed
```

1    at the bottom.

2              There, it says it, yes.

3        Q.   And those drugs include OxyContin,

4    oxycodone, hydrocodone, among others, correct?

5              MS. MILLER:  Object to form.

6        A.   It looks like there's two other drugs

7    listed than you named.

8    BY MR. ELSNER:

9        Q.   And it includes all of those, correct?

10       A.   That's what it says.

11             MS. MILLER:  Object to form.

12   BY MR. ELSNER:

13       Q.   And these are drugs that were

14   dispensed by CVS pharmacies, correct?

15             MS. MILLER:  Object to form.

16       A.   I did not -- I didn't work for CVS in

17   2006.  I can't answer that.

18   BY MR. ELSNER:

19       Q.   Were these drugs that were dispensed

20   by CVS in 2012 when you joined CVS?

21             MS. MILLER:  Object to form.

22       A.   I can't say for sure that all of these

23   were.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Hydrocodone is among the drugs that

2   were distributed by CVS when you joined them in

3   2012, correct?

4           MS. MILLER:  Object to form.

5      A.   Hydrocodone was one of the drugs that

6   pharmacies dispensed in 2012.

7   BY MR. ELSNER:

8      Q.   And it was also a drug that CVS

9   distributed to its own pharmacies in 2012,

10  correct?

11          MS. MILLER:  Object to form.

12     A.   I do believe some of our distribution

13  centers distributed hydrocodone to pharmacies.

14  BY MR. ELSNER:

15     Q.   Okay.  If you turn to the next tab,

16  the next Post-it, it says "Emergency Room Data

17  2004 to 2009."

18          Do you see that?

19     A.   I see that.

20     Q.   Okay.  And it reads the increase of

21  98.4 percent of ER visits attributable to

22  pharmaceuticals alone.

23          Did I read that correctly?

24     A.   I see where it says that.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  And beneath that it says,

2    "Prescription drugs most frequently implicated:

3    Opiates/opioids pain relievers," and it lists

4    "Oxycodone products 242.2 percent increase,"

5    correct?  Is that what it says?

6            MS. MILLER:  Object to form.

7      A.    It looks like that's what it says.

8    BY MR. ELSNER:

9      Q.    Between 2004 and 2009 for hydrocodone

10   there was 124.5 percent increase in ER visits,

11   correct?

12           MS. MILLER:  Object to form.

13   BY MR. ELSNER:

14     Q.    Is that what it says?

15           MS. MILLER:  Object to form.

16     A.    Can you reread what part you were

17   reading.

18   BY MR. ELSNER:

19     Q.    So we're talking about emergency room

20   data from 2004 to 2009, right?

21     A.    Yes.

22     Q.    And we're talking about increases in

23   ER visits attributable to those pharmaceuticals.

24   Are you with me?

Highly Confidential - Subject to Further Confidentiality Review

1             MS. MILLER:  Object to form.

2        A.   I see the top bullet.

3    BY MR. ELSNER:

4        Q.   Now we're talking about, we're

5    breaking it down, "Prescription Drugs most

6    frequently implicated:  Opiates/Opioids pain

7    relievers," and it lists hydrocodone products as

8    124.5 percent increase.

9             Do you see that?

10            MS. MILLER:  Object to form.

11       A.   I see where it lists hydrocodone and

12   124.5 percent increase.

13   BY MR. ELSNER:

14       Q.   Okay.  If you go to the next sticky,

15   there's been an increase and rise in poisoning

16   deaths from opioids and analgesics, correct,

17   from 1999 through 2007?  Do you see that?

18            MS. MILLER:  Object to form.

19       A.   I see the chart.

20   BY MR. ELSNER:

21       Q.   Okay.  Were you aware prior to this

22   conference that there was this rising death --

23   poisoning deaths from opioids?

24            MS. MILLER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.   I don't believe I was aware of this

 2    exact data in this chart.

 3    BY MR. ELSNER:

 4         Q.   Okay.  If you go to the next tab, the

 5    title is "Number of Forensic Cases, 2001 to

 6    2010."

 7              Do you see that?

 8              MS. MILLER:  Object to form.

 9         A.   I see that on the slide.

10    BY MR. ELSNER:

11         Q.   And you see in 2001 there's sort of --

12    if you just look at the hydrocodone tab, which

13    is the green.  Are you with me?  In 2010 it's

14    slightly over 10,000, correct?

15              MS. MILLER:  Object to form.

16    BY MR. ELSNER:

17         Q.   In 2001, slightly over 10,000?

18         A.   It looks like that's what the chart is

19    indicating.

20         Q.   Okay.  And that by 2010 for

21    hydrocodone there's been a 253 percent increase

22    in forensic cases, correct?

23              MS. MILLER:  Object to form.

24         A.   I see that on the chart.  I am not
```

```
 1    sure what's meant by "forensic cases," though.

 2    I'm not sure what this is saying.

 3    BY MR. ELSNER:

 4         Q.   Okay.  Were you aware that there had

 5    been a 250 percent increase in hydrocodone

 6    overdoses from 2001 to 2010 before this

 7    conference?

 8              MS. MILLER:  Object to form.

 9         A.   Yeah, I'm not exactly sure what

10    forensic cases mean, and I'm not sure, so I

11    can't say I know what that 253 percent --

12    BY MR. ELSNER:

13         Q.   You don't know that forensic cases

14    refers to an overdose?

15              MS. MILLER:  Object to form.

16    BY MR. ELSNER:

17         Q.   What's your understanding of the word

18    forensic?

19         A.   Not exactly sure what the definition

20    is.

21         Q.   Forensic refers to death.

22              MS. MILLER:  Object to form.

23    BY MR. ELSNER:

24         Q.   You don't know?
```

```
 1          A.   I don't know the exact definition.

 2          Q.   If you go to the next sticky, sort of

 3     a cover page, an introductory page, it reads

 4     that the most commonly prescribed prescription

 5     medicine is hydrocodone/acetaminophen.

 6               Did I read that correctly?

 7          A.   That looks to be what it says.

 8          Q.   Okay.  Were you aware prior to this

 9     conference that hydrocodone/acetaminophen was

10     the most commonly prescribed prescription

11     medicine in the United States?

12               MS. MILLER:  Object to form.

13          A.   I don't recall if I knew that.

14     BY MR. ELSNER:

15          Q.   If you go to the next tab, which is on

16     the very next page, the title is the "Top Five

17     Prescription Drugs Sold in the United States."

18     Do you see that?  Is that what the title says?

19          A.   That is what the title says.

20          Q.   Okay.  And do you see that hydrocodone

21     is significantly higher than all the other

22     drugs, prescription drugs, sold in the United

23     States?

24               MS. MILLER:  Object to form.
```

1    A.   I don't know exactly what's meant by

2  sold.  And I do see that the hydrocodone line is

3  higher than other lines.

4  BY MR. ELSNER:

5    Q.   Well, what do you believe sold means?

6    A.   In terms of --

7        MS. MILLER:  Object to form.

8    A.   In the terms of this slide, I'm not

9  sure.

10  BY MR. ELSNER:

11    Q.   Were you aware that there were more

12  prescriptions filled and sales of hydrocodone

13  than there were for Lipitor in the United

14  States?

15        MS. MILLER:  Object to form.

16    A.   Just based on this chart saying

17  "Prescription Drugs Sold," which I'm not --

18  still not sure exactly what sold means, the

19  hydrocodone bar is larger than the Lipitor bar.

20  BY MR. ELSNER:

21  ██    ████████████████████████

██  ██████████████████████

██  ████████████████████

██  ██    ██████████████████████████

Highly Confidential - Subject to Further Confidentiality Review

1 ███████████

█ ████████████

█ ████ ██████████████████████

█ ████████████████████████████████

█ ██████████████████████████

█ ██████████████████████████

█ █████████████████████████████

█ █████████████████████████████

█ █████████████████████████████

█ ███████████████████

█ ████ ██████████████████████

█ ██████████████████████████

█ █████████████████

█ ██████████████████████

█ ████████████████████████

█ ████████████████████████

17 BY MR. ELSNER:

18      Q.   Did you know that hydrocodone was one

19 of the most widely diverted and abused drugs in

20 the United States?

21           MS. MILLER:   Object to form.

22      A.   I don't know if I knew it was one of

23 the most highly diverted drugs.

24 BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1

15    BY MR. ELSNER:

16        Q.   Who asked you to attend this

17    conference in New York?

18            MS. MILLER:   Object to form.

19    BY MR. ELSNER:

20        Q.   If anyone.

21        A.   I don't recall.

22        Q.   Did someone at CVS ask you to go, or

23    did you decide to go on your own?

24        A.   I don't recall.



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



15    BY MR. ELSNER:

16         Q.    What's your title at CVS today?

17         A.    Director, business compliance officer.

18         Q.    And what are your responsibilities as

19    the director of the business compliance?

20         A.    My focus is on our retail business,

21    and focusing on new laws and regulations.

22





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





1 ███████████████████████

██  ████  █████████████████████

██  ███████████████████████

4          MS. MILLER:  Craig, are you ready for

5   a break?

6          THE WITNESS:  I could use a break

7   soon.

8          MS. MILLER:  Can we take a break?

9   We've been going now -- we talked about 12:15.

10  We've been going at least an hour and

11  15 minutes.

12         MR. ELSNER:  Okay.

13         THE VIDEOGRAPHER:  We're going off the

14  record at 12:17 p.m.

15         (Whereupon, a luncheon recess was

16         taken.)

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



1          AFTERNOON SESSION

2

3          THE VIDEOGRAPHER:  We're back on the

4    record at 12:57 p.m.

5

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

9       Q.   Okay.  It says on Page 8 of the

10   PowerPoint under "DEA Reporting Requirements" at

11   the very top, it says "CVS is obligated to

12   report orders determined to be Suspicious that

13   were placed to our Distribution Centers," and

14   "placed to our distribution centers" is

15   underlined and in bold, correct?

16       A.   I see that it is underlined, and it

17   appears that at least part of it is in bold.

18       Q.   Okay.  And then if you look down to

19   the third bolded item, it reads that "Orders

20   that are placed to an Outside Vendor that we

21   identify as an order deviating from the normal

22   size, frequency, and/or buying pattern and

23   deemed to not be for legitimate purposes or are

24   at the risk of being diverted are not required

Highly Confidential - Subject to Further Confidentiality Review

1    to be reported to the DEA."

2              Did I read that correctly?

3              MS. MILLER:  Object to form.

4         A.   That's what it says, but I don't know

5    how we would identify an order placed to an

6    outside vendor deviating from normal size,

7    frequency, but I don't believe that part of our

8    process monitoring specific orders to the OV

9    when they are placed.

10   ████████████████

████    ████    ████████████████████████████████

████    █████████████████████████████████████████

████    █████████████████████████████████████████

████    ████████████████████████████████████████

████    ███████████████████████████████████

████         █████████████████████████████

████    ████    ████████████████████████████████

████    █████████████████████████

████    █████████████████

████    ████    ██████████████████████

████    ████    ████████████████████████

████    ████    █████████████████████████████

████    █████████████████████████████████████

████         ████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1  ████████████████████████████████

   ████████████████████████████████████

   ██████

   ███████████████████

      ████    ████████████████████████████

   ███████████████████████████████

   ██████████████████████████████

   ██████

      ████    ████████████████████

          ████████████████████████

   ████████████████████████

12        Q.   To prepare for the deposition today,

13   what did you do?

14        A.   I had meetings with our internal and

15   outside counsel.

16        Q.   How long did you meet with counsel

17   inside CVS to prepare for today's deposition?

18             MS. MILLER:  Object to form.

19        A.   I believe we met three or four times.

20   BY MR. ELSNER:

21        Q.   How long were those meetings?

22             MS. MILLER:  Object to form.

23        A.   They varied in length.

24   BY MR. ELSNER:

1    Q.   What's your best estimate of the total

2    number of hours you met with inside counsel to

3    prepare for today's deposition?

4         MS. MILLER:  Object to form.

5    A.   I don't recall how long I prepared

6    with inside counsel, counsel at -- our internal

7    CVS counsel.  I don't recall.  I can't put hours

8    on it.  I can't recall how long.

9    BY MR. ELSNER:

10   Q.   What about your outside counsel, how

11   many days, hours did you spend preparing for

12   your deposition with them?

13   A.   We met three or four times.

14   Q.   Did you meet yesterday?  Don't say you

15   don't recall.

16        MS. MILLER:  Object to form.

17   Objection.

18   BY MR. ELSNER:

19   Q.   Did you meet with counsel yesterday?

20   A.   Yes.

21   Q.   How long?

22   A.   Most of the day.

23   Q.   Seven hours, six hours?

24        MS. MILLER:  Object to form.

1          MR. ELSNER:  What's the objection?  He

2    said most of the day, I asked six or

3    seven hours.  What's the objection?

4          MS. MILLER:  Six or seven hours of the

5    day yesterday?

6          MR. ELSNER:  Yes.

7          MS. MILLER:  Just wasn't clear.

8          MR. ELSNER:  That's not a valid

9    objection.

10   BY MR. ELSNER:

11       Q.   How many hours did you meet with your

12   counsel yesterday?

13       A.   We were probably together for seven

14   hours.

15       Q.   Okay.  Did you review documents?  Yes

16   or no.

17          MS. MILLER:  Objection.

18          I'm going to instruct you not to

19   answer to the extent it would reveal any of the

20   documents that we discussed based on privilege

21   and work product.  You may answer the question.

22       A.   We reviewed documents.

23   BY MR. ELSNER:

24       Q.   Did you meet with counsel before

```
 1    yesterday?

 2         A.    Yes.

 3         Q.    When was the prior meeting and how

 4    long did it last, roughly?

 5         A.    Prior meeting was Tuesday.

 6         Q.    How long?

 7         A.    Most of the day.

 8         Q.    Six, seven hours?

 9         A.    I don't remember exactly.

10               MS. MILLER:  Object to form.

11         A.    I don't remember exactly how long.

12    BY MR. ELSNER:

13         Q.    What time did you start?

14         A.    Sometime after 10:00 o'clock.

15         Q.    Where did you meet?

16         A.    At One CVS.

17         Q.    When did the meeting end; before

18    lunch, after lunch?

19         A.    I don't recall when it ended.

20         Q.    Dark outside, or not dark outside?

21               MS. MILLER:  Object to form.

22    BY MR. ELSNER:

23         Q.    This was Tuesday, right?

24               MS. MILLER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   I don't recall exactly the time that

 2   it ended.

 3   BY MR. ELSNER:

 4       Q.   Did you meet for more or less than

 5   four hours that day?

 6       A.   I don't remember exactly how long we

 7   met.  It was for a number of hours.

 8            MR. ELSNER:  To move this along, can

 9   you give us an idea of how long you spent with

10   the witness preparing for the deposition?  He

11   seems unable to recall what happened this week.

12            MS. MILLER:  I'm not going to make a

13   representation.  Ask your questions.

14            MR. ELSNER:  You're unwilling to tell

15   us how long you met with the witness?

16            MS. MILLER:  No, I just --

17            MR. ELSNER:  He can't answer the

18   question.

19            MS. MILLER:  He is answering the

20   question.  He's trying --

21            MR. ELSNER:  He says he can't

22   remember.

23            MS. MILLER:  Well, he said --

24            MR. ELSNER:  He can't remember when
```

1    the meeting ended on Tuesday.  It began at

2    10:00 in the morning, and he can't tell me when

3    it ended.

4    BY MR. ELSNER:

5         Q.   Did you go past lunch?  Did you work

6    into the evening?  I mean, five, six hours?

7    Please, someone, either of you, tell me.  Can

8    you answer the question?

9         A.   Tuesday we met for a good part of the

10   day.  I don't remember exactly.

11        Q.   What does that mean, "a good part of

12   the day"?

13        A.   I had many other meetings during the

14   day, so I don't know exactly how long we met

15   for.

16        Q.   Prior to that meeting on Tuesday and

17   the one yesterday, did you meet with counsel to

18   prepare for the deposition before that?

19        A.   We met on Monday.

20        Q.   So you met on Monday, you met on

21   Tuesday, and you met yesterday.  How long did

22   you spend on Monday preparing for the

23   deposition?

24        A.   I believe Monday was a good part of

1    the day.

2         Q.   You spent a good part of the day

3    meeting with counsel on Monday, a good part of

4    the day meeting with counsel on Tuesday, and you

5    spent seven hours yesterday, is that right?

6         A.   I don't know --

7              MS. MILLER:  Object to form.

8              MR. ELSNER:  That's what his testimony

9    was, right?

10        A.   I don't know exactly how long we spent

11   yesterday, but it was most of the day, a good

12   part of the day.

13   BY MR. ELSNER:

14        Q.   I thought you said seven hours.

15             Did you meet over the weekend?

16        A.   We did not meet over the weekend.

17        Q.   Did you meet last week?

18        A.   We did not meet last week.

19        Q.   And none of the process and system,

20   the questions that I've talked with you about

21   today, from 2014 to 2012, you did not have any

22   memory of any of those things we discussed,

23   correct?

24             MS. MILLER:  Object to form.

1          That's not what he testified to.  He

2    testified --

3          MR. ELSNER:  Well, the jury can

4    determine that.

5    BY MR. ELSNER:

6      Q.   Is there something in particular that

7    you remember that we discussed today that you

8    can highlight for me?

9          MS. MILLER:  Object to form.

10          The record speaks for itself.  He's

11    testified about the processing systems between

12    2012 and 2014.

13          MR. ELSNER:  You can say object to

14    form.

15    BY MR. ELSNER:

16      Q.   What's the answer, please?

17      A.   Nothing that we have reviewed today,

18    to the best of my recollection, I recall from

19    the time either they were created or they were

20    first reviewed by me.  I don't recall the

21    documents.

22      Q.   Did you meet with the Analysis Group

23    to consider their proposal to develop and

24    enhance suspicious monitoring system for CVS?

1       A.    I participated in meetings with AG

2   where enhancements to the system or the new

3   system were discussed.

4       Q.    You were among the team that

5   reviewed -- that solicited and reviewed

6   proposals to partner with CVS in the development

7   of a suspicious order monitoring algorithm and

8   system, correct?

9           MS. MILLER:  Objection.  I'd like to

10  lodge an objection right after the question in

11  296:04.  It's a follow-up to the prior question

12  I'd objected to, but I'd like that reflected on

13  the record.  Thank you.

14          I apologize for interrupting on the

15  record.

16  BY MR. ELSNER:

17      Q.    You were among the team that reviewed

18  and solicited -- that solicited and reviewed

19  proposals for consultants to assist CVS with its

20  development of an SOM algorithm and enhanced

21  program, correct?

22      A.    I was part of a team that was

23  participating in conversations prior to

24  selecting a vendor.  I don't remember viewing

 1    any specific proposals.

 2         Q.    How many other vendors submitted

 3    proposals?  Was it anyone other than the Buzzeo

 4    Group and the Analysis Group?

 5         A.    Those are the only two that I recall.

 6         Q.    Who would know if there are others?

 7              MS. MILLER:  Object to form.

 8         A.    I don't know who would know that.

 9              MR. ELSNER:  This is Motley Rice 9.

10    I'm going to mark this as the next exhibit.

11              (Whereupon, CVS-Schiavo-21 was marked

12              for identification.)

13    BY MR. ELSNER:

14         Q.    This is another e-mail that you sent

15    to Tom Bourque.  The date here is December 12,

16    2012.  It reads "Opportunity Page, SOM Flow

17    Chart," and then you wrote "These are documents

18    mentioned in my status report just in case

19    Pawlik wants to see them when we are going over

20    the SOM slide or Inventory Cycle count slide."

21              Did I read that correctly?

22         A.    That's what it says.

23         Q.    Okay.  And then it appears to be a

24    list of kind of action items, and there's an a

1    column for Duration, Start, Finish, and

2    Percentage Complete.

3             Do you see that?

4        A.   I see that.

5        Q.   Okay.  And you drafted this?

6        A.   I don't know if I drafted this.

7        Q.   You sent it to your boss, right?

8        A.   I sent it to my boss.

9        Q.   And you said these are the documents

10   that you mentioned in your status report, so are

11   these documents that you drafted or did somebody

12   else draft these?

13       A.   I don't recall.  I don't remember

14   drafting this.

15       Q.   Would there have been anyone else that

16   would have drafted this, to your knowledge, that

17   you would have sent to Mr. Bourque?  I couldn't

18   see any other e-mails where someone forwarded it

19   to you.

20            MS. MILLER:  Object to form.

21       A.   It's very possible someone else

22   drafted this.

23   BY MR. ELSNER:

24       Q.   Who would it be?

```
 1        A.    It could have been anyone on the

 2   current SOM team.

 3        Q.    Okay.  Can I ask you to look at

 4   Page 103375?  You see there's an ID number that

 5   lists sequential numbers.  If you go down to 48.

 6   Do you see where I am?  You go across 48.  It

 7   reads "Gap Analysis between current SOM & New."

 8              Do you see that?

 9        A.    I see that.

10        Q.    All right.  And then if you go over to

11   Percentage Complete, it says 50 percent.

12              Do you see that?

13        A.    I see where it says that.

14        Q.    Okay.  And then the Resource Names

15   associated with that analysis are you and

16   Tulley.  Is that right?

17        A.    Yes.

18        Q.    Okay.  So you were to perform a gap

19   analysis between the current SOM system in place

20   in 2012 and the new system that you were going

21   to develop, is that right?

22              MS. MILLER:  Object to form.  Object

23   on attorney/client privilege grounds.

24              To the extent the witness can answer
```

1    the question without revealing attorney/client

2    communications, you can answer.

3         A.   I see what it says there.  I see my

4    name with Tulley's name.  I don't recall doing a

5    gap analysis.  I don't recall doing that.

6    BY MR. ELSNER:

7         Q.   Did CVS ever compare the old system

8    and come up with a list of items that are going

9    to be in the new system other than the documents

10   that I've shown you today that you drafted about

11   that?  Is there anyone at CVS, to your

12   knowledge, that would do that?

13             MS. MILLER:  Object to form.  Object

14   on attorney/client privilege grounds.

15             And to the extent the witness can

16   answer the question without revealing

17   attorney/client communications, he can answer.

18   Otherwise I instruct him not to answer.

19        A.   I don't recall anyone that did that.

20   BY MR. ELSNER:

21        Q.   Your name is listed next to that task,

22   correct, with Tulley?  Who is Tulley?

23        A.   I believe that's Chris Tulley.

24        Q.   And your name is listed with his as

1    responsible for that task, correct?

2        A.   My name with Chris's is in the

3    resources name.

4        Q.   You were also responsible for

5    identifying all the DEA requirements in the next

6    item, correct, item 49?

7        A.   I see my name there, but I don't think

8    I would be relied on to identify all DEA

9    requirements.

10       Q.   If you go to the next page under 53,

11   it says "Develop an algorithm methodology to

12   find orders of interest (using Thresholding

13   approach)."  You and Tulley are listed there,

14   correct?

15           MS. MILLER:  Mike, where are you?

16           MR. ELSNER:  I'm at 63.

17           MS. MILLER:  63.

18           MR. ELSNER:  103376.

19           MS. MILLER:  Thank you.

20       A.   I see my name there.

21   BY MR. ELSNER:

22       Q.   Okay.  It's one of your

23   responsibilities under the new SOM system, is

24   that right?

```
 1                MS. MILLER:  Object to form.
 2           A.   I see what it says there, but at no
 3      time do I recall it being my responsibility to
 4      develop any kind of algorithm.  I don't know how
 5      I would do that.
 6                MR. ELSNER:  Why don't we go off the
 7      record quickly?
 8                THE VIDEOGRAPHER:  We're going off the
 9      record at 3:41 p.m.
10                (Whereupon, a recess was taken.)
11                THE VIDEOGRAPHER:  We're back on the
12      record at 3:47 p.m.
13      BY MR. ELSNER:
14           Q.   Mr. Schiavo, I put back before you
15      your year-end review from 2012.  This is
16      Exhibit 9.  We looked at this earlier.  It's
17      dated January 25th, 2013.  I'm going to ask you
18      to look at Page 8 of 11, which is at 120603.
19           A.   Okay.
20           Q.   Okay.  And at the end of that first
21      full paragraph, it says "To date, I have
22      contributed to the following."
23                Do you see where I'm at?
24           A.   I see where you're at.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   Okay.  And the first plus there, it

2  says "To identify gaps in the current SOM system

3  that need to be addressed when developing the

4  new system."

5          Did I read that correctly?

6     A.   That's what that says.

7     Q.   And did you do that?

8          MS. MILLER:  Object to form.

9     A.   I don't recall ever doing a deep dive

10  into the system at this time and identifying

11  CAPS.  I think at the time of this review I was

12  probably with CVS for a few months.

13  BY MR. ELSNER:

14     Q.   That's what you wrote, though, right,

15  "Identify gaps in the current SOM system that

16  need to be addressed when developing the new

17  system," correct?

18     A.   That's what it says in my year-end

19  review.

20     Q.   Okay.  And that's what it said in the

21  document we just looked at, that you were going

22  to do a gap review, correct?

23          MS. MILLER:  Object to form.

24     A.   It's -- I recall it saying something

1    about doing a gap analysis in the other

2    document.

3    BY MR. ELSNER:

4         Q.   Comparing the old system to the new

5    system, right?

6              MS. MILLER:  Object to form.

7         A.   Can I look to see what the exact

8    wording was?

9    BY MR. ELSNER:

10        Q.   Sure.

11        A.   Do we know which number it was?

12        Q.   I believe it was 48 or 49.

13             MS. VELDMAN:  63.

14        A.   63 was "Develop algorithm

15   methodology."

16   BY MR. ELSNER:

17        Q.   I think it's the page before that.

18        A.   48 says "Gap analysis between current

19   SOM and new SOM."

20        Q.   And that's what you wrote in your

21   review, "Identify gaps in the current SOM system

22   that need to be addressed when developing the

23   new system," right?

24             MS. MILLER:  Object to form.

 1     A.    It says I contributed to that process.

 2   I don't remember to what extent.

 3   BY MR. ELSNER:

 4     Q.    Okay.  Two more plusses down it says

 5   "Selecting AGI as the vendor to help develop an

 6   algorithm in order to identify potentially

 7   suspicious orders."

 8         Did I read that correctly?

 9     A.    That's what it says.

10     Q.    Okay.  And then on 63 of the prior

11   exhibit, line 63, it says "Develop algorithm

12   methodology to find orders of interest."

13   Correct?

14         MS. MILLER:  Object to form.

15     A.    This is saying with my name next to it

16   "Develop algorithm methodology."  But again, I

17   don't ever recall being in charge of developing

18   an algorithm.

19   BY MR. ELSNER:

20     Q.    Well, one of the items that you wrote

21   in your annual review was "Selecting AGI as the

22   vendor to help develop an algorithm in order to

23   identify potentially suspicious orders."  Is

24   that one of the things listed in your annual

1    review?

2         A.    It says that one of the things that I

3    contributed with was "selecting AGI to help

4    develop an algorithm," and I read that much

5    differently than me being responsible for

6    developing an algorithm.

7         Q.    But you worked on it, right?

8              MS. MILLER:  Objection to form.

9    BY MR. ELSNER:

10        Q.    I didn't say you were the only one

11   responsible.  That was one of the things you

12   worked on, right?

13        A.    I was -- I participated in meetings

14   with other team members, but I don't think I had

15   a role in developing, writing the algorithm.

16        Q.    Okay.  Toward the bottom it says

17   "Drafting of the Stop Order/Order Resumption

18   SOP."  You contributed to that, right?

19              MS. MILLER:  Object to form.

20              You're on the --

21   BY MR. ELSNER:

22        Q.    Back on your annual review, second to

23   last plus.

24        A.    I see "Drafting of Stop Order/Order

1    Resumption SOP."  But that's not a -- that is

2    not a policy that I'm -- I recall or am familiar

3    with.  I don't know if that was ever an official

4    policy.

5        Q.   Well, we saw those documents today.

6    Was it not an official policy of CVS, the policy

7    that you drafted with Aaron Burtner?

8            MS. MILLER:  Object to form.

9            And maybe it would be helpful to show

10   him the exhibit that you're referring to so he

11   can take a look.

12   BY MR. ELSNER:

13       Q.   You don't recall working on that

14   policy with Aaron Burtner, a stop order policy,

15   whether we were going to ship -- whether we were

16   going to stop the order of that exact drug or

17   the family of drugs?  We discussed it for about

18   20 minutes.

19           MS. MILLER:  Object to form.  He's

20   already given testimony on it.

21           MR. ELSNER:  I know, that's why I

22   thought it would be simple to say one of the

23   things that was listed was the drafting of the

24   stop order/order resumption SOP.

1    BY MR. ELSNER:

2        Q.   That's one of the things listed in the

3    review, correct?

4        A.   I don't recall the title of the policy

5    we reviewed today is the same policy that's

6    referred to right here.  I don't recall the

7    title of the policies we reviewed today.

8        Q.   Did you write in your annual review --

9    did you write "Drafting of the Stop Order/Order

10   Resumption SOP"?  Yes or no.

11       A.   It says there that I drafted the stop

12   order/order resumption SOP, which is a policy.

13   I'm not sure what policy that's referring to.

14       Q.   I know, we've established you can't

15   remember.

16            MS. MILLER:  Object to form.

17   BY MR. ELSNER:

18       Q.   The next plus says "Providing input on

19   key decisions (Reporting to DEA offices, what

20   drugs to hold when an order flags, whether or

21   not to include outside vendor orders)."

22   Correct?

23       A.   That's what that says.

24       Q.   Okay.  So there was a discussion at

1    CVS whether or not to include outside vendor

2    orders as part of the SOM process in 2012,

3    correct?

4            MS. MILLER:  Object to form.

5       A.   In 2012 I believe we discussed the

6    potential of including OV order in the new or

7    enhanced system that we were building.

8    BY MR. ELSNER:

9       Q.   Okay.  And it did not exist in the old

10   system, right?

11           MS. MILLER:  Object to form.

12      A.   I don't recall if OV orders were part

13   of the old system or not.

14   BY MR. ELSNER:

15      Q.   I'm going to mark this.

16           Also in there is you provided input on

17   another key decision, which was what drugs to

18   hold when an order flags, is that right, whether

19   to hold that specific drug or whether to hold

20   the family of drugs?  That's one of the other

21   things that you provided input on for key

22   decisions, correct?

23           MS. MILLER:  Object to form.

24      A.   That's what it says.  But again, this

1    is in 2012 when I don't believe any final

2    decisions have been made on how our new or

3    enhanced system was -- all the elements that

4    were going to be in there.

5    BY MR. ELSNER:

6        Q.   I understand.  But that's one of the

7    things you provided input on, right, whether to

8    do the family of drugs or specific drugs or all

9    controlled drugs, right?

10       A.   That's what it says.

11       Q.   It also says you were going to provide

12   input on reporting to the DEA offices, correct?

13       A.   That's what it says.

14            MR. ELSNER:  Okay.  Mark this next

15   document as Exhibit 22.  This is Motley Rice 23.

16            (Whereupon, CVS-Schiavo-22 was marked

17            for identification.)

18   BY MR. ELSNER:

19       Q.   CVS did hire the Analysis Group as a

20   consultant, right?

21       A.   That's who we used to develop -- help

22   develop our SOM system.

23       Q.   And so CVS hired them as a consultant,

24   is that right?  Well, they didn't do it for

1    free, right?

2         A.    That's -- yes, that's who we used to

3    do it.

4         Q.    And you hired them?

5         A.    I didn't personally hire them.

6         Q.    I asked if CVS hired them.

7              MS. MILLER:   Object to form.

8    BY MR. ELSNER:

9         Q.    Did CVS hire the Analysis Group to

10   assist it in developing its SOM program?

11        A.    Yes, the Analysis Group helped us

12   developed our SOM.

13        Q.    In February of 2013 there is this

14   note, that memo, from the Analysis Group which

15   is a request for data for the SOM algorithm data

16   inputs.  Do you see that in the "Re" line?  The

17   date is February 4, 2013.

18        A.    I see that.

19        Q.    And there's some -- there's a listing

20   here at the end of the second paragraph, there's

21   sort of some numbers here, 1 through 10.  This

22   is the data that the Analysis Group was

23   requesting in order to build the algorithm.

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

 1      A.    I see the listing of elements there

 2  that it looks like they're requesting.

 3      Q.    Okay.  Who at CVS was responsible for

 4  gathering this information to provide to the

 5  Analysis Group, to the extent you know?

 6      A.    I don't know who would have provided

 7  this information.

 8      Q.    Did you ever review the information or

 9  the data that the Analysis Group was going to

10  use to compile the algorithm?

11      A.    I don't recall reviewing any specific

12  data provided to Analysis Group.

13      Q.    Under 8 it says "Store dispensing,"

14  and it lists under A, B, C and D, prescription

15  information, patient information, prescriber

16  information, pharmacist information.  Is this

17  information -- was that a component of the SOM

18  program in place in 2012 at CVS and early 2013?

19          MS. MILLER:  Object to form.

20      A.    I don't recall whether it was or was

21  not included.

22  BY MR. ELSNER:

23      Q.    But it was information that was

24  include -- was sent to the Analysis Group to be

```
 1    included in its new algorithm for CVS, correct?

 2              MS. MILLER:  Object to form.

 3        A.   I see from this document that they

 4    requested it.

 5    BY MR. ELSNER:

 6        Q.   Do you know whether it was used by the

 7    Analysis Group as a component of the algorithm?

 8              MS. MILLER:  Object to form.

 9        A.   I'm not -- I'm not familiar with

10    exactly what is in the algorithms.

11    BY MR. ELSNER:

12        Q.   Well, do you know whether the system

13    analyzes dispensing information?

14              MS. MILLER:  Object to form.

15        A.   The current system we have today I

16    know takes into account dispensing information.

17    BY MR. ELSNER:

18        Q.   And that system is based on the system

19    that the Analysis Group built for CVS, is that

20    right?

21        A.   Yes, the current system we have today

22    is what the Analysis Group assisted with.

23        Q.   And that includes prescribing

24    information, patient information, and pharmacist
```

1    info, correct?

2            MS. MILLER:  Object to form.

3        A.   Speaking specifically to the

4    algorithms, I don't know what is in all of the

5    algorithms.  However, I'm aware that these are

6    data elements that would be available to the SOM

7    analysts during due diligence.

8    BY MR. ELSNER:

9        Q.   Today?

10       A.   Today.

11       Q.   Do you know what was available to the

12   SOM analysts in 2012 before this system went

13   into effect?

14           MS. MILLER:  Object to form.

15       A.   I don't know of all the information

16   that was available to them back in 2012.

17   BY MR. ELSNER:

18       Q.   There was a period of time in which

19   the current SOM system was working at CVS and

20   you were working with the Analysis Group to

21   develop the new SOM system, correct?

22       A.   I believe so.

23       Q.   And the new SOM system that went into

24   effect did not go into effect until 2014, is

1   that right?

2       A.   I believe the new SOM system started

3   to roll out in 2014.

4       Q.   2014.  It was on a rolling basis; you

5   did a few distribution centers at a time, is

6   that right?

7       A.   I don't remember the exact dates, but

8   I know it was a rollout approach to the

9   distribution centers.

10      Q.   You didn't hit all distributions at

11  one exact time with the new system, correct?

12      A.   No, I don't believe they were all

13  rolled out at the same time.

14      Q.   Okay.  And that process of rollout

15  continued throughout 2014 into November of 2014,

16  is that right?

17      A.   I don't recall the rollout schedule

18  and when it completed.

19      Q.   But at least through 2012 when you

20  started through some point in 2014 CVS was using

21  the old system until the rollout for each

22  distribution center, and as the rollout came

23  into effect the new system would come into place

24  for that distribution center, is that right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MILLER:  Object to form.

 2   BY MR. ELSNER:

 3       Q.   And the old distribution centers were

 4   still using the old process, correct?

 5              MS. MILLER:  Object to form.

 6       A.   I know that at the time of the

 7   rollout, obviously the rollout involved

 8   distribution centers going onto the new

 9   developed algorithm and may have also used the

10   old algorithm as well or old system as well.

11   And I believe at the time of the rollout the

12   distribution centers that it hadn't been rolled

13   out to were still utilizing the older suspicious

14   order monitoring process.

15   BY MR. ELSNER:

16       Q.   Okay.  There never came a point in

17   time where you, you know, went to Indianapolis

18   and sat down with the SOM analysts there that

19   were using the old SOM system to understand it,

20   is that true?

21              MS. MILLER:  Object to form.

22       A.   I've never been to the Indianapolis

23   distribution center.

24   BY MR. ELSNER:
```

1    Q.   Okay.  Have you ever sat down with

2  anyone at CVS and reviewed an IRR report from

3  the old suspicious order monitoring system at

4  CVS?

5        MS. MILLER:  Object to form.

6    A.   I am aware there were IRR reports.  I

7  don't recall going through one with anyone on

8  the SOM team.

9  BY MR. ELSNER:

10    Q.   Do you know how to read one?

11        MS. MILLER:  Object to form.

12    A.   I don't recall having read an IRR.  I

13  can't even think about it, whether -- I can't

14  remember what it looks like.

15  BY MR. ELSNER:

16    Q.   Okay.  That wasn't part of what you

17  did at CVS, right?

18        MS. MILLER:  Object to form.

19    A.   No, my role was never to review

20  orders.

21  BY MR. ELSNER:

22    Q.   Okay.  And no one from CVS sat down

23  with you and explained to you the system that

24  was in place with respect to suspicious order

1    monitoring at CVS in 2012 or 2013 or '14 as that

2    system was being used before the new enhanced

3    system was put into place, is that right?

4            MS. MILLER:  Object to form.

5        A.   At a high level I think I understood

6    the process, but no, I never recall a

7    conversation that went into details of exactly

8    what that old system -- how it functioned.

9    BY MR. ELSNER:

10       Q.   Okay.  Were you aware that they had

11   staffing issues with respect to the SOM

12   management team in Indianapolis in 2013?

13           MS. MILLER:  Object to form.

14       A.   I don't recall any management staffing

15   issues.

16   BY MR. ELSNER:

17       Q.   Do you recall any staffing shortages

18   or other staffing problems in the SOM review

19   team in 2013?

20       A.   I don't recall any situations where we

21   couldn't review, well, orders of interest

22   that -- well, I don't remember there ever being

23   an instance where that was an issue.

24       Q.   That wasn't my question.  I asked you

1  whether you were aware of any staffing shortages

2  or staffing issues in 2013.

3         MS. MILLER:  Object to form.

4     A.   I don't recall any staffing issues

5  that affected the SOM process.

6  BY MR. ELSNER:

7     Q.   In June of -- in June of 2013, Aaron

8  Burtner left CVS, and Kelly Baker assumed Aaron

9  Burtner's responsibilities until a replacement

10  could be found, is that true?

11     A.   I recall at some point Aaron left.  I

12  don't remember exactly when that date was.  And

13  I remember -- I somewhat remember working with

14  Kelly Baker on certain things.  I don't know the

15  time frames.

16         (Whereupon, CVS-Schiavo-23 was marked

17          for identification.)

18  BY MR. ELSNER:

19     Q.   This is Exhibit 23.  If you go -- you

20  know, with all e-mails you've got to sort of

21  look at the first one first -- last one first if

22  you want to see the flow.  So I'm going to ask

23  you to turn to Page 76116, which is the third

24  document of the e-mail I placed before you.

 1      A.   Okay.

 2      Q.   And this e-mail is from Shawna

 3  Leuhring.  Did I say that correctly?

 4      A.   I'm not sure how to pronounce her last

 5  name.

 6      Q.   Have you ever met her?

 7      A.   I don't recall meeting Shawna.

 8      Q.   Do you know who she works for?

 9      A.   At this time I'm not sure who she

10  reported to.

11      Q.   But she was with CVS?

12      A.   It says "Contractor" next to her name,

13  but I remember her working at CVS.

14      Q.   Okay.  And this is an e-mail that she

15  wrote to you dated July 1, 2013, is that right?

16      A.   Yes.

17      Q.   And she says "Craig and Team, I've

18  updated the Archer SOM prototype with the

19  'Prescriber' changes, by removing the Letter and

20  Call fields from the 'Review' tab and moved the

21  'Action' tab section over to the 'Review' tab.

22  Attached, please find screenshots of the revised

23  SOM record.  Please review and let me know if

24  you see the need for any other changes."

Highly Confidential - Subject to Further Confidentiality Review

```
 1            And then it says below "I'll also need
 2    to get requirements for Access Control."  And
 3    then there's a question and it says "Who will be
 4    entering in the SOM cases?"
 5            Do you see that, question number 1?
 6       A.   I see where it says that.
 7       Q.   Okay.  And if you see above her e-mail
 8    there is an e-mail from you dated Tuesday,
 9    July 2, 2013 to a number of people, including
10    Tom Bourque, Kelly Baker, Dean Vanelli.
11            Do you see that?
12       A.   I see that.
13       Q.   Okay.  It says "Team, My comment are
14    in red, please review and make any
15    additions/changes necessary."
16            So basically what is happening here is
17    Shawna sends you an e-mail asking who is going
18    to gain access control, and then you write in
19    red the answers to those questions, and they're
20    bolded here.
21            And next to question 1, you -- next to
22    "Who will be entering in the SOM cases?", you
23    wrote "Kelly Baker and his team (yet to be
24    hired)," correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MILLER:  Object to form.

 2        A.   That's what it says.

 3   BY MR. ELSNER:

 4        Q.   Okay.  So at this point in time we had

 5   Kelly Baker reviewing -- doing the SOM review

 6   for CVS, and you were going to include a team

 7   which was yet to be hired, is that right?

 8        A.   That's what it says.

 9        Q.   And then it says "Who will be

10   approving the SOM cases" under question 4.

11              Do you see that?

12        A.   I see what -- I see what it says, and

13   I'm not sure what that means.

14        Q.   Okay.  It says "Who will be approving

15   the SOM cases?"  And you write in response

16   "Kelly Baker or Kelly's manager, or both."

17              So at this point in time Kelly Baker

18   did not have a manager because Aaron Burtner had

19   left, correct?

20              MS. MILLER:  Object to form.

21        A.   I don't know that to be true.

22   ████████████████████
   ███    ███   █████████████████████████████
   ███   ████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review











Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

23    (Whereupon, CVS-Schiavo-28 was marked

24    for identification.)

1  BY MR. ELSNER:

2      Q.   If you go to the next document I've

3  shown you, we've marked it as Exhibit 28.  This

4  is another e-mail to Tom Bourque actually two

5  days before the e-mail we just looked at, "SOM

6  Risk Analysis."  You write "Tom, I have made the

7  updates we discussed."  And then you say there

8  may be one we want to change from medium to high

9  or both.  And attached to that is an SOM risk

10 analysis that you created, correct?

11     A.   This is an SOM risk analysis that was

12 created.  I don't recall creating the document,

13 but it's a risk analysis.

14     Q.   Okay.  And did somebody else create

15 it?

16          MS. MILLER:  Object to form.

17     A.   I don't recall if I was the one who

18 started this document, but I clearly made

19 updates to it, based on the e-mail.

20 BY MR. ELSNER:

21     Q.   And there's lists of potential risks.

22 And the first one, the risk level there is

23 listed as high, and you write "The SOM team is

24 inconsistent in the way they perform their due

1    diligence.  Not each team member is aligned with

2    the importance of reaching out to our stores in

3    order to comply with the 'Know Your Customer'

4    expectation.  This could also lead to

5    inconsistencies in the...process of what orders

6    should be released or blocked," correct?

7         A.    That --

8              MS. MILLER:  Object to form.

9         A.    That is what that potential risk says.

10   BY MR. ELSNER:

11        Q.    And then it writes in the comments,

12   "In May, the following is the percentage of

13   calls each team member made for flagged orders:

14   Annette, 19 percent."  Then there's another

15   individual at 15 percent, Noah at 13 percent,

16   Caitlin at 7 percent, and Shan at 4 percent.

17   Did I read that correctly?

18        A.    That's what that says.

19        Q.    Okay.  So part of the due diligence

20   process at CVS at this time in June of 2014 --

21   and this is under the new system, right?

22              MS. MILLER:  Object to form.

23        A.    I don't recall if it's rolled out to

24   all distribution centers, but I believe at some

1    point this was just newly rolled out to some

2    distribution centers.

3    BY MR. ELSNER:

4         Q.   Well, these individual are the

5    suspicious order monitoring analysts working in

6    Rhode Island that you participated in hiring to

7    work on the new SOM system, right?

8         A.   These are the SOM analysts who I

9    recall being part of the interview process.

10        Q.   Okay.  And less than 20 percent of

11   flagged orders were calls made to pharmacies,

12   correct?

13             MS. MILLER:  Object to form.

14        A.   Based on what that's indicating there,

15   yes.  I don't know how those percentages could

16   be pulled or how they were pulled, but that's

17   what that's saying.

18   BY MR. ELSNER:

19        Q.   Well, if you turn to the last page of

20   your e-mail to Tom Bourque on the prior exhibit,

21   the very last page of the exhibit, there's a

22   chart there of the percentage of phone calls,

23   correct?

24             MS. MILLER:  Sorry, where are you,

1    Mike?

2              MR. ELSNER:  Prior exhibit, last page.

3              MS. MILLER:  That one -- oh, last

4    page.

5      A.   It says "Team Member.  Count of Case

6    Status."  It has the percent of phone calls.  I

7    don't see how that's calculated or how someone

8    would indicate from this the percent of phone

9    calls, though.

10   BY MR. ELSNER:

11     Q.   Okay.  If you go back to Exhibit 28,

12   the third item down for lack of -- that's listed

13   as a high risk is "Lack of engagement by the

14   Management team."  Did I read that correctly?

15     A.   It says that under "Potential Risk."

16     Q.   Okay.  And you write "The team is not

17   receiving the support and guidance they need to

18   effectively do their jobs.  Since Susan has

19   started she has not taken an active role in

20   learning the position and finding the area of

21   opportunity within the team."  Did I read that

22   correctly?

23     A.   That's what the document says.

24     Q.   And you believe that that was a high

1    risk, correct?

2            MS. MILLER:  Object to form.

3        A.    It says the risk level is high.  I

4    don't know how risk level was interpreted or

5    what the risk is referring to, but under "Risk

6    Level" for that one it does say "High."

7    BY MR. ELSNER:

8        Q.    And also then the next one, another

9    high risk you identify is the "Lack of

10   communication from the SOM Management team to

11   the SOM Analysts, as well as a lack of foresight

12   by the Management team."  Did I read that

13   correctly?

14           MS. MILLER:  Object to form.

15       A.    That's what this document says.

16   BY MR. ELSNER:

17       Q.    And the next item, another high risk,

18   "Lack of resources to handle the rollout of all

19   distribution centers.  This could freeze the

20   rollout of the remaining six distribution

21   centers or cause the team to not get to every

22   flagged order each day," correct?  Is that what

23   you wrote?

24           MS. MILLER:  Object to form.

1        A.    That is what this form says.  I don't

2   know if I wrote that.  That's what the form

3   says.

4   BY MR. ELSNER:

5        Q.    That's in the chart that you forwarded

6   to your boss, correct?

7             MS. MILLER:  Object to form.

8        A.    That appears to be in the chart that I

9   sent to Tom.

10  BY MR. ELSNER:

11       Q.    Okay.  And then in the middle under

12  "Comments," it says "To date the team is

13  struggling to complete the amount of flagged

14  daily orders.  With six more distribution

15  centers still to be rolled out, there has been

16  no plan communicated on how the team intends to

17  handle the increased volume."  Did I read that

18  correctly?

19            MS. MILLER:  Object to form.

20       A.    That's what it -- that's what it says.

21  BY MR. ELSNER:

22       Q.    And that was another high risk

23  identified, correct?

24            MS. MILLER:  Object to form.

```
 1        A.   It's under "Risk Level.  High."

 2   Again, I don't know what thought process went

 3   into putting these risk levels, and for that one

 4   I'm not really sure exactly what the risk would

 5   be.

 6   BY MR. ELSNER:

 7        Q.   Go to the next one.  Another high risk

 8   level, "Today we are unclear how well the system

 9   is identifying orders that should actually be

10   flagged (false positive rate and tests that need

11   to be more stringent?)"  Did I read that

12   correctly?

13        A.   That's what it says.

14        Q.   And --

15             MS. MILLER:  I just -- I understand

16   we're at seven hours.  Are we past seven hours?

17             THE VIDEOGRAPHER:  We're just at seven

18   hours now.

19             MS. MILLER:  Okay.  So after this

20   question.

21             MR. ELSNER:  I'll probably ask two

22   questions here, three.

23             MS. MILLER:  Okay.

24   BY MR. ELSNER:
```

1      Q.    "The SOM Algorithm" in the next one

2      "is not flagging the drugs which are diverted

3      the most at our retail locations at a high

4      enough rate."  And that's identified as a

5      medium/high risk, correct?

6             MS. MILLER:  Objection to form.

7      A.    High/medium is under the risk level

8      column.

9      BY MR. ELSNER:

10      Q.    Okay.  And so --

11             MS. MILLER:  Mike, you're out of time.

12      So you can ask --

13             MR. ELSNER:  I'm just going to finish

14      this.  I've got another question to ask, and

15      I'll just finish with this document.

16             MS. MILLER:  This is the last

17      question.  This is the last question.

18      BY MR. ELSNER:

19      Q.    As of June of 2014, you were still

20      finding high risk levels even with the new

21      rollout of the new system with respect to

22      staffing issues, resources to handle the review

23      of orders, and consistent performance of due

24      diligence reviews, correct?

```
 1              MS. MILLER:  Objection to form.  And

 2    I'm going to instruct him not to answer.  We're

 3    out of time.

 4              MR. ELSNER:  No, I'll get an answer to

 5    that question.

 6              MS. MILLER:  We're out of time.

 7              MR. ELSNER:  No.

 8    BY MR. ELSNER:

 9        Q.   Answer the question.

10              MS. MILLER:  It's seven hours.  It's

11    up.

12              MR. ELSNER:  It's a summary question,

13    and I'm going to ask for more time from the

14    court in any event.

15              MS. MILLER:  Objection.

16    BY MR. ELSNER:

17        Q.   Please answer the question.

18              MS. MILLER:  Objection.

19              I instruct you not to answer.

20              MR. ELSNER:  You can't instruct him

21    not to answer.

22              MS. MILLER:  You're out of time.

23              MR. ELSNER:  You said one more

24    question, I asked him the question, now you
```

Highly Confidential - Subject to Further Confidentiality Review

1  won't let him answer the question.  You wanted

2  to see what the question was first?  You said

3  one more question, and I asked him one more

4  question.

5          MS. MILLER:  But now I've realized --

6          MR. ELSNER:  It's a good question?

7          MS. MILLER:  -- it's not fair for

8  you -- no, it's not fair for you to continue

9  after seven hours, and I think we should cut it

10 off.

11         MR. ELSNER:  No, you said I could get

12 one more question, and that's what I've done.

13 Let him answer the question.

14         MS. MILLER:  I'm instructing him not

15 to answer.  We're done.  We're out of time.

16         MR. ELSNER:  I think you should answer

17 the question.

18         I'm going to go to the court and ask

19 for more time.  I think this has been

20 ridiculous.  I think he hasn't admitted at any

21 point offering any document, remembering any

22 documents.  You had three days prepping him, and

23 he's giving us nothing that he could potentially

24 remember at all at CVS.  And you told me I could

```
1   ask one more question, and now you won't let him

2   answer the question.

3            MS. MILLER:  Okay.  You may answer the

4   question.

5            MR. ELSNER:  Can you go back to what

6   the question is so I can read it?

7            MS. MILLER:  But I object to it, and I

8   don't think it should be part of the record

9   given that you're out of time.

10  BY MR. ELSNER:

11      Q.  As of June of 2014, you were still

12  finding high risk levels even with the new

13  rollout of the new SOM monitoring system with

14  respect to staffing issues, resources to handle

15  the review of orders, and consistent performance

16  of due diligence reviews, correct?

17      A.  As I stated, I don't know how these

18  risk levels were determined, and at this point

19  in the process I had no concerns or no reason to

20  believe -- in fact, I was very confident that we

21  were meeting our obligation to have a suspicious

22  order monitoring system.

23      ■     ■■■■■■■■■■■■■■■■■■■■

■  ■■■■■■■■■■■■
```

Highly Confidential - Subject to Further Confidentiality Review





21          THE VIDEOGRAPHER:  This concludes the

22    videotaped deposition of Craig Schiavo.  The

23    time is 5:10 p.m., and we are now off the

24    record.

Highly Confidential - Subject to Further Confidentiality Review

1              (Whereupon, the deposition was

2              concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

 2

 3          I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

 4   and Commissioner in the State of Rhode Island

 5   and Providence Plantations, do certify that on

 6   the 17th day of January, 2019, at 8:06 o'clock,

 7   the person above-named was duly sworn to testify

 8   to the truth of their knowledge, and examined,

 9   and such examination reduced to typewriting

10   under my direction, and is a true record of the

11   testimony given by the witness.

12          I further certify that I am neither

13   attorney, related or employed by any of the

14   parties to this action, and that I am not a

15   relative or employee of any attorney employed by

16   the parties hereto, or financially interested in

17   the action.

18          In witness whereof, I have hereunto

19   set my hand this 20th day of January, 2019.

20

21          _____

22          COMMISSIONER

23          My Commission Expires April 30, 2020

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the appropriate

 6   space on the errata sheet for any corrections

 7   that are made.

 8              After doing so, please sign the

 9   errata sheet and date it.  It will be attached

10   to your deposition.

11              It is imperative that you return

12   the original errata sheet to the deposing

13   attorney within thirty (30) days of receipt of

14   the deposition transcript by you.  If you fail

15   to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

```
 1                    - - - - - -

                   E R R A T A

 2                    - - - - - -

 3    PAGE   LINE   CHANGE

 4    _____  _____  _____

 5         REASON:  _____

 6    ____   _____  _____

 7         REASON:  _____

 8    _____  _____  _____

 9         REASON:  _____

10    _____  _____  _____

11         REASON:  _____

12    _____  _____  _____

13         REASON:  _____

14    _____  _____  _____

15         REASON:  _____

16    _____  _____  _____

17         REASON:  _____

18    _____  _____  _____

19         REASON:  _____

20    _____  _____  _____

21         REASON:  _____

22    _____  _____  _____

23         REASON:  _____

24    _____  _____  _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do

   Hereby certify that I have read the foregoing

 4 pages, and that the same is a correct

   transcription of the answers given by me to the

 5 questions therein propounded, except for the

   corrections or changes in form or substance, if

 6 any, noted in the attached Errata Sheet.

 7

 8 _____

   WITNESS NAME              DATE

 9

10

11

12

13

14

15 Subscribed and sworn

   To before me this

16 _____ day of _____, 20_____.

17 My commission expires: _____

18

   _____

19 Notary Public

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```