1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3

       _____
4

       IN RE:  NATIONAL PRESCRIPTION     MDL No. 2804
5      OPIATE LITIGATION                 Case No. 17-md-2804

6

       This document relates to:         Judge Dan
7                                         Aaron Polster
8      The County of Cuyahoga v. Purdue
       Pharma, L.P., et al.
9      Case No. 17-OP-45005
10     City of Cleveland, Ohio vs. Purdue
       Pharma, L.P., et al.
11     Case No. 18-OP-45132
12     The County of Summit, Ohio,
       et al. v. Purdue Pharma, L.P.,
13     et al.
       Case No. 18-OP-45090
14     _____
15
16
17

               Videotaped Deposition of Hugh Shannon
18
                       Cleveland, Ohio
19
                       January 24, 2019
20
                          9:02 a.m.
21
22
23
24     Reported by:  Bonnie L. Russo
25     Job No. 3196191

Page 2

1     Videotaped Deposition of Hugh Shannon held at:

2

3

4

5

6

7     Climaco Wilcox Peca Tarantino & Garofoli, LPA

8                   55 Public Square

9                   Suite 1950

10                  Cleveland, Ohio 44113

11

12

13

14

      Pursuant to Notice, when were present on behalf

15    of the respective parties:

16

17

18

19

20

21

22

23

24

25

```
 1     APPEARANCES:
 2
       On behalf of Cuyahoga County:
 3     PLEVIN & GALLUCCI
       FRANK L. GALLUCCI, III, ESQ.
 4     55 Public Square
       Suite 2222
 5     Cleveland, Ohio 44113
       216-861-0804
 6     fgallucci@pglawyer.com
                 -and-
 7     SALVATORE C. BADALA, ESQ.
       (Via Teleconference)
 8     NAPOLI SHKOLNIK, PLLC
       400 Broadhollow Road, Suite 305
 9     Melville, New York 11747
       631-224-1133
10     212-397-1000
       sbadala@napolilaw.com
11               -and-
       MARIA FLEMING, ESQ.
12     NAPOLI SHKOLNIC, PLLC
       600 Superior Avenue East, Suite 1300
13     Cleveland, Ohio 44114
       212-397-1000
14     mfleming@napolilaw.com
15
       On behalf of Purdue Pharma, L.P.
16     MARK CHEFFO, ESQ.
       JENNA C. NEWMARK, ESQ.
17     DECHERT, LLP
       Three Bryant Park
18     1095 Avenue of the Americas
       New York, New York 10036
19     212-698-3814
       mark.cheffo@dechert.com
20     jenna.newmark@dechert.com
21     On behalf of Johnson & Johnson and Janssen
       Pharmaceuticals, Inc.
22     ERICA M. JAMES, ESQ.
       TUCKER ELLIS, LLP
23     950 Main Avenue
       Suite 1100
24     Cleveland, Ohio 44113
       216-592-5000
25     erica.james@tuckerellis.com
```

```
                                              Page 4
 1      APPEARANCES (CONTINUED):
 2      On behalf of Walmart, Inc.
        EDWARD M. CARTER, ESQ.
 3      JONES DAY
        325 John H. McConnell Boulevard
 4      Suite 600
        Cleveland, Ohio 43215
 5      614-281-3906
        emcarter@jonesday.com
 6
 7      On behalf of Endo Pharmaceuticals, Inc., Endo
        Health Solutions, Inc., Par Pharmaceuticals,
 8      Inc. and Par Pharmaceutical Companies, Inc.:
        RUTH HARTMAN, ESQ.
 9      (Via Teleconference)
        BAKER HOSTETLER
10      Key Tower, 127 Public Square
        Cleveland, Ohio 44114
11      216-621-0200
        rhartman@bakerlaw.com
12
13      On behalf of Teva Pharmaceutical Industries:
        STEVEN A. LUXTON, ESQ.
14      (Via Teleconference)
        MORGAN LEWIS & BOCKIUS, LLP
15      1111 Pennsylvania Avenue, N.W.
        Washington, D.C. 20004
16      steven.luxton@morganlewis.com
        202-739-5452
17
18      On behalf of AmerisourceBergen Drug
        Corporation:
19      STEVEN J. BORANIAN, ESQ.
        REED SMITH, LLP
20      101 Second Street, Suite 1800
        San Francisco, CA 94105
21      415-659-5980
        sboranian@reedsmith.com
22            -and-
        SANDRA K. ZERRUSEN, ESQ.
23      JACKSON KELLY, PLLC
        50 South Main Street, Suite 201
24      Akron, Ohio 44308
        330-252-9060
25      skzerrusen@jacksonkelly.com
```

Page 5

1      APPEARANCES (CONTINUED):
2      On behalf of McKesson Corporation:
       RUSSELL M. SQUIRE, ESQ.
3      (Via Teleconference)
       Covington & Burling, LLP
4      The New York Times Building
       620 Eighth Avenue
5      New York, New York 10018
       212-841-1105
6      rsquire@cov.com
7
8
9
10
11     Also Present:
       Daniel Russo, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                       C O N T E N T S
2        EXAMINATION OF HUGH SHANNON                PAGE
3        BY MR. CHEFFO                              9
4
5
6                          EXHIBITS
7        Exhibit 1   Cuyahoga County Opiate          22
                     Task Force Report 2016
8                    CUYAH_000018265-18277
9
         Exhibit 2   E-Mail dated 11-8-16           41
10                   CUYAH_001630854-0857
11       Exhibit 3   Spreadsheets                   219
12       Exhibit 4   Medical Examiner               238
                     Statistical Report
13                   2017
14       Exhibit 5   Medical Examiner's Office      267
                     Heroin/Fentanyl/Cocaine
15                   Related Deaths in Cuyahoga County
                     2018 December Update
16                   1-11-19
17       Exhibit 6   Final Drug Deaths Report       314
                     Attachment
18                   CUYAH_001623160
19       Exhibit 7   Spreadsheets                   321
20
21
22
         (Exhibits retained by Mr. Gallucci.)
23
24
25

Page 7

1              P R O C E E D I N G S

2

3              THE VIDEOGRAPHER:  Good morning.

4              We are going on the record at 9:02

5        a.m. on January 24th, 2019.

6              Please note that the microphones are

7        sensitive and may pick up whispering, private

8        conversations and cellular interference.

9        Please turn off all cell phones or place them

10       away from the microphones as they can interfere

11       with deposition -- with the deposition audio.

12       Audio and video recording will continue to take

13       place unless all parties agree to go off the

14       record.

15              This is Media Unit No. 1 of the

16       video recorded deposition of Hugh Shannon,

17       taken by counsel for defendant in the matter of

18       In Re:  National Prescription Opioid

19       Litigation, filed in the United States District

20       Court for the Northern Division of Ohio,

21       Eastern Division, case No. 17-MD-2804.

22              This deposition is being held at

23       Climaco, Wilcox, Peca, Tarantino & Garofoli,

24       LPA, located at 55 Public Square, Suite 1950,

25       Cleveland, Ohio.

1          My name is Daniel Russo from the

2     firm Veritext Legal Solutions.  I am your

3     videographer today.  The court reporter is

4     Bonnie Russo from the firm Veritext Legal

5     Solutions.

6          Counsel and all present in the room

7     and everyone attending remotely will now state

8     their appearances and affiliations for the

9     record.

10          MR. CHEFFO:  Mark Cheffo from

11     Dechert for Purdue defendants.

12          MS. NEWMARK:  Jenna Newmark from

13     Dechert for the Purdue defendants.

14          MR. BORANIAN:  Steve Boranian of

15     Reed Smith for defendant AmerisourceBerger.

16          MS. ZERRUSEN:  Sandra Zerrusen from

17     Jackson Kelly on behalf of AmerisourceBergen.

18          MR. CARTER:  Ed Carter from Jones

19     Day for Wal-Mart.

20          MS. JAMES:  Erica James, Tucker

21     Ellis, on behalf of Janssen Pharmaceuticals and

22     Johnson & Johnson.

23          MR. GALLUCCI:  Frank Gallucci,

24     Plevin & Gallucci, on behalf of Cuyahoga

25     County.

1                MS. FLEMING:  Maria Fleming, Napoli
2      Shkolnik, on behalf of Cuyahoga County.
3                THE VIDEOGRAPHER:  Will anyone
4      appearing remotely please state their
5      affiliations for the record as well.
6                MR. GALLUCCI:  Is there anybody on
7      the phone?
8                MR. LUXTON:  Yeah.  Steve Luxton,
9      L-U-X-T-O-N, from Morgan Lewis for the Teva
10     defendants.
11               MR. SQUIRE:  Russell Squire, two Ss,
12     two Ls, from Covington & Burling on behalf of
13     McKesson.
14               THE VIDEOGRAPHER:  Will the court
15     reporter please swear in the witness.
16
17                    HUGH SHANNON,
18     being first duly sworn, to tell the truth, the
19     whole truth and nothing but the truth,
20     testified as follows:
21
22        EXAMINATION BY COUNSEL FOR DEFENDANT
23                 PURDUE PHARMA L.P.
24          BY MR. CHEFFO:
25        Q.    Good morning, sir.

1              My name is Mark Cheffo.

2       A.    Good morning.

3       Q.    Can you please state your -- your

4    full name for the record.

5       A.    Hugh Shannon.

6       Q.    And what's your current title?

7       A.    I'm the director of operations at

8    the Cuyahoga County Medical Examiner's Office.

9       Q.    Okay.  And you were deposed last

10   week; is that right?

11      A.    Correct.

12      Q.    Have you ever been deposed before

13   that?

14      A.    I have not.

15      Q.    So you understand that today you're

16   under oath?

17      A.    Yes.

18      Q.    And a few ground rules.

19            If there's any time that you need a

20   break, just let us know, and we're happy to do

21   that.  This is not an endurance test.

22            You'll -- you'll tell us?

23      A.    I will.  Thank you.

24      Q.    And also, as I'm sure will happen

25   from time to time, if anything I ask you you're

1     not clear on, just let me know, and I'll try

2     and rephrase the question.  Okay?

3          A.     Very good.

4          Q.     Because I want to assume, if you

5     answered it, you understood it.

6               Fair?

7          A.     Understood.

8          Q.     And the last thing is I will try my

9     best not to speak over your -- your answers.

10    If you'd just make sure you try and let me

11    finish the question.  So this way the court

12    reporter can get both of our questions and

13    answers down.

14               Fair?

15         A.     Very good.

16         Q.     Okay.  And I don't want you to tell

17    me about any conversations you had with your

18    lawyers.

19               But would you tell me what, if

20    anything, you did to prepare for the deposition

21    today?

22         A.     Well, I -- I had done a lot for last

23    week's.  So there wasn't a whole lot I felt I

24    needed to do more than what I had already done

25    for last week's deposition.

1       Q.    Okay.  Did you speak with Dr.

2    Gleason about his deposition?

3       A.    Dr. --

4       Q.    Gilson.

5       A.    -- Gilson?

6       Q.    Excuse me.  I'm sorry.

7       A.    I -- I spoke with him, but it was

8    about work related.  I -- he was out all day

9    Tuesday.  I knew I was going to be out all day

10   today.  And I had administrative meetings

11   yesterday.  So we kind of passed in the hall.

12   But nothing specific about --

13      Q.    Sure?

14      A.    -- this.

15      Q.    Worth -- work-related issues that

16   you --

17      A.    Correct.

18      Q.    -- would normally talk to him about?

19      A.    Yes.  Correct.

20      Q.    And did you meet with the lawyers at

21   all before -- before today?

22      A.    We had a brief phone conversation

23   yesterday afternoon.

24      Q.    And how long was that for?

25      A.    Less than an hour, I think.

1          Q.    Okay.  And did you meet with or talk

2     with anyone else about --

3          A.    No, I did not.

4          Q.    Okay.  And did you review any

5     documents in particular for this deposition?

6          A.    For today, no.  I think I went over

7     some of the old -- some old e-mails.  But that

8     was the only thing I think I read.

9          Q.    You did that between your last

10    deposition and today?

11         A.    Yes.

12         Q.    And what e-mails did you look at?

13         A.    I think it was just some old

14    correspondence from the task force when we were

15    first starting to kind of put policies,

16    suggestions in place.

17         Q.    And what task force are you

18    referring to?

19         A.    That would be the U.S. attorney's

20    Opioid Task Force that Steve Dettelbach and

21    Carole Rendon were running at the time, 2013.

22         Q.    Is 2013 when that task force was

23    first started?

24         A.    Yes.

25         Q.    And there's another task force that

1      you're apart of; is that right?

2           A.    The -- I assume you're referring to

3      the Board of Health's opioid --

4           Q.    Yes, sir.

5           A.      -- Opiate Task Force.

6                  That one is primarily attended by

7      Dr. Gilson.  We kind of split the duties up.

8           Q.    But you're generally aware of the --

9           A.    I'm aware of it, yes.

10          Q.    Okay.  And when did the Board of

11     Health task force first start?

12          A.    I believe that was in 2010.

13          Q.    And what is the -- to your

14     understanding, what is the -- the function or

15     the mission statement of the Board of Health

16     task force?

17                MR. GALLUCCI:  Object to form.

18                THE WITNESS:  The Board of Health

19     started their task force.  I believe it was

20     specifically to address the overprescription of

21     pain medication, opioids and opiates.

22                BY MR. CHEFFO:

23          Q.    And -- and what -- do you -- do you

24     know the name of that -- specific name of the

25     task force?

1         A.    I believe it just says the opiate

2    task force.

3         Q.    And it was started in 2010 to

4    address overprescription of opioid --

5         A.    Prescription opiates, yeah.

6         Q.    And -- and I take it that's -- in

7    2010 or before, that's when the county and the

8    Board of Health determined that there was a

9    concern about prescription opioids?

10             MR. GALLUCCI:  Object to form.

11             THE WITNESS:  I believe that it was

12   mainly being driven out of Columbus by the

13   state.  The Board of Health here locally

14   answers up through the Department of Health at

15   the state level.  And the state had been doing

16   a lot of work legislatively to address

17   prescription opiates and how they are being

18   dispensed.

19             BY MR. CHEFFO:

20        Q.    But the -- Cuyahoga County

21   participated in that effort in 2010, right?

22        A.    The Board of Health, yes.

23        Q.    And were there other members of

24   Cuyahoga government that participated?

25             MR. GALLUCCI:  Object to form.

1            THE WITNESS:  That was before my

2     time at the medical examiner's office.  So I

3     couldn't speak to that.  I know our

4     participation, through Dr. Gilson, started

5     sometime in 2012, I believe.

6            BY MR. CHEFFO:

7        Q.    Do you know if anyone from Cuyahoga

8     County law enforcement participated?

9        A.    I'm not aware.

10       Q.    Do they participate now?

11       A.    I believe so, but I don't know for

12    sure, yeah.

13       Q.    What other agencies or departments

14    of government participate currently in the

15    Board of Health Opiate Task Force?

16            MR. GALLUCCI:  Object to form.

17            THE WITNESS:  The ADAMHS Board, so

18    that Alcohol, Drug, Mental Health Services

19    Board, participates.  I -- I -- I'm sure there

20    are others.  I'm not -- I'm -- again, I'm not

21    in those meetings.  So I don't specifically

22    know who comes in and comes out.

23       Q.    And it's -- it's your recollection

24    or understanding that this was an effort

25    started at the state level, after recognizing

1          issues and concerns with prescription opioids,

2          that they started a task force?

3                    Is that fair?

4                    MR. GALLUCCI:  Object to form.

5                    THE WITNESS:  My -- that's my

6          understanding of how the local Board of Health

7          became involved in creating the task force at

8          the local level.  I can't speak to what the

9          state was thinking or doing.

10                   BY MR. CHEFFO:

11         Q.     So let me just ask.

12                   So is -- is the -- is the -- the

13         task force that was created in 2010, is -- was

14         that created at the local level, or was that an

15         adjunct to the statewide level?

16                   MR. GALLUCCI:  Object to form.

17                   THE WITNESS:  I couldn't say

18         specifically.  I believe that it grew out of

19         directives coming from the state's Board of

20         Health.

21                   BY MR. CHEFFO:

22         Q.     But -- but in -- in the -- in the

23         Cuyahoga County Board of Health Opioid Task

24         Force, is that populated by -- and -- and --

25         and run by the county; or is that run by the

1      state?

2                    MR. GALLUCCI:  Object to form.

3                    THE WITNESS:  It's run out of the

4      county Board of Health.

5                    BY MR. CHEFFO:

6        Q.    And who is the chairperson?

7        A.    It was Vince Caraffi.  I believe

8      that has since changed in the past few months.

9        Q.    And -- and what position did Vince

10     Caraffi hold?

11       A.    He was a -- I don't know his exact

12     title at the Board of Health, but he was at

13     least one of the chairs of the opiate task

14     force.  But I believe his original duties were

15     in environmental aspects of -- of the board

16     of -- Board of Health's operations.

17       Q.    Okay.  And when we're -- and I just

18     want to make sure that we're clear.

19              When you're talking now about Mr.

20     Caraffi and the Board of Health, you're talking

21     about the Cuyahoga County Board of Health?

22       A.    Correct.

23       Q.    So in 2010 the Cuyahoga County Board

24     of Health established an opiate task force.

25              Is that --

```
                                              Page 19

 1                MR. GALLUCCI:  Object --
 2                BY MR. CHEFFO:
 3        Q.    -- your understanding?
 4                MR. GALLUCCI:  Object to form.
 5                THE WITNESS:  That's my
 6      understanding, yes.
 7                BY MR. CHEFFO:
 8        Q.    And that was done in order to
 9      address concerns about opioid prescriptions and
10      its impact on the community back in 2010; is
11      that right?
12                MR. GALLUCCI:  Object to form.
13                THE WITNESS:  Again, I'm not as
14      familiar with the operation of that.  It -- it
15      started before I got there.  I know the state
16      had been doing work legislatively; they had
17      concerns; and that this task force was one of
18      the things I think that the state was
19      encouraging, try to address the problem of
20      prescription opioids.
21                BY MR. CHEFFO:
22        Q.    And when you say "the problem of
23      prescription opioids," can you be more
24      specific?
25        A.    The overprescribing the -- I mean
```

1      I'm not entirely sure.  Again, if I'm in the

2      room, I understand these things a lot better

3      than trying to, you know, go off of what other

4      people have said and other people have

5      recollected.

6               But prescription opiates had become

7      a concern for the state.  They were addressing

8      it legislatively.  I'm sure there are a number

9      of issues that are surrounding

10     overprescription, overdispensing --

11          Q.    Okay.

12          A.    -- oversupply.

13          Q.    And does the Opioid Task Force today

14     deal only with prescription opioids, or does it

15     deal with things like heroin, illicit fentanyl,

16     carfentanil?

17          A.    So --

18               MR. GALLUCCI:  Object to form.

19               THE WITNESS:  -- the -- the U.S.

20     Attorney's task force was started in 2013 to

21     specifically address what was an emerging

22     heroin issue that led to the summit that we had

23     at the end of 2013 and then subsequently

24     community action plan.

25               A lot of that overlapped as -- the

Page 21

```
1        people who were attending one or both of those

2        overlapped.  The agencies that were involved

3        overlapped.  So there was a lot of overlap

4        between the two.

5               I believe, again, not having been in

6        the room at the -- at the Board of Health's

7        task force, that they tried to stay mainly

8        focused on prescription opiates and opioids.

9        But there may have been discussions about other

10       issues that cropped up subsequent to that

11       original.

12              BY MR. CHEFFO:

13         Q.    Fair enough.  And I -- and, you

14       know -- and I -- it probably goes without

15       saying because you have a very good lawyer,

16       but, you know, I'm going to ask you a lot of

17       questions.  Some of them you may have personal

18       knowledge; some of -- you -- you don't.

19              If you are -- if you're speculating

20       or guessing, you'll tell us you don't know.

21       And if you -- you know, if you have

22       information, then you'll give it us to.

23              Fair?

24         A.    Fair.

25              MR. CHEFFO:  The reason -- let me
```

1       just mark this, if I could.

2               (Deposition Exhibit 1 was marked for

3       identification.)

4               BY MR. CHEFFO:

5          Q.    So I just identified this.  This is

6       a -- a more recent.  We can go back and see if

7       there's something earlier, but I just want to

8       orient you to it.

9               This is a Cuyahoga County Opiate

10      Task Force report from 2016.

11              Do you see that?

12         A.    I do.

13         Q.    And is that the Board of Health

14      Opiate Task Force we've been talking about?

15              MR. GALLUCCI:  Object to form.

16              THE WITNESS:  It appears to be, yes.

17              BY MR. CHEFFO:

18         Q.    Okay.  And separate from the U.S.

19      Attorney's task force; is that right?

20         A.    Correct.

21         Q.    And do you -- if you look at the

22      first page -- or the second page, I guess --

23              MR. GALLUCCI:  Just to be clear,

24      Mark, are we talking about the cover being the

25      first page?

1              MR. CHEFFO:  Yeah.  Exact -- it's --

2      it's got a -- a spoon with -- looks like some

3      drug substance there.

4              BY MR. CHEFFO:

5         Q.    And you could feel free to -- to

6      just look through any of this.

7              But is there -- do you see on the --

8      in the -- what -- what I guess would be the

9      third page -- they're not numbered -- it's got

10     -- on -- on the right-hand column -- "Overview

11     of Local Drug-Related Deaths"?

12        A.    I see that.

13        Q.    In looking at -- at any of the

14     points in the right-hand column, does this in

15     any way refresh your recollect as to whether

16     the Board of Health Opiate Task Force is

17     focused on just prescriptions, or is it broader

18     than that?

19              MR. GALLUCCI:  Object to form.

20              THE WITNESS:  So I don't have any

21     direct knowledge because I'm not in the room.

22     So refreshing my memory, no.  But it appears to

23     be obvious that they do talk about other

24     opiates, opioids than prescriptions, based on

25     what I'm reading.

1           BY MR. CHEFFO:

2      Q.     And do you see -- do you see on the

3    bottom right it says "How did this happen?"

4      A.    I see that.

5      Q.     And -- and you could see right below

6    that, sir, it says:   "There are several

7    contributing factors that led to this

8    epidemic."

9             Do you see that?

10     A.    I do.

11     Q.     And is it a fair reading that

12   they're talking about an opioid epidemic in the

13   community?

14            MR. GALLUCCI:  Object to form.

15            THE WITNESS:  I believe that's the

16   intention, yes.

17            BY MR. CHEFFO:

18     Q.     And within that section from this

19   2016 Board of Health task force document, it --

20   there's a number of bullets.  It looks like

21   there are -- one, two, three, four, five, six,

22   seven -- eight bullets.

23            Do you see those?

24     A.    I do.

25     Q.     And those are the -- the

1      contributing factors according to this county's

2      Opiate Task Force that led to the opioid

3      epidemic, right?

4                  MR. GALLUCCI:  Object to form.

5                  THE WITNESS:  That appears to be the

6      intention, yes.

7                  BY MR. CHEFFO:

8           Q.    And have you ever talked about, in

9      your own either personal or professional work,

10     the fact that the opioid crisis or opioid

11     issues, problems in the county are

12     multifactorial and -- and complicated?

13                 MR. GALLUCCI:  Object to form.

14                 THE WITNESS:  Could you -- could

15     you --

16                 MR. CHEFFO:  Sure.

17                 THE WITNESS:  -- repeat that?

18                 MR. CHEFFO:  Well, let me -- let me

19     ask a -- a better question.

20                 THE WITNESS:  Okay.

21                 BY MR. CHEFFO:

22          Q.    Do -- is it your -- your own belief

23     that the opioid problem or crisis in Cuyahoga

24     County is a complicated one that is

25     multifactorial?

Page 26

1            MR. GALLUCCI:  Object to form.

2            THE WITNESS:  So there's no doubt

3      that it's a evolving situation, which makes

4      things complicated.

5            I would say overall it's a fairly

6      simple problem.  There was a direct link, based

7      on information that we had access to and then

8      later confirmed with our own research at the

9      Medical Examiner's Office, that most people had

10     been prescribed opiates; and that, when that

11     supply ran out due to various reasons -- loss

12     of insurance, any of the state's crackdowns on

13     pill mills -- that they turned to other means

14     and methods to -- to address their own sickness

15     of addiction.

16        Q.    And -- and what data are you relying

17     on for that -- that belief?

18        A.    So we at the Medical Examiner's

19     Office instituted a poison death review

20     committee.  It was intended to do case reviews

21     of the fatalities due to, at the time, heroin

22     overdoses, the deaths that were related to

23     heroin overdoses, and to try to determine kind

24     of the factors that led to that death and

25     possible public policy and intervention points

Page 27

1    along that continuum of that person's
2    interactions, either with the county or with
3    medical or any other interactions that we might
4    be able to identify with what we had available
5    to us in the case file.
6              And when that was -- when we had
7    done those reviews and started to compile and
8    analyze the data, it showed that about
9    three-quarters to 80 percent of people who were
10   dying of heroin overdoses had had a previous
11   prescription, and most -- most all of those
12   were prescribed pain pills, opioids, opiates.
13             So essentially about two-thirds of
14   the people end up being -- who died of a heroin
15   overdose had had a previous opiate
16   prescription.
17        Q.    So your testimony is two-thirds of
18   the people who had a heroin overdose had a
19   previous prescription of opioids?
20        A.    That's the general number.  I can
21   get the specifics if I have the reports, but...
22        Q.    And I take it you determined that
23   they had not used heroin prior to getting an
24   opioid, right?
25        A.    The research was that people who had

Page 28

1    -- that we knew had died of a heroin overdose

2    had had a previous opioid prescription.

3         Q.    Right.

4              But wasn't -- you just told me that

5    your theory was that people took medicines,

6    right?

7              Right?

8         A.    Yes.

9         Q.    And they somehow stopped taking

10   them, either because law enforcement took away

11   their source or insurance stopped giving them

12   reimbursement for prescriptions, right?

13        A.    Yes.

14        Q.    And at that time, they were not

15   using heroin, under your theory, right?

16        A.    That was a general pattern, yes.

17        Q.    Right.

18              And then they somehow went on a

19   pathway -- 80 percent of those people went on a

20   pathway to then become heroin abusers and

21   ultimately overdose, right?

22        A.    That's the general pattern that we

23   discovered, yes.

24        Q.    So in order to -- to make sure that

25   that actually made sense, you would, one, want

Page 29

1     to know, in fact, whether they actually abused

2     heroin prior to actually an opioid, right?

3           A.    If we could determine it, yes.

4           Q.    Did you look for that?

5           A.    We did.

6           Q.    How far back did -- did your review

7     go?

8           A.    Well, it's changed over time. We

9     initially did not have access to the OARRS

10     database. Dr. Gilson had to spend some time

11     lobbying to get access for coroners and medical

12     examiners.

13           I believe we received the initial

14     access middle of 2013 and then started doing

15     reviews. At the time there was only a two-year

16     look-back into the prescription histories.

17           So when we started reviewing cases

18     from 2012, if someone had died say in January

19     of 2012, we could only see six months back

20     previous history. Because getting access in

21     the middle of 2013 meant we could only see back

22     to the middle of 2011.

23           So as time went on, we were able to

24     see more and more. And then improvements to --

25     to OARRS in 2015 and then 2016 that allowed

                                                    Page 30

1       longer look-backs, more history, then we got to

2       see four then five years back in time, which

3       provided a more complete prescription history.

4            Q.    So when you use the 80 percent

5       number, is that from -- what -- what years data

6       is that from?

7            A.    It's I think an amalgamation of data

8       from 2013, '14 and then --

9            Q.    Right.

10                 And that was the time when you

11      only --

12                 MR. GALLUCCI:  Hold --

13                 MR. CHEFFO:  Oh, sorry.

14                 MR. GALLUCCI:  Are you finished

15      answering?

16                 THE WITNESS:  Well, I -- I was just

17      going to say we had most of 2015 done.  2016

18      hit.  It was actually the worst year that we

19      had had in all.  That's when we had a complete

20      doubling of the total number of drug deaths,

21      and we got overwhelmed.

22                 So it kind of delayed our ability to

23      do that kind of in-depth analysis any longer.

24      We are about ready to -- to put out '15, '16

25      and '17.

Page 31

1                MR. CHEFFO:  Okay.

2                THE WITNESS:  -- data.

3                BY MR. CHEFFO:

4        Q.    I want to talk about this 80 percent

5    statistic.

6                I understood that that largely came

7    from a review that you did in 2013 data, '14

8    data, right?

9                That's what you just told me?

10       A.    Correct.  It matched also with data

11   that other government agencies, the CDC and so

12   forth had --

13       Q.    So and at --

14       A.    -- seen.

15       Q.    -- to that point, you only had a

16   look-back of about six months?

17       A.    Well, again, it changed over time.

18   So we only had a six-month look-back at people

19   who had died in January of 2012.  We had an

20   18-month look-back in people who had died in

21   January of 2013.

22       Q.    Okay.  So somewhere between six

23   months and -- and 18 months, if they had an

24   overdose and -- you say a look-back.

25                That means you checked OARRS, right?

Page 32

1          A.    Correct.

2          Q.    And you found that there was an

3     opioid prescription -- a lawful opioid

4     prescription, right?

5          A.    Correct.

6          Q.    And just to be clear, OARRS tracks

7     controlled substances, not just opioids, right?

8          A.    Correct.

9          Q.    And when you say there was

10    80 percent of people who used heroin who used

11    opioids, that's actually not right, even on

12    your own data, is it?

13              MR. GALLUCCI:  Object to form.

14              THE WITNESS:  So what I had said was

15    is that 80 percent of the people had an OARRS

16    report and that about two-thirds of the people

17    who died of heroin overdoses ended up having a

18    prescribed opiate.

19              BY MR. CHEFFO:

20         Q.    I thought it was about 65 percent of

21    the people had an OARRS report, and then there

22    was about 80-something percent of those had an

23    opioid prescription.

24         A.    It's --

25              MR. GALLUCCI:  Object to form.

Page 33

1              THE WITNESS:  It's about 80 percent

2     had an OARRS report.  And of those, 75 percent,

3     give or take percentage points, had opiates.

4     So when you do the calculation, it ends up

5     being about two-thirds, give or take.

6              Depending on which year you're

7     looking at, it fluctuates a little bit.

8              MR. CHEFFO:  Okay.

9              THE WITNESS:  But it's held fairly

10    steady.

11             BY MR. CHEFFO:

12       Q.    And if somebody had an overdose, and

13    there was an OARRS report, and it was for --

14    and they had an OARRS report for having a

15    prescription, did you make a determination

16    that -- if it was 6 or 18 months, that they had

17    a prescription, they became addicted, became an

18    abuser, lost their insurance, lost their

19    ability, and then that led them directly to

20    heroin?

21             Is that what your -- your study did?

22             MR. GALLUCCI:  Object to form.

23             THE WITNESS:  So our study reviewed

24    what information we were able to collect during

25    our investigations:  -- family, medical

1    records, whatnot -- and tried to determine what

2    the path was that led to that person's death.

3                    MR. CHEFFO:  Right.

4                    THE WITNESS:  That's what we were

5    tasked with.

6                    BY MR. CHEFFO:

7       Q.    Would it surprise you if Dr. Gilson

8    and others have testified that there was no way

9    you could draw a causal connection using that

10   data?

11                   MR. GALLUCCI:  Object to form.

12                   THE WITNESS:  It would surprise me

13   if they made that an absolute statement, yes.

14                   BY MR. CHEFFO:

15      Q.    Okay.  Would it surprise you if they

16   said that there is a causal connection; that

17   was the point of their look-back data study?

18                   MR. GALLUCCI:  Object to form.

19                   THE WITNESS:  It wouldn't surprise

20   me, no.

21                   BY MR. CHEFFO:

22      Q.    Because that would be true, right?

23      A.    So --

24                   MR. GALLUCCI:  Object to form.

25                   THE WITNESS:  -- we reviewed

1      hundreds of cases.  Some of the investigations

2      were better informed by families.  People who

3      don't have families, there's less history.  So

4      it's a mixed bag of -- of the entire spectrum.

5                  BY MR. CHEFFO:

6          Q.     Okay.  But --

7          A.     And we've hundreds of cases to

8      review.

9          Q.     So -- so how many of those cases did

10     you find with a level of -- of comfort and

11     specificity that meets your theory, right?

12                 How many of them did you see that

13     you actually found someone who was in OARRS,

14     with an overdose, who never had an abuse

15     history, who never used heroin -- you can

16     determine that -- who was never issued

17     Naloxone, never in the -- in the -- had a drug

18     treatment problem, and then went on from

19     lawfully getting a prescription to becoming a

20     heroin addict and overdosing?

21                 How many of those do you -- and if

22     -- and if you have those, I -- I'd like to

23     figure out where we can identify those specific

24     folks.

25                 MR. GALLUCCI:  Object to form.

```
 1              THE WITNESS:  So you threw a lot in
 2     there.
 3              BY MR. CHEFFO:
 4     Q.    Right.
 5              Well, because you --
 6     A.    So --
 7     Q.    -- you've told me, sir, that -- that
 8     there's an 80 percent correlation or causation
 9     between people who took the prescription and --
10     it's your data.  You've now told us that, with
11     some level of -- of certainty, apparently,
12     80 percent of people who took prescriptions
13     went on to become heroin addicts and overdose.
14              So I want to drill down on that.
15              MR. GALLUCCI:  Object to form.
16              Were you finished answering the last
17     question?
18              THE WITNESS:  Not really.  But
19     that's fine.
20              I -- so I want to be clear so that
21     I'm answering the question that you actually --
22              MR. CHEFFO:  Uh-huh.
23              THE WITNESS:  -- are asking.
24              You keep reversing that 80 percent.
25     So what I have said, and what the data has
```

1    shown, is -- is that, of the people who had

2    died of a heroin overdose, 80 percent had a

3    OARRS report on file, on record, that we could

4    see.  Of those, a certain percentage had

5    opiates prescribed to them.  It end -- ends up

6    being about two-thirds of the people who died

7    of a heroin overdose also had a previous

8    opiate, opioid prescription.

9              That said, the last string that you

10   threw in there had a lot of elements to it,

11   some of which may have applied, some of which

12   may not.

13             Getting access to Naloxone is not

14   mutually exclusive for someone who is

15   prescribed opiates.  They may be abusing those

16   prescribed opiates.  And Naloxone will work to

17   reverse a prescription opiate overdose as well

18   as a heroin overdose.

19             So that would not be a determining

20   factor.  And that was part of your kind of list

21   of --

22             BY MR. CHEFFO:

23       Q.   So -- so tell me what the 80 percent

24   does then that you -- or the -- or the -- the

25   two-thirds figure.

```
 1              What is that?

 2              Is that -- is -- is -- is what

 3      you're telling me is what you did is you

 4      identified the number of people and -- who

 5      overdosed, and of those there was a certain

 6      percentage within the look-back period -- that

 7      could be either 6 or 12 months or perhaps even

 8      later than that that -- that, when you checked

 9      OARRS, they had a prescription for an opioid.

10              MR. GALLUCCI:  Object.

11              BY MR. CHEFFO:

12      Q.    That -- that's what the data did,

13      right?

14              MR. GALLUCCI:  Object to form.

15              THE WITNESS:  That's what the data

16      did in 2013.

17              2014 it extended that look back to

18      two years.  Improvements were made to the

19      system.  At 2015 and 2016 we were able to see

20      for five years back.

21              So we're able to establish patterns

22      with more data that showed that there -- and

23      that -- and that the number of people who were

24      dying from illicit opiates were still also

25      getting prescribed opiates in their OARRS
```

Page 39

1      history prior to their death.

2                    BY MR. CHEFFO:

3           Q.     Right.

4                    And you -- you didn't know why they

5      were prescribed the opioids, right?

6           A.     Not necessarily in all cases, no.

7           Q.     You didn't know whether they were

8      abusing them, did you?

9           A.     Not in all cases, no.

10          Q.     You didn't talk to any doctors as to

11     anything about the patient or the purpose of

12     the prescription, did you?

13          A.     I did not.

14          Q.     Did anybody?

15          A.     But we had medical records, so...

16          Q.     Did anyone talk to the doctors?

17          A.     I -- I don't know if Dr. Gilson had

18     those discussions.

19          Q.     Let me ask you this:  Are you -- are

20     -- do you hold yourself out as an expert in --

21     in statistics?

22          A.     No.

23          Q.     Are you an expert in epidemiology?

24          A.     No.

25          Q.     Are you an expert in drug addiction?

Page 40

1          A.     No.
2          Q.     Are you an expert in -- did you have
3     any medical degree?
4          A.     No.
5          Q.     Do you have any -- any medical
6     background?
7          A.     I -- I'm not a doctor, and I'm not a
8     scientist.  I didn't know I - this was expert
9     testimony.  So I'm not holding myself out to be
10    an expert at all.
11               I know more about this than I ever
12    wanted to.  Over the last seven years, having
13    lived and breathed this epidemic, I've learned
14    quite a bit.  And it falls to me to make sure
15    that the records are kept, that they're
16    available.
17               We tried to facilitate as best we
18    could partnerships within the community to be
19    able to address the issues that stemmed from
20    this, to try to marshall resources, to share
21    information and data as best we could so that
22    everybody was operating with some basic
23    fundamental foundation of information.
24         Q.    Okay.  And just -- I agree with you.
25    You're -- you're not an expert.  We're here for

Page 41

```
 1      a fact deposition.
 2              But is that clear?
 3              You're -- you're not testifying in
 4      any expert capacity, right?
 5              MR. GALLUCCI:  Object to form.
 6              THE WITNESS:  I -- no.  I didn't
 7      claim --
 8              BY MR. CHEFFO:
 9          Q.    And --
10          A.    -- I was.  No.
11          Q.    You don't hold yourself out as an
12      expert in any of these areas, do you?
13          A.    No.
14              MR. CHEFFO:  Okay.  Let's mark this.
15              (Deposition Exhibit 2 was marked for
16      identification.)
17              BY MR. CHEFFO:
18          Q.    You see that e-mail string?
19          A.    I do.
20          Q.    Is that one of the e-mails that you
21      reviewed prior to the deposition?
22          A.    It is not.
23          Q.    Okay.  And I'm -- I have a few
24      questions.  But if you need to, obviously,
25      review it or refresh your recollection.
```

1              But you see this is from 2016, and
2       it's from you to various other folks in the
3       county?
4           A.    Yes.
5           Q.    And --
6              MR. GALLUCCI:  Do you want to take a
7       minute to review it?
8              THE WITNESS:  That's fine.
9              BY MR. CHEFFO:
10          Q.    Are you ready, sir?
11          A.    Uh-huh.
12          Q.    Thanks.
13              And -- and Mr. Gallucci's point is
14       fair.  I mean sometimes I'll show you a very
15       large document; I'll have a question or two.
16       But on something like this, you know, obviously
17       if you need to review, I -- it's not a memory
18       test.
19              But do you -- does this -- well,
20       first, do you remember this -- this exchange or
21       this topic?
22          A.    Not specifically.
23          Q.    Okay.  But you know all the people
24       who are listed on the document, right?
25          A.     I do, except for Angela Conover, who

1    starts the string.

2        Q.    Okay.  And you see it says that

3    there is no empirical evidence to provide such

4    a precise correlation we can say that

5    percentage of deaths had legitimate prescribed

6    opioids previous to death, right?

7        A.    I see that.

8        Q.    And that's -- that's what we've been

9    talking about, right, that the data is meant to

10   just look at whether there were prescriptions

11   prior to death?

12           That -- that's what the -- the

13   county was looking at, right?

14           MR. GALLUCCI:  Object to form.

15           THE WITNESS:  Yeah.  I don't -- I

16   don't think that had -- I don't think we had

17   any specific percentage of -- of cases that we

18   could -- that we could say that with any

19   specificity.  Right.

20           BY MR. CHEFFO:

21       Q.    Right.

22           And you understand that correlation

23   is even less of a standard than -- than

24   causation, right?

25           MR. GALLUCCI:  Object to form.

1            THE WITNESS:  I suppose so.  I...

2            BY MR. CHEFFO:

3       Q.    Right.

4            And -- and here you're saying, based

5    on the data and the OARRS look-back, what you

6    can do is you can find out the number of people

7    who are in the OARRS database and -- and use

8    that for whatever purpose you deem appropriate,

9    but you can't correlate the fact that someone

10   had an opioid prescription in the OARRS

11   database to ultimately weather that led them to

12   become an abuser and a heroin addict, right,

13   because you just didn't have enough information

14   to make that correlation.

15       A.    Not at that time, no.

16       Q.    Do you have that now, that -- that

17   type of information?

18       A.    I'm -- I'm not entirely sure we

19   don't.  We hadn't been looking specifically at

20   that.  We can go back and try to do that.  We

21   have other people who are now engaged in the

22   research and may have access to information

23   like that.

24            I can say that, from a lot of the

25   cases that came through our office, as well as

1      speaking to parents, relatives of people that

2      they had lost, they had conveyed that sentiment

3      to us is that that was the -- that was the

4      inception of their addiction.

5           Q.    Okay.

6           A.    But yeah, I couldn't give you a

7      percentage, no --

8           Q.    Okay.

9           A.    -- at this time.

10               MR. CHEFFO:  I'll actually move to

11     strike.

12               BY MR. CHEFFO:

13          Q.    Do you remember my -- the question I

14     asked you, sir?

15          A.    You can go ahead --

16               MR. GALLUCCI:  He's asking -- he's

17     answering your question.

18               MR. CHEFFO:  Could you read back the

19     question I asked.

20               MR. GALLUCCI:  And I would say you

21     probably need to look at even the one before.

22     Because you had asked one, then you asked him

23     further clarification.  So if you want to read

24     them back, we can.

25               BY MR. CHEFFO:

Page 46

1          Q.    Okay.  Well, I -- I -- I -- you --

2     you -- you have some anecdotal information

3     you've told us about, right, from families?

4          A.    Correct.

5          Q.    And I'm sure that that's a difficult

6     situation, and they are in a very difficult

7     time, and -- and you credit what they say,

8     right?

9          A.    Correct.

10         Q.    No one's questioning that.

11              My -- my question was more focused

12    on data.

13              And in 2016 you indicated that

14    you -- you didn't have a level of information

15    or data to perform any correlation between any

16    OARRS reports and ultimate causation.  And then

17    I -- I think I asked you if you were aware of

18    any after 2016.

19              Do you recall that?

20         A.    Yes.

21         Q.    And -- and that's what I'm -- just

22    want to make sure.

23              Are you, as you sit here today,

24    aware of any actual data that's been performed

25    by your department or others after 2016 that

1    shows a correlation or causation between actual

2    OARRS data or other data that shows a linear

3    causal chain between someone using an opioid

4    and heroin overdose?

5              MR. GALLUCCI:  Object to form.

6              THE WITNESS:  I believe I had said

7    that, that we do not have a specific percentage

8    that we can point to, no.

9              BY MR. CHEFFO:

10        Q.    And -- and the same would be true

11   for any opioid, right, not just heroin?

12        A.    You mean --

13        Q.    Fentanyl --

14        A.    -- like fentanyl --

15        Q.    -- carfentanil --

16        A.    -- carfentanil --

17        Q.    -- synthetic fentanyl, oxycodone,

18   hydrocodone.

19        A.    Well, hydrocodone, oxycodone are

20   prescribed opioids.  So we would be able to

21   have a direct link if someone had died because

22   of an overdose of their prescribed opioid

23   medication.

24              But no.  With respect to the illicit

25   opioids like fentanyl, carfentanil and the

```
 1    analogs, no.  We wouldn't have any more
 2    specific information on those either.
 3         Q.    But even there you -- you -- you've
 4    heard the term "diverted," right?
 5         A.    Correct.
 6         Q.    And -- and opioids is a broad term,
 7    right?
 8               Some -- sometimes imprecise, right?
 9               MR. GALLUCCI:  Object to form.
10               THE WITNESS:  Correct.
11               BY MR. CHEFFO:
12         Q.    I mean because you have things like
13    heroin and illicit fentanyl that have no
14    legitimate medical purpose, right?
15               MR. GALLUCCI:  Object to form.
16               THE WITNESS:  Well, I'm not a drug
17    expert or a doctor.  But I believe fentanyl
18    does have medical --
19               MR. CHEFFO:  Yeah.
20               THE WITNESS:  -- efficacy.
21               BY MR. CHEFFO:
22         Q.    That's why I said "illicit
23    fentanyl."
24         A.    Yeah.  Illicit fentanyl, no.
25    Probably.
```

Page 49

1          Q.    Right.

2                Like, you know, something that's

3    made in a lab in Mexico or China, that's not a

4    legitimate medical use, right?

5          A.    I -- correct.

6                MR. GALLUCCI:  Object to form.

7                BY MR. CHEFFO:

8          Q.    And you're also aware, though,

9    that -- that there are opioids like fentanyl

10   that are manufactured pursuant to FDA guidance

11   by pharma companies, as well as oxycodone and

12   hydrocodone, that, when used appropriately and

13   lawfully, they have a legitimate medical

14   purpose, right?

15               MR. GALLUCCI:  Object to form.

16               THE WITNESS:  Correct.

17               BY MR. CHEFFO:

18         Q.    And then there are situations where

19   someone could actually have what would

20   otherwise have been a lawfully manufactured

21   product, but they divert it or use it in an

22   improper illegal way, right?

23               Like if -- if they buy it on the

24   street, or if they take it out of somebody's

25   medicine cabinet and use it improperly.

1              MR. GALLUCCI:  Object to form.

2              BY MR. CHEFFO:

3        Q.    Right?

4        A.    Correct.

5        Q.    So when you -- and I'm -- I'm trying

6    to just follow up to make sure I understand

7    your testimony.

8              If somebody has -- in -- in a

9    toxicology screening for an overdose, if they

10   have let's say hydrocodone or oxycodone in

11   their blood, or other tissue, I suppose, where

12   they do a tox screening from, that doesn't

13   necessarily mean that they received a lawful

14   prescription, does it?

15       A.    That fact alone does not, no.

16       Q.    Okay.

17       A.    However we collect, again, OARRS

18   information.  So we're aware of prescriptions.

19   There are prescription bottles at the scene

20   with the doctor's name with pill counts.  We

21   keep information on all of those things.

22       Q.    Right.

23             So in a situation where someone had

24   multiple lawful prescriptions that was in

25   OARRS, they had a prescription bottle next to

1      them that had their name on it, and you did a

2      tox screening, and there was an elevation, and

3      the medical examiner determined that was the

4      cause of death, that would be one that would be

5      something that could be tracked from a lawful

6      prescription to a cause of death, right?

7           A.    That is correct.

8           Q.    And do you have any idea of what

9      percentage of those types of connections to

10     prescriptions have been determined in the last

11     two or three years --

12               MR. GALLUCCI:  Object --

13               BY MR. CHEFFO:

14          Q.    -- in connection with overdose

15     deaths in Cuyahoga County?

16               MR. GALLUCCI:  Object to form.

17               THE WITNESS:  Deaths by prescribed

18     opiates?

19               BY MR. CHEFFO:

20          Q.    Uh-huh.

21          A.    Off the top of my head, no.  It's a

22     few hundred.  But I would have to look at

23     the -- at the data specifically.

24          Q.    What would you look at to make that

25     determination?

```
                                              Page 52
 1          A.    Well, we track --
 2          Q.    Well, what --
 3          A.    -- on --
 4          Q.    -- what data?
 5          A.    We track on a year-to-year basis the
 6     causes -- the various causes of death involving
 7     what drugs.
 8          Q.    Isn't -- I mean in the last few
 9     years, isn't it undisputed that the major
10     driver of overdose deaths from opioids is
11     heroin and illegal fentanyl?
12               MR. GALLUCCI:  Object to form.
13               THE WITNESS:  Fentanyl for sure.
14               BY MR. CHEFFO:
15          Q.    And is that prescribed fentanyl, or
16     is it synthetic street fentanyl?
17          A.    It's --
18               MR. GALLUCCI:  Object to form.
19               THE WITNESS:  -- basically illicit
20     fentanyl, yes.
21               BY MR. CHEFFO:
22          Q.    What percentage of the fentanyl
23     overdose are actually tracked, you know, using
24     the type of investigative work that you've just
25     talked about -- OARRS, on-site review, talking
```

Page 53

1    to family -- what percentage of the fentanyl

2    overdoses in the last few years are from

3    patients who received lawful prescriptions and

4    then went on to overdose using them?

5                 MR. GALLUCCI:  Object --

6                 BY MR. CHEFFO:

7         Q.    Is it very small?

8                 MR. GALLUCCI:  Object to form.

9                 THE WITNESS:  Again, we haven't

10   completed the analysis on that data yet.  It's

11   underway.  So I couldn't answer with

12   specificity, no.

13        Q.    You're looking at that right now?

14        A.    Yes.

15        Q.    And -- and specifically to --

16        A.    Our office is.

17        Q.    To try and find out how many

18   overdose deaths where there's fentanyl are

19   directly related to a lawful prescription?

20        A.    Correct.

21        Q.    And what are you doing to -- to --

22   to identify those prescriptions?

23        A.    We're using the OARRS database.

24                We did do a brief look at a subset

25   back in 2017, February.  There were about 60

1    deaths that month.  It was the worst month that

2    Cuyahoga County's experienced.

3              And they did a quick look at that

4    time.  And the numbers had mirrored what we had

5    previously seen in the 2013, '14 data.

6              But again, we're compiling and

7    analyzing now to release that later this year.

8         Q.    Do you have any idea what the

9    numbers look like?

10        A.    I don't.  I'm not doing all the

11   analysis myself, so...

12        Q.    And the -- and you would agree, even

13   if someone has an OARRS entry, that could be --

14   could still be a -- a prescription that was

15   prescribed improperly?

16             MR. GALLUCCI:  Object to form.

17             BY MR. CHEFFO:

18        Q.    Do you understand my question?

19        A.    Prescribed improperly?

20        Q.    Well, Dr. Gilson and others have

21   talked about things like doctor shopping or

22   pill mills.

23             Are you familiar with those two

24   terms?

25        A.    I am.

1          Q.    Right.

2                So doctor shopping is when someone

3     goes to multiple doctors, right, in order to

4     try to get prescriptions without necessarily

5     telling the other doctor that they're receiving

6     a -- a coordinate prescription, right?

7                MR. GALLUCCI:  Object to form.

8                THE WITNESS:  Correct.

9                BY MR. CHEFFO:

10         Q.    That's one of the reasons why OARRS

11    was established, right?

12                MR. GALLUCCI:  Object to form.

13                THE WITNESS:  I believe that's one

14    of the reasons, yes.

15                BY MR. CHEFFO:

16         Q.    And in order -- do you look at, in

17    your analysis, and are you going to be looking

18    at your analysis, whether there was doctor

19    shopping?

20         A.    Yes.

21         Q.    And what about pill mills?

22         A.    I'm not sure that we have a -- a way

23    of knowing whether certain prescribing entity

24    is a -- what law enforcement would call a pill

25    mill.

Page 56

1          Q.    Right.

2                But -- but does -- law enforcement

3     knows, right, because they prosecute those

4     people?

5                MR. GALLUCCI:  Object to form.

6                THE WITNESS:  I believe they do when

7     they can, yeah.

8                BY MR. CHEFFO:

9          Q.    Right.

10               So have you -- and is it the

11    intention to go and ask them for all the

12    identified prosecuted pill mills so you can

13    then put that into your analysis?

14         A.    Law enforcement does have a piece

15    and a role to play in the analysis.  I would

16    have to check to see what all pieces are being

17    asked from them.

18         Q.    And are you intending or the

19    department intending to talk to any of the

20    doctors as to why the prescriptions were

21    written?

22         A.    So that's really up to the forensic

23    pathologist who are investigating the death,

24    whether they feel that the medical records they

25    already have are sufficient and whether a

Page 57

1      face-to-face or telephone discussion is
2      required.
3          Q.     What happens if someone had a lawful
4      prescription for fentanyl, let's say, and then
5      they went out and also then bought street
6      fentanyl and were abusing that; would that be
7      classified as a -- a prescription
8      fentanyl-related death?
9                 MR. GALLUCCI:  Object to form.
10                THE WITNESS:  Classified as in --
11                BY MR. CHEFFO:
12         Q.     Your statistics.
13         A.     -- the death certificate or --
14         Q.     In your -- your -- your report that
15     you're doing.
16                MR. GALLUCCI:  Same objection.
17                THE WITNESS:  Unfortunately, I don't
18     believe we would be able to know with any
19     certainty.  Toxicology doesn't -- doesn't
20     differentiate.  Fentanyl is fentanyl.
21                BY MR. CHEFFO:
22         Q.     Right.
23                So you can't -- you can't really
24     tell, if someone has fentanyl in their system,
25     whether it's illicit fentanyl manufactured

Page 58

1       somewhere in China, Mexico or somewhere else,

2       or whether it's lawful fentanyl, right?

3           A.    Correct.  We would have to rely on

4       other pieces of information to make those

5       determinations.

6               I will say, having reviewed OARRS

7       over the years, there are not -- there are not

8       a significant number of fentanyl prescriptions.

9       So I don't think it comes up all that often.

10          Q.    So it's very rare that someone would

11      actually have prescription fentanyl and

12      overdose on prescription fentanyl?

13          A.    It's happened in the past.

14          Q.    Sure.

15              But what -- what percentage?

16          A.    But --

17              MR. GALLUCCI:  Please let him

18      finish --

19              MR. CHEFFO:  Sorry.

20              MR. GALLUCCI:  -- his answer.

21              THE WITNESS:  It's happened in the

22      past.  I would say that it is handfuls in a

23      year, at least going back to the numbers we

24      were talking about, 2006 and on.

25              BY MR. CHEFFO:

1          Q.    Handfuls, less than 10 percent?

2          A.    Percentage-wise I'm -- I would have

3     to -- yeah.  Probably 10 percent or less.

4          Q.    Would the same be true for

5     prescription oxycodone?

6          A.    No.  Prescription oxycodone was much

7     more of a -- a factor in opioid deaths

8     throughout the years, really up until I think

9     2016.

10         Q.    Is that in alone or in combination

11    with other drugs?

12         A.    It would be all deaths related to

13    oxycodone.  So there may have been other drugs

14    involved.

15         Q.    Could -- so if one was -- had

16    oxycodone, fentanyl and heroin in their system,

17    that would be classified as related to

18    oxycodone?

19         A.    It would be classified as related to

20    all.  So the categories, when we use the charts

21    and we try to make this clear, is that you --

22    you can't add oxycodone plus heroin plus

23    fentanyl and get total drugs deaths.

24              It'll be all drugs that involve

25    fentanyl, all drug -- all -- all overdoses that

Page 60

1      involve fentanyl, all overdoses that involve

2      heroin, all that are related specifically to

3      prescription drugs.

4                Now, as we got more sophisticated

5      in -- in our look-backs, we did try to parse it

6      out so that we could tell who died just from

7      opioid -- prescription opioids, who just died

8      from fentanyl, fentanyl in combination.  We're

9      having issues with fentanyl-laced cocaine now.

10               So the combinations get more and

11     more complicated.  It takes us longer and

12     longer to analyze and parse out the data in

13     appropriate categories.

14        Q.    Okay.  Well, and thank you.  That --

15     that's helpful.

16               So let me just ask you then about --

17     so if you wanted to answer that question,

18     right, again, it's not a memory test.  You

19     know, I'm not asking you exact numbers in 2015.

20               But if you wanted to, you said --

21     strike that.

22               You said you -- the -- the system

23     and the look-back has become more

24     sophisticated, and there's an effort to try and

25     identify if there is a single drug that is the

Page 61

1    cause, right?

2         A.    When we get a cause of death, we

3    often have multidrug combinations.  Coming up

4    with all the combination possibilities is

5    getting more and more difficult as you have

6    more and more drugs being put into the supply

7    on the street.

8              And so yes, it's -- we can try -- we

9    can identify when someone dies and they only

10   have a prescription opiate in their system or

11   if they only have heroin in their system.

12             Again, once you start adding up all

13   the possible combinations that exist, it -- it

14   gets -- it takes more time to analyze that.

15        Q.    Okay.  So if -- I take it there's a

16   database that, if you wanted to run, let's say,

17   for 2016 and say, "I'd like the printout of all

18   of the deaths where there's only one drug,

19   fentanyl," you could do that, right?

20        A.    Correct.

21        Q.    And oxycodone, you could do that?

22        A.    Correct.

23        Q.    And then you could basically query

24   the system to say, "I'd like the data where

25   there are two drugs in the system," right?

1          A.     You can.

2          Q.     And then you could probably do

3     something four or more, right, and capture

4     those, right?

5          A.     Correct.

6          Q.     And then that would be -- and you

7     could print out, if you wanted to, a -- kind of

8     a bar chart, right, saying, "Here's" -- you

9     know, like you've done in some of your other

10    data, right?

11              You can basically say, "Here is the

12    chart that" -- or the -- the bar graph that

13    says -- here's oxycodone only, fentanyl only,

14    heroin only, two or more, right?  You could do

15    all that in a -- and -- and display it

16    graphically, if you -- if you wanted to.

17         A.     Eventually, yes.

18         Q.     And -- and has that been done?

19         A.     That's part of what's being done for

20    this new release of -- of data for the '15, '16

21    and '17 cases.  I believe we had a breakdown of

22    the 2015 cases that we produced something like

23    that in a report that's on our web site.

24              I can't remember if we completed it

25    for 2016 or not.  We may have.  So there might

Page 63

1    be data in reports for 2015 and 2016 that have

2    that data in it.

3        Q.    And -- and -- and the -- the reports

4    that have been generated, are those reports

5    that identify whether they are from lawful

6    prescriptions; or are they reports that only

7    identify, for example, a medicine that can be

8    lawful, oxycodone, but don't differentiate

9    whether someone got that through diversion

10   or -- or got it through a prescription?

11       A.    I don't believe those reports

12   distinguish that.

13       Q.    So even if it said it's only

14   hydrocodone or only oxycodone, all that report

15   would mean was that the person had that in

16   their system, right?

17       A.    That it contributed to their death.

18       Q.    Right.

19            It's not a -- it's not a -- an

20   attempt or an effort to indicate that they had

21   received their oxycodone or hydrocodone or any

22   other lawful medicine from a doctor, and that

23   was the cause of death, right?

24            MR. GALLUCCI:  Object to form.

25            THE WITNESS:  I don't believe that

Page 64

1    it differentiates in those reports.  It's not

2    that we couldn't.  It's just a matter of having

3    enough time to do the analysis.

4              BY MR. CHEFFO:

5        Q.    You --

6        A.    It requires a deeper dive into the

7    data that we have.  And again, some cases we've

8    better information than others.

9        Q.    Sure.

10             So -- but if -- if the department

11   wanted to and determined that it was something

12   that was appropriate, it could actually try to

13   do just that, right, try to say which are

14   the -- which are the overdose deaths that are

15   directly related to a prescription drug, right?

16             And they could look at the tox

17   studies; they could look at the investigator

18   studies; they could look at medical records,

19   right?

20             They have an ability to talk to

21   doctors and family members?

22       A.    Correct.

23       Q.    Right?

24             So it could -- it could, one by one,

25   say, "Okay.  This person had oxycodone in their

Page 65

1      system.  We want to do a look-back and find out
2      if it ultimately was related to a prescription
3      medicine," right?
4           A.    We could, yes.
5           Q.    And you could actually do that for
6      heroin or fentanyl as well, right?
7           A.    Yes.
8           Q.    I mean in other words, you could say
9      this person is a -- has a fentanyl overdose,
10     right?
11                Let -- strike that.
12                Let's take heroin because it can't
13     be legal or illegal.
14          A.    Well, let's not take heroin.  But
15     yes.  Go ahead.
16          Q.    Yes.  Thank -- agree with that.
17                You know, if there was a heroin
18     overdose, you could, using the data and
19     information you have, look back to determine
20     whether there was actually any connection to
21     any lawful prescription, right?
22                MR. GALLUCCI:  Object to form.
23                THE WITNESS:  I believe so, yes.
24                BY MR. CHEFFO:
25          Q.    And -- and you would do that by a

1    number of ways, right?

2         A.    Correct.

3         Q.    You look at OARRS?

4         A.    Yes.

5         Q.    You would look at medical records?

6         A.    Correct.

7         Q.    You'd look at investigator reports?

8         A.    Yes.

9         Q.    Your -- your own investigators,

10    right?

11        A.    Ours and if there are any police

12    reports as well.

13        Q.    Any police.

14              You might access jail records or

15    other public health or public treatment

16    records, right?

17        A.    Correct.

18        Q.    And you -- you could talk to the

19    doctor, right?

20        A.    We could, yes.

21        Q.    If there was a doctor, right?

22        A.    Yes.

23        Q.    And -- and by doing that, you would,

24    perhaps not in all cases, but in many cases be

25    able to determine whether there really was any

Page 67

1      connection between a prescription medicine or

2      -- or even any prescription medicine in the

3      chain of events prior to a time that a person

4      died, right?

5               MR. GALLUCCI:  Object to form.

6               THE WITNESS:  I believe so, yes.

7               MR. CHEFFO:  Right.

8               THE WITNESS:  And I believe that was

9      the intent -- the original intent of the death

10     review was to try to make those determinations

11     of places where we could intervene.  Pamphlets

12     in a doctor's office about the dangers of

13     opioids regardless of their source, as an

14     example.  Or letters to people coming out of

15     treatment, you know, "Beware of going back to

16     your old habits," whether it was taking heroin

17     or abusing prescription pills or whatever else.

18         Q.    Right.

19               And because there are -- there are

20     some people who have addictive personalities

21     who abuse certain types of alcohol or drugs and

22     then they progress to abusing more serious

23     drugs, right?

24               MR. GALLUCCI:  Object to form.

25               THE WITNESS:  So again, I'm not

1     claiming to be an expert in addiction
2     treatment.  I don't believe it's a personality
3     disorder.  I believe it's a physiological one,
4     but...
5               BY MR. CHEFFO:
6         Q.    And I apologize.
7         A.    Yes.  I -- yes.
8         Q.    I didn't mean to say "personality."
9         A.    No.  It --
10        Q.    If I said that, I didn't mean to.  I
11    didn't know that I used those words.  But if --
12    thank you for --
13        A.    I just want to clarify.
14        Q.    -- the clarification.
15        A.    Sure.
16        Q.    Yeah.
17              MR. GALLUCCI:  Mark -- Mr. Cheffo,
18    we've been --
19              MR. CHEFFO:  Yeah.
20              MR. GALLUCCI:  -- going about an
21    hour.
22              MR. CHEFFO:  Oh, sure.
23              MR. GALLUCCI:  Would now be an --
24              MR. CHEFFO:  Absolutely.
25              MR. GALLUCCI:  Okay.

Page 69

1                    MR. CHEFFO:  Take a break.

2                    MR. GALLUCCI:  Yes.  About five

3      minutes?

4                    MR. CHEFFO:  Yes.

5                    THE VIDEOGRAPHER:  We are going off

6      the record.

7                    This is the end of Media Unit No. 1.

8                    The time is 10:02.

9                    (A short recess was taken.)

10                   THE VIDEOGRAPHER:  We are going back

11     on the record.

12                   This is the start of Media Unit No.

13     2.

14                   The time is 10:14.

15                   You may proceed, Counsel.

16                   MR. CHEFFO:  Thanks.

17                   BY MR. CHEFFO:

18         Q.    I'm going to --

19                   MR. GALLUCCI:  Mr. Cheffo, before I

20     think somebody wanted to go on the record.

21                   MR. CHEFFO:  Oh, sure.

22                   Is there some --

23                   MR. GALLUCCI:  Was there somebody

24     else who joined the deposition?

25                   Sorry.

Page 70

```
 1                MR. CHEFFO:  No.  Thanks, Frank.
 2                MS. HARTMAN:  Yeah.  Ruth Hartman,
 3       Baker Hostetler, on behalf of the Endo
 4       defendants.
 5                MR. GALLUCCI:  And I would just like
 6       to note that plaintiffs have a continuing
 7       objection with regards to the participation in
 8       this litigation with regards -- that pertains
 9       to Carole Rendon or Baker Hostetler.  So just
10       noted objection that we have.
11                MR. CHEFFO:  Okay.
12                MS. HARTMAN:  I -- just to note a --
13       and just to note a response, the Endo
14       defendants would be prejudiced without counsel
15       here.  Thanks.
16                BY MR. CHEFFO:
17       Q.    Okay.  Mr. Shannon, I want to ask
18       you some questions.  We started with Exhibit 1.
19       But before we do that, if I could just -- just
20       have a few kind of clarifying questions or
21       follow-up, if I could.
22                So before we move to this, are you
23       aware of any case in the county where an
24       individual who used a prescription as directed
25       by a doctor died of a -- an overdose related to
```

```
                                                Page 71
 1      that?
 2            A.     Who used a prescribed opiate --
 3            Q.     As directed.
 4            A.     As directed.
 5                   That's -- you know, that'd probably
 6      be better to ask Dr. Gilson.  I...
 7            Q.     But you're not ware of any --
 8      anything like that, are you?
 9            A.     I'm not aware, no.
10            Q.     Dr. Gilson would be the person to --
11      to be able to answer that question?
12                   MR. GALLUCCI:  Object to form.
13                   THE WITNESS:  Well, he's the medical
14      examiner and a forensic pathologist.  That's
15      more or less a -- a medical question, I think.
16                   BY MR. CHEFFO:
17            Q.     And -- and are -- do you think, if
18      you queried your various databases and sources,
19      you could -- you could determine that
20      information?
21                   MR. GALLUCCI:  Object to form.
22                   THE WITNESS:  Not the databases I
23      have access to.  It doesn't say -- you know, it
24      just gives the cause of death.
25                   BY MR. CHEFFO:
```

1        Q.    And we talked about certain

2    limitations in the data -- in the 2012 and '13

3    data.

4              Do you recall that?

5        A.    Specifically what?

6        Q.    Well, so for OARRS, it didn't list

7    why a prescription was made, right?

8        A.    Well, the OARRS database doesn't

9    have that information in it, no.  I'm not sure

10   that's a limitation on the system.  Because

11   that's not the intent of the -- the system.

12       Q.    Okay.  Well, with respect to any

13   data that's used to analyze -- well, strike

14   that.

15             With respect to data that is used

16   by -- by your office, by your department, in

17   order to take a look at issues involving the

18   opioid crisis, is -- is it the standard

19   practice to determine why a prescription

20   medicine was written if there is a record of

21   prescription medicine?

22       A.    Only if it pertains to the cause of

23   death.

24       Q.    And -- and how do they do that?

25       A.    That's a doctor question.

Page 73

1      Q.     And what about identifying a full
2   drug history; is that part of the standard
3   protocol in a overdose death?
4      A.     To the best that it can be
5   determined, yes.
6      Q.     Well, do you go and find out -- does
7   the department go and find out if -- let's say
8   someone's a -- an employee -- a government
9   employee.
10          Do you access or ask to access their
11   prescription records?
12      A.     I'm not sure I understand what
13   you're asking me.
14      Q.     Well, their drug history, including
15   non -- nonopioid drugs.
16          In other words, is part of the
17   protocol to find out whether -- you know, and
18   I -- I -- I said "government employee" because
19   you might have access to that, right?
20          Whatever your health care provider
21   is, is there an effort to go and say to
22   whatever -- whether it's Blue Cross or Aetna or
23   United Health -- send an authorization or get
24   the records to find out what medicines that
25   person may have been tacking?

1       A.    So OARRS does that for us.  So I'm
2    not sure what the need would be.
3       Q.    Does OARRS --
4       A.    So --
5       Q.    But OARRS only does controlled
6    substances, right?
7       A.    Correct.
8       Q.    But what happens if someone was
9    taking -- there are other substances that can
10   be involved in overdose deaths, right, other
11   than controlled substances?
12      A.    Correct.
13      Q.    And there could also be other
14   beneficial medicines that could inform
15   someone's view about the health of a patient,
16   right, or decedent, right?
17            MR. GALLUCCI:  Object to form.
18            THE WITNESS:  Again, that would be
19   the doctor's determination, not anything that
20   I'm involved with.
21            BY MR. CHEFFO:
22      Q.    Right.
23            I'm just trying to find out, as part
24   of the protocol and being at the office, do you
25   -- are you aware of whether the department

Page 75

1       regularly accesses prescription information

2       about a decedent?

3           A.    Yes.  Through OARRS.

4           Q.    Only through OARRS.

5           A.    Unless it's in their medical

6       records.

7           Q.    So if someone was taking blood

8       pressure medicine, how would they -- that would

9       only be something that the department would

10      evaluate if it was in medical records?

11          A.    So if somebody dies, say in their

12      home, and our investigators are on the scene,

13      again, I think I mentioned earlier any

14      prescription pills that might be on the scene

15      get collected, we document.  So that is a way

16      to determine whether or not someone has other

17      prescriptions.

18                Sometimes family history will be

19      given at the scene.  He had high blood

20      pressure.  He was taking this drug.  It'll be

21      noted in the investigator's report possibly.

22                Again, anything that is in a

23      person's system will show up on the toxicology

24      report.  It's really up to the doctor, the

25      forensic pathologist, to determine whether it

Page 76

1    has any relationship to the cause of death.

2         Q.    And I -- I -- and -- and I

3    appreciate that.  I'm just asking just a much

4    more specific question.

5              Is it part of the protocol to get

6    prescription -- a history of prescription

7    records outside of the things you've talked

8    about:  interviews, scene investigation or

9    checking OARRS?

10        A.    There may be other methods.  I'm not

11   aware of a protocol of our office to call a

12   person's insurance company after they've died,

13   no.

14        Q.    Okay.  And I -- and tell me if I got

15   this right, but I thought you said that you

16   believed -- that you couldn't point to any

17   individual and didn't believe -- well, strike

18   that.

19              I think you testified that there

20   were a certain number of heroin deaths --

21   overdose deaths that you believe were

22   potentially linked to a prescription opioid; is

23   that right?

24        A.    Correct.

25        Q.    And you don't know the percentage,

Page 77

1      do you?

2           A.    I do not.

3           Q.    It's not a hundred percent, right?

4                 MR. GALLUCCI:  Object to form.

5                 THE WITNESS:  I don't know the

6      percentage.

7                 BY MR. CHEFFO:

8           Q.    Right.

9                 But you -- it's not your testimony

10     that every heroin death is linked to a

11     prescription overdose, is it?

12                For the reasons we've just been

13     talking about.

14          A.    So what we have been informed of and

15     what we have learned over these years is that

16     the cartels in Mexico ramped up their heroin

17     production knowing that there was a market

18     created by a flood of prescribed opiates into

19     communities that people would turn to other

20     means if they were no longer be able to access

21     their prescription opioids.

22          Q.    Okay.

23          A.    That --

24          Q.    Sorry.

25          A.    The sophistication of these cartels

Page 78

1      that they are -- they track these things.

2      So -- we've heard that from case studies from

3      our law enforcement partners.  They're -- they

4      knew that, when pill mills were going to get

5      cracked down on in Ohio, that there would be a

6      market for their product.

7           Q.    Right.

8                 And we talked a little -- we can go

9      back to it.

10                But I thought we talked about that

11     that was a theory, right?

12                But in order to determine whether

13     someone actually was the person who was

14     prescribed from a pill mill, lost their

15     insurance, lost their -- their access to an

16     opioid, and then later became a heroin addict

17     and overdosed, right, that's information that

18     you could look at, but you don't have the

19     specifics, right?

20           A.    Not specifics.

21           Q.    Right.

22                And -- and you would agree with me

23     that -- that not every person -- so, for

24     example, if a 21-year-old unfortunately went

25     out today on the street and had never had a

1    prescription for opioids, never used opioids

2    before, experimented with illicit fentanyl and

3    unfortunately overdosed, that wouldn't be

4    related to the prescription opioid, right?

5                MR. GALLUCCI:  Object to form.

6                THE WITNESS:  Now, other than the

7    fact that, like I said, cartels pumped up their

8    production based on what they knew about the

9    market for prescription opiates.  And so maybe

10   we wouldn't have so much illicit fentanyl on

11   the streets had it not been for that fact.

12   So...

13               BY MR. CHEFFO:

14        Q.   Is that a speculation, or -- or do

15   you have details about that?

16        A.   What kind of details?  I think it's

17   fairly common amongst people who are dealing

18   with this day in and day out in treatment, law

19   enforcement.  These are the people that we

20   talked to at the task force.

21        Q.   So would you say that the cartels

22   are just businessmen who are taking advantage

23   of a opportunity, or do they have some

24   culpability for shipping in --

25        A.   No.  They're criminals.

Page 80

1          Q.    Right.

2                MR. GALLUCCI:  Let's -- let's let

3      him finish his --

4                THE WITNESS:  Oh, sorry.

5                MR. GALLUCCI:  -- question before

6      you answer.

7                BY MR. CHEFFO:

8          Q.    I mean they're -- right.

9                I mean that -- they're criminals,

10     right?

11         A.    They're -- they are criminals.  And

12     they -- you know, I'm not suggesting that

13     they're stand-up professionals.  But i -- what

14     I'm saying is -- is that we're told that the

15     operations that they run are very

16     sophisticated, and we shouldn't underestimate

17     what they do and don't know about the markets

18     that they're --

19         Q.    Right.

20         A.    -- that they're operating in.

21         Q.    And -- and -- and they are

22     sophisticated and try to take advantage of

23     vulnerable people, both in Cuyahoga County,

24     frankly in all of our communities, right?

25         A.    That's the business model, yeah.  I

Page 81

1    believe so.

2         Q.    And -- and they have certainly some

3    responsibility for the opioid crisis here in

4    Cuyahoga and elsewhere in the country, right?

5              MR. GALLUCCI:  Object to form.

6              THE WITNESS:  So they certainly

7    have -- don't have any -- no responsibility.

8    But again, it's a combination that, you know,

9    the market was already created for them.

10             BY MR. CHEFFO:

11        Q.    Do the -- do the -- do the person on

12   the street who actually sells the cocaine laced

13   with fentanyl or the fentanyl to the

14   individual, does that person have some

15   responsibility if that -- if -- if their

16   customer takes the illicit drug and overdoses

17   and dies?

18             MR. GALLUCCI:  Object to form.

19             THE WITNESS:  I believe that's what

20   the Prosecutor's Office and the U.S. Attorney's

21   Office, when they prosecute those people that

22   they do catch.

23             BY MR. CHEFFO:

24        Q.    Right.

25             And they prosecute them because they

Page 82

1       know that, if you -- if you stopped or

2       curtailed the drug cartel, you would reduce the

3       amount of overdose deaths, right?

4                   I mean that's what they're trying to

5       do, isn't it?

6                   MR. GALLUCCI:  Object to form.

7                   THE WITNESS:  I think they're trying

8       to enforce the law.

9                   BY MR. CHEFFO:

10         Q.     Right.

11                 But isn't it common sense that the

12      reason why they're trying to enforce the law --

13      I mean this is not like jaywalking, right?

14                 They're trying to enforce law and

15      stop the cartels because they know, if they do

16      that, they can prevent many or all of the

17      overdose deaths from illegal substances like

18      fentanyl and illicit fentanyl.

19                 MR. GALLUCCI:  Object to form.

20                 THE WITNESS:  Not all.

21                 BY MR. CHEFFO:

22         Q.     But isn't it common sense that

23      that's what they're trying to do, stop the

24      drugs from coming in as part of this massive

25      influx so that they could reduce the overdose

Page 83

1     deaths in the county?

2          A.    So that is part of the coordinated

3     strategy is to stop drugs from coming into the

4     country, yes.

5          Q.    Right.

6                Because those people who are sending

7     the drugs in the country have -- are aware of

8     where the drugs are coming from, and that's

9     where the people can access them, right?

10         A.    Well, that's -- they know that's

11    where the illicit drugs are coming from, yes.

12         Q.    Right.

13               And those people, you would agree

14    that they have a significant responsibility for

15    the illegal drug trade and the overdoses based

16    on illegal drugs.

17               MR. GALLUCCI:  Object to form.

18               THE WITNESS:  So you're asking

19    multiple questions within a question.

20               MR. CHEFFO:  Okay.  I could break it

21    down.

22               THE WITNESS:  Could you?

23               BY MR. CHEFFO:

24         Q.    Sure.

25               Is there really any dispute amongst

Page 84

1    people that the drug cartels have

2    responsibility for people who ingest the drugs

3    that they send into the country and ultimately

4    die?

5         A.    Any?  That's a broad category.  I

6    can't speak for all people.  I can speak for

7    what I know.

8         Q.    Okay.  What do you know?

9         A.    So the -- yes, there are -- people

10   who sell illicit drugs, who manufacture illicit

11   drugs and ship illicit drugs into this country

12   bear some responsibility, not all.

13             The market was not created by them.

14   They were created by massive distributions in

15   dispensing of prescription opioids.

16        Q.    Yeah.  And I -- I'm going to get to

17   that.  But I want to just -- let's just take it

18   one chain at a time.

19             So the cartels, they clearly have

20   some responsibility, right, by creating

21   these -- these illegal drugs that are shipped

22   into the country that are used unlawfully.

23             MR. GALLUCCI:  Object --

24             BY MR. CHEFFO:

25        Q.    Agree?

```
 1              MR. GALLUCCI:  Object to form.
 2              THE WITNESS:  Yes.
 3              BY MR. CHEFFO:
 4         Q.    Do people who abuse the drugs have
 5     any responsibility?
 6              MR. GALLUCCI:  Object to form.
 7              THE WITNESS:  It's an illness, so...
 8              BY MR. CHEFFO:
 9         Q.    So is the answer yes or no?
10         A.    The illness is not of their making
11     and is not really under their control.  So I
12     would say that they bear no responsibility.
13     They really need medical attention.
14         Q.    Are they prosecuted if they are
15     caught with it?
16         A.    I don't believe so anymore, that
17     that is kind of an old practice.
18         Q.    Fentanyl?
19         A.    People who are using fentanyl, yes,
20     I -- the basic protocols that are in place now
21     is to get those people treatment and help, not
22     to prosecute.
23         Q.    Are there -- so it is your testimony
24     that everybody who uses illicit fentanyl is not
25     responsible for their actions?
```

Page 86

```
 1              MR. GALLUCCI:  Object to form.
 2              THE WITNESS:  I'm saying that people
 3      who are addicted to opioids are not
 4      responsible, that they need medical attention
 5      like any other medical condition.  You don't
 6      arrest people because they're having a heart
 7      attack because they had a cheese burger.  It's
 8      not a condition that they control.  They just
 9      need treatment.
10              BY MR. CHEFFO:
11         Q.    And that -- that -- that's every
12      single person who abuses fentanyl or --
13         A.    So I'm not in law enforcement.  I am
14      not a doctor.  What has been explained to me
15      and what is my understanding, being in these
16      task forces with those people, is that it's a
17      medical condition that needs treatment.
18         Q.    Is the same true for people who
19      abuse cocaine?
20         A.    I'm not an addiction specialist.  I
21      couldn't answer.
22         Q.    Well, is there any difference
23      between cocaine and fentanyl or heroin in your
24      mind --
25         A.    Well --
```

Page 87

1          Q.     -- in terms of the population of

2     people who abuse them?

3               MR. GALLUCCI:  Object to form.

4               THE WITNESS:  From the data that we

5     see, there are some differences.  But again,

6     I'm not an addiction specialist.  I'm not in

7     law enforcement.  I really couldn't speak to

8     that.

9               BY MR. CHEFFO:

10         Q.     And the -- the street dealer, if he

11    or she sells illegal drugs, they have some

12    responsibility, I take it?

13              MR. GALLUCCI:  Object to form.

14              THE WITNESS:  When you say

15    "responsibility," I -- it's -- if you break law

16    and they get caught, they get prosecuted.

17              BY MR. CHEFFO:

18         Q.     Right.

19              But responsibility, what we're

20    talking about, I think, today is your office,

21    overdose deaths, right?

22              Do they have some responsibility --

23    if they sell an illegal drug to an individual,

24    and he or she unfortunately overdoses, does the

25    street dealer have responsibility and

1     culpability for that death?

2               MR. GALLUCCI:  Object to form.

3               THE WITNESS:  Our office doesn't

4     make that determination.  We are basically in

5     the business of determining a quasi manner of

6     death.

7               BY MR. CHEFFO:

8        Q.    I'm asking you as a -- as a -- an

9     upstanding citizen in -- in this community.

10              What do you think?

11              MR. GALLUCCI:  Object to form.

12              THE WITNESS:  Like everything else,

13    they are breaking the law.  They should be

14    prosecuted to the fullest extent.  They're

15    still operating in the same environment that

16    was created due to the flood of prescription

17    opioids.

18              BY MR. CHEFFO:

19       Q.    Are they just businessmen who are

20    just taking advantage of an opportunity?

21       A.    No.  I said they're criminals that

22    should be prosecuted to the fullest extent of

23    the law.

24       Q.    You seem --

25       A.    But they're operating in an

1      environment that was created by the flood of

2      prescription opioids.

3            Q.    You seem to want to -- to really --

4      you're -- you're kind of fighting me on the --

5      the idea that somebody who sells street drugs

6      to someone who then overdoses, that you don't

7      want to say that they have liability.

8                  Is that -- am I reading that right?

9                  MR. GALLUCCI:  Object to form.

10                 He answered the questions?

11                 THE WITNESS:  So I'm not a lawyer.

12     So liability doesn't mean all that much to me.

13     Responsibility --

14                 BY MR. CHEFFO:

15           Q.    Okay.  Let's use --

16           A.    -- they use the --

17           Q.    -- "responsibility."

18           A.    Again, if they break the law, they

19     need to be prosecuted to the fullest extent.

20           Q.    Do they have --

21           A.    They operate in the environment that

22     was created.

23           Q.    Do they have response -- does

24     someone who sells illegal drugs to someone who

25     then uses them and overdoses and dies have

1      responsibility for their death?

2          A.     I believe I --

3                 MR. GALLUCCI:  Object to form.

4                 THE WITNESS:  -- just answered that

5      question.

6                 BY MR. CHEFFO:

7          Q.     I don't think you did.

8                 Is it yes or no?

9          A.     So --

10                 MR. GALLUCCI:  Object to form.

11                 It doesn't have to be a yes-or-no

12      answer either.  You can give whatever answer

13      you believe is accurate.

14                 THE WITNESS:  I gave the most

15      complete --

16                 BY MR. CHEFFO:

17          Q.     You said --

18          A.     -- and accurate answer that I have

19      already.

20          Q.     I think you said they should be

21      prosecuted.

22                 I'm just asking you do they have

23      some responsibility at all for the death?

24                 MR. GALLUCCI:  Object to form.

25                 THE WITNESS:  I -- again, I believe

Page 91

1     I've answered your question several times now.
2               BY MR. CHEFFO:
3          Q.    I don't think you've, sir.
4               MR. GALLUCCI:  Object to form.
5               THE WITNESS:  It's not our office's
6     determination whether -- who is and isn't
7     responsible.
8               BY MR. CHEFFO:
9          Q.    Okay.  And I'm not asking you on
10    behalf of the office.  I'm asking you as a fact
11    witness here today and someone lives in the
12    community.  You've testified a lot about all
13    the things in the task forces.
14              So my question again is you
15    individually, do you believe somebody who sells
16    drugs illegally to an individual who uses the
17    drugs, overdoses and dies, does that drug
18    dealer have responsibility in some way for the
19    individual's death?
20              MR. GALLUCCI:  Object to form.
21              THE WITNESS:  Again, me personally,
22    I believe that they need to be prosecuted.
23    Prosecution is a legal process.  It determines
24    responsibility.  That's --
25              MR. CHEFFO:  Okay.

```
                                                    Page 92

 1                   THE WITNESS:  -- outside my purview.

 2                   BY MR. CHEFFO:

 3          Q.    What about a doctor who prescribes

 4    controlled substances knowing that they're not

 5    for legitimate purposes; do they have -- and

 6    the person ultimately either overdoses or has

 7    subsequent events in life that lead them to a

 8    very negative place; does that doctor have

 9    responsibility?

10                   MR. GALLUCCI:  Object to form.

11                   THE WITNESS:  Not being a doctor, I

12    don't know how to determine whether they

13    knowingly or unknowingly are doing it for

14    legitimate reasons or not -- illegitimate

15    reasons.

16                   BY MR. CHEFFO:

17          Q.    Okay.  And fair enough.  And I'm not

18    asking you to be a doctor.

19                   But let's -- let's assume there's a

20    person who was prosecuted and either pled

21    guilty or convicted -- or was convicted, right,

22    of unlawfully prescribing, like a pill mill

23    doctor, right?

24                   Does that person have responsibility

25    for any harm that was caused by their
```

Page 93

1      prescription of those -- those medicines in an

2      unlawful way?

3           A.    Well, if they've been convicted,

4      then a court system -- the judicial system has

5      determined responsibility --

6           Q.    And --

7           A.    -- of that individual.

8           Q.    And you -- you would agree with that

9      then?

10          A.    I --

11               MR. GALLUCCI:  Object to form.

12               THE WITNESS:  I'm not in a position

13     to agree or disagree with the court.  It's --

14     I'm not in the proceedings.  I assume that

15     things are done properly.

16               But as an individual, I -- how would

17     I be able to say whether or not an individual

18     judge or an individual case was done right or

19     wrong?

20               BY MR. CHEFFO:

21          Q.    When you were look -- when you look

22     back at the data to find out if somebody was --

23     if somebody's listed in the OARRS system for a

24     controlled substance, right, when you look at

25     that, wouldn't it be interesting and helpful

1    information if you knew or evaluated whether

2    the -- the OARRS prescription was written by

3    somebody who was ultimately convicted for

4    improperly prescribing medicines?

5         A.    Well, we don't -- we don't usually

6    worry about what is and isn't interesting.  It

7    doesn't have any determination as to the

8    ultimate cause and manner of death.  So for the

9    purposes of our mission and our statutory

10   responsibilities, it doesn't -- doesn't play a

11   role.

12        Q.    Well, don't -- I thought you told me

13   that you guys in your office -- not -- excuse

14   me.  Not you guys -- your office is doing a lot

15   of work beyond just determining cause of death

16   in individual cases, right?

17             You're trying to do studies and

18   reports and publish things and do informational

19   dives that you believe could be helpful from a

20   public health perspective.

21        A.    Correct.

22        Q.    That's part of the mission, too,

23   right?

24        A.    Yes, it is.

25        Q.    So as part of that aspect of your

1    mission, and you're trying to determine, for

2    example, if someone who overdosed received a

3    prescription, wouldn't you want to know whether

4    the prescription was written by somebody who

5    was later prosecuted and convicted in the

6    county for -- for improperly prescribing that

7    drug?

8         A.    So we get calls from various

9    enforcement agencies asking for additional

10   information.  We provide it when it's asked.

11          It doesn't really -- I don't know

12   how it would -- that information would better

13   inform the doctors in their work or the

14   scientists in their work.  I'm sure it would be

15   useful to the overall task force and certain

16   parts of it more than others.

17        Q.    Well, part of what you've told us

18   earlier is that you've -- you're tried to -- to

19   look at certain data to draw some conclusions

20   about populations of people who overdosed who

21   previously used some type of either legal or

22   illegal opioid, right?

23        A.    Correct.

24        Q.    And there's been a lot of work done

25   on that, right?

Page 96

1          A.    Yes.

2          Q.    And you've -- you've -- we talked

3     about some of the data sources and some of the

4     limitations of the information available to

5     you, right?

6          A.    Yes.

7          Q.    And in connection with that work,

8     you have looked at or tried to look at various

9     factors that could potentially impact both an

10    individual and a population, right?

11              MR. GALLUCCI:  Object to form.

12              THE WITNESS:  Yes.

13              BY MR. CHEFFO:

14         Q.    It could be age; it could be sex; it

15    could be whether they were previously

16    incarcerated; it could be whether they used

17    Naloxone, right?

18         A.    Yes.

19              MR. GALLUCCI:  Object --

20              BY MR. CHEFFO:

21         Q.    And there's probably other factors,

22    right?

23              MR. GALLUCCI:  Object to form.

24              THE WITNESS:  Yes.

25              BY MR. CHEFFO:

Page 97

1          Q.    And that's because this is a

2     multifactorial problem, and it's -- there's no

3     easy solution to addiction or overdose deaths,

4     right?

5               MR. GALLUCCI:  Object to form.

6               THE WITNESS:  I'm not sure the --

7     the solution is all that intricate.  Getting

8     people off drugs and in treatment, it's fairly

9     straightforward.  It's more a matter of

10    resources.

11              It's a -- it's a particularly

12    difficult addiction to break, yes.

13              BY MR. CHEFFO:

14         Q.    Let's look at Exhibit 1, please, Mr.

15    Shannon.

16              And to reorient you, this is a

17    document dated 2016 put out by the Cuyahoga

18    County Board of Health, right?

19         A.    Yes.

20         Q.    Have you -- did you participate in

21    the preparation of this document?  Is that

22    within your purview?

23         A.    I did not.

24         Q.    And do you see the -- on the --

25    there's no pages again.  I apologize.  But the

1    third page, if you count the cover as one,

2    right, then two, three.  It says "How did this

3    happen?"

4            MR. GALLUCCI:  Mr. Cheffo, just to

5    be clear, is that Bates No. 18267?

6            MR. CHEFFO:  Yes.  Thanks.  I should

7    have used that.

8            MR. GALLUCCI:  Yes.

9            BY MR. CHEFFO:

10       Q.    Do you see that, sir?

11       A.    Yes.

12       Q.    And -- and again, it says there are

13   several contributing factors that led to this

14   epidemic.

15            Do you see that?

16       A.    Yes.

17       Q.    I think we agreed that that's in

18   connection with what's being called the opioid

19   epidemic?

20            MR. GALLUCCI:  Object to form.

21            THE WITNESS:  Yes.

22            BY MR. CHEFFO:

23       Q.    And one of them is "Changes made to

24   chronic pain management guidelines during the

25   late 1990s," right?

```
                                           Page 99

 1          A.    That's how it reads.

 2          Q.    "Marketing medications directly to

 3     the consumer."

 4                Do you see that?

 5          A.    I do.

 6          Q.    "Overprescribing of high potency

 7     pain medication."

 8                Do you see that?

 9          A.    I see that.

10          Q.    And then it says:  "HCA HPS/Press

11     Ganey scores (patient satisfaction surveys)

12     that directed hospital reimbursement."

13                Do you see that?

14          A.    I do.

15          Q.    And then it says:  "Abuse

16     deterrents, formulations of medications that

17     may have inadvertently shifted abuse towards

18     heroin."

19                Do you see that?

20          A.    I do.

21          Q.    Then it says:  "Mass incarceration

22     for" violent -- I'm sorry -- "for nonviolent

23     drug-related crimes."

24                Do you see that?

25          A.    I do.
```

1        Q.     "Lack of treatment availability"?

2        A.     I see that.

3        Q.     And then it says:  "Stigma, viewing

4     drug addiction as a moral failing."

5               Do you see that?

6        A.     I do.

7        Q.     Do you agree with all those factors?

8               MR. GALLUCCI:  Object to form.

9               THE WITNESS:  Personally or as a...

10              BY MR. CHEFFO:

11       Q.     You can answer either way, sir, or

12    both.

13              MR. GALLUCCI:  Just to clarify,

14    you're here as a fact witness today, not as a

15    30(b).

16              THE WITNESS:  I don't believe this

17    is an exclusive list.  But I believe -- I agree

18    with what's written here, yes.

19              BY MR. CHEFFO:

20       Q.     What other factors would you add to

21    the list?

22              Would you add the -- the things

23    we've talked about, the drug -- influx of drug

24    cartels and drug sales from foreign countries?

25              MR. GALLUCCI:  Object to form.

1              THE WITNESS:  So one of the things

2      that had been talked about throughout the

3      preparation for the first Summit during the

4      task force -- the U.S. Attorney's task force

5      was the lack of -- it says "Lack of treatment

6      availability."

7              But there were specific regulations

8      that the IMD -- IMBD exclusion that limited

9      beds to 16.  And that was something that we had

10     talked about regularly.

11             We had talked about -- there were

12     discussion about guidelines to limit dosage and

13     the number of days supply of prescribed opiates

14     that -- that should -- might be available in --

15     in some cases.

16             BY MR. CHEFFO:

17        Q.   So just on those, Mr. Shannon, let's

18     me see if I understand that right -- so the --

19     would -- would you say that a factor were kind

20     of a regulatory and healthcare environment that

21     contributed to the lack of availability of

22     necessary beds?

23        A.   It was certainly part of the

24     discussion at the time, yes.

25        Q.   And it would -- it -- I take it,

Page 102

1       from where you say "the guidelines," it would

2       be a -- a lack of guidelines that might have

3       been more stringent in prescribing or

4       proscribing the way and the manner in which the

5       medicines were prescribed?

6            A.    That was the discussion, especially

7       among the -- the medical experts in the room,

8       yes.

9            Q.    And I take it that made sense to

10      you, and you adopt -- you believe that?

11           A.    That was the basic understanding of

12      the entire group.  And as we move forward,

13      those were things that we did advocate for as a

14      group, yes.

15           Q.    Was there anything about

16      reimbursement for other types of treatments or

17      modalities by insurance companies that would

18      reduce the way that prescriptions for opioids

19      might have been reimbursed?

20                 MR. GALLUCCI:  Object to form.

21                 THE WITNESS:  Yeah, I'm not sure.

22      I -- I don't know if you want to --

23                 MR. CHEFFO:  Sure.

24                 THE WITNESS:  -- rephrase it.

25                 BY MR. CHEFFO:

Page 103

1          Q.    In other words, have -- have you --

2     have you ever heard someone saying, "Well, if

3     -- if we reimbursed for psychotherapy or

4     acupuncture or some alternative therapies" --

5          A.    Yeah.

6          Q.    -- "as opposed to not reimbursing or

7     making them more challenging to access or

8     doctors to use those, that contributed to

9     overprescriptions and was part of the

10    complicated problem that we now all face"?

11         A.    Well, I don't know if it contributed

12    to overprescriptions.  There was discussion

13    about alternate pain management methods.

14    Again, I -- I was in the room when those were

15    taking place, but that's not really my area.

16    That was really the medical professionals in

17    the reasonable that -- that had those

18    discussions.

19         Q.    In getting back to, you know, just

20    -- and I'm asking your own view.  When we talk

21    about the various factors, you've adopted these

22    and the others that -- that you've just

23    testified about.

24              But would you -- look -- looking

25    back about how did this happen, would you also

1     add doctors who were unethical, who prescribed

2     medicines for their personal economic gain as

3     opposed to their patients' interests, if that

4     happened?

5          MR. GALLUCCI:  Object to form.

6          THE WITNESS:  I don't recall that as

7     a specific talking point.  I believe most of it

8     was focused on just the overall guidelines and

9     lowering the dosage -- the daily dosage and the

10    amount of days of prescriptions that were

11    available.

12         BY MR. CHEFFO:

13      Q.   Okay.  And let me just be clear.  I

14    know I put this document in front of you.  So I

15    didn't mean to confuse you on this.  But I'm

16    just now -- I'm going off this document and

17    asking for your -- your view.

18         In addition to the factors that

19    we've just talked about, which were talked

20    about and adopted by the Board of Health, do

21    you also believe that, again, the -- if the

22    question is factors that led to the opioid

23    problem or crisis, would you also include

24    doctors who improperly prescribed medicines for

25    their own personal gain?

1               MR. GALLUCCI:  Object to form.

2               THE WITNESS:  I -- I wouldn't really

3       have a way of determining how much of that

4       contributed.

5               BY MR. CHEFFO:

6          Q.    Right.

7               But did it contribute at all?

8               MR. GALLUCCI:  Have you finished

9       answering the question?

10              MR. CHEFFO:  Sorry.  I thought you

11      were done.  I didn't --

12              MR. GALLUCCI:  Yeah.  Just --

13              MR. CHEFFO:  -- mean to interrupt

14      you.

15              No.  That's okay.

16              THE WITNESS:  So I -- yeah.  I'm not

17      sure that I could -- I could -- I wouldn't put

18      it in a bullet point.  I don't think that it

19      had as big or as significant -- at least from

20      the time that I have been involved in the -- in

21      the U.S. Attorney's task force.

22              BY MR. CHEFFO:

23         Q.    And again, I'm -- I'm not asking

24      about the attorney's task force or any task

25      force.  I'm asking about you.  And -- and I'm

1    not asking you at this point to quantify

2    exactly what percentage.

3              But would you agree that it was a

4    factor in the aggregate?

5              And -- and we'll go through a few of

6    them.

7              But was it a factor in the aggregate

8    for doctors who unethically or improperly or

9    criminally prescribed opioids for their own

10   personal gain?

11             MR. GALLUCCI:  Object to form.

12             THE WITNESS:  I wouldn't say it was

13   zero.  But again, the contributing factors of

14   the flood of -- and the tactics that were used

15   to market and -- and distribute, it set up more

16   that -- that that case would be more likely.

17             BY MR. CHEFFO:

18        Q.   Okay.  So it's not zero, but I -- am

19   I correct, if I asked you to assign a

20   percentage, you couldn't tell me; you just know

21   that it was a factor; you can't say that --

22   what -- what percentage, right?

23             MR. GALLUCCI:  Object to form.

24             THE WITNESS:  I can't give you a

25   percentage.

1              MR. CHEFFO:  Okay.

2              THE WITNESS:  Again, these people

3     are operating in an environment that was

4     created because of the flood of prescription

5     opioid.

6              BY MR. CHEFFO:

7         Q.    We're -- we're talking about doctors

8     now who prescribed opioids to people for

9     unethical and immoral purposes.

10        A.    Uh-huh.

11        Q.    Right?

12        A.    That's your question, yes.

13        Q.    Right.

14              And you say it was creating an

15     environment.

16              Do you know whether -- what -- what

17     happens if -- if the -- if that was the first

18     time someone ever took an opioid was as a

19     result of a pill mill doctor; does that have

20     anything to do with the -- the environment?

21        A.    The first time ever?

22        Q.    Yeah.

23        A.    Like civil war?  I mean --

24        Q.    No.

25        A.    -- first time ever --

Page 108

1       Q.    First time ever that person?

2       A.    -- I mean hopefully then -- I'm --

3       Q.    No.  Sorry.

4             First time ever that person.

5       A.    That specific person.  Okay.

6       Q.    Right.  I'm not talking back

7    history --

8       A.    Okay.

9       Q.    -- or thousands of years.

10            But let -- let me rephrase it so

11   we're on the same page.

12            To the extent a person went to an

13   unscrupulous doctor who prescribed an opioid

14   for improper purposes or nonmedical purposes to

15   someone, and that was the first introduction

16   for that person of an opioid in their life, and

17   that person ultimately went on to have an

18   addiction disorder or an overdose, the doctor

19   who prescribed that would have -- that would be

20   a factor in their ultimate abuse and overdose,

21   right?

22       A.    Again, it wouldn't -- it wouldn't be

23   a zero contributing factor, no.  It would be --

24   but again, it's not the overriding.

25       Q.    Really?  The doctor who prescribed

Page 109

1     it, that -- that's nothing the overriding cause

2     of the person's death?

3               MR. GALLUCCI:   Object to form.

4               THE WITNESS:   So again, by providing

5     far more prescription pills, doses in a

6     community than was necessary by direct

7     marketing, by all of these factors that opioid

8     manufacturers and distributors undertook,

9     including pressuring doctors, I mean...

10              BY MR. CHEFFO:

11        Q.    Do you know that?

12        A.    It's not -- do I know it?

13        Q.    Yeah.

14              I mean do -- are you aware of any

15    details of any doctor who was prescribed that

16    they ever saw any of --

17        A.    I'm sure --

18        Q.    -- that information?

19        A.    -- you'll have expert witnesses that

20    will provide that information.  I -- I'm not

21    here for that purpose.

22        Q.    So I just want to make sure that I'm

23    really understanding your testimony.

24              So your -- your testimony is that,

25    if a -- a pill mill doctor who gets prosecuted

Page 110

1      for prescribing medicines to someone, and that

2      person goes out and -- and dies unfortunately

3      of an overdose, that you're not willing to --

4      to basically say that they have substantial

5      responsibility for that death, and you're --

6      it's somebody else's problem?

7          A.    It's not my --

8                MR. GALLUCCI:  Object to form.

9                THE WITNESS:  -- place to determine

10     substantial --

11               MR. GALLUCCI:  Object to form.

12               THE WITNESS:  Sorry.

13               BY MR. CHEFFO:

14         Q.    Well, do they?

15         A.    -- what is and isn't substantial.  I

16     said --

17         Q.    Do you believe it?

18         A.    I said it's not zero.

19         Q.    Is it more than 50 percent?

20               MR. GALLUCCI:  Object to form.

21               THE WITNESS:  I've already answered.

22     I'm not giving you a percentage.  I don't have

23     a percentage for you.  It's not zero.  I don't

24     think it's significant enough to put on the

25     bullet point list.

Page 111

1              BY MR. CHEFFO:
2         Q.    For that individual it's
3    significant.
4         A.    I understand that.
5              MR. GALLUCCI:  Object to form.
6              BY MR. CHEFFO:
7         Q.    Let's talk about that individual.
8              In terms of factors that led that
9    person to overdose and die, how significant is
10   it?
11             MR. GALLUCCI:  Object to form.
12             THE WITNESS:  I would have to see
13   the exact case.  And that's not my
14   determination.  That's the medical examiner's
15   determination.
16             BY MR. CHEFFO:
17        Q.    I understand.  But I'm just giving
18   you some facts, right, to -- to -- in a
19   hypothetical.
20             Someone who never used opioids, went
21   to an unscrupulous doctor, was prescribed
22   opioids improperly, and they didn't need them,
23   and the doctor did it just to make money on it,
24   and the person ultimately developed an abuse
25   disorder and overdosed and died.

Page 112

1            In that individual, how significant
2       is the doctor's role in that course of conduct?
3            A.    Again, that would be a --
4                 MR. GALLUCCI:  Object to form.
5                 THE WITNESS:  -- determination by a
6       medical professional, not...
7                 BY MR. CHEFFO:
8            Q.    Really?
9            If that happened to a friend of
10      yours, what would -- what would your view be?
11           A.    It has happened.  It has happened
12      over and over again a thousand times over in
13      this community over the last few years.
14           Q.    Unscrupulous doctors prescribing
15      medicines?
16           A.    No.  People --
17                MR. GALLUCCI:  Object to form.
18                THE WITNESS:  -- dying of overdoses.
19                BY MR. CHEFFO:
20           Q.    I get --
21           A.    Opioids.
22           Q.    I'm talking about my specific
23      hypothetical right now, sir.
24           A.    Right.
25           Q.    And --

1      A.    I don't think I'm here to deal with
2    hypotheticals.  I'm here try to give you the
3    facts as I know them.  So...
4      Q.    I understand.
5            You're -- you're not willing to tell
6    me that they are substantially responsible?
7            MR. GALLUCCI:  Object to form.
8            THE WITNESS:  I don't have a
9    specific case to determine that.  And that's
10   not my job as head of operations at the Medical
11   Examiner's Office.  I can't give you an answer.
12           BY MR. CHEFFO:
13     Q.    Well, you're -- you're a person who
14   sits on these task force, right, to try and
15   help develop public policy; isn't that right?
16     A.    The U.S. Attorney's task force I sit
17   on, yes.
18     Q.    And you attended the Board of
19   Health?
20     A.    I do not.
21           MR. GALLUCCI:  Object to form.
22           BY MR. CHEFFO:
23     Q.    You never have?
24     A.    I have not.
25     Q.    Okay.  Do you believe most people in

Page 114

1    this community would say that, if a doctor

2    prescribed a medicine for no legitimate purpose

3    to a young adult, and that young adult went on

4    to have a very serious problem with abuse and

5    overdose, that they couldn't determine whether

6    the doctor was substantially liable?

7         A.    Again, I can't speak for most

8    people.  I don't know what they do and don't

9    believe.  That's not my job.  And it's not my

10   purpose here as a fact witness, no.

11        Q.    Could you tell us that they're more

12   than 10 percent responsible?

13             MR. GALLUCCI:  Object to form.

14             THE WITNESS:  Again, I can't speak

15   to what other people do and don't believe.

16   People believe a lot of things.  I -- that's

17   not my job here today.

18             BY MR. CHEFFO:

19        Q.    Do you believe that doctor would be

20   more than 10 percent responsible?

21             MR. GALLUCCI:  Object to form.

22             THE WITNESS:  Again, my beliefs

23   aren't what's...

24             BY MR. CHEFFO:

25        Q.    No.  I'm allowed to ask you your

Page 115

1    personal beliefs here.

2         A.    Well, you can ask.  But I'm here as

3    a fact witness about my work in the opioid

4    crisis as a director of operations for the

5    Medical Examiner's Office.

6         Q.    Right.

7               And is your -- is your -- your view

8    that there is a doctor who illegally prescribes

9    an -- unlawfully a medicine to someone who

10   ultimately goes on to overdose in this

11   community, that they are more than 10 percent

12   liable?

13        A.    I wouldn't put a percentage on it.

14        Q.    Would it be 99 percent?

15        A.    I wouldn't --

16              MR. GALLUCCI:  Object to form.

17              THE WITNESS:  -- put a percentage on

18   it.  I'm telling you I don't know what people

19   do and don't believe.  My beliefs aren't

20   relevant.  My work in the medical examiner's

21   office is to review this data, to get people

22   together, to inform them about the crisis, give

23   them a baseline of data, and try to come up

24   with solutions.

25              That's what we've tried to do over

1      the last seven years.

2           Q.    Do you draw conclusions from the

3      data?

4           A.    Somebody does.  I -- not my job to

5      draw conclusions.  That's for the medical

6      professionals and the scientific professionals.

7           Q.    Do you think you've drawn some

8      conclusions earlier today when I've asked you

9      some other questions from the data or --

10          A.    Such as?

11          Q.    Well, I'm just asking.

12                Have -- don't you think you've drawn

13     some conclusions when I've asked you questions?

14                MR. GALLUCCI:  Object to form.

15                THE WITNESS:  I would have to go

16     back and read.  I don't know.

17                BY MR. CHEFFO:

18          Q.    Okay.  So your view is you don't

19     draw any conclusions; you just can testify

20     about conclusions drawn by the department?

21                MR. GALLUCCI:  Object to form.

22                THE WITNESS:  Well, I believe that's

23     why I was called to come here.  So my personal

24     beliefs aren't part of that.  What I've tried

25     to do is gather enough people in the room who

1    are experts at these task forces and get them

2    to have these discussions and try to move as

3    best we can forward in addressing the crisis.

4              BY MR. CHEFFO:

5         Q.    And Mr. -- and just to be fair,

6    right, I -- I'm not asking you about personal

7    topics or your beliefs on things that have

8    nothing to do with this litigation.  You've

9    written e-mails.  You've talked about it.

10              So just to be clear, right, I'm only

11   asking you your beliefs in connection with the

12   work that you've done in -- in connection with

13   this case, right?

14              So you -- I think you've told me

15   you're not --

16        A.    Okay.

17        Q.    -- going to testify.  But I'm -- I'm

18   not trying to intrude on your personal beliefs

19   on -- on everything in the -- in the world,

20   right?

21              You know, you -- you've -- you

22   participated in many of these things.

23              And I understood that part of being

24   on the task force and working in your capacity

25   is that you share information and assessments

Page 118

1    and beliefs, right?

2                MR. GALLUCCI:  Object to form.

3                THE WITNESS:  I share data.  And I

4    share what conclusions that the experts have

5    come up with based on our data.

6                BY MR. CHEFFO:

7        Q.    So our -- in my situation or my

8    hypothetical, are -- you -- you can't really

9    put a percentage on whether the doctor -- or

10   how much the doctor might have been

11   responsible, right?

12               MR. GALLUCCI:  Object to form.

13               THE WITNESS:  So again, doctors

14   operate in the environment that they are given.

15   That is the ultimate responsibility.  If they

16   have other responsibility, the legal system

17   will ferret that out.  That's not our job.

18               BY MR. CHEFFO:

19       Q.    Okay.  I mean are the -- in the --

20   in the -- in the hypothetical I gave you, are

21   the defendants in this case a substantial

22   cause?

23               Right.

24               I take it you can't tell me those

25   percentages, could you?

Page 119

1            MR. GALLUCCI:  Object to form.

2            THE WITNESS:  The defendants being

3     your clients.

4            BY MR. CHEFFO:

5        Q.    Well, I mean do you know --

6        A.    They weren't in the --

7        Q.    -- who the defendant --

8        A.    They weren't in the hypothetical, so

9     I didn't --

10       Q.    Yeah.

11            In that hypothetical, are they

12    substantially responsible?

13       A.    So again --

14            MR. GALLUCCI:  Object to form.

15            THE WITNESS:  -- I'm not really -- I

16    have 3,000 real cases that we can talk about

17    instead of a hypothetical.

18            BY MR. CHEFFO:

19       Q.    Okay.  We'll get --

20       A.    Largely I would say yes, the

21    defendants are responsible for creating the

22    environment that we are all operating in:

23    overdispensing, overproduction, mass marketing.

24       Q.    Okay.  So what percentage?

25       A.    I don't have --

1                    MR. GALLUCCI:  Object to form.

2                    THE WITNESS:  -- percentages either.

3                    BY MR. CHEFFO:

4          Q.    Is it a hundred percent?

5                    MR. GALLUCCI:  Object to form.

6                    THE WITNESS:  I would say it's

7      pretty close to it.  They created the

8      environment that we're operating in.

9                    BY MR. CHEFFO:

10         Q.    And -- and so any overdose that

11     occurs from now until when will be a hundred --

12     or close to a hundred percent responsibility?

13                   MR. GALLUCCI:  Object to form.

14                   THE WITNESS:  That's not -- not in

15     my purview.

16                   BY MR. CHEFFO:

17         Q.    Well, sir, you know, in fairness you

18     can't tell me that you have a view on something

19     and then tell me it's not your job.

20                   Do you have a view or not as to

21     whether the substant -- the -- that the

22     defendants are substantially responsible?

23                   If the answer is no, you don't have

24     a view, then that's your answer.  If it's

25     something different, then --

Page 121

1          A.    I --

2          Q.    -- you should tell me that too.

3          A.    I believe --

4                MR. GALLUCCI:  Object to form.

5                THE WITNESS:  I believe I said yes,

6      that they are substantially.

7                MR. CHEFFO:  Okay.

8                THE WITNESS:  And I don't --

9                BY MR. CHEFFO:

10         Q.    So --

11         A.    -- have a percentage for you.  And I

12     don't know, in perpetuity, how long that

13     responsibility is going to last.  I believe

14     that's what the lawsuit was all about.

15         Q.    Who else is responsible?

16               MR. GALLUCCI:  Object to form.

17               THE WITNESS:  For

18     creating overprescribing markets --

19               BY MR. CHEFFO:

20         Q.    No.  For --

21         A.    -- and --

22         Q.    -- the opioid --

23         A.    -- mass marketing and -- these are

24     the factors that this community has determined

25     led to the crisis that we're facing right now.

Page 122

1    I can't...
2         Q.    Who else is -- what other factors
3    and who else is responsible for the opioid
4    problem in the county?
5              MR. GALLUCCI:  Object to form.
6              THE WITNESS:  Your -- your clients
7    created the market.  They supplied it,
8    oversupplied it.  They marketed it,
9    overmarketed it.  They used tactics that were
10   not above board to create the market that we
11   exist in now --
12             BY MR. CHEFFO:
13        Q.    Who --
14        A.    -- that led to this crisis.
15             MR. CHEFFO:  Okay.  Move to strike.
16             THE WITNESS:  That's the
17   contention --
18             BY MR. CHEFFO:
19        Q.    Who --
20        A.    -- of this community.
21        Q.    Who else is responsible?
22             Is anybody else responsible?
23             MR. GALLUCCI:  Object to form.
24             THE WITNESS:  I think that's been
25   asked and answered several times --

Page 123

```
 1              MR. CHEFFO:  It has not.
 2              THE WITNESS:  -- now, so...
 3              BY MR. CHEFFO:
 4      Q.    Who else -- you -- you said the
 5   defendants.  And I'm going to go through each
 6   one and find out why.  But I want to know if
 7   there's -- who else, if anyone else, is
 8   responsible.
 9              MR. GALLUCCI:  Object to form.
10              It has been answered many times.
11   He's also --
12              MR. CHEFFO:  I don't think so.
13              MR. GALLUCCI:  -- told you that he
14   doesn't have the ability to determine
15   responsibility about 20 minutes ago when we
16   started this line of --
17              MR. CHEFFO:  Except, when --
18              MR. GALLUCCI:  -- questioning.
19              MR. CHEFFO:  -- it's the defendants,
20   he has incredible ability to -- to make
21   determinations.
22              MR. GALLUCCI:  But we keep going
23   down this same line.
24              MR. CHEFFO:  Well, that's what he
25   keeps --
```

Page 124

1              MR. GALLUCCI:  It's -- it's your

2      deposition.  You could --

3              MR. CHEFFO:  Let's -- let's --

4              MR. GALLUCCI:  -- do what you want.

5      But I'm going to --

6              MR. CHEFFO:  I understand.

7              MR. GALLUCCI:  -- continue to

8      object.

9              MR. CHEFFO:  That's fine, right?

10             BY MR. CHEFFO:

11       Q.    I mean do you have a view as to

12     substantial responsibility or not in connection

13     with this?

14             Because if you don't, we can move

15     on.  But if you have a view that it's

16     substantially the defendants' responsibility,

17     you should tell me.

18             MR. GALLUCCI:  Object to form.

19             THE WITNESS:  Can we read it back

20     and see if --

21             MR. CHEFFO:  Sure.  Do --

22             THE WITNESS:  -- I said that several

23     times already, that the defendants are

24     substantially responsible?

25             BY MR. CHEFFO:

                                                     Page 125

1          Q.    Okay.  And I'm asking you --

2                MR. GALLUCCI:  I -- I note an

3     objection.

4                You can answer his question.

5                THE WITNESS:  I think I just did.

6                BY MR. CHEFFO:

7          Q.    Who else is --

8                MR. GALLUCCI:  But -- but the --

9                BY MR. CHEFFO:

10         Q.    Who, if anyone else, is -- is

11    responsible?

12               MR. GALLUCCI:  Let's go back to the

13    question you asked before I instructed him to

14    answer.

15               You said does he have a view.  I --

16    I'm just trying to go back to the question that

17    he didn't get a chance to answer.  It is at

18    11:05:18.

19               MR. CHEFFO:  Go ahead.  I can't -- I

20    don't --

21               THE WITNESS:  It's --

22               MR. CHEFFO:  I can't read it.

23               THE WITNESS:  That's the view that

24    we have all determined, is that your -- the

25    defendants are responsible for creating the

1        opioid crisis that --

2                  MR. CHEFFO:  Okay.

3                  THE WITNESS:  -- we're facing right

4        now.

5                  BY MR. CHEFFO:

6        Q.    Is there anyone else?

7        A.    This is what we know right now.

8        Q.    Is there anyone else?

9        A.    I don't believe that's the

10       contention that we've come up with, no.

11       Q.    I'm not -- are you speaking on

12       behalf of the -- the county now or yourself?

13       A.    Both.

14                 MR. GALLUCCI:  So objection.

15                 You're here --

16                 BY MR. CHEFFO:

17       Q.    You are now a 30(b)(6)?

18                 MR. GALLUCCI:  -- as a fact witness.

19       We are not on 30(b)(6).

20                 MR. CHEFFO:  Okay.

21                 BY MR. CHEFFO:

22       Q.    So when you say "we," you're talking

23       about the county.

24                 So you're speaking on behalf of the

25       county now or not?

                                        Page 127

1                MR. GALLUCCI:  Objection.  He's

2       speaking as a fact witness, not on behalf of

3       the county.  His --

4                MR. CHEFFO:  Okay.

5                MR. GALLUCCI:  -- 30(b)(6)

6       deposition's already been held.

7                MR. CHEFFO:  Right.  That's what I

8       thought so too.

9                BY MR. CHEFFO:

10         Q.    So other than the defendants, is

11      anyone else, in your view, responsible for the

12      opioid crisis in Cuyahoga County today?

13         A.    Not if you take it back to the

14      inception, no.

15         Q.    And so drug cartels are not

16      responsible?

17         A.    For creating the market?

18         Q.    No.  For the opioid crisis that's --

19      exists today.

20                Are they responsible for that in any

21      way?

22         A.    That's a different question.

23         Q.    Okay.  Well, that's what I'm talking

24      about.  Let me ask you then differently.

25                Are -- with respect to the opioid

1    crisis that exists in the community today, is

2    there anyone other than the defendants who you

3    believe are responsible?

4        A.    Not for creating the market that

5    sets up this --

6        Q.    You're not --

7        A.    -- crisis.

8        Q.    You're -- so you know you're

9    intentionally not answering my question.  I'm

10   going to keep answer it -- asking the same

11   question.

12            All right.  I asked you very

13   specifically -- and you can't redefine my

14   question.

15            I said, with respect to the opioid

16   crisis today, is there anyone else that you

17   believe is responsible other than the

18   defendants?

19       A.    But it's not as simple as a snapshot

20   of today.  There are --

21       Q.    I get to ask the questions.

22            MR. GALLUCCI:  Well, let him finish

23   his answer.  You can certainly follow up.

24            MR. CHEFFO:  Okay.  I'm going to ask

25   for more time if we're going to -- if we're not

1     going to answer the question.

2               MR. GALLUCCI:  Let -- let's let him

3     answer the question.

4               MR. CHEFFO:  Fine.

5               MR. GALLUCCI:  You know, and you're

6     certainly welcome to.  And we feel that you've

7     gone over the same question --

8               MR. CHEFFO:  Well --

9               MR. GALLUCCI:  -- many times.

10              That being said, if you'd like to

11    answer the question.

12              THE WITNESS:  It's not a simple

13    snapshot.  It's not today versus yesterday

14    versus the year before.

15              It started with the creation of the

16    environment by overprescribing, overproduction,

17    mass marketing, direct marketing, pressure

18    tactics.

19              That is the view that I hold --

20              BY MR. CHEFFO:

21         Q.   Okay.  And I --

22         A.   -- based on what I've learned over

23    the last seven years and the last 3,000 people

24    who have died.

25         Q.   And you've testified that --

Page 130

1           A.     That's informed me.

2           Q.     -- to many times.

3                  You've talked about what started --

4      what you believe started this chain of events,

5      right?

6           A.     And that's the cause.

7           Q.     Okay.  And I'm -- I'm asking what

8      are the other contributing factors that led to

9      the opioid crisis as it exists today in

10     Cuyahoga?

11          A.     So just like the work that our

12     doctors do, the cause of death is the cause of

13     death.  So people who are in a --

14          Q.     So it's your testimony --

15          A.     -- car accident die because their

16     head hits the windshield.  That's a cause of

17     death.

18          Q.     Okay.  So tell me what --

19          A.     They may have been drinking at the

20     time.  That may have led to the crash

21     eventually.  But the cause of death is the

22     cause of death.

23                 The cause of this crisis is the work

24     that your -- the defendants did in saturating

25     this community and communities across the

1     United States with way too many prescribed

2     opioids and all the tactics that went with it.

3          Q.    Okay.  And can you -- can you tie

4     any conduct or tactic of any defendant to

5     any -- any overdose death?

6          A.    I don't know who all the defendants

7     are specifically.

8          Q.    But yet you're --

9          A.    That's not --

10         Q.    You couldn't even name them, could

11    you?

12              MR. GALLUCCI:  Well, let him finish

13    the answer, please.

14              BY MR. CHEFFO:

15         Q.    Do you know who the defendants are?

16         A.    I don't know every single company

17    that's listed, no.  I could probably check the,

18    you know, litigation and --

19         Q.    Do you have --

20         A.    -- and find out, but...

21         Q.    Do you have specific information

22    about the conduct of any defendant?

23         A.    That's not part of my job, no.

24         Q.    So the answer is no, right?

25         A.    That's not part of my job.  No, it's

1    not.

2         Q.    So do you know -- do you have any

3    information about let's say -- well, strike

4    that.

5              Are you -- are you an expert in --

6    in -- in pharmaceutical marketing?

7         A.    I think we've already established

8    I'm not here as an expert --

9         Q.    Right.

10        A.     -- on any means.

11        Q.    And you don't know -- do you have

12   any -- any personal knowledge about any

13   marketing activities of any of the defendants?

14        A.    Personal knowledge.

15        Q.    Yeah.

16        A.    Like did they market me personally?

17   No.

18        Q.    I mean do you have any -- do you --

19   could you testify with any specificity about

20   anything anyone did or didn't do?

21        A.    Just reports and books that I read

22   and not test -- and -- not testimony.  It's

23   discussions in the task force.

24        Q.    So your knowledge comes from the

25   task force?

Page 133

1      A.    Largely informed by the task force

2    and then the work that we do at the Medical

3    Examiner's Office, yes.

4      Q.    And have you seen any documents from

5    any defendant in this case?

6      A.    Can you be more specific?  Any

7    documents?  I --

8      Q.    Yeah.

9            I mean do you recall seeing any --

10     A.    Related to this lawsuit, I've seen

11   documents that have defendants' names on it.

12   Yeah, that's...

13     Q.    Have you looked at marketing

14   campaigns or any other information?

15     A.    That's not part of my job.  No, I

16   haven't.

17     Q.    Have you looked at any distribution

18   records for any opioids in Cuyahoga County?

19     A.    I don't have access to that.  If

20   we --

21     Q.    Have you --

22     A.    -- did -- that's part of the

23   problem, but...

24     Q.    Well, you would like to have -- the

25   problem is what, that you don't have access to

Page 134

1    distribution?

2         A.    Well, I think the problem is -- is

3    that, if we had seen the distribution patterns

4    sooner, we might have been able to head off the

5    problem sooner.

6         Q.    Do you know what ARCOS is?

7         A.    That's been explained to me that

8    that's the database that tracks the

9    distributions.

10        Q.    And that would be important

11   information to look at?

12        A.    It could be very helpful.

13        Q.    So I take it you've looked at it?

14        A.    I have not.

15        Q.    It could be very helpful, but you

16   have not looked at it.

17        A.    It's a federal regulated database.

18   I don't have authorization to have access to

19   that.

20        Q.    Would you be shocked to hear that

21   your lawyers actually have it in their offices?

22             MR. GALLUCCI:  Object to form.

23             THE WITNESS:  I don't think anything

24   would shock me at this point.

25             BY MR. CHEFFO:

Page 135

1          Q.    But if they had it, you'd certainly
2     like to see it?
3          A.    Wouldn't be part of my specific job
4     duties.  But I'm sure people who are addressing
5     this crisis would.
6          Q.    Law enforcement would want to see
7     it, right?
8               MR. GALLUCCI:  Object to form.
9               THE WITNESS:  I can only speculate.
10    That's...
11              BY MR. CHEFFO:
12         Q.    And your speculation would be yes,
13    right?
14              MR. GALLUCCI:  Object to form.
15              THE WITNESS:  I assume so, yes.
16              BY MR. CHEFFO:
17         Q.    And do you -- do you have any
18    information about what -- let's just start with
19    some of the pharma companies.
20              Do you have any information about
21    what any doc -- any pharmaceutical company said
22    to any prescribing doctor in Cuyahoga County?
23         A.    No personal knowledge, no.
24         Q.    And do you -- have you ever seen any
25    interviews of any doctor who prescribes opioids

1      as to why they prescribe them?

2           A.    I'm sure I've read news stories,

3      seen documentaries and things like that, yes.

4           Q.    Can -- can you tie any specific

5      prescription to any statement or -- or

6      falsehood or omission from any of the

7      defendants in this case?

8           A.    Other than the general claim that

9      they weren't addictive.  But I'm not a doctor

10     or a scientist, and that's really not part of

11     my job duties, so...

12          Q.    Well, and -- and -- have you looked

13     at the labelling for any of the products?

14          A.    No.

15          Q.    Would it shock you if it said in

16     bold that there's a risk of addiction --

17               MR. GALLUCCI:  Object to form.

18               BY MR. CHEFFO:

19          Q.    -- for opioids?

20          A.    Like I said, I don't think anything

21     would shock me at this point.

22          Q.    Well, did you know that?

23          A.    I think there's a general

24     understanding, yeah, that they were eventually

25     forced to put that label on there.

1          Q.    When -- when were they?

2          A.    I wouldn't -- I wouldn't be able to

3     give you a -- a specific date.

4          Q.    Well, within the last two years?

5          A.    I don't know.

6          Q.    Was it in the last ten years?

7          A.    I don't know.

8          Q.    If -- whenever that was put on, that

9     would be important, right?

10              If the label actually said that it

11    was -- there was a risk of addiction, wouldn't

12    that be important to you?

13              MR. GALLUCCI:  Object to form.

14              THE WITNESS:  Important to me?

15              MR. CHEFFO:  Uh-huh.

16              THE WITNESS:  I -- I think it's

17    important information that should not have been

18    kept from the public, no.

19              BY MR. CHEFFO:

20         Q.    But -- but you don't know if it was

21    or wasn't kept from the public, do you?

22         A.    Well, I know they haven't been on

23    all the time.  I couldn't give you a specific

24    date.  So...

25         Q.    But --

Page 138

1          A.    The warning wasn't on the label all
2     the time.
3          Q.    For all of the defendants and all
4     the products, your testimony is it wasn't on
5     the label?
6                MR. GALLUCCI:  Object to --
7                BY MR. CHEFFO:
8          Q.    You know that, or are you guessing?
9                MR. GALLUCCI:  Object to form.
10               THE WITNESS:  I couldn't tell you a
11    specific date when the warning about the
12    addictive nature of opioids was put on
13    prescription bottles.
14               BY MR. CHEFFO:
15         Q.    But whenever it was, that would be
16    an important event because that disclosed
17    information that you believe should be
18    disclosed to the public and doctors.
19         A.    Yes.
20         Q.    And -- and if you found out that
21    that -- it's been on the -- the label for 18
22    years or more, that would be information that
23    you would want to know, right?
24               MR. GALLUCCI:  Object to form.
25               THE WITNESS:  Like I said, I know --

                                              Page 139

1      I'm not sure that would better inform my work

2      on a day-to-day basis, but...

3              BY MR. CHEFFO:

4         Q.    But if a doctor -- I mean do -- do

5      you believe doctors don't know that opioids

6      have addictive properties?

7              MR. GALLUCCI:  Object to form.

8              THE WITNESS:  Not now.

9              BY MR. CHEFFO:

10        Q.    Real -- have you ever met a doctor

11     in your life who told you that they didn't

12     think that opioids had the risk of addiction?

13        A.    Well, unfortunately, the doctors

14     I've been hanging out with lately are the ones

15     who are trying to treat the crisis.  So they're

16     all very well informed.

17        Q.    Right.  My question was different.

18     And I'd just ask if you answer my question and

19     not give a speech.

20              If -- do -- are you -- have you ever

21     met a doctor in your life who told you that

22     they were unaware of the risk of -- of

23     addiction with opioid medicines?

24        A.    I don't recall any conversation with

25     any doctor that has specifically came up

Page 140

1      outside of my work with the task force in the

2      Medical Examiner's Office.

3          Q.    Okay.  Inside.  Any -- any time.  My

4      question's very specific.

5               Did any doctor ever tell you, in

6      substance -- sum or substance, that he or she

7      was not aware that there were addictive

8      properties of opioids?

9          A.    Again, I don't think it was ever a

10     topic of discussion outside of the task force.

11     I don't know why it would come up.  But it

12     hadn't, no.

13         Q.    So in the task force, did any doctor

14     tell you that, even the doctors who treat

15     addiction?

16         A.    No.  I said the doctors that I've

17     been dealing with in the last seven years

18     fighting this crisis are very well informed.

19         Q.    Right.

20               So -- and do those doctors write

21     opioid prescriptions?

22               MR. GALLUCCI:  Object to form.

23               THE WITNESS:  I don't know.  I don't

24     know their basic nature of their practice.  I'm

25     sure some of them do.

Page 141

1           BY MR. CHEFFO:

2      Q.    Right.

3           And if they -- if they wrote a

4    prescription for an opioid right now, would you

5    think that that was the responsibility -- the

6    people on the task force, would you think that

7    was the responsibility of some improper

8    influence by a pharmaceutical company?

9           MR. GALLUCCI:  Object to form.

10          THE WITNESS:  I'm not sure I can --

11          BY MR. CHEFFO:

12     Q.    Really?

13          MR. GALLUCCI:  Object to form.

14          THE WITNESS:  I'm not sure I

15   understand what you're trying to get me to say

16   or ask me.

17          BY MR. CHEFFO:

18     Q.    I don't think I'm trying to get you

19   to say anything other than tell the truth.

20          MR. GALLUCCI:  I think he's also

21   saying what's the question.

22          MR. CHEFFO:  Okay.  And I'll read it

23   back.  I'll -- I'll do it again.

24          BY MR. CHEFFO:

25     Q.    You work with doctors on the task

1    force who deal with addiction and opioid --

2    opioid prescriptions and have some expertise,

3    right?

4         A.    Yes.

5         Q.    You trust them?

6         A.    For what?

7         Q.    Being honorable people who have the

8    public interest at heart?

9         A.    Basically, yes.  I don't know them

10   all that well, each one of them individually,

11   but...

12        Q.    Do you think they're there

13   advocating positions for manufacturers of

14   pharmaceuticals or distributors of medicines?

15        A.    At the task force?

16        Q.    Yes.

17              MR. GALLUCCI:  Object to form.

18              THE WITNESS:  No.  But then I didn't

19   think Carole was going to do that either.  And

20   she was running the task force at the time,

21   so --

22              BY MR. CHEFFO:

23        Q.    Do -- do you think -- do you think

24   any of the doctors on the task force are acting

25   in any at the behest or under the influence of

```
 1       any pharmaceutical company or distributor?
 2            A.    I don't believe so, no.
 3            Q.    All right.  And you also believe
 4       that some of them still prescribe opioid
 5       medicines, right?
 6            A.    I would have to --
 7                  MR. GALLUCCI:  Object --
 8                  THE WITNESS:  -- ask them
 9       specifically.
10                  BY MR. CHEFFO:
11            Q.    But it's your belief --
12                  MR. GALLUCCI:  Object to form.
13                  BY MR. CHEFFO:
14            Q.    It's your belief, is -- isn't it?
15                  MR. GALLUCCI:  Object to form.
16                  THE WITNESS:  I'm sure there are
17       some that still do, yes.
18                  BY MR. CHEFFO:
19            Q.    And if that doctor -- tell me --
20       tell me the names of the doctors on -- that
21       you -- that you can recall on this task force,
22       the ones who might prescribe opioids.
23            A.    I think Dr. Pap and Dr. Collins are
24       in emergency medicine at Metro.  So I'm sure
25       that would come up, but...
```

Page 144

1      Q.    Okay.  And -- and Dr. Pap and Dr.
2   Collins you think are on the task force for
3   altruistic reasons in order to help address
4   opioid issues?
5      A.    Yes.
6      Q.    And do you believe, when they write
7   a prescription today or wrote one yesterday,
8   that they are doing so because they were under
9   the influence or are under the influence of a
10  pharmaceutical company?
11     A.    I wouldn't think so.  But that's not
12  rally my place either.
13     Q.    Okay.  But the answer -- you -- you
14  -- you -- that wouldn't be your determination,
15  would it?
16     A.    No.  But my determination doesn't --
17     Q.    Okay.  And --
18     A.    -- have a lot of weight.
19     Q.    And you would believe that -- that
20  they wrote the prescription because they
21  thought it was medically appropriate for their
22  patient, right?
23          MR. GALLUCCI:  Object to form.
24          THE WITNESS:  I believe so, yes.
25          BY MR. CHEFFO:

Page 145

1          Q.    And did they ever tell you that they
2     had written prescriptions in the past and said,
3     in sum or substance, "Oh, my gosh, I wrote a
4     lot of prescriptions because I was improperly
5     influenced by distributors of man -- or
6     manufacturers of pharmaceutical products"?
7                    MR. GALLUCCI:  Object to form.
8                    THE WITNESS:  I don't think they
9     discuss their medical prescription.  That would
10    be a HIPAA violation.  I don't --
11                   BY MR. CHEFFO:
12         Q.    Not specifics.
13         A.    -- think they discuss it.
14         Q.    But in this whole task force, did
15    they say, "In the -- this environment, I want
16    to just tell you I was subject to this improper
17    influence"?
18                   Do you remember them saying anything
19    like that?
20         A.    I haven't had a conversation like
21    that with anybody at the task force, no.
22         Q.    Okay.
23                    MR. GALLUCCI:  We've been going
24    for about hour.
25                    Do you want to take a break?

1          MR. CHEFFO:  Can I just finish this

2     for two minutes?

3          MR. GALLUCCI:  That's fine.

4          BY MR. CHEFFO:

5     Q.    And so, if a prescription was

6     written by any of these doctors -- these two

7     doctors for an opioid, would you believe that

8     it was suspect; or would you believe that,

9     based on everything you know about them, that

10    the prescription was written because they made

11    an appropriate medical determination that it

12    was in the best interest of their patient?

13         MR. GALLUCCI:  Object to form.

14         THE WITNESS:  I think you're really

15    asking me to make suppositions.  I'm not really

16    in any position to make those determinations.

17         BY MR. CHEFFO:

18    Q.    Do you have any reason to believe

19    that the prescription that they right are

20    somehow in any way connected with improper

21    conduct by any of the defendants?

22    A.    Again, you're asking me to make

23    supposition.

24    Q.    I'm not --

25    A.    I have no idea.

1         Q.    I'm asking you --

2         A.    I don't talk -- discuss their

3    medical prescribing habits.  I don't discuss

4    medical issues with them outside of the task

5    force.  And that's -- the focus is --

6         Q.    You -- you --

7         A.    -- the opioid crisis.

8         Q.    You've told me a few minutes ago or

9    told us that you think all of this relates back

10   to the cause.

11              And I want to say are -- are these

12   two doctors, if they prescribe opioids, is

13   that -- are -- are they doing so in any way

14   connected to anything any of the defendants

15   did?

16              MR. GALLUCCI:  Object to form.

17              THE WITNESS:  I don't think what has

18   happened since the opiate crisis -- it informs

19   people.  Like I said, all the people in this

20   room are highly informed.  So...

21              BY MR. CHEFFO:

22        Q.    What does that mean?

23        A.    It means that these people are

24   medical professionals.  I don't discuss their

25   medical professional interactions with patients

1      with them.

2            Q.     I understand that.

3                   But you -- you've basically told us

4      that all of the -- so if one of their patients

5      were to overdose on an opioid that they wrote,

6      would you think that that was related to the

7      conduct of the defendants?

8                   MR. GALLUCCI:  Object to form.

9                   THE WITNESS:  That's not my job to

10     determine.

11                  BY MR. CHEFFO:

12          Q.     Well, would -- would the defendants'

13     conduct be a substantial cause?

14                  MR. GALLUCCI:  Object to form.

15                  THE WITNESS:  I think that's the

16     issue that's trying to be settled.  That's --

17                  BY MR. CHEFFO:

18          Q.     Well, what do you believe?

19                  MR. GALLUCCI:  Object to form.

20                  THE WITNESS:  I don't think that my

21     suppositions in this case are relevant.

22                  BY MR. CHEFFO:

23          Q.     Well, you told us earlier that you

24     believe that all of these prescriptions going

25     back in time were a substantial cause of

```
 1     manufacturers.
 2            Now I've given you some very
 3     specific doctors and facts, and you -- you
 4     don't seem to have the same view.
 5         A.    I think that's a mix --
 6     mischaracterization --
 7         Q.    Okay.  So --
 8         A.    -- of my view.
 9         Q.    -- when they write a prescription
10     today, yesterday, last year, is it your belief
11     that every prescription for opioids that they
12     wrote was as a result of -- a substantial
13     result of the conduct or actions of the
14     defendants?
15            MR. GALLUCCI:  Object to form.
16            THE WITNESS:  So prior to this, we
17     were talking about people who were dying of
18     overdoses.
19            MR. CHEFFO:  Well --
20            THE WITNESS:  Every -- there are
21     legitimate needs for prescription opioids.  I
22     don't know what they are because I'm not a
23     doctor.
24            BY MR. CHEFFO:
25         Q.    Okay.  But if -- so there are
```

Page 150

1    legitimate needs.
2              You would agree with that, right?
3         A.    That is what I've been told.  I'm
4    not a doctor.
5         Q.    And do you believe that -- so do you
6    -- you would agree with me that -- that not --
7    the -- the defendants are not responsible for
8    all -- there's no liability or culpability in
9    your mind if a doctor writes a prescription for
10   a legitimate purpose; is that right?
11             MR. GALLUCCI:  Object to form.
12             THE WITNESS:  I don't know all
13   circumstances that could grow from that.  So I
14   couldn't answer.
15             BY MR. CHEFFO:
16        Q.    If a doc -- if one of these two
17   doctors wrote a prescription, and their -- one
18   of their patients did overdose, would that in
19   any which be the responsibility of any of the
20   defendants in this case?
21        A.    That's not --
22             MR. GALLUCCI:  Object to form.
23             THE WITNESS:  -- a determination I
24   need to make.
25             MR. GALLUCCI:  Give me a moment so

Page 151

1      that --

2                  THE WITNESS:  Sorry.

3                  MR. GALLUCCI:  -- I can put

4      objections and we're not talking over each

5      other.

6                  THE WITNESS:  I'm sorry.

7                  MR. GALLUCCI:  Object to form.

8                  You may answer.

9                  BY MR. CHEFFO:

10         Q.    I'm asking your personal view.

11         A.    I don't think my personal view has

12      anything to do with it.

13         Q.    Okay.  Do you have a view as to

14      whether -- if -- if a doctor who you know and

15      trust, Dr. Pap or Dr. Collins, wrote an opioid

16      prescription, and one of their patients had a

17      -- an unfortunate and sad outcome of an

18      overdose and died, would you think that they

19      somehow had responsibility; or would you

20      attribute that to improper conduct of the

21      defendants?

22         A.    I don't know that I could say.

23                  MR. CHEFFO:  Okay.  Let's take a

24      break.

25                  MR. CARTER:  Before we go off the

1    record, I just wanted to note something that

2    came to our attention.  I wanted to note it

3    while it was the first opportunity.

4            I just received information that

5    plaintiffs made their 89th document production

6    on MLK day.  And in that production that was

7    just uploaded within the last 24 hours, there

8    are apparently 8,200 documents from Mr. Shannon

9    where he's identified as the custodian and

10   1,500 documents where Dr. Gilson is identified

11   as the custodian.

12           I don't obviously have the ability

13   in this deposition to analyze those and compare

14   them to what's previously been produced.  So I

15   don't know the extent to which there is a

16   problem.  But obviously those numbers concern

17   me and the fact that we're in the middle of the

18   deposition.

19           So I just wanted to raise that at

20   the first opportunity that I was provided with

21   that information so that counsel can

22   investigate.

23           Obviously, to the extent there are

24   documents in that that we -- were not

25   previously covered in productions, you know, we

1       would have problems in terms of proceeding with

2       the deposition and as well as reopening Dr.

3       Gilson's.

4                   But I have not had the opportunity

5       to analyze them, so I don't know one way or the

6       other.  I wanted to flag that at the first

7       opportunity.

8                   MR. GALLUCCI:  And during the break,

9       I'll certainly look into what may have been

10      produced --

11                  MR. CHEFFO:  Okay.

12                  MR. GALLUCCI:  -- if there was

13      something and try to advise you further.

14                  MR. CHEFFO:  Thanks, Frank.

15                  And -- and I'm not -- that point, I

16      -- and I'm glad you reminded me, Ed.  Thank

17      you.

18                  Just -- we had asked for -- and --

19      and please tell me if it was produced.  Because

20      it may well have been.  But at the deposition

21      of Dr. Gilson --

22                  MR. GALLUCCI:  The 30(b) or the

23      fact?

24                  MR. CHEFFO:  The fact one on --

25      what's today?

1                MR. GALLUCCI:  Yesterday.

2                MR. CHEFFO:  Tuesday.

3                MR. GALLUCCI:  Tuesday, was it?

4                MR. CHEFFO:  He testified about a

5       poster board or abstract that had been

6       submitted.  And we asked for it then and ask

7       for it again.  So if it's been produced --

8       again, lot of paper.  I'm not throwing stones

9       here -- just tell me.

10               If not, I would kind of -- again,

11      and I think I -- again, I don't want to get off

12      -- talk too much on the record -- but think Sal

13      indicated that he was going to be looking for

14      it, if he -- if he could find it.

15               MR. GALLUCCI:  So I'll certainly get

16      you an update.  But to be clear, that was some

17      time -- that happened Tuesday, and it's now

18      Thursday.

19               So your request was Tuesday.  You

20      want me to follow up on that, correct?

21               MR. CHEFFO:  Yeah.  I made the

22      request on the record, then informally after.

23               MR. GALLUCCI:  Fair enough.

24               MR. CHEFFO:  And he just said -- you

25      know, and I know there's a lot of paper

Page 155

1     floating around.  So if you could just find out

2     if it's been produced; and if not, where it is

3     in the chain.

4              MR. GALLUCCI:  Sure.  Thank you.

5              THE VIDEOGRAPHER:  We are going off

6     the record.

7              This is the end of Media Unit No. 2.

8              The time is 11:28.

9              (A short recess was taken.)

10             THE VIDEOGRAPHER:  We are going back

11    on the record.

12             This is the start of Media Unit No.

13    3.

14             The time is 11:49.

15             MR. GALLUCCI:  And, Counsel, just

16    for further update, during the break I did look

17    into production No. 89, which you inquired

18    about.  And I don't know if it was from the

19    instructions from the court the -- during the

20    discovery conference the week of 7th or 14th,

21    but we had been asked to immediately get out

22    any and all documents that we no longer

23    believed were subject to privilege, in a review

24    of the privilege log.

25             So that's a review of the privilege

1    log after we had further instruction from the
2    court.  And that's why you see multiple
3    custodians in a single production.
4              As far as -- I belive there was a
5    request, Mr. Cheffo, with regards to the
6    abstract that you asked Dr. Gilson about on
7    Tuesday.  I am still waiting for a response as
8    far as that but will let you know as soon as I
9    do.
10             MR. CHEFFO:  Got it.  Okay.  Thank
11   you for the update.
12             MR. CARTER:  So to the extent there
13   were unresolved documents previously as a
14   result of privilege, it's your understanding
15   that those would not be duplicative of anything
16   we had before because they had all been
17   previously held under privilege?
18             MR. GALLUCCI:  I don't know with
19   specificity the documents that were produced.
20   All I can tell you is that production No. 89
21   was a roll-out of a rereview of the privilege
22   log with the further guidance that we had
23   received from Judge Polster across the
24   litigation.
25             MR. CHEFFO:  Frank, we should -- is

Page 157

1      that --

2                    MR. GALLUCCI:  Do you want me to --

3                    MR. CHEFFO:  No.  I -- for the folks

4      on the phone, we just had a little bit of

5      colloquy about an update from Frank on the

6      documents.  And you -- hopefully you're seeing

7      it on your -- your screen there.

8                    But let -- let's just move on, I

9      mean other than to say, Frank -- and now's not

10     the time.  I mean we obviously appreciate your

11     efforts in -- in looking at it.

12                   We reserve our rights and need the

13     chance to look at it.  But I know that won't

14     surprise you.

15                   BY MR. CHEFFO:

16        Q.    You ready to go again?

17        A.    Yes, sir.

18        Q.    Okay.  So what is your role on the

19     -- well, strike that.

20                   There are two task force, right?

21                   There's U.S. Attorney's task force,

22     and then there's the Board of Health task

23     force, right?

24        A.    Correct.

25        Q.    You have some involvement with the

1    Board of Health task force but not the U.S.

2    Attorney task force; is that right?

3        A.    No.

4        Q.    Okay.

5        A.    It's the other way around.

6        Q.    Oh.

7        A.    I sit on the U.S. Attorney's task

8    force for our office.  Dr. Gilson attends the

9    one for the Board of Health.

10       Q.    I see.  Sorry.  Thank you for the

11   clarification.

12             And what is your role on the U.S.

13   Attorney's task force?

14       A.    So I report out data from the

15   Medical Examiner's Office.  I also am now

16   chairing the data subcommittee.  There were a

17   number of federal grants that have been awarded

18   that have to do with getting more specificity

19   in the data and required a task -- or a

20   committee to be set up.

21             We had already begun to set one up

22   in anticipation of the summit that we held at

23   the end of last year.  It was a five-year

24   return summit.  So they asked me to chair that.

25       Q.    And when you say "data," is that

1    data just from the medical examiner's

2    department, or is it data across various

3    agencies and entities?

4         A.    So it will include data from a broad

5    spectrum.  The main task is making it more

6    readily available to make it more realtime

7    as -- as it's possible.

8              And currently it sits and -- it

9    rests in different agencies under different

10   laws of, you know, availability and in a

11   variety of formats and programs.  And there's

12   no real common platform with which to share it

13   all on.

14             And so part of the task is -- is try

15   to come up with a solution that would allow at

16   least the people who are involved in addressing

17   the crisis to be able to have access to as

18   accurate and as near realtime data as possible.

19        Q.    And can you tell us what type of

20   data you will -- you're attempting to make

21   accessible and why it's important to have that

22   data as realtime as possible?

23        A.    So we're in the process of

24   identifying specific sources and specific data

25   streams that currently exist in what formats.

1    So we're kind of surveying the community.

2              Some of it includes obviously

3    emergency room visits.  The Ohio Department of

4    Health has a program called EpiCenter that is

5    supposed to track when people are admitted to

6    an emergency room for an overdose -- for an

7    opioid overdose.

8              Obviously all the local data on --

9    that's EMS.  So when they're out in the field,

10   if they administer Naloxone because of a

11   suspected overdose, there's a stream of data

12   there.

13             Oftentimes it's not done, again, in

14   realtime.  We get reports from the state's

15   database like a quarter after the fact.  And

16   it's only done at -- at the ZIP code level.

17             So trying to find more specificity

18   and, again, trying to get it in more realtime

19   would be available.

20   Q.    Can I just ask you -- and I don't

21   want -- I'm sorry.  I didn't mean to interrupt,

22   but I just want to see if I can just clarify.

23             What is kind of the -- the -- the

24   overarching theme, if you will, of the type of

25   data -- like you're not just trying collect all

Page 161

1    data ever created, right?

2              You're -- you know, when you say,

3    "We're trying to figure out the sources,"

4    what's the hypothesis?

5              What's the question you're trying to

6    ask as to where you would search for data?

7              MR. GALLUCCI:  Object to form.

8              BY MR. CHEFFO:

9    Q.    Do you understand my question?

10   A.    Yes.

11   Q.    Okay.

12   A.    So again, the way that the -- the

13   way that we operate now, while it's far, you

14   know, more nimble than it was say seven years

15   ago, it's still, you know, not always all in

16   realtime or as near realtime.

17             Because it -- as -- as an overdose

18   unfolds, as cases unfold, whether they're fatal

19   or nonfatal, information becomes available at

20   different points in time.  So there's a

21   continuum that needs to be followed.

22             A -- many different agencies touch

23   that continuum at different points.  And being

24   able to map that out in its completeness is --

25   will help inform, you know, what is available,

Page 162

1     what is important.

2              The overall -- again, aside from the

3     grant requirements, which -- you know, Case is

4     administrating -- Case Western Reserve is

5     administrating that grant.  And they would be

6     able to speak more specifically to the grant

7     outcomes.

8              But in addition to those

9     responsibilities, we're trying to build a

10    platform that will allow accurate, near

11    realtime data to inform all the responses that

12    need to take place when an overdose occurs in

13    Cuyahoga County --

14         Q.    And that --

15         A.    -- either fatal or nonfatal.

16         Q.    Okay.  And that -- that's what I'm

17    -- so is it -- it's -- it's a U.S. Attorney's

18    task force, but is it only for law enforcement

19    purposes or prosecution?

20              It sounds like it's broader than

21    that.

22         A.    It is.  So the -- the U.S.

23    Attorney's task force was set up initially very

24    broadly, understanding that this was a crisis

25    that needed to be addressed in a variety of

1      ways, in variety of areas of expertise.  Law

2      enforcement was one piece -- law enforcement

3      and prosecution, the health policy, the data,

4      prevention and education, the treatment and

5      recovery.

6              So bringing together, again, all

7      those professionals from a variety of

8      agencies -- and, in many cases, didn't have a

9      lot of contact with each other before -- before

10     then --

11         Q.    So -- so is --

12         A.    -- as important.

13         Q.    -- is the goal then of this data

14     collection -- or the -- or one of the goals to

15     try to get a broad spectrum of information that

16     will inform the activities of those variants --

17     components?

18              So in other words, if you get data

19     that tells you where there's a law enforcement

20     need, they could on it.  If you get the data,

21     and it might inform public policy or allocation

22     of resources, that's another area.  If you get

23     data that could help perhaps focus EMS's

24     activities, that would be useful.

25              Is that -- is that a fair

1     characterization?

2                    MR. GALLUCCI:  Object to form.

3                    THE WITNESS:  I think that's

4     certainly part of it.  Again, there are things

5     that the grant is going to ask to be done that

6     are longer term.  I -- so we have short-term

7     and long-term goals both.

8                    I think, in the immediate -- the

9     immediate need is in -- in the initial -- in

10    the initial response period after an overdose

11    occurs.  Again, it's slightly different when

12    there's a fatality, whether it happens in the

13    field or at a hospital.

14                   But being able to inform the

15    response is kind of the primary short-term goal

16    and to do that in a more near realtime way.

17                   We're also reaching out to all of

18    those other task force subcommittees to ask

19    them, you know, "You've been talking about this

20    for five years.  You know what data you have

21    now.  Where is it?  What do you want that you

22    don't have?  What do you have now that can be

23    improved on?"

24                   So kind of surveying all of those --

25    all those subcommittees about what their data

Page 165

1    needs may be and -- and to better inform us

2    about what exists and what improvements

3    they think --

4         Q.    So --

5         A.    -- need to be made.

6         Q.    -- so -- so currently what are

7    the -- the sources or database of information

8    that your committee that you chair has

9    identified as being subject to review or

10   mining?

11        A.    Well, that process is underway now.

12   So we don't -- we haven't compiled a complete

13   list yet.

14        Q.    Do you have any list?

15             Who's on the list currently?

16        A.    Well, as I said, so EpiCenter is the

17   database from the Board of Health.  The data

18   that the Medical Examiner's Office collects on

19   fatalities, especially at the scene -- we issue

20   a -- a text or an e-mail alert to certain

21   investigators in the community so that, when a

22   fatality occurs, and our investigator, either

23   by the report or when they get on scene, have

24   significant indications of -- of drug use,

25   we're able to inform the investigators to

Page 166

1    respond.

2              Previously, if we had a suspected

3    overdose, we would have to wait until some

4    toxicology had been done, at least the

5    preliminary toxicology, to give them some

6    indication about whether it was, you know,

7    related to drugs or not.

8              And they weren't always all that

9    obvious at the scene.  And so waiting for

10   toxicology would -- sometimes takes weeks.  And

11   in an investigative situation, time is kind of

12   the essence.

13             Again, the EMS run reports about

14   where they're going, when they're administering

15   Naloxone, where their -- where their pickup

16   was, where -- what hospitals they may have

17   taken them to.

18             Some of that data is important to be

19   able to inform maybe certain areas, like you

20   were saying, so you can stage EMS units in a

21   different way, that they'll be able to respond

22   quicker.

23             Because, especially in the field,

24   when there's an overdose, time, again, is of

25   the essence to be able to get there in time to

1      administer Naloxone.

2              We do take data from Project DAWN.

3      Project DAWN's run out of MetroHealth.  It

4      provides free Naloxone kits to be able to give

5      to people who have addictions so that they're

6      able -- and then they're trained on how to

7      using them so they're able to have the

8      antidote --

9           Q.     Uh-huh.

10          A.     -- close by.

11          Q.     What about OARRS?

12          A.     It's kind of a harm-reduction --

13          Q.     Sorry.

14          A.     -- a -- a harm-reduction method.

15                 OARRS is one.

16          Q.     And ADAMHS?

17          A.     So the ADAMHS Board provides

18     information about people who may have had

19     treatment.  That's more in a long-term -- a

20     longer-term review.  It's not -- the initial

21     response may not -- may not be better informed.

22     But it's possible, if they've have already got

23     somebody in the -- in their database, that they

24     can look up the histories.

25                 That might become more relevant as

Page 168

1     the quick response teams become more robust.

2     They're piloting that now.  So essentially,

3     when there's an overdose, the -- they're able

4     to send people out in the field with law

5     enforcement to do assessments, answer any

6     questions about treatment, and try to take

7     those people and put them into treatment when

8     they're -- when they're able to.

9              Some of the treatment facilities

10    have set aside beds specifically for this so

11    that there's not a long wait.  Again, the

12    longer you have to wait after an overdose

13    before you get treatment can have an impact on

14    your recovery.

15    Q.   So I think this was separate, but

16    tell me if I'm right.

17             You -- you -- we talked earlier

18    about certain analysis of data.  I think you

19    said it was 2012, '13, '14.  And then there was

20    a period of time where that was put on hold --

21    my words, not yours.  But essentially you

22    didn't continue it because of resource issues.

23             Is that -- did I get that right?

24    A.   So the -- the -- the issue became in

25    2016 the -- fentanyl kind of exploded on the --

1    on the county and doubled the number of total

2    deaths in the county.  So it did -- it did tax

3    the system, the Medical Examiner's Office.

4              So it was -- it was much more

5    difficult to do that in a timely basis.

6    Priorities became, you know, kind of our

7    day-to-day operations.

8         Q.    And but -- I'm sorry.

9              Were you done?

10        A.    Well, I -- it's just there is a

11   laundry list of things that needed to be

12   done --

13        Q.    Uh-huh.

14        A.    -- from basically the end of 2015

15   for the next three years or so.  Purchasing new

16   equipment.  Again, the crisis was evolving.

17   Fentanyl.  Fentanyl analogs.  Being able to

18   detect some of these drugs was -- you need a

19   standard in the laboratory --

20        Q.    Uh-huh.

21        A.    -- to be able to compare it to -- on

22   the GCMS --

23        Q.    Okay.

24        A.    -- the gas chromatographs that are

25   used to analyze substances.

1           Carfentanil.  That was another one

2     that basically couldn't be seen initially.  You

3     have to set the machines up with the standards

4     to be able to detect --

5           Q.    Uh-huh.

6           A.    -- in advance.

7           Q.    And I'm going to ask you some

8     specific questions about the processes?

9           A.    Sure.

10          Q.    But I'd just like to just -- from a

11    factual perspective, it sounds like at some

12    point recently or -- strike that.

13          At some point you were able to

14    resume activities in looking at data from 2016

15    to the present as you had done back in 2012,

16    '13, '14.

17          Is that fair?

18          A.    Yes.  That's kind of underway now.

19          Q.    When did that start up again?

20          A.    I mean we had started work on 2015's

21    data when, you know, we kind of got swamped in

22    2016.  There were some -- there were some

23    efforts underway in 2017 and '18.  We had some

24    public health students -- actually a public

25    health student helped with the initial reviews

1      as part of her work at -- at Case.  Kind of got

2      the ball rolling when we were doing poison

3      death reviews.  That continued in '17 and then

4      in '18.

5          Q.    So it didn't --

6          A.    To be --

7          Q.    -- stop; it just -- it was --

8          A.    It --

9          Q.    -- a slow process because you had

10     more cases?

11         A.    Yeah.  It slowed significantly.

12              And then, again, having extra hands

13     on deck made it, again, feasible to kind of

14     continue at a -- at a quicker pace.

15         Q.    And now you're back up to where you

16     want to be?

17         A.    I would say that we're getting

18     close.  If we are able to get out, you know,

19     later this year, '15, '16 and '17 data.  We'll

20     have to start work on last year's data when all

21     the cases are finally ruled on.

22              And we're trying to set up a system

23     where these kind of reviews happen as we go in

24     2019, so it's kind of a dual track, so that we

25     don't ever get to the point where we're --

1    we're having to play catch-up.

2         Q.    Is the goal to -- to wait an hold

3    '15, '16 and '17 until they're all done; or are

4    you going to produced them to the public or put

5    them on your web site after each year is done?

6         A.    Well, they're -- they're kind of

7    being done -- some work, as I think I mentioned

8    previously, we had done snapshots of like

9    February of 2017.  So some of that data was

10   collected the -- I think the -- the one project

11   focused only on fentanyl and not the rest of

12   the opiates.  So we have to go back and get

13   those.

14         So we have chunks of information in

15   each year.  I think we did a comparison of the

16   first trimester of '15 and '16 as we were going

17   through 2016.  So I think they'll all be

18   completed around the same time.  I'm not sure,

19   you know, exactly where we are with each year.

20   I --

21         Q.    Is there any --

22         A.    I'd have to --

23         Q.    -- reason why --

24         A.    -- go and check.

25         Q.    -- you wouldn't just finish '15,

1    since it's old, and get that done?

2         A.    Well, it's more, at this point, a

3    matter of -- the data's collected.  It's

4    putting it -- we developed a new database so

5    that we can do this kind of in realtime, like I

6    said, for the 2019 cases.  But we're putting

7    all the old data in.

8         Q.    Uh-huh.

9         A.    So it's not a matter of collecting

10   the data.  It's more of the analysis.  And

11   then, like I said, we already have kind of big

12   chunks of '16 and '17.  I just don't know

13   specifically what's being worked on at the

14   moment.

15        Q.    Do you have a time frame as to when

16   '15, '16and '17 will be produced?

17        A.    I think I said sometime later this

18   year.  I'm -- I'm hoping mid year maybe.  But

19   it may be delayed.  I don't know.

20        Q.    Is any factor that the data may not

21   help the litigation?

22              Is that a factor that's being

23   considered?

24              MR. GALLUCCI:  Object to form.

25              THE WITNESS:  Not in our office, no.

Page 174

1           BY MR. CHEFFO:

2       Q.    You're not aware of any discussions

3     about the impact of the litigation and timing?

4               MR. GALLUCCI:  Object --

5               THE WITNESS:  No.

6               MR. GALLUCCI:  -- to form.

7               BY MR. CHEFFO:

8       Q.    So it's your testimony it's just a

9     -- a -- it's just been a resource issue, but

10    you feel like you're at a point where that data

11    should be produced in the next three, four,

12    five months?

13              MR. GALLUCCI:  Objection.

14              THE WITNESS:  I would say mid year

15    is kind of our -- our target right now, but...

16              BY MR. CHEFFO:

17      Q.    In -- let me just ask you some --

18    some broad questions.  You -- you obviously

19    have a very detailed knowledge of a lot of this

20    being around it.

21              But first question is I looked

22    through some of the annual reports, and it's

23    got a lot of information and data, right,

24    broken out into -- into a lot of different

25    ways.

Page 175

1              But I wasn't able to find -- and

2     maybe because I missed it.

3              But is there anywhere that shows the

4     overall kind of workload going back five or ten

5     years, not just specific to accidents or

6     homicides, but basically, you know, something

7     that says here's how many deaths, here's how

8     many that we took in our department, and here's

9     how many autopsies?

10        A.    Overall caseloads?

11        Q.    Right.

12        A.    That -- that data is in the stat --

13    stat books, yeah.

14        Q.    Okay.  I'm going to probably put it

15    in front of you, and you probably could find it

16    easier than I am.

17              But is -- is your sense of overall

18    caseloads, what -- what has that been for the

19    last ten years?

20              In other words, have they been --

21    has the line looked pretty straight?  Has there

22    been a dramatic uptick or downtick?

23        A.    My focus obviously has been in the

24    last seven years since I've been there.  It's

25    definitely been on a steady uptick with some

Page 176

1      dramatic changes, especially in 2016.

2              I would have to go back and look

3      previously.

4          Q.    Of overall cases?

5          A.    Yes.

6          Q.    And does that include autopsies?

7          A.    So it will.  Not every case that

8      gets reported to the Medical Examiner's Office

9      is a case that we accept jurisdiction on.  We

10     have statutory kind of outlines that tell what

11     is and is not a jurisdictional case.

12              Every case that we do accept

13     jurisdiction on, they don't necessarily get

14     autopsied.  So you'll probably have a number in

15     there of jurisdictional cases and then

16     autopsies.  The autopsies are a subset of the

17     jurisdictional cases.

18         Q.    Okay.  And I think I understand, but

19     so the record is clear.

20              It sounds like a case is when

21     someone dies in the jurisdiction, right?

22              Is that what --

23         A.    So I apologize.  I probably

24     shouldn't have used that word.

25              So jurisdictional doesn't

1    necessarily mean geographic.  All of our cases

2    are -- all of our -- what we determine as cases

3    under the jurisdiction of the Medical

4    Examiner's Office are determine by statute.

5              Violence, trauma, when -- you know,

6    obviously children, those cases are all

7    mandatorily reportable to our office.

8              And then to determine whether or not

9    the office accepts jurisdiction is determined

10   on previous medical care, whether or not

11   there's a doctor or -- that has been treating a

12   parent and who's willing to sign a death

13   certificate.  Or simply if -- you know, if it's

14   a homicide, it comes.  It doesn't matter.

15   Suicide --

16        Q.    Right.

17        A.    -- are the same way.  Now drug

18   overdoses, falls.

19              So that's what I meant by

20   jurisdiction.

21        Q.    Okay.

22        A.    All the cases that we do accept

23   jurisdiction of are within the jurisdiction of

24   Cuyahoga County.

25        Q.    Understood.  And thanks for that --

1          A.    Did it --

2          Q.    -- clarification.

3                So -- yeah.  So just to -- to

4     restate it because I think I understand.

5                So there -- not every death is

6     within your jurisdiction, but there are certain

7     cases that are technically within your

8     jurisdiction, of which you don't assume -- you

9     don't take the case.

10               Like, for example, it might be a

11    situation where someone who's 95 years old, who

12    passes away in a hospital, and the attending

13    doctor is willing to sign, you know, the death

14    certificate, and there's no question about

15    improper or unfair play, right?

16               That might be one where you might

17    have jurisdiction, but you don't take the case;

18    is --

19         A.    Correct.

20         Q.    Is that right?

21               And then, of -- of the subset of

22    cases that you take the case, a determination

23    is made based on the circumstances about

24    whether you're going to do an autopsy.

25         A.    Correct.

1      Q.    Okay.  And for the last -- let's --
2    let's use seven years, you know, since -- I
3    don't want to be unfair and ask you about stuff
4    before your time.
5            For the last seven years, what does
6    the line look like of cases for which you --
7    you took, where you took the case where you had
8    jurisdiction?
9      A.    It's, like I said, a steady kind of
10   increase year to year with kind of a
11   substantial jump in 2016 and '17.  And then,
12   you know, it's kind of leveled off since then.
13     Q.    Well, has it leveled off or
14   substantially dropped in '18?
15     A.    The cases in jurisdiction I'm --
16   we're still compiling, you know, the 2018 data.
17   So -- I know that there's a -- there's a drop.
18   I'm just not sure how big it's going to be yet.
19     Q.    Didn't you do a press release on
20   this like a few weeks ago?
21     A.    I don't believe so.  We did a --
22     Q.    No press conference about a
23   20-something percent drop?
24     A.    Of our overall caseloads?
25     Q.    Am I getting that -- did you do a

Page 180

1      press release on -- on drop, or was that only

2      related to overdose deaths?

3          A.    That was -- yeah.  That was related

4      specifically to the overdose deaths,

5      opioid-related.

6          Q.    And what was -- what was the sum and

7      substance of the -- of the press release in

8      terms of the statistics?

9              MR. GALLUCCI:  Object to form.

10             THE WITNESS:  That not all the cases

11     are ruled on.  So this is preliminary data.  We

12     have indications that there is a significant

13     drop in overall drug deaths in 2018 as well as

14     opioid-related deaths to the tune of maybe 20

15     percent, yes.

16         Q.    And -- and did -- was there any

17     reason or factors that were cited as to -- as

18     the basis of those -- of that drop?

19         A.    If I remember correctly, there were

20     -- there was no one specific thing that anyone

21     pointed to.  I believe that there were a number

22     -- you know, the ongoing efforts of a number of

23     agencies contributed.

24         Q.    Was that in -- I don't recall the

25     press release.  I think it was referenced.

                                              Page 181

1              But was it in the press release?

2              Can I go look at -- are the factors

3      articulated, or do you have knowledge outside

4      the press release as to what the department

5      determined were the factors that were at least

6      partially responsible for the drop?

7          A.    I believe there were some bullet

8      points that were included.  I would have to go

9      back and get the press release to enumerate

10     them specifically.

11             I think the one thing that we did

12     determine was that there was a noticeable

13     absence of carfentanil in the second half of

14     2018.  Carfentanil had driven a lot of deaths

15     in 2017 over the summer, almost 200.

16             That drug basically vanished from

17     the local supply I believe after June 1st of

18     last year.  So that was a significant drop.

19         Q.    Okay.

20         A.    I would have to go back and look at

21     some of the others.  I know that that was one

22     that they had determined was probably --  and

23     that -- that was due in some part to the DEA's

24     efforts in China, getting the Chinese to

25     regulate carfentanil, which had not been done

                                                  Page 182

1        previous to that.  And I think they set up an

2        office, the DEA did, in China to help with

3        interdictions.

4                  A lot of it was shipped by mail.

5        And the senate had -- Senator Portman here from

6        Ohio had sponsored a stop bill, which was

7        helping get technology into -- into postal

8        facilities to try to detect drugs before they

9        got out into the -- kind of the flow of the

10       mail system.

11           Q.    And these were -- these were

12       largely, if not exclusively, illegal sales,

13       right?

14                  It wasn't someone doing an online

15       prescription service.

16           A.    Not a prescription service, no.  A

17       lot of this was orderable in the dark net

18       online.  But yeah, I...

19           Q.    Now --

20                  MR. CHEFFO:  Can we mark one of

21       these?

22                  BY MR. CHEFFO:

23           Q.    What -- what -- what would help you

24       -- I have these -- like a 2017 thick kind of

25       Cuyahona [sic] County -- Cuyahoga County

Page 183

1    report.

2              Is -- is that where you could tell

3    year over year look-back as to what the number

4    of cases?

5        A.    If -- if I see it, yeah, I can

6    probably --

7        Q.    Okay.  We'll mark that in a minute.

8    We'll come back to it.  I just want to give you

9    what, you know --

10       A.    Sure.

11       Q.    -- would be fair that -- so you're

12   not memorizing, you know, numbers that you

13   probably don't know.

14             But before that, let me just ask you

15   a -- a few questions about budgets.

16             Do you have responsibilities for the

17   budget in the department in some respects?

18       A.    I do.

19       Q.    And what is -- what are your

20   responsibilities?

21       A.    Well, I with work with the budget

22   office to set, you know, kind of that biannual

23   budget.  We look back at kind of past spending,

24   past needs to determine if that's a trend

25   that's going to continue, is it going to

Page 184

1       increase, is it going to decrease.

2               We have to respond at times when

3       there are requests for budget cuts.  And there

4       are times when we have to determine if there

5       are needs outside of our -- what they give us

6       as kind of the starting budget, the baseline.

7       If there are going to be needs that were not

8       contacted for at the beginning of the budget

9       process.

10              Again, biannual budget means it's a

11      two-year cycle.  Obviously things change over

12      24 months.  And so we'll do a review at

13      midyear, make adjustments, things like that,

14      make requests.

15          Q.    So is -- when you say the budget

16      office, is that an office of the -- the county,

17      or is that an office within your own

18      department?

19          A.    No.  That's Cuyahoga County's office

20      of budget and management.

21          Q.    Okay.  And?

22          A.    Or budget and management.  I --

23          Q.    And of -- of the funding for the

24      office, the department -- I -- I can use those

25      interchangeable, right?

Page 185

1              A.     Yes.

2              Q.     Okay.  Of the funding that the

3       office of the medical examiner receives, does

4       it all come from the county, or does it come

5       from other sources, including federal grants or

6       something else?

7                      MR. GALLUCCI:  Object to form.

8                      THE WITNESS:  There are other source

9       outside of the general fund at Cuyahoga County.

10                     BY MR. CHEFFO:

11             Q.     Okay.  So tell us what percentage of

12      the funding for the work that's done by the

13      Office of the Medical Examiner comes from the

14      county.

15             A.     So our budget is broken up into

16      three pots essentially.  So our general

17      operating budget is all general fund, and its

18      funded fully by the -- the county.  It accounts

19      for about half of the operation, maybe

20      $6 million or so.

21                     The forensic lab gets general fund

22      money as well, but we also have other sources

23      coming in.  Some of that is intergovernmental

24      agreements to do testing, forensic testing,

25      specifically with the City of Cleveland.

Page 186

1            The grants are kind of kept
2      separate.  They're administered by the
3      Department of Public Safety and Justice
4      Services.  Because they have a grant writing
5      team that -- that we work with.  So that's not
6      technically on our budget, but it's fund that
7      we have available to us.
8            The DNA backlog grant, for instance,
9      Coverdell, allows us to buy equipment.  It
10     allows us to buy supplies.  The DNA grant
11     specifically is to make sure that we don't get
12     too far behind with a -- a large backlog of
13     cases.
14        Q.    Uh-huh.
15            And can I just ask -- if you could
16     just help us differentiate.
17            Is -- you talked about the two
18     separate ones.  Your general operate for the
19     medical examiner.  Then there's the forensic
20     lab.
21            Does the forensic lab have any
22     interaction in connection with drug overdose
23     cases?
24            Because if it doesn't, I may not
25     want to ask you as much about those questions.

Page 187

1          A.     Yeah, they do.

2          Q.     What do they -- is that in the

3     toxicology area?

4          A.     So toxicology is one.  The drug

5     chemistry laboratory is another.  DNA actually

6     has a role to play.  There have been, as the

7     crisis has grown, more and more requests for

8     DNA on drug packaging.  Same with fingerprints.

9               There are associated crimes, more

10    drug trafficking, more violence, more

11    homicides, more gun deaths.  So the firearms

12    unit is impacted as well.

13              In essence, we've seen just a

14    general rise in caseloads across most of the

15    forensic laboratories.

16         Q.     And the -- the DNA on the packaging

17    I take it is to try and identify a fingerprint

18    or some other type of DNA source so they can

19    figure out who handled the packaging, perhaps

20    sold it or prepared it?

21              MR. GALLUCCI:  Object to form.

22              THE WITNESS:  Sorry.

23              So fingerprinting is separate from

24    DNA.

25              MR. CHEFFO:  Okay.

Page 188

1              THE WITNESS:  It's usually DNA

2      because it's more specific.  If it -- if it's

3      there, it's there.  And -- and they're able to

4      create the profiles and -- and upload them into

5      the databases to check.

6              BY MR. CHEFFO:

7          Q.    Right.

8              But --

9          A.    But --

10         Q.    -- the point is, right, to try and

11     find out who was involved in the chain of

12     this -- if it's an illegal drug, finding out if

13     they could identify the person through DNA?

14         A.    Right.  That's what I was getting

15     to.  So there's a -- there's a federal database

16     that collects these profiles.  And we're able

17     to match them with any known profiles that are

18     in those databases.

19         Q.    And what happens if there's a

20     positive detection of DNA, for example, on drug

21     packaging that was found at the scene of an

22     overdose death?

23         A.    Those reports will go to the

24     investigating agencies for their use.

25         Q.    Okay.  And so let's -- let's -- I

1    just want to see if we can, big picture, do

2    funding, if there's other documents that are

3    more specific.  I think some of them have been

4    produced.  But let's see if I can get a big

5    picture.

6              So drug lab is one aspect.

7              And you have a $6 million -- or --

8    or I'm sorry.  It sounds like you have about a

9    $12 million budget for what?

10             What's the other half?

11        A.   So -- and that's what I was getting

12   at.  So I talked about the general operating

13   budget, the forensic lab budget.

14             We also have what we call the

15   medical examiner's lab fund.  That's a

16   statutory creation.  It's mainly funded through

17   work that we do for other jurisdictions,

18   autopsy work for surrounding counties, where we

19   have the facilities and the resources that

20   other smaller jurisdictions may not have.  When

21   they have a need, we'll do those -- we'll do

22   those autopsies on their behalf.

23             That -- that money goes into that

24   fund in case we need to replace equipment as

25   well.

Page 190

1      Q.    So is that a profit center when you
2    do autopsies for other counties?
3      A.    No.
4      Q.    Is that --
5      A.    Statutorily we're not allowed to
6    charge more than what it costs.  And in many
7    cases, we're not charging, I believe, the true
8    costs.
9           Basically because these smaller
10   jurisdictions are cash strapped as well.  And
11   the crisis is affect everybody, but smaller
12   jurisdictions to a greater extent.  And we've
13   tried to be helpful --
14     Q.    Right.
15           So --
16     A.    -- to them.
17     Q.    So when you -- when you don't do an
18   autopsy for a smaller jurisdiction -- and I
19   know you probably don't look at it this likely.
20           But if you're looking at it from
21   just an economic perspective, that's actually a
22   net benefit economically, right, because it
23   actually costs you more to do it, and under the
24   statute you can't make a profit, right?
25           MR. GALLUCCI:  Object to form.

```
 1              THE WITNESS:  I'm not sure that
 2      that's the way it would be characterized.
 3              BY MR. CHEFFO:
 4      Q.    Well --
 5      A.    -- I think we're --
 6      Q.    -- let's break it down.
 7      A.    -- at least at a -- at a -- at a net
 8      neutral --
 9      Q.    Okay.
10              So -- but --
11      A.    -- situation.
12      Q.    A net neutral.
13              So if you -- which means, under the
14      statute, you can't make a profit.
15              So it's not a loss, right?
16              In other words, if you -- if you do
17      them as an accommodation to the other counties,
18      then you overall view that as getting back your
19      costs and expenses.
20              But if you don't do them, you don't
21      lose anything, right, because you're only
22      charging for your costs and expenses under the
23      statute, right?
24              MR. GALLUCCI:  Object to form.
25              THE WITNESS:  So if we are not doing
```

```
                                          Page 192
 1      overdose autopsies for say Lake County, right,
 2      it doesn't cost us anything more not to do
 3      them.
 4                But I'm not sure that it's an
 5      economic net gain.
 6                BY MR. CHEFFO:
 7           Q.    Well, just --
 8           A.    It's certainly --
 9           Q.    Let's look at it --
10           A.    It's certainly not a loss, right?
11      That's why I say it's kind of neutral.
12           Q.    It's neutral, right, at -- at best,
13      right?
14                I mean, in other words, if -- if --
15      if I go and buy a sandwich and I pay $3 that
16      day, right, and it costs me $3 for the
17      sandwich; if I don't buy the sandwich the next
18      day, I don't get the sandwich, and I don't lose
19      the money, right?
20                Because, in other words, you --
21      you've set a -- a cost that -- for these people
22      that's supposed to be coordinate, right --
23           A.    Uh-huh.
24           Q.    -- with what it actually costs you
25      to do it.  So you're not losing any money if
```

Page 193

1       you don't do it.

2           A.    Right.

3                 MR. GALLUCCI:  Object to form.

4                 BY MR. CHEFFO:

5           Q.    Right?

6           A.    I guess that's -- I just have -- a

7       lot of it's embedded in the resources that

8       we've already put into building the facility,

9       having the equipment, things like that.  So,

10      you know, it's more people's time.

11          Q.    Uh-huh.

12                But -- but you --

13          A.    But I think that's a fair

14      characterization.

15          Q.    Okay.  I mean you don't look at it

16      as a -- as a profit center.

17          A.    No.  For sure.  That's not the case.

18          Q.    When you have done any of the

19      analysis that you've talked about in connection

20      with the 2015 to 2017, '18 data, has there been

21      any input whatsoever by any lawyer?

22          A.    Any lawyer?  I mean I believe we

23      had -- in early parts of the poison death

24      review, we had someone from the prosecutor's

25      office in the room.

1          Q.    Okay.  Other than -- other than a --
2     a -- a prosecutor, any outside lawyer? any
3     lawyer for the county?
4          A.    No.  Not to -- not to my knowledge.
5     Not -- not in the analysis work that we've
6     done.
7          Q.    Before any of the -- the reports --
8     the -- the annual reports go up on the web
9     site, are they reviewed by any law department
10    that you know of?
11         A.    Not the law department, no.
12         Q.    Any lawyers?
13         A.    Not that I'm aware of.
14         Q.    In -- for let's say 2018, have you
15    tried to break out what cause are specific --
16    what costs are specifically associated with
17    overdose deaths; or is that something that's
18    part of your overall budget and operations?
19         A.    I believe we tried to embed that
20    into the overall budget as best we could.
21    Again, with 2018 having just finished, I
22    haven't even seen the final analysis from OBM
23    about how our budget ended up.  So I -- I'm
24    still waiting.  That probably won't be done
25    until the first quarter -- end of the first

Page 195

1    quarter.

2         Q.    So in any years -- in your seven

3    years, have you ride to break out what specific

4    costs above and beyond what your normal

5    operations would be are attributable to

6    overdose deaths?

7         A.    Yes, we have.

8         Q.    When did you do that?

9         A.    I believe we've done a couple of

10   memos.  We did an initial one and then a couple

11   of updates, budget presentation purposes.  Any

12   identified personnel, equipment that was

13   needed, more testing supplies as best we could

14   track it.  There have been a couple at least.

15        Q.    Why'd you do that?

16        A.    Mainly because we had to justify any

17   of the requests that we were putting through

18   for additional funding.  And resources are

19   tight in county government already.

20             We certainly noticed that we had,

21   you know, started to run low on supplies.  We

22   -- we had to order more often.  Certain --

23   certain things that are required in the

24   forensic labs have shelf life.  So you can't

25   just buy in bulk and stock it on a shelf for a

Page 196

1    whole year.

2            So we just kind of noticed that

3    there were like more orders coming in.  This

4    was, you know, probably like 2015 when we

5    started noticing those kind of things.  It

6    obviously got exacerbated in 2016 and '17.

7        Q.    And -- and, if you can, just --

8    maybe just macro, the bigger budgets of the

9    whole office, right, what your approximate

10   annual budget is, what percentage of it comes

11   from the county, what from grants, and one from

12   other contributions, for example, drug or DNA

13   testing.

14           Just what are -- what are the

15   buckets that ultimately go into your -- the

16   buckets of sources that go into your -- your --

17   your budget funding?

18           MR. GALLUCCI:  Object to form.

19           THE WITNESS:  So that's -- again,

20   the bulk will be coming from the general fund.

21           BY MR. CHEFFO:

22       Q.    What percentage?

23       A.    Well, are we talking about this

24   latest budget?

25           It's changed over the years, so

Page 197

1     I'm -- just want to make sure I'm --

2         Q.    Well --

3         A.    -- getting it right.

4         Q.    -- we can start wherever you --

5     whatever's most top of mind.

6         A.    So when -- 2011, when I came to the

7     Medical Examiner's Office and Dr. Gilson

8     arrived, I believe the budget for that year in

9     aggregate was just under $9 million.

10            This last budget, I believe we

11    started somewhere around 12 and a half, maybe

12    12.7.  Again I don't have the final 2018 budget

13    to know where we actually ended up.

14            So over that period of time, it's

15    grown, you know, about -- by a third, which is

16    significant.  Some of that was planned because

17    the forensic lab, as it exists today, didn't

18    exist when we first got there.  That is a

19    project that we undertook, you know -- I think

20    2013 is when we started in earnest.

21            And that also included adding new

22    laboratories, new personal, new equipment,

23    things like that.  That accounts for some of

24    the increase.

25            We certainly noticed that there was

                                        Page 198

1    more, you know, expenses coming out than --
2    than we were tracking.  And that's kind of why
3    we tried to see if we could identify specifics
4    in these memos regarding the opioid crisis.
5             I would say, if our budget is about
6    12.7 this year, we'll have about 80 percent
7    general fund.  And then, as I said, the -- the
8    grants that we get are not on our budget.  So
9    that would be in addition to our -- our written
10   budget total, you know, the -- the 12.7 number,
11   if that's what it is for '18.
12        Q.    Was -- was it 80 percent in -- seven
13   years ago?
14             In other words, has the contribution
15   of the -- the county been relatively --
16        A.    It may have been --
17        Q.    -- steady?
18        A.    -- a little bit higher.  I would
19   have to go back and -- and really check the
20   numbers.
21        Q.    So it's actually, you think,
22   dropped?
23        A.    Well, I think, as a percentage, on
24   aggregate, general fund contribution has
25   definitely increased.  I think we've tried to

Page 199

1       identify other sources as we can to deal with

2       -- deal with the needs of the office.

3               As then --

4       Q.     And as --

5       A.     -- I've said --

6       Q.     Sorry.

7       A.     -- as -- as the crisis has kind of

8       grown, we've gotten more requests from outside

9       agencies.  So while maybe we weren't charging

10      absolutely cost, we doubled the number of cases

11      that we were handling for other counties.

12              I think, when we first got there, it

13      was under 200.  Last year it was, you know,

14      over 400.  So those -- those -- the numbers

15      everything goes into the -- what I call the

16      medical examiner's lab.  So that's --

17      Q.     Right.

18      A.     -- an increase in -- in overall

19      revenue for that particular part of the budget.

20      Q.     But the 400 you're being compensated

21      for if you're -- if they're outside the county,

22      right?

23      A.     That's what I mean.  That -- so

24      that's additional -- right.  It's an additional

25      revenue source that we did not have seven years

Page 200

1    ago.  Because it --
2         Q.    So it's a wash --
3         A.    -- it doubled.
4         Q.    -- right?
5              The cost is -- whatever your budget
6    needs are -- you get back because it's a
7    revenue source under the statue, right?
8         A.    Understood.  But it still gets
9    calculated in our --
10        Q.    Uh-huh.
11        A.    -- in our budget as additional
12   revenue.
13        Q.    Okay.
14        A.    But we --
15        Q.    But also -- you mentioned that there
16   was the creation of the -- the crime lab -- the
17   forensic lab.  Excuse me.
18             That didn't -- that wasn't an
19   outgrowth of the opioid crisis, was it?
20        A.    No.  That was actually a planning
21   process that predated Dr. Gilson and myself.
22   There was actually nontax dollars set aside for
23   construction and equipment.  But we had to pick
24   up additional personnel.  And then obviously
25   the supplies to run those new laboratories on a

Page 201

1     day-to-day basis.

2          Q.     And of the 12 and a half -- so there

3     was an increase, you said, over the seven

4     years, but some portion of it was attributable

5     to the crime -- to the forensic lab, right?

6          A.     Correct.

7          Q.     How much of that?

8          A.     I -- I would have to look at the

9     specific numbers.  It's --

10         Q.     Roughly?

11                MR. GALLUCCI:  Object to form.

12                BY MR. CHEFFO:

13         Q.     Is it a million dollars a year?

14                MR. GALLUCCI:  Object to form.

15                THE WITNESS:  Perhaps.  It's -- like

16    I said, it -- it would help for me to see the

17    budgets over the years.

18                BY MR. CHEFFO:

19         Q.     What -- what would you look at?

20         A.     Well, just to be able to have the

21    numbers in front of me and what was attributed

22    to say personnel, that we do have like specific

23    line items for --

24         Q.     Uh-huh.

25         A.     -- equipment and contracts and

Page 202

1     things like that.
2            Q.    Yeah.   That was a bad question.
3                  I was just -- there's a -- there's
4     an overall printout of a budget that you would
5     look at, and you could then figure out how much
6     was attributable to a various area --
7            A.    In a --
8            Q.    Right?
9            A.    -- rough way, yes --
10           Q.    Okay.
11           A.    -- I can.
12           Q.    Have you ever tried to figure out
13    how much is associated with the cocaine
14    epidemic?
15                 MR. GALLUCCI:  Object to form --
16                 BY MR. CHEFFO:
17           Q.    -- or crisis here?
18                 MR. GALLUCCI:  Object to form.
19                 THE WITNESS:  So the -- so the --
20    the upswing in the number of cocaine-related
21    deaths is tied almost directly to the upswing
22    in fentanyl deaths.   The cocaine supply has
23    been largely adulterated with cocaine [sic].
24                 BY MR. CHEFFO:
25           Q.    But I'm talking about -- let's

Page 203

1      assume -- I mean let -- that's in -- I think

2      you testified in the last year or so, right?

3                  But there's -- and I can show you a

4      chart if you want.  I'm sure you've seen it.

5                  Cocaine has been historically a very

6      significant driver of overdose deaths for the

7      last ten years in Cuyahoga, right?

8                  MR. GALLUCCI:  Object to form.

9                  THE WITNESS:  It has been one of the

10     more prevalent drugs, but it's been fairly

11     steady.

12                  BY MR. CHEFFO:

13          Q.    I understand.

14          A.    But it's -- it's --

15          Q.    I -- I understand.

16                  MR. GALLUCCI:  Well, let's let him

17     finish --

18                  MR. CHEFFO:  Yeah.

19                  MR. GALLUCCI:  -- his answer.

20                  MR. CHEFFO:  Okay.

21                  BY MR. CHEFFO:

22          Q.    I mean it's steady, but it's

23     still -- you -- you --

24                  MR. GALLUCCI:  Okay.  But you said,

25     "Okay," and then you started talking.

1              Can he finish his answer?

2              MR. CHEFFO:  Oh, I thought he did.

3              BY MR. CHEFFO:

4       Q.    Did you finish?

5       A.    That's fine.  I -- I -- it -- it has

6    been fairly steady over the last decade, yes.

7       Q.    It's been steady, but it's been

8    significant, in -- in fact, either the first or

9    second most common drug of overdoses, right?

10             MR. GALLUCCI:  Object to form.

11             THE WITNESS:  It had been I think

12   prior to 2013, yes.

13             BY MR. CHEFFO:

14      Q.    Okay.  And it's -- it's -- your --

15   your recollection is it's remained steady,

16   right?

17      A.    So cocaine unadulterated with

18   fentanyl has been fairly steady, yes.

19      Q.    Have you tried to break out how much

20   your office has expended on cocaine-related

21   activities?

22             MR. GALLUCCI:  Object to form.

23             THE WITNESS:  Not as of yet, no.

24             BY MR. CHEFFO:

25      Q.    Is there a plan to do it?

1                    MR. GALLUCCI:  Object to form.

2                    THE WITNESS:  Not currently that I'm

3         aware of.

4                    BY MR. CHEFFO:

5         Q.    Has anyone ever done it?

6                    MR. GALLUCCI:  Object to form.

7                    THE WITNESS:  I don't know.  Not in

8         our office.

9                    BY MR. CHEFFO:

10        Q.    And you -- you've testified that

11        there -- there was a rescinded spike in

12        cocaine-related deaths.  I think you said

13        because there was a infusion or combination of

14        the cocaine with fentanyl.

15                   Is that your understanding?

16        A.    Correct.

17        Q.    And is that a situation where

18        people, is it your understanding, intend to

19        actually use cocaine laced with fentanyl; or is

20        it something where the drug cartels or the drug

21        dealers are using fentanyl to boost the -- the

22        cocaine?

23                   MR. GALLUCCI:  Object to form.

24                   THE WITNESS:  I think there are a

25        lot of possibilities in there.  Some -- some

1      people seek fentanyl.  Some people seek

2      cocaine.  Sometimes street drugs you can't be

3      sure what you're getting.  So there's a lot of

4      possibilities, yes.

5                  BY MR. CHEFFO:

6           Q.    In -- in your work, though,

7      you've -- you've heard that the law enforcement

8      people -- this is a focus of theirs, right, in

9      the last few years?

10                 MR. GALLUCCI:  Object to form.

11                 THE WITNESS:  What is their focus?

12                 BY MR. CHEFFO:

13          Q.    The -- the increase in cocaine laced

14     with fentanyl?

15          A.    Yes.

16          Q.    And have you seen statements or

17     reports that it's an effort by the drug cartels

18     to actually lace the cocaine in order to target

19     the African-American population?

20          A.    Yes.

21          Q.    That's something that's the position

22     of the county, right?

23                 MR. GALLUCCI:  Object to form.

24                 This is not a 30(b)(6) deposition.

25     He can't speak as to position of the county.

1          BY MR. CHEFFO:

2      Q.    Has the county taken a position, to

3    the extent you're aware?

4      A.    The --

5          MR. GALLUCCI:  Object to form.

6          THE WITNESS:  The task force has --

7    has definitely made that its position.  I don't

8    know that the county, in particular, has.  I

9    know that it's been stated by myself and Dr.

10   Gilson in presentations that -- that that was a

11   strategy, yes.

12         BY MR. CHEFFO:

13     Q.    And you wouldn't state it unless you

14   believed it, right?

15     A.    I believe --

16         MR. GALLUCCI:  Object to form.

17         THE WITNESS:  -- it, yes.

18         BY MR. CHEFFO:

19     Q.    And the strategy is that the drug

20   cartels unknowingly are putting a dangerous

21   substance, fentanyl, into cocaine in order to

22   essentially increase the potency and perhaps

23   increase addiction amongst the people who are

24   using the cocaine; is that right?

25         MR. GALLUCCI:  Object to form.

```
 1              THE WITNESS:  It's -- it's hard for
 2     me to say what the cartels' intentions are.
 3              What we've been told from a variety
 4     of sources, law enforcement among them, is that
 5     including fentanyl in cocaine was a strategy to
 6     get a new segment of the market that had kind
 7     of been steered away from opiates and heroin.
 8              BY MR. CHEFFO:
 9        Q.    And I'm not trying to quibble with
10     you, sir, but -- right.
11              By saying it's a strategy, isn't
12     that the same thing as saying it was an
13     intention or an effort by the cartels to hook
14     people or increase the potency of cocaine?
15              MR. GALLUCCI:  Object to form.
16              THE WITNESS:  So again, not being a
17     scientist, I'm not sure that characterizing
18     adding fentanyl to cocaine as strengthening it.
19     It's --
20              MR. CHEFFO:  Okay.
21              THE WITNESS:  These drugs work in
22     kind of opposite ways.  And that's --
23              MR. CHEFFO:  Uh-huh.
24              THE WITNESS:  -- why people who are
25     expecting cocaine and get the mix die, or vice
```

```
 1      versa, people who are seeking out fentanyl and
 2      get infusions of cocaine instead.
 3                   So I'm not -- I'm not sure that --
 4                   MR. CHEFFO:  Okay.
 5                   THE WITNESS:  -- that's a correct
 6      characterization.
 7                   The other --
 8                   BY MR. CHEFFO:
 9           Q.     Let me --
10           A.     -- part of --
11           Q.     I'm sorry?
12           A.     -- your statement --
13           Q.     You go ahead.
14           A.     -- I would say that -- that's the
15      intention there, the strategy.
16           Q.     Let me ask you a better question.
17                   What do you think the strategy is,
18      as you understand it --
19                   MR. GALLUCCI:  Object to form.
20                   BY MR. CHEFFO:
21           Q.     -- of the cartels?
22                   MR. GALLUCCI:  Object to form.
23                   THE WITNESS:  To increase the
24      current share of the market with people who are
25      addicted to opiates and opioids.
```

Page 210

1          BY MR. CHEFFO:
2      Q.    But what is their strategy in -- in
3    putting -- lacing cocaine with fentanyl?
4              MR. GALLUCCI:  Object to form.
5              THE WITNESS:  Well, if it doesn't
6    kill the person, then they're now addicted to
7    opioids instead, and they'll start seeking
8    opiates and opioids out.
9              BY MR. CHEFFO:
10     Q.    And have you said it -- said
11   publicly or Dr. Gilson that, you know, a
12   substantial portion of the people who are
13   buying cocaine are not aware of the fentanyl?
14             MR. GALLUCCI:  Object to form.
15             THE WITNESS:  They may not be aware.
16             BY MR. CHEFFO:
17     Q.    And if a -- and this is largely
18   activity, you understand, from the drug
19   cartels?
20             MR. GALLUCCI:  Object to form.
21             THE WITNESS:  That's what we've been
22   informed, yes, by --
23             BY MR. CHEFFO:
24     Q.    By --
25     A.    -- partners.

Page 211

1        Q.    -- law enforcement, right?

2        A.    Among others, yes.

3        Q.    And these are drug cartels that are

4    based outside the United States largely?

5              MR. GALLUCCI:  Object to form.

6              THE WITNESS:  I'm not sure based.

7    I'm -- they have operations throughout the

8    United States, so...

9              BY MR. CHEFFO:

10       Q.    Well, where -- where is this cocaine

11   laced with fentanyl coming from geographically?

12       A.    That I don't know.  I think, in

13   general, a lot of it is coming from South and

14   Central America.  But where it -- where the

15   fentanyl is actually introduced is a -- is a

16   little bit unclear.  At least from my end, I'm

17   not as involved in the investigations from a

18   law enforcement perspective.

19       Q.    And if someone takes that and takes

20   that -- strike that.

21             If someone uses that cocaine and

22   they're not expecting it to be from fentanyl --

23   or fentanyl in -- involved in it and has an

24   overdose death, is the person who sold them

25   that medicine responsible for their death?

```
                                         Page 212
 1              MR. GALLUCCI:  Object to form.
 2              THE WITNESS:  Responsible.  Again,
 3     like I said, I'm sure everybody has a part to
 4     play in it.
 5              BY MR. CHEFFO:
 6         Q.    And is the cartel that ultimately is
 7     developing this strategy, are they responsible?
 8              MR. GALLUCCI:  Object to form.
 9              THE WITNESS:  It's not no
10     responsibility, no.
11              BY MR. CHEFFO:
12         Q.    And -- and can --
13         A.    But it's an outgrowth of, again,
14     kind of the oversaturation of the market for
15     opioids --
16         Q.    So are the--
17         A.    -- as a whole.
18         Q.    So are the manufacturers and
19     distributors of opioids, in the situation where
20     someone laces cocaine with fentanyl, are they
21     more responsible than the cartels and the drug
22     dealers or less?
23              MR. GALLUCCI:  Object to form.
24              THE WITNESS:  Again, now we're
25     getting back to how this crisis all kind of
```

Page 213

1    unfolded.

2              BY MR. CHEFFO:

3         Q.    Simple question.

4              MR. GALLUCCI:  Go ahead and finish

5    your answer.

6              THE WITNESS:  It's a seemingly

7    simple question.  But unfortunately, this is a

8    very complex situation.

9              Again, if the market had not been

10   created, then maybe this never came to be.

11             BY MR. CHEFFO:

12        Q.    Okay.  But --

13        A.    I -- I can't -- you're asking me to

14   take a snapshot of what's happening now and

15   assign some sort of responsibility, which is

16   what this lawsuit's really going to determine,

17   not -- not me, and what we believe that the

18   root causes are, what I believe that's been

19   informed by my work in the Medical Examiner's

20   Office.

21        Q.    And I'm not asking about the

22   lawsuit.  You keep bringing the lawsuit.  I'm

23   asking as your view.  Okay?

24             In a -- in a situation -- I think

25   you've told us you -- you -- you think that

Page 214

1    there is a -- a number of factors, and there's
2    a ultimate root cause that goes back many
3    years, right?
4         A.    Yes.
5         Q.    And you've -- you've -- you've
6    testified now that you can't quantify, but
7    there's some responsibility to bear by the drug
8    cartels and the drug dealers, right?
9              Yes?
10        A.    Yes.
11        Q.    And you believe others, including
12   the defendants, have some responsibility,
13   right?
14        A.    Yes.
15             MR. GALLUCCI:   Object to form.
16             BY MR. CHEFFO:
17        Q.    And what I'm just trying to
18   understand is, in the situation where a drug
19   dealer sells a cocaine dose to an individual
20   who doesn't know that he or she is getting
21   fentanyl that was provided in connection with a
22   cartel activity, is the drug dealer and the
23   cartel -- are they more responsible or less
24   responsible than let's say a pharmaceutical
25   company or a pharmacy?

```
                                        Page 215
 1              MR. GALLUCCI:  Object to form.
 2              THE WITNESS:  So -- and you're still
 3      trying to get me to quantify this.
 4              All I can tell you is -- is that,
 5      prior to this, we had, like I said, a steady
 6      number of cocaine-related deaths.  None of them
 7      were cocaine and fentanyl until kind of the
 8      whole opiate crisis unfolded.
 9              BY MR. CHEFFO:
10         Q.    Really?  Really.  Okay.
11              Well, so then -- so then you would
12      agree with me that nothing related to cocaine
13      beforehand had anything to do with the
14      defendants in this case, right?
15              MR. GALLUCCI:  Object to form.
16              THE WITNESS:  Well, I mean cocaine
17      was created by a drug company century-plus ago.
18      I don't know which one, but...
19              BY MR. CHEFFO:
20         Q.    So they're responsible too?
21              Is that -- that's how you -- that's
22      how far back the chain goes?
23              MR. GALLUCCI:  Object to form.
24              THE WITNESS:  Well, there were
25      documented deaths after the civil war for
```

1    opiates.  There were documented deaths at the

2    turn of the 20th century for cocaine.

3                BY MR. CHEFFO:

4        Q.    So --

5        A.    So those were introduced as

6    medicinal --

7        Q.    Right.

8        A.    -- drugs historically.  So...

9        Q.    So they're responsible in some way.

10               MR. GALLUCCI:  Object to form.

11               THE WITNESS:  Some way.

12               BY MR. CHEFFO:

13       Q.    So some -- the -- whatever company a

14   hundred or so years ago may have introduced

15   cocaine, they're responsible for the drug

16   dealer today who sells on behalf of a cartel in

17   Cuyahoga County?

18               MR. GALLUCCI:  Object to form.

19               BY MR. CHEFFO:

20       Q.    In some way.

21       A.    That -- in some way, that could be

22   argued, yes.

23       Q.    Right.

24               And the opioids, you know, have been

25   around for hundreds, if not thousands of years,

Page 217

1      right?

2           A.     Correct.

3           Q.     Derived from a poppy plant, I

4      understand it, right?

5           A.     Yes.

6           Q.     So in some way, the people who first

7      discovered the opioids are responsible for the

8      opioid crisis here today, right?

9                  MR. GALLUCCI:  Object to form.

10                 THE WITNESS:  I'm not sure who

11     you're referring to.

12                 BY MR. CHEFFO:

13          Q.     Whoever it was that determined that

14     you can develop and get op -- an opioids out of

15     a poppy plant, they have some responsibility

16     for the opioid crisis, right?

17                 MR. GALLUCCI:  Object to form.

18                 THE WITNESS:  I --

19                 BY MR. CHEFFO:

20          Q.     Just like the cocaine inventor has

21     responsibility.

22                 MR. GALLUCCI:  Object to form.

23                 THE WITNESS:  I mean I -- I think

24     we're taking this back a little --

25                 BY MR. CHEFFO:

Page 218

1          Q.     Really?

2          A.     -- absurdly, but --

3          Q.     Well, you'd say yes, right?

4          A.     Yes.

5                 MR. GALLUCCI:  Object to form.

6                 BY MR. CHEFFO:

7          Q.     Even though it's absurd.

8                 MR. GALLUCCI:  Object to form.

9                 THE WITNESS:  No.  The question was

10     absurd, but --

11                BY MR. CHEFFO:

12         Q.     But you just answered it "yes,"

13     right?

14                MR. GALLUCCI:  Object to form.

15                THE WITNESS:  Yes.

16                BY MR. CHEFFO:

17         Q.     I take it it can't be that absurd if

18     you agree with it, right?

19                MR. GALLUCCI:  Object to form.

20                BY MR. CHEFFO:

21         Q.     Right?

22         A.     I suppose.

23                MR. GALLUCCI:  You want to take a

24     break?

25                MR. CHEFFO:  Let's just go another

Page 219

1    minute or two.

2              MR. GALLUCCI:  You want to -- well,

3    we -- we ended up going way over the last

4    break.

5              MR. CHEFFO:  Okay.

6              MR. GALLUCCI:  So now we've now gone

7    through the lunch break.

8              MR. CHEFFO:  Okay.  If -- I mean

9    I --

10             MR. GALLUCCI:  So --

11             MR. CHEFFO:  I usually get -- get

12   one more question.  But if you want a break

13   right now --

14             MR. GALLUCCI:  Let's --

15             MR. CHEFFO:  -- we -- we can --

16             MR. GALLUCCI:  Yeah.  Take a break

17   now.  We've gone over an hour.

18             MR. CHEFFO:  Okay.

19             THE VIDEOGRAPHER:  We are going off

20   the record.

21             This is the end of Media Unit No. 3.

22             The time is 12:54.

23             (A lunch recess was taken.)

24             (Deposition Exhibit 3 was marked for

25   identification.)

Page 220

1                THE VIDEOGRAPHER:  We are back on
2       the record.
3                This is the start of Media Unit No.
4       4.
5                The time is 1:25.
6                You may proceed, Counsel.
7                MR. CHEFFO:  Thank you.
8                BY MR. CHEFFO:
9          Q.    Mr. Shannon, we've marked what is in
10      front of you as Exhibit 3.  You can just take a
11      look at it.
12                It -- my understanding is that
13      that's some kind of lengthy printout of budget
14      line items?
15                MR. GALLUCCI:  And, Mark, are there
16      Bates numbers or anything related to it that we
17      can identify it for the record?
18                MS. NEWMARK:  Yeah.  It's CUYAH,
19      C-U-Y-A-H, underscore, 014627783.
20                MR. GALLUCCI:  Okay.  It's -- it's
21      a -- it's a singular Bates number?
22                MR. CHEFFO:  Yeah.
23                MR. GALLUCCI:  Or is there a range?
24                MS. NEWMARK:  It's one.  It's --
25                MR. CHEFFO:  Because I think it's

Page 221

1       like a virtual --

2                    MS. NEWMARK:  It's --

3                    MR. CHEFFO:  It's a -- it's a

4       printout from like an Excel spreadsheet.

5                    MS. NEWMARK:  We have it --

6                    MR. CHEFFO:  So there's no Bates on

7       it.

8                    MR. GALLUCCI:  Okay.

9                    MS. NEWMARK:  Yeah.  It was native.

10                   MR. GALLUCCI:  That's fine.  And

11      you've provided it to me on a --

12                   MR. CHEFFO:  Yeah.

13                   MR. GALLUCCI:  -- thumb drive as

14      well.

15                   MS. NEWMARK:  Yeah.  The native

16      version should be on the thumb drive.

17                   MR. CHEFFO:  Yeah.  I said virtual.

18      It's native.  That's a better.

19                   BY MR. CHEFFO:

20          Q.    But anyway, could you -- do you --

21      I'm not going to ask you specific questions

22      about it, sir.

23                   But can you just look at it and tell

24      us if you know what that represents?

25          A.    It's marked as "Total Expenditures."

1    If this is from the budget, it's in a format

2    that I'm not used to seeing.

3         Q.    Do you use Excel spreadsheets?

4         A.    I do.

5         Q.    And I'll just represent to you --

6    I'm not testifying, but I -- I think that's a

7    printout of an Excel spreadsheet.

8              Does that have the kind of

9    information that you would expect to see on an

10   expenditure printout?

11        A.    As I said, if this is related to the

12   budget, it's in a format I'm not familiar with.

13        Q.    Okay.  Is it -- what about the type

14   of information that's listed in those tables

15   that were produced to us by the county?

16        A.    I mean I see figures in here.  But a

17   lot of this doesn't deal with my specific

18   agency, so I --

19        Q.    Okay.

20        A.    Unless I was looking specifically at

21   my agency numbers, I don't recognize anything.

22        Q.    Do you believe your agency numbers

23   are embedded within that larger document?

24        A.    I -- I can look.  I don't know how

25   much time you want me to --

1           Q.    Well, I -- I just- -
2                 MR. GALLUCCI:  Object to form.
3                 I just want to note it's couple
4       hundred pages.
5                 MR. CHEFFO:  Yeah.
6                 MR. GALLUCCI:  Right?
7                 MR. CHEFFO:  I think it's in
8       alphabetical order.  I -- I just --
9                 MR. GALLUCCI:  Okay.
10                MR. CHEFFO:  I'm just asking him to
11      look and find if he sees even any line items
12      for the -- you know, for his department.
13                MR. GALLUCCI:  Understood.  If you'd
14      like him to take the time and take a look,
15      we're happy to.
16                MR. CHEFFO:  Yeah.  If -- sure.  If
17      he can tell.
18                THE WITNESS:  That was fortuitous.
19                BY MR. CHEFFO:
20          Q.    So I'm actually -- I -- I gave you
21      my copy, sir.  And I just -- I -- I just want
22      to be clear for the record.  It looks -- I can
23      -- my eyes are not that good, but it looks like
24      that's been highlighted.  So I just want to be
25      clear so it's not unfair.

1          That may have been somebody on our

2      end highlighting that so we knew where to go.

3      I just want -- I don't want to represent to you

4      that that's what the original looks like.

5          A.    Sure.

6              MR. GALLUCCI:  Counsel, if I may

7      ask, are -- you're referring -- are there

8      highlights within the red typeface, or is the

9      red typeface --

10             MR. CHEFFO:  I think the red

11     typeface is it.  And I probably at -- at the

12     break would like to make sure that there's --

13     before we mark that, that there's nothing else

14     that's added or notes to me.  But I -- I think

15     they highlighted it to make it clear as to

16     where the budgets were for the department.

17             MR. GALLUCCI:  Why don't we both

18     just take a look at the break and figure it

19     out.

20             MR. CHEFFO:  Okay.

21             BY MR. CHEFFO:

22         Q.    Do you see at least a few entries

23     that -- that relate to your department, sir?

24         A.    It appears to be medical examiner

25     operations, regional forensic science lab,

1    medical examiner lab fund.

2         Q.    And those are listed as

3    expenditures.

4              Those are the costs that the

5    department has to pay out for various things?

6              MR. GALLUCCI:  Object to form.

7              THE WITNESS:  That's what's listed

8    here.  It says "Total Expenditures 2005 to

9    2017."  And it's pages 73, 74 and 75 that have

10   what's titled as our -- the Department of the

11   Medical Examiner's Office.

12             BY MR. CHEFFO:

13        Q.    Okay.  And I'm not going to ask you

14   any more questions about that.  You can put

15   that away if you'd like.

16             The -- we talked earlier about a

17   budget.  And I think you said that the budget

18   for 2018 was approximately 12 and a half

19   million dollars; is that right?

20        A.    Give or take.  I would have to go

21   back and check to get specific numbers, yes.

22        Q.    And I think you said you do a -- a

23   biannual budgeting process that sometimes gets

24   updated, depending on circumstances?

25        A.    That's correct.

Page 226

1      Q.    And have you done '19 and '20?

2      A.    I believe that the -- I believe

3   biennium was '18, '19, if I'm not mistaken.

4      Q.    So was the -- was the 12.7 budget --

5   did you come -- did you exceed what was

6   projected, or did you match it, or did you come

7   in lower than the budget?

8      A.    I would need the final report from

9   the budget office, which I believe I stated

10  earlier will come sometime towards the end of

11  the first quarter of this year to see exactly

12  where we came in with respect to the budget.

13        The last check of the budget at mid

14  year, we were close -- pretty close to on

15  budget.  Some areas were a little under, but...

16     Q.    So 12.7 was the 2018 budget; it's

17  not necessarily how much you expended; is that

18  right?

19     A.    Right.  The budget kind of sets the

20  plan for the year of anticipated needs.

21     Q.    And what's the budget for 2019?

22     A.    I would have to go back and check.

23  I'm -- it'll be in the same ballpark, I

24  imagine.

25     Q.    Where would you look for that?

1        A.    I would probably just check on past
2    budget documents.
3        Q.    And that -- it would have been a
4    budget that was submitted for 2018 and '19 to
5    the county that they would have approved?
6        A.    Correct.
7        Q.    And your best understanding is the
8    last time you looked about six months ago you
9    were on target for the 12.7 budget for 2018?
10       A.    Yes.
11       Q.    Do you know if any requests or
12   modifications were made for 2019?
13       A.    No.  Not as of yet.
14       Q.    And in light of the significant
15   reduction in overdose deaths in 2018, is it
16   your expectation that you will need to revise
17   or determine to revise down your budget since
18   you had a significant drop in overdose deaths?
19              MR. GALLUCCI:  Object to form.
20              THE WITNESS:  I know we have not had
21   that discussion yet.  And it would be hard for
22   me to determine that without seeing where we
23   ended up from last year's budget.
24              BY MR. CHEFFO:
25       Q.    Right.

Page 228

1                But it is somewhat basic math,

2       right?

3                If things go up and you need more

4       budget, you spend more; if they go down, you

5       need less budget and spend less, right?

6                MR. GALLUCCI:  Object to form.

7                THE WITNESS:  That's a possibility,

8       yes.  But it's not necessarily -- budgeting's

9       not, you know, a one-for-one.  It's possible

10      that there are residual effects and needs,

11      embedded costs that we've already paid for and

12      are paying for based on what we knew in 2017

13      that were locked into a contract that will

14      continue regardless of caseloads.  So --

15               BY MR. CHEFFO:

16      Q.    You just don't know?

17      A.    I wouldn't -- I wouldn't want to

18      speculate.  I would prefer to have my -- my --

19      my read of the final 2018 budget before I could

20      speculate.

21      Q.    But your -- your -- your best

22      recollection is 2019 was in the 12 and a half

23      million dollar range?

24      A.    I -- I wouldn't --

25               MR. GALLUCCI:  Object to form.

Page 229

1              THE WITNESS:  Yeah.  Sorry.

2              I wouldn't think that it -- it would

3    have been significantly different.

4              BY MR. CHEFFO:

5         Q.    Is there a -- do you allocate a

6    per-case cost or a per-autopsy cost to your

7    cases?

8              MR. GALLUCCI:  Object to form.

9              THE WITNESS:  So the contracts that

10   we have with the surrounding counties has a

11   specific cost per case in the contract.

12             BY MR. CHEFFO:

13        Q.    I'm talking about just you for

14   budgeting purposes.

15             Is there some number that you --

16   like let's say you were trying to figure out

17   how much each cocaine autopsy -- or each

18   autopsy of a person who overdosed on cocaine

19   cost.

20             Is there a number that's been done?

21        A.    Not to that degree of specificity.

22   So it's not that a case for a car accident is

23   more or less expensive than a case for a

24   gunshot wound or -- it doesn't really work that

25   way.

Page 230

1          Q.    No.  That's fair.

2                But -- but let's assume then -- and

3    that's -- thank you for that clarification.

4                But assuming that you can't

5    differentiate or don't differentiate between

6    death investigations based on cause of death,

7    right, or modality, is there some rough

8    estimate that you apply from a budgeting

9    perspective to each case?

10               So if we have a case that we accept,

11   and we do an autopsy, we've looked at it from a

12   budget perspective, and we think that cause --

13   costs X.

14               Do you do something like that?

15         A.    So you said a couple of things in

16   there.  So when we do a death investigation,

17   there are more pieces than just doing the

18   autopsy.

19         Q.    Uh-huh.

20         A.    So there are other staff, other

21   costs associated with that.  To my knowledge,

22   there hasn't been a complete review breaking it

23   down the way that you're asking.

24         Q.    There has or hasn't?

25         A.    Has not.

Page 231

1      Q.    Has not.

2      A.    What I do know is -- is that, when

3    we -- Dr. Gilson and I arrived in 2011, they --

4    Corner's Office at that time, then the Medical

5    Examiner's Office, was charging X for other

6    counties to do their autopsies on their behalf.

7    That number has changed a couple of times since

8    then.

9           But I -- I don't think I can get you

10   like the kind of specificity that you're

11   outlining.

12     Q.    Okay.  What -- so -- and that --

13   that work for other counties, is that for full

14   death investigations, or is -- is it only for

15   autopsies?

16     A.    So this gets back to kind of our

17   discussion about jurisdiction.  So we call them

18   out-of-county cases, OU cases.  This is a

19   direct request from that county's --

20     Q.    Uh-huh.

21     A.    -- corner to perform an autopsy.

22     Q.    Okay.

23     A.    We are simply doing the work.  The

24   final decisions about how they're going to --

25   how they're going to fill out the death

Page 232

1      certificate is still under the jurisdiction of

2      that county's corner.

3          Q.    Fair.

4               And I think --

5          A.    They'll take the information that we

6      give them and make that final determination.

7          Q.    Okay.  Fair.  Thanks for that -- for

8      that clarification.

9               And I'm -- you -- you obviously can

10     answer it any way you want.  I'm just going to

11     actually for a minute just be focusing on

12     costs, right?  So if we could just orient

13     ourselves.

14              So out of county, what is done on

15     other counties' behalf is just the autopsy, and

16     there's a fixed cost for that, right?

17         A.    Yes.  There is a fixed cost in the

18     contract for the autopsy work.  And it includes

19     kind of all our intake procedures.  Any body

20     that's coming into the building has to be

21     documented so that we can track it and release

22     it properly.  Toxicology -- a basic toxicology

23     panel will be done with the autopsy as well as

24     any possible needs in the future for that

25     forensic pathologist to testify on that

Page 233

1    particular case.

2          We also provide them a list of

3    forensic services in the laboratory that may be

4    required.  Say a -- a body that has not

5    yesterday yet been identified, we may have to

6    do a dental records comparison or a DNA test.

7          Those have fixed costs as well.  The

8    contract states that those will be discussed

9    between our medical examiner and the corner

10   who's referring to ensure that we are giving

11   them what it is that they ask for and that they

12   understand that there are additional costs

13   associated with that.

14        Q.    Okay.  So it sounds like there's

15   been some changes.

16          Just -- can you just tell us what

17   the costs -- what the charges were, the basic

18   costs, to an out-of-county municipality when

19   you first joined and what any changes were

20   along the way?

21          MR. GALLUCCI:  Object to form.

22          THE WITNESS:  I believe, when we

23   first got in in 2011, they had been charging

24   $1,200 per case.  Kind of did a review of what

25   other -- there are other medical examiner and

Page 234

1    corner's offices, usually in the larger
2    metropolitan areas, that do the same thing.
3    They're big enough.  They've put the resource
4    in to have the facilities and the staff to
5    handle those kind of things.
6              We were certainly the lowest that we
7    could find in Ohio.  I believe we raised it to
8    1,275 shortly after that review, understanding
9    we still didn't feel that we were even getting
10   close to covering the costs that were
11   associated with a full autopsy.
12             There have also been legislative
13   changes that required additional toxicology
14   screens for specific drugs that we did not have
15   set up in-house.  So in order to do those
16   panels, those specific tests, we would have to
17   send it out, which is an additional cost.  And
18   then to develop the procedures necessary to
19   handle those in-house also required resources
20   and so forth.
21             So I -- I don't -- we were going
22   to -- I think we were contemplating doing that
23   last year.  We did not.  I think we are
24   planning on implementing that later this year.
25             BY MR. CHEFFO:

Page 235

1          Q.     And what we -- so it was 1,200 when
2     you arrived; shortly after your review went to
3     1,275; it's still been at 1,275 for the last
4     seven years; and you're contemplating raising
5     that, right?
6          A.     Correct.
7          Q.     And you're contemplating raising it
8     because the 1,275 doesn't cover your costs.
9          A.     Correct.  Especially with the added
10    legislative mandates.
11         Q.     And what are you going to raise it
12    to?
13         A.     I believe that we're currently
14    looking at 1,475.
15         Q.     And 1,475 will be your -- you
16    believe a fair representation of what your
17    costs are without make -- taking a loss and
18    without making a profit.
19         A.     I believe so.  I think right now
20    we're trying to investigate to make sure that
21    we're not -- we're not exceeding what -- what
22    those limits are.
23         Q.     It's -- but the current price is not
24    adequate to meet your current costs, right?
25         A.     I -- I don't believe we -- we feel

1    that that's -- especially with the added

2    legislative requirements, will cover our costs.

3         Q.    All right.  So every -- every

4    autopsy that you don't do for another county

5    you, in effected, save money?

6              MR. GALLUCCI:  Object to form.

7              THE WITNESS:  I -- I'm still a

8    little fuzzy on that characterization.

9              BY MR. CHEFFO:

10        Q.    Really?

11        A.    It's a --

12        Q.    Okay.  Let's -- let's try it this

13   way:  If -- if it actually cost you 1,475 to do

14   something that you charge 1,275, don't you lose

15   money on every autopsy that you do?

16        A.    I -- I suppose that, in a certain

17   perspective, you could look at it that way.

18   But as I said, when we first got here, we were

19   doing less than 200 cases.  Now we're doing

20   more than 400 cases, so...

21        Q.    Right.

22              So you're -- you're actually -- it's

23   a good thing if you don't do those cases.

24   Because you've just told us you can't even

25   break even unless you raise your prices.

Page 237

1          A.    Well, no.  It's not a good thing.
2     It's definitely bad practice not to.  And we
3     encourage, when we can, to have them send their
4     cases to us.
5          Q.    Okay.  And I -- and I apologize.  I
6     didn't mean to be flip about it.  I was -- as I
7     said, I'm just talking about economics right
8     now.
9          A.    Right.  No.
10         Q.    So I'm not talking about deaths
11    or -- and I apologize if I was flip about --
12    obviously the deaths are serious and important.
13              I'm just talking about from an
14    economic.  Because one of the claims in the
15    lawsuit is that there's -- there's some damages
16    in claims, right?
17              So that's what I'm trying to
18    explore, right?
19              So at the very least, if -- if you
20    don't cover your costs at 1,275, putting aside
21    other social issues and policy issues, you're
22    not losing any money by not doing autopsies --
23              MR. GALLUCCI:  Object to form.
24              BY MR. CHEFFO:
25         Q.    -- by doing something under what it

Page 238

1      costs you.

2                  MR. GALLUCCI:  Same objection.

3                  THE WITNESS:  -- from a strictly

4      fiscal standpoint, yes.

5                  MR. CHEFFO:  Okay.  Let's mark this.

6                  (Deposition Exhibit 4 was marked for

7      identification.)

8                  BY MR. CHEFFO:

9          Q.   So, Doctor, these are one of these

10     things that, you know, probably we could spend

11     three days if you're -- you needed to read this

12     cover to cover.  And we're not.  And I'm not

13     going to ask you any really specific questions,

14     I don't think.

15                  But I wanted to see if I could

16     understand what this is.  And also I think you

17     told us earlier that, if you had the report,

18     you might be able to tell us what the ten-year

19     kind of rate is of cases in your office.

20         A.   I -- I might --

21                  MR. GALLUCCI:  Counsel -- sorry.

22                  Counsel, before you question, I just

23     note there's no Bates stamps on this.

24                  MR. CHEFFO:  Yeah.  It's from the

25     web site.  So it's -- it's probably pulled from

Page 239

1      the web site.  I mean --

2                MR. GALLUCCI:  Was it not produced

3      also though in discovery?

4                MS. NEWMARK:  No.

5                MR. GALLUCCI:  I believe it was.

6                MS. NEWMARK:  It was just posted.

7                MR. CHEFFO:  So --

8                THE WITNESS:  It was just posted.

9                MR. GALLUCCI:  This is the most

10     recently posted?

11                MR. CHEFFO:  That's my

12     understanding.  Thank you for that.  Yeah.

13                BY MR. CHEFFO:

14        Q.    Is that right, Doctor?

15        A.    So --

16        Q.    Doctor.  I'm sorry.

17        A.    I'm not a doctor.

18        Q.    Mister.  Mister.  I know you're not

19     a doctor.  I -- I'm so used to talking to your

20     doctor colleagues.

21        A.    Yes.

22        Q.    Is that right, sir?

23        A.    Yes.  Yes.  This was just posted at

24     the beginning of January.

25        Q.    Okay.  And it's posted on the web

Page 240

1       site, right?

2               A.      Correct.

3               Q.      And you've seen this before today?

4               A.      I have.

5               Q.      Did you take part in the preparation

6       of this document?

7               A.      To some extent, yes.

8               Q.      And what is it?  What is it?

9               A.      This is our statistical report for

10      the work done in 2017 in the Medical Examiner's

11      Office.

12              Q.      So when you said you were doing

13      additional work on 2015, '16, 17, is that

14      something different than the statistical report

15      of the Medical Examiner's Office?

16              A.      Yes.

17              Q.      And -- and how would you

18      differentiate those -- those two bodies of

19      work?

20              A.      So this is -- this is a strict I

21      think telling of numbers.  It doesn't in --

22      involve analysis.  So it's a numerical

23      representation of the work that was done by the

24      office.

25                      THE REPORTER:  Can we go off the

                                        Page 241

1      record.

2                 MR. CHEFFO:  Off the record?  Sure.

3                 THE VIDEOGRAPHER:  We are going off

4      the record.

5                 The time is 1:46.

6                 (A short recess was taken.)

7                 THE VIDEOGRAPHER:  We are going back

8      on the record.

9                 The time is 1:50.

10                You may proceed, Counsel.

11                BY MR. CHEFFO:

12          Q.    So I think I had asked you, sir,

13     what -- what your general role was in the

14     preparation of this document.

15          A.    Should we -- the general layout, it

16     changes year to year.  Some of the specific

17     information that gets put in I collect from the

18     various department heads and give it to the

19     designers.

20                And we actually have an internal

21     team that does most of the heavy lifting.  But

22     I do play intermittent roles.  I do review

23     sections before they get proofread, those kinds

24     of things.

25          Q.    Okay.  And what's the -- what's the

Page 242

1       purpose of the -- of preparing and distinct

2       this document to the public?

3            A.    Well, there's historical purpose.

4       The Cuyahoga County corner's office has

5       produced a document like this since like 1937

6       continuously.  There was a brief interruption

7       right before we got in, but we did that kind of

8       in -- after the fact.

9                 It is a requirement of our

10      accreditation with the National Association of

11      Medical Examiners to be able to produce a

12      report that will illustrate the work of the

13      office.

14                As I said, it's basically a

15      numerical representation of the work that the

16      office did the previous year.

17           Q.    And are -- is the office -- the

18      department accredited currently?

19           A.    Yes.

20           Q.    By which organization?

21           A.    So the National Association of

22      Medical Examiners accredits the medical

23      examiner portion.  I believe we're in

24      provisional accreditation at the moment due to

25      heavy caseloads because of the opioid crisis.

Page 243

1    That will be resolved I believe in April.  Each

2    of the individual forensic laboratories, as

3    well as the forensic laboratory overall, also

4    have individual accreditations through their

5    various accrediting bodies.

6            ABFT, the American Board of

7    Toxicology, accredits the toxicology

8    department.

9            ASCLD is the Association of Crime

10   Lab Directors.  They do the overall forensic

11   lab accreditation.

12           The DNA lab has to conform to

13   specific standards of the FBI to be able to

14   upload into CODIS, which is the national DNA

15   database.

16           AABB is the American Association of

17   Blood Banks.  They also have a role in

18   accrediting portions of the DNA lab as well as

19   our parentage and identification laboratory.

20           The ACGME, Council of Graduate

21   Medical Education accredits, the teaching part

22   of the office.  And we have the longest running

23   forensic training program in the United States.

24   We usually have one or two fellows who become

25   forensic pathologists once they've completed

1      their training.  It's a yearlong fellowship.

2          Q.    Okay.  And other than the

3      provisional certification that you have right

4      now, have you -- well, strike that.

5              With -- when did the professional

6      certification go into effect?

7          A.    I believe in 2017.

8          Q.    What month; do you know?

9          A.    I believe we're a April inception.

10     So it would have been April.  Or at least that

11     would have been when the inspection was done.

12     They probably didn't let us know until June or

13     July, sometime over the summer.

14         Q.    And is it your understanding the

15     only basis for the provisional certification is

16     the number of cases you've handling?

17         A.    So because of the caseloads --

18     there's a list of requirements.  And if you

19     don't meet them, you get either a class one or

20     class 2 or A or B.  I -- I can't remember.

21     Kind of a demerit.  And you can only carry so

22     many to be an accredited facility.

23              Unfortunately, the caseloads are all

24     tied in to a number of the provisions.

25     Toxicology caseloads were high.  The turnaround

1    times didn't meet the standards.  That

2    predicates the turnaround times for the overall

3    autopsy completion.  So it was kind of a double

4    hit.

5           And then the actual caseloads by the

6    doctors themselves, they're supposed to stay

7    under 250 for a -- kind of a minor demerit and

8    under 300 for the major.  And we had several

9    doctors at the were over 300, after the 2016

10   caseload.  A year.

11          And then.

12      Q.    Other than --

13      A.    Yeah.

14      Q.    Other than the -- the caseload, is

15   there any other factors that you're aware of

16   that went into the provisional certification,

17   or were they all related in some way, in your

18   view, to the caseload issue?

19      A.    Well, the other thing was is that

20   this report actually was late in being

21   produced.  It was not ready when the inspection

22   took place.

23          Again, we had been somewhat

24   overwhelmed in 2016.  We also lost staff who

25   had previously been doing this.  And so we were

1      scrambling to try to find somebody who could.

2      So I think that was the final piece that --

3      that --

4           Q.    Okay.

5           A.    -- didn't exist.

6           Q.    How many more -- how many more cases

7      did you have in 2016 and 2017 that overwhelmed

8      every aspect of your department?

9           A.    It was a significant percentage.  I

10     would have to look to get you the --

11          Q.    Okay.  We --

12          A.    -- actual numbers, but --

13          Q.    I'll ask you to.

14               But you -- you -- you don't recall?

15          A.    Like I said, we doubled the number

16     of drug deaths.  So that was a significant

17     portion right there.

18          Q.    What were the -- what were the

19     percentage of drug deaths in your overall

20     caseload?

21          A.    In 2016 or prior -- prior to that

22     or --

23          Q.    Roughly 2016, 2017.

24          A.    Well, I mean it changed

25     significantly in 2016 because we doubled the

Page 247

1    number of drug deaths.  So --

2        Q.    Okay.

3        A.    It went from about 350 to almost 700

4    in a year.

5        Q.    Okay.  So when it was -- when it was

6    350, what was that percentage of your overall

7    caseload?

8        A.    Perhaps -- it was less than 10

9    percent.

10       Q.    Less than 10 percent.

11             And when it went -- when it doubled

12   -- or -- I'm sorry.

13             Did you say doubled?

14       A.    Yes.

15       Q.    When it doubled, what was the

16   overall percentage?

17       A.    It would have been closer to 20

18   percent, but...

19       Q.    So that 10 percent jump is -- is it

20   your testimony that that completely overwhelmed

21   all aspects of your -- your department or only

22   certain places?

23       A.    So it -- again, this is kind of an

24   involving process.  There are other factors

25   that weighed in.  We lost doctors and staff.

Page 248

1      Forensic pathologists don't grow on trees.

2      They're hard to replace.

3                  And so I believe -- also at the time

4      we had -- the fellows that I mentioned earlier

5      are working on cases.  And we had two fellows

6      at -- at -- at the time.  We lost one in the

7      next round.

8                  So again, the accreditations were

9      tied to doctor caseloads.  That has a

10     significance impact when you double the number

11     of drug cases and lose two doctors.  So we were

12     kind of trying to backfill to get staffing back

13     to appropriate levels.

14          Q.    And you didn't lose the doctors

15     based on the overdose increases, did you?

16          A.    No.  I think one relocated with her

17     husband to another jurisdiction.  And again,

18     the fellows are working fellows.  And they only

19     have a year term.  And we only had one fellow

20     for the subsequent term.  So, in essence, we

21     lost a doctor.

22          Q.    So even if there was not an increase

23     in the overdose deaths, you would have had some

24     challenges, having lost a doctor, lost a

25     fellow, right?

1      A.    It would have been a challenge.  I'm
2    not sure that it would have been to the -- to
3    the point where it pushed our accreditation
4    limits.
5      Q.    But let's talk about preparing this
6    report.
7            The -- the people who prepare this
8    report, those aren't the same people who are
9    doing the autopsies, are they?
10     A.    No.
11     Q.    And they're not the investigators
12   who are investigating overdose deaths, are
13   they?
14     A.    No.
15     Q.    So you told me you were so
16   overwhelmed that -- by the overdose deaths that
17   this couldn't get published.  I'm just trying
18   to understand how.
19           Like what -- what did the -- the
20   10 percent increase in your overall caseload do
21   such that a -- a report done by nonmedical
22   professionals and noninvestigators couldn't be
23   done?
24     A.    So I believe I mentioned that the
25   person who had been responsible for the

Page 250

1      majority of this report had retired.  And we
2      were looking for someone who could replace that
3      person --
4           Q.    Okay.
5           A.    -- with the requisite skills to --
6      to do it properly.
7           Q.    So that was a -- unfortunate, right,
8      and -- and probably challenging.
9                 But that was a personnel issue based
10     on retirement, right?
11          A.    Yes.
12          Q.    Nothing to do with the overdose
13     increases, right?
14          A.    Not this specifically, no.
15          Q.    So -- so in -- and again, feel free
16     to look at this if you need to.  That's why I
17     put it in front of you.  But I -- I -- I'm just
18     going to ask you a few questions about kind of
19     rates.
20                It -- what -- prior to 2016, were
21     the cases -- the overall cases, were they
22     relatively linear that your office held?
23                And if you'd be kind enough to tell
24     us where you're looking.  Unfortunately there's
25     no pages on this.

1            Oh, is there?  Oh, I apologize.

2     There is pages on the left.  Actually, on the

3     left, on the right, depending on which page

4     you're looking at.

5            Is it 44 that we're up to?

6     A.    I forget how big this book is.

7            So Page 44, that is data taken from

8     the Ohio Department of Health on the overall

9     deaths in Cuyahoga County.

10    Q.    Okay.

11    A.    And as I stated before, not

12    everybody who dies even gets referred to the

13    Medical Examiner's Office.

14           Page 45 --

15    Q.    Can we stay on 44 for a minute.

16           So just -- even with -- the height

17    of the deaths in the county, we're in like

18    2012, '13, '14, right?

19           And then they dropped in '15, '16,

20    '17?

21           Am I reading that right?

22    A.    That's what it says, yes.

23    Q.    Okay.  And then 45 is what?

24    A.    45 will be -- it says a ten-year

25    period of cases that are referred to the

Page 252

1     Medical Examiner's Office.  So you can see

2     there have been basically a steady increase

3     2012, '13, '14, '15, and then it jumps in '16,

4     and then up slightly in '17.

5          Q.    Well, let's just --

6          A.    And --

7          Q.    -- talk --

8          A.    But --

9          Q.    Let's take it one at a time.

10               So I mean you say steady increase,

11    but there's -- '12 to '13 is what, like 20 or

12    30 case, right?

13         A.    30, yeah.

14         Q.    That's in the -- in the context of

15    2,258.

16               That's pretty similar, isn't it,

17    from a year over year from a percentage basis?

18         A.    And the same with '14 and

19    actually --

20         Q.    But from a kind of a statistical

21    look, you'd say flat, right?

22         A.    Right.

23         Q.    And then '15 there was an increase.

24    And again, I -- I won't apologize.  And I -- I

25    -- other than to just make clear to you.  I

1     know these represent deaths.  So they're all

2     very serious.

3          A.    Right.

4          Q.    I have to ask you statistical

5     questions about them.  It's not because I'm

6     trying to minimize the issue of deaths.  I'm

7     just trying to -- right now we're talking about

8     damages in the case and statistical issues.  So

9     I'm going to be somewhat formulaic about it.

10    But, you know, I understand we're talking about

11    real people.

12               Fair?

13         A.    Understood.

14         Q.    So it's -- the -- the death -- the

15    number of cases that your -- your department

16    handled from 2012 to '14 is flat.  Then there

17    is an increase in 2015.

18               But would you agree with me, from a

19    percentage basis, it's --

20         A.    About 10 percent.

21         Q.    From '14 to '15?

22         A.    Right.  In the 200 cases.

23         Q.    Okay.

24         A.    Out of 22 -- so under 10 percent.

25         Q.    And then did that 10 percent

Page 254

1      overwhelm the department?

2          A.    No.  But we started noticing the

3      strains --

4          Q.    Right?

5          A.    -- in 2015.

6          Q.    And you had at that point more

7      interns, more fellow and a doctor who hadn't --

8      decided for family reasons to move somewhere

9      else, right?

10         A.    Correct.

11         Q.    And then in 2016 there's another

12     jump of approximately what percent?

13         A.    That would be -- 450 cases out of

14     245.  So 17, 18 percent.

15         Q.    Okay.  And just the number in -- the

16     extra 175 cases didn't overwhelm the

17     department, right?

18               There were other factors, including

19     retirements and -- and other issues, right?

20         A.    Between '15 and '16?  It's a 450 --

21         Q.    Well, I -- that's what I had asked

22     you, what the percentage was.

23         A.    About 17, 18 percent.

24         Q.    That's 17 percent.

25         A.    Yeah.  That started to strain the

1    resources of office, yes.

2        Q.    The number as well as the other

3    factors we talked about?

4        A.    Yes.

5        Q.    And then in 2017 it looks like there

6    was an increase but proportionately probably

7    statistically flat, right, about 50 more cases?

8        A.    Right.  50 out of 2,900, yeah.

9        Q.    And then what does the 2018 number

10    look like?

11        A.    Again, we're compiling those

12    statistics now.  So --

13        Q.    Yeah.  But --

14        A.    I would say, in general, they've

15    gone back down some.

16        Q.    Have they gone back down to the 2015

17    levels?

18        A.    No.  Probably not.  Probably not

19    that far down, no.

20        Q.    Can you give me a -- a rough?

21            Is it about 20 percent?

22            MR. GALLUCCI:  Object to form.

23            THE WITNESS:  Not 20 percent, no.

24            Again, I -- it'd be helpful, once we

25    have the final numbers, to be able to be more

Page 256

1    precise.  I know it's gone down.  I don't

2    believe it's gone down to the levels where 2015

3    is at.

4              MR. CHEFFO:  Okay.

5              THE WITNESS:  And again, you also

6    have to take into account this is just the work

7    that's done within the jurisdiction, the IN

8    cases.  This doesn't take into account the

9    increases that we had in the out-of-county

10   cases.

11       Q.   Okay.  And the -- and all these

12   numbers are not obviously just drug overdoses,

13   right?

14             This include all manner of cases,

15   right?

16             Children cases you told us about and

17   homicides and everything else, right?

18       A.   Correct.

19       Q.   And in addition to -- just from an

20   -- other than the drug overdose cases that

21   increased in 2016, were there -- were there

22   other drivers to increase the number?

23       A.   I would have to go back and look.  I

24   believe we've been seeing steady increases in

25   suicides, gun-related deaths, homicides.

Page 257

1    They've all had some increases.  Not to the

2    statistical swings that we were seeing in the

3    drug cases but certainly contributing to the

4    increased caseloads.

5         Q.    And are -- if someone takes their

6    life via overdose using some type of drug or

7    chemical, legal or illegal, is that listed and

8    counted as a statistic for a overdose death?

9         A.    It is.

10        Q.    Is that consistent with how your

11   neighboring jurisdictions treat suicides?

12             MR. GALLUCCI:  Object to form.

13             THE WITNESS:  I would have to check

14   each individual one.  Some of them do; some of

15   them don't.

16             BY MR. CHEFFO:

17        Q.    Do you know anybody else, any other

18   county, that includes suicides in drug overdose

19   deaths?

20        A.    Again, I would have to check with

21   them specifically to see how they keep their

22   statistics.

23        Q.    And that's all I'm asking you, sir.

24             I mean do -- do you know one way or

25   the other?

Page 258

1          A.    Not -- not off the open of my head,
2      no.
3          Q.    Are you -- can you name even one
4      other ME's office that includes suicides as
5      part of drug overdose deaths?
6          A.    Again, I don't have any one specific
7      that I know of.  Technically there's only one
8      other Medical Examiner's Office in the State of
9      Ohio.  That's Summit County.  The rest of them
10     are corner's offices.  But I don't know that
11     any of them -- whether they do or don't.
12         Q.    Fair.
13             I mean I'll -- I'll broaden it.
14     Because you're -- you're appropriately being
15     more specific.  And I -- I appreciate that.
16             In the entire country, including
17     corners or medical examiner's offices, are
18     you -- can you identify any of them that
19     include suicides in the overdose death
20     statistics?
21             MR. GALLUCCI:  Object to form.
22             THE WITNESS:  Again, I can't
23     specifically say one way or the other, no.
24             BY MR. CHEFFO:
25         Q.    Can you see how that could be a

little misleading?

MR. GALLUCCI: Object to form.

THE WITNESS: You'll have to be more specific.

BY MR. CHEFFO:

Q. Well, an overdose death rate, one of the things that you use in your task force, right, is to look at statistics so you could try to interdict and figure out where to put resources, how to treat people, right, how to stem the tide of people who are inadvertently trying -- using and abusing medicines and perhaps inadvertently dying, right?

A. They're overdosing by taking drugs, yes.

Q. By accident, right?

A. That's how they're -- that's how they're termed, yes.

Q. It's a different analysis and different public health issue, isn't it, for people who are intentionally taking substances to kill themselves?

MR. GALLUCCI: Object to form.

THE WITNESS: It can be. A lot of the drug users are dual diagnosed with mental

Page 260

```
 1    health issues, somewhere in the 40 to 50
 2    percent range.  So there's a lot of overlap,
 3    meaning the -- there's a lot of overlap between
 4    people who have substance abuse disorder and
 5    mental health issues.
 6              They're sometimes very similar.
 7    Again, that's why the ADAMHS Board, the
 8    Alcohol, Drug and Mental Health Services Board,
 9    they work on all of those issues.  They call
10    them, you know, deaths of despair.  Suicide and
11    drug overdoses are very similar in -- in a lot
12    of cases.
13              And so they -- they are -- and --
14    and this was a discussion at the task force,
15    that they do need to be addressed in tandem
16    with each other.
17              BY MR. CHEFFO:
18        Q.   And you would agree with me that
19    actual suicides in the overdose population are
20    actually underreported because it's often hard
21    to really differentiate without concrete
22    evidence that someone intended to take their
23    life, right?
24              MR. GALLUCCI:  Object to form.
25              THE WITNESS:  Well, that can be the
```

Page 261

1    case in any suicide.

2           I will say that the majority of

3    suicides are done by gun or hanging.  So the

4    ones that involve substance abuse, specifically

5    ones that involve opioids, are relatively rare.

6           BY MR. CHEFFO:

7        Q.    Do you -- the ones that are done by

8    guns or hanging, are those include -- are those

9    characterized as accidents?

10       A.    No.  They're characterized as

11   suicides when it's indicated.

12       Q.    They're not -- the ones by gun are

13   not characterized as homicides, right?

14           If someone takes --

15           MR. GALLUCCI:  Object --

16           BY MR. CHEFFO:

17       Q.    -- their own life with a gun?

18           MR. GALLUCCI:  Object to form.

19           THE WITNESS:  So that's more of a

20   forensic pathologist question about how they

21   make the determination.  There are cases where

22   it's not clear.

23           BY MR. CHEFFO:

24       Q.    And I -- I'm only talking just --

25   when it is clear, right?

Page 262

1              So in other words, if it's
2      determined that the -- the -- the cause of
3      death after full investigation is death by
4      intentional gunshot wound by the individual,
5      that's labeled as a suicide, right?
6          A.    Correct.
7          Q.    It's not also then labeled as a
8      homicide, is it?
9          A.    No.
10         Q.    And when someone hangs themself or
11     takes their life in some other way, it's not
12     characterized as a accident, is it?
13         A.    Not if there's evidence to prove
14     that- - or to show that it was intentional, no.
15         Q.    But when it's a suicide with
16     overdose, it's characterized as an overdose.
17         A.    No.  So that's a modality, and
18     that's not a manner.  So when somebody takes
19     drugs to kill themselves and there's evidence
20     present, it's ruled as a suicide.  The modality
21     is drug overdose, but that's not...
22         Q.    Okay.  Fair enough.
23             So it's counted -- if they -- if
24     they take their own life using drugs, it's
25     declared -- determined to be a suicide, but

1    it's counted in the overdose statistics for

2    your county.

3         A.    Right.  Because that's modality of

4    death.

5         Q.    And when someone commits suicide by

6    gunshot wound, is it captured in any statistic

7    other than suicide?

8         A.    Yes.

9         Q.    What else would it be?

10        A.    Homicide, accident, undetermined.

11        Q.    Always?

12        A.    No, not always.  It depends case by

13   case.  So again, gunshot wound is the modality.

14   They died by a gunshot wound.  Just like an

15   overdose dies of a drug overdose.

16              Gunshot deaths are tracked as a

17   modality.  Some of them are homicide; some of

18   them are suicide; some are accidents.

19        Q.    I think we're -- just by my bad

20   question, we may be talking past each other.

21              But I understand that gunshot wounds

22   can be a whole host of things, right?

23   Accident, homicide, suicide, maybe others.

24              But if it goes through the system,

25   and some smart person determines that it's

Page 264

1       actually, unfortunately, a suicide, right, for
2       statistical purposes is it also listed as a
3       homicide?
4            A.    No.
5            Q.    And an intentional hanging is not
6       listed also as a accident; it's listed only as
7       a suicide, right?
8            A.    Correct.
9                  MR. GALLUCCI:  Object to form.
10                 BY MR. CHEFFO:
11           Q.    For statistical purposes.
12                 MR. GALLUCCI:  Object to form.
13                 THE WITNESS:  For the manner of
14      death, yes.  Not the modality.
15                 BY MR. CHEFFO:
16           Q.    And do you know what the percentage
17      of suicides are that are included in the
18      overdose death statistics?
19           A.    As I said, it's not a large number.
20      I would need to get access to our data to be
21      able to give you a specific answer.
22           Q.    And even there it's -- would you
23      agree with me, because of the overlap between
24      mental illness and individuals who abuse drugs,
25      it's not always a clear determination?

Page 265

1          A.    That's not my area of expertise.

2     That's a forensic pathologist question.

3               MR. GALLUCCI:  Object to form.

4               BY MR. CHEFFO:

5          Q.    Okay.  I mean you -- you --

6     you've -- you've testified a bit of today that

7     you have some level of knowledge about people

8     who abuse and your views about psychological

9     disorder versus physical dependence.

10              So do you believe that people who --

11    and I think you just testified two minutes ago

12    that there's an overlap between areas of mental

13    health and drug abuse, right?

14         A.    There is a overlap in people who

15    suffer from both, yes.

16         Q.    Okay.  And do you -- do you know

17    then whether there is -- have you seen anything

18    or talked in -- in the forensic community that

19    suicides are underreported?

20              MR. GALLUCCI:  Object to form.

21              THE WITNESS:  I don't recall

22    specific case where we've discussed that

23    suicides are underreported, no.

24              BY MR. CHEFFO:

25         Q.    Is it your understanding that, in

1    order -- and probably a host of reason, right?

2    Potential family issues and -- and other social

3    issues that, unless there's very clear

4    evidence, suicide is not determined to be a

5    cause of death?

6         A.    Can you -- can you repeat that?  Or

7    can you give it to me...

8         Q.    Sure.

9               I don't want to mischaracterize Dr.

10   Kohler's testimony, but I'll give you my best

11   recollection.

12        A.    Okay.

13        Q.    It was something along the lines of,

14   unless we're very sure, we see a note, we have

15   clear evidence of suicide, we don't declare

16   something suicide because of potentially

17   various other -- family and other factors, and

18   it's a policy.  So kind of, if in doubt, and we

19   think someone overdosed, it's declared an

20   overdose.

21               MR. GALLUCCI:  Object --

22               BY MR. CHEFFO:

23        Q.    My question is are you aware of any

24   kind of formal or informal policy or practice

25   whereby overdose deaths or other -- other

Page 267

1      deaths are not deemed to be a suicide by the

2      department unless there is a -- a -- a higher

3      level of -- of proof or showing than might be

4      the case in some other causes of death?

5               MR. GALLUCCI:  Object to form.

6               THE WITNESS:  Yeah.  That's you

7      citing Dr. Kohler.  She's a medical examiner.

8      That's really a forensic pathologist question.

9               BY MR. CHEFFO:

10          Q.    Fair.  You don't know.

11          A.    Yeah.

12               MR. CHEFFO:  Okay.  Can -- let's

13      mark this document, please.

14               If we can just mark this document,

15      please.

16               (Deposition Exhibit 5 was marked for

17      identification.)

18               BY MR. CHEFFO:

19          Q.    Would you take a look, sir, at

20      Exhibit 5.

21               You've seen this before, right?

22          A.    I have.

23          Q.    On the front page I think there's

24      just a typo.  It's -- should be January 11th,

25      2019.

Page 268

```
 1          A.    Yeah.
 2                MR. GALLUCCI:  Also, just for
 3     clarification, the first page after the cover,
 4     or are you on the cover?
 5                MR. CHEFFO:  I'm sorry.  On the
 6     cover.  Thanks, Frank.
 7                MR. GALLUCCI:  Okay.
 8                MR. CHEFFO:  Yeah.  Yeah.
 9                There's -- there's no -- I -- let me
10     make sure I'm correct about this.  There's no
11     numbers or Bates stamps on this.  I think this
12     is...
13                BY MR. CHEFFO:
14          Q.    But this is a recent document from
15     just a few weeks ago, right?
16          A.    Correct.
17          Q.    And -- and was -- was this published
18     on the web site; do you know?
19          A.    Yes.
20          Q.    Did you play a role in -- in
21     assembling this or reviewing it?
22          A.    Yes.
23          Q.    And what was your role?
24          A.    Taking the data that -- that we
25     collect as we go and putting it into this
```

Page 269

```
 1    report.
 2        Q.    Do you work with somebody else who
 3    assists you in preparing this?
 4        A.    Some of the information comes from
 5    other agencies.  So we do work with other
 6    people.  But in -- in the actual compilation, I
 7    -- I do most of this myself.
 8        Q.    Okay.  So pretty much this -- you
 9    know, this is generated by you at your computer
10    compiling information?
11            MR. GALLUCCI:  Did you have
12    something --
13            THE WITNESS:  Yes.
14            MR. GALLUCCI:  -- you were still
15    adding?
16            THE WITNESS:  Yeah.  I just wanted
17    to point out that this one's marked.  I didn't
18    know if that was appropriate --
19            MR. CHEFFO:  Oh.
20            THE WITNESS:  -- for the --
21            MR. CHEFFO:  Yeah.  Thank you for
22    that.
23            THE WITNESS:  -- exhibit.
24            MR. CHEFFO:  I -- I think -- let me
25    just -- can I have another copy?
```

1              MR. GALLUCCI:  Yeah.  Thank you

2       for...

3              MR. CHEFFO:  Yeah.  Thanks, sir.

4              We'll -- we'll -- let's make a note.

5       We'll just change it.

6              MR. GALLUCCI:  We'll switch his

7       copies out.

8              (Discussion held off the

9       stenographic record.)

10             THE WITNESS:  I don't know if it

11      makes a difference or...

12             MR. CHEFFO:  No, no, no, no.  You --

13      you did the right thing.  It's -- it doesn't

14      make a difference, but it's better to have an

15      adulterated document.

16             MR. GALLUCCI:  Keeps me from

17      complaining later.

18             MR. CHEFFO:  Yeah, yeah.

19             MR. GALLUCCI:  And so we've

20      renumbered it.  There was a 5 on it.  We've

21      changed the date to 2019.  Otherwise, there's

22      no markings that have been --

23             MR. CHEFFO:  Okay.

24             BY MR. CHEFFO:

25        Q.   So back to this medical examiner's

1       heroin, fentanyl, cocaine related deaths in

2       Cuyahoga County.

3               This is -- what -- what was the

4       purpose of this document?

5           A.    It was to provide the community a

6       baseline of information about how the crisis is

7       proceeding.

8           Q.    The -- the crisis of drug -- the

9       drug crisis?

10          A.    Yes.

11          Q.    That includes --

12          A.    The opioid crisis.

13          Q.    The what?

14          A.    The opioid crisis.  Right.

15          Q.    Is cocaine an opioid?

16          A.    No.

17          Q.    What does it say on the front page?

18          A.    It's says heroin, fentanyl and

19      cocaine.

20          Q.    Right.

21              So it's doing more than just talking

22      about the opioid crisis, right?

23              MR. GALLUCCI:  Object to form.

24              THE WITNESS:  As we discussed, the

25      upswing in cocaine was due mainly to fentanyl.

Page 272

1      But yes, I take your meaning that cocaine is

2      not an opioid.

3              BY MR. CHEFFO:

4      Q.    Okay.  And -- and if we were to look

5      back at your computer, this is a document that

6      you maintain and update and compile based on

7      information that's available to the department

8      and other information that you may get from

9      other departments, right?

10     A.    Yes.

11     Q.    Would you consider yourself the

12     primary author of this document?

13     A.    Yes.

14     Q.    Would you follow me to the second

15     page, which is the first page after the cover.

16     A.    Uh-huh.  Yes.

17     Q.    And -- and I apologize.  Just go

18     back to the first page.

19             It says "December Update," the

20     2000...

21             Was his previously promulgated?

22     A.    No.  I believe every month we

23     just -- we put update.  It's the November

24     update from October, the December update --

25     Q.    I see.

Page 273

1          A.     -- from November.

2          Q.     So this is kind of a -- a monthly

3     update document, right?

4          A.     Yes.  I believe we've got them on

5     our web site going back almost three years now.

6          Q.     Okay.  So let's just look at the --

7     the second page now, which is the first full

8     page.  Just a few issues.

9               The -- the orange has total drug

10    overdose deaths, right?

11         A.     Yes.

12         Q.     That's all -- all drugs that you

13    capture that you've -- you know, you've

14    identified as being part of the cause of death?

15         A.     The mode of death.

16         Q.     The mode of death.  Okay.

17              And then there are various other

18    graph endpoints that are defined below,

19    including heroin, cocaine, carfentanil,

20    fentanyl and all opioids, right?

21         A.     Yes.

22         Q.     And I think we've talked about this

23    with Dr. Gilson but make sure you understand

24    this or -- or agree with this.

25              There -- if -- if an individual has

Page 274

1    two or three drugs in their system, it -- it

2    may be listed multiple times, so you may have

3    more drugs in a particular year than actual

4    deaths; is that right?

5              MR. GALLUCCI:  Object to form.

6              BY MR. CHEFFO:

7         Q.   Do you understand my question?

8         A.   So people will have multiple drugs

9    in their systems, yes.  They are counted in

10   each category that's appropriate and

11   identified.  So you -- and I believe we talked

12   about this earlier.  You can't go through and

13   add these all up and get the number at the top,

14   no.

15        Q.   Right.

16             So if you add them up, you're going

17   to get more than the number on the bottom, and

18   that's because there's essentially a double

19   counting or triple counting, depending on how

20   many drugs are found in the system?

21        A.   Correct.

22        Q.   Okay.  So in terms of the line in

23   2011 for fentanyl -- do you see that?

24        A.   Yes.

25        Q.   That's -- and also -- and what I

1     really want to focus on -- I apologize -- is
2     actually the all opioids.
3              I think that's -- is that the 113
4     number?
5         A.    In 2011?
6         Q.    Correct.
7         A.    In 2011 it's, yes, 113.
8         Q.    And that's prescription medicines,
9     right?
10        A.    Correct.
11        Q.    And -- and just to be clear, on this
12    chart prescription medicines don't -- this
13    doesn't necessarily mean that they were
14    lawfully prescribed; it just means that it's a
15    medicine that can be lawfully prescribed if a
16    doctor determines that it's appropriate.
17        A.    Correct.
18              MR. GALLUCCI:  Object to form.
19              BY MR. CHEFFO:
20        Q.    So if a -- if a -- if -- if
21    oxycodone or hydrocodone were diverted and
22    found, it would still be deemed a prescription
23    medicine, right, for the purpose of this chart?
24              MR. GALLUCCI:  Object to form.
25              THE WITNESS:  Correct.

Page 276

1         BY MR. CHEFFO:

2    Q.    And deaths related to prescription

3    opioids were at their height in 2011, right?

4    A.    Based on this time frame, yes.

5    Q.    Well, this time frame goes from 2006

6    to 2018, right?

7    A.    Yes.

8    Q.    So for that 12-year period, in any

9    year the highest -- the highest number of

10   prescription drug related death was 113, right?

11         MR. GALLUCCI:  Object to form.

12         THE WITNESS:  Correct.

13         BY MR. CHEFFO:

14   Q.    And in 2018 they -- they dropped

15   precipitously to 67, right?

16         MR. GALLUCCI:  Object to form.

17         THE WITNESS:  That's the current

18   projection, yes.

19         BY MR. CHEFFO:

20   Q.    And in 2016, when there was a spike

21   of total drug overdose deaths, the prescription

22   drug deaths were lower than they were in 2011,

23   right?

24         MR. GALLUCCI:  Object to form.

25         THE WITNESS:  Correct.

Page 277

1              BY MR. CHEFFO:

2         Q.    And then, if you look in 2016,

3    that's the year where we see total overdose

4    deaths go from 370 to 8 -- I'm sorry -- 666?

5         A.    Correct.

6         Q.    And that is largely, if not almost

7    exclusively, driven by illegal opioids, right?

8              MR. GALLUCCI:  Object to form.

9              THE WITNESS:  It seems to be almost,

10   right, one-for-one driven by illicit fentanyl,

11   yes.

12             BY MR. CHEFFO:

13        Q.    And same for 2016 to '17, that

14   increase of 666 to 727 was also driven by

15   almost exclusively illicit fentanyl, right?

16             MR. GALLUCCI:  Object to form.

17             THE WITNESS:  Yes.  To some extent,

18   yes.

19             BY MR. CHEFFO:

20        Q.    It was also driven by cocaine,

21   right, in that years -- in those years?

22        A.    I would have to see an -- a -- a

23   different chart, a similar chart.  But we do

24   track nonfentanyl-involved cocaine deaths.  And

25   as I think I indicated before, we haven't seen

1    a lot of fluctuation in that number.

2              So most of the increase that you're

3    seeing in cocaine deaths in '16 and '17 are

4    almost all commingled with the fentanyl.  So

5    the fentanyl increase and the cocaine increase

6    coincide because they're mixed together.

7         Q.    And this is all illegal, illicit

8    fentanyl, right?

9         A.    Yes.

10        Q.    And there's data or information in

11   your office that breaks down and shows the

12   commingled cocaine and fentanyl deaths?

13        A.    Yes.  We -- we do track that.

14        Q.    And it's your belief that -- well,

15   strike that.

16              Is it your belief that virtually one

17   to one any increase over what was the baseline

18   of cocaine deaths from 2016 to 2018 was

19   attributable to a commingling of the illicit

20   fentanyl and cocaine?

21              MR. GALLUCCI:  Object to form.

22              THE WITNESS:  Very nearly so, yes.

23              BY MR. CHEFFO:

24        Q.    And -- and I think we -- I asked you

25   earlier about the number of individuals who had

Page 279

1    fentanyl-related deaths in 2016 and '17.  I
2    think you said there were just a handful of
3    those that were associated with prescription
4    fentanyl.
5            Do you recall that?
6            MR. GALLUCCI:  Object to form.
7            THE WITNESS:  In '16 and '17?
8            MR. CHEFFO:  Uh-huh.
9            THE WITNESS:  Yes.  Very few.
10           BY MR. CHEFFO:
11       Q.    And -- and by "few," five? six?
12   seven?
13       A.    Might have been just single digits.
14       Q.    Single digits.
15            So that means that, proportionally,
16   98, 99 percent of the fentanyl-related overdose
17   deaths were from illicit fentanyl.
18       A.    Yes.
19       Q.    And in your work on the task force
20   or around the office, where did that illicit
21   fentanyl come from?
22           MR. GALLUCCI:  Object to form.
23           THE WITNESS:  We are not able to
24   identify it with the work that we've done in
25   our office.  That -- that kind of tracking

Page 280

1       takes more time consuming testing.

2               I believe we send all of our results

3       to ENFLIS that -- the DEA's kind of lab.  And

4       they're able to do more specific work like

5       that.

6               As far as discussions at the task

7       force, there -- early on in the fentanyl phase,

8       there had been illicit manufacture within

9       Mexico.  But as -- as -- as time went, we are

10      told that more and more have -- had been coming

11      in from China.

12              BY MR. CHEFFO:

13          Q.  So is it fair to say that the

14      overwhelming amount of fentanyl that's come

15      into Cuyahoga County in the last three or four

16      years has come from some illegal source outside

17      the United States, based on the information

18      you've been given?

19              MR. GALLUCCI:  Object to form.

20              THE WITNESS:  That's the information

21      that I've been made aware of, yes.

22              BY MR. CHEFFO:

23          Q.  And you would agree with me -- well,

24      strike that.

25              Would you agree with me that, other

Page 281

1      than some fluctuations, the baseline of deaths
2      from prescription drugs has been relatively
3      similar from 2006 to 2018?
4                  MR. GALLUCCI:  Object to form.
5                  THE WITNESS:  Yeah.  With the
6      exception of -- well, the first part, I mean
7      2006 to 2011, it does bounce around, but it has
8      kind of gone steadily up.  And then after 2011,
9      seems to decrease a bit and level out, yeah,
10     until this past year.
11                 BY MR. CHEFFO:
12          Q.    And as I said, I'm not -- because,
13     frankly, proportionally, right, an extra 30
14     deaths is a lot of human beings.  So it's --
15     you know, there's probably -- it doesn't take a
16     lot of deaths to change the proportions.
17                 But just as -- my -- visually it --
18     it looks like, you know, a relatively straight,
19     you know, kind of line, right?
20          A.    In comparison to some of --
21                 MR. GALLUCCI:  Object to form.
22                 THE WITNESS:  -- the other lines on
23     the graphs, yes.
24                 BY MR. CHEFFO:
25          Q.    Okay.  And I guess what I was going

Page 282

1       to say is, you know, you -- the reason why I

2       was just asking that is you've talked about a

3       baseline for cocaine prior to 2016, right?

4               A.    Yes.

5               Q.    And the baseline for cocaine is

6       actually higher, other than maybe 2011, than it

7       is for prescription medicines, right?

8                     Other than when you get to 2016.

9               A.    Yes.  For the most part.  Those

10      exceptions, yes.

11              Q.    But even that baseline, right -- so

12      in 2015 there were 120 cocaine-related deaths,

13      right -- or cocaine-involved deaths, right?

14              A.    I'm sorry.  What year was that?

15              Q.    2015.  119, it looks like.

16                    Am I reading that right?

17              A.    115?

18              Q.    Is it 115?  I'm sorry.

19                    Have there been ever -- ever been

20      efforts that you're aware of to start a task

21      force or specific efforts to addresses the

22      cocaine deaths in Cuyahoga County that appear

23      to be very consistent and over a hundred every

24      single year for the last 12 years?

25                    MR. GALLUCCI:  Object to form.

```
                                           Page 283
 1              THE WITNESS:  Discussions in recent
 2    years, we have talked about cocaine and -- and
 3    the importance of addressing cocaine, again, in
 4    conjunction with fentanyl.  But yes, that's
 5    become a more prominent discussion in the task
 6    force and with -- with community.
 7              BY MR. CHEFFO:
 8        Q.    In 2016, do you know -- of the 370
 9    overdose deaths, do you know how many of them
10    were cocaine-only deaths?
11        A.    What year?
12        Q.    2015.
13        A.    '15?  Of the 370, there were 115
14    cocaine-related deaths.
15        Q.    Right.
16              Now -- and -- and you may or may not
17    know this.  So I'm just trying to find out,
18    in -- in some of the information and details
19    we've seen, it's -- it's often said and
20    reported that most people who have
21    opioid-related deaths, they have multiple drugs
22    in their system.
23              Are you familiar with that data?
24        A.    Yes.
25        Q.    So you're -- you don't usually see
```

Page 284

1    just hydrocodone or oxycodone or heroin or

2    fentanyl; it's usually a little bit of a

3    cocktail in many people, right?

4          A.    Correct.

5          Q.    And is -- is the same true for

6    cocaine?

7                In other words, people who overdose

8    on cocaine, putting aside the lacing with

9    fentanyl -- but prior to that, if you see a

10   cocaine death, would we expect to see multiple

11   drugs in the system?

12               If you know.

13         A.    Yeah.  I would have to refer back to

14   the data to be -- to be sure.

15         Q.    Are you aware of -- well, strike

16   that.

17               I take it everybody would agree

18   that, even though drug over death [sic] numbers

19   are probably almost certainly too high for

20   everyone's liking, it's good news to see a

21   drop?

22               MR. GALLUCCI:  Object to form.

23               THE WITNESS:  Yes.  They will

24   welcome whatever progress we can make.

25               BY MR. CHEFFO:

Page 285

1          Q.     And has your department assessed any

2     factors that have led to that drop?

3          A.     Again, the final rulings aren't

4     complete.  So this is still a projection based

5     on our best information to date.

6                 I believe, when we are talking about

7     the press conference that was held, one of the

8     things that had been brought up was the kind of

9     precipitous drop in carfentanil deaths.  That

10    certainly had an impact.

11         Q.     Do you think that the work that's

12    being done by the Board of Health and the --

13    the -- the U.S. Attorney's task force and

14    others has actually made an impact?

15                MR. GALLUCCI:  Object to form.

16                THE WITNESS:  I believe it has.

17                BY MR. CHEFFO:

18         Q.     And I take it you agree that

19    governments and other agencies wouldn't

20    continue to have task forces in place for six,

21    seven, eight years if they thought that they

22    were not effective, right?

23                MR. GALLUCCI:  Object to form.

24                THE WITNESS:  The -- the task force

25    itself is kind of a voluntary thing.  So people

Page 286

1      just kind of have continued with it.  I -- I

2      believe everybody still sees value in it.

3                  BY MR. CHEFFO:

4          Q.    Right.

5                  These are -- these are busy people,

6      yourself included, right?

7          A.    Yes.

8          Q.    If you thought your work was not

9      important and had a positive impact, you

10     probably would find something else to do,

11     right?

12         A.    Likely.

13         Q.    And do you agree that there's been a

14     good amount of publicity that has focused on

15     appropriate prescribing and the concerns about

16     opioid use?

17                 MR. GALLUCCI:  Object to form.

18                 THE WITNESS:  That has been one of

19     the focuses.

20                 BY MR. CHEFFO:

21         Q.    And that's been over the last few

22     years, right?

23                 MR. GALLUCCI:  Object to form.

24                 THE WITNESS:  Correct.

25                 BY MR. CHEFFO:

1     Q.    And do you think it's likely that

2     doctors in Cuyahoga County who prescribe

3     opioids as part of their the practice have,

4     through these various initiatives and

5     informational campaigns and medical boards,

6     received substantial information about

7     prescribing and other potential information

8     about opioids?

9               MR. GALLUCCI:  Object to form.

10              THE WITNESS:  I believe so, yes.

11              BY MR. CHEFFO:

12        Q.    And that's kind of the goal, right?

13        A.    That is one of the goals, yes.

14        Q.    And that's been ongoing for a few

15     years, right?

16              MR. GALLUCCI:  Object to form.

17              THE WITNESS:  Yes.

18              BY MR. CHEFFO:

19        Q.    And you also believe, I take it,

20     that that information has -- is important so it

21     can form the prescribing habits of doctors,

22     right?

23        A.    I'm -- I'm not sure that "habits" is

24     the correct word.

25        Q.    Prescribing practices.

Page 288

```
 1        A.    The -- the guidelines that have
 2    been -- been put out by various federal and
 3    state agencies I believe are designed to inform
 4    the practice of medicine with respect to the
 5    prescription of opioids.
 6        Q.    Okay.  And in any of your work,
 7    professional or personal, have you met any
 8    doctor in Cuyahoga County who advised you or
 9    indicated that he or she wrote a opioid
10    prescription for an improper purpose?
11              MR. GALLUCCI:  Object to form.
12              THE WITNESS:  I have not had that
13    discussion with any.
14              BY MR. CHEFFO:
15        Q.    Has any doctor that you're aware of,
16    in your personal or professional life, said
17    that they wrote a -- a prescription for an
18    opioid pain medicine because they were
19    improperly influenced by a pharmaceutical
20    company?
21        A.    I've not had any specific questions
22    with doctor about their prescribing habits in
23    any form.
24        Q.    And the same would be true for
25    distributors:  Are you aware of any
```

Page 289

1      information -- did any doctor ever tell you

2      that they received any information from a

3      pharmacy or distributor that caused them to

4      improperly write a -- a prescription for an

5      opioid medicine?

6                  MR. GALLUCCI:  Object to form.

7                  THE WITNESS:  So do I have any

8      information, or has any doctor told me that?

9                  BY MR. CHEFFO:

10         Q.    Has any doctor told you that?

11                MR. GALLUCCI:  Same objection.

12                THE WITNESS:  I have not had any

13     discussions with doctors about their

14     prescribing habits.  Or practices.  Sorry.

15                BY MR. CHEFFO:

16         Q.    Can you turn back to the -- the 2017

17     report for a minute.  And I'm going to ask you

18     to look at 2 -- Page 13, please.

19         A.    I'm sorry.  What number?

20         Q.    13, 1-3.

21                You see it talks about the Cuyahoga

22     County opioid initiative?

23         A.    The Opiate Initiative, yes.

24         Q.    Do you know what that is?

25         A.    That's basically the task force.

1     But it also probably encompasses any of the

2     county activities specifically.

3          Q.    Well, it's called the Cuyahoga

4     County Opiate Initiative, right?

5          A.    Correct.

6          Q.    So it's specific to this county,

7     right?

8               MR. GALLUCCI:  Object to form.

9               THE WITNESS:  Correct.

10              BY MR. CHEFFO:

11         Q.    And it's -- in fact, it's in the

12    county's medical examiner's statistical report,

13    right?

14         A.    Correct.

15         Q.    And what it says is:  "is a broad

16    response to the ongoing public health emergency

17    identified in 2011 by the Cuyahoga County

18    Medical Examiner's Office."

19              Do you see that?

20         A.    I do.

21         Q.    And when did you first start at --

22    in the office?

23         A.    2011.

24         Q.    So when you started, that's when the

25    Medical Examiner's Office identified an ongoing

1     public health emergency?

2              MR. GALLUCCI:  Object to form.

3              THE WITNESS:  No.  It's probably

4     better worded that that's when we identified

5     the issue.  At the time of the printing of

6     this, we -- I believe we were characterizing it

7     as a public health emergency.

8              BY MR. CHEFFO:

9         Q.    I'm sorry.  I don't understand that.

10        A.    So the president of the United

11    States declared a national health emergency in

12    2018, which is when this was printed.  So

13    it's -- it's not --

14        Q.    Where -- where does it say anything

15    about the president?

16        A.    It does not.

17        Q.    It -- it says pretty clearly, does

18    it not, that it's a broad response to the

19    ongoing public health emergency identified not

20    by the president but identified in 2011 by the

21    Cuyahoga County medical examine [sic] office,

22    right, through a careful review of statistics

23    of violent, suspicious and sudden or unexpected

24    deaths, such as overdose deaths, specifically

25    those due to opioids over -- opioids and

1      heroin, right?

2                MR. GALLUCCI:  Object to form.

3                THE WITNESS:  That's what it says.

4                BY MR. CHEFFO:

5         Q.    So is it wrong?

6         A.    So I said it's imprecise.  So at the

7      time of the printing of this document, the

8      president had already declared a national

9      health emergency.  When Dr. Gilson and I

10     arrived in 2011 is when we first started to

11     notice the problem with heroin.  That's what

12     this is trying to convey.  This language is

13     imprecise.

14               BY MR. CHEFFO:

15        Q.    Well, I'm -- not to quibble with

16     you, sir, but it doesn't seem imprecise to me.

17     It seems very precise.  I don't see anything

18     about the president here or 2018.

19               Let me ask you this:  If I look back

20     at -- and I guess we can.

21               Is this -- is this language in any

22     other reports?

23               MR. GALLUCCI:  Object to form.

24               And move to strike the initial

25     portion of that.

Page 293

1            THE WITNESS:  I don't have the other
2       reports in front of me.
3            BY MR. CHEFFO:
4       Q.    Okay.  Okay.  So what is it in 2000
5       -- well, let me strike that.
6            When -- did the opioid -- the
7       Cuyahoga County Opioid Initiative start in
8       20111?
9            MR. GALLUCCI:  Object to form.
10           THE WITNESS:  Again, that's kind of
11      a generic term.  But yes, that was the
12      beginning of our discussions internally, the
13      Medical Examiner's Office, that we had noticed
14      an increase in heroin deaths.
15           Going into 2012 we started to call
16      some of the partners who were working on drug
17      addiction issues, like the ADAMHS Board, the
18      Board of Health, the U.S. Attorney's Office.
19      And those were kind of the embryonic stages of
20      putting together the task force.
21           In September of 2012 I believe is
22      when the first kind of public pronouncement
23      from the county executive and the medical
24      examiner that we had identified a significant
25      statistical increase in heroin deaths.

                                              Page 294

1                And 2013 is when the task force was
2        kind of initiated.
3                     BY MR. CHEFFO:
4            Q.    So there was a review of statistics,
5        death data, violence data, drug use in 2011
6        that put you and the county on notice; and
7        that's why you then started the opioid --
8        opioid initiative as well as the task force,
9        right?
10                    MR. GALLUCCI:  Object to form.
11                    THE WITNESS:  No.
12                    So we had general numbers.  We did
13        not have full reviews or analysis until much
14        later.
15                    BY MR. CHEFFO:
16           Q.    But you -- you had enough
17        information to start an -- an -- an initiative
18        that you're actually touting, right, on Page 13
19        of your report, right, as a positive thing?
20           A.    We had an awareness that there were
21        increased heroin numbers, yes.
22           Q.    Right.
23                    So you had an awareness that puts
24        you on notice that there was a problem, right?
25                    MR. GALLUCCI:  Object to form.

1

2              THE WITNESS:  Well, it didn't put us

3      on notice.  Medical Examiner's Office was

4      telling the public that we had a statistical

5      increase in the number of heroin deaths.

6              BY MR. CHEFFO:

7        Q.    Okay.  So the Medical Examiner's

8      Office put the public and other agencies on

9      notice of a problem that it was seeing in 2011,

10     right?

11       A.    Well, the announcement wasn't until

12     September of 2012.

13       Q.    Okay.  But you had -- you had made

14     that determination, your office, back in 2011,

15     as stated on Page 13 of the document, right?

16              MR. GALLUCCI:  Object to form.

17              THE WITNESS:  Internally I believe

18     that's the first time that we noticed that

19     there were statistical numbers that needed --

20     needed to be reviewed, yes.

21              BY MR. CHEFFO:

22       Q.    So -- so --

23              MR. CHEFFO:  Can I have this

24     document.  15.

25              BY MR. CHEFFO:

Page 296

1        Q.    So your testimony is that that

2    language was imprecise because it really meant

3    to say that you picked that up after the

4    president's public health emergency, right?

5              MR. GALLUCCI:  Object to form.

6              THE WITNESS:  Well, it certainly was

7    a -- a fact at time of the printing that the

8    president had declared a national public health

9    emergency.

10             I think in 2015 or '16 -- probably

11   2016, because that's when the crisis really

12   started to hit -- internally we tried to start

13   using stronger language to make sure that

14   people understood that there was more than just

15   an awareness issue, that it -- that it was a

16   serious crisis.

17             BY MR. CHEFFO:

18       Q.    So if I told you you used the words

19   "ongoing public health emergency" in 2015 and

20   '16, does that sound right?

21             MR. GALLUCCI:  Object to form.

22             THE WITNESS:  I don't know what

23   you're referring to specifically.

24             BY MR. CHEFFO:

25       Q.    I can show it to you, but I'll read

1       it.  This is from 2016, the same sentence:

2       "The Cuyahoga County Opioid Initiative is a

3       broad response to the ongoing public health

4       emergency identified in 2011 by the Cuyahoga

5       County Medical Examiner's Office."

6            A.    It's --

7                  MR. GALLUCCI:  Object to form.

8                  BY MR. CHEFFO:

9            Q.    Does that ring a bell?

10           A.    So are you talking about the 2016

11      statistical report?

12           Q.    Yes, sir.

13           A.    Okay.  So I believe we talked about

14      this before, is that the reports had been

15      delayed.  We actually completed the 2015, 2016

16      reports in 2018.  And the 2017 report, most of

17      the work had been done in 2018 and had been

18      published online in -- just a few weeks ago.

19           Q.    Okay.  But if I look back -- and I

20      can mark them, but I'm trying to save a few

21      trees.  But you're welcome to.

22                 So if I look at 2015 and I look at

23      2016 and I look at 2017, it's the exact same

24      language.

25                 Does that surprise you?

Page 298

1          A.    No.  As I said, all three of those
2     books were completed in the calendar year 2018.
3     So it doesn't surprise me.
4          Q.    And they all say "Ongoing public
5     health emergency identified in 2011."
6          A.    So again --
7               MR. GALLUCCI:  Object to form.
8               THE WITNESS:  I --
9               MR. GALLUCCI:  Object to form.
10              Is there a question?
11              MR. CHEFFO:  Yeah.
12              BY MR. CHEFFO:
13         Q.    They do, right?
14         A.    They do.
15         Q.    They do say what I just read?
16         A.    They do.  As I stated earlier, the
17     language is imprecise.  The -- the issue became
18     a -- we became aware of the issue in 2011.
19     Public health emergency had been declared by
20     the president in 2018.
21         Q.    So in the next version, how -- how
22     would you rewrite it to make it accurate?
23              MR. GALLUCCI:  Object to form.
24              THE WITNESS:  You're asking me to
25     wordsmith on the fly here, so...

1              Perhaps something along the lines
2      of:  The Cuyahoga County Opiate Initiative is a
3      broad response first identified in 2011 by the
4      Cuyahoga County Medical Examiner's Office
5      through a review of overdose deaths,
6      specifically those due to opiates, opioids,
7      heroin and fentanyl that is now a public health
8      emergency.  But...
9              BY MR. CHEFFO:
10        Q.    So is your -- is your issue with
11     you -- you don't want to adopt that -- strike
12     that.
13              I should say you believe that it's
14     not accurate to say that you -- there was a
15     public health emergency in 2011?
16              Is that your -- what you're --
17     you're taking issue with?
18              MR. GALLUCCI:  Object to form.
19              THE WITNESS:  Well, I don't make
20     those declarations.  But like I said, we
21     identified that there was an issue with an
22     increase in heroin deaths at the end of 2011.
23              BY MR. CHEFFO:
24        Q.    But was there -- I mean putting that
25     aside, putting the words aside, was there a

Page 300

1     public health emergency back in 2011 such that

2     you formed a task force, you started looking at

3     statistics, you got a bunch of the agencies

4     together, you participated?

5          A.    So we identified the increase in

6     heroin deaths in late 2011.  We were able to

7     confirm the increase once all the cases were

8     ruled in 2012.

9              We then started talking to people

10    who had been dealing with drug issues

11    throughout that year to the point where the

12    county executive and the medical examiner

13    decided to talk about the heroin issue in 2012

14    in September.  And in 2013 we assembled what

15    would become the task force initially to put

16    together a community summit at -- in November

17    of 2013.

18         Q.    So look back, if you would, at

19    the -- the Medical Examiner's Office heroin,

20    fentanyl, cocaine document.  Same page.  Page 2

21    with the graph.

22              The blue is heroin, right?

23         A.    The dark blue.

24         Q.    I think so.  The one right -- the

25    second highest.

1      A.    No.  That's all opiate, opioid

2    deaths.  This is a poor choice of colors, I

3    believe.

4      Q.    Okay.  Okay.  So there was a -- so

5    in 2007 there was a -- a jump of heroin deaths

6    from 40 to 64, right?

7      A.    From 2007 to 2008, yes.

8      Q.    That's a what percentage increase?

9    Like --

10              MR. GALLUCCI:  Object to form.

11              THE WITNESS:  Making me do a lot

12    of --

13              MR. CHEFFO:  Okay.  It's -- it's --

14    it's --

15              THE WITNESS:  -- math on the fly,

16    too, here.  24, 40.  You know, it's more than

17    50 percent.

18              BY MR. CHEFFO:

19      Q.    More than 50 percent.

20              And then it remained the same for

21    the next year in 2009, right?

22      A.    Yes.

23      Q.    And then it jumped to -- am I

24    reading that right?  Is it 91?

25      A.    91.

Page 302

1          Q.    So that's another probably -- rough
2     math -- 30 percent increase?
3          A.    Roughly.
4          Q.    So your office and others were on
5     notice of a substantial increase over the --
6     the -- the years prior to 2011 in heroin,
7     right?
8               MR. GALLUCCI:  Object to form.
9               THE WITNESS:  I was not in the
10    office at that time.  I couldn't say.
11              BY MR. CHEFFO:
12         Q.    Do -- did anyone -- were -- are you
13    aware of whether anyone paid attention to that
14    before your joining?
15              MR. GALLUCCI:  Object to form.
16              THE WITNESS:  As I said, I wasn't
17    there.  I don't have any information.
18              BY MR. CHEFFO:
19         Q.    I understand.  But sometimes you get
20    legacy information, a memo, talking to someone.
21              Did you hear of any initiatives --
22    or anyone talk and say -- or see a memo from a
23    long-time employee or former employee who said,
24    "Gosh, we were really concerned back in 2007
25    when it jumped 50 percent.  And then back in

Page 303

1    2009 it jumped another 30, 40 percent"?

2              Are you aware of those

3    conversations?

4         A.    I am not.

5              MR. GALLUCCI:  Object to form.

6              BY MR. CHEFFO:

7         Q.    And so -- and the progression of --

8    of heroin use has been pretty steady from 2006

9    on, right?

10             MR. GALLUCCI:  Object to form.

11             THE WITNESS:  Well, there was a

12   decrease from 2006 to 2007.  But yes, there

13   was -- and then it -- a flat -- it was a flat

14   2008 to 2009.  But there's a general upward

15   trend, yes.

16             MR. CHEFFO:  Okay.  Can we just mark

17   that, please.

18             MR. GALLUCCI:  You know, we've been

19   going for kind of -- about a hour 45.

20             MR. CHEFFO:  Oh, we have?  Is it --

21             MR. GALLUCCI:  All right.  If we

22   take a break?  We had the --

23             MR. CHEFFO:  Yeah.

24             MR. GALLUCCI:  -- quick little

25   reset, but we kind of came back --

Page 304

1                    MR. CHEFFO:  That's okay.

2                    MR. GALLUCCI:  -- on at 1:24.

3                    MR. CHEFFO:  That's okay.

4                    MR. GALLUCCI:  Sorry.  Take a quick

5          break.

6                    MR. CHEFFO:  No.  It's fine.  It's a

7          good -- good natural break.

8                    MR. BORANIAN:  Can we address

9          something on the record before we go off.

10                    We're learning now that there was

11         another productions of documents from -- from

12         county on Tuesday night between 11:00 and 12:00

13         p.m., about 35,000 additional pages, including

14         documents from Mr. Shannon's custodial file.

15                    So I have two things to say.  First,

16         if you would please look into that on the break

17         maybe.

18                    MR. GALLUCCI:  Which production

19         number are you referring to?

20                    MR. BORANIAN:  We'll get that to

21         you.  91.  I'm being told it's 91.

22                    But if you could inquire about that

23         and let us know preliminarily what you can,

24         we'd appreciate it.

25                    And the second thing is that the

Page 305

```
 1      reservation of rights that Mr. Cheffo stated
 2      earlier, I wanted to clarify that -- that goes
 3      for all defendants, including the right to
 4      reopen this deposition if we deem necessary.
 5              MR. GALLUCCI:  Okay.  And I
 6      understand the reservation you're making.  I
 7      know earlier on the record we said that there
 8      was no identification of what it is.  I'm
 9      looking.  91, much like 89, does say that it's
10      further disclosure based on privilege review of
11      custodial files.  So it's the same thing as 89.
12              MR. BORANIAN:  Okay.  If there's any
13      additional information you glean during the
14      break, then let us know.
15              MR. GALLUCCI:  That -- that's all
16      I'm going to be able to have for you.  It's
17      additional documents that were produced after
18      our rereview of privilege based on the
19      instructions from the Court.
20              MR. BORANIAN:  Thank you.
21              THE VIDEOGRAPHER:  We are going off
22      the record.
23              This is the end of Media Unit No. 4.
24              The time is 2:59.
25              (A short recess was taken.)
```

Page 306

 1               THE VIDEOGRAPHER:  We are going back

 2       on the record.

 3               This is the start of Media Unit No.

 4       5.

 5               The time is 3:40.

 6               You may proceed, Counsel.

 7               MR. GALLUCCI:  So during the break,

 8       counsel had the opportunity to speak.  We've

 9       talked previously about Cuyahoga County's

10       productions No. 89 and 91.  I believe they were

11       which -- were custodial documents, some of

12       which contained documents from Mr. Shannon as

13       well as Dr. Gilson.  There's also apparently

14       been some recent production by Purdue and, as

15       we suspect, across many of the parties in light

16       of some of the recent discussions that have

17       taken place with the Court and Special Master

18       relative to privilege.

19               The parties have discussed trying to

20       work out an amicable solution.  And we have

21       agreed that, for purposes of Mr. Shannon's

22       depo, due to the disclosure of additional

23       documents within the past few days, that there

24       will be a total time that defense will be able

25       to use of eight hours of tape time, so one hour

Page 307

1     more than as called for by the deposition
2     protocol.
3              We will continue to move forward
4     here today up until the mark -- the seven-hour
5     mark, whatever amount they choose to use.
6     Whatever's remaining balance they will have the
7     right to use when we reconvene.
8              We further discussed with regards to
9     Dr. Gilson that seven hours has already been
10    used.  Upon review of the additional documents
11    that have been produced, should defense counsel
12    desire to reconvene the deposition for up to an
13    additional hour in the event that some of those
14    documents are new documents they would not have
15    had the opportunity to examine him on
16    previously, plaintiffs will agree to the
17    additional hour and will convene that at a
18    mutually agreeable date in the relatively near
19    future.
20             Is that everybody's understanding?
21             MR. CHEFFO:  Yeah.  I think
22    that's -- that's our -- I think I can speak for
23    the defendants.  That's a -- a fair
24    representation.  And we agree and appreciate
25    your -- your cooperation in trying to be as

1    efficient as we can.

2                MR. GALLUCCI:  The only other thing

3    I'd like to add is we did say that this was

4    going to be agreement whether -- relative to

5    these two depositions.  However, anything --

6                MR. CHEFFO:  Yeah.

7                MR. GALLUCCI:  -- else that may be

8    going on in the litigation is certainly to be

9    determined.

10               MR. CHEFFO:  Right.  We -- I think

11   we -- absolutely.  And we agree that this is

12   not a precedent either way for any other

13   issues.  This is a lawyers attempt to reach a

14   practical solution in connection with the issue

15   in front of us.

16               MR. GALLUCCI:  Okay.  Thank you for

17   your cooperation.

18               MR. CHEFFO:  Okay.  We are back on.

19               BY MR. CHEFFO:

20       Q.    Now, sir, as you probably heard,

21   we're going to go another, you know, half hour,

22   40 minutes.  I'm going to try and ask some kind

23   of specific, targeted questions.  So if you

24   don't understand, let me know.  But if you'd

25   work with me and try and listen to the

Page 309

1      question, I -- I would appreciate it so we can

2      kind of move through some of these.

3              So as you sit here today, in

4      connection with the -- the budget or

5      anticipated costs for 2019, are you aware of

6      any specific line items or allocations that

7      have been made for opioid-related costs that

8      your department will have to bear?

9          A.    For 2019, again, there are things

10     that are already embedded in the budget.  And

11     it's not -- our budgeting is not in line item.

12     They'll be kind of under certain subobject

13     codes for contracts or whatnot.

14             So we do have to send some

15     toxicology out to testing -- other testing

16     facilities who have a broader spectrum of

17     standards.  And they're able to detect kind of

18     the specialty, novel type opioids.  That will

19     continue in 2019.  So technically, that will be

20     in that budget somewhere.

21             Something new that we haven't

22     already, you know, had in our budget

23     previously -- I'm not aware of any -- but

24     we're, again, going to be able to review 2018's

25     budget and -- and make some determination going

Page 310

1       from -- forward from there.

2            Q.    And other than the testing that you

3       just talked about, is there anything else that

4       you can think of that you're currently aware

5       of?

6            A.    That are specifically

7       opioid-related?

8            Q.    Yes, sir.

9            A.    Nothing in comes to mind.  I have to

10      review, you know --

11           Q.    Okay.

12           A.    -- the budget.

13           Q.    And -- and am I correct that -- that

14      if I asked you "Do you have any expected

15      expenses related to opioids coming up in 2020,

16      2021, 2022?" would your answer be you're not

17      aware of any as you sit here?

18           A.    Yeah.  I mean once we get into the

19      next biennium, we'll have to do an assessment

20      of where we're at, whether, you know, the trend

21      that we saw last year continues, and make

22      adjustments from there.

23                 I can tell you already January looks

24      like -- worse than 2017 right now.  So I said

25      it will be a constant monitoring and assessment

Page 311

1      as we go forward.  2020, '21, '22 is way too

2      far down the road to make any decisions about

3      right now.

4           Q.    When you say January looks worse, is

5      that -- there's -- there's a -- an uptick in

6      overdose deaths?

7           A.    Yes.

8           Q.    Do you know what it's attributed to,

9      what -- what drugs?

10          A.    No, not yet.

11          Q.    Okay.  Do you have any order of

12     magnitude?

13          A.    Two deaths a day.

14          Q.    And where does that fit in the --

15     the normal range or the baseline range?

16               MR. GALLUCCI:  Object to form.

17               THE WITNESS:  It depends on what

18     you're saying baseline is.  It's currently the

19     highest -- if it projected out over the entire

20     year, it would be worse than 2017.

21               BY MR. CHEFFO:

22          Q.    Okay.  Now, can you look at that

23     large printout document, please.

24          A.    Which?

25          Q.    Yeah.  Sorry.  The --

Page 312

1        A.    The report or the budget?

2        Q.    The financial expenditure report.

3        A.    Okay.  Thanks.

4        Q.    So if you could turn to the areas in

5    the medical examiner operations.

6              MR. GALLUCCI:  I'm just going to

7    note an objection.  I believe, when there

8    weren't copies of this, you indicated you

9    weren't asking specific questions on it.

10             MR. CHEFFO:  You are correct.

11             We -- we can give you a copy.  I

12   mean --

13             MS. NEWMARK:  It's on the thumb

14   drive that I gave you.

15             MR. CHEFFO:  I mean --

16             MS. NEWMARK:  And then --

17             MR. CHEFFO:  So -- so it -- it's

18   fair.  And I -- I -- so here's what I would

19   say, Frank.  I mean I --

20             MR. BORANIAN:  There are copies of

21   the excerpts at which Mark is looking attached

22   to those.  You have it in your hand.  They're

23   copies.

24             MR. CHEFFO:  Oh, these are copies?

25   Okay.  So -- so --

                                                Page 313

1                    MR. GALLUCCI:  Yeah.  I -- I was
2         going to say ask, and let's see.
3                    MR. CHEFFO:  Yeah.  No.  You know
4         what?  He doesn't even need to look at that,
5         right?  He can look at this.
6                    MR. BORANIAN:  He can.
7                    MR. CHEFFO:  Right?
8                    MS. NEWMARK:  Yes.
9                    MR. CHEFFO:  Okay.  So let's just
10        mark this.  No.  It's fair.  I --
11                   MR. GALLUCCI:  And we'll proceed
12        with the excerpts but, for the record, note
13        that the entire exhibit's not being provided.
14                   MR. CHEFFO:  Right.
15                   MR. GALLUCCI:  Do we want to mark
16        the excerpt?
17                   MR. CHEFFO:  Yeah.  I think she's
18        marking it.
19                   MR. GALLUCCI:  But do we want to
20        mark it as subset of 3, or --
21                   MR. CHEFFO:  No.  Just --
22                   MR. GALLUCCI:  -- do you want to
23        keep going?
24                   MR. CHEFFO:  Just mark it as another
25        exhibit.

```
                                                Page 314
 1              (Deposition Exhibit 7 was marked for
 2       identification.)
 3              BY MR. CHEFFO:
 4       Q.    So, sir, this is a -- a subset of
 5       the expenditure information just related to the
 6       medical examiner operations.
 7              See that?
 8       A.    That's what's it says on --
 9       Q.    Okay.
10       A.    -- on the page here, yes.
11       Q.    If you look at the second page of
12       the document -- one, two, three -- one, two,
13       three, four -- five from the bottom, "Cuyahoga
14       County region forensic science laboratory."
15              Do you see that?
16       A.    I do.
17       Q.    What is that funding for?
18       A.    The regional forensic science lab.
19       Q.    Everything related to the science
20       lab?
21       A.    For the most part, yes.
22              MR. GALLUCCI:  And, counsel, for the
23       record, I just want to note that the subset
24       that we're now marking Exhibit 7 has five
25       columns on it.  The complete exhibit has
```

Page 315

1    whatever -- there's one before A, all the way

2    through S.  So it does not appear to be --

3              MR. BORANIAN:  The -- the remaining

4    columns are on subsequent pages of Exhibit 7.

5    We printed it on this size paper for

6    manageability and for readability.  But the

7    columns are all there.

8              MR. GALLUCCI:  Okay.  So Page 2 is

9    one part of it, but page later in the document

10   is still part of what he's being referred to?

11             MR. BORANIAN:  That's correct.

12             Mr. Shannon, is that what it looks

13   like to you?

14             MR. GALLUCCI:  Okay.

15             THE WITNESS:  It -- it looks like

16   there are additional columns further back in

17   the document.  It's a little hard to follow

18   this way, but -- and it doesn't appear to have

19   any headers at the top.  So I'm not sure.

20             MR. GALLUCCI:  I guess, if you would

21   be cognizant of -- as you ask questions.  It

22   appears that there's a total of 12 pages in

23   Exhibit 7, and maybe each column is represented

24   by three pages.  So probably Page 1, Page 5 and

25   Page 9, I'm guessing --

                                        Page 316

1              MR. CHEFFO:  Yep.

2              MR. GALLUCCI:  -- would line up,

3      but...

4              MR. CHEFFO:  I only have a very few

5      questions.  So -- but -- and look, if you need

6      to look at that document, if you can't tell,

7      you'll just tell me, as you have throughout the

8      deposition.

9              And I -- I apologize.  It's -- it is

10     a little challenging to read, but that's only

11     because it's an Excel spreadsheet.

12             BY MR. CHEFFO:

13     Q.    So the -- the forensic science lab

14     line items are all funding for the science lab,

15     right?

16     A.    Yes.

17     Q.    And then, for the medical examiner

18     lab fund, which is below that, and it says

19     "Coroner's Lab," what are all those entries

20     related to?

21     A.    Again, I think, as I -- I stated

22     earlier, we have it divided up into three pots:

23     the general operating, the forensic lab, and

24     then what we call the ME lab.

25             That's the statutory creation that

1      we generally use funds from our contracts with

2      other agencies to do their autopsies.  And

3      we're able to utilize that to replace equipment

4      in the Medical Examiner's Office.

5              Q.    Yeah.

6                    And then there's one more.  If you

7      look on the -- I guess fourth page of the

8      document, it says "Cuyahoga County" -- I don't

9      know if that's regional or -- or -- R-E-G

10     forensic lab.

11                   Is that the third bucket?

12             A.    I see it.

13             Q.    It's right under where -- you know,

14     in -- in another column, in the second column,

15     it says "Corner's Lab," right, on the fourth

16     page for the first six or seven entries.  And

17     then right below it there's a new entry.  It

18     changes.

19                   Do you see that?

20             A.    I do.

21             Q.    And I'm just -- would like you to

22     tell us what that represents.

23             A.    To be honest, I haven't seen

24     anything characterized this way before.  So I'm

25     having trouble differentiating this Cuyahoga

1       County regional forensic science lab SR from

2       Cuyahoga County region forensic science lab.

3               I'm -- I'm not sure what that

4       designation actually is or how it

5       differentiates.

6           Q.    Okay.  Who would be the person to

7       answer that question if you wanted to know the

8       answer?

9               MR. GALLUCCI:  Object to form.

10              THE WITNESS:  I would likely call my

11      budget analyst --

12              BY MR. CHEFFO:

13          Q.    And who is that?

14          A.    -- at OBM.

15              Either Chuck Cavano or Anthony

16      Henderson.

17          Q.    And if you take a minute just to

18      look at -- your counsel appropriately pointed

19      out that there's some other pages here.  Just

20      the way it works.

21          A.    Yes.

22          Q.    If you want to just take a minute

23      and look at the -- the correlating or the --

24      the matching documents to this forth page, see

25      if that helps you.  So it probably should be 8.

Page 319

```
 1                  MR. GALLUCCI:  Should be.
 2                  MR. CHEFFO:  8 and 12.
 3                  THE WITNESS:  I'm going to have
 4       to -- it'd be a lot easier if I look at this,
 5       assuming that you're stipulating that this
 6       comes from this, it's all the same.
 7                  MR. CHEFFO:  That's my
 8       understanding.
 9                  MR. GALLUCCI:  Do you know where in
10       the -- in Exhibit 3 this could be found?  Is
11       there somewhere you can point him to so that
12       it's --
13                  MR. CHEFFO:  It should be in the red
14       portion.
15                  MS. NEWMARK:  It's the --
16                  MR. BORANIAN:  In the parts that we
17       highlighted previously.
18                  MR. CHEFFO:  Yeah.  I think there's
19       only a few pages there.
20                  THE WITNESS:  So Cuyahoga County
21       regional forensic science lab SR appears to be
22       the -- the -- the third bucket that I have been
23       talking about.  That is what pays salaries,
24       contracts, equipment, et cetera, for the
25       forensic lab.
```

Page 320

1              This piece here, Cuyahoga County

2      region forensic science lab general operating

3      fund, it appears that's only -- it only exists

4      in the 2011 column.  And it appears to be a

5      number of different, you know, supplies and

6      whatnot.  I can't tell from this.

7              And again, I arrived in the middle

8      of 2011.  So the 2011 budget had already been

9      set prior to my and Dr. Gilson's arrival.  None

10     of this really rings any bells for me.  So I --

11     I couldn't -- I couldn't speak to what that

12     represents.

13             What I can say though is -- is that

14     the final portions here that are indicated as

15     Cuyahoga County regional forensic lab SR appear

16     to be the normal budget for the regional

17     forensic labs.

18             MR. CHEFFO:  Okay.  Thank you.  You

19     can put that away.

20             Would you be good enough to reach

21     next to and -- the court reporter's going to

22     hand you that document.

23             (Deposition Exhibit 6 was marked for

24     identification.)

25             BY MR. CHEFFO:

1        Q.    Can you tell me what that is,

2    please?

3        A.    This looks like the --

4              MR. GALLUCCI:  What number did we

5    mark this?

6              THE REPORTER:  6.

7              MR. GALLUCCI:  I'm sorry.

8              MR. CHEFFO:  6.  Exhibit 6.

9              THE WITNESS:  The final drug report

10   for 2016.

11             BY MR. CHEFFO:

12       Q.    Okay.  If you look at the second

13   page.

14             I think we talked a little earlier

15   about nonfentanyl cocaine deaths?

16             MR. GALLUCCI:  Sorry to interrupt,

17   Counsel.  My copy has two -- it has a black-and

18   white of the cover and a color.  The

19   black-and-white has a Bates number, but then

20   after that there are none.

21             I don't know if that's the same as

22   all the copies that have been distributed.

23             THE WITNESS:  That's how mine is.

24             MS. NEWMARK:  Yeah.  Because we were

25   -- the produced version was blank-and-white.

Page 322

1         And it's easier see it in color.  So the color

2     version was pulled off the web site -- the

3     Cuyahoga County medical examiner web site.

4              It is the same as the version that

5     was produced to us, only in color, because it's

6     easier for everybody to see.  So the Bates

7     number reflects the produced version.

8              MR. GALLUCCI:  And -- and again,

9     there's a singular Bates number for the entire

10    report?

11             MS. NEWMARK:  That's the starting

12    Bates number for the report.

13             MR. GALLUCCI:  Okay.

14             BY MR. CHEFFO:

15        Q.    And let me just ask you this is --

16    this is a document that's on your web site,

17    right?

18        A.    Yes.

19        Q.    And on the first page when it's

20    marked "Confidential," is this a confidential

21    document?

22        A.    I don't believe that's anything that

23    we put on there.

24        Q.    Right.

25             So look at the -- the -- the first

1      page that has a chart, which is either the

2      second -- or third page of the document, which

3      is -- of this exhibit but the second page of

4      the document.  It says:  "CCMEO 2016

5      Fentanyl-Involved Deaths."

6                  See that?

7          A.    I do.

8          Q.    And then there's a number of 119,

9      fourth -- fifth bar over?

10         A.    Yes.

11         Q.    What does that represent, sir?

12         A.    That represents all deaths that had

13     cocaine associated with it but not fentanyl.

14         Q.    For what year?

15         A.    It would be 2016.

16         Q.    In terms of -- is there -- is there

17     something called a -- a -- a death database or

18     a database that collects information on

19     decedents or information?

20         A.    So we have a decedent management

21     system, yes.

22         Q.    What is that called?

23         A.    VertiQ, V-e-r-t-i cap Q.

24         Q.    And what information does that

25     store?

Page 324

1          A.    All -- large variety really.

2     Everything that we need to do to produce the

3     autopsy reports, the death certificates.  It

4     will have your basic demographic data; next of

5     kin; who reported the death; who, you know,

6     found the body; what their relationship was to

7     the decedent; a summary of the initial call; a

8     summary of the investigative report; I couldn't

9     just -- just about every -- all the doctors --

10    notes to the doctor, notes to the

11    investigators.

12          We use it for final disposition;

13    what funeral home; whether or not there's a

14    progress form that'll say whether the body had

15    been viewed, by whom, what time; has the

16    autopsy be -- been done, by whom, what time,

17    what day; is the body ready for release; is the

18    body on hold for any reason; is the body going

19    for organ donation; has the body been released;

20    who picked up the body; who signed for it; is a

21    toxicology report done; has a death certificate

22    been issue; is it a pending death certificate

23    or an original.

24          If there is pending, then there'll

25    be a supplemental.  Has that been completed and

Page 325

1    when.
2              So there's just a --
3         Q.    A lot of information.
4         A.    -- large, large database of
5    information.
6         Q.    And is this -- is this database --
7    or strike that.
8              Does this database link information?
9              So, for example, if it says, you
10   know, has a tox report been done, can I then
11   click on some way to get the tox report; or do
12   I have to go to another database?
13        A.    I wish.  It'd be great if you could
14   come up with that.  No, it doesn't.  We have a
15   separate database for evidence.  Anything
16   relating to toxicology is part of the evidence
17   chain, even though we release it with the
18   autopsy report.  That's in JusticeTrax,
19   T-R-A-X.  And currently those two do not speak
20   the same language.  And so we have to run the
21   systems separately.
22        Q.    Is that true for other types of
23   records, like not just tox but medical records
24   or investigator reports; are they all
25   maintained outside of VertiQ, or are any of the

1     documents and work being done by the department

2     also accessible through VertiQ?

3          A.    No.  So -- and I have to -- I have

4     to back up.  So we're adding the JusticeTrax

5     toxicology module now.  It was supposed to be

6     ready January 1st.

7               There was an in-home toxicology

8     tracking system done, and we're -- we're

9     replacing it.  We're in the process of

10    replacing it.  So JusticeTrax handles all the

11    evidence for the forensic lab.  It does not yet

12    do toxicology, but we've got the module that's

13    currently stored in Pathway, as it's called.

14    And that's done by one of our in-house IT.

15              So current toxicology is in

16    Pathways.  It's moving any day now to

17    JusticeTrax.

18              I apologize.

19         Q.    Okay.

20         A.    I just -- I got ahead of myself.

21    Was wishful thinking probably.

22              And I -- I forgot the rest of your

23    question.

24         Q.    No.  That's okay.  No.  It's

25    helpful.

1              I mean so -- but I -- I guess I just

2      want to stick for a minute with VertiQ.  I -- I

3      --

4          A.    Sure --

5          Q.    -- don't want to put words in your

6      mouth.  You -- you gave us, helpfully, a long

7      list of -- it sounded to me like important

8      tracking information, right, to find out where

9      the kind of decedent -- the investigation was

10     in the -- in the process.

11             And I was just trying to understand

12     if, other than just the tracking, if it said do

13     we have medical records, or do we have a tox

14     study, or do we have something --

15         A.    Sure.

16         Q.    -- whether I could then go into that

17     system, or would I have to read VertiQ and say,

18     "Yes, there are medical records.  Now I got to

19     go over here to get them"?

20         A.    Right.  So medical records is kind

21     of a whole other ball of wax.  Every hospital

22     has an electronic medical records system.  None

23     of the hospitals have the same one.  We

24     obviously aren't part of the hospital systems.

25     So we have actual printouts of the requested

Page 328

1      medical reports.

2              There'll be a checkbox in VertiQ

3      that says a report has been requested of who,

4      by who, at what time, an whether it's been

5      received or not, and when it was received.  But

6      that report will actually be in the physical

7      paper file.

8          Q.    Okay.  So am I correct that VertiQ

9      is -- is really just a tracking tool, albeit

10     probably a helpful one; but if I want to drill

11     down into anything -- correspondence,

12     communication, records, documents, I have to go

13     somewhere else?

14         A.    Right.  It will depend specifically

15     what you're looking for.  The VertiQ database

16     is massive, but it does not include everything.

17     And so -- right.

18              For evidentiary reports and things

19     like that, you'd have to go to JusticeTrax.

20              For any of the correspondence -- say

21     a -- an attorney is asking for X.  That request

22     gets put in the hard copy file.  Those are

23     eventually digitized and stored in various

24     places, the physical copy in one place, the

25     electronic in various databases and on disks.

Page 329

1      Q.    And are they ever accessible through
2    VertiQ?
3      A.    Are -- are what accessible?
4      Q.    Those digitized medical records or
5    other records.
6      A.    So when a case file is closed, when
7    work is being completed -- and it's usually
8    about a 18-month lag -- paper files will sit in
9    the file room in the building.  Usually
10   anything older than two years is put in
11   archives.
12          When it goes to archives, they're
13   boxed, numbered.  They sit.  What we started
14   doing, I think in 2012, was taking -- I think
15   we took -- I think we had paper files back to
16   the 1970s.  We took those and started
17   digitizing them.  I think we've got about two
18   decades worth now digitized.  And they're on
19   both the hard drive and a disk.
20          But again, they don't
21   cross-reference each other in any way.  So for
22   certain things you have to go to the physical
23   file, for certain -- for evidence you have to
24   go to JusticeTrax.  For all the -- all the rest
25   of it, it's housed in VertiQ.

Page 330

1          Q.    Okay.  So let me just give you a

2     quick example.

3               And so let's assume there's a

4     checkmark that someone requested medical

5     records from Hospital ABC.

6               Will the -- the letter or the

7     request for authorization be in VertiQ?

8          A.    The request for the report will be

9     in VertiQ, yes.

10         Q.    Okay.  And -- and you know what

11    OARRS is, right?

12         A.    Yes.

13         Q.    Is -- is OARRS -- does OARRS

14    interface in any way with VertiQ?

15         A.    It does not.

16         Q.    Who has access to VertiQ.

17              Is it something that administrative

18    people do or the doctors or everyone?

19         A.    Most everybody.  A lot of the

20    administrative work, both medical secretaries

21    who are doing the autopsy reports.  The case

22    managers who are actually working on death

23    certificates, burial permits, things like, have

24    access to it.  Obviously the doctors, the

25    investigators have access to it.

Page 331

1      Q.     Do you use it for any of the
2    reporting and other kind of public policy work
3    that you do?
4      A.     So we can download reports that we
5    can utilize for those statistical reports for
6    these reports.
7      Q.     So that's -- that's what I was going
8    to ask you.
9             So the kind of reports that we've
10   been talking about in these exhibits, is that
11   information that primarily comes from VertiQ?
12             MR. GALLUCCI:  Object to form.
13             THE WITNESS:  Some of it, yes.
14             BY MR. CHEFFO:
15      Q.     What -- what information doesn't
16   come from VertiQ?
17             Or what are the other main sources
18   of data or information outside of VertiQ?
19      A.     Well, for this specific report I
20   said we've included information from the DAWN
21   program.  That has to be gotten separately.
22   The different substances, that came from the
23   forensic lab.  These are from the analysis of
24   the poison death reviews from '12, '13, '14
25   that we talked about.

1          So information that was used to
2     compile these came from a variety of different
3     sources --
4          Q.    And what page are you on, just for
5     the record?
6          A.    The very last two pages.
7          Q.    Okay.
8          A.    A lot of it does come from VertiQ.
9     And we're able to extract, you know, some of
10    the basic information:  cause of death, age,
11    gender, race, things like that.
12         Q.    When people -- when -- when --
13    professionals who are authorized to access
14    OARRS, do they print out any of the
15    information, put it in a file?
16         A.    In general we have not done that.
17    There have been requests by medical staff made
18    to be able to see them.  So starting January
19    1st of this year, we did start that practice.
20         Q.    Start what practice?
21         A.    That we would download a OARRS
22    report for the doctors to review if there was
23    one in the course of their investigation.
24         Q.    Is that -- that's like an SOP in all
25    cases?

Page 333

1              MR. GALLUCCI:  Object to form.

2              THE WITNESS:  So as I said, we just

3       started this practice three weeks ago.  We're I

4       think still kind of getting our feet wet about

5       how well it's working and whether it's worth

6       doing.  We have some questions we need to ask,

7       both of our staff and the OARRS staff, to see

8       if that's a practice that we're going to

9       continue with.

10             BY MR. CHEFFO:

11       Q.    And am I correct that you would --

12       you would look for an OARRS report in all drug

13       overdose cases but not in all cases generally?

14             Or would you look, as a matter of

15       course, in all cases for an OARRS report?

16             MR. GALLUCCI:  Object to form.

17             THE WITNESS:  So currently we're

18       downloading an OARRS report for every case,

19       whether or not we have a suspected drug

20       overdose or not.  And there are cases where

21       that's not readily obvious at the outset.  And

22       so, for -- to be thorough, I think we're

23       starting with that practice.

24             Again, that's one of the things that

25       we're discussing and evaluating on whether that

Page 334

1      practice continues or not.

2              BY MR. CHEFFO:

3      Q.    So just to be -- make sure I think

4      the record's is clear.

5              So if somebody has a vehicular --

6      vehicular accident or a fall as well as a

7      overdose, the current practice that's been in

8      place in the last two to three weeks is to do

9      an OARRS report.

10     A.    We'll review --

11             MR. GALLUCCI:  Object to form.

12             THE WITNESS:  -- to see if there's

13     an OARRS report available.  And if so, we'll --

14     we'll download it.

15             BY MR. CHEFFO:

16     Q.    Download it, print it out so that

17     it's available to the doctor?

18     A.    Correct.

19     Q.    And if you look at Exhibit 6 as an

20     example for a minute, please.

21             Is that a repeat of Exhibit 4, the

22     2017 report?

23     A.    Is Exhibit 6 the same as Exhibit 4?

24     Q.    Some of the information.

25     A.    These are not -- these are not the

Page 335

1    same reports, no.

2              MR. CHEFFO:  Yeah.  Sorry.  Bad

3    question.

4              BY MR. CHEFFO:

5        Q.    What -- what I'd like you to do --

6    and again, you can handle them separately, if

7    you'd like, if it's easier, or if you want to

8    look at them together -- is really just find

9    out, for both Exhibit 4 and Exhibit 6, what

10   sources are used.

11       A.    As I --

12             MR. GALLUCCI:  Object to form.

13             THE WITNESS:  As I said, Exhibit 6

14   has multiple sources.

15             MR. CHEFFO:  Okay.

16             THE WITNESS:  Exhibit 4 is the

17   statistical representation of the work done in

18   2017.  It includes drug overdoses, but it's not

19   exclusive to --

20             MR. CHEFFO:  All right.

21             THE WITNESS:  -- drug overdoses.

22   And this is compiled from a number of sources

23   as well.

24             BY MR. CHEFFO:

25       Q.    Okay.  Would you -- to the extent

                                          Page 336

1     that you can tell us the main sources where

2     it's pulled from, is VertiQ one of them?

3          A.     VertiQ.

4               MR. GALLUCCI:  Object to form.

5               THE WITNESS:  JusticeTrax.

6               MR. GALLUCCI:  Object to form.

7               THE WITNESS:  All right.

8               MR. GALLUCCI:  Go on.

9               THE WITNESS:  VertiQ, JusticeTrax,

10    Pathways.

11               BY MR. CHEFFO:

12         Q.    What is Pathways?

13         A.    It's the current toxicology system

14    that we're trying to get rid of and replace

15    with the module in JusticeTrax.

16         Q.    And -- and JusticeTrax -- I

17    apologize if you told me this -- what is --

18    what is the main function of that?

19         A.    That's the -- that's our database

20    that tracks evidence.

21         Q.    And evidence would include

22    ultimately the toxicology as well as medical

23    records and investigator information?

24         A.    No.

25         Q.    Okay.

Page 337

1          A.     So toxicology will move to

2     JusticeTrax.

3          Q.     Will move.

4          A.     Investigator reports is not -- not

5     forensic evidence.  Those are reports on

6     observations by our investigators at scenes of

7     death.  Medical records are separate.

8          Q.     So let me ask you a better question.

9               What does JusticeTrax do currently,

10    understanding that they're going to move the --

11    you're going to move the toxicology information

12    into JusticeTrax, but currently what is it --

13    what information does it -- how is it useful to

14    your -- your group?

15         A.     All the other forensic evidence that

16    gets submitted to the forensic laboratory.

17         Q.     Can you give us some examples of

18    that?

19         A.     Guns, ammunition, shell casings,

20    fingerprints, fibers found at crime screens,

21    analysis of other materials found at crime

22    scenes and death scenes, DNA, any substances

23    that are submitted for testing in the drug

24    chemistry laboratory.

25              Like I said, it -- it's the largest

Page 338

1    database in the county.

2         Q.    And if -- if someone accesses --

3    let's just start with any of these database --

4    are there, to the extent that you're aware,

5    records of who accesses them, inquiries that

6    are made?

7         A.    I believe that JusticeTrax and

8    VertiQ both have the ability to track, yes.

9         Q.    And by "track" it means both who

10   accessed them, what time, for example, as well

11   as if they printed anything out or made any

12   changes?

13              MR. GALLUCCI:  Object to form.

14              THE WITNESS:  I'm not sure if it

15   will show that anything gets printed out.  But

16   any additions or substractions or changes are

17   tracked.

18              BY MR. CHEFFO:

19        Q.    And for the OARRS printouts that are

20   done for all death cases, just tell -- where do

21   they actually go once they're printed out?

22        A.    They're going with the physical case

23   file for the time being.

24        Q.    And the physical case file goes to

25   the medical examiner?

1          A.    It will go to the forensic

2     pathologist whose case it was assigned, yeah.

3          Q.    And then what happens after that?

4          A.    Well, it's only been three weeks.

5     So there hasn't been and after that yet.

6          Q.    Okay.

7          A.    None of the cases are closed out

8     yet.

9          Q.    Fair.

10               What -- what's the expectation?

11               MR. GALLUCCI:  Object to form.

12               THE WITNESS:  I think that's part of

13     what we're discussing now is what -- what are

14     the next steps.  And that's part of what we're

15     asking for -- from OARRS.

16               BY MR. CHEFFO:

17          Q.    Who ws -- was Dr. Gilson the person

18     who decided to put this policy in place?

19          A.    Yeah.  He was the one who made the

20     final decision, yes.

21          Q.    And when did he make that decision?

22          A.    I mean we had had discussion on and

23     off in December.  But I -- I believe it was

24     around the first of the year.

25          Q.    And he said he thought it would be,

1      in sum or substance, appropriate to print out

2      OARRS for all death cases?

3                MR. GALLUCCI:  Object to form.

4                THE WITNESS:  I believe that was my

5      suggestion.  There have been members of the

6      medical staff who in other jurisdictions had

7      had access to them and found OARRS reports or

8      OARRS-like reports useful.

9                He wanted to facilitate that.  Asked

10     me to look into it, how we would implement

11     that.  I think the final, you know, decision

12     that he made was still based on I thought it

13     was best that we do it for all the cases for

14     the time being just so nothing got missed.

15          Q.    He -- he does autopsies, right?

16          A.    Dr. Gilson?

17          Q.    Yes, sir.

18          A.    Yes, he does.

19          Q.    In addition to his other

20     responsibilities?

21          A.    He does.

22          Q.    So he has a certain number of cases

23     that he handles, right?

24          A.    He does.

25          Q.    So he would have received these

                                                  Page 341

1       OARRS -- he's taken cases in the last few

2       weeks, I take it?

3                   MR. GALLUCCI:  Object to form.

4                   THE WITNESS:  I -- I would have to

5       check the records.  He doesn't do the same

6       caseload as the regular medical staff because

7       of his other duties.

8                   So I -- he also is responsible for

9       most of the case review cases.  They're

10      called -- they were called corner amendment

11      cases originally, CA cases.

12                  It's essentially anything that looks

13      like it needs an extra review, not necessarily

14      to bring full jurisdiction of the body to our

15      office but to review on paper medical records,

16      any other information we have to determine

17      whether or not it would be best to bring that

18      case in.

19                  Usually something gets flagged say

20      by a funeral home or what -- or a nursing home

21      or something like that.  We'll review it --

22      he'll review it.  And then they can make a

23      determine -- a better determination whether the

24      case needs to be brought in under our

25      jurisdiction.

```
 1              MR. CHEFFO:  Okay.
 2              THE WITNESS:  We did about 500 of
 3     those reviews last years.  He's primarily
 4     responsible for that.
 5              So he may have cases like that,
 6     which we have not implemented OARRS reviews of
 7     CA cases as of now.  We're just sticking to the
 8     IN cases, the cases that we're accepting
 9     jurisdiction of from Cuyahoga County.  I
10     wouldn't be able to say if or when he's done
11     any --
12              MR. CHEFFO:  Okay.
13              THE WITNESS:  -- specific IN cases
14     yet --
15              BY MR. CHEFFO:
16        Q.    Is it --
17        A.    -- this year.
18        Q.    Is it fair to say that, to the
19     extent he has, he would have received it; and
20     if he hasn't, he wouldn't have?
21              MR. GALLUCCI:  Object to form.
22              THE WITNESS:  That's a fair
23     statement.
24              BY MR. CHEFFO:
25        Q.    And who is it that actually queries
```

Page 343

1    the OARRS database in your office and puts them

2    in the file?

3         A.    That is done by different people.

4         Q.    So a number of people have access?

5         A.    No.  So the OARRS access is tightly

6    restricted.  Dr. Gilson, myself.  We just

7    recently hired an epidemiologist through the

8    grant that we are doing with Case Western.  And

9    so, as part of her duties, I've added that

10   responsibility to do the lookups and do the

11   printouts.

12              She brings them to me.  And then I

13   distribute them to the staff to put in the case

14   files.

15        Q.    So she's the one who queries the --

16   the OARRS database; and if there is a hit or

17   positive result, she prints it out, brings it

18   to you; you put it in the files; and then it

19   goes to the doctor?

20        A.    Correct.

21        Q.    Anybody else in -- in that chain?

22        A.    Well, I put it in the basket in

23   the -- in the general office.  And each case

24   manager will then -- the cases that they're

25   assigned will take out of the basket their

Page 344

1      OARRS files --

2           Q.    Okay.

3           A.    -- to add to the file.

4           Q.    The case manager is an

5      administrative type person?

6           A.    Yes.

7           Q.    And then -- and they are -- they

8      have access to if OARRS data, which they then

9      input and -- and -- well, let me strike that.

10               Does the case manager input the

11     OARRS data anywhere else, or it is just the

12     piece of paper that's printed out.

13          A.    It's only the final report that gets

14     added to the file.

15          Q.    So the people who have access are

16     the epidemiologist, yourself, the doctor, and

17     the various case managers who assist the

18     doctors in their duties?

19               MR. GALLUCCI:  Object to form.

20               THE WITNESS:  So the case managers

21     have access only to that physical form, yes.

22               BY MR. CHEFFO:

23          Q.    Well, that's --

24          A.    They don't have access to the system

25     itself.

Page 345

1          Q.    Understood.

2                Anybody else have access to the form

3     or the system?

4          A.    All the doctors will get the forms

5     in the case file.  At the moment, I don't

6     believe anybody else has access to the OARRS

7     system for our office.

8          Q.    And do -- what is the

9     epidemiologist's name?

10         A.    Manreet Bhullar.

11         Q.    And what is her function?

12         A.    She is a epidemiologist.

13         Q.    I understand.

14               But --

15         A.    And she'll -- so she'll review, per

16    the -- per the grant, a lot of the data that

17    we've been talking about, 2015, '16 and '17,

18    getting those finished, getting all the data

19    compiled so that we can get it out.

20         Q.    Have you had --

21         A.    There are other duties, again,

22    specific to the grant that aren't part of her

23    duties that she discusses with the researchers

24    at Case.

25         Q.    Prior to this -- is she a doctor?

```
 1        A.    No.  She's a -- she was a graduate
 2   student.
 3        Q.    A master's of epidemiology?
 4        A.    And she got her master's and -- no.
 5        Q.    Okay.
 6        A.    And has been hired.
 7        Q.    Prior to this epidemiologist joining
 8   your group -- your -- your office as part of
 9   this grant, had you ever employed an
10   epidemiologist?
11        A.    We never employed one, no.
12        Q.    Does she have a -- and does she have
13   a -- is there a formal job description that
14   you're aware of?
15        A.    There would have to be for her to be
16   hired, yes.
17        Q.    And the -- and I just think I just
18   have a -- another question or two.
19              Was there any -- to your knowledge,
20   any communications with the folks who run OARRS
21   about using the database in the way that you
22   have described to us today?
23              MR. GALLUCCI:  Object to form.
24              THE WITNESS:  As far as?
25              BY MR. CHEFFO:
```

                                        Page 347

1        Q.    Well, for example, I mean did -- did
2    you or someone at the department talk to the
3    OARRS people or administrators and say, "We are
4    going to query the database.  We're going to
5    print out a copy.  We're going to allow the
6    case managers to review it.  We're going to put
7    it in the files"?
8        A.    So the case managers do not review.
9    They just simply pick up the report and put it
10   in the appropriate file number.
11       Q.    Okay.
12             MR. GALLUCCI:  And object to form.
13             Just give me a second --
14             BY MR. CHEFFO:
15       Q.    Let me just ask you.
16             I mean have you talked to -- have
17   you talked at all with the OARRS people about
18   printing out the copies and using it for
19   your -- your doctors' purposes?
20       A.    I have not.
21       Q.    Do you know if anybody did?
22       A.    Dr. Gilson has his own
23   conversations.  He hasn't told me one way or
24   the other if that was part of any of his
25   discussions.

1           The reports are for any

2    investigation -- investigative purposes for our

3    office to determine cause and manner of death.

4        Q.    And the last thing.

5           I -- I pulled up this.  And

6    unfortunately I'm going to read it to you.  If

7    you need to get it, you can.  It's off your web

8    site.

9           But I went back and -- and look at

10   the 2012.  Again, you could read it across the

11   table.  This is the 2012 -- whoops -- report.

12           MR. GALLUCCI:  Which report are

13   you -- because we've talked about a couple

14   different types of reports.

15           MR. CHEFFO:  It's a statistical

16   report like the one that's in front of him.

17           MR. GALLUCCI:  Okay.

18           THE WITNESS:  Okay.

19           BY MR. CHEFFO:

20       Q.    Right.

21           And I'm -- I'd just direct your --

22   refresh your recollection.

23           I think you told us that the -- the

24   words used in -- with respect to the Cuyahoga

25   County heroin initiative for 2015, '16, and '17

Page 349

1      were inartful because they picked up the
2      language of the U.S. President, and you would
3      have rewritten them, right?
4            A.    I believe I said that --
5                  MR. GALLUCCI:  Object to form.
6                  THE WITNESS:  -- the report, as it
7      was written, that all of those reports were
8      done in the 2018 year.  And that was imprecise.
9      But because of the declaration, yes, that --
10     they were somewhat imprecise at that point.
11                 BY MR. CHEFFO:
12           Q.    They were imprecise because they
13     used the words "public health emergency,"
14     right?
15           A.    In part, yes.
16           Q.    And when was the 2012 statistical
17     document published?
18                 Was that also done in 2018?
19           A.    No.
20           Q.    So this is what it says in 2012.
21                 MR. GALLUCCI:  I'm going to object
22     to -- object to form.  But the use of a
23     exhibit.  We're reading off a laptop here --
24                 MR. CHEFFO:  Fair enough.  But
25     I'll --

Page 350

```
 1              MR. GALLUCCI:  -- without production
 2      of any documents.
 3              MR. CHEFFO:  It's public document on
 4      the web site.
 5              MR. GALLUCCI:  That was produced in
 6      this litigation.  It could have been
 7      available --
 8              MR. CHEFFO:  Okay.
 9              MR. GALLUCCI:  -- for an exhibit.
10              BY MR. CHEFFO:
11       Q.    "The Cuyahoga County heroin
12      initiative is broad" -- "is a broad response to
13      a public health emergency."
14              That was used in 2012.
15              So does that refrect [sic] --
16      refresh your recollection that none of that
17      language has anything to do with President
18      Trump's declaration?
19              MR. GALLUCCI:  Same objection.
20              THE WITNESS:  In 2012, no, that
21      would not be.
22              BY MR. CHEFFO:
23       Q.    And if the same language was used --
24      carried on up until the 2017, that would
25      refresh you recollection that the genesis of
```

Page 351

1      that language had nothing to do with the

2      president's declaration, did it?

3                  MR. GALLUCCI:  Object to form.

4                  THE WITNESS:  Likely not.  It was

5      probably just a mistake that was carried

6      through -- over and over again throughout the

7      years, yes.

8                  BY MR. CHEFFO:

9          Q.   A mistake that started back in 2012

10     and continued on till today?

11                 MR. GALLUCCI:  Object to form.

12                 THE WITNESS:  Apparently the same

13     language was used, stock --

14                 MR. CHEFFO:  Okay.

15                 THE WITNESS:  -- as we went forward.

16                 MR. CHEFFO:  All right.  And we're

17     going to break, consistent with the agreement

18     that we put on the record earlier.

19                 Thank you, sir.  I'm sure we'll have

20     an opportunity to talk soon enough and look

21     forward to continuing it after.

22                 And thank you, Counsel.

23                 MR. GALLUCCI:  Just for purpose of

24     the record, can you please identify where we

25     are in terms of time.

1            THE VIDEOGRAPHER:  We're at 5 hours
2      and 37 minutes and 37 seconds.
3            MR. BORANIAN:  Okay.  So let me
4      ask -- before we go off, let me ask we'll need
5      -- we'll need the exhibits back when we resume.
6            But will you keep custody of those,
7      or want to give them to one of us?
8            Talking to the Court Reporter.
9            THE REPORTER:  I will let you retain
10     the exhibits.
11           MR. BORANIAN:  Okay.  Will one of
12     the local attorneys be retaining the exhibits?
13           MR. GALLUCCI:  I'm -- I'm happy to
14     retain them.  I'm here in the building.  So I
15     can --
16           MR. BORANIAN:  Okay.  Would you?
17           MR. GALLUCCI:  I can retain the
18     exhibits.
19           I also think, just because we're
20     reconvening it, the transcript should not yet
21     be prepared until this deposition's finalized.
22           Everybody in agreement?
23           MR. CHEFFO:  We may get a -- a rough
24     transcript so --
25           MR. GALLUCCI:  Well, we're not

Page 353

1      reconvening it for purposes of going it --

2      going over and reexamining on questions that

3      he's already provided testimony to.  That's one

4      of the things we discussed.

5                  MR. CHEFFO:  Yeah.  Well, I -- I --

6      again, I think we agreed that we were going to

7      have a few extra hours.  Like in any

8      deposition, we're not going to keep going over

9      things.

10                 But if we want to look at a

11     transcript -- because I may not be the one

12     coming back, and we need to deal with it.  But

13     let -- we'll -- you know, if --

14                 MR. GALLUCCI:  That --

15                 MR. CHEFFO:  If you don't want to

16     order a transcript, that's fine.  But we can

17     order a rough if we want to.

18                 MR. GALLUCCI:  That -- again, just

19     noting for the record that part of the

20     discussion was that we wouldn't be going back

21     over the same stuff we had previously had

22     testimony with regards to.

23                 MR. CHEFFO:  Yeah.  Right.  We won't

24     do that.

25                 MR. GALLUCCI:  Okay.  Thank you,

Page 354

1      Counsel.

2                 MR. CHEFFO:  Sure.

3                 THE VIDEOGRAPHER:  We are going off

4      the record at 4:29 p.m.

5                 This concludes today's testimony of

6      Hugh Shannon.

7                 The total number of media units used

8      was five and will be retained by Veritext Legal

9      Solutions.

10                (Whereupon, the proceeding was

11     adjourned at 4:29 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 355

1              C E R T I F I C A T E

2

3          I, Bonnie L. Russo, Certified Shorthand

4      Reporter, and Notary Public, hereby certify:

5          That HUGH SHANNON was duly sworn by me,

6      an authorized Notary Public, and that this

7      deposition is a true and correct record of the

8      testimony given by such witness to the best of

9      my knowledge and ability.

10         I further certify that I am not related

11     to any of the parties to this action and that I

12     am in no way interested in the outcome of this

13     matter.

14         In witness whereof, I have hereunto set

15     my hand this day, January 28, 2019.

16

17         *Bonnie L. Russo*

18     Bonnie L. Russo

19     Certified Shorthand Reporter

20

21

22

23

24

25

```
                                                      Page 356

 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                            Suite 1820
                        Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
      January 29, 2019
 5
      To: FRANK L. GALLUCCI, III, ESQ.
 6
      Case Name: In Re: National Prescription Opiate Litigation
 7
      Veritext Reference Number: 3196191
 8
      Witness:  Hugh Shannon        Deposition Date:  1/24/2019
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 3196191
 3    CASE NAME: In Re: National Prescription Opiate Litigation
      DATE OF DEPOSITION: 1/24/2019
 4    WITNESS' NAME: Hugh Shannon
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have made no changes to the testimony
      as transcribed by the court reporter.
 8
      _____         _____
 9    Date                     Hugh Shannon
10         Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
      this _____ day of_____, 20_____.
17
                      _____
18                    Notary Public
19                    _____
                      Commission Expiration Date
20
21
22
23
24
25
```

```
 1                  DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 3196191
 3    CASE NAME: In Re: National Prescription Opiate Litigation
      DATE OF DEPOSITION: 1/24/2019
 4    WITNESS' NAME: Hugh Shannon
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9         I request that these changes be entered
      as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____      _____
      Date                  Hugh Shannon
14
           Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22    this _____ day of_____, 20_____.
23         _____
           Notary Public
24
           _____
25         Commission Expiration Date
```

Page 359

1                              ERRATA SHEET
                  VERITEXT LEGAL SOLUTIONS MIDWEST
2                      ASSIGNMENT NO: 1/24/2019
3        PAGE/LINE(S) /          CHANGE          /REASON
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19

         _____      _____
20       Date                   Hugh Shannon
21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22       DAY OF _____, 20_____ .
23                              _____
                                Notary Public
24

                                _____
25                              Commission Expiration Date

[& - 20111]                                                                                    Page 1

| & |
| --- |
| **&** 2:7 3:3,21 4:14 5:3 7:23 8:22,24 9:12 |

| 0 |
| --- |
| **000018265-18277** 6:8 |
| **001623160** 6:18 |
| **001630854-0857** 6:10 |
| **014627783** 220:19 |

| 1 |
| --- |
| **1** 6:7 7:15 22:2 69:7 70:18 97:14 315:24 |
| **1,200** 233:24 235:1 |
| **1,275** 234:8 235:3 235:3,8 236:14 237:20 |
| **1,475** 235:14,15 236:13 |
| **1,500** 152:10 |
| **1-11-19** 6:16 |
| **1-3** 289:20 |
| **1/24/2019** 356:8 357:3 358:3 359:2 |
| **10** 59:1,3 114:12 114:20 115:11 247:8,10,19 249:20 253:20,24 253:25 |
| **10018** 5:5 |
| **10036** 3:18 |
| **101** 4:20 |
| **1095** 3:18 |
| **10:02** 69:8 |
| **10:14** 69:14 |
| **11-8-16** 6:9 |
| **1100** 3:23 356:1 |

**1111** 4:15
**113** 275:3,7 276:10
**115** 282:17,18 283:13
**11747** 3:9
**119** 282:15 323:8
**11937** 355:17
**11:00** 304:12
**11:05:18** 125:18
**11:28** 155:8
**11:49** 155:14
**11th** 267:24
**12** 38:7 189:9 197:11 201:2 225:18 228:22 252:11 276:8 282:24 315:22 319:2 331:24
**12.7** 198:6,10 226:4,16 227:9
**12.7.** 197:12
**120** 282:12
**127** 4:10
**12:54** 219:22
**13** 72:2 168:19 170:16 251:18 252:3,11 289:18 289:20 294:18 295:15 331:24
**1300** 3:12
**14** 30:8 31:7 54:5 168:19 170:16 251:18 252:3,18 253:16,21 331:24
**14th** 155:20
**15** 30:24 62:20 171:19 172:3,16 172:25 173:16 251:19 252:3,23 253:21 254:20 283:13 295:24

**16** 30:24 62:20 101:9 171:19 172:3,16 173:12 240:13 251:19 252:3 254:20 278:3 279:7 296:10,20 345:17 348:25
**16and** 173:16
**17** 1:5,9 7:21 30:25 62:21 171:3 171:19 172:3 173:12,16 179:11 196:6 240:13 251:20 252:4 254:14,23,24 277:13 278:3 279:1,7 345:17 348:25
**175** 254:16
**18** 1:11,13 31:20 31:23 33:16 138:21 170:23 171:4 179:14 193:20 198:11 226:3 254:14,23 329:8
**1800** 4:20
**1820** 356:2
**18267** 98:5
**19** 226:1,3 227:4
**1937** 242:5
**1950** 2:9 7:24
**1970s** 329:16
**1990s** 98:25
**1:24** 304:2
**1:25** 220:5
**1:46** 241:5
**1:50** 241:9
**1st** 181:17 326:6 332:19

| 2 |
| --- |
| **2** 6:9 41:15 69:13 155:7 244:20 289:18 300:20 315:8 |
| **2,258** 252:15 |
| **2,900** 255:8 |
| **20** 123:15 179:23 180:14 226:1 247:17 252:11 255:21,23 357:16 358:22 359:22 |
| **200** 181:15 199:13 236:19 253:22 |
| **2000** 272:20 293:4 |
| **20004** 4:15 |
| **2005** 225:8 |
| **2006** 58:24 276:5 281:3,7 303:8,12 |
| **2007** 301:5,7 302:24 303:12 |
| **2008** 301:7 303:14 |
| **2009** 301:21 303:1 303:14 |
| **201** 4:23 |
| **2010** 14:12 15:3,7 15:21 17:13 18:23 19:10 |
| **2011** 29:22 197:6 231:3 233:23 274:23 275:5,7 276:3,22 281:7,8 282:6 290:17,23 291:20 292:10 294:5 295:9,14 297:4 298:5,18 299:3,15,22 300:1 300:6 302:6 320:4 320:8,8 |
| **20111** 293:8 |

**2012**   16:5 29:18,19
31:19 72:2 168:19
170:15 251:18
252:3 253:16
293:15,21 295:12
300:8,13 329:14
348:10,11 349:16
349:20 350:14,20
351:9
**2013**   13:21,22
20:20,23 29:14,21
30:8 31:7,21
38:16 54:5 197:20
204:12 294:1
300:14,17
**2014**   38:17
**2015**   29:25 30:17
38:19 60:19 62:22
63:1 169:14
193:20 196:4
240:13 253:17
254:5 255:16
256:2 282:12,15
283:12 296:10,19
297:15,22 345:17
348:25
**2015's**   170:20
**2016**   6:7 22:10
24:19 29:25 30:17
38:19 42:1 46:13
46:18,25 59:9
61:17 62:25 63:1
97:17 168:25
170:14,22 172:17
176:1 179:11
196:6 245:9,24
246:7,21,23,25
250:20 254:11
256:21 276:20
277:2,13 278:18
279:1 282:3,8

283:8 296:11
297:1,10,15,23
321:10 323:4,15
**2017**   6:13 53:25
170:23 172:9
181:15 182:24
193:20 225:9
228:12 240:10
244:7 246:7,23
255:5 289:16
297:16,23 310:24
311:20 334:22
335:18 350:24
**2018**   6:15 179:16
180:13 181:14
194:14,21 197:12
225:18 226:16
227:4,9,15 228:19
255:9 276:6,14
278:18 281:3
291:12 292:18
297:16,17 298:2
298:20 349:8,18
**2018's**   309:24
**2019**   1:19 7:5
171:24 173:6
226:21 227:12
228:22 267:25
270:21 309:5,9,19
355:15 356:4
**202-739-5452**   4:16
**2020**   310:15 311:1
**2021**   310:16
**2022**   310:16
**20th**   216:2
**21**   78:24 311:1
**212-397-1000**   3:10
3:13
**212-698-3814**   3:19
**212-841-1105**   5:5

**216-523-1313**
356:3
**216-592-5000**   3:24
**216-621-0200**   4:11
**216-861-0804**   3:5
**219**   6:11
**22**   6:7 253:24
311:1
**2222**   3:4
**238**   6:12
**24**   1:19 152:7
184:12 301:16
**245**   254:14
**24th**   7:5
**250**   245:7
**267**   6:14
**28**   355:15
**2804**   1:4,5 7:21
**29**   356:4
**2:59**   305:24

**3**

**3**   6:11 155:13
192:15,16 219:21
219:24 220:10
313:20 319:10
**3,000**   119:16
129:23
**30**   100:15 126:17
126:19 127:5
153:22 206:24
252:12,13 281:13
302:2 303:1
**300**   245:8,9
**305**   3:8
**314**   6:17
**3196191**   1:25
356:7 357:2 358:2
**321**   6:19
**325**   4:3
**330-252-9060**   4:24

**35,000**   304:13
**350**   247:3,6
**37**   352:2,2
**370**   277:4 283:8,13
**3:40**   306:5

**4**

**4**   6:12 220:4 238:6
305:23 334:21,23
335:9,16
**40**   260:1 301:6,16
303:1 308:22
**400**   3:8 199:14,20
236:20
**41**   6:9
**415-659-5980**   4:21
**43215**   4:4
**44**   251:5,7,15
**44113**   2:10 3:5,24
**44114**   3:13 4:10
356:2
**44308**   4:24
**45**   251:14,23,24
303:19
**450**   254:13,20
**45005**   1:9
**45090**   1:13
**45132**   1:11
**4:29**   354:4,11

**5**

**5**   6:14 267:16,20
270:20 306:4
315:24 352:1
**50**   4:23 110:19
255:7,8 260:1
301:17,19 302:25
**500**   342:2
**55**   2:8 3:4 7:24

[6 - actual]

**6**

**6** 6:17 33:16 38:7
126:17,19 127:5
185:20 189:7
206:24 320:23
321:6,8,8 334:19
334:23 335:9,13
**60** 53:25
**600** 3:12 4:4
**614-281-3906** 4:5
**620** 5:4
**631-224-1133** 3:9
**64** 301:6
**65** 32:20
**666** 277:4,14
**67** 276:15

**7**

**7** 6:19 314:1,24
315:4,23
**700** 247:3
**727** 277:14
**73** 225:9
**74** 225:9
**75** 33:2 225:9
**7th** 155:20

**8**

**8** 277:4 318:25
319:2
**8,200** 152:8
**80** 27:9 28:19 30:4
31:4 32:10,15,22
33:1 36:8,12,24
37:2,23 198:6,12
**89** 155:17 156:20
305:9,11 306:10
**89th** 152:5

**9**

**9** 6:3 197:9 315:25
**91** 301:24,25
304:21,21 305:9

306:10
**94105** 4:20
**95** 178:11
**950** 3:23
**98** 279:16
**99** 115:14 279:16

**a**

**a.m.** 1:20 7:5
**aabb** 243:16
**aaron** 1:7
**abc** 330:5
**abft** 243:6
**ability** 30:22 33:19
64:20 123:14,20
152:12 338:8
355:9
**able** 27:4 29:23
33:24 38:19,21
40:19 47:20 57:18
66:25 71:11 77:20
93:17 134:4 137:2
159:17 161:24
162:6 164:14
165:25 166:19,21
166:25 167:4,6,7
168:3,8 169:17,21
170:4,13 171:18
175:1 188:3,16
201:20 238:18
242:11 243:13
255:25 264:21
279:23 280:4
300:6 305:16
306:24 309:17,24
317:3 332:9,18
342:10
**absence** 181:13
**absolute** 34:13
**absolutely** 68:24
199:10 308:11

**abstract** 154:5
156:6
**absurd** 218:7,10
218:17
**absurdly** 218:2
**abuse** 35:14 67:21
85:4 86:19 87:2
99:15,17 108:20
111:24 114:4
260:4 261:4
264:24 265:8,13
**abused** 29:1
**abuser** 33:18
44:12
**abusers** 28:20
**abuses** 86:12
**abusing** 37:15
39:8 57:6 67:17
67:22 259:12
**accept** 176:9,12
177:22 230:10
**accepting** 342:8
**accepts** 177:9
**access** 26:7 29:9
29:11,14,20 37:13
44:22 66:14 71:23
73:10,10,19 77:20
78:15 83:9 103:7
133:19,25 134:18
159:17 264:20
330:16,24,25
332:13 340:7
343:4,5 344:8,15
344:21,24 345:2,6
**accessed** 338:10
**accesses** 75:1
338:2,5
**accessible** 159:21
326:2 329:1,3
**accident** 130:15
229:22 259:16

262:12 263:10,23
264:6 334:6
**accidents** 175:5
261:9 263:18
**accommodation**
191:17
**account** 256:6,8
**accounts** 185:18
197:23
**accreditation**
242:10,24 243:11
249:3
**accreditations**
243:4 248:8
**accredited** 242:18
244:22
**accrediting** 243:5
243:18
**accredits** 242:22
243:7,21
**accurate** 90:13,18
159:18 162:10
298:22 299:14
**acgme** 243:20
**acknowledge**
357:11 358:16
**act** 357:14 358:20
**acting** 142:24
**action** 20:24
355:11
**actions** 85:25
149:13
**activities** 132:13
163:16,24 170:14
204:21 290:2
**activity** 210:18
214:22
**actual** 46:24 47:1
245:5 246:12
260:19 269:6
274:3 327:25

acupuncture
    103:4
adamhs   16:17
    167:16,17 260:7
    293:17
add   59:22 100:20
    100:22 104:1
    274:13,16 308:3
    344:3
added   224:14
    235:9 236:1 343:9
    344:14
addict   35:20 44:12
    78:16
addicted   33:17
    86:3 209:25 210:6
addiction   26:15
    39:25 45:4 68:1
    86:20 87:6 97:3
    97:12 100:4
    108:18 136:16
    137:11 139:12,23
    140:15 142:1
    207:23 293:17
addictions   167:5
addictive   67:20
    136:9 138:12
    139:6 140:7
addicts   36:13
adding   61:12
    197:21 208:18
    269:15 326:4
addition   104:18
    162:8 198:9
    256:19 340:19
additional   95:9
    195:18 199:24,24
    200:11,24 233:12
    234:13,17 240:13
    304:13 305:13,17
    306:22 307:10,13

307:17 315:16
additions   338:16
address   14:20
    15:4,16 19:9,19
    20:21 26:14 40:19
    144:3 304:8
    356:15
addressed   162:25
    260:15
addresses   282:21
addressing   20:7
    117:3 135:4
    159:16 283:3
adequate   235:24
adjourned   354:11
adjunct   17:15
adjustments
    184:13 310:22
administer   160:10
    167:1
administered
    186:2
administering
    166:14
administrating
    162:4,5
administrative
    12:10 330:17,20
    344:5
administrators
    347:3
admitted   160:5
adopt   102:10
    299:11
adopted   103:21
    104:20
adult   114:3,3
adulterated
    202:23 270:15
advance   170:6

advantage   79:22
    80:22 88:20
advise   153:13
advised   288:8
advocate   102:13
advocating   142:13
aetna   73:22
affect   190:11
affiliations   8:8 9:5
affixed   357:15
    358:21
african   206:19
afternoon   12:23
age   96:14 332:10
agencies   16:13
    21:2 31:11 95:9
    159:3,9 161:22
    163:8 180:23
    188:24 199:9
    269:5 285:19
    288:3 295:8 300:3
    317:2
agency   222:18,21
    222:22
aggregate   106:4,7
    197:9 198:24
ago   123:15 147:8
    161:15 179:20
    198:13 200:1
    215:17 216:14
    227:8 265:11
    268:15 297:18
    333:3
agree   7:13 40:24
    54:12 65:16 78:22
    83:13 84:25 93:8
    93:13 100:7,17
    106:3 150:2,6
    215:12 218:18
    253:18 260:18
    264:23 273:24

280:23,25 284:17
    285:18 286:13
    307:16,24 308:11
agreeable   307:18
agreed   98:17
    306:21 353:6
agreement   308:4
    351:17 352:22
agreements
    185:24
ahead   45:15 65:15
    125:19 209:13
    213:4 326:20
akron   4:24
al   1:8,10,12,13
albeit   328:9
alcohol   16:18
    67:21 260:8
alert   165:20
allocate   229:5
allocation   163:21
allocations   309:6
allow   159:15
    162:10 347:5
allowed   29:25
    114:25 190:5
allows   186:9,10
alphabetical   223:8
alternate   103:13
alternative   103:4
altruistic   144:3
amalgamation
    30:7
amendment
    341:10
america   211:14
american   206:19
    243:6,16
americas   3:18
amerisourceberg...
    4:18 8:17

amerisourceberger
  8:15
amicable 306:20
ammunition
  337:19
amount 82:3
  104:10 280:14
  286:14 307:5
analogs 48:1
  169:17
analysis 30:23
  53:10 54:11 55:17
  55:18 56:13,15
  64:3 168:18
  173:10 193:19
  194:5,22 240:22
  259:19 294:13
  331:23 337:21
analyst 318:11
analyze 27:8 60:12
  61:14 72:13
  152:13 153:5
  169:25
analyzing 54:7
anecdotal 46:2
angela 42:25
announcement
  295:11
annual 174:22
  194:8 196:10
answer 53:11
  58:20 60:17 71:11
  80:6 85:9 86:21
  90:12,12,18
  100:11 113:11
  120:23,24 125:4
  125:14,17 128:10
  128:23 129:1,3,11
  131:13,24 139:18
  144:13 150:14
  151:8 168:5

203:19 204:1
  213:5 232:10
  264:21 310:16
  318:7,8
answered 11:5
  89:10 90:4 91:1
  110:21 122:25
  123:10 218:12
answering 30:15
  36:16,21 45:17
  105:9 128:9
answers 11:9,13
  15:14
anthony 318:15
anticipated 226:20
  309:5
anticipation
  158:22
antidote 167:8
anybody 9:6 39:14
  122:22 145:21
  257:17 343:21
  345:2,6 347:21
anymore 85:16
anyway 221:20
apart 14:1
apologize 68:6
  97:25 176:23
  237:5,11 251:1
  252:24 272:17
  275:1 316:9
  326:18 336:17
apparently 36:11
  152:8 306:13
  351:12
appear 282:22
  315:2,18 320:15
  357:11 358:15
appearances 3:1
  4:1 5:1 8:8

appearing 9:4
appears 22:16
  23:22 25:5 224:24
  315:22 319:21
  320:3,4
appended 358:11
  358:18
applied 37:11
apply 230:8
appreciate 76:3
  157:10 258:15
  304:24 307:24
  309:1
appropriate 44:8
  60:13 64:12
  144:21 146:11
  248:13 269:18
  274:10 275:16
  286:15 340:1
  347:10
appropriately
  49:12 258:14
  318:18
approved 227:5
approximate
  196:9
approximately
  225:18 254:12
april 243:1 244:9
  244:10
archives 329:11
  329:12
arcos 134:6
area 103:15
  163:22 187:3
  202:6 265:1
areas 41:12 163:1
  166:19 226:15
  234:2 265:12
  312:4

argued 216:22
arrest 86:6
arrival 320:9
arrived 197:8
  231:3 235:2
  292:10 320:7
articulated 181:3
ascld 243:9
aside 162:2 168:10
  200:22 237:20
  284:8 299:25,25
asked 45:14,19,22
  45:22 46:17 56:17
  95:10 106:19
  116:8,13 122:25
  125:13 128:12
  153:18 154:6
  155:21 156:6
  158:24 241:12
  254:21 278:24
  310:14 340:9
asking 36:23
  45:16 60:19 73:13
  76:3 83:18 88:8
  90:22 91:9,10
  92:18 95:9 103:20
  104:17 105:23,25
  106:1 116:11
  117:6,11 125:1
  128:10 130:7
  146:15,22 147:1
  151:10 213:13,21
  213:23 223:10
  230:23 257:23
  282:2 298:24
  312:9 328:21
  339:15
aspect 94:25 189:6
  246:8
aspects 18:15
  247:21

assembled 300:14
assembling 268:21
assessed 285:1
assessment 310:19
  310:25
assessments
  117:25 168:5
assign 106:19
  213:15
assigned 339:2
  343:25
assignment 357:2
  358:2 359:2
assist 344:17
assists 269:3
associated 187:9
  194:16 202:13
  230:21 233:13
  234:11 279:3
  323:13
association 242:10
  242:21 243:9,16
assume 11:4 14:2
  92:19 93:14
  135:15 178:8
  203:1 230:2 330:3
assuming 230:4
  319:5
attached 312:21
  358:7
attachment 6:17
attack 86:7
attempt 63:20
  308:13
attempting 159:20
attended 14:6
  113:18
attending 8:7 21:1
  178:12
attends 158:8

attention 85:13
  86:4 152:2 302:13
attorney 158:2
  328:21
attorney's 13:19
  20:20 22:19 81:20
  101:4 105:21,24
  113:16 157:21
  158:7,13 162:17
  162:23 285:13
  293:18
attorneys 352:12
attributable 195:5
  201:4 202:6
  278:19
attribute 151:20
attributed 201:21
  311:8
audio 7:11,12
author 272:12
authorization
  73:23 134:18
  330:7
authorize 358:11
authorized 332:13
  355:6
autopsied 176:14
autopsies 175:9
  176:6,16,16
  189:22 190:2
  192:1 231:6,15
  237:22 249:9
  317:2 340:15
autopsy 178:24
  189:18 190:18
  229:6,17,18
  230:11,18 231:21
  232:15,18,23
  234:11 236:4,15
  245:3 324:3,16
  325:18 330:21

availability 100:1
  101:6,21 159:10
available 27:4
  40:16 96:4 101:14
  104:11 159:6
  160:19 161:19,25
  186:7 272:7
  334:13,17 350:7
ave 356:1
avenue 3:12,18,23
  4:15 5:4
awarded 158:17
aware 14:8,9 16:9
  46:17,24 49:8
  50:18 70:23 71:9
  74:25 76:11 83:7
  109:14 140:7
  174:2 194:13
  205:3 207:3
  210:13,15 245:15
  266:23 280:21
  282:20 284:15
  288:15,25 298:18
  302:13 303:2
  309:5,23 310:4,17
  338:4 346:14
awareness 294:20
  294:23 296:15

## b

b 100:15 126:17
  126:19 127:5
  153:22 206:24
  244:20
back 19:10 22:6
  29:6,16,19,21 30:2
  31:16,18,20,24
  34:17 38:6,17,20
  44:5,20 45:18,24
  53:25 58:23 60:23
  65:1,19 67:15
  69:10 78:9 93:22

103:19,25 108:6
116:16 124:19
125:12,16 127:13
141:23 147:9
148:25 155:10
170:15 171:15
172:12 175:4
176:2 181:9,20
183:3,8,23 191:18
198:19 200:6
212:25 214:2
215:22 217:24
220:1 225:21
226:22 231:16
241:7 248:12
255:15,16 256:23
270:25 272:5,18
273:5 284:13
289:16 292:19
295:14 297:19
300:1,18 302:24
302:25 303:25
306:1 308:18
315:16 326:4
329:15 348:9
351:9 352:5
353:12,20 356:15
backfill 248:12
background 40:6
backlog 186:8,12
backs 30:1 60:5
bad 202:2 237:2
  263:19 335:2
badala 3:7
bag 35:4
baker 4:9 70:3,9
bakerlaw.com
  4:11
balance 307:6
ball 171:2 327:21

**ballpark** 226:23
**banks** 243:17
**bar** 62:8,12 323:9
**based** 23:24 26:6
  44:4 79:8 83:15
  118:5 129:22
  146:9 178:23
  211:4,6 228:12
  230:6 248:15
  250:9 272:6 276:4
  280:17 285:4
  305:10,18 340:12
**baseline** 115:23
  184:6 271:6
  278:17 281:1
  282:3,5,11 311:15
  311:18
**basic** 40:22 85:20
  102:11 140:24
  228:1 232:22
  233:17 324:4
  332:10
**basically** 52:19
  61:23 62:11 88:4
  110:4 142:9 148:3
  169:14 170:2
  175:6 181:16
  190:9 242:14
  252:2 289:25
**basis** 52:5 139:2
  169:5 180:18
  201:1 244:15
  252:17 253:19
**basket** 343:22,25
**bates** 98:5 220:16
  220:21 221:6
  238:23 268:11
  321:19 322:6,9,12
**bear** 84:12 85:12
  214:7 309:8

**becoming** 35:19
**beds** 101:9,22
  168:10
**beginning** 184:8
  239:24 293:12
**begun** 158:21
**behalf** 2:14 3:2,15
  3:21 4:2,7,13,18
  5:2 8:17,21,24 9:2
  9:12 70:3 91:10
  126:12,24 127:2
  189:22 216:16
  231:6 232:15
**behest** 142:25
**beings** 281:14
**belief** 25:22 26:17
  143:11,14 149:10
  278:14,16
**beliefs** 114:22
  115:1,19 116:24
  117:7,11,18 118:1
**believe** 14:12,19
  15:1,11 16:5,11
  17:18 18:7,14
  21:5 24:15 29:13
  47:6 48:17 55:13
  56:6 57:18 62:21
  63:11,25 65:23
  67:6,8 68:2,3
  76:17,21 81:1,19
  85:16 90:2,13,25
  91:15,22 94:19
  100:16,17 102:10
  104:7,21 110:17
  113:25 114:9,15
  114:16,19 115:19
  116:22 121:3,5,13
  126:9 128:3,17
  130:4 138:17
  139:5 143:2,3
  144:6,19,24 146:7

146:8,18 148:18
  148:24 150:5
  179:21 180:21
  181:7,17 190:7
  193:22 194:19
  195:9 197:8,10
  207:15 213:17,18
  214:11 222:22
  226:2,2,9 233:22
  234:7 235:13,16
  235:19,25 239:5
  242:23 243:1
  244:7,9 248:3
  249:24 256:2,24
  265:10 272:22
  273:4 274:11
  280:2 285:6,16
  286:2 287:10,19
  288:3 291:6
  293:21 295:17
  297:13 299:13
  301:3 306:10
  312:7 322:22
  338:7 339:23
  340:4 345:6 349:4
**believed** 76:16
  155:23 207:14
**belive** 156:4
**bell** 297:9
**bells** 320:10
**beneficial** 74:14
**benefit** 190:22
**best** 11:9 40:17,21
  73:4 117:3 146:12
  192:12 194:20
  195:13 227:7
  228:21 266:10
  285:5 340:13
  341:17 355:8
**better** 20:2 25:19
  35:2 64:8 71:6

95:12 139:1 165:1
  167:21 209:16
  221:18 270:14
  291:4 337:8
  341:23
**beware** 67:15
**beyond** 94:15
  195:4
**bhullar** 345:10
**biannual** 183:22
  184:10 225:23
**biennium** 226:3
  310:19
**big** 105:19 173:11
  179:18 189:1,4
  234:3 251:6
**bigger** 196:8
**bill** 182:6
**bit** 33:7 40:14
  157:4 198:18
  211:16 265:6
  281:9 284:2
**black** 321:17,19
**blank** 321:25
**blood** 50:11 75:7
  75:19 243:17
**blue** 73:22 300:22
  300:23
**board** 14:3,10,15
  14:18 15:8,13,22
  16:15,17,19 17:6
  17:19,23 18:4,12
  18:15,16,20,21,23
  21:6 22:13 23:16
  24:19 97:18
  104:20 113:18
  122:10 154:5
  157:22 158:1,9
  165:17 167:17
  243:6 260:7,8
  285:12 293:17,18

**boards** 287:5
**bockius** 4:14
**bodies** 240:18
243:5
**body** 232:19 233:4
324:6,14,17,18,18
324:19,20 341:14
**bold** 136:16
**bonnie** 1:24 8:4
355:3,18
**book** 251:6
**books** 132:21
175:13 298:2
**boost** 205:21
**boranian** 4:19
8:14,14 304:8,20
305:12,20 312:20
313:6 315:3,11
319:16 352:3,11
352:16
**bottle** 50:25
**bottles** 50:19
138:13
**bottom** 24:3
274:17 314:13
**bought** 57:5
**boulevard** 4:3
**bounce** 281:7
**boxed** 329:13
**break** 10:20 69:1
83:20 87:15 89:18
97:12 145:25
151:24 153:8
155:16 191:6
194:15 195:3
204:19 218:24
219:4,7,12,16
224:12,18 236:25
303:22 304:5,7,16
305:14 306:7
351:17

**breakdown** 62:21
**breaking** 88:13
230:22
**breaks** 278:11
**breathed** 40:13
**brief** 12:22 53:24
242:6
**bring** 341:14,17
**bringing** 163:6
213:22
**brings** 343:12,17
**broad** 48:6 84:5
159:4 163:15
174:18 290:15
291:18 297:3
299:3 350:12,12
**broaden** 258:13
**broader** 23:17
162:20 309:16
**broadhollow** 3:8
**broadly** 162:24
**broken** 174:24
185:15
**brought** 285:8
341:24
**bryant** 3:17
**bucket** 317:11
319:22
**buckets** 196:15,16
**budget** 183:17,21
183:23 184:3,6,8
184:10,15,20,22
185:15,17 186:6
189:9,13,13
194:18,20,23
195:11 196:10,17
196:24 197:8,10
197:12 198:5,8,10
199:19 200:5,11
202:4 220:13
222:1,12 225:17

225:17 226:4,7,9
226:12,13,15,16
226:19,21 227:2,4
227:9,17,23 228:4
228:5,19 230:12
309:4,10,20,22,25
310:12 312:1
318:11 320:8,16
**budgeting** 225:23
229:14 230:8
309:11
**budgeting's** 228:8
**budgets** 183:15
196:8 201:17
224:16
**build** 162:9
**building** 5:4 193:8
232:20 329:9
352:14
**bulk** 195:25
196:20
**bullet** 105:18
110:25 181:7
**bullets** 24:20,22
**bunch** 300:3
**burger** 86:7
**burial** 330:23
**burling** 5:3 9:12
**business** 80:25
88:5
**businessmen**
79:22 88:19
**busy** 286:5
**buy** 49:23 186:9
186:10 192:15,17
195:25
**buying** 210:13

**c**

**c** 3:7,16 6:1 7:1
220:19 355:1,1

**ca** 4:20 341:11
342:7 356:25
**cabinet** 49:25
**calculated** 200:9
**calculation** 33:4
**calendar** 298:2
**call** 55:24 76:11
189:14 199:15
231:17 260:9
293:15 316:24
318:10 324:7
**called** 98:18
116:23 160:4
290:3 307:1
323:17,22 326:13
341:10,10
**calls** 95:8
**campaigns** 133:14
287:5
**cap** 323:23
**capacity** 41:4
117:24
**capture** 62:3
273:13
**captured** 263:6
**car** 130:15 229:22
**caraffi** 18:7,10,20
**care** 73:20 177:10
**careful** 291:22
**carfentanil** 20:16
47:15,16,25 170:1
181:13,14,25
273:19 285:9
**carole** 13:21 70:9
142:19
**carried** 350:24
351:5
**carry** 244:21
**cartel** 82:2 212:6
214:22,23 216:16

cartels 77:16,25
79:7,21 82:15
84:1,19 100:24
127:15 205:20
206:17 207:20
208:2,13 209:21
210:19 211:3
212:21 214:8
carter 4:2 8:18,18
151:25 156:12
case 1:5,9,11,13
7:21 26:20 27:5
70:23 78:2 93:18
106:11 111:13
113:9 117:13
118:21 133:5
136:7 148:21
150:20 162:3,4
171:1 176:7,9,11
176:12,20 178:9
178:17,22 179:7
189:24 193:17
215:14 229:6,11
229:22,23 230:9
230:10 233:1,24
252:12 253:8
261:1 263:12,13
265:22 267:4
329:6 330:21
333:18 338:22,24
339:2 341:9,18,24
343:8,13,23 344:4
344:10,17,20
345:5,24 347:6,8
356:6 357:3 358:3
caseload 245:10
245:14,18 246:20
247:7 249:20
341:6
caseloads 175:10
175:18 179:24

187:14 228:14
242:25 244:17,23
244:25 245:5
248:9 257:4
cases 29:17 35:1,7
35:9 39:6,9 43:17
44:25 62:21,22
64:7 66:24,24
94:16 101:15
119:16 161:18
163:8 171:10,21
173:6 176:4,15,17
177:1,2,6,22 178:7
178:22 179:6,15
180:10 183:4
186:13,23 190:7
199:10 229:7
231:18,18 236:19
236:20,23 237:4
238:19 244:16
246:6 248:5,11
250:21,21 251:25
253:15,22 254:13
254:16 255:7
256:8,10,14,16,20
257:3 260:12
261:21 300:7
332:25 333:13,13
333:15,20 338:20
339:7 340:2,13,22
341:1,9,11,11
342:5,7,8,8,13
343:24
cash 190:10
casings 337:19
catch 81:22 172:1
categories 59:20
60:13
category 84:5
274:10

caught 85:15
87:16
causal 34:9,16
47:3
causation 36:8
43:24 46:16 47:1
cause 51:4,6 61:1
61:2 63:23 71:24
72:22 76:1 94:8
94:15 109:1
118:22 130:6,12
130:12,16,21,22
130:23 147:10
148:13,25 194:15
214:2 230:6,12
262:2 266:5
273:14 332:10
348:3
caused 92:25
289:3
causes 52:6,6
213:18 267:4
cavano 318:15
ccmeo 323:4
cdc 31:11
cell 7:9
cellular 7:8
center 190:1
193:16
central 211:14
century 215:17
216:2
certain 37:4 38:5
55:23 67:21 72:1
76:20 95:15,19
165:20 166:19
168:18 178:6
195:22,23 236:16
247:22 309:12
329:22,23 340:22

certainly 81:2,6
101:23 128:23
129:6 135:1 153:9
154:15 164:4
192:8,10 195:20
197:25 234:6
257:3 284:19
285:10 296:6
308:8
certainty 36:11
57:19
certificate 57:13
177:13 178:14
232:1 324:21,22
358:11
certificates 324:3
330:23
certification 244:3
244:6,15 245:16
357:1 358:1
certified 355:3,19
certify 355:4,10
cetera 319:24
chain 47:3 67:3
84:18 130:4 155:3
188:11 215:22
325:17 343:21
chair 158:24 165:8
chairing 158:16
chairperson 18:6
chairs 18:13
challenge 249:1
challenges 248:24
challenging 103:7
250:8 316:10
chance 125:17
157:13
change 184:11
270:5 281:16
356:13,14 358:8
359:3

[changed - cheffo]

| | | | |
|---|---|---|---|
| **changed** 18:8 29:8 | **cheffo** 3:16 6:3 | 112:19 113:12,22 | 214:16 215:9,19 |
| 31:17 196:25 | 8:10,10 9:24 10:1 | 114:18,24 116:17 | 216:3,12,19 |
| 231:7 246:24 | 14:22 15:19 16:6 | 117:4 118:6,18 | 217:12,19,25 |
| 270:21 | 17:10,21 18:5 | 119:4,18 120:3,9 | 218:6,11,16,20,25 |
| **changes** 98:23 | 19:2,7,21 21:12,25 | 120:16 121:7,9,19 | 219:5,8,11,15,18 |
| 176:1 233:15,19 | 22:4,17 23:1,4 | 122:12,15,18 | 220:7,8,22,25 |
| 234:13 241:16 | 24:1,17 25:7,16,18 | 123:1,3,12,17,19 | 221:3,6,12,17,19 |
| 317:18 338:12,16 | 25:21 30:13 31:1 | 123:24 124:3,6,9 | 223:5,7,10,16,19 |
| 356:12 357:7 | 31:3 32:19 33:8 | 124:10,21,25 | 224:10,20,21 |
| 358:7,9 | 33:11 34:3,6,14,21 | 125:6,9,19,22 | 225:12 227:24 |
| **characterization** | 35:5 36:3,22 | 126:2,5,16,20,21 | 228:15 229:4,12 |
| 164:1 193:14 | 37:22 38:11 39:2 | 127:4,7,9 128:24 | 234:25 236:9 |
| 209:6 236:8 | 41:8,14,17 42:9 | 129:4,8,20 131:14 | 237:24 238:5,8,24 |
| **characterized** | 43:20 44:2 45:10 | 134:25 135:11,16 | 239:7,11,13 241:2 |
| 191:2 261:9,10,13 | 45:12,18,25 47:9 | 136:18 137:15,19 | 241:11 256:4 |
| 262:12,16 317:24 | 48:11,19,21 49:7 | 138:7,14 139:3,9 | 257:16 258:24 |
| **characterizing** | 49:17 50:2 51:13 | 141:1,11,17,22,24 | 259:5 260:17 |
| 208:17 291:6 | 51:19 52:14,21 | 142:22 143:10,13 | 261:6,16,23 |
| **charge** 190:6 | 53:6 54:17 55:9 | 143:18 144:25 | 264:10,15 265:4 |
| 236:14 | 55:15 56:8 57:11 | 145:11 146:1,4,17 | 265:24 266:22 |
| **charges** 233:17 | 57:21 58:19,25 | 147:21 148:11,17 | 267:9,12,18 268:5 |
| **charging** 190:7 | 64:4 65:24 67:7 | 148:22 149:19,24 | 268:8,13 269:19 |
| 191:22 199:9 | 68:5,17,19,22,24 | 150:15 151:9,23 | 269:21,24 270:3 |
| 231:5 233:23 | 69:1,4,16,17,19,21 | 153:11,14,24 | 270:12,18,23,24 |
| **chart** 62:8,12 | 70:1,11,16 71:16 | 154:2,4,21,24 | 272:3 274:6 |
| 203:4 275:12,23 | 71:25 74:21 77:7 | 156:5,10,25 157:3 | 275:19 276:1,13 |
| 277:23,23 323:1 | 79:13 80:7 81:10 | 157:15 161:8 | 276:19 277:1,12 |
| **charts** 59:20 | 81:23 82:9,21 | 174:1,7,16 182:20 | 277:19 278:23 |
| **check** 56:16 | 83:20,23 84:24 | 182:22 185:10 | 279:8,10 280:12 |
| 131:17 172:24 | 85:3,8 86:10 87:9 | 187:25 188:6 | 280:22 281:11,24 |
| 188:5 198:19 | 87:17 88:7,18 | 191:3 192:6 193:4 | 283:7 284:25 |
| 225:21 226:13,22 | 89:14 90:6,16 | 196:21 201:12,18 | 285:17 286:3,20 |
| 227:1 257:13,20 | 91:2,8,25 92:2,16 | 202:16,24 203:12 | 286:25 287:11,18 |
| 341:5 | 93:20 96:13,20,25 | 203:18,20,21 | 288:14 289:9,15 |
| **checkbox** 328:2 | 97:13 98:4,6,9,22 | 204:2,3,13,24 | 290:10 291:8 |
| **checked** 31:25 | 100:10,19 101:16 | 205:4,9 206:5,12 | 292:4,14 293:3 |
| 38:8 | 102:23,25 104:12 | 207:1,12,18 208:8 | 294:3,15 295:6,21 |
| **checking** 76:9 | 105:5,10,13,22 | 208:20,23 209:4,8 | 295:23,25 296:17 |
| **checkmark** 330:4 | 106:17 107:1,6 | 209:20 210:1,9,16 | 296:24 297:8 |
| **cheese** 86:7 | 109:10 110:13 | 210:23 211:9 | 298:11,12 299:9 |
| | 111:1,6,16 112:7 | 212:5,11 213:2,11 | 299:23 301:13,18 |

302:11,18 303:6
303:16,20,23
304:1,3,6 305:1
307:21 308:6,10
308:18,19 311:21
312:10,15,17,24
313:3,7,9,14,17,21
313:24 314:3
316:1,4,12 318:12
319:2,7,13,18
320:18,25 321:8
321:11 322:14
331:14 333:10
334:2,15 335:2,4
335:15,20,24
336:11 338:18
339:16 342:1,12
342:15,24 344:22
346:25 347:14
348:15,19 349:11
349:24 350:3,8,10
350:22 351:8,14
351:16 352:23
353:5,15,23 354:2
**chemical** 257:7
**chemistry** 187:5
337:24
**children** 177:6
256:16
**china** 49:3 58:1
181:24 182:2
280:11
**chinese** 181:24
**choice** 301:2
**choose** 307:5
**chromatographs**
169:24
**chronic** 98:24
**chuck** 318:15
**chunks** 172:14
173:12

**circumstances**
150:13 178:23
225:24
**cited** 180:17
**citing** 267:7
**citizen** 88:9
**city** 1:10 185:25
**civil** 107:23
215:25 357:5
358:5
**claim** 41:7 136:8
**claiming** 68:1
**claims** 237:14,16
**clarification** 45:23
68:14 158:11
178:2 230:3 232:8
268:3
**clarify** 68:13
100:13 160:22
305:2
**clarifying** 70:20
**class** 244:19,20
**classified** 57:7,10
59:17,19
**clear** 11:1 18:18
22:23 32:6 36:20
41:2 59:21 98:5
104:13 117:10
154:16 176:19
223:22,25 224:15
252:25 261:22,25
264:25 266:3,15
275:11 334:4
**clearly** 84:19
291:17
**cleveland** 1:10,18
2:10 3:5,13,24 4:4
4:10 7:25 185:25
356:2
**click** 325:11

**clients** 119:3 122:6
**climaco** 2:7 7:23
**close** 120:7,12
167:10 171:18
226:14,14 234:10
**closed** 329:6 339:7
**closer** 247:17
**cocaine** 6:14 60:9
81:12 86:19,23
202:13,20,22,23
203:5 204:17,20
205:12,14,19,22
206:2,13,18
207:21,24 208:5
208:14,18,25
209:2 210:3,13
211:10,21 212:20
214:19 215:6,7,12
215:16 216:2,15
217:20 229:17,18
271:1,15,19,25
272:1 273:19
277:20,24 278:3,5
278:12,18,20
282:3,5,12,13,22
283:2,3,10,14
284:6,8,10 300:20
321:15 323:13
**cocktail** 284:3
**code** 160:16
**codes** 309:13
**codis** 243:14
**cognizant** 315:21
**coincide** 278:6
**colleagues** 239:20
**collect** 33:24 50:17
160:25 241:17
268:25
**collected** 75:15
172:10 173:3

**collecting** 173:9
**collection** 163:14
**collects** 165:18
188:16 323:18
**collins** 143:23
144:2 151:15
**colloquy** 157:5
**color** 321:18 322:1
322:1,5
**colors** 301:2
**columbus** 15:12
**column** 23:10,14
315:23 317:14,14
320:4
**columns** 314:25
315:4,7,16
**combination**
59:10 60:8 61:4
81:8 205:13
**combinations**
60:10 61:3,13
**come** 115:23
116:23 118:5
126:10 140:11
143:25 159:15
183:8 185:4,4
226:5,6,10 279:21
280:14,16 325:14
331:16 332:8
**comes** 16:22,22
58:9 132:24
177:14 185:13
196:10 269:4
310:9 319:6
331:11
**comfort** 35:10
**coming** 17:19 61:3
67:14 82:24 83:3
83:8,11 185:23
196:3,20 198:1
211:11,13 232:20

280:10 310:15
353:12
**commingled** 278:4
278:12
**commingling**
278:19
**commission**
357:19 358:25
359:25
**commits** 263:5
**committee** 26:20
158:20 165:8
**common** 79:17
82:11,22 159:12
204:9
**communication**
328:12
**communications**
346:20
**communities**
77:19 80:24
130:25
**community** 19:10
20:24 24:13 40:18
88:9 91:12 109:6
112:13 114:1
115:11 121:24
122:20 128:1
130:25 160:1
165:21 265:18
271:5 283:6
300:16
**companies** 4:8
49:11 102:17
135:19
**company** 76:12
131:16 135:21
141:8 143:1
144:10 214:25
215:17 216:13
288:20

**compare** 152:13
169:21
**comparison**
172:15 233:6
281:20
**compensated**
199:20
**compilation** 269:6
**compile** 27:7
272:6 332:2
**compiled** 165:12
335:22 345:19
**compiling** 54:6
179:16 255:11
269:10
**complaining**
270:17
**complete** 30:3,19
90:15 165:12
230:22 285:4
314:25
**completed** 53:10
62:24 172:18
243:25 297:15
298:2 324:25
329:7 356:15
**completely** 247:20
**completeness**
161:24
**completion** 245:3
**complex** 213:8
**complicated** 25:12
25:24 26:4 60:11
103:10
**components**
163:17
**computer** 269:9
272:5
**concern** 15:9 20:7
152:16

**concerned** 302:24
**concerns** 17:1
19:9,17 286:15
**concludes** 354:5
**conclusions** 95:19
116:2,5,8,13,19,20
118:4
**concrete** 260:21
**condition** 86:5,8
86:17
**conduct** 112:2
131:4,22 146:21
148:7,13 149:13
151:20
**conference** 155:20
179:22 285:7
**confidential**
322:20,20
**confirm** 300:7
**confirmed** 26:8
**conform** 243:12
**confuse** 104:15
**conjunction** 283:4
**connected** 146:20
147:14
**connection** 34:9
34:16 51:14 65:20
67:1 96:7 98:18
117:11,12 124:12
186:22 193:19
214:21 308:14
309:4
**connections** 51:9
**conover** 42:25
**consider** 272:11
**considered** 173:23
**consistent** 257:10
282:23 351:17
**constant** 310:25
**construction**
200:23

**consumer** 99:3
**consuming** 280:1
**contact** 163:9
**contacted** 184:8
**contained** 306:12
**contemplating**
234:22 235:4,7
**contention** 122:17
126:10
**context** 252:14
**continue** 7:12
124:7 168:22
171:14 183:25
228:14 285:20
307:3 309:19
333:9
**continued** 4:1 5:1
171:3 286:1
351:10
**continues** 310:21
334:1
**continuing** 70:6
351:21
**continuously**
242:6
**continuum** 27:1
161:21,23
**contract** 228:13
229:11 232:18
233:8
**contracts** 201:25
229:9 309:13
317:1 319:24
**contribute** 105:7
**contributed** 63:17
101:21 103:8,11
105:4 180:23
**contributing** 24:7
25:1 98:13 106:13
108:23 130:8
257:3

**contribution**
198:14,24
**contributions**
196:12
**control** 85:11 86:8
**controlled** 32:7
74:5,11 92:4
93:24
**convene** 307:17
**conversation**
12:22 139:24
145:20
**conversations** 7:8
11:17 303:3
347:23
**convey** 292:12
**conveyed** 45:2
**convicted** 92:21
92:21 93:3 94:3
95:5
**cooperation**
307:25 308:17
**coordinate** 55:6
192:22
**coordinated** 83:2
**copies** 270:7 312:8
312:20,23,24
321:22 347:18
**copy** 223:21
269:25 312:11
321:17 328:22,24
347:5
**corner** 231:21
232:2 233:9
341:10
**corner's** 231:4
234:1 242:4
258:10 317:15
**corners** 258:17
**coroner's** 316:19

**coroners** 29:11
**corporation** 4:18
5:2
**correct** 10:11
12:17,19 18:22
22:20 31:10 32:1
32:5,8 46:4,9 48:5
48:10 49:5,16
50:4 51:7 53:20
55:8 58:3 61:20
61:22 62:5 64:22
66:2,6,17 74:7,12
76:24 94:21 95:23
106:19 154:20
157:24 178:19,25
201:6 205:16
209:5 217:2
225:25 227:6
235:6,9 240:2
254:10 256:18
262:6 264:8
268:10,16 274:21
275:6,10,17,25
276:12,25 277:5
284:4 286:24
287:24 290:5,9,14
310:13 312:10
315:11 328:8
333:11 334:18
343:20 355:7
**corrections** 356:12
358:17
**correctly** 180:19
**correlate** 44:9
**correlating** 318:23
**correlation** 36:8
43:4,22 44:14
46:15 47:1
**correspondence**
13:14 328:11,20

**cost** 192:2,21
199:10 200:5
229:6,6,11,19
232:16,17 234:17
236:13
**costs** 190:6,8,23
191:19,22 192:16
192:24 194:16
195:4 225:4
228:11 230:13,21
232:12 233:7,12
233:17,18 234:10
235:8,17,24 236:2
237:20 238:1
309:5,7
**council** 243:20
**counsel** 7:17 8:6
9:22 69:15 70:14
152:21 155:15
220:6 224:6
238:21,22 241:10
306:6,8 307:11
314:22 318:18
321:17 351:22
354:1
**count** 98:1
**counted** 257:8
262:23 263:1
274:9
**counties** 189:18
190:2 191:17
199:11 229:10
231:6,13 232:15
**counting** 274:19
274:19
**countries** 100:24
**country** 81:4 83:4
83:7 84:3,11,22
258:16
**counts** 50:20

**county** 1:8,12 3:2
6:7,15 8:25 9:2
10:8 15:7,20 16:8
17:23,25 18:4,21
18:23 22:9 25:11
25:24 27:2 42:3
43:13 51:15 70:23
80:23 83:1 95:6
97:18 122:4
126:12,23,25
127:3,12 133:18
135:22 162:13
169:1,2 177:24
182:25,25 184:16
185:4,9,14,18
192:1 194:3
195:19 196:11
198:15 199:21
206:22,25 207:2,8
216:17 222:15
227:5 231:18
232:14 233:18
236:4 242:4 251:9
251:17 256:9
257:18 258:9
263:2 271:2
280:15 282:22
287:2 288:8
289:22 290:2,4,6
290:17 291:21
293:7,23 294:6
297:2,5 299:2,4
300:12 304:12
314:14 317:8
318:1,2 319:20
320:1,15 322:3
338:1 342:9
348:25 350:11
357:10 358:15
**county's** 25:1 54:2
184:19 231:19

232:2 290:12
306:9
couple 195:9,10,14
223:3 230:15
231:7 348:13
course 112:2
332:23 333:15
court 1:1 7:20 8:3
9:14 11:11 93:4
93:13 155:19
156:2 305:19
306:17 320:21
352:8 357:7
cov.com 5:6
cover 22:24 98:1
235:8 236:2
237:20 238:12,12
268:3,4,6 272:15
321:18
coverdell 186:9
covered 152:25
covering 234:10
covington 5:3 9:12
crackdowns 26:12
cracked 78:5
crash 130:20
create 122:10
188:4
created 17:13,14
77:18 81:9 84:13
84:14 88:16 89:1
89:22 107:4 120:7
122:7 161:1
213:10 215:17
creating 17:7
84:20 107:14
119:21 121:18
125:25 127:17
128:4
creation 129:15
189:16 200:16

316:25
credit 46:7
crime 200:16
201:5 243:9
337:20,21
crimes 99:23
187:9
criminally 106:9
criminals 79:25
80:9,11 88:21
crisis 25:10,23
72:18 81:3 104:23
115:4,22 117:3
121:25 122:14
126:1 127:12,18
128:1,7,16 130:9
130:23 135:5
139:15 140:18
147:7,18 159:17
162:24 169:16
187:7 190:11
198:4 199:7
200:19 202:17
212:25 215:8
217:8,16 242:25
271:6,8,9,12,14,22
296:11,16
cropped 21:10
cross 73:22 329:21
culpability 79:24
88:1 150:8
current 10:6
209:24 235:23,24
276:17 326:15
334:7 336:13
currently 16:14
159:8,25 165:6,15
205:2 235:13
242:18 310:4
311:18 325:19
326:13 333:17

337:9,12
curtailed 82:2
custodial 304:14
305:11 306:11
custodian 152:9
152:11
custodians 156:3
custody 352:6
customer 81:16
cuts 184:3
cuyah 6:8,10,18
220:18
cuyahoga 1:8 3:2
6:7,15 8:24 9:2
10:8 15:20,24
16:7 17:23 18:21
18:23 22:9 25:23
51:15 54:2 80:23
81:4 97:17 127:12
130:10 133:18
135:22 162:13
177:24 182:25
184:19 185:9
203:7 216:17
242:4 251:9 271:2
280:15 282:22
287:2 288:8
289:21 290:3,17
291:21 293:7
297:2,4 299:2,4
306:9 314:13
317:8,25 318:2
319:20 320:1,15
322:3 342:9
348:24 350:11
cuyahona 182:25
cycle 184:11

**d**

d 7:1
d.c. 4:15

daily 104:9
damages 237:15
253:8
dan 1:6
dangerous 207:20
dangers 67:12
daniel 5:11 8:1
dark 182:17
300:23
data 26:16 27:8
30:5,7 31:2,7,8,10
32:12 34:10,17
36:10,25 38:12,15
38:22 40:21 43:9
44:5 46:12,15,24
47:2,2 51:23 52:4
53:10 54:5 60:12
61:24 62:10,20
63:1,2 64:7 65:18
72:2,3,13,15 87:4
93:22 95:19 96:3
115:21,23 116:3,9
118:3,5 158:14,16
158:19,25 159:1,2
159:4,18,20,22,24
160:8,11,25 161:1
161:6 162:11
163:3,13,18,20,23
164:20,25 165:17
166:18 167:2
168:18 170:14,21
171:19,20 172:9
173:7,10,20
174:10,23 175:12
179:16 180:11
193:20 251:7
264:20 268:24
278:10 283:23
284:14 294:5,5
324:4 331:18
344:8,11 345:16

[data - defendants]

345:18
data's 173:3
database 29:10
  44:7,11 53:23
  61:16 72:8 134:8
  134:17 160:15
  165:7,17 167:23
  173:4 188:15
  243:15 323:17,18
  325:4,6,8,12,15
  328:15 336:19
  338:1,3 343:1,16
  346:21 347:4
databases 71:18
  71:22 188:5,18
  328:25
date 137:3,24
  138:11 270:21
  285:5 307:18
  356:8 357:3,9,19
  358:3,13,25
  359:20,25
dated 6:9 97:17
dawn 167:2
  331:20
dawn's 167:3
day 4:3 8:19 12:8
  12:9 79:18,18
  139:2,2 152:6
  169:7,7 192:16,18
  201:1,1 311:13
  324:17 326:16
  355:15 357:16
  358:22 359:22
days 101:13
  104:10 238:11
  306:23 356:18
dea 182:2
dea's 181:23 280:3
deal 20:14,15
  113:1 142:1 199:1

199:2 222:17
  353:12
dealer 87:10,25
  91:18 214:19,22
  216:16
dealers 205:21
  212:22 214:8
dealing 79:17
  140:17 300:10
dear 356:10
death 26:19,24
  34:2 39:1 43:6,11
  51:4,6 52:6 56:23
  57:8,13 61:2
  63:17,23 67:9
  71:24 72:23 73:3
  76:1 77:10 88:1,6
  90:1,23 91:19
  94:8,15 109:2
  110:5 130:12,13
  130:17,21,22
  131:5 171:3
  177:12 178:5,13
  188:22 193:23
  211:24,25 230:6,6
  230:16 231:14,25
  253:14 257:8
  258:19 259:6
  262:3,3 263:4
  264:14,18 266:5
  267:4 273:14,15
  273:16 276:10
  284:10,18 294:5
  323:17 324:3,5,21
  324:22 330:22
  331:24 332:10
  337:7,22 338:20
  340:2 348:3
deaths 6:15,17
  23:11 26:22 30:20
  43:5 51:15,17

52:10 53:18 54:1
  59:7,12,23 61:18
  64:14 74:10 76:20
  76:21 82:3,17
  83:1 87:21 97:3
  169:2 175:7 180:2
  180:4,13,14
  181:14 187:11
  194:17 195:6
  202:21,22 203:6
  205:12 215:6,25
  216:1 227:15,18
  237:10,12 246:16
  246:19 247:1
  248:23 249:12,16
  251:9,17 253:1,6
  256:25 257:19
  258:5 260:10
  263:16 266:25
  267:1 271:1
  273:10 274:4
  276:2,21,22 277:4
  277:24 278:3,12
  278:18 279:1,17
  281:1,14,16
  282:12,13,22
  283:9,10,14,21
  285:9 291:24,24
  293:14,25 295:5
  299:5,22 300:6
  301:2,5 311:6,13
  321:15 323:5,12
decade 204:6
decades 329:18
decedent 74:16
  75:2 323:20 324:7
  327:9
decedents 323:19
december 6:15
  272:19,24 339:23

dechert 3:17 8:11
  8:13
dechert.com 3:19
  3:20
decided 254:8
  300:13 339:18
decision 339:20,21
  340:11
decisions 231:24
  311:2
deck 171:13
declaration 349:9
  350:18 351:2
declarations
  299:20
declare 266:15
declared 262:25
  266:19 291:11
  292:8 296:8
  298:19
decrease 184:1
  281:9 303:12
deed 357:14
  358:20
deem 44:8 305:4
deemed 267:1
  275:22 356:19
deeper 64:6
defendant 7:17
  8:15 9:22 119:7
  131:4,22 133:5
defendants 8:11
  8:13 9:10 70:4,14
  118:21 119:2,21
  120:22 123:5,19
  124:16,23 125:25
  127:10 128:2,18
  130:24 131:6,15
  132:13 133:11
  136:7 138:3
  146:21 147:14

[defendants - direct]                                                    Page 16

148:7,12 149:14
150:7,20 151:21
214:12 215:14
305:3 307:23
**defense** 306:24
307:11
**defined** 273:18
**definitely** 175:25
198:25 207:7
237:2
**degree** 40:3
229:21
**delayed** 30:22
173:19 297:15
**demerit** 244:21
245:7
**demographic**
324:4
**dental** 233:6
**department** 15:14
46:25 56:19 64:10
72:16 73:7 74:25
75:9 116:20 159:2
160:3 175:8 181:4
183:17 184:18,24
186:3 194:9,11
223:12 224:16,23
225:5,10 241:18
242:18 243:8
246:8 247:21
251:8 253:15
254:1,17 267:2
272:7 285:1 309:8
326:1 347:2
356:22
**departments**
16:13 272:9
**depend** 328:14
**dependence** 265:9
**depending** 33:6
225:24 251:3

274:19
**depends** 263:12
311:17
**depo** 306:22
**deposed** 10:9,12
**deposition** 1:17
2:1 7:11,11,16,22
11:20,25 12:2
13:5,10 22:2 41:1
41:15,21 69:24
124:2 152:13,18
153:2,20 206:24
219:24 238:6
267:16 305:4
307:1,12 314:1
316:8 320:23
353:8 355:7 356:8
356:11 357:1,3
358:1,3
**deposition's** 127:6
352:21
**depositions** 308:5
**depth** 30:23
**derived** 217:3
**described** 346:22
**description** 346:13
**designation** 318:4
**designed** 288:3
**designers** 241:19
**desire** 307:12
**despair** 260:10
**detailed** 174:19
**details** 79:15,16
109:15 283:18
**detect** 169:18
170:4 182:8
309:17
**detection** 188:20
**determination**
33:15 51:25 74:19
88:4 91:6 94:7

111:14,15 112:5
144:14,16 146:11
150:23 178:22
232:6 261:21
264:25 295:14
309:25 341:23
**determinations**
58:5 67:10 123:21
146:16
**determine** 26:23
29:3 34:1 35:16
65:19 66:25 71:19
72:19 75:16,25
78:12 92:12 95:1
110:9 113:9 114:5
123:14 148:10
177:2,4,8 181:12
183:24 184:4
213:16 227:17,22
341:16,23 348:3
**determined** 15:8
27:22 51:3,10
64:11 73:5 93:5
121:24 125:24
177:9 181:5,22
217:13 262:2,25
266:4 308:9
**determines** 91:23
263:25 275:16
**determining** 37:19
88:5 94:15 105:3
**deterrents** 99:16
**dettelbach** 13:20
**develop** 113:15
217:14 234:18
**developed** 111:24
173:4
**developing** 212:7
**diagnosed** 259:25
**die** 84:4 111:9
130:15 208:25

**died** 27:14 28:1
29:18 31:19,20
32:17 37:2,6
47:21 60:6,7 67:4
70:25 76:12
111:25 129:24
151:18 263:14
**dies** 61:9 75:11
81:17 89:25 91:17
110:2 176:21
251:12 263:15
**difference** 86:22
270:11,14
**differences** 87:5
**different** 120:25
127:22 139:17
159:9,9 161:20,22
161:23 164:11
166:21 174:24
229:3 240:14
259:19,20 277:23
320:5 331:22
332:2 343:3
348:14
**differentiate** 57:20
63:8 186:16 230:5
230:5 240:18
260:21
**differentiates** 64:1
318:5
**differentiating**
317:25
**differently** 127:24
**difficult** 46:5,6
61:5 97:12 169:5
**digitized** 328:23
329:4,18
**digitizing** 329:17
**digits** 279:13,14
**direct** 23:21 26:6
47:21 109:6

129:17 231:19
348:21
**directed** 70:24
71:3,4 99:12
**directives** 17:19
**directly** 33:19
53:19 64:15 99:2
202:21
**director** 10:7
115:4
**directors** 243:10
**disagree** 93:13
**disclosed** 138:16
138:18
**disclosure** 305:10
306:22
**discovered** 28:23
217:7
**discovery** 155:20
239:3
**discuss** 145:9,13
147:2,3,24
**discussed** 233:8
265:22 271:24
306:19 307:8
353:4
**discusses** 345:23
**discussing** 333:25
339:13
**discussion** 57:1
101:12,24 102:6
103:12 140:10
227:21 231:17
260:14 270:8
283:5 288:13
339:22 353:20
**discussions** 21:9
39:18 103:18
117:2 132:23
174:2 280:6 283:1
289:13 293:12

306:16 347:25
**disk** 329:19
**disks** 328:25
**disorder** 68:3
108:18 111:25
260:4 265:9
**dispensed** 15:18
**dispensing** 84:15
**display** 62:15
**disposition** 324:12
**dispute** 83:25
**distinct** 242:1
**distinguish** 63:12
**distribute** 106:15
343:13
**distributed** 321:22
**distribution**
133:17 134:1,3
**distributions**
84:14 134:9
**distributor** 143:1
289:3
**distributors** 109:8
142:14 145:5
212:19 288:25
**district** 1:1,1 7:19
**dive** 64:6
**diversion** 63:9
**divert** 49:21
**diverted** 48:4
275:21
**dives** 94:19
**divided** 316:22
**division** 1:2 7:20
7:21
**dna** 186:8,10
187:5,8,16,18,24
188:1,13,20
196:12 233:6
243:12,14,18
337:22

**doc** 135:21 150:16
**doctor** 40:7 48:17
54:21 55:2,5,18
63:22 66:19,21
70:25 72:25 75:24
86:14 92:3,8,11,18
92:23 107:19
108:13,18,25
109:15,25 111:21
111:23 114:1,6,19
115:8 118:9,10
135:22,25 136:9
139:4,10,21,25
140:5,13 143:19
149:23 150:4,9
151:14 177:11
178:13 238:9
239:14,16,17,19
239:20 248:9,21
248:24 254:7
275:16 288:8,15
288:22 289:1,8,10
324:10 334:17
343:19 344:16
345:25
**doctor's** 50:20
67:12 74:19 112:2
**doctors** 39:10,16
55:3 56:20 64:21
95:13 103:8 104:1
104:24 106:8
107:7 109:9
112:14 118:13
130:12 138:18
139:5,13 140:14
140:16,20 141:25
142:24 143:20
146:6,7 147:12
149:3 150:17
245:6,9 247:25
248:11,14 287:2

287:21 289:13
324:9 330:18,24
332:22 344:18
345:4 347:19
**document** 1:6
24:19 42:15,24
75:15 97:17,21
104:14,16 152:5
222:23 240:6
241:14 242:2,5
267:13,14 268:14
270:15 271:4
272:5,12 273:3
292:7 295:15,24
300:20 311:23
314:12 315:9,17
316:6 317:8
320:22 322:16,21
323:2,4 349:17
350:3
**documentaries**
136:3
**documented**
215:25 216:1
232:21
**documents** 13:5
133:4,7,11 152:8
152:10,24 155:22
156:13,19 157:6
189:2 227:2
304:11,14 305:17
306:11,12,23
307:10,14,14
318:24 326:1
328:12 350:2
**doing** 15:15 17:9
19:16 29:14 53:21
54:10 57:15 66:23
92:13 94:14 144:8
147:13 171:2
182:14 191:25

230:17 231:23
234:22 236:19,19
237:22,25 240:12
245:25 249:9
271:21 329:14
330:21 333:6
343:8
**dollar**  228:23
**dollars**  200:22
201:13 225:19
**donation**  324:19
**dosage**  101:12
104:9,9
**dose**  214:19
**doses**  109:5
**double**  245:3
248:10 274:18
**doubled**  169:1
199:10 200:3
246:15,25 247:11
247:13,15
**doubling**  30:20
**doubt**  26:2 266:18
**download**  331:4
332:21 334:14,16
**downloading**
333:18
**downtick**  175:22
**dr**  12:1,3 14:7
16:4 29:10 34:7
39:17 54:20 71:6
71:10 143:23,23
144:1,1 151:15,15
152:10 153:2,21
156:6 158:8 197:7
200:21 207:9
210:11 231:3
266:9 267:7
273:23 292:9
306:13 307:9
320:9 339:17

340:16 343:6
347:22
**dramatic**  175:22
176:1
**draw**  34:9 95:19
116:2,5,19
**drawn**  116:7,12
116:20
**drill**  36:14 328:10
**drinking**  130:19
**drive**  221:13,16
312:14 329:19
**driven**  15:12
181:14 277:7,10
277:14,20
**driver**  52:10 203:6
**drivers**  256:22
**drop**  179:17,23
180:1,13,18 181:6
181:18 227:18
284:21 285:2,9
**dropped**  179:14
198:22 251:19
276:14
**drug**  4:18 6:17
16:18 23:3,11
30:20 35:17 39:25
48:16 59:25 60:25
61:18 64:15 73:2
73:14 75:20 81:16
82:2 83:15 84:1
87:23 91:17 95:7
99:23 100:4,23,23
100:24 127:15
165:24 177:17
180:13 181:16
186:22 187:4,8,10
188:12,20 189:6
196:12 204:9
205:20,20 206:17
207:19 210:18

211:3 212:21
214:7,8,18,22
215:17 216:15
246:16,19 247:1
248:11 256:12,20
257:3,6,18 258:5
259:25 260:8,11
262:21 263:15
265:13 271:8,9
273:9 276:10,21
276:22 284:18
293:16 294:5
300:10 321:9
333:12,19 335:18
335:21 337:23
**drugs**  52:7 59:11
59:13,23,24 60:3
61:6,25 67:21,23
73:15 82:24 83:3
83:7,8,11,16 84:2
84:10,11,11,21
85:4 87:11 89:5
89:24 91:16,17
97:8 166:7 169:18
182:8 203:10
206:2 208:21
216:8 234:14
259:14 262:19,24
264:24 273:12
274:1,3,8,20 281:2
283:21 284:11
311:9
**dual**  171:24
259:25
**due**  26:11,21
88:16 181:23
242:24 271:25
291:25 299:6
306:22
**duly**  9:18 355:5

**duplicative**  156:15
**duties**  14:7 18:14
135:4 136:11
341:7 343:9
344:18 345:21,23
**dying**  27:10 38:24
112:18 149:17
259:13

**e**

**e**  6:1,9 7:1,1 13:7
13:12 41:18,20
117:9 165:20
317:9 323:23
355:1,1
**earlier**  22:7 75:13
95:18 116:8
148:23 168:17
225:16 226:10
238:17 248:4
274:12 278:25
298:16 305:2,7
316:22 321:14
351:18
**early**  193:23 280:7
**earnest**  197:20
**easier**  175:16
319:4 322:1,6
335:7
**east**  3:12
**eastern**  1:2 7:21
**easy**  97:3
**economic**  104:2
190:21 192:5
237:14
**economically**
190:22
**economics**  237:7
**ed**  8:18 153:16
**education**  163:4
243:21

edward 4:2
effect 244:6
effected 236:5
effective 285:22
effects 228:10
efficacy 48:20
efficient 308:1
effort 15:21 16:24
  60:24 63:20 73:21
  206:17 208:13
efforts 157:11
  170:23 180:22
  181:24 282:20,21
eight 24:22 285:21
  306:25
eighth 5:4
either 25:9 27:2
  28:10 38:7 48:2
  90:12 92:6,20
  95:21 100:11
  120:2 142:19
  144:12 162:15
  165:22 204:8
  244:19 308:12
  318:15 323:1
electronic 327:22
  328:25
elements 37:10
elevation 51:2
ellis 3:22 8:21
else's 110:6
email 356:17
embed 194:19
embedded 193:7
  222:23 228:11
  309:10
embryonic 293:19
emcarter 4:5
emergency 143:24
  160:3,6 290:16
  291:1,7,11,19

292:9 296:4,9,19
297:4 298:5,19
299:8,15 300:1
349:13 350:13
emerging 20:21
empirical 43:3
employed 346:9
  346:11
employee 73:8,9
  73:18 302:23,23
ems 160:9 166:13
  166:20
ems's 163:23
enclosed 356:11
encompasses
  290:1
encourage 237:3
encouraging 19:19
ended 32:17
  194:23 197:13
  219:3 227:23
endo 4:7,7 70:3,13
endpoints 273:18
ends 33:4 37:5
endurance 10:21
enflis 280:3
enforce 82:8,12,14
enforcement 16:8
  28:10 55:24 56:2
  56:14 78:3 79:19
  86:13 87:7 95:9
  135:6 162:18
  163:2,2,19 168:5
  206:7 208:4 211:1
  211:18
engaged 44:21
ensure 233:10
entered 358:9
entire 35:4 102:12
  258:16 311:19
  313:13 322:9

357:5 358:5
entirely 20:1
  44:18
entities 159:3
entity 55:23
entries 224:22
  316:19 317:16
entry 54:13
  317:17
enumerate 181:9
environment
  88:15 89:1,21
  101:20 107:3,15
  107:20 118:14
  119:22 120:8
  129:16 145:15
environmental
  18:15
epicenter 160:4
  165:16
epidemic 24:8,12
  25:3 40:13 98:14
  98:19 202:14
epidemiologist
  343:7 344:16
  345:12 346:7,10
epidemiologist's
  345:9
epidemiology
  39:23 346:3
equipment 169:16
  186:9 189:24
  193:9 195:12
  197:22 200:23
  201:25 317:3
  319:24
erica 3:22 8:20
erica.james 3:25
errata 356:13,18
  358:7,10,18 359:1

especially 102:6
  165:19 166:23
  176:1 235:9 236:1
esq 3:3,7,11,16,16
  3:22 4:2,8,13,19
  4:22 5:2 356:5
essence 166:12,25
  187:13 248:20
essentially 27:13
  168:2,21 185:16
  207:22 274:18
  341:12
establish 38:21
established 18:24
  55:11 132:7
estimate 230:8
et 1:8,10,12,13
  319:24
evaluate 75:10
evaluated 94:1
evaluating 333:25
event 138:16
  307:13
events 67:3 92:7
  130:4
eventually 62:17
  130:21 136:24
  328:23
everybody 40:22
  85:24 190:11
  212:3 251:12
  284:17 286:2
  322:6 330:19
  352:22
everybody's
  307:20
everyone's 284:20
evidence 43:3
  260:22 262:13,19
  266:4,15 325:15
  325:16 326:11

[evidence - fact]

329:23 336:20,21
337:5,15
**evidentiary**
328:18
**evolving**  26:3
169:16
**exacerbated**  196:6
**exact**  18:11 23:1
60:19 111:13
297:23
**exactly**  106:2
172:19 226:11
**examination**  6:2
9:22
**examine**  291:21
307:15
**examiner**  6:12
51:3 71:14 185:3
185:13 186:19
224:24 225:1
233:9,25 242:23
267:7 293:24
300:12 312:5
314:6 316:17
322:3 338:25
**examiner's**  6:14
10:8 16:2 26:9,18
111:14 113:11
115:5,20 133:3
140:2 158:15
159:1 165:18
169:3 176:8 177:4
189:15 197:7
199:16 213:19
225:11 231:5
240:10,15 251:13
252:1 258:8,17
270:25 290:12,18
290:25 293:13
295:3,7 297:5
299:4 300:19

317:4
**examiners**  29:12
242:11,22
**example**  63:7
67:14 78:24 95:2
178:10 188:20
196:12 325:9
330:2 334:20
338:10 347:1
**examples**  337:17
**exceed**  226:5
**exceeding**  235:21
**excel**  221:4 222:3
222:7 316:11
**exception**  281:6
**exceptions**  282:10
**excerpt**  313:16
**excerpts**  312:21
313:12
**exchange**  42:20
**exclusion**  101:8
**exclusive**  37:14
100:17 335:19
**exclusively**  182:12
277:7,15
**excuse**  12:6 94:13
200:17
**executed**  358:10
**execution**  357:14
358:19
**executive**  293:23
300:12
**exhibit**  6:7,9,11,12
6:14,17,19 22:2
41:15 70:18 97:14
219:24 220:10
238:6 267:16,20
269:23 313:25
314:1,24,25 315:4
315:23 319:10
320:23 321:8

323:3 334:19,21
334:23,23 335:9,9
335:13,16 349:23
350:9
**exhibit's**  313:13
**exhibits**  6:6,22
331:10 352:5,10
352:12,18
**exist**  61:13 122:11
159:25 197:18
246:5
**exists**  127:19
128:1 130:9 165:2
197:17 320:3
**expect**  222:9
284:10
**expectation**
227:16 339:10
**expected**  310:14
**expecting**  208:25
211:22
**expended**  204:20
226:17
**expenditure**
222:10 312:2
314:5
**expenditures**
221:25 225:3,8
**expenses**  191:19
191:22 198:1
310:15
**expensive**  229:23
**experienced**  54:2
**experimented**
79:2
**expert**  39:20,23,25
40:2,8,10,25 41:4
41:12 48:17 68:1
109:19 132:5,8
**expertise**  142:2
163:1 265:1

**experts**  102:7
117:1 118:4
**expiration**  357:19
358:25 359:25
**explained**  86:14
134:7
**exploded**  168:25
**explore**  237:18
**extended**  38:17
**extent**  88:14,22
89:19 108:12
152:15,23 156:12
190:12 207:3
240:7 277:17
335:25 338:4
342:19
**extra**  171:12
254:16 281:13
341:13 353:7
**extract**  332:9
**eyes**  223:23

**f**

**f**  355:1
**face**  57:1,1 103:10
**facilitate**  40:17
340:9
**facilities**  168:9
182:8 189:19
234:4 309:16
**facility**  193:8
244:22
**facing**  121:25
126:3
**fact**  25:10 29:1
41:1 44:9 50:15
79:7,11 91:10
100:14 114:10
115:3 126:18
127:2 152:17
153:23,24 160:15
204:8 242:8

290:11 296:7

**factor** 37:20 59:7
101:19 106:4,7,21
108:20,23 173:20
173:22

**factors** 24:7 25:1
26:24 96:9,21
98:13 100:7,20
103:21 104:18,22
106:13 109:7
111:8 121:24
122:2 130:8
180:17 181:2,5
214:1 245:15
247:24 254:18
255:3 266:17
285:2

**facts** 111:18 113:3
149:3

**factual** 170:11

**failing** 100:4

**fair** 11:6,14 17:3
21:13,23,24 24:11
42:14 92:17 117:5
154:23 163:25
170:17 183:11
193:13 230:1
232:3,7 235:16
253:12 258:12
262:22 267:10
280:13 307:23
312:18 313:10
339:9 342:18,22
349:24

**fairly** 26:5 33:9
79:17 97:8 203:10
204:6,18

**fairness** 120:17

**fall** 334:6

**falls** 40:14 177:18

**falsehood** 136:6

**familiar** 19:14
54:23 222:12
283:23

**families** 35:2,3
46:3

**family** 33:25 53:1
64:21 75:18 254:8
266:2,17

**far** 29:6 109:5
156:4,8 161:13
186:12 215:22
255:19 280:6
311:2 346:24

**fatal** 161:18
162:15

**fatalities** 26:21
165:19

**fatality** 164:12
165:22

**fbi** 243:13

**fda** 49:10

**feasible** 171:13

**february** 53:25
172:9

**federal** 134:17
158:17 185:5
188:15 288:2

**feel** 23:5 56:24
129:6 174:10
234:9 235:25
250:15

**feet** 333:4

**fellow** 248:19,25
254:7

**fellows** 243:24
248:4,5,18,18

**fellowship** 244:1

**felt** 11:23

**fentanyl** 6:14
20:15 47:13,14,17

47:25 48:13,17,23
48:24 49:9 52:11
52:13,15,16,20,22
53:1,18 57:4,6,8
57:20,20,24,25
58:2,8,11,12 59:16
59:23,25 60:1,8,8
60:9 61:19 62:13
65:6,9 79:2,10
81:13,13 82:18,18
85:18,19,24 86:12
86:23 168:25
169:17,17 172:11
202:22 204:18
205:14,19,21
206:1,14 207:21
208:5,18 209:1
210:3,13 211:11
211:15,22,23
212:20 214:21
215:7 271:1,18,25
273:20 274:23
277:10,15 278:4,5
278:8,12,20 279:1
279:4,16,17,21
280:7,14 283:4
284:2,9 299:7
300:20 323:5,13

**ferret** 118:17

**fgallucci** 3:6

**fibers** 337:20

**field** 160:9 164:13
166:23 168:4

**fifth** 323:9

**fighting** 89:4
140:18

**figure** 35:23 37:25
161:3 187:19
202:5,12 224:18
229:16 259:9

**figures** 222:16

**file** 27:5 37:3
304:14 328:7,22
329:6,9,23 332:15
338:23,24 343:2
344:3,14 345:5
347:10

**filed** 7:19

**files** 305:11 329:8
329:15 343:14,18
344:1 347:7

**fill** 231:25

**final** 6:17 194:22
197:12 226:8
228:19 231:24
232:6 246:2
255:25 285:3
320:14 321:9
324:12 339:20
340:11 344:13

**finalized** 352:21

**finally** 171:21

**financial** 312:2

**find** 35:10 44:6
53:17 65:1 73:6,7
73:17,24 74:23
93:22 123:6
131:20 154:14
155:1 160:17
175:1,15 188:11
223:11 234:7
246:1 283:17
286:10 327:8
335:8 356:11

**finding** 188:12

**fine** 36:19 42:8
124:9 129:4 146:3
204:5 221:10
304:6 353:16

**fingerprint** 187:17

**fingerprinting**
187:23
**fingerprints** 187:8
337:20
**finish** 11:11 58:18
80:3 128:22
131:12 146:1
172:25 203:17
204:1,4 213:4
**finished** 30:14
36:16 105:8
194:21 345:18
**firearms** 187:11
**firm** 8:2,4
**first** 9:18 13:15,23
14:11 22:22,25
42:20 101:3
107:17,21,25
108:1,4,15 152:3
152:20 153:6
172:16 174:21
194:25,25 197:18
199:12 204:8
217:6 226:11
233:19,23 236:18
268:3 272:15,18
273:7 281:6
290:21 292:10
293:22 295:18
299:3 304:15
317:16 322:19,25
339:24
**fiscal** 238:4
**fit** 311:14
**five** 24:21 30:2
38:20 69:2 158:23
164:20 174:12
175:4 279:11
314:13,24 354:8
**fixed** 232:16,17
233:7

**flag** 153:6
**flagged** 341:19
**flat** 252:21 253:16
255:7 303:13,13
**fleming** 3:11 9:1,1
**flip** 237:6,11
**floating** 155:1
**flood** 77:18 88:16
89:1 106:14 107:4
**flow** 182:9
**fluctuates** 33:7
**fluctuation** 278:1
**fluctuations** 281:1
**fly** 298:25 301:15
**focus** 147:5 163:23
175:23 206:8,11
275:1
**focused** 21:8 23:17
46:11 104:8
172:11 286:14
**focuses** 286:19
**focusing** 232:11
**folks** 35:24 42:2
157:3 346:20
**follow** 50:6 70:21
128:23 154:20
272:14 315:17
**followed** 161:21
**follows** 9:20
**force** 6:7 13:14,17
13:20,22,25 14:5
14:11,16,19,25
15:2 16:15 17:2,7
17:13,24 18:14,24
19:17 20:13,20
21:7 22:10,14,19
23:16 24:19 25:2
79:20 95:15 101:4
101:4 105:21,24
105:25 113:14,16
117:24 132:23,25

133:1 140:1,10,13
141:6 142:1,15,20
142:24 143:21
144:2 145:14,21
147:5 157:20,21
157:23 158:1,2,8
158:13 162:18,23
164:18 207:6
259:7 260:14
279:19 280:7
282:21 283:6
285:13,24 289:25
293:20 294:1,8
300:2,15
**forced** 136:25
**forces** 86:16 91:13
117:1 285:20
**foregoing** 357:13
358:18
**foreign** 100:24
**forensic** 56:22
71:14 75:25
185:21,24 186:19
186:21 187:15
189:13 195:24
197:17 200:17
201:5 224:25
232:25 233:3
243:2,3,10,23,25
248:1 261:20
265:2,18 267:8
314:14,18 316:13
316:23 317:10
318:1,2 319:21,25
320:2,15,17
326:11 331:23
337:5,15,16 339:1
**forget** 251:6
**forgot** 326:22
**form** 14:17 15:10
15:25 16:16 17:4

17:16 18:2 19:4
19:12 20:18 22:15
23:19 24:14 25:4
25:13 26:1 32:13
32:25 33:22 34:11
34:18,24 35:25
36:15 38:14 41:5
43:14,25 47:5
48:9,15 49:6,15
50:1 51:16 52:12
52:18 53:8 54:16
55:7,12 56:5 57:9
63:24 65:22 67:5
67:24 71:12,21
74:17 77:4 79:5
81:5,18 82:6,19
83:17 85:1,6 86:1
87:3,13 88:2,11
89:9 90:3,10,24
91:4,20 92:10
93:11 96:11,23
97:5 98:20 100:8
100:25 102:20
104:5 105:1
106:11,23 109:3
110:8,11,20 111:5
111:11 112:4,17
113:7,21 114:13
114:21 115:16
116:14,21 118:2
118:12 119:1,14
120:1,5,13 121:4
121:16 122:5,23
123:9 124:18
134:22 135:8,14
136:17 137:13
138:9,24 139:7
140:22 141:9,13
142:17 143:12,15
144:23 145:7
146:13 147:16

148:8,14,19
149:15 150:11,22
151:7 161:7 164:2
173:24 174:6
180:9 185:7
187:21 190:25
191:24 193:3
196:18 201:11,14
202:15,18 203:8
204:10,22 205:1,6
205:23 206:10,23
207:5,16,25
208:15 209:19,22
210:4,14,20 211:5
212:1,8,23 214:15
215:1,15,23
216:10,18 217:9
217:17,22 218:5,8
218:14,19 223:2
225:6 227:19
228:6,25 229:8
233:21 236:6
237:23 255:22
257:12 258:21
259:2,23 260:24
261:18 264:9,12
265:3,20 267:5
271:23 274:5
275:18,24 276:11
276:16,24 277:8
277:16 278:21
279:6,22 280:19
281:4,21 282:25
284:22 285:15,23
286:17,23 287:9
287:16,21 288:11
288:23 289:6
290:8 291:2 292:2
292:23 293:9
294:10,25 295:16
296:5,21 297:7

298:7,9,23 299:18
301:10 302:8,15
303:5,10 311:16
318:9 324:14
331:12 333:1,16
334:11 335:12
336:4,6 338:13
339:11 340:3
341:3 342:21
344:19,21 345:2
346:23 347:12
349:5,22 351:3,11
**formal** 266:24
346:13
**format** 222:1,12
**formats** 159:11,25
**formed** 300:2
**former** 302:23
**forms** 345:4
**formulaic** 253:9
**formulations**
99:16
**forth** 31:12 234:20
318:24
**fortuitous** 223:18
**forward** 102:12
117:3 307:3 310:1
311:1 351:15,21
356:15
**found** 32:2 35:13
138:20 188:21
274:20 275:22
319:10 324:6
337:20,21 340:7
**foundation** 40:23
**four** 24:21 30:2
62:3 174:11
280:15 314:13
**fourth** 317:7,15
323:9

**frame** 173:15
276:4,5
**francisco** 4:20
**frank** 3:3 8:23
70:1 153:14
156:25 157:5,9
268:6 312:19
356:5
**frankly** 80:24
281:13
**free** 23:5 167:4
250:15 357:14
358:20
**friend** 112:9
**front** 104:14
175:15 201:21
220:10 250:17
267:23 271:17
293:2 308:15
348:16
**full** 10:4 73:1
231:13 234:11
262:3 273:7
294:13 341:14
**fullest** 88:14,22
89:19
**fully** 185:18
**function** 14:14
336:18 345:11
**fund** 185:9,17,21
186:6 189:15,24
196:20 198:7,24
225:1 316:18
320:3
**fundamental**
40:23
**funded** 185:18
189:16
**funding** 184:23
185:2,12 189:2
195:18 196:17

314:17 316:14
**funds** 317:1
**funeral** 324:13
341:20
**further** 45:23
153:13 155:16
156:1,22 305:10
307:8 315:16
355:10
**future** 232:24
307:19
**fuzzy** 236:8

**g**

**g** 7:1 317:9
**gain** 104:2,25
106:10 192:5
**gallucci** 3:3,3 6:22
8:23,23,24 9:6
14:17 15:10,25
16:16 17:4,16
18:2 19:1,4,12
20:18 22:15,23
23:19 24:14 25:4
25:13 26:1 30:12
30:14 32:13,25
33:22 34:11,18,24
35:25 36:15 38:10
38:14 41:5 42:6
43:14,25 45:16,20
47:5 48:9,15 49:6
49:15 50:1 51:12
51:16 52:12,18
53:5,8 54:16 55:7
55:12 56:5 57:9
57:16 58:17,20
63:24 65:22 67:5
67:24 68:17,20,23
68:25 69:2,19,23
70:5 71:12,21
74:17 77:4 79:5
80:2,5 81:5,18

82:6,19 83:17
84:23 85:1,6 86:1
87:3,13 88:2,11
89:9 90:3,10,24
91:4,20 92:10
93:11 96:11,19,23
97:5 98:4,8,20
100:8,13,25
102:20 104:5
105:1,8,12 106:11
106:23 109:3
110:8,11,20 111:5
111:11 112:4,17
113:7,21 114:13
114:21 115:16
116:14,21 118:2
118:12 119:1,14
120:1,5,13 121:4
121:16 122:5,23
123:9,13,18,22
124:1,4,7,18 125:2
125:8,12 126:14
126:18 127:1,5
128:22 129:2,5,9
131:12 134:22
135:8,14 136:17
137:13 138:6,9,24
139:7 140:22
141:9,13,20
142:17 143:7,12
143:15 144:23
145:7,23 146:3,13
147:16 148:8,14
148:19 149:15
150:11,22,25
151:3,7 153:8,12
153:22 154:1,3,15
154:23 155:4,15
156:18 157:2
161:7 164:2
173:24 174:4,6,13

180:9 185:7
187:21 190:25
191:24 193:3
196:18 201:11,14
202:15,18 203:8
203:16,19,24
204:10,22 205:1,6
205:23 206:10,23
207:5,16,25
208:15 209:19,22
210:4,14,20 211:5
212:1,8,23 213:4
214:15 215:1,15
215:23 216:10,18
217:9,17,22 218:5
218:8,14,19,23
219:2,6,10,14,16
220:15,20,23
221:8,10,13 223:2
223:6,9,13 224:6
224:17 225:6
227:19 228:6,25
229:8 233:21
236:6 237:23
238:2,21 239:2,5,9
255:22 257:12
258:21 259:2,23
260:24 261:15,18
264:9,12 265:3,20
266:21 267:5
268:2,7 269:11,14
270:1,6,16,19
271:23 274:5
275:18,24 276:11
276:16,24 277:8
277:16 278:21
279:6,22 280:19
281:4,21 282:25
284:22 285:15,23
286:17,23 287:9
287:16 288:11

289:6,11 290:8
291:2 292:2,23
293:9 294:10,25
295:16 296:5,21
297:7 298:7,9,23
299:18 301:10
302:8,15 303:5,10
303:18,21,24
304:2,4,18 305:5
305:15 306:7
308:2,7,16 311:16
312:6 313:1,11,15
313:19,22 314:22
315:8,14,20 316:2
318:9 319:1,9
321:4,7,16 322:8
322:13 331:12
333:1,16 334:11
335:12 336:4,6,8
338:13 339:11
340:3 341:3
342:21 344:19
346:23 347:12
348:12,17 349:5
349:21 350:1,5,9
350:19 351:3,11
351:23 352:13,17
352:25 353:14,18
353:25 356:5
**gallucci's** 42:13
**ganey** 99:11
**garofoli** 2:7 7:23
**gas** 169:24
**gather** 116:25
**gcms** 169:22
**gender** 332:11
**general** 27:20
28:16,22 136:8,23
185:9,16,17,21
186:18 187:14
189:12 196:20

198:7,24 211:13
241:13,15 255:14
294:12 303:14
316:23 320:2
332:16 343:23
**generally** 14:8
317:1 333:13
**generated** 63:4
269:9
**generic** 293:11
**genesis** 350:25
**geographic** 177:1
**geographically**
211:11
**getting** 27:23
29:20 35:19 37:13
38:25 61:5 97:7
103:19 158:18
171:17 179:25
181:24 188:14
189:11 191:18
197:3 206:3
212:25 214:20
234:9 333:4
345:18,18
**gilson** 12:4,5 14:7
16:4 29:10 34:7
39:17 54:20 71:6
71:10 152:10
153:21 156:6
158:8 197:7
200:21 207:10
210:11 231:3
273:23 292:9
306:13 307:9
339:17 340:16
343:6 347:22
**gilson's** 153:3
320:9
**give** 21:22 33:3,5
45:6 90:12 106:24

113:2,11 115:22
137:3,23 139:19
150:25 166:5
167:4 183:8 184:5
225:20 232:6
241:18 255:20
264:21 266:7,10
312:11 330:1
337:17 347:13
352:7
**given** 75:19
118:14 149:2
280:18 355:8
**gives** 71:24
**giving** 28:11
110:22 111:17
233:10
**glad** 153:16
**glean** 305:13
**gleason** 12:2
**go** 7:13 20:3 22:6
29:7 44:20 45:15
56:11 65:15 69:20
73:6,7,21 78:8
106:5 116:15
123:5 125:12,16
125:19 151:25
157:16 171:23
172:12,24 176:2
181:2,8,20 188:23
192:15 194:8
196:15,16 198:19
209:13 213:4
218:25 224:2
225:20 226:22
228:3,4 240:25
244:6 256:23
268:25 272:17
274:12 277:4
304:9 308:21
311:1 325:12

327:16,19 328:12
328:19 329:22,24
336:8 338:21
339:1 352:4
**goal** 163:13
164:15 172:2
287:12
**goals** 163:14 164:7
287:13
**goes** 21:14 55:3
110:2 115:10
189:23 199:15
214:2 215:22
263:24 276:5
305:2 329:12
338:24 343:19
**going** 7:4 12:9
21:16 30:17 55:17
58:23 67:15 68:20
69:5,10,18 78:4
84:16 104:16
117:17 121:13
123:5,22 124:5
128:10,24,25
129:1 142:19
145:23 148:24
154:13 155:5,10
164:5 166:14
170:7 172:4,16
175:4,14 178:24
179:18 183:25,25
184:1,7 213:16
219:3,19 221:21
225:13 231:24,25
232:10 234:21
235:11 238:13
241:3,7 250:18
253:9 273:5
274:16 281:25
289:17 293:15
303:19 305:16,21

306:1 308:4,8,21
308:22 309:24,25
312:6 313:2,23
319:3 320:21
324:18 331:7
333:8 337:10,11
338:22 347:4,4,5,6
348:6 349:21
351:17 353:1,2,6,8
353:8,20 354:3
**good** 7:3 9:25 10:2
11:3,15 21:15
223:23 236:23
237:1 284:20
286:14 304:7,7
320:20
**gosh** 145:3 302:24
**gotten** 199:8
331:21
**government** 15:24
16:14 31:11 73:8
73:18 195:19
**governments**
285:19
**graduate** 243:20
346:1
**grant** 162:3,5,6
164:5 186:4,8,10
343:8 345:16,22
346:9
**grants** 158:17
185:5 186:1
196:11 198:8
**graph** 62:12
273:18 300:21
**graphically** 62:16
**graphs** 281:23
**great** 325:13
**greater** 190:12
**grew** 17:18

**ground** 10:18
**group** 102:12,14
337:14 346:8
**grow** 150:13 248:1
**grown** 187:7
197:15 199:8
**guess** 22:22 23:8
193:6 281:25
292:20 315:20
317:7 327:1
**guessing** 21:20
138:8 315:25
**guidance** 49:10
156:22
**guidelines** 98:24
101:12 102:1,2
104:8 288:1
**guilty** 92:21
**gun** 187:11 256:25
261:3,12,17
**guns** 261:8 337:19
**gunshot** 229:24
262:4 263:6,13,14
263:16,21
**guys** 94:13,14

**h**

**h** 4:3 220:19
**habits** 67:16 147:3
287:21,23 288:22
289:14
**half** 181:13 185:19
189:10 197:11
201:2 225:18
228:22 308:21
**hall** 12:11
**hand** 23:10,14
312:22 320:22
355:15
**handful** 279:2
**handfuls** 58:22
59:1

**handle** 234:5,19
335:6
**handled** 187:19
253:16
**handles** 326:10
340:23
**handling** 199:11
244:16
**hands** 171:12
**hanging** 139:14
261:3,8 264:5
**hangs** 262:10
**happen** 10:24 24:3
98:3 103:25
171:23
**happened** 58:13
58:21 104:4 112:9
112:11,11 147:18
154:17
**happening** 213:14
**happens** 57:3 74:8
107:17 164:12
188:19 339:3
**happy** 10:20
223:15 352:13
**hard** 208:1 227:21
248:2 260:20
315:17 328:22
329:19
**harm** 92:25
167:12,14
**hartman** 4:8 70:2
70:2,12
**hca** 99:10
**he'll** 341:22
**head** 51:21 113:10
130:16 134:4
258:1
**headers** 315:19
**heads** 241:18

**health** 4:7 14:11
14:15,18 15:8,13
15:14,22 16:15,18
17:6,20,23 18:4,12
18:20,21,24 22:13
23:16 24:19 66:15
73:20,23 74:15
94:20 97:18
104:20 113:19
157:22 158:1,9
160:4 163:3
165:17 170:24,25
251:8 259:20
260:1,5,8 265:13
285:12 290:16
291:1,7,11,19
292:9 293:18
296:4,8,19 297:3
298:5,19 299:7,15
300:1 349:13
350:13
**health's** 14:3
18:16 21:6
**healthcare** 101:20
**hear** 134:20
302:21
**heard** 48:4 78:2
103:2 206:7
308:20
**heart** 86:6 142:8
**heavy** 241:21
242:25
**height** 251:16
276:3
**held** 2:1 7:22 33:9
127:6 156:17
158:22 250:22
270:8 285:7
**help** 85:21 113:15
144:3 161:25
163:23 173:21

182:2,23 186:16
201:16
**helped** 170:25
**helpful** 60:15
93:25 94:19
134:12,15 190:13
255:24 326:25
328:10
**helpfully** 327:6
**helping** 182:7
**helps** 318:25
**henderson** 318:16
**hereunto** 355:14
**heroin** 6:14 20:15
20:22 26:21,23
27:10,14,18,23
28:1,15,20 29:2
32:10,17 33:20
35:15,20 36:13
37:2,7,18 44:12
47:4,11 48:13
52:11 59:16,22
60:2 61:11 62:14
65:6,12,14,17
67:16 76:20 77:10
77:16 78:16 86:23
99:18 208:7 271:1
271:18 273:19
284:1 292:1,11
293:14,25 294:21
295:5 299:7,22
300:6,13,19,22
301:5 302:6 303:8
348:25 350:11
**high** 75:19 99:6
244:25 284:19
**higher** 198:18
267:2 282:6
**highest** 276:9,9
300:25 311:19

**highlighted**
223:24 224:15
319:17
**highlighting** 224:2
**highlights** 224:8
**highly** 147:20
**hipaa** 145:10
**hired** 343:7 346:6
346:16
**historical** 242:3
**historically** 203:5
216:8
**histories** 29:16
167:24
**history** 29:20 30:1
30:3 35:3,15 39:1
73:2,14 75:18
76:6 108:7
**hit** 30:18 245:4
296:12 343:16
**hits** 130:16
**hold** 18:10 30:12
39:20 41:11
129:19 168:20
172:2 324:18
**holding** 40:9
**home** 75:12
324:13 326:7
341:20,20
**homicide** 177:14
262:8 263:10,17
263:23 264:3
**homicides** 175:6
187:11 256:17,25
261:13
**honest** 317:23
**honorable** 142:7
**hook** 208:13
**hopefully** 108:2
157:6

**hoping** 173:18
**hospital** 99:12
164:13 178:12
327:21,24 330:5
**hospitals** 166:16
327:23
**host** 263:22 266:1
**hostetler** 4:9 70:3
70:9
**hour** 12:25 68:21
145:24 219:17
303:19 306:25
307:4,13,17
308:21
**hours** 152:7
306:25 307:9
352:1 353:7
**house** 234:15,19
326:14
**housed** 329:25
**hps** 99:10
**hugh** 1:17 2:1 6:2
7:16 9:17 10:5
354:6 355:5 356:8
357:4,9 358:4,13
359:20
**huh** 36:22 42:11
51:20 107:10
137:15 167:9
169:13,20 170:5
173:8 186:14
192:23 193:11
200:10 201:24
208:23 230:19
231:20 272:16
279:8
**human** 281:14
**hundred** 51:22
77:3 120:4,11,12
216:14 223:4
282:23

**hundreds** 35:1,7
216:25
**husband** 248:17
**hydrocodone**
47:18,19 49:12
50:10 63:14,21
275:21 284:1
**hypothesis** 161:4
**hypothetical**
111:19 112:23
118:8,20 119:8,11
119:17
**hypotheticals**
113:2

**i**

**idea** 51:8 54:8
89:5 146:25
**identification** 22:3
41:16 219:25
238:7 243:19
267:17 305:8
314:2 320:24
**identified** 22:5
38:4 56:12 152:9
152:10 165:9
195:12 233:5
273:14 274:11
290:17,25 291:4
291:19,20 293:24
297:4 298:5 299:3
299:21 300:5
**identify** 27:4
35:23 53:22 60:25
61:9 63:5,7
187:17 188:13
198:3 199:1
220:17 258:18
279:24 351:24
**identifying** 73:1
159:24

**iii** 3:3 356:5
**illegal** 49:22 52:11
65:13 82:17 83:15
83:16 84:21 87:11
87:23 89:24 95:22
182:12 188:12
257:7 277:7 278:7
280:16
**illegally** 91:16
115:8
**illegitimate** 92:14
**illicit** 20:15 38:24
47:24 48:13,22,24
52:19 57:25 79:2
79:10 81:16 82:18
83:11 84:10,10,11
85:24 277:10,15
278:7,19 279:17
279:20 280:8
**illness** 85:7,10
264:24
**illustrate** 242:12
**imagine** 226:24
**imbd** 101:8
**imd** 101:8
**immediate** 164:8,9
**immediately**
155:21
**immoral** 107:9
**impact** 19:10 96:9
168:13 174:3
248:10 285:10,14
286:9
**impacted** 187:12
**implement** 340:10
**implemented**
342:6
**implementing**
234:24
**importance** 283:3

**important** 134:10
137:9,12,14,17
138:16 159:21
162:1 163:12
166:18 237:12
286:9 287:20
327:7
**imprecise** 48:8
292:6,13,16 296:2
298:17 349:8,10
349:12
**improper** 49:22
108:14 141:7
145:16 146:20
151:20 178:15
288:10
**improperly** 49:25
54:15,19 94:4
95:6 104:24 106:8
111:22 145:4
288:19 289:4
**improved** 164:23
**improvements**
29:24 38:18 165:2
**inadvertently**
99:17 259:11,13
**inartful** 349:1
**incarcerated**
96:16
**incarceration**
99:21
**inception** 45:4
127:14 244:9
**include** 104:23
159:4 176:6
256:14 258:19
261:8 328:16
336:21
**included** 181:8
197:21 264:17
286:6 331:20

356:13
**includes** 160:2
232:18 257:18
258:4 271:11
335:18
**including** 73:14
109:9 185:5 208:5
214:11 254:18
258:16 273:19
304:13 305:3
**incorporated**
358:12
**increase** 179:10
184:1 197:24
199:18 201:3
206:13 207:22,23
208:14 209:23
248:22 249:20
252:2,10,23
253:17 255:6
256:22 277:14
278:2,5,5,17
293:14,25 295:5
299:22 300:5,7
301:8 302:2,5
**increased** 198:25
256:21 257:4
294:21
**increases** 248:15
250:13 256:9,24
257:1
**incredible** 123:20
**indicate** 63:20
**indicated** 46:13
154:13 261:11
277:25 288:9
312:8 320:14
**indicating** 356:13
**indication** 166:6
**indications** 165:24
180:12

**individual** 70:24
76:17 81:14 87:23
91:16 93:7,16,17
93:18 94:16 96:10
111:2,7 112:1
214:19 243:2,4
257:14 262:4
273:25
**individual's** 91:19
**individually** 91:15
142:10
**individuals** 264:24
278:25
**industries** 4:13
**influence** 141:8
142:25 144:9,9
145:17
**influenced** 145:5
288:19
**influx** 82:25
100:23
**inform** 74:14
95:13 115:22
139:1 161:25
162:11 163:16,21
164:14 165:1,25
166:19 288:3
**informal** 266:24
**informally** 154:22
**information** 21:22
26:7 33:24 40:21
40:23 44:13,17,22
46:2,14 48:2
50:18,21 58:4
64:8 65:19 71:20
72:9 75:1 78:17
94:1 95:10,12
96:4 109:18,20
117:25 131:21
132:3 133:14
134:11 135:18,20

137:17 138:17,22
152:4,21 161:19
163:15 165:7
167:18 172:14
174:23 222:9,14
232:5 241:17
269:4,10 271:6
272:7,8 278:10
280:17,20 283:18
285:5 287:6,7,20
289:1,2,8 294:17
302:17,20 305:13
314:5 323:18,19
323:24 325:3,5,8
327:8 331:11,15
331:18,20 332:1
332:10,15 334:24
336:23 337:11,13
341:16
**informational**
94:18 287:5
**informed** 35:2
77:14 130:1 133:1
139:16 140:18
147:20 167:21
210:22 213:19
**informs** 147:18
**infusion** 205:13
**infusions** 209:2
**ingest** 84:2
**initial** 29:13 164:9
164:10 167:20
170:25 195:10
292:24 324:7
**initially** 29:9
162:23 170:2
300:15
**initiated** 294:2
**initiative** 289:22
289:23 290:4
293:7 294:8,17

297:2 299:2
348:25 350:12
**initiatives** 287:4
302:21
**input** 193:21
344:9,10
**inquire** 304:22
**inquired** 155:17
**inquiries** 338:5
**inside** 140:3
**inspection** 244:11
245:21
**instance** 186:8
**instituted** 26:19
**instructed** 125:13
**instruction** 156:1
**instructions**
155:19 305:19
**insurance** 26:12
28:11 33:18 76:12
78:15 102:17
**intake** 232:19
**intend** 205:18
**intended** 26:20
260:22
**intending** 56:18
56:19
**intent** 67:9,9 72:11
**intention** 24:16
25:6 56:11 208:13
209:15
**intentional** 262:4
262:14 264:5
**intentionally**
128:9 259:21
**intentions** 208:2
**interaction** 186:22
**interactions** 27:2
27:3 147:25
**interchangeable**
184:25

interdict 259:9
interdictions 182:3
interest 142:8 146:12
interested 355:12
interesting 93:25 94:6
interests 104:3
interface 330:14
interfere 7:10
interference 7:8
intergovernmental 185:23
intermittent 241:22
internal 241:20
internally 293:12 295:17 296:12
interns 254:7
interrupt 105:13 160:21 321:16
interruption 242:6
intervene 67:11
intervention 26:25
interviews 76:8 135:25
intricate 97:7
introduced 211:15 216:5,14
introduction 108:15
intrude 117:18
inventor 217:20
investigate 152:22 235:20
investigating 56:23 188:24 249:12
investigation 76:8 230:16 262:3

327:9 332:23 348:2
investigations 33:25 35:1 211:17 230:6 231:14
investigative 52:24 166:11 324:8 348:2
investigator 64:17 66:7 165:22 325:24 336:23 337:4
investigator's 75:21
investigators 66:9 75:12 165:21,25 249:11 324:11 330:25 337:6
involve 59:24 60:1 60:1 240:22 261:4 261:5
involved 17:7 21:2 59:14 74:10,20 105:20 159:16 188:11 211:17,23 277:24 282:13 323:5
involvement 157:25
involving 52:6 72:17 247:24
issue 20:22 148:16 165:19 168:24 174:9 245:18 250:9 253:6 259:20 291:5 296:15 298:17,18 299:10,17,21 300:13 308:14 324:22

issued 35:16
issues 12:15 17:1 20:9 21:10 25:11 40:19 60:9 72:17 144:4 147:4 168:22 237:21,21 253:8 254:19 260:1,5,9 266:2,3 273:8 293:17 300:10 308:13
it'd 255:24 319:4 325:13
it'll 59:24 75:20 226:23
item 309:11
items 201:23 220:14 223:11 309:6 316:14

**j**

j 4:19
jackson 4:23 8:17
jacksonkelly.com 4:25
jail 66:14
james 3:22 8:20,20
janssen 3:21 8:21
january 1:19 7:5 29:18 31:19,21 239:24 267:24 310:23 311:4 326:6 332:18 355:15 356:4
jaywalking 82:13
jenna 3:16 8:12
jenna.newmark 3:20
job 1:25 113:10 114:9,17 116:4 118:17 120:19 131:23,25 133:15 135:3 136:11

148:9 346:13
john 4:3
johnson 3:21,21 8:22,22
joined 69:24 233:19
joining 302:14 346:7
jones 4:3 8:18
jonesday.com 4:5
judge 1:6 93:18 156:23
judicial 93:4
july 244:13
jump 179:11 247:19 254:12 301:5
jumped 301:23 302:25 303:1
jumps 252:3
june 181:17 244:12
jurisdiction 176:9 176:13,21 177:3,9 177:20,23,23 178:6,8,17 179:8 179:15 190:18 231:17 232:1 248:17 256:7 341:14,25 342:9
jurisdictional 176:11,15,17,25
jurisdictions 189:17,20 190:10 190:12 257:11 340:6
justice 186:3
justicetrax 325:18 326:4,10,17 328:19 329:24 336:5,9,15,16

**[justicetrax - lab]** Page 30

337:2,9,12 338:7
**justify** 195:16

**k**

**k** 4:22
**keep** 36:24 50:21
    123:22 128:10
    213:22 257:21
    313:23 352:6
    353:8
**keeps** 123:25
    270:16
**kelly** 4:23 8:17
**kept** 40:15 137:18
    137:21 186:1
**key** 4:10
**kill** 210:6 259:22
    262:19
**kin** 324:5
**kind** 12:11 13:15
    14:7 26:23 30:22
    30:23 37:20 62:7
    70:20 79:16 85:17
    89:4 101:19
    154:10 160:1,23
    164:15,24 166:11
    167:12 168:25
    169:6 170:18,21
    171:1,13,23,24
    172:6 173:5,11
    174:15 175:4
    176:10 179:9,10
    179:12 182:9,24
    183:22,23 184:6
    186:1 192:11
    196:2,5 198:2
    199:7 208:6,22
    212:14,25 215:7
    220:13 222:8
    226:19 231:10,16
    232:19 233:24
    234:5 238:19

242:7 244:21
245:3,7 247:23
248:12 250:18,23
252:20 266:18,24
273:2 279:25
280:3 281:8,19
285:8,25 286:1
287:12 293:10,19
293:22 294:2
303:19,25 308:22
309:2,12,17 327:9
327:20 331:2,9
333:4
**kinds** 241:23
**kits** 167:4
**knew** 12:9 28:1
    78:4 79:8 94:1
    224:2 228:12
**know** 10:20 11:1
    14:24 16:3,7,11,22
    18:11 19:15 20:3
    21:14,16,20,21
    29:1 39:4,7,17
    40:8,11 42:16,23
    49:2 52:23 57:18
    60:19 62:9 65:17
    67:15 68:11 71:5
    71:23 73:17 76:25
    77:5 80:12,17
    81:8 82:1,15
    83:10 84:7,8
    92:12 95:3,11
    102:22 103:11,19
    104:14 106:20
    107:16 109:11,12
    113:3 114:8
    115:18 116:16
    117:21 119:5
    120:17 121:12
    123:6 126:7 128:8
    129:5 131:6,15,16

131:18 132:2,11
134:6 136:22
137:5,7,20,22
138:8,23,25 139:5
140:11,23,24
142:9 146:9
149:22 150:12
151:14,22 152:15
152:25 153:5
154:25,25 155:18
156:8,18 157:13
159:10 161:2,14
161:15,25 162:3
164:19,20 166:6
169:6 170:21
171:18 172:19
173:12,19 175:6
177:5,13 178:13
179:2,12,16,17
180:22 181:21
183:9,12,13,22
190:19 193:10
194:10 195:21
196:4 197:13,15
197:19 198:1,10
199:13 205:7
207:8,9 210:11
211:12 214:20
215:18 216:24
221:24 222:24
223:12 227:11,20
228:9,16 231:2
238:10 239:18
244:8,12 253:1,10
256:1 257:17,24
258:7,10 260:10
264:16 265:16
267:10 268:18
269:9,18 270:10
273:13 281:15,18
281:19 282:1

283:8,9,17 284:12
289:24 296:22
301:16 303:18
304:23 305:7,14
308:21,24 309:22
310:10,20 311:8
313:3 317:9,13
318:7 319:9 320:5
321:21 324:5
325:10 330:10
332:9 340:11
347:21 353:13
**knowing** 55:23
    77:17 92:4
**knowingly** 92:13
**knowledge** 21:18
    23:21 132:12,14
    132:24 135:23
    174:19 181:3
    194:4 230:21
    265:7 346:19
    355:9
**known** 188:17
**knows** 56:3
**kohler** 267:7
**kohler's** 266:10

**l**

**l** 1:24 3:3 9:9
    355:3,18 356:5
**l.p.** 1:8,10,12 3:15
    9:23
**lab** 49:3 185:21
    186:20,21 189:6
    189:13,15 197:17
    199:16 200:16,17
    201:5 224:25
    225:1 243:10,11
    243:12,18 280:3
    314:18,20 316:13
    316:14,18,19,23
    316:24 317:10,15

318:1,2 319:21,25
320:2,15 326:11
331:23
**label** 136:25
137:10 138:1,5,21
**labeled** 262:5,7
**labelling** 136:13
**laboratories**
187:15 197:22
200:25 243:2
**laboratory** 169:19
187:5 233:3 243:3
243:19 314:14
337:16,24
**labs** 195:24 320:17
**lace** 206:18
**laced** 60:9 81:12
205:19 206:13
211:11
**laces** 212:20
**lacing** 210:3 284:8
**lack** 100:1 101:5,5
101:21 102:2
**lag** 329:8
**lake** 192:1
**language** 292:12
292:21 296:2,13
297:24 298:17
325:20 349:2
350:17,23 351:1
351:13
**laptop** 349:23
**large** 42:15 186:12
264:19 311:23
324:1 325:4,4
**largely** 31:6
119:20 133:1
182:12 202:23
210:17 211:4
277:6

**larger** 222:23
234:1
**largest** 337:25
**late** 98:25 245:20
300:6
**lately** 139:14
**latest** 196:24
**laundry** 169:11
**law** 16:8 28:10
55:24 56:2,14
78:3 79:18 82:8
82:12,14 86:13
87:7,15 88:13,23
89:18 135:6
162:18 163:1,2,19
168:4 194:9,11
206:7 208:4 211:1
211:18
**lawful** 32:3 50:13
50:24 51:5 53:3
53:19 57:3 58:2
63:5,8,22 65:21
**lawfully** 35:19
49:13,20 275:14
275:15
**laws** 159:10
**lawsuit** 121:14
133:10 213:22,22
237:15
**lawsuit's** 213:16
**lawyer** 21:15
89:11 193:21,22
194:2,3
**lawyers** 11:18
12:20 134:21
194:12 308:13
**layout** 241:15
**lead** 92:7
**learned** 40:13
77:15 129:22

**learning** 304:10
**led** 20:22 24:7
25:2 26:24 33:19
34:2 44:11 98:13
104:22 111:8
121:25 122:14
130:8,20 285:2
**left** 251:2,3
**legacy** 302:20
**legal** 8:2,4 65:13
91:23 95:21
118:16 257:7
354:8 356:1 359:1
**legislative** 234:12
235:10 236:2
**legislatively** 15:16
19:16 20:8
**legitimate** 43:5
48:14 49:4,13
92:5,14 114:2
149:21 150:1,10
**lengthy** 220:13
**letter** 330:6
356:19
**letters** 67:14
**level** 15:15 16:25
17:8,14,15 35:10
36:11 46:14
160:16 265:7
267:3 281:9
**leveled** 179:12,13
**levels** 248:13
255:17 256:2
**lewis** 4:14 9:9
**liability** 89:7,12
150:8
**liable** 114:6
115:12
**life** 92:7 108:16
139:11,21 195:24
257:6 260:23

261:17 262:11,24
288:16
**lifting** 241:21
**light** 227:14
306:15
**liking** 284:20
**limit** 101:12
**limitation** 72:10
**limitations** 72:2
96:4
**limited** 101:8
**limits** 235:22
249:4
**line** 123:16,23
175:21 179:6
201:23 220:14
223:11 274:22
281:19 309:6,11
316:2,14 356:13
358:7 359:3
**linear** 47:2 250:22
**lines** 266:13
281:22 299:1
**link** 26:6 47:21
325:8
**linked** 76:22 77:10
**list** 37:20 72:6
100:17,21 110:25
165:13,14,15
169:11 233:2
244:18 327:7
**listed** 42:24 93:23
131:17 222:14
225:2,7 257:7
264:2,6,6 274:2
358:7,17
**listen** 308:25
**listing** 358:7
**litigation** 1:5 7:19
70:8 117:8 131:18
156:24 173:21

174:3 308:8 350:6
356:6 357:3 358:3
**little** 33:7 78:8
157:4 198:18
211:16 217:24
226:15 236:8
259:1 284:2
303:24 315:17
316:10 321:14
**lived** 40:13
**lives** 91:11
**llp** 3:17,22 4:14,19
5:3
**lobbying** 29:11
**local** 17:6,8,14
23:11 160:8
181:17 352:12
**locally** 15:13
**located** 7:24
**locked** 228:13
**log** 155:24 156:1
156:22
**long** 12:24 121:12
164:7 167:19
168:11 302:23
327:6
**longer** 30:1,23
60:11,12 77:20
155:22 164:6
167:20 168:12
**longest** 243:22
**look** 13:12 22:21
23:6 29:4,16 30:1
31:16,18,20,24
34:17 38:6,17
43:10 44:5 45:21
51:22,24 53:24
54:3,9 55:16 60:5
60:23 64:16,17,18
65:1,19 66:3,5,7
72:17 78:18 93:21

93:21,24 95:19
96:8 97:14 103:24
134:11 153:9
155:16 157:13
167:24 176:2
179:6 181:2,20
183:3,23 190:19
192:9 193:15
201:8,19 202:5
220:11 221:23
222:24 223:11,14
224:18 226:25
236:17 246:10
250:16 252:21
255:10 256:23
259:8 267:19
272:4 273:6 277:2
289:18 292:19
297:19,22,22,23
300:18 304:16
311:22 313:4,5
314:11 316:5,6
317:7 318:18,23
319:4 321:12
322:25 333:12,14
334:19 335:8
340:10 348:9
351:20 353:10
**looked** 96:8
133:13,17 134:13
134:16 136:12
174:21 175:21
227:8 230:11
**looking** 23:13 33:7
43:13 44:19 53:13
55:17 103:24
154:13 157:11
170:14 190:20
222:20 235:14
250:2,24 251:4
300:2 305:9

312:21 328:15
**looks** 23:2 24:20
223:22,23 224:4
255:5 281:18
282:15 310:23
311:4 315:12,15
321:3 341:12
**lookups** 343:10
**lose** 191:21 192:18
236:14 248:11,14
**losing** 192:25
237:22
**loss** 26:11 191:15
192:10 235:17
**lost** 33:18,18 45:2
78:14,15 245:24
247:25 248:6,21
248:24,24
**lot** 11:22,23 15:16
20:2,25 21:3,16
36:1 37:10 44:24
91:12 94:14 95:24
114:16 144:18
145:4 154:8,25
163:9 174:19,23
174:24 181:14
182:4,17 193:7
205:25 206:3
211:13 222:17
259:24 260:2,3,11
278:1 281:14,16
301:11 319:4
325:3 330:19
332:8 345:16
**low** 195:21
**lower** 226:7
276:22
**lowering** 104:9
**lowest** 234:6
**lpa** 2:7 7:24

**ls** 9:12
**lunch** 219:7,23
**luxton** 4:13 9:8,8

**m**

**m** 3:22 4:2 5:2
**machines** 170:3
**macro** 196:8
**madam** 356:10
**magnitude** 311:12
**mail** 6:9 41:18
165:20 182:4,10
**mails** 13:7,12
41:20 117:9
**main** 3:23 4:23
159:5 331:17
336:1,18
**maintain** 272:6
**maintained**
325:25
**major** 52:9 245:8
**majority** 250:1
261:2
**making** 85:10
103:7 159:5
235:18 301:11
305:6
**man** 145:5
**manageability**
315:6
**management**
98:24 103:13
184:20,22 323:20
**manager** 343:24
344:4,10
**managers** 330:22
344:17,20 347:6,8
**mandates** 235:10
**mandatorily** 177:7
**manner** 88:5 94:8
102:4 256:14
262:18 264:13

348:3
**manreet** 345:10
**manufacture**
84:10 280:8
**manufactured**
49:10,20 57:25
**manufacturers**
109:8 142:13
145:6 149:1
212:18
**map** 161:24
**maria** 3:11 9:1
**mark** 3:16 8:10
10:1 22:1,24
41:14 68:17
182:20 183:7
220:15 224:13
238:5 267:13,14
297:20 303:16
307:4,5 312:21
313:10,15,20,24
321:5
**mark.cheffo** 3:19
**marked** 22:2
41:15 219:24
220:9 221:25
238:6 267:16
269:17 314:1
320:23 322:20
**market** 77:17 78:6
79:9 81:9 84:13
106:15 122:7,10
127:17 128:4
132:16 208:6
209:24 212:14
213:9
**marketed** 122:8
**marketing** 99:2
109:7 119:23
121:23 129:17,17
132:6,13 133:13

**markets** 80:17
121:18
**marking** 313:18
314:24
**markings** 270:22
**marshall** 40:20
**mart** 8:19
**mass** 99:21 119:23
121:23 129:17
**massive** 82:24
84:14 328:16
**master** 306:17
**master's** 346:3,4
**match** 188:17
226:6
**matched** 31:10
**matching** 318:24
**materials** 337:21
**math** 228:1 301:15
302:2
**matter** 7:17 64:2
97:9 173:3,9
177:14 333:14
355:13
**mcconnell** 4:3
**mckesson** 5:2 9:13
**md** 1:5 7:21
**mdl** 1:4
**me's** 258:4
**mean** 19:25 42:14
47:12 48:12 50:13
52:8 63:15 65:8
68:8,10 80:8,9
82:4,13 89:12
104:15 105:13
107:23 108:2
109:9,14 118:19
119:5 124:11
132:18 133:9
139:4 147:22
157:9,10 160:21

170:20 177:1
192:14 193:15,22
199:23 203:1,22
215:16 217:23
219:8 222:16
237:6 239:1
246:24 252:10
257:24 258:13
265:5 275:13
281:6 299:24
310:18 312:12,15
312:19 327:1
339:22 347:1,16
**meaning** 260:3
272:1
**means** 26:13 31:25
77:20 132:10
147:23 184:10
191:13 275:14
279:15 338:9
**meant** 29:21 43:9
177:19 296:2
**media** 7:15 69:7
69:12 155:7,12
219:21 220:3
305:23 306:3
354:7
**medical** 6:12,14
10:8 16:2 26:9,18
27:3 29:11 33:25
39:15 40:3,5
48:14,18 49:4,13
51:3 56:24 64:18
66:5 71:13,15
75:5,10 85:13
86:4,5,17 102:7
103:16 111:14
112:6 113:10
115:5,20 116:5
133:2 140:2 145:9
146:11 147:3,4,24

147:25 158:15
159:1 165:18
169:3 176:8 177:3
177:10 185:3,13
186:19 189:15
197:7 199:16
213:19 224:24
225:1,11 231:4
233:9,25 240:10
240:15 242:11,22
242:22 243:21
251:13 252:1
258:8,17 267:7
270:25 287:5
290:12,18,25
291:21 293:13,23
295:3,7 297:5
299:4 300:12,19
312:5 314:6
316:17 317:4
322:3 325:23
327:13,18,20,22
328:1 329:4 330:4
330:20 332:17
336:22 337:7
338:25 340:6
341:6,15
**medically** 144:21
**medication** 14:21
47:23 99:7
**medications** 99:2
99:16
**medicinal** 216:6
**medicine** 49:25
63:7,22 65:3 67:1
67:2 72:20,21
75:8 114:2 115:9
143:24 211:25
275:15,23 288:4
288:18 289:5

**medicines** 28:5
73:24 74:14 93:1
94:4 102:5 104:2
104:24 110:1
112:15 139:23
142:14 143:5
259:12 275:8,12
282:7
**meet** 12:20 13:1
235:24 244:19
245:1
**meetings** 12:10
16:21
**meets** 35:11
**melville** 3:9
**members** 15:23
64:21 340:5
**memo** 302:20,22
**memorizing**
183:12
**memory** 23:22
42:17 60:18
**memos** 195:10
198:4
**mental** 16:18
259:25 260:5,8
264:24 265:12
**mentioned** 75:13
172:7 200:15
248:4 249:24
**met** 139:10,21
288:7
**method** 167:14
**methods** 26:14
76:10 103:13
**metro** 143:24
**metrohealth** 167:3
**metropolitan**
234:2
**mexico** 49:3 58:1
77:16 280:9

**mfleming** 3:14
**microphones** 7:6
7:10
**mid** 173:18 174:14
226:13
**middle** 29:14,21
29:22 152:17
320:7
**midwest** 356:17
359:1
**midyear** 184:13
**mill** 55:25 78:14
92:22 107:19
109:25
**million** 185:20
189:7,9 197:9
201:13 225:19
228:23
**mills** 26:13 54:22
55:21 56:12 78:4
**mind** 86:24 150:9
197:5 310:9
**mine** 321:23
**minimize** 253:6
**mining** 165:10
**minor** 245:7
**minute** 42:7 183:7
219:1 232:11
251:15 289:17
318:17,22 327:2
334:20
**minutes** 69:3
123:15 146:2
147:8 265:11
308:22 352:2
**mirrored** 54:4
**mischaracterizat...**
149:6
**mischaracterize**
266:9

**misleading** 259:1
**missed** 175:2
340:14
**mission** 14:15 94:9
94:22 95:1
**mistake** 351:5,9
**mistaken** 226:3
**mister** 239:18,18
**mix** 149:5 208:25
**mixed** 35:4 278:6
**mlk** 152:6
**modalities** 102:17
**modality** 230:7
262:17,20 263:3
263:13,17 264:1
**mode** 273:15,16
**model** 80:25
**modifications**
227:12
**module** 326:5,12
336:15
**moment** 150:25
173:14 242:24
345:5
**money** 111:23
185:22 189:23
192:19,25 236:5
236:15 237:22
**monitoring** 310:25
**month** 31:18,20
54:1,1 244:8
272:22 329:8
**monthly** 273:2
**months** 18:8 29:19
31:16,23,23 33:16
38:7 174:12
184:12 227:8
**moral** 100:4
**morgan** 4:14 9:9
**morganlewis.com**
4:16

**morning** 7:3 9:25
10:2
**mouth** 327:6
**move** 45:10 70:22
102:12 117:2
122:15 124:14
157:8 254:8
292:24 307:3
309:2 337:1,3,10
337:11
**moving** 326:16
**multidrug** 61:3
**multifactorial**
25:12,25 97:2
**multiple** 50:24
55:3 83:19 156:2
274:2,8 283:21
284:10 335:14
**municipality**
233:18
**mutually** 37:14
307:18

| n |
|---|

**n** 6:1,1 7:1 9:9
**n.w.** 4:15
**naloxone** 35:17
37:13,16 96:17
160:10 166:15
167:1,4
**name** 8:1 10:1,4
14:24,24 50:20
51:1 131:10 258:3
345:9 356:6 357:3
357:4,15 358:3,4
358:21
**names** 133:11
143:20
**napoli** 3:8,12 9:1
**napolilaw.com**
3:10,14

**national** 1:4 7:18
242:10,21 243:14
291:11 292:8
296:8 356:6 357:3
358:3
**native** 221:9,15,18
**natural** 304:7
**nature** 138:12
140:24
**near** 159:18
161:16 162:10
164:16 307:18
**nearly** 278:22
**necessarily** 39:6
50:13 55:4 176:13
177:1 226:17
228:8 275:13
341:13
**necessary** 101:22
109:6 234:18
305:4
**need** 10:19 41:24
42:17 45:21 74:2
85:13 86:4,9
89:19 91:22
111:22 150:24
157:12 162:12
163:20 164:9
165:5 169:18
189:21,24 226:8
227:16 228:3,5
250:16 260:15
264:20 313:4
316:5 324:2 333:6
348:7 352:4,5
353:12
**needed** 11:24
162:25 169:11
195:13 238:11
295:19,20

**needs** 86:17
149:21 150:1
161:21 165:1
183:24 184:5,7
199:2 200:6
226:20 228:10
232:24 341:13,24
**negative** 92:8
**neighboring**
257:11
**net** 182:17 190:22
191:7,12 192:5
**neutral** 191:8,12
192:11,12
**never** 35:14,15,16
35:17 78:25 79:1
111:20 113:23
213:10 346:11
**new** 3:9,18,18 5:4
5:5,5 62:20
169:15 173:4
197:21,22,22
200:25 208:6
307:14 309:21
317:17
**newmark** 3:16
8:12,12 220:18,24
221:2,5,9,15 239:4
239:6 312:13,16
313:8 319:15
321:24 322:11
**news** 136:2 284:20
**night** 304:12
**nimble** 161:14
**non** 73:15
**nonfatal** 161:19
162:15
**nonfentanyl**
277:24 321:15
**noninvestigators**
249:22

**nonmedical**
108:14 249:21
**nonopioid** 73:15
**nontax** 200:22
**nonviolent** 99:22
**normal** 195:4
311:15 320:16
**normally** 12:18
**northern** 1:1 7:20
**notarized** 356:14
**notary** 355:4,6
356:25 357:10,18
358:15,23 359:23
**note** 7:6 70:6,12
70:13 125:2 152:1
152:2 223:3
238:23 266:14
270:4 312:7
313:12 314:23
356:12
**noted** 70:10 75:21
**notes** 224:14
324:10,10
**notice** 2:14 292:11
294:6,24 295:3,9
302:5
**noticeable** 181:12
**noticed** 195:20
196:2 197:25
293:13 295:18
**noticing** 196:5
254:2
**noting** 353:19
**novel** 309:18
**november** 272:23
273:1 300:16
**now's** 157:9
**number** 20:8
24:20 27:20 30:5
30:20 38:4,23
44:6 58:8 66:1

76:20 101:13
158:17 169:1
176:14 180:21,22
183:3 198:10
199:10 202:20
214:1 215:6
220:21 229:15,20
231:7 244:16,24
246:15 247:1
248:10 253:15
254:15 255:2,9
256:22 264:19
274:13,17 275:4
276:9 278:1,25
289:19 295:5
304:19 320:5
321:4,19 322:7,9
322:12 323:8
335:22 340:22
343:4 347:10
354:7 356:7,13
**numbered** 23:9
329:13
**numbers** 54:4,9
58:23 60:19
152:16 183:12
198:20 199:14
201:9,21 220:16
222:21,22 225:21
240:21 246:12
255:25 256:12
268:11 284:18
294:12,21 295:19
358:7
**numerical** 240:22
242:15
**nursing** 341:20

**o**

**o** 6:1 7:1 9:9
**oarrs** 29:9,25
31:25 32:6,15,21

33:2,13,14 35:13
37:3 38:9,25 44:5
44:7,10 46:16
47:2 50:17,25
52:25 53:23 54:13
55:10 58:6 66:3
72:6,8 74:1,3,5
75:3,4 76:9 93:23
94:2 167:11,15
330:11,13,13
332:14,21 333:7
333:12,15,18
334:9,13 338:19
339:15 340:2,7,8
341:1 342:6 343:1
343:5,16 344:1,8
344:11 345:6
346:20 347:3,17
**oath** 10:16
**object** 14:17 15:10
15:25 16:16 17:4
17:16 18:2 19:1,4
19:12 20:18 22:15
23:19 24:14 25:4
25:13 26:1 32:13
32:25 33:22 34:11
34:18,24 35:25
36:15 38:10,14
41:5 43:14,25
47:5 48:9,15 49:6
49:15 50:1 51:12
51:16 52:12,18
53:5,8 54:16 55:7
55:12 56:5 57:9
63:24 65:22 67:5
67:24 71:12,21
74:17 77:4 79:5
81:5,18 82:6,19
83:17 84:23 85:1
85:6 86:1 87:3,13
88:2,11 89:9 90:3

90:10,24 91:4,20
92:10 93:11 96:11
96:19,23 97:5
98:20 100:8,25
102:20 104:5
105:1 106:11,23
109:3 110:8,11,20
111:5,11 112:4,17
113:7,21 114:13
114:21 115:16
116:14,21 118:2
118:12 119:1,14
120:1,5,13 121:4
121:16 122:5,23
123:9 124:8,18
134:22 135:8,14
136:17 137:13
138:6,9,24 139:7
140:22 141:9,13
142:17 143:7,12
143:15 144:23
145:7 146:13
147:16 148:8,14
148:19 149:15
150:11,22 151:7
161:7 164:2
173:24 174:4
180:9 185:7
187:21 190:25
191:24 193:3
196:18 201:11,14
202:15,18 203:8
204:10,22 205:1,6
205:23 206:10,23
207:5,16,25
208:15 209:19,22
210:4,14,20 211:5
212:1,8,23 214:15
215:1,15,23
216:10,18 217:9
217:17,22 218:5,8

218:14,19 223:2
225:6 227:19
228:6,25 229:8
233:21 236:6
237:23 255:22
257:12 258:21
259:2,23 260:24
261:15,18 264:9
264:12 265:3,20
266:21 267:5
271:23 274:5
275:18,24 276:11
276:16,24 277:8
277:16 278:21
279:6,22 280:19
281:4,21 282:25
284:22 285:15,23
286:17,23 287:9
287:16 288:11
289:6 290:8 291:2
292:2,23 293:9
294:10,25 295:16
296:5,21 297:7
298:7,9,23 299:18
301:10 302:8,15
303:5,10 311:16
318:9 331:12
333:1,16 334:11
335:12 336:4,6
338:13 339:11
340:3 341:3
342:21 344:19
346:23 347:12
349:5,21,22 351:3
351:11
**objection** 57:16
70:7,10 125:3
126:14 127:1
174:13 238:2
289:11 312:7
350:19

**objections** 151:4
**obm** 194:22
318:14
**observations**
337:6
**obvious** 23:23
166:9 333:21
**obviously** 41:24
42:16 152:12,16
152:23 157:10
160:2,8 174:18
175:23 177:6
184:11 196:6
200:24 232:9
237:12 256:12
327:24 330:24
**occurs** 120:11
162:12 164:11
165:22
**october** 272:24
**office** 6:14 10:8
16:2 26:9,19
44:25 53:16 67:12
72:16 74:24 76:11
81:20,21 87:20
88:3 91:10 94:13
94:14 113:11
115:5,21 133:3
140:2 158:8,15
165:18 169:3
173:25 176:8
177:4,7,9 182:2
183:22 184:16,16
184:17,19,24
185:3,13 193:25
196:9 197:7 199:2
204:20 205:8
213:20 225:11
226:9 231:4,5
238:19 240:11,15
240:24 242:4,13

[office - opiates]

242:16,17 243:22
250:22 251:13
252:1 255:1 258:4
258:8 278:11
279:20,25 290:18
290:22,25 291:21
293:13,18 295:3,8
295:14 297:5
299:4 300:19
302:4,10 317:4
341:15 343:1,23
345:7 346:8 348:3
**office's** 91:5
**offices** 134:21
234:1 258:10,17
**official** 357:15
358:21
**oftentimes** 160:13
**oh** 30:13 68:22
69:21 80:4 145:3
158:6 204:2 251:1
251:1 269:19
303:20 312:24
**ohio** 1:1,10,12,18
2:10 3:5,13,24 4:4
4:10,24 7:20,25
78:5 160:3 182:6
234:7 251:8 258:9
356:2
**okay** 10:9 11:2,16
12:1 13:1,4 14:10
18:17 20:11 22:18
25:20 31:1,22
33:8 34:15 35:6
40:24 41:14,23
42:23 43:2 45:8
46:1 50:16 60:14
61:15 64:25 68:25
70:11,17 72:12
76:14 77:22 83:20
84:8 89:15 91:9

91:25 92:17
104:13 105:15
106:18 107:1
108:5,8 113:25
116:18 117:16
118:19 119:19,24
121:7 122:15
125:1 126:2,20
127:4,23 128:24
129:21 130:7,18
131:3 140:3
141:22 144:1,13
144:17 145:22
149:7,25 151:13
151:23 153:11
156:10 157:18
158:4 161:11
162:16 169:23
175:14 176:18
177:21 179:1
181:19 183:7
184:21 185:2,11
187:25 188:25
191:9 193:15
194:1 200:13
202:10 203:20,24
203:25 204:14
208:20 209:4
213:12,23 215:10
219:5,8,18 220:20
221:8 222:13,19
223:9 224:20
225:13 231:12,22
232:7 233:14
236:12 237:5
238:5 239:25
241:25 244:2
246:4,11 247:2,5
250:4 251:10,23
253:23 254:15
256:4,11 262:22

265:5,16 266:12
267:12 268:7
269:8 270:23
272:4 273:6,16
274:22 281:25
288:6 293:4,4
295:7,13 297:13
297:19 301:4,4,13
303:16 304:1,3
305:5,12 308:16
308:18 310:11
311:11,22 312:3
312:25 313:9
314:9 315:8,14
318:6 320:18
321:12 322:13
326:19,24 328:8
330:1,10 332:7
335:15,25 336:25
339:6 342:1,12
344:2 346:5
347:11 348:17,18
350:8 351:14
352:3,11,16
353:25
**old** 13:7,7,13
67:16 78:24 85:17
173:1,7 178:11
**older** 329:10
**omission** 136:6
**once** 61:12 243:25
255:24 300:7
310:18 338:21
**one's** 46:10 269:17
**ones** 139:14
143:22 186:18
261:4,5,7,12
**ongoing** 180:22
287:14 290:16,25
291:19 296:19
297:3 298:4

**online** 182:14,18
297:18
**op** 1:9,11,13
217:14
**open** 258:1
**operate** 89:21
118:14 161:13
186:18
**operating** 40:22
80:20 88:15,25
107:3 119:22
120:8 185:17
189:12 316:23
320:2
**operation** 19:14
185:19
**operations** 10:7
18:16 80:15
113:10 115:4
169:7 194:18
195:5 211:7
224:25 312:5
314:6
**opiate** 1:5 6:7 14:5
15:1 16:15 18:13
18:24 22:9,14
23:16 25:2 27:15
32:18 37:8,17
61:10 71:2 147:18
215:8 289:23
290:4 299:2 301:1
356:6 357:3 358:3
**opiates** 14:21 15:5
15:17 20:6 21:8
23:24 26:10 27:12
33:3 37:5,15,16
38:24,25 51:18
77:18 79:9 101:13
172:12 208:7
209:25 210:8
216:1 299:6

**opioid** 7:18 13:20 14:3 15:4 17:23 19:9 20:13 24:12 25:2,10,10,23 27:24 28:2 29:2 32:3,3,23 37:8 38:9 44:10 47:3 47:11,22 59:7 60:7 72:18 76:22 78:16 79:4 81:3 95:22 98:18 104:22 107:5,18 108:13,16 109:7 115:3 121:22 122:3 126:1 127:12,18,25 128:15 130:9 139:23 140:21 141:4 142:1,2 143:4 144:4 146:7 147:7 148:5 151:15 160:7 180:5,14 198:4 200:19 217:8,16 242:25 271:12,14 271:15,22 272:2 283:21 286:16 288:9,18 289:5,22 293:6,7 294:7,8 297:2 301:1 309:7 310:7
**opioids** 14:21 15:9 17:1 19:20,23 20:14 21:8 23:24 27:12,19 32:7,11 39:5 43:6 47:20 47:25 48:6 49:9 52:10 60:7 67:13 77:21 79:1,1 84:15 86:3 88:17 89:2 102:18 106:9

107:8 111:20,22 112:21 131:2 133:18 135:25 136:19 138:12 139:5,12 140:8 143:22 147:12 149:11,21 209:25 210:7,8 212:15,19 216:24 217:7,14 261:5 273:20 275:2 276:3 277:7 287:3,8 288:5 291:25,25 299:6 309:18 310:15
**opportunity** 79:23 88:20 152:3,20 153:4,7 306:8 307:15 351:20
**opposed** 103:6 104:3
**opposite** 208:22
**orange** 273:9
**order** 19:8 28:24 55:3,16 72:17 78:12 144:3 195:22 206:18 207:21 223:8 234:15 266:1 311:11 353:16,17
**orderable** 182:17
**orders** 196:3
**organ** 324:19
**organization** 242:20
**orient** 22:8 232:12
**original** 18:14 21:11 67:9 224:4 324:23
**originally** 341:11
**ou** 231:18

**outcome** 151:17 355:12
**outcomes** 162:7
**outgrowth** 200:19 212:13
**outlines** 176:10
**outlining** 231:11
**outset** 333:21
**outside** 76:7 92:1 140:1,10 147:4 181:3 184:5 185:9 194:2 199:8,21 211:4 280:16 325:25 331:18
**overall** 26:5 95:15 104:8 162:2 175:4 175:10,17 176:4 179:24 180:13 191:18 194:18,20 199:18 202:4 243:3,10 245:2 246:19 247:6,16 249:20 250:21 251:8
**overarching** 160:24
**overdispensing** 20:10 119:23
**overdose** 27:15,18 28:1,21 31:24 33:12 35:14 36:13 37:2,7,17,18 47:4 47:22 50:9 51:14 52:10,23 53:4,18 58:12 64:14 65:9 65:18 70:25 73:3 74:10 76:21 77:11 82:3,17,25 87:21 97:3 108:18,20 110:3 111:9 114:5 115:10 120:10

131:5 148:5 150:18 151:18 160:6,7,11 161:17 162:12 164:10 166:3,24 168:3,12 180:2,4 186:22 188:22 192:1 194:17 195:6 203:6 211:24 227:15,18 248:15 248:23 249:12,16 250:12 256:20 257:6,8,18 258:5 258:19 259:6 260:19 262:16,16 262:21 263:1,15 263:15 264:18 266:20,25 273:10 276:21 277:3 279:16 283:9 284:7 291:24 299:5 311:6 333:13,20 334:7
**overdosed** 38:5 78:17 79:3 95:2 95:20 111:25 229:18 266:19
**overdoses** 26:22 26:23 27:10 32:17 53:2 59:25 60:1 81:16 83:15 87:24 89:6,25 91:17 92:6 112:18 149:18 177:18 204:9 256:12 260:11 335:18,21
**overdosing** 35:20 259:14
**overlap** 21:3 260:2 260:3 264:23 265:12,14

**overlapped** 20:25
21:2,3
**overmarketed**
122:9
**overprescribing**
19:25 99:6 121:18
129:16
**overprescription**
14:20 15:4 20:10
**overprescriptions**
103:9,12
**overproduction**
119:23 129:16
**overriding** 108:24
109:1
**oversaturation**
212:14
**oversupplied**
122:8
**oversupply** 20:12
**overview** 23:10
**overwhelm** 254:1
254:16
**overwhelmed**
30:21 245:24
246:7 247:20
249:16
**overwhelming**
280:14
**oxycodone** 47:17
47:19 49:11 50:10
59:5,6,13,16,18,22
61:21 62:13 63:8
63:14,21 64:25
275:21 284:1

**p**

**p** 7:1
**p.m.** 304:13 354:4
354:11
**pace** 171:14

**packaging** 187:8
187:16,19 188:21
**page** 6:2 22:22,22
22:25 23:9 98:1
108:11 251:3,7,14
267:23 268:3
271:17 272:15,15
272:18 273:7,8
289:18 294:18
295:15 300:20,20
314:10,11 315:8,9
315:24,24,25
317:7,16 318:24
321:13 322:19
323:1,2,3 332:4
356:13,15 358:7
359:3
**pages** 97:25 223:4
225:9 250:25
251:2 304:13
315:4,22,24
318:19 319:19
332:6
**paid** 228:11
302:13
**pain** 14:21 27:12
98:24 99:7 103:13
288:18
**pamphlets** 67:11
**panel** 232:23
**panels** 234:16
**pap** 143:23 144:1
151:15
**paper** 154:8,25
315:5 328:7 329:8
329:15 341:15
344:12
**par** 4:7,8
**parent** 177:12
**parentage** 243:19

**parents** 45:1
**park** 3:17
**parse** 60:5,12
**part** 37:20 62:19
73:2,16 74:23
76:5 82:24 83:2
94:22,25 95:17
101:23 103:9
116:24 117:23
131:23,25 133:15
133:22 135:3
136:10 159:14
164:4 171:1
181:23 194:18
199:19 209:10
212:3 240:5
243:21 258:5
273:14 281:6
282:9 287:3
314:21 315:9,10
325:16 327:24
339:12,14 343:9
345:22 346:8
347:24 349:15
353:19 358:9
**partially** 181:6
**participate** 16:10
16:14 97:20
**participated** 15:21
15:24 16:8 117:22
300:4
**participates** 16:19
**participation** 16:4
70:7
**particular** 13:5
199:19 207:8
233:1 274:3
**particularly** 97:11
**parties** 2:15 7:13
306:15,19 355:11

**partners** 78:3
210:25 293:16
**partnerships**
40:18
**parts** 95:16 193:23
319:16
**passed** 12:11
**passes** 178:12
**path** 34:2
**pathologist** 56:23
71:14 75:25
232:25 261:20
265:2 267:8 339:2
**pathologists**
243:25 248:1
**pathway** 28:19,20
326:13
**pathways** 326:16
336:10,12
**patient** 39:11
74:15 99:11
144:22 146:12
**patients** 53:3
104:3 147:25
148:4 150:18
151:16
**pattern** 28:16,22
**patterns** 38:21
134:3
**pay** 192:15 225:5
**paying** 228:12
**pays** 319:23
**peca** 2:7 7:23
**pending** 324:22,24
**pennsylvania** 4:15
**people** 20:4,4 21:1
26:9 27:9,14,18,25
28:5,19 31:18,20
32:10,15,16,21
35:2 36:9,12 37:1
37:6 38:4,23

42:23 44:6,21
45:1 56:4 67:14
67:20 77:19 79:17
79:19 80:23 81:21
83:6,9,13 84:1,2,6
84:9 85:4,19,21
86:2,6,16,18 87:2
95:20 97:8 107:2
107:8 112:16
113:25 114:8,15
114:16 115:18,21
116:25 129:23
130:13 135:4
141:16 142:7
147:19,19,23
149:17 159:16
160:5 167:5,18
168:4,7 192:21
205:18 206:1,1,8
207:23 208:14,24
209:1,24 210:12
217:6 249:7,8
253:11 259:10,11
259:21 260:4
265:7,10,14 269:6
274:8 283:20
284:3,7 285:25
286:5 296:14
300:9 330:18
332:12 343:3,4
344:15 347:3,17
**people's** 193:10
**percent** 27:9 28:19
30:4 31:4 32:10
32:15,20,22 33:1,2
36:8,12,24 37:2,23
59:1,3 77:3
110:19 114:12,20
115:11,14 120:4
120:12 179:23
180:15 198:6,12

247:9,10,18,19
249:20 253:20,24
253:25 254:12,14
254:23,24 255:21
255:23 260:2
279:16 301:17,19
302:2,25 303:1
**percentage** 33:3
37:4 38:6 43:5,17
45:7 47:7 51:9
52:22 53:1 58:15
59:2 76:25 77:6
106:2,20,22,25
110:22,23 115:13
115:17 118:9
119:24 121:11
185:11 196:10,22
198:23 246:9,19
247:6,16 252:17
253:19 254:22
264:16 301:8
**percentages**
118:25 120:2
**perform** 46:15
231:21
**performed** 46:24
**period** 38:6
164:10 168:20
197:14 251:25
276:8
**permits** 330:23
**perpetuity** 121:12
**person** 63:15
64:25 65:9 67:3
71:10 73:25 78:13
78:23 81:11,14
86:12 92:6,20,24
108:1,4,5,12,16,17
110:2 111:9,24
113:13 188:13
210:6 211:24

229:18 249:25
250:3 263:25
318:6 339:17
344:5
**person's** 27:1 34:2
75:23 76:12 109:2
**personal** 21:17
25:9 104:2,25
106:10 115:1
116:23 117:6,18
132:12,14 135:23
151:10,11 197:22
288:7,16
**personalities**
67:20
**personality** 68:2,8
**personally** 91:21
100:9 132:16
357:11 358:15
**personnel** 195:12
200:24 201:22
250:9
**perspective** 94:20
170:11 190:21
211:18 230:9,12
236:17
**pertains** 70:8
72:22
**pglawyer.com** 3:6
**pharma** 1:8,10,12
3:15 9:23 49:11
135:19
**pharmaceutical**
4:8,13 132:6
135:21 141:8
143:1 144:10
145:6 214:24
288:19
**pharmaceuticals**
3:21 4:7,7 8:21
142:14

**pharmacy** 214:25
289:3
**phase** 280:7
**phone** 9:7 12:22
157:4 356:3
**phones** 7:9
**physical** 265:9
328:6,24 329:22
338:22,24 344:21
**physiological** 68:3
**pick** 7:7 200:23
347:9
**picked** 296:3
324:20 349:1
**pickup** 166:15
**picture** 189:1,5
**piece** 56:14 163:2
246:2 320:1
344:12
**pieces** 56:16 58:4
230:17
**pill** 26:13 50:20
54:22 55:21,24
56:12 78:4,14
92:22 107:19
109:25
**pills** 27:12 67:17
75:14 109:5
**piloting** 168:2
**place** 7:9,13 13:16
85:20 92:8 103:15
110:9 144:12
162:12 245:22
285:20 306:17
328:24 334:8
339:18
**places** 67:11
247:22 328:24
**plaintiffs** 70:6
152:5 307:16

**plan** 20:24 204:25 226:20
**planned** 197:16
**planning** 200:20 234:24
**plant** 217:3,15
**platform** 159:12 162:10
**play** 56:15 94:10 172:1 178:15 187:6 212:4 241:22 268:20
**please** 7:6,9 9:4,15 10:3 58:17 97:14 131:13 153:19 267:13,15 289:18 303:17 304:16 311:23 321:2 334:20 351:24 356:11,11
**pled** 92:20
**plevin** 3:3 8:24
**pllc** 3:8,12 4:23
**plus** 59:22,22 215:17
**point** 31:15 34:17 42:13 47:8 76:16 104:7 105:18 106:1 110:25 134:24 136:21 153:15 170:12,13 171:25 173:2 174:10 188:10 249:3 254:6 269:17 300:11 319:11 349:10
**pointed** 180:21 318:18
**points** 23:14 26:25 33:3 161:20,23 181:8

**poison** 26:19 171:2 193:23 331:24
**police** 66:11,13
**policies** 13:15
**policy** 26:25 113:15 163:3,21 237:21 266:18,24 331:2 339:18
**polster** 1:7 156:23
**poor** 301:2
**poppy** 217:3,15
**populated** 17:24
**population** 87:1 96:10 206:19 260:19
**populations** 95:20
**portion** 201:4 210:12 242:23 246:17 292:25 319:14
**portions** 243:18 320:14
**portman** 182:5
**position** 18:9 93:12 146:16 206:21,25 207:2,7
**positions** 142:13
**positive** 188:20 286:9 294:19 343:17
**possibilities** 61:4 205:25 206:4
**possibility** 228:7
**possible** 26:25 61:13 159:7,18,22 167:22 228:9 232:24
**possibly** 75:21
**postal** 182:7

**posted** 239:6,8,10 239:23,25
**poster** 154:5
**potency** 99:6 207:22 208:14
**potential** 266:2 287:7
**potentially** 76:22 96:9 266:16
**pots** 185:16 316:22
**practical** 308:14
**practice** 72:19 85:17 140:24 237:2 266:24 287:3 288:4 332:19,20 333:3,8 333:23 334:1,7
**practices** 287:25 289:14
**precedent** 308:12
**precipitous** 285:9
**precipitously** 276:15
**precise** 43:4 256:1 292:17
**predated** 200:21
**predicates** 245:2
**prefer** 228:18
**prejudiced** 70:14
**preliminarily** 304:23
**preliminary** 166:5 180:11
**preparation** 97:21 101:3 240:5 241:14
**prepare** 11:20 249:7
**prepared** 187:20 352:21

**preparing** 242:1 249:5 269:3
**prescribe** 136:1 143:4,22 147:12 287:2
**prescribed** 26:10 27:12 32:18 37:5 37:15,16 38:25 39:5 43:5 47:20 47:22 51:17 52:15 54:15,19 71:2 77:18 78:14 101:13 102:5 104:1,24 106:9 107:8 108:13,19 108:25 109:15 111:21 114:2 131:1 275:14,15
**prescribes** 92:3 115:8 135:25
**prescribing** 55:23 92:22 94:4 95:6 102:3 110:1 112:14 135:22 147:3 286:15 287:7,21,25 288:22 289:14
**prescription** 1:4 7:18 15:5,9,17 17:1 19:20,23 20:6,14 21:8 27:11,16,19 28:2 29:16 30:3 32:3,4 32:23 33:15,17 35:19 36:9 37:8 37:17 38:9 39:12 44:10 50:14,19,25 51:6 53:19 54:14 55:6 57:4,7 58:11 58:12 59:5,6 60:3 60:7 61:10 63:10

64:15 65:2,21
67:1,2,17 70:24
72:7,19,21 73:11
75:1,14 76:6,6,22
77:11,21 79:1,4,9
84:15 88:16 89:2
93:1 94:2 95:3,4
107:4 109:5 136:5
138:13 141:4
144:7,20 145:9
146:5,10,19 149:9
149:11,21 150:9
150:17 151:16
182:15,16 275:8
275:12,22 276:2
276:10,21 279:3
281:2 282:7 288:5
288:10,17 289:4
356:6 357:3 358:3
**prescriptions** 19:9
23:17,24 28:12
36:12 43:10 50:18
50:24 51:10 53:3
53:22 55:4 56:20
58:8 63:6 75:17
102:18 104:10
140:21 142:2
145:2,4 148:24
**present** 2:14 5:11
8:6 170:15 262:20
**presentation**
195:11
**presentations**
207:10
**president** 291:10
291:15,20 292:8
292:18 296:8
298:20 349:2
350:17
**president's** 296:4
351:2

**press** 99:10 179:19
179:22 180:1,7,25
181:1,4,9 285:7
**pressure** 75:8,20
129:17
**pressuring** 109:9
**pretty** 120:7
175:21 226:14
252:16 269:8
291:17 303:8
**prevalent** 203:10
**prevent** 82:16
**prevention** 163:4
**previous** 27:10,15
27:19 28:2 29:20
37:7 43:6 177:10
182:1 242:16
**previously** 54:5
95:21 96:15
152:14,25 156:13
156:17 166:2
172:8 176:3
245:25 272:21
306:9 307:16
309:23 319:17
353:21
**price** 235:23
**prices** 236:25
**primarily** 14:6
331:11 342:3
**primary** 164:15
272:12
**print** 62:7 332:14
334:16 340:1
347:5
**printed** 291:12
315:5 338:11,15
338:21 344:12
**printing** 291:5
292:7 296:7
347:18

**printout** 61:17
202:4 220:13
221:4 222:7,10
311:23
**printouts** 327:25
338:19 343:11
**prints** 343:17
**prior** 27:23 29:2
39:1 41:21 43:11
67:3 149:16
204:12 215:5
246:21,21 250:20
282:3 284:9 302:6
320:9 345:25
346:7
**priorities** 169:6
**private** 7:7
**privilege** 155:23
155:24,25 156:14
156:17,21 305:10
305:18 306:18
**probably** 21:14
45:21 48:25 59:3
62:2 71:5 96:21
131:17 175:14,15
176:14,23 181:22
183:6,13 190:19
194:24 196:4
224:11 227:1
238:10,25 244:12
250:8 255:6,18,18
266:1 281:15
284:19 286:10
290:1 291:3
296:10 302:1
308:20 315:24
318:25 326:21
328:10 351:5
**problem** 19:19,22
25:23 26:6 35:18
97:2 103:10

104:23 110:6
114:4 122:4
133:23,25 134:2,5
152:16 292:11
294:24 295:9
**problems** 25:11
153:1
**procedure** 357:5
358:5
**procedures** 232:19
234:18
**proceed** 69:15
220:6 241:10
306:6 313:11
**proceeding** 153:1
271:7 354:10
**proceedings** 93:14
**process** 91:23
159:23 165:11
171:9 184:9
200:21 225:23
247:24 326:9
327:10
**processes** 170:8
**produce** 242:11
324:2
**produced** 62:22
152:14 153:10,19
154:7 155:2
156:19 172:4
173:16 174:11
189:4 222:15
239:2 242:5
245:21 305:17
307:11 321:25
322:5,7 350:5
**product** 49:21
78:6
**production** 77:17
79:8 152:5,6
155:17 156:3,20

304:18 306:14
350:1 356:15,17
356:22
**productions**
152:25 304:11
306:10
**products** 136:13
138:4 145:6
**professional** 25:9
112:6 147:25
244:5 288:7,16
**professionals**
80:13 103:16
116:6,6,7 147:24
163:7 249:22
332:13
**profiles** 188:4,16
188:17
**profit** 190:1,24
191:14 193:16
235:18
**program** 160:4
243:23 331:21
**programs** 159:11
**progress** 67:22
284:24 324:14
**progression** 303:7
**project** 167:2,3
172:10 197:19
**projected** 226:6
311:19
**projection** 276:18
285:4
**prominent** 283:5
**promulgated**
272:21
**pronouncement**
293:22
**proof** 267:3
**proofread** 241:23

**properly** 93:15
232:22 250:6
**properties** 139:6
140:8
**proportionally**
279:15 281:13
**proportionately**
255:6
**proportions**
281:16
**proscribing** 102:4
**prosecute** 56:3
81:21,25 85:22
**prosecuted** 56:12
85:14 87:16 88:14
88:22 89:19 90:21
91:22 92:20 95:5
109:25
**prosecution** 91:23
162:19 163:3
**prosecutor** 194:2
**prosecutor's** 81:20
193:24
**protocol** 73:3,17
74:24 76:5,11
307:2
**protocols** 85:20
**prove** 262:13
**provide** 43:3
95:10 109:20
233:2 271:5
**provided** 30:3
152:20 214:21
221:11 313:13
353:3
**provider** 73:20
**provides** 167:4,17
**providing** 109:4
**provisional** 242:24
244:3,15 245:16

**provisions** 244:24
**psychological**
265:8
**psychotherapy**
103:3
**public** 2:8 3:4 4:10
7:24 26:25 66:15
66:15 94:20
113:15 137:18,21
138:18 142:8
163:21 170:24,24
172:4 186:3 242:2
259:20 290:16
291:1,7,19 293:22
295:4,8 296:4,8,19
297:3 298:4,19
299:7,15 300:1
331:2 349:13
350:3,13 355:4,6
357:10,18 358:15
358:23 359:23
**publicity** 286:14
**publicly** 210:11
**publish** 94:18
**published** 249:17
268:17 297:18
349:17
**pulled** 238:25
322:2 336:2 348:5
**pumped** 79:7
**purchasing** 169:15
**purdue** 1:8,10,12
3:15 8:11,13 9:23
306:14
**purpose** 39:11
44:8 48:14 49:14
109:21 114:2,10
150:10 242:1,3
271:4 275:23
288:10 351:23

**purposes** 92:5
94:9 107:9 108:14
108:14 162:19
195:11 229:14
264:2,11 306:21
347:19 348:2
353:1
**pursuant** 2:14
49:10
**purview** 92:1
97:22 120:15
**pushed** 249:3
**put** 13:15 30:24
56:13 61:6 97:17
104:14 105:17
110:24 115:13,17
118:9 136:25
137:8 138:12
151:3 168:7,20
172:4 175:14
193:8 225:14
234:3 241:17
250:17 259:9
272:23 288:2
294:6 295:2,8
300:15 320:19
322:23 327:5
328:22 329:10
332:15 339:18
343:13,18,22
347:6,9 351:18
**puts** 294:23 343:1
**putting** 173:4,6
195:17 207:20
210:3 237:20
268:25 284:8
293:20 299:24,25

**q**

**quantify** 106:1
214:6 215:3

**quarter** 160:15
194:25 195:1
226:11
**quarters** 27:9
**quasi** 88:5
**queried** 71:18
**queries** 342:25
343:15
**query** 61:23 347:4
**question** 11:2,11
25:19 36:17,21
42:15 45:13,17,19
46:11 54:18 60:17
71:11,15 72:25
76:4 80:5 83:19
90:5 91:1,14
104:22 105:9
107:12 125:4,13
125:16 127:22
128:9,11,14 129:1
129:3,7,11 139:17
139:18 141:21
161:5,9 174:21
178:14 202:2
209:16 213:3,7
218:9 219:12
238:22 261:20
263:20 265:2
266:23 267:8
274:7 298:10
309:1 318:7
326:23 335:3
337:8 346:18
**question's** 140:4
**questioning** 46:10
123:18
**questions** 11:12
21:17 41:24 70:18
70:20 83:19 89:10
116:9,13 128:21
168:6 170:8

174:18 183:15
186:25 221:21
225:14 238:13
250:18 253:5
288:21 308:23
312:9 315:21
316:5 333:6 353:2
**quibble** 208:9
292:15
**quick** 54:3 168:1
303:24 304:4
330:2
**quicker** 166:22
171:14
**quite** 40:14

**r**

**r** 7:1 317:9 323:23
325:19 355:1
**race** 332:11
**raise** 152:19
235:11 236:25
**raised** 234:7
**raising** 235:4,7
**rally** 144:12
**ramped** 77:16
**ran** 26:11
**range** 220:23
228:23 260:2
311:15,15
**rare** 58:10 261:5
**rate** 238:19 259:6
**rates** 250:19
**reach** 308:13
320:20
**reaching** 164:17
**read** 13:8 45:18,23
116:16 124:19
125:22 132:21
136:2 141:22
228:19 238:11
296:25 298:15

316:10 327:17
348:6,10 357:5,6
357:12 358:5,6,17
**readability** 315:6
**readily** 159:6
333:21
**reading** 23:25
24:11 89:8 251:21
282:16 301:24
349:23 356:19
**reads** 99:1
**ready** 30:24 42:10
157:16 245:21
324:17 326:6
**real** 119:16 139:10
159:12 253:11
**really** 36:18 56:22
57:23 59:8 66:25
75:24 83:25 85:11
85:13 87:7 89:3
95:11 103:15,16
105:2 108:25
109:23 112:8
118:8 119:15
136:10 141:12
146:14,15 198:19
213:16 215:10,10
218:1 229:24
236:10 238:13
260:21 267:8
275:1 296:2,11
302:24 320:10
324:1 328:9 335:8
**realtime** 159:6,18
159:22 160:14,18
161:16,16 162:11
164:16 173:5
**reason** 21:25
82:12 146:18
172:23 180:17
266:1 282:1

324:18 356:14
358:8 359:3
**reasonable** 103:17
**reasons** 26:11
55:10,14 77:12
92:14,15 144:3
254:8
**recall** 46:19 72:4
104:6 133:9
139:24 143:21
180:24 246:14
265:21 279:5
**receipt** 356:18
**received** 29:13
50:13 53:3 63:21
95:2 152:4 156:23
287:6 289:2 328:5
328:5 340:25
342:19
**receives** 185:3
**receiving** 55:5
**recess** 69:9 155:9
219:23 241:6
305:25
**recognize** 222:21
**recognizing** 16:25
**recollect** 23:15
**recollected** 20:5
**recollection** 16:23
41:25 204:15
228:22 266:11
348:22 350:16,25
**reconvene** 307:7
307:12
**reconvening**
352:20 353:1
**record** 7:4,14 8:9
9:5 10:4 37:3 69:6
69:11,20 72:20
152:1 154:12,22
155:6,11 176:19

219:20 220:2,17
223:22 241:1,2,4,8
270:9 304:9 305:7
305:22 306:2
313:12 314:23
332:5 351:18,24
353:19 354:4
355:7 358:9
**record's** 334:4
**recorded** 7:16
**recording** 7:12
**records** 34:1 39:15
40:15 56:24 64:18
66:5,14,16 73:11
73:24 75:6,10
76:7 133:18 233:6
325:23,23 327:13
327:18,20,22
328:12 329:4,5
330:5 336:23
337:7 338:5 341:5
341:15
**recovery** 163:5
168:14
**red** 224:8,9,10
319:13
**redefine** 128:13
**reduce** 82:2,25
102:18
**reduction** 167:12
167:14 227:15
**reed** 4:19 8:15
**reedsmith.com**
4:21
**reexamining**
353:2
**refer** 284:13
**reference** 329:21
356:7 357:2 358:2
**referenced** 180:25
357:11 358:15

**referred** 251:12
251:25 315:10
**referring** 13:18
14:2 217:11 224:7
233:10 296:23
304:19
**reflects** 322:7
**refrect** 350:15
**refresh** 23:15
41:25 348:22
350:16,25
**refreshing** 23:22
**regarding** 198:4
**regardless** 67:13
228:14
**regards** 70:7,8
156:5 307:8
353:22
**region** 314:14
318:2 320:2
**regional** 224:25
314:18 317:9
318:1 319:21
320:15,16
**regular** 341:6
**regularly** 75:1
101:10
**regulate** 181:25
**regulated** 134:17
**regulations** 101:7
**regulatory** 101:20
**reimbursed**
102:19 103:3
**reimbursement**
28:12 99:12
102:16
**reimbursing** 103:6
**relate** 224:23
**related** 6:15 12:8
12:15 23:11 26:22
53:19 57:8 59:12

59:17,19 60:2
64:15 65:2 70:25
79:4 99:23 133:10
148:6 166:7 180:2
180:3,5,14 202:20
204:20 205:12
215:6,12 220:16
222:11 245:17
256:25 271:1
276:2,10 279:1,16
282:12 283:14,21
309:7 310:7,15
314:5,19 316:20
355:10
**relates** 1:6 147:9
**relating** 325:16
**relationship** 76:1
324:6
**relative** 306:18
308:4
**relatively** 198:15
250:22 261:5
281:2,18 307:18
**relatives** 45:1
**release** 54:7 62:20
179:19 180:1,7,25
181:1,4,9 232:21
324:17 325:17
**released** 324:19
**relevant** 115:20
148:21 167:25
**relocated** 248:16
**rely** 58:3
**relying** 26:16
**remained** 204:15
301:20
**remaining** 307:6
315:3
**remember** 42:20
45:13 62:24
145:18 180:19

244:20
**reminded** 153:16
**remotely** 8:7 9:4
**rendon** 13:21 70:9
**renumbered**
270:20
**reopen** 305:4
**reopening** 153:2
**reorient** 97:16
**repeat** 25:17 266:6
334:21
**rephrase** 11:2
102:24 108:10
**replace** 189:24
248:2 250:2 317:3
336:14
**replacing** 326:9,10
**report** 6:7,12,17
22:10 32:16,21
33:2,13,14 37:3
57:14 62:23 63:14
75:21,24 158:14
165:23 183:1
226:8 238:17
240:9,14 242:12
245:20 249:6,8,21
250:1 269:1
289:17 290:12
294:19 297:11,16
312:1,2 321:9
322:10,12 324:8
324:21 325:10,11
325:18 328:3,6
330:8 331:19
332:22 333:12,15
333:18 334:9,13
334:22 344:13
347:9 348:11,12
348:16 349:6
**reportable** 177:7

reported 1:24 176:8 283:20 324:5

reporter 8:3 9:15 11:12 240:25 321:6 352:8,9 355:4,19 357:7

reporter's 320:21

reporting 331:2

reports 27:21 46:16 63:1,3,4,6 63:11 64:1 66:7 66:12 94:18 132:21 160:14 166:13 174:22 188:23 194:7,8 206:17 292:22 293:2 297:14,16 324:3 325:24 328:1,18 330:21 331:4,5,6,9 335:1 337:4,5 340:7,8 348:1,14 349:7

represent 222:5 224:3 253:1 323:11

representation 235:16 240:23 242:15 307:24 335:17

represented 315:23

represents 221:24 317:22 320:12 323:12

request 154:19,22 156:5 231:19 328:21 330:7,8 358:9,11

requested 327:25 328:3 330:4

requests 184:3,14 187:7 195:17 199:8 227:11 332:17

required 57:2 158:19 195:23 233:4 234:13,19 356:25

requirement 242:9

requirements 162:3 236:2 244:18

requires 64:6

requisite 250:5

rereview 156:21 305:18

rescinded 205:11

research 26:8 27:25 44:22

researchers 345:23

reservation 305:1 305:6

reserve 157:12 162:4

reset 303:25

residual 228:10

resolved 243:1

resource 168:22 174:9 234:3

resources 40:20 97:10 163:22 189:19 193:7 195:18 234:19 255:1 259:10

respect 47:24 72:12,15 127:25 128:15 226:12 288:4 348:24

respective 2:15

respects 183:17

respond 166:1,21 184:2

response 70:13 89:23 156:7 164:10,15 167:21 168:1 290:16 291:18 297:3 299:3 350:12

responses 162:11

responsibilities 94:10 162:9 183:16,20 340:20

responsibility 81:3,7,15 83:14 84:2,12,20 85:5,12 87:12,15,19,22,25 89:13,17 90:1,23 91:18,24 92:9,24 93:5 110:5 118:15 118:16 120:12 121:13 123:15 124:12,16 141:5,7 150:19 151:19 212:10 213:15 214:7,12 217:15 217:21 343:10

responsible 85:25 86:4 91:7 113:6 114:12,20 118:11 119:12,21 120:22 121:15 122:3,21 122:22 123:8 124:24 125:11,25 127:11,16,20 128:3,17 150:7 181:6 211:25 212:2,7,21 214:23 214:24 215:20 216:9,15 217:7

249:25 341:8 342:4

rest 172:11 258:9 326:22 329:24

restate 178:4

restricted 343:6

rests 159:9

result 107:19 149:12,13 156:14 343:17

results 280:2

resume 170:14 352:5

retain 352:9,14,17

retained 6:22 354:8

retaining 352:12

retired 250:1

retirement 250:10

retirements 254:19

return 158:24

returned 356:18

revenue 199:19,25 200:7,12

reverse 37:17

reversing 36:24

review 13:4 26:19 29:6 31:7 35:8 41:25 42:7,17 52:25 67:10 115:21 155:23,25 165:9 167:20 184:12 193:24 230:22 233:24 234:8 235:2 241:22 291:25 294:4 299:5 305:10 307:10 309:24 310:10 332:22 334:10

Page 47

341:9,13,15,21,22
345:15 347:6,8
356:12 357:1
358:1
**reviewed** 33:23
34:25 41:21 58:6
194:9 295:20
**reviewing** 29:17
268:21
**reviews** 26:20 27:7
29:15 170:25
171:3,23 294:13
331:24 342:3,6
**revise** 227:16,17
**rewrite** 298:22
**rewritten** 349:3
**rhartman** 4:11
**rid** 336:14
**ride** 195:3
**right** 10:10 14:1
15:21 19:11 22:19
23:10,14 24:3,5
25:3 27:24 28:3,6
28:7,12,15,17,21
29:2 30:9 31:8,25
32:4,7,11 34:3,22
35:11 36:4 38:13
39:3,5 41:4 42:24
43:6,9,13,19,21,24
44:3,12 46:3,8
47:11 48:4,7,8,14
49:1,4,14,22 50:3
50:22 51:6 53:13
55:1,3,6,11 56:1,3
56:9 57:22 58:2
60:18 61:1,19,25
62:3,4,8,10,14
63:16,18,23 64:13
64:15,19,23 65:3,6
65:10,21 66:1,10
66:16,19,21 67:4,7

67:18,23 72:7
73:19 74:6,10,16
74:16,22 76:15,23
77:3,8 78:7,11,17
78:19,21 79:4
80:1,8,10,19,24
81:4,24 82:3,10,13
83:5,9,12 84:20
87:18,21 89:8
92:21,23 93:18,24
94:16,23 95:22,25
96:5,10,17,22 97:4
97:18 98:2,25
101:18 105:6
106:22 107:11,13
108:6,21 111:18
112:23,24 113:14
113:15 115:6
117:6,10,13,20
118:1,11,23
121:25 124:9
126:3,7 127:7
128:12 130:5
131:24 132:9
135:7,13 137:9
138:23 139:17
140:19 141:2,4
142:3 143:3,5
144:22 146:19
150:2,10 157:20
157:23 158:2
161:1 168:16,23
174:15,23 175:11
176:21 177:16
178:15,20 182:13
184:25 188:7,10
188:14 190:14,22
190:24 191:15,21
191:23 192:1,10
192:12,13,16,19
192:22 193:2,5

196:9 197:3
199:17,22,24
200:4,7 201:5
202:8 203:2,7
204:9,16 206:8,22
207:14,24 208:10
211:1 214:3,8,13
215:14 216:7,23
217:1,4,8,16 218:3
218:13,18,21
219:13 223:6
225:19 226:18,19
227:25 228:2,5
230:7 232:12,16
235:5,19,24 236:3
236:21 237:7,9,16
237:18 239:14,22
240:1 242:7 244:3
246:17 248:25
250:7,10,13 251:3
251:18,21 252:12
252:21,22 253:3,7
253:22 254:4,9,17
254:19 255:7,8
256:13,15,17
259:8,10,13,16
260:23 261:13,25
262:5 263:3,22
264:1,7 265:13
266:1 267:21
268:15 270:13
271:14,20,22
272:9 273:3,10,20
274:4,15 275:9,23
276:3,6,10,15,23
277:7,10,15,21
278:8 281:13,19
282:3,7,11,13,13
282:16 283:15
284:3 285:22
286:4,6,11,22

287:12,15,22
290:4,7,13 291:22
292:1 294:9,18,19
294:22,24 295:10
295:15 296:4,20
298:13 300:22,24
301:6,21,24 302:7
303:9,21 305:3
307:7 308:10
310:24 311:3
313:5,7,14 316:15
317:13,15,17
322:17,24 327:8
327:20 328:14,17
330:11 335:20
336:7 340:15,23
348:20 349:3,14
351:16 353:23
**rights** 157:12
305:1
**ring** 297:9
**rings** 320:10
**rise** 187:14
**risk** 136:16 137:11
139:12,22
**road** 3:8 311:2
**robust** 168:1
**role** 56:15 94:11
112:2 157:18
158:12 187:6
241:13 243:17
268:20,23
**roles** 241:22
**roll** 156:21
**rolling** 171:2
**room** 8:6 20:2
21:6 23:21 102:7
103:14 116:25
147:20 160:3,6
193:25 329:9

**root** 213:18 214:2
**rough** 202:9 230:7
  255:20 302:1
  352:23 353:17
**roughly** 201:10
  246:23 302:3
**round** 248:7
**rsquire** 5:6
**ruled** 171:21
  180:11 262:20
  300:8
**rules** 10:18 357:5
  358:5
**rulings** 285:3
**run** 17:25,25 18:3
  61:16 80:15
  166:13 167:3
  195:21 200:25
  325:20 346:20
**running** 13:21
  142:20 243:22
**russell** 5:2 9:11
**russo** 1:24 5:11
  8:1,4 355:3,18
**ruth** 4:8 70:2

**s**

**s** 6:1 7:1 315:2
  356:15 358:8,8
  359:3
**sad** 151:17
**safety** 186:3
**sal** 154:12
**salaries** 319:23
**sales** 100:24
  182:12
**salvatore** 3:7
**san** 4:20
**sandra** 4:22 8:16
**sandwich** 192:15
  192:17,17,18

**satisfaction** 99:11
**saturating** 130:24
**save** 236:5 297:20
**saw** 109:16 310:21
**saying** 21:15 44:4
  62:8 80:14 86:2
  103:2 141:21
  145:18 166:20
  208:11,12 311:18
**says** 15:1 24:3,6
  43:2 62:13 98:2
  98:12 99:10,15,21
  100:3 101:5 175:7
  225:8 251:22,24
  271:18 272:19
  290:15 291:17
  292:3 314:8
  316:18 317:8,15
  323:4 325:9 328:3
  349:20
**sbadala** 3:10
**sboranian** 4:21
**scene** 50:19 75:12
  75:14,19 76:8
  165:19,23 166:9
  188:21
**scenes** 337:6,22,22
**science** 224:25
  314:14,18,19
  316:13,14 318:1,2
  319:21 320:2
**scientific** 116:6
**scientist** 40:8
  136:10 208:17
**scientists** 95:14
**scores** 99:11
**scrambling** 246:1
**screen** 157:7
**screening** 50:9,12
  51:2

**screens** 234:14
  337:20
**seal** 357:15 358:21
**search** 161:6
**second** 4:20 22:22
  181:13 204:9
  272:14 273:7
  300:25 304:25
  314:11 317:14
  321:12 323:2,3
  347:13
**seconds** 352:2
**secretaries** 330:20
**section** 24:18
**sections** 241:23
**see** 22:6,11 23:7
  23:12 24:2,2,4,5,9
  24:23 29:19,21,24
  30:2 35:12 37:4
  38:19 41:18 42:1
  43:2,7 56:16 87:5
  97:24 98:10,15
  99:4,8,9,13,19,24
  100:2,5 101:18
  111:12 124:20
  135:2,6 156:2
  158:10 160:22
  183:5 189:1,4
  198:3 201:16
  222:9,16 224:22
  226:11 238:15
  252:1 257:21
  258:25 266:14
  272:25 274:23
  277:3,22 283:25
  284:9,10,20
  289:21 290:19
  292:17 302:22
  313:2 314:7,15
  317:12,19 318:24
  322:1,6 323:6

  332:18 333:7
  334:12
**seeing** 133:9 157:6
  222:2 227:22
  256:24 257:2
  278:3 295:9
**seek** 206:1,1
**seeking** 209:1
  210:7
**seemingly** 213:6
**seen** 31:14 54:5
  133:4,10 134:3
  135:24 136:3
  170:2 187:13
  194:22 203:4
  206:16 240:3
  265:17 267:21
  277:25 283:19
  317:23
**sees** 223:11 286:2
**segment** 208:6
**sell** 84:10 87:23
**sells** 81:12 87:11
  89:5,24 91:15
  214:19 216:16
**senate** 182:5
**senator** 182:5
**send** 73:23 84:3
  168:4 234:17
  237:3 280:2
  309:14
**sending** 83:6
**sense** 28:25 82:11
  82:22 102:9
  175:17
**sensitive** 7:7
**sentence** 297:1
**sentiment** 45:2
**separate** 22:18
  168:15 186:2,18
  187:23 325:15

337:7
**separately**  325:21
  331:21 335:6
**september**  293:21
  295:12 300:14
**serious**  67:22
  114:4 237:12
  253:2 296:16
**service**  182:15,16
**services**  16:18
  186:4 233:3 260:8
**set**  106:15 158:20
  158:21 162:23
  168:10 170:3
  171:22 182:1
  183:22 192:21
  200:22 234:15
  320:9 355:14
**sets**  128:5 226:19
**settled**  148:16
**seven**  24:22 40:12
  116:1 129:23
  140:17 161:14
  175:24 179:2,5
  195:2 198:12
  199:25 201:3
  235:4 279:12
  285:21 307:4,9
  317:16
**sex**  96:14
**shannon**  1:17 2:1
  6:2 7:16 9:17 10:5
  70:17 97:15
  101:17 152:8
  220:9 306:12
  315:12 354:6
  355:5 356:8 357:4
  357:9 358:4,13
  359:20
**shannon's**  304:14
  306:21

**share**  40:20
  117:25 118:3,4
  159:12 209:24
**she'll**  345:15,15
**sheet**  356:13 358:7
  358:10,18 359:1
**shelf**  195:24,25
**shell**  337:19
**shifted**  99:17
**ship**  84:11
**shipped**  84:21
  182:4
**shipping**  79:24
**shkolnic**  3:12
**shkolnik**  3:8 9:2
**shock**  134:24
  136:15,21
**shocked**  134:20
**shopping**  54:21
  55:2,19
**short**  69:9 155:9
  164:6,15 241:6
  305:25
**shorthand**  355:3
  355:19
**shortly**  234:8
  235:2
**show**  42:14 75:23
  203:3 262:14
  296:25 338:15
**showed**  27:8 38:22
**showing**  267:3
**shown**  37:1 356:16
**shows**  47:1,2
  175:3 278:11
**sic**  182:25 202:23
  284:18 291:21
  350:15
**sickness**  26:14
**sign**  177:12 178:13

**signature**  355:17
  356:14
**signed**  324:20
  357:13 358:18
**significance**
  248:10
**significant**  58:8
  83:14 105:19
  110:24 111:3,9
  112:1 165:24
  180:12 181:18
  197:16 203:6
  204:8 227:14,18
  246:9,16 293:24
**significantly**
  171:11 229:3
  246:25
**signing**  356:19
**similar**  252:16
  260:6,11 277:23
  281:3
**simple**  26:6
  128:19 129:12
  213:3,7
**simply**  177:13
  231:23 347:9
**sincerely**  356:21
**single**  60:25 86:12
  131:16 156:3
  279:13,14 282:24
**singular**  220:21
  322:9
**sir**  9:25 14:4 24:6
  36:7 42:10 45:14
  91:3 98:10 100:11
  112:23 120:17
  157:17 208:10
  221:22 223:21
  224:23 239:22
  241:12 257:23
  267:19 270:3

292:16 297:12
  308:20 310:8
  314:4 323:11
  340:17 351:19
  356:10
**sit**  46:23 113:16
  158:7 309:3
  310:17 329:8,13
**site**  52:25 62:23
  172:5 194:9
  238:25 239:1
  240:1 268:18
  273:5 322:2,3,16
  348:8 350:4
**sits**  113:14 159:8
**situation**  26:3 46:6
  50:23 118:7
  166:11 178:11
  191:11 205:17
  212:19 213:8,24
  214:18
**situations**  49:18
**six**  24:21 29:19
  31:16,18,22 227:8
  279:11 285:20
  317:16
**size**  315:5
**skills**  250:5
**skzerrusen**  4:25
**slightly**  164:11
  252:4
**slow**  171:9
**slowed**  171:11
**small**  53:7
**smaller**  189:20
  190:9,11,18
**smart**  263:25
**smith**  4:19 8:15
**snapshot**  128:19
  129:13 213:14

snapshots 172:8
social 237:21
  266:2
sold 187:20 211:24
solution 97:3,7
  159:15 306:20
  308:14
solutions 4:7 8:2,5
  115:24 354:9
  356:1 359:1
somebody 33:12
  50:8 69:20,23
  75:11 89:5 91:15
  93:22 94:3 95:4
  110:6 116:4
  167:23 224:1
  246:1 262:18
  269:2 334:5
somebody's 49:24
  93:23
someone's 73:8
  74:15
somewhat 228:1
  245:23 253:9
  349:10
soon 156:8 351:20
sooner 134:4,5
sop 332:24
sophisticated 60:4
  60:24 80:16,22
sophistication
  77:25
sorry 12:6 30:13
  58:19 69:25 77:24
  80:4 99:22 105:10
  108:3 110:12
  151:2,6 158:10
  160:21 167:13
  169:8 187:22
  189:8 199:6
  209:11 229:1

238:21 239:16
247:12 268:5
277:4 282:14,18
289:14,19 291:9
304:4 311:25
321:7,16 335:2
sort 213:15
sound 296:20
sounded 327:7
sounds 162:20
  170:11 176:20
  189:8 233:14
source 28:11
  67:13 185:8
  187:18 199:25
  200:7 280:16
sources 71:18 96:3
  159:24 161:3
  165:7 185:5,22
  196:16 199:1
  208:4 331:17
  332:3 335:10,14
  335:22 336:1
south 4:23 211:13
speak 11:9 12:1
  16:3 17:8 84:6,6
  87:7 114:7,14
  162:6 206:25
  306:8 307:22
  320:11 325:19
speaking 45:1
  126:11,24 127:2
special 306:17
specialist 86:20
  87:6
specialty 309:18
specific 12:12
  14:24 19:24 35:23
  43:17 47:7 48:2
  76:4 101:7 104:7
  108:5 112:22

113:9 131:21
133:6 135:3 136:4
137:3,23 138:11
140:4 149:3
159:24,24 170:8
175:5 180:20
188:2 189:3
194:15 195:3
201:9,22 221:21
222:17 225:21
229:11 234:14,16
238:13 241:16
243:13 258:6,15
259:4 264:21
265:22 280:4
282:21 288:21
290:6 308:23
309:6 312:9
331:19 342:13
345:22
specifically 14:20
  16:21 17:18 20:21
  42:22 44:19 51:23
  53:15 60:2 72:5
  128:13 131:7
  139:25 143:9
  162:6 168:10
  173:13 180:4
  181:10 185:25
  186:11 194:16
  222:20 250:14
  257:21 258:23
  261:4 290:2
  291:24 296:23
  299:6 310:6
  328:14
specificity 35:11
  43:19 53:12
  132:19 156:19
  158:18 160:17
  229:21 231:10

specifics 27:21
  78:19,20 145:12
  198:3
spectrum 35:4
  159:5 163:15
  309:16
speculate 135:9
  228:18,20
speculating 21:19
speculation 79:14
  135:12
speech 139:19
spend 29:10 228:4
  228:5 238:10
spending 183:23
spike 205:11
  276:20
split 14:7
spoke 12:7
sponsored 182:6
spoon 23:2
spreadsheet 221:4
  222:7 316:11
spreadsheets 6:11
  6:19 222:3
square 2:8 3:4
  4:10 7:24
squire 5:2 9:11,11
sr 318:1 319:21
  320:15
ss 9:11
staff 230:20 234:4
  245:24 247:25
  332:17 333:7,7
  340:6 341:6
  343:13
staffing 248:12
stage 166:20
stages 293:19
stamps 238:23
  268:11

stand 80:13
standard 43:23
  72:18 73:2 169:19
standards 170:3
  243:13 245:1
  309:17
standpoint 238:4
start 14:11 61:12
  69:12 135:18
  155:12 170:19
  171:20 197:4
  210:7 220:3
  282:20 290:21
  293:7 294:17
  296:12 306:3
  332:19,20 338:3
started 13:23
  14:19 15:3 16:4
  16:25 17:2 19:15
  20:20 27:7 29:14
  29:17 70:18
  123:16 129:15
  130:3,4 170:20
  195:21 196:5
  197:11,20 203:25
  254:2,25 290:24
  292:10 293:15
  294:7 296:12
  300:2,9 329:13,16
  333:3 351:9
starting 13:15
  184:6 322:11
  332:18 333:23
starts 43:1
stat 175:12,13
state 8:7 9:4 10:3
  15:13,15,15 16:25
  17:9 18:1 19:15
  19:18 20:7 207:13
  258:8 288:3
  357:10 358:15

state's 17:19 26:12
  160:14
stated 207:9 226:9
  251:11 295:15
  298:16 305:1
  316:21
statement 14:15
  34:13 136:5
  209:12 342:23
  357:13,14 358:19
  358:19
statements 206:16
states 1:1 7:19
  131:1 211:4,8
  233:8 243:23
  280:17 291:11
statewide 17:15
statistic 31:5
  257:8 263:6
statistical 6:12
  240:9,14 252:20
  253:4,8 257:2
  264:2,11 290:12
  293:25 295:4,19
  297:11 331:5
  335:17 348:15
  349:16
statistically 255:7
statistics 39:21
  57:12 180:8
  255:12 257:22
  258:20 259:8
  263:1 264:18
  291:22 294:4
  300:3
statue 200:7
statute 177:4
  190:24 191:14,23
statutorily 190:5
statutory 94:9
  176:10 189:16

316:25
stay 21:7 245:6
  251:15
steadily 281:8
steady 33:10
  175:25 179:9
  198:17 203:11,22
  204:6,7,15,18
  215:5 252:2,10
  256:24 303:8
steered 208:7
stem 259:11
stemmed 40:19
stenographic
  270:9
steps 339:14
steve 8:14 9:8
  13:20
steven 4:13,19
steven.luxton 4:16
stick 327:2
sticking 342:7
stigma 100:3
stipulating 319:5
stock 195:25
  351:13
stones 154:8
stop 82:15,23 83:3
  171:7 182:6
stopped 28:9,11
  82:1
store 323:25
stored 326:13
  328:23
stories 136:2
straight 175:21
  281:18
straightforward
  97:9
strain 254:25

strains 254:3
strapped 190:10
strategy 83:3
  207:11,19 208:5
  208:11 209:15,17
  210:2 212:7
stream 160:11
streams 159:25
street 4:20,23
  49:24 52:16 57:5
  61:7 78:25 81:12
  87:10,25 89:5
  206:2
streets 79:11
strengthening
  208:18
strict 240:20
strictly 238:3
strike 45:11 60:21
  65:11 72:13 76:17
  122:15 132:3
  157:19 170:12
  211:20 244:4
  278:15 280:24
  284:15 292:24
  293:5 299:11
  325:7 344:9
string 37:9 41:18
  43:1
stringent 102:3
stronger 296:13
student 170:25
  346:2
students 170:24
studies 64:17,18
  78:2 94:17
study 33:21,23
  34:17 327:14
stuff 179:3 353:21
subcommittee
  158:16

subcommittees 164:18,25
subject 145:16 155:23 165:9
submitted 154:6 227:4 337:16,23
subobject 309:12
subscribed 357:10 358:14 359:21
subsequent 21:10 92:7 248:20 315:4
subsequently 20:23
subset 53:24 176:16 178:21 313:20 314:4,23
substance 23:3 93:24 140:6,6 145:3 180:7 207:21 260:4 261:4 340:1
substances 32:7 74:6,9,11 82:17 92:4 169:25 259:21 331:22 337:22
substant 120:21
substantial 110:4 110:10,15 118:21 124:12 148:13,25 149:12 179:11 210:12 287:6 302:5
substantially 113:6 114:6 119:12 120:22 121:6 124:16,24 179:14
substractions 338:16

sudden 291:23
suffer 265:15
sufficient 56:25
suggesting 80:12
suggestion 340:5
suggestions 13:16
suicide 177:15 260:10 261:1 262:5,15,20,25 263:5,7,18,23 264:1,7 266:4,15 266:16 267:1
suicides 256:25 257:11,18 258:4 258:19 260:19 261:3,11 264:17 265:19,23
suite 2:9 3:4,8,12 3:23 4:4,20,23 7:24 356:2
sum 140:6 145:3 180:6 340:1
summary 324:7,8
summer 181:15 244:13
summit 1:12 20:22 101:3 158:22,24 258:9 300:16
superior 3:12 356:1
supplemental 324:25
supplied 122:7
supplies 186:10 195:13,21 200:25 320:5
supply 26:11 61:6 101:13 181:17 202:22
suppose 44:1 50:11 218:22

236:16
supposed 160:5 192:22 245:6 326:5
supposition 146:23
suppositions 146:15 148:21
sure 10:24 11:10 12:13 16:12,19 18:18 20:1,8 25:16 28:24 40:14 44:18 46:5,22 50:6 52:13 55:22 58:14 64:9 68:15 68:22 69:21 72:9 73:12 74:2 83:24 95:14 97:6 102:21 102:23 105:17 109:17,22 124:21 135:4 136:2 139:1 140:25 141:10,14 143:16,24 155:4 170:9 172:18 179:18 183:10 186:11 191:1 192:4 193:17 197:1 203:4 206:3 208:17 209:3 211:6 212:3 217:10 223:16 224:5,12 235:20 241:2 249:2 266:8 266:14 268:10 273:23 284:14 287:23 296:13 315:19 318:3 327:4,15 334:3 338:14 351:19 354:2

surprise 34:7,12 34:15,19 157:14 297:25 298:3
surrounding 20:9 189:18 229:10
surveying 160:1 164:24
surveys 99:11
suspect 146:8 306:15
suspected 160:11 166:2 333:19
suspicious 291:23
swamped 170:21
swear 9:15
swings 257:2
switch 270:6
sworn 9:18 355:5 357:10,13 358:14 358:18 359:21
synthetic 47:17 52:16
system 38:19 57:24 59:16 60:22 61:10,11,24,25 63:16 65:1 72:10 72:11 75:23 93:4 93:4,23 118:16 169:3 171:22 182:10 263:24 274:1,20 283:22 284:11 323:21 326:8 327:17,22 336:13 344:24 345:3,7
systems 274:9 325:21 327:24

t

t 6:1,1 9:9 323:23 325:19 355:1,1

table  348:11
tables  222:14
tacking  73:25
tactic  131:4
tactics  106:14
  122:9 129:18
  131:2
take  7:12 15:6
  27:22 33:3,5 42:6
  49:24 61:15 65:12
  65:14 69:1 72:17
  80:22 84:17 87:12
  101:25 102:9
  118:24 127:13
  134:13 145:25
  167:2 168:6 178:9
  178:17,22 187:17
  213:14 218:17,23
  219:16 220:10
  223:14,14 224:18
  225:20 232:5
  240:5 252:9 256:6
  256:8 260:22
  262:24 267:19
  272:1 281:15
  284:17 285:18
  287:19 303:22
  304:4 318:17,22
  341:2 343:25
taken  7:17 69:9
  155:9 166:17
  207:2 219:23
  241:6 251:7
  305:25 306:17
  341:1
takes  60:11 61:14
  81:16 166:10
  211:19,19 257:5
  261:14 262:11,18
  280:1

talk  12:18 13:1
  23:23 31:4 39:10
  39:16 56:19 64:20
  66:18 103:20
  111:7 119:16
  147:2 154:12
  249:5 252:7
  300:13 302:22
  347:2 351:20
talked  25:8 52:25
  54:21 72:1 76:7
  78:8,10 79:20
  96:2 100:23 101:2
  101:10,11 104:19
  104:19 117:9
  130:3 168:17
  186:17 189:12
  193:19 225:16
  255:3 265:18
  273:22 274:11
  282:2 283:2
  297:13 306:9
  310:3 321:14
  331:25 347:16,17
  348:13
talking  18:19,20
  22:14,24 24:12
  43:9 52:25 58:24
  77:13 87:20 104:7
  107:7 108:6
  112:22 126:22
  127:23 149:17
  151:4 164:19
  196:23 202:25
  203:25 229:13
  237:7,10,13
  239:19 253:7,10
  261:24 263:20
  271:21 285:6
  297:10 300:9
  302:20 319:23

331:10 345:17
  352:8
talks  289:21
tandem  260:15
tape  306:25
tarantino  2:7 7:23
target  174:15
  206:18 227:9
targeted  308:23
task  6:7 13:14,17
  13:20,22,25 14:5
  14:11,16,19,25
  15:2 16:15 17:2,7
  17:13,23 18:13,24
  19:17 20:13,20
  21:7 22:10,14,19
  23:16 24:19 25:2
  79:20 86:16 91:13
  95:15 101:4,4
  105:21,24,24
  113:14,16 117:1
  117:24 132:23,25
  133:1 140:1,10,13
  141:6,25 142:15
  142:20,24 143:21
  144:2 145:14,21
  147:4 157:20,21
  157:22 158:1,2,7
  158:13,19 159:5
  159:14 162:18,23
  164:18 207:6
  259:7 260:14
  279:19 280:6
  282:20 283:5
  285:13,20,24
  289:25 293:20
  294:1,8 300:2,15
tasked  34:5
tax  169:2
teaching  243:21

team  186:5 241:21
teams  168:1
technically  178:7
  186:6 258:7
  309:19
technology  182:7
teleconference  3:7
  4:9,14 5:3
telephone  57:1
tell  9:18 10:22
  11:16,19 21:20
  37:23 57:24 60:6
  76:14 106:20
  113:5 114:11
  118:24 120:18,19
  121:2 124:17
  130:18 138:10
  140:5,14 141:19
  143:19,20 145:1
  145:16 153:19
  154:9 156:20
  159:19 168:16
  176:10 183:2
  185:11 215:4
  221:23 223:17
  233:16 238:18
  250:23 289:1
  310:23 316:6,7
  317:22 320:6
  321:1 336:1
  338:20
telling  38:3 55:5
  115:18 240:21
  295:4
tells  163:19
ten  137:6 175:4,19
  203:7 238:18
  251:24
term  48:4,6 164:6
  164:6,7,15 167:19
  167:20 248:19,20

293:11
**termed** 259:18
**terms** 54:24 87:1
  111:8 153:1 180:8
  274:22 323:16
  351:25
**test** 10:21 42:18
  60:18 132:22
  233:6
**testified** 9:20 34:8
  76:19 91:12
  103:23 129:25
  154:4 203:2
  205:10 214:6
  265:6,11
**testify** 116:19
  117:17 132:19
  232:25
**testifying** 41:3
  222:6
**testimony** 27:17
  40:9 50:7 77:9
  85:23 109:23,24
  130:14 132:22
  138:4 174:8
  247:20 266:10
  296:1 353:3,22
  354:5 355:8 357:6
  357:7 358:6,9,12
**testing** 185:24,24
  195:13 196:13
  280:1 309:15,15
  310:2 337:23
**tests** 234:16
**teva** 4:13 9:9
**text** 165:20
**thank** 10:23 60:14
  65:16 68:12
  153:16 155:4
  156:10 158:10
  220:7 230:3

239:12 269:21
  270:1 305:20
  308:16 320:18
  351:19,22 353:25
**thanks** 42:12
  69:16 70:1,15
  98:6 153:14
  177:25 232:7
  268:6 270:3 312:3
**that'd** 71:5
**theirs** 206:8
**theme** 160:24
**themself** 262:10
**theory** 28:5,15
  35:11 78:11
**therapies** 103:4
**thick** 182:24
**thing** 11:8 13:8
  180:20 181:11
  208:12 234:2
  236:23 237:1
  245:19 270:13
  285:25 294:19
  304:25 305:11
  308:2 348:4
**things** 19:18 20:2
  20:15 26:4 48:12
  50:21 54:21 76:7
  78:1 91:13 93:15
  94:18 100:22
  101:1 102:13
  114:16 117:7,22
  136:3 164:4
  169:11 184:11,13
  193:9 195:23
  196:5 197:23
  202:1 225:5 228:3
  230:15 234:5
  238:10 241:24
  259:7 263:22
  285:8 304:15

309:9 328:18
  329:22 330:23
  332:11 333:24
  353:4,9
**think** 12:25 13:6,8
  13:13 19:18 30:7
  43:16,16 46:17
  58:9 59:8 69:20
  71:15,17 75:13
  76:19 79:16 82:7
  87:20 88:10 90:7
  90:20 91:3 98:17
  105:18 110:24
  113:1 116:7,12
  117:14 122:24
  123:12 125:5
  132:7 134:2,23
  136:20,23 137:16
  139:12 140:9
  141:5,6,18,20
  142:12,19,23,23
  143:23 144:2,11
  145:8,13 146:14
  147:9,17 148:6,15
  148:20 149:5
  151:11,18 154:11
  154:12 164:3,8
  165:3 168:15,18
  172:7,10,15,17
  173:17 176:18
  178:4 180:25
  181:11 182:1
  189:3 191:5
  193:13 197:19
  198:21,23,25
  199:12 203:1
  204:11 205:12,24
  209:17 211:12
  213:24,25 217:23
  220:25 222:6
  223:7 224:10,14

225:17,22 229:2
  230:12 231:9
  232:4 234:22,23
  235:19 238:14,16
  240:21 241:12
  246:2 248:16
  263:19 265:11
  266:19 267:23
  268:11 269:24
  273:22 275:3
  277:25 278:24
  279:2 285:11
  287:1 296:10
  300:24 307:21,22
  308:10 310:4
  313:17 316:21
  319:18 321:14
  329:14,14,15,17
  333:4,22 334:3
  339:12 340:11
  346:17 348:23
  352:19 353:6
**thinking** 17:9
  326:21
**third** 23:9 98:1
  197:15 317:11
  319:22 323:2
**thirds** 27:13,17
  32:16 33:5 37:6
  37:25
**thirty** 356:18
**thorough** 333:22
**thought** 32:20
  76:15 78:10 94:12
  105:10 127:8
  144:21 204:2
  285:21 286:8
  339:25 340:12
**thousand** 112:12
**thousands** 108:9
  216:25

**three** 3:17 24:21 27:9 51:11 98:2 169:15 174:11 185:16 238:11 273:5 274:1 280:15 298:1 314:12,13 315:24 316:22 333:3 334:8 339:4
**threw** 36:1 37:10
**throwing** 154:8
**thumb** 221:13,16 312:13
**thursday** 154:18
**tide** 259:11
**tie** 131:3 136:4
**tied** 202:21 244:24 248:9
**tight** 195:19
**tightly** 343:5
**till** 351:10
**time** 10:19,25,25 13:21 16:2 26:21 28:14 29:8,10,15 29:23 30:2,10 31:17 44:15 45:9 46:7 54:4 61:14 64:3 67:3 69:8,14 84:18 101:24 105:20 107:18,21 107:25 108:1,4 128:25 130:20 137:23 138:2 140:3 142:20 148:25 154:17 155:8,14 157:10 161:20 166:11,24 166:25 168:20 172:18 173:15 179:4 193:10 197:14 219:22

**220**:5 222:25 223:14 227:8 231:4 241:5,9 248:3,6 252:9 276:4,5 280:1,9 291:5 292:7 295:18 296:7 302:10,23 305:24 306:5,24,25 324:15,16 328:4 338:10,23 340:14 351:25
**timely** 169:5
**times** 5:4 91:1 112:12 122:25 123:10 124:23 129:9 130:2 184:2 184:4 231:7 245:1 245:2 274:2
**timing** 174:3
**tissue** 50:11
**title** 10:6 18:12
**titled** 225:10
**today** 8:3 10:15 11:21 12:10,21 13:6,10 20:13 46:23 78:25 87:20 91:11 100:14 114:17 116:8 127:12,19 128:1 128:16,20 129:13 130:9 144:7 149:10 153:25 197:17 216:16 217:8 240:3 265:6 307:4 309:3 346:22 351:10
**today's** 354:5
**told** 28:4 31:9 36:7 36:10 46:3 80:14 94:12 95:17

**117**:14 123:13 139:11,21 147:8,9 148:3,23 150:3 208:3 213:25 236:24 238:17 249:15 256:16 280:10 289:8,10 296:18 304:21 336:17 347:23 348:23
**tool** 328:9
**top** 51:21 197:5 274:13 315:19
**topic** 42:21 140:10
**topics** 117:7
**total** 30:20 59:23 169:1 198:10 221:25 225:8 273:9 276:21 277:3 306:24 315:22 354:7
**touch** 161:22
**touting** 294:18
**tower** 4:10
**tox** 50:12 51:2 64:16 325:10,11 325:23 327:13
**toxicology** 50:9 57:19 75:23 166:4 166:5,10 187:3,4 232:22,22 234:13 243:7,7 244:25 309:15 324:21 325:16 326:5,7,12 326:15 336:13,22 337:1,11
**track** 52:1,5 78:1 160:5 171:24 195:14 232:21 277:24 278:13 338:8,9

**tracked** 51:5 52:23 263:16 338:17
**tracking** 198:2 279:25 326:8 327:8,12 328:9
**tracks** 32:6 134:8 336:20
**trade** 83:15
**trafficking** 187:10
**trained** 167:6
**training** 243:23 244:1
**transcribed** 357:7
**transcript** 352:20 352:24 353:11,16 356:11,12 357:5 357:12 358:5,11 358:17
**trauma** 177:5
**treat** 139:15 140:14 257:11 259:10
**treating** 177:11
**treatment** 35:18 66:15 67:15 68:2 79:18 85:21 86:9 86:17 97:8 100:1 101:5 163:4 167:19 168:6,7,9 168:13
**treatments** 102:16
**trees** 248:1 297:21
**trend** 183:24 303:15 310:20
**tried** 21:7 34:1 40:17 95:18 96:8 115:25 116:24 190:13 194:15,19 198:3,25 202:12 204:19 296:12

trimester 172:16
triple 274:19
trouble 317:25
true 34:22 47:10
  59:4 86:18 190:7
  284:5 288:24
  325:22 355:7
trump's 350:18
trust 142:5 151:15
truth 9:18,19,19
  141:19
try 11:1,8,10
  19:19 26:23 40:20
  44:20 53:17 55:4
  59:21 60:5,24
  61:8 64:12,13
  67:10 80:22 113:2
  113:14 115:23
  117:2 153:13
  159:14 163:15
  168:6 182:8
  187:17 188:10
  236:12 246:1
  259:9 308:22,25
trying 20:3 50:5
  74:23 82:4,7,12,14
  82:23 94:17 95:1
  117:18 125:16
  139:15 141:15,18
  148:16 160:17,18
  160:25 161:3,5
  162:9 171:22
  208:9 214:17
  215:3 229:16
  235:20 237:17
  248:12 249:17
  253:6,7 259:12
  283:17 292:12
  297:20 306:19
  307:25 327:11
  336:14

tucker 3:22 8:20
tuckerellis.com
  3:25
tuesday 12:9
  154:2,3,17,19
  156:7 304:12
tune 180:14
turn 7:9 77:19
  216:2 289:16
  312:4
turnaround
  244:25 245:2
turned 26:13
two 9:11,12 21:4
  24:21 27:13,17
  29:15 32:16 33:5
  37:6,25 38:18
  42:15 51:11 54:23
  61:25 62:14 98:2
  137:4 146:2,6
  147:12 150:16
  157:20 184:11
  186:17 219:1
  240:18 243:24
  248:5,11 265:11
  274:1 304:15
  308:5 311:13
  314:12,12 321:17
  325:19 329:10,17
  332:6 334:8
  346:18
type 44:17 52:24
  95:21 159:19
  160:24 187:18
  222:13 257:6
  309:18 344:5
typeface 224:8,9
  224:11
types 51:9 67:21
  102:16 325:22
  348:14

typo 267:24

**u**

u 9:9 220:19
u.s. 13:19 20:19
  22:18 81:20 101:4
  105:21 113:16
  157:21 158:1,7,12
  162:17,22 285:13
  293:18 349:2
uh 36:22 42:11
  51:20 107:10
  137:15 167:9
  169:13,20 170:5
  173:8 186:14
  192:23 193:11
  200:10 201:24
  208:23 230:19
  231:20 272:16
  279:8
ultimate 46:16
  94:8 108:20
  118:15 214:2
ultimately 28:21
  44:11 65:2 84:3
  92:6 94:3 108:17
  111:24 115:10
  196:15 212:6
  336:22
unadulterated
  204:17
unaware 139:22
unclear 211:16
underestimate
  80:16
underreported
  260:20 265:19,23
underscore 220:19
understand 10:15
  20:2 43:22 50:6
  54:18 73:12
  101:18 111:4,17

113:4 124:6
141:15 148:2
161:9 176:18
178:4 203:13,15
209:18 210:18
214:18 217:4
233:12 238:16
249:18 253:10
263:21 273:23
274:7 291:9
302:19 305:6
308:24 327:11
345:13
understanding
  14:14 16:24 17:6
  19:3,6 86:15
  102:11 109:23
  136:24 156:14
  162:24 205:15,18
  220:12 227:7
  234:8 239:12
  244:14 265:25
  307:20 319:8
  337:10
understood 11:5,7
  31:6 117:23
  177:25 200:8
  223:13 253:13
  296:14 345:1
undertook 109:8
  197:19
underway 53:11
  165:11 170:18,23
undetermined
  263:10
undisputed 52:9
unethical 104:1
  107:9
unethically 106:8
unexpected
  291:23

**unfair** 178:15
179:3 223:25
**unfold** 161:18
**unfolded** 213:1
215:8
**unfolds** 161:18
**unfortunate**
151:17 250:7
**unfortunately**
57:17 78:24 79:3
87:24 110:2
139:13 213:7
244:23 250:24
264:1 348:6
**unit** 7:15 69:7,12
155:7,12 187:12
219:21 220:3
305:23 306:3
**united** 1:1 7:19
73:23 131:1 211:4
211:8 243:23
280:17 291:10
**units** 166:20 354:7
**unknowingly**
92:13 207:20
**unlawful** 93:2
**unlawfully** 84:22
92:22 115:9
**unresolved** 156:13
**unscrupulous**
108:13 111:21
112:14
**update** 6:15
154:16 155:16
156:11 157:5
272:6,19,23,24,24
273:3
**updated** 225:24
**updates** 195:11
**upload** 188:4
243:14

**uploaded** 152:7
**upstanding** 88:9
**upswing** 202:20
202:21 271:25
**uptick** 175:22,25
311:5
**upward** 303:14
**use** 30:4 44:7 49:4
49:21,25 59:20
89:15,16 103:8
165:24 179:2
184:24 188:24
205:19 222:3
259:7 286:16
294:5 303:8
306:25 307:5,7
317:1 324:12
331:1 349:22
**useful** 95:15
163:24 337:13
340:8
**users** 259:25
**uses** 85:24 89:25
91:16 211:21
**usually** 94:5 188:1
219:11 234:1
243:24 283:25
284:2 329:7,9
341:19
**utilize** 317:3 331:5

---

**v**

**v** 1:8,12 323:23
**value** 286:2
**vanished** 181:16
**variants** 163:16
**variety** 159:11
162:25 163:1,7
208:3 324:1 332:2
**various** 26:11 42:2
52:6 71:18 95:8
96:8 103:21 159:2

202:6 225:5
241:18 243:5
266:17 273:17
287:4 288:2
328:23,25 344:17
**vehicular** 334:5,6
**veritext** 8:2,4
354:8 356:1,7
359:1
**veritext.com.**
356:17
**versa** 209:1
**version** 221:16
298:21 321:25
322:2,4,7
**versus** 129:13,14
265:9
**vertiq** 323:23
325:25 326:2
327:2,17 328:2,8
328:15 329:2,25
330:7,9,14,16
331:11,16,18
332:8 336:2,3,9
338:8
**vice** 208:25
**video** 7:12,16
**videographer** 5:11
7:3 8:3 9:3,14
69:5,10 155:5,10
219:19 220:1
241:3,7 305:21
306:1 352:1 354:3
**videotaped** 1:17
2:1
**view** 74:15 103:20
104:17 112:10
115:7 116:18
120:18,20,24
124:11,15 125:15
125:23 127:11

129:19 149:4,8
151:10,11,13
191:18 213:23
245:18
**viewed** 324:15
**viewing** 100:3
**views** 265:8
**vince** 18:7,9
**violation** 145:10
**violence** 177:5
187:10 294:5
**violent** 99:22
291:23
**virtual** 221:1,17
**virtually** 278:16
**visits** 160:3
**visually** 281:17
**voluntary** 285:25
**vs** 1:10
**vulnerable** 80:23

---

**w**

**wait** 166:3 168:11
168:12 172:2
**waiting** 156:7
166:9 194:24
**waived** 356:19
**wal** 8:19
**walmart** 4:2
**want** 11:4,16
18:18 22:7 28:25
31:4 36:14,20
42:6 45:23 46:22
65:1 68:13 70:17
84:17 89:3,7 95:3
102:22 109:22
123:6 124:4 135:6
138:23 145:15,25
147:11 154:11,20
157:2 160:21,22
164:21 171:16
179:3 183:8

186:25 189:1
197:1 203:4
218:23 219:2,12
222:25 223:3,21
223:24 224:3,3
228:17 232:10
266:9 275:1
299:11 313:15,19
313:22 314:23
318:22 327:2,5
328:10 335:7
352:7 353:10,15
353:17
**wanted** 40:12
60:17,20 61:16
62:7,16 64:11
69:20 152:1,2,19
153:6 238:15
269:16 305:2
318:7 340:9
**war** 107:23 215:25
**ware** 71:7
**warning** 138:1,11
**wash** 200:2
**washington** 4:15
**wax** 327:21
**way** 11:11 23:15
34:8 49:22 55:22
75:15 91:18 93:2
100:11 102:4,18
105:3 127:21
131:1 146:20
147:13 153:5
158:5 161:12,13
164:16 166:21
177:17 191:2
202:9 216:9,11,20
216:21 217:6
219:3 229:25
230:23 232:10
233:20 236:13,17

245:17 257:24
258:23 262:11
308:12 311:1
315:1,18 317:24
318:20 325:11
329:21 330:14
346:21 347:23
355:12
**ways** 66:1 163:1
174:25 208:22
**we've** 22:14 35:7
43:8 64:7 68:18
77:12 78:2 100:23
104:19 115:25
126:10 132:7
145:23 187:13
190:12 193:8
194:5 195:9
198:25 199:8
208:3 210:21
219:6,17 220:9
228:11 230:11
256:24 265:22
270:19,20 273:4
273:22 279:24
283:19 303:18
306:8 326:12
329:17 331:9,20
345:17 348:13
**weather** 44:11
**web** 62:23 172:5
194:8 238:25
239:1,25 268:18
273:5 322:2,3,16
348:7 350:4
**week** 10:10 155:20
**week's** 11:23,25
**weeks** 166:10
179:20 268:15
297:18 333:3
334:8 339:4 341:2

**weighed** 247:25
**weight** 144:18
**welcome** 129:6
284:24 297:21
**went** 13:6 28:18
28:19 29:23 35:18
36:13 53:4 57:5
78:24 108:12,17
111:20 114:3
131:2 235:2
245:16 247:3,11
280:9 348:9
351:15
**western** 162:4
343:8
**wet** 333:4
**whatever's** 197:5
307:6
**whatnot** 34:1
309:13 320:6
**whatsoever**
193:21
**whereof** 355:14
**whispering** 7:7
**white** 321:18,19
321:25
**whoops** 348:11
**why'd** 195:15
**wilcox** 2:7 7:23
**willing** 110:3
113:5 177:12
178:13
**windshield** 130:16
**wise** 59:2
**wish** 325:13
**wishful** 326:21
**witness** 9:15 14:18
15:11 16:1,17
17:5,17 18:3 19:5
19:13 20:19 22:16
23:20 24:15 25:5

25:14,17,20 26:2
30:16 31:2 32:14
33:1,9,23 34:4,12
34:19,25 36:1,18
36:23 38:15 41:6
42:8 43:15 44:1
47:6 48:10,16,20
49:16 51:17 52:13
52:19 53:9 55:8
55:13 56:6 57:10
57:17 58:21 63:25
65:23 67:6,8,25
71:13,22 74:18
77:5 79:6 80:4
81:6,19 82:7,20
83:18,22 85:2,7
86:2 87:4,14 88:3
88:12 89:11 90:4
90:14,25 91:5,11
91:21 92:1,11
93:12 96:12,24
97:6 98:21 100:9
100:14,16 101:1
102:21,24 104:6
105:2,16 106:12
106:24 107:2
109:4 110:9,12,21
111:12 112:5,18
113:8 114:10,14
114:22 115:3,17
116:15,22 118:3
118:13 119:2,15
120:2,6,14 121:5,8
121:17 122:6,16
122:24 123:2
124:19,22 125:5
125:21,23 126:3
126:18 127:2
129:12 134:23
135:9,15 137:14
137:16 138:10,25

| | | | |
|---|---|---|---|
| 139:8 140:23 | 288:12 289:7,12 | 130:11,23 133:2 | **written** 56:21 |
| 141:10,14 142:18 | 290:9 291:3 292:3 | 139:1 140:1 | 72:20 94:2 95:4 |
| 143:8,16 144:24 | 293:1,10 294:11 | 141:25 170:20 | 100:18 117:9 |
| 145:8 146:14 | 295:2,17 296:6,22 | 171:1,20 172:7 | 145:2 146:6,10 |
| 147:17 148:9,15 | 298:8,24 299:19 | 183:21 185:12 | 198:9 349:7 |
| 148:20 149:16,20 | 301:11,15 302:9 | 186:5 189:17,18 | **wrong** 93:19 292:5 |
| 150:12,23 151:2,6 | 302:16 303:11 | 194:5 206:6 | **wrote** 141:3 144:7 |
| 164:3 173:25 | 311:17 315:15 | 208:21 213:19 | 144:20 145:3 |
| 174:5,14 180:10 | 318:10 319:3,20 | 229:24 231:13,23 | 148:5 149:12 |
| 185:8 187:22 | 321:9,23 331:13 | 232:18 240:10,13 | 150:17 151:15 |
| 188:1 191:1,25 | 333:2,17 334:12 | 240:19,23 242:12 | 288:9,17 |
| 196:19 201:15 | 335:13,16,21 | 242:15 256:6 | **ws** 339:17 |
| 202:19 203:9 | 336:5,7,9 338:14 | 260:9 269:2,5 | **x** |
| 204:11,23 205:2,7 | 339:12 340:4 | 279:19,24 280:4 | **x** 9:9 230:13 231:5 |
| 205:24 206:11 | 341:4 342:2,13,22 | 285:11 286:8 | 325:19 328:21 |
| 207:6,17 208:1,16 | 344:20 346:24 | 288:6 297:17 | **y** |
| 208:21,24 209:5 | 348:18 349:6 | 306:20 308:25 | **y** 220:19 |
| 209:23 210:5,15 | 350:20 351:4,12 | 326:1 329:7 | **yeah** 9:8 15:5 |
| 210:21 211:6 | 351:15 355:8,14 | 330:20 331:2 | 16:12 23:1 43:15 |
| 212:2,9,24 213:6 | 356:8,11 357:1,4 | 335:17 | 45:6 48:19,24 |
| 215:2,16,24 | 357:11 358:1,4,15 | **worked** 173:13 | 56:7 59:3 68:16 |
| 216:11 217:10,18 | **witnesses** 109:19 | **working** 117:24 | 68:19 70:2 80:25 |
| 217:23 218:9,15 | **witness'** 356:14 | 248:5,18 293:16 | 84:16 102:21 |
| 223:18 225:7 | **word** 176:24 | 330:22 333:5 | 103:5 105:12,16 |
| 227:20 228:7 | 287:24 | **workload** 175:4 | 107:22 109:13 |
| 229:1,9 233:22 | **worded** 291:4 | **works** 318:20 | 119:10 132:15 |
| 236:7 238:3 239:8 | **words** 65:8 68:11 | **world** 117:19 | 133:8,12 136:24 |
| 255:23 256:5 | 73:16 103:1 | **worry** 94:6 | 154:21 171:11 |
| 257:13 258:22 | 163:18 168:21 | **worse** 310:24 | 175:13 178:3 |
| 259:3,24 260:25 | 175:20 191:16 | 311:4,20 | 180:3 182:18 |
| 261:19 264:13 | 192:14,20 198:14 | **worst** 30:18 54:1 | 183:5 187:1 202:2 |
| 265:21 267:6 | 262:1 284:7 | **worth** 12:15 | 203:18 219:16 |
| 269:13,16,20,23 | 296:18 299:25 | 329:18 333:5 | 220:18,22 221:9 |
| 270:10 271:24 | 327:5 348:24 | **wound** 229:24 | 221:12,15,17 |
| 275:25 276:12,17 | 349:13 | 262:4 263:6,13,14 | 223:5,16 229:1 |
| 276:25 277:9,17 | **wordsmith** 298:25 | **wounds** 263:21 | 238:24 239:12 |
| 278:22 279:7,9,23 | **work** 12:8,15 | **write** 140:20 144:6 | 245:13 252:13 |
| 280:20 281:5,22 | 15:16 19:16 25:9 | 149:9 289:4 | 254:25 255:8,13 |
| 283:1 284:23 | 37:16 52:24 94:15 | **writes** 150:9 | 267:6,11 268:1,8,8 |
| 285:16,24 286:18 | 95:13,14,24 96:7 | **writing** 186:4 | 269:16,21 270:1,3 |
| 286:24 287:10,17 | 115:3,20 117:12 | | |

270:18,18 281:5,9
284:13 298:11
303:23 307:21
308:6 310:18
311:25 313:1,3,17
317:5 319:18
321:24 335:2
339:2,19 353:5,23

**year** 29:15 30:18
33:6 52:5,5 54:7
58:23 78:24
129:14 149:10
158:23,23 171:19
172:5,15,19
173:18,18 174:14
179:10,10 181:18
183:3,3 184:11
196:1 197:8 198:6
199:13 201:13
203:2 226:11,14
226:20 234:23,24
238:18 241:16,16
242:16 245:10
247:4 248:19
251:24 252:17,17
274:3 276:8,9
277:3 281:10
282:14,24 283:11
298:2 300:11
301:21 310:21
311:20 323:14
332:19 339:24
342:17 349:8

**year's** 171:20
227:23

**yearlong** 244:1

**years** 30:2,5 38:18
38:20 40:12 51:11
52:9 53:2 58:7
59:8 77:15 108:9
112:13 116:1

129:23 137:4,6
138:22 140:17
161:14 164:20
169:15 175:5,19
175:24 178:11
179:2,5 195:2,3
196:25 198:13
199:25 201:4,17
203:7 206:9 214:3
216:14,25 235:4
273:5 277:21,21
280:16 282:24
283:2 285:21
286:22 287:15
302:6 329:10
342:3 351:7

**yep** 316:1

**yesterday** 12:11
12:23 129:13
144:7 149:10
154:1 233:5

**york** 3:9,18,18 5:4
5:5,5

**young** 114:3,3

## z

**zero** 106:13,18
108:23 110:18,23

**zerrusen** 4:22 8:16
8:16

**zip** 160:16

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.