1           IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OHIO

2                   EASTERN DIVISION

3

   IN RE:  NATIONAL PRESCRIPTION     ) No. 17-md-2804

4  OPIATE LITIGATION NO. 2804        )

                                     )

5  APPLIES TO ALL CASES              ) Hon. Dan A. Polster

                                     )

6

7           HIGHLY CONFIDENTIAL - SUBJECT TO

8             FURTHER CONFIDENTIALITY REVIEW

9

           VIDEO DEPOSITION OF LAURA SIPPIAL

10

                   January 22, 2019

11                   10:00 a.m.

12

13

14       Reporter:  John Arndt, CSR, CCR, RDR, CRR

               CSR No. 084-004605

15               CCR No. 1186

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION OF LAURA SIPPIAL produced,
      sworn, and examined on January 22, 2019, at Lindhorst &
 2    Dreidame, 312 Walnut Street, Suite 3100, in the City of
      Cincinnati, State of Ohio, before John Arndt, a
 3    Certified Shorthand Reporter and Certified Court
      Reporter.
 4
 5                   APPEARANCES OF COUNSEL
 6
      On Behalf of Plaintiffs:
 7          Wagstaff & Cartmell LLP
            4740 Grand Avenue, Suite 300
 8          Kansas City, MO  64112
            (816) 701-1174
 9          BY:  MR. ANDREW N. FAES
                 afaes@wcllp.com
10               MR. LUKE F. CALLAHAN
                 lcallahan@wcllp.com
11
            Robbins Geller Rudman & Dowd, LLP
12          655 West Broadway, Suite 1900
            San Diego, CA  92101
13          (619) 231-1058
            BY:  MS. KOMAL JAIN
14               kjain@rgrdlaw.com
15    On Behalf of Walmart:
            Jones Day
16          901 Lakeside Avenue
            Cleveland, OH  44114
17          (216) 586-3939
            BY:  MS. PATRICIA OCHMAN
18               pochman@jonesday.com
19    On Behalf of Endo Pharmaceuticals:
            Arnold & Porter Kaye Scholer, LLP
20          777 South Figueroa Street, 44th Floor
            Los Angeles, CA  90017
21          (213) 243-4000
            BY:  MS. TIFFANY M. IKEDA
22               tiffany.ikeda@arnoldporter.com
                 (present via speakerphone)
23
24
```

```
 1              APPEARANCES OF COUNSEL (CONTINUED)
 2
    On Behalf of AmerisourceBergen:
 3          Reed Smith LLP
            136 Main Street, Suite 250
 4          Princeton, NJ  08540
            (609) 514-5959
 5          BY:   MS. SHANA E. RUSSO
                  srusso@reedsmith.com
 6                (present via speakerphone)
 7    On Behalf of Cardinal Health:
            Porter Wright Morris & Arthur LLP
 8          250 East Fifth Street, Suite 2200
            Cincinnati, OH  45202
 9          (513) 369-4203
            BY:   MR. ZACHARY A. EL-SAWAF
10                zelsawaf@porterwright.com
11    On Behalf of Teva Pharmaceutical:
            Morgan, Lewis & Bockius, LLP
12          1111 Pennsylvania Avenue, NW
            Washington, DC  20004
13          (202) 739-5806
            BY:   MR. JONATHAN E. MAIER
14                jonathan.maier@morganlewis.com
                  (present via speakerphone)
15
         On Behalf of Laura Sippial:
16             Lindhorst & Dreidame, Co., LPA
17             312 Walnut Street, Suite 3100
18             Cincinnati, OH  45202
19             (513) 223-3967
20             BY:   MR. CULLEN P. ROONEY
21
22
23    Also present:  James Arndt, videographer
24                    Shawn Groat, trial technician
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INDEX OF INTERROGATION
 2   Examination by Mr. Faes                  Page 11
     Examination by Mr. Maier                 Page 350
 3   Examination by Mr. Faes                  Page 363
 4
                      INDEX OF EXHIBITS
 5
     Exhibit Teva-Sippial-001                 Page 12
 6   (Notice of deposition)
 7   Exhibit Teva-Sippial-002                 Page 52
     (LinkedIn page)
 8
     Exhibit Teva-Sippial-003                 Page 62
 9   (Résumé)
10   Exhibit Teva-Sippial-004                 Page 72
     (Ohio Valley Area Business Review)
11
     Exhibit Teva-Sippial-005                 Page 77
12   (E-mail)
     (TEVA_MDL_A_06918810 - TEVA_MDL_A_06918811)
13
     Exhibit Teva-Sippial-006                 Page 84
14   (Approval package for Application Number
     20747/S003)
15
     Exhibit Teva-Sippial-007                 Page 87
16   (August 1, 2001, risk management program)
     (TEVA_CHI_00049296 - TEVA_CHI_00049325)
17
     Exhibit Teva-Sippial-008                 Page 95
18   (Actiq master plan)
     (TEVA_CHI_00042757 - TEVA_CHI_00042817)
19
     Exhibit Teva-Sippial-009                 Page 107
20   (2003 Actiq marketing plan)
     (TEVA_CHI_00042882 - TEVA_CHI_00042950)
21
     Exhibit Teva-Sippial-010                 Page 118
22   (2005 Actiq marketing plan)
     (TEVA_CHI_00043010 - TEVA_CHI_00043093)
23
     Exhibit Teva-Sippial-011                 Page 127
24   (E-mail) (TEVA_MDL_A_09592246)
```

```
 1                 INDEX OF EXHIBITS (CONTINUED)
 2
     Exhibit Teva-Sippial-012                    Page 137
 3   (E-mail)
     (TEVA_MDL_A_11578212 - TEVA_MDL_A_11578215)
 4
     Exhibit Teva-Sippial-013                    Page 142
 5   (E-mail)
     (TEVA_MDL_A_11578216 - TEVA_MDL_A_11578222)
 6
     Exhibit Teva-Sippial-014                    Page 145
 7   (Pain Care Specialist 1st Quarter 2006
     Incentive Compensation Plan)
 8   (TEVA_MDL_A_09561278 - TEVA_MDL_A_09561279)
 9   Exhibit Teva-Sippial-015                    Page 153
     (E-mail)
10   (TEVA_MDL_A_13252191 - TEVA_MDL_A_13252193)
11   Exhibit Teva-Sippial-016                    Page 153
     (Guilty plea agreement)
12
     Exhibit Teva-Sippial-017                    Page 163
13   (E-mail)
     (TEVA_MDL_A_09593128 - TEVA_MDL_A_09593129)
14
     Exhibit Teva-Sippial-018                    Page 168
15   (Ohio Valley Area 1st Quarter 2005 Plan of
     Action)
16   (TEVA_MDL_A_09595430)
17   Exhibit Teva-Sippial-019                    Page 173
     (Letter from Department of Health & Human
18   Services to Carol S. Marchione)
     (TEVA_MDL_A_01584978 - TEVA_MDL_A_01584987)
19
     Exhibit Teva-Sippial-020                    Page 180
20   (E-mail)
     (TEVA_MDL_A_13252404 - TEVA_MDL_A_13252409)
21
     Exhibit Teva-Sippial-021                    Page 184
22   (E-mail)
     (TEVA_MDL_A_11578234 - TEVA_MDL_A_11578244)
23
     Exhibit Teva-Sippial-022  - (E-mail)        Page 187
24   (TEVA_MDL_A_06384299 - TEVA_MDL_A_06384302)
```

Highly Confidential - Subject to Further Confidentiality Review

1              INDEX OF EXHIBITS (CONTINUED)

2

   Exhibit Teva-Sippial-023                    Page 193
3  (E-mail)
   (TEVA_MDL_A_10177072 - TEVA_MDL_A_10177079)

4

   Exhibit Teva-Sippial-024                    Page 202
5  (Call notes)
   (TEVA_MDL_A_02416207)

6

   Exhibit Teva-Sippial-025                    Page 202
7  (Call notes)
   (TEVA_MDL_A_02416207)

8

   Exhibit Teva-Sippial-026                    Page 238
9  (Call notes)
   (TEVA_MDL_A_05015635)

10

   Exhibit Teva-Sippial-027                    Page 239
11 (Call notes)
   (TEVA_MDL_A_05015635)

12

   Exhibit Teva-Sippial-028                    Page 250
13 (Cephalon 2005-2006 marketing plan)
   (TEVA_MDL_A_00368405 - TEVA_MDL_A_00368625)

14

   Exhibit Teva-Sippial-029                    Page 253
15 (Marketing Plan 2007)

16 Exhibit Teva-Sippial-030                    Page 255
   (E-mail)
17 (TEVA_MDL_A_11578250 - TEVA_MDL_A_11578252)

18 Exhibit Teva-Sippial-031                    Page 259
   (E-mail)
19 (TEVA_MDL_A_11578258)

20 Exhibit Teva-Sippial-032                    Page 260
   (E-mail)
21 (TEVA_MDL_A_09058781 - TEVA_MDL_A_09058782)

22 Exhibit Teva-Sippial-033                    Page 264
   (E-mail)
23 (TEVA_MDL_A_10177349 - TEVA_MDL_A_10177350)

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INDEX OF EXHIBITS (CONTINUED)
 2
    Exhibit Teva-Sippial-034                    Page 268
 3  (E-mail)
    (TEVA_MDL_A_10177347 - TEVA_MDL_A_10177348)
 4
    Exhibit Teva-Sippial-035                    Page 270
 5  (E-mail)
    (TEVA_MDL_A_10177450)
 6
    Exhibit Teva-Sippial-036                    Page 272
 7  (E-mail)
    (TEVA_MDL_A_11578419)
 8
    Exhibit Teva-Sippial-037                    Page 274
 9  (E-mail)
    (TEVA_MDL_A_11578379)
10
    Exhibit Teva-Sippial-038                    Page 277
11  (E-mail)
    (TEVA_MDL_A_11578490)
12
    Exhibit Teva-Sippial-039                    Page 278
13  (GPE ACTIQ RMP Repeat Off-Label Prescribers:
    August 2007)
14  (TEVA_MDL_A_10177853 - TEVA_MDL_A_10177857)
15  Exhibit Teva-Sippial-040                    Page 280
    (E-mail)
16  (TEVA_MDL_A_09437385)
17  Exhibit Teva-Sippial-041                    Page 287
    (E-mail)
18  (TEVA_MDL_A_11578426 - TEVA_MDL_A_11578442)
19  Exhibit Teva-Sippial-042                    Page 294
    (Sales bulletin)
20  (TEVA_MDL_A_00739357)
21  Exhibit Teva-Sippial-043                    Page 297
    (E-mail)
22  (TEVA_MDL_A_00867400)
23  Exhibit Teva-Sippial-044                    Page 300
    (Sales bulletin)
24  (TEVA_MDL_A_00013847 - TEVA_MDL_A_00013856)
```

```
 1                INDEX OF EXHIBITS (CONTINUED)
 2
    Exhibit Teva-Sippial-045                  Page 307
 3  (10-20-2006 interoffice memo)
    (TEVA_MDL_A_10177281)
 4
    Exhibit Teva-Sippial-046                  Page 308
 5  (11-03-2006 interoffice memo)
    (TEVA_MDL_A_10177321)
 6
    Exhibit Teva-Sippial-047                  Page 309
 7  (07-20-2007 interoffice memo)
    (TEVA_MDL_A_10177764)
 8
    Exhibit Teva-Sippial-048                  Page 310
 9  (07-27-2007 interoffice memo)
    (TEVA_MDL_A_10177772)
10
    Exhibit Teva-Sippial-049                  Page 314
11  (E-mail)
    (TEVA_MDL_A_13252251 - TEVA_MDL_A_13252253)
12
    Exhibit Teva-Sippial-050                  Page 315
13  (E-mail)
    (TEVA_MDL_A_13253056 - TEVA_MDL_A_13253057)
14
    Exhibit Teva-Sippial-051                  Page 318
15  (Call log)
    (TEVA_MDL_A_00763717)
16
    Exhibit Teva-Sippial-052                  Page 321
17  (E-mail)
    (TEVA_MDL_A_09077061)
18
    Exhibit Teva-Sippial-053                  Page 322
19  (License look-up for Nilesh Bhupendra Jobalia)
20  Exhibit Teva-Sippial-054                  Page 326
    (United States Department of Justice press
21  release)
22  Exhibit Teva-Sippial-055                  Page 334
    (E-mail)
23  (TEVA_MDL_A_09593942 - TEVA_MDL_A_09593943)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INDEX OF EXHIBITS (CONTINUED)
 2
     Exhibit Teva-Sippial-056                    Page 336
 3   (E-mail)
     (TEVA_MDL_A_11578466 - TEVA_MDL_A_11578473)
 4
     Exhibit Teva-Sippial-057                    Page 340
 5   (GPS ACTIQ RMP Initial Off-Label Prescriber
     Listing: February 2007)
 6   (TEVA_MDL_A_00929920 - TEVA_MDL_A_00929923)
 7   Exhibit Teva-Sippial-058                    Page 341
     (Cogenix medical education program
 8   confirmation)
     (TEVA_MDL_A_13252390 - TEVA_MDL_A_13252391)
 9   (TEVA_MDL_A_13583363 - TEVA_MDL_A_13583364)
     (TEVA_MDL_A_13583385 - TEVA_MDL_A_13583386)
10   (TEVA_MDL_A_13583401 - TEVA_MDL_A_13583402)
     (TEVA_MDL_A_13583487 - TEVA_MDL_A_13583489)
11   (TEVA_MDL_A_13583422 - TEVA_MDL_A_13583423)
     (TEVA_MDL_A_13583413 - TEVA_MDL_A_13583515)
12   (TEVA_MDL_A_13583444 - TEVA_MDL_A_13583445)
     (TEVA_MDL_A_13583478 - TEVA_MDL_A_13583479)
13   Exhibit Teva-Sippial-059                    Page 342
     (PowerPoint - Street Pricing of Opiods)
14   Exhibit Teva-Sippial-060                    Page 344
     (E-mail)
15   (TEVA_MDL_A_13252926)
     Exhibit Teva-Sippial-061                    Page 345
16   (Cephalon memo)
     (TEVA_MDL_A_00983660 - TEVA_MDL_A_00983663)
17
18
19                  (Exhibits are attached.)
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  We are now on the

 2    record.  My name is James Arndt.  I am a videographer

 3    for Golkow Litigation Services.  Today's date is

 4    January 22nd, 2019, and the time is 10:00 AM.  This

 5    video deposition is being held in Cincinnati, Ohio, in

 6    the matter of the National Prescription Opiate

 7    Litigation for the United States District Court for the

 8    Northern District of Ohio, Eastern Division.  The

 9    deponent is Laura Sippial.  Will counsel please

10    identify themselves?

11                    MR. FAES:  Andy Faes, Komal Jain, and Luke

12    Callahan for plaintiffs.

13                    MR. ROONEY:  Cullen Rooney for Ms.

14    Sippial.

15                    MS. OCHMAN:  Patricia Ochman, Jones Day,

16    for Walmart.

17                    MR. EL-SAWAF:  Zach El-Sawaf for Cardinal

18    Health.

19                    MR. FAES:  And does counsel for Teva on

20    the phone want to identify themselves?  Okay.

21                    THE VIDEOGRAPHER:  The court reporter is

22    John Arndt and he will now swear in the witness.

23

24            The witness, LAURA SIPPIAL, first having been
```

```
 1   duly sworn, testified as follows:

 2             QUESTIONS BY MR. FAES:

 3        Q.    Would you state your name for the record,

 4   please?

 5        A.    Laura Sippial.

 6        Q.    Good morning, Ms. Sippial.  My name is

 7   Andy Faes and I represent the plaintiffs in this

 8   litigation.  Do you understand that?

 9        A.    Yes.

10        Q.    You understand that you're here today

11   because of a lawsuit, that I represent various

12   plaintiffs on behalf of cities, counties, and states

13   across the United States that have sued your former

14   employer, Cephalon and Teva, along with other

15   defendants, alleging that they are partially

16   responsible for the public nuisance caused by the

17   opioid crisis, public health crisis.  Do you understand

18   that?

19        A.    Yes.

20        Q.    Have you ever given a deposition before

21   today?

22        A.    Never.

23        Q.    So if I ask you a question and you don't

24   understand it, will you tell me that?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      And if I ask you a question and you answer

3    that question, I'm going to assume that you understood

4    the question I asked.   Is that fair enough?

5        A.      Fair.

6        Q.      I'm going to mark as Exhibit Number 1 to

7    your deposition -- and this is just the notice of your

8    deposition here today.

9                [Exhibit Teva-Sippial-001

10               marked for identification.]

11       Q.      Now, you're here pursuant to a subpoena;

12   right?

13       A.      Yes.

14       Q.      You were served with a subpoena?

15       A.      Yes.

16       Q.      And what did you do when you received that

17   subpoena?

18       A.      I read it.

19       Q.      Did anyone -- did counsel for Teva or

20   anyone from Teva reach out to you and offer to

21   represent you?

22       A.      I had a phone call from an attorney's

23   office.   I don't remember the name of it -- stating

24   that they wanted to know some information about the

1    opioid -- something with opioids dealing with Teva, and

2    I told them that I didn't have any information, I never

3    worked for Teva, and that they could talk to my

4    attorney.

5         Q.    And how long ago was that?

6         A.    This was approximately three weeks ago.

7         Q.    Was that before or after you were served

8    with the subpoena?

9         A.    This is before.

10        Q.    And so you're here pursuant to this notice

11   and subpoena; right?

12        A.    Correct.

13        Q.    And are you represented by counsel?

14        A.    Yes.

15        Q.    Who is your counsel?

16        A.    Lindhorst & Dreidame.

17        Q.    And what did you do to prepare for your

18   deposition today?

19        A.    I met with my attorney, and they pretty

20   much just told me to answer the questions.

21        Q.    No --

22              MR. ROONEY:  Object.

23        Q.    (By Mr. Faes)  I --

24              MR. ROONEY:  Don't tell him anything we

```
 1    talked -- you can say that we met, but --

 2         A.    Okay.  We met, yes.

 3         Q.    (By Mr. Faes)  So yeah, I don't -- I

 4    should have cautioned you.  I don't want to get into

 5    any communications that you had between yourself and

 6    your attorney.  I'm just -- I was just asking --

 7         A.    Yes.

 8         Q.     -- did you meet, how long did you meet

 9    for.  I don't want to hear anything substantive that

10    you discussed with your attorney.

11         A.    Okay.

12         Q.    Did you review any documents in

13    preparation for your deposition today?

14         A.    No.

15         Q.    And did you review any deposition

16    testimony in preparation for today?

17         A.    No.

18         Q.    And how long did you all meet for,

19    approximately?

20         A.    About 45 minutes to an hour.

21         Q.    What's your highest level of education?

22         A.    I have a bachelor's degree.

23         Q.    In?

24         A.    Business management.
```

```
 1          Q.     And who is your current employer?

 2          A.     I am currently unemployed.

 3          Q.     Who was your last employer?

 4          A.     My last employer was R & L Laboratory

 5   Services.

 6          Q.     And when did you leave that job?

 7          A.     I would say in June or July of this year.

 8          Q.     And what were the circumstances of your

 9   departure from R & L Laboratory Services?

10          A.     Well, I had multiple sclerosis, and so I

11   left to pursue, I guess you could say, short -- or

12   Social Security disability.

13          Q.     Now, you first started with Cephalon in

14   approximately January or February of 2001?

15          A.     Yes.

16          Q.     And you left Cephalon when?

17          A.     2010.

18          Q.     When in 2010 did you leave Cephalon?

19          A.     I don't recall.

20          Q.     Was it -- do you remember if it was early,

21   late in the year?

22          A.     I think it was like middle of the year.

23          Q.     So was it summertime?

24          A.     No, I think it was fall.
```

```
 1          Q.    So fall -- approximately fall of 2010 to

 2    the best of your recollection --

 3          A.    Yes.

 4          Q.     -- is when you left Teva?

 5          A.    Yes.

 6          Q.    And when you were --

 7          A.    Left Cephalon.

 8          Q.    I'm sorry.  Cephalon.  That's right.  It

 9    was never Teva when you were there.

10          A.    Right.

11          Q.    So what were the circumstances of your

12    departure from Cephalon in 2010?

13          A.    I was fired.

14          Q.    And what was the reason why you were told

15    you were fired to the --

16          A.    I was told I was fired because I stated

17    that I had not completed a medical education program

18    when the physician who was involved said that I had.

19          Q.    So let me understand if I see this --

20    understand this correctly.  When you say you were fired

21    because you stated that you had not completed a medical

22    education program and the doctor said you had, does

23    that mean that it was a medical education program for a

24    drug you were promoting, and this doctor that said it
```

1    had been completed said that he had actually given the

2    talk or the speaker program?

3        A.    Correct.

4        Q.    What was the speaker program for?

5        A.    Fentora.

6        Q.    And who was the doctor?

7        A.    Dr. Humam Akbik.

8        Q.    And Dr. Akbik was a physician that you had

9    used many times for medical education programs; right?

10       A.    A couple.

11       Q.    Couple?  And when you say medical edu --

12   MEP --

13       A.    Uh-huh.

14       Q.    That stands for medical education program;

15   right?

16       A.    Correct.

17       Q.    And later that changed to CSP or Cephalon

18   speaker program; right?

19       A.    Yes.

20       Q.    And that was -- those are -- those terms

21   are essentially synonymous with each other; right?

22       A.    Correct.

23       Q.    Meaning CSP and MEP mean the same thing?

24       A.    And MEP are the same.

1      Q.      So where was the Cephalon speaker program

2    that Dr. Akbik claimed that he had given the program

3    and you stated that it didn't occur?

4      A.      In another doctor's office.

5      Q.      Which other doctor?

6      A.      I'm trying to remember.  Dr. Minhas.

7      Q.      How do -- can you spell that for me?

8      A.      M-I-N-H-A-S.

9      Q.      And did Dr. Minhas or Minhas confirm what

10   Dr. Akbik said, or did he confirm what you said, or do

11   you know?

12     A.      I do not know.

13     Q.      Now, these medical education programs or

14   Cephalon speaker programs -- you typically paid doctors

15   for their time in giving these presentations to other

16   doctors; right?

17     A.      Correct.

18             MR. MAIER:  Objection.  Form.

19     Q.      (By Mr. Faes)  And Dr. Akbik would be no

20   difference; right?

21     A.      Correct.

22     Q.      So you -- Dr. Akbik would have been

23   expecting to be paid for this medical education program

24   or Cephalon speaker program that he claims he gave to

```
 1    Dr. Minhas; right?

 2         A.    Correct.

 3         Q.    How much was he claimed he was owed for

 4    giving that speaker program to Dr. Minhas?

 5         A.    That I don't recall.

 6               MR. MAIER:  Objection.  Form.

 7         Q.    (By Mr. Faes)  Was he ultimately paid for

 8    that speaker program that he claims he gave?

 9         A.    I believe so.

10               [Discussion off the record.]

11         Q.    And I know this is a little bit awkward,

12    so if you can -- you're doing a good job so far, but I

13    expect Mr. Maier will be objecting a lot through the

14    course of the day, so if you can kind of wait till I

15    get my question all the way out before you answer to

16    give anybody --

17         A.    Okay.

18         Q.     -- on the phone who wasn't here a chance

19    to object, plus your counsel, so we're not all talking

20    over each other on the video.

21         A.    Okay.

22         Q.    And the court reporter -- we'd appreciate

23    it.  But you're doing a great job of that so far.  And

24    so these Cephalon speaker programs or medical education
```

1    programs -- setting those up was an important part of

2    your job; right?

3         A.    Yes.

4         Q.    And those medical education programs or

5    Cephalon speaker programs -- those would sometimes be

6    referred to as peer-to-peer selling; right?

7         A.    Yes.

8         Q.    And did you have an understanding that if

9    a speaker were to receive payment for a speaker program

10   that he didn't actually give, that could potentially be

11   seen as a kickback or an illegal payment to that

12   doctor?

13              MR. MAIER:  Objection.  Form.

14        A.    Yes, it could.

15        Q.    (By Mr. Faes)  And you had that

16   understanding when you worked at Cephalon; right?

17        A.    Yes.

18        Q.    And that was part of your training; right?

19        A.    Yes.

20        Q.    When you were ultimately separated from

21   Cephalon, did you report or tell your story about what

22   happened with Dr. Akbik and Dr. Minhas to anyone?

23        A.    I hired an attorney.

24        Q.    Okay.  And who did you hire?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Oh, gosh.  It's on the tip of my tongue.

2    Can we come back to that question?

3        Q.    Sure.  Maybe you can --

4        A.    I'm hoping --

5        Q.    -- think about it during a break, and

6    maybe you can come up with that.  So let me just

7    proceed with the question.

8             MR. FAES:  I just want to note for the

9    record that we've requested Ms. Sippial's personnel

10   file and we haven't received it.  I'm going to do the

11   best I can without her personnel file, but it seems

12   obvious from this little bit of questioning that it

13   probably has some very relevant information in it, and

14   we would reserve the right to re-question if there's

15   any pertinent information in that personnel file that

16   we're unable to cover today.

17       Q.    (By Mr. Faes)  So you went and you hired

18   an attorney.  What was the outcome of you speaking to

19   that attorney?

20       A.    They spoke to Dr. Akbik, and he stated the

21   same thing he told my previous employer, that he had

22   completed the MEP or CSP, and that he had done it out

23   of earshot of where I was, over -- by phone.

24       Q.    And so did you actually hire that attorney

 1    or retain that attorney?

 2           A.    I did.

 3           Q.    And so that attorney conducted an

 4    investigation?

 5           A.    Yes.

 6           Q.    And did you hire that attorney on a

 7    contingent basis, or were you paying him an hourly

 8    rate?

 9           A.    I paid him a retainer.

10           Q.    Do you remember how much that retainer

11    was?

12           A.    I don't remember.

13           Q.    So you hired an attorney, you paid him a

14    retainer.  He conducted what sounds like an

15    investigation, which included talking to Dr. Akbik;

16    right?

17           A.    Correct.

18           Q.    Did he talk to Dr. Minhas?

19           A.    That, I don't know.  I don't recall.

20           Q.    So after he did an investigation, which

21    included talking to Dr. Akbik --

22           A.    He could have.  I just -- excuse me.  I'm

23    sorry.

24                 MR. ROONEY:  If you don't know you don't

Highly Confidential - Subject to Further Confidentiality Review

1  know.

2       A.    Yeah, I don't remember.

3       Q.    (By Mr. Faes)  So after your attorney that

4  you hired in this matter conducted an investigation and

5  talked to Dr. Akbik, what happened after that?  And

6  again, I don't want to get any -- into any

7  communication you had --

8       A.    Uh-huh.

9       Q.     -- with yourself and your prior counsel,

10 so I'm just looking for what happened after that.

11      A.     Nothing related --

12      Q.    Did you file a lawsuit?  Did you --

13      A.    I was trying to file a lawsuit.

14      Q.    So ultimately you ended up not filing a

15 lawsuit or pursuing the case; right?

16      A.    Correct.  Strauss and Troy.

17      Q.    So just going back, the firm that you

18 hired was Strauss and Troy?

19      A.    Correct.

20      Q.    And the attorney that you hired was

21 Charles Ashdown?

22      A.    Ashdown.  Charles Ashdown.

23      Q.    Charles Ashdown.  Okay.  When you

24 ultimately departed from Cephalon, did you receive any

```
 1    kind of severance or anything like that?

 2          A.    No.

 3          Q.    Did you receive any of your -- did you

 4    receive like your accrued vacation days or anything

 5    like that that you would have accrued?

 6          A.    No.

 7          Q.    Did you receive any bonuses that you would

 8    have been due?

 9          A.    No.

10          Q.    Who ultimately told you that you were

11    terminated or would be separated from Cephalon?

12          A.    Randy Spokane.

13          Q.    And he would have been your boss's boss at

14    that time; right?

15          A.    Correct.

16          Q.    Michael Morreale would have been your

17    direct report?

18          A.    Direct boss.  Yes.

19          Q.    And how did Randy go about informing you

20    that you were going to be separated from your job?

21    Over the phone?  Was it in person?

22          A.    Over the phone.

23          Q.    And how long was it between the time that

24    this dispute about this payment with Dr. Akbik arose
```

Highly Confidential - Subject to Further Confidentiality Review

1  and when you were ultimately separated from the

2  company?

3      A.    I would probably say a week.  Maybe two

4  weeks.

5      Q.    Now, I just want to go back to when you

6  first started with Cephalon in February two thou --

7  approximately February or January of 2001.  Is that

8  accurate, to the best of your memory?

9      A.    To the best of my memory.

10     Q.    Yeah, I think we've looked at your call

11  notes, and I think one of your first call notes was in

12  February of 2001.  Does that sound consistent with your

13  memory?

14     A.    Yes.

15     Q.    And I assume before you -- once you were

16  hired and before you went out into the field, you would

17  have received some training on the Actiq product and

18  any other products that you were going to be detailing;

19  right?

20     A.    Yes.

21     Q.    What do you remember about that training?

22     A.    Well, I will say for the record I have

23  multiple sclerosis and it affects my memory sometimes.

24  I know that we did receive training on the

Highly Confidential - Subject to Further Confidentiality Review

1    effectiveness of the product, on its safety and dosage,

2    indication for breakthrough cancer pain, and the

3    product fentanyl.

4          Q.    So one of the first products that you

5    would have been responsible for promoting or detailing

6    was the Actiq product; right?

7          A.    Correct.

8          Q.    And eventually you would have transitioned

9    in -- towards the end of 2006 and transitioned from

10   selling the Actiq product to the Fentora product;

11   right?

12         A.    I believe so.

13         Q.    And both of those products were a

14   fentanyl-based rapid-onset opioid; right?

15         A.    Yes.

16         Q.    Who was your first supervisor when you

17   were first hired at Cephalon?

18         A.    Michael Hemingway.

19         Q.    And what do you remember about him?

20         A.    He was my manager briefly.  I had him for

21   maybe a year.  He was hired after I was.

22         Q.    And what about -- at some point you had a

23   new supervisor named Phil or Phil Tocco?

24         A.    Yes.

1      Q.    And what do you think -- what do you

2  remember about him?

3      A.    I can see his face.  I mean, he seemed to

4  have experience as a rep as well as a manager.  He was

5  well-versed on the fentanyl products.

6      Q.    So Phil Tocco had been -- had he been a

7  rep for Actiq prior to becoming the division manager?

8      A.    I don't know if he was a rep for Actiq or

9  he had been a rep at another company.

10      Q.    But he had -- at any rate he had had some

11  experience selling fentanyl-based opioid products;

12  right?

13      A.    I believe so, yeah.

14      Q.    And for a short time you had another

15  supervisor named Michelle Tinkler; is that right?

16      A.    Was she my supervisor?  I know we used to

17  work together.  I don't recall if she was a supervisor

18  of mine or not.

19      Q.    And then at a certain point it looks like

20  you had Michael Morreale as a supervisor, and then Phil

21  Tocco for a while, and then Michael Morreale again?

22      A.    Yes.

23      Q.    What were the circumstances that led to

24  that happening?

1      A.     I think Phil Tocco got let go and they had

2    to rearrange the territories, and that's how I ended up

3    with Michael Morreale again.

4      Q.     And what was your understanding of why

5    Phil Tocco was let go?

6      A.     I believe it was because he drank too

7    much.

8      Q.     And Michael Morreale -- what do you

9    remember about him?

10     A.     That he was my manager for the majority of

11   my time at Cephalon.  He played favorites.

12     Q.     What do you mean by that?

13     A.     Well, he treated his reps differently

14   according to how he deemed necessary, more on a

15   personal basis than a -- not always as professional.

16     Q.     So when he says -- when you say that --

17   strike that.  Let me start over.

18     A.     Okay.

19     Q.     When you say that he treated reps

20   differently more on a personal basis, does that mean

21   that you felt like he treated reps differently based on

22   his relationship with that rep or how he felt about the

23   rep rather than their performance as -- their job

24   performance as a sales rep?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2          MR. MAIER:  Objection.  Form.

3    Q.    (By Mr. Faes)  Now, when you were a sales

4    rep for Cephalon -- and we'll look some visuals

5    later -- your -- you always had a sales territory that

6    you were assigned to; right?

7    A.    Correct.

8    Q.    And that sales territory always

9    included -- it fluctuated over time, but it always

10   included the City of Cincinnati; right?

11   A.    Correct.

12   Q.    And it always included Cincinnati and

13   parts of Ohio; right?

14   A.    Yes.

15   Q.    And at one point -- well, strike that.

16   Let me start with this.  Do you remember a sales

17   representative named David Vukovich -- V-U-K-O-V-I-C-H?

18   A.    No.

19   Q.    Do you remember that at part of his time

20   your territory overlapped his in Akron, Ohio?

21   A.    I don't remember.

22   Q.    When you were first hired at Cephalon, we

23   talked a little bit about the training and the training

24   that you would have received.  Where did that training

```
 1    occur?

 2           A.     For Cephalon?

 3           Q.     Yes.

 4           A.     At the home office.

 5           Q.     And where is that?

 6           A.     In -- I believe it was in New Jersey.

 7           Q.     And were there other representatives in

 8    your sales class or sales school?

 9           A.     Yes.

10           Q.     Who else was in your sales class or sales

11    school?

12           A.     I don't remember.

13           Q.     Was Valerie Kaisen one of those

14    individuals?  I think her name --

15           A.     She could have been.

16           Q.      -- would have been McGinley at that time.

17           A.     Yes, I'm pretty sure she was.

18           Q.     Anybody else that was in your sales

19    training class?

20           A.     I can't remember.

21           Q.     How long was the -- did the sales training

22    class or sales school last before you were put out into

23    the field?

24           A.     A week to two weeks.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     So it's accurate that after -- was there

2   some home study as well?

3      A.     Yes, home study.

4      Q.     And is that included in the week to two

5   weeks?

6      A.     No.

7      Q.     How long was --

8      A.     That was in addition to.

9      Q.     How long was the home study?

10     A.     Home study is usually about two weeks --

11   two to three weeks.

12     Q.     So after a week to two of in-class

13   training at the home office in New Jersey and two to

14   three weeks of home study --

15     A.     Uh-huh.

16     Q.      -- you essentially went out into the

17   field and started promoting and selling Actiq; is that

18   accurate?

19     A.     Correct.

20     Q.     Now, the Actiq is essentially a fentanyl

21   lollipop; right?

22     A.     Yes, doctors would refer to it as such.

23     Q.     And you would occasionally refer to it as

24   a lollipop yourself; right?

1        A.    If the doctor didn't understand my using

2    the correct verbiage saying Actiq, then I would say

3    fentanyl lollipop, and then they would -- oh, yeah.  I

4    know.

5        Q.    So you would essentially use it to be able

6    to communicate better with the doctors if they

7    initiated the conversation with that term the lollipop;

8    is that fair?

9        A.    Fair.

10        Q.    And the lollipop that was intended to

11    be -- or the Actiq stick or lollipop was intended to be

12    put in the cheek and absorbed through the mouth; right?

13        A.    Yes.

14        Q.    And at the time that you first began

15    promoting Actiq in 2001, Actiq was a relatively new

16    product at that time; right?

17        A.    It had been promoted by another company

18    before us.

19        Q.    And that was Anesta?

20        A.    I believe so, yeah.

21        Q.    And so it had only been -- it had only

22    been around since about 1999, so it had really been

23    only on the market about two years; right?

24        A.    Yes.

```
 1          Q.    So it was still a relative --

 2          A.    I'm assuming --

 3          Q.    It was still a relatively new product at

 4   that time; right?

 5          A.    Right.

 6          Q.    And is it fairly accurate that at least as

 7   far as when you first starting Actiq and started

 8   getting into the field, a lot of doctors still didn't

 9   really know about Actiq or know what Actiq was?

10          A.    That's fair.

11          Q.    It's fair to say that prior to Cephalon

12   becoming involved and prior to hiring you to promote

13   and detail Actiq, that the efforts -- the marketing

14   efforts of the prior company weren't as robust as

15   Cephalon's efforts; right?

16                MR. ROONEY:  Object --

17                MR. MAIER:  Objection.  Foundation.

18          A.    Yes.

19          Q.    (By Mr. Faes)  And you became aware that

20   at least when you first started detailing Actiq in

21   early 2001, there were some people and doctors that

22   associated it with children or a lozenge that had

23   given -- been given to children prior to surgery;

24   right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MAIER:  Objection.  Foundation.

 2          A.     Repeat that.

 3          Q.     (By Mr. Faes)  Were you -- strike that.

 4   Is it true that when you first began promoting and

 5   detailing the Actiq product in early 2001, there were

 6   some doctors and people that associated it -- the

 7   product Actiq with children or surgery?

 8                    MR. MAIER:  Objection.  Foundation.

 9          A.     Yes.

10          Q.     (By Mr. Faes)  And is that because there

11   had been a prior fentanyl-based lozenge on the product

12   that was intended to be given to children prior to

13   surgery?

14          A.     I believe so.

15                    MR. MAIER:  Same objection.

16          Q.     (By Mr. Faes)  And so that was one of the

17   things you had to do, was to educate physicians that

18   Actiq was different than this fentanyl-based lozenge

19   that had been intended for children prior to surgery

20   that had been on the market prior to you starting with

21   Cephalon; right?

22          A.     Yes.

23          Q.     And during your time early on in 2011, you

24   became aware that some doctors were using the Actiq
```

1   product for things other than cancer-related pain;

2   right?

3             MR. ROONEY:  Objection.

4             MR. MAIER:  Objection.  Form, foundation.

5        A.    Repeat that.

6        Q.    (By Mr. Faes)  Sure.  When -- I think I

7   said 2011 apparently.  And during your time early on in

8   2001 promoting and detailing Actiq, you became aware

9   that some doctors were using the Actiq product for

10  things other than cancer-related pain; right?

11            MR. ROONEY:  Objection.

12            MR. MAIER:  Objection.  Form.

13       A.    No, I don't recall that.

14       Q.    (By Mr. Faes)  You don't recall that?

15       A.    No.

16       Q.    Now, the Actiq product that you were

17  responsible for promoting and detailing when you were

18  hired in 2001 -- you promoted that right up until the

19  end of about 2006; right?

20       A.    Yes, if that's what you have there.

21       Q.    And at the end of 2006 you switched from

22  promoting the Actiq product to promoting the Fentora

23  product; right?

24       A.    Yes.

```
 1          Q.    And that was essentially a switch; right?
 2    Once you stopped promoting the Actiq product you began
 3    promoting the Fentora product; right?
 4          A.    Correct.
 5          Q.    And the Fentora product -- that was
 6    marketed by the company as a new and improved
 7    replacement to the Actiq product; right?
 8                MR. MAIER:  Objection.  Form.
 9          A.    Yes.
10          Q.    (By Mr. Faes)  And the Fentora product
11    wasn't a lollipop; it was instead a tab that was
12    intended to be kind of placed in the cheek and
13    dissolved there in the mouth; right?
14          A.    Yes.
15          Q.    Meaning it wasn't supposed to be
16    swallowed; right?
17          A.    Correct.
18          Q.    And in fact, that was something that you
19    had to educate patients on -- patients and doctors
20    on -- well, not patients, so let me start over.  That
21    was one thing that you had to educate doctors on, is
22    that the Fentora product in fact wasn't intended to be
23    swallowed; right?
24          A.    Correct.
```

1    Q.    In fact, it could be dangerous if it were

2    swallowed instead of absorbed through the cheek; right?

3    A.    Yes.

4    Q.    And there were many ways that you were

5    trained to detail doctors on to distinguish Fentora

6    from Actiq; right?

7    A.    Yes.

8    Q.    And one of those things that you promoted

9    that was different and better from Actiq was that

10   Fentora had better absorption and better ease of use?

11           MR. MAIER:  Objection.  Form.

12   A.    Yes.

13   Q.    (By Mr. Faes)  And you promoted that it

14   had a fast onset; right?

15   A.    Yes.

16   Q.    Essentially you promoted -- one of the

17   things that you would say to doctors is Fentora -- and

18   actually with Actiq too -- that you promoted both of

19   those products as a pain relief system whereby a

20   patient could potentially get ahead of their pain;

21   right?

22           MR. ROONEY:  Object to form.

23           MR. MAIER:  Objection.  Form.

24   A.    No.  Mirror their pain.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    (By Mr. Faes)  So you would promote

2     Fentora as a product whereby a patient could mirror

3     their pain?

4          A.    Their breakthrough cancer pain.

5          Q.    Not sure I -- I'm not sure I understand

6     that.

7          A.    Breakthrough cancer pain is different than

8     constant pain that a patient has.  It strikes very

9     quickly, and you don't always -- like if you were to

10    take something orally it would take too long to be

11    absorbed, so with this delivery system, it would mirror

12    the pain, meaning that it would get in and effectively

13    attack and mirror the breakthrough pain, versus taking

14    something and then missing the breakthrough pain

15    episode.  It jumps onboard right away.  Makes sense?

16         Q.    Okay.  Right.  So you would essentially

17    market both Actiq and Fentora to doctors --

18         A.    Uh-huh.

19         Q.     -- as a product to where a patient could

20    get much more immediate relief than a long-acting

21    opioid; right?

22         A.    They would be -- yes.

23         Q.    And sometimes you would even talk to the

24    doctor and have a discussion about five versus 35

 1    minutes, meaning what do you want a patient to do when

 2    they're having a pain episode?  Do you want them to

 3    have to wait 35 minutes with a long-acting opioid or

 4    would you rather have them get relief in five minutes

 5    with Actiq or Fentora; right?

 6                   MR. ROONEY:  Object to form.

 7                   MR. MAIER:  Objection.  Form.

 8         A.    They would be on around-the-clock

 9    medication to begin with.

10         Q.    (By Mr. Faes)  Right.  So one of the

11    requirements to be on Actiq or Fentora is that a

12    patient had to be opioid-tolerant to begin with; right?

13         A.    Correct.

14         Q.    Which means they had to be on a

15    maintenance long-acting opioid; right?

16         A.    Yes.

17         Q.    And the Actiq and the Fentora products

18    were meant for those folks who are on a long-acting

19    opioid and still had spikes in pain; right?

20         A.    Correct.

21         Q.    And that was something that you marketed

22    to physicians, is you said, Doctor, for these

23    breakthrough pain episodes, would you rather have your

24    patient get relief in five minutes from our product,

1    which was Actiq or Fentora, or would you rather have

2    them wait 35 minutes for relief with an alternative

3    product; right?

4            A.    Correct.

5            Q.    So you -- and you would refer to that

6    sometimes in your call notes as I had a discussion with

7    my doctor or whatever doctor you were talking about

8    about five versus 35 minutes; right?

9            A.    Yes.

10            MR. MAIER:  Objection.  Form.

11            Q.    (By Mr. Faes)  And as we talked about,

12    both the Fentora and the Actiq product were only

13    indicated for people who were on long-acting opioids;

14    right?

15            A.    Yes.

16            Q.    So those people were already in fairly

17    significant pain to where they needed to be on a

18    long-acting opioid like a hydrocodone or an OxyContin

19    all the time; right?

20            MR. ROONEY:  Object to form.

21            MR. MAIER:  Objection.  Form.

22    A.    Correct.  Long-acting.

23    Q.    And --

24            [Interruption by the reporter.]

```
 1          A.     I'm sorry.  They need to be on the
 2     long-acting.
 3          Q.     And you also understood when you started
 4     promoting Actiq that it was only supposed to be
 5     indicated for people that had cancer; right?
 6          A.     Correct.
 7          Q.     And you would sometimes refer to that as
 8     malignant pain; right?
 9          A.     Correct.
10                 MR. ROONEY:  Objection.
11          Q.     (By Mr. Faes)  So when you use a term for
12     instance in your call notes, malignant pain versus
13     nonmalignant pain, malignant pain would mean cancer
14     pain; right?
15          A.     Cancer.  Yes.
16          Q.     And nonmalignant pain would mean noncancer
17     pain; right?
18          A.     Correct.
19          Q.     So this was essentially kind of a mercy
20     drug; right?
21                 MR. ROONEY:  Objection.
22          Q.     (By Mr. Faes)  Actiq was?
23                 MR. MAIER:  Objection.  Form.
24          A.     No, we never referred to it as a mercy
```

Highly Confidential - Subject to Further Confidentiality Review

 1    drug.  Pain is very subjective, and people would have

 2    different breakthrough pain episodes, and this was --

 3    Actiq was developed to help patients -- cancer patients

 4    with that.

 5         Q.    So --

 6               MR. ROONEY:  I would just direct you to

 7    answer the question that he asks.

 8         A.    Okay.

 9         Q.    (By Mr. Faes)  So Actiq was intended for

10    people who had cancer only; right?

11         A.    Correct.

12         Q.    And you understood that people with

13    cancer -- many of those patients would be terminal and

14    may never recover; right?

15         A.    Correct.

16         Q.    And you understood that both the Actiq and

17    the Fentora really had a very limited educa -- strike

18    that.  You understood that both the Actiq and the

19    Fentora had a very limited indication in a very small

20    subset of patients that the drug was intended for;

21    right?

22               MR. ROONEY:  Object to form.

23               MR. MAIER:  Object to form.

24         A.    Cancer patients.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      (By Mr. Faes)  Right.  And that --

2        A.      Yes.

3        Q.      Would you agree with me that that is a

4    very limited indication in a very small subset of

5    patients?

6                MR. MAIER:  Object to form.

7        A.      Possibly.

8        Q.      (By Mr. Faes)  So we were talking about

9    some of the ways that you would use when Fentora was

10   ultimately launched in late 2006 to distinguish Fentora

11   from Actiq; right?  We talked about that earlier?

12       A.      Yes.

13       Q.      And one of those things -- differences or

14   improvements that you would also note is the lack of

15   sugar in the Fentora product?

16       A.      True.

17       Q.      And you marketed that as -- to physicians

18   as an improvement or a product feature that was better

19   than the old Fentora product; right?

20       A.      Correct.

21       Q.      But other than noting the differences

22   between Fentora, such as the lack of sugar, the

23   absorption, and the ease of use, you would have

24   essentially used the same selling tools and strategies

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to sell and promote Fentora as you did for Actiq;

 2   right?

 3              MR. ROONEY:  Object to form.

 4              MR. MAIER:  Object to form.

 5        A.    Yes.

 6        Q.    (By Mr. Faes)  Now, you were with Cephalon

 7   promoting Actiq and Fentora for a little over nine

 8   years?

 9        A.    Yes.

10        Q.    So between Actiq and Fentora, you would

11   have made literally thousands of sales calls during

12   that period in the state of Ohio, Cincinnati, and

13   elsewhere; right?

14              MR. ROONEY:  Object to form.

15        A.    Correct.

16        Q.    (By Mr. Faes)  And as we talked about,

17   your territory would change slightly over time, but at

18   all times it would have included Cleveland and the

19   State of Ohio; right?

20        A.    Yes.

21              MR. ROONEY:  Object to form.

22        Q.    (By Mr. Faes)  And you would have been --

23   strike that.  You would have kept notes of each time

24   that you made a sales call; right?
```

1                    MR. MAIER:  Object to form.

2          A.    No.  We didn't make sales calls -- we

3    didn't make notes my entire time that I was there.

4          Q.    (By Mr. Faes)  So you didn't keep a sales

5    note or a sales log when you --

6          A.    On the computer?

7          Q.    Well, I guess that's my question.  Didn't

8    you during your time at Cephalon enter some kind of a

9    note or a call log detailing every time that you called

10   on a doctor, noting the date, the time, and the doctor

11   that was called on?

12         A.    There was a period of time where we did

13   not record call notes.

14         Q.    And what --

15         A.    And I don't remember what year that was.

16         Q.    So let me explore that a little bit.  Upon

17   your initial hiring with Cephalon, you would have been

18   keeping call notes; right?  Because --

19         A.    Correct.

20         Q.    So -- in 2001.  And at some point you're

21   telling me that you stopped making call notes?

22         A.    It was no longer required.

23         Q.    And did you ever go back to making call

24   notes?

```
 1          A.    No.

 2          Q.    What were you told was the reason why

 3   making call notes was no longer required?

 4          A.    We weren't really given a reason.

 5          Q.    When did that occur?

 6          A.    I don't remember exactly.  Possibly when

 7   we started.  I don't know.

 8                MR. ROONEY:  Don't answer if you don't

 9   remember.

10          Q.    (By Mr. Faes)  Which product were you

11   promoting or detailing at the time that call notes were

12   discontinued?

13          A.    I don't know which one.

14          Q.    (By Mr. Faes)  So you weren't trained --

15   it's fair to say that when you stopped -- were told to

16   stop keeping -- well, let me back up.  Strike that.

17   Let me start over.  So at a certain time you stopped

18   keeping call notes, meaning that you no longer kept a

19   record of what occurred during the call, but were you

20   still making a call log, meaning you were recording

21   visits to physicians; you just weren't keeping a note

22   of what occurred during that call?

23          A.    Correct.

24                MR. MAIER:  Object to form.
```

1      Q.     (By Mr. Faes)  Okay.  So you kept a -- for

2   a while you kept call notes, and then you were told

3   notes -- that notes were no longer required, and then

4   you started keeping a call log; right?

5      A.     Correct.

6      Q.     So the entire time that you were calling

7   on doctors in the state of Ohio and Cincinnati, you

8   kept either a call log or call notes?

9      A.     Correct.

10             MR. ROONEY:  Object.

11             MR. MAIER:  Object to form.

12     Q.     (By Mr. Faes)  And at some point you

13  stopped keeping call notes, which included a detail of

14  what actually occurred during the call and just started

15  keeping a call log which didn't have notes of what

16  occurred; it just noted that -- the date and the doctor

17  that had been detailed; right?

18     A.     Correct.

19     Q.     And at that time you were told that

20  keeping notes of what occurred during the call was no

21  longer required?

22     A.     Correct.

23     Q.     And you weren't given any reason for that

24  that you recall?

1        A.      Not that I can recall.

2        Q.      Do you recall whether or not one of the

3    reasons that the company gave you was that they were

4    eliminating those call notes or comments due to

5    liability concerns?

6                MR. MAIER:  Object to form, foundation.

7        A.      It's a possibility.  I don't know.

8        Q.      (By Mr. Faes)  You just don't remember

9    either way?

10       A.      I don't.

11       Q.      But at any rate, we can agree that when

12   they switch from call notes to call logs, the company

13   took away even your ability to enter a call note

14   describing what had occurred during a sales call --

15   they took that away from you; right?

16               MR. ROONEY:  Object to form.

17       A.      Correct.

18               MR. MAIER:  Object to form.

19       Q.      (By Mr. Faes)  In other words, they took

20   away even your discretion to be able to enter in a note

21   of what occurred during a call when they made that

22   transition; right?

23               MR. ROONEY:  Object to form.

24               MR. MAIER:  Object to form.

1      A.      Repeat that.

2      Q.      (By Mr. Faes)  Would you agree with me

3  that when the company made the change from call notes

4  to call logs, the company took away your discretion to

5  be able to enter a call note of what occurred during a

6  call even if you wanted to; right?

7      A.      True.

8              MR. ROONEY:  Same objection.

9              MR. MAIER:  Objection.

10     Q.      (By Mr. Faes)  Essentially when you

11  entered your call log after the change was made, the

12  system wouldn't allow you to write a freeform note;

13  right?

14     A.      I don't believe so.

15             MR. ROONEY:  Object to form.

16     Q.      (By Mr. Faes)  What did you use to

17  enter -- after the change was made, what system did you

18  use to enter your call logs?

19     A.      Memory.

20     Q.      What -- I'm sorry?

21     A.      Memory.

22     Q.      And how did you physically enter them?

23  Did you do them into a computer or what did --

24     A.      In a computer.

1     Q.    And what did it look like?  Like did you

2  log in -- go through the process if you can.

3     A.    We would --

4     Q.    To the degree that you can remember of

5  entering a call log after the notes were taken away.

6     A.    We would log in to the doctor's name and

7  it would pull up -- I believe we would enter the

8  doctor's name or the date -- I think we'd enter in the

9  date and then what medications we -- there would be a

10  checkbox or whatever where you click to see which

11  medications you spoke about -- date, time, and place.

12     Q.    And did you log in like to --

13     A.    And doctor.

14     Q.    And did you log into like a portal over

15  the internet to do this?

16     A.    No, it wasn't a portal.  We had a database

17  that was always in our computer that we could pull up

18  the doctor's name.

19     Q.    And at some point -- and so you're working

20  on a database -- you're entering your call notes onto a

21  database on like a company-issued laptop?

22     A.    Yes.

23     Q.    And then how would that information get

24  uploaded to the company?

1          A.     We would have to download once an evening

2     to get all of our call notes quantified.

3          Q.     So was it company policy or training that

4     once a day at the end of the day, you had to --

5          A.     Connect.

6          Q.      -- essentially connect to a company

7     server to make sure that all of your call notes and

8     other information from that day had been uploaded?

9          A.     Yes.

10          Q.     And that was part of the training

11     instructions that you received from your superiors

12     while you worked at Teva?

13          A.     Yes.

14          Q.     And in fact, some -- that was necessary

15     because at some times some of your superiors would want

16     to --

17          A.     Cephalon.  I'm sorry.  You said Teva.

18          Q.     Oh, sorry.  So connecting to the company

19     server to make sure that all of your call notes or

20     other information that day had been uploaded was part

21     of the training and instructions that you received from

22     your superiors when you worked at Cephalon; right?

23          A.     Correct.

24          Q.     And you knew that that was necessary,

1    because in fact at certain times while you were at

2    Cephalon you knew that some of your superiors would

3    actually get in and review your notes on a daily basis;

4    right?

5                    MR. ROONEY:  Object to form.

6                    MR. MAIER:  Object to form, foundation.

7         A.    I don't know how often they would review

8    them.  It's possible.

9         Q.    (By Mr. Faes)  Well, it's true that --

10   well, strike that.  Is it true that at certain times

11   during your employment at Cephalon that you would have

12   felt even micromanaged by people at Cephalon?

13                   MR. ROONEY:  Object to form.

14                   MR. MAIER:  Objection.  Form.

15        A.    Yes, there were times.

16        Q.    (By Mr. Faes)  So I'm going to hand you

17   what's been marked as Exhibit Number 2 to your

18   deposition.

19                   [Exhibit Teva-Sippial-002

20                   marked for identification.]

21        Q.    And this is just your LinkedIn profile.

22   And does this appear to be a fair and accurate copy of

23   your LinkedIn profile?

24                   MR. ROONEY:  Take your time looking

Highly Confidential - Subject to Further Confidentiality Review

1    through it.

2                 [Discussion off the record.]

3                 THE VIDEOGRAPHER:  We are going off the

4    record at 10:53 AM.

5                 [A brief recess was taken.]

6                 THE VIDEOGRAPHER:  We are back on the

7    record at 11:04 AM.

8         Q.    (By Mr. Faes)  Ms. Sippial, we're back on

9    the record after a short break.  Are you ready to

10   proceed?

11        A.    Yes.

12        Q.    And when we went off the record we were

13   looking at your LinkedIn profile, which is dated August

14   30th of 2018 at the top.  Do you see that?

15        A.    Yes.

16        Q.    Does this appear to be a fair and accurate

17   copy of your LinkedIn profile as of that day?

18        A.    Yes.

19        Q.    And if you look down on your experience,

20   it looks like your -- listed as your current employer

21   is R & L Laboratory Service.  Do you see that?

22        A.    Yes, I'm unemployed.

23        Q.    Right.  And as you testified earlier, it

24   says April 2000 to the present but it should read --

```
 1          A.     Uh-huh.

 2          Q.     -- April two thousand eight -- that you

 3   left in 2018; right?

 4          A.     Yes.

 5          Q.     And when did you start at R & L Laboratory

 6   Services?

 7          A.     In April 2018.

 8          Q.     So it is -- and when did you depart?  I

 9   forgot.

10          A.     Had to be June.  It was a very short time.

11          Q.     So you were only there a couple months?

12          A.     Correct.

13          Q.     What were your responsibilities there

14   while you were there for a few months?

15          A.     I was responsible for going to different

16   physicians' offices and selling urine drug screens.

17          Q.     So you were a sales rep for urine

18   drug-screening products?

19          A.     Yes.

20          Q.     And was that the only product that you

21   were responsible for detailing?

22          A.     That and -- yes.

23          Q.     And prior to that you were an executive

24   sales consultant with DrugScan from June of 2012 to
```

1    November of 2017?

2          A.    Correct.

3          Q.    And are those dates correct, or should it

4    be two thou -- June of 2010?

5          A.    I think it should be June 2010.

6          Q.    Did you have another job between Cephalon

7    and DrugScan?

8          A.    No, I did not.

9          Q.    And how long a period of time was it

10   between the time you left Cephalon and the time you

11   joined DrugScan?

12                MR. ROONEY:  Do you remember without

13   looking at?

14         A.    I don't.

15                MR. ROONEY:  You said some of the dates

16   were off.

17         A.    Yeah, the dates are off.  A few months.

18         Q.    (By Mr. Faes)  Okay.  But to the best of

19   your recollection, you were only out of work a few

20   months between leaving Cephalon and joining DrugScan;

21   is that --

22         A.    Correct.

23         Q.    And what were -- what products were you --

24   well, strike that.  What were your responsibilities

Highly Confidential - Subject to Further Confidentiality Review

1    while you were an executive sales consultant at

2    DrugScan?

3           A.      Promoting urine drug screens.

4           Q.      So essentially the same job as R & L

5    Laboratory Services?

6           A.      Yes.

7           Q.      And what were the circumstances of your

8    departure from that company?

9           A.      I was downsized.

10          Q.      And so if you turn to the second page of

11   this, it says executive sales representative, Cephalon,

12   and it says from January 2001 to June 2012, but those

13   dates probably aren't accurate; right?

14          A.      They're not.

15          Q.      It should probably say January of 2001

16   to --

17          A.      2010.

18          Q.       -- 2010 sometime; right?

19          A.      Correct.

20          Q.      And so I just wanted to ask about a couple

21   things in here.  In your summary of your job

22   responsibilities -- which I assume you wrote these;

23   right?

24          A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It says facilitated journal club meetings

2    for the University of Cincinnati pain fellows,

3    sponsored the northern Kentucky pain conference,

4    promoted and sold medications such as Actiq and

5    Fentora; right?

6    A.    Correct.

7    Q.    So obviously you were -- as we discussed,

8    you were responsible for promoting and selling both

9    Actiq and Fentora during your time at Cephalon; right?

10    A.    Correct.

11    Q.    And one other thing that you did was

12    facilitated journal club meetings for University of

13    Cincinnati pain physicians?

14    A.    Yes.

15    Q.    So what was the University of Cincinnati

16    pain physicians and fellows?  What -- and what were you

17    sponsor -- what journal club meetings were you

18    sponsoring there?

19    A.    I don't recall.  I don't remember what

20    journals we had.  I don't remember.  Could you restate

21    that question?

22    Q.    Sure.  So the University of Cincinnati

23    pain physicians -- that was essentially a professional

24    organization or group; right?

```
 1          A.     Correct.

 2          Q.     And that professional organization or

 3   group would have meetings from time to time?

 4          A.     Yes.

 5          Q.     And they would have speakers at those

 6   events from time to time; right?

 7          A.     Yes.

 8          Q.     And one of the things that you would have

 9   done in facilitating those meetings would be to

10   potentially sponsor or provide financial support

11   through Cephalon for those meetings?

12                 MR. MAIER:  Objection.  Form.

13          A.     Yes.

14          Q.     (By Mr. Faes)  You would potentially

15   arrange to have a doctor speak about Actiq or Fentora

16   at one of those meetings through a medical education

17   program or a Cephalon speaker program?

18          A.     Journal club meetings, we did not provide

19   speakers.  We would sponsor the journal club meeting

20   based on what journals the physicians were covering

21   that -- during that meeting.

22          Q.     So you would provide financial support or

23   sponsorship for these Cincinnati pain physicians

24   meetings; right?
```

```
 1          A.    Yes.

 2          Q.    And this was a way of kind of broadening

 3   your base or your exposure with doctors who treated

 4   pain in the Cincinnati area; right?

 5                MR. ROONEY:  Object to form.

 6                MR. MAIER:  Objection.  Form.

 7          A.    Treated cancer pain.

 8          Q.    (By Mr. Faes)  Well, Cincinnati -- the

 9   University of Cincinnati pain physicians included

10   doctors --

11          A.    Oncologists.

12          Q.     -- that treated other types of pain as

13   well; right?

14          A.    Yes.

15                MR. ROONEY:  Objection.

16                MR. MAIER:  Objection.  Form, foundation.

17          Q.    (By Mr. Faes)  And you also sponsored the

18   northern Kentucky pain conference; right?

19          A.    Correct.

20          Q.    And how long of a period did you sponsor

21   that?

22          A.    That was just one instance, one time.

23          Q.    And how long of a period did you have a

24   relationship sponsoring and facilitating journal club
```

```
 1   meetings for the University of Cincinnati pain

 2   physicians?

 3        A.    It was off and on depending on my

 4   territory.

 5        Q.    But fair to say that you facilitated and

 6   sponsored those meetings over a number of years; right?

 7             MR. MAIER:  Objection.  Form, foundation.

 8        A.    No.  Not over a number of years.  They

 9   would occur once in a while, and I didn't always have

10   the University of Cincinnati.

11        Q.    (By Mr. Faes)  Fair to say that you did it

12   more -- sponsored it more than once, though; right?

13        A.    Yes.

14        Q.    And generally, physicians that attended

15   either the club meetings at the University of

16   Cincinnati pain physicians or the northern Kentucky

17   pain conference -- those were generally high

18   prescribers of opioid products in general; right?

19             MR. ROONEY:  Object to form.

20             MR. MAIER:  Objection.  Form, foundation.

21        A.    We never knew which doctors were going to

22   be there, so we didn't have background information on

23   the doctors that showed up until after they were there.

24        Q.    (By Mr. Faes)  But you had an
```

1  understanding at the time that you were providing

2  support and assistance for those professional society

3  or organizational meetings that those meetings could

4  include high prescribers of opioids; right?

5          MR. ROONEY:  Object to form.

6          MR. MAIER:  Object to form, foundation.

7      A.    Yes.

8      Q.    (By Mr. Faes)  And you'd agree with me

9  that that was part of your -- for your strategy for

10 deciding who to target or detail for Actiq and Fentora

11 was you wanted to look at physicians in general who are

12 already high prescribers of opioids; right?

13         MR. ROONEY:  Object to form.

14         MR. MAIER:  Objection.  Form, foundation.

15     A.    Repeat that.

16     Q.    (By Mr. Faes)  You'd agree with me that it

17 was part of your sales strategy for deciding on who to

18 call on for Actiq or Fentora, was to look at physicians

19 who were high prescribers of opioids; right?

20         MR. ROONEY:  Same objection.

21         MR. MAIER:  Same objection.

22     A.    Not necessary -- no.

23     Q.    (By Mr. Faes)  Not necessarily?

24     A.    Not necessarily.

1    Q.    But you'd agree with me that in order to

2    be an appropriate target for Actiq or Fentora, you

3    already had to be opioid-tolerant; right?

4         A.    Correct.

5         Q.    So it would make sense to look at lists of

6    physicians who were already prescribing a lot of

7    opioids in general as a potential target; right?

8         A.    Yes.

9              MR. ROONEY:  Object to form.

10        Q.    (By Mr. Faes)  You can set that aside.

11   I'm going to hand you what's been marked as Exhibit

12   Number 3 to your deposition.

13             [Exhibit Teva-Sippial-003

14             marked for identification.]

15        Q.    And this is a copy of your résumé, and if

16   you look at the top middle, it appears to be a résumé

17   dated November 8th of 2016.  Do you see that?

18        A.    Yes.

19        Q.    And does this appear to be -- well, strike

20   that.  I'll represent to you that this is a copy of

21   your résumé that we actually got off of LinkedIn.  Does

22   this appear to be a fair and accurate copy of your

23   résumé that you would have provided to LinkedIn?

24        A.    Yes.

```
 1              Q.     And I want to ask you specifically about a

 2    couple parts of this résumé.  And you would have

 3    written all the contents of this résumé; right?

 4              A.     Right.

 5              Q.     And you start off with dynamic and

 6    results-driven representative, top sales performer with

 7    10 years of pharmaceutical sales in the Cincinnati

 8    market.  Do you see that?

 9              A.     Yes.

10              Q.     And that's referring to your tenures with

11    Cephalon; right?

12              A.     Correct.

13              Q.     And you would have been responsible for

14    the Cincinnati market the entire time you were

15    promoting Actiq and Fentora; right?

16              A.     And more.

17              Q.     And further down you say ability to target

18    key accounts and gain solid commitments from them.  Do

19    you see that?

20              A.     Yes.

21              Q.     And that was something you did with

22    regards to Actiq and Fentora?

23              A.     Yes.

24              Q.     And what do you mean when you say that you
```

1    were able to gain solid commitments from your key

2    accounts?

3         A.    After educating them on the product,

4    asking them for their commitment, if they have patients

5    that they see that would benefit from using the

6    product.

7         Q.    So when you say that you were wanting to

8    gain a solid commitment, one of the things that you

9    were trained upon was to try to get a commitment from

10   the doctor to try either Actiq or Fentora on one of

11   their patients that they felt was appropriate for the

12   product; right?

13              MR. ROONEY:  Object to form.

14        A.    Yes.

15        Q.    (By Mr. Faes)  And if you look further

16   down, it says under executive toxicology sales

17   consultant for DrugScan, it says at that time you

18   prepared routine in-service presentations and training

19   to keep customers up to date and supported.  What are

20   you referring to there when you were at DrugScan?

21        A.    Well, I was selling toxicology, selling

22   urine drug screens, and I would set up lunches or times

23   where I would go in and educate them on the product,

24   which medications they needed to -- they wanted to test

Highly Confidential - Subject to Further Confidentiality Review

1  for, in-services on our vendors, who we had

2  available -- things of that nature.

3      Q.    Okay.  If you can turn to the second page

4  of this document.  And I want to ask you about the last

5  sentence of the first paragraph where you state you

6  launched and sold two drugs that were first in its

7  class, Actiq and Provigil.  Do you see that?

8      A.    Yes.

9      Q.    So is it true then that you helped

10 essentially launch Actiq in your territory; right?

11     A.    Yes.

12     Q.    You essentially helped create the market

13 for Actiq in the Cincinnati area, in the territory that

14 you were responsible for; right?

15          MR. ROONEY:  Object to form.

16          MR. MAIER:  Object to form, foundation.

17     A.    Yes.

18     Q.    (By Mr. Faes)  And you did that using the

19 training and strategies that Cephalon provided to you

20 while you were there as a sales representative; right?

21          MR. ROONEY:  Object to form.

22     A.    Yes.

23     Q.    (By Mr. Faes)  And if you look here, it

24 states that you were ranked four out of 110 in the

```
 1   nation for the president's club; right?

 2        A.    Yes.

 3        Q.    And what is the president's club?

 4        A.    The president's club is where the top

 5   pharmaceutical sales reps in the company are rewarded

 6   with a trip and a monetary bonus for achieving or

 7   exceeding goals.

 8        Q.    So did you make the president's club that

 9   year?

10        A.    I did not.

11        Q.    Or did you have to be Number 1?

12        A.    I did not make the president's club that

13   year.  I was --

14        Q.    So did -- who -- did you have to -- was it

15   only one person in the whole country that made the

16   president's club, or --

17        A.    No.  No, I believe there are like three.

18        Q.    So you missed it by one?

19        A.    Well, I was let go before I was --

20        Q.    Ah.  I see.  So you --

21        A.    I would have.

22        Q.    So you would have made -- probably made

23   the president's club in 2010?

24        A.    Yes.
```

```
 1                    MR. MAIER:  Objection.  Foundation.

 2          Q.    (By Mr. Faes)  At least you felt that you

 3   probably were on track to make --

 4          A.    Yes.

 5          Q.     -- the president's club in 2010; right?

 6          A.    Correct.

 7          Q.    So you were a pretty darn good sales rep

 8   in 2010; right?

 9                    MR. ROONEY:  Object to form.

10          A.    Yes.

11          Q.    (By Mr. Faes)  And one of the main drugs

12   that you were promoting at that time in 2010 was

13   Fentora; right?

14                    MR. ROONEY:  Object to form.

15          A.    Yes.

16          Q.    (By Mr. Faes)  And to be four out of 110

17   for the president's club -- you said that that was

18   based on sales goals set by the company; right?

19          A.    Correct.

20                    MR. ROONEY:  Object to form.

21          Q.    (By Mr. Faes)  So you would have had to

22   meet or exceed whatever your sales quota was in order

23   to be ranked four out of 110; right?

24                    MR. ROONEY:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     (By Mr. Faes)  And you -- the following

3   bullet point is that you were consistently ranked in

4   the top five percent of the Ohio Valley area from

5   2010 -- strike that.  It says on the bullet point below

6   that you were consistently ranked in the top five

7   percent of the Ohio Valley area from 2007 to 2010;

8   right?

9      A.     Yes.

10     Q.     And that's true, right, or you wouldn't

11  have put it in your résumé?

12     A.     Correct.

13     Q.     And again, you're basing you being in the

14  top five percent as you being in the top five percent

15  of meeting your sales goals for the drugs you were

16  promoting; right?

17     A.     Correct.

18     Q.     And during that entire time from 2007 to

19  2010, you would have been promoting the Fentora product

20  as part of your portfolio; right?

21     A.     Yes.

22     Q.     So it's fair to say that the tools and

23  strategies that you were using as a sales

24  representative for Fentora was one of the keys to your

Highly Confidential - Subject to Further Confidentiality Review

```
1     success in being in the top five percent; right?

2               MR. ROONEY:  Object to form.

3               MR. MAIER:  Object to form.

4          A.   Repeat that.

5          Q.   (By Mr. Faes)  Is it fair to say that the

6     tools and strategies that you were using as a sales

7     representative for Fentora from 2007 to 2010 were one

8     of the reasons for your success during that time

9     period?

10         A.   Yes.

11         Q.   And you were apparently doing it better

12    than just about anybody in the Ohio Valley area at that

13    time if you were in the top five percent; right?

14              MR. ROONEY:  Object to form.

15              MR. MAIER:  Object to form.

16         A.   Yes, I was up there.

17         Q.   (By Mr. Faes)  And in fact, your next

18    bullet point is, is that you were recognized for

19    outstanding sales performance for Fentora and you were

20    ranked Number 1 in Quarter 4 of 2009; right?

21         A.   Yes.

22         Q.   And that's a true statement; right?

23         A.   Yes.

24         Q.   And you were also recognized as a sales
```

1    leader for Fentora in Q -- in Quarter 3 of 2007; right?

2        A.    Yes.

3              MR. ROONEY:  Object to form.

4        Q.    (By Mr. Faes)  And you won area rep of the

5    year in 2003; right?

6        A.    Correct.

7        Q.    And at that time you would have been

8    promoting the Actiq product; right?

9        A.    Yes.

10       Q.    What did you have to do to win area rep of

11   the year in 2003 while promoting the Actiq product?

12       A.    Exceed --

13             MR. MAIER:  Object to form, foundation.

14       A.    Exceed sales goals.

15       Q.    (By Mr. Faes)  So it's fair to say again

16   that whatever tools and strategies you were using to

17   sell Actiq in 2003 were very effective in helping you

18   meet the sales goals; right?

19       A.    Yes.

20             MR. ROONEY:  Object to form.

21             MR. MAIER:  Object to form.

22       Q.    (By Mr. Faes)  And you were area rep, so

23   you were the best rep in your entire area?

24             MR. ROONEY:  Object to form.

1          Q.    (By Mr. Faes)  In 2003 for Actiq?

2          A.    Correct.

3          Q.    And your area at that time was the Great

4     Lakes region; right?

5          A.    Ohio Valley.

6          Q.    Ohio Valley.  And it also states that you

7     received a letter of accommodation naming me, meaning

8     you, among the top -- elite top 10 from Bob Roche,

9     senior vice-president.  Do you see that?

10         A.    Correct.

11         Q.    And when did that occur?

12         A.    Early on in my career.  I don't recall

13    when.

14         Q.    Was it before or after you won area rep of

15    the year in 2003?

16         A.    That was before.

17         Q.    So even before you run area -- strike

18    that.  Even before you won area rep of the year in

19    2003, you were already a very effective sales rep for

20    Actiq; right?

21              MR. ROONEY:  Object to form.

22         A.    Yes.

23         Q.    (By Mr. Faes)  And that was in part

24    because you were successfully executing the strategies

1    that you were trained on by your superiors at Cephalon?

2               MR. ROONEY:  Object to form.

3        A.    Yes.

4               MR. MAIER:  Object to form.

5        Q.    (By Mr. Faes)  And it also states that

6    you -- well, strike that.  You can set that aside.  I'm

7    going to hand you what's been marked as Exhibit Number

8    4 to your deposition.  Of course I marked the one

9    that's not stapled.  I'm going to hand you what's been

10   marked as Exhibit Number 4 to your deposition.

11              [Exhibit Teva-Sippial-004

12              marked for identification.]

13       Q.    And this is just a PowerPoint labeled Ohio

14   Valley area business review.  Do you see that on the

15   first page?

16       A.    Yes.

17       Q.    And it's dated May 18th of 2008?

18       A.    Yes.

19       Q.    And I just want to have you turn to the

20   third page in.  And do you see that center section?

21   And if you want look at the monitor you can.  That's in

22   color and it's a little easier to see.

23              MR. MAIER:  This one is not on.

24              [Discussion off the record.]

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    (By Mr. Faes)  So if you look in the

2    center, it looks like there's an area shaded in blue

3    and it's got your name, Laura Sippial there.  Do you

4    see that?

5          A.    Yes.

6          Q.    Does this appear to be a fair and accurate

7    representation of the territory that you were assigned

8    to to promote and detail Fentora as of May of 2008?

9          A.    Yes.

10         Q.    And we talked about that your area changed

11   over time, but it always included that Cincinnati area;

12   right?

13         A.    Yes.

14         Q.    You can set that aside.  That's all we're

15   doing with that.  I just want to circle back before I

16   forget.  When we were -- remember we were talking

17   earlier about in the situation that led to your

18   separation from Cephalon where you stated that Dr.

19   Akbik didn't give a Cephalon speaker program to Dr.

20   Minhas and he didn't dispute that -- I'm sorry -- and

21   he disputed that; right?

22         A.    Correct.

23         Q.    And that occurred around August of 2010?

24   Is that consistent with your memory?

1        A.      I think so.

2        Q.      And you understood that one of the reasons

3   why it was so important to establish whether or not Dr.

4   Akbik actually gave that speaker program is because he

5   was requesting payment for that program; right?

6                MR. ROONEY:  Object to form.

7                MR. MAIER:  Foundation.

8        A.      Repeat that.

9        Q.      (By Mr. Faes)  You understood that one of

10  the reasons why it was so important for the company to

11  know or establish whether Dr. Akbik did or didn't give

12  that presentation to Dr. Minhas in August of 2010 is

13  because Dr. Akbik was requesting payment for that;

14  right?

15       A.      Yes.

16                MR. ROONEY:  Same objection.

17                MR. MAIER:  Objection.  Form, foundation.

18       Q.      (By Mr. Faes)  And you understood why --

19  strike that.  You understood that one of the reasons

20  why it was so important for you to get it right or make

21  sure that what you said was accurate with regard to

22  that was because if Dr. Akbik were to receive payment

23  for a speaker program that he didn't actually do, that

24  could be seen as a potential kickback to Dr. Akbik;

1  right?

2            MR. ROONEY:  Object to form.

3            MR. MAIER:  Objection.  Form, foundation.

4       A.    Repeat that.

5       Q.    (By Mr. Faes)  You understood that one of

6  the reasons why it was so important that you made sure

7  what you said was accurate with regard to whether or

8  not Dr. Akbik gave that presentation was because you

9  knew and understood at that time from your training at

10  Cephalon that if Dr. Akbik were to receive payment for

11  a speaker program that he didn't actually give, that

12  could be seen as a potential kickback from the company

13  to Dr. Akbik; right?

14            MR. ROONEY:  Same objection.

15            MR. MAIER:  Same objection.

16       A.    I believe so.

17       Q.    (By Mr. Faes)  And you knew that that

18  could be a potential violation of the law; right?

19       A.    Correct.

20       Q.    So it was important to you to make sure

21  that what you said was accurate; right?

22       A.    Correct.

23            MR. ROONEY:  Object to form.

24       Q.    (By Mr. Faes)  Did you feel pressured by

1    anyone at Cephalon to change your statement regarding

2    whether or not Dr. Akbik gave that presentation?

3                    MR. ROONEY:  Object to form.

4                    MR. MAIER:  Objection.  Form.

5        A.    Yes.

6        Q.    (By Mr. Faes)  Who did you feel pressured

7    by?

8        A.    My manager, Michael Morreale.  Otherwise I

9    would be fired.

10       Q.    So essentially your understanding was that

11   if you didn't change your statement that Dr. Akbik

12   didn't give the presentation to Dr. Minhas in August of

13   2010, that you would be fired?

14                   MR. MAIER:  Objection.  Form, foundation.

15       A.    Yes.

16       Q.    (By Mr. Faes)  And you in fact didn't

17   change your statement; right?

18       A.    Correct.

19       Q.    Because you felt it was important to tell

20   the truth; right?

21       A.    Correct.

22       Q.    So essentially, according to your

23   understanding, you were fired for telling the truth;

24   right?

Highly Confidential - Subject to Further Confidentiality Review

 1      A.    Yes.

 2            MR. MAIER:  Objection.  Form, foundation.

 3      Q.    (By Mr. Faes)  I'm going to hand you --

 4            [Exhibit Teva-Sippial-005

 5            marked for identification.]

 6      Q.    I'm going to hand you what's been marked

 7      as Exhibit Number 5 to your deposition.  And this is an

 8      e-mail string.  It's dated 6-1 of 2011.  Do you see

 9      that?

10      A.    Yes.

11      Q.    And I want to have you turn to the second

12      page of this.

13            MR. FAES:  This is 70, by the way.  Yeah,

14      he's got it.

15      Q.    (By Mr. Faes)  And if I can have you look

16      at the second-to-last paragraph in the last sentence.

17      It states that Laura was truthful in the investigation.

18      To her knowledge, no CSP occurred and then she was

19      fired for telling the truth.  Do you see that?

20      A.    Yes.

21      Q.    Is that consistent with your understanding

22      of --

23      A.    Yes.

24      Q.    Let me get the whole question out.  Is

1   that consistent of your understanding of why you were

2   separated from Cephalon in 2010?

3        A.   Yes.

4             MR. MAIER:  Objection.  Foundation.

5        Q.   (By Mr. Faes)  You can set that aside.  So

6   I want to switch gears a little bit and just ask about

7   the compensation and how you would have been

8   compensated during your nine years at Cephalon; okay?

9        A.   Okay.

10       Q.   During your time as a sales representative

11  for both Fentora and Actiq, you generally would have

12  been paid a base salary plus a bonus; right?

13       A.   Correct.

14       Q.   And the bonus would generally be based on

15  sales goals passed down by the company; right?

16       A.   Yes.

17            MR. MAIER:  Objection.  Form.

18       Q.   (By Mr. Faes)  And the bonus would be

19  based on whether or not you met or exceeded those sales

20  goals; right?

21       A.   Yes.

22       Q.   So your bonus at least -- it wasn't based

23  on any, shall we say, educational goals set down by the

24  company?  It was based on whether you met or exceeded

1    sales goals; right?

2         A.    Correct.

3               MR. MAIER:  Objection.  Form.

4         Q.    (By Mr. Faes)  And those sales goals were

5    passed on to you by whoever your superior was at the

6    time; right?

7         A.    Yes.

8         Q.    And you really had no input onto those

9    sales goals; right?

10              MR. ROONEY:  Object to form.

11        A.    Correct.

12        Q.    (By Mr. Faes)  And your -- it's true that

13   your compensation or the bonus plan would have changed

14   from year to year, but in general, your bonus could

15   represent up to 30 percent of your income while your

16   base salary could -- generally represented about 70

17   percent of your income; right?

18        A.    Yes.

19              MR. MAIER:  Objection.  Form.

20        Q.    (By Mr. Faes)  And you remember in some

21   years your bonus -- and sometimes it was called a

22   commission -- there were certain years where that was

23   uncapped or unlimited; right?

24        A.    Yes.

```
 1                    MR. MAIER:  Objection.  Form.

 2          Q.    (By Mr. Faes)  And those were -- most of

 3    the years where it was uncapped or unlimited were the

 4    early years when you were promoting the Actiq product;

 5    right?

 6          A.    Correct.

 7                    MR. MAIER:  Objection.  Form.

 8          Q.    (By Mr. Faes)  When -- do you recall when

 9    it changed that your bonus or your commission was

10    uncapped?

11          A.    I don't recall.

12          Q.    So we talked a little bit about the

13    indications for Actiq, which was the -- one of the

14    first products you were responsible for detailing and

15    promoting when you joined Cephalon in 2001, and you

16    would agree with me that breakthrough pain without

17    cancer was not indicated for Actiq at the time you

18    joined Cephalon; right?

19          A.    Correct.

20          Q.    And in fact, during your entire time at

21    Cephalon, it was never indicated for breakthrough pain

22    without cancer; right?

23          A.    Correct.

24          Q.    And later when you switched to promoting
```

1    the Fentora product, it essentially had the same

2    indication as Actiq; right?

3              MR. ROONEY:  Object to form.

4        A.    Correct.

5        Q.    Which means it was only indicated for

6    breakthrough pain with cancer; right?

7        A.    Yes.

8        Q.    So you would agree with me that marketing

9    or promoting Actiq or Fentora for breakthrough pain

10   without cancer would be off-label promotion; right?

11             MR. ROONEY:  Object to form.

12       A.    Yes.

13       Q.    (By Mr. Faes)  And you understood that --

14   during your time at Cephalon that marketing Actiq or

15   Fentora for noncancer pain would be illegal; right?

16       A.    Yes.

17       Q.    And the limited indication of the Actiq

18   and Fentora was a challenge to your marketing efforts;

19   right?

20             MR. ROONEY:  Object to form.

21             MR. MAIER:  Objection.  Form.

22       A.    Repeat that.

23       Q.    (By Mr. Faes)  The limited indication for

24   the Actiq -- strike that.  The limited indication for

1    the Actiq and Fentora, meaning it was only indicated

2    for patients with cancer, was a challenge to your

3    marketing efforts; right?

4              MR. ROONEY:  Same objection.

5              MR. MAIER:  Objection.  Form.

6         A.   No, not necessarily.

7         Q.   (By Mr. Faes)  Well, you can agree with me

8    that if the Actiq or Fentora was indicated for

9    noncancer patients as well as cancer patients, that

10   indication would be less limited; right?

11        A.   Correct.

12             MR. ROONEY:  Objection.  Form.

13             MR. MAIER:  Objection.  Form.

14        Q.   (By Mr. Faes)  And that means that if you

15   have a less limited indication, that you can market or

16   promote the products to a wider variety of doctors and

17   patients; right?

18             MR. ROONEY:  Object to form.

19        A.   Yes.

20             MR. MAIER:  Object to form.

21        Q.   (By Mr. Faes)  Let me reask it because I

22   put patients in there.  That means if you have a less

23   limited indication, meaning one that also includes

24   noncancer pain for Actiq or Fentora, you can promote

1    the products to a wider variety of doctors; right?

2              MR. ROONEY:  Object to form.

3              MR. MAIER:  Objection.  Form.

4         A.    Yes.

5         Q.    (By Mr. Faes)  Now, during your -- strike

6    that.  So I want to kind of go back to the beginning

7    where you were trained on the Actiq product prior to

8    going out into the field.  At some point during your

9    initial training with Cephalon, you would have become

10   aware that -- would you have become aware that the

11   Actiq product was subject to a risk minimization plan?

12        A.    Yes.

13        Q.    And you understood that that was required

14   by the FDA or Food and Drug Administration as a

15   condition of being able to sell Actiq in the United

16   States?

17        A.    Yes.

18             MR. MAIER:  Objection.

19        Q.    (By Mr. Faes)  And one of your

20   responsibilities as a sales representative for Actiq

21   would have been to be familiar with that risk

22   minimization plan; right?

23        A.    Yes.

24        Q.    And that would include what the goals and

Highly Confidential - Subject to Further Confidentiality Review

1    objectives of the Actiq risk minimization plan was;

2    right?

3         A.    Yes.

4         Q.    And that was something you were trained on

5    by your superiors; right?

6         A.    Yes.

7         Q.    I'm going to hand you -- so he printed

8    this whole thing and I've only got a short one because

9    I'm only going to ask you about two pages of it.  So

10   I'm going to hand you what's been marked as Exhibit

11   Number 6 to your deposition.

12              [Exhibit Teva-Sippial-006

13              marked for identification.]

14        Q.    And you can see this is -- this is

15   actually from the FDA.  It's the application approval

16   package, and you see the trade name is Actiq.  You see

17   that on the front?

18        A.    Yes.  Yes.

19        Q.    And if you can turn to the -- I think it's

20   the fourth page in.  It's a letter from the FDA dated

21   March 26th of 1999.  And this is a letter from the FDA,

22   and you see at the top it references the supplemental

23   new drug application dated February 10th of 1999, and

24   if you look at the third paragraph from the bottom it

1    states for future reference, revisions to the RMP or

2    risk management plan must be submitted as a supplement

3    that requires our prior approval.  Do you see that?

4            A.    Yes.

5            Q.    And this is from the FDA; right?

6            A.    Yes.

7            Q.    And this is essentially the FDA letting

8    Cephalon know that if they make changes to the risk

9    management plan, that it has to be approved by the FDA;

10   right?

11           A.    Yes.

12                 MR. MAIER:  Objection.  Form.

13           Q.    (By Mr. Faes)  And if you turn to Page 15

14   of this document.  And to orient you --

15                 MR. ROONEY:  The screen.

16           Q.    (By Mr. Faes)  -- the top part of it says

17   target audience.  And it states that the target

18   audience -- the target audience for Actiq is a group of

19   approximately 5,000 oncologists, pain specialists,

20   their nurses, and office staff.  These physicians are

21   already using Class II opioids to treat cancer pain,

22   are generally knowledgeable about breakthrough cancer

23   pain, and should understand the appropriate use of

24   Actiq for opioid-tolerant cancer patients.  Do you see

1    that?

2         A.    Yes.

3         Q.    When became a sales representative for

4    Actiq, did you have an understanding and were you

5    trained that as part of the risk map or risk

6    minimization plan that the target audience for Actiq

7    was a group of approximately 5,000 oncologists and pain

8    specialists, their nurses and office staff?

9              MR. ROONEY:  Object to form.

10             MR. MAIER:  Objection.  Form.

11        A.    No, I didn't.

12        Q.    (By Mr. Faes)  So that's not something

13   that your superiors at Cephalon ever shared with you or

14   trained you on; correct?

15             MR. MAIER:  Objection.  Form.

16        A.    Not that I remember, no.

17        Q.    (By Mr. Faes)  Did they ever share with

18   you that according to the risk map that the target

19   physician audience for Actiq was oncologists and pain

20   specialists and also their nurses and office staff?

21        A.    Yes.

22             MR. MAIER:  Objection.  Form.

23        A.    You can set that aside.

24        Q.    (By Mr. Faes)  I'm going to hand you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what's been marked as Exhibit Number 7 to your

 2    deposition.

 3              [Exhibit Teva-Sippial-007

 4              marked for identification.]

 5        Q.    And you see this is a document titled risk

 6    minimization program, and the date is August 1st of

 7    2001.  Do you see that?

 8              MR. ROONEY:  Risk management?

 9              MR. FAES:  Yes.  Isn't that what I said,

10    risk management program?

11              MR. ROONEY:  You said risk minimization.

12        Q.    (By Mr. Faes)  So you see, this is a

13    document entitled August 1st, 2001, and the title is

14    risk management program.  Do you see that?

15        A.    Yes.

16        Q.    And if you can turn to Page 5 of this

17    document, and the numbers are in the upper right-hand

18    corner.  And this states under introduction that the

19    Actiq risk management plan, RMP, has been designed to

20    address three key potential risk situations.  And

21    Number 2 is improper patient selection.  Do you see

22    that?

23        A.    Yes.

24        Q.    Were you trained that one of the three
```

1    main goals of the Actiq risk minimization plan was to

2    prevent improper patient selection?

3              MR. ROONEY:  Object to form.

4         A.    Yes.

5              MR. MAIER:  Objection.  Form.

6         Q.    (By Mr. Faes)  And if you turn to the

7    following page of this document, you see there's a

8    section entitled proper patient selection messages.  Do

9    you see that?

10        A.    Yes.

11        Q.    And you see that on the third item down,

12   that a proper patient selection is that Actiq is

13   specifically contraindicated for use in opioid

14   non-tolerant patients.  Do you see that?

15        A.    Yes.

16        Q.    And that was something that you were

17   trained on; right?

18        A.    Yes.

19        Q.    And that was something that you were

20   trained to detail doctors on with regard to Actiq;

21   right?

22        A.    Yes.

23        Q.    And it's also true that Actiq is

24   specifically contraindicated for use in acute

```
1    postoperative pain; right?

2                 MR. ROONEY:  Object to form.

3         A.    Yes.

4         Q.    (By Mr. Faes)  And that's something that

5    you were trained on; right?

6         A.    Yes.

7         Q.    And that's something that you told doctors

8    or detailed them on when you were promoting or

9    detailing Actiq; right?

10        A.    Yes.

11        Q.    And the last one is Actiq is specifically

12   indicated solely for treatment of breakthrough cancer

13   pain in chronic opioid-tolerant cancer patients.  Do

14   you see that?

15        A.    Yes.

16        Q.    Is that something that you were trained

17   on, that Actiq is specifically indicated solely for the

18   treatment of breakthrough cancer pain?

19        A.    Yes.

20        Q.    And is that something that you were

21   trained to communicate to doctors when you were

22   detailing or promoting Actiq, that it was solely for

23   breakthrough cancer pain?

24        A.    Yes.
```

1      Q.     And you understood that this was a key

2   component of the risk management program which was

3   required by the FDA?

4              MR. ROONEY:  Object to form.

5      A.     Yes.

6      Q.     (By Mr. Faes)  And you understood that

7   this component and this plan were required by the FDA

8   as a condition of being able to have Actiq on the

9   market?

10             MR. ROONEY:  Object to form.

11     A.     Yes.

12             MR. MAIER:  Objection.  Form, foundation.

13     Q.     (By Mr. Faes)  If you can turn to Page 11

14   of this document.  And if you look at the bottom there,

15   it states that -- again, that Actiq is intended to be

16   used only in the care of cancer patients and only by

17   oncologists and pain specialists who are knowledgeable

18   of and skilled in the use of Schedule II opioids to

19   treat cancer pain.  Do you see that?

20     A.     Yes.

21     Q.     And is that something that you were

22   trained on by Cephalon?

23     A.     Yes.

24     Q.     And is that something that you were told

1    that you were to communicate when you were calling on

2    doctors while promoting Actiq out in the field?

3            A.    Yes.

4                  MR. MAIER:  Objection --

5            Q.    (By Mr. Faes)  So you understood during

6    your time at Cephalon that Actiq was only intended to

7    be used by oncologists and pain specialists, according

8    to the risk minimization plan or risk management

9    program for Actiq; right?

10                 MR. ROONEY:  Object to form.

11                 MR. MAIER:  Object to form, foundation.

12           A.    Yes.

13           Q.    (By Mr. Faes)  You can set that aside.

14   Now, you understood that every year or so Cephalon

15   would come out with marketing plans -- yearly marketing

16   plans for the Actiq product and later for the Fentora

17   product; right?

18           A.    Yes.

19           Q.    And those marketing plans were put

20   together by the marketing department; right?

21           A.    Yes.

22           Q.    They weren't --

23                 MR. MAIER:  Objection.  Foundation.

24           Q.    (By Mr. Faes)  They weren't put together

1    by you?

2         A.    No.

3         Q.    But those yearly market plans contain

4    strategies and tactics for successfully promoting and

5    selling both the Actiq product and later the Fentora

6    product; right?

7              MR. ROONEY:  Object to form.

8         A.    Yes.

9              MR. MAIER:  Objection.  Form, foundation.

10        Q.    (By Mr. Faes)  And those plans were

11   national marketing plans, meaning they were intended to

12   contain sales strategies to be used all over the United

13   States for Actiq and Fentora; right?

14        A.    Yes.

15             MR. ROONEY:  Object to form.

16             MR. MAIER:  Objection.

17        Q.    (By Mr. Faes)  And that would include the

18   territory you were responsible, which inclu -- strike

19   that.  And that would include the territory that you

20   were responsible for, which at all times include

21   Cincinnati and parts of Ohio; right?

22        A.    Yes.

23        Q.    And as a sales representative responsible

24   for promoting and selling Actiq and later Fentora,

1    those plans would have been shared with you; right?

2         A.    Yes.

3              MR. MAIER:  Objection.  Form, foundation.

4         Q.    (By Mr. Faes)  And that's because as a

5    sales representative you were the person in the

6    trenches, so to speak; right?

7              MR. ROONEY:  Object to form.

8         A.    Yes.

9         Q.    (By Mr. Faes)  Meaning you were the person

10   responsible for carrying out various aspects of those

11   marketing plans in the field; right?

12             MR. ROONEY:  Object to form.

13        A.    Yes.

14             MR. MAIER:  Object to form.

15        Q.    (By Mr. Faes)  With doctors; right?

16        A.    Yes.

17        Q.    You were the face of the company going out

18   and using the strategies in these marketing plans to

19   meet face-to-face with doctors; right?

20             MR. ROONEY:  Object to form.

21             MR. MAIER:  Objection.  Form.

22        A.    Yes.

23        Q.    (By Mr. Faes)  And you -- do you recall

24   that many of these early marketing plans for Actiq at

```
 1   last (ph) had a bell on the cover?

 2        A.     Yes.

 3        Q.     And the bell kind of became a symbol

 4   within the company for Actiq; right?

 5               MR. ROONEY:  Object to form.

 6               MR. MAIER:  Objection.  Form.

 7        A.     Yes.

 8        Q.     (By Mr. Faes)  And that was essentially

 9   kind of a symbol for -- it's a little desk bell, ring

10   the bell, get relief; right?

11               MR. ROONEY:  Object to form.

12               MR. MAIER:  Objection.  Form.

13        A.     I believe so.

14        Q.     (By Mr. Faes)  And that was one of the key

15   attributes of the Actiq that you were selling, was that

16   it was a rapid onset of relief; right?

17        A.     Right.

18               MR. ROONEY:  Object to form.

19        Q.     (By Mr. Faes)  Kind of like ringing a bell

20   and getting fast relief; right?

21        A.     Correct.

22               MR. MAIER:  Object to form.

23               MR. ROONEY:  Objection.

24        Q.     (By Mr. Faes)  I know these look huge, but
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   we're only talking about like two pages in each of

 2   them.  The defense counsel usually squawks if I don't

 3   mark the whole document and he's not even here, so --

 4   counsel for Teva.  I'm going to hand you what's been

 5   marked as Exhibit Number 8 to your deposition.

 6               [Exhibit Teva-Sippial-008

 7               marked for identification.]

 8        Q.    And this is a document entitled Actiq

 9   master plan.  Do you see that?

10        A.    Yes.

11        Q.    And it's dated November 16th of 2000.  Do

12   you see that?

13        A.    Yes.

14        Q.    So that's about a month or two before you

15   joined the company; right?

16        A.    Yes.

17        Q.    So this might have even been something

18   that was shared with you or went over with you during

19   your initial training with the company; right?

20               MR. ROONEY:  Object to form.

21        A.    Maybe.

22        Q.    (By Mr. Faes)  If you can turn --

23               MR. ROONEY:  Don't guess.

24        A.    Okay.
```

1          Q.    (By Mr. Faes)  Turn to Page 2 of this

2    document, which I think is -- oh.  Yeah.  Which I think

3    is the fourth page -- fourth page in.  And do you see

4    under Number 4 it states that feedback from the field

5    indicates that oncologists simply aren't treating as

6    many people -- strike that.  Paragraph 4 states that

7    feedback from the field indicates that oncologists

8    simply aren't treating that many people for

9    breakthrough cancer pain.  Do you see that?

10         A.    Yes.

11         Q.    And is that something that was

12   communicated to you early on when you were promoting

13   and selling Actiq, that oncologists simply didn't treat

14   breakthrough cancer pain that much?

15              MR. ROONEY:  Object to form.

16              MR. MAIER:  Objection.  Form.

17         A.    Yes.

18         Q.    (By Mr. Faes)  And you understood that

19   because of that, that was one of the reasons why you

20   also called on pain specialists; right?

21              MR. ROONEY:  Object to form.

22         A.    Yes.

23         Q.    (By Mr. Faes)  And you knew that sometimes

24   oncologists would even refer their patients to a pain

1   specialist; right?

2        A.    Yes.  Often.

3        Q.    And you would also ultimately call on

4   other types of physicians other than oncologists and

5   pain specialists as well; right?

6        A.    Repeat that question.

7        Q.    And you would call on physicians with

8   other types of specialties other than just oncologists

9   and pain specialists; right?

10             MR. MAIER:  Object to form.

11       A.    Yes.

12       Q.    (By Mr. Faes)  You might, for example,

13  call on primary care providers; right?

14       A.    No, not primary care.

15       Q.    So you don't remember ever having --

16       A.    I don't --

17       Q.     -- a primary care doctor as one of your

18  even top targets for Actiq or Fentora?

19             MR. MAIER:  Object to form.

20       A.    Maybe.

21             MR. ROONEY:  Don't guess.

22       A.    Okay.  I'm not sure.

23       Q.    (By Mr. Faes)  So I'm not sure I got an

24  answer, so let me ask it.  Is it true that you would

```
1    occasionally call on -- strike that.  Is it true that

2    you would sometimes call on doctors with specialties

3    other than oncology or pain specialists for Actiq and

4    Fentora?

5                 MR. ROONEY:  Object to form.

6         A.    Yes.

7         Q.    (By Mr. Faes)  And the company knew that

8    you were doing that; right?

9                 MR. ROONEY:  Object to form.

10        A.    Yes.

11        Q.    (By Mr. Faes)  And nobody ever expressed

12   any kind of concern to you that calling on doctors who

13   weren't oncologists or pain specialists was

14   inconsistent with the risk minimization plan; right?

15                MR. ROONEY:  Object to form.

16                MR. MAIER:  Object to form.

17        A.    Repeat that.

18        Q.    (By Mr. Faes)  Nobody at Cephalon -- none

19   of your superiors ever came to you or told you that

20   they had any concerns with you calling on doctors for

21   Actiq who weren't pain specialists or oncologists;

22   right?

23                MR. ROONEY:  Same objection.

24                MR. MAIER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.    There were physicians with subspecialties

2    that we called on.

3             MR. ROONEY:  Look at the question he

4    asked.

5       A.    Okay.

6             MR. ROONEY:  Just answer the question.

7       A.    No.

8       Q.    (By Mr. Faes)  So if you look back on

9    Exhibit Number 2, if you look down on Paragraph 5, it

10   states that among those physicians who are prescribing

11   Actiq, activity is skewing increasingly towards

12   non-oncologists.  Units written by oncologists

13   represent just 16 percent of total usage with 48

14   percent coming from pain management specialists.  Do

15   you see that?

16      A.    Yes.

17      Q.    And that was something that you were

18   trained on and had an understanding early on when you

19   began promoting Actiq; right?

20            MR. ROONEY:  Object to form.

21            MR. MAIER:  Objection.  Form.

22      A.    Not early on.

23      Q.    (By Mr. Faes)  But eventually you had that

24   understanding?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Yes.

2          Q.     When did you come to have that

3    understanding?

4          A.     Maybe a couple years into working for --

5                 MR. ROONEY:  Don't guess.

6          A.     Okay.  Two years.

7          Q.     (By Mr. Faes)  So to the best of your

8    recollection, within a couple years of working for

9    Cephalon, you started to have an understanding that

10   among physicians who were prescribing Actiq, activity

11   was skewing increasingly towards the non-oncologist;

12   right?

13         A.     Yes.

14         Q.     And an oncologist is essentially a cancer

15   specialist; right?

16         A.     Correct.

17         Q.     And if you look on Number 6, it states

18   that we believe the pain management specialist is

19   likely to be a more aggressive writer and rapid adopter

20   of Actiq; right?

21         A.     Yes.

22         Q.     Is that something that you were trained on

23   during your initial training and on-boarding with

24   Cephalon?
```

```
 1        A.    Yes.

 2              MR. MAIER:  Objection.  Form.

 3        Q.    (By Mr. Faes)  And you see it states on --

 4   strike that.  And you would have used that as part of

 5   your base of knowledge to decide on -- what doctors to

 6   look at for potential targets to promote or detail

 7   Actiq; right?

 8              MR. ROONEY:  Object to form.

 9              MR. MAIER:  Objection.  Form.

10        A.    As long as they treat cancer pain.

11        Q.    (By Mr. Faes)  Did you ever have an

12   occasion to call on a doctor for Actiq who wasn't

13   treating cancer pain?

14        A.    No.

15        Q.    Did you ever have occasion to call on

16   doctors who told you that they were using Actiq for

17   indications such as migraines or back pain?

18              MR. ROONEY:  Object to form.

19              MR. MAIER:  Objection.  Form.

20        A.    No.

21        Q.    (By Mr. Faes)  If you look further on down

22   on Page 6, it states in addition, from a business

23   perspective, those physicians tend to have patients who

24   are more likely to be truly chronic with many years of
```

Highly Confidential - Subject to Further Confidentiality Review

1   potential usage of the product, either for breakthrough

2   pain or more generally other chronic pain conditions.

3   Do you see that?

4          A.    Yes.

5          Q.    Is that something that you were trained

6   on, is that from a business perspective, pain

7   management specialists were more likely to treat

8   patients with other chronic pain conditions?

9                MR. MAIER:  Object to form.

10         A.    Yes.

11         Q.    (By Mr. Faes)  And that was information

12  that you were trained on and used in the field while

13  promoting Actiq; right?

14               MR. MAIER:  Object to form.

15         A.    To have the knowledge that they may treat.

16         Q.    (By Mr. Faes)  If you look on Page 3 of

17  this document under strategic recommendations -- moving

18  to Page 3.  Under strategic recommendations, do you see

19  it states based on our experience to date with Actiq we

20  believe it can continue to grow aggressively into 2001

21  and beyond by expanding the target physician and

22  patient population to allow penetration of the broad

23  chronic pain market.  This should be the driver of

24  activities associated with Actiq in 2001.  Marketing,

```
 1    clinical, regulatory, and operations.  Do you see that?

 2         A.    Yes.

 3         Q.    Is that something what you were trained on

 4    when you were on-boarded with Cephalon in 2001, that

 5    Cephalon wanted to expand the target physician and

 6    patient population, allowing penetration into the broad

 7    chronic pain market?

 8               MR. ROONEY:  Object to form.

 9         A.    No.

10               MR. MAIER:  Objection.  Form.

11         Q.    (By Mr. Faes)  And the broad chronic pain

12    market would include things like using Actiq for

13    noncancer pain; right?

14               MR. ROONEY:  Object to form.

15               MR. MAIER:  Objection.  Form, foundation.

16         A.    We were never told that.

17         Q.    (By Mr. Faes)  Right.  My question isn't

18    whether you were told that.  My question is did you

19    have an understanding that the broad chronic pain

20    market would include things like using Actiq for

21    noncancer pain?

22         A.    Yes.

23               MR. ROONEY:  Object to form.

24         Q.    (By Mr. Faes)  And that might include
```

Highly Confidential - Subject to Further Confidentiality Review

1    things like using Actiq for migraines or back pain?

2            MR. ROONEY:  Object to form.

3        A.    Yes.

4        Q.    (By Mr. Faes)  And --

5            MR. MAIER:  Same objection.

6        Q.    (By Mr. Faes)  Did you have an

7    understanding when you went into the field in 2001 that

8    marketing Actiq for those kinds of things would be

9    inappropriate?

10       A.    Yes.

11       Q.    And did you have an understanding that

12   if -- according to the risk minimization plan, that if

13   you had a doctor that was prescribing Actiq for those

14   indications, meaning off-label use for noncancer pain,

15   that that was to be discouraged?

16           MR. ROONEY:  Object to form.

17       A.    Yes.

18           MR. MAIER:  Objection.  Form, foundation.

19       Q.    (By Mr. Faes)  If you look down on the

20   last bullet point -- second-to-last bullet point on

21   this page states as part of the 2000 master plan,

22   marketing plan for Actiq to bring existing clinical

23   programs to fruition and expand them to support

24   broadened product usage.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2                MR. MAIER:  Object to form.

3          Q.    (By Mr. Faes)  And it states that --

4    further down to invest in clinical program to broaden

5    the clinical database into nonmalignant chronic pain

6    states.  Do you see that?

7          A.    Yes.

8          Q.    Did you understand when you joined

9    Cephalon and started promoting Actiq in 2001 that that

10   was -- part of Cephalon's strategy was to invest in

11   clinical studies to study Actiq outside of its

12   indicated use for cancer pain?

13               MR. ROONEY:  Object to form.

14         A.    No.

15               MR. MAIER:  Objection.  Form, foundation.

16         Q.    (By Mr. Faes)  So you didn't have an

17   understanding that there would be -- well, strike that.

18   If you look further down, it states these will be

19   mostly IND studies.  We envision trials and

20   breakthrough pain as more as chronic general pain, and

21   then it states publish and use these data in the

22   short-term for use in peer-to-peer environment under

23   the WLF.  Do you see that?

24         A.    Yes.
```

1      Q.    And you remember -- do you remember the

2    WLF or Washington Legal Foundation reprints that were

3    available to you as a sales representative?

4      A.    Vaguely.

5            MR. MAIER:  Objection.  Foundation.

6      Q.    (By Mr. Faes)  And the WLF or Washington

7    Legal Foundation reprints were reprints that typically

8    discussed the use of Actiq and later Fentora in

9    applications outside its approved indication for

10   noncancer pain; right?

11           MR. ROONEY:  Object to form.

12           MR. MAIER:  Objection.  Form, foundation.

13     A.    I don't remember.

14     Q.    (By Mr. Faes)  Okay.  Well, we'll look at

15   some of those documents later, but did you have an

16   understanding at that time that that was part of the

17   company's strategy, was to publish studies from

18   clinical programs under the Washington Legal Foundation

19   and make them available to patients?

20           MR. ROONEY:  Object to form.

21           MR. MAIER:  Objection.  Form, foundation.

22     A.    No.

23     Q.    (By Mr. Faes)  Strike that.  Did you have

24   an under -- might be the same question, but I got one

Highly Confidential - Subject to Further Confidentiality Review

1   of the words wrong.  Did you have an understanding when

2   you joined Cephalon in 2001 and were promoting Actiq

3   that it was part of the company's strategy to publish

4   studies from clinical programs under the Washington

5   Legal Foundation and make them available to doctors?

6                MR. MAIER:  Objection.  Form, foundation.

7        A.    I think so.

8        Q.    (By Mr. Faes)  And you see it says they're

9   going to publish that data for use in peer-to-peer

10  environments; right?

11               MR. ROONEY:  Object to form.

12       A.    Yes.

13       Q.    (By Mr. Faes)  And peer-to-peer

14  environments might include the medical education

15  programs or Cephalon speaker programs that we discussed

16  earlier; right?

17       A.    Yes.

18               MR. MAIER:  Objection.  Form, foundation.

19       Q.    (By Mr. Faes)  You can set that document

20  aside.  I'm going to hand you what's been marked as

21  Exhibit Number 9 to your deposition.

22               [Exhibit Teva-Sippial-009

23               marked for identification.]

24       Q.    And this is a document entitled 2003 Actiq

1    marketing plan.  And you see that the cover of this has

2    the little Actiq stick on the cover and it has the bell

3    that we talked about that became kind of a marketing

4    symbol for Actiq for the company; right?

5              MR. ROONEY:  Object to form.

6        A.    Yes.

7              MR. MAIER:  Objection.  Form.

8        Q.    (By Mr. Faes)  And if you turn to Page 2

9    of this document, it states that Cephalon experienced

10   another extraordinary successful year with Actiq in

11   2002.  This achievement can be attributed primarily to

12   focused and integrated marketing and sales effort,

13   which built upon the successful repositioning of Actiq

14   in 2001.  Do you see that?

15       A.    Yes.

16       Q.    So this would be -- you had been at the

17   company a little -- just about two years at this point,

18   right, in 2003?

19       A.    Oh, in 2003.  Yes.

20       Q.    So all of 2001 and 2002; right?

21       A.    Yes.

22       Q.    And is this consistent with your memory

23   that Actiq had an extraordinarily successful year in

24   2002?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ROONEY:  Object to form.

 2                    MR. MAIER:  Objection to form.

 3          A.    I don't remember that, but if it's on

 4     here --

 5          Q.    (By Mr. Faes)  And that was -- that would

 6     have been attributed to the marketing and sales efforts

 7     from folks like yourself; right?

 8                    MR. ROONEY:  Object to form.

 9                    MR. MAIER:  Objection.  Form.

10          A.    Yes.

11          Q.    (By Mr. Faes)  Did you ever feel like

12     sales of Actiq were exploding at this time because so

13     many physicians were writing Actiq off-label?

14                    MR. ROONEY:  Object to form.

15          A.    No.

16                    MR. MAIER:  Objection.  Form, foundation.

17          Q.    (By Mr. Faes)  If you turn to Page 4 of

18     this document.  You see under the center of this it

19     states 2002 promotional strategy by key marketing

20     issue, and you see that one of the strategies on the

21     second one down is to educate targeted physician

22     specialties about the benefits of treating breakthrough

23     pain, BTP, with Actiq.  Do you see that?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you remember that that -- well, strike

2  that.  Is that one of the things -- one of the

3  strategies that you would have used in 2002 in order to

4  make Actiq such a successful product during that time

5  period?

6              MR. ROONEY:  Object to form.

7              MR. MAIER:  Objection.  Form.

8    A.    Breakthrough cancer pain.

9    Q.    (By Mr. Faes)  So it's your testimony that

10  you would only educate targeted physician specialties

11  about the benefits of assessing and treating

12  breakthrough cancer pain, not breakthrough pain, as it

13  states here?

14    A.    Correct.

15              MR. ROONEY:  Object to form.

16    Q.    (By Mr. Faes)  So you believe it would be

17  inappropriate to educate physicians about treating just

18  breakthrough pain with Actiq; right?

19              MR. ROONEY:  Object to form.

20    A.    Correct.

21              MR. MAIER:  Objection.  Form.

22    Q.    (By Mr. Faes)  And to the best of your

23  recollection, you never would have done that; right?

24    A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And if you see under issue on the second

2    bottom, one strategy is to increase awareness of

3    breakthrough pain among targeted pain populations and

4    empower patients to discuss their pain openly with

5    physicians.  Do you see that?

6    A.    Yes.

7    Q.    Is that one of the strategies that you

8    would have used in promoting Actiq at this time?

9         MR. MAIER:  Objection.  Form.

10   Q.    (By Mr. Faes)  In 2002.

11   A.    Once again, breakthrough cancer pain.

12   Q.    And the last strategy you see states to

13   direct the most effective promotional and educational

14   efforts to the highest potential targeted physicians,

15   maximum -- maximize ROI of promotional and educational

16   efforts.  Do you see that?

17   A.    Yes.

18   Q.    And ROI refers to return on investment;

19   right?

20   A.    Correct.

21   Q.    And that's referring to the fact that

22   these Cephalon speaker programs, which are referred to

23   in here as educational efforts -- they usually cost a

24   good deal of money; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ROONEY:  Object to form.

 2                    MR. MAIER:  Objection.  Form, foundation.

 3          A.     Repeat that.

 4          Q.     (By Mr. Faes)  That's referring to the

 5     fact -- one of the components of the educational

 6     programs, meaning the Cephalon speaker programs or the

 7     medical education programs, is they cost a good deal of

 8     money because you're having to pay a physician for his

 9     time to give these talks; right?

10          A.     Correct.

11                    MR. ROONEY:  Same objection.

12                    MR. MAIER:  Objection.

13          Q.     (By Mr. Faes)  And the ROI that this is

14     talking about is return on investment.  Because of the

15     amount of money that you're spending on these you want

16     to see a return on that investment; right?

17                    MR. ROONEY:  Object to form.

18          A.     Yes.

19                    MR. MAIER:  Objection.

20          Q.     (By Mr. Faes)  And return on investment

21     means that once you hire a doctor to go out and speak

22     to other doctors about Actiq or Fentora, you do so in

23     the hopes that the doctor -- doctors that the speaker

24     presents to are going to ultimately write prescriptions
```

```
 1    for that product; right?

 2              MR. ROONEY:  Object to form.

 3         A.   Correct.

 4              MR. MAIER:  Objection.  Form.

 5         Q.   (By Mr. Faes)  And that's the return on

 6    investment that you get, is the sales from the

 7    prescriptions that these doctors who are spoken to

 8    write; correct?

 9              MR. ROONEY:  Object to form.

10         A.   Yes.

11              MR. MAIER:  Object to form.

12         A.   May I take a break?

13         Q.   (By Mr. Faes)  Sure.

14              THE VIDEOGRAPHER:  We are going off the

15    record at 12:17 PM.

16              [A brief recess was taken.]

17              THE VIDEOGRAPHER:  We are back on the

18    record at 12:30 PM.

19         Q.   (By Mr. Faes)  Ms. Sippial, we're back on

20    the record after a short break.  Are you ready to

21    proceed?

22         A.   Yes.

23         Q.   Before we took a break we were talking

24    about the Actiq 2003 marketing plan.  Do you remember
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that?
 2         A.    Yes.
 3         Q.    And you still have that document in front
 4    of you?
 5         A.    I do.
 6         Q.    If you can go to Page 14 of that document.
 7    The Bates is ending in 2896.  And when I say the Bates,
 8    that's this TEVA_CHI thing.  Sometimes it's easier to
 9    find it that way, and 14 is the little number up above
10    it.
11              So if you start on the bottom of this
12    page -- and we're going to go to the second.  See, it
13    states according to this 2003 Actiq marketing plan,
14    participating pain specialists cited Actiq usage in the
15    following disease states, illustrating a wide spectrum
16    of application and opportunity.  And if you turn to the
17    following page there's a chart, and it's titled usage
18    of Actiq cited by pain specialists.  Do you see that?
19         A.    Yes.
20         Q.    And do you see that it's got percentage of
21    MDs who have Rx or prescribed Actiq for -- and there's
22    a variety of disease states.  Do you see that?
23         A.    Yes.
24         Q.    And you see that according to this 2003
```

```
 1    company Actiq marketing plan, 48 percent of MDs at this

 2    time have prescribed Actiq for lower back pain.  Do you

 3    see that?

 4            A.    Yes.

 5                  MR. MAIER:  Object --

 6            Q.    (By Mr. Faes)  20 percent have prescribed

 7    Actiq for osteoarthritis.  Do you see that?

 8            A.    Yes.

 9                  MR. MAIER:  Objection.

10            Q.    (By Mr. Faes)  24 percent have prescribed

11    for post-trauma.

12                  MR. MAIER:  Same objection.

13            Q.    (By Mr. Faes)  Do you see that?

14            A.    Yes.

15            Q.    16 percent for diabetic neuropathy?

16                  MR. MAIER:  Same objection.

17            A.    Yes.

18            Q.    (By Mr. Faes)  12 percent for rheumatoid

19    arthritis?

20                  MR. MAIER:  Same objection.

21            A.    Yes.

22            Q.    (By Mr. Faes)  And 24 percent other type

23    of headache.  Do you see that?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

 1              MR. MAIER:  Same objection.

 2         Q.    (By Mr. Faes)  And you'd agree with me

 3    that all of the ones -- these uses that I just went

 4    over you -- would be off-label uses for Actiq; right?

 5              MR. ROONEY:  Object to form.

 6         A.    Yes.

 7         Q.    (By Mr. Faes)  And according to this 2003

 8    marketing plan, at this time the company is aware that

 9    there are doctors out there using Actiq for all of

10    these disease states; right?

11         A.    Can you repeat that?

12              MR. MAIER:  Object to form.

13         Q.    (By Mr. Faes)  And according to this 2003

14    marketing -- Actiq marketing plan, at this time the

15    company is aware that there are doctors out there using

16    Actiq for all these disease states; right?

17         A.    Yes.

18              MR. ROONEY:  Object to form.

19              MR. MAIER:  Objection.  Form.

20         Q.    (By Mr. Faes)  And is that consistent with

21    your memory that the company was aware that doctors

22    were using Actiq for these disease states at this time?

23              MR. MAIER:  Object to form.

24         A.    Not to my memory.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    (By Mr. Faes)  Is it consistent with your

 2   memory that by 2003 you were aware that at least some

 3   of your doctors were using Actiq for lower back?

 4               MR. ROONEY:  Object to form.

 5   A.    No.

 6               MR. MAIER:  Object to form.

 7   A.    Not to my --

 8          Q.    (By Mr. Faes)  Is it consistent with your

 9   memory that in 2003 you were aware that some of your

10   doctors were using Actiq for headaches?

11               MR. ROONEY:  Object to form.

12   A.    Not to my memory.

13          Q.    (By Mr. Faes)  If you can turn to Page 38

14   of this marketing plan -- and the Bates number is

15   ending in 2920.  You see under limited clinical data

16   and publications, it states that developing efficacy

17   data outside breakthrough cancer pain -- e.g., OARA

18   chronic back pain, CRPS -- highlights the need for

19   rapid pain relief as well as producing pharmacoeconomic

20   benefit data will be crucial in growing the use of

21   Actiq as well as overcoming current and future

22   reimbursement hurdles.  Do you see that that?

23               MR. ROONEY:  We just had it pulled up just

24   now.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     Let me reread that.  I see it.

2        Q.     (By Mr. Faes)  So this is a company

3   strategy that would have been communicated to you as a

4   sales representative at this time in 2003; right?

5               MR. ROONEY:  Object to form.

6               MR. MAIER:  Objection.  Form, foundation.

7        A.     I think.  I guess.

8               MR. ROONEY:  Don't guess.

9        A.     I know.

10       Q.     (By Mr. Faes)  Do you have any reason as

11  you sit here today to believe that this information in

12  this 2003 Actiq marketing plan wasn't communicated to

13  you as a sales representative responsible for promoting

14  Actiq -- Actiq in the field at this time?

15       A.     No, I don't have any reason.

16       Q.     You can set that aside.  And I'm going to

17  hand you what's been marked as Exhibit Number 10 to

18  your deposition.

19               [Exhibit Teva-Sippial-010

20               marked for identification.]

21       Q.     And this is a document titled 2005 Actiq

22  marketing plan, and for the -- yeah, that's right.  And

23  in 2005 you still would have been responsible for

24  detailing and promoting Actiq; right?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    And this is a marketing plan from that

3   time period that would have been shared with you as a

4   representative; right?

5      A.    Yes.

6            MR. MAIER:  Objection.  Form, foundation.

7      Q.    (By Mr. Faes)  And if you go to Page 25 of

8   this document, it states that based on physician

9   reporting, 90 percent of Actiq use is for breakthrough

10  pain outside of cancer, with the majority of use, 55

11  percent of total, being for chronic back pain.

12           This broad use of Actiq suggests there are

13  many prescribers who understand or are experienced with

14  prescribing fentanyl, treat the pain pathophysiology,

15  not the disease state or etiology, understand the

16  benefits of Actiq -- the benefits Actiq affords their

17  patients, and are comfortable utilizing it beyond its

18  labeled indication.  Do you see that?

19     A.    Yes.

20     Q.    So this is information that would have

21  been shared with you by the company, that in 2005,

22  based on physician reporting, 90 percent of Actiq use

23  across the country was for breakthrough pain outside of

24  cancer; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ROONEY:  Object to form.

 2                    MR. MAIER:  Objection.  Form, foundation.

 3          A.    That's what it's saying, yes.

 4          Q.    (By Mr. Faes)  And 55 percent of that

 5    total is for chronic back pain; right?

 6                    MR. ROONEY:  Same objection.

 7          A.    That's what it states.

 8          Q.    (By Mr. Faes)  And that would have been

 9    information that you would have received from the

10    company at that time; right?

11                    MR. MAIER:  Objection.  Form.

12                    MR. ROONEY:  Objection.

13          A.    I don't know.

14          Q.    (By Mr. Faes)  If you can turn to the

15    following page of this document.  Do you have any

16    reason to believe that you weren't given this

17    information by the company at this time?

18                    MR. MAIER:  Objection.

19                    MR. ROONEY:  Object to form.

20          A.    Repeat that.

21          Q.    (By Mr. Faes)  Do you have any reason to

22    believe that you wouldn't have received this

23    information about off-label use of Actiq at this time

24    in 2005?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MR. ROONEY:  Same objection.

2                    MR. MAIER:  Objection.  Form.

3          A.    No.

4          Q.    (By Mr. Faes)  If you turn to the

5     following page of this document.  It states that while

6     Actiq trials showed its efficacy in rapid onset action

7     for breakthrough cancer pain in cancer patient

8     populations, physicians who treat pain most often

9     consider cancer pain no different than noncancer pain

10    and treat it the same regardless of etiology.  Do you

11    see that?

12         A.    Yes.

13         Q.    Is that true based on your experience

14    detailing the Actiq product?

15                   MR. ROONEY:  Objection.  Form.

16                   MR. MAIER:  Objection.  Form.

17         A.    Yes.

18         Q.    (By Mr. Faes)  And you would even -- as a

19    sales representative for Actiq, there was a saying that

20    was sometimes used within the company that pain is

21    pain; right?

22                   MR. ROONEY:  Object to form.

23                   MR. MAIER:  Form.

24         A.    I don't remember.
```

1          Q.     (By Mr. Faes)  You can set that document

2     aside.  During your time at Cephalon, did you ever feel

3     pressured by management or anyone at the company to

4     expand the market for Actiq or Fentora in order to meet

5     your sales goals?

6                 MR. ROONEY:  Object to form.

7                 MR. MAIER:  Objection.  Form.

8          A.     No.

9          Q.     (By Mr. Faes)  When you were a sales rep

10    when you were at Cephalon, did any of your fellow sales

11    representatives ever express to you that they felt

12    pressured to expand the market for Actiq or Fentora in

13    order to meet sales goals?

14         A.     I don't know.

15                MR. ROONEY:  Object to form.

16                MR. MAIER:  Object to form.

17         Q.     (By Mr. Faes)  You don't recall?

18         A.     I don't know of anyone.

19         Q.     Oh, you don't know of anyone?  Okay.  Did

20    any of your -- when you were promoting Actiq or

21    Fentora, did any of your sales targets, meaning the

22    physicians that you were calling on for Actiq or

23    Fentora, ever make you feel uncomfortable or maybe they

24    didn't sit right with you?

```
 1                    MR. ROONEY:  Object to form.

 2                    MR. MAIER:  Objection.  Form.

 3          A.    Repeat that.

 4          Q.    (By Mr. Faes)  Did any of your sales

 5    targets for Actiq or Fentora ever not sit right with

 6    you or make you feel uncomfortable?

 7                    MR. ROONEY:  Same objection.

 8          A.    Yes.

 9                    MR. MAIER:  Objection.

10          Q.    (By Mr. Faes)  Tell me about that.

11          A.    Well, if they were trying to treat

12    noncancer pain I would have to reiterate indication,

13    breakthrough cancer pain.

14          Q.    And so if a doctor was -- if you became --

15    strike that.  If you became aware that a doctor was

16    using Actiq or Fentora for noncancer pain, that would

17    make you uncomfortable?

18          A.    Yes.

19                    MR. ROONEY:  Object to form.

20          Q.    (By Mr. Faes)  And so what would you do in

21    response to that?

22          A.    Tell my manager and get direction.

23          Q.    And what kind of direction did you receive

24    from your manager when you reported that you were
```

1  uncomfortable with a particular doctor because he was

2  prescribing Actiq or Fentora for noncancer pain?

3      A.    To no longer call on them.

4      Q.    So it's your testimony that if a -- your

5  direction from management was that if a -- if you

6  reported a doctor was prescribing Actiq for noncancer

7  pain and that made you feel uncomfortable, that your

8  managers always told you that you didn't need to call

9  on that doctor anymore?

10          MR. ROONEY:  Objection.

11      A.    Not always.

12          MR. MAIER:  Object to form.

13      Q.    (By Mr. Faes)  So there were times when

14  they didn't tell you that?

15      A.    Our job was to go in there and educate

16  them on the proper way.

17      Q.    And if a doctor told you that it was --

18  that they were using a Actiq or Fentora for noncancer

19  use, you were generally limited to restating what the

20  indication for the products were to the doctor; right?

21          MR. ROONEY:  Object to form.

22          MR. MAIER:  Objection.  Form.

23      A.    Yes, they had to take a REMs test.  They

24  had to agree -- the doctors had to agree on how to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prescribe.

 2         Q.    (By Mr. Faes)  And -- but that was

 3    generally the limit of your training to dissuade a

 4    doctor on prescribing Fentora for noncancer pain, was

 5    to reiterate the indication; right?

 6              MR. ROONEY:  Objection.

 7              MR. MAIER:  Objection.  Form.

 8         A.    Yes.

 9         Q.    (By Mr. Faes)  And there were instances

10    where you told one of your superiors that you felt

11    uncomfortable continuing to detail a particular doctor

12    because they were promoting -- or strike that --

13    because they were -- let me start over.  That's what

14    happens when it's all recorded.

15              And there were instances where you told

16    one of your superiors that you felt uncomfortable

17    continuing to detail a particular doctor for Fentora or

18    Actiq and you were told by your manager or superiors

19    that you needed to continue to detail that doctor

20    anyway; right?

21              MR. ROONEY:  Object to form.  That's not

22    what she testified.

23              MR. MAIER:  Object to form.

24         A.    No.
```

1     Q.    (By Mr. Faes)  So you were never told by

2     one of your superiors that -- for example, that it

3     was -- it's your job to promote or detail the product

4     as long as the physician wants to write it?

5               MR. ROONEY:  Object to form.

6     A.    No.

7               MR. MAIER:  Object to form.

8     Q.    (By Mr. Faes)  You were never told, for

9     example, that it's not your business or that you

10    shouldn't inquire into why the doctor is using it as

11    long as they're prescribing it legally?

12              MR. ROONEY:  Object to form.

13              MR. MAIER:  Object to form.

14    A.    Repeat that.

15    Q.    (By Mr. Faes)  Let me ask a better

16    question.  You were never told, for example, that it

17    was none of your business what the doctor was

18    prescribing it for, who he was prescribing it to; as

19    long as he felt it was appropriate for that particular

20    patient, you shouldn't inferior?

21              MR. ROONEY:  Object to form.

22    A.    No.

23              MR. MAIER:  Object to form.

24    Q.    (By Mr. Faes)  All right.  So I'm going to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    hand you what's been marked as Exhibit Number 11 to

 2    your deposition.

 3                  [Exhibit Teva-Sippial-011

 4                  marked for identification.]

 5         Q.    And this is an e-mail dated June 9th of

 6    2003.  Do you see that?

 7         A.    Yes.

 8         Q.    And this is from Michael Morreale, who

 9    would have been one of your direct supervisors; right?

10         A.    Yes.

11         Q.    Or your direct supervisor; right?

12         A.    Yes.

13         Q.    And this is -- this e-mail is to Sales PCS

14    Midwest, so this is an e-mail that you would have

15    received; right?

16         A.    Yes.

17                  MR. ROONEY:  Object to form.

18         Q.    (By Mr. Faes)  If you look in the first

19    line of this sentence in the middle where it --

20    starting where it says Ed over on the right-hand side.

21    It says Ed Berg did a really nice job going over the

22    compliance talk and truly clarifying where the line is

23    to properly sell Actiq.  Do you see that?

24         A.    Yes.
```

```
 1          Q.    So that's reflecting that from time to

 2    time somebody from compliance would come in and talk to

 3    you as a sales representative about where the line is

 4    as far as promoting or detailing Actiq; right?

 5          A.    Yes.

 6                MR. ROONEY:  Object to form.

 7                MR. MAIER:  Objection.  Form.

 8          Q.    (By Mr. Faes)  So there was kind of a

 9    line, so to speak, of things that you were allowed to

10    do and things that you weren't allowed to do, and as

11    long as you didn't cross over that line, it was okay to

12    do those things, according to the company; right?

13                MR. ROONEY:  Object to form.

14                MR. MAIER:  Objection.  Form, foundation.

15          A.    Yes.

16          Q.    (By Mr. Faes)  And if you go further down,

17    you see where it states finally, some key points to

18    take away from this meeting include no excuses.  I

19    don't want to hear about any excuses for your

20    territory, only solutions to possible problems.  Do you

21    see that?

22          A.    I do.

23          Q.    And that's the direction that you would

24    have received from your supervisor at this time; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2              MR. ROONEY:  Object to form.

3        Q.    (By Mr. Faes)  And his instruction that he

4   doesn't want to hear about any excuses with your

5   territory; only solutions to possible problems; right?

6        A.    Yes.

7        Q.    And he states make sure you're using all

8   of your resources on these targets such as MEPs --

9   actually, strike that.  Let me start with the line

10  above.  The line above states that targeting is a vital

11  key to success with Actiq, approximately 40 targets per

12  territory.  Make sure to focus on the Chris Meyer easy

13  money list.  Do you see that?

14       A.    Yes.

15             MR. ROONEY:  Object to form.

16       Q.    (By Mr. Faes)  So this is instructions to

17  you as a sales representative under Michael Morreale to

18  focus on this list which he refers to as the easy money

19  list for targeting and promoting Actiq; right?

20             MR. ROONEY:  Object to form.

21             MR. MAIER:  Object to form.

22       A.    Yes.

23       Q.    (By Mr. Faes)  What was the easy money

24  list?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't remember.

 2          Q.    But apparently there was a list referred

 3    to as the easy money list; right?

 4                MR. MAIER:  Object to form.

 5          A.    I don't know.  I don't recall.

 6          Q.    (By Mr. Faes)  Would you agree with me

 7    that it's likely that this easy money list included

 8    physician targets -- it obviously includes physician

 9    targets, right, because it says approximately 40

10    targets per territory; right?

11                MR. ROONEY:  Object to form.

12          A.    Yes.

13                MR. MAIER:  Object to form.

14          Q.    (By Mr. Faes)  And apparently your boss,

15    Michael Morreale, thinks that these will be targets

16    that will be easy for you as a representative to have

17    success with on Actiq; right?

18                MR. ROONEY:  Object to form.

19                MR. MAIER:  Object to form.

20          A.    Yes.

21          Q.    (By Mr. Faes)  And that's why he refers to

22    it as the easy money list; right?

23                MR. ROONEY:  Object to form.

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MAIER:  Object to form.

 2          Q.    (By Mr. Faes)  And going on, instructions

 3     from your boss is to make sure you're utilizing all of

 4     your resources on these targets such as MEP, CMEs,

 5     lunches, consultant meetings, preceptorships, and

 6     marketing initiatives.  Do you see that?

 7          A.    Yes.

 8          Q.    And so this is your boss encouraging to

 9     use all of your marketing resources, including speaker

10     programs that we talked about earlier; right?

11          A.    Yes.

12                    MR. ROONEY:  Object to form.

13          Q.    (By Mr. Faes)  And that's because you came

14     to understand as a representative that you had -- you

15     had a budget for those kind of things; right?

16          A.    Yes.

17          Q.    And generally if you had the budget for

18     it, your superiors or your bosses wanted you to use all

19     that budget; right?

20                    MR. ROONEY:  Object to form.

21          A.    Yes.

22                    MR. MAIER:  Object to form.

23          Q.    (By Mr. Faes)  And that's because you were

24     made to understand as a sales representative that the
```

1    reason the company budgeted for those things is because

2    they had a good return on investment; right?

3                MR. ROONEY:  Object to form.

4        A.    Yes.

5                MR. MAIER:  Object to form.

6        Q.    (By Mr. Faes)  And return on invest means

7    if you spend that money you're going to get that much

8    money or more back in return; right?

9        A.    Yes.

10               MR. ROONEY:  Object to form.

11               MR. MAIER:  Form.

12       Q.    (By Mr. Faes)  And you're going to get

13   that much money back in return from scripts of Actiq or

14   whatever you're speaking about or detailing about;

15   right?

16               MR. ROONEY:  Object to form.

17               MR. MAIER:  Object to form.

18       A.    Yes.

19       Q.    (By Mr. Faes)  And the next point down

20   states that when talking about managed care issues,

21   talk about the positive.  Do not dwell on the negative.

22   Keep a positive outlook for physicians.  Utilize your

23   national accounts managers and help them out by

24   acquiring denial letters and influence physicians to

1    use the reimbursement hotline to pursue appeals and

2    prior authorizations.  Do you see that?

3         A.    Yes.

4         Q.    So this is direction that you would have

5    received from your boss at that time; right?

6         A.    Yes.

7               MR. ROONEY:  Object to form.

8               MR. MAIER:  Form.

9         Q.    (By Mr. Faes)  And you would have tried to

10   follow your boss's advice to the best of your ability;

11   right?

12              MR. ROONEY:  Object to form.

13        A.    Yes.

14        Q.    (By Mr. Faes)  And this is talking about

15   managed care issue -- this is talking about that

16   sometimes patients have a difficult time getting their

17   health plan or insurance plan to pay for the cost of

18   Actiq; right?

19              MR. ROONEY:  Object to form.

20              MR. MAIER:  Object to form.

21        A.    Yes.

22        Q.    (By Mr. Faes)  And it references a

23   reimbursement hotline here; right?

24        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And that was something that Cephalon had

 2   set up for physicians or their staffs to call in with

 3   assistance in getting patients approved by their

 4   insurance plans for Actiq; right?

 5        A.    Yes.

 6              MR. ROONEY:  Object to form.

 7              MR. MAIER:  Object to form.

 8        Q.    (By Mr. Faes)  And instructions for your

 9   manager was to encourage you as a sales rep to utilize

10   that and to encourage your doctors and their offices to

11   utilize that reimbursement hotline as well; right?

12        A.    Yes.

13              MR. ROONEY:  Object to form.

14        Q.    (By Mr. Faes)  And you understood that one

15   of the reasons that a managed care company or an

16   insurance company might commonly refuse to pay for an

17   Actiq and later a Fentora prescription is if the

18   prescription was written for noncancer pain?

19              MR. ROONEY:  Object to form.

20              MR. MAIER:  Object to form, foundation.

21        A.    True.

22        Q.    (By Mr. Faes)  And if you go to the

23   second-to-last bullet point, you'll see it states I

24   want to see one or more members of this team earn a
```

```
 1    bonus in excess of $30,000 for a quarter this year;

 2    right?

 3         A.    Yes.

 4         Q.    And that was something that your manager

 5    wanted to see for you as a member of his team?

 6         A.    Yes.

 7               MR. ROONEY:  Object to form.

 8         Q.    (By Mr. Faes)  In fact, all the member of

 9    his teams; right?

10         A.    Yes.

11               MR. MAIER:  Object to form.

12         Q.    (By Mr. Faes)  And that's $30,000 a

13    quarter just in a bonus; right?

14         A.    Yes.

15         Q.    So that's a potential of $120,000 a year

16    just in bonus potentially for a sales representative

17    who does a particularly good job of detailing or

18    promoting Actiq; right?

19               MR. ROONEY:  Object to form.

20         A.    Yes.

21               MR. MAIER:  Object to form, foundation.

22         Q.    (By Mr. Faes)  And you understood that

23    that was a potential payout at that time in 2003;

24    right?
```

1                    MR. ROONEY:  Object to form.

2         A.    Yes.

3         Q.    (By Mr. Faes)  And if you see the last

4    bullet point it states everyone must find a reason to

5    motivate yourself and get out there and make it happen.

6    Once again, Mike Wetherholt showed us how much money

7    there is out there for us to make.  There is no reason

8    why everyone on this team should not be at the top of

9    the rankings and earning the top bonuses.  Do you see

10   that?

11        A.    Yes.

12        Q.    And that's instruction that your boss gave

13   to you at the time; right?

14        A.    Yes.

15                   MR. ROONEY:  Object to form.

16                   MR. MAIER:  Objection.  Form.

17        Q.    (By Mr. Faes)  And he's referencing this

18   Mike Wetherholt, who was another representative for

19   Cephalon at this time; right?

20                   MR. ROONEY:  Object to form.

21        A.    He's a repre -- regional.

22        Q.    (By Mr. Faes)  So he's referencing this

23   Mike Wetherholt, who's another regional manager for

24   Cephalon promoting Actiq at this time?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And his instruction to you is that this

 3    other regional manager has showed your team how much

 4    money there is out there for the team to make; right?

 5          A.    Yes.

 6                MR. ROONEY:  Object to form.

 7          Q.    (By Mr. Faes)  And that's referring to the

 8    money that's to be made from Actiq bonuses and

 9    commissions; right?

10          A.    Yes.

11                MR. ROONEY:  Object to form.

12                MR. MAIER:  Form.

13          Q.    (By Mr. Faes)  That's the one I just used.

14    I'll just set that over here then.  I'm going to hand

15    you what's been marked as Exhibit Number 12 to your

16    deposition.

17                [Exhibit Teva-Sippial-012

18                 marked for identification.]

19          Q.    And again, this is an e-mail dated --

20    e-mail and attachment dated April 20th of 2004.  Do you

21    see that?

22          A.    Yes.

23          Q.    And it went out to the first line as a

24    sales reps, so you would have received this e-mail and
```

1    attachment at this time; right?

2         A.    Yes.

3         Q.    And --

4              MR. ROONEY:  Do you have a list of the

5    LISTSERV?

6              MR. FAES:  I'm sorry?

7              MR. ROONEY:  Of e-mails on the LISTSERV,

8    the sales reps --

9              MR. FAES:  I'm sorry?

10              MR. ROONEY:  Do we have a list of the

11    e-mails on this?

12              MR. FAES:  I don't have one.  I'm just

13    asking her if she would have received it.  She said

14    yes.

15              MR. ROONEY:  Okay.

16              MR. FAES:  So my understanding is the

17    sales rep group is all sales reps.

18         Q.    (By Mr. Faes)  If you look on the first

19    page of this document, you see it states incentive

20    compensation plan, payment policies for all Cephalon

21    field sales personnel.  Do you see that?

22         A.    Yes.

23         Q.    So this is a -- and it says these policies

24    are in effect as of January 1st of 2004 on the bottom

Highly Confidential - Subject to Further Confidentiality Review

1    of the paragraph; right?

2        A.    Yes.

3        Q.    And so this would have been the incentive

4    compensation plan that would have been in effect at

5    this time, January 1st, 2004, that was communicated to

6    you; right?

7        A.    Yes.

8        Q.    And if you turn to the final page of this

9    document.  It states under performance rating no bonus

10   will be paid to an individual for performance during a

11   quarter or semester bonus period if the individual has

12   an overall performance rating of four, needs

13   improvement, or five, poor.  After an individual

14   receives an overall four or five performance rating,

15   the individual's performance will be periodically

16   reassessed to determine if or when bonus eligibility

17   may be instated.  Do you see that?

18       A.    Yes.

19       Q.    And did you have an understanding that

20   that was the company's policy at this time?

21       A.    Yes.

22       Q.    Is it your understanding that this policy

23   remained in effect up until your separation with

24   Cephalon?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2              MR. MAIER:  Objection.  Form, foundation.

 3        Q.    (By Mr. Faes)  Did you ever receive a

 4   rating or four or five to where you were ineligible for

 5   a bonus?

 6        A.    No.

 7        Q.    So it's fair to say that during your time

 8   at Cephalon with the company being aware of your

 9   performance, you were rated meets expectations or above

10   during the entire time that you worked at Cephalon;

11   right?

12              MR. MAIER:  Objection.  Form.

13        A.    No.

14        Q.    (By Mr. Faes)  When was that not true?

15        A.    We had different categories that we had to

16   get certain ratings for, and you might have all twos

17   and threes or ones and twos and have an occasional four

18   in a particular area, like if you weren't doing as many

19   MEPs or CEPs or you weren't on target for doing the

20   amount that you needed to.

21        Q.    Okay.  So it's fair to say that you might

22   have received a number of individual categories that

23   might have been a needs improvement or poor, but it's

24   fair to say that your overall performance rating was
```

1    always a meet expectations or above; right?

2         A.    Yes.

3               MR. MAIER:  Objection.  Form.

4         Q.    (By Mr. Faes)  And that's what this policy

5    is talking about, that for bonus it says the overall --

6         A.    Overall.

7         Q.    Overall performance rating can't be a

8    four, needs improvement, or a five, poor; right?

9         A.    Correct.

10        Q.    And my question is -- and maybe it was a

11   bad one.  There was no time during your employment with

12   Cephalon to where your overall rating was ever needs

13   improvement or poor or at a level where you weren't

14   eligible for a bonus; right?

15        A.    Correct.

16              MR. MAIER:  Object to the form.

17        Q.    (By Mr. Faes)  Except for potentially 2010

18   when you were separated from Cephalon and didn't

19   receive your bonus upon separation; right?

20        A.    Correct.

21        Q.    And that would have been -- would that

22   have been only for the last quarter that you were there

23   that you didn't receive your bonus?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So even the quarter prior to your

2  separation, you would have had an overall rating of

3  meets expectations or above and continued to be

4  bonus-eligible; right?

5    A.    Yes.

6         MR. MAIER:  Objection.  Form.

7    Q.    (By Mr. Faes)  So I'm going to hand you

8  what's been marked as Exhibit Number 13 to your

9  deposition.

10         [Exhibit Teva-Sippial-013

11         marked for identification.]

12    Q.    And I do not know why the first page of

13  this is blank.  This is the way it was produced to us.

14    A.    Okay.

15         MR. ROONEY:  That one.

16    Q.    (By Mr. Faes)  That's yours.  You always

17  get the one with the sticker.

18    A.    Okay.

19    Q.    You get the stickered copies because

20  you're in the seat of honor today.

21    A.    Oh, great.

22    Q.    So if you turn into the second page

23  because the first page is blank.  Again, this is an

24  e-mail dated July 22nd of 2004.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    And this would have been sent out, you

3     see, to the to line, to sales reps, and you would have

4     been a sales rep at this time; right?

5          A.    Correct.

6          Q.    So you would have been a person who would

7     have gotten this e-mail on this mass distribution;

8     right?

9          A.    Yes.

10          Q.    And it says attached are your third

11     quarter bonus plan, payment policy, and quota

12     calculator.  As always, your job is to grow sales above

13     your base, first quarter of 2004 sales.  Do you see

14     that?

15          A.    Yes.

16          Q.    And that's instructions that you would

17     have received at the time, is that it was your job to

18     grow sales above your base; right?

19          A.    Yes.

20          MR. ROONEY:  Objection.  Form.

21          Q.    (By Mr. Faes)  And that included sales of

22     Actiq.  If you see in the center below you've got a --

23     it looks like you've got a quota of $3,200 for Actiq

24     for that quarter; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And if you turn to the page in this

 3   document ending in 8218.  I think it's the fifth page

 4   in.  If you look at the top of this it talks

 5   specifically about the Actiq third quarter bonus.  Do

 6   you see that?

 7        A.    Yes.

 8        Q.    And it says -- well, first it says for the

 9   third quarter 2004, your sales base, first quarter 2004

10   will not be adjusted.  Do you see that?

11        A.    Yes.

12        Q.    So that's basically saying that your quota

13   is not going to be adjusted; right?  You're at the same

14   baseline for your quota; right?

15        A.    Correct.

16        Q.    And then it says for each dollar increase

17   of Actiq sold in your territory, third quarter 2004

18   versus first quarter 2004, you will receive seven

19   cents; right?

20        A.    Yes.

21        Q.    And for each percentage increase of Actiq

22   sold in your territory, third quarter 2004 versus first

23   quarter 2004, you will receive $53; right?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And so this would have been the Actiq

2    quarter bonus plan that would have been communicated to

3    you at the time; right?

4      A.    Yes.

5      Q.    And this reflects that at this time in

6    2004, there was no cap or limit on the amount of the

7    Actiq bonus that you could receive; right?

8      A.    Correct.

9            MR. MAIER:  Objection.  Form, foundation.

10     Q.    (By Mr. Faes)  You can set that aside.

11   I'm going to hand you what's been marked as Exhibit

12   Number 14 to your deposition.

13           [Exhibit Teva-Sippial-014

14           marked for identification.]

15     Q.    And this is a document that's from your

16   custodial file at Cephalon titled pain care specialist,

17   first quarter 2006 incentive compensation plan, Actiq

18   first quarter bonus.  Do you see that?

19     A.    Yes.

20     Q.    And if you look at the payout

21   calculations, it says that if your percent to quota

22   sales is greater than hundred percent, you will receive

23   100 percent of target bonus plus incremental commission

24   for every dollar over 100 percent.  See Tier 1 and Tier

Highly Confidential - Subject to Further Confidentiality Review

```
 1   2 below.  Do you see that?

 2        A.    Yes.

 3        Q.    So this would reflect that again in 2006,

 4   with regard to your Actiq sales -- and there's an

 5   example calculation below -- that there was still no

 6   cap or limit on the amount of bonus or commission that

 7   you could receive for selling Actiq at this time;

 8   right?

 9        A.    Correct.

10             MR. FAES:  You can set that aside.

11             MR. ROONEY:  If you've got an extra one --

12             MR. FAES:  That was for the guy who's not

13   here, so you can just keep the change, pal.  I'm about

14   to start another section.  Is everybody hungry or

15   should I just -- should I keep going a little while?

16             MR. ROONEY:  Do you know when the food is

17   ready?

18             MR. FAES:  It's here.

19             MR. ROONEY:  Do you want to take a break

20   for eating?

21        A.    Yeah, let's go ahead and eat.

22             MR. FAES:  Okay.

23             THE VIDEOGRAPHER:  We are going off the

24   record at 1:08 PM.
```

```
 1                [A recess was taken.]

 2                THE VIDEOGRAPHER:  We are back on the

 3     record at 1:46 PM.

 4          Q.    (By Mr. Faes)  Good afternoon, Ms.

 5     Sippial.  We are back on the record after a short lunch

 6     break.  Are you ready to proceed?

 7          A.    Yes.

 8          Q.    So now that we're back from lunch I kind

 9     of want to shift gears a little bit and talk a little

10     bit more about medical education programs or CSPs,

11     Cephalon speaker programs.  Okay?

12          A.    Yes.

13          Q.    And as we talked about, there were

14     acronyms for that, MEP or CSP, but they essentially are

15     the same thing; right?

16          A.    Correct.

17          Q.    You used MEP early on with Actiq, and then

18     at some point it started being referred to as CSP or

19     Cephalon speaker program; right?

20          A.    Correct.

21          Q.    And that's a program where you would hire

22     a speaker to talk about Actiq or Fentora to another

23     physician or group of physicians; right?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And many of the speakers that you would

2    use for Actiq or Fentora were sometimes referred to as

3    Actiq or Fentora advocates; right?

4      A.    Yes.

5      Q.    What are some of the qualities you would

6    look for in selecting a potential Actiq or Fentora

7    speaker?

8            MR. MAIER:  Objection.  Form.

9      A.    A prescriber who wrote prescriptions of

10   Fentora or Actiq.  Had a well -- or had a decent CV.

11     Q.    (By Mr. Faes)  And that means --

12     A.    Curriculum -- résumé.

13     Q.    Curriculum vitae, meaning he had good

14   credentials; right?

15     A.    Good credentials.  And is a physician who

16   felt comfortable with the product and who had taken the

17   REMs -- had been part of the REMs program.

18     Q.    Are there any qualities in your mind that

19   would disqualify a person from being a potential Actiq

20   or Fentora speaker?

21           MR. MAIER:  Objection.  Form.

22     A.    Yeah, if they wrote off-label for Actiq or

23   Fentora.  What would make them not a good speaker?

24     Q.    (By Mr. Faes)  (Nodding "yes.")

```
 1          A.    Same thing.  Their credentials, their

 2   reputation.  Their -- whether they were a thought

 3   leader or not.

 4          Q.    So I mean, you started off with your

 5   answer when I asked what are some of the things that

 6   would disqualify a person --

 7          A.    Dis --

 8          Q.     -- from being an Actiq or Fentora

 9   speaker, and I think you started off with -- yeah, I

10   said disqualify.

11          A.    Huh-uh.

12          Q.    And I think you started off with if they

13   were an off-label prescriber.  Are you -- is it your

14   testimony that that would automatically exclude a

15   person from being an Actiq or Fentora speaker or that

16   would just be a negative factor in your mind?

17          A.    It would just be a negative factor in my

18   mind.

19          Q.    So you would agree with me then that if a

20   doctor wrote Actiq or Fentora off-label, that that

21   wouldn't necessarily disqualify them from being an

22   Actiq or Fentora speaker; right?

23          A.    Correct.

24                MR. MAIER:  Objection.  Form.
```

1          Q.    (By Mr. Faes)  And early on the process

2    for selecting Actiq or Fentora speakers was relatively

3    informal; right?

4                MR. MAIER:  Object to form.

5                MR. ROONEY:  Objection.

6          A.    Repeat that.

7          Q.    (By Mr. Faes)  Early on the process for

8    selecting an Actiq speaker was relatively informal;

9    right?

10               MR. MAIER:  Objection.  Form.

11         Q.    (By Mr. Faes)  In 2001 when you first

12   joined the company.

13               MR. ROONEY:  Same objection.

14         A.    Yes.

15         Q.    (By Mr. Faes)  Essentially the process was

16   you would identify a doctor who might -- who you

17   thought might be a good speaker, and you would discuss

18   that potential speaker with your boss and you would

19   come to an agreement between you and your supervisor if

20   you could use that person as an Actiq speaker; right?

21         A.    Correct.

22         Q.    And so you wouldn't -- it's true then that

23   you would never select early on an Actiq speaker

24   without your boss's prior approval; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2                MR. MAIER:  Objection.  Form.

 3          Q.    (By Mr. Faes)  And that was -- you

 4   understood that was a requirement at the time by the

 5   company; right?

 6          A.    Yes.

 7          Q.    And no -- your bosses never communicated

 8   to you that if a doctor had written Actiq or Fentora --

 9   well, strike that, because we're just talking about

10   Actiq now.  You'd agree with me that no -- none of your

11   bosses ever communicated to you that if a prescriber

12   had prescribed Actiq off-label in the past that that

13   would automatically disqualify them from being a

14   speaker at a medical education program for Actiq;

15   right?

16                MR. MAIER:  Objection.  Form.

17                MR. ROONEY:  Object to form.

18          A.    True.

19          Q.    (By Mr. Faes)  And in fact, there were

20   lists that were circulated at the company at some point

21   identifying doctors that were in fact repeat off-label

22   prescribers of Actiq; right?

23          A.    I don't remember.

24          Q.    And later on, the process for selecting a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    speaker became a little bit more formalized; right?

 2          A.    Correct.

 3                MR. ROONEY:  Object to form.

 4          Q.    (By Mr. Faes)  Later on there was an

 5    approved list of folks that were already approved to be

 6    an Actiq or Fentora speaker, and if a doctor that you

 7    wanted to use was on the approved list you could

 8    generally just use them; right?

 9          A.    Correct.

10                MR. ROONEY:  Object to form.

11                MR. MAIER:  Object to form.

12          Q.    (By Mr. Faes)  And you expected that

13    someone else at the company prior to putting a doctor

14    or doctors on this list was vetting those doctors to

15    make sure they were qualified and were appropriate

16    speakers to be on the approved list for Actiq and

17    Fentora speaking programs; right?

18                MR. MAIER:  Objection.  Form.

19                MR. ROONEY:  Object to form.

20          A.    Yes.

21          Q.    (By Mr. Faes)  And you would agree with me

22    that during these medical education programs or

23    speaking programs, there were situations where the

24    physician speakers were allowed to speak outside the
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1   FDA-approved indication of breakthrough pain in

 2   patients with cancer; right?

 3        A.    Yes.

 4              MR. MAIER:  Objection.  Form.

 5        Q.    (By Mr. Faes)  I'm going to hand you

 6   what's been marked as 15 and 16 to your deposition.

 7   This is an e-mail and attachment, so the e-mail is 15

 8   and then the attachment is 16.

 9              [Exhibit Teva-Sippial-015

10              marked for identification.]

11              [Exhibit Teva-Sippial-016

12              marked for identification.]

13        Q.    So there's yours and there's yours.

14   There's Mr. Tintose's (ph).  So looking at Exhibit 15,

15   this is an e-mail from you to your boss, Michael

16   Morreale, dated May 23rd, 2003; right?

17        A.    Yes.

18        Q.    And at this time your name was Laura

19   Mosley-Speaks; right?

20        A.    Correct.

21        Q.    And when did that change?

22        A.    In 2007.

23        Q.    So in 2007 your name changed from -- last

24   name changed from Mosley-Speaks to Sippial; right?
```

```
 1         A.    Correct.

 2         Q.    And the e-mail says, Mike, I'm attaching

 3   my June PowerPoint POA presentation.  That refers to

 4   your June plan of action presentation; right?

 5         A.    Plan of action.  Yes.

 6         Q.    I ran into some difficulty with the top 15

 7   physician slide; however, I was able to complete all

 8   the information that was needed but in a different

 9   format.  I am also attaching an addendum to that slide

10   as well.  If you have any questions, please let me

11   know.  Thanks, Laura.  Right?

12         A.    Yes.

13         Q.    So what was the context for preparing this

14   slide deck that's attached as Exhibit Number 16.  So

15   this is a PowerPoint, so I assume you would have been

16   presenting this to someone at some point; right?

17         A.    Yes.

18         Q.    Who would you have been presenting it to?

19         A.    Our area.  Our area in Cincinnati.

20         Q.    So this would have been for either an Ohio

21   Valley or a Great Lakes sales meeting and you would

22   have been presenting to your boss plus the other sales

23   representatives in your territory?

24         A.    Yes.
```

```
 1                    MR. MAIER:  Objection.  Form.

 2          Q.    (By Mr. Faes)  And if you turn to --

 3    actually, let's look at the -- the first page of this

 4    exhibit just says Laura Mosley-Speaks, and that's your

 5    territory, Cincinnati, Ohio, and that 81700006 is just

 6    your territory number; right?

 7          A.    Yes.

 8          Q.    That's just a number assigned by the

 9    company; right?

10          A.    Correct.

11          Q.    So you turn to the next page and you've

12    got a graph on here with your total prescriptions, and

13    down in the bottom right-hand corner you chart out the

14    dosage levels for Actiq and the percent of

15    prescriptions in those categories per quarter; right?

16          A.    Yes.

17          Q.    And those are all the strengths of Actiq

18    that were available at this time in 2003.  There are

19    six different categories from 200 micrograms to 1,600

20    micrograms; right?

21          A.    Correct.

22          Q.    And you chart this out, and in general

23    you'd agree with me that the higher doses, the usage of

24    the higher dosage like the 800 -- or the 1,200, the
```

Highly Confidential - Subject to Further Confidentiality Review

1    1,600, the two top doses are increasing over time;

2    right?

3          A.    Yes, from this.

4          Q.    And so why would you have noted that on

5    this presentation to the group breaking down -- the

6    breakdown of scripts for the higher strengths?

7                MR. MAIER:  Objection.  Form.

8          A.    Well, it's for all of the strengths and

9    just looking at my territory and seeing what was being

10   prescribed more.

11         Q.    (By Mr. Faes)  And you under -- had an

12   understanding at this time in 2003 that the higher

13   dosages of Actiq had a higher price point, meaning they

14   cost more; right?

15               MR. MAIER:  Objection.  Form.

16         A.    Yes.

17               MR. ROONEY:  Object to form.

18         Q.    (By Mr. Faes)  And you knew that if a

19   doctor prescribed the higher dose Actiq dosages, that

20   would mean more revenue for the company; right?

21               MR. MAIER:  Objection.  Form.

22               MR. ROONEY:  Object to form.

23         A.    Yes.

24         Q.    (By Mr. Faes)  And that in turn would mean

```
1    more sales dollars towards meeting your quotas for

2    bonuses and commissions; right?

3              MR. MAIER:  Objection.  Form.

4         A.    Yes.

5              MR. ROONEY:  Object to form.

6         Q.    (By Mr. Faes)  If you turn to the next

7    page of this document, you see top 15 Actiq writers by

8    units.  Do you see that?

9         A.    Yes.

10        Q.    And consistently at this time in 2002, Dr.

11   Murphy was your top prescriber throughout all of two

12   thousand -- the last two quarters of 2002 and the first

13   quarter of 2003; right?

14        A.    Yes.

15        Q.    And in fact, he was your largest

16   prescriber -- in terms of units he was more than double

17   that of your next closest highest prescriber; right?

18        A.    Yes.

19              MR. MAIER:  Objection.  Form.

20              MR. ROONEY:  Object to form.

21        Q.    (By Mr. Faes)  What do you remember about

22   Dr. Murphy's practice?

23        A.    Well, he was in Louisville, Kentucky, and

24   he was a pain management physician, and I can't
```

Highly Confidential - Subject to Further Confidentiality Review

1  remember what he specifically treated outside of I'd be

2  in his office, if he was treating breakthrough cancer

3  pain.  But I don't recall that much more about him.

4      Q.    And if you look on the same chart, Dr.

5  Simons is also consistently one of your top three

6  prescribers during this time period; right?

7      A.    Yes.

8      Q.    What was Dr. Simon's practice like?

9      A.    He was pain management.  He was in

10 Cincinnati, Ohio, and he saw malignant and nonmalignant

11 pain.

12     Q.    So Dr. Simon saw both cancer and noncancer

13 patients; right?

14     A.    Yes.

15     Q.    And Dr. Jobalia is in your top five at all

16 times during this period as well; right?

17     A.    Yes.

18     Q.    And what do you remember about Dr. Jobalia

19 and his practice?

20     A.    He was a pain management physician who saw

21 both malignant and nonmalignant pain, and he was in

22 Cincinnati, Ohio.

23     Q.    And did he treat sleep disorders as well?

24     A.    That I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ROONEY:  Object to form.

 2          Q.    (By Mr. Faes)  And if you turn to MEPs,

 3    CMEs, which is the next slide, you -- at the slide

 4    MEPs, CMEs, and you note that you've got four MEPs

 5    completed and four medical education programs in the

 6    books; right?

 7          A.    Yes.

 8          Q.    And you note you've got five planned

 9    programs upcoming; right?

10          A.    Yes.

11          Q.    For a Dr. Wright -- two for Dr. Wright,

12    one for Dr. Stewart, and one for Dr. Taylor; right?

13          A.    Yes.

14          Q.    So this reflected that medical education

15    programs or peer-to-peer selling continued to be an

16    important factor in your promotional efforts for Actiq;

17    right?

18          A.    Yes.

19                    MR. ROONEY:  Object to form.

20          Q.    (By Mr. Faes)  If you turn to two slides

21    forward there's a slide titled potential barriers to

22    success.  Do you see that?

23          A.    Yes.

24          Q.    And the first potential barrier to success
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that you list on your slide is the indication; right?

 2            A.    Correct.

 3            Q.    And that's referring to the limited

 4    indication of Actiq in breakthrough pain for people

 5    with cancer only; right?

 6            A.    Correct.

 7                  MR. MAIER:  Objection.  Form.

 8                  MR. ROONEY:  Object to form.

 9            Q.    (By Mr. Faes)  And again, that's referring

10    to the barrier that there's a limited number of people

11    that you can promote to; right?

12            A.    Correct.

13                  MR. MAIER:  Object to form.

14                  MR. ROONEY:  Object to form.

15            Q.    (By Mr. Faes)  It refers to the fact that

16    there's a limited number of people that are appropriate

17    patients for Actiq use; right?

18            A.    True.

19                  MR. MAIER:  Objection.  Form.

20            Q.    (By Mr. Faes)  And it also notes the

21    second potential barrier to success is Actiq not

22    covered by Ohio Medicaid; right?

23            A.    Yes.

24            Q.    And that goes to one of the things we were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   talking about earlier, that one of your jobs was to try
 2   and help doctors get their patients approved by
 3   insurance or by Medicare or whatever the third-party
 4   payor was for the drug for -- you're trying to get them
 5   to pay for the Actiq; right?
 6             MR. MAIER:  Object to form.
 7             MR. ROONEY:  Object to form.
 8        A.   True.
 9        Q.   (By Mr. Faes)  And part of your job was to
10   help doctors with that; right?
11             MR. MAIER:  Same objection.
12             MR. ROONEY:  Same objections.
13        A.   To a degree.
14        Q.   (By Mr. Faes)  And one of the ways they
15   could do that was by filling -- having them fill out a
16   letter of medical necessity; right?
17        A.   Yes.
18        Q.   And you were encouraged to have doctors do
19   that if they had a patient that was denied by their
20   insurer or third-party payor for Actiq; right?
21             MR. ROONEY:  Object to form.
22        A.   Yes.
23        Q.   (By Mr. Faes)  And the third issue is
24   pharmacy stocking and availability; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2          Q.     And that re -- what does that refer to in

 3   your recollection?

 4          A.     Well, making sure that the pharmacies had

 5   the different strengths and stocks so when a patient

 6   went to the pharmacy they would be able to fill the

 7   prescription without problem.

 8          Q.     And part of the reason that was an issue

 9   is because the Actiq sticks took up a lot of space in a

10   pharmacy; right?

11          A.     Yes, that was one of the reasons.

12          Q.     Well, what were some of the other reasons?

13          A.     That all strengths weren't widely used.

14   You had to make sure that you knew the physician --

15   physicians nearby who were prescribing it for

16   breakthrough cancer pain and making sure that those

17   strengths were stocked and available.

18          Q.     So part of your job then was to not only

19   try to make sure pharmacies were stocked, but if a

20   doctor had a prescription for a particular patient and

21   that patient couldn't fill it at a pharmacy to kind of

22   help direct the doctor out to where a pharmacy might be

23   that that patient might be able to fill that Actiq

24   prescription; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2                MR. MAIER:  Objection.  Form.

 3                MR. ROONEY:  Object to form.

 4          Q.    (By Mr. Faes)  You can set that aside.

 5   I'm going to hand you what's been marked as Exhibit

 6   Number 17 to your deposition.

 7                [Exhibit Teva-Sippial-017

 8                marked for identification.]

 9          Q.    Sorry.  Didn't want to fake you out there.

10   So Exhibit 17 is an e-mail dated February 19th, 2003.

11   It's from your boss to sales Ohio Valley; right?

12          A.    Yes.

13          Q.    So this would have been an e-mail received

14   by you; right?

15          A.    Yes.

16          Q.    And it looks like if you look down in the

17   first part of this e-mail, it looks like your boss,

18   Michael Morreale, is actually forwarding you an old

19   e-mail from about three months earlier; right?

20          A.    Yes.

21          Q.    And he says team, this is an old -- here

22   is an old e-mail -- strike that.  Take 2.  He says here

23   is an old meal (sic) I found that I thought you all

24   might find helpful.  This should help clarify how
```

Highly Confidential - Subject to Further Confidentiality Review

1   marketing is defining who they think should be Actiq

2   targets.  Please feel free to call me if you have any

3   questions.  Do you see that?

4        A.   Yes.

5        Q.   So down below, Mr. Morreale is telling you

6   as one of his sales reps how marketing is defining who

7   they think should be potential Actiq targets; correct?

8        A.   Yes.

9             MR. MAIER:  Objection.  Form.

10       Q.   (By Mr. Faes)  And if you look down under

11  the question is what is the specialty breakdown of

12  targets, and the answer is while the specialty

13  breakdown of targets will vary by territory, the

14  national breakdown is anesthesiology, pain -- so that

15  would be a pain specialist; right?

16       A.   Correct.

17       Q.   That's at 15 percent.  Oncology, 11

18  percent.  Primary care provider, 55 percent.  If you

19  turn to the following, it says neuro, three percent,

20  psych, one percent, other, 14 percent.  Do you see

21  that?

22       A.   Yes.

23       Q.   So these are physician specialties that in

24  2003 -- and actually twice in 2003 -- that your boss,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Michael Morreale, is communicating to you that

 2   marketing things should be potential Actiq targets;

 3   right?

 4              MR. MAIER:  Objection.  Form.

 5        A.    Correct.

 6        Q.    (By Mr. Faes)  And only 26 percent

 7   between -- strike that.  Only 26 of the potential Actiq

 8   targets are either oncology or pain specialists; right?

 9              MR. MAIER:  Object to form.

10        Q.    (By Mr. Faes)  That's 15 plus 11; right?

11              MR. ROONEY:  Object to form.

12        A.    True.

13        Q.    (By Mr. Faes)  And so at no time when this

14   e-mail was sent did Michael Morreale or anyone from the

15   company tell you that it was inappropriate, for

16   example, to call on a primary care provider; right?

17              MR. MAIER:  Objection.  Form.

18              MR. ROONEY:  Object to form.

19        A.    Repeat that.

20        Q.    (By Mr. Faes)  At no time when this -- in

21   2003 did anyone at Cephalon tell you that it was

22   inappropriate to call on a primary care provider for

23   Actiq; right?

24        A.    Not if --
```

```
 1                   MR. MAIER:  Objection.  Form.

 2                   MR. ROONEY:  Same objection.

 3         A.    Not if they were treating breakthrough

 4    cancer pain.

 5         Q.   (By Mr. Faes)  Right.  And in fact, he's

 6    indicating the opposite, that 55 percent of potent --

 7    of Actiq targets marketing believes should be a

 8    potential Actiq target; right?

 9                   MR. MAIER:  Objection.  Form.

10                   MR. ROONEY:  Object to form.

11         A.    Yes.

12         Q.   (By Mr. Faes)  And he indicates that three

13    percent of potential Actiq targets might be

14    neurologists; right?

15         A.    Right, for head and neck cancer pain.

16         Q.    And he indicates that that's a -- that a

17    physician with a subspecialty of neurology might be a

18    potential Actiq target; right?

19         A.    Correct.

20         Q.    In fact, up to three percent of your

21    targets might be in that specialty; right?

22         A.    Correct.

23                   MR. ROONEY:  Objection to form.

24         Q.   (By Mr. Faes)  And he indicates that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   psychologists might even be a potential Actiq target;

 2   right?

 3              MR. MAIER:  Object to form.

 4       A.    Psychiatrists may be.

 5       Q.    (By Mr. Faes)  Isn't that what he's saying

 6   here, that marketing things -- that one percent of --

 7       A.    Yes.

 8       Q.    -- potential Actiq targets are

 9   psychiatrists?

10              MR. MAIER:  Object to form.

11              MR. ROONEY:  Object to form.

12       A.    Yes.

13       Q.    (By Mr. Faes)  And 14 percent is other;

14   right?

15       A.    Yes.

16       Q.    And I assume that doesn't mean that --

17   strike that.  And I would assume that pain specialists

18   and oncologists wouldn't be in that group because

19   they're already included in another category; right?

20              MR. ROONEY:  Object to form.

21       A.    Yes.

22              MR. MAIER:  Objection.  Form.

23       Q.    (By Mr. Faes)  And you'd agree with me

24   that at no time in 2003 did Mr. Morreale or any of your
```

Highly Confidential - Subject to Further Confidentiality Review

1    superiors ever tell you that this plan targeting

2    primary care providers, neurologists, psychologists,

3    and other doctors would be inconsistent with the Actiq

4    risk management plan which said to only call on pain

5    specialists and oncologists; right?

6         A.    Yes.

7               MR. MAIER:  Object to form.

8               MR. ROONEY:  Object to form.

9         Q.    (By Mr. Faes)  I'm going to hand you

10   what's been marked as Exhibit Number 18 to your

11   deposition.

12               [Exhibit Teva-Sippial-018

13               marked for identification.]

14               MR. FAES:  Mike, I'm skipping to 16 for

15   you.  Skipping one.

16        Q.    (By Mr. Faes)  And this is a document

17   titled Ohio Valley area first quarter 2000 plan of

18   action.  Do you see that?

19        A.    Yes.

20        Q.    And it's got your name at the top; right?

21        A.    Yes.

22        Q.    And if you look in the center portion do

23   you see there you've got top five Actiq targets for

24   Quarter 1 2005.  Do you see that?

```
 1          A.    Yes.

 2          Q.    And you've got five target -- potential

 3    targets -- top targets listed; right?

 4          A.    Yes.

 5          Q.    And the first one is a Dr. Webb; right?

 6          A.    Yes.

 7          Q.    And you've got his specialty listed as FG;

 8    right?

 9          A.    Yes.

10          Q.    And that would be a family practitioner;

11    right?

12          A.    Correct.

13          Q.    And your last top five Actiq target is a

14    Dr. Smith; right?

15          A.    Yes.

16          Q.    And you've got his specialty listed as IM;

17    right?

18          A.    Yes.

19          Q.    And that would be an internal medicine

20    doctor; right?

21          A.    Correct.

22          Q.    That's a primary specialty?

23          A.    Correct.

24          Q.    And it looks like he's already writing 183
```

```
 1    Actiq scripts at this time; right?

 2         A.    Yes.

 3         Q.    And this is a plan that you would have

 4    written up and created; right?

 5         A.    Yes.

 6         Q.    And you would have shared it with your

 7    superiors at the company, including your immediate

 8    supervisor; right?

 9         A.    Yes.

10         Q.    And if your immediate supervisor had any

11    objections or issues with this plan, he would have told

12    you; right?

13         A.    Yes.

14               MR. MAIER:  Objection.  Form, foundation.

15               MR. ROONEY:  Object to form.

16         Q.    (By Mr. Faes)  And at no time did anyone

17    ever tell you that there was any problems or issues

18    with a doctor with a primary specialty of family

19    medicine being one of your top five targets; right?

20               MR. MAIER:  Objection.  Form.

21               MR. ROONEY:  Object to form.

22         A.    Correct.

23         Q.    (By Mr. Faes)  At no time did anyone ever

24    tell you that there were any problems or issues with a
```

```
 1    doctor with a primary specialty of internal medicine

 2    being one of your top five targets; right?

 3              MR. MAIER:  Objection.  Form.

 4              MR. ROONEY:  Object to form.

 5         A.   They could have had subspecialties in

 6    pain.

 7         Q.   (By Mr. Faes)  Right, but according to

 8    your list here --

 9         A.   Uh-huh.

10         Q.    -- his primary specialty is listed as

11    internal medicine; right?

12         A.   True.

13         Q.   And like I said, you would have shared

14    this plan with your superiors; right?

15         A.   Yes.

16         Q.   And nobody at the company ever would

17    have -- strike that.  Nobody at the company ever

18    expressed to you that there were any problems or issues

19    with this doctor being one of your top five Actiq

20    targets; right?

21         A.   Correct.

22              MR. MAIER:  Objection.  Form.

23              MR. ROONEY:  Object to form.

24         Q.   (By Mr. Faes)  And you ultimately would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have executed this plan; right?

 2         A.    Yes.

 3         Q.    Now, we looked at some documents from two

 4    thou -- you can set that aside.  We're done with it.

 5    I'm sorry.

 6         A.    That's okay.

 7         Q.    We looked at some documents from 2003 and

 8    2005 regarding your promotion and detailing of Actiq;

 9    right?

10         A.    Yes.

11         Q.    Do you remember at any time in 2004 anyone

12    at the company ever telling you that the FDA had

13    expressed some concerns with the way that the company

14    was promoting Actiq?

15               MR. ROONEY:  Object to form.

16               MR. MAIER:  Objection.  Form, foundation.

17         A.    Repeat that.

18         Q.    (By Mr. Faes)  Sure.  Do you remember at

19    any time in approximately 2004 or actually anytime, but

20    do you remember anyone at the company telling you that

21    the FDA had expressed some concerns about the way that

22    the -- the way -- strike that.  Let me ask a simple,

23    less verbose question.

24               Do you remember anyone at the company ever
```

 1    telling you that the FDA had told Cephalon that they

 2    had a problem or issue with the way the company was

 3    promoting Actiq?

 4           A.    I don't remember that.

 5                 MR. MAIER:  Objection.

 6                 MR. ROONEY:  Object to form.

 7           Q.    (By Mr. Faes)  I'm going to hand you

 8    what's been marked as Exhibit Number 19 -- whoops -- to

 9    your deposition.

10                 [Exhibit Teva-Sippial-019

11                 marked for identification.]

12                 MR. FAES:  And Mike, we're going back to

13    14, so we're going to the one I just skipped over.  And

14    this is a letter and attachment from the FDA to the

15    company, and it's from 2004, and you see it states,

16    Dear Marchione, please refer to the meeting between

17    representatives of your firm and DDMAC on August 30th,

18    2004.  The purpose of the meeting was to discuss

19    Cephalon's concern with the DDMAC review process for

20    Actiq and to discuss DDMAC's concerns with Cephalon's

21    promotional activities for Actiq.  Do you see that?

22           A.    Yes.

23           Q.    And you understand from your long

24    experience in the industry, the pharmaceutical

1    industry, that DDMAC is the enforcement arm of the FDA;

2    right?

3            A.    Yes.

4                  MR. MAIER:  Objection.  Form.

5            Q.    (By Mr. Faes)  So if you turn to the next

6    page.  What's attached is titled industry meeting

7    minutes dated August 34th (sic), 2004.  Do you see

8    that?

9            A.    Yes.

10           Q.    And you see that there were six senior

11   people from Cephalon at that meeting?  You see that

12   down on the left?

13           A.    Yes.

14           Q.    And Andy Pyfer.  You know who that is;

15   right?

16           A.    Yes.

17           Q.    He was the product director for Actiq at

18   that time; right?

19           A.    Yes.

20           Q.    And if you look down in background, do you

21   see where it states following a July 14th, 2004,

22   meeting between Cephalon, the division of anesthetics,

23   critical care, and addiction drug products and the

24   division of drug marketing, advertising, and

Highly Confidential - Subject to Further Confidentiality Review

1    communications, which is DDMAC, Cephalon requested a

2    follow-up meeting with DDMAC to discuss concerns

3    regarding review process for its promotional pieces.

4              DDMAC agreed to meet with Cephalon and

5    also stated that it would like to discuss various

6    concerns DDMAC had regarding promotion of Actiq,

7    including concerns regarding information about

8    Cephalon's promotion that was provided by Cephalon

9    during the July 14th, 2004, joint meeting and in

10   Cephalon's briefing package for the July 14th, 2004,

11   meeting.  Do you see that?

12        A.    Yes.

13        Q.    And you see down in Section A it states

14   concerns regarding promotion.  Do you see that?

15        A.    Yes.

16        Q.    It states DDMAC expressed significant

17   concerns about the increasing off-label use of Actiq

18   particularly in light of the risk management plan that

19   is in effect for Actiq, which mandates that among other

20   things the company act to prevent against improper

21   patient selection.  Do you see that?

22        A.    Yes.

23        Q.    And this is referring to the risk

24   management plan that we looked at earlier today; right?

1      A.     Yes.

2      Q.     And you were aware that that risk

3  management plan was in place and was supposed to be

4  followed when you were promoting and/or detailing

5  Actiq; right?

6      A.     Yes.

7             MR. MAIER:  Objection.  Form.

8      Q.     (By Mr. Faes)  Did anyone at the company

9  tell you that -- in 2004 that DDMAC at the FDA

10  expressed to Cephalon significant concerns about the

11  increasing off-label use of Actiq?

12     A.     I don't remember.

13            MR. MAIER:  Objection.  Form.

14            MR. ROONEY:  Object to form.

15     Q.     It goes on to say DDMAC reminded Cephalon

16  that off-label promotion is illegal, especially with a

17  drug risk profile like Actiq, raises significant health

18  concerns.  Do you see that?

19     A.     Yes.

20     Q.     And you'd agree with me that that's true,

21  right, that off-label promotion is illegal?  We covered

22  that earlier; right?

23     A.     Yes.

24     Q.     And that a product like Actiq, which is a

```
 1    highly-addictive and highly-potent opioid, has a unique

 2    risk profile; right?

 3        A.    Yes.

 4              MR. MAIER:  Objection.  Form.

 5              MR. ROONEY:  Object to form.

 6        Q.    (By Mr. Faes)  It has a risk profile that

 7    can raise significant health concerns if it's not

 8    prescribed properly; right?

 9              MR. MAIER:  Objection.  Form.

10              MR. ROONEY:  Object to form.

11        A.    Correct.

12        Q.    (By Mr. Faes)  If you go on to the

13    following page, it states that DDMAC expressed concerns

14    that as indicated by Cephalon's briefing package and

15    presentation on the July 14th, 2004, meeting, the

16    company targets physicians for Actiq promotion purely

17    based on the number of opioid prescriptions they write,

18    and the company is making no effort to screen these

19    targeted physicians to determine whether they treat

20    cancer patients and thus would be appropriate to be

21    detailed on Actiq given its limited indication -- i.e.,

22    management of breakthrough cancer pain in patients with

23    malignancies who are already receiving and who are

24    tolerant to opioid therapy for their underlying
```

```
1    persistent cancer pain.  Do you see that?
2         A.    Yes.
3         Q.    Did anyone at the company ever tell you
4    that the FDA had concerns that Cephalon was targeting
5    physicians for detailing of Actiq based solely on the
6    number of opioid prescriptions that they write and that
7    that was inappropriate?
8              MR. MAIER:  Objection.  Form.
9              MR. ROONEY:  Object to form.
10        A.    I don't remember.
11        Q.    (By Mr. Faes)  If somebody had told you
12   that, it's fair to say it would probably stick out in
13   your mind; right?
14        A.    Yes.
15             MR. MAIER:  Objection.  Form.
16             MR. ROONEY:  Object to form.
17        Q.    (By Mr. Faes)  And if somebody had told
18   you that it's probably fair to say that there would be
19   some retraining or some changing in the way that you
20   were promoting and detailing Actiq at this time; right?
21        A.    True.
22             MR. ROONEY:  Object to form.
23             MR. MAIER:  Objection.  Form, foundation.
24        Q.    (By Mr. Faes)  Do you remember any
```

1    significant changes to the way you promoted and

2    detailed Actiq at this time in 2004?

3              MR. MAIER:  Objection.  Form.

4              MR. ROONEY:  I'll object to form as well.

5         A.    I don't remember.  I don't recall

6    specifically.

7         Q.    (By Mr. Faes)  Did anyone ever tell you

8    that the FDA had exper -- strike that.  Did anyone ever

9    tell you that the FDA had expressed to Cephalon that

10   the company was making no effort to screen out their

11   targeted physicians to determine whether they treat

12   cancer patients and thus would be appropriate to be

13   detailed on Actiq given its limited indication?

14             MR. MAIER:  Object to form.

15             MR. ROONEY:  Object to the form.

16        A.    Could you narrow that question down --

17        Q.    (By Mr. Faes)  Sure.  Did anyone ever tell

18   you that the FDA had expressed to Cephalon that they

19   were concerned the company was making no effort to

20   screen out their targeted physicians?

21        A.    No one ever expressed that to me.

22             MR. MAIER:  Objection.  Form.

23             MR. ROONEY:  Object to form.

24        Q.    (By Mr. Faes)  You can set that aside.

Highly Confidential - Subject to Further Confidentiality Review

1    I'm going to hand you what's been marked as Exhibit

2    Number 20 to your deposition.

3                 [Exhibit Teva-Sippial-020

4                 marked for identification.]

5                 MR. FAES:  And this is 17, Mike.  I think

6    we're back on track number-wise.

7          Q.    (By Mr. Faes)  This is an e-mail and

8    attachment from a Philip Tocco to you.  You see Laura

9    Mosley-Speaks there, right, and others?

10         A.    Yes.

11         Q.    Dated January 24th of 2006; right?

12         A.    Yes.

13         Q.    And at this time Philip Tocco would have

14   been your immediate superior, right -- your immediate

15   boss?

16         A.    Correct.

17         Q.    And it's got an attachment titled repeat

18   off-label prescribers; right?

19         A.    Yes.

20         Q.    And this is an e-mail and attachment that

21   you would have received; right?

22         A.    Yes.

23         Q.    And this was something that was sent out

24   in the ordinary course of business at your company to

1   the sales reps; right?

2          A.    Yes.

3                MR. ROONEY:  Object to form.

4          Q.    (By Mr. Faes)  And if you turn to the

5   third page in of this, you see that a Dr. B. Reddy is

6   listed there.

7          A.    Yes.

8          Q.    From Dayton, Ohio?  And if you look at the

9   top it says global product safety has identified these

10  health care providers as repeat off-label prescribers.

11  Bolded names had multiple listings for the month.  Do

12  you see that?

13         A.    Yes.

14         Q.    So Dr. Reddy -- that was a doctor that you

15  would have called on in Dayton; right?

16         A.    Correct.

17         Q.    And you would have been notified that he

18  was a repeat off-label prescriber of Actiq at this time

19  in 2006; right?

20                MR. MAIER:  Objection.  Form.

21         A.    Two thousand --

22         Q.    (By Mr. Faes)  The e-mail is dated 2006.

23  The --

24         A.    Oh.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    I realize the list says 2005 but I'm

 2   assuming you weren't notified until you got the e-mail

 3   in 2006?

 4          A.    Okay.  Correct.

 5          Q.    And you would have continued to call on

 6   Dr. Reddy after receiving this; right?

 7          A.    Yes.

 8                MR. ROONEY:  Object to form.

 9          Q.    (By Mr. Faes)  And in fact, would it

10   surprise you to learn that Dr. Reddy actually became a

11   speaker for Fentora on more -- and spoke for Fentora on

12   more than one occasion?

13                MR. ROONEY:  Object to form.

14          A.    I don't remember him being a speaker.

15          Q.    (By Mr. Faes)  Well, I'll represent to you

16   that he spoke on Fentora at least twice.  Would that

17   surprise you to learn that?

18                MR. ROONEY:  Object to form.

19          A.    No.

20          Q.    (By Mr. Faes)  And when I say spoke on

21   Fentora, I mean spoke for Fentora in a

22   company-sponsored Cephalon speaker program.  Would that

23   surprise you?

24                MR. ROONEY:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    No.

2         Q.    (By Mr. Faes)  And that wouldn't surprise

3   you because again, being a repeat off-label prescriber

4   for Actiq wouldn't necessarily disqualify you from

5   being a company-sponsored speaker for either Actiq or

6   Fentora; right?

7              MR. MAIER:  Object to form.

8              MR. ROONEY:  Object to form.

9         A.    Repeat that.

10        Q.    (By Mr. Faes)  You'd agree then that it

11  wouldn't surprise you that Dr. Reddy spoke in a

12  company-sponsored program for Fentora because being a

13  repeat off-label prescriber for Actiq or Fentora

14  wouldn't necessarily disqualify you from that; right?

15             MR. MAIER:  Objection.  Form.

16             MR. ROONEY:  Same objection.

17        A.    No.  I never used him, but I don't know

18  who did.

19        Q.    (By Mr. Faes)  Right, but my question is

20  you'd agree with me that being a repeat off-label

21  prescriber for either Actiq or Fentora wouldn't

22  necessarily disqualify you from being a speaker in a

23  company-sponsored program for those products in the

24  future; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ROONEY:  Object to form.

 2          A.    I guess not.

 3                    MR. MAIER:  Objection.  Form, foundation.

 4          Q.    (By Mr. Faes)  I'm going to hand you

 5    what's been marked as Exhibit Number 22 to your

 6    deposi -- or no, I already marked it as 21.  I'm going

 7    to hand you what's been marked as Exhibit Number 21 to

 8    your deposition.

 9                    [Exhibit Teva-Sippial-021

10                    marked for identification.]

11          Q.    And this is another e-mail and attachment

12    from Mr. Tocco to you, and this one is dated about two

13    months later on March 14th of 2006.  Do you see that?

14          A.    Yes.

15          Q.    And again, it's attaching a Actiq repeat

16    off-label prescriber list; right?

17          A.    Yes.

18          Q.    And if you go to the fourth page -- one,

19    two, three, four, five.

20                    MR. FAES:  Which I think is the sixth page

21    for you, Mike.  You know what?  That's it.

22          Q.    (By Mr. Faes)  And if you look down at the

23    second from the bottom left, there's a Dr. Gladstone

24    McDowell listed there.  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And he's listed in -- I'm sorry.  Strike

 3   that.  I'm not asking about Dr. Gladstone McDowell

 4   because he wouldn't have been in your territory; right?

 5        A.    No.

 6        Q.    So if you look at the bottom left-hand

 7   corner there you see a Dr. Hal S. Blatman.  Do you see

 8   that?

 9        A.    Yes.

10        Q.    And he was in Cincinnati, Ohio; right?

11        A.    Yes.

12        Q.    And so at this time in March of 2006 you

13   would have been notified that Dr. Blatman was a repeat

14   off-label prescriber for Actiq; right?

15        A.    Yes.

16              MR. MAIER:  Objection.  Form.

17        Q.    (By Mr. Faes)  And you still would have

18   continued calling on him for Actiq and later Fentora;

19   right?

20              MR. MAIER:  Objection.  Form.

21              MR. ROONEY:  Object to form.

22        A.    If he wrote off-label he must also have

23   had cancer patients, because we wouldn't have been in

24   there if he just wrote off-label.
```

1      Q.    (By Mr. Faes)  I understand.  But my

2  question is after having received this list indicating

3  that he was a repeat off-label prescriber for Actiq,

4  you would have continued calling on him; right?

5              MR. MAIER:  Objection.  Form.

6              MR. ROONEY:  Object to form.

7      Q.    (By Mr. Faes)  For Actiq and Fentora?

8      A.    I guess so.

9              MR. ROONEY:  Don't guess.

10     Q.    (By Mr. Faes)  And what is --

11     A.    What?

12             MR. ROONEY:  Don't guess if you don't

13 know.

14     A.    I --

15     Q.    (By Mr. Faes)  Do you have any reason to

16 think that you stopped calling on Dr. Blatman after

17 receiving this list in March of 2006?

18     A.    No.

19     Q.    And would it surprise you to learn that

20 Mr. Blatman actually became a speaker for Fentora and

21 spoke at company-sponsored programs for Fentora at

22 least six times?

23             MR. ROONEY:  Object --

24             MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ROONEY:  Object to form.

 2          A.    No.

 3          Q.    (By Mr. Faes)  And again, that wouldn't --

 4     strike that.  And again, it wouldn't surprise you that

 5     Dr. Blatman went on to become a speaker for Fentora

 6     even though he was on the repeat off-label prescribers

 7     list for Actiq because there was no company policy

 8     prohibiting people who were on this list from being a

 9     company-sponsored speaker; right?

10          A.    Correct.

11                    MR. MAIER:  Object to form.

12                    MR. ROONEY:  Object to form.

13          Q.    (By Mr. Faes)  I'm just looking for that.

14     I'll just skip to the next one and we'll come back to

15     that.  I'm going to hand you what's been marked as

16     Exhibit Number 22 to your deposition.

17                    [Exhibit Teva-Sippial-022

18                    marked for identification.]

19                    MR. FAES:  And Mike, I'm jumping one to 20

20     and I think I'm going to come back to 19 when I'm done

21     with this one.  Oh, yeah.  I keep looking at you.  I'm

22     getting my -- I'm getting the roles mixed up.

23                    TRIAL TECHNICIAN:  It's Shawn.

24                    MR. FAES:  There are so many support staff
```

Highly Confidential - Subject to Further Confidentiality Review

1   here.

2        Q.   (By Mr. Faes)  So Exhibit -- what number

3   does that have on it?

4             TRIAL TECHNICIAN:  22.

5        A.   22.

6        Q.   (By Mr. Faes)  So Exhibit Number 22 is an

7   e-mail and attachment, and the attachment is labeled

8   Actiq promotional guidelines.  Do you see that?

9        A.   Yes.

10        Q.   And this -- the first line of this

11   indicates that the PCS, meaning pain care sales force,

12   would have implemented this algorithm throughout the

13   Actiq life cycle.  Do you see that?

14        A.   Yes.

15        Q.   So let's take a look at this promotional

16   guideline.  If you can turn actually to the very last

17   page of this.  No.  I'm sorry.  The second-to-last page

18   of this.  And this is a decision tree that would have

19   been implemented by the pain care sales force during

20   the lifetime of Actiq; right?

21        A.   Yes.

22             MR. MAIER:  Objection.  Form.

23             MR. ROONEY:  Object to form.

24        Q.   (By Mr. Faes)  And you can see at the top

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of it there's a decision tree and it starts with Actiq

 2    prescribers outside the target universe, open the call

 3    with the following question.  Do you have the potential

 4    to treat patients with cancer pain.  Do you see that?

 5        A.    Yes.

 6        Q.    And that's a way that you as a sales rep

 7    for Actiq were trained to open a sales call on -- to a

 8    potential physician that you had called on for the

 9    first time; right?

10        A.    Yes.

11              MR. ROONEY:  Object to form.

12        Q.    (By Mr. Faes)  And if the physician

13    responds no, it directs you to support by providing

14    Actiq safety and efficiency info, provide coupons and

15    welcome kits, and limit calls to 12 times a year;

16    right?

17        A.    Yes.

18        Q.    So that's the instruction from the company

19    on what you were to do as a sales rep for Actiq even if

20    a physician responded no to the question do you have

21    the potential to treat patients with cancer pain;

22    right?

23              MR. MAIER:  Objection.  Form.

24              MR. ROONEY:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    (By Mr. Faes)  So even if a doctor on a

 3   sales call told you he didn't have the potential to

 4   treat patients with cancer pain, you could still call

 5   on that physician but you were supposed to limit it to

 6   12 times a year; right?

 7          A.    Yes, according to this.

 8          Q.    And you can still provide coupons and

 9   welcome kits; right?

10          A.    Yes.

11          Q.    And coupons and welcome kits -- those are

12   vouchers that the patient can use to get Actiq for free

13   or at a reduced cost while the patient tries it out;

14   right?

15                MR. MAIER:  Objection.  Form.

16          A.    Yes.

17          Q.    (By Mr. Faes)  And that's intended to get

18   the patient titrated to the right dose and see if the

19   product works for them; right?

20                MR. MAIER:  Objection.  Form.

21                MR. ROONEY:  Object to form.

22          A.    Yes.

23          Q.    (By Mr. Faes)  And you learned as a sales

24   representative that those coupons were a highly
```

Highly Confidential - Subject to Further Confidentiality Review

1    effective tool available to you in promoting and

2    detailing Actiq; right?

3         A.    Yes.

4               MR. ROONEY:  Object to form.

5         Q.    (By Mr. Faes)  In fact, you learned that

6    of the --

7               MR. MAIER:  Objection.  Form.

8         Q.    (By Mr. Faes)  Isn't it true that you

9    learned that of the various promotional or detail tools

10   available to you, that coupons or vouchers had the

11   highest ROI or return on investment of the various

12   tools available to you?

13              MR. MAIER:  Objection.  Form, foundation.

14              MR. ROONEY:  Object to form.

15        A.    I don't know.

16        Q.    (By Mr. Faes)  Did you come to learn that

17   the -- that studies were done on the coupons or

18   vouchers and they could have up to 200 percent return

19   on investment from those coupons or vouchers?

20        A.    I don't remember that.

21              MR. MAIER:  Objection.  Form, foundation.

22        Q.    (By Mr. Faes)  But at any rate you do

23   remember that they were frequently used and were one of

24   the most effective marketing tools that you had; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2              MR. ROONEY:  Object to form.

 3              MR. MAIER:  Objection.  Form.

 4        Q.    (By Mr. Faes)  And many of the patients,

 5  once they tried Actiq, using the coupons and getting it

 6  for free or reduced cost, many of those patients

 7  continued to use Actiq after that; right?

 8              MR. MAIER:  Objection.  Form, foundation.

 9              MR. ROONEY:  Object to form.

10        A.    I don't know.

11        Q.    (By Mr. Faes)  Well, that's why it was so

12  effective; right?

13              MR. MAIER:  Objection.  Form.

14              MR. ROONEY:  Object to form.

15        A.    Repeat.

16        Q.    (By Mr. Faes)  I mean, that's why the

17  coupons were so effective, is because a lot of people

18  that used them -- and that's why it had a high ROI, is

19  because a lot of the patients who got the coupons used

20  the coupons and continued on --

21        A.    Yes.

22        Q.     -- with the product; right?

23              MR. ROONEY:  Object to form.

24        Q.    (By Mr. Faes)  It makes sense; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2              MR. MAIER:  Objection.  Form.

 3              MR. ROONEY:  Objection.

 4        Q.    (By Mr. Faes)  And this is -- this

 5  instruction, this document that we're looking at, this

 6  decision tree -- this is instructions that would have

 7  been given to you by your superiors about detailing and

 8  promoting Actiq, and you would have followed their

 9  instructions; right?

10        A.    Yes.

11              MR. MAIER:  Objection.  Form.

12              MR. ROONEY:  Object to form.

13              MR. FAES:  So I'm going back to 19 now,

14  Mike.

15              [Discussion off the record.]

16        Q.    (By Mr. Faes)  Ms. Sippial, I'm going to

17  hand you what's been marked as Exhibit Number 23 to

18  your deposition.

19              [Exhibit Teva-Sippial-023

20              marked for identification.]

21        Q.    And this an e-mail from your supervisor,

22  Philip Tocco, to you, dated April 28th of 2006; right?

23        A.    Yes.

24        Q.    And it states on a recent e-mail I
```

Highly Confidential - Subject to Further Confidentiality Review

1    stressed our need to pay more attention to your top

2    prescribers.  These are the doctors who are really

3    going to drive your business for the remainder of the

4    year.  Below is a list of your top 20 Actiq unit

5    prescribers for Quarter 1 to the day.

6              I have highlighted these doctors which

7    have less than four calls over the last 90 days.  Let's

8    pay special attention to all those doctors and keep

9    growing the positive sales trends that I'm seeing in

10   your territory so far in 2006.  Do you see that?

11        A.    Yes.

12        Q.    And that's instructions from Philip Tocco

13   to you; right?

14        A.    Yes.

15        Q.    And you would have received this e-mail;

16   right?

17        A.    Yes.

18        Q.    And you would have tried to follow your

19   supervisor's instructions to the best of your ability;

20   right?

21        A.    Correct.

22              MR. ROONEY:  Object to form.

23        Q.    (By Mr. Faes)  And if you look down, it's

24   got kind of a code.  Last name, first name, specialty

Highly Confidential - Subject to Further Confidentiality Review

```
 1    group, and specialty.  Right?

 2         A.    Yes.

 3         Q.    And if you look down, the first physician

 4    on this list that Mr. Tocco thinks that you should pay

 5    special attention to is a Dr. Mitchell Simons.  Right?

 6         A.    Yes.

 7               MR. MAIER:  Objection.  Form.

 8         Q.    (By Mr. Faes)  And going to the special

 9    page, there's a Dr. Akbik.  Do you see that?

10         A.    Yes.

11         Q.    So that was a doctor that your boss wanted

12    you to pay special attention to; right?

13         A.    Yes.

14               MR. MAIER:  Objection.  Form.

15         Q.    (By Mr. Faes)  And you knew that -- came

16    to learn at some point that Dr. Akbik did write Actiq

17    off-label at times; right?

18               MR. MAIER:  Objection.  Form.

19               MR. ROONEY:  Object to form.

20         A.    I don't recall his name being on a list.

21         Q.    (By Mr. Faes)  Well, we'll look at some

22    documents with him later.

23         A.    Okay.

24         Q.    And another person that your boss, Philip
```

Highly Confidential - Subject to Further Confidentiality Review

1   Tocco, says you should pay special attention to with

2   regard to Actiq is Hal Blatman; right?

3        A.    Yes.

4        Q.    And as we saw, he was on the repeat

5   off-label prescriber list from a couple of months ago;

6   right?

7        A.    Yes.

8        Q.    And so your boss is still saying to pay

9   special attention to him even though he's been on that

10  repeat off-label list; right?

11       A.    Yes.

12             MR. ROONEY:  Object to form.

13       Q.    (By Mr. Faes)  And if you turn to the

14  following page you've got a Dr. Timothy Smith, and his

15  primary specialty is as a primary care provider in

16  family medicine; right?

17       A.    Yes.

18             MR. MAIER:  Objection.  Form.

19       Q.    (By Mr. Faes)  And that's somebody that

20  was a top prescriber for you at the time; right?

21       A.    Yes.

22             MR. MAIER:  Objection.  Form.

23       Q.    (By Mr. Faes)  And that's somebody who

24  your boss told you to pay special attention to when

Highly Confidential - Subject to Further Confidentiality Review

```
 1   detailing Actiq; right?

 2          A.    Yes.

 3                MR. MAIER:  Objection.  Form.

 4          Q.    (By Mr. Faes)  And the last name on the

 5   list is Dr. Rajbir Minhas; right?

 6          A.    Yes.

 7          Q.    And his primary specialty is primary care

 8   physician and internal medicine; right?

 9          A.    Yes.

10          Q.    And that's somebody that was one of your

11   top Actiq prescribers at this time; right?

12          A.    Yes.

13                MR. MAIER:  Object --

14          Q.    (By Mr. Faes)  And this is someone that

15   despite his specialty -- his subspecialty, your boss

16   instructed you to pay special attention to when

17   promoting and detailing Actiq; right?

18          A.    Yes.

19                MR. MAIER:  Object to form.

20          Q.    (By Mr. Faes)  And in fact, that's

21   actually the doctor that it was alleged Dr. Akbik gave

22   a Cephalon speaker program to; right?

23          A.    Correct.

24          Q.    And that's the speaker program that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   ultimately led to your separation from Cephalon; right?

 2        A.    Correct.

 3        Q.    And if you turn to the following pages --

 4   page.  You've got a Dr. Mark Rorrer on this list;

 5   right?

 6        A.    Yes.

 7        Q.    And again, his primary specialty is

 8   primary care physician and family medicine; right?

 9        A.    Yes.

10              MR. MAIER:  Objection.  Form.

11        Q.    (By Mr. Faes)  And despite that

12   subspecialty he was not only a top prescriber of Actiq

13   but someone that your boss, Michael Morreale, told you

14   you should pay special attention to in April of 2006;

15   right?

16              MR. MAIER:  Objection.  Form.

17              MR. ROONEY:  Object to form.

18        A.    Yes.

19        Q.    (By Mr. Faes)  And following page you've

20   got a Dr. Jose Martinez; right?

21        A.    Yes.

22        Q.    And again, a primary care physician and

23   internal medicine subspecialty; right?

24        A.    Yes.
```

```
 1           Q.    And again, one of your top prescribers and

 2    somebody that you were instructed to pay special

 3    incident to; right?

 4           A.    Yes.

 5                 MR. MAIER:  Object to form.

 6                 MR. ROONEY:  Object to form.

 7           Q.    (By Mr. Faes)  And last page, I swear.

 8    And you've got a Dr. Mark Thomas on the following page

 9    who's got a primary subspecialty listed of primary care

10    physician and family medicine; right?

11           A.    Yes.

12                 MR. MAIER:  Objection.  Form.

13           Q.    (By Mr. Faes)  And again, this is somebody

14    who was one of your top Actiq prescribers and someone

15    that your boss told you you should pay special

16    attention to despite his subspecialty; right?

17           A.    Yes.

18                 MR. MAIER:  Objection.  Form.

19                 MR. ROONEY:  Object to form.

20           Q.    (By Mr. Faes)  And you've got a Dr. Victor

21    Angel.  Did I get the last name and first name right?

22           A.    Correct.

23           Q.    And again, this is a doctor that's listed

24    with a primary specialty of primary care physician and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   family medicine; right?

 2        A.    Yes.

 3              MR. MAIER:  Objection.  Form.

 4        Q.    (By Mr. Faes)  And despite his

 5   subspecialty this is someone who's both a top Actiq

 6   prescriber and someone your boss told you you should

 7   pay special attention to; right?

 8        A.    Yes.

 9              MR. MAIER:  Objection.  Form.

10              MR. ROONEY:  Object to form.

11        Q.    (By Mr. Faes)  So at this time in 2006 you

12   would agree with me that at least six of your top

13   prescribers of Actiq were people who either didn't have

14   a specialty either in oncology or pain management,

15   according to what was assigned to them by the company,

16   or were on the repeat off-label prescriber list; right?

17              MR. MAIER:  Objection.  Form.

18              MR. ROONEY:  Object to form.

19        A.    Yes.

20        Q.    (By Mr. Faes)  And despite that, you'd

21   agree that your boss, Philip Tocco, in 2006 directed

22   you to continue to call on them and -- not only to call

23   on them but to pay special attention to them because

24   they were top prescribers; right?
```

```
 1          A.    Yes.

 2                MR. MAIER:  Objection.  Form.

 3                MR. ROONEY:  Object to form.

 4          Q.    (By Mr. Faes)  Do you want to take a break

 5   or do you want to go about -- because this section is

 6   going to get a little long, so --

 7                MR. ROONEY:  Let's take a break.

 8          A.    Yeah, let's take a break.

 9                THE VIDEOGRAPHER:  We are going off the

10   record at 2:50 PM.

11                [A brief recess was taken.]

12                THE VIDEOGRAPHER:  We are back on the

13   record at 3:04 PM.

14          Q.    (By Mr. Faes)  Ms. Sippial, we're back on

15   the record after a short break.  Are you ready to

16   proceed?

17          A.    Yes.

18          Q.    So now what I want to talk to you about is

19   your early -- your very first calls with Actiq and some

20   of your call notes.  Okay?

21          A.    Yes.

22          Q.    So I'm going to hand you first what's been

23   marked as Exhibit Number 24.  You can probably just set

24   it aside because that's what I'm going to do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    [Exhibit Teva-Sippial-024

 2                    marked for identification.]

 3        A.    Okay.

 4        Q.    Because it's going to be too small for you

 5   to read.

 6        A.    Yeah.  Wow.

 7        Q.    These are your call notes.  I'll represent

 8   to you -- and just for the record, Bates number is

 9   02416207.  These are some of your call notes.  So now

10   I'm going to hand you what's been marked as Exhibit

11   Number 25, which is the same document -- it's Exhibit

12   Number 24 blown up so that we can see the comments, the

13   name, your name, the specialty, and the date.  Okay?

14                    [Exhibit Teva-Sippial-025

15                    marked for identification.]

16        A.    Okay.

17        Q.    And I just do that because if I don't mark

18   the whole thing somebody will squawk that you didn't

19   get to see the whole document or something like that.

20        A.    Okay.

21             MR. FAES:  Are we still -- we're not

22   muted, are we?

23        Q.    (By Mr. Faes)  So Exhibit Number 25 is

24   some of your call notes.  You can see that --
```

Highly Confidential - Subject to Further Confidentiality Review

1                MR. FAES:  Can we put them up on the

2     screen?  Looking at -- this is 22.

3          Q.   (By Mr. Faes)  So the first entry on your

4     call notes is -- on this one is February 27th, 2001;

5     right?

6          A.   Yes.

7          Q.   And I'll represent to you that we've

8     looked at your call notes, and the first call note that

9     we can find from you ever is dated the day before this

10    on February 26th of 2001.

11         A.   Okay.

12         Q.   Is that consistent with when you would

13    have -- your memory of when you first would have gotten

14    into the field promoting and detailing Actiq?

15         A.   Yes.

16         Q.   So you see the rep name is you, Laura

17    Mosley-Speaks, which was your name up until about 2007;

18    right?

19         A.   Yes.

20         Q.   The first entry is for a Dr. Nilesh

21    Jobalia; right?

22         A.   Yes.

23         Q.   And it has a specialty.  He's an

24    anesthesiologist or kind of a pain management

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specialist; right?

 2         A.    Yes.

 3         Q.    And you look at your call comments.  It

 4    says discussed where he uses Actiq.  Malignant and

 5    nonmalignant pain.  Having problems with pharmacy

 6    stocking, has cancer in patients on 1,600 micrograms.

 7    Beverly set up lunch 3-14, Skilled Care Pharmacy, and a

 8    phone number.  Do you see that?

 9         A.    Yes.

10         Q.    So these are call notes that would have

11    been entered by you about Dr. Jobalia; right?

12         A.    Yes.

13         Q.    And you note that on your very first visit

14    with him he notes that he uses Actiq for both malignant

15    and nonmalignant pain; right?

16         A.    Yes.

17         Q.    And that's basically telling you he uses

18    it for both cancer and noncancer pain; right?

19         A.    Yes.

20         Q.    So he's basically indicating to you on

21    your very first visit with him, which is probably only

22    your second day out as a sales representative for

23    Actiq, that he's using Actiq off-label; right?

24                MR. MAIER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

1              MR. ROONEY:  Object to form.

2         A.    Yes.

3         Q.    (By Mr. Faes)  And if you look at -- well,

4    strike that.  And you'd agree with me that you

5    continued to call on Dr. Nilesh Jobalia at least

6    through 2008; correct?

7         A.    Yes, if he was using it for nonmalignant

8    pain, I was responsible for going in there and telling

9    him what the indication was and to gear him towards

10   prescribing it for malignant pain.

11        Q.    So if we can look at the third call note

12   down.  This one is dated March 8th of 2001.  Do you see

13   that?

14        A.    Yes.

15        Q.    And this is for a Dr. Lynda Groh; right?

16        A.    Yes.

17        Q.    And your notes written by you are had

18   lunch, had buy-in with using Actiq.  Gave equal chart.

19   What does that stand for?

20        A.    Equal analgesic chart.

21        Q.    So that's kind of a conversion chart --

22        A.    Yes.

23        Q.     -- to help them with appropriate doses of

24   Actiq?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And he says concerned about co-pay and

 3   what is needed to genit paint (ph) it for patients that

 4   have nonmalignant pain.  Do you see that?

 5        A.    Yeah.  I don't know.

 6        Q.    What is genit paint it for patients that

 7   have nonmalignant pain?

 8        A.    I don't know.  I have no clue.

 9        Q.    But at any rate, this indicates that he's

10   inquiring -- making inquiries to you about using Actiq

11   for nonmalignant or noncancer pain; right?

12              MR. ROONEY:  Object to form.

13        A.    Yes.

14        Q.    (By Mr. Faes)  So on this visit, Dr. Grow

15   is asking you for information about the use of Actiq

16   and off-label indications; right?

17        A.    Yes.

18              MR. MAIER:  Object to form.

19        Q.    (By Mr. Faes)  If you look at the fourth

20   note down, you've got a call dated March 9th of 2001

21   to -- who's that doctor?

22        A.    Dr. Sudarshan.

23        Q.    So with Dr. Sudarshan, your call notes are

24   lunch.  He was concerned about whether or not it was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    covered by Medicare.  I told him I would get back to

 2    him.  He has an older patient who has lower back pain.

 3    Do you see that?

 4          A.    Yes.

 5          Q.    So those are the call notes that you would

 6    have entered on that visit; right?

 7          A.    Yes.

 8          Q.    And this is indicating that this doctor

 9    whose name I can't pronounce is --

10          A.    Sudarshan.

11          Q.    Is considering using Actiq for an

12    off-label indication, namely lower back pain; right?

13          A.    It's possible that --

14                MR. ROONEY:  Object to form.

15                MR. MAIER:  Objection.  Form.

16          A.     -- cancer.  Back pain.

17          Q.    (By Mr. Faes)  It's possible?

18          A.    Yes.

19          Q.    But you didn't note that the patient has

20    cancer or that it's cancer-related lower back pain in

21    your call notes; right?

22          A.    I did not.

23          Q.    If you go to the next call note down,

24    you've got another call to Dr. Nilesh Jobalia; right?
```

```
 1        A.    Yes.

 2        Q.    And this is the doctor earlier that

 3   indicated in the first entry that he was using it for

 4   both cancer and noncancer pain; right?

 5        A.    Correct.

 6        Q.    And you note lunch.  Found out that he

 7   went to the last speakers' bureau meeting when it was

 8   Anesta.  Likes to use meds of the same molecule.

 9   Easier to titrate.  Just put a young boy on Actiq.

10   Will see him Friday at Drake hospital.  Almost never

11   uses Actiq for cancer patients.  Does not use his --

12   does not use coupons.  Right?

13        A.    Correct.

14        Q.    So those are the notes that you would have

15   made at that time; right?

16        A.    Yes.

17        Q.    And then you say preceptorship in all

18   caps; right?

19        A.    Yes.

20        Q.    So first of all, he indicated to you that

21   he put a young boy on Actiq; right?

22        A.    Yes.

23        Q.    And you know that that's off-label because

24   Actiq doesn't have a pediatric indication; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MAIER:  Object to form.

 2                    MR. ROONEY:  Object to form.

 3          A.    Young boy could have been 18, not --

 4          Q.    (By Mr. Faes)  But you'd agree with me

 5     that --

 6          A.    It doesn't have a pediatric indication,

 7     no.

 8          Q.    So you'd agree with me if the boy was a

 9     young boy, meaning under 18, or a minor, that would be

10     an off-label use because it doesn't have a pediatric

11     indication; right?

12          A.    Correct.

13                    MR. MAIER:  Object to form.

14          Q.    (By Mr. Faes)  And you also note that Dr.

15     Jobalia, who we saw in your 2003 PowerPoint

16     presentation, was one of your top five prescribers for

17     Fent -- or for Actiq at that time -- that he almost

18     never uses Actiq for cancer patients; right?

19          A.    Yes.

20                    MR. ROONEY:  Object to form.

21          Q.    (By Mr. Faes)  If you look at the

22     following call note down, you've got another call to

23     Dr. -- whose name I can't pronounce.  Can you say it

24     again for me?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Sudarshan.  Sudarshan.

 2        Q.    And this one's dated March 16th of 2001;

 3  right?

 4        A.    Yes.

 5        Q.    And you note that you left coupons for him

 6  to use on his patient with chronic back pain.  Medicare

 7  does not cover Actiq.  Do you see that?

 8        A.    Yes.

 9        Q.    So apparently you -- not only did the

10  patient have chronic back pain, which is an off-label

11  indication; right?

12        A.    Yes.

13              MR. MAIER:  Objection.  Form.

14              MR. ROONEY:  Object to form.

15        Q.    (By Mr. Faes)  You left coupons for that

16  doctor to potentially use with that patient with

17  chronic back pain; right?

18        A.    Correct.

19              MR. MAIER:  Object to form.

20              MR. ROONEY:  Object to form.

21        Q.    (By Mr. Faes)  It doesn't say anything in

22  the call notes about this having -- this patient having

23  cancer or the back pain being cancer-related; right?

24        A.    Correct.
```

```
 1          Q.    If you go down two more to the call note

 2    dated June 19th of 2001.  You've got a call note with a

 3    Dr. Karen Krone, and your notes are had lunch,

 4    discussed Ms. Snyder and that she was able to titrate

 5    her from two to six -- 200 to 600.  Discussed other

 6    patients besides cancer patients that would benefit

 7    from Actiq.  Gave Nurse Tracy coupons to place in the

 8    file.  Migraines is an area could use it in.  Do you

 9    see that?

10          A.    Yes.

11          Q.    So that indicates that on this date in

12    June of 2001 that Dr. Krone discussed with you other

13    patients -- other than cancer patients that might

14    benefit from Actiq; right?

15                MR. ROONEY:  Object to form.

16                MR. MAIER:  Objection.  Form.

17          A.    Yes.

18          Q.    (By Mr. Faes)  Meaning patients that might

19    be potentially off-label patients that could use Actiq;

20    right?

21          A.    Correct.

22                MR. ROONEY:  Objection.

23          Q.    (By Mr. Faes)  She's discussing her

24    potential off-label use of the product with you; right?
```

```
 1                    MR. MAIER:  Objection.  Form.

 2          A.    Correct.

 3                    MR. ROONEY:  Same objection.

 4          Q.    (By Mr. Faes)  And she's also discussing

 5   with you potentially using the product to treat

 6   migraines; right?

 7          A.    Yes.

 8                    MR. MAIER:  Objection.  Form.

 9                    MR. ROONEY:  Object to form.

10          Q.    (By Mr. Faes)  And that's -- strike that.

11   Migraines is not -- strike that.  Migraines is -- would

12   be an off-label use of the Actiq product; right?

13          A.    Correct.

14                    MR. ROONEY:  Object to form.

15          Q.    (By Mr. Faes)  And the following one, you

16   visit with the same doctor about two to three weeks

17   later on 7-5 of 2001.  Do you see that?

18          A.    Yes.

19          Q.    And your notes are she has found success

20   in her terminal cancer patient with Actiq.  I am now

21   trying to have her identify patient types -- i.e.,

22   migraine patients as well as other patients -- other

23   areas with patients who have breakthrough pain; right?

24          A.    Yes.
```

1        Q.      So does this indicate that you are

2    actually soliciting Dr. Krone to identify patients who

3    might be able to use Actiq for migraines?

4                MR. ROONEY:  Object to form.

5                MR. MAIER:  Objection.  Form.

6        A.      Other patients that she had brought to my

7    attention that she was interested in using Actiq in,

8    not that I was soliciting it.

9        Q.      (By Mr. Faes)  Well, don't you say I am

10   now trying to have her identify patient types -- i.e.,

11   migraine patients?

12       A.      Yes.

13       Q.      And does that indicate that you are

14   soliciting or promoting off-label?

15       A.      It sounds like -- it sounds that way.

16               MR. ROONEY:  Object to form.

17               MR. MAIER:  Object to form.

18       Q.      (By Mr. Faes)  So you'd agree it sounds

19   bad; right?

20               MR. ROONEY:  Object to form.

21               MR. MAIER:  Objection.  Form.

22       A.      Yes.

23       Q.      (By Mr. Faes)  You'd agree that it sounds

24   like you'd promoting Actiq off-label; right?

```
 1         A.    Correct.

 2               MR. ROONEY:  Object to form.

 3               MR. MAIER:  Object to form.

 4         Q.    (By Mr. Faes)  If you look at the

 5   following call note, again with Dr. Karen Krone.  It

 6   states that you spoke with other patient she could be

 7   using Actiq on, says she has a few migraine patients.

 8   Would like to set up a lunch with her with a speaker.

 9   Reminded her of free titration.  Do you see that?

10         A.    Yes.

11         Q.    So this indicates that it looks like in

12   response to your previous conversation where she's

13   trying to identify patient types -- other patients who

14   have breakthrough pain, including patients with

15   migraines, she's got a few migraine patients; right?

16               MR. ROONEY:  Object to form.

17               MR. MAIER:  Object to form.

18         A.    Yes, it appears that way.

19         Q.    (By Mr. Faes)  And you're trying to set up

20   a lunch with her with another speaker, again a

21   peer-to-peer selling situation or a Cephalon speaker

22   program where that doctor can educate her on the use of

23   Actiq for that indication; right?

24               MR. MAIER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ROONEY:  Object to form.

 2          A.     For the indication --

 3          Q.     (By Mr. Faes)  For the indication of

 4   migraine patients.

 5                    MR. MAIER:  Object to form.

 6                    MR. ROONEY:  Objection.

 7          A.     Possibly.  I don't know.

 8          Q.     (By Mr. Faes)  You just don't remember?

 9          A.     I don't remember.

10          Q.     If you look at the next sales call note

11   dated August 30 of 2001, again with this same doctor,

12   Dr. Karen Krone.  It looks like you -- your notes are

13   that you set up a speaker program with her and other

14   pain docs for September 28th, interested in using it in

15   other disease states other than cancer.  Dr. Fermanic

16   (ph) will be speaking for lunch.  Do you see that?

17          A.     Yes.

18          Q.     So this would indicate that even though

19   Dr. Krone told you that she's included in using it in

20   disease states other than cancer, you're going to set

21   her up with a speaker program to where she can learn

22   from other doctors about the use of Actiq; right?

23                    MR. ROONEY:  Object to form.

24                    MR. MAIER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Repeat that again.  I'm sorry.

 2          Q.    (By Mr. Faes)  So this would -- I'm going

 3    to ask a different question.  So this would indicate

 4    that as of this time in August after seeing Ms. Krone

 5    for about two months, she's still indicating to you

 6    that she's interested in using Actiq in disease states

 7    other than cancer; right?

 8                MR. ROONEY:  Object to form.

 9          A.    Yes.

10          Q.    (By Mr. Faes)  So she's still -- even

11    after two months she's looking at using it in more

12    patients off-label; right?

13                MR. MAIER:  Object to form.

14          A.    Yes.

15                MR. ROONEY:  Same objection.

16          Q.    (By Mr. Faes)  So we've got another call

17    on August 30th of 2001, and this is to a David L.

18    Rucknagel.  Is that right?

19          A.    Rucknagel.

20          Q.    And your notes on this call are probe to

21    find how he RXs or prescribes and what.  He has RXed

22    for nonmalignant pain, i.e., back pain.  You see that?

23          A.    Yes.

24          Q.    So this indicates yet another doctor that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you're calling on within six months of getting out in

 2    the field is telling you that he's already prescribing

 3    Actiq off-label; right?

 4              MR. MAIER:  Objection.  Form.

 5              MR. ROONEY:  Object to form.

 6         A.   Yes.

 7         Q.   (By Mr. Faes)  He's already prescribing it

 8    for noncancer pain; right?

 9         A.   Yes.

10              MR. MAIER:  Objection.  Form.

11              MR. ROONEY:  Object to form.

12         Q.   (By Mr. Faes)  If you turn to the

13    following page of this document.  You've got a call

14    again to Dr. Nilesh Jobalia, and this one's dated

15    September 26th of 2011.  Do you see that?

16         A.   Yes.

17         Q.   And your comment is took manager in with

18    me, discussed the patient type where he currently uses

19    Actiq.  Admitted that he has used other SA meds with

20    different molecules; right?

21         A.   Yes.

22         Q.   And SA meds mean short-acting meds; right?

23         A.   Short-acting.

24         Q.   Said he can do better with Actiq.  Do you
```

1    see that?

2          A.     Yes.

3          Q.     So that's you relaying to the office

4    manager that Dr. Jobalia could be using Actiq and be

5    getting better relief for his patients than the

6    short-acting meds he's using correctly; right?

7          A.     Correct.

8                 MR. MAIER:  Object to form.

9                 MR. ROONEY:  Object to form.

10         Q.     (By Mr. Faes)  And you say gave Mike the

11   corporate contribution form.  Hopefully this will get

12   him indebted to me.  Do you see that?

13         A.     Yeah.

14         Q.     What did you mean when you said that?

15         A.     I don't recall.

16         Q.     Well, apparently your call notes indicate

17   that you made some kind of corporate contribution --

18                MR. MAIER:  Objection.  Form.

19         Q.     (By Mr. Faes)  -- to a charity or

20   organization on Dr. Jobalia's behalf?

21                MR. ROONEY:  Objection to form.

22                MR. MAIER:  Objection.  Form.

23         A.     I don't recall.

24         Q.     (By Mr. Faes)  Your next call note down is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    again to a Dr. Karen Krone; right?

 2         A.    Yes.

 3         Q.    And she's the one that we saw five calls

 4    to earlier where she indicated that she was using Actiq

 5    off-label and looking for using it in her migraine

 6    patients; right?

 7         A.    Yes.

 8         Q.    And your call comments on this call are

 9    that she's a big fan of Duragesic.

10         A.    Duragesic.

11         Q.    Duragesic.  And that's a fentanyl patch;

12    right?

13         A.    Correct.

14         Q.    So it's essentially the same drug as

15    Actiq; it's just a different delivery system; right?

16         A.    It's long-acting.

17         Q.    It's a long-acting patch as opposed to a

18    short-acting rapid-release opioid like the Actiq

19    lollipop; right?

20         A.    Yes.

21         Q.    And you note that he asked the difference

22    between cancer pain and nonmalignant pain.  Do you see

23    that?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And is that the -- a typical question that

2  you would get from a doctor on a sales call?

3              MR. MAIER:  Objection.  Form.

4              MR. ROONEY:  Object to form.

5    A.    Not a typical question but it's a question

6  that you might get.

7    Q.    (By Mr. Faes)  And that's the type of

8  question where you might respond with the kind of

9  tagline that pain is pain; right?

10             MR. MAIER:  Objection.  Form.

11             MR. ROONEY:  Object to form.

12   A.    Possibly.

13   Q.    (By Mr. Faes)  If you look at the next

14  call note down.  It's dated January 23rd, 2002, and

15  this is a call -- it looks like the first one on this

16  list to a Dr. Joseph Nichols -- Nicolas; right?

17   A.    Nicolas.  Uh-huh.

18   Q.    And your call notes are that you asked him

19  what other types of patients he had on Actiq.  He said

20  it worked very well in his migraine patients and asked

21  if I had any other info for him; right?

22   A.    Yes.

23   Q.    And you look and see that his specialty

24  description is neurology; right?

1      A.    Yes.

2      Q.    So this is another doctor that's

3  indicating that he's using Actiq for migraine patients

4  off-label; right?

5      A.    Yes.

6            MR. MAIER:  Objection.  Form.

7            MR. ROONEY:  Object to form.

8      Q.    (By Mr. Faes)  And the next call note you

9  see is on January 29th of 2002.  Do you see that?

10     A.    Yes.

11     Q.    And it looks like this is already a doctor

12  that's using Actiq because you start off with thank him

13  for using Actiq; right?

14     A.    Yes.

15     Q.    And it states that you offered MIRF info

16  on migraine patients.  He's hav --

17     A.    Yes.

18     Q.    He's having success in those patients.

19  Said that I will follow up with him; right?

20     A.    Yes.

21     Q.    So this is another doctor that's using

22  Actiq off-label for migraine pain; right?

23           MR. ROONEY:  Objection.

24           MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    (By Mr. Faes)  And you say that you're

3    going to continue to follow up with him; right?

4          A.    Yes.

5          Q.    And you offer to do a medical information

6    request form for him to get him more information on

7    Actiq for migraine pain; right?

8          A.    Correct.

9                MR. MAIER:  Objection.  Form.

10               MR. ROONEY:  Objection.

11         Q.    (By Mr. Faes)  And a medical information

12   request at this time -- you were allowed to fill out

13   the form and then once it had been approved you were

14   allowed to drop off that study or whatever was

15   generated in response to that request personally at the

16   doctor's office; right?

17         A.    I believe it was sent directly to the

18   doctor.

19         Q.    Was there a time when you were allowed to

20   drop off studies or information that had been generated

21   in response to a MIRF or a medical information request

22   personally?

23         A.    That I don't remember.

24         Q.    And you were trained that that was
```

 1    something that you could and should do if a physician

 2    asked about an off-label use, was you could fill out a

 3    MIRF or a medical information request form; right?

 4         A.    Yes.

 5              MR. ROONEY:  Objection.  Form.

 6              MR. MAIER:  Objection.  Form.

 7         Q.    (By Mr. Faes)  And those MIRF request

 8    forms could ultimately come from the medical department

 9    and get that doctor information about the effectiveness

10    of Actiq in off-label indications; right?

11         A.    Correct.

12              MR. MAIER:  Objection.  Form.

13              MR. ROONEY:  Object to form.

14         Q.    (By Mr. Faes)  And you were encouraged to

15    fill out those requests, right --

16              MR. MAIER:  Objection to form.

17         Q.    (By Mr. Faes)  -- if a doctor had a

18    question?

19              MR. ROONEY:  Object to form.

20         A.    Yes, that we couldn't answer as reps.

21         Q.    Right.  In fact, you were told -- at one

22    point you were trained that you couldn't MIRF too much;

23    right?

24         A.    That I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MR. ROONEY:  Object to form.

2          Q.   (By Mr. Faes)  If you look at the

3    following call note on February 15th of 2002.  Got

4    another call to Dr. Joseph Nicolas, and again, he

5    indicates that he's interested in information on Actiq

6    in migraine patients and you wanted to invite him to a

7    program involving that; right?

8          A.   Yes.

9                    MR. ROONEY:  Object to form.

10         Q.   (By Mr. Faes)  So apparently at this time

11   there were programs or medical education programs,

12   speaker programs that you could invite doctors to that

13   would specifically discuss the use of Actiq in migraine

14   patients; right?

15                   MR. MAIER:  Objection.  Form.

16                   MR. ROONEY:  Object to form.

17         A.   It appears so.

18         Q.   (By Mr. Faes)  And that would be an

19   indication that would be off-label at this time; right?

20         A.   Yes.

21                   MR. ROONEY:  Objection to form.

22                   MR. MAIER:  Object to form.

23         Q.   (By Mr. Faes)  And in fact, two visits

24   later on March 13th of 2002, you follow up with him and
```

Highly Confidential - Subject to Further Confidentiality Review

1    you state asked him how he found about Actiq and if he

2    would be interested in attending a program on Actiq in

3    migraine patients.  He said yes.  Will follow-up.

4    Right?

5         A.    Yes.

6         Q.    So not only did the program exist, Dr.

7    Nicolas was interested in attending it; right?

8         A.    Yes.

9               MR. MAIER:  Objection.  Form.

10              MR. ROONEY:  Object to form.

11        Q.    (By Mr. Faes)  If you look at the call

12   note dated March 20th of 2002 to Dr. Nilesh Jobalia --

13   do you see that?

14        A.    Yes.

15        Q.    Your notes are -- and this is the doctor

16   who indicated he rarely uses it in cancer patients;

17   right?

18              MR. MAIER:  Objection.  Form.

19        Q.    (By Mr. Faes)  We saw that earlier in your

20   notes?

21              MR. ROONEY:  Object to form.

22        A.    From my notes, correct.

23        Q.    (By Mr. Faes)  And your notes to Dr.

24   Jobalia at this time are discussed having diff,

Highly Confidential - Subject to Further Confidentiality Review

```
1    discussed Actiq, because the pharm would not give it to

2    her because of the cancer indication.  Pat, meaning

3    patient, got it from another pharm.  Rescheduled him to

4    talk at UC on April 20th for lunch.  Do you see that?

5         A.   Yes.

6         Q.   So this indicates that Dr. Jobalia wrote

7    an Actiq prescription off-label, took it to a pharmacy,

8    and that pharmacy wouldn't fill it initially; right?

9              MR. MAIER:  Objection.  Form.

10             MR. ROONEY:  Object to form.

11        A.   Correct.

12        Q.   (By Mr. Faes)  And so that patient had to

13   take it to another pharmacy in order to get it filled;

14   right?

15        A.   Yes.

16             MR. MAIER:  Objection.  Form, foundation.

17             MR. ROONEY:  Object to form.

18        Q.   (By Mr. Faes)  And was that part of your

19   job, to call on pharmacies as well?

20        A.   Yes.

21        Q.   Part of your job was to go to pharmacies

22   and reiterate what the correct indication for Actiq

23   was; right?

24        A.   Yes.
```

```
 1              Q.    And at least one pharmacy apparently

 2    listened to that advice and refused to fill a

 3    prescription because it was written for a noncancer

 4    patient; right?

 5              A.    Yes.

 6                    MR. MAIER:  Objection.  Form.  Foundation.

 7                    MR. ROONEY:  Object to form.

 8              Q.    (By Mr. Faes)  And was that part of your

 9    job -- well, strike that.  As we discussed, it was also

10    part of your job to help doctors direct patients to

11    pharmacies where they could get prescriptions filled;

12    right?

13                    MR. MAIER:  Objection.  Form.

14                    MR. ROONEY:  Object to form.

15              A.    Yes.

16              Q.    (By Mr. Faes)  And you also note that you

17    rescheduled him, meaning Dr. Jobalia, to talk at UC on

18    April 10th for lunch; right?

19              A.    Yes.

20              Q.    And so that indicates that Dr. Jobalia is

21    being used as an Actiq -- company-sponsored Actiq

22    speaker at that time; right?

23              A.    Yes.

24                    MR. MAIER:  Objection.  Form foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

1           MR. ROONEY:  Object to form.

2           Q.   (By Mr. Faes)  And as we discussed

3    earlier, that's something that would have been approved

4    by your boss and your superiors at the company; right?

5           MR. MAIER:  Object to form.

6           A.   Yes.

7           MR. ROONEY:  Object to form.

8           Q.   (By Mr. Faes)  So your superiors and your

9    bosses at the company would have approved Dr. Jobalia

10   to go out and be a company-sponsored speaker for Actiq

11   despite the fact that according to your call notes he

12   wrote very few prescriptions -- Actiq prescriptions for

13   cancer patients?

14          MR. MAIER:  Object to form.

15          A.   Correct.

16          MR. ROONEY:  Object to form.

17          Q.   (By Mr. Faes)  Almost never uses Actiq for

18   cancer patients according to your notes; right?

19          A.   Yes.

20          Q.   If you look at the last entry, your last

21   call note on this page dated April 9th of 2002.  This

22   is another call to Dr. Joseph Nicolas; right?

23          A.   Yes.

24          Q.   And you note brief, which I assume means a

```
 1   brief visit?

 2         A.    Correct.

 3         Q.    And you state asked him if he would like

 4   to write something up on Actiq in his migraine

 5   patients.  He said that he should.  Asked me for info

 6   for his patient that he wanted to place on Actiq.  I

 7   gave him coupons as well as patient info.  Do you see

 8   that?

 9         A.    Yes.

10         Q.    And that would have been your call note at

11   this time in April of 2002; right?

12         A.    Yes.

13         Q.    And this looks like you were actually

14   asking him to write up something on Actiq for use in

15   migraine patients, meaning Actiq off-label; right?

16         A.    Correct.

17               MR. ROONEY:  Object to form.

18               MR. MAIER:  Object to form.

19         Q.    (By Mr. Faes)  And would that be some kind

20   of promotional or speaker material that could be used

21   for future speaker programs or peer-to-peer selling?

22         A.    Maybe.

23               MR. MAIER:  Objection.  Form.

24               MR. ROONEY:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1          Q.    (By Mr. Faes)  If you turn to the

  2    following page of this document.  You've got a call

  3    dated April 10th of 2002, and it's to a Dr. Bernard

  4    Aron, I guess; right?  Did I get the name of the doctor

  5    right?

  6          A.    Yes.

  7          Q.    And your note on that date is had a lunch

  8    program with him.  Dr. Barrett and Dr. Jobalia,

  9    peer-to-peer selling.  Do you see that?

 10          A.    Yes.

 11          Q.    So this indicates that you set up a

 12    peer-to-peer selling or speaker program with Dr.

 13    Jobalia as the speaker talking to Dr. Barrett; right?

 14          A.    Correct.

 15                MR. ROONEY:  Object to form.

 16          Q.    (By Mr. Faes)  And you note that he,

 17    meaning Bernard Aron, was very receptive to Dr. Jobalia

 18    as a pain doc as well as telling him that he would like

 19    to refer some patients to him based on his experience

 20    treating patients with shingles.  Actiq was discussed

 21    as a breakthrough pain medication that can be used for

 22    radiation treatments as well as patients taking oxy air

 23    (ph) or MSIR.  Do you see that?

 24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And those were the notes that you would
 2    have entered at this time; right?
 3            A.    Yes.  That was for breakthrough cancer
 4    patients.  Radiation.
 5                  MR. ROONEY:  Just answer his question.
 6            A.    Okay.
 7            Q.    (By Mr. Faes)  If you can look at the --
 8    your third call note or the fourth call note from the
 9    bottom.  You've got a call on July 11th of 2002 to a
10    Dr. Luis --
11            A.    Pagani.
12            Q.    Pagani?  Thank you.  And your note at that
13    time is that you discussed that Actiq is a med that can
14    be used for any pats, meaning patients, with chronic
15    pain, with breakthrough pain episodes.  Do you see
16    that?
17            A.    Yes.
18            Q.    So that's a discussion that you would have
19    had with this doctor at the time, that Actiq is a med
20    that can be used for any patients with chronic pain and
21    breakthrough pain episodes; right?
22            A.    Yes.
23                  MR. ROONEY:  Object to form.
24            Q.    (By Mr. Faes)  There's nothing in your
```

```
 1   call notes that indicate that you're telling Dr. Pagani

 2   that it's only for cancer pain; right?

 3              MR. MAIER:  Objection.  Form.

 4              MR. ROONEY:  Objection.  Form.

 5        A.    Correct.

 6        Q.    (By Mr. Faes)  And the following note is

 7   dated July 16th of 2002 and it's to a Dr. Timothy

 8   Smith.  Do you see that?

 9        A.    Yes.

10        Q.    And your call notes are -- at the time are

11   discussed the higher strengths of Actiq as well as him

12   telling me that he has found a new use for it in his

13   migraine patients.  Set up a preceptorship.  Do you see

14   that?

15        A.    Yes.

16        Q.    And those are the notes you would have

17   entered at the time on July of -- 16th of 2002; right?

18        A.    Yes.

19        Q.    So this is a doctor that is telling you

20   that he's found a new -- he's been using Actiq but he's

21   found a new use for it prescribing it off-label; right?

22        A.    Yes.

23              MR. ROONEY:  Object to form.

24              MR. MAIER:  Objection.  Form.
```

```
 1          Q.    (By Mr. Faes)  And your comments are to

 2   set up a preceptorship for him; right?

 3          A.    Yes.

 4                MR. MAIER:  Form --

 5          Q.    (By Mr. Faes)  And that means to

 6   potentially set him up to be a company-sponsored

 7   Cephalon speaker for peer-to-peer selling; right?

 8                MR. MAIER:  Object to form.

 9                MR. ROONEY:  Object to form.

10          A.    No.  A preceptorship for me to go in and

11   mirror him.

12          Q.    (By Mr. Faes)  Oh, okay.  So your comments

13   at this time were for you to go in and mirror him while

14   he was seeing his patients that he was treating with

15   Actiq; right?

16          A.    Correct.

17                MR. MAIER:  Objection.  Form.

18                MR. ROONEY:  Object to form.

19          Q.    (By Mr. Faes)  And your second-to-last

20   call note on this page is dated August 7th of 2002.  Do

21   you see that?

22          A.    Yes.

23          Q.    And this is to a -- this is again to Dr.

24   Nilesh Jobalia; right?
```

```
 1        A.     Uh-huh.

 2        Q.     And this is the doctor that we noted

 3   earlier almost never uses Actiq for cancer patients;

 4   right?

 5               MR. MAIER:  Object to form.

 6               MR. ROONEY:  Object to form.

 7        A.     I'm sorry.  Repeat that.

 8        Q.     (By Mr. Faes)  And this is the doctor we

 9   noted earlier almost never uses Actiq for cancer

10   patients; right?

11        A.     Correct.

12               MR. MAIER:  Object to form.

13               MR. ROONEY:  Same objection.

14        Q.     (By Mr. Faes)  And we noted earlier that

15   Dr. Jobalia is already doing company-sponsored

16   peer-to-peer speaking programs on Actiq; right?

17        A.     Correct.

18               MR. MAIER:  Object to form.

19               MR. ROONEY:  Object to form.

20        Q.     (By Mr. Faes)  And your note at this time

21   is he is using more Actiq, feels comfortable using

22   higher strengths.  Continues to RX patients he deems

23   necessary; right?

24        A.     Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Does not have a pat type, meaning patient

 2    type; right?

 3          A.    Correct.

 4          Q.    It means he's using it on all kinds of

 5    patients; right?

 6          A.    It appears --

 7                MR. MAIER:  Objection.  Form.

 8                MR. ROONEY:  Object to form.

 9                [Interruption by the reporter.]

10                MR. FAES:  So can I stipulate that if one

11    attorney objects it's good for all attorneys in the

12    room?

13                THE REPORTER:  Fine with me.

14                MR. FAES:  I'll make that stipulation.

15                MR. ROONEY:  Mr. Maier?  Maier?

16                MR. MAIER:  Yes?

17                MR. ROONEY:  How do you feel about that?

18                MR. MAIER:  Yeah, that's fine with me.

19                MR. ROONEY:  Okay.

20          Q.    (By Mr. Faes)  So I think you already

21    answered this one, but just to reorient you.  Dr.

22    Jobalia notes that he doesn't have a patient type for

23    Actiq; right?

24          A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    That means he's using it on all kinds of

2    patients; right?

3              MR. MAIER:  Object to form.

4         A.    Correct.

5         Q.    (By Mr. Faes)  And you stress to him that

6    if it works well in the patients he has it on already,

7    his other patients with breakthrough pain will do just

8    as well.  Do you see that?

9         A.    Yes.

10        Q.    And that's something that you stressed to

11   him; right?  Those are your words to him?

12        A.    Yes.

13              MR. MAIER:  Object to form.

14        Q.    (By Mr. Faes)  Would you agree with me

15   that that's promoting Actiq off-label?

16              MR. MAIER:  Object to form.

17        A.    It sounds that way.

18              MR. ROONEY:  Just yes or no if it's a yes

19   or no question.

20        Q.    (By Mr. Faes)  Would you agree with me

21   that looking at this it sounds like you're promoting

22   off-label by telling a doctor that if it, meaning

23   Actiq, works well in the patients he has it already,

24   his other patients with breakthrough pain will do just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   as well?

 2         A.    Yes.

 3               MR. MAIER:  Object to form.

 4         Q.   (By Mr. Faes)  You can set that document

 5   aside.

 6               MR. ROONEY:  Do you have another one of

 7   these that you're going to be going through?

 8               MR. FAES:  I do, but I'm really just

 9   marking it for the record.  I'm not going to go through

10   that many things on it.

11               MR. ROONEY:  Okay.

12               MR. FAES:  Do you need a break or

13   something or --

14               MR. ROONEY:  We'll take a few minutes'

15   break.

16               MR. FAES:  Okay.  We're going to go off

17   the record.

18               THE VIDEOGRAPHER:  We are going off the

19   record at 3:43 PM.

20               [A brief recess was taken.]

21               THE VIDEOGRAPHER:  We are back on the

22   record at 3:55 PM.

23         Q.   (By Mr. Faes)  Ms. Sippial, we are back on

24   the record after a short break.  Are you ready to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    proceed?

2         A.    Yes.

3         Q.    Before we went on break we were looking at

4    some of your call notes.  Do you remember that?

5         A.    Yes.

6              MR. FAES:  Somehow I lost --

7              THE REPORTER:   -- stickers?

8              MR. FAES:  No, this is the blown-up copy,

9    I think, of the next set of sales notes but I can't

10   find the tiny copy.  Where did 23 go?  Oh, here it is.

11   I set it on the floor.

12             MR. MAIER:  Excuse me.  I think the phone

13   might still be on mute.

14        Q.    (By Mr. Faes)  Ms. Sippial, I'm going to

15   hand you what's been marked as Exhibit Number 26 to

16   your deposition.

17             [Exhibit Teva-Sippial-026

18             marked for identification.]

19        Q.    I'm going to try to find a spot I can put

20   this that isn't going to cover up any text.  And again,

21   in a second I'm going to hand you a more blown-up

22   version of this.

23        A.    Okay.

24        Q.    These are some of your call notes so that
```

Highly Confidential - Subject to Further Confidentiality Review

 1    you can actually read them.  And so I'm going to mark

 2    as Exhibit Number 27 to your deposition the same

 3    document that is Exhibit 26 except the call comments

 4    section is blown up to where you can read them.

 5                    [Exhibit Teva-Sippial-027

 6                    marked for identification.]

 7            Q.    And so Exhibit 27 is a copy of some more

 8    of your call notes from your time detailing Actiq.  Do

 9    you see that?

10            A.    Yes.

11            Q.    And first entry I want to look at is the

12    second column down dated November 1st of 2015, and it's

13    again for Dr. Nilesh Jobalia.  Do you see that?

14            A.    Yes.

15            Q.    And your call notes at that time are --

16    no, wait.  Strike that.  That's not even what I wanted

17    to cover.  I withdraw that question.  The first call

18    note on this question, on this document, is actually --

19    that I want to look at is the one dated January 2nd or

20    January 4th of 2002.  I think that's the date, right,

21    in the middle of the page?

22            A.    January 4th?  Yes.

23            Q.    And this is a call to a -- looks like a

24    Dr. Gary Shearer in Hebron, Kentucky?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    And again you note that this is a brief

3   call and it says that you left the article on morphine

4   versus Actiq.  Said I would follow up on him using

5   Actiq for his -- and I know I'm going to pronounce this

6   wrong -- Duragesic --

7        A.    Duragesic --

8        Q.    Duragesic patients.  You see that?

9        A.    Yes.

10       Q.    So this would indicate at least at this

11  time in 2002 you were allowed and did leave reprints

12  behind that discussed Actiq versus morphine, making

13  comparative claims; right?

14       A.    Probably they're equal --

15             MR. MAIER:  Object to form.

16       A.    Yes.

17       Q.    (By Mr. Faes)  And two calls below that

18  you've got a call to a Dr. Renato Larocca in

19  Louisville, Kentucky.  Do you see that?

20       A.    Yes.

21       Q.    And again, this is another brief visit,

22  and you again on this visit left the Actiq on-call

23  brochure with him as well as the morphine article.  Do

24  you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    Yes.

 2         Q.    So this reflects again that you were able

 3    to leave reprints comparing Actiq versus morphine

 4    behind at doctors' offices at this time; right?

 5         A.    Yes.

 6               MR. MAIER:  Object to form.

 7         Q.    (By Mr. Faes)  If you look at the bottom

 8    call, looks like it's to a Dr. Divya Rouben on April

 9    2nd or April 3rd of 2002; right?

10         A.    Yes.

11         Q.    And your comments are lunch, discussed

12    where she is using Actiq as an OB/GYN.  She has used it

13    on her patients with migraines.  Discussed if they are

14    opioid-tolerant.  She said yes.  Interested in using

15    Actiq on her postop patients that are opioid-tolerant

16    and wanted to know the BEN (ph).  Do you see that?

17         A.    Yes.

18         Q.    So this would indicate that at this time

19    you were calling on doctors with -- for Actiq -- with a

20    primary specialty of OB/GYN; right?

21         A.    Yes.

22               MR. ROONEY:  Object to form.

23         Q.    (By Mr. Faes)  And this particular patient

24    was using it -- strike that.  This particular doctor
```

1    was using it on patients with migraines; right?

2              MR. MAIER:  Object to form.

3        A.    Yes.

4        Q.    (By Mr. Faes)  And that was an off-label

5    use; right?

6        A.    Yes.

7              MR. MAIER:  Object --

8        Q.    (By Mr. Faes)  And she also communicated

9    to you that she was interested in using Actiq on her

10   postop patients; right?

11       A.    Yes.

12       Q.    And that would be indicating she wanted to

13   use it for acute postoperative pain; right?

14             MR. MAIER:  Object to form.

15       A.    Yes.

16       Q.    (By Mr. Faes)  And that indication is

17   specifically contraindicated in the label; right?

18       A.    Yes.

19       Q.    If you turn to the following page in about

20   the middle of the page dated June 21st of 2002, there's

21   another call to a Dr. Karen Krone.  Do you see that?

22       A.    Yes.

23       Q.    And your call comments are -- painted the

24   picture of a patient dealing with chronic pain.  Gave

```
 1    them the choice five minutes versus 35 minutes.  Do you

 2    see that?

 3         A.    Yes.

 4         Q.    And that's referring to what we discussed

 5    earlier, that one of your sales pitches, if you will,

 6    would be to describe to doctors the benefits of the

 7    rapid onset of the Actiq product to where a patient

 8    with a breakthrough pain episode could get relief in

 9    five minutes versus 35 minutes with a competitor's

10    product; right?

11         A.    Yes.

12               MR. ROONEY:  Object to form.

13         Q.    (By Mr. Faes)  And that is a pitch or

14    information that you would give to doctors at this time

15    when you were calling them for the Actiq product;

16    right?

17         A.    Correct.

18               MR. MAIER:  Object to form.

19         Q.    (By Mr. Faes)  And if you turn to the last

20    page in the very last call note on this page.

21               MS. JAIN:  Second-last.

22         Q.    (By Mr. Faes)  You've got a -- sorry.  So

23    we're looking at your last page of call notes and you

24    got a call dated October 15th of 2002 to a Dr. Philip
```

1    Saks (ph).  Do you see that?

2         A.    Yes.

3         Q.    And your call note on that date is that

4    she says she has found it -- found success.  I'm sorry.

5    Said that he has found success in his headache

6    patients, painted the picture of his patients in pain.

7    Do you see that?

8         A.    Yes.

9         Q.    And so that's again discussing it for

10   headache patients which is an off-label use; right?

11              MR. MAIER:  Objection.  Form.

12        A.    Yes.

13        Q.    (By Mr. Faes)  And what did you mean when

14   you said that you painted the picture of his patients

15   in pain?

16        A.    That pain is subjective and they have to

17   believe their patients when they tell them how

18   intensely their pain is from their pain scale.

19        Q.    And that was a -- information that you

20   would regularly pass on to doctors that you called on,

21   is that you -- they needed to believe their patients

22   when they said they're in pain; right?

23              MR. MAIER:  Object to form.

24        A.    Yes.

```
 1          Q.    (By Mr. Faes)  And that was because you

 2   were trained that many times pain is undertreated;

 3   right?

 4          A.    Correct.

 5                MR. MAIER:  Object to form.

 6          Q.    (By Mr. Faes)  And that's something --

 7   that's information that you would pass on or give to

 8   the doctors who were detailing on Actiq and later

 9   Fentora as part of your sales pitch; right?

10          A.    Yes.

11                MR. MAIER:  Object to form.

12          Q.    (By Mr. Faes)  You can set that aside.  So

13   I want to switch gears a little bit now and talk about

14   the Fentora launch -- when you switched from Actiq to

15   promoting Fentora; okay?

16          A.    Yes.

17          Q.    And it was around late 2006 when you

18   switched from promoting Actiq to promoting Fentora;

19   right?

20          A.    Yes.

21          Q.    And Fentora was basically the same drug

22   with the same indication but it had a different

23   delivery system; right?

24          A.    Correct.
```

```
 1          Q.    And the marketing plan for the Fentora

 2    launch was essentially to call on the same doctors or

 3    group of doctors that you had been detailing or selling

 4    to on Actiq and convert as many of them as you could to

 5    Fentora; right?

 6          A.    Correct.

 7                MR. ROONEY:  Object to form.

 8          Q.    (By Mr. Faes)  And that's because Actiq

 9    was loosing patent protection at that time; right?

10          A.    Yes.

11          Q.    It was at the end of --

12                MR. ROONEY:  Object to form.

13          Q.    (By Mr. Faes)  You heard the term

14    sometimes that it was at the end of its life cycle;

15    right?

16          A.    Correct.

17          Q.    And you knew that a generic would soon be

18    available; right?

19                MR. MAIER:  Object to form.

20          A.    Correct.

21          Q.    (By Mr. Faes)  And you know as a

22    pharmaceutical representative with a long history and

23    experience in working in the pharmaceutical industry

24    that you can get a much higher price for an exclusive
```

Highly Confidential - Subject to Further Confidentiality Review

1    branded drug than you can for a generic one; right?

2         A.    Not always.

3              MR. MAIER:  Object to form and foundation.

4         Q.   (By Mr. Faes)  Not always?  But you'd

5    agree with me that that's generally true; right?

6              MR. MAIER:  Object to form.

7         A.    Generally.

8         Q.   (By Mr. Faes)  And you'd agree with me

9    that in general generic ones -- generic drugs don't

10   have -- don't usually typically have a sales force that

11   goes out and promotes or details; is that right?

12        A.    Correct.

13             MR. ROONEY:  Object to form.

14        Q.   (By Mr. Faes)  One thing I forgot to ask

15   you on your sales notes -- I got to back up a little

16   bit because I forgot.  Now, these sales notes that we

17   looked at earlier -- these sales notes were transmitted

18   to the company to your superiors daily or at the very

19   least weekly; right?

20        A.    Correct.

21        Q.    And your superiors had those notes

22   available to you and would have been reviewing your

23   call notes that we went through regularly; right?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. MAIER:  Object to form, foundation.

2         Q.   (By Mr. Faes)  And if any -- strike that.

3    Is it true that none of your supervisors over the

4    years, whether it be Mr. Hemingway, Mr. Tocco, Mr.

5    Morreale, Mr. Spokane -- none of them ever came to you

6    after looking at your call notes and came to you and

7    said Ms. Sippial, we have a problem with the way you're

8    promoting or detailing Actiq; right?

9         A.   Correct.

10             MR. MAIER:  Object to form.

11        Q.   (By Mr. Faes)  If anyone had come to you

12   and told you that, you'd remember it; right?

13             MR. MAIER:  Object to form.

14        A.   Yes.

15        Q.   (By Mr. Faes)  And if someone had come and

16   told you that you were doing something wrong or

17   inappropriate in your detailing or promotion of Actiq

18   and told you to change the way you were doing it, you

19   would have followed your superior's instructions to the

20   best of your abilities; right?

21        A.   Correct.

22             MR. MAIER:  Object to form.

23        Q.   (By Mr. Faes)  So essentially the call

24   notes that we looked at that we went through -- you

```
 1   were essentially following the company's direction and

 2   directives as set forth in their marketing plans to you

 3   on how to promote and detail Actiq the way the company

 4   wanted you to; right?

 5       A.    Correct.

 6             MR. MAIER:  Object to form.

 7       Q.    (By Mr. Faes)  And as we talked about

 8   earlier, at a certain point not long after 2002, you

 9   were told that the call comments, specifically the

10   comments that detailed what actually went on during

11   sales calls, was no longer required; right?

12             MR. MAIER:  Object to form.

13       A.    Correct.  Sometime after that.

14       Q.    (By Mr. Faes)  And this was company-wide?

15   It wasn't just for you; right?

16       A.    Correct.

17       Q.    And so --

18             MR. ROONEY:  Object to form.

19       Q.    (By Mr. Faes)  So going forward after that

20   change was made, we would have no way of knowing

21   specifically what occurred on any of your calls because

22   it wasn't even an option for you even if you wanted to

23   to enter a call comment when you made a sales call for

24   Actiq or Fentora; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Correct.

 2              MR. MAIER:  Object to form, foundation.

 3        Q.    (By Mr. Faes)  So now I'm going back to

 4   the Fentora launch because I forgot about it.  I

 5   apologize.  So I'm going to mark this great big

 6   document and then ask you about one page in it.

 7        A.    That's fine with me.

 8        Q.    I'll put this copy away because nobody

 9   from Teva showed up.  I'm going to hand you what's been

10   marked as Exhibit Number 28 to your deposition.

11              [Exhibit Teva-Sippial-028

12              marked for identification.]

13              MR. FAES:  And this is -- I think this is

14   25 on yours.  Got it?

15              (By Mr. Faes)  So Exhibit 28 is a document

16   entitled FEBT 2005-2006 marketing plan; right?

17        A.    Yes.

18        Q.    And you understood that prior to Fentora's

19   launch this is what Fentora was called, was FEBT or

20   FEBT; right?

21        A.    Correct.

22        Q.    And if you can turn to Page Number 8 of

23   this document.  You can see where it states in order to

24   create significant adoption of fentanyl effervescent
```

1    buccal tablet, FEBT, Cephalon must take a two-step

2    approach.  Successfully convert Actiq loyalists to FEBT

3    adopters within the first 90-day post-launch period and

4    expand the universe of ROO, meaning rapid onset opioid,

5    prescribing physicians; right?

6           A.    Yes.

7           Q.    And that was something that was

8    communicated to you as a strategy, is that you wanted

9    to go out to all of your Actiq prescribers and

10   loyalists and try to convert them to using Fentora

11   within the first 90-day period; right?

12          A.    Correct.

13                MR. MAIER:  Object to form.

14          Q.    (By Mr. Faes)  And it goes on, the former

15   step will be the priority at launch because the loss of

16   Actiq patent protection -- because of the loss of --

17   let me start over.  The former step will be the

18   priority at launch because of the loss of Actiq patent

19   protection just prior to the launch of FEBT.  Do you

20   see that?

21          A.    Yes.

22          Q.    So that's discussing what we talked about

23   earlier, that Actiq was about to lose patent protection

24   and so they needed to start promoting Fentora and get

Highly Confidential - Subject to Further Confidentiality Review

```
 1   as many people converted to the Fentora product as

 2   possible; right?

 3         A.    Correct.

 4               MR. MAIER:  Object to form.

 5         Q.    (By Mr. Faes)  And that was essentially

 6   you understood for financial reasons, right, to meet

 7   the financial goals of the company?

 8         A.    Yes.

 9               MR. MAIER:  Object to form, foundation.

10         Q.    (By Mr. Faes)  And it goes on to state

11   that because of the absence of time to convert Actiq

12   loyalists to FEBT adopters, both the market and

13   Cephalon must be fully prepared for the FEBT launch.

14   Do you see that?

15         A.    Yes.

16         Q.    So you guys were aware in 2006 that the

17   launch of Fentora was coming and you were preparing for

18   the time that it was available so you could convert as

19   many Actiq users to Fentora as possible in that first

20   90 days; right?

21         A.    Yes.

22               MR. MAIER:  Object to form.

23         Q.    (By Mr. Faes)  You can set that aside.

24   Here's another giant document that we're going to look
```

Highly Confidential - Subject to Further Confidentiality Review

1    at one page of.  I'm going to have you -- I'm going to

2    hand you what's been marked as Exhibit Number 29 to

3    your deposition.

4              [Exhibit Teva-Sippial-029

5              marked for identification.]

6         Q.    And this is a document labeled marketing

7    plan 2007 for Fentora.  Do you see that?

8         A.    Yes.

9         Q.    And if you turn to Page 49 of this

10   document, there's a slide labeled Actiq monthly

11   prescriber count by specialty.  Do you see that?

12        A.    Yes.

13        Q.    And you can see that there's a breakdown

14   of the various subspecialties that are using Actiq as

15   of September 2006.  Do you see that?

16        A.    Yes.

17        Q.    And you can see that pain is 32 percent

18   and oncology is six percent; right?

19        A.    Yes.

20        Q.    So at this time broken down by

21   subspecialty, only 40 percent of the monthly prescriber

22   count is -- for Actiq is by oncologist or pain

23   specialists; right?

24              MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     (By Mr. Faes)  And it was your goal at the

3     time that Fentora was launched to try to convert as

4     many Actiq loyalists as possible to the Fentora product

5     regardless of their subspecialty; right?

6                 MR. MAIER:  Objection.  Form.

7          A.     Correct.

8          Q.     (By Mr. Faes)  Now, prior to the Fentora

9     launch in -- prior to the Fentora launch in late 2006,

10    you would have been kind of winding down the Actiq life

11    cycle; right?

12         A.     Yes.

13                MR. MAIER:  Objection.  Form.

14         Q.     (By Mr. Faes)  And one of the things that

15    you were instructed to do from your superiors at the

16    company, including your regional managers and the

17    people above them prior to the Fentora launch was to

18    squeeze the prescribers that were prescribing Actiq for

19    all they were worth prior to the launch of the Fentora;

20    right?

21                MR. MAIER:  Objection.  Form.

22         A.     Rephrase that question.

23         Q.     (By Mr. Faes)  Were you ever told --

24    strike that.  Is it true that you were told prior to

1    the Fentora launch by your superiors that you should

2    try to squeeze existing Actiq loyalists for all they

3    were -- all the prescriptions they were worth prior to

4    the launch of the Fentora product?

5              MR. MAIER:  Objection.  Form.

6         A.   I don't remember that.

7         Q.   (By Mr. Faes)  I'm going to hand you

8    what's been marked as Exhibit Number 30 to your

9    deposition.

10             [Exhibit Teva-Sippial-030

11             marked for identification.]

12        Q.   And this is an e-mail from Philip Tocco

13   dated July 14th, 2006.  Do you see that?

14        A.   Yes.

15        Q.   And it's to Sales PCS Great Lakes.  Do you

16   see that?

17        A.   Yes.

18        Q.   So that would have included you; right?

19        A.   Correct.

20        Q.   So this would have been an e-mail that you

21   would have received; right?

22        A.   Yes.

23        Q.   And he starts off, to follow up on the

24   morning's conference calls and highlight the key points

Highly Confidential - Subject to Further Confidentiality Review

```
 1    covered.  Do you see that?

 2           A.    Yes.

 3           Q.    And then towards the bottom he states

 4    attached is the top 40 prescriber list through Quarter

 5    4 for our area.  Scrolling down with the very bottom

 6    highlighted in aqua you will see where we have done a

 7    nice job with prescriber growth.  There is a good

 8    positive trend here.  Do you see that?

 9           A.    Yes.

10           Q.    And then on the following page he states

11    what he we need to focus on for the remainder of

12    Actiq's life cycle is squeezing, in quotes, our top

13    prescribers for everything they're worth.  Do you see

14    that?

15           A.    I do.

16           Q.    So that would have been instructions from

17    your immediate supervisor, Phil Tocco, to you at the

18    time; right?

19           A.    Yes.

20           Q.    And his instructions to you were for the

21    remainder of Actiq's life cycle to squeeze the

22    company's top prescribers for everything that they're

23    worth; right?

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ROONEY:  Object to form.

 2          Q.    (By Mr. Faes)  Would you agree with me

 3    that that's not a responsible directive for someone to

 4    give when promoting an addictive, highly-potent opioid

 5    narcotic?

 6                    MR. MAIER:  Object to form.

 7          A.    The term squeezing?

 8          Q.    (By Mr. Faes)  (Nodding "yes.")

 9          A.    Yes.

10          Q.    So you think that this instruction from

11    Phil Tocco to you to, quote/unquote, squeeze the

12    company's top prescribers for everything they're worth

13    for the remainder of Actiq's life cycle was

14    inappropriate; right?

15                    MR. MAIER:  Object to form.

16          A.    The lingo is in sales, so I don't know if

17    it's inappropriate or not.

18          Q.    (By Mr. Faes)  So even though he's talking

19    about Actiq, which is -- we agreed is a highly-potent,

20    highly-addictive opioid narcotic; right?

21          A.    Uh-huh.

22          Q.    And he's telling you to squeeze the top

23    prescribers of that addictive opioid narcotic for

24    everything that they're worth, you're not sure if that
```

```
 1   was appropriate or inappropriate?

 2                  MR. ROONEY:  Objection.  Asked and

 3   answered.

 4                  MR. MAIER:  Object to form.

 5                  MR. ROONEY:  She's already answered this

 6   question.

 7        A.    No.

 8        Q.    (By Mr. Faes)  And he goes on to direct

 9   you to start thinking about -- then at the bottom,

10   start thinking about Fentora MEPs or medical education

11   programs; right?

12        A.    Correct.

13        Q.    And that's talking about speaker pro --

14   company-sponsored speaker programs; right?

15        A.    Correct.

16        Q.    We have learned a lot from the MEPs we

17   have completed so far this year.  Our team goal is to

18   get each of your top 10 Actiq prescribers and top five

19   pure short-acting prescribers to a Fentora MEP before

20   the end of January.  Do you see that?

21        A.    Yes.

22        Q.    So this continues to reflect the continued

23   push and direction by the company continuing with

24   Fentora to focus on company-sponsored speaker programs
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for Fentora; right?

 2         A.    Correct.

 3               MR. MAIER:  Object to form.

 4         Q.    (By Mr. Faes)  Peer-to-peer selling;

 5    right?

 6         A.    Yes.

 7         Q.    I'm going to hand you -- you can set that

 8    aside.  I'm going to hand you what's been marked as

 9    Exhibit Number 31 to your deposition, and again, this

10    is an e-mail dated August 7th of 2006 from Philip Tocco

11    to you and others; right?

12               [Exhibit Teva-Sippial-031

13                marked for identification.]

14         A.    Yes.

15         Q.    So this is an e-mail you would have

16    received?

17         A.    Correct.

18         Q.    Because you were part of the PCS Great

19    Lakes sales force at this time; right?

20         A.    Correct.

21         Q.    And your boss starts off with Great Lakes,

22    we spoke a lot at our June POA meeting -- POA means

23    plan of action meeting; right?

24         A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    That we should, quote/unquote, squeeze the
 2    orange with our current Actiq prescribers.  Do you see
 3    that?
 4          A.    Yes.
 5          Q.    And so this is about a month after the
 6    previous e-mail we just looked at; right?
 7          A.    Yes.
 8          Q.    And this is again directing you and other
 9    members of the sales force to continue to squeeze Actiq
10    prescribers to write more prescriptions through the end
11    of the life cycle; right?
12          A.    Correct.
13                MR. ROONEY:  Object to form.
14          Q.    (By Mr. Faes)  I'm going to hand you
15    what's been marked as Exhibit Number 32 to your
16    deposition.
17                [Exhibit Teva-Sippial-032
18                marked for identification.]
19          Q.    And this is an e-mail dated August 24th of
20    2016, and it's to the sales -- pain care specialist
21    sales force.  Do you see that?
22          A.    Yes.
23          Q.    And you would have been a sales pain care
24    specialist at that time; right?
```

```
 1          A.    Correct.

 2          Q.    So this would have been an e-mail that you

 3   would have received; right?

 4          A.    Yes.

 5          Q.    And it states -- looks like this is a

 6   e-mail getting ready for the launch of Fentora and the

 7   subject is 2006 Fentora targets.  Do you see that?

 8          A.    Correct.

 9          Q.    And it states that we are excited to

10   announce the sales and marketing.  We have recently

11   determined that Fentora targets -- strike that.  Let me

12   start over.  Starts, we are excited to announce that

13   sales and marketing have recently determined the

14   Fentora targets based on prescriber data in preparation

15   for the launch.

16                In order to determine these Fentora

17   targets, prescriber writing and detail activities from

18   the recent months were considered.  You can expect to

19   see these new targets identified in your SMART system

20   after your next successful replication.  Do you see

21   that?

22          A.    Yes.

23          Q.    And then if you look down it says

24   question, what is the specialty breakdown of the
```

1    targets?  Answer, while the specialty breakdown of the

2    targets will vary by territory, the national breakdown

3    is -- and then it gives a breakdown of the specialty

4    breakdown by area for the Fentora launch; right?

5         A.    Yes.

6         Q.    And this is similar to the document that

7    we saw analyzing the subspecialty breakdown of targets

8    for Actiq we looked at earlier today; right?

9         A.    Yes.

10        Q.    And if you look down it states that

11   anesthesiology and pain is 23.2 percent, oncology is

12   13.3 percent, primary care provider is 54.4 percent,

13   neurology is 4.8 percent, psychology is 1.9 percent,

14   and other is 2.4 percent; right?

15        A.    Yes.

16        Q.    So these are subspecialties that the

17   company anticipated were targets for Fentora detailing

18   at the Fentora launch; right?

19        A.    Correct.

20             MR. MAIER:  Objection.  Form.

21        Q.    (By Mr. Faes)  And over half of those are

22   primary care physicians; right?  54.4 percent?

23             MR. MAIER:  Object to form.

24        A.    Correct.

```
 1           Q.    (By Mr. Faes)  And the company continued

 2    to identify neurologists, psychologists, and other

 3    doctors?

 4           A.    Psychiatrists.

 5           Q.    Thank you.

 6           A.    Uh-huh.

 7           Q.    Company continued to identify

 8    neurologists, psychiatrists, and other doctors in

 9    addition to primary care doctors as appropriate targets

10    for Fentora detailing and promotion; right?

11           A.    Correct.

12                 MR. MAIER:  Object to form.

13           Q.    (By Mr. Faes)  And according to the

14    Fentora launch document, this document at launch, only

15    36.5 percent of doctors being targeted were either pain

16    specialists or cancer specialists; right?

17                 MR. MAIER:  Objection.  Form.

18           A.    Yes.

19           Q.    (By Mr. Faes)  And this was all

20    information that was given to you as a sales

21    representative at the time as a proper breakdown of

22    patient subspecialties to target for Fentora; right?

23           A.    Correct.

24                 MR. MAIER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     (By Mr. Faes)  I'm going to hand you

2    what's been marked as Exhibit 33 to your deposition.

3                 [Exhibit Teva-Sippial-033

4                 marked for identification.]

5      Q.     And this is an e-mail dated December 1st

6    of 2006.  Again, it's from your boss at the time,

7    Philip Tocco; right?

8      A.     Yes.

9      Q.     And it's to the sales force in the Great

10   Lakes region, which would have included you; right?

11     A.     Correct.

12     Q.     So this is a document that you would have

13   received; right?

14     A.     Yes.

15     Q.     And if you look down in the second

16   paragraph, it states, as we discussed, the launch of

17   Fentora has been a tremendous success.  Do you see

18   that?

19     A.     Yes.

20     Q.     So this reflects that as of December 1st,

21   2006, Fentora has been launched; right?

22     A.     Yes.

23     Q.     And according to your boss, it's been a

24   tremendous success; right?

```
1            A.    Correct.

2            Q.    The purpose of today's conference calls

3    was to help everyone fine-tune their efforts so that

4    the early ground work each of you has laid down does

5    not turn into a flat 2007.  The major topics we covered

6    and ideas from the group were as follows.  Do you see

7    that?

8            A.    Yes.

9            Q.    So then it goes through ideas that you all

10   had discussed as a -- as the Great Lakes sales pain

11   force; right?

12           A.    Yes.

13           Q.    And if you look in the third star down,

14   one of the ideas discussed is that in the meantime,

15   there may be opportunities for us to use abuse and

16   diversion CSPs or Cephalon speaker programs to reach a

17   broader audience, and we discussed targeting our

18   speakers better for the audiences.  Do you see that?

19           A.    Yes.

20           Q.    So does that reflect at that time you were

21   looking at using company-sponsored Cephalon speakers

22   for Fentora in settings where general abuse and

23   diversion of opioids was being discussed in order to

24   reach a broader audience?
```

```
 1                    MR. MAIER:  Object to form, foundation.

 2          A.    Yes.

 3          Q.    (By Mr. Faes)  And that broader audience

 4   could include doctors who don't treat cancer; right?

 5                    MR. MAIER:  Object to form, foundation.

 6          A.    Yes.

 7          Q.    (By Mr. Faes)  And that's what this means

 8   by reaching a broader audience; right?

 9          A.    Right.

10                    MR. MAIER:  Same objection.

11          A.    Yes.

12          Q.    (By Mr. Faes)  So if you look down in the

13   second-to-last bullet point, it states we discussed the

14   more coupons could help drive our efforts, especially

15   with your top five to seven key targets -- parentheses,

16   the number we discussed -- was 100 to 125 coupons per

17   rep in Quarter 1.  Everyone asked if there was any

18   possibility of introducing the debit card program for

19   Fentora alongside this coupon program, coupons being

20   for initiation and the debit cards are for maintenance.

21   Do you see that?

22          A.    Yes.

23          Q.    So this reflects that with Fentora, like

24   Actiq, you continued to use coupons or vouchers as a
```

```
 1    very effective sales -- with a high ROI or return on

 2    investment; right?

 3          A.    Correct.

 4                MR. MAIER:  Object to form, foundation.

 5          Q.    (By Mr. Faes)  And you knew it was true

 6    that very often if a patient was started and tried

 7    Fentora and was given a voucher to help defray or cover

 8    the cost for the first 30 days or so, that patient was

 9    very likely to continue on Fentora?

10          A.    Correct.

11                MR. MAIER:  Object to form, foundation.

12          Q.    (By Mr. Faes)  So essentially if you --

13    you knew that if you gave potential patients a taste or

14    a sample of Fentora, it was likely that they would

15    continue on that product; right?

16                MR. MAIER:  Object to form, foundation.

17          A.    Yes.

18          Q.    (By Mr. Faes)  And he winds up this e-mail

19    on the second page I cannot stress enough that it is

20    your efforts daily that is making this product go.

21    Keep up the momentum and finish 2006 strong.  Do you

22    see that?

23          A.    Yes.

24          Q.    And that's reflecting his feeling to the
```

Highly Confidential - Subject to Further Confidentiality Review

1    sales force that it was really you guys, the sales

2    force, the people out there in the field talking to

3    doctors, that was really helping develop and maintain

4    the market for Fentora at this time; right?

5         A.    Correct.

6              MR. MAIER:  Object to form, foundation.

7         Q.    (By Mr. Faes)  I'm going to hand you

8    what's been marked as Exhibit Number 34 to your

9    deposition.  And this is another e-mail dated December

10   1st of 2006, and again, it's from your immediate

11   supervisor, Philip Tocco, who was the regional manager

12   for the Great Lakes region at that time; right?

13             [Exhibit Teva-Sippial-034

14             marked for identification.]

15        A.    Yes.

16        Q.    And this would have been received by you

17   and other sales representatives on the Great Lakes

18   team; right?

19        A.    Correct.

20        Q.    And he starts with this -- he starts with

21   Steve asked for this, so I thought the whole group

22   might benefit from being able to see the year-to-date

23   prescription numbers for Fentora.  I have highlighted

24   some of the important points.  In burgundy, you will

1     see that as of week ending 10-20 we hit over 1,000 RXs

2     per week.  To put things in perspective, it took

3     over Actiq a -- it took Actiq over 107 weeks into the

4     launch to hit that number of prescriptions per week.

5     Do you see that?

6           A.    Yes.

7           Q.    So this continues to reflect that, as we

8     saw earlier, the launch of Fentora was extremely

9     successful; right?

10          A.    Correct.

11                MR. MAIER:  Object to form.

12          Q.    (By Mr. Faes)  And part of the reason why

13    it was extremely successful and you were able to reach

14    in less than a couple months the number of

15    prescriptions that it took two years to reach with

16    Actiq is because you were using your base of existing

17    Actiq doctors and prescribers for your marketing

18    efforts for Fentora; right?

19          A.    Yes.

20          Q.    So based --

21                MR. MAIER:  Object to form.

22          Q.    (By Mr. Faes)  Essentially the launch of

23    Fentora would not have been successful if it weren't

24    for the prior marketing that the company had done on

Highly Confidential - Subject to Further Confidentiality Review

 1    Actiq; right?

 2          A.    Correct.

 3                MR. MAIER:  Object to form, foundation.

 4          Q.    (By Mr. Faes)  And if it hadn't been for

 5    the prior relationships and promotional efforts that

 6    had been done with Actiq, the company wouldn't have

 7    been able to hit over 1,000 prescriptions per week with

 8    Fentora within the first couple months; right?

 9                MR. MAIER:  Objection.  Form, foundation.

10          A.    Correct.

11          Q.    (By Mr. Faes)  I'm going to hand you

12    what's been marked as Exhibit Number 35 to your

13    deposition.

14                [Exhibit Teva-Sippial-035

15                marked for identification.]

16          Q.    This is an e-mail dated February 5th of

17    2007, so this is about two months later from the last

18    e-mail that we looked at; right?

19          A.    Yes.

20          Q.    And again, this is from your manager, your

21    regional manager, Philip Tocco, to you and other

22    members of your -- of the Great Lakes team; right?

23          A.    Yes.

24          Q.    And it states, Great Lakes, in case you

 1    haven't already heard, there were over 16,000

 2    prescribers who received or will receive in the next

 3    few days a shipment that includes four preprinted

 4    Fentora prescription pads with the prescriber's

 5    information.  Do you see that?

 6         A.    Yes.

 7         Q.    So this reflects that there were over

 8    16,000 physicians that were sent Fentora prescription

 9    pads and kind of an introductory Fentora informational

10    kit; right?

11         A.    Correct.

12         Q.    So this reflects that the effort to

13    promote Fentora was to a pretty large group of 16,000

14    physicians; right?

15         A.    Yes.

16              MR. MAIER:  Objection.  Form.

17         Q.    (By Mr. Faes)  And the 16,000 number is a

18    lot larger than the 5,000 number of oncologists and

19    pain specialists that we saw in the original Actiq

20    RiskMAP; right?

21              MR. MAIER:  Objection.  Form.

22         A.    Yes.

23         Q.    (By Mr. Faes)  In other words, at this

24    point with -- strike that.  At this point with the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    launch of Fentora sending the welcome kits for Fentora

 2    out to 16,000 prescribers, the company is casting a

 3    pretty wide net for Fentora; right?

 4              MR. MAIER:  Objection.  Form.

 5         A.   Years later.

 6         Q.   (By Mr. Faes)  Well, I'm talking about

 7    Fentora.

 8         A.   Oh.  Yes.

 9         Q.   So let me reask the questions.

10         A.   Sorry.

11         Q.   I'm not sure if it was clear.  In other

12    words, at this point with the launch of Fentora and the

13    company sending welcome kits including Fentora

14    preprinted prescription pads to over 16,000 prescribers

15    in February of 2007, the company is casting a pretty

16    wide net in its search for potential Fentora

17    prescribers; right?

18              MR. MAIER:  Objection.  Form.

19         A.   Yes.

20         Q.   (By Mr. Faes)  I'm going to skip one.  I'm

21    going to hand you what's been marked as Exhibit Number

22    36 to your deposition.

23              [Exhibit Teva-Sippial-036

24              marked for identification.]
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And this is an e-mail dated April 12th of

2    2007, and again, it's from your boss, Philip Tocco, to

3    you and other members of the Great Lakes team; right?

4    A.    Yes.

5    Q.    So this is a e-mail that would have been

6    received by you; right?

7    A.    Correct.

8    Q.    And he starts off with attached is the

9    e-launch tract for the entire west by area.  First,

10   congratulations on consistently leading the western

11   region in terms of prescription per week over the last

12   few weeks.  Second, you can see we lag a bit behind

13   some of the areas in terms of their physician comfort

14   level with the higher doses.  Part of our sales goal

15   over the next few months should be to increase the

16   comfort level of our strong supporter -- Fentora

17   supporters with the higher doses.  Do you see that?

18   A.    Yes.

19   Q.    So that was instruction that your boss,

20   Phil Tocco, sent out to you and other members of the

21   Great Lake team; right?

22   A.    Correct.

23   Q.    And his instructions to you and other

24   members of the team was to go out there and try to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    convince or make doctors more comfortable with the

 2    higher doses of Fentora; right?

 3         A.    Correct.

 4               MR. MAIER:  Form.

 5         Q.    (By Mr. Faes)  And he states that that's

 6    part of your sales goal; right?

 7         A.    Yes.

 8         Q.    And that's because, as we talked about

 9    earlier, the higher doses of Fentora cost more and mean

10    more revenue for the company; right?

11         A.    Correct.

12               MR. MAIER:  Objection.  Form.

13         Q.    (By Mr. Faes)  I'm going to hand you

14    what's been marked as Exhibit 37 to your deposition.

15               MR. FAES:  I'm going back one now.

16               [Exhibit Teva-Sippial-037

17               marked for identification.]

18         Q.    (By Mr. Faes)  This is an e-mail dated

19    February 16th of 2007 from your supervisor, Philip

20    Tocco, to you and others -- other members of the Great

21    Lakes sales team; right?

22         A.    Yes.

23         Q.    So this is an e-mail that you would have

24    received; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Correct.

2          Q.    And his instructions to you in the middle

3     of the page is we can't focus on Actiq switches alone

4     even with our past Actiq advocates.  We might be

5     pleasantly surprised when we target and tailor our

6     messages towards other segments of your high potential

7     targets overall pure SAO or short-acting opioid

8     business.  Do you see that?

9          A.    Yes.

10         Q.    So this is your boss, Phil Tocco, at the

11    time communicating to you that you can't focus alone on

12    your previous advocate -- Actiq -- and -- strike that.

13    So this is your boss, Phil Tocco, at the time

14    communicating to you that you can't focus on Actiq

15    advocates alone to meet your sales goals for Fentora;

16    right?

17         A.    Correct.

18               MR. MAIER:  Object to form.

19         Q.    (By Mr. Faes)  In other words, you need to

20    look for other potential prescribers or widen your net

21    in order to meet your sales goals; right?

22               MR. MAIER:  Object to form.

23         A.    Yes.

24         Q.    (By Mr. Faes)  And he refers specifically
```

```
 1    to past Actiq advocates; right?

 2         A.    Yes.

 3         Q.    And that would be referring --

 4    advocates -- Actiq advocates would be referring to

 5    people that had done company-sponsored Cephalon speaker

 6    programs in the past for Actiq; right?

 7                MR. MAIER:  Objection.  Form, foundation.

 8         A.    Or past prescribers.

 9         Q.    (By Mr. Faes)  Or past prescribers, so it

10    could refer to both?

11         A.    Correct.

12         Q.    It could refer to past prescribers or

13    those who had done company-sponsored programs in the

14    past for Actiq; right?

15         A.    Yes.

16                MR. ROONEY:  Object to form.

17         Q.    (By Mr. Faes)  And your boss referred to

18    those people as Actiq advocates; right?

19         A.    Yes.

20                MR. MAIER:  Same objection.

21         Q.    (By Mr. Faes)  And you understood that

22    that's what he meant at the time; right?  That's your

23    understanding?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    This -- I'm handing you what's been marked
 2     as Exhibit Number 38 to your deposition.
 3                [Exhibit Teva-Sippial-038
 4                marked for identification.]
 5          Q.    And this is an e-mail dated June 5th of
 6     2007, and then again, it's from your supervisor, Phil
 7     Tocco, to you and other members of the Great Lakes
 8     sales force; right?
 9          A.    Yes.
10          Q.    So this is an e-mail that you would have
11     received; right?
12          A.    Yes.
13          Q.    And he starts off Great Lakes in his
14     second sentence of this e-mail -- states our work is
15     cut out for us in terms of making our top physicians
16     comfortable with all the dosing available; right?
17          A.    Yes.
18          Q.    And so again, this is reflecting the
19     company's goals and directives to get physicians that
20     you're detailing for Fentora comfortable with the
21     higher doses of Fentora; right?
22          A.    Correct.
23          Q.    (By Mr. Faes)  And that's --
24                MR. MAIER:  Objection.  Form, foundation.
```

1         Q.    (By Mr. Faes)  And that was -- you

2    understood that that was to meet the company's sales

3    goals for Fentora; right?

4         A.    Yes.

5              MR. ROONEY:  Object to form.

6         Q.    (By Mr. Faes)  And you understood that the

7    reason that that was important is because the higher

8    doses of Fentora cost more and meant more revenue for

9    the company; right?

10             MR. MAIER:  Same objection.

11        A.    Yes.

12        Q.    (By Mr. Faes)  I'm going to hand you

13   what's been marked as Exhibit Number 39 to your

14   deposition.

15             [Exhibit Teva-Sippial-039

16             marked for identification.]

17        Q.    And this is a document titled Actiq RMP or

18   risk management program repeat off-label prescribers,

19   August of 2007.  Do you see that?

20        A.    Yes.

21        Q.    So this would -- and forward in time, this

22   would be after Fentora was launched; right?

23        A.    Yes.

24        Q.    So even after Fentora was launched, you

1    were still continuing to get these reports of repeat

2    off-label prescribers of Actiq; right?

3                MR. ROONEY:  Object to form.

4        A.    I don't know if we were given this.

5        Q.    (By Mr. Faes)  If you can turn -- at this

6    time in August of 2007, you would have discontinued

7    promoting or detailing Actiq; right?

8        A.    Correct.

9        Q.    You would have been -- in terms of opioid

10   products you were promoting, Fentora would have been

11   the only product you were detailing or promoting;

12   right?

13       A.    Yes.

14       Q.    If you can turn to the second page of this

15   document.  Fifth column down.  See there's a Dr. Suresh

16   Gupta listed as a repeat off-label prescriber for

17   Actiq; right?

18       A.    Yes.

19       Q.    And that would have been -- he's in

20   Dayton, Ohio, so that would have been a doctor that you

21   would have regularly called on; right?

22                MR. MAIER:  Objection.  Form.

23       A.    Correct.

24       Q.    (By Mr. Faes)  And this document indicates

1    that he's a repeat off-label prescriber for Actiq;

2    right?

3         A.    Yes.

4               MR. MAIER:  Objection.  Form.

5         Q.    (By Mr. Faes)  And would it surprise you

6    to know that Dr. Gupta was a company-paid speaker for

7    company-sponsored programs for Fentora at least five

8    times despite being on this list?

9               MR. MAIER:  Objection.  Form.

10        A.    No.

11        Q.    (By Mr. Faes)  I'm going to hand you --

12              [Discussion off the record.]

13        Q.    Let's try to push through one more

14   section, and then --

15        A.    Yeah, that's fine.

16        Q.    Unless you need a break.

17        A.    No, that's fine.

18        Q.    You're the boss.

19        A.    Thank you.  Let's get this -- get her

20   done.

21        Q.    No, I get it.  That's why I'm trying to

22   get through them fast.  I'm going to hand you what's

23   been marked as Exhibit Number 40 to your deposition.

24              [Exhibit Teva-Sippial-040

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    marked for identification.]

 2        Q.    So before I ask you any questions about

 3   Exhibit 40, which I've now misplaced -- okay, here we

 4   go.  So I'm going to kind of switch gears a little bit

 5   and I want to talk to you about -- specifically about

 6   reimbursement for Actiq and Fentora; okay?

 7        A.    Yes.

 8        Q.    You understood that one potential barrier

 9   to doctors prescribing Actiq or Fentora was insurance

10   reimbursement; right?

11        A.    Correct.

12              MR. MAIER:  Objection.  Form.

13        Q.    (By Mr. Faes)  And you understood that if

14   doctors had difficulty getting a patient prescribed

15   Actiq or Fentora approved and paid for by his

16   insurance, the doctor may not continue writing the

17   prescription; right?

18        A.    Correct.

19              MR. MAIER:  Objection.  Form, foundation.

20        Q.    (By Mr. Faes)  So it was part of your job

21   then as a sales representative -- was to help doctors

22   with problems they might be having getting a patient

23   approved by his health plan or insurance for Actiq or

24   Fentora; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. MAIER:  Objection.  Form.

 2        A.    Correct.

 3        Q.    (By Mr. Faes)  And the company even had a

 4   hotline set up that you could refer doctors to or their

 5   office staff to if the patient -- if one of their

 6   patients was having issues; right?

 7        A.    Yes.

 8        Q.    And you understood that a common reason

 9   that an insurer might deny coverage for Actiq or

10   Fentora was because it was prescribed or when it was --

11   strike that.  You understood that a common reason that

12   an insurer might deny coverage for Actiq or Fentora was

13   when it was prescribed for noncancer patients; right?

14        A.    Yes.

15                MR. MAIER:  Objection --

16        Q.    (By Mr. Faes)  In other words, they might

17   have more problems getting approved if Actiq or Fentora

18   was prescribed off-label; right?

19        A.    Correct.

20                MR. MAIER:  Objection.  Form, foundation.

21        Q.    (By Mr. Faes)  And you'd agree with me it

22   was still part of your job to help doctors in that

23   situation even if it was off-label; right?

24                MR. MAIER:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    (By Mr. Faes)  If they felt it was

 2   medically appropriate for their patient?

 3          A.    Medically necessary, yes.

 4                MR. ROONEY:  Object to form.

 5          Q.    (By Mr. Faes)  In fact, it's fair to say

 6   that you even encouraged doctors to confront the

 7   insurance companies regarding their refusal to pay for

 8   Actiq even when a doctor wrote the product off-label?

 9                MR. MAIER:  Objection.  Form.

10          A.    Repeat that.

11          Q.    (By Mr. Faes)  Is it is it fair to say

12   that you were instructed to encourage doctors to

13   confront the insurance companies regarding their

14   refusal to pay for Actiq even when a doctor wrote the

15   product off-label if they felt it was medically

16   necessary?

17          A.    Yes.

18                MR. MAIER:  Objection.  Form.

19          Q.    (By Mr. Faes)  If I can have you look at

20   Exhibit 40 to your deposition.

21                MR. FAES:  And I think I skipped some.

22   This is 38.  Oh, you already got it up.

23          Q.    (By Mr. Faes)  And so we're looking at

24   Exhibit 40, which is a e-mail dated August 2nd of 2004,
```

 1    and it's from a Deborah Bearer to the U.S. sales force.

 2    Do you see that?

 3         A.    Yes.

 4         Q.    So you would have been part of the U.S.

 5    sales force at this time; right?

 6         A.    Correct.

 7         Q.    So this is an e-mail that you would have

 8    received; right?

 9         A.    Yes.

10         Q.    And it says attention field sales, in an

11    effort to control the growth of Actiq, United

12    Healthcare has recently instituted a stronger stand on

13    its prior authorization criteria.  Loosely enforced

14    over the last year, UHC is now aggressively limiting

15    approvals to breakthrough cancer pain for patients

16    currently on cancer medications.  You see that?

17         A.    Yes.

18         Q.    So essentially this is communicating that

19    United Healthcare is aggressively limiting approvals

20    for Actiq to only on-label indications; right?

21              MR. MAIER:  Objection.  Form, foundation.

22         A.    Yes.

23         Q.    (By Mr. Faes)  And it goes on to say

24    noncancer patients who are currently prescribed Actiq

1    will no longer be eligible for new prescriptions.  Do

2    you see that?

3         A.    Yes.

4         Q.    And that's essentially communicating to

5    you as a member of the sales force that this big

6    organization, United Health, is going to stop paying

7    for Actiq when it's written off-label for noncancer

8    patients; right?

9         A.    Correct.

10             MR. MAIER:  Objection.  Form, foundation.

11        Q.    (By Mr. Faes)  And it goes on to instruct

12   you what your physicians can do.  Take a stand, in all

13   bold, caps; right?

14        A.    Yes.

15        Q.    And it says prior authorizations and

16   appeals send a strong message we, the clinical experts,

17   believe Actiq is appropriate for our patients with

18   breakthrough pain.  Do you see that?

19        A.    Yes.

20        Q.    So essentially what this is telling you as

21   a sales representative for Actiq at the time is that

22   you can -- can and should go out and tell your

23   physicians that are writing Actiq off-label for

24   noncancer patients to take a stand against United

Highly Confidential - Subject to Further Confidentiality Review

1   Healthcare and others that might be denying coverage

2   for those prescriptions; right?

3          A.    Correct.

4                MR. MAIER:  Objection.  Form.

5          Q.    (By Mr. Faes)  And it goes on to state

6   what you can do.  Continue to drive the clinical

7   message with your frequent target UHC providers.

8   Inform your physicians to -- inform your physicians of

9   the stand UHC has taken and encourage them to appeal

10  prior authorization denials.  Do you see that?

11         A.    Yes.

12         Q.    So this is essentially instructing you as

13  a member of the sales force detailing Actiq to

14  encourage physicians that are writing Actiq off-label

15  for noncancer patients to encourage those doctors to

16  appeal those decisions with the insurance companies;

17  right?

18         A.    Yes.

19                MR. MAIER:  Objection.  Form, foundation.

20         Q.    (By Mr. Faes)  And this is all

21  instructions that you would have received from your

22  superiors at the time while you were detailing and

23  promoting Actiq; right?

24         A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And this is instructions that you would

 2   have tried to follow in your territory in Ohio to the

 3   best of your ability; right?

 4          A.    Yes.

 5                MR. MAIER:  Objection.  Form.

 6          Q.    (By Mr. Faes)  And elsewhere; right?

 7          A.    Yes.

 8          Q.    I don't want to limit it to just Ohio.

 9   I'm going to hand you -- I'm going to hand you what's

10   been marked as Exhibit Number 41 to your deposition.

11                MR. FAES:  And this is 40 for you.  I

12   don't know what -- I'm all over the place.  I don't

13   know what I'm skipping at this point.

14                [Exhibit Teva-Sippial-041

15                marked for identification.]

16          Q.    (By Mr. Faes)  So Exhibit Number 41 --

17   Exhibit 41 is an e-mail and attachment dated April 20th

18   of 2007.  Do you see that?

19          A.    Yes.

20          Q.    And that's from -- it's from your

21   supervisor, Philip Tocco, to you and other members of

22   the Great Lakes sales force; right?

23          A.    Yes.

24          Q.    And that would have included you at this
```

```
 1    time; right?

 2         A.    Yes.

 3         Q.    So you would have received this e-mail and

 4    attachment; right?

 5         A.    Correct.

 6         Q.    And if you look down towards the bottom of

 7    the page, it states attached for your review is the

 8    March 2000 activity report for the Fentora

 9    reimbursement program.  Do you see that?

10         A.    Yes.

11         Q.    So this is discussing an activity report

12    for the Fentora reimbursement center, the call

13    center -- right -- that takes the calls from doctors

14    that are having reimbursement issues with Fentora;

15    right?

16         A.    Yes.

17         Q.    And if you turn to the third page in, it

18    actually says that.  It says we attach for your review

19    the March 2007 activity report for the Fentora

20    reimbursement program; right?

21         A.    Yes.

22         Q.    And if you turn to the page in this ending

23    in 8435, and it has Exhibit 6 across the top, in order

24    to orient you.  You see the top of this -- title of
```

Highly Confidential - Subject to Further Confidentiality Review

1    this slide is Fentora reimbursement program, diagnosis

2    information, March 2007, Exhibit 6.  Do you see that?

3         A.    Yes.

4         Q.    And it states this month program staff

5    initiated insurance research on 54 cases after

6    receiving the necessary signed consent forms.  Of the

7    54 reportable diseases, 100 percent --

8         A.    Diagnosis.

9         Q.    Thank you.

10        A.    Uh-huh.

11        Q.    Of the 54 reportable diagnosises, 100

12   percent were for patients diagnosed with conditions

13   other than breakthrough cancer pain.  Do you see that?

14        A.    Yes.

15        Q.    So this reflects that of the 54 cases that

16   the Fentora reimbursement center was assisting doctors

17   with, 100 percent of them were for prescriptions

18   written off-label; right?

19        A.    Correct.

20              MR. MAIER:  Object to form.

21        Q.    (By Mr. Faes)  And it says these cases had

22   the following diagnosises.  Back-related pain, 20.

23   Migraine, six.  Radiculopathy/neurology, five.

24   Abdominal pain, six.  Fibromyalgia, four.  Neuropathy,

```
 1    three.  I don't know that word -- acro -- endiatists

 2    (ph), two.  Cerebralgia (ph), two.  Chronic pain, two.

 3    Osteoarthritis, one.  Pelvic pain, one.  Reflex

 4    sympathetic disorder, one.  Rheumatoid arthritis, one.

 5    Spondylolysis, one.  And treatment-related pain, one.

 6    You see that?

 7         A.    Yes.

 8         Q.    And you'd agree with me that those are all

 9    off-label uses for Fentora; right?

10         A.    Yes.

11         Q.    And this is information that would have

12    been received and shared with you as a sales

13    representative responsible for promoting and detailing

14    Fentora in the field; right?

15         A.    Yes.

16               MR. ROONEY:  Object to form.

17         Q.    (By Mr. Faes)  And you'd agree with me

18    that there was no instruction or direction from the

19    company at this time that you shouldn't continue to

20    refer doctors to this Fentora reimbursement program

21    hotline if they were writing Fentora off-label; right?

22               MR. MAIER:  Objection.  Form.

23         A.    Repeat that.

24         Q.    (By Mr. Faes)  In other words, you would
```

1    agree with me that even after this report was shared,

2    the direction from your superiors at the company was

3    that you were still allowed and encouraged to direct

4    physicians who were having reimbursement issues with

5    Fentora to their Fentora reimbursement hospital even if

6    those doctors were prescribing off-label; right?

7              MR. MAIER:  Objection.  Form.

8         A.    Reimbursement hospital?

9         Q.    (By Mr. Faes)  Reimbursement hotline.  So

10   let me strike that and reask the question.  You would

11   agree with me that even after this report that we're

12   looking at as Exhibit Number 41 was shared with you,

13   your direction or the direction from your superiors at

14   the company was that you were still allowed and even

15   encouraged to direct physicians who were having

16   reimbursement issues with Fentora to this Fentora

17   reimbursement hotline even if these -- even if the

18   doctors were prescribing off-label; right?

19        A.    Correct.

20             MR. MAIER:  Objection.  Form.

21        Q.    (By Mr. Faes)  And if you turn to the page

22   in this document ending in 8436.  This slide is labeled

23   Exhibit 7, and it states the program assisted with 54

24   prior authorization PA and appeal requests in March.

Highly Confidential - Subject to Further Confidentiality Review

 1   All but one of these cases were for conditions other

 2   than breakthrough cancer pain.  Do you see that?

 3        A.    Yes.

 4        Q.    So this is reflecting to you and

 5   information given to you as a sales rep that the

 6   reimbursement hotline received 54 appeal requests in

 7   March, and 53 of the 54 were for -- that they helped

 8   with were for off-label uses; right?

 9        A.    Yes.

10              MR. MAIER:  Objection.  Form, foundation.

11        Q.    (By Mr. Faes)  And if you turn to the

12   following page of this exhibit, you note that the

13   program -- it says that the program, which means the

14   Fentora reimbursement program, has secured prior

15   authorization and appeal approvals with the following

16   payers since launch, and it lists three insurers in

17   Ohio -- Anthem (ph), BCBS of Ohio, Butler Insurance

18   Service, and Medical Mutual.  Do you see that?

19        A.    Yes.

20        Q.    And these were all insurers that insured

21   patients of doctors that you called on in your

22   territory; right?

23        A.    Yes.

24        Q.    And this was communicated to you that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   because of the efforts by the company that Fentora had

 2   prior approvals with these big three insurers due to

 3   their efforts; right?

 4        A.   Yes.

 5             MR. MAIER:  Objection.  Form.

 6        Q.   (By Mr. Faes)  You need to take a quick

 7   break or keep going?  That's the end of kind of a

 8   section, so it might be --

 9             MR. MAIER:  We might take a few minutes.

10             MR. FAES:  You want to take a five-minute

11   breather break and --

12        A.   Yes.

13             THE VIDEOGRAPHER:  We are going off the

14   record at 5:04 PM.

15             [A brief recess was taken.]

16             THE VIDEOGRAPHER:  We are back on the

17   record at 5:15 PM.

18        Q.   (By Mr. Faes)  Mr. -- or I'm sorry.  Ms.

19   Sippial, we're back on the record after a short break.

20   Are you ready to proceed?

21        A.   Yes.

22        Q.   So switching gears a little bit again, as

23   part of your job as a sales rep, you could distribute

24   or have the company distribute articles that focused on
```

1  noncancer off-label uses of Fentora or Actiq upon

2  request by a physician; right?

3        A.    Yes.

4              MR. MAIER:  Objection.  Form.

5        Q.    (By Mr. Faes)  And that was called a

6  medical information request, or MIRF; right?

7        A.    Correct.

8        Q.    And MIRFs could include articles published

9  by the WLF or Washington Legal Foundation; right?

10       A.    Yes.

11             MR. FAES:  I'm going to jump in -- jumping

12  up to 50 for you.

13       Q.    (By Mr. Faes)  I'm going to have -- I'm

14  going to hand you what's been marked as Exhibit Number

15  42 to your deposition.  And Exhibit 42 is a sales

16  bulletin dated April 15th of 2008, and it's to the pain

17  care specialists sales force.  Do you see that?

18             [Exhibit Teva-Sippial-042

19             marked for identification.]

20       A.    Yes.

21       Q.    And the title or the subject is WLF policy

22  update; right?

23       A.    Yes.

24       Q.    And so this is a bulletin that you would

Highly Confidential - Subject to Further Confidentiality Review

1    have received as a sales rep for Fentora at this time;

2    right?

3              A.    Yes.

4              Q.    And it states that the -- this

5    communication is being sent to inform you of an update

6    on utilizing the WLF, Washington Legal Foundation,

7    reprints.  In order to better manage our business

8    within today's ever-changing regulatory environment, it

9    has been decided that the distribution of all WLF

10   reprints cease immediately and that all copies of these

11   reprints in your possession be destroyed.  Do you see

12   that?

13             A.    Yes.

14             Q.    So this would indicate direction to you by

15   management at this time that you may have had reprints

16   regarding the use of Fentora or Actiq in your

17   possession and that you were no longer able to

18   distribute those; right?

19             A.    Correct.

20             Q.    So it would indicate that prior to this

21   point you were able to leave some of those reprints

22   behind with your physicians; right?

23             MR. MAIER:  Object to form.

24             A.    Or had them sent to the company -- sent

Highly Confidential - Subject to Further Confidentiality Review

1  from the company.

2      Q.   (By Mr. Faes)  Right, but if they were in

3  your possession, that would indicate that at least some

4  of them you were allowed to drop off or leave behind

5  with the physician; right?

6      A.   Correct.

7           MR. MAIER:  Object to form.

8      Q.   (By Mr. Faes)  And it says that should

9  your physicians have a question or request information

10 outside the Fentora-approved indication, these articles

11 will only be available through a medical affairs

12 response via an unsolicited medical information request

13 form, MIRF; right?

14     A.   Yes.

15     Q.   And so this would indicate that prior to

16 this bulletin, which is informing you that now these

17 articles will only be available through a MIRF request,

18 that prior to this some of the articles were available

19 without a MIRF request; right?

20          MR. MAIER:  Objection.  Form.

21     A.   I believe so.

22     Q.   (By Mr. Faes)  And you understood at this

23 time that some of the WLF or Washington Legal

24 Foundation reprints discussed the use of Actiq or

```
 1    Fentora in off-label noncancer pain indications; right?

 2         A.    Yes.

 3               MR. MAIER:  Objection.  Form, foundation.

 4         Q.    (By Mr. Faes)  And if you look at Exhibit

 5    Number 43, this is an e-mail dated April 15th of 2008,

 6    the same date; right?

 7               [Exhibit Teva-Sippial-043

 8               marked for identification.]

 9         A.    Yes.

10         Q.    And this is an e-mail from a Cynthia

11    Condodina to sales and marketing and a number of other

12    groups; right?

13         A.    Yes.

14         Q.    So you would have received this e-mail;

15    right?  Sales PCS all?

16         A.    Yes.

17         Q.    And the subject of this is Fentora sales

18    force update, WLF reprint policy effective immediately;

19    right?

20         A.    Correct.

21         Q.    And it states below on behalf of the

22    Fentora brand team, this communication is being sent to

23    you to inform you of an update on utilizing the

24    following WLF, Washington Legal Foundation, reprints,
```

Highly Confidential - Subject to Further Confidentiality Review

1    and it lists two reprints there.  Do you see that?

2         A.    Yes.

3         Q.    One of them is Portenoy, et al, and the

4    title of that is for relief of breakthrough pain in

5    opioid-tolerant patients with chronic low back pain, a

6    randomized placebo controlled study.  Do you see that?

7         A.    Yes.

8         Q.    So the title of that reprint alone would

9    indicate that this reprint, this Portenoy reprint, is

10   discussing Fentora in an off-label indication; right?

11        A.    Yes.

12              MR. MAIER:  Objection.  Form.

13        Q.    (By Mr. Faes)  And the second one listed

14   here is Simpson, et al, fentanyl buccal tablets for the

15   relief of breakthrough pain in opioid-tolerant adult

16   patients with chronic neuropathic pain, a multicenter

17   randomized double-blind placebo controlled study.  Do

18   you see that?

19        A.    Yes.

20        Q.    And so again, the title of this document

21   would indicate that this reprint as well was discussing

22   the use of Fentora in an off-label indication; right?

23        A.    Yes.

24              MR. MAIER:  Objection.  Form, foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    (By Mr. Faes)  And below it states in

 2    order to better manage our business within today's

 3    ever-changing regulatory environment, it has been

 4    decided that the distribution of all WL reprints cease

 5    immediately and all copies of those reprints in your

 6    possession be destroyed; right?

 7          A.    Yes.

 8          Q.    So this indicates that prior to this sales

 9    bulletin, you were able to leave these two articles or

10    handouts behind even though they discussed off-label

11    uses of Fentora; right?

12          A.    Yes.

13                MR. ROONEY:  Object to form.

14          Q.    (By Mr. Faes)  And you would have done

15    that be -- at -- strike that.  And you would have

16    followed the instructions of your superiors at the

17    company and distributed those reprints if a physician

18    asked a question about the use of Fentora in those

19    off-label indications; right?

20          A.    Yes.

21                MR. MAIER:  Objection.  Form.

22          Q.    (By Mr. Faes)  I'm going to hand you

23    what's been marked as Exhibit Number 44 to your

24    deposition.
```

```
 1                   [Exhibit Teva-Sippial-044

 2                   marked for identification.]

 3        Q.    And this is a sales bulletin dated July

 4   19th of 2009.  Do you see that?

 5        A.    Yes.

 6        Q.    And the subject of this -- well, first of

 7   all, this is a sales bulletin that was sent to all

 8   sales personnel; right?

 9        A.    Yes.

10        Q.    And you would have been a member of the

11   sales force at this time; right?

12        A.    Yes.

13        Q.    So this is a sales bulletin that you would

14   have received; right?

15        A.    Yes.

16        Q.    And the subject of this sales bulletin is

17   frequently-asked questions from compliance sales

18   meeting.  Do you see that?

19        A.    Yes.

20        Q.    And if you turn to the second page in of

21   this document and you look down under model call sales

22   behaviors.  And it's got kind of a model question and

23   answer; right?

24        A.    Yes.
```

1      Q.    And if you look under Section 2, it states

2   should we still complete MIRFs for off-label questions?

3   Is there a thing as MIRFing too much?  Do you see that?

4      A.    Yes.

5      Q.    And the model answer is representatives

6   should definitely complete MIRFs for off-label

7   questions.  This is the appropriate vehicle for

8   responding when a physician asks a question regarding

9   off-label use of one of Cephalon's products.  There's

10  no such thing as MIRFing too much.  Do you see that?

11     A.    Yes.

12     Q.    And that's instructions that you would

13  have received from your superiors at the company at

14  this time that there was no such thing as MIRFing too

15  much; right?

16     A.    Correct.

17           MR. MAIER:  Objection.  Form.

18     Q.    (By Mr. Faes)  Meaning that your direction

19  and instructions from the company that you received is

20  that you couldn't submit too many requests to the

21  company from doctors for reprints discussing Actiq or

22  Fentora in off-label indications; right?

23     A.    Correct.

24           MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    (By Mr. Faes)  If you turn to the third

 2   page in of this document, see there's questions and

 3   answers regarding compensation and off-label sales.  Do

 4   you see that?  It's the -- oh, I think I gave you the

 5   wrong page.  It's ending in 3850.  I think it's the

 6   fourth page in.  I think I said the third page in.

 7   It's the fourth page in.

 8             MR. FAES:  It's Page 3 at the top, though.

 9   Yeah, there we go.

10        Q.    (By Mr. Faes)  So you see there's a

11   section here labeled compensation and off-label sales,

12   and there's some questions and answers here; right?

13        A.    Yes.

14        Q.    And if you look at Number 3, one of the

15   questions is, why do we call on physicians who may be

16   likely to prescribe our products for off-label uses?

17   Do you see that?

18        A.    Yes.

19        Q.    And do you see the model answer is we call

20   on physicians who may be interested in using our

21   products to help their patients.  We have created a set

22   of rules for reps that we believe if followed legally

23   permit them to call on doctors who may decide in their

24   independent medical judgment to prescribe the products
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    off-label.  Do you see that?

2         A.    Yes.

3         Q.    And that's essentially the communication

4    from the company at this time in 2007 of why you were

5    calling on physicians who may be likely to prescribe

6    Actiq or Fentora off-label; right?

7         A.    Yes.

8               MR. MAIER:  Objection.  Form.

9         Q.    (By Mr. Faes)  And then there's another

10   question here.  Why do our sales forecasts include so

11   much in off-label sales?  And the answer is physicians

12   routinely prescribe drugs for off-label uses and our

13   drugs are no expectation.  Our sales forecasts capture

14   the usage and any anticipated growth in this usage as

15   well as growth due to independent changes in the

16   marketplace such as potential new medical information

17   and changes to managed care reimbursement.  Do you see

18   that?

19        A.    Yes.

20        Q.    So you'd agree with me that this was

21   direction or information that was provided to you by

22   the company of why a large part of your quota, if you

23   will, was based on off-label sales; right?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1                   MR. MAIER:  Objection.  Form, foundation.

2        Q.    (By Mr. Faes)  So you had a sales quota

3   that was set forth by the company by your superiors;

4   right?

5        A.    Yes.

6        Q.    And you had no input into what that sales

7   quota was; right?

8        A.    Correct.

9        Q.    And it was based on essentially your prior

10  quarter or your prior year for your territory; right?

11       A.    Yes.

12       Q.    And --

13                  MR. ROONEY:  Object to form.

14       Q.    (By Mr. Faes)  And you knew that that

15  included off-label sales that physicians in your

16  territory were writing for the prior quarter or the

17  prior year; right?

18                  MR. MAIER:  Objection.  Form.

19       A.    Yes.

20       Q.    (By Mr. Faes)  And you knew that that

21  could be a significant amount of prescriptions for some

22  doctors; right?

23                  MR. MAIER:  Objection.  Form, foundation.

24       A.    Yes.

1    Q.    (By Mr. Faes)  And you knew that if all of

2  your -- all of the prescribers in your territory who

3  were writing off-label were suddenly convinced or

4  persuaded that they should no longer do that with Actiq

5  and Fentora, it would be basically impossible for you

6  to meet your quota; right?

7    A.    Correct.

8         MR. MAIER:  Objection.  Form, foundation.

9    Q.    (By Mr. Faes)  And so if you can't -- and

10  if you didn't meet your quota, you wouldn't receive

11  your bonus or your compensation, which could be up to

12  30 percent of your total compensation or more; right?

13    A.    True.

14         MR. MAIER:  Objection.  Form, foundation.

15    Q.    (By Mr. Faes)  So you'd agree with me that

16  the system put in an incentive to you to not discourage

17  doctors who were prescribing off-label to stop that;

18  right?

19         MR. MAIER:  Objection.  Form.

20    A.    Repeat that.

21    Q.    (By Mr. Faes)  You would agree with me

22  that the system that was put in place by the company

23  where they were using off-label use as part of your

24  quota put in a financial incentive in place for reps

Highly Confidential - Subject to Further Confidentiality Review

1    like you to not discourage doctors who were already

2    writing off-label to stop that usage; right?

3              MR. MAIER:  Objection.  Form.

4         A.    Not necessarily.

5         Q.    (By Mr. Faes)  Well, you'd agree with me

6    that if a -- well, strike that.  You'd agree with me

7    that if the numbers that we saw on the 2005 marketing

8    plan were true that up to 90 percent of prescriptions

9    for Actiq were off-label and all of the doctors who

10   were writing off-label suddenly stopped, it would be

11   impossible to meet your sales goals; right?

12             MR. MAIER:  Objection.  Form.

13        A.    Probably.

14        Q.    (By Mr. Faes)  So there was -- so you'd

15   agree with me that under the system set forth by the

16   company, there was a financial incentive for reps like

17   you to essentially maintain the status quo as far as

18   their current prescribers' off-label use of Actiq or

19   Fentora; right?

20        A.    Yes.

21             MR. MAIER:  Objection.  Form.

22        Q.    (By Mr. Faes)  I'm going to hand you

23   what's been marked as Exhibit Number 45 to your

24   deposition.

Highly Confidential - Subject to Further Confidentiality Review

1                    [Exhibit Teva-Sippial-045

2                    marked for identification.]

3        Q.    And this is a medical information request

4    submitted by you regarding a Dr. John Brush (ph), who

5    was a doctor in your territory; right?

6        A.    Correct.

7        Q.    And the question is doctor would like any

8    studies on Fentora and nonmalignant pain, and it's

9    dated October 12th of 2006; right?

10       A.    Correct.

11       Q.    And in response to that the company sends

12   a document FENT014 use for the management of

13   breakthrough pain in opioid-tolerant patients with

14   cancer -- with chronic noncancer pain conditions;

15   right?

16       A.    Yes.

17             MR. ROONEY:  Object to form.

18       Q.    (By Mr. Faes)  So this is an example of a

19   MIRF request for an off-label use that was submitted by

20   you and fulfilled by the company; right?

21       A.    Yes.

22             MR. MAIER:  Object to form.

23       Q.    (By Mr. Faes)  I'm going to hand you

24   what's been marked as Exhibit Number 46 to your

Highly Confidential - Subject to Further Confidentiality Review

```
 1    deposition.

 2              [Exhibit Teva-Sippial-046

 3              marked for identification.]

 4         Q.   And this is another MIRF or medical

 5    information request submitted by you dated October 23rd

 6    of 2006; right?

 7         A.   Yes.

 8         Q.   And this request is by a Dr. James Molnar.

 9         A.   Molnar.

10         Q.   And his question is doctor would like any

11    articles or studies on the use of Fentora and

12    nonmalignant pain; right?

13         A.   Correct.

14         Q.   And that means noncancer pain; right?

15         A.   Yes.

16         Q.   And so this is another document dated

17    October 20th, a MIRF request, asking the company for

18    information regarding off-label use of Fentora; right?

19         A.   Yes.

20              MR. MAIER:  Objection.  Form.

21         Q.   (By Mr. Faes)  And the company responded

22    by sending this doctor a document titled use for the

23    management of breakthrough pain in opioid-tolerant

24    patients with chronic noncancer pain conditions; right?
```

```
 1                     MR. ROONEY:  Object to form.

 2          A.    Yes.

 3          Q.    (By Mr. Faes)  So this is another example

 4   of a medical information request submitted by you and

 5   fulfilled by the company; right?

 6          A.    Yes.

 7                     MR. MAIER:  Objection.  Form.

 8          Q.    (By Mr. Faes)  I'm going to hand you

 9   what's been marked as Exhibit Number 47 to your

10   deposition.

11                     [Exhibit Teva-Sippial-047

12                     marked for identification.]

13          Q.    And this is another medical information

14   request dated July 18th of 2007 submitted by you on

15   behalf of a Dr. Gulam Mukhdomi?

16          A.    Mukhdomi.  Mukhdomi.

17          Q.    And the question that this doctor

18   submitted on July 17th of 2007 is that doctor would

19   like information on the use of Fentora in nonmalignant

20   back pain; right?

21          A.    Yes.

22          Q.    And so he's asking about noncancer back

23   pain, which is an off-label use; right?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1                 MR. ROONEY:  Object to form.

  2         Q.    (By Mr. Faes)  And in response to this

  3    request, the company sends -- looks like the same

  4    document use for the management of breakthrough pain in

  5    opioid-tolerant patients with chronic noncancer pain

  6    conditions; right?

  7         A.    Correct.

  8                 MR. ROONEY:  Object to form.

  9         Q.    (By Mr. Faes)  So this is another example

 10    of a medical information request submitted by you and

 11    fulfilled on behalf of the company regarding a

 12    off-label use of the product; right?

 13         A.    Yes.

 14                 MR. ROONEY:  Object.

 15                 MR. MAIER:  Object to form.

 16         Q.    (By Mr. Faes)  I'm going to hand you

 17    what's been marked as Exhibit 48 to your deposition.

 18                 [Exhibit Teva-Sippial-048

 19                 marked for identification.]

 20         Q.    And this is another -- it looks like a set

 21    of medical information requests from you on behalf

 22    of -- another one on behalf of Dr. -- the previous

 23    doctor we looked at and Dr. Suresh Gupta; right?

 24         A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And the question that Dr. Mukhdomi asked

2    on July 24th of 2007 is that doctor is interested in

3    studies using Fentora and chronic back pain and

4    neuropathic pain after speaking with Dr. Nalamachu at

5    our lunch Cephalon speaking program.  Do you see that?

6    A.    Yes.

7    Q.    And so this indicates that one of your --

8    strike that.  This indicates that one of the

9    company-sponsored speakers gave a talk on Fentora at a

10   company-sponsored program and that sparked an interest

11   by this other doctor in using Fentora for back pain and

12   neuropathic pain; right?

13   A.    Yes.

14         MR. MAIER:  Objection.  Form, foundation.

15   Q.    (By Mr. Faes)  And this would be one of

16   the peer-to-peer selling situations you talked about

17   where one doctor talks to another doctor about the use

18   of Fentora or Actiq; right?

19   A.    Correct.

20         MR. MAIER:  Objection.  Form, foundation.

21   Q.    (By Mr. Faes)  And there's another request

22   down here from Dr. Gupta dated the same date, July 24th

23   of 2007, and it looks like Dr. Gupta has a similar

24   request.  He's interested in using Fentora in chronic

Highly Confidential - Subject to Further Confidentiality Review

1    back pain and neuropathic pain after speaking to the

2    same doctor at the Cephalon speaker program; right?

3         A.    Correct.

4         Q.    And so I'm guessing that because there's

5    two requests on the same day, that these requests were

6    given to you immediately after a Cephalon speaker

7    program, most likely; right?

8         A.    Most likely.

9              MR. MAIER:  Objection.  Form, foundation.

10        Q.    (By Mr. Faes)  And most likely the

11   presenter -- the company-paid presenter, Dr. Nalamachu,

12   at some point discussed off-label uses for Fentora at

13   the end of the program; right?

14             MR. MAIER:  Objection.  Form, foundation.

15        A.    Repeat that.

16        Q.    (By Mr. Faes)  Most likely the reason that

17   these two responses that are almost identical in nature

18   are submitted on the same day at the end of a speaker

19   program is that Dr. Nalamachu, the company-sponsored

20   speaker, discussed potential off-label uses of Fentora

21   in neuropathic pain and back pain during or immediately

22   after the program; right?

23        A.    Possibly.

24             MR. MAIER:  Objection.  Form, foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MR. ROONEY:  Don't guess.

2         Q.    (By Mr. Faes)  And you knew -- you say

3    possibly, but you knew that that was something that a

4    speaker was allowed to do at the end of a Cephalon

5    speaker program; right?

6         A.    Yes.

7         Q.    You knew that speakers were permitted to

8    respond to off-label questions at the end of a Cephalon

9    speaker program during the Q & A portion of the

10   program; right?

11        A.    Yes.

12                   MR. MAIER:  Objection.  Form.

13        Q.    (By Mr. Faes)  And you'd agree with me

14   that that was one of the key plusses or key benefits to

15   doing a company-sponsored Cephalon speaker program --

16   is because that was something that you couldn't do with

17   a doctor in any circumstance; right?

18        A.    Yes.

19                   MR. MAIER:  Objection.  Form.

20                   MR. FAES:  All right.  So I'm going to

21   switch gears a little bit again.  I'm jumping to 54

22   now.

23        Q.    (By Mr. Faes)  And I'm going to hand you

24   what's been marked as Exhibit Number 49 to your
```

```
 1    deposition.

 2              [Exhibit Teva-Sippial-049

 3              marked for identification.]

 4         Q.   And this is a HR self appraisal submitted

 5    by you to your boss, Michael Morreale, on October 15th

 6    of 2004; right?

 7         A.   Yes.

 8         Q.   And so if you turn in to the first page of

 9    this document, this reflects on -- this is a document

10    that would have been written by you to your boss,

11    Michael Morreale; right?

12         A.   Yes.

13         Q.   And you note that your objectives and

14    accomplishments at this time is that you had conducted

15    10 to 20 MEPs or medical education programs with

16    national speakers while developing local physicians --

17    i.e., Dr. Smith and Dr. Simons -- to speak with us.

18    You completed 13 to date; right?

19         A.   Yes.

20         Q.   And so this reflects that at this time in

21    2004 you're doing quite a few company-sponsored medical

22    education programs; right?

23         A.   Yes.

24              MR. ROONEY:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    (By Mr. Faes)  And I'm going to hand you

 2   what's been marked as Exhibit Number 50 to your

 3   deposition.

 4               [Exhibit Teva-Sippial-050

 5                marked for identification.]

 6               MR. FAES:  Did I give you one?

 7               MR. ROONEY:  No.

 8               MR. FAES:  I thought I gave you one.

 9   Sorry.  I'm almost trying to go too fast now.

10               MR. ROONEY:  I appreciate it.

11          Q.    (By Mr. Faes)  So Exhibit Number 50 is an

12   e-mail from you to a Michelle Tinkler dated August 28th

13   of 2008; right?

14          A.    Yes.

15          Q.    And who is Michelle Tinkler?  Was she your

16   area supervisor for a brief time at this -- in August

17   of 2008?

18          A.    She was a -- she was in upper management.

19          Q.    So she was possibly your boss's boss or

20   even higher than that; right?

21          A.    No, they were probably on the same --

22          Q.    Same level as Michael Morreale?

23          A.    Same level.  Mike Morreale, yeah.

24          Q.    So she was another area regional manager?
```

1    A.    Yes.

2    Q.    And act --

3    A.    She was a liaison.  That's what she was.

4    A liaison.

5    Q.    So actually further down on this is what I

6    want to ask about.  You're sending an e-mail to your

7    actual boss at this time, Michael Morreale, and you

8    state I know it's early, but I need, in all caps, Dr.

9    Jobalia to become an Amrix speaker.  He's now my one --

10   Number 1 to Number 2 highest writer of Amrix, but is

11   also becoming my second highest Fentora prescriber.  Do

12   you see that?

13   A.    Yes.

14   Q.    So at this time -- and this is the same

15   Jobalia -- Dr. Jobalia that we saw in your call notes

16   that said he rarely prescribes Fentora for cancer

17   patient -- or strike that.  This is the same Jobal --

18   Dr. Jobalia from your speaker notes that said that he

19   rarely prescribed Actiq for his cancer patients; right?

20   A.    Yes.

21         MR. MAIER:  Objection.  Form.

22   Q.    (By Mr. Faes)  And now he's become -- he's

23   becoming your second highest -- this same doctor is

24   becoming your second highest Fentora prescriber; right?

```
 1           A.    Yes.

 2           Q.    And you're wanting to consider him to be a

 3     speaker for one of the other products that you're

 4     detailing, which is Amrix; right?

 5           A.    Yes.

 6           Q.    And Amrix was a -- kind of a muscle

 7     relaxer that you would have sometimes detailed on the

 8     same call or same trip as Fentora; right?

 9           A.    Correct.

10           Q.    And so did you actually proceed and use

11     Dr. Jobalia as a speaker either for Amrix or Fentora?

12           A.    Yes.  I don't know.

13           Q.    And you note that his wife is also opening

14     a practice in northern Kentucky and will also be a high

15     potential prescriber; right?

16           A.    Correct.

17           Q.    What did you remember about Dr. Jobalia's

18     practice?

19           A.    He was pain management.  He was in --

20     located in Cincinnati, and he was a high prescriber.

21           Q.    Did you ever -- any time you called on

22     him, did you ever notice anything unusual or suspicious

23     about his practice or any of the patients that were in

24     his office?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2              MR. ROONEY:  Objection.

 3              MR. MAIER:  Objection.  Form.

 4        Q.    (By Mr. Faes)  Did you ever notice

 5   anything unusual or suspicious about any doctors'

 6   offices of any -- that you called on during your time

 7   for Actiq or Fentora?

 8              MR. MAIER:  Object to form.

 9        Q.    (By Mr. Faes)  Anything unusual or

10   suspicious?

11        A.    Not particularly, no.

12        Q.    Did you ever have cause -- strike that.

13   Did you ever, for example, walk through a patient's

14   waiting room and see a patient using an Actiq stick or

15   a Fentora tablet right in the waiting room?

16        A.    I would not have known to see a patient

17   with an -- with a Fentora, and I never saw patients

18   with Actiq in the waiting room.  I don't think so.

19        Q.    I'm going to hand you what's been marked

20   as Exhibit 51 to your deposition.

21              [Exhibit Teva-Sippial-051

22               marked for identification.]

23        Q.    And this is your call log --

24              MR. ROONEY:  Do you have a copy for me?
```

1    Thanks.

2         Q.    (By Mr. Faes)  To Dr. Jobalia between

3    October 2nd of 2006 and May 9th of 2009.  And so

4    looking at these call notes, this is after the period

5    of time that the company made the change to the way you

6    were allowed to enter your call log or call notes and

7    you were no longer allowed to enter any kind of a

8    comment detailing what happened during these visits;

9    right?

10              MR. MAIER:  Objection.  Form.

11        A.    Yes.

12        Q.    (By Mr. Faes)  And I'll represent to you

13   that there are 83 visits on this call log between

14   October 2nd of 2006 and May 6th of 2009, all to Dr.

15   Jobalia; okay?

16        A.    How many?

17        Q.    83.

18        A.    Okay.

19        Q.    Does that sound accurate to you?

20        A.    Within that time frame, yes.

21        Q.    And so you'd agree with me that we would

22   have no way of knowing what went on or what was

23   discussed during any of these 83 visits to Dr.

24   Jobalia's office during this time frame because the

1    company took away your discretion and your ability to

2    be able to enter a note describing what occurred during

3    those visits; right?

4         A.    Correct.

5               MR. MAIER:  Objection.  Form.

6         Q.    (By Mr. Faes)  And if you look at the

7    third column, the third column is presentation order.

8    Do you see that?

9         A.    Yes.

10        Q.    And these notes are for Fentora, so a one

11   would indicate that you detailed Fentora first during

12   that visit and Amrix or some other product second

13   during that visit; right?

14              MR. MAIER:  Objection.  Form.

15        A.    Correct.

16        Q.    (By Mr. Faes)  And you would agree with me

17   that on the major -- well, strike that.  Now, your last

18   call date to Dr. Jobalia was on May 6th of 2009.  Do

19   you see that?

20        A.    Yes.

21        Q.    And you didn't leave the company until

22   approximately the fall of 2010; right?

23        A.    Correct.

24        Q.    Why did you stop calling on Dr. Jobalia

```
 1   after May 6th of 2009?

 2          A.    I think he lost his license.

 3          Q.    Do you recall -- strike that.  Were you

 4   ever told why Dr. Jobalia lost his license?

 5                MR. ROONEY:  Object to form.

 6          A.    Yes.

 7          Q.    (By Mr. Faes)  And why was that?

 8          A.    Because he slept with one of his patients.

 9          Q.    And was that the only reason that you knew

10   of that Dr. Jobalia lost his license?

11          A.    The only reason I knew of, yes.

12          Q.    I'm going to hand you what's been marked

13   as Exhibit Number 52 to your deposition.

14                [Exhibit Teva-Sippial-052

15                marked for identification.]

16          Q.    And this is an e-mail dated June 3rd of

17   2009.  Do you see that?

18          A.    Yes.

19          Q.    And the subject is physicians in trouble.

20   Do you see that?

21          A.    Yes.

22          Q.    And it states I wanted to make you -- and

23   this is from your boss to your boss's -- his boss,

24   Randy Spokane; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Right.

 2          Q.    And your boss writes to his boss, Randy, I

 3   wanted to make you aware of a couple situations in the

 4   area.  Laura Sippial's Number 1 Amrix writer and top

 5   five Fentora writer, Nil Jobalia, lost his license for

 6   two years due -- to due -- I assume he means due to --

 7   inappropriate behavior with his patients.  His office

 8   is not closing.  They have other physicians and PAs

 9   covering while he is out, so hopefully his territory

10   won't take a big hit.  Do you see that?

11          A.    Yes.

12          Q.    And is that consistent with your

13   understanding of why Dr. Jobalia lost his license?

14          A.    Yes.

15                MR. MAIER:  Objection.  Form, foundation.

16          Q.    (By Mr. Faes)  And you weren't told any

17   other reason why Dr. Jobalia lost his license; right?

18          A.    No.

19          Q.    I'm going to hand you what's been marked

20   as Exhibit Number 53 to your deposition.

21                [Exhibit Teva-Sippial-053

22                marked for identification.]

23          Q.    And this is a license lookup for Dr.

24   Jobalia, and if you turn to Page 4 of 5 of this, you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    see that on 5-13-2009, the medical board notes consent

 2    agreement, permanent revocation of medical license

 3    stayed subject to suspension for at least two years.

 4    Conditions for reinstatement and subsequent

 5    probationary terms, conditions, and limitations for at

 6    least five years established based on the doctor's

 7    admitted history of sexual contact with three specified

 8    patients and presigning otherwise blank controlled

 9    substance prescriptions prior to their issuance.  Do

10    you see that?

11         A.    Yes.

12         Q.    So this document from the medical board

13    would seem to indicate that in addition to

14    inappropriate sexual conduct with three patients, Dr.

15    Jobalia was -- also had his license suspended for two

16    years basically because he was leaving presigned

17    controlled substance prescription forms lying around;

18    right?

19              MR. MAIER:  Objection.  Form.

20         A.    Yes.

21         Q.    (By Mr. Faes)  And you'd agree with me

22    that a doctor who leaves presigned controlled substance

23    prescription forms laying around probably isn't an

24    appropriate target to be calling on for Fentora and
```

Highly Confidential - Subject to Further Confidentiality Review

1    Actiq; right?

2                MR. MAIER:  Objection.  Form.

3         A.    I was unaware of that.

4         Q.    (By Mr. Faes)  Yeah, I understand you were

5    unaware, but you'd agree that that would --

6         A.    Yes.

7         Q.    -- that would be an inappropriate target;

8    right?

9         A.    Yes.

10               MR. MAIER:  Objection.  Form.

11        Q.    (By Mr. Faes)  Certainly not one that

12   you'd want to call on 83 times in the space of three

13   years; right?

14        A.    Correct.

15               MR. MAIER:  Objection.  Form.

16        Q.    (By Mr. Faes)  And if you turn to the

17   following page of this document, you see that the

18   doctor's license was reinstated on August 10th of 2011.

19   Do you see that?

20               MR. ROONEY:  It's not on ours.

21               MR. FAES:  It's on the third page.  Flip

22   one page forward.

23        A.    Repeat that.

24        Q.    (By Mr. Faes)  So if you look on the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    following page it looks like on August 10th of 2011,

 2    approximately two years later, Dr. Jobalia's license

 3    was reinstated; right?

 4         A.    Yes.

 5               MR. MAIER:  Object to form.

 6         Q.    (By Mr. Faes)  And you would have left

 7    Cephalon at this time; right?

 8         A.    I was already gone.

 9         Q.    Right.  So would it surprise you to learn

10    that within two months of Dr. Jobalia being reinstated

11    after being suspended for, among other things, leaving

12    blank controlled substance prescription pads laying

13    around, your replacement, Colleen (sic) Gillenkirk,

14    began calling on Dr. Jobalia for Fentora again?

15               MR. MAIER:  Objection.  Form, foundation.

16         A.    Would it surprise me?

17         Q.    (By Mr. Faes)  Yes.

18         A.    Yes.

19         Q.    Do you believe that would be -- strike

20    that.  So do you believe that that would be

21    inappropriate based on this doctor's history to begin

22    calling on him for Fentora or any controlled substance

23    again?

24               MR. MAIER:  Objection.  Form, foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      (By Mr. Faes)  And if you turn to Page 2

3    of this document, looks like your reaction that it

4    would be inappropriate to call on him again would be

5    correct, because on November 8th of 2017, Dr. Jobalia's

6    license was surrendered and revoked in lieu of further

7    formal disciplinary proceedings.  Do you see that?

8       A.      Yes.

9               MR. ROONEY:  Object to --

10              MR. MAIER:  Objection, form, foundation.

11      Q.      (By Mr. Faes)  And if you look at Exhibit

12   Number 54.  This is a statement from the Department of

13   Justice dated June 28th of 2018, and the headline is

14   four individuals indicted with charges related to

15   running pills in Hamilton, defrauding Medicare.  Do you

16   see that?

17              [Exhibit Teva-Sippial-054

18              marked for identification.]

19      A.      Yes.

20      Q.      And the first paragraph reads a federal

21   grand jury has charged four individuals in three

22   separate cases related to pill mills in Hamilton, Ohio.

23   The charging documents allege responsibility for the

24   death of at least three patients and more than $2.4

Highly Confidential - Subject to Further Confidentiality Review

```
 1    million in health care fraud.  Do you see that?
 2         A.    Yes.
 3         Q.    And if you turn to the following page,
 4    specifically talks about Dr. Nilesh Jobalia, and it
 5    states that the 114-count indictment alleges patients
 6    were prescribed fentanyl, oxycodone, methadone,
 7    morphine, and other controlled substances on many
 8    occasions without actually being seen by the doctor.
 9    According to the indictment, at least one patient died
10    as a result of using the prescribed controlled
11    substances.  Do you see that?
12         A.    Wow.  Yeah.
13         Q.    So essentially what this is saying is that
14    Dr. Jobalia was running a pill mill; right?
15         A.    Yes.
16               MR. MAIER:  Objection.  Form.
17         Q.    (By Mr. Faes)  And you'd agree with me
18    that this isn't the kind of doctor that would be an
19    appropriate target to call on or detail for Fentora;
20    right?
21         A.    Yes.
22               MR. MAIER:  Objection.  Form.
23         Q.    (By Mr. Faes)  And you'd agree with me
24    that you were never told by anyone at the company that
```

1    you shouldn't call on Dr. Jobalia or that he was an

2    inappropriate target; right?

3                MR. MAIER:  Objection.  Form.

4        A.    Correct.

5        Q.    (By Mr. Faes)  And your superiors at the

6    company knew you were calling on Dr. Jobalia because

7    you submitted call logs on a daily, if not weekly,

8    basis; right?

9        A.    Yes.

10               MR. MAIER:  Objection.  Form.

11       Q.    (By Mr. Faes)  And you would agree with me

12   that you would be relying on others at the company to

13   review Dr. Jobalia's orders or prescriptions and

14   monitor them in case they were suspicious or indicative

15   of diversion or abuse; right?  That wasn't your job?

16       A.    Correct.

17               MR. MAIER:  Objection.  Form.

18       Q.    (By Mr. Faes)  You relied on others for

19   that; right?

20       A.    Yes.

21       Q.    And nobody at the company ever told you

22   that there were any issues with Dr. Jobalia's

23   prescriptions; right?

24       A.    Correct.

1           MR. MAIER:  Objection.  Form.

2       Q.   (By Mr. Faes)  And if someone had told you

3    that there were an issue with Dr. Jobalia's

4    prescriptions and told you to stop calling Joba -- on

5    Dr. Jobalia, you would have done that; right?

6       A.   Yes.

7           MR. MAIER:  Objection.  Form.

8           MR. FAES:  You want to go back to

9    Exhibit -- or jumping back to 41.

10      Q.   (By Mr. Faes)  Now, at some point during

11   your employment with the company, you would have become

12   aware that -- the company actually pled guilty to

13   promoting Actiq off-label; right?

14      A.   Yes.

15      Q.   And that was because you understood that

16   the company signed a guilty plea with the United States

17   of America agreeing that they had promoted, among other

18   drugs, Actiq off-label at some point in 2001; right?

19          MR. MAIER:  Objection.  Form.

20      A.   I believe so.

21      Q.   (By Mr. Faes)  And we'll just mark it real

22   quick.  I'm going to hand you what's been marked as

23   Exhibit Number 55.  Actually, no, I'm not going to mark

24   it.  I'm going to hand you what's been marked as an

1    exhibit in a previous deposition, Spokane 16, and you

2    can see that this is a guilty plea agreement between

3    the United States of America and Cephalon, Inc.  Do you

4    see that?

5         A.    Yes.

6         Q.    And it states that Cephalon agrees to

7    plead guilty to one count of an information-waiving

8    prosecution by indictment charging it with the

9    transportation into interstate commerce of drugs that

10   were misbranded through off-label promotion; right?

11        A.    Yes.

12        Q.    And it says further down that this is all

13   arising from Cephalon's off-label promotion of its

14   drugs Provigil, Gabitril, and Actiq; right?

15        A.    Yes.

16        Q.    And this was -- if you need to look, it's

17   on the second-to-last page, but this is an agreement

18   that counsel for Cephalon signed on September 15th of

19   2008; right?

20        A.    Yes.

21        Q.    And you were made aware of this agreement

22   during the course of your employment at Cephalon;

23   right?

24        A.    Yes.

1       Q.    And you understood that as part of this

2   agreement with the Department of Justice, among other

3   things, the company had to enter into a CIA or

4   corporate integrity agreement; right?

5       A.    Correct.

6       Q.    And you're also aware that as part of this

7   that -- this guilty plea and settlement with the

8   Department of Justice, that Cephalon had to pay a fine

9   of $425 million; right?

10      A.    I don't remember the amount, but --

11      Q.    Okay.  Well, let me mark it real quick.

12  That's why we have the documents.

13      A.    Sure.

14      Q.    I'm going to hand you what's been

15  previous --

16          MS. JAIN:  It's already been marked.

17          MR. FAES:  Yeah, I know.

18      Q.    (By Mr. Faes)  I'm going to hand you

19  what's been previously marked as Spokane 15.  And you

20  see that the title of this is pharmaceutical company

21  Cephalon to pay $425 million for off-label marketing.

22  And the second paragraph down states the information

23  alleges that from approximately January 2001 through at

24  least 2006, Cephalon promoted the drugs Actiq,

1    Gabitril, and Provigil for uses other than what the

2    federal Food and Drug Administration approved.  Do you

3    see that?

4            A.    Yes.

5            Q.    And then specifically down at the bottom

6    it states that the FDA approved Actiq, a fentanyl

7    product manufactured as a lollipop, for use only in

8    opioid-tolerant cancer patients, meaning those patients

9    for whom morphine-based painkillers are no longer

10   effective.  The drug is a strong and highly addictive

11   narcotic which signifi -- with significant potential

12   for abuse.  See that?

13           A.    Yes.

14           Q.    And from 2001 to at least 2006, Cephalon

15   was allegedly promoting the drug for noncancer patients

16   to use for such maladies as migraines, sickle cell

17   pain, crises, injuries, and in anticipation of changing

18   wound dressings or radiation therapy.  Do you see that?

19           A.    Yes.

20           Q.    And you were made aware that these were

21   the allegations that were made against Cephalon that

22   ultimately led to a guilty plea agreement; right?

23           A.    Yes.

24                 MR. MAIER:  Objection.  Form.

1    Q.    (By Mr. Faes)  So you would have been made

2    aware of this at some time in late 2008; right?

3    A.    Yes.

4    Q.    Do you recall -- strike that.  Are you

5    aware of anyone who lost their job as a result of this

6    guilty plea agreement and settlement payment?

7    A.    No.

8         MR. MAIER:  Objection.  Form, foundation.

9    Q.    (By Mr. Faes)  Are you aware of anyone who

10   was disciplined as a result of this guilty plea

11   agreement and settlement agreement?

12        MR. MAIER:  Objection.  Form, foundation.

13   A.    No.

14   Q.    (By Mr. Faes)  Are you aware of any major

15   changes to the marketing practices made by the company

16   with regard to its Actiq or Fentora product as a result

17   of this guilty plea agreement and $425 million

18   settlement?

19   A.    Yes.

20        MR. MAIER:  Objection.  Form, foundation.

21   Q.    (By Mr. Faes)  What changes are you aware

22   of?

23   A.    The wording in our sales pieces, the

24   direction, that the sales force was able to able to

1    take more initiative for targeting cancer physicians.

2    That's all I really can recall.

3         Q.    So as far as your recollection goes in

4    response to the guilty plea agreement and the $425

5    million settlement agreement, the only changes that you

6    can remember are that the sales force was able to take

7    more initiative with regard to which physicians they

8    targeted and some of your sales pieces changed -- some

9    of the wording changed?

10              MR. MAIER:  Objection.  Form.

11        A.    And I think they decreased the sales force

12   as well.

13        Q.    (By Mr. Faes)  I'm going to hand you

14   what's been marked as Exhibit Number 55 to your

15   deposition.

16              [Exhibit Teva-Sippial-055

17              marked for identification.]

18        Q.    And this is an e-mail dated May 26th of

19   2004, and it's to the Ohio Valley sales team; right?

20        A.    Yes.

21        Q.    And so that would have included you at

22   this time; right?

23        A.    Yes.

24        Q.    So this is a document that you would have

1    received; right?

2         A.    Yes.

3         Q.    And if you look down, it starts with this

4    is a story -- this story is a brief -- I mean, it was

5    ultimately forwarded to you, but if you look down it

6    starts with this story is a brief synopsis of other

7    coverage we have seen, including the Wall Street

8    Journal.

9              And if you turn to the second page it

10   states when morphine isn't enough, cancer patients can

11   get added pain relief from Actiq, a narcotic lollipop,

12   shown above, that delivers the drug fentanyl through

13   the mouth's mucous membranes.  While its candy-like

14   form may appear innocuous, the potent painkiller would

15   be fatal to a child or an adult not already taking

16   opioid narcotics, according to the manufacturer

17   Cephalon.  Concerns about misuse, though, are growing.

18             And it goes on, people who may be leery

19   about putting something up their nose or putting a

20   needle in their arm might not think twice about taking

21   a couple of licks off a lollipop, said Kevin Harley,

22   spokesperson for the Attorney General of Pennsylvania,

23   who reports that street trade in perc-o-pops has spread

24   across the street.  Do you see that?

1     A.    Yes.

2     Q.    So you were aware at this time that there

3  was an increased street trade for Actiq lollipops and

4  the street name for those was perc-o-pops; right?

5          MR. MAIER:  Objection.  Form, foundation.

6     A.    In certain parts of the nation.

7     Q.    (By Mr. Faes)  Did you ever feel at this

8  time or at any time that people were latching onto

9  Actiq because it was so easy to abuse?

10         MR. MAIER:  Objection.  Form, foundation.

11    A.    No.

12    Q.    (By Mr. Faes)  I'm going to hand you

13  what's been marked as Exhibit Number 56 to your

14  deposition.

15        [Exhibit Teva-Sippial-056

16        marked for identification.]

17    Q.    And this is an e-mail and attachment dated

18  May 24th of 2007.  And this is from Peter Daniel to the

19  Great Lakes sales team, which would have included you

20  at this time; right?

21    A.    Yes.

22    Q.    And so this is a document that you would

23  have received; right?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And it says good evening to all of you.

2              MR. FAES:  I'm sorry.  This is 45.

3              MS. JAIN:  He got it.

4              MR. FAES:  Okay.

5        Q.    (By Mr. Faes)  It says good evening to all

6    of you.  For those of you who have asked for Mary Jo

7    Eoff's CV, she has finally sent me an updated copy.  It

8    goes on in the third paragraph, Mary Jo requested at

9    least three weeks, months, notice if you would like her

10   to speak.  She has been working in a very busy pain

11   management office since 2000, but full-time for the

12   last two-and-a-half years.  Do you see that?

13       A.    Yes.

14       Q.    So this would be apparently a e-mail from

15   Peter David (sic) forwarding Mary Jo Eoff's CV in case

16   you want to use her as a potential company-sponsored

17   Cephalon speaker for Fentora; right?

18       A.    Correct.

19             MR. MAIER:  Objection.  Form.

20       Q.    (By Mr. Faes)  And it states in the final

21   paragraph she is advanced, aggressive in her use with

22   Fentora.  The majority of her patients are on 600- and

23   800-microgram strength.  As far as the clinic goes,

24   don't let the name fool you.  Yes, it contains sports

1    rehabilitation, but there is very little of that and it

2    is more of a classic pain management clinic that we all

3    know and love.  Do you see that?

4            A.    Yeah.

5            Q.    And so this is an e-mail from a David

6    Peter suggesting that you consider Ms. Mary Jo Eoff as

7    a potential company-sponsored speaker for Fentora;

8    right?

9            A.    Yes.

10              MR. MAIER:  Objection.  Form.

11           Q.    (By Mr. Faes)  And who was David Peter?

12           A.    He was a sales representative.

13           Q.    So he was a sales representative.  Was he

14   in the Great Lakes region?

15           A.    Yes.

16           Q.    So he was another fellow sales rep that

17   had likely use -- strike that.  He was another fellow

18   sales rep in your territory that had used Mary Jo in

19   the past and was suggesting that you use her for your

20   territory; right?

21              MR. MAIER:  Objection.  Form.

22           Q.    (By Mr. Faes)  And he notes that one of

23   the reasons why he's recommending her is that she's

24   advanced and aggressive with her use of Fentora; right?

```
 1          A.    Yes.

 2                MR. MAIER:  Objection.  Form.

 3          Q.    (By Mr. Faes)  And he also notes that

 4   despite the name of her clinic having sports

 5   rehabilitation, there's very little of that actually

 6   going on in her clinic; right?

 7          A.    That's what he -- yes.

 8                MR. MAIER:  Objection.  Form.

 9          Q.    (By Mr. Faes)  And he also says that it's

10   a -- well, strike that.

11                [Discussion off the record.]

12                MR. FAES:  Yeah, we need to go off the

13   record.

14                MR. MAIER:  Two-minute break?

15                MR. FAES:  Yeah.

16                THE VIDEOGRAPHER:  We are going off the

17   record at 6:16 PM.

18                [A brief recess was taken.]

19                THE VIDEOGRAPHER:  We are back on the

20   record at 6:23 PM.

21          Q.    (By Mr. Faes)  Ms. Sippial, we're back on

22   the record after a short break.  Are you ready to

23   proceed?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I'm going to hand you what's been marked

2   as Exhibit Number 57 to your deposition.

3            [Exhibit Teva-Sippial-057

4            marked for identification.]

5      Q.    And this is a document titled Actiq RMP

6   initial off-label prescribing list of Fentora, February

7   2007.  Do you see that?

8      A.    Yes.

9      Q.    And do you see at the very top of the list

10  that Dr. Akbik is listed on -- as the very top entry on

11  this report; right?

12     A.    Yes.

13     Q.    And I'm just bringing this up because I

14  think earlier I asked you if Dr. Akbik ever appeared on

15  a Actiq off-label prescriber listing and you said you

16  couldn't remember.  Remember that?

17     A.    Correct.

18     Q.    And so does this refresh your memory that

19  Dr. Akbik in fact was a repeat off-label prescriber of

20  Actiq?

21     A.    Yes.

22            MR. MAIER:  Objection.  Form.

23     Q.    (By Mr. Faes)  And Dr. Akbik was a doctor

24  that you used as a company-paid speaker for

Highly Confidential - Subject to Further Confidentiality Review

```
1    company-sponsored speaker programs for Actiq and

2    Fentora on numerous occasions; right?

3         A.    Yes.

4              MR. MAIER:  Objection.  Form.

5         Q.    (By Mr. Faes)  And I'm going to hand you

6    what's been marked as Exhibit 58, which is a composite

7    exhibit.

8              [Exhibit Teva-Sippial-058

9              marked for identification.]

10             MR. FAES:  And I don't think the tech has

11   this one, so we're not going to put this up on screen.

12   We're just going to kind of talk about it.  This is a

13   composite exhibit that I'll represent to you shows that

14   Dr. Akbik was used by you as a speaker either for Actiq

15   or Fentora at least nine times between 2005 and 2009.

16   If you want to go through it you can.  On the first

17   page you used him on 9-22-2005.  Two pages in, May

18   13th, 2008.  Then again on May 23rd, 2008, then again

19   on June 2nd, 2008.  Again on June 8th, 2009.  Again on

20   July 11th, 2008.  Again on July 21st, 2009, and another

21   one which is out of order on November 13th of 2008.  Do

22   you see that?

23        A.    Yes.

24        Q.    And we know that he was at least scheduled
```

1    for at least one more program in 2010 because that was

2    the program that led to your separation from Cephalon;

3    right?

4          A.    Yes.

5                MR. MAIER:  Objection.  Form.

6          Q.    (By Mr. Faes)  So you'd agree with me that

7    you used Dr. Akbik as a speaker for Actiq or Fentora at

8    least nine times between 2005 and 2009; right?

9          A.    Yes.

10               MR. MAIER:  Objection.  Form.

11         Q.    (By Mr. Faes)  I'm going to hand you

12   what's been marked as Exhibit Number 59 to your

13   deposition.

14               [Exhibit Teva-Sippial-059

15               marked for identification.]

16         Q.    And this is a PowerPoint that was produced

17   from your custodial file, and the title of it is street

18   pricing of opioids.  And I'll represent to you that

19   this was attached to an e-mail.

20               MR. FAES:  If I can have -- I can't find

21   my copy of it.  If I can have the technician put the

22   copy of the e-mail up on the screen, which is 62.

23         Q.    (By Mr. Faes)  So this was attached from

24   an e-mail from a Dr. Kenneth Kirsh to you dated April

1    14th of 2008.  Do you see that?

2         A.    Yes.

3         Q.    And Dr. Kirsh writes to you that good

4    meeting you the other day when Steve Passik was in

5    town.  Hopefully we don't bore you too much.  As

6    promised, attached are a few of the slides I have on

7    street pricing of opioids with specific data on Actiq

8    and why it is not an attractive street drug compared to

9    other options.  Do you see that?

10        A.    Yes.

11        Q.    What was the circumstances of why you were

12   communicating with Dr. Kirsh and why he sent this to

13   you?

14        A.    Probably talking about abuse and diversion

15   of Actiq.

16              MR. ROONEY:  Don't guess.

17        A.    Oh.

18        Q.    (By Mr. Faes)  And if you turn to the

19   first pa -- second page in of Exhibit 59, which is the

20   PowerPoint that's attached, it states Actiq media hype,

21   lollipop drug hitting the streets.  Do you see that?

22        A.    Yes.

23        Q.    And if you see that in quotes it states

24   manufacturer spokeswoman, like any opioid, there is

```
1    potential for misuse.  Do you see that?

2         A.    Yes.

3         Q.    And that was a -- kind of a tagline or

4    generic response that the company would give to news

5    stories about abuse or diversion of the Actiq lollipop;

6    right?

7               MR. MAIER:  Objection.  Form.

8         A.    Yes.

9               MR. FAES:  And can I have the trial tech

10   go back to the e-mail?  And just for the record, the

11   parent e-mail to this -- can you zoom down on the

12   bottom?  Sorry.  I want the Bates number at the bottom.

13   Just for the record, the Bates number on this e-mail,

14   which is attached to Exhibit 59, is

15   TEVA_MDL_A_13252926.  And I'm going to mark that -- I'm

16   going to mark a placeholder as Exhibit 60 and I'll get

17   that to the court reporter probably before we leave

18   today, because it's here somewhere.

19               [Exhibit Teva-Sippial-060

20               marked for identification.]

21        Q.    (By Mr. Faes)  Now, earlier we were

22   talking about Dr. "Abkik."

23        A.    "Akbik."

24        Q.    And you would agree with me that he was
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    referred to within the company as a very good Fentora

2    advocate; right?

3        A.    Correct.

4              MR. MAIER:  Objection.  Form, foundation.

5        Q.    (By Mr. Faes)  In fact, your boss, Michael

6    Morreale, referred to him on at least one occasion as a

7    very good Fentora advocate; right?  I'm sorry.  Your --

8    strike that.  In fact, your boss, Philip Tocco, would

9    refer to Dr. Akbik as a very good Fentora advocate on

10   at least one occasion; right?

11       A.    Yes.

12             MR. MAIER:  Objection.  Form, foundation.

13       Q.    (By Mr. Faes)  I'm going to hand you

14   what's been marked as Exhibit Number 61 to your

15   deposition.

16             [Exhibit Teva-Sippial-061

17             marked for identification.]

18       Q.    And this is a document that was sent to

19   you from your boss, Michael Morreale, at the time dated

20   December 1st of 2008, and it's regarding a performance

21   improvement plan.  Do you see that?

22       A.    Uh-huh.  Yes.

23       Q.    Do you recall being put on a performance

24   improvement plan by your superior, Michael Morreale, in
```

Highly Confidential - Subject to Further Confidentiality Review

1    2008?

2         A.    Yes.

3         Q.    And it starts off with --

4               MR. FAES:  And this is 37.

5         Q.    (By Mr. Faes)  And it starts off with the

6    purpose of this memo is to advise you that you are

7    being placed on a performance improvement plan, PIP,

8    effective immediately.  The goal of this plan is to

9    address major deficiencies in core competencies of your

10   job responsibility.  Do you see that?

11        A.    Yes.

12        Q.    And if you look forward to Page 2, Mr.

13   Morreale talks about selling skills that he wants you

14   to implement or improve upon; right?

15        A.    Yes.

16        Q.    And the first -- the second bullet point

17   is that you must appropriately use an approved visual

18   aid and/or reprint on each call; right?

19        A.    Yes.

20        Q.    And he also says that you must

21   consistently close gain commitment for increased

22   product use; right?

23        A.    Yes.

24        Q.    And that's regarding, among other things,

```
 1    Fentora; right?

 2          A.    Yes.

 3                MR. MAIER:  Object to form.

 4          Q.    (By Mr. Faes)  And this is despite the

 5    fact that you were consistently rated, according to

 6    your résumé, within the top percent -- five percent of

 7    the Ohio Valley in terms of sales during this time

 8    period; right?

 9          A.    Yes.

10                MR. ROONEY:  Object to form.

11          Q.    (By Mr. Faes)  So even though you were

12    rated within the top five percent of your peer group,

13    your boss is telling you that as part of your

14    performance improvement plan that you must consistently

15    gain commitment for increased product use of Fentora;

16    right?

17          A.    Yes.

18                MR. ROONEY:  Object to form.

19                MR. MAIER:  Form.

20          Q.    (By Mr. Faes)  And in fact, two years

21    after this in the year that you were separated for

22    Cephalon, you were on pace to be Number 4 in the entire

23    country for sales of Fentora; right?

24          A.    Correct.
```

```
 1                  MR. MAIER:  Objection.  Form, foundation.

 2         Q.    (By Mr. Faes)  After sitting here today

 3    and going through this deposition, how do you feel

 4    about your time at the company at Cephalon when you

 5    were there from 2001 to 2010?

 6                  MR. MAIER:  Objection.  Form.

 7         A.    I believe the company misled several of

 8    its representatives.

 9         Q.    (By Mr. Faes)  In what way?

10         A.    Encouraging them to possibly sell

11    off-label, encouraging them to exceed goals for the

12    products that we sold.  Management micromanaging,

13    playing favorites.  I always said that a manager could

14    make or break your experience as a pharmaceutical rep.

15         Q.    Are you finished?  I don't want to

16    interrupt you.

17         A.    Yeah, yeah.  I'm done.  I'm finished.

18         Q.    So I just have just one little area of

19    questioning and then I'll be done for the day.  When

20    you were a representative for Actiq and Fentora, what

21    were -- what was your training with regard to your duty

22    to report any suspected abuse or diversion of opioid

23    narcotics that you might see?

24                  MR. MAIER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.    We had an abuse hotline that we could call

2  to report if we saw any abuse or misuse of the

3  medications that we were selling for many of our

4  physicians.  Telling our direct manager.  Following up

5  with documentation.

6     Q.    (By Mr. Faes)  So you were trained that

7  you did -- if you suspected, saw something, or heard

8  something that made you suspect a potential abuse,

9  misuse, or diversion of any opioid narcotics, you were

10  supposed to report it either through the company

11  hotline or to your superior; right?

12     A.    Yes.

13          MR. MAIER:  Object to form.

14     Q.    (By Mr. Faes)  And that was the limit of

15  where you were supposed to report those suspicions to?

16     A.    Yes.

17     Q.    You were never trained to, for example,

18  report any of those suspicions directly to the DEA or

19  law enforcement; right?

20     A.    No.

21          MR. MAIER:  Form.

22     Q.    (By Mr. Faes)  And so if you were to make

23  a report either on the hotline or to one of your

24  superiors, you would expect those people to pass it

Highly Confidential - Subject to Further Confidentiality Review

```
 1    along the chain and for somebody else to ultimately

 2    make the decision on whether your report needed to be

 3    passed along to the DEA or other law enforcement;

 4    right?

 5        A.    Correct.

 6              MR. MAIER:  Object to form.

 7        Q.    (By Mr. Faes)  During your time at

 8    Cephalon, did you ever make a report either to your

 9    supervisor or to the hotline about suspected misuse,

10    abuse, or diversion of opioid narcotics?

11              MR. MAIER:  Object to form.

12        A.    I don't remember.

13        Q.    (By Mr. Faes)  Are you aware of any others

14    at the company who ever made a report of suspected

15    abuse, diversion, or misuse of opioid narcotics?

16              MR. MAIER:  Objection.  Form, foundation.

17        A.    I don't remember.

18              MR. FAES:  That's all the questions I have

19    for you right now, Ms. Sippial, subject to any

20    follow-up after anybody else questions you.  Thank you

21    for your time.

22        A.    Okay.  Thank you.

23              QUESTIONS BY MR. MAIER:

24        Q.    Ms. Sippial, this is Jon Maier.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    represent the Teva defendants.  Are you okay to go for

 2    another -- I'm hoping to keep it to five, 10 minutes.

 3         A.    Sure.

 4         Q.    All right.  So we've talked about two

 5    products that you helped promote while you were at

 6    Cephalon, Actiq and Fentora; right?

 7         A.    Yes.

 8         Q.    They were both approved by the FDA?

 9         A.    Yes.

10               MR. FAES:  Objection.

11         Q.    (By Mr. Maier)  Did they both require a

12    valid prescription from a doctor?

13         A.    Yes.

14               MR. FAES:  Objection.

15         Q.    (By Mr. Maier)  Did they both have

16    FDA-approved labels that you remember?

17               MR. FAES:  Objection.

18         A.    Yes.

19         Q.    (By Mr. Maier)  Did the FDA-approved label

20    for Actiq and Fentora include their indications?

21               MR. FAES:  Object to form.

22         A.    Yes.

23         Q.    (By Mr. Maier)  Did the FDA-approved label

24    for Actiq include information about the risks
```

Highly Confidential - Subject to Further Confidentiality Review

 1    associated with it?

 2              MR. FAES:  Object to form.

 3         A.    Yes.

 4         Q.    (By Mr. Maier)  Do you recall what some of

 5    the risks that were included on the FDA-approved label

 6    for Actiq were?

 7              MR. FAES:  Object to form.

 8         A.    Yes.

 9         Q.    (By Mr. Maier)  What were they?

10         A.    Could cause respiratory depression, could

11    cause death, could cause abuse.

12         Q.    Did the FDA-approved label for Fentora

13    include information about risks associated with it?

14              MR. FAES:  Object to form.

15         A.    Yes.

16         Q.    (By Mr. Maier)  And what were the risks

17    disclosed on that label that you can remember?

18         A.    Basically the same thing.  Could cause

19    death, could cause respiratory depression, could cause

20    abuse.  Could be abused.

21         Q.    You mentioned earlier today a REMs program

22    that applied to Actiq and Fentora.  Do you remember

23    that?

24         A.    I do.

1      Q.    What was that REMs program, if you can

2   recall?

3      A.    I believe it was a risk evaluation

4   mitigation strategy that doctors had to comply with in

5   order to prescribe those opioids.

6      Q.    Do you remember if there was an enrollment

7   requirement for the REMs program?

8      A.    Yes.

9      Q.    So as you recall, did doctors have to

10   enroll in REMs before they could prescribe Actiq or

11   Fentora?

12           MR. FAES:  Object to form.

13      A.    Yes.

14      Q.    (By Mr. Maier)  Was there an enrollment

15   requirement for patients that you remember?

16           MR. FAES:  Objection.

17      A.    I don't recall.

18      Q.    (By Mr. Maier)  To your recollection, did

19   the REMs program that these doctors had to enroll in

20   disclose the risks associated with Actiq and Fentora?

21           MR. FAES:  Objection.

22      A.    Yes.

23      Q.    (By Mr. Maier)  Changing gears a little

24   bit.  I'm going to jump around topics a bit to try to

 1    streamline this.  So did you receive compliance

 2    training at Cephalon?

 3              MR. FAES:  Objection.

 4        A.    Yes.

 5        Q.    (By Mr. Maier)  How often were you

 6    required to have compliance training?

 7              MR. FAES:  Objection.

 8        A.    I'd probably say once a quarter.

 9        Q.    (By Mr. Maier)  Was it mandatory?

10        A.    Yes.

11        Q.    Did that compliance training include any

12    information about obligation to only promote products

13    for labeled indications?

14              MR. FAES:  Objection.

15              MR. ROONEY:  Objection.

16        A.    Yes.

17        Q.    (By Mr. Maier)  Did it inform you that

18    promoting products off-label was illegal?

19              MR. FAES:  Objection.

20        A.    Yes.

21        Q.    (By Mr. Maier)  Did you receive not

22    specific compliance training, but training on how to

23    promote Actiq?

24        A.    Yes.

1        Q.    Do you remember when you received your

2    first training on that?

3              MR. FAES:  Objection.

4        A.    I don't recall.

5        Q.    (By Mr. Maier)  Do you recall if that

6    initial training included instructions to sales reps to

7    only promote Actiq on label?

8              MR. FAES:  Objection.

9              MR. ROONEY:  Objection.

10       A.    Yes.

11       Q.    (By Mr. Maier)  Did you receive ongoing

12   training during what we referred to before as the life

13   cycle of Actiq?

14             MR. FAES:  Objection.

15       A.    Yes.

16       Q.    (By Mr. Maier)  How often did that

17   additional sales training occur?

18       A.    Maybe once to twice a year.

19       Q.    Did that training instruct sales

20   representatives to only promote Actiq on-label?

21             MR. FAES:  Object to form.

22       A.    Yes.

23       Q.    (By Mr. Maier)  Did you receive initial

24   training for the promotion of Fentora when that --

```
1    either before it launched or as it launched?

2                MR. FAES:  Object to form.

3                MR. ROONEY:  Object to form.

4        A.    Yes.

5        Q.    (By Mr. Maier)  Did that training instruct

6    you to promote Fentora only on-label?

7                MR. FAES:  Object to form.

8                MR. ROONEY:  Objection.

9        A.    Yes.

10       Q.    (By Mr. Maier)  Did you receive ongoing

11   training for promoting Fentora during its life cycle in

12   your time at Cephalon?

13               MR. FAES:  Objection.

14               MR. ROONEY:  Object to form.

15       A.    Yes.

16       Q.    (By Mr. Maier)  Do you recall how often

17   that training occurred?

18               MR. FAES:  Objection.

19       A.    I don't recall.

20       Q.    (By Mr. Maier)  Did that training instruct

21   you to promote Fentora only on label?

22               MR. FAES:  Objection.

23               MR. ROONEY:  Object to form.

24       A.    Yes.
```

```
 1            Q.    (By Mr. Maier)  We've spoken about this a

 2    little bit, but just to be clear -- did you use

 3    promotional materials when you were promoting Actiq and

 4    Fentora?

 5                  MR. FAES:  Objection.

 6                  MR. ROONEY:  Object to form.

 7            A.    Yes.

 8            Q.    (By Mr. Maier)  Where did you get those

 9    materials?

10            A.    From the home office.

11            Q.    To your knowledge did the FDA review

12    Cephalon promotional materials?

13                  MR. FAES:  Objection.

14                  MR. ROONEY:  Object to form.

15            A.    Yes.

16            Q.    (By Mr. Maier)  To your knowledge did

17    Cephalon ever provide you with promotional materials

18    that promoted off-label use of Actiq or Fentora?

19                  MR. FAES:  Objection.

20                  MR. ROONEY:  Object to form.

21            A.    Yes.

22            Q.    (By Mr. Maier)  They -- were these also

23    approved by the FDA?

24                  MR. FAES:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     I believe so.

2          Q.     (By Mr. Maier)  So to your knowledge the

3    promotional materials that you used to promote Actiq

4    and Fentora were approved by the FDA?

5                 MR. FAES:  Objection.

6          A.     For the most part, yes.

7          Q.     (By Mr. Maier)  Were you ever instructed

8    by Cephalon -- actually, let me start that over.  Did

9    you ever promote Actiq or Fentora off-label?

10                MR. FAES:  Objection.

11         A.     Not to my knowledge.

12         Q.     (By Mr. Maier)  Did you ever report

13   off-label marketing to anyone at Cephalon?

14         A.     Repeat that.

15                MR. FAES:  Objection.

16         Q.     (By Mr. Maier)  Did you ever report

17   off-label marketing by anyone else, by any other sales

18   reps or any other Cephalon employees, to anyone at

19   Cephalon?

20                MR. FAES:  Objection.

21         A.     No.

22         Q.     (By Mr. Maier)  Earlier today you were

23   asked about physicians prescribing medication

24   off-label.  Do you remember that?
```

```
 1          A.    Yes.

 2          Q.    As you understand it, are physicians

 3    permitted to prescribe medications off-label?

 4                MR. FAES:  Objection.

 5          A.    Yes.

 6          Q.    (By Mr. Maier)  Who makes the decision

 7    about whether an off-label use of a prescription is a

 8    medically appropriate use of that medication?

 9                MR. FAES:  Objection.

10          A.    The physician.

11          Q.    (By Mr. Maier)  Were you permitted by

12    Cephalon to discuss off-label use of Actiq or Fentora?

13                MR. FAES:  Objection.

14          A.    Yes.

15          Q.    (By Mr. Maier)  What was supposed to

16    happen if a doctor asked you a question about off-label

17    use of Actiq or Fentora?

18                MR. ROONEY:  Object to form.

19          A.    We were supposed to fill out a medical

20    information request form.

21          Q.    (By Mr. Maier)  Was there anything that

22    you were supposed to say to them in the room?

23                MR. ROONEY:  Object to form.

24          A.    State the indication.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    (By Mr. Maier)  Excuse me?

 2          A.    State the indication again.

 3          Q.    So to understand it, if you were engaged

 4    with -- by a doctor with an off-label question, you

 5    could fill out a MIRF that -- the medical information

 6    request form we talked about, but you also were

 7    supposed to direct them back to the labeled indication?

 8                MR. FAES:  Objection.

 9          A.    Correct.

10          Q.    (By Mr. Maier)  Do you recall earlier that

11    you were shown a document related to speaking to

12    doctors who didn't have cancer patients?

13                MR. ROONEY:  Object to form.

14          A.    No.

15          Q.    (By Mr. Maier)  In your experience, if a

16    doctor that you called on did not have cancer patients,

17    could that doctor have cancer patients in the future?

18                MR. FAES:  Object to form.

19          A.    Yes.

20          Q.    (By Mr. Maier)  And in that situation,

21    would it have been helpful to the patient for the

22    doctor to understand if Actiq and Fentora could have

23    helped them?

24                MR. FAES:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2          Q.     (By Mr. Maier)  Do you know who answered

 3    the medical information request forms submitted by

 4    sales reps?

 5                 MR. FAES:  Objection.

 6                 MR. ROONEY:  Object to form.

 7          A.     No.

 8          Q.     (By Mr. Maier)  We talked a little bit

 9    about your departure from Cephalon.  Do you remember

10    that?

11          A.     Yes.

12          Q.     And I believe you said that it related to

13    a speaker program with Dr. Akbik.  Is that right?

14          A.     Correct.

15          Q.     Was it your understanding that the company

16    identified what it believed was a problem related to

17    that speaker program?

18          A.     Yes.

19          Q.     Did Cephalon do an investigation that you

20    recall?

21                 MR. ROONEY:  Object to form.

22          A.     I don't recall.

23          Q.     (By Mr. Maier)  Did anyone from Cephalon

24    talk to you about what happened?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. ROONEY:  Object to form.

2     A.    No.

3     Q.    (By Mr. Maier)  No?  So there was no

4  compliance personnel involved in that investigation?

5     A.    No.

6          MR. FAES:  Objection.

7     Q.    (By Mr. Maier)  What was the reason that

8  Cephalon gave you for your termination?

9          MR. FAES:  Objection.

10    A.    Stating that I -- they fired me because I

11 told the truth about a medical education program that

12 did not occur.

13    Q.    (By Mr. Maier)  But you don't recall there

14 being any investigation into whether that actually was

15 correct?

16         MR. FAES:  Objection.

17    A.    I don't remember.

18    Q.    (By Mr. Maier)  Do you recall being told

19 that -- and putting aside whether you agreed with it,

20 do you recall being told by Cephalon that they

21 essentially did not believe what you were telling them?

22    A.    Yes.

23         MR. FAES:  Objection.

24         MR. ROONEY:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     (By Mr. Maier)  And you disagreed with

 2    that decision, so you engaged an attorney to conduct --

 3    to represent you and conduct your own investigation;

 4    correct?

 5            A.     Correct.

 6                   MR. FAES:  Objection.

 7                   MR. ROONEY:  Object to form.

 8            Q.     (By Mr. Maier)  But you ultimately did not

 9    file any lawsuit against Cephalon?

10                   MR. FAES:  Objection.

11            A.     I tried.

12            Q.     (By Mr. Maier)  But do you know if any

13    lawsuit was ever filed?

14                   MR. FAES:  Objection.

15            A.     No.

16                   MR. MAIER:  All right.  Those are all the

17    questions I have.  Thank you very much.

18            A.     Thank you.

19                   QUESTIONS BY MR. FAES:

20            Q.     I just have like five follow-up questions.

21                   MR. ROONEY:  Holding the phone.

22            A.     Yeah.

23            Q.     (By Mr. Faes)  You've worked in the

24    pharmaceutical industry for a number of years as a
```

Highly Confidential - Subject to Further Confidentiality Review

1    sales representative; right?

2         A.    Yes.

3         Q.    And you'd agree with me that you in

4    general enjoyed working as a pharmaceutical

5    representative in the sales industry; right?

6         A.    Yes.

7              MR. ROONEY:  Object to form.

8         Q.    (By Mr. Faes)  And I know that you've got

9    a medical situation going on now, but you would agree

10   with me that if sometime in the future you're able to

11   return to work, you'd like it to be an option for you

12   to return to the pharmaceutical industry and have the

13   option to become a sales representative again; right?

14             MR. ROONEY:  Object to form.

15        A.    No.  I think I'm finished with

16   pharmaceutical sales.

17        Q.    (By Mr. Faes)  Okay.  And is that because

18   of some of the things that we talked about earlier

19   regarding your experiences with Cephalon?

20        A.    Yes.

21             MR. FAES:  That's all the further

22   questions I have for you, Ms. Sippial.  Thank you for

23   your time.

24        A.    Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. ROONEY:  Anyone else?

2           MR. MAIER:  Nothing further from me.

3           THE REPORTER:  You going to waive or read?

4    Waive signature?

5           MR. ROONEY:  We'll reserve it.

6           THE VIDEOGRAPHER:  We are going off the

7    record at 6:52 PM.

8

9                 [SIGNATURE RESERVED.]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  C E R T I F I C A T E

 2

 3          I, JOHN ARNDT, a Certified Shorthand

 4   Reporter and Certified Court Reporter, do hereby

 5   certify that prior to the commencement of the

 6   examination, LAURA SIPPIAL was sworn by me to testify

 7   the truth, the whole truth and nothing but the truth.

 8          I DO FURTHER CERTIFY that the foregoing is a

 9   true and accurate transcript of the proceedings as

10   taken stenographically by and before me at the time,

11   place and on the date hereinbefore set forth.

12          I DO FURTHER CERTIFY that I am neither a

13   relative nor employee nor attorney nor counsel of any

14   of the parties to this action, and that I am neither a

15   relative nor employee of such attorney or counsel, and

16   that I am not financially interested in this action.

17

18

19          _____

20          JOHN ARNDT, CSR, CCR, RDR, CRR

21          CSR No. 084-004605

22          CCR No. 1186

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                    I, LAURA SIPPIAL, the witness herein,

 3      having read the foregoing testimony of the pages of

 4      this deposition, do hereby certify it to be a true and

 5      correct transcript, subject to the corrections, if any,

 6      shown on the attached page.

 7

 8

 9

10                                        _____

11                                        LAURA SIPPIAL

12

13

14      Sworn and subscribed to before me,

15      This _____ day of _____, 201_.

16

17

18      _____

19            Notary Public

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1        DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21

22   SIGNATURE:_____DATE:_____

23              LAURA SIPPIAL

24