```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                     -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                     -  -  -
            Friday November 2, 2018
11                     -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                       -  -  -
14
                  Videotaped deposition of
15   JULIE SNYDER, taken pursuant to notice,
     was held at the law offices of Lieff
16   Cabraser Heimann & Bernstein, LLP, 250
     Hudson Street, 8th Floor, New York, New
17   York 10013 beginning at 9:12 a.m., on the
     above date, before Amanda Dee
18   Maslynsky-Miller, a Certified Realtime
     Reporter.
19
                       -  -  -
20
21
22
23          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24             deps@golkow.com
```

Page 2

1
2
APPEARANCES:
3

ROBBINS GELLER RUDMAN & DOWD, LLP
BY: MATTHEW S. MELAMED, ESQUIRE
4  1 Montgomery Street
San Francisco, California 94104
5  (415) 393-1500
Mmelamed@rgrdlaw.com
6

7  - and -

BY: CARISSA J. DOLAN, ESQUIRE
8  655 West Broadway
San Diego, California 92101
9  (619) 702-0655
Cdolan@rgrdlaw.com
10  Representing the Plaintiffs
11

12  MORGAN LEWIS & BOCKIUS, LLP
BY: EVAN K. JACOBS, ESQUIRE
13  1701 Market Street
Philadelphia, Pennsylvania 19103
14  (215) 963-5000
evan.jacobs@morganlewis.com
15  Representing the Defendants,
Teva Pharmaceuticals, Inc.,
16  Cephalon, Inc., Watson
Laboratories, Actavis LLC, and
17  Actavis Pharma, Inc
18
19  JONES DAY
BY: EDWARD M. CARTER, ESQUIRE
20  325 John H. McConnell Boulevard
Suite 600
21  Columbus, Ohio 43215
(614) 469-3939
22  emcarter@jonesday.com
Representing the Defendant,
23  Walmart
24

Page 4

1
2
APPEARANCES: (Continued)
3

ROPES & GRAY LLP
BY: WILLIAM T. DAVISON, ESQUIRE
4  Prudential Tower
800 Boylston Street
5  Boston, Massachusetts 02199
(617) 951-7000
6  William.Davison@ropesgray.com
Representing the Defendant,
7  Mallinckrodt
8

9  VIA TELECONFERENCE/LIVESTREAM:
10

11  ROBBINS GELLER RUDMAN & DOWD, LLP
BY: AELISH MARIE BAIG, ESQUIRE
12  1 Montgomery Street
San Francisco, California 94104
13  (415) 393-1500
Aelishb@rgrdlaw.com
14  Representing the Plaintiffs
15
16

17  ARNOLD & PORTER KAYE SCHOLER LLP
BY: JOHN CELLA, ESQUIRE
18  601 Massachusetts Avenue, N.W.
Washington, DC 20001
19  (202) 942-5000
john.cella@arnoldporter.com
20  Representing the Defendant,
Endo Pharmaceuticals
21
22
23
24

Page 3

1
2
APPEARANCES: (Continued)
3

PELINI CAMPBELL & WILLIAMS, LLC
BY: PAUL B. RICARD, ESQUIRE
4  8040 Cleveland Avenue NW
Suite 400
5  North Canton, Ohio 44720
(330) 305-6400
6  pbricard@pelini-law.com
Representing the Defendant,
7  Prescription Supply, Inc.
8
9  WILLIAMS & CONNOLLY, LLP
BY: ANDREW C. MCBRIDE, ESQUIRE
10  725 Twelfth Street, N.W.
Washington, DC 20005
11  (202) 434-5000
amcbride@wc.com
12  Representing the Defendant,
Cardinal Health
13
14

15  KIRKLAND & ELLIS LLP
BY: DONNA M. WELCH, P.C, ESQUIRE
16  300 North LaSalle
Chicago, Illinois 60654
17  (312) 862-2000
donna.welch@kirkland.com
18  - and -
19  BY: CATIE VENTURA, ESQUIRE
655 Fifteenth Street, N.W.
20  Washington, D.C. 20005
(202) 879-5000
21  Catie.ventura@kirkland.com
Representing Allergan Finance, LLC
22
23
24

Page 5

1
2
APPEARANCES: (Continued)
VIA TELECONFERENCE/LIVESTREAM:
3
4

COVINGTON & BURLING LLP
5  BY: CLAYTON BAILEY, ESQUIRE
850 Tenth Street, NW
6  Suite 856N
Washington, DC 20001
7  (202) 662-5000
cbailey@cov.com
8  Representing the Defendant,
McKesson Corporation
9
10

REED SMITH, LLP
11  BY: SAMANTHA L. ROCCHINO, ESQUIRE
BY: NEIL A. HLAWATSCH, ESQUIRE
12  Three Logan Square
1717 Arch Street
13  Philadelphia, Pennsylvania 19103
(215) 851-8100
14  Srocchino@reedsmith.com
nhlawatsch@reedsmith.com
15  Representing the Defendant,
Amerisource Bergen Drug
16  Corporation
17
18
19
20

ALSO PRESENT:
21  Dan Lawlor, Videographer
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1            - - -
2         I N D E X
3            - - -
4
Testimony of:  Julie Snyder
5
6   By Mr. Melamed                    10
7
            - - -
8
        E X H I B I T S
9
            - - -
10
11  NO.        DESCRIPTION              PAGE
12  Allergan-Snyder
    Exhibit-001  Timeline of Key Dates    14
13
    Allergan-Snyder
14  Exhibit-002  Summary Notes of Witness
                 Spreadsheet; Topic,
15               Objections, Responses,
                 Materials Reviewed        14
16
    Allergan-Snyder
17  Exhibit-003  Witness Spreadsheet; Topic,
                 Objections, Responses,
18               Materials Reviewed        14
19  Allergan-Snyder
    Exhibit-004  Topic 12 Spreadsheet;
20               Entity, Point of Contact,
                 Type of Data Provided     15
21
    Allergan-Snyder
22  Exhibit-005  ALLERGAN_MDL_00988613-679
                 Contract Sales Force
23               Agreement, Ventiv
                 Commercial Services and
24               Actavis Kadian LLC        15

Page 7

1            - - -
2         E X H I B I T S
3            - - -
4
    NO.        DESCRIPTION              PAGE
5
6
    Allergan-Snyder
7   Exhibit-006  10/29/18 Letter from
                 M. Melamed to J. Levy,
8                Subjects of Testimony     39
9   Allergan-Snyder
    Exhibit-007  Allergan_MDL_01493707
10               And Allergan_MDL_1493708
                 E-mail and Attachment     50
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1            - - -
2     DEPOSITION SUPPORT INDEX
3            - - -
4
5   Direction to Witness Not to Answer
6   Page Line    Page Line    Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line    Page Line    Page Line
12  None
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17  9     1
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  None
23
24

Page 9

1            - - -
2        (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9            - - -
10       VIDEO TECHNICIAN:  We are
11   now on the record.  My name is Dan
12   Lawlor.  I'm a videographer with
13   Golkow Litigation Services.
14   Today's date is November 2nd,
15   2018, and the time is 9:12 a.m.
16       This video deposition is
17   being held in New York City, New
18   York in the matter of National
19   Prescription Opiate Litigation,
20   MDL Number 2804.  The deponent is
21   Julie Snyder.
22       Counsel will be noted on the
23   stenographic record.  The court
24   reporter is Amanda Miller and will

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 now swear in the witness.

2 - - -

3 JULIE SNYDER, after having

4 been duly sworn, was examined and

5 testified as follows:

6 - - -

7 EXAMINATION

8 - - -

9 BY MR. MELAMED:

10 Q. Good morning, my name is

11 Matt Melamed, and I represent plaintiffs

12 in this matter, from the law firm of

13 Robbins Geller Rudman & Dowd.

14 I said this before we went

15 on the record, if you need to take a

16 break at any time, please let me know.

17 I'll just ask that we don't take a break

18 in the middle of a line of questioning.

19 That's goes for the court

20 reporter, videographer, anyone else in

21 the room. Just give me a wave.

22 Can you please provide your

23 full name, your home address and your

24 work address for the record, please?

Page 11

1 MS. WELCH: I'm sorry, are

2 we going to put appearances on the

3 record?

4 - - -

5 (Whereupon, a discussion off

6 the record occurred.)

7 - - -

8 THE WITNESS: Julie Snyder.

9 I live at 12 Pomeroy Road in

10 Madison, New Jersey. And my work

11 address is 5 Giralda Farms in

12 Madison, New Jersey, as well.

13 BY MR. MELAMED:

14 Q. Have you been deposed

15 before?

16 A. Yes. Once.

17 Q. So you're somewhat familiar

18 with the process; is that right?

19 A. Somewhat, yes.

20 Q. What was the nature of the

21 matter you were deposed in?

22 A. It was for one of the

23 products that I worked on. It was an

24 antitrust case, I believe.

Page 12

1 Q. Do you know who is -- what

2 was the product you worked on that was

3 the subject of that?

4 A. It was Namenda XR.

5 MS. WELCH: Keep your voice

6 up just a little bit, there's a

7 fan in the room.

8 THE WITNESS: Namenda XR,

9 which is a product for moderate to

10 severe Alzheimer's disease.

11 BY MR. MELAMED:

12 Q. And what was the company

13 that manufactured Namenda XR?

14 A. The company that

15 manufactured it, at the time, I believe

16 it was Forest Laboratories.

17 Q. And who did you represent --

18 who were you testifying for in that suit,

19 if anyone?

20 A. I believe it was Forest

21 Laboratories. But there's been a number

22 of mergers and acquisitions that I'm not

23 totally familiar with.

24 Q. So I'll just go over a few

Page 13

1 basic rules of the deposition.

2 A. Sure.

3 Q. Hopefully, these are

4 familiar to you from that experience.

5 Let's try not to talk over

6 each other, even if you know where I'm

7 going with the question. Please let me

8 finish. That's primarily so that we get

9 a clear record of the question and

10 answer.

11 A. Sure.

12 Q. Please respond verbally; no

13 nodding, no shaking your head. I may ask

14 you, if I see that you've nodded

15 affirmatively or shaken your head, to

16 just state for the record clearly what

17 the response was.

18 Please respond in a way

19 that's easily transcribed, so no uh-huhs

20 or uh-uhs, which are difficult to

21 capture, instead yeses or nos or the

22 like.

23 My job today is to ask clear

24 questions. If you're unclear about what

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 I'm asking, please let me know so I can
2 try to clarify it.
3          Your counsel may object to
4 certain of my questions from time to
5 time. That's fine. You still need to
6 answer the question, unless you get an
7 instruction from your counsel not to
8 answer the question, in which case it
9 remains your choice whether to answer,
10 and I will ask you whether you choose to
11 answer or not.
12          Do you understand?
13     A.   Yes.
14          - - -
15          (Whereupon, Allergan-Snyder
16     Exhibit-001, Timeline of Key
17     Dates, was marked for
18     identification.)
19          - - -
20          (Whereupon, Allergan-Snyder
21     Exhibit-002, Summary Notes of
22     Witness Spreadsheet; Topic,
23     Objections, Responses, Materials
24     Reviewed, was marked for

Page 15

1     identification.)
2          - - -
3          (Whereupon, Allergan-Snyder
4     Exhibit-003, Witness Spreadsheet;
5     Topic, Objections, Responses,
6     Materials Reviewed, was marked for
7     identification.)
8          - - -
9          (Whereupon,Allergan-Snyder
10     Exhibit-004, Topic 12 Spreadsheet;
11     Entity, Point of Contact, Type of
12     Data Provided, was marked for
13     identification.)
14          - - -
15          (Whereupon, Allergan-Snyder
16     Exhibit-005,
17     ALLERGAN_MDL_00988613-679,
18     Contract Sales Force Agreement,
19     Ventiv Commercial Services and
20     Actavis Kadian LLC, was marked for
21     identification.)
22          - - -
23 BY MR. MELAMED:
24     Q.   I've marked Exhibits 1

Page 16

1 through 5, which are materials that were
2 provided by counsel that I believe you
3 used to prepare for today; is that
4 correct?
5     A.   These are documents that I
6 put together based on my preparation.
7     Q.   Did you create each of those
8 documents?
9     A.   At my direction, my counsel
10 put together the information. I then
11 marked it up and changed it. And so they
12 pretty much typed it up, but I was -- it
13 was all at my direction.
14     Q.   And that's true for the
15 timeline of key dates, which is Exhibit
16 Number 1?
17     A.   Yes.
18     Q.   And same for the Exhibit
19 Number 2, which is a cheat sheet to
20 Exhibit Number 3; is that correct?
21          MS. WELCH: She doesn't have
22     exhibit numbers on it.
23          MR. MELAMED: I'm sorry.
24     You can use the ones with the

Page 17

1     exhibit numbers, they are right in
2     front of you.
3          THE WITNESS: Yes. So
4     Number 2 is the cheat sheet for
5     Number 3.
6          So, for example, I wrote
7     this all down and then someone
8     typed it up for me.
9 BY MR. MELAMED:
10     Q.   And Number 4 is specific to
11 Topic 12; is that correct?
12     A.   Number 4, yes, that's
13 specific to Topic 12.
14     Q.   And you created that?
15     A.   Yes. At my direction, my
16 attorneys typed it up. Same as the
17 others, yes.
18     Q.   Counsel created it at your
19 direction, correct?
20     A.   My direction, yes, they
21 typed it up.
22          But it's my -- I marked it
23 up and made sure it was -- the
24 information that I wanted in there was in

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 there.
2 Q. And then Exhibit-5 is a
3 contract sales force agreement by and
4 between Ventiv Commercial Services and
5 Actavis Chadian LLC, correct?
6 A. A contract between Ventiv
7 and Actavis, yes.
8 Q. We may return to these
9 later. You can put them aside for now.
10 As a general matter, try to keep the
11 marked exhibits neat. So when we go back
12 to them, it will be easier to go back to.
13 I'm going to hand you what's
14 previously been marked Exhibit 1 from the
15 Allergan Kaufheld deposition.
16 Have you seen this document
17 before?
18 A. It looks familiar. I'm not
19 sure if I saw this exact one, but it
20 looks familiar.
21 Q. You know that you are
22 designated, on the second -- on the
23 second page, which is Page Number 1 of
24 this, to testify on behalf of the

Page 19

1 corporate entity for a series of topics,
2 correct?
3 A. Yes.
4 Q. And you are prepared to
5 testify on those topics today?
6 A. Yes, I am prepared.
7 Q. What is the name of the
8 corporation you've been designated to
9 provide testimony on behalf of?
10 A. It's on behalf of Allergan,
11 I'm not clear on the exact corporate
12 structure. That wasn't part of my --
13 what I prepared for.
14 But my understanding is it's
15 Allergan. I believe Allergan Finance.
16 Q. Are you prepared to offer
17 testimony on behalf of Watson
18 Pharmaceuticals, Inc.?
19 A. On behalf of Watson?
20 MS. WELCH: Objection to the
21 extent you're asking her legal
22 questions. She's been designated
23 on behalf of Allergan Finance,
24 LLC. That's clear from the

Page 20

1 pleading that you've put in front
2 of her.
3 MR. MELAMED: I was asking
4 the witness who she understands
5 she's been designated to testify
6 on.
7 MS. WELCH: And she answered
8 the question. And in response to
9 follow-up questions, I'm saying
10 it's clear, on behalf of the
11 pleading, who she's been
12 designated to testify on behalf
13 of.
14 MR. MELAMED: You're free to
15 object.
16 BY MR. MELAMED:
17 Q. Can you answer the question,
18 please?
19 A. Can you repeat the question?
20 Q. Sure.
21 Are you prepared to testify
22 on behalf of Watson Pharmaceuticals, Inc.
23 today?
24 MS. WELCH: Same objection.

Page 21

1 THE WITNESS: My
2 understanding is I'm here to
3 testify on behalf of Allergan
4 Finance.
5 BY MR. MELAMED:
6 Q. How many employees does
7 Allergan Finance have?
8 A. I'm really not familiar or
9 prepared to discuss the intricacies of
10 the corporate structure of Allergan.
11 Q. Do you know who you are
12 employed by, which Allergan entity you
13 are employed by?
14 A. Yes. I did prepare
15 information on that.
16 So I'm a member of the
17 marketing department, which is part of
18 Allergan USA, Inc.
19 Q. Allergan USA, Inc. is a
20 wholly owned subsidiary of Allergan PLC;
21 is that correct?
22 A. Again, I'm really not
23 familiar with the corporate structure and
24 didn't understand that to be part of the

Page 22

1 prep for today.
2      Q.  Are you prepared to testify
3 on behalf of -- to provide answers on the
4 designated topics on behalf of the
5 Actavis Group?
6          MS. WELCH:  Objection to
7      form.  Objection.  I don't know
8      how you're defining "Actavis
9      Group."
10         And, again, based on the
11     pleading in the case prepared by
12     counsel, it is clear she is
13     testifying on behalf of the named
14     defendant in the case who has been
15     served.
16         THE WITNESS:  So, again, I'm
17     here to testify on behalf of
18     Allergan Finance.
19 BY MR. MELAMED:
20     Q.  And you are not here to
21 testify on behalf of Allergan,
22 Incorporated -- I'm sorry, let me
23 withdraw that.
24         You are not here to testify

Page 23

1 on behalf of the company formerly known
2 as Actavis, Incorporated; is that
3 correct?
4          MS. WELCH:  Objection to
5      form.  Same series of objections.
6      The pleading is clear who she is
7      testifying on behalf of in the
8      case.
9          MR. MELAMED:  Just object to
10     form.
11         Thank you.
12         THE WITNESS:  I mean, again,
13     I've been designated to testify on
14     behalf of Allergan Finance.  I'm
15     not familiar with the legal
16     entities and different corporate
17     structures.
18 BY MR. MELAMED:
19     Q.  Are you prepared to testify
20 on the designated topics on behalf of
21 Actavis PLC?
22         MS. WELCH:  Same objections.
23         THE WITNESS:  I'm prepared
24     to talk about the topics on behalf

Page 24

1      of Allergan Finance, LLC.
2 BY MR. MELAMED:
3      Q.  Are you prepared to testify
4 on the designated topics on behalf of
5 Allergan PLC?
6          MS. WELCH:  Same objections.
7          THE WITNESS:  I'm prepared
8      to talk about the topics on behalf
9      of Allergan Finance LLC.
10 BY MR. MELAMED:
11     Q.  You know that Allergan
12 Finance LLC is the successor to Actavis,
13 Incorporated, correct?
14         MS. WELCH:  Objection to
15     form.
16         THE WITNESS:  Again, I am
17     not familiar with the intricacies
18     of the corporate structure.
19 BY MR. MELAMED:
20     Q.  So you don't know whether
21 your testimony will also be on behalf of
22 the entity formerly known as Actavis,
23 Incorporated; is that correct?
24         MS. WELCH:  Objection to the

Page 25

1 extent it calls for a legal
2 conclusion.  Same --
3          MR. MELAMED:  I'm asking --
4      I'm just asking if she knows --
5          MS. WELCH:  I can put my
6      objections on the record.
7          MR. MELAMED:  Please
8      object --
9          MS. WELCH:  Same objections.
10         MR. MELAMED:  Please object
11     as to form, and then let her
12     answer the question.  As opposed
13     to instructing her how to answer
14     the question.
15         MS. WELCH:  I'm not
16     instructing.  I'm objecting that
17     you're asking for a legal
18     conclusion.  And I'm going to
19     place that on the record.
20 BY MR. MELAMED:
21     Q.  I'm asking whether you
22 understand that your testimony today --
23 let me withdraw that.
24         I'm asking whether you're

Page 26

1 prepared -- whether your testimony today
2 will be on behalf of the company formerly
3 known as Actavis Incorporated?
4        MS. WELCH:  Same objections.
5        THE WITNESS:  I'm here to
6    talk on behalf of Allergan
7    Finance, LLC.  And I don't know
8    the corporate structure well
9    enough to comment on that.
10 BY MR. MELAMED:
11    Q.   So I'm just going to ask a
12 series of yes/no questions.
13        Are you aware that Allergan
14 Finance LLC is a successor to Actavis,
15 Incorporated?
16        MS. WELCH:  Objection to
17    form.
18        THE WITNESS:  Again, I'm not
19    familiar with the corporate
20    structure.
21 BY MR. MELAMED:
22    Q.   Are you aware that Actavis,
23 Incorporated is the successor to Watson
24 Pharmaceuticals, Incorporated?

Page 27

1        MS. WELCH:  Objection to
2    form.
3        THE WITNESS:  Can you ask
4    that again, please?
5 BY MR. MELAMED:
6    Q.   Are you aware that Actavis,
7 Incorporated is the successor to Watson
8 Pharmaceuticals, Incorporated?
9        MS. WELCH:  Same objection.
10        THE WITNESS:  I'm not clear
11    on the corporate structure and how
12    that was put together.
13        I do know that there were a
14    number of mergers and
15    acquisitions, and I don't know the
16    full details of them.
17 BY MR. MELAMED:
18    Q.   Okay.  So as a general
19 matter, when I ask you questions about
20 marketing, for instance, of Norco, which
21 has been marketed by Watson
22 Pharmaceuticals, Incorporated going back
23 approximately 20 years, are you going to
24 be able to answer questions about Watson

Page 28

1 Pharmaceuticals, Incorporated's marketing
2 of Norco in the early 2000s?
3    A.   I will be able to answer
4 questions about the detailing of Norco,
5 not exactly which legal entity people
6 were employed by.
7    Q.   How long have you been in
8 your current position?
9    A.   My current role, since
10 January of 2018.
11    Q.   And prior to that, what role
12 were you in?
13    A.   I was in a series of
14 marketing roles at Forest Labs, Actavis
15 and Allergan.
16    Q.   Let's take that question
17 from the other side.
18        Can you briefly recount your
19 educational history, starting with
20 college, and work history subsequent to
21 college, please.
22    A.   Sure.  I have a Bachelor's
23 Degree from Drew University in Madison,
24 New Jersey.  After that, I received an

Page 29

1 MBA -- I don't know if you want to know
2 what my Bachelor's was in, it was in
3 applied math.
4        And then I have an MBA in
5 marketing from Rutgers University.
6    Q.   And then after -- did you
7 work between the time you graduated Drew
8 and the time you received your MBA at
9 Rutgers?
10    A.   I did my MBA part time, so I
11 was working before and during the time --
12    Q.   And what --
13    A.   -- I was getting that.
14    Q.   Sorry for interrupting you.
15        What company were you
16 working with?
17    A.   So I was actually -- my
18 first job right after college was I was a
19 teacher for, I believe, it was Jefferson
20 Township public schools.
21    Q.   And then subsequent to
22 graduating from Rutgers, what jobs have
23 you held?
24    A.   So I'll talk about after

Page 30

1 teaching, because I was getting my MBA
2 while working.
3        So after -- I was a teacher
4 for about three months.  And then I was
5 employed by Prudential and that was about
6 two and-a-half to three years.
7     Q.   What did you do at
8 Prudential?
9     A.   I worked in the actuarial
10 group in their individual health
11 insurance.
12     Q.   Then after you worked in the
13 actuarial group at Prudential, what did
14 you do?
15     A.   Then -- it's a long time
16 ago.  I'm just trying to recall.
17        Then I went to Lowenstein
18 Sandler for about three months in a
19 database marketing capacity.
20     Q.   After Lowenstein Sandler,
21 what did you do?
22     A.   After Lowenstein Sandler, I
23 went to a company called NECA, the
24 National Exchange Carrier Association.

Page 31

1 That was a telecommunications company.
2     Q.   And you did that
3 approximately what dates?
4     A.   That would have been, I
5 believe, 1999 to 2002.
6     Q.   And after you left NECA,
7 where did you go?
8     A.   Then I was at a company
9 called Health Products Research, or HPR,
10 which is a pharmaceutical consulting
11 company.  I was there for about two
12 years.
13     Q.   What was your role at Health
14 Products Research?
15     A.   I worked on analytics for
16 the pharmaceutical industry.  I don't
17 remember my exact title, but I worked on
18 call planning and targeting for
19 pharmaceutical clients.
20     Q.   Are you aware of the
21 entities that are defendants in this
22 lawsuit?
23        MS. WELCH:  Objection to
24     form.

Page 32

1        THE WITNESS:  Not all of
2     them, no.
3 BY MR. MELAMED:
4     Q.   Did you -- when you were at
5 HPR, did you provide any services to
6 Allergan Finance, LLC or its predecessor
7 entities?
8     A.   Not that I recall.
9     Q.   Did you provide any services
10 to Purdue Pharmaceuticals?
11     A.   Not that I recall.
12     Q.   Teva Pharmaceuticals?
13     A.   Not that I recall.
14     Q.   Mallinckrodt?
15     A.   Not that I recall.
16     Q.   Endo?
17     A.   Not that I recall.
18     Q.   Johnson & Johnson?
19     A.   Not that I recall.
20     Q.   Did any of your services
21 relate to opioids?
22     A.   Not that I recall.
23     Q.   After you left HPR, what was
24 your next job?

Page 33

1     A.   I went to Schering-Plough.
2     Q.   What did you do at
3 Schering-Plough?
4     A.   I started in the global
5 business analytics group doing similar
6 call planning work, and then I moved over
7 to the marketing group while I was there.
8     Q.   Do you remember what -- let
9 me withdraw that.
10        When you were in the
11 marketing group, did you work on
12 marketing campaigns concerning any of
13 Schering-Plough's drugs?
14     A.   I was a product manager in
15 the marketing group for Avalox, which was
16 a Bayer product that Schering-Plough
17 promoted.
18     Q.   How long were you at
19 Schering-Plough?
20     A.   About three years.
21     Q.   And was your last position
22 at Schering-Plough in the marketing group
23 working on Avalox?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  Q.   And after you left
2  Schering-Plough, where did you go?
3      A.   Then I went to Forest Labs.
4      Q.   And what year was that?
5      A.   That was 2007.
6      Q.   And what did you -- and what
7  position did you take at Forest Labs?
8      A.   I was a product manager
9  working on Namenda.
10     Q.   How long did you work on
11 Namenda?
12     A.   From 2007 until, I believe,
13 2011.  But then I also, I worked on
14 another product, Viibryd, and then went
15 back to working on Namenda, I believe, in
16 2014.  But I don't remember the exact
17 dates.
18     Q.   So from 2007 to 2011, you
19 were a product manager at Forest Labs,
20 correct?
21     A.   From 2007 to 2011, I worked
22 in the marketing group.  I had different
23 titles, which I don't recall the exact
24 years, product manager, senior product

Page 35

1  manager.
2      Q.   And then in -- what happened
3  in 2011?
4      A.   2011, I believe, that was
5  the year we acquired a product, Viibryd,
6  and I went to work on that product.  It's
7  an antidepressant.
8      Q.   And then how long did you
9  work on that project?
10     A.   I believe that was for three
11 years, but I'm not 100 percent sure.  I
12 believe that was three years.  And then
13 in 2014 went back to work on the Namenda
14 products, Namenda and Namenda XR and
15 Namzaric.
16     Q.   And that was at Forest?
17     A.   I don't remember the timing
18 of whether it was at Forest or after they
19 had been acquired by Actavis.  I'd have
20 to check the exact dates.
21     Q.   And then what -- how long
22 did you -- once you returned to work on
23 Namenda and Namenda XR in 2014, was that
24 your primary position at the company --

Page 36

1  your primary responsibility at the
2  company at that time?
3      A.   My primary responsibility
4  was working on Namenda XR and a product
5  called Namzaric, which is also for
6  Alzheimer's disease.
7      Q.   And can you take us forward
8  from 2014 to today, what positions have
9  you held?  What products have you worked
10 on?
11     A.   Sure.  So up until December
12 of 2017, I continued my work on the
13 Alzheimer's products, Namenda XR and
14 Namzaric.  And then in January of 2018, I
15 assumed responsibility, in addition to
16 the Alzheimer's products, for Bystolic
17 for hypertension, and a number of
18 products that we refer to as our
19 established brands portfolio, meaning
20 there's no sales force effort behind them
21 and, in most cases, little to no
22 promotion behind them.
23     Q.   Does that include Kadian?
24     A.   So the established brand

Page 37

1  portfolio includes Kadian.
2      Q.   Does the established brand
3  portfolio also include Norco?
4      A.   It does.
5      Q.   Are there any other opioids
6  within the established brand portfolio?
7      A.   There are a lot of products
8  in there.  I'm not 100 percent sure if
9  there are any others.
10          There is no -- any of the
11 products that I work on in a marketing
12 capacity and, you know, creating
13 promotional materials, there are no
14 opioids that I created any materials for.
15     Q.   What are the opioids
16 currently sold under the Allergan PLC
17 umbrella, whether branded or generic?
18 Can you just list those for me?
19     A.   I'm here today to talk about
20 Kadian and Norco, which my understanding
21 are the two opioids that fall into the
22 portfolio that I manage.
23          I don't know outside of the
24 portfolio that I manage.

Page 38

1    Q.   Is it true, then, that
2  you're not prepared today to testify
3  concerning any generic or nonbranded
4  opioids?
5        MS. WELCH:  Objection.
6  Misrepresents her testimony.
7        THE WITNESS:  That's not the
8  case.  I am prepared to talk about
9  generics.
10        I don't have any generic
11  products in my portfolio, but as
12  far as historically, I have spoken
13  to people who did manage generics
14  in some capacity and have -- am
15  prepared to talk about that.
16  BY MR. MELAMED:
17    Q.   I don't mean to
18  mischaracterize.  I just want to -- the
19  reason I asked that question is you had
20  responded to a prior question by saying,
21  I'm here today to talk about Kadian and
22  Norco, which my understanding are the two
23  opioids that fall into the portfolio that
24  I manage.

Page 39

1    A.   Right.
2    Q.   Am I to understand your
3  clarification that you are also here
4  today to talk about generic and/or
5  nonbranded opioids?
6    A.   Yes.  Sorry if that was not
7  clear.
8            - - -
9        (Whereupon, Allergan-Snyder
10  Exhibit-006, 10/29/18 Letter from
11  M. Melamed to J. Levy, Subjects of
12  Testimony, was marked for
13  identification.)
14            - - -
15  BY MR. MELAMED:
16    Q.   I'm going to hand you what I
17  marked as Exhibit Number 6.
18    A.   Sure.
19    Q.   For the record, Exhibit
20  Number 6 is a letter from Matthew Melamed
21  at Robbins Geller to Jennifer Levy at
22  Kirkland & Ellis, dated October 29th,
23  2018.
24        I just want you to turn to

Page 40

1  the second and third pages of this
2  letter.  And you see that the list that
3  starts with the numbered question Number
4  1, and then continues through the
5  numbered question, I believe, 15?
6    A.   I do see that.  I'm not
7  familiar with this letter.  So I'd have
8  to read through it.
9    Q.   Fair enough.
10        Can you read -- can you read
11  Number 1 and tell me whether you're
12  prepared to offer testimony on that
13  subject today?
14        MS. WELCH:  Objection to
15  form.  Objection that this is
16  outside the scope of what the
17  witness has been prepared to talk
18  about.
19        And if you're asking her to
20  identify from your enumerated
21  Number 15 where they may or do
22  fall within the scope of the
23  topics, I think it's going to be a
24  lengthy exercise.

Page 41

1        MR. MELAMED:  I'm happy
2  to -- we can -- I'll let you
3  review that during a break and
4  then I can return and ask you.
5  BY MR. MELAMED:
6    Q.   I'm just generally -- we had
7  a series of questions that we asked
8  another 30(b)(6) witness and -- that he
9  was unable to answer.  I'm just trying to
10  understand whether you are prepared to
11  offer testimony on those topics today.
12        If your answer is no, that's
13  fine.  As your counsel noted, these are
14  not topics for which you're designated.
15  I'm just curious whether you are or are
16  not.
17        MS. WELCH:  Objection to
18  form.  She's been identified to
19  speak on a number of topics, as
20  you've noted.
21        To the extent one of these
22  questions falls within that topic,
23  you're welcome to ask her
24  questions.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    But, again, if you're asking
2  a lay witness to read through a
3  lawyer's letter and identify, of
4  these 15 topics, where they may or
5  do fall within these topics, I'm
6  going to tell her to take a break
7  on the record and review this
8  carefully.
9  BY MR. MELAMED:
10   Q.   You said you hadn't seen
11 these before, this letter before?
12   A.   I hadn't seen this letter
13 so, I mean, I'm not --
14   Q.   Has anybody mentioned any of
15 these questions to you in preparation for
16 today's -- have you talked about these
17 questions in preparation for today's
18 testimony?
19   MS. WELCH:  Objection to
20 form.  Objection to the extent
21 you're now getting into --
22 directly into communications with
23 counsel.
24   MR. MELAMED:  I asked

Page 43

1  whether.  I didn't ask what.
2  BY MR. MELAMED:
3    Q.   Have you spoken to counsel
4  about any of these questions today?
5    MS. WELCH:  Same objections.
6    THE WITNESS:  I am not
7  familiar, and I'd have to read
8  through this document in order to
9  effectively answer that.
10   What I would say is I'd go
11 back to the exhibit you provided
12 me earlier and the topics that I'm
13 designated to talk about are
14 listed here.
15   Sorry, I don't know the
16 number of this.  Exhibit-1.
17   And to the extent that these
18 questions fall into those topics,
19 I'm prepared to talk about it.
20 BY MR. MELAMED:
21   Q.   Is it true that you're
22 generally not prepared, other than to the
23 extent any -- let me withdraw that.
24   You said before you're not

Page 44

1  prepared to talk about the corporate
2  entity, Allergan PLC, Watson
3  Pharmaceuticals, Inc., et cetera; is that
4  correct?
5    A.   I'm not prepared to talk
6  about how the -- the legal entities.  I'm
7  prepared for the topics that we discussed
8  earlier.
9    Q.   Okay.  And your preparation
10 did not extend beyond the topics that are
11 listed in the deposition notice, which is
12 what you're currently looking at; is that
13 correct?
14   A.   My preparation to speak was
15 related to these topics.  I reviewed a
16 number of documents.  If there's
17 anything, you know, that I -- you know,
18 am I able to offer, I can.  But I'm
19 prepared to talk about these topics.
20   Q.   Did you prepare to talk
21 about topics beyond the topics listed in
22 the notice by your name?
23   MS. WELCH:  Objection to
24 form.

Page 45

1    THE WITNESS:  I specifically
2  prepared to talk about these
3  topics that are listed by my name.
4  BY MR. MELAMED:
5    Q.   And you did not undertake
6  any specific preparation to talk about
7  anything other than the topics listed by
8  your name; is that correct?
9    MS. WELCH:  Objection to
10 form.
11   THE WITNESS:  Again, I'm
12 prepared to talk about the topics
13 that are listed next to my name in
14 Exhibit-1.
15 BY MR. MELAMED:
16   Q.   But I'm just asking, did you
17 take any -- did you specifically prepare
18 to talk about anything other than those
19 topics?
20   A.   I mean, it's a very general
21 question.  I reviewed a lot of documents.
22 Some of the information in the documents
23 probably fell outside of the scope and
24 I've read them as part of my preparation

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 for these topics.
2         But my specific preparation
3 was for these topics that are listed
4 here.
5     Q.   And if you pull out Exhibit
6 Number 3, which is one of the exhibits
7 you handed me earlier, it's 27 pages of a
8 table that lists number of topic,
9 objections, response and then materials
10 reviewed.
11        Do you see that?
12    A.   Yes.
13    Q.   Does this list -- the
14 materials reviewed for each topic list
15 the materials that you used to prepare
16 for today's testimony?
17    A.   Generally.  They list what I
18 used to prepare.  In some cases, there
19 are more specific -- I believe you guys
20 call them Bates numbers that are listed
21 here that have specific documents and
22 information there in the response column.
23    Q.   Did you review those Bates
24 numbered documents?

Page 47

1    A.   I reviewed these documents
2 that are here.  And this document is the
3 information that I summarized from those
4 documents.
5    Q.   So I just want to be clear.
6        In the response column, is
7 that a summary of your response?
8    A.   This is -- based on
9 everything that I've read, this is the
10 response, this is the summary of -- this
11 is really my notes to be able to
12 summarize what I have read and reviewed.
13    Q.   And under the materials
14 reviewed column, and I'm just looking at
15 the first page, which is listed as Number
16 3, it also identifies not only materials
17 but individuals you spoke to, correct?
18    A.   Yes, correct.
19    Q.   So in the materials reviewed
20 column, as you go throughout this
21 document, does this identify each of the
22 individuals you spoke to in preparation
23 for providing testimony on a topic?
24    A.   This provides a list of

Page 48

1 people that I talked to, yes.
2    Q.   And did you speak to outside
3 counsel to prepare to give testimony
4 today?
5        MS. WELCH:  Objection to
6    form.
7        THE WITNESS:  I've met with
8    my attorneys on a number of cases
9    throughout a number of dates
10    throughout the past several
11    months.
12 BY MR. MELAMED:
13    Q.   Who are the attorneys you
14 met with?
15    A.   Sitting right here, Donna
16 Welch and Catie Ventura.
17    Q.   Approximately how many times
18 did you meet with them?
19    A.   A lot of times.
20        I would say, all told, over
21 the course of the last several months, I
22 probably spent 40, 50 hours in either
23 reviewing documents, having conversations
24 with them, meeting with them.  And then

Page 49

1 in addition to that, have done, you know,
2 additional research on my own.
3        So probably the better part
4 of -- if you broke it down, if you
5 consolidated it all into a short period
6 of time, maybe two weeks of preparation,
7 but over the course of the last several
8 months.
9    Q.   Did you speak to anyone from
10 Teva Pharmaceuticals?
11        MS. WELCH:  Objection to
12    form.
13        THE WITNESS:  The people I
14    spoke to are listed here.  I don't
15    know their current jobs right now.
16    I spoke to them in the capacity as
17    I was preparing for this and what
18    they did in the past.
19        But I couldn't confirm
20    whether or not they work for one
21    of the -- work for Teva right now.
22 BY MR. MELAMED:
23    Q.   Did you -- in preparation
24 for today's deposition, did you make any

Page 50

1 specific effort to reach out to
2 individuals at Teva Pharmaceuticals that
3 you know of?
4     A.   You know, I spoke to people
5 about -- you know, who were familiar with
6 what -- what I was preparing to testify
7 regarding.
8         My understanding is that
9 Teva is a named defendant in this suit,
10 so I did not reach out to anyone
11 specifically who is currently employed
12 there to talk to them.
13          - - -
14     (Whereupon, Allergan-Snyder
15     Exhibit-007, Allergan_MDL_01493707
16     and Allergan_MDL_1493708, E-mail
17     and Attachment, was marked for
18     identification.)
19          - - -
20     MR. MELAMED: I'm handing you
21     what's been marked as Exhibit-7.
22 BY MR. MELAMED:
23     Q.   Exhibit-7 is an e-mail and
24 attachment.  The e-mail is

Page 51

1 Allergan_MDL_01493707.  The attachment is
2 a multipage Excel document at
3 Allergan_MDL_1493708.
4         And as the top of the first
5 page of the Excel attachment states, this
6 is Watson Pharmaceuticals, Incorporated's
7 projected income statements, 2009 actual,
8 2010 budget.
9         Do you see that?
10     A.   I do see that, yes.
11     Q.   Are you familiar with this
12 document?
13     A.   No, I don't believe I've
14 seen this document.
15     Q.   Do you know whether this is,
16 in fact, Watson Pharmaceuticals,
17 Incorporated's projected income
18 statements, 2009 actual and 2010 budget?
19     A.   I can see that's the title
20 of it.  I mean, since I don't have
21 familiarity with it, I don't know whether
22 it's an official document or what someone
23 just titled that.
24     Q.   If you turn at the bottom of

Page 52

1 each page, there's a label in the middle
2 that reflects the name of the individual
3 spreadsheet.
4         Can you turn to the one that
5 says, Product Family-Units, please?
6     MS. WELCH:  Can you give us
7     a Bates number?
8     MR. MELAMED:  It's all the
9     same Bates number.  So it's a
10     single document.
11     THE WITNESS:  And I'm
12     looking at the middle of the page?
13     MR. MELAMED:  Correct.
14     THE WITNESS:  And you said
15     it was called what?
16     MR. MELAMED:  It's called
17     Product Family-Units.  It is
18     approximately halfway through.
19     THE WITNESS:  Okay.
20 BY MR. MELAMED:
21     Q.   If you could just turn to
22 the second page of that.  It's a
23 multipage exhibit.  And you see it stops
24 -- the group in the upper left is

Page 53

1 Doxepin.
2     A.   Uh-huh.
3     Q.   I just want to make sure --
4     A.   I see that.
5     Q.   -- we're all on the same
6 page.
7         Can you identify what the
8 top -- the first column is group, do you
9 see that?  The title at the top of the
10 first column.
11         Do you see that?
12     A.   Oh, group.  Yes.
13     Q.   And that refers to a drug
14 group; is that correct?
15     A.   I don't know.
16     Q.   Who would you ask about this
17 document if you wanted to find out about
18 it?
19     A.   Probably the person who sent
20 it.  But I don't know James Williamson,
21 but that would be the first place I would
22 go.
23     Q.   You understand you've been
24 designated to speak on the annual sales

1 for each opioid product 2007 to present?
2     A.   That's included in one of
3 the -- one of the topics, yes.
4     Q.   And this reflects, if you're
5 on the second page, if you look, for
6 instance, approximately a quarter of the
7 way down, and these are alphabetical, you
8 see it reflects Fentanyl?
9     A.   I see that listed here.
10     Q.   And Fentanyl is an opioid,
11 correct?
12     A.   I don't know.
13     Q.   So you are not the correct
14 person to speak to the annual sales for
15 each opioid product reflected in this
16 document; is that correct?
17         MS. WELCH:  Objection to
18     form.
19         THE WITNESS:  So in the
20     preparation for today, I did talk
21     to our finance group to get the
22     information that we currently
23     have.
24         My understanding is that we

1     have sales officially from 2016 to
2     the present.  And prior to that,
3     the databases that included the
4     historical sales went with the
5     company when those products were
6     sold to Teva.
7         So I'm here -- so, I mean, I
8     am prepared to talk about what
9     Allergan Finance has in its
10     systems from -- that we have
11     currently available.  My
12     understanding is that the database
13     with the sales for these products
14     prior to that was -- is with Teva.
15 BY MR. MELAMED:
16     Q.   You see reflected in the
17 Bates number that this document has been
18 produced in this litigation?  And I can
19 represent to you, and I think counsel
20 will agree, that this document has been
21 produced in this litigation, correct?
22     A.   Produced in this litigation.
23 It's in front of me, yes.
24     Q.   I'll represent to you that

1 it was provided to us during the course
2 of this litigation.
3     A.   Yes.
4     Q.   This reflects -- appears to
5 reflect sales, revenues, units, et
6 cetera, for a whole series of drugs under
7 the Watson -- sold by Watson
8 Pharmaceuticals, Incorporated in 2009 and
9 forecasted for sales in 2010.
10         Does that appear to be
11 correct?  I understand you're not
12 familiar with this document.
13         MS. WELCH:  Objection to
14     form.
15         THE WITNESS:  I mean, this
16     is titled, in the e-mail, a budget
17     planning model.  So I don't know
18     if this is official numbers, what
19     this is.
20         It appears to be an Excel
21     spreadsheet.  So I really can't
22     speak to if these are actual
23     numbers or if they were as part of
24     a forecast and not final numbers.

1 BY MR. MELAMED:
2     Q.   And you did not prepare to
3 speak about the opioid sales by Watson
4 Pharmaceuticals in 2009; is that correct?
5         MS. WELCH:  Objection to
6     form.
7         THE WITNESS:  As I
8     mentioned, as part of my
9     preparation, I talked to our
10     finance group, who keeps the
11     official numbers for the company,
12     and asked what was available for
13     us.
14         And the only information
15     that we currently maintain is a
16     database with sales for 2016
17     through 2018, through current, and
18     future projections.
19         So my understanding is that
20     the database with the sales is not
21     available to us at Allergan
22     currently.
23 BY MR. MELAMED:
24     Q.   Just to be clear, you are

Page 58

1 prepared to speak about the annual sales
2 of opioid products at Allergan currently
3 and going back to 2016; is that correct?
4     A. So I prepared -- you know,
5 as part of my preparation, I researched
6 whatever historical information that we
7 had. And that's, you know, what I was
8 able to turn up, that the -- we currently
9 have data from 2016 and 2017. I also was
10 able to find -- and I just want to pull
11 up my notes regarding this.
12     I also did review some
13 additional forecast files that I had,
14 that I had received from my predecessor.
15 And that had some information from 2014
16 and 2015 for Kadian and Norco. And that
17 was -- is what was available to me.
18     My understanding is that the
19 remainder of the financial information is
20 with the Actavis generic companies that
21 still exist with Teva.
22     And as I mentioned, they are
23 named defendants in the case, so they
24 should have that information and be able

Page 59

1 to provide it.
2     Q. The information about the
3 Actavis generic groups -- from the
4 Actavis generic groups that were
5 transferred to Teva is not available --
6 let me withdraw that, and state it in the
7 present tense -- or the past tense.
8     The information from the
9 Actavis generic groups about the sales of
10 their opioids and the revenues from their
11 opioids and the marketing budgets for
12 their opioids was transferred to Teva;
13 that's your testimony?
14     A. My understanding is that the
15 official databases from finance were
16 transferred to Teva, yes.
17     Q. Do you know whether anyone
18 at Allergan PLC retained a copy of the
19 information that was transferred in those
20 databases?
21     A. I don't know if anyone has a
22 copy. My understanding is the official
23 finance group, who Tom Riley, who I spoke
24 with, said that we did not, from an

Page 60

1 official finance capacity, have a
2 database.
3     If someone has an Excel file
4 on their desktop, you know, that, I
5 really can't speak to.
6     Q. Were you working at
7 Actavis -- I'm sorry, at Allergan
8 Finance, LLC in 2014?
9     A. 2014? I'd have to -- so I
10 was -- I believe it was Actavis in 2014,
11 and the Actavis/Allergan integration
12 happened in 2015.
13     Q. What was the name of the
14 Actavis entity you worked at in 2014?
15     A. I don't recall.
16     Q. Do you recall receiving a
17 litigation hold concerning the marketing
18 of opioids in 2014?
19     A. I'm sure I did. I received
20 a number of legal holds. So I don't
21 remember the specific one, but I'm sure I
22 did.
23     Q. In the event you receive a
24 litigation hold, how do you -- how do you

Page 61

1 respond to that litigation hold? What
2 actions do you take to make sure that
3 documents are preserved?
4     A. Because I have a number of
5 legal holds, I really just -- I don't
6 delete anything. So I would have, in my
7 normal course of business, not to get rid
8 of anything.
9     Q. Going back to what's been
10 marked as Exhibit --
11     A. Exhibit-7? This one?
12     Q. Exhibit-7, thank you.
13     Does what you reviewed in
14 preparation for today concerning sales of
15 opioids in 2016 and 2017 and 2018 look
16 similar to this document?
17     A. This document looks
18 different.
19     Q. Generally, what did the
20 document you looked at look like?
21     Let's start, was it an Excel
22 spreadsheet?
23     A. I believe it was a database
24 that was downloaded to Excel

Highly Confidential - Subject to Further Confidentiality Review

Page 62

spreadsheets.

Q. So it was a number of worksheets that had been downloaded from the database?

A. I don't remember. I had conversations with Tom Riley, and I believe he gave me a table of that information.

Q. Do you have that table with you?

A. No.

Q. Do you know if that table was provided to plaintiffs, was produced to plaintiffs in this litigation?

A. I don't know. I don't know.

Q. Mr. Riley is currently an employee of what company, if you know?

A. I believe that -- I don't specifically know where finance falls, whether it falls -- my understanding is sales and marketing employees are Allergan USA, but regulatory and legal compliance are Allergan Sales LLC. I'm not sure where finance

Page 63

falls. So I don't know exactly the entity that he's in.

Q. And it also says, and we're on Exhibit-3, I believe, which is one of the materials you prepared in your preparation for Number 33, Page 19, it says that you reviewed Allergan PLC's 2017 10-K.

A. Yes. Yes, I did see that.

Q. What was the purpose of reviewing Allergan PLC's 2017 10-K in preparation for this?

A. I'm trying to recall which information came from there. And I believe that was to calculate the percentages that you will see on Page 19 in here to -- I think there was a question regarding the percent of revenue that Kadian and Norco represented. And so to come up with those calculations, I had to get the sales from the 10-K.

Q. Did you calculate a

Page 64

percentage of revenue for the generic drugs prior to their transfer to Teva Pharmaceuticals?

A. No, I didn't have that -- as I mentioned, I didn't have the official sales numbers for the generic drugs, since the information I had was post the Teva divestiture -- I mean, the generics company divestiture to Teva, excuse me.

Q. That Teva and Allergan agreed to collaborate and provide each other information as necessary to respond to information -- information requests such as this in this lawsuit?

MS. WELCH: Objection to form.

THE WITNESS: I'm not aware of what -- of any official discussions regarding that. I know that, you know, I reached out to people at Allergan who would have the information that I needed to prepare.

BY MR. MELAMED:

Page 65

Q. And nobody instructed you specifically to reach out to anybody at Teva; is that correct?

A. No one instructed me to reach out to Teva. I mean, all of this was driven, really, by my request to talk to different people. And since my understanding was that Teva is a named defendant in this, I didn't ask to talk to anyone at Teva.

Q. So in the response column on Page 19 of Exhibit-3, you talk about anticipated annual revenues, actual -- forecasted revenues and actual revenues for Norco and Kadian, correct?

A. Yes. So the distinction here is -- so if you look at the second paragraph, I have the official numbers for Kadian and Norco for 2016 and 2017. Since I didn't have information before that, I did review some files that were provided by my predecessor that had some forecast files

Page 66

1 that had numbers for Kadian and Norco.
2 So I included them in this document so I
3 could speak to that.
4         Those aren't official
5 company numbers, so I can't verify 100
6 percent the accuracy. But those were in
7 the documents that I was able to review.
8     Q.   Where did you find the
9 official numbers?
10     A.   The official numbers I got
11 from discussions with Tom Riley.
12     Q.   Where would those be -- what
13 document would you look at if you wanted
14 to verify the official numbers?
15     A.   Honestly, I would just call
16 Tom Riley and ask him for those numbers.
17     Q.   You're unaware -- I don't
18 mean to put words in your mouth, if
19 you're aware, please correct me.
20         But you're unaware of
21 specific documents reflecting the
22 information in the response column to
23 Number 33 on Page 19 of Exhibit-3?
24     MS. WELCH:  Objection to

Page 67

1     form.
2         THE WITNESS:  Tom is my
3     finance colleague, so I typically
4     would call him and ask him.  I
5     can't remember whether he told
6     them to me over the phone or
7     whether he e-mailed them; that,
8     I'm not 100 percent sure.
9         But Tom is my resource for
10     financial information.  So I go to
11     him to get that.
12         I don't know whether a --
13     some of the -- since Kadian and
14     Norco are such small products, I
15     don't know if they would be
16     detailed out in a lot of the
17     specific financial information
18     that the company puts out.  So
19     that's why Tom would be the best
20     source for those.
21 BY MR. MELAMED:
22     Q.   And by talking -- when
23 you're referencing the specific financial
24 information the company puts out, you're

Page 68

1 talking about things like the 10-K?
2     A.   Things like that.
3         I don't think the breakdown
4 for Kadian and Norco would be on there,
5 but I'm not 100 percent sure.
6     Q.   Do you have any idea about
7 the percentage of revenue generated in
8 2014 from the sale of generic opioids?
9     A.   No.  As I mentioned, the
10 information that I was able to get from
11 Tom was 2016 to the present.
12     MR. MELAMED:  Let's go off
13     the record.
14     VIDEO TECHNICIAN:  Going off
15     the record.  The time is 10:04.
16         - - -
17     (Whereupon, a brief recess
18     was taken.)
19         - - -
20     VIDEO TECHNICIAN:  We're
21     going back on the record.
22     Beginning of Media File Number 2.
23     The time is 10:22.
24 BY MR. MELAMED:

Page 69

1     Q.   Does Allergan, PLC maintain
2 budgeting and forecast spreadsheets
3 similar to the one we were just looking
4 at concerning its opioid products?
5     MS. WELCH:  Objection to
6     form.
7     MR. MELAMED:  Let me
8     withdraw that and state it more
9     generally.
10 BY MR. MELAMED:
11     Q.   Does Allergan, PLC maintain
12 similar budget forecast spreadsheets on a
13 yearly basis?
14     A.   So --
15     MS. WELCH:  Objection to
16     form.
17         THE WITNESS:  Again, I'm not
18     familiar whether it's Allergan,
19     PLC, or the corporate structure,
20     but, you know, Allergan has P&L
21     statements.  It does -- we do keep
22     information.  I don't know whether
23     the information here is exactly
24     the same.  But we do have basic

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    P&L statements, yes.
2  BY MR. MELAMED:
3    Q.   Who maintains those?
4    A.   Finance.
5    Q.   Who would you talk to at
6  finance if you wanted to have a copy of
7  those?
8    A.   I would talk to Tom Riley.
9    Q.   Does Allergan Finance, LLC
10 maintain any P&L statements?
11   A.   Since I'm not clear on
12 whether on finance sits an Allergan
13 Finance, LLC or Allergan, PLC, I would
14 just say that the finance department at
15 Allergan maintains P&L statements.
16   Q.   And does it maintain P&L
17 statements for the entirety of the
18 Allergan, PLC corporate entity, do you
19 know?
20       MS. WELCH:  Objection to
21 form.
22       THE WITNESS:  As part of my
23 preparation, I talked to Tom
24 specifically about Kadian and

Page 71

1  Norco and opioids and what the
2  sales were there and what types of
3  financial information was
4  maintained for those products.
5       As far as the whole company,
6  I really couldn't speak to that.
7  BY MR. MELAMED:
8    Q.   And just to be clear, when
9  you talked to Tom, you said specifically
10 about Kadian and Norco.
11       Did you talk to Tom about
12 generic opioids?
13   A.   When I originally contacted
14 Tom, I asked for all the historical
15 information for the opioids that we have.
16 And that's when he informed me that we
17 only have information from 2016 going
18 forward.
19       So he has maintained that we
20 don't have anything prior to that date.
21   Q.   Do you know when Watson
22 Pharmaceuticals, Incorporated started
23 selling opioids in the United States?
24   A.   What I'm prepared to talk

Page 72

1  about is when Watson detailed and
2  promoted Norco, which was, my
3  understanding, in 1997.
4    Q.   Are you prepared to talk
5  about the sales, marketing, detailing of
6  any of the generic opioids that Watson
7  Pharmaceuticals, Incorporated sold?
8        MS. WELCH:  Objection to
9  form.
10       THE WITNESS:  I'm prepared
11 to talk about what -- when I
12 spoke -- I spoke with several
13 people.  I talked to Nathalie
14 Leitch.  I talked to Jennifer.
15 And there was some information
16 about some generic products that
17 the sales forces that they worked
18 with for Kadian had talked to
19 physicians about the availability
20 of those generics.
21       I don't know, you know,
22 which company they came from.  But
23 I am prepared to talk about that.
24       As far as the, you know,

Page 73

1  other generics, and I think I
2  mentioned this earlier, is that my
3  understanding is that those
4  Actavis generic products were
5  divested to Teva.  And Teva is a
6  named defendant in the case and
7  could speak better to them.
8  BY MR. MELAMED:
9    Q.   Regardless of whether Teva
10 can speak better to them, are you
11 prepared to speak about those divested
12 generic opioids in the context of sales
13 and marketing at all?
14       MS. WELCH:  Objection.
15 Asked and answered.
16       THE WITNESS:  I'm prepared
17 to talk about the -- what I was
18 able to -- the information I was
19 able to get from the people who,
20 you know, who I spoke with,
21 Jennifer and Natalie and Terri
22 Nataline and the people I've
23 spoken to.
24       I have not spoken with

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 people who left the company
2 altogether or went with -- went to
3 Teva.
4 BY MR. MELAMED:
5     Q.   You mentioned Jennifer,
6 Natalie and Terri.  You said Terri's last
7 name is Nataline.
8         And I just want to be clear,
9 Natalie is Natalie Leech, correct?
10     A.   Natalie Leech, right.
11     Q.   And Jennifer is Jennifer
12 Altier?
13     A.   Correct.
14     Q.   Did any of them work at
15 Watson Pharmaceuticals at any point in
16 time?
17     A.   I don't know for sure who --
18 my understanding is no.  I know Jennifer
19 talked about her employment history in
20 her deposition.  So I don't recall her
21 saying she worked at Watson.
22         My understanding is she was
23 a consultant for Actavis.  But I don't
24 know, you know, any time in her

Page 75

1 historical career.
2     Q.   Can you describe, generally,
3 the structure of the Watson
4 Pharmaceuticals, Incorporated department
5 that was responsible for marketing
6 opioids in the United States?
7     A.   What I can talk about is
8 the -- based on my information-gathering,
9 as far as the marketing and sales for
10 Norco, my understanding is there were
11 sales representatives who reported to
12 regional sales managers.  I believe there
13 were three regional sales managers that I
14 was able to uncover from the research
15 that I did.  And they were responsible
16 for overseeing the activities of the
17 sales representatives.  And those three
18 regional sales managers reported to an
19 executive director of sales, based on the
20 information that was available.
21         Obviously, Norco was
22 promoted a very long time ago, so there
23 wasn't a ton of information.  But I was
24 able to find documents that listed people

Page 76

1 from those roles.
2     Q.   What's the time period
3 during which the structure you just
4 described was in place?
5     A.   So my understanding is Norco
6 was detailed from 1997 to 2003.  I don't
7 know if they made changes.  You know,
8 there were documents that I reviewed that
9 had information about sales
10 representatives and had a list of names,
11 and I was able to look through those and
12 figure out who was in these specific
13 positions.
14     Q.   Do you know if those
15 documents were produced in this
16 litigation?
17     A.   I don't know for sure.
18         MS. WELCH:  I'm happy to
19 make a representation on that, but
20 I won't unless you want it.
21         MR. MELAMED:  You can make a
22 representation.
23         MS. WELCH:  Yes.  All of the
24 documents she's discussing were

Page 77

1 produced.
2 BY MR. MELAMED:
3     Q.   Do you know -- so given that
4 they were all produced, and if the answer
5 is no to this, that's fine, do you know
6 from what -- do you know what corporate
7 entity provided those documents for
8 production in this case?
9     A.   No, I don't know.  I would
10 assume it's Allergan Finance, but I don't
11 know for sure.
12     Q.   Do you know whether Allergan
13 Finance had to ask anybody else for those
14 documents?
15         MS. WELCH:  Objection to
16 form.  And, again, I'm happy to
17 make a representation, but you can
18 ask the witness if you'd like.
19         THE WITNESS:  I don't know
20 for sure how -- where every
21 document was found.
22 BY MR. MELAMED:
23     Q.   Who was the executive
24 director of sales for Norco between 1997

Page 78

1 and 2003?

2     A.   The documents I found, and I

3 don't know for that entire period, but

4 Mike Pusiteri was the name that I was

5 able to see.

6     Q.   And you're looking at

7 Exhibit-3 to provide that information?

8     A.   Yes, Exhibit-3.

9     Q.   What page?

10     A.   I'm sorry, Page 1. And it's

11 the second paragraph under Topic Number 3

12 in the response column.

13     Q.   Do you know who Mike

14 Pusiteri reported to?

15     A.   I don't recall who he

16 reported to.

17     Q.   Do you know the name of the

18 position to which he reported?

19     A.   My understanding is the

20 executive director of sales was the

21 top-level salesperson. So I'm not sure

22 who he would have reported to.

23     You know, there -- as I

24 mentioned, there weren't a ton of

Page 79

1 documents related to Norco since it was

2 so long ago.

3     Q.   Is it your understanding --

4 withdraw that.

5     Did Watson Pharmaceuticals

6 cease detailing Norco specifically in

7 2003?

8     A.   That was my understanding,

9 that 2003 was the last time of detailing.

10     Q.   Did Watson Pharmaceuticals,

11 Incorporated undertake any other

12 marketing efforts to sell Norco, other

13 than detailing?

14     A.   You know, based on

15 everything that I reviewed, there were

16 not a lot of documents that I was able to

17 see what marketing efforts were -- were

18 behind Norco.

19     I -- you know, in order to

20 provide the sales representatives with

21 information -- with materials, there had

22 to be marketing. I spoke with Dirk Pica,

23 I believe you say his last name, and he

24 didn't have a lot of information. He was

Page 80

1 in the sales force and didn't really have

2 a lot of recollection.

3     Q.   Where is Dirk Pica

4 currently? Where is he employed?

5     A.   He currently works for

6 Allergan.

7     Q.   In what role?

8     A.   He is, I believe, in a sales

9 position. But I'm not 100 percent sure,

10 maybe a managed care position.

11     Q.   Do you know what corporate

12 entity he works for?

13     A.   I believe that would be --

14 since he is in the sales, he would be

15 employed by Allergan USA.

16     Q.   Do you know whether Watson

17 Pharmaceuticals marketed generic opioids

18 at any time prior to acquiring the

19 Actavis Group in 2012?

20     MS. WELCH: Objection to

21 form.

22     THE WITNESS: I was not able

23 to uncover documents showing what

24 Watson, you know, what efforts

Page 81

1 they put behind the generic drugs.

2     As I mentioned, even for

3 Norco, the information that was

4 available was -- was limited.

5 BY MR. MELAMED:

6     Q.   What is the definition of

7 marketing you're using as you answer

8 these questions?

9     A.   Sure. That's a good

10 question. I think people use it

11 differently.

12     What I'm referring to in

13 terms of marketing is us speaking -- like

14 having a sales force or creating

15 materials that we would mail out to

16 physicians.

17     So, basically, either direct

18 communication with physicians or what we

19 would call nonpersonal promotion, which

20 is mailings and providing information.

21 Right now we do a lot of it

22 electronically, but I don't think as much

23 was done back then electronically.

24     Q.   So I'm going to give you a

Page 82

1 slightly different definition.
2     A.   Sure.
3     Q.   Which is, any activity
4 undertaken with the goal of getting
5 people or companies to buy your products.
6         Does that definition change
7 any of the answers you gave about
8 marketing Norco?
9     A.   No, that doesn't change
10 anything.
11     Q.   Does it change any answers
12 you gave about marketing generics?
13     A.   No.
14     Q.   And the questions have
15 solely been about Watson Pharmaceuticals,
16 Inc., so far, correct?
17     A.   Yes, that's my
18 understanding.
19     Q.   Just clarifying the record.
20         As we go forward and I'm
21 speaking about marketing, please keep in
22 mind that definition, any activity
23 undertaken with the goal of getting
24 people or companies to buy your products.

Page 83

1     A.   And where is that
2 definition --
3         MS. WELCH:  Object to the
4     form.
5         THE WITNESS:  And where is
6     that definition from?
7 BY MR. MELAMED:
8     Q.   It's from the Special Master
9 Cohen, who is presiding over the
10 discovery in this case.
11         MS. WELCH:  Objection to
12     form.
13         MR. MELAMED:  It wasn't a
14     question.
15         MS. WELCH:  The form of a
16     statement.
17         MR. MELAMED:  Fair enough.
18         I could have not answered
19     the question as well.
20 BY MR. MELAMED:
21     Q.   Do you know if the structure
22 of the marketing department at Watson
23 Pharmaceuticals, Incorporated changed
24 over time prior to its merger with the

Page 84

1 Actavis Group?
2     A.   Based on everything that I
3 reviewed, I was not able to find
4 information about the specific Watson
5 structure of the marketing group.
6     Q.   So you don't know?  Your
7 testimony is you don't know whether it
8 changed over time before its acquisition;
9 is that correct?
10     A.   I don't know the details of
11 that.
12     Q.   So is Mike Pusiteri the
13 individual who is in charge of the Watson
14 Pharmaceuticals, Incorporated marketing
15 department from 1997 to 2003?
16     A.   He was in charge, his title
17 was executive director of sales.  It
18 wasn't clear whether there was a separate
19 person who oversaw marketing at the time.
20 I wasn't able to find that information.
21 I would assume there was, but I was not
22 able to find it.
23     Q.   Do you know if Mike Pusiteri
24 continued in the position of executive

Page 85

1 director of sales after 2003 at Watson
2 Pharmaceuticals?
3     A.   I don't know.  I focused on
4 what his role was in terms of promoting
5 Norco.
6     Q.   Would he have been the
7 person also in charge of marketing
8 efforts concerning generic opioids by
9 Watson Pharmaceuticals between 1997 and
10 2003?
11         MS. WELCH:  Objection to
12     form.
13         THE WITNESS:  I don't know.
14     My understanding is that -- is
15     that he was the executive director
16     of sales.  And this is, you know,
17     partially my -- me interjecting my
18     thoughts on this.
19         But my thought is there
20     typically aren't a ton of what I
21     would call marketing efforts
22     behind generic drugs.  So my
23     assumption would be that there
24     wouldn't be a specific marketing

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    person over that.  But I don't
2    know for sure.
3  BY MR. MELAMED:
4       Q.   Who was in charge of
5  developing the training for the sales
6  force for Watson Pharmaceuticals,
7  Incorporated when that sales force was
8  detailing Norco?
9       A.   So based on the documents
10  that I reviewed, I'm looking now at Page
11  3 of Exhibit-3, at the bottom, the
12  response column for Number 8, Topic 8,
13  where it says, Based on Allergan
14  Finances' investigation to date -- so I
15  have a number of people that I was able
16  to uncover provided sales training to
17  Norco sales representatives.
18         There's a full -- there's a
19  list of them.  Do you want me to read
20  these names out loud?
21       Q.   Do you know when Brian
22  Russel provided training to Norco sales
23  representatives?
24       A.   I don't have the dates in

Page 87

1  front of me.  There is a document here if
2  we wanted to pull it.  I could take a
3  look and see if there was that
4  information.
5       Q.   So sitting here, you
6  wouldn't know, for any of the individuals
7  listed in the paragraph you were
8  referring to, when they provided specific
9  training; is that right?
10       A.   The exact date of a specific
11  training class or something, no, I would
12  not know.
13         However, it was between the
14  time of 1997 to 2003 when there was a
15  sales force detailing Norco.
16       Q.   Did you review the materials
17  that they used to train sales
18  representatives?
19       A.   For Norco, the documents
20  really weren't available.  Since it was
21  back in 1997, there just wasn't as much
22  over e-mail as there would be for Kadian,
23  for example, from a more recent time
24  period.

Page 88

1       Q.   So you did not review the
2  specific training materials used to
3  detail Norco?
4         MS. WELCH:  Objection to
5    form.  Misrepresents her
6    testimony.
7  BY MR. MELAMED:
8       Q.   If I'm misrepresenting
9  something, please clarify.
10       A.   I say going to say, I could
11  not find those.  I did not find -- I was
12  not able to locate those documents.
13       Q.   The next paragraph
14  concerns -- identifies, in Exhibit-3,
15  Page 4, states, The following persons --
16  sorry for those following with the Elmo,
17  it's a little difficult to get on there.
18         The following persons are
19  identified on agendas as presenters at
20  training sessions for the sales
21  representatives who promoted Kadian and
22  informed doctors about the availability
23  of certain generic opioids.
24         Do you know when those --

Page 89

1  let me withdraw that.
2         At the bottom of the
3  paragraph, it also lists a series of
4  Bates numbered documents.
5         Do you see that?
6       A.   Yes.
7       Q.   Do those Bates numbered
8  documents identify or include the
9  materials used during the training
10  sessions reflected in this paragraph?
11       A.   I don't remember if these
12  specific ones include the training
13  materials, but I did review training
14  materials regarding Kadian.  So those
15  documents were part of the review.  But I
16  don't know what these Bates numbers
17  correspond to exactly.
18       Q.   What was the company that
19  was selling Kadian at the time that these
20  individuals were providing training
21  sessions?
22         MS. WELCH:  Objection to
23    form.
24         THE WITNESS:  So my

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 understanding was that when Kadian
2 was acquired, it was acquired by
3 Actavis Inc., and then -- and that
4 was -- the detailing of Kadian
5 took place between 2009 and 2012.
6 At the very end of that,
7 Watson acquired Actavis and became
8 Actavis, Inc., is my
9 understanding.
10 And I'm looking at Exhibit-1
11 to refresh my memory of that.
12 BY MR. MELAMED:
13 Q. Do you know the name of the
14 specific company that was booking
15 revenues for the sales of Kadian before
16 Watson acquired Actavis?
17 MS. WELCH: Objection to
18 form.
19 THE WITNESS: Sorry, say
20 that again.
21 BY MR. MELAMED:
22 Q. Do you know the name of the
23 specific company that was booking
24 revenues for the sale of Kadian prior to

Page 91

1 the time Actavis was acquired by Watson
2 Pharmaceuticals?
3 A. I don't know the legal
4 entity. I understand that Alpharma was
5 marketing and selling Kadian prior to the
6 acquisition of the product by Actavis.
7 Q. And Actavis did not acquire
8 Alpharma; is that correct?
9 A. That's correct. Alpharma
10 was acquired by King, I believe. But as
11 part of that transaction, they divested
12 Kadian to Actavis.
13 Q. Was there a person in charge
14 of implementing the training that was
15 undertaken for the marketing department
16 for Watson Pharmaceuticals?
17 A. I'm sorry, say that again.
18 Q. Was there a person in charge
19 of implementing training of -- training
20 those who marketed opioids at Watson
21 Pharmaceuticals?
22 MS. WELCH: Objection to
23 form.
24 THE WITNESS: I'm not sure

Page 92

1 who was involved -- who was in
2 charge of that. What I was able
3 to find were the people who did
4 provide training. And those are
5 the people I mentioned earlier
6 that are listed on Page 3 and
7 Topic 8, in the response. Those
8 were the ones I was able to
9 identify.
10 BY MR. MELAMED:
11 Q. Are those the same
12 individuals who are responsible for
13 implementing training of the sales force
14 at Watson Pharmaceuticals?
15 MS. WELCH: Objection to
16 form.
17 THE WITNESS: I'm not sure
18 what -- what you mean by that.
19 They were -- the people that I
20 identified were the people who
21 were responsible for training
22 sales representatives on Norco.
23 BY MR. MELAMED:
24 Q. Do you know if the group

Page 93

1 responsible for selling Watson
2 Pharmaceuticals, Incorporated branded
3 opioids, such as Norco, was separate from
4 the group responsible for selling Watson
5 Pharmaceutical's generic opioids in the
6 United States?
7 A. I don't know. I'm not sure
8 exactly how they're -- how that was
9 structured.
10 The information that I was
11 able to find on Norco was pretty limited
12 and was able to identify people doing
13 sales training as well as some of the
14 sales personnel. The marketing
15 information was not as readily available.
16 Q. I may have already asked
17 this question, apologies if I did.
18 Did the structure of the
19 sales group, sales representatives, sales
20 directors, et cetera, did that structure
21 change at Watson Pharmaceuticals over
22 time between 1995 and 2012?
23 A. Yeah, I think you did ask me
24 that, maybe a different time period.

Page 94

1 But as I mentioned, I was
2 able to find documents that showed, you
3 know, who was responsible for sales at a
4 specific time point. But since the
5 documents were not -- since I couldn't
6 find as many documents on Norco, I don't
7 know the progression of structure
8 changes.
9 Q. And just to be clear, I was
10 asking not only for a broader time
11 period, but a broader set of drugs, like,
12 for all drugs.
13 Do you have information
14 about the organizational structure of the
15 sales force and supervisors at Watson
16 Pharmaceuticals for generic opioids?
17 MS. WELCH: Objection to
18 form.
19 THE WITNESS: The
20 information that I was able to
21 uncover regarding Watson and --
22 was mainly related to Norco and
23 was specifically what I had
24 mentioned earlier.

Page 95

1 BY MR. MELAMED:
2 Q. And specifically being what
3 page and column are you --
4 A. Topic 8, on Page 3, the
5 response column, first paragraph.
6 Q. And that's in Exhibit-3,
7 correct?
8 A. That is in Exhibit-3,
9 correct.
10 Q. So Actavis acquired Kadian
11 from Alpharma.
12 You testified to that
13 earlier, right?
14 A. Correct.
15 Q. What -- do you know the
16 corporate name of Actavis at that point
17 in time?
18 A. My understanding was that it
19 was Actavis Inc., with no comma in
20 between Actavis and Inc.
21 Q. Do you know the name of the
22 company at Actavis Inc. -- withdraw that.
23 Can you describe generally
24 the structure of the department at

Page 96

1 Actavis Inc. that was responsible for
2 marketing opioids in the United States?
3 A. So I'm going to refer to my
4 notes, so Exhibit-3. And this is Topic
5 Number 3. And I'll go to the response
6 column.
7 If you look at the very
8 first part here, so I'm on Page -- the
9 first page.
10 I'm sorry, did you ask about
11 the marketing department for Kadian?
12 What did you ask specifically about sales
13 and marketing?
14 Q. The structure of the
15 department that was responsible for
16 marketing opioids generally in the United
17 States.
18 A. Okay. So to start off with
19 Kadian, it consisted of Jennifer Altier
20 and Lisa Miller. And they were both
21 responsible for developing marketing
22 materials for Kadian. They reported to
23 Nathalie Leitch who reported to Terry
24 Fullem.

Page 97

1 Q. What was Terry Fullem's role
2 at the company?
3 A. I don't remember. I think
4 Jennifer may have talked about it in her
5 deposition, but I don't recall her title.
6 Q. Do you know who Ms. Fullem
7 reported to, if anyone?
8 A. No, I'm not sure.
9 And then in terms of generic
10 opioids, I'm going down to the third
11 paragraph on this page now, Page 1, Topic
12 3, in the response column.
13 There are product managers,
14 our director of marketing and then a vice
15 president of sales and marketing. And
16 the people's names are listed there, if
17 you'd like me to read them.
18 Q. Product managers, you listed
19 David Myers and Rochelle Galant.
20 Were there any others?
21 A. Those are the two I was able
22 to find in the documents. I can't say
23 for certain there were no others. That
24 was my understanding.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    And then Jinping McCormick,
2  who I believe Jennifer referenced in her
3  deposition, was the director of
4  marketing.  And then someone named
5  Michael Perfetto was the vice president
6  of sales and marketing.
7    So that's my understanding
8  of the generic opioids marketing
9  department.
10    Q.   And is it your understanding
11  that Mr. Myers and Ms. Galant reported to
12  Ms. McCormick who reported to -- who
13  reported to Mr. Perfetto?
14    A.   That's my understanding.
15    Q.   And who did Mr. Perfetto
16  report to?
17    A.   I'm not sure.  It would have
18  been someone whose responsibilities were
19  broader than sales and marketing.
20    Q.   Were there any changes to
21  this organizational structure that you've
22  just described from Mr. Myers and Ms.
23  Galant up through Mr. Perfetto during any
24  point that Actavis, prior to its merger

Page 99

1  with Watson, was selling opioids?
2    A.   I'm sorry, was there any
3  changes to who were in these roles or the
4  structure of this department?
5    MS. WELCH:  And objection to
6  form.
7    THE WITNESS:  Can you repeat
8  the full question?  I'm not sure I
9  followed it.
10  BY MR. MELAMED:
11    Q.   I'll break it down.
12    Were Mr. Myers and Ms.
13  Galant in those positions the entirety of
14  the time that Actavis was selling
15  opioids?
16    A.   I'm not sure.  I can't say
17  for certain.
18    Q.   Was Ms. McCormick in that
19  position during the entirety of the time
20  that Actavis was selling opioids?
21    A.   I can't say for certain how
22  long --
23    Q.   And was Mr. Perfetto in that
24  position the entirety of the time when

Page 100

1  Actavis was selling opioids?
2    A.   Based on the documents that
3  I reviewed, these were the people who
4  were in the positions.  I don't know the
5  exact start and end dates of their
6  tenure.
7    Q.   So in 2012, Watson
8  Pharmaceuticals acquired Actavis, right?
9    A.   In 2012, Watson acquired
10  Actavis, yes.
11    Q.   And then shortly thereafter,
12  it changed its name to Actavis,
13  Incorporated, right?
14    A.   That's my understanding,
15  yes.
16    Q.   Were there -- can you -- let
17  me withdraw that.
18    Can you describe generally
19  the structure of the department that was
20  in charge -- that was responsible for
21  marketing opioids in the United States
22  for Actavis, Incorporated?
23    MS. WELCH:  Objection to
24  form.

Page 101

1    THE WITNESS:  How is that
2  question different than what we
3  just talked about?  I'm not sure
4  I'm following.
5  BY MR. MELAMED:
6    Q.   Well, we were talking about
7  Actavis prior to its acquisition by
8  Watson Pharmaceuticals; was that your
9  understanding of the last line of
10  questions?
11    A.   In terms of I know -- it was
12  really my understanding I was talking
13  about Actavis and the entire time that
14  Kadian was detailed.
15    And then for the generics, I
16  don't -- I don't have the time period in
17  terms of when they -- whether this was
18  before or after that acquisition.
19    Q.   So --
20    MS. WELCH:  It may be
21  helpful, given the no comma and
22  comma, just to put a time period.
23    My sense is that may be
24  driving a little bit of the --

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    MR. MELAMED:  I don't think
2 that's driving much of the
3 confusion on my end.  It may be
4 for other people, but I
5 understand --
6    MS. WELCH:  It's some of my
7 objection on form, just so you
8 know.
9 BY MR. MELAMED:
10    Q.   Well, did the entity -- if
11 you don't know the answer to this
12 question, fair enough, you are not
13 designated for it.
14    But did the entity known as
15 Actavis Incorporated, without a comma,
16 continue to exist once Watson
17 Pharmaceuticals acquired Actavis, no
18 comma, Incorporated?
19    MS. WELCH:  Objection.
20 Outside of the scope of the topics
21 she's designated to speak on.
22    THE WITNESS:  I don't -- I
23 don't know.
24 BY MR. MELAMED:

Page 103

1    Q.   So is it your understanding
2 that the structure of the department
3 responsible for marketing opioids stayed
4 the same from when Kadian was first
5 detailed through the time when the
6 detailing of Kadian ceased?
7    MS. WELCH:  Objection to the
8 form.
9    THE WITNESS:  So my
10 understanding, in talking to
11 Jennifer, was that she -- you
12 know, she was brought on, I
13 believe it was in 2009, for the
14 marketing of Kadian.  And then
15 once the marketing of Kadian
16 ceased toward the end of 2012, I
17 believe she was no longer with the
18 company, because she was a
19 consultant and not employed by the
20 company.  So there were changes,
21 such as that.
22 BY MR. MELAMED:
23    Q.   Who was in charge of the
24 marketing group at Actavis, Inc., once

Page 104

1 the company -- the two companies merged
2 and took that name?
3    A.   My understanding was that
4 Nathalie Leitch was in charge of the --
5 you know, she was the one in charge of
6 marketing for Kadian, to the extent there
7 was any.
8    And then in terms of the
9 marketing for the generics was Jinping
10 McCormick.
11    Q.   Do you know the name of the
12 corporate entity that Ms. McCormick
13 worked for in 2013?
14    A.   In 2013, I would assume that
15 would be Actavis, Inc. was the entity.
16 But I don't know the corporate structure,
17 again.
18    Q.   Same question for Nathalie
19 Leitch?  I'm sorry, Nathalie Leitch, I
20 think is how you pronounce it.
21    A.   And same answer.  I would
22 assume it would be the -- it would be
23 Actavis, Inc.  But I'm not familiar
24 enough with the corporate structure to

Page 105

1 know if there were any subsidies or who
2 they would have remained employed by.
3    Q.   You say that marketing for
4 generics -- that Ms. McCormick was in
5 charge of marketing for generics at that
6 time; that's your testimony, right?
7    A.   That's my understanding,
8 yes.
9    Q.   Is it your understanding
10 that in that role she oversaw the
11 marketing of the generic drugs that had
12 formerly been owned by Watson
13 Pharmaceuticals and were brought into the
14 combined company?
15    MS. WELCH:  Objection to
16 form.
17    THE WITNESS:  My
18 understanding is that she was the
19 director of marketing for generic
20 opioids and -- but I don't know
21 whether -- how the Watson
22 Pharmaceuticals' products would
23 have been folded into, you know,
24 the legacy Actavis products.

Page 106

BY MR. MELAMED:

Q. So your testimony is that you have an understanding of how the legacy Actavis products were being marketed once the companies merged in 2012 and going forward in 2013; is that right?

A. My understanding was that the people that I named were in charge of the marketing department for generic opioids at legacy Actavis, yes.

Q. Is it also accurate to say that you're not sure who was in charge of marketing the generic opioids that came into the combined company from Watson Pharmaceuticals?

A. It's correct to say I don't know how those were folded in and in terms of responsibilities.

I do know that, you know, these people that I named earlier were in charge of generic opioids. I don't know if they -- you know, specifically which products.

Page 107

Q. Who was in charge of the sales force responsible for selling branded opioids in 2013, once the combined companies had taken on the name Actavis, Inc.?

A. My understanding is that the branded opioids were no longer promoted after 2012.

Q. So using the definition of marketing that we discussed before, meaning any efforts to sell -- undertaken to sell the branded opioids in this case, who was in charge of the department that oversaw efforts to sell branded opioids at Actavis, Inc. in 2013?

A. My understanding is that would have been Nathalie Leitch. But, yeah, my -- my understanding was that the -- most of the promotional efforts for Kadian and, therefore, branded opioids, most of the promotion stopped toward the end of 2012.

Q. I just want to note, you're prefacing many of your answers with "it's

Page 108

my understanding" --

A. Yes.

Q. -- which is fine.

I just want to confirm that you understand you're testifying on behalf of the corporation.

A. Yes.

Q. So it's the corporation's understanding.

Is that -- are you testifying that way because you're not sure and you want to make it clear that you're not sure about your answers when you're saying "my understanding was that"?

A. I mean, my understanding based on the conversations that I've had with everyone, I wasn't there, I think, is the distinction that I'm trying to make.

Q. Just to be clear, and I think you do understand this, you understand this testimony binds the company, correct?

Page 109

A. Binds this company how?

Q. It's as if the company itself is testifying to these facts.

A. Yes, I understand.

Q. Can you describe the structure of the group at Actavis, Inc. in 2013 that was responsible for selling opioids in the United States?

A. 2013? Are you -- you're speaking about branded opioids or generic opioids?

Q. Were the structures for branded opioids and generic opioids different?

A. My understanding is that they were. However, my understanding is that the branded opioids promotion ended mostly in 2012, early 2013. My understanding is Nathalie Leitch was responsible for that. And then the people that I had mentioned earlier were responsible for the generic opioid marketing.

I will say, I don't recall

Page 110

1 the exact time frame of each of these
2 people that I named earlier worked for
3 that. I don't -- I don't remember.
4     Q.   I just want to clarify, I
5 was trying to ask about the actual sales.
6     A.   Oh, okay.
7     Q.   Who was -- who was the sales
8 force for opioids at Actavis, Inc. in
9 2013? And it may be that your answer is
10 the same, it may not --
11     A.   So sales --
12     Q.   -- I just want to be clear.
13     A.   I'm sorry. So sales force,
14 not marketing.
15     So the sales force, my
16 understanding was that, you know, the
17 sales force that was selling Kadian was
18 employed by inVentiv and they no longer
19 were employed by or were contracted by
20 Actavis after the end of 2012.
21     As far as the generic
22 promotion, my understanding is there was
23 not a sales force that was responsible
24 for selling the generic products.

Page 111

1     Q.   Actavis Incorporated
2 continued to sell branded Kadian in 2013,
3 correct?
4     A.   Continued to sell, like make
5 it available and book sales, yes.
6     Q.   Who was the sales force
7 responsible for those sales in 2013?
8     A.   So the -- after the
9 inVentiv sales force was no longer being
10 used, there was a telesales force that
11 was still employed to sell Kadian.
12     I don't recall the exact
13 time. I'd have to look through the exact
14 timing of when they ceased their
15 promotion. But that continued into 2013.
16     But there was no other sales
17 force selling Kadian after the inVentiv
18 sales force.
19     Q.   Who at -- let me withdraw
20 that.
21     Who was the primary contact
22 at Actavis prior to the -- its
23 acquisition by Watson Pharmaceuticals for
24 inVentiv? Who managed the relationship

Page 112

1 between inVentiv and Actavis concerning
2 the sales of Kadian?
3     A.   I'm taking a look to see
4 what notes I have on this. Just give me
5 a minute.
6     I'm just looking for the
7 names of the people who were the head of
8 sales at inVentiv.
9     So I was looking for the
10 business directors. I can give you their
11 names. Nathalie Leitch was the one who,
12 my understanding, was in charge of the
13 relationship between them. But I'm just
14 not able to find right now who the names
15 of the two sales directors were that she
16 worked with.
17     Q.   If you find it at some point
18 later today, please let me know.
19     A.   Sure.
20     Q.   Who provided the training
21 materials for inVentiv sales
22 representatives who were selling Kadian?
23     A.   So a group -- there's a
24 number of people who put together the

Page 113

1 training. So Nathalie Leitch worked with
2 the sales managers.
3     But I have, if you turn to
4 Page 4, Topic 8, in Exhibit-3, and
5 there's a whole list of people who
6 provided sales training to the inVentiv
7 sales force.
8     Q.   What it says here is the
9 individuals are identified on agendas as
10 presenters at training sessions.
11     A.   Uh-huh.
12     Q.   Do you mean to say that each
13 of them trained the sales force
14 concerning the sales of Kadian?
15     A.   They were on the agenda and
16 they trained different pieces of it. So
17 it wasn't that, you know, this person
18 went and trained some of the sales force,
19 it was that they provided different
20 information in the training.
21     Q.   Why did Actavis hire an
22 outside sales force?
23     A.   So it's pretty common
24 practice, if you have a company that

Page 114

1 doesn't have a sales force and you
2 acquire a product to promote, then to go
3 to a contract sales force who would be
4 able to get that up and running and kind
5 of know all the ins and outs of hiring a
6 sales force.
7      Q.   If we were to go through the
8 names that are listed in the response
9 column on Page 4 as the persons
10 identified on agendas as presenters at
11 training sessions for the sales reps who
12 promoted Kadian, do you know what each
13 individual's responsibility during those
14 training sessions was, what topics they
15 were responsible for?
16      A.   Some of them, based on their
17 title.  But the agendas, I believe, are
18 in these Bates numbers.
19           So if we brought them up, we
20 could -- I could give more specifics on
21 what they were responsible for
22 presenting.
23           I do know that Jennifer
24 presented marketing updates, in my

Page 115

1 conversations with her.
2      Q.   You mentioned certain of the
3 individuals you could tell what they
4 presented on based on their titles?
5      A.   Uh-huh.
6      Q.   Can you identify which of
7 those individuals and then the topic?
8      A.   Well, Jennifer Altier and
9 Nathalie Leitch would have presented on
10 marketing.  I know that.
11           And then there was a managed
12 care -- I don't know how to say the name,
13 Ara Aprahamian, that would have presented
14 on managed care.
15           But the others, in order to
16 get the specifics, I would have to pull
17 up those agendas.
18      Q.   Do you know if the employees
19 listed in the same paragraph we're
20 discussing as working for inVentiv
21 created their own materials for these
22 presentations?
23      A.   No.  The training materials
24 would have gone through the review

Page 116

1 process at Actavis.  So they would have
2 been created and gone through that review
3 process.
4      Q.   What is the review
5 process -- at what time are you
6 describing the review process?
7      A.   That would have been during
8 the time period that Kadian was promoted
9 by a sales force, between May of 2009 and
10 December of 2012.
11      Q.   What was that process?
12      A.   Sure.  Let me bring that up.
13 I have information on that in Exhibit-3
14 as well.  I believe it's Topic 40.
15      Q.   What page number are you on?
16      A.   Page 24.
17           So I reviewed documents
18 related to the PRC process.  I believe
19 Jennifer also testified regarding this
20 during her deposition.
21           But the basic process is
22 outlined here, and I can take you through
23 it.
24           The marketing department

Page 117

1 will develop promotional pieces for the
2 sales force or also training for internal
3 use.  And they bring them to this, what
4 we call a PRC, or promotional review
5 committee, which people from legal,
6 regulatory and medical sit on the PRC.
7 And they review the documents for
8 compliance with regulations and the
9 policies and determine whether the piece
10 is approved or needs some changes.  And
11 they will request, then, that changes are
12 made.  And then once those changes are
13 incorporated, they would determine that
14 the piece is approved with no further
15 revisions.
16           And then at that time, the
17 marketing department can -- authorizes
18 the use -- the piece for use and
19 distribution.
20           And then at the end of the
21 process, the regulatory affairs
22 department submits it to -- at the time
23 it was DDMAC, now it's OPDP.
24      Q.   Are you familiar with

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  leave-behinds?
2      A.   Yes.
3      Q.   Leave-behinds are materials
4  left behind at doctors' offices, correct?
5      A.   Yes, they are materials that
6  are left behind, yes.
7      Q.   Did leave-behinds go through
8  the same PRC review process?
9      A.   Yes.
10     Q.   Did anyone -- let me
11  withdraw that.
12          Are you familiar with
13  promotions that were direct to
14  pharmacies?
15          MS. WELCH:  Objection to
16      form.
17          THE WITNESS:  The materials
18      that -- you mean in general, or do
19      you mean specific to Kadian and
20      Norco?
21  BY MR. MELAMED:
22     Q.   Are you familiar with
23  materials to -- that were created to
24  promote Kadian and were intended to be

Page 119

1  shared with pharmacies?
2      A.   I'm aware there were
3  materials that were created to be sent to
4  be given to pharmacists, yes.
5      Q.   Did those also go through
6  the PRC?
7      A.   Yes, those would also go
8  through the PRC.
9      Q.   What about similar materials
10  for Norco; are you familiar with any
11  similar materials for Norco?
12     A.   So for Norco I wasn't able
13  to uncover a full description of a PRC
14  process.  So I don't know the details of
15  that.
16     Q.   So at the time Norco was
17  being detailed, do you have any knowledge
18  about how marketing materials were
19  developed?
20     A.   Really, all the documents I
21  reviewed, I was not able to find details
22  on that.  It was really more for Kadian,
23  because it was a more recent time period.
24     Q.   Were you able to review any

Page 120

1  of the marketing materials themselves
2  used to detail Norco?
3      A.   I don't recall seeing
4  materials for promotion of Norco.
5      Q.   Are you familiar with
6  materials created for pharmacies on
7  behalf of the generic opioids that were
8  sold by Actavis?
9          MS. WELCH:  Objection to
10      form.
11          THE WITNESS:  So the
12      materials that I did see related
13      to generics were the materials
14      that were used by the inVentiv
15      sales force to announce the
16      availability of generic, I believe
17      it was oxymorphone, and I'd have
18      to double check that.
19          And they -- so I did see
20      those materials.  And they would
21      announce the availability of the
22      generics.  And those were for
23      pharmacists as well as physicians.
24  BY MR. MELAMED:

Page 121

1      Q.   Are you aware of any
2  promotional materials created for generic
3  opioids during the time that Watson
4  Pharmaceuticals existed and was selling
5  generic opioids?
6      A.   I do not have those
7  materials.  I did not see those
8  materials.
9          My understanding is, you
10  know, all the generic businesses, as I
11  mentioned earlier, went to -- went to
12  Teva.  And so the legacy documents, I
13  would assume, would be with them.
14     Q.   During what time period did
15  inVentiv provide sales reps to Actavis
16  and any of the Actavis entities that we
17  talked about?
18          MS. WELCH:  Objection to
19      form.
20  BY MR. MELAMED:
21     Q.   Let's start, did inVentiv --
22  I'll withdraw that.
23          Did inVentiv ever provide
24  sales representatives to Watson

Page 122

1 Pharmaceuticals prior to Watson's
2 acquisition of Actavis?
3     A.   To Watson -- I'm sorry,
4 you're talking about Watson?
5         So I don't know whether
6 inVentiv ever had a contract with Watson.
7 The specific inVentiv sales force that
8 detailed Kadian was not -- did not detail
9 Norco.
10     Q.   During what time period did
11 inVentiv detail Kadian?
12     A.   That was middle of 2009
13 through, I believe, it was the end of
14 2012.  The contract that I have here,
15 Exhibit-5, is dated May of 2009.
16     Q.   So are you aware that in
17 2013 a company called Actavis PLC was
18 incorporated to facilitate the merger of
19 Actavis, Inc. and Warner Chilcott, PLC?
20         MS. WELCH:  Objection.
21     Outside of the scope of topics
22     that the witness has been
23     designated on.
24         THE WITNESS:  That's my

Page 123

1     understanding, is that's outside
2     the scope.
3 BY MR. MELAMED:
4     Q.   My question isn't whether
5 it's outside the scope or not.
6         It's whether you are aware
7 of that?
8         MS. WELCH:  Same objection.
9         THE WITNESS:  No, I'm not
10     aware.  I mean, I'm aware that
11     Warner Chilcott was acquired, but
12     I don't know the details of the
13     corporate structure.
14 BY MR. MELAMED:
15     Q.   Once Warner Chilcott was
16 acquired, were there any changes to the
17 marketing department organization you
18 described before that existed at Actavis,
19 Inc.?
20     A.   I don't know.
21     Q.   Do you know if there were
22 any changes to the marketing department
23 that you described before at Actavis,
24 Inc., once Warner Chilcott was acquired?

Page 124

1     A.   I don't know.
2     Q.   Once -- you're aware that in
3 2015, the parent company became a company
4 called Allergan PLC?  Is that -- are you
5 aware of that?
6     A.   Yes.
7     Q.   At that point, do you
8 know -- are you aware of the structure of
9 the marketing department in 2015 at
10 Allergan PLC?
11     A.   In 2015, I was employed by
12 Allergan, like I said, probably not PLC,
13 but Allergan.  And there were several
14 different pieces of the marketing group.
15 There was a group that was legacy
16 Allergan, there was also a group that
17 was -- we call legacy Actavis.
18         So, yes, there were changes
19 made to personnel and structure at that
20 time.
21     Q.   Was there also a legacy
22 Watson group?
23     A.   There were definitely people
24 who had come from Watson.  Since the

Page 125

1 merger at that time happened between
2 Actavis and Allergan, there was -- the
3 way that I think of it is an Allergan
4 group and an Actavis Group because that
5 was the current -- the current situation.
6     Q.   And Watson -- legacy Watson
7 was, thus, inside the Actavis Group; is
8 that right?
9         MS. WELCH:  Objection to
10     form.
11         THE WITNESS:  The -- in
12     2015, Allergan and Actavis merged.
13     And I believe it was Actavis
14     purchased Allergan.  But as far
15     as, you know, the structure of
16     individual Actavis, I'm not
17     familiar enough with the corporate
18     structure to speak on that.
19 BY MR. MELAMED:
20     Q.   What about for the marketing
21 group?  Are you familiar enough with the
22 marketing group to speak about that
23 structure?
24     A.   The marketing group, I mean,

Page 126

1  what do you -- I mean, structure is a
2  very broad term.
3      Q.   You were part of the
4  marketing group --
5      A.   Yes.
6      Q.   -- at Allergan PLC, correct?
7      A.   Correct.
8      Q.   And you're not sure whether
9  you worked for Allergan PLC, but at the
10 time the corporate entity, the top
11 corporate entity was called Allergan PLC,
12 you were part of the marketing group,
13 correct?
14     A.   I was part of the marketing
15 group at Allergan, yes.
16     Q.   Were there multiple
17 marketing groups at Allergan PLC or a
18 single?
19         MS. WELCH:  Objection to
20     form.
21 BY MR. MELAMED:
22     Q.   I'll rephrase that.
23         Were there multiple
24 marketing groups at Allergan PLC?

Page 127

1          MS. WELCH:  Objection to
2      form.
3          THE WITNESS:  There are --
4      there are different products that
5      people market.  So there's --
6      there's what you would call --
7      there would be marketing for the
8      Alzheimer's products, there would
9      be marketing for Botox.
10         So there would be different
11     people in charge of different
12     pieces of the marketing.
13 BY MR. MELAMED:
14     Q.   Did all the different people
15 in charge of different pieces of
16 marketing, as you've just described,
17 report up through a single structure?
18     A.   In 2015 -- there have been
19 changes since then, and I don't recall
20 whether there was one person in charge.
21 I mean, I guess, everyone ultimately
22 reports up to the CEO.
23         But in terms of were there
24 multiple heads of marketing at that time,

Page 128

1  I'm not sure.
2      Q.   What actions -- I'm going to
3  state a time frame first.
4          Prior to Teva's acquisition
5  of the generic portfolio of drugs, what
6  actions did Allergan PLC undertake to
7  sell those drugs?
8          MS. WELCH:  Objection to
9      form.
10         THE WITNESS:  The -- I'm
11     sorry, the marketing of the
12     generic drugs at Allergan?
13 BY MR. MELAMED:
14     Q.   Any actions that Allergan
15 PLC undertook, prior to the sale of the
16 generic opioid portfolio to Teva, in
17 order to get their drugs to market, what
18 actions was it taking?
19         MS. WELCH:  Objection to
20     form.  Specifically with respect
21     to PLC, she has said she's not a
22     designee on corporate structure.
23         THE WITNESS:  So as far as
24     the marketing for the generic

Page 129

1      drugs, you're asking about?
2  BY MR. MELAMED:
3      Q.   So there were generic drugs
4  in --
5      A.   Yes.
6      Q.   -- under the umbrella of
7  Allergan PLC, correct?
8          MS. WELCH:  Objection to
9      form.  She's not a designee on
10     corporate structure.
11 BY MR. MELAMED:
12     Q.   Do you know whether there
13 were generic drugs under the umbrella of
14 the corporation Allergan PLC in 2015?
15         MS. WELCH:  Objection to
16     form.
17         THE WITNESS:  I don't know
18     the corporate structure.  I don't
19     know what fell under Allergan PLC.
20 BY MR. MELAMED:
21     Q.   You reviewed forms 10-K in
22 preparation for today, correct?
23     A.   There was one, yes.  There
24 was -- I believe it was 2017.

Page 130

1　　　　The 2017 10-K. I would say,
2　though, I didn't review it in its
3　entirety. I reviewed it in order to
4　respond to the questions regarding the
5　percent of Allergan Finances' revenue
6　that those sales accounted for, for
7　Kadian and Norco.
8　　　Q.　Does the 10-K -- I'm sorry,
9　let me withdraw that.
10　　　　Who is the 10-K filed by,
11　the 2017 10-K filed by?
12　　　MS. WELCH: Objection.
13　　　She's not a corporate designee on
14　　　that topic and she has stated
15　　　she's not a corporate --
16　　　MR. MELAMED: I'm just
17　　　asking -- she just testified that
18　　　she reviewed the 2017 10-K to
19　　　determine what percentage of
20　　　Allergan Finance LLC's sales were
21　　　derived from the sale of opioids.
22　BY MR. MELAMED:
23　　　Q.　Is that correct?
24　　　MS. WELCH: Same objections.

Page 131

1　　　　THE WITNESS: As I
2　　　mentioned, I looked at the
3　　　specific sales for the company to
4　　　be able to calculate those
5　　　percentages.
6　　　　I don't have all the details
7　　　on how the 10-K was filed.
8　BY MR. MELAMED:
9　　　Q.　And you're on Page?
10　　　A.　I'm sorry, Page 19.
11　　　Q.　19 of Exhibit-3?
12　　　A.　Yes, Topic 33. And in the
13　response column, I'm looking at the last
14　paragraph.
15　　　　And as you see here -- so
16　what I calculated here was the revenue of
17　Kadian and Norco as a percent of revenue
18　for Allergan PLC. And that was the .33
19　percent and .28 and .2 that you see here.
20　　　Q.　Did you undertake a similar
21　exercise concerning all of the opioids
22　sold by Allergan PLC for the year --
23　fiscal year 2017?
24　　　MS. WELCH: Objection to

Page 132

1　form.
2　　　THE WITNESS: This was --
3　BY MR. MELAMED:
4　　　Q.　This was 2017?
5　　　A.　I specifically looked at
6　Kadian and Norco for 2017.
7　　　Q.　Did you, in any of your --
8　in preparation to answer this question,
9　did you consider the sales of generic
10　opioids at all?
11　　　MS. WELCH: Asked and
12　　　answered.
13　　　THE WITNESS: In -- as I
14　　　mentioned earlier, the databases
15　　　with the information on the
16　　　generics had gone over to Teva,
17　　　and we did not have access to
18　　　those in the current, 2016 to the
19　　　present, information that we keep
20　　　on file.
21　BY MR. MELAMED:
22　　　Q.　Who did you ask for that
23　information?
24　　　A.　Tom Riley.

Page 133

1　　　Q.　Did you ask anybody else for
2　that information?
3　　　A.　Tom Riley is my finance
4　contact.
5　　　Q.　Did you ask anybody else
6　aside from Tom Riley?
7　　　A.　No. I talked to Tom Riley.
8　He's my finance contact. He's the person
9　I would go to for this information. And
10　if he says that it doesn't exist, then
11　that's the -- that's the information that
12　I received.
13　　　Q.　When you say he's your
14　"finance contact," are you speaking on
15　behalf of yourself or the company?
16　　　A.　Myself. So he's the person
17　that I would go to for finance questions.
18　　　Q.　In 2015, the consolidated
19　company rolling up to Allergan PLC sold
20　generic Fentanyl patches.
21　　　　Are you aware of that?
22　　　A.　In 2015?
23　　　Q.　Yes.
24　　　A.　What -- the company sold --

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  I'm sorry, say that again.
2      Q.   It wasn't -- the question
3  wasn't what company.
4          I'm asking whether you're
5  aware that the consolidated entities that
6  rolled up to Allergan PLC sold Fentanyl
7  patches.
8          MS. WELCH:  Objection to
9      form.
10 BY MR. MELAMED:
11     Q.   Are you aware of that?
12         MS. WELCH:  Objection to
13     form.
14         THE WITNESS:  I am not clear
15     on which -- what company sold
16     that.
17 BY MR. MELAMED:
18     Q.   That's not my question.
19         My question is just whether
20 you're aware that a company within the
21 corporate umbrella of Allergan PLC sold
22 Fentanyl patches in 2015?
23         MS. WELCH:  Objection to
24     form.

Page 135

1          THE WITNESS:  I'm not aware.
2  BY MR. MELAMED:
3      Q.   Or are you aware that some
4  corporate entity reporting up through
5  Allergan PLC sold generic hydrocodone --
6          MS. WELCH:  Objection.
7  BY MR. MELAMED:
8      Q.   -- in 2015?
9          MS. WELCH:  Objection to
10     form.
11         THE WITNESS:  I'm not sure I
12     understand the question.
13         It's -- I thought we had --
14     my understanding is that the
15     generic businesses had been sold
16     to Teva and legacy was --
17 BY MR. MELAMED:
18     Q.   When were they sold to Teva?
19     A.   I don't recall the date.  I
20 don't have it in front of me.
21     Q.   Are you aware that prior to
22 their sale to Teva, some corporate entity
23 rolling up through and reporting through
24 Allergan PLC sold hydrocodone?

Page 136

1          MS. WELCH:  Objection.  And
2  questions about what rolled up
3  through PLC is not something this
4  witness has been designated to
5  speak on.
6          If you want to ask
7  questions --
8          MR. MELAMED:  I asked the
9  question.
10         MS. WELCH:  -- relating to
11 the topics.  But you're baking
12 in --
13         MR. MELAMED:  There's no
14 bake in.
15     You can object.
16         MS. WELCH:  You are --
17         MR. MELAMED:  You can object
18 in the record --
19         MS. WELCH:  You are baking
20 in --
21         MR. MELAMED:  -- to the
22 court.  You've objected.
23 BY MR. MELAMED:
24     Q.   Please answer the question.

Page 137

1          MS. WELCH:  She is not
2  designated to speak on those
3  topics.
4          MR. MELAMED:  That's fair
5  enough.  She can answer that.
6          She can answer that she
7  doesn't know.  She can answer she
8  does know.  She can answer the
9  question is unclear, that's her
10 prerogative.
11         THE WITNESS:  Well, I can --
12         MR. MELAMED:  You can raise
13 the objection.  And then you can
14 raise it with the court if and
15 when necessary.
16         MS. WELCH:  Objection.
17 She's not designated to speak on
18 the topic.
19         THE WITNESS:  I'm not sure I
20 understand the question, and so
21 I'm just going to say I don't
22 know.
23 BY MR. MELAMED:
24     Q.   Well, I want to make sure

Page 138

1  you understand the question.  She can
2  object.  And then I want to get your
3  answer.  And if the answer is, I don't
4  understand, at that point I'll try to
5  rephrase it.
6              Are you aware -- let me
7  phrase it this way:  Are you aware that
8  Allergan PLC reported revenues associated
9  with the sales of hydrocodone in 2015?
10      A.   I'm not aware.
11             MS. WELCH:  Objection, to
12      the extent she's not been
13      designated on this topic.
14  BY MR. MELAMED:
15      Q.   You're not aware; is that
16  correct?
17      A.   I'm not aware.
18             MR. MELAMED:  I'm not trying
19      to rephrase that to get around
20      your objection.  I understand your
21      objection.
22  BY MR. MELAMED:
23      Q.   Are you aware of any generic
24  opioid for which Allergan PLC booked

Page 139

1  revenue in 2015?
2              MS. WELCH:  Objection.  She
3      is not designated on that topic.
4              THE WITNESS:  Same answer;
5      I'm not aware.
6  BY MR. MELAMED:
7      Q.   Are you aware of any generic
8  opioid for which Actavis PLC booked
9  revenue?
10             MS. WELCH:  Objection to the
11      extent you are asking the
12      corporate intricacies for which
13      she is not the designated topic.
14             THE WITNESS:  So can you
15      repeat that question?
16  BY MR. MELAMED:
17      Q.   Sure.
18             Are you aware whether
19  Actavis PLC reported revenues based on
20  the sale of any generic opioids?
21             MS. WELCH:  Same objection.
22  BY MR. MELAMED:
23      Q.   Actavis PLC existed from
24  some point in 2013 until mid 2015.

Page 140

1              MR. MELAMED:  Just as an
2      assistance, I'm not trying to
3      testify on her behalf.
4              THE WITNESS:  So your
5      question is, am I aware of any
6      generic sales of Actavis from 2013
7      on?  Is that the question?
8  BY MR. MELAMED:
9      Q.   I'm just stating that, and
10  asking if you are aware of it or not,
11  that there were revenues booked on behalf
12  of a corporate entity called Actavis PLC
13  based on the sales of generic opioids.
14             MS. WELCH:  Same objections.
15  BY MR. MELAMED:
16      Q.   Are you aware of that?
17      A.   I'm confused by the
18  corporate structure.  So I'm not sure
19  that I can answer that.
20      Q.   Are you -- did Allergan
21  Finance LLC book revenues based on the
22  sale of generic opioids in 2013?
23             MS. WELCH:  Same objection.
24             THE WITNESS:  I don't know.

Page 141

1  BY MR. MELAMED:
2      Q.   Who implements training now
3  for the marketing department?
4              MS. WELCH:  Objection to
5      form.
6              THE WITNESS:  So who -- when
7      you say "implements training," who
8      is responsible for --
9  BY MR. MELAMED:
10      Q.   Who is responsible for
11  designing --
12      A.   -- training the sales force?
13      Q.   -- the training, training?
14      A.   So, I mean, I can answer for
15  my current marketing group.  I work in
16  what's called the general medicine
17  marketing group, and there is a person
18  who runs training for general medicine.
19             I can't speak for who the
20  people are who might do training for
21  Botox or specialty, things that are
22  outside of -- so the person who runs the
23  training group right now is a woman named
24  Karen Conneely.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    Q.   And does she run training
2  related to opioid products?
3    A.   No.  There is no training
4  related to the sales force.  We're
5  talking specifically sales force
6  training.  There is no sales force that
7  sells opioid.
8    Q.   How are -- how does the
9  company -- is your understanding -- let
10  me withdraw that and restate it.
11       What is your understanding
12  of the way the company currently sells
13  opioids?
14       MS. WELCH:  Objection to
15  form.
16       THE WITNESS:  It's a very
17  broad topic.  Can you be more
18  specific?
19  BY MR. MELAMED:
20    Q.   Sure.
21       Does any entity that you're
22  aware of within this universe of Allergan
23  PLC sell opioids?
24       MS. WELCH:  Objection to

Page 143

1  form.
2       THE WITNESS:  I mean, what's
3  your definition of "sell"?
4  BY MR. MELAMED:
5    Q.   Why don't you -- explain to
6  me why you're confused about -- what are
7  the definitions of sales that --
8    A.   So does a sales force go out
9  to sell it to physicians?  Does the
10  company make it available to wholesalers
11  to purchase?  Those are --
12    Q.   Those are both within the
13  definition of sell.
14       So does the company sell
15  opioids?
16    A.   The company makes opioids
17  available for purchase, both -- the
18  second piece of the definition.  The
19  company does not have a sales force that
20  would go talk to physicians.
21       There's also no marketing
22  materials that would be created
23  currently, and the website is simply a
24  link to the prescribing information for

Page 144

1  the product.
2    Q.   The website for what?
3    A.   I'm sorry.  For Kadian,
4  specifically.  And there's a website that
5  just -- I believe it's Kadian.com, and it
6  just has a link to the prescribing
7  information.
8    Q.   So for -- let's say I'm a
9  wholesaler that wants to purchase Kadian,
10  can you talk me through that process?
11       How do I -- who do I
12  contact?  How do I contact them?  If it's
13  a group, feel free to talk about the
14  group.
15       We can delve -- I'm just
16  trying to get a big picture and then we
17  can delve into --
18    A.   I can give you a general
19  understanding of how.  And, actually, I
20  have -- I'm going to turn us to a page in
21  here on Topic 21.
22       Page 12.
23    Q.   Page 12 of Exhibit-3,
24  correct?

Page 145

1    A.   Of Exhibit-3, correct.
2    Q.   Is it Topic 21 or 20 that
3  you're referring to?
4    A.   21.  And in the response
5  column, the first paragraph.
6       So in general, wholesalers
7  and distributors would order product from
8  Allergan, and then we would -- UPS would
9  ship to the wholesalers.  And then the
10  wholesalers would fulfill orders to
11  pharmacies, who then, of course, provide
12  the product to patients.
13       You know, we typically -- we
14  have -- what the second sentence refers
15  to is we have reports that allow us to
16  monitor inventory to ensure that we, from
17  a manufacturing perspective, have product
18  to make these sales.
19       Currently, Teva
20  manufacturers the products, and Allergan
21  does not.
22    Q.   So in layman's terms --
23    A.   Yes.
24    Q.   -- somebody calls up a

Page 146

1 distributor, pharmacy, and says, I would
2 like to purchase X units of Kadian, X
3 milligrams.
4        And then from there just
5 talk me through who does what or which
6 role each person is playing.
7    A.   So it could be online versus
8 a phone call.  And then there is a group
9 that would -- that I believe Mary Woods
10 runs that is responsible for fulfilling
11 the orders.
12   Q.   And do you have any idea
13 what that group does to fulfill the
14 orders, the steps it takes?
15      MS. WELCH:  Objection, to
16 the extent she is not designated
17 on that specific topic.
18      You can explain what you
19 know.
20      THE WITNESS:  I mean,
21 everything comes in through an
22 ordering system, and the --
23 because this is manufactured by
24 Teva, you know, the order would

Page 147

1 get -- actually, I'm not sure
2 which distribution facility,
3 someone else would know -- the
4 supply chain or the customer
5 service department would have to
6 talk through the details of that.
7      But UPS then would ship the
8 product to the wholesaler.
9 BY MR. MELAMED:
10   Q.   And I see at the bottom of
11 this column, on Page 12 of Exhibit-3, it
12 says, With regards to marketing --
13   A.   Yes.
14   Q.   -- Allergan Finance would
15 occasionally use Cardinal to send e-mail
16 blasts to retail pharmacies regarding
17 Kadian.
18      And then it provides
19 examples.
20      And then it continues and
21 says, Allergan Finance would also
22 occasionally use Cardinal and McKesson to
23 send e-mail blasts and make telesales
24 calls regarding oxymorphone.

Page 148

1      Which is a generic, correct?
2      MR. BAILEY:  Objection to
3 form.
4      THE WITNESS:  So that's what
5 the -- that's what the document
6 says here in terms of -- and I can
7 explain.
8      And if -- I don't know if
9 there's other comments on that.
10 This is looking historically back.
11 And I believe Jennifer talked
12 about it in her deposition.  What
13 these typically would be for the
14 ones that I reviewed are
15 information about a product being
16 available, NDC numbers, and I
17 believe one of the ones I reviewed
18 had information about a co-pay
19 card.
20 BY MR. MELAMED:
21   Q.   So regarding the -- going
22 back to Page 12, Allergan Finance would
23 occasionally use Cardinal to send e-mail
24 blasts to retail pharmacies regarding

Page 149

1 Kadian.
2      When did Allergan Finance
3 use Cardinal to send those e-mail blasts?
4    A.   I don't have the exact date.
5 I mean, it was during the time period
6 that -- between 2009 and 2012.  Jennifer
7 spoke about that.
8      It sounds like periodically
9 she would get information from the trade
10 group that said, we had, what she called
11 points, to be able to send these e-mail
12 notifications or other notifications that
13 talked about the availability of products
14 or co-pay card availability or whatever
15 the case may be.
16   Q.   So your understanding of
17 that, of those promotions, was that they
18 were limited to the period during which
19 Actavis was actively detailing Kadian; is
20 that correct?
21    A.   The ones that I saw were.
22 There could have been information --
23 sometimes when a product -- so I'm
24 speaking specifically about what I saw.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 As far as, you know, could
2 there have been other ones that -- you
3 know, sometimes you would send an e-mail
4 blast when there was a change in the NDC
5 number or some other type of change. So
6 there could have been other ones that I
7 didn't review.
8 The ones I specifically saw
9 were during this time period.
10 Q. And there could have been
11 others but you're not sure?
12 A. There could have been others
13 that they sent that I haven't reviewed.
14 However, you know, based on
15 the extensive documents that I looked at,
16 the ones that I saw were, I believe,
17 during that time period.
18 Q. About how many documents did
19 you look at in preparation for testimony
20 today?
21 A. Oh, in general or related to
22 this?
23 Q. In general.
24 A. In general.

Page 151

1 Q. Just an estimate, I'm not
2 asking --
3 A. I mean, there were thousands
4 of pages of documents. I'd have a hard
5 time estimating. But, yeah, definitely
6 thousands of pages of documents.
7 Q. And for responding to this
8 question, did you review documents other
9 than those that are called out in this
10 column?
11 A. You mean the Bates numbers
12 that are listed here?
13 Q. Correct.
14 A. Those would be the ones that
15 I looked at, I believe. I'd have to
16 double check exactly what each one of
17 these are. But, yes, in general, those
18 are the ones that I reviewed.
19 Q. So going back to what you
20 said about the e-mail blasts by -- that
21 Allergan Finance would occasionally use
22 Cardinal to send, you're not sure whether
23 any e-mail blasts that fit that
24 description were sent after Actavis

Page 152

1 ceased detailing Kadian; is that correct?
2 A. I don't recall the dates on
3 those, so I don't want to speak
4 incorrectly.
5 Q. Just to be clear, I'm not
6 talking about the specific dates on those
7 documents. They are what they are.
8 A. Okay.
9 Q. I'm talking about -- there
10 could exist other documents in the
11 universe of -- in the universe that
12 reflect other e-mail blasts that Allergan
13 Finance had Cardinal send?
14 A. There could be others.
15 MR. BAILEY: Object to form.
16 BY MR. MELAMED:
17 Q. You're unaware, other than
18 the documents you specifically referenced
19 here, whether Allergan Finance used
20 Cardinal to send e-mail blasts regarding
21 Kadian?
22 MR. MCBRIDE: Object to
23 form.
24 THE WITNESS: So just one

Page 153

1 clarification. So the documents
2 we have listed here are the ones
3 that I felt were relevant to help
4 me answer these questions.
5 I reviewed so many of those
6 documents, I can't say for certain
7 that these list all of these
8 e-mail blasts. I wouldn't --
9 BY MR. MELAMED:
10 Q. I'm just trying to --
11 A. -- be sure of that.
12 Q. Maybe I'll frame it as a
13 policy or practice.
14 Did Actavis have a policy or
15 practice of using Cardinal to send e-mail
16 blasts, other than at the time it was
17 detailing Kadian?
18 A. I don't know what you mean
19 by a policy or practice of doing that.
20 Q. Do you know if -- do you
21 know if Actavis ever used Cardinal to
22 send e-mail blasts regarding any drug but
23 Kadian?
24 MS. WELCH: Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  form.  And well outside the scope
2  of what she's been prepared to
3  testify on.
4      THE WITNESS:  I would just
5  turn you to the next page here,
6  and I do specifically call out
7  that -- their e-mail blasts
8  regarding oxymorphone.
9  BY MR. MELAMED:
10     Q.   Do you know whether Allergan
11 Finance used Cardinal to send e-mail
12 blasts for a drug -- any opioid drug
13 aside from oxymorphone and Kadian?
14     A.   I don't know for sure.  I
15 don't know for sure that they were --
16 what other e-mail blasts would have been
17 sent from Cardinal.
18     Q.   Do you know whether Allergan
19 Finance ever used McKesson to send e-mail
20 blasts --
21     MR. BAILEY:  Objection to
22 form.
23     MR. MELAMED:  I haven't
24 finished the question, so I'll

Page 155

1  start again.
2  BY MR. MELAMED:
3      Q.   Do you know whether Allergan
4  Finance ever used McKesson to send e-mail
5  blasts to pharmacies regarding any opioid
6  drug other than oxymorphone?
7      MR. BAILEY:  Same objection.
8      THE WITNESS:  I don't know
9  everything that McKesson would
10 have sent regarding opioid drugs.
11 BY MR. MELAMED:
12     Q.   Can you describe the
13 telesales calls -- let me withdraw.
14     MR. MELAMED:  For the people
15 on the phone, in Exhibit-3, Page
16 13, the document states that,
17 Allergan Finance would also
18 occasionally use Cardinal and
19 McKesson to send e-mail blasts and
20 make telesales calls to pharmacies
21 regarding oxymorphone.
22 BY MR. MELAMED:
23     Q.   Concerning those telesales
24 calls, were there scripts prepared?  Do

Page 156

1  you know whether there were scripts
2  prepared for those calls?
3      A.   I don't know whether there
4  were scripts prepared for those.  I'm
5  trying to think back to the documents
6  that I reviewed.
7      I believe they were.  This
8  was really to announce the availability.
9  But I don't recall the details of the
10 document.
11     Q.   Do you know whether Allergan
12 Finance had final say over what was
13 supposed to be said during these
14 telesales calls?
15     A.   I don't remember.  I'd have
16 to look at the -- at the documents.
17     Q.   But you don't know whether
18 there were other telesales calls in
19 addition to those reflected in the two
20 documents you note on Exhibit-3; is that
21 correct?
22     A.   That's correct.
23     MR. MELAMED:  Why don't we
24 go off the record?

Page 157

1      VIDEO TECHNICIAN:  We are
2  going off record.  The time is
3  11:50.
4          - - -
5      (Whereupon, a brief recess
6  was taken.)
7          - - -
8      VIDEO TECHNICIAN:  We're
9  going back on record.  This is the
10 beginning of Media File Number 3.
11 The time is 12:06.
12     THE WITNESS:  So there were
13 a few names I was looking for
14 before that I found during our
15 break.
16     Do you want me to go back
17 and just read those?  Those were
18 the sales directors at inVentiv.
19 And they were Mark Killion,
20 K-I-L-L-I-O-N, Patrick McClenahan
21 and Mike Shepherd.
22 BY MR. MELAMED:
23     Q.   So they were peers in the
24 hierarchal structure of the sales group

Page 158

1 at Ventiv -- or inVentiv? Sorry.
2     A.   Yes. inVentiv, yes.
3     Q.   Did they have responsibility
4 for separate geographical regions?
5     A.   Yes. So Mark Killion was
6 the Midwest. Patrick McClenahan was the
7 Southeast. And let's see, Mike Shepherd,
8 I don't have the specific geography. But
9 if we're talking Midwest and Southeast, I
10 would assume it's the West. But don't
11 quote me on that.
12     Q.   So possibly the West but
13 you're not sure?
14     A.   Yes.
15     Q.   Did the Midwest include
16 Ohio?
17     A.   I would assume so. I don't
18 know 100 percent.
19     Q.   So if we turn to Page 22 of
20 Exhibit-3, you described the incentive
21 compensation structure for the sales
22 force for certain time periods and
23 certain drugs; is that accurate?
24     A.   So, yes. Specifically,

Page 159

1 there's information on Kadian. That's
2 the first paragraph.
3         I don't know if you want to
4 go through it in detail.
5     Q.   Let's start with the Kadian
6 information.
7         You reference a document,
8 Allergan_MDL_00988613, as defining base
9 salaries and bonuses for sales of Kadian;
10 is that correct?
11     A.   There's a document, it's
12 actually Exhibit-5 here, that, yes, lays
13 out the base salaries and then the
14 methodology for calculating bonuses.
15     Q.   And so the information you
16 provided in the first paragraph of your
17 response on Page 22 to Topic 38 reflects
18 information contained within the document
19 in Exhibit-5; is that right?
20     A.   Yes. The information here
21 comes from this document, Exhibit-5, yes.
22     Q.   And the information is
23 essentially -- let me withdraw that.
24         The information includes

Page 160

1 that a bonus would be paid based on the
2 percentage of a predetermined annual
3 sales quota, correct?
4     A.   So, yes. There was a base
5 salary and then there was a sales
6 incentive program that was based on a
7 percentage of a predetermined sales
8 quota. And then there's a -- different
9 dollar amounts associated with different
10 percentages.
11     Q.   And the target payout for
12 the 100 percent quota attainment, as
13 reflected in Exhibit-5, was $20,000,
14 correct?
15     A.   That's correct, $20,000 for
16 the sales representatives.
17     Q.   Who defined the sales quota?
18     A.   The quotas, those would have
19 been -- those would have been set in
20 combination of -- Nathalie Leitch, I
21 believe, was involved in setting those
22 sales quotas. But they worked -- she
23 worked directly with Tegra Analytics to
24 do most of the analysis around the data.

Page 161

1     Q.   Tegra Analytics is a
2 third-party analytics provider?
3     A.   Yes.
4     Q.   And Nathalie Leitch worked
5 with Tegra to identify -- use the
6 information from Tegra to identify target
7 sales amounts for -- on a
8 representative-by-representative basis?
9     A.   She worked -- they analyzed
10 the data and summarized it for her. And
11 then she would have worked with them to
12 determine what the -- yeah, what the --
13 the overall goal for Kadian was to
14 maintain the prescription level.
15         And so the -- they would
16 have looked at the prescription levels
17 and -- historical, and determined the
18 goals based on that.
19     Q.   In Exhibit-5, if you look at
20 the Bates numbers, because I don't see
21 page numbers, the Bates number ending
22 668.
23     A.   Yes.
24     Q.   It's Table 1, Kadian ABM

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 payout versus percentage to goal.
2    A.   I see that.
3    Q.   ABM is a business -- I'm
4 sorry, is a sales representative,
5 correct?
6    A.   It stands for area business
7 manager, I believe. But, yes, it's a --
8 what we would typically call a sales
9 representative.
10    Q.   And the target schedule sets
11 out bonuses that start at 85 percent of
12 the target amount, correct?
13    A.   So that's the percent to
14 goal, 85 percent. It starts under 85
15 percent, and then goes to 85 and up.
16    Q.   And I just want to make sure
17 I'm reading this correctly, that at 85
18 percent to goal, to the target goal, a
19 sales rep would receive a $5,000 payout
20 bonus?
21    A.   At 85 percent, they would
22 receive $5,000 for the year.
23    Q.   And then the table goes up
24 to 150 percent of target goal, at which

Page 163

1 point the sales rep would receive a
2 $50,000 payout for the year; is that
3 correct?
4    A.   That's correct.
5    Q.   And then there's for greater
6 than 150 percent, it indicates $250/PT.
7    Does that mean an additional
8 $250 for every percentage point above the
9 target percent to goal?
10    A.   That's my understanding of
11 reading this.
12    Q.   Do you know if, during the
13 time this agreement was in use, a sales
14 rep was -- ever received a payout of
15 $50,000 for a bonus?
16    A.   I don't know 100 percent
17 what every sales representative received.
18    I will say that I reviewed
19 some documents. And in everything I saw,
20 the representatives were nowhere near the
21 150 percent mark.
22    The way an incentive
23 compensation program is typically built
24 is that, you know, the average -- you

Page 164

1 know, on average, the bulk of people
2 would be in that middle range of around
3 100 percent, and then kind of a normal
4 distribution curve. Everything I saw had
5 representatives around there or below.
6    I would also say that, you
7 know, in the documents I reviewed, I saw
8 that the sales of Kadian continued to
9 decline. So I wouldn't expect that there
10 were sales representatives receiving the
11 highest amount, but I don't know for sure
12 from the documents I saw.
13    Q.   What types of documents are
14 you referring to when you talk about the
15 documents you saw reflecting the bonus
16 payouts?
17    A.   Sure. So they were reports
18 from Tegra Analytics. There were
19 documents that they had created and
20 e-mailed, whether it was to Jennifer or
21 Natalie, or to the business -- sales
22 business directors. I saw some of those
23 reports, but not all of them.
24    Q.   So those reports were sent

Page 165

1 via e-mail to Jennifer Altier and
2 Nathalie Leitch?
3    A.   I don't remember whether
4 they were to both or to all of them. But
5 I knew that they were recipients. I
6 believe they went to Nathalie. But there
7 was some -- some Tegra Analytics reports
8 went to a variety of different people.
9    And I have specifics in
10 the -- in this document, if we want to
11 talk about some of the Tegra Analytics
12 reports and who received those.
13    Q.   There's a similar table
14 reflecting the bonuses that were
15 available to regional managers, correct?
16    A.   Yes. That is a few pages
17 later in the document, yes, ending in
18 674.
19    Q.   And it's titled, Table 1,
20 Kadian RBD payout versus percentage to
21 goal?
22    A.   Yes.
23    Q.   Were there bonuses paid out
24 to the people to whom regional business

Page 166

1 directors reported based on sales of
2 Kadian?
3     A.   The people to whom regional
4 business directors reported?
5     I don't believe there were,
6 but I'm not 100 percent sure.  This
7 contract specifically laid out the sales
8 representatives and the regional business
9 directors who were inVentiv employees.
10     Q.   And those regional business
11 directors included the people you
12 mentioned earlier, Mark Killion, Patrick
13 McClenahan and somebody Shepherd, whose
14 first name I'm forgetting?
15     A.   Mike, I think.
16     Q.   Mike Shepherd.
17     Did they report to
18 anybody -- let me withdraw that.
19     Concerning the management of
20 the Kadian sales force, did Killion and
21 Shepherd and McClenahan report to
22 somebody inside of inVentiv?
23     A.   I believe they reported to
24 Mike Pusiteri.

Page 167

1     No, I'm sorry, that was
2 Norco.  Let's see if I have that
3 information, who they reported to.
4     It doesn't look like it.  I
5 think they were the most senior-level
6 sales personnel, but I don't recall 100
7 percent.
8     Q.   The most senior-level sales
9 personnel --
10     A.   From inVentiv.
11     Q.   -- from inVentiv?
12     A.   From inVentiv, yes.
13     Q.   And did Jennifer Altier
14 receive a bonus based on the percentage
15 to target of Kadian sales?
16     A.   I just want to check some of
17 my notes here.
18     So if you look at Topic 4 on
19 Page 2 of Exhibit-3.  I gathered
20 information, tried to locate personnel
21 files.  And Allergan Finance does not
22 currently have a personnel file for
23 Jennifer Altier.  So there's no record of
24 whether or not she did.

Page 168

1     Q.   So you have no independent
2 knowledge of whether Jennifer Altier
3 received compensation based on target to
4 sales of any opioids sold?
5     A.   No.  We looked for a
6 personnel file to find out her
7 compensation structure, and that was not
8 available.
9     Q.   What about Nathalie Leitch?
10     A.   Same thing; there was not a
11 personnel file for Nathalie.
12     Q.   So you're not aware, either
13 way, whether they received compensation
14 based on the number of any drug sold; is
15 that correct?
16     A.   I don't have the details of
17 their compensation structure.
18     Q.   What about the sales
19 representatives who sold Norco during the
20 time it was being detailed at Watson
21 Pharmaceuticals, Inc., do you have any
22 knowledge of whether there was any
23 compensation paid to them based on the
24 number of -- the amount of their Norco

Page 169

1 sales?
2     A.   I'm sorry, can we just go
3 back for one minute to the previous
4 question?
5     The one thing, we talked
6 about the payouts here.  The one other
7 thing that's in this document that I
8 would point you to, and this is
9 Exhibit-5 -- Exhibit-5, if I can see what
10 page it's on.
11     So we talked about the
12 incentive compensation program for the
13 Kadian representatives.  However, what I
14 would also point out, that they received
15 a base salary, which is on Page 30 of the
16 document, of Exhibit-5, and it was
17 $85,000.  So Page 30 in C, Exhibit-C.
18     Q.   Page 30, Exhibit C.
19     What's the Bates number at
20 the bottom of the page?
21     A.   8663 is at the end.
22     Q.   Okay.
23     A.   So the -- you know, on
24 average, we would say that, you know, the

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  representatives received about $85,000,
2  in terms of a base salary.
3         And then the table that we
4  had looked at talked about their bonus,
5  which if you want to say 100 percent is
6  the average, you know, that was probably
7  around $20,000.
8         So in talking to Jennifer
9  and Nathalie, my understanding here, and
10 also if even you look at the requirements
11 for the job description here, that the
12 goal was really to get sales
13 representatives with experience.  And so
14 the base salary was a larger percentage
15 of the total compensation than -- so I'd
16 say in most cases the majority of the
17 salary -- of the compensation was based
18 on salary as opposed to the incentive
19 compensation bonus plan.
20    Q.   And are you making a
21 comparison between your knowledge of this
22 structure, where most of the salary
23 was -- most of the compensation was
24 salary versus structures for sales reps,

Page 171

1  elsewhere where a greater percentage is
2  in bonuses?
3     A.   It was really -- my
4  comparison was more in my discussions
5  with Jennifer and Nathalie.  And I think
6  it was specifically Nathalie that said
7  that that was the goal of this incentive
8  compensation program, to have a higher
9  percentage.
10        So this is, I mean, ten
11 years ago, so I wouldn't want to compare
12 it to what we pay sales representatives
13 today.  But that was -- the goal was to
14 find a -- to find experienced
15 representatives.
16    Q.   And you said -- you referred
17 to higher percentage.  I just want to
18 know, higher percentage in comparison to
19 what?
20    A.   In her experience, into what
21 was typically -- what typically would --
22 you see for other sales representatives.
23 That was, you know, based on her
24 recollection.

Page 172

1     Q.   Do you have any knowledge
2  about the compensation structure for
3  sales representatives who sold Norco at
4  the time it was being detailed?
5     A.   Sure.  Let me just pull up
6  the page that I have that information on.
7         So if we go to -- back in
8  Exhibit-3, and Topic 9, Page 5.
9         Since a detailed contract
10 like we had for inVentiv wasn't
11 available, what we were able to find was
12 Dirk Pica's personnel file.  And he was
13 one of the regional sales managers
14 promoting Norco.  And it shows that 75
15 percent of his compensation was based on
16 market share and market share change for
17 his portfolio of products, and the
18 remaining 25 percent was based on his
19 manager's assessment of performance.
20    Q.   So is it correct to say that
21 that 75 percent reflects incentive
22 compensation?
23    A.   Yes, that's fair.  It's
24 incentive compensation for his portfolio

Page 173

1  of products.  I don't have details
2  exactly what products that was.  But,
3  yes, he would have promoted Norco in
4  addition to other products.
5     Q.   And what was Dirk Pica's
6  role at Watson Pharmaceuticals in 2001?
7     A.   Regional sales manager.
8     Q.   Did he manage other sales
9  representatives in that role?
10    A.   Yes, he did manage other
11 sales representatives.
12    Q.   Do you know anything about
13 the compensation structure for the sales
14 representatives who would have reported
15 up to Dirk or his peers?
16    A.   No.  There weren't personnel
17 files, we didn't have names of those
18 people.  Like I had said earlier, there
19 just wasn't a lot of information
20 available regarding Norco, since it was
21 so long ago.
22    Q.   Do you know the name of the
23 position to which Dirk Pica would have
24 reported?

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    A.   No, I don't know who exactly
2  he would have reported to.
3    Q.   And you don't know whether
4  the person to whom he reported had a
5  compensation structure based on -- that
6  incorporated any incentive payment?
7    A.   No.  His was really the only
8  personnel file that we were able to
9  locate that would have given us
10  information about that.
11    Q.   Do you know if Watson
12  Pharmaceuticals used incentive
13  compensation for anyone involved in the
14  sale of the generic opioids?
15    A.   I don't know.
16    Q.   Do you know if Actavis,
17  prior to its acquisition by Watson
18  Pharmaceuticals, used incentive
19  compensation for anyone involved in the
20  sale of generic opioids?
21    A.   So as far as the generic
22  information, all those -- all that
23  historical information would have -- like
24  I had talked about earlier, would have

Page 175

1  gone with the Actavis generic companies,
2  which went to Teva.  So I don't have the
3  details of their compensation.
4    Q.   I understand the answer may
5  be the same, I just want to ask the
6  question.
7    A.   Sure.
8    Q.   When Watson acquired Actavis
9  and became Actavis, Inc., are you aware
10  whether anyone within the organization
11  had their compensation based in any part
12  on incentives for the sale of generic
13  opioids?
14    A.   I'm not aware of the
15  compensation structure for the employees
16  who would have been employed by the
17  Actavis generics company.  The personnel
18  files that we have don't reflect that.
19  They would have, I assume, gone to Teva.
20    Q.   Meaning don't reflect that,
21  not that they don't -- it means they
22  don't reflect compensation structure for
23  the individuals who went to Teva; is that
24  correct?

Page 176

1    A.   We don't have personnel
2  files for people who would have had --
3  who would have gone to Teva.
4    Q.   And so that same answer
5  continues from when Actavis Inc. becomes
6  Actavis PLC; is that correct?  That you
7  don't have -- the question being whether
8  you know whether any individuals received
9  compensation, incentive-based
10  compensation, due to the -- based on the
11  number of generic opioid sales they made,
12  or the amount of generic opioid sales
13  they made?
14        MS. WELCH:  Objection to
15    form.
16        THE WITNESS:  So what I
17    do -- so I don't know specifically
18    the compensation structure for
19    employees that were working on the
20    generic business.
21        As far as in that post time
22    period, I know that the branded
23    business, branded Norco and
24    Kadian, were under the portfolio

Page 177

1  that I currently manage, and my
2  predecessor, Michael Kerderka, and
3  I can say that I -- no percent of
4  my compensation is based on the
5  sale of opioids.
6  BY MR. MELAMED:
7    Q.   What about anybody reporting
8  to you?  Is anybody -- does anybody
9  reporting to you receive any percent of
10  their compensation based on incentives to
11  sell -- based on the amount of opioids,
12  the number of opioids that is sold?
13    A.   No.
14    Q.   Do you know if your
15  predecessor received any incentive-based
16  compensation relating to the sale of
17  opioids?
18    A.   I'm just going to pull up
19  the -- what we had on file, as far as his
20  personnel files.
21        So my predecessor was
22  Michael Kerderka.  There was no personnel
23  file for him.  But I can pretty
24  confidently say that he did not receive

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 any compensation based on opioids,
2 because I assumed the responsibilities
3 for what he was doing.
4     Q.   So your confidence is based
5 on your belief that you received a
6 parallel compensation structure to the
7 one he had when he left?
8     A.   That's correct, yes.
9     Q.   What company did Michael --
10 what was his name?
11     A.   Kerderka.
12     Q.   Kerderka.
13         What company employed him?
14     A.   It would have been the same
15 company that employs me, which would be
16 Allergan USA, I believe.
17     Q.   Who preceded Michael
18 Kerderka in the same position?
19     A.   I don't -- I don't recall
20 who would have had the responsibilities
21 prior to him.
22         I don't -- I'd have to -- I
23 don't know Nathalie Leitch's full --
24 Nathalie Leitch's full tenure, so I'm not

Page 179

1 sure when she no longer had
2 responsibility for Kadian.
3         MR. MELAMED:  Let's go off
4     the record.
5         VIDEO TECHNICIAN:  Going off
6     the record.  The time is 12:33.
7             - - -
8         (Whereupon, a luncheon
9     recess was taken.)
10            - - -
11         VIDEO TECHNICIAN:  We are
12     going back on the record.
13     Beginning of Media File Number 4.
14     The time is 1:13.
15 BY MR. MELAMED:
16     Q.   Who are the individuals at
17 Watson Pharmaceuticals, Incorporated,
18 prior to its merger with Actavis, who
19 were primarily responsible for
20 interacting with the U.S. Food and Drug
21 Administration concerning opioids?
22         MS. WELCH:  I'll object that
23     I believe that's beyond the scope
24     of topics as agreed to, subject to

Page 180

1 our objections, which you did not
2 raise prior to today, as I'm
3 aware.
4         THE WITNESS:  So I found the
5     piece of the document I was
6     looking for.
7         Can you repeat the question
8     that you had?
9 BY MR. MELAMED:
10     Q.   Sure.
11         Who are the -- who were the
12 individuals at Watson Pharmaceuticals,
13 Incorporated, prior to its merger with
14 Actavis, who were primarily responsible
15 for interacting with the U.S. Food and
16 Drug Administration concerning opioids?
17     A.   I'm prepared to talk about
18 the specifics who were -- who were --
19 specifically the interactions regarding
20 Kadian and generic opioids for Actavis.
21         I'm not sure of the
22 distinction with Watson prior to the
23 merger, so I don't think -- I don't think
24 I have that information.

Page 181

1         I can talk about the
2 interactions with Kadian and generics at
3 Actavis, if you'd like.
4     Q.   Do you know which generics
5 at Actavis you're talking about -- you're
6 prepared to talk about?
7     A.   Just in general.  So I
8 talked to Terri Nataline, and she said
9 that her scope of responsibilities
10 included branded and generics at Actavis.
11     Q.   Did Terri Nataline work at
12 Watson Pharmaceuticals, Incorporated,
13 before she worked at Actavis?
14     A.   I don't know her employment
15 history.  When I spoke to her, it was
16 regarding her time at Actavis.
17     Q.   I'm just trying to
18 understand the universe of generics that
19 you spoke to Ms. Nataline about --
20     A.   Right.
21     Q.   -- and whether it includes
22 the entire universe of generic opioids
23 that became part of Actavis subsequent to
24 the merger, or whether it includes a

Page 182

¹ subset.
² Can you define the subset of
³ generic opioids that you spoke to Terri
⁴ Nataline regarding?
⁵ A. Not the specific products,
⁶ no. I talked to her in general about her
⁷ responsibilities. And she talked about
⁸ Kadian and generics, but not the specific
⁹ generics.
¹⁰ Q. During what time frame did
¹¹ she refer to concerning the
¹² responsibilities you talked to her about?
¹³ A. She didn't -- she didn't
¹⁴ specify. I didn't ask her the specific
¹⁵ dates that she was -- that she was
¹⁶ employed there.
¹⁷ Q. So you identified Terri
¹⁸ Nataline as the primary individual who
¹⁹ interacted with the FDA regarding Kadian
²⁰ and generic opioids, correct?
²¹ A. Yes, correct. Without
²² specifying the time period, but, yes.
²³ Q. Do you have a time range
²⁴ that you can provide that you believe --

Page 183

¹ during which you believe she was the
² primary individual responsible for these
³ interactions?
⁴ A. I know when I spoke to her
⁵ that we specifically talked about Kadian.
⁶ So she was interactions with the FDA that
⁷ occurred in 2010, I believe. So I know
⁸ she was there in that time frame.
⁹ Q. I just -- just so the record
¹⁰ is clear, though, you don't know
¹¹ specifically which dates she was the
¹² primary individual responsible for
¹³ interacting with the FDA concerning
¹⁴ Kadian and generic opioids, right?
¹⁵ A. I don't know the range of
¹⁶ dates. I do know that she was during the
¹⁷ 2010 period that we specifically talked
¹⁸ about.
¹⁹ Q. And you don't know whether
²⁰ the generic opioids component of that
²¹ responsibility reflects legacy Actavis
²² generic opioids, legacy Watson generic
²³ opioids, or the sum total of all of those
²⁴ generic opioids when the companies

Page 184

¹ merged; is that correct?
² MS. WELCH: Objection to
³ form.
⁴ THE WITNESS: She didn't
⁵ specify the specifics. She said
⁶ that she was at Actavis and she
⁷ had responsibility for Kadian and
⁸ generic opioids.
⁹ BY MR. MELAMED:
¹⁰ Q. Did she specify which
¹¹ generic opioids she had responsibility
¹² for at Actavis?
¹³ A. She did not specify which --
¹⁴ which ones.
¹⁵ Q. Do you know if Watson
¹⁶ Pharmaceuticals, Incorporated, prior to
¹⁷ its merger with Actavis, maintained any
¹⁸ policies and procedures for interacting
¹⁹ with the U.S. Food and Drug
²⁰ Administration concerning opioids?
²¹ A. Based on the investigation
²² that we did, we have not uncovered the
²³ interaction -- the information regarding
²⁴ interactions with the FDA related to

Page 185

¹ Norco or Watson.
² Q. So you don't know either way
³ whether Watson, in fact, maintained
⁴ policies and procedures for such
⁵ interactions?
⁶ MS. WELCH: I'm going to
⁷ make another objection on the
⁸ record that this is outside the
⁹ scope of the topic as agreed to,
¹⁰ based on our objections that were
¹¹ provided to you and were not
¹² objected to.
¹³ BY MR. MELAMED:
¹⁴ Q. Is that -- is that accurate,
¹⁵ that you don't know either way whether
¹⁶ Watson had policies and procedures for
¹⁷ those interactions?
¹⁸ A. I don't know what Watson had
¹⁹ in place. I am prepared to talk about
²⁰ Actavis subsequent to that.
²¹ Q. Do you know the identity of
²² the individuals at Watson
²³ Pharmaceuticals, Inc., prior to the
²⁴ merger, who were primarily responsible

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 for interacting with the U.S. Department
2 of Justice concerning opioids?
3        MS. WELCH:  Same objection,
4    that it goes beyond the scope of
5    the topic as narrowed by our
6    objections, with your agreement.
7        THE WITNESS:  I'm not aware
8    of who they -- those people are.
9        I am aware of who interacted
10    with the FDA regarding Kadian and
11    generic.  And that was, as I
12    mentioned, Terri Nataline.
13 BY MR. MELAMED:
14    Q.   Do you have any information
15 about any individuals at Watson
16 Pharmaceuticals, prior to the merger, who
17 had responsibility for interacting with
18 any federal or state agencies concerning
19 opioids?
20        MS. WELCH:  Same objection.
21        THE WITNESS:  I don't.  I
22    think I've already answered what
23    information I do have.
24 BY MR. MELAMED:

Page 187

1    Q.   At the time Terri Nataline
2 was the individual primarily responsible
3 for interacting with the FDA concerning
4 Kadian and some generic opioids, what was
5 her title?
6    A.   I don't have her specific
7 title in front of me.
8    Q.   What was her general job
9 description?
10    A.   She was in charge of the
11 regulatory function.
12    Q.   For what company did she
13 work?
14    A.   I don't know the legal
15 entity.  My understanding is Actavis,
16 Actavis Inc., was where she was employed.
17        But, like I said, I don't
18 know the details of the corporate
19 structure to be 100 percent sure that
20 that was the official title of the
21 company she was employed by.
22    Q.   Was Terri Nataline also the
23 person responsible for interacting with
24 the United States Department of Justice

Page 188

1 concerning Kadian and some subset of --
2 some set of generic opioids?
3        MS. WELCH:  Objection to
4    form.
5        THE WITNESS:  I don't know.
6    My understanding was that she
7    was -- we talked about her
8    interactions with the FDA.  I'm
9    not sure of her scope of
10    responsibilities beyond that.
11 BY MR. MELAMED:
12    Q.   Who was the person at
13 Actavis primarily responsible for
14 interacting with the DOJ concerning
15 Kadian?
16    A.   I don't have information on
17 that.  My understanding was, you know, I
18 prepared to talk about who was
19 responsible with the interaction with the
20 FDA, and that was Terri Nataline.
21        MS. WELCH:  And I'll make
22    the same objection for the record
23    that these questions go beyond the
24    scope of the topics as narrowed by

Page 189

1    our objections to which you didn't
2    raise any objection at the time.
3 BY MR. MELAMED:
4    Q.   Who was the person -- is the
5 answer the same concerning the person who
6 was primarily responsible for interacting
7 with the DOJ concerning Actavis generic
8 opioids; that you don't know because you
9 didn't prepare to answer that question?
10        MS. WELCH:  Same objections.
11        THE WITNESS:  Yes, that
12    is -- that is correct.  I was
13    prepared to talk about the
14    interactions with the FDA, which
15    was Terri Nataline.
16 BY MR. MELAMED:
17    Q.   When did Terri Nataline stop
18 working for whatever Actavis -- leave the
19 Actavis universe?
20    A.   I don't know.  You know, the
21 main discussion that we had was what her
22 responsibilities were, in terms of being
23 in charge with the FDA interaction.  We
24 didn't talk about the specific time frame

Page 190

1 that she left the company.
2    Q.  Do you know whether she was
3 the primary person responsible for
4 interacting with the FDA concerning
5 Kadian after the merger between Watson
6 Pharmaceuticals and Actavis Group?
7    MS. WELCH:  Objection to
8 form.
9    THE WITNESS:  Like I said, I
10 don't know the specific time
11 period and which entity she was
12 employed by.  What we talked about
13 was her interaction with the FDA
14 regarding Kadian and the generic
15 opioids, but not the specific
16 length of her tenure at the
17 company.
18 BY MR. MELAMED:
19    Q.  Do you know who the primary
20 person responsible, or persons
21 responsible, for interacting with the FDA
22 at -- within the Actavis PLC corporate
23 entity concerning opioids was?
24    MS. WELCH:  Same objections.

Page 191

1    And objection to form.
2    THE WITNESS:  And we're
3 getting into the details of the
4 corporate structure, which I'm not
5 prepared to answer.
6 BY MR. MELAMED:
7    Q.  I just want to be clear.
8 I'm not trying to get into details of
9 corporate structure.
10    I want to know throughout
11 time -- this company has existed and sold
12 opioids, either through its predecessors
13 or sub -- you know, subsidiaries for
14 greater than 20 years.  And I'm trying to
15 figure out who was primarily responsible
16 for interacting with the FDA throughout
17 that time period.
18    So you can feel free to
19 provide me a narrative response on that,
20 starting in '97 going through to today.
21    MS. WELCH:  Objection to
22 form.  Same objections with
23 respect to the scope of objections
24 that were not raised.

Page 192

1    THE WITNESS:  So, yeah, that
2 was a pretty broad topic.  I would
3 say that, you know, I talked to
4 Terri, and I know she was
5 responsible for interaction with
6 the FDA during a period of time.
7 I don't know that specific period
8 of time.
9    And I don't know if you plan
10 to talk to her.  But she probably
11 could give that specific
12 information about when she was
13 employed.
14 BY MR. MELAMED:
15    Q.  Do you know any individuals
16 who had the primary responsibility for
17 talking to the DOJ from 1997 to present
18 for any one of the predecessors,
19 subsidiaries of Actavis, or successors?
20    A.  I don't.  And I wasn't
21 prepared, based on the topics listed here
22 in Topic 10, to discuss that.
23    Q.  You see that Topic 10 lists
24 the U.S. Department of Justice, correct?

Page 193

1    A.  If you look at -- I'm sorry,
2 I'm in Exhibit-3, Page 6.
3    If you look in the column
4 called Objections, and the final
5 paragraph there.  So my understanding was
6 I was designated to talk about the
7 interactions with the FDA.
8    Q.  Okay.  So you see that the
9 topic includes it, but that the
10 objections said that -- your
11 understanding of the objections is you
12 need not prepare to testify on the DOJ;
13 is that correct?
14    A.  My understanding is that
15 this paragraph here describes what I was
16 preparing to discuss.
17    Q.  And by "this paragraph
18 here," you're talking about the second
19 paragraph for -- on Page 6 of Exhibit-3
20 under the objections column?
21    A.  Yes.
22    Q.  In the response column, you
23 state that, Allergan Finance's current
24 written policy regarding communications

Page 194

1  with regulatory agencies including the
2  FDA can be found at
3  Allergan_MDL_03367352.
4          Do you see that?
5      A.   Yes.
6      Q.   Is the current policy
7  different in any way from the -- from the
8  written policies that preceded it?
9      A.   I don't have a history --
10         MS. WELCH:  And same
11  objection.  That's beyond the
12  scope of the topic as narrowed by
13  objections that you didn't object
14  to.
15         THE WITNESS:  So I'm not
16  sure what the progression of
17  policy is.  These policies
18  typically get revised -- get
19  revised on an as-needed basis.  So
20  I would assume there are multiple
21  versions of them.
22         This is the one that I
23  reviewed, which is our -- the
24  current policy.

Page 195

1  BY MR. MELAMED:
2      Q.   Do you know if that current
3  policy also concerns communications with
4  the DOJ?
5         MS. WELCH:  Same objections.
6         THE WITNESS:  I don't
7  recall.  If you have that
8  document, I'm happy to take a look
9  at it.
10  BY MR. MELAMED:
11     Q.   Can you list all the formal
12  investigations conducted by federal law
13  enforcement authorities concerning
14  opioids between the years of 1997 and the
15  present?
16         And I will -- I will -- for
17  that question, I will give you a name of
18  a corporate entity I'd like you to
19  testify on behalf of.
20         So all formal investigations
21  conducted by law enforcement authorities
22  concerning opioids between the years of
23  1997 and the present where Watson
24  Pharmaceuticals, Inc. was subject to the

Page 196

1  investigation?
2         MS. WELCH:  I'm going to
3  object to form.  And I'm going to
4  object specifically to counsel's
5  instructions about what corporate
6  entities the witness is testifying
7  on behalf of.  I suspect that is
8  not the language you meant to use.
9         But she is testifying on
10  behalf of Allergan Finance, LLC.
11         MR. MELAMED:  Understood.
12  Let me rephrase the question.
13  BY MR. MELAMED:
14     Q.   Can you list all formal
15  investigations conducted by federal law
16  enforcement authorities concerning
17  opioids at Watson Pharmaceuticals, Inc.
18  starting in 1997?
19         MS. WELCH:  Objection that
20  that is beyond the scope of the
21  topics as narrowed by objections
22  to which plaintiffs didn't raise,
23  in advance of the deposition, any
24  objection to.

Page 197

1         THE WITNESS:  So if you turn
2  to Page 13 in Exhibit-3, Topic 27,
3  what I'm prepared to talk about
4  are the government investigations
5  regarding Kadian and Norco to
6  which Allergan Finance is aware.
7         And if you see here in the
8  response column, there's a list of
9  the entities who have issued
10  subpoenas about information about
11  the marketing or sale of opioids.
12  There's a list of them right
13  there.
14         I don't know if you want me
15  to read through them.
16  BY MR. MELAMED:
17     Q.   No.  That's okay.
18         The list says that, The
19  following entities have issued subpoenas
20  to Allergan Finance seeking information.
21         My question is whether,
22  starting in 1997 and continuing through
23  until it ceased to exist as a named
24  entity, Watson Pharmaceuticals, Inc.

Page 198

1 received subpoenas for any information
2 regarding the marketing or sale of
3 opioids?
4      MS. WELCH:  Same objections.
5      THE WITNESS:  The paragraph
6   starting on the bottom of Page 13
7   in the objections column, starting
8   with Subject 2, that describes
9   what I'm prepared to talk about.
10 BY MR. MELAMED:
11    Q.   So is it accurate to say
12 you're not prepared to talk about any
13 subpoenas issued to Watson
14 Pharmaceuticals, Inc., concerning seeking
15 information regarding the marketing or
16 sale of opioids?
17    A.   I'm prepared to talk about
18 the subpoenas to Allergan Finance seeking
19 information about the marketing or sale
20 of opioids.
21    Q.   So is it accurate to say
22 that you're not prepared to talk about
23 subpoenas issued to Watson
24 Pharmaceuticals, Inc. regarding the

Page 199

1 marketing or sales of opioids?
2      MS. WELCH:  Same objections.
3      THE WITNESS:  No, I'm
4   prepared to talk about
5   investigations regarding Kadian
6   and Norco in terms of
7   investigations and the ones listed
8   here in this topic.
9 BY MR. MELAMED:
10    Q.   I just want to clarify the
11 "no" at the beginning of the answer.
12      You said "no, I'm
13 prepared" -- was the answer "no" the
14 answer to the question I asked?  What was
15 the "no" in reference to?
16    A.   The "no" is I'm not prepared
17 to talk to -- about anything outside of
18 this, which, I think, what you're
19 referring to is outside of that topic.
20 If I'm understanding your question
21 correctly.
22    Q.   Okay.  The preface to the
23 first paragraph of the response on Page
24 13 of Exhibit-3 is, The following

Page 200

1 entities have exhibited -- I'm sorry.
2 The following entities have issued
3 subpoenas to Allergan Finance seeking
4 information regarding the marketing or
5 sale of opioids.
6      Do you see that?
7    A.   Yes.
8    Q.   Are you prepared to talk
9 about subpoenas issued to any other
10 entity seeking information regarding the
11 marketing or sale of opioids?
12      MS. WELCH:  Same objections.
13      THE WITNESS:  These are the
14   ones that I know of.  These are
15   the -- this is what I know of.
16      As far as, you know, if
17   there were ones that were outside
18   of the list here, I have not seen
19   them and am not aware of them.
20 BY MR. MELAMED:
21    Q.   Did you make any effort to
22 determine whether subpoenas had been
23 issued to any entity other than Allergan
24 Finance seeking information regarding

Page 201

1 marketing or sale of opioids?
2    A.   Regarding Kadian and --
3 Kadian and Norco, this was -- these were
4 related -- I made an effort to find out
5 anything related to Kadian and Norco, and
6 this is the list that I was able to come
7 up with.
8    Q.   So Norco was, for many years
9 before Actavis merged with Watson, sold
10 by Watson, correct?
11    A.   Sorry, say that again.
12    Q.   For many years before --
13    A.   Yes.
14    Q.   -- the merger between Watson
15 and Actavis, Norco was sold by Watson,
16 correct?
17    A.   Norco was sold by Watson,
18 correct.
19    Q.   Did you make any effort to
20 determine whether Watson received any
21 subpoenas seeking information regarding
22 the marketing or sale of Norco?
23    A.   What I looked for was
24 anything related to Norco for which

Page 202

1  Allergan Finance has record of.  And
2  that's what I was able to locate.
3         If there were things that
4  were part of that company that were not
5  then transferred over, if you will, to
6  Actavis or Allergan, I'm not aware of
7  those.
8      Q.   Do you know whether
9  information -- I'm trying to think of how
10 best to phrase this.
11        Does Allergan Finance have
12 records from Watson Pharmaceuticals,
13 Incorporated, as a general matter?
14        MS. WELCH:  Objection to
15 form.  And beyond the scope of the
16 topics identified.
17        THE WITNESS:  I would assume
18 during a merger that there were
19 exchanges of records.  I don't
20 know where they are right now.  I
21 don't know which ones then
22 eventually went to Teva.
23        There's a series of mergers
24 and acquisitions, and I think it

Page 203

1  would be difficult for me to
2  determine the entire -- it really
3  goes back to the entire corporate
4  structure and how these entities
5  came together.
6  BY MR. MELAMED:
7      Q.   So as you sit here today,
8  you don't know whether Watson
9  Pharmaceuticals received subpoenas
10 seeking information regarding the
11 marketing or sale of opioids; is that
12 correct?
13        MS. WELCH:  Objection to
14 form.
15        THE WITNESS:  You're talking
16 about prior to 2012, when Watson
17 Pharmaceuticals existed?  You're
18 saying do I know whether they had
19 received subpoenas?  Is that what
20 you're asking?
21 BY MR. MELAMED:
22     Q.   Yes.  Specifically
23 concerning the marketing or sale of
24 opioids.

Page 204

1      A.   The ones that I'm aware of
2  are listed here in the response of Topic
3  27 on Page 13.
4      Q.   In the first paragraph of
5  that response?
6      A.   Yes.  To the ones that were
7  subpoenas to Allergan Finance, those are
8  the ones that I'm aware of.
9      Q.   And each of those subpoenas
10 was directed at Allergan Finance?
11     A.   Allergan Finance, yes.
12     Q.   And you don't know whether
13 any subpoenas were issued to Watson
14 Pharmaceuticals, Incorporated concerning
15 the marketing or sale of opioids; is that
16 correct?
17        MS. WELCH:  Same objection.
18        THE WITNESS:  I don't know
19 of any.
20 BY MR. MELAMED:
21     Q.   Actavis acquired branded
22 Kadian from Alpharma at the end of 2008,
23 right?
24     A.   Actavis acquired Kadian from

Page 205

1  Alpharma, yes, that's correct.
2      Q.   Around the end of 2008?
3      A.   Yes.
4      Q.   Upon completion of the
5  acquisition, did Actavis make use of
6  training materials created by Alpharma to
7  train sales representatives to market
8  Kadian?
9         MS. WELCH:  Objection to
10 form.
11        THE WITNESS:  So when
12 Actavis acquired Kadian from
13 Alpharma, and in talking to the
14 people I mentioned I've talked to,
15 there were questions about whether
16 or not they were going to promote
17 the product, have a sales force.
18        And Kadian was nearing the
19 end of its lifecycle, in terms of
20 patents.  And so there were
21 questions about what would be done
22 with Kadian.
23        My understanding is that
24 then there was a decision,

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 eventually, to hire a small sales
2 force to promote Kadian. And
3 Terri Nataline, you know, received
4 some of the materials, which
5 included promotional materials and
6 training from Alpharma, reviewed
7 those materials, made some minor
8 changes, and then those were used
9 by the sales force subsequently.
10 BY MR. MELAMED:
11     Q.    What kind of minor changes
12 did she make?
13     A.    I believe there were changes
14 to, you know, the footnote that usually
15 has the company that is responsible -- or
16 putting out the materials and so, you
17 know, changes to footnotes.
18         I don't know the scope of
19 all the changes, but that's one example.
20     Q.    Any other changes that you
21 can think of?
22     A.    I don't recall.
23     Q.    Alpharma agreed to pay $42
24 and-a-half million, in 2010, to resolve

Page 207

1 false claims allegations in connection
2 with the marketing of Kadian.
3         Was the company aware of
4 those allegations at the time it acquired
5 Kadian?
6     A.    I don't know.
7         MS. WELCH:  And I'll object
8     that I believe that's outside the
9     scope of the referenced topics.
10 BY MR. MELAMED:
11     Q.    In the wake of that
12 settlement that I just referred to, the
13 2010 False Claims Act settlement between
14 Alpharma and the Department of Justice,
15 did Actavis do anything to modify the
16 marketing materials it used to market
17 Kadian?
18         MS. WELCH:  Objection to
19     form.  And objection to the extent
20     it's outside of the scope of the
21     referenced topics.
22         THE WITNESS:  Can you talk a
23     little bit more -- clarify the
24     question in terms of what timing

Page 208

1     you're talking about, what
2     materials you're talking about?
3 BY MR. MELAMED:
4     Q.    Sure.
5         So 2010, there's a
6 settlement agreement between Alpharma and
7 the Department of Justice.  The
8 allegations that were settled concern
9 misrepresentations about the safety and
10 efficacy of Kadian.
11         Did Actavis -- did anybody
12 at Actavis change any of the training
13 materials used to train sales reps to
14 sell Kadian, based on knowledge of that
15 settlement?
16         MS. WELCH:  Same objections.
17         THE WITNESS:  Can you
18     provide me with information that
19     you're talking about?  Like, is
20     there a document that summarizes
21     what the claims -- I'm just not
22     sure I'm following what you're --
23 BY MR. MELAMED:
24     Q.    Are you aware -- you're

Page 209

1 designated to testify, in part, about the
2 marketing --
3     A.    Yes.
4     Q.    -- that the company did,
5 correct?
6     A.    Yes.  And I'm prepared to do
7 that.
8     Q.    Did the company change any
9 of its marketing in 2010 as a result of
10 the settlement between Alpharma and the
11 DOJ concerning the manner in which Kadian
12 had been marketed?
13         MS. WELCH:  Objection to
14     form.  Objection to the extent the
15     topic is outside of the referenced
16     topics that the witness has been
17     prepared to testify on.
18         THE WITNESS:  So what I'm
19     prepared to talk about is an FDA
20     warning letter that Actavis
21     received in February of 2010 and
22     the reaction -- and the result of
23     that.
24         Is that what you -- would

Page 210

1    you like me to talk about that?
2        That's what I'm prepared to talk
3    about.
4    BY MR. MELAMED:
5        Q.   I would love you to talk
6    about that, that's not what I'm asking
7    about now, though.
8        A.   Right.
9        Q.   What I'm asking about now is
10   the Alpharma settlement with the DOJ
11   concerning marketing material --
12   marketing -- sorry.
13       What I'm talking about now
14   is the Alpharma settlement with the DOJ
15   concerning allegations of
16   misrepresentations about the safety and
17   efficacy of Kadian.
18       A.   And when was that
19   settlement?  What was the date?
20       Q.   Are you aware of when that
21   settlement occurred?
22       MS. WELCH:  Objection.
23   Outside the scope of the
24   referenced topics.

Page 211

1        THE WITNESS:  No.  I'm
2    asking you the date of that
3    settlement.
4    BY MR. MELAMED:
5        Q.   Do you recall any
6    conversation within Actavis concerning
7    the allegations in that False Claims Act
8    case?
9        MS. WELCH:  Outside of the
10   scope of the referenced topics.
11   Objection.
12       THE WITNESS:  I haven't had
13   any conversations about that.
14       But what I do know is there
15   were changes made to the marketing
16   as a result of the FDA warning
17   letter in 2010.
18   BY MR. MELAMED:
19       Q.   Do you know if Actavis was
20   aware of the allegations concerning
21   misrepresentations employed -- alleged
22   misrepresentations by Alpharma about the
23   safety and efficacy of Kadian at the time
24   Actavis acquired Kadian?

Page 212

1        MS. WELCH:  Objection.
2    Outside of the scope of the
3    referenced topics.  Objection.
4        THE WITNESS:  I don't know.
5    I wasn't prepared to talk about --
6    to talk about that.  I haven't had
7    any conversations about that.
8        However, like I said, in
9    2010 there was a very
10   comprehensive effort to revise
11   materials, which I believe
12   Jennifer talked about in her
13   deposition, about how she was
14   brought on to revise those
15   marketing materials.  And I'm
16   prepared to talk about that
17   effort, which was in 2010.
18   BY MR. MELAMED:
19       Q.   And you're referring to a
20   warning letter received from the FDA's
21   DDMAC division in February of 2010,
22   correct?
23       A.   That's correct.
24       Q.   And in response to the

Page 213

1    letter, you write, in Exhibit-3, Page 14,
2    that, Actavis immediately ceased
3    distributing the materials identified in
4    the warning letter and other materials --
5    any other materials identified as
6    containing similar language and requested
7    the sales force return the pieces
8    identified in the letter to the warehouse
9    for destruction.  And that Actavis
10   replace the website with an under
11   construction message.
12       Is that accurate?
13       A.   That's correct.  My
14   understanding, from talking to Jennifer
15   and Terri, that once they received the
16   warning letter, the -- they quickly
17   responded by ceasing using those
18   materials, as well as the others that
19   contained some more language, and started
20   revising the materials as they were
21   corresponding back and forth with the
22   FDA.
23       Q.   What was the language at
24   issue in the letter?

Page 214

1        MS. WELCH:  Objection to
2    form.
3        MR. MELAMED:  I'll withdraw
4    that.
5    BY MR. MELAMED:
6    Q.   What was the language -- you
7    just spoke about language, specific
8    language.
9    A.   Yes.
10   Q.   What was the language
11   identified by the warning letter that
12   Actavis received on February 18th, 2010?
13       MS. WELCH:  Objection to
14   form.
15       THE WITNESS:  I don't have
16   the warning letter memorized.  I'm
17   happy, if you want to pull it up,
18   we can talk about the specific
19   components.  But I don't have the
20   letter memorized.
21   BY MR. MELAMED:
22   Q.   Do you remember the subject
23   matter of the language?  What it was --
24   what the misrepresentations concerned?

Page 215

1    A.   There were -- there were
2    several pages to that letter, and I don't
3    want to misspeak.  So I'd prefer to have
4    the letter in front of me if I'm going to
5    quote anything from there.
6    Q.   Without quoting it, do you
7    recall what it concerned?  What was said
8    about Kadian that the DDMAC warning
9    letter identified as problematic?
10       MS. WELCH:  Objection to
11   form.
12       THE WITNESS:  Again, I don't
13   want to summarize and, you know,
14   misquote the document.  So I'd
15   prefer to have it in front of me
16   if we're going to talk specifics
17   about the contents of the warning
18   letter.
19   BY MR. MELAMED:
20   Q.   Other than the response
21   listed on Pages -- on Page 14 of
22   Exhibit-3, did Actavis do anything else
23   once it received the warning letter?
24       MS. WELCH:  Objection to

Page 216

1    form.
2        MR. MELAMED:  Let me
3    specify.
4    BY MR. MELAMED:
5    Q.   I don't mean anything else
6    in the world.
7        I mean anything else
8    regarding its marketing of Kadian.
9        MS. WELCH:  Objection.
10   Form.
11       THE WITNESS:  So, I mean, I
12   think it's worth walking through
13   this.
14       So there were a series of
15   communications.  First Actavis
16   responded back to the FDA
17   acknowledging receipt of the
18   warning letter.  And then for the
19   next several months there was
20   communication back and forth
21   between Actavis and the FDA,
22   laying out a corrective action
23   plan.
24       And, you know, initially,

Page 217

1    earlier in this conversation, I
2    had identified, you know, they
3    specifically pulled all the pieces
4    and revised any materials -- I
5    mean, and also identified any
6    other materials containing similar
7    language that they pulled from
8    promotion.
9        And then committed, with the
10   FDA, to retraining the sales force
11   with corrective information,
12   sending Dear Healthcare
13   Professional letters to
14   prescribers who receive
15   promotional materials or sales
16   calls containing that language
17   that was referenced in the warning
18   letter, sending Dear Consumer
19   letters to patients who would have
20   received co-pay cards who were
21   either identified by having
22   registered via the website or
23   phone, and then also hiring a
24   sales force to distribute Dear

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 Consumer letters to prescribers'
2 offices.
3 So they had to hire, I
4 believe it was around 150
5 temporary sales representatives to
6 just distribute the information to
7 those doctors' offices.
8 So it was a pretty extensive
9 and comprehensive plan that the
10 FDA then did agree with -- that
11 they were satisfied with.
12 BY MR. MELAMED:
13 Q. Did Actavis do anything else
14 in response to the letter, other than
15 what's listed?
16 A. These were the core
17 components. "Anything else" is a pretty
18 broad term.
19 I mean, there was -- I don't
20 know if I mentioned training -- we did
21 retrain the sales force. So, I mean,
22 these are pretty broad things.
23 This is what I gathered from
24 all of the communications and information

Page 219

1 that I received.
2 Q. How did Actavis retrain the
3 training force?
4 A. Retrain the sales force?
5 Q. Thank you for clarifying my
6 ill-framed -- my improper question, my
7 incorrect question.
8 A. So there were sales training
9 decks that were created to specifically
10 lay out what the FDA's concerns were and
11 what the sales representatives should do,
12 what their messaging should contain, what
13 they should say.
14 I mean, it's all laid out in
15 the training documents that I believe are
16 part of the documents that are listed
17 here.
18 And they -- I don't remember
19 the date of the meeting, but they had a
20 meeting with all of the sales
21 representatives to walk them through that
22 presentation and make sure that they were
23 all clear on what they were supposed to
24 do.

Page 220

1 Q. Are you familiar with the
2 Kadian learning system, which is also
3 sometimes called, internally, the Kadian
4 training module?
5 A. I've seen some drafts, some
6 versions of that, yes.
7 Q. When -- did you see that in
8 preparation for today's testimony?
9 A. Yes.
10 Q. Did they make any changes --
11 let me withdraw that.
12 Did anyone at Actavis make
13 any changes to the Kadian learning system
14 in response to the DDMAC letter?
15 A. Yes. My understanding is
16 that the -- that training was revised.
17 And there was also a separate training
18 deck that was created to train the sales
19 force specifically on the items that they
20 had committed to with the FDA.
21 Q. How quickly was that
22 training module revised? About what date
23 was the revised training module --
24 training module made available?

Page 221

1 A. I don't remember the exact
2 date. I'd have to -- I'd have to see it.
3 But I know there was back-and-forth with
4 the FDA for a couple of months and the --
5 you know, the documents are reviewed. I
6 believe, all of the actions that the
7 sales force was hired to -- the
8 corrective actions that were laid out
9 that they were hired to do was completed
10 in the September time frame, is what I
11 recall.
12 Q. Was the Kadian learning
13 system provided to the FDA as part of the
14 back-and-forth in response to the warning
15 letter?
16 A. I don't believe that was --
17 that was provided to the FDA. I don't
18 remember seeing that go back and forth.
19 Q. You don't remember or --
20 A. I don't believe it was part
21 of what was sent to the FDA, as is -- I
22 don't believe they requested it. I think
23 what they wanted to review were the
24 documents that were going to go out to

Page 222

1 consumers as well as healthcare
2 professionals.
3     Q.   Do you know whether Actavis,
4 Incorporated received any subpoena
5 seeking information regarding the
6 marketing or sales of opioids?
7     A.   I'm just going back to my
8 notes on that section.
9     Q.   I believe it's on Page 13 --
10     A.   Yes, Page 13.
11     Q.   -- of Exhibit-3.
12     A.   So you're talking about
13 Actavis, Inc.?
14     Q.   Yes.
15     A.   So all the ones listed here
16 went to Allergan Finance. So I'm not
17 aware of any that went to Actavis, Inc.
18     Q.   Are you -- is that the same
19 answer for Actavis PLC? Are you aware of
20 any subpoenas to Actavis PLC seeking
21 information regarding the marketing or
22 sale of opioids?
23     A.   Now we're just getting,
24 again, into the corporate structure and

Page 223

1 the designation between Allergan Finance
2 versus Allergan -- Allergan PLC.
3     So, I mean, the way that I
4 understand it is that these subpoenas
5 were issued to Allergan Finance. And how
6 that interacts with Allergan PLC I'm not
7 100 percent sure.
8     Q.   I believe I asked about
9 Actavis PLC.
10     A.   I'm sorry.
11     Q.   I would -- I'm going to ask
12 the same question about Allergan PLC.
13     Is the answer the same?
14     A.   The answer is the same.
15     Q.   Has Allergan Finance
16 produced documents in response to the
17 subpoenas listed on Page 13 of Exhibit-3?
18 The first paragraph of your response to
19 Topic 27.
20     A.   If you look at the last
21 sentence there, I have written, Allergan
22 Finance has not entered into any
23 settlements, agreements, consent decrees
24 related to these subpoenas.

Page 224

1     Q.   Do you know if they provided
2 any documents to any of those entities --
3 if Allergan -- I'm sorry, let me withdraw
4 that.
5     Do you know if Allergan
6 Finance has provided any documents to any
7 of the entities listed in that paragraph
8 in response to the subpoenas those
9 entities issued?
10     A.   I assume they have. I don't
11 know.
12     Q.   And your answer may be the
13 same.
14     Do you know whether the
15 documents provided to each of those
16 entities have been provided to plaintiffs
17 in this litigation?
18     MS. WELCH: Objection.
19 Beyond the scope of the notice
20 topics.
21     THE WITNESS: Yes, I don't
22 know all the files that were
23 produced.
24 BY MR. MELAMED:

Page 225

1     Q.   Turn to Page 16, Topic 30 of
2 Exhibit-3.
3     I just wanted to ask
4 specifically whether you are aware of any
5 representation -- any of the
6 representations -- there are eight
7 listed, A through H, in the topics.
8     Do you see that?
9     A.   I see that.
10     Q.   Are you aware whether any of
11 those representations were made to
12 promote Kadian?
13     A.   In all the review that I
14 did, I did not see these statements in
15 any of the marketing materials. And when
16 I reviewed the marketing materials,
17 everything in my discussions with
18 Jennifer, everything was based on the PI.
19 I think she called it a colorful PI that
20 they essentially created. And everything
21 was, in the marketing materials that she
22 created, were in the scientific research.
23 And I didn't see any of these specific
24 statements in A through H in the

Page 226

1 materials that I reviewed.
2     Q.   When did Jennifer join the
3 company, do you know?
4     A.   Jennifer joined the company
5 in 2009, I believe.
6     Q.   Do you know whether any of
7 these representations were made to
8 promote Kadian before 2009?
9     A.   In the materials that I
10 reviewed, I did not see these statements
11 in the marketing promotional materials.
12     Q.   What about materials used to
13 promote opioids generally?  Were any of
14 these statements used in any materials
15 used to promote opioids generally?
16     MS. WELCH:  Objection.
17     Form.
18     THE WITNESS:  I don't think
19     the company did any general opioid
20     marketing.  The marketing was
21     specifically related to Kadian.
22     So I have not seen any
23     materials on that.
24 BY MR. MELAMED:

Page 227

1     Q.   Were any of these
2 representations made in the process of
3 training sales reps to market Kadian?
4     A.   I didn't see any of these
5 specific statements in there.
6     So the one -- the one
7 distinction I would make between sales
8 training materials and marketing
9 materials is sales training information
10 typically contained definitions,
11 information, background for sales
12 representatives so they can go into a
13 physician's office, just prepared,
14 understanding lingo that people use
15 and -- but it's very clear what
16 representatives -- what is training and
17 background information versus what they
18 can say in their promotional marketing
19 materials.
20     That said, I didn't see any
21 of these specific statements in there
22 either.
23     Q.   So you didn't see any
24 statements concerning tapering -- opioid

Page 228

1 withdrawal can be avoided by tapering in
2 training materials provided to sales
3 representatives?
4     A.   I didn't see that specific
5 statement, no.
6     Q.   Do you know of any basis for
7 that statement as you sit here today?
8     A.   Do I know a basis for -- I
9 mean, I'm not -- certainly not an expert
10 in opioids.  So from my capacity, I can't
11 really make a statement on that.
12     Q.   You've referred several
13 times to not having seen these specific
14 statements.  And, again, by "these
15 specific statements," I'm talking about
16 the listed statements on Topic 30, which
17 are reprinted on Exhibit-3, Page 16.
18     Have you seen statements to
19 the same effect as any of the statements
20 listed there?
21     MS. WELCH:  Objection to
22     form.
23     THE WITNESS:  I think that
24     would, you know, call for me to

Page 229

1 make a judgment on what something
2 means versus what it's -- you
3 know, what it says versus what
4 it's intended to say.
5     I haven't seen anything
6 that, in my review, in my
7 understanding, says something
8 similar to this.
9     I did include in here some
10 statements in -- on Page 16, Topic
11 30, in the response column, with
12 information related to guidelines
13 for treating chronic pain, dosing
14 flexibility, were some examples of
15 some statements regarding whether
16 it's dosing or treating chronic
17 pain.
18     For example, the World
19 Health Organization guidelines
20 recommend treating chronic pain
21 with a long-acting opioid, Kadian
22 contains morphine sulfate, an
23 opioid agonist, and a Schedule II
24 controlled substance with an abuse

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1   liability similar to other opioid
2   analgesics, and flexibility to
3   dose Q12 hours or Q24 hours.
4          So those are the statements
5   that I identified that were along
6   the topics of whether it's dosing
7   or treating chronic pain, the more
8   general statements.
9   BY MR. MELAMED:
10     Q.   I'm going to hand you what's
11  previously been marked as Altier
12  Exhibit-2. It's quite lengthy. I will
13  point you to specific passages that I
14  want to look at.
15         MS. WELCH: While he's
16     passing those out, do you guys
17     have a charger for the real time?
18            - - -
19     (Whereupon, a discussion off
20  the record occurred.)
21            - - -
22         VIDEO TECHNICIAN: We are
23     going off the record. The time is
24     2:10 p.m.

Page 231

1            - - -
2      (Whereupon, a brief recess
3      was taken.)
4            - - -
5         VIDEO TECHNICIAN: We're
6      going back on the record. The
7      beginning of Media File Number 5.
8      The time is 2:19.
9   BY MR. MELAMED:
10     Q.   So I just handed you what
11  was previously marked Allergan Altier
12  Exhibit-2.
13         It's an e-mail from Jennifer
14  Altier to Lisa Miller, e-mail string, the
15  most recent being from Jennifer Altier to
16  Lisa Miller, Bates stamped
17  Allergan_MDL_01610520. It's a two-page
18  e-mail string. And there are two
19  attachments, the first starts at
20  Allergan_MDL_01610522 and the second
21  starts at Allergan_MDL_01610714.
22         MS. WELCH: I'm sorry, can
23     you give me the Bates number
24     again?

Page 232

1         MR. MELAMED: 01610714 is
2      the second attachment.
3   BY MR. MELAMED:
4      Q.   So if you look at the
5   first-in-time e-mail on the second page,
6   it's Allergan_MDL_01610521.
7      A.   Yes.
8      Q.   It's from Jennifer Altier to
9   Carla Hendrick, stating the need to
10  re-submit the Kadian training module to
11  Watson's PRC and stating that the two
12  attachments are the Actavis module, first
13  attached, created based on the Alpharma
14  module, second attached.
15         Do you see that?
16     A.   Yes.
17     Q.   So this Actavis module, the
18  first attached, was in use -- is it your
19  understanding that the Actavis module was
20  in use as of January 15th, 2013?
21     A.   Let's see.
22         It doesn't specifically
23  state that. So my understanding is the
24  representatives were no longer promoting

Page 233

1   Kadian as of the end of 2012. So I don't
2   know if there was anyone using this
3   specific document.
4      Q.   Do you have any
5   understanding why Jennifer Altier would
6   be requesting references in order to
7   resubmit the training module in 2013 if
8   nobody was detailing the drug anymore?
9      A.   Around that time period, I
10  believe they were still in discussions
11  about, you know, what, if any, promotion
12  that they would -- that they would do.
13  So to have a training module on file, an
14  active training module, would be the
15  reason.
16         There may have also been --
17  I'm trying to think of the dates. There
18  may have been some teleservice
19  representatives that they were still
20  training, because they were active
21  slightly longer than the inVentiv sales
22  representatives.
23     Q.   Is it your understanding
24  that the training module, the first

Page 234

1 attached document that starts at
2 Allergan_MDL_01610522, would have been
3 the training module in use up until this
4 point in time, to the extent any training
5 module was used?
6     A.   Based on the fact she sent
7 it as, you know, the Actavis module, I
8 think this is the version that was being
9 used.  But it's a big module, I can't say
10 for certain this is what they were using
11 to train the sales force.  It looks like
12 it was.
13         It has a date on it of July
14 1st of 2010, so it doesn't have an end
15 date.  But, yes, it has -- that is the
16 date it looks like it was started to be
17 used.
18     Q.   Based on that date, the July
19 1st, 2010 date on which it appears it was
20 started -- it started to be used, or it
21 was completed, is it your understanding
22 that this training module reflected
23 changes in response to the DDMAC letter
24 sent -- received by the company in

Page 235

1 February of 2010?
2     A.   Since it was active in July
3 of 2010, it should contain those updates.
4 I would assume that it does.
5     Q.   You saw in Topic 30 the --
6 one of the representations we asked about
7 was whether there was a description of
8 signs of addictive behavior as
9 pseudo-addiction requiring more opioids.
10     Do you see that?
11     A.   I'm sorry, in Topic 30 --
12     Q.   Yes.
13     A.   Yes.
14         You're asking -- you're
15 asking about Statement C?
16     Q.   Yes.  I'm just referencing
17 that.
18     A.   Yes.
19     Q.   Can you turn to Page 7 of
20 the first training module?
21         Do you see that there's a
22 terminology page and that among the terms
23 defined is pseudo-addiction?
24     A.   I see that pseudo-addiction

Page 236

1 is defined in a glossary, if you will, of
2 terms for the training system, yes.
3     Q.   And it's defined as
4 behaviors that mimic addictive behaviors
5 exhibited by patients with inadequately
6 treated pain.
7         Do you see that?
8     A.   I see the definition listed
9 there.
10     Q.   Is that a representation
11 that you consider consistent with Topic
12 30, Number C?
13     A.   There are a couple of
14 distinctions that I would make here.  So,
15 this is a -- first of all, this is a
16 definition of pseudo-addiction that is
17 different than the statement that's in C.
18         The other thing is that
19 these are training materials for
20 background information for sales
21 representatives.  They're not marketing
22 materials for what representatives would
23 discuss with physicians.
24         And the reason for that -- I

Page 237

1 don't know how familiar you are with the
2 sales force and training.  You know, when
3 these representatives are going in to
4 have a conversation with a physician,
5 it's important that they know the
6 terminology that a physician may use.
7         And so that this way they
8 have an understanding of that, so just
9 they're credible when they're going in to
10 talk to a physician.
11     Q.   So it was appropriate to
12 provide them with a definition of
13 pseudo-addiction?
14     A.   It's appropriate to provide
15 them with all the definitions of terms
16 that they may hear in the context of --
17 in the course of business when they're
18 talking to physicians.
19     Q.   So -- and you referenced
20 differences between the definition on
21 Page 7 of Altier Exhibit-2 and Topic 30C.
22         The different -- I assume
23 one, Topic C, says that, Addictive
24 behaviors require more opioids.  This one

Page 238

1  says, Behaviors that mimic addictive
2  behaviors reflect inadequately treated
3  pain.
4         Is that true?
5     A.   I'm sorry, I'm going back
6  and forth.  I'm not following.
7         Yes, yes.  So the definition
8  here is -- one, it's slightly different
9  than -- it's different than what we see
10 here in C, it's a different statement.
11 And the other is that -- you know, I
12 think the question -- the topic was
13 around marketing materials, not training
14 materials.  Two totally different types
15 of materials.
16    Q.   Did you consider -- in
17 response to -- withdraw that.
18        In preparation to respond to
19 Topic 30, did you consider training
20 materials?
21        MS. WELCH:  Objection to
22    form.
23        THE WITNESS:  I reviewed the
24    training materials as well.  I

Page 239

1     don't necessarily consider these
2     marketing materials.
3         But these are -- marketing
4     materials are also -- are things
5     that a representative would take
6     and communicate -- use with a
7     physician to communicate.  Whereas
8     training materials are background.
9         But I did review these to
10    get the full scope in connection
11    with Topic 30.
12 BY MR. MELAMED:
13    Q.   What's the purpose of
14 providing sales reps training materials?
15    A.   Sure.  There's several
16 different purposes.  You know, typically,
17 you would want to train sales
18 representatives on the disease state for
19 the condition that they are going to be
20 selling products for.  You would want to
21 train representatives on the types of
22 physicians that they would be talking to.
23 You'd want to train them on the materials
24 that they have to talk to physicians

Page 240

1  with.
2         So it's really to give them
3  background information, as well as the
4  information that they will use to promote
5  the product.
6         Additionally, what data they
7  have available to them and all of that.
8         So it's -- I mean, it's
9  several-fold.  But definitely background,
10 as well as what their promotional
11 statements can be, what materials they
12 can use.
13    Q.   And to state the obvious,
14 you would try to -- the goal would be to
15 provide the sales reps with accurate
16 information in their training materials;
17 is that true?
18    A.   Of course.
19    Q.   Can you turn to Page 31 of
20 the training materials?
21    A.   Sure.
22    Q.   The bottom paragraph.
23        You see that it says,
24 Although some progress has been made in

Page 241

1  providing good pain control to every
2  patient, many factors still interfere
3  with pain management.
4         It goes on to list three
5  factors.  The last of those factors is an
6  inappropriate fear of addiction.
7         Do you see that?
8     A.   I see the statement you're
9  referring to.
10    Q.   And that's something you
11 were providing your training
12 representatives so they were aware that
13 that was something they would need to
14 overcome in conversations with doctors?
15        MS. WELCH:  Objection to the
16    form.
17        THE WITNESS:  I mean, I
18    think -- I think you're adding
19    some context in terms of why you
20    would be providing this statement,
21    what the rationale behind
22    including it is.
23        So, I think, like I said,
24    documents for training are to give

Page 242

1 representatives background
2 information so when they talk to
3 physicians they understand the
4 landscape. It's very different
5 than what they are instructed to
6 communicate to physicians.
7 BY MR. MELAMED:
8     Q.   From the perspective of
9 Actavis in this training module, the
10 inappropriate fear of addiction still
11 interferes with pain management, correct?
12     A.   I think -- I just want to
13 make sure that it's clear.
14         There -- this isn't saying
15 that fear of addiction is inappropriate.
16 It's talking about -- the "inappropriate"
17 is qualifying, I'm sure -- qualifying the
18 fear of addiction. So I don't want -- I
19 think the way you said it was broadening
20 the sentence a little bit.
21         But, I mean, this is
22 summary, and I haven't read through all
23 the details. So I don't want to guess as
24 to what this specific statement, taken

Page 243

1 out of context, is referencing.
2         So, I mean, if you want me
3 to speak specifically about any one
4 statement in there, I'd have to do a
5 little bit of reading.
6     Q.   You'd need context to decide
7 whether this paragraph, fairly read,
8 states essentially that, among other
9 things that interfere with pain
10 management is an inappropriate fear of
11 addiction; is that what you're saying?
12         MS. WELCH:  Objection to
13     form.
14         THE WITNESS:  I'm saying
15     that I would -- you know, it's a
16     large document, it's 192 pages.
17     And just, you know, picking out
18     one sentence and asking me to say
19     what that is, is just kind of hard
20     to do.  So I'd --
21 BY MR. MELAMED:
22     Q.   So you have trouble --
23     A.   -- like to read it.
24     Q.   -- understanding that one

Page 244

1 paragraph without the context of the
2 document?
3     A.   I would want to read through
4 the document before I drew any type of
5 conclusion as to exactly what that is
6 saying.
7     Q.   As you sit here today, you
8 have no conclusion to draw as to what
9 that paragraph is saying?
10     A.   I'm just reading through the
11 document.
12         So I read through the
13 summary, and it does talk about some
14 factors that may interfere with pain
15 management and lists some specific
16 examples that are, you know, potential
17 things that would interfere with pain
18 management.
19         And so -- but if I'm --
20 since this is a summary, I would assume
21 that there's more information I could
22 read through to really understand what
23 the point of it is.
24     Q.   Can you see where in that

Page 245

1 final paragraph -- or can you point me
2 where, I'm sorry, in that final paragraph
3 it says that the three things listed in
4 the second sentence may interfere, or
5 would possibly interfere with pain
6 management?
7     A.   It says, Many factors still
8 interfere with pain management. So there
9 are several factors that do.
10         However, every one of the
11 factors listed would not interfere in
12 every case, which is why I would qualify
13 that.
14     Q.   Fair enough.
15         Going back to the
16 pseudo-addiction definition, I don't know
17 if -- feel free to look back to the page,
18 it was Page 7, I believe.
19     A.   Sure.
20     Q.   But do you know what the
21 basis of that definition is?  The
22 terminology listed here on Page 7, do you
23 know where that definition comes from?
24     A.   Without looking through to

Page 246

1  see if there's references, I don't know
2  where this exact definition comes from.
3      Q.   And do you know what the
4  basis is for saying that an inappropriate
5  fear of addiction still interferes with
6  pain management, as reflected on Page 31?
7      A.   If you go back to Jennifer's
8  e-mail, I think the purpose of her e-mail
9  was to ask for some -- I believe she was
10 asking for some references.  I just want
11 to find that.
12          Yeah, in the last line on --
13 so this is Bates number 0520 -- I'm
14 sorry, 0521.  There she was asking
15 someone, Carla Hedrick, if she had the
16 references on file.
17          So these materials would
18 typically go through the Promotional
19 Response -- Promotional Review Committee
20 and the legal, regulatory, medical groups
21 would review the statements in there, and
22 also the references where they were
23 pulled from.
24          So I don't have the specific

Page 247

1  reference that these were pulled from.
2  But because they went through that
3  Promotional Review Committee, they would
4  have checked the references to make sure
5  that the statements were accurately
6  reflecting the references.
7      Q.   So the statement on 31 would
8  be sourced to some -- some of -- one of
9  the articles cited on 32 and 33, if not
10 more?  Is that your understanding?
11     A.   I don't know if these are
12 the only references in the document,
13 but --
14     Q.   I'll represent to you that
15 they are not the only references in the
16 document.
17     A.   They're not.  Okay, then I
18 don't know.
19     Q.   They are the references for
20 that chapter.
21     A.   Then I don't know for sure
22 whether those are a reference to it.  You
23 know, each statement doesn't have a
24 specific reference number there.

Page 248

1      So it looked like Jennifer
2  was looking for all of the, you know,
3  literature cited.  She was looking for
4  all those for different chapters.
5      So because this is a
6  summary, I don't know if it's a summary
7  of that specific chapter, which is why
8  I'd have to look through the whole
9  document to understand if that's a
10 summary of a specific chapter or a
11 summary of more pages of it.
12         But one of the references in
13 the document would likely be the source
14 for that.  And that's the job of the
15 Promotional Review Committee, to look
16 through those references and look through
17 the documents and make sure everything
18 that is in this learning system or any
19 promotional material or anything that
20 comes out from the company is accurate.
21     Q.   So you are confident that it
22 isn't inaccurate to state that an
23 inappropriate fear of addiction is one
24 factor that still interferes with pain

Page 249

1  management, as of, you know, 2010 when
2  this training module was created?
3         MS. WELCH:  Objection to
4      form.
5         THE WITNESS:  I'm confident
6      that these materials went through
7      the Promotional Review Committee.
8      I'm not a medical person, which I
9      think you would need to rely on to
10     really make that distinction of,
11     like, this is accurate, this is --
12     but there was a medical person on
13     the Promotional Review Committee,
14     and they reviewed this document.
15 BY MR. MELAMED:
16     Q.   Okay.  If you look again at
17 Topic 30, Number -- or Subletter D.
18     A.   Sure.
19     Q.   It says, Opioid withdrawal
20 can be avoided by tapering.
21         Do you see that?
22     A.   Yes.
23     Q.   Can you turn to Page 75 of
24 Altier Exhibit-2?  It will be Bates stamp

Page 250

1 ending 596.
2        Do you see the two bullet
3 points at the bottom of 75?
4    A.   Yes.
5    Q.   Do you see the last sentence
6 at the end of the first bullet point, and
7 it says, Physical dependence simply
8 requires a tapered withdrawal should the
9 opioid medication no longer be needed.
10    A.   I see the sentence you're
11 referring to.  I haven't read through
12 the --
13    Q.   Is that sentence consistent
14 with the meaning of the sentence in
15 Subtopic D in Topic 30, that opioid
16 withdrawal can be avoided by tapering?
17    A.   No, those are two different
18 statements.  And, again, I really don't
19 have medical expertise to determine
20 exactly what they mean in terms of, you
21 know, physical dependence.  And it's
22 different language.
23        So, again, I mean, I can
24 make a few comments about this document,

Page 251

1 that it went through the medical, legal,
2 regulatory review.  And the statements in
3 here, to my understanding, are based on
4 the references that are in here.  And it
5 was also -- it's a background training
6 piece as opposed to a marketing piece.
7        So I just want to make sure
8 that that distinction remains clear,
9 because this is a training module, not
10 something that the representatives would
11 be out saying to physicians.
12    Q.   Do you know whether this
13 training module says anywhere in here,
14 don't say any of this to physicians?
15    A.   I'd have to look through to
16 see it.
17    Q.   I'm not going to ask you to
18 look through it.
19    A.   But the --
20    Q.   If it's there, it's there.
21 I'm just asking you.
22    A.   I do know that when -- the
23 training presentations that I reviewed
24 have always specified that the training

Page 252

1 is for background and what statements
2 are -- but I don't know whether this
3 specific -- well, actually, here it says
4 for internal and training purposes only,
5 not to be distributed.
6    Q.   Right.  The document is not
7 to be distributed.
8        I'm just asking about the
9 messages therein.  Is there anything in
10 here, and you may not know and that's
11 fair, and I don't want to take the time
12 to go through the whole document, it will
13 say it or not say it.
14    A.   Right.
15    Q.   But do you know, off the top
16 of your head, whether the document itself
17 says, this information is for your own
18 background, please do not provide it to
19 any doctors?
20    A.   So the document does say --
21    Q.   The information, not the
22 document.
23    A.   -- for internal -- oh, the
24 information in here?

Page 253

1    Q.   Yes.
2    A.   I mean, I think that's -- I
3 think that's encompassing, in my opinion,
4 for internal and training purposes only,
5 not to be distributed, doesn't mean the
6 physical document -- it can mean the
7 physical document as well as the
8 information in there.
9    Q.   So it's your understanding
10 that sales representatives who received
11 this would know that it was not provided
12 to them to provide information that they
13 should discuss with the doctor?
14    A.   I mean, in my experience,
15 and I'll speak from my experience, it's
16 very clear up front to sales
17 representatives in training that these
18 are not to be provided; and that they
19 understand that language, that if
20 something says it's for internal and
21 training purposes only, that they are not
22 able to communicate that.
23        I obviously wasn't in the
24 training classes, and I don't have all

Page 254

1 the e-mails that went back and forth with
2 the sales force. But that is -- that is
3 my understanding.
4     Q.   And just to be clear, I
5 understand that the document makes clear
6 it was not to be provided.
7     A.   Yes.
8     Q.   But it's your understanding
9 that sales representatives also would
10 have understood that the information
11 contained in the document should not be
12 provided?
13     A.   That's very, very standard
14 practice with sales representatives, yes,
15 that they know what their marketing
16 materials are.
17     Q.   But the purpose of this was
18 to provide sales reps with education so
19 that they could engage with doctors,
20 correct?
21         MS. WELCH:  Objection.
22 BY MR. MELAMED:
23     Q.   What was -- what was the
24 purpose --

Page 255

1         MS. WELCH:  Objection.
2 BY MR. MELAMED:
3     Q.   -- of the training document?
4         MS. WELCH:  Objection to
5 form.
6         THE WITNESS:  The purpose of
7 the training is several things.
8         And, you know, I think I
9 talked about this in the
10 beginning.  It's to give
11 information, background
12 information, on the overall market
13 and the terminology that they may
14 encounter.
15         And then there's also
16 sections that talk specifically
17 about the product and -- so they
18 have information on the -- on
19 Kadian and what the indication is,
20 the warnings, all of that type of
21 information.
22         So it's to provide
23 information to sales
24 representatives as they're

Page 256

1 learning about product -- the
2 product and getting ready to go
3 into the sales force to talk to
4 doctors about Kadian.
5 BY MR. MELAMED:
6     Q.   Turn to 76, please.
7     A.   Sure.
8     Q.   Do you see the bullet point,
9 Substance abuse?  The second sentence.
10         It says, However, despite
11 the continued unscientific beliefs of
12 some clinicians, there is no evidence
13 that simply taking opioids for a period
14 of time will cause substance abuse or
15 addiction.
16         Why was that information
17 provided to sales representatives who
18 were going to detail opioids to doctors?
19     A.   As I said earlier, I mean,
20 this is background information that needs
21 to be provided to sales representatives
22 so when they're in conversations with
23 physicians, if a physician makes a
24 statement that they are aware of the

Page 257

1 types of -- whether it's terminology that
2 a physician would use or something that,
3 you know, a physician might say in the
4 course of a discussion with a sales
5 representative.
6         So there's background
7 information that is typically provided to
8 the sales representatives.
9     Q.   What about that specific
10 sentence I just read?  What's the purpose
11 of providing that to a sales rep who is
12 about to go detail opioids to doctors?
13         MS. WELCH:  Objection to
14 form.
15         THE WITNESS:  I mean, I
16 didn't put together the document,
17 so I can't be sure what the intent
18 behind it was.
19 BY MR. MELAMED:
20     Q.   If you look at Topic 30, Sub
21 A, it says, The risk of addiction from
22 chronic opioid therapy is low.
23         The sentence we just read on
24 Page 76 of the Kadian learning system is

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  consistent in meaning with Sub A, is it
2  not?
3      A.   I don't think it is.  I
4  think what these -- what the point that
5  training module would want to -- is
6  trying to make is that Kadian has
7  legitimate medical use and it was
8  approved by the FDA because there are
9  patients who have pain that are
10  appropriate patients for Kadian.
11          And I think that is what
12  some of this background information is
13  trying to include.
14      Q.   Do you see where any of what
15  you just said is in that bulleted
16  paragraph on Page 76?
17      A.   I mean, it's two different
18  things.  You're asking me what does the
19  document say, but then you're also asking
20  what is the intent behind it.  So I'm --
21      Q.   I'm ask --
22      A.   -- trying to provide the
23  intent.
24      Q.   I wasn't asking you about

Page 259

1  the intent.  I was asking you if the
2  meaning of the sentence we read on Page
3  76 was to you, in your mind, as you sit
4  here on behalf of the corporation,
5  consistent with Topic 30, Sub A, the
6  meaning of that, the risk of addiction
7  from chronic opioid therapy is low?
8          MS. WELCH:  Asked and
9      answered.
10          THE WITNESS:  No.
11          MR. MELAMED:  I don't think
12      the first part of that.
13          THE WITNESS:  I think they
14      are two -- they are two different
15      statements.
16          The statement that you have
17      in here is the risk of addiction
18      from chronic opioid therapy is
19      low.  And this says that there's
20      no evidence that simply taking
21      opioids for a period of time will
22      cause substance abuse or
23      addiction.
24          To me what that says is that

Page 260

1  there are legitimate uses for
2  patients taking opioids that --
3  and not every person who takes an
4  opioid will become addicted.
5  That's how I read that.
6  BY MR. MELAMED:
7      Q.   Would a sales representative
8  have been able to make that statement to
9  a doctor -- let me withdraw that.
10          Would it have been proper
11  for a sales representative detailing
12  Kadian to make that statement to a
13  doctor?
14          MS. WELCH:  Objection.
15      Beyond the scope of the noticed
16      topics.
17          THE WITNESS:  Sales
18      representatives were trained to
19      use the materials that were in
20      there that were -- they're
21      marketing materials, which they
22      were trained on.
23          And so the statements that
24      they were -- that they would use

Page 261

1  to a physician were in those
2  marketing materials, not from the
3  training system.
4  BY MR. MELAMED:
5      Q.   So would it have been
6  inappropriate, in response to a doctor
7  who says, I'm worried that taking opioids
8  for a period of time may cause my
9  patients to become addicted or have
10  substance abuse issues, would it have
11  then been appropriate for a sales
12  representative to say, I understand, but
13  I believe that's an unscientific belief?
14          MS. WELCH:  Objection.
15      Asked and answered.  Speculative.
16      And outside the scope of the
17      noticed topics.
18          THE WITNESS:  Our
19      representatives were trained to
20      only communicate the approved
21      messages in their marketing
22      materials.
23          If this was not in their
24      marketing materials, it would not

Page 262

1  be appropriate for them to respond
2  with this information.
3  BY MR. MELAMED:
4    Q.   Do you know whether any
5  sales representatives detailing Kadian
6  stated any -- anything to doctors
7  reflected in the training materials but
8  not the marketing materials?
9      MS. WELCH:  Objection.
10  Outside the scope of the noticed
11  topics.
12      You can go ahead.
13      THE WITNESS:  The only
14      information I have specifically on
15      what sales representatives would
16      have said were some of the call
17      notes that I looked at.  And there
18      were no evidence of any of that
19      particular statement in that, in
20      those call notes.
21  BY MR. MELAMED:
22    Q.   More broadly in those call
23  notes that you reviewed, was there
24  evidence of any communications that were

Page 263

1  contained within the training materials
2  but not contained within the marketing
3  materials for the sales reps?
4    A.   I did not see any statements
5  outside of the marketing materials.
6    Q.   Returning to Topic 30, do
7  you know whether anyone acting on behalf
8  of Actavis made any of the
9  representations listed from A through H
10  to any doctors they detailed Kadian to?
11    A.   I have no evidence that
12  anyone made these statements to doctors.
13    Q.   And what is the evidence you
14  looked at to -- when you say you "have no
15  evidence," what have you considered?
16    A.   So I've looked at the
17  training materials that the
18  representatives received, in terms of
19  there were presentations that had
20  information about the marketing messages.
21  And I've also looked at the call notes
22  that were available.
23      And, as I mentioned just a
24  few minutes ago, I did not see anything

Page 264

1  related to that.
2      Did I have conversations
3  with all the representatives?  No.  But
4  from reviewing those official marketing
5  documents and the call notes, I have not
6  seen any evidence that representatives
7  made that.
8      And the other thing I would
9  draw your attention to.  Can I bring --
10  Exhibit-5, the contract sales force
11  agreement between inVentiv and Actavis.
12  If you look at Page 34, which is 8679
13  Bates number, in the job description for
14  the sales representatives, it
15  specifically talks about their goals.
16      And the first bullet point,
17  the second half of that sentence, Will
18  act in complete and total compliance with
19  laws, regulations and policies.
20      So that was specifically in
21  the job description for the
22  representatives.  And by accepting the
23  job, those were -- they agreed to follow
24  the policies that were set forth by the

Page 265

1  company.
2    Q.   Is there a policy at Actavis
3  that says, do not use training materials
4  in detailing calls?
5    A.   I don't know if there was --
6  in my review of the documents, I don't
7  remember seeing whether something was --
8  specifically stated that as a general
9  policy.
10      I know at Allergan, there
11  is.  And representatives are routinely
12  told that.  I wouldn't know for sure.
13  That might be a better question for
14  someone who was there at the time.  But I
15  don't have that policy in front of me.
16    Q.   Who would you ask, if you
17  were looking to find out that
18  information?
19    A.   I'd probably ask Nathalie.
20    Q.   Nathalie Leitch?
21    A.   Yes.  That's a question I
22  would ask her.
23    Q.   You just mentioned that you
24  didn't see anything -- I'm sorry, in

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1 responding and saying that you had not
2 seen evidence that any sales
3 representative had made any of the
4 representations in Topic 30, Subtopics A
5 through H, you stated that you didn't
6 have conversations with all the sales
7 representatives. Understandably.
8        Did you have conversations
9 with any of the sales representatives who
10 detailed Kadian, in preparation for this
11 testimony?
12      A.   No, I didn't have
13 conversations with sales representatives.
14 I talked to Jennifer and Nathalie, since
15 they were the marketing people who
16 provided direction to the sales force.
17      Q.   Jennifer --
18      A.   Altier.
19      Q.   -- Altier and Nathalie
20 Leitch?
21      A.   And Nathalie Leitch, yes.
22      Q.   Did you specifically ask
23 them whether sales representatives
24 said -- made any of the representations

Page 267

1 in 30, Sub A through H?
2      A.   I specifically asked them
3 about what the basis for the sales
4 representative marketing communications
5 were. And what they communicated to me
6 was that the -- and I think Jennifer
7 actually represented this in her
8 testimony as well, that the
9 representatives were trained on what the
10 statements in their marketing materials
11 were and what they were able to talk
12 about.
13        I think she referred several
14 times to the marketing materials being,
15 like, a colorful PI, and that was the
16 basis for all of the statements that
17 representatives were trained to make.
18      Q.   You also testified that this
19 training module went through PRC,
20 correct?
21      A.   Yes.
22      Q.   And that's the legal and
23 regulatory review committee that approved
24 marketing and training materials, right?

Page 268

1      A.   That's correct.
2      Q.   And is it your testimony
3 that because it went through PRC it,
4 therefore, had a basis in fact and was
5 adequate -- was -- let me withdraw that
6 and restate it.
7        Is it your testimony that
8 because it went through PRC, it was
9 something that was permissible to provide
10 to sales representatives?
11      A.   If you're asking me, then,
12 is the -- permissible to the company,
13 yes. Once something goes through PRC, if
14 it's a marketing material and a
15 leave-behind, that can go to -- that can
16 go from sales representatives to
17 physicians.
18        The training documents went
19 through that review process, but those
20 were not provided to physicians.
21      Q.   Certain materials that did
22 go through PRC were subject of the FDA
23 DDMAC letter, however, right?
24      A.   So the -- just a distinction

Page 269

1 there.
2        So the materials that went
3 through -- that were subject to the
4 warning letter were materials that came
5 from Alpharma. And in talking to Terri
6 Nataline, she mentioned, at the time,
7 that she really -- she looked at those
8 materials, there wasn't a formal PRC
9 process in place at the time, and she --
10 but she went through them and she okayed
11 them to be used at the sales force at the
12 time.
13      Q.   When did the PRC process
14 come into being?
15      A.   I don't know the date. It
16 would have been soon afterwards, since I
17 saw, you know, in talking to Jennifer,
18 all of her materials went through the PRC
19 process. And she, I know, started in
20 2009.
21        So it would have been some
22 time then. But I don't know the exact
23 date.
24      Q.   Just to be clear, though,

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 all of the materials didn't go through
2 the PRC, right? Because certain
3 materials, on the acquisition of Kadian,
4 were taken from Alpharma, reviewed by
5 Terri Nataline, but not PRC, and then
6 used; is that correct?
7     A.   So they would have gone
8 through Terri's review. I don't know
9 whether she officially called the process
10 that she put it through a PRC, but it
11 was -- it was a -- it went through her.
12 It didn't go through the same committee
13 that then the revised materials went
14 through.
15     Q.   Was she a part of the PRC
16 after it was constituted?
17     A.   From Jennifer's testimony,
18 she gave other names who were the
19 regulatory -- the regulatory person. So
20 I don't believe she was part of that PRC.
21     Q.   And you have no other
22 knowledge, aside from Jennifer Altier's
23 testimony, regarding the members of the
24 PRC?

Page 271

1     A.   The actual people that were
2 on there, that all came from -- my
3 knowledge of that came from Jennifer's
4 testimony and talking to Jennifer.
5     Q.   In terms of the marketing
6 materials that were provided to sales
7 representatives to market Kadian, were
8 any of those regionally specific?
9     A.   None of the ones I saw were
10 regionally specific. They were all --
11 they were all national -- the same
12 materials that were used nationally.
13     Q.   So to the best of your
14 knowledge, all of the marketing materials
15 concerning Kadian that were provided to
16 sales reps were used by sales reps across
17 the country?
18     A.   Yes, that's my
19 understanding.
20         There was one contract I
21 reviewed with MetaMedia, they provided
22 some managed care data where I believe
23 sales representatives could pull up
24 coverage specific to an area and provide

Page 272

1 that to physicians. So that would be the
2 only exception that I could think of that
3 would fall into that category.
4     Q.   Do you know where the --
5 those -- let me withdraw that and restate
6 it.
7         Do you know what
8 geographical areas the managed care data
9 was provided for?
10     A.   It would have been plans,
11 there would have been specific plans that
12 were on there. So I think it would be
13 a -- MetaMedia is a national database, so
14 anyone could pull it -- could pull that
15 information to figure out managed care
16 coverage in a state or another geography.
17         But I don't know enough
18 about the database to know exactly
19 whether it was broken down by MSA, state,
20 that type of information.
21     Q.   Turn to Page 7 of Exhibit-3.
22 It's the notes that you prepared. This
23 concerns Topic 11 --
24     A.   Yes.

Page 273

1     Q.   -- which is your
2 relationship with compensation paid by
3 you to an identity of persons who
4 interacted with a series of persons and
5 entities regarding opioid -- opioids or
6 opioid products.
7         And you responded that,
8 Allergan does not have a relationship
9 with the listed individuals or entities
10 for the purpose of promoting Kadian or
11 Norco.
12         Do you see that?
13     A.   Yes.
14     Q.   Did Allergan have a
15 relationship with any of the listed
16 entities for the purpose of promoting
17 opioids generally?
18     A.   No. In my conversation with
19 Jennifer -- I'm sorry, can you repeat the
20 question? I just want to make sure I got
21 the right time period.
22     Q.   Did Allergan -- I'm just
23 responding based on your response.
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    Q.   Did Allergan have a
2  relationship with any of the listed
3  entities for the purpose of promoting
4  opioids generally?
5    A.   No.  My understanding is
6  there was no relationship with these
7  organizations for the purpose of
8  promoting Kadian or Norco.
9         As far as the generic
10 opioids, again, I think I mentioned this
11 earlier, is that any records related to
12 the generics are -- remained with the
13 Actavis generic companies that are now
14 with Teva.  So they would have the --
15 they would have any records related to
16 that.
17   Q.   So is it accurate to say
18 that you're not aware whether there was
19 any relationship between Allergan and any
20 of these entities or individuals
21 regarding generic opioids?
22   A.   I'm not aware of any
23 relationship with them.
24   Q.   I want to rephrase the

Page 275

1  question a little bit differently as
2  well.
3    A.   Okay.
4    Q.   Did Allergan have any
5  relationship, where compensation paid by,
6  et cetera, between itself and any of the
7  following -- the listed persons or
8  entities relating to those person's or
9  entities' promotion of opioids?
10   A.   Can you repeat that?
11   Q.   So let me rephrase this
12 certain ways.
13        A number of these entities
14 put out materials concerning opioids
15 generally, not brand specific.
16        Are you aware of that?
17   A.   Not really.  But I would
18 imagine that they -- that they do.
19   Q.   They wouldn't have
20 mentioned -- certain materials wouldn't
21 have mentioned a brand name or a company.
22 They would just talk about the
23 appropriateness of opioid treatment for
24 certain conditions.

Page 276

1    A.   Okay.
2    Q.   In that general way, where
3  it's not speaking about any particular
4  branded opioids or any particular generic
5  opioids, but just about the appropriate
6  use of opioids generally, did Allergan
7  have a relationship with any of the
8  listed entities or doctors that you are
9  aware of?
10   A.   Meaning did we purchase
11 reports or something?
12   Q.   Fund them?  Did you -- were
13 you members of the organizations?  Did
14 you fund reports?  Any relationship with
15 them?
16   A.   From my understanding and my
17 review and discussions, Allergan does not
18 have a relationship in terms of promoting
19 Kadian or Norco.
20        I know Jennifer did talk
21 about there was an ad board that was for
22 a product, I believe she called it
23 MoxDuo, that was never launched, that
24 there was a -- Perry Fine did attend.  So

Page 277

1  I assume there was a contract in place
2  with him to attend that ad board.  But
3  that's all I'm aware of.
4    Q.   Was Allergan ever a member
5  of any of the organizations listed from A
6  to Q?
7    A.   I'm specifically -- I
8  specifically looked at this related to
9  Kadian and Norco and the opioids.  And I
10 don't know, in the course of -- you know,
11 with some of the other products.  You
12 know, we do have a product for
13 fibromyalgia, Savella.  So I couldn't
14 answer that with certainty.
15   Q.   Do you know whether Allergan
16 ever sponsored any events put on by any
17 of the entities listed in A through Q
18 related to opioids?
19   A.   Again, I mean, my
20 understanding is that there was no
21 relationship between Allergan and any of
22 these for the purposes of promoting
23 Kadian and Norco, which is what I
24 prepared to talk about.

Page 278

1    Q.   Is it fair, then, to say
2 that you're just not sure either way
3 whether Allergan ever sponsored any
4 events put on by any of the entities
5 listed in A through Q of Topic 11?
6         MS. WELCH:  Objection.
7 Misstates her testimony.
8         THE WITNESS:  Are you
9 talking specifically about
10 opioids, or are you making this a
11 more general question?
12        The reason I ask that is
13 because, I mean, I worked on
14 Alzheimer's products, there may
15 have been some -- the American
16 Geriatric Society, there could
17 have been a relationship there.  I
18 don't want to broaden that
19 testimony.
20 BY MR. MELAMED:
21    Q.   Fair enough.
22        Did you do anything to
23 prepare for today -- let me withdraw that
24 and state it more cleanly.

Page 279

1         In preparing for today, did
2 you look at whether Allergan sponsored
3 events by any of the entities listed, A
4 through Q, in Topic 11?
5    A.   I looked at -- I talked to
6 Jennifer about specifically Kadian and
7 Norco.
8    Q.   Other than Kadian and Norco,
9 did you consider -- did you do anything
10 to prepare -- I'm going to withdraw that
11 all and state it again.
12        In preparation for today,
13 did you investigate whether Allergan made
14 any payments to any of the entities, A
15 through Q, other than payments concerning
16 Kadian and Norco, which you have said
17 they did not?
18        MS. WELCH:  Objection.  Well
19 beyond the scope of the topics, if
20 you're asking her if she prepared,
21 for example, by looking at whether
22 a payment was made on behalf of
23 something nonopioid related.  And
24 your question is broad enough to

Page 280

1 include that.
2         So --
3         MR. MELAMED:  I'll restate --
4         MS. WELCH:  -- to the extent
5 you're talking beyond opioids, I
6 object it's outside the scope.
7         MR. MELAMED:  I'll restate
8 it to be limited to opioids.  Or
9 I'll attempt to restate it to be
10 limited to opioids.
11 BY MR. MELAMED:
12    Q.   In preparation for today,
13 putting aside the specific conversations
14 you had about Kadian and Norco with
15 Jennifer Altier, did you do anything to
16 investigate whether Allergan made any
17 payments to any of the entities, Subtopic
18 11, Sub A through Sub Q, related in any
19 way to opioids?
20        And by the breadth of that
21 question I mean sponsorship of events,
22 memberships, funding of publications.
23        Did you look -- did you
24 investigate that at all in preparation

Page 281

1 for today?
2    A.   I had a -- I reviewed the
3 transcript with Jennifer and that
4 Jennifer testified that she -- there were
5 no relationships, these didn't exist.
6         And so beyond that, I did
7 not dig into the databases or request
8 information on any payment that would
9 have gone out from Allergan.
10    Q.   Was Jennifer's testimony
11 limited to Kadian, Norco and MoxDuo?
12    A.   I believe that was -- yeah,
13 that was the subject.  There were
14 questions to her regarding things outside
15 of that, but that was her -- I believe
16 that was her testimony.
17        As far as the generic
18 opioids, I think I've said this a few
19 times, is that the people who were -- who
20 would have been involved with the generic
21 opioids are no longer a part of Allergan,
22 they would have gone to Teva, which I
23 understand is a named defendant in the
24 case.  And so they went with the Actavis

Page 282

1 generic companies. So they would
2 probably be the best to answer that
3 topic.
4 Q. So Teva employees would be
5 the best to answer the topic about
6 Allergan activities?
7 MS. WELCH: Objection.
8 Misstates her testimony.
9 Objection to form.
10 THE WITNESS: Talking about
11 the Actavis generic business.
12 BY MR. MELAMED:
13 Q. The Actavis generic business
14 was part of Allergan Finance, correct?
15 MS. WELCH: Objection.
16 Outside the scope of the noticed
17 topics. She's not a corporate
18 structure witness.
19 THE WITNESS: Keep going.
20 MR. MELAMED: A corporate
21 structure witness couldn't answer
22 this either, so it's fair you
23 can't answer it.
24 BY MR. MELAMED:

Page 283

1 Q. If you can, I'd like an
2 answer; if not, that's okay.
3 A. I don't really want to
4 misstate the corporate structure.
5 I mean, my understanding is
6 that the people with primary
7 responsibility for the Actavis generic
8 opioids, I want to make sure I'm saying
9 this right, remained with the Actavis
10 generic company or left the company
11 altogether at the time of the
12 transaction.
13 So I would refer you to the
14 Actavis generic companies, which is now
15 Teva.
16 Q. Prior to their transfer to
17 Teva, they were part of some Actavis
18 entity, correct?
19 MS. WELCH: Objection to
20 form. And objection, it's outside
21 the scope of the topics.
22 THE WITNESS: Again, I don't
23 know the corporate structure, who
24 employed who. So I would go back

Page 284

1 to the statement I just made on
2 that.
3 BY MR. MELAMED:
4 Q. Did Allergan ever provide
5 funding for any research concerning
6 opioids published by any of the entities
7 or individuals listed A through AA of
8 Subtopic 11?
9 A. Sorry, I need you to restate
10 that again. Did Allergan what?
11 Q. Provide any funding for any
12 research published by any of the listed
13 entities and individuals in Topic 11.
14 MS. WELCH: I think the
15 first -- I'll object. I think you
16 restated the question much more
17 broadly than you originally did.
18 MR. MELAMED: I restated it
19 without opioids. I'm sorry.
20 Thank you. I'm sorry. I'll
21 restate it again.
22 BY MR. MELAMED:
23 Q. Did Allergan ever provide
24 funding for any research concerning

Page 285

1 opioids published by any of the entities
2 and individuals listed in Topic 11?
3 A. Based on my research, not to
4 my knowledge.
5 Q. Did you -- in preparing for
6 today's testimony, did you ask anybody
7 whether Allergan had ever provided such
8 funding?
9 A. No. I specifically, as I
10 mentioned, reviewed Jennifer's testimony
11 regarding the relationships with the
12 specific entities.
13 Q. Did you talk to anybody else
14 in preparation for today about the
15 Topic -- about Topic 11, other than
16 Jennifer Altier?
17 A. I believe she was the only
18 person specifically for this topic. You
19 know, with the -- as I mentioned several
20 times with the generic companies, those
21 employees are no longer here with
22 Allergan.
23 Q. And you spoke to her as well
24 as reviewing her testimony, correct?

Page 286

1    A.   I spoke to her, yes.  I
2  spoke to Jennifer.  And I -- I mean, I
3  spoke to her a couple of times.  I don't
4  remember which specific things I'm
5  getting from her transcript versus I
6  have -- the note I have to myself here is
7  reviewed deposition transcript.  So I
8  think that was the source for the
9  information regarding this topic.
10    Q.   Did you do anything to
11  prepare for answering Topic 11 concerning
12  Watson Pharmaceuticals before it merged
13  with Actavis?
14    A.   No.  This goes back to the
15  conversation that we've had about the
16  people who are no longer with the
17  company.
18    Q.   So is it fair to say that
19  you are not prepared to answer Topic 11
20  to the extent the answer concerns Watson
21  Pharmaceuticals, Inc.?
22    A.   I would say based on the
23  review that I did and the conversations,
24  that I don't -- I didn't find any

Page 287

1  information about relationships with
2  these named people or entities.
3    Q.   And in preparation to answer
4  this question, you primarily reviewed
5  Jennifer Altier's transcript, right?
6    A.   Yes, that's correct.
7    Q.   Do you know if she ever
8  worked at Watson Pharmaceuticals, Inc.?
9    A.   I don't believe she does.
10    Q.   Do you know if she was asked
11  any questions during her deposition about
12  Watson Pharmaceuticals, Inc.?
13    A.   I don't think she was.
14    Q.   Or otherwise provided
15  testimony about Watson Pharmaceuticals,
16  Inc.?
17    A.   Not that I recall.
18    Q.   Can you answer Topic 11 on
19  behalf of Allergan PLC?
20      MS. WELCH:  Objection to
21    form.  Objection to the extent
22    that it is outside of the noticed
23    topics.
24      THE WITNESS:  Are you asking

Page 288

1  if I -- if there's any Allergan
2  current relationship with the
3  people or topics listed here?
4  BY MR. MELAMED:
5    Q.   We can go through the same
6  series of questions I asked you about
7  Actavis, which you were prepared to
8  answer at least some of, and go through
9  those questions with Allergan PLC.
10      My assumption is that you're
11  going to say that you are not here
12  representing Allergan PLC and, therefore,
13  you can't answer these questions on
14  behalf of it.  If that's true, we can
15  shortcut it.
16      Are you prepared to
17  answer -- to provide testimony on Topic
18  11 on behalf of Allergan PLC?
19      MS. WELCH:  Objection to
20    form.  And, again, I'll make it
21    clear that you keep asking the
22    witness if she's prepared to
23    testify on behalf of Allergan PLC.
24      I'm going to object to that,

Page 289

1  she's designated on behalf of
2  Allergan Finance LLC.
3      MR. MELAMED:  So is the
4  answer no?
5      MS. WELCH:  I'm going to
6    object to the question and make
7    clear that what you're not asking
8    her is if she can -- what review
9    she did about what happened.
10      But she's not testifying on
11    behalf of an entity that there's
12    been no notice served on.  So --
13    or I should say has not been
14    served in the case and no proper
15    notice has been served on.
16  BY MR. MELAMED:
17    Q.   Did Allergan PLC have any
18  relationship with or pay any compensation
19  to any of the entities and individuals
20  listed A to AA in Topic 11?
21    A.   I'm talking specifically
22  about Allergan Finance.  And I've said a
23  couple of times that there was no
24  relationships with these organizations

Page 290

1 that I was aware of.
2     Q.   You've testified that there
3 are no relationships you were aware of
4 between these organizations and Allergan
5 Finance, correct?
6     A.   And Allergan Finance for the
7 purposes of promoting Kadian and Norco,
8 is what I had specified.
9     Q.   Are you aware whether there
10 are any relationships with compensation
11 paid by Allergan PLC to any of the
12 entities or individuals listed A through
13 AA concerning opioids?
14     A.   I'm not aware.  And my
15 understanding is that I'm not testifying
16 on behalf of Allergan PLC.
17     Q.   I just wanted to know, as
18 you sit here today, testifying on behalf
19 of Allergan Finance, if you know of any.
20 And if the answer is no, that's fine, we
21 can move on.
22     MS. WELCH:  Can we take a
23     break?
24     MR. MELAMED:  Sure.

Page 291

1 BY MR. MELAMED:
2     Q.   Is the answer no?
3     A.   The answer is no.
4     MR. MELAMED:  Can I just ask
5     one more question?
6 BY MR. MELAMED:
7     Q.   Are you aware of any
8 relationships with compensation paid by
9 Actavis PLC to any of the entities listed
10 in Topic 11, Sub A through AA?
11     A.   I'm trying to figure out the
12 corporate structure again; Actavis PLC,
13 Actavis Inc., Allergan.
14     I can't answer that question
15 because the structure is beyond the scope
16 of my knowledge.
17     MR. MELAMED:  Okay.  We can
18     go off the record.
19     VIDEO TECHNICIAN:  Going off
20     the record.  The time is 3:21.
21         - - -
22     (Whereupon, a brief recess
23     was taken.)
24         - - -

Page 292

1     VIDEO TECHNICIAN:  Going
2 back on record.  Beginning of
3 Media File Number 6.  The time is
4 3:37.
5     THE WITNESS:  So just
6 picking back up on Topic Number
7 11, I think my confusion was
8 around the terminology you used.
9 I think you said general opioids,
10 or I don't remember the exact
11 word, and I was understanding that
12 to mean the generic opioids.
13     So I want to make sure that
14 I specifically answer your
15 questions related to Kadian and
16 Norco and the -- and, you know,
17 based on everything that I've
18 reviewed, you know, my
19 conversations with Jennifer, all
20 the documents and everything that
21 I reviewed, you know, I'm
22 testifying on behalf of Allergan
23 Finance, but I'm testifying for
24 any Allergan -- I'm saying that

Page 293

1 any Allergan entity, there were no
2 payments that were made, in
3 anything that I found, to any of
4 these organizations.
5     So setting generics aside
6 for a second, because I think that
7 was what was causing my confusion,
8 that, you know, there -- in
9 everything that I saw, I mean,
10 marketing budgets, there were no
11 payments that were made to any of
12 these for any Allergan entity,
13 including PLC.
14     The generic piece that I was
15 talking about, I have not seen
16 anything regarding -- regarding
17 payments made on behalf of the
18 generics.  But I think my comment
19 there was really that the best
20 people to answer that would be the
21 people who were -- remained with
22 the Actavis generic companies that
23 went to Teva.
24     So I just wanted to clarify

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    that, since I was confused by the
2    general marketing meaning that it
3    was unbranded as opposed to the
4    generics.
5  BY MR. MELAMED:
6        Q.   Thank you for the
7  clarification.
8            In that clarification, you
9  just said, I'm testifying on behalf of
10 Allergan Finance, but also can speak to
11 all Allergan entities.
12           That includes Allergan PLC?
13       A.   So in my review of
14 everything there, the -- I am testifying
15 that there were -- yes, including PLC,
16 there were no Allergan -- there were no
17 payments that were made to any of
18 these -- any of these organizations.
19       Q.   Did you review documents
20 from Allergan PLC in which you would look
21 for such payments?
22       A.   I mean, I reviewed all of
23 the marketing budgets that I could find
24 related to Kadian and Norco.

Page 295

1        I personally now work on the
2  Allergan -- I work on the marketing,
3  there is none, but I work on these brands
4  and there are no payments that are made
5  to any of these organizations.
6        Q.   And in response to the
7  clarification, I'm just trying to figure
8  out what -- who is encompassed in the
9  "any Allergan entity."
10           Does that include Watson
11 Pharmaceuticals, Inc.?
12       A.   So in talking specifically
13 about -- I'm trying to make sure that I
14 get this correct and understand the full
15 corporate structure.
16           But as far as any -- you
17 know, everything that I reviewed, I saw
18 no information about any payments related
19 to Kadian or Norco of any entity.
20           That's it.
21       Q.   I understand that you saw no
22 payments concerning -- specific to Kadian
23 or Norco --
24       A.   Right.

Page 296

1        Q.   -- made to any of these
2  entities and individuals.
3            Let's -- starting with that,
4  did you review Watson Pharmaceuticals,
5  Incorporated documents reflecting -- to
6  look to see whether there were any
7  payments concerning Norco to any of these
8  individuals or entities in Topic 11?
9        A.   To the extent those -- that
10 those documents, I didn't find any
11 documents that existed related to
12 payments going back that far.  I think we
13 talked about this.
14       Q.   What did you do to attempt
15 to look for documents related to payments
16 going back that far?
17       A.   We looked for marketing
18 budgets, but didn't find any.  They were
19 available for Kadian, but not for Norco,
20 which is where you would likely see
21 listings of that information.
22       Q.   Did you look at -- let me
23 withdraw that.
24           It's your belief that any

Page 297

1  payments to any of the individuals or
2  entities in Topic 11 would be reflected
3  in any marketing budget for the entity
4  making the payment; is that right?
5        A.   It's a pretty general
6  statement, but the marketing budget is
7  usually where these -- you know, any
8  marketing activities would be accounted
9  for.
10       Q.   And in the marketing budgets
11 you reviewed, there were detailed line
12 items for marketing efforts -- as
13 specific as these marketing efforts in
14 Topic 11?
15           MS. WELCH:  Objection.
16 BY MR. MELAMED:
17       Q.   I'm trying to figure out --
18           MS. WELCH: Objection to
19 form.
20           MR. MELAMED:  Let me
21 withdraw that.
22 BY MR. MELAMED:
23       Q.   Do you know if the marketing
24 budgets you reviewed have been produced

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  in this litigation?
2      A.   I assume they have been.
3      Q.   You don't know either way,
4  but your assumption is they have been?
5      A.   My assumption is all the
6  documents, yes, have been produced.
7      Q.   Do you remember whether they
8  had Bates numbers at the bottom?
9      A.   I can look.  I think I do
10  have that information.  Let me just pull
11  up my -- budgets, 32.
12          Yes.  So if you turn to, in
13  Exhibit-3, and Page 17, if you look at
14  the response, there is reference to
15  budgets for Kadian from 2009, '10, and
16  I'm going over to Page 18, '11, '12 and
17  '13.  And those Bates numbers are listed
18  there.
19      Q.   Okay.  And if you had -- if
20  Allergan Finance had made any payments to
21  any of the entities listed in Topic 11 --
22  let me withdraw that and preface this
23  question first.
24          Do you see in your

Page 299

1  description on Page 17 of Exhibit-3, for
2  instance, the 2009 Allergan Finance
3  marketing budget, you have categories of
4  expenditures?
5      A.   Yes.
6      Q.   Co-pay assistance, patient
7  assistance, et cetera.
8      A.   Uh-huh.
9      Q.   If Allergan Finance had made
10  payments to any of the entities listed in
11  Topic 11, which category, as reflected on
12  Page 17, would those payments be recorded
13  in?
14      A.   I would expect them to be a
15  separate category.  If you want to pull
16  up the budgets, we can look through.  But
17  each category has detailed information on
18  who the -- you know, who the payment was
19  made to and who the marketing -- or who
20  the marketing activity was -- was
21  budgeted for.
22          For example, you know, for
23  the co-pay program, if Meta Media was
24  administering that program, it would say

Page 300

1  the details behind that and broken down,
2  a lot of times, into production and
3  claims and different categories within
4  that.
5      Q.   So you were able to
6  answer -- is it true that you were able
7  to answer Topic 11 on behalf of any
8  Allergan entity?
9          That was the clarification
10  you offered when you came back in, and
11  I'm just trying to get -- understand the
12  scope of the clarification.
13          MS. WELCH:  And I'll object.
14      And I'll just make the point that
15      I think if you can exclude
16      generics and ask her the question,
17      she can -- and then if you can
18      break it out two ways, you'll get
19      a different level of --
20          MR. MELAMED:  Thank you.
21          MS. WELCH:  -- granularity.
22  BY MR. MELAMED:
23      Q.   For branded opioids in Topic
24  11 --

Page 301

1      A.   Yes.
2      Q.   -- your testimony is that
3  you are able to answer that question as
4  to all Allergan entities; is that
5  correct?
6      A.   Yes.
7      Q.   And if it's not, please
8  clarify.
9      A.   Yes.  For branded opioids in
10  all of the documents that I reviewed,
11  everything that I looked at, the
12  marketing budgets that I reviewed, I saw
13  no payments related to any of those
14  listed entities or people.
15      Q.   Did you have -- do you have
16  marketing -- withdraw that.
17          Did you review marketing
18  budgets going back to 1997?
19      A.   I reviewed all marketing
20  budgets that were available to me.  The
21  ones I found are listed here, starting in
22  2009.  But I didn't find anything that
23  indicated there was any payment there.
24          I was unable to locate at

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 all those documents related to Norco, as
2 they were pretty old.
3      Q.   So you were able to say, on
4 behalf of all Allergan entities, that
5 there were no payments made relating to
6 Kadian for Topic 11; is that correct?
7      A.   That's a correct statement.
8           But, also, I didn't find any
9 evidence of payments made regarding Norco
10 either.
11     Q.   But you weren't able to find
12 marketing budgets --
13     A.   I was not able to.
14     Q.   -- from the time period
15 during which Norco was being actively
16 detailed to physicians; is that correct?
17     A.   I was not able to find
18 marketing budgets going back that far.
19     Q.   Thank you.
20          And then as to generic
21 opioids, you are unable to answer -- let
22 me pull that back.
23          As to generic opioids, your
24 testimony is that any payments related to

Page 303

1 generic opioids to the entities Topic 11,
2 Sub A through AA, are not payments
3 that -- to which you can -- about which
4 you can access information; is that
5 correct?
6          MS. WELCH:  Objection to
7      form.
8           You can go ahead.
9          THE WITNESS:  I would say,
10     you know, based on all the
11     investigation and the documents
12     that I reviewed, I didn't find
13     anything.
14          But, again, I maintain that
15     the people who had the primary
16     responsibility for generic opioids
17     were with Actavis generics and
18     they went to Teva.
19 BY MR. MELAMED:
20     Q.   And then the third category
21 is the general opioids, not generic
22 opioids, so generally opioid promoting
23 or -- let me withdraw -- general opioid
24 materials or projects?

Page 304

1      A.   So when you're talking
2 general --
3          MS. WELCH:  I'm going to
4      object to the form there, because
5      it's a terminology that I know
6      confuses the witness.
7          MR. MELAMED:  Right.  I'm
8      just -- that's -- I'm trying to
9      ask it so we have clear testimony.
10     I understand the objection.
11 BY MR. MELAMED:
12     Q.   Can you answer, on behalf of
13 Allergan Finance, whether it made any
14 payments or had any relationship with any
15 of the subentities in Topic 11 concerning
16 non -- general opioids but not specific
17 to any particular opioid?
18     A.   So you're saying --
19 basically, I think what I would call
20 unbranded, unbranded.  So just general
21 information about opioids, is what you're
22 saying, right?
23     Q.   That's not precisely my
24 question, but that's a good way of

Page 305

1 interpreting it.
2      A.   So in all the review that I
3 did, I mean, that -- even if it's not
4 related to a specific brand, if it was
5 done, you know, unbranded marketing, it
6 would still show up in a Kadian budget,
7 for example, if the Kadian marketing team
8 was working with any of these
9 organizations.
10          And in my reviews of that,
11 there were no line items related to any
12 of these organizations.  As well as
13 Jennifer specifically told me that there
14 were no relationships, with the one
15 exception that I talked about for Perry
16 Fine for MoxDuo, which she testified
17 about that he was part of an advisory
18 board.
19     Q.   But you were unable to
20 review marketing budgets related to
21 generic opioids -- let me phrase that as
22 a question.
23          Were you able to review
24 marketing budgets related to generic

Page 306

1 opioids in preparation for today's
2 testimony?
3     A.   The -- I requested
4 information regarding anything that was
5 available for marketing budgets. And,
6 no, there was nothing that was still
7 available with our company related to
8 generic opioids.
9     Q.   So you can testify that
10 there were no payments to any of these
11 individuals or groups reflected in the
12 Kadian budgets for any entity, correct?
13     A.   That's correct.
14     Q.   At the same time, you are
15 unable to testify whether there were any
16 payments made to any of these entities
17 that were made from the generic opioids
18 budget; is that correct?
19     A.   The generic opioids budgets,
20 as I understand, are with those
21 individuals who created those budgets.
22 And they would likely be with Teva, who,
23 as I've mentioned a couple of times, are
24 a defendant in the case.

Page 307

1     Q.   Just to -- I'm just trying
2 to make a simple point that I think
3 you're going to agree with, not
4 obviously.
5     Because you weren't able to
6 look at generic opioid budgets, you can't
7 tell whether any payments were made to
8 any of these entities or individuals out
9 of any generic opioid budget that at one
10 time was in Actavis's control?
11     MS. WELCH:  Objection to
12 form.  Specifically now we're
13 talking about generic opioid
14 budget, and I'm not sure -- I
15 predict that's going to confuse
16 again.
17     MR. MELAMED:  I agree that
18 the topic and corporate entities
19 are very confusing.
20     THE WITNESS:  So the -- you
21 want me to --
22 BY MR. MELAMED:
23     Q.   You had no access to generic
24 opioid budgets from Allergan, correct?

Page 308

1 Any Allergan entity; is that correct?
2     MS. WELCH:  Objection to
3 form.
4     THE WITNESS:  So the only
5 budget information -- let me make
6 sure I get this correct.
7     There's something specific
8 I'm looking for.  Just give me a
9 minute.
10     So if you turn to Page --
11 Exhibit-3, Page 22, Topic 38, the
12 response.
13     So I do want to reflect that
14 in terms of budgeting, there was
15 some funding that was related to
16 the Ventiv sales force and those
17 contracts.  They received
18 compensation for informing doctors
19 about the availability of generic
20 oxymorphone in 2011.
21     I believe the total budget
22 was about $20,000.  So when I say
23 that, you know, in terms of what
24 budget information I was able to

Page 309

1 obtain for generics, I want to
2 make sure that I mention that.
3 BY MR. MELAMED:
4     Q.   Is it fair to say that you
5 had fairly limited access to budget
6 information about generic opioids?
7     A.   I think it's fair to say
8 that we -- we talked about this a few
9 times, that my understanding is a lot of
10 the detailed information about generic
11 opioids is in possession of the Actavis
12 generic companies that were sold to Teva.
13     Q.   Is it fair to say that it is
14 possible payments to the individuals and
15 entities in Topic 11 could have been made
16 from the generic opioids budget?
17     MS. WELCH:  Objection.
18 Calls for speculation.
19     THE WITNESS:  In everything
20 I reviewed, I did not see
21 anything.  And I don't want to
22 speculate what might exist in the
23 files for a different entity.
24 BY MR. MELAMED:

Page 310

1  Q.  So the company doesn't know
2  whether that information may exist in
3  files that it formerly possessed?
4        MS. WELCH:  Same objection.
5        THE WITNESS:  I don't want
6  to -- like I said, I don't want to
7  speculate.
8        In all my review, I didn't
9  see anything that related to
10  payments to any of these
11  organizations.
12  BY MR. MELAMED:
13  Q.  Did Allergan ever have any
14  relationship with the Healthcare
15  Distributor Association, also referred to
16  sometimes as HDA?
17        MS. WELCH:  Objection.
18  Outside the scope of the noticed
19  topics.
20        I believe that Mary Woods
21  has been designated on that topic.
22  BY MR. MELAMED:
23  Q.  Do you know the answer to
24  the question?

Page 311

1        MS. WELCH:  Objection.
2  Outside the scope of the noticed
3  topics.  Mary Woods is designated
4  on Topic 16.
5        THE WITNESS:  My
6  understanding is Mary is
7  designated on that.
8  BY MR. MELAMED:
9  Q.  Do you have an answer, is my
10  question?
11        MR. MELAMED:  The objection
12  is noted.
13        THE WITNESS:  What's the
14  question -- I'm sorry, what's the
15  question?
16        MS. WELCH:  She's not
17  designated to speak on behalf of
18  the company on Topic 16.  She does
19  not have an answer on behalf of
20  the company.
21        MR. MELAMED:  You can't
22  answer for her.
23        MS. WELCH:  If you want to
24  ask her in her personal

Page 312

1  capacity --
2        MR. MELAMED:  I'm going to
3  ask her -- I'm going to ask her
4  the question.  You've objected.
5  That's fair.  And she can answer.
6  BY MR. MELAMED:
7  Q.  Did Allergan ever have any
8  relationship with Healthcare Distributor
9  Association, also referred to sometimes
10  as HDA?
11        MS. WELCH:  Objection.
12  Outside of the scope of the
13  noticed topics.  She cannot
14  testify on behalf of the company
15  on Topic 16.
16        If you have any personal
17  knowledge, you can answer the
18  question.
19        THE WITNESS:  I don't know.
20        MR. MELAMED:  Thank you for
21  the instruction.
22  BY MR. MELAMED:
23  Q.  Did Allergan ever have a
24  relationship with the National

Page 313

1  Association of Chain Drug Stores?
2        MS. WELCH:  Objection.
3  Outside of the scope of the
4  noticed topics.
5        THE WITNESS:  I don't know.
6  BY MR. MELAMED:
7  Q.  You don't know?
8  A.  I don't know.
9  Q.  Okay.  Did Allergan ever
10  have any relationship with the National
11  Initiative on Pain Control, NIPC?
12        MS. WELCH:  Objection.
13  Outside the scope of the noticed
14  topics.  She is not prepared on
15  that topic.
16  BY MR. MELAMED:
17  Q.  Do you know?
18  A.  I don't know.
19  Q.  Okay.  NIPC is the former
20  name of the American Pain Foundation.
21        But I take it your answer is
22  still the same; is that correct?
23  A.  Yeah.  Is that one of the --
24  Q.  That was one of the listed

Page 314

1 companies from before. I just want to
2 make sure that we captured their former
3 name.
4         MS. WELCH: To be clear,
5     that name does not appear in Topic
6     11. So if you're representing it
7     was a former name, that's fine.
8 BY MR. MELAMED:
9     Q.  Do you --
10        MS. WELCH: It's outside --
11 BY MR. MELAMED:
12    Q.  Do you know --
13        MS. WELCH: -- the scope of
14    the noticed topics.
15 BY MR. MELAMED:
16    Q.  Do you know whether Allergan
17 ever had a relationship with the National
18 Initiative on Pain Control?
19        MS. WELCH: Same objection.
20        THE WITNESS: I don't know.
21 BY MR. MELAMED:
22    Q.  Do you know if Allergan ever
23 had a relationship with the Alliance for
24 Patient Access?

Page 315

1         MS. WELCH: Same objection.
2     Outside of the noticed topics.
3         THE WITNESS: I don't know.
4     I prepared for the specific
5     topics.
6 BY MR. MELAMED:
7     Q.  If you don't know, you
8 don't. That's -- and that's your answer.
9 That's fine.
10        Did Allergan ever have a
11 relationship with the Pharmaceutical
12 Research and Manufacturers of America or
13 PhRMA, P-H-R-M-A?
14        MS. WELCH: Same objection.
15    Outside of the noticed topics.
16        To the extent you want
17    testimony on behalf of the
18    company, it should be directed in
19    a topic for the company to prepare
20    a witness.
21        If you want to ask the
22    witness if she knows personally,
23    you're able to do that. But
24    you're not entitled to simply ask

Page 316

1 her question after question that
2 you know are outside of the scope
3 of the noticed topics and ask her
4 to testify as a corporate
5 representative.
6         MR. MELAMED: You can
7 instruct her not to answer if you
8 think there's basis for
9 instructing her not to answer.
10        MS. WELCH: I'm going to
11 make my objection on the record.
12        MR. MELAMED: You've spent
13 five minutes making an objection,
14 when we have 14 hours of total
15 30(b)(6).
16        You made your objection.
17 Let her answer. If she says no,
18 we move on. If she says yes, then
19 I inquire.
20        MS. WELCH: And when you ask
21 for a topic -- ask on questions
22 outside the noticed topics, I will
23 make my objection.
24        MR. MELAMED: You can make

Page 317

1 an objection.
2 BY MR. MELAMED:
3     Q.  Do you know whether Allergan
4 has ever had any relationship with
5 P-H-R-M-A, PhRMA, or the Pharmaceutical
6 Research and Manufacturers of America?
7         MS. WELCH: Objection.
8     Outside of the very detailed list
9     of noticed topics provided to the
10    witness on which we've prepared.
11        THE WITNESS: I don't know
12    for sure. I believe that -- I
13    believe we do, but I don't know
14    for sure.
15 BY MR. MELAMED:
16    Q.  Who would you ask to find
17 out whether, and if so, the nature of the
18 relationship between Allergan and PhRMA?
19    A.  I honestly don't know. I
20 probably would -- I'd probably ask Tom
21 Riley. I don't know if he would know,
22 but I would -- he might be someone that I
23 would ask, or at least ask to direct me
24 to someone who might know.

Page 318

1    Q.   You've asked -- you've
2    mentioned Tom Riley before.
3    A.   Yes.
4    Q.   Sorry, I don't remember.
5    Can you remind me of his
6    position within the company right now?
7    A.   He works in finance.
8    Q.   How long has he been at the
9    company?
10   A.   I believe a year.
11   Q.   Can you identify each entity
12   that provided Allergan information about
13   the sales of opioid products in the U.S.
14   market?
15   MS. WELCH:  Objection to
16   form.
17   THE WITNESS:  So I assume
18   you're talking about Topic 12 and
19   who provided Allergan with sales,
20   distribution or prescribing data
21   about Kadian and Norco; is that
22   the nature of your question?
23   BY MR. MELAMED:
24   Q.   You can start with that.

Page 319

1    That wasn't the specific question, but we
2    can start with that information.
3    A.   Sure.  And there's a
4    specific exhibit, Exhibit-4, that walks
5    through the types of data that -- sorry,
6    I'm stuck on my cord.
7    Sorry about that.
8    So, yes, specifically
9    about -- or we're talking specifically
10   about people who provided Allergan
11   Finance with sales or prescribing data.
12   So I can walk through that,
13   as I mentioned, Exhibit-4.
14   Q.   You don't need to walk
15   through it.
16   Does this list every entity
17   that provided Allergan Finance with sales
18   or prescribing data concerning opioids in
19   the U.S. market?
20   A.   So this information is
21   during a certain -- during a specific
22   time period.  So the contracts that I was
23   able to find were for the years, if you
24   look, some of these are mainly 2009,

Page 320

1    2010, '11 and '12, in terms of the opioid
2    market data.
3    And, I mean, you'll see here
4    listed, it was IMS, MediMedia, Tegra
5    Analytics, ValueCentric and, I believe,
6    there's one more, Wolters Kluwer.
7    Q.   Do you know whether the
8    company has continued to receive
9    information from any third parties
10   concerning the U.S. opioid -- U.S. opioid
11   market after 2012?
12   A.   Yes.  In my current role, I
13   believe I get some monthly prescription
14   data for Kadian.  So there are -- I do
15   still receive some IMS data.
16   Q.   You receive that from IQVIA,
17   which is formerly named IMS?
18   A.   From IQVIA, yes.
19   Q.   Since -- starting in 2013,
20   has the company received any other
21   information about sales, distribution or
22   prescribing data in the U.S. opioid
23   market from third parties?
24   A.   Yes.  We currently also

Page 321

1    receive ValueCentric data, I believe.
2    Q.   And is that -- do you
3    receive that data on a market -- an
4    opioid market-wide basis?
5    A.   I believe we only receive it
6    for Norco and Kadian, for our branded
7    products.
8    Q.   Did Actavis receive --
9    withdraw that.
10   Did Allergan receive any
11   information from any third parties
12   related to sales, distribution or
13   prescribing data about the U.S. opioid
14   market prior to 2009?
15   A.   Prior to 2009, I didn't find
16   any contracts about specific information.
17   Since the products were detailed and
18   the -- in talking to Dirk, the
19   representatives had -- Dirk Pica, had,
20   you know, target lists, I would assume
21   there were data -- there was data that
22   was provided.  I didn't find the specific
23   contracts, though.
24   Q.   Do you know whether any

Page 322

1 third parties provided Watson
2 Pharmaceuticals Inc., prior to the merger
3 with Actavis, with information concerning
4 sales, distribution or prescribing data
5 on the U.S. opioid market?
6        MS. WELCH:  Objection to
7    form.
8        THE WITNESS:  In my review,
9    I think I've mentioned this, but I
10   haven't seen documents from
11   contracts from -- going back that
12   far.  So I'm not aware of the
13   specifics.
14 BY MR. MELAMED:
15   Q.   Do you know if Allergan ever
16 received information from third-party
17 distributors regarding sales,
18 distribution or prescribing data in the
19 U.S. opioid market?
20   A.   When you say "third-party
21 distributors," do you have a specific --
22   Q.   What about, did it ever
23 receive information from McKesson
24 concerning that information?

Page 323

1    A.   I don't know for sure.  I
2 haven't seen any contracts specifically
3 with McKesson.
4    Q.   What about Cardinal?
5    A.   So my understanding is that
6 the data we received from ValueCentric is
7 the basis for, you know, inventory data
8 that we get regarding, you know, what the
9 inventory is at McKesson or Cardinal.
10       So my understanding is the
11 source for that data was ValueCentric.
12   Q.   So your understanding is you
13 do not receive any information directly
14 from McKesson about sales and
15 distribution and prescribing data in the
16 U.S. opioid market; is that right?
17       MR. BAILEY:  Objection to
18   form.
19       THE WITNESS:  I'm not aware
20   of the specific information that
21   is exchanged there.  That may be
22   better for -- a topic for someone
23   like Mary Woods.
24       The data that I look through

Page 324

1 and receive are more related to
2 the -- to the marketing and the
3 sales.  And so that may be a
4 better question for her.
5 BY MR. MELAMED:
6    Q.   As you sit here today,
7 though, you are not aware of any
8 information received by Allergan from
9 McKesson concerning the sales,
10 distribution or prescribing of opioids in
11 the U.S. market; is that correct?
12       MR. BAILEY:  Objection to
13   form.
14       THE WITNESS:  I'm trying to
15   think through the systems and how
16   that data might be provided.
17       I'm not -- I'm not aware of
18   specific contracts with
19   distributors to provide data.
20 BY MR. MELAMED:
21   Q.   Are you aware of any
22 information Allergan received from
23 Cardinal Health concerning sales,
24 distribution, or prescribing of opioids

Page 325

1 in the U.S. market?
2       MR. MCBRIDE:  Object to
3   form.
4       THE WITNESS:  Repeat that
5   again, please.
6 BY MR. MELAMED:
7    Q.   Are you aware of any
8 information you received from Cardinal
9 Health concerning the sales of opioids in
10 the U.S. market?
11       MR. MCBRIDE:  Same
12   objection.
13       THE WITNESS:  That's a
14   pretty broad question.  And I know
15   that, you know, when the
16   wholesalers order, I think I
17   talked about this earlier in the
18   general supply chain, that
19   wholesalers will order product
20   from a pharmaceutical company and
21   the -- and then we provide that --
22   via UPS, provide that to the
23   wholesaler.
24       As far as the -- so they're

Highly Confidential – Subject to Further Confidentiality Review

Page 326

1  providing information, in terms of
2  what they are -- I just want to
3  make sure I'm not misinterpreting
4  your question.
5        So they are providing
6  information in terms of what they
7  want to order, you know, what
8  their orders are.
9  BY MR. MELAMED:
10       Q.   Are they providing any
11 broader information about opioid sales on
12 the U.S. market at large?
13       MS. WELCH:  Objection.
14 Outside of the scope of the
15 noticed topics for her.
16       I think she's correct that
17 Mary Woods may be providing
18 testimony on that topic.
19       You can go ahead if you
20 know.
21       THE WITNESS:  I don't know.
22 BY MR. MELAMED:
23       Q.   And I assume your answer, I
24 don't want to answer for you, but I

Page 327

1  assume your answer is the same for
2  AmerisourceBergen; is that correct?
3        A.   Yes, that's correct.
4        Q.   Exhibit-4, which is the
5  chart prepared for -- to answer Topic 12.
6        A.   Yes.
7        Q.   It lists the primary point
8  of contact at each of the entities that
9  provided Allergan information, is that
10 correct, information as specified by
11 Topic 12?
12       A.   Yes.
13       Q.   Does it provide the point of
14 contact at Allergan for the relationship
15 with the entity?
16       A.   This does not.  I believe
17 there -- in Topic 13 there were lists of
18 people who -- I'm sorry, on Page --
19 Exhibit-3, Page 8, in Topic 13, of people
20 who received the data.  And if the -- the
21 contracts themselves would have been
22 signed by someone at the company who --
23 so we would be able to get that
24 information.  But I don't have that right

Page 328

1  here in front of me.
2        Q.   Is the person who executed
3  the contract on behalf of Allergan the
4  person who was the primary contact for
5  the relationship?
6        Is that what you're saying?
7  If we look to the contract and look who
8  signed on Allergan's behalf, and we would
9  know who the primary point of contact was
10 for Allergan?
11       A.   The person signing the
12 agreement may not have been the person
13 using the data.  I don't remember
14 specifically, but my thought is Jennifer
15 Altier was probably not signing contracts
16 when she was an employee of the company,
17 but she would have been the person using
18 a lot of the data.  So I'm making that
19 distinction.
20       Q.   Were there different points
21 of contact within Allergan for the
22 different entities listed in response to
23 Exhibit-4?
24       MS. WELCH:  Objection to

Page 329

1  form.
2        THE WITNESS:  Say that
3  again, please.
4  BY MR. MELAMED:
5        Q.   So Exhibit-4, which is the
6  chart you provided in response to Topic
7  12, lists -- I believe you listed five
8  entities.  It is what it is.
9        Is the person who is
10 Allergan's point of contact -- primary
11 point of contact with IQVIA, or
12 I-Q-V-I-A, the same as the person who was
13 Allergan's primary point of contact with
14 MediMedia?
15       A.   I don't remember who signed
16 those contracts.  I don't think it was
17 the same person.
18       But as far as, you know, who
19 was using the data and who was receiving
20 the data, they were similar people;
21 Jennifer Altier and Nathalie used this
22 data.  But I don't remember who
23 specifically signed the contracts.
24       Q.   How did Jennifer Altier use

Page 330

1 this data?

2    A.  So she would provide it to
3 Tegra Analytics. I believe that's the
4 name of the company. Yes, Tegra
5 Analytics, if you go to Page 3 of
6 Exhibit-4.

7      And, you know, these -- I
8 don't know the exact format that these
9 databases came in, but they would send
10 them over to Tegra Analytics, who would
11 provide the three different types of
12 reports that are listed here on Page 3 of
13 Exhibit-4: weekly prescription reporting
14 at the territory, regional and national
15 levels; weekly company management reports
16 that helps them monitor trends; and
17 incentive compensation reporting.

18    Q.  So in Exhibit-4, on Page 3,
19 under Tegra Analytics, for instance,
20 there's an introduction about the
21 services agreement and then a
22 discrimination of the services provided
23 in three bullet points, right?

24    A.  Correct.

Page 331

1    Q.  And that references a Bates
2 number document that I presume is the
3 services agreement, is my assumption
4 correct?

5    A.  Yes.

6    Q.  Okay. The -- under the
7 services agreement as reflected in
8 Exhibit-4, Tegra Analytics would provide
9 Actavis Kadian LLC a series of reports.

10      First bullet is weekly
11 prescription reporting at a series of
12 levels; second is weekly company
13 management reporting; and then the third
14 is incentive compensation reporting.

15    A.  Yes.

16    Q.  Do you know if those reports
17 have been produced in this litigation?

18    A.  I'm not sure. I'm not sure.
19 I don't know if my attorneys can speak to
20 that.

21      MS. WELCH:  Matt, I'll
22      represent that they have all been
23      produced.

24 BY MR. MELAMED:

Page 332

1    Q.  Same question --

2      MR. MELAMED:  And if you're
3      able to tell me, Donna, that would
4      be helpful.

5 BY MR. MELAMED:

6    Q.  -- for the second master
7 services agreement that starts on the
8 bottom of Page 3 and continues on Page 4.

9      It describes monthly
10 prescription reporting, weekly management
11 reporting, ad hoc services and incentive
12 comp reporting.

13      MR. MELAMED:  Have those
14      been produced?

15      MS. WELCH:  Yes.

16 BY MR. MELAMED:

17    Q.  Do you know whether Watson
18 Pharmaceuticals, Incorporated, received
19 reports -- let me withdraw that.

20      Do you know if Watson
21 Pharmaceuticals, Incorporated, had
22 relationships with third-party entities
23 to provide sales, distribution or
24 prescribing data about opioids in the

Page 333

1 U.S. market?

2    A.  So I wasn't able to get any
3 of those agreements. Based on my
4 conversations with Dirk Pica, you know,
5 like I said, they have a target list and
6 so that was likely developed from the
7 data that would have been provided by one
8 of these types of companies.

9    Q.  And I know you said you
10 couldn't find the contracts.

11      Do you know which or --
12 which company or companies provided that
13 data to Watson Pharmaceuticals,
14 Incorporated?

15    A.  No, I'm not sure. He was
16 not aware of whether it was, you know --
17 there's several different ones, and I
18 don't think that he had any information
19 on that.

20    Q.  You mentioned a target list
21 in connection to Dirk Pica.

22      What is a target list?

23    A.  A target list is a list of
24 physicians that the sales representatives

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  would call on or speak to in the course
2  of their day.
3      Q.   So Allergan used information
4  provided by some of the entities, or all
5  of the entities, listed in Exhibit-4 to
6  develop target lists for its sales
7  representatives; is that right?
8      A.   So I'd say -- I'd clarify
9  that Tegra Analytics appears to help
10 develop the lists.  I don't -- in talking
11 to Jennifer, it didn't sound like the
12 company had a sales analytics group that
13 would do that internally.
14     Q.   So how did -- what was the
15 process Allergan went through to
16 determine whether to call on a particular
17 doctor?
18         MS. WELCH:  Objection to
19 form.
20         THE WITNESS:  And are you
21 speaking specifically related to
22 Kadian?  Are you asking a general
23 question?
24 BY MR. MELAMED:

Page 335

1      Q.   You can start with Kadian,
2  that would be good.
3      A.   So -- and we may have some
4  details of this, but I can -- let me just
5  see if I have it written out.  If not, I
6  can just speak to them.  It's Topic 37.
7         So going to Exhibit-3, Topic
8  37, Page 21.
9      Q.   Thank you.
10     A.   And this kind of walks
11 through the process.
12         So prescriber data from
13 Wolters Kluwer would be provided to Tegra
14 Analytics, as I mentioned.  And then
15 Tegra Analytics would use the data to
16 develop the target lists for -- I
17 specifically said inVentiv, I should also
18 mention TMS Health and Techniques were
19 the telesales vendors or organizations
20 that I believe -- I believe Jennifer
21 talked about them in her deposition as
22 well.
23         And the way that they
24 developed the target list, they

Page 336

1  identified the top Kadian brand of
2  morphine and generic morphine
3  prescribers.  And if the prescribers were
4  in the territories of the inVentiv sales
5  representative, they would be prescribed
6  those prescribers.
7         If they were not in that,
8  because there were only 18
9  representatives at the start, they can't
10 cover the entire country, they would be
11 assigned to TMS Health or Techniques.
12         You know, the overall goal
13 for when Actavis assumed responsibility
14 for -- or acquired Kadian was to maintain
15 the sales, maintain the prescription
16 levels.  So, really, what they were
17 looking to do was to identify those --
18 those physicians that were, as I wrote
19 here, the top Kadian prescribers.  And
20 those were the ones that the
21 representatives would call on.
22     Q.   What about for Norco?
23     A.   For Norco, there really
24 wasn't specific information that I could

Page 337

1  find, in terms of how prescribers were
2  identified for those sales
3  representatives.
4      Q.   What about for oxymorphone?
5         MR. JACOBS:  Objection to
6  form.
7         THE WITNESS:  So I haven't
8  found any specific separate target
9  lists for generic opioids.
10        The one thing I would say is
11 that there was a time period, let
12 me just check the -- I'm going to
13 Page 22 here -- in 2011 where the
14 inVentiv sales force also informed
15 doctors about the availability of
16 generic oxymorphone.
17        And so there were no
18 specific target lists for those.
19 The target lists were the same
20 ones that they were calling on for
21 Kadian.
22 BY MR. MELAMED:
23     Q.   So you're not aware of any
24 specific target lists developed for the

Page 338

1  purpose of selling oxymorphone; is that
2  correct?
3      A.   That's correct.  They, you
4  know -- based on what I reviewed, the
5  inVentiv sales force went to the same
6  doctors that they were calling on for
7  Kadian and informed them the
8  availability -- about the availability of
9  generic oxymorphone.
10     Q.   Are you aware of any
11 specific target lists that were developed
12 for the purpose of selling any generic
13 opioid that was sold by Allergan?
14     A.   I'm not aware of any
15 separate target list for generic opioids.
16          You know, my understanding
17 is that in looking at the training
18 materials when the inVentiv
19 representatives were trained on their
20 responsibilities with oxymorphone, was
21 that this was not typical that you would
22 have a sales force necessarily talking
23 about -- out talking about availability
24 of generics, but there was a sales force

Page 339

1  that was selling Kadian, and so they also
2  assumed those responsibilities.
3          But, again, I mean, we
4  talked about this several times, but, you
5  know, if there is any information about
6  generic opioids in addition to what I
7  saw, they would likely be with Teva.
8      Q.   And you were not able to
9  review the material that you're referring
10 to that is now likely with Teva; is that
11 correct?
12     A.   Yeah.  So I didn't --
13          MR. JACOBS:  Objection to
14 form.
15          THE WITNESS:  -- I didn't
16 identify any separate target lists
17 with Narco opioids in my review,
18 so I didn't see any except for the
19 oxymorphone.
20          And I should -- I should
21 clarify one thing.  I also believe
22 that the Kadian representatives
23 also, when Kadian went generic,
24 they also did provide some

Page 340

1          information about the availability
2          of generic Kadian.
3  BY MR. MELAMED:
4      Q.   Were there any separate
5  target lists developed to -- for the
6  purpose of providing information about
7  generic Kadian, once it went generic?
8      A.   Not that I saw, no.
9      Q.   So it was the same as the
10 Kadian branded target list?
11     A.   That's my understanding,
12 yes, from what I reviewed.
13     Q.   A couple of times today you
14 mentioned UPS --
15     A.   Yes.
16     Q.   -- in the context of the
17 delivery process, the supply chain
18 process.
19          What service does UPS
20 currently provide vis-à-vis Allergan's
21 supply chain for opioids?
22     A.   Let me just look that up.
23          So I'm just looking at
24 Exhibit-3, Page 12, Topic 21, where we

Page 341

1  talk about the supply chain.
2          And based on the discussions
3  I had, and my knowledge, Teva
4  manufactures these products and then UPS
5  will ship the products to the
6  wholesalers.
7      Q.   As of when does -- first,
8  let's pull back.
9          What are "these products"
10 that you're testifying to?
11     A.   So I'm talking about Kadian
12 and Norco.
13     Q.   Since when has Teva
14 manufactured Kadian?
15     A.   I don't know the time frame.
16 I know that they currently do.
17     Q.   Since when has Teva
18 manufactured Norco?
19     A.   Same comment.
20     Q.   Since when has Allergan
21 fulfilled orders to pharmacies via UPS?
22     A.   I don't know the time frame
23 of the agreement.  That may be something
24 that Mary would be able to provide more

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 information on.
2    Q.   Do you know approximately
3 how long UPS has been providing that
4 service to Allergan?  Is it a matter of a
5 couple of years, or a couple of decades?
6    A.   I really don't know.
7    Q.   You couldn't say if it was
8 more than ten years?
9         MS. WELCH:  Objection.  Mary
10 Woods has been designated on that
11 topic.
12        THE WITNESS:  I really don't
13 know.
14 BY MR. MELAMED:
15    Q.   Who is Allergan's primary
16 contact for lobbying activities?
17        MS. WELCH:  Objection to
18 form.  Objection to form and
19 outside the scope of the noticed
20 topics.  We have not designated
21 this witness on lobbying.
22 Plaintiffs chose to seek written
23 responses to those topics.
24        THE WITNESS:  I don't know.

Page 343

1        Is there a specific topic
2 number I should be looking at?
3 BY MR. MELAMED:
4    Q.   Do you know who Allergan's
5 primary -- primary person in charge of
6 lobbying efforts on the company's behalf
7 is?
8         MS. WELCH:  Objection to
9 form.  And objection, it's outside
10 the scope of this witness's
11 noticed topics.
12        THE WITNESS:  I don't know.
13 BY MR. MELAMED:
14    Q.   Who would you ask to find
15 out?
16        MS. WELCH:  Objection.
17 Outside the scope of the noticed
18 topics.  We provided written
19 responses on the topics.
20        If you know the answer, you
21 can answer.
22        THE WITNESS:  No, I don't
23 know.  I don't even know who I
24 would ask.

Page 344

1 BY MR. MELAMED:
2    Q.   So you understand that you
3 were designated today to speak on a
4 number of topics related to marketing,
5 correct?
6    A.   Yes.
7    Q.   And you're currently
8 involved in marketing at Allergan; is
9 that correct?
10    A.   I currently work in the
11 marketing department at Allergan, yes.
12    Q.   And that marketing
13 department is currently in Allergan
14 Sales, LLC; is that correct?
15    A.   I don't think so.  The --
16    Q.   Before you look --
17    A.   Yes.
18    Q.   -- do you know what
19 corporate entity your department is
20 located in currently?
21    A.   It's Allergan USA.  And I
22 just want to make sure I -- Allergan USA,
23 Inc.
24    Q.   Allergan, USA or --

Page 345

1    A.   Allergan USA, Inc.
2    Q.   Comma Inc.?
3    A.   Yes.
4    Q.   And are you aware, in the
5 corporate structure, where Allergan --
6 who Allergan USA reports up to?
7         MS. WELCH:  Objection.
8 Outside the scope of the noticed
9 topics.
10        THE WITNESS:  I don't know
11 the full corporate structure.
12        I do know I'm -- in addition
13 to people in sales and marketing,
14 are a part of Allergan USA; while
15 regulatory, legal, compliance are
16 employed by Allergan Sales, LLC.
17 BY MR. MELAMED:
18    Q.   Ultimately, through a series
19 of individuals, you report up to the CEO
20 of Allergan, correct?
21    A.   Through a number of
22 individuals, yes.
23    Q.   Does the CEO -- do you work
24 in the same office as the CEO?

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1   A.   Yes.  He works out of the
2  Madison, New Jersey office as well.
3   Q.   Since you've worked in the
4  marketing department, has it been part of
5  a -- has it always been part of Allergan
6  USA, Inc.?
7       MS. WELCH:  Objection.
8   Outside the scope of the noticed
9   topics.
10       THE WITNESS:  I don't know.
11   Like I said before, I'm not really
12   familiar with the entire corporate
13   structure.
14  BY MR. MELAMED:
15   Q.   Are you aware of the
16  corporate entity that marketed Kadian
17  prior to the merger with Watson
18  Pharmaceuticals?
19   A.   I'm just looking at
20  Exhibit-1.
21       And so prior to the
22  acquisition of -- by Watson, it was
23  Actavis Inc., with no comma.
24   Q.   And once Watson acquired

Page 347

1  Actavis, what was the name of the
2  corporate entity in which the marketing
3  department for Kadian resided?
4       MS. WELCH:  Objection.
5   Outside the scope of the noticed
6   topics.
7       THE WITNESS:  What I know is
8   when Watson acquired Actavis Inc.,
9   with no comma, the name was -- the
10   company was changed to Actavis,
11   Inc.
12       I don't know the intricacies
13   of the structure of where
14   everything fell.
15  BY MR. MELAMED:
16   Q.   Just to be clear, what
17  you're saying, you don't know where
18  within Actavis, Inc., the marketing
19  department responsible for marketing
20  Kadian fell; is that an accurate
21  representation of what you're saying?
22       MS. WELCH:  Objection to
23   form.  Objection.  Outside the
24   scope of the noticed topics.

Page 348

1       THE WITNESS:  Like I said a
2   few times, I don't know the full
3   corporate structure, and I
4   wouldn't know that.
5  BY MR. MELAMED:
6   Q.   Do you know the corporate
7  entity in which the marketing department
8  existed at Watson Pharmaceuticals,
9  Inc. -- let me withdraw that and state it
10  more particularly.
11       Do you know the corporate
12  entity in which the marketing department
13  responsible for Norco existed at Watson
14  Pharmaceuticals, Inc.?
15       MS. WELCH:  Objection to
16   form.  Outside the noticed topics.
17       THE WITNESS:  That's another
18   question on corporate structure
19   that I'm not familiar with.
20  BY MR. MELAMED:
21   Q.   Are you -- are your answers
22  any different as to the department that
23  oversaw sales of Kadian at Actavis prior
24  to its merger with Watson?

Page 349

1       I can restate that, that was
2   a stumbling, poor question.  I'll start
3   at the beginning of time.
4       Are you aware of the
5   department that handled sales of Norco at
6   Watson Pharmaceuticals prior to its
7   merger with Actavis?
8   A.   You're asking if I'm aware
9  of what --
10   Q.   Department.
11   A.   -- corporate entity or --
12   Q.   Yes.
13       What corporate entity did
14  the sales department for Norco exist
15  within at Watson Pharmaceuticals prior to
16  the merger with Actavis?
17   A.   I'm not sure what the -- how
18  the corporate structure -- if there were
19  different entities within Watson
20  Pharmaceuticals.  I don't know.
21   Q.   What was the specific
22  corporate entity within Actavis that
23  handled the sales of Kadian prior to the
24  merger with Watson Pharmaceuticals, Inc.?

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    MS. WELCH: Same objections.
2  Objection to form and outside of
3  the noticed topics.
4    THE WITNESS: You know, I
5  keep going back to Exhibit-1, and
6  this is what I prepared regarding
7  the different corporate entities.
8    And my understanding is that
9  the company was Actavis Inc. and
10  once Watson acquired it, the
11  company was -- name was changed to
12  Actavis, Inc.
13    As far as how it was
14  structured and if there were
15  individual departments that sat
16  within different corporate
17  entities under that umbrella, I
18  don't know.
19  BY MR. MELAMED:
20    Q.  And is it fair to say that
21  you don't know that for departments that
22  may have existed for sales?
23    MS. WELCH: Objection to
24  form. Objection. Outside the

Page 351

1  scope of the noticed topics.
2    THE WITNESS: And I think we
3  have been clear that I have not
4  been designated to talk about the
5  corporate structure.
6    So I -- so I don't think I
7  can answer the question.
8  BY MR. MELAMED:
9    Q.  Fair enough. I was hoping,
10  since you've been designated to talk
11  about marketing and sales, that you could
12  tell me where within the corporate entity
13  marketing and sales occurred.
14    You can presently, I
15  believe?
16    A.  Presently, yes, because I
17  know what -- where I sit, yes.
18    Q.  And does the sales group sit
19  within the same department that you
20  currently sit in?
21    A.  I mean, department, I think
22  we're using that term loosely. In terms
23  of the corporate entity -- so sales and
24  marketing are both employees of Allergan

Page 352

1  USA.
2    Q.  Thank you.
3    But prior to the current
4  situation where sales and marketing
5  employees are all employees of Allergan
6  Sales USA, you don't -- you are not sure
7  which corporate entity, walking back
8  through time, either sales or marketing
9  individuals worked within?
10    A.  I know the current -- I
11  think you called it Allergan Sales USA,
12  it's just Allergan USA.
13    Q.  Thank you.
14    A.  But prior to that, I don't
15  know the structure of where the marketing
16  or sales departments would have fallen.
17    MR. MELAMED: Let's go off
18  the record.
19    VIDEO TECHNICIAN: Going off
20  record. The time is 4:42.
21    - - -
22    (Whereupon, a brief recess
23  was taken.)
24    - - -

Page 353

1    VIDEO TECHNICIAN: We are
2  going back on the record.
3    Beginning of Media File Number 7.
4    The time is 5:00 p.m.
5  BY MR. MELAMED:
6    Q.  I want to ask you about
7  Topic 14, which your prepared answer is
8  on Page 10 of Exhibit-3.
9    It's the identity of any
10  defendants or third parties to whom you
11  provided sales, distribution or
12  prescribing data about opioids or opioid
13  products, along with specific information
14  about who provided that information --
15  provided the data.
16    Your prepared answer on Page
17  10 of Exhibit-3 mentions that Allergan
18  Finance provided data about Kadian to
19  Ventiv and to Techniques and to TMS
20  Health and Tegra Analytics.
21    Do you see that?
22    A.  I see that, yes.
23    Q.  Did Allergan Finance provide
24  data about Kadian to any other entity,

Page 354

1 third-party entity, that you're aware of,
2 in response to this question?
3 　　A.　Through the research that I
4 did and the e-mails, these are the --
5 these are the entities that I could find
6 that Allergan Finance provided data to,
7 yes.
8 　　Q.　Did Allergan Finance provide
9 sales, distribution or prescribing data
10 about Norco to any third parties?
11 　　A.　In my review of the
12 documents, I didn't find anything
13 specifically related to data being
14 provided to -- about Norco.  This was --
15 the documents I found were specifically
16 Kadian.
17 　　Q.　So is it accurate to say
18 that you're not sure either way, but
19 based on the documents you reviewed, you
20 did not identify any entities to which
21 you provided information about Norco?
22 　　A.　Based on the review of data.
23 Like I said, it was very limited what was
24 still available from back 15 years ago.

Page 355

1 　　Q.　What about information
2 regarding generic opioids, specific
3 generic opioids?
4 　　A.　I have not been able to talk
5 to anyone who had, you know, primary
6 responsibility for the data regarding
7 generic opioids.  And so consistent with
8 what we've discussed earlier, I would
9 refer you to the existing Actavis generic
10 companies which are with Teva.
11 　　Q.　I just want to clarify
12 something you just said.
13 　　A.　Sure.
14 　　Q.　You may not have meant it
15 the way I'm taking it.
16 　　　　You say you haven't been
17 able to talk to anyone who had that
18 responsibility.
19 　　　　Did you attempt to speak to
20 anyone and that attempt just wasn't
21 successful?
22 　　A.　So my understanding, in
23 preparing for this, was that the
24 individuals who had primary

Page 356

1 responsibility for generic opioids are
2 with Teva.  And that was -- and they
3 are -- and that is a named defendant in
4 the case.  So I did not reach out to
5 anyone at Teva regarding this.
6 　　Q.　I want to talk about Topic
7 35.  And your prepared answer is on Page
8 19 of Exhibit-3.
9 　　A.　Sure.
10 　　Q.　Exhibit-35 -- I'm sorry.
11 Topic 35 concerns your analysis of the
12 effectiveness of your marketing
13 promotions and advertising related to
14 your opioid products.
15 　　　　And your response says that,
16 Actavis did not provide a formal ROI
17 analysis to assess its return on -- to
18 assess its return on investment for all
19 promotional efforts regarding Kadian.
20 　　　　MR. MELAMED:  Sorry for
21 　　those of you looking at the Elmo.
22 BY MR. MELAMED:
23 　　Q.　Who is Actavis in that
24 response?

Page 357

1 　　A.　Sure.  So this was -- this
2 was related to Kadian, so this would have
3 been Actavis Inc., and subsequent to that
4 Actavis, Inc.
5 　　　　So I did not see any ROI
6 analyses related to promotional efforts
7 for Kadian with either of those
8 companies.
9 　　Q.　Your response says you had
10 some forward-looking research looking at
11 the potential effects of discontinuing
12 field-based promotion of Kadian, correct?
13 　　A.　Well, yeah.  So in -- let me
14 just go back for a second.
15 　　　　In talking to Jennifer, you
16 know, my understanding was there was a
17 pretty limited marketing budget.  There
18 weren't, you know, what she would
19 consider significant promotional efforts.
20 And so, therefore, they did not conduct
21 any ROI analyses.
22 　　　　One thing, you know, that I
23 think I had talked about earlier today
24 was when the product was acquired, there

Page 358

1 was, you know, discussion about whether
2 you would retain a sale -- whether they
3 would retain a sales force to promote the
4 product. So they did hire Health
5 Products Research, HPR, which is a
6 company that I had talked about earlier
7 that I had worked for but not during this
8 time period or on this project. They did
9 hire Health Products Research to
10 understand the impact of discontinuing
11 field promotion of Kadian.
12    Q.    Who was the primary point
13 person responsible for interacting with
14 Health Products Research?
15    A.    I believe that was Nathalie,
16 but I'd have to go back and double check.
17 But I believe that was her.
18    Q.    And HPR concluded that sales
19 of Kadian branded opioids would drop
20 between 34 and 47 percent if Actavis no
21 longer detailed Kadian to doctors; is
22 that correct?
23    A.    So I believe they were
24 looking at the promotional levels that

Page 359

1 Alpharma had been putting behind Kadian.
2 And they -- based on the prescribing data
3 that they looked at, they concluded that
4 if Actavis did not detail Kadian, sales
5 would drop. They had a range of 34 to 47
6 percent in the document.
7    Q.    What date was that document,
8 approximately? I'm not asking for a
9 specific day and month.
10    A.    I don't remember. It would
11 have likely been some time in 2009. But
12 I don't know the date.
13    Q.    So that document was
14 provided by HPR before Actavis made the
15 decision to discontinue detailing Kadian;
16 is that right?
17    A.    So you mean before 2012 when
18 they discontinued detailing?
19    Q.    Did HPR provide that
20 document before 2012?
21    A.    Is that what you're asking
22 me?
23    Q.    I'm asking --
24    A.    Yes, the document was --

Page 360

1    Q.    -- at some point Kadian was
2 no longer detailed, correct?
3    A.    Yes. So Kadian was no
4 longer detailed in the end of 2012. This
5 document would have been provided prior
6 to that, yes.
7    Q.    A couple of years prior to
8 that, right?
9    A.    Yeah, I --
10    Q.    About?
11    A.    If my memory serves me,
12 looking at that document, I believe it
13 was in 2009.
14    Q.    The next paragraph talks
15 about a company called Adheris. Is that
16 a -- that's a third-party company?
17    A.    Yes.
18    Q.    And they also did a
19 projected return-on-investment analysis
20 of some sort; is that correct?
21    A.    So their analysis was based
22 on a program that they were doing, a
23 patient adherence program that they were
24 doing. And they analyzed the expected

Page 361

1 impact of that, I believe from the
2 prescription level data during the time
3 of the program.
4         And they expected an ROI of,
5 yes, 19.9 to 1 when they did that in
6 2009; and then when they did it again in
7 2010, 15.9 to 1.
8    Q.    And by "19.9 to 1," does
9 that mean for every dollar spent they
10 would expect $19.9 in return? Is that
11 the analogy that's been set up with those
12 numbers?
13    A.    So that's my understanding
14 of what ROI is. I don't know how they
15 did that analysis for what they
16 projected.
17    Q.    Just --
18    A.    I will say, one additional,
19 this is -- if -- when I'm doing an ROI
20 analysis, just speaking for my personal
21 experience, I would usually do it
22 internally rather than having the company
23 assess its own program. Just to be fair.
24    Q.    What do you mean you would

Page 362

1 rather do it internally instead of having
2 the company assess its own program?
3     A.   I mean, if you have an
4 outside vendor that you're contracting
5 with to perform a program for you, and
6 they're doing the ROI analysis, I
7 wouldn't typically, as a marketing
8 person, rely on those numbers.
9     Q.   You would expect a bias in
10 favor of the program?
11     A.   I would, yes.
12     Q.   I just want to be clear.  I
13 think I got this answer from you, I just
14 want to make sure I understand.
15     A.   Sure.
16     Q.   Because I don't.
17     The 19.9 to 1 in the return
18 on investment that's mentioned for May of
19 2009, that is that they would expect to
20 see $19.9 in revenue for every one dollar
21 spent on the program?
22     A.   So that is what Adheris is
23 saying, for every dollar you spend with
24 us, this is what you would potentially

Page 363

1 expect in return is my understanding.
2     Q.   Did Actavis continue the
3 program with Adheris after receiving this
4 ROI -- this projected ROI analysis?
5     A.   I don't know.  I'd have to
6 look at the document to see the time
7 period of when the program took place
8 versus this.
9     Q.   And Actavis did not do any
10 retrospective ROI analysis for any of
11 their marketing or detailing efforts; is
12 that accurate?
13     A.   So one point, going back to
14 this, is when you say prospective versus
15 retrospective, this was a program that
16 was done by Adheris.  So if you have any
17 of these -- if you want to get this
18 document, I can look and see what the
19 exact time period was versus when the
20 program ran.
21     I don't -- I'm not sure of
22 that distinction you're making, in terms
23 of prospective versus retrospective in
24 terms of the time period for this.

Page 364

1     What I will say is in
2 talking to Jennifer, and I think I
3 mentioned this earlier, they really
4 weren't doing any ROI analyses on their
5 programs.  If you see, the time period of
6 this is early in 2009, which was early
7 on.  So -- and I'd have to see the
8 document, but I'm thinking that this was
9 a program that was in place prior to the
10 acquisition.  I would have to double
11 check that.
12     Q.   Do you know if there was any
13 return-on-investment analysis done by
14 Watson Pharmaceuticals, Inc. concerning
15 its promotion of Norco?
16     A.   I did not find any documents
17 in my review that showed any ROI analyses
18 that they would have done.
19     Q.   Similarly, did you find any
20 documents showing ROI analysis done for
21 Watson Pharmaceuticals concerning
22 promotion of Norco?
23     A.   By -- you're talking about
24 by a third-party vendor?

Page 365

1     Q.   Whether internal or
2 external, yes.
3     A.   Like I said, that was
4 probably -- that was 15 to 20 years ago,
5 so I have not identified any of those
6 documents.  I have not been able to
7 locate them.
8     Q.   And those are the subject
9 areas for which documents are sparse?
10     A.   Very sparse, yes.
11     Q.   Was there any ROI analysis
12 conducted concerning the promotion by
13 sales representatives of generic opioids
14 at Actavis?
15     MR. JACOBS:  Objection.
16     THE WITNESS:  Are you
17 talking about the oxymorphone that
18 the inVentiv sales
19 representatives -- are you talking
20 specifically about the impact of
21 their detailing of the
22 availability of the product?
23 BY MR. MELAMED:
24     Q.   If I remember correctly, you

Page 366

1 testified that sales representatives
2 detailed oxymorphone for a period of
3 time, and sales representatives also
4 detailed generic Kadian for a period of
5 time; is that correct?
6      A.   Depending on the definition
7 used of detailed, I think what I had
8 said, and if I hadn't, I want to correct
9 that, they provided information about the
10 availability of those products.
11           So detailing is a rather
12 loose term.  So that's specifically what
13 they were doing.
14      Q.   Was there any analysis
15 conducted by Actavis -- any ROI analysis
16 conducted by Actavis for that messaging?
17      A.   I did not see anything
18 related to that.  No, I don't believe
19 that existed.
20      Q.   And for neither of the
21 generic drugs; is that correct?
22      A.   That's my understanding,
23 yes.
24      Q.   I want to turn your

Page 367

1 attention to Topic 19, which concerns
2 surveys, focus groups, market research,
3 concerning the safety, efficacy and/or
4 addictive nature of the opioid products,
5 other opioid products or opioid --
6 there's a wide list of topics in -- or
7 different subjects in Topic 19.
8           In response -- in your
9 prepared response on Page 11 of
10 Exhibit-3, you identified studies
11 prepared for Alpharma when Alpharma owned
12 Kadian and that were sent to Allergan
13 Finance when it acquired Kadian, correct?
14      A.   Yes.
15      Q.   Were there any other studies
16 prepared for Alpharma, when it owned
17 Kadian, that were provided to Allergan
18 Finance concerning any of the topics
19 listed in Topic Number 19?
20      A.   In my review of the
21 documents, I saw e-mails where these were
22 sent over, I think they referred to it
23 as, I may be quoting out of turn, a data
24 dump or here is the information.

Page 368

1           So these are the ones that
2 were attached to the e-mails that I saw.
3 I don't have any information as to
4 whether anyone reviewed them, but these
5 are the materials that were sent.  And I
6 don't know of any others.
7      Q.   Did you see any studies
8 prepared concerning Norco about physician
9 or public perceptions of the safety,
10 efficacy and/or addictive nature of
11 Norco?
12      A.   No, I didn't see any market
13 research related to Norco.  The documents
14 were -- from that time period were sparse
15 and hard to come by.
16      Q.   When you see -- when you
17 responded you didn't see any market
18 research related to Norco, that response
19 was broader than my question.
20      A.   I'm sorry.
21      Q.   So you didn't see any --
22 that's fine.  I just want to make sure
23 that I understand the answer.
24           You didn't see any market

Page 369

1 research concerning Norco --
2      A.   I did not uncover any market
3 research documents related to Norco.
4      Q.   Did you see any market
5 research concerning the safety, efficacy
6 and/or addictive nature of opioids
7 generally?
8           And I don't mean
9 generically, I mean opioids as a class of
10 prescription drugs.
11      A.   Within some of these
12 documents, there were other products that
13 were specifically called out, like other
14 opioids, and I would need the document to
15 see which ones.
16           But there were different
17 perceptions of different opioids.  It
18 was -- Kadian was in there, but as were
19 other opioids as well.
20      Q.   Does your response capture
21 every study that -- of which you are
22 aware concerning physician or public
23 perceptions of the safety, efficacy
24 and/or addictive nature of opioid

Page 370

1 products?

2 MS. WELCH: Objection to the

3 form of the question. Objection

4 to the extent it appears to be

5 broader and outside the scope of

6 Topic 19.

7 THE WITNESS: So can you

8 repeat what you're asking?

9 BY MR. MELAMED:

10 Q. So Topic 19 asks not only

11 for the surveys, focus groups, market

12 research or similar research and

13 investigations, that class of information

14 on behalf of your opioid products, it

15 also asks for it on behalf of other

16 opioid products.

17 And you mentioned that

18 certain articles you referenced here have

19 information about other opioid products

20 and opioids. Full stop.

21 Are you aware of any

22 surveys, focus groups, market research or

23 other similar research or investigation

24 that either you performed or that you had

Page 371

1 performed on your behalf or that you

2 received or reviewed concerning physician

3 or public perceptions of the safety,

4 efficacy or addictive nature of opioids

5 as a class of pharmaceutical drugs?

6 MS. WELCH: Objection to

7 form. Objection that it is

8 outside the scope of Topic 19 as

9 narrowed by objections to which

10 you did not object.

11 THE WITNESS: So my

12 understanding of the topic that I

13 was designated to talk about

14 were -- was -- is on Page 11,

15 Topic 19, under the objections

16 column.

17 And I think you're reading

18 from the topic column.

19 BY MR. MELAMED:

20 Q. Correct. I'm just asking

21 you -- I understand the objections.

22 I'm asking whether you're

23 aware of any studies of opioids generally

24 concerning their safety, efficacy and/or

Page 372

1 addictive nature that Allergan had.

2 A. The market research that I

3 specifically reviewed was listed here.

4 It was related to Kadian.

5 As I mentioned, there -- in

6 the course of market research regarding

7 Kadian, there were other products that

8 were listed. Those are -- the documents

9 that I'm aware of, are listed in here.

10 Q. If a document -- if the

11 market research did not mention Kadian,

12 is it accurate that you did not -- you

13 did not, then, review it for purposes of

14 responding to this topic?

15 MS. WELCH: Objection to

16 form. And I think it misstates

17 her testimony.

18 THE WITNESS: The market

19 research that I reviewed was when

20 Alpharma divested Kadian to

21 Actavis. There were a number of

22 documents that were sent over,

23 GFK, CMR, Emperic Medical

24 Marketing. And so those were the

Page 373

1 ones that I reviewed.

2 Are we still talking about

3 that time period from Alpharma, or

4 are you talking more generally?

5 BY MR. MELAMED:

6 Q. No, more generally.

7 Did you review -- in

8 preparation for answering this topic, did

9 you review any surveys, focus groups,

10 market research, or similar, performed by

11 anyone concerning perceptions of safety,

12 efficacy or addictiveness of opioids?

13 A. So if you turn to Page 12,

14 the next page, as I mentioned that I had

15 reviewed the documents on the previous

16 page, there were also documents that you

17 see listed here conducted on -- by

18 Actavis and the HPR study that we talked

19 about, a KGC study. And Genesis

20 conducted a study about perceptions of

21 Kadian and drivers of product selection.

22 And then you'll see underneath that, Pain

23 Week conducted a survey about

24 practitioners' practices when prescribing

Page 374

1 opioids.
2 So those are the documents I
3 found and reviewed.
4 Q. How did you go about finding
5 those documents?
6 A. You know, I talked to -- I
7 talked to Jennifer Altier about, you
8 know, what documents may have existed. I
9 talked to my attorneys about finding me
10 documents related to the market research
11 that Jennifer mentioned. And just went
12 through all of the materials that could
13 be found about the topics and requested
14 any market research that was related to
15 opioids, specifically Kadian and Norco.
16 Q. Do you agree that the
17 profits of your company increase with the
18 volume of drugs supplied by your firm to
19 distributors?
20 MR. JACOBS: Object to the
21 form.
22 MS. WELCH: Objection to the
23 form. Outside the scope of the
24 noticed topics.

Page 375

1 THE WITNESS: I didn't even
2 understand the question. What did
3 you say?
4 BY MR. MELAMED:
5 Q. You make money by selling a
6 bunch of drugs, correct?
7 MS. WELCH: Objection to
8 form. Outside the scope of the
9 noticed topics.
10 THE WITNESS: That's a very
11 broad question.
12 BY MR. MELAMED:
13 Q. Do your company's profits
14 increase when it -- when you sell more
15 opioids?
16 MS. WELCH: Objection to
17 form.
18 THE WITNESS: That's a --
19 like, a more specific question?
20 I'm not sure what you're asking
21 me.
22 BY MR. MELAMED:
23 Q. As compared to fewer
24 opioids.

Page 376

1 Does your company make more
2 money when it sells more opioids versus
3 fewer opioids?
4 A. My company is not an opioid
5 company. I'd say Kadian and Norco make
6 up a very small percentage of --
7 Q. That's not my question.
8 A. -- of the sales.
9 Q. As it sells Kadian, if it
10 sells more Kadian, does it make more
11 money?
12 A. It depends on a lot of
13 things. It depends on -- someone could
14 purchase Kadian and they could return it
15 later, and they wouldn't make more money.
16 So it's a very broad
17 statement that I am not prepared to talk
18 about.
19 Q. Taking returns out of the
20 equation, is it true that your company
21 makes money -- let me -- taking returns
22 out of the equation, is it true that your
23 company makes more money when it sells
24 more Kadian than it does when it sells

Page 377

1 less Kadian?
2 A. If you're asking if the
3 company -- the company is a
4 pharmaceutical company that sells
5 pharmaceutical products, and there's
6 revenue associated with the
7 pharmaceutical products.
8 But there's a lot of things
9 that go into that. And so I'm not going
10 to comment on how much money the company
11 makes for specific levels of sales.
12 Q. Just to be clear, I wasn't
13 asking you to comment on how much money
14 the company makes for specific levels of
15 sales.
16 I was just asking whether it
17 makes more -- you know, net of returns,
18 does it make more money by selling more
19 product, in this case, specific to
20 Kadian?
21 A. So -- but taking returns out
22 of the situation is an artificial
23 situation. So I feel like it's not a
24 valid question.

Page 378

1    Q.   Okay.  So you're not willing
2  to say -- you can't say whether your
3  company makes more money the more Kadian
4  it sells?
5        MS. WELCH:  Objection to
6    form.
7  BY MR. MELAMED:
8    Q.   It seems a rather simple
9  question to me, and I think you're making
10  it complicated.  Maybe I'm not asking the
11  question correctly.
12        But if I sell bottled water
13  and I sell ten units of bottled water, I
14  make less than if I sell a million units
15  of bottled water.
16        Absent returns, if somebody
17  returns all of those million units, then
18  I've made less.  That's all I'm trying to
19  get at.
20        Does -- does the amount of
21  revenue brought into the company grow the
22  more Kadian it sells, taking returns out
23  of the equation?
24    A.   There is a cost per bottle

Page 379

1  of Kadian.  So if you sell one bottle of
2  Kadian, I don't know that -- the dollar
3  amount, but you get a certain dollar
4  amount; if you sell two bottles of
5  Kadian, you would get the cost of two
6  dollars.
7        But then, as I mentioned,
8  there's a number of other factors that
9  play into it, such as returns.
10    Q.   What other factors?
11    A.   There could be discounts,
12  there could be other fees associated with
13  shipping the product.  There's a number
14  of things that go into a P&L statement,
15  if you will.
16    Q.   Do you currently have any
17  contracts with distributors where the per
18  unit price of Kadian reduces due to
19  volume discounts?
20        MS. WELCH:  Objection to
21    form.  Outside the scope of the
22    noticed topics.
23        THE WITNESS:  I don't know.
24  BY MR. MELAMED:

Page 380

1    Q.   Do you currently have any
2  contracts with distributors where your
3  per unit price reduces due to rebates?
4        MS. WELCH:  Objection to
5    form.  Outside the scope of the
6    noticed topics.
7        THE WITNESS:  And I don't
8    know the answer.
9  BY MR. MELAMED:
10    Q.   You just spoke about
11  discounts, there could be discounts for
12  certain sales.
13        What does -- are there
14  contracts for discounts of certain levels
15  that currently exist for the sale of
16  Kadian?
17        MS. WELCH:  Objection.
18    Outside the scope of the noticed
19    topics.
20        THE WITNESS:  I'm going to
21    say I don't know.  And that's why
22    I was having trouble answering
23    your earlier question, because I
24    don't know the details of that.

Page 381

1  BY MR. MELAMED:
2    Q.   Is your answer the same if
3  we change from Kadian to Norco?
4    A.   Yes.
5    Q.   Is your answer the same if
6  we talk about the generic drugs that
7  were -- the generic opioids that were
8  sold in 2016 to Teva?  Do you know
9  anything about the generic opioids
10  discounts or rebates?
11        MS. WELCH:  Objection.
12    Outside the scope of the noticed
13    topics.
14        THE WITNESS:  I don't know
15    the details of the discounts and
16    rebates.
17  BY MR. MELAMED:
18    Q.   Do you know whether any
19  existed at all?
20        MS. WELCH:  Same objections.
21        THE WITNESS:  Same answer.
22    I don't know.
23  BY MR. MELAMED:
24    Q.   You testified earlier that

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1 certain distributors provide certain
2 promotional activities, like e-mail
3 blasts, correct?
4    A.  We talked about some
5 specific e-mail blasts that were sent,
6 yes.
7    Q.  Do distributors provide any
8 additional promotional activities on
9 behalf of the company?
10    MR. MCBRIDE: Object to the
11    form.
12    THE WITNESS: And are you
13    talking specifically about Kadian
14    and Norco?
15 BY MR. MELAMED:
16    Q.  Let me -- yeah. Let me go
17 back.
18    Do distributors provide you
19 with any additional promotional services
20 to increase sales of Kadian?
21    MR. MCBRIDE: Object to
22    form.
23    THE WITNESS: So currently I
24    work -- Kadian and Norco fall into

Page 383

1    the portfolio that I manage. And
2    there are no services that they
3    perform to do any marketing or
4    selling of Kadian or Norco.
5 BY MR. MELAMED:
6    Q.  Since when have you held
7 this position, your current position?
8    A.  Since January of this year,
9 2018.
10    Q.  Do you know, prior to
11 January of this year, whether
12 distributors provided any promotional
13 services to increase the product sales of
14 Kadian?
15    MR. MCBRIDE: Object to
16    form.
17    THE WITNESS: I don't
18    believe that was a specific topic
19    in my preparation. But based on
20    my knowledge, there is no
21    arrangement. But I don't know.
22 BY MR. MELAMED:
23    Q.  I'm just trying to figure
24 out, based on your current knowledge.

Page 384

1    A.  Yes, yes.
2    Q.  I understand there's no
3 current arrangement.
4    A.  Yes, yes.
5    Q.  Before you were in this
6 position, so before the beginning of this
7 year, do you know that there was no
8 arrangement, or you don't know either way
9 whether there was an arrangement?
10    MR. MCBRIDE: Objection to
11    the form.
12    MS. WELCH: Objection to the
13    extent it's outside the scope of
14    the noticed topics.
15    You can answer, if you know.
16    THE WITNESS: So I don't
17    know for sure. When my
18    predecessor, Michael Kerderka, who
19    I mentioned earlier, provided me
20    all his files, and I reviewed
21    them, and I did not see anything
22    related to any of those types of
23    arrangements that you referenced
24    earlier.

Page 385

1 BY MR. MELAMED:
2    Q.  When did he start in that
3 position?
4    A.  I don't know the dates. I
5 just know that he was in that position
6 prior to me. But I don't know how long.
7    Q.  And do you know whether,
8 prior to his being in that position,
9 whether any distributors provided any
10 promotional services to increase sales of
11 Kadian?
12    MR. MCBRIDE: Object to
13    form.
14    THE WITNESS: The -- let's
15    go back to -- I'll just bring us
16    back to Topic 21, Page 12 of
17    Exhibit-3.
18    And I'll remind you that we
19    talked -- when we were talking
20    about the promotion of Kadian, we
21    did say that -- I did say that
22    based on my conversations with
23    Jennifer and the review of her
24    deposition and the documents, that

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  Cardinal would -- did send e-mail
2  blasts to -- regarding Kadian, the
3  availability, and NDC numbers, and
4  that type of information, as well
5  as for generic oxymorphone.
6       Those are the only ones that
7  I'm specifically aware of.
8  BY MR. MELAMED:
9     Q.   Do you know whether
10 distributors provided any promotional
11 services to increase product sales of any
12 of the generic opioids that were
13 transferred in 2016 to Teva?
14      MR. MCBRIDE:  Object to
15 form.
16      THE WITNESS:  So I think
17 even in the prior question you
18 used that terminology to -- how do
19 you say -- to increase sales?  Is
20 that -- was that the part of the
21 question --
22 BY MR. MELAMED:
23    Q.   That was -- I think that's
24 what I said.

Page 387

1     A.   Was that part of your prior
2  question?
3       And I just want to clarify
4  that my response said that they used
5  these e-mail blasts to inform people of
6  the availability of Kadian or
7  oxymorphone, NDC numbers, the
8  availability of a co-pay card; not
9  specifically something that was -- that I
10 would characterize as to increase sales,
11 but to let people know that this was
12 available.
13    Q.   They were providing a public
14 service, just providing information?
15      MS. WELCH:  Objection to
16 form.
17      THE WITNESS:  They were
18 providing information about how
19 the product, you know -- you know,
20 when -- in order to order a
21 product, you need an NDC number,
22 you need information about what
23 its indication is.
24      So they were materials that

Page 388

1  were -- that contained that type
2  of information.
3  BY MR. MELAMED:
4     Q.   Do you know if distributors
5  provided any promotional services
6  concerning the generic opioids that were
7  transferred to Teva prior to their
8  transfer?
9       MR. BAILEY:  Objection to
10 form.
11      THE WITNESS:  As I
12 mentioned, there were -- Cardinal,
13 McKesson did send e-mail blasts to
14 pharmacies regarding oxymorphone.
15 That's all I'm aware of in my
16 review of documents.
17      Again, I would direct you
18 back to the people who are at Teva
19 who worked on the Actavis generic
20 businesses.
21 BY MR. MELAMED:
22    Q.   Did distributors provide any
23 promotional services to the company -- to
24 Watson Pharmaceuticals, Incorporated on

Page 389

1  the launch of -- at and around the time
2  Norco launched concerning --
3       MR. BAILEY:  Objection to
4  form.
5  BY MR. MELAMED:
6     Q.   -- specific to Norco?
7       It's a clumsy phrased
8  question.
9       Do you understand what I'm
10 asking?
11    A.   Let me see if I can clarify.
12      So are you asking me if
13 there were any e-mail blasts or other
14 types of marketing that were done by
15 Cardinal or McKesson for Norco?  Is that
16 the question?
17    Q.   Yes.
18    A.   Not that I'm aware.  I
19 haven't seen any of those.  But, like I
20 said, those documents are pretty old, and
21 I did not have access to many of them.
22    Q.   Same answer for
23 AmerisourceBergen?
24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1    Q.   Same answer for Anda, the
2  distributor Anda Pharmaceuticals?
3    A.   Yes.
4    Q.   How many employees do you
5  currently have in the sales department?
6    A.   Right now in the sales
7  organization at --
8    Q.   Where you work.
9    A.   -- at Allergan?
10       MS. WELCH:  Objection.
11   Outside the scope of the noticed
12   topics.
13       THE WITNESS:  I really don't
14   know.
15 BY MR. MELAMED:
16   Q.   What's your estimate?
17   A.   I don't know.  There's so
18 many -- there's several different sales
19 forces and different divisions of the
20 company.  So I would not be able to
21 estimate.
22       I work in the general
23 medicine marketing group.  Maybe 1,000
24 sales representatives.  I'm not sure.

Page 391

1    Q.   What about in the marketing
2  group?  Do you have an understanding of
3  approximately how many people are
4  employed in the marketing group at
5  Allergan currently?
6        MS. WELCH:  Again, outside
7    the scope of the noticed topics.
8    And well overbroad with respect to
9    all of Allergan not related to
10   opioids.
11       THE WITNESS:  So that's --
12   so you're asking a general
13   question about Allergan?  How many
14   people work in the marketing
15   group, I'm not sure.  There's
16   several different departments.
17       What I could say is that the
18   marketing department, the people
19   who have any responsibility for
20   Kadian and Norco are me and one
21   other person in the marketing
22   group.
23 BY MR. MELAMED:
24   Q.   At the time that Actavis

Page 392

1  acquired Kadian from Alpharma, how many
2  people were in the marketing group at
3  Actavis?
4    A.   When Actavis acquired
5  Kadian?
6    Q.   Yes.
7    A.   So --
8        MS. WELCH:  Same objections,
9    in terms of overbreadth, given the
10   topics.
11       THE WITNESS:  I don't know
12   how many people were in the
13   marketing group.
14       I do know that the marketing
15   group for Kadian consisted of
16   Jennifer Altier, Lisa Miller, and
17   Nathalie Leitch, part of her
18   responsibility.
19 BY MR. MELAMED:
20   Q.   And your understanding is
21 they were part of a larger marketing
22 department?
23   A.   I really don't know.
24   Q.   How many sales

Page 393

1  representatives were detailing Kadian in
2  2009?
3    A.   My understanding, from
4  Jennifer's deposition and my discussions
5  with her, that there were 18 sales
6  representatives who were employed by
7  inVentiv at the beginning.  And by the
8  end, I believe she said it was 48.
9        If we look at the inVentiv
10 contract, you can see the specific,
11 detailed numbers.
12   Q.   During the time period that
13 Watson Pharmaceuticals was detailing
14 Norco, do you know how many sales
15 representatives were detailing Norco to
16 physicians?
17   A.   I don't know the number of
18 sales representatives.  I was not able to
19 find that information.
20       I do have some -- I did talk
21 to Dirk, who was a specific person there.
22 But if you -- you know, in some of the
23 documents that I reviewed, I believe
24 there were a couple of other people

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1  listed, but I don't know how many there
2  were.
3      If you look -- let's see,
4  I'm on the first page of Exhibit-3. I
5  know there were three regional sales
6  managers; Dirk Pica, Bill Chase and Jim
7  Wallace were the three I was able to
8  identify. There may have been more, but
9  those were the three that I was able to
10  identify from my documents. And they
11  oversaw the sales representatives.
12      I don't know how many -- how
13  many representatives each of them had in
14  their group.
15      Q.  When you spoke to Dirk Pica,
16  did he tell you how many sales
17  representatives were -- he was
18  responsible for as a regional sales
19  manager?
20      A.  I can't remember.
21      Q.  Is that you can't remember
22  whether he told you or he told you but
23  you can't remember the number?
24      A.  I can't remember if he told

Page 395

1  me.
2      Q.  Do you have any idea how
3  many people were in the marketing
4  department at Watson Pharmaceuticals,
5  Inc., that was responsible for marketing
6  Norco subsequent to its launch?
7      A.  No, I don't. I was not able
8  to look at anyone who had information on
9  that. Dirk did not remember.
10      MR. MELAMED:  I don't have
11  any other questions at this time.
12      I will note for the record
13  that I think there were a number
14  of questions for which the witness
15  should have been prepared to
16  respond or should have been able
17  to provide a response and did not.
18  So we'll leave it open. I don't
19  expect you to waive your objection
20  to that.
21      Does anybody else have any
22  questions?
23      VIDEO TECHNICIAN:  This
24  concludes today's deposition.

Page 396

1  Going off the record. The time is
2  5:42 p.m.
3      - - -
4      (Whereupon, the deposition
5  was concluded for the day at 5:42
6  p.m.)
7      - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 397

1      CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
     Amanda Maslynsky-Miller
11   Certified Realtime Reporter
     Dated:  November 5, 2018
12
13
14
15
16
17      (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 398

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 400

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 396, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
JULIE SNYDER            DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Page 399

- - - - - -
## E R R A T A
- - - - - -

PAGE LINE CHANGE/REASON

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

Page 401

## LAWYER'S NOTES

PAGE LINE

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____