```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                   |
 4   OPIATE LITIGATION             |   Case No. 17-MD-2804
                                   |
 5   This Document Relates to:     |   Judge Dan Aaron Polster
                                   |
 6   The County of Summit, Ohio,   |
     et al., v.                    |
 7   Purdue Pharma L.P., et al.    |
     Case No. 17-op-45004          |
 8                                 |
     The County of Cuyahoga v.     |
 9   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45090          |
10                                 |
     City of Cleveland, Ohio v.    |
11   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45132          |
12                                 |
13
                   Thursday, January 10, 2019
14
                         - - -
15
            HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                   CONFIDENTIALITY REVIEW
17
                         - - -
18
             Videotaped deposition of SABRINA SOLIS, held
19       at Foley & Lardner LLP, One Biscayne Tower,
         2 Biscayne Boulevard, Suite 1900, Miami, Florida,
20       commencing at 10:27 a.m., on the above date,
         before Susan D. Wasilewski, Registered
21       Professional Reporter, Certified Realtime
         Reporter, Certified Realtime Captioner.
22
                         - - -
23
                 GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
25
```

```
 1    APPEARANCES:
 2       WEITZ & LUXENBERG, P.C.
         BY:  TIFFANY ELLIS, ESQUIRE
 3           PAUL NOVAK, ESQUIRE
         3011 West Grand Boulevard, Suite 2150
 4       Detroit, Michigan 48202
         (313) 800-4170
 5       tellis@weitzlux.com
         pnovak@weitzlux.com
 6       Representing the Plaintiffs
 7
 8       FOLEY & LARDNER LLP
         BY:  KATY E. KOSKI, ESQUIRE
 9       111 Huntington Avenue
         Boston, Massachusetts 02199
10       (617) 342-4000
         kkoski@foley.com
11       Representing Anda, Inc., and the witness
12
13       REED SMITH LLP
         BY:  CRISTINA CÁRDENAS, ESQUIRE
14       1001 Brickell Bay Drive, Suite 900
         Miami, Florida 33131
15       (786) 747-0207
         ccardenas@reedsmith.com
16       Representing AmerisourceBergen Corporation and
         AmerisourceBergen Drug Corporation
17
18
         ALLEGAERT BERGER & VOGEL LLP
19       BY:  CHRISTOPHER ALLEGAERT, ESQUIRE
         111 Broadway, 20th Floor
20       New York, New York 10006
         (212) 571-0550
21       callegaert@abv.com
         Representing Rochester Drug Co-op
22
23
24
25
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2    JONES DAY
      BY:  NICHOLAS HODGES, ESQUIRE
 3    4655 Executive Drive, Suite 1500
      San Diego, California 92121-3134
 4    (858) 314-1200
      nhodges@jonesday.com
 5    Representing Walmart
 6
      ARNOLD & PORTER
 7    BY:  SEAN P. HENNESSY, ESQUIRE
      601 Massachusetts Avenue, NW
 8    Washington, DC 20001-3743
      (202) 942-5000
 9    sean.hennessy@arnoldporter.com
      Representing Endo Health Solutions Inc., Endo
10    Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
      Par Pharmaceutical Companies, Inc.,
11    (f/k/a Par Pharmaceutical Holdings, Inc.)
12
      COVINGTON & BURLING LLP
13    BY:  ALEJANDRO BARRIENTOS, ESQUIRE
      One CityCenter, 850 Tenth Street, NW
14    Washington, DC 20001-4956
      (202) 662-6000
15    abarrientos@cov.com
      Representing McKesson Corporation
16
17    KIRKLAND & ELLIS, LLP
      BY:  TUCKER HUNTER, ESQUIRE
18    300 North LaSalle Drive
      Chicago, Illinois 60654
19    (312) 862-2000
      tucker.hunter@kirkland.com
20    Representing Allergan Finance LLC
21
      ROPES & GRAY LLP
22    BY:  SOFIA McDONALD, ESQUIRE
      1211 Avenue of the Americas
23    New York, New York 10036-8704
      (212) 596-9000
24    sofia.mcdonald@ropesgray.com
      Representing Mallinckrodt PLC, Mallinckrodt LLC,
25    and SpecGx LLC
```

```
1    ALSO PRESENT:

2       ANTHONY BARBARO, Videographer

3       MICHAEL PIGGINS, Weitz & Luxenberg

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        - - -
 2                    I N D E X
 3                        - - -
 4  Testimony of:  SABRINA SOLIS                    PAGE
 5      DIRECT EXAMINATION BY MS. ELLIS................  11
 6
                    E X H I B I T S
 7
                 (Attached to transcript)
 8
     SABRINA SOLIS DEPOSITION EXHIBITS              PAGE
 9
```

```
    Anda - Solis    Notice of Videotaped Deposition of    13
10  Exhibit 1       Sabrina Solis
11  Anda - Solis    Résumé of Sabrina A. Solis             27
    Exhibit 2       ANDA_SOLIS_PERSONNEL_019 and 20
12
    Anda - Solis    Résumé of Sabrina A. Solis             27
13  Exhibit 3       ANDA_SOLINAS_PERSONNEL_032
                    through 34
14
    Anda - Solis    E-mail - Subject: Added: DD report    106
15  Exhibit 4       to O:drive (TPS): 66351)**No
                    controls ever**
16                  Anda_Opioids_MDL_0000453833
17  Anda - Solis    E-mail - Subject: 450176: 2 S Drug    153
    Exhibit 5       Mart
18                  Anda_Opioids_MDL_0000415442
19  Anda - Solis    E-mail - Subject: Request for         178
    Exhibit 6       Clonazepam increase new QOL Meds
20                  location
                    Anda_Opioids_MDL_000042114 through
21                  422117
22  Anda - Solis    E-mail - Subject: 825257              188
    Exhibit 7       Anda_Opioids_MDL_0000460932 and
23                  460933
24
25
```

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3     SABRINA SOLIS DEPOSITION EXHIBITS            PAGE
 4   Anda - Solis   E-mail - Subject: FYI Safeway    214
     Exhibit 8      (154132) -
 5                  Anda_Opioids_MDL_0000421668
                    through 421670
 6
     Anda - Solis   E-mail - Subject: Bucket         232
 7   Exhibit 9      Anda_Opioids_MDL_0000339317
 8   Anda - Solis   E-mail - Subject: Bucket         235
     Exhibit 10     Anda_Opioids_MDL_0000339315 and
 9                  339316
10   Anda - Solis   SOP #:040                        270
     Exhibit 11     Anda_Opioids_MDL_0000527936
11                  through 527938
12   Anda - Solis   SOP #:040                        278
     Exhibit 12     Anda_Opioids_MDL_0000084445
13                  through 84447
14   Anda - Solis   E-mail - Subject: Acct #389613   288
     Exhibit 13     Anda_Opioids_MDL_0000423540
15
     Anda - Solis   E-mail - Subject: Loading        293
16   Exhibit 14     Walgreens Limits
                    Anda_Opioids_MDL_0000089949
17
     Anda - Solis   E-mail - Subject: Customer       296
18   Exhibit 15     Questionnaire Meeting: Follow-Up
                    Info
19                  Anda_Opioids_MDL_0000418852
                    through 418854
20
     Anda - Solis   E-mail - Subject: Customers Not  298
21   Exhibit 16     Actively Purchasing Controls
                    Anda_Opioids_MDL_0000418832
22                  through 418834
23   Anda - Solis   E-mail - Subject: Just FYI       306
     Exhibit 17     Anda_Opioids_MDL_0000351076 and
24                  351077
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3     SABRINA SOLIS DEPOSITION EXHIBITS              PAGE
 4   Anda - Solis     E-mail - Subject: Notes          314
     Exhibit 18       Anda_Opioids_MDL_0000350910 and
 5                    350911
 6   Anda - Solis     E-mail - Subject: Conference -    316
     Exhibit 19       Cardinal SOM Program
 7                    Anda_Opioids_MDL_0000089620
 8   Anda - Solis     E-mail - Subject: News            318
     Exhibit 20       Anda_Opioids_MDL_0000485846
 9
     Anda - Solis     E-mail - Attachments: ALL Controls 322
10   Exhibit 21       Y, CQ N (1st Meeting) MASTER
                      COMBINED.xlsx
11                    Anda_Opioids_MDL_0000850138 and
                      850139
12
     Anda - Solis     E-mail - Subject: 087298: Star    331
13   Exhibit 22       Pharmacy
                      Anda_Opioids_MDL_0000493634 and
14                    496335
15   Anda - Solis     E-mail - Subject: Order           335
     Exhibit 23       #21212859/Acct #319849 - WAKE
16                    FOREST DRUG, INC.
                      Anda_Opioids_MDL_0000493357
17                    through 493359
18   Anda - Solis     E-mail - Subject: SOMS order-     338
     Exhibit 24       803415 PRESCRIPTION CENTER
19                    PHARMACIES
                      Anda_Opioids_MDL_0000419725  and
20                    419726
21   Anda - Solis     Produced in Native Format         341
     Exhibit 25       Anda_Opioids_MDL_0000018604
22
     Anda - Solis     E-mail - Subject: Updated List of 349
23   Exhibit 26       Customers Not Eligible to Purchase
                      Controls from Anda
24                    Anda_Opioids_MDL_0000018603
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3     SABRINA SOLIS DEPOSITION EXHIBITS              PAGE

 4   Anda - Solis   E-mail - Subject: Trends - Pills   355

     Exhibit 27     to Heroin

 5                  Anda_Opioids_MDL_0000493332

                    through 493336

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1                    - - -

  2            THE VIDEOGRAPHER:  We are now on the record.

  3    My name is Anthony Barbaro.  I am a videographer

  4    for Golkow Litigation Services.  Today's date is

  5    January 10th, 2019, and the time is 10:27 a.m.

  6            This video deposition is being held today in

  7    Miami, Florida, In Re:  The National Opiate

  8    Prescription Litigation, MDL Number 2804, for the

  9    United States District Court, Northern District

 10    of Ohio, Eastern Division.

 11            The deponent is Sabrina Solis.

 12            Counsel, would you please introduce

 13    yourselves for the video record?

 14            MS. ELLIS:  Yes.  This is Tiffany Ellis,

 15    Michael Piggins, and Paul Novak of Weitz &

 16    Luxenberg on behalf of the MDL plaintiffs.

 17            MS. KOSKI:  Katy Koski, Foley & Lardner in

 18    Boston, on behalf of Anda, Inc., and the witness.

 19            MS. CARDENAS:  Cristina Cardenas from Reed

 20    Smith on behalf of AmerisourceBergen.

 21            MR. ALLEGAERT:  Christopher Allegaert,

 22    Allegeart Berger & Vogel, on behalf of Rochester

 23    Drug Co-Op.

 24            MS. ELLIS:  I think we have some people on

 25    the phone.  Could they introduce themselves?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. HENNESSY:  Good morning.  This is Sean

 2    Hennessy from Arnold & Porter here today on

 3    behalf of the Endo and Par Pharmaceutical

 4    defendants.

 5              MR. BARRIENTOS:  Hello.  This is Alejandro

 6    Barrientos from Covington & Burling for McKesson.

 7              MR. HUNTER:  This is Tucker Hunter from

 8    Kirkland & Ellis on behalf of Allergan Finance,

 9    LLC.

10              MS. McDONALD:  Hello.  This is Sofia

11    McDonald at Ropes & Gray on behalf of

12    Mallinckrodt.

13              MR. HODGES:  This is Nick Hodges with Jones

14    Day for Walmart.

15              THE VIDEOGRAPHER:  The court reporter is

16    Susan Wasilewski and she will now swear in the

17    witness.

18              THE COURT REPORTER:  Would you raise your

19    right hand?

20         Do you solemnly swear or affirm the

21    testimony you're about to give will be the truth,

22    the whole truth, and nothing but the truth?

23              THE WITNESS:  Yes.

24              THE COURT REPORTER:  Thank you.

25              SABRINA SOLIS, called as a witness by the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Plaintiffs, having been duly sworn, testified as

2    follows:

3                    DIRECT EXAMINATION

4    BY MS. ELLIS:

5        Q.   Good morning, Ms. Solis.  May I call you

6    Sabrina?

7        A.   Sure.

8        Q.   Will you please introduce yourself for the

9    record, please?

10       A.   I'm Sabrina Solis.
```

```
14       Q.   And what do you do for a living?

15       A.   I'm the current manager for DEA compliance

16   at Anda, Inc.

17       Q.   How long have you had that position?

18       A.   I've had this current role for about

19   14 months.

20            MR. ALLEGAERT:  Could I just ask the witness

21       to try to keep your voice up a little bit?  There

22       is a noise coming off this machine, and we've got

23       a whole bunch of counsel who are on the phone.

24       Thank you.

25            MS. ELLIS:  That brings up a good time to go
```

```
 1        over some ground rules.

 2   BY MS. ELLIS:

 3        Q.   Have you ever had your deposition taken

 4   before?

 5        A.   No.

 6        Q.   So to make it easier for the court reporter,

 7   we'll just go over a few things.

 8             When I ask you questions, just try to wait

 9   until I finish my question before you begin to

10   answer.  Even if you think you know the answer, just

11   wait so we don't talk over each other.  Okay?

12        A.   Okay.

13        Q.   And then please use "yes" or "no" answers so

14   that she can record it.  It's being recorded both by

15   video and audio today, so that the record can pick

16   it up.  Okay?

17        A.   Uh-huh.  Yes.

18             MS. KOSKI:  She means no head nods and "ums"

19        or "ahs."

20             THE WITNESS:  Right.

21        Q.   So if I -- if we sometimes find ourselves

22   doing that anyway, I may remind you from time to

23   time.  I'm not trying to be rude.  Okay?

24        A.   Okay.

25        Q.   And similarly, I may ask you sometimes a
```

```
 1    question that leads you into different directions in

 2    your answers.  I want to ensure that I still get the

 3    answer to my original question, so if I direct you

 4    back, I'm not trying to be rude.  We'll come back to

 5    what you're saying.  I know you enjoy your job and

 6    you think it's important.  I want to make sure you

 7    have a chance to say everything that you want, but

 8    just don't think I'm being rude if I try to, you

 9    know, get you back to the original question.  Okay?

10        A.   Okay.

11        Q.   And then one last point:  At -- from time to

12    time your attorney may object, and unless she tells

13    you not to answer, you should go ahead and answer

14    the question.  Okay?

15        A.   Okay.

16        Q.   Do you ever work remotely?

17        A.   Yes.

18        Q.   You do?

19        A.   Yes.

20        Q.   Do you have a laptop that you work from?

21        A.   Yes, I do.

22        Q.   Where is your primary office?

23        A.   In Weston.

24             (Anda - Solis Exhibit 1 was marked for

25    identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. ELLIS:

 2      Q.   I'm going to show you what's been marked as

 3   Exhibit 1.  Have you seen this before?

 4      A.   No, I have not.

 5      Q.   This is your notice of deposition for this

 6   case.  You have not seen it?

 7      A.   I have not seen this.

 8           MS. ELLIS:  We'll just enter in the record

 9      that it's to be used for all applicable purposes

10      under the appropriate pretrial and case

11      management orders in the proceedings.

12   BY MS. ELLIS:

13      Q.   Did you do anything to prepare for today's

14   deposition?

15      A.   We had a conversation yesterday.

16      Q.   When you say "we," who is that?

17      A.   Attorney, client.

18      Q.   Your attorney, Katy, sitting next to you?

19      A.   Yes.

20      Q.   Was anybody else involved in that

21   conversation?

22      A.   No.

23      Q.   How long did it last?

24      A.   A couple of hours.

25      Q.   Did you review any documents?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   There were some e-mails.

 2      Q.   Do you remember what they were?

 3           MS. KOSKI:  Objection.

 4      Q.   You do?  You can answer.

 5           MS. KOSKI:  I'm sorry.

 6           THE WITNESS:  Yeah.

 7           MS. KOSKI:  Unless I tell you not to

 8      answer --

 9           THE WITNESS:  Okay.

10           MS. KOSKI:  -- you can answer, yeah.

11      A.   Yes, some of them I do.

12      Q.   Anything other than e-mails?

13      A.   Nothing other than e-mails.

14      Q.   Did you do any independent research besides

15   your meeting with your attorney to prepare for

16   today's deposition?

17      A.   I did not do research.

18      Q.   You said you've been in your position now

19   for about 12 months; is that right?

20      A.   Yeah, about.

21      Q.   What is your job responsibility?

22      A.   I oversee a team of, you know, analysts,

23   what I would call analysts, who review the current

24   consumer base that is either requesting access to

25   controlled substance eligibility or we are currently
```

```
 1    servicing.

 2         Q.   When you say "we," you mean Anda?

 3         A.   Anda.

 4         Q.   How many people are on your team?

 5         A.   Right now, there are -- there's five of us,

 6    including myself.

 7         Q.   Are the other four all analysts?

 8         A.   They have a variety of different titles.  So

 9    one of them is considered an auditor, and there's

10    two specialists.  The other is a clerk 3.

11         Q.   I'll ask you about what those mean in a

12    moment, but in general, can you tell me, what is the

13    role of the compliance department at Anda?

14         A.   The role of the compliance department is to

15    ensure compliance, to adhere to what is regulated,

16    and to ensure that we're doing what we need to do to

17    operate.

18         Q.   Anything else?

19         A.   I think that sums it up.

20         Q.   And who do you report to?

21         A.   Jay Spellman.

22         Q.   How long -- have you reported to Jay

23    Spellman the entire time you've been in that role?

24         A.   Yes.

25         Q.   So you said the role of the compliance
```

1    department is to ensure compliance, adhere to what

2    is regulated, and to do what you need to do to

3    operate; is that right?

4        A.    Yes.

5        Q.    Okay.  So let's go through those one by one.

6    When you say "ensure compliance," what do you mean?

7        A.    Meaning that in order to be licensed and

8    operate, there are certain statutes or laws that you

9    have to adhere to, to ensure compliance.

10       Q.    Compliance with those laws, right?

11       A.    With those laws.

12       Q.    Are those both federal and state?

13       A.    Yes, they are.

14       Q.    Are there any locals, local laws?

15             MS. KOSKI:  Object to form.

16             You can answer.

17       A.    I focus on the state and federal.

18       Q.    The next thing you said was to adhere to

19    what is regulated.  That ties into what you just

20    said, to ensure compliance, right?

21       A.    Yes.

22       Q.    Is there anything else that you to do to

23    adhere to what is regulated in the compliance

24    department?

25             MS. KOSKI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1      A.   I'd like to understand the question better.

2      Q.   Well, I'm just trying to use your words to

3   understand what the compliance department does.  And

4   we'll break this down, I guess, into some specific

5   tasks, but I guess generally speaking right now, I

6   want to understand what you mean.

7      A.   Generally speaking, I mean, our job to

8   operate is to understand what is required to

9   operate.  So each day we try to maintain and do what

10  is required for us to operate.

11     Q.   So what is required for you to operate?

12     A.   I like to think of it as who licenses you,

13  whether it's state or federal.  They set certain

14  requirements, and in order for us to engage in the

15  type of business that we do, we adhere to those

16  requirements.

17     Q.   If I were to ask you what those requirements

18  are, sitting here today, could you tell me them?

19     A.   I could round and about tell you, but it

20  would be specific to what you're looking for.

21     Q.   Well, let's just start with roundabout.

22  What are the requirements that you, as a compliance

23  department and the leader of the compliance

24  department, need to adhere to ensure that Anda can

25  operate?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. KOSKI:  Object to form.

 2      A.    I think we need to be familiar with the

 3   customers that either seek to do business with us or

 4   we have approved to do business with.  In addition,

 5   we need to be mindful of who we're selling to after

 6   our review of them.

 7      Q.    Anything else?

 8      A.    That's the round and about.

 9            MR. HENNESSY:  I apologize, I don't mean to

10       interrupt.  I'm having a hard time hearing on the

11       phone.

12      Q.    I'll just ask you to try to keep your voice

13   up.

14      A.    Okay.

15            MS. ELLIS:  And I'll try to do the same for

16       those on the phone.  Please let us know if it

17       dies down at any point.

18            THE COURT REPORTER:  Can I ask who that was?

19       This is the court reporter.

20            MR. HENNESSY:  Sure.  This is Sean Hennessy,

21       and again, I apologize for interrupting.

22            (Discussion off the record.)

23            MS. ELLIS:  Could we go off the record for a

24       second?

25            THE VIDEOGRAPHER:  Off the record at 10:38.
```

```
 1              (Recess from 10:38 a.m. until 10:40 a.m.)

 2              THE VIDEOGRAPHER:  We're now back on the

 3       video record at 10:40 a.m.

 4   BY MS. ELLIS:

 5       Q.   Before we took a break, you said you -- in

 6   order to adhere to regulations, your role in the

 7   compliance department was to be familiar with

 8   customers who seek to do business with Anda or have

 9   been approved to do business with Anda, correct?

10       A.   Correct.

11       Q.   And also be mindful of who Anda is selling

12   to after the review of those customers, right?

13       A.   Correct.

14       Q.   Anything else?

15       A.   That's the round and about.

16       Q.   And what is your understanding of what

17   requires you to do those things?

18       A.   My understanding is the different laws or

19   regulations.

20       Q.   Do you know what those laws or regulations

21   are?

22              MS. KOSKI:  Object to form.

23       A.   I would need you to be more specific because

24   there are so many.

25       Q.   Are there ones that you think are more
```

```
 1    important than others?

 2            MS. KOSKI:  Object to form.

 3       A.   There are not.

 4       Q.   Are there laws and regulations specific to

 5    the -- specific to controlled substances that you're

 6    aware of?

 7       A.   Yes.

 8       Q.   What are those?

 9       A.   For example, understanding who you do

10    business with, and understanding meaning

11    understanding based on your review of the customer,

12    being knowledgeable of what you are selling to them.

13       Q.   Anything else?

14       A.   That's the majority of what we're doing.

15       Q.   Are you familiar with the term due

16    diligence?

17       A.   Yes.

18       Q.   What does that mean to you?

19       A.   To me, it means an overall review of the

20    customer and what we collect in order to feel that

21    we understand our customer well enough to engage in

22    business with them.

23       Q.   Are you familiar with the term "know your

24    customer"?

25       A.   I'm familiar.
```

1     Q.   What does that mean to you?

2     A.   I believe that that means that we have to

3  collect enough information to feel that we know our

4  customer, who they are, what their business looks

5  like, what they want from Anda, and ultimately where

6  the product is going.

7     Q.   So you said know your customer, who they

8  are, what their business looks like, what they want,

9  and where the product is going.  Anything else?

10         MS. KOSKI:  Object to form.

11    A.   That's a good summary.

12    Q.   Is there any other information that you

13  would include on that list of "know your customer"?

14         MS. KOSKI:  Object to form.

15    A.   I'm -- please elaborate.  Like, what we

16  review or --

17    Q.   We'll talk about what you review --

18    A.   Okay.

19    Q.   -- specifically, but generally those things.

20    A.   Generally, yes.

21    Q.   If I were to say the term "public health,"

22  what does that mean to you?

23    A.   The overall good.

24    Q.   What about safety?

25    A.   Overall safety.

```
1        Q.   For who?

2        A.   Public.

3        Q.   Are you familiar with the name Rannazzisi

4        A.   I've heard the name.

5        Q.   In what context?

6        A.   I've just heard the name.

7        Q.   Who have you heard it from?

8        A.   I don't know who I've heard it from.  I've

9   heard the name, so I'm unfamiliar with the person.

10       Q.   Would you agree that part of the role of

11  Anda's compliance department is to ensure that the

12  company is abiding by federal and state rules?

13            MS. KOSKI:  Object to form.  Are you asking

14       her opinion?

15            MR. NOVAK:  I asked if she would agree with

16       that statement.

17       A.   I would agree that you attempt to do that at

18  all times.

19       Q.   Would you agree that that's important?

20       A.   Of course.

21       Q.   Why?

22            MS. KOSKI:  Object to form.  Are you asking

23       her opinion about why it's important to follow

24       laws?  How is -- how is that within the scope of

25       a deposition, given the special master's orders
```

Highly Confidential - Subject to Further Confidentiality Review

1       about the law?

2           MS. ELLIS:  She is the manager of

3       compliance.  I'm asking her understanding of what

4       the role of the compliance department is.

5           MS. KOSKI:  That's not what you asked her.

6       You asked her her opinion about why someone

7       follows the law.  That's -- that's -- Special

8       Master Cohen's order is to not ask people's

9       opinions about the law, what it means.  I think

10      you're -- you've run afoul of that order.

11          If you want to ask her what you said in

12      response to me, her understanding of what the

13      role of the compliance department is, that's a

14      different question.

15          MS. ELLIS:  Okay.  I'll move on.

16  BY MS. ELLIS:

17      Q.  Would you agree that recordkeeping is

18  important in the -- in the compliance department of

19  Anda?

20      A.  Yes.

21      Q.  Why?

22      A.  Because it reflects the different records

23  that come into the department.

24      Q.  Why does that matter?

25      A.  Because you're keeping them to show that you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have taken in those records.

 2        Q.   Would you agree that consistency in that

 3    process is important?

 4             MS. KOSKI:  Object to form.

 5        A.   It should be important.

 6        Q.   Why?

 7        A.   Because being consistent, I believe, is

 8    always good.

 9        Q.   Why?

10        A.   Because you're wanting to do the right

11    thing.

12        Q.   What does that mean?

13        A.   So I'm not really --

14             MS. KOSKI:  Object to form.

15        A.   -- following the "why," actually.

16        Q.   Well, I'm just following up on what you

17    said.  You want to do the right thing.  What does

18    that mean to you?

19        A.   Consistency.

20             MS. KOSKI:  Object to form -- excuse me for

21    a second.

22             Object to form.  You're asking in general,

23    in the universe, what's --

24             MS. ELLIS:  I'm asking --

25             MS. KOSKI:  -- the right thing?
```

```
 1              MS. ELLIS:  -- for clarification on what she

 2       just testified to.

 3              MS. KOSKI:  You can answer if you understand

 4       the question.

 5     BY MS. ELLIS:

 6       Q.   You just testified a moment ago that

 7     consistency is important because you want to do the

 8     right thing.  Is that right?

 9              MS. KOSKI:  You're talking about a

10       consistency in recordkeeping --

11              MS. ELLIS:  Yes.

12              MS. KOSKI:  -- specifically?

13              You can answer that question.

14       A.   Correct.

15       Q.   And why is that important?

16       A.   Because recordkeeping is important to a

17     compliance department.

18       Q.   To ensure that federal rules are followed?

19              MS. KOSKI:  Object to form.

20       A.   Not necessarily.  It's in order to show that

21     you are collecting documents and doing appropriate

22     due diligence to the customer base that you're

23     reviewing.

24       Q.   As manager of DEA compliance, are you in

25     charge of that process for Anda?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I am in charge of the review of customers

2    for controlled substances at this point in time.

3        Q.    When you say "this point in time," what do

4    you mean?

5        A.    Because I've been in this role specifically

6    since December of last year.

7        Q.    So since December of last year, you've been

8    in charge of that process?

9        A.    Correct.

10            MS. KOSKI:  I don't know that it matters,

11       but I think by last year, she means 2017, not

12       2018.

13       A.    I'm sorry.  2017.

14       Q.    Thank you for that clarification.

15            (Anda - Solis Exhibit 2 was marked for

16    identification.)

17    BY MS. ELLIS:

24            (Anda - Solis Exhibit 3 was marked for

25    identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MS. ELLIS:
```



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review





1      Q.   Are there certain things about the company

2   you like?

3      A.   Yes.

4      Q.   What?

5      A.   I think that it's a great company.  I think

6   they care about their employees, and I like the

7   business.

8      Q.   The business of distributing drugs?

9      A.   I like pharmaceuticals.

10      Q.   When you went back to Anda in 2009, had you

11   continued your formal education outside the company

12   at all?

13      A.   When I went back in 2009, that was the

14   intention, to continue on.  And as soon as I became

15   eligible, I did.

16      Q.   When you say you "became eligible," what do

17   you mean?

18      A.   Because the company allows you to become

19   eligible after a certain amount of time you work

20   there and I had to start all over again.

21      Q.   So the company would help you pay for your

22   education, is what you mean?

23      A.   Tuition reimbursement, yeah.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
  8           MS. KOSKI:  Object to form.

  9      A.   Yes.

 10           MS. KOSKI:  Sorry.  Object to form.

 11           You can answer.

 12      A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



16     Q.   Has the company grown over the time since

17    you've been with it?

18          MS. KOSKI:   Object to form.

19     A.   I mean, we're -- how many years are you

20    talking about?

21     Q.   I mean, is the company bigger now than it

22    was when you started as a national account

23    representative in 2009?

24     A.   I don't know if it's bigger than at that

25    time.  It's bigger from maybe the time that I first

1    started.

2         Q.    From 2003?

3         A.    Probably.

4         Q.    Okay.  What makes you say that?

5         A.    Because it's a different -- it's almost --

6    how many years is that?  I'd have to do some math

7    there.  It's 20 -- 16 years.

8         Q.    Things have changed a bit?

9         A.    There's -- I don't know how to answer that

10   question.

11        Q.    Who did you report to when you were a

12   national accounts representative?

13        A.    Elizabeth Shefferman.

14        Q.    And when did you leave that position?

15        A.    2011.

16        Q.    Why did you leave that position?

17        A.    It wasn't challenging enough.

18        Q.    Okay.  What did you want to do?

19        A.    So I had returned back to school, and I had

20   more of an interest specifically in business.

21        Q.    Any particular type of business?

22        A.    Business analytics.

23        Q.    What did you do after you left that

24   position?

25        A.    I went into the compliance area.

1    Q.    Do you recall what position that was?

2    A.    DEA compliance analyst.

3    Q.    Did you specifically want to work in the

4    compliance area?

5    A.    No.

6    Q.    Why did you go in?  Just because there was

7    an open position?

8    A.    I was actually referred to the position when

9    I spoke to HR.

10   Q.    Who referred you?

11   A.    Lisa Anderson.

12   Q.    Do you know why, or did she tell you why?

13   A.    She felt that I was qualified with my work

14   history at Anda.

15   Q.    Did she give you a job description at that

16   point of what the position in compliance would be?

17   A.    It was posted online, public.

18   Q.    What was that for, what position?

19   A.    DEA compliance analyst.

20   Q.    What was your understanding of what your job

21   would be as a DEA compliance analyst?

22   A.    Being compliant with the people that you

23   sold controlled substances to.

24   Q.    Did you ultimately get that job?

25   A.    Yes.

1      Q.   When did you start?

2      A.   I believe it was July of 2011.

3      Q.   When you started in July of 2011, did you

4  receive any training specific to compliance?

5      A.   I received training for the responsibilities

6  that I had.

7      Q.   What were your responsibilities at that

8  time?

9      A.   It was learning how to review customers that

10  you're asked to approve to engage in business with

11  or continued engaging in business with.

12      Q.   Anything else?

13      A.   That sums it up.

14      Q.   So as a DEA compliance analyst, your

15  responsibility was to review customers that you were

16  asked to engage in business with or that Anda was

17  already engaged in business with, right?

18      A.   We were not, like, for example, asked to do

19  business with someone, but if a customer wanted to

20  do business with Anda, it -- the sales department

21  would request a review.

22      Q.   Any other responsibilities that you had as a

23  DEA compliance analyst?

24      A.   That is -- that's where I started with the

25  training.

```
 1        Q.    Who trained you?

 2        A.    Emily Schultz.

 3        Q.    How long did that training last?

 4        A.    I would say that it was a good one year of

 5   working through different facets of the department.

 6        Q.    What did the training consist of?

 7        A.    Reviewing customers, reviewing due diligence

 8   provided to us by the customer, such as their

 9   dispensing information questionnaire, reviewing

10   their limits.

11        Q.    Anything else?

12        A.    That's about what I recall.

13        Q.    So your training was reviewing customers,

14   which meant reviewing the due diligence provided by

15   the customer -- customer including dispensing

16   information?

17        A.    Uh-huh.

18        Q.    Yes?

19        A.    Yes.

20        Q.    And customer questionnaires?

21        A.    Yes.

22        Q.    Yes.  And then reviewing customer limits,

23   correct?

24        A.    Correct.

25        Q.    Would customer limits also be called
```

1    thresholds?

2        A.    I don't refer to it as a threshold, but it's

3    what we assign and what we allow a customer to

4    purchase.

5        Q.    When you say "we," you mean the compliance

6    department --

7        A.    The --

8        Q.    -- at Anda?

9        A.    -- compliance department, uh-huh.

10            MS. KOSKI:   That was a good example of wait

11        until she finishes just so the court reporter can

12        get the full question and answer.

13            MS. ELLIS:   Thank you.

14    BY MS. ELLIS:

15        Q.    So you said this was part of training.  Did

16    you continue to do these responsibilities after a

17    year?

18        A.    Yes.

19        Q.    What made it training, then, in the first

20    year?

21            MS. KOSKI:   Object to form.

22        A.    It was an understanding of the department

23    and what the department's responsibilities are.

24        Q.    Were there, like, webinars that you did to

25    understand these things or sessions that you

```
 1    participated in?

 2    A.   Yes.  We went to different sessions.

 3    Q.   Who would present at those sessions?

 4    A.   We went to a couple of Buzzeo seminars, and

 5    there was various presenters, and we went to DEA

 6    seminars specific to distributors.

 7    Q.   When you say "we," who do you mean?

 8    A.   Everyone in the department.

 9    Q.   At that time, how many people were in the

10    department?

11    A.   So when I started the position, it was

12    myself, and it was Emily Schultz and Michael

13    Cochrane specific to controlled substances.

14    Q.   Anybody else?

15    A.   Not -- not in my day-to-day.  I don't know.

16    Q.   Was your position as DEA compliance analyst

17    specific to controlled substances?

18    A.   Yes.

19    Q.   Was that the -- that was part of the

20    position that you had applied to, was a controlled

21    substances-specific position?

22    A.   It was not called controlled substances.  It

23    was a DEA compliance analyst.

24    Q.   Were there other DEA compliance analysts

25    there?
```

```
 1        A.   At the -- they started shortly after I was

 2   hired.

 3        Q.   So who did you report to when you started in

 4   2011 as a DEA compliance analyst?

 5        A.   Michael Cochrane.

 6        Q.   Do you know what his role was at that time?

 7        A.   I believe it was executive director of

 8   regulatory compliance.

 9        Q.   Do you know if Emily Schultz also reported

10   to Michael Cochrane at that time?

11        A.   Yes.

12        Q.   So the three of you were the ones

13   responsible for Anda's controlled substance

14   compliance at that time?

15             MS. KOSKI:  Object to form.

16        A.   We were the three in that area of the

17   department at that time.

18        Q.   What were the other areas of the department?

19        A.   There is regulatory compliance as well.

20        Q.   What's the difference?

21        A.   Regulatory compliance is customer

22   licensing-specific, facility licensing, FDA issues.

23        Q.   So you said you went to a couple of seminars

24   as part of your training done by Buzzeo and the DEA,

25   right?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.   Yes.

2     Q.   Was that within the first year that you were

3     a DEA compliance analyst?

4     A.   I believe so.

5     Q.   Do you remember specifically any of those

6     seminars, what they were?

7     A.   They were specific to distributors.

8     Q.   Do you remember when they were?

9     A.   I don't recall the exact dates.

10    Q.   Do you remember where any of them were?

11    A.   They were all in Maryland, outside of DC.

12    Q.   Who -- was there anybody besides Emily,

13    Michael, and yourself that went to these seminars at

14    that time?

15    A.   As we hired more people, they attended as

16    well.

17    Q.   But initially, it was you and Emily and

18    Michael?

19    A.   Yes.

20    Q.   Did you ever go to seminars done by HGMA or

21    HGA?

22    A.   No.

23    Q.   Do you know what those acronyms stand for?

24    A.   Yes.

25    Q.   How do you know?

```
 1        A.   I know Healthcare Distribution Alliance, and

 2   HGMA is just part of the industry.

 3        Q.   Were any -- did you ever receive materials

 4   from either of those groups as part of your

 5   training?

 6        A.   We follow, like, various news topics, and we

 7   keep up to speed with different bulletins, yes.

 8        Q.   So I want to take you back to -- let's just

 9   say your first day as a DEA compliance analyst.

10   What did it look like?  What did you do?

11        MS. KOSKI:  Object to form.

12        A.   Understanding the customers, the -- what the

13   department is responsible for.

14        Q.   How would you get that understanding?

15        A.   So can you please be more specific, like, of

16   what --

17        Q.   What is -- I'm just asking day-to-day, you

18   know, I want to understand how you evolved from the

19   pricing department and the national accounts

20   management department into the compliance

21   department.

22        A.   So basically, I would say a lot of it is

23   analytics and looking at data.

24        Q.   We'll come back to your responsibilities and

25   what you did as a DEA compliance analyst in a
```

```
 1    moment, but that brings us to a good point to ask

 2    you about some Anda systems.

 3            You've already mentioned TPS?

 4    A.    Uh-huh.

 5    Q.    Yes?

 6    A.    Yes.

 7    Q.    And that's something that you've used

 8    consistently throughout your time at Anda?

 9    A.    Yes.

10    Q.    Are you aware of any user guides that exist

11    now or at any point for using TPS?

12    A.    I am not.

13    Q.    Have you ever done any formal training,

14    besides people sitting with you at a computer

15    terminal, into how to use TPS?

16            MS. KOSKI:  Object to form.

17    Q.    Meaning have you been trained?

18    A.    That's --

19            MS. KOSKI:  Go ahead.

20    A.    The training consists of sitting down with

21    people who are showing you the responsibility in the

22    department.

23    Q.    You said earlier that almost anybody who

24    works for Anda would use TPS; is that right?

25    A.    I believe that most departments utilize TPS.
```

```
 1      Q.    Do they use it for different functions?

 2      A.    Every department has a different function.

 3      Q.    And they would use TPS accordingly?

 4      A.    Yes.

 5      Q.    Is there one particular department that

 6      controls the TPS system, that you know of?

 7            MS. KOSKI:   Object to form.

 8      A.    I believe that everything falls within the

 9      IT department if it's -- if it's a computer system

10      or software.

11      Q.    When you used TPS in the DEA -- as a DEA

12      compliance analyst, was it different than how you

13      used it in the -- as a national accounts

14      representative?

15      A.    Yes.

16      Q.    How so?

17      A.    Because your access is different, and your

18      job responsibilities are different, so you have

19      access in TPS only to what your current

20      responsibilities are.

21      Q.    So when you became a DEA compliance analyst,

22      how did your access in TPS change?

23      A.    It was very limited.

24      Q.    What do you mean?

25      A.    Meaning that it was specific to my role with
```

1    the customer.

2        Q.   As a customer account manager, you mean, or

3    as a DEA compliance analyst?

4        A.   Sorry.  Which one are you asking about?

5        Q.   Well, my initial question was:  How did

6    it -- how did your access in TPS change?  So you

7    said it was limited.  Was it limited when you were

8    an account manager or when you were in the

9    compliance department?

10       A.   In the compliance department.

11       Q.   That's when it was limited?

12       A.   You have different access because you're

13   only using basically a customer master.

14       Q.   What do you mean, customer master?

15       A.   You're focused on the customer and their

16   eligibility to do business at Anda.

17       Q.   What is customer master?

18       A.   Like, the customer's information.

19       Q.   Is master a term for, like, a data set, or

20   is it --

21       A.   I refer to it as the customers that we do

22   business with.

23       Q.   So when you say "customer master," is that

24   everybody who's -- every customer of Anda who's

25   eligible to purchase controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.    No.

2      Q.    What -- is it every customer of Anda at all?

3      A.    It's every customer that has probably come

4    through Anda and been set up at Anda as a customer.

5      Q.    At any point in time?

6      A.    At any point in time.

7      Q.    Is it your understanding that TPS has

8    historical data in it?

9            MS. KOSKI:  Object to form.

10     A.    I -- that has to be more specific.

11     Q.    So let's talk about your time as an

12   account -- national account representative.  Could

13   you see a customer's purchase history, for example,

14   when you were in that role?

15     A.    I don't recall.

16     Q.    Could you see how a customer's activity with

17   Anda had changed over time when you were in that

18   role?

19     A.    No.

20     Q.    When you came to the compliance department,

21   could you see a customer's purchase history through

22   TPS?

23     A.    Yes.

24     Q.    Are there other things that you could see

25   when you came to the compliance department that you
```

1    could not see when you were at the national

2    account -- when you were a national account

3    representative?

4        A.   Yeah.  I stated before, every department is

5    able to see what is specific to that department.

6        Q.   So I guess I'm asking you for some specific

7    examples of what you would see in compliance that

8    you had not seen in national accounts, or vice

9    versa.

10       A.   So you would see -- you would have access to

11   the customer's licensing, whether or not they're

12   allowed controls or not.

13       Q.   You're talking about when you're in

14   compliance, right?

15       A.   Yes.

16       Q.   Okay.  Anything else?

17       A.   Anything that the -- has to do with the

18   customer's setup.

19       Q.   Such as?

20       A.   It's also maybe the controlled substances,

21   if they're allowed those items.

22       Q.   You said anything that has to do with the

23   customer's setup.  What would that be?

24       A.   So the department, again, they focus on

25   licensing.  They focus on whether or not a person is

Highly Confidential - Subject to Further Confidentiality Review

1   allowed controls or not, and they focus on, if they

2   are allowed controls, what would they be eligible

3   for.

4       Q.   Are you aware of any reporting capabilities

5   in TPS?

6       A.   Yes.

7       Q.   What are those?

8            MS. KOSKI:   Object to form.

9       A.   TPS has the -- you are able to report in

10  TPS.  And every department is different, and

11  everything that they want to do is different.

12      Q.   So let's talk about national accounts

13  representative for a moment.  Do you recall any

14  reports that you were capable of running when you

15  were a national account representative in TPS?

16      A.   Yes.

17      Q.   What were those?

18      A.   Proof of delivery reports.

19      Q.   Anything else?

20      A.   Something referred to as an invoice file.

21      Q.   Anything else?

22      A.   That's what I recall.

23      Q.   Okay.  Were those reports that you would

24  just push a button in TPS and they would run?

25      A.   No.

1      Q.   How would you run a report?

2      A.   You would have to say what it is that you're

3   trying to pull.  So is it a specific customer?  Is

4   it a specific customer type?  Is it a specific date

5   range?  Is it a specific item?

6      Q.   Were there ever reports, when you were a

7   national accounts representative, that you wanted to

8   see, but the system was not capable of?

9      A.   No.  I mean, I wasn't so much into a variety

10  of different reporting factors.  It was whatever was

11  my job responsibility.

12     Q.   When you came to the compliance department

13  in 2011, were there certain reports that you were

14  aware TPS was capable of?

15     A.   Yes.

16     Q.   Do you recall what those were?

17     A.   There were -- I have -- I have to think

18  about that.  I'll come back with that.

19     Q.   Is there something that would help you

20  recall what reports were available at that time?

21     A.   Well, it's because it's 10 years ago, so I'm

22  trying to remember what those reports were then

23  specifically.

24     Q.   I understand it's been some time.

25     A.   Yeah.  It's --

1      Q.   Is it fair to say that the system's ability

2   to -- strike that.

3           Is it fair to say that the reports that are

4   available in TPS now are different than the ones

5   that were available at that time?

6           MS. KOSKI:   Object to form.

7      A.   There are new reports created with time.

8      Q.   So there have been reports created since

9   2011 in TPS?

10     A.   Probably, yes.

11     Q.   Can you think of any off the top of your

12  head?

13     A.   No, I cannot think off the top of my head.

14     Q.   How would you know what reports the system

15  was capable of in 2011 anyway?  Was there, like, a

16  list or something that you were given?

17     A.   No.

18     Q.   How would you know what the system could do,

19  then?

20     A.   So TPS reports -- something called a query,

21  and there are different reports that were already

22  created.  So you could see a report created.

23     Q.   Do you know who was responsible for creating

24  those reports?

25     A.   Any --

1    Q.   Go ahead.

2    A.   It could be any employee who was capable of

3    creating a report in any department.

4    Q.   When you were a national account

5    representative, were you capable of creating a

6    report?

7    A.   No.

8    Q.   When you became a DEA compliance analyst,

9    were you capable of creating a report?

10    A.   Capable of authoring a report to be created.

11    Q.   What does that mean?

12    A.   So it was a little bit more complex, and so

13    I partnered with IT.  I partnered with our sales

14    reporting department.

15    Q.   Was that part of what you understood your

16    job to be as a DEA compliance analyst?

17    A.   Yes.

18    Q.   Were you told that the -- were you told

19    about any specific focuses that the compliance

20    department had at the time you became an analyst in

21    2011?

22    A.   Yes.

23    Q.   What were those?

24    A.   Knowing a customer's business, who they are,

25    what they want from Anda, whether or not we would

1   choose to do business with them.

2       Q.   Were you told, when you started with

3   compliance, if the department was facing any

4   challenges?

5            MS. KOSKI:  Object to form.

6       A.   I was told that we wanted to maintain

7   standards.

8       Q.   What standards?

9       A.   Standards of knowing our customers.

10      Q.   According to what?

11           MS. KOSKI:  Object to form.

12      A.   Knowing our customers and being familiar

13  with them at all times.

14      Q.   Were you told, when you became a DEA

15  compliance analyst, whether there were specific

16  areas that the department needed to improve upon in

17  order to do that?

18           MS. KOSKI:  Object to form.

19      A.   We wanted to collect updated information on

20  everyone that we were doing business with.

21      Q.   Were you told that was part of your job

22  responsibility back in 2011?

23      A.   Yes.

24      Q.   When you say "wanted to collect updated

25  information," what do you mean?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Information in 2011, at that time.

2      Q.   Why is that?

3      A.   To have updated recordkeeping.

4      Q.   Earlier you said that recordkeeping and

5   being thorough is important, correct?

6      A.   Correct.

7      Q.   And that was part of what you understood

8   your job to be, yes?

9      A.   Yes.

10     Q.   So was it your understanding that

11  information had not been updated as well as it could

12  have been previously?

13     A.   No.

14     Q.   It had not been?

15     A.   It -- that was not pointed out to me.

16     Q.   Well, you said you wanted to collect updated

17  information.  Does -- was it your understanding that

18  there was information that was out of date?

19          MS. KOSKI:  Object to form.

20     A.   No.

21     Q.   Then what would the information you were

22  collecting be updating?

23     A.   So, for example, if you're reviewing a

24  customer, they're required to provide updated

25  information to you in order for you to conduct your

 1    review.

 2         Q.   Was that entitled a specific project of some

 3    sort?

 4              MS. KOSKI:  Object to form.

 5         A.   So please help me understand.  Is there a

 6    project that you're talking about or --

 7         Q.   No.  I'm just asking you.  At the time, was

 8    there a project, in 2011, that you were working on

 9    that was focused on up -- collecting updated

10    information on customers?

11         A.   I did collect updated information in a

12    project, yes.  And then I also collected updated

13    information depending on the different requests that

14    came to our department.

15         Q.   So what was the -- was there a name for the

16    project that you collected updated information

17    through?

18         A.   So we collected questionnaires, and we

19    collected dispensing data.

20         Q.   Was there a name for that project?

21         A.   Not anything formal, no.

22         Q.   If I said Customer Questionnaire Project,

23    was -- does that mean anything?

24         A.   Yes.

25         Q.   What does that mean?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I mean, a project to collect questionnaires.

 2      Q.   Let's go back to TPS for a second.  You said

 3   you could author a report in TPS when you were a DEA

 4   compliance analyst; is that right?

 5      A.   Correct.

 6      Q.   So if you wanted to author a report, what

 7   would you do?

 8      A.   You would identify what you're wanting to

 9   see in the report, and then you would create a

10   report to see what you're wanting to see.

11      Q.   How would you know whether there was a

12   report that already existed that included what you

13   wanted to see?

14      A.   I wanted to create my own, so I -- at that

15   time, there was a new type of reporting, and so I

16   used that type of reporting.

17      Q.   So let's break that down.  Back in 2011, you

18   said you wanted to create your own report, right?

19      A.   Correct.

20      Q.   What kind of report did you want to create?

21      A.   It's called a Cognos report.

22      Q.   What does that mean?

23      A.   It's a different means of reporting.  It's

24   not using TPS to report.  It's just -- it's better

25   looking, and it's more efficient.
```

```
 1      Q.   Is it a different program?

 2      A.   It's a different way of reporting.

 3      Q.   What does Cognos stand for, do you know?

 4      A.   No.

 5      Q.   And when you say it's a different way of

 6   reporting to some agency or to someone or --

 7      A.   No.  It's just -- to be honest, like, TPS is

 8   an older system, and so Cognos is just easier to

 9   look at.

10      Q.   So it's a different program?

11      A.   Correct.

12      Q.   So when you open your desktop, you would

13   have an icon for TPS, correct?

14           MS. KOSKI:  Object to form.

15      Q.   Or how would you get into TPS?

16      A.   Sign in.

17      Q.   Through, like, clicking on a computer icon

18   or sign into what, online?

19      A.   Icon.

20      Q.   If I were to hand you a laptop today, could

21   you sign into TPS?

22      A.   I'm unaware because I'm off-site, and

23   there's different security measures.  I'm not sure.

24      Q.   When you work from home, are you able to

25   access TPS?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   How do you do that?

3      A.   Through a secured website.

4      Q.   You sign in with your own credentials?

5      A.   Yes.

6      Q.   Those are specific to you at your permission

7   level, correct?

8      A.   Correct.

9      Q.   And you do that through the Internet?

10     A.   Correct.

11     Q.   When you say "a secured website," do you

12   have a secured work environment that you access for

13   Anda, or is it just on your home computer, you go to

14   a web browser, and you type in a web address?

15     A.   Anda has various security measures.

16     Q.   Okay.  Well, I'm trying to understand what

17   they are.

18     A.   Yeah.

19     Q.   So when you -- say you're at home.  You're

20   working from home, and you want to access TPS.  Walk

21   me through the steps of what you would do.

22     A.   So you have to sign on to Teva-secured

23   environment, and then the Internet, and then TPS.

24     Q.   So sitting here today, if you had a laptop,

25   and you could access the Internet, you could sign

1    into Teva's secured environment?

2        A.   I'm unsure of that.

3        Q.   Why are you unsure of that?

4        A.   Because I haven't tried it.

5        Q.   You have done it from home?

6        A.   From home.

7        Q.   On your own computer?

8        A.   Yes.

9        Q.   Have you done it from any other location

10   besides that?

11       A.   No, I have not.

12       Q.   Are you aware of your sign-in credentials

13   from Teva?

14            MS. KOSKI:  Object to the form of the

15       question.

16       Q.   Do you know what they are, sitting here

17   today?

18       A.   Sorry.  So which -- there's so many

19   sign-ons.  Which environment?

20       Q.   So if you wanted to access Teva in your home

21   computer sitting at your house, just sitting here

22   today, could you do that?

23       A.   I could attempt to get into their secured

24   website.

25       Q.   Is there something that would prevent you

1    from doing that, that you're aware of?

2        A.    I have had difficulty getting into that

3    sometimes, yes.

4        Q.    Such as what?  What would cause a

5    difficulty?

6        A.    Something that I don't understand.  It has

7    to do with Teva allowing you to do it.

8        Q.    So to access TPS, once you sign into the

9    secure environment, you said you would go into a

10   website, and then you would sign into TPS?

11       A.    TPS is actually not a website, so it's just

12   signing into the application.

13       Q.    So it would be in your start menu or on your

14   desktop or something like that?

15       A.    Correct.

16       Q.    And what about Cognos, is that something

17   that you would sign into separately?

18       A.    I'm unable to access Cognos from home.

19       Q.    But whether you're at home or not --

20       A.    Uh-huh.

21       Q.    -- how would you access Cognos?

22       A.    Cognos is Internet access.

23       Q.    And you can only access that one when you're

24   onsite at Anda?

25       A.    Yes.

1       Q.   Okay.  What is CSOS?

2       A.   It's an electronic controlled substance

3    ordering.

4       Q.   Do you have access to that program?

5       A.   No, I do not.

6       Q.   Do you know who uses CSOS?

7       A.   It's various customers who have gone through

8    with the program.

9       Q.   What do you mean, "that have gone through

10   with the program"?

11      A.   Having it installed and wanting to do

12   business with Anda using CSOS.

13      Q.   So what is your understanding of what CSOS

14   does?

15      A.   It's electronic controlled substance

16   ordering.

17      Q.   So that's how customers would order

18   controlled substances from Anda?

19      A.   If they were set up to do business that way.

20      Q.   What other way would they order controlled

21   substances from Anda?

22      A.   Is there, like, a specific controlled

23   substance that you're talking about?  Like a

24   schedule or, like, CII, CIII, CIV, CV.

25      Q.   Does it make a difference?

1       A.     Yes.

2       Q.     Why?

3       A.     Because if they order CIIs, the only other

4    way is, like, a 222 form, rather than electronic

5    ordering.

6       Q.     That's a DEA form, correct?

7       A.     Correct.

8       Q.     So you said Schedule IIs were a 222 form?

9       A.     Correct, if not CSOS.

10      Q.     Are there any other ways somebody could

11   order -- an Anda customer could order a Schedule II

12   besides a 222 form or CSOS?

13      A.     I'm unaware.

14      Q.     So do you understand how -- what happens

15   once a customer puts an order in CSOS, how does

16   it -- do you ultimately see that in the compliance

17   department?

18      A.     We don't have visibility to that.

19      Q.     You don't have visibility into CSOS?

20      A.     Correct.

21      Q.     But you would have visibility into a

22   customer's order, correct?

23      A.     Correct.

24      Q.     How would -- and just -- I'll stop you.

25   Let's try not to talk over each other.  I know that

1    this is the part where you probably are going to

2    know the answers to my questions before I ask them.

3    But for the record to be clear, let's just try not

4    to talk over each other.

5            So let's just walk through the process.  If

6    a customer puts an order into CSOS, what is your

7    understanding of how it comes to Anda so that you

8    can review that order?

9        A.   It's ordered electronically, and should it

10   need review, if it is flagged in our system to be

11   reviewed, then we review it.

12       Q.   So is it your understanding that CSOS talks

13   to -- when I say "talk," I just mean communicates

14   with electronically in some way some Anda system or

15   program?

16           MS. KOSKI:  Object to form.

17       A.   I would assume that orders -- not specific

18   to CSOS, orders speak to the system.

19       Q.   What system would that be, TPS?

20       A.   Yes.

21       Q.   So an order -- a customer places an order

22   through CSOS that you do not have access to,

23   correct?

24       A.   Correct.

25       Q.   But you and the compliance department would

1    be able to see that order at some point, right?

2        A.    If it was needing reviewed.

3        Q.    If it were flagged, per se?

4        A.    Correct.

5        Q.    And TPS is the program that would flag it?

6    Let's say back in 2011.

7        A.    Yes.

8        Q.    Now it's a Buzzeo cloud-based program?

9        A.    Correct.

10       Q.    So we'll talk about these two separate

11   periods separately.  Okay?  For the time being,

12   unless I ask you about Buzzeo, let's assume we're

13   talking about pre-Buzzeo.

14       A.    Okay.

15       Q.    So a customer places an order through CSOS,

16   and you would see it within TPS, right?

17       A.    No.

18       Q.    No.  Why --

19       A.    So --

20       Q.    -- or what would you -- what would happen?

21           MS. KOSKI:  Object to form.

22       A.    Not every order is reviewed by compliance.

23       Q.    I apologize.  If an order was flagged, you

24   would then see it in TPS?

25       A.    Yes.

1      Q.   What about Remedy, what is that?

2      A.   Remedy is a task management system.  It's a

3    part of our suspicious order monitoring system where

4    we take the approach of approving customers and

5    reviewing them on the front end, and we have control

6    of any requests that come from a customer to their

7    sales rep, and we review and determine whether we

8    will allow or not allow.

9      Q.   Are you aware if TPS and Remedy communicate

10   with each other electronically?

11        MS. KOSKI:  Object to form.

12     A.   I'm unaware of behind the scenes.

13     Q.   Is there any overlap between TPS and Remedy?

14     A.   Remedy is specific to customers'

15   information.  And for our purposes, again, Remedy

16   has different purposes in different departments.

17   For our purpose, it's a request-based purpose.

18     Q.   When you say "our," you mean the compliance

19   department?

20     A.   The compliance department.

21     Q.   Is that a computer program that you are able

22   to access if you're working virtually?

23     A.   Sometimes, yes.

24     Q.   Why sometimes?

25     A.   Because, as I mentioned before, sometimes

```
 1    there are hurdles with getting into different

 2    systems from home that I can't explain.

 3         Q.   So the system might be down, and it just

 4    doesn't let you sign in?

 5         A.   Yes.

 6         Q.   Or you may be having some problem with the

 7    company intranet or something like that?

 8         A.   Yes.

 9         Q.   But on a day where things are running

10    smoothly, you could sit at your home computer and

11    sign into Remedy, yes?

12         A.   Yes.

13         Q.   And you could also sign into TPS?

14         A.   Yes.

15         Q.   And you could access the same information in

16    each of those programs as you would as if you were

17    sitting at your desk at work?

18         A.   I believe so.

19         Q.   And you've done that before?

20         A.   Yes.

21         Q.   Did you use Remedy when you were a national

22    accounts representative?

23         A.   Sparingly.

24         Q.   What did you use it for?

25         A.   There were requests to open a new store
```

1    within a chain, and that was all that was done.

2        Q.    When you would use Remedy to open a new

3    store within a chain, what would you do as a

4    national accounts representative?

5        A.    You were asking the company and another

6    department within the company to review customers'

7    information to create an account at Anda.  And it

8    went through numerous processes, but in national

9    accounts, you pulled the licensing and provided it

10   to other departments to load, review and load.

11       Q.    When you say "other departments," do you

12   mean compliance?

13       A.    Yes.

14       Q.    Who -- were you aware of who was working in

15   compliance at that point?

16       A.    I did not have a relationship with anyone in

17   compliance.  We sent our requests to a group e-mail

18   or a group fax machine.

19       Q.    Do you remember what that was?

20       A.    Warehouse --

21             MS. KOSKI:  Object to form.

22             Sorry.  Go ahead.

23       A.    Warehouse 20 Compliance.  It's an e-mail

24   group.

25       Q.    So what would you e-mail?

```
 1        A.   Hard copies of customers' licenses.

 2        Q.   And you said it was Warehouse 20 Compliance?

 3        A.   Yes.

 4        Q.   @Anda?

 5        A.   @Andanet.

 6        Q.   So you would e-mail hard copy of a

 7   customer's license.  Anything else?

 8        A.   That was all.

 9        Q.   When you were at national accounts, did you

10   ever help collect customer questionnaires?

11        A.   No.

12        Q.   Did you help collect dispense data?

13        A.   No.

14        Q.   Were you aware of whether new accounts -- or

15   customer questionnaires at that point were required

16   for new accounts?

17        A.   I don't recall.

18        Q.   Do you recall whether dispense data was

19   required for new accounts when you were a national

20   accounts representative?

21        A.   I don't recall.

22        Q.   Is there anything that would refresh --

23   refresh your recollection?

24        A.   We had nothing to do with controlled

25   substances at that point.  This was just opening a
```

 1    customer to Anda.

 2        Q.   So if a customer came in, it didn't matter

 3    whether they wanted to purchase controlled

 4    substances or not; you just did basic things?

 5        A.   Basic.

 6        Q.   Would somebody else vet, then, them for

 7    controlled substances?

 8        A.   If that were to happen, it would be probably

 9    a manager who was in charge of the relationship.  It

10    wasn't my role.

11        Q.   It would have been one of the salespeople

12    that worked with the customer?

13        A.   Correct.

14        Q.   Were you aware, as a representative, whether

15    a customer was purchasing controls or wanted to

16    purchase controls or not?

17        A.   I was not aware of that process.

18        Q.   Okay.  So we've talked about TPS, Remedy,

19    CSOS, and Cognos.  Are there any other programs

20    that you're -- computer programs at Anda that you're

21    aware of or that you've used on a regular basis,

22    either as a national accounts representative or in

23    the compliance department?

24             MS. KOSKI:  Object to form.

25        A.   Those are most frequently used.

```
 1        Q.   You said Cognos is another program, correct?

 2        A.   It's another source of reporting.

 3        Q.   A source of reporting?

 4        A.   Uh-huh.

 5        Q.   Yes?

 6        A.   Yes.

 7        Q.   Who within Anda uses Cognos?

 8        A.   I have no idea.

 9        Q.   Did you use Cognos when you were a national

10   accounts representative?

11        A.   No, I did not.

12        Q.   Did you receive any training in Cognos at

13   any point in your time with Anda?

14        A.   Yes.

15        Q.   When?

16        A.   I don't recall the time.  There were

17   training sessions.

18        Q.   Who would have done those training sessions?

19   Do you recall?

20        A.   The sales reporting department.

21        Q.   Do you recall what sort of things they

22   trained you on?

23        A.   Report capabilities.

24        Q.   And this is when you were -- you came to the

25   compliance department?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I believe so.

 2      Q.   What sort of report capabilities do you

 3   recall being trained on through Cognos?

 4      A.   Understanding what you could pull by

 5   customer or by item.

 6      Q.   So what sort of information could you pull

 7   by customer from Cognos?

 8      A.   The training doesn't consist of them telling

 9   you what you could or could not pull.  It's what you

10   are wanting to pull.  And again, all accesses are

11   different.

12      Q.   So the training consisted of showing you how

13   you could pull things, right?

14      A.   Correct.

15      Q.   But not necessarily what it was that you

16   were able to pull?

17      A.   Correct.

18      Q.   So as a DEA compliance analyst, were you

19   able to pull things from Cognos?

20      A.   Yes.

21      Q.   What things would you pull from Cognos?

22      A.   Customer information or item information.

23      Q.   What sort of customer information?

24      A.   Specific to our department, control

25   eligibility.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   When you say "control eligibility," is

2    that -- what does that mean?

3    A.   So if I were wanting to look and see, is

4    this customer currently allowed controls or not.

5    Q.   So if you were to pull a customer

6    information from Cognos through a report, would it

7    be as simple as a "yes" or "no"?

8         MS. KOSKI:  Object to form.

9    A.   Say -- please repeat.

10   Q.   So I guess I'm trying to understand when you

11   say the reporting capability of customer

12   information.  Like, what would that include?

13   A.   Things that we managed in our area, so if

14   you wanted to look at licensing, if you wanted to

15   look at control eligibility.

16   Q.   And so control eligibility, if you wanted to

17   look at that, what would the report include?

18   A.   It would include a "yes" or "no" flag, if

19   they are allowed controlled substances or not.

20   Q.   Anything else?

21   A.   Whatever information that you felt was

22   important to your report.

23   Q.   Have you pulled these reports before?

24   A.   Yes.

25   Q.   What sort of information have you included

1    that you felt was important?

2        A.   If they had various documents, so

3    questionnaire, dispensing data, and if I wanted to

4    see what was sold to them.

5        Q.   Anything else?

6        A.   That sums it up.

7        Q.   And you used Cognos to pull that?

8        A.   Yes.

9        Q.   And then you also said item information, you

10   could pull reports, correct?

11       A.   Yes.

12       Q.   What sort of information would you be able

13   to pull out of items?

14       A.   What was sold.

15       Q.   What was sold to a particular customer?

16       A.   Yes.

17       Q.   Would that include what was sold over a

18   period of time?

19       A.   If that's how the report was written.

20       Q.   What are ways that the report could be

21   written?

22       A.   That's however the report author wants to

23   see the information they're reporting on.

24       Q.   I understand that these questions are kind

25   of complicated, and it's hard.  Why don't I try to

```
 1    ask you this a different way.

 2          If I were a new employee coming into your

 3    compliance department, and you were training me on

 4    Cognos, how would you show me what I could do in

 5    Cognos?

 6       A.   So new employees are not in the Cognos

 7    world.

 8       Q.   If I were an employee who needed to access

 9    Cognos whether -- at any point, I guess what would

10    my role be, is the first question?

11       A.   It would be discussing capabilities for

12    reporting based on what your training and what you

13    want to see.

14       Q.   So you said you have five employees in your

15    compliance department right now, correct?

16       A.   Including myself.

17       Q.   So yourself and then four other employees?

18       A.   Uh-huh.

19       Q.   Correct?

20       A.   Yes.

21       Q.   Which, if any, of those employees need to

22    know or are able to use Cognos?

23       A.   There is one employee.

24       Q.   Who is that?

25       A.   Latoya Laroche.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Why did Latoya need to know?

2    A.   Because she's, like, an analyst --

3    Q.   So --

4    A.   -- senior analyst.

5    Q.   If I were Latoya starting in the position

6    that she has now, and you were training me on using

7    Cognos, how would you show me what the system was

8    capable of?

9    A.   We would sit together and go through the

10   different ways to pull the report.

11   Q.   Would you give me a list of any reports that

12   are currently available?

13   A.   Maybe.

14   Q.   Where would you get that list from?

15   A.   Training, just speaking and training.

16   Q.   It's one that you could create perhaps off

17   the top of your head?

18   A.   Not off the top of my head.

19   Q.   Is it one that would be in a file that's

20   already been created?

21   A.   There's reports that have been created.

22   Q.   But do you have a list of reports that have

23   been created anywhere?

24   A.   I don't believe there's a list anywhere.

25   Q.   Are there any other programs besides TPS,

Highly Confidential - Subject to Further Confidentiality Review

```
 1     Remedy, CSOS, and Cognos that the compliance

 2     department -- you have used in the compliance

 3     department at any point in time on a regular basis?

 4           MS. KOSKI:  Object to form.

 5      A.   Those are the ones that are most frequently

 6     used.

 7      Q.   Are those -- are there others that are not

 8     as frequently used?

 9      A.   I can't think off the top of my head.

10      Q.   So what's the difference between Cognos and

11     TPS besides, you said, Cognos being a little bit

12     more user friendly and look -- looking differently?

13      A.   To put it in, like, easy form, it's fancier.

14     It just looks better.

15      Q.   Do you know if there is a reason why they're

16     both used?

17      A.   It was just a preference for the person

18     running the report and how they want to view the

19     data.

20      Q.   So you could -- is it your understanding

21     that the same data is in TPS as it is in Cognos?

22      A.   Correct.

23      Q.   Is it your understanding that TPS and Cognos

24     share the same information?

25      A.   Yes.
```

 1          MS. KOSKI:  Object to form.  Sorry.

 2     Objection to form.

 3     Q.   Do you have an understanding of how they

 4     share that information?

 5     A.   No, I do not.

 6     Q.   Is it your understanding that if you update

 7     something in Cognos, it will automatically be

 8     updated in TPS?

 9     A.   You can't update in Cognos.

10     Q.   Is it your understanding that if you update

11     something in TPS, it will automatically be updated

12     in Cognos?

13     A.   Not all the time.

14     Q.   Sometimes?

15     A.   So that's maintained by IT, and you're not

16     always able to pull, in Cognos, what is in TPS.

17     Q.   TPS includes more information?

18     A.   No.  TPS maintains its own information.

19     Q.   So let's try the other approach again.  If I

20     am Latoya, and in my --

21     A.   Uh-huh.

22     Q.   -- new role as an analyst, I need to

23     understand these programs, how would you explain the

24     difference between TPS and Cognos to me?

25     A.   I would say Cognos looks better.  And if

Highly Confidential - Subject to Further Confidentiality Review

 1    you're pulling information from TPS, there's a lot

 2    of activity in the company, because it's the heart

 3    of the company's information, that sometimes if you

 4    try to run information, the report will cancel

 5    itself because it's too busy, too much traffic.

 6    Cognos gives you an ability to run information and

 7    not have to worry about that at -- as often.

 8        Q.   If I'm Latoya or somebody in her position,

 9    what would you tell me to use TPS for?

10          MS. KOSKI:   Object to form.

11        A.   TPS is the internal information for the

12    customers and the items that we sell.

13        Q.   So what would you tell me to use it for

14    specific to my job?

15        A.   We review a customer's profile; we review

16    their eligibility; we review sales.

17        Q.   If I'm Latoya or somebody in her position,

18    what would you tell me to use Cognos for?

19        A.   Reporting.

20        Q.   When you access Cognos, whether you're

21    Latoya or yourself, can you make changes to

22    information in Cognos?

23        A.   Changes?

24        Q.   Well, you said previously you can't update

25    things in Cognos.  I guess I want to understand what

```
 1    you mean by that.

 2        A.   No, I cannot make any changes to information

 3    that you're reporting on.

 4        Q.   Can you make changes to, say, customer

 5    information?

 6        A.   No.

 7        Q.   So Cognos is simply a program that you pull

 8    information from, not one that you put information

 9    into?

10        A.   Correct.

11        Q.   If you want to put information in about a

12    customer, that would go into TPS?

13        A.   Correct.

14        Q.   Is there any other way that you understand

15    information goes into Cognos besides TPS?

16        A.   I believe they have information -- the

17    reporting capabilities, there is information, but

18    it's not something that I use.

19        Q.   You said you believe they have information,

20    the reporting capabilities.  What do you mean by

21    that?  It's not something you -- what do you --

22    explain that to me.

23        A.   They call it, like, a data warehouse, and

24    different departments have different needs and

25    different things that they're looking at and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reporting on in that -- in their data warehouse that

 2    I don't -- I'm unfamiliar with, I don't use.

 3        Q.   When you say "they," who is "they"?

 4        A.   All the other departments at Anda.

 5        Q.   So that's in Cognos?

 6        A.   Yes.

 7        Q.   Got it.  So let's go back for second.  In

 8    2011 -- we'll just spend a little bit -- and by way

 9    of background, we'll spend a little while longer on

10    reports, and then we'll probably take a break for

11    lunch --

12        A.   Uh-huh.

13        Q.   -- once we get done with this section.

14             But let's go back to 2011.  You said that

15    there was a report you wanted to create in Cognos

16    that didn't exist; is that right?

17        A.   I don't know if it existed or not.  I had a

18    preference to view the report in a different way.

19        Q.   What report was that?  Do you recall?

20        A.   The report that I wanted to view was looking

21    at a customer's profile and sales.

22        Q.   Why did you want to do that?

23        A.   Because it's part of the job

24    responsibilities within the department.

25        Q.   Do you recall the first time you wanted to
```

Highly Confidential - Subject to Further Confidentiality Review

 1     look at that report?

 2              MS. KOSKI:  Object to form.

 3        A.    The -- the report had to be created first.

 4        Q.    The report had to be created.  Okay.

 5        A.    In that -- in that environment.

 6        Q.    Because it did not exist before?

 7        A.    In the Cognos environment.

 8        Q.    It did exist in the TPS?

 9        A.    Perhaps.

10        Q.    Was this report your idea, or was it someone

11     else's?

12        A.    It was my idea and preference to report in

13     that environment.

14        Q.    Is that the first report you remember

15     creating in Cognos?

16        A.    Yes.

17        Q.    And when did you do that, when you first

18     started?

19              MS. KOSKI:  Object to form.

20        A.    I don't recall the time frame.

21        Q.    When you first started as a DEA compliance

22     analyst, were you told by Michael Cochrane or Emily

23     Schultz that there are certain reports that you're

24     going to need to look at on a regular basis as a

25     compliance analyst?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I was tasked with standards that Anda wanted

2    with regards to the review of our customers and how

3    I would ultimately adhere to those standards.

4      Q.    What specific standards were you tasked

5    with?

6      A.    Recordkeeping, reviewing customers for

7    eligibility, reviewing their sales, and collecting

8    the due diligence that was required to engage in

9    controlled substance business.

10     Q.    When you started as a compliance analyst --

11   or a DEA analyst in the compliance department, were

12   you given a list of, say, procedures that you were

13   to follow to do your job?

14     A.    We were familiar with the procedures in the

15   department, yes.

16     Q.    Do you recall what those were at that time?

17     A.    I don't recall what they were at the time.

18     Q.    Do you recall if they had certain names?

19     A.    No, I do not.

20     Q.    Do you recall if they were given to you

21   orally or on a piece of paper?

22     A.    I do not recall.

23     Q.    Are you familiar with the company's, Anda's,

24   standard operating procedures now --

25     A.    Now, yes.

1      Q.    -- sitting here today?

2      A.    Today, yes.

3      Q.    Were you trained in the company's standard

4   operating procedures when you first started as a DEA

5   analyst?

6      A.    I don't recall.

7      Q.    Do you know what SOP 40 is?

8      A.    Yes, I do.

9      Q.    When do you first remember becoming aware of

10  SOP 40?

11     A.    So those -- the SOP is guidelines for what's

12  required of our department and our position.  So I

13  immediately became aware of the requirements and the

14  guidelines for the department.

15     Q.    How did you become aware of them?

16     A.    Training.

17     Q.    By whom?

18     A.    By Emily and Michael.

19     Q.    You said earlier your training over the

20  course of the year was learning about, you know, the

21  different ways that you needed to do your job, going

22  to some different conferences sponsored by the DEA

23  and Buzzeo.  And now you've added to that list Emily

24  and Michael would have trained you in Anda internal

25  company procedures, correct?

Highly Confidential - Subject to Further Confidentiality Review

 1      A.   Correct.

 2      Q.   Are there other things that your training

 3   consisted of in 2011 when you became a DEA

 4   compliance analyst?

 5      A.   It's not training, but we monitor news.  We

 6   monitor anything pertinent to what we do.

 7      Q.   At that time, how many people were in the

 8   compliance department?  Do you recall?

 9          MS. KOSKI:  Object to form.

10      A.   So compliance -- specifically DEA compliance

11   or regulatory compliance?

12      Q.   DEA compliance, that was you and Michael and

13   Emily.

14      A.   Yes, for a short period of time.

15      Q.   Did that change?

16      A.   Yes.

17      Q.   When?

18      A.   Within a month or so.

19      Q.   How did that change?

20      A.   There was a new hire.

21      Q.   Who was that?

22      A.   It was, I believe, Howard, and I don't

23   remember his last name.  He was there for a short

24   period of time.

25      Q.   Okay.  What was his role?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   He was brought in as the director.

 2      Q.   Did you have an understanding why they were

 3   hiring a director?

 4      A.   No, I did not.

 5      Q.   Were you told when you took the job as a

 6   compliance analyst that they would be hiring a

 7   director?

 8      A.   There was a job posted.

 9      Q.   There was a job posted, and that's how you

10   were aware of it?

11      A.   Correct.

12      Q.   Did you have a meeting with Emily and

13   Michael, when you started as a compliance analyst,

14   that talked about what was going to be happening in

15   the compliance department in the next few months?

16      A.   No.

17      Q.   Did you have any conversations about what to

18   expect in the coming months?

19      A.   No.

20      Q.   They just said:  This is your job; this is

21   what you need to do; start doing it?

22      A.   Correct.

23      Q.   You said that Howard was there for just a

24   short period of time?

25      A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   How long would you say?

2        A.   I really don't know.  It was less than

3   probably three months.

4        Q.   Do you have any understanding of why it was

5   such a short period of time?

6        A.   I do not.

7        Q.   Did you report to Howard?

8        A.   No, I did not.

9        Q.   Did you interact with Howard?

10       A.   Yes.

11       Q.   In what way?

12       A.   He worked in the same department.

13       Q.   Did you have an understanding of what his

14   job was as director?

15       A.   The same as ours, same reviews and same

16   responsibilities.

17       Q.   Is that the job that you hold now?

18       A.   No.  He was a director.

19       Q.   So what would make him a director and you an

20   analyst, then?

21            MS. KOSKI:  Object to form.

22       A.   At that time?  I don't know.

23       Q.   What was your understanding of Emily's role

24   at that time?

25       A.   Emily -- I don't -- I don't recall her title
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    at the time.

2        Q.   What was your understanding of her role?

3        A.   She was a manager.

4        Q.   So what did that mean?

5        A.   She was a manager within the compliance

6    department.

7        Q.   And what was your understanding of Michael's

8    role at that time?

9        A.   He was an executive director of the

10   compliance department.

11       Q.   Sitting here today, do you use TPS or Cognos

12   to report -- pull reports?

13       A.   I use both.

14       Q.   What sort of reports do you pull from TPS?

15            MS. KOSKI:  Object to form.

16       A.   Sales and customer information.

17       Q.   What sort of -- any -- anything else?

18       A.   That's specific to what we do.

19       Q.   So sales -- what do you mean by sales?

20       A.   Customer sales.

21       Q.   So a customer's sales history with --

22       A.   Correct.

23       Q.   -- Anda?  And then you said customer

24   information you would also pull from TPS?

25       A.   Correct.
```

```
 1      Q.   What would that include?

 2      A.   The customer's profile, so licensing,

 3   eligibility for controls.

 4      Q.   What would you -- what reports would you

 5   pull today from Cognos?

 6      A.   So as a report, like, author, it depends on

 7   what I needed to see.

 8      Q.   When you go into TPS, are there certain

 9   reports that are created in the system that you can

10   just hit a button and say this is the report that I

11   want?

12      A.   So nothing is, like, a button.  It's --

13   there are reports that are created, and you have to

14   go into these reports.  And even though the report

15   is created, you would have to specify what it is

16   you're wanting to pull.

17      Q.   And if I were, say, someone in Latoya's

18   position and you were to show me how to do that,

19   how -- you would sign into TPS, correct?

20      A.   Correct.

21      Q.   And you would just walk her through those

22   steps, right?

23      A.   Correct.

24      Q.   And you said, sitting here today, you're not

25   sure if you could do that or not?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    Here?

2       Q.    Yes.

3       A.    I'm not sure.

4       Q.    Because you're just not sure if you can

5    access that environment?

6       A.    Correct.

7       Q.    But you know that you are able to access it

8    at home?

9       A.    Yes.

10      Q.    And then in Cognos, are there -- is a report

11   created every time, or are there certain saved

12   reports that you can just access at any point?

13            MS. KOSKI:  Object to form.

14      A.    So reports are created, but we -- we refer

15   to something as a prompt, meaning the person who is

16   pulling the report has to use prompts and specify

17   what you're pulling.

18      Q.    Okay.  So give me an example of what you

19   mean by that.

20      A.    So am I wanting to look at all active

21   customers at Anda?  I would have to specify that I'm

22   wanting to see active customers at Anda.

23      Q.    Would you specify anything else?

24      A.    It depends on the business needs of what I

25   was wanting to pull.
```

```
 1        Q.   When you mean "active customers at Anda,"
 2   what do you mean?
 3        A.   So we have customers that are now out of
 4   business.  They're not active at Anda.
 5        Q.   Active means eligible to purchase or that
 6   are actively purchasing?
 7        A.   Active meaning eligible to purchase at Anda
 8   because they are an active customer at Anda.
 9        Q.   Do you know what ARCOS is?
10        A.   Yes.
11        Q.   What is it?
12        A.   They -- it's reporting directly to the DEA
13   specific to narcotics.
14        Q.   Is it a program?
15        A.   No.
16        Q.   Is it -- is it a database?
17        A.   No.
18        Q.   Is it something that you have responsibility
19   for?
20        A.   It's the responsibility of the compliance
21   department, yes.
22        Q.   How does Anda report information to ARCOS?
23             MS. KOSKI:  Object to form.
24        Q.   If you know.
25        A.   I don't -- I'm not a part of that.
```

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.   Who is a part of that?

 2      A.   IT.

 3      Q.   Do you under -- do you have an understanding

 4  of how IT gets the information to report to ARCOS?

 5      A.   I do not.  I would assume it's transactions

 6  and sales.

 7      Q.   Through TPS?

 8      A.   Yes.

 9           (Anda - Solis Exhibit 4 was marked for

10  identification.)

11  BY MS. ELLIS:

Case: 1:17-md-02804-DAP Doc #: 2177-6 Filed: 08/12/19 107 of 363. PageID #: 319419.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

     4       Q.   So you could go to IT and say, I want all of

     5    this information from any customer that has

     6    information there?

     7       A.   Correct.

     8       Q.   Have you ever done that before?

     9       A.   I have -- we -- in our department, our focus

    10    is on our notes, so we look at it customer by

    11    customer.

    12       Q.   You wouldn't look at them as a -- as a

    13    group, per se?

    14       A.   It's not important to our function.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

4      Q.   Let's walk through that process, and then we

5      may be at a good point to break.

6           So when a customer makes a request to

7      someone in sales, what is your understanding of how

8      they do that?

9      A.   If a customer is an existing Anda customer,

10     and they've never been eligible for controls, they

11     may have this conversation with our sales rep.  And

12     the sales rep will tell the customer what is

13     required for review of controlled substance

14     eligibility.  And then that information is put in a

15     queue of sorts for the compliance department to

16     review the customer.

17     Q.   Would the customer use any sort of computer

18     program to communicate with the sales reps, that

19     you're aware of?

20     A.   I'm not aware of that.

21     Q.   So it would be a conversation over the phone

22     or perhaps --

23     A.   Right.

24     Q.   -- by e-mail, correct?

25     A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And then the sales rep would communicate

 2   with the compliance department by sending things to

 3   a particular e-mail?

 4        A.    It's possible the customer could submit the

 5   information to the sales rep, and they also have the

 6   option to submit it directly to compliance by

 7   preference.

 8        Q.    How would -- is there a way that they should

 9   do it, according to Anda policy?

10        A.    No.

11        Q.    How would a customer know the compliance

12   information?  Do you talk to customers on a regular

13   basis?

14        A.    No.

15              MS. KOSKI:  Object to form.

16              Go ahead, sorry.

17        A.    No, we do not.

18        Q.    Then how would a customer just know to send

19   something directly to compliance?

20        A.    So on our questionnaire, there is a section

21   that indicates how they're able to submit

22   information to the compliance department, and the

23   questionnaire indicates different requirements that

24   are needed in order to be reviewed for a controlled

25   substance eligibility.
```

```
 1              And the sales representatives, if we're

 2     speaking of today, they're -- they're aware of

 3     compliance requirements because if those

 4     requirements are not received, then it's not

 5     reviewed by compliance.

 6        Q.   So in 2011, what were the requirements that

 7     needed to be received to set up a new customer?

 8              MS. KOSKI:  Object to form.

 9        A.   Sorry.  So for a person who --

10        Q.   When you started in 2011 in this role, and

11     you were to receive this in --

12        A.   Uh-huh.

13        Q.   -- what sort of information would you expect

14     to see from a new customer?

15        A.   If a customer was wanting to be approved for

16     controls, they would need to provide dispensing

17     information.  They would need to have a customer

18     questionnaire on file.  It's also asked that they

19     provide policies, procedures, pictures, and anything

20     other, that they're specifically requesting to be

21     reviewed.

22        Q.   And how did you know, as a new DEA

23     compliance analyst, that that's what the customer

24     needed to submit?

25        A.   Remedy indicates what is required, and you
```

1    know because that's part of your training to the

2    standards that are required to review a new customer

3    to controls.

4         Q.   So when you say "standards," what are you

5    referring to?

6         A.   Procedures, standards, requirements.

7         Q.   Is there a specific procedure?

8         A.   The procedure to -- so, sorry, if I'm

9    following, are you saying, like, is there something

10   outlined or in training?

11        Q.   Outlined, is there something outlined that

12   you would know as a reference?  Say, I'm a new DEA

13   compliance analyst.  I need to know what it takes to

14   set up a new customer.  Is there something I can go

15   to see what that list required?

16        A.   At the time, it was training, and again,

17   Remedy states those requirements.  So any time that

18   you're reviewing any task on the front end as part

19   of our suspicious order monitoring, it's required

20   that those documents are provided in order for us to

21   review it.

22        Q.   So when you say it was training, you mean

23   there wasn't, like, a procedure you could look at to

24   say this is what's required, correct?

25             MS. KOSKI:  Object to form.  You mean a

1       written procedure?

2           MS. ELLIS:  Yes.

3       A.   At the time, it was training on what are the

4    standards and requirements.

5       Q.   Are you aware of who had set the

6    requirements in Remedy at that point?

7       A.   I'm not aware.

8       Q.   Are you aware of whether there were any

9    written procedures that governed the requirements

10   that were in Remedy at that time?

11      A.   At that point, no.

12      Q.   You don't know, or there weren't any?

13      A.   At that point, it was not something that I

14   was aware of.

15          MS. ELLIS:  This is probably a good time for

16       a break.

17          MS. KOSKI:  Okay.  I heard noise at the

18       door.

19          THE VIDEOGRAPHER:  The time is 12:27 p.m.

20       We're going now off the record.

21          (Recess from 12:27 p.m. until 1:06 p.m.)

22          THE VIDEOGRAPHER:  The time is 1:06 p.m.

23       We're now back on the video record.

24   BY MS. ELLIS:

25      Q.   Sabrina, I'm going to direct you back to

1    Exhibit 4 for a moment.

2         A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



13      Q.   Who is Mary Barber?

14      A.   She was a compliance analyst.  She's no

15  longer with Anda.

16      Q.   Did she work -- did she work under you?  Did

17  she report to you?

18      A.   No, she did not.

19      Q.   Were you in the same position?

20      A.   She was a compliance analyst, and we were in

21  the same position for a short time.

22      Q.   So your jobs would have been the same?

23      A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review



23      Q.   When you started as a DEA compliance analyst

24   in 2011, were you able to make compliance notes?

25      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Since you've been in the compliance

2    department, have you seen compliance notes in TPS

3    prior to -- that were dated prior to 2011?

4        A.    I believe so.

5        Q.    Do you recall the earliest or any sort of

6    date prior to 2011 that you recall seeing in a

7    compliance note field?

8        A.    I don't recall how -- how old they are.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23      Q.   So you testified earlier that due diligence

24   can happen at two times:  One, when a customer

25   applies to purchase controls for the first time,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2        A.   Correct.

 3        Q.   And, two, if a customer would like -- has

 4    not purchased controls before and would like to

 5    purchase controls, correct?

 6        A.   Correct.

 7        Q.   And so that might be an existing customer

 8    that just wants to add a new product, right?

 9        A.   A new product family, correct.

10        Q.   Any other times that you might do due

11    diligence for a customer?

12        A.   Upon request.

13        Q.   What do you mean by "request"?

14        A.   If compliance requests it for whatever

15    reason.

16        Q.   What sort of reasons would compliance

17    request it for?

18        A.   It could be a sales rep-initiated request.

19    It could be a customer's question through their

20    sales rep.  I can't speculate, but something would

21    make us look into something further.

22        Q.   Well, I'm not asking you to speculate.  I'm

23    asking you if you can recall some examples of when

24    you might have received one of those requests from

25    the sales department and what those requests would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have been.

 2        A.   So, like, in this example, if oxycodone was

 3    denied, somebody seemed to have requested it.  And

 4    if you see the previous note, you would probably be

 5    interested in understanding their current state of

 6    business, their business overall, and you would want

 7    to look into it.
```

18        Q.   So when you log into Remedy, do you -- is

19    there, like, a -- what do you see?

20        A.   It's a queue of sorts where the different

21    types of requests are entered by the sales rep for

22    our review.

23        Q.   So you log into Remedy, and you see sort of

24    a queue.  Is that a queue that's shared with you

25    alone as a compliance analyst, or is it shared with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the compliance department, and multiple analysts see

 2    the same thing?

 3        A.   Compliance analysts have access to the same

 4    queue.

 5        Q.   So is this something, as a compliance

 6    analyst, that you would do on a daily basis, log

 7    into Remedy?

 8        A.   No.

 9        Q.   When would you log into Remedy?

10        A.   So it would be the person who is -- that is

11    their core responsibility, is reviewing the pharmacy

12    sales rep requests.
```

[redacted]

```
18        Q.   So when you began in the compliance

19    department in 2011, was this the system that was

20    followed at that point?

21        A.   Please explain "the system" as far as --

22        Q.   Well, you said there was one person assigned

23    to review the sales rep requests that came through

24    Remedy.  Was that what was done in 2011?

25        A.   No.  In 2011 it was a shared effort.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   So what does that mean?

2      A.   That means that in 2011, Emily Schultz was

3   there, and I came into the department.  And then in

4   addition, Mary came, I believe, in in 2012, so --

5      Q.   So in 2011, if a Anda customer who had been

6   a customer, but had never purchased controls and

7   wanted to purchase controls, that customer would

8   talk to their sales rep, right?

9      A.   Correct.

10     Q.   And then that sales rep would put in a

11   request to the compliance department, right?

12     A.   Correct.

13     Q.   And they would do that using Remedy,

14   correct?

15     A.   That is what should happen, yes.

16     Q.   There are other ways that it could happen?

17     A.   It should not, no.  That should be how it

18   works, yes.

19     Q.   But were there other ways?  Whether it

20   should happen or not, did it --

21     A.   I can't answer that.  You would hope it's

22   not in an e-mail, but this is what was required at

23   the time.

24     Q.   But it could have been in an e-mail?

25     A.   I don't know.

1    Q.   Do you ever recall it being in an e-mail?

2    A.   There have been instances where people

3    request something in an e-mail, but it was always

4    asked to be entered into Remedy.

5    Q.   So in any event, this system that -- the

6    Anda compliance system, whether -- as it was laid

7    out through training that you testified earlier, was

8    that sales reps would make requests through Remedy,

9    right?

10   A.   Correct.

11   Q.   And you don't know that that was on any sort

12   of written policy or paper anywhere, right?

13   A.   Sorry?

14   Q.   So, like, if a sales rep e-mailed you a

15   request from a customer, and you wanted them to put

16   it in Remedy instead --

17   A.   Uh-huh.

18   Q.   -- would you just tell them to put it in

19   Remedy instead, or would you say, per this policy

20   located in this place?

21   A.   It would not be a policy.  It would be a

22   compliance requirement.

23   Q.   So those weren't written down somewhere for

24   sales reps to reference?

25   A.   Other than instruction by our department and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    an awareness of what's required by our department.
 2        Q.   That's the only way a sales rep would know?
 3        A.   Right.
 4        Q.   So at that point, let's assume that the
 5    sales rep makes the request through Remedy, and it
 6    was you and Emily Schultz.  You said it was a shared
 7    responsibility to review that request, right?
 8             MS. KOSKI:  Object to form.
 9        A.   There was shared access to Remedy.
10        Q.   So you each had your own log-in?
11        A.   Correct.
12        Q.   But you would see the same information?
13        A.   You could see the same information.
14        Q.   So do you recall when that changed?
15        A.   Sorry.  When what part changed?
16        Q.   I guess it was when you -- when you couldn't
17    see the same information.  You didn't have shared
18    access.
19        A.   Well, the department -- anyone in the
20    department has access to log into Remedy within the
21    DEA compliance side.
22        Q.   But I think you testified earlier that at
23    some point in time, it changed, like, you
24    individually could only see certain things at some
25    point now, or you all still see the same
```

Highly Confidential - Subject to Further Confidentiality Review

 1      information?

 2          A.   You could -- you could still all log into

 3      Remedy.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

    4        Q.    So let's take those one at a time.   You

    5    would, one, collect dispensing data, you said,

    6    right?

    7        A.    But the time difference is not -- is not --

    8    in this situation, it's within, it looks like, three

    9    months, so --

   10        Q.    And why -- why is that significant to you?

   11        A.    It's significant because the data is not

   12    outdated.

   13        Q.    When does it become outdated?   Is there a

   14    certain time frame?

   15        A.    It's your discretion with each customer.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1      Q.   So one analyst could potentially find that

2   enough time had passed; whereas a different analyst

3   would find that enough time had not passed.  Is that

4   fair?

5      A.   I -- I don't know that.  I don't know what

6   they would feel.

24      Q.   Okay.  That's fair.  But I'm, again, asking

25   you -- and remember, I'm not trying to be difficult

```
 1    here.  But at the beginning, I said I want to talk

 2    about those things, but first I want to ensure we

 3    get this question answered.

 4            Analysts could come to different

 5    conclusions, right?

 6       A.   Of course.

 7       Q.   So you said you would look at dispensing

 8    data.  There would be changes in the business that

 9    you would look at, such as ownership or new

10    locations or other information like that.  Right?

11       A.   So when you're reviewing a customer for

12    control eligibility, you're looking at control and

13    noncontrol ratio.

14       Q.   And what do you mean by that?

15       A.   The ratio of controlled pills dispensed in

16    relation to the nonprescription or prescription

17    drugs that are not controlled substances.

18       Q.   And what are you looking for in that ratio?

19       A.   Pills, like, the pills -- pill volume

20    dispensed.

21       Q.   So a certain percentage of pills dispensed

22    being controlled substances would raise a red flag,

23    per se?

24       A.   It's not necessarily a percentage.  It's

25    looking at the top items and top pill volume
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   dispensed.

 2      Q.   Why is that important?

 3      A.   Because it indicates the majority of the

 4   pill volume going in and out of a pharmacy.

 5      Q.   Why is that important?

 6      A.   Because for the purposes of our department,

 7   we're reviewing someone for controlled substances.

 8      Q.   And so what would the pill volume going out

 9   of a pharmacy, if there was a higher number of

10   controls and noncontrols, indicate to you, as a

11   compliance analyst?

12      A.   It can indicate a lot of things.  So if it's

13   a special pharmacy, if it's oncology, if there's

14   different situations, it could make total sense and

15   be justified.

16          If there isn't anything that stands out as

17   an explanation or a justification, based on the type

18   of specialization a pharmacy has, then you would

19   look at it and say there's a lot of controlled

20   substances.

21      Q.   And if there were a lot of controlled

22   substances, what would that indicate to you, as a

23   compliance analyst?

24      A.   We're always looking to evaluate risk.

25      Q.   And a lot of controlled substances would
```

1    indicate a higher risk?

2       A.    Of course.

3       Q.    Why?

4       A.    Because we're discussing selling to a

5    customer controlled substances.

6       Q.    And when you say "risks," what do you mean,

7    risks of what?

8       A.    So we're supposed to be knowing who we're

9    selling to, and we're supposed to be aware of who

10   we're selling to.  And we have to feel comfortable

11   with their business, so if they're wanting to apply

12   for controlled substance eligibility with us, and we

13   see that they're dispensing a lot of controlled

14   substances, we would need to understand, number one,

15   why they want to do business with Anda, number two,

16   why they have that volume.

17      Q.    And the risk that you're referring to is

18   that somehow those controlled substances would be

19   misused?

20      A.    That's always a possibility.

21      Q.    That somehow they would not go into

22   treatment as they were intended?

23      A.    That's always a possibility.

24      Q.    So you would look at the control to

25   noncontrol ratio based on the dispensing data,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2        A.    Correct.

3        Q.    And then you said changes in business or

4    ownership you would look at, right?

5        A.    Yes.

20        Q.    So you would talk through the sales rep as a

21   middle person?

22        A.    Correct.

23        Q.    Okay.  So you would look at dispensing data.

24   You would determine whether there was a change in

25   business or ownership.  You would potentially ask

```
 1    questions from the sales rep.  Anything else that

 2    you would do?

 3        A.   And then research all of the documentation

 4    that we have in our possession.

 5        Q.   And so when you research the documentation,

 6    what documentation would that include?

 7        A.   Dispensing information, policies and

 8    procedures, those are the most pertinent, and the

 9    customer questionnaire.

10        Q.   And where would you find that information,

11    as a sales analyst?

12        A.   That's warehoused on the O drive.

13        Q.   Would you expect to find policies and

14    procedures, dispensing information, customer

15    questionnaire -- and I think that those were the

16    three that you said -- for every customer on -- that

17    was attempting to purchase controls?

18        A.   Those are the guidelines.

19        Q.   According to what?

20        A.   To what the department is -- it does upon

21    review of a customer.

22        Q.   And where are those guidelines located?

23        A.   The procedures.

24        Q.   That would be one of the standard operating

25    procedures?
```

```
 1     A.   Correct.

 2     Q.   Would that -- do you know which number that

 3   would be?

 4     A.   40.3.

 5     Q.   What do you mean when you say 40.3?

 6     A.   It's a version of the SOP, but I would have

 7   to see if there's other versions.

 8     Q.   What's the difference in the versions, or

 9   what would that mean to you?

10     A.   Because there's a number of different DEA

11   compliance SOPs that are out there.

12     Q.   So are there multiple versions of the same

13   SOP that could apply at the same time?

14     A.   There should not be.

15     Q.   So when you say "versions," do you mean one

16   version would replace an earlier version?

17     A.   Correct.

18     Q.   It's not as if there is one version that

19   applies to certain customers and another version

20   that applies to other customers of the same SOP

21   number?

22     A.   Not that I'm aware of.

23     Q.   Okay.  So you would -- say, after this

24   request came in to renew the controls, you would

25   look at the recordkeeping, including the due
```

Highly Confidential - Subject to Further Confidentiality Review

1    diligence.  You would review the ratio of controls

2    to noncontrols.  You would potentially ask the sales

3    rep to ask the customer for additional information.

4         Anything else that you would do in order to

5    determine whether or not you would allow a customer

6    to purchase controls?

7    A.   That's among what we use as a guideline,

8    yes.

9    Q.   Is there anything else?

10   A.   I'm not thinking of anything right now.

11   Q.   After you did all of those things, what

12   would you do next?

13   A.   Make a determination.

14   Q.   A determination of whether that customer

15   should buy -- be able to -- be allowed to use

16   controls or not?

17   A.   We would make a determination on whatever

18   the request was, yes.

19   Q.   And once you made that determination, how

20   would you indicate that to the customer?

21   A.   If it came through Remedy, and it was a

22   sales rep-initiated request, what the -- what

23   happens is the sales rep communicates to the

24   customer with compliance's determination.

25   Q.   Would you record your determination

 1    anywhere?

 2        A.   If there was a determination made in Remedy,

 3    it's an outcome disposition, and that is recorded.

 4        Q.   You will have to bear with me because I'm a

 5    little dense when it comes to corporate speak

 6    sometimes.  What does -- what does that mean?

 7        A.   So Remedy has something called an outcome

 8    disposition.  This is a sales-initiated request.

 9    This is what the request is, and this is

10    compliance's determination.

11        Q.   And that's what you mean by outcome

12    disposition?

13        A.   Yes.

14        Q.   So it sends it back to the sales rep?

15        A.   Correct.

16        Q.   And then the sales rep would communicate it

17    to the customer?

18        A.   Right.

19        Q.   Would you then record that information

20    anywhere so that you would know in the future that

21    you had made that decision?

22        A.   It's possible that it would be in the

23    compliance notes.

24        Q.   Why do you say it's possible?

25        A.   Because that's where -- if a note is

```
 1   entered, that's where it's entered.

 2       Q.   Would there be occasions where it's not

 3   entered?

 4       A.   Not that I'm aware of, but it depends on the

 5   person who is making a determination to enter a note

 6   or not.

 7       Q.   You would agree that if it's not entered,

 8   that a person later looking at the account may not

 9   have the most accurate information about what had

10   happened with that account, right?

11       A.   Correct.

12       Q.   And that could be problematic in making

13   decisions about whether or not controls should be

14   allowed for purchase or not?

15           MS. KOSKI:  Object to form.

16       A.   Correct.

17       Q.   Is it your understanding that -- is it your

18   understanding that DEA compliance analysts were

19   required to enter this information into TPS for

20   those very reasons that you just said?

21           MS. KOSKI:  Object to form.

22       A.   Compliance analysts were aware that there is

23   an area for entering notes.

24       Q.   That was something you became aware of

25   during training, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Correct.

 2      Q.   But your -- it was not a requirement that

 3   they include that information?

 4      A.   It's a part of your training that it should

 5   be done.

 6      Q.   Are you aware or were you aware, when you

 7   were trained that it should be done, of any

 8   consequences if you didn't enter that information?

 9           MS. KOSKI:  Object to form.

10      A.   I'm not aware of a consequence.  Probably a

11   best practice is what you would say.

12      Q.   So at that point in time, in 2011, when you

13   started as a DEA compliance analyst, and you

14   theoretically did not enter your determination into

15   TPS, you're not aware that you were violating any

16   written policy, correct?

17           MS. KOSKI:  Object to form.

18      A.   There's no written policy about what -- a

19   comment, I don't -- I don't believe.

20      Q.   Your understanding would have been that you

21   were just violating a best practice?

22           MS. KOSKI:  Object to form.

23      A.   Correct.

24      Q.   And that wouldn't necessarily be anything

25   that you could be disciplined for?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.
 2       A.    Correct.
 3       Q.    Did that change at any point, that it became
 4   a requirement that an analyst needed to enter
 5   information and keep track of their determinations
 6   in TPS?
 7       A.    There's multiple ways of tracking what an
 8   analyst does.  So because Remedy is a task
 9   management system with an outcome disposition, you
10   could also go in there and track an outcome.
11   Another way of tracking an outcome is using the
12   compliance notes.
13       Q.    So there's multiple ways of tracking what an
14   analyst did; is that right?  That's what you said?
15       A.    An outcome of something that was requested.
16       Q.    So let's set this Exhibit Number 4 aside for
17   a -- for a second and just think about a
18   hypothetical customer, a customer who was a customer
19   of Anda and a requisite time had passed when they
20   were eligible to purchase OxyContin.  Okay?
21              MS. KOSKI:  Object to form.
22       Q.    Do you follow the hypothetical?
23       A.    No, I'm sorry.  I missed that.
24       Q.    That's okay.  I just want to run you through
25   a hypothetical situation so that I can understand
```

Highly Confidential - Subject to Further Confidentiality Review

1    how to get an accurate picture of what compliance's

2    interaction was with that customer.  Okay?

3        A.    Okay.

4            MS. KOSKI:  Object to form.

5        Q.    So let's assume that there is a customer of

6    Anda's that has not -- that has purchased products

7    from Anda in the past.  Follow me so far?

8        A.    Yes.

9        Q.    You said earlier that a customer who has

10   purchased products is not able to purchase Anda --

11   or is not able to purchase OxyContin until a certain

12   period of time goes by; is that right?

13       A.    When a customer -- from the time that I've

14   been there, and you're doing a part of the upfront

15   review, that is correct.

16       Q.    Do you know what that period of time is?

17       A.    It's discretionary upon the person reviewing

18   the account.  Typically, we like to wait around

19   three months.

20       Q.    Why three months?

21       A.    It's something that we determined

22   internally.  One of the big asks in our department

23   is knowing why our customer wants to do business

24   with Anda.

25       Q.    Why is that important?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   It's important because you want to know why,

 2  as a secondary supplier, a customer is asking to

 3  have a relationship with your company.

 4      Q.   What difference does it make?

 5          MS. KOSKI:   Object to form.

 6      A.   I'm not following.

 7      Q.   Why does it matter why a customer wants to

 8  have a relationship with your company?

 9      A.   Because you're a secondary supplier, so you

10  can presume that in most cases, they are getting

11  supply other places as well.

12      Q.   Are there reasons that you would think are

13  bad for a customer to want to have a relationship

14  with Anda?

15      A.   It's not necessarily bad.  When you're --

16  when you're analyzing it, your job is to find out

17  why that is.

18      Q.   I understand, but I'm trying to understand

19  why that matters.

20      A.   So you -- in this specific example, if this

21  customer was only coming to Anda for oxycodone, and

22  the customer had just been turned on as an Anda

23  customer overall, you would not know at the time

24  that they only wanted oxycodone.

25      Q.   Could there be other reasons why you would
```

```
 1    want to know; for example, if they had been denied

 2    purchases of a product from another place that they

 3    could purchase it?

 4        A.    That's important information.

 5        Q.    You would want to know that, right?

 6        A.    You would want to know that.

 7        Q.    And you would try to ask questions that

 8    would help you know that, right?

 9        A.    There is a possibility that you can ask

10    supplemental questions to ask that information, yes.

11        Q.    But the goal of this whole process is to

12    prevent customers, in one way, from coming to Anda

13    after they've been denied from purchasing controls

14    from other companies, right?

15        A.    Correct.

16        Q.    So the requisite amount of time to purchase

17    oxycodone, you said, was usually around three

18    months, but it's discretionary?

19        A.    Correct.

20        Q.    Is there any written policy that you're

21    aware of that guides what that time frame is or

22    should be?

23        A.    I believe that it is a part of the

24    procedures, because oxycodone review is typically a

25    separate review, apart from a new customer review.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So the requisite amount of time has passed
 2   with our -- with our hypothetical customer, right?
 3   They've purchased products from Anda in the past,
 4   they now want to purchase oxy, around three months
 5   has passed and you get the request as an analyst.
 6   Okay?
 7        A.   Uh-huh.
 8        Q.   You follow me?
 9        A.   Yes.
10        Q.   You would then look at what's on file in the
11   compliance recordkeeping, right?
12        A.   Yes.
13        Q.   And that would be located where?
14        A.   So if we're talking about due diligence, the
15   due diligence would be on the O drive.
16        Q.   And then you said that there were a couple
17   of other places where you could also look to find
18   information about a customer in your research.  One
19   of those would be the customer notes in TPS, right?
20        A.   Correct.
21        Q.   And one of those would also be the customer
22   history in Remedy; is that right?
23        A.   Correct.
24        Q.   Are there other places that you would look,
25   in your research as an analyst, to determine the
```

Highly Confidential - Subject to Further Confidentiality Review

1   history of Anda's relationship with that customer?

2       A.   That's typically where you would go to do

3   your research.

4       Q.   Would you, as an analyst, try to look at all

5   three of those places in order -- before you made a

6   decision?

7       A.   Me, as an analyst, yes, I would.

8       Q.   You would think that it's important to get a

9   complete picture of what had happened with that

10  customer at Anda in the past, right?

11      A.   Based on these notes, yes.

12      Q.   Because these notes contain vital

13  information that you need to understand to make your

14  determination?

15      A.   Correct.

16      Q.   If an analyst had made a decision on that --

17  on our hypothetical account prior to the time you

18  were reviewing it, and didn't enter that information

19  into one of those three systems, it might lead to an

20  inaccurate picture for you, as the analyst, right?

21      A.   So, like, the most important thing is the

22  due diligence, because you're looking at the

23  customer's business.  It's helpful to see previous

24  information, of course, but you're reviewing the

25  information that you have on file if you're the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    person reviewing it.

 2          This only helps you know what someone

 3    previously entered, but you would look at what you

 4    have on file as well.

 5    Q.   It would help you understand what you had on

 6    file and why it was there or why it wasn't there?

 7    A.   The -- if you saw this note, you would look

 8    on the O drive to see what information was collected

 9    to make that note.
```



```
17    Q.   Can you give me some examples of things that

18    you've entered in that field upon review that you

19    thought would be important?

20    A.   Typically, that's when you say -- you're --

21    upon review, something is approved or denied.

22    Q.   Anything else?

23    A.   That's usually what it's used for.

24    Q.   What about limits for a purchase of certain

25    controlled substances?
```

1      A.   If a customer's limits went through a review

2    process, it's ideal that a note is entered that

3    there was a review process, and this is what the

4    limit was changed to.

5      Q.   Why is that ideal?

6      A.   Because it's just a history of the review in

7    one of these areas that it could be recorded.

8      Q.   And so that's so an analyst, at any point,

9    could go back and look at the account and understand

10    what had happened with it, right?

11      A.   Correct.

12      Q.   Has that always been the case, that that

13    should be what analysts should be entered in TPS

14    notes?

15      A.   Has it always been the case that analysts

16    know --

17      Q.   Should enter that information.

18      A.   It's always been the case that review notes

19    should be entered.

20      Q.   But that was just something you learned in

21    your training, right?

22      A.   Correct.

23      Q.   There's not a piece of paper that you can

24    point to that says you should enter X, Y, and Z if

25    they occur?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   I don't recall right now.

2       Q.   You don't know of one, sitting here as you

3    are today?

4       A.   I know that we talk about a review process,

5    and we do talk about notes, yes.

6       Q.   But you don't recall any place that, if a

7    new analyst were to start tomorrow, that you could

8    say, here, as part of this packet, this is what

9    you're supposed to enter into TPS?

10      A.   There is a procedure that does indicate that

11   notes should be entered.

12      Q.   Generally, but not necessarily according to

13   what specific criteria those notes should be?

14      A.   It's -- the criteria is review

15   determinations.

16      Q.   Okay.  Has that -- has this process of

17   entering notes and tracking information for a

18   particular customer over time changed throughout

19   your time in the compliance department?

20      A.   Can you please help me understand?  Are

21   you -- are you saying that has it changed that they

22   should not be entered?

23      Q.   No.  Just that -- has there been more of an

24   emphasis on entering notes placed on analysts at one

25   point versus another?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I'm not --

 2              MS. KOSKI:  Object to form.

 3        A.    I'm not aware.

 4              (Anda - Solis Exhibit 5 was marked for

 5        identification.)

 6        BY MS. ELLIS:
```

20        Q.    And so just so the record reflects what

21        we're talking about here --

22              MS. ELLIS:  Do you want to turn this on?  I

23        can put this up here.

Highly Confidential - Subject to Further Confidentiality Review

2      Q.    And at this point, was Robert Brown your

3   boss?

4      A.    Yes.

5      Q.    What was his role?  Do you know?

6      A.    Director.

7      Q.    Okay.  You reported to him?

8      A.    Yes.

9      Q.    So at some point, you no longer reported to

10   Michael Cochrane?

11      A.    Yes.

12      Q.    Do you remember when that changed?

13      A.    When Robert Brown came on board.

14      Q.    Do you remember when that was?

15      A.    I don't recall, but I think he was with the

16   company for a discretionary amount of time before

17   they transferred the analysts under him.

18      Q.    What -- do you know why?

19      A.    I think they usually do that when there is a

20   new employee.  I don't know.

21      Q.    Just like a trial period?

22      A.    I believe so.

23      Q.    Was that after Howard, who you had mentioned

24   before, left?

25      A.    Yes.

```
 1        Q.   Do you know why Howard left?

 2        A.   I don't know.

 3        Q.   Do you know if he was fired?

 4        A.   Well, he was there less than a couple of

 5   months, so you would assume that was the case.

 6        Q.   Do you remember hearing any rumors about it?

 7        A.   No.

 8        Q.   Do you remember having any conversations

 9   about it?

10        A.   I don't remember.

11        Q.   Do you remember any specific priorities that

12   were in place from Anda leadership for the

13   compliance department at the time that Howard left

14   the position and Robert took over?

15             MS. KOSKI:  Object to form.

16        A.   From the time I've been in the position, the

17   priorities have been to have the appropriate

18   information and review process in place for

19   customers who engage in business for controlled

20   substances with.

21        Q.   When you became a DEA compliance analyst,

22   were you made aware of any areas of weakness that

23   they expected the compliance department to improve

24   upon?

25             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   I was made aware of the standards that the

2   department wanted, which is collecting information

3   on all of our customers.

4      Q.   Were you made aware that the department had

5   not been doing as good a job upholding or meeting

6   those standards as Anda would have liked?

7      A.   That was not communicated to me.

8      Q.   Were you given specific areas of focus that

9   you were to prioritize in your role as a DEA

10   analyst?

11      A.   Yes.  It was just what I said.  We're -- my

12   focus was collecting data on all the customers we

13   did controlled substances business with.

14      Q.   And your goal -- one of your goals, I

15   presume, would have been to do your job as best as

16   you could, right?

17      A.   Right.

18      Q.   And to ensure that you got as much customer

19   information on file as possible, right?

20      A.   Correct.

21      Q.   To ensure that analysts like yourself had as

22   much information about -- about customers and

23   potential customers as they could in order to make

24   the most accurate determinations, right?

25      A.   That was the goal.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

17      Q.    Okay.  And it seems like throughout the

18   course of your career at Anda, that's something

19   you've prided yourself on, is trying to make systems

20   better, and this might be an example of you trying

21   to do that, right?

22            MS. KOSKI:  Object to form.

23      A.    It's an example of where I made a suggestion

24   to improve a process.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 7       Q.   And those determinations, again, are so that

 8   Anda is compliant with state and federal laws,

 9   right?

10          MS. KOSKI:  Object to form.

11       A.   No.  So a determination does not mean

12   necessarily that you'll be compliant or not.  A

13   determination is what the analysts determine was the

14   best course of action at the time of review.

15       Q.   Well, and the best course of action is in

16   furtherance of the goal that Anda remain compliant

17   with regulatory and compliance-based goals, right?

18          MS. KOSKI:  Object to form.

19       A.   No.  I don't -- I don't think that we look

20   at that necessarily in this specific situation.  In

21   every situation when we're reviewing a customer, of

22   course, we want to be compliant in who we are

23   selling to.  But we're making a decision based on

24   the information that we reviewed for a customer,

25   whether or not we'll engage in business with them.
```

Highly Confidential - Subject to Further Confidentiality Review

1    So that doesn't necessarily mean that you would not

2    be compliant if you were to do business or were not

3    to do business.

4        Q.    Well, you would agree part of being

5    compliant with state and federal regulation is to

6    not break those regulations, right?

7            MS. KOSKI:   Object to form.

8        A.    I'm not following.  Sorry.

9            MS. KOSKI:   We're getting into the area that

10           I think is limited by Special Master Cohen's

11           order.

12           MS. ELLIS:   Well, Katy, I'm not asking her

13           opinion.  I'm asking her what the goals and her

14           responsibility are of a compliance department and

15           her particular position.  I've been pretty

16           lenient with speaking objections so far, but I --

17           MS. KOSKI:   You're violating the court's

18           order, not -- the restatement of your question is

19           different from the question that I just objected

20           to, if you look at the transcript.

21           The question you asked is:  Would you agree

22           part of being compliant with state and federal

23           regulation is to not break those regulations,

24           right?

25           Compliance with regulations is specifically

Highly Confidential - Subject to Further Confidentiality Review

```
 1        within the parameters of Special Master Cohen's
 2        order.  You've restated the question, in response
 3        to me, in a different way.  I'm telling you, you
 4        need to restate the question in order to be
 5        compliant with Special Master Cohen's order.
 6            MS. ELLIS:  I'll continue to ask my
 7        questions.  I don't believe it was in violation,
 8        but I'll continue on with this line.
 9            MS. KOSKI:  Okay.
10   BY MS. ELLIS:
```

Highly Confidential - Subject to Further Confidentiality Review



17    Q.   Would you agree that communication can help

18  you be more effective in your job?

19    A.   Communication is important with a team of

20  people working together.

21    Q.   So that one person knows what the other

22  person is doing, right?

23    A.   So that you know that suspicious order

24  monitoring has taken place, yes.

25    Q.   Because if you're not communicating about

1    it, and it's not written down for another analyst to

2    review, you can't be sure that it's taken place,

3    right?

4        A.   You can't be sure.

5        Q.   You -- and you can't assume it's taken place

6    if there is no record of it, right?

7        A.   You can't assume.

8        Q.   So this is a suggestion to help you, as an

9    analyst, understand whether or not suspicious order

10   monitoring has occurred?

11       A.   Correct.

12       Q.   Without the type of information that you're

13   suggesting here, you would not make that assumption

14   that suspicious order monitoring had occurred, would

15   you?

16           MS. KOSKI:  Object to form.

17       A.   Sorry.  I'm not following the question.  Are

18   you saying specific to this customer?

19       Q.   Not specific to this customer, just

20   generally, the type of information that you're

21   referencing here.  As an analyst, if you didn't see

22   that sort of information, you would not assume that

23   suspicious order monitoring had occurred, would you?

24       A.   Well, I know that we do monitor orders and

25   identify orders of interest, so I would assume, with

1    any customer that we have, that it's possible if

2    they're purchasing controlled substances from Anda,

3    that I know we're monitoring on the back end, as

4    well as on the front end.

5        Q.   So even without the records of the

6    monitoring, you would make the assumption that the

7    monitoring had been done?

8        A.   I would make the assumption that we have

9    something in place that monitors all customers who

10   purchase from Anda.  I would not know, based on this

11   specific e-mail, that this particular customer was

12   reviewed in that one place I was looking, which is

13   the compliance notes.

Highly Confidential - Subject to Further Confidentiality Review

    3      Q.   And you would want that sort of proof to

    4   ensure that a specific order was looked at, right?

    5      A.   The suggestion was that the communication

    6   would be beneficial on the team.

    7      Q.   Because it would help you ensure that the

    8   system was effective?

    9      A.   No, because it would help us -- it would

   10   ensure that there was proper communication between

   11   the different people working within the team.

   23      Q.   If I could hand you a laptop right now so

   24   that you could sign into your environment and look

   25   up TPS, and you were to look up this customer

1    number, could you tell me if that was in the TPS

2    field?

3        A.   Sorry.  Which field, the notes?

4        Q.   The customer notes field.

5        A.   I'm not able to sign on through Teva's

6    environment here.  If I were able to do it, then I

7    would be able to check and see if that's in the

8    notes.

9        Q.   Earlier today you said you weren't sure if

10   you were able to sign on through Teva's environment

11   here.

12       A.   Right.

13       Q.   Have you tried to do that?

14       A.   I've never tried to sign on here.

15       Q.   Then how are you able to say that you're not

16   sure or you don't think that you can sign on?

17       A.   Because Teva's security is very difficult

18   and even when you work at home remotely, you can

19   have a day where you can get in.  And then you can

20   have another instance where you cannot get in.  I've

21   never tried logging in here, so I don't know if I

22   would be able to get in.

23       Q.   Okay.  Well, that's just different than what

24   you said a second ago, because this morning you said

25   you weren't sure.  A second ago you said you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    couldn't, and now you're not sure again.

 2    A.   I'm not following.

 3    Q.   Well, sitting here today, could you sign

 4    into Teva's environment, Yes or no?

 5    A.   Teva has a secured VPN environment, so I

 6    would have to see if I'm able to get into that.  If

 7    I'm able to get into that, then I should be able to

 8    get into what I'm normally eligible to get into, and

 9    that response has been consistent the whole time.

10    Q.   You don't know?

11    A.   I'm unaware if I can.

12    Q.   Okay.  I'm not trying to --

13    A.   Yeah.  No.  I mean, I'm just saying --

14    because I think that's the issue, is there is a lot

15    of security with their systems, and to be honest,

16    you don't know when you can get in or not.

17    Q.   Prior to today, were you asked to pull

18    together any information from Anda or their systems

19    responsive to discovery requests in this case?

20         MS. KOSKI:  I'm going to object to form.

21         And I'm going to instruct you not to answer

22    any communications that you had with counsel for

23    Anda.

24    Q.   I'm not asking you specifically as far as

25    what counsel has asked you to do.  I'm asking if you
```

Highly Confidential - Subject to Further Confidentiality Review

 1    have -- if you have done anything personally in your

 2    job responsibilities to respond to discovery in this

 3    case.

 4         MS. KOSKI:  I'm going to object to form, and

 5      instruct you that you can answer to the extent

 6      that you're not communicating correspondence

 7      you've had between the legal department and

 8      outside counsel and yourself.

 9    A.    Yeah.  I don't feel that that can be

10    responded to.

11    Q.    You don't feel that that can be responded to

12    because everything -- because you've been instructed

13    by counsel on pulling these materials together, if

14    you've done so?

15    A.    There's attorney-client privilege, as just

16    mentioned.

17    Q.    I'm asking you -- I understand your attorney

18    just made an objection, and it's made for the

19    record.  But I'm asking you:  Were there -- are

20    there things that you have done that were not at the

21    explicit instruction of your attorney related to

22    this case?

23    A.    No.

24    Q.    Earlier you said threshold is not a term

25    that you would personally use, but you are aware

Highly Confidential - Subject to Further Confidentiality Review

1    that some people use it in the context of controlled

2    substances; is that right?

3        A.   Correct.

4        Q.   So what does it mean to you, sitting here

5    today, when I say threshold?

6        A.   So Anda determines what control family limit

7    is allowed to a customer upon review.

8        Q.   What is that based upon?

9             MS. KOSKI:  Object to form.  What's the

10        limit based upon, or what's her understanding of

11        the definition of limits?

12            MS. ELLIS:  Fair enough.

13       Q.   What is -- what is your definition of

14   threshold based upon?

15       A.   We don't use the term "threshold."  We use

16   the term "limit."  So a control limit is determined

17   based on a review of the customer, understanding

18   their business, understanding our position with

19   them.

20       Q.   What would you need to understand in order

21   to determine a limit?

22       A.   Anda's position with the customer.

23       Q.   Have you been involved, as a DEA analyst or

24   now as a manager, in setting customer limits?

25       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And when have you been involved in that

 2   process, since you were a DEA compliance analyst?

 3        A.   Yes.

 4        Q.   Did you continue to be involved in that

 5   process as a senior analyst?

 6        A.   Yes.

 7        Q.   And are you involved now, as the manager of

 8   the compliance department, in setting customer

 9   limits?

10        A.   Yes.

11        Q.   Okay.  So what do you look at when you set a

12   customer's limit for controlled substance purchases?

13        A.   We're reviewing the customer's dispensing

14   information, and we're considering that along with

15   the increase request.  Then we make a determination

16   on what that controlled family limit will be, based

17   on the customer's request.

18             If they ask for a specific item -- remember,

19   a limit is set on a control family.  It's not set

20   based on an item.  So if a customer is asking for a

21   particular item, we look at the dispensing

22   information, and you make a determination where you

23   would allow that customer to purchase that item from

24   you.

25        Q.   Does the type of customer -- type of
```

```
 1    customer make any difference in setting the limit?

 2       A.   Every customer has a different need from

 3    Anda, so knowing your customer would make a

 4    difference because every customer has a different

 5    need from Anda.

 6       Q.   So let's say, for example, there's a chain

 7    customer versus an independent retail customer.

 8    What difference would that make in setting a limit

 9    for a customer's ability to purchase controlled

10    substances?

11       A.   So chain customers are looked at on the

12    corporate level as a business relationship.  There's

13    more corporate oversight.  And so you collect a

14    corporate questionnaire, understanding the

15    relationship that that corporation has to Anda.

16            And usually with a corporate relationship,

17    there's a specific relationship that's not usually

18    all controlled substances.  It could be specific

19    items, specific control families.  Every situation

20    is different.

21       Q.   So you're saying it's not as important to

22    look at individual pharmacies in a corporate setting

23    as it is when you're looking at independent

24    retailers?

25            MS. KOSKI:  Object to form.
```

```
 1        A.    No, I did not say that.  I said that when

 2   you're looking at a corporate customer, you're

 3   looking at the overall relationship with that

 4   corporation.  You never are looking, oh, this store

 5   just usually decided to come to you.  And we're

 6   talking about national corporate chains.  I don't

 7   know what you're referring to.

 8            But a national corporate chain, usually the

 9   stores do business with you based on the

10   relationship with corporate.  So it's a -- it's a

11   relationship where all stores should be purchasing

12   along with the corporate relationship.

13        Q.    So you want to preserve the relationship of

14   Anda corporate to whatever that chain's corporate?

15            MS. KOSKI:  Object to form.

16        A.    No, I'm not following.

17        Q.    Well, you just said that when you're looking

18   at a corporate customer, you're looking at the

19   overall relationship with that corporation.

20        A.    Relationship meaning business needs from

21   Anda.

22        Q.    So you would look at -- let's say, for

23   example, there were a Walgreens relationship, right?

24        A.    Uh-huh.

25        Q.    And there are 100 Walgreens stores.  Okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Uh-huh.

 2      Q.    You would --

 3            MS. KOSKI:   Answer verbally.

 4      Q.    You have to say "yes" or "no."

 5      A.    Yes.  I'm sorry.

 6      Q.    You would want to make decisions based on

 7   individual orders for those Walgreens stores keeping

 8   that overall relationship in mind, right?

 9      A.    You should consider the big picture.

10      Q.    Why is that?

11      A.    Because the stores are usually purchasing

12   with the oversight and direction that corporate has

13   engaged in business with Anda to do.

14      Q.    So there's a broader base of information

15   that's available from corporate, is what you're

16   saying?

17      A.    Usually with a corporate customer -- and

18   we're speaking national corporate chains -- if there

19   is -- if Anda engages in business, there's an

20   understanding of what corporate is allowing or

21   instructing stores to purchase from Anda.

22      Q.    You would agree it's important to have

23   information for every order that comes in that might

24   be suspicious, though, right?

25            MS. KOSKI:   Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   In our world, there -- we order -- we do
2    suspicious order monitoring all the way from the
3    front end into the back end.  And so a lot of orders
4    that hold in the suspicious order monitoring on the
5    back end have already been prescreened on the front
6    end.
7        Q.   Okay.  I want to break that down a little
8    bit, so I understand a little bit what you're
9    saying.  When you say "all the way from the front
10   end to the back end," what -- what do you mean by
11   front end?
12       A.   In our world, suspicious order monitoring is
13   not just electronic monitoring of orders on the back
14   end.  We take a very conservative approach where a
15   customer is looked at on the front end before you
16   even determine to make that customer eligible.  And
17   if and when you do determine to make them eligible,
18   then there is another hindrance where they're
19   limited by customer limits.
20            And then after those two phases, there is
21   the third phase of the back end monitoring, where
22   you are now monitoring what they are ordering after
23   you already made them eligible to order, gave them a
24   limit of where they are allowed to order.
25       Q.   Thank you for that explanation, but I still
```

1    want to break it down some more.  So let's just try

2    to answer my brief questions.

3           What you say "our world," what do you --

4    what world is that?

5        A.   From Anda, we monitor orders from the

6    upfront process of allowing eligibility to the

7    back-end process of the orders that are placed.

8        Q.   So "our" is Anda or is "our" Anda

9    compliance?

10       A.   Anda compliance.

11       Q.   So remember when I said at the beginning I'm

12   not trying to be rude.  I'm just trying to break it

13   down, and we'll get to the rest of the things that

14   you talked about.  But I want to ensure that we're

15   breaking -- that I'm getting answers to individual

16   questions.

17          So our world is Anda compliance, right?

18       A.   Correct.

19       Q.   What does the front end mean?

20       A.   We begin monitoring customers from the time

21   that we review sales-initiated requests.

22       Q.   Okay.

23       A.   So at that point in time, since the time

24   that I've been there, they will come to you and say

25   I would like to do business, this is the

Highly Confidential - Subject to Further Confidentiality Review

 1    information, it's reviewed by compliance, a

 2    controlled limit is decided and set.

 3         And then as a third portion, the orders are

 4    monitored as they are placed, should they be

 5    indicated they needed an additional look at them as

 6    they're placed.

 7    Q.   So when you say back end, what do you mean?

 8    A.   Meaning the third part of our order

 9    monitoring process, which is as the orders are

10    placed.

11    Q.   You would agree that it would make it

12    difficult to do any work on the back end if you

13    didn't have information from the front end, right?

14         MS. KOSKI:  Object to form.

15    A.   It depends on the situation.  I'm not

16    familiar with an instance right now where that

17    happened.

18    Q.   But you said those things sort of go hand in

19    hand; it's a process for Anda, correct?

20    A.   Correct.

21    Q.   So you want to make sure that everything is

22    set up correctly as the relationship starts, so that

23    as the relationship continues and potentially

24    suspicious or nonsuspicious orders for controls are

25    vetted, that you have all the proper foundational

1    information, right?

2        A.   Correct.

3        Q.   Because without that, you may not be able to

4    make accurate determinations, like you testified to

5    before?

6        A.   Correct.

7        Q.   And if that's not done correctly on the

8    front end, it would be difficult to do the work on

9    the back end, right?

10       A.   You wouldn't have the due diligence that you

11   could refer to.

12       Q.   And you want that due diligence because it

13   helps you understand that customer, right?

14       A.   Correct.

15       Q.   It helps you know the customer?

16       A.   Correct.

17       Q.   And that's really what the goal of your

18   department is, is to know the customer to ensure

19   you're complying with these regulations?

20       A.   Correct.

21            (Anda - Solis Exhibit 6 was marked for

22   identification.)

23   BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12      Q.    So for chain customers at least, you said

13    that you rely on the broader information that the

14    chain gives you, right, to determine whether an

15    individual store or maybe a new location should be

16    able to get controls?

17          MS. KOSKI:   Object to form; mischaracterizes

18      testimony.

19      A.    I wouldn't use the term "broader

20    information."  I would say that you're looking at a

21    group of customers and what that group is wanting

22    from Anda in comparison to the way that you would

23    look at an independent pharmacy, who is just coming

24    to you in and of themselves.  Usually the group is

25    coming to you through the corporate ownership

1    wanting similar things.

2        Q.   That would be the front end that you were

3    talking about before, right?

4        A.   Correct.

5        Q.   So as a compliance department, you would

6    have an understanding of a chain from the

7    information that you gathered on the front end, yes?

8        A.   Yes.

9        Q.   And based on that, you may or may not have a

10   certain level of comfort with a chain in order to

11   add a new location or perhaps change the limits on

12   control purchases to a location, right?

13       A.   It helps you to know and have an

14   understanding, yes, of that customer.

15       Q.   So is it fair to say that you're willing to

16   be more flexible with some individual pharmacies

17   within a chain because of what you understand from

18   the front end?

19            MS. KOSKI:  Object to form.

20       A.   I wouldn't use the term "flexible."  I think

21   that it's the job of compliance to know the

22   customer.  In this situation, it's also the group

23   and the individual location.  So there is a

24   familiarity with the overall group.

25       Q.   And so would you be more comfortable, as a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    compliance analyst, allowing the sale of controlled

 2    substances to some groups -- other -- versus other

 3    groups?

 4         A.   No.

 5         Q.   No, it doesn't depend?

 6         A.   No.

 7         Q.   It doesn't make any difference?

 8         A.   No.

 9         Q.   Because you want to ensure that you have the

10    most accurate information for all the groups, right?

11         A.   That's the goal.

12         Q.   Are there times that you are okay selling

13    with controls to some chains, but not to others?

14         A.   As with anything, you approve and you deny.

15              (Anda - Solis Exhibit 7 was marked for

16    identification.)

17    BY MS. ELLIS:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10    Q.   So the flag in one of those systems, like

11    TPS or Cognos, could be wrong and not reflective of

12    what you actually have in the system?

13    A.   It's possible that you could have had

14    something on the corporate level that was saved that

15    was not indicated on the individual level.



Highly Confidential - Subject to Further Confidentiality Review



    12        Q.    Were there other people that had titles not

    13   related to compliance that you considered members of

    14   your department?

    15        A.    Jim.

    16        Q.    Jim was sort of the outlier?

    17        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



13      Q.   So suspicious order monitoring -- let's just

14   back up for a second, then.  SOMS --

15      A.   Uh-huh.

16      Q.   -- stands for suspicious order monitoring

17   system; is that right?

18      A.   Yes.

19      Q.   So when I say suspicious order monitoring

20   system -- let's assume that we're in 2012 -- what

21   does that mean to you?  What does that entail?

22      A.   He was reviewing the orders.

23      Q.   So you said that it's a review of the

24   orders?

25      A.   Uh-huh.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Yes?

 2        A.    Yes.

 3        Q.    And those would come through Remedy?

 4              MS. KOSKI:   Object to form.

 5        A.    No.

 6        Q.    No?

 7        A.    No.

 8        Q.    Where would they come from?

 9        A.    The electronic ordering system.

10        Q.    Oh, the CSOS that we talked about?

11        A.    No.

12        Q.    No?

13        A.    No.  Electronic ordering meaning what was in

14   place to detect orders of interest.

15        Q.    What program would have done that?

16        A.    We had a legacy suspicious order monitoring

17   system at this point in time, in 2012, through TPS.

18        Q.    So that was part of TPS at this point?

19        A.    Yes.

20        Q.    So the SOMS system -- or the SOM system in

21   2012 that he was watching was TPS, right?

22        A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



```
 8      Q.   So if an order comes in, presumably it's

 9   being looked at by somebody in the compliance

10   department, right?

11      A.   Correct.

12      Q.   And that was from at least 2012 on?

13      A.   Yes.

14      Q.   Was that always the case since you've been

15   in the compliance department?

16      A.   I'm not aware.  I wasn't directly involved

17   immediately in that area.

18      Q.   When did you become aware of the suspicious

19   order monitoring system process?

20      A.   I don't recall exactly.  It wasn't

21   immediately.

22      Q.   So when it was you and Michael and Emily in

23   charge of the controlled substance compliance, you

24   were not aware of the suspicious order monitoring

25   system at first?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Not immediately.

 2      Q.   How long would you say before you became

 3   aware of it?

 4      A.   I don't recall.

 5      Q.   Do you remember who made you aware of it?

 6      A.   I don't recall.

 7      Q.   Do you remember getting any training about

 8   it?

 9      A.   At the time I became aware, of course, there

10   would be training on how to review the orders, yes.

11      Q.   Do you know who did that for you?

12      A.   Most likely it was Emily Schultz.

13      Q.   Do you remember what she told you or what

14   that training consisted of?

15      A.   I don't remember what she told me.  I know

16   what it consists of today.

17      Q.   Let's stay focused back in 2012 for a

18   second, because I think with Buzzeo, it's a very

19   different --

20      A.   Uh-huh.

21      Q.   -- time today than it was then.  Is that

22   fair?

23           MS. KOSKI:  Object to form.

24      A.   They were just two different systems.

25      Q.   Different, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    They were -- one was legacy in-house TPS and

2    the other is a different system, cloud-based system,

3    yes.

4       Q.    When you say legacy, what do you mean?

5       A.    Meaning that that was built internally

6    through the TPS system, legacy meaning that that is

7    no longer what is used today.

8       Q.    Old?

9       A.    Previous to what we're using today.
```

Highly Confidential - Subject to Further Confidentiality Review



6    Q.    So what was the difference between a senior

7    analyst and regular analyst?

8    A.    Reporting.

9    Q.    What do you mean?

10   A.    I was reporting, I was auditing, I was doing

11   different things.

12   Q.    You had more responsibility?

13   A.    I was working on a different set of

14   responsibilities.

15   Q.    Did you continue to do the things you did as

16   an analyst, as a senior analyst?

17   A.    I was reviewing customers, yes, but I wasn't

18   reviewing them as a sales-initiated request in

19   Remedy primary -- as my primary job.

20   Q.    You were looking at them with a different

21   lens, per se?

22   A.    No.  I was reviewing Anda's customer base in

23   the aggregate.

24   Q.    We'll come back to that in a second.

25   When --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Do you need a break?

 2         I'm just -- sorry.  I'm just asking if she

 3    needs a break, because she's looking at me.

 4    But --

 5              THE WITNESS:  No.

 6              MS. KOSKI:  -- maybe she's just looking at

 7    the screen.  Sorry.  Maybe at 3:00 we can do a

 8    break.  Is that a good stopping point?

 9              MS. ELLIS:  Assuming that we're not in the

10    middle of a question.

11    BY MS. ELLIS:
```

Highly Confidential - Subject to Further Confidentiality Review



```
 8      Q.   Let's just step away from this document for

 9   a second, because I understand his ask.  But what

10   I'm trying to understand is what that process looked

11   like.

12           So TPS, the legacy system that you talked

13   about --

14      A.   Uh-huh.

15      Q.   -- before, would flag an order, right?

16      A.   Uh-huh.

17      Q.   Yes?

18      A.   Yes.

19      Q.   Okay.  And that order would be flagged as

20   potentially suspicious, correct?

21      A.   An order of interest, yes.

22      Q.   An order of interest.  What's the difference

23   between order of interest and suspicious?

24      A.   Suspicious means that you've determined that

25   the order is suspicious after review.  An order of
```

 1    interest is something that you need to look into to

 2    make that determination.

 3         Q.   Where do those terms come from?

 4         A.   That's the way we refer to it.

 5         Q.   Anda?

 6         A.   Yes.

 7         Q.   Were you told -- were you trained in that

 8    manner, to differentiate between an order of

 9    interest and a suspicious order?

10         A.   No.

11         Q.   Where did you get that language from?

12         A.   Because every order that is held is

13    obviously not suspicious.

14         Q.   Okay.  Is that written down somewhere or --

15         A.   No.  It's just a fact that every order that

16    is held is not suspicious.

17         Q.   But it potentially is, and it needs to be

18    reviewed, right?

19         A.   Right.  That's why it's of interest.

20         Q.   So an order of interest is determined by

21    some automated method in TPS, right?

22         A.   Yes.

23         Q.   Do you know what that method was that

24    determined an order to be an order of interest, as

25    you call it?

```
 1        A.   I was not a part of the implementation or

 2   the programming of that system.

 3        Q.   Fair enough.  But do you -- do you know what

 4   it was within the system that would cause an order

 5   to be held and called of interest?

 6        A.   I'm not aware of the exact criteria that was

 7   programmed, but I believe it was looking at

 8   patterns, and it was looking at frequency and

 9   different factors.

10        Q.   Were you trained on that as a compliance

11   analyst?

12        A.   As -- the suspicious order monitoring?  At

13   the point that I did become involved, yes.

14        Q.   But sitting here today, you can't tell me

15   what would have triggered the system to put some --

16   a particular order into an order of interest

17   category?

18        A.   The system was programmed to detect anything

19   that was unusual, size, pattern, or frequency.

20        Q.   TPS was programmed in that way?

21        A.   Correct.

22        Q.   Do you know what the specifics of those

23   equations were?

24        A.   I do not because I was not a part of the

25   programming.
```

```
 1        Q.   Do you know if those were written down

 2   anywhere?

 3        A.   I am unaware.

 4        Q.   Do you know who was part of the programming?

 5        A.   I believe it was Michael Cochrane.

 6        Q.   Do you know when that programming was done?

 7        A.   I do not know the exact time.

 8        Q.   Was it done prior to you joining the

 9   compliance department?

10        A.   I do not know.

11        Q.   Was it done when you joined the compliance

12   department, or was that happening as you were

13   joining?

14        A.   I wasn't a part of the suspicious order

15   monitoring immediately, so I don't know that.  I

16   knew it existed when I became involved with it.

17        Q.   And again, you don't remember when you

18   became involved?

19        A.   I don't remember.

20        Q.   Is there anything that would refresh your --

21   refresh your recollection as to when you became

22   involved in that?

23        A.   No.

24        Q.   When somebody was watching the suspicious

25   order monitoring system within TPS, would they have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to -- well, strike that.  I'll get to that question

 2    in a moment.

 3         What were the steps that a person watching

 4    the suspicious order monitoring step -- system would

 5    do at this point within TPS in order to potentially

 6    release the order?

 7    A.   What we do look at is the customer's sales

 8    history with Anda to determine what type of a

 9    customer it is with Anda.  Is this a customer that

10    is buying controls, noncontrols?  Do they come to

11    Anda specifically for certain items that were

12    indicated on the front end?  We look at due

13    diligence.

14    Q.   And you would look at those for each order

15    to determine if that order was just of interest or

16    if it was potentially suspicious?

17    A.   It's usual that you should look at what

18    information you have pertaining to that customer.

19    Q.   Usual meaning that's what's expected?

20    A.   That's what should be done when you're

21    researching something, is to research what you have.
```

Highly Confidential - Subject to Further Confidentiality Review



15       Q.   Okay.  Let me ask it a different way.  When

16   you would look at the suspicious orders -- or orders

17   of interest, rather, held in TPS, whenever it was

18   that you became involved, would you go back and look

19   at the customer questionnaire and the sales history

20   and the dispense data and any other due diligence

21   materials that were on file before determining

22   whether to release that order or not?

23       A.   There's a number of different ways that

24   things are looked at.  Yes, that would be one

25   approach.

1      Q.    What are the other ways?

2      A.    The other approach is, under the assumption

3   that a customer was already reviewed on the front

4   end and that they already went through a thorough

5   review process, they were already given very

6   conservative limits to buy, period, and then

7   understanding our secondary position, so that on the

8   third step, if an order was on hold as an order of

9   interest, you would then be looking at what they

10  ordered.

11     Q.    Okay.  So if I understand you correctly, the

12  research could be done very thoroughly on the front

13  end, right?

14     A.    Right.

15     Q.    And you said that's often the case with

16  chains because of the business relationship and

17  because there is numerous stores, right?

18     A.    It's been the case since I've been in the

19  department on the front end with any new customers

20  to controls, yes.

21     Q.    That on the front end, the initial review is

22  so thorough that you don't necessarily need to do as

23  thorough of a review on the back end for the

24  individual orders?

25     A.    I'm not indicating that.  I'm saying that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you've already approved that this customer can buy.

 2   You've limited what they're allowed to buy, and then

 3   you're then reviewing what they are buying.

 4        Q.   And so you might be more lenient when it

 5   comes to determining whether an order is suspicious

 6   or not based on your previous approval?

 7        A.   I wouldn't --

 8             MS. KOSKI:  Object to form.

 9             Sorry.  Go ahead.

10        A.   I wouldn't use the term "lenient."

11        Q.   What term would you use?

12        A.   I would say that there may be a familiarity

13   with the customer based on the review that you --

14   that's already taken place.

15        Q.   So you may be more comfortable with the

16   orders that are coming in and tagged by the system

17   as potentially of interest because of the

18   information that you've gathered up front?

19        A.   If there was a comfort -- assuming that

20   there was a comfort with the customer, you would --

21   unless there was something to indicate that the

22   order was suspicious and make you uncomfortable,

23   that's why we're researching it, yes.
```

Highly Confidential - Subject to Further Confidentiality Review



19      Q.   So let's just back up for a second.  My

20   understanding, based on your testimony today, is

21   that within TPS, Cognos, and I think Remedy, you

22   said, a customer might be screened or flagged "yes"

23   or "no" for controls; is that right?

24      A.   The -- Remedy is not where a customer is

25   flagged.  Remedy is a task management system for

```
 1    sales reps to make a request to us.  But a customer

 2    would be flagged in TPS.

 3        Q.   So a customer would be flagged "yes" or "no"

 4    for controls in TPS, right?

 5        A.   Yes.

 6        Q.   And that flag and ability to purchase

 7    controls would be based on this initial upfront

 8    information that you've just been talking about,

 9    right?

10        A.   From the time I've been there, yes.

11        Q.   And you said you've been very comfortable

12    with the information that you've gathered up front

13    from the time that you've been there, right?

14        A.   I can't speak to a specific example going

15    back this far, but I know that we've been reviewing

16    new customers to controls with that information.

17        Q.   And based on that information, you wouldn't

18    be as concerned that a particular order was

19    suspicious because you had already done the review

20    at the front end, right?

21        A.   I wouldn't use the term "as concerned."  I

22    would say that you already had a comfort level with

23    a customer and what you had allowed, and then you

24    would need to take another look at what is pending

25    based on what you have already made available to
```

1    them.

2        Q.   So the other look was triggered by TPS --

3        A.   Right.

4        Q.   -- using some sort of equation that you

5    don't know what it was, you said before, right?

6        A.   Right.

7        Q.   You said it might be frequency or --

8        A.   Size.

9        Q.   -- size or something like that?

10       A.   Yes.

11       Q.   All right.  And then depending on your

12   comfort level with that customer, your research into

13   whether or not that order of interest should be

14   suspicious or not might look different?

15       A.   No.  So you're -- you have an awareness of

16   who you are comfortable with as a customer, and then

17   you're looking at what they are ordering for sure.

18   But it depends on what it is that they're ordering

19   that stands out as being something you need to look

20   into more, because there's already a few different

21   limitations and checks in place.

22       Q.   So would those be some of the things that

23   might cause TPS to flag an order of interest?

24       A.   Whatever was behind the scenes flagging it

25   as something that needed looked into.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And then if it were flagged, you would,

 2  coming back to where we started this line of

 3  questioning, do certain research into that customer

 4  to determine if it was, in fact, potentially

 5  suspicious, right?

 6      A.   Yes.

 7      Q.   And that would include looking at the due

 8  diligence information such as customer

 9  questionnaire, right?

10      A.   It -- you could do that, yes.

11      Q.   You -- and the dispense data?

12      A.   Yes.

13      Q.   And the sales data?

14      A.   Yes.

15      Q.   And whatever customer notes might be in TPS?

16      A.   Correct.

17      Q.   And some of the other things that we've

18  talked about, you said it might look different in

19  each situation?

20      A.   Correct.

21      Q.   And this would up -- be up to an analyst to

22  decide what process that they wanted to follow for

23  each of those orders?

24      A.   Not up to the analyst to decide what process

25  they want to follow, but for the analyst to
```

Highly Confidential - Subject to Further Confidentiality Review

1   determine where the information is to do their

2   research for each of those customers and what

3   information is available.

Highly Confidential - Subject to Further Confidentiality Review

3      Q.   We'll take a break in just a second here,

4    but I want to just finish this line of questioning.

5           (Anda - Solis Exhibit 8 was marked for

6    identification.)

7    BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



24          MS. ELLIS:  Okay.  We can take a break.

25          THE VIDEOGRAPHER:  Off the video record at

Highly Confidential - Subject to Further Confidentiality Review

```
 1      2:59.

 2           (Recess from 2:59 p.m. until 3:25 p.m.)

 3           THE VIDEOGRAPHER:  The time is 3:25 p.m.

 4      We're now back on the video record.

 5    BY MS. ELLIS:

 6      Q.    A moment ago we were talking about the

 7    suspicious order monitoring system.  Do you recall?

 8      A.    Yes.
```



```
19      Q.    And so what -- if somebody were to say,

20    these orders are in the bucket, we need to deal with

21    them, what does that mean to you?

22      A.    I don't know what "deal with them" means.  I

23    would assume it's saying they need reviewed.

24      Q.    Okay.  So if an order is in the bucket, it

25    needs -- it would mean that it needs to be reviewed?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.   Yes.

2      Q.   And the review could take on, as we talked

3  about at length, a couple of different forms,

4  looking at the research that Anda has on file,

5  right?

6      A.   Yes.

7      Q.   Including dispense data, yes?

8      A.   Yes.

9      Q.   The customer questionnaire?

10     A.   Yes.

11     Q.   Potentially asking the customer more

12 questions through the sales rep, right?

13     A.   Yes.

14     Q.   And that was something that you said was

15 ideal to do in all circumstances where you look at

16 an order of interest, right?

17     A.   Yes.

18     Q.   So orders of interest are in the bucket,

19 right?

20     A.   Right.

21     Q.   So an order of interest, according to

22 compliance standards at Anda, needed to be reviewed

23 before -- so that it could be determined if it was

24 suspicious or not, right?

25     A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   And without that review, Anda policy was not

2   to fill that order; is that right?

3      A.   Please help me understand the point of what

4   you're saying.

5      Q.   Well, just walk me through what happens when

6   something goes into the bucket.  So an order goes

7   into the bucket.

8      A.   Right.

9      Q.   What happens to that order next?

10     A.   You look at what is being ordered, what is

11  the SKU, what is the item, what is the quantity, who

12  is the customer.

13     Q.   So customer would look at the order -- or,

14  I'm sorry, compliance would look at the order,

15  right?

16     A.   Yes.

17     Q.   And then from there they would make a

18  determination to either release it, correct?

19     A.   Correct.

20     Q.   And that means that the order would be

21  filled and would be shipped, right?

22     A.   Yes.

23     Q.   Or determine that perhaps more research was

24  needed, right?

25     A.   Right.
```

1      Q.   In which case it would continue to be held,

2    yes?

3      A.   Yes.

4      Q.   Or potentially determine that it was

5    suspicious, right?

6      A.   Yes.

7      Q.   And that was all according to Anda

8    compliance policy, right?

9      A.   Yes.

10     Q.   In furtherance of the goals of upholding the

11   regulatory environment that Anda was operating in,

12   right?

13     A.   Those are guidelines for reviewing a

14   customer, yes.

15     Q.   Guidelines, because that's the goals of what

16   the compliance department does, as you testified to

17   before, right?

18     A.   Yes.

19     Q.   Now, how long -- it sounds like there is a

20   couple of steps that are involved in reviewing an

21   order of interest in the bucket, right?

22     A.   Yes.

23     Q.   It could take some time?

24     A.   It can.

25     Q.   What's the longest you've ever spent

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reviewing an order?

 2            MS. KOSKI:  Object to form.

 3      A.   I don't know what the longest time is that

 4    I've reviewed something.

 5      Q.   Have you ever spent more than three hours

 6    reviewing an order?

 7      A.   An order can be reviewed for three days.

 8      Q.   Have you ever spent more than three days

 9    reviewing an order?

10      A.   I don't recall off the top of my head.  It's

11    possible.

12      Q.   Have you ever spent more than two weeks

13    reviewing an order?

14      A.   Not that I'm aware of.

15      Q.   Have you ever spent more than a week

16    reviewing an order?

17      A.   I'm not aware of --

18      Q.   Have you ever spent more than -- do you ever

19    recall spending more than five days reviewing an

20    order?

21      A.   Not that I remember.

22      Q.   Do you remember spending more than three

23    days reviewing an order?

24      A.   If information is requested from a customer,

25    our department has to wait for the customer to
```

```
 1    respond.  So typically, as is today, if we give a

 2    customer three days to respond, usually, before we

 3    make a determination.

 4            In the past, I don't know how long it

 5    could -- would have been.

 6       Q.   So today it would be three days; is that

 7    fair?

 8       A.   They have up to three days, yes.

 9       Q.   In the past it could have been longer, but

10    you don't know for sure?

11       A.   I don't know.

12       Q.   What's the least amount of time that it

13    might take you to review an order?

14            MS. KOSKI:  Object to form.

15       A.   I don't know that.

16       Q.   Could you do it in an instant?  Can -- have

17    you ever looked at an order and just known this

18    is -- this is okay, it's not suspicious?

19            MS. KOSKI:  Object to form.

20       A.   There -- being a secondary supplier, and

21    there's so much review already up front, you can

22    look at what you've already approved and allowed,

23    and you can look at the items and the quantities,

24    and you can make a determination of what you feel

25    needs to be looked into more and could potentially
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    be suspicious.

 2         Q.   So no matter the order, you've said a few

 3    things that you look at every time.  One, you figure

 4    out who the customer is, right?

 5         A.   Right.

 6         Q.   And you either have familiarity with that

 7    customer as an analyst or you don't, right?

 8         A.   Right.

 9         Q.   Sorry, let's try not to talk over each

10    other.

11         A.   Sorry.

12         Q.   I know it's a long day, but we'll try to

13    stay with the rules we agreed on.

14              So you can -- you have to determine whether

15    you're familiar with that customer or not, right?

16         A.   Yes.

17         Q.   You would almost always look at what was on

18    file for that customer?

19         A.   You're also looking at the item being

20    purchased, the reason it's being held, and the

21    quantity of what they're purchasing.

22         Q.   Within TPS, when an order is viewed in the,

23    quote-unquote, bucket, does it give a reason that

24    the order is being held?

25         A.   There used to be a code, and I don't know
```

```
 1   off the top of my head what that code represented,

 2   but there was a hold code.

 3       Q.   Were there different hold codes depending on

 4   the reason that an order was held as of interest?

 5       A.   It had to do with the programming that it

 6   would be flagged to hold, yes.

 7       Q.   So I guess by way of example, you had said a

 8   couple of things earlier that an order might have

 9   held of interest, although you weren't sure the

10   exact equation, that it might be a higher quantity,

11   right?

12       A.   Right.

13       Q.   Or it could be a different frequency, right?

14       A.   Yes.

15       Q.   Would that be two separate codes in TPS, or

16   would there be something you could look at in TPS

17   and the bucket to tell you which one of those two

18   things it was?

19       A.   There was -- the way it was programmed is if

20   a line item was held, there was a reason code.

21       Q.   And that -- there were multiple reasons,

22   right?

23       A.   Yes.

24       Q.   Do you know how many reasons there were?

25       A.   I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Do you know if a report could have been run

2   off of those reason codes for items that were held?

3       A.   There -- if it was in TPS, and there was a

4   reason code, I assume that that could be pulled out.

5       Q.   That could be made into a report?

6       A.   Yes.

7       Q.   Did you ever make that into a report?

8       A.   I don't recall.

9       Q.   Do you know if anybody else ever made that

10  into a report, why items were being held?

11      A.   Anything can be made into a report if it's

12  requested.

13      Q.   So if the data is in TPS, and there's a

14  separate field for it, it can be made into a report?

15      A.   Any -- any field can be reported on, yes.

16      Q.   And that can be done with a combination of

17  reports, right?

18      A.   Yes.

19      Q.   I'm sorry.  A combination of fields, not

20  reports.

21      A.   Combination of fields, yes.

22      Q.   And you do that in cooperation with IT,

23  correct?

24      A.   Yes.

25      Q.   All right.  So you weren't able to say, you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    know, that you could just release an order in an

 2    instant.  Would you say that the least amount of

 3    time it might take to review an order of interest is

 4    five minutes?

 5        A.   I think that we don't look at it as a time

 6    frame, like speeding through something.  We have a

 7    familiarity with what passes through the department,

 8    and we're focusing on -- we have a very high volume

 9    of customers, and we're looking at what is the item

10    that's flagging, what is the reason, and who is the

11    customer.

12             So, for example, in today's world, a

13    customer's first order for the first 30 days is in

14    there.  So you can tell that that is a first-time

15    order on someone that you just reviewed and you just

16    approved.

17             So I wouldn't say that anything is speedily

18    done.  It's looking at all of those factors and

19    deciding how much it needs looked into.

20        Q.   Is there a -- so you do that for every order

21    that you look at, right?

22        A.   You're -- you're looking at all of those

23    factors.

24        Q.   Is there a time frame in which you -- and I

25    guess I'll differentiate time frame here, because it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    seems like you're differentiating between today's

 2    world, which I guess would be post-Buzzeo.  Is that

 3    fair to say?

 4         A.   Yes.

 5         Q.   And pre-Buzzeo?

 6         A.   Yes.

 7         Q.   Okay.  So in the pre-Buzzeo world, was there

 8    a time frame in which you, as in the compliance

 9    department, told customers you would review and

10    potentially release orders in or guaranteed to do

11    that in?

12         A.   I don't recall.

13         Q.   Is there anything that would help refresh

14    your recollection?

15         A.   Possibly.

16         Q.   What would that be?

17         A.   Going back into that place and time.  I

18    don't recall if we -- if we responded in a certain

19    way.  I know today it's three days.

20         Q.   But you don't -- do you remember any other

21    limit besides three days and that you gave customers

22    to tell them when they could expect to hear about an

23    order that might be flagged of interest?

24         A.   I don't recall going back that far.

25         Q.   Okay.  So anywhere between five minutes and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    three days, it's fair to say, it might take an order

 2    to be reviewed; is that fair?

 3          MS. KOSKI:  Object to form.

 4    A.    I really can't calculate that.  It depends

 5    on -- every situation is different.

 6    Q.    Okay.  I understand that.

 7    A.    Yeah.

 8    Q.    I'm trying to account for all of the

 9    situations, then, and understand that there is a

10    variance and -- you said it's not done in an instant

11    because you have to do those steps that we just went

12    through, realizing who the customer is, right?

13    A.    Right.

14    Q.    Thinking about what you have in your own

15    head, as an analyst, about what is on file for that

16    customer, right?

17    A.    I wouldn't say it's in my own head, but I

18    would say if you have an awareness and you recently

19    reviewed them, then you know what you just reviewed,

20    yes.

21    Q.    So at the very least, those two things you

22    have to be able to recognize when you see an order

23    of interest, right?

24    A.    Yes.

25    Q.    So that takes, would you say, fair to say, a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    minute?

 2        A.   To do -- to do which part?

 3        Q.   Just that.

 4        A.   Just to look at the order and say --

 5        Q.   Yeah.

 6        A.   -- is this an order that I consider?  I

 7    think that you can make a quick deduction looking at

 8    the quantity, the customer, the item, and the reason

 9    code.

10        Q.   What's quick?

11        A.   You can say, I need to look into this

12    further, or this doesn't need looked into further.

13        Q.   So could you do that in 30 seconds?

14        A.   I don't know.

15        Q.   Could you do that in 10 seconds?

16        A.   I don't know.

17        Q.   So somewhere between zero seconds and three

18    days is what it would take you to review a potential

19    order of interest; is that fair?

20        A.   Yes.

21        Q.   Would you say it was more the exception or

22    the norm that you would look at orders that were

23    placed by customers who had just become customers of

24    Anda?

25             MS. KOSKI:  Object to form.
```

```
 1        A.    Customers that have just become customers of

 2    Anda, in today's world, always appear because

 3    they're first-time orders.

 4        Q.    What about pre-Buzzeo?

 5        A.    Pre-Buzzeo, I don't recall because I wasn't

 6    a part of that background programming.

 7        Q.    But you were reviewing orders of interest in

 8    TPS at that point.

 9        A.    It -- I think it's important to note I was

10    in that department in '11, and I left in, like, '14.

11    And I worked in another area of compliance.  And so

12    at that point in time when I was in the department,

13    I wasn't in the suspicious order monitoring very

14    often.

15        Q.    But you were doing suspicious order

16    monitoring releases at that point?

17        A.    Few and far between, yes.

18        Q.    Do you think you would have spent more time

19    reviewing particular orders, given the fact that you

20    didn't do it that frequently?

21            MS. KOSKI:  Object to form.

22        A.    Say that again.

23        Q.    You said it was few and far between.  So do

24    you think that meant you would review orders faster

25    or slower than other analysts?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't know.  I don't know where I would

 2    compare to another analyst.  I'm not sure.

 3        Q.    In the period of time between 2011 and 2014,

 4    were there any conversations within the compliance

 5    department about levels of orders that fell into the

 6    bucket and the amount of time that it took to clear

 7    them?

 8        A.    Levels and the time that it took to clear?

 9    I don't -- I don't recall.  I don't know.

10        Q.    So you don't remember whether anybody ever

11    had any concern about whether there were too many

12    orders in a bucket on a given day?

13        A.    Going back in time, there were issues with

14    items that were held in the bucket, and it was

15    different concerns with programming.  So

16    something -- for example, preallocated was holding,

17    and that -- this was a determination by whoever put

18    together the program.  And I don't know why that was

19    done.

20            And so I think why it was done was it would

21    be looked at preallocated and then when it was

22    finally confirmed.

23            What was happening, if I recall back in

24    those days, was that there was a lot that was

25    holding, and it was actually a bad NDC that was not
```

1   even active at Anda, or there was actually no

2   inventory for the orders to ever go out.

3        So there were times where you would have

4   tons and tons and tons of orders because they

5   weren't actual orders, yet they were still holding,

6   and they still needed to be cleared, so you could

7   review the orders that were legitimate.

8   Q.   So was that something that was -- happened

9   regularly, would you say?

10  A.   It did occur because it continued -- so

11  there is different issues that I'm recalling.  One

12  of them was the preallocating point.  And I don't

13  believe -- I think that the upper management made a

14  decision they wanted it to stay that way for

15  whatever they -- reason they wanted to logistically.

16       And then other than that, a bad NDC was a

17  flaw with an item that was in our system.  And I

18  know that that did occur quite often, yes, and they

19  were not real orders.

20  Q.   When you say they weren't real orders, you

21  mean because it wasn't an actual NDC --

22  A.   It could never be fulfilled.  There was

23  never any quantity or the NDC was not a real good

24  NDC with quantity on hand.

25  Q.   How would that get in the system?

```
 1        A.    Because -- it depends on who the customer

 2    is, but if a customer was -- they tried to purchase

 3    an item, and the system would suggest a substitute

 4    or something like that.  And they were directed to

 5    the substitute item, but the item was not a good

 6    item, they continued to be pushed towards that item

 7    that wasn't going to be fulfilled.

 8            (Anda - Solis Exhibit 9 was marked for

 9    identification.)

10    BY MS. ELLIS:

11        Q.    I'm handing you Exhibit 9, marked with

12    Anda_Opioid_MDL Bates Number 339317.

13        A.    Uh-huh.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16      Q.   So when you put in an order release, or you

17    approved an order for release, would you have put in

18    reason why you released it?

19      A.   There's a code, yes.

20      Q.   And that code would be reported and capable

21    of -- recorded, pardon me, and capable of being

22    reported as well, right?

23      A.   Yes.  That note is within the SOM system,

24    not like a compliance note, yes.

25      Q.   So there's a separate field for an order

Highly Confidential - Subject to Further Confidentiality Review

1    being released, right?

2        A.    Correct.

11            (Anda - Solis Exhibit 10 was marked for

12    identification.)

13    BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



23      Q.   So what steps would you go through to

24   release an order in the system?

25      A.   You would look --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2              Sorry.  Go ahead.

 3         A.   You would look at the customer, the code,

 4    the quantity, and the item.

 5         Q.   I'm sorry.  That was my mistake.  I should

 6    have been more specific in my question.

 7         A.   Yeah.

 8         Q.   So if you had determined that an order could

 9    be released, was there just, like, a field that you

10    coded the reason why you're releasing the order

11    into, or did you push a button?  What did you

12    actually do within TPS so that the order was

13    released?

14         A.   There is -- at that time, going back this

15    far, there was an area where you can select the

16    reason that you're saying it could be cleared.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 4      Q.    Do you have Google Alerts set up related to

 5   your job?

 6      A.    Sorry?

 7      Q.    Do you have Google Alerts set up related to

 8   your job?

 9      A.    Yes.

10      Q.    What are they?

11      A.    I don't -- I set this up maybe nine years

12   ago, and it's pertinent to what we do.

13      Q.    Did somebody ask you to do that?

14      A.    I believe when I was hired, yes.

15      Q.    Do you know who asked you?

16      A.    Most likely Michael Cochrane or Emily

17   Schultz.

18      Q.    Do you remember what they said about it?

19      A.    To always know what's going on in the news.

20      Q.    Why?

21      A.    Because it's relevant to what we do.

22      Q.    Why is it -- what importance would the news

23   have to do with your job in compliance?

24      A.    To be aware of the industry as a whole, to

25   be aware of what's going on with the state, with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    DEA, and with customers.

 2       Q.   So you could do your job better?

 3       A.   To be aware of what's happening in the news,

 4    yes.

 5       Q.   Do you remember -- you don't remember,

 6    sitting here today, what Google Alerts you have set

 7    up?

 8       A.   I would assume that the Google Alerts are

 9    set up to identify DEA-related issues, narcotic

10    issues, control issues, doctor issues.

11       Q.   Did you ever use Google Alerts to identify

12    issues that you might want to look at from a

13    compliance perspective?

14            MS. KOSKI:  Object to form.

15            Go ahead.  Sorry.

16       A.   Yes.

17       Q.   Sitting here today, if I were to ask you to

18    pull up SOP 040.3 that you had mentioned earlier,

19    how -- where would you go to do that?

20       A.   That's -- everything that -- all of our

21    records are saved in the O drive.

22       Q.   Is there a folder or something that they're

23    saved in?

24       A.   Yes.

25       Q.   Do you know what it's called?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   SOP.

 2      Q.   And there's a folder presumably for

 3   different SOPs?

 4      A.   Yes.

 5      Q.   Do -- does that folder include historical

 6   versions of SOPs or previous versions?

 7      A.   I believe so.

 8      Q.   Have you gone in and accessed those at any

 9   point?

10      A.   The historical?

11      Q.   Yeah.

12      A.   I have not looked at the historical.  I was

13   not part of those.

14      Q.   Have you authored an SOP yourself?

15      A.   If -- in my current role, I have only been

16   in this since December of '17, so I have not

17   authored one to date.

18      Q.   Have you been the reviewer on one?

19      A.   I have, yes.

20      Q.   What does that mean?

21      A.   Reviewing to see if there's any pertinent

22   changes that I felt needed added at the time of

23   review.

24      Q.   What is your understanding of how an SOP

25   comes to exist within Anda?
```

1     A.   Meaning who authors it?

2     Q.   Meaning there's some issue that the company

3   wants to adopt a standard operating procedure for,

4   what do they do?

5        MS. KOSKI:  Object to form.

6     A.   To be honest, I can't even answer that,

7   because I haven't been a part of that end of it to

8   this point in time.

9     Q.   You've been a part of the SOP review

10  process, right?

11    A.   Yes.

12    Q.   You've been responsible for abiding by SOPs,

13  right?

14    A.   Yes.

15    Q.   But you have not authored it, yet, one; is

16  that right?

17    A.   Not that I recall, no.

18    Q.   Okay.  Do you -- do you have any

19  understanding of how an SOP is adopted?

20        MS. KOSKI:  Object to form.

21    A.   I understand that an SOP is adopted so that

22  you have a set of guidelines and procedures that

23  you're identifying are what should be followed.

24    Q.   Okay.  So sitting here today, say you

25  identify some sort of issue within compliance that

1    you want your compliance team members to follow a

2    certain procedure.  What would you do in order to

3    have a procedure adopted by the company?

4        A.   If it needs to be adopted by the company, it

5    would have to be revised and added.

6        Q.   And how would you do that?

7        A.   Well, when I do do that, it would be

8    initiating the change.

9        Q.   So that's referring to an existing SOP,

10   right?

11       A.   Most likely, yes.

12       Q.   So let's use that as our first example.

13   Let's say you want to make a change to SOP 40 about

14   suspicious order monitoring, sitting here today.

15   What would the first step be that you would take in

16   order to make that change?

17       A.   Hypothetically, it would have to make sense

18   and then be identified as something that you wanted

19   to do going forward.

20       Q.   Okay.  And so you would make a draft,

21   perhaps, of that?

22       A.   Perhaps.

23       Q.   And then what would you do with that draft?

24       A.   I haven't done anything with a draft to this

25   point in time, but if you create a draft, assuming

Highly Confidential - Subject to Further Confidentiality Review

1   that you want to make it permanent, you would

2   probably take it to different approvals to make it

3   permanent.

4       Q.   Who would need to approve it?

5       A.   Most likely it would be the heads of

6   compliance, meaning, like, a Jay Spellman today.

7       Q.   How would you know who would need to approve

8   it?

9       A.   Well, that sort of a thing, I think, should

10  be approved by multiple people, if it's going to

11  become a company standard.

12      Q.   Are you aware of any written process that

13  Anda has for the development and adoption of SOPs?

14      A.   I'm not familiar with a written process for

15  that.

16      Q.   Are you aware of any -- has anybody told you

17  of any process that Anda has for the development and

18  adoption of SOPs?

19      A.   I am not familiar with that.

20      Q.   Are you, in your current role, responsible

21  for complying with Anda SOPs?

22      A.   In my current role, we're supposed to be

23  cognizant of guidelines, yes.

24      Q.   You're supposed to follow those guidelines,

25  right?

```
 1        A.   We're supposed to be aware and try to

 2   follow, of course.

 3        Q.   Are there certain guidelines that are more

 4   important in your role now, as manager of compliance

 5   at Anda, than they were, say, when you were in

 6   purchasing?

 7             MS. KOSKI:  Object to form.

 8        A.   I don't -- I don't think anything is more or

 9   less important, but I do think that where you are

10   today versus the past is always going to be

11   different.

12        Q.   All right.  You said you were a DEA analyst

13   from 2011 until 2013; is that right?

14             MS. KOSKI:  Object to form.

15        A.   I believe it was '14 or '15.

16        Q.   Well, you became -- after -- strike that.

17             You were a DEA analyst starting in 2011?

18        A.   Yes.

19        Q.   Right?

20        A.   Uh-huh.

21        Q.   You stayed in that position for a couple

22   years, you said?

23        A.   Yes.

24        Q.   And then what happened?

25        A.   Then I transitioned to the other side of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    department, which is the regulatory compliance area,

2    which focuses on the licensing of customers, the

3    facility licensing of every place that we operate.

4        Q.   And is that the area that Emily Schultz is

5    the head of?

6        A.   Currently, yes.

7        Q.   And was your title the same at that point?

8        A.   The title part is very confusing, because

9    when Teva purchased us -- and I don't remember.  I

10   think it went from a regulatory compliance manager.

11   And even though I was working on the regulatory

12   licensing side when Teva purchased us, they tried to

13   find like titles.  And so they created the title DEA

14   compliance manager, even though I was in the other

15   role.  And they did the same for Emily Schultz.

16       Q.   Meaning Emily Schultz has the same title as

17   you or she --

18       A.   She had a title of, like, a senior or -- I

19   don't know exactly what it was -- senior DEA

20   compliance manager when Teva purchased us and they

21   did the title review, even though prior to Teva

22   purchasing us, we were considered regulatory

23   compliance managers.

24       Q.   So Teva purchased Anda in what year?

25       A.   October of -- is it -- 2016, I believe.

```
 1       Q.   So prior to that, from 2011 to 2013, you
 2   were a DEA compliance analyst dealing with
 3   controlled substances, right?
 4       A.   I believe it was '11 to maybe '15.
 5       Q.   '11 to '15.  And in '15, you transferred to
 6   the regulatory compliance side of things, right?
 7       A.   Yes.
 8       Q.   And you were there from '15 until when?
 9       A.   December of 2017.
10       Q.   And then what happened in December of 2017?
11       A.   There was a restructuring of the department,
12   and so I transitioned over to the DEA compliance
13   side.
14       Q.   So back to the area where you had been
15   working up until 2015?
16       A.   Correct.
17       Q.   So you now, again, are responsible for
18   dealing with controlled substances and Anda
19   compliance with applicable rules and regulations?
20       A.   Yes.
21       Q.   And that's been since 2015, right?
22       A.   No.
23       Q.   Or '17, I'm sorry.
24       A.   Yes.
25       Q.   So from -- with the exception of 2015 to
```

Highly Confidential - Subject to Further Confidentiality Review

1    2017, your entire time in the compliance department

2    has been dealing with controlled substances?

3        A.   Yes.

4        Q.   From 2015 to 2017, what was different about

5    your job compared to 2011 to 2015, if anything?

6        A.   Sorry.  So the time that I left the

7    department and went into the regulatory side, I was

8    not dealing with controlled substances any longer.

9    I was dealing with the customers and their licensing

10   and Anda's facility licensing to operate.

11       Q.   Are you aware of whether anybody took your

12   position when you left the department?

13       A.   Nobody took my position, but, however, you

14   had Robert Brown there, who was the director of the

15   department.  Latoya -- actually, no, I stand

16   corrected.  Latoya Samuels was made a senior DEA

17   compliance analyst.  When I -- when I left the

18   department, I became a manager of regulatory

19   compliance, and so she did take my previous title.

20       Q.   Does she hold that title today?

21       A.   So with Teva purchasing us, she -- it --

22   she's doing the same thing, but they gave her

23   another name, a DEA compliance auditor.

24       Q.   And you said Mr. -- or Howard, Howard was

25   the first boss that you had, and then it was Robert

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Brown, right?
 2       A.   The first person that I reported to in that
 3    department was Michael Cochrane.  Howard was brought
 4    into the company.  I never reported under him, and
 5    then I did at some point report under Robert Brown.
 6       Q.   How long between when Howard left the
 7    company and -- do you recall how long of a time
 8    passed between when Howard left the company and
 9    Robert Brown started?
10       A.   I don't recall exactly, but it was a couple
11    of months.
12       Q.   Were you involved in any conversations about
13    the hiring of Robert Brown?
14       A.   I was not.
15       Q.   Were you aware, prior to the time that
16    Robert Brown was hired, that they were looking for
17    somebody to fulfill that position?
18       A.   The job was posted online.
19       Q.   Did you apply for it?
20       A.   No.  It's a director position.
21       Q.   Did you not feel you were qualified for
22    that?
23       A.   I was an analyst at the time.
24       Q.   Do you have any understanding of why Robert
25    Brown left the company?
```

```
 1      A.   There was layoffs with Teva overall when

 2   there was financial issues with the corporation.  He

 3   left at the same time that many other people were

 4   laid off.

 5      Q.   So in 2017, you left the regulatory

 6   environment, and you went back to controlled

 7   compliance; is that right?

 8      A.   Yes.

 9      Q.   Why did you do that?

10      A.   It was a restructuring of the department,

11   and the -- Jay Spellman made the decision.

12      Q.   Was it a promotion?

13      A.   No, it was not.

14      Q.   Are you in the same position now as you were

15   in 2017 when you started?

16      A.   Yes.

17      Q.   And who do you report to now?

18      A.   Jay Spellman.

19      Q.   And does Emily Schultz now still work in

20   regulatory compliance?

21      A.   Yes.

22      Q.   Did she ever do the control side of things?

23      A.   Yes.

24      Q.   When was that?  Do you know?

25      A.   I don't know the exact years, but I would
```

1    say that she was involved until Robert Brown came in

2    and took over the department.

3        Q.   Have you ever done any training of others

4    related to compliance and controlled substances?

5             MS. KOSKI:  Object to form.

6        A.   What type of training?

7        Q.   Well, if I were -- I mean, what do you --

8    what do you think of when I say training?

9        A.   Training in the way we review customers and

10   the type of information and, yes, the way the

11   industry works as a whole, we do those sorts of

12   things.

13       Q.   Who do you do those sorts of things for?

14       A.   There's been very few new employees, but if

15   there is a new employee, you would do something like

16   that --

17       Q.   Was that --

18       A.   -- or if they were cross-training.

19       Q.   I'm sorry.  I cut you off.

20            Was that new employees within compliance?

21       A.   Yes.

22       Q.   What about employees within other

23   departments within Anda?

24       A.   We do training related to various things we

25   need to communicate.  Yes, we do something like

Highly Confidential – Subject to Further Confidentiality Review

1    that.

2        Q.   When is the first time you remember doing a

3    training for somebody outside of compliance once you

4    joined the compliance department?

5        A.   There has been a lot of different sales

6    training.  I don't recall the first time.  The type

7    of training that has occurred is explaining what we

8    need to review a customer, explaining what we're

9    wanting as a guideline to review people, what's

10   expected, what's expected of communications back to

11   the customer.  That always took place, and it takes

12   place today.

13       Q.   So from 2011 on, that was taking place?

14       A.   Yes.

15       Q.   What form did that take?

16       A.   There's new hire seminars where you kind of

17   introduce the new hires to different concerns with

18   the marketplace, the industry.  You also indicate

19   what's needed by your department to review a

20   request.

21       Q.   So those were, like, day-long seminars that

22   new hires would sit through?

23       A.   They're not day-long, but maybe an hour or

24   two.

25       Q.   Would compliance present the entire hour or

Highly Confidential - Subject to Further Confidentiality Review

1    two of those programs?

2        A.   If it was focused on compliance, yes.

3        Q.   Does every new hire receive compliance

4    training?

5        A.   Since I've been in the department in the

6    last year, we've been doing that.  We've been asking

7    to be included in those new hire sessions, yes.

8        Q.   What about prior to that?

9        A.   I know -- I can't speak to exactly what

10   happened, but I know Robert Brown did do sales

11   trainings.

12       Q.   Do you -- did you ever assist with those?

13       A.   Not with the ones that he attended when I

14   was out of the department.

15       Q.   What about prior to being out of the

16   department, prior to 2015, did you assist with

17   trainings for salespeople?

18       A.   I don't recall being directly involved with

19   the salespeople, but we did speak with, like,

20   national account managers and such.

21       Q.   Do you recall ever putting together

22   materials for the sales department or people within

23   the sales department of Anda?

24       A.   It could have been asked of me to put

25   together materials.  I don't off the top of my head

1    remember.

2        Q.   Prior to taking your position now, were

3    you -- are you aware if there were any set materials

4    that the compliance department had developed and/or

5    distributed to departments other than compliance?

6        A.   I'm sure that materials were distributed.  I

7    don't know anything off the top of my head.

8        Q.   Do you know where those would have been

9    found?

10       A.   No.

11       Q.   If I were to ask you to run a report of

12   customer limits for controlled substances

13   companywide, could you do that?

14       A.   Current, today?

15       Q.   Yes.

16       A.   You're able to see it currently where a

17   limit is at, yes.

18       Q.   Could you run a report of that?

19       A.   Yes.

20       Q.   And what -- how would you do that?

21       A.   How would you run the report?

22       Q.   Yes.

23       A.   You would have to question to see the

24   control limit for a particular customer for a

25   particular control family.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.   Would you use a certain program?

 2         A.   You could use any of the ones we discussed

 3    this morning.  You could use Cognos; you could use

 4    TPS.

 5         Q.   Prior to 2015, could you have done that?

 6         A.   Yes.

 7         Q.   Could you run a report of customer limits of

 8    any customer, including any customer that was

 9    eligible to buy controls?

10         A.   Yes.

11         Q.   Could you run a report of how those customer

12    limits have changed over time?

13         A.   No.  There is no historical -- well, I

14    wasn't aware.  I don't believe there is a way to do

15    historical.  We always ran reports to see where they

16    were at at the current time.

17         Q.   Would those reports be saved anywhere?

18         A.   They were not saved in any one particular

19    place.

20         Q.   If I, prior to 2015, were to ask you to run

21    a report of reasons why a customer limit had changed

22    when -- well, just that first, reasons why a

23    customer limit had changed, could you have done

24    that?

25         A.   Prior to 2015?
```

1      Q.    Yes.

2      A.    Assuming that the request went through

3   Remedy, you would be able to identify the request

4   and when it changed.

5      Q.    Could you also have identified why it

6   changed?

7      A.    You could identify if the customer provided

8   that in the request, giving a reason, such as a

9   market condition, a shortage, a backorder issue, or

10  simply because they didn't have that item before, if

11  that was entered into the Remedy opportunity, we

12  could retrieve that.

13     Q.    When you say opportunity, what do you mean?

14     A.    That's what we call a sales request for a

15  compliance review, is an opportunity.

16     Q.    Is it your understanding that when a

17  customer purchase limit changed for a particular

18  reason, that that change went on in perpetuity?

19        MS. KOSKI:   Object to form.

20     A.    Sorry?

21     Q.    So by way of an example, if a customer

22  requested an increase in their ability to purchase

23  controls and their control limit, based on one

24  particular one-time reason -- are you familiar with

25  any situations like that?

Highly Confidential - Subject to Further Confidentiality Review

 1      A.   A one-time situation?

 2      Q.   Yes.

 3      A.   I'm not familiar with a one-time situation.

 4   Usually, if a customer is reviewed for an increase,

 5   it's supposed to be ongoing.  There may be an

 6   example of a one-time opportunity where the customer

 7   has a certain limit, and there's only 100 of the

 8   limit left.  And we only have a certain bottle count

 9   available, and that's their only option to purchase.

10   That's a one-time opportunity that I'm thinking of.

11      Q.   So in that circumstance, would you change

12   the limit and allow the customer to purchase more?

13      A.   If we did our research and our research

14   indicated that there was not a concern, and it could

15   be justified because that's the only option

16   available, yes.

17      Q.   There was at that point -- this is

18   pre-2015 -- nothing in the system that the limit was

19   changed and that would automatically change it back,

20   was there?

21      A.   No.

22      Q.   That limit would be increased into the

23   future as well, right?

24      A.   If it was supposed to be a permanent

25   increase.

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.   Do you ever remember moving limits back down

 2   on a customer?

 3      A.   Yes.

 4      Q.   Do you -- did you do that on a regular

 5   basis?

 6      A.   No.

 7      Q.   How many times do you remember doing that?

 8      A.   So, for example, if a customer needed to

 9   return a product, we don't automatically re-increase

10   the limit because a product is returned.  So we

11   would maybe say, well, we'll verify that that

12   product is being picked up.  And once we verify it's

13   being picked up and returned to Anda, we will

14   increase your limit so you can place an order for

15   the correct item, that sort of a scenario.

16      Q.   From 2011 to 2015 were you responsible for

17   running any sort of reports on a regular basis?

18      A.   Yes.

19      Q.   What were they?

20      A.   Auditing sorts of reports where I was

21   collecting updated information.

22      Q.   Did they have specific names, those reports?

23      A.   They had various names.  They could be an

24   audit of particular states.  It could be audits of

25   particular control families.  It could be audits of

```
 1    customers that we needed updated due diligence on,

 2    questionnaires and dispensing data.

 3        Q.   And how would you know at that time whether

 4    to run a report or not?  Did somebody tell you?

 5        A.   There was a standard that -- when I was

 6    brought into the department, that was expressed to

 7    me of what was wanted when I came into the

 8    department, and that was one of the tasks.

 9        Q.   By whom?

10        A.   Michael Cochrane and Emily Schultz.

11        Q.   And what was the standard that they

12    expressed to you at that time?

13        A.   They wanted updated information on the

14    customer base.

15        Q.   Did you ever do any analysis into shipments

16    into a particular geographic area?

17        A.   Yes.

18        Q.   When did you do that?

19        A.   During that same time period you mentioned,

20    probably '11 to '15.

21        Q.   How would do you that?

22        A.   I would select different regions for

23    different reasons and go into that region and

24    report -- report on what I was looking at, whether

25    it was sales or the customer's information.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Why would you do that?

 2        A.   As a form of auditing.

 3        Q.   Was that one of your main responsibilities

 4   as a DEA compliance analyst?

 5        A.   When I became a senior analyst, that became

 6   one of my main responsibilities, yes.

 7        Q.   Was auditing information?

 8        A.   Yes.

 9        Q.   And when you say "auditing information," I

10   guess what do you mean by that?

11        A.   I was looking at our entire customer base,

12   and I was making determinations, well, this person

13   at one point was approved for controls.  They're not

14   active -- an actively buying customer from Anda.

15   They will now become ineligible for controls because

16   they're inactive.

17             If they want to purchase from us again,

18   they're going to have to go through the Remedy

19   process.  I was looking at them and determining

20   if -- like, what it was they were buying and if

21   updated data was needed.

22        Q.   Would you do that on a regular basis?

23        A.   Yes.

24        Q.   How frequently?

25        A.   There was no specific time frame.  All of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them I would consider, like, a project and --

 2        Q.    What are some of the projects that you

 3    remember doing when you had the senior analyst role?

 4        A.    Well, I created a lot of the reporting that

 5    I was using.

 6        Q.    What are some of the reporting that you

 7    created?

 8        A.    Just what we mentioned, like, customer

 9    information and sales transactions.

10        Q.    When you created reports to look at

11    shipments into a particular geographic location, are

12    there certain fields that you were looking at or

13    types of information that you were looking at in

14    those reports?

15        A.    I was looking, like, for volume of product

16    shipped and whether -- how updated the data was.

17        Q.    And why were you doing that?

18        A.    As a form of auditing of our customer base.

19        Q.    Do you remember on how many occasions you

20    did that?

21        A.    I did it a lot.

22        Q.    Would you say that looking at shipments into

23    a particular geographic area was something that you

24    did regularly?

25        A.    Once I got into that role, yes.
```

```
 1        Q.   When I say regularly, is that monthly?

 2        A.   Well, again, they were projects, so -- and

 3   you're looking at a very large amount of data.  So

 4   once we had either received what we needed in a

 5   project or we were ready to go to another project, I

 6   would do that.

 7        Q.   So you said earlier that Remedy is a

 8   task-based system that you used and others in the

 9   company used to keep track of tasks, right?

10        A.   That's our way of controlling sales

11   requests, because there are a lot of requests that

12   come from the sales department.  That way, honestly,

13   they don't have to come to you and request something

14   by phone or by e-mail, and it's archived in there.

15        Q.   So when you say "task," you're talking about

16   specifically orders?

17        A.   No.  Remedy is a task management system of

18   any type of a request that they are asking from

19   compliance, whether it's an increase, a new customer

20   to controls.

21        Q.   So was Remedy, like, an efficiency program

22   that you would have used, as an analyst, to keep

23   track of, say, like your to-do list for projects?

24        A.   No.

25        Q.   Did you have a program like that where you
```

Highly Confidential - Subject to Further Confidentiality Review

1    kept track of what projects you were working on,

2    when?

3        A.    No.

4        Q.    Did you have any system on keeping track of

5    projects, when, and what their duties were?

6            MS. KOSKI:  Object to form.

7        A.    No.  I did not have a system, but there were

8    sometimes deadlines of when you would want

9    information back.

10       Q.    And what were those deadlines based upon?

11       A.    Based upon requests of information and

12    trying to ensure you got it in, or you had some sort

13    of a response.

14       Q.    To the customer or to people within Anda?

15       A.    No.  So a deadline was created because if we

16    sought that information, and the customer did not

17    reply in a certain amount of time, we created the

18    dead line so that we could make a determination to

19    commence with control substance eligibility or to

20    cut it off temporarily until we received the

21    information we needed.

22       Q.    At any point in time in your time with

23    compliance, Anda compliance, have you taken part in

24    preparing materials for submission to the DEA?

25       A.    Preparing, like, what type of materials?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Any type of materials.

 2      A.   We've had an inspection, yes.  I

 3   participated in the inspection.

 4      Q.   What about orders or customers to be

 5   reported?

 6      A.   Every person who's in the department who is

 7   reviewing orders makes a suggestion of what needs to

 8   be reported, and then there have been people within

 9   the department that had the -- like, the

10   responsibility to pass that information over to the

11   DEA.

12      Q.   Has that been the case since you started in

13   the compliance department in 2011?

14      A.   Yes.

15      Q.   When you first started in 2011, what was

16   your understanding of your obligation to report

17   things to the DEA?

18      A.   It's not an obligation to report suspicious

19   customers; however, it was an arrangement, and they

20   have always been communicated with about all of the

21   customers that we determine suspicious during our

22   reviews of the customers.

23      Q.   Okay.  My question was a little bit

24   different.  It was:  Back in 2011, what was your

25   understanding of what you were required to report to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the DEA?

 2        A.   My understanding was any customer that we

 3    found to be suspicious.

 4        Q.   And where did you get that understanding?

 5        A.   I got that understanding because we reviewed

 6    customers, and we had a sort of a system where we

 7    were reviewing them on the front end.  And if you

 8    determined that a customer was someone you did not

 9    want to engage in business with, we were notifying

10    the DEA, because we never actually allowed them to

11    purchase from us.

12        Q.   And who told you that system?

13        A.   It was something that was in place prior to

14    me even getting into the department, that our

15    department was always communicating suspicious

16    customers to the DEA.

17        Q.   It was your understanding that your

18    department was always doing that, right?

19        A.   Yes, from a certain period of time that that

20    was discussed.

21        Q.   So what was that system at that time, say,

22    in 2011 when you came in?

23        A.   If a customer was reviewed and for whatever

24    reason the data that you reviewed, you made a

25    determination that this is a customer that I will no
```

Highly Confidential - Subject to Further Confidentiality Review

 1    longer sell to or I will not sell to, it was

 2    communicated to the DEA.

 3        Q.   Was that based on your review of TPS orders

 4    of interest?

 5        A.   It could have been.

 6        Q.   What else?

 7        A.   The overall review of the customer.

 8        Q.   And what would trigger an overall review of

 9    a customer?

10        A.   Some of it is initiated by a sales request,

11    and some of it could be auditing or new information

12    received.

13        Q.   Have you ever had, yourself, direct

14    correspondence with anybody from the DEA?

15        A.   Inspections, yes.

16        Q.   What about as it relates to suspicious order

17    monitoring?

18        A.   In an inspection, yes.

19        Q.   Do you remember when inspections occurred?

20        A.   This year -- or this past year in the end of

21    September.

22        Q.   What about prior to that?

23        A.   I don't know.  I was not a part of those.

24        Q.   Were you aware of whether specific orders

25    needed to be reported to the DEA as suspicious?

```
1              MS. KOSKI:  Object to form.

2       A.   Suspicious orders?

3       Q.   Yes.

4       A.   I'm not aware of a specific order.

5       Q.   I didn't ask if you were aware of any one

6  particular suspicious order.  I'm asking if, in

7  2011, when you started as a DEA compliance analyst

8  at Anda, were you aware that suspicious orders were

9  to be reported to the DEA?

10             MS. KOSKI:  Object to form.

11      A.   I don't know if I immediately was aware, but

12 I did become aware within the next year or so, yes.

13      Q.   That suspicious orders were to be reported

14 to the DEA?

15      A.   Yes.

16      Q.   You said it was your understanding, however,

17 that the Anda system was reporting suspicious

18 customers; is that right?

19      A.   I know that Anda had always communicated

20 with the DEA about customers we would not do

21 business with.

22      Q.   But you -- at that time, were you also aware

23 that Anda was not reporting suspicious orders

24 specifically to the DEA?

25             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I was not aware immediately of the order

 2   part of it.  As I said earlier, I wasn't immediately

 3   engaged in the suspicious order monitoring.  When I

 4   became engaged with it, I became more aware of that.

 5      Q.   How did you become aware of the order

 6   monitoring process part of it?

 7           MS. KOSKI:  Object to form; asked and

 8      answered.

 9           Go ahead.

10      A.   Different literature, conferences attended.

11      Q.   Do you remember at what point you became --

12   at what date you became involved in the order

13   monitoring process?

14      A.   I don't recall that.

15      Q.   When you started in the Anda compliance

16   department, were you aware of customer

17   questionnaires that were in existence that customers

18   had to fill out?

19      A.   Yes.

20      Q.   Were you a part of developing those customer

21   questionnaires?

22           MS. KOSKI:  Object to form.

23           Go ahead.

24      A.   I -- I don't remember if at that time I had

25   input.
```

```
 1        Q.   You said that you have been a part of
 2   communications with the DEA related to specific
 3   reviews or audits?  Is that the word that you used?
 4        A.   If the -- if we determine as a result of an
 5   audit where information was received or reviewed
 6   that we would no longer sell to a customer or we
 7   would not sell to that customer, I was aware
 8   that that was -- I was a part of submitting that
 9   customer to the person who at that time -- because
10   if we're going back in history, it was -- reporting
11   it to the DEA.
12        Q.   You -- so you would submit the name of a
13   customer to the person within Anda who would submit
14   it to the person at the DEA?
15        A.   Correct.
16        Q.   When is the first time you remember seeing
17   SOP 40?
18        A.   I don't remember when the first time was.
19        Q.   Earlier you said SOP 40.3 is the one that
20   you follow to deal with suspicious orders?
21             MS. KOSKI:  Object to form.
22        A.   That explains a lot of the different facets
23   of what's in the department and how areas are
24   reviewed.
25        Q.   Were you involved in any process to change
```

Highly Confidential - Subject to Further Confidentiality Review

1    SOPs over different points in time since you've been

2    in the compliance department?

3        A.    No.

4        Q.    Do you remember the first time that you were

5    given a written copy of SOP 40?

6        A.    I don't remember that.

7        Q.    Do you remember SOP 40 being adopted?

8        A.    Because I was not directly involved with the

9    creation, I don't remember when it was adopted.

10        Q.    Do you remember what month you started in

11    the compliance department?

12        A.    I believe it was in July of '11.

13        Q.    In July of '11, you would have started?

14        A.    I believe so.

15        Q.    Were you aware of any Anda process --

16    written process for suspicious order monitoring at

17    that point?

18            MS. KOSKI:  Object to form.

19        A.    I don't -- I'm not aware of that process,

20    no.

21        Q.    Were you at that time?

22        A.    No.

23        Q.    And you, again, don't remember when you

24    became aware of it?

25        A.    Well, because I was not involved in that,

Highly Confidential - Subject to Further Confidentiality Review

1    like, immediately once getting into the department.

2        Q.   Would it surprise you if I told you that

3    Anda didn't have a written SOM, written monitoring

4    process at that time?

5        MS. KOSKI:  Object to form.

6        A.   I can't tell you the emotion that I would

7    feel, but I could say I wasn't aware.

8        Q.   Would you have expected Anda to have a

9    written process at that point for suspicious order

10   monitoring?

11       MS. KOSKI:  Object to form.

12       A.   You would expect that you would have a

13   formalized procedure.

14       Q.   You would have expected that as an employee

15   of the compliance department, right?

16       MS. KOSKI:  Object to form.

17       A.   You would expect that, if someone said it

18   should have been authored as an SOP in a procedure,

19   that it would be there.

20       (Anda - Solis Exhibit 11 was marked for

21   identification.)

22   BY MS. ELLIS:

23       Q.   I'm handing you what's been marked as

24   Anda -- I'm sorry, Exhibit 11, Anda Opioids Bates

25   Number 527936.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you recognize this?

2     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23      Q.   You started in compliance in July of 2011,

24   right?

25      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

15          (Anda - Solis Exhibit 12 was marked for

16     identification.)

17     BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



20      Q.   Was it ever the case that you did not abide

21   by the SOPs?

22      A.   I don't know.

23      Q.   Were you ever aware of any consequences of

24   not abiding by SOPs?

25      A.   I don't know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Have you had performance reviews in any of

 2    your roles in the Anda compliance department?

 3        A.    Yes.  You have one every year.

 4        Q.    Are those written?

 5        A.    Yes.

 6        Q.    Is it your understanding that those become

 7    part of your personnel file?

 8        A.    I believe that has to do with your

 9    employment, yes.
```

```
13        Q.    Would you have become aware of any

14    differences as they were adopted in SOPs?

15        A.    Only if the review process was different.

16        Q.    What do you mean?

17        A.    Meaning that if something was done

18    differently and it was determined that the team

19    should do it differently, then I would have been

20    aware of that.

21        Q.    How would you have become aware of that?

22        A.    I can't presume how, but I'm sure it would

23    have been communicated to me, we're going to do this

24    differently.

25        Q.    By whom?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Management.

2      Q.   Would that be Jay Spellman?

3      A.   No, because at this point in time it was

4  Robert Brown.

5      Q.   And how would he have communicated that to

6  you?

7      A.   If he wanted something done differently, he

8  would tell the team that.

9      Q.   Would he put it in writing?

10     A.   I'm not sure what he would have done.

11     Q.   Well, do you remember him ever telling you

12  to do things differently in writing?

13     A.   I mean, him being the director of the

14  department, it could be that he sent out e-mails or

15  he could have had a meeting with us in our team

16  meeting indicating that.

17     Q.   But there was no standard process by which

18  Mr. Brown would tell you to do things differently?

19          MS. KOSKI:  Object to form.

20     A.   Not that I can recall.

21     Q.   Did that frustrate you?

22     A.   What?

23     Q.   If you were told to do things differently

24  but you didn't know when to expect those sorts of

25  changes.

```
 1              MS. KOSKI:  Object to form.

 2       A.   Say that again, please.

 3       Q.   I'll strike that.  I'll just move on.

 4            You said earlier that you occasionally would

 5       take place in trainings for salespeople in Anda; is

 6       that right?

 7              MS. KOSKI:  Object to form.

 8       A.   What time frame are we talking about?

 9       Q.   From 2011 to 2015.

10       A.   I would participate in a lot of national

11       account communication, chain communication, and it

12       could be that I was invited to different sales

13       meetings, yes.

14       Q.   Why would you be invited to a sales meeting?

15       A.   Because if someone is directing the

16       department and they wanted me to be there, I would

17       go.

18       Q.   But it was at that person's invitation,

19       right?

20       A.   Correct.

21       Q.   It was never sort of part of the -- any

22       standardized process, that compliance would do

23       training for salespeople?

24              MS. KOSKI:  Object to form.

25       A.   No, that's not what I was saying.
```

1          Robert Brown, like being the director at

2     this point in time, it's possible that he had

3     engagement with the sales floor.

4          Q.   Did you have direct correspondence with

5     salespeople at that time, from 2011 to 2015?

6          A.   Yes.

7          Q.   On what occasions?

8          A.   It's possible that a salesperson could

9     e-mail.

10         Q.   Why would a salesperson e-mail you?

11         A.   For a variety of different reasons, they can

12    e-mail you.

13         Q.   Like what?

14         A.   You could request information from them,

15    from their customer, and they provide it to you or

16    they could have a question.

17         Q.   Would you ever rely on salespeople for your

18    input -- for their input into whether a customer was

19    allowed to buy controls or not?

20         MS. KOSKI:  Object to form.

21         A.   Would they sway my decision?

22         Q.   Yes.

23         A.   I don't believe that they would sway my

24    decision.  Salespeople, though, could provide

25    information that would help us understand the

1    pharmacy better, if it was a specialty pharmacy or

2    if there was something that we needed to know.

3        Q.   Were you ever aware of any tension between

4    the salespeople of Anda and compliance?

5        MS. KOSKI:  Object to form.

6        A.   Can you explain tension?

7        Q.   Well, what do you understand tension to

8    mean?

9        A.   Well, compliance is considered sales

10    prevention, so I think there is like a normal

11    tension.

12        Q.   Compliance is considered sales prevention?

13    Is that what you said?

14        A.   In a lot of ways, yes.

15        Q.   Where does that understanding come from?

16        A.   Well, we are always making determinations to

17    not do business with someone or collect information

18    or we say no a lot.

19        Q.   Is that a term that you became familiar with

20    at Anda?

21        A.   That's a term that we know -- we are always

22    saying no.

23        Q.   So there's a natural tension, you think,

24    between sales and compliance?

25        A.   I don't know if there is a natural tension,

```
1     but you're -- you're not on the same team.

2         Q.   When you say you're not on the same team, do

3     you mean the goals are different?

4         A.   I don't know what their goals are, but our

5     goals are not sales.  So our goals are knowing who

6     we're selling to and if we feel comfortable selling

7     to them so that we can continue to operate.

8         Q.   Do you share any goals with the sales team?

9         A.   No.

10        Q.   No goals with the sales team?

11        A.   We don't have anything to do with sales.

12        Q.   At any time in your time with Anda

13    compliance did you become aware of salespeople that

14    were more aggressive than others in the sale of

15    controlled substance products?

16        MS. KOSKI:  Object to form.

17        A.   I don't know if it's a salesperson being

18    more aggressive with relation to controlled

19    substances.  There are salespeople that are

20    successful because of their level of -- whatever you

21    would call it, they're aggressive.

22        Q.   Well, what would you call it?

23        A.   There are salespeople that you can see how

24    they're successful because they are consistently

25    trying.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Trying to do what?

 2        A.    Sell.

 3        Q.    Did you come into contact with certain

 4   salespeople more than others?

 5        A.    I don't recall there being a person that I

 6   was in contact more or less.

 7        Q.    Do you recall ever having to admonish

 8   anybody in sales about contacting you?

 9              MS. KOSKI:  Object to form.

10        A.    We have had instances over the course of

11   time where we felt it was inappropriate for them to

12   contact us, like if we made a decision and they

13   wanted us to revisit a decision or they just wanted

14   to vent.  Those types of things, we considered

15   inappropriate contact.

16        Q.    Who is "we"?

17        A.    The compliance department.

18        Q.    Were there any written policies in place

19   that you're aware of related to sales correspondence

20   with compliance?

21        A.    Not written policies, no.

22        Q.    How would a salesperson know what their

23   responsibilities were for communicating with

24   compliance?

25              MS. KOSKI:  Object to form.
```

```
 1       A.    There were discussions with the heads of the

 2   compliance department, with the heads of the sales

 3   floor, and the department managers within the sales

 4   floor.

 5       Q.    Were any of those your primary contact as a

 6   DEA analyst?

 7            MS. KOSKI:  Object to form.

 8       A.    Sorry, I'm not following.

 9       Q.    Would you talk to salespeople directly or

10   were there certain people within sales as a

11   compliance analyst you corresponded with more

12   frequently?

13       A.    We tried to funnel requests that reached

14   compliance through their managers.  And that is why

15   the Remedy task management system was created, so

16   that there was less communication verbally or

17   through e-mail with a rep and that it was through

18   that queue.

19       Q.    Were there certain managers that you worked

20   with more frequently than others?

21       A.    When I became a senior analyst, I worked a

22   lot on corporate accounts.  And other than that, if

23   I was involved with pharmacy, we asked to be dealing

24   with management.

25       Q.    And why would you ask to be dealing with
```

Highly Confidential - Subject to Further Confidentiality Review

 1    management?

 2        A.   So that they can funnel what was coming to

 3    us.

 4        Q.   What do you mean by funnel?

 5        A.   Is it something that compliance needs to be

 6    looking at.

 7             (Anda - Solis Exhibit 13 was marked for

 8    identification.)

 9    BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2      Q.   Did you tell customers when they were cut

3   off from purchasing controls?

4      A.   We had the sales reps tell the customers

5   that they were cut off for controls.

6      Q.   Would you tell them why?

7      A.   No.

8      Q.   Why not?

9      A.   I don't think that they should know why we

10   made a decision or not.

11      Q.   Why not?

12      A.   Because that's compliance.

13      Q.   What does that have to do with anything?

14      A.   Why should they know why we decide not to do

15   business with them?

16         MS. KOSKI:  If you get to a natural break,

17      we've been going about two hours, I think, if we

18      wanted to take a break.

19         MS. ELLIS:  We can break.

20         MS. KOSKI:  I don't want to interrupt your

21      flow.

22         MS. ELLIS:  No, we can break.  That's fine.

23         THE VIDEOGRAPHER:  The time is 4:50 p.m.

24      We're going off the record.

25         (Recess from 4:50 p.m. until 5:05 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  The time is 5:05 p.m.

 2      We're now back on the record.

 3   BY MS. ELLIS:

 4      Q.   A moment ago you used the word preallocation

 5   in talking about chain stores.

 6           What does that mean?

 7      A.   It's not relating to chain stores.  Are you

 8   referring to the SOM system and the programming?

 9      Q.   I don't know.  I guess that's what I'm

10   asking for clarification on is what does

11   preallocation mean to you?

12      A.   It has to do with the, like, logistics in

13   the warehouse.  So if an order is flagged in SOMs as

14   an order of interest, it's possible that something

15   is ordered preallocation which means it hasn't

16   allocated to be actually picked and shipped.  And at

17   that point in time, preallocated, it was being

18   reviewed by compliance.

19           Should it have been -- had gone through --

20   past the preallocation portion, we could have seen

21   that there was no inventory on the item that was

22   appearing in the ordering bucket.

23      Q.   So it's a way of saving inventory for orders

24   that you know are going to come in?

25      A.   No.  No.  This is something that is more of
```

Highly Confidential - Subject to Further Confidentiality Review

1    a warehouse -- it was -- it was something that was

2    related to the warehouse, and I don't know why the

3    legacy SOMs was programmed in that way.

4         So where items that were preallocated or

5    orders that were preallocated were actually

6    appearing to be reviewed by suspicious order

7    monitoring.  Had they gone the next step past

8    preallocation in the warehouse, it would be

9    determined that there was no inventory or it was a

10   bad item, yet it was still appearing as if it was a

11   legitimate order in the suspicious order monitoring

12   queue.

13   Q.   So are orders set -- this is apart from the

14   topic of preallocation for a minute.

15        Are orders -- or, pardon me -- limits for

16   particular stores or customers set automatically on

17   any occasions?

18   A.   Like automatically, meaning?

19   Q.   I mean, are there certain occasions where

20   you just know that a customer's limit is going to be

21   a certain amount?

22        MS. KOSKI:  Object to form.

23   A.   It's not that you know that it's going to be

24   a certain amount, but if you're familiar -- for

25   example, with a chain customer who is coming to you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specifically for certain items, specifically for a

 2    certain reason, and you understand that those stores

 3    are coming to you for those items and that reasons,

 4    after you've reviewed the group, then you know

 5    what -- where you would set your limit for those

 6    items should they be approved.

 7              (Anda - Solis Exhibit 14 was marked for

 8    identification.)

 9    BY MS. ELLIS:

10        Q.   I'm handing you what's been marked as

11    Exhibit 14.

12              MS. ELLIS:  I'll represent to counsel that

13         the Bates number for some reason didn't print on

14         the bottom, but it is Anda_Opioids_MDL 711769 and

15         we will supplement the record with the court

16         reporter to ensure that they get the correct

17         version that has the Bates number on it.

18              MS. KOSKI:  711769?

19              MS. ELLIS:  Yes.

20              MS. KOSKI:  Okay.  And it's an Anda

21         obviously?

22              MS. ELLIS:  It is an Anda document, correct.

23    BY MS. ELLIS:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

10      Q.    What does it mean?

11      A.    I can interpret what that -- those words

12   mean, good faith dispensing.

13      Q.    What do you understand it to mean, please?

14      A.    I would assume that someone has good faith

15   that what is being dispensed is for legitimate

16   purposes.

17      Q.    Are there -- is that a term that you've

18   heard in your position at Anda?

19      A.    I've heard that, yes.

20      Q.    And has anybody explained it to you in that

21   way, the way that you just explained it?

22      A.    No.

23      Q.    At some point in your time in Anda

24   compliance, were you in charge of a program called

25   CQDD project?

1      A.   Yes.  That's what we were speaking about

2   earlier, which was auditing.

3      Q.   And was that an ongoing project?

4      A.   Yes.

5      Q.   What was the goal of that project?

6      A.   To collect updated data on our customer

7   base.

8      Q.   Was there a number of customers that you did

9   not have updated data for?

10     A.   There was a number of customers that were

11  targeted as we needed updated data, yes.

12     Q.   But they were still eligible to purchase

13  controls; is that right?

14     A.   Yes.

15          (Anda - Solis Exhibit 15 was marked for

16  identification.)

17  BY MS. ELLIS:

18     Q.   I'm handing you what's been marked as

19  Exhibit 15.

20          MS. KOSKI:  You can just make a pile.  Thank

21      you.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6      Q.   And what would happen if a customer -- you

7   did not have updated data for a customer?

8      A.   So because our order monitoring is many

9   facets, we would then monitor their orders.  And if

10   something stuck out to us in their ordering pattern,

11   it would also require that we collect updated data.

12         (Anda - Solis Exhibit 16 was marked for

13   identification.)

14   BY MS. ELLIS:





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

2      Q.   Client compliance is in charge of

3    determining whether you can buy controls or not,

4    right?

5      A.   Yes.

25           MS. KOSKI:  Just for the record, you have an

Highly Confidential - Subject to Further Confidentiality Review

```
 1      attachment that just says it was produced in

 2      native, but you didn't include the substance of

 3      the attachment, right?  Is that what you meant to

 4      do?  It just says --

 5          MS. ELLIS:  Yes.  The attachments that are

 6      included in native format -- and we will

 7      supplement the record as we have done in previous

 8      depositions -- with the actual Excel spreadsheet,

 9      and we can send those to you afterward but

10      they're not printable.

11          MS. KOSKI:  Sure.

12          MS. ELLIS:  Because they're very large.

13          MS. KOSKI:  Yeah, I just figured you just

14      haven't shown it to her.  I just want to make

15      sure it's clear on the record she doesn't have

16      the spreadsheet attached, so she can't look at it

17      to refer to it.

18  BY MS. ELLIS:
```

Highly Confidential - Subject to Further Confidentiality Review



14      Q.   Okay.  You said a moment ago that there was

15   a substantial amount of -- let me go back and read

16   it so I get it right.

17           You said you were giving an extension

18   sometimes and communicating with sales because this

19   is a very large initiative of data collection.

20           Is it fair -- is it fair to say that that

21   means that there was a fair amount of accounts

22   that -- or a large amount of accounts, to use your

23   words, that you needed up-to-date data for?

24      A.   There was a large amount of customers that

25   we were going after for various reasons to collect

```
 1    updated data for.  So I don't know how many of them

 2    exactly didn't have data, but we were going after

 3    customers for a variety of different reasons.

 4         Q.   And you were collecting a substantial amount

 5    of information that you did not previously have in

 6    the system; is that right?

 7              MS. KOSKI:  Object to form.

 8         A.   That's not necessarily the case, but when we

 9    were going after different segments of our customer

10    base, we were collecting and bringing in a large

11    amount of data due to that initiative.

12         Q.   Was this called the customer questionnaire

13    project?

14         A.   Yes.

15              (Anda - Solis Exhibit 17 was marked for

16    identification.)

17    BY MS. ELLIS:
```

Highly Confidential - Subject to Further Confidentiality Review



1     Q.   So at that time it says:  9,624 customers

2     that no questionnaire yet were flagged as yes for

3     being able to purchase controls; is that right?

4     A.   Yes.

5     Q.   So it's your testimony today that that's the

6     standard that the Anda leadership wanted to keep

7     once they brought you into compliance?

8     A.   Yes.

9     Q.   They wanted to keep that large number of

10    customers as being flagged for yes yet not having

11    customer questionnaires on file?

12    A.   No, that's not what I was saying.  I'm

13    saying the department wanted to collect updated

14    questionnaires on the customer base.

15    Q.   Because at that time there were nearly

16    10,000 customers that were allowed to buy controls

17    within TPS, yet there was no customer questionnaire

18    on file for them?

19    A.   They were eligible to buy controls, but as

20    we talked about, previous to this e-mail, a lot of

21    them were not even actively buying from Anda.

22    Q.   But if a -- if they attempted to purchase a

23    control from Anda and a compliance analyst went into

24    the TPS program and looked at whether they were

25    eligible for it, they would see the flag as yes,

1    correct?

2        A.    Yes.

3        Q.    And that would, as we discussed before,

4    potentially shorten the time that they would take to

5    review an order for controls to be approved or not?

6        MS. KOSKI:   Object to form.

7        A.    No.   We don't ever look at the control flag

8    and make a determination that it's going to take a

9    shorter amount of time because they are flagged Y.

10   And that's why we delve into the other procedures

11   where our review process kicks in and we look at

12   what is the item the customer is ordering, who is

13   the customer, and what is the quantity they are

14   ordering.

15       Q.    That 9,624 number did not even include

16   chains, did it?

17       A.    No.

18       Q.    So there were, in fact, more than 9,624

19   customers in October of -- I guess that was in 2011

20   that were eligible for controls but there was none

21   of the -- no questionnaire on file for them?

22       MS. KOSKI:   Object to form.

23       Go ahead.

24   BY MS. ELLIS:

25       Q.    Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

9       Q.   If a customer was eligible to purchase

10   controls and placed an order for controls in TPS --

11   let me ask that a different way.

12           If a customer was not eligible to purchase

13   controls but purchased or placed an order for

14   controls, that would make it an order of interest,

15   correct?

16           MS. KOSKI:  Object to form.

17       A.   They wouldn't be able to place an order if

18   they are not eligible for controls.

19       Q.   So unless the flag was yes, they would not

20   be able to place the order is what you're saying?

21       A.   Correct.

22       Q.   So this allowed customers to -- the yes flag

23   within TPS allowed the customer to be able to place

24   the order in the first place?

25       A.   They could place the order and then most --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that would go then to another process of reviewing

 2    an order if it was flagged an order of interest.
```

10    Q.   And so presumably if there are more

11    people -- or more customers that are flagged yes for

12    controls and able to place orders for controlled

13    substances, that might lead to more orders of

14    interest being generated in the TPS program.

15         Is that fair?

16    A.   No, because just -- even though they are

17    flagged Y, that doesn't necessarily indicate that

18    should they buy from us and we didn't have data,

19    that what they would buy would stand out to us as

20    being an order of interest.

21    Q.   Then why would you want to cut them down?

22    A.   Simply because we were trying to collect

23    updated data on these customers.

24    Q.   So what you're saying is that even though

25    you didn't have the updated data, because their flag

Highly Confidential - Subject to Further Confidentiality Review

 1    was yes, an order would not necessarily be

 2    determined by the system to be an order of interest?

 3        A.    No.

 4            I was saying that if they were flagged Y,

 5    regardless of any information that we had on file,

 6    the order would still go through the regular process

 7    of review, and then we would still be reviewing what

 8    was consistent -- what the order consisted of.

 9        Q.    Okay.  So they were flagged yes, correct, in

10    the system, in TPS?

11        A.    That's -- yes.  That line is saying that.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

20          (Anda - Solis Exhibit 18 was marked for

21     identification.)

22     BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8       Q.   Did you ever do a comparison of your SOM --

9    I'm sorry, Anda's SOM processes to any of your

10   competitors' or other people in the controlled

11   substance distribution or manufacturing space?

12      A.   That wasn't something that I was involved in

13   if it happened.

14      Q.   Is it something you would take an interest

15   in if you became aware of it?

16          MS. KOSKI:  Object to form.

17      A.   I always think it's possible for the entry

18   to work together.

19          (Anda - Solis Exhibit 19 was marked for

20   identification.)

21   BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



24       Q.   At this point in time, do you recall any

25    internal meetings related to Anda's SOM process and

Highly Confidential - Subject to Further Confidentiality Review

1    potential changes to it?

2            MS. KOSKI:  Object to form.

3       A.   Our department is always looking for ways of

4    enhancing processes.

5       Q.   You don't remember specifically at this

6    point any conversations related to changing the SOM

7    process?

8            MS. KOSKI:  Object to form.

9       A.   I know that there was always discussions

10   about enhancing.  I don't know when they took place.

11           (Anda - Solis Exhibit 20 was marked for

12   identification.)

13   BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17      Q.    You would agree that at least in 2017 you

18    were aware that there was an obligation to report

19    the specific orders to the DEA and not just

20    customers, right?

21          MS. KOSKI:   Object to form.

22      A.    Yes, I know that there was an ask to report

23    orders.

24      Q.    And you knew that that was an ask previous

25    in time to that point, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And you know that Anda had not been doing

 3   that, correct?

 4             MS. KOSKI:  Object to form.

 5        A.   I don't know --

 6             MS. KOSKI:  Time period.

 7        A.   -- the specifics of what took place all

 8   throughout the period of time.  I know that we were

 9   always in communication with the DEA about our

10   customer reviews.

11        Q.   You were on e-mails that were sent to the

12   DEA with suspicious customers, right?

13        A.   Yes.  Oh, no.  I would, at that point in

14   time, submit customers to be reported.  I don't

15   believe at this period in time I was the one that

16   was communicating and doing the reporting.

17        Q.   But you were at least cc'd or on the e-mails

18   throughout your period or throughout your time in

19   the Anda compliance department on e-mails that were

20   sent to the DEA, right?

21        A.   There was a period of time where I was not

22   cc'd on the communication.  Today, I am.

23        Q.   There was a period of time up until 2017

24   where you were cc'd on the communication, right?

25        A.   There is a possibility that I was, but there
```

Highly Confidential - Subject to Further Confidentiality Review

1    is also -- I don't know the date ranges.  There was

2    a time period where I was not cc'd on it.

3              (Anda - Solis Exhibit 21 was marked for

4    identification.)

5    BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6      Q.   And it's your understanding, per your

7   testimony earlier today, that that's one of the

8   requirements of federal law, that you know your

9   customers, right?

10         MS. KOSKI:   Object to form; mischaracterize

11      her testimony.

12      A.   It's one of the asks, yes.

13      Q.   It's one of the asks and it's one of the

14   responsibilities of Anda's compliance department,

15   right?

16      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

        4          MS. ELLIS:  I'm going to take a minute here
        5      to take a quick break.  And we'll probably wrap
        6      up after the next break, but I just want to get a
        7      couple of things organized first.
        8          MS. KOSKI:  Okay.
        9          THE VIDEOGRAPHER:  The time is 5:50 p.m.
       10      We're going off the record.
       11          (Recess from 5:50 p.m. until 6:04 p.m.)
       12          THE VIDEOGRAPHER:  The time is 6:04 p.m.
       13      We're now back on the record.
       14    BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3      Q.    Throughout your time in the compliance

4   department, were you -- how were you made aware of

5   what was being reported to the DEA at what time?

6           MS. KOSKI:   Object to form.

7      Q.    If at all.

8      A.    I'm not following how I was made aware.   I

9   know that it was -- if an analyst reviewed a

10  customer at any point in time and we determined that

11  we would not sell to them or we would discontinue

12  selling to them, we notified the DEA.

13     Q.    And sometimes you were on that list and

14  sometimes you were not, right?

15     A.    There was a period of time that I was not on

16  the list.   I am today.

17     Q.    There was a period of time when you were on

18  the list, right?

19     A.    Yes.

20     Q.    Have you seen the list before?

21     A.    That we report to the DEA?

22     Q.    Yes?

23     A.    Yes.

24     Q.    Do you know where that list was in the Anda

25  systems?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. KOSKI:  Object to form.

 2       A.   Not at all times during the time I've worked

 3   at Anda.  I do today, yes.

 4       Q.   Is it your understanding that up until 2017

 5   it was a running spreadsheet that included all

 6   customers that had been reported at any point in

 7   time between, say, 2011 to 2017?

 8       A.   Yes.

 9       Q.   And that that same spreadsheet would be sent

10   over and over to the DEA, just with additional

11   information, right?

12       A.   Yes.

13       Q.   So if you were to look at the last version

14   of the spreadsheet, you could see all reports that

15   had been made prior to that point to the DEA on that

16   spreadsheet, right?

17       A.   Up to a certain time frame today, yes.

18       Q.   And that process, of course, changed when

19   Buzzeo came into effect; is that right?

20                MS. KOSKI:  Object to form.

21       A.   No.  We still notified the DEA with a

22   similar spreadsheet.

23       Q.   But it's a different spreadsheet?  It

24   changed at some point?

25       A.   It changes with updates, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Would you recognize that spreadsheet if I
 2   showed it to you?
 3      A.   Yes.
 4      Q.   Would you say -- is it fair to say that
 5   there was some confusion in the compliance
 6   department about who was to be reported or what
 7   customers were to be reported to the DEA at what
 8   point in time?
 9           MS. KOSKI:  Object to form.
10      A.   I wouldn't use the word confusion.  I think
11   that there has been discussions about who should be
12   reported.
13      Q.   Would you agree that it has not been
14   consistent throughout your time in the compliance
15   department about who was report -- or what customers
16   were reported at what time?
17           MS. KOSKI:  Object to form.
18      A.   I don't know if it's consistency because
19   it's due to who is reviewing the customer and what
20   they determine should be reported.
21           So, for example, if you're reviewing a
22   customer and you deny them controls at this period
23   of time because you don't have enough information to
24   make a conclusion, would you notify the DEA that
25   you're not selling to them just because you wanted
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    more time, or are you going to notify the DEA of

2    someone that as of this moment you would not sell

3    to?

4              That's the type of conversations we've had.

5              (Anda - Solis Exhibit 22 was marked for

6    identification.)

7    BY MS. ELLIS:

8         Q.   I'm handing you what's been marked as

9    Exhibit 22.

10             Is that right?

11             MS. ELLIS:  Is that right?

12             MS. KOSKI:  Yes.

13        A.   Yes.

14        Q.   Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

23          (Anda - Solis Exhibit 23 was marked for

24     identification.)

25     BY MS. ELLIS:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

7          (Anda - Solis Exhibit 24 was marked for

8     identification.)

9     BY MS. ELLIS:

15     Q.   Take a moment.

16     A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1              (Anda - Solis Exhibit 25 was marked for

2      identification.)

3      BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

15          (Anda - Solis Exhibit 26 was marked for

16     identification.)

17     BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3      Q.   You testified earlier that within the

4   compliance -- or within the -- pardon me, the notes

5   field of TPS that it would include the customer

6   reported to the DEA, right?

7      A.   If a person did make that entry, yes, it

8   would be found there.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
12              MS. ELLIS:  I just want to take a quick

13      break.

14              THE VIDEOGRAPHER:  Off the record at 6:42.

15              (Recess from 6:42 p.m. until 6:46 p.m.)

16              THE VIDEOGRAPHER:  The time is 6:46 p.m.

17      We're now back on the record.

18      BY MS. ELLIS:

19      Q.  Can you go back to Exhibit 1, Sabrina,

20      please.

21              Is it fair to say you did nothing to prepare

22      to access your TPS or Remedy accounts from this

23      deposition here today?

24              MS. KOSKI:  Object to form.

25      A.  I'm not understanding the question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Did you do anything prior to coming to

 2   today's deposition so that you could access TPS or

 3   Remedy from the deposition today?

 4        A.   No.  I don't know, other than working.  I

 5   don't understand.

 6        Q.   You didn't bring a laptop with you?

 7        A.   No.

 8        Q.   You didn't make sure that you had the

 9   website address that you could go to so you could

10   log into the system?

11        A.   I don't have that with me, no.

12        Q.   You didn't bring anything like that with

13   you, right?

14        A.   No.

15        Q.   Do you see in the deposition notice where it

16   says that you're requested to produce access to

17   Anda's Turning Point system and Remedy system there?

18        A.   As mentioned, when you first gave it to me,

19   it was my first time seeing it.

20        Q.   But you do see that that's there now, right?

21        A.   Yes.

22             (Anda - Solis Exhibit 27 was marked for

23   identification.)

24   BY MS. ELLIS:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3            MS. ELLIS:  I have no further questions.

4            MS. KOSKI:  Good news.  I don't have any

5       questions.  This is Katy.

6            Anyone in the room have further questions?

7            Anyone on the phone have any questions for

8       the witness?

9            Hearing none, we're adjourned.

10            THE VIDEOGRAPHER:  The time is 6:51 p.m.

11       This marks the end of the deposition.

12            (Whereupon, the deposition concluded at

13       6:51 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2          I, SUSAN D. WASILEWSKI, Registered

 3   Professional Reporter, Certified Realtime Reporter

 4   and Certified Realtime Captioner, do hereby certify

 5   that, pursuant to notice, the deposition of SABRINA

 6   SOLIS was duly taken on Thursday, January 10, 2019,

 7   at 10:27 a.m. before me.

 8          The said SABRINA SOLIS was duly sworn by me

 9   according to law to tell the truth, the whole truth

10   and nothing but the truth and thereupon did testify

11   as set forth in the above transcript of testimony.

12   The testimony was taken down stenographically by me.

13   I do further certify that the above deposition is

14   full, complete, and a true record of all the

15   testimony given by the said witness, and that a

16   review of the transcript was requested.

17

18   _____

19   Susan D. Wasilewski, RPR, CRR, CCP

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5      and make any necessary corrections.  You should

 6      state the reason in the appropriate space on the

 7      errata sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10      and date it.  It will be attached to your

11      deposition.

12

13           It is imperative that you return the

14      original errata sheet to the deposing attorney

15      within thirty (30) days of receipt of the deposition

16      transcript by you.  If you fail to do so, the

17      deposition transcript may be deemed to be accurate

18      and may be used in court.

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                    E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON:  _____

 7    _____   _____   _____

 8       REASON:  _____

 9    _____   _____   _____

10       REASON:  _____

11    _____   _____   _____

12       REASON:  _____

13    _____   _____   _____

14       REASON:  _____

15    _____   _____   _____

16       REASON:  _____

17    _____   _____   _____

18       REASON:  _____

19    _____   _____   _____

20       REASON:  _____

21    _____   _____   _____

22       REASON:  _____

23    _____   _____   _____

24       REASON:  _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3        I, _____, do hereby

 4    acknowledge that I have read the foregoing pages, 1

 5    through 362, and that the same is a correct

 6    transcription of the answers given by me to the

 7    questions therein propounded, except for the

 8    corrections or changes in form or substance, if any,

 9    noted in the attached Errata Sheet.

10

11

12    _____      _____

13    SABRINA SOLIS                               DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20____.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                              LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____   _____

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25
```