Highly Confidential - Subject to Further Confidentiality Review

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4

5     ---------------------------x

6     IN RE: NATIONAL PRESCRIPTION ) MDL No. 2804

7     LITIGATION                   ) Case No. 17-md-2804

8     This document relates to:    ) Hon. Dan A. Polster

9     All Cases                    )

10    ---------------------------x

11         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12                 CONFIDENTIALITY REVIEW

13      VIDEOTAPED DEPOSITION OF TINA STEFFANIE-OAK

14                  YORK, PENNSYLVANIA

15                MONDAY, MARCH 11, 2019

16                     9:34 A.M.

17

18

19

20

21

22

23

24    Reported by: Leslie A. Todd

Page 2

1  Deposition of TINA STEFFANIE-OAK, held at
2  the offices of:
3
4
5
6
7      BARLEY SNYDER
8      100 East Market Street
9      York, Pennsylvania 17401
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1  APPEARANCES (Continued):
2
3  ON BEHALF OF WALMART CORPORATION:
4      PAIGE E. ZIELINSKI, ESQUIRE (Telephonically)
5      JONES DAY
6      555 California Street, 26th Floor
7      San Francisco, California 94104
8      (415) 875-5788
9
10  ON BEHALF OF McKESSON CORPORATION:
11     ALEJANDRO BARRIENTOS, ESQUIRE (Telephonically)
12     COVINGTON & BURLING, LLP
13     850 10th Street, Northwest
14     Washington, DC 20001
15     (202) 662-6000
16
17  ON BEHALF OF HBC SERVICES:
18     PAUL M. MANNIX, ESQUIRE (Telephonically)
19     MARCUS & SHAPIRA, LLP
20     One Oxford Centre, 35th Floor
21     Pittsburgh, Pennsylvania 15219
22     (412) 471-3490
23
24

Page 3

1      A P P E A R A N C E S
2
3  ON BEHALF OF PLAINTIFFS:
4      DONALD A. MIGLIORI, ESQUIRE
5      MOTLEY RICE, LLC
6      28 Bridgeside Boulevard
7      Mount Pleasant, South Carolina 29464
8      (843) 216-9000
9
10  ON BEHALF OF HENRY SCHEIN, INC.:
11     LAUREN MORGAN FINCHER, ESQUIRE
12     JOHN P. MCDONALD, ESQUIRE
13     LOCKE LORD LLP
14     600 Congress Avenue, Suite 2200
15     Austin, Texas 78701
16     (512) 305-4700
17
18  ON BEHALF OF THE WITNESS:
19     JUSTIN A. TOMEVI, ESQUIRE
20     BARLEY SNYDER
21     100 East Market Street
22     York, Pennsylvania 17401
23     (717) 852-4977
24

Page 5

1  APPEARANCES (Continued):
2
3  ON BEHALF OF AMERISOURCEBERGEN DRUG CORPORATION:
4      SYLVIA WINSTON NICHOLS, ESQUIRE (Telephonically)
5      JACKSON KELLY, PLLC
6      150 Clay Street
7      Suite 500
8      Morgantown, West Virginia 26501
9      (304) 284-4138
10
11  ALSO PRESENT:
12     CHRIS RITONA (Videographer)
13
14
15
16
17
18
19
20
21
22
23
24

Page 6

## CONTENTS

1  C O N T E N T S
2  EXAMINATION OF TINA STEFFANIE-OAK          PAGE
3   By Mr. Migliori                          12
4
5
6        E X H I B I T S
7      (Attached to transcript)
8  STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE
9  No. 1    Plaintiffs' Amended Notice of Oral
10      Videotaped Deposition of Tina
11      Steffanie-Oak as Fact Witness for
12      Defendant Henry Schein              14
13  No. 2    Henry Schein personnel file for
14      Tina Steffanie-Oak, Bates
15      HSI-MDL-00642956 to 00642995        21
16  No. 3    Henry Schein Inc. Export Compliance
17      Program, Corporate Procedural
18      Manual HSI-MDL-00170080 to
19      00170108                           27
20  No. 4    2012 Performance Appraisal for
21      Tina Steffanie-Oak, Bates
22      HSI-MDL-00643039 to 00643043       38
23  No. 5    E-mail re Need 3 embers, Bates
24      HSI-MDL-00552881 to 00552883       68

Page 7

1        E X H I B I T S (Continued)
2      (Attached to transcript)
3  STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE
4  No. 6    Henry Schein Regulatory affairs,
5      October 2017 Report, Regulatory
6      Affairs - Sergio Tejeda, Bates
7      HSI-MDL-00569496                   86
8  No. 7    Industry Compliance Guidelines,
9      Healthcare Distribution Management
10      Association (HDMA) Industry
11      Compliance Guidelines: Reporting
12      Suspicious Orders and Preventing
13      Diversion of Controlled Substances,
14      Bates HSI-MDL-00063613 to 0063627   91
15  No. 8    Schein SOM Procedural Review,
16      Prepared for Henry Schein, Bates
17      HSI-MDL-00404369 to 00404373      107
18  No. 9    Interoffice Memorandum dated
19      February 14, 2014, Subject: Meeting
20      Minutes from our February 11, 2014
21      Review of the SOM audit findings,
22      Bates HSI-MDL-00622219 to 00622224  119
23
24

Page 8

1        E X H I B I T S (Continued)
2      (Attached to transcript)
3  STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE
4  No. 10    Interoffice Memorandum dated
5      December 23, 2013, Subject:
6      Regulatory Internal Assessment of
7      our DEA Suspicious Order
8      Monitoring/Know Your Customer
9      Systems and Procedures,
10      Bates HSI-MDL-00622244 to 00622250
11      and 00621989 to 00621996          122
12  No. 11    PowerPoint presentation entitled
13      "Individual Opportunity/Issue,"
14      Presented by Tina Steffanie-Oak,
15      Bates HSI-MDL-00072607            133
16  No. 12    2013 Performance Appraisal for
17      Tina Steffanie-Oak, Bates HSI-MDL-
18      00643069 to 00643073              150
19  No. 13    DEA Compliance Update, May 12, 2014,
20      Bates HSI-MDL-00602191 to 00602193  159
21  No. 14    2014 Performance Appraisal for Tina
22      Steffanie-Oak, Bates HSI-MDL-00643077
23      to 00643082                       167
24

Page 9

1        E X H I B I T S (Continued)
2      (Attached to transcript)
3  STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE
4  No. 15    E-mail re JDE 2316982 Frank Spendel -
5      do not notify DEA, Bates HSI-MDL-
6      0003834                           173
7  No. 16    Code of Federal Regulations, Title 21
8      Food and Drugs, Chapter II. Drug
9      Enforcement Administration,
10      Department of Justice, Part 1301.
11      Registration of Manufacturers,
12      Distributors, and Dispensers of
13      Controlled Substances, Security
14      Requirements                      182
15  No. 17    Henry Schein Inc. Follow Up Action
16      Report (FUAR) - Suspicious Order
17      Monitoring, May 19, 2014, Bates
18      HSI-MDL-00623318 to 00623325      186
19  No. 18    2015 Performance Appraisal for Tina
20      Steffanie-Oak, Bates HSI-MDL-
21      00643092 to 00643097              194
22  No. 19    Customer Service Imaging, Bates
23      HSI-MDL-00001198 to 00001210      197
24

Page 10

1    E X H I B I T S (Continued)

2    (Attached to transcript)

3 STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE

4 No. 20    E-mail string re Charles P.

5    Virden - JDE 692579, Bates

6    HSI-MDL-00581110 to 00581111    227

7 No. 21    E-mail re Conduct Expectation -

8    2nd Verbal Warning, Bates HSI-MDL-

9    00643112 to 00643113    234

10 No. 22    Exit Interview, Bates HSI-MDL-

11    00643108 to 00643109    236

12 No. 23    Letter of Resignation, Bates

13    HSI-MDL-00643121    239

14

15

16

17

18

19

20

21

22

23

24

Page 11

1    P R O C E E D I N G S

2    -------------------

3    THE VIDEOGRAPHER:  We are now on the

4 record.  My name is Chris Ritona.  I'm the

5 videographer with Golkow Litigation Services.

6 Today's date is March 11, 2019, and the time is

7 approximately 9:34 a.m.

8    This video deposition is being held at

9 Barley Snyder, 100 East Market Street, York, PA,

10 in the matter of National Prescription Opiate

11 Litigation, MDL No. 2804, Case No. 17-md-2804, for

12 the court of -- for the United States District

13 Court, Northern District of Ohio, Eastern

14 Division.

15    The deponent today is Tina

16 Steffanie-Oak.

17    And will all counsel please identify

18 themselves for the record.

19    MR. MIGLIORI:  Good morning.  Donald

20 Migliori from Motley Rice on behalf of the

21 plaintiff.

22    MR. TOMEVI:  Justin Tomevi from Barley

23 Snyder on behalf of the witness.

24    MS. FINCHER:  Lauren Fincher from Locke

Page 12

1 Lord on behalf of Henry Schein.

2    MS. McDONALD:  John McDonald from Locke

3 Lord on behalf of Henry Schein.

4    THE VIDEOGRAPHER:  The court reporter

5 today is Leslie Todd, and she will now please

6 swear in the witness.

7    MR. BARRIENTOS:  I'm sorry, you have

8 counsel on the phone.

9    THE VIDEOGRAPHER:  Oh, my apologies.  Go

10 ahead.

11    MR. BARRIENTOS:  This is Alejandro

12 Barrientos from Covington & Burling for McKesson.

13    MR. MANNIX:  Paul Mannix with Marcus &

14 Shapira for HBC Services.

15    MS. WINSTON:  Sylvia Winston for

16 AmerisourceBergen Drug Corporation from Jackson

17 Kelly.

18    THE VIDEOGRAPHER:  Anyone else?  Okay.

19    TINA STEFFANIE-OAK,

20    and having been first duly sworn,

21    was examined and testified as follows:

22    EXAMINATION

23 BY MR. MIGLIORI:

24    Q   Good morning.

Page 13

1    A   Good morning.

2    Q   My name is Don Migliori.  I will be

3 asking you questions today.

4    I think we're situated in a way where we

5 should be able to hear each other pretty well, but

6 if you don't hear me or if you don't understand my

7 question, just let me know --

8    A   Okay.

9    Q   -- and I'll rephrase.

10    Have you ever had your deposition taken

11 before?

12    A   No.

13    Q   Okay.  The most important rule for you

14 is the court reporter is taking both of our words

15 down.  So it's critically important to not speak

16 until I'm finished, and I'll do the same for you.

17    A   Okay.

18    Q   It will also give your counsel an

19 opportunity to interpose an objection if necessary

20 and give you instruction if necessary.

21    But if you answer my question, I'll

22 assume you've understood it.  Okay?

23    A   Yes.

24    Q   Okay.  The other helpful tip is that

Page 14

1  gestures are not easily recorded, so I'll just ask
2  you to verbally respond.  If it's yes, please say
3  "yes"; no, "no," and then the like.
4      Do you have any questions before we get
5  started?
6      A    No.
7      (Steffanie-Oak Exhibit No. 1 was
8      marked for identification.)
9  BY MR. MIGLIORI:
10     Q    Okay.  Let me show you what's been
11 marked as Exhibit 1.  This is just the notice for
12 today.  The copy I give you will be the one with
13 the blue sticker.
14     A    Okay.
15     Q    And then I'll pass out copies to other
16 folks.
17     You understand you're here today in
18 litigation that's pending in the Northern District
19 of Ohio?
20     A    Yes.
21     Q    Okay.  And we're going to primarily be
22 speaking about your time working at Henry Schein.
23     When were you received -- or when did
24 you receive notice of this deposition?

Page 15

1      A    January.  This January.
2      Q    Okay.  And who contacted you about that?
3      A    I first was contacted by Sergio Tejeda
4  of Henry Schein to let me know that there was a
5  chance that I may be called for a deposition, and
6  had given Henry Schein counsel my phone number to
7  contact me, and then Margie Hahn reached out to me
8  in January.
9      Q    Okay.  And did you talk substantively
10 with Mr. Tejeda about your testimony?
11     A    No.
12     Q    And then you said Margie contacted you
13 later?
14     A    Correct.
15     Q    And when you spoke with Margie, was
16 anything substantive discussed about your
17 testimony?
18     A    No.
19     Q    When was the first time you met with any
20 counsel to talk about the substance of your
21 testimony?
22     A    Yesterday.
23     Q    And who did you speak with?
24     A    I spoke with my attorney, Justin, and

Page 16

1  then also counsel from Locke Lord, John and
2  Lauren.
3      Q    How long did you meet yesterday?
4      A    Five hours.
5      Q    And what did you review?  Generally
6  speaking.
7      A    Just some documentation.
8      Q    Was the documentation provided to you to
9  review?
10     A    Yes.
11     Q    Did you bring anything with you to
12 review?
13     A    No.
14     Q    Did you review any testimony of prior
15 witnesses?
16     A    No.
17     Q    You didn't read any transcripts --
18     A    No.
19     Q    -- or any -- did you speak to any other
20 people at Henry Schein about your testimony today?
21     A    No.
22     Q    Other than the five hours you spent
23 yesterday and the documents that you reviewed, did
24 you do any other preparation for today?

Page 17

1      A    No.
2      Q    You're here represented by counsel,
3  correct?
4      A    Correct.
5      Q    And how did you retain counsel?
6      A    Through Henry Schein.
7      Q    Okay.  So you had no prior relationship
8  with your counsel before this deposition?
9      A    Correct.
10     Q    And I assume Henry Schein is paying for
11 your counsel to be here?
12     A    Correct.
13     Q    Okay.  Let's start by having you again,
14 could you please tell the jury your full name and
15 where you reside.
16     A    Sure.  Tina Steffanie-Oak, and I reside
17 in Mount Wolf, Pennsylvania.
18     Q    Who is your employer?
19     A    Integra Life Sciences.
20     Q    And what's your job?
21     A    International Regulatory Affairs
22 manager.
23     Q    Generally speaking, what does that mean?
24     A    I work for a medical device firm, so I

Page 18

1　assist with product registrations to market
2　products in countries outside the U.S.
3　　Q　In your current position, do you do any
4　work with pharmaceuticals?
5　　A　No.
6　　Q　And you started this job when?  When did
7　you start this job?
8　　A　At Henry Schein?
9　　Q　No, this job here.
10　　A　This particular job?
11　　Q　Yeah.
12　　A　2012.  March 2012.
13　　Q　And you --
14　　　MR. McDONALD:  Well, let me just tell
15　you, Don, I think she --
16　　　MR. MIGLIORI:  Yeah, I think she'd
17　have -- yeah.
18　BY MR. MIGLIORI:
19　　Q　When did -- when did you start your job
20　with your current employer?
21　　A　Oh, I'm sorry.  With my current employer
22　was November 17, 2016.
23　　Q　And was that immediately after you
24　resigned from Henry Schein?

Page 19

1　　A　Yes, it was.
2　　Q　Now, you started at Henry Schein in
3　2004?
4　　A　Correct.
5　　Q　All right.  So we'll spend most of today
6　talking about from 2004, November of 2004 to
7　November of 2016.
8　　　But before we get to that, tell me about
9　your educational background.
10　　A　I have a bachelor's in business
11　management.
12　　Q　From where?
13　　A　From Dowling College.
14　　Q　And when did you graduate?
15　　A　1998, May.
16　　Q　Okay.  And what was your first
17　employment after that?
18　　A　I was -- well, I went to school in the
19　evening, night, so I was employed.
20　　Q　And where were you working?
21　　A　Olympus America.
22　　Q　What were you doing at Olympus?
23　　A　I was an associate manager for a medical
24　device company.

Page 20

1　　Q　And what did --
2　　A　Regulatory affairs.
3　　Q　I'm sorry.  And what did that entail?
4　　A　510(k) submissions, again, related to
5　product approvals in the U.S.; assisting with FDA
6　inspections; writing procedures; approving
7　labeling.
8　　Q　And at that time all of your work was
9　with medical devices?
10　　A　Correct.
11　　Q　Prior to joining Schein, had you done
12　any work in the area of pharmaceuticals?
13　　A　No.
14　　Q　How long did you have the job at
15　Olympus?
16　　A　Almost seven years.
17　　Q　How did you transition from Olympus to
18　Henry Schein?
19　　A　Olympus announced that they were going
20　to be moving their headquarters from Long Island,
21　New York, to Pennsylvania, and at that point in
22　time I wasn't open to relocation.  I wanted to
23　stay on Long Island.  So I searched for open
24　employment, and I received the position at Henry

Page 21

1　Schein.
2　　　(Steffanie-Oak Exhibit No. 2 was
3　　　marked for identification.)
4　BY MR. MIGLIORI:
10　　　If you look on the bottom right corner
11　of these pages, you'll see that there's something
12　called a Bates number, and I'll generally refer to
13　the last three numbers.
14　　　So it says 971 on the page that I'm
15　looking at.  So if you look --
16　　A　Oh, I'm sorry.  Yes.
17　　Q　Okay, we're on the same page?  Okay.
18　　　Is this your application for employment
19　at Schein?
20　　A　Yes.
21　　Q　And this is dated October 8th, 2004.
22　Does that sound to be around the time that you
23　applied for this position?
24　　A　Yes.

Page 22

1    Q   It says "Employment desired," it says
2  "Senior RA Analyst."  Is that correct, on the
3  bottom?
4    A   Correct.
5    Q   What is a senior RA analyst?
6    A   It's not a managerial position so I did
7  not have staff reporting to me, so it was a
8  professional level position.
9    Q   And what were your responsibilities in
10  that position?
11    A   At Henry Schein at that time?
12    Q   Yes, mm-hmm.
13    A   Okay.
14    Q   Well, what -- what is it that you
15  believed you were applying for, what position?
16    A   At the point in time that I actually
17  applied, there wasn't an open job description.  I
18  knew someone who had handed in my resume.  So at
19  that point in time there were -- based on my
20  qualifications and an acquisition that they were
21  dealing with, my skill set was something that they
22  were looking for.  So 510(k) submissions again,
23  helping them understand those.
24    Q   Who was the person that you knew there?

Page 23

1    A   I didn't know him directly.  It was
2  through a colleague at Olympus.  Amit Raksit.
3    Q   And so you applied for this position,
4  and it looks like in your application you
5  reference a couple other earlier employments.
6  From '93 to '98 --
7    A   Yes.
8    Q   -- does it say Qosina?
9    A   Correct.
10    Q   What is that?
11    A   They were a medical component
12  distributor.
13    Q   And what did you do for them?
14    A   I was their quality assurance manager.
15    Q   And those are medical devices?
16    A   Medical components, yes.
17    Q   Were they covered by FDA medical device
18  regulations, as you understand them?
19    A   No.
20    Q   All right.  And what kind of components?
21  What did they go to?
22    A   A lot of components were for the IV
23  sets.
24    Q   Okay.  Again, no pharmaceutical

Page 24

1  background in that position, correct?
2    A   Yes.  Correct.
3    Q   And before that, from 1988 to '93, it
4  says Lanner.  Is that right?
5    A   Langer.
6    Q   Langer.  And what did you do at Langer
7  from '88 to '93?
8    A   I started off as an administrative
9  assistant, and then I was promoted into a -- an
10  associate quality role.  They were also a medical
11  company, and at the time that I was promoted, they
12  were introducing some products that were FDA
13  regulated at that time.
14    Q   Okay.  Again, nothing at Langer that was
15  related to pharmaceuticals, correct?
16    A   Correct.
17    Q   And so it's fair to say that in your
18  employment history prior to joining Henry Schein,
19  you had no experience or background relative to
20  pharmaceuticals or specifically controlled
21  substances, correct?
22    A   Correct.
23    Q   The position that you were hired into --
24  let's see.  I think I'm -- well, let me ask you

Page 25

1  this.  If you turn to the page that's got the
2  Bates numbers 973.  Do you see that?
3    A   Yes.
4    Q   Is this the curriculum vitae that you
5  submitted to Henry Schein when you first applied?
6    A   Yes.
7    Q   And to the best of your recollection,
8  this would describe your work history leading up
9  to that application?
10    A   Yes.
11    Q   And it includes Olympus, Qosina and the
12  Langer Biomechanics Group, correct?
13    A   Yes.
14    Q   All right.  There's a page that ends in
15  976.  Are you on that page?
16    A   Yes, I am.
17    Q   Okay.  This is dated October 18th, 2004,
18  and it appears to be an offer letter for
19  employment at Henry Schein.
20        Does that document look familiar to you?
21    A   Yes.
22    Q   And these are the terms under which you
23  were employed or hired by Henry Schein in October
24  2004?

Page 26

1    A   Yes.
2    Q   And you were to begin work, as I
3  understand from the rest of your file, on the
4  first paragraph of this, effective November 1st,
5  2004, reporting to Maurizio Romano, quality
6  assurance manager?
7    A   Correct.
8    Q   And again, this letter generally
9  describes your offer and the expectations and
10  responsibilities as you understood them when you
11  signed on to hire at Henry Schein, right?
12    A   Correct.
13    Q   It's signed by Joanne Gianninoto, human
14  resource specialist.  And on the last page ending
15  in 978, that is your signature dated October 21st,
16  2004, correct?
17    A   Yes.
18    Q   All right.  So you hire in at Schein
19  effective November 1st, 2004, and your background
20  at this point is in medical devices, correct?
21    A   Correct.
22    Q   And you are to then report to
23  Mr. Romano, correct?
24    A   Correct.

Page 27

1        (Steffanie-Oak Exhibit No. 3 was
2        marked for identification.)
3  BY MR. MIGLIORI:



20        MS. FINCHER:  Object to form.
21  BY MR. MIGLIORI:
22    Q   In terms of your role, not everybody
23  else's role.
24    A   Yes.

Page 28

Page 29

3    Q   And what did that -- what did that
4  entail for you?
5    A   I was involved in acquisitions for
6  medical device companies, so I would do due
7  diligence.  I also would perform audits of
8  suppliers and internal -- Henry Schein sites or
9  subsidiaries.  I was responsible for labeling
10  approval of corporate branded products, and I also
11  was responsible for supplier approvals.
12    Q   These were all for medical devices,
13  correct?
14    A   Some of the suppliers may have sold
15  pharmaceuticals, so it could have been a
16  combination, and supplier approvals.
17    Q   Okay.  What would your roles have been,
18  if any, with those suppliers as they related to
19  controlled substances?  If you had any.
20    A   I did not have any as far as controlled
21  substances.  Only Rx pharmaceuticals.
22    Q   Okay.  So it's fair to say that from
23  2004, at least through this date, 2007, you were
24  not in any way involved with DEA compliance,

Page 30

1 suspicious order monitoring or anything like that,
2 correct?
3     A   Correct.
4     Q   And this position you held for how long?
5     A   That was held until March of 2012.
6     Q   Okay.  So I have about ten different
7 appraisals in front of me here that I can avoid
8 with this one question.  I'm giving you incentive.
9     A   Okay.
10    Q   It's fair to say that from 2004 through
11 2012, all of your responsibilities were outside
12 the realm of controlled substances, correct?
13    A   Up until 2012, correct.
14    Q   Okay.  And your role at Henry Schein was
15 more directly related to or consistent with the
16 prior work you had been doing at Olympus in terms
17 of FDA regulatory applications, compliance, things
18 like that, correct?
19    A   Correct.
20    Q   At this point, through 2012, you had not
21 dealt with the DEA at all, correct?
22    A   Correct.
23    Q   And you had not dealt with any
24 Controlled Substances Act requirements, correct?

Page 31

1     A   Correct.
2     Q   And your role at Henry Schein in quality
3 assurance was distinct from the role of those that
4 reported to Sergio Tejeda in Regulatory Affairs,
5 correct?
6     A   Correct.
7     Q   All right.  In 2012, you transitioned
8 over to a position in Regulatory Affairs, correct?
9     A   Correct.
10    Q   Tell me about how that came about.
11    A   I was offered a promotion from Mike
12 DiBello and Sergio Tejeda.  So they approached me
13 about this position.
14    Q   Okay.  And what did they approach you --
15 what did they tell you?
16    A   I had been with the company for a number
17 of years, so there had been previous discussions
18 that I did want some advancement within the
19 company.  So when they approached me about this
20 position, you know, they indicated that I was a
21 loyal employee, they felt that this was something
22 that I could handle, and they explained what the
23 position was.
24    Q   What did they explain it to be?

Page 32

1     A   Being responsible for DEA compliance.
2     Q   All aspects of DEA compliance or a
3 particular area?
4     A   Basically for the Henry Schein
5 distribution centers, the sites that distributed
6 controlled substances.
7     Q   And how would you go about dealing with
8 DEA compliance for the distribution centers?  How
9 did they explain it to you?  Did they tell you it
10 involved travel?  Did they tell you it involved
11 meeting with the DEA?  What -- what more
12 specifically can you remember, if anything?
13    A   They did indicate that some travel would
14 be involved.  They did mention about customer site
15 visits, that I would be involved in those.
16    Q   What did they tell you, if anything,
17 about the recently implemented Suspicious Order
18 Monitoring Program?
19    A   During that conversation, that didn't
20 come up.
21    Q   At that -- during that conversation, did
22 they talk to you at all about the "Know Your
23 Customer" due diligence project that was then
24 ongoing?

Page 33

1     A   I don't recall.
2     Q   Were you asked at any point in that
3 initial conversation or before you took the
4 position to take over the catchup project for the
5 due diligence files for existing controlled
6 substance customers?
7         MS. FINCHER:  Object to the form.
8 BY MR. MIGLIORI:
9     Q   Go ahead.
10    A   During the conversation when they
11 offered the position, correct?  Was that the
12 question?
13    Q   Initially, yes.
14    A   No.
15    Q   When did they first ask you to assume a
16 position, if they did, where you would be
17 responsible for the due diligence project?
18    A   Can I ask for clarification?  So
19 specific to --
20    Q   Controlled substances.
21    A   Just generally the responsibility.
22    Q   Yes.
23    A   So due to the fact that I didn't have
24 prior experience in this area, it was something

Page 34

1 that I had to be trained into. So it wasn't an
2 immediate takeover of that responsibility.
3     Q   Okay.
4     A   So I probably -- at the point that I
5 became more heavily involved in it would have been
6 the summer of 2012. So around the August --
7     Q   Okay.
8     A   -- time frame.
9     Q   So who is it that trained you on due
10 diligence?
11     A   Multiple sources.
12     Q   And who are they?
13     A   Internally through Henry Schein, I
14 shadowed with Mike DiBello, Sergio Tejeda, Craig
15 Schiavo.
16         We also worked with external
17 consultants, Pharma Compliance, and Buzzeo,
18 Cegedim. I also attended multiple outside
19 industry conferences that were available. So I
20 attended HDMA, the Cegedim PDMA conference that
21 they hold. If there were any DEA conferences that
22 were being held, I also attended those. And then
23 we -- I also joined NADDI, but I'm not sure if it
24 was in that exact time frame.

Page 35

1     Q   Okay. So I understand there were
2 essentially three sources of training. There was
3 internal training, primarily with Mr. DiBello and
4 Mr. Tejeda. There was some training with third-
5 party vendors, including Buzzeo. And then you
6 went to some conferences, including the Buzzeo
7 conferences, HDMA, potentially DEA.
8         Is that generally --
9         MS. FINCHER: Object to form.
10 BY MR. MIGLIORI:
11     Q   -- what you testified to was the sources
12 of -- of information?
13     A   Yes.
14     Q   Do you believe you did all of that in
15 2012 or is this over time? Was this sort of on
16 the job?
17     A   It was continual.
18     Q   Okay. But it started in 2012.
19     A   Correct.
20     Q   And who was performing the due diligence
21 task, if anybody, when you were first introduced
22 to that responsibility?
23         MS. FINCHER: Object to the form.
24         THE WITNESS: I -- I will need you to be

Page 36

1 more specific.
2 BY MR. MIGLIORI:
3     Q   Was it -- was there somebody else
4 primarily responsible for the due diligence
5 project when you first were asked to move over to
6 Regulatory Affairs?
7         MS. FINCHER: Object to form.
8         THE WITNESS: I guess I wouldn't
9 consider it a project. The process itself starts
10 with the department, our Verifications department
11 in Henry Schein. And then also Regulatory Affairs
12 would be involved in that process.
13 BY MR. MIGLIORI:
14     Q   Okay. Maybe I -- that's a fair point.
15 Let me approach it this way.
16         You realize that by 2012 that Henry
17 Schein had come to the realization that they had a
18 lack of due diligence, both for onboarding new
19 customers and for existing customers, correct?
20     A   No.
21     Q   There was a deficiency.
22         MS. FINCHER: Object to the form.
23         THE WITNESS: No.
24 BY MR. MIGLIORI:

Page 37

1     Q   Okay. You -- you were not told of any
2 deficiency at Henry Schein in terms of the
3 completeness of due diligence files for your
4 customers in 2012?
5     A   No.
6     Q   All right. So no one shared with you
7 any of the third-party audits about the lack of
8 completeness with new customer questionnaires and
9 due diligence?
10         MS. FINCHER: Object to the form.
11         THE WITNESS: Not that I recall.
12 BY MR. MIGLIORI:
13     Q   All right. And nobody shared with you
14 any of the reactions to the HDMA guidances
15 relative to due diligence?
16         MS. FINCHER: Object to the form.
17         THE WITNESS: Yes, they did, as far as
18 the guidance that HDMA was giving to the industry
19 and understanding the need for the process, but it
20 was more putting more resources into the process.
21 BY MR. MIGLIORI:
22     Q   Okay. And -- and was that what you
23 understood your role to be, was to be additional
24 resources into the process?

Page 38

1    A   Yes.
2        (Steffanie-Oak Exhibit No. 4 was
3        marked for identification.)
4  BY MR. MIGLIORI:



8        Do you recognize that to be you?
9    A   Yes.
10   Q   Okay.  Let me ask you to turn to the
11 second page in particular.
12       Now, by the end of 2012, you have now
13 moved over to Regulatory Affairs, correct?
14   A   Correct.
15   Q   And this is the first time that you're
16 dealing with controlled substances in any job
17 description, correct?
18   A   Correct.
19   Q   How did you educate yourself on what
20 the -- the law is?
21   A   I read the CFR.
22   Q   Okay.  So you know what the -- you then
23 learned in this position what the Controlled
24 Substances Act required of a distributor?

Page 39

1    A   Correct.
2    Q   And you understand that under the
3  statute and the regulations, the distributors are
4  referred to as DEA registrants?
5    A   Correct.
6    Q   And part of the obligations of the
7  registrants then and today is to design and
8  operate a system for the detection of suspicious
9  orders, correct?
10   A   Correct.
11       MS. FINCHER:  Object to form.
12 BY MR. MIGLIORI:
13   Q   And a component part of that obligation
14 is an ongoing obligation to know your customer and
15 perform due diligence, correct?
16   A   Correct.
17       MS. FINCHER:  Object to the form.
18 BY MR. MIGLIORI:
19   Q   And that due diligence starts with
20 bringing a new client on board into the company,
21 correct?  A new customer, correct?
22   A   Correct.
23   Q   And as of 2012, nobody shared with you
24 any third-party observation that the only due

Page 40

1  diligence being performed at Henry Schein for a
2  new customer was just verifying a DEA license?
3        MS. FINCHER:  Object to form.
4  THE WITNESS:  No.
5  BY MR. MIGLIORI:
6    Q   If that were true, is that something you
7  would have liked to have seen?
8    A   Yeah --
9        MS. FINCHER:  Object to the form.
10       THE WITNESS:  Yes.
11 BY MR. MIGLIORI:



Page 41

Highly Confidential - Subject to Further Confidentiality Review

Page 42



14    So at this point, did you become the
15  contact person for folks in the Verifications
16  department?
17    A   Yes.
18    Q   And at that time was Shaun Abreu the
19  head of the Verifications department?
20    A   He was -- he wasn't the head of the
21  department, but he was -- he was in the
22  department, yes.  He was my contact.
23    Q   Okay.  Who was the head of the
24  department?

Page 43

1    MS. FINCHER:  Object to the form.
2    THE WITNESS:  It would be Bill Brandt,
3  because that's who he would have reported into
4  eventually.
5  BY MR. MIGLIORI:
6    Q   Okay.  But your contact with
7  Verifications was Shaun, correct?
8    A   Correct.
9    Q   You developed new and enhanced existent
10  policies and procedures related to the HSI
11  Suspicious Order Monitoring System and "Know Your
12  Customer" function.
13    What new -- let's start with new.  What
14  new policies and procedures did you bring to Henry
15  Schein's Suspicious Order Monitoring System and
16  "Know Your Customer" function?
17    MS. FINCHER:  Object to the form.
18    THE WITNESS:  It was related to the
19  "Know Your Customer" due diligence process.  So
20  there were enhancements to the questionnaires that
21  we would use to send to the customers, the "Know
22  Your Customer" form.  Also developing audit
23  checklists that we would use during site --
24  customer site visits.

Page 44

1  BY MR. MIGLIORI:
2    Q   Okay.  Anything else you can think of?
3    A   I don't recall.
4    Q   Do you recall if in 2012 there was a
5  standard operating procedure in place for new
6  customer due diligence?
7    A   I -- yes.
8    Q   Yes, you recall or, yes, there was?
9    A   Yes, I recall.
10    Q   And what -- what's the answer?
11    A   Yes.
12    Q   Okay.  And did you do anything to
13  enhance or change that in 2012?
14    A   I -- I don't recall specifically, other
15  than the "Know Your Customer" forms themselves.
16    Q   Okay.  Did you update the standard
17  operating procedures with the new form
18  information?
19    A   I believe that would have been under
20  Shaun.
21    Q   Okay.  You didn't do it, to your
22  recollection?
23    A   No.
24    Q   It says you also performed a significant

Page 45

1  number of customer due diligence assessments
2  visits.
3    Do you know how many you would have done
4  between August and December of 2012?
5    A   No, I don't recall.
6    Q   Do you know how you prioritized which
7  customer visits for due diligence you undertook?
8    A   As an overall, not just myself you
9  mean --
10    Q   Yeah.
11    A   -- correct?
12    Q   Well, that's fine.
13    A   Yeah, I -- I'm sorry.
14    Q   Do you recall the question?
15    A   Yeah, I recall the question.  I had to
16  reprioritize the site -- the site visits.
17  Basically if it -- new -- new customers, it was
18  based on territory, where the customers were
19  located.  At that point in time they would be
20  assigned based off of that.
21    Q   Did you prioritize based on volume of
22  business?
23    MS. FINCHER:  Object to the form.
24    THE WITNESS:  That would be one

Page 46

1 criteria, yes.
2 BY MR. MIGLIORI:
3 Q Did you prioritize based on risk of
4 diversion?
5 A Yes.
6 Q And how did you assess that?
7 A Through review of the "Know Your
8 Customer" due diligence information that had been
9 prepared.
10 Q What if there hadn't been any due
11 diligence information in the file?
12 A I don't recall a situation where we
13 didn't have any.
14 Q Well, okay. You don't recall looking at
15 any files in 2012 where there were no -- there was
16 no due diligence in the file other than
17 verification of registration?
18 MS. FINCHER: Object to the form.
19 THE WITNESS: In relation to a planned
20 site visit, no.
21 BY MR. MIGLIORI:
22 Q Okay. So you did not, in prioritizing
23 planned site visits in 2012, look for those places
24 for which you had no due diligence.

Page 47

1 MS. FINCHER: Object to the form.
2 BY MR. MIGLIORI:
3 Q In the file. Correct?
4 MS. FINCHER: Object to the form.
5 THE WITNESS: In order to set up the
6 site visit, we would've had to have had some
7 information to review and make a determination.
8 BY MR. MIGLIORI:
9 Q You will agree with me at this point
10 there were files that had insufficient information
11 for you to make those decisions as of 2012,
12 correct?
13 MS. FINCHER: Object to the form.
14 THE WITNESS: I would say no. Because
15 we made the decision to do a site visit, so we
16 would have had some information to base that
17 decision off of.
18 BY MR. MIGLIORI:

Page 48

8 Who developed the DEA-focused audits?
9 A I don't recall specifically.
10 Q So these were audits that were already
11 in place that you just joined in on, or are these
12 audits that you came up with? If you recall.
13 A I'm sorry, I misunderstood the first
14 question.
15 Q Sure. It says conduct the focused
16 audits. Were these --
17 A Oh, okay.
18 Q -- new types of audits, or were these
19 ongoing or regular occurring audits that you then
20 joined when you joined this department?
21 A They were ongoing audits that were
22 performed by other employees until I came into the
23 role.
24 Q Okay. And then it says you conducted

Page 49

1 trainings. What kind of trainings did you conduct
2 in 2012 on DEA audits?
3 A I performed mock DEA audits at our
4 distribution centers.
5 Q Do you know which distribution centers
6 service Ohio?
7 A Denver, Pennsylvania can service it.
8 All Schedule IIs had only come out of the
9 Indianapolis facility, but technically any of the
10 distribution centers other than Schedule IIs could
11 ship into Ohio based on availability of the
12 product.
13 Q All controlled substances, including
14 opioid narcotics, came out of the Indianapolis
15 distribution center?
16 A All Schedule IIs.
17 Q Right. And that includes OxyContin,
18 oxycodone, hydrocodone, correct?
19 A As of now, correct. In 2012,
20 hydrocodone wasn't a Class II.
21 Q Where did the Class IIIs come out of in
22 2012, which distribution center?
23 A All of them.
24 Q Do you know which would have supplied

Page 50

1 Ohio?

2 A Based on territory, I would say that the
3 Denver, Pennsylvania distribution center would
4 have been the closest.

5 Q Okay. Is that generally the preference
6 in the -- in the Schein system that the closest
7 distributing -- distribution center fill those
8 orders if they had the supply?

9 A Correct.

10 Q So more likely than not for the
11 northern -- for the Cleveland, Cuyahoga, Summit
12 County areas of Ohio, hydrocodone, until it was
13 reclassified as a Schedule II drug in 2014,
14 hydrocodone would have been most likely shipped
15 out of the Denver, Pennsylvania distribution
16 center, correct?

17 A Correct.

18 MS. FINCHER: Object to the form.

19 BY MR. MIGLIORI:

20 Q All right. In these trainings, did you
21 have any materials, any training materials,
22 handouts, booklets? Was there something that you
23 used to train?

24 A There would have been something, yes.

Page 51

1 Q And do you recall what it was called?

2 A Not at this time in 2012.

3 Q Was it a paper handout, was it online,
4 do you know?

5 A It -- we had an audit checklist that we
6 would work off of. I -- I don't recall handing
7 out anything specifically after the audits.

8 Q What -- what kinds of things were on the
9 audit -- audit checklist?

10 A It basically was set up to follow the
11 requirements under the CFR. So it would talk
12 about receipts of controlled substances, inventory
13 records that are required to be kept, shipment
14 records that are required to be kept,
15 reconciliation of inventory.

16 Q What, if anything, did the checklist
17 have relative to due diligence and due diligence
18 files?

19 A It did ask whether or not there was a
20 system in place, and whether or not there was due
21 diligence --

22 Q Okay.

23 A -- available.

24 Q Did it have specifics about new

Page 52

1 customers?

2 A Not that I recall, no.

3 Q Did it have any components that talked
4 about background checks of new customers?

5 A No, because these audits were being done
6 at the distribution center, and that process was
7 not handled at the -- at that level. So no.

8 Q Okay. So the due diligence components
9 were handled by the Verifications department and
10 not at the distribution centers; is that correct?

11 MS. FINCHER: Object to form.

12 THE WITNESS: Verifications in the
13 corporate office managed the due diligence
14 process.

15 BY MR. MIGLIORI:

16 Q Okay. Distribution centers did not,
17 correct?

18 A They did not manage the process,
19 correct.

20 Q They helped execute it, implement the --
21 the shipment -- would it ship directly from the
22 distribution center to the physicians?

23 A Yes.

24 Q Was there a process at the distribution

Page 53

1 center -- let's stick to Indianapolis and
2 controlled substances. Was there a process at the
3 Indianapolis distribution center to check the due
4 diligence file before shipment?

5 MS. FINCHER: Object to form.

6 Q In 2012?

7 A I -- I don't know.

8 Q Would the distribution center in
9 Indianapolis have access to the due diligence file
10 prior to shipment in filling a physician's order?

11 MS. FINCHER: Object to the form. Lack
12 of foundation.

13 THE WITNESS: I don't know. I wasn't
14 involved directly in that part of it.

15 BY MR. MIGLIORI:

16 Q If that existed, that wasn't part of the
17 training that you did at the distribution centers
18 for DEA audits?

19 MS. FINCHER: Object to the form.

20 THE WITNESS: Correct. I -- I did not
21 do training specifically myself at Indianapolis.
22 So no, I wasn't part.

23 BY MR. MIGLIORI:

24 Q What about for hydrocodone, was there

Page 54

1 any special process that you can recall in your
2 training that's referred to in your performance
3 evaluation relative to hydrocodone and
4 controlled -- and Schedule III drugs?
5    A   I'm sorry.  Can you rephrase the
6 beginning?
7    Q   Sure.
8    A   I don't know what the question exactly
9 was.
10   Q   Do you recall in your training that's
11 referenced in this document, Exhibit No. 4, in
12 this training that you would give, if there was
13 anything specific to hydrocodone and Schedule III
14 drugs?
15   A   What we would speak to the -- the team
16 about is what drugs we knew were being abused and
17 that were potentially to be diverted.  So that was
18 part of the discussion.
19   Q   Which drugs did you tell the team were
20 being abused and potentially diverted?
21   A   Opioids.  And also some other, Xanax
22 and --
23   Q   Did that include hydrocodone?
24   A   Yes.

Page 55

1    Q   And what was the training -- what more
2 specifically, if you can recall, was that
3 training?  Did you just tell them which drugs they
4 were?  Did you tell them anything else in
5 particular?
6    A   Just reemphasizing security of those
7 drugs, making sure that the processes were always
8 being followed.  That's all that I recall.
9    Q   Okay.  Was there a particular paperwork
10 or reporting requirements that were specific to
11 the distribution centers in this training?
12       MS. FINCHER:  Object to the form.
13       THE WITNESS:  It was a mock audit or
14 internal audit.  So, again, we had a checklist
15 that we would use, so that was filled out, and
16 then a report would be generated if there were any
17 potential issues, and to document that the audit
18 took place.
19 BY MR. MIGLIORI:
20   Q   Did that audit involve anything to do
21 with ARCOS data?  Or ARCOS reporting requirements?
22   A   Yes.
23   Q   And what do you recall?
24   A   Confirmation that ARCOS was being

Page 56

1 reported.
2    Q   Okay.  What about suspicious orders, did
3 anything come out of that audit training relative
4 to suspicious order reporting?
5    A   I don't recall at that time in 2012
6 specifically.
7    Q   Okay.  What about reporting to states
8 for those states that had reporting requirements?
9 Was there anything in that training?
10   A   No, not for the distribution centers
11 because they were not involved in that process.
12   Q   Who handled the state reporting process
13 in 2012?
14       MS. FINCHER:  Object to the form.
15 BY MR. MIGLIORI:
16   Q   If you know.
17   A   It would have been between Regulatory
18 and Verifications.
19   Q   This has come up a few times.  What does
20 that mean, it would be between Verifications and
21 Regulatory, specific to state reporting
22 requirements?
23   A   At that point in time, some reports may
24 have been run by Verifications for certain states,

Page 57

1 and other states may have been run for -- by
2 Regulatory.
3    Q   Do you know in 2012 who was supposed to
4 be running Ohio's state reporting requirements?
5    A   No.
6    Q   Do you know at any point after that 2012
7 who was supposed to be running Ohio's reporting
8 requirements?
9        MS. FINCHER:  Object to the form.
10       THE WITNESS:  I know that eventually all
11 the state reporting came under regulatory's
12 responsibility.
13 BY MR. MIGLIORI:
14   Q   Did you have any responsibilities with
15 respect to state reporting requirements?
16   A   Not directly, no.
17   Q   How were you indirectly involved?
18   A   I don't remember what year it was.  It
19 wasn't for the first couple of years that I was in
20 the position.  Once it transferred under
21 Regulatory, I had a staff member that was
22 responsible for running the reports.
23   Q   And did that staff member report
24 directly to you?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 A  Yes.

2 Q  Did you become aware that for almost a

3 two-year period of time, that Henry Schein had not

4 been reporting at all to the Ohio Board of

5 Pharmacy?

6     MS. FINCHER:  Object to the form.

7     THE WITNESS:  No.

8 BY MR. MIGLIORI:

9 Q  But that responsibility at some point

10 fell on your staff member, correct?

11 A  Correct.

12 Q  Do you know what years?

13 A  No.

14 Q  And ultimately you reported throughout

15 this period of time to Sergio Tejeda?

16 A  Correct.

17 Q  Did you have -- beginning in 2012 going

18 through 2016, did you have regular meetings about

19 DEA compliance with your Regulatory team?

20 A  Yes.

21 Q  When did those start?  Were they ongoing

22 when you got there or did they begin sometime

23 after?

24 A  They were ongoing as part of training,

Page 59

1 bringing on the new hires, and also meeting

2 internally.

3 Q  And how often did you meet?

4 A  With my staff, it was at least once a

5 week.

6 Q  Were there minutes to those meetings?

7 A  No.

8 Q  Did you report out your meetings to

9 anybody above you?

10 A  Not -- no, not the specific ones.  I may

11 have had conversations with Sergio as far as the,

12 you know, training of each of the new hires, kind

13 of where they were at.

14 Q  From 2012 to 2016, did you have regular

15 meetings with those above you, with Sergio, with

16 Mr. DiBello, Mr. Peacock?

17     MS. FINCHER:  Object to the form.

18     THE WITNESS:  I would -- yes.  Mike

19 DiBello wasn't there then.  But also for

20 Verifications, we were in contact on a daily

21 basis, so we also had scheduled meetings but it

22 was a constant communication.

23 BY MR. MIGLIORI:

24 Q  Okay.  I'm focusing right now

Page 60

1 specifically, though, with regularly scheduled

2 meetings, that is, a weekly meeting, a monthly

3 meeting, a quarterly meeting.

4     Did you have any kind of organizational

5 meeting or regular reporting meeting with your

6 supervisors, whether or not it included

7 Verifications?

8 A  No.

9 Q  Okay.  And that was through 2016?

10 A  Correct.

11 Q  Were you ever part of a team of -- of

12 specific people within Regulatory to -- well,

13 strike that.

14     There's a reference in your appraisal to

15 conducting audits.  Was there an audit team?  In

16 2012, let's start there.

17 A  In reference to these conducted DEA-

18 focused audits?

19 Q  Yeah.

20 A  As far as the internal sites that were

21 done at -- for Henry Schein, it would have been my

22 team, once they were trained.  So it would have

23 been myself, Ken and Glenn.

24 Q  Okay.

Page 61

1 A  And Sergio if we needed him.

2 Q  Was there anybody between 2012 and 2016

3 added to that team?

4 A  Yes.

5 Q  Who was that?

6 A  Beverly Butcher.

7 Q  Okay.  And what was her title?

8 A  Senior Regulatory specialist.

9 Q  Okay.  And who -- anyone else?

10 A  I'm just trying to remember the year.

11 So Liam Schauer.

12 Q  Okay.  Anyone else you can think of?

13 A  Pete Schmidt.  He was not a new hire,

14 but he was moved into my team.

15 Q  Okay.  How often were these audits done?

16 A  The mock audits were done once a year.

17 Q  And were you the project leader for the

18 mock audits?

19 A  I would say no.  I mean, each -- each of

20 my staff was -- they were at a distribution center

21 or the corporate office, so they were responsible

22 for that site.  I was a project leader as far as

23 making sure they got completed.

24 Q  Okay.  So you didn't actually actively

Page 62

1 participate yourself in all of the audits. You
2 coordinated them. Is that a fair statement?
3     A   Yes.
4     Q   All right. Did you actively participate
5 in any yourself?
6     A   Yes.
7     Q   Was that throughout the entire period or
8 mostly in the beginning or --
9     A   The entire period.
10     Q   All right. And what would your specific
11 role be in audits?
12     A   So I was based in the Denver,
13 Pennsylvania facility, so I would conduct a mock
14 audit once a year.
15     Q   Okay. And that's where the hydrocodone
16 would have come into Ohio?
17        MS. FINCHER: Object to the form.
18        THE WITNESS: Correct. Up until it was
19 reclassed.
20 BY MR. MIGLIORI:
21     Q   Okay. And so you had those
22 responsibilities from 2012 to 2014, when it was
23 reclassed, correct?
24     A   Yes.

Page 63

1     Q   Did you find -- in your audits, did you
2 find any observations of -- of DEA risks of
3 enforcement relative to hydrocodone?
4     A   No.
5        MS. FINCHER: Object to the form.
6 BY MR. MIGLIORI:
7     Q   You did not?
8     A   No.
9     Q   If you had found any observations or
10 risks for DEA enforcement, would that end up in a
11 checklist, a memorandum, or report?
12     A   Yes.
13        MS. FINCHER: Objection to the form.
14 BY MR. MIGLIORI:
15     Q   And what would that report be called?
16     A   An audit report.
17     Q   Okay. And so for every distribution
18 center, if I were to look, there should be an
19 audit report once a year from somebody within your
20 team, correct?
21     A   Correct.
22     Q   And that's true for Denver,
23 Pennsylvania. That's also true for the
24 Indianapolis distribution center, correct?

Page 64

1     A   Excuse me. I can't say if it was done
2 every year for Indianapolis because I wasn't
3 directly --
4     Q   Okay.
5     A   -- involved then.
6     Q   Did those reports get electronically
7 uploaded into the system?
8     A   The -- yeah, a scanned PDF was saved to
9 a folder.
10     Q   And what was that folder called, if you
11 recall?
12     A   I don't remember.
13     Q   And was that in the JDE system?
14     A   No.
15     Q   Where did those reports go?
16     A   In a folder on a -- a shared folder.
17 There again, they were PDF scanned, so...
18     Q   If somebody else wanted to review them,
19 where would they go on their computer?
20     A   It would have been on a shared
21 Regulatory drive.
22     Q   Okay. Was that accessed only by folks
23 in the Regulatory team?
24     A   Yes.

Page 65

1     Q   All right. So Sergio Tejeda, the entire
2 time you were in Regulatory, was your immediate
3 supervisor, correct -- or was one of your
4 supervisors, correct?
5     A   Yes.
6     Q   Your first report was to Mr. Romano?
7     A   Not under this role, no.
8     Q   Not under this role. Oh, Mr. Romano was
9 under your -- your medical device role?
10     A   Correct.
11     Q   So when you switched over, your
12 immediate report was to Sergio Tejeda, correct?
13     A   Yes.
14     Q   In 2012, correct?
15     A   Correct.
16     Q   All right. And so Mr. Tejeda would have
17 access to all of these annual audits of the
18 distribution centers, correct?
19     A   Correct.
20        MS. FINCHER: Object to the form.
21 BY MR. MIGLIORI:
22     Q   And do you know whether there was a
23 document retention policy relative to those audit
24 reports?

Page 66

1    MS. FINCHER: Object to the form.
2    THE WITNESS: Yes.
3  BY MR. MIGLIORI:
4    Q   What is that?
5    A   I don't recall what -- how many years,
6  but there was a policy.
7    Q   Okay. Did you review any of those
8  audits in preparation for today?
9    A   No.
10   Q   Counsel didn't bring any of those
11 with -- with them to show you yesterday?
12   A   No.
13   MR. MIGLIORI: Why don't we take a
14 break. It's been an hour.
15   MS. FINCHER: Sure.
16   THE VIDEOGRAPHER: 10:33, we are off the
17 record.
18   (Recess.)
19   THE VIDEOGRAPHER: 10:45, and we are on
20 the video record.
21 BY MR. MIGLIORI:

Page 67

1    How much of a backlog did you realize in
2  2012 had developed at Henry Schein?
3    MS. FINCHER: Object to the form.
4    THE WITNESS: I'm sorry. How much of a
5  backlog?
6  BY MR. MIGLIORI:
7    Q   Yeah. Do you recall?
8    A   This -- I recall specifically what this
9  is referring to.
10   Q   Okay. What was that?
11   A   Basically what this was referring to was
12 as new customer due diligence was being put
13 together, it had to be reviewed by Regulatory.
14 Because we at that point in time had lost some of
15 the staff, it was just taking longer because it
16 was less people to review it. So it wasn't a
17 significant backlog. It was just if we had more
18 staff, it would have been reviewed quicker.
19   Q   You don't recall actually quantifying
20 that backlog?
21   MS. FINCHER: Object to the form.
22   THE WITNESS: I don't recall
23 specifically here, no. I just remember it was not
24 significant.

Page 68

1  BY MR. MIGLIORI:
2    Q   Not significant.
3    MR. MIGLIORI: Just give me one second.
4  I'm sorry. Not off the record -- I'm just -- just
5  bear with me.
6    (Steffanie-Oak Exhibit No. 5 was
7    marked for identification.)
8  BY MR. MIGLIORI:

18   Q   And at this time Jeff Peacock is in
19 Mr. DiBello's role?
20   A   Correct.
21   Q   So Sergio Tejeda reports to Jeff
22 Peacock, correct?
23   A   Correct.
24   Q   Have you seen this e-mail before?

Page 69

1    A   No. No.
2    Q   Let me show you -- so if you go to the
3  first page -- the last page. So e-mails, as we go
4  through this, read back to front --
5    A   Mm-hmm.
6    Q   -- because they're a string.
7    There is an e-mail from Jeff Peacock to
8  several people, including you.
9    A   Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

Page 70



Page 71

21      MS. FINCHER:  Object to the form.
22  BY MR. MIGLIORI:
23      Q   And these customers that you're talking
24  about are primarily individual physicians,

Page 72

1  correct?
2      MS. FINCHER:  Object to the form.
3      THE WITNESS:  No.
4  BY MR. MIGLIORI:
5      Q   What percentage of Schein customers
6  were -- were individual physicians or individual
7  practices as opposed to dispensaries?
8      MS. FINCHER:  Object to the form.
9  Foundation.
10      THE WITNESS:  I wouldn't know the
11  percentage, but I wasn't referring to
12  dispensaries.  I -- I'm not sure what you mean by
13  that.
14  BY MR. MIGLIORI:
15      Q   Okay.  Well, let me ask you maybe a
16  little differently.  Of the 1560 new accounts
17  ordering substances -- controlled substances each
18  year, how many of those are individual physicians
19  or private practices, what percentage?
20      MS. FINCHER:  Object to the form.
21  Foundation.
22      THE WITNESS:  I don't know.
23  BY MR. MIGLIORI:
24      Q   You would agree with me that Henry

Page 73

1  Schein's general business model was not to be a
2  supplier to pharmacies as much as directly to
3  physicians and their practices, correct?
4      A   Correct.
5      Q   And of the 1500, you have no idea how
6  many are physicians and their practices?
7      A   No.
8      Q   Are they the vast majority of them?
9      MS. FINCHER:  Object to the form.
10      THE WITNESS:  I'm not -- I'm not sure.
11  It's -- you're saying individual doctors, like
12  you're saying one --
13  BY MR. MIGLIORI:
14      Q   Or their practices.
15      A   Yes.  I would say yes.
16      Q   Okay.  So let me make sure it's clear.
17      The vast -- it's -- of the 1560 new
18  accounts that Henry Schein was onboarding each
19  year that were intending to order controlled
20  substances, the vast majority of those were
21  individual physicians or private practices,
22  correct?
23      MS. FINCHER:  Object to the form.
24      THE WITNESS:  Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

BY MR. MIGLIORI:

[black redaction box covering lines 2-8]

9    Q    "I learned from a recent conversation
10 with Shaun Abreu, Verifications manager, that the
11 number of active accounts ordering controlled
12 substance products is now closer to 40,000, and
13 that we have completed due diligence for about
14 13,000 accounts."
15        Were you aware of that information from
16 Shaun Abreu?
17    A    At that point --
18        MS. FINCHER:  Object to the form.
19        THE WITNESS:  -- in time, yes.
20 BY MR. MIGLIORI:
21    Q    Okay.  "So, therefore, the gap is now
22 approximately 27,000 accounts."
23        Do you recall that being based on 2012
24 numbers, the number of accounts that had no due

Page 75

1 diligence or completed due diligence?
2    A    I recall based off of reading this
3 e-mail.
4    Q    Okay.  So going back to my earlier
5 question when you said there was a small amount of
6 backlog, will you agree with me that 27,000 out of
7 40,000 customers is not a small amount of due
8 diligence backlog?
9        MS. FINCHER:  Object to the form.
10       THE WITNESS:  Yes.
11 BY MR. MIGLIORI:
12    Q    All right.  "Based on year-to-date
13 records, we can expect Regulatory Affairs to
14 process 400 to 450 due diligence files each year."
15       Was that a statistic or a projection
16 that you put together?
17       MS. FINCHER:  Object to the form.
18       THE WITNESS:  I don't recall.  I may --
19 I'm sure I had input, but I'm not sure if I'm the
20 only one that reviewed that.
21 BY MR. MIGLIORI:
22    Q    Okay.  Let me explore that a little bit.
23 If you're bringing on 1560 new accounts ordering
24 controlled substances each year, of those, are --

Page 76

1 is it only a fraction of those getting due
2 diligence files updated?
3        MS. FINCHER:  Object to the form.
4        THE WITNESS:  Can you repeat that again?
5 BY MR. MIGLIORI:
6    Q    Sure.  I'm trying to understand of the
7 400 to 450 files this year, is that the backlog
8 project or is that new -- new customers?
9        MS. FINCHER:  Object to the form.
10       THE WITNESS:  It -- it would include
11 both.
12 BY MR. MIGLIORI:
13    Q    Okay.  So we can agree that by the end
14 of 2012, when you had your appraisal that we --
15 your -- your work appraisal that we looked at,
16 Exhibit No. 4, at the end of that year, based on
17 the statistics that you gave to Sergio Tejeda,
18 there were approximately 27,000 accounts or
19 customers in the Henry Schein system that did not
20 have complete due diligence.
21       MS. FINCHER:  Object --
22 BY MR. MIGLIORI:
23    Q    Correct?
24       MS. FINCHER:  Object to the form.

Page 77

1 Mischaracterizes the document.
2        THE WITNESS:  Correct, but I still stand
3 by what I said in 2012, I was not aware of that
4 information.
5 BY MR. MIGLIORI:
6    Q    That's fine.
7    A    Okay.
8    Q    And maybe you weren't aware of it.
9 That's fine.
10   A    Okay.
11   Q    But as you're providing this statistical
12 information --
13   A    Mm-hmm.
14   Q    -- in August of 2013 to your
15 supervisor --
16   A    Yes.
17   Q    -- it turned out to be true that in
18 2012, of the 40,000 customers of Henry Schein,
19 27,000 of them did not have completed due
20 diligence in their files, correct?
21       MS. FINCHER:  Object to the form.
22 Mischaracterizes the document.
23 BY MR. MIGLIORI:
24   Q    Correct?

Highly Confidential - Subject to Further Confidentiality Review



Page 78

1  A  Correct.

Page 79

2        MS. FINCHER:  Object to the form.
3  BY MR. MIGLIORI:
4      Q  Help me understand.
5      A  Regulatory was not responsible for
6  reviewing every single account.
7      Q  Okay.
8      A  So the first process and who owned the
9  process initially was Verifications.  So there was
10  only maybe a percentage of those accounts where
11  they felt needed a secondary review.
12      Q  Okay.
13      A  That would come to Regulatory.

Page 80

24  BY MR. MIGLIORI:

Page 81

1      Q  Okay.  At some point, did you accelerate
2  that process so it would be a quicker resolution
3  to be DEA compliant relative to due diligence and
4  "Know Your Customer"?
5      A  Yes.
6      Q  When did you bring on new people to --
7  to become compliant with DEA's due diligence?
8        MS. FINCHER:  Object to the form.
9        THE WITNESS:  I brought on one more
10  staff member.  That was Beverly Butcher in 2014.
11        And then I know that Shaun's team grew.
12  I can't say specifically how many, but I know that
13  there was a significant increase in his staffing,
14  because, again, they are the ones that are the
15  front end of the process.
16  BY MR. MIGLIORI:
17      Q  Okay.  And you left in November of 2016?
18      A  Yes.
19      Q  As of the time you left in November of
20  2016, was Henry Schein caught up in the backlog of
21  due diligence?
22      A  Yes.
23      Q  When did that happen?
24      A  I can't -- I don't recall the exact

Page 82

1 date, but there were certain actions that were put
2 in place to ensure that that happened quicker than
3 the time frame that's discussed here.
4     Q    Okay.  But you don't know if it happened
5 just before you left or 2015 --
6     A    It was at least a year before I left,
7 but I don't know the specific date.
8     Q    All right.  So it's fair to say that
9 whatever that date is, based on your information
10 that you provided to Sergio Tejeda, Henry Schein
11 was not compliant with DEA due diligence until
12 that date, correct?
13         MS. FINCHER:  Object to the form.
14         THE WITNESS:  No.  Not correct.
15 BY MR. MIGLIORI:
16     Q    Let me word -- use exact words.
17         "We are looking at three to four years
18 to become current/fully compliant with DEA due
19 diligence."
20         That was Mr. Tejeda's words, correct?
21         MS. FINCHER:  Object to the form.
22         THE WITNESS:  Correct, based on the
23 current resources and the process.
24 BY MR. MIGLIORI:

Page 83

1     Q    Right.  So when additional resources
2 were put together and processes were put in place,
3 that projection was shortened to sometime you
4 think a year prior to your departure in 2016?
5     A    It was sooner than that based off of the
6 actions that were taken.  So when we look at that
7 overall number of accounts, that was looking back
8 at previous history of when they ordered
9 controlled substances.  So a large percentage of
10 those accounts may not have ordered again.
11         There were actions that were put in
12 place to make sure that if those customers that
13 did not have due diligence were to order, that the
14 order would pend.  So the DEA was removed from the
15 account.  So if they were to place an order, that
16 we did take the necessary steps to do due
17 diligence.  So it's not that they just left those
18 accounts there for two or three years allowing
19 them to continue to order.
20     Q    I appreciate that.  That wasn't my
21 question.
22         My question was simply, there was a
23 certain point at which this backlog project, this
24 backlog process caught up.  Correct?

Page 84

1     A    Correct.
2     Q    And you're telling me that it happened
3 sometime before this projection in this exhibit,
4 that is before 2016, 2017, correct?
5     A    Correct.
6     Q    All right.  So instead of taking three
7 to four years for Henry Schein to become current
8 and fully compliant with DEA due diligence, it
9 took some time less than that, correct?
10     A    Correct.
11         MS. FINCHER:  Object to the form.
12 BY MR. MIGLIORI:
13     Q    But you're saying that it was probably a
14 year or more before your departure, correct?
15     A    I'm going to say no.
16     Q    When would it have been?  I'm just
17 trying to find out the time frame.
18     A    Yeah, it -- it would have been shortly
19 after this was issued, because, again, they
20 removed the DEA numbers from those accounts to
21 prevent them from continually -- being able to
22 continue to order without due diligence.
23     Q    I'm not asking about the ordering.  I'm
24 asking about the files being compliant with DEA

Page 85

1 due diligence.  I'm only asking about the files
2 being complete.  Okay?  I'm not asking about
3 placing orders.
4         You'll agree with me that the files were
5 not updated completely and the backlog resolved
6 until -- and up until your departure from the
7 company, correct?
8         MS. FINCHER:  Object to the form, asked
9 and answered.
10         You can answer again.
11 BY MR. MIGLIORI:
12     Q    Can you answer the question?
13         MS. FINCHER:  Do you need him to repeat
14 it?
15         THE WITNESS:  Yes, please.
16 BY MR. MIGLIORI:
17     Q    Will you agree with me that the
18 backup -- the backlog and due diligence at Henry
19 Schein was not resolved completely even at the
20 time of your departure?
21     A    No.
22         MS. FINCHER:  Object to the form.
23 BY MR. MIGLIORI:
24     Q    When do you think the backlog was

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 resolved?

2    A  It was at least a year or more before I

3 left.

4    Q  All right. So it's your testimony right

5 now that at least a year or more before November

6 of 2016, Henry Schein became current and fully

7 compliant with the DEA due diligence requirements.

8 Is that a fair statement?

9        MS. FINCHER: Object to the form.

10        THE WITNESS: Based on my recollection,

11 I would say yes.

12        (Steffanie-Oak Exhibit No. 6 was

13        marked for identification.)

14 BY MR. MIGLIORI:

15    Q  Let me show you Exhibit 6.

20      By this point you've left the company,

21 correct?

22    A  Correct.

23    Q  I'm going to direct you to page 7 of the

24 PowerPoint.

Page 87

1      Page 7 is a chart of the Regulatory

2 Affairs SOM and due diligence review increases.

3 Do you see that?

4    A  Mm-hmm. Yes.

5    Q  And you'll see that through 2017, there

6 is -- from 2012 when you start through 2017, every

7 year there is an increase in the number of due

8 diligence reviews and site visits, or let's stick

9 with due diligence reviews.

10      Do you see that?

11        MS. FINCHER: Object to the form.

12        THE WITNESS: Yes.

13 BY MR. MIGLIORI:

14    Q  On the next page -- I'm sorry, on

15 page -- it doesn't have a number suddenly all of a

16 sudden.

17      So on page 10, it would be --

18    A  Is it that one? Okay.

Page 88

5      Were you --

6    A  No, I don't see that. Where's that?

7    Q  It's --

8    A  This one? Oh. (Peruses document.)

9 Okay.

10    Q  What was Frank -- Francis O'Regan's

11 position, if you know?

12    A  I don't know him.

13    Q  You don't know him.

14    A  No.

15    Q  Did he show up after you?

16    A  I'm guessing, yes.

17    Q  Okay. So do you see -- first of all,

18 did you know that there was a need for

19 standardization and enhancement of due diligence

20 file review process and the standard operating

21 procedure as of the time you left in November of

22 2016?

23        MS. FINCHER: Object to the form.

24        THE WITNESS: No.

Page 89

1 BY MR. MIGLIORI:

2    Q  And going back to page 7, you'll agree

3 with me that the volume of due diligence reviews

4 did not stop as of the end of 2016 when you left

5 the company?

6        MS. FINCHER: Object to the form.

7 Foundation.

8        THE WITNESS: No, because we bring on

9 new customers every day.

10 BY MR. MIGLIORI:

11    Q  All right.

12    A  So it would not stop.

13    Q  And it continued to grow exponentially?

14    A  Correct.

15        MS. FINCHER: Object to the form.

16 BY MR. MIGLIORI:

17    Q  All right. So as of the end of 2012,

18 going back to Exhibit 5, the gap of existing

19 customers was 27,000 without complete due

20 diligence, and the going forward projection of new

21 customers ordering controlled substances was just

22 over 1500 a year, correct?

23        MS. FINCHER: Object to the form. Are

24 you asking what this document says?

Page 90

1     MR. MIGLIORI: I'm asking if that's her
2  recollection of the data.
3  BY MR. MIGLIORI:
4     Q   Correct?
5     MS. FINCHER: Object to the form.
6     THE WITNESS: There's a hundred -- yes.
7  1560 new accounts added per year.
8  BY MR. MIGLIORI:
9     Q   Did that number change in the subsequent
10  years, '13, '14, '15 or '16, to your knowledge?
11    A   I would say yes, because they were
12  continuing to -- the business would grow and the
13  market would grow, so, yes, it would.
14    Q   So your general recollection is that
15  more than 1560 new accounts came on board from
16  2012 through 2016 for those physicians and
17  practices wanting to order controlled substances,
18  correct?
19    A   Correct.
20    Q   Now, the -- in 2012 when you started,
21  you said that one of the things you did was go to
22  HDMA conferences.
23    A   They have one a year, so yes.
24    Q   Okay. Do you recall going to one in

Page 91

1  2012?
2     A   Yes.
3     Q   And what, if anything, do you recall
4  learning at that conference as it related to due
5  diligence?
6     A   I know that there was a presentation
7  related to "Know Your Customer," suspicious order
8  monitoring.
9     Q   Were you ever provided the HDMA guidance
10  about due diligence?
11    MS. FINCHER: Object to the form.
12    (Steffanie-Oak Exhibit No. 7 was
13     marked for identification.)
14  BY MR. MIGLIORI:
15    Q   Exhibit No. 7.
16    A   Yes.
17    Q   And what do you recall the expectations
18  to be by the trade association for distributors
19  relative to "Know Your Customer"?
20    MS. FINCHER: Object to the form.
21    THE WITNESS: That you were responsible
22  to know your customer.
23  BY MR. MIGLIORI:
24    Q   Did that involve more than verification

Page 92

1  of registration?
2     A   Yes.
3     Q   If you turn to the -- just the first
4  page of the document, you'll see it's a 2008
5  Healthcare Distribution Management Association
6  Industry Compliance Guideline.
14     Did you understand when you first
15  started working with controlled substances in 2012
16  that there was a growing, if not very grown,
17  problem of misuse and diversion of controlled
18  substances?
19    A   Yes.
20    MS. FINCHER: Object to the form.
21  Foundation.
22     I'll just note here that the document
23  predated her time at Schein relative to controlled
24  substances.

Page 93

1     MR. MIGLIORI: I want to make sure I
2  understand that. You said that 2008 was before
3  Schein was working with controlled substances?
4     MS. FINCHER: Before her role at
5  Schein --
6     MR. MIGLIORI: Okay.
7     MS. FINCHER: -- working with controlled
8  substances.
9  BY MR. MIGLIORI:
10    Q   You said you educated yourself when you
11  got there in 2012, right, about controlled
12  substances?
13    A   Yes.
14    Q   And one of the sources of that education
15  was the HDMA?
16    A   Yes.
17    Q   And this would -- did you -- were you
18  provided this guidance, do you recall?
19    A   I don't -- I don't recall specifically.
20  I know I've seen it over time, but I don't
21  remember if it was then.

Page 94

Page 96

Page 95

Page 97

6  BY MR. MIGLIORI:
7      Q    And isn't it true that from 2012 to
8  2016, Henry Schein's compliance with this was a
9  one-page questionnaire?
10         MS. FINCHER:  Object to the form.
11         THE WITNESS:  No.
12  BY MR. MIGLIORI:
13      Q    How did Henry Schein obtain this
14  information --
15         MS. FINCHER:  Object to the form.
16  BY MR. MIGLIORI:
17      Q    -- that -- or information like this when
18  you got there in 2012?
19      A    In 2012, there was -- it was at least a
20  two-page questionnaire in 2012, and then after
21  that there were additional questionnaires that
22  were developed based off of the practice type that
23  the account would fill out.
24         And then as part of the whole overall

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 due diligence process, we also -- there was a
2 licensure background check for state level DEA.
3 There was also an address verification check to
4 make sure it appeared to be a legitimate address,
5 a legitimate practice office.
6        A Google search.  If there was a website
7 for the account, we would look at that.
8 Healthgrades was used to look at different reviews
9 of the physician.  You know, any information that
10 was available on the internet.
11    Q   You would agree with me that all those
12 sources of information are important to understand
13 and know your customer, correct?
14    A   Correct.
15    Q   And when they had 27,000 cases that did
16 not have full and complete due diligence, some
17 aspect of that information was missing in those
18 27,000 due diligence files, correct?
19        MS. FINCHER:  Object to the form.
20        THE WITNESS:  Correct.
21 BY MR. MIGLIORI:

Page 99



6        Did you ever do that, develop SOPs for
7 due diligence?
8    A   I don't recall actually developing one.
9 I was definitely involved in revising and changing
10 existing procedures.
11    Q   Did they get implemented?
12    A   Yes.
13    Q   Were they relative to due diligence?
14    A   Yes.
15    Q   So if they happened between 2012 and
16 2016, you would have had some input relative to
17 due diligence?
18    A   Yes.
19    Q   Did you have any roles from 2012 to 2016
20 relative to the setting of thresholds in the
21 Suspicious Order Monitoring Systems?
22    A   No.
23    Q   Did you have any roles at all with
24 respect to the Suspicious Order Monitoring Systems

Page 100

1 themselves?  And -- and I'm distinguishing that
2 from the "Know Your Customer" due diligence.
3    A   I would say yes.
4    Q   What roles did you have with SOMS?
5    A   I think overall it was a joint role
6 between Verifications and Regulatory to make sure
7 that the system was working, there was an adequate
8 system, and that we were meeting the requirements.
9    Q   Well, specifically, what would your role
10 be in that?
11    A   It's understanding different pends that
12 we had set up, making sure we were pending orders
13 for different reasons.  It's -- if there were new
14 drugs that were becoming -- we were learning on
15 the marketplace that being diverted, making
16 sure that we were looking at those drugs.  Do an
17 internal auditing of the system to make sure that
18 it was working as it was expected to work.
19    Q   But you didn't yourself get involved
20 with setting the algorithms, correct?
21    A   Correct.  No.
22    Q   And the assumptions for those
23 algorithms, that wasn't part of your
24 responsibility, correct?

Page 101

1    A   Correct.
2    Q   Is it fair to say that in the world of
3 DEA compliance from 2012 to 2016, your primary
4 responsibilities were in the area of "Know Your
5 Customer" due diligence and -- and distribution
6 center audits?
7        MS. FINCHER:  Object to the form.
8        THE WITNESS:  Yes.
9 BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

Page 102



Page 104

1 You'll agree with me earlier that a pended order
2 in the Henry Schein system was an order that
3 somehow triggered or tripped a concern about an
4 order deviating in size, frequency or pattern from
5 prior orders of that customer?
6      MS. FINCHER: Object to the form.
7      THE WITNESS: No.
8 BY MR. MIGLIORI:
9      Q   How is that wrong?
10     A   Any new customer would automatically
11 pend, and so it would be their first order.
12     Q   Okay. So I'll increase the definition.
13 Any new customer is pended until they are cleared,
14 correct?
15     A   Correct.
16     Q   So in order to clear a new customer,
17 it's essential in the Henry Schein system to
18 perform due diligence, correct?
19     A   Correct.
20     Q   And it's essential to document that due
21 diligence, correct?
22     MS. FINCHER: Object to the form.
23     THE WITNESS: Correct.
24 BY MR. MIGLIORI:

Page 103

15     You would agree with me that at least
16 when you got there in 2012, you were trained that
17 suspicious orders that were investigated, their
18 outcome needed to not only be determined but
19 documented in the due diligence files at Henry
20 Schein, correct?
21     MS. FINCHER: Object to the form.
22     THE WITNESS: Correct.
23 BY MR. MIGLIORI:
24     Q   You mentioned the word "pend" earlier.

Page 105

1      Q   And a new customer, would the due
2 diligence include criminal background checks?
3      MS. FINCHER: Object to the form.
4      THE WITNESS: No.
5 BY MR. MIGLIORI:
6      Q   In new customers, would due diligence
7 include prior convictions for drug-related
8 offenses?
9      MS. FINCHER: Object to the form.
10 Foundation.
11     Are you asking, Don, about her role in
12 Regulatory or Verifications or --
13     MR. MIGLIORI: Due diligence.
14     THE WITNESS: The license would be
15 checked. There was a check on the license. There
16 was no criminal background.
17 BY MR. MIGLIORI:
18     Q   Well, you've seen -- have you ever seen
19 the letters from the DEA about not relying on the
20 mere existence of a registration as due diligence?
21     A   Yes.
22     Q   All right. So I'll go back to the
23 original question.
24     In the onboarding of a new client at

Page 106

1 Henry Schein from 2012 to 2016, in the due
2 diligence for that pended new customer, was there
3 a process by which to verify that that customer
4 did not have any prior drug-related criminal
5 offenses?
6     A   If that offense affected their medical
7 license, yes.
8     Q   So the only way at Henry Schein to
9 determine whether or not somebody had a prior
10 drug-related criminal conviction would be if the
11 medical license were suspended?
12         MS. FINCHER:  Object to the form.
13         THE WITNESS:  Correct.
14 BY MR. MIGLIORI:
15     Q   There was no independent review of a new
16 onboarded customer of whether or not that doctor
17 or practice had any convictions for drug-related
18 offenses, other than verifying the medical
19 license?
20         MS. FINCHER:  Object to the form.
21 BY MR. MIGLIORI:
22     Q   Correct?
23     A   Correct.

Page 108

1 the Cegedim Dendrite Company, correct?
2     A   Correct.
3     Q   Cegedite -- Cegedim actually performed
4 external third-party audits of your -- of Henry
5 Schein's suspicious order monitoring and due
6 diligence files, correct?
7         MS. FINCHER:  Object to the form.
8 Foundation.
9         THE WITNESS:  Prior to me coming into
10 the position, yes.
11 BY MR. MIGLIORI:
12     Q   Okay.  They didn't do any while you were
13 there?
14     A   No.  No audits, no.
15     Q   But they did help you train to
16 understand the DEA requirements, correct?
17     A   It was an industry conference that I had
18 gone to, yes.
19     Q   Okay.  Had you, when you took this
20 position, done anything to educate yourself on the
21 prior audits of Cegedim?
22     A   I don't recall being aware.  In this --

Page 107



10     Q   All right.  So if I were to take a file
11 of a customer of Henry Schein, that information --
12 that is, all the information relied upon and all
13 the conclusions from that information about the
14 new customer, the pended new customer, should
15 actually be in the file to be compliant with the
16 DEA regulations, correct?
17         MS. FINCHER:  Object to the form.
18         THE WITNESS:  Correct.
19         (Steffanie-Oak Exhibit No. 8 was
20         marked for identification.)
21 BY MR. MIGLIORI:
22     Q   I show you exhibit -- Exhibit 8.
23         You said one of the companies that you
24 educated yourself on DEA regulatory compliance was

Page 109

Page 110

Page 112

21    Are you familiar with the MedPro
22  inquiry?
23    A   Somewhat, yes.
24    Q   And -- and what was it?

Page 111

Page 113

1    A   That is the computer database that
2  Verifications would use to access the doctor's
3  license.  They could see if they were licensed in
4  other states too, see if there were any actions
5  against the license or if it was, you know, in
6  good standing.
7    Q   So if a physician went into MedPro --
8  I'm sorry.  Strike that.
9      If Henry Schein went into MedPro and saw
10  that a physician's license had been suspended and
11  then reinstated, that information would be in
12  MedPro, correct?
13      MS. FINCHER:  Object to the form.
14      THE WITNESS:  It -- yes, it should be in
15  MedPro.
16  BY MR. MIGLIORI:
17    Q   And the basis for the suspension should
18  also be in MedPro, correct?
19      MS. FINCHER:  Object to the form,
20  foundation.
21      THE WITNESS:  Yes.
22  BY MR. MIGLIORI:
23    Q   And if that information were relied upon
24  by Henry Schein, that would be in your due

Highly Confidential - Subject to Further Confidentiality Review

| Page 114 | Page 116 |
|---|---|

Page 114

1 diligence file, correct?
2     A   Correct.
3     Q   And as of this time, at least in 2009,
4 it appears from this document that MedPro was only
5 being used in the states that required it for
6 background checks.
7         MS. FINCHER:  Object --
8 BY MR. MIGLIORI:
9     Q   Was that true --
10     A   I don't --
11     Q   -- when you got there in 2012?
12     A   No.
13         MS. FINCHER:  Object to the form.
14 BY MR. MIGLIORI:

20         By the time you got there in 2012, was
21 there a standard operating procedure or memorandum
22 that documented how on site -- or what the
23 criteria would be for due diligence for new
24 customers?

Page 115

1     A   Yes.
2     Q   Do you know when between 2009 and 2012
3 that happened?
4         MS. FINCHER:  Object to the form.
5         THE WITNESS:  No.
6 BY MR. MIGLIORI:
7     Q   You would agree with me that in order
8 for there to be a criteria for due diligence, that
9 it would have to be included in a standard
10 operating procedure of the company, correct?
11         MS. FINCHER:  Object to the form.
12         THE WITNESS:  It would need to be
13 documented.
14 BY MR. MIGLIORI:
15     Q   And that's where it would be documented,
16 correct, in the SOPs?
17         MS. FINCHER:  Object to the form,
18 foundation.
19         THE WITNESS:  Yes.  Yes.
20 BY MR. MIGLIORI:



Highly Confidential – Subject to Further Confidentiality Review

Page 118

Page 120

5      Do you recall writing this?
6      A   I recall completing the minutes to the
7   meeting.  I don't -- yes, I didn't -- these are
8   minutes from a meeting.
9      Q   All right.  So you -- you compiled these
10   minutes, correct?
11      A   Correct.
12      Q   And these minutes are from a meeting
13   that related to certain findings of the SOM audit
14   team, which included you, correct?
15          MS. FINCHER:  Object to the form.
16          THE WITNESS:  The audit was done -- from
17   my recollection, was done by Ken Romeo, who was --
18   who reported to me.
19   BY MR. MIGLIORI:
20      Q   Okay.  And so when Mr. Peacock testified
21   in this case that you were part of a team with
22   Mr. Romeo and with Sergio Tejeda, would that have
23   been accurate relative to SOM auditing?
24          MS. FINCHER:  Object to the form.

24          MS. FINCHER:  Object to the form,

Page 119

Page 121

1   foundation.
2          THE WITNESS:  No.
3   BY MR. MIGLIORI:
4      Q   And when you got there in 2012, did you
5   share that concern?
6          MS. FINCHER:  Object to the form.
7          THE WITNESS:  No.  I wasn't -- I've
8   never seen this before, so no.
9   BY MR. MIGLIORI:
10      Q   You did in fact participate in your own
11   audits where members of your team concluded
12   similarly, correct?
13          MS. FINCHER:  Object to the form.
14   BY MR. MIGLIORI:
15      Q   Do you recall that?
16      A   Not how you're wording it.  I know that
17   there was a finding about additional training
18   being needed or recommended.  So I can agree to
19   that, yes.  I'd like to see the report if I can.
20      Q   Sure.  I'll give it to you right now.
21          (Steffanie-Oak Exhibit No. 9 was
22          marked for identification.)
23   BY MR. MIGLIORI:

1          THE WITNESS:  We had been involved in
2   other audits.  This particular -- let me see if
3   this was the particular one that he had done on
4   his own.
5   BY MR. MIGLIORI:
6      Q   You -- you think Mr. Romeo did this on
7   his own?
8      A   Yes.
9      Q   And you -- you reported this out to
10   everyone.  Did you report it as only being
11   Mr. Romeo's?
12      A   Well, the original audit report should
13   be from him.  This is just meetings -- we held a
14   meeting to review the audit report and have
15   discussions, so I just documented the minutes.
16      Q   Okay.  Well, let's go through the
17   findings.
18      A   Okay.



Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    MS. FINCHER: Object to the form.
2 Mischaracterizes the document.
3    THE WITNESS: I didn't report that, no.
4 It's in the -- this is -- I added minutes within
5 his report. So, is that what you're asking?
6 BY MR. MIGLIORI:
7    Q    Maybe that's the question, but --
8    A    Okay. Okay.
9    Q    -- I can actually -- it's helpful to me
10 if that's the distinction you're making. I can go
11 to the very original one and see if it -- let's
12 see.
13    (Steffanie-Oak Exhibit No. 10 was
14    marked for identification.)
15 BY MR. MIGLIORI:
16    Q    I show you Exhibit 10.
17    A    (Peruses document.)

Page 123

1    MS. FINCHER: Object to the form.
2 BY MR. MIGLIORI:
3    Q    At this point.
4    A    No. I report to Sergio, and Sergio
5 reports to Jeff. I mean ultimately I reported to
6 Jeff.
7    Q    Okay. Fair enough. I'm sorry. I'm
8 sorry.
9    But -- but he took Mr. DiBello's
10 position at this point, correct?
11    A    Yes.

23    Does that refresh your recollection of
24 who was doing the compliance assessment?

Page 124

1    A    I know we had meetings about the, yes,
2 audit itself. I don't remember actually carrying
3 out audit functions of this, but --
4    Q    Okay.
5    A    -- based off what Ken had done at his
6 site, what he had looked at, he had reviewed the
7 information with me and Sergio.
8    Q    Okay.
9    A    But I don't recall taking -- actually
10 doing the audit myself.
11    Q    All right. But at least as it
12 represents here --
13    A    Mm-hmm.
14    Q    -- from the 2nd to the 3rd of 2013, you,
15 Ken and Sergio were on site in Melville to
16 complete the DEA compliance assessment, correct?
17    A    Correct.
18    Q    You have no reason to think that's
19 not --

Page 125

Highly Confidential - Subject to Further Confidentiality Review

Page 126

Page 128

Page 127

Page 129

5      MR. MIGLIORI:  That's coaching.  We just
6  got Cohen involved with these, okay?  I'm not a
7  guy that usually cares, but that's way too much.
8      MS. FINCHER:  I'll do what I need to do
9  to protect the record.
10      MR. MIGLIORI:  And we'll call Cohen if
11  we have to.  He gave a number of eight words at
12  most.  If you have form -- form, if you want to
13  say "asked and answered," that's fine.  Please no
14  coaching.
15      MS. FINCHER:  I'll continue to do what I
16  need to do to protect the record.
17      MR. MIGLIORI:  And then we'll call
18  Cohen.  All right?
19      MR. McDONALD:  Don, just ask the
20  question.
21      MR. MIGLIORI:  No, no, I just -- I want
22  some acknowledgment.  I appreciate what you're
23  doing, but it's coaching.
24      MS. FINCHER:  I -- I respectfully

Highly Confidential - Subject to Further Confidentiality Review



Page 130

1  disagree with you.
2  BY MR. MIGLIORI:

Page 131

Page 132

24        MS. FINCHER:  Don, I'll just point out

Page 133

1  it's almost noon.  So I'm not sure when you wanted
2  to take a lunch break.
3        MR. MIGLIORI:  Why don't we go off the
4  record for a second and talk about that.
5        THE VIDEOGRAPHER:  11:55.  We're off the
6  video record.
7        (Lunch recess.)
8        THE VIDEOGRAPHER:  12:29, we're on the
9  video record.
10        (Steffanie-Oak Exhibit No. 11 was
11        marked for identification.)
12  BY MR. MIGLIORI:
13      Q    Okay.  I'll show you Exhibit 11.
14        Exhibit 11 has a date of November 27,
15  2013.  It's a PowerPoint presentation with -- that
16  bears your name on it.  It says "Individual
17  Opportunity/Issue, Presented by Tina
18  Steffanie-Oak."
19        Did you review this in preparation for
20  today?
21      A    I do remember seeing it yesterday.
22      Q    Okay.  And is this something you
23  prepared?
24      A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Q   Okay.  On the second page, it says
2  "Opportunity/Issue."  It says:  "Are we in
3  substantial compliance with DEA SOM/Know Your
4  Customer regulations?"
5         And the first bulleted item says:  "We
6  do not have Know Your Customer Due Diligence for
7  approximately 60 percent of our customers.
8  Remaining 40 percent has varying degrees of due
9  diligence (files are not consistent)."
10        First of all, are those your words?
11   A   Yes.
12   Q   And the 60 percent represents files that
13 have no due diligence, correct?
14        MS. FINCHER:  Object to the form.
15        THE WITNESS:  I don't recall

Page 136

Page 135

10        You'll agree with me that, at least for
11 this PowerPoint presentation that Henry Schein
12 produced to us, it says that:  "We," Henry Schein,
13 "do not have Know Your Customer Due Diligence for
14 approximately 60 percent of our customers."
15        That's a statement that you wrote,
16 correct?
17   A   Correct.
18   Q   All right.  And then on the remaining
19 40 percent, there were varying degrees of due
20 diligence, the files were not consistent.
21        Those were your words, correct?
22   A   Correct.

Page 137

Page 138

Page 140

Page 139

Page 141



Page 142

Page 144

24    Then you put together a slide that says

Page 143

Page 145

1  "Potential Risks to Henry Schein."  And you raise
2  the question:  "How vulnerable are we to potential
3  DEA Regulatory action by not having complete due
4  diligence on all customers purchasing controlled
5  substances?"
6        So you -- you raise the question of --
7  of vulnerability because the due diligence files
8  are incomplete, correct?
9     A   Correct.

Highly Confidential - Subject to Further Confidentiality Review



Page 146

Page 148

Page 147

Page 149

```
15        Q   So, again, this is dated November 27th,
16   2013.  One of the solutions you posit is:
17   "Develop and execute a plan to obtain due
18   diligence on all active customers purchasing
19   controlled substances within a reasonable time
20   frame."
21           We discussed the 27,000 customer
22   backlog.  Do you recall in November of 2013 the
23   need to develop and execute a plan to catch up on
24   those customer files that did not have due
```

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 diligence?

2    A   Yes.

3    Q   And the last point says: "Additional

4 Regulatory resources are needed to prepare, review

5 and complete customer due diligence."

6        Was that the need to hire more people in

7 order to catch up on the backlog?

8    A   Yes, additional resources were needed,

9 correct, to complete the due diligence.  Yes.

10    Q   And so that's going into the beginning

11 of 2014.  That is, the need to come up with this

12 plan, to execute on it, and to get Schein in

13 compliance with its due diligence requirements,

14 and that's the state of affairs as of the end of

15 2013, correct?

16        MS. FINCHER:  Object to the form.

17        THE WITNESS:  2014, you said, right?

18 Was it '14 or '13."

19 BY MR. MIGLIORI:

20    Q   The end of 2013 was that document.

21    A   Okay.  Yes.

22        (Steffanie-Oak Exhibit No. 12 was

23        marked for identification.)

24 BY MR. MIGLIORI:



Highly Confidential - Subject to Further Confidentiality Review



Page 154

Page 155

Page 156

Page 157

**Page 156**

1 process, explain what it is, why we do it, and how
2 they need to help educate their customers as well
3 on what information that we need.
4     Then there was a second show again for
5 the medical sales where we had a table set up,
6 where we would share our "Know Your Customer"
7 forms and speak one on one with the sales reps to,
8 again, educate them on the process and why we're
9 doing what we're doing, and why it's so important.
10    Q   Did the sales force have any role in
11 your suspicious order monitoring/"Know Your
12 Customer" process at this time?
13    A   Only as far as just educating the
14 customer on the forms that they're going to need
15 to fill out and why we need their cooperation in
16 providing the data that we're asking for.
17    Q   It would be inappropriate for a
18 salesperson to tell customers how to fill out the
19 form, correct?
20     MS. FINCHER:  Object to the form.
21     THE WITNESS:  Correct.
22 BY MR. MIGLIORI:
23    Q   And that is, and to provide answers that
24 would generate the least amount of scrutiny,

**Page 155**

19     Tell me what you did with the sales
20 force at Henry Schein.
21    A   There was one specific sales meeting
22 where Shaun and I did a presentation to the
23 medical sales reps -- excuse me -- explaining what
24 this sort of monitoring was, "Know Your Customer"

**Page 157**

1 correct?
2     MS. FINCHER:  Object to the form.
3     THE WITNESS:  Correct.
4 BY MR. MIGLIORI:
5    Q   And -- and what kind of training
6 materials had you used for the sales teams?  Was
7 it -- it says "online training module."  Where --
8 where was that housed?
9    A   It was -- I can't remember the name of
10 the computer system.  It was -- it's a -- it's an
11 online training software that all the sales reps
12 have access to, so they use it for multiple types
13 of medical type training.
14     So my team, we created a specific
15 module, again to explain what "Know Your Customer"
16 is, why we do it, why it's important, how to help
17 educate the customer, and why they need to
18 cooperate.  You know, we showed some -- some of
19 the previous companies that had been fined to try
20 to show the importance of what could happen if we
21 don't, you know, comply with the --
22    Q   Was the prior exhibit, No. 11, part of
23 that module?  Is that one of the things that you
24 would have shown the sales force?

Page 158

1    A    Exhibit 11?
2    Q    Your PowerPoint presentation.
3    A    No.
4    Q    Okay.  Was -- was that online module
5  something that continued -- you continued to use
6  right through the time of your resignation?
7    A    Yes.
8    Q    And you don't know what system that that
9  module was housed on?
10   A    I -- I can't remember the name of it.
11   Q    The --
12   A    It was controlled through the medical
13  education team.
14   Q    And it was content that you put together
15  for "Know Your Customer" obligations for the
16  benefit of the sales force at Henry Schein?
17   A    Correct.
18   Q    And we've had a lot of testimony about
19  JD Edwards.  I think it was called JD Edwards --
20   A    Mm-hmm, yes.
21   Q    -- platform.  Would it have been housed
22  there?
23   A    No.
24   Q    Was it something that they could print

Page 159

1  out if they needed to print it out as a resource?
2    A    No.  No.
3         (Steffanie-Oak Exhibit No. 13 was
4         marked for identification.)
5  BY MR. MIGLIORI:

Page 160

Page 161

Page 162

Page 164

Page 163

Page 165

BY MR. MIGLIORI:

5

6    Q    So about 80 percent of the pended orders

7 were managed or cleared or otherwise handled by

8 Verifications, 20 percent was handled by your

9 department.  Correct?

10    A    Correct.

11    Q    And the only MD was in Regulatory, not

12 in Verifications, correct?

13    A    Correct.

14    Q    And what does it mean if a physician is

15 self-medicating, restriction letters are sent by

16 them?

17    A    Henry Schein had a policy that if the

18 doctor indicated on their "Know Your Customer"

19 form that they were ordering the drugs for their

20 own use, we would restrict them.  So those

21 accounts did not have to go to Regulatory to --

22 for us to agree that they were self-medicating.

23        So Verifications had the authority to go

24 ahead and restrict those accounts based off of the

Page 166

1 information provided by the doctors.
2     Q   And in that context, does "restrict"
3 mean they got nothing, no controlled substances
4 after that or --
5     A   Correct.
6     Q   Go ahead.
7     A   Correct.
8     Q   Okay.  And you would agree with me that
9 a physician self-medicating is on its face a
10 suspicious order, correct?
11         MS. FINCHER:  Object to the form.
12         THE WITNESS:  I would say that, in many
13 cases, what we ended up finding out was that the
14 doctor had a valid prescription from his own
15 doctor, and he was just thinking that he could
16 just fill it out of his own supply.
17 BY MR. MIGLIORI:
18     Q   Would that --
19     A   So --
20     Q   Sorry, I didn't mean to interrupt you.
21     A   That's okay.
22     Q   Would that be enough to release the
23 prescription, if he had a valid --
24     A   No, it wouldn't.  We would explain to

Page 167

1 them that they're acting as a pharmacy, and
2 they're not licensed as a pharmacy.  And we found
3 a lot of doctors didn't realize that they couldn't
4 do that, because it's not like they were writing
5 their own prescription and taking the drugs.
6     Q   So if a doctor were deemed or determined
7 to be self-medicating, and a restriction letter
8 went out, would a suspicious order be reported to
9 the DEA field office or headquarters?
10     A   If there was an open order at the time,
11 it would be reported as suspicious, correct.
12     Q   Okay.  And failure to report a
13 suspicious order if there was an open order at the
14 time would be noncompliant with the DEA
15 regulations as you understood them, correct?
16         MS. FINCHER:  Object to the form.
17         THE WITNESS:  If -- yes, if there was an
18 open order and it was deemed to be suspicious,
19 yes.
20         (Steffanie-Oak Exhibit No. 14 was
21         marked for identification.)
22 BY MR. MIGLIORI:



Page 168

Page 169

Highly Confidential - Subject to Further Confidentiality Review

Page 170

Page 172

Page 171

Page 173

13    Q    Okay.
14    A    Because here it's saying something was
15 developed.  So I -- I'm not sure if it was ever
16 implemented or not.
17         (Steffanie-Oak Exhibit No. 15 was
18         marked for identification.)
19 BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review



Page 174

Page 176

Page 175

Page 177

Page 178

Page 180

Page 179

Page 181



Highly Confidential - Subject to Further Confidentiality Review



Page 182

16    (Steffanie-Oak Exhibit No. 16 was
17    marked for identification.)
18  BY MR. MIGLIORI:
19    Q   Exhibit 16.
20    Do you recognize this as a portion of
21  the CFR related to controlled substances?
22    A   Yes.
23    Q   It says:  "The registrant shall design
24  and operate a system to disclose to the registrant

Page 183

1  suspicious orders of controlled substances.  The
2  registrant shall inform the field office of the
3  administration in this area of suspicious orders
4  when discovered by the registrant."
5    You'll agree with me that the obligation
6  of the registrant is to report suspicious orders
7  when discovered.  Correct?
8    A   That's the wording, yes.

Page 184

22  BY MR. MIGLIORI:
23    Q   In looking at the provision that I put
24  up here, Exhibit 16, in anywhere in this provision

Page 185

1  does it say, Unless you've already shipped the
2  suspicious order?
3    MS. FINCHER:  Object to the form.
4    THE WITNESS:  I still look at it that
5  the order at the point that it was released had
6  not been deemed suspicious.
7  BY MR. MIGLIORI:
8    Q   I understand that.  I'm not talking
9  about the shipment.  I'm talking about the
10  reporting requirement.  You understand that there
11  is a shipping requirement and a reporting
12  requirement.  Those are independent requirements,
13  correct?
14    MS. FINCHER:  Object to the form.
15    THE WITNESS:  I still feel at that point
16  in time there was nothing to report.  I don't know
17  how -- that's all I can say.  I don't know how
18  many --
19  BY MR. MIGLIORI:
20    Q   That's fine.  My question is simple,
21  though.
22    You will agree with me that nothing in
23  this provision says that you don't have to report
24  it if you've already shipped a suspicious order.

Page 186

1  That's not what the regulation says, correct?
2       MS. FINCHER:  Object to the form.  Asked
3  and answered.
4       THE WITNESS:  It doesn't mention
5  anything about shipping, correct.
6       MR. MIGLIORI:  I'm going to keep my
7  promise to you of 2:00-ish.
8       (Steffanie-Oak Exhibit No. 17 was
9       marked for identification.)
10  BY MR. MIGLIORI:

Page 188

Page 187

Page 189

Page 190

Page 192

Page 191

Page 193



Page 194



17     (Steffanie-Oak Exhibit No. 18 was
18     marked for identification.)
19  BY MR. MIGLIORI:

Page 196

Page 195

Page 197

8     I just want you to identify some
9  documents for me.
10     This is the due diligence file for one
11  of Henry Schein's customers.  It's a doctor in
12  Summit County, Ohio, or -- yeah, it's a doctor in
13  the northern district of Ohio named Brian Heim.
14  This is Exhibit No. 19.  And this was provided to
15  us as the entire due diligence file for Dr. Heim.
16     So let's start on the first page.  So
17  when you did your review of the due diligence
18  files as the person working on -- particularly on
19  that part of the DEA compliance for Henry Schein,
20  this would be information that you would go online
21  and pull up, correct?  This is an online printout,
22  isn't it?
23     MS. FINCHER:  Object to the form.
24     THE WITNESS:  No, we would not.

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  BY MR. MIGLIORI:
2      Q   Okay.
3      A   This looks to be a printout from perhaps
4  JD Edwards --
5      Q   Okay.
6      A   -- that Verifications would enter notes
7  in.  So this is not how I -- when I was in the
8  role, how we would receive --
9      Q   Okay.
10     A   -- the information.
11     Q   Okay.  I'm going to represent to you
12  this was presented to us as the entire file for
13  this one customer.
14     A   Mm-hmm.
15     Q   Okay.  So this -- this -- this looks
16  like a JE Edwards inventory of the file of some
17  sort or a docketing?  Is that a good word?
18     A   Yeah, it looks like notes from -- I
19  can't tell with the abbreviation specifically what
20  it's referring to.
21     Q   Did you work in this format at all?
22     A   No.
23     Q   Okay.  Let's see if we can at least
24  understand some of it.



Highly Confidential - Subject to Further Confidentiality Review

Page 202



Page 204

8    A    Mm-hmm.
9    Q    Which is the same date on the prior page
10   as the received completed questionnaire.
11   A    Yeah.
12   Q    So what -- what is this questionnaire?
13   At what stage of the process is this
14   questionnaire?
15        MS. FINCHER:  Object to the form.
16        THE WITNESS:  This is the beginning of
17   the --
18   BY MR. MIGLIORI:
19   Q    Okay.
20   A    -- the first form that we would -- well,
21   not that -- we may have had a prior form, but this
22   is the form that we would send out to gather the
23   initial information.
24   Q    So this would be the new client

Page 203

Page 205

1    onboarding questionnaire that would go out to
2    clients -- to new customers, correct?
3    A    New customers, correct.  And then over
4    time, I don't remember the specific time period,
5    but we would resend out to get updated
6    information.
7        So the -- one account would -- would
8    receive it multiple occasions, depending on the --
9    the time that they would continue ordering with
10   Henry Schein.
11   Q    Okay.  But the form, as we're looking at
12   it now, is at least consistent with, in 2012, the
13   forms that would go out initially to a new
14   customer, correct?
15   A    Yes.
16   Q    All right.  And it may, as you said, go
17   out before or again, if necessary, for some other
18   due diligence, correct?
19   A    Correct.

Highly Confidential - Subject to Further Confidentiality Review



Page 206

Page 208

Page 207

Page 209

Highly Confidential - Subject to Further Confidentiality Review



Page 210

Page 212

Page 211

Page 213

Highly Confidential - Subject to Further Confidentiality Review



Page 214

Page 216

1 review.

2    Q   If there were further investigation,

3 would that investigation be in this due diligence

4 file?

5       MS. FINCHER: Object to the form.

6       THE WITNESS: Yes.

7 BY MR. MIGLIORI:

8    Q   And is there any experience that you've

9 had of doing further investigation and finding out

10 that in fact the potential new customer was in

11 fact convicted of drug trafficking?

12    A   Not that I'm aware of, no.

13    Q   And if somebody had been previously

14 convicted of drug trafficking, is that enough in

15 the Henry Schein system to restrict that customer

16 or terminate that customer?

17       MS. FINCHER: Object to the form.

18       THE WITNESS: It -- it would depend on

19 the circumstances, I think. I mean, we would need

20 to look at it. I can't -- I mean, what -- is that

21 like selling a joint? Is that drug trafficking?

22 I don't know. I mean, I'm not sure.

23 BY MR. MIGLIORI:

24    Q   Bear with me for one second.

Page 215

Page 217

3    A   While I was in the role, yes, we would

4 attempt to get a copy of what the disciplinary

5 action was.

6    Q   Okay. And if that disciplinary action

7 demonstrated a prior history of conviction for

8 drug trafficking, is that something you would want

9 to know?

10    A   Yes.

11    Q   If it demonstrates a prior history for

12 loss of medical license, is that something you

13 would want to know?

14    A   Yes.

15    Q   And would that immediately pend or keep

16 pended this potential new customer?

17       MS. FINCHER: Object to the form.

18 BY MR. MIGLIORI:

19    Q   If there was a prior conviction for drug

20 trafficking?

21    A   The order would be pended, yes.

22 Initially that would be why we would do the

23 review. But, correct, that would be a reason not

24 to. To continue to hold until you can do the

Highly Confidential - Subject to Further Confidentiality Review



Page 218

10      THE WITNESS:  If we're able to access
11  it.  So there are cases where it says, "Yes," and
12  we may not be able to access it and reach out to
13  the state, and sometimes they won't release it.
14      So sometimes there's a link directly to
15  it.  I know there have been -- I can think of at
16  least one other time where we tried to get copies
17  and weren't able to get it, and maybe due to the
18  length of time that has passed because the system
19  only holds a certain -- they only go back so far.
20      But if it's available, I know when I was
21  in the role, we did the best to make sure that we
22  can get a copy of it and review it.
23  BY MR. MIGLIORI:
24      Q   If you inquired of the Ohio Board of

Page 219

1  Pharmacy or the State Medical Board of Ohio about
2  prior disciplinary actions, would that notation of
3  inquiry be in the file?
4      A   Yes.
5      MS. FINCHER:  Object to the form.
6  BY MR. MIGLIORI:
7      Q   And if they provided you with any
8  information, would that be in the file?
9      A   Yes.
10      Q   And did Henry Schein do anything to look
11  in the criminal justice system to see whether or
12  not its new customers had been convicted or
13  indicted on drug-related offenses --
14      MS. FINCHER:  Object to the form.
15  BY MR. MIGLIORI:
16      Q   -- in performing its due diligence?
17      MS. FINCHER:  Object to the form.
18      THE WITNESS:  As I mentioned earlier,
19  they only did a -- we only did a license
20  verification.  If the charge had an impact to the
21  medical license, even if they were on probation
22  for something, if that was in the system, we would
23  review it.
24  BY MR. MIGLIORI:

Page 220

Page 221

Highly Confidential – Subject to Further Confidentiality Review

Page 222



BY MR. MIGLIORI:

Q    If it -- if the DEA contacted Henry Schein and said, We're investigating one of your customers, please send us information, is that inquiry alone something that should be in the due diligence file?

MS. FINCHER:  Object to the form.

THE WITNESS:  It's part of the customer file, but it --

BY MR. MIGLIORI:

Q    Let me be more specific.

If the DEA contacts Henry Schein and

Page 223

says, We believe that your customer has ordered unusually large volumes of controlled substances, please provide us your supply transactions, is that something that at Henry Schein should show up in the due diligence file?

MS. FINCHER:  Object to the form. Improper hypothetical, assumes facts not in evidence.

THE WITNESS:  I've never seen a request like that from the DEA where they actually stated that, but we would get requests all the time for sales data, and it would be part of the customer file, but it didn't -- it doesn't get matched up to the questionnaire, I guess is what I'm saying. Overall, it's additional information that's stored in the system, it's reviewed, but it's not attached with this.  So you wouldn't get it with -- it's in the system.

BY MR. MIGLIORI:

Q    It's in -- in what system?

A    They'll scan it into JDE, but it's not part of -- this file at the time that it's produced, it's scanned in, so you can't keep adding to a scan.  There may be multiple documents

Page 224

over the course of time in the system.

Q    So this --

A    So it's reviewed and saved.  Just --

Q    What -- I'm sorry.  What's been produced to you is -- produced to us as the due -- as the file, the due diligence file for that doctor.

And my question very simply is, if the DEA informs Henry Schein that it is investigating for criminal purposes one of your customers, would you as the DEA person at Henry Schein expect that information to go into the due diligence file or somewhere else?

MS. FINCHER:  Object to the form. Improper hypothetical, assumes facts not in evidence.

THE WITNESS:  I would expect it to go into the system and be notified of the concern.

BY MR. MIGLIORI:

Q    If a doctor puts in an order, does Verifications have to go through multiple different files to find out whether or not to pend it?

MS. FINCHER:  Object to the form.

THE WITNESS:  There's different scanned

Page 225

attachments in the system, but they're named a certain way so that when they open them, they know what they are.

BY MR. MIGLIORI:

Q    And so DEA inquiries, other than the one you referenced on August 30th, 2012, would not automatically go into a due diligence file?

MS. FINCHER:  Object to the form.

THE WITNESS:  I guess I look at it different, but it's in -- it's in the customer file.  I guess if everything is in there, you're referring to it as a due diligence file, then it's there.  I'm looking at it as an initial packet that they get when they first approve a customer, and it's a snapshot in time of what was looked at.

BY MR. MIGLIORI:

Q    Let me --

A    And then there may be additional things that come in.

Q    Maybe that's a disconnect.

I want you to assume that Exhibit 19, the document in front of you, that is, the customer file, that's what was produced to us from Henry Schein about this doctor.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    A   Okay.

2    Q   If that's how it's been produced to us,
3   would you expect a DEA inquiry and request for
4   transactional information about a doctor to be
5   somewhere in that customer file?

6       MS. FINCHER:  Object to the form.

7       THE WITNESS:  No, if it wasn't
8   specifically requested, and you're only asking for
9   the KYC customer file, then no, it may not have
10  been pulled.

11  BY MR. MIGLIORI:

12   Q   No, I'm asking for actual orders, number
13  of pills sold.

14      MS. FINCHER:  Object to the form.

15      THE WITNESS:  I'm misunderstanding.

16      MS. FINCHER:  You want to reask the
17  question again?

18      THE WITNESS:  Yeah, please reask it.

19  BY MR. MIGLIORI:

20   Q   If the DEA calls up Henry Schein and
21  says, We are investigating one of your customers,
22  and we need to know how many pills were sold to
23  this guy over the past X number of months, does
24  your due diligence system do anything to try to

Page 227

1   make sure that that information is documented in
2   the customer file?

3    A   Yes.

4       MS. FINCHER:  Object to the form.

5       THE WITNESS:  Yes.

6   BY MR. MIGLIORI:

7    Q   All right.  So that kind of inquiry from
8   DEA should be somewhere in the customer file,
9   wherever it is.

10   A   Correct.

11   Q   Okay.  That's all I was asking.  Thank
12  you.

13      (Steffanie-Oak Exhibit No. 20 was
14      marked for identification.)

15  BY MR. MIGLIORI:

16   Q   I'll show you Exhibit 20, and then I've
17  got one more after this.

18      Now, you said you hired Glenn Linnquist,
19  right?

20   A   I was one of the people.  I interviewed
21  him, yes.

22   Q   So he was hired on to be sort of the
23  backup help for the -- the due diligence project,
24  correct?

Page 228

1    A   That's one of the things that he did,
2   but that wasn't the sole reason why he was hired.

3    Q   Right.  But when we talked about him
4   earlier, he was one of the -- that was one of the
5   first things you did is you hired him and another,
6   correct?

7    A   I -- when I came into the role, I lost
8   the two people that were going to be reporting to
9   me, so Glenn was one of the ones that replaced the
10  two I already had.



16      So the due diligence form, would that be
17  the initial form, do you know?

18      MS. FINCHER:  Object to the form.

19  BY MR. MIGLIORI:

20   Q   Or is it too --

21   A   I don't know.

22   Q   -- not specific enough?

23   A   I don't know.  I would have to see the
24  file.  Because, again, customers, they don't just

Page 229

1   stick with one form.  As time goes on, we get a
2   new form.

3    Q   Okay.

4    A   And also, again, because it's coming to
5   Regulatory, we're kind of given that package of
6   information from Verifications.

7    Q   Got you.  This is all that's attached.
8   That's why I'm asking --

9    A   Yeah.

10   Q   -- because I don't -- I don't know
11  either.

12   A   Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

Page 232

Page 231

Page 233



Highly Confidential - Subject to Further Confidentiality Review

Page 234

Page 236

Page 235

Page 237



Highly Confidential - Subject to Further Confidentiality Review

Page 238

Page 240



18    Q    And did you have any -- do you have any,
19 as you sit here today, any specific recollection
20 of dealing with any issues or DEA compliance
21 issues in the state of Ohio?
22    A    No.
23    Q    Do you ever remember having any direct
24 dealings with any of the DEA field offices in

Page 239

Page 241

1 Ohio?
2    A    Not that I can recall, no.
3    Q    Did you have any roles with respect to
4 suspicious order reporting either to the DEA field
5 office for Ohio or for the state reporting
6 requirements in Ohio?
7    A    As I mentioned earlier, later on in my
8 role, one of the people that reported to me was
9 responsible for the reporting.
10    Q    Right.
11    A    But I didn't really get directly
12 involved in that.
13    Q    Okay.  And who -- remind me again, I'm
14 sorry, who was that person?
15    A    Pete Schmidt.
16    Q    Schmidt.  Okay.
17         And you had -- as you sit here today,
18 you have no recollection of any failure to report
19 to the State of Ohio for any period of time while
20 you were in Regulatory, correct?
21    A    The only thing I'm aware of, and I don't
22 remember all the specifics, for the state
23 reporting, I thought that at one point in time
24 they found an error with a report, that it wasn't

Page 242

1 pulling in all controls, that it was limited to
2 certain drugs, and then when they discovered that,
3 they corrected it. But that wasn't under my
4 responsibility. I just remember hearing about it.
5     Q    Okay. And so have you reviewed or read
6 Sergio Tejeda's letter to the Ohio Board of
7 Pharmacy about failing to report to Ohio under the
8 required state law?
9         MS. FINCHER: Object to the form.
10         THE WITNESS: I don't recall reading the
11 whole letter, no.
12 BY MR. MIGLIORI:
13     Q    Okay. Are you -- if this case is tried
14 in the fall of this year, in October or November,
15 are you available to testify as a fact witness?
16     A    No. Can I say no?
17     Q    Have you been asked to be available to
18 testify as a fact witness?
19     A    No.
20         MR. MIGLIORI: Okay. I appreciate your
21 time. Thank you so much.
22         THE WITNESS: Thank you.
23         MS. FINCHER: Pass the witness now?
24         MR. MIGLIORI: Yes.

Page 243

1         MS. FINCHER: We'll reserve our
2 questions.
3         MR. MIGLIORI: Thank you very much.
4         THE VIDEOGRAPHER: 2:24, we're off the
5 video record. This concludes the video
6 deposition.
7         (Whereupon, the deposition of
8         TINA STEFFANIE-OAK was concluded
9         at 2:24 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 244

1     CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2     The undersigned Certified Shorthand Reporter
3 does hereby certify:
4     That the foregoing proceeding was taken before
5 me at the time and place therein set forth, at
6 which time the witness was duly sworn; That the
7 testimony of the witness and all objections made
8 at the time of the examination were recorded
9 stenographically by me and were thereafter
10 transcribed, said transcript being a true and
11 correct copy of my shorthand notes thereof; That
12 the dismantling of the original transcript will
13 void the reporter's certificate.
14     In witness thereof, I have subscribed my name
15 this date: March 14, 2019.
16
17         _____
18         LESLIE A. TODD, CSR, RPR
19         Certificate No. 5129
20 (The foregoing certification of
21 this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)

Page 245

1     INSTRUCTIONS TO WITNESS
2     Please read your deposition over carefully and
3 make any necessary corrections. You should state
4 the reason in the appropriate space on the errata
5 sheet for any corrections that are made.
6 After doing so, please sign the errata sheet
7 and date it.
8     You are signing same subject to the changes
9 you have noted on the errata sheet, which will be
10 attached to your deposition. It is imperative
11 that you return the original errata sheet to the
12 deposing attorney within thirty (30) days of
13 receipt of the deposition transcript by you. If
14 you fail to do so, the deposition transcript may
15 be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject To Further Confidentiality Review

Page 246

```
1          ------
2          E R R A T A
3          ------
4   PAGE LINE CHANGE
5   ____ ____ _____
6   REASON: _____
7   ____ ____ _____
8   REASON: _____
9   ____ ____ _____
10  REASON: _____
11  ____ ____ _____
12  REASON: _____
13  ____ ____ _____
14  REASON: _____
15  ____ ____ _____
16  REASON: _____
17  ____ ____ _____
18  REASON: _____
19  ____ ____ _____
20  REASON: _____
21  ____ ____ _____
22  REASON: _____
23  ____ ____ _____
24  REASON: _____
```

Page 247

```
1          ACKNOWLEDGMENT OF DEPONENT
2      I,_____, do hereby
3   certify that I have read the foregoing pages, and
4   that the same is a correct transcription of the
5   answers given by me to the questions therein
6   propounded, except for the corrections or changes
7   in form or substance, if any, noted in the
8   attached Errata Sheet.
9
10  _____
11  TINA STEFFANIE-OAK              DATE
12
13
14  Subscribed and sworn to
15  before me this
16  _____day of_____,20___.
17  My commission expires:_____
18  _____
19  Notary Public
20
21
22
23
24
```