Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF OHIO

3                EASTERN DIVISION

4

                ~~~~~~~~~~~~~~~~~~~~

5

6    IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
     OPIATE LITIGATION

7                                Case No. 17-md-2804

8                                Judge Dan Aaron
     This document relates to:     Polster

9

     The County of Summit, Ohio, et al.

10   v. Purdue Pharma L.P., et al.

11   Case No. 1:18-OP-45090 (N.D. Ohio)

12

                ~~~~~~~~~~~~~~~~~~~~

13

14             Videotaped deposition of
                 GEORGE STERBENZ, M.D.

15

16               October 17, 2018
                   9:05 a.m.

17

18

19                 Taken at:

20            Akron Bar Association

21           57 South Broadway Street

22               Akron, Ohio

23

24

25        Renee L. Pellegrino, RPR, CLR

```
                                                    Page 2
 1    APPEARANCES:

 2
      On behalf of Summit County and City of Akron:
 3        Motley Rice
          ANNE McGINNESS KEARSE, ESQ.
 4        KRISTEN M. HERMIZ, ESQ.
          TAMMY CAULEY RIVERS, ESQ.
 5        28 Bridgeside Boulevard
          Mt. Pleasant, South Carolina  29464
 6        (843) 216-9343
          akearse@motleyrice.com
 7        khermiz@motleyrice.com
          trivers@motleyrice.com
 8
      On behalf of Walmart, Inc.:
 9        Jones Day
          EDWARD M. CARTER, ESQ.
10        BRANDY H. RANJAN, ESQ.
          325 John H. McConnell Boulevard
11        Suite 600
          Columbus, Ohio  43215-5017
12        (614) 469-3939
          emcarter@jonesday.com
13        branjan@jonesday.com
14    On behalf of Mallinckrodt:
          (Via Virtual Veritext Stream)
15        Ropes & Gray
          KAITLIN A. BERGIN, ESQ.
16        Prudential Tower
          800 Boylston Street
17        Boston, Massachusetts  02199-3600
          (617) 951-7000
18        kaitlin.bergin@ropesgray.com
19    On behalf of Endo Pharmaceuticals, Inc., Endo
      Health Solutions, Inc., Par Pharmaceuticals,
20    Inc. and Par Pharmaceutical Companies, Inc.:
          Arnold & Porter,
21        ANGEL NAKAMURA, ESQ.
          44th Floor
22        777 South Figueroa
          Los Angeles, California  90017-5844
23        (213) 243-4000
          angel.nakamura@aporter.com
24
25                      ~ ~ ~ ~ ~
```

```
 1    APPEARANCES, CONT'D:
 2
      On behalf of Purdue Pharma L.P., Purdue Pharma,
 3    Inc. and The Purdue Frederick Company:
          Dechert LLP
 4        MARK S. CHEFFO, ESQ.
          Three Bryant Park
 5        1095 Avenue of the Americas
          New York, New York  10036-6797
 6        (212) 698-3500
          mark.cheffo@dechert.com
 7           - and -
          Dechert LLP
 8        SARA B. ROITMAN, ESQ.
          35 West Wacker Drive
 9        Suite 3400
          Chicago, Illinois 60601-1608
10        (312) 646-5800
          sara.roitman@dechert.com
11
      On behalf of Prescription Supply, Inc.:
12        Pelini, Campbell & Williams
          GIANNA M. CALZOLA-HELMICK, ESQ.
13        Bretton Commons, Suite 400
          8040 Cleveland Avenue NW
14        North Canton, Ohio  44720
          (330) 305-6400
15        giannac@pelini-law.com
16    On behalf of McKesson Corporation:
          (Via Telephone and Veritext Virtual Stream)
17        Covington & Burling LLP
          STEPHEN F. RAIOLA, ESQ.
18        One CityCentre
          850 Tenth Street, NW
19        Washington, D.C.  20001-4956
          (202) 662-2000
20        sraiola@cov.com
21    On behalf of Allergan Finance, LLC:
          Kirkland Ellis LLP
22        (Via Telephone and Veritext Virtual Stream)
          TUCKER HUNTER, ESQ.
23        300 North LaSalle
          Chicago, Illinois  60654
24        (312) 862-2000
          tucker.hunter@kirkland.com
25                        ~ ~ ~ ~ ~
```

```
                                                     Page 4
 1    APPEARANCES, CONT'D

 2
      On behalf of HBC Service Company:
 3        (Via Telephone and Veritext Virtual Stream)
          Marcus & Shapira
 4        ERIN GIBSON ALLEN, ESQ.
          One Oxford Centre, 35th Floor
 5        301 Grant Street
          Pittsburgh, Pennsylvania  15219-6401
 6        (412) 471-3490
          allen@marcus-shapira.com
 7
      On behalf of Cardinal Health:
 8        Williams & Connolly
          BRADLEY MASTERS, ESQ.
 9        725 Twelfth Street, NW
          Washington, D.C.  20005
10        (202) 434-5421
          wmasters@wc.com
11
      On behalf of Johnson & Johnson and Janssen
12    Pharmaceuticals, Inc.:
          Tucker Ellis LLP
13        ZACHARY ADAMS, ESQ.
          950 Main Avenue
14        Suite 1100
          Cleveland, Ohio  44113-7213
15        (216) 592-5000
          zachary.adams@tuckerellis.com
16
      On behalf of Teva Pharmaceuticals:
17        (Via Telephone and Veritext Virtual Stream)
          Morgan, Lewis & Bockius, LLP
18        THEODORE DAYNO, ESQ.
          600 Anton Boulevard, Suite 1800
19        Costa Mesa, California  92626-7653
          (714) 830-0600
20        theodore.dayno@morganlewis.com
21
                         ~ ~ ~ ~ ~
22

23

24

25
```

Page 5

1    APPEARANCES, CONT'D:
2
     On behalf of AmerisourceBergen Drug Corporation:
3       Jackson Kelly
        A.L. EMCH, ESQ.
4       1600 Laidley Tower
        Charleston, West Virginia  25322
5       (304) 340-1172
        aemch@jacksonkelly.com
6           - and -
        Jackson Kelly
7       SANDRA K. ZERRUSEN, ESQ.
        50 South Main Street
8       Suite 201
        Akron, Ohio  44308
9       (330) 252-9060
        skzerrusen@jacksonkelly.com
10
11   ALSO PRESENT:  Jim Torok, Videographer
12
                        ~ ~ ~ ~ ~
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    TRANSCRIPT INDEX

2

3    APPEARANCES ...................................2

4    INDEX OF EXHIBITS .............................7

5    INDEX OF OBJECTIONS ..........................9

6

7    EXAMINATION OF GEORGE STERBENZ, M.D.:

8    BY MR. CHEFFO ................................17

9    BY MR. EMCH .................................225

10   BY MS. RANJAN ...............................229

11   BY MR. CHEFFO ...............................287

12   BY MS. HERMIZ ...............................318

13   BY MR. CHEFFO ...............................320

14

15   AFTERNOON SESSION ...........................145

16

17   REPORTER'S CERTIFICATE ......................333

18

19   EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

20

21

22

23

24

25

1                    INDEX OF EXHIBITS
2
3      Number            Description          Marked
4
5    Exhibit 1    Curriculum Vitae - George C.    28
                  Sterbenz, M.D.
6
     Exhibit 2    Multi-Page Document Titled "Drug  47
7                 Overdose Deaths, Summit County
                  Medical Examiner 01/01/2016 to
8                 12/31/2016," Beginning Bates
                  Number SUMMIT_000068523 - Marked
9                 Confidential
10   Exhibit 3    E-Mail from Patrick Gillepsie to 135
                  Steve Perch, dated January 31,
11                2017, with Attachment, Beginning
                  Bates number SUMMIT_000118414
12
     Exhibit 4    2016 Summit County Medical      174
13                Examiner Annual Report Beginning
                  Bates Number SUMMIT_000022367
14
     Exhibit 5    E-Mail from Lisa Kohler to      201
15                George Sterbenz and Todd Barr,
                  dated September 12, 2017,
16                Beginning Bates Number
                  SUMMIT_000117014
17
     Exhibit 6    E-Mail String Beginning Bates   217
18                Number SUMMIT_000117010
19   Exhibit 7    E-Mail from Lisa Kohler to Gary 238
                  Guenther, dated September 14,
20                2017, with Attachment, Beginning
                  Bates Number SUMMIT_000201288
21
     Exhibit 8    Copy of Ohio Revised Code       240
22                Section 313.212, Notice of Death
                  by Overdose
23
     Exhibit 9    E-Mail String Beginning Bates   246
24                Number SUMMIT_000028995
25

1                 INDEX OF EXHIBITS, CONT'D

2

3    Exhibit 10    E-Mail String Beginning Bates    250
                   Number SUMMIT_000092858

4

     Exhibit 11    E-Mail from George Sterbenz to    257
5                  Lisa Kohler, dated February 5,
                   2015, with Attachment, Beginning
6                  Bates Number SUMMIT_000098977

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              INDEX OF OBJECTIONS
 2
```

```
 3    Objection ...................................29
      Objection ...................................30
 4    Objection ...................................31
      Objection ...................................31
 5    Objection ...................................32
      Objection ...................................32
 6    Objection ...................................34
      Objection ...................................37
 7    Objection ...................................38
      Objection ...................................39
 8    Objection...................................39
      Objection ...................................41
 9    Objection ...................................43
      Objection...................................43
10    Objection ...................................49
      Objection ...................................52
11    Objection ...................................53
      Objection ...................................55
12    Objection ...................................56
      Objection ...................................56
13    Objection ...................................57
      Objection ...................................58
14    Objection ...................................58
      Objection ...................................59
15    Objection ...................................60
      Objection ...................................63
16    Objection ...................................66
      Objection ...................................66
17    Objection ...................................67
      Objection ...................................68
18    Objection ...................................77
      Objection ...................................79
19    Objection ...................................83
      Objection ...................................87
20    Objection ...................................88
      Objection ...................................89
21    Objection ...................................89
      Objection ...................................90
22    Objection ...................................92
      Objection ...................................93
23    Objection ...................................93
      Objection ...................................94
24    Objection ...................................95
      Objection ...................................97
25
```

1              INDEX OF OBJECTIONS, CONT'D

2

3    Objection .....................................97
     Objection .....................................98
4    Objection .....................................98
     Objection .....................................99
5    Objection ....................................101
     Objection ....................................103
6    Objection ....................................104
     Objection ....................................104
7    Objection ....................................106
     Objection ....................................107
8    Objection ....................................108
     Objection ....................................114
9    Objection ....................................115
     Objection ....................................119
10   Objection ....................................120
     Objection ....................................121
11   Objection ....................................125
     Objection ....................................125
12   Objection ....................................126
     Objection ....................................126
13   Objection ....................................127
     Objection ....................................128
14   Objection ....................................129
     Objection ....................................131
15   Objection ....................................137
     Objection ....................................137
16   Objection ....................................138
     Objection ....................................138
17   Objection ....................................139
     Objection ....................................140
18   Objection ....................................140
     Objection ....................................140
19   Objection ....................................140
     Objection ....................................141
20   Objection ....................................141
     Objection ....................................141
21   Objection ....................................142
     Objection ....................................142
22   Objection ....................................143
     Objection ....................................143
23   Objection ....................................146
     Objection ....................................146
24   Objection ....................................152
     Objection ....................................153
25   Objection ....................................153

1                 INDEX OF OBJECTIONS, CONT'D
2
3       Objection ....................................153
        Objection ....................................154
4       Objection ....................................154
        Objection ....................................154
5       Objection ....................................155
        Objection ....................................156
6       Objection ....................................156
        Objection ....................................157
7       Objection ....................................157
        Objection ....................................158
8       Objection ....................................161
        Objection ....................................161
9       Objection ....................................162
        Objection ....................................164
10      Objection ....................................165
        Objection ....................................169
11      Objection ....................................170
        Objection ....................................173
12      Objection ....................................174
        Objection ....................................177
13      Objection ....................................178
        Objection ....................................179
14      Objection ....................................180
        Objection ....................................180
15      Objection ....................................181
        Objection ....................................182
16      Objection ....................................182
        Objection ....................................182
17      Objection ....................................183
        Objection ....................................183
18      Objection ....................................183
        Objection ....................................183
19      Objection ....................................184
        Objection ....................................184
20      Objection ....................................185
        Objection ....................................185
21      Objection ....................................186
        Objection ....................................186
22      Objection ....................................187
        Objection ....................................188
23      Objection ....................................188
        Objection ....................................189
24      Objection ....................................189
        Objection ....................................189
25

1                INDEX OF OBJECTIONS, CONT'D
2
3     Objection ....................................190
      Objection ....................................190
4     Objection ....................................191
      Objection ....................................191
5     Objection ....................................192
      Objection ....................................192
6     Objection ....................................192
      Objection ....................................192
7     Objection ....................................194
      Objection ....................................195
8     Objection ....................................195
      Objection ....................................195
9     Objection ....................................197
      Objection ....................................198
10    Objection ....................................198
      Objection ....................................199
11    Objection ....................................200
      Objection ....................................207
12    Objection ....................................207
      Objection ....................................211
13    Objection ....................................211
      Objection ....................................212
14    Objection ....................................214
      Objection ....................................215
15    Objection ....................................216
      Objection ....................................216
16    Objection ....................................220
      Objection ....................................220
17    Objection ....................................221
      Objection ....................................221
18    Objection ....................................222
      Objection ....................................223
19    Objection ....................................223
      Objection ....................................224
20    Objection ....................................224
      Objection ....................................232
21    Objection ....................................232
      Objection ....................................233
22    Objection ....................................235
      Objection ....................................239
23    Objection ....................................241
      Objection ....................................242
24    Objection ....................................242
      Objection ....................................242
25

1              INDEX OF OBJECTIONS, CONT'D

2

3   Objection ...................................243
    Objection ...................................244
4   Objection ...................................245
    Objection ...................................252
5   Objection ...................................254
    Objection ...................................254
6   Objection ...................................255
    Objection ...................................262
7   Objection ...................................264
    Objection ...................................264
8   Objection ...................................265
    Objection ...................................265
9   Objection ...................................266
    Objection ...................................268
10  Objection ...................................269
    Objection ...................................270
11  Objection ...................................271
    Objection ...................................274
12  Objection ...................................274
    Objection ...................................275
13  Objection ...................................276
    Objection ...................................279
14  Objection ...................................282
    Objection ...................................286
15  Objection ...................................289
    Objection ...................................290
16  Objection ...................................291
    Objection ...................................291
17  Objection ...................................293
    Objection ...................................294
18  Objection ...................................298
    Objection ...................................300
19  Objection ...................................300
    Objection ...................................302
20  Objection ...................................305
    Objection ...................................306
21  Objection ...................................319
    Objection ...................................320
22  Objection ...................................321
    Objection ...................................323
23  Objection ...................................324
    Objection ...................................326
24  Objection ...................................326
    Objection ...................................327

25

INDEX OF OBJECTIONS, CONT'D

Objection .....................................327

Objection .....................................327

Objection .....................................328

Page 15

1           THE VIDEOGRAPHER:  We're on the
2    record.  Today's date is October 17th, 2018.
3    The time is approximately 9:05 a.m.  This is the
4    videotaped deposition of Dr. Sterbenz in the
5    case of National Prescription Opiate Litigation,
6    Case Number 17-md-2804, to be heard in the
7    United States District Court, Northern District
8    of Ohio, Eastern Division.
9           Would counsel please state their
10   name for the record?
11          MS. HERMIZ:  Kristen Hermiz with
12   Motley Rice on behalf of the County of Summit
13   and the City of Akron.
14          MS. KEARSE:  Anne Kearse, Motley
15   Rice, County of Summit and City of Akron.
16          MS. RIVERS:  Tammy Rivers, Motley
17   Rice, on behalf of Summit County and the City of
18   Akron.
19          MS. CALZOLA-HELMICK:  Gianna
20   Calzola-Helmick from Pelini, Campbell & Williams
21   on behalf of Prescription Supply, Inc.
22          MR. MASTERS:  Brad Masters, Williams
23   & Connolly, on behalf of Cardinal Health.
24          MR. ADAMS:  Zach Adams from Tucker
25   Ellis on behalf of Defendant J&J and Janssen

Page 16

1    Pharmaceutical.

2              MS. RANJAN:  Brandy Ranjan, Jones

3    Day, on behalf of Walmart.

4              MS. ZERRUSEN:  Sandra Zerrusen from

5    Jackson Kelly on behalf of AmerisourceBergen

6    Drug Corporation.

7              MR. EMCH:  Al Emch, Jackson Kelly,

8    AmerisourceBergen Drug Corporation.

9              MS. ROITMAN:  Sara Roitman, on

10   behalf of Purdue Pharma.

11             MR. CHEFFO:  And Mark Cheffo, on

12   behalf of Purdue Parma.

13             MR. CARTER:  Ed Carter, on behalf of

14   Walmart.

15             MS. NAKAMURA:  Angel Nakamura, on

16   behalf of the Endo and Par entities.

17             THE VIDEOGRAPHER:  Folks on the

18   phone?

19             MS. ALLEN:  This is Erin Gibson

20   Allen from Marcus & Shapira on behalf of HBC.

21             MR. DAYNO:  This is Theodore Dayno

22   from Morgan Lewis on behalf of Teva.

23             MR. RAIOLA:  Stephen Raiola with

24   Covington & Burling on behalf of McKesson.

25             MR. HUNTER:  Tucker Hunter from

```
 1   Kirkland & Ellis on behalf of the Allergan
 2   Defendants.
 3              MR. CHEFFO:  Anyone else on the
 4   phone?
 5              THE VIDEOGRAPHER:  Please swear the
 6   witness.
 7         GEORGE STERBENZ, M.D., of lawful age,
 8   called for examination, as provided by the
 9   Federal Rules of Civil Procedure, being by me
10   first duly sworn, as hereinafter certified,
11   deposed and said as follows:
12         EXAMINATION OF GEORGE STERBENZ, M.D.
13   BY MR. CHEFFO:
14         Q.    Good morning, Doctor.  Would you
15   please state your name for the record?
16         A.    My name is Dr. George Sterbenz.
17         Q.    Thank you.
18              My name is Mark Cheffo, as you just
19   heard, and I represent Purdue, and I'll be
20   asking you some questions.  I may be followed by
21   some of my colleagues this afternoon.
22              You've been deposed before; is that
23   right?
24         A.    Yes.
25         Q.    And you have very able counsel, so
```

1   I'm sure that they explained some of the ground

2   rules, but let me just cover a few of them.

3               You do understand that you're under

4   oath?

5       A.    I do.

6       Q.    If at any time that you need a break

7   today, just let us know.  Just answer the

8   question that's pending.  Let us -- you know,

9   tell us and we'll be happy to take a break.

10  Okay?

11      A.    Yes.

12      Q.    Also, if there's anything I ask you,

13  which will likely happen from time to time, that

14  you don't exactly understand, please just let me

15  know, okay?

16      A.    Yes.

17      Q.    Because if you answer, I'm going to

18  assume that you understood the question; is that

19  fair?

20      A.    Yes.

21      Q.    Great.

22            Where are you currently employed?

23      A.    I'm employed at the Summit County

24  Medical Examiner's Office located in Akron.

25      Q.    And what is your position there?

1        A.      I'm the chief deputy medical

2    examiner.

3        Q.      And how long have you held that

4    role?

5        A.      Approximately 18 years.

6        Q.      Is that the title that you assumed

7    when you first joined the department?

8        A.      No.  I was -- I joined the medical

9    examiner's office -- so I should clarify.  I

10   joined the medical examiner's office

11   approximately 18 years ago.  The first year I

12   was the deputy medical examiner, and after the

13   first year, approximately, I was -- my title

14   changed to the chief deputy medical examiner.

15       Q.      And that's the title that you've

16   held since that time?

17       A.      That's correct.

18       Q.      Would you tell us generally what

19   your job duties entail as the chief deputy

20   medical examiner?

21       A.      I perform death investigations for

22   those cases which fall under the jurisdiction of

23   the Summit County Medical Examiner's Office and

24   for which I will be participating in the death

25   investigation.  So I don't perform death

Page 20

1  investigations on every -- or I don't
2  participate in death investigations on all of
3  the cases that the medical examiner's office
4  assumes jurisdiction of, but some of them.
5       Q.    And there's another full-time
6  physician that works with you at the department;
7  is that right?
8       A.    That's correct.
9       Q.    And when I say "the department," is
10  that fair when we're talking about the Summit
11  County Medical Examiner's Office?
12       A.    Yes.
13       Q.    Okay.  And that's Dr. Lisa Kohler?
14       A.    That's correct.
15       Q.    Is there any -- are there any other
16  doctors, physicians, who work on a regular basis
17  with you and Dr. Kohler?
18       A.    Not currently.
19       Q.    Was there a time when you had
20  another physician working with the both of you?
21       A.    Yes.
22       Q.    Who was that?
23       A.    Until recently, Dr. Todd Barr was
24  the deputy medical examiner.
25       Q.    And in terms of reporting, did

1  Dr. Barr report to you as the chief deputy
2  medical examiner?
3          A.    Can you clarify what you mean by
4  report to me?
5          Q.    Were you his supervisor or boss?
6          A.    I wasn't his boss, and I wasn't his
7  direct supervisor.
8          Q.    Who was his direct supervisor?
9          A.    Dr. Kohler.
10         Q.    And is Dr. Kohler your direct
11  supervisor?
12         A.    Yes.
13         Q.    As the head of the department; is
14  that right?
15         A.    As the chief medical examiner for
16  Summit County, she is my immediate supervisor.
17         Q.    So is it fair to say that you and
18  Dr. Barr were more coordinate colleagues than
19  one reporting to the other?
20         A.    Yes.
21         Q.    And did Dr. Barr essentially perform
22  the same types of duties and responsibilities
23  that you and Dr. Kohler perform?
24         A.    Dr. Barr performed death
25  investigations, just as I performed death

Page 22

1   investigations.

2          Q.     And where is Dr. Barr now?

3          A.     Cuyahoga County Medical Examiner's

4   Office.

5          Q.     And do you remember when he left?

6          A.     He left to join the Cuyahoga County

7   Medical Examiner's Office last spring, or this

8   past spring.

9          Q.     Do you know if he made that

10  determination or was he asked to leave your

11  department?

12         A.     It's my understanding it was his

13  choice.

14         Q.     And how long had he been employed by

15  the Summit Medical Examiner's Office prior to

16  leaving to go to Cuyahoga?

17         A.     Slightly less than a year.  I don't

18  recall the exact number of months.  About ten

19  months, maybe 11.

20         Q.     Was he hired to be a full-time

21  employee, or was there an understanding between

22  you and the department that he would have

23  somewhat of a temporary or short-term

24  employment?

25         A.     When you say "understanding" between

1    me, that I had --

2         Q.    No.   The department.   Sometimes

3    people will say, you know, I'm going to come for

4    a year and then I'm going to transition.

5    Sometimes people will say, I'm going to -- I

6    intend to stay here for the rest of my career.

7    Do you have an understanding as to why his

8    length of time was less than a year?

9         A.    I did not hire Dr. Barr.   The --

10   Dr. Barr's appointment to the medical examiner's

11   office is through the executive's department,

12   and that was at the discretion of the county

13   executive and Dr. Kohler.   It was my

14   understanding that Dr. Barr would be, and he

15   was, a full-time employee at the time that he

16   was employed.   It's my understanding that the

17   Summit County Medical Examiner's Office, in

18   terms of our administrative staff and

19   Dr. Kohler, would have liked it if he had

20   stayed, but he chose to go to -- move to the

21   Cuyahoga County Medical Examiner's Office when a

22   forensic pathologist position became available

23   there.

24        Q.    Thank you.

25             And since he's left -- since he

1   left, have you or anyone else in the department

2   been looking to replace him?

3          A.    Well, I have not personally

4   performed a job search to replace the deputy

5   medical examiner, but there has been a job

6   search to replace the deputy medical examiner.

7          Q.    So that's an open search to your

8   knowledge?

9          A.    Well, the position is not filled,

10  and you would have to refer to Dr. Kohler and to

11  the -- to the county executive's department as

12  to the status of that position.  It's my

13  understanding that there is a -- an individual

14  who will be possibly joining the office later

15  this year.

16         Q.    And other than Dr. Barr, let's say

17  in the last ten years, have there been other

18  physicians who have been employed by the

19  department in a similar role doing death

20  investigations?

21         A.    Yes.

22         Q.    Who has that been?

23         A.    Prior to Dr. Barr, Dr. Dorothy Dean

24  was the deputy medical examiner.

25         Q.    And do you know her term of

Page 25

1    employment, approximately?

2          A.    I don't recall her exact term of

3    employment.  It was years.

4          Q.    And was there anyone prior to

5    Dr. Dean?

6          A.    Prior to Dr. Dean, Dr. Ruiz was

7    the -- was a medical examiner in the -- in the

8    -- Summit County.  I don't know what his title

9    was.

10         Q.    And, again, Dr. Dean, Dr. Ruiz,

11   Dr. Barr, they all performed death

12   investigations alongside you and Dr. Kohler?

13         A.    Yes.

14         Q.    Is the -- in order to hold the role

15   of deputy or medical examiner, are all of these

16   folks -- do they typically have a degree in

17   forensic pathology?

18         A.    It's my understanding the

19   qualifications to be a medical examiner at the

20   Summit County Medical Examiner's Office is to

21   have completed a fellowship in forensic

22   pathology.

23               There is also an expectation that if

24   that individual has not yet passed their board

25   examinations for anatomic and forensic

Page 26

1   pathology, that they will successfully pass

2   those board exams also to maintain their

3   employment.

4          Q.    Are you boarded in forensic

5   pathology?

6          A.    Yes.  I am boarded by the American

7   Board of Pathology in anatomic pathology and

8   forensic pathology.

9          Q.    You -- as I understand it, you did

10  your initial education, at least your higher

11  education, in New Jersey; is that right?

12         A.    That's correct.

13         Q.    At Rutgers?

14         A.    Yes.

15         Q.    And then you worked at -- I'm sorry.

16  Then you went to Robert Wood Johnson Medical

17  School; is that right?

18         A.    Yes.  I attended medical school

19  at -- at the University of Medicine and

20  Dentistry of New Jersey, specifically at Robert

21  Wood Johnson Medical School.

22         Q.    And would you just take us, then,

23  prior to 18 years ago, when you joined the

24  Summit County medical examiner, what was your

25  path in terms of employment?

Page 27

1      A.    Following my completion of medical

2    school, I performed a residency in anatomic

3    pathology at New York University Medical Center.

4    That's located in New York City.

5            After completing a residency in

6    anatomic pathology at NYU Medical Center, I

7    performed a fellowship in forensic pathology at

8    the Office of the Chief Medical Examiner for the

9    City of New York.

10           After completing my fellowship in

11   forensic pathology, I stayed at the Office of

12   the Chief Medical Examiner for the City of New

13   York as a city medical examiner.  I worked in

14   the boroughs of Brooklyn and Queens.

15           And then I returned to New Jersey,

16   where I worked as a regional medical examiner at

17   the regional medical examiner's office in New

18   Jersey located in Newark, New Jersey.

19           After that, I went to California,

20   where I worked as the forensic pathologist

21   consultant to the sheriff-coroners in San Luis

22   Obispo and Santa Barbara counties.

23           And after that, I came here to Ohio,

24   where I have since been employed by the Summit

25   County Medical Examiner.

Page 28

```
 1        Q.    Can you tell us the years that you
 2   worked in New York and New Jersey approximately?
 3        A.    Can I refer to my CV so I'm correct?
 4        Q.    Of course.
 5              MR. CHEFFO:  If you have a clean
 6   copy, we could actually mark it.
 7              MS. HERMIZ:  Sure.
 8                   -   -   -   -   -
 9              (Thereupon, Deposition Exhibit 1,
10              Curriculum Vitae - George C.
11              Sterbenz, M.D., was marked for
12              purposes of identification.)
13                   -   -   -   -   -
14        Q.    Doctor, let me just show you what
15   we've marked as Exhibit 1.  Would you just take
16   a look at that and let us know if that's an
17   accurate copy of your CV?
18        A.    Yes.
19        Q.    Great.
20              And is it relatively current?
21        A.    Yes.
22        Q.    And I had asked you if you would be
23   good enough to tell us when you worked in New
24   Jersey and New York.  Could you do that based on
25   your CV?
```

Page 29

1          A.    Yes.

2                My fellowship in forensic pathology

3    was from 1993 to 1994.  So after the fellowship,

4    I continued to work as a city medical examiner

5    in New York City, and that was between 1994 to

6    1997.  I was in New Jersey for approximately one

7    year at the regional medical examiner's office,

8    and that was from 1997 to 1998.

9          Q.    During those years was there an

10   incidence of crack, or what people have talked

11   about, the crack cocaine epidemic?  Do you

12   recall that as a medical examiner?

13                MS. HERMIZ:  Objection to form.

14         Q.    You can answer, unless your counsel

15   directs you not to.

16         A.    I don't have an immediate

17   recollection of the specific incidence of crack

18   cocaine in New York and New Jersey at that time.

19   There were indeed people that died from

20   cocaine-related deaths.  I'm not -- I can't

21   offer testimony as to how many of those deaths

22   were specifically associated with crack cocaine.

23         Q.    Do you remember dealing with cases

24   of overdoses of drugs back then?

25         A.    Yes.  I did deal with cases of drug

Veritext Legal Solutions

www.veritext.com                                          888-391-3376

1    overdoses at that time.

2         Q.    Do any types of drugs kind of stick

3    in your mind as -- as prevalent in terms of your

4    autopsies, back in the years that you just

5    talked about in New York and New Jersey?

6         A.    Are you referring to illicit drugs?

7         Q.    Yes.

8         A.    What types of illicit drugs I recall

9    people died from in -- when I was employed in

10   New York City and New Jersey?

11        Q.    With some type of frequency.

12        A.    What do you mean by "some type of

13   frequency"?

14        Q.    You've heard of the crack crisis or

15   crack epidemic in America?  Are you familiar

16   with that?

17             MS. HERMIZ:  Objection to form.

18        A.    Your question seems more like a

19   statement.  You're telling me that there is a

20   crack epidemic.  I am aware that there is

21   illicit -- there are deaths due to illicit drug

22   abuse and crack cocaine is one of those illicit

23   drugs.

24        Q.    Do you remember in the popular press

25   reading about what people were talking about as

Page 31

1   a crack epidemic?

2           MS. HERMIZ:  Objection to form.

3       A.   So you're -- you're asking me to

4   agree that there -- with the popular press that

5   there's a crack epidemic?

6       Q.   I'm asking you to just answer the

7   question, Doctor, which is, do you recall

8   being -- anything in the popular press over a

9   number of years talking about the crack

10  epidemic?

11          MS. HERMIZ:  Objection to form.

12          You can answer the question if you

13  understand it.

14      A.   I -- I can't say yes to the form --

15  the way you've stated the question.

16      Q.   Have you ever heard the term "crack

17  epidemic" before today?

18      A.   I can't say that I've heard the term

19  "crack epidemic" before today.

20      Q.   Okay.  When you were in medical

21  school, did you take any courses that related to

22  pharmacology or anything to do with drug

23  interactions or pharmacology or things like

24  pharmacokinetics?

25      A.   You mean did I take a pharmacology

1  class as part of my medical school training?

2      Q.    Yes, Doctor.

3      A.    Yes.

4      Q.    Are you familiar with what opioids

5  are?

6      A.    Yes.

7      Q.    And opioids -- is it correct that

8  opioids would include both the active ingredient

9  that's used in lawful medicines but it can also

10  be used in illicit drugs?  Is that fair?

11      A.    Yes.

12      Q.    And are you aware that opioids have

13  the potential to cause addiction or abuse?

14          MS. HERMIZ:  Objection to form.

15      A.    Opioids do have the potential to

16  cause addiction and, therefore, abuse.

17      Q.    And is that something that you have

18  known since medical school --

19          MS. HERMIZ:  Objection to form.

20      Q.    -- if not before?

21      A.    Yes.  I have been aware that opioids

22  can cause addiction and, therefore, abuse for

23  many years since medical school.

24      Q.    And what years were you in medical

25  school?

1      A.    I attended medical school between

2  19 -- 1985 to -- let me clarify.  1985 till

3  1990.  I had a one-year period between my second

4  and third years of medical school where I did a

5  year of research, and that's why my medical

6  school years stretch over a five-year period.

7      Q.    Okay.  And the properties of

8  opioids, including their potential for addiction

9  and abuse, those were things that you learned,

10  amongst many other things, I'm sure, in medical

11  school and, in particular, with respect to your

12  studies about drug properties and pharmacology;

13  is that fair?

14      A.    Yes.

15      Q.    And has there ever been a time since

16  medical school that you've changed that belief;

17  in other words, have you ever -- has there ever

18  been a period of time where you thought that

19  opioids did not have a potential for abuse or

20  addiction up until today?

21      A.    And can I clarify your question?

22      Q.    Sure.

23      A.    You're speaking in terms of opioids

24  as a general class of drugs?

25      Q.    Yes.

Page 34

1          A.     All opioids?

2          Q.     Yes.

3          A.     That all opioids have the potential

4    for -- or opioids as a general class of drugs

5    have a potential for addiction and, therefore,

6    abuse?

7          Q.     Yes, Doctor.

8          A.     And you're asking me if I ever

9    believe that they did not --

10         Q.     Right.

11         A.      -- have the potential for addiction

12   and, therefore, abuse?

13         Q.     Right.  Since having that belief

14   that you just told us about in medical school,

15   is that a belief that you've held since that

16   time until today?

17              MS. HERMIZ:  Objection to form.

18         A.     When you say it's my belief, are you

19   implying that this -- that opioids having --

20   being a class of drugs that can be addictive

21   and, therefore, abused is just my personal

22   belief and not something that's established by

23   -- within the medical community scientifically?

24         Q.     I think you're reading too much into

25   my question, but I'm happy to try and keep

Page 35

1    clarifying it.

2              We started -- I thought you told

3    us -- we can read it back -- that you learned in

4    medical school, if not before, that opioids had

5    the potential for abuse and addiction, right?

6    Isn't that what you testified to?

7         A.    That's correct.

8         Q.    And I'm just trying to find out,

9    have you -- has there ever been a time where you

10   believed something other than that between

11   medical school and today?

12        A.    I have never been presented with any

13   evidence that opioid drugs as a class can be --

14   are indeed non-addictive and, therefore, non --

15   do not have a potential to be abused in my years

16   of practicing medicine.

17        Q.    Do you prescribe any types of

18   medicines?

19        A.    No.  You mean do I currently

20   actively prescribe drugs, prescription drugs?

21        Q.    Yes, Doctor.

22        A.    No, I do not.

23        Q.    My recollection -- and I think you

24   can quote me on this one, but you'll tell me if

25   this is right -- Dr. Kohler had a similar

Page 36

1   testimony, in that she doesn't prescribe -- I

2   seem to recall she gave one exception, that she

3   might prescribe certain types -- I don't know if

4   it was antibiotics, but certain types of

5   prophylactic medicines to the staff from time to

6   time if you were doing an autopsy, for example,

7   and there might be a risk to the staff of having

8   some type of negative outcome from performing

9   their jobs.  Does that ring a bell to you at

10  all?  Is that something that's done in the

11  medical examiner's office?

12        A.    Do you mean do I prescribe

13  prophylactic drugs to staff members if they're

14  exposed to a potentially infectious disease

15  through the course of an autopsy?

16        Q.    Yes.

17        A.    I do not do that commonly.  I let

18  Dr. Kohler do that if she feels it's necessary.

19  For the most part, staff members can receive

20  prophylactic drugs through their personal

21  physicians if it's necessary.  I only have

22  recollection of needing to do that a few times

23  within the 18 years that I've been practicing in

24  instances where staff members were not able to

25  reach their personal physicians in a timely

Page 37

1   fashion, generally because of the date falling
2   on a weekend or a holiday.
3        Q.    So when was the last time that you
4   actually wrote a prescription?
5        A.    I have not written a prescription
6   within the past year, and I can't -- I don't
7   have specific recollection of the precise date
8   where I wrote my last prescription.
9        Q.    You're aware that prescription
10  opioids are still available to doctors to write
11  prescriptions, correct?
12       A.    Yes.
13       Q.    And you're aware that they are
14  generally prescribed for -- to manage pain; is
15  that fair?
16       A.    Yes.  Pain management is one of the
17  primary reasons why opioid drugs are prescribed.
18       Q.    And you agree that the management of
19  chronic pain in patients is a legitimate medical
20  service, correct?
21            MS. HERMIZ:  Objection to form.
22       A.    The prescription of opioid drugs for
23  pain management is one of the reasons why opioid
24  drugs are prescribed to patients.
25       Q.    And it's a legitimate use of opioids

Page 38

1    if a doctor, in his or her medical expertise and

2    discretion, determines that a patient would

3    benefit from those medicines who is experiencing

4    chronic pain; is that right?

5              MS. HERMIZ:  Same objection.

6         A.    So it appears that your question is

7    referring only specifically to chronic pain

8    management.

9         Q.    We can start there.

10        A.    But that's what you said.  You said

11   if a patient is experiencing chronic pain, then

12   it's legitimate -- then the prescription for

13   opioid drugs is a legitimate reason to be

14   prescribing those drugs.

15        Q.    Yes.

16        A.    I don't agree or disagree with that.

17        Q.    You just don't have a view?

18        A.    I don't -- I don't participate in

19   chronic pain management or prescription of

20   opioid drugs for patients with chronic pain

21   management; and chronic pain management, as it

22   developed through the 1990s and the early 2000s,

23   did not exist when I was in medical school.  So

24   I don't really have an opinion for or against

25   that type of prescription practice.  It didn't

1    exist at the time in the fashion as it evolved

2    into at the time that I was in medical school.

3         Q.    What if I took away the word

4    "chronic"?  Would pain -- would that change your

5    answer?

6         A.    In what setting?

7         Q.    Let's try it this way, Doctor.  You

8    have -- if you see, in your profession -- your

9    professional capacity, if you see something,

10   that you think a doctor or healthcare provider

11   has done something beyond the standard of care,

12   amongst the tools or avenues available to you is

13   to actually report that doctor, correct?

14             MS. HERMIZ:  Objection to form.

15        A.    I'm not sure what you -- what you're

16   getting at by prescription practices beyond

17   standard of care and reporting doctors.

18        Q.    If you saw something in a medical

19   record while you were performing your

20   professional duties that you thought was well

21   beyond the standard of care, do you have an

22   obligation to report that to the medical boards

23   or to your supervisors?

24             MS. HERMIZ:  Objection to form.

25             The witness is here in his capacity

Page 40

1   as a fact witness.  He's not here about the

2   standard of care for prescription and pain

3   management.

4        Q.    You can answer.

5        A.    Generally speaking, the medical

6   examiner is not the doctor police.

7        Q.    That's not my question, Doctor.

8              If you see something --

9        A.    I didn't finish.

10       Q.    Okay.

11       A.    Generally speaking, the medical

12  examiner is not the doctor police.  The medical

13  examiner is charged with determining cause and

14  manner of death, but the medical examiner is not

15  specifically charged with determining whether or

16  not standard of care has been followed in

17  clinical -- in a clinical setting for those

18  decedents that the medical examiner assumes

19  jurisdiction of their death investigation.  So,

20  in a practical sense, the extent of the medical

21  examiner investigation is not aimed at

22  addressing the issue which you have raised,

23  which is an evaluation of -- a post-mortem

24  evaluation of ante-mortem adequacy of standard

25  of care.

1          Q.    I'm going to move to strike.  Let's

2     see if you can answer my question now, Doctor.

3              If you're conducting an autopsy or

4     some other function and you see something that

5     you believe is outside the standard of care, do

6     you or do you not have an obligation or a

7     responsibility to report that?  It's a simple

8     question.

9              MS. HERMIZ:  Objection to form.

10         A.    I have never, during the course of

11    one of my death investigations, specifically

12    performed such an investigation that -- as

13    you're referring to, looking for prescription

14    practices outside the standard of care.  I've

15    never had the occasion to -- to do what -- to do

16    what you are -- what you're indicating.

17         Q.    So in the 18 years that you've

18    worked at the Summit County Medical Examiner's

19    Office, you have never once reported a doctor or

20    healthcare provider to any governmental or

21    medical regulatory body based on any type of

22    suspicion or conduct that you believe violated

23    the standard of care; is that fair?

24         A.    Your question is making a

25    presumption that I am doing -- that I personally

1   and the medical examiner's office does an

2   investigation to determine -- to evaluate

3   standard of care, one.

4        Q.    Doctor, I don't want to interrupt

5   you, but it's a yes or no question.

6             MS. HERMIZ:  He's trying to answer

7   your question in the way that you've posed it.

8             MR. CHEFFO:  I don't think he is.

9             Okay.  That's fine.

10       A.    I think it's not a yes and no

11  question.  And you're making a statement.

12  You're stating that the medical examiner, during

13  the course of their investigations, has the

14  capacity to be evaluating medical or clinical

15  standard of care.  The very nature of your

16  question is wrong.

17            The medical examiner office does not

18  have the capacity or the resources, in most

19  instances, to -- on a case-by-case, on a daily

20  basis to evaluate clinical standard of care.  So

21  in those instances with deaths due to --

22  associated with prescription medications, I have

23  never reported a physician based upon the

24  investigation performed by the medical

25  examiner's office to a medical board for

Page 43

1  deviating from standard of care.

2       Q.    Have you ever reported a medical

3  doctor for any reason to a medical board?

4       A.    No.

5       Q.    Are you an expert in toxicology?

6       A.    I am able to provide expert

7  testimony with regard to toxicology to the

8  extent that it involves my determination or my

9  need to make a determination for cause and

10 manner of death.

11      Q.    So is that a yes or a no?

12      A.    It's what I said it was.

13      Q.    Do you hold yourself out as an

14 expert in toxicology?

15      A.    I already answered that question.

16           MS. HERMIZ:  Objection to form.

17      Q.    I didn't understand it.  Can you

18 please tell me again?

19      A.    I can't be any more clear than I

20 was.  I think I was very clear.

21      Q.    I would disagree.

22           So you're not going to answer my

23 question?

24           MS. HERMIZ:  Objection to form.

25 He's answered your question.

Page 44

1           MR. CHEFFO:  I don't think he did.

2           MS. HERMIZ:  I disagree.

3           MR. CHEFFO:  I don't want to argue

4    with you.  And all you can do is just object,

5    okay, because I'm going to, right now, say that

6    we're going to reserve more time because I think

7    the witness is not being responsive and I think

8    he's intentionally trying to delay the

9    deposition by not answering.  Okay.  And I don't

10   say that very lightly.  I don't think I've said

11   that in the last ten years, but I'm just putting

12   that on the record right now.

13           MS. HERMIZ:  Okay.  And I disagree.

14           MR. CHEFFO:  That's fine.

15       Q.    So, Doctor, are you an expert in

16   pharmacology?

17       A.    I am a licensed physician and a

18   forensic -- and a physician who has been trained

19   in anatomic and forensic pathology.  My -- I'm

20   not a -- specifically a pharmacologist, but I

21   can have an expert opinion to pharmacology to

22   the extent of which it involves my practice of

23   forensic pathology, just as toxicology.

24       Q.    Are you an expert in pharmaceutical

25   advertising?

Page 45

1        A.      No.

2        Q.      Are you an expert in pharmaceutical

3   marketing?

4        A.      No.

5        Q.      Have you ever been -- well, strike

6   that.

7                Do you know what it means, called on

8   by a sales rep?  Have you heard that term?

9        A.      What?

10       Q.      Called on by a sales rep for a

11   pharmaceutical company, have you heard that

12   term?

13       A.      No.

14       Q.      I'm sorry.  That was a bad question.

15                So you've never -- you cannot recall

16   ever being -- having an interaction with a

17   pharmaceutical sales rep; is that right?

18       A.      That's not right.

19       Q.      Okay.  When was the last time that

20   you had such an interaction?

21       A.      When I was in medical school.

22       Q.      Okay.  Other than that?

23       A.      No.

24       Q.      Are you required or do you attend

25   CME programs?

Page 46

1        A.     Yes.

2        Q.     With what frequency?

3        A.     I'm required to have 50 CME -- class

4   one CME credits per year.

5        Q.     Do you publish in any peer-reviewed

6   literature?

7        A.     I don't -- do not routinely publish.

8        Q.     Have you ever published?

9        A.     I have had my name on publications,

10  as indicated in my CV.

11       Q.     Yeah.  We weren't given a copy of

12  your CV, so I can look at that, if it's listed

13  there.

14            MS. KEARSE:  Do you want us to make

15  a copy of it?

16            MR. CHEFFO:  No.  I can just look at

17  it.

18       Q.     There's two publications here, the

19  Journal of Forensic Sciences, back in 2012, and

20  a publication in the American Journal of Medical

21  Genetics.  It looks like it's accepted.  Are

22  those the only two publications?

23       A.     That's correct.

24       Q.     May I see that?

25            Do you teach at any healthcare

Page 47

1   school, medical school, nursing school,

2   dentistry?

3          A.    The medical examiner -- the Summit

4   County Medical Examiner participates with

5   medical students and pathology residency

6   training through NEOUCOM and Summa.

7                       -   -   -   -   -

8                  (Thereupon, Deposition Exhibit 2,

9                  Multi-Page Document Titled "Drug

10                  Overdose Deaths, Summit County

11                  Medical Examiner 01/01/2016 to

12                  12/31/2016," Beginning Bates Number

13                  SUMMIT_000068523 - Marked

14                  Confidential, was marked for

15                  purposes of identification.)

16                       -   -   -   -   -

17          Q.    Doctor, I've put before you what

18   we've marked as Exhibit 2.  Do you see that?

19          A.    Yes.

20          Q.    Do you know what it is?

21          A.    Well, Exhibit 2 says, "Drug Overdose

22   Deaths, Summit County Medical Examiner."

23          Q.    What's the date of the document, or

24   at least the date that it looks like it might

25   have been printed out on the bottom left?

Page 48

1          A.    The date on the bottom left is
2    Wednesday, January 3rd, 2018.
3          Q.    Have you seen this document?
4          A.    No.
5          Q.    Have you seen a document in the form
6    that this is presented?
7          A.    Like this is a printout, you're
8    referring to?
9          Q.    Yes, sir.  In other words, obviously
10   you would not be able to memorize every entry on
11   a 46-page document, but is this a format of a
12   type of printout that you've seen before in your
13   professional practice?
14         A.    No.
15         Q.    Do you see the heading?  It says,
16   "Drug Overdose Deaths, Summit County Medical
17   Examiner."
18         A.    Yes.
19         Q.    And it's from January 1st, 2016 to
20   December 31st, 2016.  Do you see that?
21         A.    Yes.
22         Q.    And do you see the bottom right-hand
23   side, it says, "Summit," and then there's a
24   bunch of numbers?
25         A.    Yes.

```
                                            Page 49

 1         Q.    I'll represent to you, this was

 2    produced through your lawyers from the records

 3    of the Summit County Medical Examiner, so these

 4    were documents from the Summit County Medical

 5    Examiner.  That's why they're Bates stamped.

 6               MS. HERMIZ:  Objection to form.

 7         Q.    What did you do to prepare for this

 8    deposition?

 9         A.    I met with the Summit County

10    counsel.

11         Q.    And I don't want you to tell me

12    anything you talked about, but how often or how

13    many times did you meet with them and for how

14    long?

15         A.    We met twice, for an hour or so each

16    time.

17         Q.    When?

18         A.    I don't recall the exact dates.

19         Q.    Approximately?

20         A.    Once a few weeks ago, and once two

21    or three months ago.

22         Q.    Did you meet with anybody else in

23    connection or preparation for this deposition?

24         A.    No.

25         Q.    Who was there at your two meetings?
```

```
                                              Page 50
 1   Was it just your two attorneys here today?
 2          A.    No, not both of these attorneys.
 3          Q.    Were there other attorneys?
 4          A.    There were.
 5          Q.    Do you remember who they were?
 6          A.    I have to check their cards to tell
 7   you their names.  There was a -- Jodi Flowers
 8   was at one of the meetings, if I remember
 9   correctly, along with Ms. Kearse here.
10          Q.    Okay.  Was anybody on the phone?
11          A.    Yes.
12          Q.    Who?
13          A.    I don't recall.
14          Q.    Were there any non-lawyers?
15          A.    Not that I'm aware of.
16          Q.    Did you speak with anybody other
17   than lawyers to prepare for this deposition
18   today?
19          A.    No.
20          Q.    Did you talk to Dr. Kohler about
21   either her deposition or your deposition?
22          A.    No.
23          Q.    Anyone else at the ME's office?
24   Anybody else at the ME's office?
25          A.    That I what?
```

1        Q.    Talked to.

2        A.    Regarding my deposition today?

3        Q.    That's the question, Doctor, yes.

4        A.    No.

5        Q.    Did you review any documents?

6        A.    No.

7        Q.    Do you have an understanding about

8    why you're being deposed today?

9        A.    Yes, generally; yes.

10       Q.    What is that?

11       A.    I am being deposed as part of the

12   county lawsuit regarding opioid deaths for

13   your -- for the individuals that you represent.

14       Q.    Do you -- other than that general

15   understanding, do you have any specific

16   understanding about anything in the lawsuit?

17       A.    I have not read the lawsuit.

18       Q.    If we asked you to identify all the

19   entities that were being sued, could you do

20   that?

21       A.    No.

22       Q.    Were you shown a copy of the

23   complaint in this case?

24       A.    I think visually I saw it, saw the

25   complaint.  I have not read the complaint.

Page 52

1          Q.    I had asked you if you looked at any
2     documents in connection with the preparation.
3     Did you?
4          A.    No.
5          Q.    But you did see the complaint?
6                MS. HERMIZ:  Objection to form.
7          A.    So I'll be more specific.  I believe
8     I visually saw the complaint.  I did not read
9     the complaint.
10         Q.    Okay.  Did you visually see any
11    other documents that you didn't read?
12         A.    What type of documents?
13         Q.    I don't know.  I'm asking you.
14         A.    What type of documents?
15         Q.    You know what documents mean --
16         A.    Documents other than the complaint?
17    So I have not seen this document before, and I
18    did not -- have not read that document before.
19    I believe I did visually see the complaint.  I
20    have not taken the time to read the complaint.
21    And I have not been provided any other documents
22    regarding the complaint.
23         Q.    Did you visually see any documents
24    other than the complaint in connection with the
25    preparation of your deposition?

Page 53

1           MS. HERMIZ:  Objection to form.

2      A.    Not that I'm aware of.

3      Q.    Would you please refer to Exhibit 2,

4  the drug overdose deaths?  There's a listing

5  here of -- and if you look at the last page --

6  340 drug overdose deaths between January 1st,

7  2016 and December 31st, 2016.

8           Do you see that?

9      A.    Yes.  On the last page it says,

10  "Total, 340."

11      Q.    Okay.  And let's go back to the

12  first page.

13           Within the -- the scope of the

14  responsibilities of the medical examiner's

15  office, one of the jobs or efforts that's made

16  is to try and determine the cause of death; is

17  that right?

18      A.    Yes.

19      Q.    And there are various ways that

20  death can be characterized or classified; is

21  that right?

22      A.    You mean the cause of death, there's

23  various ways the cause of death can be

24  classified?

25      Q.    Yes, sir.  Like, it could be an

1    accident, it could be a homicide, it could be

2    undetermined.

3         A.    That's not cause of death.

4         Q.    Okay.  What is that?

5         A.    Manner of death.

6         Q.    Okay.  So the manner of death is --

7    what are the ways that someone could be

8    classified in terms of a manner of death?

9         A.    Natural, homicide, accident,

10   suicide, undetermined.

11        Q.    Okay.  And then how does that differ

12   from the cause of death?

13        A.    Cause of death is the medical reason

14   why an individual is dead.  There can be

15   thousands of different causes of death.  Heart

16   attack -- a heart attack or a stroke, for

17   example, are examples of causes of death.

18   Manner of death is a medical-legal

19   classification of the death.  Whereas there can

20   be thousands of different causes of death,

21   manner of death is limited to five choices:

22   Natural, homicide, suicide, accident and

23   undetermined.

24        Q.    And this -- this report or document

25   was classified by drug overdose deaths.  Do you

Page 55

1   see that?

2           A.     Yes.   The heading of the document is

3   "Drug Overdose Deaths."

4           Q.     And can you query your database in

5   order to identify drug overdose deaths, or do

6   you believe you would have to go through the

7   entire database to make that determination.

8               Do you understand my question?

9           A.     No.

10          Q.     Okay.   So there's 340 entries,

11  right?  We determined that, right?

12              MS. HERMIZ:   Objection to form.

13          A.     Well, I haven't counted the number

14  of entries, but on the last page it says,

15  "Total, 340."

16          Q.     Right.   And the heading says, "Drug

17  Overdose Deaths," right?

18          A.     Yes, the heading does say, "Drug

19  Overdose Deaths."

20          Q.     Do you know how someone would run a

21  document like this, using the databases in the

22  Summit County Medical Examiner Offices, in order

23  to produce a listing of the drug overdose deaths

24  for a particular year?

25          A.     So you're asking do I know how to

Page 56

1   run -- how to perform the query?

2          Q.    Yes, or how it would be done.

3          A.    I cannot run the query.

4          Q.    Can it be done?

5          A.    It can be done.

6          Q.    Okay.  In terms of the toxicology

7   results -- do you see that right next to "cause

8   of death"?

9          A.    Yes.

10         Q.    What does that represent?

11                MS. HERMIZ:  Objection to form.

12         A.    I didn't run this query and I did

13  not set the parameters for the query, but it is

14  a heading that says "Toxicology Results," so

15  those are the results for the toxicology screen

16  that were inputted for the decedent -- that were

17  inputted into the database for the decedent.

18         Q.    So in the -- when you list

19  toxicology results, or when it's listed, would

20  that include all drugs that were found in the

21  decedent's system or is there some type of

22  cutoff that you -- or differentiation that you

23  don't list?

24                MS. HERMIZ:  Objection to form.

25         A.    I didn't run the query.  I do not

Page 57

1    enter data into the database, so when you say

2    "you" -- you were saying "you" -- I don't, so

3    "you," me, me, I do not run the queries nor do I

4    enter the data into the database, so I cannot

5    vouch for the completeness of the data in the

6    database, or I cannot offer testimony as to the

7    completeness of the data in the database.

8         Q.    Let's move aside from this document.

9              When you are doing an autopsy, is

10   there typically a toxicological evaluation done?

11        A.    Yeah.  In the majority of instances,

12   a tox -- or a drug screen or a toxicologic

13   analysis will be performed.

14        Q.    And is the idea of the tox screen to

15   identify every drug or -- strike that.

16              Is the -- is the tox screen set up

17   to identify every drug that's found in the

18   person's system no matter what level?

19              MS. HERMIZ:  Objection to form.

20        A.    It's my understanding that it's

21   virtually -- I don't think it's possible to

22   perform a drug screen -- I don't think it's

23   possible for any toxicology lab to perform a

24   drug screen that will detect every drug that

25   exists at all potential levels.  So I think the

Page 58

1    answer is, you're asking -- what you're asking

2    is impossible.

3           Q.    So the answer is no?

4           A.    No.

5           Q.    Right.

6                 What -- what drugs does the tox

7    screen look for?

8                 MS. HERMIZ:  Objection to form.

9           A.    I am not the chemist, the

10   toxicology -- the forensic chemist for the

11   office, so if you have -- I cannot offer

12   testimony as to what drugs are specifically

13   looked for and not looked for.  The toxicology

14   report does list, on the bottom of each report,

15   what is included in the routine toxicology

16   screen.

17          Q.    I asked you earlier if you were an

18   expert in toxicology, and you told me you had

19   some expertise in toxicology, right, at least as

20   it relates to your job function?

21                MS. HERMIZ:  Objection to form.

22          Q.    Is that right?

23          A.    I believe I said I can have an

24   expert opinion in toxicology to the extent that

25   it involves my need to evaluate cause and manner

Page 59

1   of death.

2          Q.    Okay.  So that's what I want to find

3   out.  When you are doing a cause and manner of

4   death, what drugs are screened for in the tox

5   studies?

6                MS. HERMIZ:  Objection to form.

7          A.    The toxicology report indicates

8   which classes of drugs and which types of drugs

9   are screened for.  I can talk in terms of

10  generalities.

11               In general, a volatile screen is

12  performed, which will pick up drugs like alcohol

13  or ethanol and other alcohol-type drugs, related

14  drugs.  For example, I know that all drugs, all

15  classes of drugs, are not routinely screened

16  for.

17         Q.    So in order to determine

18  specifically which drugs, you would have to look

19  at the tox screen document, that would tell us;

20  is that right?

21         A.    The tox -- the tox -- each

22  toxicology report lists which drugs and classes

23  of drugs are screened for.

24               With regard to individual deaths, if

25  there is a question with -- regarding a specific

Page 60

1    decedent, one would need to look at the

2    toxicology report and refer to the individual

3    investigations to see if a specific drug of

4    concern was or was not screened for.

5          Q.    So is there a standard tox screen

6    that's done for all decedents, or does that

7    change based on the circumstances of death, age,

8    sex, other factors?  In other words, from time

9    to time, do you say, I'm only going to run, you

10   know, a certain number of toxicological screens,

11   or is there a kind of standard operating

12   procedure where you will just have a format and

13   it's run for everyone?

14          MS. HERMIZ:  Objection to form.

15         A.    I thought I answered that.  The

16   toxicology report -- each toxicology report

17   lists, at the bottom of the report, the drugs

18   that are routinely screened for.  That is the

19   routine screen.  That is the screen that all

20   specimens will undergo.  Any drug that is not

21   within the routine screen or any concern for a

22   drug that is not in the routine screen would

23   have to be screened for separately.

24         Q.    And as you sit here today, could you

25   tell us the drugs that are in the routine screen

1  that you've been using for the last number of

2  years?

3         A.    I can -- I can generally tell you,

4  yes.  They're volatile drugs, such as alcohol;

5  common drugs of abuse, such as opiates or

6  opioids.  Drugs like cocaine and methamphetamine

7  will be routinely screened for.  Benzodiazepine

8  drugs will be routinely included in this screen.

9  Tricyclic antidepressants are routinely included

10  on the screen.  And I don't have immediate

11  recall of all the other drug types that are

12  routinely included in the screen.

13         Q.    And do you know, as to any of those,

14  whether there's a threshold, in other words,

15  above which it's the intent of the screen to

16  capture?  Do you understand my question?

17         A.    Are you asking is that -- do these

18  drugs have a threshold below which they are not

19  reportable?

20         Q.    I think we're saying the same thing.

21  Yeah.  So, in other words -- let's just use

22  alcohol, for example.  Is it designed, for

23  example, to capture if someone had one beer

24  or -- in their system or the equivalent of

25  alcohol, or is it designed to capture what might

Page 62

1   be, you know, something more of an alcohol abuse

2   situation?

3          A.     I don't think we're talking about

4   the same thing.

5          Q.     Okay.

6          A.     We're not talking about the same

7   thing.

8          Q.     Okay.

9          A.     The screens -- as a medical

10  examiner, I have to render opinions to within a

11  reasonable degree of medical certainty.  The

12  toxicology reports have to be within a

13  reasonable degree of certainty based upon the

14  scientific methodologies used.  So the drugs

15  that are reported in the drug screen fall

16  within -- above a threshold that is deemed to be

17  within a reasonable degree of certainty.  So

18  there needs to be a minimum amount of drug, a

19  minimum threshold of drug for those drugs to be

20  reportable.

21              So certainly there can be instances

22  where drugs, such as, say, alprazolam, for

23  example, which is a benzodiazepine drug, might

24  be present in a specimen but it doesn't reach

25  the threshold to be reportable, therefore, it

Page 63

1  will not appear on the toxicology screen.

2        Q.     Thank you for that.

3              So reportable, though, is that -- by

4  that does that mean that it can't be detected or

5  that it's not appropriate to report based on,

6  kind of, the analysis?

7              MS. HERMIZ:  Objection to form.

8        Q.     Let me see if I can just tell you

9  and see if this will help you.

10             There may be a situation, for

11  example, where you would want to know if someone

12  had heroin at all in their system, right,

13  because that would show illegal drug use; but

14  there may also be a situation where someone was

15  taking an SSRI in the normal course, and that

16  would not raise a question for you in connection

17  with your expert analysis, but to the extent it

18  looks like it may have been an overdose, you'd

19  kind of want to know kind of the threshold.  So

20  what I'm trying to find out is, is it at a

21  detection level or is some judgment call made as

22  to at what level the drug is going to be

23  reportable to someone like you?

24        A.     You mean at what level is the drug

25  reportable on the toxicology report?

Page 64

1          Q.     Yes, Doctor.

2          A.     Yeah.   There are threshold levels

3     by -- at which drugs are reportable on the

4     toxicology report.   The specific threshold

5     levels I do not know off the top of my head.

6     But I do not do the specific chemical analysis

7     myself.   That is done by the forensic chemist.

8               And I don't recall the rest of your

9     question.

10          Q.     Okay.   Is that -- if you wanted to

11     have -- understand with more specificity these

12     types of toxicological questions, would

13     Dr. Perch be the person that you would go to?

14          A.     Yes.

15          Q.     Let's go back to Exhibit 2, Doctor.

16     Let's just look at the first one for a minute.

17     It talks about, the manner of death is

18     "accident."   The cause of death is "combined

19     methamphetamine and fentanyl toxicity."

20               Do you see that?

21          A.     I do.

22          Q.     And then there's some tox results

23     that list a number of drugs, or chemicals.   Do

24     you see that?

25          A.     Yes.

Page 65

1          Q.      Methamphetamine, amphetamine,
2    oxycodone and fentanyl, those are listed here?
3          A.      Yes.
4          Q.      And the cause of death is "combined
5    methamphetamine and fentanyl toxicity."  Do you
6    see that?
7          A.      Yes.
8          Q.      There's no mention of oxycodone in
9    the cause of death.  Do you see that?
10         A.      Yes.
11         Q.      Can you -- do you have an
12    explanation as to why that is?
13         A.      No.
14         Q.      Can you tell which of these you were
15    the person who performed the autopsy?
16         A.      I can't tell.
17         Q.      Would there be a way --
18         A.      I can't tell by this document.
19         Q.      There would be a way of figuring
20    out, if you wanted to know, whether this was you
21    or one of your other colleagues, right?
22         A.      Yes.
23         Q.      There was some testimony from
24    Dr. Kohler that, with respect to the fentanyl
25    that's listed, and I think we were talking about

1    2015 documents, it was her understanding that

2    that was largely illicit fentanyl.

3              Do you believe that when you see

4    fentanyl in the toxicology results for 2016,

5    that it is predominantly or almost exclusively

6    illicit fentanyl that's being abused?

7              MS. HERMIZ:  Objection to form.

8         A.   When you say "illicit fentanyl,"

9    what type of -- in what form are you referring

10   to?

11        Q.   You understand that fentanyl is one

12   of those products that can be used, right, in a

13   lawful, FDA-approved medicine, right?

14             MS. HERMIZ:  Objection to form.

15        A.   Yes.  Fentanyl is a -- can be a

16   prescription drug.

17        Q.   It can also be used as a street

18   drug, so in an illicit, non-FDA approved

19   medicine that someone could abuse?

20        A.   Yes.

21        Q.   And when we see fentanyl -- and

22   you're free to look through this document.  It's

23   listed many, many times.  And based on your

24   expertise and your understanding, do you believe

25   that the fentanyl that's listed in the majority

Page 67

1   of the overdose deaths in 2016 is illegal,
2   non-prescription fentanyl?
3              MS. HERMIZ:  Objection to form.
4         A.    So illicit -- illicit fentanyl can
5   be through a -- a duragesic patch prescribed to
6   a patient and the patch is being used
7   improperly.  It's being abused or it's being
8   obtained illicitly and used.  And illicit
9   fentanyl can also be non-prescription fentanyl,
10  powdered fentanyl, that is -- was outside of any
11  type of clinical use.  That's simply a street
12  drug fentanyl.  And I think it's safe to say
13  that the majority of the fentanyl drugs are
14  either illicit, powdered fentanyl that was --
15  never had a clinical application, or fentanyl
16  obtained through duragesic patches that were
17  either being abused or were obtained illicitly
18  and are being abused.
19        Q.    Okay.  And what -- what's the basis
20  for that belief?
21        A.    It's -- I believe it to be true.  I
22  mean, we can go back and check.  We can go look
23  at all these cases and see if any of those are
24  indeed deaths due to fentanyl due to a clinical
25  practice.  But I believe that these are probably

Page 68

```
1    outside of clinical practice.
2         Q.    And how would we -- if, for some
3    reason, we wanted to go back and find out if it
4    was a death associated with clinical practice,
5    how would we do that?
6         A.    You'd have to review the cases that
7    were of concern.
8         Q.    Understood.  But can you -- a little
9    more practical.  You know, one way might be to,
10   as is your practice, right, to check the OARRS
11   database?  Would that be part of the process?
12              MS. HERMIZ:  Objection to form.
13        A.    I'm not -- so you're asking, with a
14   specific case, will an OARRS search determine if
15   fentanyl was prescribed to the patient?
16        Q.    I'm going to withdraw that question
17   for right now, Doctor.  Let me go back to what
18   you said.
19              You said we would have to go back
20   and look at the case file, the information.
21   What information would be in the file or
22   information available to you, if we went back
23   and looked at the medical examiner records,
24   whatever they may be, that would help us
25   determine whether someone whose tox results
```

1  showed fentanyl was from illicit fentanyl or

2  from clinical practice?

3       A.    For example, if -- it would be

4  routine to indicate if drug -- illicit drug

5  paraphernalia was present, if illicit fentanyl

6  powder was found at the scene.  So that could be

7  evaluated.

8       Q.    Anything else?

9       A.    We can see what -- if the individual

10  was using a fentanyl patch, we could see if --

11  if a fentanyl patch was being used.

12       Q.    Do you or the investigators collect

13  medical records?

14       A.    Yes.

15       Q.    You could look at the medical

16  records to the extent that they were collected,

17  right?

18       A.    Medical records can be requested and

19  they -- and they are -- once -- if they are

20  obtained, they will be reviewed.

21       Q.    And the same would be true for

22  prescription records, right, you could try and

23  find -- get the prescription records and find

24  out if someone had a valid prescription for

25  fentanyl?

Page 70

```
 1        A.    If it was pertinent to determining
 2   cause and manner of death, that could be done,
 3   or an attempt could be made to -- to obtain
 4   prescription records.
 5        Q.    And you're familiar with the OARRS
 6   database?
 7        A.    Yes.
 8        Q.    And, generally, what is that?
 9        A.    The OARRS database is a database
10   of -- it's a listing of patients and
11   prescriptions for controlled substances that's
12   entered by prescribing physicians, and it's a
13   voluntary database, as I understand it.  And
14   since I do not prescribe -- prescribe controlled
15   substances, I do not actually report to the
16   OARRS database because I have nothing to report
17   because I don't prescribe controlled substances;
18   but since it's a voluntary database, it's not
19   necessarily comprehensive therefore.
20        Q.    Do you ever access it in connection
21   with your work?
22        A.    Yes.  I can access it if I need to.
23        Q.    Do you?
24        A.    I do.
25        Q.    Why?
```

Page 71

1        A.    I access it in those instances where
2   individuals -- generally, two reasons.  To
3   review what recent narcotic prescriptions a
4   decedent might have been given; and, secondly, I
5   can access it to see if a decedent has an active
6   physician or physicians in those instances where
7   we don't have any other mechanism to evaluate
8   that.
9        Q.    And why would it be important or
10  relevant to your analysis to determine what
11  recent narcotics were given?
12       A.    In the course of determining cause
13  and manner of death, it's useful to know which
14  medications appearing on a drug screen represent
15  drugs being used under a legitimate prescription
16  and drugs that might be used outside of a
17  legitimate prescription.
18       Q.    Why is that?
19       A.    It's useful because I ultimately
20  have to determine cause and manner of death.
21       Q.    And the OARRS database is one of the
22  tools available to you to determine whether
23  someone is taking a lawfully prescribed narcotic
24  or whether they are using an illicit narcotic;
25  is that right?

1      A.    It's not a perfect tool, but it's

2   one resource that I can use to see if an

3   individual has a legitimate prescription for a

4   narcotic medication.  The absence of being

5   listed on the OARRS database doesn't necessarily

6   mean that the drug was being used outside of a

7   legitimate prescription because it's a voluntary

8   reporting system.

9      Q.    So is it fair to say it's not

10  perfect, but it's not useless either, right?

11     A.    That's correct.

12     Q.    And, in fact, it's something that

13  you do rely on in your daily work, but you

14  understand that it has some limitations?

15     A.    Yes.  I use the OARRS to assist me

16  in my -- in my death investigation to help

17  determine -- or make a determination ultimately

18  for cause and manner of death.

19     Q.    So if you wanted to find out if

20  anyone who -- their cause of death -- let me

21  strike that.  Let's use a real example.

22          The second listing here -- this is

23  the 55235; do you see that, Doctor?

24     A.    Yes.

25     Q.    And this is a 40-year-old woman, and

Page 73

```
 1   it says fentanyl toxicity is the cause of death,
 2   right?
 3        A.    Yes.
 4        Q.    And there's a listing of fentanyl,
 5   and it has an amount that presumably was
 6   detected in the blood?
 7        A.    Yes.
 8        Q.    And the only one in this one listed
 9   is fentanyl and the cause of death is fentanyl
10   toxicity?
11        A.    Yes.
12        Q.    Just a quick question before we get
13   to my other question, Doctor.
14              Are you aware of what the threshold
15   is for fentanyl, for example, that is deadly?
16        A.    In what setting?
17        Q.    Death.
18        A.    I don't think you know what you're
19   asking.
20        Q.    Then all you need to do is just ask
21   me to clarify it.
22              This has 11.8, and then above it, it
23   says 14.2.  Do you see that?
24        A.    Yes.
25        Q.    I'm just trying to find out --
```

Page 74

1          A.     When you say "above it," you mean

2     the other decedent?

3          Q.     The entry above it.  I'm just trying

4     to find out, if you know, if that said 2, would

5     that tox result be something that would lead you

6     to say it was the cause of death because it

7     could be the cause of death, or does it have to

8     be 10?  I'm just trying to find out if there's a

9     threshold, that, if that was the only thing in

10    the system, would cause you to determine that

11    fentanyl was the cause of death.

12         A.     The post-mortem drug screen is not

13    the only consideration for determining cause and

14    manner of death in an individual that's

15    ultimately certified as a drug overdose.

16    Generally, a complete autopsy examination will

17    be performed, and it's a consideration of the

18    investigation, scene investigation, medical

19    history if available, and the physical findings

20    at the time of the autopsy that will ultimately

21    combine and be considered for determination for

22    cause and manner of death.

23              And an individual could have a

24    fentanyl level of 11.8 nanograms per milliliter,

25    like the second decedent in this list, and they

1    might -- their toxicology report alone is not,

2    you know -- you know, the -- you know,

3    necessitate a determination for -- that this

4    person is a drug overdose.  If this person had a

5    bullet hole through their head, that would be a

6    very important consideration also.

7         Q.    I agree, and I wasn't trying to

8    imply that.  I'm just really trying to just

9    understand if there are any, essentially, kind

10   of rules of the road, right; if it's above a

11   certain amount, it can be deemed legitimately to

12   be caused by a fentanyl-related death or, if

13   it's below, it's at such a low level, that it

14   would be unrealistic.  And I'm just trying to

15   find out if there's any guideposts that you use.

16        A.    There is no safe amount, or there is

17   no recognized safe amount of illicit drug or --

18   or there is no recognized safe amount of drug

19   abuse, whether it's abuse of illicit street

20   drugs or abuse of what would be prescription

21   drugs but are illicitly obtained on the street,

22   or prescription drugs that are being used

23   outside the scope of the directions of the

24   prescription.  So there is no recognized safe

25   amount of drug abuse.

1          Q.     I think I understand.  Thank you.

2                 So, just hypothetically, if this had

3     said fentanyl .8, it's possible that that could

4     still be the cause of death because there's no

5     recognized minimum threshold; is that fair?

6          A.     It -- a lower level of fentanyl

7     identified on the post-mortem drug screen for

8     individual case number 55235 would not negate

9     the possibility of certifying that individual as

10    a drug overdose because, one, there is no

11    recognized safe amount of drug abuse; two, the

12    post-mortem drug screen is simply a snapshot in

13    time.  It is not a representation of the peak

14    intoxicating concentration for that individual.

15    That is -- the peak intoxicating concentration

16    is essentially unknown, but the post-mortem drug

17    screen lets us confirm that the individual was

18    indeed using that drug, and then the complete

19    death investigation can give an indication if it

20    was being used abusively and in what way, and

21    are there any other physical findings or medical

22    issues that need to be considered concurrently

23    in determining the potential lethality of the

24    presumed drug, you know -- the -- if we're

25    talking in terms of drug abuse, presumed drug

Page 77

1    abuse in any given individual.

2         Q.    Let's look at 55235 again for a

3    minute.  If it was important for you to know

4    whether this individual ever received a

5    prescription opioid prior to ingesting this

6    fentanyl, how would you do that?

7         A.    I don't need to know if a decedent

8    has ever received a specific drug legitimately.

9    I just need to know, did they have a legitimate

10   active prescription for a drug that's being

11   evaluated at the time of determining cause and

12   manner of death.

13        Q.    Well, let's just -- let's assume it

14   was for a homicide or some other investigation.

15   Let's say that was a question that was asked of

16   you by your supervisor, you know, I'd like to

17   find out if any -- if this particular person had

18   a lawful prescription.  How would you do that?

19        A.    You mean a current prescription?

20        Q.    Or a prior prescription.

21             MS. HERMIZ:  Objection to form.

22        A.    I don't know if I can, with absolute

23   certainty, go back through any decedent's entire

24   medical history to find out if they've ever had

25   a -- a legitimate prescription for a drug.  I

Page 78

1   can, for example, make some attempts to see if

2   an individual has a current prescription for

3   a -- for a drug.  If we know who their physician

4   is, we can ask for their active prescription

5   medications.  If there's a concern for a

6   controlled substance, I can look that individual

7   up on OARRS to see if there is a recent

8   prescription, recognizing that the absence of

9   that recent -- inclusion in OARRS doesn't

10  necessarily exclude a -- the potential for a

11  legitimate prescription.  We can also interview

12  family members to see what prescriptions that

13  they might have, and we can try to retrieve

14  prescription medication bottles if there's a

15  residence that's the scene of the death.

16       Q.    Understand, I'm not talking about

17  absolute certainty or precision, but if -- if it

18  was important to you, for your investigation, to

19  find out, not just recent but prior prescription

20  history -- I think we talked about a few of

21  them -- one is you could look at the OARRS

22  database, right, and that would tell you, at

23  least as far as the information that's posted in

24  that database, right?

25            MS. HERMIZ:  Objection to form.

1        A.     I'm going to review the OARRS

2   database to the extent that it's important to me

3   for determining cause and manner of death, and I

4   don't ever recall reviewing the OARRS database

5   as a tool for determining if a decedent has ever

6   been prescribed a medication.  The OARRS

7   database generally has a default for the time

8   period that it will list, unless one manually

9   changes the default, and it's -- the majority of

10  the OARRS searches are going to be back when --

11  12 months prior to the date of the search.

12             Currently, I know the default has

13  been set back two years.

14        Q.     And, Doctor, for purposes of these

15  questions, I'm not -- and I understand it's your

16  distinction, it's not something you've done, but

17  these are questions, you know, if you had to in

18  a circumstance, right, or wanted to, how would

19  you do it.  So for the next few questions, let's

20  just assume -- I'm just asking you as an expert,

21  and understanding if there some was medical

22  reason or investigatory reason that you needed

23  to do it.  So that's what I'm going to be asking

24  you.

25             Do you know how far back you could

1   go back in terms of looking at OARRS, if you

2   wanted to manually adjust it?

3        A.    It's my recollection that I can go

4   back, I think, five years.

5        Q.    Okay.  If you wanted to, you could

6   go back and certainly look at the records in the

7   file, whatever was there, whatever medical

8   records, right?

9        A.    You mean primary care physician

10  records?

11       Q.    Sure.  Whatever was in the file.

12       A.    Right.  That's going to vary

13  depending upon the individual physician's office

14  as to what -- their individual recordkeeping.

15       Q.    I understand, but you could start

16  with them, right?

17       A.    To find out if -- so I have to

18  clarify.  It seems you're asking me if I wanted

19  to do a -- an investigation as to if an

20  individual has ever been prescribed a

21  medication.

22       Q.    I'm trying to find out what tools

23  are available to you as a person who's worked at

24  the department for 18 years.  So let me see if I

25  can give you a hypothetical, and you may quibble

```
                                            Page 81

 1   with the terms, but it's just an example, okay?

 2              There was -- let's say a person

 3   had -- had a tox study that showed fentanyl,

 4   okay, and they had illicit drug material

 5   available to them, and -- but there was a

 6   question about whether that was actually an

 7   overdose or suicide or homicide, right, whether

 8   the person -- there was some suspicion, for

 9   example, that someone may have actually tried to

10   set that up and make it look like a homicide,

11   right, and you or your investigator had some

12   suspicion.  Some of the factors that you might

13   look for are whether this person ever had a

14   history of drug abuse, whether they reported

15   that, whether their family did, whether they

16   took other medicines, right?  In a homicide

17   situation, wouldn't that be some of the things

18   that you would try to validate whether or not it

19   was likely an overdose or whether there was some

20   other foul play?

21              MS. HERMIZ:  Form.

22        A.    Are you talking about poisoning?

23        Q.    I'm talking about homicide.

24        A.    In what -- I don't understand -- I

25   don't understand.  I don't understand your
```

```
                                        Page 82
 1   hypothetical.
 2        Q.    I'm going to strike.  If we're going
 3   to quibble about -- I'm talking about someone
 4   who is set up for murder, okay.  You don't
 5   understand my question?
 6        A.    You mean like a gunshot wound or a
 7   stab wound case?
 8        Q.    No.  Someone who made it look like
 9   someone had overdosed on an illicit drug.
10        A.    But they didn't?
11        Q.    That's what you would find out,
12   isn't it?  Wouldn't that be part of your job, to
13   determine whether it was a homicide or an
14   overdose?
15        A.    Okay.  Let me clarify your
16   hypothetical.  So are you saying that if that
17   individual was given a drug and, therefore, it's
18   a homicide versus they personally took the drug?
19   Is that what you're saying?
20        Q.    A homicide is someone else trying to
21   kill them, right?
22        A.    A homicide is generally, by
23   convention, defined as death at the hands of
24   another.
25        Q.    Okay.
```

Page 83

```
 1         A.    With individuals using drugs
 2   recreationally, drug abuse, the -- "by
 3   convention," the certification or the
 4   classification for their manner of death is
 5   accident.  That's not to say that the person
 6   who's providing them the drug didn't commit a
 7   crime potentially, but the individual using the
 8   drug recreationally will be classified as an
 9   accident.
10         Q.    My question is, if someone
11   intentionally tried to kill someone and make it
12   look like that person overdosed.  That's my
13   question.  That's the scenario I'm positing.
14               MS. HERMIZ:  Objection to form.
15         A.    So you're talking in terms of
16   poisoning?
17         Q.    Yes, with fentanyl, for example.
18   And -- do you understand it?
19         A.    Is there more to the --
20         Q.    There is, but I don't know if you
21   understand that or not.
22         A.    So you're proposing a hypothetical
23   where an individual is poisoned.  They don't
24   realize they're taking a drug, but they're being
25   slipped a drug, so to speak.
```

1        Q.    Right.  It looks on a tox study that
2    they have overdosed by fentanyl.  Okay?
3        A.    That they have -- so on their drug
4    screen there's a large amount of fentanyl?
5        Q.    Right.
6            My question is, if there's a
7    question about whether that was a homicide,
8    there would be a number of questions that you,
9    and probably others, would need to answer,
10   correct?
11       A.    I would have to establish to a
12   reasonable degree of certainty that that
13   individual was poisoned to -- you know, was --
14   that that individual was poisoned, that they
15   were not -- that is not a recreational drug use
16   then.
17       Q.    Understood.
18       A.    And I would do that in conjunction
19   with a law enforcement agency at that point.
20       Q.    Okay.  Would you -- would you look
21   at their prior medical history, the decedent's?
22       A.    I mean, the kind of -- this scenario
23   that you're proposing is not that usual, and at
24   that point I would -- if I had a serious concern
25   that there is a homicidal poisoning, I would

2177-8

1  indeed elicit the appropriate local law

2  enforcement agency where that death occurred

3  and, in those circumstances, I would probably

4  have the law enforcement agency obtain medical

5  records.

6       Q.   Can you tell from looking at any of

7  these overdoses and -- on this page, on this

8  document, whether or not they had a lawful

9  prescription for an opioid medicine?

10      A.   I -- I can't tell by looking at this

11  printout alone, no.

12      Q.   Okay.  Now, let's go through this a

13  bit more.  Look at the second page on 55260,

14  please.  I'm calling out this one because I

15  think this is the next entry that has oxycodone

16  listed as part of the tox studies, amongst

17  others.  Do you see that?

18      A.   Yes, case number 55260.

19      Q.   And it has fentanyl, oxycodone,

20  benzo -- how do you pronounce that, Doctor?

21      A.   Benzoylecgonine.

22      Q.   -- benzoylecgonine and Tramadol.

23  The cause of death is fentanyl and cocaine

24  toxicity overdose.  Do you see that?

25      A.   Yes.

Page 86

1          Q.    Do you know why fentanyl and cocaine
2     are specifically listed and the others are not?
3          A.    No.  I don't have a recollection if
4     case number 55260 was my personal death
5     investigation or not.
6          Q.    Is there anything about the
7     information that's listed here that would
8     explain why oxycodone was not listed as the
9     cause of death?
10         A.    No.
11         Q.    And then look at 55281 on the next
12    page.  Do you see that?  It's 1-23-2016.
13         A.    Yes.
14         Q.    And oxycodone is, along with
15    morphine and alazopram, listed as the tox
16    results.  Do you see that?
17         A.    Yes.
18         Q.    And, in this one, it's acute mixed
19    heroin, alazopram and oxycodone toxicity listed
20    as the cause of death.  Do you see that?
21         A.    Yes.
22         Q.    And in this situation, the amount
23    found is 54 nanograms per milliliter, and in
24    55260 it's 143 nanograms per milliliter.  Do you
25    see that?

Page 87

1        A.    Yes.

2        Q.    Do you have an explanation as to why

3   oxycodone is listed as the cause of death in

4   55281, where the amount is about one third of

5   the amount listed in 55260, but it's not listed

6   in 55260?

7             MS. HERMIZ:  Objection to form.

8        A.    Let me clarify.  You're asking if

9   just looking at this printout --

10        Q.    Yes.

11        A.    -- can I explain why the cause of

12   death excluded oxycodone for case number 55260,

13   whereas the cause of death included oxycodone

14   for case number 55281?

15        Q.    That's correct.

16        A.    I can't.

17        Q.    Okay.  Would you look at 55336?

18   It's a 2-19-2016 entry.

19        A.    Yes.

20        Q.    Do you see the oxycodone listed in

21   the tox results is 755 nanograms per milliliter?

22        A.    Yes.

23        Q.    And the cause of death is acute

24   oxycodone toxicity?

25        A.    Yes.

```
                                            Page 88

 1        Q.    It's listed as an accident.  Do you

 2   see that?

 3        A.    Yes.

 4        Q.    Is there anything about the amount

 5   that's found in the tox studies that would cause

 6   suspicion as to whether this was a suicide?

 7              MS. HERMIZ:  Objection to form.

 8        A.    I can't answer that concern simply

 9   looking at the data that's listed here.

10        Q.    Well, just looking at the number,

11   does someone having 755 nanograms per milliliter

12   in their system, does that -- as a person who's

13   been doing this for 30 years, does that raise

14   any questions to you as to whether it's a

15   potential suicide?

16        A.    It could present a concern.

17        Q.    Why?

18        A.    The level is higher than in

19   individuals that are using the oxycodone within

20   a prescription, legitimate prescription, and

21   higher than in some individuals using it

22   abusively, so it could present a concern.

23        Q.    And am I correct that, unless

24   there's some type of definitive evidence, like a

25   note, that the medical examiner's policy is to
```

Page 89

1    list it as an accident, not a suicide?

2              MS. HERMIZ:  Objection to form.

3         A.    Suicide is a classification of death

4    by an intentional self-destructive act.  Like

5    all certifications, it has to be within a

6    reasonable degree of certainty.  You said

7    "definitive."  I will point out that no

8    certification has to be within absolute

9    certainty.  Absolute certainty is an

10   impossibility, but to a reasonable degree of

11   certainty.  And I'll also point out that the

12   presence or -- of a note, though that might add

13   to a reasonable degree of certainty, it might

14   not.  On the other hand, the absence of a note

15   does not exclude a reasonable degree of

16   certainty for a potential suicide death either.

17        Q.    So then how would you determine to a

18   reasonable degree of certainty that this is an

19   accident as opposed to a suicide?

20              MS. HERMIZ:  Objection to form.

21        A.    One would have to look at that

22   individual case.

23        Q.    Is there a default, as a general

24   matter -- I believe as Dr. Kohler testified --

25   that, unless there's a high degree of confidence

1  that it's a suicide, it's listed as an accident?

2          MS. HERMIZ:   Objection to form.

3      A.    The determination for classification

4  of manner of death needs, once again, to be

5  within a reasonable degree of certainty.

6          There are probably instances where

7  certain manner of deaths are underrepresented

8  and some manner of deaths are overrepresented,

9  so, therefore, individuals that are chronic drug

10  abusers are likely to be classified as

11  accidental deaths if their investigation

12  supports that they died due to an acute drug

13  toxicity even in those instances where it's

14  possible that they had some suicidal intent at

15  the time they abused the drug, if there is

16  insufficient investigative evidence to indicate

17  that there was suicidal intent.  So, therefore,

18  if a chronic drug abuser doesn't use -- uses a

19  drug with dis -- with disregard for their health

20  and some intent to cause self-harm, there --

21  they're very likely going to be classified as an

22  accident.

23          But, on the other hand, you can

24  argue that that behavior that they've been

25  practicing for a period of time is chronic,

Page 91

1    self-destructive behavior and that, for purposes

2    of statistics for local, state and federal

3    statistics, they are indeed better classified as

4    accidental deaths.

5              So, you know, if that individual,

6    you know -- well -- so, yes, I -- people who are

7    chronic drug abusers have the potential for

8    being overrepresented as accidental deaths as

9    opposed to suicidal -- suicide deaths, but I

10   think you can argue, on the other hand, that

11   maybe that's better -- where they're better

12   classified in the absence of documentation of

13   explicit suicidal ideation.

14        Q.    So if there's someone -- let's go

15   off opioids for a minute.  If there's a very

16   large and un, kind of, clinically appropriate

17   amount of benzodiazepine in someone's tox study,

18   is an initial thought that that's a suicide?

19        A.    Well, initially we're not going to

20   know what their blood level of drug is going to

21   be.  Initially there's going to be a scene

22   investigation.

23        Q.    I'm talking about initially when you

24   get the tox study.

25        A.    When I get the tox study, I'm going

Page 92

1  to be considering the drug -- the toxicology

2  results in connection with the entirety, the

3  totality of the investigation.  A strikingly

4  large drug -- post-mortem drug level will

5  present a concern certainly for an intentional,

6  self-destructive act that needs to be

7  considered.

8         Q.    So does this -- does this amount, on

9  its face, raise that concern in case 55336?

10               MS. HERMIZ:  Objection to form.

11         A.    I don't know enough about the

12  entirety of the case to answer that yes or no.

13  One would need to look at the entirety of the

14  case.

15         Q.    So the answer is no, just by looking

16  at the tox study showing oxycodone, 755

17  nanograms per milliliter, you can't -- that

18  would not raise a significant concern in your

19  mind as to whether that was a suicide?  Is that

20  what you're saying?

21         A.    I'm saying you cannot certify to a

22  reasonable degree of certainty cause and --

23         Q.    That's not what I asked.

24         A.    -- manner of death based upon the

25  drug screen, and the best you can say is the

Page 93

1  drug -- the toxicology, a strikingly large

2  amount of drug on a post-mortem drug screen can

3  present a concern that needs to be considered.

4  So I think this would present -- in case number

5  55336, that drug level can present a concern for

6  an intentional, self-destructive act that needs

7  to be considered in the course of determining

8  cause and manner of death.

9      Q.    So is that strikingly large in your

10  professional judgment?

11      A.    It is a large amount of oxycodone.

12      Q.    It's strikingly large, isn't it?

13          MS. HERMIZ:  Objection to form.

14      A.    It is a -- it's a large amount of

15  oxycodone.

16      Q.    Okay.  You used the word "strikingly

17  large."  I'm trying to find out what that means.

18  Is that strikingly large?

19          MS. HERMIZ:  Objection to form.

20      A.    I -- I don't know enough about this

21  specific individual based -- this is just not

22  enough information.

23      Q.    What is a strikingly large amount of

24  oxycodone in someone's tox study?

25          MS. HERMIZ:  Objection to form.

1      A.    I can't specifically quantitate that

2  at this moment.

3            THE VIDEOGRAPHER:  Is this a good

4  time to change the videotape?

5            MR. CHEFFO:  Sure.  Why don't we

6  take a five-minute break.

7            THE VIDEOGRAPHER:  Off the record,

8  10:58.

9                 (Recess had.)

10            THE VIDEOGRAPHER:  Back on the

11  record, 11:16.

12  BY MR. CHEFFO:

13      Q.    Doctor, we're back on the record.

14            You mentioned Dr. Dean earlier

15  today, I think?

16      A.    Yes.

17      Q.    Do you know where Dr. Dean is

18  located now?

19      A.    I believe she's at the Hamilton

20  County Coroner's Office.

21      Q.    Okay.  In order to determine a cause

22  of death and a manner of death, to the extent

23  that it's the same, is the standard reasonable

24  degree of medical certainty?

25            MS. HERMIZ:  Objection to form.

Page 95

1          A.    The -- the determination of cause
2    and manner of death needs to be made to within a
3    reasonable degree of medical certainty.
4          Q.    So the answer is yes?
5          A.    Well, you said the cause and manner
6    of death, to the extent that they're the same,
7    but I'm not sure what you meant.
8          Q.    Same standard.
9          A.    Oh, same standard.  Yes, the
10   standard for cause and manner of death are both
11   reasonable degree of medical certainty.
12         Q.    And if you can't come to a
13   reasonable degree of medical certainty, is that
14   when the designation of undetermined is used?
15         A.    Yes.
16         Q.    In looking at any individual drug
17   overdose case in Exhibit 2, just as an example,
18   am I correct that we could not determine whether
19   that person was ever lawfully prescribed an
20   opioid unless we went back and looked at the
21   file and did some additional digging?
22         A.    One, you cannot determine if any
23   decedent had a legitimate prescription based
24   upon this database as I'm reviewing it right
25   now; and, yes, you would have to do additional

Page 96

1   digging or effort to determine if an individual

2   had a legitimate prescription.  Reviewing the

3   file would be a start, the case file.

4        Q.    And you would agree with me that

5   such an analysis or evaluation would necessarily

6   have to be done on a case-by-case basis?

7        A.    Yes.

8        Q.    You're not aware of any aggregate

9   model that would tell us which of these people

10  started on a prescription, are you?

11       A.    I don't do the database query -- or

12  I don't perform the database queries for the

13  medical examiner's office.  I'm not aware of a

14  parameter that would -- I'm not aware of a

15  parameter that's routinely inputted into the

16  database that would indicate who might have been

17  the decedent's prescribing physicians, for

18  example.  You would have to refer to those

19  individuals that deal with the database.

20       Q.    But for each of the 340 entries

21  listed for the year 2016 in Summit County, if we

22  wanted to determine whether they were, at some

23  point, prescribed a lawful opioid prescription,

24  we'd have to do a case-by-case analysis to

25  determine whether that was the case or whether

Page 97

1   we couldn't make that determination?

2               MS. HERMIZ:  Objection to form.

3       Q.    Do you understand my question?

4       A.    No.

5       Q.    Okay.  If we wanted to find out

6   whether any one of the 340 individuals listed on

7   Exhibit 2 had a lawful prescription of an opioid

8   at some point, we would have to do a

9   case-by-case determination; is that right?

10              MS. HERMIZ:  Same objection.

11      A.    You mean a case-by-case

12  investigation?

13      Q.    Yes.

14      A.    Yes, you would.

15      Q.    And amongst the things that -- that

16  one might look at to at least see if you could

17  find that answer was to look at the OARRS

18  database, right?

19      A.    You could, yes.

20      Q.    You would also want to look back at

21  the file to determine if there was any medical

22  records, right?

23      A.    You could.  You could do that.

24      Q.    You would look at the medical

25  records and the prescription records?

1         MS. HERMIZ:  Objection to form.
2      A.    Well, you mean the decedent's
3   medical records, go back to the decedent's
4   medical records?
5      Q.    Yes.
6      A.    You could -- you would have to --
7   and you're referring to the medical records of
8   all of these other potential agencies, such as
9   primary care physicians and hospitals and so
10  forth?
11     Q.    Those would be amongst the resources
12  or -- or individuals or entities of which you
13  could go if you wanted to answer that question,
14  right?
15     A.    You mean me, me personally --
16     Q.    Somebody.
17     A.    -- I would go?  For you, or an
18  individual doing what you're suggesting, you
19  would have to address HIPAA laws, and then you
20  could proceed with your investigation.
21     Q.    But you're not bound by those same
22  HIPAA laws, are you?
23        MS. HERMIZ:  Objection to form.
24     A.    No.  Of course, we're bound by HIPAA
25  laws.

Page 99

1        Q.      Okay.  So would the way you -- I do

2    the investigation differ from the way that you

3    do it?

4              MS. HERMIZ:  Objection to form.

5        A.      The medical examiner office can

6    perform death investigations to the extent of

7    the needs of the medical examiner's office.  So

8    the medical examiner is charged with determining

9    cause and manner of death to a reasonable degree

10   of medical certainty.  That doesn't give us free

11   rein to, you know, query all aspects of the

12   decedent's past necessarily, but it does give us

13   ability to determine or investigate issues

14   specifically addressing cause and manner of

15   death.

16            Beyond that, we generally don't

17   pursue additional investigation if it's

18   exceeding the scope of the needs of the medical

19   examiner's office to establish cause and manner

20   of death to a reasonable degree of medical

21   certainty.

22       Q.      Amongst the tools available to you

23   if you believe that you need to do -- to access

24   them is to ask a primary care physician to

25   provide you medical records; that would be

Page 100

1   something that would be within the scope of your

2   abilities if, in a particular case, you

3   determined that it was appropriate?

4        A.    Yes.  We can request medical records

5   from other -- from physicians that treated the

6   decedents during life.

7        Q.    And you could request hospital

8   records?

9        A.    Yes.

10       Q.    And you could request pharmacy

11  records, or prescription records?

12       A.    We do not routinely request records

13  from individual pharmacies.  So I can't really

14  answer or address that question.  But physician

15  records will include prescription -- current

16  prescriptions and past prescriptions, depending

17  upon the individual physician offices and how --

18  and their individual recordkeeping.

19       Q.    Are there any limitations on the

20  records that you could obtain -- strike that.

21            Are there any limitations on the

22  types of healthcare records that you could

23  obtain if you, in your considered professional

24  judgment, determined that it was necessary for

25  your investigation?

Page 101

1              MS. HERMIZ:  Objection to form.

2        A.    I'm not -- I'm not really sure if I

3    understand what you mean by healthcare records.

4    I can address what is routinely requested.  The

5    extent of the investigation, once again, is

6    going to be directed to addressing cause and

7    manner of death.  I mean, some restrictions, for

8    example, are, we, as the office, simply might

9    not be able to access records if physicians have

10   retired and the medical records are just no

11   longer available.  We might -- I might want to

12   get other records, but they just might not be

13   available.  And hospitals, for example, have

14   kept records on -- you know, paper records up

15   until very, very recently, and in many instances

16   it becomes not practical to obtain records that

17   are filed away, or to delay a certification of

18   death for many months if records are not readily

19   available, if it's not essential for determining

20   cause and manner of death.

21              So there is always potential

22   limitations to the records that I can obtain,

23   but we do make an attempt to obtain records that

24   are necessary for determining cause and manner

25   of death.

1      Q.    It's a fair point.  And to maybe put

2  a finer point on my question, putting aside the

3  impracticality or kind of the impossibility,

4  right, of a doctor who may have died or a fire

5  or something like that, what I'm just trying to

6  find out is, is there any SOP, any rule or

7  restriction that would prevent you from even

8  asking for healthcare records to the extent that

9  you believed it was appropriate?

10      A.    There's no HIPAA restrictions for

11  the medical examiner's office to obtain medical

12  records on decedents that we are actively

13  investigating pursuant to the determination of

14  cause and manner of death, no HIPAA

15  restrictions, at least that I'm aware of.  If

16  there is some type of restriction, I am unaware

17  of one.

18      Q.    In your experience -- I'm sorry.  Go

19  ahead.

20      A.    I'll qualify that.

21          For example, I am restricted by

22  HIPAA laws from obtaining medical records from

23  non-decedents that might be related to the

24  decedent.  For example -- I can't obtain medical

25  records on other family members, for example.

Page 103

1        Q.    As a general matter, and I'm not

2    referring to any specific, though I've seen some

3    general references, if someone has a stroke and

4    also has a tox test that shows methamphetamine

5    or some other illicit medicine or drug, will

6    that cause of death or manner of death typically

7    be assigned a drug overdose?

8              MS. HERMIZ:  Objection to form.

9        A.    It is difficult to just generically,

10   out-of-hand say that all deaths of a certain

11   type out of necessary -- necessarily will be

12   certified one way or the other; so in this

13   hypothetical that you're giving, you have an

14   individual that is actively abusing drugs, using

15   illicit drugs, but they also have a significant

16   natural event or potentially natural event or

17   significant anatomic event, like a stroke, so

18   that individual case is going to be examined and

19   considered for the -- for the issues for that

20   individual person, and then a determination will

21   be made based upon the merits of their -- of

22   their findings.  It could be certified as a drug

23   overdose or it could be certified as a non-drug

24   toxicity based upon the merits of the specific

25   findings of that specific case.

1      Q.    And if it's -- is there a bias one

2  way or the other?  In other words, if there's --

3  if you can't, obviously, determine certainty,

4  but in that typical case, would there be a bias

5  to list it as drug overdose as a matter of

6  office policy?

7              MS. HERMIZ:  Objection to form.

8      A.    Do you mean is it the policy of the

9  Summit County Medical Examiner's Office to rule

10  one way or the other if there is combined

11  post-mortem findings?

12      Q.    Yes.  Is there some type of general

13  bias -- and I think you know what that means,

14  and I don't mean it in a pejorative sense, but

15  is there a bias that if someone has

16  methamphetamines at the time of death and they

17  also had a stroke, that it would be listed as a

18  drug overdose?

19              MS. HERMIZ:  Same objection.

20      A.    That's not the way death

21  certification works.  There aren't arbitrary

22  office policies for death certifications that I

23  or the other forensic pathologists practicing in

24  the office follow or are bound to follow.  The

25  merits of each individual case need -- are

```
 1   evaluated and an appropriate certification is
 2   done with an intent to achieve reasonable degree
 3   of certainty.
 4              So, for example, two individuals
 5   with -- who are actively abusing drugs and
 6   actively have an anatomic finding, like a
 7   stroke, can have different rulings based upon
 8   the unique finding -- their personal unique
 9   findings.  Everybody has a face, we all have two
10   eyes, a nose and a mouth, but everyone looks a
11   little bit different, so each case can be
12   potentially a little bit different, and the
13   merits of each case need to be individually
14   considered.
15        Q.    And you've mentioned that a few
16   times.  That's very important in your analysis,
17   that every case stands alone and every case has
18   to be looked at individually, right?
19        A.    Yes.
20        Q.    And you also just testified that a
21   factor at least that weighs into this analysis
22   is whether someone is actively abusing drugs, or
23   may weigh into it, right?
24        A.    Yes.  That would be considered, yes.
25        Q.    So how would you determine if
```

Page 106

1  someone is actively abusing drugs?

2           MS. HERMIZ:  Objection to form.

3      A.    An investigation can support that an

4  individual is actively abusing drugs, for

5  example, by the presence of drug paraphernalia

6  identified at the scene, by the presence of

7  physical stigmata of active drug abuse, such as

8  intravenous needle punctures and prior needle

9  tracks.

10      Q.    Anything else?

11      A.    There's probably other -- other

12  criteria that's just eluding my mind at this

13  moment.

14      Q.    I suppose if your investigator

15  talked to a friend or family member and they

16  said, this is a terrible -- you know, John or

17  Susie has been actively abusing drugs for a

18  number of years, that would make its way into

19  the investigation report, right?

20      A.    You mean history, history of active

21  drug abuse?

22      Q.    Yes.

23      A.    Yes.  If a history of active drug

24  abuse is elicited, that is probably going to be

25  documented in the investigation report, and that

Page 107

1  would be considered.

2       Q.    And that's one of the things that

3  the investigators look for, correct?

4       A.    Yes.  The investigators will

5  document a history -- a history of prior drug

6  use if that history is available.

7       Q.    In your estimation, is Summit County

8  currently facing any type of drug epidemic

9  either from lawful prescription drugs or illicit

10  drugs?

11            MS. HERMIZ:  Objection to form.

12       A.    Yeah.  I think the term "drug

13  epidemic" is used in a non-medical,

14  non-scientific way, the way the term "heart

15  attack" is being used.  I cannot provide

16  testimony to the extent to which Summit County

17  is experiencing an epidemic in terms of how a

18  epidemiologist would define epidemic, but Summit

19  County is experiencing a serious issue with

20  drug-related deaths, and the majority of which

21  are associated with, you know, obviously drug

22  abuse.

23       Q.    And currently is that related to

24  cocaine and methamphetamine?

25            MS. HERMIZ:  Objection to form.

1      A.    Currently, you mean like right now?

2      Q.    Like 2018.

3      A.    Like 2018.  It's been my personal

4   experience with my cases that, in 2018, the

5   majority of the drug deaths which I have

6   certified have been due to what can be termed

7   illicit street drugs, fentanyl analogs, fentanyl

8   itself that's non-prescription, cocaine and

9   methamphetamine.

10      Q.    And maybe you could just help me

11  understand your -- your reluctance, and you can

12  tell me if it's a different word you'd like to

13  use, to classifying the current situation as an

14  epidemic.

15      A.    It's my impression that the

16  classification, or referring to the drug use

17  fatalities as an epidemic is being used in terms

18  of a common sense, like heart attack -- the term

19  "heart attack" and "stroke."  It might be being

20  used in terms of specific epidemiologic studies,

21  but I have not reviewed those.

22      Q.    Can you recall a case or a situation

23  in your experience where the cause of death was

24  from a prescription opioid medicine where the

25  patient was using it as indicated and as

Page 109

1  prescribed?

2       A.    I don't have a crystal ball.  I

3  can't go back in time and watch an individual

4  use their drugs.  So in an instance of

5  prescription medications, I can't go back in

6  time and watch them take their prescription

7  drugs.  I can only evaluate the information

8  available to me.  So if I -- if an individual is

9  coming to me, they are dead.  If an individual

10 is coming to me and I'm ruling their death as

11 due to a drug which they have a legitimate

12 prescription for, they have a -- the

13 investigation has supported that they died due

14 to that amount of drug, the ruling that they

15 died due to the -- of a drug overdose with a

16 substance that is prescribed to them isn't

17 necessarily a ruling that they were or were

18 not -- or how they were taking their

19 prescription medications necessarily.

20            So your specific question, I mean,

21 the most -- for the most part, it's not

22 something that I -- I consider in terms of my

23 ruling.

24      Q.    And I understand that, Doctor, and

25 that's why it was a specific question.  Putting

Page 110

1  all of the caveats that you just put, that it
2  may not be something that you traditionally do,
3  my question was just, very simply, in the course
4  of your practice can you remember a situation
5  where, through investigation or some other
6  facts, you learned of a person who had been
7  prescribed a lawful opioid and had been taking
8  it consistent with their prescription and had
9  somehow died from that?  Can you remember any
10  situation where that actually happened and you
11  had information of it?
12         A.    I would point out that once someone
13  is taking the prescription medications outside
14  of a clinical setting, I can never say with
15  certainty that they're taking their medications
16  properly or not, so I -- I don't know for those
17  individuals.  I have had individuals who have
18  died in a hospital setting on rare occasions
19  receiving opioid medications.
20         Q.    And has the cause of death been the
21  opioid medications?
22         A.    Yes.
23         Q.    And has that been an overdose
24  situation?
25         A.    It's been a drug toxicity.

Page 111

1          Q.    And that's in hospital settings?

2          A.    Yes.

3          Q.    Anything else?  Any other situations

4    that you can recall?

5          A.    Those are the only settings where I

6    can have certainty that an individual is taking

7    their medication specifically as prescribed,

8    because it's being given to them as prescribed.

9          Q.    Okay.  Would you please look at --

10   it's page 23 of 46 of this document.

11               MS. HERMIZ:  Is there a Bates

12   number?

13               MR. CHEFFO:  There is.  There's also

14   a page number.

15               MS. HERMIZ:  Oh, okay.  I didn't see

16   the page number.  I apologize.

17               MR. CHEFFO:  I can read the whole

18   long thing.

19               MS. HERMIZ:  No.  That's okay.

20         Q.    Are you with me, Doctor?

21         A.    Um-hum.

22         Q.    55702, do you see that?  It's, like,

23   near the bottom.

24         A.    Yes.

25         Q.    7-27-2016.  I think you understand,

Page 112

1    but just for the record, when I talk about

2    55702, I'm talking about the case number on the

3    far left hand, right?

4           A.    Yes.

5           Q.    That's how you assign some kind of

6    identifying feature to a particular person as

7    opposed to using their name; is that right?

8           A.    Yeah.  So all decedents will have a

9    case number, but they also have a name, so we

10   can search for individuals based upon their name

11   or based upon their case number.

12          Q.    Now, I have a few questions about

13   this one.

14                So this basically says the manner of

15   death is accident, right?

16          A.    Yes.

17          Q.    The type of death is drug overdose.

18   Do you see that?

19          A.    Yes.

20          Q.    Then the cause of death is

21   carfentanil toxicity, right?

22          A.    Yes.

23          Q.    Now, carfentanil is a fentanyl

24   analog that's an illegal street drug, right?

25          A.    Yes.

1     Q.    Under the tox results it says, "None

2  detected."  Do you see that?

3     A.    Yes.

4     Q.    And we can go through this chart,

5  but there's a number of times where it says,

6  "None detected," particularly with respect to

7  carfentanil in terms of the tox, but yet the

8  cause of death is fentanyl -- I'm sorry,

9  carfentanil toxicity.

10          My question for you, Doctor, is, can

11  you help us understand how a determination would

12  be made that a cause of death is carfentanil

13  toxicity when there's no tox results showing

14  carfentanil?

15     A.    So for each of these instances in

16  this database printout, to know the specific

17  reason why an individual is listed as a

18  carfentanil toxicity accidental drug overdose,

19  one would have to go back and review that

20  specific case.  It could be that car -- well,

21  carfentanil is a very, very potent fentanyl

22  analog, and it's potentially toxic and fatal at

23  levels that are lower than the limit of the

24  methodologies available to the Summit County

25  Medical Examiner.  So then other criteria would

                                        Page 114

1    be used to support that the individual was

2    using -- abusing carfentanil at the time of

3    their death, such as, you know, a syringe next

4    to the body with -- that is positive for

5    carfentanil, and it appeared that the

6    individual -- it was reasonable to presume that

7    the individual had injected, for example.

8         Q.    Okay.  I mean, other than a syringe,

9    what other factors, in your professional

10   judgment, would -- would you look at or have you

11   looked at, kind of from a broad spectrum, in

12   cases where a tox screen shows no carfentanil

13   detected but yet you've been able to make a

14   determination that carfentanil is the likely

15   cause of death?

16             MS. HERMIZ:  Objection to form.

17        A.    So one can -- so any criteria that

18   helps establish a reasonable degree of

19   certainty.

20             There could be a carfentanil drug

21   positive paraphernalia.  That could be a

22   syringe.  That could be carfentanil positive

23   powder.  The individuals might have urine that

24   is positive for carfentanil.  There -- it could

25   be a group overdose of individuals that are

                                        Page 115

1    abusing the same batch of drugs, and some of the

2    other individuals in that group could

3    successfully have carfentanil confirmed in their

4    post-mortem specimens.  It's just a combination

5    of factors like that.

6           Q.    Those -- it sounds to me at least,

7    those are all kind of circumstantial around the,

8    kind of, place and location of death, right, at

9    least the ones -- the examples you've given?

10                MS. HERMIZ:  Objection to form.

11          Q.    They're with other people perhaps,

12   they have a syringe, they have powder next to

13   them, things like that, right?

14          A.    So these are criteria that are other

15   than confirming the presence of carfentanil in

16   their blood.

17          Q.    And are there other things, in terms

18   of medical records you might look at or in the

19   investigation report, that would also point to a

20   carfentanil cause of death when it's not

21   detected in their blood?

22          A.    I'm not sure what you're getting at.

23          Q.    I'm just asking a question, Doctor.

24   We've spent some amount of time saying that what

25   you do as a medical examiner is to have a

Page 116

1   reasonable degree of cause of death, and I'm

2   just trying to understand when something is

3   listed to a reasonable degree, like carfentanil

4   toxicity, and it's not detected, what are some

5   of the factors in your professional experience

6   that could lead you to conclude, to a reasonable

7   degree of certainty, that someone actually died

8   of carfentanil when it's not detected in their

9   tox results.  You've given me a few factors.

10  I'm just trying to find out and probe if there

11  are any others that you can think of.

12          A.    As with a potential carfentanil

13  death -- I mean, as with any potential drug

14  overdose death, including carfentanil, the -- a

15  complete investigation will be done to the

16  extent that it's practical and reasonable to do.

17  Individuals will be interviewed, if there are

18  individuals to be -- to be interviewed, such as

19  other individuals that were present at the time

20  the decedent was found deceased.  Family members

21  will be interviewed, if they're available to be

22  interviewed.  Carfentanil is a large animal

23  anesthetic agent.  It doesn't have any clinical

24  applications in humans that I am aware of.  I

25  am, therefore -- therefore, it won't appear on

Page 117

1    an OARRS screen and it won't appear in medical

2    records because it's not a prescription drug.

3              And then a complete death -- I mean,

4    autopsy examination is performed.  Based upon

5    the physical findings and the weight of the

6    investigation and the scene investigation, a

7    determination for cause of death of a

8    carfentanil toxicity in an individual where

9    there is either -- it's not possible for the --

10   the toxicology laboratory to confirm the

11   presence of carfentanil in blood, or it's

12   perhaps detected but not the -- the amount is

13   not large enough to report, the -- in those

14   instances the -- whether or not a death will be

15   classified as a carfentanil toxicity drug

16   overdose accident will be based upon the merits

17   of the -- of that specific case.

18             As I've previously talked about,

19   there might be drug paraphernalia present.  That

20   could be a syringe, it could be powder.  There

21   might be carfentanil in a person's other --

22   other specimens other than blood.  It could be

23   in their urine.  Carfentanil could be in other

24   individuals that are found deceased at the scene

25   even if it can't be confirmed in that -- in a

1    specific individual.

2         Q.    We've talked about some of your

3    areas of expertise.  Are you an expert or do you

4    hold yourself out as an expert in addiction?

5         A.    I -- you know, I'm a licensed

6    physician in the State of Ohio and I've been

7    licensed to practice medicine in other states,

8    so to the extent that I'm a physician, I can

9    offer opinions to addiction to the extent that

10   it affects my practice immediately.  I am not a

11   clinical physician that deals with living

12   individuals who are -- I don't deal with

13   management of patients -- of living patients for

14   addiction.  So I cannot offer expert opinion

15   regarding the most current standards of

16   practices -- practice for drug addiction

17   management.

18        Q.    So how does addiction then come into

19   play in your practice?

20        A.    Well, people who are drug addicts do

21   tend to become my patients with some frequency.

22        Q.    And what is it -- have you studied

23   addiction in any regard?  How does that

24   interplay with your work?

25        A.    Well, once again, I'm a physician.

Page 119

1    I've -- I'm aware of addiction, and people who

2    are drug addicts do become my patients with some

3    frequency, and I need to be aware of what type

4    of -- of drug addiction management is occurring

5    to evaluate the deaths which come to me and make

6    a ruling for cause and manner of death to a

7    reasonable degree of certainty.

8         Q.    Why does the manner of or the

9    process or the procedures for drug addiction

10   impact your day-to-day work?

11        A.    People who are actively being

12   treated for drug addiction sometimes overdose

13   and die and they become my patients.

14        Q.    So do -- so is it important that you

15   find out those records, as to whether they are

16   being treated for drug addiction?

17             MS. HERMIZ:  Objection to form.

18        A.    I obtain records with the direction

19   of determining cause and manner of death.  When

20   it is important to obtain a record for a

21   specific individual for determining cause and

22   manner of death, I -- I or someone at the office

23   will be charged with doing so.

24        Q.    And that would be records regarding

25   drug addiction treatment, correct?

1           MS. HERMIZ:  Objection to form.

2      A.    It could be.

3      Q.    When was the last time you reviewed

4  a record for drug addiction treatment of any

5  decedent?

6      A.    Within the past few weeks.

7      Q.    And what was the circumstances of

8  that?

9      A.    It was an individual who died who

10  was receiving methadone through a methadone

11  clinic, or a drug addiction clinic.

12      Q.    And how did it come to pass that

13  those records were collected?

14      A.    When it became -- when -- when the

15  office was made aware that the individual was in

16  a drug treatment program, the records were

17  requested.

18      Q.    And that was one of your patients?

19  Do you call them patients?

20      A.    Patients, decedents.

21      Q.    That was a case you were working on?

22      A.    Yes.

23      Q.    And is that something that you

24  directed or is it something that the

25  investigator, in his or her kind of just work

Page 121

1    experience, goes out and does?

2         A.    In that specific instance, I

3    directed the investigator to make the request,

4    but the investigator can do it independently if

5    they're aware.

6         Q.    And how did you know that that

7    person was in a drug treatment program?

8         A.    We were ultimately told, "we"

9    meaning the office was told.

10        Q.    By?

11        A.    By -- in that specific instance, it

12   was through a civil lawsuit.

13        Q.    So -- I don't want to get into the

14   details of that, but there was a lawsuit that

15   made you aware that there was an individual who

16   was a decedent, your case, who was receiving

17   drug treatment; is that right?

18        A.    Yes.

19        Q.    And then that -- with that knowledge

20   that there was drug treatment, you determined to

21   ask someone in your office to get any records

22   for that person, correct?

23             MS. HERMIZ:  Objection to form.

24        Q.    Get any records from the drug

25   treatment facility?

Page 122

1          A.     Yes.

2          Q.     And they complied?

3          A.     They did.

4          Q.     And how was that information used by

5      you?

6          A.     What do you mean, "used"?

7          Q.     Well, I take it you wanted the

8      records for some purpose, right, or else you

9      wouldn't have requested them?

10         A.     Yeah.  I wanted the records to

11     review the records.  That was the purpose.

12         Q.     You weren't looking to waste the

13     time of the clinic, right?

14         A.     Yeah.  I wanted the records to

15     review them.

16         Q.     But why?

17         A.     Because that was part of that

18     individual's -- because it was related to their

19     death certification, the issues of their death

20     certification, their cause and manner of death.

21         Q.     Well, yeah.  And maybe this is

22     intuitive to you, so forgive me.  I'm not sure

23     that I understand, so that's why I'm going to

24     ask you some questions about it.  You understood

25     that the person had -- the cause of death was a

Page 123

1    drug overdose, right?

2         A.    Yes.

3         Q.    And that determination was -- well,

4    strike that.

5              How did the records that you

6    received from this clinic or this treatment

7    facility inform your view as to the cause of

8    death?

9         A.    It was confirmation that the

10   individual was in a drug treatment program.

11        Q.    And why did you want that

12   confirmation in order to determine, to a

13   reasonable degree of certainty, that the person

14   died of a drug overdose?

15        A.    I didn't need the information to be

16   certain that they died of a drug overdose, but

17   they did die due to a drug overdose, so the fact

18   that they were in a drug treatment program was

19   part of their evaluation for their -- that

20   specific individual for cause and manner of

21   death.

22        Q.    And before you received them, was

23   there some information that you believed might

24   be pertinent to your analysis that you wanted to

25   explore?

1      A.    Yes.  I wanted to confirm that they
2   were indeed in a drug treatment program at the
3   time of their death.
4      Q.    And how did the fact that they were
5   in a drug treatment program as opposed to they
6   were not in a drug treatment program, how would
7   that have impacted your determination?
8      A.    Well, in this instance, it didn't
9   change the cause and manner of death, so we
10  didn't -- it didn't alter the determination for
11  cause and manner of death.
12     Q.    But you believed it was appropriate
13  to ask for it and there may have been
14  information that could have helped you and you
15  thought it was medically appropriate and
16  professionally appropriate to get that
17  information because it was part of the
18  constellation of facts and information that you
19  wanted before you made a final determination; is
20  that right?
21     A.    Well, I was within my jurisdiction,
22  within the -- I didn't exceed my jurisdictional
23  investigational limits to request those reports,
24  I had every right to request them.  So I'm not
25  really sure what you're asking.

Page 125

1        Q.    You made a determination that you
2   thought it was both appropriate and potentially
3   informative to request that information, so you
4   did, and you got it, and you waited until you
5   received it, then you made a final
6   determination?
7              MS. HERMIZ:  Objection to form.
8        A.    No.  I didn't do it in that form.
9        Q.    How did you do it?
10       A.    In that specific instance, the death
11  certification was completed because, at the time
12  of the certification, it wasn't evident by our
13  initial investigation that that individual was
14  actively in a drug treatment program.
15       Q.    Oh, so if you get information after
16  the fact, it's appropriate for you to continue
17  to request records in connection with a decedent
18  even though you had previously made a
19  determination, as you just testified to?
20             MS. HERMIZ:  Objection to form.
21       A.    It could be appropriate.  It's
22  not -- it's not necessarily appropriate.  It's
23  not necessarily necessary.  I mean, it's not
24  absolutely necessary.  It depends on the
25  circumstances.

Page 126

1          Q.    I assume, since you did it, you

2     think it was appropriate in this case, right?

3          A.    In this specific instance, I -- in

4     this specific instance, I did obtain the records

5     after the certification had already been

6     completed.

7          Q.    Would you do that if you thought it

8     was inappropriate?

9               MS. HERMIZ:  Objection to form.

10         A.    If it was not within -- if I did not

11    have the authority, if it was inappropriate for

12    me to request the records, if I did not have the

13    authority to request the records, I would not

14    have.

15         Q.    Is it your testimony that as long as

16    you have the authority -- strike that.

17              When you made the determination to

18    ask for more records, did you believe it was an

19    appropriate thing to do?

20              MS. HERMIZ:  Objection to form.

21         A.    I think we're having a difference of

22    concept of the word "appropriate."  It's -- I --

23    there are some records that I can request and

24    it -- because this individual died within the

25    jurisdiction of the Summit County Medical

1    Examiner, then it was certainly appropriate for

2    me to request medical records from any medical

3    provider.  I had the authority to do it.  It was

4    appropriate for me to do it.  It's not -- it's

5    not absolutely necessary for me to request all

6    medical records from all potential medical

7    providers for every decedent, not even practical

8    or possible; but, in this instance, I did it

9    because it was part of the -- it was brought to

10   the attention of the medical examiner's office

11   through the civil lawsuit that the individual

12   was in a methadone treatment program.

13        Q.   So the answer is yes, you did it

14   because you thought it was appropriate because

15   you wouldn't knowingly do something that you

16   thought was inappropriate, right?  Isn't that

17   the answer?

18             MS. HERMIZ:  Objection to form.

19        A.   Well, it's appropriate, I had the

20   authority to do it, so it wasn't inappropriate

21   for me to request the records.  It wasn't

22   necessary to have those records to draw the

23   ultimate determination for cause and manner of

24   death.  Those records did not alter the cause or

25   manner of death.

1          Q.     But you didn't know that until after

2     you reviewed the records, right?

3               MS. HERMIZ:  Objection to form.

4          A.     Well, in this instance, I think I

5     did know that it wasn't necessary for cause and

6     manner of death.  I didn't need those records to

7     make the determination for cause and manner of

8     death in that specific instance, but it was

9     brought to the attention of the medical examiner

10    that that individual was in a methadone

11    treatment program and at the time of the death

12    it wasn't clear -- clearly -- that part of the

13    medical history wasn't clearly defined at the

14    time of the certification, though it wasn't

15    necessary for the certification, and because

16    there was an active civil lawsuit, I did request

17    those records because I had the authority to do

18    so.

19         Q.     So you had the authority to do it

20    but it wasn't necessary, but you still went

21    ahead and requested the records?

22         A.     It wasn't necessary for the

23    determination for cause and manner of death, but

24    it wasn't inappropriate for me to request those

25    records.  We -- the medical examiner will often

Page 129

1    request -- receive more records than what's

2    absolutely necessary for determining cause and

3    manner of death because, until I review those

4    records, I don't know what's absolutely

5    necessary for determining cause and manner of

6    death.

7              If those records in that specific

8    instance affected or had a significant effect on

9    the initial ruling for cause and manner of

10   death, I could change the ruling for cause and

11   manner of death.  As it so happened, it didn't

12   make a difference.

13        Q.   I'm just trying to understand.  So

14   you basically just told us, though, you didn't

15   think it was necessary because you said you

16   didn't believe it was going to change your view,

17   you thought it was appropriate, but what

18   authority do you have to request records that

19   you don't think are necessary?  Do you think

20   that's within the scope of your authority?

21             MS. HERMIZ:  Objection to form.

22        A.   Okay.  So I can request records

23   pursuant to a death investigation.  I can't -- I

24   won't always know what records are going to be

25   essential for the death investigation until I

Page 130

1    receive them and review them.

2         Q.    All right.  So information came to

3    you, you wanted to receive it so you could then

4    look at the records to determine if your initial

5    judgment was correct or not; isn't that what

6    happened?

7         A.    Yes, in part.

8         Q.    Okay.  And that was an appropriate

9    thing to do, right, under the -- whatever

10   definition, the nomenclature, the general

11   understanding that a person like you, I'm

12   assuming, would not intentionally do something

13   inappropriate, right?  This shouldn't be a hard

14   question, Doctor.

15        A.    It was within my authority to do

16   that, to request those records in that specific

17   instance.

18        Q.    Okay.  And, similarly, in other

19   situations, to the extent that new information

20   becomes available, it would be within your

21   authority, or the department's authority, to

22   request additional records of people like drug

23   addiction centers and others, correct?

24        A.    Each individual case would have to

25   be evaluated to see if additional information is

1    necessary, or would it be necessary, or would it

2    be appropriate to request.

3         Q.    And I assume you're not going to

4    tell us under oath that the only reason you did

5    this was because you had a civil lawsuit

6    pending, right?  There had to be some legitimate

7    reason, other than a civil lawsuit, where you

8    thought that it was appropriate to ask for more

9    records, right?

10              MS. HERMIZ:  Objection to form.

11        A.    In that specific instance, the

12   certification for cause and manner of death,

13   it's my opinion then, it's my opinion now, was

14   correct and appropriate.  The additional

15   information or the additional records did not

16   alter that classification for cause and manner

17   of death.

18        Q.    But the point is, it didn't change

19   it, we know that, because you had a chance to

20   look at it.  But when you made the determination

21   to ask for those, I take it you thought that was

22   a legitimate, appropriate request and you had an

23   open mind as to what that information might show

24   as a medical professional, and then you reviewed

25   it and then you determined that it didn't change

                                            Page 132

1    your initial finding, right?

2               MS. HERMIZ:  Asked and answered.

3         A.    Wow, it's like we're talking in the

4    dark here, though.

5         Q.    I think the lights are on, at least

6    on this side of the room.

7         A.    This specific individual had active

8    intravenous drug abuse, and the -- the issue of

9    whether or not they were actively in a drug

10   treatment program was not going to make a

11   difference in whether or not -- for their cause

12   of death.

13        Q.    Then why did you request it?

14        A.    I requested the -- the confirmation

15   records to confirm that they were indeed in a

16   drug treatment program.

17        Q.    And determining whether someone is

18   in a drug treatment program is a legitimate

19   inquiry as part of the medical examiner's

20   office's work in appropriate cases?

21        A.    Yes.

22        Q.    Can you look at page 26 of 46,

23   please, 55751?  Do you see that?

24        A.    Which case?

25        Q.    8-13-2016.  It's 55751.  Do you see

Page 133

1  that?

2          A.    Yes.

3          Q.    And you may tell me that you don't

4  have specific recollection of this case, but I

5  just -- is there anything that you can tell us

6  as to why, when the only -- there's a tox result

7  here that shows oxycodone, 178 nanograms per

8  millimeter, but the cause of death is

9  carfentanil and there's no cause of death

10  attributable to oxycodone.  Do you have an

11  explanation as to why that might be?

12          A.    I can't say why that is with the

13  information here.

14          Q.    Are there some potential

15  explanations based on your experience?

16          A.    I can presume that -- I don't recall

17  who this individual is.  I don't recall this

18  specific decedent being one of my personal

19  investigations, so I'm not sure why this

20  specific individual was listed as a carfentanil

21  toxicity with a presence of oxycodone in the

22  blood.

23          Q.    It's a fair point, right, you don't

24  have a lot of information, this is from a few

25  years ago, so I'm not asking you to opine on

Page 134

1   this specific case; but again, as an expert in

2   this field, what would some explanations be that

3   you could think of as to why someone would be

4   classified as a cause of death being carfentanil

5   toxicity when there's no tox results for

6   carfentanil and the only tox results show

7   oxycodone and there's no listing of oxycodone

8   being a cause of death?  Do you have any

9   potential explanations as to what factors may

10  have driven that determination?

11       A.   I mean, we don't have to guess.  A

12  case -- a case folder exists.  One could just go

13  back and look at the specific case and see what

14  the parameters were for this specific case, why

15  this individual has carfentanil listed as the

16  cause of death and oxycodone was not included.

17       Q.   But as you sit here today, you can't

18  shed any more light on that; is that fair?

19       A.   My presumption is that the

20  investigation supported that the individual was

21  actively abusing carfentanil.

22            MR. CHEFFO:  Let's mark this,

23  please, as 3.

24                 -   -   -   -   -

25            (Thereupon, Deposition Exhibit 3,

1              E-Mail from Patrick Gillepsie to
2              Steve Perch, dated January 31, 2017,
3              with Attachment, Beginning Bates
4              Number SUMMIT_000118414, was marked
5              for purposes of identification.)
6                   -    -    -    -    -
7         Q.    So let me just orient you as to what
8    I think this is.  So this is also produced --
9    you'll see the Summit County Bates numbers here,
10   and it's from 8-1-2016 to 1-31-2017.
11             Do you see that?
12        A.    Yes.
13        Q.    It's basically, you know, August to
14   January, whereas the prior exhibit was the full
15   year.
16        A.    Yes.
17        Q.    And then there's 14 pages in this
18   document.  I also just want to orient you.
19   There's a date.  I assume it's when it's printed
20   out, though I don't know that for a fact, but
21   it's January 31st, 2017.  Do you see that?
22        A.    I do.
23        Q.    And that's in contrast to the
24   Exhibit 2 -- Exhibit 2, I think, which is
25   January 3rd, 2018, so approximately a year

                                              Page 136

1    later.  Are you with me?  The one we've been

2    talking about.

3            A.    Yes.

4            Q.    Now, if you look at -- if you look

5    at Exhibit 2 for a minute.  You may just want to

6    put them side by side because I'm going to ask

7    you -- there's a few I want to compare.  Exhibit

8    2, page 24, and I'm going to ask you to look at

9    55719.

10                Are you with me?

11           A.    Yes.

12           Q.    So in the entry with a printout from

13   January 3rd, 2018, for that tox result it says,

14   "None detected."

15           A.    I'm sorry.  Which one?

16           Q.    That's a fair point.  I'm on the

17   Exhibit 2, 55719, page 24 of 46, and I'm in the

18   toxicology result, and it says, "None detected,"

19   but it has a cause of death as carfentanil

20   toxicity.

21           A.    Yes.

22           Q.    And then I'd like to -- you can hold

23   that place, if you would -- direct your

24   attention to Exhibit 3, which I just gave you,

25   and if you look at the same entry, 55719, on the

Page 137

1    printout from a year earlier the tox results

2    say, "carfentanil present."  Do you see that?

3         A.    Yes.

4         Q.    Do you -- strike that.

5               And if you look at the other

6    information, it looks to me like this is a

7    44-year-old white female, right?  The address

8    looks to be the same, right?

9         A.    Yes.

10        Q.    And you don't use redundant case

11   numbers, right?  In other words, we would expect

12   that 55719 to carry through?

13        A.    Yes.

14        Q.    So do you know why it would be that

15   one report a year earlier says carfentanil was

16   present, but later, when the same case is run,

17   it says none detected?

18             MS. HERMIZ:  Objection to form.

19        A.    I don't know why.

20        Q.    Does that concern you at all?

21             MS. HERMIZ:  Objection to form.

22        A.    Once again, I don't -- I don't enter

23   the database.  I don't -- I don't know why

24   there's a discrepancy on the two printouts.

25        Q.    It's not a matter of entering,

```
1    though, right?  Wouldn't you have had to change

2    the database, because the earlier one has

3    carfentanil present and then a year later it

4    says none detected, right?

5         A.    I think -- I think one would have to

6    refer back to the specific case.

7         Q.    Under what circumstances would

8    that -- I mean, that's not the only one, Doctor.

9    Look at 55724, just two below it, and then

10   55725, 55741.  I mean, there's multiple examples

11   where someone apparently changed it to say that

12   carfentanil was not detected whereas, in an

13   earlier version, it said it was detected.

14              MS. HERMIZ:  Objection to form.

15        Q.    Do you have any explanation for

16   that?

17        A.    I don't.

18        Q.    If you had seen this outside this

19   scope of a deposition, would that have raised

20   questions in your mind?

21              MS. HERMIZ:  Objection to form.

22        A.    I would go back and look at the

23   individual case folders.

24        Q.    You would?

25        A.    If you -- if there was a question.
```

Page 139

1   I didn't run the parameters here.  I don't know
2   what parameters were put in.  And I didn't -- I
3   don't enter the case data into the database.
4          Q.    And you've made that clear.  You're
5   not the data entry person, so my question is not
6   focused on who did that.  I'm just asking you,
7   having seen this information as a professional
8   in the office, does this raise some questions
9   and concerns in your own mind?
10         A.    No.
11         Q.    None?  You don't have any -- having
12  seen the information that you can't explain --
13  well, strike that.
14               Are these reconcilable?
15               MS. HERMIZ:  Objection to form.
16         A.    I would refer back to the
17  individuals who are running the -- the actual
18  queries.
19         Q.    You're the deputy chief medical
20  examiner, right?
21         A.    The chief deputy medical examiner,
22  that's correct.
23         Q.    Chief deputy.
24               As the chief deputy medical
25  examiner, can you tell me how these entries on

1  these two different exhibits can be reconciled,

2  where one says none detected and the other one

3  says carfentanil?  Do you have an explanation

4  for that?

5          MS. HERMIZ:  Asked and answered.

6      A.    I think one could go back and look

7  at the individual cases and see what the

8  explanation is.

9      Q.    And are you going to do that?

10          MS. HERMIZ:  Objection to form.

11      A.    Are you telling me I need to do

12  that?

13      Q.    My question was, are you going to do

14  that?  Do you feel a sense of obligation, having

15  had this brought to your attention, to find out

16  why that information is inconsistent?

17          MS. HERMIZ:  Objection to form.

18      A.    Reconciling the statistics generated

19  are not specifically within my duties.

20      Q.    These are not statistics, though,

21  are they?

22          MS. HERMIZ:  Objection to form.

23      Q.    These are facts.

24          MS. HERMIZ:  Objection to form.

25      Q.    Are they facts or statistics?

Page 141

1           MS. HERMIZ:  Objection to form.

2      A.    Well, this is the printout from

3 which statistics are going to be generated from,

4 or this type of query is the format in which

5 statistics are going to be generated from.

6      Q.    Well, gosh, doesn't that make it

7 even more important then; if you know you're

8 going to generate statistics from information,

9 don't you want to make sure it's actually

10 accurate?

11           MS. HERMIZ:  Objection to form.

12           He's already testified he doesn't do

13 statistics.

14           MR. CHEFFO:  That's not my question.

15 He's seen -- look, I'm not going to -- you've

16 objected.

17      Q.    Doesn't it make it more important

18 for you, Doctor, to have an understanding that

19 this is accurate knowing that it's going to be

20 used for statistical analysis?

21           MS. HERMIZ:  Objection to form.

22      A.    Well, these two are different dates.

23 You're referring to a query that's run in 2016

24 and then queries that are run in --

25      Q.    How do you get a query is run in

                                              Page 142

1    2016?

2              MS. HERMIZ:  Objection to form.

3         A.    The only differences are in these --

4    these -- so you're pointing out cases with

5    carfentanil differences for an undetected versus

6    carfentanil present.

7         Q.    That's what my questions have been,

8    Doctor.

9         A.    They're probably both true.  There

10   was probably a drug screen done where none was

11   detected in our office and probably we did a

12   send-out to an office that had a methodology to

13   detect carfentanil at lower levels, and then the

14   send-out came back and then the database was

15   probably updated.

16        Q.    Well, that might make sense if it

17   happened in that order, but the earlier printout

18   actually shows that it was detected and the

19   later one shows that it wasn't.

20             MS. HERMIZ:  Objection to form.

21        A.    Well, I did not perform this query

22   so --

23        Q.    Doesn't it raise enough questions in

24   your mind that you want to understand it and

25   make sure that the details are correct, or do

1  you just not care and it's not your job?

2              MS. HERMIZ:  Objection.

3              Counsel, I don't know how long

4  you're going to go around in circles.

5              MR. CHEFFO:  We're not.

6              MS. HERMIZ:  You are.  There's no

7  foundation for him to answer any of these

8  questions.  He's already said he's not

9  familiar --

10             MR. CHEFFO:  He's a medical

11  professional.  That's fine.  Please just object.

12  I take your objection.  That's fine.

13             Read my question back.

14                 (Record read.)

15             MS. HERMIZ:  Objection.

16       A.    I can't explain these two apparent

17  discrepancies between these specific printouts.

18  I'm -- I didn't do these queries.  I'm not the

19  individual who does the queries.  I can't

20  resolve it here.

21       Q.    My question is, do you have an

22  intention to look into this further, yes or no?

23       A.    I don't have a specific intent to

24  look into it further at this time.

25       Q.    Okay.

1              MR. CHEFFO:  Let's take a short

2   break, please.

3              THE VIDEOGRAPHER:  Off the record,

4   12:30.

5

6              (Luncheon recess taken.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                            Page 145
 1              THE VIDEOGRAPHER:  We're back on the
 2    record, 1:22.
 3                    -  -  -  -  -
 4                  AFTERNOON SESSION
 5     CONTINUED EXAMINATION OF GEORGE STERBENZ, M.D.
 6    BY MR. CHEFFO:
 7         Q.    Doctor, I just had a question or two
 8    about Exhibit 2.  I'm on page 26.  That may be
 9    what we left off on, 55751, in the middle of the
10    page.
11         A.    Which page?
12         Q.    25.  I'm sorry.  Maybe it's 26.
13    Sorry.  26.
14              Are you with me?
15         A.    Yes.
16         Q.    So 55751, on the cause of death it
17    says, "carfentanil toxicity," correct?
18         A.    I'm sorry.  Which case number?
19         Q.    55751, third from the bottom.
20         A.    Yes.
21         Q.    Carfentanil toxicity, correct?
22         A.    Yes.
23         Q.    And I'm actually -- you're welcome
24    to look at that other document, but -- I'm not
25    doing the cross-referencing thing, but you can
```

1    look.  So my only questions are on 55751 as
2    they're on Exhibit 2 for right now.
3              Is -- the cause of death, that
4    determination is what's done to a reasonable
5    degree of medical certainty; is that right?
6              MS. HERMIZ:  Objection to form.
7         Q.    I'm actually only talking about
8    Exhibit 2.
9         A.    I know you are.
10        Q.    And I'm using it as an illustrative
11   example --
12        A.    I know.
13        Q.    -- okay.
14        A.    Yes.
15        Q.    And for reasons that we would --
16   strike that.
17              And as appears kind of, I think,
18   obvious, in 55751, the fact that oxycodone was
19   found in the toxicology results, that doesn't,
20   in and of itself, mean that oxycodone was a
21   cause of death in this case or in any potential
22   case, right?
23              MS. HERMIZ:  Objection to form.
24        A.    Yeah.  It's -- I had become aware
25   that Exhibit 53 -- Exhibit 3 and Exhibit 2 are

1   different types of queries.  Exhibit 2

2   references only blood.  Exhibit 3 references

3   blood and then sometimes it references urine.

4        Q.    And I don't think I asked you

5   anything about 3.  I'll come back to that if

6   you --

7        A.    But you did.

8        Q.    No.  Do you want me to read the

9   question back?

10        A.    So these are different -- different

11   queries.

12        Q.    Doctor, I don't think I asked you a

13   single question right now about 3.

14        A.    I know.

15        Q.    I'm talking about 2.

16        A.    Okay.  Read your question back.

17        Q.    And I think that's why you're

18   smiling.

19              On Exhibit 2 -- so you can close

20   Exhibit 3.  I have no questions about that.

21        A.    Okay.

22        Q.    I'm not going to ask you about

23   Exhibit 3.

24        A.    Okay.  Don't do it then.

25        Q.    Okay.  Exhibit 55751 on Exhibit 2 --

Page 148

1   are you with me?

2        A.    Yes.

3        Q.    It says it's carfentanil toxicity as

4   the cause of death, right?

5        A.    Yes.

6        Q.    And that means that a determination

7   was made either by you or one of your colleagues

8   to a reasonable degree of medical certainty that

9   carfentanil toxicity was the cause of death,

10  right?

11       A.    Yes.

12       Q.    And with respect to oxycodone,

13  right, even though it was listed in the

14  toxicology results, a determination was made to

15  a reasonable degree of medical certainty that

16  oxycodone was not a cause of death; in fact, it

17  was carfentanil.  Isn't that what Exhibit 2

18  says?

19       A.    Okay.  So this specific decedent,

20  55715, I don't have specific recall of her, and

21  I can't specifically recall if I was indeed the

22  pathologist who certified or the physician that

23  certified her death certificate.  But to me what

24  this means is that, to a reasonable degree of

25  certainty, carfentanil is a fatal mechanism in

1   this specific decedent's death and that it
2   cannot be -- one cannot say to a reasonable
3   degree of certainty that oxycodone is a
4   mechanism in this individual's death.  That's
5   not to say that it's impossible that the
6   oxycodone had a contributory -- or some type of
7   contribution, but it was determined at the time
8   of the certification that it could not be
9   contributed to a reasonable degree of certainty.
10          Q.    Okay.  And that's what I understood,
11  and I'm glad you clarified that.  And that's why
12  I think you testified earlier that we can't just
13  kind of mechanically look at the tox results and
14  say that's the cause of death.  There has to be
15  an analysis of the tox results, along with an
16  additional analysis by a professional like
17  yourself, to ultimately make the reasonable
18  degree of medical certainty as in all the
19  columns on Exhibit 2, right?
20          A.    Exactly.  And with this specific
21  individual, for example, when we co-reference
22  Exhibit 3, which has -- which doesn't reference
23  urine in this instance, I mean, blood, but urine
24  rather, the individual is also actively abusing
25  amphetamine, but amphetamine is not included in

1    the -- in the cause of death statement because

2    it was -- in this instance, it's a drug with a

3    comparatively short halflife that's only present

4    in urine, not present in blood, so it's

5    difficult to say, within a reasonable degree of

6    certainty, that mechanistically the amphetamine

7    was contributing to this individual's death.  It

8    doesn't mean that the urine results are

9    incorrect and the blood results are more

10   correct.  They're both correct.  Just like with

11   Barbara Sands, has urine results and blood

12   results in two different exhibits.  They're both

13   correct.

14        Q.    Again, I'm referring to Exhibit 2.

15   You can answer it any way you need to.  But my

16   question is -- I think we're on the same page on

17   this one -- is just the fact that a tox result

18   shows a particular chemical or drug doesn't

19   necessarily mean that it's the cause of death

20   and that requires an independent analysis by a

21   professional to make an overall determination as

22   to what the reasonable degree of the cause of

23   death was.

24            Do you understand my question?  I

25   can rephrase it if you need me to.

1           Do you understand my question or

2    not?

3         A.    Your question was somewhat garbled

4    and circular.

5         Q.    That's why I asked you -- if it's

6    garbled, all you need to do, Doctor, is say "I

7    don't understand it" and I will be more than

8    happy to repeat it, which I'm going to do right

9    now.  Okay.  None of us want you to guess, and

10   if my questions are so garbled or muddy or

11   cloudy, you just tell me that and I'll rephrase

12   it.  Okay?

13           Just because something is listed in

14   a toxicology result does not mean mechanically

15   that it's the cause of death; in order to

16   determine cause of death, a medical examiner has

17   to look at the totality of the circumstances and

18   form an independent judgment based on the -- to

19   a reasonable degree of certainty, based on all

20   of the facts; isn't that right?

21        A.    It's correct that the -- the

22   pertinent findings of the case, the pertinent

23   facts of the case need to be considered rather

24   than just reflexively looking at a single test

25   and making it a blatant or a reflexive policy

```
                                            Page 152
 1  decision based upon a single test that a
 2  certification will be -- now I'm rambling.
 3            Just because a drug is present on a
 4  drug screen doesn't mean it will automatically
 5  be represented in the cause of death statement.
 6  The case does need to be examined for all
 7  pertinent facts.
 8       Q.    So I'll take that as a yes, but let
 9  me ask you another question, and I'm going to
10  move off of this for a minute.
11            Is Dr. Kohler a good medical
12  examiner?
13            MS. HERMIZ:  Objection to form.
14       A.    Yes.
15       Q.    Do you trust her judgment?
16       A.    I do.
17       Q.    Do you think she has integrity?
18       A.    Yes.
19       Q.    Do you think she's skilled and
20  capable at her job?
21       A.    Yes.
22       Q.    Do you believe that the department
23  currently has the resources to do the job that
24  the county executive and the public expects of
25  it?
```

1                   MS. HERMIZ:  Objection to form.

2          A.     We're short-staffed currently.

3          Q.     Are you able to function and --

4     excuse me.  Strike that.

5                   Are you able to perform the

6     functions that you think are necessary for your

7     department?

8                   MS. HERMIZ:  Objection to form.

9          A.     We are short-staffed currently.  If

10    we are going to be able to continue providing

11    the service that -- within the statutes of the

12    State of Ohio that the medical examiner's office

13    needs to fulfill, we will need to be fully

14    staffed at some point in the near future.

15         Q.     Up to this point, have you, in your

16    view, complied with all of the obligations that

17    the statutes of Ohio require you to do?

18                  MS. HERMIZ:  Objection to form.

19         A.     I believe -- I believe we have, yes.

20         Q.     And that's as far back as you can

21    remember; is that right?

22         A.     Yes.

23         Q.     There's never been a time where you

24    don't think you've had adequate funding or

25    staffing to do the job and the functions that's

1    required of you by the state; isn't that fair?

2              MS. HERMIZ:  Objection to form.

3         A.    We periodically go through periods

4    of being short-staffed when individuals leave,

5    which makes it more difficult to carry out

6    our -- our duties.  But I -- I believe we have

7    always fulfilled our statutory duties.

8         Q.    Has there ever been a time where you

9    have gone to a superior or anyone and said you

10   are unable to fulfill your statutory duties to

11   the citizens of Summit County because of funding

12   or some other constraints?

13        A.    No.

14        Q.    And I take it if you believed that,

15   you would have voiced that concern; is that

16   right?

17             MS. HERMIZ:  Objection to form.

18        A.    Maybe.

19        Q.    So you think that it's possible that

20   if you believed you were deficient as a

21   department in performing your duties and

22   obligations to the citizens, that you might tell

23   somebody about that?

24             MS. HERMIZ:  Objection to form.

25        A.    I believe your initial question was

Page 155

1    regarding funding.

2         Q.    Sure.  You can -- so if -- aren't

3    they tied together?

4         A.    Well, I believe your initial

5    question was if I believed that the -- that the

6    office wasn't adequately funded, is what was my

7    impression that you were asking, that I would go

8    to some -- a superior to state that we were --

9    it was my -- that it's my opinion that the

10   office is inadequately funded to fulfill the

11   duties of the office.

12        Q.    I don't think I asked that, but if I

13   did, I apologize.  That wasn't my question I

14   meant.  Let me just ask you, if you believed

15   that, for whatever reason, funding or something

16   else, that you or the people in your department

17   were unable to perform the core duties and the

18   required duties of the department, is there any

19   question in your mind that you would raise that

20   concern with your superiors and/or others?

21             MS. HERMIZ:  Objection to form.

22        A.    If I believed I was unable to carry

23   out my duties in the office, I would raise my

24   concerns with Dr. Kohler.

25        Q.    And have you ever done that?

1          A.     There have been times when we were

2     short-staffed and I presented my concerns

3     regarding time management to Dr. Kohler.

4          Q.     And in presenting that to

5     Dr. Kohler, was there ever a time where you told

6     her that you were unable to perform the duties

7     that were required of you and, in fact, you

8     didn't perform those?

9               MS. HERMIZ:  Objection to form.

10         A.     No.  I have always performed my

11     required duties.

12         Q.     And do you believe the same is true

13     for your department?

14               MS. HERMIZ:  Objection to form.

15         A.     Yes.

16         Q.     At all times that you've been there,

17     right?

18         A.     I do.  I believe that's true.

19         Q.     Have you ever diagnosed a decedent

20     with -- with addiction?

21         A.     Addiction is a clinical diagnosis,

22     so that's not a diagnosis that I would make;

23     therefore, I've never listed the term

24     "addiction" on -- on an autopsy report.  I would

25     use the term a chronic drug abuse or acute drug

Page 157

1    abuse or chronic active drug abuse.

2         Q.    I thought you told me earlier that

3    you actually had some experience or expertise

4    with addiction.

5              MS. HERMIZ:  Objection to form.

6         A.    Insofar as it involves the work that

7    I do at the medical examiner's office, I do.

8    The individuals which I am classifying as

9    chronic drug abuse would have a clinical

10   correlate of drug addiction in most instances.

11        Q.    So they're basically the same thing?

12             MS. HERMIZ:  Objection to form.

13        A.    Well, it's very similar.  It's a

14   similar thing.

15        Q.    So you may not have diagnosed them

16   with addiction --

17        A.    For example, pulmonary emphysema is

18   a similar thing to chronic obstructive pulmonary

19   disease, but pulmonary emphysema is the anatomic

20   manifestation of a clinical disease, which is

21   chronic obstructive pulmonary disease, or

22   something like congestive heart failure is a

23   clinical classification, whereas ischemic

24   cardiomyopathy is -- or ischemic dilated

25   congestive cardiomyopathy is an anatomic

1    manifestation of that clinical classification.

2        Q.    So is drug abuse the anatomical

3    manifestation of addiction?

4        A.    It's the term most commonly used by

5    forensic pathologists for -- with regards to

6    death classification.

7        Q.    Do you have any -- do you know what

8    the DSM is?

9        A.    No.

10       Q.    You've not heard of the DSM-4,

11   DSM-5?

12       A.    I've heard of DSM, of course, but I

13   don't know what that specific DSM is.  It's

14   not -- DSM, once again, is a clinical form of

15   classification and it doesn't apply to the

16   practice of forensic pathology directly.

17       Q.    To the extent that drug abuse is the

18   physical manifestation, according to your

19   testimony, of addiction, wouldn't you want to

20   know how addiction is defined?

21            MS. HERMIZ:  Objection to form.

22       A.    Clinical classifications are used

23   for issues such as prognosis and treatment, and

24   when -- with regards to my patients, with regard

25   to individuals that come to the medical

1   examiner's office, there is no treatment and

2   their prognosis is grim, they're dead, so a

3   classification system like a DSM does not apply.

4        Q.    So what -- are there any criteria to

5   determine or to benchmark how you would

6   determine that someone is or was a drug abuser?

7        A.    Yes.  Through the investigation and

8   through the autopsy examination, I can establish

9   a reasonable degree of certainty to indicate

10  that an individual has acute drug abuse, chronic

11  drug abuse or acute and chronic active drug

12  abuse or acute and chronic drug abuse.

13       Q.    And I guess I'm just trying to

14  understand -- and the answer may be no and it

15  may be yes.  I just don't know, Doctor.  I'm

16  just trying to understand if there's any

17  objective criteria or guidelines that you call

18  upon or use in your professional capacity that

19  outline the methodology or the criteria to

20  determine whether someone is or is not a drug

21  abuser.

22       A.    Are you referring to established

23  diagnostic criteria for forensic pathologists?

24       Q.    Yes.  That's why I referenced the

25  DSM.  So, in other words, if you wanted to

Page 160

1    know -- I think it's to your point earlier -- I

2    don't want to give a speech, but you took issue

3    a little bit with the epidemiology or epidemic

4    because there are certain criteria, right?

5    There are -- people may say I'm addicted to this

6    or addicted to that, but there are defined terms

7    and characteristics, right, in the DSM and

8    others, as I understand it, that talk about

9    addiction, okay.  And all I'm trying to find out

10   is whether there are such defined terms or

11   characteristics outlined somewhere that talk

12   about drug abuse that you rely on in making a

13   determination of drug abuse.

14        A.    There's no such diagnostic criteria

15   as would be presented by a DSM type of

16   diagnostic format.

17        Q.    So there's -- there's probably some

18   overlap in factors that certain medical

19   examiners would use here and across the country,

20   but there's no kind of objective criteria that

21   you're talking about that would kind of define

22   what someone should or should not look for to

23   determine whether someone is a drug abuser; is

24   that fair?

25             MS. HERMIZ:  Objection to form.

Page 161

1          A.     Well, let's recognize that for the

2     vast majority of individuals that are listed

3     with drug abuse issues, they are active drug

4     abusers.  The criteria is going to be their

5     active drug use.  But there is no DSM style

6     diagnostic criteria scheme to follow.

7          Q.     And as you sit here today, you're

8     not familiar with what the DSM criteria are for

9     addiction; is that right?

10          A.     I mean, that's not to say I've never

11     reviewed the DSM, but I know I'm not so familiar

12     that I can testify as to the content of the DSM.

13          Q.     Would you have reviewed the DSM in

14     connection with your professional work?

15               MS. HERMIZ:  Objection to form.

16          A.     No.  I would have reviewed the DSM

17     in conjunction with my medical school education.

18          Q.     Right.  Because you just told us

19     that's clinical and you're not clinical, right?

20          A.     I'm not making a clinical assessment

21     of the individuals because they're beyond that

22     point.

23          Q.     So the last time you would have

24     reviewed the DSM would have been 30 years ago?

25          A.     The last time I would have tried to

Page 162

1    attempt to memorize the DSM was when I was in

2    medical school, close to 30 years ago, yes.

3         Q.    Do people memorize -- let me strike

4    that.  When was the last time that you looked at

5    the DSM for professional purposes?

6         A.    Are you referring to the DSM --

7    well, it used to be in a book.  Itself, I

8    haven't reviewed the DSM book itself in years.

9    The only -- my only connection to the DSM

10   classifications would be in decedents' medical

11   records at this point in my career.

12        Q.    So isn't the answer that you don't

13   regularly look at the DSM because it's not part

14   of what you need to do?

15        A.    That's true, I don't.  It's not part

16   of what I need to regularly do.

17        Q.    Now, under your classification, how

18   long does someone need to be abusing a substance

19   in order to have a drug abuse disorder?

20             MS. HERMIZ:  Objection to form.

21        A.    I don't diagnose people with drug

22   abuse disorder.  I'm going to classify them as

23   acute drug abuse, chronic drug abuse, or acute

24   and chronic drug abuse, but that's -- it's not a

25   DSM style of diagnosis, like drug abuse

Page 163

 1   disorder.

 2        Q.    What's acute -- give us some

 3   parameters -- and what's chronic?

 4        A.    Acute would be, for example,

 5   individuals that are deceased with acute drug

 6   toxicities.  That's an acute drug abuse episode.

 7   A chronic drug abuse would be an individual

 8   who's been abusing substances in the past and

 9   are perhaps presenting with physical stigmata of

10   chronic drug abuse, such as, for example, liver

11   disease in chronic alcoholics, or lung disease

12   in people that are smoking crack cocaine or

13   smoking methamphetamine.

14        Q.    So acute could be a one-time use?

15        A.    Acute drug abuse, in theory, could

16   be one-time use, yes.

17        Q.    So if someone was the first time --

18   strike that.

19             If someone used a drug for the first

20   time and, unfortunately, died, they would be an

21   acute drug user, or drug abuser?

22        A.    No, not exactly.

23        Q.    Well, how would you know?

24        A.    I wouldn't classify them as an acute

25   drug abuser.  They would be classified as having

Page 164

1    died of acute drug abuse if it was determined by

2    the course of the investigation that they were

3    using a drug illicitly for recreational

4    purposes.

5          Q.    So what would be an acute drug

6    abuser?

7          A.    Well, I wouldn't classify someone as

8    an acute drug abuser.  I would classify someone

9    as -- their acute drug toxicity as acute drug

10   abuse.

11         Q.    Okay.  So then the only

12   characterization for drug abuser is chronic?

13              MS. HERMIZ:  Objection to form.

14         Q.    Because I thought you told me that

15   there was acute.  I mean, I wrote these down,

16   Doctor.  I'm just trying to follow your

17   testimony.  Acute and chronic you told me for

18   drug abuser.  Maybe I misunderstood.  Is there

19   such a thing --

20         A.    So, by history, we -- there could be

21   clinical or anecdotal history that an individual

22   is a chronic or acute -- is a drug abuser.

23   You're referring to a DSM style of --

24         Q.    Doctor, just so we don't get too far

25   afield, I'm really just talking about -- we

1    talked about DSM.  I'm not talking about that

2    anymore.  I'm just trying to understand, if I

3    was to look at your records and see drug abuser,

4    how it would be defined, right.  So, in your

5    mind, if someone was -- because you told me you

6    don't diagnose people with addiction, but you

7    would label them, as part of your professional

8    duties, as a drug abuser.  Is that right?

9         A.    I wouldn't use the term "drug

10   abuser" with e-r at the end.  I would classify

11   them as acute drug abuse, chronic drug abuse, or

12   a combination of acute and chronic drug abuse.

13        Q.    So acute drug abuse by a decedent

14   would be what?

15             MS. HERMIZ:  Objection to form.

16        A.    As I previously stated, individuals,

17   for example, who are dying of acute drug

18   toxicity can be classified under acute drug

19   abuse.

20        Q.    And is there any -- is that done by

21   the number of times?  So, in other words, if

22   someone was to use a methamphetamine

23   recreational, once or two times, would that be

24   acute drug abuse?

25        A.    Okay.  So all of my patients are

Page 166

1    dead.

2          Q.     We got that.

3          A.     But just to clarify that.  They're

4    all dead.  So if someone dies with an acute

5    cocaine intoxication or acute cocaine toxicity,

6    for example, that is, by definition, acute drug

7    abuse because they died from an acute

8    intoxication.  That same person might be a

9    chronic drug -- cocaine abuser, and part of

10   their chronic disease, they might have developed

11   cardiovascular manifestations of their cocaine

12   use.  They might have cocaine-induced changes of

13   their coronary arteries, for example.  They

14   might have visceral infarcts, for example, from

15   prior, but more remote, cocaine use.  So that

16   same -- so that individual, now with evidence of

17   prior abuse of cocaine, who is now dying of an

18   acute cocaine toxicity, is dying -- can be

19   classified as chronic active drug abuse, or one

20   could also say acute and chronic drug abuse.

21         Q.     So I think I understand.  So is it

22   fair to say, then, that because you don't have a

23   crystal ball, you can't know what happened to

24   someone during their lifetime; what you can do

25   is try and determine if there are sequelae of

Page 167

1    their conduct while they were alive that gives

2    you insight as to how their drug abuse or drug

3    use may have impacted their death?

4              These are not trick questions.  I

5    can read them back if you want me to.

6         A.    Yeah.  Can you repeat that?

7              MR. CHEFFO:  Can you please read

8    that?

9                   (Record read.)

10        A.    Okay.  Everything that I do is

11   directed towards establishing cause and manner

12   of death.  During the course of that

13   investigation, I will, for example, be able to

14   establish, in many individuals who are dying of

15   drug overdoses, that they have prior history of

16   drug abuse.  That can come from medical records.

17   That can come from next of kin.  That can come

18   from anatomic stigmata of chronic drug abuse.

19   What I'm really interested in is their cause and

20   manner of death, and if that individual is dying

21   of an acute drug toxicity, that's what --

22   obviously, that's what I'm mostly concerned

23   about for establishing cause and manner of

24   death.  I'm not going to ignore all the other

25   information, and I will appropriately list it in

Page 168

1    a list of -- diagnostic list on the autopsy

2    report.

3                    Should I not be able to interview

4    family, because family cannot be found, should I

5    not be able to obtain medical records because I

6    do not know who that individual's doctor is, or

7    maybe they never had a doctor, and should that

8    individual never -- doesn't have well-defined

9    stigmata of chronic drug abuse, that still

10   doesn't prevent me from certifying their death

11   certificate to a reasonable degree of certainty

12   as an acute drug toxicity, and the fact that I

13   might not be able to elucidate their history

14   doesn't prevent me from certifying their cause

15   of death, and it's not -- because it's not

16   necessary in some instances.

17          Q.    You don't make clinical

18   determinations about whether someone was

19   addicted or a drug abuser during their lifetime,

20   right; that's not within your purview?

21          A.    The term "clinical determination,"

22   that's -- you're talking about living people, so

23   I do not examine living people and treat living

24   people and make determinations that living

25   people have a drug addiction problem, because I

1    don't have a clinical practice, I'm not

2    practicing clinical drug addiction medicine.

3          Q.    So if someone comes into your --

4    into the medical examiner's office, you may note

5    drug abuse as part of --

6          A.    You mean a decedent?

7          Q.    When a decedent comes in --

8          A.    Yeah.

9          Q.    -- you may note drug abuse, but do

10   you make a determination that they were a drug

11   abuser when they were living or that they were

12   addicted when they were living?  Is that a

13   diagnosis that you make?

14               MS. HERMIZ:  Objection to form.

15         A.    If I'm told they had a history of

16   prior drug abuse, I can include that in my

17   diagnostic list.  If I find physical

18   manifestations of prior drug abuse, I can

19   include that in my diagnostic list.

20         Q.    You don't independently make a

21   determination -- let's just stick with

22   addiction.  Do you ever make a determination

23   that a decedent was addicted to a particular

24   substance?

25         A.    All of my patients are not addicted

Page 170

1    anymore.  They're all dead.  So the very

2    question that you're posing is really a clinical

3    question for people that are alive.  None of my

4    patients are addicted anymore because they're

5    dead.

6         Q.    Thank you for that clarification.

7              Do you make a determination that a

8    decedent, when he or she was alive, was

9    addicted?

10             MS. HERMIZ:  Objection to form.

11        Q.    Do you look back prior to their

12   death and make a determination as to whether

13   they were addicted or not?  This is a pretty

14   simple question.

15        A.    Your question is using terminology

16   that applies to living people.

17        Q.    That's right.  Isn't the answer,

18   Doctor, that you don't make determinations as to

19   living people when they're alive?  Isn't that

20   what you've just been telling me, and I've just

21   been trying to put a finer point on it so I can

22   understand it?

23        A.    I can make a -- I will do a

24   classification of acute -- of chronic drug

25   abuse, for example.  The presumption is that if

Page 171

1    this individual had chronic drug abuse, that

2    they were addicted -- they possibly had an

3    addiction to their -- to that substance.  But

4    even the term "addiction" has different clinical

5    implications, as opposed, you know -- you know,

6    I'm sitting here, I'm thinking addiction is

7    meaning a physiologic dependence upon a

8    substance; that if that individual stops using

9    that substance, they can have bad physiologic

10   withdrawal responses.  And -- so I -- I can't

11   presume to make clinical diagnoses, but on the

12   other hand, sometimes the -- the history and the

13   physical stigmata imply a clinical situation.

14   Sometimes anatomy can imply a potential

15   operation in physiology.

16           So that, for example, with people

17   that are addicted to alcohol, many of these

18   people die during the course of alcohol

19   withdrawal.  Well, they come to me dead.

20   They're not withdrawing from anything at the

21   time when they come to me.  But I can -- during

22   the course of my examination, I can say it is

23   reasonable to conclude based upon, at the end of

24   my total investigation, that this person

25   probably died due to complications of their

1    chronic alcoholism and as might be related to

2    alcohol withdrawal due to being addicted to

3    alcohol.  I'm not making -- really making a

4    diagnosis that -- of addiction per se, but I'm

5    implying that the post-mortem findings are

6    implying -- the history and the anatomy is

7    implying something more clinical, implying

8    something more physiologic.

9         Q.    Do you have any role in the budget

10   for the department, the medical examiner's

11   department?

12        A.    I think my role in the budget is my

13   salary.

14        Q.    You don't do any projections or

15   submissions to the county executive?  Is that

16   within Dr. Kohler's ambit of responsibilities?

17        A.    I don't do budget projections.  I

18   assume Dr. Kohler is involved with that to some

19   extent.  Exactly how she's involved, I don't

20   know.

21        Q.    There's an annual report that is

22   done.  It seems to be lagging a few years, but

23   it's done with some level of frequency.  Are you

24   familiar with that annual report?  Are you

25   familiar with it?

Page 173

1        A.    Are you talking with regards to the

2    annual statistics?

3        Q.    Yes.  I'll show it to you.  It's the

4    one that says "Annual Report" on it and has the

5    statistics.

6              Are there more than one annual

7    report?

8        A.    I don't know.

9        Q.    Wouldn't you know?

10             MS. HERMIZ:  Objection to form.

11       A.    Not necessarily.

12       Q.    Really?  Okay.

13             MR. CHEFFO:  Let's mark this,

14   please.

15             THE VIDEOGRAPHER:  May I change

16   video?

17             MR. CHEFFO:  Sure.

18             THE VIDEOGRAPHER:  We're off the

19   record at 2:02.

20                  (Short recess had.)

21             THE VIDEOGRAPHER:  We're back on the

22   record, 2:04.

23                   -    -    -    -    -

24             (Thereupon, Deposition Exhibit 4,

25             2016 Summit County Medical Examiner

```
                                           Page 174
 1              Annual Report Beginning Bates Number
 2              SUMMIT_000022367, was marked for
 3              purposes of identification.)
 4                   -   -   -   -   -
 5         Q.    I've put before you Exhibit 4,
 6    Doctor.  Have you ever seen this document
 7    before?
 8         A.    Yes.
 9         Q.    What is it?
10         A.    This is the statistical report
11    that's generated by the Summit County Medical
12    Examiner's Office.  This one is specifically for
13    the year 2016.
14         Q.    Are you aware of any annual reports
15    that are prepared by the Summit County Medical
16    Examiners other than this one?
17         A.    It's my understanding an annual
18    report is generated, which means every year.
19         Q.    No.  Is this the only type of report
20    that's generated, or are there others?
21              MS. HERMIZ:  Objection to form.
22         A.    This is the only -- so this is the
23    only statistical report I'm aware of that's
24    generated by the office.
25         Q.    Are you aware --
```

Page 175

1        A.    I think queries are run for various

2    agencies if -- when requested, but I'm not

3    part -- involved in that.

4        Q.    What's your role in connection with

5    this annual report?

6        A.    My role is that I'm performing some

7    of the autopsies and death certifications that

8    are being used to generate these statistics.

9        Q.    Do you have any input into this

10   report?

11       A.    No.

12       Q.    Do you review it before it goes out?

13       A.    No.

14       Q.    Have you ever reviewed it before,

15   either the 2016 or prior?

16       A.    Reviewed it in what sense?  I mean,

17   right now you could say I'm reviewing it.  Do

18   you mean like this?

19       Q.    No.  I don't mean flipping through

20   it.  I mean, you know, taking any time to go

21   through it, either for accuracy or for general

22   interest.

23       A.    I can say that I have definitely not

24   reviewed it for accuracy, and I don't recall

25   spending time with the 2016 stat report,

1   reviewing it previously, other than just

2   basically what you see me doing here, just kind

3   of looking through it quickly.

4          Q.    Okay.  And other than the fact,

5   right, that the work you have done on some

6   granular level may get caught up in the

7   statistics, have you actually done independent

8   work to compile data or statistics specifically

9   for the purpose of putting it into this report?

10         A.    No.  That's not part of my function

11  at the office.

12         Q.    And your name is on the second page?

13         A.    Yes.

14         Q.    Did you know that?

15         A.    I do now.

16         Q.    Page 18, please.  This has a heading

17  of -- actually, the page before -- excuse me --

18  it's unpaginated.  I guess it -- it's before 17.

19  It says, "Toxicological Studies."  I'm just

20  trying to orient you to the section.  And then

21  17 says, "Statistics Report," and then 18 has

22  some statistics data in bar charts.

23               Do you see that?

24         A.    Yes.

25         Q.    If you need to, though I suspect

Page 177

1   you're relatively familiar with it, there's a

2   number of entries in 2016 in that Exhibit 2 that

3   we've been looking at that talk about deaths

4   associated with methamphetamines.

5              MS. HERMIZ:  Objection to form.

6        A.    I don't know what -- what are you

7   specifically referring to?

8        Q.    If you need to go through it, you

9   can, but like the very first one that we've

10   talked about, 1-1-2016, do you see that?

11       A.    Case number 55236?

12       Q.    Right.

13             What's the cause of death?

14       A.    "Combined methamphetamine and

15  fentanyl toxicity."

16       Q.    Down below, 55240, what does that

17  one say?

18       A.    "Combined fentanyl/methamphetamine

19  toxicity/overdose."

20       Q.    And we can -- you can flip to the

21  next page, 55244, "Combined fentanyl and

22  methamphetamine toxicity."  Do you see that?

23       A.    Yes.

24       Q.    55247, "acute mixed methamphetamine

25  and ethanol toxicity," do you see that?

Page 178

```
 1        A.    Yes.

 2        Q.    55257, "methamphetamine toxicity,"

 3  do you see that?

 4        A.    Yes.

 5        Q.    You're welcome to flip through this,

 6  but there are other examples of methamphetamine

 7  toxicity in the report?

 8        A.    Yes.

 9        Q.    So my question is, where on page 18

10  is or are methamphetamine deaths reflected?

11              MS. HERMIZ:  Objection to form.

12        A.    Well, there's two figures on page

13  18.  Figure 20 is headed, "Reflects the number

14  of most commonly found drugs that were not

15  necessarily the cause of death but were found in

16  a routine drug screen."  And the drugs that

17  were -- are listed in figure 20 are carfentanil,

18  citalopram, cocaine, fentanyl, heroin,

19  hydrocodone, methadone, morphine and oxycodone;

20  therefore, that would imply, then, that

21  methamphetamine was not one of the most commonly

22  found drugs that were not necessarily the cause

23  of death but were found in a routine drug

24  screen.

25              Figure 21 states that it reflects
```

1  the number of most commonly found drugs that

2  were determined to be the cause of death," and

3  those are listed as carfentanil, citalopram,

4  cocaine, fentanyl, heroin, hydrocodone,

5  methadone, morphine and oxycodone, and

6  methamphetamine is not included in that -- that

7  list of one, two, three, four, five, six, seven,

8  eight, nine; nine drugs.

9        Q.    We know figure 21 is not accurate

10  based on Exhibit 2, right?

11              MS. HERMIZ:  Objection to form.

12        A.    I don't know that to be true.

13        Q.    Well, it says, "Drugs most commonly

14  found as the cause of death."  Do you see that?

15        A.    Yes.

16        Q.    And it lists -- let's look at

17  hydrocodone.  How many numbers of hydrocodone

18  deaths?

19        A.    Two.

20        Q.    Well, we only need to go probably

21  two or three pages into this.  Look at 55236,

22  right.  Then look at the ones we just talked

23  about, 55240, 55257, 55247, 55244.  We're

24  already above two, aren't we?

25              MS. HERMIZ:  Objection to form.

Page 180

1           A.      From this query, yes.

2           Q.      So how can it be that the internal

3     query of the documents showing cause of death

4     has many, many more than two in terms of

5     methamphetamine deaths but it doesn't show up on

6     the chart?

7           A.      I did not participate in the

8     generation of these statistics, so I don't -- I

9     don't know why it's not there or --

10          Q.      I think you just explained this

11    chart says it reflects the number of most

12    commonly found drugs that were determined to be

13    the cause of death, right?  That's what figure

14    21 purports to do, right?

15          A.      That's what it states in the

16    heading, yes.

17          Q.      Would you agree with me that

18    methamphetamines were found to be the cause of

19    death in at least more than two?  And we could

20    probably go through it and find 20, 30, 40.

21               MS. HERMIZ:  Objection to form.

22          A.      I can't -- I can't -- I can't

23    explain the query and I can't explain the chart

24    in the report.

25          Q.      And you've testified you did not

Page 181

1   personally perform or create this chart.  I

2   understand that.  And I'm just asking you just

3   some fact-based questions, and you'll tell me as

4   honestly as you can.

5                Would you agree with me that there

6   are more incidences where the cause of death by

7   the medical examiner's office in 2016 attributes

8   methamphetamines as the cause of death than

9   several of these other drugs or chemicals?

10               MS. HERMIZ:  Objection to form.

11       A.    I don't know enough about the

12   criteria that was used to generate the bar

13   graphs on page 18 to provide testimony about

14   them.

15       Q.    Okay.  Well, let me -- this is for

16   the general public, isn't it?

17       A.    I think it's accessible by the

18   general public, yes.

19       Q.    I'll represent to you, it's on the

20   website.

21       A.    Okay.

22       Q.    So putting aside -- and I know you

23   will tell me that you didn't make this document,

24   you didn't put the chart together, but what do

25   you think figure 21 is supposed to represent?

Page 182

1   What is it supposed to tell the reader?

2            MS. HERMIZ:  Objection to form.

3        A.    I can state what it says on the bar

4   graph.

5        Q.    You, as a citizen, what do you think

6   that it's trying to represent?

7            MS. HERMIZ:  Same objection.

8        A.    I can only state what it says on the

9   bar graph, which I've already read.

10       Q.    Which is this is supposed to tell

11  people the most commonly found causes of

12  death -- the drugs that are most commonly found

13  as the cause of death in 2016, right?

14       A.    That's what it says, yes.

15            Wait.  Yes.

16       Q.    And you've now seen, which we spent

17  a fair amount of time on Exhibit 2, the data

18  from your department that was produced, right?

19            MS. HERMIZ:  Objection to form.

20       A.    I was not involved in this query.

21       Q.    Do you have any reason to believe

22  that's inaccurate?  Is there anything that

23  you've seen today that shows you that it's not

24  accurate or didn't come from your office?

25            MS. HERMIZ:  Objection to form.

Page 183

1      A.    All I can say is I was not involved
2  in this query.  I can't say it's accurate or
3  inaccurate.
4      Q.    If you assume it was produced in
5  connection with the litigation by your office,
6  would you expect it to be accurate or
7  inaccurate?
8          MS. HERMIZ:  Same objection.
9      A.    I can't testify to the accuracy of
10  Exhibit 2.  I was not involved in producing
11  Exhibit 2.
12      Q.    Should the public be able to rely on
13  this annual report, Exhibit 4?
14          MS. HERMIZ:  Objection to form.
15      A.    I was not involved in the production
16  of the annual report for 2016.
17      Q.    I understand that, Doctor, but do
18  you ever go on to a government website ever, not
19  the Summit County but just a government website?
20  Do you?
21      A.    I have, yes.
22      Q.    Do you have an expectation that you
23  should be able to rely on the information?
24          MS. HERMIZ:  Objection to form.
25      A.    I assume so, yes.

Page 184

1      Q.    And wouldn't you assume that the

2  citizens of Summit County, if they flip on your

3  website and read figure 20 or 21, that they

4  should have an assumption that it's accurate?

5            MS. HERMIZ:  Same objection.

6      A.    I would assume so, yes.

7      Q.    And wouldn't you assume that

8  there's -- there's also reporting that's done,

9  both from a state level and probably federal

10  level, based on your details and statistics from

11  your office?

12           MS. HERMIZ:  Objection to form.

13      A.    The office is not my personal

14  office.  I am an employee at the office.  But,

15  once again, I -- I was not involved in the

16  production of the -- the figures on page 18, and

17  I can't testify that they're inaccurate or

18  accurate.

19      Q.    Even though you've just seen -- for

20  three hours, we've looked at all this data that

21  clearly shows that the cause of death listed is

22  methamphetamine, and it's more than many of

23  these entries, you're not willing to say that

24  there's an inaccuracy here?

25           MS. HERMIZ:  Objection to form.

Page 185

1          A.     That's correct.

2          Q.     Are you willing to say it's at

3     least --

4          A.     I don't know enough about these two

5     figures on page 18 to say they're accurate or

6     inaccurate.

7          Q.     Do you know any more than any

8     citizen would take away from this?

9               MS. HERMIZ:   Objection to form.

10         A.     I'm not even sure what you're

11    asking.

12         Q.     This is supposed to tell people in

13    the public and others data and information,

14    right?  That's what figures 20 and 21 are

15    supposed to do, right?

16         A.     Yes.

17         Q.     And it's supposed to be accurate,

18    isn't it?

19         A.     Yes.

20         Q.     Because if it's inaccurate, it could

21    get reported and that could lead to further

22    inaccurate results if they're aggregated,

23    correct?

24         A.     Yes.

25         Q.     And you have professional pride in

Page 186

1   your job, don't you?

2        A.    Yes.

3        Q.    And you have professional pride and

4   integrity in your department, whether or not you

5   personally did something or whether your

6   colleagues did it, right?  Don't you take pride

7   in what your office does?

8        A.    I do.

9        Q.    Right.

10            And if you looked at something and

11  you saw it was just clearly wrong, wouldn't you

12  want to understand why that's the case?

13            MS. HERMIZ:  Objection to form.

14       A.    I cannot testify that the

15  information in -- on page 18 of the 2016 annual

16  report is wrong.

17       Q.    Can you explain why there's no

18  reference to methamphetamine when you know,

19  because you're one of the medical examiners,

20  that you've made a determination that the cause

21  of death in multiple cases is higher than what's

22  listed on this chart?

23            MS. HERMIZ:  Objection to form.

24       A.    You're making a comparison between

25  an exhibit, a statistical exhibit, which I was

Page 187

1    not involved in its -- directly involved in its

2    production, and a database query, which I was

3    not directly involved with producing the query.

4    So I cannot compare the two.  I cannot provide

5    testimony regarding the comparison of these two

6    exhibits.

7           Q.    Let me ask you -- put that aside

8    then.

9                 Can you tell us, in 2016 are you

10   aware of one death that you worked on that the

11   cause of death was methamphetamine?  Can you

12   remember one case?

13          A.    I don't have immediate recall of the

14   causes of death for 2016.

15          Q.    One case.

16          A.    I would like to say that I

17   remember -- have immediate recall of all of my

18   deaths that I have performed investigations on,

19   but I don't have a specific recall for 20 -- for

20   the year 2016.

21          Q.    Can you remember one that the cause

22   of death was methamphetamine?

23                MS. HERMIZ:  Objection to form.

24   Asked and answered.

25          A.    I can't answer it any better than I

                                        Page 188

1    already have.

2          Q.     And if you look through Exhibit 3,

3    and you can take the time to look through

4    Exhibit 3, that wouldn't refresh your

5    recollection that one of those -- one of those

6    cases worked on was yours?

7                MS. HERMIZ:  Same objection.

8          Q.     Let me ask you a different question.

9    I mean, looking at this, how many people in 2016

10   did autopsies?

11         A.     Other than myself?  The majority of

12   the autopsies in 2016 were performed by myself

13   and Dr. Kohler.

14         Q.     And what percentage, roughly, do you

15   think you did?

16         A.     What percentage?  Many of the

17   autopsies.  The exact percent, I don't know.

18         Q.     50 percent, if not more?

19                MS. HERMIZ:  Objection to form.

20         A.     Something like that.

21         Q.     And if I represented to you, and you

22   can look at it, that 39 of the causes of death

23   in 2016 list methamphetamine -- you're a

24   statistics person, right?  You like hard data?

25                MS. HERMIZ:  Objection to form.

```
                                          Page 189

 1        A.    I don't think that's a question.

 2        Q.    It is.  Do you believe in

 3   statistics?

 4             MS. HERMIZ:  Objection to form.

 5        A.    I do recognize statistics, yes.

 6        Q.    So do you think of the 39 causes of

 7   death that list methamphetamine, based on the

 8   fact that you did 50 percent or so of the

 9   autopsies, that one of them was performed by

10   you?

11             MS. HERMIZ:  Objection to form.

12        A.    I can't -- I don't have immediate

13   recall so I cannot offer testimony as to the

14   number of deaths that I -- for the death

15   investigations that I performed in 2016 were --

16   which number were methamphetamine fatalities.

17        Q.    Whether they were yours or somebody

18   else, can you explain why, even though there's

19   39 listed as the cause of death, not one of them

20   made it onto figures 20 or 21?

21             MS. HERMIZ:  Asked and answered.

22        A.    I was not involved in the

23   statistical figures shown in page 18 of the 2016

24   annual report.  I did not -- I was not involved

25   in the query that's Exhibit 2, and I cannot
```

Page 190

1    offer testimony for the comparison between the

2    two exhibits.

3         Q.    When you go back to the office

4    tomorrow, are you going to ask and look into why

5    there's this discrepancy?

6              MS. HERMIZ:  Objection to form.

7         A.    I can't -- I can't state that there

8    is indeed a discrepancy or some type of

9    discrepancy, and I was not involved in this

10   query.

11        Q.    That's not my question.  My question

12   was, are you going to go back -- are you going

13   to go in the office tomorrow and ask if there's

14   a discrepancy and, if so, how are you going to

15   fix it?  It's a yes or no question.

16        A.    I do not have plans to do that at

17   this time.

18        Q.    What would it take for you to ask

19   somebody if there was a mistake in documents

20   when you believe that there was?

21             MS. HERMIZ:  Objection to form.

22   Argumentative.

23        A.    Repeat your question.

24        Q.    Sure.

25             What would prompt you to ask one of

Page 191

1    your colleagues or supervisor if there was a

2    mistake in publicly available documents?

3                MS. HERMIZ:  Same objection.

4        A.    I don't even know how to answer

5    that.  I don't have -- I don't have a response.

6        Q.    You can't think of any situation

7    where you would ask somebody if there was a

8    mistake?

9        A.    Not right now.

10       Q.    Is part of your job to give the

11   public accurate information?

12               MS. HERMIZ:  Objection to form.

13       A.    I am not directly involved in the

14   statistical annual report, so it is not part of

15   my responsibilities for verifying the accuracy

16   of the statistical annual report.  I do perform

17   death investigations, and the content or the

18   accuracy of my death certifications need to be

19   within a reasonable degree of certainty, and I

20   believe that I've always performed death

21   certifications to within a reasonable degree of

22   certainty.

23       Q.    You view your job just regarding

24   death investigations and you don't believe you

25   have any responsibility for the public

Page 192

1  perception of data that's generated by your
2  department?  Is that your testimony?
3           MS. HERMIZ:  Objection to form.
4      A.   I don't participate directly in the
5  statistics generated by the office that are
6  compiled in the annual report.
7      Q.   Do you care if they're accurate?
8           MS. HERMIZ:  Objection to form.
9      A.   I don't have a response to that at
10  this time.
11      Q.   Well, it's yes or no, isn't it?
12           MS. HERMIZ:  Objection.
13      A.   I don't -- I don't know that they're
14  inaccurate.
15      Q.   That's not my question.  My question
16  is, do you care if they're accurate or not?
17           MS. HERMIZ:  Objection.
18      A.   I don't have a response.
19      Q.   How can that be, Doctor?
20           MS. HERMIZ:  Counsel, at this point
21  I feel like you're harassing the witness here.
22  We've spent four hours on three exhibits that he
23  has told you that he has no personal knowledge
24  as to how they're made.
25           MR. CHEFFO:  That's a different

Page 193

1   question, though, counsel.  I think we both know

2   that.  But I understand your point.

3               MS. KEARSE:  Why don't we take a

4   five-minute break.

5               MR. CHEFFO:  That's fine.

6               MS. KEARSE:  Do you want to take a

7   break?

8               MR. CHEFFO:  Sure.

9               THE VIDEOGRAPHER:  Off the record,

10  2:30.

11                   (Recess had.)

12              THE VIDEOGRAPHER:  Back on the

13  record, 2:50.

14  BY MR. CHEFFO:

15       Q.    We're back on, Doctor.

16              With respect to the annual report,

17  are you aware of who ultimately reviews and

18  signs off on that report before it's issued?

19       A.    I believe it's Dr. Kohler.

20       Q.    Do you know if it's anybody above

21  her or in the county's office?

22       A.    I'm not aware of anyone else in the

23  executive's department that might be reviewing

24  or signing off on the annual report.  The report

25  is generated by whoever is designated to do the

Page 194

1   office statistics, and it's reviewed by

2   Dr. Kohler.

3        Q.    Has there ever been a time where you

4   were the designee for the office statistics?

5        A.    Excuse me?

6        Q.    Sorry.  I probably mumbled that.

7             Has there ever been a time where you

8   were the designee for the office statistics?

9        A.    No.

10        Q.    And are you aware of any discussion

11   around any concerns about listing

12   methamphetamine in your statistics for your

13   department because of any perceptions about how

14   it may look to the outside world?

15             MS. HERMIZ:  Objection.  Form.

16        A.    No.

17        Q.    Nothing you've ever heard before?

18        A.    No.

19        Q.    And do you know who -- the person

20   who collected the statistics was for 2016?

21        A.    I believe in 2016 Patrick Gillespie

22   was still with -- had not yet retired and was

23   still with the office and issued the 2016

24   statistical report.

25        Q.    Now that we're almost in 2019, do

Page 195

1   you know when 2017 and 2018 will be issued?

2         A.    No.

3         Q.    Do you know what the hold-up is?

4               MS. HERMIZ:  Objection to form.

5               MS. KEARSE:  I think 2017 --

6               MR. CHEFFO:  Was it?  I stand

7   corrected.

8               MS. KEARSE:  That may be right.

9   2018 and --

10        Q.    Well, if it has, then let me

11  withdraw it, because I was not aware of that,

12  and I don't want to ask you an unfair question.

13              Do you believe that opioid medicines

14  are beneficial for some people?

15              MS. HERMIZ:  Objection to form.

16        A.    Yes.

17        Q.    Do you have a view as to who they

18  are appropriate for?

19              MS. HERMIZ:  Objection to form.

20        A.    Yes.

21        Q.    Could you testify about that?

22        A.    Opioid medications are useful for

23  pain management for individuals that are in --

24  undergoing surgical procedures and people --

25  individuals in their post-operative surgical

Page 196

1   period.  Opioid medications are useful for

2   people that are dealing with acute pain with

3   various disease processes.  And opioid

4   medications are useful for people with, oh,

5   chronic pain due to various medical conditions.

6          Q.    You mentioned earlier -- you

7   testified -- excuse me -- earlier about the

8   OARRS database.  Do you remember that?

9          A.    Yes.

10         Q.    And correct me if I'm wrong, but I

11  think you said that your understanding was that

12  it was voluntary amongst doctors; is that right?

13         A.    Yes.

14         Q.    And that is your understanding?

15         A.    Yes.

16         Q.    Is that something that you are

17  certain of or you believe to be true?

18         A.    Well, I believe it to be true.  I've

19  never heard otherwise, that it's anything other

20  than voluntary.

21         Q.    You're not aware of any rules or

22  regulations that make it mandatory?

23         A.    It's possible that various

24  institutions have their own internal rules and

25  regulations, but it's my understanding that it's

1    voluntary and, once again, I don't report to

2    the -- to OARRS because I'm not an

3    opioid-prescribing physician.

4         Q.    Do you have a view one way or the

5    other as to whether it's the doctor's

6    responsibility to actually report when he or she

7    writes a prescription for an opioid, or do you

8    view OARRS as a tool for doctors to review so

9    that they can make a determination as to whether

10   a patient may be doctor shopping or may be

11   getting a prescription from some other source?

12            MS. HERMIZ:  Objection to form.

13        Q.    Do you understand my question,

14   Doctor?

15        A.    That was awfully long.

16        Q.    What do you think doctors -- what's

17   the interplay between a prescribing physician

18   and OARRS, in your understanding?

19        A.    It's my understanding that the --

20   that OARRS allows physicians to communicate

21   amongst themselves and other prescribing

22   agencies to be aware of what active

23   prescriptions a patient might have and what

24   prescriptions a patient might have received in

25   the past.

1          Q.     Do you understand OARRS to be a

2     system where doctors input information or where

3     the doctors review the system for information?

4               MS. HERMIZ:  Objection to form.

5          A.     Are you talking about clinical -- a

6     doctor that practices clinical medicine?

7          Q.     Prescribing doctors.

8          A.     It's my understanding that they can

9     do both.

10         Q.     And do you understand who sets the

11    rules for whether participation with the OARRS

12    requirements are voluntary or not?

13         A.     Who establishes the reporting rules

14    to OARRS?

15         Q.     Right.  The rules of the road.

16         A.     You know, I'm not really sure if

17    it's a state level or federal level.

18         Q.     Would you be an advocate for making

19    reporting mandatory to the extent that it wasn't

20    mandatory?

21              MS. HERMIZ:  Objection to form.

22         A.     I haven't really considered that

23    question.

24         Q.     I ask because I think earlier you

25    told us that one of the limitations you have is

Page 199

1   that it's voluntary and you saw that as a

2   potential limitation, or at least that was my

3   takeaway from your testimony.  Was that a fair

4   takeaway?

5          A.    It's fair.  If it's not --

6   physicians that do not report routinely to OARRS

7   does make it more of a limited tool; however, I

8   can't say -- I can't testify that it's my

9   opinion all physicians must or should be

10  reporting to OARRS because I'm -- really haven't

11  been involved in the clinical side of it, where

12  physicians have decided it's beneficial not to

13  report to OARRS, so I just don't know enough

14  about the issues surrounding that aspect of

15  OARRS.

16         Q.    Have you -- either in preparation

17  for this deposition or, frankly, in the last ten

18  years, have you looked at any labeling for any

19  opioid medicines?

20             MS. HERMIZ:  Objection to form.

21         A.    You mean the prescription, the box

22  packet that comes with the prescriptions?

23         Q.    I'm talking about things that would

24  be in a PDR, you know, a package insert.

25         A.    Yeah, I've reviewed package inserts.

Page 200

1      Q.    What's the occasion -- strike that.

2            For opioids you've done that?

3      A.    For a broad variety of drugs,

4  including opioids.

5      Q.    Why do you do that?

6      A.    To -- there are instances where it's

7  necessary to review what is reported,

8  indications and what might be not listed as an

9  indication for prescribing, what might be listed

10  as a complication, or what might be absent as a

11  listed complication of any given medication.

12     Q.    Do you have a view as to whether any

13  of the Defendants in this case engaged in any

14  wrongful conduct?

15           MS. HERMIZ:  Objection to form.

16     A.    I don't have an opinion right now

17  that -- or currently that any of the Defendants

18  have performed wrongful conduct.

19           MR. CHEFFO:  If you could mark this,

20  please.

21                 -    -    -    -    -

22           (Thereupon, Deposition Exhibit 5,

23           E-Mail from Lisa Kohler to George

24           Sterbenz and Todd Barr, dated

25           September 12, 2017, Beginning Bates

1            Number SUMMIT_000117014, was marked
2            for purposes of identification.)
3                 -   -   -   -   -
4       Q.    This is a short one, Doctor.  Let me
5   give you a minute to take a look at it.  Tell me
6   when you've had a chance to read it.
7       A.    Yes.
8       Q.    Do you recall this e-mail?
9       A.    Yes.
10      Q.    Could you explain both the context
11  in which it was sent and perhaps help us
12  understand what it means?
13      A.    Okay.
14            So the e-mail says, "Hypoxic
15  ischemic encephalopathy due to unexpected
16  cardiac arrest, status post-resuscitation, due
17  to probable fentanyl analog overdose."  The
18  following line is -- it's being abbreviated ACC.
19  That's box 33F on the death certificate, how
20  injury occurred, and stating "unconfirmed
21  illicit drug overdose."
22            Dr. Kohler says here, "I think the
23  wording -- that wording, similar to this work
24  on -- will work on many of our probable
25  overdoses that die in the hospital for whom we

1   cannot confirm the presence of illicit fentanyl
2   drugs."  This specific setting -- so what this
3   is is a -- is a wording for a cause of death,
4   and it's -- on the death certificate there is
5   part 1 cause of death and part 2 cause of death,
6   and this would be the format for wording in part
7   1 cause of death.  So line one would be the
8   immediate mechanism of death and, in this case,
9   hypoxic ischemic encephalopathy, which can be
10  abbreviated HIE.  And then there will be lines
11  that say "due to" and "due to" and "due to."
12  And in this instance this person had hypoxic
13  ischemic encephalopathy due to having a cardiac
14  arrest and then being resuscitated.  Since
15  they -- since their heart stopped for a period
16  of time, their brain didn't get enough blood,
17  therefore, didn't get enough oxygen, even after
18  their heart was restarted, and so they had
19  irreversible anoxic brain injury or hypoxic
20  ischemic encephalopathy.
21          And there was indication, based upon
22  investigative information, that this person had
23  an illicit drug overdose or illicit drug
24  toxicity that turned into a drug overdose that
25  was some type of fentanyl analog.

Page 203

1           And then the conundrum in many of

2    these instances is, is it better to leave these

3    deaths unclassified or is it to -- better to

4    give them a classification, recognizing that the

5    degree of certainty might not be 99 percent

6    certainty, for example, but is more likely -- is

7    a more likely than not degree of certainty.

8           Q.    To a reasonable degree of medical

9    certainty?

10          A.    Reasonable degree of medical

11   certainty is not a set percentage.  At the bare

12   minimum, it needs to be more likely than not,

13   which is 51 percent certain.  And it's desirable

14   to be -- have a higher degree of certainty,

15   obviously, than the bare minimum degree of

16   certainty, and so one can choose, when the

17   certainty is lower, such as just 51 percent or

18   50 something percent, to say, well, maybe it's

19   better to classify as undetermined, with some

20   kind of comment that there's a suspicion for

21   illicit drug overdose; or one can look at the

22   strength of the investigation and say, even

23   though it's not possible to confirm the presence

24   of fentanyl analogs, because in individuals that

25   die in the hospitals, one cannot do a drug

Page 204

1    screen on these individuals from specimens

2    obtained on them at the time of their death in

3    most instances because they've had a delayed

4    death and their blood -- or specimens that one

5    would obtain at the time of their death, hours

6    or days following the actual overdose period,

7    are not representative of what their overdose

8    would have been or what their toxicology would

9    have been in their specimens at the time of

10   their acute drug overdose.  So one can't go back

11   in time and grab that specimen, particularly if

12   the hospitals haven't retained admission

13   specimens.

14            And that's what happened in this

15   situation.  There was not -- if I remember

16   correctly, there was not an admission specimen

17   available.  The individual survived too long of

18   a period of time to be able to do a post-mortem

19   drug screen at that point, and there was

20   investigative evidence to indicate that there

21   was a probable fentanyl analog overdose

22   toxicity.

23       Q.    Let me just ask you a few questions.

24   Thank you for that.

25            So this is not written for one

Page 205

 1   specific case, right?  This is a -- kind of a
 2   going-forward policy, right?  It says, "I think
 3   the wording similar to this will work on
 4   many" -- not this one -- "many of our probable
 5   ODs that die in the hospital for whom we cannot
 6   confirm the presence of illicit drugs."  Right?
 7        A.    So this was a specific case, and
 8   this was a specific -- this was a specific death
 9   on a specific decedent.  I don't recall their
10   name, but this was a specific death on a
11   specific decedent.  This is an individual who
12   lingered in the hospital for a period of time,
13   which I don't recall if -- I think it was a
14   period of days, and it was such a long period of
15   time that, unfortunately, the hospital didn't
16   retain any admission specimens -- either there
17   wasn't admission, they didn't retain admission
18   specimens or, if they had it, they were not of a
19   sufficient quality to be able to screen.  It was
20   that type of situation.  But there was strong
21   investigative evidence to indicate that this
22   person was actively abusing illicit drugs and,
23   in this instance, there was investigative
24   evidence to indicate that they were using some
25   type of fentanyl analog.

Page 206

1          Q.    Now --

2          A.    So Dr. Kohler is saying that this is

3    not the way we should certify all deaths.

4    Dr. Kohler is saying, well, this is a way of --

5    so this is a cause of death, on a case that was

6    mine, for a specific case that I was -- that I

7    had conferred with Dr. Kohler to get her opinion

8    as to if this was a reasonable certification for

9    that specific individual.  And Dr. Kohler, I

10   believe, was, if I remember correctly, sharing

11   this certification for this specific individual

12   with Dr. Barr, who had similar cases of

13   individuals suffering delayed deaths following

14   probable drug toxicities.

15         Q.    So let me ask you this, Doctor.  We

16   spent a fair amount of time on Exhibit 2, and

17   then 3 for a little bit, where I thought, in

18   order to have a cause of death, you told me a

19   number of times, it was a reasonable degree of

20   medical certainty.

21         A.    That's correct.

22         Q.    But is it your testimony that in

23   this case it's not a reasonable degree of

24   medical certainty; it's a, what lawyers might

25   say, a preponderance, it's a 51 percent

Page 207

1    standard?

2              MS. HERMIZ:  Objection to form.

3         A.    A reasonable degree of medical

4    certainty in some instances needs to be no

5    greater than 51 percent certainty.

6         Q.    So that's your standard, reasonable

7    degree is 51 percent?

8         A.    No.  As I stated earlier, reasonable

9    degree of medical certainty, the term

10   "reasonable degree of medical certainty" is

11   stated quite frequently, but the -- how it's

12   quantitated is not -- or -- there is no legal

13   specificity for what that means in terms of

14   degree of certainty.  And one person might look

15   at the evidence and say, well, I'm 90 percent

16   certain and another might say, well, I'm only 75

17   percent certain.

18        Q.    For you, Doctor, what would it --

19   for you to make a determination of reasonable

20   degree of medical certainty, when you put your

21   name and signature on it, what is your

22   percentage or how do you quantify it?

23             MS. HERMIZ:  Objection to form.

24        A.    The degree of what I would estimate,

25   my degree of certainty mentally, as in terms of

1    percentage, depends upon the specific case.  So

2    in this instance, for this specific individual,

3    after considering the evidence that was

4    available, I felt that this fulfilled the

5    requirement for reasonable degree of -- of

6    certainty, and, particularly, recognizing that

7    this is not a -- a certification near absolute

8    certainty, which absolute certainty is never

9    required; and by stating in the cause of death

10   statement that this is a probable fentanyl

11   analog overdose, it's -- it's representing that

12   this is a case where the degree of certainty is

13   sufficient for certification, but it recognizes

14   that the -- that the level of certainty is not

15   as high as in other cases, for example, other

16   cases where the fentanyl analog can be confirmed

17   with a biological specimen.

18        Q.    So is reasonable degree of medical

19   certainty a sliding scale?

20        A.    Reasonable degree of medical

21   certainty is not a fixed scale.  Reasonable

22   degree of medical certainty is -- is on a

23   case-by-case basis.

24        Q.    And even within the individual

25   doctor, it could change?

Page 209

1          A.    Yes.

2               For example, for homicide -- for an

3     instance where I'm certifying a death as a

4     homicide, I am going to always require of my

5     certification to be -- have a very, very high

6     level of certainty.

7               For instances of individuals dying

8     of apparent natural disease, where there's no --

9     absolutely no concern for unnatural death, the

10    degree of certainty then can be lower, and that,

11    more likely than not, on a case-by-case basis --

12    in this instance, for example -- well, for drug

13    overdose deaths, where we can confirm the --

14    toxicologically the -- an illicit drug within a

15    biological specimen, the degree of certainty can

16    be very, very high.  In this instance, where

17    it's not -- there's no specimens available to

18    test anymore, one has to decide what their

19    degree of certainty is based upon the

20    investigation alone.

21         Q.    So the degree of certainty here is

22    kind of a 51 percent in this specific case and

23    it's an overdose case?

24         A.    No.  That's not -- I would not say

25    that the degree of certainty was 51 percent.

Page 210

1    Q.    More likely than not?

2    A.    I don't recall enough of this, with

3    regard to this specific case investigatively, to

4    estimate the degree of certainty, if the degree

5    of certainty was only 51 percent.  If I felt at

6    the time of certification that the -- the

7    certainty was only 51 percent, for example, I

8    probably would have just opted to give a

9    qualified undetermined cause of death.

10    Q.    So it's more than 51 percent but

11    something less than a homicide standard?

12    A.    I would say it's -- I would have to

13    review the specific case, which I don't recall

14    what the specific case was, because there's more

15    than one -- there were a number of individuals

16    that died under these type of circumstances with

17    unconfirmed fentanyl analog toxicity.

18    Q.    By your own terms, Doctor, it says,

19    "probable fentanyl overdose, unconfirmed."

20    That's not a high level of specificity like we

21    saw in some of the others, where there's

22    toxicological data you had in some of your other

23    cases?

24    A.    That's exactly what the

25    certification statement is recognizing, that

Page 211

1     the -- there is enough certainty to classify

2     this individual's death as a drug overdose,

3     recognizing that the certainty is lower than in

4     instances where quality biological specimens are

5     available.

6          Q.    And for statistical purposes, that

7     case would be classified as an overdose death,

8     right?

9          A.    Yes.

10         Q.    Is there any, that you can think of,

11    any economic benefit to the department, the

12    medical examiner's department, to have cases

13    classified as overdose deaths?

14              MS. HERMIZ:  Objection to form.

15         A.    Not that I'm aware of.

16         Q.    I mean, in terms of trying to get

17    more funding, is -- you know, to the extent that

18    there's more data saying, oh, look at all these,

19    kind of, overdose deaths, we need more services,

20    is that used in a way that you've seen that

21    would impact, either negatively or positively,

22    budgetary issues?

23              MS. HERMIZ:  Same objection.

24         A.    Not specifically for drug overdose

25    deaths.  Deaths that fall within our -- just

Page 212

1  deaths in general, increased number of deaths in

2  general require more resources and more time on

3  the part of the medical examiner.  The ultimate

4  mechanism of death isn't necessarily a budgetary

5  consideration beyond issues of what ancillary

6  tests the office might have to pay for.  Perhaps

7  drug overdose deaths might require additional

8  toxicologic analysis that requires additional

9  spending.

10        Q.    Are all potential overdose deaths

11  autopsied?

12        A.    In general, all suspected drug

13  overdose deaths will be autopsied.

14        Q.    And that's not true for all deaths

15  generally, right?

16              MS. HERMIZ:  Objection to form.

17        A.    Well, for individuals that suffer

18  delayed deaths, where they've had -- like, in,

19  for example, an individual like this, who has

20  had a delayed death in the hospital, in many of

21  these instances they've had very extensive

22  ante-mortem clinical diagnostic testing.

23  They've had CTs and MRIs of their heads and

24  their brains.  They've had CTs sometimes of

25  their chest and abdomen and so forth.  They've

Page 213

1    had all sorts of clinical testing and
2    physiological testing.  In many of these
3    instances there's nothing -- there's no --
4    it's -- the necessity for doing an autopsy --
5    the period of time that necessitated doing the
6    autopsy has passed and they've had adequate
7    clinical documentation so that an autopsy is no
8    longer absolutely necessary; but this is not the
9    typical type of case that comes to the medical
10   examiner's office.  In most instances the
11   individuals are dying at a scene, not in a
12   hospital.  Or if they're dying in a hospital,
13   they're being pronounced -- they're already dead
14   and they're being brought to an emergency
15   department and pronounced dead.  Those
16   individuals will have autopsies performed.
17              In terms of natural deaths, it
18   depends.  On many -- we do many autopsies on
19   natural deaths, just not all natural deaths.  It
20   depends if there's a compelling public need to
21   perform an autopsy examination, because the
22   medical examiner's office can perform an autopsy
23   without -- generally, without the consent of
24   next of kin.  We don't ask next of kin if they
25   would like us to do an autopsy or they will

Page 214

1    permit us to do an autopsy.  We will tell the

2    next of kin that one is necessary due to a

3    compelling public need.

4             On some occasions there might be an

5    instance where, with a natural death, that a

6    family, next of kin, might be requesting the

7    medical examiner's office to do an autopsy, and

8    then we'll examine those instances to see if

9    there's sufficient forensic concern by the

10   medical examiner's office that it warrants the

11   medical examiner to perform an autopsy.

12        Q.    Is the -- would you agree that the

13   data in the statistics from the medical

14   examiner's office can be used to impact public

15   policy both locally and statewide?

16             MS. HERMIZ:  Objection to form.

17        A.    Yes.

18        Q.    And to that point, would you also

19   agree, so, for example, if you, and perhaps

20   police and other law enforcement were seeing,

21   you know, an uptick in violent crime, in

22   homicides, that may inform public policy about

23   how funds and resources should be spent in a

24   community, right?  It could be at least one

25   factor that would be considered?  Would you

Page 215

1   agree with that?

2        A.    Yes.

3        Q.    And would you also agree that the

4   same would be true if there's an uptick in

5   carfentanil deaths in a particular year or

6   jurisdiction or time, that could inform public

7   policy because, at least the powers at be, the

8   government folks could make a determination

9   whether they needed to spend more time and

10  effort and resources on addressing that issue?

11       A.    Yes.

12       Q.    And that's why it's important for

13  the data and information to be as accurate

14  and -- as possible so that public policy

15  decisions and others can be made based on good

16  information?

17            MS. HERMIZ:  Objection to form.

18       A.    Yes.

19       Q.    And the same would be true if

20  information from a local level, like the Summit

21  County Medical Examiner, was aggregated in terms

22  of regional, statewide, multi-state, federal;

23  it's important that all of those data points and

24  all that information is as accurate as possible

25  because, ultimately, if the information is not

Page 216

1    accurate, the ultimate data that's aggregated is

2    going to be less useful?

3              MS. HERMIZ:  Objection to form.

4         A.    Could you repeat?

5         Q.    Sure.

6              You've heard the term "garbage in,

7    garbage out," right?

8         A.    Yes.

9         Q.    What do you think that means?

10        A.    Okay.  Yes.  It's important that the

11   statistics that are generated are accurate.

12        Q.    Because they could have a cascading

13   effect; if local information is then aggregated

14   with other information and that information is

15   not accurate, the more inaccurate information

16   that gets aggregated, the less useful the

17   ultimate aggregation data is going to be, right?

18             MS. HERMIZ:  Objection to form.

19        A.    Yes.

20             MR. CHEFFO:  Would you mark this,

21   please?

22                  -   -   -   -   -

23             (Thereupon, Deposition Exhibit 6,

24             E-Mail String Beginning Bates Number

25             SUMMIT_000117010, was marked for

1          purposes of identification.)

2                  -   -   -   -   -

3      Q.    I'm going to give you a chance,

4  Doctor, to read this.  I'm nearing the end of my

5  time, so I'm just going to ask you a few

6  targeted questions, if I could, but just let me

7  give you a chance to read this.

8          This is an e-mail -- are you done?

9      A.    Pardon me?

10      Q.    Are you done?

11      A.    Yes.

12      Q.    This is an e-mail from about a year

13  ago, October of 2017, from Dr. Kohler to you and

14  Todd Barr, correct?

15      A.    That's correct.

16      Q.    And she's forwarding on an e-mail

17  from an Angelina {sic} Genet or Genet

18  {phonetic}, who is a public health specialist

19  for the Summit County Public Health Department,

20  right?

21      A.    Yes.

22      Q.    And the sum and substance of this

23  e-mail is asking whether you or Dr. -- Todd Barr

24  was a doctor, right?  He's a doctor, right?

25      A.    He's a doctor.

1        Q.     The sum and substance of this e-mail

2    is asking whether you or Dr. Barr would be

3    interested in serving on an overdose fatality

4    review board representing your office.  Do you

5    see that?

6        A.     Yes.

7        Q.     Did you wind up serving on that

8    board?

9        A.     No.

10       Q.     Did Dr. Barr wind up serving on the

11   board?

12       A.     I don't know if he did.

13       Q.     Do you know if anybody did?

14       A.     No, I don't know.

15       Q.     Did you express an interest in

16   working on this?

17       A.     No.  I did not want to be on the

18   overdose fatality review board.

19       Q.     Why?

20       A.     I believe that I'm too familiar with

21   the, you know, specific individuals, and that --

22   that have died with drug overdoses, and I make

23   an effort to distance myself from individuals

24   that have specific connections to, you know,

25   family members and friends and so forth of

1    individuals that I've performed autopsies on.

2    And I try not to put myself in positions where I

3    might be pressured to discuss any type of active

4    investigations that I'm participating in.  So

5    I -- I felt that there were probably other

6    people within our office that are more

7    appropriate to serve on the overdose fatality

8    review board than myself.

9         Q.    And what -- I can't tell exactly,

10   but what is it that you understood, at least

11   from this e-mail, or maybe further discussions,

12   about what this role or this board would be

13   doing?

14        A.    I didn't get further details.  I was

15   under the impression it's some type of community

16   outreach board, because it does mention that

17   it's being established through the public health

18   department or through -- by a public health

19   specialist, Angela Genet.

20        Q.    So is it fair to say that after this

21   e-mail and your consideration and determination

22   that it wasn't a project for you, that you had

23   nothing else to do with it?

24        A.    That's correct.

25        Q.    Have you received any more

Page 220

1   information about this after this e-mail?

2         A.    No.

3         Q.    You couldn't talk about anything

4   that this organization did or didn't do?

5         A.    No.

6         Q.    Have you seen any data or statistics

7   regarding an increase in the last number of

8   years in deaths, overdose deaths, related to

9   prescription medicines?

10              MS. HERMIZ:  Objection to form.

11        A.    Statistics within Summit County?

12        Q.    Yes.

13        A.    I am aware that there is an increase

14  in overdose deaths, or there has been an

15  increase in overdose deaths during the period

16  that I had been with the office.  I am not

17  specifically aware of an increase in overdose

18  deaths due to prescription medications.

19        Q.    Would you also agree that the

20  increase in overdose deaths in the last two to

21  three years is driven by drugs and illicit

22  substances such as fentanyl, fentanyl analogs,

23  methamphetamine and cocaine --

24              MS. HERMIZ:  Objection to form.

25        Q.    -- and heroin?

1          A.     I'm -- currently, and in the past

2     few years, it is my impression that the majority

3     of drug overdoses are due to street drugs, such

4     as what you've listed.

5          Q.     Do you believe that that -- that

6     more can be done by government to address the

7     influx of those street drugs?

8               MS. HERMIZ:  Objection to form.

9          A.     I always think more could be done to

10    address the influx of street drugs, because the

11    influx of street drugs into the community

12    directly affects my workload, so I always

13    welcome more influx, but I -- of intervention

14    from other agencies, like law enforcement

15    agencies, but I believe our local law

16    enforcement agencies have been doing more, so to

17    speak, to address the influx of street drugs

18    into the community.

19         Q.     And do you also believe that there

20    can be a crisis of illicit drugs completely

21    independent from any marketing or advertising of

22    corporations?

23              MS. HERMIZ:  Objection to form.

24         Q.     Should I be more specific?

25         A.     Yes.

```
 1        Q.    So you would agree that there's a --
 2   what's a word that we can agree on -- a crisis?
 3   I know we don't -- you don't like the word
 4   "epidemic," but there's a social problem with
 5   respect to carfentanil; would you agree with
 6   that?
 7              MS. HERMIZ:  Objection to form.
 8        Q.    There is a social problem with the
 9   abuse of carfentanil in Summit County; would you
10   agree with that?
11        A.    Yes.
12        Q.    And you would also agree that
13   carfentanil is an illegal drug that has no human
14   benefit and is certainly not sold legally in
15   some other form for human use, right?
16        A.    I am aware of no recognized clinical
17   application for carfentanil in humans.  There
18   might be some -- some benefit to humans found
19   for carfentanil at some point in the future.  It
20   is used as a veterinary agent, so I guess you
21   can argue that is a benefit to humans, but it
22   does not have a clinical application in humans
23   as far as I know.
24        Q.    To your knowledge, it's become a
25   social problem or a social abuse crisis
```

Page 223

1    independent of any advertising or promotion of

2    the product, right?

3              MS. HERMIZ:  Objection to form.

4         A.   It's -- it's an illicit drug.  It's

5    not advertised.  So there is no advertising for

6    carfentanil that I'm aware of.

7         Q.   And yet it is a significant social

8    problem that's caused many of the deaths that

9    you see in your facility, right?

10        A.    It has caused many deaths, yes.

11        Q.    And the same would be true of

12   heroin, right, it's an illegal drug with no

13   advertising, yet it is subject to abuse and has

14   been responsible for many deaths in this

15   community?

16        A.    Yes, it has.

17        Q.    And the same would be true for

18   methamphetamine; it's an illegal drug that's

19   never been marketed or advertised or sold by any

20   company, yet it is a drug of significant abuse

21   and is a significant social problem in this

22   community; is that right?

23             MS. HERMIZ:  Objection to form.

24        A.    Methamphetamine is an illicit drug.

25   It's not marketed commercially, and it is a drug

Page 224

1    that's abused within the community and it's a

2    problem.

3         Q.    And the same would be true of

4    cocaine, right --

5         A.    Yes.

6         Q.    -- not marketed, a problem, and

7    became a drug of choice amongst many people,

8    even though it was not detailed or sold by any

9    pharmaceutical company, right?

10        A.    That's correct.

11        Q.    And the same would be true of PCP

12   and crack cocaine, right?

13             MS. HERMIZ:  Objection to form.

14        A.    PCP is not so much a problem here,

15   but cocaine, in any form, has been a problem

16   during the period of time that I've been

17   employed at the Summit County Medical Examiner's

18   Office.

19        Q.    And marijuana is not legal in Ohio,

20   at least not yet, right, but I take it, it's not

21   a drug that's directly attributable to many of

22   the deaths that you see, but it is -- it is a

23   drug that's prone to abuse; is that fair?

24             MS. HERMIZ:  Objection to form.

25        A.    I have never certified a death of

Page 225

1    marijuana overdose from cannabinoids derived

2    from a marijuana plant, only deaths of synthetic

3    cannabinoids.

4              MR. CHEFFO:  We don't even need a

5    long break.  Just like a two-minute.  I think

6    I'm done.  Just to give them a chance to orient

7    themselves.

8              THE VIDEOGRAPHER:  Off the record,

9    3:37.

10                   (Recess had.)

11             THE VIDEOGRAPHER:  We are back on

12   the record, 3:53.

13        EXAMINATION OF GEORGE STERBENZ, M.D.

14   BY MR. EMCH:

15        Q.    Dr. Sterbenz, you testified a lot

16   about two things, cause of death and manner of

17   death, right?  And those are two things that you

18   indicated it is your job and the other forensic

19   pathologists in Summit County and other places

20   to certify; is that right?

21        A.    Yes.

22        Q.    And by that you mean that's a

23   certification of those two items, what was the

24   cause of death for this individual, what was the

25   manner of death for this individual, and that

Page 226

1    goes on the death certificate?

2           A.    Yes.

3           Q.    And I want to make sure that I

4    understood your testimony earlier about the

5    cause of death correctly.

6                 So is it correct that if the

7    forensic pathologist, you or one of your

8    colleagues in Summit County, determines, to a

9    reasonable degree of medical certainty, that a

10   particular type of drug or substance was a cause

11   of death, then you name that particular drug or

12   substance in the cause of death line?

13          A.    Yes.

14                THE COURT REPORTER:  I'm sorry.

15   Cause of death what?

16                MR. EMCH:  Cause of death, and you

17   name the cause of death in that particular line.

18          A.    You name the drug in the cause of

19   death.

20          Q.    Yes.  You name the particular drug

21   or substance in the cause of death line, right?

22          A.    Yes.

23                There are some exceptions.

24   Sometimes an individual may have so many

25   different drugs that are present that are

Page 227

1    generating a combined effect toxicity, that it

2    simply won't fit on the death certificate, and

3    in those instances, in a practical sense, the

4    only option is to list some kind of generic

5    term, like mixed drug toxicity, and then be

6    certain that all of the different drugs are

7    indeed listed accurately in the autopsy report.

8          Q.    And, again, we saw many instances in

9    Exhibit 2 and Exhibit 3 where there were many,

10   many drugs listed in the toxicology report but

11   the cause of death would name only those that

12   you would determine to a reasonable degree of

13   medical certainty were a cause?

14         A.    Yes.

15               And there are some forensic

16   pathologists who, when there's more than one

17   drug, tend to just say "mixed drug toxicity" on

18   the death certificate and then list the drugs

19   that they believe are part of the mechanism of

20   death in their autopsy reports.

21         Q.    Okay.  But again, we're still on the

22   same wavelength.  If you make a determination to

23   a reasonable degree of medical certainty that a

24   particular type of drug or substance is a cause,

25   you cull that drug out and name it in the cause

Page 228

1  of death?

2       A.    Yes.  So if the specific drug is

3  listed in the cause of death statement on the

4  death certificate, that specifically means that

5  that drug has reached reasonable degree of

6  certainty that it is part of the mechanism of

7  death, always recognizing that there's thousands

8  and thousands of drugs and that doesn't exclude

9  the possibility of other drugs that might be

10  present that were simply not detected with the

11  current capabilities of the methodologies.

12            For example, I think it was prior to

13  2016 the drug carfentanil was not on anyone's

14  radar and nobody was screening for it, and

15  should, for example, someone have had a heroin

16  and carfentanil toxicity in 2014, the

17  carfentanil would have been missed, the heroin

18  would have been picked up and only heroin would

19  have been included on the death certificate.

20  But that's just -- that's just the nature of the

21  beast.  There's always a potential for other

22  intoxicating substances that might be present

23  that just are beyond the capabilities of the

24  current methodologies to -- for detection.

25       Q.    But, of course, once you determined

Page 229

1    and were able to detect carfentanil, if you
2    found it and determined to a reasonable degree
3    of medical certainty that it was a cause, then
4    it got listed in the cause of death?
5           A.    Moving forward from that period of
6    time, yes.
7                 MR. EMCH:  Okay.
8                 EXAMINATION OF GEORGE STERBENZ, M.D.
9    BY MS. RANJAN:
10          Q.    Dr. Sterbenz, we met earlier.  My
11   name is Brandy Ranjan.  I'm an attorney with the
12   firm of Jones Day and I represent Walmart in
13   this lawsuit, and I'm going to ask you some
14   questions that, hopefully, won't take too much
15   more of your time because I'm sure you're ready
16   to wrap up.  If at any time you need a break,
17   then just let me know.
18                Is that okay?
19          A.    Yes.
20          Q.    First, I'd like to cover if you ever
21   received -- did you ever receive a notification
22   to retain documents for this litigation?
23          A.    Yes.
24          Q.    When did you receive that?
25          A.    I don't recall the exact dates, but

```
 1   I've -- I've been -- received notifications at
 2   least twice.
 3          Q.    When did you receive the first one
 4   approximately?  Has it been a year?
 5          A.    I don't -- I don't recall back a
 6   full year with regard to the specific
 7   litigation, but I know within the past few
 8   months I've received two updated notifications.
 9   We possibly might have gotten a notification
10   even farther back.  I just don't recall at this
11   time.
12          Q.    But ever since you received that
13   initial notification, you've been retaining your
14   documents related to this litigation?
15          A.    Yes.
16          Q.    And that includes both your
17   electronic documents, like e-mail?
18          A.    Yes.
19          Q.    And any electronic files that you
20   might have in, like, for instance, PDF or Word
21   form?
22          A.    Yes.
23          Q.    And it also relates to any paper
24   documents that you might have in your office?
25          A.    Yes.
```

1        Q.    And then at some point were you
2    asked to actually collect your documents and
3    give them to someone, maybe give them to your
4    attorneys, in connection with the lawsuit?
5        A.    Yes.  They had asked me to provide
6    any documents that I might have that are --
7    relate to the lawsuit.
8        Q.    And did you comply with that
9    request?
10       A.    I did.
11       Q.    Did you go back and check your
12   e-mails to see if any of those pertained to this
13   lawsuit?
14       A.    My e-mails?
15       Q.    Yes.
16       A.    No.  I didn't -- I didn't go
17   screening my e-mails.
18       Q.    Did any attorney ever collect your
19   e-mail file or any person ever collect your
20   e-mail file in connection with the lawsuit?
21       A.    I was told it was, yeah.
22       Q.    Okay.  The reason why I'm asking is
23   because we saw surprisingly few e-mails from you
24   in the production in what your attorneys gave
25   us, and I was just curious if you have an

Page 232

1    explanation for why that might be.

2              MS. HERMIZ:  Objection to form.

3         A.    Fewer e-mails than?

4         Q.    Than most folks.  Is it fair to say

5    that you receive a lot of e-mails every day?

6         A.    I -- not particularly.

7         Q.    On an average day, how much

8    communication by e-mail do you do?

9         A.    I don't do communication by e-mail

10   daily.

11        Q.    Okay.  Do you receive e-mails daily

12   from other people?

13        A.    The majority of the e-mail -- I do

14   receive e-mails daily.

15        Q.    And you just don't respond to those?

16             MS. HERMIZ:  Objection to form.

17        A.    Well, a lot of the e-mail is junk

18   e-mail that's unrelated to work.

19        Q.    Okay.

20        A.    Some of the e-mails are county

21   notifications about outages of the wi-fi or

22   outages of the daily mail run, and, I mean --

23   you know, that type of e-mail.  I receive

24   e-mails for notifications for exercise classes

25   and so forth with the county.  But in terms of

1  work-related e-mails, I'll get the routine

2  administrative notifications from the -- the

3  office administrator, some updates from

4  Dr. Kohler.  And some of the e-mails that

5  Dr. Kohler would get -- for example, I wouldn't

6  get administrative e-mails.  And Dr. Kohler is

7  also active on the name listserv, which I'm not.

8        Q.  Do you and Dr. Kohler correspond

9  about cases via e-mail?

10        A.  Rarely.

11        Q.  Okay.  But to the extent that those

12  e-mails exist, do you typically delete them or

13  do you file them away somewhere?

14        MS. HERMIZ:  Objection to form.

15        A.  I've -- I can't remember the last

16  time that I've corresponded with Dr. Kohler

17  regarding any specific case through an e-mail.

18  We -- we have our offices virtually side by

19  side.  I usually just talk to her directly.

20        Q.  Do you and Dr. Kohler ever work

21  together on cases?

22        A.  Do you mean like do we share --

23        Q.  Do you collaborate?

24        A.  -- death investigation

25  responsibilities?

Page 234

1          Q.    Yes.  Do you collaborate on any

2     single case together?

3          A.    Generally not.  Generally, we have a

4     rotating on-call schedule.  Those cases which I

5     assume during my on-call schedule are mine.

6     Those cases which she assumes during her on-call

7     schedules are hers.

8               We've gone through a period of time

9     now where, more often than not, we've been

10    short-staffed with forensic pathologists, and I

11    don't generally have the time to just

12    out-of-hand review her cases.  On the other

13    hand, she, as the chief medical examiner, does

14    review my cases because she co-signs my cases,

15    whereas I do not co-sign her.

16         Q.    Has she ever disagreed with you

17    about the cause or manner of death that you

18    determined in a case?

19         A.    I don't ever recall her just

20    outright disagreeing with my -- with the cause

21    of death.  If I am conferring with her regarding

22    a case, we can discuss, you know, the death

23    certification, we can discuss appropriateness

24    for manner of death classification, but in -- in

25    those instances, obviously my determination is

Page 235

1   not -- you know, not solidified at that point,

2   so I'm specifically bringing cases to her to get

3   her perspective and her point of view, of

4   another forensic pathologist, in those cases.

5   The vast majority of cases that are mine, I

6   simply certify without telling her in advance

7   because there's just far too many cases that I

8   perform on -- every year to run every single

9   case past her, and she's far too busy to have me

10  run every single case past her; and of those

11  cases where they've already been certified,

12  gosh, I don't think she's ever said, this is

13  just absolutely wrong, it needs to be changed.

14          Q.    How frequently do you do that type

15  of collaboration with her before you would

16  actually make the final determination on an

17  overdose case?

18              MS. HERMIZ:  Objection to form.

19          A.    A few times each year.

20          Q.    What would be the circumstances that

21  might lead you to do that?

22          A.    Well, for example, the individual

23  who I certified regarding Exhibit Number 5, I

24  felt that I had reasonable degree of medical

25  certainty to certify it with this type of

1    wording, but I -- I did present that case to

2    Dr. Kohler and we discussed it first.

3         Q.    I want to talk to you about --

4    changing gears, I want to talk to you about your

5    involvement in professional associations.  Are

6    you at all involved in -- and I assume, based on

7    your prior answer -- your prior testimony, that

8    your answer is probably no, but are you at all

9    involved in the ADM board?

10        A.    No.

11        Q.    Have you ever had any interaction

12   with the ADM board?

13        A.    No.

14        Q.    Are you involved in any other

15   governmental body in Summit County?

16        A.    No.

17        Q.    Are you involved in any professional

18   associations?

19        A.    You mean like forensic pathologist

20   associations?

21        Q.    Yes.

22        A.    I keep an active membership with the

23   AAFS, the American Association of Forensic

24   Sciences.

25        Q.    Anything else?

1          A.     Yeah.  I have on my CV listed the

2    National Association of Medical Examiners, but I

3    should qualify that I -- I haven't maintained,

4    in the past year or so, my -- my membership dues

5    with the National Association of Medical

6    Examiners, because I stopped going to their

7    meetings.

8          Q.     And I'm sorry.  What was the first

9    organization, the AAMF?

10         A.     AAFS, American Academy of Forensic

11   Sciences.

12         Q.     And how involved are you with them?

13   What is your involvement with them?

14         A.     I'm not actively involved.

15         Q.     Okay.

16         A.     I don't have an active involvement

17   with the AAFS.

18         Q.     Have you ever been asked to give any

19   presentations related to opioids?

20         A.     Well, no, I don't -- I don't recall

21   giving any presentations, particularly since

22   I've been here in Ohio.  I've -- I haven't done

23   presentations in the past few years.

24         Q.     Prior to the past few years, do you

25   recall giving any presentations on the topic of

Page 238

1    opioids?

2         A.    No.

3         Q.    Is it fair to say that you're not

4    familiar with the business practices of drug

5    distributors?

6         A.    That's correct.

7         Q.    You're not familiar with the laws

8    and regulations that govern drug distributors?

9         A.    That's correct.

10                    -   -   -   -   -

11              (Thereupon, Deposition Exhibit 7,

12              E-Mail from Lisa Kohler to Gary

13              Guenther, dated September 14, 2017,

14              with Attachment, Beginning Bates

15              Number SUMMIT_000201288, was marked

16              for purposes of identification.)

17                    -   -   -   -   -

18         Q.    Dr. Sterbenz, I've handed you a

19    document that was previously marked as Exhibit

20    7.  It's an e-mail.  It's from Dr. Kohler to

21    Gary Guenther, and the subject is "Opiates," and

22    the Bates number is SUMMIT_000201288.  Attached

23    to the e-mail is a document labeled "Narrative

24    in Support of Opioid Crisis Costs, County of

25    Summit Medical Examiner."

1           Have you ever seen this document?
2    I'll give you a moment to review it.
3           A.    No, I haven't seen this document
4    before.
5           Q.    So I believe earlier you testified
6    that you don't have much visibility, if any,
7    into the budget of the office.  Did I recall
8    your testimony correctly?
9           A.    That's correct.
10          Q.    So is it fair to say that you've not
11   been involved in preparing any type of damages
12   or cost analysis related to this lawsuit?
13          A.    That's correct.
14          Q.    In your typical job duties at the
15   Summit County Medical Examiner's Office, would
16   you ever be involved in something like that?
17               MS. HERMIZ:  Objection to form.
18          Q.    In the past -- let me ask it a
19   different way.  In the past have you ever
20   prepared any type of analysis of the costs of
21   the office?
22          A.    No.
23          Q.    Or the expenditures of the office?
24          A.    No.  I have never done any type of
25   budgetary analysis for the office, for the

Page 240

1   Summit County Medical Examiner.

2        Q.    Okay.  You can set that aside.

3                  -    -    -    -    -

4             (Thereupon, Deposition Exhibit 8,

5             Copy of Ohio Revised Code Section

6             313.212, Notice of Death by

7             Overdose, was marked for purposes of

8             identification.)

9                  -    -    -    -    -

10       Q.    Dr. Sterbenz, you are aware that the

11  Summit County Medical Examiner's Office, its

12  duties are set forth in the Ohio Revised Code;

13  is that correct?

14       A.    Yes.

15       Q.    And specifically in Chapter 313?

16       A.    Yes.

17       Q.    I've handed you a portion of the

18  Ohio Revised Code.  It's Section 313.212.  I

19  believe you've had a moment to review it.  Is

20  this something that you have ever seen before?

21       A.    I've read through the 313's code, so

22  I must have reviewed it at some time in the

23  past, though I don't have the specific recall of

24  313.212 at this time.

25       Q.    Okay.  The section says, "If the

Page 241

1    coroner determines that a drug overdose is the

2    cause of death of a person, the coroner may

3    provide a notice of the death to the State

4    Medical Board, Board of Nursing or State Dental

5    Board.  The coroner may include in the notice

6    any information relating to the drug that

7    resulted in the overdose, including whether it

8    was obtained by prescription and, if so, the

9    name of the individual who prescribed it."

10               Did I read that properly?

11        A.    Yes.

12        Q.    Have you ever made a report as is

13   described in this section of the Ohio Revised

14   Code?

15               MS. HERMIZ:  Objection to form.

16        A.    I don't personally do reporting for

17   the office to other agencies.  That would be

18   dealt with by other individuals within our

19   office.

20        Q.    In the cases where you have been the

21   medical examiner assigned to the case, have you

22   ever thought, wow, you know, this particular

23   drug overdose, it's really something someone

24   should know about?

25               MS. HERMIZ:  Objection to form.

Page 242

```
1        A.    Once again, I don't do direct
2   reporting for the Summit County Medical Examiner
3   to other agencies.  The office, I know, does do
4   reporting to other agencies, and that's done by
5   other individuals within the office.
6        Q.    But you have responsibility for the
7   cases where you're the medical examiner who is
8   assigned to that case, correct?
9             MS. HERMIZ:  Objection to form.
10       Q.    You're the person in the office
11  who's the most familiar with the cases where
12  you're the assigned medical examiner; is that
13  correct?
14       A.    Yes.  My responsibility is for
15  determining and certifying the death
16  certificate, cause and manner of death.
17       Q.    And where there was a prescription
18  drug that was involved in that -- in an overdose
19  death, let's say, you're the person who would be
20  most familiar with the background of that case;
21  is that accurate?
22            MS. HERMIZ:  Objection to form.
23       A.    I would be familiar, yes.
24       Q.    And so you would know if, you know,
25  that person, for instance, had a prescription
```

Page 243

1    that -- well, let's just start there.  You would

2    know, for instance, if that person had a

3    prescription drug that was involved in their

4    overdose?

5         A.    Yes.

6         Q.    And in the cases where you've been

7    the medical examiner, you've never made an

8    independent determination that, you know, this

9    particular prescription, it's just -- it's

10   something that I feel the need to report to the

11   state board?

12             MS. HERMIZ:  Objection to form.

13        A.    So the way this statute is written,

14   it's talking about "the coroner," and Summit

15   County is a medical examiner jurisdiction, there

16   is no coroner in Summit County, and it's written

17   as such, as "the coroner," because each county

18   has an elected coroner, except for Summit County

19   and Cuyahoga County.  So the statutes that are

20   written for the coroner, therefore, then apply

21   to the medical examiner, and the medical

22   examiner, with a capital T, in Summit County is

23   Dr. Lisa Kohler, and I am a medical examiner, so

24   to speak, in Summit County.  There certainly may

25   be autopsies which -- on individuals whom I

Page 244

1    performed investigation -- or individuals whom I
2    performed autopsies on and death certifications
3    that have been reported to the state medical
4    board, but I am not the individual within our
5    office who would actually perform the -- the
6    reporting activity.
7           Q.    So what you're saying is that it's
8    your belief that it would be Dr. Kohler's
9    responsibility to make the report that's
10   described in Ohio Revised Code Section 313.212?
11              MS. HERMIZ:  Objection to form.
12          A.    It's my understanding that
13   Dr. Kohler would be reviewing cases at the time
14   when she's co-signing cases and determining if
15   there is a need to refer specific cases to the
16   state medical board, because as the appointed
17   coroner -- I mean, as the appointed medical
18   examiner, the medical examiner for the state --
19   for Summit County, as the chief medical
20   examiner, she is the -- has the statutory
21   requirement to -- I mean, she's the individual
22   in our office to which this statutory
23   requirement is directly applying to, myself
24   indirectly, and I assist in that by performing
25   death investigations and then forwarding all of

1    my report information on to Dr. Kohler.

2         Q.    Are you done with your answer?

3         A.    Yes.

4         Q.    Do you know if, in fact, Dr. Kohler

5    actually makes those reports?

6              MS. HERMIZ:  Objection to form.

7         A.    I don't know.

8              MS. RANJAN:  I'm asking about his

9    knowledge.  What's the basis for the objection?

10              MS. HERMIZ:  The basis for the

11    objection, foundation.  You're implying that

12    it's required to report, which, I mean, if you

13    want me to go on with my issues about this

14    question, I can go on, but I don't want to do a

15    speaking objection.

16              MS. RANJAN:  No.  It's fine.  I'm

17    just asking about his knowledge.

18              MS. HERMIZ:  Sure.

19         Q.    Have you ever had a specific

20    conversation with Dr. Kohler about potentially

21    making such a report?

22         A.    No.

23         Q.    And you yourself have never reported

24    one of your cases to the authorities?

25         A.    That's correct.

```
                                          Page 246
 1              You mean to the state medical board?
 2       Q.    Correct.
 3       A.    Not --
 4       Q.    Is that how you understood my
 5  question?
 6       A.    You said "the authorities."
 7       Q.    Yes.
 8              You yourself have never made any
 9  such report to the medical board?
10       A.    To the state medical board, that's
11  correct.
12       Q.    Right.
13               -    -    -    -    -
14              (Thereupon, Deposition Exhibit 9,
15              E-Mail String Beginning Bates Number
16              SUMMIT_000028995, was marked for
17              purposes of identification.)
18               -    -    -    -    -
19       Q.    Dr. Sterbenz, I'm handing you
20  another e-mail.  It is Bates labeled
21  SUMMIT_28995, and I realize that you are not
22  copied on this e-mail until the top, but I'm
23  going to cover some of the substance below that
24  you received.
25              So starting with the bottom of the
```

Page 247

1   chain, the subject is "Discuss Tox Cases," and

2   it's an e-mail from Dr. Kohler to a Brian

3   LoPrinzi.

4               Do you know who Brian LoPrinzi is?

5        A.     Brian LoPrinzi is with the Summit

6   County Prosecutor's Office.

7        Q.     Okay.  And Dr. Kohler discusses her

8   availability, and she says, "What days would you

9   be available to meet to discuss where we are

10  with tox issues and the court?"

11              And in the subsequent chain,

12  Mr. LoPrinzi responds, and gives her a date --

13  you'll see that -- and then eventually -- in the

14  next chain you're copied, and Dr. Kohler says,

15  again, to Brian LoPrinzi, copying you, "I'm

16  available on October 12th at 2 p.m. to discuss

17  the issues of toxicology in the courts for

18  overdose cases.  Dr. Sterbenz is on call that

19  week and may be able to join us if his schedule

20  allows."

21              Did I read that correctly?

22       A.     Yes.

23       Q.     Do you recall receiving this e-mail,

24  first of all?

25       A.     I don't specifically recall

Page 248

1    receiving it.

2          Q.    Do you recall if indeed any kind

3    of -- strike that.

4                Do you recall ever participating in

5    such a meeting with Mr. LoPrinzi?

6          A.    I vaguely remember.  It's two years

7    ago.  I vaguely remember discussing issues with

8    the prosecutor's office and -- or expediting our

9    certifications for drug-related deaths.

10         Q.    So Mr. LoPrinzi specifically wanted

11   to meet with you and Dr. Kohler related to the

12   certification of drug-related deaths.  Is that

13   what you're saying?

14         A.    Expediting the certification of

15   drug-related deaths.  In 2016 we were

16   short-staffed and there was a backlog for

17   signing out cases, for certifying cases, that

18   was becoming long, running into months, and

19   Mr. LoPrinzi was interested in having the

20   medical examiner's office expedite certification

21   of drug-related death, particularly on cases

22   that they were interested in -- in

23   investigating.

24         Q.    And so Mr. LoPrinzi wanted to

25   discuss with you the reason why it was taking so

Page 249

1    long for certain types of overdose deaths to be

2    certified?

3            A.    I guess in part, and to see what

4    mechanism he could put in place to expedite

5    certifications of deaths which were of concern

6    to the prosecutor's office.

7            Q.    Anything else that you discussed at

8    that meeting?

9            A.    That's what that meeting was about.

10           Q.    Okay.  But you didn't discuss

11   anything else?

12           A.    Not that I recall.

13           Q.    And who else was present at the

14   meeting?

15           A.    Dr. Kohler.

16           Q.    Anyone else?

17           A.    I think John Baumoel, who is cc'd on

18   this, might have been present.

19           Q.    Who is he?

20           A.    He's with the prosecutor's office.

21           Q.    Okay.

22           A.    I can't recall if we met in person

23   or if it was just by phone.

24           Q.    You can put that aside.

25                        -    -    -    -    -

```
 1              (Thereupon, Deposition Exhibit 10,
 2              E-Mail String Beginning Bates Number
 3              SUMMIT_000092858, was marked for
 4              purposes of identification.)
 5                   -   -   -   -   -
 6         Q.    Dr. Sterbenz, I'm showing you what's
 7    been marked as Exhibit 10.  This is an e-mail
 8    chain from January of 2011, and you are copied
 9    on the bottom e-mail.  And in the e-mail
10    Dr. Kohler sent you an attachment, and then --
11    I'm sorry.  This document is Bates labeled
12    SUMMIT_000092858 through 860.
13              Dr. Sterbenz, do you see that you
14    were copied on this e-mail?
15         A.    Yes.
16         Q.    And the subject is "Investigator
17    Report Information"?
18         A.    Yes.
19         Q.    And in it Dr. Kohler writes, "Here
20    is the document that I started for the
21    investigators.  The goal is to put down the
22    types of information that we feel are important
23    to particular types of investigation and to
24    provide a brief explanation as to why it is
25    important.  What I am sending is just a starting
```

Page 251

1   point.  Please add to and improve what is there,

2   and then we can distribute it to the

3   investigators.  I believe that if they

4   understand the rationale behind why we are

5   asking for the information, they will more

6   quickly embrace the concept of including it."

7              Did I read that accurately?

8        A.    Yes.

9        Q.    Do you recall this document being

10  circulated?

11       A.    This document was from the beginning

12  of 2011, and I don't have immediate recall of

13  it.

14       Q.    The Summit County Medical Examiner's

15  Office has an investigator's manual; is that

16  right?

17       A.    That's correct.

18       Q.    Do you know why Dr. Kohler would

19  want to -- do you know why Dr. Kohler was

20  circulating this document -- strike that.

21             Do you recall if at any time there

22  was some type of an issue with compliance by the

23  investigators in relation to death

24  investigation?

25       A.    Compliance, you mean the way they do

Page 252

1    the investigation?

2         Q.    Let me rephrase the question.

3               Was there a specific circumstance

4    that necessitated the circulation of this type

5    of information?

6               Dr. Kohler's cover e-mail speaks to

7    the investigators understanding the rationale

8    behind what's being asked of them.

9         A.    Yes.

10        Q.    Do you know why that would have been

11   a concern to her, based on your experience at

12   the office?

13              MS. HERMIZ:  Objection to form.

14        A.    I don't recall what was the specific

15   issue in 2011 that Dr. Kohler was -- decided to

16   generate or felt a need to generate this

17   correspondence.

18        Q.    Let's take a look at the second page

19   of the document.  There's a section labeled

20   "Overdose Deaths," and in it there's a section

21   on medication history.  Do you see that?

22        A.    Yes.

23        Q.    And there are a number of items that

24   are listed there.  Let's walk through them.

25              First, "what type of medications was

Page 253

1    this person prescribed, by whom, and for what

2    ailment?  Are the suspected OD drugs ones that

3    were prescribed for the victim or for family

4    members or friends?  How did the decedent obtain

5    the medication?  If the person is prescribed the

6    meds, how compliant have they been on this

7    regimen?  Has the physician documented concerns

8    of abuse?  How long have they been taking the

9    medication?"

10              Let's stop there for a moment.  Do

11   you agree that those are all necessary data

12   points in a drug overdose investigation?

13       A.    I mean, ideally it would be

14   phenomenal to have an unlimited amount of

15   information.  All of this type of information in

16   reality -- in reality, the practical --

17   practicality sets in, and all of this -- this

18   type of information cannot be obtained for every

19   or even most decedents.  So it would certainly

20   be nice to have all of this information; it's

21   certainly not absolutely necessary to have all

22   of this information to ultimately make a ruling

23   for cause and manner of death.

24       Q.    Did you ever discuss these

25   requirements with the investigators?

1          MS. HERMIZ:  Objection to form.

2     A.    I'm sure I talked with the

3  investigators over and over again about what

4  type of information I would like them to obtain

5  and sent them back to go get additional

6  information to the point that they were annoyed

7  with me, and this whole memo might be about the

8  investigators annoyed with me for asking for

9  additional information over and over again.

10     Q.    So the investigators get annoyed

11  with you because you feel that sometimes they

12  don't provide you adequate information?

13          MS. HERMIZ:  Objection to form.

14     A.    The investigators will provide me

15  information that they believe to be adequate or

16  they believe to be appropriate, but what they

17  believe to be adequate and appropriate is not

18  always what I believe to be complete, and I can

19  direct them to go and do additional

20  investigation, which I do do.

21     Q.    And that additional investigation

22  would look for the things that are listed here?

23     A.    It could include this type of

24  information, as Dr. Kohler has outlined for

25  them.

Page 255

1          Q.    And then under "Illicit Drug Use,"

2    she lists, "What type of drugs does this person

3    usually use and how do they administer it?  Have

4    they had medical treatment related to drug use

5    or incarceration related to drug use?  Are they

6    involved now or have they been involved in drug

7    rehab or with agencies such as community

8    services or methadone programs?"

9              Did I read that accurately?

10         A.    Yes.

11         Q.    And I assume that your answer would

12   be the same there, that this is probably

13   something that the investigators try to get but

14   don't always manage to meet your expectations?

15         A.    If they don't obtain that

16   information initially and I feel it's important

17   or necessary to ask, I will direct them to go

18   back and obtain that information.

19         Q.    So to the extent that any of the

20   items listed here in "Medication History" or

21   "Illicit Drug Use" are particularly pertinent to

22   a particular case, that would be found in the

23   case file?

24              MS. HERMIZ:  Objection to form.

25         A.    It could be found in the case file.

Page 256

1      Q.    It could be but it --

2      A.    All of these questions can be asked

3  to next of kin, and they don't -- people

4  providing -- friends and family who might be

5  providing history might not tell us the full

6  truth, so these questions can be asked, but the

7  information -- they might just say they don't

8  know, they might give us an answer that's

9  incorrect.  So this -- this is just standard

10  investigative -- or a standard investigative

11  approach for various types of deaths.  It would

12  be expected that the investigators addressed

13  these, all or most of these types of issues,

14  during the course of their investigation, and

15  the lack of being able to -- being able to

16  obtain all of this information doesn't

17  necessarily negate the ability to have an

18  ultimate certification of cause and manner of

19  death.

20      Q.    But you sometimes might have the

21  information and sometimes you might not?

22      A.    Right, but an attempt should be

23  made.

24            THE VIDEOGRAPHER:  Can I change the

25  video?

Page 257

1                MS. RANJAN:  Sure.

2                THE VIDEOGRAPHER:  Go off the

3     record, 4:46.

4                     (Short recess had.)

5                THE VIDEOGRAPHER:  Back on the

6     record, 4:48.

7                     -   -   -   -   -

8                (Thereupon, Deposition Exhibit 11,

9                E-Mail from George Sterbenz to Lisa

10               Kohler, dated February 5, 2015, with

11               Attachment, Beginning Bates Number

12               SUMMIT_000098977, was marked for

13               purposes of identification.)

14                    -   -   -   -   -

15       Q.    Dr. Sterbenz, picking up where we

16    left off, I've just handed you a document that's

17    been marked as Exhibit 11, and, for the record,

18    it's SUMMIT_000098977 through 981.

19               Do you recognize this document?

20       A.    This was an e-mail from Dr. Kohler

21    from 2015.

22       Q.    And I'll just say it appears to me

23    as if the e-mail was from you.

24       A.    From me, 2015, yes.

25       Q.    And it attaches a document, and your

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

1    subject line is "Investigatory Manual"?

2         A.    Um-hum.  Yes.

3         Q.    And you said, "Here are my tweaks to

4    the" -- I think that's meant to read

5    investigation report section.  Is that right?

6         A.    That's correct.

7         Q.    And there's a document that's

8    attached to the e-mail.  Did you draft this

9    document?

10        A.    Yeah.  I believe this is mine.

11        Q.    Why did you draft this document?

12        A.    Because I have a strong opinion as

13   to the format that the investigator should use

14   for a logical investigation report, and this was

15   my attempt to get everyone on board with what I

16   wanted for an investigation report; but I'm not

17   the chief medical examiner, so I was presenting

18   it to Dr. Kohler to show her what I feel should

19   be the format for the investigation reports for

20   the investigators to follow.

21        Q.    You were essentially pitching an

22   idea to your boss?

23        A.    Yes.

24        Q.    And how was that idea received?

25        A.    We've moved more into this

Page 259

 1  direction.

 2       Q.    That's one answer, but it wasn't

 3  really an answer to my question.  I'm curious

 4  about how Dr. Kohler received your suggestions.

 5       A.    I think she received it positively,

 6  and I think the investigators have moved more

 7  into this direction.

 8       Q.    And is that a result of your efforts

 9  to bring them along on board with your

10  suggestions?

11       A.    Yes.

12       Q.    Are you involved in any other way

13  with training the investigators?

14       A.    Well, the investigators have a

15  specific -- okay.  When the investigators join

16  the office, they have a specific training

17  period, and I am not directly included as one of

18  their trainers.  They are trained by the other

19  senior investigators.  So I don't know if I

20  would call this exhibit, this e-mail, which is

21  Exhibit Number 11, part of their training, but

22  in a sense, I guess, if I'm a big enough nag, it

23  becomes training.

24       Q.    Yeah.  I noticed you chuckling about

25  the document.  I think if one of your -- if one

Page 260

1    of the investigators in the office described you

2    as a stickler for this, would that surprise you?

3        A.    Yeah.   No, I would not be surprised.

4        Q.    So this document includes some

5    things that you believe are important for the

6    investigators to include in their reports; is

7    that right?

8        A.    Yes.

9        Q.    So looking at Section B, it reads,

10   "The second paragraph should provide the

11   pertinent past medical history of the decedent."

12   And it says, "Include the source of your

13   information.   Although a documented primary

14   source of medical history, such as a medical

15   record is most favorable, sometimes the only

16   source of information may be a family member or

17   friend."

18              Did I read that accurately?

19       A.    Yes.

20       Q.    I think that's consistent with your

21   prior testimony that, you know, sometimes you

22   want the medical records, but they're not always

23   available to review?

24       A.    The medical examiner's investigation

25   should include medical history, past medical

1    history, or even current medical history that's

2    pertinent to the medical examiner.  It's not

3    meant to be a comprehensive history of the

4    decedent's entire past medical existence.

5    That's generally not possible, nor necessary,

6    and impractical given the number of cases that

7    we need to manage during the course of the year.

8    But it should include information that's

9    pertinent to the medical examiner.  That's why,

10   under number 2, I indicated that minor or

11   irrelevant diagnoses, such as seasonal

12   allergies, generally need not be listed.  I can

13   be told about their hay fever, but that's not

14   really going to help me generate an opinion for

15   cause and manner of death.

16        Q.    But to the extent that it is

17   relevant to the investigation, you would prefer

18   to have the medical records as opposed to just a

19   statement from a family member, for instance?

20        A.    It's most desirable to obtain

21   information from a primary source, and in most

22   instances that primary source indeed will be a

23   medical record.  In the absence of the medical

24   record or if there's an inability to obtain a

25   medical record, well, family and the next of kin

Page 262

1   and friends are also a -- can be a source of

2   information, or both can be used.

3          Q.    And then item 4 says, "Do list

4   pertinent prescription medications, such as

5   narcotic drugs."  Did I read that accurately?

6          A.    Item 4, yes.

7          Q.    Did you have issues with the

8   investigators failing to list pertinent

9   medications in the past?

10         A.    There were instances where some

11  investigators were not as fastidious about

12  obtaining prescription history and so might not

13  initially obtain that history until directed to

14  do so.  On the other hand, there are

15  investigators that, in a shotgun fashion, list

16  every single medication.  That's just

17  distracting and unnecessary and irrelevant.  So

18  that's why I felt a need to indicate to list

19  pertinent medications to the investigation.

20         Q.    And it's fair to say that you would

21  always want them to list pertinent

22  non-prescription medications as well; is that

23  right?

24              MS. HERMIZ:  Objection to form.

25         A.    Are you referring to

Page 263

1  over-the-counter medications?

2        Q.    No.  I'm referring to illicit drugs.

3        A.    So illicit drugs are not

4  medications.  I mean, those are -- I mean,

5  they're not --

6        Q.    Sure.  That's fair.

7        A.    -- medicines or medications.

8        Q.    That's fair.  Let me ask the

9  question in a different way.

10              It's fair to say that you would also

11  want them to list any illegal drugs in the

12  investigation report as well, correct?

13        A.    Yes.  That's obviously part of the

14  pertinent medical history.  See, that might be

15  medical history that might not be obtainable

16  through clinical documentation.  It might be

17  better obtained through friends and next of kin.

18        Q.    And that's why in your next example

19  you specifically list whether the decedent had a

20  history of drug abuse as an example?

21        A.    As an example, yes.

22        Q.    That's something that you would want

23  the investigator to look for?

24        A.    Exactly.

25        Q.    And so you were providing the

Page 264

1    investigators additional guidance to look for

2    those things?

3           A.    Exactly.

4           Q.    Because you felt that it hadn't

5    always been consistently done that way in the

6    past?

7                 MS. HERMIZ:  Objection to form.

8           A.    Because it hadn't been reliably done

9    in the past.  I can say certainly with deaths

10   that I was participating in the investigation

11   of, it eventually got done.

12          Q.    Okay.  Changing gears for a moment,

13   based on your prior training as a medical

14   doctor, you had some -- at least some education

15   in addiction; is that correct?

16          A.    Yes.

17          Q.    And as a part of that training and

18   based on that training, would you agree with me

19   that all addictions can be overcome?

20                MS. HERMIZ:  Objection to form.

21          A.    What do you mean by "overcome"?

22          Q.    I mean someone who you would

23   characterize as addicted could come to a place

24   where they are no longer addicted.

25                MS. HERMIZ:  Same objection.

Page 265

1          A.    The way you phrased the question, I

2    think, is a concept that is held to be

3    potentially -- something that could be

4    potentially true by the general public.  I think

5    most individuals in the medical community view

6    addiction to any substance, including legal

7    substances, like tobacco and alcohol, a

8    life-long process that's managed rather than

9    cured necessarily, more like having cancer,

10   where -- where -- a more advanced stage of

11   cancer where it's not possible to cure it per se

12   but it can be managed over a period of time.

13          Q.    So someone who is addicted to a

14   substance can make changes that will lead to

15   their ability to manage that addiction?

16              MS. HERMIZ:  Objection to form.

17          A.    Can you repeat that?

18              MS. RANJAN:  Can you read the

19   question back to him?

20                  (Record read.)

21          A.    I think the answer is yes.  When you

22   say "make changes," you're -- I think you're

23   implying make behavioral changes --

24          Q.    Sure.

25          A.    -- life behavioral changes that will

Page 266

1    help them, in a behavioral sense, avoid their

2    addiction cycle of -- or their cycle of using --

3    using substances abusively.  I think that's a

4    fair statement for management of individuals

5    clinically with drug -- with substance abuses.

6    The goal is to manage their addiction cycle --

7    sometimes that's a terminology that's used -- to

8    help them stay clean, stay off of drugs, rather

9    than relapse and go back to using, whether it's

10   alcohol or street drugs or improperly used

11   prescription drugs.

12        Q.    In other words, it requires a

13   decision on the part of the person who is

14   addicted?

15             MS. HERMIZ:  Objection to form.

16        A.    Well, we're getting farther afield

17   from my area of expertise, so I don't know

18   enough about the clinical and -- the

19   psychological clinical approach to addiction

20   management to talk in terms of patient

21   management in that level of detail.

22        Q.    So we would need to ask someone who

23   has the proper clinical training those types of

24   questions?

25        A.    Yes.

Page 267

1          Q.     And I believe you testified earlier
2     that you don't do clinical work?
3          A.     That's correct.
4          Q.     Because your patients are deceased?
5          A.     Right.  I don't practice clinical
6     medicine.  I mean, technically I could.  I hold
7     a medical license in the State of Ohio that
8     allows me to practice medicine and surgery.  If
9     I wanted -- I mean, it would be advisable, I
10    think, if I wanted to go back and practice
11    internal medicine or surgery, that I go back and
12    do a residency in internal medicine and surgery,
13    but for my career I've practiced pathology and
14    indeed forensic pathology.
15         Q.     And if you wanted to start
16    diagnosing someone in a clinical setting as
17    addicted to substances, for instance, you would
18    also need additional training?
19         A.     I'm not -- I don't think -- I
20    actually don't think I'm required to get
21    additional training according to my -- my
22    medical license, but I think that would be
23    desirable and it's not something that I'm going
24    to do.
25         Q.     If we wanted to make a determination

```
 1    about whether any particular individual who came
 2    through your office as a deceased individual and
 3    had an autopsy and an investigation -- if we
 4    wanted to make a determination about whether
 5    that individual decedent was, during their
 6    lifetime, addicted to a particular substance, we
 7    would need to review that particular case file
 8    in order to do that, correct?
 9              MS. HERMIZ:  Objection to form.
10         A.    You would have to do an
11    investigation into -- on that particular
12    individual.  The case file itself or the medical
13    examiner investigation may or may not include
14    that information depending upon the extent of
15    the medical examiner's investigation.  I can't
16    guarantee that if you go back to a medical -- to
17    the case file, that there will be the specific
18    information that you're looking for --
19         Q.    Um-hum.
20         A.    -- because it's the purpose of the
21    medical examiner investigation to facilitate
22    cause and manner of death investigation.
23              For example, for homicide deaths,
24    for individuals that are gunshot wound
25    fatalities, there are issues that are important
```

Page 269

1   to the medical examiner that are not necessarily

2   important to the police department, and there

3   are issues that are important to the police

4   department that aren't important to the medical

5   examiner.

6              So the information -- all the

7   information regarding a case might not be

8   included in the medical examiner's case file.

9   It's going to deal with information that's

10  important to the medical examiner.

11       Q.   And the information that would

12  determine whether or not a person was

13  specifically addicted to a substance may not be

14  in that file?

15       A.   It could be, but it might not be.  I

16  don't know.  We'd have to look at individual

17  cases.

18       Q.   But if someone with the particular

19  clinical training wanted to set out about that

20  inquiry, they would need to look at, like you

21  said, each case individually?

22            MS. HERMIZ:  Objection to form.

23       A.   Yes.  I believe you would look at

24  the individual cases that you had questions

25  regarding.

Page 270

1        Q.    For instance, they would need to

2   know things like how frequently the person used

3   the substance?

4        A.    For -- for just -- what are we

5   talking about, their level of addiction?

6        Q.    We're talking about determining

7   whether the person, during his or her lifetime,

8   was addicted to a substance, and if someone with

9   the proper clinical training wanted to make that

10  determination, they would need to, for example,

11  look at things like how long the person abused

12  the substance?

13              MS. HERMIZ:  Objection to form.

14       A.    Just one substance?

15       Q.    Just -- yeah, hypothetically.  Let's

16  say, you know, someone with the proper clinical

17  training wanted to determine whether a

18  particular person, during their lifetime, was

19  addicted to -- choose your drug -- heroin; they

20  would need to make an individual determination

21  about that person, right?

22              For instance, they couldn't look at

23  a report like Exhibit 2, that's in front of you,

24  and tell, based on these statistics, how many of

25  these individuals were addicted?

Page 271

1          A.    Oh.  So you're asking about
2     chronicity of their use?
3          Q.    You'll have to explain that term to
4     me.  I'm not familiar with it.
5          A.    So -- so a document like Exhibit 2,
6     which lists cause and manner of death and a
7     portion of the drug screen does not necessarily
8     let us know what the chronicity of the
9     decedent's drug use was, if this is a one-time
10    use of drug or if they had been using for a year
11    or two years or 20 years, if that's what you're
12    asking.
13         Q.    That's not exactly what I'm asking.
14    I am asking about the factors that a clinical
15    practitioner would need to look for in order to
16    determine whether an individual is addicted to a
17    substance.
18         A.    In a living person?
19         Q.    Yes, in a living person.
20               MS. HERMIZ:  Objection to form.
21         Q.    If you know.  If you don't know,
22    that's okay.  You can just say so.
23         A.    So you're deviating from death
24    investigation into clinical medical practice?
25         Q.    Correct.

Page 272

1          A.    And I think you're now exceeding the
2     scope of my -- of my expertise.
3          Q.    Okay.  That's fair.
4               MS. RANJAN:  Let's go off the
5     record.
6               THE VIDEOGRAPHER:  Off the record at
7     5:09.
8                    (Recess had.)
9               THE VIDEOGRAPHER:  We're back on the
10    record.
11    BY MS. RANJAN:
12         Q.    Dr. Sterbenz, I want to go back to
13    Exhibit 2 for a moment.  Are you looking at the
14    correct exhibit?  Yes.  Okay.  So I just have a
15    couple of follow-up questions along the same
16    lines as where we previously left off and then I
17    think we will wrap up.
18               So I wanted to ask you if a
19    doctor -- if a clinical doctor with the
20    appropriate training wanted to make a
21    determination about how many of the individual
22    decedents listed in Exhibit 2 were addicted
23    during their lifetimes, the information that
24    that clinical doctor would need is not available
25    in Exhibit 2; is that an accurate statement?

Page 273

1          A.      No.

2          Q.      It's not an accurate statement?

3          A.      I mean, the information -- when you

4    say they're addicted, you're -- you're asking,

5    can one state that the -- the various decedents

6    had chronic drug abuse as well as acute?

7          Q.      Correct.  Is that something that we

8    can determine based solely on Exhibit 2?

9          A.      No.

10         Q.      And do you have Exhibit 4 there in

11   front of you?  If you could grab it, please.

12   It's the annual report, the 2016 annual report.

13         A.      Yes.

14         Q.      You looked at some toxicology

15   figures that were in this 2016 annual report.

16   Do you recall that?

17         A.      Yes.

18         Q.      And I assume that your answer would

19   be the same, that a clinical doctor with

20   appropriate training would not be able to make a

21   determination about whether any particular

22   individuals were addicted to a substance during

23   their lifetimes based solely on these toxicology

24   stats?

25         A.      That's correct.

1      Q.    And in order to make that
2  determination, we would need some additional
3  information, right?
4      A.    You could look at the death
5  certificates for box 33F.
6      Q.    So it's your testimony that the
7  death certificates --
8      A.    Could be helpful.
9      Q.    -- would tell us whether any
10  particular individual was addicted during his or
11  her lifetime?
12          MS. HERMIZ:  Objection to form.
13      A.    It could.  It could be helpful for
14  an indication of chronicity of the drug abuse,
15  but the box 33F could state, for example, acute
16  and chronic or chronic active drug abuse.
17      Q.    And in your mind, that's the same as
18  the person being addicted during his or her
19  lifetime?
20          MS. HERMIZ:  Objection to form.
21      A.    Well, the classification of chronic
22  abuse is as close as you're going to get to the
23  clinical classification of addiction, I
24  believe --
25      Q.    So you made --

Page 275

1          A.     -- for a decedent.

2          Q.     I'm sorry.  I didn't mean to cut you

3    off.

4                 So you make clinical determinations

5    about addiction on your death certificates;

6    that's your testimony?

7                 MS. HERMIZ:  Objection to form.

8          A.     No, but the death certificate can --

9    it could possibly reflect a finding of

10   chronicity of drug abuse, and it might be also

11   reflected in the autopsy report --

12         Q.     Um-hum.

13         A.     -- and the investigation report, a

14   chronicity of drug use, abuse.

15         Q.     So the information may be there, but

16   it may not be, right?

17         A.     That's correct.

18         Q.     There may be other information that

19   you need to look for; for instance, reviewing

20   the case file for that particular decedent might

21   be useful?

22         A.     Well, if there was documentation of

23   chronic drug use in records obtained by the

24   medical examiner's office, I assume it's going

25   to be reflected either on the death certificate

1   or in the autopsy report, investigation report,

2   or all of the above.

3        Q.    And there would be other information

4   that would be relevant to making that clinical

5   determination that an individual was addicted to

6   a substance during his or her lifetime; is that

7   right?

8        A.    What other --

9        Q.    Well, for instance, you would want

10  to know some background on the particular

11  person.  You would want to have all of that

12  person's medical records, right?

13            MS. HERMIZ:  Objection to form.

14       A.    Obtaining a decedent's medical

15  records is not a panacea for elucidating the

16  chronicity of their drug -- potential drug

17  abuse.  Primary care doctor records might not

18  reflect a history of drug abuse.  They might,

19  but they might not, so --

20       Q.    They might or they might not?

21       A.    Yeah.  So I'm not really sure what

22  you're -- where you're going, what you're trying

23  to ask of me to answer yes or no to here.

24            MS. RANJAN:  Sorry, Anne.  Were you

25  saying that you wanted to take a break?

1           MS. KEARSE:  I thought you were
2    still -- are you done?
3           MS. RANJAN:  Oh, no.  I'm not.
4    Yeah.  I just -- sorry.  I overheard.
5       Q.    So you've testified that you do not
6    make clinical diagnoses?
7       A.    That's correct.
8       Q.    And so with respect to box 33 on the
9    death certificates that you previously referred
10   to --
11      A.    33F is --
12      Q.    It's 33F.  Thank you.
13      A.    Yes.
14      Q.    That's not a determination of
15   clinical chronic drug use, true?
16      A.    Clinical chronic drug use?
17      Q.    It's not a clinical determination,
18   correct?
19      A.    It's -- that's a post-mortem --
20   that's a general -- the statement of chronic
21   drug abuse or acute and chronic drug abuse with
22   the chronic part indicating prior drug abuse is
23   a classification that could be drawn --
24   supported by prior clinical documentation,
25   though obviously I'm not making a clinical

Page 278

1   assessment because the person is dead.  It can

2   also be, in part, supported by history from

3   non-clinical sources, such as friends and

4   family; though I'm not directly talking to the

5   decedent, we're getting that history because the

6   decedent is dead.  And it can be information

7   drawn upon by anatomic findings that are

8   consistent with or indicative of prior drug

9   abuse, for example, needle track scars on the

10  arms or evidence of -- of organ changes

11  associated with substance abuse, such as liver

12  disease with alcoholism or heart disease

13  associated with alcohol abuse or cocaine abuse

14  or methamphetamine abuse.

15        Q.   And so in order to determine whether

16  or not a particular person was addicted during

17  his or her lifetime, we would need to go back

18  and review all of that information with respect

19  to that individual case, correct?

20        A.   Yes.

21        Q.   And we can't make that kind of a

22  determination based on statistics; is that

23  right?

24        A.   You mean death certificate --

25  death -- death statistics, as listed in -- in

Page 279

1    the end of your reports?

2         Q.    No.  I'm asking we can't make that

3    kind of a determination based on statistics,

4    like, for instance, the information that's found

5    in Exhibit 2?

6              MS. HERMIZ:  Objection to form.

7         Q.    Can you look through Exhibit 2 and

8    tell me which of those individuals was addicted

9    to a substance during his or her lifetime?

10         A.    The vast majority of these

11    individuals, as I'm just glancing down this list

12    with methamphetamine and fentanyl toxicity,

13    fentanyl toxicity, acute mixed drug toxicity

14    where there's fentanyl and cocaine included,

15    fentanyl and methamphetamine included -- the

16    vast majority of these people are chronic drug

17    addicts because, generally speaking, people do

18    not choose to start their -- their substance

19    abuse with a heavy-duty street drug.  So the

20    vast majority of these people, as we're glancing

21    down this list, are probably chronic drug

22    abusers.  Even people that abuse what is

23    prescription medication, it's the rare

24    individual that's unfortunate enough to fatally

25    overdose the first time they take a dosage

Page 280

1   abusively or they take more than what's

2   prescribed to them.  These individuals usually

3   build up to larger levels over a period of time.

4              So the vast majority of -- of the

5   people that are accidental drug overdoses that

6   come to the coroner or the medical examiner's

7   office are people that have an issue with

8   chronic drug abuse and are dying from an

9   acute -- so you can say they have a chronic

10  disease or chronic drug abuse and they're dying

11  from an acute exacerbation of their disease.

12             There might be one or -- you know,

13  the rare individual that just took too -- you

14  know -- you know, indeed was a first-time user,

15  and then you could argue, well, they're not a

16  chronic drug abuser, this is the very first time

17  they've ever abused drugs, and, therefore,

18  they're not a chronic abuser.  But for the

19  individuals that are on this list, almost all of

20  these people are going to be chronic drug

21  abusers with an acute exacerbation of their

22  chronic drug abuse disease that's bringing about

23  their death.

24             I mean, that's like looking at

25  someone who's like a chronic alcoholic dying of

Page 281

```
 1    an acute alcohol poisoning versus like a college
 2    student who is joining a frat and chugs a bottle
 3    of vodka.  You know, they're both dying from the
 4    same alcohol poisoning, but they're -- we
 5    conceptualize them a little bit differently in
 6    terms of their -- of their alcohol poisoning.
 7    The chronic alcoholic is viewed by convention as
 8    an acute exacerbation of their chronic disease
 9    whereas -- and, you know, they can be classified
10    as, you know, acute alcoholism, acute chronic
11    alcoholism, whereas the college student who's
12    not an alcoholic, who's not alcohol tolerant,
13    who chugs the whole bottle of vodka, is then
14    dying of an acute alcohol poisoning that's
15    unrelated to chronic alcoholism.
16         Q.    All right.  You're now testifying
17    about statistics and I thought that your
18    testimony earlier was that you don't really have
19    any input into the statistics of the office, so
20    I'm a little puzzled by that.
21              MS. HERMIZ:  Objection to form.
22         A.    I don't generate the statistics, end
23    of year statistics.
24         Q.    But since we can tell --
25         A.    But I was talking about death
```

Page 282

1    certification.

2           Q.    Okay.  You're talking about Exhibit

3    2?

4           A.    Yeah.

5           Q.    Okay.  So since we can tell from

6    Exhibit 2 who had an addiction, let's look at

7    them.  Let's see.

8                 MS. HERMIZ:  Objection to form.

9           Q.    So let's take a look at the very

10   first case on the list, case number 55236.

11                Can you tell me if that particular

12   decedent was addicted to a substance during his

13   or her lifetime?

14          A.    This person, 55236, case 55236, is

15   an individual whose death is certified as

16   combined methamphetamine and fentanyl toxicity.

17          Q.    So was that person addicted to

18   methamphetamine during his lifetime?

19          A.    There's probability that this is not

20   their -- their first -- that their fatal drug

21   toxicity was not their first illicit drug

22   intoxication.  It's what one -- it's -- it's

23   very likely what they were addicted to

24   throughout the course of their life -- I can't

25   tell by looking at just the information on

Page 283

1   Exhibit 2 --
2          Q.    Um-hum.  And --
3          A.    -- and I would be guarded with
4   saying that -- with certainty they were probably
5   a drug -- had chronicity of drug abuse without
6   referring back to the specific case.
7          Q.    Right.  So in order to make that
8   determination, you would need to go back and
9   refer to the specific case?
10         A.    Yeah, just review the specific case
11  and then -- and see if the investigation
12  supported acute chronic active drug abuse.
13         Q.    All right.  Let's look at the second
14  one, case number 55235.  Was that person
15  addicted to fentanyl during her lifetime?
16         A.    Well, people who abuse opiate-type
17  drugs generally will -- might abuse various
18  opioid drugs throughout the course of their
19  disease process, so I can't tell by their
20  terminal intoxication what their pattern of
21  usage previously was for various drugs.  They
22  might have been using fentanyl in the past.
23  They might have been using other opioid drugs in
24  the past and I can't even say with certainty
25  that they are a chronic -- issue of chronic drug

Page 284

1    abuse unless there is -- one goes back and looks

2    at the specific case.

3         Q.    And the same would be true of --

4         A.    Of all of these, every case, every

5    case.

6         Q.    Right.  You can't tell me, sitting

7    here, which of these cases involved someone who

8    was addicted to a substance during his or her

9    lifetime?

10        A.    Yeah.  If we went back and looked at

11   the specific cases, I think we would find that

12   the vast -- virtually all of these deaths are in

13   individuals with evidence of chronic -- acute

14   chronic active drug abuse.

15        Q.    That wasn't my question, Doctor,

16   with all due respect.  My question was, you

17   can't tell me, sitting here today, which one of

18   these individuals was addicted to a substance

19   during his or her lifetime?

20        A.    Right.  You keep asking me about

21   addiction and who's addicted, and that's, I

22   feel, like a clinical classification, and as a

23   pathologist, the terminology that I use is

24   chronic drug abuse; and so I can talk in terms

25   of who has a chronicity of drug use, and then

Page 285

1   the vast majority of the people on this list I
2   think we would find have a history of chronic,
3   active drug abuse, which might mean they have a
4   clinical documentation of addiction, but then
5   again, they might not have -- they might not
6   have any documented clinical histories.  They
7   don't go to doctors, or they might go to a
8   doctor and their doctor never diagnosed them
9   with addiction in their past.  So the lack of a
10  clinical diagnosis of addiction doesn't mean
11  that any specific decedent didn't have -- wasn't
12  an addict prior to their death, but as a
13  pathologist certifying their death, I can
14  reflect chronicity of drug abuse as chronic
15  active drug abuse.
16       Q.    Okay.  I'm going to ask my question
17  one more time because I still am just not sure
18  I've gotten an answer.  I don't believe I have.
19  The question that I asked you was, you can't
20  tell me, sitting here today, which of these
21  specific cases involved an individual who was
22  addicted to a substance during his or her
23  lifetime?  Not generalities, not anecdotal.  Can
24  you tell me whether case number 55235, whether
25  that person was addicted to a substance during

Page 286

1    their lifetime based on the information here?

2              MS. HERMIZ:   Objection to form.

3         A.    I -- virtually all of the people on

4    this list --

5         Q.    I'm not talking about all the people

6    on this list, Doctor.  I'm talking about case

7    number 55235.  Was she addicted to a substance

8    during her lifetime, yes or no?

9         A.    I think the only way I can answer

10   that question is that based upon the information

11   on this list, I can't say with certainty that

12   that specific individual has a documentation

13   of -- of chronic drug abuse by death

14   investigation or prior clinical documentation of

15   addiction within medical records that might or

16   might not exist.

17        Q.    So the answer to my question is no,

18   you can't tell me?

19        A.    Like I just said, I can't say based

20   upon -- for any specific individual on this

21   list.  I believe the vast majority, if not all

22   of the people on this list, have -- what we

23   would find, have a history of chronic drug

24   abuse.

25      FURTHER EXAMINATION OF GEORGE STERBENZ, M.D.

Page 287

1  BY MR. CHEFFO:

2      Q.    Let me see if we -- I think we -- I

3  think I understand you, but chronic drug abuse

4  is not necessarily addiction; you would agree

5  with me, right?

6      A.    Well, from my personal point of

7  view, I believe the term "addiction" is used in

8  the clinical setting and chronic drug abuse is

9  used in a pathologic setting in forensic

10  pathology.

11      Q.    You are not qualified to make a

12  diagnosis of a living human being as to whether

13  they're addicted pursuant to the DM-4 {sic}, the

14  DSM-5 or any other diagnostic tool; isn't that

15  right?

16      A.    Addiction, according to those

17  standards, implies psychological and physical

18  dependence on a drug, so I cannot make those

19  assessments in a decedent.  It's not only do I

20  not do it on living people, but on decedents it

21  cannot be done because they're dead and that's

22  an assessment that's made on living people.

23      Q.    Understood.  It can't be done on

24  dead people because they're dead and you cannot,

25  because you are not qualified, make a

Page 288

1    determination about whether someone was addicted
2    while they were alive; isn't that fair?
3         A.    I don't -- you can't apply
4    diagnostic criteria that -- that can only be
5    applied to living people on dead people
6    directly.
7         Q.    I think -- I think we're actually
8    agreeing here, Doctor.
9         A.    You keep saying -- you're asking --
10   I can't do it because I don't know how to do it.
11   I probably could learn how to do it, but you
12   can't apply criteria for living people on dead
13   people because those criteria no longer apply.
14   Those are psychological and physiologic criteria
15   and I have pathologic criteria that I'm --
16        Q.    And I'm trying to -- I think we're
17   agreeing, okay, that you can make a
18   determination based on looking at a decedent
19   that they may or may not be -- based on the
20   information that's available to you, they may or
21   may not have been a chronic drug abuser in your
22   estimation, right; that's something that you do
23   from a pathological perspective?
24        A.    Routinely on the death certificates
25   and in the autopsy reports I will make a

1    determination or a classification of chronic

2    drug abuse or chronic active drug abuse.

3    Realistically, those chronic drug abusers are

4    people that had addiction during life.

5         Q.    But how do you know that?  You don't

6    even know the criteria.  What are the criteria

7    for addiction?  You've told us that you're

8    wedded to the scientific definition.  Tell us,

9    then, on the record what is the definition of

10   addiction.

11        A.    People with clinical -- I mean, a

12   clinical diagnosis of addiction follows criteria

13   for psychological dependence and physiological

14   dependence.

15        Q.    What are they?  Do you hold yourself

16   out in diagnosing living human beings with

17   addiction?  Have you ever done that?

18             MS. HERMIZ:  Objection.

19        A.    No, and I'm not presenting myself as

20   such at this time.

21        Q.    Okay.  So what --

22        A.    But it's unrealistic, I mean, to --

23   well, it's unrealistic to suggest that these

24   individuals that are -- have evidence of chronic

25   drug abuse are not -- therefore, did not --

```
 1   would not have fit the criteria for being a
 2   person with addiction during life.
 3        Q.    But that's speculative, right, they
 4   may have or they may not have?  Someone may have
 5   chosen to use a medicine or a drug and not be
 6   addicted, right?  That's possible, isn't it?
 7        A.    If a person drinks themselves to the
 8   point where they have cirrhosis and alcoholic
 9   cardiomyopathy, that person had realistically an
10   addiction to alcohol.
11        Q.    How do you know that?  How do you
12   know that they fit the characteristic of
13   addiction if you don't even know what addiction
14   is?
15             MS. HERMIZ:  Objection to form.
16        A.    Well, in some instances -- because
17   some of the criteria for drug withdrawal is a
18   physiologic process, and I can't see after
19   death, and maybe we can elicit that kind of
20   history that an individual suffered with
21   physiological drug withdrawal, whether it be
22   alcohol or opiates, and then there is evidence
23   there of that individual having addiction
24   clinically.  In many instances such clinical
25   documentation simply doesn't exist.
```

Page 291

1      Q.    Are you -- are you qualified to make

2  a clinical diagnosis of addiction in a living

3  human being?  Have you done that in the last 30

4  years?

5      A.    No, and I'm not doing that.

6      Q.    So you certainly, then, wouldn't be

7  qualified to look back after somebody dies and

8  determine if they're addicted if you're not

9  qualified to basically suggest that they're

10 addicted when they're alive?  Isn't that kind of

11 an illogical --

12              MS. HERMIZ:  Objection to form.

13      A.    That's ridiculous.

14      Q.    So you think you could make --

15      A.    Realistically --

16      Q.    Excuse me.  I'm not done with my

17 question.  You could make determinations after

18 the fact on dead people about whether they were

19 addicted even though you have never in your

20 life, at least in the last 30 years, made a

21 determination of whether a live person is

22 addicted?  Is that really your testimony?

23              MS. HERMIZ:  Objection to form.

24      A.    It is my testimony that

25 realistically the -- a large percentage, if not

1    the majority of the individuals that are dying
2    with -- on Exhibit 2, with their varied illicit
3    drug toxicities realistically had -- were
4    struggling with drug addiction during their
5    life, thus the classification of chronic drug
6    abuse.
7         Q.    Will we find -- if we look at all of
8    your reports from 2016, will we find a
9    determination that you've made a medical
10   determination with a reasonable degree of
11   scientific certainty, medical certainty, that an
12   individual was addicted?  Will we find that?
13        A.    No, and that's not what I said I do.
14        Q.    Okay.  So you've never actually
15   determined in an actual medical record or report
16   or autopsy report that somebody was addicted,
17   correct?
18        A.    I don't --
19        Q.    Yes or no?
20        A.    I don't make a clinical
21   determination of addiction in a decedent.
22        Q.    Okay.  So the answer is no, you have
23   never made a determination and never written in
24   an autopsy report or any record in connection
25   with your work that a decedent was addicted,

Page 293

1   right, because that's not what you're supposed

2   to do, correct?

3              MS. HERMIZ:  Objection to form.

4         Q.    That's really a yes or no question.

5         A.    Well -- so -- once again, I make a

6   determination of chronic and acute drug abuse or

7   chronic active drug abuse that is a pathologic

8   correlate to a clinical manifestation of

9   addiction.  So I am not making a clinical

10  diagnosis of addiction, but it implies a

11  clinical -- that individual had clinical

12  addiction.  Just like when I make a diagnosis of

13  a dilated cardiomyopathy due to chronic

14  ischemia, I can't say -- I can't make a

15  diagnosis necessarily of clinical congestive

16  heart failure because that's a diagnosis that's

17  made during life, but I can state to a

18  reasonable degree of certainty that that person

19  had -- had to have had congestive heart failure

20  during life.

21        Q.    Can we agree, then, that the --

22  while you're going to make -- you have made a

23  finding of chronic drug abuse or acute drug

24  abuse, that may be evidence of addiction or may

25  be used in connection with some other

Page 294

1    information or diagnosis, but you're not the

2    person and your office is not the entity to be

3    making determinations about somebody was

4    addicted during their life?

5           A.    Once again --

6           Q.    Do you need the question read back

7    because you can keep answering another question

8    if you want.  I'll keep asking my question.

9           A.     -- the finding of -- that an

10   individual is dying with chronic active drug

11   abuse is a pathologic implication that that is a

12   person that was dealing with addiction during

13   their life.

14          Q.    And if someone asked you would you

15   swear under oath that any of these people --

16   frankly, anybody that you have seen in the last

17   18 years was or was not addicted, would you be

18   in a position to make that determination and

19   sign your name to it?

20                MS. HERMIZ:  Objection to form.

21                Counsel, we're about 20 minutes

22   over, so --

23                THE VIDEOGRAPHER:  20 minutes left.

24                MR. CHEFFO:  We may need to go 20

25   minutes over if I can't get an answer.

Page 295

1      Q.    Do you want me to read it back,
2  Doctor?
3      A.    Yeah.  Friends and family and
4  primary care doctors certainly -- well, friends
5  and family will -- it is not unusual for friends
6  and family of decedents to state that an
7  individual with evidence of chronic drug abuse
8  had no history of drug abuse or had no history
9  of addiction, but their -- nonetheless that
10  individual might have physical stigmata of
11  chronic drug abuse and an acute drug
12  intoxication that's fatal that's bringing them
13  to the office that supports that they were
14  indeed someone who suffered with a history of
15  drug addiction and drug use.
16      Q.    Do you remember my question?  Do you
17  remember the question I asked you?
18      A.    Yeah.  You were asking me that --
19  you were making a statement that I am not
20  qualified to render an opinion that decedents
21  for which I have conducted death investigations
22  might have been drug addicts during their life.
23      Q.    That's not the question I asked you.
24  Let's just see if we can do this in bite size so
25  we can actually end this deposition, if that

Page 296

1    would be convenient for you and us.

2              You have never made a determination

3    that any single decedent that you have ever

4    performed their autopsy or looked at their case

5    was addicted during their lifetime; fact?

6         A.    I've never classified any decedent

7    with the term "addict."

8         Q.    And you've never said someone had

9    addiction disorder during the course of their

10   lifetime, correct?

11        A.    Correct.

12        Q.    You've never said someone was an

13   opioid addict during their lifetime, correct?

14        A.    No, that's not correct.

15             The classification of chronic active

16   alcoholism indeed implies that -- or chronic

17   active drug abuse or chronic opioid drug abuse

18   or whatever implies that they are chronically

19   using -- they're -- or abusing drugs.  Abuse

20   is -- the classification of abuse is, in and of

21   itself, an implication of addiction.

22        Q.    Is abuse addiction clinically?  Is

23   abuse -- if someone said you are a drug abuser,

24   is it your testimony under oath that that would

25   mean that there would be a clinical diagnosis of

Page 297

1   addiction without knowing anything more?

2        A.     Chronicity of abuse --

3        Q.    I don't know what that means.  What

4   does chronicity mean, Doctor?

5        A.     Well, let me finish my statement.

6   Chronicity of abuse is part of the diagnosis

7   of -- of -- you know, considered in part of the

8   diagnosis of addiction, so -- what was your

9   question again?

10       Q.     You've told us five times now,

11  right, that you don't know the definition or the

12  criteria for addiction, right?  Just like, you

13  know, I am not holding myself out as a forensic

14  pathologist, presumably you don't hold yourself

15  out as a psychiatrist or an addiction

16  specialist, correct?  Is that true?

17       A.     I am not presenting myself as a

18  clinical addiction or a clinical substance abuse

19  patient management healthcare provider.

20       Q.     And if a live person came to you and

21  said, "Doc, do I have an addiction disorder,"

22  would you tell them, "If you're concerned about

23  that, I think you should talk to a healthcare

24  provider who actually specializes in that," and

25  maybe you might refer them or say, "Go talk to

```
                                          Page 298
 1    your primary care," or would you say, "Come on
 2    and sit down and I'll give you a diagnosis"?
 3         A.    I would not -- yes, I would refer
 4    them back to their primary care doctor or an
 5    appropriate clinical specialist.
 6         Q.    And that's because the diagnosis of
 7    addiction is complicated and it would require
 8    someone to understand all the parameters, what
 9    the factors were, be able to take a history,
10    someone who was qualified and specializes in
11    that area, right?
12         A.    That's because I'm a forensic
13    pathologist.  Obviously if someone came to me
14    and said, "I have high blood pressure," I would
15    refer them back to their primary care doctor.
16         Q.    Agreed.  And just like determining
17    whether someone has addiction disorder when
18    they're alive, it's just as complicated, if not
19    more complicated, to determine whether they were
20    addicted after they're dead because you don't
21    even have a chance to talk to them and ask them
22    any questions, right?
23              MS. HERMIZ:  Objection.
24         A.    You're missing the whole point.
25         Q.    I don't think so, Doctor.
```

1          A.    I think you are.  I think you are.

2     I think you're not hearing what I'm saying

3     because I'm not saying what you want me to say,

4     but I am saying that the vast majority of these

5     people on Exhibit 2 are indeed -- if we looked

6     at the individual cases, have issues of chronic

7     drug abuse or acute exacerbations of their

8     chronic drug abuse, and are -- fit the -- had a

9     probable history of addiction leading up to

10    their death.  It's very, very extraordinary for

11    someone to, just out of the blue, take fentanyl

12    and methamphetamine together and happen to die,

13    and it's very, very extraordinary for someone to

14    just, you know, mix some fentanyl and meth --

15    and methadone and oxycodone together and die in

16    one -- in a one-time shot.

17          Q.    So tell me --

18          A.    These are much more likely people

19    that have a history of chronicity, which is part

20    of the spectrum of their addiction.  Even the

21    people -- this guy over here, 55370, with

22    methadone, methadone, this person could be in a

23    drug addiction treatment program and then

24    concurrently abused oxycodone and fentanyl.

25          Q.    Don't you think it's a little

```
 1    interesting when I asked you specific questions
 2    about any of these, you had no recollection, now
 3    you have specific understandings about how these
 4    people used their drugs?
 5                 MS. HERMIZ:  Objection to form.
 6         Q.    Which one of these did you work on?
 7    Let's get back to the methadone -- the
 8    methamphetamine.  You couldn't tell me any
 9    answers about any of these people, right, so you
10    don't really know anything about these cases, do
11    you?
12                 MS. HERMIZ:  Objection to form.
13         Q.    Do you?
14         A.    I don't even know what your question
15    is.
16         Q.    Let's just -- I want to talk
17    specifics because you keep pointing randomly to
18    people.  Tell me, then, details about -- you've
19    made a broad statement that you think many of
20    these people or most of them are drug abusers
21    and that's evidence of addiction or something
22    along those lines.
23                 So let's talk about the very first
24    one.  Tell me about this person's use, the
25    frequency, and your basis for a determination
```

1  that you believe they had an addiction disorder

2  while they were alive.

3          MS. HERMIZ:  Asked and answered.

4      Q.   Can you do that?

5      A.   I've answered that already.

6      Q.   Can you?

7      A.   I feel like I'm just answering the

8  same question over and over again.

9      Q.   Can you do that for any of these

10  specific people?

11      A.   I've answered it in so many

12  different ways, I don't even know how to answer

13  it anymore.

14      Q.   Yes or no, can you do it for any of

15  these specific people?  We can go through and do

16  a checkmark.

17      A.   I think for each of these specific

18  people, we could go back and look and see that

19  the majority of these individuals had evidence

20  of chronicity in their history.

21      Q.   Let's take the first one, Doctor.

22  When is the first time that this person used an

23  illicit substance?

24      A.   I obviously cannot determine that by

25  the information here.

1      Q.    How often did they use it?

2      A.    I obviously can't determine that by

3 this -- the information here.

4      Q.    Did they have drug-seeking behavior?

5            MS. HERMIZ:  Objection to form.

6      A.    Well, they -- they sought out

7 methamphetamine and toxicity -- methamphetamine

8 and fentanyl, along with -- well, so that is --

9 those were illicit drugs that they sought out.

10      Q.    Is it your testimony that you're

11 certain to a reasonable degree of medical

12 certainty that this wasn't the first time that

13 someone used all these medicines or these drugs?

14      A.    I'm saying that any individual on

15 this list is -- one cannot reach a degree of

16 certainty based upon the information on this

17 list individually for individuals, but if we

18 were to go back and look at the individual

19 cases, the vast majority of these individuals

20 realistically are going to have a history of

21 chronic drug abuse with an acute exacerbation.

22      Q.    So if the vast majority -- you keep

23 testifying that the vast majority, so then it

24 should be easy to tell us all the ones if the --

25      A.    That's not what I'm saying.  You're

Page 303

1   just misrepresenting what I'm --

2        Q.    It's your testimony.

3        A.    No, it's not.

4        Q.    So is your testimony that you

5   believe that there are individuals here who may

6   or were likely addicted but you cannot identify

7   one specific --

8        A.    My testimony is what I said it was.

9        Q.    Well, I don't seem to be able to

10  understand it.

11       A.    The vast -- I believe that if we

12  looked at the individual cases beyond the

13  information that's provided on this list, the

14  vast majority are probably individuals with

15  chronic drug abuse histories and are dying with

16  an acute exacerbation of their -- of their drug

17  use.

18       Q.    And if you wanted to validate that

19  hypothesis --

20       A.    For example --

21       Q.    -- what would you do for all of

22  these?  What would you want to do?  If you

23  wanted to show the vast majority, let's say 80

24  percent of these people, 75 percent, tell me the

25  specific steps that you would need to validate

1   that hypothesis.

2        A.    I would start just by reviewing the

3   death certificates first.

4        Q.    Well, the death certificates are

5   only based on the information in the file,

6   right?  So that's the first thing you would do.

7   What else would you do?

8        A.    I would review -- you could start

9   with reviewing what's public record, the autopsy

10  report, the investigation report and the death

11  certificate.

12       Q.    And that would tell us whether

13  somebody was addicted during life?

14       A.    That would tell us -- that would

15  tell us if they have a history of chronic drug

16  abuse by investigation.

17       Q.    And would that tell us -- I'm

18  talking about whether they were addicted.

19  That's what I keep asking.  You keep talking

20  about chronic drug abuse.  Because again,

21  Doctor, I'm using your words.  Your point is if

22  you said -- you're conflating chronic drug

23  abuse, right, but then you said the vast

24  majority of these people would be addicted,

25  okay, and I'm trying to find out since -- you

Page 305

1    can't understand that from looking at your death
2    certificate.
3         A.    The vast majority of these people I
4    think we would find have a history of chronic
5    drug abuse.
6         Q.    Okay.
7         A.    The vast majority of people with
8    chronic drug abuse have a history of -- or --
9    either have a history of addiction or were
10   addicted, and that's why they have their
11   history -- their pattern of chronic drug abuse.
12        Q.    What's your scientific,
13   peer-reviewed data or epi studies that you're
14   relying on to say that the vast majority of
15   these people who would suffer from chronic drug
16   abuse were addicted?  Is it just total
17   speculation?
18             MS. HERMIZ:  Objection to form.
19        A.    No.  The vast majority of people
20   with chronic substance abuse, particularly
21   illicit street drugs, are struggling with
22   addiction.
23        Q.    Okay.  What's your data for that?
24        A.    It's a fact.
25        Q.    Okay.  If it's a fact, then you

Page 306

1   should be able to justify it.

2        A.    It's true.  It's just a fact.

3        Q.    It's true because you say so?

4              MS. HERMIZ:  Objection to form.

5        A.    It's true because it's true.

6        Q.    So you don't know?  You don't have

7   any data, do you?

8        A.    The -- the classification of chronic

9   drug abuse is a -- is the pathologic correlate

10  of a clinical diagnosis or the clinical

11  manifestation of addiction, just like the

12  pathologic diagnosis of -- of ischemic

13  cardiomyopathy is an anatomic manifestation of

14  clinical congestive heart failure.

15       Q.    I think we've been through this, but

16  you've told me they're not the same and you

17  don't know what addiction is and --

18       A.    The terminology is not the same, but

19  one is implying the other.

20       Q.    So is it your testimony that if we

21  see in an autopsy report that someone has

22  chronic drug abuse, that someone would

23  automatically determine that that person had an

24  addiction disorder during their lifetime?  Is

25  that really your testimony?

Page 307

1          A.     Some of the individuals that are --

2     that have autopsy or post-mortem classifications

3     of chronic active drug abuse will have clinical

4     documentation of drug abuse or addiction abuse

5     or addiction disorder during their life.  Some

6     won't.

7          Q.     But they're not automatically --

8     whether documented or not, they're not

9     automatically addicted or they would be

10    diagnosed with addiction disorder?

11         A.     They would have to be evaluated for

12    addiction disorder to start with to get that --

13    such a classification.

14         Q.     And you wouldn't be the person to do

15    that, would you?

16         A.     Well, I'm doing -- I'm doing a

17    post-mortem examination.  I'm not doing a

18    clinical assessment.  So I can't -- I'm not

19    going to end up making a diagnosis of addiction

20    disorder.  They're dead.  So the whole purpose

21    of that type of classification is for prognosis

22    and treatment.  They're dead.  I'm going to give

23    them a post -- an appropriate pathologic

24    classification, but some of those individuals

25    that I will be performing death investigations

1  on, they're dying with drug toxicities and
2  history of chronic drug overdose, will have had
3  clinical assessments during their life and will
4  have had documentation of -- of addiction
5  disorder during their life.  And I know that
6  some of the individuals that I perform autopsies
7  on have, but some have never had, that type of
8  clinical intervention so they will never have
9  that clinical diagnosis of addiction disorder.
10  But that doesn't negate their post-mortem
11  pathologic finding.  You just don't throw it out
12  the window because you don't have a -- you
13  weren't lucky enough to get a clinical diagnosis
14  of addiction during life.  The pathologic
15  diagnosis still holds and that still does imply
16  that they had an addiction during life, just
17  like an individual that might not have a
18  diagnosis of heart disease during life and then
19  they die and I do an autopsy and I find heart
20  disease.  That doesn't mean they didn't have it.
21  It means it wasn't diagnosed during their life.
22       Q.   I think you've said that probably
23  ten times already, and I'm going to keep asking
24  my questions and I'm going to ask for more time,
25  but you keep saying the same thing and you're

Page 309

1  filibustering.

2       A.    I am not filibustering and I've

3  answered your question many times --

4       Q.    You have not.

5       A.    -- and I'm just not saying what you

6  want.

7       Q.    That's not true, Doctor.

8       A.    So you keep asking the same question

9  over again.

10       Q.    Are you done, because you tell me

11  when you're done and I'm going to ask another

12  question?

13            Can you make a diagnosis to a

14  reasonable degree of medical certainty that any

15  one of the people on this list from 2016 who had

16  drug abuse to a reasonable degree of medical

17  certainty was addicted to any substance?  Can

18  you do that?

19       A.    I can't answer that question

20  anymore.  I feel like I've -- it's been asked,

21  I've answered.  I've answered in as many ways as

22  I can.  I have nothing left to say.

23       Q.    Doctor, you've told me it implies

24  it, okay.  You've said that a number of times.

25  And my question is specific.  It's, can you make

```
 1    a determination to a reasonable degree of
 2    medical certainty, based on a finding in an
 3    autopsy report or some other finding that
 4    someone had chronic drug abuse, that you were
 5    willing to determine that that person had an
 6    addiction disorder?
 7             MS. HERMIZ:  Are you talking a
 8    pathological diagnosis or a clinical diagnosis?
 9    I don't know if that would make a difference.
10             MR. CHEFFO:  Well, maybe -- if you
11    don't understand, I'm happy to try and explain
12    it.  What I'm trying to understand -- and if you
13    keep saying it, then this should be easy and
14    I'll tell you if I'm missing it.  We understand
15    from pathological, he said a number of times --
16        Q.    Doctor, I'll talk to you.  You said
17    that you could make a determination from a
18    pathological perspective that someone is a
19    chronic drug abuser based on various forms,
20    finding drugs, needle marks, and probably a host
21    of other things, right?  That's something that
22    you do as part of your autopsy process, right?
23    Yes?
24        A.    Yes.
25        Q.    And that's a determination based on
```

                                                   Page 311

1    looking at somebody when they are deceased,

2    right?

3         A.    Obviously.  It's a death

4    investigation.  The individual is deceased.

5         Q.    Right.  And that information may

6    inform or be relevant to a determination of

7    whether someone had an addiction disorder when

8    they were alive, agreed?

9         A.    Some of that information might be

10   the only information that we have regarding

11   their addiction disorder while they're alive.  I

12   mean, some people -- some of these people on

13   this list will obviously have clinical history

14   of -- of a -- clinical documentation of

15   substance abuse, of addiction disorder.  Some of

16   them won't have primary care doctors and they

17   won't have clinical documentation of addiction

18   disorder.

19        Q.    Let's try and take it in bite size,

20   okay, because -- let's just try and take it in

21   bite size.  You need to answer my questions.

22              The mere fact that someone has been

23   found to be a chronic drug abuser as part of an

24   autopsy and medical examiner's finding does not,

25   in and of itself, mean that that person was or

                                    Page 312

1    was not addicted, right?

2         A.    So when you say -- you've just said

3    that a chronic drug abuser can be a chronic drug

4    abuser but doesn't have addiction, meaning a

5    psychological dependence on the drug and/or a

6    physiologic dependence on the drug that

7    they're -- or the substances that they're

8    abusing.

9         Q.    Are you asking me a question or --

10        A.    I'm trying to clarify your

11   question --

12        Q.    My question was --

13        A.    -- because I don't think you know

14   what you're talking about when you keep throwing

15   around this term "addiction, addiction," and

16   someone is a chronic abuser, but they're not

17   really addicted, they're just using chronically

18   because they could stop anytime they wanted.

19        Q.    I think I've asked you a few times

20   to tell us what the definition of addiction is,

21   and you can't tell us, right?

22        A.    Addiction is a psychological and a

23   physical dependence on a substance.

24        Q.    Is that the definition in the DSM-5?

25        A.    I can't provide testimony about the

Page 313

1   DSM-5 because I don't work within the scope of
2   the DSM-5.
3        Q.    You don't diagnose -- we talked
4   about this.  You don't diagnose human beings who
5   are alive with addiction?
6        A.    The individuals that I'm
7   investigating are dead.
8        Q.    Right.  And you do not --
9        A.    The DSM-5 is criteria for living
10  people.
11       Q.    And that's what we're talking about
12  is extrapolating.
13       A.    But if a person is using chronically
14  to the point that they are terminal, they are
15  dying, that they are unlucky enough to die,
16  their chronic drug abuse is a pathologic
17  correlate to an ante-mortem addiction.
18       Q.    Is it an automatic?  In other words,
19  if you find someone in their post-mortem that
20  they're a chronic drug abuser, is it a certainty
21  and can you say to a reasonable degree of
22  medical certainty that that person was
23  clinically addicted?  This is really a yes or
24  no, but you can answer it any way you want,
25  Doctor.

Page 314

1          A.    Some individuals with chronic -- who

2     are -- who there is evidence of chronic drug

3     abuse will have clinical documentation of

4     addiction and some won't.  I can't predict which

5     will -- who will and who won't.

6          Q.    Move to strike.  I'm not talking

7     about whether someone was addicted.  That's

8     where you want to keep not answering my

9     question, Doctor.  You want to talk about

10    clinical evidence when they were alive, not my

11    question.  Okay.

12          My question is, if you make a

13    determination that someone was a chronic drug

14    abuser in a post-mortem, whether they were ever

15    diagnosed or not, is that finding enough --

16    would you then say under oath to a reasonable

17    degree of medical certainty that they are

18    automatically addicted or were addicted during

19    their lifetime?  Do they correlate one to one?

20          A.    I -- I feel like I've answered the

21    question to my knowledge, and I don't -- at this

22    point I just don't understand what you're asking

23    to answer it in any other way than I already

24    have.

25          Q.    Well, again, I think you do, Doctor.

```
1    Is chronic -- a post-mortem diagnosis of chronic
2    drug abuse, does that mean that someone was
3    clinically addicted full stop when they were
4    alive, or would you need more information to
5    make that clinical diagnosis about whether they
6    were addicted when they were alive?
7         A.    Even the determination of chronic
8    drug abuse is based upon more information about
9    when they were alive.  So I don't even know what
10   you're talking about at this point.  There
11   probably was information about -- many of these
12   individuals that are classified as chronic
13   active substance abusers, they are, they do
14   have -- there is -- that is the clinical or that
15   is the historical information, that they had
16   addiction during their life.
17        Q.    If we see someone designated as
18   chronic drug abuser, is it your testimony that
19   it's also your finding that they were addicted
20   when they were alive to a reasonable degree of
21   medical certainty?
22        A.    It could be.
23        Q.    Is it?
24        A.    It could be.
25        Q.    Is it, yes or no?
```

Page 316

1          A.     I don't know.  I don't know.  On
2      who?  What specific person?
3          Q.     Anybody.
4          A.     Well, I don't know.  I can talk
5      about specific people or I can talk in terms of
6      generalities.  You're asking in terms of
7      generalities.  I can answer in terms of
8      generalities.
9          Q.     With respect to any specific person
10     that's diagnosed with a chronic drug abuse
11     problem, does it automatically mean that they
12     were addicted clinically at the time that they
13     were alive?
14         A.     That might be how they got their
15     classification of chronic drug abuse to start
16     with.
17         Q.     Is it automatic?  Can we make that
18     determination just by a finding of chronic drug
19     abuse?  Can we?
20         A.     As I said, I don't even know how to
21     answer your question anymore.  I don't know if
22     there is such a thing as a -- of a -- some -- a
23     non-chronic drug abuser, a non-addict chronic
24     drug abuser.  But you're asking apples and
25     oranges to some extent.  The terms are related

1  when it's a clinical term.  When it's a

2  pathologic term, the classification of chronic

3  drug abuse does indeed imply that there was an

4  addiction during life.  There might be a

5  diagnosis of -- a clinical diagnosis of

6  addiction during life, but there might not be a

7  diagnosis of clinical addiction during life.  It

8  depends on what type of clinical intervention

9  and interaction that person had during their

10  life.  And often I'm using that history of --

11  prior history of a clinical addiction during

12  life to assist me in my certification of the

13  death.

14      Q.    In any of your autopsy materials or

15  findings do you ever make a finding that someone

16  was addicted during their lifetime, a direct

17  finding?

18      A.    In what autopsy material?

19      Q.    Any.  Do you ever write that someone

20  was addicted during their life?  Have you made

21  that finding?

22      A.    I generally refrain from using

23  clinical terminology in a post-mortem state.

24      Q.    So the answer is no, you don't

25  determine whether someone was addicted during

Page 318

1    their life?

2           A.    So I don't know, if we go back

3    through every single autopsy report I've ever

4    written, which is in the thousands, if I've ever

5    used the term "addict," but I generally refrain

6    from using clinical terminology or clinical

7    classifications for my pathologic

8    determinations.

9                 MR. CHEFFO:  Okay.  All right.  I

10   have no further questions.

11                MS. HERMIZ:  Can we take a

12   five-minute break?

13                MR. CHEFFO:  Sure.

14                THE VIDEOGRAPHER:  Off the record,

15   6:36.

16                     (Recess had.)

17                THE VIDEOGRAPHER:  We're back on the

18   record, 6:50.

19         EXAMINATION OF GEORGE STERBENZ, M.D.

20   BY MS. HERMIZ:

21         Q.    Good evening.  We've met before.  I

22   just have a couple of questions.  I just wanted

23   to clear up a little bit of confusion I had from

24   some earlier questioning today.

25                Do you remember earlier this

                                        Page 319

1    afternoon counsel for Purdue asked you various

2    questions about some alleged discrepancies in

3    the toxicology results for certain drug overdose

4    cases referenced in Exhibit 2 and Exhibit 3?  Do

5    you remember those questions?

6              MR. CHEFFO:  Objection.

7         A.    Yes.

8         Q.    For instance, if you turn to Exhibit

9    3 on page 1 and you look at case number 55724,

10   where the cause of death is carfentanil toxicity

11   and the toxicology results note carfentanil

12   present; is that correct?

13        A.    Yes.

14        Q.    And then if you turn to Exhibit 2 on

15   page 24, and it's the same case number -- that

16   case number is 55724 -- the cause of death is

17   also carfentanil but in the toxicology results

18   in lists none detected; is that correct?

19        A.    Yes.

20        Q.    And since counsel originally asked

21   you those questions several hours ago, have you

22   come to any conclusion as to why the toxicology

23   results in Exhibit 2 and Exhibit 3 say different

24   things?

25        A.    They say different things because

1  they're different queries.  Exhibit 3 queried a
2  urine specimen and Exhibit 2 queried a blood
3  specimen, so for that specific case, 55724, the
4  urine specimen was reported as carfentanil
5  present, although the blood was reported as none
6  detected.  So they are two different specimens.
7        Q.    And, Doctor, you would agree, based
8  on the specimen tested between the blood and
9  urine, that both of those queries could be
10  accurate; is that correct?
11            MR. CHEFFO:  Objection.
12        A.    Yes, they both can be accurate.
13            MS. HERMIZ:  I have no further
14  questions, Doctor.  Thank you for your time.
15    FURTHER EXAMINATION OF GEORGE STERBENZ, M.D.
16  BY MR. CHEFFO:
17        Q.    Just a few, Doctor.
18            In Exhibit 2, if you look at page 20
19  of 46, on the top one, 55653 --
20        A.    Yes.
21        Q.     -- there's -- it's not just blood,
22  this one talks about a urine specimen in Exhibit
23  2, right?
24        A.    55653; is that correct?
25        Q.    It's the very first one, yes.

Page 321

1          A.     I only see urine listed.

2          Q.     Right.  I thought you had testified

3    that Exhibit 2 only tested for blood, or did I

4    get them backwards?

5               MS. HERMIZ:  It's a different case

6    number.

7          A.     It's a different case number.

8          Q.     No.  I understand.  But there was --

9    there's testing on Exhibit 2 for both blood and

10   urine, right?

11              MS. HERMIZ:  Are you talking

12   generally in --

13              MR. CHEFFO:  Yes.

14         A.     I only see one or the other listed

15   for each individual case.

16         Q.     No.  I understand.  But in Exhibit 2

17   there is testing for carfentanil and it's either

18   blood or urine, but some of them have urine

19   results, some of them have blood results, right?

20              MS. HERMIZ:  Objection to form.

21         A.     I don't -- I can't tell by looking

22   at this sheet which individuals had urine tested

23   for carfentanil, which -- and which individuals

24   had urine and blood tested for carfentanil, but

25   what I can tell from this query is what's --

Page 322

1   what was actually queried, and in case number
2   55653 the query was for urine.
3          Q.    Am I correct that what you -- your
4   counsel asked you some questions basically to
5   show that one chart had urine testing for some
6   of the decedents and the other had blood
7   testing?
8               MS. HERMIZ:  For the one case.
9          A.    No.  That's not what -- I mean,
10  these are two different queries.
11         Q.    I understand.
12         A.    So I don't know what the actual
13  toxicology reports are for each of these
14  individuals.  But, for example, on Exhibit 2,
15  the very first case, 55236, urine was
16  probably -- had to have been tested.  It's just
17  urine wasn't part of the query so you don't
18  have -- it's not reported in this query.  It's
19  reporting the blood results in this query.
20         Q.    Right.  So if we wanted to actually
21  find full, accurate information about these
22  cases, we would actually need the database
23  information that had both blood and urine,
24  right?
25              MS. HERMIZ:  Objection.

Page 323

1          A.     You would have to include it in your

2     query.

3          Q.     Right.  You would have to run a

4     query to actually give us the information so

5     that we could see what the blood testing was and

6     what the urine testing was, right, because in

7     Exhibit 2 and Exhibit 3 some of them show urine,

8     some of them show blood, right?

9          A.     For example, all of those presumed

10     discrepancies that you were concerned about

11     earlier were not discrepancies in results,

12     discrepancies in specimens.  One was reporting

13     urine and one was reporting blood.  Once again,

14     that's apples and oranges.  They can be the same

15     but they might be different.

16          Q.     Can you run a query to actually

17     provide all of that information, blood and

18     urine, at the same time?

19          A.     I don't run the queries so you would

20     have to ask the people that run the queries to

21     set the parameters.

22          Q.     When you get information,

23     toxicological information, do you get it

24     typically, blood and urine, at the same time and

25     look at it and then make your findings?

Page 324

1          A.    I don't make final certifications

2     based upon a database query.  I have the actual

3     report in hand.

4          Q.    What report?

5          A.    The toxicology report.

6          Q.    So there's a toxicology report?

7          A.    Yes.

8          Q.    And is that for blood and for urine?

9               MS. HERMIZ:  Objection to form.

10              Counsel, I think you're already at

11    two minutes for --

12              MR. CHEFFO:  I'm following up just

13    on this question.

14         A.    You can talk to the toxicologist

15    about how he proceeds with toxicologic analysis,

16    but in general, the -- you know, during the

17    course of the autopsy I will collect specimens

18    that can be tested toxicologically.  Routine

19    specimens that are collected are urine and

20    blood.

21              Urine is a fluid that, you know, we

22    can hold in our body and it can be concentrated,

23    so it doesn't necessarily reflect serum

24    concentrations or blood concentrations, but on

25    the other hand, it might show substances that

Page 325

1    might not appear in the blood because the levels

2    are too low to be reported.  So the screen will

3    often start -- if there is urine to collect,

4    assuming there is -- the individual didn't

5    urinate prior to their death, there is urine to

6    collect, the drug screen will start with a urine

7    screen that's qualitative and then proceed with

8    a blood or serum screen that's quantitative.

9         Q.    When you get -- when you get that

10   information, is it in a document, either two

11   separate screens or unified in some way?

12        A.    It's in the autopsy report as if you

13   requested an -- you know, an autopsy report

14   through public record, you would get the autopsy

15   report, and the last page is the toxicology.

16        Q.    So before you do your final autopsy

17   report, are you presented with a screen of data

18   from a blood tox report and a urine tox report?

19        A.    It's all on the same report.  Before

20   I do a final certification of an individual who

21   I suspect is dying of a drug overdose, I will

22   make -- you know, have the final toxicology

23   report obviously.

24        Q.    And then the last two questions.

25             And all that information you believe

Page 326

1  is entered into the database and it can be

2  queried as either blood or urine or perhaps

3  both?

4          MS. HERMIZ:  Objection to form.

5      A.   Yeah.  I can't testify as to

6  limitations or what can or cannot be queried

7  for -- within the database, but I just note --

8  these two queries are different and that's

9  why -- there isn't necessarily any discrepancy.

10  It's just that they're different queries.

11  You're looking at -- some of the results are for

12  blood in specific decedents and some are for

13  urine.

14     Q.   But they're incomplete, either one

15  of them; they may not be different in what

16  you're saying, but if you looked at Exhibit 2,

17  you wouldn't know the results of Exhibit 3

18  without having Exhibit 3, right?

19          MS. HERMIZ:  Objection to form.

20     A.   I'm not sure what you're asking.

21     Q.   There is certain information there

22  about urine in Exhibit 3 that's not included in

23  Exhibit 2, right?  That's what caused us to ask

24  you questions about the potential discrepancy.

25          MS. HERMIZ:  Objection to form.

Page 327

1          A.    Both reports are just reporting one

2    specimen, not both, and in some instances one

3    specimen is reported in one of the queries

4    that's not reported, you know, in the other; in

5    some it's the same specimen.

6          Q.    Is there different information about

7    the specimens in Exhibit 2 and Exhibit 3?

8               MS. HERMIZ:  Objection to form.

9               I think we're over two questions at

10   this point.

11         A.    It's not different information.

12   They're just different specimens.  I mean, you

13   get different results for -- the results that

14   are reported are based upon the specimen that

15   was queried for.

16         Q.    It's not the same in Exhibit 2 and

17   3, you would agree with me?

18               MS. HERMIZ:  Objection to form.

19         A.    Well, sometimes it's the same.

20   Sometimes a specimen that's within the query is

21   different.

22         Q.    Sometimes it's different, sometimes

23   it's the same, right?

24         A.    It's your -- it's the query.  It's

25   the query that's different.

Page 328

1          Q.    Is the information completely the
2    same or is it sometimes the same, sometimes
3    different?
4               MS. HERMIZ:  Objection.
5               This is -- that's the last question.
6    You can answer, Doctor, and then we're done.
7               MR. CHEFFO:  These are very simple
8    questions.
9               MS. HERMIZ:  You're already over.
10              MR. CHEFFO:  Because I'm not getting
11    an answer.
12              MS. HERMIZ:  That's not true.
13         A.    They're different queries.  The
14    information is according to the query.
15         Q.    Is the information the same or
16    different?
17              MS. HERMIZ:  We're done.  You don't
18    need to answer that question.  The deposition is
19    over.
20              THE VIDEOGRAPHER:  Off the record at
21    6:02.
22              MR. CHEFFO:  So we're just going to
23    put on the record that we're reserving our right
24    to keep this deposition open.  In my view it's
25    not closed for two or three reasons.

Page 329

1           The first is the record will show
2    very, very clearly that I believe the witness
3    deliberately delayed on answering questions,
4    sometimes took incredibly long, intentional
5    pauses in order to not answer the question in a
6    timely way.
7           I think the record will also be
8    crystal clear that while I would fully admit
9    that, probably me asking most of them, there
10   were clearly going to be unintelligible and
11   questions that were not clear, I think when the
12   record is read, there were an inordinate number
13   of questions that any person would understand
14   and have answered squarely and candidly and in a
15   timely manner, and as a result, that ate into
16   our legitimate time to take the deposition.  So
17   we're going to go back and look at it, and to
18   the extent that we think we need more time, we
19   will request it.  I know counsel will probably
20   want to put something -- I suspect that counsel
21   will not agree with that characterization, but I
22   also wanted to just make sure that our point on
23   the record was clear.
24           MS. HERMIZ:  And you're correct, we
25   don't agree with the characterization of the

                                        Page 330

 1    witness' testimony.  I think Dr. Sterbenz

 2    answered all the questions to the best of his

 3    ability.  He was very precise in answering his

 4    questions.  And, you know, you were -- you

 5    decided which questions you were going to ask

 6    him and how long you wanted to go in a certain

 7    direction, and that was your decision, and he

 8    answered the questions to the best of his

 9    ability and he didn't do anything to obstruct

10    the deposition, so we disagree in that respect.

11              MS. KEARSE:  And, Mark, I'll just

12    add, you actually did pass the witness and you

13    had other people ask questions and you came back

14    and we let you actually come back and ask

15    questions again after you had passed the

16    witness.  So we gave you that courtesy to do

17    that and I don't think that's another reason to

18    keep it open.

19              You also started the deposition

20    talking about all his work in New York City, so,

21    you know, we're here talking about the Akron

22    cases.

23              MR. CHEFFO:  I'm not going to argue

24    with you.  I don't think there's any prohibition

25    about asking questions that are follow-up within

1   the time period, so, you know, I'm not aware of

2   that rule, and I think to the extent that we're

3   asking about general questions, again, I'm not

4   sure that questions about New York are per se

5   off limits.

6           MS. KEARSE:  No.  I'm just saying

7   you spent a lot of time on that.  We can agree

8   to disagree.

9           MR. CHEFFO:  Fair enough.

10

11          (Deposition concluded at 7:05 p.m.)

12                  - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 332

1  Whereupon, counsel was requested to give instruction

2  regarding the witness' review of the transcript

3  pursuant to the Civil Rules.

4

5                    SIGNATURE:

6  Transcript review was requested pursuant to the

7  applicable Rules of Civil Procedure.

8

9                  TRANSCRIPT DELIVERY:

10 Counsel was requested to give instruction regarding

11 delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 333

1              REPORTER'S CERTIFICATE

2     The State of Ohio,    )

3                           ) SS:

4     County of Cuyahoga.   )

5

6            I, Renee L. Pellegrino, a Notary Public

7     within and for the State of Ohio, duly commissioned

8     and qualified, do hereby certify that the within

9     named witness, GEORGE STERBENZ, M.D., was by me

10    first duly sworn to testify the truth, the whole

11    truth and nothing but the truth in the cause

12    aforesaid; that the testimony then given by the

13    above referenced witness was by me reduced to

14    stenotypy in the presence of said witness;

15    afterwards transcribed, and that the foregoing is a

16    true and correct transcription of the testimony so

17    given by the above referenced witness.

18           I do further certify that this deposition

19    was taken at the time and place in the foregoing

20    caption specified and was completed without

21    adjournment.

22

23

24

25

Page 334

1          I do further certify that I am not a

2    relative, counsel or attorney for either party, or

3    otherwise interested in the event of this action.

4          IN WITNESS WHEREOF, I have hereunto set my

5    hand and affixed my seal of office at Cleveland,

6    Ohio, on this 22nd day of October, 2018.

7

8

9

10

11

12    Renee L. Pellegrino, Notary Public

13    within and for the State of Ohio

14

15    My commission expires October 12, 2020.

16

17

18

19

20

21

22

23

24

25

```
                                                         Page 335
 1                        Veritext Legal Solutions
                            1100 Superior Ave
 2                             Suite 1820
                          Cleveland, Ohio 44114
 3                        Phone: 216-523-1313
 4
      October 22, 2018
 5
      To: Motley Rice
 6
      Case Name: In Re: National Prescription Opiate Litigation v.
 7
      Veritext Reference Number: 3058685
 8
      Witness:  George Sterbenz, M.D.      Deposition Date:  10/17/2018
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

```
1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2

   ASSIGNMENT REFERENCE NO: 3058685
3  CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 10/17/2018
4  WITNESS' NAME: George Sterbenz, M.D.
5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have made no changes to the testimony
   as transcribed by the court reporter.
8

   _____        _____
9  Date                    George Sterbenz, M.D.
10       Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12

        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15

        I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 3058685
 3    CASE NAME: In Re: National Prescription Opiate Litigation v.
      DATE OF DEPOSITION: 10/17/2018
 4    WITNESS' NAME: George Sterbenz, M.D.
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9         I request that these changes be entered
      as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____          _____
      Date                     George Sterbenz, M.D.
14
           Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22    this _____ day of_____, 20____.
23              _____
                Notary Public
24
                _____
25              Commission Expiration Date
```

Page 338

1                        ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                  ASSIGNMENT NO: 10/17/2018
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19
       _____        _____
20     Date                    George Sterbenz, M.D.
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                     _____
                       Notary Public
24
                       _____
25                     Commission Expiration Date

**[& - 2]**                                                          Page 1

| & | |
|---|---|
| **&** | 2:15,20 3:12,17 4:3,8,11,17 15:20 15:23 16:20,24 17:1 |

| 0 | |
|---|---|
| **000022367** | 7:13 174:2 |
| **000028995** | 7:24 246:16 |
| **000068523** | 7:8 47:13 |
| **000092858** | 8:3 250:3,12 |
| **000098977** | 8:6 257:12,18 |
| **000117010** | 7:18 216:25 |
| **000117014** | 7:16 201:1 |
| **000118414** | 7:11 135:4 |
| **000201288** | 7:20 238:15,22 |
| **01/01/2016** | 7:7 47:11 |
| **02199-3600** | 2:17 |

| 1 | |
|---|---|
| **1** | 7:5 28:9,15 202:5,7 319:9 |
| **1-1-2016** | 177:10 |
| **1-23-2016** | 86:12 |
| **1-31-2017** | 135:10 |
| **10** | 8:3 74:8 250:1 250:7 |
| **10/17/2018** | 335:8 336:3 337:3 338:2 |
| **10036-6797** | 3:5 |
| **101** | 10:5 |

| | |
|---|---|
| **103** | 10:5 |
| **104** | 10:6,6 |
| **106** | 10:7 |
| **107** | 10:7 |
| **108** | 10:8 |
| **1095** | 3:5 |
| **10:58** | 94:8 |
| **11** | 8:4 22:19 257:8 257:17 259:21 |
| **11.8** | 73:22 74:24 |
| **1100** | 4:14 335:1 |
| **114** | 10:8 |
| **115** | 10:9 |
| **119** | 10:9 |
| **11:16** | 94:11 |
| **12** | 7:15 79:11 200:25 334:15 |
| **12/31/2016** | 7:8 47:12 |
| **120** | 10:10 |
| **121** | 10:10 |
| **125** | 10:11,11 |
| **126** | 10:12,12 |
| **127** | 10:13 |
| **128** | 10:13 |
| **129** | 10:14 |
| **12:30** | 144:4 |
| **12th** | 247:16 |
| **131** | 10:14 |
| **135** | 7:10 |
| **137** | 10:15,15 |
| **138** | 10:16,16 |
| **139** | 10:17 |
| **14** | 7:19 135:17 238:13 |
| **14.2.** | 73:23 |
| **140** | 10:17,18,18,19 |
| **141** | 10:19,20,20 |
| **142** | 10:21,21 |
| **143** | 10:22,22 86:24 |

| | |
|---|---|
| **145** | 6:15 |
| **146** | 10:23,23 |
| **152** | 10:24 |
| **15219-6401** | 4:5 |
| **153** | 10:24,25 11:3 |
| **154** | 11:3,4,4 |
| **155** | 11:5 |
| **156** | 11:5,6 |
| **157** | 11:6,7 |
| **158** | 11:7 |
| **1600** | 5:4 |
| **161** | 11:8,8 |
| **162** | 11:9 |
| **164** | 11:9 |
| **165** | 11:10 |
| **169** | 11:10 |
| **17** | 1:7,16 6:8 15:6 176:18,21 |
| **170** | 11:11 |
| **173** | 11:11 |
| **174** | 7:12 11:12 |
| **177** | 11:12 |
| **178** | 11:13 133:7 |
| **179** | 11:13 |
| **17th** | 15:2 |
| **18** | 19:5,11 26:23 36:23 41:17 80:24 176:16,21 178:9 178:13 181:13 184:16 185:5 186:15 189:23 294:17 |
| **180** | 11:14,14 |
| **1800** | 4:18 |
| **181** | 11:15 |
| **182** | 11:15,16,16 |
| **1820** | 335:2 |
| **183** | 11:17,17,18,18 |
| **184** | 11:19,19 |
| **185** | 11:20,20 |

| | |
|---|---|
| **186** | 11:21,21 |
| **187** | 11:22 |
| **188** | 11:22,23 |
| **189** | 11:23,24,24 |
| **19** | 33:2 |
| **190** | 12:3,3 |
| **191** | 12:4,4 |
| **192** | 12:5,5,6,6 |
| **194** | 12:7 |
| **195** | 12:7,8,8 |
| **197** | 12:9 |
| **198** | 12:9,10 |
| **1985** | 33:2,2 |
| **199** | 12:10 |
| **1990** | 33:3 |
| **1990s** | 38:22 |
| **1993** | 29:3 |
| **1994** | 29:3,5 |
| **1997** | 29:6,8 |
| **1998** | 29:8 |
| **1:18** | 1:11 |
| **1:22** | 145:2 |
| **1st** | 48:19 53:6 |

| 2 | |
|---|---|
| **2** | 6:3 7:6 47:8,18 47:21 53:3 64:15 74:4 95:17 97:7 135:24,24 136:5,8 136:17 145:8 146:2,8,25 147:1 147:15,19,25 148:17 149:19 150:14 177:2 179:10 182:17 183:10,11 189:25 202:5 206:16 227:9 247:16 261:10 270:23 271:5 272:13,22 272:25 273:8 279:5,7 282:3,6 |

283:1 292:2 299:5
319:4,14,23 320:2
320:18,23 321:3,9
321:16 322:14
323:7 326:16,23
327:7,16
**2-19-2016** 87:18
**20** 178:13,17
180:20 184:3
185:14 187:19
189:20 271:11
294:21,23,24
320:18 336:16
337:22 338:22
**200** 12:11
**20001-4956** 3:19
**20005** 4:9
**2000s** 38:22
**201** 5:8 7:14
**2011** 250:8 251:12
252:15
**2012** 46:19
**2014** 228:16
**2015** 8:5 66:1
257:10,21,24
**2016** 7:12 48:19,20
53:7,7 66:4 67:1
96:21 141:23
142:1 173:25
174:13 175:15,25
177:2 181:7
182:13 183:16
186:15 187:9,14
187:20 188:9,12
188:23 189:15,23
194:20,21,23
228:13 248:15
273:12,15 292:8
309:15
**2017** 7:11,15,20
135:2,21 195:1,5

**200:25 217:13**
238:13
**2018** 1:16 15:2
48:2 108:2,3,4
135:25 136:13
195:1,9 334:6
335:4
**2019** 194:25
**202** 3:19 4:10
**2020** 334:15
**207** 12:11,12
**21** 178:25 179:9
180:14 181:25
184:3 185:14
189:20
**211** 12:12,13
**212** 3:6 12:13
**213** 2:23
**214** 12:14
**215** 12:14
**216** 4:15 12:15,15
**216-523-1313**
335:3
**216-9343** 2:6
**217** 7:17
**22** 335:4
**220** 12:16,16
**221** 12:17,17
**222** 12:18
**2227** 334:11
**223** 12:18,19
**224** 12:19,20
**225** 6:9
**229** 6:10
**22nd** 334:6
**23** 111:10
**232** 12:20,21
**233** 12:21
**235** 12:22
**238** 7:19

**239** 12:22
**24** 136:8,17 319:15
**240** 7:21
**241** 12:23
**242** 12:23,24,24
**243** 13:3
**243-4000** 2:23
**244** 13:3
**245** 13:4
**246** 7:23
**25** 145:12
**250** 8:3
**252** 13:4
**252-9060** 5:9
**25322** 5:4
**254** 13:5,5
**255** 13:6
**257** 8:4
**26** 132:22 145:8,12
145:13
**262** 13:6
**264** 13:7,7
**265** 13:8,8
**266** 13:9
**268** 13:9
**269** 13:10
**270** 13:10
**271** 13:11
**274** 13:11,12
**275** 13:12
**276** 13:13
**279** 13:13
**28** 2:5 7:5
**2804** 1:6,7 15:6
**282** 13:14
**286** 13:14
**287** 6:11
**289** 13:15
**28995** 246:21
**29** 9:3

**290** 13:15
**291** 13:16,16
**293** 13:17
**294** 13:17
**29464** 2:5
**298** 13:18
**2:02** 173:19
**2:04** 173:22
**2:30** 193:10
**2:50** 193:13

**3**

**3** 7:10 134:23,25
136:24 146:25
147:2,5,13,20,23
149:22 188:2,4
206:17 227:9
319:4,9,23 320:1
323:7 326:17,18
326:22 327:7,17
**30** 9:3 88:13
161:24 162:2
180:20 291:3,20
**300** 3:23 13:18,19
**301** 4:5
**302** 13:19
**304** 5:5
**305** 13:20
**305-6400** 3:14
**3058685** 335:7
336:2 337:2
**306** 13:20
**31** 7:10 9:4,4
135:2
**312** 3:10,24
**313** 240:15
**313's** 240:21
**313.212** 7:22 240:6
240:24 244:10
**313.212.** 240:18
**318** 6:12

**[319 - 862-2000]**                                                          Page 3

**319**  13:21
**31st**  48:20 53:7
  135:21
**32**  9:5,5
**320**  6:13 13:21
**321**  13:22
**323**  13:22
**324**  13:23
**325**  2:10
**326**  13:23,24
**327**  13:24 14:3,3
**328**  14:4
**33**  277:8
**330**  3:14 5:9
**333**  6:17
**33f**  201:19 274:5
  274:15 277:11,12
**34**  9:6
**340**  53:6,10 55:10
  55:15 96:20 97:6
**340-1172**  5:5
**3400**  3:9
**35**  3:8
**35th**  4:4
**37**  9:6
**38**  9:7
**39**  9:7,8 188:22
  189:6,19
**3:37**  225:9
**3:53**  225:12
**3rd**  48:2 135:25
  136:13

**4**

**4**  7:12 158:10
  173:24 174:5
  183:13 262:3,6
  273:10 287:13
**40**  72:25 180:20
**400**  3:13
**41**  9:8

**412**  4:6
**43**  9:9,9
**43215-5017**  2:11
**434-5421**  4:10
**44**  137:7
**44113-7213**  4:14
**44114**  335:2
**44308**  5:8
**44720**  3:14
**44th**  2:21
**45090**  1:11
**46**  48:11 111:10
  132:22 136:17
  320:19
**469-3939**  2:12
**47**  7:6
**471-3490**  4:6
**49**  9:10
**4:46**  257:3
**4:48**  257:6

**5**

**5**  7:14 8:5 158:11
  200:22 235:23
  257:10 287:14
  312:24 313:1,2,9
**50**  5:7 46:3 188:18
  189:8 203:18
**51**  203:13,17
  206:25 207:5,7
  209:22,25 210:5,7
  210:10
**52**  9:10
**53**  9:11 146:25
**54**  86:23
**55**  9:11
**55235**  72:23 76:8
  77:2 283:14
  285:24 286:7
**55236**  177:11
  179:21 282:10,14
  282:14 322:15

**55240**  177:16
  179:23
**55244**  177:21
  179:23
**55247**  177:24
  179:23
**55257**  178:2
  179:23
**55260**  85:13,18
  86:4,24 87:5,6,12
**55281**  86:11 87:4
  87:14
**55336**  87:17 92:9
  93:5
**55370**  299:21
**55653**  320:19,24
  322:2
**55702**  111:22
  112:2
**55715**  148:20
**55719**  136:9,17,25
  137:12
**55724**  138:9 319:9
  319:16 320:3
**55725**  138:10
**55741**  138:10
**55751**  132:23,25
  145:9,16,19 146:1
  146:18 147:25
**56**  9:12,12
**57**  1:21 9:13
**58**  9:13,14
**59**  9:14
**592-5000**  4:15
**5:09**  272:7

**6**

**6**  7:17 216:23
**60**  9:15
**600**  2:11 4:18
**60601-1608**  3:9

**60654**  3:23
**614**  2:12
**617**  2:17
**63**  9:15
**646-5800**  3:10
**66**  9:16,16
**662-2000**  3:19
**67**  9:17
**68**  9:17
**698-3500**  3:6
**6:02**  328:21
**6:36**  318:15
**6:50**  318:18

**7**

**7**  6:4 7:19 238:11
  238:20
**7-27-2016**  111:25
**714**  4:19
**725**  4:9
**75**  207:16 303:24
**755**  87:21 88:11
  92:16
**77**  9:18
**777**  2:22
**79**  9:18
**7:05**  331:11

**8**

**8**  7:21 76:3 240:4
**8-1-2016**  135:10
**8-13-2016**  132:25
**80**  303:23
**800**  2:16
**8040**  3:13
**83**  9:19
**830-0600**  4:19
**843**  2:6
**850**  3:18
**860**  250:12
**862-2000**  3:24

| | | | |
|---|---|---|---|
| **87** 9:19 | 273:20 298:9 | 278:11,13,13,14 | 300:20 315:13 |
| **88** 9:20 | 303:9 306:1 | 279:19,22 280:8 | **abuses** 266:5 |
| **89** 9:20,21 | **absence** 72:4 78:8 | 280:10,22 283:5 | **abusing** 103:14 |
| **9** | 89:14 91:12 | 283:12,16,17 | 105:5,22 106:1,4 |
| | 261:23 | 284:1,14,24 285:3 | 106:17 114:2 |
| **9** 6:5 7:23 246:14 | **absent** 200:10 | 285:14,15 286:13 | 115:1 134:21 |
| **90** 9:21 207:15 | **absolute** 77:22 | 286:24 287:3,8 | 149:24 162:18 |
| **90017-5844** 2:22 | 78:17 89:8,9 | 289:2,2,25 292:6 | 163:8 205:22 |
| **92** 9:22 | 208:7,8 | 293:6,7,23,24 | 296:19 312:8 |
| **92626-7653** 4:19 | **absolutely** 125:24 | 294:11 295:7,8,11 | **abusively** 76:20 |
| **93** 9:22,23 | 127:5 129:2,4 | 296:17,17,19,20 | 88:22 266:3 280:1 |
| **94** 9:23 | 209:9 213:8 | 296:22,23 297:2,6 | **academy** 237:10 |
| **95** 9:24 | 235:13 253:21 | 297:18 299:7,8 | **acc** 201:18 |
| **950** 4:13 | **abuse** 30:22 32:13 | 302:21 303:15 | **accepted** 46:21 |
| **951-7000** 2:17 | 32:16,22 33:9,19 | 304:16,20,23 | **access** 70:20,22 |
| **97** 9:24 10:3 | 34:6,12 35:5 61:5 | 305:5,8,11,16,20 | 71:1,5 99:23 |
| **98** 10:3,4 | 62:1 66:19 75:19 | 306:9,22 307:3,4,4 | 101:9 |
| **981** 257:18 | 75:19,20,25 76:11 | 309:16 310:4 | **accessible** 181:17 |
| **99** 10:4 203:5 | 76:25 77:1 81:14 | 311:15 313:16 | **accident** 54:1,9,22 |
| **9:05** 1:16 15:3 | 83:2 106:7,21,24 | 314:3 315:2,8 | 64:18 83:5,9 88:1 |
| **a** | 107:22 132:8 | 316:10,15,19 | 89:1,19 90:1,22 |
| | 156:25 157:1,1,9 | 317:3 | 112:15 117:16 |
| **a.l.** 5:3 | 158:2,17 159:10 | **abused** 34:21 | **accidental** 90:11 |
| **a.m.** 1:16 15:3 | 159:11,12,12 | 35:15 66:6 67:7 | 91:4,8 113:18 |
| **aafs** 236:23 237:10 | 160:12,13 161:3 | 67:17,18 90:15 | 280:5 |
| 237:17 | 162:19,22,23,23 | 224:1 270:11 | **accuracy** 175:21 |
| **aamf** 237:9 | 162:24,25 163:6,7 | 280:17 299:24 | 175:24 183:9 |
| **aaron** 1:8 | 163:10,15 164:1 | **abuser** 90:18 | 191:15,18 |
| **abbreviated** | 164:10 165:11,11 | 159:6,21 160:23 | **accurate** 28:17 |
| 201:18 202:10 | 165:12,13,19,24 | 163:21,25 164:6,8 | 141:10,19 179:9 |
| **abdomen** 212:25 | 166:7,17,19,20 | 164:12,18,22 | 182:24 183:2,6 |
| **abilities** 100:2 | 167:2,16,18 168:9 | 165:3,8,10 166:9 | 184:4,18 185:5,17 |
| **ability** 99:13 | 169:5,9,16,18 | 168:19 169:11 | 191:11 192:7,16 |
| 256:17 265:15 | 170:25 171:1 | 280:16,18 288:21 | 215:13,24 216:1 |
| 330:3,9 | 222:9,25 223:13 | 296:23 310:19 | 216:11,15 242:21 |
| **able** 17:25 36:24 | 223:20 224:23 | 311:23 312:3,4,16 | 272:25 273:2 |
| 43:6 48:10 101:9 | 253:8 263:20 | 313:20 314:14 | 320:10,12 322:21 |
| 114:13 153:3,5,10 | 273:6 274:14,16 | 315:18 316:23,24 | **accurately** 227:7 |
| 167:13 168:3,5,13 | 274:22 275:10,14 | **abusers** 90:10 | 251:7 255:9 |
| 183:12,23 204:18 | 276:17,18 277:21 | 91:7 161:4 279:22 | 260:18 262:5 |
| 205:19 229:1 | 277:21,22 278:9 | 280:21 289:3 | |
| 247:19 256:15,15 | | | |

**achieve** 105:2
**acknowledge**
  336:11 337:16
**act** 89:4 92:6 93:6
  336:14 337:20
**action** 334:3
**active** 32:8 71:5
  77:10 78:4 106:7
  106:20,23 128:16
  132:7 157:1
  159:11 161:3,5
  166:19 197:22
  219:3 233:7
  236:22 237:16
  274:16 283:12
  284:14 285:3,15
  289:2 293:7
  294:10 296:15,17
  307:3 315:13
**actively** 35:20
  102:12 103:14
  105:5,6,22 106:1,4
  106:17 119:11
  125:14 132:9
  134:21 149:24
  205:22 237:14
**activity** 244:6
**actual** 139:17
  204:6 292:15
  322:12 324:2
**acute** 86:18 87:23
  90:12 156:25
  159:10,11,12
  162:23,23 163:2,4
  163:5,6,14,15,21
  163:24 164:1,5,8,9
  164:9,15,17,22
  165:11,12,13,17
  165:18,24 166:4,5
  166:6,7,18,20
  167:21 168:12

170:24 177:24
196:2 204:10
273:6 274:15
277:21 279:13
280:9,11,21 281:1
281:8,10,10,14
283:12 284:13
293:6,23 295:11
299:7 302:21
303:16
**adams** 4:13 15:24
  15:24
**add** 89:12 251:1
  330:12
**addict** 285:12
  296:7,13 316:23
  318:5
**addicted** 160:5,6
  168:19 169:12,23
  169:25 170:4,9,13
  171:2,17 172:2
  264:23,24 265:13
  266:14 267:17
  268:6 269:13
  270:8,19,25
  271:16 272:22
  273:4,22 274:10
  274:18 276:5
  278:16 279:8
  282:12,17,23
  283:15 284:8,18
  284:21 285:22,25
  286:7 287:13
  288:1 290:6 291:8
  291:10,19,22
  292:12,16,25
  294:4,17 296:5
  298:20 303:6
  304:13,18,24
  305:10,16 307:9
  309:17 312:1,17

313:23 314:7,18
314:18 315:3,6,19
316:12 317:16,20
317:25
**addiction** 32:13,16
  32:22 33:8,20
  34:5,11 35:5
  118:4,9,14,16,18
  118:23 119:1,4,9
  119:12,16,25
  120:4,11 130:23
  156:20,21,24
  157:4,10,16 158:3
  158:19,20 160:9
  161:9 165:6
  168:25 169:2,22
  171:3,4,6 172:4
  264:15 265:6,15
  266:2,6,19 270:5
  274:23 275:5
  282:6 284:21
  285:4,9,10 286:15
  287:4,7,16 289:4,7
  289:10,12,17
  290:2,10,13,13,23
  291:2 292:4,21
  293:9,10,12,24
  294:12 295:9,15
  296:9,21,22 297:1
  297:8,12,15,18,21
  298:7,17 299:9,20
  299:23 300:21
  301:1 305:9,22
  306:11,17,24
  307:4,5,10,12,19
  308:4,9,14,16
  310:6 311:7,11,15
  311:17 312:4,15
  312:15,20,22
  313:5,17 314:4
  315:16 317:4,6,7

317:11
**addictions** 264:19
**addictive** 34:20
  35:14
**addicts** 118:20
  119:2 279:17
  295:22
**additional** 95:21
  95:25 99:17
  130:22,25 131:14
  131:15 149:16
  212:7,8 254:5,9,19
  254:21 264:1
  267:18,21 274:2
**address** 98:19
  100:14 101:4
  137:7 221:6,10,17
  335:15
**addressed** 256:12
**addressing** 40:22
  99:14 101:6
  215:10
**adequacy** 40:24
**adequate** 153:24
  213:6 254:12,15
  254:17
**adequately** 155:6
**adjournment**
  333:21
**adjust** 80:2
**adm** 236:9,12
**administer** 255:3
**administrative**
  23:18 233:2,6
**administrator**
  233:3
**admission** 204:12
  204:16 205:16,17
  205:17
**admit** 329:8

advance 235:6
advanced 265:10
advertised 223:5
223:19
advertising 44:25
221:21 223:1,5,13
advisable 267:9
advocate 198:18
aemch 5:5
affixed 334:5
336:15 337:21
afield 164:25
266:16
aforesaid 333:12
afternoon 6:15
17:21 145:4 319:1
age 17:7 60:7
agencies 98:8
175:2 197:22
221:14,15,16
241:17 242:3,4
255:7
agency 84:19 85:2
85:4
agent 116:23
222:20
aggregate 96:8
aggregated 185:22
215:21 216:1,13
216:16
aggregation
216:17
ago 19:11 26:23
49:20,21 133:25
161:24 162:2
217:13 248:7
319:21
agree 31:4 37:18
38:16 75:7 96:4
180:17 181:5
214:12,19 215:1,3

220:19 222:1,2,5
222:10,12 253:11
264:18 287:4
293:21 320:7
327:17 329:21,25
331:7
agreed 298:16
311:8
agreeing 288:8,17
ahead 102:19
128:21
ailment 253:2
aimed 40:21
akearse 2:6
akron 1:20,22 2:2
5:8 15:13,15,18
18:24 330:21
al 1:9,10 16:7
alazopram 86:15
86:19
alcohol 59:12,13
61:4,22,25 62:1
171:17,18 172:2,3
265:7 266:10
278:13 281:1,4,6
281:12,14 290:10
290:22
alcoholic 280:25
281:7,12 290:8
alcoholics 163:11
alcoholism 172:1
278:12 281:10,11
281:15 296:16
alive 167:1 170:3,8
170:19 288:2
291:10 298:18
301:2 311:8,11
313:5 314:10
315:4,6,9,20
316:13

alleged 319:2
allen 4:4,6 16:19
16:20
allergan 3:21 17:1
allergies 261:12
allows 197:20
247:20 267:8
alongside 25:12
alprazolam 62:22
alter 124:10
127:24 131:16
ambit 172:16
america 30:15
american 26:6
46:20 236:23
237:10
americas 3:5
amerisourceberg...
5:2 16:5,8
amount 62:18
73:5 75:11,16,17
75:18,25 76:11
84:4 86:22 87:4,5
88:4 91:17 92:8
93:2,11,14,23
109:14 115:24
117:12 182:17
206:16 253:14
amphetamine
65:1 149:25,25
150:6
analog 112:24
113:22 201:17
202:25 204:21
205:25 208:11,16
210:17
analogs 108:7
203:24 220:22
analysis 57:13
63:6,17 64:6
71:10 96:5,24

105:16,21 123:24
141:20 149:15,16
150:20 212:8
239:12,20,25
324:15
anatomic 25:25
26:7 27:2,6 44:19
103:17 105:6
157:19,25 167:18
278:7 306:13
anatomical 158:2
anatomy 171:14
172:6
ancillary 212:5
anecdotal 164:21
285:23
anesthetic 116:23
angel 2:21 16:15
angel.nakamura
2:23
angela 219:19
angeles 2:22
angelina 217:17
animal 116:22
anne 2:3 15:14
276:24
annoyed 254:6,8
254:10
annual 7:13
172:21,24 173:2,4
173:6 174:1,14,17
175:5 183:13,16
186:15 189:24
191:14,16 192:6
193:16,24 273:12
273:12,15
anoxic 202:19
answer 18:7,17
29:14 31:6,12
39:5 40:4 41:2
42:6 43:22 58:1,3

84:9 88:8 92:12
92:15 95:4 97:17
98:13 100:14
127:13,17 143:7
150:15 159:14
162:12 170:17
187:25 191:4
236:7,8 245:2
255:11 256:8
259:2,3 265:21
273:18 276:23
285:18 286:9,17
292:22 294:25
301:12 309:19
311:21 313:24
314:23 316:7,21
317:24 328:6,11
328:18 329:5
**answered** 43:15
43:25 60:15 132:2
140:5 187:24
189:21 301:3,5,11
309:3,21,21
314:20 329:14
330:2,8
**answering** 44:9
294:7 301:7 314:8
329:3 330:3
**answers** 300:9
**ante** 40:24 212:22
313:17
**antibiotics** 36:4
**antidepressants**
61:9
**anton** 4:18
**anybody** 49:22
50:10,16,24
193:20 218:13
294:16 316:3
**anymore** 165:2
170:1,4 209:18

301:13 309:20
316:21
**anyone's** 228:13
**anytime** 312:18
**apologize** 111:16
155:13
**aporter.com** 2:23
**apparent** 143:16
209:8
**apparently** 138:11
**appear** 63:1
116:25 117:1
325:1 336:11
337:15
**appearances** 2:1
3:1 4:1 5:1 6:3
**appeared** 114:5
**appearing** 71:14
**appears** 38:6
146:17 257:22
**appended** 337:11
337:18
**apples** 316:24
323:14
**applicable** 332:7
**application** 67:15
222:17,22
**applications**
116:24
**applied** 288:5
**applies** 170:16
**apply** 158:15
159:3 243:20
288:3,12,13
**applying** 244:23
**appointed** 244:16
244:17
**appointment**
23:10
**approach** 256:11
266:19

**appropriate** 63:5
85:1 91:16 100:3
102:9 105:1
124:12,15,16
125:2,16,21,22
126:2,19,22 127:1
127:4,14,19
129:17 130:8
131:2,8,14,22
132:20 195:18
219:7 254:16,17
272:20 273:20
298:5 307:23
**appropriately**
167:25
**appropriateness**
234:23
**approved** 66:13
66:18
**approximately**
15:3 19:5,11,13
25:1 28:2 29:6
49:19 135:25
230:4
**arbitrary** 104:21
**area** 266:17
298:11
**areas** 118:3
**argue** 44:3 90:24
91:10 222:21
280:15 330:23
**argumentative**
190:22
**arms** 278:10
**arnold** 2:20
**arrest** 201:16
202:14
**arteries** 166:13
**aside** 57:8 102:2
181:22 187:7
240:2 249:24

**asked** 22:10 28:22
51:18 52:1 58:17
77:15 92:23 132:2
140:5 147:4,12
151:5 155:12
187:24 189:21
231:2,5 237:18
252:8 256:2,6
285:19 294:14
295:17,23 300:1
301:3 309:20
312:19 319:1,20
322:4
**asking** 17:20 31:3
31:6 34:8 52:13
55:25 58:1,1
61:17 68:13 73:19
79:20,23 80:18
87:8 102:8 115:23
124:25 133:25
139:6 155:7 181:2
185:11 217:23
218:2 231:22
245:8,17 251:5
254:8 271:1,12,13
271:14 273:4
279:2 284:20
288:9 294:8
295:18 304:19
308:23 309:8
312:9 314:22
316:6,24 326:20
329:9 330:25
331:3
**aspect** 199:14
**aspects** 99:11
**assessment** 161:20
278:1 287:22
307:18
**assessments**
287:19 308:3

assign 112:5
assigned 103:7
  241:21 242:8,12
assignment 336:2
  337:2 338:2
assist 72:15
  244:24 317:12
associated 29:22
  42:22 68:4 107:21
  177:4 278:11,13
association 1:20
  236:23 237:2,5
associations 236:5
  236:18,20
assume 18:18
  77:13 79:20 126:1
  131:3 135:19
  172:18 183:4,25
  184:1,6,7 234:5
  236:6 255:11
  273:18 275:24
assumed 19:6
assumes 20:4
  40:18 234:6
assuming 130:12
  325:4
assumption 184:4
ate 329:15
attached 238:22
  258:8 337:7
attaches 257:25
attachment 7:11
  7:20 8:5 135:3
  238:14 250:10
  257:11
attack 54:16,16
  107:15 108:18,19
attempt 70:3
  101:23 162:1
  256:22 258:15

attempts 78:1
attend 45:24
attended 26:18
  33:1
attention 127:10
  128:9 136:24
  140:15
attorney 229:11
  231:18 334:2
attorneys 50:1,2,3
  231:4,24
attributable
  133:10 224:21
attributes 181:7
august 135:13
authorities 245:24
  246:6
authority 126:11
  126:13,16 127:3
  127:20 128:17,19
  129:18,20 130:15
  130:21,21
authorize 337:11
automatic 313:18
  316:17
automatically
  152:4 306:23
  307:7,9 314:18
  316:11
autopsied 212:11
  212:13
autopsies 30:4
  175:7 188:10,12
  188:17 189:9
  213:16,18 219:1
  243:25 244:2
  308:6
autopsy 36:6,15
  41:3 57:9 65:15
  74:16,20 117:4
  156:24 159:8

168:1 213:4,6,7,21
213:22,25 214:1,7
214:11 227:7,20
268:3 275:11
276:1 288:25
292:16,24 296:4
304:9 306:21
307:2 308:19
310:3,22 311:24
317:14,18 318:3
324:17 325:12,13
325:14,16
availability 247:8
available 23:22
  37:10 39:12 68:22
  71:22 74:19 80:23
  81:5 99:22 101:11
  101:13,19 107:6
  109:8 113:24
  116:21 130:20
  191:2 204:17
  208:4 209:17
  211:5 247:9,16
  260:23 272:24
  288:20
ave 335:1
avenue 3:5,13 4:13
avenues 39:12
average 232:7
avoid 266:1
aware 30:20 32:12
  32:21 37:9,13
  50:15 53:2 73:14
  96:8,13,14 102:15
  116:24 119:1,3
  120:15 121:5,15
  146:24 174:14,23
  174:25 187:10
  193:17,22 194:10
  195:11 196:21
  197:22 211:15

220:13,17 222:16
223:6 240:10
331:1
awfully 197:15

**b**

b 3:8 260:9
back 29:24 30:4
  35:3 46:19 53:11
  64:15 67:22 68:3
  68:17,19,22 77:23
  79:10,13,25 80:1,4
  80:6 94:10,13
  95:20 97:20 98:3
  109:3,5 113:19
  134:13 138:6,22
  139:16 140:6
  142:14 143:13
  145:1 147:5,9,16
  153:20 167:5
  170:11 173:21
  190:3,12 193:12
  193:15 204:10
  225:11 230:5,10
  231:11 254:5
  255:18 257:5
  265:19 266:9
  267:10,11 268:16
  272:9,12 278:17
  283:6,8 284:1,10
  291:7 294:6 295:1
  298:4,15 300:7
  301:18 302:18
  318:2,17 329:17
  330:13,14 335:15
background
  242:20 276:10
backlog 248:16
backwards 321:4
bad 45:14 171:9
ball 109:2 166:23

**bar** 1:20 176:22
181:12 182:3,9
**barbara** 27:22
150:11
**bare** 203:11,15
**barr** 7:15 20:23
21:1,18,21,24 22:2
23:9,14 24:16,23
25:11 200:24
206:12 217:14,23
218:2,10
**barr's** 23:10
**based** 28:24 41:21
42:23 60:7 62:13
63:5 66:23 92:24
93:21 95:23
103:21,24 105:7
112:10,11 117:4
117:16 133:15
151:18,19 152:1
171:23 179:10
181:3 184:10
189:7 202:21
209:19 215:15
236:6 252:11
264:13,18 270:24
273:8,23 278:22
279:3 286:1,10,19
288:18,19 302:16
304:5 310:2,19,25
315:8 320:7 324:2
327:14
**basically** 112:14
129:14 135:13
157:11 176:2
291:9 322:4
**basis** 20:16 42:20
67:19 96:6 208:23
209:11 245:9,10
300:25

**batch** 115:1
**bates** 7:8,11,13,16
7:17,20,23 8:3,6
47:12 49:5 111:11
135:3,9 174:1
200:25 216:24
238:14,22 246:15
246:20 250:2,11
257:11
**baumoel** 249:17
**beast** 228:21
**becoming** 248:18
**beer** 61:23
**beginning** 7:8,11
7:13,16,17,20,23
8:3,5 47:12 135:3
174:1 200:25
216:24 238:14
246:15 250:2
251:11 257:11
**behalf** 2:2,8,14,19
3:2,11,16,21 4:2,7
4:11,16 5:2 15:12
15:17,21,23,25
16:3,5,10,12,13,16
16:20,22,24 17:1
**behavior** 90:24
91:1 302:4
**behavioral** 265:23
265:25 266:1
**beings** 289:16
313:4
**belief** 33:16 34:13
34:15,18,22 67:20
244:8
**believe** 34:9 41:5
41:22 52:7,19
55:6 58:23 66:3
66:24 67:21,25
89:24 94:19 99:23
126:18 129:16

152:22 153:19,19
154:6,25 155:4
156:12,18 182:21
189:2 190:20
191:20,24 193:19
194:21 195:13
196:17,18 206:10
218:20 221:5,15
221:19 227:19
239:5 240:19
251:3 254:15,16
254:17,18 258:10
260:5 267:1
269:23 274:24
285:18 286:21
287:7 301:1 303:5
303:11 325:25
329:2
**believed** 35:10
102:9 123:23
124:12 154:14,20
155:5,14,22
**bell** 36:9
**benchmark** 159:5
**beneficial** 195:14
199:12
**benefit** 38:3
211:11 222:14,18
222:21
**benzo** 85:20
**benzodiazepine**
61:7 62:23 91:17
**benzoylecgonine**
85:21,22
**bergin** 2:15
**best** 92:25 330:2,8
**better** 91:3,11,11
187:25 203:2,3,19
263:17
**beyond** 39:11,16
39:21 99:16

161:21 212:5
228:23 303:12
**bias** 104:1,4,13,15
**big** 259:22
**biological** 208:17
209:15 211:4
**bit** 85:13 105:11
105:12 160:3
206:17 281:5
318:23
**bite** 295:24 311:19
311:21
**blatant** 151:25
**blood** 73:6 91:20
115:16,21 117:11
117:22 133:22
147:2,3 149:23
150:4,9,11 202:16
204:4 298:14
320:2,5,8,21 321:3
321:9,18,19,24
322:6,19,23 323:5
323:8,13,17,24
324:8,20,24 325:1
325:8,18 326:2,12
**blue** 299:11
**board** 25:24 26:2
26:7 42:25 43:3
218:4,8,11,18
219:8,12,16 236:9
236:12 241:4,4,5
243:11 244:4,16
246:1,9,10 258:15
259:9
**boarded** 26:4,6
**boards** 39:22
**bockius** 4:17
**body** 41:21 114:4
236:15 324:22
**book** 162:7,8

boroughs 27:14
boss 21:5,6 258:22
boston 2:17
bottle 281:2,13
bottles 78:14
bottom 47:25 48:1
48:22 58:14 60:17
111:23 145:19
246:25 250:9
boulevard 2:5,10
4:18
bound 98:21,24
104:24
box 199:21 201:19
274:5,15 277:8
boylston 2:16
brad 15:22
bradley 4:8
brain 202:16,19
brains 212:24
brandy 2:10 16:2
229:11
branjan 2:13
break 18:6,9 94:6
144:2 193:4,7
225:5 229:16
276:25 318:12
bretton 3:13
brian 247:2,4,5,15
bridgeside 2:5
brief 250:24
bring 259:9
bringing 235:2
280:22 295:12
broad 114:11
200:3 300:19
broadway 1:21
brooklyn 27:14
brought 127:9
128:9 140:15
213:14

bryant 3:4
budget 172:9,12
172:17 239:7
budgetary 211:22
212:4 239:25
build 280:3
bullet 75:5
bunch 48:24
burling 3:17 16:24
business 238:4
busy 235:9

**c**

c 7:5 28:10
ca 335:25
california 2:22
4:19 27:19
call 63:21 120:19
159:17 234:4,5,6
247:18 259:20
called 17:8 45:7,10
calling 85:14
calzola 3:12 15:19
15:20
campbell 3:12
15:20
cancer 265:9,11
candidly 329:14
cannabinoids
225:1,3
canton 3:14
capabilities
228:11,23
capable 152:20
capacity 39:9,25
42:14,18 159:18
capital 243:22
caption 333:20
capture 61:16,23
61:25
car 113:20

cardiac 201:16
202:13
cardinal 4:7 15:23
cardiomyopathy
157:24,25 290:9
293:13 306:13
cardiovascular
166:11
cards 50:6
care 39:11,17,21
40:2,16,25 41:5,14
41:23 42:3,15,20
43:1 80:9 98:9
99:24 143:1 192:7
192:16 276:17
295:4 298:1,4,15
311:16
career 23:6 162:11
267:13
carfentanil 112:21
112:23 113:7,9,12
113:14,18,21
114:2,5,12,14,20
114:22,24 115:3
115:15,20 116:3,8
116:12,14,22
117:8,11,15,21,23
133:9,20 134:4,6
134:15,21 136:19
137:2,15 138:3,12
140:3 142:5,6,13
145:17,21 148:3,9
148:17,25 178:17
179:3 215:5 222:5
222:9,13,17,19
223:6 228:13,16
228:17 229:1
319:10,11,17
320:4 321:17,23
321:24

carolina 2:5
carry 137:12
154:5 155:22
carter 2:9 16:13
16:13
cascading 216:12
case 1:7,11 15:5,6
42:19,19 51:23
68:14,20 76:8
82:7 85:18 86:4
87:12,14 89:22
92:9,12,14 93:4
95:17 96:3,6,6,24
96:24,25 97:9,9,11
97:11 100:2
103:18,25 104:4
104:25 105:11,13
105:17,17 108:22
112:2,9,11 113:20
117:17 120:21
121:16 126:2
130:24 132:24
133:4 134:1,12,12
134:13,14 137:10
137:16 138:6,23
139:3 145:18
146:21,22 151:22
151:23 152:6
177:11 186:12
187:12,15 200:13
202:8 205:1,7
206:5,6,23 208:1
208:12,23,23
209:11,11,22,23
210:3,13,14 211:7
213:9 233:17
234:2,18,22 235:9
235:10,17 236:1
241:21 242:8,20
255:22,23,25
268:7,12,17 269:7

269:8,21 275:20
278:19 282:10,10
282:14 283:6,9,10
283:14 284:2,4,5
285:24 286:6
296:4 319:9,15,16
320:3 321:5,7,15
322:1,8,15 335:6
336:3 337:3
**cases** 19:22 20:3
29:23,25 67:23
68:6 108:4 114:12
132:20 140:7
142:4 186:21
188:6 206:12
208:15,16 210:23
211:12 233:9,21
234:4,6,12,14,14
235:2,4,5,7,11
241:20 242:7,11
243:6 244:13,14
244:15 245:24
247:1,18 248:17
248:17,21 261:6
269:17,24 284:7
284:11 285:21
299:6 300:10
302:19 303:12
319:4 322:22
330:22
**caught** 176:6
**cauley** 2:4
**cause** 32:13,16,22
40:13 43:9 53:16
53:22,23 54:3,12
54:13 56:7 58:25
59:3 64:18 65:4,9
70:2 71:12,20
72:18,20 73:1,9
74:6,7,10,11,13,22
76:4 77:11 79:3

85:23 86:9,20
87:3,11,13,23 88:5
90:20 92:22 93:8
94:21 95:1,5,10
99:9,14,19 101:6
101:20,24 102:14
103:6 108:23
110:20 112:20
113:8,12 114:15
115:20 116:1
117:7 119:6,19,21
122:20,25 123:7
123:20 124:9,11
127:23,24 128:5,7
128:23 129:2,5,9
129:10 131:12,16
132:11 133:8,9
134:4,8,16 136:19
145:16 146:3,21
148:4,9,16 149:14
150:1,19,22
151:15,16 152:5
167:11,19,23
168:14 177:13
178:15,22 179:2
179:14 180:3,13
180:18 181:6,8
182:13 184:21
186:20 187:11,21
189:19 202:3,5,5,7
206:5,18 208:9
210:9 225:16,24
226:5,10,12,15,16
226:17,18,21
227:11,13,24,25
228:3 229:3,4
234:17,20 241:2
242:16 253:23
256:18 261:15
268:22 271:6
319:10,16 333:11

**caused** 75:12
223:8,10 326:23
**causes** 54:15,17,20
182:11 187:14
188:22 189:6
**caveats** 110:1
**cc'd** 249:17
**center** 27:3,6
**centers** 130:23
**centre** 4:4
**certain** 36:3,4
60:10 75:11 90:7
103:10 123:16
160:4,18 196:17
203:13 207:16,17
227:6 249:1
302:11 319:3
326:21 330:6
**certainly** 62:21
80:6 92:5 127:1
222:14 243:24
253:19,21 264:9
291:6 295:4
**certainty** 62:11,13
62:17 77:23 78:17
84:12 89:6,9,11
89:13,16,18 90:5
92:22 94:24 95:3
95:11,13 99:10,21
104:3 105:3
110:15 111:6
114:19 116:7
119:7 123:13
146:5 148:8,15,25
149:3,9,18 150:6
151:19 159:9
168:11 191:19,22
203:5,6,7,9,11,14
203:16,17 206:20
206:24 207:4,5,9
207:10,14,20,25

208:6,8,8,12,14,19
208:21,22 209:6
209:10,15,19,21
209:25 210:4,5,7
211:1,3 226:9
227:13,23 228:6
229:3 235:25
283:4,24 286:11
292:11,11 293:18
302:12,16 309:14
309:17 310:2
313:20,22 314:17
315:21
**certificate** 6:17
148:23 168:11
201:19 202:4
226:1 227:2,18
228:4,19 242:16
275:8,25 278:24
304:11 305:2
333:1 337:11
**certificates** 274:5
274:7 275:5 277:9
288:24 304:3,4
**certification** 83:3
89:8 101:17
104:21 105:1
122:19,20 125:11
125:12 126:5
128:14,15 131:12
149:8 152:2 206:8
206:11 208:7,13
209:5 210:6,25
225:23 234:23
248:12,14,20
256:18 282:1
317:12 325:20
336:1 337:1
**certifications** 89:5
104:22 175:7
191:18,21 244:2

[certifications - circumstantial]                                          Page 12

248:9 249:5 324:1
**certified** 17:10
  74:15 103:12,22
  103:23 108:6
  148:22,23 224:25
  235:11,23 249:2
  282:15
**certify** 92:21
  206:3 225:20
  235:6,25 333:8,18
  334:1
**certifying** 76:9
  168:10,14 209:3
  242:15 248:17
  285:13
**chain** 247:1,11,14
  250:8
**chance** 131:19
  201:6 217:3,7
  225:6 298:21
**change** 39:4 60:7
  94:4 124:9 129:10
  129:16 131:18,25
  138:1 173:15
  208:25 256:24
  335:13,14 337:8
  338:3
**changed** 19:14
  33:16 138:11
  235:13
**changes** 79:9
  166:12 265:14,22
  265:23,25 278:10
  335:12 336:7
  337:7,9
**changing** 236:4
  264:12
**chapter** 240:15
**characteristic**
  290:12

**characteristics**
  160:7,11
**characterization**
  164:12 329:21,25
**characterize**
  264:23
**characterized**
  53:20
**charged** 40:13,15
  99:8 119:23
**charleston** 5:4
**chart** 113:4 180:6
  180:11,23 181:1
  181:24 186:22
  322:5
**charts** 176:22
**check** 50:6 67:22
  68:10 231:11
**checkmark** 301:16
**cheffo** 3:4 6:8,11
  6:13 16:11,11
  17:3,13,18 28:5
  42:8 44:1,3,14
  46:16 94:5,12
  111:13,17 134:22
  141:14 143:5,10
  144:1 145:6 167:7
  173:13,17 192:25
  193:5,8,14 195:6
  200:19 216:20
  225:4 287:1
  294:24 310:10
  318:9,13 319:6
  320:11,16 321:13
  324:12 328:7,10
  328:22 330:23
  331:9
**chemical** 64:6
  150:18
**chemicals** 64:23
  181:9

**chemist** 58:9,10
  64:7
**chest** 212:25
**chicago** 3:9,23
**chief** 19:1,14,19
  21:1,15 27:8,12
  139:19,21,23,24
  234:13 244:19
  258:17
**choice** 22:13 224:7
**choices** 54:21
**choose** 203:16
  270:19 279:18
**chose** 23:20
**chosen** 290:5
**chronic** 37:19 38:4
  38:7,11,19,20,21
  39:4 90:9,18,25
  91:7 156:25 157:1
  157:9,18,21
  159:10,11,12
  162:23,24 163:3,7
  163:10,11 164:12
  164:17,22 165:11
  165:12 166:9,10
  166:19,20 167:18
  168:9 170:24
  171:1 172:1 196:5
  273:6 274:16,16
  274:21 275:23
  277:15,16,20,21
  277:22 279:16,21
  280:8,9,10,16,18
  280:20,22,25
  281:7,8,10,15
  283:12,25,25
  284:13,14,24
  285:2,14 286:13
  286:23 287:3,8
  288:21 289:1,2,3
  289:24 292:5

293:6,7,13,23
  294:10 295:7,11
  296:15,16,17
  299:6,8 302:21
  303:15 304:15,20
  304:22 305:4,8,11
  305:15,20 306:8
  306:22 307:3
  308:2 310:4,19
  311:23 312:3,3,16
  313:16,20 314:1,2
  314:13 315:1,1,7
  315:12,18 316:10
  316:15,18,23,23
  317:2
**chronically**
  296:18 312:17
  313:13
**chronicity** 271:2,8
  274:14 275:10,14
  276:16 283:5
  284:25 285:14
  297:2,4,6 299:19
  301:20
**chuckling** 259:24
**chugs** 281:2,13
**circles** 143:4
**circular** 151:4
**circulated** 251:10
**circulating** 251:20
**circulation** 252:4
**circumstance**
  79:18 252:3
**circumstances**
  60:7 85:3 120:7
  125:25 138:7
  151:17 210:16
  235:20
**circumstantial**
  115:7

**[cirrhosis - comment]**

cirrhosis 290:8
citalopram 178:18
   179:3
citizen 182:5
   185:8
citizens 154:11,22
   184:2
city 2:2 15:13,15
   15:17 27:4,9,12,13
   29:4,5 30:10
   330:20
citycentre 3:18
civil 17:9 121:12
   127:11 128:16
   131:5,7 332:3,7
   336:5 337:5
clarification 170:6
clarified 149:11
clarify 19:9 21:3
   33:2,21 73:21
   80:18 82:15 87:8
   166:3 312:10
clarifying 35:1
class 32:1 33:24
   34:4,20 35:13
   46:3
classes 59:8,15,22
   232:24
classification
   54:19 83:4 89:3
   90:3 108:16
   131:16 157:23
   158:1,6,15 159:3
   162:17 170:24
   203:4 234:24
   274:21,23 277:23
   284:22 289:1
   292:5 296:15,20
   306:8 307:13,21
   307:24 316:15
   317:2

classifications
   158:22 162:10
   307:2 318:7
classified 53:20,24
   54:8,25 83:8
   90:10,21 91:3,12
   117:15 134:4
   163:25 165:18
   166:19 211:7,13
   281:9 296:6
   315:12
classify 162:22
   163:24 164:7,8
   165:10 203:19
   211:1
classifying 108:13
   157:8
clean 28:5 266:8
clear 43:19,20
   128:12 139:4
   318:23 329:8,11
   329:23
clearly 128:12,13
   184:21 186:11
   329:2,10
cleveland 3:13
   4:14 334:5 335:2
clinic 120:11,11
   122:13 123:6
clinical 40:17,17
   42:14,20 67:11,15
   67:24 68:1,4 69:2
   110:14 116:23
   118:11 156:21
   157:9,20,23 158:1
   158:14,22 161:19
   161:19,20 164:21
   168:17,21 169:1,2
   170:2 171:4,11,13
   172:7 198:5,6
   199:11 212:22

213:1,7 222:16,22
   263:16 266:18,19
   266:23 267:2,5,16
   269:19 270:9,16
   271:14,24 272:19
   272:24 273:19
   274:23 275:4
   276:4 277:6,15,16
   277:17,24,25
   278:3 284:22
   285:4,6,10 286:14
   287:8 289:11,12
   290:24 291:2
   292:20 293:8,9,11
   293:11,15 296:25
   297:18,18 298:5
   306:10,10,14
   307:3,18 308:3,8,9
   308:13 310:8
   311:13,14,17
   314:3,10 315:5,14
   317:1,5,7,8,11,23
   318:6,6
clinically 91:16
   266:5 290:24
   296:22 313:23
   315:3 316:12
close 147:19 162:2
   274:22
closed 328:25
cloudy 151:11
clr 1:25
cme 45:25 46:3,4
cocaine 29:11,18
   29:20,22 30:22
   61:6 85:23 86:1
   107:24 108:8
   163:12 166:5,5,9
   166:11,12,15,17
   166:18 178:18
   179:4 220:23

224:4,12,15
   278:13 279:14
code 7:21 240:5,12
   240:18,21 241:14
   244:10
collaborate 233:23
   234:1
collaboration
   235:15
colleagues 17:21
   21:18 65:21 148:7
   186:6 191:1 226:8
collect 69:12 231:2
   231:18,19 324:17
   325:3,6
collected 69:16
   120:13 194:20
   324:19
college 281:1,11
columbus 2:11
columns 149:19
combination
   115:4 165:12
combine 74:21
combined 64:18
   65:4 104:10
   177:14,18,21
   227:1 282:16
come 23:3 95:12
   118:18 119:5
   120:12 147:5
   158:25 167:16,17
   167:17 171:19,21
   182:24 264:23
   280:6 298:1
   319:22 330:14
comes 169:3,7
   199:22 213:9
coming 109:9,10
comment 203:20

commercially
  223:25
commission
  334:15 336:19
  337:25 338:25
commissioned
  333:7
commit  83:6
common  61:5
  108:18
commonly  36:17
  158:4 178:14,21
  179:1,13 180:12
  182:11,12
commons  3:13
communicate
  197:20
communication
  232:8,9
community  34:23
  214:24 219:15
  221:11,18 223:15
  223:22 224:1
  255:7 265:5
companies  2:20
company  3:3 4:2
  45:11 223:20
  224:9
comparatively
  150:3
compare  136:7
  187:4
comparison
  186:24 187:5
  190:1
compelling  213:20
  214:3
compile  176:8
compiled  192:6
complaint  51:23
  51:25,25 52:5,8,9

52:16,19,20,22,24
complete  74:16
  76:18 116:15
  117:3 254:18
completed  25:21
  125:11 126:6
  333:20 335:15
completely  221:20
  328:1
completeness  57:5
  57:7
completing  27:5
  27:10
completion  27:1
compliance
  251:22,25
compliant  253:6
complicated  298:7
  298:18,19
complication
  200:10,11
complications
  171:25
complied  122:2
  153:16
comply  231:8
comprehensive
  70:19 261:3
concentrated
  324:22
concentration
  76:14,15
concentrations
  324:24,24
concept  126:22
  251:6 265:2
conceptualize
  281:5
concern  60:4,21
  68:7 78:5 84:24
  88:8,16,22 92:5,9

92:18 93:3,5
  137:20 154:15
  155:20 209:9
  214:9 249:5
  252:11
concerned  167:22
  297:22 323:10
concerns  139:9
  155:24 156:2
  194:11 253:7
conclude  116:6
  171:23
concluded  331:11
conclusion  319:22
concurrently
  76:22 299:24
conditions  196:5
conduct  41:22
  167:1 200:14,18
conducted  295:21
conducting  41:3
conferred  206:7
conferring  234:21
confidence  89:25
confidential  7:9
  47:14
confirm  76:17
  117:10 124:1
  132:15 202:1
  203:23 205:6
  209:13
confirmation
  123:9,12 132:14
confirmed  115:3
  117:25 208:16
confirming  115:15
conflating  304:22
confusion  318:23
congestive  157:22
  157:25 293:15,19
  306:14

conjunction  84:18
  161:17
connection  49:23
  52:2,24 63:16
  70:20 92:2 125:17
  161:14 162:9
  175:4 183:5 231:4
  231:20 292:24
  293:25
connections
  218:24
connolly  4:8 15:23
consent  213:23
consider  109:22
consideration
  74:13,17 75:6
  212:5 219:21
considered  74:21
  76:22 92:7 93:3,7
  100:23 103:19
  105:14,24 107:1
  151:23 198:22
  214:25 297:7
considering  92:1
  208:3
consistent  110:8
  260:20 278:8
consistently  264:5
constellation
  124:18
constraints  154:12
consultant  27:21
cont'd  3:1 4:1 5:1
  8:1 10:1 11:1 12:1
  13:1 14:1
content  161:12
  191:17
context  201:10
continue  125:16
  153:10

[continued - criteria]                                                                 Page 15

**continued** 29:4
  145:5
**contrast** 135:23
**contributed** 149:9
**contributing**
  150:7
**contribution**
  149:7
**contributory**
  149:6
**controlled** 70:11
  70:14,17 78:6
**conundrum** 203:1
**convenient** 296:1
**convention** 82:23
  83:3 281:7
**conversation**
  245:20
**coordinate** 21:18
**copied** 246:22
  247:14 250:8,14
**copy** 7:21 28:6,17
  46:11,15 51:22
  240:5
**copying** 247:15
**core** 155:17
**coronary** 166:13
**coroner** 241:1,2,5
  243:14,16,17,18
  243:20 244:17
  280:6
**coroner's** 94:20
**coroners** 27:21
**corporation** 3:16
  5:2 16:6,8
**corporations**
  221:22
**correct** 19:17 20:8
  20:14 26:12 28:3
  32:7 35:7 37:11
  37:20 39:13 46:23

72:11 84:10 87:15
  88:23 95:18 107:3
  119:25 121:22
  130:5,23 131:14
  139:22 142:25
  145:17,21 150:10
  150:10,13 151:21
  185:1,23 196:10
  206:21 217:14,15
  219:24 224:10
  226:6 238:6,9
  239:9,13 240:13
  242:8,13 245:25
  246:2,11 251:17
  258:6 263:12
  264:15 267:3
  268:8 271:25
  272:14 273:7,25
  275:17 277:7,18
  278:19 292:17
  293:2 296:10,11
  296:13,14 297:16
  319:12,18 320:10
  320:24 322:3
  329:24 333:16
**corrected** 195:7
**corrections** 335:12
  337:17
**correctly** 50:9
  204:16 206:10
  226:5 239:8
  247:21
**correlate** 157:10
  293:8 306:9
  313:17 314:19
**correspond** 233:8
**corresponded**
  233:16
**correspondence**
  252:17

**cost** 239:12
**costa** 4:19
**costs** 238:24
  239:20
**counsel** 15:9 17:25
  29:14 49:10 143:3
  192:20 193:1
  294:21 319:1,20
  322:4 324:10
  329:19,20 332:1
  332:10 334:2
**counted** 55:13
**counter** 263:1
**counties** 27:22
**country** 160:19
**county** 1:9 2:2 7:7
  7:12 15:12,15,17
  18:23 19:23 20:11
  21:16 22:3,6
  23:12,17,21 24:11
  25:8,20 26:24
  27:25 41:18 47:4
  47:10,22 48:16
  49:3,4,9 51:12
  55:22 94:20 96:21
  104:9 107:7,16,19
  113:24 126:25
  135:9 152:24
  154:11 172:15
  173:25 174:11,15
  183:19 184:2
  215:21 217:19
  220:11 222:9
  224:17 225:19
  226:8 232:20,25
  236:15 238:24
  239:15 240:1,11
  242:2 243:15,16
  243:17,18,19,22
  243:24 244:19
  247:6 251:14

333:4 336:10
  337:15
**county's** 193:21
**couple** 272:15
  318:22
**course** 28:4 36:15
  41:10 42:13 63:15
  71:12 93:7 98:24
  110:3 158:12
  164:2 167:12
  171:18,22 228:25
  256:14 261:7
  282:24 283:18
  296:9 324:17
**courses** 31:21
**court** 1:1 6:19
  15:7 226:14
  247:10 336:7
**courtesy** 330:16
**courts** 247:17
**cov.com** 3:20
**cover** 18:2 229:20
  246:23 252:6
**covington** 3:17
  16:24
**crack** 29:10,11,17
  29:22 30:14,15,20
  30:22 31:1,5,9,16
  31:19 163:12
  224:12
**create** 181:1
**credits** 46:4
**crime** 83:7 214:21
**crisis** 30:14 221:20
  222:2,25 238:24
**criteria** 106:12
  113:25 114:17
  115:14 159:4,17
  159:19,23 160:4
  160:14,20 161:4,6
  161:8 181:12

288:4,12,13,14,15
289:6,6,12 290:1
290:17 297:12
313:9
**cross** 145:25
**crystal** 109:2
166:23 329:8
**cts** 212:23,24
**cull** 227:25
**cure** 265:11
**cured** 265:9
**curious** 231:25
259:3
**current** 28:20
77:19 78:2 100:15
108:13 118:15
228:11,24 261:1
**currently** 18:22
20:18 35:19 79:12
107:8,23 108:1
152:23 153:2,9
200:17 221:1
**curriculum** 7:5
28:10
**custody** 6:19
**cut** 275:2
**cutoff** 56:22
**cuyahoga** 22:3,6
22:16 23:21
243:19 333:4
**cv** 28:3,17,25
46:10,12 237:1
**cycle** 266:2,2,6

**d**

**d.c.** 3:19 4:9
**daily** 42:19 72:13
232:10,11,14,22
**damages** 239:11
**dan** 1:8
**dark** 132:4

**data** 57:1,4,5,7
88:9 139:3,5
176:8,22 182:17
184:20 185:13
188:24 192:1
210:22 211:18
214:13 215:13,23
216:1,17 220:6
253:11 305:13,23
306:7 325:17
**database** 55:4,7
56:17 57:1,4,6,7
68:11 70:6,9,9,13
70:16,18 71:21
72:5 78:22,24
79:2,4,7 95:24
96:11,12,16,19
97:18 113:16
137:23 138:2
139:3 142:14
187:2 196:8
322:22 324:2
326:1,7
**databases** 55:21
**date** 15:2 37:1,7
47:23,24 48:1
79:11 135:19
247:12 332:11
335:8 336:3,9,19
337:3,13,25
338:20,25
**dated** 7:10,15,19
8:5 135:2 200:24
238:13 257:10
**dates** 49:18 141:22
229:25
**day** 2:9 16:3
119:10,10 229:12
232:5,7 334:6
336:16 337:22
338:22

**dayno** 4:18 16:21
16:21
**days** 204:6 205:14
247:8 335:18
**dead** 54:14 109:9
159:2 166:1,4
170:1,5 171:19
213:13,15 278:1,6
287:21,24,24
288:5,12 291:18
298:20 307:20,22
313:7
**deadly** 73:15
**deal** 29:25 96:19
118:12 269:9
**dealing** 29:23
196:2 294:12
**deals** 118:11
**dealt** 241:18
**dean** 24:23 25:5,6
25:10 94:14,17
**dear** 335:10
**death** 7:22 19:21
19:24,25 20:2
21:24,25 24:19
25:11 40:14,19
41:11 43:10 53:16
53:20,22,23 54:3,5
54:6,8,12,13,15,17
54:18,19,20,21
56:8 59:1,4 60:7
64:17,18 65:4,9
68:4 70:2 71:13
71:20 72:16,18,20
73:1,9,17 74:6,7
74:11,14,22 75:12
76:4,19 77:12
78:15 79:3 82:23
83:4 85:2,23 86:4
86:9,20 87:3,12,13
87:23 89:3,16

90:4 92:24 93:8
94:22,22 95:2,6,10
99:6,9,15,20 101:7
101:18,20,25
102:14 103:6,6
104:16,20,22
108:23 109:10
110:20 112:15,17
112:20 113:8,12
114:3,15 115:8,20
116:1,13,14 117:3
117:7,14 119:6,19
119:22 122:19,19
122:20,25 123:8
123:21 124:3,9,11
125:10 127:24,25
128:6,8,11,23
129:3,6,10,11,23
129:25 131:12,17
132:12 133:8,9
134:4,8,16 136:19
145:16 146:3,21
148:4,9,16,23
149:1,4,14 150:1,7
150:19,23 151:15
151:16 152:5
158:6 167:3,12,20
167:24 168:10,15
170:12 175:7
177:13 178:15,23
179:2,14 180:3,13
180:19 181:6,8
182:12,13 184:21
186:21 187:10,11
187:14,22 188:22
189:7,14,19
191:17,18,20,24
201:19 202:3,4,5,5
202:7,8 204:2,4,5
205:8,10 206:5,18
208:9 209:3,9

210:9 211:2,7
212:4,20 214:5
224:25 225:16,17
225:24,25 226:1,5
226:11,12,15,16
226:17,19,21
227:2,11,18,20
228:1,3,4,7,19
229:4 233:24
234:17,21,22,24
240:6 241:2,3
242:15,16,19
244:2,25 248:21
251:23 253:23
256:19 261:15
268:22 271:6,23
274:4,7 275:5,8,25
277:9 278:24,25
278:25 280:23
281:25 282:15
285:12,13 286:13
288:24 290:19
295:21 299:10
304:3,4,10 305:1
307:25 311:3
317:13 319:10,16
325:5
**deaths** 7:7 29:20
29:21 30:21 42:21
47:10,22 48:16
51:12 53:4,6
54:25 55:3,5,17,19
55:23 59:24 67:1
67:24 90:7,8,11
91:4,8,9 103:10
107:20 108:5
119:5 177:3
178:10 179:18
180:5 187:18
189:14 203:3
206:3,13 209:13

211:13,19,25,25
212:1,1,7,10,13,14
212:18 213:17,19
213:19 215:5
220:8,8,14,15,18
220:20 223:8,10
223:14 224:22
225:2 248:9,12,15
249:1,5 252:20
256:11 264:9
268:23 284:12
**deceased** 116:20
117:24 163:5
267:4 268:2 311:1
311:4
**decedent** 56:16,17
60:1 71:4,5 74:2
74:25 77:7 79:5
95:23 102:24
116:20 120:5
121:16 125:17
127:7 133:18
148:19 156:19
165:13 169:6,7,23
170:8 205:9,11
253:4 260:11
263:19 268:5
275:1,20 278:5,6
282:12 285:11
287:19 288:18
292:21,25 296:3,6
**decedent's** 56:21
77:23 84:21 96:17
98:2,3 99:12
149:1 261:4 271:9
276:14
**decedents** 40:18
60:6 100:6 102:12
102:23 112:8
120:20 162:10
253:19 272:22

273:5 287:20
295:6,20 322:6
326:12
**december** 48:20
53:7
**dechert** 3:3,7
**dechert.com** 3:6
3:10
**decide** 209:18
**decided** 199:12
252:15 330:5
**decision** 152:1
266:13 330:7
**decisions** 215:15
**deed** 336:14
337:20
**deemed** 62:16
75:11 335:19
**default** 79:7,9,12
89:23
**defendant** 15:25
**defendants** 17:2
200:13,17
**deficient** 154:20
**define** 107:18
160:21
**defined** 82:23
128:13 158:20
160:6,10 165:4
168:8
**definitely** 175:23
**definition** 130:10
166:6 289:8,9
297:11 312:20,24
**definitive** 88:24
89:7
**degree** 25:16
62:11,13,17 84:12
89:6,10,13,15,18
89:25 90:5 92:22
94:24 95:3,11,13

99:9,20 105:2
114:18 116:1,3,7
119:7 123:13
146:5 148:8,15,24
149:3,9,18 150:5
150:22 151:19
159:9 168:11
191:19,21 203:5,7
203:8,10,14,15
206:19,23 207:3,7
207:9,10,14,20,24
207:25 208:5,12
208:18,20,22
209:10,15,19,21
209:25 210:4,4
226:9 227:12,23
228:5 229:2
235:24 292:10
293:18 302:11,15
309:14,16 310:1
313:21 314:17
315:20
**delay** 44:8 101:17
**delayed** 204:3
206:13 212:18,20
329:3
**delete** 233:12
**deliberately** 329:3
**delivery** 332:9,11
**dental** 241:4
**dentistry** 26:20
47:2
**department** 19:7
20:6,9 21:13
22:11,22 23:2,11
24:1,11,19 80:24
152:22 153:7
154:21 155:16,18
156:13 172:10,11
182:18 186:4
192:2 193:23

194:13 211:11,12
213:15 217:19
219:18 269:2,4
335:22
**department's**
130:21
**dependence** 171:7
287:18 289:13,14
312:5,6,23
**depending** 80:13
100:16 268:14
**depends** 125:24
208:1 213:18,20
317:8
**deposed** 17:11,22
51:8,11
**deposition** 1:14
15:4 28:9 44:9
47:8 49:8,23
50:17,21,21 51:2
52:25 134:25
138:19 173:24
199:17 200:22
216:23 238:11
240:4 246:14
250:1 257:8
295:25 328:18,24
329:16 330:10,19
331:11 333:18
335:8,11 336:1,3
337:1,3
**deputy** 19:1,12,14
19:19 20:24 21:1
24:4,6,24 25:15
139:19,21,23,24
**derived** 225:1
**described** 241:13
244:10 260:1
**description** 7:3
**designated** 193:25
315:17

**designation** 95:14
**designed** 61:22,25
**designee** 194:4,8
**desirable** 203:13
261:20 267:23
**destructive** 89:4
91:1 92:6 93:6
**detail** 266:21
**detailed** 224:8
**details** 121:14
142:25 184:10
219:14 300:18
**detect** 57:24
142:13 229:1
**detected** 63:4 73:6
113:2,6 114:13
115:21 116:4,8
117:12 136:14,18
137:17 138:4,12
138:13 140:2
142:11,18 228:10
319:18 320:6
**detection** 63:21
228:24
**determination**
22:10 43:8,9 55:7
72:17 74:21 75:3
90:3 95:1 97:1,9
102:13 103:20
113:11 114:14
117:7 123:3 124:7
124:10,19 125:1,6
125:19 126:17
127:23 128:7,23
131:20 134:10
146:4 148:6,14
150:21 160:13
168:21 169:10,21
169:22 170:7,12
186:20 197:9
207:19 215:8

219:21 227:22
234:25 235:16
243:8 267:25
268:4 270:10,20
272:21 273:21
274:2 276:5
277:14,17 278:22
279:3 283:8 288:1
288:18 289:1
291:21 292:9,10
292:21,23 293:6
294:18 296:2
300:25 310:1,17
310:25 311:6
314:13 315:7
316:18
**determinations**
168:18,24 170:18
275:4 291:17
294:3 318:8
**determine** 42:2
53:16 59:17 68:14
68:25 71:10,20,22
72:17 74:10 82:13
89:17 94:21 95:18
95:22 96:1,22,25
97:21 99:13 104:3
105:25 123:12
130:4 151:16
159:5,6,20 160:23
166:25 227:12
269:12 270:17
271:16 273:8
278:15 291:8
298:19 301:24
302:2 306:23
310:5 317:25
**determined** 55:11
100:3,24 121:20
131:25 149:7
164:1 179:2

180:12 228:25
229:2 234:18
292:15
**determines** 38:2
226:8 241:1
**determining** 40:13
40:15 70:1 71:12
74:13 76:23 77:11
79:3,5 93:7 99:8
101:19,24 119:19
119:21 129:2,5
132:17 242:15
244:14 270:6
298:16
**developed** 38:22
166:10
**deviating** 43:1
271:23
**diagnose** 162:21
165:6 313:3,4
**diagnosed** 156:19
157:15 285:8
307:10 308:21
314:15 316:10
**diagnoses** 171:11
261:11 277:6
**diagnosing** 267:16
289:16
**diagnosis** 156:21
156:22 162:25
169:13 172:4
285:10 287:12
289:12 291:2
293:10,12,15,16
294:1 296:25
297:6,8 298:2,6
306:10,12 307:19
308:9,13,15,18
309:13 310:8,8
315:1,5 317:5,5,7

**diagnostic** 159:23
  160:14,16 161:6
  168:1 169:17,19
  212:22 287:14
  288:4
**die** 119:13 123:17
  171:18 201:25
  203:25 205:5
  299:12,15 308:19
  313:15
**died** 29:19 30:9
  90:12 102:4
  109:13,15 110:9
  110:18 116:7
  120:9 123:14,16
  126:24 163:20
  164:1 166:7
  171:25 210:16
  218:22
**dies** 166:4 291:7
**differ** 54:11 99:2
**difference** 126:21
  129:12 132:11
  310:9
**differences** 142:3
  142:5
**different** 54:15,20
  105:7,11,12
  108:12 140:1
  141:22 147:1,10
  147:10 150:12
  171:4 188:8
  192:25 226:25
  227:6 239:19
  263:9 301:12
  319:23,25 320:1,6
  321:5,7 322:10
  323:15 326:8,10
  326:15 327:6,11
  327:12,13,21,22
  327:25 328:3,13

**328**:16
**differentiation**
  56:22
**differently** 281:5
**difficult** 103:9
  150:5 154:5
**digging** 95:21 96:1
**dilated** 157:24
  293:13
**direct** 21:7,8,10
  136:23 242:1
  254:19 255:17
  317:16
**directed** 101:6
  120:24 121:3
  167:11 262:13
**direction** 119:18
  259:1,7 330:7
**directions** 75:23
**directly** 158:16
  187:1,3 191:13
  192:4 221:12
  224:21 233:19
  244:23 259:17
  278:4 288:6
**directs** 29:15
**dis** 90:19
**disagree** 38:16
  43:21 44:2,13
  330:10 331:8
**disagreed** 234:16
**disagreeing**
  234:20
**discrepancies**
  143:17 319:2
  323:10,11,12
**discrepancy**
  137:24 190:5,8,9
  190:14 326:9,24
**discretion** 23:12
  38:2

**discuss** 219:3
  234:22,23 247:1,9
  247:16 248:25
  249:10 253:24
**discussed** 236:2
  249:7
**discusses** 247:7
**discussing** 248:7
**discussion** 194:10
**discussions** 219:11
**disease** 36:14
  157:19,20,21
  163:11,11 166:10
  196:3 209:8
  278:12,12 280:10
  280:11,22 281:8
  283:19 308:18,20
**disorder** 162:19
  162:22 163:1
  296:9 297:21
  298:17 301:1
  306:24 307:5,10
  307:12,20 308:5,9
  310:6 311:7,11,15
  311:18
**disregard** 90:19
**distance** 218:23
**distinction** 79:16
**distracting** 262:17
**distribute** 251:2
**distributors** 238:5
  238:8
**district** 1:1,2 15:7
  15:7
**division** 1:3 15:8
**dm** 287:13
**doc** 297:21
**doctor** 17:14
  28:14 31:7 32:2
  34:7 35:21 38:1
  39:7,10,13 40:6,7

**40**:12 41:2,19
  42:4 43:3 44:15
  47:17 51:3 64:1
  64:15 68:17 72:23
  73:13 79:14 85:20
  94:13 102:4
  109:24 111:20
  113:10 115:23
  130:14 138:8
  141:18 142:8
  145:7 147:12
  151:6 159:15
  164:16,24 168:6,7
  170:18 174:6
  183:17 192:15
  193:15 197:10,14
  198:6 201:4
  206:15 207:18
  208:25 210:18
  217:4,24,24,25
  264:14 272:19,19
  272:24 273:19
  276:17 284:15
  285:8,8 286:6
  288:8 295:2 297:4
  298:4,15,25
  301:21 304:21
  309:7,23 310:16
  313:25 314:9,25
  320:7,14,17 328:6
**doctor's** 197:5
**doctors** 20:16
  37:10 39:17
  196:12 197:8,16
  198:2,3,7 285:7
  295:4 311:16
**document** 1:8 7:6
  47:9,23 48:3,5,11
  52:17,18 54:24
  55:2,21 57:8
  59:19 65:18 66:22

[document - drug]                                                                 Page 20

| | | | |
|---|---|---|---|
| 85:8 107:5 111:10 | 22:2 23:9,10,13,14 | 60:3,20,22 61:11 | 162:25 163:5,6,7 |
| 135:18 145:24 | 23:19 24:10,16,23 | 62:15,18,19,23 | 163:10,15,19,21 |
| 174:6 181:23 | 24:23 25:5,6,6,10 | 63:13,22,24 66:16 | 163:21,25 164:1,3 |
| 238:19,23 239:1,3 | 25:10,11,12 35:25 | 66:18 67:12 69:4 | 164:5,8,9,9,12,18 |
| 250:11,20 251:9 | 36:18 50:20 64:13 | 69:4 71:14 72:6 | 164:22 165:3,8,9 |
| 251:11,20 252:19 | 65:24 89:24 94:14 | 74:12,15 75:4,17 | 165:11,11,12,13 |
| 257:16,19,25 | 94:17 152:11 | 75:18,25 76:7,10 | 165:17,18,24 |
| 258:7,9,11 259:25 | 155:24 156:3,5 | 76:11,12,16,18,24 | 166:6,9,19,20 |
| 260:4 271:5 | 172:16,18 188:13 | 76:25,25 77:8,10 | 167:2,2,15,16,18 |
| 325:10 | 193:19 194:2 | 77:25 78:3 81:4 | 167:21 168:9,12 |
| **documentation** | 201:22 206:2,4,7,9 | 81:14 82:9,17,18 | 168:19,25 169:2,5 |
| 91:12 213:7 | 206:12 217:13,23 | 83:2,6,8,24,25 | 169:9,10,16,18 |
| 263:16 275:22 | 218:2,10 225:15 | 84:3,15 90:9,12,15 | 170:24 171:1 |
| 277:24 285:4 | 229:10 233:4,5,6,8 | 90:18,19 91:7,20 | 178:16,23 201:21 |
| 286:12,14 290:25 | 233:16,20 236:2 | 92:1,4,4,25 93:1,2 | 202:23,23,24 |
| 307:4 308:4 | 238:18,20 240:10 | 93:2,5 95:16 | 203:21,25 204:10 |
| 311:14,17 314:3 | 243:23 244:8,13 | 103:5,7,22,23 | 204:19 206:14 |
| **documented** | 245:1,4,20 246:19 | 104:5,18 106:5,7 | 209:12,14 211:2 |
| 106:25 253:7 | 247:2,7,14,18 | 106:21,23 107:5,8 | 211:24 212:7,12 |
| 260:13 285:6 | 248:11 249:15 | 107:12,20,21 | 218:22 221:3 |
| 307:8 | 250:6,10,13,19 | 108:5,16 109:11 | 222:13 223:4,12 |
| **documents** 49:4 | 251:18,19 252:6 | 109:14,15 110:25 | 223:18,20,24,25 |
| 51:5 52:2,11,12,14 | 252:15 254:24 | 112:17,24 113:18 | 224:7,21,23 |
| 52:15,16,21,23 | 257:15,20 258:18 | 114:20 116:13 | 226:10,11,18,20 |
| 66:1 180:3 190:19 | 259:4 272:12 | 117:2,15,19 | 227:5,17,17,24,25 |
| 191:2 229:22 | 330:1 | 118:16,20 119:2,4 | 228:2,5,13 238:4,8 |
| 230:14,17,24 | **draft** 258:8,11 | 119:9,12,16,25 | 241:1,6,23 242:18 |
| 231:2,6 | **draw** 127:22 | 120:4,11,16 121:7 | 243:3 248:9,12,15 |
| **doing** 24:19 36:6 | **drawn** 277:23 | 121:17,20,24 | 248:21 253:12 |
| 41:25 57:9 59:3 | 278:7 | 123:1,10,14,16,17 | 255:1,4,5,6,21 |
| 88:13 98:18 | **drinks** 290:7 | 123:18 124:2,5,6 | 263:20 266:5 |
| 119:23 145:25 | **drive** 3:8 | 125:14 130:22 | 270:19 271:7,9,10 |
| 176:2 213:4,5 | **driven** 134:10 | 132:8,9,16,18 | 273:6 274:14,16 |
| 219:13 221:16 | 220:21 | 142:10 150:2,18 | 275:10,14,23 |
| 291:5 307:16,16 | **drug** 5:2 7:6 16:6 | 152:3,4 156:25,25 | 276:16,16,18 |
| 307:17 | 16:8 29:25 30:21 | 157:1,9,10 158:2 | 277:15,16,21,21 |
| **dorothy** 24:23 | 31:22 33:12 47:9 | 158:17 159:6,10 | 277:22 278:8 |
| **dosage** 279:25 | 47:21 48:16 53:4 | 159:11,11,12,20 | 279:13,16,19,21 |
| **dr** 15:4 17:16 | 53:6 54:25 55:3,5 | 160:12,13,23 | 280:5,8,10,16,20 |
| 20:13,17,23 21:1,9 | 55:16,18,23 57:12 | 161:3,3,5 162:19 | 280:22 282:20,21 |
| 21:10,18,21,23,24 | 57:15,17,22,24,24 | 162:21,23,23,24 | 283:5,5,12,25 |

284:14,24,25
285:3,14,15
286:13,23 287:3,8
287:18 288:21
289:2,2,3,25 290:5
290:17,21 292:3,4
292:5 293:6,7,23
293:23 294:10
295:7,8,11,11,15
295:15,22 296:17
296:17,23 299:7,8
299:23 300:20
302:4,21 303:15
303:16 304:15,20
304:22 305:5,8,11
305:15 306:9,22
307:3,4 308:1,2
309:16 310:4,19
311:23 312:3,3,5,6
313:16,20 314:2
314:13 315:2,8,18
316:10,15,18,23
316:24 317:3
319:3 325:6,21
**drugs** 29:24 30:2,6
30:8,23 32:10
33:24 34:4,20
35:13,20,20 36:13
36:20 37:17,22,24
38:13,14,20 56:20
58:6,12 59:4,8,8
59:12,13,14,14,15
59:18,22,23 60:17
60:25 61:4,5,6,8
61:18 62:14,19,22
64:3,23 67:13
71:15,16 75:20,21
75:22 83:1 103:14
103:15 105:5,22
106:1,4,17 107:9
107:10 108:7

109:4,7 115:1
178:14,16,22
179:1,8,13 180:12
181:9 182:12
200:3 202:2 205:6
205:22 220:21
221:3,7,10,11,17
221:20 226:25
227:6,10,18 228:8
228:9 253:2 255:2
262:5 263:2,3,11
266:8,10,11
280:17 283:17,18
283:21,23 296:19
300:4 302:9,13
305:21 310:20
**dsm** 158:8,10,11
158:12,13,14
159:3,25 160:7,15
161:5,8,11,12,13
161:16,24 162:1,5
162:6,8,9,13,25
164:23 165:1
287:14 312:24
313:1,2,9
**due** 30:21 42:21
67:24,24 90:12
108:6 109:11,13
109:15 123:17
171:25 172:2
196:5 201:15,16
202:11,11,11,13
214:2 220:18
221:3 284:16
293:13
**dues** 237:4
**duly** 17:10 333:7
333:10
**duragesic** 67:5,16
**duties** 19:19 21:22
39:20 140:19

154:6,7,10,21
155:11,17,18,23
156:6,11 165:8
239:14 240:12
**duty** 279:19
**dying** 165:17
166:17,18 167:14
167:20 209:7
213:11,12 280:8
280:10,25 281:3
281:14 292:1
294:10 303:15
308:1 313:15
325:21

**e**

**e** 7:10,14,17,19,23
8:3,4 135:1
165:10 200:23
201:8,14 216:24
217:8,12,16,23
218:1 219:11,21
220:1 230:17
231:12,14,17,19
231:20,23 232:3,5
232:8,9,11,13,14
232:17,18,20,23
232:24 233:1,4,6,9
233:12,17 238:12
238:20,23 246:15
246:20,22 247:2
247:23 250:2,7,9,9
250:14 252:6
257:9,20,23 258:8
259:20
**earlier** 58:17
94:14 137:1,15
138:2,13 142:17
149:12 157:2
160:1 196:6,7
198:24 207:8
226:4 229:10

239:5 267:1
281:18 318:24,25
323:11
**early** 38:22
**eastern** 1:3 15:8
**easy** 302:24
310:13
**economic** 211:11
**ed** 16:13
**education** 26:10
26:11 161:17
264:14
**edward** 2:9
**effect** 129:8
216:13 227:1
**effort** 96:1 215:10
218:23
**efforts** 53:15
259:8
**eight** 179:8
**either** 50:21 67:14
67:17 72:10 89:16
107:9 117:9 148:7
175:15,21 199:16
205:16 211:21
275:25 305:9
321:17 325:10
326:2,14 334:2
**elected** 243:18
**electronic** 230:17
230:19
**elicit** 85:1 290:19
**elicited** 106:24
**ellis** 3:21 4:12
15:25 17:1
**elucidate** 168:13
**elucidating** 276:15
**eluding** 106:12
**email** 335:17
**embrace** 251:6

**emcarter** 2:12

**emch** 5:3 6:9 16:7
16:7 225:14
226:16 229:7

**emergency** 213:14

**emphysema**
157:17,19

**employed** 18:22
18:23 22:14 23:16
24:18 27:24 30:9
224:17

**employee** 22:21
23:15 184:14

**employment** 22:24
25:1,3 26:3,25

**encephalopathy**
201:15 202:9,13
202:20

**enclosed** 335:11

**endo** 2:19,19
16:16

**enforcement**
84:19 85:2,4
214:20 221:14,16

**engaged** 200:13

**entail** 19:19

**enter** 57:1,4
137:22 139:3

**entered** 70:12
326:1 337:9

**entering** 137:25

**entire** 55:7 77:23
261:4 336:5 337:5

**entirety** 92:2,12
92:13

**entities** 16:16
51:19 98:12

**entity** 294:2

**entries** 55:10,14
96:20 139:25
177:2 184:23

**entry** 48:10 74:3
85:15 87:18
136:12,25 139:5

**epi** 305:13

**epidemic** 29:11
30:15,20 31:1,5,10
31:17,19 107:8,13
107:17,18 108:14
108:17 160:3
222:4

**epidemiologic**
108:20

**epidemiologist**
107:18

**epidemiology**
160:3

**episode** 163:6

**equivalent** 61:24

**erin** 4:4 16:19

**errata** 335:13,18
337:7,10,18 338:1

**esq** 2:3,4,4,9,10,15
2:21 3:4,8,12,17
3:22 4:4,8,13,18
5:3,7

**essential** 101:19
129:25

**essentially** 21:21
75:9 76:16 258:21

**establish** 84:11
99:19 114:18
159:8 167:14

**established** 34:22
159:22 219:17

**establishes** 198:13

**establishing**
167:11,23

**estimate** 207:24
210:4

**estimation** 107:7
288:22

**et** 1:9,10

**ethanol** 59:13
177:25

**evaluate** 42:2,20
58:25 71:7 109:7
119:5

**evaluated** 69:7
77:11 105:1
130:25 307:11

**evaluating** 42:14

**evaluation** 40:23
40:24 57:10 96:5
123:19

**evening** 318:21

**event** 103:16,16,17
334:3

**eventually** 247:13
264:11

**everybody** 105:9

**evidence** 35:13
88:24 90:16
166:16 204:20
205:21,24 207:15
208:3 278:10
284:13 289:24
290:22 293:24
295:7 300:21
301:19 314:2,10

**evident** 125:12

**evolved** 39:1

**exacerbation**
280:11,21 281:8
302:21 303:16

**exacerbations**
299:7

**exact** 22:18 25:2
49:18 188:17
229:25

**exactly** 18:14
149:20 163:22
172:19 210:24

219:9 263:24
264:3 271:13

**examination** 6:7
17:8,12 74:16
117:4 145:5 159:8
171:22 213:21
225:13 229:8
286:25 307:17
318:19 320:15

**examinations**
25:25

**examine** 168:23
214:8

**examined** 103:18
152:6

**examiner** 7:7,13
19:2,12,14,20
20:24 21:2,15
24:5,6,24 25:7,15
25:19 26:24 27:8
27:12,13,16,25
29:4,12 40:6,12,13
40:14,18,21 42:12
42:17 47:3,4,11,22
48:17 49:3,5
55:22 62:10 68:23
99:5,8 113:25
115:25 127:1
128:9,25 139:20
139:21,25 151:16
152:12 173:25
212:3 214:11
215:21 234:13
238:25 240:1
241:21 242:2,7,12
243:7,15,21,22,23
244:18,18,20
258:17 261:2,9
268:13,21 269:1,5
269:10

| | | | |
|---|---|---|---|
| **examiner's** 18:24 | 235:22 263:18,20 | 149:19,22 150:14 | **expects** 152:24 |
| 19:9,10,23 20:3,11 | 263:21 268:23 | 173:24 174:5 | **expedite** 248:20 |
| 22:3,7,15 23:10,17 | 270:10 274:15 | 177:2 179:10 | 249:4 |
| 23:21 25:20 27:17 | 278:9 303:20 | 182:17 183:10,11 | **expediting** 248:8 |
| 29:7 36:11 41:18 | 322:14 323:9 | 183:13 186:25,25 | 248:14 |
| 42:1,25 53:14 | **examples** 54:17 | 188:2,4 189:25 | **expenditures** |
| 88:25 96:13 99:7 | 115:9 138:10 | 200:22 206:16 | 239:23 |
| 99:19 102:11 | 178:6 | 216:23 227:9,9 | **experience** 102:18 |
| 104:9 127:10 | **exams** 26:2 | 235:23 238:11,19 | 108:4,23 116:5 |
| 132:19 153:12 | **exceed** 124:22 | 240:4 246:14 | 121:1 133:15 |
| 157:7 159:1 169:4 | **exceeding** 99:18 | 250:1,7 257:8,17 | 157:3 252:11 |
| 172:10 174:12 | 272:1 | 259:20,21 270:23 | **experiencing** 38:3 |
| 181:7 211:12 | **exception** 36:2 | 271:5 272:13,14 | 38:11 107:17,19 |
| 213:10,22 214:7 | **exceptions** 226:23 | 272:22,25 273:8 | **expert** 43:5,6,14 |
| 214:10,14 224:17 | **exclude** 78:10 | 273:10 279:5,7 | 44:15,21,24 45:2 |
| 239:15 240:11 | 89:15 228:8 | 282:2,6 283:1 | 58:18,24 63:17 |
| 248:20 251:14 | **excluded** 87:12 | 292:2 299:5 319:4 | 79:20 118:3,4,14 |
| 260:24 268:15 | **exclusively** 66:5 | 319:4,8,14,23,23 | 134:1 |
| 269:8 275:24 | **excuse** 153:4 | 320:1,2,18,22 | **expertise** 38:1 |
| 280:6 311:24 | 176:17 194:5 | 321:3,9,16 322:14 | 58:19 66:24 118:3 |
| **examiners** 160:19 | 196:7 291:16 | 323:7,7 326:16,17 | 157:3 266:17 |
| 174:16 186:19 | **executed** 337:10 | 326:18,22,23 | 272:2 |
| 237:2,6 | **execution** 336:14 | 327:7,7,16 | **expiration** 336:19 |
| **example** 36:6 | 337:19 | **exhibits** 6:4 7:1 | 337:25 338:25 |
| 54:17 59:14 61:22 | **executive** 23:13 | 8:1 140:1 150:12 | **expires** 334:15 |
| 61:23 62:23 63:11 | 152:24 172:15 | 187:6 190:2 | **explain** 86:8 87:11 |
| 69:3 72:21 73:15 | **executive's** 23:11 | 192:22 | 139:12 143:16 |
| 78:1 81:1,9 83:17 | 24:11 193:23 | **exist** 38:23 39:1 | 180:23,23 186:17 |
| 95:17 96:18 101:8 | **exercise** 232:24 | 233:12 286:16 | 189:18 201:10 |
| 101:13 102:21,24 | **exhibit** 6:19 7:5,6 | 290:25 | 271:3 310:11 |
| 102:25 105:4 | 7:10,12,14,17,19 | **existence** 261:4 | **explained** 18:1 |
| 106:5 114:7 | 7:21,23 8:3,4 28:9 | **exists** 57:25 | 180:10 |
| 146:11 149:21 | 28:15 47:8,18,21 | 134:12 | **explanation** 65:12 |
| 157:17 163:4,10 | 53:3 64:15 95:17 | **expect** 137:11 | 87:2 133:11 |
| 165:17 166:6,13 | 97:7 134:25 | 183:6 | 138:15 140:3,8 |
| 166:14 167:13 | 135:14,24,24 | **expectation** 25:23 | 232:1 250:24 |
| 170:25 171:16 | 136:5,7,17,24 | 183:22 | **explanations** |
| 203:6 208:15 | 145:8 146:2,8,25 | **expectations** | 133:15 134:2,9 |
| 209:2,12 210:7 | 146:25,25 147:1,2 | 255:14 | **explicit** 91:13 |
| 212:19 214:19 | 147:19,20,23,25 | **expected** 256:12 | **explore** 123:25 |
| 228:12,15 233:5 | 147:25 148:17 | | |

exposed  36:14
express  218:15
extensive  212:21
extent  40:20 43:8
  44:22 58:24 63:17
  69:16 79:2 94:22
  95:6 99:6 101:5
  102:8 107:16
  116:16 118:8,9
  130:19 158:17
  172:19 198:19
  211:17 233:11
  255:19 261:16
  268:14 316:25
  329:18 331:2
extraordinary
  299:10,13
extrapolating
  313:12
eyes  105:10

**f**

f  3:17
face  92:9 105:9
facilitate  268:21
facility  121:25
  123:7 223:9
facing  107:8
fact  40:1 72:12
  123:17 124:4
  125:16 135:20
  146:18 148:16
  150:17 156:7
  168:12 176:4
  181:3 189:8 245:4
  291:18 296:5
  305:24,25 306:2
  311:22
factor  105:21
  214:25
factors  60:8 81:12
  114:9 115:5 116:5

116:9 134:9
  160:18 271:14
  298:9
facts  110:6 124:18
  140:23,25 151:20
  151:23 152:7
failing  262:8
failure  157:22
  293:16,19 306:14
fair  18:19 20:10
  21:17 32:10 33:13
  37:15 41:23 72:9
  76:5 102:1 133:23
  134:18 136:16
  154:1 160:24
  166:22 182:17
  199:3,5 206:16
  219:20 224:23
  232:4 238:3
  239:10 262:20
  263:6,8,10 266:4
  272:3 288:2 331:9
fall  19:22 62:15
  211:25
falling  37:1
familiar  30:15
  32:4 70:5 143:9
  161:8,11 172:24
  172:25 177:1
  218:20 238:4,7
  242:11,20,23
  271:4
family  78:12 81:15
  102:25 106:15
  116:20 168:4,4
  214:6 218:25
  253:3 256:4
  260:16 261:19,25
  278:4 295:3,5,6
far  78:23 79:25
  112:3 153:20

164:24 222:23
  235:7,9
farther  230:10
  266:16
fashion  37:1 39:1
  262:15
fastidious  262:11
fatal  113:22
  148:25 282:20
  295:12
fatalities  108:17
  189:16 268:25
fatality  218:3,18
  219:7
fatally  279:24
favorable  260:15
fda  66:13,18
feature  112:6
february  8:5
  257:10
federal  17:9 91:2
  184:9 198:17
  215:22
feel  140:14 192:21
  243:10 250:22
  254:11 255:16
  258:18 284:22
  301:7 309:20
  314:20
feels  36:18
fellowship  25:21
  27:7,10 29:2,3
felt  208:4 210:5
  219:5 235:24
  252:16 262:18
  264:4
female  137:7
fentanyl  64:19
  65:2,5,24 66:2,4,6
  66:8,11,15,21,25
  67:2,4,9,9,10,12

67:13,14,15,24
  68:15 69:1,1,5,10
  69:11,25 73:1,4,9
  73:9,15 74:11,24
  75:12 76:3,6 77:6
  81:3 83:17 84:2,4
  85:19,23 86:1
  108:7,7 112:23
  113:8,21 177:15
  177:18,21 178:18
  179:4 201:17
  202:1,25 203:24
  204:21 205:25
  208:10,16 210:17
  210:19 220:22,22
  279:12,13,14,15
  282:16 283:15,22
  299:11,14,24
  302:8
fever  261:13
fewer  232:3
fi  232:21
field  134:2
figueroa  2:22
figure  178:13,17
  178:25 179:9
  180:13 181:25
  184:3
figures  178:12
  184:16 185:5,14
  189:20,23 273:15
figuring  65:19
file  68:20,21 80:7
  80:11 95:21 96:3
  96:3 97:21 231:19
  231:20 233:13
  255:23,25 268:7
  268:12,17 269:8
  269:14 275:20
  304:5

**filed** 101:17

**files** 230:19

**filibustering** 309:1
309:2

**filled** 24:9

**final** 124:19 125:5
235:16 324:1
325:16,20,22

**finance** 3:21

**find** 35:8 59:2
63:20 68:3 69:23
69:23 72:19 73:25
74:4,8 75:15
77:17,24 78:19
80:17,22 82:11
93:17 97:5,17
102:6 116:10
119:15 140:15
160:9 169:17
180:20 284:11
285:2 286:23
292:7,8,12 304:25
305:4 308:19
313:19 322:21
335:11

**finding** 105:6,8
132:1 275:9
293:23 294:9
308:11 310:2,3,20
311:24 314:15
315:19 316:18
317:15,17,21

**findings** 74:19
76:21 103:22,25
104:11 105:9
117:5 151:22
172:5 278:7
317:15 323:25

**fine** 42:9 44:14
143:11,12 193:5
245:16

**finer** 102:2 170:21

**finish** 40:9 297:5

**fire** 102:4

**firm** 229:12

**first** 17:10 19:7,11
19:13 53:12 64:16
163:17,19 177:9
229:20 230:3
236:2 237:8
247:24 252:25
279:25 280:14,16
282:10,20,21
300:23 301:21,22
302:12 304:3,6
320:25 322:15
329:1 333:10

**fit** 227:2 290:1,12
299:8

**five** 33:6 54:21
80:4 94:6 179:7
193:4 297:10
318:12

**fix** 190:15

**fixed** 208:21

**flip** 177:20 178:5
184:2

**flipping** 175:19

**floor** 2:21 4:4

**flowers** 50:7

**fluid** 324:21

**focused** 139:6

**folder** 134:12

**folders** 138:23

**folks** 16:17 25:16
215:8 232:4

**follow** 104:24,24
161:6 164:16
258:20 272:15
330:25

**followed** 17:20
40:16

**following** 27:1
201:18 204:6
206:13 324:12

**follows** 17:11
289:12

**foregoing** 333:15
333:19 336:13
337:18

**forensic** 23:22
25:17,21,25 26:4,8
27:7,11,20 29:2
44:18,19,23 46:19
58:10 64:7 104:23
158:5,16 159:23
214:9 225:18
226:7 227:15
234:10 235:4
236:19,23 237:10
267:14 287:9
297:13 298:12

**forgive** 122:22

**form** 29:13 30:17
31:2,11,14 32:14
32:19 34:17 37:21
39:14,24 41:9
43:16,24 48:5
49:6 52:6 53:1
55:12 56:11,24
57:19 58:8,21
59:6 60:14 63:7
66:7,9,14 67:3
68:12 77:21 78:25
81:21 83:14 87:7
88:7 89:2,20 90:2
92:10 93:13,19,25
94:25 97:2 98:1
98:23 99:4 101:1
103:8 104:7 106:2
107:11,25 114:16
115:10 119:17
120:1 121:23

125:7,8,20 126:9
126:20 127:18
128:3 129:21
131:10 137:18,21
138:14,21 139:15
140:10,17,22,24
141:1,11,21 142:2
142:20 146:6,23
151:18 152:13
153:1,8,18 154:2
154:17,24 155:21
156:9,14 157:5,12
158:14,21 160:25
161:15 162:20
164:13 165:15
169:14 170:10
173:10 174:21
177:5 178:11
179:11,25 180:21
181:10 182:2,19
182:25 183:14,24
184:12,25 185:9
186:13,23 187:23
188:19,25 189:4
189:11 190:6,21
191:12 192:3,8
194:15 195:4,15
195:19 197:12
198:4,21 199:20
200:15 207:2,23
211:14 212:16
214:16 215:17
216:3,18 220:10
220:24 221:8,23
222:7,15 223:3,23
224:13,15,24
230:21 232:2,16
233:14 235:18
239:17 241:15,25
242:9,22 243:12
244:11 245:6

252:13 254:1,13
255:24 262:24
264:7,20 265:16
266:15 268:9
269:22 270:13
271:20 274:12,20
275:7 276:13
279:6 281:21
282:8 286:2
290:15 291:12,23
293:3 294:20
300:5,12 302:5
305:18 306:4
321:20 324:9
326:4,19,25 327:8
327:18
**format** 48:11
60:12 141:4
160:16 202:6
258:13,19
**forms** 310:19
**forth** 98:10 212:25
218:25 232:25
240:12
**forward** 205:2
229:5 335:15
**forwarding**
217:16 244:25
**foul** 81:20
**found** 56:20 57:17
69:6 86:23 88:5
116:20 117:24
146:19 168:4
178:14,15,22,23
179:1,14 180:12
180:18 182:11,12
222:18 229:2
255:22,25 279:4
311:23
**foundation** 143:7
245:11

**four** 179:7 192:22
**frankly** 199:17
294:16
**frat** 281:2
**frederick** 3:3
**free** 66:22 99:10
336:14 337:20
**frequency** 30:11
30:13 46:2 118:21
119:3 172:23
300:25
**frequently** 207:11
235:14 270:2
**friend** 106:15
260:17
**friends** 218:25
253:4 256:4 262:1
263:17 278:3
295:3,4,5
**front** 270:23
273:11
**fulfill** 153:13
154:10 155:10
**fulfilled** 154:7
208:4
**full** 20:5 22:20
23:15 135:14
230:6 256:5 315:3
322:21
**fully** 153:13 329:8
**function** 41:4
58:20 153:3
176:10
**functions** 153:6,25
**funded** 155:6,10
**funding** 153:24
154:11 155:1,15
211:17
**funds** 214:23
**further** 143:22,24
185:21 219:11,14

286:25 318:10
320:13,15 333:18
334:1
**future** 153:14
222:19

**g**

**garbage** 216:6,7
**garbled** 151:3,6,10
**gary** 7:19 238:12
238:21
**gears** 236:4
264:12
**general** 33:24 34:4
51:14 59:11 89:23
103:1,3 104:12
130:10 175:21
181:16,18 212:1,2
212:12 265:4
277:20 324:16
331:3
**generalities** 59:10
285:23 316:6,7,8
**generally** 19:18
37:1,14 40:5,11
51:9 61:3 70:8
71:2 74:16 79:7
82:22 99:16
212:15 213:23
234:3,3,11 261:5
261:12 279:17
283:17 317:22
318:5 321:12
**generate** 141:8
175:8 181:12
252:16,16 261:14
281:22
**generated** 140:18
141:3,5 174:11,18
174:20,24 192:1,5
193:25 216:11

**generating** 227:1
**generation** 180:8
**generic** 227:4
**generically** 103:9
**genet** 217:17,17
219:19
**genetics** 46:21
**george** 1:14 6:7
7:5,15 8:4 17:7,12
17:16 28:10 145:5
200:23 225:13
229:8 257:9
286:25 318:19
320:15 333:9
335:8 336:4,9
337:4,13 338:20
**getting** 39:16
115:22 197:11
266:16 278:5
328:10
**gianna** 3:12 15:19
**giannac** 3:15
**gibson** 4:4 16:19
**gillepsie** 7:10
135:1
**gillespie** 194:21
**give** 76:19 80:25
99:10,12 160:2
163:2 191:10
201:5 203:4 210:8
217:3,7 225:6
231:3,3 237:18
239:2 256:8 298:2
307:22 323:4
332:1,10
**given** 46:11 71:4
71:11 77:1 82:17
111:8 115:9 116:9
200:11 261:6
333:12,17

**[gives - help]** Page 27

gives 167:1 247:12
giving 103:13
   237:21,25
glad 149:11
glancing 279:11
   279:20
go 22:16 23:20
   53:11 55:6 64:13
   64:15 67:22,22
   68:3,17,19 77:23
   80:1,3,6 85:12
   91:14 98:3,13,17
   102:18 109:3,5
   113:4,19 134:12
   138:22 140:6
   143:4 154:3 155:7
   175:20 177:8
   179:20 180:20
   183:18 190:3,12
   190:13 204:10
   231:11,16 245:13
   245:14 254:5,19
   255:17 257:2
   266:9 267:10,11
   268:16 272:4,12
   278:17 283:8
   285:7,7 294:24
   297:25 301:15,18
   302:18 318:2
   329:17 330:6
goal 250:21 266:6
goes 121:1 175:12
   226:1 284:1
going 18:17 23:3,4
   23:5 41:1 43:22
   44:5,6 60:9 63:22
   68:16 79:1,10,23
   80:12 82:2,2
   90:21 91:19,20,21
   91:25 101:6
   103:18 106:24

122:23 129:16,24
131:3 132:10
136:6,8 140:9,13
141:3,5,8,15,19
143:4 147:22
151:8 152:9
153:10 161:4
162:22 167:24
190:4,12,12,14
205:2 209:4 216:2
216:17 217:3,5
229:13 237:6
246:23 261:14
267:23 269:9
274:22 275:24
276:22 280:20
285:16 293:22
302:20 307:19,22
308:23,24 309:11
328:22 329:10,17
330:5,23
good 17:14 28:23
   94:3 152:11
   215:15 318:21
gosh 141:6 235:12
gotten 230:9
   285:18
govern 238:8
government
   183:18,19 215:8
   221:6
governmental
   41:20 236:15
grab 204:11
   273:11
grant 4:5
granular 176:6
graph 182:4,9
graphs 181:13
gray 2:15

great 18:21 28:19
greater 207:5
grim 159:2
ground 18:1
group 114:25
   115:2
guarantee 268:16
guarded 283:3
guenther 7:19
   238:13,21
guess 134:11
   151:9 159:13
   176:18 222:20
   249:3 259:22
guidance 264:1
guidelines 159:17
guideposts 75:15
gunshot 82:6
   268:24
guy 299:21

**h**

h 2:10,10
halflife 150:3
hamilton 94:19
hand 48:22 89:14
   90:23 91:10
   103:10 112:3
   171:12 234:12,13
   262:14 324:3,25
   334:5
handed 238:18
   240:17 257:16
handing 246:19
hands 82:23
happen 18:13
   299:12
happened 110:10
   129:11 130:6
   142:17 166:23
   204:14

happy 18:9 34:25
   151:8 310:11
harassing 192:21
hard 130:13
   188:24
harm 90:20
hay 261:13
hbc 4:2 16:20
head 21:13 64:5
   75:5
headed 178:13
heading 48:15
   55:2,16,18 56:14
   176:16 180:16
heads 212:23
health 2:19 4:7
   15:23 90:19
   217:18,19 219:17
   219:18
healthcare 39:10
   41:20 46:25
   100:22 101:3
   102:8 297:19,23
heard 15:6 17:19
   30:14 31:16,18
   45:8,11 158:10,12
   194:17 196:19
   216:6
hearing 299:2
heart 54:15,16
   107:14 108:18,19
   157:22 202:15,18
   278:12 293:16,19
   306:14 308:18,19
heavy 279:19
held 19:3,16 34:15
   265:2
helmick 3:12
   15:19,20
help 63:9 68:24
   72:16 108:10

113:11 201:11
261:14 266:1,8
**helped** 124:14
**helpful** 274:8,13
**helps** 114:18
**hereinafter** 17:10
**hereunto** 334:4
**hermiz** 2:4 6:12
15:11,11 28:7
29:13 30:17 31:2
31:11 32:14,19
34:17 37:21 38:5
39:14,24 41:9
42:6 43:16,24
44:2,13 49:6 52:6
53:1 55:12 56:11
56:24 57:19 58:8
58:21 59:6 60:14
63:7 66:7,14 67:3
68:12 77:21 78:25
81:21 83:14 87:7
88:7 89:2,20 90:2
92:10 93:13,19,25
94:25 97:2,10
98:1,23 99:4
101:1 103:8 104:7
104:19 106:2
107:11,25 111:11
111:15,19 114:16
115:10 119:17
120:1 121:23
125:7,20 126:9,20
127:18 128:3
129:21 131:10
132:2 137:18,21
138:14,21 139:15
140:5,10,17,22,24
141:1,11,21 142:2
142:20 143:2,6,15
146:6,23 152:13
153:1,8,18 154:2

154:17,24 155:21
156:9,14 157:5,12
158:21 160:25
161:15 162:20
164:13 165:15
169:14 170:10
173:10 174:21
177:5 178:11
179:11,25 180:21
181:10 182:2,7,19
182:25 183:8,14
183:24 184:5,12
184:25 185:9
186:13,23 187:23
188:7,19,25 189:4
189:11,21 190:6
190:21 191:3,12
192:3,8,12,17,20
194:15 195:4,15
195:19 197:12
198:4,21 199:20
200:15 207:2,23
211:14,23 212:16
214:16 215:17
216:3,18 220:10
220:24 221:8,23
222:7 223:3,23
224:13,24 232:2
232:16 233:14
235:18 239:17
241:15,25 242:9
242:22 243:12
244:11 245:6,10
245:18 252:13
254:1,13 255:24
262:24 264:7,20
264:25 265:16
266:15 268:9
269:22 270:13
271:20 274:12,20
275:7 276:13

279:6 281:21
282:8 286:2
289:18 290:15
291:12,23 293:3
294:20 298:23
300:5,12 301:3
302:5 305:18
306:4 310:7
318:11,20 320:13
321:5,11,20 322:8
322:25 324:9
326:4,19,25 327:8
327:18 328:4,9,12
328:17 329:24
**heroin** 63:12
86:19 178:18
179:4 220:25
223:12 228:15,17
228:18 270:19
**hie** 202:10
**high** 89:25 208:15
209:5,16 210:20
298:14
**higher** 26:10
88:18,21 186:21
203:14
**hipaa** 98:19,22,24
102:10,14,22
**hire** 23:9
**hired** 22:20
**historical** 315:15
**histories** 285:6
303:15
**history** 74:19
77:24 78:20 81:14
84:21 106:20,20
106:23 107:5,5,6
128:13 164:20,21
167:15 168:13
169:15 171:12
172:6 252:21

255:20 256:5
260:11,14,25
261:1,1,3 262:12
262:13 263:14,15
263:20 276:18
278:2,5 285:2
286:23 290:20
295:8,8,14 298:9
299:9,19 301:20
302:20 304:15
305:4,8,9,11 308:2
311:13 317:10,11
**hold** 25:14 43:13
118:4 136:22
195:3 267:6
289:15 297:14
324:22
**holding** 297:13
**holds** 308:15
**hole** 75:5
**holiday** 37:2
**homicidal** 84:25
**homicide** 54:1,9
54:22 77:14 81:7
81:10,16,23 82:13
82:18,20,22 84:7
209:2,4 210:11
268:23
**homicides** 214:22
**honestly** 181:4
**hopefully** 229:14
**hospital** 100:7
110:18 111:1
201:25 205:5,12
205:15 212:20
213:12,12
**hospitals** 98:9
101:13 203:25
204:12
**host** 310:20

hour 49:15
hours 184:20
192:22 204:5
319:21
hum 111:21 258:2
268:19 275:12
283:2
human 222:13,15
287:12 289:16
291:3 313:4
humans 116:24
222:17,18,21,22
hunter 3:22 16:25
16:25
hydrocodone
178:19 179:4,17
179:17
hypothesis 303:19
304:1
hypothetical
80:25 82:1,16
83:22 103:13
hypothetically
76:2 270:15
hypoxic 201:14
202:9,12,19

**i**

idea 57:14 258:22
258:24
ideally 253:13
ideation 91:13
identification
28:12 47:15 135:5
174:3 201:2 217:1
238:16 240:8
246:17 250:4
257:13
identified 76:7
106:6
identify 51:18
55:5 57:15,17

303:6
identifying 112:6
ignore 167:24
illegal 63:13 67:1
112:24 222:13
223:12,18 263:11
illicit 30:6,8,21,21
30:22 32:10 66:2
66:6,8,18 67:4,4,8
67:14 69:1,4,5
71:24 75:17,19
81:4 82:9 103:5
103:15 107:9
108:7 201:21
202:1,23,23
203:21 205:6,22
209:14 220:21
221:20 223:4,24
255:1,21 263:2,3
282:21 292:2
301:23 302:9
305:21
illicitly 67:8,17
75:21 164:3
illinois 3:9,23
illogical 291:11
illustrative 146:10
immediate 21:16
29:16 61:10
187:13,17 189:12
202:8 251:12
immediately
118:10
impact 119:10
211:21 214:14
impacted 124:7
167:3
implication
294:11 296:21
implications 171:5

implies 287:17
293:10 296:16,18
309:23
imply 75:8 171:13
171:14 178:20
308:15 317:3
implying 34:19
172:5,6,7,7 245:11
265:23 306:19
important 71:9
75:6 77:3 78:18
79:2 105:16
119:14,20 141:7
141:17 215:12,23
216:10 250:22,25
255:16 260:5
268:25 269:2,3,4
269:10
impossibility
89:10 102:3
impossible 58:2
149:5
impractical 261:6
impracticality
102:3
impression 108:15
155:7 219:15
221:2
improperly 67:7
266:10
improve 251:1
inability 261:24
inaccuracy 184:24
inaccurate 182:22
183:3,7 184:17
185:6,20,22
192:14 216:15
inadequately
155:10
inappropriate
126:8,11 127:16

127:20 128:24
130:13
incarceration
255:5
incidence 29:10,17
incidences 181:6
include 32:8 56:20
100:15 169:16,19
241:5 254:23
260:6,12,25 261:8
268:13 323:1
included 58:15
61:8,9,12 87:13
134:16 149:25
179:6 228:19
259:17 269:8
279:14,15 326:22
335:13
includes 230:16
260:4
including 33:8
116:14 200:4
241:7 251:6 265:6
inclusion 78:9
incomplete 326:14
inconsistent
140:16
incorporated
337:12
incorrect 150:9
256:9
increase 220:7,13
220:15,17,20
increased 212:1
incredibly 329:4
independent
150:20 151:13
176:7 221:21
223:1 243:8
independently
121:4 169:20

**index** 6:1,4,5 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
**indicate** 69:4
90:16 96:16 159:9
204:20 205:21,24
262:18
**indicated** 46:10
108:25 225:18
261:10
**indicates** 59:7
**indicating** 41:16
277:22 335:13
**indication** 76:19
200:9 202:21
274:14
**indications** 200:8
**indicative** 278:8
**indirectly** 244:24
**individual** 24:13
25:24 54:14 59:24
60:2 69:9 72:3
74:14,23 76:8,9,14
76:17 77:1,4 78:2
78:6 80:13,14,20
82:17 83:7,23
84:13,14 89:22
91:5 93:21 95:16
96:1 98:18 100:13
100:17,18 103:14
103:18,20 104:25
106:4 109:3,8,9
111:6 113:17
114:1,6,7 117:8
118:1 119:21
120:9,15 121:15
123:10,20 125:13
126:24 127:11
128:10 130:24
132:7 133:17,20
134:15,20 138:23

140:7 143:19
149:21,24 159:10
163:7 164:21
166:16 167:20
168:8 171:1,8
204:17 205:11
206:9,11 208:2,24
212:19 225:24,25
226:24 235:22
241:9 244:4,21
268:1,2,5,12
269:16,24 270:20
271:16 272:21
274:10 276:5
278:19 279:24
280:13 282:15
285:21 286:12,20
290:20,23 292:12
293:11 294:10
295:7,10 299:6
302:14,18 303:12
308:17 311:4
321:15 325:4,20
**individual's**
122:18 149:4
150:7 168:6 211:2
**individually**
105:13,18 269:21
302:17
**individuals** 51:13
71:2 83:1 88:19
88:21 90:9 96:19
97:6 98:12 105:4
110:17,17 112:10
114:23,25 115:2
116:17,18,19
117:24 118:12
139:17 154:4
157:8 158:25
161:2,21 163:5
165:16 167:14

195:23,25 203:24
204:1 206:13
209:7 210:15
212:17 213:11,16
218:21,23 219:1
241:18 242:5
243:25 244:1
265:5 266:4
268:24 270:25
273:22 279:8,11
280:2,19 284:13
284:18 289:24
292:1 301:19
302:17,19 303:5
303:14 307:1,24
308:6 313:6 314:1
315:12 321:22,23
322:14
**induced** 166:12
**infarcts** 166:14
**infectious** 36:14
**influx** 221:7,10,11
221:13,17
**inform** 123:7
214:22 215:6
311:6
**information** 68:20
68:21,22 78:23
86:7 93:22 109:7
110:11 122:4
123:15,23 124:14
124:17,18 125:3
125:15 130:2,19
130:25 131:15,23
133:13,24 137:6
139:7,12 140:16
141:8 167:25
183:23 185:13
186:15 191:11
198:2,3 202:22
215:13,16,20,24

215:25 216:13,14
216:14,15 220:1
241:6 245:1
250:17,22 251:5
252:5 253:15,15
253:18,20,22
254:4,6,9,12,15,24
255:16,18 256:7
256:16,21 260:13
260:16 261:8,21
262:2 268:14,18
269:6,7,9,11
272:23 273:3
274:3 275:15,18
276:3 278:6,18
279:4 282:25
286:1,10 288:20
294:1 301:25
302:3,16 303:13
304:5 311:5,9,10
315:4,8,11,15
322:21,23 323:4
323:17,22,23
325:10,25 326:21
327:6,11 328:1,14
328:15
**informative** 125:3
**ingesting** 77:5
**ingredient** 32:8
**initial** 26:10 91:18
125:13 129:9
130:4 132:1
154:25 155:4
230:13
**initially** 91:19,21
91:23 255:16
262:13
**injected** 114:7
**injury** 201:20
202:19

**inordinate** 329:12
**input** 175:9 198:2
  281:19
**inputted** 56:16,17
  96:15
**inquiry** 132:19
  269:20
**insert** 199:24
**inserts** 199:25
**insight** 167:2
**insofar** 157:6
**instance** 109:4
  121:2,11 124:8
  125:10 126:3,4
  127:8 128:4,8
  129:8 130:17
  131:11 149:23
  150:2 202:12
  205:23 208:2
  209:3,12,16 214:5
  230:20 242:25
  243:2 261:19
  267:17 270:1,22
  275:19 276:9
  279:4 319:8
**instances** 36:24
  42:19,21 57:11
  62:21 71:1,6 90:6
  90:13 101:15
  113:15 117:14
  157:10 168:16
  200:6 203:2 204:3
  207:4 209:7 211:4
  212:21 213:3,10
  214:8 227:3,8
  234:25 261:22
  262:10 290:16,24
  327:2
**institutions** 196:24
**instruction** 332:1
  332:10

**insufficient** 90:16
**integrity** 152:17
  186:4
**intend** 23:6
**intent** 61:15 90:14
  90:17,20 105:2
  143:23
**intention** 143:22
**intentional** 89:4
  92:5 93:6 329:4
**intentionally** 44:8
  83:11 130:12
**interaction** 45:16
  45:20 236:11
  317:9
**interactions** 31:23
**interest** 175:22
  218:15
**interested** 167:19
  218:3 248:19,22
  334:3
**interesting** 300:1
**internal** 180:2
  196:24 267:11,12
**interplay** 118:24
  197:17
**interrupt** 42:4
**intervention**
  221:13 308:8
  317:8
**interview** 78:11
  168:3
**interviewed**
  116:17,18,21,22
**intoxicating** 76:14
  76:15 228:22
**intoxication** 166:5
  166:8 282:22
  283:20 295:12
**intravenous** 106:8
  132:8

**intuitive** 122:22
**investigate** 99:13
**investigating**
  102:13 248:23
  313:7
**investigation**
  19:25 40:19,21
  41:12 42:2,24
  72:16 74:18,18
  76:19 77:14 78:18
  80:19 86:5 90:11
  91:22 92:3 97:12
  98:20 99:2,17
  100:25 101:5
  106:3,19,25
  109:13 110:5
  115:19 116:15
  117:6,6 125:13
  129:23,25 134:20
  159:7 164:2
  167:13 171:24
  203:22 209:20
  233:24 244:1
  250:23 251:24
  252:1 253:12
  254:20,21 256:14
  258:5,14,16,19
  260:24 261:17
  262:19 263:12
  264:10 268:3,11
  268:13,15,21,22
  271:24 275:13
  276:1 283:11
  286:14 304:10,16
  311:4
**investigational**
  124:23
**investigations**
  19:21 20:1,2
  21:25 22:1 24:20
  25:12 41:11 42:13

60:3 99:6 133:19
  187:18 189:15
  191:17,24 219:4
  244:25 295:21
  307:25
**investigative**
  90:16 202:22
  204:20 205:21,23
  256:10,10
**investigatively**
  210:3
**investigator** 81:11
  106:14 120:25
  121:3,4 250:16
  258:13 263:23
**investigator's**
  251:15
**investigators**
  69:12 107:3,4
  250:21 251:3,23
  252:7 253:25
  254:3,8,10,14
  255:13 256:12
  258:20 259:6,13
  259:14,15,19
  260:1,6 262:8,11
  262:15 264:1
**investigatory**
  79:22 258:1
**involved** 172:18
  172:19 175:3
  182:20 183:1,10
  183:15 184:15
  187:1,1,3 189:22
  189:24 190:9
  191:13 199:11
  236:6,9,14,17
  237:12,14 239:11
  239:16 242:18
  243:3 255:6,6
  259:12 284:7

285:21
**involvement** 236:5
237:13,16
**involves** 43:8
44:22 58:25 157:6
**irrelevant** 261:11
262:17
**irreversible**
202:19
**ischemia** 293:14
**ischemic** 157:23
157:24 201:15
202:9,13,20
306:12
**issue** 40:22 107:19
132:8 160:2
215:10 251:22
252:15 280:7
283:25
**issued** 193:18
194:23 195:1
**issues** 76:22 99:13
103:19 122:19
158:23 161:3
199:14 211:22
212:5 245:13
247:10,17 248:7
256:13 262:7
268:25 269:3
299:6
**item** 262:3,6
**items** 225:23
252:23 255:20

**j**

**j&j** 15:25
**jackson** 5:3,6 16:5
16:7
**jacksonkelly.com**
5:5,9
**janssen** 4:11 15:25

**january** 7:10 48:2
48:19 53:6 135:2
135:14,21,25
136:13 250:8
**jersey** 26:11,20
27:15,18,18 28:2
28:24 29:6,18
30:5,10
**jim** 5:11
**job** 19:19 24:4,5
58:20 82:12 143:1
152:20,23 153:25
186:1 191:10,23
225:18 239:14
**jobs** 36:9 53:15
**jodi** 50:7
**john** 2:10 106:16
249:17
**johnson** 4:11,11
26:16,21
**join** 22:6 247:19
259:15
**joined** 19:7,8,10
26:23
**joining** 24:14
281:2
**jones** 2:9 16:2
229:12
**jonesday.com**
2:12,13
**journal** 46:19,20
**judge** 1:8
**judgment** 63:21
93:10 100:24
114:10 130:5
151:18 152:15
**junk** 232:17
**jurisdiction** 19:22
20:4 40:19 124:21
126:25 215:6
243:15

**jurisdictional**
124:22
**justify** 306:1

**k**

**k** 5:7
**kaitlin** 2:15
**kaitlin.bergin**
2:18
**kearse** 2:3 15:14
15:14 46:14 50:9
193:3,6 195:5,8
277:1 330:11
331:6
**keep** 34:25 236:22
284:20 288:9
294:7,8 300:17
302:22 304:19,19
308:23,25 309:8
310:13 312:14
314:8 328:24
330:18
**kelly** 5:3,6 16:5,7
**kept** 101:14
**khermiz** 2:7
**kill** 82:21 83:11
**kin** 167:17 213:24
213:24 214:2,6
256:3 261:25
263:17
**kind** 30:2 60:11
63:6,19,19 75:9
84:22 91:16 102:3
112:5 114:11
115:7,8 120:25
146:17 149:13
160:20,21 176:2
203:20 205:1
209:22 211:19
227:4 248:2
278:21 279:3
290:19 291:10

**kirkland** 3:21 17:1
**kirkland.com** 3:24
**know** 18:7,8,15
22:9 23:3 24:25
25:8 28:16 36:3
45:7 47:20 52:13
52:15 55:20,25
59:14 60:10 61:13
62:1 63:11,19
64:5 65:20 68:9
71:13 73:18 74:4
75:2,2,2 76:24
77:3,7,9,16,22
78:3 79:12,17,25
83:20 84:13 86:1
91:5,6,20 92:11
93:20 94:17 99:11
101:14 104:13
106:16 107:21
110:16 113:16
114:3 118:5 121:6
128:1,5 129:4,24
131:19 135:13,20
137:14,19,23
139:1 141:7 143:3
146:9,12 147:14
158:7,13,20
159:15 160:1
161:11 163:23
166:23 168:6
171:5,5 172:20
173:8,9 175:20
176:14 177:6
179:9,12 180:9
181:11,22 185:4,7
186:18 188:17
191:4 192:13
193:1,20 194:19
195:1,3 198:16
199:13,24 211:17
214:21 218:12,13

218:14,21,24
222:3,23 229:17
230:7 232:23
234:22 235:1
241:22,24 242:3
242:24,24 243:2,8
245:4,7 247:4
251:18,19 252:10
256:8 259:19
260:21 266:17
269:16 270:2,16
271:8,21,21
276:10 280:12,14
280:14 281:3,9,10
288:10 289:5,6
290:11,12,13
297:3,7,11,13
299:14 300:10,14
301:12 306:6,17
308:5 310:9
312:13 315:9
316:1,1,4,20,21
318:2 322:12
324:16,21 325:13
325:22 326:17
327:4 329:19
330:4,21 331:1
**knowing** 141:19
297:1
**knowingly** 127:15
**knowledge** 24:8
121:19 192:23
222:24 245:9,17
314:21
**known** 32:18
**kohler** 7:14,19 8:5
20:13,17 21:9,10
21:23 23:13,19
24:10 25:12 35:25
36:18 50:20 65:24
89:24 152:11

155:24 156:3,5
172:18 188:13
193:19 194:2
200:23 201:22
206:2,4,7,9 217:13
233:4,5,6,8,16,20
236:2 238:12,20
243:23 244:13
245:1,4,20 247:2,7
247:14 248:11
249:15 250:10,19
251:18,19 252:15
254:24 257:10,20
258:18 259:4
**kohler's** 172:16
244:8 252:6
**kristen** 2:4 15:11

**l**

**l** 1:25 333:6
334:12
**l.p.** 1:10 3:2
**lab** 57:23
**label** 165:7
**labeled** 238:23
246:20 250:11
252:19
**labeling** 199:18
**laboratory** 117:10
**lack** 256:15 285:9
**lagging** 172:22
**laidley** 5:4
**large** 84:4 91:16
92:4 93:1,9,11,12
93:14,17,18,23
116:22 117:13
291:25
**largely** 66:2
**larger** 280:3
**lasalle** 3:23
**law** 84:19 85:1,4
214:20 221:14,15

**law.com** 3:15
**lawful** 17:7 32:9
66:13 77:18 85:8
96:23 97:7 107:9
110:7
**lawfully** 71:23
95:19
**laws** 98:19,22,25
102:22 238:7
**lawsuit** 51:12,16
51:17 121:12,14
127:11 128:16
131:5,7 229:13
231:4,7,13,20
239:12
**lawyers** 49:2
50:14,17 206:24
**lead** 74:5 116:6
185:21 235:21
265:14
**leading** 299:9
**learn** 288:11
**learned** 33:9 35:3
110:6
**leave** 22:10 154:4
203:2
**leaving** 22:16
**left** 22:5,6 23:25
24:1 47:25 48:1
112:3 145:9
257:16 272:16
294:23 309:22
**legal** 54:18 207:12
224:19 265:6
335:1 338:1
**legally** 222:14
**legitimate** 37:19
37:25 38:12,13
71:15,17 72:3,7
77:9,25 78:11
88:20 95:23 96:2

109:11 131:6,22
132:18 329:16
**legitimately** 75:11
77:8
**length** 23:8
**lethality** 76:23
**letter** 335:19
**level** 57:18 63:21
63:22,24 74:24
75:13 76:6 88:18
91:20 92:4 93:5
172:23 176:6
184:9,10 198:17
198:17 208:14
209:6 210:20
215:20 266:21
270:5
**levels** 57:25 64:2,5
113:23 142:13
280:3 325:1
**lewis** 4:17 16:22
**license** 267:7,22
**licensed** 44:17
118:5,7
**life** 100:6 265:8,25
282:24 289:4
290:2 291:20
292:5 293:17,20
294:4,13 295:22
304:13 307:5
308:3,5,14,16,18
308:21 315:16
317:4,6,7,10,12,20
318:1
**lifetime** 166:24
168:19 268:6
270:7,18 274:11
274:19 276:6
278:17 279:9
282:13,18 283:15
284:9,19 285:23

286:1,8 296:5,10
296:13 306:24
314:19 317:16
**lifetimes**  272:23
273:23
**light**  134:18
**lightly**  44:10
**lights**  132:5
**liked**  23:19
**limit**  113:23
**limitation**  199:2
**limitations**  72:14
100:19,21 101:22
198:25 326:6
**limited**  54:21
199:7
**limits**  124:23
331:5
**line**  201:18 202:7
226:12,17,21
258:1 335:13
337:7 338:3
**lines**  202:10
272:16 300:22
**lingered**  205:12
**lisa**  7:14,19 8:5
20:13 200:23
238:12 243:23
257:9
**list**  56:18,23 58:14
64:23 74:25 79:8
89:1 104:5 167:25
168:1,1 169:17,19
179:7 188:23
189:7 227:4,18
262:3,8,15,18,21
263:11,19 279:11
279:21 280:19
282:10 285:1
286:4,6,11,21,22
302:15,17 303:13

309:15 311:13
**listed**  46:12 56:19
65:2,25 66:23,25
72:5 73:8 85:16
86:2,7,8,15,19
87:3,5,5,20 88:1,9
90:1 96:21 97:6
104:17 113:17
116:3 133:20
134:15 148:13
151:13 156:23
161:2 178:17
179:3 184:21
186:22 189:19
200:8,9,11 221:4
227:7,10 228:3
229:4 237:1
252:24 254:22
255:20 261:12
272:22 278:25
321:1,14 337:7,17
**listing**  53:4 55:23
70:10 72:22 73:4
134:7 194:11
337:7
**lists**  59:22 60:17
179:16 255:2
271:6 319:18
**listserv**  233:7
**literature**  46:6
**litigation**  1:6 15:5
183:5 229:22
230:7,14 335:6
336:3 337:3
**little**  68:8 105:11
105:12 160:3
206:17 281:5,20
299:25 318:23
**live**  291:21 297:20
**liver**  163:10
278:11

**living**  118:11,13
168:22,23,23,24
169:11,12 170:16
170:19 271:18,19
287:12,20,22
288:5,12 289:16
291:2 313:9
**llc**  3:21
**llp**  3:3,7,17,21
4:12,17
**local**  85:1 91:2
215:20 216:13
221:15
**locally**  214:15
**located**  18:24 27:4
27:18 94:18
**location**  115:8
**logical**  258:14
**long**  19:3 22:14
49:14 111:18
126:15 143:3
162:18 197:15
204:17 205:14
225:5 248:18
249:1 253:8 265:8
270:11 329:4
330:6
**longer**  101:11
213:8 264:24
288:13
**look**  28:16 46:12
46:16 53:5 58:7
59:18 60:1 64:16
66:22 67:22 68:20
69:15 77:2 78:6
78:21 80:6 81:10
81:13 82:8 83:12
84:20 85:13 86:11
87:17 89:21 92:13
97:16,17,20,24
107:3 111:9

114:10 115:18
130:4 131:20
132:22 134:13
136:4,4,8,25 137:5
138:9,22 140:6
141:15 143:22,24
145:24 146:1
149:13 151:17
160:22 162:13
165:3 170:11
179:16,21,22
188:2,3,22 190:4
194:14 201:5
203:21 207:14
211:18 252:15
254:22 263:23
264:1 269:16,20
269:23 270:11,22
271:15 274:4
275:19 279:7
282:6,9 283:13
291:7 292:7
301:18 302:18
319:9 320:18
323:25 329:17
**looked**  52:1 58:13
58:13 68:23 95:20
105:18 114:11
162:4 184:20
186:10 199:18
273:14 284:10
296:4 299:5
303:12 326:16
**looking**  24:2 41:13
80:1 85:6,10 87:9
88:9,10 92:15
95:16 122:12
151:24 176:3
177:3 188:9 260:9
268:18 272:13
280:24 282:25

[looking - mean]

288:18 305:1
311:1 321:21
326:11
**looks** 46:21 47:24
63:18 84:1 105:10
137:6,8 284:1
**loprinzi** 247:3,4,5
247:12,15 248:5
248:10,19,24
**los** 2:22
**lot** 133:24 225:15
232:5,17 331:7
**low** 75:13 325:2
**lower** 76:6 113:23
142:13 203:17
209:10 211:3
**lucky** 308:13
**luis** 27:21
**luncheon** 144:6
**lung** 163:11

**m**

**m** 2:4,9 3:12
**m.d.** 1:14 6:7 7:5
17:7,12 28:11
145:5 225:13
229:8 286:25
318:19 320:15
333:9 335:8 336:4
336:9 337:4,13
338:20
**madam** 335:10
**mail** 7:10,14,17,19
7:23 8:3,4 135:1
200:23 201:8,14
216:24 217:8,12
217:16,23 218:1
219:11,21 220:1
230:17 231:19,20
232:8,9,13,17,18
232:22,23 233:9
233:17 238:12,20

238:23 246:15,20
246:22 247:2,23
250:2,7,9,9,14
252:6 257:9,20,23
258:8 259:20
**mails** 231:12,14,17
231:23 232:3,5,11
232:14,20,24
233:1,4,6,12
**main** 4:13 5:7
**maintain** 26:2
**maintained** 237:3
**majority** 57:11
66:25 67:13 79:9
107:20 108:5
161:2 188:11
221:2 232:13
235:5 279:10,16
279:20 280:4
285:1 286:21
292:1 299:4
301:19 302:19,22
302:23 303:14,23
304:24 305:3,7,14
305:19
**making** 41:24
42:11 151:25
160:12 161:20
172:3,3 186:24
198:18 245:21
276:4 277:25
293:9 294:3
295:19 307:19
**mallinckrodt** 2:14
**manage** 37:14
255:14 261:7
265:15 266:6
**managed** 265:8,12
**management**
37:16,18,23 38:8
38:19,21,21 40:3

118:13,17 119:4
156:3 195:23
266:4,20,21
297:19
**mandatory** 196:22
198:19,20
**manifestation**
157:20 158:1,3,18
293:8 306:11,13
**manifestations**
166:11 169:18
**manner** 40:14
43:10 54:5,6,8,18
54:21 58:25 59:3
64:17 70:2 71:13
71:20 72:18 74:14
74:22 77:12 79:3
83:4 90:4,7,8
92:24 93:8 94:22
95:2,5,10 99:9,14
99:19 101:7,20,24
102:14 103:6
112:14 119:6,8,19
119:22 122:20
123:20 124:9,11
127:23,25 128:6,7
128:23 129:3,5,9
129:11 131:12,16
167:11,20,23
225:16,25 234:17
234:24 242:16
253:23 256:18
261:15 268:22
271:6 329:15
**manual** 251:15
258:1
**manually** 79:8
80:2
**marcus** 4:3,6
16:20

**marijuana** 224:19
225:1,2
**mark** 3:4 16:11
17:18 28:6 134:22
173:13 200:19
216:20 330:11
**mark.cheffo** 3:6
**marked** 7:3,8
28:11,15 47:13,14
47:18 135:4 174:2
201:1 216:25
238:15,19 240:7
246:16 250:3,7
257:12,17
**marketed** 223:19
223:25 224:6
**marketing** 45:3
221:21
**marks** 310:20
**massachusetts**
2:17
**masters** 4:8 15:22
15:22
**material** 81:4
317:18
**materials** 317:14
**matter** 57:18
89:24 103:1 104:5
137:25
**mcconnell** 2:10
**mcginness** 2:3
**mckesson** 3:16
16:24
**md** 1:7 15:6
**mdl** 1:6
**me's** 50:23,24
**mean** 21:3 30:12
31:25 35:19 36:12
52:15 53:22 63:4
63:24 67:22 72:6
74:1 77:19 80:9

82:6 84:22 97:11
98:2,15 101:3,7
104:8,14 106:20
108:1 109:20
114:8 116:13
117:3 122:6
125:23 134:11
138:8,10 146:20
149:23 150:8,19
151:14 152:4
161:10 164:15
169:6 175:16,18
175:19,20 188:9
199:21 211:16
225:22 232:22
233:22 236:19
244:17,21 245:12
246:1 251:25
253:13 263:4,4
264:21,22 267:6,9
273:3 275:2
278:24 280:24
285:3,10 289:11
289:22 296:25
297:4 308:20
311:12,25 315:2
316:11 322:9
327:12
**meaning** 121:9
171:7 312:4
**means** 45:7 93:17
104:13 148:6,24
174:18 201:12
207:13 216:9
228:4 297:3
308:21
**meant** 95:7 155:14
258:4 261:3
**mechanically**
149:13 151:14

**mechanism** 71:7
148:25 149:4
202:8 212:4
227:19 228:6
249:4
**mechanistically**
150:6
**medical** 7:7,12
18:24 19:1,8,10,12
19:14,20,23 20:3
20:11,24 21:2,15
22:3,7,15 23:10,17
23:21 24:5,6,24
25:7,15,19,20
26:16,18,21,24
27:1,3,6,8,12,13
27:16,17,25 29:4,7
29:12 31:20 32:1
32:18,23,24 33:1,4
33:5,10,16 34:14
34:23 35:4,11
36:11 37:19 38:1
38:23 39:2,18,22
40:5,11,12,14,18
40:20 41:18,21
42:1,12,14,17,24
42:25 43:2,3
45:21 46:20 47:1
47:3,4,5,11,22
48:16 49:3,4
53:14 54:13,18
55:22 62:9,11
68:23 69:13,15,18
74:18 76:21 77:24
79:21 80:7 84:21
85:4 88:25 94:24
95:3,11,13 96:13
97:21,24 98:3,4,7
99:5,7,8,10,18,20
99:25 100:4
101:10 102:11,11

102:22,24 104:9
107:13 113:25
115:18,25 117:1
126:25 127:2,2,6,6
127:10 128:9,13
128:25 131:24
132:19 139:19,21
139:24 143:10
146:5 148:8,15
149:18 151:16
152:11 153:12
157:7 158:25
160:18 161:17
162:2,10 167:16
168:5 169:4
172:10 173:25
174:11,15 181:7
186:19 196:5
203:8,10 206:20
206:24 207:3,9,10
207:20 208:18,20
208:22 211:12
212:3 213:9,22
214:7,10,11,13
215:21 224:17
226:9 227:13,23
229:3 234:13
235:24 237:2,5
238:25 239:15
240:1,11 241:4,21
242:2,7,12 243:7
243:15,21,21,23
244:3,16,17,18,19
246:1,9,10 248:20
251:14 255:4
258:17 260:11,14
260:14,22,24,25
260:25 261:1,2,4,9
261:18,23,23,25
263:14,15 264:13
265:5 267:7,22

268:12,15,16,21
269:1,4,8,10
271:24 275:24
276:12,14 280:6
286:15 292:9,11
292:15 302:11
309:14,16 310:2
311:24 313:22
314:17 315:21
**medically** 124:15
**medication** 72:4
78:14 79:6 80:21
111:7 200:11
252:21 253:5,9
255:20 262:16
279:23
**medications** 42:22
71:14 78:5 109:5
109:19 110:13,15
110:19,21 195:22
196:1,4 220:18
252:5 262:4,9,19
262:22 263:1,4,7
**medicine** 26:19
35:16 66:13,19
85:9 103:5 108:24
118:7 169:2 198:6
267:6,8,11,12
290:5
**medicines** 32:9
35:18 36:5 38:3
81:16 195:13
199:19 220:9
263:7 302:13
**meds** 253:6
**meet** 49:13,22
247:9 248:11
255:14
**meeting** 248:5
249:8,9,14

**meetings** 49:25
50:8 237:7
**member** 106:15
260:16 261:19
**members** 36:13,19
36:24 78:12
102:25 116:20
218:25 253:4
**membership**
236:22 237:4
**memo** 254:7
**memorize** 48:10
162:1,3
**mentally** 207:25
**mention** 65:8
219:16
**mentioned** 94:14
105:15 196:6
**mere** 311:22
**merits** 103:21,24
104:25 105:13
117:16
**mesa** 4:19
**met** 49:9,15
229:10 249:22
318:21
**meth** 299:14
**methadone** 120:10
120:10 127:12
128:10 178:19
179:5 255:8
299:15,22,22
300:7
**methamphetamine**
61:6 64:19 65:1,5
103:4 107:24
108:9 163:13
165:22 177:14,18
177:22,24 178:2,6
178:10,21 179:6
180:5 184:22

186:18 187:11,22
188:23 189:7,16
194:12 220:23
223:18,24 278:14
279:12,15 282:16
282:18 299:12
300:8 302:7,7
**methamphetami...**
104:16 177:4
180:18 181:8
**methodologies**
62:14 113:24
228:11,24
**methodology**
142:12 159:19
**middle** 145:9
**midwest** 335:17
338:1
**milliliter** 74:24
86:23,24 87:21
88:11 92:17
**millimeter** 133:8
**mind** 30:3 92:19
106:12 131:23
138:20 139:9
142:24 155:19
165:5 274:17
**mine** 206:6 234:5
235:5 258:10
**minimum** 62:18
62:19 76:5 203:12
203:15
**minor** 261:10
**minute** 64:16 77:3
91:15 94:6 136:5
152:10 193:4
201:5 225:5
318:12
**minutes** 294:21,23
294:25 324:11

**misrepresenting**
303:1
**missed** 228:17
**missing** 298:24
310:14
**mistake** 190:19
191:2,8
**misunderstood**
164:18
**mix** 299:14
**mixed** 86:18
177:24 227:5,17
279:13
**model** 96:9
**moment** 94:2
106:13 239:2
240:19 253:10
264:12 272:13
**months** 22:18,19
49:21 79:11
101:18 230:8
248:18
**morgan** 4:17
16:22
**morganlewis.com**
4:20
**morning** 17:14
**morphine** 86:15
178:19 179:5
**mortem** 40:23,24
74:12 76:7,12,16
92:4 93:2 104:11
115:4 172:5
204:18 212:22
277:19 307:2,17
308:10 313:17,19
314:14 315:1
317:23
**motley** 2:3 15:12
15:14,16 335:5

**motleyrice.com**
2:6,7,7
**mouth** 105:10
**move** 23:20 41:1
57:8 152:10 314:6
**moved** 258:25
259:6
**moving** 229:5
**mris** 212:23
**mt** 2:5
**muddy** 151:10
**multi** 7:6 47:9
215:22
**multiple** 138:10
186:21
**mumbled** 194:6
**murder** 82:4

**n**

**n.d.** 1:11
**nag** 259:22
**nakamura** 2:21
16:15,15
**name** 15:10 17:15
17:16,18 46:9
112:7,9,10 176:12
205:10 207:21
226:11,17,18,20
227:11,25 229:11
233:7 241:9
294:19 335:6
336:3,4,15 337:3,4
337:21
**named** 333:9
**names** 50:7
**nanograms** 74:24
86:23,24 87:21
88:11 92:17 133:7
**narcotic** 71:3,23
71:24 72:4 262:5
**narcotics** 71:11

**narrative** 238:23
**national** 1:6 15:5
237:2,5 335:6
336:3 337:3
**natural** 54:9,22
103:16,16 209:8
213:17,19,19
214:5
**nature** 42:15
228:20
**near** 111:23
153:14 208:7
**nearing** 217:4
**necessarily** 70:19
72:5 78:10 96:5
99:12 103:11
109:17,19 125:22
125:23 150:19
173:11 178:15,22
212:4 256:17
265:9 269:1 271:7
287:4 293:15
324:23 326:9
**necessary** 36:18
36:21 100:24
101:24 103:11
125:23,24 127:5
127:22 128:5,15
128:20,22 129:2,5
129:15,19 131:1,1
153:6 168:16
200:7 213:8 214:2
253:11,21 255:17
261:5
**necessitate** 75:3
**necessitated** 213:5
252:4
**necessity** 213:4
**need** 18:6 43:9
58:25 60:1 70:22
73:20 76:22 77:7

77:9 84:9 92:13
99:23 104:25
105:13 119:3
123:15 128:6
140:11 150:15,25
151:6,23 152:6
153:13 162:14,16
162:18 176:25
177:8 179:20
191:18 211:19
213:20 214:3
225:4 229:16
243:10 244:15
252:16 261:7,12
262:18 266:22
267:18 268:7
269:20 270:1,10
270:20 271:15
272:24 274:2
275:19 278:17
283:8 294:6,24
303:25 311:21
315:4 322:22
328:18 329:18
**needed** 79:22
215:9
**needing** 36:22
**needle** 106:8,8
278:9 310:20
**needs** 62:18 90:4
92:6 93:3,6 95:2
99:7,18 153:13
203:12 207:4
235:13
**negate** 76:8
256:17 308:10
**negative** 36:8
**negatively** 211:21
**neoucom** 47:6
**never** 35:12 41:10
41:15,19 42:23

45:15 67:15
110:14 153:23
156:23 161:10
168:7,8 196:19
208:8 223:19
224:25 239:24
243:7 245:23
246:8 285:8
291:19 292:14,23
292:23 296:2,6,8
296:12 308:7,8
**new** 3:5,5 26:11,20
27:3,4,9,12,15,17
27:18 28:2,2,23,24
29:5,6,18,18 30:5
30:5,10,10 130:19
330:20 331:4
**newark** 27:18
**nice** 253:20
**nine** 179:8,8
**nomenclature**
130:10
**non** 35:14,14
50:14 66:18 67:2
67:9 102:23
103:23 107:13,14
108:8 262:22
278:3 316:23,23
**normal** 63:15
**north** 3:14,23
**northern** 1:2 15:7
**nose** 105:10
**notarized** 335:14
**notary** 333:6
334:12 335:25
336:10,18 337:15
337:23 338:23
**note** 88:25 89:12
89:14 169:4,9
319:11 326:7
335:12

**notice** 7:22 240:6
241:3,5
**noticed** 259:24
**notification**
229:21 230:9,13
**notifications** 230:1
230:8 232:21,24
233:2
**number** 7:3,8,11
7:13,16,18,20,24
8:3,6 15:6 22:18
31:9 47:12 55:13
60:10 61:1 64:23
76:8 84:8 85:18
86:4 87:12,14
88:10 93:4 106:18
111:12,14,16
112:2,9,11 113:5
135:4 145:18
165:21 174:1
177:2,11 178:13
179:1 180:11
189:14,16 201:1
206:19 210:15
212:1 216:24
220:7 235:23
238:15,22 246:15
250:2 252:23
257:11 259:21
261:6,10 282:10
283:14 285:24
286:7 309:24
310:15 319:9,15
319:16 321:6,7
322:1 329:12
335:7,13
**numbers** 48:24
135:9 137:11
179:17 337:7
**nursing** 47:1
241:4

**nw** 3:13,18 4:9
**nyu** 27:6

**o**

**oarrs** 68:10,14
 70:5,9,16 71:21
 72:5,15 78:7,9,21
 79:1,4,6,10 80:1
 97:17 117:1 196:8
 197:2,8,18,20
 198:1,11,14 199:6
 199:10,13,15
**oath** 18:4 131:4
 294:15 296:24
 314:16
**obispo** 27:22
**object** 44:4 143:11
**objected** 141:16
**objection** 9:3,3,4,4
 9:5,5,6,6,7,7,8,8,9
 9:9,10,10,11,11,12
 9:12,13,13,14,14
 9:15,15,16,16,17
 9:17,18,18,19,19
 9:20,20,21,21,22
 9:22,23,23,24,24
 10:3,3,4,4,5,5,6,6
 10:7,7,8,8,9,9,10
 10:10,11,11,12,12
 10:13,13,14,14,15
 10:15,16,16,17,17
 10:18,18,19,19,20
 10:20,21,21,22,22
 10:23,23,24,24,25
 11:3,3,4,4,5,5,6,6
 11:7,7,8,8,9,9,10
 11:10,11,11,12,12
 11:13,13,14,14,15
 11:15,16,16,17,17
 11:18,18,19,19,20
 11:20,21,21,22,22
 11:23,23,24,24

12:3,3,4,4,5,5,6,6
12:7,7,8,8,9,9,10
12:10,11,11,12,12
12:13,13,14,14,15
12:15,16,16,17,17
12:18,18,19,19,20
12:20,21,21,22,22
12:23,23,24,24
13:3,3,4,4,5,5,6,6
13:7,7,8,8,9,9,10
13:10,11,11,12,12
13:13,13,14,14,15
13:15,16,16,17,17
13:18,18,19,19,20
13:20,21,21,22,22
13:23,23,24,24
14:3,3,4 29:13
30:17 31:2,11
32:14,19 34:17
37:21 38:5 39:14
39:24 41:9 43:16
43:24 49:6 52:6
53:1 55:12 56:11
56:24 57:19 58:8
58:21 59:6 60:14
63:7 66:7,14 67:3
68:12 77:21 78:25
83:14 87:7 88:7
89:2,20 90:2
92:10 93:13,19,25
94:25 97:2,10
98:1,23 99:4
101:1 103:8 104:7
104:19 106:2
107:11,25 114:16
115:10 119:17
120:1 121:23
125:7,20 126:9,20
127:18 128:3
129:21 131:10
137:18,21 138:14

138:21 139:15
140:10,17,22,24
141:1,11,21 142:2
142:20 143:2,12
143:15 146:6,23
152:13 153:1,8,18
154:2,17,24
155:21 156:9,14
157:5,12 158:21
160:25 161:15
162:20 164:13
165:15 169:14
170:10 173:10
174:21 177:5
178:11 179:11,25
180:21 181:10
182:2,7,19,25
183:8,14,24 184:5
184:12,25 185:9
186:13,23 187:23
188:7,19,25 189:4
189:11 190:6,21
191:3,12 192:3,8
192:12,17 194:15
195:4,15,19
197:12 198:4,21
199:20 200:15
207:2,23 211:14
211:23 212:16
214:16 215:17
216:3,18 220:10
220:24 221:8,23
222:7 223:3,23
224:13,24 232:2
232:16 233:14
235:18 239:17
241:15,25 242:9
242:22 243:12
244:11 245:6,9,11
245:15 252:13
254:1,13 255:24

262:24 264:7,20
264:25 265:16
266:15 268:9
269:22 270:13
271:20 274:12,20
275:7 276:13
279:6 281:21
282:8 286:2
289:18 290:15
291:12,23 293:3
294:20 298:23
300:5,12 302:5
305:18 306:4
319:6 320:11
321:20 322:25
324:9 326:4,19,25
327:8,18 328:4
**objections** 6:5 9:1
 10:1 11:1 12:1
 13:1 14:1
**objective** 159:17
 160:20
**obligation** 39:22
 41:6 140:14
**obligations** 153:16
 154:22
**obstruct** 330:9
**obstructive** 157:18
 157:21
**obtain** 70:3 85:4
 100:20,23 101:16
 101:22,23 102:11
 102:24 119:18,20
 126:4 168:5 204:5
 253:4 254:4
 255:15,18 256:16
 261:20,24 262:13
**obtainable** 263:15
**obtained** 67:8,16
 67:17 69:20 75:21
 204:2 241:8

253:18 263:17
275:23
**obtaining** 102:22
262:12 276:14
**obvious** 146:18
**obviously** 48:9
104:3 107:21
167:22 203:15
234:25 263:13
277:25 298:13
301:24 302:2
311:3,13 325:23
**occasion** 41:15
200:1
**occasions** 110:18
214:4
**occurred** 85:2
201:20
**occurring** 119:4
**october** 1:16 15:2
217:13 247:16
334:6,15 335:4
**od** 253:2
**ods** 205:5
**offer** 29:21 57:6
58:11 118:9,14
189:13 190:1
**office** 18:24 19:9
19:10,23 20:3,11
22:4,7,15 23:11,17
23:21 24:14 25:20
27:8,11,17 29:7
36:11 41:19 42:1
42:17,25 50:23,24
53:15 58:11 80:13
94:20 96:13 99:5
99:7,19 101:8
102:11 104:6,9,22
104:24 119:22
120:15 121:9,21
127:10 139:8

142:11,12 153:12
155:6,10,11,23
157:7 159:1 169:4
174:12,24 176:11
181:7 182:24
183:5 184:11,13
184:14,14 186:7
190:3,13 192:5
193:21 194:1,4,8
194:23 212:6
213:10,22 214:7
214:10,14 218:4
219:6 220:16
224:18 230:24
233:3 239:7,15,21
239:23,25 240:11
241:17,19 242:3,5
242:10 244:5,22
247:6 248:8,20
249:6,20 251:15
252:12 259:16
260:1 268:2
275:24 280:7
281:19 294:2
295:13 334:5
**office's** 132:20
**offices** 55:22
100:17 233:18
**official** 336:15
337:21
**oh** 95:9 111:15
125:15 196:4
211:18 271:1
277:3
**ohio** 1:2,9,11,22
2:11 3:14 4:14 5:8
7:21 15:8 27:23
118:6 153:12,17
224:19 237:22
240:5,12,18
241:13 244:10

267:7 333:2,7
334:6,13 335:2
**okay** 18:10,15
20:13 31:20 33:7
40:10 42:9 44:5,9
44:13 45:19,22
50:10 52:10 53:11
54:4,6,11 55:10
56:6 59:2 62:5,8
64:10 67:19 80:5
81:1,4 82:4,15,25
84:2,20 85:12
87:17 93:16 94:21
97:5 99:1 111:9
111:15,19 114:8
129:22 130:8,18
143:25 146:13
147:16,21,24,25
148:19 149:10
151:9,12 160:9
164:11 165:25
167:10 173:12
176:4 181:15,21
201:13 216:10
227:21 229:7,18
231:22 232:11,19
233:11 237:15
240:2,25 247:7
249:10,21 259:15
264:12 271:22
272:3,14 282:2,5
285:16 288:17
289:21 292:14,22
304:25 305:6,23
305:25 309:24
311:20 314:11
318:9
**old** 72:25 137:7
**once** 41:19 49:20
49:20 69:19 90:4
101:5 110:12

118:25 137:22
158:14 165:23
184:15 197:1
228:25 242:1
293:5 294:5
323:13
**ones** 115:9 179:22
253:2 302:24
**op** 1:11
**open** 24:7 131:23
328:24 330:18
**operating** 60:11
**operation** 171:15
**operative** 195:25
**opiate** 1:6 15:5
283:16 335:6
336:3 337:3
**opiates** 61:5
238:21 290:22
**opine** 133:25
**opinion** 38:24
44:21 58:24
118:14 131:13,13
155:9 199:9
200:16 206:7
258:12 261:14
295:20
**opinions** 62:10
118:9
**opioid** 35:13 37:17
37:22,23 38:13,20
51:12 77:5 85:9
95:20 96:23 97:7
108:24 110:7,19
110:21 195:13,22
196:1,3 197:3,7
199:19 238:24
283:18,23 296:13
296:17
**opioids** 32:4,7,8
32:12,15,21 33:8

33:19,23 34:1,3,4
34:19 35:4 37:10
37:25 61:6 91:15
200:2,4 237:19
238:1
**opposed** 89:19
91:9 112:7 124:5
171:5 261:18
**opted** 210:8
**option** 227:4
**oranges** 316:25
323:14
**order** 25:14 55:5
55:22 59:17 94:21
123:12 142:17
151:15 162:19
206:18 268:8
271:15 274:1
278:15 283:7
329:5
**organ** 278:10
**organization**
220:4 237:9
**orient** 135:7,18
176:20 225:6
**originally** 319:20
**outages** 232:21,22
**outcome** 36:8
**outline** 159:19
**outlined** 160:11
254:24
**outreach** 219:16
**outright** 234:20
**outside** 41:5,14
67:10 68:1 71:16
72:6 75:23 110:13
138:18 194:14
**overall** 150:21
**overcome** 264:19
264:21

**overdose** 7:7,22
47:10,21 48:16
53:4,6 54:25 55:3
55:5,17,19,23
63:18 67:1 74:15
75:4 76:10 81:7
81:19 82:14 85:24
95:17 103:7,23
104:5,18 109:15
110:23 112:17
113:18 114:25
116:14 117:16
119:12 123:1,14
123:16,17 177:19
201:17,21 202:23
202:24 203:21
204:6,7,10,21
208:11 209:13,23
210:19 211:2,7,13
211:19,24 212:7
212:10,13 218:3
218:18 219:7
220:8,14,15,17,20
225:1 235:17
240:7 241:1,7,23
242:18 243:4
247:18 249:1
252:20 253:12
279:25 308:2
319:3 325:21
**overdosed** 82:9
83:12 84:2
**overdoses** 29:24
30:1 85:7 167:15
201:25 218:22
221:3 280:5
**overheard** 277:4
**overlap** 160:18
**overrepresented**
90:8 91:8

**oxford** 4:4
**oxycodone** 65:2,8
85:15,19 86:8,14
86:19 87:3,12,13
87:20,24 88:19
92:16 93:11,15,24
133:7,10,21 134:7
134:7,16 146:18
146:20 148:12,16
149:3,6 178:19
179:5 299:15,24
**oxygen** 202:17

**p**

**p.m.** 247:16
331:11
**package** 199:24,25
**packet** 199:22
**page** 7:6 47:9
48:11 53:5,9,12
55:14 85:7,13
86:12 111:10,14
111:16 132:22
136:8,17 145:8,10
145:11 150:16
176:12,16,17
177:21 178:9,12
181:13 184:16
185:5 186:15
189:23 252:18
319:9,15 320:18
325:15 335:13,15
337:7 338:3
**pages** 135:17
179:21
**pain** 37:14,16,19
37:23 38:4,7,11,19
38:20,21 39:4
40:2 195:23 196:2
196:5
**panacea** 276:15

**paper** 101:14
230:23
**par** 2:19,20 16:16
**paragraph** 260:10
**parameter** 96:14
96:15
**parameters** 56:13
134:14 139:1,2
163:3 298:8
323:21
**paraphernalia**
69:5 106:5 114:21
117:19
**pardon** 217:9
**park** 3:4
**parma** 16:12
**part** 32:1 36:19
51:11 68:11 82:12
85:16 109:21
122:17 123:19
124:17 127:9
128:12 130:7
132:19 162:13,15
165:7 166:9 169:5
175:3 176:10
191:10,14 202:5,5
202:6 212:3
227:19 228:6
249:3 259:21
263:13 264:17
266:13 277:22
278:2 297:6,7
299:19 310:22
311:23 322:17
337:9
**participate** 20:2
38:18 180:7 192:4
**participates** 47:4
**participating**
19:24 219:4 248:4
264:10

participation
198:11
particular 33:11
55:24 77:17 100:2
112:6 150:18
169:23 215:5
226:10,11,17,20
227:24 241:22
243:9 250:23
255:22 268:1,6,7
268:11 269:18
270:18 273:21
274:10 275:20
276:10 278:16
282:11
particularly 113:6
204:11 208:6
232:6 237:21
248:21 255:21
305:20
party 334:2
pass 26:1 120:12
330:12
passed 25:24
213:6 330:15
patch 67:5,6 69:10
69:11
patches 67:16
path 26:25
pathologic 287:9
288:15 293:7
294:11 306:9,12
307:23 308:11,14
313:16 317:2
318:7
pathological
288:23 310:8,15
310:18
pathologist 23:22
27:20 148:22
226:7 235:4

236:19 284:23
285:13 297:14
298:13
pathologists
104:23 158:5
159:23 225:19
227:16 234:10
pathology 25:17
25:22 26:1,5,7,7,8
27:3,6,7,11 29:2
44:19,23 47:5
158:16 267:13,14
287:10
patient 38:2,11
67:6 68:15 108:25
197:10,23,24
266:20 297:19
patients 37:19,24
38:20 70:10
118:13,13,21
119:2,13 120:18
120:19,20 158:24
165:25 169:25
170:4 267:4
patrick 7:10 135:1
194:21
pattern 283:20
305:11
pauses 329:5
pay 212:6
pcp 224:11,14
pdf 230:20
pdr 199:24
peak 76:13,15
peer 46:5 305:13
pejorative 104:14
pelini 3:12,15
15:20
pellegrino 1:25
333:6 334:12

pending 18:8
131:6
pennsylvania 4:5
people 23:3,5
29:10,19 30:9,25
91:6 96:9 115:11
118:20 119:1,11
130:22 155:16
160:5 162:3,21
163:12 165:6
168:22,23,24,25
170:3,16,19
171:16,18 182:11
185:12 188:9
195:14,24 196:2,4
219:6 224:7
232:12 256:3
279:16,17,20,22
280:5,7,20 283:16
285:1 286:3,5,22
287:20,22,24
288:5,5,12,13
289:4,11 291:18
294:15 299:5,18
299:21 300:4,9,18
300:20 301:10,15
301:18 303:24
304:24 305:3,7,15
305:19 309:15
311:12,12 313:10
316:5 323:20
330:13
percent 188:17,18
189:8 203:5,13,17
203:18 206:25
207:5,7,15,17
209:22,25 210:5,7
210:10 303:24,24
percentage 188:14
188:16 203:11
207:22 208:1

291:25
perception 192:1
perceptions
194:13
perch 7:10 64:13
135:2
perfect 72:1,10
perform 19:21,25
21:21,23 56:1
57:22,23 96:12
99:6 142:21 153:5
155:17 156:6,8
181:1 191:16
213:21,22 214:11
235:8 244:5 308:6
performed 21:24
21:25 24:4 25:11
27:2,7 41:12
42:24 57:13 59:12
65:15 74:17 117:4
156:10 187:18
188:12 189:9,15
191:20 200:18
213:16 219:1
244:1,2 296:4
performing 36:8
39:19 154:21
175:6 244:24
307:25
period 33:3,6,18
79:8 90:25 196:1
202:15 204:6,18
205:12,14,14
213:5 220:15
224:16 229:5
234:8 259:17
265:12 280:3
331:1
periodically 154:3
periods 154:3

**permit**  214:1

**person**  64:13
65:15 75:4,4
77:17 80:23 81:2
81:8,13 83:5,12
88:12 95:19
103:20 110:6
112:6 121:7,22
122:25 123:13
130:11 139:5
166:8 171:24
188:24 194:19
202:12,22 205:22
207:14 231:19
241:2 242:10,19
242:25 243:2
249:22 253:1,5
255:2 266:13
269:12 270:2,7,11
270:18,21 271:18
271:19 274:18
276:11 278:1,16
282:14,17 283:14
285:25 290:2,7,9
291:21 293:18
294:2,12 297:20
299:22 301:22
306:23 307:14
310:5 311:25
313:13,22 316:2,9
317:9 329:13

**person's**  57:18
117:21 276:12
300:24

**personal**  34:21
36:20,25 86:4
105:8 108:3
133:18 184:13
192:23 287:6

**personally**  24:3
41:25 82:18 98:15

181:1 186:5
241:16 336:11
337:15

**perspective**  235:3
288:23 310:18

**pertained**  231:12

**pertinent**  70:1
123:24 151:22,22
152:7 255:21
260:11 261:2,9
262:4,8,19,21
263:14

**pharma**  1:10 3:2,2
16:10

**pharmaceutical**
2:20 16:1 44:24
45:2,11,17 224:9

**pharmaceuticals**
2:19,19 4:12,16

**pharmacies**
100:13

**pharmacokinetics**
31:24

**pharmacologist**
44:20

**pharmacology**
31:22,23,25 33:12
44:16,21

**pharmacy**  100:10

**phenomenal**
253:14

**phone**  16:18 17:4
50:10 249:23
335:3

**phonetic**  217:18

**phrased**  265:1

**physical**  74:19
76:21 106:7 117:5
158:18 163:9
169:17 171:13
287:17 295:10

312:23

**physician**  20:6,20
42:23 44:17,18
71:6 78:3 80:9
99:24 100:14,17
118:6,8,11,25
148:22 197:3,17
253:7

**physician's**  80:13

**physicians**  20:16
24:18 36:21,25
70:12 71:6 96:17
98:9 100:5 101:9
197:20 199:6,9,12

**physiologic**  171:7
171:9 172:8
288:14 290:18
312:6

**physiological**
213:2 289:13
290:21

**physiology**  171:15

**pick**  59:12

**picked**  228:18

**picking**  257:15

**pitching**  258:21

**pittsburgh**  4:5

**place**  115:8 136:23
249:4 264:23
333:19

**places**  225:19

**plans**  190:16

**plant**  225:2

**play**  81:20 118:19

**pleasant**  2:5

**please**  15:9 17:5
17:15 18:14 43:18
53:3 85:14 111:9
132:23 134:23
143:11 144:2
167:7 173:14

176:16 200:20
216:21 251:1
273:11 335:11,11

**point**  84:19,24
89:7,11 96:23
97:8 102:1,2
110:12 115:19
131:18 133:23
136:16 153:14,15
160:1 161:22
162:11 170:21
192:20 193:2
204:19 214:18
222:19 231:1
235:1,3 251:1
254:6 287:6 290:8
298:24 304:21
313:14 314:22
315:10 327:10
329:22

**pointing**  142:4
300:17

**points**  215:23
253:12

**poisoned**  83:23
84:13,14

**poisoning**  81:22
83:16 84:25 281:1
281:4,6,14

**police**  40:6,12
214:20 269:2,3

**policies**  104:22

**policy**  88:25 104:6
104:8 151:25
205:2 214:15,22
215:7,14

**polster**  1:8

**popular**  30:24
31:4,8

**porter**  2:20

**portion** 240:17
271:7
**posed** 42:7
**posing** 170:2
**positing** 83:13
**position** 18:25
23:22 24:9,12
294:18
**positions** 219:2
**positive** 114:4,21
114:22,24
**positively** 211:21
259:5
**possibility** 76:9
228:9
**possible** 57:21,23
76:3 90:14 117:9
127:8 154:19
196:23 203:23
215:14,24 261:5
265:11 290:6
**possibly** 24:14
171:2 230:9 275:9
**post** 40:23 74:12
76:7,12,16 92:4
93:2 104:11 115:4
172:5 195:25
201:16 204:18
277:19 307:2,17
307:23 308:10
313:19 314:14
315:1 317:23
**posted** 78:23
**potent** 113:21
**potential** 32:13,15
33:8,19 34:3,5,11
35:5,15 57:25
76:23 78:10 88:15
89:16 91:7 98:8
101:21 116:12,13
127:6 133:14

134:9 146:21
171:14 199:2
212:10 228:21
276:16 326:24
**potentially** 36:14
83:7 103:16
105:12 113:22
125:2 245:20
265:3,4
**powder** 69:6
114:23 115:12
117:20
**powdered** 67:10
67:14
**powers** 215:7
**practical** 40:20
68:9 101:16
116:16 127:7
227:3 253:16
**practicality**
253:17
**practice** 38:25
44:22 48:13 67:25
68:1,4,10 69:2
110:4 118:7,10,16
118:19 158:16
169:1 267:5,8,10
271:24
**practiced** 267:13
**practices** 39:16
41:14 118:16
198:6 238:4
**practicing** 35:16
36:23 90:25
104:23 169:2
**practitioner**
271:15
**precise** 37:7 330:3
**precision** 78:17
**predict** 314:4

**predominantly**
66:5
**prefer** 261:17
**preparation** 49:23
52:2,25 199:16
**prepare** 49:7
50:17
**prepared** 174:15
239:20
**preparing** 239:11
**preponderance**
206:25
**prescribe** 35:17,20
36:1,3,12 70:14,14
70:17
**prescribed** 37:14
37:17,24 67:5
68:15 71:23 79:6
80:20 95:19 96:23
109:1,16 110:7
111:7,8 241:9
253:1,3,5 280:2
**prescribing** 38:14
70:12 96:17 197:3
197:17,21 198:7
200:9
**prescription** 1:6
3:11 15:5,21
35:20 37:4,5,8,9
37:22 38:12,19,25
39:16 40:2 41:13
42:22 66:16 67:2
67:9 69:22,23,24
70:4 71:15,17
72:3,7 75:20,22,24
77:5,10,18,19,20
77:25 78:2,4,8,11
78:14,19 85:9
88:20,20 95:23
96:2,10,23 97:7,25
100:11,15 107:9

108:8,24 109:5,6
109:12,19 110:8
110:13 117:2
197:7,11 199:21
220:9,18 241:8
242:17,25 243:3,9
262:4,12,22
266:11 279:23
335:6 336:3 337:3
**prescriptions**
37:11 70:11 71:3
78:12 100:16,16
197:23,24 199:22
**presence** 89:12
106:5,6 115:15
117:11 133:21
202:1 203:23
205:6 333:14
**present** 5:11 62:24
69:5 88:16,22
92:5 93:3,4,5
116:19 117:19
137:2,16 138:3
142:6 150:3,4
152:3 226:25
228:10,22 236:1
249:13,18 319:12
320:5
**presentations**
237:19,21,23,25
**presented** 35:12
48:6 156:2 160:15
325:17
**presenting** 156:4
163:9 258:17
289:19 297:17
**press** 30:24 31:4,8
**pressure** 298:14
**pressured** 219:3
**presumably** 73:5
297:14

presume 114:6
133:16 171:11
presumed 76:24
76:25 323:9
presumption
41:25 134:19
170:25
pretty 170:13
prevalent 30:3
prevent 102:7
168:10,14
previously 117:18
125:18 165:16
176:1 238:19
272:16 277:9
283:21
pride 185:25
186:3,6
primary 37:17
80:9 98:9 99:24
260:13 261:21,22
276:17 295:4
298:1,4,15 311:16
printed 47:25
135:19
printout 48:7,12
85:11 87:9 113:16
136:12 137:1
141:2 142:17
printouts 137:24
143:17
prior 22:15 24:23
25:4,6 26:23 77:5
77:20 78:19 79:11
84:21 106:8 107:5
135:14 166:15,17
167:15 169:16,18
170:11 175:15
228:12 236:7,7
237:24 260:21
264:13 277:22,24

278:8 285:12
286:14 317:11
325:5
probability
282:19
probable 201:17
201:24 204:21
205:4 206:14
208:10 210:19
299:9
probably 67:25
84:9 85:3 90:6
106:11,24 142:9
142:10,11,15
160:17 171:25
179:20 180:20
184:9 194:6 210:8
219:5 236:8
255:12 279:21
283:4 288:11
303:14 308:22
310:20 315:11
322:16 329:9,19
probe 116:10
problem 168:25
222:4,8,25 223:8
223:21 224:2,6,14
224:15 316:11
procedure 17:9
60:12 332:7 336:5
337:5
procedures 119:9
195:24
proceed 98:20
325:7
proceeds 324:15
process 68:11
119:9 265:8
283:19 290:18
310:22

processes 196:3
produce 55:23
produced 49:2
135:8 182:18
183:4
producing 183:10
187:3
product 223:2
production 183:15
184:16 187:2
231:24 335:15,17
335:22
products 66:12
profession 39:8
professional 39:9
39:20 48:13 93:10
100:23 114:9
116:5 131:24
139:7 143:11
149:16 150:21
159:18 161:14
162:5 165:7
185:25 186:3
236:5,17
professionally
124:16
prognosis 158:23
159:2 307:21
program 120:16
121:7 123:10,18
124:2,5,6 125:14
127:12 128:11
132:10,16,18
299:23
programs 45:25
255:8
prohibition
330:24
project 219:22
projections 172:14
172:17

promotion 223:1
prompt 190:25
prone 224:23
pronounce 85:20
pronounced
213:13,15
proper 266:23
270:9,16
properly 110:16
241:10
properties 33:7,12
prophylactic 36:5
36:13,20
proposing 83:22
84:23
prosecutor's 247:6
248:8 249:6,20
provide 43:6
99:25 107:15
181:13 187:4
231:5 241:3
250:24 254:12,14
260:10 312:25
323:17
provided 17:8
52:21 303:13
provider 39:10
41:20 127:3
297:19,24
providers 127:7
providing 83:6
153:10 256:4,5
263:25
prudential 2:16
psychiatrist
297:15
psychological
266:19 287:17
288:14 289:13
312:5,22

**public** 152:24
181:16,18 183:12
185:13 191:11,25
213:20 214:3,14
214:22 215:6,14
217:18,19 219:17
219:18 265:4
304:9 325:14
333:6 334:12
336:10,18 337:15
337:23 338:23
**publication** 46:20
**publications** 46:9
46:18,22
**publicly** 191:2
**publish** 46:5,7
**published** 46:8
**pulmonary** 157:17
157:18,19,21
**punctures** 106:8
**purdue** 1:10 3:2,2
3:3 16:10,12
17:19 319:1
**purports** 180:14
**purpose** 122:8,11
176:9 268:20
307:20
**purposes** 28:12
47:15 79:14 91:1
135:5 162:5 164:4
174:3 201:2 211:6
217:1 238:16
240:7 246:17
250:4 257:13
**pursuant** 102:13
129:23 287:13
332:3,6
**pursue** 99:17
**purview** 168:20
**put** 47:17 102:1
110:1 136:6 139:2

170:21 174:5
181:24 187:7
207:20 219:2
249:4,24 250:21
328:23 329:20
**putting** 44:11
102:2 109:25
176:9 181:22
**puzzled** 281:20

**q**

**qualifications**
25:19
**qualified** 210:9
287:11,25 291:1,7
291:9 295:20
298:10 333:8
**qualify** 102:20
237:3
**qualitative** 325:7
**quality** 205:19
211:4
**quantify** 207:22
**quantitate** 94:1
**quantitated**
207:12
**quantitative** 325:8
**queens** 27:14
**queried** 320:1,2
322:1 326:2,6
327:15
**queries** 57:3 96:12
139:18 141:24
143:18,19 147:1
147:11 175:1
320:1,9 322:10
323:19,20 326:8
326:10 327:3
328:13
**query** 55:4 56:1,3
56:12,13,25 96:11
99:11 141:4,23,25

142:21 180:1,3,23
182:20 183:2
187:2,3 189:25
190:10 321:25
322:2,17,18,19
323:2,4,16 324:2
327:20,24,25
328:14
**question** 18:8,18
30:18 31:7,12,15
33:21 34:25 38:6
40:7 41:2,8,24
42:5,7,11,16 43:15
43:23,25 45:14
51:3 55:8 59:25
61:16 63:16 64:9
68:16 73:12,13
77:15 81:6 82:5
83:10,13 84:6,7
97:3 98:13 100:14
102:2 109:20,25
110:3 113:10
115:23 130:14
138:25 139:5
140:13 141:14
143:13,21 145:7
147:9,13,16
150:16,24 151:1,3
152:9 154:25
155:5,13,19 170:2
170:3,14,15 178:9
188:8 189:1
190:11,11,15,23
192:15,15 193:1
195:12 197:13
198:23 245:14
246:5 252:2 259:3
263:9 265:1,19
284:15,16 285:16
285:19 286:10,17
291:17 293:4

294:6,7,8 295:16
295:17,23 297:9
300:14 301:8
309:3,8,12,19,25
312:9,11,12 314:9
314:11,12,21
316:21 324:13
328:5,18 329:5
**questioning**
318:24
**questions** 17:20
64:12 79:15,17,19
84:8 88:14 112:12
122:24 138:20
139:8 142:7,23
143:8 146:1
147:20 151:10
167:4 181:3
204:23 217:6
229:14 256:2,6
266:24 269:24
272:15 298:22
300:1 308:24
311:21 318:10,22
319:2,5,21 320:14
322:4 325:24
326:24 327:9
328:8 329:3,11,13
330:2,4,5,8,13,15
330:25 331:3,4
**quibble** 80:25 82:3
**quick** 73:12
**quickly** 176:3
251:6
**quite** 207:11
**quote** 35:24

**r**

**r** 165:10
**radar** 228:14
**raiola** 3:17 16:23
16:23

**raise** 63:16 88:13
92:9,18 139:8
142:23 155:19,23
**raised** 40:22
138:19
**rambling** 152:2
**randomly** 300:17
**ranjan** 2:10 6:10
16:2,2 229:9,11
245:8,16 257:1
265:18 272:4,11
276:24 277:3
**rare** 110:18
279:23 280:13
**rarely** 233:10
**rationale** 251:4
252:7
**reach** 36:25 62:24
302:15
**reached** 228:5
**read** 35:3 51:17,25
52:8,11,18,20
111:17 143:13,14
147:8,16 167:5,7,9
182:9 184:3 201:6
217:4,7 240:21
241:10 247:21
251:7 255:9 258:4
260:18 262:5
265:18,20 294:6
295:1 329:12
336:5,6,12 337:5,6
337:17
**reader** 182:1
**readily** 101:18
**reading** 30:25
34:24 335:19
**reads** 260:9
**ready** 229:15
**real** 72:21

**realistically** 289:3
290:9 291:15,25
292:3 302:20
**reality** 253:16,16
**realize** 83:24
246:21
**really** 38:24 75:8
100:13 101:2
124:25 164:25
167:19 170:2
172:3 173:12
198:16,22 199:10
241:23 259:3
261:14 276:21
281:18 291:22
293:4 300:10
306:25 312:17
313:23
**reason** 38:13 43:3
54:13 68:3 79:22
79:22 113:17
131:4,7 155:15
182:21 231:22
248:25 330:17
335:14 337:8
338:3
**reasonable** 62:11
62:13,17 84:12
89:6,10,13,15,18
90:5 92:22 94:23
95:3,11,13 99:9,20
105:2 114:6,18
116:1,3,6,16 119:7
123:13 146:4
148:8,15,24 149:2
149:9,17 150:5,22
151:19 159:9
168:11 171:23
191:19,21 203:8
203:10 206:8,19
206:23 207:3,6,8

207:10,19 208:5
208:18,20,21
226:9 227:12,23
228:5 229:2
235:24 292:10
293:18 302:11
309:14,16 310:1
313:21 314:16
315:20
**reasons** 37:17,23
71:2 146:15
328:25
**recall** 22:18 25:2
29:12 30:8 31:7
36:2 45:15 49:18
50:13 61:11 64:8
79:4 108:22 111:4
133:16,17 148:20
148:21 175:24
187:13,17,19
189:13 201:8
205:9,13 210:2,13
229:25 230:5,10
234:19 237:20,25
239:7 240:23
247:23,25 248:2,4
249:12,22 251:9
251:12,21 252:14
273:16
**receipt** 335:18
**receive** 36:19
129:1 130:1,3
229:21,24 230:3
232:5,11,14,23
**received** 77:4,8
123:6,22 125:5
197:24 219:25
229:21 230:1,8,12
246:24 258:24
259:4,5

**receiving** 110:19
120:10 121:16
247:23 248:1
**recess** 94:9 144:6
173:20 193:11
225:10 257:4
272:8 318:16
**recognize** 161:1
189:5 257:19
**recognized** 75:17
75:18,24 76:5,11
222:16
**recognizes** 208:13
**recognizing** 78:8
203:4 208:6
210:25 211:3
228:7
**recollection** 29:17
35:23 36:22 37:7
80:3 86:3 133:4
188:5 300:2
**reconcilable**
139:14
**reconciled** 140:1
**reconciling** 140:18
**record** 15:2,10
17:15 39:19 44:12
94:7,11,13 112:1
119:20 120:4
143:14 144:3
145:2 167:9
173:19,22 193:9
193:13 225:8,12
257:3,6,17 260:15
261:23,24,25
265:20 272:5,6,10
289:9 292:15,24
304:9 318:14,18
325:14 328:20,23
329:1,7,12,23
337:9

**recordkeeping**
80:14 100:18
**records** 49:2 68:23
69:13,16,18,22,23
70:4 80:6,8,10
85:5 97:22,25,25
98:3,4,7 99:25
100:4,8,11,11,12
100:15,20,22
101:3,9,10,12,14
101:14,16,18,22
101:23 102:8,12
102:22,25 115:18
117:2 119:15,18
119:24 120:13,16
121:21,24 122:8
122:10,11,14
123:5 125:17
126:4,12,13,18,23
127:2,6,21,22,24
128:2,6,17,21,25
129:1,4,7,18,22,24
130:4,16,22 131:9
131:15 132:15
162:11 165:3
167:16 168:5
260:22 261:18
275:23 276:12,15
276:17 286:15
**recreational** 84:15
164:3 165:23
**recreationally**
83:2,8
**reduced** 333:13
**redundant** 137:10
**refer** 24:10 28:3
53:3 60:2 96:18
138:6 139:16
244:15 283:9
297:25 298:3,15

**reference** 149:21
149:22 186:18
335:7 336:2 337:2
**referenced** 159:24
319:4 333:13,17
336:11 337:15
**references** 103:3
147:2,2,3
**referencing**
145:25
**referred** 277:9
**referring** 30:6
38:7 41:13 48:8
66:9 98:7 103:2
108:16 141:23
150:14 159:22
162:6 164:23
177:7 262:25
263:2 283:6
**reflect** 275:9
276:18 285:14
324:23
**reflected** 178:10
275:11,25
**reflects** 178:13,25
180:11
**reflexive** 151:25
**reflexively** 151:24
**refrain** 317:22
318:5
**refresh** 188:4
**regard** 43:7 59:24
118:23 158:24
210:3 230:6
**regarding** 51:2,12
52:22 59:25
118:15 119:24
155:1 156:3 187:5
191:23 220:7
233:17 234:21
235:23 269:7,25

311:10 332:2,10
**regards** 158:5,24
173:1
**regimen** 253:7
**regional** 27:16,17
29:7 215:22
**regular** 20:16
**regularly** 162:13
162:16
**regulations** 196:22
196:25 238:8
**regulatory** 41:21
**rehab** 255:7
**rein** 99:11
**relapse** 266:9
**relate** 231:7
**related** 29:20
31:21 59:13 75:12
102:23 107:20,23
122:18 172:1
220:8 230:14
233:1 237:19
239:12 248:9,11
248:12,15,21
255:4,5 316:25
**relates** 1:8 58:20
230:23
**relating** 241:6
**relation** 251:23
**relative** 334:2
**relatively** 28:20
177:1
**relevant** 71:10
261:17 276:4
311:6
**reliably** 264:8
**reluctance** 108:11
**rely** 72:13 160:12
183:12,23
**relying** 305:14

**remember** 22:5
29:23 30:24 50:5
50:8 110:4,9
153:21 187:12,17
187:21 196:8
204:15 206:10
233:15 248:6,7
295:16,17 318:25
319:5
**remote** 166:15
**render** 62:10
295:20
**renee** 1:25 333:6
334:12
**rep** 45:8,10,17
**repeat** 151:8 167:6
190:23 216:4
265:17
**rephrase** 150:25
151:11 252:2
**replace** 24:2,4,6
**report** 7:13 21:1,4
39:13,22 41:7
54:24 58:14,14
59:7,22 60:2,16,16
60:17 63:5,25
64:4 70:15,16
75:1 106:19,25
115:19 117:13
137:15 156:24
168:2 172:21,24
173:4,7 174:1,10
174:18,19,23
175:5,10,25 176:9
176:21 178:7
180:24 183:13,16
186:16 189:24
191:14,16 192:6
193:16,18,24,24
194:24 197:1,6
199:6,13 227:7,10

241:12 243:10
244:9 245:1,12,21
246:9 250:17
258:5,14,16
263:12 270:23
273:12,12,15
275:11,13 276:1,1
292:15,16,24
304:10,10 306:21
310:3 318:3 324:3
324:4,5,6 325:12
325:13,15,17,18
325:18,19,23
**reportable** 61:19
62:20,25 63:3,23
63:25 64:3
**reported** 41:19
42:23 43:2 62:15
81:14 185:21
200:7 244:3
245:23 320:4,5
322:18 325:2
327:3,4,14
**reporter** 6:19
226:14 336:7
**reporter's** 6:17
333:1
**reporting** 20:25
21:19 39:17 72:8
184:8 198:13,19
199:10 241:16
242:2,4 244:6
322:19 323:12,13
327:1
**reports** 62:12
124:23 174:14
227:20 245:5
258:19 260:6
279:1 288:25
292:8 322:13
327:1

**represent** 17:19
49:1 51:13 56:10
71:14 181:19,25
182:6 229:12
**representation**
76:13
**representative**
204:7
**represented** 152:5
188:21
**representing**
208:11 218:4
**request** 100:4,7,10
100:12 121:3
124:23,24 125:3
125:17 126:12,13
126:23 127:2,5,21
128:16,24 129:1
129:18,22 130:16
130:22 131:2,22
132:13 231:9
329:19 337:9,11
**requested** 69:18
101:4 120:17
122:9 128:21
132:14 175:2
325:13 332:1,6,10
**requesting** 214:6
**require** 153:17
209:4 212:2,7
298:7
**required** 45:24
46:3 154:1 155:18
156:7,11 208:9
245:12 267:20
335:25
**requirement**
208:5 244:21,23
**requirements**
198:12 253:25

**requires** 150:20
212:8 266:12
**research** 33:5
**reserve** 44:6
**reserving** 328:23
**residence** 78:15
**residency** 27:2,5
47:5 267:12
**resolve** 143:20
**resource** 72:2
**resources** 42:18
98:11 152:23
212:2 214:23
215:10
**respect** 33:11
65:24 113:6
148:12 193:16
222:5 277:8
278:18 284:16
316:9 330:10
**respond** 232:15
**responds** 247:12
**response** 191:5
192:9,18
**responses** 171:10
**responsibilities**
21:22 53:14
172:16 191:15
233:25
**responsibility**
41:7 191:25 197:6
242:6,14 244:9
**responsible**
223:14
**responsive** 44:7
**rest** 23:6 64:8
**restarted** 202:18
**restricted** 102:21
**restriction** 102:7
102:16

**restrictions** 101:7
102:10,15
**result** 74:5 133:6
136:13,18 150:17
151:14 259:8
329:15
**resulted** 241:7
**results** 56:7,14,15
56:19 64:22 66:4
68:25 86:16 87:21
92:2 113:1,13
116:9 134:5,6
137:1 146:19
148:14 149:13,15
150:8,9,11,12
185:22 319:3,11
319:17,23 321:19
321:19 322:19
323:11 326:11,17
327:13,13
**resuscitated**
202:14
**resuscitation**
201:16
**retain** 205:16,17
229:22
**retained** 6:19
204:12
**retaining** 230:13
**retired** 101:10
194:22
**retrieve** 78:13
**returned** 27:15
335:18
**review** 51:5 68:6
71:3 79:1 113:19
122:11,15 129:3
130:1 175:12
197:8 198:3 200:7
210:13 218:4,18
219:8 234:12,14

239:2 240:19
260:23 268:7
278:18 283:10
304:8 332:2,6
335:12 336:1
337:1
**reviewed**  46:5
69:20 108:21
120:3 128:2
131:24 161:11,13
161:16,24 162:8
175:14,16,24
194:1 199:25
240:22 305:13
**reviewing**  79:4
95:24 96:2 175:17
176:1 193:23
244:13 275:19
304:2,9
**reviews**  193:17
**revised**  7:21 240:5
240:12,18 241:13
244:10
**rice**  2:3 15:12,15
15:17 335:5
**ridiculous**  291:13
**right**  17:23 20:7
21:14 26:11,17
34:10,13 35:5,25
38:4 44:5,12
45:17,18 48:22
53:17,21 55:11,11
55:16,17 56:7
58:5,19,22 59:20
63:12 65:21 66:12
66:13 68:10,17
69:17,22 71:25
72:10 73:2 75:10
78:22,24 79:18
80:8,12,16 81:7,11
81:16 82:21 84:1

84:5 95:24 97:9
97:18,22 98:14
102:4 105:18,23
106:19 108:1
112:3,7,15,21,24
115:8,13 121:17
122:8,13 123:1
124:20,24 126:2
127:16 128:2
130:2,9,13 131:6,9
132:1 133:23
137:7,8,11 138:1,4
139:20 146:2,5,22
147:13 148:4,10
148:13 149:19
151:8,20 153:21
154:16 156:17
160:4,7 161:9,18
161:19 165:4,8
168:20 170:17
175:17 176:5
177:12 179:10,22
180:13,14 182:13
182:18 185:14,15
186:6,9 188:24
191:9 195:8
196:12 198:15
200:16 205:1,2,6
211:8 212:15
214:24 216:7,17
217:20,24,24
222:15 223:2,9,12
223:22 224:4,9,12
224:20 225:17,20
226:21 246:12
251:16 256:22
258:5 260:7
262:23 267:5
270:21 274:3
275:16 276:7,12
278:23 281:16

283:7,13 284:6,20
287:5,15 288:22
290:3,6 293:1
297:11,12 298:11
298:22 300:9
304:6,23 310:21
310:22 311:2,5
312:1,21 313:8
318:9 320:23
321:2,10,19
322:20,24 323:3,6
323:8 326:18,23
327:23 328:23
**ring**  36:9
**risk**  36:7
**rivers**  2:4 15:16,16
**road**  75:10 198:15
**robert**  26:16,20
**roitman**  3:8 16:9,9
**role**  19:4 24:19
25:14 172:9,12
175:4,6 219:12
**room**  132:6
**ropes**  2:15
**ropesgray.com**
2:18
**rotating**  234:4
**roughly**  188:14
**routine**  58:15
60:19,21,22,25
69:4 178:16,23
233:1 324:18
**routinely**  46:7
59:15 60:18 61:7
61:8,9,12 96:15
100:12 101:4
199:6 288:24
**rpr**  1:25
**ruiz**  25:6,10
**rule**  102:6 104:9
331:2

**rules**  17:9 18:2
75:10 196:21,24
198:11,13,15
332:3,7 336:5
337:5
**ruling**  109:10,14
109:17,23 119:6
129:9,10 253:22
**rulings**  105:7
**run**  55:20 56:1,3
56:12,25 57:3
60:9,13 137:16
139:1 141:23,24
141:25 175:1
232:22 235:8,10
323:3,16,19,20
**running**  139:17
248:18
**rutgers**  26:13

| s |
|---|

**s**  3:4 335:15 337:8
337:8 338:3
**safe**  67:12 75:16
75:17,18,24 76:11
**salary**  172:13
**sales**  45:8,10,17
**san**  27:21
**sandra**  5:7 16:4
**sands**  150:11
**santa**  27:22
**sara**  3:8 16:9
**sara.roitman**  3:10
**saw**  39:18 51:24
51:24 52:8 186:11
199:1 210:21
227:8 231:23
**saying**  57:2 61:20
82:16,19 92:20,21
115:24 206:2,4
211:18 244:7
248:13 276:25

283:4 288:9 299:2
299:3,4 302:14,25
308:25 309:5
310:13 326:16
331:6
**says** 47:21 48:15
48:21 53:9 55:14
55:16 56:14 73:1
73:23 112:14
113:1,5 136:13,18
137:15,17 138:4
140:2,3 145:17
148:3,18 173:4
176:19,21 179:13
180:11 182:3,8,14
201:14,22 205:2
210:18 240:25
247:8,14 260:12
262:3
**scale** 208:19,21
**scars** 278:9
**scenario** 83:13
84:22
**scene** 69:6 74:18
78:15 91:21 106:6
117:6,24 213:11
**schedule** 234:4,5
247:19
**schedules** 234:7
**scheme** 161:6
**school** 26:17,18,21
27:2 31:21 32:1
32:18,23,25 33:1,4
33:6,11,16 34:14
35:4,11 38:23
39:2 45:21 47:1,1
47:1 161:17 162:2
**sciences** 46:19
236:24 237:11
**scientific** 62:14
107:14 289:8

292:11 305:12
**scientifically**
34:23
**scope** 53:13 75:23
99:18 100:1
129:20 138:19
272:2 313:1
**screen** 56:15 57:12
57:14,16,22,24
58:7,16 59:11,19
60:5,19,19,21,22
60:25 61:8,10,12
61:15 62:15 63:1
71:14 74:12 76:7
76:12,17 84:4
92:25 93:2 114:12
117:1 142:10
152:4 178:16,24
204:1,19 205:19
271:7 325:2,6,7,8
325:17
**screened** 59:4,9,15
59:23 60:4,18,23
61:7
**screening** 228:14
231:17
**screens** 60:10 62:9
325:11
**se** 172:4 265:11
331:4
**seal** 334:5 336:15
337:21
**search** 24:4,6,7
68:14 79:11
112:10
**searches** 79:10
**seasonal** 261:11
**second** 33:3 72:22
74:25 85:13
176:12 252:18
260:10 283:13

**secondly** 71:4
**section** 7:22
176:20 240:5,18
240:25 241:13
244:10 252:19,20
258:5 260:9
**see** 39:8,9 40:8
41:2,4 46:24
47:18 48:15,20,22
52:5,10,19,23 53:8
55:1 56:7 60:3
63:8,9 64:20,24
65:6,9 66:3,21
67:23 69:9,10
71:5 72:2,23
73:23 78:1,7,12
80:24 85:17,24
86:12,16,20,25
87:20 88:2 97:16
111:15,22 112:18
113:2 130:25
132:23,25 134:13
135:9,11,21 137:2
140:7 165:3 176:2
176:23 177:10,22
177:25 178:3
179:14 214:8
218:5 223:9
224:22 231:12
247:13 249:3
250:13 252:21
263:14 282:7
283:11 287:2
290:18 295:24
301:18 306:21
315:17 321:1,14
323:5
**seeing** 214:20
**seeking** 302:4
**seen** 48:3,5,12
52:17 103:2

138:18 139:7,12
141:15 174:6
182:16,23 184:19
211:20 220:6
239:1,3 240:20
294:16
**self** 89:4 90:20
91:1 92:6 93:6
**send** 142:12,14
**sending** 250:25
**senior** 259:19
**sense** 40:20 104:14
108:18 140:14
142:16 175:16
227:3 259:22
266:1
**sent** 201:11 250:10
254:5
**separate** 325:11
**separately** 60:23
**september** 7:15,19
200:25 238:13
**sequelae** 166:25
**serious** 84:24
107:19
**serum** 324:23
325:8
**serve** 219:7
**service** 4:2 37:20
153:11
**services** 211:19
255:8
**serving** 218:3,7,10
**session** 6:15 145:4
**set** 56:13 57:16
79:13 81:10 82:4
203:11 240:2,12
269:19 323:21
334:4
**sets** 198:10 253:17

**setting** 39:6 40:17
73:16 110:14,18
202:2 267:16
287:8,9
**settings** 111:1,5
**seven** 179:7
**sex** 60:8
**shapira** 4:3 16:20
**shapira.com** 4:6
**share** 233:22
**sharing** 206:10
**shed** 134:18
**sheet** 321:22
335:13 337:7,10
337:18 338:1
**sheriff** 27:21
**shopping** 197:10
**short** 22:23 144:1
150:3 153:2,9
154:4 156:2
173:20 201:4
234:10 248:16
257:4
**shot** 299:16
**shotgun** 262:15
**show** 28:14 63:13
131:23 134:6
173:3 180:5
258:18 303:23
322:5 323:7,8
324:25 329:1
**showed** 69:1 81:3
**showing** 92:16
113:13 180:3
250:6
**shown** 51:22
189:23 335:16
**shows** 103:4
114:12 133:7
142:18,19 150:18
182:23 184:21

**sic** 217:17 287:13
**side** 48:23 132:6
136:6,6 199:11
233:18,19
**sign** 234:15 294:19
**signature** 207:21
332:5 334:11
335:14
**signed** 336:13
337:18
**significant** 92:18
103:15,17 129:8
223:7,20,21
**signing** 193:24
244:14 248:17
335:19
**signs** 193:18
234:14
**similar** 24:19
35:25 157:13,14
157:18 201:23
205:3 206:12
**similarly** 130:18
**simple** 41:7
170:14 328:7
**simply** 67:11
76:12 88:8 101:8
110:3 227:2
228:10 235:6
290:25
**sincerely** 335:21
**single** 147:13
151:24 152:1
234:2 235:8,10
262:16 296:3
318:3
**sir** 48:9 53:25
335:10
**sit** 60:24 134:17
161:7 298:2

**sitting** 171:6 284:6
284:17 285:20
**situation** 62:2
63:10,14 81:17
86:22 108:13,22
110:4,10,24
171:13 191:6
204:15 205:20
**situations** 111:3
130:19
**six** 179:7
**size** 295:24 311:19
311:21
**skilled** 152:19
**skzerrusen** 5:9
**sliding** 208:19
**slightly** 22:17
**slipped** 83:25
**smiling** 147:18
**smoking** 163:12
163:13
**snapshot** 76:12
**social** 222:4,8,25
222:25 223:7,21
**sold** 222:14 223:19
224:8
**solely** 273:8,23
**solidified** 235:1
**solutions** 2:19
335:1 338:1
**somebody** 98:16
154:23 189:17
190:19 191:7
291:7 292:16
294:3 304:13
311:1
**someone's** 91:17
93:24
**somewhat** 22:23
151:3

**sop** 102:6
**sorry** 26:15 45:14
102:18 113:8
136:15 145:12,13
145:18 194:6
226:14 237:8
250:11 275:2
276:24 277:4
**sorts** 213:1
**sought** 302:6,9
**sounds** 115:6
**source** 197:11
260:12,14,16
261:21,22 262:1
**sources** 278:3
**south** 1:21 2:5,22
5:7
**speak** 50:16 83:25
221:17 243:24
**speaking** 33:23
40:5,11 245:15
279:17
**speaks** 252:6
**specialist** 217:18
219:19 297:16
298:5
**specializes** 297:24
298:10
**specific** 29:17 37:7
51:15 52:7 59:25
60:3 64:4,6 68:14
77:8 93:21 103:2
103:24,25 108:20
109:20,25 113:16
113:20 117:17
118:1 119:21
121:2,11 123:20
125:10 126:3,4
128:8 129:7
130:16 131:11
132:7 133:4,18,20

134:1,13,14 138:6
143:17,23 148:19
148:20 149:1,20
158:13 187:19
202:2 205:1,7,8,8
205:9,10,11 206:6
206:9,11 208:1,2
209:22 210:3,13
210:14 218:21,24
221:24 228:2
230:6 233:17
240:23 244:15
245:19 252:3,14
259:15,16 268:17
283:6,9,10 284:2
284:11 285:11,21
286:12,20 300:1,3
301:10,15,17
303:7,25 309:25
316:2,5,9 320:3
326:12
**specifically** 26:20
29:22 38:7 40:15
41:11 44:20 58:12
59:18 86:2 94:1
99:14 111:7
140:19 148:21
174:12 176:8
177:7 211:24
220:17 228:4
235:2 240:15
247:25 248:10
263:19 269:13
**specificity** 64:11
207:13 210:20
**specifics** 300:17
**specified** 333:20
**specimen** 62:24
204:11,16 208:17
209:15 320:2,3,4,8
320:22 327:2,3,5

327:14,20
**specimens** 60:20
115:4 117:22
204:1,4,9,13
205:16,18 209:17
211:4 320:6
323:12 324:17,19
327:7,12
**spectrum** 114:11
299:20
**speculation**
305:17
**speculative** 290:3
**speech** 160:2
**spend** 215:9
**spending** 175:25
212:9
**spent** 115:24
182:16 192:22
206:16 214:23
331:7
**spring** 22:7,8
**squarely** 329:14
**sraiola** 3:20
**ss** 333:3
**ssri** 63:15
**stab** 82:7
**staff** 23:18 36:5,7
36:13,19,24
**staffed** 153:2,9,14
154:4 156:2
234:10 248:16
**staffing** 153:25
**stage** 265:10
**stamped** 49:5
**stand** 195:6
**standard** 39:11,17
39:21 40:2,16,24
41:5,14,23 42:3,15
42:20 43:1 60:5
60:11 94:23 95:8

95:9,10 207:1,6
210:11 256:9,10
**standards** 118:15
287:17
**stands** 105:17
**start** 38:9 80:15
96:3 243:1 267:15
279:18 304:2,8
307:12 316:15
325:3,6
**started** 35:2 96:10
250:20 330:19
**starting** 246:25
250:25
**stat** 175:25
**state** 15:9 17:15
91:2 118:6 153:12
154:1 155:8 182:3
182:8 184:9 190:7
198:17 215:22
241:3,4 243:11
244:3,16,18 246:1
246:10 267:7
273:5 274:15
293:17 295:6
317:23 333:2,7
334:13 336:10
337:15
**stated** 31:15
165:16 207:8,11
**statement** 30:19
42:11 150:1 152:5
208:10 210:25
228:3 261:19
266:4 272:25
273:2 277:20
295:19 297:5
300:19 336:13,14
337:19,19
**states** 1:1 15:7
118:7 178:25

180:15
**statewide** 214:15
215:22
**stating** 42:12
201:20 208:9
**statistical** 141:20
174:10,23 186:25
189:23 191:14,16
194:24 211:6
**statistics** 91:2,3
140:18,20,25
141:3,5,8,13 173:2
173:5 175:8 176:7
176:8,21,22 180:8
184:10 188:24
189:3,5 192:5
194:1,4,8,12,20
214:13 216:11
220:6,11 270:24
278:22,25 279:3
281:17,19,22,23
**stats** 273:24
**status** 24:12
201:16
**statute** 243:13
**statutes** 153:11,17
243:19
**statutory** 154:7,10
244:20,22
**stay** 23:6 266:8,8
**stayed** 23:20 27:11
**stenotypy** 333:14
**stephen** 3:17
16:23
**steps** 303:25
**sterbenz** 1:14 6:7
7:5,15 8:4 15:4
17:7,12,16 28:11
145:5 200:24
225:13,15 229:8
229:10 238:18

**[sterbenz - supports]**

240:10 246:19
247:18 250:6,13
257:9,15 272:12
286:25 318:19
320:15 330:1
333:9 335:8 336:4
336:9 337:4,13
338:20
**steve** 7:10 135:2
**stick** 30:2 169:21
**stickler** 260:2
**stigmata** 106:7
163:9 167:18
168:9 171:13
295:10
**stop** 253:10
312:18 315:3
**stopped** 202:15
237:6
**stops** 171:8
**stream** 2:14 3:16
3:22 4:3,17
**street** 1:21 2:16
3:18 4:5,9 5:7
66:17 67:11 75:19
75:21 108:7
112:24 221:3,7,10
221:11,17 266:10
279:19 305:21
**strength** 203:22
**stretch** 33:6
**strike** 41:1 45:5
57:15 72:21 82:2
100:20 123:4
126:16 137:4
139:13 146:16
153:4 162:3
163:18 200:1
248:3 251:20
314:6

**strikingly** 92:3
93:1,9,12,16,18,23
**string** 7:17,23 8:3
216:24 246:15
250:2
**stroke** 54:16 103:3
103:17 104:17
105:7 108:19
**strong** 205:20
258:12
**struggling** 292:4
305:21
**student** 281:2,11
**students** 47:5
**studied** 118:22
**studies** 33:12 59:5
85:16 88:5 108:20
176:19 305:13
**study** 81:3 84:1
91:17,24,25 92:16
93:24
**style** 161:5 162:25
164:23
**subject** 223:13
238:21 247:1
250:16 258:1
**submissions**
172:15
**subscribed** 336:10
337:14 338:21
**subsequent** 247:11
**substance** 78:6
109:16 162:18
169:24 171:3,8,9
217:22 218:1
226:10,12,21
227:24 246:23
265:6,14 266:5
268:6 269:13
270:3,8,12,14
271:17 273:22

276:6 278:11
279:9,18 282:12
284:8,18 285:22
285:25 286:7
297:18 301:23
305:20 309:17
311:15 312:23
315:13
**substances** 70:11
70:15,17 163:8
220:22 228:22
265:7 266:3
267:17 312:7
324:25
**successfully** 26:1
115:3
**sued** 51:19
**suffer** 212:17
305:15
**suffered** 290:20
295:14
**suffering** 206:13
**sufficient** 205:19
208:13 214:9
**suggest** 289:23
291:9
**suggesting** 98:18
**suggestions** 259:4
259:10
**suicidal** 90:14,17
91:9,13
**suicide** 54:10,22
81:7 88:6,15 89:1
89:3,16,19 90:1
91:9,18 92:19
**suite** 2:11 3:9,13
4:14,18 5:8 335:2
**sum** 217:22 218:1
**summa** 47:6
**summit** 1:9 2:2 7:7
7:8,11,12,13,16,18

7:20,24 8:3,6
15:12,15,17 18:23
19:23 20:10 21:16
22:15 23:17 25:8
25:20 26:24 27:24
41:18 47:3,10,13
47:22 48:16,23
49:3,4,9 55:22
96:21 104:9 107:7
107:16,18 113:24
126:25 135:4,9
154:11 173:25
174:2,11,15
183:19 184:2
201:1 215:20
216:25 217:19
220:11 222:9
224:17 225:19
226:8 236:15
238:15,22,25
239:15 240:1,11
242:2 243:14,16
243:18,22,24
244:19 246:16,21
247:5 250:3,12
251:14 257:12,18
**superior** 154:9
155:8 335:1
**superiors** 155:20
**supervisor** 21:5,7
21:8,11,16 77:16
191:1
**supervisors** 39:23
**supply** 3:11 15:21
**support** 106:3
114:1 238:24
**supported** 109:13
134:20 277:24
278:2 283:12
**supports** 90:12
295:13

**suppose** 106:14
**supposed** 181:25
  182:1,10 185:12
  185:15,17 293:1
**sure** 18:1 28:7
  33:10,22 39:15
  80:11 94:5 95:7
  101:2 115:22
  122:22 124:25
  133:19 141:9
  142:25 155:2
  173:17 185:10
  190:24 193:8
  198:16 216:5
  226:3 229:15
  245:18 254:2
  257:1 263:6
  265:24 276:21
  285:17 318:13
  326:20 329:22
  331:4
**surgery** 267:8,11
  267:12
**surgical** 195:24,25
**surprise** 260:2
**surprised** 260:3
**surprisingly**
  231:23
**surrounding**
  199:14
**survived** 204:17
**susie** 106:17
**suspect** 176:25
  325:21 329:20
**suspected** 212:12
  253:2
**suspicion** 41:22
  81:8,12 88:6
  203:20
**swear** 17:5 294:15

**sworn** 17:10
  333:10 336:10,13
  337:14,18 338:21
**synthetic** 225:2
**syringe** 114:3,8,22
  115:12 117:20
**system** 56:21
  57:18 61:24 63:12
  72:8 74:10 88:12
  159:3 198:2,3

**t**

**t** 243:22
**take** 18:9 26:22
  28:15 31:21,25
  94:6 109:6 122:7
  131:21 143:12
  144:1 152:8
  154:14 185:8
  186:6 188:3
  190:18 193:3,6
  201:5 224:20
  229:14 252:18
  276:25 279:25
  280:1 282:9 298:9
  299:11 301:21
  311:19,20 318:11
  329:16
**takeaway** 199:3,4
**taken** 1:19 52:20
  144:6 333:19
**talk** 50:20 59:9
  112:1 160:8,11
  177:3 220:3
  233:19 236:3,4
  266:20 284:24
  297:23,25 298:21
  300:16,23 310:16
  314:9 316:4,5
  324:14
**talked** 29:10 30:5
  49:12 51:1 78:20

106:15 117:18
  118:2 165:1
  177:10 179:22
  254:2 313:3
**talking** 20:10
  30:25 31:9 62:3,6
  65:25 76:25 78:16
  81:22,23 82:3
  83:15 91:23 112:2
  132:3 136:2 146:7
  147:15 160:21
  164:25 165:1
  168:22 173:1
  198:5 199:23
  243:14 270:5,6
  278:4 281:25
  282:2 286:5,6
  304:18,19 310:7
  312:14 313:11
  314:6 315:10
  321:11 330:20,21
**talks** 64:17 320:22
**tammy** 2:4 15:16
**targeted** 217:6
**teach** 46:25
**technically** 267:6
**telephone** 3:16,22
  4:3,17
**tell** 18:9 19:18
  28:1,23 35:24
  43:18 49:11 50:6
  59:19 60:25 61:3
  63:8 65:14,16,18
  78:22 85:6,10
  96:9 108:12 131:4
  133:3,5 139:25
  151:11 154:22
  181:3,23 182:1,10
  185:12 187:9
  201:5 214:1 219:9
  256:5 270:24

274:9 279:8
  281:24 282:5,11
  282:25 283:19
  284:6,17 285:20
  285:24 286:18
  289:8 297:22
  299:17 300:8,18
  300:24 302:24
  303:24 304:12,14
  304:15,17 309:10
  310:14 312:20,21
  321:21,25
**telling** 30:19
  140:11 170:20
  235:6
**temporary** 22:23
**ten** 22:18 24:17
  44:11 199:17
  308:23
**tend** 118:21
  227:17
**tenth** 3:18
**term** 22:23 24:25
  25:2 31:16,18
  45:8,12 107:12,14
  108:18 156:23,25
  158:4 165:9
  168:21 171:4
  207:9 216:6 227:5
  271:3 287:7 296:7
  312:15 317:1,2
  318:5
**termed** 108:6
**terminal** 283:20
  313:14
**terminology**
  170:15 266:7
  284:23 306:18
  317:23 318:6
**terms** 20:25 23:18
  26:25 30:3 33:23

54:8 56:6 59:9
76:25 80:1 81:1
83:15 107:17
108:17,20 109:22
113:7 115:17
160:6,10 180:4
207:13,25 210:18
211:16 213:17
215:21 232:25
266:20 281:6
284:24 316:5,6,7
316:25
**terrible** 106:16
**test** 103:4 151:24
152:1 209:18
**tested** 320:8 321:3
321:22,24 322:16
324:18
**testified** 35:6
89:24 105:20
125:19 141:12
149:12 180:25
196:7 225:15
239:5 267:1 277:5
321:2
**testify** 161:12
183:9 184:17
186:14 195:21
199:8 326:5
333:10
**testifying** 281:16
302:23
**testimony** 29:21
36:1 43:7 57:6
58:12 65:23
107:16 126:15
158:19 164:17
181:13 187:5
189:13 190:1
192:2 199:3
206:22 226:4

236:7 239:8
260:21 274:6
275:6 281:18
291:22,24 296:24
302:10 303:2,4,8
306:20,25 312:25
315:18 330:1
333:12,16 336:6,7
337:6,9,12
**testing** 212:22
213:1,2 321:9,17
322:5,7 323:5,6
**tests** 212:6
**teva** 4:16 16:22
**thank** 17:17 23:24
63:2 76:1 170:6
204:24 277:12
320:14
**theodore** 4:18
16:21
**theodore.dayno**
4:20
**theory** 163:15
**thing** 61:20 62:4,7
74:9 111:18
126:19 130:9
145:25 157:11,14
157:18 164:19
304:6 308:25
316:22
**things** 31:23 33:9
33:10 81:17 97:15
107:2 115:13,17
199:23 225:16,17
254:22 260:5
264:2 270:2,11
310:21 319:24,25
**think** 34:24 35:23
39:10 42:8,10
43:20 44:1,6,7,10
51:24 57:21,22,25

61:20 62:3 65:25
67:12 73:18 76:1
78:20 80:4 85:15
91:10 93:4 94:15
104:13 107:12
111:25 116:11
126:2,21 128:4
129:15,19,19
132:5 134:3 135:8
135:24 138:5,5
140:6 146:17
147:4,12,17
149:12 150:16
152:17,19 153:6
153:24 154:19
155:12 160:1
166:21 172:12
175:1 180:10
181:17,25 182:5
188:15 189:1,6
191:6 193:1 195:5
196:11 197:16
198:24 201:22
205:2,13 211:10
216:9 221:9 225:5
228:12 235:12
249:17 258:4
259:5,6,25 260:20
265:2,4,21,22
266:3 267:10,19
267:20,22 272:1
272:17 284:11
285:2 286:9 287:2
287:3 288:7,7,16
291:14 297:23
298:25 299:1,1,2
299:25 300:19
301:17 305:4
306:15 308:22
312:13,19 314:25
324:10 327:9

329:7,11,18 330:1
330:17,24 331:2
**thinking** 171:6
**third** 33:4 87:4
145:19
**thirty** 335:18
**thought** 33:18
35:2 39:20 60:15
91:18 124:15
125:2 126:7
127:14,16 129:17
131:8,21 157:2
164:14 206:17
241:22 277:1
281:17 321:2
**thousands** 54:15
54:20 228:7,8
318:4
**three** 3:4 49:21
179:7,21 184:20
192:22 220:21
328:25
**threshold** 61:14
61:18 62:16,19,25
63:19 64:2,4
73:14 74:9 76:5
**throw** 308:11
**throwing** 312:14
**tied** 155:3
**till** 33:2
**time** 15:3 18:6,13
18:13 19:16 20:5
20:19 22:20 23:8
23:15,15 29:18
30:1 33:15,18
34:16 35:9 36:5,6
37:3 39:1,2 44:6
45:19 49:16 52:20
60:8,9 74:20
76:13 77:11 79:7
90:15,25 94:4

104:16 109:3,6
114:2 115:24
116:19 120:3
122:13 124:3
125:11 128:11,14
143:24 149:7
153:23 154:8
156:3,5 161:23,25
162:4 163:14,16
163:17,20 171:21
175:20,25 182:17
188:3 190:17
192:10 194:3,7
202:16 204:2,5,9
204:11,18 205:12
205:15 206:16
210:6 212:2 213:5
215:6,9 217:5
224:16 229:6,15
229:16 230:11
233:16 234:8,11
240:22,24 244:13
251:21 265:12
271:9 279:25
280:3,14,16
285:17 289:20
299:16 301:22
302:12 308:24
316:12 320:14
323:18,24 329:16
329:18 331:1,7
333:19
**timely** 36:25 329:6
329:15
**times** 36:22 49:13
66:23 105:16
113:5 156:1,16
165:21,23 206:19
235:19 297:10
308:23 309:3,24
310:15 312:19

**title** 19:6,13,15
25:8
**titled** 7:6 47:9
**tobacco** 265:7
**today** 18:7 31:17
31:19 33:20 34:16
35:11 50:1,18
51:2,8 60:24
94:15 134:17
161:7 182:23
284:17 285:20
318:24
**today's** 15:2
**todd** 7:15 20:23
200:24 217:14,23
**told** 34:14 35:2
58:18 121:8,9
129:14 156:5
157:2 161:18
164:14,17 165:5
169:15 192:23
198:25 206:18
231:21 261:13
289:7 297:10
306:16 309:23
**tolerant** 281:12
**tomorrow** 190:4
190:13
**tool** 72:1 79:5
197:8 199:7
287:14
**tools** 39:12 71:22
80:22 99:22
**top** 64:5 246:22
320:19
**topic** 237:25
**torok** 5:11
**total** 53:10 55:15
171:24 305:16
**totality** 92:3
151:17

**tower** 2:16 5:4
**tox** 57:12,14,16
58:6 59:4,19,21,21
60:5 64:22 68:25
74:5 81:3 84:1
85:16 86:15 87:21
88:5 91:17,24,25
92:16 93:24 103:4
113:1,7,13 114:12
116:9 133:6 134:5
134:6 136:13
137:1 149:13,15
150:17 247:1,10
325:18,18
**toxic** 113:22
**toxicities** 163:6
206:14 292:3
308:1
**toxicity** 64:19 65:5
73:1,10 85:24
86:19 87:24 90:13
103:24 110:25
112:21 113:9,13
113:18 116:4
117:8,15 133:21
134:5 136:20
145:17,21 148:3,9
164:9 165:18
166:5,18 167:21
168:12 177:15,19
177:22,25 178:2,7
202:24 204:22
210:17 227:1,5,17
228:16 279:12,13
279:13 282:16,21
302:7 319:10
**toxicologic** 57:12
212:8 324:15
**toxicological**
57:10 60:10 64:12
176:19 210:22

323:23
**toxicologically**
209:14 324:18
**toxicologist**
324:14
**toxicology** 43:5,7
43:14 44:23 56:6
56:14,15,19 57:23
58:10,13,15,18,19
58:24 59:7,22
60:2,16,16 62:12
63:1,25 64:4 66:4
75:1 92:1 93:1
117:10 136:18
146:19 148:14
151:14 204:8
227:10 247:17
273:14,23 319:3
319:11,17,22
322:13 324:5,6
325:15,22
**track** 278:9
**tracks** 106:9
**traditionally**
110:2
**trained** 44:18
259:18
**trainers** 259:18
**training** 32:1 47:6
259:13,16,21,23
264:13,17,18
266:23 267:18,21
269:19 270:9,17
272:20 273:20
**tramadol** 85:22
**transcribed**
333:15 336:7
**transcript** 6:1
332:2,6,9,11
335:11,12 336:5
336:12 337:5,11

337:17
**transcription**
333:16
**transition** 23:4
**treat** 168:23
**treated** 100:5
119:12,16
**treatment** 119:25
120:4,16 121:7,17
121:20,25 123:6
123:10,18 124:2,5
124:6 125:14
127:12 128:11
132:10,16,18
158:23 159:1
255:4 299:23
307:22
**trick** 167:4
**tricyclic** 61:9
**tried** 81:9 83:11
161:25
**trivers** 2:7
**true** 67:21 69:21
142:9 156:12,18
162:15 179:12
196:17,18 212:14
215:4,19 223:11
223:17 224:3,11
265:4 277:15
284:3 297:16
306:2,3,5,5 309:7
328:12 333:16
**trust** 152:15
**truth** 256:6 333:10
333:11,11
**try** 34:25 39:7
53:16 69:22 78:13
81:18 166:25
219:2 255:13
310:11 311:19,20

**trying** 35:8 42:16
44:8 63:20 73:25
74:3,8 75:7,8,14
80:22 82:20 93:17
102:5 116:2,10
129:13 159:13,16
160:9 164:16
165:2 170:21
176:20 182:6
211:16 276:22
288:16 304:25
310:12 312:10
**tucker** 3:22 4:12
15:24 16:25
**tucker.hunter**
3:24
**tuckerellis.com**
4:15
**turn** 319:8,14
**turned** 202:24
**tweaks** 258:3
**twelfth** 4:9
**twice** 49:15 230:2
**two** 46:18,22
49:20,25 50:1
71:2 76:11 79:13
105:4,9 137:24
138:9 140:1
141:22 143:16
145:7 150:12
165:23 178:12
179:7,19,21,24
180:4,19 185:4
187:4,5 190:2
220:20 225:5,16
225:17,23 230:8
248:6 271:11
320:6 322:10
324:11 325:10,24
326:8 327:9
328:25

**type** 30:11,12 36:8
38:25 41:21 48:12
52:12,14 56:21
59:13 66:9 67:11
88:24 102:16
103:11 104:12
107:8 112:17
119:3 141:4 149:6
160:15 174:19
190:8 202:25
205:20,25 210:16
213:9 219:3,15
226:10 227:24
232:23 235:14,25
239:11,20,24
251:22 252:4,25
253:15,18 254:4
254:23 255:2
283:16 307:21
308:7 317:8
**types** 21:22 30:2,8
35:17 36:3,4 59:8
61:11 64:12
100:22 147:1
249:1 250:22,23
256:11,13 266:23
**typical** 104:4
213:9 239:14
**typically** 25:16
57:10 103:6
233:12 323:24

## u

**ultimate** 127:23
212:3 216:1,17
256:18
**ultimately** 71:19
72:17 74:15,20
121:8 149:17
193:17 215:25
253:22

**um** 111:21 258:2
268:19 275:12
283:2
**un** 91:16
**unable** 154:10
155:17,22 156:6
**unaware** 102:16
**unclassified** 203:3
**unconfirmed**
201:20 210:17,19
**undergo** 60:20
**undergoing**
195:24
**underrepresented**
90:7
**understand** 18:3
18:14 26:9 31:13
43:17 55:8 61:16
64:11 66:11 70:13
72:14 75:9 76:1
78:16 79:15 80:15
81:24,25,25 82:5
83:18,21 97:3
101:3 108:11
109:24 111:25
113:11 116:2
122:23 129:13
142:24 150:24
151:1,7 159:14,16
160:8 165:2
166:21 170:22
181:2 183:17
186:12 193:2
197:13 198:1,10
201:12 251:4
287:3 298:8
303:10 305:1
310:11,12,14
314:22 321:8,16
322:11 329:13

**understanding**
22:12,21,25 23:7
23:14,16 24:13
25:18 51:7,15,16
57:20 66:1,24
79:21 130:11
141:18 174:17
196:11,14,25
197:18,19 198:8
244:12 252:7
**understandings**
300:3
**understood** 18:18
68:8 84:17 122:24
149:10 219:10
226:4 246:4
287:23
**undetected** 142:5
**undetermined**
54:2,10,23 95:14
203:19 210:9
**unexpected**
201:15
**unfair** 195:12
**unfortunate**
279:24
**unfortunately**
163:20 205:15
**unified** 325:11
**unintelligible**
329:10
**unique** 105:8,8
**united** 1:1 15:7
**university** 26:19
27:3
**unknown** 76:16
**unlimited** 253:14
**unlucky** 313:15
**unnatural** 209:9
**unnecessary**
262:17

**unpaginated**
176:18
**unrealistic** 75:14
289:22,23
**unrelated** 232:18
281:15
**unusual** 295:5
**updated** 142:15
230:8
**updates** 233:3
**uptick** 214:21
215:4
**urinate** 325:5
**urine** 114:23
117:23 147:3
149:23,23 150:4,8
150:11 320:2,4,9
320:22 321:1,10
321:18,18,22,24
322:2,5,15,17,23
323:6,7,13,18,24
324:8,19,21 325:3
325:5,6,18 326:2
326:13,22
**usage** 283:21
**use** 37:25 61:21
63:13 67:11 72:2
72:15,21 75:15
84:15 90:18 107:6
108:13,16 109:4
137:10 156:25
159:18 160:19
161:5 163:14,16
165:9,22 166:12
166:15 167:3
222:15 255:1,3,4,5
255:21 258:13
271:2,9,10 275:14
275:23 277:15,16
284:23,25 290:5
295:15 300:24

302:1 303:17
**useful** 71:13,19
195:22 196:1,4
216:2,16 275:21
**useless** 72:10
**user** 163:21
280:14
**uses** 90:18
**usual** 84:23
**usually** 233:19
255:3 280:2

**v**

**v** 1:10 335:6 336:3
337:3
**vaguely** 248:6,7
**valid** 69:24
**validate** 81:18
303:18,25
**varied** 292:2
**variety** 200:3
**various** 53:19,23
175:1 196:3,5,23
256:11 273:5
283:17,21 310:19
319:1
**vary** 80:12
**vast** 161:2 235:5
279:10,16,20
280:4 284:12
285:1 286:21
299:4 302:19,22
302:23 303:11,14
303:23 304:23
305:3,7,14,19
**verifying** 191:15
**veritext** 2:14 3:16
3:22 4:3,17 335:1
335:7 338:1
**veritext.com.**
335:17

**version** 138:13
**versus** 82:18 142:5
281:1
**veterinary** 222:20
**victim** 253:3
**video** 173:16
256:25
**videographer** 5:11
15:1 16:17 17:5
94:3,7,10 144:3
145:1 173:15,18
173:21 193:9,12
225:8,11 256:24
257:2,5 272:6,9
294:23 318:14,17
328:20
**videotape** 94:4
**videotaped** 1:14
15:4
**view** 38:17 123:7
129:16 153:16
191:23 195:17
197:4,8 200:12
235:3 265:5 287:7
328:24
**viewed** 281:7
**violated** 41:22
**violent** 214:21
**virginia** 5:4
**virtual** 2:14 3:16
3:22 4:3,17
**virtually** 57:21
233:18 284:12
286:3
**visceral** 166:14
**visibility** 239:6
**visually** 51:24
52:8,10,19,23
**vitae** 7:5 28:10
**vodka** 281:3,13

**[voiced - writes]**

**voiced**  154:15
**volatile**  59:11 61:4
**voluntary**  70:13
  70:18 72:7 196:12
  196:20 197:1
  198:12 199:1
**vouch**  57:5

**w**

**wacker**  3:8
**wait**  182:15
**waited**  125:4
**waived**  335:19
**walk**  252:24
**walmart**  2:8 16:3
  16:14 229:12
**want**  42:4 44:3
  46:14 49:11 59:2
  63:11,19 97:20
  101:11 121:13
  123:11 135:18
  136:5,7 141:9
  142:24 147:8
  151:9 158:19
  160:2 167:5
  186:12 193:6
  195:12 218:17
  226:3 236:3,4
  245:13,14 251:19
  260:22 262:21
  263:11,22 272:12
  276:9,11 294:8
  295:1 299:3
  300:16 303:22
  309:6 313:24
  314:8,9 329:20
**wanted**  64:10
  65:20 68:3 72:19
  79:18 80:2,5,18
  96:22 97:5 98:13
  122:7,10,14
  123:24 124:1,19

130:3 159:25
  248:10,24 258:16
  267:9,10,15,25
  268:4 269:19
  270:9,17 272:18
  272:20 276:25
  303:18,23 312:18
  318:22 322:20
  329:22 330:6
**warrants**  214:10
**washington**  3:19
  4:9
**waste**  122:12
**watch**  109:3,6
**wavelength**
  227:22
**way**  31:15 39:7
  42:7 65:17,19
  68:9 76:20 99:1,2
  103:12 104:2,10
  104:20 106:18
  107:14,14 150:15
  197:4 206:3,4
  211:20 239:19
  243:13 251:25
  259:12 263:9
  264:5 265:1 286:9
  313:24 314:23
  325:11 329:6
**ways**  53:19,23
  54:7 301:12
  309:21
**wc.com**  4:10
**we've**  28:15 47:18
  115:24 118:2
  136:1 177:3,9
  184:20 192:22
  234:8,9 258:25
  306:15 318:21
**website**  181:20
  183:18,19 184:3

**wedded**  289:8
**wednesday**  48:2
**week**  247:19
**weekend**  37:2
**weeks**  49:20 120:6
**weigh**  105:23
**weighs**  105:21
**weight**  117:5
**welcome**  145:23
  178:5 221:13
**went**  26:16 27:19
  68:22 95:20
  128:20 284:10
**west**  3:8 5:4
**whereof**  334:4
**white**  137:7
**wi**  232:21
**williams**  3:12 4:8
  15:20,22
**willing**  184:23
  185:2 310:5
**wind**  218:7,10
**window**  308:12
**withdraw**  68:16
  195:11
**withdrawal**
  171:10,19 172:2
  290:17,21
**withdrawing**
  171:20
**witness**  17:6 39:25
  40:1 44:7 192:21
  329:2 330:1,12,16
  332:2 333:9,13,14
  333:17 334:4
  335:8,11 336:1,4
  336:11 337:1,4,15
**witness'**  335:14
**wmasters**  4:10
**woman**  72:25

**wood**  26:16,21
**word**  39:3 93:16
  108:12 126:22
  222:2,3 230:20
**wording**  201:23
  201:23 202:3,6
  205:3 236:1
**words**  33:17 48:9
  60:8 61:14,21
  104:2 137:11
  159:25 165:21
  266:12 304:21
  313:18
**work**  20:16 29:4
  70:21 72:13
  118:24 119:10
  120:25 132:20
  157:6 161:14
  176:5,8 201:23,24
  205:3 232:18
  233:1,20 267:2
  292:25 300:6
  313:1 330:20
**worked**  26:15
  27:13,16,20 28:2
  28:23 41:18 80:23
  187:10 188:6
**working**  20:20
  120:21 218:16
**workload**  221:12
**works**  20:6 104:21
**world**  194:14
**wound**  82:6,7
  268:24
**wow**  132:3 241:22
**wrap**  229:16
  272:17
**write**  37:10 317:19
**writes**  197:7
  250:19

**[written - zerrusen]**                                    Page 61

**written**  37:5
    204:25 243:13,16
    243:20 292:23
    318:4
**wrong**  42:16
    186:11,16 196:10
    235:13
**wrongful**  200:14
    200:18
**wrote**  37:4,8
    164:15

|          y          |
| --- |

**yeah**  46:11 57:11
    61:21 64:2 107:12
    112:8 122:10,14
    122:21 146:24
    167:6 169:8
    199:25 231:21
    237:1 258:10
    259:24 260:3
    270:15 276:21
    277:4 282:4
    283:10 284:10
    295:3,18 326:5
**year**  19:11,13
    22:17 23:4,8
    24:15 29:7 33:3,5
    33:6 37:6 46:4
    55:24 72:25 96:21
    135:15,25 137:1,7
    137:15 138:3
    174:13,18 187:20
    215:5 217:12
    230:4,6 235:8,19
    237:4 261:7
    271:10 281:23
**years**  19:5,11
    24:17 25:3 26:23
    28:1 29:9 30:4
    31:9 32:23,24
    33:4,6 35:15

    36:23 41:17 44:11
    61:2 79:13 80:4
    80:24 88:13
    106:18 133:25
    161:24 162:2,8
    172:22 199:18
    220:8,21 221:2
    237:23,24 248:6
    271:11,11 291:4
    291:20 294:17
**york**  3:5,5 27:3,4
    27:9,13 28:2,24
    29:5,18 30:5,10
    330:20 331:4

|          z          |
| --- |

**zach**  15:24
**zachary**  4:13
**zachary.adams**
    4:15
**zerrusen**  5:7 16:4
    16:4

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.