1           UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4

5    ----------------------------x   MDL No. 2804

6    IN RE: NATIONAL PRESCRIPTION   ) Case No.

7    OPIATE LITIGATION              ) 1:17-MD-2804

8    APPLIES TO ALL CASES           ) Hon. Dan A. Polster

9    ----------------------------x

10        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11                CONFIDENTIALITY REVIEW

12

        VIDEOTAPED DEPOSITION OF ELIZABETH T. TATUM

13

                    WASHINGTON, D.C.

14

                TUESDAY, DECEMBER 11, 2018

15

                      9:27 A.M.

16

17

18

19

20

21

22

23

24    Reported by: Leslie A. Todd

1     Deposition of ELIZABETH T. TATUM, held at

2     the law offices of:

3

4

5               Motley Rice LLC

6               401 9th Street, NW

7               Suite 1001

8               Washington, DC 20004

9

10

11

12

13     Pursuant to notice, before Leslie Anne Todd,

14     Court Reporter and Notary Public in and for the

15     District of Columbia, who officiated in

16     administering the oath to the witness.

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4         KRISTA BAISCH, ESQUIRE

 5         ERIN DICKINSON, ESQUIRE

 6         CRUEGER DICKINSON LLC

 7         4532 North Oakland Avenue

 8         Whitefish Bay, Wisconsin 53211

 9         (414) 210-4367

10

11    ON BEHALF OF THE WITNESS:

12         SHERIDAN ENGLAND, ESQUIRE

13         S.L. ENGLAND, PLLC

14         1050 Connecticut Avenue, N.W.

15         5th Floor

16         Washington, D.C. 20036

17         (202) 572-1020

18

19    ON BEHALF OF CARDINAL HEALTH:

20         BRAD MASTERS, ESQUIRE

21         WILLIAMS & CONNOLLY LLP

22         725 Twelfth Street, N.W.

23         Washington, D.C. 20005

24         (202) 434-5000
```

```
 1    APPEARANCES (Continued):

 2

 3    ON BEHALF OF McKESSON CORPORATION:

 4         MICHELLE YOCUM, ESQUIRE

 5         COVINGTON & BURLING, LLP

 6         One CityCenter

 7         850 Tenth Street, NW

 8         Washington, DC 20001-4956

 9         (202) 662-5103

10

11    ON BEHALF OF ENDO PHARMACEUTICALS, INC. and

12        ENDO HEALTH SOLUTIONS, INC., and PAR

13        PHARMACEUTICAL:

14         ANGELA R. VICARI, ESQUIRE

15         SEAN MCCORMICK, ESQUIRE (Telephonically)

16         ARNOLD & PORTER KAYE SCHOLER, LLP

17         250 West 55th Street

18         New York, NY 10019-9710

19         (212) 836-8000

20

21

22

23

24
```

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF AMERISOURCEBERGEN:

 4        MOLLY Q. CAMPBELL, ESQUIRE (Telephonically)

 5        REED & SMITH, LLP

 6        1301 K Street, N.W.

 7        Suite 1000 - East Tower

 8        Washington, D.C. 20005

 9        (202) 414-9173

10

11   ON BEHALF OF MALLINCKRODT PHARMACEUTICALS and

12   SPECGX, LLC:

13        JOSHUA GOLDSTEIN, ESQUIRE

14        ROPES & GRAY, LLP

15        800 Boylston Street

16        Boston, Massachusetts 02199-3600

17        (617) 951-7000

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF PURDUE PHARMA:

 4       JENNA C. NEWMARK, ESQUIRE

 5       DECHERT, LLP

 6       Three Bryant Park

 7       1095 Avenue of the Americas

 8       New York, NY 10036-6797

 9       (212) 649-8723

10

11   ALSO PRESENT:

12       DANIEL HOLMSTOCK (Videographer)

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    C O N T E N T S

 2  EXAMINATION OF ELIZABETH T. TATUM            PAGE

 3      By Ms. Baisch                        11, 155

 4      By Ms. Vicari                            144

 5      By Mr. Masters                           153

 6

 7

 8                    E X H I B I T S

 9               (Attached to transcript)

10  AAPM-TATUM DEPOSITION EXHIBITS               PAGE

11  No. 1      Subpoena to Testify at a Deposition

12             in a Civil Action                  16

13  No. 2      Article entitled "The Use of

14             Opioids for the Treatment of

15             Chronic Pain"                       73

16  No. 3      E-mail string re ASIPP Meeting

17             Update, Bates PPLP004025116 to

18             004025118                           88

19  No. 4      E-mail string re Confirmation:

20             Jan 31-Feb 1 Meeting, Bates

21             CHI_000970678 to 000970698          93

22  No. 5      E-mail re Announcement: Establishment

23             Of the AAPM Foundation, Bates

24             PLLP004349978 to 004349981          96
```

```
 1                    E X H I B I T S (Continued)

 2                    (Attached to transcript)

 3    TATUM DEPOSITION EXHIBITS                        PAGE

 4    No. 6      E-mail string re Safe Opioid

 5               Prescribing Curriculum, Bates

 6               PPLP004352212 to 004352216            100

 7    No. 7      E-mail string re AAPM Grant,

 8               Bates END00446489 to 00446491         103

 9    No. 8      E-mail re AAPM Safe Opioid

10               Prescribing Initiative, Bates

11               ALLERGAN_MDL_00498466                 104

12    No. 9      E-mail string re Grant Submission:

13               AAPM Safe Opioid Prescribing

14               Initiative, Bates MNK-T1_0004298965

15               to 0004298985                         106

16    No. 10     E-mail string re Initial

17               teleconference: SOPrescribing

18               Planning Committee, Bates

19               PPLP004345388 to 004345444            108

20    No. 11     E-mail string re Initial

21               teleconference: SOPrescribing

22               Planning Committee, Bates

23               PPLP004346926 to 004346930            111

24
```

```
 1                E X H I B I T S (Continued)

 2              (Attached to transcript)

 3    AAPM-TATUM DEPOSITION EXHIBITS                    PAGE

 4    No. 12    E-mail string re Grant contacts:

 5              SOPrescribing Planning Committee,

 6              Bates PPLP004345177 to 004345181        116

 7    No. 13    E-mail string re Presentation

 8              Materials: Due Feb 1, Bates

 9              PPLP004349855 to 0043498900             122

10    No. 14    E-mail string re Presentation

11              materials: Due Feb 1, Bates

12              PPLP004353080 to 004353084              124

13    No. 15    E-mail string re SOP Presentation

14              Deadline, Bates PPLP004084596 to

15              004084599                               129

16    No. 16    E-mail string re Confirmation for

17              SOP Lecture and Workshops, Bates

18              PPLP004351948 to 004351951              129

19    No. 17    Brochure entitled "Safe Opioid

20              Prescribing"                            134

21    No. 18    Letter to Martin Grabois from the

22              United States Senate, dated

23              May 8, 2012                             140

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 E X H I B I T S (Continued)

 2               (Attached to transcript)

 3    AAPM-TATUM DEPOSITION EXHIBITS                    PAGE

 4    No. 19     HSGAC Brochure entitled "Fueling

 5               an Epidemic," Report Two, Exposing

 6               the Financial Ties Between Opioid

 7               Manufacturers and Third Party

 8               Advocacy Groups                        143

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P R O C E E D I N G S

 2              --------------------

 3              THE VIDEOGRAPHER:  We are now on the

 4   record.  My name is Daniel Holmstock.  I'm the

 5   videographer for Golkow Litigation Services.

 6   Today's date is December 11th, 2018, and the time

 7   on the video screen is 9:27 a.m.

 8              This video deposition is being held at

 9   the law offices of Motley Rice, LLC, at 401 9th

10   Street, Northwest, in Washington, D.C., in the

11   matter of In Re:  National Prescription Opiate

12   Litigation.  It's pending before the United States

13   District Court for the Northern District of Ohio,

14   Eastern Division.

15              The deponent is Elizabeth Tatum.

16              Counsel will be noted on the

17   stenographic record for appearances.

18              The court reporter is Leslie A. Todd,

19   who will now administer the oath.

20                   ELIZABETH T. TATUM,

21         and having been first duly sworn,

22        was examined and testified as follows:

23                   DIRECT EXAMINATION

24   BY MS. BAISCH:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q    Good morning.  My name is Krista Baisch.

 2   I am one of the attorneys that represents the

 3   plaintiffs in this matter.  I just introduced

 4   myself to you off the record.

 5                May I call you Elizabeth today?

 6            A    Yes.

 7            Q    All right.  Can you please state your

 8   full name?

 9            A    Yes.  Elizabeth Therese Tatum.

10            Q    And have you ever been deposed before?

11            A    No.

12            Q    Do you understand that you were just put

13   under oath?

14            A    Yes.

15            Q    Are you taking any medication or is

16   there any reason why your memory may be impaired?

17            A    No.

18            Q    Is there any other reason --

19            A    Actually, excuse me, I am taking one

20   type of medication, but --

21            Q    Would it interfere with your -- your

22   memory?

23            A    No.

24            Q    Is there any reason that your ability to
```

```
 1   answer my questions fully and truthfully today

 2   would be a problem?

 3        A    No.

 4        Q    All right.  I'm going to ask you a

 5   series of questions.  If you provide an answer,

 6   then I'm going to assume you understood my

 7   question.  Okay?

 8        A    Okay.

 9        Q    If at any time you do not understand my

10   question, you'll need to tell me.  Okay?

11        A    Okay.

12        Q    And if at any time you need a break,

13   you'll need to tell me.  Okay?

14        A    Okay.

15        Q    Do you recall when you were first

16   contacted about this case?

17        A    Yes.

18        Q    When was that?

19        A    It was this summer.

20        Q    The summer of 2018?

21        A    Yes.

22        Q    Do you recall who contacted you?

23        A    Yes.

24        Q    Who was that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A    Desiree Torres with Griffin Strategies.

2    Q    And what did Desiree tell you?

3    A    She told me she was an investigator

4  serving with a law firm that was part of a -- some

5  sort of lawsuit.

6    Q    Did she confirm with you that you were a

7  former employee of AAPM?

8    A    She did.

9    Q    And what is AAPM?

10   A    The American Academy of Pain Medicine.

11   Q    Did she confirm with you your prior

12  position with AAPM?

13   A    She did.

14   Q    Did she ask you whether you were

15  represented by counsel at that time?

16   A    No, she did not.

17   Q    Were you represented by counsel at that

18  time?

19   A    No.

20   Q    Did you agree to be interviewed by her?

21   A    Yes.

22   Q    And were you interviewed by her?

23   A    Yes.

24   Q    Were you asked if you would submit a

1    written statement called a declaration consistent

2    with the facts you shared during your interview?

3        A    She did ask me.  Not at the beginning.

4        Q    Did you ever sign such a statement?

5        A    No.

6        Q    At what point did you retain legal

7    counsel?

8             MR. ENGLAND:  Objection.

9             You can answer.

10            THE WITNESS:  I don't remember the exact

11   date.

12   BY MS. BAISCH:

13       Q    Was it sometime in the summer of 2018?

14       A    Yes.

15       Q    Was it before you were asked to submit a

16   written statement?

17       A    No.

18       Q    Is the legal counsel you retained the

19   same legal counsel representing you here today?

20       A    Yes.

21       Q    Is any corporation or company paying for

22   your legal counsel?

23       A    No.

24       Q    After you retained legal counsel, did

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the investigator contact you again?

 2         A    Yes.

 3         Q    Did you refer the investigator to your

 4    legal counsel?

 5         A    Yes.

 6         Q    Were you ever contacted by the

 7    investigator after that?

 8         A    No, not that I recall.

 9         Q    Were you ever contacted by plaintiffs'

10    counsel prior to your retaining legal counsel?

11         A    No.

12         Q    Have you ever been contacted by legal

13    counsel?

14         A    By legal counsel --

15         Q    I'm sorry, for -- legal counsel for the

16    plaintiffs.

17         A    No.

18              (A discussion was held off the record.)

19              (Tatum Exhibit No. 1 was marked

20              for identification.)

21    BY MS. BAISCH:

22         Q    Elizabeth, I've placed in front of you a

23    document that we've marked today as Tatum document

24    number -- Exhibit No. 1.  Do you recognize this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    document?

 2          A    I do.

 3          Q    Did you -- and this is a subpoena to

 4    testify at a deposition in a civil action; is that

 5    correct?

 6          A    Yes, it is.

 7          Q    And did you receive this document?

 8          A    Yes.

 9          Q    And do you agree that you are appearing

10    today pursuant to that subpoena?

11          A    Yes.

12          Q    And do you understand that we are here

13    today to discuss your knowledge about AAPM as it

14    relates to the litigation that was put on the

15    record earlier?

16          A    Yes.

17          Q    And do you understand that we are here

18    to discuss your recollection consistent with

19    information that you previously provided to the

20    investigator?

21               MS. VICARI:  Objection to form.

22               THE WITNESS:  Can you restate the

23    question?

24               MS. BAISCH:  Yeah.  Can you read it
```

```
 1   back.

 2              (Whereupon, the requested record

 3              was read.)

 4              THE WITNESS:  Yes.

 5   BY MS. BAISCH:

 6        Q    Did you meet with counsel to prepare for

 7   today's deposition?

 8        A    We had a couple of discussions, yes.

 9        Q    Do you recall how many?

10        A    No.

11        Q    More than two?

12        A    Yes.

13        Q    More than five?

14        A    No.

15        Q    When did you meet with your attorney?

16        A    We've had conversations over the phone

17   on a few occasions.

18        Q    Did you review any documents to prepare

19   for this deposition?

20        A    No.

21        Q    Do you have any documents from the time

22   frame wherein you were employed at AAPM?

23        A    I --

24        Q    Related to AAPM to be clear.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    I -- I -- I may.  I'm not sure.

 2        Q    Have you looked for them?

 3        A    No.

 4        Q    Have you talked to anyone other than

 5   your lawyer to prepare for today's deposition?

 6        A    No.

 7        Q    Did you go to college?

 8        A    Yes.

 9        Q    When?

10        A    2004 to 2008.

11        Q    Where?

12        A    Taylor University in Upland, Indiana.

13        Q    Did you earn a degree?

14        A    Yes, I did.

15        Q    What was your degree?

16        A    Bachelor of Science, English education.

17        Q    What did you do after graduating from

18   college in 2008?

19        A    Yes, I graduated in 2008.  And for six

20   or nine months after graduation, I worked a

21   variety of part-time jobs, including nannying,

22   working at a library, making calls for the Chicago

23   Symphony Orchestra.

24             And following that, I took a position
```

Highly Confidential - Subject to Further Confidentiality Review

1   with Association Management Center, and the

2   American Academy of Pain Medicine was the client I

3   served.

4       Q    Okay.  Where do you work today?

5       A    I work at Deloitte Consulting.

6       Q    And what is your position at Deloitte

7   Consulting?

8       A    I'm a senior consultant in the

9   government and public services practice.

10      Q    Do you recall when you started your

11  employment with the Association Management Center?

12      A    I started as a temp to hire in -- let's

13  see -- in 2008.  Then I don't remember when I

14  became a full employee.  Maybe three -- three or

15  six months after.

16      Q    Were you immediately assigned to the

17  American Academy of Pain Medicine?

18      A    Yes.

19      Q    So from the time that you started --

20  from the time that you started with the

21  Association Management Center --

22           MR. ENGLAND:  I'm sorry.

23           MS. BAISCH:  That's all right.

24           MR. ENGLAND:  Excuse me.  I'm so sorry.

```
 1    It may be the room.  I don't know.  It just comes

 2    on.

 3              MS. BAISCH:  No problem.

 4    BY MS. BAISCH:

 5         Q    I'm just going to start that over.

 6              So from the time that you started with

 7    the Association Management Center, you started

 8    working with the American Academy of Pain

 9    Medicine?

10         A    Yes.

11         Q    And what was your position at AAPM?

12         A    My first position was -- the title was

13    account administrator.

14         Q    How long were you account administrator?

15              MS. BAISCH:  Do you -- why don't we take

16    a break?  I'm sorry.

17              THE VIDEOGRAPHER:  The time is 9:37 a.m.

18    We're going off the record.

19              (Pause in the proceedings.)

20              THE VIDEOGRAPHER:  The time is 9:38 a.m.

21    We're back on the record.

22    BY MS. BAISCH:

23         Q    All right, Elizabeth, how long were you

24    the account administrator at AAPM?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A    I don't recall the exact dates.

2        Q    Do you recall what your next position

3   was at AAPM?

4        A    Yes.

5        Q    What was that?

6        A    The title was special projects

7   coordinator.

8        Q    Do you recall how long you were special

9   projects coordinator?

10       A    Again, I don't remember the exact dates.

11  I would need to look at my resume.

12       Q    Did you hold any positions other than

13  account administrator and special project

14  coordinator while you were at AAPM?

15       A    Yes.

16       Q    Can you tell me what your job duties

17  were as the account administrator -- oh, I'm

18  sorry, did you say "yes"?

19       A    Yes.

20       Q    Okay.  What other positions?

21       A    The last position was education

22  coordinator.

23       Q    Can you tell me what your job duties

24  were as an account administrator?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A     I served as an assistant to the

 2    executive director.  I scheduled meetings, I took

 3    notes, I drafted letters, memorandum, and provided

 4    general administrative support.

 5          Q     And who was the executive director

 6    during that time?

 7          A     Philip Saigh.

 8          Q     What were your job duties as a special

 9    project coordinator?

10          A     They were essentially the same as the

11    previous position.  It was providing

12    administrative assistance.

13          Q     Administrative assistance to who?

14          A     To the executive director.  Also to the

15    director of operations.

16          Q     Anybody else?

17          A     No.

18          Q     Who was the director of operations

19    during that time?

20          A     Sarah Bilissis.

21          Q     Do you know how to spell that, by any

22    chance?

23          A     B-I-L-I-S-S-I-S.  She may have changed

24    her last name, I'm not sure, but that's what it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was at that time.

 2         Q    Other than Philip Saigh and Sarah

 3    Bilissis, did you report to anyone else during

 4    your employment at AAPM?

 5         A    Yes.

 6         Q    Who else?

 7         A    Towards the end I was reporting to Susie

 8    Flynn.

 9         Q    What was Susie's title?

10         A    Director of education.

11         Q    Was that when you were education

12    coordinator?

13         A    Yes.

14         Q    What were your job duties as education

15    coordinator?

16         A    I provided administrative support to

17    Susie.  So I helped prepare documents, I helped

18    with logistical arrangements for educational

19    conferences, and I also helped prepare

20    applications for educational grants.

21         Q    Other than Susie Flynn, Sarah Bilissis

22    and Philip Saigh, did you report to anyone else

23    during your time at AAPM?

24         A    No.
```

```
 1          Q    You started -- you said you started with

 2   AAPM in 2008.  When did you leave AAPM?

 3          A    2012.

 4          Q    Do you recall when in 2012?

 5          A    Yes.  Summer of 2012.

 6          Q    Late summer or early summer?

 7          A    Late summer.

 8          Q    So August of 2012?

 9          A    Yes.  That's -- yes.

10          Q    Are you familiar with the manufacturers

11   of opioid pharmaceuticals?

12          A    I'm not --

13               MS. VICARI:  Objection to form.

14               THE WITNESS:  Yeah, I'm not sure I

15   understand the question, when you say am I

16   familiar.

17   BY MS. BAISCH:

18          Q    Mm-hmm.

19          A    What -- what do you mean by "familiar"?

20          Q    If I say "manufacturer of opioids" --

21          A    Mm-hmm.

22          Q    -- do you know who I'm referring to?

23               Let me state it this way:  I just want

24   to get on the right terminology with you.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A    Sure.

2      Q    So we're going to start talking about

3   during the time frame that you were at AAPM, the

4   entities that you worked with.

5      A    I see.

6           MS. VICARI:  Objection to form.

7   BY MS. BAISCH:

8      Q    So what industry -- what industry did

9   you work with when you were at AAPM?

10          MS. VICARI:  Objection to form.

11          THE WITNESS:  The -- so I worked for the

12  American Academy of Pain Medicine, and it was -- I

13  worked for the association, a professional

14  association of physicians.

15  BY MS. BAISCH:

16     Q    Did you have any contact with outside

17  companies during that time frame?

18     A    Yes.

19     Q    Were they pharmaceutical companies?

20     A    Some.  Yes.

21     Q    What other types of companies?

22     A    I don't recall.  I don't recall, but I

23  think there was more than pharmaceutical

24  companies.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q     Do you know whether the pharmaceutical

 2     companies that you interacted with, whether or not

 3     they manufactured opioids?

 4          A     Yes.

 5          Q     So if I say -- if I say "opioid

 6     manufacturer," do you understand what that means?

 7          A     Yes, I do.

 8          Q     Okay.  Have you ever received any

 9     compensation directly from an opioid manufacturer?

10          A     No.

11          Q     Have you ever received any compensation

12     directly from a distributor of opioid

13     manufacturers?

14          A     No.

15          Q     Have you ever received any compensation

16     directly from a pharmacy that distributes opioids?

17          A     No.

18          Q     All right.  What is the Association

19     Management Center?

20          A     It is a privately held company that

21     provides management services, full-service

22     management services to professional associations.

23          Q     Does it manage healthcare societies?

24          A     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q    Does it manage any type of societies or

2    associations other than healthcare?

3      A    Yes.

4      Q    Do you know how many healthcare

5    societies it managed?

6      A    No.

7      Q    Do you know of any healthcare societies

8    it managed other than the American Academy of Pain

9    Medicine?

10     A    Yes.

11     Q    Can you tell me what they are?

12     A    There was the American Academy of

13   Hospice and Palliative Medicine.  The American

14   Pain Society.  There were plenty of others.  It's

15   been a long time.  I don't remember.

16     Q    Do you know when the Association

17   Management Center was first started?

18     A    No.

19     Q    Do -- what types of administrative

20   services did AMC provide?

21     A    They provided, again, full-service

22   management services.  So the entire staff for a

23   professional association would -- would be

24   provided by AMC.

```
 1          Q     Even the executive director?

 2          A     I don't know what those arrangements

 3    were, but, yes -- yes, that person was an employee

 4    of AMC as well.

 5          Q     So all of the -- all of the employees of

 6    AAPM were employees of AMC?

 7          A     Yes.

 8                MS. VICARI:  Counsel, just so the record

 9    is clear, we're going to -- AMC is going to be the

10    Association Management Center, is that the acronym

11    used?

12                MS. BAISCH:  Yes, Association Management

13    Center will be AMC.

14    BY MS. BAISCH:

15          Q     Are you familiar with Partners Against

16    Pain?

17          A     No.

18          Q     Do you know when the American Academy of

19    Pain Medicine was first started?

20          A     No.

21          Q     And we are going to refer to American

22    Academy of Pain Medicine as AAPM.  Are you okay

23    with that?

24          A     Yes.
```

```
1        Q     During the time frame that you worked

2    with AAPM, how many staff members were at AAPM?

3        A     I don't recall the exact number.

4        Q     Was it more than ten?

5        A     No.

6        Q     Was it more than five?

7        A     Yes.

8        Q     Can you tell me what type of staff

9    members would have worked at AAPM?

10        A     Yes.  There was an executive director,

11   marketing, operations, and education.

12        Q     Was Phil Saigh the executive director

13   the entire time that you were at AAPM?

14        A     Yes.

15        Q     And was Susie Flynn the director of

16   education the entire time you were at AAPM?

17        A     Yes.

18        Q     And was Sarah Bilissis the director of

19   operations the entire time you were at AAPM?

20        A     Yes.

21        Q     Who was the director of marketing?

22        A     I don't recall her last name.

23        Q     Do you recall her first name?

24        A     Sue.
```

```
 1          Q    Did anybody work with the executive

 2    director, under the executive director other than

 3    the administrative assistant -- account

 4    administrator?  Sorry.

 5          A    Yes.

 6          Q    What other positions worked with the

 7    executive director?

 8          A    Do you mean direct reports?

 9          Q    Yes.

10          A    The director of operations, director of

11    education, and director of marketing.

12          Q    Okay.  So all -- all three of the other

13    directors, director of marketing, director of

14    operations and director of education, all three of

15    them reported to the executive director?

16          A    Yes.

17          Q    Was there a different director for sales

18    or is that marketing?

19          A    There was a different director for

20    sales, yes.

21          Q    And who did the director of sales report

22    to?

23          A    I don't recall.  I don't know what that

24    arrangement was.
```

1      Q    Do you recall who the director of sales

2   was during the time frame that you were at AAPM?

3      A    Yes.

4      Q    Who was that?

5      A    Kathy Checea.

6           I can try to spell her last name.

7      Q    Please do so.

8      A    C-H-E-C-E-A.

9      Q    Thank you.

10          Who else would have worked with the

11  director of education?  What other positions, I

12  should say?

13     A    There was another education coordinator.

14     Q    And who was that?

15     A    Her first name -- her first name was

16  Mary.

17     Q    Was it Mary O'Keefe?

18     A    Yes.

19     Q    O-K-E-E-F-E?

20     A    Mm-hmm.

21     Q    Is that a "yes"?

22     A    Yes.

23     Q    Was there anyone else who worked with

24  the director of marketing?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A     Yes.

 2        Q     Who?

 3        A     Her name was Pola Henderson.

 4        Q     And what was Pola's position?

 5        A     I don't remember the title.

 6        Q     How do you spell Pola?

 7        A     P-O-L-A.

 8        Q     And did anybody else work with the

 9   director of sales?

10        A     Yes.

11        Q     Who?

12        A     She had a number of direct reports.

13   I -- I don't know their -- I don't know the name

14   of the -- all of those team members.

15        Q     Was it more than five?

16        A     I -- I don't -- I honestly don't know.

17        Q     Do you know what the -- what the team

18   members for the director of sales, what their job

19   responsibilities were?

20        A     Not the full scope of their job

21   responsibilities, no.

22        Q     What is the scope as you understand it?

23        A     So I -- I know they helped with our --

24   the exhibit booths, selling exhibit space at the
```

 1    annual conference.  And handling those

 2    relationships, so coordinating with folks,

 3    recruiting them to hold exhibit space.  Beyond

 4    that, I -- I don't know.

 5         Q    Did anybody work -- did anybody work

 6    under the director of operations?

 7         A    Yes.

 8         Q    Do you recall what that position was?

 9         A    I don't remember the title.  Operations

10    assistant coordinator.  Something like that.

11         Q    Do you recall who it was?

12         A    Yes.

13         Q    Who was that?

14         A    Her first name was Carolyn.  Again, I

15    don't remember her last name.

16         Q    Okay.  So we have just -- any other

17    positions that we haven't covered that you can

18    recall during the time frame that you were at

19    AAPM?

20         A    There was a communications or a graphic

21    design staff member, but they weren't with -- they

22    were not a full-time employee.  So helped us with

23    preparing materials and layout, that kind of

24    thing.

Highly Confidential - Subject to Further Confidentiality Review

1          Q    All right.  So we had -- during the time
2     frame that you were at AAPE -- AAPM, Phil Saigh
3     was the executive director, and then under him, we
4     had the director of marketing who was named Sue;
5     is that correct?
6          A    Yes.
7          Q    The director of operations, whose name
8     was Sarah Bilissis; is that correct?
9          A    Yes.
10         Q    And then the director of education, who
11    was Susie Flynn; is that correct?
12         A    Yes.
13         Q    And then Mary O'Keefe worked with Susie
14    Flynn; is that correct?
15         A    Yes.
16         Q    And Carolyn worked with Sarah Bilissis;
17    is that correct?
18         A    Yes.
19         Q    And then there -- did anybody work with
20    Sue on marketing?
21         A    Yes.  Pola Henderson.
22         Q    Oh, yes.  Okay.
23              Did all of these people work at the
24    Glenview office in Illinois during the time frame

1  that you were at AAPM?

2      A   Yes.

3      Q   Was the director of sales in that office

4  too?

5      A   Yes.

6      Q   All right.  What did the AAPM do?

7      A   It was a professional association for

8  pain medicine physicians.  So they organized an

9  annual conference, provided continuing medical

10  education.  Provided a forum, I suppose, for

11  physicians to interact and discuss their

12  profession.

13      Q   So the AAPM would host an annual

14  conference every year?

15      A   Yes.

16      Q   And the AAPM would host CMEs?

17      A   Yes.

18      Q   Would the AAPM host forums for

19  physicians?

20      A   They organized them, yes.

21      Q   What do you mean by that?  Is that

22  something different -- let me ask it this way:  Is

23  that something different from the annual

24  conference and the CMEs?

```
 1          A    No.

 2          Q    So were there any types of events that

 3   the AAPM would host other than the annual

 4   conference and CMEs?

 5          A    No.

 6          Q    Did the AAPM prepare publications?

 7          A    Yes.

 8          Q    What kind of publications?

 9          A    A medical journal.

10          Q    Anything else?

11          A    They -- I -- I don't remember exactly.

12   I know that they -- there was a website, there was

13   material on the website.  They would publish press

14   releases or statements.  I don't recall anything

15   beyond that.

16          Q    And who -- what type of people would be

17   members of the AAPM?

18               MS. VICARI:  Objection to form.

19               THE WITNESS:  Physicians.  And there

20   were also affiliate memberships for healthcare

21   providers who were not physicians.

22   BY MS. BAISCH:

23          Q    What about researchers?

24          A    I'm not sure if that was a class that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was permitted.

 2         Q    Anything other than physicians and

 3    affiliated members?

 4         A    No.

 5         Q    How are corporations involved with the

 6    AAPM?

 7              MS. VICARI:  Object to the form.

 8              THE WITNESS:  Companies provided --

 9    provided sponsorship for events, and companies

10    also purchased booth space in the exhibit hall.

11    BY MS. BAISCH:

12         Q    Anything else?

13         A    No.

14         Q    Can you tell me during the time frame

15    that you were at AAPM who you would have

16    considered the person the most knowledgeable about

17    AAPM's interactions with pharmaceutical companies?

18         A    The executive director.

19         Q    Phil Saigh?

20         A    Yes.

21         Q    Are you familiar with the Corporate

22    Relations Council of AAPM?

23         A    Yes.

24         Q    What is the Corporate Relations Council?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    That was a gathering of companies who

 2   provided sponsorship and typically would hold one

 3   meeting at the annual conference.

 4        Q    You said it was a council of companies?

 5        A    Yes.

 6        Q    What kind of companies?

 7        A    Pharmaceutical companies and other

 8   companies providing healthcare services related to

 9   pain management.

10        Q    How many companies were on the Corporate

11   Relations Council during the time frame that you

12   worked at AAPM?

13        A    I don't recall.

14        Q    Was it more than ten?

15        A    I'm not -- I'm not sure.

16        Q    Do you know if it was more than 20?

17        A    No, I don't think so.

18        Q    Do you know was it -- would you say it

19   was somewhere around ten?

20        A    Sure.  Yes.

21        Q    Do you know if Purdue was on the

22   Corporate Relations Council?

23        A    No, I don't recall.

24        Q    Do you know whether Endo was on the
```

```
 1    corporation relations council?

 2         A    I don't -- I don't recall.

 3         Q    Do you know whether Teva was on the

 4    Corporate Relations Council?

 5         A    I -- I don't recall that either.

 6         Q    Do you recall whether Cephalon was on

 7    the Corporate Relations Council?

 8         A    I -- I don't recall.

 9         Q    Do you know whether Mallinckrodt was on

10    the Corporate Relations Council?

11         A    I don't know.

12         Q    Do you know whether Pfizer was on the

13    Corporate Relations Council?

14         A    I don't know.

15         Q    Do you know whether Janssen was on the

16    Corporate Relations Council?

17         A    I don't know.

18         Q    Do you know whether Johnson & Johnson

19    was on the Corporate Relations Council?

20         A    I don't know.

21         Q    Do you know whether Allergan was on the

22    Corporate Relations Council?

23         A    I don't know.

24         Q    Do you know whether Actavis was on the
```

```
 1   Corporate Relations Council?

 2       A    I don't know.

 3       Q    Do you know whether Covidien was on the

 4   Corporate Relations Council?

 5       A    I don't know.

 6       Q    Do you know whether Insys was on the

 7   Corporate Relations Council?

 8       A    I'm not sure.

 9       Q    Do you know how corporations got a seat

10   on the council?

11       A    I don't remember the particular details.

12   I would need materials.  It's been over six years.

13       Q    What kind of materials would you need?

14       A    Materials the organization prepared

15   about the -- what the Corporate Relations Council

16   is and how to belong to it.

17       Q    Did corporations pay money to get a seat

18   on the council?

19            MS. VICARI:  Object to form.

20            THE WITNESS:  A level of sponsorship was

21   required, I -- I believe.

22   BY MS. BAISCH:

23       Q    Do you know, were there different types

24   of levels of sponsorship?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A    Yes.

 2         Q    And were there benefits associated with

 3    each level of sponsorship?

 4         A    Yes.

 5         Q    Can you give me an example of a benefit

 6    that would be associated with a level of

 7    sponsorship?

 8         A    An invitation to the Corporate Relations

 9    Council meeting.

10         Q    Were all companies that donated money to

11    the AAPM to be on the Corporate Relations Council

12    invited to the Corporate Relations Council

13    meeting?

14              MS. VICARI:  Objection.  Form.

15              THE WITNESS:  Could you say that again?

16              MS. BAISCH:  Yes.

17              Could you read that back.

18              (Whereupon, the requested record

19              was read.)

20    BY MS. BAISCH:

21         Q    I'm sorry, I'll reask that question.

22         A    Yeah.  Okay.

23         Q    Okay.  Were all companies that paid

24    money for the sponsorship for the Corporate
```

Highly Confidential - Subject to Further Confidentiality Review

1    Relations Council invited to the Corporate

2    Relations Council meeting?

3              MS. VICARI:  Objection to form.

4              THE WITNESS:  I don't remember the

5    levels of sponsorship and who received which

6    benefit.

7    BY MS. BAISCH:

8         Q    Okay.  So you don't know if there was --

9    if there would have been a, like, low level of

10   sponsorship that would have not included a meeting

11   invite?

12        A    Correct.

13        Q    Can you give an example of any other

14   types of benefits that a member of the Corporate

15   Relations Council would receive when they paid

16   money to the AAPM?

17             MS. VICARI:  Objection to form.

18             THE WITNESS:  I -- I don't recall.  I

19   know the Corporate Relations Council meeting was a

20   benefit.  I -- anything else would just be me

21   speculating about what it was.

22   BY MS. BAISCH:

23        Q    Did you ever attend a Corporate

24   Relations Council meeting?

Highly Confidential - Subject to Further Confidentiality Review

1      A      Yes.

2      Q      Do you recall how many times?

3      A      Two or three times.

4      Q      Other than the companies that pay money

5   to the AAPM to be on the Corporate Relations

6   Council, what other type of people would be at the

7   Corporate Relations Council meeting?

8             MS. VICARI:  Objection.  Form.

9             THE WITNESS:  Other -- other attendees.

10  BY MS. BAISCH:

11     Q      What do you mean by that?

12     A      Well, you're -- you're asking -- I'm not

13  sure I understand your question.  Can you reask

14  it?

15     Q      Is the Corporate Relations Council

16  meeting a meeting between the Corporate Relations

17  Council and the AAPM board?

18     A      Yes.

19     Q      Is there anybody other than the AAPM

20  board and the companies that pay money to be at

21  the Corporate Relations Council meeting?

22     A      Yes.

23            MS. VICARI:  Objection to form.

24  BY MS. BAISCH:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Who?

 2          A    Staff members.

 3          Q    What kind of staff members?

 4          A    Members of the AAPM staff.

 5          Q    All staff members?

 6          A    No, I don't think so.

 7          Q    Would the executive director attend?

 8          A    Yes.

 9          Q    Would the director of operations attend?

10          A    Yes.

11          Q    Would the director of marketing attend?

12          A    Yeah -- yes.  There -- there wasn't a --
```
a set list.  I don't know how -- I don't know what
the expectation was for staff members to attend.
I needed to be there, but I don't know who had --
who else was required to be there.
```
17          Q    So you needed to be there, the AAPM
```
board needed to be there, and the companies that
paid money to be on the Corporate Relations
Council needed to be there.
```
21               MS. VICARI:  Objection to form.

22               THE WITNESS:  I don't know what you mean
```
by -- by "needed to be there."  I mean, were they
required to be there?  Is that what you're asking?

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. BAISCH:

2        Q    Well, you used the word "needed."  I was

3    just using your word.

4        A    Well, as --

5        Q    What do you mean by "needed to be

6    there"?

7        A    Right, so I needed to be there because I

8    was a paid staff member and I provided -- I put up

9    tent cards, I printed out board materials.  I was

10   there to help the meeting to go smoothly.

11       Q    And what happened at the meetings

12   between the Corporate Relations Council and the

13   AAPM board?

14           MS. VICARI:  Objection.  Form, vague.

15           THE WITNESS:  There was an agenda with

16   different discussion items of interest.  I don't

17   remember what those agenda items were.

18   BY MS. BAISCH:

19       Q    What do you mean by discussion items of

20   interest?

21       A    I -- hmm.  There may have been

22   discussion about industry support.  I really

23   don't -- I really don't remember what -- I really

24   don't remember what the discussion items were.

1          Q    And would it -- would the meeting for

2    the Corporate Relations Council and the AAPM

3    board, would that be open to members at large?

4          A    No.

5          Q    So it was just the companies that paid

6    money to be on the Corporate Relations Council,

7    the AA -- AAPM board, and then the staff members

8    from the AAPM that -- that were attending the

9    meeting?

10         A    Correct.

11              MS. VICARI:  Objection to form.

12   BY MS. BAISCH:

13         Q    And do you know what type of

14   representatives from the companies that paid money

15   to be on the Corporate Relations Council, like

16   what type of people from those companies would

17   attend those meetings?

18              MS. VICARI:  Objection to form.

19              THE WITNESS:  I believe it was up to the

20   companies to decide who -- who to send.

21   BY MS. BAISCH:

22         Q    And do you know how many from any one

23   particular company could attend the meeting?

24         A    Somewhere between one and three people.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. ENGLAND:  Counsel, let me stop you.

 2   Can we take -- I don't mean to stop so early, but

 3   can I just take five or so --

 4                MS. BAISCH:  Yes, of course.

 5                THE VIDEOGRAPHER:  The time is 10:10

 6   a.m.  We're going off the record.

 7                (Recess.)

 8                THE VIDEOGRAPHER:  The time is

 9   10:21 a.m., and we're back on the record.

10   BY MS. BAISCH:

11        Q    All right.  Elizabeth, we were talking

12   about the Corporate Relations Council.  Earlier I

13   went through some companies, and you didn't recall

14   whether or not they were on the Corporate

15   Relations Council; is that correct?

16        A    That's correct.

17        Q    Do you recall now the name of any

18   companies that were on the Corporate Relations

19   Council?

20        A    No.

21        Q    Do you recall whether the companies that

22   were on the Corporate Relations Council were --

23   were manufacturers of opioid pharmaceuticals?

24        A    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Yes, they were?

 2          A    Yes.

 3          Q    Other than having access to the AA --

 4    the AAPM board during the Corporate Relations

 5    Council meeting, can you recall now whether there

 6    were any other benefits of being on the Corporate

 7    Relations Council?

 8               MS. VICARI:  Objection to form.

 9               THE WITNESS:  There were other benefits.

10    I don't recall what they were.

11    BY MS. BAISCH:

12          Q    And the benefits corresponded to the

13    amount of money that the company paid; is that

14    correct?

15               MS. VICARI:  Objection to form.

16               THE WITNESS:  That's correct, yes.

17    BY MS. BAISCH:

18          Q    Do you know how long the Corporate

19    Relations Council meeting would last?

20               MS. VICARI:  Objection.  Form.

21               THE WITNESS:  One hour.

22    BY MS. BAISCH:

23          Q    Who prepared the agenda for the

24    Corporate Relations Council meeting?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. VICARI:  Objection to form.

 2              THE WITNESS:  I believe the AAPM staff

 3    drafted the agenda.

 4    BY MS. BAISCH:

 5       Q    Did -- did the members of the Corporate

 6    Relations Council contribute to the agenda?

 7              MS. VICARI:  Objection to form.

 8              THE WITNESS:  I don't recall.

 9    BY MS. BAISCH:

10       Q    Do you recall discussions related to a

11    Pain Medicine Foundation?

12       A    Yes.

13       Q    What was the Pain Medicine Foundation?

14       A    It was a concept that the board

15    discussed a foundation to fund advocacy for their

16    profession and medical education.

17       Q    Did the AAPM board discuss the Pain

18    Medicine Foundation with the Corporate Relations

19    Council?

20              MS. VICARI:  Objection to form.

21              THE WITNESS:  I don't remember.

22    BY MS. BAISCH:

23       Q    Do you know how the pain -- do you know

24    whether the Pain Medicine Foundation was started?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A    Yes.  I believe it was.

2        Q    Do you know how the Pain Medicine

3   Foundation was funded?

4        A    No.

5        Q    Who would know the answer to -- and

6   during the time frame that you were at the AAPM,

7   who would you ask for the answer to how was the

8   Pain Medicine Foundation funded?

9        A    Phil Saigh.

10       Q    Can you describe generally what your

11  interactions were with the AAPM board?

12       A    Yes.  I scheduled meetings.  I would

13  draft letters or memos that a board member would

14  sign.  I handed out printed material at board

15  meetings.  I also took notes during their meetings

16  and I took notes during phone calls.

17       Q    How often did the board meet?

18       A    The full board met twice a year.

19       Q    Were there subcommittees to the board?

20       A    There was an executive committee on the

21  board.

22       Q    Any subcommittees other than the

23  executive committee?

24       A    Not that I remember.
```

```
1         Q    Was there a conflict of interest

2    committee?

3         A    There was a conflict of interest

4    committee.  It was not part of the board.

5         Q    What do you mean by that?

6         A    The board of directors was defined by

7    the organization's bylaws.  So the conflict of

8    interest committee members were different than the

9    board.

10        Q    Were there -- during your -- the time

11   that you were at AAPM, do you recall any persons

12   that were both a member of the conflict of

13   interest committee and the board of directors?

14        A    Yes.

15        Q    So there was some overlap.

16        A    Yes.

17        Q    All right.  How many persons were on the

18   board of directors for AAPM?

19        A    I don't --

20             MS. VICARI:  Objection.  Vague as to

21   time.

22   BY MS. BAISCH:

23        Q    During the time -- during the time frame

24   that you were at AAPM, how many persons were on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the board of directors for AAPM?

 2         A    I don't know the exact number.

 3         Q    More than 10?

 4         A    Yes.

 5         Q    Less than 20?

 6         A    Yes.

 7         Q    Somewhere around 15?

 8         A    Yes.

 9         Q    Did you have to be a member of AAPM to

10    have a position on the board of directors?

11         A    Yes.

12         Q    Were any -- I'm sorry.  Do you recall

13    the names of any persons who were on the board of

14    directors during the time frame that you were at

15    AAPM?

16         A    Yes.

17         Q    What names do you recall?

18         A    Eddie Fraifeld.

19         Q    Can you spell that?

20         A    The -- the last name?

21         Q    Yes.

22         A    F-R-A-I-F-E-L-D.

23              Zahid Bajwa, Z-A-H-I-D, B-A-J-W-A.

24    Rollin Gallagher.  Donna Bloodworth.  Philipp
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Lippe.

 2         Q    How do you spell Lippe?

 3         A    Lippe, L-I-P-P-E.

 4              Perry Fine.  Lynn Webster.  Scott

 5    Fishman.  Jerome Schofferman.

 6         Q    Did you say Jerome?

 7         A    Jerome.

 8         Q    And the last name was?

 9         A    Schofferman.

10              That's -- that's all I remember.

11         Q    Do you recall whether David Haddox was

12    on the board of the AAPM during the time frame

13    that you were employed at AAPM?

14         A    Yes, he was on the board.

15         Q    Do you recall the names of any other

16    persons who were on the board of directors at AAPM

17    during the time frame that you were at AAPM?

18         A    No.

19         Q    Can you tell me how a member of the AAPM

20    got a position on the board of directors?

21              MS. VICARI:  Objection to form.

22              THE WITNESS:  There was a nominating

23    committee, and then there was a vote by the

24    members.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. BAISCH:

2         Q    How often did that take place?

3         A    Once a year.

4         Q    You mentioned an executive committee.

5    Do you recall how many persons were on the

6    executive committee during the time frame that you

7    were at AAPM?

8         A    Somewhere between five and eight.

9         Q    During -- of the persons that you have

10   identified as being on the board of directors, do

11   you recall which of those persons were also on the

12   executive committee?

13             MS. VICARI:  Objection to form.

14             THE WITNESS:  Yes.

15   BY MS. BAISCH:

16        Q    Can you tell me who was on the executive

17   committee during the time frame that you worked

18   for AAPM?

19        A    I don't -- the executive committee would

20   change.  I don't remember who belonged to it when.

21        Q    How did the executive committee differ

22   from the -- the board of directors?

23        A    The executive committee met more

24   regularly.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    More than twice per year.

 2        A    Yes.

 3        Q    Do you know how many times the executive

 4   committee would meet per year?

 5             MS. VICARI:  Objection to form.

 6             THE WITNESS:  They met once per month.

 7   BY MS. BAISCH:

 8        Q    So approximately 12 times per year?

 9        A    It -- it may have been once a month or

10   every other month.  I don't remember which.

11        Q    Do you recall whether Eddie Fraifeld was

12   on the --

13        A    Fraifeld.

14        Q    -- executive commit- -- committee?

15        A    Yes.

16        Q    Do you recall whether Zahid Bajwa was on

17   the executive committee?

18        A    Yes.

19        Q    Yes, he was?

20        A    Yes, he was.

21        Q    Do you recall whether Rollin Gallagher

22   was on the executive committee?

23        A    Yes, he was.

24        Q    Do you recall whether Donna Bloodworth
```

1    was on the executive committee?

2         A    No, I'm not sure.  I can't remember.

3         Q    Do you recall whether Philipp Lippe was

4    on the executive committee?

5         A    I don't remember.

6         Q    Do you recall whether Perry Fine was on

7    the executive committee?

8         A    Yes, he was.

9         Q    Do you recall whether Lynn Webster was

10   on the executive committee?

11        A    Yes, he was.

12        Q    Do you recall whether Scott Fishman was

13   on the executive committee?

14        A    No.

15        Q    Do you recall whether Jerome Schofferman

16   was on the executive committee?

17        A    No.

18        Q    Do you recall whether David Haddox was

19   on the executive committee?

20        A    No.

21        Q    Are there any other persons that you can

22   recall right now that would have been on the

23   executive committee during any of the time frame

24   that you worked at AAPM?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A     No.

 2          Q     Do you recall how many persons were on

 3    the conflict of interest committee?

 4                MS. VICARI:  Objection.  Form.

 5                THE WITNESS:  Somewhere between five and

 6    eight.

 7    BY MS. BAISCH:

 8          Q     Do you recall the names of any of the

 9    persons on the conflict of interest committee

10    during the time frame that you worked at AAPM?

11          A     Yes.  Jerome Schofferman.

12          Q     Do you recall anybody other than Jerome

13    Schofferman?

14          A     No.

15          Q     And what did the conflict of interest

16    committee do?

17          A     They met to discuss a revision of the

18    conflict of interest form.

19          Q     Anything else?

20          A     There were general discussions about

21    support from companies.

22          Q     Anything else?

23          A     No.

24          Q     You attended the AAPM board of director
```

1    meetings?

2         A    Yes.

3         Q    What types of things would be discussed

4    at the board of director meetings?

5              MS. VICARI:  Objection.  Form.

6              THE WITNESS:  They discussed the

7    organization's budget.  They would discuss the

8    annual meeting.  They would discuss the American

9    Board of Pain Medicine.  They would discuss an

10   interest in making pain medicine a specialty.  And

11   really any other business of the association.

12   BY MS. BAISCH:

13        Q    Would the board of directors be the

14   entity that would determine what AAPM would focus

15   on?

16             MS. VICARI:  Object to form.

17             THE WITNESS:  Yes.

18   BY MS. BAISCH:

19        Q    Would the board of directors determine

20   what types of issues would be discussed at the

21   annual AAPM meeting?

22        A    Yes.

23             MS. VICARI:  Objection to form.

24   BY MS. BAISCH:

Highly Confidential - Subject to Further Confidentiality Review

1       Q     Would the board of directors determine

2    what AAPM's strategy would be for the year?

3              MS. VICARI:  Object to form.

4              THE WITNESS:  Yes.

5    BY MS. BAISCH:

6       Q     All right.  Elizabeth, from here on out

7    during the deposition, I'm going to tell you that

8    every question I ask I'm asking for your knowledge

9    during the time frame while you worked at AAPM.

10             Do you understand that?

11      A     Yes.

12      Q     And to the extent that there is an

13   objection other than to time frame, I want that

14   noted on the record from opposing counsel.

15      A     Okay.  Understood.

16             MS. BAISCH:  Can you please tell me what

17   my last question was.

18             (Whereupon, the requested record

19             was read.)

20   BY MS. BAISCH:

21      Q     Would the board of directors guide the

22   AAPM agenda for all AAPM conferences during the

23   time frame that you were at AAPM?

24      A     No.

```
 1          Q     What do you mean by that?

 2          A     They delegated that responsibility to

 3   other committees.

 4          Q     Can you give me an example?

 5          A     There was an annual conference

 6   committee.  They planned the agenda, identified

 7   speakers, selected topics.

 8          Q     Was the annual conference committee made

 9   up of members of the board of directors?

10          A     There was overlap.

11          Q     What do you mean by that?

12          A     There were a few board members who were

13   also part of the -- the planning committee, but it

14   was not exclusively board members.

15          Q     Who would determine -- or how would it

16   be determined who would be on the committee for

17   planning AAPM conferences?

18          A     I don't know.

19          Q     Do you know whether the committee would

20   have to be approved by the board of directors?

21          A     I don't remember.

22          Q     Do you know whether the committee would

23   have to be approved by the executive director of

24   AAPM?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A     I don't -- I don't remember.

 2           Q     Would the board of directors determine

 3   what information would be conveyed in the AAPM

 4   magazine during the time frame that you were at

 5   AAPM?

 6           A     The medical journal?

 7           Q     Yes.

 8           A     The medical journal had an editor-in-

 9   chief who was a member of the board.  I don't know

10   how they managed sourcing articles.  I don't have

11   any insight into that.

12           Q     Were articles for the medical journal

13   discussed during board of director meetings that

14   you attended?

15           A     No.

16           Q     Were any AAPM publications discussed

17   during board of director meetings that you

18   attended?

19           A     That I -- I don't -- I don't know.  It's

20   possible that they discussed a publication.  I

21   don't remember.

22           Q     Going back to the conflict of interest

23   committee, what was the conflict of interest

24   process at AAPM during the time frame that you
```

 1    were employed at the AAPM?

 2         A    On an annual basis, board members would

 3    complete, sign and submit a conflict of interest

 4    form.  And that would be held on record with the

 5    association.

 6         Q    Did you ever review a conflict of

 7    interest form during the time frame that you were

 8    employed at the AAPM?

 9         A    What do you mean by "review"?

10         Q    Did you have access to a -- the conflict

11    of interest forms?

12         A    I did.

13         Q    Did you ever look at the type of

14    information that was included on the form?

15         A    Yes.

16         Q    What type of information was included on

17    the conflict of interest form?

18         A    Relationships with other organizations.

19    If you were -- if you received any -- if you had

20    either a financial or formal relationship with

21    another organization.

22         Q    What do you mean by "formal"?

23         A    Formal.  So if you're a member of the

24    board of directors of a different organization,

Highly Confidential - Subject to Further Confidentiality Review

1   or if you serve in -- if you serve as a staff

2   member at a particular organization.

3          Q     Do you recall whether current employment

4   was included on the conflict of interest

5   disclosure form?

6          A     I don't recall that.

7          Q     Do you recall whether the -- you said

8   the form would disclose whether a member had a

9   financial relationship with another company?

10         A     Yes.

11         Q     Would the form ask what company, the

12  name of the company that a member had a financial

13  relationship with?

14         A     Yes.

15         Q     Would the form ask how much funding or

16  how -- or, I'm sorry, would the form ask what the

17  financial relationship was with the other company?

18         A     I don't remember.

19         Q     Do you recall what the revisions were to

20  the conflict form during the time frame that you

21  worked at AAPM?

22         A     The -- I don't remember the specific

23  provisions.

24         Q     Were you involved in the revision

Highly Confidential - Subject to Further Confidentiality Review

```
 1    process?

 2         A    I took direction from the chair of the

 3    committee and from committee members.

 4         Q    Who was the chair of the committee that

 5    you took direction from?

 6         A    Jerome Schofferman.

 7         Q    And what was the direction that you took

 8    from Jerome Schofferman?

 9         A    I don't remember exactly.  He would -- I

10    would redraft a question or redraft a portion

11    based on his direction.

12         Q    Do you know who reviewed the completed

13    conflict of interest forms?

14         A    No, I don't.

15         Q    Do you know who verified that the

16    information on the forms was accurate?

17         A    No, I don't know.

18         Q    Do you know whether anybody did that?

19         A    I don't know.

20         Q    Do you know where the completed forms

21    were maintained at the AAPM?

22         A    Yes.  They were maintained both

23    electronically in the -- the shared folders for

24    the association, and they were also maintained in
```

Highly Confidential - Subject to Further Confidentiality Review

1   paper form.

2        Q    Did the AAPM have a document destruction

3   policy during the time frame that you worked

4   there?

5        A    Yes.

6        Q    Do you recall what it was?

7        A    No.

8        Q    Do you know how long the conflict of

9   interest forms would have been maintained?

10       A    No.

11       Q    Do you know how often documents were

12  destroyed at the AAPM?

13       A    No.

14       Q    Do you know who was responsible for

15  destroying documents at the AAPM?

16            MS. VICARI:  Objection to form.

17            THE WITNESS:  No.

18  BY MS. BAISCH:

19       Q    Do you remember anything about what the

20  destruction -- the document destruction policy was

21  during the time frame that you were at AAPM?

22       A    No.  I -- I know there was a record

23  retention policy.  I don't remember anything

24  beyond that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Do you remember any documents being --
 2   being shredded during the time frame that you were
 3   at AAPM?
 4          A    Yes.
 5          Q    And tell me your recollection
 6   surrounding the shredding of documents.
 7          A    We had storage space there, and we would
 8   sometimes clean it out and throw away old
 9   conference material.
10          Q    Do you recall the time frame that you
11   considered when you determined what to throw out?
12          A    No.
13               MS. VICARI:  Objection to form.
14   BY MS. BAISCH:
15          Q    During the time frame that you worked at
16   AAPM, who would you ask about the company's -- or,
17   I'm sorry, about the association's document
18   destruction policy?
19          A    It was part of the policies and
20   procedures manual.  I don't think I would have
21   asked anyone.  I probably would have read that if
22   I had a need to.
23          Q    During the time frame that you were at
24   AAPM, do you recall any occasion when an AAPM
```

Highly Confidential - Subject to Further Confidentiality Review

1   member was not allowed to join the board of

2   directors because of a conflict of interest?

3        A    No.

4        Q    Do you recall any occasion when a member

5   of AAPM was not allowed to join a subcommittee

6   because of a conflict of interest?

7        A    No.

8        Q    Do you know how many board members --

9   how many AAPM board of director members had a

10  financial relationship with pharmaceutical

11  companies during the time that you worked for

12  AAPM?

13            MS. VICARI:  Objection to form.

14            THE WITNESS:  No, I don't know how many.

15  BY MS. BAISCH:

16       Q    Do you know if it was more than half of

17  the board members?

18            MS. VICARI:  Objection.  Form.

19            THE WITNESS:  I can't say that with

20  confidence.  I don't know.

21  BY MS. BAISCH:

22       Q    Who would you ask if you were still

23  working at AAPM about how many board members had a

24  financial relationship with pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

1    companies during that time frame?

2         A    I would ask the executive director of

3    the organization.

4         Q    Would Jerome Schofferman have access to

5    that information to your knowledge?

6         A    I don't know.

7         Q    Did you ever have any conversations with

8    Jerome Schofferman about how many members of the

9    board of directors had a financial relationship

10   with pharmaceutical companies?

11        A    No.

12        Q    Did you ever have a conversation with

13   any members of the conflict of interest committee

14   about board members that had a financial

15   relationship with pharmaceutical companies?

16             MS. VICARI:  Objection to form.

17             THE WITNESS:  No.  I was there to

18   provide administrative, not strategic, support.

19   BY MS. BAISCH:

20        Q    Did anyone at AAPM ever express concern

21   that AAPM was reliant on industry funding?

22             MS. VICARI:  Objection to form.

23   BY MS. BAISCH:

24        Q    To you.

```
 1          A    Did I --

 2               MS. VICARI:  Same objection.

 3               THE WITNESS:  Did anyone say to me, I am

 4    concerned?  No.

 5    BY MS. BAISCH:

 6          Q    Did anyone express any concern about

 7    industry funding?

 8               MS. VICARI:  Objection to form.

 9               THE WITNESS:  Yes.

10    BY MS. BAISCH:

11          Q    Tell me your recollection about that.

12               MS. VICARI:  Same objection.

13               THE WITNESS:  Jerome Schofferman

14    indicated some interest in decreasing the amount

15    of industry support.  I heard -- I heard it said.

16    BY MS. BAISCH:

17          Q    In your role as supporting the conflict

18    of interest committee during the time frame that

19    you worked at AAPM, did you ever revise a

20    conflict -- the conflict of interest form in a

21    fashion that would decrease the amount of support

22    that a board of director -- a member of the board

23    of directors could obtain from a pharmaceutical

24    company?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. VICARI:  Objection to form.

 2              THE WITNESS:  No.

 3    BY MS. BAISCH:

 4        Q    Do you know whether there was ever a

 5    parameter set on the amount of support a board of

 6    director could receive from a pharmaceutical

 7    company?

 8        A    No.

 9        Q    No, you don't know or, no, you don't --

10    no, there wasn't one?

11        A    No, there was not a parameter.  The

12    disclosure said, For this amount or -- or above,

13    you must disclose.  But it wouldn't exclude

14    someone from serving.

15        Q    Do you know what the minimum disclosure

16    threshold was?

17        A    No, I don't remember.

18        Q    And to your knowledge, during the time

19    frame that you worked at AAPM, no one was

20    precluded from serving on the board of directors

21    as a result of receiving funding from a

22    pharmaceutical company?

23        A    Correct.

24        Q    Can you tell me what your understanding
```

1   is of the mission of the AAPM?

2       A    The mission was, I believe, to connect

3   physicians in the same -- who were specializing in

4   the same field who had common professional

5   interests.

6       Q    Do you agree that the AAPM had a

7   pro-opioid message when you were at AAPM?

8            MS. VICARI:  Objection.  Form.

9            THE WITNESS:  No, because I don't know

10  what you mean by "pro-opioid."

11  BY MS. BAISCH:

12      Q    Can you tell me what your understanding

13  was of AAPM's message with respect to opioids

14  during the time frame that you were at AAPM?

15           MS. VICARI:  Objection to form.

16           THE WITNESS:  Their position was that

17  it's one treatment option among other treatment

18  options.

19  BY MS. BAISCH:

20      Q    What other types of treatment options?

21      A    So one board member was doing something

22  around biofeedback; injections -- where you'd

23  receive injections of medications.  Also an

24  interest in an integrative medicine approach, so

```
 1    physical therapy, other types of treatment.

 2         Q    During the time frame that you were at

 3    the AAPM, do you know whether the AAPM

 4    communicated risks of opioid overdose?

 5              MS. VICARI:  Objection to form.

 6              THE WITNESS:  Yes, they did.

 7    BY MS. BAISCH:

 8         Q    Do you know whether the AAPM

 9    communicated risks of addiction to opioids?

10              MS. VICARI:  Objection to form.

11              THE WITNESS:  Yes, they did.

12    BY MS. BAISCH:

13         Q    During the time frame that you worked at

14    the AAPM, did the AAPM consistently take a

15    position supporting access to opioids?

16              MS. VICARI:  Objection to form.

17              THE WITNESS:  Yes, they did.

18              (Tatum Exhibit No. 2 was marked

19              for identification.)

20    BY MS. BAISCH:

21         Q    Elizabeth, I placed a document in front

22    of you that we've marked as Tatum document --

23    Exhibit No. 2.

24              Do you recognize the document I've
```

Highly Confidential - Subject to Further Confidentiality Review

1   placed in front of you?

2       A   I recognize the logos.  I recognize the

3   logos, yeah, and I may have seen it during my time

4   there.

5       Q   And at the top of the document, it

6   states that it's "The Use of Opioids For the

7   Treatment of Chronic Pain"; is that correct?

8       A   Yes, that's correct.

9       Q   And then under that it says:  "A

10  consensus statement from the American Academy of

11  Pain Medicine and the American Pain Society."

12      A   Yes.

13      Q   And the American Academy of Pain

14  Medicine is the entity you worked for?

15      A   Correct.

16      Q   Can you turn to the last page of the

17  document.  Do you see in the middle section where

18  it says:  "This" -- or "The statement was prepared

19  by the following committee members"?

20      A   Yes.

21      Q   Can you take a look at that list, and

22  tell me whether you recognize any of the names on

23  that list as persons who were members of the AAPM

24  board of directors?

```
 1              MS. VICARI:  Object to the form.

 2              THE WITNESS:  Yes, Dr. Haddox.  J. David

 3    Haddox.  And I believe Richard Blonsky.  I think

 4    he's now deceased.

 5    BY MS. BAISCH:

 6         Q    Anybody else?

 7         A    I recognize names.  I don't know if they

 8    were on the board or not.

 9         Q    Do you recognize any of the names as

10    members of AAPM?

11              MS. VICARI:  Objection to form.

12              THE WITNESS:  I -- I don't -- I don't

13    know what the membership list was.  I -- I would

14    imagine they were, but I don't know for sure.

15    BY MS. BAISCH:

16         Q    Going back to the first page of the

17    document, can you look at the paragraph 1 that

18    says:  "The management of pain is becoming a

19    higher priority in the United States."

20              Do you see that?

21         A    Yes.

22         Q    And do you see in the middle of that

23    paragraph where it starts:  "These publications

24    which have been endorsed by AAPM and APS" -- do
```

1    you see that?

2        A    Yes.

3        Q    -- "state that opioids, sometimes called

4    narcotic analgesics, are an essential part of a

5    pain management plan."

6            Do you see that?

7        A    Yes.

8        Q    Would you agree that that message in the

9    sentence I just read, that "opioids are an

10   essential part of a pain management plan," was

11   consistent with the messages delivered by the AAPM

12   when you were at the AAPM?

13           MS. VICARI:  Objection to form.

14           THE WITNESS:  It feels -- that feels

15   like a very broad question.  The organization made

16   lots of statements.

17   BY MS. BAISCH:

18       Q    Do you recall the organization making

19   the statement that "opioids are an essential part

20   of a pain management plan"?

21           MS. VICARI:  Object to the form.

22           THE WITNESS:  I -- I'm reading it here.

23   I don't know whether that appeared in other

24   documents or publications.

Highly Confidential - Subject to Further Confidentiality Review

 1  BY MS. BAISCH:

 2      Q    Do you know whether the AAPM promoted

 3  non-prescription drugs, drug treatments like

 4  NSAIDs as a part of a pain management plan?

 5           MS. VICARI:  Objection to form.

 6           THE WITNESS:  Promoted?  I know that

 7  NSAIDs were considered part of the array of

 8  options available to treat pain.

 9  BY MS. BAISCH:

10      Q    Do you recall any AAPM messages during

11  the time frame that you worked at AAPM that NSAIDs

12  are dangerous?

13           MS. VICARI:  Objection to form.

14           THE WITNESS:  There was a press release

15  or some kind of published statement that warned

16  about the dangers of taking too many NSAIDs, like

17  ibuprofen.

18  BY MS. BAISCH:

19      Q    Do you recall any AAPM messages about

20  acetaminophen during the time frame that you were

21  at AAPM?

22           MS. VICARI:  Objection to form.

23           THE WITNESS:  Yes.  I believe that

24  was -- acetaminophen is part of NSAIDs, I think.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. BAISCH:

 2       Q    That was your understanding of

 3   acetaminophen?

 4       A    Yes.  I honestly don't know.

 5       Q    Do you know -- other than opioids, do

 6   you know what would also be an essential part of a

 7   pain management plan?

 8            MS. VICARI:  Objection to form.

 9            THE WITNESS:  No.  No.  I'm not a -- I

10   don't have any --

11   BY MS. BAISCH:

12       Q    I wasn't --

13       A    -- healthcare training at all.

14       Q    I wasn't asking for your personal

15   opinion.

16       A    Yeah.

17       Q    I was asking about the messages during

18   the time frame that you were at the AAPM.  Do you

19   know whether the AAPM considered any other

20   pharmaceuticals an essential part of a pain

21   management plan?

22            MS. VICARI:  Objection to form.

23            THE WITNESS:  I -- I don't -- I don't

24   know.  I remember mention of opioids and NSAIDs.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    I don't know if there are other products.

2    BY MS. BAISCH:

3        Q    And would -- was it your understanding

4    that opioids and NSAIDs were both essential parts

5    of a pain management plan?

6             MS. VICARI:  Objection to form.

7    BY MS. BAISCH:

8        Q    Based on the message of the AAPM?

9             MS. VICARI:  Objection to form.

10            THE WITNESS:  Their -- their position, I

11   believe, is that it was one part.  It was one

12   piece or one option among other options.

13   BY MS. BAISCH:

14       Q    Can you take a look at the next section:

15   "Current conditions dictate the need for a joint

16   consensus statement of two major national pain

17   organizations."  Do you see that?

18       A    Yes.

19       Q    And the last sentence in that first

20   paragraph, do you see where it says:  "Our

21   objective is for state policies to recognize but

22   not interfere with the medical use of opioids for

23   pain relief"?

24       A    Yes.
```

1        Q    Do you see that?

2        A    Yes.

3        Q    Was it your understanding that that

4    statement was consistent with messages that were

5    delivered by the AAPM while you were employed at

6    AAPM?

7             MS. VICARI:  Objection to form.

8             THE WITNESS:  Can I -- can I ask a

9    question?

10   BY MS. BAISCH:

11       Q    I suppose so.

12       A    I'm not sure what to make of -- when the

13   other attorney makes an objection.

14            MR. ENGLAND:  Well, unless I tell you

15   not to answer the question, answer the question.

16            THE WITNESS:  Okay.

17            Yes, that was -- that was consistent --

18   yes, that was consistent with the organization's

19   position.

20   BY MS. BAISCH:

21       Q    That you recall -- just to clear that

22   up, during the time frame that you worked at AAPM,

23   you recall similar messages that were relayed by

24   AAPM that:  "Our objective is for state policies

1   to recognize but not interfere with the medical

2   use of opioids for pain relief."

3          MS. VICARI:  Objection to form.

4          THE WITNESS:  Yes, similar messages.

5   BY MS. BAISCH:

6     Q   Okay.  Turning the page, going to

7   Section 4:  "Current information and experience

8   suggests that many commonly held assumptions need

9   modification."

10         Do you see that?

11     A   Yes.

12     Q   The first sentence, "By addiction" --

13   and this is going to be the same question, is this

14   a similar message during the time frame that you

15   worked at AAPM that was relayed by AAPM, the first

16   sentence being:  "Misunderstanding of addiction

17   and mislabeling of patients as addicts result in

18   unnecessary withholding of opioid medications"?

19          MS. VICARI:  Objection to form.

20          THE WITNESS:  It's -- so it's hard to

21   make a statement about these very specific --

22   about these very specific set of assumptions.  The

23   organization had many trainings, many continuing

24   medical education sessions.  I did not attend

1    those.  I don't know the full scope of the

2    messages that they conveyed to their members.

3    BY MS. BAISCH:

4         Q    Do you recall whether the statement,

5    "Misunderstanding of addiction and mislabeling of

6    patients as addicts results in unnecessary

7    withholding of opioid medications," do you recall

8    that being similar to the messages that you saw at

9    AAPM during the time frame that you were there?

10             MS. VICARI:  Objection.  Form.

11             THE WITNESS:  It was -- yes, it was --

12   it was similar.

13   BY MS. BAISCH:

14        Q    And then going to the next paragraph,

15   which starts with "Respiratory depression and

16   other side effects," in the second sentence, it

17   states:  "It is now accepted by practitioners of

18   the specialty of pain medicine that respiratory

19   depression induced by opioids tends to be a

20   short-lived phenomenon, generally occurs only in

21   the opioid-naive patient and is antagonized by

22   pain."

23             Do you see that sentence?

24        A    I do.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q    Do you recall whether that sentence is

 2    consistent with messages by AAPM during the time

 3    frame that you were at AAPM?

 4                MS. VICARI:  Objection to form.

 5                THE WITNESS:  I don't think it's

 6    consistent with things I heard, no.

 7    BY MS. BAISCH:

 8           Q    Is it similar to things that you heard

 9    during the time frame that you were at AAPM?

10                MS. VICARI:  Objection to form.

11                THE WITNESS:  No.

12    BY MS. BAISCH:

13           Q    The next sentence that says:

14    "Therefore, withholding the appropriate use of

15    opioids from a patient who is experiencing pain on

16    the basis of respiratory concerns is unwarranted."

17                Were you familiar with that -- that

18    statement during the time frame that you were at

19    AAPM?

20           A    No.

21           Q    Is that similar to statements that were

22    set out by AAPM during the time frame that you

23    were there?

24                MS. VICARI:  Objection.  Form.
```

```
 1                 THE WITNESS:  No.  There was -- there
 2     were -- I only know this from reading titles,
 3     because I didn't attend the sessions.  But there
 4     were continuing medical education sessions about
 5     accidental overdose, and typically accidental
 6     overdose, you know, was -- that resulted in death
 7     was the result of respiratory depression.  So I --
 8     I don't think this is consistent.
 9     BY MS. BAISCH:
10         Q    In the next section that says
11     "Tolerance," in the second sentence is the
12     sentence:  "Tolerance, or decreasing pain relief
13     with the same dosage over time, has not proven to
14     be a prevalent limitation to a long-term opioid
15     use."
16                 Is that similar to messages that were
17     delivered by AAPM when you were at AAPM?
18                 MS. VICARI:  Objection to form.
19                 THE WITNESS:  I don't know the -- I
20     don't know.
21     BY MS. BAISCH:
22         Q    And then in the last paragraph, the
23     second part of the first sentence where it says:
24     "Efforts to stop diversion should not interfere
```

1    with prescribing opioids for pain management."

2            Do you recall whether that message is

3    similar to messages from AAPM during the time

4    frame that you were at AAPM?

5            MS. VICARI:  Objection.  Form.

6            THE WITNESS:  The organization, again, I

7    know from titles, had sessions about preventing

8    diversion, strategies for doing that like

9    prescription monitoring programs.  So they -- they

10   talked about that as a -- a risk that had to be

11   managed.

12   BY MS. BAISCH:

13       Q    Were you involved in any AAPM-sponsored

14   events that educated on the dangers of opioids?

15       A    I'm sorry.  Can you say the first part

16   again?

17       Q    Were you involved in any AAPM-sponsored

18   events that educated on the dangers of opioids?

19       A    Yes.

20       Q    Do you recall how many times?

21       A    I rarely attended those events.  But I

22   helped to organize them.

23       Q    Are you familiar with how AAPM is

24   funded?

```
 1        A     Generally, yes.

 2        Q     Do you recall what the annual budget was

 3   during the time frame that you were at AAPM?

 4        A     No.  Not the exact amount, no.

 5        Q     Do you know if it was more than a

 6   million?

 7        A     Yes.

 8        Q     Do you know if it was less than

 9   5 million?

10        A     Yes.

11        Q     Do you know if it was less than

12   3 million?

13        A     No.  I'm not sure.

14        Q     During the time frame that you were at

15   AAPM, who was the person that was most familiar

16   with the funding of AAPM?

17        A     The director of operations, the

18   executive director and the executive committee.

19        Q     The executive committee of the board of

20   directors?

21        A     Yes.

22        Q     Do you know how much of the annual

23   budget came from pharmaceutical companies?

24        A     No, I don't know how much.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Do you know roughly how much?

 2        A    No.  Again, I could speculate.  I don't

 3   know.

 4        Q    Do you know whether the AAPM was

 5   dependent on pharmaceutical companies for funding?

 6             MS. VICARI:  Objection to form.

 7             THE WITNESS:  What do you mean by

 8   "dependent"?

 9   BY MS. BAISCH:

10        Q    Well, how was the -- how was AAPM

11   funded?

12        A    AAPM was funded through membership fees,

13   through registrations for its annual conference,

14   from sponsorships associated with its annual

15   conference, and there may have been a couple of

16   other sources.  Those are the main ones that I

17   remember.

18        Q    Is the sponsorship for its annual

19   conference different from the payments that were

20   made to be on the Corporate Relations Council?

21        A    I -- I know there was overlap.  I don't

22   remember -- I don't remember exactly.

23        Q    So other than the payments to be on the

24   Corporate Relations Council and sponsorship for
```

Highly Confidential - Subject to Further Confidentiality Review

1    the annual conference, are you aware of any other

2    opportunities for pharmaceutical companies to

3    contribute to the AAPM fund?

4        A    No.

5        Q    Do you know when the -- when

6    pharmaceutical companies contribute to the AAPM

7    fund, do you know whether any third parties would

8    pay money on behalf of a pharmaceutical company?

9            MS. VICARI:  Objection to form.

10           THE WITNESS:  No, I -- no, I've never

11   heard of that.

12           Can we take a break for a few minutes?

13   I just need to use the restroom.

14           MS. BAISCH:  Yep.

15           THE VIDEOGRAPHER:  The time is

16   11:12 a.m., and we're going off the record.

17           (Recess.)

18           THE VIDEOGRAPHER:  The time is 11:21

19   a.m., and we're back on the record.

20           (Tatum Exhibit No. 3 was marked

21           for identification.)

22   BY MS. BAISCH:

23       Q    Elizabeth, I placed a document in front

24   of you that we've marked as Exhibit No. 3.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. NEWMARK:  Counsel, we haven't

 2    received that.

 3                MS. BAISCH:  Oh, I'm sorry.

 4    BY MS. BAISCH:

 5        Q    Do you see in the cc line where it says

 6    ElizabethTatum -- etatum@connect2amc.com?

 7        A    Yes.

 8        Q    And is that your e-mail address?

 9        A    Yes, it was.

10        Q    In the text of the e-mail, do you see

11    it's an e-mail from Lynn Webster to Michael --

12    Michel Dubois?

13                MS. NEWMARK:  Counselor, I'm going to

14    object to the use of this document.  This document

15    is labeled "Confidential" pursuant to CMO No. 2.

16    I don't believe that Ms. Tatum has signed the

17    protective -- Exhibit A to the protective order.

18                MS. BAISCH:  Paragraphs 43 and 44 of

19    CMO-2 say that if you're a recipient, an author or

20    if you've previously seen the document, it is not

21    confidential.  And I have a copy of that with me

22    if you would like to confirm.

23                MS. NEWMARK:  No, that's fine.  Thank

24    you.
```

```
 1              THE WITNESS:  (Peruses document.)

 2   BY MS. BAISCH:

 3       Q    Elizabeth, have you had an opportunity

 4   to take a look at this e-mail?

 5       A    Yes.

 6       Q    In the middle of the sentence -- or, I'm

 7   sorry, in the middle of the paragraph, do you see

 8   where it says:  "As far as REMS is concerned, we

 9   have been on the lookout for what exactly FDA was

10   going to require.  I don't think this is final

11   yet."

12              Do you see that?

13       A    Yes.

14       Q    Are you familiar with what that

15   discussion is about?

16       A    REMS is the Risk Evaluation and

17   Mitigation Strategy.  I believe it's a formal

18   program within the FDA.

19       Q    Do you know what AAPM's role was with

20   respect to REMS during the time frame that you

21   were at AAPM?

22       A    I believe the organization provided

23   comments about what the REMS would include.

24       Q    Provided comments to who?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A     I believe the FDA had an open comments

 2     period.  And the -- the organization may have also

 3     released a statement or a position of some kind.

 4     I don't remember exactly what, though.

 5          Q     Do you know who at AAPM would have

 6     provided feedback on REMS during the time frame

 7     that you were there?

 8                MS. VICARI:  Objection to form.

 9                THE WITNESS:  Members of AAPM.

10     BY MS. BAISCH:

11          Q     Do you know if the board of directors

12     provided any feedback on REMS?

13                MS. VICARI:  Objection to form.

14                THE WITNESS:  Yes, I believe they did.

15     BY MS. BAISCH:

16          Q     Do you know what type of feedback the

17     board of directors provided?

18          A     No, I --

19                MS. VICARI:  Objection to form.

20                THE WITNESS:  -- don't remember.

21     BY MS. BAISCH:

22          Q     Do you recall any discussions about the

23     physical examination requirement -- I'm sorry, the

24     physician examination requirement that's referred
```

1    to in the e-mail in front of you?

2         A    I don't remember that discussion.  I was

3    copied on the e-mail, but I don't remember a

4    discussion about that.

5              I remember a discussion about a

6    continuing medical education course but not a

7    certificate program.

8         Q    What discussion do you remember about a

9    continuing education course?

10        A    I remember the organization being

11   interested in providing -- providing that

12   continuing medical education or CME to physicians.

13        Q    Just take one more look at the e-mail

14   that's in front of you.  None of the people who

15   sent this e-mail, received this e-mail or were

16   copied on this -- who -- was anybody on this

17   e-mail not a member of the board of directors or a

18   staff member at AAMP?

19        A    AAPM.

20        Q    Yes, AAPM.

21             MS. VICARI:  Objection to form.

22   BY MS. BAISCH:

23        Q    Was anybody on this e-mail not on the

24   board of directors or a staff member at AAPM?

```
 1        A    All of them were at some point a member

 2   of the board of directors.  And then, yes, there

 3   are also staff members.

 4             (Tatum Exhibit No. 4 was marked

 5             for identification.)

 6   BY MS. BAISCH:

 7        Q    All right, Elizabeth, I placed in front

 8   of you a document we've marked as Exhibit 4.  And

 9   do you see that this is an e-mail from Perry Fine,

10   and you are listed as one of the recipients?

11        A    I just need a moment.

12        Q    Yep.

13        A    (Peruses document.)  Yes, I see that.

14             MS. VICARI:  Counsel, could we just have

15   a moment?  There's a lot of pages to this exhibit.

16             (Pause in the proceedings.)

17   BY MS. BAISCH:

18        Q    All right.  Do you see in the first

19   e-mail, do you see where the name Malene Davis

20   appears?

21        A    Yes.

22        Q    Do you know who Malene Davis is?

23        A    I -- I remember her now that I -- I see

24   her name.  I know that she had some kind of
```

```
 1    professional relationship with Dr. Fine.  And is

 2    it -- I don't even know if it was Malene.  It

 3    might have been Marlene.

 4        Q    Do you recognize that she was a member

 5    at APF -- a board member at APF?

 6        A    I don't know who board members of APF

 7    were.

 8        Q    Okay.  Do you know who Lisa Robin is who

 9    appears on this e-mail?

10        A    I recognize the name.  I don't know her.

11        Q    Can you turn the second -- to the second

12    page at the bottom where you are sending the

13    e-mail to Scott Fishman, Lisa Robin, Perry Fine --

14        A    Yes.

15        Q    -- Will Rowe.  Is that Humayun Chaudhry?

16        A    Mm-hmm.

17        Q    Is that a "yes"?

18        A    Yes, I recognize that e-mail, yes.

19        Q    And then J. Horowitz?

20        A    Uh-huh.  Yes, yes.

21        Q    You're sending an e-mail confirming a

22    REMS alliance meeting; is that correct?

23        A    Right.

24        Q    Can you tell me what the REMS alliance
```

Highly Confidential - Subject to Further Confidentiality Review

1   is?

2        A    I -- I honestly don't remember what the

3   REMS alliance was.  I know the organization was

4   interested in providing input on REMS.  I don't --

5   I don't remember.  I -- again, I was just

6   scheduling a meeting.

7        Q    And did -- do you see that this meeting

8   was located at the FSMB office in Washington,

9   D.C.?

10       A    Yes, I see that.

11       Q    Did you attend the meeting at the FSMB

12   office?

13       A    No, I did not.

14       Q    Do you know what the connection was

15   between the FSMB and the REMS alliance?

16            MS. VICARI:  Objection to form.

17            THE WITNESS:  No.  No, I can't remember

18   what the acronym stands for.

19   BY MS. BAISCH:

20       Q    Did you attend --

21       A    Or I guess it's here.

22       Q    What do you mean, what acronym?

23       A    FSMB.

24       Q    Oh.

```
 1        A    I couldn't remember what it stood for,

 2  but it's here.  Federation of State Medical

 3  Boards.

 4        Q    Do you recall having any other contact

 5  with Lisa Robin of -- at FSMB?

 6        A    I may have sent again scheduling

 7  e-mails.

 8        Q    Do you recall scheduling a lot of

 9  meetings between FSMB and AAPM?

10             MS. VICARI:  Objection to form.

11             THE WITNESS:  No, I don't -- I don't

12  recall.

13  BY MS. BAISCH:

14        Q    Did you ever attend a meeting with FSMB?

15        A    I --

16             MS. YOCUM:  Objection to form.

17             THE WITNESS:  I may have.  I don't -- I

18  don't know.

19             (Tatum Exhibit No. 5 was marked

20             for identification.)

21  BY MS. BAISCH:

22        Q    Elizabeth, I placed a document in front

23  of you that we've marked as Exhibit 5.  Do you see

24  where your name appears on the cc line of this
```

Highly Confidential - Subject to Further Confidentiality Review

1    e-mail from -- from Phil Saigh?

2        A    Yes.

3             MS. VICARI:  Counsel, just to be clear,

4    what has been marked as Exhibit 5 is two

5    documents, the e-mail stapled together and --

6             MS. BAISCH:  And the attachment to the

7    e-mail, that's -- that is correct.

8    BY MS. BAISCH:

9        Q    Do you see that there's -- Exhibit 5

10   consists of the e-mail dated February 16, 2011,

11   and then the attachment to that e-mail, which is

12   American Academy of Pain Medicine Foundation?  Do

13   you see that?

14       A    I see that there's an attachment, but I

15   don't have that attachment.

16       Q    Oh, I'm sorry.

17            MS. BAISCH:  Do you have a stapler where

18   we can staple it all?

19            THE VIDEOGRAPHER:  I'll find one in

20   there.

21   BY MS. BAISCH:

22       Q    And just to be clear, the first document

23   starts at the bottom with a number on the bottom

24   of PPLP004349978.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A     Yes, I do.

2          Q     And then if you go through the four

3     pages consecutively, the last one, the last page

4     of the exhibit is PPLP004349981.  Do you see that?

5          A     Yes.

6                MS. BAISCH:  Why don't we staple all

7     four of those pages.

8     BY MS. BAISCH:

9          Q     We talked earlier today about the -- the

10    establishment of a foundation.  Do you remember

11    that discussion?

12         A     Yes.

13         Q     Okay.  And do you see the attachment to

14    the e-mail that is in front of you right now that

15    is Exhibit 5 --

16         A     Yes.

17         Q     -- is talking about an American Academy

18    of Pain Medicine Foundation?

19         A     Yes.

20         Q     Can you take a look at that -- that

21    memorandum and tell me if that is the same

22    foundation that we were talking about earlier.

23         A     Yes, it is the same foundation that we

24    were talking about earlier.

```
 1        Q    And can you tell me the foundation

 2   committee members that are listed at the bottom of

 3   PPLP004349980, can you tell me whether you

 4   recognize any of those names as persons who are on

 5   the board of directors of AAPM?

 6        A    Yes.

 7        Q    All of them or just some of them?

 8        A    No, some of them.  Lynn Webster at one

 9   point.  Michel DuBois, Rollin Gallagher, and Sean

10   Mackey.

11        Q    And at the -- towards the top of that

12   same page where it says -- where it has the three

13   principal strategic initiatives, do you see that?

14        A    Yes.

15        Q    And it lists three:  "Gaining primary

16   medical specialty recognition for pain medicine,

17   expanding breadth and scope of pain medication

18   education programs, and supporting pain medicine

19   research."

20             Is that consistent with your

21   understanding from the time frame that you were at

22   AAPM and what the foundation's strategic

23   initiatives were?

24        A    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Do you know whether the foundation

 2    promoted the use of opioids as an effective tool

 3    for treating pain?

 4               MS. YOCUM:  Objection to form.

 5               THE WITNESS:  No, I don't know.

 6               (Tatum Exhibit No. 6 was marked

 7               for identification.)

 8    BY MS. BAISCH:

 9          Q    All right, Elizabeth, I've placed a

10    document in front of you we've marked as Tatum

11    Exhibit 6, and do you see again where your name

12    appears in the cc line of this document?

13          A    Yes.

14          Q    And this is -- this is an e-mail from

15    Susie Flynn, who was the director of education

16    during the time that you were at AAPM?

17          A    Yes.

18          Q    And do you see that she is forwarding on

19    an e-mail from David Haddox?

20          A    Yes, I see that.

21          Q    And do you see that the -- the e-mail

22    from David Haddox appears to be a list of -- of

23    resources or literature.  What would -- what would

24    you call that list that he is forwarding on?
```

```
 1        A    That seems accurate.  Resources or

 2  medical literature.

 3        Q    Was that a common practice during the

 4  time frame that you were at AAPM to receive lists

 5  of resources or literature from members of the

 6  board of directors?

 7             MS. VICARI:  Objection to form.

 8             THE WITNESS:  I was an education

 9  coordinator for a short period of time.

10  Otherwise, I don't remember -- I don't remember

11  seeing things like this.  I wouldn't call it

12  common, no.

13  BY MS. BAISCH:

14        Q    Do you know who David Haddox worked for?

15        A    Yes.

16        Q    Who did he work for?

17        A    Purdue Pharmaceuticals.

18        Q    Were you -- do you know what this list

19  was used for?

20        A    No.

21        Q    Do you know what the safe opioid

22  prescribing curriculum was?

23        A    Yes.

24        Q    What was that?
```

```
 1          A    That was a continuing medical education

 2    conference organized and held by AAPM.  From the

 3    e-mail, it looks like -- just from the subject

 4    line, it looks like these were materials for that

 5    curriculum.

 6          Q    So who -- so was David Haddox preparing

 7    the materials for that curriculum?

 8               MS. VICARI:  Objection to form.

 9               THE WITNESS:  I don't -- I don't know.

10    BY MS. BAISCH:

11          Q    Do you know why else he would be sending

12    a list of resources and literature?

13               MS. VICARI:  Objection to form.

14               THE WITNESS:  No, I -- I don't --

15    typically there was a planning committee, and that

16    planning committee decided on content.  I don't

17    know if he was part of the planning committee or

18    why they might have been exchanging this e-mail or

19    what his formal role was.  I don't know.

20    BY MS. BAISCH:

21          Q    Did the planning committee review -- to

22    your knowledge, did the planning committee review

23    the content of the programs?

24          A    Yes.
```

```
 1                (Tatum Exhibit No. 7 was marked

 2                for identification.)

 3   BY MS. BAISCH:

 4        Q    Elizabeth, a document that has been

 5   identified as Exhibit 7 has been placed in front

 6   of you.  Do you see this is an e-mail from you to

 7   Bobbie Sue Brown?

 8        A    Yes.

 9        Q    And can you just take a second to read

10   over the text of your e-mail to Mrs. Brown -- or,

11   I'm sorry, to Ms. Brown.

12        A    (Peruses document.)  Yes.

13        Q    Was one of your responsibilities during

14   the time frame that you were at AAPM to send --

15   or, I'm sorry, to request grants from

16   pharmaceutical companies like Endo?

17        A    Yes.

18        Q    And is this e-mail confirming that you

19   submitted such a request through Endo's online

20   grant portal?

21        A    Yes.

22        Q    Do you recall whether Endo funded or

23   submitted any funds to AAPM during the time frame

24   that you were at AAPM?
```

```
 1                    MS. VICARI:  Objection to form.

 2                    THE WITNESS:  Yes.

 3      BY MS. BAISCH:

 4           Q    Yes, you do recall?

 5           A    Yes, I do recall.

 6           Q    That they were one of the -- one of the

 7      companies that submitted money to AAPM?

 8           A    Yes.

 9                    MS. VICARI:  Objection to form.

10      BY MS. BAISCH:

11           Q    Do you recall whether they were on

12      the -- the corporate council?

13           A    No, I don't remember.

14                    (Tatum Exhibit No. 8 was marked

15                    for identification.)

16      BY MS. BAISCH:

17           Q    Elizabeth, we placed in front of you a

18      document that's been identified as Tatum

19      Exhibit 8.

20                    Do you see this is an e-mail that you

21      are sending to InfoUS?

22           A    Yes.

23           Q    And its subject is "AAPM Safe Opioid

24      Prescribing Initiative"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A    Yes.

2          Q    Can you just take a few seconds to

3     review that e-mail.

4          A    (Peruses document.)  Yes.

5          Q    Do you see in the last paragraph where

6     it says:  "As Actavis is a member of the REMS

7     Industry Working Group, we would like to submit a

8     medical education grant application to Actavis for

9     support of this critical initiative"?

10         A    Yes, I see that.

11         Q    What is a medical education grant

12    application?

13         A    It is a request for a grant to support a

14    continuing medical education program.

15         Q    Do you know whether Actavis submitted a

16    grant to AAPM during the time frame that you were

17    at AAPM?

18         A    I don't --

19              MS. VICARI:  Objection.  Form.

20              THE WITNESS:  -- remember.

21    BY MS. BAISCH:

22         Q    Do you know what the REMS Industry

23    Working Group was?

24         A    No.  I imagine it was a committee of
```

Highly Confidential - Subject to Further Confidentiality Review

1    some kind, but I don't remember.

2         Q    Do you know if Actavis funded AAPM in

3    any way during the time frame that you were at

4    AAPM?

5         A    No, I don't know.

6         Q    Were -- when you sent this e-mail, do

7    you recall whether you were working off a list of

8    REMS Industry Working Group members?

9         A    I don't remember --

10              MS. VICARI:  Objection to form.

11              THE WITNESS:  I don't remember if I was

12   working off a list, no.

13   BY MS. BAISCH:

14        Q    Do you remember why you were reaching

15   out to Actavis to submit a grant?

16        A    No, I don't know why that company.

17              (Tatum Exhibit No. 9 was marked

18              for identification.)

19   BY MS. BAISCH:

20        Q    All right, Elizabeth, we placed in front

21   of you Exhibit 9.  Do you see this is an e-mail

22   that you are sending to Jackie Kim at Covidien?

23        A    Yes.

24        Q    Do you know whether Covidien provided

1    any funds to AAPM during the time frame that you

2    were at AAPM?

3         A    Yes.  Yes, they did.

4         Q    Is this -- can you just tell me briefly

5    or in your own words how this worked that you

6    would send -- well, what was going on here?  Take

7    a second to read this e-mail.  You're sending a

8    grant -- a completed grant application to the

9    company?

10             MR. GOLDSTEIN:  Object to the form.

11             THE WITNESS:  Yes, I was sending a

12   completed grant application to the company.

13   BY MS. BAISCH:

14        Q    And you are asking for additional -- an

15   additional grant?

16             MR. GOLDSTEIN:  Object to the form.

17             MS. VICARI:  Objection.

18             THE WITNESS:  Well, it looks like from

19   the language of the e-mail, I'm revising the

20   initial application and submitting a new one.

21   BY MS. BAISCH:

22        Q    Do you see in the third paragraph where

23   it says:  "We would like to formally revise the

24   requested amount from $250,000 to $900,000 in

Highly Confidential - Subject to Further Confidentiality Review

```
 1   grant funding"?

 2        A    Yes.

 3        Q    Does that mean that you were -- is

 4   that -- that's an increase in the request?

 5        A    Correct.

 6        Q    Okay.  Do you know whether there was an

 7   agreement for $900,000 in grant funding from this

 8   company?

 9             MS. VICARI:  Objection to form.

10             THE WITNESS:  No.  No, I don't think

11   there was.

12             (Tatum Exhibit No. 10 was marked

13             for identification.)

14   BY MS. BAISCH:

15        Q    Elizabeth, going back briefly to

16   Exhibit 9.

17        A    Yes.

18        Q    When companies would pay grants to AAPM,

19   do you recall what entity it was paid to?

20             MS. VICARI:  Objection to form.

21             THE WITNESS:  I believe to the American

22   Academy of Pain Medicine.

23   BY MS. BAISCH:

24        Q    Do you recall whether grants were also
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    paid to the foundation?

 2         A    I don't recall that.  It's possible.  I

 3    don't remember.

 4         Q    Would grants -- to your knowledge, would

 5    grants have been included in the -- in any

 6    disclosure of total funding that AAPM received?

 7              MS. VICARI:  Objection to form.

 8              THE WITNESS:  Yes.

 9              (Tatum Exhibit No. 10 was marked

10              for identification.)

11    BY MS. BAISCH:

12         Q    All right.  The next document that is in

13    front of you is Tatum Exhibit 10.  Do you see that

14    is an e-mail that you are sending on November 8th,

15    2011?

16         A    Yes.

17         Q    And it is an e-mail with two

18    attachments.

19         A    Yes.

20         Q    Materials for planning committee and

21    C.A.R.E.S. Alliance?

22         A    Yes.

23         Q    Do you recall the SOP planning

24    committee?
```

```
 1         A    Yes.  I recall that this was the

 2   planning committee for the Safe Opioid Prescribing

 3   Conference.

 4         Q    Do you recall -- recall who was the

 5   chair for that committee?

 6         A    Dr. Lynn Webster was the chair.

 7         Q    And would the persons who are in the

 8   recipient line of your e-mail, would those persons

 9   have been on the committee for that conference,

10   that planning -- is that the planning committee?

11         A    I don't remember the -- all the members

12   of the planning committee.  Since I'm addressing

13   it to the planning committee members, it seems

14   like --

15         Q    Right.

16         A    -- that's probably what they are, but

17   I -- there may have been other people mixed in.  I

18   don't know.

19         Q    Can you flip forward to the fifth page,

20   which is page number 1 of the first attachment.

21   Do you see it says PPLP004345392 at the bottom?

22         A    Yes.

23         Q    And this appears to --

24              MS. VICARI:  Just give me a second to --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the fifth page of the document?

 2              MS. BAISCH:  It's the first page of the

 3    first attachment to the e-mail sent on

 4    November 8th.

 5              MS. VICARI:  Thank you.

 6    BY MS. BAISCH:

 7         Q    Do you see the list on that page?

 8         A    Yes.

 9         Q    Do you know whether this is a list of

10    the committee, the Safe Opioid Prescribing

11    Initiative planning committee?

12         A    Yes.  It looks like the list.

13         Q    Do you recall the planning for this --

14    this conference?

15         A    I have vague recollections of these

16    kinds of interactions, meetings, sending

17    materials, listening in on conference calls.

18         Q    This was a -- this was a conference that

19    was scheduled for February of 2012 in Palm

20    String -- in Palm Springs, California?

21         A    Yes, that sounds right.

22              MS. BAISCH:  Oh, I marked the wrong one.

23              (Tatum Exhibit No. 11 was marked

24              for identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. BAISCH:

 2        Q    All right, Elizabeth, we put in front of

 3   you Exhibit 11, which is another e-mail sent from

 4   you, and it appears to be another SOP planning

 5   committee e-mail.

 6        A    Yes.

 7        Q    Do you see that?

 8        A    Mm-hmm.

 9        Q    And is it -- do you say SO Prescribing

10   planning committee?

11        A    If I remember, we said SOP.

12        Q    Okay.

13        A    Yeah.

14        Q    And I would like to look at the

15   attachments that you are sending out in this

16   e-mail, going all the way to the very last page of

17   the exhibit.

18        A    Okay.

19        Q    Do you see number 8, it says C.A.R.E.S.

20   Alliance?

21        A    Yes.

22        Q    Do you recall what that was?

23        A    I recognize the name.  I don't -- I

24   don't remember what that group was.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Do you know what number 9 means where it

 2   says "Engagement with other stakeholders"?

 3        A    No.

 4        Q    Would you have been -- would you have

 5   attended these planning meetings?

 6        A    Yes.

 7        Q    And then going to the third page of your

 8   e-mail, there's another e-mail that you sent on

 9   October 25th, 2011.

10        A    Yes.

11        Q    And number 2 in the e-mail that you're

12   sending, it says:  "Complete the attached conflict

13   of interest disclosure statement."  Do you see

14   that?

15        A    Yes.

16        Q    And you're sending that to the planning

17   committee members?

18        A    Correct.

19        Q    Do you know if that conflict of interest

20   disclosure statement would have been different

21   from the conflict of interest disclosure statement

22   that would've had to have been filled out by the

23   board of directors every year?

24        A    I don't remember if it was the same or
```

Highly Confidential - Subject to Further Confidentiality Review

1    if it was a different form.

2         Q    Do you know who reviewed the disclosure

3    statements in connection with the SOP planning

4    committee?

5         A    No, I don't know who reviewed them.

6         Q    Do you know whether any persons on the

7    SOP planning committee -- any potential persons to

8    the SOP planing committee were disqualified as a

9    result of a conflict of interest?

10        A    No, I --

11             MS. VICARI:  Objection to form.

12             THE WITNESS:  I don't remember anyone

13   being disqualified.

14   BY MS. BAISCH:

15        Q    Do you remember whether all of the

16   members of the SOP planning committee submitted

17   their conflict of interest forms?

18        A    It was my responsibility, I believe, to

19   collect those statements, and I -- I'm -- I don't

20   remember if anybody -- I imagine we followed --

21   typically our practice was to follow up and follow

22   up until we received the completed form.

23        Q    When you received them, where would you

24   put them?

 1          A    I would save them to -- I would save

 2     them within paper files, and then also typically

 3     we got them electronically, so I would save them

 4     electronically.

 5          Q    Would you notify anybody when you

 6     received them?

 7          A    I would not notify anyone, no.  I

 8     probably had a checklist where I was checking off

 9     who had submitted and who had not, and then

10     following up if someone had not submitted.

11          Q    Do you know who -- do you know whether

12     anybody else ever looked at those conflict of

13     interest forms?

14               MS. VICARI:  Objection to form.

15               THE WITNESS:  I don't know.  I don't

16     know.

17     BY MS. BAISCH:

18          Q    If you were still at AAPM, who would you

19     ask about reviewing -- who reviewed the conflict

20     of interest forms for the SOP planning committee

21     for the February 2012 conference?

22          A    I -- if I was still at AAPM, I would

23     probably ask Susie Flynn.  I don't think she works

24     there any longer, but I probably would have asked

Highly Confidential - Subject to Further Confidentiality Review

1  her, or I would have asked the committee chair.

2      Q    Who was Lynn Webster?

3      A    Yes.

4      Q    Did you ever send any of the conflict of

5  interest forms to Lynn Webster?

6      A    I don't remember doing that.

7      Q    Do you recall ever sending them to

8  Susie?

9      A    Susie had access to electronic files

10  that I had.  I don't remember sending them to her,

11  though, specifically.

12              (Tatum Exhibit No. 12 was marked

13              for identification.)

14  BY MS. BAISCH:

15      Q    All right, Elizabeth, we placed in

16  front of you what has been marked as Tatum

17  Exhibit 12.  It is another e-mail that you sent on

18  November 10th, 2011.  Do you see that?

19      A    Yes.

20      Q    And this e-mail also has an attachment

21  with it.

22      A    Mm-hmm.

23      Q    Is that a "yes"?  Do you have the

24  attachment included in your exhibit?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    Yes, I do.

 2        Q    Okay.  Going back to the text of the

 3   e-mail, can you just take a second to read the

 4   e-mail that you sent on November 10th.

 5        A    (Peruses document.)  Yes.

 6        Q    All right.  Do you see where you are

 7   stating:  "We are seeking to identify the correct

 8   contacts at several companies which may be

 9   interested in offering medical education grants

10   for the SOP -- SO prescribing program"?

11        A    Yes, I see that.

12        Q    "And then in the attached spreadsheets

13   of the companies we need correct contacts for are

14   highlighted in yellow."

15        A    Yes, I see that.

16        Q    Do you recall the -- the discussion that

17   led -- led to you sending this list out?

18             MS. VICARI:  Objection to form.

19             THE WITNESS:  No, I don't remember that

20   discussion.

21   BY MS. BAISCH:

22        Q    Did you maintain the list that is

23   attached as the list of pharma contacts?  The list

24   that you're sending out attached to this e-mail,
```

1   was that something that you maintained?

2        A    Yes.

3        Q    Do you know whether this is a list of

4   companies that provided funds to AAPM at one

5   occasion during the time frame that you were at

6   AAPM?

7             MS. VICARI:  Objection to form.

8             THE WITNESS:  No, I can't say that with

9   any confidence.

10  BY MS. BAISCH:

11       Q    Do you know whether this is a list of --

12  well, do you know what -- how you created this

13  list?

14       A    No.  I don't -- I'm looking at the list.

15  So there's a heading that says "Companies with an

16  established relationship with AAPM."  I imagine

17  those were organizations that provided us with

18  funding.  Companies without a previous connection

19  to AAPM, I don't know how those got on the list.

20       Q    Can you just take a second to look at

21  the list.  The -- the first page of the attachment

22  that you're sending in this e-mail, does this

23  refresh your memory as to whether Endo contributed

24  funds to AAPM during the time frame that you were

```
 1   at AAPM?

 2        A     Yes, I believe they -- they did provide

 3   funding.   How --

 4        Q     Do you --

 5        A     How much and for what, I don't remember.

 6        Q     Do you remember whether Cephalon

 7   provided funding during the time frame that you

 8   were at AAPM?

 9        A     Yes.

10        Q     Do you remember whether Janssen provided

11   funding during the time frame that you were at

12   AAPM?

13        A     I am not sure.

14        Q     Do you know whether Mallinckrodt

15   provided funding during the time frame that you

16   were at AAPM?

17        A     Yes.

18        Q     Do you remember whether Pfizer provided

19   funding during the time frame that you were at

20   AAPM?

21        A     Yes.

22        Q     Do you remember whether Purdue Pharma

23   provided funding at -- during the time frame that

24   you were at AAPM?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A    Yes.

2      Q    Do you know why -- do you recall why

3   Janssen is in gray here versus the green?

4      A    No.

5      Q    Do you recall whether the --

6      A    Bad administrative practice.

7      Q    -- what the -- do you recall what the

8   yellow meant?

9      A    I see from my e-mail what I said.  And

10  according to the e-mail, it says:  "The companies

11  we need correct contacts for are highlighted in

12  yellow."  So I imagine it's because we didn't have

13  contacts at those companies.

14     Q    Can you take a second to look at this

15  list and tell me whether you recall, now that you

16  have this list in front of you, whether any of the

17  other companies on this list provided funds during

18  the time frame that you were at AAPM, funds to

19  AAPM.

20     A    No, I don't know if any of these

21  companies provided funding.

22     Q    Do you know whether any of these

23  companies were on the -- the -- what was it

24  called, the initiative -- the company initiative

Highly Confidential - Subject to Further Confidentiality Review

```
 1    committee?

 2            MS. VICARI:  Objection to form.

 3    BY MS. BAISCH:

 4        Q    I'm sorry, the -- the council --

 5        A    The Corporate Relations Council?

 6        Q    Yes, that's it.

 7        A    No, I don't remember.

 8        Q    Going back to the text of your e-mail,

 9    do you see in the second paragraph where you say:

10    "While I read through the list of REMS Industry

11    Working Group members"?  Do you recall what that

12    list was?

13        A    No, I -- I don't.

14        Q    When you were getting -- when you were

15    involved in the planning for meetings like this

16    SOP meeting that was going to happen in February

17    of 2012, was this something that you would have

18    been responsible for, reaching out to these

19    entities to seek grants?

20        A    That was my --

21            MS. VICARI:  Objection to form.

22            THE WITNESS:  That was my responsibility

23    for this conference, yes, was preparing and

24    submitting grants.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. BAISCH:

 2        Q    Do you recall whether any of the

 3   companies you reached out to did not submit

 4   grants?

 5        A    No, I don't remember.

 6        Q    Meaning that --

 7        A    I don't know -- I can't remember which

 8   companies provided grants and which ones did not

 9   provide grants.

10        Q    So it is possible that a company did not

11   provide a grant?

12        A    Yes.

13             (Tatum Exhibit No. 13 was marked

14             for identification.)

15   BY MS. BAISCH:

16        Q    All right, Elizabeth, you have in front

17   of you a document that has been marked as

18   Exhibit 13; is that correct?

19        A    Yes.

20        Q    And this is an e-mail that you're

21   sending on January 19th, 2012?

22        A    Yes.

23        Q    And it -- it says, "Presentation

24   Materials:  Due February 1st," but does this also
```

Highly Confidential - Subject to Further Confidentiality Review

1    relate to that same SOP planning committee?

2         A    Yes.

3         Q    For the February 2012 conference?

4         A    Yes.

5         Q    And do you see in the instruction

6    section that you're providing, there's some

7    bullets in the text of your e-mail?  Do you see

8    the bullets?

9         A    Yes, I do.

10        Q    And then in the second line it says:

11   "Timeline:  All presentation materials are due by

12   February 1st," and then send to

13   etatum@connect2amc.com.

14        A    Yes, I see that.

15        Q    And that is -- that's your e-mail

16   address?

17        A    Yes, it was at that time.

18        Q    When you received the present --

19   presentation materials, what would you do with

20   them?

21             MS. VICARI:  Objection to form.

22             THE WITNESS:  I probably filed them

23   away.

24             MS. VICARI:  Counsel, just for the

1    record, from the e-mail there are -- one, two,

2    three, four -- five attachments, but I think

3    there's only three included in the exhibit.

4             MS. BAISCH:  For the record, attachment

5    1 and attachment 2 were withheld as nonresponsive

6    by defense.

7             MS. VICARI:  Okay.

8             MS. BAISCH:  And the other three

9    attachments are included here.

10   BY MS. BAISCH:

11        Q    And what did you -- I'm sorry, when you

12   received the presentation materials, where -- you

13   were saying, where did you save them?

14        A    I believe I saved them to the shared

15   file for AAPM.

16        Q    And do you know whether anybody within

17   AAPM would have reviewed them?

18        A    I --

19        Q    Any of the staff members.

20        A    I believe staff members would have

21   reviewed them with members of the planning

22   committee.  Yes, I imagine that.  Yeah.

23             (Tatum Exhibit No. 14 was marked

24             for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. BAISCH:

 2         Q    All right.  We put another exhibit in

 3    front of you, and it's marked as Exhibit 14.  Is

 4    that correct?

 5         A    Yes.

 6         Q    And it is another e-mail sent by you on

 7    January 27th, 2012?

 8         A    Yes.

 9         Q    And this also relates to presentation

10    materials for the February 2012 SOP conference?

11         A    Yes.

12         Q    And this e-mail has -- on the first

13    page, it references four attachments.  Do you see

14    that?

15         A    Yes.

16         Q    But the exhibit in front of you only has

17    two attachments included with it.

18         A    Mm-hmm.

19         Q    Is that a "yes"?  Why don't you

20    double-check that.

21         A    Yeah.  (Peruses document.)

22         Q    The first being the handout

23    instructions?

24         A    And then the timeline, yep.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q    And then being the timeline.

2      A    Yep.

3      Q    Can you tell me -- looking back at

4   Exhibit 13, can you tell me whether the handout

5   instructions and the timeline for handout

6   submission, to your knowledge, are the documents

7   that are attached to Exhibit 14, would those have

8   been the same ones you would have attached in

9   Exhibit 13?

10     A    Yes, that seems -- that seems likely.

11     Q    Would there have been any reason that

12   you would have made any changes to the handout

13   instruction and the timeline for handout

14   submission between the time frame of

15   January 1st -- I'm sorry, January 19th, 2012,

16   which is the date of Exhibit 13, and January 27th

17   of 2012, which is the date of Exhibit 14?

18     A    Yes, it's very possible I made changes

19   in between.  I wasn't particularly good at version

20   control back then.

21     Q    Can you take a look at the attachment,

22   the handout instructions attachment to this

23   e-mail.

24     A    Yes.  (Peruses document.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Just -- it's a two-page document.  Can

 2    you tell me whether this handout instructions

 3    document is consistent with a document that would

 4    be used for handouts for any AAPM conference

 5    versus being unique to this one?

 6               MS. VICARI:  Objection to form.

 7               THE WITNESS:  I can't -- I -- I don't

 8    know.  This was the only conference -- the only

 9    CME program that I personally helped put together

10    from a logistics standpoint.  So I don't know what

11    those other submission requirements would look

12    like.

13    BY MS. BAISCH:

14          Q    Do you recall making any changes to this

15    document?

16          A    I don't recall, no.

17          Q    At the bottom of the first page that

18    ends in PPLP004353082, do you see where it says:

19    "Items that should not be included"?

20          A    Yes.

21          Q    And you see the second bullet that says:

22    "Trade names.  Whenever generic names can be used

23    when discussing pharmaceutical agents or medical

24    devices and products.  If trade names are used,
```

1    include the names of products made by more than

2    one manufacturer."

3              Do you see that?

4      A    Yes, I do.

5      Q    Do you know why that was included in the

6    handout instructions?

7      A    No, I don't.  I don't know if that was

8    an organizational requirement; if that was

9    standard practice or a requirement for continuing

10   medical education --

11     Q    Do you know --

12     A    -- or -- I really don't know.

13     Q    Do you know who -- do you know who

14   prepared the handout instructions?

15     A    I prepared them, but I would not have --

16   I would have prepared a draft, and then it would

17   have been reviewed by the director of education,

18   and potentially by the committee chair as well.

19     Q    Do you know whether anybody checked,

20   like reviewed the handout specifically for the use

21   of generic names versus trade names?

22              MS. VICARI:  Objection to form.

23              THE WITNESS:  I don't know.

24   BY MS. BAISCH:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    And then on the last page of this

 2   handout instructions attachment, do you see at the

 3   top where it says "Review process," and then it

 4   says "The content review committee"?

 5          A    Yes.

 6          Q    Do you know who would have been on the

 7   content review committee?

 8          A    No.

 9          Q    Would that have included the chair of

10   the -- of the SOP planning committee?

11               MS. VICARI:  Objection to form.

12               THE WITNESS:  I'm not -- I'm not sure.

13   I don't remember the composition of that

14   committee.

15               (Tatum Exhibit Nos. 15 and 16 were

16               marked for identification.)

17   BY MS. BAISCH:

18          Q    All right.  Now, so, Elizabeth, there

19   are two exhibits in front of you right now.

20   Exhibit 15, which is a February 17th e-mail from

21   David Haddox to you, and Exhibit 16, which is a

22   February 16th e-mail from -- from you to David

23   Haddox.

24               Do you see that?  I'm sorry, no, from
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    David Haddox to you.

2         A    Yes, I see that.  Yep.

3         Q    All right.  And looking first at

4    Exhibit 16, can you just -- going back to the very

5    last page of this exhibit, which is PPLP004351951.

6         A    Yes.

7         Q    Do you see at the top there is an e-mail

8    from Susie Flynn to David Haddox, and you are

9    cc'd?

10        A    I believe it's from David Haddox to

11   Susie Flynn -- or am I looking at the wrong one?

12   I'm looking at the wrong one.

13        Q    Exhibit --

14        A    Yes, I see -- I see that, yep, the last

15   page.

16        Q    And you see where she says:  "Can you

17   please confirm your ability to participate in the

18   regular -- regulatory response lecture?"

19             Do you see that paragraph?

20        A    Yes.

21        Q    Okay.  So this -- Susie here is just

22   confirming that he is going to be a presenter in

23   one of the lectures of that SOP conference?

24        A    Yes.
```

```
 1        Q    And this again -- what is the faculty

 2   agreement and attestation form?  Is that just --

 3        A    I don't know what that includes.

 4        Q    Do you know whether you received it from

 5   David Haddox?

 6        A    Probably.  I believe all faculty members

 7   had to complete an agreement and attestation form.

 8   So I -- again, I probably collected the document.

 9        Q    Going forward two pages to the e-mail

10   sent on February 13th, 2012, from David Haddox to

11   Susie Flynn, where you are cc'd, do you see that?

12        A    Yes.

13        Q    And do you see in the -- the very first

14   paragraph that he's saying that:  "I will send my

15   slides for AA -- AAPM review ASAP, but I will not

16   submit them to our internal review until AAPM

17   signs off on the content to prevent our reviewers

18   from having to review it, and, if need be, accept

19   changes from AAPM necessitating a second review"?

20        A    Yes, I see that.

21        Q    Are you familiar with the review process

22   that he is talking about?

23        A    No, I'm not.

24        Q    Do you know what he means by "our
```

```
 1    reviewers"?

 2              MS. VICARI:  Objection to form.

 3              THE WITNESS:  I -- I don't -- it looks

 4    like he's referring to members of his company.

 5    But I don't -- I honestly don't know.

 6    BY MS. BAISCH:

 7         Q    And if you go up to the e-mail that

 8    you're sending, the next e-mail above that,

 9    February 14th, 2012, that you're sending to

10    David -- David Haddox?

11         A    Yes.

12         Q    In the very last paragraph of that

13    e-mail, you're stating:  "I will seek a quick

14    turnaround from our reviewers after your slide

15    decks have been submitted.  Once all of the review

16    processes from the AAPM and Purdue perspectives

17    have been completed, I will place your content

18    into our branded PPT template."

19              Do you see that?

20         A    Yes.

21         Q    Does that help clarify what "our

22    reviewers" means?

23         A    Yes.

24         Q    And --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A     Yes.

2          Q     And what is your understanding of what

3    "our reviewers" means?

4          A     Reviewers from the company that employed

5    him, Purdue Pharmaceuticals.

6          Q     And if you -- going now to Exhibit 15,

7    which is the e-mail chain that starts on

8    February 17th, at the top of that exhibit.

9          A     Yes.

10         Q     Do you see that?

11         A     Yes.

12         Q     Okay.  Do you see at the second page,

13   there's an e-mail sent February 17th from David to

14   Susie, and you are cc'd?

15         A     It's not clear that I'm --

16         Q     I think it starts at the bottom of --

17   let's just do this.  Go to the e-mail that David

18   is sending to Susie, the last e-mail.

19         A     Uh-huh.  The one on -- oh, the very last

20   e-mail.

21         Q     Yeah, the very last e-mail.

22         A     Yep.

23         Q     "Sounds like a plan."

24         A     Yep.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q    "Our review has started."  Do you see

2   that?

3        A    Yes, uh-huh.

4        Q    In the context of this e-mail, is it

5   your understanding that that is a review being

6   conducted by David Haddox's company, Purdue?

7        A    Yes.

8             (Tatum Exhibit No. 17 was marked

9             for identification.)

10  BY MS. BAISCH:

11       Q    All right, Elizabeth, is -- do you have

12  Exhibit 17 in front of you now?

13       A    Yes.

14       Q    Do you recognize this document?

15       A    Yes, I do.

16       Q    Is this the brochure for the SOP

17  conference that we've been talking about in

18  February 2012?

19       A    Yes.

20       Q    And can you turn to the third page of

21  this brochure where it says "Commercial Support"?

22       A    Yes.

23       Q    Did you know -- or, I'm sorry, does

24  the -- the entities that are listed here, the
```

```
 1   companies that are listed here, does this mean

 2   that they provided funding to AAPM?

 3         A    Yes.

 4         Q    And does --

 5         A    To support this specific program.

 6         Q    And does the -- at the top where it says

 7   "Four Star Diamond," does that mean that they

 8   would have paid more money than the next line, the

 9   diamond?

10         A    Yes.

11         Q    And do you recall what the distinction

12   was between the different levels that are set out

13   here?

14         A    No, I don't remember the dollar amount.

15         Q    If an entity provided funding for this

16   conference, do you know if there was a level --

17   another level that they wouldn't have appeared on

18   the brochure?

19         A    I don't remember.

20              MS. BAISCH:  All right.  I'm going to

21   take a break.

22              THE VIDEOGRAPHER:  The time is 12:23

23   p.m.  We're going off the record.

24              (Recess.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE VIDEOGRAPHER:  The time is 12:42

 2    p.m., and we're back on the record.

 3    BY MS. BAISCH:

 4         Q    All right, Elizabeth, did Webster --

 5    Lynn Webster, did he have a significant role in

 6    the AAPM?

 7                 MS. VICARI:  Objection to form.

 8                 THE WITNESS:  Yes.

 9    BY MS. BAISCH:

10         Q    Was he influential on the direction of

11    the AAPM?

12                 MS. VICARI:  Objection to form.

13                 THE WITNESS:  At one point he was

14    president of the board of directors.  So, yes.

15    BY MS. BAISCH:

16         Q    Did David Haddox have a big role in -- a

17    significant role in AAPM?

18                 MS. VICARI:  Objection to form.

19                 THE WITNESS:  Not -- his position on the

20    board was different.  I don't believe he was a

21    member of the executive committee.

22    BY MS. BAISCH:

23         Q    Do you know whether he was influential

24    in the direction of the AAPM?
```

```
 1                  MS. VICARI:  Objection to form.

 2                  THE WITNESS:  I can't assess that.

 3     BY MS. BAISCH:

 4          Q    Did anyone ever express concern about

 5     the financial connection between pharmaceutical

 6     companies and members of the board of directors?

 7                  MS. VICARI:  Objection to form.

 8                  THE WITNESS:  I heard people express

 9     concern.

10     BY MS. BAISCH:

11          Q    Who did you --

12          A    Verb -- verbally.

13          Q    Who did you hear express concern?

14          A    I remember Jerome Schofferman expressing

15     concern.

16          Q    And what concern was expressed?

17          A    That the organization needed to

18     diversify its sources of funding so that industry

19     funding was a smaller portion of its overall

20     budget.

21          Q    Do you -- do you recall what industry

22     funding -- what the budget -- the percentage of

23     the budget was from industry fund -- funding?

24          A    No, I don't.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. VICARI:  Objection to form.

 2  BY MS. BAISCH:

 3       Q    Did anyone else ever express concern

 4  about the financial connection between

 5  pharmaceutical companies and members of the board

 6  of directors?

 7              MS. VICARI:  Objection.  Form.

 8              THE WITNESS:  No, I don't remember

 9  anyone else expressing concern.

10  BY MS. BAISCH:

11       Q    Do you recall Susie Flynn ever

12  expressing concern about the financial connection

13  between members of the board of directors and

14  pharmaceutical companies?

15       A    Yes.

16              MS. VICARI:  Object to form.

17              THE WITNESS:  I remember her saying to

18  me privately that she had concerns.

19  BY MS. BAISCH:

20       Q    What concerns did Susie Flynn have?

21              MS. VICARI:  Objection.  Form.

22              THE WITNESS:  Nothing specific, just

23  she noted the fact that members of the board of

24  directors had relationships with the
```

1    pharmaceutical industry.

2    BY MS. BAISCH:

3        Q    Do you know whether Dr. Schofferman ever

4    did anything about his concerns?

5        A    He led the conflict of interest

6    committee and revised the form, the conflict of

7    interest disclosure form, which I believe we

8    talked about earlier.  And I think he -- he asked

9    the question about diversifying the organization's

10   funding, and attempted to generate a discussion,

11   but nothing beyond that.

12       Q    Do you know whether the AAPM's funding

13   was ever diversified during the time frame that

14   you were at AAPM?

15            MS. VICARI:  Objection to form.

16            THE WITNESS:  No.

17   BY MS. BAISCH:

18       Q    Did -- yeah, no, you don't -- no, it

19   wasn't?

20       A    No, it was not diversified.

21       Q    So there were no changes with respect to

22   the -- the funding that AAPM received from

23   pharmaceutical companies during the time frame

24   that you were at AAPM?

```
 1        A    No, I don't believe so.  It was

 2   fairly -- it was fairly consistent.  Again,

 3   that's speaking very generally.  I don't remember

 4   percentages.

 5        Q    Do you know if anyone ever expressed

 6   concern about the financial connection between

 7   AAPM and pharmaceutical companies?

 8             MS. VICARI:  Objection.  Form.

 9             THE WITNESS:  Other than the two people

10   I've already mentioned, no.

11   BY MS. BAISCH:

12        Q    When we were talking about

13   Dr. Schofferman and Susie Flynn, were they

14   expressing concern about members of the board of

15   directors or were they expressing concern about

16   AAPM in general?

17             MS. VICARI:  Objection.  Form.

18             THE WITNESS:  Susie was expressing

19   concern about members of the board.

20             Dr. Schofferman, those are his

21   colleagues, I don't think he would have done that.

22   I think he was asking the question generally about

23   the organization.

24             (Tatum Exhibit No. 18 was marked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              for identification.)

 2   BY MS. BAISCH:

 3       Q    Elizabeth, we put in front of you a

 4   document that has been labeled as Exhibit 18.  It

 5   is a letter.  Are you -- are you familiar with

 6   this -- this letter?

 7       A    Honestly, I -- I don't -- I don't

 8   remember seeing this letter.  Although this was

 9   during my time of employment, I don't remember

10   seeing this.

11       Q    All right.  So the date of the letter is

12   May 8th, 2012?

13       A    Yes.

14       Q    And it's from the United States Senate

15   Committee on Finance?

16       A    Yes.

17       Q    And it's addressed to who?

18       A    Mart -- Martin Grabois.

19       Q    Did you know Martin?

20       A    Yes, as the president of the -- the

21   board of AAPM.

22       Q    And he was president during the time

23   frame that you were there?

24       A    Yes.
```

```
 1          Q    And you don't recall -- you don't recall

 2   seeing this letter before?

 3          A    No.  I may have seen it before, but I

 4   don't -- I don't remember.

 5          Q    Can you just go to the third page of the

 6   letter where it says -- there's a list that says:

 7   "Please provide the following information," and

 8   then it lists off 1, 2, 3, 4, 5.

 9          A    Yes, I see that.

10          Q    Does that help refresh your memory as to

11   whether you've seen this letter before?

12          A    No.  Again, it's very possible.  I -- I

13   may have even helped respond to the letter, but

14   I -- I don't remember.

15          Q    Do you remember -- do you remember the

16   United States Senate Committee on Finance

17   requesting information from AAPM?

18          A    No, I don't remember that.

19          Q    Do you -- were you aware that the United

20   States Senate Committee on Finance conducted -- or

21   conducted an investigation in which it requested

22   information from AAPM?

23               MS. VICARI:  Objection to form.

24               THE WITNESS:  Honestly, no.  I mean
```

```
 1   that's embarrassing, it's the Senate, but I -- I

 2   honestly don't remember.

 3               (Tatum Exhibit No. 19 was marked

 4               for identification.)

 5   BY MS. BAISCH:

 6       Q    I'm placing in front of you Exhibit 19.

 7   It is a report -- at the bottom you see it says

 8   U.S. Senate Homeland Security and Governmental

 9   Affairs Committee?

10       A    Yes.

11       Q    And then it's called "Fueling An

12   Epidemic, Report Two, Exposing the Financial Ties

13   Between Opioid Manufacturers and Third Party

14   Advocacy Groups."  Do you see that?

15       A    Yes.

16               MS. VICARI:  Counsel, we seem to have

17   two different documents.  I just want to make sure

18   we're all looking at the right one.

19               MR. GOLDSTEIN:  Is this part of the

20   exhibit?

21               MS. BAISCH:  Oh, no, that's not part of

22   the exhibit.  Sorry.

23   BY MS. BAISCH:

24       Q    Have you ever seen this document before?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    No, I have not.

 2        Q    Does this help refresh -- refresh your

 3   recollection as to whether the Senate conducted an

 4   investigation that involved AAPM?

 5        A    No.

 6             MS. VICARI:  Objection.  Form.

 7             MS. BAISCH:  All right, we'll turn the

 8   microphone over to whoever may need it.

 9             We don't have any further questions for

10   you at this time.

11             THE WITNESS:  Okay.

12             MS. VICARI:  We'll just go off the

13   record for a minute.

14             THE VIDEOGRAPHER:  Yes.  The time is

15   12:52 p.m., and we're going off the record.

16             (Pause in the proceedings.)

17             THE VIDEOGRAPHER:  The time is 12:54

18   p.m., and we're back on the record.

19                  CROSS-EXAMINATION

20   BY MS. VICARI:

21        Q    Ms. Tatum, thank you for your time and

22   your patience today.

23             My name is Angela Vicari.  I'm with the

24   law firm Arnold & Porter, and I represent Endo
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and -- the Endo and Par defendants in this

 2    litigation.

 3              We've never met before today's

 4    deposition, correct?

 5        A    Correct.

 6        Q    And we've never spoken before today's

 7    deposition?

 8        A    Correct.

 9        Q    You testified earlier about being

10    contacted by someone named Desiree Torres from

11    Griffin Strategies.

12              Do you recall that?

13        A    Yes.

14        Q    And Ms. Torres told you that she was

15    hired by a law firm?

16        A    Yes.

17        Q    Do you know what law firm hired her?

18        A    Motley Rice.

19        Q    What was your understanding of the

20    nature of Ms. Torres's investigation?

21        A    I -- I didn't understand it, honestly.

22    She didn't really explain it to me.  She asked a

23    series of questions but didn't explain the nature

24    of her -- the investigation fully.
```

1     Q    Do you recall any of the questions that

2  she asked you?

3     A    She asked me some of the questions I've

4  been asked today about the conflict of interest

5  form, about members of the board and their

6  relationships to pharmaceutical companies.  That's

7  what I remember.

8     Q    And did you tell her anything different

9  than what you testified about here today?

10    A    I think we had -- we had -- ended up

11  having a number of conversations, and I -- I may

12  have said different things during that

13  conversation.  It was a different kind of

14  interaction.

15    Q    How so?

16    A    It was less structured and less formal.

17    Q    So how many -- how many conversations

18  did you have with Ms. Torres?

19    A    I can't say.  Maybe -- maybe three,

20  maybe four.  It was several.

21    Q    When you said that one was less

22  structured, which one was less structured?

23    A    All of the conversations with her were

24  less structured than what we've had today.

1     Q    I see.  Did Ms. Torres tell you whether

2  she contacted other current or former employees of

3  AAPM?

4     A    No.  I asked her that question.  I did

5  not get a clear answer.

6     Q    So you don't know whether she did

7  contact anyone else from AAPM?

8     A    No, I don't know.

9     Q    Did Ms. Torres tell you whether she

10  spoke to anyone else regarding opioid litigation?

11     A    It was clear she was speaking to the

12  attorney at Motley Rice, Linda Singer.  I don't

13  know -- I don't remember her mentioning speaking

14  to anyone else.

15     Q    And you mentioned a statement that

16  Ms. Torres asked if you had signed.  Do you recall

17  that?

18     A    Yes, she asked me to sign a declaration.

19  That's the term that she used.

20     Q    Did you ever see a declaration?

21     A    I did.

22     Q    How did you come about seeing the

23  declaration?

24     A    She sent it to me in an e-mail.

1      Q      When you say "she," who are you

2  referring to?

3      A      Desiree Torres.

4      Q      Do you know who drafted the e-mail --

5  sorry, do you know who drafted the declaration?

6      A      She drafted the declaration.

7      Q      Did you review the declaration that she

8  provided you over e-mail?

9      A      Yes, I did.

10      Q      Do you still have a copy of the

11  declaration?

12      A      Yes, I do.

13      Q      And in what form?

14      A      I believe it's either a Word document or

15  a PDF.

16      Q      And you did not sign the declaration

17  that Ms. Torres sent you?

18      A      Correct, I did not sign it.

19      Q      Did Ms. Torres put pressure on you to

20  sign it?

21            MS. DICKINSON:  Objection.  Form.

22            THE WITNESS:  No.

23  BY MS. VICARI:

24      Q      Did you feel any pressure to sign it?

Case: 1:17-md-02804-DAP Doc #: 2177-10 Filed: 08/12/19 149 of 161. PageID #: 320384


Highly Confidential - Subject to Further Confidentiality Review

1      A    No.

2      Q    Did Ms. Torres say whether anyone else

3   from AAPM signed a declaration?

4      A    No, she did not.

5      Q    Did Ms. Torres say whether anyone else

6   signed a declaration regarding the opioid

7   litigation?

8      A    She did not say.

9      Q    Did Ms. Torres provide you with any

10  documents other than the declaration that she sent

11  to you via e-mail?

12     A    No.

13     Q    Approximately when did she send the

14  declaration via e-mail?

15     A    It was sometime during the summer.  I

16  think towards the beginning of the summer of 2018.

17     Q    Approximately how many times did you

18  speak with Ms. Torres before she sent you the

19  declaration?

20     A    Three to four times.

21     Q    Other than the e-mail by which

22  Ms. Torres transmitted the declaration that we've

23  been talking, did you -- that we've been talking

24  about, did you have any other written

Golkow Litigation Services                    Page 149

1    communications with Ms. Torres?

2         A    No.

3         Q    Did you have any written communications

4    with anyone from Griffin Strategies other than

5    Ms. Torres?

6         A    No.

7         Q    Let's turn briefly just to -- to your

8    role at AAPM.

9              Would you categorize -- would you

10   describe yourself as an administrative employee of

11   the organization?

12        A    Yes.

13        Q    You weren't a decision maker for AAPM?

14        A    Correct.

15        Q    And you played no role in the decisions

16   about, you know, what the content would be for

17   AAPM events, correct?

18        A    Correct.

19        Q    And you also played no role in any --

20   with respect to deciding the content of any AAPM

21   publications, correct?

22        A    Correct.

23        Q    And you don't feel qualified to opine on

24   any sort of AAPM messaging.  I believe that was

```
 1    the term used before.

 2              MS. DICKINSON:  Objection.  Form.

 3              THE WITNESS:  I don't remember using the

 4    word "opine."  I don't feel qualified to assess

 5    those statements.

 6    BY MS. VICARI:

 7         Q    And you're not qualified to assess the

 8    accuracy of any of AAPM's messaging?

 9              MS. DICKINSON:  Objection.  Form.

10              THE WITNESS:  Correct.  I don't have any

11    medical training.

12    BY MS. VICARI:

13         Q    I just want to turn back to Ms. Torres

14    for a moment.  I believe you said that her

15    explanation of why she was contacting you was

16    confusing.  Is that the word you used?

17         A    I don't remember using that word.  It

18    was unclear.  When she first contacted me, I

19    didn't have any way to verify her identity, and so

20    I wasn't honestly sure that it was even a

21    legitimate call.

22         Q    Did you take steps to try to verify her

23    identity?

24         A    No.  That was a busy time in my life and
```

Highly Confidential - Subject to Further Confidentiality Review

1    I did not.

2         Q    Your conversations with Ms. Torres, were

3    they in person or by phone?

4         A    By phone.

5         Q    Did you ever meet Ms. Torres in person?

6         A    No.

7         Q    Do you have any understanding of how

8    Ms. Torres received your contact information?

9         A    Yes.

10        Q    How?

11        A    She found me on LinkedIn.  I asked her.

12   My -- my -- she called me on my cell phone.  I

13   don't know how she got my cell phone number.

14        Q    Was your cell phone number included in

15   your LinkedIn profile?

16        A    No.

17        Q    Did you ever ask her how she got your

18   cell phone number?

19        A    No.

20             MS. VICARI:  I have no further questions

21   for you.

22             Thank you so much for your time.

23                  CROSS-EXAMINATION

24   BY MR. MASTERS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Good afternoon, Ms. Tatum.  Thank you

 2   again for your patience here today.

 3               My name is Brad Masters.  I represent

 4   Cardinal Health, and as she said as well, we've

 5   never spoken before, correct?

 6          A    Correct.

 7          Q    I just have a couple of very quick

 8   questions.

 9               Counsel for the plaintiffs asked a

10   number of questions about opioid manufacturers.

11          A    Yes.

12          Q    Are you familiar with a -- with what a

13   pharmaceutical distributor is?

14          A    No.  Not as distinct from manufacturer.

15          Q    So you don't have any idea of what the

16   role of a pharmaceutical distributor is in the

17   supply chain for opioids?

18          A    No.

19          Q    And so it's safe to say that you can't

20   recall the names of any pharmaceutical

21   distributors sitting on the Corporate Relations

22   Council, correct?

23          A    That's correct.  I -- I couldn't

24   distinguish between the two.
```

```
 1          Q    Okay.  One last question:  How did

 2    Ms. Torres respond after you indicated that you

 3    wouldn't sign the declaration?

 4          A    She said she understood and said there

 5    was a possibility that I would be served a

 6    subpoena.

 7          Q    And what did you say in response to

 8    that?

 9          A    I said, Okay.  I didn't -- there wasn't

10    much to say other than, Okay, if that happens,

11    I'll -- I'll handle it.

12          Q    Okay.  After she indicated that there's

13    a possibility you would be served with a subpoena,

14    did she ask you to reconsider signing the

15    affidavit?

16          A    I don't remember her asking me to

17    reconsider.  I made it clear I was not going to

18    sign it.

19          Q    Great.  Thank you.

20               MR. MASTERS:  No further -- no further

21    questions.

22               MS. BAISCH:  We will switch again.

23                    REDIRECT EXAMINATION

24    BY MS. BAISCH:
```

```
 1        Q    All right, thank you, Elizabeth.  Just a

 2   couple more things.

 3             The reason that you did not sign the

 4   declaration sent to you by Ms. Torres was not

 5   because it was inaccurate; is that correct?

 6             MR. GOLDSTEIN:  Object to form.

 7             THE WITNESS:  I -- when I reviewed it, I

 8   saw it in a different way, and I no longer could

 9   stand by those statements.

10   BY MS. BAISCH:

11        Q    Did you tell Ms. Torres that the AAPM

12   was definitely influenced by the manufacturers?

13             MS. VICARI:  Objection to form.

14             THE WITNESS:  I may have said something

15   like that to her.  Um, I may have said something

16   like that to her.

17   BY MS. BAISCH:

18        Q    Did you tell Ms. Torres that you

19   generally recalled that there was a concern among

20   the AAPM board members and staff about the opioid

21   crisis, noting that they saw it coming?

22             MS. VICARI:  Objection to form.

23             THE WITNESS:  Yeah, that -- that's -- I

24   don't agree with that statement.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. BAISCH:

 2       Q    Meaning you did not say that to

 3   Ms. Torres?

 4       A    I don't remember saying, "They saw it

 5   coming."  No, I don't remember that.

 6       Q    Do you remember saying that there was a

 7   concern among the AAPM board members about the

 8   opioid crisis?

 9       A    Yes.

10       Q    Do you remember saying that AAPM did not

11   make efforts to curtail the opioid crisis and

12   continued to support the companies who made the

13   opioids?

14            MS. VICARI:  Objection.  Form.

15            THE WITNESS:  Again, I -- I may have

16   said that at one time.  That's not the statement

17   I'm making right now.

18   BY MS. BAISCH:

19       Q    Did you say that there was no ownership

20   taken by AAPM in terms of ensuring that the risks

21   of opioids were accurately conveyed to

22   prescribers?

23            MS. VICARI:  Object to form.

24            THE WITNESS:  That may have been a
```

Highly Confidential - Subject to Further Confidentiality Review

1    personal opinion that I expressed.  Again, as -- I

2    was an administrative assistant.  I have no

3    medical training, no grounds on which to assess

4    the decisions of that organization.

5    BY MS. BAISCH:

6        Q    But that's a statement you would have

7    made to Ms. Torres?

8              MS. VICARI:  Object to form.

9              THE WITNESS:  It's possible I said that,

10   yes.

11             MS. BAISCH:  I don't have any further

12   questions.

13             MS. DICKINSON:  Thank you.

14             THE VIDEOGRAPHER:  Okay.  The time is

15   1:08 p.m., December 11th, 2018.  Going off the

16   record, completing the videotaped deposition.

17             MR. ENGLAND:  We're going to read and

18   sign, by the way.

19             (Whereupon, the deposition of

20             ELIZABETH T. TATUM was concluded at

21             1:08 p.m.)

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2         The undersigned Certified Shorthand Reporter

 3     does hereby certify:

 4         That the foregoing proceeding was taken before

 5     me at the time and place therein set forth, at

 6     which time the witness was duly sworn; That the

 7     testimony of the witness and all objections made

 8     at the time of the examination were recorded

 9     stenographically by me and were thereafter

10     transcribed, said transcript being a true and

11     correct copy of my shorthand notes thereof; That

12     the dismantling of the original transcript will

13     void the reporter's certificate.

14         In witness thereof, I have subscribed my name

15     this date:  December 13, 2018.

16

17                     _____

18                     LESLIE A. TODD, CSR, RPR

19                     Certificate No. 5129

20     (The foregoing certification of

21     this transcript does not apply to any

22     reproduction of the same by any means,

23     unless under the direct control and/or

24     supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               INSTRUCTIONS TO WITNESS

 2       Please read your deposition over carefully and

 3   make any necessary corrections. You should state

 4   the reason in the appropriate space on the errata

 5   sheet for any corrections that are made.

 6   After doing so, please sign the errata sheet

 7   and date it.

 8       You are signing same subject to the changes

 9   you have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative

11   that you return the original errata sheet to the

12   deposing attorney within thirty (30) days of

13   receipt of the deposition transcript by you. If

14   you fail to do so, the deposition transcript may

15   be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24
```

```
 1                    - - - - - -

 2                    E R R A T A

 3                    - - - - - -

 4   PAGE LINE CHANGE

 5   _____ _____ _____

 6   REASON: _____

 7   _____ _____ _____

 8   REASON: _____

 9   _____ _____ _____

10   REASON: _____

11   _____ _____ _____

12   REASON: _____

13   _____ _____ _____

14   REASON: _____

15   _____ _____ _____

16   REASON: _____

17   _____ _____ _____

18   REASON: _____

19   _____ _____ _____

20   REASON: _____

21   _____ _____ _____

22   REASON: _____

23   _____ _____ _____

24   REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               ACKNOWLEDGMENT OF DEPONENT

 2       I,_____, do hereby

 3   certify that I have read the foregoing pages, and

 4   that the same is a correct transcription of the

 5   answers given by me to the questions therein

 6   propounded, except for the corrections or changes

 7   in form or substance, if any, noted in the

 8   attached Errata Sheet.

 9

10   _____

11   ELIZABETH T. TATUM                    DATE

12

13

14   Subscribed and sworn to

15   before me this

16   _____day of_____,20___.

17   My commission expires:_____

18   _____

19   Notary Public

20

21

22

23

24
```