1  IN THE UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF OHIO
3         EASTERN DIVISION
4            -  -  -
5

IN RE:  NATIONAL         :   HON. DAN A.
6  PRESCRIPTION OPIATE      :   POLSTER
LITIGATION              :
7                          :
APPLIES TO ALL CASES     :   NO.
8                          :   1:17-MD-2804
                         :
9

        - HIGHLY CONFIDENTIAL -
10
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                  -  -  -
12
              April 2, 2019
13
                  -  -  -
14
15          Videotaped deposition of
SERGIO TEJEDA taken pursuant to notice,
16  was held at the offices of Locke Lord,
LLP, 200 Vesey Street, New York, New
17  York, beginning at 9:01 a.m., on the
above date, before Michelle L. Gray, a
18  Registered Professional Reporter,
Certified Shorthand Reporter, Certified
19  Realtime Reporter, and Notary Public.
20            -  -  -
21

     GOLKOW LITIGATION SERVICES
22    877.370.3377 ph| 917.591.5672
          deps@golkow.com
23
24

Page 2

1
2 APPEARANCES:

3 MOTLEY RICE, LLC
BY: DONALD A. MIGLIORI, ESQ.
JOHN C. DUANE, ESQ.
4 28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
5 (843) 216-9000
dmigliori@motleyrice.com
6 jduane@motleyrice.com
Representing the Plaintiffs
7
8 LOCKE LORD, LLP
BY: JOHN P. McDONALD, ESQ.
9 2200 Ross Avenue
Suite 2800
10 Dallas, Texas 75201
(214) 740.8758
11 jpmcdonald@lockelord.com
Representing Henry Schein, Inc. and the
12 Witness
13
WILLIAMS & CONNOLLY, LLP
14 BY: KATELYN ADAMS, ESQ.
725 12th Street, NW
15 Washington, D.C. 20005
(202) 434-5148
16 Kadams@wc.com
Representing the Defendant, Cardinal
17 Health
18
COVINGTON & BURLING, LLP
19 BY: MEGAN A. CROWLEY, ESQ.
850 Tenth Street, N.W., Suite 586N
20 Washington, D.C. 20001
(202) 662-5516
21 mcrowley@cov.com
Representing the Defendant, McKesson
22 Corporation
23
24

Page 3

1 APPEARANCES: (Cont'd.)
2
3 MARCUS & SHAPIRA, LLP
BY: JOSHUA A. KOBRIN, ESQ.
4 One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219
5 (412) 338-3990
kobrin@marcus-shapira.com
6 Representing the Defendant, HBC
Service Company
7
8
TELEPHONIC/STREAMING APPEARANCES:
9
10 JACKSON KELLY, PLLC
BY: SYLVIA WINSTON NICHOLS, ESQ.
11 150 Clay Street, Suite 500
Morgantown, WV 26501
12 (304) 284-4138
Sylvia.winston@jacksonkelly.com
13 Representing the Defendant,
AmerisourceBergen
14
15
16 VIDEOTAPE TECHNICIAN:
David Lane
17
18
ALSO PRESENT:
19
Marjorie Han, Esq.
20 (Henry Schein, Inc.)
21
22
23
24

Page 4

1                   - - -
2              I N D E X
3                   - - -
4
Testimony of:
5
              SERGIO TEJEDA
6
7    By Mr. Migliori          11
8
9
10
11
12                - - -
13         E X H I B I T S
              - - -
14
15 NO.        DESCRIPTION          PAGE
16 Henry Schein
Tejeda-1    Notice of Deposition  30
17
18 Henry Schein
Tejeda-2    Resumé of Sergio     31
19          Tejeda
20 Henry Schein
Tejeda-3    Henry Schein          48
21          Appoints New Director
Of Compliance
22
23
24

Page 5

1                   - - -
2         E X H I B I T S (Cont'd.)
3                   - - -
4
5 NO.        DESCRIPTION          PAGE
6 Henry Schein
Tejeda-4    PDMA Record          75
7          Retention Policy
1/30/02
8          HSI-MDL-00092255-70
9 Henry Schein
Tejeda-5    Due Diligence        116
10          Documents
Schein Summit
11          County Customers
Opioid Orders
12          2001-2008
HSI-MDL-00648726
13
14 Henry Schein
Tejeda-6    Customer Service     125
15          Imaging
Harper, Jr. Adolph
16          HSI-MDL-00000983-84
17 Henry Schein
Tejeda-7    Due Diligence        142
18          Documents
Schein Summit County
19          Customers
Opioid Post January 2009
20          HSI-MDL-00648726
21 Henry Schein
Tejeda-8    Customer Service     149
22          Imaging
Heim, Brian
23          HSI-MDL-00001198-210
24

Page 6

E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Henry Schein
Tejeda-9    Letter, 11/9/12       158
            To Droz from
            Tejeda
            HSI-MDL-00397293-94
Henry Schein
Tejeda-10   E-mail Thread         180
            7/11/12
            Subject, Brian Heim
            HSI-MDL-00648727
Henry Schein
Tejeda-11   DEA/Prof Licence      186
            Maintenance
            HSI-MDL-00648813

Henry Schein
Tejeda-12   Cegedim Dendrite      207
            New Account Issues
            Involving Controlled
            Substances
            HSI-MDL-00231217-18
Henry Schein
Tejeda-13   E-mail, 8/6/13        223
            Subject, Need 3
            Embers
            HSI-MDL-00552881-83
Henry Schein
Tejeda-14   Individual            228
            Opportunity/Issue
            Presented by
            Tina Steffanie-Oak
            (No Bates)

Page 7

E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Henry Schein
Tejeda-15   Cegedim Draft         230
            Schein SOM Procedural
            Review
            21 CFR 1301.74(b)
            HSI-MDL-00404369-73

Henry Schein
Tejeda-16   E-mail, 3/5/11        242
            Subject, Draft DEA
            Presentation
            HSI-MDL-00007351-52

Henry Schein
Tejeda-17   Due-Diligence         250
            Documents
            Schein Summit County
            Customers
            Canceled Orders
            HSI-MDL-00648726

Henry Schein
Tejeda-18   E-mail Thread         261
            2/6/08
            Subject, HDMA
            Meeting
            HSI-MDL-00376363-64
Henry Schein
Tejeda-19   HDMA Industry         279
            Compliance Guidelines
            HSI-MDL-00063613

Page 8

E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Henry Schein
Tejeda-20   E-mail Thread         300
            11/6/13
            Subject, December
            Audit Basis
            HSI-MDL-00622264-67

Henry Schein
Tejeda-21   Projects - Tejeda     315
            Slide

Henry Schein
Tejeda-22   21 CFR 1301.74(b)     321
Henry Schein
Tejeda-23   US DEA Letter         335
            12/27/07
            HSI-MDL-00404079-80

Page 9

DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1           - - -
2       THE VIDEOGRAPHER:  We're now
3   on the record.  My name is David
4   Lane, videographer for Golkow
5   Litigation Services.
6       Today's date is April 2nd,
7   2019.  Our time is 9:01 a.m.
8       This deposition is taking
9   place in New York, New York, in
10  the matter of National
11  Prescription Opiate Litigation.
12      Our deponent today is Sergio
13  Tejeda.
14      Counsel will be noted on the
15  stenographic record.
16      Our court reporter today is
17  Michelle Gray and will now swear
18  in our witness.
19          - - -
20  ... SERGIO TEJEDA, having
21  been first duly sworn, was
22  examined and testified as follows:
23          - - -
24      THE VIDEOGRAPHER: Please

Page 11

1   begin.
2           - - -
3       EXAMINATION
4           - - -
5   BY MR. MIGLIORI:
6       Q.   Good morning.
7       A.   Good morning.
8       Q.   My name is Don Migliori.  I
9   represent some of the plaintiffs in this
10  litigation, and I'll be asking you some
11  questions this morning.
12      My voice is a little weak
13  today.  If you can't understand my
14  question or can't hear it, I'll ask you
15  to let me know.  Okay?
16      A.   Okay.
17      Q.   Have you ever had your
18  deposition taken before?
19      A.   No.
20      Q.   So I'll be asking you some
21  questions.  The court reporter will be
22  taking down your answers.
23      A.   Okay.
24      Q.   I ask that you wait for my

Page 12

1   question to be complete before you
2   answer.  Also, to give a little bit of
3   time so that your counsel can make an
4   objection, if necessary.
5       I'll ask that also your
6   answers be verbal; that is, gestures, or
7   sounds are hard to type, so if you can
8   say "yes" or "no" as appropriate, I'd
9   appreciate it.  And if you have any
10  questions or want to take a break, just
11  let me know and we'll do so.
12      Do you have any questions
13  before we get started?
14      A.   No.
15      Q.   Okay.  If you answer my
16  question, I'm going to assume that you've
17  understood it.  Is that understandable?
18      A.   Yes, it is.
19      Q.   Okay.  Could you tell the
20  jury your name and your address?
21      A.   My name is Sergio Tejeda.
22  My address is 93 Edgewood Road, Port
23  Washington, New York 11050.
24      Q.   I'm going to ask you to keep

Page 13

1   your voice up too.  We're both
2   struggling.  Just so the court reporter
3   can hear you.  Okay?
4       A.   Okay.
5       Q.   What's your current position
6   and employer?
7       A.   I'm the director of
8   regulatory affairs for Henry Schein
9   Incorporated.
10      Q.   And how long have you held
11  that position?
12      A.   About four years with the
13  same title.
14      Q.   Going back to 2015?
15      A.   Yes.
16      Q.   And what was the title
17  before that?
18      A.   Director of regulatory for
19  North America.
20      Q.   How long did you hold that
21  title?
22      A.   About three years.
23      Q.   Going back to 2012?
24      A.   More or less.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.   Okay.  What, if anything,
2  was a change in your responsibilities
3  between those two positions?
4    A.   I am focused on domestic
5  compliance at this point.
6    Q.   Okay.  We're going to get
7  into some of the specifics of all of
8  that.  Before we get started with that,
9  when did you first learn about this
10 deposition?
11   A.   When did I first learn?
12 Sometime last year.
13   Q.   And did you meet with
14 counsel in preparation for this
15 deposition?
16   A.   Yes.
17   Q.   Do you recall the first time
18 that you met with counsel?
19   A.   I think it was late
20 February.
21   Q.   February?
22   A.   Late February.
23   Q.   And who did you meet with?
24   A.   I met with the local team

Page 15

1  and our inhouse attorneys.
2    Q.   Did you meet in Melville, or
3  did you meet at the -- or did you meet
4  here in the office?
5    A.   First meeting was here.
6    Q.   Do you recall how long you
7  met?
8    A.   Maybe four hours.
9    Q.   Did you review documents at
10 that time?
11   A.   Yeah, we reviewed some
12 documents.
13   Q.   Did you review any testimony
14 of other witnesses in this case?
15   A.   No.
16   Q.   Have you ever reviewed any
17 testimony of other witnesses in this
18 case?
19   A.   No.
20   Q.   The documents that you
21 reviewed in that first meeting, were they
22 documents that you brought with you to
23 the meeting or were they provided to you
24 by counsel?

Page 16

1    A.   They were provided by
2  counsel.
3    Q.   Did you meet again with
4  counsel in preparation for today?
5    A.   Yes.
6    Q.   How many more times?
7    A.   Three.
8    Q.   And were those meetings also
9  here or were they in other places?
10   A.   In Melville once, we had
11 teleconference once, and here once.
12   Q.   When was the meeting in
13 Melville?
14   A.   So I don't remember the
15 exact date, sorry.
16   Q.   Was it the second meeting
17 you had?
18   A.   It was the second meeting,
19 yes.
20   Q.   Do you know how long that
21 meeting last -- lasted?
22   A.   About six, seven hours.
23   Q.   Did you review documents at
24 that meeting?

Page 17

1    A.   Yes.
2    Q.   Were they documents that you
3  had in Melville?  That is, were they
4  kept -- were you the -- did you bring
5  those documents with you to the meeting?
6    A.   I brought some documents.
7    Q.   And do you recall what kinds
8  of documents you brought with you,
9  yourself, to the meeting?
10   A.   Material that we had
11 reviewed the first meeting.
12   Q.   Okay.  Anything that you got
13 out of your own files that had not been
14 provided to you by counsel?
15   A.   No.
16   Q.   Were you asked to gather any
17 documents that weren't part of what the
18 counsel showed you?
19   A.   No.
20   Q.   Did you prepare -- at any
21 point were you asked to set aside
22 documents in your own control in order to
23 comply with any discovery requests in
24 this case?

Page 18

1     A.   Do you mean prior to the
2 preparation?
3     Q.   Yeah.
4     A.   Yes.
5     Q.   And did you provide all
6 those documents that you had in your
7 control?
8     A.   Yeah.
9     Q.   Relative to this case?
10     A.   Yes.
11     Q.   And since that initial
12 production, did you go back and get any
13 more documents or look for more
14 documents?
15     A.   I don't think so.
16     Q.   Did you review any
17 transactional records of controlled
18 substances for your testimony in this
19 case?
20     A.   Not for my testimony.
21 For -- as a matter of my -- the nature of
22 my work, I do.
23     Q.   Okay.  And I'm not talking
24 about generally in the course of your own

Page 19

1 business.  I'm asking relative to the
2 issues in this case, relative to Ohio or
3 Summit County, Ohio.  Did you review any
4 transactional records in preparation for
5 your testimony?
6     A.   Not transactional records.
7 We produced some reports.
8     Q.   Were you helpful in
9 producing those reports?
10     A.   It was a collab -- an effort
11 between my team and the verifications
12 department.
13           MR. McDONALD:  He said
14           collaborative effort.
15           THE WITNESS:  Sorry.
16 BY MR. MIGLIORI:
17     Q.   Which reports did your team
18 and the verifications team gather
19 together?
20     A.   Sales reports.  Any due
21 diligence that we may have.
22     Q.   What about pended order
23 reports?  Did you review anything like
24 that?

Page 20

1     A.   No.
2     Q.   Did you help produce any
3 reports relevant to canceled orders?
4     A.   My team did.
5     Q.   What is a canceled order?
6     A.   Canceled order is an order
7 that has been placed and either the
8 customer or Henry Schein, somebody at
9 Henry Schein has canceled.
10     Q.   Okay.  When it's canceled by
11 Henry Schein, what are their bases to
12 cancel an order?
13     A.   Many different types of
14 reasons.
15     Q.   Is there a canceled order
16 for an order that's considered
17 suspicious?
18     A.   So an order can be deemed
19 suspicious and can be canceled by the
20 customer.
21     Q.   Okay.  My question is a
22 little more particular to these reports
23 that you gathered.  Did you prepare a
24 canceled order report with the

Page 21

1 verifications team?
2     A.   No.
3     Q.   Any other reports that you
4 or your team prepared for this
5 litigation, to your knowledge?
6     A.   Training.  We produced SOPs.
7     Q.   What kind of training
8 documents did you gather?
9     A.   Training materials, some
10 training records.
11     Q.   And describe the training
12 records in particular.  Are they the
13 actual manuals for training, are they
14 scores or grades for success in training?
15 What kind of records did you pull
16 together?
17     A.   May have been just pieces of
18 PowerPoint presentations, or forms that
19 they were completed after a training has
20 completed.  The employees record their
21 name and sign.
22     Q.   Were any of these employees
23 sales employees?
24     A.   No.  It was mainly

Page 22

1 verifications and/or regulatory.
2     Q.   Verifications and what?
3     A.   And/or regulatory.
4     Q.   All right.  Do you know when
5 the training records started, what years
6 they started from what you gathered?
7     A.   I don't remember.
8     Q.   You said standard operating
9 procedures, were you part of the
10 collection of the SOPs, or your team?
11     A.   They were collected by
12 verifications, and some were collected by
13 my team.
14     Q.   Did you review those in
15 preparation for today at any point?
16     A.   I remember looking at one or
17 two.
18     Q.   Okay.  Were the same people
19 at the Melville meeting that were at the
20 initial meeting here at Locke Lord?
21     A.   No.
22     Q.   Who else was there?
23     A.   Somebody was missing, and I
24 apologize if I don't remember his name.

Page 23

1 I think it was somebody from the Locke
2 Lord team.
3     Q.   Okay.  Did you ever speak
4 with Shaun Abreu about your testimony?
5     A.   About?
6     Q.   About this litigation?
7     A.   So about being deposed or
8 the --
9     Q.   Any aspect of this --
10     A.   -- in particular from --
11     Q.   Any aspect of this
12 litigation?
13     A.   The only thing has been that
14 we know that we both were deposed or
15 being deposed.
16     Q.   Okay.  Did you ask him about
17 his deposition?
18     A.   No.
19     Q.   Did you ask anybody about
20 testimony they've given in this case?
21     A.   No.
22     Q.   Did you talk to Mr. Peacock?
23     A.   Every day.
24     Q.   Did you talk about this

Page 24

1 litigation?
2     A.   Just on the matter that I
3 was being deposed.
4     Q.   Okay.  You didn't talk about
5 the substance of his testimony?
6     A.   No.
7     Q.   Did you talk to Tina -- let
8 me get this -- Tina Steffanie-Oak at any
9 point about this litigation?
10     A.   I haven't talked to Tina in
11 months.
12     Q.   Okay.  Have you talked to
13 her since she left the company?
14     A.   Yes.
15     Q.   Did you talk to her about
16 this litigation?
17     A.   Only when -- last year when
18 we were talking about her being deposed.
19     Q.   Okay.  And you haven't
20 talked to her since her deposition about
21 her testimony?
22     A.   No, I haven't.
23     Q.   Okay.  When you had your
24 teleconference, did you continue to

Page 25

1 review documents in preparation for
2 today?
3     A.   Yes.
4     Q.   Were there any new documents
5 presented to you?
6     A.   I think so.
7     Q.   Any new testimony described
8 to you at any point?
9     A.   No testimony.
10     Q.   Were the same people
11 involved in that meeting?
12     A.   It was -- yes.
13     Q.   Okay.  That is, counsel
14 inhouse from Henry Schein and counsel
15 from Locke Lord?
16     A.   Yes, that's correct.
17     Q.   Was it Mr. McDonald or was
18 it Mr. Jones or both?
19     A.   No, it was Mr. Jones and
20 also Lauren, I don't remember her last
21 name.
22     Q.   That's fine.  It's not a
23 quiz.
24         How long did the

Page 26

1  teleconference last?
2      A.   Teleconference last six
3  hours.
4      Q.   And during that six hours,
5  no testimony was described to you?
6      A.   No, no testimony.
7      Q.   And that was the third of
8  your four meetings?
9      A.   Yes, sir.
10     Q.   And then you had one more
11 meeting here at this law office?
12     A.   Yes, sir.
13     Q.   And was that yesterday?
14     A.   Yesterday.
15     Q.   And how long was that
16 meeting?
17     A.   It started at around nine
18 and finished around four.
19     Q.   Okay.  So about seven hours?
20     A.   About seven hours.
21     Q.   So if my math is correct,
22 you spent somewhere between 20 and
23 25 hours preparing for today?
24     A.   Between that.

Page 27

1      Q.   In the meeting yesterday,
2  did you see any documents that were new
3  that you hadn't seen before?
4      A.   I think I saw a couple, yes.
5      Q.   And the documents that
6  you're looking at generally, were they
7  documents relating to suspicious order
8  monitoring systems?
9      A.   The process, yes, and
10 relating to the suspicious order
11 monitoring.
12     Q.   Did you review any documents
13 specific to Ohio or Summit County, Ohio?
14     A.   No.
15     Q.   Did you review any answers
16 to interrogatories that Henry Schein
17 prepared in this -- in this litigation?
18     A.   I'm sorry, say that again.
19     Q.   Did you review any written
20 responses, sworn statements, that your
21 company prepared for this litigation?
22     A.   No.
23     Q.   Do you know whether or not a
24 single suspicious order has ever been

Page 28

1  reported in the state of Ohio or in
2  some -- for Summit County transactions
3  ever?
4      A.   I don't know.
5      Q.   Do you know whether or not
6  any pended orders were ever discovered
7  for Summit County, Ohio, or anywhere
8  within the state of Ohio?
9          MR. McDONALD:  Object to the
10 form.
11         THE WITNESS:  What?
12         MR. McDONALD:  Go ahead.
13 Answer if you know.
14         THE WITNESS:  Okay.  Sorry,
15 by knowing, you mean a specific
16 or -- because we know that we were
17 doing it -- we were more like --
18 more than likely reported to Ohio.
19 BY MR. MIGLIORI:
20     Q.   Well, I'm not asking about
21 reporting to Ohio, the state of Ohio,
22 I'll get to that separately.  Right now
23 I'm talking about, and I'll be clear I
24 guess, to the DEA field office.

Page 29

1          Did you report any pended
2  orders to the DEA field office for Summit
3  County or within the state of Ohio at any
4  point while you were at Henry Schein to
5  your knowledge?
6      A.   I don't remember.
7      Q.   And in the 25 hours that you
8  prepared for today, you didn't do
9  anything to familiarize yourself with
10 Summit County, Ohio, the county where
11 Henry Schein has been sued?
12     A.   We really didn't talk
13 about --
14         MR. McDONALD:  Don't --
15 don't disclose the specifics of
16 what we discussed.  Just answer
17 his question.
18 BY MR. MIGLIORI:
19     Q.   I'm just asking whether you
20 familiarized yourself with anything from
21 Summit County, Ohio, relevant to
22 suspicious orders, pended orders, any
23 activity, transactional activity that
24 would rise to the level of a pended or

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 suspicious order?
2     A.   No.
3     Q.   I'm going to hand you
4 documents throughout the day.  It's a
5 tough reach but...
6         (Document marked for
7         identification as Exhibit
8         Henry Schein-Tejeda-1.)
9 BY MR. MIGLIORI:
10     Q.   This is today's notice of
11 deposition for the record.
12         And you have seen this,
13 haven't you?
14     A.   Yes.
15     Q.   This tells you to come here
16 today.  Did you bring any documents with
17 you today?
18     A.   Not related to the -- to
19 this.
20     Q.   No?  Okay.  I've been
21 provided with what appears to be a
22 curriculum vitae.  I'm not sure when this
23 was prepared.
24         (Document marked for

Page 31

1     identification as Exhibit
2     Henry Schein-Tejeda-2.)
3 BY MR. MIGLIORI:
4     Q.   If you can take a couple
5 seconds.  I marked it as Exhibit 2.
6         Could you look at this and
7 let me know when you think this may have
8 been prepared?
9     A.   I think this was prepared
10 sometime last year.
11     Q.   For what purpose?
12     A.   I wanted to update it, to
13 update my resumé.
14     Q.   Okay.  Was it -- were you
15 asked to prepare this by counsel?
16     A.   No.
17     Q.   Do you recall when you
18 provided it to counsel?
19     A.   I don't.
20     Q.   Did you have any help in
21 preparing this document?
22     A.   No.  Not unless my wife read
23 it and give me comments.
24     Q.   Those are the best critics.

Page 32

1     A.   Yes.
2     Q.   Let's start at the last
3 page.
4     A.   Okay.

15     Q.   Okay.  Was that a school --
16 was that a full law school program to
17 become a lawyer or was there another
18 program within the university that you
19 were attending?
20     A.   It was a full law school to
21 become a lawyer.
22     Q.   Okay.  So you did not
23 complete law school?
24     A.   No.

Page 33

6     Q.   Is that a degree that you
7 obtained?
8     A.   Yes, sir.
9     Q.   And that's in -- it was in
10 criminal justice?
11     A.   Yes, sir.
12     Q.   When did you move from
13 Guatemala to the United States?
14     A.   1989.



Page 34

3    Q.    But you were not a lawyer,
4  correct?
5        A.    No, I wasn't.

11    Q.    At any point during that
12  professional experience, did you have any
13  role or relationship to any kind of
14  pharmaceutical litigation?
15        A.    Not litigation.  My role was
16  more, on that end, drug registration, you
17  know, intellectual property, things like
18  that.

Page 35

6  manager of sorts, correct?
7        A.    A manager.

Page 36

1  are we talking about?
2        A.    Drugs, medical devices,
3  supplies, paper goods, vitamins.

16    Q.    I assume at this point
17  through 1995 -- from 1990 to 1995 you had
18  no responsibilities relative to
19  controlled substances, correct?
20        A.    As far as processing the
21  returns and processing paperwork to
22  return controlled substances, or dispose
23  of it, that was my role with controlled
24  substances.

Page 37

1    Q.    You had no issue -- no
2  responsibilities relative to compliance
3  issues or training or oversight with
4  regulatory affairs, correct?
5        A.    No.
6        Q.    No you didn't or --
7        A.    I didn't.  I didn't.

15    Q.    So at this point now,
16  instead of being a representative, you're
17  now managing 40 associates and
18  coordinators?
19        A.    Yes, sir.
20        Q.    And again, to the extent it
21  related to controlled substances, it
22  would just be the return and processing
23  of returned controlled substances from
24  Henry Schein customers, correct?

Page 38

1    A.   So at that point I started
2 to get more involved in policy issues,
3 SOPs, working with the verifications
4 teams, understanding the controlled
5 substance operations, and obviously
6 because of the returns, what to do with
7 the inventories, what to do with special
8 outgoings and things like that.
9    Q.   Okay.  How did you learn
10 about all those things?
11    A.   So my manager was also a
12 manager of the person that was doing
13 controlled substance monitoring, I can
14 say.
15    Q.   Who was that?
16    A.   Janet Nalbeaiko.  Or I'm
17 sorry, my manager or the person that was
18 doing -- that was focusing on
19 verifications?
20    Q.   Well, I was referring to the
21 person that you were referring to.  So I
22 think you said that you learned from
23 somebody who was your manager.  I was
24 trying to figure out who that person was.

Page 39

1    A.   So my manager, his name was
2 Bob Carlson.  He was also the manager for
3 Janet, who was more involved in the
4 controlled substance management.
5    Q.   Okay.  And how did they
6 teach you about issues relating to
7 policies, standard operating procedures,
8 and controlled substance compliance?
9    A.   So work -- on the work
10 education, and I also started to become
11 responsible of the processes and
12 procedures for the department.
13    Q.   How?  How did you learn
14 about it?  Who taught you?  Did you have
15 training materials?
16    A.   Do I have training
17 materials?
18    Q.   Were you provided training
19 materials?
20    A.   I don't remember.
21    Q.   Did you go to any classes to
22 learn about the Controlled Substances
23 Act?
24    MR. McDONALD:  You are

Page 40

1 talking about at that point in
2 time?
3    MR. MIGLIORI:  Yeah.
4 BY MR. MIGLIORI:
5    Q.   As you're starting to learn
6 about policies and standard operating
7 procedures.
8    A.   I don't remember.
9    Q.   Is it fair to say that
10 whatever you were starting to learn about
11 DEA compliance, you were learning on the
12 job?
13    A.   And -- yes, and by working
14 with -- with Janet and Rob -- Bob.  Yes.
15    Q.   At this point do you recall
16 doing any returns or issues relating to
17 compliance with returns for Schedule II
18 drugs?
19    A.   When you say doing any
20 returns, what do you mean?
21    Q.   We're still talking about a
22 period of time when you're in the returns
23 department, 1995 to 1998.  You were the
24 supervisor of customer returns.  And I'm

Page 41

1 asking you, in that role did you have any
2 direct involvement with Schedule II
3 controlled substances, other than the
4 returns being processed from your
5 customers?
6    A.   Other than the returns being
7 processed from our customers, the
8 security of the drugs, making sure that
9 they went to the proper inventory, that
10 they were recorded appropriately, and
11 that if we needed to return anything to
12 the supplier, we were going to do it
13 according to our processes and their
14 policies.  Some, maybe investigations on
15 inventories, things like that.
16    Q.   So of all the different
17 products that were coming into the
18 returns department from 1995 to 1998,
19 what percentage were controlled
20 substances?
21    A.   Very little.
22    Q.   Is it fair to say that most
23 of your work in the returns department
24 related to medical devices and other

Page 42

1 non-controlled-substance products sold by
2 Henry Schein?
3    A.   You mean as far as -- yes.

16    Q.   And again, it's fair to say
17 that the recalls that you're talking
18 about during this period of time, only a
19 small percentage of those related to
20 controlled substances, correct?
21    A.   Yes.
22    Q.   And were there any recalls
23 of controlled substances from '98 to 2002
24 that you can recall?

Page 43

1    A.   Wow.  I can't recall any
2 specific.
3    Q.   Okay.  If you go to Page 2,
4 you moved over to just supervisor of
5 regulatory affairs.  How did your job
6 responsibilities change at that point?
7    A.   Now I was responsible to
8 managing the team and to -- on a
9 day-to-day workload, as well as special
10 projects, and getting more into
11 developing, bonuses, SOPs.
12    Q.   Okay.  And the work here is
13 still across all product lines at Henry
14 Schein, correct?
15    A.   Yes.
16    Q.   And a small percentage of
17 that product line that you oversaw was
18 controlled substances, correct?
19    A.   As far as my
20 responsibilities it was more than what it
21 used to be.
22    Q.   My question to you is
23 simply:  Was it a small percentage of
24 your time working with controlled

Page 44

1 substances from 2002 to 2006?
2    A.   What would you consider
3 small percentage?
4    Q.   You tell me.
5       MR. McDONALD:  Object to the
6    form.
7 BY MR. MIGLIORI:
8    Q.   Was it a --
9    A.   So --
10    Q.   -- half your job, was it a
11 fraction of your job, did you spend any
12 time doing it?
13    A.   About 25 percent.
14    Q.   Related to controlled
15 substances?
16    A.   Mm-hmm.  Yes.
17    Q.   Were you --
18       MR. McDONALD:  You've got to
19    say yes.
20 BY MR. MIGLIORI:
21    Q.   And were you involved with
22 the suspicious order monitoring programs,
23 if any, at Schein during this period of
24 time?

Page 45

1    A.   Yes, as super -- one of the
2 persons on the team was responsible for
3 DEA compliance, they were -- she was more
4 close to it.  But as her supervisor, I
5 was involved.
6    Q.   Who was that person in 2002
7 to 2006 that was directly involved with
8 DEA compliance?
9    A.   Nancy Fariello.
10    Q.   And is Nancy still with the
11 company?
12    A.   No.
13    Q.   And she reported to you?
14    A.   Yes.

Page 46



11  Q.   Did -- was that still being
12  held -- managed by Ms., I think you said
13  Fariello?
14  A.   I don't remember at what
15  point she left the company.
16  Q.   Okay.  Did somebody replace
17  her in that role?
18  A.   Yes.
19  Q.   Who?
20  A.   Craig Schiavo.
21  Q.   Okay.  And Craig continued
22  to work under you for several years,
23  correct?
24  A.   Yes, he did.

Page 47

1  Q.   And his position was more
2  directly related to DEA compliance?
3  A.   He did evolve into that,
4  yes.
5  Q.   Okay.  So you were also
6  responsible for hazardous material
7  handling, OSHA, environmental
8  regulations, as well as managing the
9  completion of a wide variety of
10  regulatory projects.
11  Is it fair to say that DEA
12  compliance was not your primary focus at
13  this point, from 2006 to 2010?
14  A.   Was not the only focus.
15  Q.   Henry Schein has several
16  divisions during this period of time,
17  correct?
18  A.   Business units?
19  Q.   Yes.
20  A.   Yes.
21  Q.   All right.  And you were
22  director of regulatory affairs for the
23  various business units domestically,
24  correct?

Page 48

1  A.   Yes.
2  (Document marked for
3  identification as Exhibit
4  Henry Schein-Tejeda-3.)
5  BY MR. MIGLIORI:
6  Q.   Let me show you Exhibit 3.
7  It is a document we found online that
8  describes -- it's -- it's dated June 7,
9  2010.  It says, "Henry Schein appoints
10  new director of compliance.  6.5 billion,
11  Henry Schein, a Melville, New York-based
12  distributor of healthcare products and
13  services to office-based practitioners,
14  has promoted Sergio Tejeda to director of
15  regulatory operations and compliance."
16  It says -- do you -- do you
17  recall this promotion?
18  A.   Yes.
19  Q.   Was this about the period of
20  time when this happened, about 2010?
21  A.   The promotion to director,
22  yes.
23  Q.   Okay.  It says, "Tejeda
24  joined Henry Schein in 1990 and spent his

Page 49

1  first eight years at the company as a
2  returns supervisor.  In 2006 he was
3  promoted to regulatory affairs manager
4  and assumed responsibility of the
5  regulatory affairs team at GIV, General
6  Injectables and Vaccines, a Henry Schein
7  company."
8  In 2006, was your promotion
9  to the GIV division of Henry Schein?
10  A.   GIV was a subsidiary of
11  Henry Schein and their regulatory team
12  did report to me.  I think that was 2007,
13  but...
14  Q.   So in 2010, was your
15  responsibility as director of compliance
16  limited to the general injectables and
17  vaccines division?
18  A.   No.  That was in addition to
19  the Henry Schein regulatory compliance.
20  Q.   Okay.  So did the GIV have
21  controlled substances?
22  A.   Yes.
23  Q.   And were the suspicious
24  order monitoring systems in place at GIV

Page 50

1 that were in place throughout the rest of
2 Henry Schein?
3        MR. McDONALD: Object to the
4 form.
5 BY MR. MIGLIORI:
6    Q.   At this time?
7        MR. McDONALD: Object to the
8 form.
9        Go ahead. You can answer if
10 you understand.
11       THE WITNESS: They weren't
12 the same. They were similar.
13 BY MR. MIGLIORI:
14    Q.   Wasn't it true that GIV was
15 lagging behind Henry Schein in terms of
16 suspicious order monitoring compliance?
17       MR. McDONALD: Object to the
18 form.
19 BY MR. MIGLIORI:
20    Q.   In 2010?
21       MR. McDONALD: Object to the
22 form.
23       THE WITNESS: As far as our
24 best practices, they had some

Page 51

1 opportunities.
2 BY MR. MIGLIORI:
3    Q.   They had some opportunities
4 to improve?
5    A.   Yes.
6    Q.   So on the first page of your
7 CV going back to Exhibit Number 2. This
8 position is described here as director of
9 regulatory operations and compliance 2010
10 to 2013.
11       Are we talking about the
12 same position?
13    A.   The same position as -- as
14 the document?
15    Q.   As -- as the press release?
16    A.   Yes.
17    Q.   And again, this is across
18 all Henry Schein business units, correct?
19       MR. McDONALD: Object to the
20 form.
21 BY MR. MIGLIORI:
22    Q.   Domestically?
23       MR. McDONALD: Same
24 objection.

Page 52

1        THE WITNESS: Domestically.
2 BY MR. MIGLIORI:
3    Q.   Okay. So it involved --
4 what were the other business units that
5 you were responsible for at this time?
6    A.   Dental, medical, vet.
7    Q.   Vet?
8    A.   Veterinary medicine.
9    Q.   Okay. Okay. And it makes
10 reference here to the FDA, DEA, and
11 HAZMAT compliance.
12       Do you see that?
13    A.   Yes.
14    Q.   So -- and it also has
15 oversight of the Canadian regulatory team
16 on the second page, right?
17    A.   Yes.
18    Q.   Who was the person that was
19 more directly involved under you at this
20 point for DEA compliance relative to
21 controlled substances, was that Craig
22 Schiavo?
23       MR. McDONALD: Object to the
24 form. Vague as to time.

Page 53

1        THE WITNESS: Should I
2 respond?
3        MR. McDONALD: If you
4 understand the question, Sergio,
5 then you should answer the
6 question unless I tell you not to.
7        THE WITNESS: Okay.
8        So I -- I think at the
9 beginning of that period, Craig
10 Schiavo was focused on that. We
11 added resources to that function
12 over time.
13 BY MR. MIGLIORI:
14    Q.   Okay. In 2010, Henry
15 Schein -- at the beginning of 2010, Henry
16 Schein implemented a new suspicious order
17 monitoring system, correct?
18       MR. McDONALD: Object to the
19 form.
20       THE WITNESS: The enhanced
21 suspicious order monitoring
22 system, my recollection is that it
23 was implemented in 2009.
24 BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 Q. At the end of 2009, in
2 October, November of 2009, correct?
3 A. I don't remember the exact
4 time. But I think it was earlier than
5 that.
6 Q. Okay. Well, I'll show you
7 some documents.
8 But that program, was that
9 as of 2010 when you took this position of
10 director of regulatory operations and
11 compliance, were you then responsible
12 overall for the implementation and
13 execution of that suspicious order
14 monitoring program as it related to
15 controlled substances?
16 A. From the regulatory side, I
17 was responsible for the development and
18 implementation of the system, yes.
19 Q. Okay. And you're
20 distinguishing that from the
21 verifications side?
22 A. We had several project
23 managers.
24 Q. Okay. And my question was,

Page 55

1 was the verifications department also
2 involved with the execution of that
3 enhanced suspicious order monitoring
4 system?
5 A. Yes.
6 Q. And the person there that
7 was most responsible in verifications,
8 was that Shaun Abreu during this period
9 of time?
10 A. You know, I don't remember
11 exactly when Shaun joined the team. But
12 if you're asking between 2008 and 2009, I
13 don't remember that he was the
14 verifications manager at that point.
15 Q. I'm asking from 2010 going
16 forward, now that the enhanced monitoring
17 program has been implemented, who else
18 outside of regulatory was responsible for
19 its oversight and management?
20 A. Okay. Yes, the
21 verifications manager and their
22 management team.
23 Q. Okay. And do you recall if
24 that was Shaun Abreu at the time?

Page 56

1 A. Again, I don't remember at
2 what point Shaun joined as manager.
3 Q. In 2010, beginning of 2010,
4 what percentage of the responsibilities
5 with the enhanced suspicious order
6 monitoring program were the
7 responsibility of regulatory, and what
8 percentage was the responsibility of
9 verifications, if you can estimate?
10 MR. McDONALD: Object to the
11 form.
12 THE WITNESS: As far as
13 reviewing the orders that have
14 pended in the system,
15 verifications was the first line.
16 And a percentage of that came to
17 regulatory.
18 BY MR. MIGLIORI:
19 Q. Okay. Do you know what
20 percentage came to regulatory?
21 A. Approximately, I mean, but
22 I'm not sure.
23 Q. Okay. What approximately?
24 MR. McDONALD: Object to the

Page 57

1 form.
2 Go ahead.
3 THE WITNESS: Around 12,
4 15 percent.
5 BY MR. MIGLIORI:
6 Q. Came to regulatory?
7 A. Came to regulatory, yes.
8 Q. So beginning in 2010 and
9 going forward to today, is it still true
10 that 85 to 88 percent of the review of
11 suspicious orders at Henry Schein are
12 handled at the verifications stage
13 without regulatory involvement?
14 MR. McDONALD: Object to the
15 form.
16 BY MR. MIGLIORI:
17 Q. The regulatory department's
18 involvement?
19 MR. McDONALD: Same
20 objection.
21 THE WITNESS: Around that
22 percentage.
23 BY MR. MIGLIORI:
24 Q. And today, is that

Page 58

1 department managed and overseen by Shaun
2 Abreu?
3     A.   Shaun Abreu, yes.
4     Q.   Okay.  In 2013, it's the
5 last entry here on your resumé.  It says
6 director of regulatory affairs.  Is that
7 the current position that you hold now,
8 or is this the one that switched in 2015?
9     A.   Director of regulatory
10 affairs is what I currently hold.
11     Q.   Okay.  I don't see the
12 distinction that you made earlier for me
13 about North America versus domestic.
14     A.   So I'm no longer responsible
15 for the Canadian regulatory team.
16     Q.   Okay.  Is that what dropped
17 out from this description in your
18 curriculum vitae around 2015, the
19 oversight of Canadian affairs?
20     A.   Well, based on this, it
21 dropped down in 2013.
22     Q.   Okay.  So the position that
23 you hold today, based on this resumé that
24 you prepared last year, the position that

Page 59

1 you hold today is the one described here
2 as director of regulatory affairs, 2013
3 to the present?
4     A.   Has changed a little bit.
5     Q.   In any way that was
6 significant or related to controlled
7 substances?
8     A.   To controlled substances, we
9 are now responsible for licensure, so we
10 are responsible to maintain controlled
11 substance licenses for the company.  And
12 we are responsible for item initiation.
13     Q.   I'm sorry.  For what
14 initiation?
15     A.   Item initiation, item
16 creation, to make sure that all items
17 have the correct regulatory attributes in
18 the system, so as it pertains to
19 controlled substances, yes.
20         And I have less involvement
21 in the quality side, but that's probably
22 not relative to controlled substances.
23     Q.   Do you continue to be
24 responsible for retuning and enhancing

Page 60

1 the company's suspicious order monitoring
2 systems?
3     A.   Yes.
4     Q.   Do you continue to be
5 responsible for the "know your customer"
6 obligations of the DEA?
7     A.   Yes.
8     Q.   And the due diligence
9 program at Henry Schein, are you still
10 responsible for that?
11     A.   Know your customers, the
12 diligence program, yes.
13     Q.   And is that entirely within
14 regulatory affairs, or is that shared
15 with verifications?
16     A.   That is shared with
17 verifications.
18     Q.   Same percentages with
19 responsibility, 85 to 88 percent?
20         MR. McDONALD:  Object to the
21     form.
22         THE WITNESS:  Yeah, around
23     that.
24 BY MR. MIGLIORI:

Page 61

1     Q.   Okay.  It says that you
2 helped to formalize the "know your
3 customer" site visit program for
4 different types of accounts.
5         Were you involved in the
6 "know your customer" site visit program
7 that Tina Steffanie-Oak and others were
8 involved in?
9     A.   Yes, I was.
10     Q.   Did they have to report to
11 you their progress in the "know your
12 customer" project to complete the due
13 diligence --
14     A.   Yes.
15     Q.   -- files?
16     A.   I'm sorry.  Yes.
17     Q.   Okay.  And it says here that
18 one of your major accomplishments during
19 this period of time, 2013 to the present,
20 was compliance awareness manual and
21 inspection preparedness guidelines for
22 Henry Schein operations.  Did you prepare
23 a manual?
24     A.   My team did.

Page 62

1  Q.   Did you approve it?
2  A.   Yes.
3  Q.   Did you review it in
4  preparation for today?
5  A.   Did I review it in
6  preparation for today?
7  Q.   In any of the 25 hours of
8  review?
9      MR. McDONALD:  Object to the
10  form.
11     THE WITNESS:  No.  That
12  wasn't one of the documents as I
13  remember reviewing.
14  BY MR. MIGLIORI:
15  Q.   Do you know where that
16  document is today?
17  A.   The current version of which
18  one?  The compliance --
19  Q.   The compliance -- I'm sorry,
20  the compliance awareness manual and
21  inspection preparedness guidelines for
22  Henry Schein operations.
23  A.   It's two different
24  documents.

Page 63

1  Q.   Okay.  Do you know where
2  they are?  Where would you go to look for
3  them right now if you had to go get them?
4  A.   Our document management
5  system.
6  Q.   Is that the JDW -- JEW, JWE?
7  A.   No.  No, it's not that one.
8  Q.   What is it?
9  A.   It is called PowerDMS.
10  Q.   Okay.
11  A.   It's a specific document
12  control system.
13  Q.   Okay.  What kind of
14  documents are kept there, like training
15  manuals?
16  A.   SOPs, training manuals, work
17  instructions, records related to those
18  documents.
19  Q.   Is due diligence kept there?
20  A.   Due diligence?
21  Q.   Yeah.
22  A.   No.  For due diligence we
23  have a different system.
24  Q.   Okay.  I'll get into that in

Page 64

1  a moment.
2      And so the compliance
3  awareness manual, what kind of manual --
4  what kind of topics were covered in that?
5  A.   The compliance awareness
6  manual is meant to be a tool for Henry
7  Schein operations, Henry Schein
8  facilities so it covers awareness for our
9  regulatory responsibilities with many
10  different agencies, many different
11  regulations.  We cover DEA compliance, we
12  cover FDA compliance.  EPA, OSHA.  We
13  cover state law.
14  Q.   So would the Ohio suspicious
15  order reporting requirements be in there?
16  A.   That is -- the answer is no,
17  because that document is meant to be
18  awareness for the operations team.  So
19  Ohio compliance is covered in a different
20  SOP.
21  Q.   Okay.  Did you review that
22  SOP in preparation for today, for the
23  Ohio compliance?
24  A.   No.

Page 65

1  Q.   If you were to go look for
2  that today, would that be in the PowerDMS
3  system that you talked about --
4  A.   Yes.
5  Q.   -- with the other SOPs?
6      Did you help create the
7  compliance awareness manual?
8  A.   Like I said, we -- we
9  discussed the plan, what should cover,
10  then my team developed it.  We went
11  through several revisions and then we
12  implemented.
13  Q.   Did -- was that also true
14  for the inspection preparedness
15  guidelines?
16  A.   Yes.
17  Q.   And I assume that includes
18  DEA inspections of distribution centers
19  as well?
20  A.   Yes, it does include DEA
21  inspections.
22  Q.   And then it says, "DEA/FDA
23  compliance education for fields" --
24  "field sales consultants."

Page 66

1       Were you involved with that
2  compliance education?
3       A.   What was that, I'm sorry?
4       Q.   I'm sorry, the second to
5  last bullet point.  If you look on the
6  screen in front of you I can point to it.
7       A.   Okay.
8       Q.   "DEA and FDA compliance
9  education for field sales consultants."
10      A.   Yes, sir.
11      Q.   All right.  So tell me about
12 that.  What kind of education program did
13 you put together for your field sales
14 consultants?
15      A.   Okay.  So we have done a
16 couple of different things.  We have
17 attended regional sales meetings, and
18 prepare material to train them on the
19 obligations of the company, their
20 responsibility, what we need to do.
21      We have, when we do attend
22 regional meetings, there is -- the field
23 sales consultants spend some time with us
24 in either by group or one-to-one basis.

Page 67

1  We provide the explanation, they ask
2  questions.  They tell us what their
3  concerns may be.  Then we develop a
4  program that we use to train them via
5  phone and web conference.  And that was
6  delivered as well in groups, so we had
7  several meetings, so several sessions on
8  that.  That was in -- in partnership with
9  Bill Brandt the director of verifications
10 at that point.
11      We also have developed
12 online education models so our field
13 sales consultants now, when they join the
14 company, they are required to go through
15 this online training, and then I forget
16 how often they need to take refresher.
17      But those have been some of
18 the things that we have done.  We have
19 also meet with field sales consultants
20 groups in our distribution centers.  And
21 provide some training that way.
22      Q.   The online training that you
23 discuss, when did that first get
24 implemented?

Page 68

1       A.   Last year.
2       Q.   And that includes DEA
3  compliance --
4       A.   Yes.
5       Q.   -- for the sales force.
6       A.   Sorry, yes.
7       Q.   And why is it important to
8  educate the sales force on DEA
9  compliance?
10      MR. McDONALD:  Objection.
11 BY MR. MIGLIORI:
12      Q.   What role, if any, do they
13 play in DEA compliance at Henry Schein?
14      MR. McDONALD:  Object to the
15 form.
16      THE WITNESS:  It is
17 important to us that everybody
18 knows what the requirements that
19 the company need to comply are.
20 Everybody plays a role.
21      We have very good
22 relationship with our customers,
23 especially the field sales
24 consultants.  They visit our

Page 69

1  practitioners' offices on a daily
2  basis.  So they need to understand
3  what they can, what they cannot
4  do.  They need to understand it in
5  order to -- for them to be able to
6  do their work, better service our
7  customer without putting the
8  company at any risk or...
9  BY MR. MIGLIORI:
10      Q.   Are they involved in the due
11 diligence process either for a new
12 customer that they onboard or for
13 existing companies -- customers?
14      MR. McDONALD:  Object to the
15 form.  Go ahead.
16      THE WITNESS:  Not really.
17 We -- we are developing a program
18 that somebody from operations or
19 an FSC may carry a laptop or
20 something to the customer office,
21 and we will be on the other side
22 of the -- of the line, and they
23 will be able to interact with the
24 customer by showing documents,

Page 70

1  assisting to show us what the
2  facility is, things like that.
3      But the -- the review will be
4  conducted by somebody in
5  regulatory.
6  BY MR. MIGLIORI:
7      Q.   Okay.  This is something
8  you're developing now that's not yet
9  implemented?
10     A.   Yeah.  We have tested a
11 couple of times.
12     Q.   So it's essentially a
13 virtual site visit, that is, it's
14 through -- through laptop interaction of
15 some sort?
16     A.   Essential, yes.  Virtual
17 site visit.
18     Q.   Does the sales force, are
19 they trained in this either online or
20 written or regional sales meeting
21 trainings, are they trained to identify
22 red flags or potential suspicious issues
23 relating to controlled substances, is
24 that part of the training?

Page 71

1      A.   Yes.  We cover red flags, we
2  cover potential signs of issues.
3      Q.   So before the online
4  training, was there written training
5  material that you would hand out at these
6  regional sales meetings on issues like
7  red flags, things for sales force to
8  watch out for?
9      A.   Yes.  Usually what we did is
10 we had a laptop on the table.  We can
11 have the PowerPoint presentation there.
12 And we have printouts of the
13 presentation.  Then that evolved into an
14 electronic flash drive that they can
15 carry with them.  They were complaining
16 that they had too much paper, they don't
17 want to carry anything.
18     Q.   How often did you have these
19 regional sales meetings where you would
20 educate the sales force on DEA
21 compliance?
22     A.   So it used to be more often.
23 Now it's probably once, twice a year.
24     Q.   Okay.  And did they go back

Page 72

1  before 2013 when you took this
2  position --
3      A.   I --
4      Q.   -- that is, the regulatory
5  training and education of sales
6  force-type meetings, do you recall them
7  happening before 2013?
8      A.   Yes.
9      Q.   How far back, to your
10 recollection, were those types of
11 training sessions or -- or presentations
12 made to the sales force, to your best
13 recollection?
14     A.   2010, maybe.
15     Q.   So, since the launch of the
16 enhanced suspicious order monitoring
17 system maybe, that you incorporated
18 training of sales force in the DEA
19 compliance training program, does that
20 seem to coincide with your recollection?
21     A.   Yeah, it is a separate
22 program, yes.
23     Q.   Okay.  And are those written
24 materials or presentations, things that

Page 73

1  are on the thumb drives, is that
2  something that you still use today?
3      A.   PowerPoint changed.  I mean,
4  the materials change.  They evolve, you
5  know.
6      Q.   If you were to go to look
7  for them, either historically what you
8  were using in 2011 or up to today, would
9  they also be in the PowerDMS system?
10     A.   PowerDMS wasn't in place in
11 2011.  I would think it would be a
12 combination of hard copies or somewhere
13 in somebody's computer.  I don't know how
14 much we have retained.
15     Q.   Sure.  And we'll take a
16 break in a second.  I just want to know,
17 was there a title to this kind of
18 training manual or these kind of
19 presentations for the sales force?  Is
20 there some way that you referred to those
21 types of education and training materials
22 for the sales team?
23         MR. McDONALD:  Object to the
24 form.

Page 74

BY MR. MIGLIORI:

Q. Was it called regional sales training? Was it called anything that you can particularly remember if you were to say, I need to go grab the education materials for the sales force?

A. No, not really.

Q. Okay. Who would you ask in your department for the latest version of it?

A. The latest version?

Q. Yeah. If you said I want to read it this afternoon, ask so and so to go get it for me. Who would be that person?

A. Liam Schauer would be one.

Q. What position is Liam Schauer in?

A. He's a senior regulatory specialist.

Q. Okay. And is your team responsible for updating it, verifying its accuracy, making changes and modifications to it?

Page 75

A. Yes.

MR. MIGLIORI: Why don't we take a break here.

THE VIDEOGRAPHER: Going off the record 10:15 a.m.

Page 76

Q. And by looking at it, would you have prepared the original issue, or is the way this is prepared, this would say that you prepared the revision in March of 2003? How do I read this document?

A. It is -- would be prepared in collaboration with Frank. At this point, Frank will have more of a role of doing the revision, and I will have more of a role of reviewing and approving. But, you know, we worked close together.

Q. I guess my question is a little more basic. In looking at the document, can you tell whether you were involved with the original issue or are you only necessarily here involved in preparing the revision? And can you tell from looking at the document? And if you don't know, that's fine too.

A. I don't remember.

Page 77

Q. Does it cover all the distribution centers?

A. At this point we had two. WCS and WMS were both warehouse management systems.

Q. And they were -- in 2003, they were online?

Page 78

1    A.   Online.
2    Q.   And everybody -- what kind
3 of information relative to controlled
4 substances would have been stored there,
5 if any?
6    A.   The receipt, storage,
7 location moves, pick, pack.
8    Q.   What is pick, pack?
9    A.   I'm sorry.  When we get an
10 order then our distribution centers have
11 a print room.  So the print room will
12 print a batch record, which will cover
13 several invoices, several shipments.  So
14 pickers are assigned batches.  And then
15 they go to the locations of the products,
16 and they pick the product, they put it in
17 a tote or box that is specified for that
18 order.
19        In the case of controlled
20 substances, either the box will travel
21 into the drug room, or if it's only a
22 controlled substance, then the whole
23 order, the batch will go directly to the
24 drug room to be completed.

Page 79

1    Q.   So these systems are
2 designed to track the intake and the
3 movement of controlled substances within
4 the distribution center?
5        MR. McDONALD:  Object to the
6    form.
7 BY MR. MIGLIORI:
8    Q.   That is, the people and the
9 places where the controlled substances
10 are being moved while they're in the
11 position -- distribution center?
12        MR. McDONALD:  Object to the
13    form.
14        THE WITNESS:  Well, I will
15    say that at a very big level they
16    are much more complex.  But again,
17    big picture, it will be inventory
18    control and things like that.
19 BY MR. MIGLIORI:
20    Q.   So would every order, for
21 example, from the state of Ohio be
22 recorded somewhere in the warehouse
23 control system and/or the warehouse
24 maintenance system?

Page 80

1    A.   The warehouse management
2 system.  At the point of the order being
3 processed, yes.
4    Q.   And processed means from the
5 distribution center out the door?
6    A.   Yes.
7    Q.   Okay.  And those records
8 are -- are searchable by zip code or by
9 region?  How are they managed, if you
10 know?
11    A.   The records that are in the
12 system, they may be searchable by account
13 number.  They may be searchable by
14 invoice number.  They may be searchable
15 by item code.
16    Q.   What about -- so by a
17 physician or a practitioner?
18    A.   Account, yes -- by the
19 account number, yes.
20    Q.   And what kind of information
21 is in the JD Edwards system as it relates
22 solely to controlled substances?
23        MR. McDONALD:  Object to the
24    form.

Page 81

1        THE WITNESS:  So to my
2    understanding, JD is the sales
3    management -- the transaction
4    management system.  So it will be
5    the transaction side.
6 BY MR. MIGLIORI:
7    Q.   Now, are the transactions
8 different from the distribution records
9 from the warehouse control system?  Are
10 they two separate databases of
11 transactions?
12    A.   So JDE, it's a different
13 system than WCS.
14    Q.   And but each would record a
15 portion at least of the order and
16 processing of each transaction, correct?
17    A.   That is my understanding.
18    Q.   So if I have a record or a
19 field for a Dr. Smith in Summit County,
20 Ohio, for placing an order, I'd be able
21 to find that order both in the warehouse
22 control system or the warehouse
23 management system, as well as in the JD
24 Edwards system?

Page 82

1   MR. McDONALD: Object to the
2   form.
3   BY MR. MIGLIORI:
4   Q.   Correct?
5   MR. McDONALD: Object to the
6   form.
7   THE WITNESS: At the time
8   that the order has been -- that's
9   being processed and through the
10  recordkeeping time.
11  BY MR. MIGLIORI:
12  Q.   Where would the pended
13  orders be stored?  What system would
14  pended orders show up in?
15  A.   I'm not sure if it's a
16  different system.
17  Q.   Okay.  Where would an order
18  pend?  Would an order -- would it pend at
19  the warehouse control system?  Or would
20  it pend at the transactional level in the
21  JD Edwards system?  In other words, where
22  would the actual trigger occur?
23  A.   Would pend -- would be
24  pended by the suspicious order monitoring

Page 83

1   system.  My point was, I'm not sure where
2   that SOM resides and what part of the
3   software.
4   Q.   Okay.  Let me see if I can
5   walk through an example.  So a doctor
6   places an order.  Does the doctor in --
7   let's say in 2010, does the doctor place
8   that order online?
9   MR. McDONALD: Object to the
10  form.
11  THE WITNESS: So there were
12  many different ways for a doctor
13  to place an order.
14  BY MR. MIGLIORI:
15  Q.   Okay.  At what point does
16  that order hit the warehouse control
17  system?  Immediately or after it's been
18  reviewed by the suspicious order
19  monitoring system?
20  MR. McDONALD: Object to the
21  form.
22  THE WITNESS: After it has
23  been reviewed by not only the
24  suspicious order management

Page 84

1   system, but any other systems that
2   look at the order.
3   BY MR. MIGLIORI:
4   Q.   Okay.  So if an order gets
5   to the warehouse control system, it has
6   already passed through the suspicious
7   order monitoring system?
8   A.   Yes.
9   Q.   What about the JD Edwards
10  system, those transaction records?  For
11  it to show up in the JD Edwards system,
12  would it already have passed through the
13  suspicious order monitoring process?
14  MR. McDONALD: Object to the
15  form.
16  THE WITNESS: I'm sorry, I
17  was a little distracted.  Could
18  you repeat?
19  BY MR. MIGLIORI:
20  Q.   Sure.
21  So the transactional records
22  for that same order that we just
23  discussed, a doctor in Summit County
24  making an order in 2010, will that order

Page 85

1   pass through the suspicious order
2   monitoring system before it gets to the
3   JD Edwards system or after?
4   MR. McDONALD: Object to the
5   form.
6   THE WITNESS: Again, I
7   don't -- I'm -- I don't know where
8   the SOM resided.  It's different
9   than JDE, or within JDE or within
10  a different system.
11  BY MR. MIGLIORI:



Page 86

Page 88

1     THE WITNESS:  I'm not sure
2   that that's the case.
3 BY MR. MIGLIORI:
4     Q.   Well, this is the document
5 retention policy of Henry Schein,
6 correct?
7     A.   Correct.
8     Q.   And this section lists the
9 different departments and the records
10 that they maintain, correct?  Am I
11 misreading this?
12    A.   The records that we will be
13 responsible to produce, I don't know that
14 we will be responsible to maintain the
15 system.

Page 87

Page 89

21    Q.   And to retain it under this
22 policy, correct?
23        MR. McDONALD:  Object to the
24   form.

21    Q.   Okay.  So let's start
22 with -- I'm reading that correctly,
23 right?  This is a record of the
24 regulatory affairs department, correct?

Page 90

1    A.   It is a record that the
2 regulatory affairs department will be
3 responsible to produce.
4    Q.   To produce to whom?
5    A.   Well, we will go to whatever
6 system, whatever process we had --
7 somebody will request it.  Then we will
8 go to the system.  We will type a query
9 or whatever was the procedure.
10   Q.   Okay.
11   A.   And then get a report, and
12 that's your record.
13   Q.   Are you responsible for
14 making sure that it's maintained and
15 secure within your department?
16   A.   Again, it is maintained in
17 the system.  So we have IT security, IT
18 management that are responsible to make
19 sure that everything is the -- is in the
20 system is kept correctly and secure.
21   Q.   Okay.  And the regulatory
22 affairs department, part of the record
23 would be customer purchasing history for
24 controlled substances only.  That was

Page 91

1 maintained or the responsibility of the
2 regulatory affairs department to produce,
3 correct?
4       MR. McDONALD:  Object to the
5 form.
6       THE WITNESS:  Yes.
7 BY MR. MIGLIORI:
8    Q.   All right.  So is that still
9 true today?
10   A.   No.
11   Q.   Who is responsible for that
12 today?
13   A.   So if somebody requests a
14 customer purchase history, I would go to
15 verifications to input the request.
16   Q.   Was an SOP revised to say
17 that's a verifications function then, to
18 your knowledge?
19   This is a 2003 document.
20   A.   Yeah, I'm -- I think there
21 were more than one revisions after this
22 one.
23   Q.   That's not my question.  Was
24 that revised to say that you are no

Page 92

1 longer responsible for customer purchase
2 history for controlled substances only in
3 the regulatory affairs department, was
4 that moved in an SOP to your knowledge?
5    A.   I don't know.
6    Q.   It says that the regulatory
7 affairs department would be required to
8 produce product recall information?
9    A.   That is correct.
10   Q.   Regulatory affairs would be
11 required to produce government inquiries,
12 is that true?
13   A.   At that point, it was.
14   Q.   Did that change?
15   A.   That process has changed.
16   Q.   When?
17   A.   I don't remember when.
18   Q.   To whom?  Who is now
19 responsible to produce government
20 inquiries?
21   A.   Now it is an effort between
22 verifications, regulatory with copy to
23 legal.
24   Q.   What about DEA inquiries

Page 93

1 into doctor prescribing habits, would
2 that be considered a government inquiry?
3    A.   Yes.
4    Q.   Or DOJ inquiry into
5 suspicious transactions that appear
6 either in ARCOS or in the Ohio reporting
7 system, would that be a government
8 inquiry?
9    A.   Yes.
10   Q.   And where would that be
11 documented in the system today?
12   A.   Where the -- the inquiry or
13 the response or?
14   Q.   Yes.  The inquiry or the
15 response.
16      MR. McDONALD:  Well --
17 BY MR. MIGLIORI:
18   Q.   Whatever is referred to here
19 as the record of government inquiries.
20 Whatever that means to Henry Schein?
21      MR. McDONALD:  Object to the
22 form.
23      THE WITNESS:  I'm not sure.
24 BY MR. MIGLIORI:

Page 94

1    Q.   Is that in JD Edwards?
2         MR. McDONALD:  Object to the
3    form.  If you know tell him, but
4    don't guess.
5         THE WITNESS:  I don't know.
6    BY MR. MIGLIORI:
7    Q.   Okay.  That's --
8         MR. McDONALD:  And, Sergio,
9    this is true throughout.  If you
10   tell him an answer, he's going to
11   assume that's true and that's
12   actual factual.  If you don't
13   know, then tell him that you don't
14   know.  He doesn't want you to
15   guess.
16        MR. MIGLIORI:  That's a
17   substantial -- I'll accept it.
18        MR. McDONALD:  You don't
19   want him to guess.  You don't want
20   him to guess, do you?
21        MR. MIGLIORI:  And I asked
22   him in the beginning.
23        MR. McDONALD:  Right.
24        MR. MIGLIORI:  But I don't

Page 95

1    need a --
2         MR. McDONALD:  And he was --
3    he was --
4         MR. MIGLIORI:  I don't
5    need --
6         MR. McDONALD:  --
7    hesitating.
8         MR. MIGLIORI:  You know what
9    I'm saying.
10        MR. McDONALD:  You and I
11   both know that he was hesitating
12   and about to guess.
13        MR. MIGLIORI:  And I agree
14   with the instruction.  And we can
15   stipulate that it doesn't have to
16   be made again.  Fair?
17        MR. McDONALD:  Unless I feel
18   like he's about ready to guess
19   again.
20        MR. MIGLIORI:  Just try not
21   to coach.  We've had plenty of
22   issues with that.
23        MR. McDONALD:  You and I
24   haven't had very many issues at

Page 96

1    all.
2         MR. MIGLIORI:  We haven't.
3    That's why I'm smiling.
4    BY MR. MIGLIORI:
5    Q.   You don't know where the
6    government inquiries would be recorded
7    and documented in the system, correct?
8    A.   I'm not sure what the office
9    of record is for that documentation.
10   Q.   One of the beauties of this
11   document is you signed it, and you wrote
12   it.  So I'm just trying to understand
13   what you understand this to mean.  There
14   is a government inquiries record referred
15   to in an SOP that you literally signed
16   off on.
17        And I'm trying to
18   understand, one, what is a government
19   inquiry as it relates to controlled
20   substances, and two, where would you find
21   it?
22   A.   Okay.
23   Q.   So let's start with the
24   first part.  The government inquiries, as

Page 97

1    it relates to controlled substances.
2    What would those be, to your knowledge?
3    A.   It would be a subpoena for
4    records.
5    Q.   Okay.  And would that
6    include transactional records that the
7    DEA or DOJ might request of a particular
8    physician?
9    A.   Yes.
10   Q.   And would it be the practice
11   of Henry Schein to maintain that
12   subpoena?
13   A.   Yes.
14   Q.   If there were a letter from
15   a DEA field office or the DOJ asking for
16   information voluntarily, would you
17   maintain that letter as well?
18        MR. McDONALD:  Object to the
19   form.
20        THE WITNESS:  At the point
21   of this SOP being written,
22   regulatory would have.
23   BY MR. MIGLIORI:
24   Q.   Okay.  And you said at some

Page 98

1  point, that may have changed to
2  verifications?
3      A.   I said at some point it was
4  changed, that the process includes
5  verifications, regulatory, with copy to
6  legal.
7      Q.   Okay.  And so at some point
8  it's not maintained just by regulatory,
9  but three different departments would
10  have that record somewhere --
11      MR. McDONALD:  Objection.
12  BY MR. MIGLIORI:
13      Q.   -- or access to that record
14  somewhere, correct?
15      MR. McDONALD:  Object to the
16  form.
17      THE WITNESS:  I didn't say
18      that.  I said that the effort to
19      put that information together will
20      be shared.  I said I don't really
21      know where that record is
22      maintained, what is the office of
23      record for that record for right
24      now.

Page 99

1  BY MR. MIGLIORI:
2      Q.   All right.  And we don't
3  have to talk about the other ones.
4      If you go to the previous
5  page, verifications has a list of records
6  in your SOP here.  And in verifications,
7  222 forms are the responsibility of the
8  verifications department in 2003,
9  correct, return forms?
10      A.   Yes.
11      Q.   In fact, that was one of --
12  that was your job title at this point in
13  time, correct, returns?
14      A.   No.  I wasn't in returns at
15  that point.
16      Q.   In 2003?
17      A.   I was in regulatory affairs
18  in 2003.
19      Q.   Okay.  But this was your
20  department before that, correct?  You
21  would have handled 222 forms when you
22  were in the returns department?
23      A.   For returns only.  Yes.
24      Q.   Yeah.  So did you fill out

Page 100

1  222 forms?
2      A.   No.
3      Q.   And the sales and return or
4  the 222 forms, did they apply to
5  controlled substances?
6      A.   The 222 forms required for
7  Schedule II controlled substances.
8      Q.   Okay.  And so at least at
9  this time in 2003, that was the
10  responsibility of the verification
11  department to produce, if requested,
12  correct?
13      A.   Correct.
14      Q.   Did it remain the
15  verifications' responsibility through
16  till today?
17      A.   Yes.
18      Q.   How about suspicious
19  monitoring monthly reports?  Are those
20  maintained by the verifications
21  department in 2003, or did they -- were
22  they the department responsible for
23  producing them?
24      A.   They were the primary

Page 101

1  responsible for producing them.
2      Q.   Do they -- is that still
3  true today?
4      MR. McDONALD:  Objection.
5      THE WITNESS:  We don't --
6      Sorry.  We don't produce
7      those reports anymore.
8  BY MR. MIGLIORI:
9      Q.   Did the monthly reports stop
10  after the 2017 master's decision or some
11  time before that, or was that the 2010
12  enhancement?
13      MR. McDONALD:  Object to the
14      form.
15      THE WITNESS:  I don't
16      remember when it stopped.
17  BY MR. MIGLIORI:
18      Q.   After the monthly
19  reporting -- and so there was a period of
20  time at Henry Schein where suspicious
21  orders were gathered and reported on a
22  monthly basis to the DEA field office,
23  correct?
24      MR. McDONALD:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  form.
2      THE WITNESS:  Do you mean
3  the report of orders pended and
4  not released?
5  BY MR. MIGLIORI:
6      Q.   I'm actually -- actually
7  just using your words in your document.
8  There was a period of time when
9  suspicious monitoring monthly reports --
10     A.   Yes.
11     Q.   -- were submitted to the DEA
12  field office on a monthly basis, correct?
13     A.   Correct.
14     Q.   Not when the suspicious
15  orders were discovered, correct?
16     A.   Correct.
17     Q.   And that was changed as a
18  result of Buzzeo consulting with Henry
19  Schein and coming up with an -- I think
20  you referred to it as an enhanced
21  suspicious order monitoring program that
22  was implemented sometime in 2009,
23  correct?
24     MR. McDONALD:  Object to the

Page 103

1  form.
2      THE WITNESS:  I'm sorry.
3  The question was kind of long,
4  so --
5  BY MR. MIGLIORI:
6      Q.   This change in this monthly
7  reporting occurred as a result of Buzzeo
8  consulting and advising you that it was
9  noncompliant to report to the DEA on a
10  monthly basis suspicious orders, correct?
11     MR. McDONALD:  Object to the
12  form.
13     THE WITNESS:  I don't
14  remember when we discontinued the
15  report.
16  BY MR. MIGLIORI:
17     Q.   Do you know if it was before
18  2009?
19     A.   I don't remember.
20     Q.   Okay.  But you understand
21  that that process of monthly reporting
22  was at some point terminated because it
23  was noncompliant with DEA regulations on
24  suspicious order monitoring, correct?

Page 104

1      MR. McDONALD:  Object to the
2  form.
3      THE WITNESS:  No.  I don't
4  remember the process not being
5  compliant with the DEA
6  requirements.
7  BY MR. MIGLIORI:
8      Q.   So as you sit here today as
9  the director of regulatory affairs, you
10  cannot recall whether or not it was ever
11  acceptable to report suspicious orders on
12  a monthly basis and not when discovered?
13     MR. McDONALD:  Object to the
14  form.
15     THE WITNESS:  For a period
16  of time it was industry-based
17  practices and the DEA did accept
18  that.
19  BY MR. MIGLIORI:
20     Q.   The -- the DEA accepted
21  that.
22     Did a DEA person tell you
23  that that was acceptable ever?
24     A.   Not personally.

Page 105

1      Q.   No?
2      A.   But as a matter of fact, we
3  just got a communication maybe less than
4  two months ago of some -- one local
5  office requesting that type of
6  information.
7      Q.   Okay.  Did you get the 2007
8  letters from Joe Rannazzisi, did you see
9  those letters from the DEA in 2007 when
10  they -- when they arrived in 2006 and
11  2007?
12     A.   The 2006 letter and the
13  December 2007 letter.
14     Q.   Did you understand those
15  letters when you received them?
16     A.   We did review the letters.
17     Q.   I didn't ask if you reviewed
18  them.  Did you understand them?
19     A.   Yes.
20     Q.   Okay.  Did you change your
21  monthly suspicious monitoring reporting
22  to a system where you now reported pended
23  or suspicious orders at the time you
24  discovered them instead of on a monthly

Page 106

1 basis?
2        MR. McDONALD:  Object to the
3    form.
4        THE WITNESS:  You mean based
5    on --
6 BY MR. MIGLIORI:
7    Q.   No, at any point.  Did you
8 change that system?
9    A.   Yes.
10    Q.   Is the verifications
11 department responsible for producing
12 licensing information for all of your
13 customers?
14    A.   They are responsible for
15 maintaining and verifying the licensure
16 information for our customers.
17    Q.   Okay.  Including DEA
18 registration?
19    A.   Including DEA registrations.
20    Q.   Is the verifications
21 department responsible for producing
22 documents relating to the DEA NTIS tape?
23    A.   The DEA NTIS tape is part of
24 our verifications system.  It is a

Page 107

1 service that we use.
2    Q.   Right.  You -- and you --
3 and you download from that service for
4 each customer, correct?
5    A.   Yes.
6    Q.   It's part of verifications,
7 right?
8    A.   Yes.
9    Q.   And those records are the
10 responsibility of verifications
11 department to produce, correct?
12    A.   Correct.
13    Q.   The customer licenses and
14 DEA microfilm, that was required to be
15 produced as a record of the verifications
16 department, correct?
17    A.   Correct.
18    Q.   And that contained
19 information about -- including customer
20 due diligence, correct?
21    A.   Microfilm?
22    Q.   This -- this particular DEA
23 microfilm reference, what is it?
24    A.   I'm not sure.

Page 108

1    Q.   Do you -- are you familiar
2 with any microfilm storage of documents
3 and information or records maintained by
4 Henry Schein?
5        MR. McDONALD:  Object to the
6    form.
7        You mean currently?
8        THE WITNESS:  We no --
9        MR. MIGLIORI:  At any time.
10 For controlled substances.
11        THE WITNESS:  We no longer
12    have microfilm.
13 BY MR. MIGLIORI:
14    Q.   Were you involved in any
15 decisions to purge microfilm records?
16    A.   No.
17    Q.   Are you familiar with any
18 point in time when Henry Schein decided
19 to purge microfilm records?
20    A.   No.
21    Q.   The ARCOS reporting, was
22 that a record that was supposed to be
23 maintained and produced by the
24 verifications department?

Page 109

1        MR. McDONALD:  Object to the
2    form.
3 BY MR. MIGLIORI:
4    Q.   In 2003?
5        MR. McDONALD:  Object to the
6    form.
7        THE WITNESS:  So the ARCOS
8    report is produced by the
9    verifications department based on
10    the system information.
11 BY MR. MIGLIORI:
12    Q.   And is that still true
13 today?
14    A.   Yes.
15    Q.   Go to the last pages.
16        MR. McDONALD:  Which page?
17        MR. MIGLIORI:  It ends in
18    269.
19 BY MR. MIGLIORI:

Page 110



9   Q.   So -- so at this point,
10 those 222 forms were maintained as hard
11 copies?
12   A.   Yes.
13   Q.   Is there a file room for
14 those hard copies?  Where would you go
15 for those hard copies?
16   A.   I will go to the
17 verifications department.
18   Q.   Okay.  And are they still
19 maintained in hardcopy?
20   MR. McDONALD:  Well, can --
21 I'd like to clarify the record.
22 You said so at this point.  Did
23 you mean today or did you mean at
24 the time of this document?

Page 111

1   MR. MIGLIORI:  Well, first I
2 said at this point, and now I said
3 I said still today.
4   MR. McDONALD:  Okay.  I just
5 want to be sure that when he
6 answered at this point, he
7 meant -- he understood you to say
8 at the time this document was
9 prepared.
10   That's how you were
11 answering the question.  I just
12 want it to be clear.
13   MR. MIGLIORI:  Sure.
14   THE WITNESS:  Right, so
15 at -- at the time this document
16 was produced, the 222 forms,
17 verifications was responsible to
18 produce them to maintaining.
19 That's --
20 BY MR. MIGLIORI:
21   Q.   My question is today, are
22 222 forms maintained as hard copies to
23 your knowledge?
24   A.   To my knowledge I think it

Page 112

1 is a combination of.  We have implemented
2 a controlled substance ordering system.
3 So some customers may still order using
4 222 forms.  Some customers order using
5 CSOS.
6   Q.   And those are maintained by
7 the verifications department today?
8   A.   The 222 forms?
9   Q.   Yes.
10   A.   Yes.
11   Q.   Okay.  Does verifications
12 still maintain the -- the current
13 suspicious monitoring reporting, not the
14 monthly, but the current reporting
15 system?
16   A.   The current reporting system
17 is shared.  Verifications will report
18 some suspicious orders, regulatory will
19 report some others.
20   Q.   Based on what?
21   A.   Based on who did the review.
22 Based on what type of restriction it
23 wants.
24   Q.   Is it fair to say that the

Page 113

1 percentage of review would be what we
2 discussed earlier, that -- that -- about
3 85 to 88 percent of the suspicious
4 reporting is managed at the verifications
5 level and the balance, 12 to 15 percent,
6 is managed at the regulatory affairs
7 department level?
8   A.   You mean that verifications,
9 when it comes to regulatory, is about
10 15 percent of the volume, yes.
11   Q.   Okay.  On the last page it
12 talks about the document retention and
13 regulatory affairs.  And it says that the
14 product distribution history is in the
15 JDE system and it's to be maintained for
16 ten years.
17   Do you see that?
18   A.   I see that.
19   Q.   And that's for controlled
20 substances as well, correct?
21   A.   That was mainly for recall,
22 product recall purposes.
23   Q.   Okay.  The next one says,
24 "Customer purchase history for controlled

Page 114

1  substances only, has controlled purchases
2  by DEA number (report), WCS" -- that's
3  the warehouse control system -- "for ten
4  years."
5      That's how long the record
6  retention program was for customer
7  purchase history in 2003?
8      A.  That is correct.
9      Q.  Is that still the record
10  retention policy?
11      A.  Record retention policy
12  right now for controlled substances,
13  because of the Drug Quality and Security
14  Act has been revised.
15      Q.  And what is it now?
16      A.  Six years.
17      Q.  And when did that change?
18      A.  I don't remember.
19      Q.  And the basis for that was
20  which statute?
21      A.  Drug Quality and Security
22  Act.
23      Q.  And so did it reduce from
24  ten to six as a result of that act?

Page 115

1      A.  So I know that today, that
2  is the record retention.  I don't know
3  when this changed.
4      Q.  Okay.  If there is
5  litigation, is that handled or is that
6  dealt with in the Schein document
7  retention program relative to this type
8  of purchase history?
9          MR. McDONALD:  Object to the
10      form.
11          THE WITNESS:  I'm sorry.  I
12      don't understand the question.
13  BY MR. MIGLIORI:
14      Q.  Sure.  Have you been asked
15  not to purge or destroy any records
16  relevant to customer purchase history
17  during the pendency of this litigation?
18      A.  Yes.
19      Q.  And that would include these
20  types of documents here, correct, the
21  controlled purchases by DEA number of
22  Schein customers, correct?
23      A.  Well, that will include
24  whatever was in my possession or on my

Page 116

1  records.
2      Q.  Okay.  And do you know when
3  that order was implemented relative to
4  this type of information for controlled
5  substances?
6          MR. McDONALD:  You mean the
7      litigation document hold?
8          MR. MIGLIORI:  Mm-hmm.
9          MR. McDONALD:  You just said
10      order.  He looked puzzled by what
11      you meant by that.
12          THE WITNESS:  Yeah, the
13      document hold, I don't remember
14      exactly.
15  BY MR. MIGLIORI:
16      Q.  If you were to go right now
17  and go look at the orders in Ohio of
18  controlled substances, where would you
19  go?
20      A.  Well, I could ask
21  verifications to run a report.

Page 117

6      Q.  It doesn't come out --
7  strike that.
8          This has a title that's been
9  added for purposes of this litigation.
10  Do you see that on top, Schein Summit
11  County customers?
12      A.  Yes.
13      Q.  And it has opioid orders
14  from 2001 to 2008.
15          Do you see that?
16      A.  Yes.
17      Q.  Who would put that
18  information on top of an Excel
19  spreadsheet like this?
20          MR. McDONALD:  Object to the
21      form.
22  BY MR. MIGLIORI:
23      Q.  Do you know?
24      A.  Whoever was responsible to

Page 118

1 prepare this report.
2 Q. What does this report
3 demonstrate? Take Line 1 and walk me
4 through it.
5 Is this a -- is this a
6 purchase history? Is this a product
7 distribution history? Is this one of the
8 documents that comes out of the warehouse
9 control system? Or does it come out of
10 the JD Edwards system? Tell me what you
11 can tell me from looking at this
12 Exhibit 5.
13 MR. McDONALD: Object to the
14 form. Lack of foundation.
15 MR. MIGLIORI: I'll
16 stipulate that there's a lack of
17 foundation. That's why I'm trying
18 to figure out what the heck this
19 thing says.
20 MR. McDONALD: Well, and
21 with all due respect, Don, I don't
22 think he's the guy to do it.
23 MR. MIGLIORI: Well, I just
24 got it this weekend. So I don't

Page 119

1 have any more depositions to find
2 out.
3 MR. McDONALD: Well, you
4 know, Don, as I have told your
5 colleagues, if there's some issue
6 with documents that were recently
7 produced that's --
8 MR. MIGLIORI: We'll get to
9 it.
10 MR. McDONALD: I know. Let
11 me finish because I want it clear
12 on the record. If there is some
13 issue with documents that we
14 recently produced and the person
15 that knows the most about it or
16 can explain to you has already
17 been deposed, we're happy to have
18 a conversation with you to
19 facilitate that process.
20 MR. MIGLIORI: I appreciate
21 the offer. I want to understand,
22 since he is responsible for this
23 type of information or the
24 production of this type of

Page 120

1 information, I want to understand
2 what his recollection or knowledge
3 is of it. And he can limit it,
4 obviously, to what he knows.
5 BY MR. MIGLIORI:
6 Q. But if you look at
7 Exhibit 5, Mr. Tejeda, what is this, as
8 best you can tell as director of
9 regulatory affairs at Henry Schein?
10 A. It's a report that was
11 produced as a request of information for
12 this litigation.
13 Q. So as I'm looking at this
14 Exhibit 5, this is not a document that's
15 kept in this form, correct? This is a
16 query in a report of things that were
17 particularly asked for. Is that a fair
18 statement?
19 A. That is my understanding.
20 Q. Okay. And so somebody came
21 up with parameters of what to put into
22 this Excel spreadsheet, and these are the
23 different fields that were requested,
24 correct?

Page 121

1 A. Yes.
2 Q. And can you tell by looking
3 at this where these fields come from;
4 that is, which system this reporting
5 comes out of?
6 MR. McDONALD: Again, object
7 to the form. Lack of foundation.
8 THE WITNESS: I can't.
9 BY MR. MIGLIORI:
10 Q. Okay. And if you were to
11 ask for the opioid orders from 2001 to
12 2008 as director of regulatory affairs,
13 who would you ask for this information
14 from? Who is required to produce it
15 under the Henry Schein retention program?
16 MR. McDONALD: Object to the
17 form. Assumes facts not in
18 evidence.
19 THE WITNESS: I would define
20 the parameters as far as what type
21 of information were you looking
22 for, and I think I will ask the
23 verifications team for the report.
24 BY MR. MIGLIORI:

Page 122

1  Q. Now, it says opioid orders.
2  And so as you go through it, it seems
3  like most of these are self --
4  self-explanatory. But I can't tell how
5  this is organized; that is, the dates
6  aren't chronological.
7      Can you tell, in the
8  ordinary course of business, looking at a
9  sheet like this, how this may have been
10 organized?
11     MR. McDONALD: You mean how
12 it's sorted?
13     MR. MIGLIORI: Yeah.
14 BY MR. MIGLIORI:
15     Q. I mean, the order dates are
16 not chronological. The ordering
17 physicians are not -- repeat themselves.
18 So I'm just trying -- again, it seems
19 like the most -- it seems to be organized
20 in part by practitioner. But I'm just
21 trying to get a sense of how you would
22 read this.
23     A. I would read that it seems
24 to be organized by practitioner by

Page 123

1  account.
2      Q. Okay. And so did you review
3  this in preparation for today?
4      A. No, I didn't.
5      Q. Were you advised who would
6  request the certain fields of information
7  to be gathered and printed into this?
8  Were you part of that process or know who
9  was part of that process?
10     A. I think the request came
11 from legal.
12     Q. Okay. And did it -- was it
13 Shaun Abreu or his department that would
14 have put this together?
15     MR. McDONALD: Object to the
16 form.
17     THE WITNESS: I am not sure
18 who put it together.
19 BY MR. MIGLIORI:
20     Q. Okay. Let's take another
21 example. If you go to Page 11 and 12.
22 You see there are multiple references to
23 Adolph Harper, Junior.
24     Do you see that?

Page 124

1      A. Multiple references to the
2  name of the account or --
3      Q. It says under mailing, but
4  it has a name.
5      A. Okay. Okay.
6      Q. Do you see where I am?
7      A. Adolph.
8      Q. Harper Junior.
9      A. Okay.
10     Q. And then it's got orders
11 that range from 2000 -- best I can tell,
12 2004 to 2008 over the next several pages.
13     2003. I see one entry of
14 2003.
15     A. Yes.
16     Q. Do you know who Dr. Harper
17 is?
18     A. I don't.
19     Q. Did you do anything to
20 educate yourself on the amount of volume
21 Dr. -- any of the doctors in Summit
22 County ordered in preparation for today?
23     A. No, I didn't.

Page 125



9  BY MR. MIGLIORI:
10     Q. Have you -- the due
11 diligence file for Henry Schein, is that
12 something that you maintain in your
13 department or you were responsible for
14 producing today?
15     A. Again, it depends on if
16 regulatory conducted that due diligence,
17 yes. And if it was conducted by
18 verifications, then verifications will
19 produce it.

Highly Confidential - Subject to Further Confidentiality Review

Page 126



9     Q.   I'm representing that to
10  you.
11        MR. McDONALD:  Well, I'll
12  represent to you that we told you
13  guys that we produced initial
14  screen shots for all these
15  customers last week.
16        MR. MIGLIORI:  Right.
17  And -- and you've produced to me
18  due diligence folders of due
19  diligence files or supported due
20  diligence files months ago.
21        MR. McDONALD:  Right.
22        MR. MIGLIORI:  To date, all
23  I have for Harper is this.  That's
24  all I'm representing.

Page 127

1         MR. McDONALD:  And there
2   wasn't an additional screen shot
3   on Friday.
4         MR. MIGLIORI:  This is
5   Friday's.
6         MR. McDONALD:  Okay.
7         MR. MIGLIORI:  The only
8   reason I'm doing this is because
9   I'm -- I'm trying to understand
10  what I got.
11  BY MR. MIGLIORI:
12      Q.   And if you look at this
13  Exhibit 6, this is the screen shot of
14  Dr. Harper's due diligence file.  Are you
15  familiar with the system where you can go
16  look at this inventory?
17        MR. McDONALD:  Well, Don, I
18  hate to interrupt you, but based
19  on the Bates number, I find it
20  hard to believe that this was
21  Friday.  Because it's 983.
22        MR. MIGLIORI:  I will stand
23  corrected if that's true.  This is
24  what I have.  This is all I have

Page 128

1   for Harper on due diligence.
2         MR. McDONALD:  Okay.
3         MR. MIGLIORI:  Do you have
4   the rest in there?
5   BY MR. MIGLIORI:
6         Q.   I want you to, while he's
7   looking, to verify my comment.
8             This screen shot may have
9   been produced to me earlier.  This is
10  literally the entire file that I have for
11  Adolph Harper on due diligence.
12            If we go through this screen
13  shot -- you are familiar with this screen
14  on the system, correct?
15        A.   Not really.
16        Q.   Not really?  Sort of?
17        A.   I know about the screen, but
18  I don't work on it.
19        Q.   All right.  Well, you know
20  some of the initials of some of the
21  people that work for you, correct?
22        A.   That work for me, yes.
23        Q.   Yeah.
24        A.   Yes, I do know.

Page 129

1         Q.   Do you know some of the
2   initials for people in the verifications
3   department, correct?
4         A.   For some.
5         Q.   Okay.  If you look at the
6   second page, there are initials entered
7   by C-U-R-Q-U-I.
8             Do you know who that
9   references in 2002?
10        A.   I'm sorry, I don't.
11        Q.   How about above that,
12  Y. Mason?  Do you know anybody named
13  Y. Mason?
14        A.   No.
15        Q.   On the first page, GS
16  Stewart.  Is that familiar to you?
17        A.   No, I'm sorry.
18        Q.   Siebel, are you familiar
19  with that name?
20        A.   I'm sorry.  No.
21        Q.   M-D-O-N-O-2.  Do you know
22  who that might be?
23        A.   No.
24        Q.   Kunick, K-U-N-I-C-K?

Page 130

1    A.   No.  I -- I wouldn't tell --
2  I couldn't tell you who that identifies.
3    Q.   N-M-A-L-N-O.  Do you know
4  who that might be?
5    A.   No.
6    Q.   D. Marin.  Do you know who
7  that might be referencing?
8    A.   No.
9    Q.   How about D-B-L-A?
10    A.   No.
11    Q.   D. Hagan.  Do you know who
12  that is?
13    A.   No.
14    Q.   T-H-A-R-R-2?
15    A.   I don't know what -- who
16  that would identify.
17    Q.   And how about R-S-W-A-I-M?
18  Do you know who that might reference?
19    A.   No.
20    Q.   So you see that this is a --
21  you understand from your knowledge of the
22  system that this is a computer printout
23  referencing certain due diligence steps
24  related to this particular doctor,

Page 131

1  correct, you understand that much?
2    A.   I understand that this is a
3  printout of customer service part of the
4  system that records some changes that
5  were made in the system or some notes.
6    Q.   Okay.  Each one of these
7  notes should have a document associated
8  with it, correct, in the system?
9         MR. McDONALD:  Object to the
10  form.
11         THE WITNESS:  I don't know.
12  BY MR. MIGLIORI:
13    Q.   As director of regulatory
14  affairs, do you have any knowledge
15  whatsoever of how you maintain your due
16  diligence files?
17    A.   Absolutely.
18    Q.   So tell me how you maintain
19  them for a doctor like Dr. Harper, given
20  that in this litigation, this is what I
21  have to go by?
22    A.   So I couldn't tell you about
23  specifics on Dr. Harper.  But if your
24  question is what -- how our system works

Page 132

1  and how we maintain it, I can answer
2  that.
3    Q.   Well, right now I want to
4  know what you can tell me, if anything,
5  about Dr. Harper.  This is the --
6    A.   I have no specifics for
7  Dr. Harper.
8    Q.   You can't read any of these
9  abbreviations and tell me that "letter on
10  file pain meds," you don't know what that
11  reference is?
12    A.   I will be guessing.
13    Q.   I don't want you to guess.
14         W/IV S/A X10.  That means
15  nothing to you?
16    A.   I know that the W is with.
17  The I is image.  I don't recall what V
18  is.
19    Q.   Okay.  Is there a document
20  that's associated with that?
21    A.   I don't know.
22    Q.   What is a T-D-D-D letter?  I
23  may have said too many Ds.
24    A.   TDDD is an acronym for

Page 133

1  terminal drug distributor -- or dangerous
2  drug distributor.
3    Q.   What does that mean?
4    A.   It's a license -- specific
5  license issued by Ohio.
6    Q.   For what?
7    A.   For practitioners that
8  handle controlled substances, if I
9  remember correctly.
10    Q.   And is there a particular
11  right or privilege that goes along with
12  that Ohio distinction?
13    A.   They implemented that
14  program to provide additional ordering
15  privilege to practitioners, yes.
16    Q.   For what purpose?
17    A.   I will answer your question.
18         May I ask you, the spelling
19  of my right -- my last name is
20  T-E-J-E-D-A.
21         MR. MIGLIORI:  You can make
22         fun of the very kind woman who has
23         been very patiently taking all of
24         your words down.  I didn't do it.

Page 134

1    I apologize. But we will fix
2    that.
3        THE WITNESS: Okay. Thank
4    you. I'm sorry, can you repeat
5    your question?
6  BY MR. MIGLIORI:
7    Q.   Is there a particular right
8  or privilege that goes along with the
9  Ohio distinction of TDDD?
10       MR. McDONALD: Object to the
11   form.
12 BY MR. MIGLIORI:
13   Q.   What's the purpose of that
14 privilege?
15       MR. McDONALD: Object to
16   form.
17       THE WITNESS: I will have to
18   go back to the file to review all
19   the ins and out of the regulation.
20 BY MR. MIGLIORI:
21   Q.   If you were to read through
22 Exhibit Number 6 and go through any line
23 of Dr. Harper, you'd be able to find out
24 an order number, correct? If you just

Page 135

1  take the categories on top. I'm now back
2  on Exhibit 6.
3        MR. McDONALD: Oh,
4    different. He's on this one.
5        THE WITNESS: Exhibit 5?
6  BY MR. MIGLIORI:
7    Q.   Is it five?
8    A.   Yes.
9    Q.   I'm sorry. I apologize.
10 Five.
11       So there's an order number?
12       MR. McDONALD: Why don't you
13   get him to the page again.
14 BY MR. MIGLIORI:
15   Q.   Pick any -- Dr. Harper. You
16 can do Page 13.
17       MR. McDONALD: He's on page
18   one is why I said that.
19       THE WITNESS: Page 12,
20   right?
21 BY MR. MIGLIORI:
22   Q.   12 or 13. Either one.
23   A.   Okay.
24   Q.   So this will give you the

Page 136

1  order number, correct?
2    A.   Correct.
3    Q.   What does SO stand for?
4    A.   Sales order.
5    Q.   What is a line reference?
6    A.   I don't know.
7    Q.   Do you know what item number
8  reference is?
9    A.   It's the SKU for the
10 specific product.
11   Q.   Okay. There's a ship
12 number. Is there a separate tracking
13 number for shipment? What is ship?
14   A.   Ship number is the ship to
15 location.
16   Q.   So that's specific to this
17 doctor?
18   A.   That is specific to that
19 doctor.
20   Q.   And the bill is the same
21 number, and not specific to this doctor?
22   A.   The ship is where we're
23 shipping. The bill is where we send the
24 invoices.

Page 137

1    Q.   Okay. The drug order class
2  of the controlled schedule?
3    A.   The schedule.
4    Q.   How is that different from
5  the current item master drug class?
6    A.   So the current item master
7  drug class is Schedule II because
8  hydrocodone was rescheduled sometime ago.
9    Q.   So this distinction would be
10 at the time of this order, it was a
11 Schedule III. But currently it's a
12 Schedule II. Is that --
13   A.   Yes. At the time of
14 printing that report, the current would
15 be a Schedule II.
16   Q.   Gotcha. What is a Julian
17 order date?
18   A.   I'm not sure.
19   Q.   Order date and year, that's
20 self-explanatory. Do you know what AT
21 stands for?
22   A.   No. Sorry.
23   Q.   It's the doctor, the
24 doctor's address, and then it has the

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  doctor's zip code and then there's a
2  number for a distribution center.
3       Do you know which
4  distribution center this is on Page 13
5  that's referenced in all of these orders?
6       A.  On Page 13?
7       Q.  Yep.  I assume it's true
8  throughout.  But I'm only looking on Page
9  13 now.  The distribution center --
10      A.  So the distribution center,
11  there was a couple of them, right?
12      Q.  I just see the ones that end
13  in 002.
14      A.  002.
15      Q.  Is that Indianapolis?
16      A.  Indicating Indianapolis.
17      Q.  The quantity shipped is the
18  amount of orders shipped?
19      A.  Quantity shipped will be the
20  amount of selling units.
21      Q.  Okay.  What is UOM?
22      A.  Unit of measure.
23      Q.  And what does BT stand for?
24      A.  Bottle.

Page 139

1       Q.  Bottle.  And then the size
2  would be the number of milligrams per
3  bottle?
4       MR. McDONALD:  Object to the
5  form.
6  BY MR. MIGLIORI:
7       Q.  Is that -- what is the
8  500/BT on the first line of Page 13 for
9  hydrocodone?
10      A.  That would indicate --
11      Q.  Dosage?
12      A.  -- the selling unit size.
13      Q.  So -- which is what for
14  500/BT?
15      A.  500 per bottle.
16      Q.  500 what?
17      A.  In this case tablets.
18      Q.  500 hydrocodone tablets of a
19  strength of 7.5 codeine and
20  750 milligrams --
21      A.  Correct.
22      Q.  -- hydrocodone?
23      MR. McDONALD:  Object to the
24  form.

Page 140

1  BY MR. MIGLIORI:
2       Q.  Or of oxy?
3       MR. McDONALD:  Object to the
4  form.
5       THE WITNESS:  So you are
6  looking at Page 3, right?
7  BY MR. MIGLIORI:
8       Q.  13.
9       MR. McDONALD:  13.
10      THE WITNESS:  I mean 13.
11  BY MR. MIGLIORI:
12      Q.  I'm looking at the very last
13  column under strength?
14      A.  Page 13, okay.
15      Q.  All the way at the end.
16  Strength, when it says
17  7.5/750 milligrams, when you combine the
18  last two columns it's 500 pills of that
19  dosage strength, correct, for that
20  particular order?
21      A.  For -- yes, for hydrocodone,
22  yes.
23      Q.  Times two bottles, correct?
24      A.  Depending what it says in

Page 141

1  the quantity shipped.
2       Q.  Right.  On the first line.
3  So in this particular order, there were
4  two separate orders of 500 pills at the
5  strength 7.5/750, correct?
6       MR. McDONALD:  Object to the
7  form.
8       THE WITNESS:  I'm sorry,
9  what particular order?  I thought
10  we were under purchase in general?
11  BY MR. MIGLIORI:
12      Q.  Page 13.  Page 13.  Stay on
13  the top line.
14      A.  Okay.  Top line.
15      Q.  Just go to the last two
16  columns --
17      A.  Okay.
18      Q.  -- last four columns.  There
19  were two bottles of 500 pills in
20  each bottle at the strength of
21  7.5/750 milligrams, correct?
22      A.  That's my understanding.
23      Q.  All right.  Exhibit 7 is
24  what we received earlier of 2009 to

Page 142

1 present.
2      (Document marked for
3      identification as Exhibit
4      Henry Schein-Tejeda-7.)
5      THE WITNESS:  Thank you.
6 BY MR. MIGLIORI:
7      Q.   If you look on the top of
8 these two documents, it says, "Due
9 diligence documents."  Transactional
10 records are not due diligence, are they,
11 in Schein's system?
12      A.   Transactional documents are
13 not due diligence.
14      Q.   You -- you would -- you
15 would agree with me that Exhibit 7 that
16 we're looking at and Exhibit 5 that we
17 were looking at, these are summaries of
18 transactional information, correct?
19 These are opioid orders, the first from
20 2001 to 2008, the second post January of
21 2009.  These are transactional records,
22 correct?
23      A.   The way I read it.
24      Q.   And so these aren't due

Page 143

1 diligence documents the way the title
2 reads, correct?
3      MR. McDONALD:  Object to the
4      form.
5      THE WITNESS:  Yeah, I
6      don't -- I don't think these are
7      due diligence documents.
8 BY MR. MIGLIORI:
9      Q.   Okay.  And so you'll see
10 that the information is organized the
11 same for Exhibit Number 7.  And again,
12 there are a couple more entries on Page 2
13 for Dr. Harper.
14      Here he got a total of nine
15 more bottles, 500 pills in each bottle,
16 of the same dosage that we just discussed
17 7.5/750 milligrams.
18      Do you see that?
19      A.   Yes, I see it.
20      Q.   And were you aware that he
21 was, by dosage, the largest customer of
22 Henry Schein in Summit County?
23      A.   Right now?
24      Q.   Ever.

Page 144

1      A.   At the time?
2      Q.   Were you ever made aware of
3 that?
4      A.   No.
5      Q.   And I showed you Exhibit 6,
6 which I believe was the printout of his
7 due diligence file, or at least the
8 inventory of the computer screen shots of
9 his due diligence file.  Is there
10 anything on there that pops out at you to
11 suggest that he might be the largest
12 customer of Henry Schein in Summit County
13 based on dosage units?
14      A.   Do you want me to go over
15 the whole report to see who is the
16 largest?  Oh.
17      Q.   No, I'm asking you whether
18 by looking at this particular due
19 diligence printout, if there's anything
20 that pops out at you.
21      You can see it's the
22 verifications group that produced this
23 document.
24      But I'm asking, by looking

Page 145

1 at it as director of regulatory affairs,
2 whether anything pops out at you that
3 this is a large volume customer of Henry
4 Schein or --
5      MR. McDONALD:  Object to the
6      form.
7      THE WITNESS:  Again, we
8      don't work with this.
9 BY MR. MIGLIORI:
10      Q.   I'm sorry, I didn't hear
11 you.
12      A.   So no, we don't work with
13 this.
14      Q.   Okay.  So if there were
15 government inquiries about this doctor in
16 2010, would those records be the
17 verifications department or the
18 regulatory department's obligation to
19 produce?
20      MR. McDONALD:  Object to the
21      form.
22      THE WITNESS:  I don't
23      remember.
24 BY MR. MIGLIORI:

Page 146

1    Q.   Would it be a joint
2  responsibility by 2010?
3    A.   I'm sorry?
4    Q.   Would it be a joint
5  responsibility by 2010?
6    A.   I know it is a joint
7  responsibility now.
8    Q.   It is now?
9    A.   Yes.
10   Q.   So that -- those documents
11 would exist somewhere still if the --
12 there was such an inquiry?
13   A.   Dr. Harper, if it was
14 inquiry when?
15   Q.   In 2010?  Would you still
16 have those records?
17   A.   I don't know.  But if I go
18 by the record retention, I wouldn't think
19 so.
20   Q.   Were you aware of the fact
21 that Dr. Harper was sentenced to ten
22 years in prison for illegal
23 prescription --
24   A.   No.

Page 147

1    Q.   -- of opioids and controlled
2  substances?
3    A.   No.
4    Q.   Were you aware that
5  prosecutors connect him to eight deaths
6  of opioid-addicted users?
7    A.   No.
8    Q.   The second largest volume by
9  dosage in this county is a Dr. Name Brian
10 Heim.  Are you familiar with Dr. Heim?
11   A.   No.  I have heard the name,
12 but not familiar with his file.
13   Q.   Have you ever seen any
14 documentation of the DOJ and the DEA
15 asking Henry Schein for his transactional
16 information?
17   A.   I may have seen a copy of
18 it.
19   Q.   What's that?
20   A.   I may have seen a copy of
21 it.
22   Q.   What did you see to your
23 recollection?
24   A.   A copy of a request.

Page 148

1    Q.   From whom?
2    A.   I think it was DEA.
3    Q.   And what do you recall the
4  document requesting?
5    A.   Records of -- transaction
6  records I think.
7    Q.   And were you involved --
8  did -- did you receive that request --
9  did you see that request at the time?
10   A.   No.
11   Q.   Did you receive it in
12 preparation for today, did you look at it
13 in preparation for today?
14   A.   I think I saw it in one of
15 the meetings.
16   Q.   One of the meetings with
17 counsel to prepare for today's
18 deposition?
19   A.   Mm-hmm.
20   Q.   Yes?
21   A.   Yes.
22   Q.   Where would that request in
23 2012 be documented, that is, which
24 department would be required under the

Page 149

1  document retention policy to produce that
2  document?  Verifications, regulatory,
3  legal or some combination of them?
4    A.   I don't know.
5    Q.   Do you recall the date of
6  the document that you saw where DEA
7  requested this information?
8    A.   No.

███████████████████████████████

15      MR. McDONALD:  And there was
16 a supplementation to Dr. Heim
17 produced to you last week.
18      MR. MIGLIORI:  Did we get
19 that?
20      MR. DUANE:  It was noted in
21 relativity to Sunday at 7:00 p.m.
22 --
23      MR. McDONALD:  I think it
24 was produced to you early last

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  week.
2       MR. MIGLIORI:  No, Friday
3  was the production.
4       MR. McDONALD:  Well, we
5  produced stuff to you on Tuesday
6  as well.
7       MR. MIGLIORI:  And you think
8  you produced that to us on
9  Tuesday?
10      MR. McDONALD:  I can find
11  out, Don.
12      MR. MIGLIORI:  No, I --
13      MR. McDONALD:  And we
14  specifically identified for you
15  what we produced.  So --
16      MR. MIGLIORI:  No.  Whoa,
17  whoa, whoa, whoa.  Let's be
18  careful.  Let's be careful.
19      I'm perfectly happy with you
20  creating a record, but you didn't
21  specifically show me, identify and
22  direct me to any due diligence of
23  Dr. Heim.
24      MR. McDONALD:  We told you

Page 151

1  that -- well, I can go back and
2  look at the communications with
3  you.  But I talked to your
4  colleague last week.
5       MR. MIGLIORI:  I know you
6  did.
7       MR. McDONALD:  And I told
8  him on the phone exactly what we
9  had produced, including the
10  additional screen shots --
11      MR. MIGLIORI:  Right.
12      MR. McDONALD:  -- for all of
13  them, which you specifically had,
14  an additional production.  You got
15  further documentation from my
16  colleague, Scott Jones, in an
17  e-mail to you guys, telling you
18  that there had been additional
19  screen shot of Dr. Heim that
20  identified the inquiry from DOJ or
21  whoever it came from, the
22  government entity, because I don't
23  know off the top of my head right
24  now who it came from, as well as

Page 152

1  we produced to you the supporting
2  documentation of the government
3  inquiry.
4       MR. MIGLIORI:  I don't --
5       MR. McDONALD:  That was sent
6  to you in an e-mail telling you
7  exactly what we had done.
8       MR. MIGLIORI:  That e-mail
9  did not say any of that
10  information about Dr. Heim.
11      MR. McDONALD:  Yeah, it did.
12      MR. MIGLIORI:  No, it
13  didn't.  I actually just reviewed
14  it.  And I have my -- my counsel
15  here for the sole purpose --
16      MR. McDONALD:  Well, I
17  will -- I will tell you that I was
18  on the phone and I told him that.
19      MR. MIGLIORI:  Well, he is
20  here, and I'll let him explain the
21  position that he --
22      Do you have that?
23      MR. DUANE:  I think I've got
24  it now.  He just sent it to me.

Page 153

1       MR. MIGLIORI:  And this is?
2       MR. McDONALD:  There is the
3  additional screen shot for
4  Dr. Heim, and there is the
5  additional due diligence
6  documentation for Dr. Heim.
7       MR. MIGLIORI:  Can you tell
8  when this was produced?
9       MR. DUANE:  I'll check.
10      MR. McDONALD:  And, Don, I
11  told your -- I told your
12  colleagues this, that -- that
13  this -- hang on.  That this was
14  brought to our attention as a
15  result of your inquiry from Tina
16  Steffanie-Oak where she said that
17  this isn't -- she wasn't familiar
18  with this file, there should have
19  been something else in the file if
20  there was, in fact, an inquiry
21  from DEA or DOJ.
22      And so we went and looked,
23  and said we must be
24  miscommunicating what we're asking

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  for.  And we found this additional
2  screen shot, as well as the DOJ
3  inquiries, and we produced them to
4  you.
5      But it's a verifications
6  issues, Don.  And -- and let me be
7  clear.  As I told you before, if
8  there's some -- you can ask --
9      MR. MIGLIORI:  I appreciate
10 it.
11     MR. McDONALD:  Hang on.  You
12 can ask him all the questions you
13 want, but if he doesn't know about
14 it and you need to ask Mr. Grey or
15 somebody else, I'll open his
16 deposition for a short period of
17 time to ask about it, we're happy
18 to accomplish that.
19     There was certainly no
20 intention on our part not to
21 produce this stuff.
22     MR. MIGLIORI:  I'm not -- I
23 have never in the seven
24 depositions I've done, I have

Page 155

1  never accused you of anything
2  untoward.  I'm trying to get to
3  the bottom of this.  And I can
4  tell you that this was never
5  referenced directly or brought to
6  my attention, and to my knowledge
7  to my law partner's attention,
8  that this screen shot particularly
9  to Heim existed.
10     I know that I saw the
11 general reference to additional
12 screen shots which was contained
13 in several other screen shots.
14     This is the first time I'm
15 seeing a screen shot.  And I'm
16 looking at it through the database
17 right now.
18     MR. McDONALD:  Okay.
19     MR. MIGLIORI:  So that's --
20 that's my side of the story.
21 BY MR. MIGLIORI:
22     Q.   You did review -- the letter
23 from DEA to Henry Schein about Dr. Heim?
24     A.   I remember seeing it.

Page 156

1      Q.   But your recollection of
2  that is only from preparation for today,
3  not that you were involved with the
4  inquiry back in 2012, correct?
5      A.   I don't remember.

12     Q.   And are you aware that
13 Dr. Heim is also in federal prison as a
14 result of convictions on drug-related
15 charges including -- specifically
16 including controlled substances?
17     A.   I wasn't aware.
18     Q.   Are you aware that
19 Dr. Heim's conviction was actually
20 premised on the information about Henry
21 Schein's transactions with Dr. Heim?
22     MR. McDONALD:  Object to the
23 form.  Assumes facts not in
24 evidence.

Page 157

1      THE WITNESS:  I wasn't
2  aware.
3  BY MR. MIGLIORI:

Page 158



11      MR. MIGLIORI:  This is the
12  last document and we'll take a
13  break.
14      (Document marked for
15  identification as Exhibit
16  Henry Schein-Tejeda-9.)
17  BY MR. MIGLIORI:
18      Q.   Did you see this document in
19  your preparation for today, the letter
20  that you wrote to the field office of DEA
21  about the reporting --
22      A.   This was in --
23      Q.   Let me finish.  I'm sorry.
24      A.   Okay.

Page 159

1      Q.   Did you review this document
2  in preparation for today, which was your
3  letter to Danna Droz of the Ohio State
4  Board of Pharmacy regarding Schein
5  reporting practices in the state of Ohio?
6      A.   I did review this slide.
7      Q.   It's a November 9, 2012,
8  letter, which is over your name, correct?
9      A.   Correct.
10      Q.   This version that I have is
11  not signed.  Did you believe that in fact
12  you sent this to the Ohio Board of
13  Pharmacy?
14      A.   The letter was sent to the
15  Ohio Board of Pharmacy.
16      Q.   And in this letter you tell
17  the Ohio Board of Pharmacy in November of
18  2012 that Henry Schein was writing for --
19  quote, "The purpose of this letter is to
20  notify the Ohio Board of Pharmacy of an
21  issue that was recently discovered while
22  conducting a routine internal review of
23  operations.  During the course of our
24  internal review, we realized that Henry

Page 160

1  Schein Incorporated has been
2  underreporting sales of controlled
3  substances to Ohio Board of Pharmacy as
4  required by the state's prescription
5  monitoring program (PMP)."
6      Do you recall sending that
7  letter to the Ohio Board of Pharmacy?
8      A.   Yes.
9      Q.   And do you recall the
10  realization that Henry Schein had been
11  underreporting controlled substances as
12  to Ohio as required by Ohio law?
13      A.   Yes.
14      Q.   Who was the person that
15  discovered this?
16      A.   It was one of our regulatory
17  specialists.
18      Q.   Who was that?
19      A.   I don't remember exactly who
20  it was.  I can tell you who I think it
21  was.
22      Q.   What's your best educated
23  guess?
24      MR. McDONALD:  Object to the

Page 161

1  form.
2      Go ahead.
3      THE WITNESS:  Peter Schmidt.
4  BY MR. MIGLIORI:
5      Q.   Who?
6      A.   Peter Schmidt.
7      Q.   And did Peter Schmidt -- is
8  he the one that discovered that the
9  reports that you had been sending to Ohio
10  for sales of products that contained
11  tramadol and carisoprodol didn't -- but
12  did not include any other controlled
13  substances, is he the one that made that
14  realization?
15      MR. McDONALD:  Object to the
16  form.
17      THE WITNESS:  So one of our
18  specialists brought it up to our
19  attention.
20  BY MR. MIGLIORI:
21      Q.   And how many controlled
22  substances were missing from the list of
23  what was required in 2012?
24      A.   I can't tell you that.

Page 162

1    Q.   Is it dozens?

2    A.   I don't know.

3    Q.   Do you know how many -- how

4  significant in numbers the underreporting

5  was as of November of 2012?

6    A.   I don't remember.

7    Q.   Isn't it true that this

8  underreporting continued for two years

9  before it was discovered?

10    A.   I'm sorry.  Say that again?

11    Q.   Isn't it true that this

12  underreporting of controlled substances

13  to the Ohio State Board of Pharmacy had

14  been going on for two years?

15    A.   I'm not sure about the time

16  frame, if it's in the letter.

17    Q.   I'll show you.  On the third

18  paragraph, it says, "Please be reassured

19  that there was never any intent to avoid

20  or circumvent the company's obligation

21  under Ohio state law, and as an act of

22  good faith, Henry Schein is providing all

23  controlled substances sales information

24  which was mistakenly omitted for the

Page 163

1  previous two years.  See enclosures."

2    A.   Okay.

3    Q.   Isn't it true that Henry

4  Schein, for two years, underreported the

5  sale of controlled substances within the

6  state of Ohio, from at least 2010 to

7  2012?

8    MR. McDONALD:  Object to the

9    form.

10    THE WITNESS:  So I don't

11    know if it was two years that we

12    underreported.  I know that we

13    were providing two years of

14    information.

15  BY MR. MIGLIORI:

16    Q.   Your letter says,

17  unequivocally, "Information which was

18  mistakenly omitted for the previous two

19  years."

20    Those are your words,

21  correct?

22    A.   Those are my words.

23    Q.   That would include Summit

24  County, Ohio, my client, correct?

Page 164

1    A.   The state of Ohio.

2    Q.   So at this point in 2010,

3  the oxycodone would have been a

4  controlled substance that would not be

5  reported here, correct?

6    A.   From what the letter says,

7  we only were reporting a couple of drugs.

8    Q.   Hydrocodone would not have

9  been reported, correct?

10    A.   According to the letter.

11    Q.   And you understand that in

12  Ohio, hydrocodone was almost 99 percent

13  of the orders filled from 2006 to 2014 in

14  Summit County?  Were you aware of that?

15    MR. McDONALD:  Object to the

16    form.

17  BY MR. MIGLIORI:

18    Q.   From Henry Schein?

19    MR. McDONALD:  Object to the

20    form.

21  BY MR. MIGLIORI:

22    Q.   Were you aware of that?

23    A.   No, sir, I wasn't.

24    Q.   Were you aware that

Page 165

1  Dr. Heim, who was convicted of drug

2  trafficking, had received over 11,000

3  dosage units of hydrocodone from Henry

4  Schein leading up to his conviction?

5    MR. McDONALD:  Object to the

6    form.

7    THE WITNESS:  I wasn't

8    aware.

9  BY MR. MIGLIORI:

10    Q.   And that the inquiry that

11  you saw from the DEA about Dr. Heim, that

12  was dated in July of 2012, correct?

13    A.   I don't remember.

14    Q.   I can only show you by a

15  computer screen.

16    MR. MIGLIORI:  Can you pull

17    that back up?

18    Maybe it will refresh your

19    recollection.

20    THE WITNESS:  Okay.

21  BY MR. MIGLIORI:

22    Q.   I -- I can show it to you

23  here so we can all see it.  And then I

24  can give this to you if you'd like.  This

Page 166

1  is -- forgive me for having to do it this
2  way.
3          Is this what you saw as a --
4      A.   The note?
5      Q.   -- screen shot?
6      A.   The note?
7      Q.   And what I'm looking at here
8  is -- there is an 11 -- 7/11/12, "Please
9  contact Shaun to notify DEA if a control
10 is ordered."
11         Do you see that?
12     A.   Yes.
13     Q.   It says, "Deleted account."
14 Do you know what that means?
15     A.   Deleted account will mean
16 that the account is not longer current in
17 our system.
18     Q.   You don't know when it was
19 deleted, do you?
20     A.   No.
21     Q.   So you'll see here that
22 these -- this -- if -- if the date of
23 inquiry is in -- is in -- let's see --
24 July of 2012, if I'm reading this

Page 167

1  correctly, you would agree with me that
2  based on your letter to the Ohio board on
3  November 9, 2012, Exhibit Number 9, that
4  none of those 11,500 hydrocodone orders
5  to Dr. Heim would have been reported to
6  the Ohio Board of Pharmacy based on your
7  letter, correct?
8          MR. McDONALD:  Object to the
9      form.
10         THE WITNESS:  So is the
11     record showing that we were in
12     communication with the DEA and
13     this is a record to the board of
14     pharmacy?  I'm just confused how
15     you can -- and what --
16 BY MR. MIGLIORI:
17     Q.   I -- I can show you several
18 different ways.  We can start with the
19 exhibit, I believe it's Exhibit 8.
20         But if you look at the Henry
21 Schein transactional records from post
22 January 2009 and you turn to Page 3.
23     A.   Okay.
24     Q.   You see all of these orders

Page 168

1  for Dr. Heim?
2      A.   Yes.
3      Q.   And you see these are all
4  hydrocodone orders?
5      A.   Yes.
6      Q.   For Dr. Heim?
7      A.   Mm-hmm, yes.
8      Q.   And these are all in the
9  transactional records of Henry Schein,
10 correct?
11     A.   That is correct.
12     Q.   And they say he is
13 getting -- according to this chart, he is
14 getting, on the first line of his, one
15 bottle of 500 pills, at
16 10/500 milligrams.  And goes down the
17 list.  Then he increases to two bottles
18 of 500 pills at 10/500 milligrams.
19         You see all of those
20 entries, correct?
21     A.   Yes.
22     Q.   These are records maintained
23 by Henry Schein, correct?
24     A.   That is correct.

Page 169

1      Q.   And those records were also
2  reported to ARCOS, the federal DEA,
3  correct?
4      A.   Yes, they were.
5      Q.   And the DEA, by looking at
6  those very same records, contacted Henry
7  Schein and said to Henry Schein, there's
8  something unusual about this doctor's
9  ordering, correct?
10         MR. McDONALD:  Object to the
11     form.
12         THE WITNESS:  I don't know.
13         MR. McDONALD:  Form and
14     foundation.  Mischaracterizes the
15     evidence.
16 BY MR. MIGLIORI:
17     Q.   Do you recall the inquiry
18 about the transactional records from DEA
19 that you read?
20     A.   No.
21     Q.   You don't recall the
22 substance of it?
23     A.   No.
24     Q.   When the DEA contacted Henry

Page 170

1 Schein, was the DEA -- did Henry Schein
2 have an appreciation that the DEA, when
3 they asked for transactional record, is
4 looking for suspicious order practices,
5 would that be a reasonable assumption at
6 Henry Schein?
7　　　MR. McDONALD:  Object to the
8　　form.
9　　　THE WITNESS:  Not really.
10　　Henry Schein has had a very good
11　　relationship with all the local
12　　DEA offices and also the
13　　Washington office.  The fact that
14　　they asked for records doesn't
15　　necessarily mean that they are
16　　looking for something on the
17　　customer.
18 BY MR. MIGLIORI:
19　　Q.　In that month, he was
20 indicted in August, based on the
21 transactional records Henry Schein
22 provided.  Were you aware of that?
23　　　MR. McDONALD:  Object to the
24　　form.

Page 171

1　　　THE WITNESS:  No, I wasn't.
2 BY MR. MIGLIORI:
3　　Q.　In August of 2012, these
4 records that you have here, in this
5 exhibit that we're looking at, were
6 never, ever reported to the Ohio Board of
7 Pharmacy as required by Ohio law,
8 correct?
9　　A.　They were reported at the
10 time of this letter.
11　　Q.　Right.  They weren't
12 reported until November of 2012 with two
13 years of unreported transactions,
14 correct?
15　　A.　Again, I don't know -- I
16 cannot tell you the time frame of the
17 underreporting.
18　　Q.　You -- you write it out and
19 you put a number in.  It says,
20 "Mistakenly omitted for the previous two
21 years, see enclosures."
22　　　Did you ever look at these
23 enclosures when you reviewed this
24 document?

Page 172

1　　A.　I would have.
2　　Q.　When you prepared for this
3 deposition and you saw this Exhibit
4 Number 9, where you wrote to the Ohio
5 Board of Pharmacy and said we have
6 mistakenly omitted two years of
7 controlled substance reporting to you,
8 did it have attached to it the enclosures
9 that's referenced in your letter to the
10 board of pharmacy?
11　　A.　Did I have the enclosures?
12 No, I didn't read the enclosures.
13　　Q.　Those two years of -- of
14 omitted reporting to the Ohio Board of
15 Pharmacy, do you know if they still exist
16 somewhere at Henry Schein?
17　　A.　I don't know.  But, however,
18 I think my point is that we are offering
19 two years of records to the board.
20　　Q.　Which --
21　　A.　I don't think we're
22 necessarily saying that we omitted two
23 years of records.
24　　Q.　Let's go through it

Page 173

1 together.  Because the jury can actually
2 see this as we print it.  So I -- I don't
3 want there to be any confusion.  Or if
4 I've mistaken, you can show me how I'm
5 mistaken.
6　　　Do you see where I am where
7 it says in the third paragraph, please?
8　　A.　Right.
9　　Q.　And we'll read this
10 altogether for the jury's benefit.
11　　"Please be reassured that
12 there was never any intent to avoid or
13 circumvent the company's obligation under
14 Ohio state law, and as an act of good
15 faith, Henry Schein Incorporated is
16 providing all controlled substance sales
17 information which was mistakenly omitted
18 for the previous two years, see
19 enclosures."
20　　　Those are your words,
21 correct?
22　　A.　Correct.
23　　Q.　You haven't seen the
24 enclosures in preparation for today,

Page 174

1  correct, just this letter?
2      A.   Correct.
3      Q.   But at least based on this
4  letter, you provided two years of
5  mistakenly omitted reporting to the Ohio
6  Board of Pharmacy, correct?
7      A.   So we provided two years of
8  information.  I can see -- you can read
9  it that way.  I can read it a little
10  different too.
11      Q.   Did I read it properly?
12      MR. McDONALD:  Object to the
13      form.
14  BY MR. MIGLIORI:
15      Q.   Did I read it properly?
16  Whatever the information is, did I read
17  it properly?
18      A.   I think the fact that I can
19  say over here is that the information
20  that we produced at this time was two
21  years of information.
22      Q.   Okay.  Those are -- those
23  are some of the words of the sentence.
24  If you put them all together, it

Page 175

1  references, "All controlled substance
2  sales information which was mistakenly
3  omitted."
4      That's what you provided,
5  for the previous two years?
6      A.   Right.
7      Q.   You provided all of the
8  controlled substance sales information
9  which was mistakenly omitted for the
10  previous two years.
11      Do you see that?
12      A.   I see that.
13      Q.   Those are your words?
14      A.   Those are my words.
15      Q.   And that would include,
16  because it's November 2012, all of the
17  hydrocodone that Dr. Heim ordered from
18  Henry Schein, which led to his conviction
19  in federal court, in this federal court
20  in Ohio, correct?
21      MR. McDONALD:  Object to the
22      form.
23      THE WITNESS:  That would
24      include all the information of

Page 176

1  controlled substances that was
2  distributed to Ohio customers for
3  the prior two years.
4  BY MR. MIGLIORI:
5      Q.   And in these prior two
6  years, as we just saw, hydrocodone was
7  the order -- the only thing that Dr. Heim
8  ordered from Henry Schein in Summit
9  County, correct?
10      MR. McDONALD:  Object to the
11      form.
12      You've totally
13  mischaracterized this record.
14      MR. MIGLIORI:  I have your
15  objection.
16      MR. McDONALD:  It only --
17  only as to controlled substance.
18  Be careful.
19      MR. MIGLIORI:  This is a
20  controlled substance letter.
21      MR. McDONALD:  Correct.  But
22  you're saying that is all we sold
23  to him.  I don't know if we sold
24  him all other kinds of stuff.

Page 177

1      MR. MIGLIORI:  With all due
2  respect, that is all I have.  And
3  it's all you -- it's what you've
4  given me.  So everything that
5  Dr. Heim --
6      MR. McDONALD:  This is -- if
7  you want to ask him if that's all
8  the controlled substances that we
9  sold to him, that's fine.  But
10  there's no evidence that that's
11  all we sold to him.
12      MR. MIGLIORI:  All right.
13  In fact that's the only evidence,
14  because that's what you've
15  provided me.
16      MR. McDONALD:  You only
17  asked for evidence of controlled
18  substance.
19      MR. MIGLIORI:  Listen, we
20  don't need to debate this.  We
21  don't need to -- I get to ask the
22  questions.  And if you have a
23  problem, you state your objection.
24      MR. McDONALD:  You do.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

¹ BY MR. MIGLIORI:
²    Q.   In this exhibit of
³ Dr. Heim's transactions as we've gone
⁴ through, they are all related to
⁵ hydrocodone tablets, correct?
⁶    A.   The report?
⁷    Q.   Take as much time as you
⁸ want to look at it.
⁹    A.   What report are you looking
¹⁰ at?
¹¹       MR. McDONALD:  The exhibit.
¹² BY MR. MIGLIORI:
¹³    Q.   The opioid orders post
¹⁴ January 2009.
¹⁵       MR. McDONALD:  Tell him what
¹⁶ exhibit, Don.
¹⁷       MR. MIGLIORI:  He's going to
¹⁸ have to tell me because he's got
¹⁹ it.
²⁰ BY MR. MIGLIORI:
²¹    Q.   What number is that exhibit?
²²    A.   That is Tejeda Number 7.
²³    Q.   Exhibit Number 7, if you
²⁴ start on Page 3, and you look at all of

Page 179

¹ the Brian Heim orders listed there, every
² one of them on Page 3 and Page 4, is
³ hydrocodone tablets, correct?
⁴    A.   Yes.
⁵    Q.   If you go to the order date,
⁶ every one of them is in 2011 or 2012,
⁷ correct?
⁸    A.   Yes.
⁹    Q.   And they are all before
¹⁰ November 9, 2012, correct?
¹¹    A.   That is correct.
¹²    Q.   And in your letter to Danna
¹³ Droz from the Ohio State Board of
¹⁴ Pharmacy, you specifically inform the
¹⁵ Board of Pharmacy in November of 2012
¹⁶ that you did not report any hydrocodone
¹⁷ orders from Summit County from -- for the
¹⁸ prior two years from November of 2012,
¹⁹ correct?
²⁰    A.   I didn't specifically
²¹ mention hydrocodone in my letter.
²²    Q.   You specifically referenced
²³ that it was not the two controlled
²⁴ substances that you did report, correct?

Page 180

¹ You only reported two controlled
² substances in those two years.
³    A.   Right.
⁴    Q.   And neither were
⁵ hydrocodone, correct?
⁶    A.   Correct.
⁷    Q.   So every single pill that
⁸ you sold to Dr. Heim in Summit County in
⁹ 2011 and 2012 went unreported to the Ohio
¹⁰ Board of Pharmacy, correct?
¹¹       MR. McDONALD:  Object to the
¹² form.
¹³       THE WITNESS:  Up to this
¹⁴ point, yes.
¹⁵       MR. MIGLIORI:  Thank you.
¹⁶ I want to take a break.
¹⁷       THE VIDEOGRAPHER:  Going off
¹⁸ the record at 12:04 p.m.
¹⁹        - - -
²⁰       (Lunch break.)
²¹        - - -
²²       THE VIDEOGRAPHER:  Back on
²³ the record at 12:49 p.m.
²⁴       (Document marked for

Page 181

¹    identification as Exhibit
²    Henry Schein-Tejeda-10.)
³ BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

Page 182



21 BY MR. MIGLIORI:
22      Q.   And so if an order came in
23 after this date in your system, would you
24 expect that order to be filled?

Page 183

1           MR. McDONALD:  Object to
2      form.
3           Go ahead.
4           THE WITNESS:  I would expect
5      a communication to go back to
6      Mr. Brinks.
7  BY MR. MIGLIORI:
8      Q.   Okay.  My question was,
9  would you expect an order for a
10 controlled substance after July 5, 2012,
11 to be filled?
12          MR. McDONALD:  Object to the
13     form.  Asked and answered.
14          THE WITNESS:  I cannot
15     answer that because it depends on
16     what the communication with the
17     DEA was.
18          THE REPORTER:  Counsel on
19     the phone have asked that you
20     speak up.
21 BY MR. MIGLIORI:

Page 184

13      Q.   Correct.  Did you see any
14 other response from Ms. Steele to Scott
15 Brinks of the DEA asking for information
16 on Dr. Heim?
17      A.   No.
18      Q.   Okay.  If you go to the
19 first e-mail in the chain, she doesn't
20 ever, based on this string of e-mails,
21 ever respond to the DEA.  She writes to
22 Shaun Abreu, Donna Tomaselli and Craig
23 Schiavo and asks, can somebody contact
24 him.

Page 185

1           Do you see that?
2      A.   I see that.
3      Q.   Which department is Donna
4  Tomaselli in?
5      A.   Verifications.
6      Q.   And Craig Schiavo is in
7  regulatory, correct, at this time?
8      A.   Yes, sir.
9      Q.   He reported to you, correct?
10     A.   Yes, sir.
11     Q.   So other than these three
12 e-mails from the DEA, or two from the DEA
13 asking for information about Dr. Heim,
14 have you seen any other correspondence
15 between the DEA and Henry Schein about
16 Dr. Heim and his controlled substance
17 purchase history?
18     A.   Not that I recall.
19     Q.   Did you say not that I
20 recall?
21     A.   Not that I recall.
22     Q.   Do you know who ended up
23 contacting the DEA in response to this
24 inquiry about Dr. Heim?

Page 186

1    A.   No.
2    Q.   Put up on the screen off the
3  computer at the break I printed out the
4  screen shot counsel was referring to in
5  his very concise objection.
6         MR. McDONALD:  Thank you.

19   Q.   Do you know which system
20  this is printed off of?
21        It actually has on the title
22  "DEA/Proof License Maintenance."
23        Do you know which database
24  that is?

Page 187

1    A.   It's something used by the
2  verifications team.
3    Q.   Okay.  Is that separate and
4  apart, to your knowledge, from the due
5  diligence printout that I showed you
6  earlier?
7         I'll put it back on the
8  screen.  I don't remember the exhibit
9  number but...
10        Is that a separate system
11  from the customer service imaging
12  database?
13   A.   Again, I don't use the
14  system so I couldn't tell you.

22   Q.   Who would have access to
23  that notation?
24        Would that be in the

Page 188

1  warehouse system, would that be in the
2  JD Edwards system?  What -- how would
3  this trigger the DEA?
4    A.   So that -- that note would
5  be placed by Shaun or somebody in his
6  team, somebody in the verifications team.
7    Q.   And by what process would an
8  order prompt contacting Shaun?  If
9  Dr. Heim placed an order, how would it
10  prompt somebody to contact Shaun based on
11  that note, how does that work?
12   A.   I'm not sure what process
13  they put in place at the time.  It could
14  simply just regard the license number
15  from the system.
16   Q.   Okay.  Do you know if that
17  was done here?
18   A.   I don't know.
19   Q.   If you go back to the due
20  diligence file for Dr. Heim, you'll see
21  that a month and a half later, the due
22  diligence file -- Shaun directed that a
23  new questionnaire be sent to Dr. Heim on
24  August 23, 2012, a month after the DEA

Page 189

1  made this inquiry.
2         Do you see that?
3    A.   Yes.
4    Q.   The next day that
5  questionnaire was completed and placed in
6  a bin to be approved.
7         Do you see that?
8    A.   Yes.
9    Q.   And then that was given to
10  Shaun.
11        Do you know what action was
12  taken at that point in August of 2012 on
13  whether or not to approve Dr. Heim for
14  any further controlled substances?
15   A.   I wouldn't know just by
16  looking at this document.
17   Q.   The last page of this due
18  diligence file has a reference to
19  something called MedPro.
20        Do you see that?
21   A.   Yes, sir.
22   Q.   Are you familiar with
23  MedPro?
24   A.   I'm familiar with what it

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1 is.

2   Q.   What do you understand it to

3 be?

4   A.   MedPro is the third party

5 service that we contract with to verify

6 license information.

7   Q.   And this is done at the

8 onboarding, that is, bringing on of a new

9 customer at Schein?

10   A.   This is a live process,

11 because we refresh the data.

12   Q.   You'll notice that the date

13 of the MedPro search is June 3, 2011.

14      Do you see that?

15   A.   Yes.

16   Q.   Going back to the

17 transactional records of Dr. Heim, the

18 first order processed for hydrocodone is

19 dated August 17, 2011.  It's on page --

20   A.   I'm sorry, which one of the

21 two are you --

22   Q.   It's Page 3 of that one

23 there which is exhibit -- what's the

24 number on that, Exhibit 7 --

Page 191

1   A.   7, okay.

2   Q.   Yeah.  Page 3.

3   A.   Okay.

4   Q.   The first order is -- order

5 date is August 17, 2011.

6      Do you see that?

7   A.   Yes.

8   Q.   And it's to fill an order

9 for controlled substances, correct, for

10 hydrocodone, correct?

11   A.   This order was for -- for

12 hydrocodone, correct.

13   Q.   And the way that this

14 information has been organized in this

15 spreadsheet, it's one bottle, 500 doses

16 of 10/500 milligrams, correct?

17   A.   500 tabs, yes.

18   Q.   And that would have been

19 filled based on the way this information

20 is presented, correct?

21   A.   Based on how the report is

22 presented, yes.

23   Q.   And then all of these

24 subsequent orders on the -- throughout

Page 192

1 the rest of the Page 3, going onto

2 Page 4, are the hydrocodone controlled

3 substance orders that were filled,

4 correct?

5   A.   Correct.

6   Q.   And when you go back to

7 Exhibit 11 that I was showing you under

8 MedPro, when the search was run in June,

9 before the very first order to Dr. Heim

10 was filled, under the MedPro category of

11 disciplinary action it says yes.

12      Do you see that?

13   A.   Yes.

14   Q.   Where would the follow-up to

15 that disciplinary action be stored in

16 Henry Schein?

17   A.   Today?

18   Q.   Today or in 2011 when this

19 was done.

20   A.   Today's process would be for

21 our teams to review it, and then it will

22 be stored either on their SOM system or

23 on our SOM software.

24   Q.   Is it random which system

Page 193

1 it's on, or is it on both systems?

2      When you say or, what does

3 that mean?

4   A.   Today's process, it depends

5 on who conducted the review.  If

6 regulatory conducted the review, it will

7 be housed in a system called FileMarker,

8 which is what we have implemented and

9 customized to be our software that we use

10 for due diligence files.

11   Q.   That's separate and apart

12 from verifications system?

13   A.   Verifications was integrated

14 to that system late last year.  So there

15 are still some separation of records.

16   Q.   2011, where would

17 disciplinary action -- strike that.

18      You would agree with me that

19 if a MedPro inquiry in 2011 generated a

20 positive answer for disciplinary action,

21 that under Henry Schein's "know your

22 customer" due diligence system, that that

23 would require follow-up, correct?

24      MR. McDONALD:  Object to the

Page 194

1    form.
2        THE WITNESS:  Under Henry
3    Schein's due diligence process,
4    there would be follow-up.
5  BY MR. MIGLIORI:
6    Q.    Yes?
7    A.    That would be followed up.
8    Q.    And that information would
9  be followed up in the first instance by
10 verifications or by regulatory?
11   A.    By the department that is
12 conducting the due diligence.  So if this
13 was conducted by verifications, it will
14 be verifications.
15   Q.    Okay.  For a new client,
16 would that be verifications?
17   A.    For a new account, that most
18 likely will be verifications.
19   Q.    And it's important in a
20 follow-up like this, especially if you're
21 going to go ahead and ship controlled
22 substances to this doctor, that the file
23 be documented that the follow-up has
24 occurred, correct?

Page 195

1        MR. McDONALD:  Object to the
2    form.
3        THE WITNESS:  Yes.
4  BY MR. MIGLIORI:
5    Q.    Are you aware that this
6  doctor in the 1990s was convicted of more
7  than 20 drug trafficking charges, felony
8  charges?
9        MR. McDONALD:  Object to the
10 form.
11       THE WITNESS:  No, I wasn't.
12 BY MR. MIGLIORI:
13   Q.    Were you aware that this
14 doctor had lost his license to practice
15 medicine for a period of time --
16       MR. McDONALD:  Objection.
17 BY MR. MIGLIORI:
18   Q.    -- because of that drug
19 trafficking charge?
20       MR. McDONALD:  Object to the
21 form.
22       THE WITNESS:  This indicates
23   that the doctor had a license.
24 BY MR. MIGLIORI:

Page 196

1    Q.    I'm asking you, were you
2  aware that this doctor lost his license
3  for a period of time as a result of drug
4  trafficking charges?
5    A.    No, I wasn't.
6    Q.    I'm going to ask you to
7  assume that this doctor was convicted of
8  felony drug trafficking charges and lost
9  his license for a period of time to
10 practice medicine.  Is that something, in
11 the Henry Schein due diligence "know your
12 customer" system that Henry Schein would
13 want to know about before filling the
14 first prescription or order of controlled
15 substances?
16   A.    Our process is that we
17 collect as much information as we can on
18 the -- during the due diligence process.
19   Q.    My question to you is a
20 little more basic.  At Henry Schein in
21 2011, would you want to know if a new
22 customer of yours had a prior felony
23 conviction for more than 20 counts of
24 drug trafficking and lost his medical

Page 197

1  license as a result of that in years
2  prior?  Would you want to know that in
3  your "know your customer" obligations to
4  the DEA?
5        MR. McDONALD:  Object to the
6    form.
7        THE WITNESS:  I don't
8    remember how in depth the process
9    was at that point.  If your
10   question is just if me personally
11   would like to know, again, we
12   always strive to know as much --
13   to get as much information of any
14   account as we could.
15 BY MR. MIGLIORI:
16   Q.    I'm asking, as the director
17 of regulatory affairs, whether or not
18 your system -- whether you would expect
19 your system to follow up on a MedPro
20 disciplinary action that turned out to be
21 more than 20 felony convictions for drug
22 trafficking?  Is that what you would
23 expect of your system to produce?
24       MR. McDONALD:  Object to the

Page 198

1 form.
2 THE WITNESS: Second, I'm
3 not trying to be difficult here,
4 but the system has been enabled,
5 and we always look for continuous
6 improvement. I can't tell you
7 what -- how in depth or what the
8 expectation was from the system at
9 that time.
10 BY MR. MIGLIORI:
11 Q. You could not tell me
12 whether or not Henry Schein would want to
13 know whether one of its customers was
14 convicted of drug trafficking charges?
15 MR. McDONALD: Object to
16 form.
17 BY MR. MIGLIORI:
18 Q. As director of regulatory
19 affairs for the company?
20 MR. McDONALD: Object to the
21 form.
22 Don, you're just arguing him
23 and asking the same question over
24 and over.

Page 199

1 MR. MIGLIORI: You get about
2 five words. That's enough.
3 MR. McDONALD: Well, you're
4 being abusive.
5 MR. MIGLIORI: John --
6 MR. McDONALD: You know you
7 are.
8 MR. MIGLIORI: No. In the
9 face of questions, I can follow up
10 on. Please stop.
11 MR. McDONALD: You know why
12 I'm interrupting you.
13 MR. MIGLIORI: I know --
14 just stop.
15 BY MR. MIGLIORI:
16 Q. You want her to read back
17 the question?
18 MR. McDONALD: Yes, please.
19 (Whereupon, the court
20 reporter read back the requested
21 portion of testimony.)
22 MR. McDONALD: Object to
23 form.
24 THE WITNESS: As director of

Page 200

1 regulatory affairs, I believe I
2 already answered your question.
3 We would strive to get as much
4 information as we could from every
5 account.
6 BY MR. MIGLIORI:
7 Q. As director of regulatory
8 affairs, if you found out that a new
9 potential customer had more than 20
10 convictions, felony convictions for drug
11 trafficking, and you were asked to review
12 it at regulatory affairs as to whether or
13 not that is an appropriate customer of
14 Henry Schein in 2011, what would you have
15 concluded?
16 MR. McDONALD: Objection to
17 form. Improper hypothetical.
18 THE WITNESS: I would have
19 to review the file to be able to
20 answer your question.
21 BY MR. MIGLIORI:
22 Q. So there are some doctors
23 with more than 20 felony convictions for
24 drug trafficking charges that would be an

Page 201

1 appropriate customer for Henry Schein for
2 the ordering of controlled substances?
3 MR. McDONALD: Object to the
4 form.
5 THE WITNESS: I didn't say
6 that.
7 BY MR. MIGLIORI:
8 Q. That's what I'm trying to
9 find out.
10 A. I'm saying that I would have
11 to review the file in order to be able
12 for answer -- to give you a -- for answer
13 on what the review was.
14 Q. Okay. And I'm telling you
15 that the file says that this customer
16 that you have not yet filled a single
17 controlled substance order for, that this
18 customer previously had more than 20
19 felony convictions for drug trafficking
20 charges. And I'm asking you as the
21 director of regulatory affairs whether or
22 not that is a customer that Henry Schein
23 would have wanted in June -- in June of
24 2011?

Page 202

1  MR. McDONALD: Object to the
2 form.
3  THE WITNESS: Do you have
4 the file?
5 BY MR. MIGLIORI:
6  Q.  Yeah.  You have the file.
7 That's the entire file.  You're looking
8 at it right now.  The MedPro inquiry is
9 the only entry related to the
10 disciplinary action that I'm asking you
11 about.
12  A.  You said that the file says
13 that the doctor was convicted for more
14 than 20 felonies.
15  Q.  No.  The federal judge that
16 we're in front of in this case said that.
17  A.  Oh, I'm sorry.  I
18 misunderstood.
19  So what was your question
20 again?
21  Q.  At Henry Schein, would you
22 want as a customer somebody that in your
23 due diligence you found out had been
24 previously convicted of more than 20

Page 203

1 felony counts of drug trafficking
2 charges?  Is that a customer Henry Schein
3 would want for its controlled substances
4 business?
5  MR. McDONALD: Object to the
6 form.
7  THE WITNESS: The proposed
8 action of approving or
9 disapproving an account is based
10 on the review of the totality of
11 circumstances, not on one or two
12 factors.
13  Also including issues as of,
14 okay, if the doctor had issues
15 with his license or was convicted
16 of anything, so did he get his
17 license back, why did he get his
18 license back.  Was it any review
19 of the medical board, how did the
20 DEA give the license back to the
21 customer.
22  So we are not there to make
23 a judgment on the doctor or
24 practicing medicine.  We're there

Page 204

1 just to look at a set of issues
2 and -- and facts and make a
3 determination on what we see.
4  If -- if there is any issues
5 with the character of the doctor,
6 I think the DEA and board of
7 pharmacy are -- are the most --
8 the bodies in the best position to
9 make a judgment on that.
10 BY MR. MIGLIORI:
11  Q.  So it's -- you just -- I
12 believe you just told me that it's not
13 your position to pass judgment on the
14 customer?
15  MR. McDONALD: Object to the
16 form.  Mischaracterizes testimony.
17 BY MR. MIGLIORI:
18  Q.  Isn't that the purpose of
19 "know your customer"?
20  A.  Our mission is to put all
21 the information that we can together to
22 make a recommendation as far as the
23 company servicing that account or not.
24  Q.  All that information you

Page 205

1 just referenced, what were the
2 circumstances around the convictions,
3 what did the board of pharmacy decide,
4 what did they -- that's all part of "know
5 your customer," correct?
6  A.  Today it is.
7  Q.  And all of that information
8 would be in your due diligence file,
9 before you took a person with a noted
10 disciplinary action history, you would
11 want all of that information, put it in
12 the file and make a judgment, correct?
13  MR. McDONALD: Object to the
14 form.
15  THE WITNESS: We will -- all
16 the information that we collect
17 will be in the due diligence file
18 today.
19 BY MR. MIGLIORI:
20  Q.  All right.  And so, that due
21 diligence file would have to have an
22 explanation that would be sufficient
23 enough for Henry Schein to say that a
24 person with more than 20 felony

Page 206

1 convictions for drug trafficking, that
2 explanation would have to be sufficient
3 and documented in the file for you to
4 give that doctor an order of controlled
5 substances, correct?
6     A.   Yes.
7     Q.   And if it's not in the file,
8 isn't it true, it doesn't exist?
9          MR. McDONALD:  Object to the
10     form.
11 BY MR. MIGLIORI:
12     Q.   Isn't it true in the
13 regulatory world of regulatory affairs
14 and compliance, that that which is not
15 documented doesn't exist?
16          MR. McDONALD:  Object to the
17     form.
18          THE WITNESS:  That is to
19     say, that is not necessarily the
20     truth.
21 BY MR. MIGLIORI:
22     Q.   Have you seen anything in
23 any of your review of this case or what
24 was provided to you this week on

Page 207

1 Dr. Heim, where any follow-up or inquiry
2 about his felony convictions was
3 undertaken, did you see anything?
4     A.   Again, I didn't review the
5 file in completeness.
6     Q.   In fact, Henry Schein
7 doesn't do background checks, criminal
8 background checks, even today, on new
9 customers, correct?
10     A.   Are we supposed to?
11     Q.   My question to you is you
12 don't do it as of today, correct?
13     A.   Background checks on
14 customers, as a general rule, no.

Page 208

2     Q.   They are a consultant to
3 Henry Schein, correct?
4     A.   Yes, sir, they have been.
5     Q.   And this Exhibit 12 is one
6 of the Cegedim reports that Henry Schein
7 commissioned, correct?
8          I can tell you from the
9 metadata that the date of this document
10 is January 28, 2008.
11     A.   2008, okay.
12     Q.   So this -- you would have
13 been in regulatory affairs at this point,
14 correct?
15     A.   Correct.

Page 209

4     Q.   Take your time.
5     A.   -- where you -- where --
6 what the --
7     Q.   I'm reading fright from the
8 first sentence right now.
9     A.   Okay.

Page 210



Page 212

1    A.   Okay.  So -- so then, my
2 understanding of this is that they were
3 asking us to implement a document that we
4 asked the customer to provide with some
5 information that will allow us to make a
6 determination on the potential use of the
7 drugs.
8    Q.   The customer should be
9 provided with a document with information
10 pertaining to controlled substances.  Did
11 you provide a document to your customers
12 with information pertaining to controlled
13 substances?
14    A.   We have a welcome package
15 that we provide to the customers.  It
16 contains several pieces that refer to
17 controlled substances.
18    Q.   It might be advisable to
19 have a signed document from the client
20 acknowledging his or her receipt and
21 understanding of the information.  Do you
22 make them sign for it, that welcome
23 package?
24    A.   Yes.

Page 211



9    Q.   Like, this --
10    A.   And they are -- they are
11 asked about it.
12    Q.   This says you would give
13 them a basic legal issues document once
14 you brought them onboard.  Did you ever
15 start doing that?
16       MR. McDONALD:  Object to the
17    form.
18       THE WITNESS:  I'm not sure
19    what is your understanding of
20    basic legal issues.
21 BY MR. MIGLIORI:
22    Q.   Well, this is -- my -- my
23 understanding doesn't matter.  This is
24 between you and your consultant.

Page 213

1    Q.   A background investigation
2 should be conducted to determine whether
3 there are convictions or regulatory
4 actions in the client's past that may
5 affect their suitability for ordering
6 controlled substances.
7       Do you recall in 2008
8 Cegedim advising you that you should do
9 criminal background checks of your new
10 customers?
11    A.   I don't recall the
12 conversation in 2008.  I don't think that
13 this says that we need to do background
14 checks on customers.  We need to do
15 background investigations, which is what
16 we implemented.



23    Q.   They're criminal, right?
24    A.   Right.

Page 214

1   Q.   All right.  So you don't
2  know if this recommendation refers to
3  doing background investigation of
4  convictions?
5       A.   Background investigation is
6  not necessarily background checks.
7       Q.   All right.  Take the word
8  "checks" out.  Did you ever implement the
9  system at Henry Schein from January of
10 2008 to present where you, Henry Schein,
11 do background investigations to determine
12 whether there are convictions of your
13 customers' or clients' pasts that may
14 affect their suitability?
15      A.   We do an in-depth review of
16 any documents that are publicly
17 available.
18      Q.   Okay.  Well, you see that
19 one of the things is to provide the birth
20 date and social security numbers to
21 perform public record inquiries.
22          Do you see that?
23      A.   Yeah, we don't -- we don't
24 ask for social security numbers.

Page 215

1       Q.   So you didn't follow that
2  recommendation of Cegedim?
3       A.   That might be something that
4  we either disagree or we found that it
5  wasn't really a suitable recommendation.
6       Q.   So you don't get social
7  security background information?
8       A.   No.
9       Q.   And so you don't do
10 background checks either, correct?
11          MR. McDONALD:  Object to the
12      form.
13 BY MR. MIGLIORI:
14      Q.   Isn't that what you just
15 told me?
16      A.   Yeah.
17          MR. McDONALD:  Object to the
18      form.
19          THE WITNESS:  I -- that's
20      what I said.
21 BY MR. MIGLIORI:
22      Q.   All right.  And you'll agree
23 with me that Cegedim is recommending in
24 2008 that background investigations for

Page 216

1  criminal convictions be conducted of each
2  new client?
3       A.   I agree to that, and I also
4  said that we implemented that.
5       Q.   You did?
6       A.   Yes.
7       Q.   Show me where in Brian
8  Heim's entire file you see an indication
9  of criminal background checks?
10      A.   I don't know if I have the
11 entire file in front of me.
12      Q.   I can represent to you you
13 do, because this is all I have.  This is
14 what was provided to me.  This is my
15 chance to ask you about it.  So this is
16 all I have.  I'll give you as much time
17 as you want.
18      A.   Okay.
19      Q.   You can even count it
20 against my time.
21      A.   I'm sorry?
22      Q.   You can take as much time as
23 you'd like.
24          MR. McDONALD:  Well, for the

Page 217

1       record, that is not the entire
2       file.  There's the other screen
3       shot as well as the information
4       that we produced to you about the
5       DEA inquiry.
6           MR. MIGLIORI:  Those are
7       both in front of you.
8           One is -- all three of those
9       documents are in front of him.
10          MR. McDONALD:  No, they're
11      not.
12          MR. MIGLIORI:  What?
13          MR. McDONALD:  No, they're
14      not.
15          MR. MIGLIORI:  I just gave
16      him the DEA inquiry, the screen
17      shot.  They're Exhibits 11 and 12.
18          MR. McDONALD:  There's more
19      to the DEA inquiry than that one
20      e-mail that you cited.
21          MR. MIGLIORI:  Maybe that's
22      in tomorrow's production.
23          MR. McDONALD:  No, Don.  You
24      know, I'll tell you the Bates

Page 218

1  numbers if you want.
2      MR. MIGLIORI:  I would love
3  it.
4      MR. McDONALD:  Sure.
5      MR. MIGLIORI:  You can't be
6  shocked at my frustration with
7  getting a production in April on
8  this.  You can't be.  And I
9  haven't given you any gripe about
10  it.  But don't are exasperated.
11      MR. McDONALD:  I am not
12  exasperated.  I had a conversation
13  with your colleague --
14      MR. MIGLIORI:  It doesn't
15  matter.  It was produced in April.
16      MR. McDONALD:  And you know
17  why?
18      MR. MIGLIORI:  It was
19  requested in August.  It's been
20  four days.
21      MR. McDONALD:  648727 to
22  648728.
23      MR. MIGLIORI:  Is that a
24  criminal background check?

Page 219

1      MR. McDONALD:  I don't think
2  there's a criminal background
3  check in there.  But that's the
4  rest of the DEA file.  You guys
5  have it.
6  BY MR. MIGLIORI:
7      Q.   Do you see any reference in
8  the exhibit that you have or in anything
9  that you were shown yesterday about
10  Dr. Heim to a criminal background check,
11  including the documents produced to us
12  last week that you reviewed?
13      A.   I don't see any notes under
14  review of the information provided by
15  Dr. Heim.
16      Q.   So in 2008 when Cegedim
17  recommended background investigations to
18  determine whether there are convictions
19  that may affect the suitability for
20  ordering controlled substances, at least
21  in Dr. Heim's case, that was not done
22  based on the records we have in front of
23  us, correct?
24      A.   Based on what I have in

Page 220

1  front of me, I cannot say if it was done
2  or not.
3      Q.   There's no evidence of it in
4  any of the documents that you've seen
5  today or yesterday in preparation,
6  correct?
7      A.   There's no evidence that it
8  was done.  I would suggest that there is
9  no evidence that it wasn't done either.
10      Q.   Well, is that how the Henry
11  Schein due diligence system works?
12      A.   No, sir.
13      Q.   The absence of evidence is
14  sufficient to go ahead and fill orders of
15  controlled substances to doctors with
16  felony convictions?
17      A.   No, sir.  The Henry Schein
18  due diligence files are very complete and
19  inclusive of any write-up of the
20  recommendation of whoever review the
21  file.
22      Q.   But Henry Schein due
23  diligence records were not complete in
24  2011, were they, sir?

Page 221

1      A.   It has been a work in
2  progress.  There has been a process, that
3  as we learn, we have implemented best
4  practices.  There has been something that
5  we would have hoped that we'd get some
6  guidance from the DEA to see what needed
7  to be done and what needed to be
8  implemented.
9      Q.   Are you saying that it is
10  the DEA that failed to get due diligence
11  on 60 percent of the 40,000 customers
12  that you had in 2013?  Is that the DEA's
13  fault?
14      MR. McDONALD:  Object to the
15  form.
16      THE WITNESS:  I'm saying
17  that the DEA failed to provide
18  proper instructions to industry on
19  how to -- what the expectations
20  were and how to perform due
21  diligence.
22  BY MR. MIGLIORI:
23      Q.   You didn't, in 2013, have
24  compliance with your own due diligence

Page 222

¹ system, correct?
² A. Say that again.
³ MR. McDONALD: Object to
⁴ form.
⁵ BY MR. MIGLIORI:
⁶ Q. Tiffany Steffanie-Oak
⁷ reported to you in 2013, that 60 percent
⁸ of your customers had no due diligence,
⁹ and the other 40 percent had varying
¹⁰ degrees of due diligence in their files,
¹¹ based on Henry Schein's "know your
¹² customer" system, correct?
¹³ A. Again, I already told you
¹⁴ that it was a process. It was over
¹⁵ 20,000 customers that needed to be worked
¹⁶ on, and it took some time to get there.
¹⁷ Q. Maybe you can answer my
¹⁸ question. My question to you was, more
¹⁹ than 60 percent of your customers in 2013
²⁰ had no due diligence in their files based
²¹ on the due diligence system that Henry
²² Schein had in place, correct?
²³ A. I couldn't tell you what we
²⁴ had, what we had in file in 2013. I can

Page 223

¹ tell you that on or about 2015, we make
² sure that all the customers that were
³ ordering controlled substances would have
⁴ a due diligence file.
⁵ Q. Your due diligence was
⁶ finally complete by 2015?
⁷ A. Our due diligence process
⁸ was close to the fact that if a customer
⁹ ordered a controlled substance, they
¹⁰ will -- and they didn't have a due
¹¹ diligence file, they will be required to
¹² provide information so we can build a due
¹³ diligence file.



²¹ Q. Jeff Peacock is your boss,
²² correct?
²³ A. Yes, sir.
²⁴ Q. This is August of 2013,

Page 224

¹ correct?
² A. August of 2013, yes.
³ Q. Bullet point Number 1. All
⁴ right, let me start with the top.
⁵ "Jeff, here are the areas
⁶ that I think represent the highest
⁷ regulatory risk for the company at this
⁸ point, August of 2013."
⁹ Do you recall writing this?
¹⁰ A. I don't.
¹¹ Q. "One, DEA customer due
¹² diligence. I have to agree with Tina
¹³ that this is the area of most risk. A
¹⁴ couple of additional pieces to consider
¹⁵ on this issue."
¹⁶ Do you remember customer due
¹⁷ diligence being a highest degree of risk
¹⁸ with respect to DEA compliance?
¹⁹ A. I remembered something that
²⁰ we were always on our top priority to
²¹ complete.
²² Q. Right. And approximately
²³ number -- "Approximate number of new
²⁴ accounts opened in a daily basis is 150.

Page 225

¹ From to those, an appropriate 4 to
² 5 percent will place an order for
³ controlled substances. Using the
⁴ 4 percent that equates to 1,560 new
⁵ accounts ordering controlled substances
⁶ each year."
⁷ Do you recall performing
⁸ that analysis?
⁹ A. I don't recall, but I
¹⁰ certainly did.
¹¹ Q. "Tina based her analysis on
¹² 2012 numbers. I learned from a recent
¹³ conversation with Shaun Abreu,
¹⁴ verifications manager, that the number of
¹⁵ active accounts ordering controlled
¹⁶ substances products is now closer to
¹⁷ 40,000 and that we have completed due
¹⁸ diligence for about 13,000 accounts."
¹⁹ Do you recall that 27,000
²⁰ accounts, as of the writing of this
²¹ document in August of 2013, had no due
²² diligence in them?
²³ A. They didn't have a complete
²⁴ due diligence file, yeah.

Page 226

1   Q.   27,000 accounts for
2   customers that were expected to order
3   controlled substance had no due
4   diligence, correct?
5       A.   Correct.
6       Q.   And based on the estimates
7   then, you didn't expect to be caught up
8   in this process for another three years,
9   correct?
10      A.   That's what it says, yes.
11      Q.   Do you think you may have
12  gotten it done in 2015, instead of 2016,
13  correct?
14      A.   Yeah, the -- the completion
15  of due diligence file for all accounts
16  was done around that time.  However, we
17  put the process in place to ensure that
18  if an account doesn't have a due
19  diligence on file and places an order,
20  then we will be required to complete one.
21      Q.   But that --
22      A.   That was on or about 2015.
23      Q.   Let's explore that.
24          So there are -- through

Page 227

1   2013, there are 27,000 doctors and
2   prescriber -- and -- and facilities
3   ordering controlled substances from Henry
4   Schein without the due diligence required
5   from DEA to know your customer, correct?
6           MR. McDONALD:  Object to the
7       form.
8           THE WITNESS:  Without the
9       complete due diligence file.
10  BY MR. MIGLIORI:
11      Q.   No.  The 27,000 represents
12  those that had no due diligence.  The
13  13,000 represents due diligence of
14  varying degrees, correct?
15          MR. McDONALD:  Object to
16      form.
17  BY MR. MIGLIORI:
18      Q.   Do you remember that from
19  Tina?
20          MR. McDONALD:  Object to the
21      form.
22  BY MR. MIGLIORI:
23      Q.   Do you remember Tina telling
24  you that?

Page 228

1       A.   I -- listen, it's in
2   writing.  However, I cannot remember the
3   conversations around it.

9   BY MR. MIGLIORI:
10      Q.   Exhibit 14, this is Tina
11  Steffanie-Oak.  She reported to you,
12  correct?
13      A.   Yes, she did.
14      Q.   And this is dated November
15  of 2013.  So this is actually after your
16  e-mail here.
17      A.   Okay.
18      Q.   If you turn to the second
19  page of it.
20      A.   Okay.

Page 229

11      Q.   And what we know from other
12  distributor DEA civil actions and recent
13  DEA sponsored conferences, the fact that
14  a customer has a valid DEA registration
15  is not enough due diligence to know your
16  customer.
17          You appreciated that in
18  2013, correct?
19      A.   Correct.
20      Q.   You appreciated that in
21  2008, correct?
22      A.   Correct.
23      Q.   In fact, in 2008 you had
24  another Dendrite review of your systems.

Page 230



10    Q.   This is a Schein suspicious
11  order monitoring procedural review.
12          At this point you are in
13  regulatory affairs, correct?
14    A.   This was dated 2009, yes.
15    Q.   And if you go to conclusions
16  on Page 4 of the document, these are my
17  highlights on the screen.
18    A.   Okay.

Page 231

7    Q.   And Cegedim was telling you
8  that what you were doing was not
9  sufficient for DEA compliance, correct?
10    A.   Cegedim was giving their
11  recommendation for best practices.
12    Q.   And that included that what
13  you were doing was noncompliant with DEA
14  expectations on know your customer,
15  correct?
16          MR. McDONALD:  Object to the
17      form.
18          THE WITNESS:  So that will
19      be their opinion and their
20      interpretation.  We were --
21      absolutely took that very
22      seriously and immediately
23      implemented processes to make sure
24      that by risk -- risk review, we

Page 232

1    completed due diligence files for
2    all the accounts that we have.
3  BY MR. MIGLIORI:
4    Q.   This report and
5  recommendation is dated December 16,
6  2009.
7    A.   Okay.
8    Q.   You said you promptly
9  responded to this recommendation?
10    A.   Yes, we did.
11    Q.   In 2013, according to your
12  employee, 60 percent of those files had
13  nothing in them for due diligence,
14  correct?
15    A.   Correct.
16    Q.   Is that prompt response to
17  the new onboarding due diligence "know
18  your customer" process at Henry Schein?
19          MR. McDONALD:  Object to the
20      form.
21          THE WITNESS:  Yeah.  We set
22      processes to look at the accounts
23      based on risk level.  We
24      prioritize it that way.  We

Page 233

1    prioritize new accounts.
2          So if you are telling me you
3    are expecting me to say from this
4    day till tomorrow, we wouldn't be
5    expected to have due diligence
6    accounts for every customer, well,
7    that's a little unrealistic.
8  BY MR. MIGLIORI:
9    Q.   You were told in 2009 that
10  what you were doing to open a new account
11  for due diligence did not comply with DEA
12  regulations, correct?
13    A.   Correct.
14    Q.   In 2013, Tina told you that
15  60 percent of your files had no due
16  diligence, correct?
17    A.   Correct.
18    Q.   2013, you wrote to your
19  boss, Jeff Peacock, and you said 27,000
20  of our files have no due diligence,
21  correct?  Files that are expected
22  controlled substance ordering
23  practitioners, correct?
24          MR. McDONALD:  Object to

Page 234

1  form.  Mischaracterizes the
2  document.
3      MR. MIGLIORI:  It's on the
4  screen right here.
5  BY MR. MIGLIORI:
6  Q.   You write to Jeff Peacock,
7  in August of 2013, and you say that you
8  learned from these conversations that the
9  number of active accounts ordering
10  controlled substance products is now
11  closer to 40,000 and that we have
12  completed due diligence for about 13,000;
13  therefore, the gap is now 27,000
14  accounts.
15      A.   That's what is written, yes.
16      Q.   So this is now four years
17  after the Cegedim recommendation and
18  notification to Henry Schein that you
19  aren't doing proper due diligence for new
20  customers, correct?
21      MR. McDONALD:  Object to the
22  form.
23      THE WITNESS:  Like I said,
24  we were working on completing all

Page 235

1  these files for all these tens of
2  thousands of customers, and we
3  were doing it in a very organized
4  fashion to make sure that we limit
5  any risk, or minimize any risk,
6  and we in fact completed that
7  before -- you know, like, two
8  years after that.  So to me, if 47
9  thousand accounts were still left
10  as a gap at this point, we did
11  complete 27,000 accounts in about
12  two years.
13  BY MR. MIGLIORI:
14      Q.   So by 2015, all of your
15  files were finally compliant with DEA
16  regulations and due diligence, correct?
17      A.   By 2015, we have closed the
18  gap.  We have closed the gap in a way
19  that if we had any account that didn't
20  have any due diligence file, we wouldn't
21  ship any controlled substance to that
22  account until the due diligence file was
23  completed.
24      Q.   Where does it say that?  You

Page 236

1  show me in any document that you've seen
2  over the 26 hours of preparation that
3  these 27,000 client -- customers of yours
4  didn't get controlled substances?
5      MR. McDONALD:  Object to the
6  form.  Don't argue with him, okay?
7      MR. MIGLIORI:  I'm not.
8      MR. McDONALD:  Yeah, you
9  are.
10      MR. MIGLIORI:  No, I'm
11  asking him a question.  Where are
12  the --
13      MR. McDONALD:  Come on, Don.
14  Really.  Ask a question.
15  BY MR. MIGLIORI:
16      Q.   Where's a -- where's a
17  document that shows that these 27,000
18  customers were put on a pended or
19  suspended status?
20      MR. McDONALD:  Object to the
21  form.
22  BY MR. MIGLIORI:
23      Q.   Where is that?
24      MR. McDONALD:  Object to the

Page 237

1  form.
2      It's not his job to produce
3  documents to you.
4  BY MR. MIGLIORI:
5      Q.   Go ahead.  Have you seen a
6  document like that?
7      A.   Yes.
8      Q.   You're going to testify
9  under oath -- and you understand the
10  significance of being under oath, right?
11      A.   Right.
12      Q.   You're going to testify
13  under oath that these 27,000 customers of
14  Henry Schein were not given any
15  controlled substances until their files
16  were caught up?
17      A.   That's not what I'm saying.
18  That's totally not what I'm saying.
19      I'm saying that by 2015, we
20  have closed the gap.  And that's what I'm
21  saying I have seen documentation on that.
22      Q.   Is that --
23      A.   I have e-mail correspondence
24  or e-mail correspondence that exists on

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 that.
2     Q.    Okay.  As of 2015, the gap
3 was closed and those customers now had
4 what was sufficient due diligence in
5 their files based on DEA expectations or
6 compliance, correct?
7     A.    They did have due diligence
8 files based on DEA -- our interpretation
9 of DEA expectations, because DEA never
10 provided any instruction on what was the
11 due diligence file to have.
12     Q.    Cegedim did.  In 2009,
13 Cegedim, in this exhibit that I'm showing
14 you, Exhibit Number 15, told you what you
15 needed in every file, correct?
16         MR. McDONALD:  Object to the
17     form.
18 BY MR. MIGLIORI:
19     Q.    Not DEA, Cegedim, correct?
20         MR. McDONALD:  Object to the
21     form.
22         THE WITNESS:  We did
23     communicate --
24 BY MR. MIGLIORI:

Page 239

1     Q.    Just answer my question, and
2 I'll give you all the opportunity to
3 elaborate.
4         My question to you is, in
5 2009, Cegedim told you what you needed to
6 do to be compliant with DEA, and that was
7 more than just verifying DEA
8 registration, correct?
9         MR. McDONALD:  Objection.
10 BY MR. MIGLIORI:
11     Q.    That's what Exhibit 15
12 shows, correct?
13         MR. McDONALD:  Object to the
14     form.
15         THE WITNESS:  Where does it
16     say that?
17 BY MR. MIGLIORI:
18     Q.    I can read it to you again
19 if you'd like.
20     A.    Yeah.



Page 240

Page 241

18 BY MR. MIGLIORI:
19     Q.    This is 2009.  They're
20 telling you what DEA's expectations are
21 clearly and you paid -- Henry Schein paid
22 for this consultancy, correct?
23     A.    And we implemented that.
24     Q.    Henry Schein paid for this

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 information from Cegedim, correct?
2     A.   Yes.
3     Q.   And you implemented it and
4 you got around to finishing it in 2015,
5 correct?
6     A.   Correct.
7     Q.   But by August and November
8 of 2013, you were only 40 percent, not
9 even quite 40 percent of the way there,
10 correct?
11     A.   Correct.
12     Q.   Now I've made a mess.

22     Q.   And it's to you and to
23 Michael DiBello.  Michael DiBello
24 preceded Jeff Peacock, correct?

Page 243

1     A.   That is correct.
2     Q.   He was your boss at this
3 time?
4     A.   That's correct.

11     Q.   It's on the -- it's on the
12 e-mail.  March 5, 2011.
13     A.   March 5, 2011.  Okay.
14     Q.   Do you recall getting this?
15     A.   I don't.
16     Q.   Okay.  Do you recall
17 reviewing this in preparation for today?
18     A.   I don't remember reviewing
19 it in preparation for this meeting.
20     Q.   So I'm going to direct your
21 attention to the page.  There's no
22 numbers on this so I apologize, but...
23     A.   Okay.
24     Q.   New account setup, system

Page 244

1 enhancement in process.  It's about
2 halfway through.
3          This is the in-process
4 system with respect to customer
5 questionnaire for every customer ordering
6 controlled substances.
7          Do you see that?
8     A.   Yes.
9     Q.   So part of this new account
10 setup was to, in fact -- this is now two
11 years later -- implement what Cegedim has
12 been saying, that you should be getting
13 due diligence of every new customer for
14 the file, correct?
15          MR. McDONALD:  Object to the
16     form.
17          THE WITNESS:  Are you saying
18     that we are implementing it at
19     this point?
20 BY MR. MIGLIORI:

Page 245

Page 246

8    Q.   You agree with me that's
9 more than two years after Cegedim
10 recommended it in Exhibit Number 15,
11 correct?
12        MR. McDONALD:  Object to the
13   form.
14        THE WITNESS:  It is stating
15   what, I'm sorry?
16 BY MR. MIGLIORI:
17    Q.   This new account setup with
18 the -- getting out the new questionnaires
19 for due diligence, that was recommended
20 in 2009 by Cegedim.
21        In March of 2011, your
22 presentation shows that that's something
23 that was going to be implemented in 2011,
24 correct?

Page 247

1    A.   Sending each customer our
2 due diligence questionnaire.
3    Q.   Right.
4    A.   I'm making a difference
5 here.  Because I don't know if your
6 records show that we had a due diligence
7 questionnaire prior to that.
8    Q.   Yeah.
9    A.   Okay.
10   Q.   Do you see this, the new
11 to-be-implemented system?  Do you recall
12 implementing the new system of sending
13 customer due diligence questionnaires for
14 new customers beginning in 2011?
15        MR. McDONALD:  Object to the
16   form.
17        THE WITNESS:  Again, what it
18   says is sending each customer our
19   due diligence questionnaire.
20 BY MR. MIGLIORI:
21   Q.   Right.  To be implemented in
22 2011.
23   A.   Right.
24   Q.   That's what it says,

Page 248

1 correct?
2        MR. McDONALD:  Object to the
3   form.
4        THE WITNESS:  Which could --
5        MR. McDONALD:  Go ahead.
6        THE WITNESS:  Which is a
7   modification of this process.  But
8   that doesn't mean that
9   questionnaires didn't exist prior
10   to that.
11 BY MR. MIGLIORI:
12   Q.   Okay.  Two years after this
13 document, 60 percent of your files have
14 no due diligence, correct?
15        MR. McDONALD:  Object to the
16   form.
17        THE WITNESS:  What was the
18   date?
19 BY MR. MIGLIORI:
20   Q.   2011, March of 2011.
21   A.   I just said that that
22 presentation was 2013, so...
23   Q.   You already -- you had an
24 August 2013 e-mail saying that 27,000

Page 249

1 files didn't have due diligence, correct,
2 two years later?
3    A.   Correct.
4    Q.   Now, I'll try to --
5        MR. McDONALD:  Are you done
6   with this?
7        MR. MIGLIORI:  Yeah.
8 BY MR. MIGLIORI:
9    Q.   I asked you a question
10 earlier about something --
11        MR. McDONALD:  Hang on --
12   hold on a second.  I'm just trying
13   to put this exhibit back
14   together --
15        MR. MIGLIORI:  Sorry.
16        MR. McDONALD:  -- that was
17   paper-clipped before it gets lost.
18        Thanks.  Go ahead.
19 BY MR. MIGLIORI:
20    Q.   I asked you some questions
21 about transaction reports.  I'm going to
22 show you something now that is produced
23 in the same format, but I just want to
24 understand, see if you understand what

Page 250

1 this may be, so I can better understand
2 it.

20        Q.    Yeah.
21        A.    -- we already saw.  Okay.
22        Q.    Correct.  This one says
23 canceled orders on top.  But it has
24 otherwise the exact same title as the

Page 251

1 prior.
2        A.    Okay.
3        Q.    Do you see that?
4        A.    Yes, I see that.
5        Q.    So I assume, based on
6 looking at this, that this isn't
7 maintained at Henry Schein in this form,
8 correct?
9        A.    Correct.
10        Q.    Somebody said, I need you to
11 get me these 15, 20 fields of information
12 and import them into a spreadsheet.
13 That's how this would be generated,
14 correct?
15        A.    Yes, sir.
16        Q.    And do you know from which
17 database this would be generated?
18        A.    No, not exactly.
19        Q.    Okay.  The -- is there
20 something in the ordinary course of
21 business that you know as the canceled
22 orders report?
23        A.    The canceled order report?
24        Q.    That's not a term you're

Page 252

1 familiar with, is it?
2        A.    No.
3        Q.    Okay.  And so I just want to
4 again try to understand the columns.
5              There's an order number.  It
6 says type.  What is a CM versus an SO for
7 type?
8        A.    So it's -- it's a comment to
9 what we use.  It would mean credit memo.
10        Q.    Credit memo?
11        A.    Mm-hmm.
12        Q.    What does that mean, like a
13 chargeback?
14        A.    Like a credit to the
15 customer, if it was a return.
16        Q.    Oh I see.  Okay.
17              The line, what did we say
18 that was?
19        A.    I'm sorry?
20        Q.    What is line, the third
21 column?
22        A.    Oh, line, that's one that I
23 really can't tell you what --
24        Q.    Okay.

Page 253

1        A.    -- what it was.
2        Q.    Item, is that a base code?
3 What -- what's the item number?
4        A.    The -- the S-K-U.
5        Q.    S-K-U?
6              Description.  And the
7 shipping number and the billing number.
8        A.    Right.
9        Q.    So it seems like the
10 exact -- for the most part, the exact
11 same columns as the transactional report,
12 except it's got an additional column
13 called "Pend."
14              Do you see that, on the very
15 last column?
16        A.    Yes.
17        Q.    So is it fair to say that
18 somebody said run that report but add the
19 column of pend, is that what you would
20 interpret -- imagine this report being
21 generated --
22              MR. McDONALD:  Objection.
23 BY MR. MIGLIORI:
24        Q.    -- based on your knowledge

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  of the databases and the record
2  retention?
3        MR. McDONALD: Object to the
4     form. If you know, tell him, but
5     don't guess.
6  BY MR. MIGLIORI:
7     Q.  We can go back to the other
8  charts too. I mean, I think the columns
9  are all exactly the same, except some --
10  except there's an added column of "pend."
11        MR. McDONALD: There's --
12        MR. MIGLIORI: Hmm?
13        MR. McDONALD: P is on one
14     of them too.
15        MR. MIGLIORI: It is? I
16     appreciate that.
17  BY MR. MIGLIORI:
18     Q.  So going back to the prior
19  chart, I think this one is seven.
20     A.  Which one?
21     Q.  Seven. The post 2009.
22        MR. McDONALD: That's it.
23  BY MR. MIGLIORI:
24     Q.  Is that right?

Page 255

1        When we were talking about
2  Dr. Shein -- Dr. Heim, three of his
3  orders were pended but released.
4        Do you see that?
5        MR. McDONALD: Well, and let
6     me state for the record, as we've
7     told you, the company is not
8     verifying the reliability of this
9     information.
10        MR. MIGLIORI: Yeah. We
11     have other testimony from Shaun
12     Abreu that they found pended
13     orders.
14  BY MR. MIGLIORI:
15     Q.  And it may be unreliable to
16  your company, this information, but this
17  is the only information I have of your
18  company. So maybe you can help me
19  understand it.
20     A.  Okay.
21     Q.  Three of these orders,
22  according to Exhibit 7, based on the
23  information that your company provided to
24  me, were pended orders of Dr. Schein.

Page 256

1        MR. McDONALD: Dr. Heim.
2  BY MR. MIGLIORI:
3     Q.  Dr. Heim, but all of them
4  were actually filled. And Shaun Abreu
5  testified to that earlier in the
6  litigation.
7        So the P there, as I
8  understand it, is for pended, right? Is
9  that how you understand it?
10        MR. McDONALD: If you know,
11     tell him.
12        THE WITNESS: I don't know.
13     I will be assuming.
14  BY MR. MIGLIORI:
15     Q.  Okay. Well, the column is
16  called pend and the only letter in any of
17  the columns is P. So is it a reasonable
18  assumption that those were pended orders?
19     A.  Again, I will be assuming
20  that that's what it is.
21     Q.  Okay. Well, if we go back
22  to the exhibit that I just showed you,
23  Exhibit Number 17, these are so-called
24  canceled orders. And some of them have a

Page 257

1  P next to them, not many. But there are
2  some.
3        If you go to page that ends
4  in 726.
5        MR. McDONALD: They're all
6     726, Don?
7        MR. MIGLIORI: What?
8        MR. McDONALD: They're all
9     726.
10        MR. MIGLIORI: Oh, are they?
11        MR. McDONALD: It's an
12     electronic file.
13  BY MR. MIGLIORI:
14     Q.  All right. If you go to one
15  of the ones that's 726, towards the end,
16  about four pages towards the end.
17     A.  Number 20.
18     Q.  No, actually Page 19.
19  There's a different number.
20     A.  Okay.
21        MR. McDONALD: 19. Page
22     726.
23  BY MR. MIGLIORI:
24     Q.  Page 19. Do you see the P's

Page 258

1 there?

2     A.   Yes, sir.

3     Q.   So those would be pended

4 orders for those particular doctors. And

5 I think one is lorazepam. One is

6 testosterone.

7        Do you see that? Is --

8     A.   Testosterone. Lorazepam.

9 Yes.

10     Q.   Are these all controlled

11 substance?

12     A.   Yes, they're all controlled

13 substances.

14     Q.   They are not Schedule II

15 substances, right? Lorazepam and

16 testosterone?

17     A.   Lorazepam is Schedule IV.

18 Testosterone is a Schedule III.

19     Q.   Okay. Is there any way in

20 looking at this spreadsheet -- you would

21 agree with me, again, that this isn't

22 a -- these aren't due diligence

23 documents, that that's just a

24 mislabeling, correct?

Page 259

1     A.   This is just a report.

2     MR. McDONALD: Objection to

3    form.

4 BY MR. MIGLIORI:

5     Q.   Just a report.

6     And it's not a typical

7 business report that you would get

8 regularly in the course of business,

9 right, this is something called canceled

10 orders that isn't a part of your standard

11 operating procedures, correct?

12     A.   This report is not part of

13 our -- okay.

14     Q.   Is there anything in looking

15 at this report of canceled orders that

16 denotes to you that the order was

17 canceled at the customer's request versus

18 by some process of due diligence?

19     A.   Not on this report, not to

20 me. But again, there are a couple of

21 columns that I don't really know what the

22 information is about.

23     Q.   Okay. And that would be

24 like the line code and things like that?

Page 260

1     A.   Line and AT.

2     Q.   What was the other one? AT?

3     A.   AT. Yeah.

4     Q.   You have no idea what AT

5 stands for?

6     A.   No. I'm sorry.

7     Q.   AT did exist in the

8 transactional reports, Exhibit 7.

9     And UOM, did I ask you what

10 that stands for?

11     A.   Yeah. That one I understand

12 to be unit of measure.

13     Q.   Okay. Unit of measure. Oh,

14 that's right.

15     So with this list of

16 canceled orders, you have -- you have no

17 way of telling me, as you sit here today,

18 why any one of these orders may have been

19 canceled, correct?

20     A.   Not -- no, I couldn't tell

21 you.

22     Q.   And based on your review of

23 this, this isn't limited to opioids or

24 Schedule II drugs. This is all

Page 261

1 controlled substances of all schedules,

2 correct? Maybe not Schedule I. But this

3 isn't limited to Schedule II drugs,

4 correct?

5     A.   Schedule II to V.

6     Q.   Okay. Clear as mud.

7     MR. McDONALD: I'll let that

8 go. We've been going about an

9 hour and 20 when you get to a

10 point.

11     MR. MIGLIORI: I think this

12 could very reasonably be the end.

13 Let me -- this stack. So why

14 don't we take a break and I'll

15 make sure.

16     THE VIDEOGRAPHER: Going off

17 the record at 2:06 p.m.

18     (Short break.)

19     THE VIDEOGRAPHER: Back on

20 the record at 2:22 p.m.

21 BY MR. MIGLIORI:

Page 262

14    Q.   I notice in your curriculum
15 vitae and some other places, that you
16 were -- you yourself were fairly involved
17 with the HDMA as a representative of
18 Henry Schein; is that correct?
19    A.   Yes, sir.
20    Q.   Do you recall how often you
21 attended HDMA meetings or conferences?
22    A.   In person, maybe twice a
23 year.  Conference calls, maybe another
24 few times a year.

Page 263

1    Q.   Okay.  And does that go back
2 to 2006 or two thousand -- whenever you
3 moved over to regulatory?  When did you
4 first start getting involved with the
5 HDMA?
6    A.   I think it might have been
7 around that time.
8    Q.   Around 2006?
9    A.   Around 2006, yeah.
10    Q.   Did you serve on any
11 committees for the HDMA?
12    A.   As a participant, yes.
13    Q.   Which committees?
14    A.   Regulatory affairs
15 committee, which now my team actually
16 participates in now, and I guess very --
17 the more infrequent there is a policy --
18 a public policy committee that we
19 participate probably once every so often.
20 Not even every year.
21    Q.   Do you remember any
22 interactions with the HDMA where the DEA
23 was presenting or giving best practice
24 presentations?

Page 264

1    A.   Yes.
2    Q.   Do you recall who from the
3 DEA that you've seen present to HDMA?
4    A.   So the -- the most recent
5 one, his name is Keith Brown, I think
6 deputy administrator.
7    Q.   Okay.
8    A.   And he was actually very
9 friendly to the industry.  He just stated
10 that -- that they don't like the reports
11 that they receive everyday with -- that
12 our computer system sends everyday.  That
13 they much rather prefer for us to
14 complete our due diligence and then send
15 the report.
16        And he also stated that the
17 final rule that we have been waiting for
18 years may actually be something that is
19 material, is here.
20    Q.   Okay.  A friend of industry,
21 is that what you called him?
22    A.   He was --
23        MR. McDONALD:  Object to
24    form.

Page 265

1 BY MR. MIGLIORI:
2    Q.   Go ahead.
3    A.   He said that -- that they --
4 they understand that they have to do
5 better in customer service, whatever that
6 means.
7    Q.   Customer service as in the
8 distributors are the customer in that
9 context, right?
10    A.   The audience was
11 manufacturers and distributors.
12    Q.   Okay.  Do you recall any
13 presentations by a guy named Kyle Wright
14 from headquarters in the distributor
15 initiative?
16    A.   Not really.  I mean I have
17 spoken with many people in DEA.
18    Q.   Do you recall ever meeting
19 with the DEA on behalf of Henry Schein
20 for what was called a distributor
21 initiative?
22    A.   Yes.
23    Q.   Were you part of that
24 meeting?

Page 266

1    A.    Yes, sir.
2    Q.    Do you recall when it was?
3    A.    It was in 2009.
4    Q.    And who -- was -- was that
5  the, to your knowledge, the first meeting
6  with DEA for the DEA initiative program?
7    A.    To my knowledge, that was
8  the only meeting.
9    Q.    Okay.  Who else was there
10 from Schein?
11    A.    I believe it was Len David.
12 Mike DiBello, Craig Schiavo and myself.
13    Q.    And do you recall seeing a
14 presentation about internet pharmacies
15 and suspicious order monitoring?
16    A.    They did have material.  I
17 don't really recall what it was about.  I
18 do recall that they have prepared some
19 material based on our ARCOS reporting.
20    Q.    Okay.  That was my next
21 question.  So did they present to you
22 some of your own reporting data from
23 ARCOS that they thought was exemplary or
24 illustrative of certain ordering trends?

Page 267

1    A.    Yeah, I think the way they
2  characterize it, they wanted to review
3  some customer orders with us.
4    Q.    And do you recall what those
5  orders showed, or they -- they believed
6  they showed?
7    A.    I think it was information
8  out of our ARCOS report.  So it would
9  have identified the customer, their DEA
10 registration and transaction information.
11    Q.    And isn't it true that the
12 purpose of showing you those particular
13 examples was to show you where they
14 believed that there was irregular
15 ordering patterns for that particular
16 surgeon that they thought were
17 appropriate for follow-up?
18         MR. McDONALD:  Object to the
19    form.
20         THE WITNESS:  So, I
21    apologize.  I don't really
22    remember what did they say about
23    this orders.
24         I do remember that they were

Page 268

1  happy that we actually meet about
2  these customers and we have taken
3  care of any due diligence issues
4  that we had with those accounts.
5  BY MR. MIGLIORI:
6    Q.    Okay.  So as you recall, the
7  DEA wanted to show you some information
8  from your ARCOS data that raised issues
9  or questions for them.  And you were able
10 to report back to them that you had
11 actually addressed those issues already.
12         Is that what you generally
13 recall?
14    A.    Yes.
15    Q.    All right.  Do you recall
16 anything else from that distributor
17 initiative meeting?
18    A.    I recall that the -- the
19 main person traveled from Washington.
20 Then it was the -- a couple of ranking
21 officers from the local office.  I recall
22 that he said that that meeting was in
23 good faith, that they were talking
24 with -- with the industry players and

Page 269

1  they were trying to discuss issues on
2  distribution of controlled substances.
3  And I -- I think that the conversation
4  was cordial.
5         We did -- also we did have a
6  PowerPoint presentation that we shared
7  with them at that point as far as who
8  Henry Schein was and what our focus is.
9  You know, we service office-based
10 practitioners, we don't service
11 pharmacies.  We -- we tend to be -- we
12 are aimed to be a one-stop shop for
13 office-based practitioners.  We service
14 from the pen that they use in their
15 office to the x-ray machine.  And, you
16 know, each comments about the controlled
17 substances being a very teeny-tiny piece
18 of our operation.
19         Well, I mean, and also kind
20 of the relationship that we had with our
21 customers, the mission that we had with
22 our customers, things like that.
23    Q.    And so that interaction
24 was -- was broad-based about your role

Highly Confidential – Subject to Further Confidentiality Review

Page 270

1 though, as a distributor of controlled
2 substances, correct?
3     A.   Well --
4     Q.   That is, you were there,
5 although you said it was a teeny piece of
6 your business, you were there for the
7 controlled substances and the DEA
8 regulations governing controlled
9 substances, correct?
10     A.   Yes, that is correct.
11     Q.   All right.
12         Exhibit Number 18 in front
13 of you makes reference to the DEA coming
14 to the HDMA to talk about best practices
15 as it relates to distribution of
16 controlled substances.
17         Do you recall writing this
18 e-mail?
19         While you are reading it,
20 for the record I'll just say what it is.
21 It's an e-mail from you to Michael
22 DiBello on Wednesday, February 6, 2008,
23 regarding an HDMA meeting.
24         Do you either recall writing

Page 271

1 this e-mail or the meeting itself?
2     A.   I vaguely, very vaguely
3 recall the meeting.
4     Q.   Okay.  Do you remember where
5 this meeting was?
6     A.   All of our meetings in
7 person with HDMA, they -- I think this
8 time, I think that it was -- it was in
9 Washington DC.
10     Q.   Okay.  So you wrote to Mike,
11 and you showed him a response that you
12 wrote to Jim.  Who -- who is Jim?
13     A.   So Jim Owens was the most
14 responsible person for the verifications
15 team at that point.
16     Q.   Okay.  Was he replaced by
17 Shaun Abreu at some point?
18     A.   No.  Actually he has been
19 replaced by Bill Brandt.
20     Q.   Okay.  So -- so this would
21 be a position underneath Shaun Abreu's --
22 above Shaun Abreu's position?
23     A.   Yes.

Page 272

Page 273

7     Q.   These recommendations for
8 best practices to the DEA though, they
9 were actually being made by the HDMA in
10 this meeting for industrywide
11 understanding of best practices, correct?
12     A.   That was the goal, to come
13 up with industrywide best practices.
14     Q.   And one of the HDMA, that is
15 the distributor's trade association,
16 recommendations, was to do an on-site
17 visit for all new accounts industrywide
18 for the due diligence requirements,
19 correct, that was one of the HDMA's
20 proposals?
21     A.   That was in this e-mail?
22         MR. McDONALD:  Take a
23     look --
24 BY MR. MIGLIORI:

Page 274



Page 276

1 practice would be among other
2 manufacturers and distributors, other DEA
3 registrants.  And you are arguing to the
4 trade group that you're different than
5 most of those because of your type of
6 customer, correct?
7     A.   Yeah.  Part of the
8 discussion was understanding, again,
9 different business models, because the
10 focus seemed to be on pharmacists most
11 than anything else.
12     Q.   Do you believe that your
13 customers are low risk for diversion?
14     A.   I believe that most
15 practitioners, the vast majority of them,
16 are trying to do the right thing, they
17 are not somebody that is going to divert
18 drugs.
19     Q.   My question is, based on the
20 wording here, do you believe that you had
21 a different or a lower standard that you
22 had to comply with in terms of your
23 obligations to the DEA because your
24 customers were doctors, veterinarians,

Page 275



14     Q.   Well, this was a meeting,
15 though, facilitated by the HDMA with the
16 DEA, correct?
17        MR. McDONALD:  Object to the
18     form.  Mischaracterizes the
19     document.
20 BY MR. MIGLIORI:
21     Q.   If I'm wrong --
22     A.   I -- I don't think so.
23     Q.   Okay.  So internally you're
24 discussing what a good industrywide

Page 277

1 and dentists?
2     A.   I think the tough process
3 was that, because our customers were
4 practitioners, the volume of what they
5 order is much lower than what a pharmacy
6 will order.  And they will order all
7 different type of supplies as opposed to
8 just controlled substances.  And you
9 know, as opposed for the distributors,
10 that they ship maybe even pallet size of
11 shipments, our shipments are several, but
12 one or two pieces of -- of the product.
13     Q.   Between 2006 and 2014, Henry
14 Schein distributed more than 1.2 million
15 doses of opioids into the state of Ohio.
16 Do you believe that because your
17 customers were practitioners primarily,
18 that you had a lower or lesser obligation
19 to prevent diversion than other
20 distributors?
21        MR. McDONALD:  Object to the
22     form.
23        THE WITNESS:  No.  We never
24     said that we had a lesser

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1  obligation.
2      Our point was that our
3  business model was different and
4  that we couldn't treat our
5  customers as pharmacists.
6  BY MR. MIGLIORI:

Page 279

18 BY MR. MIGLIORI:
19     Q.   Okay.  At the end of that
20 year, as part of the HDMA, there was in
21 fact a guidance issued for the
22 distribution of controlled substances,
23 correct?
24     A.   I don't remember.

Page 280

1      (Document marked for
2  identification as Exhibit
3  Henry Schein-Tejeda-19.)
4  BY MR. MIGLIORI:
5      Q.   Let me show you Exhibit 19.
6  Exhibit 19 is the HDMA industry
7  compliance guidelines, reporting
8  suspicious orders and preventing
9  diversion of controlled substances.
10     Do you recall this guidance
11 being reported out that same year that
12 you had this meeting in the prior
13 exhibit?
14     A.   I'm sorry.  I couldn't tell
15 you the actual timing of this document.
16     Q.   I can tell you.  It's
17 November 13th of 2008.
18     A.   Okay.
19     Q.   Okay.  So you had a meeting
20 in February of 2008 that you reported to
21 Jim and to Michael DiBello.  And then
22 later that year, this guidance came out.
23     Do you recall participating
24 in either the preparation of or the

Page 281

1  ratification of this guidance, you
2  yourself?
3      A.   Yes.
4      Q.   Okay.  And was there a point
5  at which this was passed around and each
6  company had to acknowledge or approve the
7  guidance or vote?
8      A.   I don't remember formal
9  vote.  I think it was more a process of
10 several meetings, discussions, and then
11 coming up with a couple of drafts or
12 several drafts, and then coming up to the
13 final document.
14     Q.   Okay.  And did Henry Schein
15 sign on to this final document?  Did it
16 approve of this document?
17     A.   I think Henry Schein made a
18 commitment to do as much as we can to
19 comply with this document.
20     Q.   Okay.  So to the best of
21 your recollection, there was nothing that
22 Henry Schein objected to in this document
23 as you sit here today?
24     MR. McDONALD:  Object to the

Page 282

1  form.
2      Go ahead.
3  BY MR. MIGLIORI:
4      Q.  Go ahead.
5      A.  So again, the distribution
6  industry is very complex and there is no
7  one way to look at all the participants
8  the same way that one formula will fit
9  all.  So it might have been parts of the
10 document that we didn't find were
11 relevant or we couldn't implement.
12     Q.  Okay.  But in that sense,
13 it's a guidance.  It's not a --
14     A.  It's a guidance.
15     Q.  And so depending on your
16 company, you adapted to what would be
17 best and appropriate for your company,
18 correct?
19     A.  Yeah, I think that was.
20     Q.  So as far as Henry Schein
21 was concerned in 2008 when this was
22 issued, this was acceptable to Henry
23 Schein as a guidance with all of those
24 limitations that you've stated, correct?

Page 283

1      A.  I think so.
2      Q.  Yes?
3      A.  Yes.
4      Q.  One of the statements here
5  on the front page is, "At the center of
6  the sophisticated supply chain,
7  distributors are uniquely situated to
8  perform the due diligence in order to
9  help support the security of the
10 controlled substances they deliver to
11 their customers."
12         Did you agree with that
13 statement, that the distributors are
14 uniquely situated to perform due
15 diligence to support the security of
16 controlled substances?
17     A.  I don't remember discussing
18 that statement.
19     Q.  As you sit here today, does
20 that statement sound like a reasonable
21 statement that you would agree to?
22     A.  We are in a situation to
23 perform due diligence, yes.
24     Q.  Okay.  And because Henry

Page 284

1  Schein actually does not have a pharmacy
2  between it and the practitioner, would
3  you say that Henry Schein has a
4  particularly unique opportunity to
5  understand its customer because of the
6  direct relationship with the prescriber
7  that it has?
8      A.  We do have a close
9  relationship with our customers, yes.
10     Q.  And you have a particularly
11 unique positioning to perform the due
12 diligence because of your direct
13 relationship with those practitioners,
14 correct?
15         MR. McDONALD:  Object to the
16     form.
17         THE WITNESS:  Yes, and it
18     has to do with also understanding
19     the level of due diligence based
20     on the review of each account.
21 BY MR. MIGLIORI:
22     Q.  Correct.  And if you turn to
23 Page 4 of 15 in the guidance, there's a
24 whole section here on knowing your

Page 285

1  customer and due diligence.  And it goes
2  through the different types of data that
3  should be collected.
4          Do you recall being part of
5  the process of coming up with these
6  guidances on knowing your customer?
7      A.  I remember the conversation
8  in general, I mean.
9      Q.  It talks about doing the
10 background questionnaires and asking for
11 certain types of information for new
12 clients, right?
13     A.  Right.
14     Q.  And it -- it talks about, on
15 the next page, the types of prescribing
16 expectations and the -- particularly,
17 "Identification of physicians in other
18 treatment centers that are potential
19 customers' most frequent prescribers or
20 highest purchasing doctors."
21         Do you recall that being a
22 guidance that you all thought
23 appropriate?
24     A.  I'm sorry.  Could you point

Page 286

1 to me where --
2     Q.   Sure.  The very last bullet
3 point on Page 2.  "Identification of
4 physicians and other treatment centers
5 that are the potential customers' most
6 frequent prescribers or highest
7 purchasing doctors."
8        Did you think that was a
9 reasonable guidance in the onboarding of
10 new customers and the ongoing "know your
11 customer" obligations, to keep track of
12 the most frequent and highest purchasing
13 doctors are?
14     A.   Again --
15        MR. McDONALD:  Object to the
16 form.
17        Go ahead.
18        THE WITNESS:  This is one of
19 the things that probably didn't
20 fit in our world, because we -- we
21 don't sell to pharmacies.  So the
22 companies that were selling to
23 pharmacies, they were looking at
24 prescriber information.  We were

Page 287

1     really looking more at
2     administration during the course
3     of practice.
4 BY MR. MIGLIORI:
5     Q.   So as a company that sells
6 directly to the physicians and the
7 veterinarians and the dentists, you
8 didn't have as a component part of your
9 due diligence and know your customer a
10 sensitivity to who the highest purchasing
11 doctors were, or most frequent purchasing
12 doctors were?
13     A.   Purchasing doctors from
14 Henry Schein, we did, yes.
15     Q.   And that's what it says
16 here, highest purchasing doctors.
17        That's a reasonable thing to
18 have in the guidance, right, a
19 sensitivity in your "know your customer"
20 obligations to the highest purchasing
21 doctors?
22     A.   Yes, highest purchasing
23 doctors, absolutely.  Yes, we did.
24     Q.   So in a community like Ohio

Page 288

1 or Summit County, understanding who the
2 highest prescribers are would be a
3 reasonable thing to do in terms of
4 knowing your customer and satisfying your
5 due diligence obligations, correct?
6        MR. McDONALD:  Object to the
7 form.
8        THE WITNESS:  So our
9 suspicious order monitoring system
10 is based on two different sides.
11 So the way we look at our
12 customers is based on the market,
13 meaning medical, dental, or vet,
14 and then their specialty.
15        Then at some point it was
16 the practice type, then it changed
17 to the practice size.
18        So we don't specifically
19 look at Ohio customer or Alaska
20 customer.  We look at medical
21 doctors within this specialty
22 within this practice type within
23 this practice size, and we group
24 them.

Page 289

1        The other piece, another
2     part of the SOM is to look at the
3     account purchasing behavior
4     itself.
5 BY MR. MIGLIORI:
6     Q.   So in Henry Schein's
7 suspicious order monitoring system, it
8 never factored in the demographics of the
9 community where the pills were going?
10     A.   We did, and we have done
11 that more on a ad hoc basis that when we
12 are notified or we learn that there is
13 specific trend of something being used in
14 a specific part of the country, then,
15 yes, we do add to our system either a
16 combination of drugs or geographic
17 location that may be an issue with a
18 specific drug.
19     Q.   And in fact, after Dendrite
20 initially consulted with you, it was
21 pointed out that it was necessary for
22 Schein to develop a system to monitor
23 frequency and pattern in order to comply
24 with DEA expectations, correct?

Page 290

1    MR. McDONALD: Object to the
2 form.
3    THE WITNESS: So we enhanced
4 our computer system to include
5 those elements. Previous to that
6 enhancement we relied on our DSMs
7 that have close contact with the
8 customers and they get to learn --
9 to know them to, you know,
10 identify or try to identify any
11 potential issues with any orders.
12 BY MR. MIGLIORI:
13    Q. Did that transition happen
14 around 2009 with the implementation of
15 the enhanced SOM system?
16    A. The enhanced SOM system was
17 implemented in 2009. Our sales
18 personnel, our customer service
19 personnel, our telesales personnel, they
20 always -- they keep being, like, an
21 additional resource to identify any
22 potential issues.
23    Q. But when Henry Schein was
24 only monitoring for size of orders, and

Page 291

1 not yet frequency or pattern before 2009,
2 Henry Schein was relying on the sales
3 representatives to identify issues of
4 deviation in frequency and pattern. Is
5 that a fair statement?
6    MR. McDONALD: Hold on.
7 Object to the form. Go ahead.
8    THE WITNESS: Not only on
9 the sales personnel, on the
10 personnel that will have contact
11 with the customers.
12 BY MR. MIGLIORI:
13    Q. Who else would that be,
14 besides the sales rep?
15    A. Customer service.
16    Q. Okay.
17    A. So.
18    Q. Customer service is a phone
19 call, correct?
20    A. Well, customer service could
21 be one phone call. It could be a
22 dedicated customer service to an account.
23    Q. And they work in concert
24 with the sales representatives, correct?

Page 292

1    A. No. Not necessarily. They
2 are -- so telesales would be different
3 from field sales and will be different
4 from customer service and will be
5 different from customer support.
6    Q. Okay. And so prior to 2009,
7 the suspicious order monitoring system at
8 Henry Schein relied on the customer
9 service and sales force to identify and
10 bring attention to deviations in
11 frequency and pattern, and afterwards
12 when the suspicious order monitoring
13 system picked up frequency and pattern,
14 those sales force and customer service
15 representatives continued to service or
16 continued to monitor?
17    A. They always have.
18    Q. All right. So prior to
19 2009, deviations in frequency of
20 pattern -- strike that.
21    Prior to 2009, deviations
22 for frequency and pattern were primarily
23 detected through the sales force and
24 customer service representatives,

Page 293

1 correct?
2    A. Yes, sir.
3    Q. After 2009 and after Buzzeo
4 made recommendations to changing the
5 actual suspicious order monitoring
6 system, there was a computer or an
7 automated algorithm for picking up
8 variations in -- variations or deviations
9 in frequency and pattern, correct?
10    A. Yes.
11    MR. McDONALD: Object to the
12 form.
13 BY MR. MIGLIORI:
14    Q. The document in front of
15 you, the HDMA document, Number 19, the --
16 references that it's a best practice,
17 good guidance for distributors to
18 identify physicians in other treatment
19 centers of highest purchasing doctors.
20 As of 2008, was that something that you
21 agreed was a good best practice?
22    A. You're pointing to the last
23 paragraph, right?
24    Q. This one here, yeah.

Page 294

1    A.   Okay.  (Reading to himself
2 quietly.)
3        Yeah, as far as the data
4 from our customers, yes.
5    Q.   Other people have talked
6 about this document, so I won't go
7 through all of it.  I just want to ask
8 you about Page 11, a section called
9 "Documentation."
10       I want to ask you if you
11 agree whether or not this was also in
12 2008 best practices for distributors.
13 Under documentation, it says, "All
14 investigations should be fully
15 documented, and all records of
16 investigation should be retained in an
17 appropriate location within the firm,
18 such as with other records relating to
19 the particular customer."
20       As of 2008, did you
21 appreciate that as a best practice for
22 distributors of controlled substances?
23    A.   Let me ask a clarification
24 question right here.

Page 295

1        So the way I am reading this
2 is all investigations conducted by the
3 company should be fully documented.  If
4 that's the question, yes.
5    Q.   Okay.  It says -- again, the
6 HDMA guidance says, "At a minimum,
7 documentation should include the names,
8 titles and other relevant identification
9 of the representative of the customer
10 contacted.  For example, the pharmacist
11 in charge, the dates of contact and a
12 full description of the questions asked
13 and the requests for information made by
14 the distributor and of information
15 provided to the customer."
16       Would you agree as of 2008
17 that part of the "know your customer" due
18 diligence investigation, best practice
19 would be to document those types of
20 details about the investigation at a
21 minimum?
22       MR. McDONALD:  Object to the
23    form.
24       THE WITNESS:  So if we did

Page 296

1 an outbound call or conducted a
2 due diligence site visit to an
3 account, yes, absolutely.
4        When the customer provided
5 information from us, the customer
6 will provide us that information.
7 BY MR. MIGLIORI:
8    Q.   Okay.  So if an order is
9 pended and it required interaction with
10 the customer, you would agree that
11 these -- this type of information, who
12 you spoke with, and when, and what issues
13 were discussed, those are all issues that
14 would be appropriate to document in the
15 file?
16    A.   Yes.
17    Q.   And preferably in a place
18 where the other records relating to that
19 customer would be, correct?
20    A.   Correct.
21    Q.   "The document should include
22 a clear statement of the final conclusion
23 of the investigation, including why the
24 order investigated was or was not

Page 297

1 determined to be suspicious."
2        Did Henry Schein maintain a
3 decision tree of questionable orders that
4 were -- are ultimately deemed or not
5 deemed to be suspicious?
6        MR. McDONALD:  Object to the
7    form.
8        THE WITNESS:  So Henry
9    Schein have SOPs as guidance
10    documents.  We have obtained
11    information from the DEA from our
12    consultants.  And most recently
13    document some of those areas as
14    far as to be a reference to ensure
15    consistency.  And we do document
16    our review in a -- what we call a
17    due diligence report.
18 BY MR. MIGLIORI:
19    Q.   Okay.  And when did those
20 reports start?  When did you implement
21 that SOP?
22    A.   I want to say 2008.
23    Q.   2008?
24    A.   Mm-hmm.

Page 298

1    Q.   So every pended order that
2  had a decision, it was a standard
3  operating procedure as of 2008 for every
4  cleared or canceled pended order, that
5  there would be a statement in the due
6  diligence file about who was contacted,
7  what was discussed, and what the -- a
8  clear statement of the final conclusion
9  of the investigation, that should be in
10 every pended order investigation based on
11 the standard operating procedures of
12 Henry Schein from 2008 to present?
13   A.   That should be in the
14 account file if we conducted due
15 diligence on that account.
16   Q.   Failure for that to be in an
17 account would be a violation of the
18 standard operating procedures at Henry
19 Schein from 2008 to present, correct?
20        MR. McDONALD:  Object to the
21 form.
22        THE WITNESS:  If somebody
23 was conducting due diligence and
24 didn't document it correctly,

Page 299

1    yeah, it was either a mistake
2  or...
3  BY MR. MIGLIORI:
4    Q.   It violated the companies
5  standard operating procedures, correct?
6    A.   Right.
7    Q.   And it would be inconsistent
8  with the HDMA guidance of 2008 based on
9  this paragraph, correct?
10   A.   Correct.
11   Q.   And this also says that that
12 statement should be signed and dated by
13 the reviewer.
14        Does Henry Schein require in
15 its standard operating procedures as of
16 2008 a signed statement of its
17 investigation of suspicious orders by the
18 reviewer?
19        MR. McDONALD:  Object to the
20 form.
21        THE WITNESS:  I believe so.
22 BY MR. MIGLIORI:
23   Q.   Failure to sign a statement
24 about that would be a violation of Henry

Page 300

1  Schein's standard operating procedures
2  for -- for investigation of suspicious
3  orders as of 2008 to present, correct?
4        MR. McDONALD:  Object to the
5  form.
6        THE WITNESS:  I mean as far
7  as process, yes.
8  BY MR. MIGLIORI:

14 BY MR. MIGLIORI:
15   Q.   Did Ken Romeo work for you?
16   A.   Yes.
17   Q.   Do you recall Ken Romeo in
18 2013 writing to you about the Melville
19 audit by a company called PCG?
20   A.   I'm trying to remember who
21 PCG was.
22   Q.   You don't recall the -- the
23 Melville audit?
24   A.   Well, it's been so long,

Page 301

1  I -- a lot of things have happened, so...
2    Q.   Sure.
3    A.   I cannot tell you I can.
4    Q.   Do you remember Ken Romeo
5  referring to you as "Padrino"?
6    A.   Yes.
7    Q.   Is that a nickname he came
8  up with?
9    A.   Yes.  He was a character.
10   Q.   And he called Tina
11 Steffanie-Oak "Giovani Padrino"?
12   A.   That one I didn't -- I don't
13 think she -- he used that often.
14   Q.   He called himself Dr. Fredo
15 at the end of this.  Did you see that?
16   A.   Dr. Fredo?
17   Q.   Yeah.  He signs it, "Thanks,
18 Dr. Fredo."
19   A.   Oh yeah.
20   Q.   What was Ken -- Ken Romeo
21 had a medical degree, correct?
22   A.   Yes, sir.
23   Q.   In fact, he was the only
24 medical doctor within the regulatory or

Page 302

1 verifications department from the time he
2 was hired even to date, correct?
3     A.   Yes, sir.
4     Q.   And it was sometimes
5 observed that his knowledge of medicine
6 was useful and indicated to make some
7 judgment calls about whether to deem a
8 pended order suspicious, correct?
9     A.   Yeah, we thought it was a
10 good idea to get somebody with that
11 background to help us grow our system,
12 to -- to help us build up our process,
13 bring a different perspective to how we
14 look at the accounts and our reviews.
15     Q.   And the Cegedim consultants
16 actually said that one of the concerns
17 about verifications doing so many of the
18 clearing of shipments for pended orders,
19 was the lack of medical training, do you
20 recall that?
21     A.   Not exactly.
22     Q.   You don't remember any --
23 I'm hoping I don't have to pull this out.
24 You don't remember any audits in 2013 of

Page 303

1 Cegedim saying that the verifications
2 team does not have any medical training,
3 and it would be beneficial to give them
4 more medical training because of the
5 amount of work that they do on reviewing
6 pended orders?
7         MR. McDONALD:  Object to the
8     form.
9 BY MR. MIGLIORI:
10     Q.   You don't remember anything
11 like that?
12         MR. McDONALD:  Object to
13     form.
14         THE WITNESS:  So I do
15     remember that we always wanted
16     to -- for somebody to do -- to
17     look at our system, to look at our
18     processes as far as the -- do
19     audits on what we are doing to
20     make sure that we understood and
21     if there were -- if there were any
22     opportunities, we -- we work on
23     that.
24         As far as the specific one

Page 304

1 that you're referring, I'm sorry,
2     I don't remember.
3 BY MR. MIGLIORI:
4     Q.   I've got plenty of other
5 people that talk about it.  But did you
6 consider Ken Romeo to be a good employee?
7         MR. McDONALD:  Object to the
8     form.
9         THE WITNESS:  I did consider
10     Ken Romeo to have very good
11     background knowledge and to bring
12     a lot to the table.  He did have a
13     little bit of personality issues.
14 BY MR. MIGLIORI:
15     Q.   And Tina Steffanie-Oak
16 addressed those directly with you, in
17 some of her e-mails, correct?
18     A.   I believe so.  Yes.
19     Q.   But from a DEA compliance
20 standpoint, he was a good employee?
21     A.   From the process and how to
22 do reviews, he was a good employee.  Also
23 conducting training for departments like
24 verifications, for other members of

Page 305

1 regulatory, to give that added
2 perspective.
3     Q.   And he -- but he worked
4 under you, he worked in your department,
5 in regulatory affairs, correct?
6     A.   He reported to Tina, who
7 reported to me.



Page 306



Page 308

1 Q. Okay. So you can pick a
2 state and, by ingredient, active
3 ingredient, identify the top volume
4 purchasers?
5 A. Yes.
6 Q. And how long have you been
7 doing that process?
8 A. I believe we started that in
9 2017.
10 Q. Okay. Do you do that state
11 by state now?
12 A. We do that state by state.
13 Q. And who analyzes it? Who is
14 responsible for that analysis?
15 A. It is a collaboration
16 between verifications and regulatory.

Page 307

1 Q. Okay. And by top
2 purchasers, you mean volumewise, correct?
3 A. And volumewise, yes.
4 Q. And when you measured that,
5 did you do that by dosage units? Did you
6 do it by MME? Do you recall how you --
7 how you determined the top users, whether
8 it be top 50 or some other number?
9 A. So it was done based on
10 active ingredient volume.
11 Q. Okay. Is that still how you
12 do it today?
13 A. Yes. We do conduct -- our
14 current program, although we have
15 complete due diligence file for
16 everybody, we do conduct reviews of
17 specific segments, like we run Virginia
18 customers, for example. We identify the
19 top purchasers in Virginia for specific
20 products. It could be testosterone. It
21 could be hydrocodone. It could be
22 something else. But that's -- yeah,
23 that's the type of product review that we
24 do at this point.

Page 309

10 Q. Did you have a recollection
11 of Buzzeo or Cegedim actually expressing
12 that one of its observations about Henry
13 Schein was that there was no clear
14 delineation between the responsibilities
15 of the verification department and the
16 regulatory affairs department, and that's
17 something that needed to be addressed
18 based on Cegedim's review?
19 A. Vaguely.
20 Q. Do you know if this was ever
21 addressed? Was the interface between
22 verifications and regulatory affairs
23 improved after 2013 in any meaningful way
24 or memorialized in any SOP that was

Highly Confidential - Subject to Further Confidentiality Review



Page 310

1 developed?
2     A.   There are SOPs that talk
3 about the responsibilities for
4 verifications and responsibilities for
5 regulatory.  And there have been some
6 communications as far as that.
7     Q.   Do you know when those
8 occurred?
9     A.   I think it has been an
10 ongoing process.  It has been more than
11 once.

Page 311

Page 312

9     Q.   Do you know if you made any
10 specific changes as a result of this
11 particular observation or letter or
12 e-mail from Ken Romeo?
13     A.   I cannot tell you specific
14 to this document, but I can tell you that
15 working with Ken, we did get to some
16 opportunities, and we worked on
17 improvements to our process.

Page 313

17     Q.   As a result of this proposed
18 format, was a new audit ever done to your
19 knowledge of Melville?  Did he ever issue
20 a report using his proposal?
21     A.   He did do -- I think he did
22 an audit in -- of Melville.  And then the
23 subsequent year Tina did an audit of the
24 program as well.  And as well, as you

Page 314

¹ know, we also hire outside consultants to
² do an audit for our program as well.
³     Q.   Do you recall though a
⁴ specific publication of -- of an audit
⁵ performed by Ken Romeo?
⁶     A.   The report?
⁷     Q.   Yeah.  For -- well, that he
⁸ was speaking of there, do you recall a --
⁹ a report that issued, that he -- did he
¹⁰ do an audit of his own based on the
¹¹ proposal he had made?
¹²     A.   So, yeah, for -- on any
¹³ internal audit that we do, we do issue a
¹⁴ report.
¹⁵     Q.   I'm asking whether you know
¹⁶ that there was one done there.
¹⁷     A.   Again, I'm trying to answer
¹⁸ your question, but I think if you ask
¹⁹ me --
²⁰     Q.   If you don't remember --
²¹     A.   -- the specifics, I -- I
²² don't remember.
²³     Q.   I only have this one sheet
²⁴ of paper.  I don't have copies of this.

Page 315

¹ Let me put it on the screen.  I'll mark
² it and we can get copies afterwards.
³ This is exhibit --
⁴         MR. McDONALD:  Do you want
⁵     to take two minutes and make a
⁶     copy?
⁷         MR. MIGLIORI:  It's -- I can
⁸     give it to him.  I don't even need
⁹     to look at it.  I'd rather finish
¹⁰     actually.  If that's all right.
¹¹     You both can look at it.



Page 316

¹     Q.   Are you familiar with that?
²     A.   I'm familiar with the
³ document.  This is our monthly report to
⁴ our management team.
⁵     Q.   Okay.  When did these
⁶ monthly reports begin, do you recall?
⁷     A.   In different formats, but I
⁸ think they had been there since -- since
⁹ I got supervisor position in regulatory.
¹⁰     Q.   Okay.  So they go back to
¹¹ 2003, '4, '5, '6?
¹²     A.   2002.
¹³     Q.   And you would have presented
¹⁴ this to Mr. Peacock or DiBello?
¹⁵     A.   I would have sent it --
¹⁶ again different formats.
¹⁷     Q.   Right.
¹⁸     A.   I would have sent it to Mike
¹⁹ or Jeff, and then they will, you know,
²⁰ summarize everybody's report and send it
²¹ up the chain.
²²     Q.   Okay.  Can I put that on the
²³ screen just to -- and we can read it
²⁴ together and --

Page 317

¹         MR. McDONALD:  You said you
²     didn't need it.
³         MR. MIGLIORI:  Well, it's
⁴     actually recording it, so...
⁵         It would be helpful for the
⁶     folks listening to see it.
⁷ BY MR. MIGLIORI:
⁸     Q.   It says, "The Masters Pharma
⁹ decision on June 30th, the United States
¹⁰ District Court" -- "Circuit Court of
¹¹ Appeals for the District of Columbia
¹² decided the Masters Pharmaceuticals
¹³ versus DEA case."
¹⁴         Do you recall that case?
¹⁵     A.   Yes, sir.
¹⁶     Q.   And this is a project that
¹⁷ you were, I guess, responsible for
¹⁸ reporting on?
¹⁹         "The case has direct bearing
²⁰ on wholesale" -- "wholesale distributors
²¹ and our obligation as DEA registrants to
²² prevent diversion."
²³         That's what you understood
²⁴ this case to be, correct, a case that

Page 318

1  dealt with -- that had a bearing on
2  wholesale distributors' obligations as
3  DEA registrants to prevent diversion?
4      A.   Yes, sir.
5      Q.   "As a result of the Masters
6  decision, distributors must review the
7  way we evaluate and process orders of
8  controlled substances to assure
9  compliance with the new interpretation of
10  articulate" -- "articulated in Masters."
11      That's what you were now
12  recommending to Henry Schein the company,
13  is that they had to look at how you had
14  been doing things with respect to the
15  shipping of pended orders, correct?
16      A.   That was --
17      MR. McDONALD:  Object to
18  form.  Go ahead.
19      THE WITNESS:  I'm sorry.
20      That was more the reporting
21      of suspicious orders.
22  BY MR. MIGLIORI:
23      Q.   Well, the reporting in
24  the -- okay.  And what's highlighted

Page 319

1  here, it says, "Based on the decision,
2  there is consensus that when a suspicious
3  order monitoring system designed to
4  evaluate orders based on frequency,
5  volume or pattern flags an order, that
6  order is suspicious and must be reported
7  to the DEA."
8      Is that the takeaway that --
9  that you were reporting to Henry Schein
10  of the -- of the import of the Masters
11  decision?
12      A.   Yeah, the Masters decision
13  actually clarified that.
14      Q.   Okay.  What it clarified was
15  that what you were calling pended orders
16  that whole time, Masters clarified to be,
17  in fact, suspicious orders, correct?
18      MR. McDONALD:  Object to the
19      form.
20  BY MR. MIGLIORI:
21      Q.   That was a clarification?
22      A.   Yeah, that was our read of
23  the -- of the opinion from the judge.
24      Q.   So if, in fact, your system

Page 320

1  flagged an order because of a deviation
2  based on frequency, volume, or pattern,
3  that the order, in all caps, is
4  suspicious and must be reported to the
5  DEA at that time, correct?
6      A.   Yes, that's what the -- the
7  judge interpretation was.
8      Q.   It's also what the
9  Controlled Substances Act says, doesn't
10  it?
11      MR. McDONALD:  Object to the
12      form.
13      THE WITNESS:  The Controlled
14      Substances Act?
15  BY MR. MIGLIORI:
16      Q.   Have you ever read the
17  Controlled Substances Act?
18      A.   Could you help me with what
19  section you are referring to?
20      Q.   I'm referring to the section
21  that says suspicious orders include.  Do
22  you recall that section?
23      A.   From the C.F.R.?
24      Q.   Yes.

Page 321

1      A.   I remember reading the
2  section.
3      Q.   Okay.  Well, I'll help you.
4  I'm not under oath so I get to mark one
5  more document.
6      A.   Okay.
7      MR. MIGLIORI:  Exhibit 22.
8      (Document marked for
9      identification as Exhibit
10      Henry Schein-Tejeda-22.)
11  BY MR. MIGLIORI:
12      Q.   This one I can give you a
13  copy of.
14      This is Exhibit 22.  You
15  understand that as the director of
16  regulatory affairs that this is the --
17  this is one of the governing provisions
18  of the Controlled Substances Act that
19  relates to controlled substances, right?
20      A.   Yes, sir.
21      Q.   It says, "The registrant
22  shall design and operate a system to
23  disclose to the registrant suspicious
24  orders of controlled substances.  The

Highly Confidential - Subject to Further Confidentiality Review

Page 322

¹ registrant shall inform the field
² division of the office of the
³ administration in his area of suspicious
⁴ orders when discovered bring the
⁵ registrant.
⁶        "Suspicious orders include
⁷ orders of unusual size, orders deviating
⁸ substantially from a normal pattern, and
⁹ orders of unusual frequency."
¹⁰        That's the definition in the
¹¹ C.F.R., correct?
¹²        A.   Yes, sir.



Page 323



²³        Q.   The DEA has already
²⁴ testified to that in this case.  So I

Page 324

¹ won't ask you what the DEA thinks or
² doesn't think.  Okay?
³        A.   Well, some letter from the
⁴ DEA --
⁵        Q.   There's a process --
⁶        MR. McDONALD:  Hang on.  Let
⁷    him talk.
⁸ BY MR. MIGLIORI:
⁹        Q.   There's a process for us to
¹⁰ talk to the DEA.  I'm talking to you.
¹¹ This is my last moment to speak with you
¹² before we go to trial, if we go to trial.
¹³ Okay?
¹⁴        A.   Okay.
¹⁵        Q.   My question to you is very
¹⁶ simple.  This decision said that a system
¹⁷ that's designed to evaluate orders based
¹⁸ on frequency, volume, or pattern that
¹⁹ flags an order for a deviation in those,
²⁰ is suspicious, right?
²¹        A.   And that was in your
²² interpretation.
²³        Q.   And when you compare it to
²⁴ the actual language of the statute of the

Page 325

¹ C.F.R. like the judge did in the Masters
² case, you'll agree that the definition of
³ the C.F.R., in the C.F.R., that you as
⁴ director of regulatory affairs are
⁵ responsible for at Henry Schein, you'll
⁶ agree with me at least that the C.F.R.
⁷ defines a suspicious order as an order of
⁸ unusual size, deviating substantially
⁹ from normal pattern and unusual
¹⁰ frequency.  That's what the C.F.R. says,
¹¹ right?
¹²        MR. McDONALD:  Object to the
¹³    form.
¹⁴        THE WITNESS:  It defines
¹⁵    what the suspicious order is;
¹⁶    however, it doesn't define when
¹⁷    you need to report it.
¹⁸ BY MR. MIGLIORI:
¹⁹        Q.   Okay.  It does say, "when
²⁰ discovered by the registrant" in the
²¹ C.F.R., correct?
²²        A.   And we were doing that.
²³        Q.   Okay.  So it does define
²⁴ when it has to be reported in the C.F.R.,

Page 326

1 and it does define what is a suspicious
2 order in the C.F.R. That's your
3 understanding as director of regulatory
4 affairs at Henry Schein, correct?
5          MR. McDONALD: Object to the
6     form.
7          THE WITNESS: And I'm also
8     telling you that based on
9     consultant opinions, based on
10     discussions with DEA, they told us
11     that what we were doing, the
12     practice that we were doing was
13     accepted according to the
14     interpretation at the time. There
15     were even conferences that we
16     attended that the DEA, maybe not
17     the person that you are talking
18     with, had said that there were two
19     accepted different methods to
20     report controlled substance.
21          And even in this last
22     conference, not to -- not a month
23     ago, the DEA actually came out and
24     said that they don't want to see

Page 327

1     all these letters spit out from
2     our computer systems, but they
3     want to learn when we actually
4     have deemed the order to be
5     suspicious.
6          MR. MIGLIORI: I'm going to
7     move to strike. Way beyond my
8     question.
9 BY MR. MIGLIORI:
10     Q.  My question is very simple,
11 and I promise when we're done with this,
12 we're done.
13     A.  Okay.
14     Q.  The C.F.R. has in it a clear
15 statement of when a suspicious order
16 needs to be reported, correct?
17          MR. McDONALD: Object to the
18     form.
19          THE WITNESS: When
20     discovered.
21 BY MR. MIGLIORI:
22     Q.  Correct. So when a
23 suspicious order is discovered, it's your
24 understanding as director of regulatory

Page 328

1 at -- at Henry Schein, that when
2 discovered, a suspicious order needs to
3 be reported to the field office of the
4 DEA. There's no confusion about that,
5 correct?
6          MR. McDONALD: Object to
7     form.
8          THE WITNESS: Correct, and
9     we were doing that.
10 BY MR. MIGLIORI:
11     Q.  Okay. The C.F.R. also says
12 that a suspicious order includes orders
13 of unusual size, deviating substantially
14 from a normal pattern, and orders of
15 unusual frequency. That's in the C.F.R.
16 going back to 1971, correct?
17     A.  I don't know the date,
18 but --
19     Q.  It's right here --
20     A.  -- it is in the C.F.R.
21     Q.  Okay. And that's always
22 been the governing provision in the
23 C.F.R. as long as you've been at Henry
24 Schein, correct?

Page 329

1     A.  Correct.
2     Q.  All right. And in the
3 Masters decision, the court concluded
4 that a system that's designed to flag
5 based on volume, frequency or pattern,
6 when it flags an order, that is when the
7 order is deemed suspicious, and
8 therefore, under the C.F.R., it must be
9 reported then, when discovered, to the
10 DEA, correct? That's holding of the case
11 as you understood it and reported to your
12 boss in 2017, correct?
13     A.  Which wasn't clear until
14 that time.
15     Q.  Okay. But it's clear now.
16 As you -- at the time that you wrote this
17 presentation, you understood that to be
18 what was required, correct?
19          MR. McDONALD: Object to the
20     form.
21          THE WITNESS: We understood
22     that that was the required coming
23     from the Masters decision, and we
24     were moving to implement it.

Page 330

1  BY MR. MIGLIORI:
2      Q.   All right.  And prior to the
3  Masters decision, that is not what Henry
4  Schein was doing, correct?  That is,
5  prior to the Masters decision, prior to
6  June 30th of 2017, Henry Schein was not
7  reporting any flagged order that had a
8  deviation of size, frequency, or pattern
9  in the Henry Schein suspicious order
10 monitoring program, they were not
11 reporting it to the DEA's field office,
12 correct?
13     MR. McDONALD:  Object to the
14     form.
15     THE WITNESS:  Prior to
16     Masters decision, we were
17     complying with the regulation --
18     with the regulation by notifying
19     the DEA, by reporting to the DEA,
20     orders that were deemed
21     suspicious, which were an accepted
22     practice.
23 BY MR. MIGLIORI:
24     Q.   Not my question.  My

Page 331

1  question to you is, prior to the Masters
2  decision in June of 2017, Henry Schein
3  did not deem an order that was a
4  deviation in frequency, volume, or
5  pattern a suspicious order and report it
6  to the DEA when discovered, correct?
7      MR. McDONALD:  Object to the
8      form.
9      THE WITNESS:  We didn't
10     report orders that were flagged by
11     our system until we deem it
12     suspicious.
13 BY MR. MIGLIORI:
14     Q.   So Henry Schein, prior to
15 the Masters decision would pend an order
16 that was a deviation of frequency,
17 volume, or pattern and not report it to
18 the DEA unless and until it later
19 determined it to be suspicious, correct?
20     A.   Which was what was compliant
21 with the regulation.
22     Q.   No.  My question to you, is
23 that correct?  Is that what you did?
24     A.   We would pend an order,

Page 332

1  review it.  If deemed suspicious, we
2  would report it immediately.
3      Q.   And the Masters
4  Pharmaceutical was doing the same thing,
5  and as a result of this decision, lost
6  its license to distribute controlled
7  substances, correct?
8      MR. McDONALD:  Object to the
9      form.
10     I don't think he can answer
11     that question.
12 BY MR. MIGLIORI:
13     Q.   Do you know?
14     MR. McDONALD:  If you know,
15     tell him.
16     MR. MIGLIORI:  He wrote this
17     page here.
18     THE WITNESS:  I don't know
19     what Masters was doing.
20 BY MR. MIGLIORI:
21     Q.   And you know that the
22 Rannazzisi letters that we talked about
23 earlier specifically said that you cannot
24 rely upon any statements of the DEA as a

Page 333

1  basis for compliance with the
2  requirements of the C.F.R., correct?
3      MR. McDONALD:  Object to the
4      form.
5  BY MR. MIGLIORI:
6      Q.   Were you aware of that?
7      MR. McDONALD:  Object to the
8      form.
9      THE WITNESS:  I think he
10     actually said any previous
11     statements.
12 BY MR. MIGLIORI:
13     Q.   What he says was he's going
14 to reiterate what the rules are, and that
15 he -- you're not able -- I'll show it to
16 you if you'd like.  But you're not --
17     MR. McDONALD:  The
18     document -- Don, the document
19     speaks for itself.  It says what
20     it says.
21     MR. MIGLIORI:  Well, I want
22     to know what his understanding of
23     the document is.
24 BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1     Q.   You understood back in 2007
2 that it was not appropriate at Henry
3 Schein to rely on a DEA statement that
4 you were in compliance or not in
5 compliance with the DEA's obligations
6 under the Controlled Substances Act,
7 correct, you understood that, didn't you?
8        MR. McDONALD: Object to the
9     form.
10     THE WITNESS: I don't know
11     how to answer that question. If
12     we weren't able to go to the DEA
13     to look for guidance and interpret
14     what -- and take what they told us
15     as guidance, then...
16 BY MR. MIGLIORI:
17     Q.   Do you recall the letters?
18     A.   I do recall --
19     Q.   Do you --
20     A.   -- a letter from 2006 and a
21 letter from 2007.
22     Q.   And do you recall the
23 statement in the letters about whether or
24 not the -- it's -- it's considered

Page 335

1 compliant for you to rely on a statement
2 made by a DEA person about whether your
3 system was appropriate?
4        MR. McDONALD: Object to the
5     form.
6     THE WITNESS: I don't recall
7     the specific language in the
8     letters.
9     (Document marked for
10     identification as Exhibit
11     Henry Schein-Tejeda-23.)
12 BY MR. MIGLIORI:
13     Q.   Here is the December 27,
14 2007 letter. You were in regulatory at
15 this date, correct?
16     A.   Yes, sir, I was.
17     Q.   This is Henry Schein's
18 version of this letter. And it's Exhibit
19 Number 23. Henry Schein.
20     This letter is being sent to
21 every entity in the United States
22 registered with the Drug Enforcement
23 Agency to manufacture or distribute
24 controlled substances. The purpose of

Page 336

1 this letter is to reiterate the
2 responsibilities of controlled substance
3 manufacturers and distributors to inform
4 DEA of suspicious orders in accordance
5 with 21 C.F.R. 1301.74(b). We just
6 looked at that.
7     It says, "In addition to,
8 and not in lieu of, the general
9 requirement under 21 U.S.C. 823, that
10 manufacturers should maintain effective
11 controls" -- and it goes through the
12 design and operations further.
13     Do you see that?
14     A.   Give me a minute to read it.
15 Okay.
16     Q.   The regulation clearly
17 indicates that it is the sole
18 responsibility of the registrant to
19 design and operate such a system.
20 Accordingly, DEA does not approve or
21 otherwise endorse any specific system for
22 reporting suspicious orders.
23     Do you recall that
24 statement?

Page 337

1     A.   Yes.
2     Q.   And is that -- was that
3 understood by Henry Schein in December of
4 2007?
5        MR. McDONALD: Object to the
6     form.
7     THE WITNESS: Yeah, that was
8     understood and it was also kind of
9     confusing why they needed to
10     clarify that.
11 BY MR. MIGLIORI:
12     Q.   Because -- well, we can ask
13 them why they believe they needed to do
14 it.
15     My question to you is
16 simply, you as a person at this point in
17 regulatory affairs, in a -- a supervising
18 person in regulatory affairs, you
19 understood, at Henry Schein, that the DEA
20 did not and could not approve or
21 otherwise endorse your system for
22 reporting suspicious orders. You
23 understood that, correct?
24     A.   Yeah, we had a couple of

Page 338

1 conversations with consultants and DEA
2 and we came to that conclusion. They
3 didn't want to provide guidance on what
4 can be acceptable.
5     Q.   And you appreciated that as
6 of December 2007?
7     A.   After we have those -- those
8 conversations, a little bit after 2000 --
9 December 2007.
10     Q.   And as was written directly
11 to you by Joseph Rannazzisi, the deputy
12 assistant administrator of the office of
13 diversion control at DEA, you received
14 this document in 2000 --
15     A.   I didn't personally. It was
16 sent to one of our distribution centers.
17     Q.   And you were aware of this?
18     A.   I received a copy
19 afterwards.
20     Q.   Sometime in this time?
21     A.   Sometime around that.
22     MR. MIGLIORI: Okay. All
23 right. That's all I have. Thank
24 you very much for your time.

Page 339

1     Actually, wait. This is
2 just housekeeping.
3     THE WITNESS: Okay.
4 BY MR. MIGLIORI:
5     Q.   I received a personnel file
6 of yours Monday? Sunday? Friday, a file
7 on Friday and it got uploaded so that I
8 could look at it Sunday night. So --
9     A.   Okay.
10     Q.   -- this is purely
11 housekeeping, because I'm not sure.
12     But I have an evaluation for
13 you for year-end 2001 through 2004. And
14 then I have an evaluation for you for
15 year-end 2009 through 2017. And I have
16 nothing during the years of the -- from
17 2005 through 2009.
18     Did you review any of your
19 own personnel files in preparation for
20 today, and did you see any files related
21 to those years?
22     A.   I did review some of my
23 performance appraisals. I cannot tell
24 you what years I reviewed or if -- what

Page 340

1 was missing.
2     Q.   Well, of interest to me were
3 the years where the Buzzeo suspicious
4 order monitoring program was being
5 implemented -- developed and implemented,
6 and those are the years that are not
7 here. And so, I'm not suggesting
8 anything nefarious, I was just curious if
9 I just missed it because I only got it
10 literally 24 hours ago.
11     Did you see performance
12 appraisal reports for those years?
13     A.   Absolutely, yes.
14     Q.   All right. So they exist
15 somewhere?
16     A.   Yes.
17     Q.   All right. Well, we'll --
18 we'll --
19     MR. McDONALD: Well, hang
20 on.
21     MR. MIGLIORI: -- we'll look
22 for them and see if I missed them.
23 I didn't see them.
24     MR. McDONALD: I -- I don't

Page 341

1 think he's saying that he saw them
2 in preparation for the deposition.
3 He's seen them at some point in
4 life.
5 BY MR. MIGLIORI:
6     Q.   Is that -- is that what
7 you're saying? Is it -- did your counsel
8 remind you that that's what you're
9 saying?
10     A.   Well, that's what I
11 understood your question was.
12     Q.   So in preparation for today,
13 in the 25 hours of preparation, did you
14 see any performance appraisal forms for
15 those years 2005 through 2009?
16     A.   And again, I'm sorry for the
17 misunderstanding --
18     Q.   No.
19     A.   -- but I thought I had
20 answered that question. I did see
21 performance evaluations. I couldn't tell
22 you if it was complete or what years were
23 missing.
24     Q.   You saw them in -- in recent

Page 342

1 weeks?

2     A.   Yeah. I saw the -- some of

3 the performance evaluations.

4     Q.   Okay.

5     MR. MIGLIORI: Well, we'll

6 continue to look. I -- I doubt

7 it's going to raise any issue that

8 I'll need to follow up on. But I

9 just wanted it to be clear or see

10 if you had an explanation to why

11 there would be a gap of five years

12 in your -- in your record.

13     THE WITNESS: No. No, I'm

14 sorry. Actually I am sure it was

15 a good review, because that's when

16 I was promoted.

17     MR. MIGLIORI: All of your

18 reviews are -- are very good. And

19 I was just curious.

20     That's all I have. I

21 appreciate your time.

22     THE WITNESS: All right,

23 sir. Thank you. I appreciate it.

24     THE VIDEOGRAPHER: This ends

Page 343

1 today's deposition. We're going

2 off the record at 3:48 p.m.

3     (Excused.)

4     (Deposition concluded at

5 approximately 3:51 p.m.)

Page 344

1

2           CERTIFICATE

3

4

5     I HEREBY CERTIFY that the

witness was duly sworn by me and that the

6 deposition is a true record of the

testimony given by the witness.

7

    It was requested before

8 completion of the deposition that the

witness, SERGIO TEJEDA, have the

9 opportunity to read and sign the

deposition transcript.

10

11

12 _____

    MICHELLE L. GRAY,

13 A Registered Professional

Reporter, Certified Shorthand

14 Reporter, Certified Realtime

Reporter and Notary Public

15 Dated: April 5, 2019

16

17

18     (The foregoing certification

19 of this transcript does not apply to any

20 reproduction of the same by any means,

21 unless under the direct control and/or

22 supervision of the certifying reporter.)

23

24

Page 345

1     INSTRUCTIONS TO WITNESS

2

3     Please read your deposition

4 over carefully and make any necessary

5 corrections. You should state the reason

6 in the appropriate space on the errata

7 sheet for any corrections that are made.

8     After doing so, please sign

9 the errata sheet and date it.

10     You are signing same subject

11 to the changes you have noted on the

12 errata sheet, which will be attached to

13 your deposition.

14     It is imperative that you

15 return the original errata sheet to the

16 deposing attorney within thirty (30) days

17 of receipt of the deposition transcript

18 by you. If you fail to do so, the

19 deposition transcript may be deemed to be

20 accurate and may be used in court.

21

22

23

24

Page 346

ERRATA

- - - - - -

PAGE LINE CHANGE

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

_____ _____

REASON: _____

Page 348

LAWYER'S NOTES

PAGE LINE

Page 347

ACKNOWLEDGMENT OF DEPONENT

I,_____, do
hereby certify that I have read the
foregoing pages, 1 - 348, and that the
same is a correct transcription of the
answers given by me to the questions
therein propounded, except for the
corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____

SERGIO TEJEDA                    DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____

Notary Public