Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

      **************************

 4

    IN RE:  NATIONAL          MDL No. 2804

 5  PRESCRIPTION OPIATE

    LITIGATION                Case No.

 6                            1:17-MD-2804

    **************************

 7

    THIS DOCUMENT RELATES TO    Hon. Dan A. Polster

 8  ALL CASES

 9  **************************

10

11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12              CONFIDENTIALITY REVIEW

13        VIDEOTAPED DEPOSITION OF DEAN A. VANELLI

14

15            Wednesday, January 16th, 2019

16                   8:03 a.m.

17

18        Held At:

19              Omni Hotel

20              One West Exchange Street

21              Providence, Rhode Island

22

23  REPORTED BY:

24  Maureen O'Connor Pollard, RMR, CLR, CSR
```

```
 1    APPEARANCES:
 2
      FOR THE PLAINTIFFS:
 3
          MICHAEL E. ELSNER, ESQ.
 4        KAITLYN EEKHOFF
              MOTLEY RICE LLC
 5            28 Bridgeside Boulevard
              Mt. Pleasant, South Carolina 29464
 6            843-216-9250
              melsner@motleyrice.com
 7
                  -and-
 8
          JAMES A. DeROCHE, ESQ., of Counsel
 9        PATTI CARDINAL
              WEISMAN, KENNEDY & BERRIS CO., LPA
10            101 W. Prospect Avenue
              Cleveland, Ohio 44115
11            800-747-9330
              lderoche@garson.com
12
13
      FOR CARDINAL HEALTH, INC.:
14
          CHRISTOPHER N. DAWSON, ESQ.
15            WHELAN, CORRENTE, FLANDERS, KINDER
              & SIKET LLP
16            100 Westminster Street, Suite 710
              Providence, Rhode Island 02903
17            401-270-4500
              cdawson@whelancorrente.com
18
19
      FOR AMERISOURCEBERGEN DRUG CORPORATION:
20
          CHRISTIAN SAUCEDO, ESQ. (Remotely)
21            REED SMITH LLP
              Three Logan Square
22            1717 Arch Street, Suite 3100
              Philadelphia, Pennsylvania 19103
23            215-851-8100
              csaucedo@reedsmith.com
24
```

```
 1    APPEARANCES (Continued):
 2

      FOR WALMART:
 3

          PAMELA YAACOUB, ESQ. (Remotely)
 4            JONES DAY
              77 West Wacker
 5            Chicago, Illinois 60601
              312-782-3939
 6            pyaacoub@jonesday.com
 7

 8    FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.
      and THE DEPONENT:
 9

          GRAEME W. BUSH, ESQ.
10            ZUCKERMAN SPAEDER LLP
              1800 M Street NW, Suite 1000
11            Washington, DC 20036-5807
              202-778-1800
12            gbush@zuckerman.com
13

14    FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
      SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
15    INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
16        DAVID KOUBA, ESQ. (Remotely)
              ARNOLD & PORTER KAYE SCHOLER, LLP
17            601 Massachusetts Avenue, NW
              Washington, DC 20001-3743
18            202-942-5000
              david.kouba@arnoldporter.com
19

20

      FOR JANSSEN and JOHNSON & JOHNSON:
21

          ANDREA PRZYBYSZ, ESQ. (Remotely)
22            TUCKER ELLIS LLP
              233 South Wacker Drive
23            Chicago, Illinois 60606
              312-624-6317
24            andrea.przybysz@tuckerellis.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2

     FOR WEST VIRGINIA BOARD OF PHARMACY:

 3

         HARRISON CYRUS, ESQ. (Remotely)

 4           BAILEY & WYANT PLLC

             500 Virginia Street East

 5           Charleston, West Virginia 25301

             304-345-4222

 6           hcyrus@baileywyant.com

 7

 8   VIDEOGRAPHER:  Robert Sweig

 9   TRIAL TECHNICIAN:  Gina Veldman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                         INDEX
 2   EXAMINATION                               PAGE
 3   DEAN A. VANELLI
 4    BY MR. DEROCHE                             9
 5
 6
 7          E X H I B I T S
 8   NO.          DESCRIPTION                   PAGE
 9   CVS-Vanelli-3    8/13/10 memo, Bates
                      CVS-MDLT1-000034183.........  202
10
     CVS-Vanelli-5    Document Bates
11                    CVS-MDLT1-000082312 and
                      2313........................  126
12
     CVS-Vanelli-9    CVS Logistics, DC
13                    Suspicious Order
                      Monitoring, June 6, 2014,
14                    Bates CVS-MDLT1-000039935
                      and 9936....................  183
15
     CVS-Vanelli-14   E-mail chain, Bates
16                    CVS-MDLT1-000083064 through
                      3066, and 3855 and 3856......   69
17
     CVS-Vanelli-16   Logistics Planning Update,
18                    Bates CVS-MDLT1-000002299
                      through 2301................  174
19
     CVS-Vanelli-17   E-mail chain with
20                    attachment, Bates
                      CVS-MDLT1-000003026 through
21                    3032........................  190
22   CVS-Vanelli-20   IRR report, Bates
                      CVS-MDLT1-000011359 and
23                    11393 through 1399..........  245
24   CVS-Vanelli-25   3/8/13 e-mail, Bates
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CVS-Vanelli-26    Draft SOM Algorithm Size
                  Tests, April 1, 2013, Bates
                  CVS-MDLT1-000030208 through
                  219......................... 104

CVS-Vanelli-28    Document titled SOM End
                  State Enhancement Solution,
                  Bates CVS-MDLT1-000058035
                  through 8037................. 131

CVS-Vanelli-29    Document titled CVS
                  Logistics, DC Suspicious
                  Order Monitoring, March 26,
                  2012, Bates
                  CVS-MDLT1-000058176 and
                  8177......................... 87

CVS-Vanelli-31    4/3/08 e-mail, Bates
                  CVS-MDLT1-000081210.......... 54

CVS-Vanelli-32    E-mail chain, Bates
                  CVS-MDLT1-000081281.......... 48

CVS-Vanelli-33    Document titled
                  Opportunities - Current SOM
                  Process, Bates
                  CVS-MDLT1-000083065 and
                  3066......................... 59

CVS-Vanelli-35    Document titled Why is the
                  Distribution Center
                  initiating the research of
                  the suspicious orders?,
                  Bates CVS-MDLT1-000083969
                  through 3971................. 119

CVS-Vanelli-36    Item Review Report -
                  Control Drugs, CR, 7/7/19,
                  Bates CVS-MDLT1-000088412
                  through 8433................. 241

CVS-Vanelli-39    8/21/13 letter, Bates
                  CVS-MDLT1-000104918 through
                  4921......................... 235

Highly Confidential - Subject to Further Confidentiality Review

CVS-Vanelli-40    Graph titled Hydrocodone
                  Shipments: CVS Pharmacy
                  #03322, 2007 Brookpark
                  Road, Cleveland, OH
                  (Cuyahoga County) January
                  2006 to December 2008........  212
CVS-Vanelli-41    Graph titled Hydrocodone
                  Shipments: CVS Pharmacy,
                  590 East Market St., Summit
                  County, OH, April 2006 to
                  December 2008...............  216
CVS-Vanelli-43    E-mail chain with
                  attachment, Bates
                  CVS-MDLT1-000113943 through
                  3949........................  207

CVS-Vanelli-44    Requirements Document,
                  Suspicious Order
                  Monitoring, Bates
                  CVS-MDLT1-000115821 through
                  5848........................   92

CVS-Vanelli-45    E-mail chain, Bates
                  CVS-MDLT1-000028615 through
                  8617........................  230

CVS-Vanelli-46    E-mail chain, Bates
                  CVS-MDLT1-000017250..........  238
CVS-Vanelli-47    E-mail chain, Bates
                  CVS-MDLT1-000017246..........  172

CVS-Vanelli-50    E-mail chain with
                  attachments, Bates
                  CVS-MDLT1-000003749 through
                  3777........................   39
CVS-Vanelli-51    1/14/14 e-mail with
                  attached DEA letter, Bates
                  CVD-MDLT1-000013534 through
                  536.........................   28

CVS-Vanelli-54    E-mail chain, Bates
                  CVS-MDLT1-000059258 through

 1

     CVS-Vanelli-55    1/18/13 e-mail, Bates
 2                     CVS-MDLT1-000103329.......... 136
 3   CVS-Vanelli-56    4/29/11 e-mail with
                       attachment, Bates
 4                     CVS-MDLT1-000029864 through
                       9866........................ 109
 5
     CVS-Vanelli-58    10/29/10 e-mail with
 6                     attached Logistics Core
                       Team Update, Bates
 7                     CVS-MDLT1-000103859 and
                       000103867.................... 162
 8
     CVS-Vanelli-59    E-mail chain, Bates
 9                     CVS-MDLT1-000108797 through
                       8800........................ 111
10
     CVS-Vanelli-64    E-mail chain with
11                     attachment, Bates
                       CVS-MDLT1-000104850 through
12                     4852........................ 164
13   CVS-Vanelli-69    E-mail chain, Bates
                       CVS-MDLT1-000018729 and
14                     8730........................ 199
15   CVS-Vanelli-77    10/15/12 e-mail, Bates
                       CVS-MDLT1-000109962.......... 220
16
     CVS-Vanelli-78    Work Instruction, Irregular
17                     Order Review Process, Bates
                       CVS-MDLT1-000109963 through
18                     9965........................ 221
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                P R O C E E D I N G S

 2

 3            THE VIDEOGRAPHER:  We are now on the

 4    record.  My name is Robert Sweig, and I'm a

 5    videographer for Golkow Litigation Services.

 6            Today's date is January 16, 2019, and

 7    the time is 8:03 a.m.

 8            This video deposition is being held in

 9    Providence, Rhode Island in the matter of In Re

10    National Prescription Opiate Litigation pending

11    before the United States District Court for the

12    Northern District of Ohio, Eastern Division.

13            Our deponent is Dean Vanelli.

14            Counsel appearances will be as noted

15    on the stenographic record.

16            Our court reporter is Maureen Pollard,

17    who will now swear in the witness.

18

19            DEAN A. VANELLI,

20    having been duly sworn, was examined and

21    testified as follows:

22                   EXAMINATION

23    BY MR. DEROCHE:

24        Q.   Good morning.  Will you please state
```

```
 1    your name for the record?

 2         A.   Dean Anthony Vanelli.

 3         Q.   Mr. Vanelli, my name is Jim DeRoche,

 4    and I have some questions for you today.  I'm

 5    hopefully going to ask some direct questions.  I

 6    expect you to give me direct answers.  Do you

 7    agree to do that?

 8         A.   Yes.

 9         Q.   Do you understand the oath you just

10    took?

11         A.   Yes.

12         Q.   You understand you're testifying as if

13    you were at trial, as if the jury is in the room

14    with us today, so we need you to be forthright,

15    give them the information they need to make a

16    decision in this case.  Do you agree to do that?

17         A.   Yes.

18         Q.   You have to give oral answers to all

19    questions so the court reporter can take down

20    your testimony.  Nods of the head won't work

21    even though we're on video, so I need you to

22    hopefully speak up so she can hear you, take

23    down your oral testimony.  Okay?

24         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

     1          Q.   Did you prepare for your deposition

     2     here today?

     3          A.   Yes.

     4          Q.   What did you do?

     5          A.   Spent some time with counsel.

     6          Q.   Okay.  When was that?

     7          A.   Probably sometime back in October, and

     8     early this week.

     9          Q.   Okay.  So did you spend yesterday with

    10     counsel?

    11          A.   I spent time with the counsel

    12     yesterday, yes.

    13          Q.   That was here in Providence?

    14          A.   It was in Cumberland, Rhode Island.

    15          Q.   Okay.  Is that where your office is?

    16          A.   Yes.

    17          Q.   Did you look at documents?

    18          A.   Yes.

    19          Q.   Okay.  Can you tell me generally what

    20     those documents were?

    21               MR. BUSH:  Objection.

    22               That's privileged.

    23     BY MR. DEROCHE:

    24          Q.   Okay.  Let's start with where you work

1    now.  Who is your employer?

2         A.   CVS Health.

3         Q.   Okay.  And how long has CVS Health

4    been your employer?

5         A.   Don't know that I understand their

6    corporate structure.  I've worked for the

7    company referred to today as CVS Health for

8    23 years.

9         Q.   23 years, okay.  So let's just --

10   we'll dispense with the problems with the names

11   and --

12        A.   Yes.

13        Q.   -- changing over time and everything

14   else.  Let's just call them CVS.

15        A.   CVS.

16        Q.   That makes them -- makes things easy

17   for all of us.

18             So you've worked for CVS for 23 years.

19   I'd like to go through where you started, what

20   your job -- what your responsibilities were up

21   through when you started through today.  Can you

22   do that for me?

23        A.   Certainly.

24        Q.   Okay.  So let's start with your first

Highly Confidential - Subject to Further Confidentiality Review

```
 1   position.
 2        A.   I'll correct myself as well.  It will
 3   be 23 years in March of this year.
 4        Q.   Okay.  Sure.
 5        A.   I was first hired as an internal
 6   auditor into the internal audit department, in
 7   that role for two years approximately.
 8        Q.   Where was your office?
 9        A.   It was in Woonsocket, Rhode Island on
10   CVS Drive.
11        Q.   Okay.  And what was your general job
12   duty as an internal --
13        A.   Operational and financial auditing.
14        Q.   Okay.  What department were you
15   assigned to?
16        A.   The internal audit department.
17        Q.   Okay.  And that was a department that
18   was part of the financial reporting department?
19        A.   It actually, in my time there,
20   reported into loss prevention at one point, and
21   then reported into the finance organization,
22   yes.
23        Q.   Okay.  And how long did you hold that
24   position?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Probably short of two and a half

2    years.

3       Q.    Okay.  I'm sorry, I didn't -- did you

4    say when you started work?  What year was that?

5       A.    I believe it was March of '96.

6       Q.    Okay.  Then what did you do?

7       A.    From that position I moved into a

8    position within the logistics department, within

9    the logistics planning organization as a

10   manager.

11      Q.    So your first position was as a

12   manager in logistics?

13      A.    Logistics planning, yes.

14      Q.    Logistics planning.  Is that different

15   than logistics department?

16      A.    Well, it was within -- a group within

17   the logistics organization.

18      Q.    Okay.  Tell me what you did in that

19   position.

20      A.    A host of different activities.  I

21   interacted mainly with finance.  I was hired to

22   do the annual budget, monthly financial closes,

23   financial explanations.  I also did work with

24   capital, capital planning, capital budget,

1    coordinating, you know, purchase of equipment,

2    computers, such.

3        Q.   Okay.  What does the logistics

4    department in general do?

5        A.   Logistics oversees the distribution

6    centers.

7        Q.   Okay.  So you were working with the

8    distribution centers starting roughly within two

9    and a half years of your employment with CVS?

10       A.   Correct.

11       Q.   Okay.  And at that time how many were

12   there?

13       A.   When I moved into the logistics

14   department I believe there were three.

15       Q.   Okay.  Were they all licensed to

16   distribute controlled substances --

17       A.   No, they were not.

18       Q.   You have to let me finish my

19   questions --

20       A.   Sorry.

21       Q.   -- so we don't talk over each other.

22   Maureen will go crazy if we do that all day.

23   Sometimes I pause so you have --

24       A.   That's why I thought you were.

1     Q.    I apologize.

2           So you had three distribution centers

3     at that time.  How many were licensed, if any?

4     A.    At that time I would not be able to

5     answer.  I did not know if they were licensed at

6     that time.  I know their license status today.

7     Q.    Okay.

8     A.    So today those facilities, two of them

9     were licensed --

10    Q.    Okay.

11    A.    -- currently are licensed.

12    Q.    At that time where were these three?

13    A.    Woonsocket, Rhode Island, which would

14    include the North Smithfield distribution which

15    is the licensed distribution center.  It's a two

16    building operation, but the license -- I refer

17    to it as a single distribution center, multiple

18    operating buildings.  One building that's

19    located in North Smithfield, Rhode Island --

20    Q.    I see.

21    A.    -- has the registrant.  The prior

22    building did have a registration, but that

23    registration was transferred as we moved

24    pharmacy to that other building.

Highly Confidential - Subject to Further Confidentiality Review

1          Then also the facility in Lumberton,

2    New Jersey was a licensed facility.

3          The third facility was in

4    Fredericksburg, Virginia, which was not a

5    licensed facility, did not carry

6    pharmaceuticals.

7      Q.   Okay.  How long did you hold your

8    first position, which was manager?

9      A.   Don't recall.  Multiple years.

10      Q.   Okay.  What was your next position

11   then?

12      A.   Senior manager, logistics planning.

13      Q.   Okay.  And after that?

14      A.   Director of logistics planning.

15      Q.   What year did you become director of

16   logistics planning?

17      A.   It was probably in and around 2011,

18   2012, somewhere in that time frame.

19      Q.   Okay.  And is that the top position in

20   logistics planning?

21      A.   At the time, yes, it was.

22      Q.   Okay.  How many direct reports did you

23   have to you?

24      A.   Do not recall.  I'd estimate three.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   How big a department is logistics

2    planning?

3      A.   Does that question pertain to today or

4    at that time?

5      Q.   Let's talk about at that time, say

6    2011.

7      A.   Probably about 10 to 12.

8      Q.   Okay.  And how did that change over

9    time?

10      A.   The responsibilities of the department

11   grew, and the head count grew accordingly.

12      Q.   So say in 2013, what had it grown to?

13      A.   Probably about 18.  Again, do not

14   recall exact numbers.

15      Q.   Okay.  Did you have budget

16   responsibility for logistics planning when you

17   became the director in 2011?

18      A.   Logistics planning in and of itself

19   did not have a budget other than payroll and

20   travel.  There was no real budget.  We didn't

21   open -- we didn't run facilities.

22      Q.   Sure.

23           In terms of the logistics planning,

24   was that part of another group?

```
 1          A.    It was part of logistics, logistics

 2    organization.   It was a group or team within

 3    that logistics organization.

 4          Q.    And why is it called logistics

 5    planning?   Explain what that role is.

 6          A.    As I mentioned previously, you know,

 7    budgeting, handling the budgeting,

 8    communication, where the group is basically a

 9    liaison between the departments in -- we refer

10    to it as the customer support center, but more

11    commonly referred to as corporate and the

12    distribution centers.

13          Q.    I see.

14                So you interface between the

15    distribution centers and the corporate office in

16    terms of arranging what the distribution centers

17    need with corporate?

18          A.    Yes.

19          Q.    Essentially?

20          A.    Yeah.

21          Q.    Okay.

22          A.    Yes, so product flow, like scheduling,

23    you know, providing information about new items

24    coming into the distribution centers, when those
```

Highly Confidential - Subject to Further Confidentiality Review

1    needed to be received, be available to be

2    shipped to stores, handling the flow of

3    promotional goods for the weekly ad, things

4    along those lines.

5        Q.   Okay.  And that included the flow of

6    controlled substances as well?

7        A.   At that time, no, it did not.

8        Q.   Okay.

9        A.   To state -- me and my team didn't have

10   much influence in the control -- or the flow of

11   controlled substances.  If there were situations

12   where the pharmacy merchandising group, like any

13   other group, needed or had something that was

14   occurring that could impact the distribution

15   centers, they would usually communicate that so

16   we could share that information with the

17   distribution centers to help make sure there's

18   an efficient process, goals and timelines were

19   met.

20       Q.   Even in 2011 there were --

21   distribution centers were shipping controlled

22   substances to the pharmacies, correct?

23       A.   Yes.

24       Q.   And so that was part of what the

1   distribution centers that you interfaced were

2   doing, right?

3        A.   I can't -- I do not recall if we were

4   engaged in the communication or information flow

5   or flow of controlled substances at that point.

6        Q.   Well, as early as 2008, you would

7   agree you were involved at some level in the

8   operations of the distribution centers including

9   standard operating procedures, correct?

10       A.   No.  I was responsible for sharing

11  information to allow the DCs to perform their

12  jobs.  I was not providing the DCs instruction

13  per se more than I was communicating

14  information.

15       Q.   So you communicated to the

16  distribution centers concerning controlled

17  substances and the standard operating procedures

18  associated with controlled substances starting

19  in 2008 at least, correct?

20       A.   No.  I do not recall if my

21  responsibilities as early as 2008 involved any

22  information regarding controlled substances.  I

23  will tell you my responsibility, or the areas in

24  my work evolved to that perspective, but I can't

Highly Confidential - Subject to Further Confidentiality Review

1  tell you the exact timeline and I can't commit

2  to you and say that 2008 was the beginning of me

3  having involvement.  I do not recall.

4      Q.   Okay.  Fair enough.  Hopefully we'll

5  have the documents that will help you refresh

6  your recollection in a few minutes here.

7           You do agree, though, at some point

8  you took ownership of the suspicious order

9  monitoring process, correct?

10     A.   Yes.  I oversee the operation of the

11 suspicious order monitoring program beginning --

12 I'm sorry?

13     Q.   Go ahead.  I don't want to cut you

14 off.

15     A.   Thank you.

16          -- beginning in 2014.

17     Q.   2014 is when you said you became

18 involved in suspicious order monitoring process?

19     A.   No, I did not.

20          MR. BUSH:  That's not -- misstates the

21 record.

22          MR. DEROCHE:  Again, I'm asking.  It's

23 his testimony, Graeme.  You want to object,

24 object to the form.

1          MR. BUSH:  I did.

2          MR. DEROCHE:  Go ahead.

3          MR. BUSH:  That's what I did, and I

4   will continue to do that if necessary.

5          MR. DEROCHE:  Great.

6   BY MR. DEROCHE:

7      Q.   Now, when did you first become

8   involved in the suspicious order monitoring

9   program at CVS?

10     A.   My first recollection of involvement

11  in suspicious order monitoring was in the fourth

12  quarter of 2012.

13     Q.   And what was that involvement?

14     A.   That involvement was a discussion with

15  my immediate supervisor and his supervisor that

16  they wanted me to get involved in a project to

17  create or to develop and design a suspicious

18  order monitoring program to replace the program

19  that we were using at that time.

20     Q.   And in the meantime weren't you

21  involved in, at some level, in what that

22  existing program entailed?

23     A.   Beginning at that point in 2012, in

24  Q4, I became -- I got in -- I actually spent

1    some time to understand high-level operation of

2    that system in order to understand what was

3    happening today as a baseline of how we would

4    develop the new system.

5         Q.   Okay.  Makes sense.

6              Did you also get involved in ensuring

7    that that existing system remained operational

8    until your new system was up and running?

9         A.   I was not responsible for the

10   operation of that system.  But in my role, as I

11   described earlier, assisting the distribution

12   network, I did partner with the individual

13   responsible for the operation of that system.

14        Q.   And that entailed dealing with issues

15   such as staffing, correct?

16        A.   Correct.

17        Q.   There were issues you recall at that

18   time in terms of the staff for seeing their jobs

19   going away and perhaps there being a problem

20   with staffing that you had to address?

21        A.   There was transition in that team that

22   I assisted the director in trying to determine

23   ways to build staffing, build bench strength for

24   that team.  And then subsequently as we got

 1   closer to the role of the new system, I did

 2   assist, because obviously the individuals who

 3   were performing the system, I had discussions

 4   with them, weren't -- I'll use the term willing,

 5   but weren't -- were not interested in moving to

 6   Rhode Island to perform the task in the new

 7   system there, so we had worked on contingency

 8   plans in case if there were staffing shortfalls

 9   of how we'd maintain that system, again,

10   assisting the director in how we could maintain

11   that system until the new system was running.

12        Q.   When you said the director, who are

13   you referring to?

14        A.   I'm referring to Mark Nicastro.

15        Q.   And he was the director of the

16   Indianapolis DC?

17        A.   Correct.

18        Q.   When I say DC, I assume you know what

19   I mean?

20        A.   Yes, I do.

21        Q.   That's a common term for distribution

22   center.

23             And he was the one who was overseeing

24   the operation at that point of the SOM system

1    for the entire chain?

2         A.    In 2012, yes.

3         Q.    Okay.

4         A.    2012 through the sunset of that

5    system, yes.

6         Q.    Okay.  Did you go to Indianapolis to

7    check out the system, watch it in operation?

8         A.    Yes, I took a trip to Indianapolis.

9         Q.    Okay.  So you wanted to get a firm

10   understanding of the existing system, I take it,

11   so that you could better perform the duty of

12   coming up with the new system?

13        A.    Yeah, I wanted to get a general

14   understanding of the process that the team

15   followed to see where there are opportunities

16   for improvement.

17        Q.    Okay.  And I take it that you also had

18   to have some understanding of why there was an

19   SOM system and what the regulations and laws

20   were that you were attempting to comply with in

21   designing your new system, correct?

22        A.    I was aware that there were

23   regulations that required a suspicious order

24   monitoring system to be in place.

1     Q.   And you -- did you understand why?

2   What were you trying to accomplish with it?

3     A.   Trying to accomplish that we were in

4   compliance with the regulations.

5     Q.   Okay.  What do the regulations

6   require?

7     A.   In essence to ensure that we -- to

8   review all controlled substance orders, to --

9     Q.   Go ahead.

10    A.   No?  You threw me off there a little

11  bit with your body language, I apologize.

12         To review orders of unusual size,

13  frequency, or ordering pattern.

14    Q.   Okay.  Did you review the regulations

15  in connection with your duties in terms of

16  coming up with a new SOM system?

17    A.   I've read a couple portions.  The

18  interpretation of the requirements or the

19  responsibility of legal, legal transition that

20  are -- translated those requirements for me to

21  put into business action.

22    Q.   I'm going to hand you what we've

23  marked as Exhibit 51.

24

```
 1              (Whereupon, CVS-Vanelli-51 was marked

 2              for identification.)

 3   BY MR. DEROCHE:

 4        Q.   Take a moment.

 5              MR. DEROCHE:  It's not the same?

 6              MR. BUSH:  I'm sorry, I'm just looking

 7   because the number I have is Vernazza 4.  I'm

 8   trying to figure out --

 9              MR. DEROCHE:  I see what you're

10   saying.  That's from a prior deposition.

11              MR. BUSH:  Yeah, that's fine.  Okay.

12              MR. DEROCHE:  You should sticker over

13   those.

14              MS. CARDINAL:  I did.

15              MR. BUSH:  It's on the original.

16   Yeah, mine didn't have it.  I think I was just

17   trying to figure out --

18              MR. DEROCHE:  That's the confusion.

19   This is 51 for Vanelli deposition.

20   BY MR. DEROCHE:

21        Q.   Do you recognize that document, sir?

22        A.   Yes.

23        Q.   Okay.  It's an e-mail from Mr. Schiavo

24   with a copy to you, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Correct.

2      Q.   Are you familiar with the folks that

3   it was sent to?

4      A.   Yes, I am.

5      Q.   Okay.  Who is Noah Zimmerman?

6      A.   Noah Zimmerman was a former SOM

7   analyst.

8      Q.   Okay.  Annette Lamoureux?

9      A.   Annette was also at that time an SOM

10   analyst.

11      Q.   I'm going to blow this next name.

12      A.   Shan Xue.

13      Q.   Shan Xue?

14      A.   Yes.

15      Q.   Another analyst?

16      A.   Yes, she was.

17      Q.   And --

18      A.   Khalilul Mia, also a former analyst.

19      Q.   A former analyst.

20           And Beatty, Caitlin Beatty?

21      A.   Caitlin Beatty.

22      Q.   Beatty.

23      A.   Also a former.  That was the actual

24   original five individuals that were hired to be

1    SOM analysts to do all the -- perform the due

2    diligence work on the new or current existing

3    SOM system that we were designing.

4        Q.   This is your first team of analysts

5    that actually operated the SOM system that you

6    were involved in designing?

7        A.   Correct.

8        Q.   Okay.  And you hired all these folks?

9        A.   Yes, I did.

10       Q.   What kind of background were you

11   looking for for the analysts?

12       A.   I was looking for a background of

13   statistics, law, pharmacy, loss prevention or

14   diversion background.  And, of course, SOM

15   experience if they had that.  The experienced

16   SOM analysts, as I had previously mentioned,

17   weren't interested in relocating to Rhode

18   Island.

19       Q.   Sure.

20            And when you refer to those prior

21   analysts, who are you referring to?

22       A.   At the time Shauna Helfrich.  At one

23   point Aaron Burtner.  I apologize, there's one

24   other name that's escaping me right now.

1     Q.   Kelly Baker?

2     A.   Kelly Baker.

3     Q.   Was Aaron Burtner replaced when he

4  left the company?

5     A.   Was Aaron Burtner?  Not with a

6  permanent associate.  His responsibilities were

7  replaced by multiple individuals, including

8  third party.

9     Q.   Are you talking about a consultant

10  that came in?

11     A.   Yes.

12     Q.   At one point you had to hire an

13  outside consulting firm to add additional staff

14  to the SOM program?

15     A.   At one point we chose to bring in

16  outside assistance to review and perform the

17  process.

18     Q.   Okay.

19     A.   Yes.

20     Q.   Was it one particular individual who

21  came in?

22     A.   No.  There were multiple.

23     Q.   Does Shauna Helfrich have a background

24  in statistics that you're aware of?

Highly Confidential - Subject to Further Confidentiality Review

1        A.   I'm not aware of Shauna Helfrich's

2    background.

3        Q.   So you don't know if she had any

4    background in pharmacy?

5        A.   I do not.

6        Q.   Okay.

7        A.   I did not hire her.

8        Q.   What about Kelly Baker, did he have

9    any background in statistics or law or loss

10   prevention or --

11       A.   I believe Kelly, as well as Aaron,

12   were from the loss prevention department.

13       Q.   They previously were in loss

14   prevention?

15       A.   To my understanding, yes.

16       Q.   Let's go back to 51.  If you look at

17   the attachment to the e-mail, do you recognize

18   that letter, sir?

19       A.   Don't recall.  I mean, if I -- I see

20   the e-mail.  I do not recall anything about

21   this -- the letter from -- with the DEA heading?

22       Q.   Correct.  This is a letter from the

23   Drug Enforcement Agency -- Administration that

24   was sent to all distributors of --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yeah, I assume it was the --

 2             MR. BUSH:  Hold on.  Let him finish

 3   his question.

 4   BY MR. DEROCHE:

 5        Q.   -- distributors of controlled

 6   substances.

 7             Now, this was e-mailed to you to

 8   review it.  Did you review it?

 9        A.   I do not recall.  It was an e-mail

10   from four years ago.

11        Q.   Okay.

12        A.   Five years ago.

13        ███    ████████████████████████████████
███  ███████████████████████████████████████████
███  ███████████████████████████████████████████
███  ██████████████████████████████
███            ████████████████████████████
███  █████████████████████
███    ███    ████████████████████████████████████
███  ██████████████████████████
███    ███    ████████████████████████████████
███  ██████████████████████████████████████
███  ████████████████████████████████████████████
███  ████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





23   BY MR. DEROCHE:

24       Q.   Do you know what factors that the

1   algorithm that was being used at the time

2   considered?

3       A.   I do not know.  My focus was not

4   actually on the system, it was more on the

5   process.

6       Q.   The process in terms of what the

7   analysts were looking at?

8       A.   The process of the -- the due

9   diligence process that the analysts looked at on

10   the orders that were generated to review.

11       Q.   Did you get an understanding of how

12   many of the orders that were flagged by the

13   algorithm were actually looked at on a daily

14   basis?

15       A.   No.

16       Q.   Did you look at the standard operating

17   procedures that were in place at the time --

18       A.   I did not.

19       Q.   -- to determine what they said they

20   should -- that they should have looked at?

21       A.   I do not recall looking at standard

22   operating procedures.

23       Q.   Did you determine what documentation

24   existed with respect to orders that may or may

Highly Confidential - Subject to Further Confidentiality Review

1    not have been reviewed?

2        A.   No.

3        Q.   Sorry?  I didn't hear that.

4        A.   Repeat your question, please.

5        Q.   Yeah.  Did you determine what

6    documentation existed on a -- with respect to

7    the process that was being used prior to the

8    time you implemented your new process?

9        A.   I sat with the analysts over the

10   portion of a couple of days and just observed

11   the process that they had gone through to review

12   orders.  I mean, in the course of that time I

13   reviewed a few orders with them to go through

14   the process to understand some of the -- what --

15   the data that they were looking at.

16       Q.   Okay.  Do you know how many of the

17   flagged orders were looked at on a daily basis

18   that were on the IRR, the review report?

19       A.   I do not recall.

20       Q.   Were you aware in 2011 that there was

21   an opioid crisis in the United States?

22       A.   No, I was not.

23       Q.   When did you become aware of the

24   opioid crisis?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. BUSH:  Objection.

2       A.   I don't see myself as qualified to

3   know if there was or was not an opioid crisis.

4   I mean, I understand people in this country

5   have, you know, addictions to drugs and that

6   addiction could lead to death or other negative

7   consequences, but not qualified to say if there

8   is a crisis or not.

9   BY MR. DEROCHE:

10       ■     ██████████████████████████████

██   ████████████████████████████████████

██   ███████████████████████████████████████████████

██   ██████████████████████████████████

██   ██████████████████

██     ■     ████████████████████████████████████

██   █████████████████████████

██     ■     ██████████████████████████

██     ■     ███████████████████████████████████

██   ██████████████████████████████

██     ■     ████

██     ■     ████████████████████████████████████████

██   ████████████████████████████████████

██   ███████████████████████████████████

██   █████████████████████████████████



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
19        Q.    Were you trying to reiterate to them

20    the importance of their job --

21              (Phone interruption.)

22              MR. DEROCHE:  Everybody on the

23    speakerphone, please mute your phones.  Thank

24    you.
```



1           (Phone interruption.)

2    BY MR. DEROCHE:

3

24           Q.   Who is Chris Preli?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Chris Preli at the time was my

2  manager.

3      Q.   And your job at this time was what?

4      A.   2009, my best guess I was senior

5  manager of logistics planning.

6      Q.   You state "LP" -- and that's loss

7  prevention, correct?

8      A.   Correct.

9      Q.   -- "is pulling out of the DEA

10  operations and will play more of a compliance

11  auditing role.  Frank and I talked earlier in

12  the week."  Frank Devlin?

13      A.   I believe, yes, that would be

14  referring to.

15      Q.   Did you work with Mr. Devlin?

16      A.   I worked with Frank, yes.  Frank was

17  loss prevention for the distribution center so

18  our paths have obviously crossed.  We both

19  supported the DCs.

20      Q.   Chris C, who is that?

21      A.   I believe that refers to Chris

22  Cassidy, or Christopher Cassidy.  He was on my

23  team at one point.

24      Q.   Did he --

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I'm sorry.

2        Q.    I'm sorry.  Go ahead.

3        A.    And look at the timing.  It most

4    likely would be Amy Propatier's direct manager

5    at this time.

6        Q.    Amy Propatier was what?

7        A.    Amy Propatier was a coordinator.

8        Q.    Were you aware that she was the

9    director of DEA compliance?

10        A.    Not in any time that Amy reported to

11    me was she the director of DEA compliance.  I do

12    not believe Amy has ever been a director in her

13    time at CVS.

14        Q.    Or manager of DEA compliance, or the

15    head of DEA compliance, or any term like that?

16        A.    Amy had a role where -- again, going

17    back to our previous discussion of the role of

18    my department as being the liaison between

19    customer support center and the distribution

20    centers, Amy would facilitate or coordinate

21    activities between those two groups.  At no time

22    did Amy have ownership of any DEA compliance, to

23    my knowledge, with the exception of she was

24    responsible for filing ARCOS reporting.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Other than filing ARCOS reporting, she

 2   had no role in terms of DEA compliance that you

 3   were aware of?

 4        A.   No.  As I previously said, Amy would

 5   coordinate activities between the distribution

 6   centers and customer support.  She may have been

 7   involved in or had information on DEA compliance

 8   activities, but she was not the owner of any of

 9   those activities other than ARCOS reporting, to

10   my recollection.

11
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1  ███

███  ███  ███████████████████████████

███  █████████████████████████████

███  ████████████████████████████

███  ███  █████████████████████████████

███  ████████████████████████████

███  █████████████████████████████

███  ███████████████████████████

███  █████████████████

10      Q.   Okay.  When you started your work in

11  developing the new SOM system at CVS, did you go

12  back and review documentation concerning the old

13  system so you knew what you were replacing and

14  what the problems might have been?

15      A.   When I began the design I spent some

16  time in the Indianapolis facility to get a

17  general understanding of the process that they

18  were following as a baseline, as a jumping off

19  point for the process that we were building in

20  the system that we were building to replace that

21  system.

22      Q.   Okay.  Did you at any time try to

23  research any issues that may be involved with

24  the existing system in terms of problems in its

1    operation?

2        A.    I do not recall doing that, no.

3        Q.    Did you ever try to determine whether

4    or not the existing system you were replacing

5    made any effort to compare controlled drugs

6    versus non-controlled in terms of the pharmacies

7    ordering controlled drugs from the distribution

8    centers?

9        A.    I recall that the team had access to

10   data, dispensing data, data regarding patients,

11   prescribers, the dispensers.  I understand they

12   had data available which is data we wanted to

13   ensure we had available.  I believe I tried -- I

14   got some indication of how they got about

15   getting to that data and the efforts -- in the

16   new system we wanted to be able to make that

17   data more readily providable that doesn't

18   require somebody to look for the information,

19   that I would be presented that information for

20   each case right -- or each flagged order as --

21   order of interest that our system would actually

22   generate and to look at that and have them

23   provide that information.  But I do believe they

24   had access to that data.

1    Q.   I understand that access to dispensing

2    data, if someone wanted to go look for it.  What

3    I'm talking about is with respect to the

4    algorithm itself in terms of flagging orders,

5    was there any effort made at that time to

6    compare controlled versus non-controlled volume

7    at the pharmacy?

8             MR. BUSH:  In the algorithm?

9             MR. DEROCHE:  In the algorithm.

10    A.   Yeah, I have no and gained no

11    understanding of how the algorithm actually

12    worked.

13    BY MR. DEROCHE:

14    Q.   You made no effort to determine what

15    the algorithm looked at or didn't look at?

16    A.   The operation of that algorithm was

17    irrelevant in the development of the program we

18    were designing.  I did not spend my time looking

19    at that.

20    Q.   Did you look at the IRRs?

21    A.   Over the couple of days that I was in

22    Indianapolis, when I said I had spent periods of

23    time with that team, I, you know, recall looking

24    at reports, and I believe the IRR was one of

Highly Confidential - Subject to Further Confidentiality Review

1   those reports that we looked at.

2       Q.   Do you know if the existing SOM system

3   you were replacing had any methodology by which

4   new stores were assessed within the SOM

5   algorithm?

6       A.   Again, I didn't look at the -- how

7   that -- the algorithm worked in my time

8   reviewing that system or that process.

9       Q.   Do you know if there was any effort

10  made in the existing SOM system that you were

11  replacing to assess outside vendor orders in

12  connection with the analysis of orders placed to

13  the distribution centers?

14      A.   I did not look at the operations of

15  the algorithm so I can't say if they -- it did

16  or did not look at that.  I do not know.

17      ██    ████████████████████████████

██  ██████████████

██          ████████████████████████████████████

██          █████████████████████████

██  ███████████████████

██      ██   ████████████████████████████████████

██  ████████████████████████████████

██  ██████████████████████████████████

Case: 1:17-md-02804-DAP Doc #: 2177-12 Filed: 08/12/19 60 of 260. PageID #: 320544.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12      A.    Until the period it became a Schedule

13  II drug, CVS pharmacies were able to order

14  hydrocodone products from the servicing CVS

15  distribution center.

16      Q.    And at the same time they were able to

17  order those same products from outside vendors?

18      A.    I believe so, yes.

19



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1 ████ ████████████

 ██ ██████████████

 ██ ██████████████

 ██ ████████████

 ██ ██████████████

 ██ ██████

 ██ ███ ██████████

 ██ ██████████████

 ██ ███████████████

 ██ ████████████

11          MR. BUSH:  Is now a good time for a

12    break?  About an hour and a half.

13          MR. DEROCHE:  Yes, that's a good idea.

14          THE VIDEOGRAPHER:  We're going off the

15    record at 9:29 a.m.

16          (Whereupon, a recess was taken.)

17          THE VIDEOGRAPHER:  We're back on the

18    record at 9:47 a.m.

19    BY MR. DEROCHE:

20       Q.   In 2013, Mr. Vanelli, was Christopher

21    Tulley your boss?

22       A.   No, he was not.

23       Q.   What was he?

24       A.   He was a project manager.

1    Q.   Okay.  And what role did he have in

2  the work that you were doing on the SOM system?

3    A.   Chris was a project manager for the --

4  on the project for developing the new suspicious

5  order monitoring system.

6    Q.   I'm going to show you what we marked

7  as Exhibit 25.

8         (Whereupon, CVS-Vanelli-25 was marked

9         for identification.)

10  BY MR. DEROCHE:

11    Q.   Before you get there, you said that

12  with respect to the old SOM system that was

13  running that you were going to be sunsetting and

14  replacing, that you didn't do any deep dive into

15  how it operated.

16    A.   That existing system that we were

17  going to sunset?

18    Q.   Right.

19    A.   No, I did not.

20    Q.   You didn't do anything with respect to

21  that system other than sit in the DC in

22  Indianapolis for a couple days and watch what

23  the analysts were doing?

24         MR. BUSH:  Objection.

1    A.   I sat in the DC with the analysts

2    multiple times over the course of a couple days

3    to review their process.  And we also discussed

4    that I did assist ensuring staffing, and

5    assisted Mark Nicastro in where he may have

6    needed assistance to maintain that system while

7    it was running until the time that we sunset it

8    by replacing it with the new system that was my

9    focus in developing with a team of folks.

10   BY MR. DEROCHE:

11       Q.   Again I want to make sure I've got a

12   bracket around your full interaction with the

13   SOM system that was in place.  Is that the end

14   of it?  That's all you did with respect to that

15   system?

16       A.   Like I said, I spent time to

17   understand the due diligence process, and I

18   assisted Mark when there were challenges that he

19   had, such as staffing.

20       Q.   Any other challenges?

21       A.   Not that I recall.  Not that I recall.

22   ███    ████████████████████████████████

███  ████████████████████████████████████████████

███  ██████████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

23          That was the Analysis Group that you

24    were involved in retaining to design the new

1    algorithm, correct?

2        A.    I was not involved in the retaining of

3    the Analysis Group.  The Analysis Group was

4    introduced to me as a third party that was going

5    to assist.  I was not involved in contracting

6    with them, soliciting them.  That happened prior

7    to my involvement in SOM.

8        Q.    Do you know why they were chosen over

9    some other consultant?

10       A.    I do not know.  I was not involved in

11   the decision.

12       Q.    Did you ever work with the Buzzeo

13   Group or any company associated with Buzzeo?

14       A.    I am aware of the Buzzeo Group, but I

15   do not recall having any interaction with the

16   Buzzeo Group.  Although I am aware that the

17   Buzzeo Group was the company that the -- you had

18   referred to prior as the existing, so the system

19   that was in place in 2012, that that system was

20   acquired from the Buzzeo Group, they developed

21   it.  I do know that.

22       Q.    Do you know why they weren't retained

23   for the new system?

24       A.    I do not know.  I was not involved in

Highly Confidential - Subject to Further Confidentiality Review

1    that decision.

2         Q.   Do you know if they were fired by CVS

3    for any reason?

4         A.   They were not an employee of CVS, so

5    being fired, I'm not sure how you fire somebody

6    that is not an employee of you.

7         Q.   Do you know why the relationship as a

8    consultant with Buzzeo was discontinued by CVS?

9         A.   No, I do not.

10        MR. BUSH:   Objection.

11        A.   I had no involvement in the

12   relationship with Buzzeo.

13   BY MR. DEROCHE:

14        Q.   You have consultants that you fired

15   before, haven't you?

16        A.   About as many as you've hired, yes.

17   ███  ████████████████████████

███  ████████████████████████████████

███  █████████████████████████

███  █████████████████████████████

███  █████████████████████

███      ████████████████████

███  ███  ███████████████████

███  ███  ██████████████████████

Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review

















Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

7       Q.   Did you work with Pam Hinkle at all in

8  determining what the existing SOM process

9  entailed?

10      A.   I do not recall.

11      Q.   Do you know who Pam Hinkle was?

12      A.   Yes, I know who Pam Hinkle is.

13      Q.   Okay.  Is she still with the company?

14      A.   Yes, she is.

15      Q.   She works in the Knoxville DC, is that

16  correct?

17      A.   She's resident in the Knoxville DC,

18  yes.

19      Q.   What is her position?

20      A.   She's a senior manager of supply chain

21  compliance and quality.

22      Q.   Was she in charge of the SOM system at

23  one point in time?

24      A.   Prior to my time I believe that she

Highly Confidential - Subject to Further Confidentiality Review

1    may have been.  I do not know certainly.  I know

2    the SOM system was managed out of Knoxville at

3    one point, and Pam was in that facility.  I

4    don't know if that was her -- I do not recall if

5    that was her -- she was ultimately responsible

6    for it.

7              (Whereupon, CVS-Vanelli-5 was marked

8              for identification.)

9    BY MR. DEROCHE:

10   ██    ████████████████████████████████████

██ ████████████████████████████████████████████

██ ████████████████████████████████████████████

██ ███████████████████████████████████████████

██ ████████████████████████████████████████████

██ ██████████████████████████████████████

██     █████████████████████████████████████

██    ██   ██████

██    ██  ████████████████████████████████

██ ██████████████████████████████████████████████

██    ██  ████████████

██    ██  █████████████████████████████████

██ ████████████████████████████████████████

██ ████████████████████████████████████

██         ████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review















Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







1          A

24         Q.    Do you know what diversion means, sir?

1      A.    The Webster definition of diversion?

2      Q.    How about the definition of diversion

in connection with the suspicious order

monitoring process and what you're attempting to

prevent, do you know what that means?

6            MR. BUSH:   Objection.

7      A.    Do I know what that means.   I'm trying

to again review all those controlled substances

for unusual size, frequency and pattern.

10  BY MR. DEROCHE:

11     Q.    The DEA has a department of diversion,

you're aware of that, right?

13     A.    Yes.

14     Q.    Okay.   They're your regulator, aren't

they?   You're trying to comply with their

requirements, aren't you?

17     A.    I'm trying to comply with the federal

code of regulation.

19     Q.    They send diversion investigators to

the DCs, don't they, from time to time?

21     A.    They send agents to the DCs.   I can't

particularly say if they're diversion

investigators or they play a different role.

24     Q.    So in the context of controlled

1    substances, do you know what diversion means?

2        A.    I believe it to mean to take drugs and

3    use them for non-medical purposes.





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

























Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review











Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1   h █████████████████████████████

█   ████████████████████████████████████

█   ███████████████████████████████

█   ████████████████████████████████████

█   ███████████████████

█   ██      ██      ████████████

7            MR. DEROCHE:  We can break for lunch

8   now.

9            MR. BUSH:  Okay.

10           THE VIDEOGRAPHER:  We're going off the

11  record at 12:19 p.m.

12           (Whereupon, a luncheon recess was

13           taken.)

14

15

16

17

18

19

20

21

22

23

24

```
1              AFTERNOON SESSION

2

3              THE VIDEOGRAPHER:  We're back on the

4    record at 1:13 p.m.

5    BY MR. DEROCHE:

6        Q.   Mr. Vanelli, we just had a lunch

7    break, but you understand you're still under

8    oath, correct?

9        A.   Yes, I do.

10
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



1



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1       ██    ████████████████████████████

    ██    ████████████

    ██    ██    ████████████████████████

    ██    ████████████████████

    ██      ████████████████████████

    ██    ████████████

7           (Whereupon, CVS-Vanelli-40 was marked

8           for identification.)

9   BY MR. DEROCHE:

10      Q.   Sir, I want to show you what was

11   marked as Exhibit 40. It's a chart that was

12   created from data extracted from the ARCOS

13   database that was produced in this case

14   concerning a pharmacy located on Brookpark Road

15   in Cuyahoga County, Ohio.

16         First of all, are you familiar at all

17   with the Brookpark Road CVS Pharmacy?

18      A.   No.

19      Q.   Have you ever been to Ohio?

20      A.   Columbus.

21      Q.   Other than Columbus, nowhere else?

22      A.   Jacobs Field in Cleveland.

23      Q.   You came to Cleveland one time?

24      A.   I have been to Cleveland one time.

1    I've been to Columbus, Dublin particularly, one

2    time.

3         Q.   Did you ever come to Cuyahoga County

4    to visit a CVS store?

5         A.   I do not recall ever visiting a CVS

6    store in Cuyahoga County.

7         Q.   So you never visited, for instance,

8    the store located at 2070 Brookpark Road?

9         A.   No, sir.

10        Q.   This is a recap of orders on a monthly

11   basis in January, 2006 to December, 2008, and it

12   compares those orders for hydrocodone shipped to

13   the store to the average of all CVS stores in

14   Cuyahoga County.  And it appears that this store

15   substantially exceeds the average in the county

16   every month that's covered by this chart.

17             Under your system that you put in

18   place, do you believe that this store would be

19   flagged, given the volume exceeding the average

20   in the county that it's located in?

21             MR. BUSH:  Objection.

22        A.   I've never seen this chart before.  I

23   don't know the source of the chart.  I don't

24   know the source of the average.  I could not

1  make that determination just strictly on this

2  chart.  The algorithms are a little more

3  in-depth than just data on the chart.

4  BY MR. DEROCHE:

5      Q.   I understand.  I understand they don't

6  look at just volume, but volume is one of the

7  issues or one of the factors that's considered

8  by the current algorithm, correct?

9      A.   Could you repeat that?

10      Q.   Volume is one of the factors that's

11  considered by the current algorithm, correct?

12      A.   Ordering size, frequency, and pattern

13  are all part of the tests that occur today in

14  the system we operate.

15      Q.   Do you know if there was any system in

16  place in the time period covered by this chart

17  at CVS that systematically assessed the order

18  volume for stores such as the Brookpark Road

19  store in Cuyahoga County?

20      A.   I do not know.  I do not know what

21  systems were in place at that time.  I had no

22  involvement in SOM in 2006 to 2008 time period.

23      Q.   If you looked at a store like this

24  Brookpark Road store and you saw that, for

1  instance, in September of 2008 a store was

2  ordering close to 40,000 doses of hydrocodone

3  compared to an average somewhere in the 8 range

4  of all stores in that county, would that raise a

5  concern for you?

6      A.   Again, I have no basis of any

7  information for this particular store.  I don't

8  know if it's located in the center point of 16

9  hospitals.  I have no background on this to be

10  able to say on one piece of data -- on one data

11  point that I can make a determination such as

12  that.

13      Q.   You can look at that, I mean, and say,

14  well, it would raise a concern, and if it was

15  located as the center point of 16 hospitals,

16  maybe someone should find that out and confirm,

17  yes, that's the case, as opposed to it being

18  located in a seedy neighborhood with a

19  substantial overdose problem?

20      A.   I have no knowledge if that was or was

21  not --

22      Q.   But wouldn't you want to --

23      A.   -- performed.

24      Q.   Wouldn't you want to find out?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I am telling you I can speak to what I

2    know in the current process.  They review that,

3    what you are looking at, the stores.  I cannot

4    speak to this time period.

5         (Whereupon, CVS-Vanelli-41 was marked

6         for identification.)

7    BY MR. DEROCHE:

8         Q.   Did CVS ever attempt to look at

9    publicly available information about overdose

10   rates and to overlay that to a map of their

11   store locations?

12        A.   I do not know.

13        Q.   Do you know if the rate of overdose

14   deaths would correlate to location of high

15   volume CVS stores if that process was done?

16        A.   I do not -- I do not know.

17        Q.   As part of your annual review of

18   your -- I mean, I assume you do reviews of your

19   SOM system, right, and you do an annual check-up

20   to make sure it's operating properly, something

21   along those lines, correct?

22        A.   We have done reviews of our existing

23   system, yes, we have.

24        Q.   You do quality control of some sort,

1  correct?

2      A.   Quality control reviews are in place

3  within the current SOM system.

4      Q.   Wouldn't you want to know what stores

5  are located in high overdose areas to make sure

6  your SOM system was appropriately focusing on

7  those stores?

8      A.   We focus on all stores and all orders.

9  If it flags, it is reviewed and proper due

10  diligence is performed.

11     Q.   I understand you're saying that you do

12  that now with the system you put in place, but

13  you have no idea before you put your new system

14  in place if that was the case, isn't that

15  correct?

16     A.   I had no responsibility to -- it was

17  not my responsibility to know.  CVS is a very

18  large organization.  I have a set of

19  responsibilities.  Those are the

20  responsibilities that I focus on.

21     Q.   So back then before you put your new

22  system in place, did anybody try to correlate

23  and see if overdose deaths clustered around CVS

24  high volume stores?

1    A.    I don't know if that did or did not

2   happen.  I have no recollection of any

3   involvement in those types of discussions.  I do

4   not recall.

5    Q.    Would you find that problematic if you

6   discovered that that was, in fact, the case?

7           MR. BUSH:  I'm sorry, if what was the

8   case?

9   BY MR. DEROCHE:

10    Q.    Overdose deaths --

11           MR. BUSH:  I'm not sure --

12   BY MR. DEROCHE:

13    Q.    -- overdose deaths clustered around

14   high volume CVS stores.

15    A.    Based on that one point, no, would

16   have to -- you would have to look at a lot of

17   other data to understand if there is some

18   correlation.

19    Q.    Take a look at Exhibit 41 real quick.

20   Again, this is a chart that's created in

21   extracting ARCOS data that was produced in this

22   case.  It has to do with the hydrocodone

23   shipments to CVS Pharmacy located at 590 East

24   Market Street in Summit County, Ohio.

Highly Confidential - Subject to Further Confidentiality Review

1          I take it you haven't been to Summit

2    County?

3          A.    I don't know where Summit County is.

4    Is it Cleveland?  I've been to Cleveland.  We've

5    established that.  I don't know counties well.

6          Q.    Cleveland is Cuyahoga County.

7          A.    Is it?

8          Q.    Yes.

9          A.    If it wasn't Dublin or Columbus, those

10   are the only places I recall I've been to in

11   Ohio.

12         Q.    Again, this is a store that from

13   April, 2006 to December, 2008, the period

14   covered by this chart, appears to have a volume

15   of hydrocodone shipments that is substantially

16   in excess of the average for CVS stores in the

17   Summit County area.  I'm wondering if this type

18   of data is something -- this aggregate data is

19   something that was ever looked at by CVS so you

20   could focus your attention on these types of

21   stores when you're doing your SOM analysis.

22              MR. BUSH:  Objection.

23         A.    Performing my SOM analysis, this data

24   is, you know, 11 plus years old.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. DEROCHE:

 2        Q.   I'm saying, did CVS ever do these

 3   types of charts to at least get a picture of,

 4   hey, this is a high volume store compared to all

 5   the other stores in this county, maybe we want

 6   to focus on it, give it more attention in the

 7   SOM process?  That type of analysis ever done?

 8             MR. BUSH:  Objection.

 9        A.   The question is?

10   BY MR. DEROCHE:

11        Q.   Was that ever done that you know of?

12        A.   As a single individual working in a

13   logistics department, I certainly cannot be

14   aware of what everybody in a major organization

15   is doing, and particularly in an area that I had

16   no involvement and no job responsibility at the

17   time that this graph is depicting, so I do not

18   know if anyone did or did not.

19        Q.   Let me show you what we marked as

20   Plaintiffs' Exhibit 77.

21
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review











Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





1

24        Q.    And again, you then sent an e-mail, I

Highly Confidential - Subject to Further Confidentiality Review

1    believe, to Mr. Nicastro again addressing the

2    staffing issue, correct?

3        A.   I see that e-mail that I sent to

4    Mr. Nicastro on the 16th of July, '13.

5        Q.   You ask "Has Aaron's job been posted?"

6             Do you know, had Aaron left by that

7    point?

8        A.   I don't -- I cannot state if Aaron had

9    left or given notice that he had planned to

10   leave.

11       Q.   You state "I did speak to Andy about

12   staffing and suggested to replace Aaron, add two

13   analysts (like Kelly) and six clerical staff."

14             Who is Andy?

15       A.   I believe I was referring to Andy

16   Koropoulis who was the operations manager of the

17   Indianapolis distribution center who reported in

18   to Mark.

19       Q.   Do you know if two analysts and six

20   clerical staff were added to the SOM team in

21   Indianapolis at any point in time after this

22   e-mail?

23       A.   I do not recall that two analysts or

24   six clerical staff were added.  I recall that we

Highly Confidential - Subject to Further Confidentiality Review

```
 1   had -- as we discussed earlier, we had

 2   interviewed for some positions, we back-trained

 3   and pulled in a former employee, former

 4   pharmacist employee to come in and work on the

 5   process, as well as hired third-party DEA

 6   consultants to assist.

 7        Q.   Who was that person that was brought

 8   in, the former pharmacist?

 9        A.   Gary Millikan.  He was a pharmacist,

10   and he ran the pharmacy operation in

11   Indianapolis for a period of time.  I don't know

12   how long.

13             (Whereupon, CVS-Vanelli-39 was marked

14             for identification.)

15   BY MR. DEROCHE:

16        Q.   I show you what we marked as

17   Exhibit 39.  This is a letter from yourself to

18   Matthew Murphy at Pharma Compliance Group, is

19   that correct?

20        A.   Appears so by looking at the heading,

21   yes.

22        Q.   Appears to be a letter agreement that

23   you sent to engage Pharma Compliance Group to

24   perform some services for CVS, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That is what I see.

2    Q.    Is this the group that you referred to

3  in terms of coming in and providing some SOM

4  staffing as needed?

5    A.    Yes.

6    Q.    How many folks do you know were

7  assigned by Pharma to CVS to provide the

8  staffing you needed?

9    A.    How many folks?  I could recall

10  probably maybe three.  I don't know the exact

11  number.

12    Q.    Do you know what training they were

13  provided with respect to the SOM system that was

14  currently in place in Indianapolis?

15    A.    Other than being former DEA agents,

16  I'm not aware of training that they were

17  provided prior to coming in to assist in the

18  facility.

19    Q.    Did you ever see them do their work?

20    A.    I did not.  It occurred in

21  Indianapolis, and I was in Rhode Island.

22    Q.    Do you know as former DEA agents if

23  they had performed SOM analysis in the past?

24    A.    I do not know.  Do not recall.

1    Q.   Do you know if -- I'm sorry, go ahead.

2    A.   I just said I do not know.  I don't

3  recall.

4    Q.   Do you know if they were provided the

5  work instructions that we reviewed a moment ago

6  with respect to how to perform the IRR analysis

7  at CVS?

8    A.   I do not know.  Again, I was in Rhode

9  Island, I wasn't responsible with the process.

10  I was assisting between the distribution center

11  and our legal department, which is where I got

12  the contacts for Mr. Murphy, through Betsy

13  Ferguson, to facilitate the assistance they

14  required.

15    Q.   Do you know how often Pharma

16  Compliance Group provided personnel following

17  this August 21, 2013 letter agreement?

18    A.   Multiple months.  I don't recall the

19  exact time they started.  I believe it was

20  sometime around the date of this letter, and I

21  believe it continued into early -- into January,

22  the following -- sometime into the following

23  year.  I don't know exact dates, but my memory

24  says sometime in that time period.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Do you know if the Pharma Compliance

2  personnel that came in to assist with the IRR

3  process used the IRR recap spreadsheet to

4  document reviews?

5    A.   I do not know the actual tasks that

6  they performed, not being there.







Highly Confidential - Subject to Further Confidentiality Review











Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

















19        Q.   You don't know.  Okay.  Fair enough.

20             MR. DEROCHE:  I have nothing further.

21   You're free to go.

22             MR. DAWSON:  No questions.  Thank you.

23             MR. BUSH:  Really, you guys are

24   champs.  I love this.  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1            THE VIDEOGRAPHER:  This concludes the

2    video deposition of Dean Vanelli.  The time is

3    3:10 p.m., and we are now off the record.

4            (Whereupon, the deposition was

5            concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1   STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

2

3           I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

4   and Commissioner in the State of Rhode Island

5   and Providence Plantations, do certify that on

6   the 16th day of January, 2019, at 8:03 o'clock,

7   the person above-named was duly sworn to testify

8   to the truth of their knowledge, and examined,

9   and such examination reduced to typewriting

10  under my direction, and is a true record of the

11  testimony given by the witness.

12          I further certify that I am neither

13  attorney, related or employed by any of the

14  parties to this action, and that I am not a

15  relative or employee of any attorney employed by

16  the parties hereto, or financially interested in

17  the action.

18          In witness whereof, I have hereunto

19  set my hand this 20th day of January, 2019.

20

21          _____

22          COMMISSIONER

23          My Commission Expires April 30, 2020

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the appropriate

 6    space on the errata sheet for any corrections

 7    that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  It will be attached

10    to your deposition.

11              It is imperative that you return

12    the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt of

14    the deposition transcript by you.  If you fail

15    to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              - - - - - -

            E R R A T A

 2              - - - - - -

 3   PAGE   LINE   CHANGE

 4   _____  _____  _____

 5       REASON: _____

 6   ____  _____  _____

 7       REASON: _____

 8   _____  _____  _____

 9       REASON: _____

10   _____  _____  _____

11       REASON: _____

12   _____  _____  _____

13       REASON: _____

14   _____  _____  _____

15       REASON: _____

16   _____  _____  _____

17       REASON: _____

18   _____  _____  _____

19       REASON: _____

20   _____  _____  _____

21       REASON: _____

22   _____  _____  _____

23       REASON: _____

24   _____  _____  _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do

     Hereby certify that I have read the foregoing

 4   pages, and that the same is a correct

     transcription of the answers given by me to the

 5   questions therein propounded, except for the

     corrections or changes in form or substance, if

 6   any, noted in the attached Errata Sheet.

 7

 8   _____

     WITNESS NAME                 DATE

 9

10

11

12

13

14

15   Subscribed and sworn

     To before me this

16   _____ day of _____, 20_____.

17   My commission expires: _____

18

     _____

19   Notary Public

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```