```
  1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
  2                        EASTERN DIVISION
  3   IN RE NATIONAL PRESCRIPTION   | MDL No. 2804
                                    |
  4   OPIATE LITIGATION             | Case No. 17-MD-2804
                                    |
  5   This Document Relates to:     | Hon. Dan A. Polster
                                    |
  6   The County of Summit, Ohio,   |
      et al., v.                    |
  7   Purdue Pharma L.P., et al.    |
      Case No. 17-op-45004          |
  8                                 |
      The County of Cuyahoga v.     |
  9   Purdue Pharma L.P., et al.    |
      Case No. 18-op-45090          |
 10                                 |
      City of Cleveland, Ohio v.    |
 11   Purdue Pharma L.P., et al.    |
      Case No. 18-op-45132          |
 12                                 |
 13                      - - -
 14            Friday, December 7, 2018
 15                      - - -
 16       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 17               CONFIDENTIALITY REVIEW
 18                      - - -
 19        Videotaped deposition of WILLIAM VERSOSKY,
          held at Foley & Lardner LLP, One Biscayne Tower,
 20       2 Biscayne Boulevard, Suite 1900, Miami, Florida,
          commencing at 9:25 a.m., on the above date,
 21       before Susan D. Wasilewski, Registered
          Professional Reporter, Certified Realtime
 22       Reporter and Certified Realtime Captioner.
 23                      - - -
 24            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
 25                 deps@golkow.com
```

```
 1    APPEARANCES:
 2       WEITZ & LUXENBERG, P.C.
         BY:  PAUL PENNOCK, ESQUIRE
 3            BURTON KING, ESQUIRE
         700 Broadway
 4       New York, New York 10003
         (212) 558-5526
 5       ppennock@weitzlux.com
         bking@weitzlux.com
 6       Representing Plaintiffs
 7
 8       FOLEY & LARDNER LLP
         BY:  KATY E. KOSKI, ESQUIRE
 9       111 Huntington Avenue
         Boston, Massachusetts 02199
10       (617) 342-4000
         kkoski@foley.com
11       Representing Anda, Inc., and the witness
12
13       REED SMITH LLP
         BY:  SUJEY S. HERRERA, ESQUIRE
14       1001 Brickell Bay Drive, Suite 900
         Miami, Florida 33131
15       (786) 747-0207
         sherrera@reedsmith.com
16       Representing AmerisourceBergen Corporation and
         AmerisourceBergen Drug Corporation
17
18
      APPEARANCES VIA TELEPHONE AND STREAM:
19
         WILLIAMS & CONNOLLY LLP
20       BY:  KATELYN ADAMS, ESQUIRE
         725 Twelfth Street, N.W.
21       Washington, D.C. 20005
         (202) 434-5239
22       kadams@wc.com
         Representing Cardinal Health, Inc.
23
24
25
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2    JONES DAY
      BY:  CASTEEL E. BORSAY, ESQUIRE
 3    325 John H. McConnell Boulevard, Suite 600
      Columbus, Ohio 43215
 4    (614) 281-3618
      cborsay@jonesday.com
 5    Representing Walmart
 6
 7    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  CAITLIN MARTINI MIKA, ESQUIRE
 8    70 West Madison Street, Suite 4200
      Chicago, Illinois 60602-4231
 9    (312) 583-2300
      Representing Endo Health Solutions Inc.,
10    Endo Pharmaceuticals Inc., Par Pharmaceutical,  Inc.,
      Par Pharmaceutical Companies, Inc., f/k/a Par
11    Pharmaceutical Holdings, Inc.
12
13    COVINGTON & BURLING LLP
      BY:  WEISS NUSRATY, ESQUIRE
14    One CityCenter, 850 Tenth Street, NW
      Washington, DC 20001-4956
15    (202) 662-5518
      wnusraty@cov.com
16    Representing McKesson Corporation
17
18    MARCUS & SHAPIRA LLP
      BY:  PAUL MANNIX, ESQUIRE
19    One Oxford Centre, 35th Floor
      Pittsburgh, Pennsylvania 15219
20    (412) 471-3490
      pmannix@marcus-shapira.com
21    Representing HBC Service Company
22
    ALSO PRESENT:
23
      JEFF FLEMING, Videographer
24    CONNOR KENNEDY, Weitz & Luxenbreg
      BEN TRUAX, Weitz & Luxenbreg
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -
 2                   I N D E X
 3                      - - -
 4   Testimony of:  WILLIAM VERSOSKY              PAGE
 5        DIRECT EXAMINATION BY MR. PENNOCK............  9
 6
 7                 E X H I B I T S
 8              (Attached to transcript)
 9   ANDA VERSOSKY      DEPOSITION EXHIBITS        PAGE
10   Exhibit 1    September 27, 2006 - DEA Letter      32
                  Anda_Opioids_MDL_0000540738 through
11                540741
12   Exhibit 2    February 7, 2007 DEA letter          32
                  Anda_Opioids_MDL_0000571720 through
13                571723
14   Exhibit 3    E-mail - Subject: Customer           43
                  Limitations by Controlled Substance
15                Chemical Family
                  Anda_Opioids_MDL_0000152299 through
16                152301
17   Exhibit 4    E-mail - Subject: OXYCODONE FAMILY   48
                  LIMITS REVIEW
18                Anda_Opioids_MDL_0000274353 through
                  274354
19
     Exhibit 5    Leadership Meeting Minutes -         52
20                March 17, 2009
                  Anda_Opioids_MDL_0000614431 through
21                614435
22   Exhibit 6    E-mail - Subject: CII Order: BARTELL 62
                  DRUG 46, Ship To: 490342, Over the
23                Limit, Status Closed
                  Anda_Opioids_MDL_0000077689
24
25
```

```
 1                E X H I B I T S
 2             (Attached to transcript)
 3   ANDA VERSOSKY     DEPOSITION EXHIBITS          PAGE
 4   Exhibit 7    E-mail - Subject: Bi Mart - CSOS    71
                  roll out - Max Limit Request
 5                Anda_Opioids_MDL_0000077935 through
                  77939
 6
     Exhibit 8    Slide Presentation - Anda Overview   94
 7                Anda_Opioids_MDL_0000721153 through
                  721174
 8
     Exhibit 9    E-mail - Subject: New deck ready?    94
 9                Anda_Opioids_MDL_0000721151 and
                  721152
10
     Exhibit 10   E-mail - Subject: Tadek Inc.        108
11                Anda_Opioids_MDL_0000272169 through
                  272171
12
     Exhibit 11   E-mail - Subject: Sales            101
13                Anda_Opioids_MDL_0000618116
14   Exhibit 12   E-mail - Subject: Assured Pharmacy's 123
                  new Chief Compliance Officer
15                Anda_Opioids_MDL_0000078156 through
                  78158
16
     Exhibit 13   E-mail - Subject: Oxycodone CR 10 &  132
17                20mg from Ranbaxy
                  Anda_Opioids_MDL_0000110089
18
     Exhibit 14   Fax Promotion - Oxycodone CR 10 &    143
19                20 MG
                  Anda_Opioids_MDL_000011042
20
     Exhibit 15   E-mail - Subject: New Acct Request   152
21                for Wholesale Client
                  Anda_Opioids_MDL_0000610318
22
     Exhibit 16   Article - Judge Approves Consent     157
23                Decree Against Shamrock Medical
                  Solutions Group
24
25
```

```
 1              E X H I B I T S
 2           (Attached to transcript)
 3   ANDA VERSOSKY    DEPOSITION EXHIBITS         PAGE
 4   Exhibit 17   E-mail - Subject: Remedy CSOS     159
                  Profile Related Question Pertaining
 5                to Anita's Account List: Sales for
                  accounts cut off from control
 6                Anda_Opioid_MDL_0000078673 and 78674
 7   Exhibit 18   E-mail - Subject: Controlled      169
                  Substance Training Materials
 8                Anda_Opioids_MDL_0000077289
 9   Exhibit 19   Slide Presentation - Controlled   169
                  Substances: Know Your Customer
10                Ando_Opioids_MDL_0000077290
11   Exhibit 20   E-mail - Subject: Chains          178
                  Anda_Opioids_MDL_0000105969 and
12                105970
13   Exhibit 21   E-mail - Subject: Controlled      195
                  Substance Query Questions
14                Anda_Opioids_MDL_000072880 through
                  725883
15
     Exhibit 22   Spreadsheet                       199
16                Anda_Opioids_MDL_0000647317
17   Exhibit 23   Spreadsheet                       202
                  Anda_Opioids_MDL_0000725057
18
     Exhibit 24A  Spreadsheet                       206
19                Anda_Opioids_MDL_0000725057
20   Exhibit 24B  Spreadsheet                       206
                  Anda_Opioids_MDL_0000725057
21
     Exhibit 25   E-mail - Subject: Controlled      209
22                Substance Sales
                  Anda_Opioids_MDL_0000728018 through
23                728020
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   E X H I B I T S

 2              (Attached to transcript)

 3   ANDA VERSOSKY      DEPOSITION EXHIBITS            PAGE

 4   Exhibit 26   E-mail - Subject: Rite Aid           215

                  Anda_Opioids_MDL_0000090003
 5

     Exhibit 27   Spreadsheet                          216

 6                Anda_Opioids_MDL_0000090004

 7   Exhibit 28   Slide Presentation - CAP -           221

                  Compliance Assistance Program
 8                Anda_Opioids_MDL_0000085420

 9   Exhibit 29   E-mail - Subject: Rite Aid           221

                  Presentation
10                Anda_Opioids_MDL_0000085419

11   Exhibit 30   Press Release                        230

                  Pfizer confirms merger discussions
12                with AstraZeneca

                  April 28, 2014
13

     Exhibit 31   Interim Report of the Broward County 234
14                Grand Jury

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    - - -

 2           THE VIDEOGRAPHER:  We are now on the record.

 3     My name is Jeff Fleming.  I am a videographer for

 4     Golkow Litigation Services.  Today's date is

 5     December 7th, 2018.  The time is 9:25 a.m.

 6           This video deposition is being held in

 7     Miami, Florida, in the matter of National

 8     Prescription Opiate Litigation, MDL Number 2804,

 9     for the United States District Court, Northern

10     District of Ohio, Eastern Division.  The deponent

11     is William Versosky.

12           Counsel, please introduce yourselves for the

13     record.

14           MR. PENNOCK:  Paul Pennock, Weitz &

15     Luxenberg, for the plaintiffs.

16           MR. KING:  Burton King, Weitz & Luxenberg,

17     for the plaintiffs.

18           MS. KOSKI:  Katy Koski, Foley & Lardner for

19     Anda, Inc., and the witness, Mr. Versosky.

20           MS. HERRERA:  Sujey Herrera for -- from Reed

21     Smith for AmerisourceBergen Drug Corporation.

22           MS. KOSKI:  Folks on the phone, can you

23     identify yourselves?

24           MS. ADAMS:  I'm Katelyn Adams with Williams

25     & Connolly on behalf of Cardinal Health.
```

```
 1                MS. MARTINI MIKA:  Caitlin Martini Mika from
 2       Arnold & Porter on behalf of Endo Health
 3       Solutions, Inc., Endo Pharmaceuticals, Inc., Par
 4       Pharmaceutical, Inc., Par Pharmaceutical
 5       Companies, Inc., f/k/a Par Pharmaceutical
 6       Holdings, Inc.
 7                MR. MANNIX:  Paul Mannix with Marcus &
 8       Shapira on behalf of HBC Services.
 9                MS. BORSAY:  Casteel Borsay with Jones Day
10       on behalf of Walmart.
11                THE VIDEOGRAPHER:  Thank you.
12                The court reporter is Susan Wasilewski and
13       will now swear in the witness.
14                THE COURT REPORTER:  Sir, would you raise
15       your right hand?
16                Do you solemnly swear or affirm the
17       testimony you're about to give will be the truth,
18       the whole truth, and nothing but the truth?
19                THE WITNESS:  Yes.
20                THE COURT REPORTER:  Thank you.
21                WILLIAM VERSOSKY, called as a witness by the
22       Plaintiffs, having been duly sworn, testified as
23       follows:
24                         DIRECT EXAMINATION
25       BY MR. PENNOCK:
```

Highly Confidential - Subject To Further Confidentiality Review

```
 1       Q.   Good morning, Mr. Versosky.  My name is Paul

 2   Pennock.  I'm going to have a lot of questions for

 3   you today.

 4       A.   Sure.

 5       Q.   If at any time you don't understand my

 6   questions, will you let me know?

 7       A.   Uh-huh.

 8       Q.   If you don't, I'm going to assume that you

 9   understood them.  Is -- can we have that agreement?

10       A.   Sure.

11       Q.   Where are you currently working?

12       A.   I'm consulting right now.  So -- I'm doing

13   consulting.

14       Q.   Are you with any particular employer, or are

15   you self-employed?

16       A.   I -- I have a -- I have an agree -- I'm

17   self-employed as a consulter.  I have an agreement

18   with ABC from a consulting standpoint.

19       Q.   Okay.  Are you working for or consulting for

20   any particular clients right now?  You mentioned --

21       A.   I -- AmerisourceBergen is a client.

22       Q.   Oh, ABC is AmerisourceBergen?

23       A.   Yes.  I'm sorry.

24       Q.   Okay.  Anyone else?

25       A.   Not at this point.
```

```
 1      Q.   And is that what you've been doing since you

 2   left the employ of Anda?

 3      A.   No, not really.  That's been probably the

 4   last -- it's basically this year.  Prior to that, I

 5   wasn't really doing anything.

 6      Q.   You left Anda around April 2016; is that

 7   right?

 8      A.   That's correct.

 9      Q.   And did you leave of your own accord or were

10   you asked to leave?

11      A.   I left of my own accord, but I did get a

12   package.

13      Q.   Okay.  So tell me how that worked.

14           MS. KOSKI:  Object to form.

15           THE WITNESS:  What's that?

16           MS. KOSKI:  You can go ahead.

17      A.   I'm sorry.

18           So there was kind of a leadership change at

19   Anda.  So Chip Phillips came in, replaced Al

20   Paonessa.  You know, with any leadership change, I

21   think he was looking to shake things up a little

22   bit.  For me, you know, I was kind of ready to move

23   on.  The fact that there was a new leader of Anda

24   sort of meant that there was no advancement possible

25   for me in that -- in that role, and so I kind of was
```

Highly Confidential - Subject to Further Confidentiality Review

 1    done.

 2          So between Chip and I and him kind of

 3    figuring out how was he going to build his team

 4    going forward, I wasn't really willing or able to

 5    commit long-term.  So we worked out, you know, a

 6    deal where I would exit the company.  I kind of

 7    stayed a little longer than I would have liked, you

 8    know, to be able to transition things away, and he

 9    gave me a package on the way out.

10    Q.    Okay.  What was the package that they gave

11    you?

12    A.    There was a -- at that time, it was --

13    Pfizer was about to buy Allergan, and so there was a

14    standard package available.  And for me

15    specifically, I believe it was -- I think I got paid

16    for a year-and-a-half with, I think, a two-year

17    noncompete.

18    Q.    Anything else in the package?

19    A.    Within that year-and-a-half, any theoretical

20    stock that was remaining was -- was, you know,

21    vested as if I was an employee.

22    Q.    Sir, you worked for a -- well, let me back

23    up.

24          You are William Versosky, correct?

25    A.    I am, yes.  Yes.

```
 1        Q.   And you got out of college in 1999; is that

 2    right?

 3        A.   I believe so, yeah.

 4        Q.   And you went to work after college for a

 5    couple of different places.  But in 2003, you ended

 6    up working for a company known as Anda; is that

 7    right?

 8        A.   Yes.  Yes.

 9        Q.   And that's A-n-d-a, right?

10        A.   Yes.

11        Q.   And when you -- you went to work for Anda,

12    tell us what that company did for their business in

13    2003?

14        A.   Sure.  So Anda is a or was a distributor of

15    predominantly generic pharmaceuticals to, again,

16    back then, predominantly independent pharmacies.  So

17    they were a wholesaler or a middle man buying

18    product from generic manufacturers and then

19    reselling it to mom-and-pop pharmacies.

20        Q.   Now, you were at Anda for about almost 13

21    years, right?

22        A.   Yes.  Yes.

23        Q.   And in -- well, about two-and-a-half years

24    after you were there, you were first promoted; is

25    that right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   Correct.  Yeah.

 2       Q.   So tell us what you did first and then what

 3   you did once you were promoted.

 4       A.   What -- so what I was brought in to do and

 5   what I did first was I was one of the negotiators

 6   with generic manufacturers for buy-side contracts.

 7   So we would, you know, reach out to the

 8   manufacturers and kind of negotiate our price on any

 9   generic drug.

10            The promotion -- I -- I believe it was an

11   in-line promotion, honestly.  Am I able to -- are

12   you able to share a copy of my résumé there, or no?

13       Q.   I can give you a copy; but you started out,

14   as I understand it, as a director of purchasing?

15       A.   Correct.

16       Q.   Right?

17       A.   Yes.

18       Q.   And then you went and became senior director

19   of purchasing --

20       A.   Yeah.

21       Q.   -- and trade relations, right?

22       A.   Yes.

23       Q.   And that was in -- so you started out in

24   November '03, you were promoted in May of 2006?

25       A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Right?

 2        A.   Yes.

 3        Q.   And then in June of 2007, you were again

 4   promoted to senior director program development?

 5        A.   Yes.

 6        Q.   And then in February 2008, you were promoted

 7   again, but now you became vice -- a vice president?

 8        A.   Yes.

 9        Q.   And so you became vice president for

10   national accounts at Anda, right?

11        A.   Correct.  Yes.

12        Q.   And national accounts dealt primarily with

13   the major chain pharmacies, right?

14             MS. KOSKI:  Object to form.

15        A.   Yeah.  That -- that was the goal, right?

16   Back then, when that promotion occurred, they really

17   didn't have a lot of business with kind of larger

18   customers.  Over time it evolved into that.

19             At that time when I -- when I was promoted,

20   they were really selling to -- we'll call it very

21   small chains, retail independent buying groups, and,

22   you know, maybe some long-term care accounts.

23        Q.   So when you were promoted to vice president

24   for national accounts, one of the things you wanted

25   to do was to expand Anda's business, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.  Yes.

 2       Q.   And you wanted to expand their business

 3  specifically into major retail chains of

 4  pharmacies --

 5       A.   We wanted to find larger customers for sure.

 6       Q.   Okay.  And the last promotion that you got

 7  was in May of 2010, right?

 8       A.   Yes.

 9       Q.   And at that time, you became vice president

10  for all of sales and marketing, right?

11       A.   Yes.  In -- it's interesting in title,

12  right?  So what happened there was there was a

13  gentleman who was running the marketing department

14  who moved into purchasing.  So Marc Falkin was

15  running marketing.  He moved into purchasing.  I

16  absorbed the marketing department, and that title

17  change was reflective of me now running national

18  accounts and marketing.

19            There was a separate gentleman who ran sales

20  for what we called inside sales or telesales.

21       Q.   Okay.

22       A.   So I -- the sales to the mom-and-pop

23  pharmacies was still managed separately.

24       Q.   Okay.  But nevertheless, in May of 2010, you

25  received a promotion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.   Yes.  Yes.  Yes.

2      Q.   Okay.  And it was a promotion to handle and

3   be responsible not just for national accounts, but

4   for all sales and marketing?

5      A.   No.  No.  That's what I was just trying to

6   clarify for you.

7      Q.   There was someone else that did telesales?

8      A.   There was someone else that did telesales.

9      Q.   Okay.  So other than telesales, you were in

10  charge of sales?

11     A.   Correct.  But from -- as a point of

12  clarification, owning the marketing department, I

13  did have interaction with the telesales.  I wasn't

14  responsible for their number or for their management

15  of their people or anything like that.

16     Q.   You had indicated on your résumé that you

17  were part of the leadership team at Anda?

18     A.   Yes.

19     Q.   Right?

20     A.   Yes.

21     Q.   And that meant that you were interacting

22  with the -- with whom?  The other VPs?

23     A.   Yeah.  Yeah, it was the other VPs, the other

24  kind of functional heads of departments.

25     Q.   Okay.  So would you agree that as of 2010,
```

1    you had risen to the level of -- at Anda where you

2    were one of the people helping to run the company?

3        A.   Sure.  I think that's a fair assessment.

4        Q.   Now, when you got to Anda in 2003, did you

5    at any time in your initial role with Anda have

6    involvement with the purchasing of opiates?

7        A.   Yes.

8        Q.   Okay.  And what do you recall about

9    purchasing of opiates in 2003 that you were

10   responsible for?

11       MS. KOSKI:  Object to form.

12       A.   Yeah, I don't know that I recall anything

13   specific to the opiates with the exception of, you

14   know, obviously they were controlled substances, you

15   know.  But from a -- the role that I managed in --

16   on the purchasing team was the negotiations role,

17   trying to figure out what was the cost we were going

18   to pay from the manufacturer.  So we were, you know,

19   bidding those products, those manufacturers against

20   each other, trying to get lower costs.

21       Q.   So when you went there in 2003 and you were

22   bidding those manufacturers to get lower costs for

23   opiates, you mentioned that opiates were a

24   controlled substance.

25       A.   Uh-huh.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   So you knew that?

 2       A.   Yes.

 3       Q.   And did you know what that meant?

 4       A.   Yes.

 5       Q.   And you understood that it -- that most of

 6  the opiates at that time at least were -- we'll call

 7  it -- can we call them CIIs?

 8       A.   Yes.

 9       Q.   And CIIs means that the only more controlled

10  opiate would -- or the only more controlled

11  substance would be substances nobody can sell

12  legally, right, CIs?

13           MS. KOSKI:  Object to form.

14       A.   Yes.

15       Q.   Right.  And so the CIIs were the most

16  controlled substances that could be sold legally?

17       A.   Yes.

18           MS. KOSKI:  Object to form.

19       Q.   Now, at the time that you first went --

20  became involved in any way with purchasing opiates,

21  did you -- were you provided any training with

22  respect to opiates and their use?

23       A.   I don't recall receiving any training, no.

24       Q.   Did you do any reading or educate yourself

25  with respect to opiates?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I would say yes.  I don't know that anything

2    specific, but I had been in the -- in the

3    pharmaceutical industry for some time at the point

4    when I went to Anda, so I was generally aware.

5    Q.   You'd been in the industry.  You've worked

6    as a financial consultant for a company --

7    A.   So --

8    Q.   -- a pharmacy for about a year and then you

9    went to work for another --

10   A.   Well, the -- so the -- the interesting part

11   is, as you read my résumé literally there, the -- I

12   worked for PCS Health Systems kind of through --

13   from high school through when I went to Anda.  That

14   company was bought and sold several times, similar

15   to Anda, where I think the company you're

16   referencing there was one of the owners; and my role

17   as a financial analyst on that team was, you know,

18   part of their buying team.  So it was as kind of my

19   first entry into the purchasing side of the

20   pharmaceutical business.

21   Q.   Okay.  So opioids were not a mystery to you

22   when you went to Anda?

23   A.   No.

24   Q.   And when you went to Anda, you understood

25   that opioids could be addictive?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2       A.   Yes.  I would say, though, from a

 3   clarification standpoint, I think, you know, CIIs as

 4   opposed to opioids, I don't know if those are the

 5   opioids specifically.  I think there are other --

 6       Q.   Oh, okay.

 7       A.   -- controlled substances --

 8       Q.   That's fine.  You -- did you understand when

 9   you went to Anda in 2003 that CII opioids could be

10   addictive?

11       A.   Sure.  Yes.

12              MS. KOSKI:  Object to form.  Excuse me for a

13       second.  You guys -- just a little pause if I

14       need to object.

15              THE WITNESS:  Okay.

16              MS. KOSKI:  Thank you.

17       Q.   Okay.  So we -- from the time that you got

18   there, you were initially involved -- withdrawn.

19              I'll tell you that I'm obviously going to

20   focus my questioning today on opioids, and you may

21   have been doing other --

22       A.   Yeah.

23       Q.   -- purchasing for other pharmaceuticals.

24   You understand that, right?

25       A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  But I'm going to be talking about

 2   opioids.

 3             So one of the things you were doing when you

 4   got there in '03 was you were involved in the

 5   purchasing of opioids.  You already mentioned that,

 6   right?

 7        A.   Uh-huh.

 8        Q.   Correct?

 9        A.   Yeah.

10        Q.   And you, from that point in time, until when

11   you left in April of 2016, throughout that entire

12   course, in one -- whatever role you were in, you had

13   some activity with regard to opioids, correct?

14             MS. KOSKI:  Object to form.

15        A.   Yes.

16        Q.   Okay.  In other words, if you were maybe in

17   some early on, you were involved in purchasing

18   opioids, right?

19        A.   Uh-huh.

20        Q.   Correct?

21        A.   Yes.

22        Q.   And then -- and then subsequently, you

23   became involved in the sales of opioids, right?

24        A.   Yes.

25        Q.   And you became involved in the marketing of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    opioids, right?

2         MS. KOSKI:  Object to form.

3    A.   I don't know that we -- we did -- no, we

4    didn't market opioids.  I guess I think of

5    marketing, when you say "marketing," as, you know,

6    advertising or something like that.

7    Q.   So when you were there, at no time did you

8    do any advertising for opioids?

9    A.   The -- I would say -- I can really only

10   speak to my time when I took over marketing and

11   going forward --

12   Q.   Uh-huh.

13   A.   -- and I believe the answer to that is we

14   did not.  What we would promote was -- we were

15   promoting programs related to trying to get

16   customers to purchase their controlled substances

17   using Anda as a secondary or option to buy their

18   controlled substances through us.

19   Q.   Okay.  So -- so with respect to opioids,

20   from the time you took over being VP of sales, you

21   were involved, of course, in the sale of opioids,

22   right?

23   A.   Yes.

24   Q.   And you did not -- according to you, you did

25   not market opioids?
```

```
 1              MS. KOSKI:  Object to form.

 2      Q.   Right?

 3      A.   Correct.

 4      Q.   But you were involved in promoting to

 5  customers opioids for purchase based on essentially

 6  pricing or other benefits you might confer on then,

 7  right?

 8              MS. KOSKI:  Object to form.

 9      A.   Not necessarily pricing; but again, as part

10  of a larger CII program, yes.

11      Q.   What do you mean by "as part of a larger CII

12  program"?

13      A.   Again, my team wasn't necessarily trying to

14  sell an individual product.  It wasn't really a

15  transactional sell.  It was a program-based sell.

16  So we were going to large customers saying, you

17  know, not -- you know, "Will you buy product X from

18  us."  It was more, "Will you buy" -- "will you take

19  your control volume and put a portion of that

20  through Anda as opposed to through someone else."

21      Q.   So will you take -- so when you were --

22  withdrawn.

23              MR. PENNOCK:  One second.  I want to ask the

24      videographer.  Are you having any problem with

25      the buttons, his buttons on his jacket scratching
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       on the table?
 2              THE VIDEOGRAPHER:  No.
 3              MR. PENNOCK:  You're not picking that up?
 4              THE VIDEOGRAPHER:  I heard a -- I heard one
 5       scratch.
 6              MR. PENNOCK:  Okay.  Let me know if it
 7       becomes -- I don't want that playing through the
 8       whole tape.
 9              THE VIDEOGRAPHER:  Okay.
10              MR. PENNOCK:  Okay.
11              THE WITNESS:  I'll try to be cognizant of
12       that.  Sorry.
13              MR. PENNOCK:  That's okay.  It's not your --
14       not your issue.
15  BY MR. PENNOCK:
16       Q.   But -- okay.  So you would certainly be
17  involved in promoting CIIs to customers, right?
18       A.   Yes.
19              MS. KOSKI:  Object to form.
20       A.   Yes.
21       Q.   But you're saying that at no time were you
22  involved in promoting a particular opioid to a
23  customer.  Is that what you're saying?
24       A.   Look, I -- it's hard to say "at no time,"
25  like it never happened, but that wasn't what our
```

Highly Confidential - Subject to Further Confidentiality Review

1    team did.  Our team wasn't a transactional sell an

2    individual product team.  It's not -- that wasn't

3    what our goal was out there.

4        Q.   What about --

5        A.   Our goal was --

6        Q.   Okay.

7        A.   -- selling larger programs.  And, yes,

8    opioids would have been part of a CII program, and

9    we were actively promoting CII programs to

10   customers.

11       Q.   What about promoting not a particular

12   opioid, but opioids as a group?

13       A.   I don't recall that that ever happened.

14       Q.   Okay.  So from 2003 to 2012 -- I'm sorry.

15   Withdrawn.

16            From 2003 till April 2016, I think we've

17   established you did have some activity with -- in

18   your company with respect to opioids throughout that

19   entire time period; is that correct?

20       A.   Yes.

21       Q.   Okay.  Now, during -- from 2003 to 2016,

22   when you left, there was an e-mail system that

23   existed at Anda, correct?

24       A.   Yes.

25       Q.   Did you have a particular practice of not

```
 1    using that e-mail system, you yourself?

 2        A.    No.

 3        Q.    Okay.  Did you have a particular practice of

 4    regularly deleting your e-mails?

 5        A.    No.

 6        Q.    And you --

 7        A.    I was like most people in that I used my

 8    e-mail sort of as my filing system.  I think there

 9    were -- over the course of, you know, 13 years, I

10    believe there were different times where the e-mail

11    system changed or, you know, I think they -- towards

12    the end of my time there, I think they started, you

13    know, allowing you almost -- only so much space and

14    things like that that would potentially purge some

15    e-mails, but --

16        Q.    Okay.  And did you use your e-mail like many

17    people, to speak with people about issues?

18        A.    Yes.

19        Q.    So would it surprise you to learn that

20    for -- from 2003 to 2016, when you left, from when

21    you started until when you left, there are only

22    approximately 167 e-mails with your name on it as a

23    "from," a "to," or a "CC" --

24            MS. KOSKI:  Object to form.

25        Q.    -- that relate in some way to opioids, 167?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KOSKI:  I'm going to object.

2         Hold on for a second.

3              THE WITNESS:  Yeah.

4              MS. KOSKI:  I think that --

5              MR. PENNOCK:  Excuse me?

6              MS. KOSKI:  This is an issue that if you had

7         an issue with those documents and you had a

8         question about them, you could have asked counsel

9         in advance.  I don't -- Mr. Versosky doesn't work

10        at the company anymore.

11             We, you know, obviously as part of the

12        discovery process --

13             MR. PENNOCK:  Look, I'm going -- look.  The

14        protocol is clear as to speaking objections.  If

15        you have an objection, okay?

16             MS. KOSKI:  It's also an improper question.

17             MR. PENNOCK:  Well, I don't think it's

18        improper at all.

19             MS. KOSKI:  You're asking about something he

20        doesn't know about.

21             MR. PENNOCK:  That's fine.  The judge can

22        decide that and strike it.

23     BY MR. PENNOCK:

24        Q.   Let me rephrase the question.

25        A.   Sure.
```

```
1       Q.   Okay.  So --

2       A.   I -- I don't think --

3       Q.   You get what I'm driving at?

4       A.   Yeah.  I don't think you need to rephrase

5   the question.

6       Q.   Okay.

7       A.   I -- you know, does it surprise me there is

8   only 167 with me on them?  I think as I -- as I

9   described to you, we were more looking at programs,

10  not necessarily opioids.  It is a long time, 167, I

11  mean, that's --

12      Q.   Well, it was -- it was even -- let's just

13  say --

14           MR. PENNOCK:  We're getting the buttons on

15      the video.

16           THE WITNESS:  Want me to try to keep my arms

17      below the table?

18           MR. PENNOCK:  Well, I don't -- I want you to

19      be comfortable, but maybe there is something -- I

20      don't know how to solve it.

21  BY MR. PENNOCK:

22      Q.   Okay.  Let's say if from -- if I told you

23  from May 2003 to when you left in April 2016 --

24      A.   Sure.

25      Q.   -- there were only 167 e-mails that you sent
```

1   that related to opioids, that would surprise you,

2   wouldn't it?

3          MS. KOSKI:  Object to form.

4      A.   Yeah, I don't -- I don't know.  Again, I --

5   thinking about, like, the purchasing role, I don't

6   know that we were speaking about opioids

7   specifically, you know, anywhere.  We would have

8   been speaking about a product contract, a

9   manufacturer -- a new contract happening with a

10  manufacturer that may or may not have been selling

11  opioids.

12         On the sales side, we wouldn't have been

13  speaking specifically about opioids.  We would have

14  been speaking related to a controlled substance

15  program or a customer as opposed to the products.

16     Q.   So what you're telling us is that if you

17  sent only 167 e-mails that related to opioids

18  between the time you started in 2003 to the time you

19  left in April 2016, that's not something that seems

20  unusual to you?

21         MS. KOSKI:  Object to form.

22     A.   I think it's possible.  I think it's

23  possible.  167 over, you know, 13 years, what is

24  that, 10 a year.

25     Q.   You do know that we're relying upon the

1    truth of your answers here today, don't you?

2    A.   I do.

3         MS. KOSKI:  Object to the form.

4    A.   I do.  I'm trying -- I'm trying to be --

5    Q.   Okay.

6    A.   -- truthful.

7         MS. KOSKI:  And, again, Paul, if you want to

8    off the record ask us about the number of

9    documents that he doesn't know anything about,

10   you can ask us about it.

11   A.   My assumption is you have all the data, so

12   I --

13   BY MR. PENNOCK:

14   Q.   So at some point -- well, withdrawn.

15        So it -- I want to understand and be clear.

16   At no time before you left the company did you make

17   any effort to delete e-mails from you that related

18   to opioids?

19   A.   No.

20   Q.   Are you familiar with or you've heard of

21   the -- you know, the DEA letters that came from a

22   DEA agent in 2006 and 2007 regarding opioids?

23   A.   Came to --

24   Q.   To the company.

25   A.   Not specifically, no.

```
 1              MR. PENNOCK:  Let's mark this as Exhibit 1,

 2       and we'll mark this one as Exhibit 2.

 3              I'll give you copies in just a second.

 4              (Anda-Versosky Exhibit 1 was marked for

 5    identification.)

 6              (Anda-Versosky Exhibit 2 was marked for

 7    identification.)

 8              MS. KOSKI:  Thank you.

 9              Which one did you hand me?  Is that 1 or 2?

10    BY MR. PENNOCK:

11       Q.  Sir, we've marked as Exhibit 1 to your

12    deposition a document that appears to be from U.S.

13    Department of Justice Drug Enforcement

14    Administration.

15       A.  Uh-huh.

16       Q.  It's dated September 27th, 2006, right?  Do

17    you see that?

18       A.  I do.

19       Q.  Okay.  And then we've marked as Exhibit 2 to

20    your deposition a document that also appears to be

21    from the U.S. Department of Justice Drug Enforcement

22    Administration dated February 7th, 2007, right?  Got

23    that?

24       A.  I do.

25       Q.  And if you look at the last page of both of
```

Highly Confidential - Subject to Further Confidentiality Review

1    these exhibits, a Drug Enforcement Administration

2    deputy assistant administrator Joseph T. Rannazzisi

3    is the signatory.  Do you see that?

4         A.   I do.

5         Q.   All right.  Have you ever seen these

6    documents before?

7         A.   Not that I can recall.

8         Q.   Have you ever seen them reported on in the

9    media?

10        A.   Not that I can recall.

11        Q.   When you -- back in -- let's take the first

12   one in 2006, September 2006.  When -- did anyone

13   ever discuss this communication with you at that

14   time?

15        A.    Not that I remember.  In 2006, I believe I

16   was still in my role in purchasing, so I wasn't on

17   the leadership team.  At the point when I got to the

18   leadership team, I would have probably, you know,

19   had more visibility to something like this; but at

20   that point, I don't believe I did.

21        Q.   So when you got to the leadership team, you

22   still don't recall these being brought to your

23   attention?

24        A.   No.

25        Q.   And do you recall any discussion about the

Highly Confidential - Subject to Further Confidentiality Review

 1    DEA's communication to the company regarding what

 2    the company should be doing and not doing?

 3        A.    Sure.

 4              MS. KOSKI:  Object to form.

 5        Q.    You do recall that?

 6        A.    Yes.

 7        Q.    Okay.  Let's look at the 2007 letter.

 8        A.    It's Number 2?

 9        Q.    Yes.  If you might, feel free to read any

10    aspect of the letter that you want, but I wanted to

11    direct your attention to the next-to-last page.

12    It's Page 3.  The pages are noted in the upper

13    left-hand corner.

14              MS. KOSKI:  And you should take your time to

15        read whatever portion you think you need to.

16        A.    Uh-huh.

17        Q.    Okay.  And I've highlighted here -- and

18    that's my highlight -- a line I'd like to read to

19    you.  Tell me if I'm reading this correctly:  "A

20    distributor seeking to determine whether a

21    suspicious order is indicative of diversion of

22    controlled substances to other than legitimate

23    medical channels may wish to inquire with the

24    ordering pharmacy about the following."

25              Do you see that statement?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I do.

 2      Q.   Okay.  And then it goes on to list 10

 3   different potential inquiries from a pharmacy.  Do

 4   you see that?

 5      A.   I do.

 6      Q.   Okay.  Take a minute to read those 10,

 7   please.

 8      A.   All right.

 9      Q.   Thank you.

10           When you became vice president for national

11   accounts in 2008, February 2008, did you have any

12   understanding as to the suggestions made by the DEA

13   in this -- in these 10 numbered points here?

14           MS. KOSKI:  Object to form.

15      A.   Yeah, I don't know that I knew that they

16   were specifically from this; but these are very

17   consistent with the things that our compliance team

18   was looking at or requiring of, you know,

19   salespeople to talk to their customers about.

20      Q.   And in order for the compliance team to

21   effectively be in line with what the DEA wanted, the

22   salespeople would have to know, right?

23           MS. KOSKI:  Object to form.

24      A.   Yes.

25      Q.   So in other words, the salespeople are sort
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of where the rubber meets the road on much of the

 2    compliance with what the DEA may have directed,

 3    correct?

 4         MS. KOSKI:  Object to form.

 5    A.   Yes and no.  All right.  So it's

 6    interesting.  I would say the salespeople had a --

 7    kind of a general understanding; but the -- their

 8    role was to collect data and pass it to compliance

 9    who had, you know, full authority to make a decision

10    of yes or no if we were going to sell a customer.

11    Q.   Did you find when you got to this position

12    of director of -- sorry, vice president of national

13    accounts, that the salespeople were acting with

14    concern regarding opioids?

15         MS. KOSKI:  Object to form.

16    A.   My -- I would say my short answer is not

17    necessarily, but, again, that's only because they

18    weren't actively, you know, promoting opioids.  You

19    know, the -- they were out promoting programs to

20    customers.

21         And one other point of clarification.  When

22    you -- when you speak to the sales team, the team

23    that I'm responding on behalf of would be the

24    national account team, which was a, you know, I

25    think 8- to 10-person team at any given time, not
```

1    the larger 150-person telesales floor.

2        Q.   Tell me what you mean when you say they were

3    not actively promoting opioids.

4            MS. KOSKI:  Object to form.

5        A.   Yeah.  So "actively promoting opioids"

6    meaning it's not like there was a program out there

7    where we were trying to say, "Buy all your opioids

8    from us."  You know, to my recollection, our only

9    promises were related to, "Buy your controlled

10   substances from us," unless there was, you know,

11   some arrangement between a manufacturer and a

12   customer.

13       Q.   What percentage of your controlled

14   substances in 2008 were opioids versus other

15   controlled substances?

16       A.   I don't know the answer to that.

17       Q.   Did you know it back then?

18       A.   No.  Probably not at the beginning, but over

19   time I probably would have, you know, maybe a few --

20       Q.   Are you able to estimate for me what that

21   percentage was?

22       A.   If I were to take a guess, may -- you said

23   opioids, which I would guess --

24           MS. KOSKI:  Object to form.  Don't guess.

25       Q.   I'm trying to assess if you're only out

Highly Confidential - Subject to Further Confidentiality Review

```
 1    promoting CIIs.

 2        A.   Sure.

 3        Q.   But if opioids were 99 percent of your CIIs,

 4    then you're out promoting opioids, right?

 5             MS. KOSKI:   Object to form.

 6        A.   If -- if that's a case and you know that

 7    answer, then yes, I'm wrong on that.  I -- my

 8    assumption is there are other CIIs outside of

 9    opioids, but --

10        Q.   There are.

11        A.   Yeah.

12        Q.   And I'm just giving you an example and

13    that's why --

14        A.   Sure.

15        Q.   So you say you were not out actively

16    promoting opioids, right?

17        A.   Yes.

18        Q.   That's your testimony?

19        A.   Yes.

20        Q.   All right.  But you also say you don't know

21    what the percentage of opioids was of the CII

22    programs you were promoting, correct?

23        A.   Correct.

24             And when you asked would I have known that

25    number then, I don't know that I would have known
```

Highly Confidential - Subject to Further Confidentiality Review

 1   that number.  I would have known the number of

 2   controlled substances overall versus, you know, like

 3   the total sales of the -- you know, total sales

 4   versus controlled sales; and that was probably, you

 5   know, that was low, 10 percent maybe.  I don't know.

 6       Q.   So when you became vice president for

 7   national accounts, you did not undertake any steps

 8   to understand what the percentage of CIIs,

 9   controlled substances, were opioids?

10       A.   No.

11       Q.   And that's -- the same is true when you

12   became vice president for sales and marketing, you

13   did not undertake to ascertain what percentage of

14   overall controlled substances sales were opioid

15   sales?

16       A.   I never looked at it that way, no.

17       Q.   At some point, the Anda company had

18   threshold limits that they set for purchasers of

19   opioids, right?

20       A.   Correct.

21            MS. KOSKI:   Object -- object to form.

22       Q.   And do you know what that limit was?

23       A.   No.

24       Q.   So I'd like to understand this.  So you --

25   do you recall that the company set a benchmark

1   threshold back in 2007 to permit customers to

2   purchase up to 5,000 dosage units of opioids per

3   month?

4          MS. KOSKI:  Object to form.

5      A.   Yeah.  So it sounds familiar.  I would say

6   again, 2007 was kind of -- you know, I was sort of

7   in purchasing.  I don't -- I didn't have as much

8   broad experience to what else was happening; but it

9   sounds familiar, yes.

10     Q.   Sir, you -- you are aware that there is

11  something out there called "the opioid crisis" in

12  this country?

13         MS. KOSKI:  Object to form.

14     Q.   Aren't you?

15     A.   Yes.

16     Q.   And you are aware that it is -- there's data

17  that as many as 200,000 people have died from opioid

18  overdoses, right?

19     A.   Yes.

20         MS. KOSKI:  Object to form.

21     Q.   And you are aware that there are

22  allegations, to say the least, that much of the

23  opioids crisis is generated through the use of

24  prescription opioids, right?

25         MS. KOSKI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   So the reason I ask this question is that

 3   you -- it seems that you've not -- well, let me

 4   withdraw that.

 5             You -- at what point did you become familiar

 6   with those assertions that are out there in the

 7   world regarding the number of people that have died,

 8   the fact that there is an opioid crisis, the fact

 9   that it seems to have substantially got going

10   because of prescription opioids?  When did you first

11   become aware of all that?

12             MS. KOSKI:  Object to form.

13        A.   Yeah, I think, you know, sort of as with

14   everything else, the visibility to a situation like

15   that grew over time, right?  So if you want to judge

16   2000 based on, you know, today's understanding of

17   the -- of the issue, it's -- that's challenging.

18   You know, all I can tell you is related to 2007, I

19   was not, you know, really that big of a deal in the

20   Anda organization as far as seeing other things.

21             Would I have been aware of that?  Very

22   possibly I would have been aware of that.  I don't

23   recall that limit specifically.  Over time the

24   limits, you know -- your initial question related to

25   do you remember what the limit was.
```

Highly Confidential - Subject to Further Confidentiality Review

1          The limits were, I believe, placed by a

2     customer, so I don't know that there is any specific

3     answer to that with the exception of potentially if

4     that was the first limit that was placed before my

5     knowledge, then maybe there was.

6     Q.   Yeah.  Well, you get what I'm driving at.  I

7     mean, have you -- have you at any time since you --

8     let's just say since you left the company sat back

9     and thought through in your head how things

10    progressed with respect to your involvement with the

11    promotion of controlled substances at Anda and how

12    it may have contributed to this crisis?

13         MS. KOSKI:  Object to form; mischaracterizes

14    testimony.

15    Q.   Have you thought about that?

16    A.   Of course.  Yeah.  My -- you know, the

17    interesting thing -- and I'm sure you'll be talking

18    to other people from Anda -- I think we felt we had

19    a responsibility, and we were always trying to be

20    cautious.

21    Q.   Okay.

22    A.   And I'll say from a sales standpoint, you

23    know, the feedback we would receive from customers

24    is that we were always, you know, more restrictive

25    than, you know, anybody else they were buying from.

Highly Confidential - Subject to Further Confidentiality Review

1    And that's -- you know, our compliance team was

2    tough.  I feel like we had good, stringent policies.

3        Q.   Sir, back at the time that you were with

4    Anda, is it your view that you -- you and Anda

5    recognized that you had a responsibility with

6    respect to opioids?

7         MS. KOSKI:  Object to form.

8        Q.   And is it your view that back at the time,

9    that you and those under you and the company was

10    trying to be cautious with respect to opioids?

11        A.   Yes, with all controls.

12        Q.   With all controls as well?  Okay.

13         (Anda-Versosky Exhibit 3 was marked for

14    identification.)

15         MR. PENNOCK:  Could you please mark this as

16         Exhibit 3 to Mr. Versosky's deposition.

17         MS. KOSKI:  Counsel, just as a matter of

18         practice, can I get the document from the witness

19         so just in case -- I don't expect you're going to

20         give him something of -- objectionable; but just

21         before he sees it, if I can see it, it would be

22         helpful, just as a matter of procedure?

23         MR. PENNOCK:  Oh, that's -- that's fine.

24    Yeah.  Of course.  Just remind me.

25    BY MR. PENNOCK:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Sir, I've marked as Exhibit 3 to your

 2   deposition an e-mail thread.  The top e-mail is

 3   dated Thursday, July 24, 2008.  Do you have that?

 4        A.   I do.

 5        Q.   Okay.  And I will tell you that I don't

 6   believe you were on this e-mail thread from what I

 7   can tell.  Okay?

 8        A.   Yes, I see that.

 9        Q.   So in case you were wondering?

10        A.   Yeah.

11        Q.   I don't think you were.  All right.

12             But you know who Michael Cochrane was?

13        A.   Yeah.  Michael ran compliance.

14        Q.   He ran compliance, meaning that Michael

15   Cochrane ran that part of the Anda business that was

16   in charge of making sure that the -- whatever you

17   were doing with controlled substances was compliant

18   with the regulation and directives from the

19   government?

20             MS. KOSKI:  Object to the form.

21        A.   Choosing which --

22        Q.   Fair statement?

23        A.   -- which customers we were willing to sell

24   controls to or not, yes.

25        Q.   Okay.  So --
```

```
1     A.   And Brian Witte ran the -- that he was the

2   other lead of sales that ran the larger telesales

3   group.

4     Q.   Okay.  And incidentally, what was the

5   telesale -- what did the telesales people do?

6     A.   So that -- that's the -- that's the basic of

7   what Anda's business is, is that they call

8   mom-and-pop pharmacies and try to sell them

9   products.

10    Q.   Okay.  All right.  Well, could you turn to

11  the third page of this Exhibit 3, please?

12    A.   Sure.

13    Q.   And for the record, I'm going to read the

14  starting Bates number.  This is

15  Anda_Opioids_MDL_0000152299.

16         MR. PENNOCK:  Do I have to do that every

17     time?

18         MS. KOSKI:  That's the cover page?

19         MR. PENNOCK:  That's the front first page.

20         MS. KOSKI:  I will -- if you want a

21     stipulation, that as long as that's the prefix of

22     the document, you can use some shorthand of the

23     numbers at the end.  That's fine with me.

24         MR. PENNOCK:  That would be great.  I'd

25     rather not to have to read them at all.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KOSKI:  Yeah.  Obviously, if it doesn't
2         have that prefix, we should say something.
3              MR. PENNOCK:  Okay.  Thank you for that.  So
4         I'll just read the digits the next time.
5              MS. KOSKI:  That's fine.
6    BY MR. PENNOCK:
7         Q.   Okay.  And this document ends at 301.
8              Okay.  Could you -- do you see that third
9    page?
10        A.   I do.
11        Q.   Have you had an opportunity to read that?
12        A.   I haven't, no.
13        Q.   Okay.  Please do that.
14        A.   Okay.
15        Q.   Thank you, sir.
16             Reading that, does that refresh your
17   recollection as to the 5,000 dosage unit limit per
18   month that I asked you about earlier?
19             MS. KOSKI:  Object to form.
20        A.   Again, I'm -- I feel like I'm aware of that.
21   Specifics, not really.
22        Q.   You're not really aware of it as we sit here
23   today, but you're not sure what your awareness was
24   going back when you were at the company?
25        A.   I would say I feel like I remember that this
```

```
 1    was happening; but again, I, you know, like, changes

 2    in this and kind of that time frame, I mean, I

 3    just -- I was more focused on the national account

 4    side and kind of launching that than what was really

 5    happening on the telesales floor.  But, yes, I guess

 6    I have some cursory knowledge of this.

 7        Q.   Okay.  Well, so you -- with respect to

 8    selling to national chains --

 9        A.   Yeah.

10        Q.   -- or large chains, you certainly still

11    needed to be aware of any dosage unit limit that

12    individual stores for those chains might have,

13    right?

14        A.   Yes.

15        Q.   And you needed to be aware of that because

16    once -- well, let's -- let me rephrase.

17             You would -- you were responsible at one

18    point for getting these large chains to become Anda

19    customers, right?

20        A.   Yes.

21        Q.   And part of being an Anda customer is you

22    wanted to promote to them a CII program --

23        A.   Yes.

24        Q.   -- controlled substances program, right?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   But part of that is each of the individual

 2   stores for the chain had to comply with the --

 3   whatever limits were set for the stores, right?

 4        A.   Yes.

 5             MS. KOSKI:   Object to the form.

 6        A.   But again, you know, to my clarification

 7   earlier, you know, like 2008, we didn't really have

 8   big business there, you know.  It evolved over time,

 9   you know.  So the thought that a large chain was

10   working with us in 2008, they weren't, right.

11             But I would say generally, you know,

12   you're -- generally you're correct, I would have

13   been aware in some form or fashion.

14             MR. PENNOCK:   Mark this as Exhibit 4,

15        please.

16             (Anda-Versosky Exhibit 4 was marked for

17   identification.)

18             MR. PENNOCK:   Just hold that till counsel

19        sees it.

20             MS. KOSKI:   Okay.   Thank you.

21   BY MR. PENNOCK:

22        Q.   Sir, we've marked as Exhibit 4 to your

23   deposition an e-mail from Marc Falkin --

24        A.   Uh-huh.

25        Q.   -- dated November 1st, 2007.  You mentioned
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     him earlier.  Who is Marc Falkin?

2          A.   Marc Falkin was a -- he was an executive

3     with Anda for many years.  He held the roles of VP

4     of purchasing, I believe VP of marketing.  He ran

5     the telesales floor at one point.  He held many

6     different roles, kind of -- while I was there.

7               In this specific case, I don't know if it

8     was -- he was sending this from a position of

9     running sales or running marketing, but it probably

10    would have been one of those two in 2007.

11         Q.   He certainly sent it to everybody, didn't

12    he?

13              MS. KOSKI:  Object to form.

14         Q.   I mean that literally.  He seems to have

15    sent it to everyone involved in sales or marketing

16    at the company.

17              MS. KOSKI:  Object to form.

18         Q.   Do you agree with that?

19         A.   Yes.

20         Q.   Okay.  And you were one of the people named

21    about nine-tenths down this list, correct?

22         A.   I don't see my name on there, but I'm sure

23    it is.

24         Q.   It's --

25         A.   Yeah, that's me.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MR. PENNOCK:  We'll mark this, please.

13          (Anda-Versosky Exhibit 5 was marked for

14     identification.)

15          MS. KOSKI:  Okay.  Thank you.

16          MR. PENNOCK:  Katy, I have a couple of legal

17     assistants I'm going to have come into the depo

18     at this point.

19          Can you go get them?

20          MS. KOSKI:  Do you want to take a break so

21     they can --

22          MR. PENNOCK:  It's just going to take a

23     second.

24          MS. KOSKI:  They can come in that door

25     maybe.

```
 1   BY MR. PENNOCK:

 2       Q.   Sir, have you had an opportunity to look at

 3   that?  I specifically want to direct your attention

 4   to the paragraph that begins "Teva Matrix Patches"

 5   on Page 2.

 6            MS. KOSKI:  If you need to read the whole

 7       thing, take your time.

 8            THE WITNESS:  Yeah, I'm going to read it

 9       real quick.  Sorry.

10       A.   Okay.  I've read it.

11   BY MR. PENNOCK:

12       Q.   Thank you.

13            Mr. Versosky, we've marked as Exhibit 5 to

14   your deposition a document entitled "Leadership

15   Meeting, March 17, 2009 Minutes."

16       A.   Yes.

17       Q.   Do you see that?

18            And these are minutes, meaning somebody took

19   notes and then -- from the meeting and then typed

20   them up, right?

21       A.   Yes.

22       Q.   And these meeting minutes were prepared at

23   or about the time of the meeting, right?

24       A.   Sure.  Yeah.

25       Q.   And they were prepared and maintained in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    regular course of business of Anda, right?

 2        A.   Yes.

 3        Q.   Okay.  And your -- your name appears on here

 4    as an attendee at the meeting?

 5        A.   Yes.

 6        Q.   You -- so as of this time, you were -- you

 7    were vice president for national accounts, right?

 8        A.   Correct.

 9        Q.   But when you became vice president for

10    national accounts, you moved into the leadership

11    role --

12        A.   Yes.

13        Q.   -- for the whole company, right?

14             MS. KOSKI:  Object to form.

15        Q.   You moved into a leadership role for Anda?

16        A.   Yes.

17        Q.   All right.  And Al Paonessa --

18        A.   Al.

19        Q.   -- Al, sorry -- Al Paonessa, who is that?

20        A.   Al was president of Anda.

21        Q.   All right.  Now, so the -- y'all had a

22    meeting in March of 2009, right?  And the purpose --

23    right, correct?

24        A.   Correct.

25        Q.   And the purpose of that meeting was to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    discuss any issues that people on the leadership

2    team thought might be raised with the rest of the

3    leadership, right?

4        A.   Correct.

5        Q.   And you'd have a -- you had a discussion

6    about these issues, and then maybe some conclusions

7    were drawn on each of the issues and some action

8    items, right?

9        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
12        Q.    Earlier you told us that you think everyone

13   acted -- recognized the responsibility that you had

14   for opioids, right?  Do you remember saying that?

15        A.    Absolutely.  Uh-huh.

16             MS. KOSKI:  Object to form.

17        Q.    You said that you believed that everyone

18   acted cautiously with respect to opioids.  Do you

19   remember saying that?

20        A.    Absolutely.
```

Highly Confidential - Subject to Further Confidentiality Review



 6      Q.   Well, I mean, these minutes are intended to

 7   be an important record of the leadership of this

 8   company getting together and meeting in person,

 9   right?

10           MS. KOSKI:  Object to form.

11      A.   I would say that's a misrepresentation of

12   what the meeting minutes were.

13      Q.   Oh, really?

14      A.   I -- yeah.  I --

15      Q.   Well, what do you think meeting minutes were

16   for?

17           MS. KOSKI:  Object to form.

18      A.   I -- I would say for this leadership meeting

19   at that period of time, I'm -- I don't know that we

20   had meeting minutes, you know, for a majority of the

21   meetings.  You know, so, yes, were they a record of

22   what happened in the meeting?  Sure, they were, for

23   distribution to us, frankly, to try to keep people

24   moving forward on the things that we committed to in

25   the meeting.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9        Q.   But it's your testimony that -- that people

10   at the company would not have acted without caution

11   with respect to opioid products?  Is that your

12   testimony?

13        A.   Yes.

14        Q.   Do you know who Rachelle Vance was?

15        A.   Yes.

16        Q.   Who was she?

17        A.   Rachelle was a national account manager on

18   my team.

19        Q.   She was on your team?

20        A.   She was.

21        Q.   Okay.  With respect to any sale that might

22   be possible to a customer, you-all had a term for

23   those.  You called them "opportunities," right?

24        A.   Sure.

25        Q.   Didn't you use that term a lot?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   As a --

 2      Q.   As a term for a potential sale?

 3      A.   I guess, yeah, sure.

 4      Q.   You don't remember that?

 5      A.   I know the definition of the word

 6   "opportunity" and I use the word "opportunity," but

 7   as a formal -- you know, from a reporting standpoint

 8   or anything, I don't know that.  I believe

 9   "opportunity" was used in Remedy, our process

10   management system, that -- that may be what you're

11   referring to from a --

12      Q.   So didn't -- didn't you --

13      A.   An "opportunity" would have been something

14   we would have been working on, sure.

15      Q.   When you and the salespeople used the term

16   "opportunity," quote/unquote --

17      A.   Sure.

18      Q.   -- to mean a potential sale of a product?

19           MS. KOSKI:  Object to form.

20      A.   Yes.

21      Q.   Right?

22      A.   Yes.

23      Q.   So even for opioids, you would say -- you

24   would call the potential sale of opioids an

25   "opportunity"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   Okay.   Even though it was a controlled

 3  substance?

 4      A.   Yes.

 5      Q.   A CII?

 6      A.   Yes.

 7           MR. PENNOCK:   Would you mark that, please.

 8           (Anda-Versosky Exhibit 6 was marked for

 9  identification.)

10  BY MR. PENNOCK:

11      Q.   Sir, we've marked as Exhibit 6 to your

12  deposition an e-mail dated February 1st, 2010.

13      A.   Sure.

14      Q.   And take a second and read that, please.

15      A.   Okay.

16      Q.   So this e-mail was sent by one of your

17  people, Rachelle Vance, to Michael Cochrane --

18      A.   Uh-huh.

19      Q.   -- who was in charge of compliance, but also

20  to you, right, Marc Falkin and Kim Bloom, right?

21      A.   Yes.

22      Q.   Falkin and Bloom were involved in sales,

23  right?

24      A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
12        Q.   Well, you said earlier that you believed

13   everyone looked at -- recognized their -- the

14   responsibility that they had with opioids?

15        A.   Uh-huh.

16        Q.   Right?

17        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   And --

2        A.   But, again, that's looking at an e-mail

3    from, you know, eight years ago through today's

4    lens, you know.

5        Q.   So at that -- at that time, there was -- are

6    you saying people inside Anda -- withdrawn.

7             At that time are you saying that you did not

8    have an understanding as to the seriousness of

9    opioid distribution in terms of the risks associated

10   with their use?

11       A.   No, that's not what I'm saying.

12            MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 7      Q.   No.   In term -- I'm not asking -- I'm asking

 8   in general.  You said that -- you said that Rachelle

 9   would be an advocate for her customer?

10      A.   Yes.

11      Q.   And -- right?

12      A.   Yes, I did.

13      Q.   And would be pushing you and compliance to

14   get limits increased, right?

15      A.   The --

16           MS. KOSKI:  Object to form; mischaracterizes

17      his testimony.

18           Go ahead.

19      A.   Her ask would have been for them to relook

20   at a store, right?  So stores had their own

21   individual limits, I believe, by this point.  So,

22   you know, that would have been her ask.

23           Your question about wouldn't I have trained

24   them to not do this, stores had their own individual

25   limits.  So if they were potentially set arbitrarily
```

Highly Confidential - Subject to Further Confidentiality Review

1    too low, we would have wanted them to potentially

2    ask and say, "Can you relook at this?"  There may

3    have been some additional data that was needed.

4         As a secondary in the market, it was a

5    little more difficult for us to get at dispense data

6    than, you know, call it a primary wholesaler,

7    because the primary wholesaler, they are buying 90

8    some-odd percent of their drugs through that person,

9    so they can run some kind of internal -- internal

10   data to calculate potentially their limits.  For us,

11   it was a little more difficult.

24        MR. PENNOCK:  Mark this, please.

25        MS. KOSKI:  Are we at 7?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PENNOCK:  Yeah.

 2              MS. KOSKI:  Thank you.

 3              (Anda-Versosky Exhibit 7 was marked for

 4      identification.)

 5      BY MR. PENNOCK:

 6         Q.  I have marked as Exhibit 7 to Mr. Versosky's

 7      deposition Bates number 0000077935 through 938.

 8              Sir, could you please take a moment and look

 9      at that?

10         A.  Yes.

11              MS. KOSKI:  Is this set up so it's the

12         earliest in time is at the back then it moves

13         forward?

14              MR. PENNOCK:  I'm sorry.  What's your

15         question?

16              MS. KOSKI:  The first e-mail in time is at

17         the back and then it moves forward and --

18              MR. PENNOCK:  That's correct.

19              MS. KOSKI:  Okay.

20      BY MR. PENNOCK:

21         Q.  Are you ready, sir?

22         A.  Just give me one more second, I'm sorry.

23      I'm on the last section here.

24              Okay.  I think I'm ready.

25         Q.  This is an e-mail thread that starts with an
```

Highly Confidential - Subject to Further Confidentiality Review

1    e-mail, again, sent by Ms. Vance.

2        A.    Uh-huh.  Yes.

3        Q.    And the e-mail is sent to a number of

4    people.  Ms. Vance, again, she worked for you in

5    national accounts, right?

6        A.    Yes.

7        Q.    And she sent the e-mail to Kim Bloom.  She

8    was also in national accounts?

9        A.    No.  Kim -- Kim never worked for me.  I took

10   over national accounts from Kim.

11       Q.    Okay.

12       A.    So at this point, I'm not sure what her

13   exact role was.

14       Q.    Well, you were cc'd in any event?

15       A.    Yes.

16       Q.    Do you see that?

17       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6        A.    So let me put some context around this.

7    That CSOS Enterprise, the CSOS Enterprise is a

8    software application, was a CSOS system for chains

9    to buy centrally.  Right?  So no one in the market,

10   from a competitive standpoint, had another central

11   buying kind of application, electronic ordering

12   platform for controlled substances.  So we were out

13   promoting that to customers.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6      Q.   Do you need me to rephrase that?

7           MS. KOSKI:  Please.

8      A.   Yes, please.

9  BY MR. PENNOCK:

10     Q.   Yeah.  You keep -- you've referenced a

11  couple times "historical dispense data," right?

12     A.   Right.

13     Q.   And what you mean by that is, "Well, we look

14  and see, well, how much product has the store sold

15  over time and is what they are asking for from us

16  now consistent with what they've been selling,"

17  right?

18          MS. KOSKI:  Object to form.

19     Q.   That's what you're saying what "historical

20  dispense data" is, right?

21     A.   So -- so let me -- let me clarify for

22  myself -- for myself.  Yes, that's what I'm saying,

23  but that wasn't my role in the organization.  So to

24  me, that's a generalized way of saying how Mike and

25  his team would have reviewed stores.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   So, I mean, you were vice president of

 2    national accounts.  We've already said that a bunch

 3    of times, right?

 4       A.   Yeah.

 5       Q.   And you were vice president of national

 6    accounts at the time of this e-mail, right?

 7       A.   Yes.

 8       Q.   And you were on the leadership team at the

 9    time of this e-mail, right?

10       A.   Yes.
```



```
24            MS. KOSKI:  Object to form.  Sorry.  I

25       thought you were done.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No, I don't -- I -- I wouldn't have paid

 2    specific attention to that unless Mike, you know,

 3    brought that up as an issue as -- you know, where

 4    that might have come up as an issue is if Rachelle

 5    was making requests of Mike, Mike saying, "This

 6    doesn't make any sense."  He might come to me and

 7    say, "tell Rachelle to stop, you know, bothering me

 8    about this."

 9             That's where -- that analysis would have

10    happened within Mike and his team, the one that

11    you're asking for.

12             Me specifically, I was looking at, at a high

13    level, you know, we were selling thousands of

14    accounts product.  So I'm -- I'm sorry.  That

15    answer's --

16        Q.   What -- well, you may have been selling --

17    okay.

18             You were selling thousands of accounts you

19    just said, right?

20        A.   Yes.

21        Q.   And -- and just --

22        A.   I don't know where every store is for every

23    one of those accounts.  I wouldn't have looked them

24    up.  So the idea that I can -- that I would have --

25        Q.   Who -- who was going to do that then?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Mike and his team absolutely would have been

2    doing that.

3    Q.   That's it?

4    A.   Yes.

5    Q.   So the -- how many people were on Mike's

6    team?

7    A.   I don't know the answer to that.  I know --

8    because it varied from time to time.  I think when I

9    left, there were probably six maybe.

10   Q.   Six people.

11        How many salespeople did you have in --

12   withdrawn.

13        How many people were in your national

14   accounts team, like Rachelle Vance?

15   A.   I think, you know, we peaked out.  The most

16   we ever had was maybe 12.  At this time we probably

17   were in the 8 to 10 range, I would guess.

18   Q.   And not -- they had no responsibility, the

19   national account people, the 12 people that you had,

20   they had no responsibility for making their own

21   independent sort of assessment to provide

22   information to compliance as to the nature of the

23   store they were asking to max out at?

24        MS. KOSKI:  Object to form; mischaracterizes

25        testimony.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   They didn't have none?  I'm just asking.

2     They had no responsibility, is that what you're

3     telling me?

4     A.   I would say they didn't have direct

5     responsibility; but we would have asked them to, you

6     know, not be, you know, foolishly asking for things

7     that didn't make sense.

8     Q.   Right.  Like --

9     A.   But we -- we always --

Highly Confidential - Subject to Further Confidentiality Review



```
 8          MS. KOSKI:  Object to form.

 9     A.   Again, I -- possibly, but we sort of had,

10     you know, Mike's team as our -- was handling that

11     for us.  I don't know.  You know, I -- I'm sorry

12     that that's not the answer that you like, but that's

13     sort of the way we were operating as we were out

14     trying to sell, and Mike was a very hard backstop

15     and he was handling that piece.

16          Our sales team, from a national account

17     standpoint, was requesting additional information

18     where Mike needed it, was, you know --

19     Q.   But your sales team for national accounts

20     that you were in charge of didn't undertake any

21     activity to see what they were asking for to begin

22     with?  Give it to Mike, Mike is the backstop, if he

23     passes it, wonderful, we sell it and we move on.

24     That's what was happening at this --

25     A.   I would say at this period of time, that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that's fair.  I think as we moved forward, we were

 2    doing a lot more of, you know, getting

 3    questionnaires and getting data, getting

 4    questionnaires, all that stuff.

 5            MS. KOSKI:  I could use a bathroom break.

 6        We've been going about an hour and a half.  It

 7        doesn't have to be right this second.  If --

 8        when --

 9            (Discussion off the record.)

10        MR. PENNOCK:  No, we can take a break.

11        MS. KOSKI:  Okay.

12        THE VIDEOGRAPHER:  Off the record,

13    11:06 a.m.

14      (Recess from 11:06 a.m. until 11:18 a.m.)

15        THE VIDEOGRAPHER:  On the record, 11:18 a.m.

16        MR. PENNOCK:  Are you ready, Counsel?

17        MS. KOSKI:  Yes.  All set.  Thank you.

18    BY MR. PENNOCK:
```

Highly Confidential - Subject to Further Confidentiality Review

3      Q.   Who is Kim Bloom?  We talked about her

4    earlier.  You took over national accounts from her,

5    right?

6      A.   Yes.

7      Q.   And she's now executive director of sales

8    operations, right?

9      A.   Yes.

10     Q.   It looks like she was on this e-mail

11   chain -- I'm trying to find -- she didn't get on

12   this e-mail chain until a few e-mails in.

13          MS. KOSKI:  Object to form.

14          MR. PENNOCK:  Yeah, I'll withdraw that.

15   BY MR. PENNOCK:

16     Q.   You see, if you look on the second page of

17   this e-mail thread, it looks like Kim Bloom got

18   thrown on a cc in the middle of this thread.

19          MS. KOSKI:  Object to the form.

20     A.   I see that.

21     Q.   Right?

22     A.   Yeah, I see that.

23          THE VIDEOGRAPHER:  Excuse me, Counsel.  I

24      just need to adjust the witness's position again.

25      I didn't realize you were blocking that camera.

1      So just a little bit more.

2           That's good.  Thank you.

3   BY MR. PENNOCK:

4      Q.   I'm sorry, she jumped on -- she -- it was

5   before that she -- she was on -- she was an

6   addressee of the original e-mail.  Okay.

7      A.   Yes.

8      Q.   But Michael Cochrane, he's in compliance.

9   Kim Bloom is in sales.  She's the executive director

10  of sales operations.

11          Cochrane is the compliance guy you've been

12  talking about, right?

13     A.   Yes.

14     Q.   Michael Cochrane?

15     A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 7        Q.   So in any event, the -- the backstop,

 8    Michael Cochrane that you referred to earlier --

 9        A.   Yes.

10        Q.   Well, this executive director of sales

11    operations is trying to go by the backstop and go

12    right to the president because she doesn't want to

13    hurt the relationship with the accounts, right?

14             MS. KOSKI:  Object to the form.

15        A.   I think she's -- she's suggesting that he

16    talk to Al, yes.  Al was his -- Al was Mike's boss,

17    right?  So I would assume from an escalation

18    perspective, talk to Al.

19        Q.   So you mentioned that in terms of making

20    decisions to sell to particular -- make particular

21    sales, you said that they were, quote, scientific

22    decisions.

23             Do you remember saying that earlier?

24        A.   I do.

25        Q.   Okay.  Kim is not -- Ms. Bloom is not
```

Highly Confidential - Subject to Further Confidentiality Review

1    engaging in this scientific decision process, is

2    she?

3        A.   No.

24       Q.   But sales in general, even the people under

25    you, were you -- they didn't really have that --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    That's what I was saying --

 2        Q.    -- scientific decisionmaking process

 3    applying to their attempts to make sales?

 4        A.    Correct.  Correct.
```

 8            I want to show you something, a PowerPoint.

 9            MR. PENNOCK:  Would you mark this, please.

10            (Anda-Versosky Exhibit 8 was marked for

11    identification.)

12            (Anda-Versosky Exhibit 9 was marked for

13    identification.)

14            MS. KOSKI:  She was waiting for me, and I

15    didn't give the high sign.

16    BY MR. PENNOCK:

17        Q.    Let me know when you're ready, sir.

18        A.    Sure.

19            MS. KOSKI:  This doesn't have any notes on

20    it.  Is that what you're asking?

21            Is there any notes on the one you have?

22            THE WITNESS:  No.

23            MS. KOSKI:  Oh, that's the one.  It's

24    dog-eared.

25    BY MR. PENNOCK:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    It's the same document, Mr. Versosky.

 2        A.    Okay.

 3        Q.    Sir, have you had an occasion to look at

 4   Exhibit 9 -- or Exhibit 8?

 5        A.    Yes.

 6        Q.    That's a PowerPoint presentation that you

 7   had some input on, isn't it?

 8        A.    Yeah.  So the interesting thing is the

 9   general kind of Anda overview presentation was a

10   large deck that we used and kind of clipped for a

11   bunch of different presentations.  So many of the

12   slides in here, I created.  Many of them, I've never

13   seen before.

14        Q.    Okay.  Well, can you look at Exhibit 9,

15   please.

16        A.    Sure.

17        Q.    Let me identify Exhibit 8 first.  I didn't

18   do that yet.

19              So Exhibit 8 is a PowerPoint presentation

20   entitled "Anda, Incorporated, Anda Overview," and it

21   is Bates number 0000721153 and it runs through 1174.

22              Exhibit 9 is an e-mail thread, Bates number

23   0000721151 and 152.  So it's the Bates number that

24   immediately precedes the PowerPoint Bates number.

25              Okay?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Okay.

2      Q.   Now, Exhibit 9, this e-mail thread reflects

3    that the -- this PowerPoint presentation was sent to

4    you by Michael Cochrane, right?

5      A.   Yes.

6      Q.   And he asked you to take a -- take a look at

7    it and perhaps give a couple bullet points on

8    Slide 4.

9           Do you see that?

10     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



```
13      Q.   Now, were you at any meetings with the DEA?

14      A.   No, never.

15      Q.   Never?

16      A.   Never, not that I'm aware of.
```

Highly Confidential - Subject to Further Confidentiality Review



23        Q.   Got it.  Okay.

24             As of 2014, were you -- were you then paying

25     attention to the city and state of request?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I'll tell you, I don't know that.  Yeah.  I
 2    don't know that it was a -- no.
 3        Q.   On the sales side.
 4        A.   Yeah.
 5             No, I don't believe so.
 6        Q.   Who is George Fields?
 7        A.   So George -- George was with Anda for a very
 8    long time.  I believe he ran -- he also ran sales at
 9    some point, the telesales function; moved into
10    purchasing; and before we had sort of a formal
11    marketing department, he kind of ran some of the
12    promotions and things like that out of -- I believe
13    out of purchasing.  He kind of had a bunch of
14    different roles at Anda at the time.
15        Q.   And who is Brian Witte?
16        A.   Brian was my counterpart that led the inside
17    sales -- telesales team.  So he was owner of the
18    budget and whatnot for telesales.
19        Q.   Do you remember someone by the name of Norm?
20        A.   Yes.
21        Q.   Who might that be?
22        A.   Norm Dodes was a -- was a national account
23    manager also on my team.
24             MR. PENNOCK:  Do you have copies of this?
25             We'll mark my copy.  Could you -- I only --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        I don't seem to have another copy of this.  I
 2        don't know, but could you take that?
 3             MS. KOSKI:  If you want to walk out to the
 4        front desk, they can make copies for you if you
 5        need to.
 6             MR. PENNOCK:  If you want me to.
 7             MS. KOSKI:  I guess I can read it first.  I
 8        don't know.
 9             MR. PENNOCK:  Yeah.
10             MS. KOSKI:  Just go --
11             MR. PENNOCK:  Hold on.  Why don't you go and
12        see if you have a copy next door.
13             While we're doing that, Ben, why don't you
14        take this out and make a copy before she puts the
15        tab on there.  Yeah.
16   BY MR. PENNOCK:
17        Q.  All right.  Let's see if I can go on to
18   something else.
19             Not really.
20             MR. PENNOCK:  Got it.  That was easier than
21        I thought.
22             MS. KOSKI:  We've all been there.
23             MR. PENNOCK:  Of course there is only one
24        copy.  No, this is not it.  This is not -- this
25        is not -- 143.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Okay.  We'll wait for copies.

 2              (Discussion off the record.)

 3    BY MR. PENNOCK:

 4        Q.   Okay.  All right.

 5              (Anda-Versosky Exhibit 11 was marked for

 6    identification.)

 7    BY MR. PENNOCK:

 8        Q.   Sir, take a look, please, at Exhibit 11 to

 9    your deposition.  This is an e-mail, one page,

10    0000618116.

11        A.   Yes, please.

12        Q.   So this is an e-mail.  The top e-mail is

13    from you, right?

14        A.   Uh-huh.

15        Q.   This is September 26, 2008.  Were you yet in

16    charge of national accounts?

17        A.   I believe so by then.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



8      Q.   Do you know -- are you familiar with a place

9    called The Hometown Pharmacy?

10     A.   I've heard the name.

11     Q.   They were -- they were a growing chain back

12    in 2008, weren't they?

13     A.   Like I said, I've heard the name.  I don't

14    know specifically.  I believe, were they a customer?

15     Q.   Do you know who Heath Ullman is?

16     A.   Yes.  He was a telesales rep.

17     Q.   Yeah.  So -- let's take a look at this.

18          (Discussion off the record.)

19          (Anda-Versosky Exhibit 10 was marked for

20    identification.)

21    BY MR. PENNOCK:

22     Q.   Sir, take a look at this e-mail.  It begins

23    with an e-mail from Mr. Ullman.

24          MS. KOSKI:  Is there another one?

25          MR. PENNOCK:  That's the same one.  I gave

Highly Confidential - Subject to Further Confidentiality Review

```
 1       you two.

 2            THE VIDEOGRAPHER:  Could you slide a little

 3       more to your left?  I'm sorry.

 4            Thank you.

 5    BY MR. PENNOCK:

 6       Q.   Are you ready, sir?

 7       A.   No, I'm sorry.  I'm reading the last page.

 8            Okay.

 9       Q.   Exhibit 10 is an e-mail thread that bears

10    Bates number 0000272169, and it runs to 171.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
19        Q.   Do you know how many overdose deaths there

20   were in Cuyahoga County, Ohio, in 2008?

21        A.   I don't.

22        Q.   What about 2009?

23        A.   I don't.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    Q.    Right.  And, in fact, you told us earlier

14    that sales didn't collect any of this information

15    that might be of assistance to Mr. Cochrane.

16          MS. KOSKI:  Objection; mischaracterizes his

17    prior testimony.

18    A.    Yeah, I don't believe I said that.

19    Q.    Oh, you don't believe you said that?

20    A.    No.

21    Q.    You said that --

22    A.    Can I stop you for one second and continue?

23    Q.    No.  You said you don't believe you said

24    that.

25    A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   You have testified here today on several

2   occasions that sales was -- was focused on the

3   opportunities and attempting to make the sale and

4   not involved with what the backstop was doing unless

5   asked.

6           Haven't you said that?

7           MS. KOSKI:   Object to form.

8       A.   Sales was collecting information for them,

9   for sure, and I believe I said that.



Highly Confidential - Subject to Further Confidentiality Review





18        Q.   Do you know who Norman -- Norman Dodes, is

19    that the Norm that was going to call Aetna?

20        A.   Yes.

25             MS. KOSKI:  Make sure he finishes his

Highly Confidential - Subject to Further Confidentiality Review

```
 1      question first.

 2              MR. PENNOCK:  Mark that, please.

 3              (Anda-Versosky Exhibit 12 was marked for

 4      identification.)

 5      BY MR. PENNOCK:

 6      Q.   Sir, while you're reading that, I'm going to

 7      identify for the record we've marked as Exhibit 12

 8      to your deposition an e-mail thread that is

 9      0000078156 through 158.

10              Are you ready?

11      A.   Yes.

12      Q.   This e-mail is -- the top e-mail is from

13      March 16th, 2009, 4:26 p.m.

14              Right?

15      A.   Yes.

16      Q.   Just coincidentally, this was the day before

17      the leadership meeting with those minutes that we

18      looked at, isn't it?  That meeting was on March 17,

19      2009.

20      A.   Okay.

21      Q.   And Mr. Dodes sent an e-mail to Mr. Cochrane

22      and you, right?

23      A.   Yes.

24      Q.   It started out with an e-mail from Mike

25      Schneidereit from Assured Pharmacy.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.   Yes.

3     Q.   And this has been forwarded on to you?

4     A.   Yes.  I see that.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So if what you're now telling us is the

 2   correct interpretation of this, why did he want it

 3   to happen, as he put it, as quick as possible?

 4        A.   Because Norm -- Norma -- it's a

 5   Norm-specific -- he's a very aggressive talker, a

 6   very aggressive salesperson in trying to make sure

 7   things happen quickly.

 8             He's a New York guy.  He's -- he's very

 9   aggressive.

10             MS. KOSKI:  Not that all New York guys are

11        aggressive, necessarily.

12             I think they're all from New York.

13             THE WITNESS:  I'm from New York.

14             (Anda-Versosky Exhibit 13 was marked for

15   identification.)

16             MS. KOSKI:  Thank you.

17   BY MR. PENNOCK:

18        Q.   Okay.  Sir, we've marked as Exhibit 13 to

19   your deposition an e-mail bearing Bates number

20   0000110089.

21             Have you had a chance to look at that?

22        A.   Yes.

23        Q.   And this is an e-mail from Marc Falkin.

24             He was in sales, right?

25        A.   Yes.
```

```
 1      Q.    And it's to a very large distribution list.

 2            Would you agree with me?

 3      A.    Yes.

 4      Q.    He's got the Anda Pharmacy Group, Anda

 5   Pricing, Anda Gurney Reps, Anda West Coast Group,

 6   Anda Marketing, Anda Purchasing.

 7      A.    Yeah, just a point of clarification.  At

 8   this point, Marc may have been in marketing, but I

 9   don't know that it matters.

10      Q.    Okay.  Anda National Accounts.

11            That would include you, right?

12      A.    Yes.

13      Q.    Anda New York Sales, Anda Injectables, Anda

14   PR Sales, Anda Sales Floor Managers.

15            All of these have lots of people in these

16   distribution lists, right?

17      A.    Yes.

18      Q.    And then he listed a number of people

19   individually, including you?

20      A.    Yes.

21      Q.    And Mike Cochrane, the backstop, right?

22      A.    Yes.

23      Q.    And this Patrick Cochrane, he's -- he was

24   in --

25      A.    Logistics.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    Logistics?

2       A.    Yeah.   The warehouses.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14      Q.   Well, that -- in -- that's the problem with

15   all of this that we've been looking at, isn't it?

16   The attitude?

17           MS. KOSKI:  Object to form.

18   BY MR. PENNOCK:

19      Q.   I'll rephrase.

20           You understand that the issue that we're --

21   that we've been looking at is that attitude that

22   prevailed inside Anda with respect to selling

23   opioids?  Do you understand that's the point that

24   we've been looking at?

25           MS. KOSKI:  Objection --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PENNOCK:

 2        Q.   Or no, maybe you don't understand that?

 3             MS. KOSKI:  Object to form.

 4        Mischaracterizes testimony.

 5             You can answer.

 6    BY MR. PENNOCK:

 7        Q.   I'm sorry.  My questioning -- I'll rephrase.

 8        She's right this time.

 9             We're -- these e-mails that we've been

10    looking at, sir, all reflect an attitude inside

11    sales at Anda that had to do with moving product

12    and -- when you were talking about controlled

13    substances were the product.

14             MS. KOSKI:  Object to form.

15    BY MR. PENNOCK:

16        Q.   Do you understand that?

17        A.   I do understand that.

18        Q.   Don't you agree that the attitude, back

19    then, at least, was not a responsible attitude

20    toward this product?

21             MS. KOSKI:  Object to form.

22        A.   I don't agree.

23        Q.   Don't you agree that it was not a cautious

24    attitude toward this product distribution?

25             MS. KOSKI:  Object to form.
```

```
 1      A.   I do not agree.

 2      Q.   Don't you agree that it was an attitude to

 3   inside sales of "just move this product" like it was

 4   any other type of product, widgets?

 5           MS. KOSKI:  Object to form.

 6      A.   I think there was -- there was definitely

 7   more caution related to these types of products than

 8   others; however, from a sales standpoint, we were

 9   very much trying to sell with having the compliance

10   as a separate group, as you mentioned, as our

11   backstop.

12           We -- but, you know, pulling e-mails across

13   years and looking at someone's language, I mean, I

14   would ask Marc about his language on looking for a

15   home for that.  I don't -- you know, that's --

16   that's pulling a lot of strings together.

17      Q.   Looking for a home to destroy maybe, huh?

18           MS. KOSKI:  Object to form.

19           You don't have to answer that.

20   BY MR. PENNOCK:

21      Q.   You made some allusion to one e-mail or a

22   handful of e-mails, but we talked earlier, we're

23   only looking at e-mails that you were on, right?

24           MS. KOSKI:  Object to form.

25   BY MR. PENNOCK:
```

Highly Confidential – Subject to Further Confidentiality Review

```
1        Q.   Aren't we?

2        A.   I don't know.  Was I on all of these?

3        Q.   At some point in the thread you were on the

4   e-mails.

5        A.   Okay.

6        Q.   And we talked earlier, there are only a few

7   hundred over 12 years with your name on it?

8             MS. KOSKI:  Object to form.

9        A.   Is that a question?

10       Q.   Yes.  The question was:  And we talked

11  earlier, there are only a few hundred over 12 years

12  with your name on it?

13            MS. KOSKI:  Object to form.

14       A.   Okay.

15       Q.   Right?

16       A.   That's not a question.

17       Q.   That exists today?

18       A.   You're asking me if that's the case.  I

19  don't know.  I can't look that up.

20            MS. KOSKI:  Objection.  That

21       mischaracterizes -- "that exists today" is not

22       what you talked about earlier, right?

23  BY MR. PENNOCK:

24       Q.   We're talking about e-mails with your name

25  on it related to opioids.  There are only some few
```

Highly Confidential - Subject to Further Confidentiality Review

1    hundred e-mails for an entire 12-year period.

2          MS. KOSKI:  Object to form.

3       Mischaracterizes the discovery record.

4       A.   Again, I'm sorry, I'm not -- I don't know

5    what your question is because I can't --

6       Q.   My question is you understand that there are

7    only --

8       A.   I understand that you're telling me that.

9       Q.   That I'm telling you that?

10      A.   Yes.

11      Q.   And you said that didn't surprise you or

12   words to that effect?

13      A.   Correct.

14          MS. KOSKI:  Object to form.

15   BY MR. PENNOCK:

16      Q.   Right?

17      A.   Yeah.

18      Q.   You said, yeah, there might have only been a

19   few hundred e-mails related to opioids with my name

20   on it, right?

21      A.   Yes.

22      Q.   Okay.  But then you made some allusion to

23   this, like I'm picking out, you know, a limited

24   number of e-mails, but you understand the pool from

25   which we had to look was pretty limited.

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Okay.

2              MS. KOSKI:  Object to form.  Argumentative.

3     BY MR. PENNOCK:

4        Q.    Okay.  I'll withdraw that.

5              (Discussion off the record.)

6              (Anda-Versosky Exhibit 14 was marked for

7     identification.)

8     BY MR. PENNOCK:

9        Q.    We've marked as Exhibit 14 to your

10    deposition a document that appears to be some type

11    of promotion that was faxed out to customers, right?

12       A.    Yes.

13       Q.    And it would have been faxed out to

14    customers who still ordered by paper.

15             Do you agree with that?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16      Q.   Did y'all ever wonder why this product was

17   always in short supply on the market?

18          MS. KOSKI:  Object to form.

19   BY MR. PENNOCK:

20      Q.   That's a simple question.

21          Did you ever sit there and go, gee, how

22   come -- how come oxycodone always seems to be in

23   short supply on the market?

24          MS. KOSKI:  Object to form.

25   BY MR. PENNOCK:

```
 1        Q.   Did you ever think about that?

 2             MS. KOSKI:  Object to form.   Sorry.

 3    BY MR. PENNOCK:

 4        Q.   Yes or no?

 5        A.   Yes, we knew why.

 6        Q.   Oh, you knew why.  Why did you know?

 7        A.   It wasn't in short supply overall.  The

 8    generic was in short supply.

 9        Q.   I see.

10        A.   Not the brand.  So people were looking to

11    get the generic so that they would --

12        Q.   Get it cheaper?

13        A.   -- could dispense that instead of the brand.

14        Q.   I think we've all heard that phrase before,

15    haven't we?  We've heard that phrase before, "order

16    while supplies last"?

17        A.   Yes.

18             MS. KOSKI:  Object to form.

19    BY MR. PENNOCK:

20        Q.   Everybody has heard that phrase before

21    probably, right?

22        A.   Yes.

23        Q.   Doesn't it sound to you like "just move the

24    product"?  Doesn't it sound like that --

25             MS. KOSKI:  Object to form.
```

```
 1    BY MR. PENNOCK:

 2        Q.   -- to you?

 3        A.   It doesn't.

 4        Q.   Doesn't.  Does not?

 5        A.   No.  I still go back to this was a -- this

 6    was a product that people needed that we had supply

 7    of.  So this is -- is it a, you know, an

 8    incentivizing statement to a customer that you need

 9    to do this quickly?  Yes.  It's because we were

10    going to run out of product.

11        Q.   So an incentivizing statement to a customer

12    about selling what, in essence, were heroin pills,

13    right?

14             MS. KOSKI:  Object to form.

15             You don't have to answer that.

16        A.   Yes.
```

```
25        Q.   Okay.
```

```
 1             MR. PENNOCK:  I guess this would be a good

 2        time to break for lunch if you want to.

 3             MS. KOSKI:  Okay.

 4             MR. PENNOCK:  Okay.  Let's do that.

 5             THE VIDEOGRAPHER:  Off the record,

 6        12:44 p.m.

 7          (Recess from 12:44 p.m. until 1:36 p.m.)

 8             THE VIDEOGRAPHER:  On the record, 1:36 p.m.

 9    BY MR. PENNOCK:

10        Q.   Mr. Versosky, are you ready?

11        A.   Yes.

12        Q.   I want to --

13             MR. PENNOCK:  I need a copy of this.  Sorry,

14        I'll do it later.  Here, take that.

15    BY MR. PENNOCK:

16        Q.   Okay.

17                (Discussion off the record.)

18             MR. PENNOCK:  Katy, let's go off the record,

19        please.

20             THE VIDEOGRAPHER:  Off the record, 1:37.

21          (Recess from 1:37 p.m. until  1:40 p.m.)

22             THE VIDEOGRAPHER:  On the record, 1:40 p.m.

23    BY MR. PENNOCK:

24        Q.   Sir, I'm going to mark the next exhibit to

25        your deposition.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Anda-Versosky Exhibit 15 was marked for

 2     identification.)

 3     BY MR. PENNOCK:

 4        Q.   Let me know when I may proceed,

 5     Mr. Versosky.

 6        A.   Sure, I think you can proceed.

 7        Q.   I've marked as Exhibit 15 to your deposition

 8     an e-mail bearing the number 0000610318.

 9              This is an e-mail -- started out with an

10     e-mail from Kristin Watson to a few people,

11     including you, and then it ended up with a response

12     from you.

13              Right?

14        A.   Yes.

15        Q.   And continuing where we were, this talk --

16     the topic that I was talking to you about, so this

17     is -- this is November 10th, 2009, right?

18        A.   Yeah.

19        Q.   That's your e-mail -- your response, anyway,

20     was November 10th.  Yeah, the original e-mail was

21     also November 10th.

22              And it's -- this Kristin Watson, department

23     coordinator, what was that?  What would she do?

24        A.   I believe -- so on the telesales floor,

25     there were, you know, I think 100 some-odd -- 150
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    telesales people.  The department coordinator was

2    kind of a -- you know, what you would call like an

3    admin for -- within that group to handle some

4    process stuff related to that many telesales people.
```



Highly Confidential - Subject to Further Confidentiality Review



```
12   BY MR. PENNOCK:

13       Q.   If you were selling to a whole -- if you

14   were opening up a new account for a wholesale

15   distributor in 2009, that company, after you opened

16   the account, might ask to buy opioids?

17            MS. KOSKI:  Same objection.  You can answer.

18       A.   Yeah, I would -- I would say it's possible,

19   but in -- I don't recall specific dates on this, but

20   I don't believe we sold wholesalers and distributors

21   controlled substances past a certain point.

22       Q.   Yeah.  We'll get to that.

23       A.   Okay.

24       Q.   And wholesale -- or wholesale repackagers

25   past a certain point?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A.   Right.

 2    Q.   But at this point in time you did.

 3         MS. KOSKI:  Object to form.

 4    A.   I don't -- I don't know that factually.

 5    Q.   Okay.  The cutoff was June 17th, 2010.

 6         Does that ring a bell?

 7         MS. KOSKI:  Object to form.

 8    A.   It doesn't ring a bell, but if you're

 9    telling me -- I know there was a date after which we

10    did not do that anymore.

11    Q.   Right.  There was a date after which you

12    didn't sell to wholesalers, wholesale repackagers,

13    repackagers --

14    A.   Yeah.  Anybody that was not in use, yeah.

15    Q.   -- doctors, clinics.

16         Remember that cutoff, when that happened?

17    A.   I don't remember that cutoff, no.

18    Q.   Okay.  We'll talk about that in a minute.

19         So that was -- subject to connection, you

20    will see that was on June 17th, 2010.

21    A.   Okay.

22    Q.   Can you accept that for a second?

23    A.   Yes.

24         MS. KOSKI:  Object to form.

25    BY MR. PENNOCK:
```

Highly Confidential - Subject to Further Confidentiality Review



1          MR. PENNOCK:  I have to remember not to

2      break for lunch next time.

3          MS. KOSKI:  I was going to give you a hot

4      turkey dinner in the hopes that you'd just fall

5      asleep.

6          (Anda-Versosky Exhibit 16 was marked for

7   identification.)

8   BY MR. PENNOCK:

9      Q.   Sir, I've shown you what's been marked as

10   Exhibit 16 to your deposition.  This is a printout

11   off the internet I'll represent to you that I

12   printed out.  It's from an article from

13   September 18th, 2013, about four years after the

14   exchange we were just looking at, three-and-a-half

15   years, whatever.

16          Okay.  Do you see Exhibit 16?

17      A.   Yes.

18      Q.   Does that at all refresh your recollection

19   as to learning that Shamrock was ultimately shut

20   down by the FDA?

21      A.   No.

22      Q.   If a company was shut down by a governmental

23   agency, one that you had been selling to, is there

24   any procedure for alerting you to that?

25      A.   No.  The -- so the individual rep would have

Highly Confidential - Subject to Further Confidentiality Review

 1    been notified, but, you know, me, at multiple levels

 2    above that, I would not have seen that.

 3        Q.    Wouldn't that have been important for you to

 4    know, to see if companies were being shut down that

 5    you had been selling to and then trying to find out

 6    why?

 7        A.    Potentially, if it was a large customer or

 8    there was some, you know, specific issue that I was

 9    involved with that customer.  And in this case, I

10    think we -- we sold to several hundred small

11    wholesalers and distributors.  I don't know that I

12    would have seen this.

13        Q.    Well, this -- this company, according to

14    this article, was shut down because it was

15    packaging -- it was packaging opioids without proper

16    labeling.

17            MS. KOSKI:  Object to form.

18    BY MR. PENNOCK:

19        Q.    Right?

20        A.    Yeah, I think that's what the article says,

21    yes.

22        Q.    And just coming back to did you ever ask

23    anyone to put a procedure in place to let leadership

24    in sales, namely you, know when a -- when a customer

25    had been shut down by the DEA or FDA for some -- --

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   No.

 2      Q.   -- for some irregularity?

 3      A.   No.

 4      Q.   In -- we -- I mentioned earlier this

 5   shutdown of June 17th, 2010, and I'm going to show

 6   you some documents that will perhaps refresh your

 7   recollection on that.

 8           (Anda-Versosky Exhibit 17 was marked for

 9   identification.)

10   BY MR. PENNOCK:

11      Q.   May I proceed, Mr. Versosky?

12      A.   Yes, please.

13      Q.   So Exhibit 17, this is an e-mail thread and

14   it -- the first e-mail is on June 18th, 2010.

15      A.   Uh-huh.

16      Q.   And it's from Anita Isabella -- or is that

17   Isabella Anita?

18      A.   Anita Isabella.

19      Q.   And it's to the president of the company,

20   Albert Paonessa, right?

21      A.   Yes.

22      Q.   Brian Witte.  We heard about him earlier?

23      A.   Yes.

24      Q.   Marc Falkin?

25      A.   Yes.
```

```
1         Q.    And yourself?

2         A.    Yes.

3         Q.    And Kim Bloom?

4         A.    Yes.

5         Q.    And a host of others, including Michael

6    Cochrane, right?

7         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14      Q.    Well, you -- you were a member of the

15      leadership team for the entire company?

16      A.    I am saying I am aware -- I was aware, yes.

17      Q.    Your title was vice president for sales --

18      A.    That's why I continue to clarify that it was

19      a title, right, but I had a vertical in sales.

20      There was another vertical in sales.

21            Frankly, there were three verticals because

22      physicians were in a completely different group

23      but --

24      Q.    So -- okay.

25            Nevertheless --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.
```





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 8       Q.   Okay.  Well, subsequent to this, there was

 9    the development of something you made mention of

10    earlier, a questionnaire.

11       A.   Uh-huh.

12       Q.   Right?

13       A.   Yes.

14       Q.   Yeah.  You mentioned it in passing earlier,

15    one of your answers.

16            MS. KOSKI:  Object to form.

17       Q.   And the -- what you were alluding to, the

18    questionnaire is a document that Anda started to

19    require each of their controlled substance customers

20    to fill out, right?

21       A.   Yes.

22       Q.   And that was also something that resulted

23    from dealings with the DEA, right?

24            MS. KOSKI:  Object to form.

25       A.   Yes, I believe so.
```

```
1              MR. PENNOCK:  I think I only have -- did you

2         have other copies of this?  I only have one extra

3         copy of this.  Know your controlled substances.

4         Oh, no, they are all clipped together.  Okay.

5              (Discussion off the record.)

6              (Anda-Versosky Exhibit 18 was marked for

7    identification.)

8              (Anda-Versosky Exhibit 19 was marked for

9    identification.)

10   BY MR. PENNOCK:

11        Q.   So, Mr. Versosky, Exhibit Number 18 to your

12   deposition is a document bearing Bates number

13   000077289.  Have you had a chance to look at that?

14        A.   Yes.

15        Q.   And it's an e-mail from someone by the name

16   of Megan Talber.

17        A.   Yes.

18        Q.   It went to the president of the company,

19   right?

20        A.   Yes.

21        Q.   A number of others and it was cc'd to you

22   and some, Christine Leon-Laurent, right?

23        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



25          Q.   Did you have any involvement in the training

1    for your team?

2        A.   I don't believe so, but -- I don't remember

3    training my team on this.

4        Q.   Did you get trained?

5        A.   I would have read the document, I'm sure,

6    but --

7        Q.   You would have read the document but you

8    don't have any recollection of actually receiving

9    training about the document?

10       A.   It don't -- I don't remember that, no.

11       Q.   So the document is Exhibit 19.

12            MS. KOSKI:  Yes, go ahead.

13       Q.   And the document is Bates number 0000077290.

14   It is produced in native format and therefore has a

15   cover sheet.  Controlled substances:  Know your

16   customer.

17       A.   I believe I may have -- I believe I sat

18   through this training.

Highly Confidential - Subject to Further Confidentiality Review



17    Q.   Okay.  So we talked earlier, and you had

18    pointed out that in your view, compliance was

19    dealing with the customer issues and identifying

20    them as it may concern controlled substances and

21    sales did not do that.  Do you remember that

22    discussion on and off?

23    A.   Yeah, correct.  It's again, sales was

24    collecting information and --

25    Q.   Right?

```
 1      A.    Sales was where there were questionnaires,

 2   they were getting the questionnaires and passing

 3   those to compliance.

 4      Q.    But now we're taking it to another level for

 5   sales, right?

 6      A.    Yes.

 7      Q.    And the questionnaire was something that --

 8   it was a questionnaire that the question had to fill

 9   out for each of its stores, if it had more than one

10   store, right?

11      A.    Yes.

12      Q.    And the point of filling out the

13   questionnaire -- withdrawn.

14            The questionnaire or the -- was a form that

15   was being used in order to try and get in one place,

16   in a uniform way, information about the store and

17   its dispensing history, is that reasonably fair?

18      A.    Yeah.  I think it was a -- there was already

19   a quantitative look.  This was more of getting some

20   qualitative information.

21      Q.    And by that you mean just -- more getting

22   some information that related to a particular store,

23   not just its numbers, but --

24      A.    Yes.

25      Q.    -- answers to specific questions about how
```

```
 1    they were operating?

 2       A.   Yes.

 3       Q.   And where they were operating, right?

 4       A.   Yes.

 5       Q.   And it comes back, these things come back to

 6    having a better understanding of who the customer is

 7    so that you can have a better understanding as to

 8    whether or not they should be selling as much

 9    controlled substances as they are asking for?

10       A.   Yes.

11       Q.   And in the presentation, if you turn -- I'm

12    sorry these aren't paginated, but you can look on

13    the screen.  There is a -- the know your customer

14    initiative --

15            MS. KOSKI:  On the bottom right there is

16       slide numbers, they are hard to see but you can

17       see them on the bottom right hand.

18       A.   They are in the dark.

19            MS. KOSKI:  It's hard to see because it's

20       not in color.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
12        Q.   So -- I'll just find something here.

13             (Anda-Versosky Exhibit 20 was marked for

14   identification.)

15   BY MR. PENNOCK:

16        Q.   Sir, we've marked as Exhibit 20 to your

17   deposition, an e-mail thread bearing Bates number

18   0000105969 through 970.  Could you take a look at

19   that, please.

20             So, sir --

21        A.   I'm sorry.

22        Q.   Oh, you're not done yet?  I apologize?

23        A.   Yeah, just one second.  I'm sorry.

24             Okay.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 7              Who is NACDS?

 8         A.   They are an industry association, so it's

 9    the chain drug stores, National Association of Chain

10    Drug Stores.

11         Q.   Did you work with them?

12         A.   We attended their shows, we were a member of

13    their --

14         Q.   You were a member of them?

15         A.   Yeah.

16         Q.   So you kind of worked with them in terms

17    of -- well, you're getting, potentially getting

18    forms from them or stuff like that?

19         A.   No.  No.

20         Q.   What are you getting from them?

21         A.   As far as getting anything from them, I

22    think -- I don't know that we got anything from

23    them.  We -- it's -- again, it's the chain store

24    group, people like Anda are a part of that because

25    their trade show is where you go to meet with large
```

Highly Confidential - Subject to Further Confidentiality Review

1    numbers of chain customers.

Highly Confidential - Subject to Further Confidentiality Review



```
11       Q.   All right.  And the whole points of getting

12    the questionnaire was to understand or get some

13    understanding -- what was the word you used?  I lost

14    it now.

15            You wanted to get some understanding of each

16    store, right?

17       A.   Yes.

18            MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

3      Q.   Well, the process -- the point of the

4  process work -- withdrawn.

5           The way the process was supposed to work was

6  to give you information on each individual store

7  that you might be selling controlled substances to,

8  including opioids, so that you could make a fuller

9  and better assessment, by you I mean the company.

10     A.   Sure.

11     Q.   To continue to sell to them or somehow limit

12  them, that's -- that's how the process was supposed

13  to work, right?

14     A.   Sure, and I think it's reasonable for me to

15  ask a question here, to say, is there another way we

16  can do this because the current process doesn't work

17  for large customers.

18     Q.   It didn't work for the customer because they

19  were frustrated, extremely frustrated, it didn't

20  work for the customer because they were extremely

21  frustrated?

22     A.   Sure.

23     Q.   There is nothing in here that's saying the

24  process isn't giving us information that's useful

25  from each store?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I agree that doesn't say that, yeah.

 2        Q.   Okay.  And in fact, even though you said a

 3   little while ago that these corporate chains had the

 4   same standard operating procedure across all the

 5   stores, one of their frustrations is that the

 6   questionnaire was so store specific that they

 7   couldn't fill it out for all the stores at once,

 8   they had to fill it out for each individual store,

 9   that's one of their main frustrations, that's what

10   it says, right?

11        A.   True, and that was an operational

12   frustration, so we would have been talking to the

13   corporate office.  Someone in the corporate was then

14   having frustration of having to disseminate that

15   packet out to an individual store level.  If it's

16   somebody that has 500 stores, they are now having to

17   track, you know, 500 questionnaires.

18        Q.   Well, that's terrible that they would have

19   this frustration.  I mean, was there -- was anyone

20   considering, when dealing with this frustration that

21   they had, the devastation that was happening

22   throughout the country from opioids?

23             MS. KOSKI:  Object to form.

24        Q.   That's a real question.  Do you -- I'll

25   rephrase it to correct the form objection.
```

```
 1              I'm sorry to hear about the frustration from

 2      these businesses for filling out these

 3      questionnaires.  Did anyone say to you, but let's

 4      consider the devastation that's happening and

 5      balance that against our frustration to decide

 6      whether we want to jettison the questionnaire from

 7      each store, was that ever discussed?

 8      A.   I don't recall that ever being asked of me.

 9      Q.   The -- okay.

10              Anyway, Patrick Cochrane, whoever he is,

11      he's with you.  He's sure he can come up with

12      something.  Right?

13              MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

5       Q.   Well, it was feasible operationally to send

6    individual packets of opioids every month, if not

7    more frequently, to every single individual store,

8    wasn't it?  Wasn't it?  You were able -- you just

9    said, operationally it wasn't feasible to send a

10   questionnaire to every store?

11      A.   You were comparing that to something else.

12      Q.   I'm asking you.  You said operationally it

13   wasn't feasible to send this questionnaire to every

14   single store, that's what you said?

15      A.   Yeah, for the corporate chain buyers we were

16   working with.

17      Q.   But it was operationally feasible for you to

18   send product to them, opioid product to the

19   individual stores?

20      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KOSKI:   What exhibit are you looking at?

2              MR. PENNOCK:   I think it was Exhibit 9.   I

3      got it.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2          MS. KOSKI:  When you're at -- I'm sorry.  I

3     didn't mean to interrupt you.

4     Q.    There is just as much danger from one store

5     and a group of thousands in a chain than there is

6     from one independent pharmacy, isn't there?

7     A.    Yeah, I agree with you.  I don't know that I

8     would have -- I don't know that I would have been as

9     aware of that in 2011.

10         MR. PENNOCK:  I'm sorry, counsel?

11         MS. KOSKI:  I was just going to suggest when

12    have you a good stopping point to take a break.

13         MR. PENNOCK:  This is a good stopping point.

14         THE VIDEOGRAPHER:  Off the record, 2:43 p.m.

15         (Recess from 2:43 until 3:00 p.m.)

16         THE VIDEOGRAPHER:  On the record, 3:00 p.m.

17    BY MR. PENNOCK:

18    Q.    Mr. Versosky, do you remember developing a

19    process to flag stores in chains for potentially

20    exceeding what would be expected of them for

21    controlled substances sales, including opioids?

22         MS. KOSKI:  Object to form.

23    A.    Yes.

24    Q.    You do remember that?

25    A.    Yes.

1    Q.   That's something that you -- you actually

2    had a hand in developing, right?

3    A.   Yes.

4    Q.   And you developed this system, I think

5    around the time you had -- you had Walgreens come to

6    you to seek getting opioids from you, right?

7    A.   Yeah, they were seeking to get controls from

8    us, yes.

9    Q.   And they were seeking to get controls from

10   you because they had had an entire distribution

11   center in Jupiter, Florida, shut down, right?

12   A.   I believe it --

13        MS. KOSKI:   Object to form.

14   A.   Yeah.   I believe it was their -- I thought

15   it was their wholesaler had a distribution center

16   shut down.

17   Q.   There was a distribution -- there was one or

18   two distribution centers shut down and they could no

19   longer get opioids from those places, right?

20   A.   Correct.

21   Q.   And so they could however -- the problem

22   apparently, was with the sent -- the distribution of

23   the drugs, but they were still allowed -- their

24   stores were still allowed to buy the drugs, they

25   just needed to find somewhere else to buy them,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2       A.   Correct.

3       Q.   So at that time, you had a hand in

4    developing this system and I'd like to go over that

5    quickly.  I think this is it here.

6            MR. PENNOCK:  Ben, yeah, this is it.

7            (Anda-Versosky Exhibit 21 was marked for

8    identification.)

9    BY MR. PENNOCK:

10      Q.   Mr. Versosky, you -- we've marked as

11   Exhibit 21 to your deposition an e-mail thread.  It

12   begins with Bates number 0000725880 and the last

13   document is 883.

14           Okay?  You've had a chance to look at that?

15      A.   Yes.

16      Q.   And this is an e-mail from you to the

17   president of the company, Albert Paonessa, right?

18      A.   Yes.

19      Q.   This is from November 2012, right?

20      A.   Yes.

21      Q.   And it's titled -- you were forwarding it,

22   it's, Controlled Substances Query Questions, right?

23      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19      Q.   And -- okay.  I'll mark this?

20           (Anda-Versosky Exhibit 22 was marked for

21      identification.)

22      BY MR. PENNOCK:

23      Q.   So Walgreens had, like, what, 8,000 stores,

24      something like that?

25      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



```
24       Q.   And if we go back a page, and this is all

25    laid out by states, true?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    And if we look at Ohio, in Ohio there were

3    255 stores, right?

4        A.    Yes.
```



```
14       Q.    Okay.  Now, so when you -- after you ran

15   this, did you provide this information to Walgreens?

16       A.    I believe we did, yes.

17       Q.    And when you provided it to them, did

18   they -- at any point thereafter, did Walgreens tell

19   you, well, I think we're going to be shutting down

20   some controlled substances sales at some of our

21   stores in Ohio?

22            MS. KOSKI:  Object to form.

23       A.    I don't recall that ever happening.

24       Q.    And let's just look at some of the Ohio

25   stores.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PENNOCK:  Could you mark this, please.

 2              (Anda-Versosky Exhibit 23 was marked for

 3        identification.)

 4    BY MR. PENNOCK:

 5        Q.   So I've marked as Exhibit 23 to your

 6    deposition, sir, a document produced in native

 7    bearing Bates -- the cover sheet is Bates number

 8    0000725057?
```



```
18              MR. PENNOCK:  You're right, Katy, this is

19        excerpted from the entire state, individual store

20        data, or the entire list of individual store

21        data.

22              MS. KOSKI:  We can talk offline  I just want

23        to know how you sorted it.  I'll just have a few

24        more questions.

25    BY MR. PENNOCK:
```



Highly Confidential - Subject to Further Confidentiality Review



```
12          MS. KOSKI:  Object to form; lack of
13      foundation.
14          MR. PENNOCK:  Okay.  Well, that's fair.
15      We'll hopefully get a stip on that later.  I can
16      do it if you want me to.
17          MS. KOSKI:  You can just ask him if he
18      understands that rather than --
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11      Q.   Let me mark this, this is another slice of

12   the same data.

13           MS. KOSKI:  Separate number.

14           MR. PENNOCK:  The only problem is they're

15      not -- your second piece is right there -- okay.

16      So that is part of the same exhibit.

17               (Discussion off the record.)

18           (Anda-Versosky Exhibit 24A was marked for

19   identification.)

20           MS. KOSKI:  I don't know if it makes your

21      life easier, I'm marking this 24A and B so that I

22      know what we are talking about.

23           MR. PENNOCK:  That is probably a good idea.

24           (Anda-Versosky Exhibit 24B was marked for

25   identification.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PENNOCK:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

7           (Anda-Versosky Exhibit 25 was marked for

8     identification.)

9           MR. PENNOCK:  Can he look at that document?

10          MS. KOSKI:  Oh, yeah, sorry.  Go ahead.

11    BY MR. PENNOCK:

12      Q.   While you're looking at that sir, marked as

13    Exhibit 25 to your deposition a document bearing

14    0000728018.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5        Q.   Let's take a look at that for now.

6             (Anda-Versosky Exhibit 26 was marked for

7        identification.)

8        BY MR. PENNOCK:

9        Q.   We've marked as Exhibit 26 to Mr. Versosky's

10       deposition, an e-mail, one page, bearing 000090003.

11            Okay.  So here you were -- you're getting an

12       e-mail from Jeffery Daum.  He was sort of the IT

13       guy, is that right?

14       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



 6          MR. PENNOCK:  Another exhibit, please.

 7          (Anda-Versosky Exhibit 27 was marked for

 8     identification.)

 9     BY MR. PENNOCK:

10     Q.   Exhibit 27 is a document produced in native

11     format bearing Bates number 0000090004.  That's the

12     cover sheet.  This will be Exhibit 27.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
15          MS. KOSKI:  Object to form.

16     Q.   Go ahead?

17          MS. KOSKI:  There is just more than one

18     question.
```

Highly Confidential - Subject to Further Confidentiality Review

3          MS. KOSKI:  Is this another A and B, or are

4      these separate?  Are we doing this as an A and B

5      or are these two separate?

6          MR. PENNOCK:  There's just one.  There

7      should only be one.

8          MS. KOSKI:  Oh, I just got two copies of the

9      same thing.  Sorry.  Yeah.  Okay.

10          (Anda-Versosky Exhibit 28 was marked for

11   identification.)

12   BY MR. PENNOCK:

13      Q.  We've marked as Exhibit 28 a document

14   bearing Bates numbers 0000085420.  That's the cover

15   sheet.  It was produced in native format.

16          MR. PENNOCK:  This is the e-mail, right?

17      Let me mark this, too, because this is the

18      corresponding e-mail.

19          (Anda-Versosky Exhibit 29 was marked for

20   identification.)

21          MS. KOSKI:  Go ahead, yeah.

22          THE WITNESS:  Sorry.

23      A.  I'm ready.

24      Q.  Okay.  So we first marked Exhibit 28, this

25   is a PowerPoint that you had prepared, right?

1    A.   Yes.

2    Q.   And the Exhibit 29 is the e-mail

3    disseminating that PowerPoint internally and this is

4    in April of 2013, and you sent it to Robert Brown,

5    who was in compliance, right?

6    A.   Yes.

14    Q.   Subsequently, and you were not on this

15    e-mail, there was some concerns raised to the

16    president of the company about whether you should be

17    doing this PowerPoint, apparently.  Do you see that?

18    A.   It wasn't -- yeah, yeah.  It's funny, this

19    -- this PowerPoint, this never -- I don't know that

20    this ever got sent to anyone externally.  This was

21    something that I authored, I thought it was a good

22    idea, you know.

23    Q.   Yeah.

24    A.   I think the organization didn't.  So this

25    was theoretically taking that big data solution and

1    could we do this as a service to help our customers

2    to look at their data in the way that we're looking

3    at their data.

4        Q.   Right?

5        A.   Because at the chain level at that point,

6    the chains and their regulatory folks were able to

7    see kind of, you know, their information, whereas

8    Mike and our team were able to see sort of the --

9    more of the market's information.  Potentially

10   better informed, another set of eyes, I thought it

11   could be a good service.  It didn't really become a

12   service.

13       Q.   Okay.  So Mike Cochrane's suggestion to the

14   president of the company apparently, the president

15   went with that and you never gave this presentation

16   to --

17       A.   Yeah, I don't believe it ever went anywhere.

18   We may have discussed the concept with people, but I

19   don't think the formal presentation or anything ever

20   went anywhere and we definitely never got any kind

21   of customers on board with it.

22       Q.   With the flag system that you had developed?

23       A.   With, like a formal, you know, named

24   program.  The -- so the flag system, as you

25   mentioned --

```
 1        Q.   Was part of the named program?

 2        A.   Walgreens saw that.  This was after that.

 3   This was taking that, you know, kind of data

 4   solution that we created and trying to turn it into

 5   something that we could offer out to others,

 6   potentially.

 7        Q.   So you did it for Walgreens, you showed it

 8   to Walgreens, so that they could use it, whether

 9   they did or didn't, we don't know?

10        A.   We shared it as part of our discussion with

11   them related to were we going to sell product to

12   them.

13        Q.   And you called -- then you said well, let's

14   develop that into a program --

15        A.   Yeah.

16        Q.   -- to assist the chains?

17        A.   Yes.

18        Q.   And you were going to call that the

19   Compliance Assisted Program, right?

20        A.   Yes.

21        Q.   CAP.  Maybe they didn't like the word CAP,

22   huh?

23        A.   Maybe.

24        Q.   Maybe.  So in any event, put -- this CAP

25   program does not materialize as something being
```

Highly Confidential - Subject to Further Confidentiality Review

1    offered to other customers, as I understand it,

2    correct?

3        A.   Correct.  Yeah.

4        Q.   Now, does this PowerPoint refresh your

5    recollection as to whether you were selling to

6    Walgreens at that time?

7        A.   To Rite Aid.

8        Q.   I'm sorry.  To Rite Aid at that time?

9        A.   It does not, and I see at the end there is a

10   chart related to Rite Aid, so this would have been a

11   draft kind of for presentation to Rite Aid.  I don't

12   know that they ever got this or saw this chart.

Highly Confidential - Subject to Further Confidentiality Review

3         You told me that they didn't go along with

4    this CAP program that you had thought up might be

5    helpful, right?

6         A.   Yes.

7         Q.   And you thought it might be helpful because

8    your customers might look at it as the two of you

9    working better together regarding controlled

10   substances, right?

11        A.   Yes.

12        Q.   And you were trying to improve the working

13   together relationship on controlled substances that

14   had existed to date, right?

15        A.   Yes.

16        Q.   But your -- the president of the company

17   apparently turned it down, we established that,

18   right?

19        A.   I don't know that it was him specifically

20   that turned it down, but, yes, it never went

21   anywhere.

22        Q.   And do you know why it never went anywhere?

23        A.   I don't recall specifically.  Right?  The --

24   I think there was some development involved.  We

25   were trying to, I think, put it in as part of the

```
 1    CSOS enterprise application, but I don't recall

 2    specifically.

 3        Q.   Okay.  Do you -- do you remember having

 4    symposiums from year to year?

 5        A.   Yes.

 6        Q.   And these were events where you invited both

 7    manufacturers and customers to, right?

 8        A.   Yes.

 9        Q.   What were -- what was the purpose of

10    those -- of these symposiums?

11        A.   So -- I mean the purpose of everything we

12    did was to grow sales.  So these were

13    specifically -- as a distributor, right, we had

14    customers that were both manufacturers and

15    retailers.  We treated the customer -- the --

16    treated the manufacturers as customers as well, but

17    a good chunk of our customer base, our retailer

18    customer base didn't really have strong

19    relationships with generic manufacturers, so we

20    created this thing to kind of bring them together,

21    help our smaller customers build relationships with

22    manufacturers hoping that it would lead to

23    opportunities for us, for them to connect together

24    through us.

25        Q.   So they would meet -- they would come to
```

```
 1    this symposium?

 2        A.   It was like a trade show.

 3        Q.   There would be golf, like a convention, at a

 4    lot of places?

 5        A.   Yes.

 6        Q.   You had maybe some golf involved, right?

 7        A.   Yes.

 8        Q.   You had a motivational speaker, I think one

 9    of them you had Joe Montana?

10        A.   Right.

11        Q.   And you had Dr. J at one?

12        A.   Yes.

13        Q.   Jack Nicklaus showed up to one.

14        A.   Yes.

15        Q.   You had one around Scottsdale, Arizona?

16        A.   Yes.

17        Q.   What would -- by the retail customer meeting

18    with the manufacturer, how would that benefit Anda?

19        A.   Yeah.  So the -- I mentioned -- an indirect

20    contract.  The customers, depending on how they were

21    organized from a buying structure, if they had their

22    own warehouse, if they didn't -- depending on that,

23    they could utilize us in different ways.  Right?  So

24    if they didn't have their own warehouse, their

25    ability to buy outside of their primary wholesaler
```

```
 1    was limited.  We would try to get them to load an

 2    indirect contract through us, we would ship them,

 3    they would buy the rest of their products from the

 4    primary wholesaler.

 5         If they had a warehouse, they may not be

 6    warehousing CIIs, they may not be warehousing -- I

 7    don't know, special items or some other type of, you

 8    know, niche item.  So it was basically we would

 9    provide a distribution service that connected that

10    manufacturer to that store.

11    Q.   I see.  So they would meet the manufacturer

12    at the symposium, presumably, the convention,

13    whatever, trade show, and by meeting the

14    manufacturer, they might decide, well, you know

15    what, I want to buy from that manufacturer now.

16    A.   Correct.  That was our hope.

17    Q.   So -- and it would be a generic, so they

18    could be buying that product from any number of

19    manufacturers but because they made a personal

20    connection, they are like, you know what, I'm going

21    to give that guy the business.  Is that sort of it?

22    A.   It is a very relationship heavy business,

23    yes.

24    Q.   Okay.  I see.  And were there -- the seventh

25    annual chains -- let me just mark this and show you
```

1    this.

2        A.    Sure.

3            (Anda-Versosky Exhibit 30 was marked for

4    identification.)

5    BY MR. PENNOCK:

6        Q.    I printed out the entire thing off the web,

7    but your quote, I think, is on page 3.  It starts at

8    page 2.  It says -- and this is Exhibit Number 30.

9            So Anda facilitates relationship building,

10   this is exactly what you were just telling me?

11       A.    Right.

12       Q.    April 28, 2014, this is an example, you had

13   Joe Montana in there, right?

14       A.    Yeah.

15       Q.    Okay.  So I don't know who wrote this, but

16   it's from the web, this is -- here's the -- from

17   Drugstore News, right?  Okay.  More than 350

18   executives who participated in Anda's seventh annual

19   supply chain symposium Thursday and Friday here,

20   including a record 25 retail representatives, were

21   treated to a keynote address from sports legend

22   Dr. J and four-time Super Bowl Champion Joe Montana,

23   right?

24       A.    Yes.

25       Q.    And then you had a quote in here:  Yeah, the

```
 1    key to this event, what really does make it unique,

 2    is the casual atmosphere, said Bill Versosky, VP

 3    sales and marketing for Anda.

 4          Do you see that?

 5    A.    Yes.

 6    Q.    Quote:  We look at both the manufacturers

 7    and the retailers as our customers.

 8          Do you see that?

 9    A.    Yes.

10    Q.    That's exactly what you were saying?

11    A.    Yes.

12    Q.    Okay.  So this event is where we bring all

13    of our customers together and enable conversations

14    between them to help grow their businesses.  End

15    quote.

16          So I think your prior comments already

17    established what I was asking about, is that's what

18    it was all about?

19    A.    Yes.  Yes.

20    Q.    And their -- were they successful?

21          MS. KOSKI:  Object to form.

22    A.    You know, it's funny.  So this event we

23    always held, and I believe Anda still to this day

24    holds it sort of piggyback to one of the NACDS

25    shows.  You asked about NACDS before, so this is
```

1    like the day before, two days before.

2        Q.   Got it?

3        A.   Traditionally coming out of those shows we

4    would leave with new opportunities either with a

5    manufacturer or with a customer, so we thought they

6    were generally successful.

7        Q.   That's why you keep having them?

8        A.   Yes, why they keep having them.

9        Q.   They are not inexpensive propositions, they

10   are not inexpensive propositions?

11       A.   They were inexpensive for us because the

12   manufacturers supported them.

13       Q.   Oh, they helped pay for them?

14       A.   Yes.

15       Q.   I see.  That makes sense.  Because the

16   manufacturer is trying to get new retailers --

17       A.   Yes.

18       Q.   -- to connect with as well?

19       A.   Yeah, most customers have some type of trade

20   show of their own that manufacturers pay to attend.

21   We created this and kind of piggybacked on that but

22   brought in other customers.

23       Q.   Did they -- how would you invite people?

24   How did you decide to invite people?  Like, I mean,

25   would you -- or did they just know about it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.  No.  We would -- I would go through a

 2    list, I would speak with my national account

 3    managers, who did they want us to invite.  We would

 4    look at who are our current customers, are there any

 5    prospective customers that might want to come.

 6        Q.   Then you just mail out an invitation?

 7        A.   I think I e-mailed them, I think I e-mailed

 8    them personally, but we invited a lot of people.

 9    Only -- 25 people came.  I might have invited 100,

10    you know.

11        Q.   Got it.  Do you -- do you know where I can

12    find one of those invitations?

13        A.   I would think in my sent e-mail.

14        Q.   Okay.

15             MR. PENNOCK:  Okay.  Let's take a short

16        break.  All right?

17             MS. KOSKI:  Uh-huh.

18             THE VIDEOGRAPHER:  Off the record, 4:03 p.m.

19         (Recess from 4:03 p.m. until  4:17 p.m.)

20             THE VIDEOGRAPHER:  On the record, 4:17 p.m.

21    BY MR. PENNOCK:

22        Q.   Mr. Versosky, you -- Anda -- is Anda located

23    in Broward County?

24        A.   Yes.

25        Q.   And you also have lived in Broward County,
```

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2       A.   Yes.

3       Q.   And you did back in the time you were

4    working for Anda?

5       A.   Yes.

6       Q.   Did you ever hear of a Broward County grand

7    jury report that was issued in November 2009, it

8    would have been public -- potentially public --

9    well, it was public information.  Did you ever hear

10   about it back then, on opioids?

11      A.   I don't remember specifically hearing of

12   anything like that, no.

13           MR. PENNOCK:  Do you have another copy of

14      this?

15           (Anda-Versosky Exhibit 31 was marked for

16      identification.)

17   BY MR. PENNOCK:

18      Q.   Sir, I've marked as Exhibit 31 a copy of an

19   interim report from the Broward County grand jury

20   titled:  The Proliferation of Pain Clinics in South

21   Florida.  It's dated November 19th, 2009.

22           Do you see that?

23      A.   I do.

24      Q.   Have you ever been provided this document

25   before by anyone?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I don't recall ever seeing it, no.

 2      Q.   Do you recall anyone at Anda talking about

 3   the issuance of this report by the Broward County

 4   grand jury?  And I ask just because, I mean, it's

 5   the County in which the company was located, so --

 6      A.   Yeah, and -- I -- I don't recall that.

 7   Right?  I do -- I do know there was discussion

 8   related to, you know, legislative actions against

 9   pharmacies over time and things like that, but I

10   don't recall this one specifically.

11      Q.   So do you -- did you ever hear it being

12   reported back in late 2009 that there was a finding

13   that in 2007 there were four pain clinics operating

14   in Broward County but in -- by the end of 2009 there

15   were 115 pain clinics operating in Broward County.

16           MS. KOSKI:  Object to form.

17      Q.   Do you remember hearing that report?

18      A.   I don't know that I remember hearing that

19   reporting.  I do remember there was a general

20   culture of concern around, you know, pain

21   management, like that, anybody speaking related to

22   pain management was sort of a concern for a

23   customer.

24      Q.   What do you mean by that?

25      A.   Mike could have been very interested in
```

1    hearing if anybody was, you know, quote, unquote, a

2    pain clinic or anything like that.

3        Q.   Because they might be -- they might not be

4    appropriately prescribing opioids?

5        A.   Correct.

6        Q.   Living and working in Broward County during

7    those years, did you observe any or make any

8    observations regarding the proliferation of pain

9    clinics in Broward County?

10       A.   Not really.

11            MR. PENNOCK:  Sorry.

12            MS. KOSKI:  Object to form.

13       Q.   Back at that time, by that I mean late 2009,

14   do you remember -- do you ever remember any

15   discussion within Anda that there had been a finding

16   that the top 25 dispensing doctors of oxycodone in

17   the nation were located in the state of Florida,

18   with 22 of the top 25 dispensing doctors of

19   oxycodone in South Florida, did you ever hear

20   anything like that?

21            MS. KOSKI:  Object to form.

22       A.   I don't remember specific points of data,

23   but again, being, as you mentioned, being in

24   Florida, we sort of always knew we were ground zero

25   for every, you know -- it seems like every epidemic

```
 1   started in Florida, so we were always looking at

 2   Florida.

 3       Q.   What do you mean by every epidemic?

 4       A.   Anything that -- I mean that's a joke on

 5   Saturday Night Live.  Everything that can go bad

 6   across the country related to everything starts in

 7   Florida.  From the example that you gave, it's not

 8   unreasonable we would have -- we would have talked

 9   about that specific to Florida.  It wouldn't have

10   been a surprise to us that Florida was, you know,

11   top in prescribing docs or anything like that.

12   Florida is an interesting market.

13       Q.   At any point before you left Anda, did you

14   personally develop a heightened concern that Anda,

15   together with its customers, both manufacturers and

16   retailers, had at least in part contributed to the

17   opioid crisis in a way that they may have avoided?

18       A.   You know, I would say it's a difficult

19   question.  You know, over -- over time, I feel like

20   at Anda everybody was very much trying to do the

21   right thing, right?  And your question related to

22   looking back.  You know, looking backwards, there

23   was a learning process that happened at Anda, I

24   think that happened at customers, at, you know,

25   competitors.  At all times, I think, in relation to
```

```
 1    that learning process, we were trying to, you know,

 2    push to be more stringent on any requirement that

 3    was out there.  That was my belief.  I felt that we

 4    were -- we were trying to be good stewards of the

 5    business.

 6         MR. PENNOCK:  Can I see --

 7    Q.   May I see that stack of exhibits, sir?

 8    A.   Yes.

 9         MR. PENNOCK:  There seems to be one missing.

10    I'm looking for the CAP.

11    A.   It would have been high up in that stack.

12    Q.   Oh, I see.  It's going the other way.

13    A.   That's probably it.

14         MS. KOSKI:  28?

15    Q.   There's 28.  Well, when you prepared the CAP

16    PowerPoint, may I see that please?

17    A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



```
 8          MR. PENNOCK:  Thank you.  I have no further

 9     questions.

10          MS. KOSKI:  I have none.

11          Does anyone on the phone have any questions

12     for the witness?

13                    (No response.)

14          MS. KOSKI:  Silence is noted.

15          THE VIDEOGRAPHER:  Off the record, 4:27 p.m.

16          (Whereupon, the deposition concluded at

17     4:27 p.m.)

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2         I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby certify

 5    that, pursuant to notice, the deposition of WILLIAM

 6    VERSOSKY was duly taken on Friday, December 7, 2018,

 7    at 9:25 a.m. before me.

 8         The said WILLIAM VERSOSKY was duly sworn by

 9    me according to law to tell the truth, the whole

10    truth and nothing but the truth and thereupon did

11    testify as set forth in the above transcript of

12    testimony.  The testimony was taken down

13    stenographically by me.  I do further certify that

14    the above deposition is full, complete, and a true

15    record of all the testimony given by the said

16    witness, and that a review of the transcript was

17    requested.

18

19    _____

20    Susan D. Wasilewski, RPR, CRR, CCP

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5    and make any necessary corrections.  You should

 6    state the reason in the appropriate space on the

 7    errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10    and date it.  It will be attached to your

11    deposition.

12

13          It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the deposition

16    transcript by you.  If you fail to do so, the

17    deposition transcript may be deemed to be accurate

18    and may be used in court.

19

20

21

22

23

24

25
```

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     through 243, and that the same is a correct

 6     transcription of the answers given by me to the

 7     questions therein propounded, except for the

 8     corrections or changes in form or substance, if any,

 9     noted in the attached Errata Sheet.

10

11

12     _____      _____

13     WILLIAM VERSOSKY                                  DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                              LAWYER'S NOTES

2    PAGE    LINE

3    _____   _____   _____

4    _____   _____   _____

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25