1          IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4
                  ~~~~~~~~~~~~~~~~~~~~
5
6    IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
     OPIATE LITIGATION
7                                    Case No. 17-md-2804
8                                    Judge Dan Aaron
     This document relates to:      Polster
9
     The County of Summit, Ohio, et al.
10   v. Purdue Pharma L.P., et al.
     Case No. 17-OP-45004
11
     The County of Cuyahoga v. Purdue
12   Pharma L.P., et al.
     Case No. 18-OP-45090
13
     City of Cleveland, Ohio v. Purdue
14   Pharma L.P., et al
     Case No. 18-OP-45132
15
                  ~~~~~~~~~~~~~~~~~~~~
16
                 Videotaped deposition of
17                   APRIL R. VINCE
18
                   December 13, 2018
19                     9:07 a.m.
20
21                    Taken at:
     Climaco, Wilcox, Peca & Garofoli Co., L.P.A.
22            55 Public Square, Suite 1950
                   Cleveland, Ohio
23
24
25          Renee L. Pellegrino, RPR, CLR

```
 1
 2    APPEARANCES:
 3    On behalf of Cuyahoga County:
          McHugh Fuller
 4        AMY J. QUEZON,  ESQ.
          97 Elias Whiddon Road
 5        Hattiesburg, Mississippi  39402
          (800) 939-5580
 6        amy@mchughfuller.com
             - and -
 7        Napoli Shkolnik PLLC
          MARIA FLEMING, ESQ.
 8        55 Public Square
          Suite 2100
 9        Cleveland, Ohio 44113
          (844) 230-7676
10        mfleming@napolilaw.com
             - and -
11        Plevin & Gallucci
          ROBIN M. WILSON, ESQ.
12        55 Public Square.
          Suite 2222
13        Cleveland, Ohio  44113-1901
          (216) 861-0804
14        fgallucci@pglawyer.com
15    On behalf of Johnson & Johnson and Janssen
      Pharmaceuticals, Inc.:
16        Tucker Ellis LLP
          MATTHEW MORIARTY, ESQ.
17        950 Main Avenue
          Suite 1100
18        Cleveland, Ohio  44113-7213
          (216) 592-5000
19        matthew.moriarty@tuckerellis.com
20    On behalf of Walmart, Inc.
          Jones Day
21        LISA B. GATES, ESQ.
          North Point
22        901 Lakeside Avenue East
          Cleveland, Ohio  44114-1190
23        (216) 586-3939
          lgates@jonesday.com
24
25                        ~ ~ ~ ~ ~
```

```
                                                    Page  3
 1   APPEARANCES, CONT'D:
 2   On behalf of Endo Pharmaceuticals, Inc., Endo
     Health Solutions, Inc., Par Pharmaceuticals,
 3   Inc. and Par Pharmaceutical Companies, Inc.:
         Arnold & Porter
 4       (Via Telephone)
         REBECCA E. ZOLLER, ESQ.
 5       250 West 55th Street
         New York, New York  10019-9710
 6       (212) 836-8000
         rebecca.zoller@arnoldporter.com
 7
     On behalf of Teva Pharmaceutical Industries:
 8       (Via Telephone)
         Morgan Lewis & Bockius LLP
 9       WENDY WEST FEINSTEIN, ESQ.
         One Oxford Centre
10       Thirty Second Floor
         Pittsburgh, Pennsylvania  15219-6401
11       (412) 560-7455
         wendy.feinstein@morganlewis.com
12           - and -
         Morgan Lewis & Bockius
13       (Via Telephone)
         ZACHARY R. LAZAR, ESQ.
14       77 West Wacker Drive
         Chicago, Illinois  60601-5094
15       (312) 324-1492
         zachary.lazar@morganlewis.com
16
     On behalf of Cardinal Health, Inc.:
17       Williams & Connolly LLP
         BRAD MASTERS, ESQ.
18       PAUL BOEHM, ESQ.
         725 12th Street NW
19       Washington, D.C.  20005
         (202) 434-5000
20       bmasters@cov.com
         pboehm@wc.com
21
22                     ~ ~ ~ ~ ~
23
24
25
```

```
                                                   Page  4
 1   APPEARANCES, CONT'D:
 2   On behalf of Rite-Aid:
         Morgan Lewis
 3       SCOTT T. SCHUTTE, ESQ.
         77 West Wacker Drive
 4       Chicago, Illinois  60601-5094
         (312) 324-1773
 5       sschutte@morganlewis.com
 6   On behalf of McKesson Corporation:
         (Via Telephone and Virtual Veritext Stream)
 7       Covington & Burling
         STEPHEN F. RAIOLA, ESQ.
 8       One CityCentre, NW
         Washington, D.C.  20001-4956
 9       (202) 662-6000
         sraoila@cov.com
10
     On behalf of AmerisourceBergen Drug Corporation:
11       (Via Telephone)
         Reed Smith LLP
12       ERIC L. ALEXANDER, ESQ.
         1301 K Street, N.W.
13       Suite 1000 - East Tower
         Washington, D.C.  20005
14       (202) 414-9200
         ealexander@reedsmith.com
15
16   ALSO PRESENT:  Kurt Henschel, Videographer
17                       ~ ~ ~ ~ ~
18
19
20
21
22
23
24
25
```

1                    TRANSCRIPT INDEX

2     APPEARANCES .....................................2

3     INDEX OF EXHIBITS ...............................6

4     INDEX OF OBJECTIONS .............................7

5

6     EXAMINATION OF APRIL R. VINCE:

7     BY MR. MASTERS ................................11

8     BY MS. FEINSTEIN .............................251

9     BY MR. SCHUTTE ...............................317

10

11    AFTERNOON SESSION ............................162

12

13    REPORTER'S CERTIFICATE .......................340

14

15    EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS
2
3     Number           Description              Marked
4
5     Exhibit 1     Resume - April R. Vince,        19
                    M.S.S.A., L.S.W., Beginning
6                   Bates Number CUYAH_013470572
7     Exhibit 2     Cuyahoga County Board of Health 25
                    Program Organizational Chart
8                   dated January 2015
9     Exhibit 3     Article Entitled "Polypharmacy  41
                    in the Elderly"
10
      Exhibit 4     Program Narrative Excerpt -     45
11                  Injury Prevention Grant-CCBH
                    2018, Beginning Bates Number
12                  CUYAH_013457563
13    Exhibit 5     Ohio's Drug Overdose Epidemic:  98
                    Contributing Factors and Ongoing
14                  Prevention Efforts Presentation
                    Outline
15
      Exhibit 6     2019 Prescription Drug Overdose 117
16                  Prevention Annual Work Plan
                    2019, Beginning Bates Number
17                  CUYAH_013756844
18    Exhibit 7     Cuyahoga County Opiate Task     125
                    Force Report 2015, Beginning
19                  Bates Number CUYAH_014194642
20    Exhibit 8     Cuyahoga County Opiate Task     134
                    Force Report 2016, Beginning
21                  Bates Number CUYAH_014194735
22    Exhibit 9     Cuyahoga County Board of Health 273
                    2017 Organizational Chart,
23                  Beginning Bates Number
                    CUYAH_002503210 - Marked
24                  "Confidential"
25

1                  INDEX OF OBJECTIONS
2
3    Objection ......................................18
     Objection ......................................19
4    Objection ......................................23
     Objection ......................................42
5    Objection ......................................42
     Objection ......................................43
6    Objection ......................................43
     Objection ......................................44
7    Objection ......................................45
     Objection ......................................55
8    Objection ......................................56
     Objection ......................................62
9    Objection ......................................62
     Objection ......................................62
10   Objection ......................................74
     Objection ......................................74
11   Objection ......................................75
     Objection ......................................75
12   Objection ......................................76
     Objection ......................................77
13   Objection ......................................78
     Objection ......................................78
14   Objection ......................................78
     Objection ......................................84
15   Objection ......................................88
     Objection ......................................89
16   Objection ......................................96
     Objection .....................................102
17   Objection .....................................103
     Objection .....................................107
18   Objection .....................................107
     Objection .....................................108
19   Objection .....................................108
     Objection .....................................111
20   Objection .....................................112
     Objection .....................................113
21   Objection .....................................114
     Objection .....................................115
22   Objection .....................................131
     Objection .....................................132
23   Objection .....................................132
     Objection .....................................133
24   Objection .....................................147
     Objection .....................................151
25   Objection .....................................153

```
 1              INDEX OF OBJECTIONS, CONT'D
 2
 3   Objection ....................................153
     Objection ....................................156
 4   Objection ....................................157
     Objection ....................................158
 5   Objection ....................................166
     Objection ....................................167
 6   Objection ....................................167
     Objection ....................................167
 7   Objection ....................................167
     Objection ....................................168
 8   Objection ....................................169
     Objection ....................................174
 9   Objection ....................................174
     Objection ....................................174
10   Objection ....................................174
     Objection ....................................175
11   Objection ....................................176
     Objection ....................................176
12   Objection ....................................178
     Objection ....................................179
13   Objection ....................................180
     Objection ....................................184
14   Objection ....................................185
     Objection ....................................185
15   Objection ....................................186
     Objection ....................................186
16   Objection ....................................186
     Objection ....................................187
17   Objection ....................................187
     Objection ....................................189
18   Objection ....................................190
     Objection ....................................193
19   Objection ....................................193
     Objection ....................................206
20   Objection ....................................207
     Objection ....................................208
21   Objection ....................................208
     Objection ....................................208
22   Objection ....................................217
     Objection ....................................218
23   Objection ....................................219
     Objection ....................................219
24   Objection ....................................219
     Objection ....................................219
25   Objection ....................................220
```

1                INDEX OF OBJECTIONS, CONT'D
2
3    Objection ....................................221
     Objection ....................................221
4    Objection ....................................222
     Objection ....................................222
5    Objection ....................................222
     Objection ....................................223
6    Objection ....................................226
     Objection ....................................230
7    Objection ....................................232
     Objection ....................................237
8    Objection ....................................239
     Objection ....................................240
9    Objection ....................................241
     Objection ....................................248
10   Objection ....................................253
     Objection ....................................257
11   Objection ....................................268
     Objection ....................................270
12   Objection ....................................272
     Objection ....................................272
13   Objection ....................................280
     Objection ....................................281
14   Objection ....................................283
     Objection ....................................283
15   Objection ....................................284
     Objection ....................................288
16   Objection ....................................295
     Objection ....................................301
17   Objection ....................................303
     Objection ....................................305
18   Objection ....................................309
     Objection ....................................310
19   Objection ....................................310
     Objection ....................................314
20   Objection ....................................332
     Objection ....................................333
21
22
23
24
25

```
                                                  Page 10
 1                THE VIDEOGRAPHER:  Today's date is
 2    December 13, 2018.  The time is 9:07.  We're on
 3    the record.  We're here in the matter of
 4    National Prescription Opiate Litigation.  This
 5    deposition is taking place in Cleveland, Ohio.
 6                Would counsel please identify
 7    themselves for the record.
 8                MS. QUEZON:  Amy Quezon, on behalf
 9    of the Plaintiff.
10                MS. FLEMING:  Maria Fleming, on
11    behalf of the Plaintiff.
12                MR. MASTERS:  Brad Masters, on
13    behalf of Cardinal Health.
14                MR. MORIARTY:  Matthew Moriarty from
15    Tucker Ellis for Janssen.
16                MS. FEINSTEIN:  Wendy West Feinstein
17    with Morgan Lewis for the Teva Defendants.
18                MR. SCHUTTE:  Scott Schutte with
19    Morgan Lewis for the Rite-Aid Defendant.
20                MS. GATES:  Lisa Gates from Jones
21    Day for Walmart.
22                THE VIDEOGRAPHER:  Anyone on the
23    telephone?
24                MR. ALEXANDER:  Eric Alexander from
25    Reed Smith for AmerisourceBergen Drug
```

Page 11

1   Corporation.

2              MR. LAZAR:  Zachary Lazar, Morgan

3   Lewis & Bockius, for the Teva Defendants.

4              MR. RAIOLA:  Stephen Raiola with

5   Covington & Burling on behalf of McKesson.

6              MS. ZOLLER:  Rebecca Zoller with

7   Arnold & Porter on behalf of the Endo and Par

8   Defendants.

9         APRIL R. VINCE, of lawful age, called for

10   examination, as provided by the Federal Rules of

11   Civil Procedure, being by me first duly sworn,

12   as hereinafter certified, deposed and said as

13   follows:

14              EXAMINATION OF APRIL R. VINCE

15   BY MR. MASTERS:

16         Q.    Good morning, Ms. Vince.

17         A.    Good morning.

18         Q.    I introduced myself off the record,

19   but thank you for being here.

20         A.    Sure.

21         Q.    Would you please, for the record,

22   state your full name?

23         A.    April Renee Vince.

24         Q.    And what is your current home

25   address?

```
                                           Page 12
 1        A.    It's 68 Hillary Lane, Aurora, Ohio
 2    44202.
 3        Q.    Great.
 4              And Aurora, Ohio is in Cuyahoga
 5    County, correct?
 6        A.    It's in Portage County.
 7        Q.    Oh, it's in Portage County?
 8        A.    It is.
 9        Q.    Okay.  How long have you been a
10    resident of Portage County?
11        A.    Three years.
12        Q.    Have you ever been deposed before?
13        A.    No.
14        Q.    This is your first time?
15        A.    Yes.
16        Q.    In light of that, let's go over a
17    few ground rules to get started.
18              First, when I ask a question,
19    because this is being recorded, your response
20    needs to be audible.  You can nod your head, but
21    unless you say something, the record won't
22    reflect your answer.
23        A.    Okay.
24        Q.    Sometimes it's hard to remember
25    because it feels like a conversation, but just
```

1    remember to say yes or no if that's your answer.

2         A.    Okay.

3         Q.    Sometimes I might, and very likely

4    will, ask a question that is unclear.  If I

5    catch it myself, I'll try to correct it.  If

6    there's a question that I ask that you don't

7    understand or would like clarification on, feel

8    free to ask and I will try to reword it.  Okay?

9         A.    Okay.

10        Q.    So, like I said, this is a

11   conversation but it's also being recorded, and

12   for the sake of our court reporter, we'll both

13   need to be mindful of how fast we talk so we

14   don't burden her too much.

15             In light of that, we also should try

16   to not speak over each other.  Sometimes I might

17   ask a question that you already know the answer

18   to before I finish the question, but I'm going

19   to ask that you let me finish asking the

20   question and then respond.  Okay?

21        A.    Okay.

22        Q.    And sometimes other attorneys in the

23   room might object, including counsel sitting

24   next to you.  These objections are for the judge

25   to consider later, okay?

1          A.     Okay.

2          Q.     Unless the attorney sitting next to

3    you -- the attorney sitting next to instructs

4    you not to answer, you should answer despite an

5    objection.  Okay?

6          A.     Okay.

7          Q.     And we'll try to get through as much

8    of this material as quickly and efficiently as

9    possible today, but if you ever need a break to

10   use the restroom, for example, feel free to ask.

11         A.     Okay.

12         Q.     Do you understand that you are under

13   oath today?

14         A.     Yes.

15         Q.     And do you understand what it means

16   to be under oath?

17         A.     That I have to tell the truth.

18         Q.     Okay.  And do you understand you're

19   here to give testimony based on what you know

20   and not what someone told you?

21         A.     Yes.

22         Q.     Okay.  And is there any reason why

23   your testimony today might not be truthful,

24   accurate -- is there any reason why you would

25   not be able to give truthful or accurate

Page 15

1    testimony today?

2         A.     No.

3         Q.     So when did you first learn that you

4    were going to be deposed in this case?

5         A.     When our legal counsel at the Board

6    of Health told me I was going to be deposed.

7         Q.     And who is that?

8         A.     Tom O'Donnell.

9         Q.     Tom O'Donnell.  And when did he tell

10   you that you were going to be deposed?

11        A.     I can't tell you the exact date.

12   I'd have to look back at my e-mails.

13        Q.     Okay.

14        A.     I'm sorry.

15        Q.     And Tom O'Donnell, he's the general

16   counsel of CCBH?

17        A.     Correct.

18        Q.     Okay.  And did you meet with him to

19   prepare for today's deposition?

20        A.     No, I did not.

21        Q.     Did you prepare for today's

22   deposition?

23        A.     I met briefly with the attorneys

24   yesterday.

25        Q.     So with --

Page 16

```
 1          A.     Amy and Frank Gallucci briefly and

 2     Robin.  I can't remember her last name.

 3          Q.     Okay.  Great.

 4                 And how long did you meet with them?

 5          A.     It was like half a day maybe.

 6          Q.     Half a day?

 7          A.     Yeah.

 8          Q.     And that was in person?

 9          A.     Correct.

10          Q.     Did you meet with lawyers in

11     preparation for this deposition at any other

12     time?

13          A.     No.

14          Q.     Did you review documents as part of

15     your preparation?

16          A.     I reviewed documents that I had.

17          Q.     So your own documents that you

18     brought to the meeting?

19          A.     No.  I didn't bring anything to the

20     meeting.

21          Q.     Okay.  Any documents you hadn't seen

22     before?

23          A.     Several I was not familiar with,

24     yes.

25          Q.     You were not familiar with, meaning
```

1   this was the first time you had seen them?

2         A.    It could have been.  I'm not

3   positive, because at first glance, I would have

4   to cross-reference it to any document I've seen

5   in the past, and I can't be sure if it was

6   something I had or hadn't seen before.

7         Q.    Okay.  Did you review the

8   pleading -- the complaint in this case as

9   preparation for today's deposition?

10        A.    No.

11        Q.    Did you review any documents on your

12  own outside of that meeting with the attorneys

13  yesterday?

14        A.    No.

15        Q.    And one other kind of preliminary

16  question.  Were you ever asked to preserve and

17  not throw away documents that could be related

18  to this litigation?

19        A.    Yes.

20        Q.    When were you asked?

21        A.    It was, again, from Tom O'Donnell.

22  I can't give you the exact date.  Again, I'd

23  have to look back at e-mails that I had, the

24  letter that I got.

25        Q.    Was it before, after or around the

```
1   same time as you learned that you would be

2   deposed in this case?

3              MS. QUEZON:  Object to the form.

4        A.    I really apologize, but I would have

5   to literally go back to the e-mails and look at

6   when that date was.  Off the top of my head, I

7   can't recall.

8        Q.    Okay.  And did you comply with that

9   request to preserve documents?

10       A.    Yes.

11       Q.    And did someone come and collect

12  documents from you?

13       A.    That was worked out with our IT

14  department and our legal counsel and Frank.

15  They worked it out.

16       Q.    Do you know what documents they

17  collected?

18       A.    I have no idea.

19       Q.    So you don't know if there were

20  documents that they collected -- sorry.  Let me

21  rephrase that.

22             You don't know if there were

23  documents that they didn't collect that they

24  should have collected?

25             MS. QUEZON:  Object to the form.
```

1    A.    All I know is the documents that I
2  had on my hard drive, anything we had uploaded,
3  scanned, e-mailed, I believe the IT department
4  provided that for them.
5    Q.    And what about hard copy documents
6  that might be in a desk drawer, for instance?
7    A.    Those are all scanned and uploaded
8  as well.
9    Q.    Okay.  Great.
10    I'm going to show you what I'm
11  marking as Exhibit 1.
12    -   -   -   -   -
13    (Thereupon, Vince Deposition Exhibit
14    1, Resume - April R. Vince,
15    M.S.S.A., L.S.W., Beginning Bates
16    Number CUYAH_013470572, was marked
17    for purposes of identification.)
18    -   -   -   -   -
19    A.    Okay.
20    Q.    Ms. Vince, do you recognize this
21  document?
22    A.    Yes.
23    Q.    This is a copy of your resume?
24    A.    Correct.
25    Q.    Is this the most current version of

Page 20

1  your resume?

2        A.    I believe it to be so, but I'm not

3  positive.  I'd have to go look at my electronic

4  file I have.

5        Q.    Okay.  Looking at it here, though,

6  program manager is your current position; is

7  that correct?

8        A.    Correct.

9        Q.    It says you graduated in -- from the

10  College of Wooster with a B.A. in psychology?

11        A.    The College of Wooster, yes.

12        Q.    Wooster.  Pardon me.  I had a hunch

13  that it was Wooster.  Didn't go with my gut.

14              And with an M.S.S.A. from Case

15  Western two years later?

16        A.    Correct.

17        Q.    What is an M.S.S.A?

18        A.    Master's of Social Science

19  Administration.  Basically it's administration,

20  psychology and social work in one degree.

21        Q.    Okay.  And you received a

22  gerontology certificate with that?

23        A.    Separately, correct, from Case.

24        Q.    And what is a gerontology

25  certificate?

1          A.      Basically, you specialize in aging.

2          Q.      Okay.  Did you have to take a course

3    for that?

4          A.      You have to take extra courses, yes.

5          Q.      And then do you have to do clinical

6    work --

7          A.      No.

8          Q.      -- or any kind of substantive

9    experience --

10         A.      No.

11         Q.      -- to get that certificate?

12                 Okay.  And then you became a

13   licensed social worker in 1998?

14         A.      Correct.

15         Q.      And then your -- so looking on page

16   2, it shows that -- starting from the beginning

17   of your employment history, it shows you were

18   the director of social services at Maple Care

19   Center?

20         A.      Correct.

21         Q.      What is Maple Care Center?

22         A.      Nursing home, skilled nursing and

23   rehab center.

24         Q.      So you got your gerontology

25   certificate and worked at a nursing home.  Was

1  it a nursing home focused on aging clientele?

2        A.    Mainly, yes, but there were some

3  clients there that were not aging as well.

4        Q.    And what did you do as the director

5  of social services?

6        A.    I was responsible for admissions,

7  meeting with the families before they were

8  admitted, making sure the clients had what they

9  need basically, coordinating care plans for them

10  with the staff and with the families, and doing

11  insurance verification and discharge planning,

12  and marketing the facility.

13        Q.    All right.  That's a lot of

14  activities.

15        A.    Yeah.

16        Q.    Did you interact with the nursing

17  and physician staff while you were there?

18        A.    Formally I had to when we were doing

19  care planning, and informally on, you know,

20  lunches.

21        Q.    And in your formal or informal

22  interactions with physicians and nursing staff,

23  did you ever discuss prescription medication,

24  for example?

25              MS. QUEZON:  Object to the form.

Page 23

1          A.      No.
2          Q.      Did physicians and nurses at the
3  nursing home prescribe prescription opioids?
4          A.      I have no idea.
5          Q.      You don't know.  So you weren't
6  aware of any theft or diversion or misuse of
7  prescription opioids?
8          A.      I was not aware of any, no.
9          Q.      And then after Maple Care Center,
10  you moved over to the Cuyahoga County Board of
11  Health; is that right?
12          A.      Correct.
13          Q.      And if I refer to it as CCBH, do you
14  follow that?
15          A.      Yes.
16          Q.      Is that how you normally refer to
17  the organization?
18          A.      Yes.
19          Q.      So why did you leave the nursing
20  home to join CCBH?
21          A.      Basically, I left the nursing home
22  to join CCBH because I wanted to expand my
23  knowledge base professionally.  Being at the
24  nursing home, I didn't see much growth, and I
25  saw an opportunity at the Board of Health to

1   work as a public servant.

2          Q.     Did you always have an idea that you

3   might some day work in -- for a government

4   agency?

5          A.     No.

6          Q.     No.  So it was an unexpected

7   opportunity?

8          A.     Correct.

9          Q.     Were you drawn to public health?

10         A.     I would say indirectly, just because

11  of social work.  It's kind of -- they go hand in

12  hand, social work and public service, yes.

13         Q.     What is public health?

14         A.     To me?

15         Q.     Yes.

16         A.     I apologize.  I would have to

17  literally get a dictionary out to give you that

18  definition.

19         Q.     Fair enough.

20                So we're going to come back to this

21  resume, we're going to kind of jump back and

22  forth, but I'm going to show you what I'm

23  marking as Exhibit 2.

24                      -   -   -   -   -

25                (Thereupon, Vince Deposition Exhibit

1              2, Cuyahoga County Board of Health

2              Program Organizational Chart dated

3              January 2015, was marked for

4              purposes of identification.)

5                   -   -   -   -   -

6       Q.    Do you recognize this document?

7       A.    Yes.

8       Q.    What is it?

9       A.    It's CCBH's organizational chart.

10      Q.    This says that it was -- well, this

11   document indicates that it's from January 2015,

12   but does this reflect the current organization

13   as you understand it?

14      A.    To be honest with you, I have no

15   idea.  It's not my role to know.  I don't know.

16      Q.    Okay.  So what is CCBH?

17      A.    Could you expand upon that question?

18      Q.    Sure.

19            CCBH is the Board of Health for this

20   area of Cuyahoga County, correct?

21      A.    The Cuyahoga County Board of Health

22   is the district board of health separate from

23   the Cuyahoga County Executive's Office.  We have

24   our own board.  We're a separate entity.  We do

25   not cover the City of Cleveland or Shaker

1   Heights.  We only represent or provide services

2   for those other outlying cities.

3          Q.    Okay.  So if we look at this

4   organizational chart, it shows something called

5   a District Advisory Council.  What is that?

6          A.    Honestly, I don't have a definition

7   for what it is.  Our commissioner would -- or

8   someone else would probably be a better person

9   to explain what that is.  I don't have direct

10  contact with them or interaction with whatever

11  that is.

12         Q.    And is the same true of the District

13  Licensing Board?

14         A.    Yes.

15         Q.    Underneath them is the Cuyahoga

16  County Board of Health, which, is it fair to

17  say, that represents the board members?

18         A.    I don't know what that square

19  represents.

20         Q.    But the Cuyahoga County Board of

21  Health does have a board?

22         A.    Yes.

23         Q.    And there are how many members on

24  that board?

25         A.    I should know that.  I don't know

Page 27

1    the exact number.   I apologize.

2          Q.    Do you know what the role of the

3    board is?

4          A.    Again, I'd have to have the

5    definition of what the role of the board is in

6    front of me to give you that exact definition on

7    record.

8          Q.    Underneath the Board of Health is

9    the health commissioner?

10         A.    Um-hum.

11         Q.    Who is the health commissioner?

12         A.    Terry Allan.

13         Q.    Do you know him personally?

14         A.    Yeah.   I know who he is.

15         Q.    Do you interact regularly with him?

16         A.    More regularly now.

17         Q.    More regularly now in your --

18         A.    My current role.

19         Q.    Because of your current position?

20         A.    Correct.

21         Q.    What is his role at CCBH?

22         A.    He's the health commissioner.

23         Q.    What does the health commissioner

24    do?

25         A.    You would have to ask Terry Allan

1  that.

2       Q.    How frequently do you interact with

3  him?

4       A.    Now, I would say probably weekly,

5  every other week maybe.

6       Q.    Why does your current role require

7  more interaction with Terry Allan?

8       A.    I would say because my current role

9  is much more visible in the public health realm

10  currently than my previous role.

11       Q.    Why is it more visible in the public

12  health realm?

13       A.    Because right now I'm the program

14  manager of Injury Prevention for the grant that

15  I manage from the State of Ohio, which

16  encompasses opiate and opioid use, and it's in

17  the news a lot and it's a public health issue

18  right now.

19       Q.    So do you discuss opioids and

20  opiates with Terry Allan?

21       A.    I don't discuss that with him.  He

22  might send an article that's interesting or

23  something.

24       Q.    So you don't regularly sit down with

25  Terry Allan to discuss what you're doing in your

Page 29

1    current capacity?

2         A.    No.

3         Q.    Underneath the health commissioner,

4    it looks like there are a few categories of

5    departments.  One is the Prevention and Wellness

6    Department.

7         A.    Um-hum.

8         Q.    What is that?

9         A.    It's a department called Prevention

10   and Wellness that I used to work in.  That's the

11   old department I worked in.  Previous to that it

12   was called Community Health.

13        Q.    When was that change made?

14        A.    January of this year, 2018.

15        Q.    And Environmental Public Health

16   Services, what is the purpose of that

17   department?

18        A.    Well, I'm new to the department in

19   January of 2018.  That's where this grant is

20   housed.  So I can't speak historically what

21   their role was, or even what it is now.  I'm

22   sure there's somebody better qualified to speak

23   to that point.

24        Q.    Okay.  It looks like to the side of

25   health commissioner is the medical director?

Page 30

1          A.      Yes.

2          Q.      Who is the medical director?

3          A.      Dr. Heidi Gullet.

4          Q.      And what is her function or role at

5     CCBH?

6          A.      I personally would not be able to

7     define that for you.

8          Q.      Have you ever interacted with Heidi

9     Gullet?

10         A.      Yes.

11         Q.      What is the nature of your

12     interaction with her?

13         A.      I can't tell you exactly what year,

14     but I used to work on fall prevention with

15     seniors and she was interested in that, so we

16     worked together in a capacity trying to do

17     programming around fall prevention for seniors.

18     Recently I've been interacting with her on a new

19     project that we have through the CDC for ACEs as

20     it's tied to opiate use disorder.

21         Q.      What is that project -- could you

22     tell me more about that project?

23         A.      Sure.

24                 So it's a project being funded

25     through the CDC via the National Network --

1    excuse me if I get it wrong.  I believe it's the
2    National Network of Public Health Institutes.
3    They have some funding that is going to fund a
4    pilot project in four different areas, two in
5    Michigan and two in Ohio, Cuyahoga County and
6    Hamilton County, specifically looking at the
7    relationship between an ACEs score -- and an
8    ACEs score is adverse childhood experiences, so
9    something a child experiences when they're
10   younger that might be traumatic is going to
11   affect who they are when they're older, and they
12   found a correlation between a child that has a
13   high ACEs score when they're younger is more
14   prone to have an opioid use disorder or a
15   substance use disorder when they're older.  And
16   so we've been given some funding to do
17   preliminary work to look at that correlation and
18   how we can reduce or at least prevent high ACEs
19   score -- high ACEs scores in the future.
20        Q.    And that funding comes from the CDC?
21        A.    Correct.
22        Q.    Do you get funding for this project
23   from anywhere else?
24        A.    No.
25        Q.    How regularly do you interact with

1  Dr. Gullet relating to this project?

2       A.    Literally, this project just started

3  December 1, so I'd say maybe three or four times

4  I have in the past month.

5       Q.    And how long do you expect this

6  project to last?

7       A.    Our contract is until September

8  30th, 2019.

9       Q.    Great.

10            CCBH publishes an annual report; is

11  that right?

12       A.    Correct.

13       Q.    That report summarizes the various

14  activities and operations of CCBH throughout the

15  year?

16       A.    Some of, yes.

17       Q.    Some of, but not all?

18       A.    No.

19       Q.    So there might be other activities

20  that CCBH does?

21       A.    Yes.

22       Q.    That don't make the report?

23       A.    Correct.

24       Q.    Do you -- have you ever helped

25  prepare those reports?

1          A.     I do assist with the annual report.

2          Q.     You do assist with that?

3          A.     Yes.

4          Q.     How long have you been assisting

5     with the annual report?

6          A.     Again, I apologize.  I can't give

7     you an exact year.  I've been helping I know for

8     sure for the past three years; I've been

9     assisting with the annual report.  I serve on

10    the Community Reckoning Committee as well.

11         Q.     And prior to that, prior to serving

12    on that committee, did you read the reports that

13    came out?

14         A.     Briefly.

15         Q.     Briefly?

16         A.     Yeah.

17         Q.     And the committee drafts these

18    reports.  Who signs off on them before they get

19    published?

20         A.     I do not have the answer to that.

21         Q.     This last category on the

22    organizational chart is administration.  Have

23    you ever worked in the administration section of

24    CCBH?

25         A.     No, I have not.

Page 34

1         Q.    Do you interact with the

2    administration folks very often?

3         A.    Yes.

4         Q.    What is the -- who at the

5    administration -- on the administration side of

6    CCBH do you interact with?

7         A.    What time frame?

8         Q.    In your current capacity.

9         A.    My current capacity?

10        Q.    Yes.

11        A.    Well, communication and marketing I

12   interact with because I'm on the committee.

13        Q.    Okay.

14        A.    Epidemiology and surveillance I

15   interact with because of their role in this new

16   ACEs grant that we received.  One of their data

17   analysts is helping to head up the project.

18        Q.    And who is that?

19        A.    Becky Karns.

20        Q.    Becky Karns?

21        A.    The director of epidemiology I've

22   been interacting with because we also have an

23   Epidemiology Validation project through the

24   State of Ohio that we've been tasked to do, and

25   --

Page 35

1          Q.      What is that?

2          A.      So, also, we were given $10,000 to

3    review 60 cases through MetroHealth Hospital,

4    matching up -- it's called EpiCenter, this

5    database that tracks overdoses, and matching it

6    up to MetroHealth's medical record, to make sure

7    that the information is valid.  So our

8    epidemiologists are working on that currently.

9    That's the capacity that I work with them.

10         Q.      When you say to make sure the

11   information is valid, can you explain what you

12   mean?

13         A.      To make sure that on both sides that

14   they're matching up correctly, that both -- that

15   they're being entered correctly, both in the

16   EpiCenter database and the MetroHealth database.

17         Q.      How might incorrect information be

18   entered into the system?

19         A.      I have no idea.  I rely on the

20   epidemiologists for that specialty.

21         Q.      But this is part of a project that

22   you are tasked with?

23         A.      The reason why I'm involved is

24   because I manage our injury prevention grant

25   through the State of Ohio, and that is separate

Page 36

1    from this, so since I'm the program manager for

2    that grant, this is a supplemental to that.

3    Then I hand it off to our epidemiologist.

4         Q.    And who's the epidemiologist?

5         A.    Chris Kippes.

6         Q.    How long have you known Chris?

7         A.    Since he started at the Board of

8    Health, which I do not know what year that was.

9         Q.    More than ten years ago?

10         A.    I really don't know.  I can't

11    remember.

12         Q.    You mentioned EpiCenter data?

13         A.    Um-hum.

14         Q.    Can you explain what that means?

15         A.    And, again, I'm not a specialist.

16    It's not my role at the Board of Health to know

17    exactly what EpiCenter -- I know it's kind of

18    tertiary.  It's data that's collected on

19    overdoses, I believe through EMS.

20         Q.    All right.  And, again, kind of

21    moving back to the resume -- we'll keep that

22    exhibit in front of you as well -- your first

23    role at CCBH was regional referral coordinator

24    for the Dental Options program; is that right?

25         A.    Correct.

Page 37

1      Q.    And what is the Dental Options

2   program?

3      A.    The Dental Options program, when I

4   started at the Board of Health -- basically

5   individuals who did not have dental insurance

6   would apply to this program.  We had dentists

7   that volunteered their time and were not paid to

8   do service for these individuals if they were

9   deemed a donated case.  We had to go through

10  this whole evaluation to see if they were going

11  be discounted or donated, and I won't bore you

12  with all the details, but basically it's

13  dentists who would donate their time or discount

14  their time and do services for these individuals

15  and get them dental treatment.

16         It was our job as the coordinator,

17  the regional referral coordinator, because

18  again, it was seven counties, to manage their

19  case.

20     Q.    Was there any particular reason why

21  you were in the Dental Options program or was

22  that just what was available?

23     A.    Well, it's social work based, which

24  is my training, so, again, kind of social work

25  and public health going hand in hand.  And, as

Page 38

1    you may know, people that go into social work
2    want to help people, so this was an avenue where
3    I could help people get something that they
4    didn't have.
5            Q.    Great.
6                  From there you moved to become a
7    grant case manager with the Breast and Cervical
8    Cancer project as well as, shortly thereafter, a
9    program manager with the Breast and Cervical
10   Cancer project; is that right?
11           A.    In the -- yeah, program manager for
12   Breast and Cervical project, Dental Options and
13   the Home Injury Prevention program.
14           Q.    So over all those programs, you
15   managed them?
16           A.    Correct.
17           Q.    Why did you switch to this position?
18   Was it just a promotion?
19           A.    It was an advancement in my
20   position, but also because, with this position,
21   I was able to take on and utilize my gerontology
22   certificate.  The Home Injury Prevention program
23   was geared toward 65 and older, so --
24           Q.    Which led to your next position,
25   which was the program coordinator, case

1  management specialist, in the Aging and Dental

2  Options program, right?

3       A.    Yep.

4       Q.    A natural move from your previous

5  position to your second one.

6            Where does this fit on the CCBH

7  organizational chart?

8       A.    Well, this chart has changed many

9  times, from the time I started to what it looks

10  like as -- in January 2015, so I can't speak to

11  anything until 2015, where it would fall, but

12  mainly all of my positions were in the

13  Prevention and Wellness, previously Community

14  Health, until January 2018.

15       Q.    And you were in this role from 2006

16  to 2015?

17       A.    Which role?

18       Q.    This program coordinator/case

19  manager specialist for the Aging programs and

20  Dental Options.

21       A.    Yes.

22       Q.    Can you tell me what you did in this

23  role?

24       A.    That would take a long time.

25       Q.    Briefly.

Page 40

1          A.    Briefly, basically, anything that
2    had to do with Dental Options, Aging, or the
3    Breast and Cervical Cancer program.  I was
4    responsible to keep the staff on task with
5    meeting deliverables set forth from the Ohio
6    Department of Health.  They're all Ohio
7    Department of Health grants, other than the Home
8    Injury Prevention grant, which that was a local
9    grant.
10         Q.    Okay.
11         A.    Also, writing the grants, making
12   sure the budgets were expended.
13         Q.    It looks like, from your resume on
14   page 2, around this time you were participating
15   in professional events relating to poly-pharmacy
16   in the elderly; is that right?
17         A.    Correct.
18               So when I was managing the aging
19   grant, there was a pharmacy student who was
20   getting her Master's in Public Health that
21   did -- it's not an internship, but she did a
22   round at the Board of Health and she studied
23   poly-pharmacy with seniors, and I just reviewed
24   her paper and made changes, helped her write it.
25         Q.    And you're listed as a contributor

Page 41

1   on the paper.

2          A.     That was my contribution.

3                     -    -    -    -    -

4                 (Thereupon, Vince Deposition Exhibit

5                 3, Article Entitled "Polypharmacy in

6                 the Elderly", was marked for

7                 purposes of identification.)

8                     -    -    -    -    -

9          Q.    Okay.  I'm handing you now what's

10  been marked as Exhibit 3, and I'll represent to

11  you that this exhibit is a copy of your article

12  from the internet.  Does this look like the

13  article that you helped with?

14         A.     I have to be honest with you.  I

15  have not read the article in many, many years.

16  I read her final article that she was going to

17  submit for admission.  I don't know if this is

18  the same article that I read or helped create.

19  I don't know if it's exactly the same article.

20         Q.     What is poly-pharmacy?

21         A.     Use of multiple medications

22  basically, and also using different pharmacies

23  to get those medications.

24         Q.     And this is a common problem among

25  the elderly?

Page 42

```
 1              MS. QUEZON:  Object to form.
 2       A.    I can't speak to that.  My current
 3   role isn't -- I don't know that answer.
 4       Q.    So let's look at page 3 of this
 5   exhibit.
 6              MS. QUEZON:  That begins at the top
 7   "Limitations"?
 8              MR. MASTERS:  The third paragraph
 9   from the top begins with "In conclusion."
10       Q.    It says, "In conclusion, this study
11   found that poly-pharmacy was frequent among
12   Cuyahoga County seniors associated with
13   duplicated therapy and inappropriate drug
14   combinations."
15              Does that refresh your recollection
16   as to whether poly-pharmacy is frequent in
17   Cuyahoga County?
18              MS. QUEZON:  Object to form.
19       A.    It does not refresh my recollection.
20   To be honest with you, again, I reviewed the
21   article for her.  I didn't help her collect the
22   information.  I didn't help her write it.  I
23   made edits.  I basically assisted her with
24   getting in contact with those who might be able
25   to provide that for her.
```

Page 43

1        Q.     Let's look at page 2 of this

2   article.  The bottom paragraph begins with,

3   "Many seniors used multiple pharmacies," and

4   then says, "Switching between pharmacies may

5   exacerbate communication among patients,

6   pharmacists, and physicians, increase the risk

7   of inappropriate medication use and potential

8   adverse consequences."

9             Do you have a view of how switching

10   pharmacies -- switching between pharmacies can

11   affect communication between patients,

12   pharmacists and prescribers?

13             MS. QUEZON:  Object to the form.

14        A.     Could you repeat the question?

15        Q.     How does switching between

16   pharmacies exacerbate or affect the

17   communication among patients, pharmacists and

18   prescribers?

19             MS. QUEZON:  Object to the form.

20        A.     Again, I have to apologize.  She was

21   the pharmacist writing the paper, which she -- I

22   think a pharmacist or someone with that kind of

23   specialty would be better poised to answer that

24   question.  I professionally can't answer that

25   question.

Page 44

1           Q.     In your current role as injury
2     program -- Injury Prevention program director,
3     project director, do you examine public policy
4     problems relating to opioids?
5                  MS. QUEZON:  Object to the form.
6           A.     In my current role, that's not my
7     role, that's not part of my role to review those
8     type of forms.
9           Q.     I'm not speaking about forms.
10          A.     Okay.
11          Q.     In your current role you attend
12    conferences relating to prescription opioids,
13    correct?
14          A.     Um-hum.
15          Q.     You attend meetings related to
16    prescription opioids?
17          A.     Correct.
18          Q.     And heroin?
19          A.     Correct.
20          Q.     And fentanyl, and prescribing
21    guidelines?
22          A.     Sometimes that's addressed.
23          Q.     In any of these meetings do they
24    ever discuss the role of prescribers in the
25    current public health issues relating to

Page 45

1  opioids?

2            MS. QUEZON:  Object to the form.

3        A.    To be honest with you, it's not one

4  of the main things that's discussed.  It might

5  be discussed amongst professionals at these

6  meetings that I go to, but I don't remember that

7  being a point of topic at conferences or

8  meetings that I've gone to.

9        Q.    Okay.  We may come back to this

10  article.

11                -    -    -    -    -

12            (Thereupon, Vince Deposition Exhibit

13            4, Program Narrative Excerpt -

14            Injury Prevention Grant-CCBH 2018,

15            Beginning Bates Number

16            CUYAH_013457563, was marked for

17            purposes of identification.)

18                -    -    -    -    -

19                -    -    -    -    -

20        Q.    I'm showing you now what's been

21  marked as Exhibit 4.  Do you recognize this

22  document?

23        A.    Yes.

24        Q.    What is it?

25        A.    It appears to be part of our program

1   narrative for our grant application to the Ohio

2   Department of Health.

3        Q.    What's a program narrative?

4        A.    It's one of the required pieces that

5   you have to submit to the Ohio Department of

6   Health as a grant -- a grant submission.  The

7   exact what it entails, I literally would have to

8   go back to my desk and grab my RFP for the Ohio

9   Department of Health to tell you everything

10  that's supposed to be encompassed in it.

11       Q.    I don't need to know everything

12  that's supposed to be encompassed in it, but

13  perhaps you could provide a little bit more

14  detail about what the purpose of this document

15  is.

16       A.    Let me see.  So as part of the

17  program narrative, you also have to supply a

18  budget narrative.  This is the budget narrative

19  piece that lays out who is going to work on the

20  program, a definition of what their role will

21  be, which is fluid.  It may or may not cover

22  everything within the definition.  It may cover

23  more; as you can see, facility cost, and

24  out-of-state training.

25       Q.    And this is for the Injury

Page 47

1    Prevention grant?

2        A.    Correct.

3        Q.    That was awarded in 2014, right?

4        A.    I don't know.  That was before I was

5    on the grant.  I'm not positive.

6        Q.    Is this something that you submit --

7    is a document like this something you submit

8    every single year?

9        A.    This is something that was

10   submitted -- okay.  So I started January 2018.

11   They submitted the grant application in 2017,

12   were awarded, and then we were required this

13   year to apply competitively.  I believe when

14   they applied every year, it's non-competitive,

15   meaning they should get it back unless there's

16   something really wrong with their application.

17   When we applied this year, it was competitive.

18   There were ten applicants and only three

19   awardees.  The pot is very small as far as the

20   money that they give the core, which is -- this

21   is only $125,000, and we're tasked to do many

22   different deliverables with that core grant.

23   Unfortunately, we were not awarded that grant

24   this year because of the competitive nature of

25   the grant.  We were very grateful that they

Page 48

1  found crisis funding to fund us through

2  September at the end of this -- until the end of

3  this year, and beyond that we'll have to apply

4  for more grants to meet the need.  They saw the

5  need in Cuyahoga County, so they found crisis

6  money for it.

7       Q.    So the Injury Prevention grant that

8  you are in charge of running will not continue

9  past the end of this month?

10      A.    It will continue with the crisis

11  funding through the State of Ohio.

12      Q.    Until September?

13      A.    30th.

14      Q.    Of 2019?

15      A.    Correct.

16            In March of this year they will be

17  releasing more funding so we can reapply to,

18  hopefully, continue beyond September 30th, 2019.

19      Q.    Did the Department of Health

20  indicate why your application was not accepted?

21      A.    No.

22      Q.    But for the last 11 months you have

23  been working on directing the activities of CCBH

24  relating to this Injury Prevention grant,

25  correct?

Page 49

1          A.      Correct.   My supervisor and myself,

2    correct.

3          Q.      And this -- page 1 of this document

4    describes the personnel who are involved in this

5    program, correct?

6          A.      Yeah.   Page 1 and page 2, yes.

7          Q.      And you're the first name listed

8    here?

9          A.      Um-hum.

10               MS. QUEZON:  Yes?

11               THE WITNESS:  Yes.

12         Q.      Project director, program manager,

13   grant coordinator, correct?

14         A.      That's correct.

15         Q.      This document indicates the various

16   responsibilities associated with your role,

17   right?

18         A.      Yes.   Again, they are fluid.

19         Q.      What do you mean by they're fluid?

20         A.      Meaning it could be more than this,

21   and usually is more than that, but this is the

22   core of what is required from the Ohio

23   Department of Health.

24         Q.      That involves coalition building,

25   implementing PSEC strategies, right?  What is a

Page 50

1   PSEC strategy?

2           A.      I was afraid you were going to ask

3   me that.  So policy, systems and environmental

4   changes.

5           Q.      What does that mean?

6           A.      They're called PSECs that ODH puts

7   forth.  Again, they're in our work plan.

8   There's about eight to ten that we're tasked

9   with that we have to accomplish, being -- let's

10  say, for example, policy change.  We have to

11  work with college campuses to hopefully make a

12  policy change on college campuses let's say for

13  their emergency responders to carry naloxone.

14  That would be something they would like to see

15  as far as policy.  Systems change may be in the

16  hospital.  Environmental change may be with the

17  police force.  Those are just some examples.

18          Q.      These are categories of goals or

19  missions that the ODH wants you to complete?

20          A.      Correct.

21          Q.      Moving on -- and program evaluation.

22  What programs are you evaluating?

23          A.      The Injury Prevention program.

24          Q.      And what does your evaluation

25  entail?

Page 51

1          A.     Currently, since I'm new to the

2     position, we haven't done an evaluation yet.

3     I've been told it will be a logic model.

4          Q.     What's a logic model?

5          A.     It's -- it's a document that tracks

6     your inputs to the program and expected outputs,

7     so it tracks activities to make sure that you're

8     successful.

9          Q.     Did you create this logic model?

10         A.     I did not.

11         Q.     Who created this logic model?

12         A.     I would have to look at the authors

13    who created it.  That was before I started.  I'm

14    not positive.

15         Q.     So you don't know who contributed to

16    help make --

17         A.     I know three main contributors.  I

18    don't know all of their names.

19         Q.     Who are the three main contributors?

20         A.     Allisyn Leffla, Vince Caraffi and

21    Dr. Tom Gilson.

22         Q.     Who is Vince Caraffi?

23         A.     He's my supervisor.

24         Q.     How long have you known Vince

25    Caraffi?

1          A.    I started working with him when we
2    did fall prevention education with seniors.
3          Q.    Do you remember around what year
4    that was?
5          A.    I'd have to look at my resume
6    because it was around the year I started
7    managing the program.
8          Q.    Would that be 2006?
9          A.    Around 2004, 2006.  I mean, I've
10   been at the Board of Health since 1999, so you
11   know someone in passing in the hallway.
12         Q.    How many employees -- I don't need a
13   specific number, but generally speaking, how big
14   is CCBH?
15         A.    Now?
16         Q.    Yes.
17         A.    I think around 120.
18         Q.    And how big was it when you started?
19         A.    I have no idea.
20         Q.    Was it smaller?
21         A.    It was smaller.
22         Q.    So it's grown over the years?
23         A.    Yeah.
24         Q.    So you met Vince Caraffi when you
25   were in the -- when you were program manager

Page 53

1    from 2004 to 2006.  How frequently did you

2    interact with Mr. Caraffi during that time

3    period?

4          A.    Probably on a weekly basis.

5          Q.    And what about in your next role,

6    program coordinator/management specialist in the

7    Aging programs and Dental Options program?

8          A.    Probably weekly, biweekly.

9          Q.    What did you and Mr. Caraffi meet to

10   discuss?

11         A.    Well, initially, when we started for

12   the Home Injury Prevention program, we did home

13   visits with seniors to make sure that their home

14   was safe.  We would do safety inspections and

15   give them suggestions as far as what they could

16   do to correct their home to make it safer.

17         Q.    Safer for --

18         A.    Fall prevention.

19         Q.    Did those inspections include safety

20   relating to prescription medication,

21   poly-pharmacy, anything like that?

22         A.    No.  We would have liked that to

23   have been part of the model, but we were not

24   able to incorporate that.

25         Q.    You were not able to incorporate

1    that for what reason?

2          A.     Funding.

3          Q.     So you requested to include that as

4    part of your operation but were denied?

5          A.     Well, there was one pot of money.

6    There were two interested entities at the Board

7    of Health, one for fall prevention education,

8    one for medication management.  One was housed

9    in community health.  One was housed in nursing.

10   They said we can't fund one agency for two

11   projects, so they picked the project that they

12   wanted to fund.

13         Q.     Who is "they"?

14         A.     The Western Reserve Area Agency on

15   Aging.

16         Q.     And they were the funders of this

17   project?

18         A.     Initially, yes.

19         Q.     And so do you recall when you sought

20   this funding, around what year?

21         A.     I do not.  Mr. Caraffi was the one

22   that sought the funding.

23         Q.     Was it around 2006?

24         A.     I'm sorry.  I don't have the exact

25   year.  I don't know.

1      Q.    And at this time, in whatever year

2   it was, you requested and were denied funding

3   to, as part of your visits to the homes of

4   seniors, review with them prescription

5   medication safety?  Is that a fair description?

6              MS. QUEZON:  Object to the form.

7      A.    We didn't apply.  I didn't apply.

8   Vince didn't apply.  There was another entity,

9   and I can't recall who it was.  There was

10  another staff member that applied for that

11  funding.  We wouldn't have been doing the

12  evaluation.  It would have been one of the home

13  visiting nurses.

14     Q.    Okay.  But they were denied?

15     A.    Correct.

16     Q.    Okay.  So looking back at this

17  prevention grant narrative, you have not had to

18  do a program evaluation yet?

19     A.    Not yet.

20     Q.    Vince Caraffi, has he done a program

21  evaluation for this grant before?

22     A.    I have no idea.  I can't speak to

23  that.

24     Q.    Vince Caraffi had been involved with

25  the Cuyahoga County Opiate Task Force for a

Page 56

1    number of years, correct?

2           A.    That's my understanding.

3           Q.    Do you have an idea of how he became

4    involved in that project?

5           A.    No, I do not.  I mean, I know that

6    they received the grant and he helped manage it.

7    I know in that capacity.

8           Q.    Did he have an interest in this

9    issue?

10                MS. QUEZON:  Object to form.

11          A.    I don't know.  I didn't speak with

12   him about that.

13          Q.    So in your role as program

14   coordinator/case management specialist for the

15   Aging and Dental Options program from 2006 to

16   2015, you met with Vince Caraffi regularly?

17          A.    Um-hum.

18          Q.    But didn't speak to him about the

19   Cuyahoga County Opiate Task Force?

20          A.    No, I didn't speak to him about the

21   task force.  He spoke to me about writing the

22   grant, but the task force wasn't a main piece of

23   it.  That was something that he was part of.  We

24   didn't talk about it.

25          Q.    You mentioned Allisyn Leppla?

Page 57

1          A.     Um-hum.

2          Q.     Who is she?

3          A.     I'm her predecessor.  She helped

4   manage this grant and write the grant prior to

5   me stepping into the role.

6          Q.     So you succeeded her --

7          A.     Right.

8          Q.     -- in this role?

9          A.     Right.

10         Q.     Did you interact with her prior to

11  your interest in this role?  In other words --

12  let me rephrase that.

13                When you were in your role just

14  previous to this one, did you interact with

15  Ms. Leppla?

16         A.     Informally.  We would see each other

17  in the hallway or in the lunchroom.

18         Q.     Did you interact with her on a

19  professional basis relating to the Injury

20  Prevention grant?

21         A.     No.

22         Q.     So you didn't have any involvement

23  in the grant prior to January 2018?

24         A.     Not in the current role that I have.

25  As I said before, I did help them review the

1  grant when they were initially writing it

2  because they had never written a grant before

3  and I had, so they looked to me for advice, and

4  I just helped them with formatting basically.

5       Q.    So your role in the grant

6  application was limited to formatting?

7       A.    Correct.  Sometimes at the Board of

8  Health, if you have other individuals who are

9  more proficient in grant writing, we will ask

10  people to review it.  So I helped review it,

11  made sure the formatting was correct.

12       Q.    And you didn't comment on the

13  substance at all?

14       A.    Not to my recollection.  That was

15  many years ago.

16       Q.    Why did Ms. Leppla leave the

17  Cuyahoga County Board of Health?

18       A.    She -- I can't answer for her.  I

19  just know what position she moved to.

20       Q.    And what position was that?

21       A.    I can't remember her exact title,

22  but it was at the Center for Health Affairs, and

23  she was helping -- she was an executive director

24  to help lead the hospital consortium.

25       Q.    Did she ever communicate with you

Page 59

1   about why she was leaving?

2        A.    She saw it as an opportunity for

3   growth basically.  I believe that was what she

4   conveyed to me.

5        Q.    Did you hear anything else about --

6   from her or from anyone else about why she left?

7        A.    No.

8        Q.    When did you become interested in

9   this current role?

10       A.    When the position was posted.

11       Q.    Which was when?

12       A.    I don't know.  I'd have to look at

13  the position posting from CCBH.

14       Q.    You don't have any recollection

15  about --

16       A.    It was in 2017 at some point.

17       Q.    At some point in 2017.  Beginning of

18  2017?

19       A.    I don't know.

20       Q.    Was it posted after she left?

21       A.    Yes.  It would have had to have been

22  because they would have had to have received her

23  resignation.

24       Q.    So did you talk to her about the

25  position once the position was posted?

```
                                        Page 60
 1          A.     No.
 2          Q.     You didn't ever speak with her about
 3   the nature of her role, how much work it was,
 4   what she did, et cetera?
 5          A.     To be honest with you, it was last
 6   year.  Sometimes I can't remember what happened
 7   yesterday.  So I will be honest with you, that I
 8   cannot remember if I talked to her about that or
 9   not.
10          Q.     Have you spoken with Ms. Leppla
11   since she left CCBH?
12          A.     Yes.  We're friends.
13          Q.     You're friends.
14                 Have you spoken about your work at
15   CCBH with her?
16          A.     Sure.  Yeah.  Everybody discusses
17   that with friends.
18          Q.     Okay.  And when you were selected
19   for this position that you currently hold, did
20   she provide any information or insight to you
21   about the nature of the role?
22          A.     No.  I mean, I asked her, you know,
23   basically, you know, is it a lot of work or if I
24   was working with an individual, what's the
25   history, what role did you play, because I
```

Page 61

1  wanted to live up to her role and step into her

2  shoes.  I didn't want there to be any lag time

3  for this program.  There can't be lag time for

4  this program.  You can't lose footing.  So the

5  only thing she would provide to me is just

6  support and telling me -- she actually offered

7  to come in and help review information with me,

8  which I did not accept that; I wasn't going to

9  ask her to do that.

10       Q.    Did she provide any documents to

11  you?

12       A.    No.

13       Q.    The other individual you mentioned

14  is Dr. Gilson?

15       A.    Um-hum.

16       Q.    Who is he?

17       A.    He's the medical examiner for

18  Cuyahoga County.

19       Q.    Do you know him personally?

20       A.    I just know him from working with

21  him.

22       Q.    So you have met him before?

23       A.    Um-hum.

24            MS. QUEZON:  Yes?

25            THE WITNESS:  Yes.

Page 62

1        Q.     And how many times have you met him?

2        A.     I'd say probably around ten.

3        Q.     What is the nature of your

4   interaction?

5               MS. QUEZON:  Object to form.

6        Q.     In other words, on the ten occasions

7   that you've met with him, has it been relating

8   to your work on the Injury Prevention program?

9        A.     Yes.  So by saying I've met with

10  him, I haven't met with him one-on-one

11  personally; I've been in meetings with him.

12       Q.     I see.

13              What is his relationship to the

14  Injury Prevention program?

15              MS. QUEZON:  Object to form.

16       A.     His role is to provide data that we

17  report out to the community on overdoses.

18       Q.     Do you review that data?

19              MS. QUEZON:  Object to the form.

20       A.     I look at the data.  I'm not an

21  epidemiologist or a statistician, so I can't

22  define what the data means, but I review the

23  data.

24       Q.     Is it part of your job description

25  to review the data?

Page 63

1          A.     Sure.

2          Q.     For what purpose?

3          A.     I review the data so that we have an

4    overdose fatality review.  We have to look and

5    see if there's certain trends in Cuyahoga County

6    that are occurring, and we have to report that

7    back to the Ohio Department of Health.

8          Q.     And so when you say you are in

9    charge of -- for example, this document says,

10   "Case reviews from the Overdose Fatality Review

11   Community," and you indicated that you have

12   looked at the data.  Can you tell me exactly

13   what a case review entails?

14         A.     I cannot, because, like I said, it's

15   fluid.  Sometimes it will encompass all of this,

16   but then not all, so my supervisor, Vince

17   Caraffi, is actually the individual that meets

18   with Dr. Gilson for the case reviews.

19         Q.     So you don't have any involvement in

20   the case reviews from the Overdose Fatality

21   Review Committee?

22         A.     I have not yet.  And, again, this is

23   my first year, so I'm getting used to what my

24   responsibilities are.  That may be part of my

25   role next year.

1      Q.    The next item on this job
2  description says, "Coordinating education and
3  policy development on local college campuses."
4  What kind of education and policy development on
5  local campuses are you helping to coordinate?
6      A.    So we contract with Recovery
7  Resources, and they help coordinate the efforts
8  on college campuses.  I review what they're
9  initiating, make sure it's on task with our
10  deliverables with the Ohio Department of Health.
11  So my role is, again, the program coordinator.
12  Some of these tasks we contract out to
13  sub-grantees.  It's not me doing all of it.
14  That would be impossible for the amount of money
15  that we get.  Even for them to do it with the
16  amount of money that we get, it's impossible.
17      Q.    Right.  So can you tell me what your
18  involvement is in coordinating education and
19  policy development with Recovery Resources?
20      A.    Sure.
21          I meet with Recovery Resources, I
22  get updates from them as far as progress that
23  they've made on college campuses, and I might
24  make suggestions to help them move forward with
25  it.

Page 65

1        Q.    What kind of suggestions might you

2   make?

3        A.    Again, my knowledge is limited since

4   I started in January, so I'm literally learning.

5   I do help lead the policy team for the State of

6   Ohio for something called PDAAG.  It's the

7   Prescription Drug Awareness Action Group.  So

8   I'm learning through them.  They have a lot more

9   experience than I do in this realm.  So I might

10  make a suggestion as far as a contact that my

11  supervisor might have.  I would do research as

12  far as policies that have been implemented on

13  other campuses that they might be able to

14  implement on Cleveland State campus.

15       Q.    How do you research that?

16       A.    The internet.

17       Q.    What's PDAAG?

18       A.    It's the Prescription Drug Abuse

19  Action Group.  It's through OIPP, which is the

20  Ohio Injury Prevention program at the State of

21  Ohio.  It's a statewide coalition.

22       Q.    And what is your involvement with

23  PDAAG?

24       A.    So we also were given $60,000 from

25  the State of Ohio.  And, again, this is prior to

Page 66

1   my role, but I subsequently stepped into it, and

2   in coordinating the coalition for the State of

3   Ohio.  So setting up speakers, making sure the

4   speakers are relevant, taking minutes, reporting

5   the minutes out, getting those to ODH, getting

6   the reports to ODH, making sure that all the

7   subcommittees are on task as far as the PDAAG

8   strategic plan that they have.

9        Q.    What exactly is your title or role

10  within PDAAG?

11       A.    I don't have a title or role right

12  now with PDAAG.  My supervisor is the chair.

13       Q.    Who is that?

14       A.    That's Vince Caraffi.

15       Q.    And you're not a chair of a

16  subcommittee?

17       A.    I am a chair of the policy

18  subcommittee.

19       Q.    You're the chair of the policy

20  subcommittee?

21       A.    Yeah.  I stated that.

22       Q.    And what does the policy

23  subcommittee of PDAAG do?

24       A.    Right now we're in the infancy

25  stages.  They just established the strategic

1  plan in March.  So we've been having conference

2  calls around what kind of policy changes we may

3  be able to make in different areas.  And, again,

4  we're learning from each other since this is a

5  new field for all of us.

6      Q.    What are some of those areas?

7      A.    Specifically, we're hoping to make a

8  recommendation for high school campuses to carry

9  naloxone.  We're also looking at doing training

10  with local law enforcement to encourage them to

11  all use ODMAPs, which is a mapping system that

12  tracks overdoses.

13      Q.    Any other kinds of policies that you

14  --

15      A.    Those are the two main policies

16  we're looking at.

17          MS. QUEZON:  Hey, Brad.  We've been

18  going about an hour.  Finish up whatever you

19  want to finish up, but if we can maybe, you

20  know, within the next 10 or 15 minutes take a

21  break.

22          MR. MASTERS:  I think this is a fine

23  place to take a break.

24          THE VIDEOGRAPHER:  Off the record,

25  10:08.

Page 68

1              (Recess had.)

2              THE VIDEOGRAPHER:  On the record,

3    10:26.

4    BY MR. MASTERS

5         Q.    Hi, Ms. Vince.  Welcome back.

6         A.    Thank you.

7         Q.    Let's continue reviewing the Exhibit

8    Number 4, the Injury Prevention grant.  We've

9    been discussing your role as project director.

10              After "Coordinating education and

11   policy development on local college campuses,"

12   it says, "Coordinating physician education

13   curriculum at MetroHealth and expansion of

14   Project DAWN."

15              What do you do to coordinate

16   physician education curriculum at MetroHealth?

17        A.    So this is one of the deliverables

18   that we contract with Metro for.  I personally

19   help coordinate the physician education

20   curriculum by basically instructing MetroHealth

21   that they need to be doing proper prescribing

22   guideline curriculum and also proper usage of

23   OARRS.  That's a database where they're supposed

24   to enter any opiate that they prescribe to an

25   individual.  Not all doctors utilize that.  It's

Page 69

1    the goal for the State of Ohio for all doctors

2    to be utilizing that.

3            So, again, I wasn't involved with

4    the initial coordination.  The role that I play

5    now is making sure that they stay on target and

6    meet numbers for the deliverables for the State

7    of Ohio.

8        Q.    You mentioned that you instruct them

9    to complete this physician education.  Do you

10   meet with them in person to give that

11   instruction?

12       A.    So this was set up initially, again,

13   by Allisyn Leppla and Vince Caraffi.  Stepping

14   into the position, the role that I have played

15   with them is reviewing the education materials

16   that they have, and, also, I've attended several

17   of their trainings with the physicians.

18       Q.    What does your review of the

19   materials they have entail?

20       A.    Basically, them giving me their

21   PowerPoint that they're going to use.

22       Q.    And so you read these PowerPoints

23   and determine whether they're satisfactory?

24       A.    Dr. Papp sets forth the material,

25   and the only requirement from our -- my role is

Page 70

1    that any proper prescribing guidelines are the

2    ones that the CDC recommends.

3            Q.    What are proper prescribing

4    guidelines?

5            A.    I was afraid you were going to ask

6    that.  I don't know as a social worker what

7    they're supposed to be.  I think a pharmacist --

8            Q.    I didn't ask what they're supposed

9    to be.  What is your understanding of what

10   proper prescribing guidelines are?

11           A.    Whatever the CDC says they are.

12           Q.    And a prescribing guideline is what?

13           A.    It -- basically, from my

14   understanding, it tells a physician how to

15   properly prescribe a medication.

16           Q.    And the CDC --

17           A.    The Center for Disease Control.

18           Q.    The CDC issues these prescribing

19   guidelines; is that correct?

20           A.    They're recommendations.  There's no

21   policy in place.

22           Q.    And then you review MetroHealth

23   materials to make sure that they reflect what

24   the CDC is recommending?

25           A.    Yes.  They have an Office on Opiate

Page 71

1    Safety.

2         Q.    Who has --

3         A.    MetroHealth.

4         Q.    MetroHealth has an Office on Opioid

5    Safety?

6         A.    Opiate Safety.

7         Q.    Opiate Safety.  What is that office?

8    What does that office do?

9         A.    I can't speak to everything that

10   they do.

11        Q.    What is your understanding of what

12   that office does?

13        A.    In the capacity that we fund them,

14   we help provide funding for part of their staff

15   for their Project DAWN and also their

16   Alternatives to Incarceration project.  We were

17   given money from the State of Ohio for that

18   project as well.

19        Q.    And you interact with Joan Papp you

20   said?

21        A.    I personally do not directly

22   interact with her.  We can e-mail back and forth

23   sometimes, but one on one I've met with her a

24   couple times in the past year.

25        Q.    Who is she?

Page 72

```
 1          A.     She's the director.
 2          Q.     She's the director of the Office on
 3   Opioid Safety?
 4          A.     Well, Emily Metz is also -- I'm not
 5   sure of the exact titles.  I have to be honest
 6   with you.
 7          Q.     That's fine.
 8          A.     Okay.
 9          Q.     But Joan Papp is affiliated with the
10   Office of Opiate Safety?
11          A.     Correct.
12          Q.     And so is Emily Metz?
13          A.     Correct.
14          Q.     And who is Emily Metz?
15          A.     She helps with the Office on Opiate
16   Safety and helps facilitates projects that they
17   have.  She oversees all activities.
18          Q.     And what -- what else do you
19   understand about the purpose, role or function
20   of the Office on Opioid Safety?
21          A.     They give out naloxone kits.  They
22   do Narcan trainings with the public on proper
23   usage of Narcan.  They do that both with the
24   physicians and, also, they have open hours for
25   the community.  They help man four clinics
```

1   throughout Cuyahoga County that distribute

2   Narcan.  I've been on a panel with them at Case

3   for medical students doing education around

4   Narcan and its usage.  I'm sure they do much

5   more than that, but that's my relationship with

6   them.

7        Q.    And does the Office -- is the Office

8   on Opioid Safety the department, as you

9   understand it, that does the physician education

10  and prescribing education?

11       A.    Um-hum.  Yes.

12       Q.    So Joan Papp, through the Office of

13  Opioid Safety, leads efforts to -- to educate

14  physicians on how to prescribe opioids?

15       A.    Proper prescribing guidelines.

16       Q.    Proper prescribing guidelines.

17            Is that curriculum, as you

18  understand it, limited to physicians at

19  MetroHealth or is it broader than that?

20       A.    As I understand it, it's specific to

21  their physicians at MetroHealth.  Again, we

22  contract with them for MetroHealth.  I'm not

23  aware of other physicians attending this

24  education component.  They may, but I'm not

25  aware of.

Page 74

1          Q.     Why are prescribing guidelines --

2     why are proper prescribing guidelines important?

3                 MS. QUEZON:  Object to the form.

4          A.     Again, as my role at the Board of

5     Health, I don't feel qualified to answer that

6     question.

7          Q.     But you have -- you've been

8     reviewing these PowerPoints and reviewing the

9     CDC recommendations and you've been in this role

10    now for a year, which you said is a highly

11    visible role and it's very important.

12         A.     Um-hum.

13         Q.     It's in the news.  So, in your view,

14    why do prescribing -- why is it important to

15    have prescribing guidelines?

16                MS. QUEZON:  Object to the form.

17         A.     Again, I agree that this is a highly

18    visible program.  It's a very important issue

19    that needs a lot of attention.  As my role

20    relates to proper prescribing guidelines, we

21    contract with MetroHealth to lead that

22    initiative, and they follow the CDC guidelines.

23         Q.     My question is --

24         A.     Why do I think they're important?

25         Q.     Different than that, right.  It's

Page 75

1   why, in your view, do you think that prescribing

2   guidelines are important?

3                MS. QUEZON:  Same objection.

4        A.    Same answer.  My role is not to have

5   an opinion either way whether they're important

6   or not.  My role at the Board of Health as

7   Injury Prevention coordinator is to make sure

8   that all of our deliverables are met either

9   through our staff or staff that we contract

10  with.  That's my role; not to have an opinion on

11  that.

12       Q.    I understand that's your role, but I

13  am asking about your opinion because you're here

14  today to give testimony about what you have done

15  and what you've learned and what you've

16  experienced in your role as Injury Prevention

17  program director.

18       A.    Agreed.

19       Q.    So I understand that you do not view

20  your role as having an opinion, but I'm asking

21  for your opinion.  What -- in your view, are

22  prescribing guidelines important?

23                MS. QUEZON:  Object to the form.

24       A.    Again, I would have to defer to an

25  epidemiologist, a pharmacist or physician to

Page 76

1   answer that question, not me.  I'm not a

2   specialist.

3        Q.    So you do not have a view one way or

4   the other about whether prescribing guidelines

5   help prevent injury?

6              MS. QUEZON:  Same objection.

7        A.    Again, I'm telling you honestly, I

8   don't feel qualified to even give an opinion on

9   that.  My role is to direct deliverables from

10  the Ohio Department of Health and make sure that

11  those are met through either our staff or our

12  contractors that we contract with.  I'm not

13  offering an opinion on that topic.

14       Q.    I'm asking for your opinion on that

15  topic here, so I --

16       A.    I agree in some capacity there

17  probably is a place for proper prescribing

18  guidelines.  I cannot define what those are or

19  how they should be implemented.

20       Q.    So you think that there is a place

21  for proper prescribing guidelines?

22       A.    I agree there could be a place for

23  proper prescribing guidelines.  I do not feel

24  qualified to answer where that would be or what

25  they would be.

Page 77

1          Q.    But do you have a view on it?

2          A.    That's my view.

3          Q.    What is your view?

4          A.    That there is a place for proper

5    prescribing guidelines.

6          Q.    And what is your view about the

7    place for proper prescribing guidelines?

8                MS. QUEZON:  Object to the form.

9          A.    I'll state again.  I'm not

10   professionally trained to state where they would

11   take place or what they would be.  I'm not a

12   physician.  I'm not an epidemiologist.  I'm not

13   qualified to say where or how they would take

14   place.

15         Q.    So your view is that they have a

16   place but you don't have a view as to -- you

17   don't have an opinion, whether it's qualified or

18   not, about what that place is?

19         A.    No.

20         Q.    So you haven't thought about what

21   role prescribing guidelines play in injury

22   prevention?

23         A.    The only way that I've thought about

24   it is through MetroHealth and the training that

25   they do, again, implementing CDC recommended

1   guidelines.

2          Q.     And tell me more about that.  What

3   have you thought about prescribing guidelines in

4   the course of your role with MetroHealth?

5                 MS. QUEZON:  Object to the form.

6          A.     My role with MetroHealth, as it

7   relates to proper prescribing guidelines, is

8   making sure that they're adhering to the CDC

9   guidelines that have been set forth in educating

10  their physicians on such.  That's my role.

11         Q.     Perhaps I misunderstood you.  I

12  thought you said that you have thought about the

13  place of prescribing guidelines in the course of

14  working with MetroHealth.  Is that fair?

15                MS. QUEZON:  Object to the form.

16         A.     Could you repeat that?

17         Q.     I thought you had testified a moment

18  ago that in the course of working with

19  MetroHealth on their physician education

20  curriculum, that you thought about or have had

21  thoughts about the place or role of prescribing

22  guidelines.

23                MS. QUEZON:  Same objection.

24         A.     I thought I said there probably is a

25  place for proper prescribing guidelines, but I

Page 79

1   am not the person to determine where that place

2   is or what they would be.

3       Q.    What's Project DAWN?

4       A.    That's the project where they

5   educate people on usage of naloxone.

6       Q.    And you coordinate education and

7   policy development relating to Project DAWN?

8       A.    No.

9       Q.    Sorry.  You coordinate the expansion

10  of Project DAWN?

11      A.    What we do -- so one deliverable

12  that we're tasked with through the state is

13  expanding Project DAWN sites.  Contracting with

14  Metro, we help to facilitate connections,

15  whether it be with EMS or local free clinics

16  where they could possibly establish a site.  So

17  let's say there's three sites for 2019; they

18  might want to see four sites.

19      Q.    You also provide oversight to field

20  component in family medicine and preventative

21  medicine.  Can you tell me what that entails?

22      A.    Sure.

23            So initially that was supposed to be

24  a deliverable that was going to be met through

25  Case Western Reserve.  When I stepped on, I

Page 80

```
 1    found out that that deliverable is not able to
 2    be met because of the -- the doctor that was
 3    leading that initiative had left and no one took
 4    over his initiative, so that was not met.
 5         Q.    So you didn't do anything with that
 6    initiative at all?
 7         A.    No.
 8         Q.    And, last, "assisting with the
 9    coordination of the PDAAG, its work groups and
10    mini-grant projects."
11         A.    Sure.
12              So that is what I spoke about
13    previously.  At the State of Ohio they have the
14    subcommittee the Prevention Drug Awareness Abuse
15    Action Group.  And so the work groups that they
16    have in the strategic plan, they have several
17    work groups, again, me leading up policy, and
18    I'm responsible for making sure that they stay
19    on task with the strategic plan.
20              As far as mini-grants, they have
21    given us a very small amount of money, which is
22    almost laughable -- it's about $20,000 -- where
23    we have to create an RFP out to the community,
24    which is the State of Ohio.  Any agency can
25    apply for grants in amounts up to $5,000 to
```

```
                                                    Page 81
 1    implement some kind of prevention strategy to
 2    either increase awareness around opioid use and
 3    abuse -- it could be -- Deterra pouches was one
 4    of the mini-grants, which is the proper disposal
 5    of medications.  We did fund several of those
 6    across the State of Ohio, which is a drop in the
 7    bucket as far as funding goes to be able to make
 8    any kind of difference, but we're grateful for
 9    something.  So that's what the mini-grants are.
10          Q.    The $20,000 mini-grants, is that
11    part of the yearly amount that you are given
12    through the Injury Prevention grant?
13          A.    No.  That's supplemental.  It's in
14    addition to.
15          Q.    And that $20,000 comes from the
16    state?
17          A.    Correct.
18          Q.    The Ohio Department of Health?
19          A.    Correct.
20          Q.    You mentioned earlier $60,000
21    related to PDAAG; is that correct?
22          A.    Correct.
23          Q.    Is that separate from the Injury
24    Prevention grant?
25          A.    Correct.
```

Page 82

1          Q.    And that money comes from where?

2          A.    The State of Ohio.  Again, the State

3    of Ohio directing everything that we do with

4    those dollars, we have to stay within the

5    parameters that they give us.  We recognize

6    there could be much more that can be done.

7    That's why locally we try to find local funders

8    and we need the money to stay local so that we

9    can do the work that needs to be done and not

10   just stay within the parameters of the State of

11   Ohio.

12         Q.    You mentioned that the $20,000 for

13   mini-grant projects was laughable.

14         A.    Yes.

15         Q.    What did you mean by that?

16         A.    It's a very, very small amount of

17   money to even make a small impact on the

18   opioid -- with what's happening with opioids

19   right now.  Again, grateful.

20         Q.    The State of Ohio determines how

21   much money you get; is that correct?

22         A.    Correct.

23         Q.    And so any decision to give --

24   strike that.

25               Does any of the money for the Injury

1    Prevention grant come from Cuyahoga County?

2         A.    So the way it filters is it is

3    federal dollars that's filtered to the State of

4    Ohio.  The State of Ohio filters it to CCBH and

5    it becomes our money.  We get no money from the

6    county executor's office.

7         Q.    So they don't provide any money for

8    the opioid or opiate-related activities that

9    CCBH is doing?

10        A.    Correct.

11        Q.    So as part of your job description

12   then, we've talked about coalition building,

13   PSEC strategies, coordinating education and

14   policy developments, prescribing curriculum.

15   We've talked about OARRS, Project DAWN, PDAAG,

16   co-chairing the policy committee of PDAAG, its

17   work groups, deciding mini-grant projects.

18   That's a pretty big job, it sounds like.

19        A.    It's a lot of work.

20        Q.    A lot of work.

21             And it requires -- would you say

22   that it's required you to learn a lot over the

23   past year?

24        A.    Absolutely.

25        Q.    What have you done to learn and

1    study issues relating to the opioid and opiate

2    abuse problem to prepare yourself for this role?

3                MS. QUEZON:  Object to the form.

4         A.    So not knowing if I would get the

5    position or not, I didn't do anything leading up

6    to.  I mean, you hear things in the news, but I

7    didn't take any courses or anything like that.

8                Once I was awarded the position, you

9    know, there's -- I'm a social worker, so we have

10   to have certain CEUs.  There's conferences that

11   you go to.  I can't remember what it stands for.

12   It's HPIO.  I think it's Health Policy in Ohio

13   group.  They had a conference around it.  So I

14   went to that in Columbus.  When we go to our

15   meetings in Columbus, they have speakers that

16   speak specifically to this issue.  So soaking in

17   every bit of information I can through those

18   venues.

19        Q.    So you attended conferences.  Did

20   you read articles about it?

21        A.    Sure.

22        Q.    Did you -- what were some articles

23   that you read?

24        A.    One that comes off the top of my

25   head is the Martinsburg project, and that's

Page 85

1  specific to the ACEs grant that we're working

2  with with how it relates to opioids and how the

3  police department were involved.  I would have

4  to go back to my calendar to look at the

5  specifics as far as how many conferences and

6  documents that I've read.

7       Q.    Okay.  Do you remember any -- did

8  you read any books about the issue?

9       A.    I started reading Dreamland by

10  Sam -- Quinones I think his last name is.  I did

11  not finish it.

12       Q.    When did you start reading that?

13       A.    Probably the beginning of 2018.

14       Q.    The beginning of 2018.

15            What else did you do to understand

16  the opioid issues?

17       A.    Talked to people on the task force.

18       Q.    Talked to people on the task force.

19  Who did you talk to on the task force?

20       A.    I can't give you specific names.  I

21  mean --

22       Q.    Can you remember any?

23       A.    I mean, well, Dr. Papp has given

24  presentations, so I take information from her

25  presentations.  Dr. Gilson has given

Page 86

1  presentations, so I've learned from his
2  PowerPoints that he's given.  There was an
3  addiction specialist.  He's a psychiatrist at
4  Southwest Hospital.  He gave a presentation --
5  it was very interesting -- about the medical
6  background of addiction.  Those are some I can
7  think of off the top of my head.
8       Q.    You mentioned a presentation by Joan
9  Papp.  What did she present on?
10      A.    Well -- so it was her department
11 that presented, I should say.  They presented on
12 the work that was being done at the Office on
13 Opiate Safety.
14      Q.    On prescribing guidelines?
15      A.    I would have to look at the
16 PowerPoint to see specifics.  I do not believe
17 that that was part of the PowerPoint.
18      Q.    Okay.  So once you're promoted to
19 this very visible role, you worked hard to try
20 to understand opioid-related issues?
21      A.    Yes.
22      Q.    You mentioned some conversations
23 with individuals on the task force.  This is the
24 Cuyahoga County Opiate Task Force?
25      A.    Correct.

Page 87

1        Q.     What were those conversations about?

2        A.     Again, I can't recall specifics.  I

3   know that we have had conversations around

4   creating logic models for the subcommittees.  So

5   we have a treatment and recovery subcommittee

6   and we have an education subcommittee.  I would

7   have to have conversation with them as far as

8   what they were doing, what tasks that they were

9   proposing for the coming year as it relates to

10  opiates.

11       Q.     These conversations would have taken

12  place around the time you started -- or when did

13  these conversations take place?

14       A.     I would have to look at the e-mails

15  that I sent to them for exact dates.  It was

16  sometime within 2018 obviously.  Probably

17  spring, summer, when we started looking at logic

18  models.

19       Q.     I'm speaking -- so let's step back

20  from the logic models part and let's get back to

21  sort of your conversations with the Cuyahoga

22  County Opiate Task Force relating to opioids and

23  opiates and the drug abuse problems that exist.

24              Those conversations took place

25  around the time that you came into this new

Page 88

1    position; is that fair?

2              MS. QUEZON:  Object to the form.

3         A.    Again, I can't give you specific

4    dates, and to be honest with you, I was more of

5    an observer when I first stepped into the

6    position, kind of learning what the program was,

7    what my role was going to be, and I didn't step

8    into being the co-chair until recently, when

9    my --

10        Q.    The co-chair of?

11        A.    Of the task force.

12        Q.    So you're currently the co-chair --

13        A.    Correct.

14        Q.    -- of the Cuyahoga County Opiate

15   Task Force?

16        A.    Correct.  My supervisor was the

17   chair prior to me.

18        Q.    Okay.  You testified that you worked

19   hard to understand opioid-related issues.

20        A.    And I'm still working hard.

21        Q.    And you're still working on it.  And

22   that some of what you did involved conversations

23   with opiate task force members, and you

24   mentioned conversations about logic models.

25   What other conversations did you have with the

```
 1    Cuyahoga County Opiate Task Force members
 2    relating to opioids?
 3              MS. QUEZON:  Object to the form.
 4         A.    I have to be honest.  I can't
 5    remember exact conversations.  I talked to
 6    people after meetings, you know.  I talked to
 7    people before the meetings.  I can't remember
 8    exact conversations we had or even the content
 9    of conversations that we had.  I can't remember
10    what I talked to my husband about yesterday.
11    I'm being honest.
12         Q.    Again, I'm not necessarily asking
13    for specific conversations on specific dates,
14    but generally speaking, did you ask about how
15    this problem started, for example?
16         A.    No.
17         Q.    Did you -- have you ever
18    investigated -- in the course of your work as
19    the opiate task force co-chair, have you ever
20    looked at or thought about how the current
21    opiate abuse problem started?
22         A.    Since I currently stepped into the
23    role, I'm still learning, basically observing,
24    and looking at how it started.  I've seen stuff
25    on the news.  As far as reading when or how it
```

Page 90

1    started, I haven't discussed specifics with

2    anyone.  We know there's a problem.  That's what

3    we know.  And that's my role to know that now

4    and how do we address it now.  It's not my role

5    to go back and say how it started or who started

6    it or when it started.  It's my role to address

7    what are we going to do about it now.

8          Q.    So in your role as the Cuyahoga

9    County Opiate Task Force co-chair --

10         A.    Yes.  That's a tenth of my position

11   at the Board of Health.

12         Q.    A tenth of your position at the

13   Board of Health.  What do you do?

14         A.    As the co-chair?

15         Q.    Yes.

16         A.    Talk to people getting their logic

17   models done because, again, that's a deliverable

18   set by the State of Ohio and I'm very confined

19   to what needs to be done and the time frame it

20   needs to be done with the money that we have.

21   We have to follow a work plan.  We set up

22   speakers for the task force.  And next year we

23   have to create a strategic plan.

24         Q.    What kind of speakers do you set up?

25         A.    So I haven't -- I've only set up

Page 91

1    speakers for one meeting.  That was the last

2    meeting that we had.  It was centered around --

3    Circle of Health did a speech on their harm

4    reduction efforts.  There was another individual

5    that spoke about an event coming up around

6    opioids and families.  And then we had

7    St. Vincent Medical -- Charity Medical Center

8    talk about their new outpatient program.

9          Q.    How do you research which speakers

10   to invite?

11         A.    To be honest, I don't have to

12   research.  They come to me and say, "Can I

13   speak?"

14         Q.    How do you make a determination as

15   to who should speak?

16         A.    I talk to my supervisor and we kind

17   of agree, and, also, we have open-ended forum at

18   the end where anyone can speak.

19         Q.    But do you make the decision

20   ultimately?

21         A.    No.

22         Q.    Who makes that decision?

23         A.    That would be between -- well, right

24   now that would be between myself and Beth

25   DeJesus at the ADAMHS Board.

Page 92

1        Q.     Why is she involved in that
2    decision?
3        A.     So last year at some point -- again,
4    I don't know the exact date -- the State of Ohio
5    determined that the ADAMHS Board must be the hub
6    in all counties in Ohio for the opiate task
7    force, so they are the legal hub of the opiate
8    task force.  Therefore, we had to, obviously,
9    reach out to them and say I guess legally now
10   you have to be the hub even though the Board of
11   Health have had it for so many years, so now we
12   -- she's a co-chair.
13       Q.     And how has that affected the nature
14   of CCBH's involvement?
15       A.     Not at all.  We're still as
16   involved, but now, instead of having all the
17   meetings on our terms, you know, we'll have some
18   at the ADAMHS Board, some at the Board of
19   Health.  Beth may lead -- Beth is leading the
20   next meeting.  I'll probably lead the new one in
21   the new year.  So we're sharing
22   responsibilities.
23       Q.     And you mentioned that Beth has
24   decision-making authority for speakers.  Is
25   there anything else that the ADAMHS Board now

Page 93

1    has decision-making authority for?

2         A.    Not to my knowledge.

3         Q.    So you control how the money is

4    being directed?

5         A.    Define what you mean by money being

6    directed.

7         Q.    So funding relating to the Cuyahoga

8    County Opiate Task Force.

9         A.    Correct.  That comes to CCBH.

10        Q.    And even though ADAMHS is the legal

11   hub, you guys make the decision as to where that

12   goes?

13        A.    Right now.

14        Q.    And that money for the Cuyahoga

15   County Opiate Task Force comes from the state?

16        A.    Correct.  Well, that's one of our

17   deliverables.  I'll state that.

18        Q.    What do you mean by that?

19        A.    I would have to provide the work

20   plan for you.  We have certain deliverables.

21   There's about eight pretty heavy deliverables

22   that we have to meet.  And that's just one of

23   them is to have a task force and to manage it.

24        Q.    As co-chair of the Cuyahoga County

25   Opiate Task Force, do you have a presenting or

Page 94

1    conducting role at Cuyahoga County Opiate Task

2    Force meetings?

3         A.    I open the meeting, I introduce the

4    speakers, and close the meeting.  Again, I'm new

5    to the role, so I've only done it twice, like

6    really one and a half times because the other

7    half was my supervisor.  My supervisor served in

8    that capacity before me.  This is just in

9    October.

10        Q.    And are you the point of contact for

11   Cuyahoga County Opiate Task Force members?

12        A.    Myself and Beth.

13        Q.    So when somebody wants to reach out

14   with an idea about what the task force ought to

15   do, they will e-mail you and Beth or do they

16   sometimes e-mail you?

17        A.    So that's a transition right now

18   just because it always went to my supervisor.

19   He still gets requests, and he will filter that

20   to both Beth and I until people get familiar

21   with the new contacts.

22        Q.    So your -- you continue to study the

23   issue of opioid-related issues, right?

24        A.    Yes, when I have extra time.

25        Q.    And -- but you've been studying and

1    reading as much as you can within the time that

2    you have?

3         A.    Um-hum.

4         Q.    Do you feel like you have a -- is

5    that information useful to you as you co-chair

6    the opiate task force or -- yeah.  Is that

7    information useful to you as you co-chair the

8    opiate task force?

9         A.    Sure.  To have any kind of knowledge

10   base on which your job is positioned is helpful.

11        Q.    In some ways it's probably necessary

12   to know about the opioid drug abuse problem in

13   order to co-chair the task force, right?

14        A.    Correct.

15        Q.    So you have to use that -- that

16   knowledge is necessary to conduct the daily

17   activities?

18        A.    I wouldn't -- I wouldn't say daily,

19   but yes I'll say.

20        Q.    It's necessary to conduct --

21        A.    Activities.

22        Q.    -- the operations relating to the

23   task force?

24        A.    Yeah.

25        Q.    And if you didn't know much about

Page 96

1    the opioid abuse epidemic, you probably wouldn't
2    be a very effective co-chair of the Cuyahoga
3    County Opiate Task Force?
4              MS. QUEZON:  Object to the form.
5         A.    Again, being new to the position,
6    I'm still learning what that person needs to
7    know.  I'm educating myself because of other
8    things that I have to do, not just the task
9    force.
10        Q.    In your role as the prevention -- or
11   Injury Prevention project director and the
12   Cuyahoga County Opiate Task Force co-chair, do
13   you ever do any public speaking relating to
14   opioid issues?
15        A.    I have not yet, no.
16        Q.    You have not yet.  So you have never
17   given a presentation on opioids?
18        A.    I take that back.  Before I was
19   co-chair, I did do a presentation as the program
20   manager at the drug courts.  I've done two.
21        Q.    And what was that presentation?
22        A.    So Judge Synenberg requested us to
23   speak at her drug courts.  One was towards
24   females and one was towards males.  And the
25   first presentation -- well, actually, both

Page 97

1   presentations I did with a nurse at the Board of
2   Health, and I presented kind of what the -- like
3   what is an opioid, what is an opiate, and talked
4   about data that the medical examiner has given
5   us as far as overdose rates, and then the nurse
6   stepped in to dispel kind of contraception
7   issues with the females and males.
8           Q.    So you came into this -- sorry.  Was
9   it the female-only group?
10          A.    There was females first and then
11  males.
12          Q.    You presented to both?
13          A.    Correct.
14          Q.    You came in and you gave a
15  presentation about what an opioid is, what an
16  opiate is, and the problems facing Cuyahoga
17  County relating to opioids?
18          A.    We would give death data.
19          Q.    Death data?
20          A.    Correct.
21                And I'd have to have that
22  presentation in front of me to tell you exactly
23  what we talked about.
24                      -   -   -   -   -
25                (Thereupon, Vince Deposition Exhibit

1              5, Ohio's Drug Overdose Epidemic:

2              Contributing Factors and Ongoing

3              Prevention Efforts Presentation

4              Outline, was marked for purposes of

5              identification.)

6                    -   -   -   -   -

7         Q.    Showing you what's been marked as

8    Exhibit 5, does this look like a copy of the

9    presentation that you gave?

10        A.    No.

11        Q.    It does not?

12        A.    No.

13        Q.    I'll represent to you that when this

14   was produced, this was produced under the title

15   "Standard Opiate" -- sorry, one second --

16   "Standard Opiate Presentation."

17        A.    I believe this is a document that my

18   supervisor has utilized to do presentations that

19   he has given.  I have not utilized this.

20        Q.    So if you look at the very last page

21   of this document, is that your name on it?

22        A.    Yes.

23        Q.    And you have never seen this

24   document before?

25        A.    I don't know if I've seen this exact

1    document.  I believe it to be the document that

2    my supervisor uses when he does presentations to

3    the public, and he asked if he could place my

4    name on there, when I stepped into the role, as

5    a contact when he would do his presentations.

6         Q.    And when you gave your presentation

7    to the drug court, did you rely on this

8    presentation to make yours?

9         A.    No.

10        Q.    Do you have a copy of your

11   presentation?

12        A.    Somewhere.  It's an electronic file

13   on my desktop.

14        Q.    Do you recall what the name of that

15   file was?

16        A.    I don't.  I'm really sorry.

17        Q.    Do you recall when you made that

18   presentation?

19        A.    I'm trying to remember if it was

20   warm out or not if we went there.  I don't

21   remember the date.  I think it was in the

22   summertime sometime.

23        Q.    In the summertime?

24        A.    Yeah.  I'm not positive.

25        Q.    If you look at page 3 -- excuse me,

1    page 4.  It starts with the title "Definitions."

2    Have you seen this page before?

3         A.    I might have.  I look at so many

4    documents.  I don't know for sure.  I can't say

5    it's the exact same document I may have looked

6    at before.

7         Q.    Have you seen -- have you seen a

8    description of opiate and opioid before?

9         A.    Sure.  I've read it before.

10        Q.    And what is your understanding of

11   what an opiate is?

12        A.    My understanding of what an -- so an

13   opioid is synthetically made.  This is my

14   understanding.  An opiate can be synthetically

15   or naturally made.  But they're both opioids

16   because they bind to the opioid receptor in the

17   brain.

18        Q.    So they both have a similar

19   function; is that what you're saying?

20        A.    I don't know about that medically

21   speaking.

22        Q.    They both bind to the brain, what

23   does that mean?

24        A.    So there's receptors in your brain

25   that -- okay.  This is what I'm saying because

1    I've read it, that they bind to a receptor in

2    your brain, an opioid receptor.  I'm not a

3    doctor, so I can't speak to the biology behind

4    it.

5            Q.    So what's an example of an opiate?

6            A.    So that would be -- I don't feel

7    qualified to answer that question specifically.

8            Q.    Did you present on this topic to the

9    drug court?

10           A.    I did, but I didn't give like what

11   exactly an opiate is, like, as far as, like,

12   oxycodone or Oxycontin.  I didn't give those

13   kind of names.

14           Q.    What did you tell them?

15           A.    I gave a definition.

16           Q.    And what did that -- so you didn't

17   tell them anything more than one is synthetic

18   and one is naturally occurring?

19           A.    I'd have to look at my PowerPoint to

20   see exactly what I said.

21           Q.    You can't recall?

22           A.    No.  I just told you what I thought

23   the definition was and I'd have to look at the

24   PowerPoint to see if that's exactly what I said.

25           Q.    What were some of the death

1    statistics that you -- sorry.  Part of the

2    problem is that I do not believe that we have

3    received a copy of the PowerPoint presentation

4    that you gave, which is, in part, why I was

5    asking what the name of it was.

6              Do you recall when you might have --

7    you said you gave the presentation in the

8    summer.  Do you recall when you created that

9    PowerPoint?

10             MS. QUEZON:  Object to the form.

11        A.    I am sorry.  I'm really sorry.  I

12    don't know.  I would have to go back and look.

13        Q.    So on this page are -- do the

14    definitions on this page of opiate and opioid

15    reflect the definitions that you conveyed to the

16    drug court?

17        A.    I'd literally have to

18    cross-reference these definitions that are in

19    here to my PowerPoint.  I would have to look.  I

20    didn't, like, copy and paste.  I'd have to look.

21        Q.    But you do know what the difference

22    between opiate and opioid is, right?  You just

23    told us.

24        A.    I stated that previously.

25        Q.    And so is that -- is what you told

Page 103

1  me previously what you told the drug court?

2          MS. QUEZON:  Object to the form.

3      A.    I don't know.  Again, I would have

4  to look at the PowerPoint to see if it's

5  matching to what I'm saying to you right now.

6      Q.    Do you have any reason to believe

7  you told them anything different than that?

8      A.    I don't have any reason to believe

9  that I would have told them anything

10 differently.

11     Q.    Do these definitions here reflect

12 what you just told me?

13     A.    I don't -- I didn't use this exact

14 phrasing.  I did say it could be natural or

15 synthetic, the opiate.  I used that terminology.

16     Q.    And this is -- opiate drug types

17 include heroin, opium, morphine and codeine.

18 Does that sound right to you?

19     A.    I didn't write it.  I don't know.

20     Q.    So a minute ago you told me you

21 provided the drug court with very specific

22 information, definitions of opiates and opioids

23 and death data.  Generally speaking, what do you

24 mean by death data?

25     A.    We get information from the Cuyahoga

1    County Medical Examiner's Office on overdose

2    death.

3           Q.     On overdose deaths?

4           A.     Um-hum.

5           Q.     And from your understanding, what

6    does that data tell us about the problem of drug

7    abuse in Cuyahoga County?

8           A.     I can't say what it tells us about

9    the problem of drug abuse in Cuyahoga County.  I

10   can only say it represents the amount of people

11   that have died from drug overdose.

12          Q.     And do you recall how many people,

13   generally speaking, have died from drug

14   overdose?

15          A.     What time span are you speaking of?

16          Q.     In -- since you came into the role

17   in 2018.

18          A.     The last report I looked at from the

19   medical examiner, which was September of this

20   year, was 721 for overall death from all drugs.

21          Q.     And do you recall what it was in

22   2017?

23          A.     It was in the 700s, but I can't

24   remember the exact amount.

25          Q.     What did you tell the drug court

Page 105

1    about the death data?

2         A.    That it was increasing.

3         Q.    That it was increasing?

4         A.    Um-hum.

5         Q.    Did you tell them why -- what did

6    you tell them about the reason why it was

7    increasing?

8         A.    I didn't tell them the reason why.

9    I just presented the data.

10        Q.    Did you present data about what

11   kinds of drugs were causing the overdoses?

12        A.    So verbally I didn't go into detail.

13   I just presented them the total overdose drugs,

14   and that was from all drug use.

15        Q.    So you didn't break it down by

16   heroin, fentanyl, cocaine, methamphetamine?

17        A.    The graph did, but I didn't verbally

18   break it out for them.  They could look at the

19   graph and figure it out on the screen.  I didn't

20   provide a PowerPoint for them to look at.

21        Q.    What did the graph -- what did the

22   graph show?

23        A.    I can't remember exactly what graph

24   I used.  If I were to use a graph, it probably

25   would have broken it down by drugs and years and

Page 106

1   overdose rate.

2        Q.    If you look at page -- I believe

3   it's page 16, it is titled "2018 CCMEO Overdose

4   Deaths, Most Common Drug Involved," from January

5   to May --

6             MS. QUEZON:  I'm sorry.  What page?

7   I apologize.  16 did you say?

8             MR. MASTERS:  I believe it's 16.

9   It's the one that's -- the number is cut off in

10  the corner here.

11            MS. QUEZON:  2018 CCMEO?

12            MR. MASTERS:  Yes.

13            MS. QUEZON:  Okay.  Got it.  Thank

14  you.

15       A.    Okay.

16       Q.    Does this look familiar to you?

17       A.    This isn't the graph that I used for

18  that presentation.

19       Q.    Did the graph you used look similar

20  to this?

21       A.    No.

22       Q.    This graph shows the number of

23  deaths in January, February, March, April and

24  May, correct?

25       A.    Um-hum.  Yes.

1      Q.    And it shows the number of deaths

2   that are heroin, fentanyl, heroin and fentanyl

3   combined and cocaine alone and cocaine/fentanyl

4   combined, right?

5      A.    Correct.

6            Again, this is the presentation my

7   supervisor used, so it might be a graph that

8   represents the same information in a different

9   format.

10     Q.    Correct.

11           What is your understanding of the

12  role of fentanyl in -- in driving the numbers of

13  opioid-related deaths?

14           MS. QUEZON:  Object to the form.

15     A.    My understanding of its role?

16     Q.    Is fentanyl responsible for the

17  majority of overdose deaths in your

18  understanding?

19           MS. QUEZON:  Object to the form.

20     A.    To be honest with you, I don't know

21  the answer to that.  I look at the data that's

22  given to us from the medical examiner.

23     Q.    What does that data reflect?

24     A.    I'd have to -- I'd have to see it in

25  front of me.  Again, as my role at the Board of

1  Health, it's not -- it's not my position to

2  define or understand what fentanyl's role is.

3  It's not what our grant evaluates.

4      Q.    Does fentanyl cause a lot of

5  overdoses?

6             MS. QUEZON:  Object to form.

7      A.    I don't know.  I'd have to, again,

8  refer to the medical examiner and speak with

9  them or some professional that would know that

10 information.  I don't know.

11     Q.    So as chair of the -- co-chair of

12 the Cuyahoga County Opiate Task Force and the

13 program prevention grant manager {sic}, do you

14 think it's important to know what kinds of drugs

15 are causing overdoses?

16     A.    I agree that it's important to know

17 what kinds of drugs are causing overdoses.  I

18 don't think it's my role to determine if one or

19 the other is more responsible for the overdoses.

20     Q.    More responsible might have been a

21 poor choice of words.  My second question is

22 probably more accurate, which is, does fentanyl

23 cause a lot of overdoses?

24            MS. QUEZON:  Object to the form.

25     A.    Again, I'll reiterate my answer to

1    your question that I stated previously.  I'm not

2    qualified to answer that question.  It's not my

3    role to analyze that.  It's my role --

4         Q.    But you are the Cuyahoga County

5    Opiate Task Force co-chair.

6         A.    I know.  It sounds like a really big

7    job, doesn't it?

8         Q.    Yes.

9         A.    Again, it's not -- that's not part

10   of my role to determine that.

11        Q.    So earlier you testified that it's

12   important as the co-chair, to be effective --

13   it's necessary to understand issues relating to

14   opiate abuse.

15        A.    Um-hum.

16        Q.    Part of the reason why that's

17   important is because there's currently a lot of

18   drug overdoses; is that right?

19        A.    Sure.

20        Q.    And yet you're saying it's not your

21   role to understand the number of deaths -- it's

22   not your role to understand what drugs are

23   resulting in deaths?

24        A.    It's my role to report out what the

25   medical examiner gives me.  It's not my role,

1    again, to determine the class of drugs or what

2    type of drug or the rate of drug.  It's my role

3    to report out data that we have been given from

4    the medical examiner.  It's not my role to have

5    an opinion either way on that data.

6         Q.    Right.  But you indicated that it's

7    important -- it's necessary even -- you said it

8    was necessary, as Cuyahoga County Opiate Task

9    Force co-chair, to understand the opiate abuse

10   problem --

11        A.    Sure.

12        Q.    -- in Cuyahoga County because there

13   are a lot of deaths relating to opiate abuse.

14        A.    Um-hum.

15        Q.    Isn't it, therefore, also important

16   to understand which opiates are causing deaths?

17        A.    It's important to know which opiates

18   are causing death.  It's not my role to have an

19   opinion on the data.

20        Q.    Would it be important to know, for

21   example, whether prescription opioids are

22   causing more deaths than heroin?

23        A.    Again, right now in my current role,

24   mandated by the State of Ohio, the task force,

25   yes, we have -- it's a highly visible position

Page 111

1    in the community, but we are tasked with

2    deliverables from the State of Ohio that I'm

3    supposed to be -- and I have to stick to those

4    deliverables.  Understanding and interpreting is

5    not part of those deliverables at all.

6         Q.    So as chair of the Cuyahoga County

7    Opiate Task Force, it's not important that you

8    understand whether prescription opioids are a

9    cause -- are causing more deaths than illicit

10   opioids?

11              MS. QUEZON:  Object to the form.

12        A.    I'm not saying that it's not my --

13   did you say my responsibility or --

14        Q.    It's not important.

15        A.    I didn't state that it's not

16   important.  I stated that it's not my role to

17   have an opinion about it to the community.

18        Q.    And I -- just to be clear, I'm not

19   asking if a role entails having an opinion.  I'm

20   asking you, as co-chair of the -- of the

21   Cuyahoga County Opiate Task Force, is it

22   important for you to know whether prescription

23   opioids are causing more overdoses than illicit

24   opioids?

25        A.    To be honest with you, I, again,

                                        Page 112

1    defer to the medical examiner and their data.  I
2    report out the data.  I don't specifically look
3    at those trends.  We look at trends as far as if
4    a certain demographic is being more affected,
5    not specific drugs.
6         Q.    So as co-chair of the Cuyahoga
7    County Opiate Task Force and the Injury
8    Prevention program coordinator, program
9    director, you do not look at -- sorry.  Let me
10   rephrase.
11             As co-chair of the Cuyahoga County
12   Opiate Task Force and Injury Prevention program
13   director, you do not think it is important or
14   necessary to understand whether prescription
15   opioids are causing more deaths than illicit
16   opioids?
17             MS. QUEZON:  Object to the form.
18        A.    I, again, am going to repeat what I
19   said previously.
20        Q.    Just so you know, you have not
21   answered my question.  I know that you have
22   given an answer that you think is an answer to
23   my question.  My question is a little bit
24   different, so I'll ask it again.
25             MS. QUEZON:  And I'm going to say

1  that you don't like the answer to the question
2  and you keep asking the same question, so we can
3  agree to disagree on that.
4        MR. MASTERS:  I appreciate the
5  objection.  We don't need a speaking objection.
6        MS. QUEZON:  I haven't been doing
7  speaking objections, but you're instructing my
8  witness that she hasn't answered the question,
9  and I'm simply responding to that that, in my
10 opinion, she has.
11    Q.   Is it important or not to understand
12 whether prescription opioids are causing more
13 overdoses than illicit opioids in conducting
14 your role at CCBH?
15        MS. QUEZON:  Object to the form.
16    Q.   It's a yes or no question.
17        MS. QUEZON:  You can answer the
18 question any way you feel appropriate.
19    A.   Again, my role, as directed by the
20 Ohio Department of Health, through specific
21 deliverables that are set forth through the Ohio
22 Department of Health, they do not require us to
23 do that.
24    Q.   And you don't do that?
25    A.   I personally do not break down

1    specifics.  We look at overall drug data.

2         Q.    Do you know whether prescription

3    opioids are causing more injuries than illicit

4    opioids?

5         A.    No, I do not know that.

6         Q.    Do you make any effort to

7    differentiate between overdoses caused by

8    prescription opioids and illicit opioids?

9         A.    To be honest with you, being new to

10   the role and being new to reading the data and

11   getting the data from the medical examiner's

12   office, I have only looked at overall deaths

13   from all drugs.  I have not evaluated or broken

14   out or looked at the specifics.

15        Q.    And is it your understanding that

16   when the Cuyahoga County Opiate Task Force talks

17   about the opiate problem, that they also don't

18   make an effort to differentiate between

19   prescription opioids and illicit opioids?

20             MS. QUEZON:  Object to the form.

21        A.    To be honest with you, I can't speak

22   to that.  I haven't heard people differentiate

23   between the two, but again, being rather new to

24   the position, and only attending maybe three or

25   four meetings, I haven't gathered a lot of that

                                        Page 115

1    kind of information.

2          Q.     Okay.  Do you know what fentanyl is?

3          A.     I've heard of it.

4          Q.     What is it -- in your understanding,

5    what is fentanyl?

6                 MS. QUEZON:  Object to the form.

7          A.     I've only heard about it like on the

8    news, and, I mean, I've seen it, like they talk

9    about fentanyl analogs from the medical

10   examiner's standpoint.  I don't know what that

11   means because I'm not a doctor.  I've just heard

12   that it's a powerful drug for pain.

13         Q.     Do you know the difference

14   between -- strike that.

15                Have you heard that fentanyl has

16   caused overdoses in Cuyahoga County?

17         A.     To be honest with you, I would -- I

18   would have to look at the medical examiner's

19   data recently to be able to answer that

20   question.

21         Q.     Just to be clear, I'm not asking if

22   you know how many deaths or, like, the ratio or

23   percentage.  I'm just asking have you heard that

24   fentanyl is a cause of some overdoses in

25   Cuyahoga County.

Page 116

1          A.    Yes.

2          Q.    And do you know -- have you heard

3    whether that fentanyl -- have you made an effort

4    to determine whether those fentanyl-related

5    overdoses are caused by illicit fentanyl or

6    prescription fentanyl?

7          A.    I have not made that effort.  It's

8    not my role to do that at all.

9          Q.    Are you aware that fentanyl can be

10   obtained through prescription?

11         A.    Yes, I'm aware of that.

12         Q.    Are you aware that fentanyl can be

13   obtained illicitly on the street?

14         A.    Yes, I'm aware of that.

15         Q.    And you have not made an effort to

16   understand whether the fentanyl-related

17   overdoses are connected to prescription versus

18   illicit fentanyl?

19         A.    No, absolutely not.  That is --

20   again, directing back to the deliverables set by

21   the State of Ohio, we're held very closely to

22   those and it doesn't encompass that at all.

23         Q.    You've mentioned these deliverables.

24   What are those deliverables?

25         A.    Again, I'd have to have my work plan

Page 117

1  in front of me to tell you exactly the wording

2  and exactly the deliverables.  I can tell you a

3  general outline of them.

4                      -   -   -   -   -

5                  (Thereupon, Vince Deposition Exhibit

6                  6, 2019 Prescription Drug Overdose

7                  Prevention Annual Work Plan 2019,

8                  Beginning Bates Number

9                  CUYAH_013756844, was marked for

10                 purposes of identification.)

11                     -   -   -   -   -

12      Q.    And I'm marking and handing Exhibit

13  6 -- do you recognize this document?

14      A.    I believe this document to be the

15  annual work plan that we submitted for the

16  current grant, which we did not receive.

17      Q.    Okay.  So this reflects the grant

18  that was not accepted.  Did you base this

19  application, or this work plan rather, on the

20  previous work plan?

21      A.    We based this work plan on the RFP

22  that was given to us through the State of Ohio.

23      Q.    Okay.  And were -- so if we look at

24  -- page 2 of this document discusses -- I guess

25  page 1 and page 2 discuss the role of the

1    Cuyahoga County Opiate Task Force and states

2    what the expected impact objective would be if

3    you were to have gotten this grant, right?

4         A.    Correct.

5         Q.    And then on page 2 it shows a number

6    of objectives.  If this had been granted, would

7    this be what you're describing as deliverables?

8         A.    Yes.

9         Q.    And do these deliverables listed

10   here reflect some of the deliverables that you

11   currently have in 2018?

12        A.    Yes.

13        Q.    Are they -- are they exactly the

14   same?

15        A.    No.

16        Q.    What is different about them?

17        A.    I would have to get out the 2018

18   work plan and cross-reference.

19        Q.    How often do you work on these --

20   sorry.

21              Are these deliverables in this work

22   plan -- is it something you work on on a daily

23   basis, weekly basis?

24        A.    Since, as you see, there's so many

25   of them and I'm one person, I move through the

Page 119

1   document at different stages of the week doing
2   different things.
3         Q.    But you're in this document quite a
4   bit?  Again, not this one.
5         A.    I'm not in this document, but I have
6   in my mind what my job is I'm supposed to be
7   doing to meet these deliverables.  Again, we
8   contract with several entities to also help meet
9   these deliverables.
10        Q.    Would you say this is kind of the
11  most time-intensive part of your job is working
12  on these deliverables?
13        A.    Oh, yes.  That's my job.
14        Q.    You spend a lot of time thinking
15  about accomplishing these deliverables?
16        A.    Me and our sub-grantees, yes.
17        Q.    It's your responsibility to make
18  sure that the deliverables are met?
19        A.    Me and my supervisor, yes.
20        Q.    You and your supervisor.
21              But if I understand the breakdown of
22  the role of your supervisor and you, you spend
23  more time on this than your supervisor does?
24        A.    Yes.
25        Q.    And this is -- you're sort of the

1    quarterback, to use that, you know, metaphor,

2    for this project?

3         A.    Yes.

4         Q.    And so because you work on this on a

5    daily basis, you have a good idea, for example,

6    right now, where you're at in terms of your

7    deliverables for this year?

8         A.    Pretty much.  Again, I'd have to go

9    back to the work plan and see what kind of notes

10   that I've made.

11        Q.    So what are -- so -- you said that

12   you need to go back and look at the

13   deliverables, but these are also -- you've also

14   said this is something you're thinking about

15   constantly.  So can you give me a general idea

16   of the deliverables related to the Cuyahoga

17   County Opiate Task Force?

18        A.    Well, that's laid out in page 1 and

19   page 2.  That's only two pages of this document.

20        Q.    Right.  So let's talk about page 1

21   and page 2, talking about the -- we're focused

22   on the Cuyahoga County Opiate Task Force here.

23        A.    Um-hum.

24        Q.    You've been talking about the

25   deliverables of the task force.  This lists

Page 121

1   five -- four or five deliverables.

2          A.     Um-hum.

3          Q.     And what I asked is, are these four

4   or five deliverables the same deliverables that

5   you currently have in 2018?

6          A.     Again, I said I'd have to go back

7   and look to make sure that they're the exact

8   same.

9          Q.     A couple words might be off.  But

10  generally speaking, when it says "Coalition will

11  conduct regularly scheduled meetings on a

12  quarterly basis," is that a deliverable you

13  currently have in 2018?

14         A.     No.  It's bimonthly.

15         Q.     Bimonthly, so that's different.  So

16  currently you're meeting more often than you

17  were expecting to meet going forward?

18         A.     Well, this is the minimum.  We can

19  meet more than that if we see fit.

20         Q.     Why did you change it in this

21  application to be from bimonthly to quarterly?

22         A.     The subcommittees were meeting more

23  often, so we felt that more groundwork on the --

24  groundwork needed to be done.  Rather than

25  meeting bimonthly as a group, we felt we could

Page 122

1    get more work done with a lot of the

2    subcommittees' work that's being done.  We

3    wanted them to meet more often.

4            Q.    Okay.  The second deliverable is "A

5    strategic plan will be established for the

6    CCOTF."  Is that a current deliverable you guys

7    have in 2018?

8            A.    I don't know, to be honest with you.

9            Q.    You don't know?

10           A.    I don't know.  I think this was a

11   new one for 2019.

12           Q.    This is a new one?

13           A.    I think.

14           Q.    "Maintain involvement and statewide

15   coalition and implementation of state plans."

16   Is that a deliverable for 2018?

17           A.    I don't know, to be honest with you.

18   I'd have to go back and look.  I'm being honest.

19           Q.    So even though these are -- this is

20   something you work on every day, you don't know

21   if -- not every day, but this is something you

22   said you spend the vast majority of your time

23   doing.

24           A.    I don't look at the document every

25   day.  Everyone knows what their job is

Page 123

1   supposed -- you're doing your job.  I don't look

2   at this document every day and make sure I'm

3   doing every single one of these deliverables.

4          Q.    I didn't mean to imply that you look

5   at the document every day, but you testified

6   that the most important part of your job and the

7   time -- and the thing you spend the most time on

8   is accomplishing deliverables.

9          A.    Um-hum.

10         Q.    And I'm simply asking whether this

11  deliverable, "maintain involvement with

12  statewide coalition and implementation of state

13  plans," is something that you guys have as a

14  deliverable in 2018?

15         A.    I'm telling you I don't know.  I'd

16  have to look.  Because we have supplemental

17  funding to run this PDAAG program, so it might

18  be within the supplemental last year.  I don't

19  know.  I'd have to look.

20         Q.    How many deliverables are there in

21  2018 for the Cuyahoga County Opiate Task Force?

22         A.    So I have to be clear.  The task

23  force, again, is just this one deliverable.  The

24  Injury Prevention grant is different.  We have

25  27 deliverables for the Injury Prevention grant.

```
1        Q.    Okay.  So this is one deliverable
2   with subparts or objectives?
3        A.    Correct.
4        Q.    And how many objectives is the
5   Cuyahoga County Opiate Task Force --
6        A.    Right here (indicating).
7        Q.    -- working toward in 2018?
8        A.    Whatever is in the 2018 plan, and,
9   again, I'd have to look at it.
10       Q.    So you don't remember?
11       A.    It's four or five, so it's
12  relatively the same.
13       Q.    Relatively the same, quarterly,
14  bimonthly changed, but there's -- other than a
15  few changes, this is basically a fair
16  description of what the Cuyahoga County Opiate
17  Task Force is working toward?
18       A.    Probably.
19       Q.    Probably, okay.
20            MR. BOEHM:  Could we take a break?
21            MS. QUEZON:  Sure.
22            MR. BOEHM:  Are we at a good time to
23  do that?
24            THE VIDEOGRAPHER:  Off the record at
25  11:34.
```

1                   (Recess had.)

2              THE VIDEOGRAPHER:   On the record,

3     12:01.

4     BY MR. MASTERS:

5          Q.    All right.  Nice to see you again.

6          A.    Hi.

7                     -   -   -   -   -

8                (Thereupon, Vince Deposition Exhibit

9                7, Cuyahoga County Opiate Task Force

10               Report 2015, Beginning Bates Number

11               CUYAH_014194642, was marked for

12               purposes of identification.)

13                    -   -   -   -   -

14         Q.    I'm showing you what has been marked

15    as Exhibit 7.  Do you recognize this document?

16         A.    To be honest, I don't know if I've

17    seen this document or not.  I've reviewed their

18    task force reports in the past.  I may have read

19    this one, but I'm not positive.

20         Q.    You said you've reviewed task force

21    reports in the past?

22         A.    Correct.

23         Q.    How often does the Cuyahoga County

24    Opiate Task Force create a report like this?

25         A.    It's my understanding that they did

1  it annually.  Again, I'm not positive.  I don't

2  know if they did one last year.  I know Allisyn

3  was leaving and they were filling the position.

4  So I don't know if one was done last year.  And

5  I'm responsible for doing one for 2018.

6       Q.    And have you been working on that?

7       A.    We just started working on it this

8  month.

9       Q.    What does writing the task force

10  report for this year entail?

11       A.    So in the past they have titled it

12  Cuyahoga County Opiate Task Force.  For 2018

13  I've decided not to call it the task force

14  report because it encompasses so much more than

15  just what the task force does, again, it being a

16  small part of this job.  We're calling it

17  Cuyahoga County Injury Prevention report and

18  highlighting our sub-grantees and the work that

19  they've done.  So they will be providing a lot

20  of the narrative for it.

21       Q.    "They" meaning who?

22       A.    Our sub-grantees.

23       Q.    So, in writing the report, you will

24  reach out to the sub-grantees for a report of

25  their activities for the year; is that fair?

1        A.     Correct.  Per the Ohio Department of

2   Health, we have to report out what they've done

3   for the year, and this is the way that we're

4   going to do it.

5        Q.     And you mentioned that you have

6   reviewed Cuyahoga County Opiate Task Force

7   reports.  Which -- which reports have you

8   reviewed?

9        A.     The main one that I've referenced is

10   2017, just to get an idea of what they've done

11   in the past, to see what direction we wanted to

12   go for 2018.  I mean, not '17.  I believe it was

13   '16.

14        Q.     2016?

15        A.     Yes.  I believe, because I don't

16   think they did one in '17.  Again, I wasn't on

17   the grant yet, so I'd have to go back and look

18   at the exact date.

19        Q.     Did you review any others?

20        A.     Not to my knowledge.

21        Q.     So you didn't review Cuyahoga County

22   Opiate Task Force Report 2014?

23        A.     I may have looked at it.  I didn't

24   read it thoroughly.  I might have just looked at

25   it just, honestly, for formatting, to see what

Page 128

1  kind of format we wanted to go with.

2      Q.    So why didn't you look at the 2014

3  report?

4      A.    I don't know.  I didn't read it

5  thoroughly.  There was no reason for me to

6  really.

7      Q.    Why did you think there was no

8  reason to read a report of the Cuyahoga County

9  Opiate Task Force, of which you're a co-chair?

10      A.    Because there were more recent

11  reports to read.

12      Q.    So that information was outdated?

13      A.    Um-hum.

14          MS. QUEZON:  Yes?

15          THE WITNESS:  Yes.

16      Q.    When did you review the 2016 report?

17      A.    When I started -- when I was

18  formatting the document for 2018.

19      Q.    And you thought it was important

20  that you understand what the Cuyahoga County

21  Opiate Task Force report in 2016 said?

22      A.    Correct.

23      Q.    Why did you think that was

24  important?

25      A.    The reason why I thought it was

1    important, because I wanted to look at the

2    formatting that they utilized and see what

3    partners they highlighted and see what direction

4    we wanted to go for 2018, which -- it was

5    extremely comprehensive, the 2016 one.  And we

6    decided we wanted to go more streamline to just

7    highlight our sub-grantees rather than

8    absolutely every single activity that's

9    happening in Cuyahoga County, because we don't

10   get funded to do those activities.

11        Q.    Was -- was the 2016 report the only

12   task force report that you reviewed?

13        A.    That I remember.

14        Q.    That you remember?

15        A.    Um-hum.

16        Q.    You might have reviewed others?

17        A.    I might have briefly opened them up

18   on my desktop, looked at it and closed it, but

19   not thoroughly read them.

20        Q.    But the 2016 you thoroughly read?

21        A.    I can't say that.  I can't say I

22   read every word.  Again, I was looking at it for

23   formatting purposes and kind of what partners

24   they highlighted and what direction we wanted to

25   go in for 2018.  I wasn't looking at it for

Page 130

1   content.

2        Q.    So why -- why not look at the

3   substance of the report?

4        A.    I read some of it, not all of it.

5   There's no reason why I had to.

6        Q.    You didn't think it was -- why did

7   you not thoroughly read the substance of the

8   report?

9        A.    Because it was outdated data anyway.

10  I didn't need any of the data.  I wasn't looking

11  for any narrative within it.  Again, I was

12  looking at it for the formatting.

13       Q.    But it is the most recent report of

14  the Cuyahoga County Opiate Task Force?

15       A.    To my knowledge, yes.

16       Q.    So the activities of the opiate task

17  force summarized in the 2016 report is the most

18  recent summary of the activities of the Cuyahoga

19  County Opiate Task Force; is that correct?

20       A.    Again, I would have to speak to the

21  people who created the document.  I don't know

22  if it encompassed -- let me say this.  So

23  there's the Cuyahoga County Opiate Task Force

24  that is comprised of about 250 members.

25  Definitely not all 250 members were highlighted

1   in that report.  It would be 100 pages long.

2   They highlighted certain partners who we

3   contract with and we don't contract with.  So I

4   was looking at it from the perspective of what

5   kind of format I want to go forward with.  I

6   want to highlight our sub-grantees because

7   that's who we're paying to do the work that's

8   within the work plan.  That's why I was looking

9   at it.  I'm not saying it's not important for me

10  to read all of it, but it wasn't relative to why

11  I was looking at it.

12      Q.    Is there another description of the

13  activities of the Cuyahoga County Opiate Task

14  Force that you have read for substantive

15  purposes?

16      A.    No, other than just the deliverables

17  that we're supposed to meet within the work

18  plan.  I've read that.

19      Q.    Do you agree that reading the

20  substance of task force reports might have

21  provided you important information about the

22  nature and scope of opioid abuse and its impact

23  in Cuyahoga County?

24          MS. QUEZON:  Object to form.

25      A.    I agree that it's important to be

                                          Page 132

1    aware of the problem.  I don't agree that it's

2    important for me to know every aspect of

3    everything that the task force has done for the

4    past five years.  I know generally, and what

5    their goal is.

6          Q.    Do you agree that reading the

7    substance of reports, like the task force

8    report, might have provided you important

9    information about the nature and scope of opioid

10   abuse and its impact in Cuyahoga County?

11              MS. QUEZON:  Objection to form.

12         A.    I have to look at the report to see

13   if that's what it even highlighted.

14         Q.    Let me rephrase the question.

15              Do you agree that reviewing the

16   substance of reports, like the task force

17   report, might have provided you important

18   information about the nature and scope of opioid

19   abuse and its impact in Cuyahoga County?

20              MS. QUEZON:  Object to form.

21         A.    Reviewing documents like the task

22   force report, sure.  There's many documents like

23   the task force report that can be reviewed.  I

24   read portions of the task force report, not

25   everything in its entirety.

1        Q.    What other documents, like the task

2    force report, provide helpful substance?

3        A.    And this is just an example.  This

4    isn't something I definitely did.  I'm saying

5    for an example, if I wanted to look at other

6    task forces and what they've done, I go to

7    Summit County opiate task force and kind of look

8    at their minutes or notes or -- and I'll look at

9    previous minutes or notes from the task force if

10   I want to know what they have done.  That's

11   other documents that would reflect activity.

12       Q.    And those reports might provide

13   important information on the nature of substance

14   abuse in the region and its impact?

15       A.    Sure.

16       Q.    But you did not read the 2016 report

17   for substance reasons?

18            MS. QUEZON:  Object to the form.

19       A.    I didn't read it word for word.  I

20   read portions of it.

21       Q.    What portions did you read?

22       A.    I don't remember.  I literally would

23   have to have the report in front of me to

24   reference it.

25                    -    -    -    -    -

```
                                        Page 134
     1                  (Thereupon, Vince Deposition Exhibit
     2                  8, Cuyahoga County Opiate Task Force
     3                  Report 2016, Beginning Bates Number
     4                  CUYAH_014194735, was marked for
     5                  purposes of identification.)
     6                      -   -   -   -   -
     7          Q.    I'm showing you what has been marked
     8    as Exhibit 8.  Is this the Cuyahoga County
     9    Opiate Task Force Report 2016 that you reviewed?
    10          A.    Yes.
    11          Q.    All right.  Which portions of this
    12    report do you remember reviewing?
    13          A.    So, you know when you skim a
    14    document, when you skim over a document, that's
    15    basically what I did, again, looking at, okay,
    16    historic year.  I kind of looked at the RNC.
    17    Didn't really look at the first part.  Looked at
    18    the timeline.  And in my head, reading the
    19    timeline, I'm seeing lives lost, overview of
    20    local drug-related deaths.  Looked over -- I
    21    didn't read verbatim the definitions.  I looked,
    22    okay, they have definitions, how did this
    23    happen, read over some of the bullet points.  I
    24    skimmed through it to look at the main bullet
    25    points about what they were addressing.
```

1      Q.    Just for clarification purposes,

2    what are some of the main bullet points?

3      A.    I -- you know, I looked at the

4    timeline and read what happened within the

5    timeline, how did it happen, which are all the

6    bullets listed under it happened, how it

7    happened.  I read the definitions.

8      Q.    Did I understand you to be saying

9    that there were particular bullet points that

10   you read?

11     A.    To be honest with you, I skimmed the

12   document.  I didn't read it verbatim, you know.

13   I skimmed the document to get a feel of what the

14   document was saying.  What the document was

15   saying to me, there's a problem in Cuyahoga

16   County.  What are we doing about it?  That's

17   what I wanted to know, what the theme was.  So I

18   skimmed the document and saw, wow, they did a

19   lot -- they've done a lot.  Oh, my gosh, they've

20   grown a lot.  All these initiatives were taken.

21   That's amazing.  You know, they're listing every

22   treatment facility.  That's great.  Okay.

23   There's awards that were given.  That's pretty

24   cool.  That's how I was going through the

25   document.  I wasn't reading it all for

1    substance.  Again, I was looking also for

2    formatting.  I didn't want it to be this intense

3    for this year.  I just wanted to highlight our

4    sub-grantees.

5           Q.    Okay.  You testified that you were

6    looking for formatting and you didn't want it to

7    be this intense for this year.

8           A.    Intensive, right.

9           Q.    What did you mean by that?

10          A.    I also stated that they highlighted

11   a lot of initiatives that weren't paid through

12   for the Ohio Department of Health grant.  This

13   year we were taking the direction that we wanted

14   to highlight our sub-grantees.  A lot of the

15   initiatives in here are not sub-grantees of the

16   Ohio Department of Health grant.

17          Q.    You said, "I didn't want it to be

18   this intensive this year."  What does that mean?

19          A.    I guess I should have said

20   "extensive."  I should have used that term,

21   "extensive."  Again, because a lot of these

22   initiatives are outside of the scope of work for

23   the Ohio Department of Health grant and I wanted

24   to focus just on our sub-grantees and work that

25   they do because that's what we report out for

Page 137

1   the Ohio Department of Health.

2       Q.    And just so we're clear, when you

3   say this -- you didn't want it to be this

4   extensive, are you referring to the task force

5   operations or are you referring to the report?

6       A.    Just the report.

7       Q.    So you didn't want the report that

8   you were preparing for 2018 to be as descriptive

9   as the 2016 report?

10      A.    No.  I'm not saying as descriptive.

11  I'm saying as extensive.  Again, because they

12  highlight almost every initiative in Cuyahoga

13  County, which is wonderful, but that's not what

14  the Ohio Department of Health grant that I

15  manage pays for.  So we are only highlighting

16  what the Ohio Department of Health pays for

17  because that's what we're responsible to report

18  out on.

19      Q.    So you want to limit the task force

20  report to only cover the areas covered by the

21  grant?

22      A.    We're not calling it the task force

23  report for that purpose.  There may be a

24  separate task force report that we come out

25  with, you know, whole year, five year, what did

1    we do the last five years, and we will call it

2    "the task force report" and it may look

3    something like this.  But for the Ohio

4    Department of Health grant and its sub-grantees,

5    it won't be called "opiate task force Report."

6         Q.    So why do you -- why keep it more

7    limited in 2018?

8         A.    Because that's what we're limited to

9    for our deliverables.  I don't know what

10   direction they took or why they took this

11   initiative.  I wasn't in the program at that

12   time.  But the way that I -- my role right now

13   is just to stick to our sub-grantees and what

14   deliverables they accomplished for the purposes

15   of this funding.

16        Q.    Was the deliverable different in

17   2016 as it is now?

18        A.    No.  Again, I was not in the role at

19   this time, so I don't -- I don't know why they

20   call it a task force report.  I don't know why

21   they have every single thing in here -- that's

22   done in Cuyahoga County in here.  That was their

23   choice.  Again, they do highlight the

24   sub-grantees in here, but they also talk about

25   everything else.  We don't -- we're not required

1   to do that from the Ohio Department of Health.

2   Again, I said for 2018 we are going to highlight

3   our sub-grantees and we may come out with a

4   report summarizing called "The opiate task force

5   report," which will encompass all of these

6   initiatives.

7           Q.    The deliverable was the same,

8   though, in 2016 as it is now?

9           A.    I'd have to look at their work plan.

10  I wasn't on the program at the time.

11          Q.    Do you have any reason to believe

12  that it's different now?

13          A.    Again, I would have to look at the

14  work plan.  This was a competitive year.  It was

15  non-competitive in the past.  It would have

16  changed.

17          Q.    But for 2018 it's -- it was

18  non-competitive?

19          A.    Oh, right.  Yeah.  I'm sorry.

20          Q.    So do you have any reason to believe

21  that the deliverable that you are currently

22  working on for this report is different than the

23  deliverable in 2016?

24          A.    No.  And let me say this as well.

25  Since our budget is extremely limited, we are

1    very limited as far as what we can produce.

2    Their budget at this point, what was allotted

3    for printing and design services, was much more

4    robust than what it is now.

5          Q.    What did you mean by your statement

6    that there were programs described in the 2016

7    report that were not covered by the Department

8    of Health grant?

9          A.    For example, what it says on what is

10   being done in Cuyahoga County.

11              MS. QUEZON:  What page are you on?

12   I'm sorry.

13              THE WITNESS:  Oh, this is -- it

14   starts with the opiate task force emblem in the

15   left -- the logo in the upper left-hand side.

16              MS. QUEZON:  "What is being done"?

17              THE WITNESS:  "What is being done."

18              MS. QUEZON:  It's 737 at the bottom

19   on the Bates stamp.

20         A.    The task force itself, these

21   initiatives to the very right, those are things

22   that entities and service agencies are doing on

23   their own, but they're not being funded through

24   the Ohio Department of Health grant.

25              The same with on the next page.

```
                                     Page 141
 1    Those are things that individual agencies are
 2    doing on their own, but not through the Ohio
 3    Department of Health grant.
 4               Again, two pages later, where it
 5    says, "The United States Attorney's Heroin and
 6    Opioid Task Force," that's not funded from the
 7    Ohio Department of Health.
 8               Here, when she finally talks
 9    about -- well, the report talks about the Ohio
10    Department of Health Injury Prevention Grant,
11    this is where she's highlighting the
12    sub-grantees.  This is what we're going to do
13    for this year.  So she highlights, which I'm
14    referring to Allisyn, because I believe her to
15    be one of the co-authors of this, the three
16    sub-grantees, the medical examiner, MetroHealth,
17    and this Dr. Melanie -- I can't pronounce her
18    last name.  She highlights the work that they're
19    doing, along with Recovery Resources.  I don't
20    know if they're sub-grantees or not.  So she
21    does highlight them, she does meet that
22    deliverable in this report, but the other
23    initiatives are things that are not paid for
24    through the grant.
25          Q.    And one reason why you are not
```

1    including that information in the current report

2    you're working on is because of cost, right?

3          A.    Not only cost, but, also, there's a

4    distinction that is clear from the Ohio

5    Department of Health as far as the opiate task

6    force being a piece and the Injury Prevention

7    grant.  So the task force is a piece of the

8    grant, but it's not only the grant.  So there's

9    a definition between the two.

10         Q.    And why were these non-ODH-funded

11   programs included in the task force report in

12   2016?

13               MS. QUEZON:  Object to form.

14         A.    I don't know.  I didn't write it.  I

15   have no idea what they were thinking.  I don't

16   know what their goal was.  I don't know what

17   their thought process was.  I have no idea.

18         Q.    So in preparing to write the 2018

19   report, you didn't speak with anybody who was

20   involved in the drafting of the previous

21   reports?

22         A.    I don't know if my supervisor was

23   involved with drafting the previous reports.  I

24   asked him if it was okay if, you know, we made

25   it a little slimmer in 2018 to highlight only

Page 143

1    the sub-grantees, and then if we needed to

2    create a more comprehensive report for the task

3    force and its members, that would be a different

4    project.

5         Q.    And right now is there -- are there

6    plans to do a more comprehensive task force

7    report?

8         A.    If we get funding to do so, yes.

9         Q.    But without funding, there's no

10   plans to write a new report?

11        A.    We could do one electronically

12   possibly.

13        Q.    Is that something you've discussed?

14        A.    It's something, yes, that I've

15   thought about that we should do separately.

16        Q.    Is that something that you have

17   discussed?

18        A.    No, not with my supervisor.

19        Q.    And, again, a task force report was

20   not written in 2017, right?

21        A.    I believe that there was not.

22   Again, I wasn't on the project yet and I haven't

23   seen one, so unless one is floating out there

24   that I don't know about.

25        Q.    Did you -- what is your

1    understanding as to why a task force report

2    wasn't written for 2017?

3           A.    Because there was no one in the

4    position to do it.  The position was open.

5           Q.    Allisyn Leppla worked in the

6    position for most of 2017, right?

7           A.    I'm not sure when she left.  I don't

8    know if it was the middle of the year or a

9    quarter -- I can't remember.

10          Q.    So did you ask somebody why a task

11   force report wasn't written?

12          A.    No.  I wasn't tasked to do it, so --

13          Q.    You never, in conversation with your

14   supervisor, asked why wasn't there a report for

15   2017?

16          A.    No.  There was something that was

17   written called a dissemination report that only

18   highlighted some small things that were done,

19   but it wasn't an annual report.

20          Q.    What is the dissemination report?

21          A.    We highlighted an initiative with

22   Edna House, which is a recovery house for women.

23   It was a new initiative that they did.  And I

24   cannot remember what else was in it.

25          Q.    Was that affiliated with the task

Page 145

1   force?

2          A.    No.  That was just affiliated with

3   new and different work that they had done in

4   2017.

5          Q.    And when was that report released?

6          A.    I don't know.  I'd have to go back

7   and look.

8          Q.    So on this dissemination report that

9   you just mentioned, is it available on your

10  website?

11         A.    Um-hum.

12                MS. QUEZON:  Yes?

13                THE WITNESS:  Yes.

14         Q.    Are there other reports -- are there

15  other dissemination reports like the one you

16  mentioned?

17         A.    That's the only one called a

18  dissemination plan.  It's a plan.  I don't know

19  why it was titled that.  But the annual reports

20  are on the website as well.

21         Q.    So in addition to the annual reports

22  and the dissemination plan or report, are there

23  any other reports that you're aware of that have

24  been written relating to the work of the task

25  force or the Injury Prevention program?

1       A.    To be specific, I'd have to look at

2   our website and see what's been uploaded.  I

3   know that -- I'm almost positive that every

4   annual report has been uploaded.  I don't

5   believe that the minutes or agenda have been

6   uploaded.  Those are only sent out to the task

7   force members.

8       Q.    So there's annual reports, there's

9   the Edna dissemination plan report.  What other

10  reports are there?

11      A.    We have to do a quarterly report

12  back to the Ohio Department of Health.  But

13  that's not public.  It's just something that we

14  do back to the Ohio Department of Health.

15      Q.    And what does that report contain?

16      A.    That is the work plan that we went

17  through previously.  We have to report on a

18  quarterly basis the progress that has been made

19  on each deliverable.

20      Q.    And who is that sent to?

21      A.    It's to our program consultant, Tina

22  Kranposki, at the Ohio Department of Health.

23      Q.    And what do they do with that

24  report?

25              MS. QUEZON:  Object to form.

1          A.     They review it for content and
2     either approve or disapprove it.
3          Q.     And you said these are done
4     quarterly?
5          A.     Yes.
6          Q.     Are there any other reports?
7          A.     So there's the core report that we
8     have to submit, there's the supplemental PDAAG
9     work plan that we have to submit, and -- oh, and
10    the supplemental alternative to incarceration
11    report that we submit, and then recently the Epi
12    Validation report that we have to submit.
13         Q.     Are any of these reports that you
14    just mentioned public reports?
15         A.     No.
16         Q.     Are they all sent to the Ohio
17    Department of Health?
18         A.     Correct.
19         Q.     Do you have copies of all these
20    reports?
21         A.     Yeah.
22         Q.     Did you discuss the Cuyahoga County
23    Opiate Task Force report 2016 with your
24    supervisor, Vince Caraffi?
25         A.     No, I did not.

Page 148

1        Q.    Have you discussed the current

2   version of the report that you're drafting with

3   your supervisor, Vince Caraffi?

4        A.    So my supervisor is only -- like

5   five percent of his time is with this project.

6   So it's basically me doing most of the work

7   behind the report.  The capacity that he's

8   involved in would be basically verifying that

9   it's okay for me to move forward with a certain

10   printer or what dollar amount we have available,

11   so it's limited.

12        Q.    But the substance you are in charge

13   of?

14        A.    The sub-grantees myself, and he will

15   do the final review.

16        Q.    And when you said -- you said it's 5

17   percent of his time.

18        A.    I think.

19        Q.    Is that just -- is that 5 percent of

20   his time is occupied by the task force itself or

21   by this report?

22        A.    So -- oh, no.  So, again, I'd have

23   to look at our budget, but we have to do certain

24   budgets and assign a percentage to that person

25   based on their availability and also their

Page 149

1   percentage of their salary that will be on the

2   grant, and that is the time they are to expend

3   within the project.  It might be 10 percent for

4   the past year.  I can't remember exactly.  It's

5   5 to 10 percent, I believe, for the project in

6   general, not for this.

7           Q.     The project in general is what?

8           A.     The Injury Prevention grant.

9           Q.     So Vince Caraffi spends 5 to 10

10  percent of his time on the Injury Prevention

11  grant project?

12          A.     That's what is written as supposed

13  to be happening, yes.

14          Q.     And the Cuyahoga County Opiate Task

15  Force is one part of the Injury Prevention

16  grant?

17          A.     Correct.

18          Q.     So that 5 to 10 percent of Vince

19  Caraffi's time is split between a number of

20  deliverables, one of which is the Cuyahoga

21  County Opiate Task Force?

22          A.     Correct.

23          Q.     So you are responsible, then, for

24  the vast majority of Cuyahoga County Opiate Task

25  Force-related responsibilities?

Page 150

1          A.    Myself and Beth DeJesus, yes.

2          Q.    Beth DeJesus is at --

3          A.    The ADAMHS Board.

4                And, again, prior to -- my

5     supervisor stepped down as the chair of the task

6     force, I believe it was, October, so I'm very

7     new to this role as well.

8          Q.    Is the Cuyahoga County Opiate Task

9     Force funded through the ODH grant?

10         A.    Yes.  It's one of the deliverables.

11         Q.    Does it receive funding from anyone

12    else?

13         A.    No.  The only thing they may receive

14    is in kind funding, where we don't have the

15    money to pay speakers who normally would be

16    paid, but they're doing it pro bono because they

17    see the need.

18         Q.    So aside from in kind contributions

19    and the ODH grant, is there any other source of

20    funding or contribution to the Cuyahoga County

21    Opiate Task Force?

22         A.    No.

23         Q.    Let's turn to page 3, the one with

24    the opiate task force symbol?

25                MS. QUEZON:  The "What is Being

Page 151

1  Done" page?

2          MR. MASTERS:  The "What is Being

3  Done" page.

4      Q.    There's a section called "Membership

5  and Structure."  What is the membership and

6  structure of the Cuyahoga County Opiate Task

7  Force in your understanding?

8          MS. QUEZON:  Object to form.

9      A.    From my understanding, again, being

10  new to the task force and not having -- other

11  than attending the meetings this past year, not

12  being involved with that, the membership is the

13  people who are members of the task force, and

14  when it refers to structure, I don't know if

15  they're referring as far as who's involved and

16  what agencies.

17      Q.    And when was the task force formed?

18      A.    Well, I'm reading here it says 2010.

19  I wasn't a part of it.  So I guess it was 2010.

20  That's what it says.

21      Q.    You were at CCBH at the time, right?

22      A.    Um-hum.

23          MS. QUEZON:  Yes?

24          THE WITNESS:  Yes.

25      Q.    And you knew Vince Caraffi in 2010?

1        A.     Yes.

2        Q.     Were you aware that the Cuyahoga

3   County Opiate Task Force was created?

4        A.     No, to be honest with you.

5        Q.     Did you ever receive an e-mail or an

6   announcement that the Cuyahoga County Opiate

7   Task Force was created?

8        A.     No.

9        Q.     So when did you first learn of the

10  existence of the Cuyahoga County Opiate Task

11  Force?

12       A.     That's a hard question to nail down

13  an exact date of when I learned that it existed.

14  I started hearing more about it at our agency, I

15  would say, '15, '16 probably, because the

16  members were growing.

17       Q.     When -- you started hearing about it

18  more and more in '15 and '16, but had you known

19  of its existence prior to that?

20       A.     No.  I'm being completely honest.  I

21  didn't -- I worked in a different program.  This

22  was housed in environmental health, which was on

23  the opposite end of the building.  They kind of

24  do their own thing.  I was in prevention and

25  wellness, previously community health, and we

1   just stayed in our own programs.  Not that you

2   didn't want to be aware, but it was very, very

3   hard to keep track of everything that the Board

4   of Health does.

5        Q.    So in 2015, 2016 the membership was

6   growing.  Do you know why the membership was

7   growing in 2015, 2016?

8             MS. QUEZON:  Object to form.

9        A.    I don't know.  I could speculate.

10  Because there seemed to be more interest from

11  the public because of what they were seeing in

12  the news.

13       Q.    And what were they seeing in the

14  news?

15       A.    Everything you and I would see.  I

16  don't know.  Reports on overdose deaths, reports

17  on epidemic.

18       Q.    And there were no reports like that

19  prior to 2015?

20            MS. QUEZON:  Object to the form.

21       A.    I have no idea.  I'd have to go back

22  and look at everything that was aired on

23  television.  I don't know.

24       Q.    But in 2015, 2016, that's when you

25  started hearing about the task force and

1  opioid-related issues?

2      A.    To be honest with you, it wasn't

3  like a hugely promoted thing at the Board of

4  Health if you were not a part of it.  That's the

5  truth.

6      Q.    What do you mean by that?

7      A.    I mean, e-mails weren't sent out to

8  staff members to come to the meetings.  As far

9  as the task force reports, I don't know if that

10  was circulating -- circulated amongst employees

11  either.  You know, if you were interested, you

12  probably knew where to find it, but it wasn't

13  like something on display or something passed

14  out to staff members, so unless you were seeking

15  it out, you wouldn't know about it.

16      Q.    What did you hear -- do you know why

17  it wasn't more broadly disseminated throughout

18  CCBH?

19      A.    No, I do not.

20      Q.    In 2015, when you started hearing

21  about the task force, what did you hear about

22  it?

23      A.    And, again, it might be 2015, '16,

24  roughly around there, because I was still in my

25  own program doing my own thing, and you have a

1    lot of work to do, so you don't have a lot of

2    time to make yourself aware of what is going on

3    in the entire agency.  But in the news, as you'd

4    see, you know, it being kind of called an

5    epidemic or declared an epidemic last year, I

6    think there was just more awareness around it,

7    so people were becoming more interested so there

8    was more conversation around it.

9        Q.    And you said the Cuyahoga County

10   Opiate Task Force is comprised of individuals

11   throughout the county.  Who are these

12   individuals?

13       A.    Well, within the narrative it kind

14   of names different entities, so it can range

15   anywhere from citizens to people that work in

16   recovery housing, physicians, professors.  We

17   don't have any pharmacists, I believe.  Dental

18   professionals we've been trying to get on board.

19   We've been trying to get faith-based initiatives

20   on -- or agencies on board as well.

21       Q.    Why have you been trying to get

22   faith-based entities on board?

23       A.    To be honest, because it's a

24   conversation as far as who's -- what populations

25   are hard to reach, and it was just a

1    conversation at ODH that they have with us as

2    sub-grantees, what populations are hard to

3    reach, and faith-based communities came up as

4    one, them and dental professionals.

5         Q.    Have you communicated with others at

6    CCBH about the task force?

7         A.    Since when?

8              MS. QUEZON:  Object to the form.

9         Q.    Since 2015.

10        A.    Not really.

11        Q.    You haven't spoken to people at CCBH

12   about the task force?

13        A.    I mean, I'm sure in conversation

14   I've talked about the task force meetings that I

15   now help co-chair, but at CCBH, as far as the

16   capacity of my role, there's no reason for me to

17   speak about it, other than to my supervisor and

18   my director, or if the board asks for us to

19   report out on it, but I haven't been asked that.

20        Q.    But that is something that the board

21   can ask?

22        A.    Yes.  They could ask that.

23        Q.    Has the board asked that in the

24   past?

25        A.    I have no idea.  I don't know.

1      Q.    So what gives you the impression

2   that the board can ask for a report specifically

3   about the task force?

4      A.    They could ask about anything that

5   the Board of Health does and its activities.

6      Q.    So there's nothing in particular

7   that comes to mind about this being done in the

8   past -- let me rephrase that.

9           There's nothing in particular that

10  comes to mind about the Board of Health asking

11  for information about task force-related

12  opportunities or operations?

13     A.    Again, I've only been involved this

14  year, so I only know my role, and I haven't been

15  asked to be involved in that capacity.  My

16  supervisor may have been.  And I don't know what

17  has happened in the past.

18     Q.    You mentioned that the Board of

19  Health can ask for reports on what the task

20  force is doing.  How would that happen?

21          MS. QUEZON:  Object to the form.

22     A.    To be honest with you, I'm not very

23  involved with board meetings or board members,

24  so I don't know the answer to that.  I don't

25  know how that would happen.  I don't know how

1   they communicate with the commissioner.  I have

2   no idea.  I'm not that important yet.

3        Q.    So what is your -- what is the basis

4   for your statement that the Board of Health can

5   ask for these kinds of reports?

6        A.    Well, because they serve on the

7   board to serve a purpose as far as making sure

8   they agree with directions that the Board of

9   Health is taking, so if they heard of the task

10  force and heard something they were doing that

11  they agreed or didn't agree with, they could ask

12  can I get kind of a summary of what you guys

13  have been doing for the past year.

14       Q.    And that's part of their

15  responsibility?

16       A.    Sure.

17       Q.    And it's important for the Board of

18  Health to make sure that CCBH is acting

19  appropriately?

20            MS. QUEZON:  Object to the form.

21       A.    Again, I can only speak to anything

22  that I've had to do with anything with the

23  board, which is nothing.  My supervisor may have

24  had more conversations with the board or the

25  health commissioner.  I've -- I've never been in

1  that role.

2       Q.    Has Vince Caraffi ever told you that

3  he speaks with board members?

4       A.    No, not specifically about this.

5  The only time that we're asked to go to a board

6  meeting is if we've been awarded a grant, they

7  have to submit the budget, we would provide a

8  narrative, and then you have to describe what

9  the project is.

10      Q.    And has that happened?

11      A.    It will happen this month.

12      Q.    How do you know?

13      A.    Because I have to go to the board

14  and describe the crisis funding that we were

15  awarded.  I also have to describe our ACEs

16  funding that we were awarded.

17      Q.    So did the board reach out to you to

18  tell you that they need you to present at the

19  meeting?

20      A.    No.  It only occurs as a formality

21  because you're establishing a budget.

22      Q.    And what will you do to prepare for

23  this meeting with the board?

24      A.    I provided a summary of both grants

25  and I'll basically read the summary to the board

1    and answer questions that they have.

2         Q.    When did you provide -- when did you

3    draft that summary?

4         A.    Sometime this month.

5         Q.    And you still have a copy of that

6    summary?

7         A.    Yes, somewhere.

8              MR. BOEHM:  I just want to state for

9    the record that the lunch has arrived, so

10   whenever you all --

11             MS. QUEZON:  Listen, we can do --

12   however you want to do this.  Whenever you all

13   want to take a lunch is fine.  I would love to

14   make it as short as possible, simply because I

15   was wrong about my flight time and my 6-year-old

16   has a Christmas program that I have to be in

17   town for tomorrow morning.  Now, I might be able

18   to have somebody come take over for me, so,

19   again, I don't want to rush you, but the more

20   condensed is better for me, if that's okay with

21   you guys, too.

22             MR. BOEHM:  I don't think we need a

23   super long lunch, but we'll just have to see how

24   it goes.  What do you all want to do, though, in

25   terms of timing?

1                MS. QUEZON:  I'm going to leave that

2    up to Brad.

3                MR. BOEHM:  Brad, let us know when

4    you're ready --

5                MR. MASTERS:  Sure.

6                MR. BOEHM:  -- keeping in mind that

7    I didn't get breakfast.

8                MR. MASTERS:  I lost my train of

9    thought, so let's take a break here.

10               THE VIDEOGRAPHER:  Off the record,

11   12:43.

12

13                  (Luncheon recess had.)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  On the record,

2     1:44.

3                    - - - - -

4               AFTERNOON SESSION

5        CONTINUED EXAMINATION OF APRIL R. VINCE

6     BY MR. MASTERS:

7          Q.    Welcome back.

8          A.    Thank you.

9          Q.    When did you hear about the

10    opportunity to work as program manager and

11    project director of the IPP Grant?

12         A.    Of the Injury Prevention grant?

13         Q.    Yes.

14         A.    Probably when it was posted.

15         Q.    And do you recall around when that

16    was?

17         A.    I know it was sometime in 2017, but

18    I don't know the exact date.

19         Q.    Why were you interested in this

20    position?

21         A.    This position?  I will disclose that

22    I have seen it personally in my family, people

23    who have been affected by this epidemic.  I've

24    seen it destroy lives.  I've seen it destroy

25    relationships.  I feel very passionately about

Page 163

1   helping to get those in treatment that need

2   treatment and end this epidemic.

3        Q.    When did your personal experience

4   with drug abuse in family members happen?

5        A.    About ten years ago.

6        Q.    About ten years ago?

7        A.    It started.

8        Q.    Was that -- was that someone in your

9   immediate family?

10        A.    I'm not going to disclose that.

11   It's a family member.

12        Q.    Was that someone in your immediate

13   family?

14        A.    I don't need to offer that

15   information.

16             MR. MORIARTY:  I'm having a little

17   bit of trouble hearing.

18        A.    I said I'm not going to disclose if

19   it's immediate family or not.  I said it was a

20   family member.

21             MR. BOEHM:  On what basis are you

22   not going to disclose that information?

23             THE WITNESS:  Privacy.

24             MR. BOEHM:  Respectfully, you raised

25   the issue.

1              THE WITNESS:  Right.  And I said it

2    was a family member, and that's as far as I'm

3    willing to go with that answer.

4              MR. BOEHM:  Just create a record.

5         Q.    Again, counsel has not instructed

6    you not to answer the question, correct?

7         A.    No.

8         Q.    And --

9         A.    That's respect for my family.

10        Q.    Right.  So who in your family had

11   this problem with drug abuse?

12        A.    I'm not going to answer that

13   question out of respect for my family.

14        Q.    Let me ask that a little bit

15   differently.

16             Who in your family was affected by

17   drug abuse?

18        A.    As you know, or you might know, that

19   addiction is a family disease, so all of our

20   family was affected by it.  Anyone who that

21   person's life touched was affected by it.

22        Q.    And who was that person?

23        A.    I'm not going to disclose that

24   information.

25        Q.    And what substance was this person

                                              Page 165

1    addicted to?

2         A.    I don't know.  I don't have records

3    to their medications.

4         Q.    Was it an opiate?

5         A.    I don't know.

6         Q.    Was it cocaine?

7         A.    I don't know.

8         Q.    But you indicated that this personal

9    experience was motivation for joining the opiate

10   task force?

11        A.    It wasn't motivation for joining the

12   task force.  It was one of the driving factors

13   as to why I feel passionately about the epidemic

14   at hand.

15        Q.    Was the substance a prescription?

16        A.    I don't know.  I'd have to get

17   records of their medications.  I don't know, to

18   be honest with you.  I will state that I

19   believed that they had some kind of a painful

20   condition where they were prescribed a

21   medication.  That's all I do know.

22        Q.    So they were prescribed a medication

23   for their painful condition?

24        A.    Correct.

25        Q.    And is that the substance that the

Page 166

1   person became addicted to?

2          A.     I don't know.  It started somewhere,

3   but I don't know if that's the substance they

4   were addicted to.  I can't answer that.

5          Q.     You never spoke with this family

6   member about the nature of their addiction?

7          A.     No.

8          Q.     You never asked this person what

9   they were addicted to?

10         A.     No.

11         Q.     It was never revealed to you by

12  another family member what this person was

13  addicted to?

14         A.     No.

15         Q.     But it began with a prescription to

16  treat a painful condition?

17                MS. QUEZON:  Object to the form.

18         Q.     I'll withdraw the question.

19                So you have -- do you have an idea

20  whether this prescription for the painful

21  condition had anything to do with the addiction?

22         A.     I don't know.

23         Q.     You don't know?

24         A.     No.  I never spoke with the

25  individual about it.  I don't know.

1          Q.     Have you ever been prescribed

2    medication for a painful condition?

3          A.     Yes.

4          Q.     Have you ever been prescribed an

5    opioid?

6                 MS. QUEZON:  Objection --

7          A.     Yes.

8                 MS. QUEZON:  -- to the form.

9          Q.     Did you become addicted?

10         A.     No.

11                MS. QUEZON:  Object to the form to

12   the last question.

13         Q.     When were you prescribed an opioid?

14         A.     About seven weeks ago I had foot

15   surgery.

16                MS. QUEZON:  Object to the form to

17   the last question.

18         Q.     How many dosages or how many pills

19   were you prescribed?

20                MS. QUEZON:  Object to the form.

21         A.     I have to be honest, I can't

22   remember.  I filled it.  I didn't take all of

23   them.  It didn't do anything as far as my pain

24   so I took ibuprofen instead.

25         Q.     But you did take some of them?

Page 168

1          A.     Um-hum.

2                 MS. QUEZON:  Object to the form.

3                 Can I get a standing objection to

4   all questions regarding her personal

5   prescriptions?

6                 MR. MASTERS:  Sure.  That's fine.

7                 MS. QUEZON:  I mean, I can keep

8   objecting.

9                 MR. MASTERS:  That's fine.

10         Q.     What medication were you prescribed?

11         A.     I think it was oxycodone.

12         Q.     And how many oxycodone pills were

13  you prescribed?

14         A.     Again, I'd have -- I'd have to look

15  at the prescription bottle because I knew that I

16  didn't want to take them.  I knew that I

17  wouldn't have to take all of them.  I had had

18  the foot surgery before, so I knew kind of the

19  process of healing and recovery and what kind of

20  pain I would have.  So I didn't even look at how

21  many were in there because I didn't take all of

22  them.  I took it for maybe two days.

23         Q.     How many pills did you take?

24         A.     Maybe six, eight.

25         Q.     Who is your healthcare provider?

```
                                                 Page 169
 1                  MS. QUEZON:  Object to form.
 2          A.     In what capacity?
 3          Q.     Who is your prescribing physician?
 4          A.     The prescribing physician for that
 5   specific surgery?
 6          Q.     Right.
 7          A.     I'm not going to say her name
 8   correctly.
 9          Q.     The prescribing physician who
10   prescribed you the oxycodone.
11          A.     Why does that matter?  I'm just
12   curious.
13          Q.     Respectfully, I --
14                  MR. BOEHM:  The question is pending.
15   Go ahead.
16                  MS. QUEZON:  It's up to you whether
17   to answer private medical information.
18          A.     I'd rather not say just for her
19   privacy.  I don't think it has relevance.
20          Q.     Did you get this filled at a
21   pharmacy?
22          A.     Yes.
23          Q.     Which pharmacy did you fill this
24   prescription at?
25          A.     At a CVS pharmacy.
```

Page 170

1          Q.     Which CVS?

2          A.     I don't think that matters.

3          Q.     I'll ask again.  Which CVS did you

4     fill this prescription at?

5          A.     I don't think I have to answer.  I

6     don't think it matters.  It's my private

7     information.

8                 MR. BOEHM:  Respectfully, counsel --

9                 MS. QUEZON:  I'm not instructing.

10    There's no HIPAA waiver here.  There's -- I

11    mean, she's answered questions that I don't even

12    think she has to answer, but I'm not instructing

13    her not to.  This is up to her, what she wants

14    to -- what information she wants to give you

15    about her private medical conditions.

16                MR. BOEHM:  I didn't even get to say

17    anything before you --

18                MS. QUEZON:  I'm sorry.  I

19    apologize.

20                MR. BOEHM:  It's okay.

21                MS. QUEZON:  But I don't know why

22    you're directing --

23                MR. BOEHM:  Because I don't want to

24    direct it at the witness, right.  If you'd like

25    me to, I will, but that's not my practice.

1            MS. QUEZON:  That's fine.

2            MR. BOEHM:  The only point I'm going

3    to make is with respect to the specific question

4    that was pending, that -- where did she fill the

5    medication, number one, the witness doesn't get

6    to choose what's relevant, and then, on that

7    basis, choose not to answer questions.  That one

8    in particular doesn't implicate any privacy

9    consideration.

10           MS. QUEZON:  Listen.  She doesn't

11   have a case pending.  She is not a plaintiff

12   suing the Defendants.  She is not here in her

13   personal capacity.  She didn't have to answer

14   any of those questions in my opinion.  She chose

15   to.

16           MR. BOEHM:  She raised it.

17           MS. QUEZON:  No, she didn't raise

18   it.

19           MR. BOEHM:  She did.

20           MS. QUEZON:  No.  You asked whether

21   or not she had ever taken an opioid before, and

22   she answered it honestly, and at that point I

23   don't think she had to.  She is not a plaintiff

24   here, as you know.  She has not waived her HIPAA

25   rights.

Page 172

1          MR. BOEHM:  We would just ask you to
2    maybe indicate to the witness, to the extent
3    this is an issue, that there's no HIPAA
4    consideration with respect to where she, as far
5    as I know -- especially when she's the one who's
6    providing testimony about this, about where she
7    filled a particular prescription.  If you don't
8    want to, that's fine.  I'm just asking.  I
9    didn't want to direct it right at the witness.
10          MS. QUEZON:  No.  I respect that and
11    I thank you for that.
12          In this particular instance, this is
13    her own personal health information, and she has
14    the right to divulge or to refuse to divulge any
15    of her own personal health information in that
16    she's not bringing a claim from a personal
17    perspective against the Defendants.  So I'm not
18    going to instruct her in any way.  She can make
19    her own decisions about what she wants to reveal
20    or refuse to reveal regarding her own personal
21    medical conditions, who her pharmacist is, who
22    her physicians are.  That is up to the witness
23    to make those decisions.
24    BY MR. MASTERS:
25          Q.    Which CVS did you fill your

Page 173

1  prescription at?

2          A.    One in the Cleveland area.

3          Q.    One in the Cleveland area?

4          A.    Um-hum.

5          Q.    Do you know the address of that CVS?

6          A.    Again, I'm going to reiterate that

7  I'm not going to provide that information.

8          Q.    Do you intend, if called upon at

9  trial, to testify about your use of prescription

10 opioids?

11         A.    Sure.  I can testify.

12         Q.    About your own personal use of

13 prescription opioids?

14         A.    That were prescribed for a medical

15 procedure?

16              MS. QUEZON:  If she's asked and the

17 Court instructs her to answer, she'll answer any

18 questions asked of her.  She isn't -- we do not

19 intend to call this witness and get into her own

20 personal prescriptions or medical conditions in

21 any way, shape or form.

22         Q.    Would you -- if called upon at trial

23 to testify about your family's experience with

24 substance abuse, would you testify about that?

25         A.    No.

1          Q.     Did you share the fact that your

2     family has experience with substance abuse with

3     CCBH when you applied for the job?

4          A.     No.

5          Q.     Do you think that your doctor

6     shouldn't have prescribed you that opioid?

7                 MS. QUEZON:  Object to the form.

8          A.     I'm not a doctor, so that would be

9     up to the doctor to decide that.

10         Q.     So this was the doctor's discretion

11    to prescribe you the opioid?

12                MS. QUEZON:  Object to the form.

13         Q.     Do you think that the doctor

14    shouldn't have prescribed you this opioid?

15                MS. QUEZON:  Object to the form.

16         A.     Again, I'm not a doctor, so I

17    don't -- I can't answer that question if they

18    should or shouldn't.

19         Q.     Let me ask it again.  Do you think

20    that the prescribing physician you went to

21    shouldn't have prescribed you oxycodone to

22    recover from your foot surgery?

23                MS. QUEZON:  Object to form.

24         A.     Again, I'm not a doctor.  It's up to

25    the doctor to make that decision on a

Page 175

1    case-by-case basis.

2        Q.    When the doctor prescribed oxycodone

3    to you, did that raise any concerns --

4              MS. QUEZON:  Object to the form.

5        Q.    -- to you?

6              MS. QUEZON:  Same.

7        A.    I mean, I'm more aware of things

8    being a problem for people because of the nature

9    of my job.  I wouldn't say that it caused

10   concern of any kind.  I mean, I'm just aware of

11   it because of the nature of my job.

12       Q.    So when you went and filled the

13   prescription, you did that because you thought

14   that was an appropriate thing to do under your

15   circumstances?

16       A.    That's what I was instructed to do

17   by the physician, correct.

18       Q.    You could have chosen not to fill

19   the prescription?

20       A.    Correct.

21       Q.    But you chose to because your

22   physician told you to do it and you thought that

23   that was appropriate?

24       A.    Um-hum.

25             MS. QUEZON:  Object to the form.

1              MR. BOEHM:  You got to say yes or
2    no.
3         A.    Yes.
4              MR. BOEHM:  You've been doing a good
5    job with helping her a lot.
6              MS. QUEZON:  Sorry.  I'm a little on
7    the objections to form right now, but I will try
8    to help her.
9         Q.    So you applied for the job that
10   Allisyn Leppla had vacated because -- in part
11   because of your family's history with substance
12   abuse.  Were there any other reasons that
13   motivated your application?
14             MS. QUEZON:  Object to the form.
15        A.    Sure.  I wouldn't say motivated my
16   application.  I would say at the Cuyahoga County
17   Board of Health there's many different programs
18   you can work in.  I've worked in several.  And
19   this was another area of interest where I saw
20   that I could have personal growth.  So that's
21   another reason why.
22        Q.    What kind of personal growth did you
23   see?
24        A.    Well, professional growth I should
25   say.

1      Q.    What kind of professional growth did
2  you see?
3      A.    It was also a promotion.
4      Q.    It was a promotion.  Was that all
5  the professional growth that you foresaw?
6      A.    No.  Obviously I knew -- I mean, I
7  like to learn, so I knew this was going to be a
8  completely different area than I've ever worked
9  in, so I knew there was going to be a lot of
10  learning.  I was looking forward to that as
11  well.
12      Q.    Who else was under consideration for
13  this position?
14      A.    I don't have privilege to that
15  information.
16      Q.    So you don't know anybody else that
17  was being considered for this job?
18      A.    That information wasn't shared to me
19  by CCBH HR staff.
20      Q.    Let me ask another way.
21            Have you learned who else was being
22  considered for that position?
23      A.    I know one other internal candidate
24  that was considered for the position, yes.
25      Q.    And who was that?

1          A.     Becky Karns.

2          Q.     Who is she?

3          A.     She's a data analyst at the Board of

4     Health.

5          Q.     And what role was she in at the time

6     that this position opened up?

7          A.     I'm not sure.  I just know her title

8     is data analyst.

9          Q.     Did you know her at the time?

10         A.     We worked on work site wellness

11    together, but that's the only capacity.

12         Q.     What is work site wellness?

13         A.     It's another committee that I help

14    chair at the Board of Health.  Basically we try

15    to establish work site wellness activities for

16    our staff to better morale, like water

17    challenges, exercise challenges, things like

18    that.

19         Q.     Do you know if Becky Karns had prior

20    experience working in the opioid-related field?

21         A.     No, I don't know that.

22         Q.     Do you know why you were selected?

23                MS. QUEZON:  Object to the form.

24         A.     You would have to ask the people who

25    interviewed me that question.  I don't know why.

                                    Page 179

1   That wasn't shared with me.

2        Q.    No one ever told you why you were

3   selected to fill the position?

4        A.    No.

5        Q.    Do you have an idea why you were

6   selected to?

7             MS. QUEZON:  Object to form.

8        A.    I'm assuming most qualified, but I

9   don't know the answer to that.

10       Q.    Most qualified based on what?

11       A.    Whatever their needs were, whatever

12  they had in mind that they foresaw the person

13  filling that position.  Again, you would have to

14  speak to the people that interviewed me.

15       Q.    And what did you understand the

16  needs of the position to be?

17       A.    I would, again, have to look at the

18  posting.

19       Q.    So sitting here today, you have no

20  recollection of what the needs of the position

21  were and the purpose of filling that position?

22       A.    No.  The posting is very general and

23  generic to a program manager position.  Applying

24  for the position you may not even know that you

25  were applying for an opioid grant.  It's very

Page 180

1   generic.

2          Q.     Did you know you were applying for

3   an opioid-related grant?

4          A.     I knew that because I knew because

5   Allisyn was leaving the position.  That was the

6   only program manager position open possible at

7   CCBH, so that's the reason why I knew.

8          Q.     And when did you become the Cuyahoga

9   County Opiate Task Force co-chair?

10         A.     October of this year.

11         Q.     And how did that come about?

12         A.     Because my supervisor stepped down.

13         Q.     Your supervisor, Mr. Caraffi?

14         A.     Correct.

15         Q.     Why did he step down as chair?

16                MS. QUEZON:  Object to the form.

17         A.     He -- that wasn't shared with me.  I

18   don't know why.

19         Q.     So you have no understanding of the

20   circumstances of his departure?

21         A.     Absolutely not.

22         Q.     Is he still employed at CCBH?

23         A.     Yes.

24         Q.     Was this something that you applied

25   for?

Page 181

1          A.     Yes.

2          Q.     Who did you apply -- to whom did you

3    send your application?

4          A.     The HR department.

5          Q.     Was anyone else under consideration

6    for this position?

7          A.     Well, I just stated that I knew that

8    Becky Karns was.  I believe that there were

9    other people under consideration as well.

10         Q.     Sorry.  I was speaking specifically

11   about the Cuyahoga County Opiate Task Force

12   co-chair position.

13         A.     Oh.

14         Q.     Let me back up.

15                Did you apply to become the co-chair

16   of the task force?

17         A.     No.

18         Q.     How did you -- how did that come

19   about?

20         A.     Well, basically, my supervisor

21   stepped down and I had to step forward because

22   it's one of our deliverables that had to be met,

23   so I had to step forward to do that.

24         Q.     Who asked you to step forward to do

25   that?

Page 182

1          A.     My supervisor.

2          Q.     Did he ask anyone else to step

3    forward?

4          A.     Well, we reached out to the ADAMHS

5    Board, since now they're technically the hub of

6    the task force.

7          Q.     So in your position as co-chair, the

8    other co-chair is the ADAMHS Board person?

9          A.     Correct.

10         Q.     Is this a job that you take

11   seriously?

12         A.     Sure.

13         Q.     Do you view the Cuyahoga County

14   Opiate Task Force as an important entity?

15         A.     Yes.

16         Q.     Why do you view it as an important

17   entity?

18         A.     Well, from my limited experience

19   with the task force this year, in the three

20   meetings that I've attended, I can see the

21   camaraderie and the relationships that it has

22   built, so I think that's important to the

23   community.

24         Q.     Why is the camaraderie and the

25   relationships that it has built important to the

Page 183

1   community?

2        A.    I think, as we all know, if we work

3   in a fragmented approach to anything, you're not

4   going to get anything done, but if you work

5   collectively together, you accomplish a lot more

6   so you don't duplicate resources.

7        Q.    Accomplish what kinds of things?

8        A.    Anything from education and

9   awareness around opiate use, treatment for

10  individuals, trainings that may occur we can

11  share with one another so we make sure that the

12  community is aware of the trainings that are

13  available.

14       Q.    And would you say that your position

15  as co-chair is an important one in this

16  organization?

17       A.    It's an important one as part of

18  this grant.

19       Q.    Is being co-chair of the Cuyahoga

20  County Opiate Task Force -- strike that.  Let me

21  rephrase.

22            Do the duties you've undertaken as

23  chair -- as co-chair of the Cuyahoga County

24  Opiate Task Force -- is co-chair an important

25  role on the task force?

1          A.     Yes.

2          Q.     Why is it important?

3          A.     Because me, along with the ADAMHS

4    Board member, again, being new to the role, it's

5    my understanding that they help direct

6    information that is shared at the task force

7    meetings.

8          Q.     So because the task force itself is

9    important, your role is important in

10   accomplishing the goals of the task force?

11         A.     Correct.  And again I will say the

12   task force is a group of individuals doing very

13   important things on their own, not related to

14   our deliverables within the grant.  This is a

15   very small piece of my job.  I know that it's a

16   big focus for this conversation.  It's a very

17   small piece of my job.

18         Q.     Do you feel you have a duty to the

19   citizens of Cuyahoga County to function

20   effectively as a co-chair of the Cuyahoga County

21   Opiate Task Force?

22               MS. QUEZON:  Object to form.

23         A.     Absolutely.

24         Q.     Have you undertaken to -- what duty

25   do you owe to the citizens of Cuyahoga County as

Page 185

1  co-chair?

2              MS. QUEZON:  Object to form.

3       A.    Again, since I'm very new to the

4  role, I'm learning what my duty is.  It's not

5  written anywhere.  It's not described anywhere.

6  It's happened organically from people who have

7  chaired the task force in the past, and I'm

8  stepping into a position that I'm new to and I'm

9  learning, so I'm learning what that

10  responsibility is.

11      Q.    To clarify, you indicated that you

12  absolutely have a duty to the citizens of

13  Cuyahoga County as co-chair of the opiate task

14  force.  What do you understand that duty to be?

15             MS. QUEZON:  Object to the form.

16      A.    I understand it right now, again,

17  being new to the position and learning what my

18  role is, is convening all of these very

19  passionate people, who are very passionate about

20  this epidemic, and many family members who have

21  lost sons and daughters, that get together, talk

22  about what's going on in the community, share

23  information, and make more awareness to

24  hopefully end this epidemic.

25      Q.    And that's an important job and

Page 186

1   something that you think requires the best of
2   your abilities?
3                MS. QUEZON:   Object to the form.
4        A.    It requires me to help co-chair,
5   yes, and get information to the public.
6        Q.    Have you undertaken, as co-chair or
7   in your current role as Injury Prevention
8   program manager, to understand when opiate abuse
9   became a public health crisis in Cuyahoga
10  County?
11               MS. QUEZON:   Object to the form.
12       A.    Could you repeat that again?
13       Q.    Have you undertaken to understand
14  when opiate abuse became a public health crisis
15  in Cuyahoga County?
16               MS. QUEZON:   Same objection.
17       A.    To pinpoint a particular date, a
18  particular year, I mean, I'm aware of the
19  governor declaring it a crisis last year.  I'm
20  aware of the president declaring it a public
21  health emergency last year.  That's the
22  information that I've gathered.  I know that,
23  looking at the medical data -- when I'm trying
24  to see any kind of what's going on here, I look
25  at the medical data from the medical examiner's

Page 187

1    office, and if I look at 2015 to 2016, it looks
2    like there's a huge spike in overdose deaths,
3    which again, I'm not a statistician, I'm not an
4    epidemiologist, I can't make any inferences as
5    to exactly what that means, but that looks like
6    that's not a good thing to me if there's an
7    increase in deaths due to drugs.
8         Q.    So we talked earlier about the
9    creation of the task force, and you said it was
10   created in 2010; is that right?
11              MS. QUEZON:  Object to the form.
12        A.    That's what I read was in the
13   report.
14        Q.    Do you know why the task force was
15   created in 2010?
16              MS. QUEZON:  Object to the form.
17        A.    No, I do not.
18        Q.    As your -- in your capacity as
19   co-chair of the task force, have you undertaken
20   to understand the origins of the task force?
21        A.    Origins being as to why it was
22   established?
23        Q.    Yes.  Let me ask it again.
24              As co-chair of the task force, have
25   you made any effort to understand why the task

1  force was created in 2010?

2       A.    Yes.  With my limited knowledge

3  again, I believe it was through some initiative

4  called "Prescription for Safety" or something

5  like that.  I don't know the name.  It was some

6  initiative back in 2010 that was set forth by

7  some entity I'm not aware of.  That's all the

8  knowledge I have.

9       Q.    So the task force was created

10  through this Prescription for --

11       A.    I think it was Prescription for

12  Knowledge or something like that.

13       Q.    Prescription for Knowledge program.

14  And you don't know anything more than that?

15       A.    No.  To be honest with you, it is my

16  job -- again, I have very limited time.  I agree

17  that it's important, but I'm one person, that

18  can do all these deliverables and make sure

19  their sub-grantees meet all of their

20  deliverables -- it's a huge undertaking, so --

21            MS. QUEZON:  Slow down a little bit.

22       A.    I do feel like it's important -- now

23  I lost my train of thought.

24            MS. QUEZON:  Do you want to ask the

25  question again?  I apologize.

Page 189

1          MR. MASTERS:  Sure.  I'll move on.

2          MR. BOEHM:  Her brain only goes at

3   one speed.

4          MR. MASTERS:  I wish my brain went

5   at that speed.

6      Q.    But you do understand that there was

7   an initiative in 2010 that led to the creation

8   of the task force?

9      A.    That's what I have read.

10      Q.    So based on what you understand

11   about the history of the task force, do you have

12   an idea, a view about when opioid abuse became a

13   public health crisis in Cuyahoga County?

14          MS. QUEZON:  Object to the form.

15      A.    Again, I'll just restate what I

16   stated earlier, is I know that the task force

17   was established in 2010.  I don't know the

18   purpose or what they were doing or what kind of

19   initiatives they took.  I have no idea.  I have

20   done my research as far as the past couple of

21   years, because I just took the position in 2018,

22   to be aware of, okay, what's happened the last

23   couple years.  That's my time frame I'm looking

24   at.  I don't have time to go back eight years

25   and research all of the history.  So I've

Page 190

1    researched the most recent, and, again, going

2    back to '15 to '16 was the most recent trend I

3    saw as far as overdose deaths, so, to me, that

4    was more of an alarming trend in '15, '16.

5        Q.    Have you undertaken an effort to

6    understand why opiate abuse became a public

7    health crisis in Ohio?

8            MS. QUEZON:  Object to the form.

9        A.    Have I taken time to understand why

10   it's become a crisis in Ohio?  I've definitely

11   tried to research, you know, what kind of trends

12   could possibly be happening, why Ohio.  And,

13   again, I'm not a professor, I'm not a

14   researcher.  I can't give an astute answer as to

15   as far as exactly why.  I don't think there's

16   one reason.  There's many facets of the epidemic

17   that have played a role.

18       Q.    As co-chair of the Cuyahoga County

19   Opiate Task Force, do you know who is

20   responsible for putting information on the task

21   force website?

22       A.    So prior to me being in the

23   position, I believe that the website was pretty

24   stagnant.

25            There's two websites.  We have our

Page 191

1   CCBH website, where we house an opiate task
2   force opiate page, and then there's the Cuyahoga
3   County Opiate Task Force.  That page was created
4   before I was part of the program.  That was
5   my -- the person who worked on it before me
6   would upload that information.  I had a very
7   hard time -- it was the county executive's
8   office who created that page, it was my
9   understanding.  We had no part in creating that
10  page.  So it wasn't handled for a very long
11  time, until recently.  I finally got in contact
12  with their IT department, which finally returned
13  my calls, and we were able to upload, I think,
14  the two most recent reports.  So I work in
15  coordination with their IT department now trying
16  to get updated.
17          Q.    And just to be clear, the website
18  you were just talking about, the one that you've
19  been working with the IT department to get
20  access to, is which website?
21          A.    The Cuyahoga County Opiate Task
22  Force website created by the executive's office.
23          Q.    And now you have access to that
24  website?
25          A.    I do not have access to it.  I

1    cannot do anything to it.  If I want something

2    changed, I have to e-mail their IT department

3    and request that it be uploaded by them.

4         Q.    Which you have done?

5         A.    Yes.

6         Q.    Describe for me what information you

7    asked them to upload.

8         A.    I asked them to upload the 2017

9    dissemination plan because the last thing that

10   was uploaded was 2016.  I asked them to

11   integrate -- and I can't remember exactly what

12   page it is on there -- a Narcan distribution

13   map, that our data analyst created, where people

14   can interact and see where they can find Narcan

15   that's available at pharmacies.

16              There was outdated data on two of

17   the pages.  One was a graph by the medical

18   examiner's office that I asked them to update

19   and one was data from 2017 that would be more

20   reflective of current data.  I think they had

21   2013 or '14 data on there.

22        Q.    So it sounds like you went through

23   the website, reviewed it, and made sure it was

24   all up to date and accurate; is that fair?

25        A.    Yeah.  To the best of my knowledge,

                                              Page 193

1    yes.

2         Q.    Is it important that that website

3    reflect accurate information?

4              MS. QUEZON:  Object to the form.

5         A.    I'll reply with saying I am working

6    on getting it to be reflective of correct

7    information.  It's not all-inclusive at this

8    point.

9         Q.    Is it important that the website

10   convey accurate information to the public?

11        A.    Yes.

12        Q.    What information on the website is

13   not currently accurate?

14        A.    I would have to look at it.

15             MS. QUEZON:  Object to form.

16        A.    I can't say off the top of my head.

17   I didn't create it so it's hard for me to know

18   organically what is not up to date.  I'm in the

19   process, literally as we speak, of going through

20   it, combing through it, updating it with the IT

21   department.

22             MS. QUEZON:  Not this second.

23        A.    Not this second, but currently, this

24   month.

25        Q.    And that is your role as co-chair?

Page 194

1          A.    That's not my role as co-chair.  I
2    am taking that role on because I feel it's
3    important.  I wasn't told by anybody to do it.
4    It sat stagnant for a year and I looked at it
5    and said this needs to be updated, so I am
6    taking the initiative to update it.
7          Q.    And sitting here today, you can't
8    think of anything in particular that is
9    inaccurate about the website?
10         A.    Again, I would have to look at it,
11   because I just updated those two pages in that
12   map.  I know that there's more to be updated.
13         Q.    What pages have you looked at?
14         A.    I would have to look at the website.
15   I can't tell you off the top of my head.
16         Q.    Have you looked at the entire
17   website?
18         A.    I've looked at -- I think I have.
19   Again, I didn't create it so maybe there's
20   facets to it that I don't know, but I clicked on
21   every tab that was there and looked at it.  I
22   haven't had time to have a very comprehensive
23   look at it.  I'm the only person doing all of
24   these deliverables and making sure they all get
25   done.

1      Q.    So you clicked on each tab and read

2  the page to see if it was accurate.  Is that a

3  fair description?

4      A.    Yes.  And the most important pages

5  that I thought needed updated, I tried to do as

6  soon as I could.

7      Q.    So there was some information that

8  was very important that was inaccurate and

9  that's the information that you updated with the

10  IT department at the county?

11      A.    I won't say that.  I will say I

12  updated the information that I had available

13  that was most recent.  There might be other

14  information on there that's old that isn't

15  updated that I don't have the data yet so it's

16  not updated.

17      Q.    When you say you provided an update

18  to the county, was that to correct inaccurate

19  information or out-of-date information?

20      A.    Out of date.

21      Q.    So, for example, you mentioned

22  reports from the medical examiner were out of

23  date?

24      A.    There was a graph.

25      Q.    And what did that graph discuss?

1        A.    I can't say off the top of my head.

2   Again, I'd have to look at it.  There's many

3   graphs that I review.  I can't remember that

4   specific graph and what it stated.

5        Q.    Why was it out of date?

6        A.    Because the date was 2013 or '14 and

7   I knew that there was probably more recent data

8   out there that the medical examiner had.

9        Q.    Other than the information that is

10  out of date that you've identified, in your

11  review of the Cuyahoga County Opiate Task Force

12  website have you seen anything that was

13  inaccurate?

14       A.    Well, again, it was created by

15  someone else, so I can't make a stance on that.

16  And, again, me not being the person that created

17  it or knowing what they meant by what they were

18  saying, I can't say that.  I don't know if it

19  was inaccurate or not because I didn't create

20  it.

21       Q.    But you reviewed it, right?

22       A.    I looked at the pages that needed to

23  be updated.

24       Q.    You said you clicked on each tab?

25       A.    Well, I did, yes.  I didn't read it

                                                      Page 197

1    thoroughly.  I specifically looked at the most

2    recent data, because that's what I had time to

3    do that day.

4          Q.    So you looked at the tab and then

5    you read the page and then you provided an

6    update if some of the information was out of

7    date, correct?

8          A.    Correct.

9          Q.    In those pages that you reviewed,

10   was there any information that you saw that was

11   inaccurate?

12         A.    Again, I'll restate.  I don't know

13   because I didn't create the narrative for what

14   was on the platform.  I only updated the graphs

15   that were out of date.  So it's not my place to

16   say if it's inaccurate or accurate.  I wasn't

17   the person that put it up there in the first

18   place.

19         Q.    You reviewed the information, right?

20         A.    Sure.

21         Q.    You read it, right?

22         A.    I specifically looked through each

23   tab, and as I stated, what stood out to me the

24   most that was most high on my priority was the

25   fact that it had been sitting stagnant for a

1    year.  I knew there was data that was most

2    recent.  So I sent the data that was most

3    recent, the graphs that I had.  As far as the

4    other narrative, I did not specifically word for

5    word comb through to make sure that it was

6    accurate.  I am, again, in the process of

7    working with their IT department to do that

8    currently.

9         Q.    And so far in the review process

10   have you found anything that is inaccurate?

11        A.    So far in my review process, the

12   furthest I've gotten, because I just recently

13   gained access to their IT department, is the

14   graphs.

15        Q.    But you've had access to the website

16   for longer than you've had access to the IT

17   department, right?

18        A.    No.

19        Q.    You can access the website on the

20   internet?

21        A.    I can look at it.

22        Q.    And you can review the content

23   that's on the internet?

24        A.    I did not.  I did not have time to

25   do that because of everything else I was tasked

Page 199

1   with.  That was low on my priority, to be honest

2   with you.

3        Q.    So until recently, you didn't

4   undertake an effort to read what was listed on

5   the Cuyahoga County Opiate Task Force website?

6        A.    I did make an effort, and I did that

7   initially with my job.  I realized that things

8   were out of date again, so it took me months to

9   gain access to the executive's office IT

10  department for them to respond to me to where

11  now I can give them updated information, which I

12  am doing.

13       Q.    And so far in whatever review you've

14  been able to do, have you determined that

15  anything on the website was inaccurate?

16       A.    I will state once again, in my

17  review of the documents, I was looking

18  specifically at the data because it's very

19  important to get the correct data out, and

20  updated data.  So that's what I updated with the

21  IT department.  I am currently, this month,

22  reviewing, combing over the pages, to update any

23  information on the other pages.  There's no

24  other way I can word it.

25       Q.    You mentioned there were two

Page 200

1   websites?

2          A.    Yes.

3          Q.    What is the other website?

4          A.    It's under CCBH.net.  It's our

5   Cuyahoga County Board of Health website.

6          Q.    And who maintains the content on

7   that website?

8          A.    We contract with a web team and they

9   maintain the contact.  We have to go through

10  them to get things uploaded to our website.

11         Q.    They upload the content that you

12  guys provide, so who is responsible for

13  providing content to them?

14         A.    Staff at the Board of Health.

15         Q.    Does that include you?

16         A.    Yes.

17         Q.    Who else does it include?

18         A.    Every single staff member at the

19  Board of Health.  If they need an update to

20  their program that they work in, they literally

21  have to take that -- it's a queue that they call

22  it.  We have to e-mail that to our communication

23  and marketing director as well as the

24  epidemiology director.  They have some Excel

25  spreadsheet that has these queues of requests

1    that need to be updated to our website.  And I

2    don't know how they prioritize what gets done

3    and what doesn't.  We make the request, we

4    provide the information, and then we wait for

5    that to be updated on our website.

6         Q.    To be specific, with respect to the

7    opiate task force portion of the CCBH website

8    that you mentioned earlier --

9         A.    Um-hum.

10        Q.    -- who is responsible for providing

11   content to the IT entity that uploads?

12        A.    That would be my supervisor and

13   myself.

14        Q.    Have you provided content to upload

15   to the website related to opioids?

16        A.    The content that -- yes.  So the

17   recent report, the 2017 dissemination report, we

18   requested for that to be uploaded, and then the

19   interactive Narcan map we requested to be

20   uploaded.

21        Q.    Anything else?

22        A.    I'd have to go back and look at my

23   e-mails to the two departments and look at the

24   queue, to be honest with you.  There might have

25   been minor changes, like formatting or something

Page 202

1    like that, but I don't -- I don't remember
2    specifics.
3           Q.    You mentioned that the annual report
4    for the Cuyahoga County Opiate Task Force is
5    printed?
6           A.    It used to be printed.
7           Q.    Is it disseminated?
8           A.    I don't know -- I don't know what
9    they did before.  I know that it's definitely
10   uploaded on the two websites.  I don't know how
11   it was passed out or given the previous years.
12          Q.    This report that you're currently
13   working on relating to the task force, do you
14   intend to send it out?
15          A.    The report that I'm currently
16   related on -- working on are the Injury
17   Prevention grant, which encompasses the task
18   force.  We intend on distributing it
19   electronically.
20          Q.    You will not print it?
21          A.    We do not have the budget to print
22   it.
23          Q.    And to whom will you distribute it
24   electronically?
25          A.    Primarily task force members.

1          Q.    How are these task force members
2     identified?
3          A.    We have a running list of e-mails of
4     individuals that attend meetings, and any time
5     there's anyone new, we add them to the group
6     e-mail.
7          Q.    Who's responsible for adding them to
8     the group e-mail?
9          A.    My supervisor and myself.
10         Q.    Does your supervisor do that
11     regularly?
12         A.    Um-hum.
13               MS. QUEZON:  Yes?
14               THE WITNESS:  Yes.
15         Q.    Do you do that regularly?
16         A.    Yes.
17         Q.    Who's primarily responsible for
18     making sure that the membership rolls are up to
19     date?
20         A.    I am.
21         Q.    So you have an understanding of who
22     the members of the opiate task force are?
23         A.    I have an understanding as far as
24     the regular attendees and who they are and
25     people who are very active in the task force,

1    yes.  The 250, I don't know them all, no.

2         Q.    Who are the active members of the

3    task force that you are aware of?

4         A.    I'd have to look at our last

5    meeting, honestly.  There was 60 people there.

6    So I'd have to look at our last meeting sign-in

7    sheet to tell you all their names.  Roughly,

8    there's 40 to 60 people at every meeting.

9         Q.    You said you have an understanding

10   as far as the regular attendees.  Who are the

11   regular attendees?

12        A.    The people that we see at the

13   meetings, the 40 to 60.  There's a core group of

14   40 to 60.  Again, I would have to look at the

15   list of names to give you those regular

16   attendees.

17        Q.    Are there any county officials that

18   are included in the regular attendees of the

19   task force?

20        A.    They do not attend.  Okay.  They

21   haven't attended since I have been involved with

22   the task force.

23        Q.    What about other county employees?

24        A.    Well, there's myself.  My supervisor

25   hasn't attended since he resigned.  We have

1  support staff that attends sometimes and takes

2  minutes.  But as far as other county employees,

3  I guess the ADAMHS Board is considered a county

4  employee.  I'm not sure.  I'd have to define

5  exactly what a county employee is since we're

6  separate from the executive's office.

7        Q.    You mentioned Mr. Caraffi stopped

8  attending task force meetings?

9        A.    Correct.

10        Q.    Why?

11        A.    I didn't ask.  I don't know.  You'll

12  have to ask him.

13        Q.    He hasn't said anything to you about

14  it?

15        A.    Nope.

16        Q.    Nobody else has said anything to you

17  about it?

18        A.    I've been asked why and I say I

19  can't provide that answer, you'll have to talk

20  to him about it.

21        Q.    Are you -- strike that.

22              You mentioned the Injury Prevention

23  grant, which you receive from the state, and the

24  PDAAG grant, that you receive from the state?

25        A.    Yes.

1      Q.    Are there any other grants that fund

2   opioid-related activities at CCBH?

3           MS. QUEZON:  Object to the form.

4      A.    Yes.  Well, there's other

5   initiatives that have been funded through the

6   Ohio Department of Health and the CDC.  I

7   mentioned earlier in the day we have the

8   supplemental grant called "Alternatives to

9   Incarceration."  That's done through

10  MetroHealth.  And then we have the Epi

11  Validation project that's funded through Ohio

12  Department of Health.  And then we have the ACEs

13  grant that I referred to earlier as well.

14      Q.    Are there any other grants?

15      A.    Not to my knowledge.  That's all I'm

16  aware of at CCBH.

17      Q.    So all of the grants that CCBH has

18  for opioid-related activities are provided by

19  the Ohio Department of Health and the CDC?

20      A.    Yes, so far.

21      Q.    Has CCBH ever requested funding from

22  Cuyahoga County?

23      A.    I don't have any knowledge of that.

24  At least not in the year that I've been there.

25  That's the only knowledge I have.

1          Q.    To put a finer point on it, has CCBH

2    ever requested money from Cuyahoga County

3    relating to opioid abuse?

4          A.    Again, I don't have that answer

5    because I wasn't in the program in the past.  So

6    I'm not aware of any this year in my current

7    capacity starting in January.

8          Q.    Are you aware of CCBH ever receiving

9    funding from Cuyahoga County relating to opiate

10   and opioid abuse?

11         A.    I am not aware.

12         Q.    Has CCBH ever undertaken an

13   analysis, computation or calculation to

14   determine what expenditures the county has made

15   or would need to make to address opioid abuse

16   and its complications in the county?

17              MS. QUEZON:  Object to the form.

18         A.    Again, I started in this position in

19   January.  I only have knowledge as far as the --

20   what capacity I serve in January with my -- as a

21   program manager.  I do not know of some kind of

22   initiative.  I'm sure that kind of initiative

23   could be completed by someone.  Maybe it's

24   happening at the executive's office.  I don't

25   know.

1        Q.    But at CCBH you are not aware of any

2   analysis, computation or calculation to

3   determine expenditures the county has made or

4   would need to make to resolve or respond to

5   opioid abuse and its complications in the

6   county?

7              MS. QUEZON:  Same objection.

8        A.    Again, me, as an Injury Prevention

9   coordinator, that's not my role to know those

10  things.  It has never been told to me.  It's not

11  my role to seek out if that's happening as well.

12       Q.    Given that you're the opiate task

13  force co-chair and the Injury Prevention

14  coordinator, do you think that if such an

15  analysis were undertaken, that you would be

16  consulted?

17             MS. QUEZON:  Object to the form.

18       A.    I have no idea.

19       Q.    Who else -- who would they consult

20  if they were to do such a thing?

21             MS. QUEZON:  Object to the form.

22       A.    To be honest with you, that's out of

23  my scope of knowledge or expertise.  I have no

24  idea.

25       Q.    All right.  We're turning to -- all

1    the way back to Exhibit 1.  On page 2, at the

2    top of the section titled "Leadership" --

3          A.    Um-hum.

4          Q.    -- it lists "Safer Prescribing

5    Practices Collaboration Member"; is that right?

6          A.    Correct.

7          Q.    What is the Safer Prescribing

8    Practices Collaboration?

9          A.    And I apologize.  I incorrectly

10   named the collaboration.  It's actually called

11   "Safe Rx," so safe prescriptions.

12              The goal of the collaboration --

13   there's seven counties involved, and Summit

14   County heads up the initiative.  It's focused

15   around Duterra pouches, so our main and only

16   goal is to distribute Duterra pouches, which, if

17   you're not familiar with them, they help you

18   properly dispose of medications in a household.

19   So we get them from the collaborative and we

20   distribute those through Cuyahoga County.

21         Q.    What is the collaborative?

22         A.    Again, it's seven counties.  There's

23   an individual from each county, whether it be

24   the Mental Health Board or the Cuyahoga County

25   Board of Health.  It could be somebody from --

1   Drug Safe Ohio serves on it from Summit County.

2   So there's seven of us representing the seven

3   counties, and then we take the disposable

4   pouches and distribute them throughout each of

5   our respective counties.

6        Q.    And are you Cuyahoga County's member

7   on that collaborative?

8        A.    Correct.

9        Q.    Does this collaborative do anything

10  other than distribute Duterra pouches?

11       A.    We meet to discuss how we can

12  distribute them, what is the best method to

13  distribute them, can we partner with pharmacies

14  to distribute them.

15       Q.    What pharmacies have you partnered

16  with to distribute them?

17       A.    And, again, I'm not the lead on it

18  so I can't speak to all of her work.  I know

19  that they have partnered with Acme in Summit

20  County, but I don't know other pharmacies that

21  they've partnered with.

22       Q.    Does this collaborative discuss

23  prescribing practices?

24       A.    No.  That's why I apologize.  It's

25  mislabeled.  I apologize.

Page 211

1          Q.     I missed it.  So it's not just the
2    word "Safer" that's wrong?
3          A.     It's just called "Safe Rx."
4          Q.     Safe Rx Collaboration?
5          A.     Like safe prescriptions, correct.
6    So I apologize.
7          Q.     In your work at CCBH, were you a
8    board member on the Council on Older Persons?
9          A.     Yes.  That was when I worked in my
10   capacity for aging.
11         Q.     And what did you do on the Council
12   on Older Persons?
13         A.     Basically, it's a meeting where they
14   have presenters that present pertinent
15   information on elder issues in Northeast Ohio.
16         Q.     Did opiate use and abuse ever come
17   up as part of your work on that council?
18         A.     No, not while I served on it.  I
19   haven't been to a meeting in a very long time
20   because I haven't had time to go.
21         Q.     When did you join that council?
22         A.     2014.
23         Q.     And just so I understand correctly,
24   this council discussed important issues relating
25   to the elderly?

1          A.    Yes.  But, again, I haven't been to
2    a meeting, I would say, in a year and a half.
3          Q.    And while you were going to these
4    meetings regularly, what kinds of issues were
5    discussed?
6          A.    Mostly legal that was happening with
7    Medicare and Medicaid.  That's more of its focus
8    is Medicare and Medicaid issues with seniors.
9          Q.    Medicare and Medicaid covers
10   prescription medications, right?
11         A.    Right.  But again, I -- it's been a
12   while since I've been there.  I can't recall
13   every speaker that spoke and what they spoke
14   about.
15         Q.    My question is just did prescription
16   medications, including prescription opioids,
17   ever come up in your discussions on the council?
18         A.    I honestly do not remember.
19         Q.    What is the PDO Committee?
20         A.    That's Prescription Drug Overdose.
21   So that's -- there are two pots of money at the
22   state level.  There's the Injury Prevention pot
23   of money and there's PDO's pot of money.  We got
24   our funding out of the Injury Prevention pot of
25   money.  There are other entities in the state

Page 213

1   that get their money from the PDO pot of money.

2   And I'm not very familiar with it.  That's all I

3   know really.

4           Q.    So Cuyahoga County has -- sorry.

5   Let me strike that and let me rephrase.

6                 Cuyahoga County Board of Health does

7   not get any money from the PDO pot of funding?

8           A.    I honestly can't speak to the

9   logistics behind that.  I know that it's an

10  Injury Prevention grant, and what I can say is

11  there's the Ohio Injury Prevention Partnership,

12  the OIPP, and under that there's three entities.

13  There's the traumatic brain injury, there's

14  falls amongst older adults, and there's

15  prescription drug overdose.  And we are on the

16  committee of prescription drug overdose because

17  that's our world.  But I can't say if -- I

18  can't, you know, define exactly what PDO

19  committee is.

20          Q.    Do you participate in calls or

21  conferences relating to PDO?

22          A.    Our conference calls are called

23  "PDO," yes, monthly conference calls with ODH.

24          Q.    What are these conference calls?

25          A.    It could be them providing a speaker

1  from one of the agencies that currently has a

2  grant to talk about current work that they're

3  doing, successes that they've had, barriers that

4  they've had.  They might talk about what kind of

5  policies you see in your area that are being

6  successful.  It's basically information sharing

7  from all the grantees.

8         Q.    And who joins in on these calls?

9         A.    There are several people from the

10  Ohio Department of Health, program consultants,

11  and then all of the grantees around the state.

12         Q.    Is there someone who is in charge of

13  these calls?

14         A.    Yes.  The person right now that

15  coordinates this call is a program consultant at

16  the State of Ohio, Esther Benatar.

17         Q.    Have you ever met Esther?

18         A.    Um-hum.

19               MS. QUEZON:  Yes?

20               THE WITNESS:  Yes.

21         Q.    Who is she?

22         A.    She's one of the program consultants

23  at the State of Ohio for Injury Prevention.

24         Q.    What does it mean to be a program

25  consultant?

Page 215

1          A.      I have no idea.

2          Q.      Does she oversee your work at CCBH?

3          A.      So she's one of the program

4    consultants.  There are many different facets to

5    our work.  She oversees our monthly conference

6    calls.  Our direct program consultant for work

7    that needs to be tracked and reported is Tina

8    Kranposki, who I referred to before.

9          Q.      And nobody at Cuyahoga County is

10   involved in overseeing your work on the Injury

11   Prevention program grant, correct?

12         A.      My supervisor is.

13         Q.      So he -- your supervisor is employed

14   by the Cuyahoga County Board of Health?

15         A.      Um-hum.

16                 MS. QUEZON:  Yes?

17                 THE WITNESS:  Yes.

18         Q.      Is there anyone in the county

19   executive's office who is involved in overseeing

20   your work for the Injury Prevention program

21   grant?

22         A.      No, not at all.

23         Q.      Do you report anything that you do

24   to them?

25         A.      Not in -- not since I've been there

Page 216

1   in January 2018.  They may have prior.

2         Q.    Have you ever provided updates to

3   somebody employed by the county relating to your

4   work for Injury Prevention program --

5         A.    Just through the website, the IT

6   department that I work with.

7         Q.    Other than through the website, you

8   have not provided any update to anybody at the

9   county relating to your work?

10        A.    No.  I haven't been asked to.  I

11  mean, if they attend one of our opiate task

12  force meetings, they're going to get that

13  information, but directly I haven't been asked

14  to do that task.

15        Q.    The Injury Prevention program --

16                  (Interruption.)

17              THE VIDEOGRAPHER:  Off the record.

18            (Short recess had.)

19              THE VIDEOGRAPHER:  On the record,

20  2:48.

21        Q.    The Injury Prevention program grant

22  that you are in charge of coordinating and

23  directing is set to expire in September after

24  the crisis funding runs out; is that correct?

25        A.    Correct.

1          Q.     How much crisis funding did you

2     receive from ODH?

3          A.     $125,000.

4          Q.     Is that consistent with the amount

5     of funding you typically receive for that time

6     period?

7          A.     For the core grant, correct.

8          Q.     What injuries does the Injury

9     Prevention program grant intend to prevent?

10               MS. QUEZON:  Object to the form.

11          A.     Within the work plan, which is

12     Exhibit 6, the long-term objective, by September

13     30th, 2023 fatalities related to drug overdose

14     in Cuyahoga County will be reduced by 10

15     percent.

16          Q.     So the grant is specific to drug

17     overdoses?

18          A.     Correct.

19          Q.     Does that include any kind of drug

20     overdose?

21          A.     Again, I didn't write this

22     terminology.  It's kind of set by the State of

23     Ohio.  But we do track all drug overdoses, yes.

24          Q.     Now, are the activities that CCBH

25     undertakes under this grant targeted toward all

1   drug overdoses?

2           MS. QUEZON:  Object to the form.

3       A.    The activities of this current grant

4   is towards all drug overdoses, but initially,

5   for the past five years, it was prescription

6   drug overdose.  They just currently changed that

7   terminology this year to drug overdose.  The

8   past five years has been prescription drug

9   overdose.

10      Q.    Part of the activities included in

11  the logic model for the Injury Prevention

12  program grant are activities relating to

13  naloxone; is that correct?

14      A.    In the logic model?

15      Q.    Yes.

16      A.    I'd have to look at the logic model

17  that they created.

18      Q.    Was naloxone part of a deliverable

19  in the grant that you currently work on?

20      A.    In the grant that we currently work

21  on, which is reflective of some of these

22  deliverables, I can speak to naloxone increase

23  in site distribution.

24      Q.    So some of your activities relate to

25  naloxone?

1          A.     Distribution of naloxone.

2          Q.     What is naloxone?

3                 MS. QUEZON:  Object to the form.

4          A.     I can describe it in the capacity

5     that I know naloxone to be.  Again, I'm not a

6     physician or a specialist in naloxone.  It's a

7     life-saving drug that saves someone from a drug

8     overdose.

9          Q.     Any particular kind of drug

10    overdose?

11                MS. QUEZON:  Object to form.

12         A.     Specific to opioids is my

13    understanding.

14         Q.     Specific to prescription opioids or

15    prescription and illicit opioids?

16                MS. QUEZON:  Object to the form.

17         A.     The way that I've been trained

18    through Narcan training that I've taken, it's

19    all opioids.

20         Q.     Including illicit opioids?

21                MS. QUEZON:  Objection.

22         A.     They didn't define it as such.  They

23    just said all opioids.

24         Q.     But do you understand naloxone to be

25    administered when, for example, an individual

Page 220

1    suffers an overdose from heroin?

2         A.    Yes.

3         Q.    What about from illicit fentanyl?

4              MS. QUEZON:  Object to the form.

5         A.    I don't know.

6         Q.    So it's -- how much of your funding

7    on a year-to-year basis relates to the

8    distribution of naloxone?

9         A.    Well, so this previous year, January

10   till now, 2018, it has not been deliverable

11   based, so like I wouldn't be able to break it

12   out percentage-wise for you.  Moving forward,

13   they are moving towards a deliverable base, but

14   again, I don't know that exact percentage.

15        Q.    You mentioned that the previous

16   grant was specific to prescription drug

17   overdoses?

18        A.    That five-year, non-competitive was

19   called "Prescription Drug Overdose Grant."

20        Q.    That language was included in the

21   grant?

22        A.    That language is included as far as

23   what tier you could apply for.  So, again, there

24   was childhood brain -- traumatic brain injuries,

25   fall prevention for seniors, and prescription

Page 221

1  drug overdose.

2        Q.    Going forward, that language is no

3  longer there you said?

4        A.    It's changed -- it was changed for

5  this application, which again, we didn't get.

6  It was changed for 2019, drug overdose

7  prevention.

8        Q.    So, going forward, the emphasis of

9  the Injury Prevention program grant is all drug

10  overdoses?

11        A.    Correct.

12        Q.    Why did that language change?

13              MS. QUEZON:  Object to the form.

14        A.    I have no idea.  It was a decision

15  made at the state.

16        Q.    Do you have a view about why they

17  might have made that decision?

18              MS. QUEZON:  Same objection.

19        A.    No, I do not.

20        Q.    What was prescription drug overdoses

21  meant to include?

22        A.    Again, I wasn't involved with the

23  writing of it.  I don't know what it was meant

24  to include.  I just know what was written in the

25  work plan.

                                             Page 222

1          Q.    In your experience as the project
2    director for this particular grant, how do you
3    interpret that language?
4          A.    Which language?
5          Q.    In your experience as project
6    director for the Injury Prevention program
7    grant, how do you understand prescription drug
8    overdoses to mean?
9          A.    Overdose from prescription drugs.
10         Q.    It does not -- it is not meant to
11   include -- strike that.
12               What about heroin?
13               MS. QUEZON:  Object to form.
14         A.    What about heroin?
15         Q.    Would heroin be encompassed within
16   the phrase "prescription drug overdoses"?
17               MS. QUEZON:  Object to the form.
18         A.    To my knowledge -- again, I'm not an
19   expert, but I don't believe heroin is a
20   prescription drug.
21         Q.    And if cocaine and heroin were mixed
22   together and resulted in an overdose, would that
23   be considered a prescription drug overdose?
24               MS. QUEZON:  Object as to form.
25         A.    Well, the way that we report back to

Page 223

1   ODH is all overdoses.  They don't have us break

2   it out as to what -- what substance it is.

3          Q.    So the grant says that it is focused

4   specifically on prescription drug overdoses, but

5   you report all overdoses?

6          A.    Well, again, in my current capacity,

7   I'm learning how to report to ODH, and what

8   numbers they require from us, so I give them the

9   medical examiner's report, and if they need

10  further information and want us to break it out,

11  they request that we give them all overdose

12  data, so that's what we give them; and if they

13  need us to break it out, then we break it out.

14         Q.    What do you mean by "all overdose

15  data"?

16         A.    Meaning from the medical examiner's

17  report.

18         Q.    What does the medical examiner's

19  report contain?

20               MS. QUEZON:  Object to the form.

21         A.    I would have to look at the medical

22  examiner's report, but what I'm referring to is

23  drug overdose data that he tracks.

24         Q.    And you pass the medical examiner

25  report on to the state?

Page 224

1          A.     Um-hum.

2                 MS. QUEZON:  Yes?

3                 THE WITNESS:  Yes.

4          Q.     Do you aggregate it?

5          A.     I don't do anything with it other

6     than give it to the state.

7          Q.     So it just passes through you?

8          A.     Correct.

9          Q.     And so if that report contains

10    overdoses not related to prescription drug

11    overdoses, that information will get passed on

12    to the state?

13         A.     Um-hum.

14                MS. QUEZON:  Yes?

15                THE WITNESS:  Yes.

16                MS. QUEZON:  My substitute is here,

17    so whenever you want to take a break.  We don't

18    have to wait until 3:15.  We can if you guys

19    want to.  I just wanted to let you know.

20                MR. MASTERS:  Let's take a break.

21                THE VIDEOGRAPHER:  Off the record.

22                    (Recess had.)

23                THE VIDEOGRAPHER:  On the record,

24    3:22.

25    BY MR. MASTERS:

1          Q.     All right.  Earlier today you

2     testified that there are many facets of the

3     epidemic that have played a role; is that

4     correct?

5          A.     Correct.

6          Q.     What did you mean by that?

7          A.     Just from my short time that I'm

8     becoming familiar with the epidemic, you know,

9     sometimes people say, "Well, what caused the

10     epidemic?"  A lot of people ask that question,

11     what caused the epidemic, and there's not one

12     answer for that.  So that's what I mean, many

13     facets.  You can point to society.  You can

14     point to individual addiction behavior.  You can

15     point to pharmaceutical companies.  You could

16     point to doctors.  You can point to many

17     different facets, but there's not one.

18          Q.     What other facets are there other

19     than the ones you've mentioned?

20          A.     Oh, I don't know.  I'm just

21     generally speaking.  I'm not an expert as far as

22     how many there are.  I'm sure there's hundreds,

23     but I don't know.  As far as an addiction

24     specialist, I'm not one.

25          Q.     So let's go through the ones that

```
                                                  Page 226
 1   you just mentioned.
 2         A.     Sure.
 3         Q.     You said society as a cause of the
 4   current epidemic.  What did you mean by that?
 5         A.     I guess maybe the stress of our
 6   society.  I'm generally speaking as just an
 7   individual.  You know, life can be hard.  Some
 8   people take it easier than others.
 9         Q.     And by that you mean that our stress
10   and the difficulty of life has an impact on
11   prescription drug abuse?
12              MS. WILSON:  Objection to form.
13         A.     I don't think I'm saying that.  I
14   think I'm just speaking in general.  There are
15   many factors that play into the role of the
16   epidemic.
17         Q.     Individual addiction behavior is
18   another facet that you mentioned.  How does that
19   play a role in the epidemic?
20         A.     I guess I was speaking to the
21   science behind someone who suffers from
22   addiction.  Again, I'm not a medical doctor, but
23   in conversations amongst public health
24   professionals, individuals that discuss this,
25   documentaries I've watched, that's one thing
```

Page 227

1   that's mentioned is someone's own internal

2   makeup, they can't help that.

3        Q.    What documentaries have you watched?

4        A.    Oh, geez.  There's -- I would have

5   to go back and look at my history on Google or

6   YouTube.

7        Q.    Can you think of one?

8        A.    One documentary that I watched is a

9   documentary called "Dopesick," and that was

10  recommended through a conference that I went to.

11       Q.    What conference was that?

12       A.    The National Harm Reduction

13  Conference of this year.

14       Q.    What was the focus of that

15  conference?

16       A.    Harm reduction, so the focus was,

17  again -- so this was written into last year's

18  grant.  I didn't write it.  I didn't choose for

19  me to go to this conference, but I went because

20  that encompassed my current role.

21            So harm reduction being safe needle

22  exchange, clean needle exchange, making sure

23  that the drugs that the individuals are using

24  are safe, so they had fentanyl testing

25  information there, fentanyl strip testing

Page 228

1    information there.

2         Q.    You said you can point to doctors.

3    What is the doctor's role in the opioid

4    epidemic?

5         A.    So, again, just in general I was

6    throwing out things that have been mentioned in

7    documentaries or just in conversation, things

8    you've seen on the television.  I'm not

9    personally saying that I believe that to be

10   true.  I'm saying things I've seen on

11   television.

12        Q.    You said you could point to doctors

13   as being a cause of the opioid epidemic.  What

14   did you mean by that?

15        A.    So what I meant -- when you asked me

16   what facets and I gave examples of what those

17   facets could be, I'm not saying that that is the

18   facet that caused it.  You asked me to give

19   examples as far as what kind of facets.  So I

20   was just speaking in general terms.

21        Q.    Why did you mention doctors in

22   particular?

23        A.    Because I've heard that on the

24   television.

25        Q.    Have you looked into the role of

Page 229

1   doctors in your capacity as co-chair of the

2   opiate task force?

3          A.    No.   That's not my role to look into

4   that.  My role is to address these deliverables

5   within our grant.

6          Q.    Those deliverables include -- are

7   aimed at reducing overall fatalities from drug

8   overdoses, right?

9          A.    Correct.  If we had more money

10  perhaps locally, then I could hire another

11  individual to do that, but my role is to stick

12  to these deliverables within the grant and make

13  sure that they're accomplished.

14         Q.    Do any of the deliverables that you

15  have involve doctors?

16         A.    The only deliverable is the proper

17  prescribing guidelines that we discussed earlier

18  with MetroHealth, and I detailed that for you

19  previously.

20         Q.    So that is a deliverable?

21         A.    To give the education, yes, but it's

22  not my role to research what role doctors may or

23  may not have had in the epidemic.

24         Q.    But do you have a view?

25         A.    That's not my role to have a view.

Page 230

1          Q.    Do you have a view on the role of

2     doctors in the opioid epidemic?

3          A.    Again, that's not my role to have a

4     view on the role of doctors in the opioid

5     epidemic.

6          Q.    I understand that that is not your

7     role as you see it, but I'm asking a slightly

8     different question.  Do you have a view about

9     the role of doctors in the opioid epidemic?

10          A.    And I'll just restate my answer from

11     previously.  I don't believe it's my job to have

12     a view.  My role specific to my job --

13          Q.    Do you have a view about the role of

14     physicians in the opioid epidemic?

15          A.    I understand your question.  I'm

16     going to answer it the same way.

17          Q.    Do you have a view about the role of

18     physicians in the opioid epidemic?

19          A.    No, I do not have a view.

20              MS. WILSON:  Objection.

21          Q.    You have no view about --

22          A.    It's not my job to have a view.

23          Q.    What other facets or causes of the

24     opioid epidemic can you point to?

25          A.    Again, I'm not a researcher.  Just

Page 231

1    in general I spoke to certain facets that may

2    contribute.

3         Q.    But you're the chair -- co-chair of

4    the opioid -- of the Cuyahoga County Opiate Task

5    Force.

6         A.    Yes.

7         Q.    And in that capacity, have you

8    thought about other aspects, other facets that

9    might have contributed to the opioid epidemic?

10        A.    What I've thought about is how am I

11   going to meet these deliverables that have to be

12   done with a very small amount of money from the

13   Ohio Department of Health.  That's what I've

14   thought about.

15        Q.    Are there any other facets or causes

16   that you didn't mention earlier?

17        A.    There could be.

18        Q.    What other facets could there be?

19        A.    Again, I'm not a researcher or an

20   epidemiologist to follow that kind of

21   information.

22        Q.    So you don't know what other

23   possible facets could be contributing to the

24   opioid epidemic?

25        A.    No.  What I'm saying is I'm not an

1   expert and it's not my job to know all of the

2   facets that may have contributed to this

3   epidemic.  If I was, I would be a researcher.

4        Q.    So if you know of other facets that

5   you did not mention, we are asking you to do

6   that right now.

7        A.    I'm telling you in my role it's not

8   my job to know other facets that may contribute

9   to the epidemic.

10       Q.    Do you know of any other facets that

11  have contributed to the epidemic?

12            MS. WILSON:  Objection to form.

13       A.    There could be other facets.  I

14  don't know all of them.

15       Q.    Are you aware of some of them?

16       A.    I just spoke perhaps to some of

17  them.

18       Q.    In addition to those, are there any

19  others that you currently personally are aware

20  of?

21       A.    I just said there could be.  I don't

22  know.

23       Q.    So other than the ones that you

24  mentioned, there are no other causes that you're

25  aware of for the opioid --

Page 233

1          A.    I'm not stating that.  I said there

2    could be, but I do not know because I am not an

3    expert, I'm not a researcher, I'm not a

4    published researcher, I'm not an epidemiologist.

5    I'm a program manager of an ODH grant to meet

6    the deliverables of the work plan.

7          Q.    And you're also the co-chair of the

8    Cuyahoga County Opiate Task Force?

9          A.    Correct, which is a small piece of

10   my job.

11         Q.    What percentage of your job is it?

12         A.    Again, I said it's not deliverable

13   based, so I can't give you a percentage.  I

14   don't know what percentage.

15         Q.    When you say "small piece," what

16   does that mean?

17         A.    If you refer to Exhibit 6, again,

18   coalition building is the first program impact

19   objective.  That's one objective of -- if you go

20   through, I can count them for you, but it's only

21   one objective of this -- however many pages this

22   document is.  It's one objective of many.

23         Q.    How much time do you spend on your

24   duties as Cuyahoga County Opiate Task Force

25   chair?

1       A.    I would have to go back and look at

2    my recorded time at the Board of Health.

3       Q.    Do you spend more than 20 hours a

4    week?

5       A.    It varies from week to week

6    depending on when the meeting is, what speakers

7    we're collaborating with.  It varies.

8       Q.    On average, how many hours a week do

9    you spend?

10      A.    I cannot on record give you an exact

11   amount.

12      Q.    I'm asking for an estimate.

13      A.    And I'm telling you the truth.  I

14   cannot give you an estimate.  It varies from

15   week to week, from month to month.

16      Q.    Is it more than half of your time?

17      A.    I can't give you an estimate.

18      Q.    Is it something that you do or think

19   about every day?

20      A.    No.

21      Q.    Every week?

22      A.    Probably every week, but I don't

23   know how long.  I might be researching speakers.

24   I might be talking to the ADAMHS Board.  There

25   might be a day I don't think about it at all.

1    Again, I can't give you an exact answer.  And

2    I'm being honest.  No matter how you ask me the

3    same question over and over and over again, it's

4    going to be the same answer.  I don't know.

5         Q.    All right.  When you say a small

6    part of your job, does that mean half?

7         A.    Again, if you look at the

8    deliverables, if you wanted to get a calculator

9    out and break it out and take one hundred

10   percent of my job and look at how many

11   deliverables are here and divide it by the

12   number of deliverables, that may be the

13   percentage I spend.  It could be more or less,

14   again, depending on the week or day and what

15   activities I have going on for that day.

16        Q.    When you say it's a small part of

17   your job, do you intend that to mean it is less

18   than half of your job?

19        A.    I just mean it to intend that it is

20   one of the many deliverables that I am supposed

21   to reach, meaning like -- you keep speaking

22   about it like it's my main job and that's the

23   only job I have, and I keep trying to redirect

24   you to this work plan, saying there's many other

25   things that are part of my job.

Page 236

1        Q.    Right now what I'm trying to do is
2    to understand how much of a part of your job it
3    is.
4        A.    I told you I can't give you that
5    answer.
6        Q.    And so my question is, you have some
7    basis for saying it's a small part of your job,
8    and I'm trying to get an estimate of what -- how
9    much of your job that is.  So is it less than --
10   is less than half of your time spent on the
11   Cuyahoga County Opiate Task Force?
12       A.    Probably -- if we were to equate it,
13   again, to this work plan and we did some
14   mathematical equation dividing a hundred percent
15   by the number of objectives I have, it's
16   probably going to be less because it's only one
17   of ten, if you want to see that on paper.
18       Q.    Is it -- do you spend more time on
19   the Cuyahoga County Opiate Task Force
20   deliverable or less time than you do on the
21   others?
22       A.    I try to spend equal time.
23       Q.    So you spend equal time on each
24   deliverable?
25       A.    I try to, depending again on the

Page 237

1  day.  One might be more important one day than

2  the other day.

3          Q.    So would it be fair to say that only

4  1/27th of your time is spent on Cuyahoga County

5  Opiate Task Force-related duties?

6          A.    No, that's not fair to say.

7                MS. WILSON:  Objection to form.

8          Q.    Why isn't it fair to say?

9          A.    Because I can't give you an answer

10  again because, yes, there might be 27

11  deliverables, but this is one objective.  And,

12  again, not to get into the weeds about how ODH

13  works and their grants, but there are also

14  process objectives under the program objectives.

15  There are 27 process objectives.  There are

16  about 10 program objectives.  So I don't think I

17  need to explain that.

18          Q.    Returning to the Cuyahoga County

19  Opiate Task Force report --

20          A.    Yes.

21          Q.    -- from 2016 --

22          A.    Yes.

23          Q.    -- there's a section that says, "How

24  Did This Happen?"

25          A.    Okay.

1          Q.    It says, "There are several

2     contributing factors that led to this epidemic."

3          A.    Um-hum.

4          Q.    "Changes made to clinic pain

5     management guidelines during the 1990s."

6          A.    Okay.

7          Q.    "Marketing medications directly to

8     the consumer."

9          A.    Um-hum.

10         Q.    "Overprescribing of high potency

11    pain medication."

12         A.    Um-hum.

13         Q.    "HCAHPS/Press Ganey scores (patient

14    satisfaction surveys) that affected hospital

15    reimbursement."

16         A.    Okay.

17         Q.    "Abuse-deterrent formulations of

18    medications that may have inadvertently shifted

19    abuse towards heroin.  Mass incarceration of

20    non-violent drug-related crimes.  Lack of

21    treatment availability.  Stigma; viewing

22    addiction as a moral failing."

23         A.    Okay.

24         Q.    Do you agree that these are causes

25    of the opioid epidemic?

1          A.     Again, I agree that they could be

2     facets of the epidemic.  I don't know if they're

3     all-inclusive or not.  I didn't write it.  I

4     didn't participate in authoring the report or

5     any information in it.

6          Q.     This is a public-facing document of

7     the Cuyahoga County Opiate Task Force, right?

8          A.     Before I was on it, yeah.

9          Q.     Do you have any reason to believe

10    that this was incorrect?

11         A.     I don't know.  I didn't write it.  I

12    wasn't part of writing it.  I have no idea.  I

13    didn't research it.

14         Q.     Is there anything you would add to

15    the list?

16         A.     Again, I'm not an expert.  I don't

17    know.

18         Q.     So you can't think of anything you

19    would add to this list?

20              MS. WILSON:  Objection to form.

21         A.     Again, there could be many other

22    facets.  I'm not an expert.  I don't know what

23    else could or could not be added.  That would

24    take years and years of research.

25         Q.     And in your capacity as co-chair of

1    the Cuyahoga County Opiate Task Force and the

2    program director for the Injury Prevention

3    program, you have not undertaken an effort to

4    understand the causes of the opioid epidemic?

5              MS. WILSON:  Objection.

6         A.   It's not my job to understand the

7    causes as to what got us here.  It's my job to

8    know what to do now that we are here.

9         Q.   And you have not undertaken that

10   effort?

11        A.   No.  It's not my role to do that.

12        Q.   You said, "It is not my job to

13   understand the causes as to how -- as to what

14   got us here.  It's my job to know what to do now

15   that we are here."

16        A.   Correct.

17        Q.   So what should be done now that we

18   are here?

19        A.   Again, referring to my work plan

20   through the Ohio Department of Health, those are

21   deliverables that they have set forward that we

22   are to follow.  If we had more funding, more

23   staff and more time, perhaps we could establish

24   other initiatives, but this is the bible for my

25   program, this is what I do, this is my role.

Page 241

1      Q.    So in addition to the deliverables

2   that you currently are working toward, what

3   other things do you think should or need to be

4   done?

5      A.    Should or need to be done?

6      Q.    What else -- you said it's your job

7   to know what to do now that we're here.   In

8   addition to the deliverables, what else should

9   be done now that we're here?

10          MS. WILSON:  Objection to form.

11     A.    Again, not being an expert, as far

12  as what needs to be done -- you know, I'm not a

13  recovery expert, I'm not an addiction specialist

14  or a psychiatrist that works with addiction, or

15  a physician.  I think that they would be more

16  well formed to answer specifically what could be

17  done.  I can't speak to specific initiatives off

18  the top of my head that I think should be done.

19  I just feel like there is not enough being done.

20     Q.    Sitting here today, you can't tell

21  me what else should be done?

22     A.    No, not off the top of my head.

23     Q.    Returning to Exhibit 2, I believe it

24  was, the organizational chart --

25     A.    Yes.

1      Q.     -- in your current capacity as

2  Injury Prevention program director, where on

3  this organizational chart is your position

4  located?

5      A.     It's not.

6      Q.     It's not?

7      A.     Nope.  That's why I said it's not up

8  to date.

9      Q.     If this were updated, do you know

10  where your position likely would fall?

11      A.     Probably under the "Injury

12  Prevention" square.

13      Q.     Which is under?

14      A.     "General Environmental Health."

15      Q.     "General Environmental Health."

16      A.     And, again, for the record, this is

17  not an updated organizational chart.  I don't

18  even know if they have the "Injury Prevention"

19  box there under "Environmental" any longer.

20      Q.     And in your capacity, you work on

21  the Injury Prevention grant, the PDAAG grant and

22  the CDC grants that you have mentioned, right?

23      A.     I will not be working on the CDC

24  grant because a hundred percent of my time is

25  doing the Injury Prevention grant, so we have

1   other staff members that are working on the CDC

2   ACEs grant.

3        Q.    Okay.  Aside from those three

4   grants, does CCBH do anything else related to

5   prescription opioids?

6        A.    Yeah.  We talked about the Epi

7   Validation supplemental funding as well through

8   ODH.

9        Q.    And that is the program that is run

10  by Chris Kippes?

11       A.    Chris Kippes, correct.

12       Q.    Are there any other CCBH programs

13  relating to opioids?

14       A.    Not to my knowledge.

15       Q.    Would you know if there were?

16       A.    I should know.

17       Q.    Why should you know?

18       A.    I should be informed since that's my

19  role as the program manager for the Injury

20  Prevention grant.

21       Q.    You should be informed of

22  opioid-related activities at CCBH?

23       A.    Yes.

24       Q.    Why is it important that you be

25  informed of opioid-related activities at CCBH?

Page 244

1        A.    I guess in case I'm asked about it

2   from the public.

3        Q.    Does the public ask you about

4   opioid-related issues?

5        A.    No.  Not yet.  Again, I'm new to the

6   role.

7        Q.    Returning to the 2019 prescription

8   overdose prevention work plan --

9        A.    Okay.

10        Q.    -- your name is listed as the

11   contact name on this document, right?

12        A.    Correct.

13        Q.    Did you work on drafting this

14   document?

15        A.    Yes.

16        Q.    Did anyone else help you?

17        A.    Vince Caraffi.

18        Q.    Were you the principal author?

19        A.    We both were.  I'm just the contact

20   because I'm one hundred percent on the grant.

21        Q.    But you, as the contact, reviewed

22   the document before it was submitted?

23        A.    Correct.

24        Q.    And you're comfortable with

25   everything that was in the document?

Page 245

1          A.     Yes.

2          Q.     On page 4 and 5 it's the overdose

3   fatality review deliverable.

4               MS. WILSON:   What Bates numbers?

5               MR. MASTERS:   That's 13756847.

6               MS. WILSON:   Thank you.

7               MR. MASTERS:   And then also 848.

8               MS. WILSON:   Okay.

9          Q.     What is the overdose fatality

10  review?

11         A.     Basically, my supervisor,

12  Mr. Caraffi, meets with the medical examiner and

13  they review data that he's recently analyzed

14  from drug overdoses in Cuyahoga County.

15         Q.     Okay.  And this indicates that the

16  OFR will meet on a quarterly basis?

17         A.     If we would have gotten the grant,

18  then that was what was supposed to happen in

19  2019, yes.

20         Q.     What does "Evaluation Measure" mean

21  at the top of that column?

22         A.     That means how do you know that

23  you're successful.

24         Q.     And one of the things that it

25  indicates is "Deidentified data entered into ODH

1  database."

2       A.    That's something new to my knowledge

3  for 2019, and they didn't get into that yet as

4  far as a definition from ODH what that would

5  mean.  That's a new initiative.

6       Q.    So who wrote that part of this?  Did

7  you write that part of this grant?

8       A.    No.  This was Mr. Caraffi.  He does

9  the OFR.

10       Q.    And the OFR, who is on the OFR?

11       A.    You know what, to be honest with

12  you, I don't know all the members since he's the

13  key staff that does that -- he does those

14  activities.

15       Q.    Do you participate in the OFR?

16       A.    No, not currently.

17       Q.    Moving up, previously -- or,

18  actually, hold on.

19            In your current set of deliverables

20  for 2018, do any of them deal with OARRS?

21       A.    I believe so.  I'd have to go back

22  and look, but I believe so.

23       Q.    OARRS -- was OARRS included in the

24  set of proposed deliverables for 2019?

25       A.    Let me see.  I thought it was, but

Page 247

1    I'm trying to find where it is in the

2    deliverables.  To be honest with you, I don't

3    see it.  It's usually with the MetroHealth

4    proper prescribing guidelines area, but I don't

5    see it in there.

6         Q.    What is OARRS?

7         A.    Again, forgive me but I can't

8    remember exactly what -- I think it's O-A-A-R-S

9    {sic}, but it's a database that I believe

10   physicians enter any opiate that they prescribe

11   and who it's prescribed to.

12        Q.    And what is CCBH's deliverable with

13   respect to OARRS?

14        A.    Again, to give you exact language,

15   I'd have to have the 2018 work plan in hand,

16   but, in general, it's working with MetroHealth

17   to encourage usage of OARRS so all the

18   physicians use OARRS.

19        Q.    Do you know if OARRS usage is

20   required?

21        A.    I believe it's required initially.

22   I don't know -- I don't know the legality behind

23   it or the verbiage behind what is required or

24   not required, to be honest with you.

25        Q.    Why do you have a deliverable that

Page 248

1   focuses on OARRS?

2       A.    It's set forth by the State of Ohio.

3   I don't know.

4       Q.    Did they indicate why you have an

5   OARRS deliverable?

6       A.    No.

7       Q.    Do you have a view as to why an

8   OARRS deliverable is important?

9       A.    I mean, I would imagine it's to

10  ensure that doctors are properly entering that

11  data to track prescriptions given to

12  individuals.

13      Q.    Why is that data important?

14      A.    I don't know.

15      Q.    Do you have a view about why it's

16  important for a doctor to use OARRS?

17      A.    No.  I'm not a doctor.

18      Q.    But you do -- you do coordinate the

19  education and awareness with respect to OARRS,

20  correct?

21          MS. WILSON:  Objection to form.

22      A.    No.  I coordinate encouraging usage

23  of OARRS.

24      Q.    So you encourage doctors to use

25  OARRS but you don't have a view about why OARRS

1    is important?

2          A.     We contract with MetroHealth to do

3    the education piece.  I don't have a view as to

4    why OARRS is important.

5          Q.     Have you read the complaint that was

6    filed in this lawsuit?

7          A.     No.

8          Q.     Do you know what this lawsuit is

9    about?

10         A.     To be honest, not specifically.

11         Q.     Do you know who the Defendants are

12   in this litigation?

13         A.     No.

14         Q.     Do you know what a pharmaceutical

15   manufacturer is?

16         A.     A manufacturer who manufactures

17   pharmaceuticals.  I mean, honestly, that's my

18   honest answer.

19         Q.     Are you familiar with any particular

20   manufacturers of pharmaceuticals?

21         A.     I mean, only -- well, I mean, I

22   guess main ones that you hear out there, like --

23   I mean, I can't name, like, main ones off topic.

24   I don't track manufacturers of drugs, to be

25   honest with you.

1      Q.    So sitting here today, you don't
2  know -- you can't tell me the names of any
3  manufacturers?
4      A.    No.
5      Q.    What about, do you know what a
6  pharmaceutical distributor is?
7      A.    No.
8      Q.    Do you know anything about their
9  role in the supply chain?
10      A.    No.
11      Q.    Have you ever heard the name of a
12  pharmaceutical distributor?
13      A.    If I don't know what they are, then
14  I don't know if I've heard their name or not.
15  I'm sorry.  I'm being honest.
16      Q.    Have you heard about this lawsuit?
17      A.    I heard about it when I -- when I
18  was deposed to be part of it.
19      Q.    So prior to having been asked for
20  your deposition, you had no knowledge about this
21  litigation?
22      A.    I have to be honest.  I can't
23  remember if it was before or after I was deposed
24  that I read the Cleveland.com article about the
25  attorney that was going to head it up in

Page 251

1   Cleveland.  I cannot remember if it was before

2   or after, and that's the only knowledge I had of

3   it.

4          Q.    Who was that attorney?

5          A.    I have a terrible memory with names.

6   I don't know.

7                MR. MASTERS:  I have no further

8   questions.

9                MS. FEINSTEIN:  Do you want to go

10  off the record for a second just so we can

11  switch?

12               THE VIDEOGRAPHER:  Off the record,

13  3:54.

14                   (Short recess had.)

15               THE VIDEOGRAPHER:  On the record,

16  3:58.

17            EXAMINATION OF APRIL R. VINCE

18  BY MS. FEINSTEIN:

19          Q.    Good afternoon, Ms. Vince.

20          A.    Hi.

21          Q.    My name is Wendy West Feinstein and

22  I'm with Morgan Lewis and I represent the Teva

23  Defendants, and we met briefly this morning

24  before going on the record.

25          A.    Okay.

1          Q.    I'm going to ask you a few

2    questions, and I'll do my best not to cover too

3    much of the same ground that my colleague

4    covered this morning, but I do have some

5    follow-up questions on some of those topics.  So

6    I may skip around a little bit.  It will be a

7    little bit disjointed, but I'll try to be

8    efficient.

9          A.    Okay.

10         Q.    As with the questioning this

11   morning, if at any point I ask you a question

12   you don't understand, please let me know and

13   I'll do my best to rephrase it.  Okay?

14         A.    Okay.

15         Q.    And if you answer a question that

16   I've asked, I'll assume that you understood it

17   as I asked it.  Fair enough?

18         A.    Okay.

19         Q.    And if you need a break at any time,

20   just let us know.

21         A.    Okay.

22         Q.    So right before we just took that

23   short break to switch seats here, my colleague

24   was asking you a little bit about the complaint

25   in this lawsuit.  Do you recall that?

Page 253

1          A.     Um-hum.

2          Q.     You'll need to answer verbally with

3     yeses or nos.

4          A.     Yes.

5          Q.     Thanks.

6                 He asked you whether you knew who

7     the Defendants were and you answered that you

8     did not, right?

9          A.     Correct.

10         Q.     Do you know who the Plaintiff is or

11    who the Plaintiffs are in this litigation?

12         A.     It's my understanding that it's

13    Cuyahoga County.

14         Q.     Do you have any understanding of

15    what Cuyahoga County hopes to accomplish with

16    this lawsuit?

17                MS. WILSON:  Objection to form.

18         A.     I haven't personally -- I don't have

19    any knowledge as far as what they're hoping to

20    accomplish.

21         Q.     Have you read anything about what

22    the goals of the lawsuit are in the local paper?

23         A.     No.

24         Q.     Do you have any understanding of

25    whether the county is seeking money,

Page 254

1    compensation, through this lawsuit?

2         A.    No.

3         Q.    And earlier my colleague asked you

4    whether or not you could think of the names of

5    any pharmaceutical manufacturers off the top of

6    your head, and I believe you couldn't at that

7    point, right?

8         A.    Correct.

9         Q.    I'm going to ask you just some names

10   and ask whether you -- those names are familiar

11   to you or if you know who they are.

12        A.    Okay.

13        Q.    Have you ever heard of Teva

14   Pharmaceuticals USA?

15        A.    No.

16        Q.    Do you know what types of

17   pharmaceuticals Teva manufactures?

18        A.    No.

19        Q.    Have you ever heard of Cephalon?

20        A.    No.

21        Q.    Have you ever heard of Actavis?

22        A.    No.

23        Q.    Have you heard of Watson

24   Laboratories?

25        A.    No.

1      Q.    Have you heard of Allergan?

2      A.    No.

3      Q.    Have you heard of Insys?

4      A.    No.

5      Q.    Have you heard of Purdue?

6      A.    Yes.

7      Q.    What have you heard about Purdue?

8      A.    Literally, the only thing I've heard

9   about Purdue is when people say "big pharma,"

10   then they follow up with Purdue in

11   conversations.  This is like amongst -- just

12   overhearing.  That's it.

13      Q.    Do you know what types of products

14   Purdue manufactures?

15      A.    No.

16      Q.    Have you heard of Mallinckrodt?

17      A.    No.

18      Q.    And I may be forgetting one, but if

19   I think of it, I'll come back to it.

20            In the context of hearing about

21   Purdue in the context of big pharma, what are

22   those discussions around when you're talking

23   about big pharma?  What is the context of those

24   discussions?

25      A.    I guess literally if CNN is on at

Page 256

1    home and they say "big pharma," I assume they're

2    talking about all pharmaceutical companies.

3    That's how I interpret it.

4          Q.    And I just remembered the others

5    that I meant to ask you.

6                Have you heard of Janssen?

7          A.    I don't think so.

8          Q.    Have you heard of Johnson & Johnson?

9          A.    Yes.

10         Q.    In the context of pharmaceutical

11   manufacturing?

12         A.    No.  Mostly baby lotion.

13         Q.    You mentioned in your testimony

14   earlier today that you were recently prescribed

15   an opioid, correct?

16         A.    Um-hum.

17         Q.    Do you know who manufactured that

18   opioid that you were prescribed?

19         A.    No.

20         Q.    Do you recall the name of the

21   opioid?

22         A.    Again, I'm not positive.  I think it

23   was oxycodone.

24         Q.    Did you -- when you received the

25   oxycodone from the pharmacy, did it come with

Page 257

1    any written information?

2              MS. WILSON:  Objection.

3         A.    I'm positive it did because all

4    prescriptions do; however, my husband was the

5    one that picked it up and he didn't give me the

6    whole bag.  I just had the bottle.

7         Q.    So you didn't see whether anything

8    was stapled to the bag with information?

9         A.    Correct.

10        Q.    Did you read any of the information

11   that came with your prescription from the

12   pharmacy?

13        A.    No.  I don't know what was done with

14   it.

15        Q.    At any point in time have you ever

16   read any of the patient labeling information for

17   any opioid prescription medication?

18        A.    The last time I believe I was

19   prescribed an opioid was for foot surgery on my

20   other foot, which was 13 years ago, so I don't

21   remember.

22        Q.    As a part of your job with either

23   the opiate task force or the Injury Prevention

24   grant, has there ever been an occasion where you

25   read the prescribing information or the patient

1    information for any prescription opioids?

2         A.    No.  And, also, I just want to

3    backtrack in case -- since this is on the

4    record.  I cannot remember if I was prescribed

5    an opiate for my two childbirths.  I can't

6    remember that.  I may have been.

7         Q.    No problem.  And you don't remember

8    anything about that prescription?

9         A.    No.

10        Q.    Or whether you read any information?

11        A.    I don't even know if I was

12   prescribed, but I didn't want to misspeak just

13   in case.

14        Q.    Do you have an understanding from

15   any source about whether opioids have addictive

16   properties?

17        A.    I guess, again, with my limited

18   knowledge, one source recently.  I heard an

19   addiction specialist speak at our opiate task

20   force.  Again, I'm very sorry.  I'm terrible

21   with names.  He spoke at our task force meeting

22   about the science behind addiction.

23        Q.    In the context of that discussion,

24   did the speaker address opioids specifically?

25        A.    Yes.

Page 259

1          Q.    Did the speaker address prescription
2     opioids specifically?
3          A.    I would have to go back to his
4     PowerPoint presentation.  I can't remember if he
5     was specific to prescriptions or in general.
6          Q.    Did you keep a copy of that
7     PowerPoint?
8          A.    We have an electronic copy of it.
9          Q.    Do you remember what the title of
10    that PowerPoint is?
11         A.    I don't.  My supervisor might know.
12    He had direct contact with obtaining that
13    PowerPoint.
14         Q.    You believe, though, somewhere in
15    the electronic records of the Cuyahoga County
16    Board of Health there is an electronic copy of
17    that PowerPoint?
18         A.    I believe that it was distributed
19    through our task force via e-mail because they
20    requested it.
21         Q.    When you say "it was distributed
22    through our task force," do you mean the opiate
23    task force?
24         A.    Correct.
25         Q.    Do you recall when that presentation

Page 260

1    was?

2         A.    It wasn't at our October one, so it

3    had to be -- I believe it was our August

4    meeting.

5         Q.    Do you recall a summit in

6    September -- a meeting called an opiate summit?

7         A.    Yes.

8         Q.    Was that something that was put on

9    by the opiate task force?

10        A.    No.  In fact, we didn't have any

11   involvement other than weighing in on the

12   planning of it.  It was put on by the Cleveland

13   Clinic and the U.S. Attorney General's Office.

14        Q.    Did you attend that?

15        A.    Yes.

16        Q.    The September 6th conference?

17        A.    Yes.

18        Q.    Did you receive any materials from

19   that conference?

20        A.    Yes.

21        Q.    What did you receive?

22        A.    If there was a PowerPoint provided,

23   I would have the PowerPoint.  There were

24   recovery houses that were there that had

25   information that they -- you know, you get a bag

Page 261

1    at a conference.  To be honest, I can't remember
2    everything to be specific, but, in general, it
3    was around the opioid crisis.
4           Q.    Do you recall any of the presenters
5    specifically?
6           A.    They had a lot of panels.
7    Specifically, I remember Dr. Papp presenting,
8    Dr. Gilson presenting.  They had a plenary
9    speaker of Aaron Marks.  He's in recovery.
10                Those are the names I can remember.
11   There are many more.
12          Q.    Did anyone from the Cuyahoga County
13   Board of Health speak?
14          A.    No.
15          Q.    Did anyone who has a leadership role
16   in the Cuyahoga County Opiate Task Force speak?
17          A.    No.  We were initially asked to, and
18   then they rescinded their ask.
19          Q.    Who reached out to the task force to
20   initially seek a speaker?
21          A.    Sure.
22                So we also serve on the heroin task
23   force at the Attorney General's Office, and Mike
24   Tobin kind of leads that up.  He reached out to
25   Vince Caraffi and myself.

1      Q.    Was Mr. Tobin who rescinded the

2   invitation as well?

3      A.    I don't know the details behind it.

4   I just was told we were no longer speaking.

5      Q.    Who told you that someone was no

6   longer speaking from the task force?

7      A.    So I sent over a summary that I had

8   put together for speaking, and I received a

9   phone call, I believe it was from Mike Tobin,

10  that said, "Oh, I'm sorry, I thought I let you

11  know, we've changed directions as far as

12  speakers, so thank you for being willing but we

13  won't need you."

14     Q.    Was it you who was planning to

15  speak?

16     A.    Yes.

17     Q.    What was the subject matter of your

18  planned presentation?

19     A.    It was based on work that had been

20  done by the task force and accomplishments that

21  had been made.

22     Q.    Did you prepare a draft of a

23  PowerPoint for that presentation?

24     A.    It was just a draft summary.  It was

25  like three pages.

1      Q.    Do you still have that?

2      A.    Yeah.  Somewhere I have it.

3      Q.    From where did you get the

4  information that went into your three-page

5  summary?

6      A.    From the medical examiner, so some

7  data from them.  Mr. Caraffi provided a lot of

8  the data since I was new to the position.  He

9  gave me some verbiage to use.  And looking at

10  2017, again, death data.

11      Q.    Do you recall the subject matter of

12  Dr. Papp's presentation at the September 6th

13  conference?

14      A.    So it was -- it wasn't a

15  presentation.  It was more of a panel.  So they

16  had four individuals up there, and let's say the

17  topic was pain management or something.  Then

18  she would speak about pain management, someone

19  else would speak about -- I don't think that was

20  even one of the topics.  That's just for an

21  example.  I don't remember specifically what she

22  spoke about.

23      Q.    You mentioned that some of the

24  take-aways that you got from that September 6th

25  summit were PowerPoints.  Do you recall the

1  subject matter of any of the PowerPoints that

2  you received during that conference?

3       A.    Well, again, I'm trying to remember

4  if there were even PowerPoints.  If there were,

5  they were probably provided.  Most, again, of

6  those speakers were panel sessions.

7            I know that the CEO of the Cleveland

8  Clinic spoke and said thank you for all coming

9  together to address this topic, thank you for

10  your hard work, but I cannot remember the

11  specifics about each panel breakout session.

12       Q.    Do you remember about how many

13  people were there in attendance?

14       A.    The cap was 300.

15       Q.    Do you know whether it sold out?

16       A.    I believe it did.

17       Q.    How many people from the Board of

18  Health, the Cuyahoga County Board of Health,

19  attended?

20       A.    I know I attended, I saw our

21  commissioner there in the morning, and I'm not

22  sure who else was there.

23       Q.    Did anyone else from the opiate task

24  force attend?

25       A.    Probably, but I don't know.

1      Q.     Did your co-chair of the opiate task
2   force attend?
3      A.     She wasn't the co-chair yet, so I
4   don't know if she was at that conference yet.
5   She probably was, because she attends almost all
6   of them, but I don't -- I'm not positive.
7      Q.     You mentioned that the addiction
8   specialist, whose name that you can't remember
9   as you sit here today, spoke either at the
10  August or the October task force meeting?
11     A.     I believe it was August.
12     Q.     How frequently does the task force
13  have meetings?
14     A.     This year, they met every other
15  month.
16     Q.     Are minutes kept of every meeting?
17     A.     Yes.
18     Q.     Where are those minutes kept?
19     A.     They're housed on our hard drive at
20  the Board of Health.
21     Q.     Who keeps the minutes?
22     A.     Who is most readily available for
23  that meeting.  It can be an administrative
24  assistant.  It could be myself.  It could be
25  Mr. Caraffi.

1      Q.    Do you recall who had responsibility

2   for the minutes for the August meeting?

3      A.    I remember I was stuck in traffic

4   and I had to let one of the administrative

5   assistants know, so I believe it was one of the

6   administrative assistants that kept minutes that

7   day.

8      Q.    What are the names of the

9   administrative assistants that it may have been?

10      A.    So someone who -- and, again,

11   forgive me.  There's been a lot of movement with

12   this grant this year.  There's a new staff

13   member that joined.  And I don't know if she was

14   officially hired or if she was interested in the

15   position and she was attending because she was

16   interested in the position and gaining

17   information.  It would either be Pam Ditlevson

18   -- I'm terrible with pronouncing her last

19   name -- or Marlene Skovenski.

20      Q.    Any idea how to spell Pam's last

21   name?

22      A.    D-i-t-l-e-v-s-o-n.

23      Q.    Thank you.

24           And Marlene Skovenski?

25      A.    S-k-o-v-e-n-s-k-i, I think.

Page 267

1          Q.      Thank you.

2                  Are they both still with the Board

3    of Health?

4          A.      Yes.

5          Q.      Do you recall the title of that

6    PowerPoint on addiction?

7          A.      No.

8          Q.      Were there any other presentations

9    at that meeting?

10         A.      I think there were two more.

11         Q.      Were there PowerPoints for those

12   other presentations as well?

13         A.      Yes.

14         Q.      You mentioned that you thought maybe

15   Pam -- and I'm going to hack her last name.

16         A.      We call her Pam D.

17         Q.      Perfect.  You mentioned that Pam D

18   may have attended that meeting so she could

19   learn about it because she was applying for the

20   position?

21         A.      Um-hum.

22         Q.      Before you applied for the position,

23   did you attend any task force meetings?

24         A.      No.

25         Q.      Before you applied for the position

Page 268

1    that you currently have, did you review the --

2    either the Board of Health website with task

3    force information or the task force website

4    itself?

5                MS. WILSON:  Objection to form.

6         A.    To be honest with you, I can't

7    remember.  I would hope that in preparation for

8    the interview that I did, but I can't remember

9    if I did or not.

10        Q.    Did you talk with Ms. Leppla before

11   your interview so that you would be prepared for

12   the interview?

13        A.    Briefly, but nothing in depth.  I

14   just generally wanted to know the intensity of

15   the job, you know, kind of her main

16   responsibilities as far as with the public.

17        Q.    Do you remember what she told you

18   about that?

19        A.    Verbatim, no.

20        Q.    Just generally?

21        A.    I mean, I just -- in general, I

22   wanted to know -- I think I remember having a

23   conversation like is it really intense, you

24   know, what your responsibilities are, and she

25   didn't share exact responsibilities, no.

Page 269

1      Q.    What was your understanding going

2   into the job of what your -- what your

3   responsibilities would be like?

4      A.    Not as in depth of the work plan.

5   To be honest with you, going into the position,

6   I knew that the opiate task force was a piece of

7   it, I knew that working with ODH was a piece of

8   it.  I did not understand to what detail we were

9   directed by ODH to meet these certain

10  deliverables.

11     Q.    Had you been a program manager

12  previously?

13     A.    For a short period of time I was a

14  program manager with the Breast and Cervical

15  Cancer project, yes.

16     Q.    Did it have similar -- strike that.

17           Was that project also funded by a

18  grant?

19     A.    Correct.  Ohio Department of Health.

20     Q.    Did that project funded by the grant

21  from the Ohio Department -- the Ohio Department

22  of Health also have deliverables that you needed

23  to meet?

24     A.    It was structured much differently.

25  We had numbers we had to meet as far as women

Page 270

1   served, but that was about it.

2        Q.    Have you worked on any other

3   programs where you were responsible for

4   deliverables for a specific grant?

5        A.    Dental Options.  The same thing.  It

6   was structured much differently.  It was mostly

7   clients served.

8        Q.    So reporting the numbers of clients

9   served?

10       A.    Correct.

11       Q.    How is this different?  How are the

12  deliverables here, with the Injury Prevention

13  grant, different than those grants?

14            MS. WILSON:  Objection to form.

15       A.    Specifically with BCCP and Dental

16  Options, the Breast and Cervical Cancer project

17  and Dental Options, it's more service driven,

18  direct client services-based, so Breast and

19  Cervical Cancer project delivering services to

20  women who are uninsured or underinsured; Dental

21  Options, the same thing, and reporting those

22  numbers back as far as how many clients you

23  reached or served.  This is different in that

24  these are more activities-based.

25       Q.    When you say "activities-based," can

1  you explain to me a little bit -- what you mean

2  by that?

3        A.    Sure.

4              By activities I'm referring to the

5  objectives within the work plan.

6        Q.    Is one of the activities, then,

7  running the opiate task force?

8        A.    Correct, one of.

9        Q.    What are some of the other

10  activities that are a part of the Injury

11  Prevention grant that you are the program

12  manager for?

13        A.    Well, they're listed in, I think,

14  Exhibit 6.  We kind of talked about them earlier

15  today.  I could go through them one by one if

16  you would like me to.

17        Q.    Let's talk about which activities

18  relate specifically to opioid abuse or opioid

19  use disorders.  Are there any other activities

20  besides the opioid task force that relate to

21  that?

22        A.    All of them.

23        Q.    Okay.  So every one of the

24  activities that -- let me just back up.

25              Exhibit 6 relates to the proposal

1   for the grant that was not received, right?

2          A.    Correct.

3          Q.    So the deliverables for the grant

4   that is expiring are slightly different than

5   Exhibit 6, correct?

6          A.    Yes.

7          Q.    But all of the deliverables for the

8   grant that you're currently operating under,

9   they all relate to opioid misuse?

10              MS. WILSON:  Objection to form.

11         A.    They encompass prescription drug and

12  illicit.

13         Q.    Okay.  So any type of prescription

14  drug or illicit drug abuse; is that correct?

15         A.    Yeah.

16         Q.    Are there any of the deliverables

17  that you can think of -- and feel free to refer

18  to Exhibit 6, but if you know of any off the top

19  of your head, any deliverables that focus on

20  other types of substances besides opioids, where

21  they have a specific -- like the opiate task

22  force is opioids.  Is there a specific

23  deliverable with respect to some other drug?

24              MS. WILSON:  Objection to form.

25         A.    Again, it's the Injury

1   Prevention/Drug Overdose grant for 2019.

2   Previously it was prescription drug overdose.

3   But again, they still had us report on all

4   drugs.

5          Q.    And I think you alluded to this or

6   talked about it earlier, that in your role you

7   don't differentiate between prescription and

8   illicit drugs when you report to the state; is

9   that right?

10         A.    Correct.

11         Q.    I'm going to mark an exhibit that I

12   think will have an updated org chart in it.

13   This will be Exhibit 9.

14         A.    I'd like to see it.  I haven't seen

15   one in a while.

16                    -   -   -   -   -

17                    (Thereupon, Vince Deposition Exhibit

18                    9, Cuyahoga County Board of Health

19                    2017 Organizational Chart, Beginning

20                    Bates Number CUYAH_002503210 -

21                    Marked "Confidential," was marked

22                    for purposes of identification.)

23                    -   -   -   -   -

24         Q.    Ms. Vince, if you could please take

25   a look at what I've marked as Exhibit 9 for

Page 274

1    identification purposes.  It is a packet that

2    was produced by Cuyahoga County and had Bates

3    numbers, and let's see what page I marked first,

4    Bates numbers 002503210 through 3189 --

5            A.    Okay.

6            Q.    -- if I read that correctly.  Sorry.

7    My eyes are horrible.  And I'd like to direct

8    your attention, please, to -- and the Bates

9    numbers that I'm referring to are kind of on the

10   right-hand side, depending where your staple is.

11   Those we call Bates numbers.  So you'll see on

12   Bates page ending 194 is an organizational

13   chart, I believe, for 2017.

14           A.    Okay.

15           Q.    Do you see that?

16           A.    Yes.

17           Q.    And this is an organizational chart

18   for the Cuyahoga County Board of Health

19   Environmental Public Health Services for 2017,

20   correct?

21           A.    Okay.

22           Q.    Does that name ring a bell to you?

23           A.    That's the service area that I work

24   in right now.

25           Q.    Have you seen the 2017

1   organizational chart before?

2          A.     No.

3          Q.     Directing your attention further

4   down the page, so it's kind of a little bit of a

5   sprawling chart -- and I'm sorry.  For whatever

6   reason I can't read today.  But there is --

7   immediately to the left of the box with the date

8   in it, with 2017, so to the right of that,

9   there's a box at the top that says "Director."

10         A.     Um-hum.

11         Q.     Do you see that?

12         A.     Um-hum.

13         Q.     That box, there is a line that goes

14  straight down and branches out to the left and

15  to the right, correct?

16         A.     Yes.

17         Q.     The branch that goes to the left has

18  a Deputy Director Sobolewski?

19         A.     Sobolewski.

20         Q.     Do you know who that is?

21         A.     Yes.

22         Q.     Who is that?

23         A.     He's our deputy director for

24  environmental health.  I don't know if this is,

25  again, up to date.  I think things have changed.

Page 276

1   I think these two guys have flip-flopped, but I
2   can't be sure.
3        Q.    Okay.  So at least -- for purposes
4   of this chart, I just want to walk you through.
5        A.    Okay.
6        Q.    And then we'll go to the 2018 chart.
7             So underneath the deputy director
8   there are -- Deputy Director Sobolewski, there
9   are three boxes, three reports to him, correct?
10       A.    That's what it appears to be,
11  correct.
12       Q.    The farthest right of the reports to
13  Director Sobolewski is Supervisor Caraffi?
14       A.    Correct.
15       Q.    Is that -- do you know whether that
16  is Vince Caraffi, your supervisor?
17       A.    Yes, it is.
18       Q.    And underneath Mr. Caraffi's name,
19  can you please read for the record what it says?
20       A.    "Injury Prevention Lead and
21  General."
22       Q.    Is that -- do you have an
23  understanding of whether that group is the group
24  that Mr. Caraffi supervised in 2017?
25       A.    I have no idea.

1          Q.     Underneath Mr. Caraffi there are

2     several boxes.  The first line has three boxes,

3     and the furthest right of the three boxes

4     underneath Mr. Caraffi's name is a box that says

5     "Grant Prog MG" and has "Leppla" underneath.

6          A.     Um-hum.

7          Q.     Do you see that?

8          A.     Yes.

9          Q.     Do you understand that to be

10    Ms. Leppla?

11         A.     Correct.

12         Q.     And in 2017 did she report directly

13    to Mr. Caraffi?

14         A.     I believe so.

15         Q.     Now, if you could flip the page

16    to -- of course the staple is right on the Bates

17    number for me -- page 195, it ends in 195 --

18    this is the -- appears to be the organizational

19    chart for 2018 for the same group; is that

20    right?

21         A.     Yes.

22         Q.     If you could take a moment to take a

23    look at this page.  Have you seen this org chart

24    before?

25         A.     No.

1      Q.    Looking at the org chart today, does

2  this appear to be accurate, at least with

3  respect to your group?

4      A.    No.

5      Q.    What is inaccurate about it?

6      A.    And, again, I might be wrong because

7  nobody tells me exactly what's going on as far

8  as the org chart goes, but under Caraffi, where

9  it says "PHN program manager Schoch," I'm almost

10  positive she does not report to him.  She

11  reports to -- well, not necessarily reports to,

12  but I'm trying to find her name.  It would be

13  Stephanie McConaughey, but I don't see her name

14  on here.

15      Q.    Is that name just to the left of

16  Ms. Schoch?

17      A.    Oh, yes.  So they both work on the

18  lead program.  They do not report to Vince

19  Caraffi.  They report to John Sobolewski.  And,

20  again, I know that my deputy director is Wallace

21  Chambers, which is on the right.  That's why I'm

22  confused.

23      Q.    Okay.  So this chart that we're

24  looking at in Exhibit 9 on page Cuyahoga

25  002503195 does not -- at least as far as you

1   understand the organizational structure, doesn't

2   accurately reflect the organizational structure?

3           A.    Correct.  Not the way that I've been

4   operating since I've been working in there in

5   January.

6           Q.    Okay.  When you started in January,

7   did you receive an organizational chart of your

8   group?

9           A.    No.

10          Q.    Have you at any point in time since

11  working with the Cuyahoga County Board of Health

12  reviewed an organizational chart?

13          A.    The last time that a public

14  organizational chart was given to the staff I

15  want to say was 2014, '15.  Not positive.  I

16  just remember -- I remember reviewing it with

17  everyone else in our lunchroom.

18          Q.    At that time where did you work at

19  the Cuyahoga County Board of Health?

20          A.    In prevention and wellness.

21          Q.    Was that still within this

22  environmental public health services group?

23          A.    No.

24          Q.    That was a separate arm?

25          A.    Correct.

Page 280

1       Q.     Looking at this organizational
2   chart, if you can, and if you can't, to respond
3   to my questions, feel free just to tell me based
4   on what you know.
5       A.     Okay.
6       Q.     But what I was hoping we could do is
7   just understand how the grant flows.
8       A.     Um-hum.
9       Q.     So the Injury Prevention grant that
10  you are the program manager for, is that all
11  within this environmental and public health
12  services group --
13             MS. WILSON:  Objection to form.
14      Q.     -- as far as you know?
15      A.     It's housed in the environmental
16  public health service -- service area.
17      Q.     Okay.  Are there any other service
18  areas of the Cuyahoga County Board of Health
19  that are funded by the Injury Prevention grant?
20      A.     No.
21      Q.     The EpiCenter grant that you
22  referred to earlier, does that also come from
23  the Ohio Department of Health?
24      A.     Correct.  It's a supplemental
25  funding to our core Injury Prevention funding.

Page 281

1          Q.    So it's supplemental to the Injury

2    Prevention?

3          A.    Correct.

4          Q.    But also from the Ohio Department of

5    Health?

6          A.    Correct.

7          Q.    Is that also then housed within

8    environmental and public health services?

9                MS. WILSON:  Objection to form.

10         A.    The money is being allocated to our

11   epidemiology department.  They are doing the

12   work behind it.

13         Q.    So do you and Mr. Caraffi make that

14   allocation or does that come directly from the

15   state?

16         A.    It comes from the state.

17         Q.    But it is supplemental to the Injury

18   Prevention grant?

19         A.    Correct.

20         Q.    You mentioned earlier the ACEs

21   program.  Is that a program?

22         A.    It's a new project that started

23   December 1.

24         Q.    That just started this December 1?

25         A.    Correct.

Page 282

1      Q.    Is that funded also by the

2   Department of Health?

3      A.    No.

4      Q.    What is that funded by?

5      A.    That is funded through the CDC,

6   which flows through to the National Network of

7   Public Health Institutes, which flows to

8   Michigan Public Health Institute, which then

9   flows to us.

10      Q.    In the environmental and public

11   health services group of CCBH?

12      A.    Yes.

13      Q.    For your Injury Prevention program,

14   does that program receive funding from any other

15   source besides the State of Ohio?

16      A.    Other than in kind that we get

17   through volunteers that come to the task force

18   for speaking and we can't pay them, no.

19      Q.    At any point in time since you

20   started your position in January, have you

21   sought out funding from any county sources to

22   fund the programs related to substance abuse?

23      A.    Since I've been on board in 2018, we

24   have not.

25      Q.    Are you aware of at any point in

Page 283

1  time whether the Injury Prevention program has

2  sought county funding to assist with any

3  programming related to opioid abuse?

4           MS. WILSON:  Objection to form.

5      A.   Since I wasn't involved then, I have

6  no idea.  I don't even know if any was available

7  to apply for.

8      Q.   Have you seen anything, in getting

9  up to speed or in any of your work kind of

10 preparing the proposal for the grant request to

11 the state -- did you see anything where it

12 appeared that the CCBH sought funding from the

13 county for opiate work?

14          MS. WILSON:  Objection to form.

15     A.   Again, this year I haven't seen

16 anything.  I can't speak to years prior.

17     Q.   Do you have any plans on a

18 prospective basis, because the crisis grant will

19 expire in December -- do you have any plans on a

20 prospective basis to seek funding from any

21 county source to fund the opiate work?

22     A.   I don't know if they even have money

23 to fund it, so it doesn't do us any justice to

24 seek it out if they -- you know, they have to

25 RFP that out.  They have to put an RFQ or RFP.

Page 284

1    We try to keep our eyes out for something like

2    that.  Our commissioner is definitely on task

3    with making sure if there is any funding, he

4    would let us know about it.  But specifically

5    for this Injury Prevention grant, there's

6    another pot of money coming out in March that we

7    will apply for.  That's from the state.

8         Q.    From the state?

9         A.    Yeah.

10        Q.    Are you aware of any potential

11   county sources of funding for the work that

12   you're doing either with the Injury Prevention

13   program related to opioid work or the task force

14   specifically?

15             MS. WILSON:  Objection to form.

16        A.    Currently I'm not aware of any.

17   There may be some that I'm not aware of, but I'm

18   not aware of any.

19        Q.    Earlier my colleague asked you about

20   one of the deliverables, I believe, was the

21   Prescription Education program with MetroHealth,

22   right?

23        A.    Um-hum.

24        Q.    You mentioned, I think -- please

25   correct me if I'm misstating anything, but I

1    think you mentioned that there were prescription

2    kind of recommendations or guidelines that came

3    from the CDC.

4           A.    Um-hum.

5           Q.    Is that right?  Yes?

6           A.    Yes.

7           Q.    Did those -- strike that.

8                 Do those guidelines from the CDC

9    relate specifically to prescribing opioids?

10          A.    Again, I do rely on MetroHealth to

11   be the experts at that and they set the

12   curriculum.  I personally haven't reviewed the

13   exact prescribing guidelines that CDC has set,

14   so I don't know.

15          Q.    Who is the -- kind of the point

16   person or your contact at MetroHealth for that

17   prescribing program?

18          A.    That would be Emily Metz and

19   Dr. Papp.

20          Q.    Do you know whether they have any

21   printed materials that include those prescribing

22   guidelines?

23          A.    I'm not sure if they do or not.

24   When they do the training, they have some kind

25   of PowerPoint.  It might be in there.

1          Q.    Do you know whether anyone at the

2    Cuyahoga County Board of Health has a copy of

3    that, of any of their training materials?

4          A.    I don't know.  I can imagine it's

5    probably somewhere, but I don't know where that

6    would be.

7          Q.    Is it part of your reporting to the

8    state for the satisfaction of the

9    deliverables --

10          A.    Yes.

11          Q.    Do you review the training that's

12    performed by MetroHealth?

13          A.    I haven't personally reviewed it.

14    It was something that was set forth prior to me

15    being there, so I don't know if they reviewed it

16    or not.  I went to one training and watched the

17    training, but I wasn't tasked with reviewing

18    the -- what do you want to call it -- the

19    materials that were utilized or information

20    being given.

21          Q.    From attending that training do you

22    remember just generally what the subject matter

23    was?

24          A.    I know that they require all of

25    their physicians to attend a proper prescribing

Page 287

1    town hall.  I remember them handing out

2    PowerPoints to them.  I do not remember

3    specifics as far as what was said to the

4    physicians.  It wasn't all physicians.  It was

5    some nurse practitioners as well.

6         Q.    So individuals who can write

7    prescriptions in the State of Ohio attended?

8         A.    Yes.

9         Q.    Do you know whether the attendees

10   were all MetroHealth employees?

11        A.    I believe so.

12        Q.    Do you know whether that -- strike

13   that.

14              As a part of the deliverable for the

15   Injury Prevention grant, does that prescribing

16   program need to reach all physicians in Cuyahoga

17   County?

18        A.    I'm sorry.  Could you say that

19   again?

20        Q.    So the program is contracted out to

21   MetroHealth, the prescribing program?

22        A.    Correct.

23        Q.    And you attended a program that you

24   believe was attended by MetroHealth people?

25        A.    Correct.

Page 288

1          Q.     Do you know whether -- as a part of
2     the deliverable to the State of Ohio, whether
3     part of that prescribing program is to reach out
4     to prescribers in general in Cuyahoga County,
5     not just at MetroHealth?
6               MS.  WILSON:   Objection to form.
7          A.     To be honest with you, just being in
8     it this year, I know that Metro was our partner.
9     Again, that wasn't set forth by me.  It was in
10    place before I got there.  So I don't know if
11    there was any conversations ever if they wanted
12    it to reach beyond Metro.  I don't know.
13         Q.     What is your understanding of what
14    the deliverable is for that portion of the
15    Injury Prevention grant?
16         A.     Education and training to physicians
17    through MetroHealth on proper prescribing
18    guidelines.
19         Q.     So you don't have any understanding,
20    as you sit here today, whether MetroHealth
21    should -- should reach out to prescribers at the
22    Cleveland Clinic or prescribers at University
23    Hospitals or just private practitioners?
24         A.     No.   No.   I don't know.
25         Q.     Would Ms. Metz or Dr. Papp be the

Page 289

1    right person to ask that information?

2         A.    Yes.

3         Q.    Did either of them prepare any

4    written materials for you as a part of your --

5    the document that you're drafting to report on

6    the deliverables to the state?

7         A.    No.   The only thing we report back

8    to the state is number of training and dates of

9    the trainings.

10        Q.    So the substance and attendees is

11   not a part of your report?

12        A.    They haven't requested it from me

13   this year.   They may have requested it in the

14   past and already have it on file.   I don't know.

15        Q.    Do you know whether, as a part of

16   the Injury Prevention grant, there is an

17   expectation or a requirement that materials used

18   to fulfill the deliverables be maintained for

19   any certain period of time?

20        A.    I don't know.   I'm sure there are,

21   but I don't know what they are.

22        Q.    I believe earlier during your

23   testimony my colleague asked you a bit about the

24   mini-grants.

25        A.    Yes.

1        Q.    How many mini-grants did -- did you

2   or the Cuyahoga County Board of Health award?

3        A.    Four.

4        Q.    What were they for?

5        A.    I have to think.  Two of the awards

6   were for Duterra drug disposal pouches that they

7   would like to distribute.  One of the awards was

8   for a sticker awareness program in regard to

9   overdose.  And the fourth one was to a medical

10  center about a tool kit that they had called

11  Pause, P-a-u-s-e, in regard to prescribing

12  prescription opiates.

13       Q.    Starting first with -- we talked a

14  bit about the disposable pouches.  Do you recall

15  what entities received those two mini-grants on

16  the disposable pouches?

17       A.    I don't remember who received what.

18  I'd have to look just because I don't want to

19  misspeak.

20       Q.    Sure.

21             You have records of that, though?

22       A.    Yes.

23       Q.    So if we needed to know the names of

24  the entities that received those two mini-grants

25  on the pouches, we could get that from the

Page 291

1   county?

2        A.    Absolutely.

3        Q.    The stickers, do you recall who was

4   awarded that project?

5        A.    I could take a guess because I'm

6   almost 90 percent positive I know, but I don't

7   want to misspeak.

8        Q.    Well, why don't you tell me what you

9   recall, with the proviso that you don't have any

10  records in front of you and this is just your

11  best recollection.

12       A.    Okay.  I believe it was Coshocton

13  Health.

14       Q.    What is your understanding of what

15  those stickers were for?

16       A.    So they worked with pharmacies and

17  requested for a sticker to be placed on any

18  prescription opiate that was given to an

19  individual to make them aware of possible

20  addiction to that drug.

21       Q.    Did you receive, as a part of their

22  mini-grant application, a sample of the sticker

23  that they were proposing that they would put on

24  that?

25       A.    No.  We request the final outcomes

1  to be presented at the OIPP meeting in the

2  following year.  So that's where they would

3  present their findings and how many people they

4  reached, how many stickers, et cetera.

5      Q.   Do you know from where the

6  information on the stickers would come?

7      A.   I do not know, no.

8      Q.   Who selected -- who made the

9  decision to select that sticker program as one

10  of the mini-grant recipients?

11      A.   Sure.

12          So we have an RFP that goes out to

13  all of the OIPP members across the State of

14  Ohio.  Anyone who is interested responds with

15  notice of intent to apply to myself.  Then we

16  have a deadline as far as when they could submit

17  their application to CCBH.  Once it's accepted,

18  we have a panel of individuals who score the

19  application, and then they're awarded based on

20  the score but also ODH recommendation.

21      Q.   So these are ODH mini-grants, not

22  from CCBH?

23      A.   Correct.

24      Q.   And you don't know what the -- other

25  than kind of a general warning about addiction,

Page 293

1    you don't know what the content of the stickers

2    was?

3          A.    Correct.

4          Q.    Do you know whether it was going

5    directly on -- strike that.

6                Do you know where the sticker was

7    going to be placed?

8          A.    I do not.  They just stated it was

9    going to go home with the person receiving it.

10         Q.    So you don't know if it goes on the

11   bag or actually on the bottle if it's a pill?

12         A.    Correct.  I don't know.

13         Q.    The fourth mini-grant was the Pause

14   program.  What's your understanding of that?

15         A.    My understanding of that, as they

16   described it in the application, is that it's a

17   tool kit that literally makes the physician

18   pause before writing the prescription.  They

19   weren't required to give us the exact

20   curriculum.  We just had to know kind of in

21   general what they were planning on doing.

22         Q.    Do you know what entity received

23   that?

24         A.    I believe it was the physicians at

25   Kettering Medical Center.

Page 294

1        Q.    Does the Ohio Board of Health --
2   strike that.
3              These applications came in to you,
4   correct?
5        A.    Yes.
6        Q.    Did you maintain copies of them at
7   your office at Cuyahoga County Board of Health?
8        A.    Yes.  I have them electronically.
9        Q.    And do you still have them?
10       A.    Um-hum.
11       Q.    Do you know whether those
12   applications were gathered as a part of the
13   discovery process in this litigation?
14       A.    I don't know.  I know that we gave
15   everyone full rein of all of our documents and
16   they gathered what they needed to gather, so I
17   don't know.
18       Q.    How about hard copy materials that
19   you have, whether it be hard copies of any
20   applications or PowerPoints that you received at
21   seminars; were those collected as a part of the
22   document collection process, if you know?
23       A.    Anything that was scanned and
24   uploaded that we had, I don't know, again, if
25   they collected it or not.  I know that they were

Page 295

1  able to scan my entire hard drive as well as my

2  supervisor's and many other individuals.

3       Q.    Do you keep hard copies of anything

4  that isn't scanned and uploaded like in a drawer

5  or a file or anything?

6       A.    No.

7       Q.    So anything that you receive even at

8  a conference, you scan it and upload it?

9       A.    Well, not if it's an agenda or

10 something like that, no.

11      Q.    But a PowerPoint of substantive

12 information you would scan and upload?

13      A.    I have not scanned and uploaded

14 every PowerPoint that I have received, no.

15      Q.    What do you do with those?

16      A.    Probably keep a file at my desk if I

17 deemed fit to need reference to it later.

18      Q.    So in your role now, in the Injury

19 Prevention role and as co-chair of the task

20 force, have you maintained hard copies of any

21 PowerPoints or any other written materials

22 you've received at any meetings or conferences?

23           MS. WILSON:  Objection to form.

24      A.    Not that I can think of.  I could go

25 back to my desk and look, but not that I can

Case: 1:17-md-02804-DAP Doc #: 2177-14 Filed: 08/12/19 296 of 405. PageID #: 321284

Page 296

1  think of.

2      Q.    I'm thinking like, for example, the

3  September 6th conference.  If you received hard

4  copies of any presentations that were made at

5  that opioid summit, do you -- would you keep

6  copies of that for purposes of doing your job?

7      A.    Anything that was given at that

8  summit would have been sent to us

9  electronically, and I would have kept it that

10  way, from Mike Tobin.

11      Q.    When did you start attending opiate

12  task force meetings?

13      A.    I attended one in November, and,

14  again, there were things that were happening at

15  the Board of Health where I wasn't being -- I

16  wasn't able to step into my position officially

17  until January.  It was tentative in November;

18  therefore, I attended a meeting.

19      Q.    Have you attended every meeting

20  since then?

21      A.    Yes.

22      Q.    Who comes up with the agenda for

23  each task force meeting?

24      A.    Up until me stepping into the role,

25  I'm not sure who was -- who was setting the

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

1   agenda.  I know my supervisor had a strong hand

2   in it.  Now it's myself and Beth from the ADAMHS

3   Board.

4        Q.   At what point did the -- did the

5   ADAMHS Board become involved in -- and I forget

6   how you described it earlier, something about

7   housing the program.

8        A.   Sure.

9        Q.   So when did the ADAMHS Board become

10  involved in the opiate task force?

11       A.   They've been a member of the opiate

12  task force as long as I've been with the

13  project.  But it was this last year -- I believe

14  it was last year -- it was passed through Ohio

15  Revised Code -- and I can't tell you exactly the

16  number of it -- that all ADAMHS Boards in Ohio

17  had to house any opioid or opiate task force.

18  That hadn't happened since I was on board.  And

19  with Mr. Caraffi stepping down as chair, it was

20  time to pull them in and say, hey, you know,

21  this is Ohio Revised Code, and they stepped

22  forward, we had a meeting with them as far as

23  logistically how that was going to work out.  So

24  I think Beth and I started co-chairing in

25  October.

```
                                          Page 298
1          Q.     October?

2          A.     Of 2018.

3          Q.     Just this October?

4          A.     Yes.

5          Q.     Okay.  And Mr. Caraffi stepped down

6    around that same time?

7          A.     Yes.

8          Q.     And I believe you testified earlier

9    that you don't know why he stepped down?

10         A.     Correct.

11         Q.     He didn't talk to you at all about

12   it?

13         A.     He said he needed to take a break.

14         Q.     For how long had he served as the

15   chair of the opiate task force?

16         A.     I don't know, to be honest.  To

17   reference one of the materials we spoke about

18   earlier, it said it was established in 2010.  I

19   don't know if that's when he started or not.

20         Q.     Do you know for how long he has been

21   with the CCBH?

22         A.     I believe 28 years.

23         Q.     So he's been longer than you?

24         A.     Yes.

25         Q.     Is he -- is he changing his role at
```

1    CCBH?

2           A.     Not that I'm aware of.

3           Q.     And he remains your supervisor?

4           A.     Correct.

5           Q.     Does anyone report to you directly?

6           A.     No.

7           Q.     Do you have any assistance in

8    implementing the deliverables for purposes of

9    the Injury Prevention grant?

10          A.     Just through our sub-grantees.

11          Q.     How many sub-grantees are there?

12          A.     Four.

13          Q.     MetroHealth is one?

14          A.     Correct.

15          Q.     Who are the other three?

16          A.     Recovery Resources.

17          Q.     What do they do?

18          A.     They assist with directing policies

19   that may be implemented on college campuses.

20          Q.     Any others?

21          A.     Medina County Health Department and

22   Lorain County Health Department.

23          Q.     What do they do?

24          A.     The Medina -- and, again, this was

25   set before I stepped into the role, so I

Page 300

1   followed what they had already written.  Medina

2   County Health Department, the money was given to

3   them to help them establish their task force in

4   their county; and then Lorain Health Department,

5   money was given to them to start a task force

6   and also to direct a drug overdose awareness.

7          Q.    The money that was given to them was

8   money out of the allocation -- strike that.

9                The money that was given to Medina

10  and Lorain Counties' departments of health came

11  out of the Cuyahoga County Board of Health grant

12  from the State of Ohio?

13         A.    Correct.

14         Q.    What was the -- what is the

15  deliverable that is serviced by those two

16  allocations?

17         A.    Again, I'm not positive.  I didn't

18  write it.  I really don't know.  I stepped into

19  the role and just assured that they accomplished

20  what I was told they were supposed to

21  accomplish.

22         Q.    What were you told they were

23  supposed to accomplish?

24         A.    That Medina County Health Department

25  was to establish a task force and report back to

Page 301

1    us any activities that they accomplished, and

2    then Lorain County Health Department, the same

3    thing, along with their drug awareness campaign.

4         Q.    They report to you?

5         A.    They report it back to me and I

6    report it to the state, correct.

7         Q.    As a part of preparing your report

8    to the state that's in process, what -- what

9    have they reported to you, both Medina and

10   Lorain County?

11              MS. WILSON:  Objection to form.

12              Go ahead.

13        A.    I've met with both of them

14   separately stepping into my role, so I had a

15   good idea as far as what to expect from them.

16              Medina County Health Department,

17   they report things to me as far as when they're

18   meeting.  I don't ask for their minutes because

19   ODH doesn't ask for their minutes either.

20   Activities that they've done within the quarter.

21   Successes, barriers that they've had within the

22   quarter.

23              And then the same with Lorain.  They

24   send me information that they might distribute

25   through different entities, like gas stations.

1   They have the drug awareness campaign, so
2   they'll distribute flyers about drug overdose
3   prevention at the gas station.  Things of that
4   nature.
5        Q.    It sounded to me from your
6   description like it's drug overdose in general.
7   Is there a specific opioid focus of either of
8   those two as far as you know?
9        A.    Well, for Medina, it's their opiate
10  task force is their title.  And Lorain, their
11  focus is drug overdose in general.
12       Q.    Prior to receiving those, kind of,
13  sub-grants or -- I'm sorry if I am
14  mischaracterizing, but prior to receiving the
15  funds from Cuyahoga County, did either Medina or
16  Lorain have an opiate task force?
17       A.    I don't know, to be honest.  It was
18  before I was with the program.  I'm not sure.
19       Q.    Is one of the deliverables or one of
20  the parts of your job ensuring that the
21  public-facing information available from the
22  Cuyahoga County Board of Health and the opiate
23  task force, making sure that it's up to date and
24  accurate?
25       A.    I'm sorry.  Could you repeat that?

Page 303

1      Q.    Sure.  Sure.  I know it's getting

2   late.

3            As a part of your responsibilities

4   as the program manager, is one of your

5   responsibilities ensuring that publicly

6   available information from the Cuyahoga County

7   Board of Health or the opiate task force on the

8   work that your program is doing -- is part of

9   your role ensuring that that information is

10  accurate --

11           MS. WILSON:  Objection to form.

12      Q.    -- that is provided to the public?

13      A.    My role, again, is to make sure that

14  these deliverables are met.  I take it upon

15  myself to review the information and try to

16  update it as often as I can.

17      Q.    Is one of the deliverables -- strike

18  that.

19           Is education one of the deliverables

20  generally?

21      A.    It's not specifically one of the

22  deliverables.

23      Q.    Is maintaining the website

24  information?

25      A.    No.

Page 304

1          Q.     So that's just something that
2    Cuyahoga County has done --
3          A.     Correct.
4          Q.     -- as a service?
5          A.     Correct.
6          Q.     When did you first learn of the
7    lawsuit brought by Cuyahoga County?  Excuse me.
8          A.     Again, I first learned about the
9    lawsuit -- and I apologized earlier.  I cannot
10   remember if I read the Cleveland.com before or
11   after I was deposed.  I can't remember.
12         Q.     Okay.  Before you received notice of
13   your deposition?
14         A.     Correct.
15         Q.     This is your first deposition?
16         A.     Okay.  Yes.  Correct.
17         Q.     Okay.  Earlier my colleague was
18   asking you a little bit about the reference to
19   the multiple factors that kind of brought us to
20   where we are today with the opioid epidemic.
21                Do you recall that?
22         A.     Yes.
23         Q.     Do you know -- strike that.
24                As a part of your job, did you
25   develop an understanding of when the opioid

Page 305

1   issue became a critical issue within Cuyahoga

2   County?

3               MS. WILSON:  Objection to form.

4        A.     As a part of my job, it was my job

5   to review data from the medical examiner, but

6   not to understand when the epidemic started.

7        Q.     Do you have any understanding just

8   personally of when it started?

9        A.     Not really.

10       Q.     Was it five years ago?

11       A.     Again, if I was to look at the

12   medical examiner's data and it reflected

13   anything as far as overdose dates, 2015, '16

14   there was a large spike in overdose deaths.

15   That's the most -- that's the thing that -- the

16   only thing I have that's concrete.

17       Q.     So you would tie the epidemic to the

18   number of overdose deaths?

19       A.     At least for Cuyahoga County, yes.

20       Q.     Okay.  Not the formation of the task

21   force or anything like that?

22       A.     Again, that was before I worked with

23   it at all, so I can't speak to that.

24       Q.     How about just as a member of the

25   community, though?  Did you have any

```
 1    understanding, as a member of Cuyahoga County

 2    community and working at CCBH, in other arms I

 3    understand, but did you have any just general

 4    understanding of opioid misuse being a problem

 5    in Cuyahoga County?

 6          A.    No.

 7          Q.    You mentioned earlier that people

 8    often ask about what caused this, how did we end

 9    up here.  What do you tell them when they ask

10    you that question?

11          A.    I say, "I don't have that answer."

12          Q.    Do you point them to any source?

13          A.    No.

14          Q.    You just say, "I don't have that

15    answer"?

16          A.    I said, "There's no specific answer

17    to that question."

18          Q.    Are people satisfied with that

19    response?

20          A.    Nobody is.

21          Q.    What do they follow up with?

22          A.    They really don't have anything to

23    say to that.  Again, from the task force

24    standpoint and from our grant standpoint, the

25    only thing we can do is say it is a problem now
```

Page 307

1   and now what can we do to help mitigate this
2   problem.
3          MS. WILSON:  We've been going about
4   an hour I think.  I didn't know if -- I mean,
5   are you okay or do you need a break?
6          THE WITNESS:  What time is it?
7          MS. FEINSTEIN:  It's like three
8   minutes to 5.  We can take a short break now, if
9   you want, and I'll go through my notes, and then
10  one of my colleagues may have a few questions.
11  I have a few more, but --
12         THE WITNESS:  I'm fine.
13         MS. WILSON:  If April is all right.
14  I just wanted to ask.
15         THE WITNESS:  I appreciate it.  I'm
16  fine.
17         MS. FEINSTEIN:  Are you sure you
18  don't need to get up --
19         THE WITNESS:  Yes.
20         MS. FEINSTEIN:  -- because lawyers
21  are notoriously horrible about predicting how
22  much time they have left.  I'll try to be
23  efficient, though, and I apologize again for
24  skipping around a bit because I am just kind of
25  going through my notes a bit.

Page 308

1      Q.    Do you have an understanding that --
2  of whether prescription opioids in the United
3  States are approved by the Food and Drug
4  Administration?
5      A.    Could you say that again?
6      Q.    Sure.
7            Do you know anything about how drugs
8  in the U.S., prescription drugs, are approved
9  for sale?
10     A.    Do I have knowledge as far as how
11 the FDA approves drugs for sale?
12     Q.    Or just that the FDA is -- strike
13 that.
14           Do you have any information at all
15 about the FDA's involvement in prescription
16 drugs?
17     A.    No.
18     Q.    Do you know anything about any
19 regulations that govern prescription drugs?
20     A.    No.
21     Q.    As a part of your work with the
22 opioid task force or the opiate task force or
23 the Injury Prevention grant, have you learned
24 anything about risk evaluation and mitigation
25 strategies with respect to opioids?

1          A.     No.

2          Q.     Have you ever heard of REMS?

3          A.     No.

4          Q.     As a part of the prescribing

5     practices training, do you recall hearing

6     anything about the risk evaluation or mitigation

7     strategies?

8          A.     No.

9          Q.     Have you ever seen any advertising

10    for any prescription opioids?

11         A.     I'm trying to think.  Not really.

12    Not that I can think of.

13         Q.     Any print materials about

14    prescription opioids?

15         A.     As far as advertising goes?

16         Q.     Um-hum.

17         A.     Not off the top of my head.

18         Q.     Have you ever talked with anyone, in

19    your role over the past year or at any time,

20    about any statements that were perceived as

21    being false made by any company in the promotion

22    of prescription opioids?

23              MS. WILSON:  Objection to form.

24         A.     Wait.  Could you say that again?

25         Q.     Sure.

Page 310

1          At any time, either in your role

2    over the past year or any time before that, have

3    you had any discussions with anyone about

4    perceived false statements made in the promotion

5    of prescription opioids?

6              MS. WILSON:  Objection to form.

7         A.    I'm sorry.  I don't know if I'm

8    really tired or it's really -- but I don't

9    understand your question.

10         Q.    Sure.  I'll try to ask it better.

11              At any point has anyone ever

12    complained to you that they heard someone say

13    something untrue about a prescription opioid, so

14    that it wasn't addictive or something like that?

15              MS. WILSON:  Objection to form.

16         A.    I haven't heard anyone say something

17    like that.  I've read something like that at the

18    Harm Reduction Conference that I went to in

19    October.  Nothing was cited.  It was about

20    pregnancy and opioid use.

21         Q.    What do you recall being said?

22         A.    It was a pamphlet.  It wasn't said.

23    Again, it was written.  It was in a pamphlet.

24    And it was specific to pregnancy and opioid use.

25    They cited nothing medically.  They were making

1   blanket statements, that were not medically

2   based at all, that women who used opioids and

3   were pregnant, that their babies weren't in a

4   lot of pain and were not going through

5   withdrawal when born, and, again, not referring

6   to anything medically.  It was disturbing to

7   read that, to be honest.

8          Q.    Do you know -- do you still have a

9   copy of that pamphlet?

10         A.    I believe I have it somewhere, yes.

11         Q.    Do you know who wrote that?

12         A.    I don't.

13         Q.    Did it list any specific opioid in

14  the pamphlet?

15         A.    No.

16         Q.    Was it just sitting at a table or

17  was someone handing that out at the conference?

18         A.    It was in the packet that was given

19  to us at this conference, this National Harm

20  Reduction Conference.

21         Q.    Where was that conference?

22         A.    New Orleans.

23         Q.    Was who the sponsor of the

24  conference?

25         A.    The National Harm Reduction

1   Coalition.  Again, that was written into the

2   grant before I was in the grant.  That is not a

3   conference I would have chosen to go to.  As a

4   public health official, we certainly wouldn't

5   support that type of stance.

6        Q.    When you say you wouldn't support

7   that type of stance, what do you mean, the

8   stance in the pamphlet or the stance of the

9   whole conference?

10       A.    The stance in the pamphlet.

11       Q.    Was there a speaker who was talking

12  about what you read in the pamphlet?

13       A.    No.

14       Q.    How big was the pamphlet?

15       A.    Probably 3-by-5.

16       Q.    And you think you may still have a

17  copy of that?

18       A.    I might.

19       Q.    Did you discuss that pamphlet with

20  anybody?

21       A.    Yes.  My co-worker that was there at

22  the conference with me.

23       Q.    Who was that?

24       A.    Marlene Skovenski.

25       Q.    Did she get one also?

1          A.     Correct.

2          Q.     Was anyone else there from the

3     Cuyahoga County Board of Health?

4          A.     No.

5          Q.     Anyone from the Ohio Department of

6     Health that you know of?

7          A.     Not to my knowledge.

8          Q.     Were there other written materials

9     that you received at that conference?

10          A.     Yes.

11          Q.     Anything else that you received at

12     that conference that had inaccurate information

13     in it as far as you thought?

14          A.     Not that I can remember.

15          Q.     Do you remember whether there was

16     like a title or something on that pamphlet?

17          A.     I think it was like pregnancies and

18     opioids or something like that.

19          Q.     Anything else other than that

20     pamphlet that you can think of where you have

21     seen or heard what you perceived to be

22     misinformation about opioids?

23          A.     I guess it's hard for me -- you

24     would have to define what misinformation is.

25     Since, again, I'm not a pharmacist or a

Page 314

1  physician, I don't think I'd be qualified to

2  determine.  Other than that being kind of a

3  public health issue, I don't think I could speak

4  to it otherwise.

5       Q.    Are you aware of any false or

6  misleading statements having been made by any

7  manufacturer of a prescription opioid?

8            MS. WILSON:  Objection to form.

9       A.    I'm not aware of any because I

10  haven't read anything like that.

11       Q.    Have you -- have you ever gone on

12  the websites for any prescription opioids to see

13  what information is available about those

14  opioids?

15       A.    No.

16       Q.    Do you know whether prescription

17  opioids in the United States have a black box

18  warning that talks about addiction?

19       A.    I have no idea.

20       Q.    And you understand that a person can

21  take a prescription opioid and not become

22  addicted, right?

23       A.    I understand that.

24       Q.    Do you know whether the Cuyahoga

25  County Board of Health has performed any

Page 315

1    research on opioids?

2         A.    No.

3         Q.    The EpiCenter project, what -- and I

4    know you talked a little bit about that earlier.

5    Can you please tell me what your understanding

6    is of that project?

7         A.    Sure.

8               So it's the Epi Validation project.

9    The State of Ohio reached out to us and said

10   we'd like you to perform some kind of matchup

11   between the electronic health record of some

12   hospital -- we determined MetroHealth because we

13   already had an established data sharing

14   agreement with them -- and the epidemiologist

15   and the data analyst at CCBH are tasked with

16   taking 60 electronic records and not using

17   identifying data and matching them up to the

18   data that's entered into EpiCenter and making

19   sure that they match up so that each entity is

20   reporting the same information.  So they want to

21   validate the data to make sure that it matches

22   up.

23        Q.    How far along is that project?

24        A.    It just started.  It took a very

25   long time to gain access to the electronic

1   health records and the data sharing agreement to

2   be agreed upon.

3        Q.    For how long will it go; do you

4   know?

5        A.    December 31st we have to have them

6   all reviewed.

7        Q.    So it will be done this year?

8        A.    Hopefully, yes.

9        Q.    And who's heading that up again?

10       A.    Chris Kippes.

11       Q.    Is anyone, as far as you know,

12   working on that with him?

13       A.    Becky Karns.

14       Q.    Do you know for how long MetroHealth

15   has had an Office of Opiate Safety?

16       A.    I don't.

17       Q.    Do you know who heads up that

18   office?

19       A.    Dr. Papp and Emily Metz.

20            MS. FEINSTEIN:  If you give me one

21   second, I'm just going to flip through my notes,

22   but I think I'm almost done.

23            MR. SCHUTTE:  While you do that, can

24   we take five minutes, so then we can switch

25   places, or do you want to finish and then we can

Page 317

1    switch places?

2              MS. FEINSTEIN:  Either way works for

3    me.  I can take a break right now.

4              MR. MORIARTY:  Let's take five

5    minutes.

6              THE VIDEOGRAPHER:  Off the record,

7    5:07.

8                   (Recess had.)

9              THE VIDEOGRAPHER:  We're on the

10   record, 5:17.

11             MS. FEINSTEIN:  Thank you,

12   Ms. Vince.  I have no further questions for you

13   today.  I'm going to pass the mic to one of my

14   colleagues.

15             THE WITNESS:  Thank you.

16             EXAMINATION OF APRIL R. VINCE

17   BY MR. SCHUTTE:

18        Q.    Good afternoon, Ms. Vince.  My name

19   is Scott Schutte.  I represent Rite-Aid.  I just

20   have a few questions.  I'm going to try not to

21   jump around too much, although I think that's

22   inevitable at this time of the day.

23        A.    Okay.

24        Q.    First of all, I have in my notes

25   that you mentioned something called a heroin

Page 318

1    task force.

2          A.    Correct.

3          Q.    What is that?

4          A.    It's led by the U.S. District

5    Attorney General's Office.  And, in fact,

6    there's a meeting tomorrow afternoon I'm

7    attending.  I started attending those midway

8    through this year in replacement of my

9    supervisor, Mr. Caraffi.

10          Q.    How does that fit in, if at all,

11    with the Injury Prevention project that you're

12    spearheading?

13          A.    Sure.

14              So with the Injury Prevention

15    project, basically Mr. Caraffi was attending it

16    because it also involves local law enforcement

17    and DEA, and also the medical examiner.  The

18    medical examiner reports out data at that

19    meeting, so we do collect data from that meeting

20    as far as his report.

21          Q.    The Cuyahoga County Medical

22    Examiner?

23          A.    Correct.  He reports out.

24          Q.    He reports out data at those

25    meetings, and then that's your opportunity to

Page 319

1  bring that data back?

2         A.    Just in case it's something we

3  haven't captured in a report he sent us,

4  correct.

5         Q.    How does that intersect, if at all,

6  with any of the deliverables of the Injury

7  Prevention project, and by that I mean your

8  participation in the heroin task force?

9         A.    Sure.

10               So, for coalition building, that

11  deliverable, as far as reaching out to

12  individuals, that's an avenue where we would

13  reach out to individuals to join our task force

14  as well if they're not already a member.

15         Q.    Okay.  Could you please take a look

16  at Exhibit Number 4, which is the Injury

17  Prevention grant CCBH 2018?

18         A.    Sure.

19         Q.    Ms. Vince, there's a reference on

20  the paragraph under the project description --

21  directive description that refers to the

22  Overdose Fatality Review Committee.  Could you

23  tell us what that is?

24         A.    Sure.

25               That's basically Dr. Gilson, who is

1    the medical examiner, and Mr. Caraffi, and I

2    believe that there's another individual, Hugh

3    Shannon, that meets with them as well.  I'm not

4    sure of how often they meet.  And I don't

5    participate in those meetings.  Mr. Caraffi does

6    lead up that initiative.  So I would have to ask

7    him how often they meet.

8            Q.    Who is Hugh Shannon?

9            A.    He works at the medical examiner's

10   office with Dr. Gilson.

11           Q.    You've testified a couple different

12   times today about the fact that Mr. Caraffi

13   meets with Dr. Gilson and reviews overdose

14   information.  Is this separate from that or is

15   this what you were referring to?

16           A.    That's what I was referring to.

17           Q.    Okay.  There's also a -- if you look

18   at the second page of Exhibit 4 under

19   "Statistician," there's something called -- and

20   I apologize if I don't pronounce this correctly

21   -- the Syndromic Surveillance Validation

22   project.  What is that?

23           A.    Let me see.  So that's one and the

24   same of the Epi Validation project.

25           Q.    Okay.  Thank you.

1          There's also a reference to the
2    Cuyahoga County Overdose Prevention project.
3    What is that?
4          A.    Cuyahoga County Overdose Prevention
5    program?
6          Q.    Program, yes.  Thank you.
7          A.    So that's the Injury Prevention
8    grant that we have.  I honestly don't know why
9    it's called Cuyahoga County Overdose Prevention
10   program.  It's the Injury Prevention program is
11   what it should read.
12         Q.    Sorry about that.  When we see
13   references to the Cuyahoga County Overdose
14   Prevention program in Exhibit 4, that's the same
15   as the Injury Prevention grant project we've
16   been talking about all day?
17         A.    The same as the Injury Prevention
18   grant, correct.
19         Q.    Okay.  Great.  You can put that
20   aside.
21              If you would take a look at your
22   resume, which is Exhibit 1.
23         A.    Yes.
24         Q.    I believe you testified very early
25   this morning that when you were doing work on

Page 322

1    aging, there was a project that you did that had

2    touched on opioids, I think specifically the

3    Fall Prevention project.

4         A.    The Fall Prevention project didn't

5    involve opioids, no.

6         Q.    It did not.  Okay.

7         A.    No.

8         Q.    Prior to the time you became the

9    program manager for the Injury Prevention

10   project, did you have any role with respect to

11   opioids or opiates while you've been employed by

12   the County Board of Health?

13        A.    No.

14        Q.    So the very first time you began

15   having any involvement with opioids or opiates

16   was in January 2018?

17        A.    Correct.

18        Q.    There's a reference in your resume

19   on the second page under "Leadership" to the web

20   tech liaison IT for CCBH.  What does that mean?

21        A.    Basically that means I know how to

22   upload some documents to the website, which I

23   previously did, and I am no longer allowed to do

24   that because we contract with someone to do

25   that.

Page 323

1        Q.    And by "the website," you mean the
2   Cuyahoga County Board of Health website?
3        A.    Correct.
4        Q.    And that's what you testified to
5   earlier today, which is the -- there's a piece
6   of that that is the Cuyahoga County Opiate Task
7   Force that, if it needs to be updated, you have
8   to submit a request to the vendor, it's then put
9   in the queue and then it's done; is that right?
10       A.    That's for the Cuyahoga County Board
11  of Health website, not for the opiate task force
12  website.
13       Q.    The reference to the web tech
14  liaison for IT -- and when you said a moment ago
15  that you used to be able to upload information
16  directly and now have to go through a vendor,
17  which of the two websites were you referring to?
18       A.    The Cuyahoga County Board of Health
19  website.
20       Q.    Okay.  And is it -- if you know, is
21  that the website that has the address
22  www.CCBH.net/opiates?
23       A.    Correct.
24       Q.    And the website that is the one that
25  is for the opiate task force that you also

Page 324

1    talked about today, is that the one that has the

2    long address of www -- excuse me --

3    opiatecollaborative.cuyahogacounty.US?  Is that

4    correct?

5         A.    I'd have to look at it to see if

6    that's the correct one.

7         Q.    Okay.  But with respect to the

8    website, the opiate task force website within

9    the Cuyahoga County Board of Health website,

10   that's the one that if you want to make changes,

11   you can just put the request into the queue and

12   it be done?

13        A.    Technically, yes.

14        Q.    Why are you hedging the answer?

15        A.    The company that we contract with,

16   all requests have to be approved through the

17   epidemiology director and our communication and

18   marketing director, and they prioritize what

19   needs to be updated.

20        Q.    Have there been any requests that

21   you've made for changes on the Cuyahoga County

22   Board of Health website portion for the opiate

23   task force that -- changes you've requested that

24   have not yet been made?

25        A.    To be honest, I'd have to look at

Page 325

1   requests that I've made.  There might be small
2   formatting requests that I've made that have not
3   been done.  I'd have to go back and look at
4   requests that I made and cross-reference it to
5   the current site.
6        Q.    Do you recall that Mr. Masters
7   showed you a section of the 2016 opiate task
8   force on contributing factors?  We looked at
9   that earlier today.
10       A.    I think.  I'd have to go back to the
11  document and look.
12       Q.    We can move on.
13            The last question about your resume.
14  Under the section of your resume for program
15  manager for the Injury Prevention project, it
16  says that part of your job is public speaking as
17  it relates to the program.  Do I have it right
18  that the only public speaking you've done so far
19  was with respect to the -- to the -- well, let's
20  do it this way.  What public speaking have you
21  done so far with respect to your role as the
22  program manager?
23       A.    The only public speaking I've done
24  so far is speaking at the opiate task force,
25  introducing speakers.  I haven't done any

Page 326

1    speaking on the topic yet.  Strike that.  I'm

2    learning terminology today.

3            I have --

4       Q.    Very nicely done.

5       A.    I don't know why this slipped my

6    mind.  I did speak as a panelist at Case Western

7    Reserve University to medical students and

8    dental students November 28th and December 5th.

9       Q.    What were those presentations about?

10      A.    It wasn't -- I didn't have a

11   PowerPoint presentation or a speech written up.

12   It was someone from the Office on Opiate Safety

13   from MetroHealth did a Narcan training for the

14   students, and then it was open discussion for

15   them to ask us questions.

16      Q.    Do you remember any of the questions

17   you were asked of either of those two panels?

18      A.    I'm trying to think of specifics.

19   Mostly they were directed to the physician that

20   was there.  They were interested behind -- the

21   medicine behind addiction.  They asked questions

22   like can Narcan be carried on an airplane, can a

23   pregnant woman use Narcan.  They were focused

24   mostly around Narcan.

25      Q.    Okay.  Who was the physician you

1    referenced who was on the panel with you?

2         A.    I'm terrible with names.

3         Q.    If you recall.

4         A.    Again, it was the addiction

5    specialist, the psychiatrist that spoke at our

6    task force from Southwest Hospital.  He was on

7    the first panel with me on the 28th.  And then

8    the second one, this is not her last name, this

9    is her first name, but everyone calls her

10   Dr. Chris.  She was the physician on the second

11   panel.

12        Q.    I believe that Ms. Feinstein asked

13   you a question about whether you've been asked

14   questions about the cause of the opioid

15   situation in Cuyahoga County.

16        A.    Um-hum.

17        Q.    Did that question get asked at

18   either one of those panels?

19        A.    Not that I can recall.

20        Q.    I also have a note from earlier

21   today, you also presented at drug court as well?

22        A.    Yes.

23        Q.    So those are -- the speaking that

24   you've done so far are at the opiate task force

25   meetings, at these two panels that you just

1  described for me, and then also to the drug

2  court?

3          A.    Correct.

4          Q.    Okay.

5          A.    I'm sorry.  I'm remembering things

6  now that I didn't before.

7          Q.    I had a note that you mentioned

8  something earlier today in response to a

9  question about how you apportion your time, and

10  you said -- I think this is an exact quote --

11  you recorded -- you have to look at your

12  recorded time at the Board of Health.  What did

13  you mean by that?

14          A.    So as public health officials, we're

15  required to document our time and what it's

16  spent on in .25 increments, which you can make

17  that two hours, you can make that 15 minutes,

18  but they have to be in .25 increments.  So we

19  have a system called the daily system.  We have

20  to enter our time, what it's spent on, what

21  we're doing for the day every day for the past

22  19 years.

23          Q.    You should go to law school.

24  Lawyers have to do that, too.

25                Is there a certain amount of time

1  you have to account for each day?

2       A.    One hundred percent has to be spent

3  on injury prevention every day.

4       Q.    Thank you for that.  And I think my

5  question wasn't clear.  Is there a requirement

6  that you put in at least eight hours or seven

7  hours or nine hours?

8       A.    7.5.

9       Q.    7.5.  What if you work more than

10 7.5?  Would you account for that as well?

11      A.    Yes.

12      Q.    Is this different than any kind of a

13 sort of payroll system or swipe system?

14      A.    Yes.

15      Q.    How is it different?

16      A.    I don't know how to describe how

17 it's different.  It's not tied to our payroll, I

18 don't believe.  I could be wrong because I don't

19 work in payroll.

20      Q.    Yes.

21            What is your understanding of the

22 purpose for the daily system and the requirement

23 that you enter your time in .25-hour increments?

24      A.    To track our time and what we spend

25 it on.

Page 330

1          Q.     Okay.  So with respect to the time
2     you spent since January of 2018, when you became
3     the program manager, conceivably we could look
4     at the daily system and find out how you've
5     accounted for your time throughout the year?
6          A.     Sure.
7          Q.     Is there a -- do you have any coding
8     in there where you apportion it to certain
9     deliverables that we've been talking about
10    today?
11         A.     No.  They just don't get that
12    detailed.  It's just programmatically.
13         Q.     And is it -- are you allowed to do
14    block entries, if you will?
15         A.     Yes.  Like two hours I did this,
16    yes.  Yeah.
17         Q.     You testified earlier today that
18    Mr. Caraffi -- you estimated 5 to 10 percent of
19    his time for budget purposes were apportioned to
20    the Injury Prevention project?
21         A.     Right.  And when I say for budget
22    purposes, we have to do like a salary
23    projection, we see what time is available, and
24    then that's when we determine what percentage he
25    can spend on the grant.

1          Q.    I see.

2                Is a hundred percent of your time

3     apportioned to -- or allocated to the Injury

4     Prevention program?

5          A.    Yes.

6          Q.    Is that also true of Ms. Skovenski?

7          A.    No.  She's a percentage of it.  And,

8     again, I'd have to look at our budget to see

9     exactly.

10         Q.    What about Becky Gray?

11         A.    She's a percentage.  Her -- she has

12    fluctuated over the year as far as

13    percentage-wise.  She began at a lower

14    percentage and went up in the middle of the

15    year, I believe.

16         Q.    Do you recall what the new

17    percentage she's at now is?

18         A.    I want to say 20 percent, but I'm

19    not positive.

20         Q.    What about Chris Kippes?  Is it

21    Kippes?

22         A.    That's correct.

23                He is not allocated as a percentage

24    on injury prevention other than the Epi

25    Validation project, just that.

1      Q.    Is there anyone whose time is
2   allocated to the Injury Prevention project other
3   than you, Mr. Caraffi, Ms. Skovenski, Ms. Gray
4   and Mr. Kippes, and at least with Mr. Kippes it
5   applies to the Epi project?
6              MS. WILSON:  Objection to form.
7      A.    As far as I know, recently we added
8   a staff member, again Pam D, because I don't
9   want to butcher her last name.  She was just
10  added as a staff member.
11     Q.    Anyone else?
12     A.    Not to my knowledge this year.
13     Q.    Thank you for that.
14     A.    And also for the record, Gray is now
15  Karns.  I've been speaking about Becky Karns.
16  Her last name is now Karns.
17     Q.    Thank you.
18     A.    Sorry.
19     Q.    No, not at all.
20              You had been asked earlier today --
21  you've never seen the complaint in this case,
22  correct?
23     A.    Correct.
24     Q.    And you don't know what the
25  allegations are in the case?

Page 333

1           A.    I do not.

2           Q.    So I take it, then, that you would

3    not be able to testify with respect to any of

4    the allegations in the complaint?

5           A.    No.

6           Q.    You have no knowledge -- because

7    you've never seen them, you aren't in a position

8    today to testify as to whether any of the

9    allegations in the complaint are accurate,

10   correct?

11          A.    That's correct.

12          Q.    Ms. Feinstein asked you about

13   manufacturers and distributors.  I represent

14   Rite-Aid.  There are also other retail pharmacy

15   names, CVS, Walgreens and Walmart.  Do you have

16   any understanding as to why they have been named

17   Defendants in the lawsuit?

18          A.    No, I don't.

19          Q.    I take it you would not be able to

20   testify as to any reason why Walgreens, Walmart,

21   CVS or Rite-Aid could be held liable in this

22   case?

23                MS. WILSON:  Objection to form.

24          A.    No, I could not testify.

25          Q.    You were asked some questions

Page 334

1   earlier today about whether you looked into any

2   damages at all in connection with this case.

3   Pardon me if you've already been asked this, but

4   do you know what damages are being sought by

5   Cuyahoga County in this case?

6           A.    I do not know.

7           Q.    I take it, then, you wouldn't be in

8   a position to testify about whether the damages

9   being sought are accurate or valid?

10          A.    That's correct.

11          Q.    There have been a lot of questions

12  asked of you today about overdoses and whether

13  those are overdoses on legal prescriptions

14  versus illicit drugs versus drugs that aren't

15  even opiates.  Do you have any knowledge, as you

16  sit here today, of the portion of overdoses in

17  Cuyahoga County that are attributable to legal

18  prescriptions?

19          A.    I do not have that knowledge

20  accessible currently off the top of my head.  I

21  know that that exists at the medical examiner's

22  office through data that is provided to us.

23          Q.    And would the answer be the same if

24  I asked about overdoses based on illegal drug --

25  illegal opiate usage?

```
                                              Page 335
  1            A.    Yes.
  2            Q.    And also if I asked the question
  3    about illegal drug usage that are not opiates;
  4    in other words, for example, if someone
  5    overdosed on cocaine or methamphetamine?
  6            A.    Yes.
  7            Q.    As you sit here today, do you have
  8    any knowledge about the percentage of people who
  9    overdose on an illegal opiate who at one time
 10    were taking legal prescription opiates?
 11            A.    I don't have that knowledge.  I
 12    don't know if there's research been done around
 13    that.  I'm not sure.
 14            Q.    Okay.
 15            A.    I've heard stories through parents
 16    that that's what happened to their son or
 17    daughter, but I don't have research that I'm
 18    aware of.
 19            Q.    Okay.  And you would not be in a
 20    position to testify as to which percentage or
 21    which particular cases in Cuyahoga County are
 22    overdoses from an illegal drug and that person
 23    started as a user of a legal opiate?
 24            A.    No.
 25            Q.    Legal opiate or opioid?
```

Page 336

1          A.     Right.  No.

2          Q.     I think the last thing I have is

3    about the transition into your current position.

4    As I understood your testimony, you -- well, I

5    certainly started talking today and asked you

6    the question where you said you had not had any

7    involvement with opioids in your job prior --

8    that you took your current position in January

9    of 2018, correct?

10         A.     Correct.

11         Q.     And I think I heard you say earlier

12   today that you did very little research before

13   you interviewed for the current position you're

14   in, correct?

15         A.     Well, I said I would hope that

16   that's what I did.  I'm not positive I did.  I

17   would hope that I prepared for the interview.

18         Q.     But as you sit here today, you don't

19   recall?

20         A.     I don't remember exactly what I

21   looked at, no.

22         Q.     Okay.  You also testified, I

23   believe, that -- and you'll correct me if I'm

24   wrong I hope, that the only reason that you knew

25   that the program manager position that was open

Page 337

1    had to do with the Injury Prevention project is
2    because you knew that -- I'm going to draw a
3    blank on her name.
4           A.    Allisyn Leppla.
5           Q.    Was leaving.  Is that correct?
6           A.    Correct.
7           Q.    The job posting was not specific to
8    the opioid Injury Prevention project?
9           A.    As I remember, it was not.  I
10   believe it was posted as a program manager
11   within Environmental Health Services, and I
12   don't believe anywhere in the job description it
13   specified this specific grant.
14          Q.    So if you prepared for that
15   interview by looking at opioid issues, it would
16   have been because you surmised, from the fact
17   that it was your predecessor who was leaving,
18   that that was the nature of the open position?
19          A.    Correct.  I knew the nature of her
20   job.
21          Q.    Right.  Do you remember who you
22   interviewed with?
23          A.    Mr. Caraffi and Desiree Hudson.
24          Q.    Who is Ms. Hudson?
25          A.    She worked in our HR department.

Page 338

1   She's since left.

2        Q.    Okay.  Do you recall, Ms. Vince,

3   whether there were specific questions about

4   opioids or opiates asked during the course of

5   that interview?

6        A.    I can't remember.

7             MR. SCHUTTE:  I don't believe

8   anybody in the room on the defense side has

9   anything, but I should ask whether anyone on the

10  phone has follow-up questions before we pass the

11  mic over to Plaintiff's counsel.

12            MR. ALEXANDER:  No questions for

13  AmerisourceBergen.

14            MR. SCHUTTE:  Anyone else on the

15  phone?

16            MS. WILSON:  Plaintiff has no

17  questions.

18            MR. SCHUTTE:  Thank you very much

19  for your time and your patience today.

20            THE WITNESS:  Thank you all.

21            THE VIDEOGRAPHER:  Off the record,

22  5:39.

23

24       (Deposition concluded at 5:39 p.m.)

25                  - - - - -

1    Whereupon, counsel was requested to give

2    instruction regarding the witness' review of

3    the transcript pursuant to the Civil Rules.

4

5                        SIGNATURE:

6    Transcript review was requested pursuant to

7    the applicable Rules of Civil Procedure.

8

9                   TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 340

1              REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                          ) SS:

4    County of Cuyahoga.   )

5

6            I, Renee L. Pellegrino, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, APRIL R. VINCE, was

10   by me first duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the cause

12   aforesaid; that the testimony then given by the

13   above referenced witness was by me reduced to

14   stenotypy in the presence of said witness;

15   afterwards transcribed, and that the foregoing is a

16   true and correct transcription of the testimony so

17   given by the above referenced witness.

18           I do further certify that this

19   deposition was taken at the time and place in the

20   foregoing caption specified and was completed

21   without adjournment.

22

23

24

25

Page 341

1          I do further certify that I am not a

2     relative, counsel or attorney for either party,

3     or otherwise interested in the event of this

4     action.

5          IN WITNESS WHEREOF, I have hereunto set

6     my hand and affixed my seal of office at

7     Cleveland, Ohio, on this 18th day of December, 2018.

8

9

10

11

12     _Renee L. Pellegrino_

13     Renee L. Pellegrino, Notary Public

14     within and for the State of Ohio

15

16     My commission expires October 12, 2020.

17

18

19

20

21

22

23

24

25

```
                                               Page  342

 1                      Veritext Legal Solutions
                            1100 Superior Ave
 2                              Suite 1820
                          Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
     December 18, 2018
 5
     To: Ms. Quezon
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3155430
 8
     Witness:  April R. Vince          Deposition Date:  12/13/2018
 9
10   Dear Sir/Madam:
11
     The deposition transcript taken in the above-referenced
12
     matter, with the reading and signing having not been
13
     expressly waived, has been completed and is available
14
     for review and signature.  Please call our office to
15
     make arrangements for a convenient location to
16
     accomplish this or if you prefer a certified transcript
17
     can be purchased.
18
19   If the errata is not returned within thirty days of your
20   receipt of this letter, the reading and signing will be
21   deemed waived.
22
23   Sincerely,
24   Production Department
25
     NO NOTARY REQUIRED IN CA
```

Page 343

1                    DEPOSITION REVIEW

                  CERTIFICATION OF WITNESS

2

       ASSIGNMENT REFERENCE NO: 3155430

3       CASE NAME: In Re: National Prescription Opiate Litigation v.

       DATE OF DEPOSITION: 12/13/2018

4       WITNESS' NAME: April R. Vince

5       In accordance with the Rules of Civil

Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7       I have made no changes to the testimony

as transcribed by the court reporter.

8

  _____      _____

9  Date              April R. Vince

10       Sworn to and subscribed before me, a

Notary Public in and for the State and County,

11  the referenced witness did personally appear

and acknowledge that:

12

       They have read the transcript;

13       They signed the foregoing Sworn

          Statement; and

14       Their execution of this Statement is of

          their free act and deed.

15

       I have affixed my name and official seal

16

this _____ day of_____, 20_____.

17

             _____

18             Notary Public

19             _____

             Commission Expiration Date

20

21

22

23

24

25

```
1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2

         ASSIGNMENT REFERENCE NO: 3155430
3        CASE NAME: In Re: National Prescription Opiate Litigation v.
         DATE OF DEPOSITION: 12/13/2018
4        WITNESS' NAME: April R. Vince
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9        I request that these changes be entered
    as part of the record of my testimony.
10

         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                   April R. Vince
14

         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18            in the appended Errata Sheet;
         They signed the foregoing Sworn
19            Statement; and
         Their execution of this Statement is of
20            their free act and deed.
21       I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23            _____
              Notary Public
24
              _____
25            Commission Expiration Date
```

Page 345

1                           ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                     ASSIGNMENT NO: 12/13/2018
3     PAGE/LINE(S) /           CHANGE          /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____        _____
20    Date                     April R. Vince
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                     _____
                       Notary Public
24

                       _____
25                     Commission Expiration Date

| & | | | |
|---|---|---|---|
| **&** 1:21 2:11,15 3:3 3:8,12,17 4:7 11:3 11:5,7 256:8 | **1100** 2:17 342:1 | **162** 5:11 | 345:22 |
| | **111** 7:19 | **166** 8:5 | **20,000** 80:22 81:10 |
| | **112** 7:20 | **167** 8:5,6,6,7 | 81:15 82:12 |
| | **113** 7:20 | **168** 8:7 | **20001-4956** 4:8 |
| | **114** 7:21 | **169** 8:8 | **20005** 3:19 4:13 |
| **0** | **115** 7:21 | **17** 1:7,10 127:12 | **2004** 52:9 53:1 |
| **002503195** 278:25 | **117** 6:15 | 127:16 | **2006** 39:15 52:8,9 |
| **002503210** 6:23 273:20 274:4 | **11:34** 124:25 | **174** 8:8,9,9,10 | 53:1 54:23 56:15 |
| | **12** 341:16 | **175** 8:10 | **2010** 151:18,19,25 |
| **013457563** 6:12 45:16 | **12/13/2018** 342:8 343:3 344:3 345:2 | **176** 8:11,11 | 187:10,15 188:1,6 |
| | | **178** 8:12 | 189:7,17 298:18 |
| **013470572** 6:6 19:16 | **120** 52:17 | **179** 8:12 | **2013** 192:21 196:6 |
| | **125** 6:18 | **18** 1:12,14 7:3 | **2014** 47:3 127:22 |
| **013756844** 6:17 117:9 | **125,000** 47:21 217:3 | 342:4 | 128:2 211:22 |
| | | **180** 8:13 | 279:15 |
| **014194642** 6:19 125:11 | **12:01** 125:3 | **1820** 342:2 | **2015** 6:8,18 25:3 |
| | **12:43** 161:11 | **184** 8:13 | 25:11 39:10,11,16 |
| **014194735** 6:21 134:4 | **12th** 3:18 | **185** 8:14,14 | 56:16 125:10 |
| | **13** 1:18 10:2 257:20 | **186** 8:15,15,16 | 153:5,7,19,24 |
| **1** | | **187** 8:16,17 | 154:20,23 156:9 |
| **1** 6:5 19:11,14 32:3 49:3,6 117:25 120:18,20 209:1 281:23,24 321:22 | **1301** 4:12 | **189** 8:17 | 187:1 305:13 |
| | **131** 7:22 | **18th** 341:7 | **2016** 6:20 127:14 |
| | **132** 7:22,23 | **19** 6:5 7:3 328:22 | 128:16,21 129:5 |
| | **133** 7:23 | **190** 8:18 | 129:11,20 130:17 |
| | **134** 6:20 | **193** 8:18,19 | 133:16 134:3,9 |
| | **13756847** 245:5 | **194** 274:12 | 137:9 138:17 |
| **1/27th** 237:4 | **14** 192:21 196:6 | **195** 277:17,17 | 139:8,23 140:6 |
| **10** 67:20 149:3,5,9 149:18 217:14 237:16 330:18 | **147** 7:24 | **1950** 1:22 | 142:12 147:23 |
| | **15** 67:20 152:15,18 190:2,4 279:15 328:17 | **1990s** 238:5 | 153:5,7,24 187:1 |
| | | **1998** 21:13 | 192:10 237:21 |
| | | **1999** 52:10 | 325:7 |
| **10,000** 35:2 | **151** 7:24 | **1:44** 162:2 | **2017** 6:22 47:11 |
| **100** 131:1 | **15219-6401** 3:10 | **2** | 59:16,17,18 |
| **1000** 4:13 | **153** 7:25 8:3 | | 104:22 127:10 |
| **10019-9710** 3:5 | **156** 8:3 | **2** 5:2 6:7 21:16 24:23 25:1 40:14 43:1 49:6 117:24 117:25 118:5 120:19,21 209:1 241:23 | 143:20 144:2,6,15 |
| **102** 7:16 | **157** 8:4 | | 145:4 162:17 |
| **103** 7:17 | **158** 8:4 | | 192:8,19 201:17 |
| **107** 7:17,18 | **16** 106:3,7,8 127:13 152:15,18 154:23 190:2,4 305:13 | | 263:10 273:19 |
| **108** 7:18,19 | | | 274:13,19,25 |
| **10:08** 67:25 | | **20** 234:3 331:18 343:16 344:22 | 275:8 276:24 |
| **10:26** 68:3 | | | 277:12 |
| **11** 5:7 48:22 | | | |

**2018** 1:18 6:11
10:2 29:14,19
39:14 45:14 47:10
57:23 85:13,14
87:16 104:17
106:3,11 118:11
118:17 121:5,13
122:7,16 123:14
123:21 124:7,8
126:5,12 127:12
128:18 129:4,25
137:8 138:7 139:2
139:17 142:18,25
189:21 216:1
220:10 246:20
247:15 276:6
277:19 282:23
298:2 319:17
322:16 330:2
336:9 341:7 342:4
**2019** 6:15,16 32:8
48:14,18 79:17
117:6,7 122:11
221:6 244:7
245:19 246:3,24
273:1
**202** 3:19 4:9,14
**2020** 341:16
**2023** 217:13
**206** 8:19
**207** 8:20
**208** 8:20,21,21
**2100** 2:8
**212** 3:6
**216** 2:13,18,23
**216-523-1313**
342:3
**217** 8:22
**218** 8:22
**219** 8:23,23,24,24

**220** 8:25
**221** 9:3,3
**222** 9:4,4,5
**2222** 2:12
**2227** 341:12
**223** 9:5
**226** 9:6
**23** 7:4
**230** 9:6
**230-7676** 2:9
**232** 9:7
**237** 9:7
**239** 9:8
**240** 9:8
**241** 9:9
**248** 9:9
**25** 6:7 328:16,18
329:23
**250** 3:5 130:24,25
204:1
**251** 5:8
**253** 9:10
**257** 9:10
**268** 9:11
**27** 123:25 237:10
237:15
**270** 9:11
**272** 9:12,12
**273** 6:22
**28** 298:22
**280** 9:13
**281** 9:13
**283** 9:14,14
**284** 9:15
**288** 9:15
**28th** 326:8 327:7
**295** 9:16
**2:48** 216:20

**3**

**3** 6:9 41:5,10 42:4
99:25 150:23
312:15
**300** 264:14
**301** 9:16
**303** 9:17
**305** 9:17
**309** 9:18
**30th** 32:8 48:13,18
217:13
**310** 9:18,19
**312** 3:15 4:4
**314** 9:19
**3155430** 342:7
343:2 344:2
**317** 5:9
**3189** 274:4
**31st** 316:5
**324-1492** 3:15
**324-1773** 4:4
**332** 9:20
**333** 9:20
**340** 5:13
**39402** 2:5
**3:15** 224:18
**3:22** 224:24
**3:54** 251:13
**3:58** 251:16

**4**

**4** 6:10 45:13,21
68:8 100:1 245:2
319:16 320:18
321:14
**40** 204:8,13,14
**41** 6:9
**412** 3:11
**414-9200** 4:14
**42** 7:4,5

**43** 7:5,6
**434-5000** 3:19
**44** 7:6
**44113** 2:9
**44113-1901** 2:13
**44113-7213** 2:18
**44114** 342:2
**44114-1190** 2:22
**44202** 12:2
**45** 6:10 7:7
**45004** 1:10
**45090** 1:12
**45132** 1:14

**5**

**5** 6:13 98:1,8
148:16,19 149:5,9
149:18 245:2
307:8 312:15
330:18
**5,000** 80:25
**55** 1:22 2:8,12 7:7
**55th** 3:5
**56** 7:8
**560-7455** 3:11
**586-3939** 2:23
**592-5000** 2:18
**5:07** 317:7
**5:17** 317:10
**5:39** 338:22,24
**5th** 326:8

**6**

**6** 5:3 6:15 117:6
117:13 160:15
217:12 233:17
271:14,25 272:5
272:18
**60** 35:3 204:5,8,13
204:14 315:16
**60,000** 65:24 81:20

[60601-5094 - addition]

**60601-5094** 3:14
4:4
**62** 7:8,9,9
**65** 38:23
**662-6000** 4:9
**68** 12:1
**6th** 260:16 263:12
263:24 296:3

**7**

**7** 5:4 6:18 125:9
125:15
**7.5** 329:10
**7.5.** 329:8,9
**700s** 104:23
**721** 104:20
**725** 3:18
**737** 140:18
**74** 7:10,10
**75** 7:11,11
**76** 7:12
**77** 3:14 4:3 7:12
**78** 7:13,13,14

**8**

**8** 6:20 134:2,8
**800** 2:5
**836-8000** 3:6
**84** 7:14
**844** 2:9
**848** 245:7
**861-0804** 2:13
**88** 7:15
**89** 7:15

**9**

**9** 6:22 273:13,18
273:25 278:24
**90** 291:6
**901** 2:22
**939-5580** 2:5
**950** 2:17

**96** 7:16
**97** 2:4
**98** 6:13
**9:07** 1:19 10:2

**a**

**a.m.** 1:19
**aaron** 1:8 261:9
**abilities** 186:2
**able** 14:25 30:6
38:21 42:24 53:24
53:25 65:13 67:3
80:1 81:7 115:19
160:17 191:13
199:14 220:11
295:1 296:16
323:15 333:3,19
**absolutely** 83:24
116:19 129:8
180:21 184:23
185:12 291:2
**abuse** 65:18 80:14
81:3 84:2 87:23
89:21 95:12 96:1
104:7,9 109:14
110:9,13 131:22
132:10,19 133:14
163:4 164:11,17
173:24 174:2
176:12 186:8,14
189:12 190:6
207:3,10,15 208:5
211:16 226:11
238:17,19 271:18
272:14 282:22
283:3
**accept** 61:8
**accepted** 48:20
117:18 292:17
**access** 191:20,23
191:25 198:13,15
198:16,19 199:9

315:25
**accessible** 334:20
**accomplish** 50:9
183:5,7 253:15,20
300:21,23 342:16
**accomplished**
138:14 229:13
300:19 301:1
**accomplishing**
119:15 123:8
184:10
**accomplishments**
262:20
**account** 329:1,10
**accounted** 330:5
**accurate** 14:24,25
108:22 192:24
193:3,10,13 195:2
197:16 198:6
278:2 302:24
303:10 333:9
334:9
**accurately** 279:2
**aces** 30:19 31:7,8
31:13,18,19 34:16
85:1 159:15
206:12 243:2
281:20
**acknowledge**
343:11 344:16
**acme** 210:19
**act** 343:14 344:20
**actavis** 254:21
**acting** 158:18
**action** 65:7,19
80:15 341:4
**active** 203:25
204:2
**activities** 22:14
32:14,19 48:23
51:7 72:17 83:8

95:17,21 126:25
129:10 130:16,18
131:13 157:5
178:15 206:2,18
217:24 218:3,10
218:12,24 235:15
243:22,25 246:14
270:24,25 271:4,6
271:10,17,19,24
301:1,20
**activity** 129:8
133:11
**adamhs** 91:25
92:5,18,25 93:10
150:3 182:4,8
184:3 205:3
234:24 297:2,5,9
297:16
**add** 203:5 239:14
239:19
**added** 239:23
332:7,10
**addicted** 165:1
166:1,4,9,13 167:9
314:22
**addiction** 86:3,6
164:19 166:6,21
225:14,23 226:17
226:22 238:22
241:13,14 258:19
258:22 265:7
267:6 291:20
292:25 314:18
326:21 327:4
**addictive** 258:15
310:14
**adding** 203:7
**addition** 81:14
145:21 232:18
241:1,8

**address** 11:25 90:4,6 173:5 207:15 229:4 258:24 259:1 264:9 323:21 324:2
**addressed** 44:22
**addressing** 134:25
**adhering** 78:8
**adjournment** 340:21
**administered** 219:25
**administration** 20:19,19 33:22,23 34:2,5,5 308:4
**administrative** 265:23 266:4,6,9
**admission** 41:17
**admissions** 22:6
**admitted** 22:8
**adults** 213:14
**advancement** 38:19
**adverse** 31:8 43:8
**advertising** 309:9 309:15
**advice** 58:3
**advisory** 26:5
**affairs** 58:22
**affect** 31:11 43:11 43:16
**affiliated** 72:9 144:25 145:2
**affixed** 341:6 343:15 344:21
**aforesaid** 340:12
**afraid** 50:2 70:5
**afternoon** 5:11 162:4 251:19 317:18 318:6

**age** 11:9
**agencies** 140:22 141:1 151:16 155:20 214:1
**agency** 24:4 54:10 54:14 80:24 152:14 155:3
**agenda** 146:5 295:9 296:22 297:1
**aggregate** 224:4
**aging** 21:1 22:1,3 39:1,19 40:2,18 53:7 54:15 56:15 211:10 322:1
**ago** 36:9 58:15 78:18 103:20 163:5,6 167:14 257:20 305:10 323:14
**agree** 74:17 76:16 76:22 91:17 108:16 113:3 131:19,25 132:1,6 132:15 158:8,11 188:16 238:24 239:1
**agreed** 75:18 158:11 316:2
**agreement** 315:14 316:1
**ahead** 169:15 301:12
**aid** 4:2 10:19 317:19 333:14,21
**aimed** 229:7
**aired** 153:22
**airplane** 326:22
**al** 1:9,10,12,14
**alarming** 190:4

**alexander** 4:12 10:24,24 338:12
**allan** 27:12,25 28:7,20,25
**allegations** 332:25 333:4,9
**allergan** 255:1
**allisyn** 51:20 56:25 69:13 126:2 141:14 144:5 176:10 180:5 337:4
**allocated** 281:10 331:3,23 332:2
**allocation** 281:14 300:8
**allocations** 300:16
**allotted** 140:2
**allowed** 322:23 330:13
**alluded** 273:5
**alternative** 147:10
**alternatives** 71:16 206:8
**amazing** 135:21
**amerisourceberg...** 4:10 10:25 338:13
**amount** 64:14,16 80:21 81:11 82:16 104:10,24 148:10 217:4 231:12 234:11 328:25
**amounts** 80:25
**amy** 2:4,6 10:8 16:1
**analogs** 115:9
**analysis** 207:13 208:2,15
**analyst** 178:3,8 192:13 315:15

**analysts** 34:17
**analyze** 109:3
**analyzed** 245:13
**announcement** 152:6
**annual** 6:16 32:10 33:1,5,9 117:7,15 144:19 145:19,21 146:4,8 202:3
**annually** 126:1
**answer** 12:22 13:1 13:17 14:4,4 33:20 42:3 43:23 43:24 58:18 74:5 75:4 76:1,24 101:7 107:21 108:25 109:2 112:22,22 113:1 113:17 115:19 157:24 160:1 164:3,6,12 166:4 169:17 170:5,12 171:7,13 173:17 173:17 174:17 179:9 190:14 205:19 207:4 225:12 230:10,16 235:1,4 236:5 237:9 241:16 249:18 252:15 253:2 306:11,15 306:16 324:14 334:23
**answered** 112:21 113:8 170:11 171:22 253:7
**anybody** 142:19 177:16 194:3 216:8 312:20 338:8

anyway 130:9
apologize 18:4
24:16 27:1 33:6
43:20 106:7
170:19 188:25
209:9 210:24,25
211:6 307:23
320:20
apologized 304:9
appear 278:2
343:11 344:15
appearances 2:2
3:1 4:1 5:2
appeared 283:12
appears 45:25
276:10 277:18
appended 344:11
344:18
applicable 339:7
applicants 47:18
application 46:1
47:11,16 48:20
58:6 117:19
121:21 176:13,16
181:3 221:5
291:22 292:17,19
293:16
applications 294:3
294:12,20
applied 47:14,17
55:10 174:3 176:9
180:24 267:22,25
applies 332:5
apply 37:6 47:13
48:3 55:7,7,8
80:25 181:2,15
220:23 283:7
284:7 292:15
applying 179:23
179:25 180:2
267:19

apportion 328:9
330:8
apportioned
330:19 331:3
appreciate 113:4
307:15
approach 183:3
appropriate
113:18 175:14,23
appropriately
158:19
approve 147:2
approved 308:3,8
324:16
approves 308:11
april 1:17 5:6 6:5
11:9,14,23 19:14
106:23 162:5
251:17 307:13
317:16 340:9
342:8 343:4,9
344:4,13 345:20
area 25:20 54:14
173:2,3 176:19
177:8 214:5 247:4
274:23 280:16
areas 31:4 67:3,6
137:20 280:18
arm 279:24
arms 306:2
arnold 3:3 11:7
arnoldporter.com
3:6
arrangements
342:15
arrived 160:9
article 6:9 28:22
41:5,11,13,15,16
41:18,19 42:21
43:2 45:10 250:24

articles 84:20,22
aside 150:18 243:3
321:20
asked 17:16,20
60:22 99:3 121:3
142:24 144:14
156:19,23 157:15
159:5 166:8
171:20 173:16,18
181:24 192:7,8,10
192:18 205:18
216:10,13 228:15
228:18 244:1
250:19 252:16,17
253:6 254:3
261:17 284:19
289:23 326:17,21
327:12,13,17
332:20 333:12,25
334:3,12,24 335:2
336:5 338:4
asking 13:19
75:13,20 76:14
89:12 102:5
111:19,20 113:2
115:21,23 123:10
157:10 172:8
230:7 232:5
234:12 252:24
304:18
asks 156:18
aspect 132:2
aspects 231:8
assign 148:24
assignment 343:2
344:2 345:2
assist 33:1,2 283:2
299:18
assistance 299:7
assistant 265:24

assistants 266:5,6
266:9
assisted 42:23
assisting 33:4,9
80:8
associated 42:12
49:16
assume 252:16
256:1
assuming 179:8
assured 300:19
astute 190:14
attached 344:7
attend 44:11,15
203:4 204:20
216:11 260:16
264:24 265:2
267:23 286:25
attendance 264:13
attended 69:16
84:19 182:20
204:21,25 264:19
264:20 267:18
287:7,23,24
296:13,18,19
attendees 203:24
204:10,11,16,18
287:9 289:10
attending 73:23
114:24 151:11
205:8 266:15
286:21 296:11
318:7,7,15
attends 205:1
265:5
attention 74:19
274:8 275:3
attorney 14:2,3
250:25 251:4
260:13 261:23
318:5 341:2

**attorney's** 141:5
**attorneys** 13:22
15:23 17:12
**attributable**
334:17
**audible** 12:20
**august** 260:3
265:10,11 266:2
**aurora** 12:1,4
**author** 244:18
**authoring** 239:4
**authority** 92:24
93:1
**authorize** 344:11
**authors** 51:12
141:15
**availability**
148:25 238:21
**available** 37:22
145:9 148:10
183:13 192:15
195:12 265:22
283:6 302:21
303:6 314:13
330:23 342:13
**ave** 342:1
**avenue** 2:17,22
38:2 319:12
**average** 234:8
**award** 290:2
**awarded** 47:3,12
47:23 84:8 159:6
159:15,16 291:4
292:19
**awardees** 47:19
**awards** 135:23
290:5,7
**aware** 23:6,8
73:23,25 116:9,11
116:12,14 132:1
145:23 152:2

153:2 155:2 175:7
175:10 183:12
186:18,20 188:7
189:22 204:3
206:16 207:6,8,11
208:1 232:15,19
232:25 282:25
284:10,16,17,18
291:19 299:2
314:5,9 335:18
**awareness** 65:7
80:14 81:2 155:6
183:9 185:23
248:19 290:8
300:6 301:3 302:1
**aways** 263:24

**b**

**b** 2:21
**b.a.** 20:10
**babies** 311:3
**baby** 256:12
**back** 15:12 17:23
18:5 24:20,21
36:21 45:9 46:8
47:15 55:16 63:7
68:5 71:22 85:4
87:19,20 90:5
96:18 102:12
116:20 120:9,12
121:6 122:18
127:17 145:6
146:12,14 153:21
162:7 181:14
188:6 189:24
190:2 201:22
209:1 222:25
227:5 234:1
246:21 255:19
259:3 270:22
271:24 289:7
295:25 300:25

301:5 319:1 325:3
325:10
**background** 86:6
**backtrack** 258:3
**bag** 257:6,8
260:25 293:11
**barriers** 214:3
301:21
**base** 23:23 95:10
117:18 220:13
**based** 14:19 37:23
117:21 148:25
155:19,22 156:3
179:10 189:10
220:11 233:13
262:19 270:18,24
270:25 280:3
292:19 311:2
334:24
**basically** 20:19
21:1 22:9 23:21
37:4,12 40:1
41:22 42:23 58:4
59:3 60:23 68:20
69:20 70:13 89:23
124:15 134:15
148:6,8 159:25
178:14 181:20
211:13 214:6
245:11 318:15
319:25 322:21
**basis** 53:4 57:19
118:23,23 120:5
121:12 146:18
158:3 163:21
171:7 175:1 220:7
236:7 245:16
283:18,20
**bates** 6:6,11,16,19
6:21,23 19:15
45:15 117:8

125:10 134:3
140:19 245:4
273:20 274:2,4,8
274:11,12 277:16
**bccp** 270:15
**becky** 34:19,20
178:1,19 181:8
316:13 331:10
332:15
**becoming** 155:7
225:8
**began** 166:15
322:14 331:13
**beginning** 6:5,11
6:16,18,20,23
19:15 21:16 45:15
59:17 85:13,14
117:8 125:10
134:3 273:19
**begins** 42:6,9 43:2
**behalf** 2:3,15,20
3:2,7,16 4:2,6,10
10:8,11,13 11:5,7
**behavior** 225:14
226:17
**believe** 19:3 20:2
31:1 36:19 47:13
59:3 86:16 98:17
99:1 102:2 103:6
103:8 106:2,8
117:14 127:12,15
139:11,20 141:14
143:21 146:5
149:5 150:6
155:17 181:8
188:3 190:23
222:19 228:9
230:11 239:9
241:23 246:21,22
247:9,21 254:6
257:18 259:14,18

260:3 262:9
264:16 265:11
266:5 274:13
277:14 284:20
287:11,24 289:22
291:12 293:24
297:13 298:8,22
311:10 320:2
321:24 327:12
329:18 331:15
336:23 337:10,12
338:7
**believed** 165:19
**bell** 274:22
**benatar** 214:16
**best** 186:1 192:25
210:12 252:2,13
291:11
**beth** 91:24 92:19
92:19,23 94:12,15
94:20 150:1,2
297:2,24
**better** 26:8 29:22
43:23 160:20
178:16 310:10
**beyond** 48:3,18
288:12
**bible** 240:24
**big** 52:13,18 83:18
109:6 184:16
255:9,21,23 256:1
312:14
**bimonthly** 121:14
121:15,21,25
124:14
**bind** 100:16,22
101:1
**biology** 101:3
**bit** 46:13 84:17
112:23 119:4
163:17 164:14

188:21 252:6,7,24
271:1 275:4
289:23 290:14
304:18 307:24,25
315:4
**biweekly** 53:8
**black** 314:17
**blank** 337:3
**blanket** 311:1
**block** 330:14
**bmasters** 3:20
**board** 6:7,22 15:5
23:10,25 25:1,19
25:21,22,24 26:13
26:16,17,20,21,24
27:3,5,8 36:7,16
37:4 40:22 52:10
54:6 58:7,17 74:4
75:6 90:11,13
91:25 92:5,10,18
92:18,25 97:1
107:25 150:3
153:3 154:3
155:18,20,22
156:18,20,23
157:2,5,10,18,23
157:23 158:4,7,8
158:17,23,24
159:3,5,13,17,23
159:25 176:17
178:3,14 182:5,8
184:4 200:5,14,19
205:3 209:24,25
211:8 213:6
215:14 234:2,24
259:16 261:13
264:17,18 265:20
267:2 268:2
273:18 274:18
279:11,19 280:18
282:23 286:2

290:2 294:1,7
296:15 297:3,5,9
297:18 300:11
302:22 303:7
313:3 314:25
322:12 323:2,10
323:18 324:9,22
328:12
**boards** 297:16
**bockius** 3:8,12
11:3
**boehm** 3:18
124:20,22 160:8
160:22 161:3,6
163:21,24 164:4
169:14 170:8,16
170:20,23 171:2
171:16,19 172:1
176:1,4 189:2
**bono** 150:16
**books** 85:8
**bore** 37:11
**born** 311:5
**bottle** 168:15
257:6 293:11
**bottom** 43:2
140:18
**box** 242:19 275:7
275:9,13 277:4
314:17
**boxes** 276:9 277:2
277:2,3
**brad** 3:17 10:12
67:17 161:2,3
**brain** 100:17,22
100:24 101:2
189:2,4 213:13
220:24,24
**branch** 275:17
**branches** 275:14

**break** 14:9 67:21
67:23 105:15,18
113:25 124:20
161:9 220:11
223:1,10,13,13
224:17,20 235:9
252:19,23 298:13
307:5,8 317:3
**breakdown**
119:21
**breakfast** 161:7
**breakout** 264:11
**breast** 38:7,9,12
40:3 269:14
270:16,18
**briefly** 15:23 16:1
33:14,15 39:25
40:1 129:17
251:23 268:13
**bring** 16:19 319:1
**bringing** 172:16
**broader** 73:19
**broadly** 154:17
**broken** 105:25
114:13
**brought** 16:18
304:7,19
**bucket** 81:7
**budget** 46:18,18
139:25 140:2
148:23 159:7,21
202:21 330:19,21
331:8
**budgets** 40:12
148:24
**building** 49:24
83:12 152:23
233:18 319:10
**built** 182:22,25
**bullet** 134:23,24
135:2,9

**[bullets - certain]**

**bullets** 135:6
**burden** 13:14
**burling** 4:7 11:5
**butcher** 332:9

**c**

**ca** 342:25
**calculation** 207:13
208:2
**calculator** 235:8
**calendar** 85:4
**call** 126:13 138:1
138:20 173:19
200:21 214:15
262:9 267:16
274:11 286:18
342:14
**called** 11:9 26:4
29:9,12 35:4 50:6
65:6 138:5 139:4
144:17 145:17
151:4 155:4 173:8
173:22 188:4
206:8 209:10
211:3 213:22
220:19 227:9
260:6 290:10
317:25 320:19
321:9 328:19
**calling** 126:16
137:22
**calls** 67:2 191:13
213:20,22,23,24
214:8,13 215:6
327:9
**camaraderie**
182:21,24
**campaign** 301:3
302:1
**campus** 65:14
**campuses** 50:11
50:12 64:3,5,8,23

65:13 67:8 68:11
299:19
**cancer** 38:8,10
40:3 269:15
270:16,19
**candidate** 177:23
**cap** 264:14
**capacity** 29:1
30:16 34:8,9 35:9
56:7 71:13 76:16
94:8 148:7 156:16
157:15 169:2
171:13 178:11
187:18 207:7,20
211:10 219:4
223:6 229:1 231:7
239:25 242:1,20
**caption** 340:20
**captured** 319:3
**caraffi** 51:20,22
51:25 52:24 53:2
53:9 54:21 55:20
55:24 56:16 63:17
66:14 69:13
147:24 148:3
149:9 151:25
159:2 180:13
205:7 244:17
245:12 246:8
261:25 263:7
265:25 276:13,16
276:24 277:1,13
278:8,19 281:13
297:19 298:5
318:9,15 320:1,5
320:12 330:18
332:3 337:23
**caraffi's** 149:19
276:18 277:4
**cardinal** 3:16
10:13

**care** 21:18,21 22:9
22:19 23:9
**carried** 326:22
**carry** 50:13 67:8
**case** 1:7,10,12,14
15:4 17:8 18:2
20:14,23 37:9,19
38:7,25 39:18
56:14 63:10,13,18
63:20 73:2 79:25
171:11 175:1,1
244:1 258:3,13
319:2 326:6
332:21,25 333:22
334:2,5 342:6
343:3 344:3
**cases** 35:3 335:21
**catch** 13:5
**categories** 29:4
50:18
**category** 33:21
**cause** 108:4,23
111:9 115:24
226:3 228:13
327:14 340:11
**caused** 114:7
115:16 116:5
175:9 225:9,11
228:18 306:8
**causes** 230:23
231:15 232:24
238:24 240:4,7,13
**causing** 105:11
108:15,17 110:16
110:18,22 111:9
111:23 112:15
113:12 114:3
**ccbh** 6:11 15:16
23:13,20,22 25:16
25:19 27:21 30:5
32:10,14,20 33:24

34:6 36:23 39:6
45:14 48:23 52:14
59:13 60:11,15
83:4,9 93:9
113:14 151:21
154:18 156:6,11
156:15 158:18
174:3 177:19
180:7,22 191:1
201:7 206:2,16,17
206:21 207:1,8,12
208:1 211:7 215:2
217:24 243:4,12
243:22,25 282:11
283:12 292:17,22
298:21 299:1
306:2 315:15
319:17 322:20
**ccbh's** 25:9 92:14
247:12
**ccbh.net.** 200:4
**ccmeo** 106:3,11
**ccotf** 122:6
**cdc** 30:19,25 31:20
70:2,11,16,18,24
74:9,22 77:25
78:8 206:6,19
242:22,23 243:1
282:5 285:3,8,13
**center** 21:19,21,23
23:9 58:22 70:17
91:7 290:10
293:25
**centered** 91:2
**centre** 3:9
**ceo** 264:7
**cephalon** 254:19
**certain** 63:5 84:10
93:20 112:4 131:2
148:9,23 231:1
269:9 289:19

328:25 330:8
**certainly** 312:4
336:5
**certificate** 5:13
20:22,25 21:11,25
38:22 340:1
344:11
**certification** 343:1
344:1
**certified** 11:12
342:16
**certify** 340:8,18
341:1
**cervical** 38:7,9,12
40:3 269:14
270:16,19
**cetera** 60:4 292:4
**ceus** 84:10
**chain** 250:9
**chair** 66:12,15,17
66:19 88:8,10,12
88:17 89:19 90:9
90:14 92:12 93:24
95:5,7,13 96:2,12
96:19 108:11,11
109:5,12 110:9
111:6,20 112:6,11
128:9 150:5
156:15 178:14
180:9,15 181:12
181:15 182:7,8
183:15,19,23,23
183:24 184:20
185:1,13 186:4,6
187:19,24 190:18
193:25 194:1
208:13 229:1
231:3,3 233:7,25
239:25 265:1,3
295:19 297:19
298:15

**chaired** 185:7
**chairing** 83:16
297:24
**challenges** 178:17
178:17
**chambers** 278:21
**change** 29:13
50:10,12,15,16
121:20 221:12
344:8 345:3
**changed** 39:8
124:14 139:16
192:2 218:6 221:4
221:4,6 262:11
275:25
**changes** 40:24
50:4 67:2 124:15
201:25 238:4
324:10,21,23
343:7 344:7,9
**changing** 298:25
**charge** 48:8 63:9
148:12 214:12
216:22
**charity** 91:7
**chart** 6:7,22 25:2
25:9 26:4 33:22
39:7,8 241:24
242:3,17 273:12
273:19 274:13,17
275:1,5 276:4,6
277:19,23 278:1,8
278:23 279:7,12
279:14 280:2
**chicago** 3:14 4:4
**child** 31:9,12
**childbirths** 258:5
**childhood** 31:8
220:24
**choice** 108:21
138:23

**choose** 171:6,7
227:18
**chose** 171:14
175:21
**chosen** 175:18
312:3
**chris** 36:5,6
243:10,11 316:10
327:10 331:20
**christmas** 160:16
**circle** 91:3
**circulated** 154:10
**circulating** 154:10
**circumstances**
175:15 180:20
**cited** 310:19,25
**cities** 26:2
**citizens** 155:15
184:19,25 185:12
**city** 1:13 25:25
**citycentre** 4:8
**civil** 11:11 339:3,7
343:5 344:5
**claim** 172:16
**clarification** 13:7
135:1
**clarify** 185:11
**class** 110:1
**clean** 227:22
**clear** 111:18
115:21 123:22
137:2 142:4
191:17 329:5
**cleveland** 1:13,22
2:9,13,18,22 10:5
25:25 65:14 173:2
173:3 251:1
260:12 264:7
288:22 341:7
342:2

**cleveland.com**
250:24 304:10
**clicked** 194:20
195:1 196:24
**client** 270:18
**clientele** 22:1
**clients** 22:3,8
270:7,8,22
**climaco** 1:21
**clinic** 238:4
260:13 264:8
288:22
**clinical** 21:5
**clinics** 72:25 79:15
**close** 94:4
**closed** 129:18
**closely** 116:21
**clr** 1:25
**cnn** 255:25
**coalition** 49:24
65:21 66:2 83:12
121:10 122:15
123:12 233:18
312:1 319:10
**cocaine** 105:16
107:3,3 165:6
222:21 335:5
**code** 297:15,21
**codeine** 103:17
**coding** 330:7
**collaborating**
234:7
**collaboration**
209:5,8,10,12
211:4
**collaborative**
209:19,21 210:7,9
210:22
**colleague** 252:3,23
254:3 284:19
289:23 304:17

colleagues 307:10
  317:14
collect 18:11,23
  42:21 318:19
collected 18:17,20
  18:24 36:18
  294:21,25
collection 294:22
collectively 183:5
college 20:10,11
  50:11,12 64:3,8,23
  68:11 299:19
columbus 84:14
  84:15
column 245:21
comb 198:5
combinations
  42:14
combined 107:3,4
combing 193:20
  199:22
come 18:11 24:20
  45:9 61:7 83:1
  91:12 137:24
  139:3 154:8
  160:18 180:11
  181:18 211:16
  212:17 255:19
  256:25 280:22
  281:14 282:17
  292:6
comes 31:20 81:15
  82:1 84:24 93:9
  93:15 157:7,10
  281:16 296:22
comfortable
  244:24
coming 87:9 91:5
  264:8 284:6
comment 58:12

commission
  341:16 343:19
  344:25 345:25
commissioned
  340:8
commissioner
  26:7 27:9,11,22,23
  29:3,25 158:1,25
  264:21 284:2
committee 33:10
  33:12,17 34:12
  63:21 83:16
  178:13 212:19
  213:16,19 319:22
common 41:24
  106:4
communicate
  58:25 158:1
communicated
  156:5
communication
  34:11 43:5,11,17
  200:22 324:17
communities
  156:3
community 29:12
  33:10 39:13 54:9
  62:17 63:11 72:25
  80:23 111:1,17
  152:25 182:23
  183:1,12 185:22
  305:25 306:2
companies 3:3
  225:15 256:2
company 309:21
  324:15
compensation
  254:1
competitive 47:14
  47:17,24 139:14
  139:15,18 220:18

competitively
  47:13
complained
  310:12
complaint 17:8
  249:5 252:24
  332:21 333:4,9
complete 50:19
  69:9
completed 207:23
  340:20 342:13
completely 152:20
  177:8
complications
  207:16 208:5
comply 18:8
component 73:24
  79:20
comprehensive
  129:5 143:2,6
  194:22
comprised 130:24
  155:10
computation
  207:13 208:2
conceivably 330:3
concern 175:10
concerns 175:3
concluded 338:24
conclusion 42:9,10
concrete 305:16
condensed 160:20
condition 165:20
  165:23 166:16,21
  167:2
conditions 170:15
  172:21 173:20
conduct 95:16,20
  121:11
conducting 94:1
  113:13

conference 67:1
  84:13 213:22,23
  213:24 215:5
  227:10,11,13,15
  227:19 260:16,19
  261:1 263:13
  264:2 265:4 295:8
  296:3 310:18
  311:17,19,20,21
  311:24 312:3,9,22
  313:9,12
conferences 44:12
  45:7 84:10,19
  85:5 213:21
  295:22
confidential 6:24
  273:21
confined 90:18
confused 278:22
connected 116:17
connection 334:2
connections 79:14
connolly 3:17
consequences 43:8
consider 13:25
consideration
  171:9 172:4
  177:12 181:5,9
considered 177:17
  177:22,24 205:3
  222:23
consistent 217:4
consortium 58:24
constantly 120:15
consult 208:19
consultant 146:21
  214:15,25 215:6
consultants
  214:10,22 215:4
consulted 208:16

consumer 238:8
cont'd 3:1 4:1 8:1
9:1
contact 26:10
42:24 65:10 94:10
99:5 191:11 200:9
244:11,19,21
259:12 285:16
contacts 94:21
contain 146:15
223:19
contains 224:9
content 89:8 130:1
147:1 198:22
200:6,11,13
201:11,14,16
293:1
context 255:20,21
255:23 256:10
258:23
continue 48:8,10
48:18 68:7 94:22
continued 162:5
contraception
97:6
contract 32:7 64:6
64:12 68:18 73:22
74:21 75:9 76:12
119:8 131:3,3
200:8 249:2
322:24 324:15
contracted 287:20
contracting 79:13
contractors 76:12
contribute 231:2
232:8
contributed 51:15
231:9 232:2,11
contributing 6:13
98:2 231:23 238:2
325:8

contribution 41:2
150:20
contributions
150:18
contributor 40:25
contributors
51:17,19
control 70:17 93:3
convenient 342:15
convening 185:18
conversation
12:25 13:11 87:7
144:13 155:8,24
156:1,13 184:16
228:7 268:23
conversations
86:22 87:1,3,11,13
87:21,24 88:22,24
88:25 89:5,8,9,13
158:24 226:23
255:11 288:11
convey 193:10
conveyed 59:4
102:15
cool 135:24
coordinate 64:5,7
68:15,19 79:6,9
248:18,22
coordinates
214:15
coordinating 22:9
64:2,18 66:2
68:10,12 83:13
216:22
coordination 69:4
80:9 191:15
coordinator 36:23
37:16,17 38:25
39:18 49:13 53:6
56:14 64:11 75:7
112:8 208:9,14

copies 147:19
294:6,19 295:3,20
296:4,6
copy 19:5,23
41:11 98:8 99:10
102:3,20 160:5
259:6,8,16 286:2
294:18 311:9
312:17
core 47:20,22
49:22 147:7
204:13 217:7
280:25
corner 106:10
corporation 4:6
4:10 11:1
correct 12:5 13:5
15:17 16:9 19:24
20:7,8,16,23 21:14
21:20 23:12 24:8
25:20 27:20 31:21
32:12,23 36:25
38:16 40:17 44:13
44:17,19 47:2
48:15,25 49:1,2,5
49:13,14 50:20
53:16 55:15 56:1
58:7,11 70:19
72:11,13 81:17,19
81:21,22,25 82:21
82:22 83:10 86:25
88:13,16 93:9,16
95:14 97:13,20
106:24 107:5,10
118:4 124:3
125:22 127:1
128:22 130:19
147:18 149:17,22
164:6 165:24
175:17,20 180:14
182:9 184:11

193:6 195:18
197:7,8 199:19
205:9 209:6 210:8
211:5 215:11
216:24,25 217:7
217:18 218:13
221:11 224:8
225:4,5 229:9
233:9 240:16
243:11 244:12,23
248:20 253:9
254:8 256:15
257:9 259:24
269:19 270:10
271:8 272:2,5,14
273:10 274:20
275:15 276:9,11
276:14 277:11
279:3,25 280:24
281:3,6,19,25
284:25 287:22,25
292:23 293:3,12
294:4 298:10
299:4,14 300:13
301:6 304:3,5,14
304:16 313:1
318:2,23 319:4
321:18 322:17
323:3,23 324:4,6
328:3 331:22
332:22,23 333:10
333:11 334:10
336:9,10,14,23
337:5,6,19 340:16
corrections 344:17
correctly 35:14,15
169:8 211:23
274:6 320:20
correlation 31:12
31:17

**[coshocton - currently]**  Page 12

**coshocton** 291:12
**cost** 46:23 142:2,3
**council** 26:5 211:8
  211:11,17,21,24
  212:17
**counsel** 10:6 13:23
  15:5,16 18:14
  164:5 170:8
  338:11 339:1,10
  341:2
**count** 233:20
**counties** 37:18
  92:6 209:13,22
  210:3,5 300:10
**county** 1:9,11 2:3
  6:7,18,20,22 12:5
  12:6,7,10 23:10
  25:1,20,21,23
  26:16,20 31:5,6
  42:12,17 48:5
  55:25 56:19 58:17
  61:18 63:5 73:1
  83:1,6 86:24
  87:22 88:14 89:1
  90:9 93:8,15,24
  94:1,11 96:3,12
  97:17 104:1,7,9
  108:12 109:4
  110:8,12 111:6,21
  112:7,11 114:16
  115:16,25 118:1
  120:17,22 123:21
  124:5,16 125:9,23
  126:12,17 127:6
  127:21 128:8,20
  129:9 130:14,19
  130:23 131:13,23
  132:10,19 133:7
  134:2,8 135:16
  137:13 138:22
  140:10 147:22

149:14,21,24
150:8,20 151:6
152:3,6,10 155:9
155:11 176:16
180:9 181:11
182:13 183:20,23
184:19,20,25
185:13 186:10,15
189:13 190:18
191:3,7,21 195:10
195:18 196:11
199:5 200:5 202:4
204:17,23 205:2,3
205:5 206:22
207:2,9,14,16
208:3,6 209:14,20
209:23,24 210:1
210:20 213:4,6
215:9,14,18 216:3
216:9 217:14
231:4 233:8,24
236:11,19 237:4
237:18 239:7
240:1 245:14
253:13,15,25
259:15 261:12,16
264:18 273:18
274:2,18 279:11
279:19 280:18
282:21 283:2,13
283:21 284:11
286:2 287:17
288:4 290:2 291:1
294:7 299:21,22
300:2,4,11,24
301:2,10,16
302:15,22 303:6
304:2,7 305:2,19
306:1,5 313:3
314:25 318:21
321:2,4,9,13

322:12 323:2,6,10
323:18 324:9,21
327:15 334:5,17
335:21 340:4
343:10 344:15
**county's** 210:6
**couple** 71:24
  121:9 189:20,23
  320:11
**course** 21:2 78:4
  78:13,18 89:18
  277:16 338:4
**courses** 21:4 84:7
**court** 1:1 5:15
  13:12 99:7 101:9
  102:16 103:1,21
  104:25 173:17
  327:21 328:2
  343:7
**courts** 96:20,23
**cov.com** 3:20 4:9
**cover** 25:25 46:21
  46:22 137:20
  252:2
**covered** 137:20
  140:7 252:4
**covers** 212:9
**covington** 4:7 11:5
**create** 41:18 51:9
  80:23 90:23
  125:24 143:2
  164:4 193:17
  194:19 196:19
  197:13
**created** 51:11,13
  102:8 130:21
  152:3,7 187:10,15
  188:1,9 191:3,8,22
  192:13 196:14,16
  218:17

**creating** 87:4
  191:9
**creation** 187:9
  189:7
**crimes** 238:20
**crisis** 48:1,5,10
  159:14 186:9,14
  186:19 189:13
  190:7,10 216:24
  217:1 261:3
  283:18
**critical** 305:1
**cross** 17:4 102:18
  118:18 325:4
**curious** 169:12
**current** 11:24
  19:25 20:6 25:12
  27:18,19 28:6,8
  29:1 34:8,9 42:2
  44:1,6,11,25 57:24
  59:9 89:20 110:23
  117:16 122:6
  142:1 148:1 186:7
  192:20 207:6
  214:2 218:3 223:6
  226:4 227:20
  242:1 246:19
  325:5 336:3,8,13
**currently** 28:10
  35:8 51:1 60:19
  88:12 89:22
  109:17 118:11
  121:5,13,16
  139:21 193:13,23
  198:8 199:21
  202:12,15 214:1
  218:6,19,20
  232:19 241:2
  246:16 268:1
  272:8 284:16
  334:20

**curriculum** 68:13
68:16,20,22 73:17
78:20 83:14
285:12 293:20
**custody** 5:15
**cut** 106:9
**cuyah** 6:6,12,17
6:19,21,23 19:16
45:16 117:9
125:11 134:4
273:20
**cuyahoga** 1:11 2:3
6:7,18,20,22 12:4
23:10 25:1,20,21
25:23 26:15,20
31:5 42:12,17
48:5 55:25 56:19
58:17 61:18 63:5
73:1 83:1 86:24
87:21 88:14 89:1
90:8 93:7,14,24
94:1,11 96:2,12
97:16 103:25
104:7,9 108:12
109:4 110:8,12
111:6,21 112:6,11
114:16 115:16,25
118:1 120:16,22
123:21 124:5,16
125:9,23 126:12
126:17 127:6,21
128:8,20 129:9
130:14,18,23
131:13,23 132:10
132:19 134:2,8
135:15 137:12
138:22 140:10
147:22 149:14,20
149:24 150:8,20
151:6 152:2,6,10
155:9 176:16

180:8 181:11
182:13 183:19,23
184:19,20,25
185:13 186:9,15
189:13 190:18
191:2,21 196:11
199:5 200:5 202:4
206:22 207:2,9
209:20,24 210:6
213:4,6 215:9,14
217:14 231:4
233:8,24 236:11
236:19 237:4,18
239:7 240:1
245:14 253:13,15
259:15 261:12,16
264:18 273:18
274:2,18 278:24
279:11,19 280:18
286:2 287:16
288:4 290:2 294:7
300:11 302:15,22
303:6 304:2,7
305:1,19 306:1,5
313:3 314:24
318:21 321:2,4,9
321:13 323:2,6,10
323:18 324:9,21
327:15 334:5,17
335:21 340:4
**cvs** 169:25 170:1,3
172:25 173:5
333:15,21

**d**

**d** 266:22 267:16
267:17 332:8
**d.c.** 3:19 4:8,13
**daily** 95:16,18
118:22 120:5
328:19 329:22
330:4

**damages** 334:2,4,8
**dan** 1:8
**data** 34:16 36:12
36:18 62:16,18,20
62:22,23,25 63:3
63:12 97:4,18,19
103:23,24 104:6
105:1,9,10 107:21
107:23 110:3,5,19
112:1,2 114:1,10
114:11 115:19
130:9,10 178:3,8
186:23,25 192:13
192:16,19,20,21
195:15 196:7
197:2 198:1,2
199:18,19,20
223:12,15,23
245:13,25 248:11
248:13 263:7,8,10
305:5,12 315:13
315:15,17,18,21
316:1 318:18,19
318:24 319:1
334:22
**database** 35:5,16
35:16 68:23 246:1
247:9
**date** 10:1 15:11
17:22 18:6 92:4
99:21 127:18
152:13 162:18
186:17 192:24
193:18 195:19,20
195:23 196:5,6,10
197:7,15 199:8
203:19 242:8
275:7,25 302:23
339:11 342:8
343:3,9,19 344:3
344:13,25 345:20

345:25
**dated** 6:8 25:2
**dates** 87:15 88:4
89:13 289:8
305:13
**daughter** 335:17
**daughters** 185:21
**dawn** 68:14 71:15
79:3,7,10,13 83:15
**day** 2:20 10:21
16:5,6 24:3
122:20,21,25
123:2,5 197:3
206:7 234:19,25
235:14,15 237:1,1
237:2 266:7
317:22 321:16
328:21,21 329:1,3
341:7 343:16
344:22 345:22
**days** 168:22
342:19
**dea** 318:17
**deadline** 292:16
**deal** 246:20
**dear** 342:10
**death** 97:18,19
101:25 103:23,24
104:2,20 105:1
110:18 263:10
**deaths** 104:3
106:4,23 107:1,13
107:17 109:21,23
110:13,16,22
111:9 112:15
114:12 115:22
134:20 153:16
187:2,7 190:3
305:14,18
**december** 1:18
10:2 32:3 281:23

281:24 283:19
316:5 326:8 341:7
342:4
**decide** 174:9
**decided** 126:13
129:6
**deciding** 83:17
**decision** 82:23
91:19,22 92:2,24
93:1,11 174:25
221:14,17 292:9
**decisions** 172:19
172:23
**declared** 155:5
**declaring** 186:19
186:20
**deed** 343:14
344:20
**deemed** 37:9
295:17 342:21
**defendant** 10:19
**defendants** 10:17
11:3,8 171:12
172:17 249:11
251:23 253:7
333:17
**defense** 338:8
**defer** 75:24 112:1
**define** 30:7 62:22
76:18 93:5 108:2
205:4 213:18
219:22 313:24
**definitely** 130:25
133:4 190:10
202:9 284:2
**definition** 24:18
26:6 27:5,6 46:20
46:22 101:15,23
142:9 246:4
**definitions** 100:1
102:14,15,18

103:11,22 134:21
134:22 135:7
**degree** 20:20
**deidentified**
245:25
**dejesus** 91:25
150:1,2
**deliverable** 79:11
79:24 80:1 90:17
121:12 122:4,6,16
123:11,14,23
124:1 138:16
139:7,21,23
141:22 146:19
218:18 220:10,13
229:16,20 233:12
236:20,24 245:3
247:12,25 248:5,8
272:23 287:14
288:2,14 300:15
319:11
**deliverables** 40:5
47:22 64:10 68:17
69:6 75:8 76:9
93:17,20,21 111:2
111:4,5 113:21
116:20,23,24
117:2 118:7,9,10
118:21 119:7,9,12
119:15,18 120:7
120:13,16,25
121:1,4,4 123:3,8
123:20,25 131:16
138:9,14 149:20
150:10 181:22
184:14 188:18,20
194:24 218:22
229:4,6,12,14
231:11 233:6
235:8,11,12,20
237:11 240:21

241:1,8 246:19,24
247:2 269:10,22
270:4,12 272:3,7
272:16,19 284:20
286:9 289:6,18
299:8 302:19
303:14,17,19,22
319:6 330:9
**delivering** 270:19
**delivery** 339:9,11
**demographic**
112:4
**denied** 54:4 55:2
55:14
**dental** 36:24 37:1
37:3,5,15,21 38:12
39:1,20 40:2 53:7
56:15 155:17
156:4 270:5,15,17
270:20 326:8
**dentists** 37:6,13
**department** 18:14
19:3 29:6,9,11,17
29:18 40:6,7 46:2
46:5,9 48:19
49:23 63:7 64:10
73:8 76:10 81:18
85:3 86:10 113:20
113:22 127:1
136:12,16,23
137:1,14,16 138:4
139:1 140:7,24
141:3,7,10 142:5
146:12,14,22
147:17 181:4
191:12,15,19
192:2 193:21
195:10 198:7,13
198:17 199:10,21
206:6,12,19
214:10 216:6

231:13 240:20
269:19,21,21
280:23 281:4,11
282:2 299:21,22
300:2,4,24 301:2
301:16 313:5
337:25 342:24
**departments** 29:5
201:23 300:10
**departure** 180:20
**depending** 234:6
235:14 236:25
274:10
**deposed** 11:12
12:12 15:4,6,10
18:2 250:18,23
304:11
**deposition** 1:16
10:5 15:19,22
16:11 17:9 19:13
24:25 41:4 45:12
97:25 117:5 125:8
134:1 250:20
273:17 304:13,15
338:24 340:19
342:8,11 343:1,3
344:1,3
**depth** 268:13
269:4
**deputy** 275:18,23
276:7,8 278:20
**describe** 159:8,14
159:15 192:6
219:4 329:16
**described** 140:6
185:5 293:16
297:6 328:1
**describes** 49:4
**describing** 118:7
**description** 6:3
55:5 62:24 64:2

83:11 100:8
124:16 131:12
195:3 302:6
319:20,21 337:12
**descriptive** 137:8
137:10
**design** 140:3
**desiree** 337:23
**desk** 19:6 46:8
295:16,25
**desktop** 99:13
129:18
**despite** 14:4
**destroy** 162:24,24
**detail** 46:14
105:12 269:8
**detailed** 229:18
330:12
**details** 37:12
262:3
**determination**
91:14
**determine** 69:23
79:1 108:18
109:10 110:1
116:4 207:14
208:3 314:2
330:24
**determined** 92:5
199:14 315:12
**determines** 82:20
**deterra** 81:3
**deterrent** 238:17
**develop** 304:25
**development** 64:3
64:4,19 68:11
79:7
**developments**
83:14
**dictionary** 24:17

**died** 104:11,13
**difference** 81:8
102:21 115:13
**different** 31:4
41:22 47:22 67:3
74:25 103:7 107:8
112:24 118:16
119:1,2 121:15
123:24 138:16
139:12,22 143:3
145:3 152:21
155:14 176:17
177:8 215:4
225:17 230:8
270:11,13,23
272:4 301:25
320:11 329:12,15
329:17
**differentiate** 114:7
114:18,22 273:7
**differently** 103:10
164:15 269:24
270:6
**difficulty** 226:10
**direct** 26:9 76:9
170:24 172:9
184:5 215:6
259:12 270:18
274:7 300:6
**directed** 93:4,6
113:19 269:9
326:19
**directing** 48:23
82:3 116:20
170:22 216:23
275:3 299:18
**direction** 127:11
129:3,24 136:13
138:10
**directions** 158:8
262:11

**directive** 319:21
**directly** 71:21
216:13 238:7
277:12 281:14
293:5 299:5
323:16
**director** 21:18
22:4 29:25 30:2
34:21 44:2,3
49:12 58:23 68:9
72:1,2 75:17
96:11 112:9,13
156:18 162:11
200:23,24 222:2,6
240:2 242:2 275:9
275:18,23 276:7,8
276:13 278:20
324:17,18
**disagree** 113:3
**disapprove** 147:2
**discharge** 22:11
**disclose** 162:21
163:10,18,22
164:23
**discount** 37:13
**discounted** 37:11
**discovery** 294:13
**discretion** 174:10
**discuss** 22:23
28:19,21,25 44:24
53:10 117:25
147:22 195:25
210:11,22 226:24
312:19
**discussed** 45:4,5
90:1 143:13,17
148:1 211:24
212:5 229:17
**discusses** 60:16
117:24

**discussing** 68:9
**discussion** 258:23
326:14
**discussions** 212:17
255:22,24 310:3
**disease** 70:17
164:19
**disjointed** 252:7
**disorder** 30:20
31:14,15
**disorders** 271:19
**dispel** 97:6
**display** 154:13
**disposable** 210:3
290:14,16
**disposal** 81:4
290:6
**dispose** 209:18
**disseminated**
154:17 202:7
**dissemination**
144:17,20 145:8
145:15,18,22
146:9 192:9
201:17
**distinction** 142:4
**distribute** 73:1
202:23 209:16,20
210:4,10,12,13,14
210:16 290:7
301:24 302:2
**distributed** 259:18
259:21
**distributing**
202:18
**distribution**
192:12 218:23
219:1 220:8
**distributor** 250:6
250:12

**distributors**
333:13
**district** 1:1,2
25:22 26:5,12
318:4
**disturbing** 311:6
**ditlevson** 266:17
**diversion** 23:6
**divide** 235:11
**dividing** 236:14
**division** 1:3
**divulge** 172:14,14
**doctor** 80:2 101:3
115:11 174:5,8,9
174:13,16,24,25
175:2 226:22
248:16,17
**doctor's** 174:10
228:3
**doctors** 68:25 69:1
225:16 228:2,12
228:21 229:1,15
229:22 230:2,4,9
248:10,24
**document** 1:8 17:4
19:21 25:6,11
45:22 46:14 47:7
49:3,15 51:5 63:9
98:17,21,24 99:1,1
100:5 117:13,14
117:24 119:1,3,5
120:19 122:24
123:2,5 125:15,17
128:18 130:21
134:14,14 135:12
135:13,14,14,18
135:25 233:22
239:6 244:11,14
244:22,25 289:5
294:22 325:11
328:15

**documentaries**
226:25 227:3
228:7
**documentary**
227:8,9
**documents** 16:14
16:16,17,21 17:11
17:17 18:9,12,16
18:20,23 19:1,5
61:10 85:6 100:4
132:21,22 133:1
133:11 199:17
294:15 322:22
**doing** 22:10,18
28:25 55:11 64:13
67:9 68:21 73:3
83:9 87:8 113:6
119:1,7 122:23
123:1,3 126:5
135:16 140:22
141:2,19 148:6
150:16 154:25
157:20 158:10,13
176:4 184:12
189:18 194:23
199:12 214:3
242:25 281:11
284:12 293:21
296:6 303:8
321:25 328:21
**dollar** 148:10
**dollars** 82:4 83:3
**donate** 37:13
**donated** 37:9,11
**dopesick** 227:9
**dosages** 167:18
**dr** 30:3 32:1 51:21
61:14 63:18 69:24
85:23,25 141:17
261:7,8 263:12
285:19 288:25

316:19 319:25
320:10,13 327:10
**draft** 160:3 262:22
262:24
**drafting** 142:20,23
148:2 244:13
289:5
**drafts** 33:17
**draw** 337:2
**drawer** 19:6 295:4
**drawn** 24:9
**dreamland** 85:9
**drive** 3:14 4:3 19:2
265:19 295:1
**driven** 270:17
**driving** 107:12
165:12
**drop** 81:6
**drug** 4:10 6:13,15
10:25 42:13 65:7
65:18 80:14 87:23
95:12 96:20,23
98:1 99:7 101:9
102:16 103:1,16
103:21 104:6,9,11
104:13,25 105:14
106:4 109:18
110:2,2 114:1
115:12 117:6
134:20 163:4
164:11,17 210:1
212:20 213:15,16
217:13,16,19,23
218:1,4,6,7,8
219:7,7,9 220:16
220:19 221:1,6,9
221:20 222:7,16
222:20,23 223:4
223:23 224:10
226:11 229:7
238:20 245:14

272:11,14,14,23
273:1,2 290:6
291:20 300:6
301:3 302:1,2,6,11
308:3 327:21
328:1 334:24
335:3,22
**drugs** 104:20
105:11,13,25
108:14,17 109:22
110:1 112:5
114:13 187:7
222:9 227:23
249:24 273:4,8
308:7,8,11,16,19
334:14,14
**due** 187:7
**duly** 11:11 340:7
340:10
**duplicate** 183:6
**duplicated** 42:13
**duterra** 209:15,16
210:10 290:6
**duties** 183:22
233:24 237:5
**duty** 184:18,24
185:4,12,14

---

**e**

**e** 3:4 15:12 17:23
18:5 19:3 71:22
87:14 94:15,16
152:5 154:7 192:2
200:22 201:23
203:3,6,8 259:19
266:22,25 290:11
**ealexander** 4:14
**earlier** 81:20
109:11 187:8
189:16 201:8
206:7,13 225:1
229:17 231:16

254:3 256:14
271:14 273:6
280:22 281:20
284:19 289:22
297:6 298:8,18
304:9,17 306:7
315:4 323:5 325:9
327:20 328:8
330:17 332:20
334:1 336:11
**early** 321:24
**easier** 226:8
**east** 2:22 4:13
**eastern** 1:3
**edits** 42:23
**edna** 144:22 146:9
**educate** 73:13
79:5
**educating** 78:9
96:7
**education** 52:2
54:7 64:2,4,18
68:10,12,16,19
69:9,15 73:3,9,10
73:24 78:19 79:6
83:13 87:6 183:8
229:21 248:19
249:3 284:21
288:16 303:19
**effective** 96:2
109:12
**effectively** 184:20
**efficient** 252:8
307:23
**efficiently** 14:8
**effort** 114:6,18
116:3,7,15 187:25
190:5 199:4,6
240:3,10
**efforts** 6:14 64:7
73:13 91:4 98:3

**eight** 50:8 93:21
168:24 189:24
329:6
**either** 75:5,8 76:11
81:2 110:5 147:2
154:11 257:22
265:9 266:17
268:2 284:12
289:3 301:19
302:7,15 310:1
317:2 326:17
327:18 341:2
**elder** 211:15
**elderly** 6:9 40:16
41:6,25 211:25
**electronic** 20:3
99:12 259:8,15,16
315:11,16,25
**electronically**
143:11 202:19,24
294:8 296:9
**elias** 2:4
**ellis** 2:16 10:15
**emblem** 140:14
**emergency** 50:13
186:21
**emily** 72:4,12,14
285:18 316:19
**emphasis** 221:8
**employed** 180:22
215:13 216:3
322:11
**employee** 205:4,5
**employees** 52:12
154:10 204:23
205:2 287:10
**employment** 21:17
**ems** 36:19 79:15
**encompass** 63:15
116:22 139:5
272:11

**encompassed**
46:10,12 130:22
222:15 227:20
**encompasses**
28:16 126:14
202:17
**encourage** 67:10
247:17 248:24
**encouraging**
248:22
**ended** 91:17
**endo** 3:2,2 11:7
**ends** 277:17
**enforcement**
67:10 318:16
**ensure** 248:10
**ensuring** 302:20
303:5,9
**entail** 50:25 69:19
126:10
**entails** 46:7 63:13
79:21 111:19
**enter** 68:24 247:10
328:20 329:23
**entered** 35:15,18
245:25 315:18
344:9
**entering** 248:10
**entire** 155:3
194:16 295:1
343:5 344:5
**entirety** 132:25
**entities** 54:6 119:8
140:22 155:14,22
212:25 213:12
290:15,24 301:25
**entitled** 6:9 41:5
**entity** 25:24 55:8
182:14,17 188:7
201:11 293:22
315:19

**entries** 330:14
**environmental**
29:15 50:3,16
152:22 242:14,15
242:19 274:19
275:24 279:22
280:11,15 281:8
282:10 337:11
**epi** 147:11 206:10
243:6 315:8
320:24 331:24
332:5
**epicenter** 35:4,16
36:12,17 280:21
315:3,18
**epidemic** 6:13
96:1 98:1 153:17
155:5,5 162:23
163:2 165:13
185:20,24 190:16
225:3,8,10,11
226:4,16,19 228:4
228:13 229:23
230:2,5,9,14,18,24
231:9,24 232:3,9
232:11 238:2,25
239:2 240:4
304:20 305:6,17
**epidemiologist**
36:3,4 62:21
75:25 77:12 187:4
231:20 233:4
315:14
**epidemiologists**
35:8,20
**epidemiology**
34:14,21,23
200:24 281:11
324:17
**equal** 236:22,23

equate 236:12
equation 236:14
eric 4:12 10:24
errata 342:19
   344:7,10,18 345:1
especially 172:5
esq 2:4,7,11,16,21
   3:4,9,13,17,18 4:3
   4:7,12
establish 79:16
   178:15 240:23
   300:3,25
established 66:25
   122:5 187:22
   189:17 298:18
   315:13
establishing
   159:21
esther 214:16,17
estimate 234:12
   234:14,17 236:8
estimated 330:18
et 1:9,10,12,14
   60:4 292:4
evaluated 114:13
evaluates 108:3
evaluating 50:22
evaluation 37:10
   50:21,24 51:2
   55:12,18,21
   245:20 308:24
   309:6
event 91:5 341:3
events 40:15
everybody 60:16
exacerbate 43:5
   43:16
exact 15:11 17:22
   27:1,6 33:7 46:7
   54:24 58:21 72:5
   87:15 89:5,8 92:4

98:25 100:5
103:13 104:24
121:7 127:18
152:13 162:18
220:14 234:10
235:1 247:14
268:25 285:13
293:19 328:10
exactly 30:13
36:17 41:19 63:12
66:9 97:22 101:11
101:20,24 105:23
117:1,2 118:13
149:4 187:5
190:15 192:11
205:5 213:18
247:8 278:7
297:15 331:9
336:20
examination 5:6
11:10,14 162:5
251:17 317:16
examine 44:3
examiner 61:17
97:4 104:19
107:22 108:8
109:25 110:4
112:1 141:16
195:22 196:8
223:24 245:12
263:6 305:5
318:17,18,22
320:1
examiner's 104:1
114:11 115:10,18
186:25 192:18
223:9,16,18,22
305:12 320:9
334:21
example 14:10
22:24 50:10 63:9

89:15 101:5
110:21 120:5
133:3,5 140:9
195:21 219:25
263:21 296:2
335:4
examples 50:17
228:16,19
excel 200:24
excerpt 6:10 45:13
exchange 227:22
227:22
excuse 31:1 99:25
304:7 324:2
executed 344:10
execution 343:14
344:19
executive 58:23
executive's 25:23
191:7,22 199:9
205:6 207:24
215:19
executor's 83:6
exercise 178:17
exhibit 5:15 6:5,7
6:9,10,13,15,18,20
6:22 19:11,13
24:23,25 36:22
41:4,10,11 42:5
45:12,21 68:7
97:25 98:8 117:5
117:12 125:8,15
134:1,8 209:1
217:12 233:17
241:23 271:14,25
272:5,18 273:11
273:13,17,25
278:24 319:16
320:18 321:14,22
exhibits 5:3 6:1

exist 87:23
existed 152:13
existence 152:10
152:19
exists 334:21
expand 23:22
25:17
expanding 79:13
expansion 68:13
79:9
expect 32:5 301:15
expectation
289:17
expected 51:6
118:2
expecting 121:17
expend 149:2
expended 40:12
expenditures
207:14 208:3
experience 21:9
65:9 163:3 165:9
173:23 174:2
178:20 182:18
222:1,5
experienced 75:16
experiences 31:8,9
expert 222:19
225:21 232:1
233:3 239:16,22
241:11,13
expertise 208:23
experts 285:11
expiration 343:19
344:25 345:25
expire 216:23
283:19
expires 341:16
expiring 272:4
explain 26:9 35:11
36:14 237:17

271:1
**expressly**  342:13
**extensive**  136:20
136:21 137:4,11
**extent**  172:2
**extra**  21:4 94:24
**extremely**  129:5
139:25
**eyes**  274:7 284:1

**f**

**f**  4:7
**facet**  226:18
228:18
**facets**  190:16
194:20 215:4
225:2,13,17,18
228:16,17,19
230:23 231:1,8,15
231:18,23 232:2,4
232:8,10,13 239:2
239:22
**facilitate**  79:14
**facilitates**  72:16
**facility**  22:12
46:23 135:22
**facing**  97:16 239:6
302:21
**fact**  174:1 197:25
260:10 318:5
320:12 337:16
**factors**  6:13 98:2
165:12 226:15
238:2 304:19
325:8
**failing**  238:22
**fair**  24:19 26:16
55:5 78:14 88:1
124:15 126:25
192:24 195:3
237:3,6,8 252:17

**faith**  155:19,22
156:3
**fall**  30:14,17 39:11
52:2 53:18 54:7
220:25 242:10
322:3,4
**falls**  213:14
**false**  309:21 310:4
314:5
**familiar**  16:23,25
94:20 106:16
209:17 213:2
225:8 249:19
254:10
**families**  22:7,10
91:6
**family**  79:20
162:22 163:4,9,11
163:13,19,20
164:2,9,10,13,16
164:19,20 166:5
166:12 174:2
185:20
**family's**  173:23
176:11
**far**  47:19 50:15
53:15 64:22 65:10
65:12 66:7 80:20
81:7 85:5 87:7
89:25 97:5 101:11
112:3 140:1 142:5
151:15 154:8
155:24 156:15
158:7 164:2
167:23 172:4
189:20 190:3,15
198:3,9,11 199:13
203:23 204:10
205:2 206:20
207:19 220:22
225:21,23 228:19

241:11 246:4
253:19 262:11
268:16 269:25
270:22 278:7,25
280:14 287:3
292:16 297:22
301:15,17 302:8
305:13 308:10
309:15 313:13
315:23 316:11
318:20 319:11
325:18,21,24
327:24 331:12
332:7
**farthest**  276:12
**fast**  13:13
**fatalities**  217:13
229:7
**fatality**  63:4,10,20
245:3,9 319:22
**fda**  308:11,12
**fda's**  308:15
**february**  106:23
**federal**  11:10 83:3
**feel**  13:7 14:10
74:5 76:8,23 95:4
101:6 113:18
135:13 162:25
165:13 184:18
188:22 194:2
241:19 272:17
280:3
**feels**  12:25
**feinstein**  3:9 5:8
10:16,16 251:9,18
251:21 307:7,17
307:20 316:20
317:2,11 327:12
333:12
**felt**  121:23,25

**female**  97:9
**females**  96:24 97:7
97:10
**fentanyl**  44:20
105:16 107:2,2,3
107:12,16 108:4
108:22 115:2,5,9
115:15,24 116:3,4
116:5,6,9,12,16,18
220:3 227:24,25
**fentanyl's**  108:2
**fgallucci**  2:14
**field**  67:5 79:19
178:20
**figure**  105:19
**file**  20:4 99:12,15
289:14 295:5,16
**filed**  249:6
**fill**  169:23 170:4
171:4 172:25
175:18 179:3
**filled**  167:22
169:20 172:7
175:12
**filling**  126:3
179:13,21
**filter**  94:19
**filtered**  83:3
**filters**  83:2,4
**final**  41:16 148:15
291:25
**finally**  141:8
191:11,12
**find**  82:7 154:12
192:14 247:1
278:12 330:4
**findings**  292:3
**fine**  67:22 72:7
160:13 168:6,9
171:1 172:8
307:12,16

**finer** 207:1
**finish** 13:18,19
  67:18,19 85:11
  316:25
**first** 11:11 12:14
  12:18 15:3 17:1,3
  36:22 49:7 63:23
  88:5 96:25 97:10
  134:17 152:9
  197:17 233:18
  274:3 277:2
  290:13 304:6,8,15
  317:24 322:14
  327:7,9 340:10
**fit** 39:6 121:19
  295:17 318:10
**five** 121:1,1,4
  124:11 132:4
  137:25 138:1
  148:5 218:5,8
  220:18 305:10
  316:24 317:4
**fleming** 2:7 10:10
  10:10
**flight** 160:15
**flip** 276:1 277:15
  316:21
**floating** 143:23
**floor** 3:10
**flopped** 276:1
**flows** 280:7 282:6
  282:7,9
**fluctuated** 331:12
**fluid** 46:21 49:18
  49:19 63:15
**flyers** 302:2
**focus** 136:24
  184:16 212:7
  227:14,16 272:19
  302:7,11

**focused** 22:1
  120:21 209:14
  223:3 326:23
**focuses** 248:1
**folks** 34:2
**follow** 23:14 74:22
  90:21 231:20
  240:22 252:5
  255:10 306:21
  338:10
**followed** 300:1
**following** 292:2
**follows** 11:13
**food** 308:3
**foot** 167:14 168:18
  174:22 257:19,20
**footing** 61:4
**force** 6:18,20
  50:17 55:25 56:19
  56:21,22 85:17,18
  85:19 86:23,24
  87:22 88:11,15,23
  89:1,19 90:9,22
  92:7,8 93:8,15,23
  93:25 94:2,11,14
  95:6,8,13,23 96:3
  96:9,12 108:12
  109:5 110:9,24
  111:7,21 112:7,12
  114:16 118:1
  120:17,22,25
  123:21,23 124:5
  124:17 125:9,18
  125:20,24 126:9
  126:12,13,15
  127:6,22 128:9,21
  129:12 130:14,17
  130:19,23 131:14
  131:20 132:3,7,16
  132:22,23,24
  133:2,7,9 134:2,9

  137:4,19,22,24
  138:2,5,20 139:4
  140:14,20 141:6
  142:6,7,11 143:3,6
  143:19 144:1,11
  145:1,25 146:7
  147:23 148:20
  149:15,21,25
  150:6,9,21,24
  151:7,10,13,17
  152:3,7,11 153:25
  154:9,21 155:10
  156:6,12,14 157:3
  157:11,20 158:10
  165:10,12 180:9
  181:11,16 182:6
  182:14,19 183:20
  183:24,25 184:6,8
  184:10,12,21
  185:7,14 187:9,14
  187:19,20,24
  188:1,9 189:8,11
  189:16 190:19,21
  191:2,3,22 196:11
  199:5 201:7 202:4
  202:13,18,25
  203:1,22,25 204:3
  204:19,22 205:8
  208:13 216:12
  229:2 231:5 233:8
  233:24 236:11,19
  237:5,19 239:7
  240:1 257:23
  258:20,21 259:19
  259:22,23 260:9
  261:16,19,23
  262:6,20 264:24
  265:2,10,12
  267:23 268:3,3
  269:6 271:7,20
  272:22 282:17

  284:13 295:20
  296:12,23 297:10
  297:12,17 298:15
  300:3,5,25 302:10
  302:16,23 303:7
  305:21 306:23
  308:22,22 318:1
  319:8,13 323:7,11
  323:25 324:8,23
  325:8,24 327:6,24
**forces** 133:6
**foregoing** 340:15
  340:20 343:13
  344:18
**foresaw** 177:5
  179:12
**forget** 297:5
**forgetting** 255:18
**forgive** 247:7
  266:11
**form** 18:3,25
  22:25 42:1,18
  43:13,19 44:5
  45:2 55:6 56:10
  62:5,15,19 74:3,16
  75:23 77:8 78:5
  78:15 84:3 88:2
  89:3 96:4 102:10
  103:2 107:14,19
  108:6,24 111:11
  112:17 113:15
  114:20 115:6
  131:24 132:11,20
  133:18 142:13
  146:25 151:8
  153:8,20 156:8
  157:21 158:20
  166:17 167:8,11
  167:16,20 168:2
  169:1 173:21
  174:7,12,15,23

175:4,25 176:7,14
178:23 179:7
180:16 184:22
185:2,15 186:3,11
187:11,16 189:14
190:8 193:4,15
206:3 207:17
208:17,21 217:10
218:2 219:3,11,16
220:4 221:13
222:13,17,24
223:20 226:12
232:12 237:7
239:20 241:10
248:21 253:17
268:5 270:14
272:10,24 280:13
281:9 283:4,14
284:15 288:6
295:23 301:11
303:11 305:3
309:23 310:6,15
314:8 332:6
333:23
**formal** 22:21
**formality** 159:20
**formally** 22:18
**format** 107:9
128:1 131:5
**formation** 305:20
**formatting** 58:4,6
58:11 127:25
128:18 129:2,23
130:12 136:2,6
201:25 325:2
**formed** 151:17
241:16
**forms** 44:8,9
**formulations**
238:17

**forth** 24:22 40:5
50:7 69:24 71:22
78:9 113:21 188:6
248:2 286:14
288:9
**forum** 91:17
**forward** 64:24
121:17 131:5
148:9 177:10
181:21,23,24
182:3 220:12
221:2,8 240:21
297:22
**found** 31:12 42:11
48:1,5 80:1
198:10
**four** 31:4 32:3
72:25 79:18
114:25 121:1,3
124:11 263:16
290:3 299:12
**fourth** 290:9
293:13
**fragmented** 183:3
**frame** 34:7 90:19
189:23
**frank** 16:1 18:14
**free** 13:8 14:10
79:15 272:17
280:3 343:14
344:20
**frequent** 42:11,16
**frequently** 28:2
53:1 265:12
**friends** 60:12,13
60:17
**front** 27:6 36:22
97:22 107:25
117:1 133:23
291:10

**fulfill** 289:18
**full** 11:22 294:15
**fuller** 2:3
**function** 30:4
72:19 100:19
184:19
**fund** 31:3 48:1
54:10,12 71:13
81:5 206:1 282:22
283:21,23
**funded** 30:24
129:10 140:23
141:6 142:10
150:9 206:5,11
269:17,20 280:19
282:1,4,5
**funders** 54:16
82:7
**funding** 31:3,16
31:20,22 48:1,11
48:17 54:2,20,22
55:2,11 71:14
81:7 93:7 123:17
138:15 143:8,9
150:11,14,20
159:14,16 206:21
207:9 212:24
213:7 216:24
217:1,5 220:6
240:22 243:7
280:25,25 282:14
282:21 283:2,12
283:20 284:3,11
**funds** 302:15
**further** 223:10
251:7 275:3
317:12 340:18
341:1
**furthest** 198:12
277:3

**future** 31:19

**g**

**gain** 199:9 315:25
**gained** 198:13
**gaining** 266:16
**gallucci** 2:11 16:1
**ganey** 238:13
**garofoli** 1:21
**gas** 301:25 302:3
**gates** 2:21 10:20
10:20
**gather** 294:16
**gathered** 114:25
186:22 294:12,16
**geared** 38:23
**geez** 227:4
**general** 15:15
117:3 120:15
149:6,7 179:22
226:14 228:5,20
231:1 242:14,15
247:16 259:5
261:2 268:21
276:21 288:4
292:25 293:21
302:6,11 306:3
**general's** 260:13
261:23 318:5
**generally** 52:13
89:14 103:23
104:13 121:10
132:4 225:21
226:6 268:14,20
286:22 303:20
**generic** 179:23
180:1
**gerontology** 20:22
20:24 21:24 38:21
**getting** 40:20
42:24 63:23 66:5
66:5 90:16 114:11

193:6 283:8 303:1
**gilson** 51:21 61:14
  63:18 85:25 261:8
  319:25 320:10,13
**give** 14:19,25
  17:22 24:17 27:6
  33:6 47:20 53:15
  69:10 72:21 75:14
  76:8 82:5,23
  85:20 88:3 97:18
  101:10,12 120:15
  170:14 190:14
  199:11 204:15
  223:8,11,12 224:6
  228:18 229:21
  233:13 234:10,14
  234:17 235:1
  236:4 237:9
  247:14 257:5
  293:19 316:20
  339:1,10
**given** 31:16 35:2
  65:24 71:17 80:21
  81:11 85:23,25
  86:2 96:17 97:4
  98:19 107:22
  110:3 112:22
  117:22 135:23
  202:11 208:12
  248:11 279:14
  286:20 291:18
  296:7 300:2,5,7,9
  311:18 340:12,17
**gives** 109:25 157:1
**giving** 69:20
**glance** 17:3
**go** 12:16 18:5 20:3
  20:13 24:11 37:9
  38:1 45:6 46:8
  84:11,14 85:4
  90:5 102:12

105:12 120:8,12
121:6 122:18
127:12,17 128:1
129:4,6,25 131:5
133:6 145:6
153:21 159:5,13
164:3 169:15
189:24 200:9
201:22 211:20
225:25 227:5,19
233:19 234:1
246:21 251:9
259:3 271:15
276:6 293:9
295:24 301:12
307:9 312:3 316:3
323:16 325:3,10
328:23
**goal** 69:1 132:5
  142:16 209:12,16
**goals** 50:18 184:10
  253:22
**goes** 81:7 93:12
  160:24 189:2
  275:13,17 278:8
  292:12 293:10
  309:15
**going** 13:18 15:4,6
  15:10 19:10 24:20
  24:21,22 31:3,10
  37:10,25 41:16
  46:19 50:2 61:8
  67:18 69:21 70:5
  79:24 88:7 90:7
  112:18,25 121:17
  127:4 135:24
  139:2 141:12
  155:2 161:1
  163:10,18,22
  164:12,23 169:7
  171:2 172:18

173:6,7 177:7,9
183:4 185:22
186:24 190:1
193:19 212:3
216:12 221:2,8
230:16 231:11
235:4,15 236:16
250:25 251:24
252:1 254:9
267:15 269:1,5
273:11 278:7
293:4,7,9 297:23
307:3,25 311:4
316:21 317:13,20
337:2
**good** 11:16,17
  120:5 124:22
  176:4 187:6
  251:19 301:15
  317:18
**google** 227:5
**gosh** 135:19
**gotten** 118:3
  198:12 245:17
**govern** 308:19
**government** 24:3
**governor** 186:19
**grab** 46:8
**graduated** 20:9
**grant** 6:11 28:14
  29:19 34:16 35:24
  36:2 38:7 40:8,9
  40:19 45:14 46:1
  46:6,6 47:1,5,11
  47:22,23,25 48:7
  48:24 49:13 55:17
  55:21 56:6,22
  57:4,4,20,23 58:1
  58:2,5,9 68:8
  80:10 81:12,24
  82:13 83:1,17

85:1 108:3,13
117:16,17 118:3
123:24,25 127:17
136:12,16,23
137:14,21 138:4
140:8,24 141:3,10
141:24 142:7,8,8
149:2,8,11,16
150:9,19 159:6
162:11,12 179:25
180:3 183:18
184:14 202:17
205:23,24 206:8
206:13 213:10
214:2 215:11,21
216:21 217:7,9,16
217:25 218:3,12
218:19,20 220:16
220:19,21 221:9
222:2,7 223:3
227:18 229:5,12
233:5 242:21,21
242:24,25 243:2
243:20 244:20
245:17 246:7
257:24 266:12
269:18,20 270:4
270:13 271:11
272:1,3,8 273:1
277:5 280:7,9,19
280:21 281:18
283:10,18 284:5
287:15 288:15
289:16 291:22
292:10 293:13
299:9 300:11
306:24 308:23
312:2,2 319:17
321:8,15,18
330:25 337:13

**granted** 118:6
**grantees** 64:13
119:16 126:18,22
126:24 129:7
131:6 136:4,14,15
136:24 138:4,13
138:24 139:3
141:12,16,20
143:1 148:14
156:2 188:19
214:7,11 299:10
299:11
**grants** 40:7,11
48:4 80:20,25
81:4,9,10 159:24
206:1,14,17
237:13 242:22
243:4 270:13
289:24 290:1,15
290:24 292:21
302:13
**graph** 105:17,19
105:21,22,23,24
106:17,19,22
107:7 192:17
195:24,25 196:4
**graphs** 196:3
197:14 198:3,14
**grateful** 47:25
81:8 82:19
**gray** 331:10 332:3
332:14
**great** 12:3 16:3
19:9 32:9 38:5
135:22 321:19
**ground** 12:17
252:3
**groundwork**
121:23,24
**group** 65:7,19
80:15 84:13 97:9

121:25 184:12
203:5,8 204:13
276:23,23 277:19
278:3 279:8,22
280:12 282:11
**groups** 80:9,15,17
83:17
**growing** 152:16
153:6,7
**grown** 52:22
135:20
**growth** 23:24 59:3
176:20,22,24
177:1,5
**guess** 92:9 117:24
136:19 151:19
205:3 226:5,20
244:1 249:22
255:25 258:17
291:5 313:23
**guideline** 68:22
70:12
**guidelines** 44:21
70:1,4,10,19 73:15
73:16 74:1,2,15,20
74:22 75:2,22
76:4,18,21,23 77:5
77:7,21 78:1,3,7,9
78:13,22,25 86:14
229:17 238:5
247:4 285:2,8,13
285:22 288:18
**gullet** 30:3,9 32:1
**gut** 20:13
**guys** 93:11 122:6
123:13 158:12
160:21 200:12
224:18 276:1

**h**

**hack** 267:15
**half** 16:5,6 94:6,7
212:2 234:16
235:6,18 236:10
**hall** 287:1
**hallway** 52:11
57:17
**hamilton** 31:6
**hand** 24:11,12
36:3 37:25,25
140:15 165:14
247:15 274:10
297:1 341:6
**handing** 41:9
117:12 287:1
311:17
**handled** 191:10
**happen** 134:23
135:5 157:20,25
159:11 163:4
237:24 245:18
**happened** 60:6
135:4,6,7 157:17
159:10 185:6
189:22 297:18
335:16
**happening** 82:18
129:9 149:13
190:12 207:24
208:11 212:6
296:14
**hard** 12:24 19:2,5
86:19 88:19,20
152:12 153:3
155:25 156:2
191:7 193:17
226:7 264:10
265:19 294:18,19
295:1,3,20 296:3
313:23

**harm** 91:3 227:12
227:16,21 310:18
311:19,25
**hattiesburg** 2:5
**hcahps** 238:13
**head** 12:20 18:6
34:17 84:25 86:7
134:18 193:16
194:15 196:1
241:18,22 250:25
254:6 272:19
309:17 334:20
**heading** 316:9
**heads** 209:14
316:17
**healing** 168:19
**health** 3:2,16 6:7
6:22 10:13 15:6
23:11,25 24:9,13
25:1,19,21,22
26:16,21 27:8,9,11
27:22,23 28:9,12
28:17 29:3,12,15
29:25 31:2 36:8
36:16 37:4,25
39:14 40:6,7,20,22
44:25 46:2,6,9
48:19 49:23 52:10
54:7,9 58:8,17,22
63:7 64:10 74:5
75:6 76:10 81:18
84:12 90:11,13
91:3 92:11,19
97:2 108:1 113:20
113:22 127:2
136:12,16,23
137:1,14,16 138:4
139:1 140:8,24
141:3,7,10 142:5
146:12,14,22
147:17 152:22,25

153:4 154:4 157:5
157:10,19 158:4,9
158:18,25 172:13
172:15 176:17
178:4,14 186:9,14
186:21 189:13
190:7 200:5,14,19
206:6,12,19
209:24,25 213:6
214:10 215:14
226:23 231:13
234:2 240:20
242:14,15 259:16
261:13 264:18,18
265:20 267:3
268:2 269:19,22
273:18 274:18,19
275:24 279:11,19
279:22 280:11,16
280:18,23 281:5,8
282:2,7,8,11 286:2
290:2 291:13
294:1,7 296:15
299:21,22 300:2,4
300:10,11,24
301:2,16 302:22
303:7 312:4 313:3
313:6 314:3,25
315:11 316:1
322:12 323:2,11
323:18 324:9,22
328:12,14 337:11
**healthcare** 168:25
**hear** 59:5 84:6
154:16,21 162:9
249:22
**heard** 114:22
115:3,7,11,15,23
116:2 158:9,10
228:23 250:11,14
250:16,17 254:13

254:19,21,23
255:1,3,5,7,8,16
256:6,8 258:18
309:2 310:12,16
313:21 335:15
336:11
**hearing** 152:14,17
153:25 154:20
163:17 255:20
309:5
**heavy** 93:21
**hedging** 324:14
**heidi** 30:3,8
**heights** 26:1
**held** 116:21
333:21
**help** 38:2,3 42:21
42:22 51:16 57:25
58:24 61:7 64:7
64:24 65:5 68:19
71:14 72:25 76:5
79:14 119:8
156:15 176:8
178:13 184:5
186:4 209:17
227:2 244:16
300:3 307:1
**helped** 32:24
40:24 41:13,18
56:6 57:3 58:4,10
**helpful** 95:10
133:2
**helping** 33:7 34:17
58:23 64:5 163:1
176:5
**helps** 72:15,16
**henschel** 4:16
**hereinafter** 11:12
**hereunto** 341:5
**heroin** 44:18
103:17 105:16

107:2,2 110:22
141:5 220:1
222:12,14,15,19
222:21 238:19
261:22 317:25
319:8
**hey** 67:17 297:20
**hi** 68:5 125:6
251:20
**high** 31:13,18,19
67:8 197:24
238:10
**highlight** 129:7
131:6 136:3,14
137:12 138:23
139:2 141:21
142:25
**highlighted** 129:3
129:24 130:25
131:2 132:13
136:10 144:18,21
**highlighting**
126:18 137:15
141:11
**highlights** 141:13
141:18
**highly** 74:10,17
110:25
**hillary** 12:1
**hipaa** 170:10
171:24 172:3
**hire** 229:10
**hired** 266:14
**historic** 134:16
**historically** 29:20
**history** 21:17
60:25 176:11
189:11,25 227:5
**hold** 60:19 246:18
**home** 11:24 21:22
21:25 22:1 23:3

23:20,21,24 38:13
38:22 40:7 53:12
53:12,13,16 55:12
256:1 293:9
**homes** 55:3
**honest** 25:14
41:14 42:20 45:3
60:5,7 72:5 88:4
89:4,11 91:11
107:20 111:25
114:9,21 115:17
122:8,17,18
125:16 135:11
152:4,20 154:2
155:23 157:22
165:18 167:21
188:15 199:1
201:24 208:22
235:2 246:11
247:2,24 249:10
249:18,25 250:15
250:22 261:1
268:6 269:5 288:7
298:16 302:17
311:7 324:25
**honestly** 26:6 76:7
127:25 171:22
204:5 212:18
213:8 249:17
321:8
**hope** 268:7 336:15
336:17,24
**hopefully** 48:18
50:11 185:24
316:8
**hopes** 253:15
**hoping** 67:7
253:19 280:6
**horrible** 274:7
307:21

**hospital** 35:3
50:16 58:24 86:4
238:14 315:12
327:6
**hospitals** 288:23
**hour** 67:18 307:4
329:23
**hours** 72:24 234:3
234:8 328:17
329:6,7,7 330:15
**house** 144:22,22
191:1 297:17
**housed** 29:20 54:8
54:9 152:22
265:19 280:15
281:7
**household** 209:18
**houses** 260:24
**housing** 155:16
297:7
**hpio** 84:12
**hr** 177:19 181:4
337:25
**hub** 92:5,7,10
93:11 182:5
**hudson** 337:23,24
**huge** 187:2 188:20
**hugely** 154:3
**hugh** 320:2,8
**hum** 27:10 29:7
36:13 44:14 49:9
56:17 57:1 61:15
61:23 73:11 74:12
95:3 104:4 105:4
106:25 109:15
110:14 120:23
121:2 123:9
128:13 129:15
145:11 151:22
168:1 173:4
175:24 201:9

203:12 209:3
214:18 215:15
224:1,13 238:3,9
238:12 253:1
256:16 267:21
275:10,12 277:6
280:8 284:23
285:4 294:10
309:16 327:16
**hunch** 20:12
**hundred** 235:9
236:14 242:24
244:20 329:2
331:2
**hundreds** 225:22
**husband** 89:10
257:4

**i**

**ibuprofen** 167:24
**idea** 18:18 23:4
24:2 25:15 35:19
52:19 55:22 56:3
94:14 120:5,15
127:10 142:15,17
153:21 156:25
158:2 166:19
179:5 189:12,19
208:18,24 215:1
221:14 239:12
266:20 276:25
283:6 301:15
314:19
**identification**
19:17 25:4 41:7
45:17 98:5 117:10
125:12 134:5
273:22 274:1
**identified** 196:10
203:2
**identify** 10:6

**identifying** 315:17
**illegal** 334:24,25
335:3,9,22
**illicit** 111:9,23
112:15 113:13
114:3,8,19 116:5
116:18 219:15,20
220:3 272:12,14
273:8 334:14
**illicitly** 116:13
**illinois** 3:14 4:4
**imagine** 248:9
286:4
**immediate** 163:9
163:12,19
**immediately** 275:7
**impact** 82:17
118:2 131:22
132:10,19 133:14
226:10 233:18
**implement** 65:14
81:1
**implementation**
122:15 123:12
**implemented**
65:12 76:19
299:19
**implementing**
49:25 77:25 299:8
**implicate** 171:8
**imply** 123:4
**important** 74:2,11
74:14,18,24 75:2,5
75:22 108:14,16
109:12,17 110:7
110:15,17,20
111:7,14,16,22
112:13 113:11
123:6 128:19,24
129:1 131:9,21,25
132:2,8,17 133:13

158:2,17 182:14
182:16,22,25
183:15,17,24
184:2,9,9,13
185:25 188:17,22
193:2,9 194:3
195:4,8 199:19
211:24 237:1
243:24 248:8,13
248:16 249:1,4
**impossible** 64:14
64:16
**impression** 157:1
**inaccurate** 194:9
195:8,18 196:13
196:19 197:11,16
198:10 199:15
278:5 313:12
**inadvertently**
238:18
**inappropriate**
42:13 43:7
**incarceration**
71:16 147:10
206:9 238:19
**include** 53:19 54:3
103:17 200:15,17
217:19 221:21,24
222:11 229:6
285:21
**included** 142:11
204:18 218:10
220:20,22 246:23
**including** 13:23
142:1 212:16
219:20
**inclusive** 193:7
239:3
**incorporate** 53:24
53:25

**incorporated**
  344:12
**incorrect**  35:17
  239:10
**incorrectly**  209:9
**increase**  43:6 81:2
  187:7 218:22
**increasing**  105:2,3
  105:7
**increments**  328:16
  328:18 329:23
**index**  5:1,3,4 6:1
  7:1 8:1 9:1
**indicate**  48:20
  172:2 248:4
**indicated**  63:11
  110:6 165:8
  185:11
**indicates**  25:11
  49:15 245:15,25
**indicating**  124:6
**indirectly**  24:10
**individual**  60:24
  61:13 63:17 68:25
  91:4 141:1 166:25
  209:23 219:25
  225:14 226:7,17
  229:11 291:19
  320:2
**individuals**  37:5,8
  37:14 58:8 86:23
  155:10,12 183:10
  184:12 203:4
  226:24 227:23
  248:12 263:16
  287:6 292:18
  295:2 319:12,13
**industries**  3:7
**inevitable**  317:22
**infancy**  66:24

**inferences**  187:4
**informal**  22:21
**informally**  22:19
  57:16
**information**  35:7
  35:11,17 42:22
  60:20 61:7 84:17
  85:24 95:5,7
  103:22,25 107:8
  108:10 115:1
  128:12 131:21
  132:9,18 133:13
  142:1 157:11
  163:15,22 164:24
  169:17 170:7,14
  172:13,15 173:7
  177:15,18 184:6
  185:23 186:5,22
  190:20 191:6
  192:6 193:3,7,10
  193:12 195:7,9,12
  195:14,19,19
  196:9 197:6,10,19
  199:11,23 201:4
  211:15 214:6
  216:13 223:10
  224:11 227:25
  228:1 231:21
  239:5 257:1,8,10
  257:16,25 258:1
  258:10 260:25
  263:4 266:17
  268:3 286:19
  289:1 292:6
  295:12 301:24
  302:21 303:6,9,15
  303:24 308:14
  313:12 314:13
  315:20 320:14
  323:15

**informed**  243:18
  243:21,25
**initial**  69:4
**initially**  53:11
  54:18 58:1 69:12
  79:23 199:7 218:4
  247:21 261:17,20
**initiating**  64:9
**initiative**  74:22
  80:3,4,6 137:12
  138:11 144:21,23
  188:3,6 189:7
  194:6 207:22,22
  209:14 246:5
  320:6
**initiatives**  135:20
  136:11,15,22
  139:6 140:21
  141:23 155:19
  189:19 206:5
  240:24 241:17
**injuries**  114:3
  217:8 220:24
**injury**  6:11 28:14
  35:24 38:13,22
  40:8 44:1,2 45:14
  46:25 48:7,24
  50:23 53:12 57:19
  62:8,14 65:20
  68:8 75:7,16 76:5
  77:21 81:12,23
  82:25 96:11 112:7
  112:12 123:24,25
  126:17 141:10
  142:6 145:25
  149:8,10,15
  162:12 186:7
  202:16 205:22
  208:8,13 212:22
  212:24 213:10,11
  213:13 214:23

  215:10,20 216:4
  216:15,21 217:8
  218:11 221:9
  222:6 240:2 242:2
  242:11,18,21,25
  243:19 257:23
  270:12 271:10
  272:25 276:20
  280:9,19,25 281:1
  281:17 282:13
  283:1 284:5,12
  287:15 288:15
  289:16 295:18
  299:9 308:23
  318:11,14 319:6
  319:16 321:7,10
  321:15,17 322:9
  325:15 329:3
  330:20 331:3,24
  332:2 337:1,8
**inputs**  51:6
**insight**  60:20
**inspections**  53:14
  53:19
**instance**  19:6
  172:12
**institute**  282:8
**institutes**  31:2
  282:7
**instruct**  69:8
  172:18
**instructed**  164:5
  175:16
**instructing**  68:20
  113:7 170:9,12
**instruction**  69:11
  339:2,10
**instructs**  14:3
  173:17
**insurance**  22:11
  37:5

insys 255:3
integrate 192:11
intend 173:8,19
  202:14,18 217:9
  235:17,19
intense 136:2,7
  268:23
intensity 268:14
intensive 119:11
  136:8,18
intent 292:15
interact 22:16
  27:15 28:2 31:25
  34:1,6,12,15 53:2
  57:10,14,18 71:19
  71:22 192:14
interacted 30:8
interacting 30:18
  34:22
interaction 26:10
  28:7 30:12 62:4
interactions 22:22
interactive 201:19
interest 56:8 57:11
  153:10 176:19
interested 30:15
  54:6 59:8 154:11
  155:7 162:19
  266:14,16 292:14
  326:20 341:3
interesting 28:22
  86:5
internal 177:23
  227:1
internet 41:12
  65:16 198:20,23
internship 40:21
interpret 222:3
  256:3
interpreting 111:4

interruption
  216:16
intersect 319:5
interview 268:8,11
  268:12 336:17
  337:15 338:5
interviewed
  178:25 179:14
  336:13 337:22
introduce 94:3
introduced 11:18
introducing
  325:25
investigated 89:18
invitation 262:2
invite 91:10
involve 229:15
  322:5
involved 35:23
  49:4 55:24 56:4
  69:3 85:3 88:22
  92:1,16 106:4
  142:20,23 148:8
  151:12,15 157:13
  157:15,23 204:21
  209:13 215:10,19
  221:22 283:5
  297:5,10
involvement 57:22
  63:19 64:18 65:22
  92:14 122:14
  123:11 260:11
  308:15 322:15
  336:7
involves 49:24
  318:16
ipp 162:11
issue 28:17 56:9
  74:18 84:16 85:8
  94:23 163:25
  172:3 305:1,1

314:3
issues 44:25 70:18
  84:1 85:16 86:20
  88:19 94:23 96:14
  97:7 109:13 154:1
  211:15,24 212:4,8
  244:4 337:15
item 64:1

j

j 2:4
janssen 2:15 10:15
  256:6
january 6:8 25:3
  25:11 29:14,19
  39:10,14 47:10
  57:23 65:4 106:4
  106:23 207:7,19
  207:20 216:1
  220:9 279:5,6
  282:20 296:17
  322:16 330:2
  336:8
joan 71:19 72:9
  73:12 86:8
job 37:16 62:24
  64:1 83:11,18
  95:10 109:7 119:6
  119:11,13 122:25
  123:1,6 126:16
  174:3 175:9,11
  176:5,9 177:17
  182:10 184:15,17
  185:25 188:16
  199:7 230:11,12
  230:22 232:1,8
  233:10,11 235:6
  235:10,17,18,22
  235:23,25 236:2,7
  236:9 240:6,7,12
  240:14 241:6
  257:22 268:15

269:2 296:6
  302:20 304:24
  305:4,4 325:16
  336:7 337:7,12,20
john 278:19
johnson 2:15,15
  256:8,8
join 23:20,22
  211:21 319:13
joined 266:13
joining 165:9,11
joins 214:8
jones 2:20 10:20
jonesday.com
  2:23
judge 1:8 13:24
  96:22
jump 24:21
  317:21
justice 283:23

k

k 4:12 266:25,25
karns 34:19,20
  178:1,19 181:8
  316:13 332:15,15
  332:16
keep 36:21 40:4
  113:2 138:6 153:3
  168:7 235:21,23
  259:6 284:1 295:3
  295:16 296:5
keeping 161:6
keeps 265:21
kept 265:16,18
  266:6 296:9
kettering 293:25
key 246:13
kind 17:15 21:8
  24:11,21 36:17,20
  37:24 43:22 64:4
  65:1 67:2 81:1,8

88:6 90:24 91:16
95:9 97:2,6
101:13 115:1
119:10 120:9
128:1 129:23
131:5 133:7
134:16 150:14,18
152:23 155:4,13
158:12 165:19
168:18,19 175:10
176:22 177:1
186:24 189:18
190:11 207:21,22
214:4 217:19,22
219:9 228:19
231:20 261:24
268:15 271:14
274:9 275:4
282:16 283:9
285:2,15,24
292:25 293:20
302:12 304:19
307:24 314:2
315:10 329:12
**kinds** 67:13
105:11 108:14,17
158:5 183:7 212:4
**kippes** 36:5
243:10,11 316:10
331:20,21 332:4,4
**kit** 290:10 293:17
**kits** 72:21
**knew** 151:25
154:12 168:15,16
168:18 177:6,7,9
180:4,4,7 181:7
196:7 198:1 253:6
269:6,7 336:24
337:2,19
**know** 13:17 14:19
18:16,19,22 19:1

22:19 23:5 25:15
25:15 26:18,25,25
27:2,13,14 33:7
36:8,10,16,17 38:1
41:17,19 42:3
46:11 47:4 51:15
51:17,18 52:11
54:25 56:5,7,11
58:19 59:12,19
60:22,23 61:19,20
67:20 70:6 84:9
87:3 89:6 90:2,3,3
92:4,17 95:12,25
96:7 98:25 100:4
100:20 102:12,21
103:3,19 107:20
108:7,9,10,14,16
109:6 110:17,20
111:22 112:20,21
114:2,5 115:2,10
115:13,22 116:2
120:1 122:8,9,10
122:17,20 123:15
123:19 125:16
126:2,2,4 128:4
130:21 132:2,4
133:10 134:13
135:3,12,17,21
137:25 138:9,19
138:20 141:20
142:14,16,16,22
142:24 143:24
144:8 145:6,18
146:3 151:14
153:6,9,16,23
154:9,11,15,16
155:4 156:25
157:14,16,24,25
157:25 159:12
161:3 162:17,18
164:18,18 165:2,5

165:7,16,17,21
166:2,3,22,23,25
170:21 171:24
172:5 173:5
177:16,23 178:7,9
178:19,21,22,25
179:9,24 180:2,18
183:2 184:15
186:22 187:14
188:5,14 189:16
189:17 190:11,19
193:17 194:12,20
196:18 197:12
201:2 202:8,8,9,10
204:1 205:11
207:21,25 208:9
210:18,20 213:3,9
213:18 219:5
220:5,14 221:23
221:24 224:19
225:8,20,23 226:7
231:22 232:1,4,8
232:10,14,22
233:2,14 234:23
235:4 239:2,11,17
239:22 240:8,14
241:7,12 242:9,18
243:15,16,17
245:22 246:11,12
247:19,22,22
248:3,14 249:8,11
249:14 250:2,5,8
250:13,14 251:6
252:12,20 253:10
254:11,16 255:13
256:17 257:13
258:11 259:11
260:25 262:3,11
264:7,15,20,25
265:4 266:5,13
268:14,15,22,24

272:18 275:20,24
276:15 278:20
280:4,14 283:6,22
283:24 284:4
285:14,20 286:1,4
286:5,15,24 287:9
287:12 288:1,8,10
288:12,24 289:14
289:15,20,21
290:23 291:6
292:5,7,24 293:1,4
293:6,10,12,20,22
294:11,14,14,17
294:22,24,25
297:1,20 298:9,16
298:19,20 300:18
302:8,17 303:1
304:23 307:4
308:7,18 310:7
311:8,11 313:6
314:16,24 315:4
316:4,11,14,17
321:8 322:21
323:20 326:5
329:16 332:7,24
334:4,6,21 335:12
**knowing** 84:4
196:17
**knowledge** 23:23
65:3 93:2 95:9,16
127:20 130:15
188:2,8,12,13
192:25 206:15,23
206:25 207:19
208:23 222:18
243:14 246:2
250:20 251:2
253:19 258:18
308:10 313:7
332:12 333:6
334:15,19 335:8

335:11
**known** 36:6 51:24
  152:18
**knows** 122:25
**kranposki** 146:22
  215:8
**kurt** 4:16

**l**

**l** 1:25 4:12 266:22
  340:6 341:13
**l.p.** 1:10,12,14
**l.p.a.** 1:21
**l.s.w.** 6:5 19:15
**labeling** 257:16
**laboratories**
  254:24
**lack** 238:20
**lag** 61:2,3
**laid** 120:18
**lakeside** 2:22
**lane** 12:1
**language** 220:20
  220:22 221:2,12
  222:3,4 247:14
**large** 305:14
**late** 303:2
**laughable** 80:22
  82:13
**law** 67:10 318:16
  328:23
**lawful** 11:9
**lawsuit** 249:6,8
  250:16 252:25
  253:16,22 254:1
  304:7,9 333:17
**lawyers** 16:10
  307:20 328:24
**lays** 46:19
**lazar** 3:13 11:2,2
**lead** 58:24 65:5
  74:21 92:19,20

210:17 276:20
  278:18 320:6
**leadership** 209:2
  261:15 322:19
**leading** 80:3,17
  84:5 92:19
**leads** 73:13 261:24
**learn** 15:3 83:22
  83:25 152:9 177:7
  267:19 304:6
**learned** 18:1 75:15
  86:1 152:13
  177:21 304:8
  308:23
**learning** 65:4,8
  67:4 88:6 89:23
  96:6 177:10 185:4
  185:9,9,17 223:7
  326:2
**leave** 23:19 58:16
  161:1
**leaving** 59:1 126:3
  180:5 337:5,17
**led** 38:24 189:7
  238:2 318:4
**leffla** 51:20
**left** 23:21 59:6,20
  60:11 80:3 140:15
  140:15 144:7
  275:7,14,17
  278:15 307:22
  338:1
**legal** 15:5 18:14
  92:7 93:10 212:6
  334:13,17 335:10
  335:23,25 342:1
  345:1
**legality** 247:22
**legally** 92:9
**leppla** 56:25 57:15
  58:16 60:10 69:13

144:5 176:10
  268:10 277:5,10
  337:4
**letter** 17:24
  342:20
**level** 212:22
**lewis** 3:8,12 4:2
  10:17,19 11:3
  251:22
**lgates** 2:23
**liable** 333:21
**liaison** 322:20
  323:14
**licensed** 21:13
**licensing** 26:13
**life** 164:21 219:7
  226:7,10
**light** 12:16 13:15
**liked** 53:22
**limit** 137:19
**limitations** 42:7
**limited** 58:6 65:3
  73:18 138:7,8
  139:25 140:1
  148:11 182:18
  188:2,16 258:17
**line** 275:13 277:2
  344:7 345:3
**lisa** 2:21 10:20
**list** 203:3 204:15
  239:15,19 311:13
**listed** 40:25 49:7
  118:9 135:6 199:4
  244:10 271:13
  344:7,17
**listen** 160:11
  171:10
**listing** 135:21
  344:7
**lists** 120:25 209:4

**literally** 18:5
  24:17 32:2 46:7
  65:4 102:17
  133:22 193:19
  200:20 255:8,25
  293:17
**litigation** 1:6 10:4
  17:18 249:12
  250:21 253:11
  294:13 342:6
  343:3 344:3
**little** 46:13 112:23
  142:25 163:16
  164:14 176:6
  188:21 252:6,7,24
  271:1 275:4
  304:18 315:4
  336:12
**live** 61:1
**lives** 134:19
  162:24
**llp** 2:16 3:8,17
  4:11
**local** 40:8 64:3,5
  67:10 68:11 79:15
  82:7,8 134:20
  253:22 318:16
**locally** 82:7
  229:10
**located** 242:4
**location** 342:15
**logic** 51:3,4,9,11
  87:4,17,20 88:24
  90:16 218:11,14
  218:16
**logistically** 297:23
**logistics** 213:9
**logo** 140:15
**long** 12:9 16:4
  32:5 33:4 36:6
  39:24 51:24 131:1

160:23 191:10
211:19 217:12
234:23 297:12
298:14,20 315:25
316:3,14 324:2
**longer**  198:16
221:3 242:19
262:4,6 298:23
322:23
**look**  15:12 17:23
18:5 20:3 26:3
31:17 41:12 42:4
43:1 51:12 52:5
59:12 62:20 63:4
85:4 86:15 87:14
98:8,20 99:25
100:3 101:19,23
102:12,19,20
103:4 105:18,20
106:2,16,19
107:21 112:2,3,9
114:1 115:18
117:23 120:12
121:7 122:18,24
123:1,4,16,19
124:9 127:17
128:2 129:1 130:2
132:12 133:5,7,8
134:17,24 138:2
139:9,13 145:7
146:1 148:23
153:22 168:14,20
179:17 186:24
187:1 193:14
194:10,14,23
196:2 198:21
201:22,23 204:4,6
204:14 218:16
223:21 227:5
229:3 234:1 235:7
235:10 246:22

273:25 277:23
290:18 295:25
305:11 319:15
320:17 321:21
324:5,25 325:3,11
328:11 330:3
331:8
**looked**  58:3 63:12
89:20 100:5
104:18 114:12,14
127:23,24 129:18
134:16,17,20,21
135:3 194:4,13,16
194:18,21 196:22
197:1,4,22 228:25
325:8 334:1
336:21
**looking**  20:5 21:15
31:6 55:16 67:9
67:16 87:17 89:24
129:22,25 130:10
130:12 131:4,8,11
134:15 136:1,6
177:10 186:23
189:23 199:17
263:9 278:1,24
280:1 337:15
**looks**  29:4,24 39:9
40:13 187:1,5
**lorain**  299:22
300:4,10 301:2,10
301:23 302:10,16
**lose**  61:4
**lost**  134:19 161:8
185:21 188:23
**lot**  22:13 28:17
60:23 65:8 74:19
83:19,20,22 108:4
108:23 109:17
110:13 114:25
119:14 122:1

126:19 135:19,19
135:20 136:11,14
136:21 155:1,1
176:5 177:9 183:5
225:10 261:6
263:7 266:11
311:4 334:11
**lotion**  256:12
**love**  160:13
**low**  199:1
**lower**  331:13
**lunch**  160:9,13,23
**luncheon**  161:13
**lunches**  22:20
**lunchroom**  57:17
279:17

## m

**m**  2:11
**m.s.s.a**  20:17
**m.s.s.a.**  6:5 19:15
20:14
**madam**  342:10
**mail**  71:22 94:15
94:16 152:5 192:2
200:22 203:6,8
259:19
**mailed**  19:3
**mails**  15:12 17:23
18:5 87:14 154:7
201:23 203:3
**main**  2:17 45:4
51:17,19 56:22
67:15 127:9
134:24 135:2
209:15 235:22
249:22,23 268:15
**maintain**  122:14
123:11 200:9
294:6
**maintained**
289:18 295:20

**maintaining**
303:23
**maintains**  200:6
**majority**  107:17
122:22 149:24
**makeup**  227:2
**making**  22:8 40:11
66:3,6 69:5 78:8
80:18 92:24 93:1
158:7 194:24
203:18 227:22
284:3 302:23
310:25 315:18
**males**  96:24 97:7
97:11
**mallinckrodt**
255:16
**man**  72:25
**manage**  28:15
35:24 37:18 56:6
57:4 93:23 137:15
**managed**  38:15
**management**  39:1
53:6 54:8 56:14
238:5 263:17,18
**manager**  20:6
28:14 36:1 38:7,9
38:11 39:19 49:12
52:25 96:20
108:13 162:10
179:23 180:6
186:8 207:21
233:5 243:19
269:11,14 271:12
278:9 280:10
303:4 322:9
325:15,22 330:3
336:25 337:10
**managing**  40:18
52:7

mandated 110:24
manufactured
 256:17
manufacturer
 249:15,16 314:7
manufacturers
 249:20,24 250:3
 254:5 333:13
manufactures
 249:16 254:17
 255:14
manufacturing
 256:11
map 192:13
 194:12 201:19
maple 21:18,21
 23:9
mapping 67:11
march 48:16 67:1
 106:23 284:6
maria 2:7 10:10
mark 273:11
marked 6:3,23
 19:16 25:3 41:6
 41:10 45:16,21
 98:4,7 117:9
 125:11,14 134:4,7
 273:21,21,25
 274:3
marketing 22:12
 34:11 200:23
 238:7 324:18
marking 19:11
 24:23 117:12
marks 261:9
marlene 266:19,24
 312:24
martinsburg
 84:25
mass 238:19

master's 20:18
 40:20
masters 3:17 5:7
 10:12,12 11:15
 42:8 67:22 68:4
 106:8,12 113:4
 125:4 151:2 161:5
 161:8 162:6 168:6
 168:9 172:24
 189:1,4 224:20,25
 245:5,7 251:7
 325:6
match 315:19
matches 315:21
matching 35:4,5
 35:14 103:5
 315:17
matchup 315:10
material 14:8
 69:24
materials 69:15,19
 70:23 260:18
 285:21 286:3,19
 289:4,17 294:18
 295:21 298:17
 309:13 313:8
mathematical
 236:14
matter 10:3
 169:11 235:2
 262:17 263:11
 264:1 286:22
 342:12
matters 170:2,6
matthew 2:16
 10:14
matthew.moriarty
 2:19
mcconaughey
 278:13

mchugh 2:3
mchughfuller.com
 2:6
mckesson 4:6 11:5
md 1:7
mdl 1:6
mean 35:12 49:19
 50:5 52:9 56:5
 60:22 82:15 84:6
 85:21,23 93:5,18
 100:23 103:24
 115:8 123:4
 127:12 136:9,18
 140:5 154:6,7
 156:13 168:7
 170:11 175:7,10
 177:6 186:18
 214:24 216:11
 222:8 223:14
 225:6,12 226:4,9
 228:14 233:16
 235:6,17,19
 245:20 246:5
 248:9 249:17,21
 249:21,23 259:22
 268:21 271:1
 307:4 312:7 319:7
 322:20 323:1
 328:13
meaning 16:25
 47:15 49:20
 126:21 223:16
 235:21
means 14:15 36:14
 62:22 115:11
 187:5 245:22
 322:21
meant 196:17
 221:21,23 222:10
 228:15 256:5

measure 245:20
medicaid 212:7,8
 212:9
medical 29:25
 30:2 35:6 61:17
 73:3 86:5 91:7,7
 97:4 104:1,19
 107:22 108:8
 109:25 110:4
 112:1 114:11
 115:9,18 141:16
 169:17 170:15
 172:21 173:14,20
 186:23,25,25
 192:17 195:22
 196:8 223:9,16,18
 223:21,24 226:22
 245:12 263:6
 290:9 293:25
 305:5,12 318:17
 318:18,21 320:1,9
 326:7 334:21
medically 100:20
 310:25 311:1,6
medicare 212:7,8
 212:9
medication 22:23
 43:7 53:20 54:8
 55:5 70:15 165:21
 165:22 167:2
 168:10 171:5
 238:11 257:17
medications 41:21
 41:23 81:5 165:3
 165:17 209:18
 212:10,16 238:7
 238:18
medicine 79:20,21
 326:21
medina 299:21,24
 300:1,9,24 301:9

301:16 302:9,15
**meet** 15:18 16:4
16:10 48:4 53:9
64:21 69:6,10
93:22 119:7,8
121:17,19 122:3
131:17 141:21
188:19 210:11
231:11 233:5
245:16 269:9,23
269:25 320:4,7
**meeting** 16:18,20
17:12 22:7 40:5
91:1,2 92:20 94:3
94:4 121:16,22,25
159:6,19,23 204:5
204:6,8 211:13,19
212:2 234:6
258:21 260:4,6
265:10,16,23
266:2 267:9,18
292:1 296:18,19
296:23 297:22
301:18 318:6,19
318:19
**meetings** 44:15,23
45:6,8 62:11
84:15 89:6,7
92:17 94:2 114:25
121:11 151:11
154:8 156:14
157:23 182:20
184:7 203:4
204:13 205:8
212:4 216:12
265:13 267:23
295:22 296:12
318:25 320:5
327:25
**meets** 63:17
245:12 320:3,13

**melanie** 141:17
**member** 55:10
163:11,20 164:2
166:6,12 184:4
200:18 209:5
210:6 211:8
266:13 297:11
305:24 306:1
319:14 332:8,10
**members** 26:17,23
88:23 89:1 94:11
130:24,25 143:3
146:7 151:13
152:16 154:8,14
157:23 159:3
163:4 185:20
202:25 203:1,22
204:2 243:1
246:12 292:13
**membership**
151:4,5,12 153:5,6
203:18
**memory** 251:5
**mental** 209:24
**mention** 228:21
231:16 232:5
**mentioned** 36:12
56:25 61:13 69:8
81:20 82:12 86:8
86:22 88:24 92:23
116:23 127:5
145:9,16 147:14
157:18 195:21
199:25 201:8
202:3 205:7,22
206:7 220:15
225:19 226:1,18
227:1 228:6
232:24 242:22
256:13 263:23
265:7 267:14,17

281:20 284:24
285:1 306:7
317:25 328:7
**met** 15:23 52:24
56:16 61:22 62:1
62:7,9,10 71:23
75:8 76:11 79:24
80:2,4 119:18
181:22 214:17
251:23 265:14
301:13 303:14
**metaphor** 120:1
**methamphetamine**
105:16 335:5
**method** 210:12
**metro** 68:18 79:14
288:8,12
**metrohealth** 35:3
35:16 68:13,16,20
70:22 71:3,4
73:19,21,22 74:21
77:24 78:4,6,14,19
141:16 206:10
229:18 247:3,16
249:2 284:21
285:10,16 286:12
287:10,21,24
288:5,17,20
299:13 315:12
316:14 326:13
**metrohealth's**
35:6
**metz** 72:4,12,14
285:18 288:25
316:19
**mfleming** 2:10
**mg** 277:5
**mic** 317:13 338:11
**michigan** 31:5
282:8

**middle** 144:8
331:14
**midway** 318:7
**midwest** 345:1
**mike** 261:23 262:9
296:10
**mind** 119:6 157:7
157:10 161:6
179:12 326:6
**mindful** 13:13
**mini** 80:10,20 81:4
81:9,10 82:13
83:17 289:24
290:1,15,24
291:22 292:10,21
293:13
**minimum** 121:18
**minor** 201:25
**minute** 103:20
**minutes** 66:4,5
67:20 133:8,9
146:5 205:2
265:16,18,21
266:2,6 301:18,19
307:8 316:24
317:5 328:17
**mischaracterizing**
302:14
**misinformation**
313:22,24
**mislabeled** 210:25
**misleading** 314:6
**missed** 211:1
**missions** 50:19
**mississippi** 2:5
**misspeak** 258:12
290:19 291:7
**misstating** 284:25
**misunderstood**
78:11

**misuse** 23:6 272:9
306:4
**mitigate** 307:1
**mitigation** 308:24
309:6
**mixed** 222:21
**model** 51:3,4,9,11
53:23 218:11,14
218:16
**models** 87:4,18,20
88:24 90:17
**moment** 78:17
277:22 323:14
**money** 47:20 48:6
54:5 64:14,16
71:17 80:21 82:1
82:8,17,21,25 83:5
83:5,7 90:20 93:3
93:5,14 150:15
207:2 212:21,23
212:23,25 213:1,1
213:7 229:9
231:12 253:25
281:10 283:22
284:6 300:2,5,7,8
300:9
**month** 32:4 48:9
126:8 159:11
160:4 193:24
199:21 234:15,15
265:15
**monthly** 213:23
215:5
**months** 48:22
199:8
**moral** 238:22
**morale** 178:16
**morgan** 3:8,12 4:2
10:17,19 11:2
251:22

**morganlewis.com**
3:11,15 4:5
**moriarty** 2:16
10:14,14 163:16
317:4
**morning** 11:16,17
160:17 251:23
252:4,11 264:21
321:25
**morphine** 103:17
**motivated** 176:13
176:15
**motivation** 165:9
165:11
**move** 39:4 64:24
118:25 148:9
189:1 325:12
**moved** 23:10 38:6
58:19
**movement** 266:11
**moving** 36:21
50:21 220:12,13
246:17
**multiple** 41:21
43:3 304:19

**n**

**n** 266:22,25
**n.w.** 4:12
**nail** 152:12
**naloxone** 50:13
67:9 72:21 79:5
218:13,18,22,25
219:1,2,5,6,24
220:8
**name** 11:22 16:2
49:7 85:10 98:21
99:4,14 102:5
141:18 169:7
188:5 244:10,11
249:23 250:11,14
251:21 256:20

265:8 266:19,21
267:15 274:22
276:18 277:4
278:12,13,15
317:18 327:8,9
332:9,16 337:3
342:6 343:3,4,15
344:3,4,21
**named** 209:10
333:16 340:9
**names** 51:18 85:20
101:13 155:14
204:7,15 250:2
251:5 254:4,9,10
258:21 261:10
266:8 290:23
327:2 333:15
**napoli** 2:7
**napolilaw.com**
2:10
**narcan** 72:22,23
73:2,4 192:12,14
201:19 219:18
326:13,22,23,24
**narrative** 6:10
45:13 46:1,3,17,18
46:18 55:17
126:20 130:11
155:13 159:8
197:13 198:4
**national** 1:6 10:4
30:25 31:2 227:12
282:6 311:19,25
342:6 343:3 344:3
**natural** 39:4
103:14
**naturally** 100:15
101:18
**nature** 30:11
47:24 60:3,21
62:3 92:13 131:22

132:9,18 133:13
166:6 175:8,11
302:4 337:18,19
**necessarily** 89:12
278:11
**necessary** 95:11
95:16,20 109:13
110:7,8 112:14
**need** 13:13 14:9
22:9 46:11 48:4,5
52:12 68:21 82:8
113:5 120:12
130:10 150:17
159:18 160:22
163:1,14 200:19
201:1 207:15
208:4 223:9,13
237:17 241:3,5
252:19 253:2
262:13 287:16
295:17 307:5,18
**needed** 121:24
143:1 195:5
196:22 269:22
290:23 294:16
298:13
**needle** 227:21,22
**needs** 12:20 74:19
82:9 90:19,20
96:6 179:11,16,20
194:5 215:7
241:12 323:7
324:19
**network** 30:25
31:2 282:6
**never** 58:2 96:16
98:23 144:13
158:25 166:5,8,11
166:24 208:10
332:21 333:7

**new** 3:5,5 29:18
30:18 34:15 51:1
67:5 87:25 91:8
92:20,21 94:4,21
96:5 114:9,10,23
122:11,12 143:10
144:23 145:3
150:7 151:10
184:4 185:3,8,17
203:5 244:5 246:2
246:5 263:8
266:12 281:22
311:22 331:16
**news** 28:17 74:13
84:6 89:25 115:8
153:12,14 155:3
**nice** 125:5
**nicely** 326:4
**nine** 329:7
**nod** 12:20
**non** 47:14 139:15
139:18 142:10
220:18 238:20
**nope** 205:15 242:7
**normally** 23:16
150:15
**north** 2:21
**northeast** 211:15
**northern** 1:2
**nos** 253:3
**notary** 340:6
341:13 342:25
343:10,18 344:15
344:23 345:23
**note** 327:20 328:7
**notes** 120:9 133:8
133:9 307:9,25
316:21 317:24
**notice** 292:15
304:12

**notoriously**
307:21
**november** 296:13
296:17 326:8
**number** 6:3,6,11
6:16,19,21,23
19:16 27:1 45:15
52:13 56:1 68:8
106:9,22 107:1
109:21 117:8
118:5 125:10
134:3 149:19
171:5 235:12
236:15 273:20
277:17 289:8
297:16 305:18
319:16 342:7
**numbers** 69:6
107:12 223:8
245:4 269:25
270:8,22 274:3,4,9
274:11 344:7
**nurse** 97:1,5 287:5
**nurses** 23:2 55:13
**nursing** 21:22,22
21:25 22:1,16,22
23:3,19,21,24 54:9
**nw** 3:18 4:8

**o**

**o** 247:8 266:22,25
**o'donnell** 15:8,9
15:15 17:21
**oarrs** 68:23 83:15
246:20,23,23
247:6,13,17,18,19
248:1,5,8,16,19,23
248:25,25 249:4
**oath** 14:13,16
**object** 13:23 18:3
18:25 22:25 42:1
42:18 43:13,19

44:5 45:2 55:6
56:10 62:5,15,19
74:3,16 75:23
77:8 78:5,15 84:3
88:2 89:3 96:4
102:10 103:2
107:14,19 108:6
108:24 111:11
112:17 113:15
114:20 115:6
131:24 132:20
133:18 142:13
146:25 151:8
153:8,20 156:8
157:21 158:20
166:17 167:11,16
167:20 168:2
169:1 174:7,12,15
174:23 175:4,25
176:14 178:23
179:7 180:16
184:22 185:2,15
186:3,11 187:11
187:16 189:14
190:8 193:4,15
206:3 207:17
208:17,21 217:10
218:2 219:3,11,16
220:4 221:13
222:13,17,24
223:20
**objecting** 168:8
**objection** 7:3,3,4,4
7:5,5,6,6,7,7,8,8,9
7:9,10,10,11,11,12
7:12,13,13,14,14
7:15,15,16,16,17
7:17,18,18,19,19
7:20,20,21,21,22
7:22,23,23,24,24
7:25 8:3,3,4,4,5,5

8:6,6,7,7,8,8,9,9
8:10,10,11,11,12
8:12,13,13,14,14
8:15,15,16,16,17
8:17,18,18,19,19
8:20,20,21,21,22
8:22,23,23,24,24
8:25 9:3,3,4,4,5,5
9:6,6,7,7,8,8,9,9
9:10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20 14:5 75:3
76:6 78:23 113:5
113:5 132:11
167:6 168:3
186:16 208:7
219:21 221:18
226:12 230:20
232:12 237:7
239:20 240:5
241:10 248:21
253:17 257:2
268:5 270:14
272:10,24 280:13
281:9 283:4,14
284:15 288:6
295:23 301:11
303:11 305:3
309:23 310:6,15
314:8 332:6
333:23
**objections** 5:4 7:1
8:1 9:1 13:24
113:7 176:7
**objective** 118:2
217:12 233:19,19
233:21,22 237:11
**objectives** 118:6
124:2,4 236:15

237:14,14,15,16
271:5
**observer** 88:5
**observing** 89:23
**obtained** 116:10
116:13
**obtaining** 259:12
**obviously** 87:16
92:8 177:6
**occasion** 257:24
**occasions** 62:6
**occupied** 148:20
**occur** 183:10
**occurring** 63:6
101:18
**occurs** 159:20
**october** 94:9 150:6
180:10 260:2
265:10 297:25
298:1,3 310:19
341:16
**odh** 50:6,19 66:5,6
142:10 150:9,19
156:1 213:23
217:2 223:1,7
233:5 237:12
243:8 245:25
246:4 269:7,9
292:20,21 301:19
**odmaps** 67:11
**offer** 163:14
**offered** 61:6
**offering** 76:13
**office** 25:23 70:25
71:4,7,8,12 72:2
72:10,15,20 73:7,7
73:12 83:6 86:12
104:1 114:12
187:1 191:8,22
192:18 199:9
205:6 207:24

215:19 260:13
261:23 294:7
316:15,18 318:5
320:10 326:12
334:22 341:6
342:14
**official** 312:4
343:15 344:21
**officially** 266:14
296:16
**officials** 204:17
328:14
**ofr** 245:16 246:9
246:10,10,15
**oh** 12:7 119:13
135:19 139:19
140:13 147:9
148:22 181:13
225:20 227:4
262:10 278:17
**ohio** 1:2,9,13,22
2:9,13,18,22 10:5
12:1,4 28:15 31:5
34:24 35:25 40:5
40:6 46:1,5,8
48:11 49:22 63:7
64:10 65:6,20,21
65:25 66:3 69:1,7
71:17 76:10 80:13
80:24 81:6,18
82:2,3,11,20 83:4
83:4 84:12 90:18
92:4,6 110:24
111:2 113:20,21
116:21 117:22
127:1 136:12,16
136:23 137:1,14
137:16 138:3
139:1 140:24
141:2,7,9 142:4
146:12,14,22

147:16 190:7,10
190:12 206:6,11
206:19 210:1
211:15 213:11
214:10,16,23
217:23 231:13
240:20 248:2
269:19,21,21
280:23 281:4
282:15 287:7
288:2 292:14
294:1 297:14,16
297:21 300:12
313:5 315:9 340:2
340:7 341:7,14
342:2
**ohio's** 6:13 98:1
**oipp** 65:19 213:12
292:1,13
**okay** 12:9,23 13:2
13:8,9,20,21,25
14:1,5,6,11,18,22
15:13,18 16:3,21
17:7 18:8 19:9,19
20:5,21 21:2,12
25:16 26:3 29:24
34:13 40:10 41:9
44:10 45:9 47:10
55:14,16 60:18
72:8 85:7 86:18
88:18 100:25
106:13,15 115:2
117:17,23 122:4
124:1,19 134:15
134:22 135:22
136:5 142:24
148:9 160:20
170:20 189:22
204:20 237:25
238:6,16,23 243:3
244:9 245:8,15

251:25 252:9,13
252:14,18,21
254:12 271:23
272:13 274:5,14
274:21 276:3,5
278:23 279:6
280:5,17 291:12
298:5 304:12,16
304:17 305:20
307:5 317:23
319:15 320:17,25
321:19 322:6
323:20 324:7
326:25 328:4
330:1 335:14,19
336:22 338:2
**old** 29:11 160:15
195:14
**older** 31:11,15
38:23 211:8,12
213:14
**once** 59:25 84:8
86:18 199:16
292:17
**ones** 70:2 225:19
225:25 232:23
249:22,23
**ongoing** 6:13 98:2
**op** 1:10,12,14
**open** 72:24 91:17
94:3 144:4 180:6
326:14 336:25
337:18
**opened** 129:17
178:6
**operating** 272:8
279:4
**operation** 54:4
**operations** 32:14
95:22 137:5
157:12

**opiate** 1:6 6:18,20
10:4 28:16 30:20
55:25 56:19 68:24
70:25 71:6,7
72:10,15 83:8
84:1 86:13,24
87:22 88:14,23
89:1,19,21 90:9
92:6,7 93:8,15,25
94:1,11 95:6,8
96:3,12 97:3,16
98:15,16 100:8,11
100:14 101:5,11
102:14,22 103:15
103:16 108:12
109:5,14 110:8,9
110:13 111:7,21
112:7,12 114:16
114:17 118:1
120:17,22 123:21
124:5,16 125:9,24
126:12 127:6,22
128:9,21 130:14
130:16,19,23
131:13 133:7
134:2,9 138:5
139:4 140:14
142:5 147:23
149:14,21,24
150:8,21,24 151:6
152:3,6,10 155:10
165:4,9 180:9
181:11 182:14
183:9,20,24
184:21 185:13
186:8,14 190:6,19
191:1,2,3,21
196:11 199:5
201:7 202:4
203:22 207:9
208:12 211:16

216:11 229:2
231:4 233:8,24
236:11,19 237:5
237:19 239:7
240:1 247:10
257:23 258:5,19
259:22 260:6,9
261:16 264:23
265:1 269:6 271:7
272:21 283:13,21
291:18 296:11
297:10,11,17
298:15 302:9,16
302:22 303:7
308:22 316:15
323:6,11,25 324:8
324:22 325:7,24
326:12 327:24
334:25 335:9,23
335:25 342:6
343:3 344:3
**opiatecollaborat...**
324:3
**opiates** 28:20
87:10,23 103:22
110:16,17 290:12
322:11,15 323:22
334:15 335:3,10
338:4
**opinion** 75:5,10,13
75:20,21 76:8,13
76:14 77:17 110:5
110:19 111:17,19
113:10 171:14
**opioid** 28:16 31:14
71:4 72:3,20 73:8
73:13 81:2 82:18
83:8 84:1 85:16
86:20 88:19 94:23
95:12 96:1,14
97:3,15 100:8,13

100:16 101:2
102:14,22 107:13
131:22 132:9,18
141:6 154:1 167:5
167:13 171:21
174:6,11,14
178:20 179:25
180:3 189:12
206:2,18 207:3,10
207:15 208:5
228:3,13 230:2,4,9
230:14,18,24
231:4,9,24 232:25
238:25 240:4
243:22,25 244:4
256:15,18,21
257:17,19 261:3
271:18,20
272:9 283:3
284:13 296:5
297:17 302:7
304:20,25 306:4
308:22 310:13,20
310:24 311:13
314:7,21 327:14
335:25 337:8,15
**opioids** 23:3,7
28:19 44:4,12,16
45:1 73:14 82:18
85:2 87:22 89:2
91:6 96:17 97:17
100:15 103:22
110:21 111:8,10
111:23,24 112:15
112:16 113:12,13
114:3,4,8,8,19,19
173:10,13 201:15
212:16 219:12,14
219:15,19,20,23
243:5,13 258:1,15
258:24 259:2

272:20,22 285:9
308:2,25 309:10
309:14,22 310:5
311:2 313:18,22
314:12,14,17
315:1 322:2,5,11
322:15 336:7
338:4
**opium** 103:17
**opportunities**
157:12
**opportunity** 23:25
24:7 59:2 162:10
318:25
**opposite** 152:23
**options** 36:24 37:1
37:3,21 38:12
39:2,20 40:2 53:7
56:15 270:5,16,17
270:21
**order** 95:13
**org** 273:12 277:23
278:1,8
**organically** 185:6
193:18
**organization**
23:17 25:12
183:16
**organizational** 6:7
6:22 25:2,9 26:4
33:22 39:7 241:24
242:3,17 273:19
274:12,17 275:1
277:18 279:1,2,7
279:12,14 280:1
**origins** 187:20,21
**orleans** 311:22
**ought** 94:14
**outcomes** 291:25
**outdated** 128:12
130:9 192:16

outline 6:14 98:4
117:3
outlying 26:2
outpatient 91:8
outputs 51:6
outside 17:12
136:22
overall 104:20
114:1,12 229:7
overdose 6:13,15
63:4,10,20 97:5
98:1 104:1,3,11,14
105:13 106:1,3
107:17 117:6
153:16 187:2
190:3 212:20
213:15,16 217:13
217:20 218:6,7,9
219:8,10 220:1,19
221:1,6 222:9,22
222:23 223:11,14
223:23 244:8
245:2,9 273:1,2
290:9 300:6 302:2
302:6,11 305:13
305:14,18 319:22
320:13 321:2,4,9
321:13 335:9
overdosed 335:5
overdoses 35:5
36:19 62:17 67:12
105:11 108:5,15
108:17,19,23
109:18 111:23
113:13 114:7
115:16,24 116:5
116:17 217:17,23
218:1,4 220:17
221:10,20 222:8
222:16 223:1,4,5
224:10,11 229:8

245:14 334:12,13
334:16,24 335:22
overhearing
255:12
overprescribing
238:10
oversee 215:2
overseeing 215:10
215:19
oversees 72:17
215:5
oversight 79:19
overview 134:19
owe 184:25
oxford 3:9
oxycodone 101:12
168:11,12 169:10
174:21 175:2
256:23,25
oxycontin 101:12

**p**

p 290:11
p.m. 338:24
packet 274:1
311:18
page 21:15 40:14
42:4 43:1 49:3,6,6
98:20 99:25 100:1
100:2 102:13,14
106:2,3,6 117:24
117:25,25 118:5
120:18,19,20,21
140:11,25 150:23
151:1,3 191:2,3,8
191:10 192:12
195:2 197:5 209:1
245:2 263:4 274:3
274:12 275:4
277:15,17,23
278:24 320:18
322:19 344:7

345:3
pages 120:19
131:1 141:4
192:17 194:11,13
195:4 196:22
197:9 199:22,23
233:21 262:25
paid 37:7 136:11
141:23 150:16
pain 115:12
167:23 168:20
238:4,11 263:17
263:18 311:4
painful 165:19,23
166:16,20 167:2
pam 266:17
267:15,16,17
332:8
pam's 266:20
pamphlet 310:22
310:23 311:9,14
312:8,10,12,14,19
313:16,20
panel 73:2 263:15
264:6,11 292:18
327:1,7,11
panelist 326:6
panels 261:6
326:17 327:18,25
paper 40:24 41:1
43:21 236:17
253:22
papp 69:24 71:19
72:9 73:12 85:23
86:9 261:7 285:19
288:25 316:19
papp's 263:12
par 3:2,3 11:7
paragraph 42:8
43:2 319:20

parameters 82:5
82:10
pardon 20:12
334:3
parents 335:15
part 16:14 35:21
44:7 45:25 46:16
53:23 54:4 55:3
56:23 62:24 63:24
71:14 81:11 83:11
86:17 87:20 102:1
102:4 109:9,16
111:5 119:11
123:6 126:16
134:17 149:15
151:19 154:4
158:14 176:10
183:17 191:4,9
211:17 218:10,18
235:6,16,25 236:2
236:7 239:12
246:6,7 250:18
257:22 271:10
286:7 287:14
288:1,3 289:4,11
289:15 291:21
294:12,21 301:7
303:3,8 304:24
305:4 308:21
309:4 325:16
344:9
participate 213:20
239:4 246:15
320:5
participating
40:14
participation
319:8
particular 37:20
135:9 157:6,9
171:8 172:7,12

186:17,18 194:8
219:9 222:2
228:22 249:19
335:21
**partner** 210:13
288:8
**partnered** 210:15
210:19,21
**partners** 129:3,23
131:2
**partnership**
213:11
**parts** 302:20
**party** 341:2
**pass** 223:24
317:13 338:10
**passed** 154:13
202:11 224:11
297:14
**passes** 224:7
**passing** 52:11
**passionate** 185:19
185:19
**passionately**
162:25 165:13
**paste** 102:20
**patience** 338:19
**patient** 238:13
257:16,25
**patients** 43:5,11
43:17
**paul** 3:18
**pause** 290:11
293:13,18
**pay** 150:15 282:18
**paying** 131:7
**payroll** 329:13,17
329:19
**pays** 137:15,16
**pboehm** 3:20

**pdaag** 65:6,17,23
66:7,10,12,23 80:9
81:21 83:15,16
123:17 147:8
205:24 242:21
**pdo** 212:19 213:1
213:7,18,21,23
**pdo's** 212:23
**peca** 1:21
**pellegrino** 1:25
340:6 341:13
**pending** 169:14
171:4,11
**pennsylvania** 3:10
**people** 38:1,2,3
58:10 79:5 85:17
85:18 89:6,7
90:16 94:20
104:10,12 114:22
130:21 151:13
155:7,15 156:11
162:22 175:8
178:24 179:14
181:9 185:6,19
192:13 203:25
204:5,8,12 214:9
225:9,10 226:8
255:9 264:13,17
287:24 292:3
306:7,18 335:8
**perceived** 309:20
310:4 313:21
**percent** 148:5,17
148:19 149:3,5,10
149:18 217:15
235:10 236:14
242:24 244:20
291:6 329:2
330:18 331:2,18
**percentage** 115:23
148:24 149:1

220:12,14 233:11
233:13,14 235:13
330:24 331:7,11
331:13,14,17,23
335:8,20
**perfect** 267:17
**perform** 315:10
**performed** 286:12
314:25
**period** 53:3 217:6
269:13 289:19
**person** 16:8 26:8
69:10 79:1 96:6
118:25 148:24
164:22,25 166:1,8
166:12 179:12
182:8 188:17
191:5 194:23
196:16 197:17
214:14 285:16
289:1 293:9
314:20 335:22
**person's** 164:21
**personal** 163:3
165:8 168:4
171:13 172:13,15
172:16,20 173:12
173:20 176:20,22
**personally** 27:13
30:6 61:19 62:11
68:18 71:21
113:25 162:22
228:9 232:19
253:18 285:12
286:13 305:8
343:11 344:15
**personnel** 49:4
**persons** 211:8,12
**perspective** 131:4
172:17

**pertinent** 211:14
**pglawyer.com**
2:14
**pharma** 1:10,12
1:14 255:9,21,23
256:1
**pharmaceutical**
3:3,7 225:15
249:14 250:6,12
254:5 256:2,10
**pharmaceuticals**
2:15 3:2,2 249:17
249:20 254:14,17
**pharmacies** 41:22
43:3,4,10,10,16
192:15 210:13,15
210:20 291:16
**pharmacist** 43:21
43:22 70:7 75:25
172:21 313:25
**pharmacists** 43:6
43:12,17 155:17
**pharmacy** 40:15
40:19,23 41:20
42:11,16 53:21
169:21,23,25
256:25 257:12
333:14
**phn** 278:9
**phone** 262:9
338:10,15 342:3
**phrase** 222:16
**phrasing** 103:14
**physician** 22:17
68:12,16,19 69:9
70:14 73:9 75:25
77:12 78:19 169:3
169:4,9 174:20
175:17,22 219:6
241:15 293:17
314:1 326:19,25

327:10
**physicians** 22:22
23:2 43:6 69:17
72:24 73:14,18,21
73:23 78:10
155:16 172:22
230:14,18 247:10
247:18 286:25
287:4,4,16 288:16
293:24
**picked** 54:11
257:5
**piece** 46:19 56:22
142:6,7 184:15,17
233:9,15 249:3
269:6,7 323:5
**pieces** 46:4
**pill** 293:11
**pills** 167:18
168:12,23
**pilot** 31:4
**pinpoint** 186:17
**pittsburgh** 3:10
**place** 10:5 67:23
70:21 76:17,20,22
77:4,7,11,14,16,18
78:13,21,25 79:1
87:12,13,24 99:3
197:15,18 288:10
340:19
**placed** 291:17
293:7
**places** 316:25
317:1
**plaintiff** 10:9,11
171:11,23 253:10
338:16
**plaintiff's** 338:11
**plaintiffs** 253:11
**plan** 6:16 50:7
66:8 67:1 80:16

80:19 90:21,23
93:20 116:25
117:7,15,19,20,21
118:18,22 120:9
122:5 124:8 131:8
131:18 139:9,14
145:18,18,22
146:9,16 147:9
192:9 217:11
221:25 233:6
235:24 236:13
240:19 244:8
247:15 269:4
271:5
**planned** 262:18
**planning** 22:11,19
260:12 262:14
293:21
**plans** 22:9 122:15
123:13 143:6,10
283:17,19
**platform** 197:14
**play** 60:25 69:4
77:21 226:15,19
**played** 69:14
190:17 225:3
**pleading** 17:8
**please** 10:6 11:21
252:12 273:24
274:8 276:19
284:24 315:5
319:15 342:14
**plenary** 261:8
**plevin** 2:11
**pllc** 2:7
**point** 2:21 29:23
45:7 59:16,17
92:3 94:10 140:2
171:2,22 193:8
207:1 225:13,14
225:15,16,16

228:2,12 230:24
252:11 254:7
257:15 279:10
282:19,25 285:15
297:4 306:12
310:11
**points** 134:23,25
135:2,9
**poised** 43:23
**police** 50:17 85:3
**policies** 65:12
67:13,15 214:5
299:18
**policy** 44:3 50:3
50:10,12,15 64:3,4
64:19 65:5 66:17
66:19,22 67:2
68:11 70:21 79:7
80:17 83:14,16
84:12
**polster** 1:8
**poly** 40:15,23
41:20 42:11,16
53:21
**polypharmacy** 6:9
41:5
**poor** 108:21
**populations**
155:24 156:2
**portage** 12:6,7,10
**porter** 3:3 11:7
**portion** 201:7
288:14 324:22
334:16
**portions** 132:24
133:20,21 134:11
**position** 20:6
27:19 38:17,20,20
38:24 39:5 51:2
58:19,20 59:10,13
59:25,25 60:19

69:14 84:5,8 88:1
88:6 90:10,12
96:5 108:1 110:25
114:24 126:3
144:4,4,6 162:20
162:21 177:13,22
177:24 178:6
179:3,13,16,20,21
179:23,24 180:5,6
181:6,12 182:7
183:14 185:8,17
189:21 190:23
207:18 242:3,10
263:8 266:15,16
267:20,22,25
269:5 282:20
296:16 333:7
334:8 335:20
336:3,8,13,25
337:18
**positioned** 95:10
**positions** 39:12
**positive** 17:3 20:3
47:5 51:14 99:24
125:19 126:1
146:3 256:22
257:3 265:6
278:10 279:15
291:6 300:17
331:19 336:16
**possible** 14:9
160:14 180:6
231:23 291:19
**possibly** 79:16
143:12 190:12
**posted** 59:10,20,25
162:14 337:10
**posting** 59:13
179:18,22 337:7
**pot** 47:19 54:5
212:22,23,24

213:1,7 284:6
**potency** 238:10
**potential** 43:7
284:10
**pots** 212:21
**pouches** 81:3
209:15,16 210:4
210:10 290:6,14
290:16,25
**powerful** 115:12
**powerpoint** 69:21
86:16,17 101:19
101:24 102:3,9,19
103:4 105:20
259:4,7,10,13,17
260:22,23 262:23
267:6 285:25
295:11,14 326:11
**powerpoints**
69:22 74:8 86:2
263:25 264:1,4
267:11 287:2
294:20 295:21
**practice** 170:25
**practices** 209:5,8
210:23 309:5
**practitioners**
287:5 288:23
**predecessor** 57:3
337:17
**predicting** 307:21
**prefer** 342:16
**pregnancies**
313:17
**pregnancy** 310:20
310:24
**pregnant** 311:3
326:23
**preliminary** 17:15
31:17

**preparation** 16:11
16:15 17:9 268:7
**prepare** 15:19,21
32:25 84:2 159:22
262:22 289:3
**prepared** 268:11
336:17 337:14
**preparing** 137:8
142:18 283:10
301:7
**prescribe** 23:3
68:24 70:15 73:14
174:11 247:10
**prescribed** 165:20
165:22 167:1,4,13
167:19 168:10,13
169:10 173:14
174:6,14,21 175:2
247:11 256:14,18
257:19 258:4,12
**prescribers** 43:12
43:18 44:24 288:4
288:21,22
**prescribing** 44:20
68:21 70:1,3,10,12
70:18 73:10,15,16
74:1,2,14,15,20
75:1,22 76:4,17,21
76:23 77:5,7,21
78:3,7,13,21,25
83:14 86:14 169:3
169:4,9 174:20
209:4,7 210:23
229:17 247:4
257:25 285:9,13
285:17,21 286:25
287:15,21 288:3
288:17 290:11
309:4
**prescription** 1:6
6:15 10:4 22:23

23:3,7 44:12,16
53:20 55:4 65:7
65:18 110:21
111:8,22 112:14
113:12 114:2,8,19
116:6,10,17 117:6
165:15 166:15,20
168:15 169:24
170:4 172:7 173:1
173:9,13 175:13
175:19 188:4,10
188:11,13 212:10
212:15,16,20
213:15,16 218:5,8
219:14,15 220:16
220:19,25 221:20
222:7,9,16,20,23
223:4 224:10
226:11 243:5
244:7 257:11,17
258:1,8 259:1
272:11,13 273:2,7
284:21 285:1
290:12 291:18
293:18 308:2,8,15
308:19 309:10,14
309:22 310:5,13
314:7,12,16,21
335:10 342:6
343:3 344:3
**prescriptions**
168:5 173:20
209:11 211:5
248:11 257:4
259:5 287:7
334:13,18
**presence** 340:14
**present** 4:16 86:9
101:8 105:10
159:18 211:14
292:3

**presentation** 6:14
86:4,8 96:17,19,21
96:25 97:15,22
98:3,9,16 99:6,8
99:11,18 102:3,7
106:18 107:6
259:4,25 262:18
262:23 263:12,15
326:11
**presentations**
85:24,25 86:1
97:1 98:18 99:2,5
267:8,12 296:4
326:9
**presented** 86:11
86:11 97:2,12
105:9,13 292:1
327:21
**presenters** 211:14
261:4
**presenting** 93:25
261:7,8
**preserve** 17:16
18:9
**president** 186:20
**press** 238:13
**pretty** 83:18 93:21
120:8 135:23
190:23
**prevent** 31:18
76:5 217:9
**preventative**
79:20
**prevention** 6:11
6:14,16 28:14
29:5,9 30:14,17
35:24 38:13,22
39:13 40:8 44:2
45:14 47:1 48:7
48:24 50:23 52:2
53:12,18 54:7

55:17 57:20 62:8
62:14 65:20 68:8
75:7,16 77:22
80:14 81:1,12,24
83:1 96:10,11
98:3 108:13 112:8
112:12 117:7
123:24,25 126:17
141:10 142:6
145:25 149:8,10
149:15 152:24
162:12 186:7
202:17 205:22
208:8,13 212:22
212:24 213:10,11
214:23 215:11,20
216:4,15,21 217:9
218:11 220:25
221:7,9 222:6
240:2 242:2,12,18
242:21,25 243:20
244:8 257:23
270:12 271:11
273:1 276:20
279:20 280:9,19
280:25 281:2,18
282:13 283:1
284:5,12 287:15
288:15 289:16
295:19 299:9
302:3 308:23
318:11,14 319:7
319:17 321:2,4,7,9
321:10,14,15,17
322:3,4,9 325:15
329:3 330:20
331:4,24 332:2
337:1,8
**previous** 28:10
29:11 39:4 57:14
117:20 133:9

142:20,23 202:11
220:9,15
**previously** 39:13
80:13 102:24
103:1 109:1
112:19 146:17
152:25 229:19
230:11 246:17
269:12 273:2
322:23
**primarily** 202:25
203:17
**principal** 244:18
**print** 202:20,21
309:13
**printed** 202:5,6
285:21
**printer** 148:10
**printing** 140:3
**prior** 33:11,11
57:4,10,23 65:25
88:17 150:4
152:19 153:19
178:19 190:22
216:1 250:19
283:16 286:14
302:12,14 322:8
336:7
**prioritize** 201:2
324:18
**priority** 197:24
199:1
**privacy** 163:23
169:19 171:8
**private** 169:17
170:6,15 288:23
**privilege** 177:14
**pro** 150:16
**probably** 26:8
28:4 53:4,8 62:2
76:17 78:24 85:13

87:16 92:20 95:11
96:1 105:24
108:22 124:18,19
152:15 154:12
162:14 196:7
234:22 236:12,16
242:11 264:5,25
265:5 286:5
295:16 312:15
**problem** 41:24
84:2 89:15,21
90:2 95:12 102:2
104:6,9 110:10
114:17 132:1
135:15 164:11
175:8 258:7 306:4
306:25 307:2
**problems** 44:4
87:23 97:16
**procedure** 11:11
173:15 339:7
343:5 344:5
**process** 142:17
168:19 193:19
198:6,9,11 237:14
237:15 294:13,22
301:8
**produce** 140:1
**produced** 98:14
98:14 274:2
**production** 342:24
**products** 255:13
**professional** 40:15
57:19 108:9
176:24 177:1,5
**professionally**
23:23 43:24 77:10
**professionals** 45:5
155:18 156:4
226:24

**professor** 190:13
**professors** 155:16
**proficient** 58:9
**prog** 277:5
**program** 6:7,10
20:6 25:2 28:13
36:1,24 37:2,3,6
37:21 38:9,11,13
38:22,25 39:2,18
40:3 44:2,2 45:13
45:25 46:3,17,20
49:5,12 50:21,23
51:6 52:7,25 53:6
53:7,12 55:18,20
56:13,15 61:3,4
62:8,14 64:11
65:20 74:18 75:17
88:6 91:8 96:19
108:13 112:8,8,12
123:17 138:11
139:10 145:25
146:21 152:21
154:25 160:16
162:10 179:23
180:6 186:8
188:13 191:4
200:20 207:5,21
214:10,15,22,24
215:3,6,11,20
216:4,15,21 217:9
218:12 221:9
222:6 233:5,18
237:14,16 240:2,3
240:25 242:2
243:9,19 269:11
269:14 271:11
278:9,18 280:10
281:21,21 282:13
282:14 283:1
284:13,21 285:17
287:16,20,21,23

288:3 290:8 292:9
293:14 297:7
302:18 303:4,8
321:5,6,10,10,14
322:9 325:14,17
325:22 330:3
331:4 336:25
337:10
**programmatically**
330:12
**programming**
30:17 283:3
**programs** 38:14
39:19 50:22 53:7
140:6 142:11
153:1 176:17
243:12 270:3
282:22
**progress** 64:22
146:18
**project** 30:19,21
30:22,24 31:4,22
32:1,2,6 34:17,23
35:21 38:8,10,12
44:3 49:12 54:11
54:17 56:4 68:9
68:14 71:15,16,18
79:3,4,7,10,13
83:15 84:25 96:11
120:2 143:4,22
148:5 149:3,5,7,11
159:9 162:11
206:11 222:1,5
269:15,17,20
270:16,19 281:22
291:4 297:13
315:3,6,8,23
318:11,15 319:7
319:20 320:22,24
321:2,15 322:1,3,4
322:10 325:15

330:20 331:25
332:2,5 337:1,8
**projection** 330:23
**projects** 54:11
72:16 80:10 82:13
83:17
**promoted** 86:18
154:3
**promotion** 38:18
177:3,4 309:21
310:4
**prone** 31:14
**pronounce** 141:17
320:20
**pronouncing**
266:18
**proper** 68:21,22
70:1,3,10 72:22
73:15,16 74:2,20
76:17,21,23 77:4,7
78:7,25 81:4
229:16 247:4
286:25 288:17
**properly** 70:15
209:18 248:10
**properties** 258:16
**proposal** 271:25
283:10
**proposed** 246:24
**proposing** 87:9
291:23
**prospective**
283:18,20
**provide** 26:1
42:25 46:13 60:20
61:5,10 62:16
71:14 79:19 83:7
93:19 105:20
133:2,12 159:7
160:2 173:7
200:12 201:4

205:19
**provided** 11:10
19:4 103:21
131:21 132:8,17
159:24 195:17
197:5 201:14
206:18 216:2,8
260:22 263:7
264:5 303:12
334:22
**provider** 168:25
**providing** 126:19
172:6 200:13
201:10 213:25
**proviso** 291:9
**psec** 49:25 50:1
83:13
**psecs** 50:6
**psychiatrist** 86:3
241:14 327:5
**psychology** 20:10
20:20
**public** 1:22 2:8,12
24:1,9,12,13 28:9
28:11,17 29:15
31:2 37:25 40:20
44:3,25 72:22
96:13 99:3 146:13
147:14 153:11
186:5,9,14,20
189:13 190:6
193:10 226:23
239:6 244:2,3
268:16 274:19
279:13,22 280:11
280:16 281:8
282:7,8,10 302:21
303:12 312:4
314:3 325:16,18
325:20,23 328:14
340:6 341:13

343:10,18 344:15
344:23 345:23
**publicly** 303:5
**published** 33:19
233:4
**publishes** 32:10
**pull** 297:20
**purchased** 342:17
**purdue** 1:10,11,13
255:5,7,9,10,14,21
**purpose** 29:16
46:14 63:2 72:19
137:23 158:7
179:21 189:18
329:22
**purposes** 19:17
25:4 41:7 45:17
98:4 117:10
125:12 129:23
131:15 134:5
135:1 138:14
273:22 274:1
276:3 296:6 299:8
330:19,22
**pursuant** 339:3,6
**put** 197:17 207:1
260:8,12 262:8
283:25 291:23
321:19 323:8
324:11 329:6
**puts** 50:6
**putting** 190:20

**q**

**qualified** 29:22
74:5 76:8,24
77:13,17 101:7
109:2 179:8,10
314:1 340:8
**quarter** 144:9
301:20,22

**quarterback**
120:1
**quarterly** 121:12
121:21 124:13
146:11,18 147:4
245:16
**question** 12:18
13:4,6,17,18,20
17:16 25:17 43:14
43:24,25 74:6,23
76:1 101:7 108:21
109:1,2 112:21,23
112:23 113:1,2,8
113:16,18 115:20
132:14 152:12
164:6,13 166:18
167:12,17 169:14
171:3 174:17
178:25 188:25
212:15 225:10
230:8,15 235:3
236:6 252:11,15
306:10,17 310:9
325:13 327:13,17
328:9 329:5 335:2
336:6
**questioning**
252:10
**questions** 160:1
168:4 170:11
171:7,14 173:18
251:8 252:2,5
280:3 307:10
317:12,20 326:15
326:16,21 327:14
333:25 334:11
338:3,10,12,17
**queue** 200:21
201:24 323:9
324:11

**queues** 200:25
**quezon** 2:4 10:8,8
18:3,25 22:25
42:1,6,18 43:13,19
44:5 45:2 49:10
55:6 56:10 61:24
62:5,15,19 67:17
74:3,16 75:3,23
76:6 77:8 78:5,15
78:23 84:3 88:2
89:3 96:4 102:10
103:2 106:6,11,13
107:14,19 108:6
108:24 111:11
112:17,25 113:6
113:15,17 114:20
115:6 124:21
128:14 131:24
132:11,20 133:18
140:11,16,18
142:13 145:12
146:25 150:25
151:8,23 153:8,20
156:8 157:21
158:20 160:11
161:1 166:17
167:6,8,11,16,20
168:2,7 169:1,16
170:9,18,21 171:1
171:10,17,20
172:10 173:16
174:7,12,15,23
175:4,6,25 176:6
176:14 178:23
179:7 180:16
184:22 185:2,15
186:3,11,16
187:11,16 188:21
188:24 189:14
190:8 193:4,15,22
203:13 206:3

207:17 208:7,17
208:21 214:19
215:16 217:10
218:2 219:3,11,16
219:21 220:4
221:13,18 222:13
222:17,24 223:20
224:2,14,16 342:5
**quickly** 14:8
**quinones** 85:10
**quite** 119:3
**quote** 328:10

**r**

**r** 1:17 3:13 5:6 6:5
11:9,14 19:14
162:5 247:8
251:17 317:16
340:9 342:8 343:4
343:9 344:4,13
345:20
**raiola** 4:7 11:4,4
**raise** 171:17 175:3
**raised** 163:24
171:16
**range** 155:14
**rate** 106:1 110:2
**rates** 97:5
**ratio** 115:22
**reach** 92:9 94:13
126:24 155:25
156:3 159:17
235:21 287:16
288:3,12,21
319:13
**reached** 182:4
261:19,24 270:23
292:4 315:9
**reaching** 319:11
**read** 33:12 41:15
41:16,18 69:22
84:20,23 85:6,8

100:9 101:1
125:18 127:24
128:4,8,11 129:19
129:20,22 130:4,7
131:10,14,18
132:24 133:16,19
133:20,21 134:21
134:23 135:4,7,10
135:12 159:25
187:12 189:9
195:1 196:25
197:5,21 199:4
249:5 250:24
253:21 257:10,16
257:25 258:10
274:6 275:6
276:19 304:10
310:17 311:7
312:12 314:10
321:11 343:5,6,12
344:5,6,17
**readily** 265:22
**reading** 85:9,12
89:25 95:1 114:10
131:19 132:6
134:18 135:25
151:18 342:12,20
**ready** 161:4
**realized** 199:7
**really** 18:4 36:10
47:16 94:6 99:16
102:11 109:6
128:6 134:17
156:10 213:3
268:23 300:18
305:9 306:22
309:11 310:8,8
**realm** 28:9,12 65:9
**reapply** 48:17
**reason** 14:22,24
35:23 37:20 54:1

103:6,8 105:6,8
109:16 128:5,8,25
130:5 139:11,20
141:25 156:16
176:21 180:7
190:16 239:9
275:6 333:20
336:24 344:8
345:3

**reasons** 133:17
176:12

**rebecca** 3:4 11:6

**rebecca.zoller** 3:6

**recall** 18:7 54:19
55:9 87:2 99:14
99:17 101:21
102:6,8 104:12,21
162:15 212:12
252:25 256:20
259:25 260:5
261:4 263:11,25
266:1 267:5
290:14 291:3,9
304:21 309:5
310:21 325:6
327:3,19 331:16
336:19 338:2

**receipt** 342:20

**receive** 117:16
150:11,13 152:5
205:23,24 217:2,5
260:18,21 279:7
282:14 291:21
295:7

**received** 20:21
34:16 56:6 59:22
102:3 256:24
262:8 264:2 272:1
290:15,17,24
293:22 294:20
295:14,22 296:3

304:12 313:9,11

**receiving** 207:8
293:9 302:12,14

**receptor** 100:16
101:1,2

**receptors** 100:24

**recess** 68:1 125:1
161:13 216:18
224:22 251:14
317:8

**recipients** 292:10

**reckoning** 33:10

**recognize** 19:20
25:6 45:21 82:5
117:13 125:15

**recollection** 42:15
42:19 58:14 59:14
179:20 291:11

**recommendation**
67:8 292:20

**recommendations**
70:20 74:9 285:2

**recommended**
77:25 227:10

**recommending**
70:24

**recommends** 70:2

**record** 10:3,7
11:18,21 12:21
27:7 35:6 67:24
68:2 124:24 125:2
160:9 161:10
162:1 164:4
216:17,19 224:21
224:23 234:10
242:16 251:10,12
251:15,24 258:4
276:19 315:11
317:6,10 332:14
338:21 344:9

**recorded** 12:19
13:11 234:2
328:11,12

**records** 165:2,17
259:15 290:21
291:10 315:16
316:1

**recover** 174:22

**recovery** 64:6,19
64:21 87:5 141:19
144:22 155:16
168:19 241:13
260:24 261:9
299:16

**redirect** 235:23

**reduce** 31:18

**reduced** 217:14
340:13

**reducing** 229:7

**reduction** 91:4
227:12,16,21
310:18 311:20,25

**reed** 4:11 10:25

**reedsmith.com**
4:14

**refer** 23:13,16
108:8 233:17
272:17

**reference** 17:4
102:18 118:18
133:24 295:17
298:17 304:18
319:19 321:1
322:18 323:13
325:4 342:7 343:2
344:2

**referenced** 127:9
327:1 340:13,17
342:11 343:11
344:15

**references** 321:13

**referral** 36:23
37:17

**referred** 206:13
215:8 280:22

**referring** 137:4,5
141:14 151:15
223:22 240:19
271:4 274:9 311:5
320:15,16 323:17

**refers** 151:14
319:21

**reflect** 12:22 25:12
70:23 102:15
103:11 107:23
118:10 133:11
193:3 279:2

**reflected** 305:12

**reflective** 192:20
193:6 218:21

**reflects** 117:17

**refresh** 42:15,19

**refuse** 172:14,20

**regard** 290:8,11

**regarding** 168:4
172:20 339:2,11

**region** 133:14

**regional** 36:23
37:17

**regular** 203:24
204:10,11,15,18

**regularly** 27:15,16
27:17 28:24 31:25
56:16 121:11
203:11,15 212:4

**regulations** 308:19

**rehab** 21:23

**reimbursement**
238:15

**rein** 294:15

**reiterate** 108:25
173:6
**relate** 218:24
271:18,20 272:9
285:9
**related** 17:17
44:15 81:21 83:8
86:20 88:19 94:23
107:13 116:4,16
120:16 134:20
149:25 154:1
157:11 178:20
180:3 184:13
201:15 202:16
206:2,18 217:13
224:10 237:5
238:20 243:4,22
243:25 244:4
282:22 283:3
284:13
**relates** 1:8 74:20
78:7 85:2 87:9
220:7 271:25
325:17
**relating** 32:1
40:15 44:4,12,25
48:24 53:20 57:19
62:7 79:7 84:1
87:22 89:2 93:7
95:22 96:13 97:17
109:13 110:13
145:24 202:13
207:3,9 211:24
213:21 216:3,9
218:12 243:13
**relationship** 31:7
62:13 73:5
**relationships**
162:25 182:21,25
**relative** 131:10
341:2

**relatively** 124:12
124:13
**released** 145:5
**releasing** 48:17
**relevance** 169:19
**relevant** 66:4
171:6
**rely** 35:19 99:7
285:10
**remains** 299:3
**remember** 12:24
13:1 16:2 36:11
45:6 52:3 58:21
60:6,8 84:11 85:7
85:22 89:5,7,9
99:19,21 104:24
105:23 124:10
129:13,14 133:22
134:12 144:9,24
149:4 167:22
192:11 196:3
202:1 212:18
247:8 250:23
251:1 257:21
258:4,6,7 259:4,9
261:1,7,10 263:21
264:3,10,12 265:8
266:3 268:7,8,17
268:22 279:16,16
286:22 287:1,2
290:17 304:10,11
313:14,15 326:16
336:20 337:9,21
338:6
**remembered**
256:4
**remembering**
328:5
**rems** 309:2
**renee** 1:25 11:23
340:6 341:13

**repeat** 43:14 78:16
112:18 186:12
302:25
**rephrase** 18:21
57:12 112:10
132:14 157:8
183:21 213:5
252:13
**replacement** 318:8
**reply** 193:5
**report** 6:18,20
32:10,13,22 33:1,5
33:9 62:17 63:6
104:18 109:24
110:3 112:2
125:10,24 126:10
126:14,17,23,24
127:2,22 128:3,8
128:16,21 129:11
129:12 130:3,8,13
130:17 131:1
132:8,12,17,22,23
132:24 133:2,16
133:23 134:3,9,12
136:25 137:5,6,7,9
137:17,20,23,24
138:2,5,20 139:4,5
139:22 140:7
141:9,22 142:1,11
142:19 143:2,7,10
143:19 144:1,11
144:14,17,19,20
145:5,8,22 146:4,9
146:11,15,17,24
147:7,11,12,23
148:2,7,21 156:19
157:2 187:13
201:17,17 202:3
202:12,15 215:23
222:25 223:5,7,9
223:17,19,22,25

224:9 237:19
239:4 273:3,8
277:12 278:10,18
278:19 289:5,7,11
299:5 300:25
301:4,5,6,7,17
318:20 319:3
**reported** 215:7
301:9
**reporter** 5:15
13:12 343:7
**reporter's** 5:13
340:1
**reporting** 66:4
270:8,21 286:7
315:20
**reports** 32:25
33:12,18 66:6
125:18,21 127:7,7
128:11 131:20
132:7,16 133:12
142:21,23 145:14
145:15,19,21,23
146:8,10 147:6,13
147:14,20 153:16
153:16,18 154:9
157:19 158:5
191:14 195:22
276:9,12 278:11
278:11 318:18,23
318:24
**represent** 26:1
41:10 98:13
251:22 317:19
333:13
**representing**
210:2
**represents** 26:17
26:19 104:10
107:8

**request** 18:9 192:3
  201:3 223:11
  283:10 291:25
  323:8 324:11
  344:9,11
**requested** 54:3
  55:2 96:22 201:18
  201:19 206:21
  207:2 259:20
  289:12,13 291:17
  324:23 339:1,6,10
**requests** 94:19
  200:25 324:16,20
  325:1,2,4
**require** 28:6
  113:22 223:8
  286:24
**required** 46:4
  47:12 49:22 83:22
  138:25 247:20,21
  247:23,24 293:19
  328:15 342:25
**requirement**
  69:25 289:17
  329:5,22
**requires** 83:21
  186:1,4
**rescinded** 261:18
  262:1
**research** 65:11,15
  91:9,12 189:20,25
  190:11 229:22
  239:13,24 315:1
  335:12,17 336:12
**researched** 190:1
**researcher** 190:14
  230:25 231:19
  232:3 233:3,4
**researching**
  234:23

**reserve** 54:14
  79:25 326:7
**resident** 12:10
**resignation** 59:23
**resigned** 204:25
**resolve** 208:4
**resources** 64:7,19
  64:21 141:19
  183:6 299:16
**respect** 164:9,13
  171:3 172:4,10
  201:6 247:13
  248:19 272:23
  278:3 308:25
  322:10 324:7
  325:19,21 330:1
  333:3
**respectfully**
  163:24 169:13
  170:8
**respective** 210:5
**respond** 13:20
  199:10 208:4
  280:2
**responders** 50:13
**responding** 113:9
**responds** 292:14
**response** 12:19
  306:19 328:8
**responsibilities**
  49:16 63:24 92:22
  149:25 268:16,24
  268:25 269:3
  303:3,5
**responsibility**
  111:13 119:17
  158:15 185:10
  266:1
**responsible** 22:6
  40:4 80:18 107:16
  108:19,20 126:5

137:17 149:23
  190:20 200:12
  201:10 203:7,17
  270:3
**restate** 189:15
  197:12 230:10
**restroom** 14:10
**resulted** 222:22
**resulting** 109:23
**resume** 6:5 19:14
  19:23 20:1 24:21
  36:21 40:13 52:5
  321:22 322:18
  325:13,14
**retail** 333:14
**retained** 5:15
**returned** 191:12
  342:19
**returning** 237:18
  241:23 244:7
**reveal** 172:19,20
**revealed** 166:11
**review** 16:14 17:7
  17:11 35:3 44:7
  55:4 57:25 58:10
  58:10 61:7 62:18
  62:22,25 63:3,4,10
  63:13,21 64:8
  69:18 70:22
  127:19,21 128:16
  147:1 148:15
  196:3,11 198:9,11
  198:22 199:13,17
  245:3,10,13 268:1
  286:11 303:15
  305:5 319:22
  339:2,6 342:14
  343:1 344:1
**reviewed** 16:16
  40:23 42:20
  125:17,20 127:6,8

129:12,16 132:23
  134:9 192:23
  196:21 197:9,19
  244:21 279:12
  285:12 286:13,15
  316:6
**reviewing** 68:7
  69:15 74:8,8
  132:15,21 134:12
  199:22 279:16
  286:17
**reviews** 63:10,18
  63:20 320:13
**revised** 297:15,21
**reword** 13:8
**rfp** 46:8 80:23
  117:21 283:25,25
  292:12
**rfq** 283:25
**right** 22:13 23:11
  28:13,18 32:11
  36:20,24 38:10
  39:2 40:16 47:3
  49:17,25 57:7,9
  64:17 66:11,24
  74:25 82:19 91:23
  93:13 94:17,23
  95:13 102:22
  103:5,18 107:4
  109:18 110:6,23
  118:3 120:6,20
  124:6 125:5
  134:11 136:8
  138:12 139:19
  140:21 142:2
  143:5,20 144:6
  151:21 164:1,10
  169:6 170:24
  172:9,14 176:7
  185:16 187:10
  196:21 197:19,21

**[right - scott]**

198:17 208:25
209:5 212:10,11
214:14 225:1
229:8 232:6 235:5
236:1 239:7
242:22 244:11
252:22 253:8
254:7 272:1 273:9
274:10,24 275:8
275:15 276:12
277:3,16,20
278:21 284:22
285:5 289:1
307:13 314:22
317:3 323:9
325:17 330:21
336:1 337:21
**rights** 171:25
**ring** 274:22
**risk** 43:6 308:24
309:6
**rite** 4:2 10:19
317:19 333:14,21
**rnc** 134:16
**road** 2:4
**robin** 2:11 16:2
**robust** 140:4
**role** 25:15 27:2,5
27:18,21 28:6,8,10
29:21 30:4 34:15
36:16,23 39:15,17
39:23 42:3 44:1,6
44:7,7,11,24 46:20
49:16 53:5 56:13
57:5,8,11,13,24
58:5 59:9 60:3,21
60:25 61:1 62:16
63:25 64:11 66:1
66:9,11 68:9 69:4
69:14,25 72:19
74:4,9,11,19 75:4

75:6,10,12,16,20
76:9 77:21 78:4,6
78:10,21 84:2
86:19 88:7 89:23
90:3,4,6,8 94:1,5
96:10 99:4 104:16
107:12,15,25
108:2,18 109:3,3
109:10,21,22,24
109:25 110:2,4,18
110:23 111:16,19
113:14,19 114:10
116:8 117:25
119:22 138:12,18
150:7 156:16
157:14 159:1
178:5 183:25
184:4,9 185:4,18
186:7 190:17
193:25 194:1,2
208:9,11 225:3
226:15,19 227:20
228:3,25 229:3,4
229:11,22,22,25
230:1,3,4,7,9,12
230:13,17 232:7
240:11,25 243:19
244:6 250:9
261:15 273:6
295:18,19 296:24
298:25 299:25
300:19 301:14
303:9,13 309:19
310:1 322:10
325:21
**rolls** 203:18
**room** 13:23 338:8
**roughly** 154:24
204:7
**round** 40:22

**rpr** 1:25
**rules** 11:10 12:17
339:3,7 343:5
344:5
**run** 123:17 243:9
**running** 48:8
203:3 271:7
**runs** 216:24
**rush** 160:19
**rx** 209:11 211:3,4

**s**

**s** 247:8 266:22,25
266:25 290:11
344:8,8 345:3
**safe** 53:14 209:11
209:11 210:1
211:3,4,5 227:21
227:24
**safer** 53:16,17
209:4,7 211:2
**safety** 53:14,19
55:5 71:1,5,6,7
72:3,10,16,20 73:8
73:13 86:13 188:4
316:15 326:12
**sake** 13:12
**salary** 149:1
330:22
**sale** 308:9,11
**sam** 85:10
**sample** 291:22
**sat** 194:4
**satisfaction**
238:14 286:8
**satisfactory** 69:23
**satisfied** 306:18
**saves** 219:7
**saving** 219:7
**saw** 23:25 48:4
59:2 135:18
176:19 190:3

197:10 264:20
**saying** 62:9 100:19
100:25 103:5
109:20 111:12
131:9 133:4 135:8
135:14,15 137:10
137:11 193:5
196:18 226:13
228:9,10,17
231:25 235:24
236:7
**says** 20:9 25:10
42:10 43:4 63:9
64:2 68:12 70:11
121:10 140:9
141:5 151:18,20
223:3 237:23
238:1 275:9
276:19 277:4
278:9 325:16
**scan** 295:1,8,12
**scanned** 19:3,7
294:23 295:4,13
**scheduled** 121:11
**schoch** 278:9,16
**school** 67:8 328:23
**schutte** 4:3 5:9
10:18,18 316:23
317:17,19 338:7
338:14,18
**science** 20:18
226:21 258:22
**scope** 131:22
132:9,18 136:22
208:23
**score** 31:7,8,13,19
292:18,20
**scores** 31:19
238:13
**scott** 4:3 10:18
317:19

[screen - signed]                                                   Page 48

**screen** 105:19
**seal** 341:6 343:15
  344:21
**seats** 252:23
**second** 3:10 39:5
  98:15 108:21
  122:4 193:22,23
  251:10 316:21
  320:18 322:19
  327:8,10
**section** 33:23
  151:4 209:2
  237:23 325:7,14
**see** 23:24 37:10
  46:16,23 50:14
  57:16 62:12 63:5
  79:18 86:16
  101:20,24 103:4
  107:24 118:24
  120:9 121:19
  125:5 127:11,25
  129:2,3 132:12
  146:2 150:17
  153:15 155:4
  160:23 176:23
  177:2 182:20
  186:24 192:14
  195:2 204:12
  214:5 230:7
  236:17 246:25
  247:3,5 257:7
  273:14 274:3,11
  274:15 275:11
  277:7 278:13
  283:11 314:12
  320:23 321:12
  324:5 330:23
  331:1,8
**seeing** 134:19
  153:11,13

**seek** 208:11
  261:20 283:20,24
**seeking** 154:14
  253:25
**seen** 16:21 17:1,4
  17:6 89:24 98:23
  98:25 100:2,7,7
  115:8 125:17
  143:23 162:22,24
  162:24 196:12
  228:8,10 273:14
  274:25 277:23
  283:8,15 309:9
  313:21 332:21
  333:7
**select** 292:9
**selected** 60:18
  178:22 179:3,6
  292:8
**seminars** 294:21
**send** 28:22 181:3
  202:14 301:24
**seniors** 30:15,17
  40:23 42:12 43:3
  52:2 53:13 55:4
  212:8 220:25
**sent** 87:15 146:6
  146:20 147:16
  154:7 198:2 262:7
  296:8 319:3
**separate** 25:22,24
  35:25 81:23
  137:24 205:6
  279:24 320:14
**separately** 20:23
  143:15 301:14
**september** 32:7
  48:2,12,18 104:19
  216:23 217:12
  260:6,16 263:12
  263:24 296:3

**seriously** 182:11
**servant** 24:1
**serve** 33:9 158:6,7
  207:20 261:22
**served** 94:7
  211:18 270:1,7,9
  270:23 298:14
**serves** 210:1
**service** 24:12 37:8
  140:22 270:17
  274:23 280:16,16
  280:17 304:4
**serviced** 300:15
**services** 21:18
  22:5 26:1 29:16
  37:14 140:3
  270:18,19 274:19
  279:22 280:12
  281:8 282:11
  337:11
**serving** 33:11
**session** 5:11 162:4
  264:11
**sessions** 264:6
**set** 40:5 69:12 78:9
  90:18,21,24,25
  113:21 116:20
  188:6 216:23
  217:22 240:21
  246:19,24 248:2
  285:11,13 286:14
  288:9 299:25
  341:5
**sets** 69:24
**setting** 66:3
  296:25
**seven** 37:18
  167:14 209:13,22
  210:2,2 329:6
**shaker** 25:25

**shannon** 320:3,8
**shape** 173:21
**share** 174:1
  183:11 185:22
  268:25
**shared** 177:18
  179:1 180:17
  184:6
**sharing** 92:21
  214:6 315:13
  316:1
**she'll** 173:17
**sheet** 204:7 344:7
  344:10,18 345:1
**shifted** 238:18
**shkolnik** 2:7
**shoes** 61:2
**short** 160:14
  216:18 225:7
  251:14 252:23
  269:13 307:8
**shortly** 38:8
**show** 19:10 24:22
  105:22
**showed** 325:7
**showing** 45:20
  98:7 125:14 134:7
**shows** 21:16,17
  26:4 106:22 107:1
  118:5
**sic** 108:13 247:9
**side** 29:24 34:5
  140:15 274:10
  338:8
**sides** 35:13
**sign** 204:6
**signature** 339:5
  341:12 342:14
**signed** 343:13
  344:18

signing 342:12,20
signs 33:18
similar 100:18
106:19 269:16
simply 113:9
123:10 160:14
sincerely 342:23
single 47:8 123:3
129:8 138:21
200:18
sir 342:10
sit 28:24 265:9
288:20 334:16
335:7 336:18
site 79:16 178:10
178:12,15 218:23
325:5
sites 79:13,17,18
sitting 13:23 14:2
14:3 179:19 194:7
197:25 241:20
250:1 311:16
situation 327:15
six 168:24
skilled 21:22
skim 134:13,14
skimmed 134:24
135:11,13,18
skip 252:6
skipping 307:24
skovenski 266:19
266:24 312:24
331:6 332:3
slightly 230:7
272:4
slimmer 142:25
slipped 326:5
slow 188:21
small 47:19 80:21
82:16,17 126:16
144:18 184:15,17

231:12 233:9,15
235:5,16 236:7
325:1
smaller 52:20,21
smith 4:11 10:25
soaking 84:16
sobolewski 275:18
275:19 276:8,13
278:19
social 20:18,20
21:13,18 22:5
24:11,12 37:23,24
38:1 70:6 84:9
society 225:13
226:3,6
sold 264:15
solutions 3:2
342:1 345:1
somebody 29:22
94:13 144:10
160:18 209:25
216:3
someone's 227:1
son 335:16
sons 185:21
soon 195:6
sorry 15:14 18:20
54:24 79:9 97:8
98:15 99:16 102:1
102:11,11 106:6
112:9 118:20
139:19 140:12
170:18 176:6
181:10 213:4
250:15 258:20
262:10 274:6
275:5 287:18
302:13,25 310:7
321:12 328:5
332:18

sort 87:21 119:25
329:13
sought 54:19,22
282:21 283:2,12
334:4,9
sound 103:18
sounded 302:5
sounds 83:18
109:6 192:22
source 150:19
258:15,18 282:15
283:21 306:12
sources 282:21
284:11
southwest 86:4
327:6
span 104:15
speak 13:16 29:20
29:22 39:10 42:2
55:22 56:11,18,20
60:2 71:9 84:16
91:13,15,18 96:23
101:3 108:8
114:21 130:20
142:19 156:17
158:21 179:14
193:19 210:18
213:8 218:22
241:17 258:19
261:13,16 262:15
263:18,19 283:16
305:23 314:3
326:6
speaker 212:13
213:25 258:24
259:1 261:9,20
312:11
speakers 66:3,4
84:15 90:22,24
91:1,9 92:24 94:4
150:15 234:6,23

262:12 264:6
325:25
speaking 44:9
52:13 87:19 89:14
96:13 100:21
103:23 104:13,15
113:5,7 121:10
181:10 225:11
226:6,14,20
228:20 235:21
262:4,6,8 282:18
325:16,18,20,23
325:24 326:1
327:23 332:15
speaks 159:3
spearheading
318:12
specialist 36:15
39:1,19 53:6
56:14 76:2 86:3
219:6 225:24
241:13 258:19
265:8 327:5
specialize 21:1
specialty 35:20
43:23
specific 52:13
73:20 85:1,20
88:3 89:13,13
103:21 112:5
113:20 146:1
169:5 171:3 196:4
201:6 217:16
219:12,14 220:16
230:12 241:17
259:5 261:2 270:4
272:21,22 302:7
306:16 310:24
311:13 337:7,13
338:3

**specifically** 31:6
67:7 84:16 101:7
112:2 157:2 159:4
181:10 197:1,22
198:4 199:18
223:4 241:16
249:10 258:24
259:2 261:5,7
263:21 270:15
271:18 284:4,14
285:9 303:21
322:2
**specifics** 85:5
86:16 87:2 90:1
114:1,14 202:2
264:11 287:3
326:18
**specified** 337:13
340:20
**speculate** 153:9
**speech** 91:3
326:11
**speed** 189:3,5
283:9
**spell** 266:20
**spend** 119:14,22
122:22 123:7
233:23 234:3,9
235:13 236:18,22
236:23 329:24
330:25
**spends** 149:9
**spent** 236:10
237:4 328:16,20
329:2 330:2
**spike** 187:2 305:14
**split** 149:19
**spoke** 56:21 80:12
91:5 166:5,24
212:13,13 231:1
232:16 258:21

263:22 264:8
265:9 298:17
327:5
**spoken** 60:10,14
156:11
**sponsor** 311:23
**sprawling** 275:5
**spreadsheet**
200:25
**spring** 87:17
**square** 1:22 2:8,12
26:18 242:12
**sraoila** 4:9
**ss** 340:3
**sschutte** 4:5
**st** 91:7
**staff** 22:10,17,22
40:4 55:10 71:14
75:9,9 76:11
154:8,14 177:19
178:16 200:14,18
205:1 240:23
243:1 246:13
266:12 279:14
332:8,10
**stages** 66:25 119:1
**stagnant** 190:24
194:4 197:25
**stamp** 140:19
**stance** 196:15
312:5,7,8,8,10
**standard** 98:15,16
**standing** 168:3
**standpoint** 115:10
306:24,24
**stands** 84:11
**staple** 274:10
277:16
**stapled** 257:8
**start** 85:12 296:11
300:5

**started** 12:17 32:2
36:7 37:4 39:9
47:10 51:13 52:1
52:6,18 53:11
65:4 85:9 87:12
87:17 89:15,21,24
90:1,5,5,6 126:7
128:17 152:14,17
153:25 154:20
163:7 166:2
207:18 279:6
281:22,24 282:20
297:24 298:19
305:6,8 315:24
318:7 335:23
336:5
**starting** 21:16
207:7 290:13
**starts** 100:1
140:14
**state** 11:22 28:15
34:24 35:25 46:24
48:11 65:5,14,20
65:25 66:2 69:1,6
71:17 77:9,10
79:12 80:13,24
81:6,16 82:2,2,10
82:20 83:3,4
90:18 92:4 93:15
93:17 110:24
111:2,15 116:21
117:22 122:15
123:12 160:8
165:18 199:16
205:23,24 212:22
212:25 214:11,16
214:23 217:22
221:15 223:25
224:6,12 248:2
273:8 281:15,16
282:15 283:11

284:7,8 286:8
287:7 288:2 289:6
289:8 292:13
300:12 301:6,8
315:9 340:2,7
341:14 343:10
344:15
**stated** 66:21
102:24 109:1
111:16 136:10
181:7 189:16
196:4 197:23
293:8
**statement** 140:5
158:4 343:13,14
344:19,19
**statements** 309:20
310:4 311:1 314:6
**states** 1:1 118:1
141:5 308:3
314:17
**statewide** 65:21
122:14 123:12
**stating** 233:1
**station** 302:3
**stations** 301:25
**statistician** 62:21
187:3 320:19
**statistics** 102:1
**stay** 69:5 80:18
82:4,8,10
**stayed** 153:1
**stenotypy** 340:14
**step** 61:1 87:19
88:7 180:15
181:21,23,24
182:2 296:16
**stephanie** 278:13
**stephen** 4:7 11:4
**stepped** 66:1
79:25 88:5 89:22

97:6 99:4 150:5
180:12 181:21
297:21 298:5,9
299:25 300:18
**stepping**   57:5
69:13 185:8
296:24 297:19
301:14
**stick**   111:3 138:13
229:11
**sticker**   290:8
291:17,22 292:9
293:6
**stickers**   291:3,15
292:4,6 293:1
**stigma**   238:21
**stood**   197:23
**stopped**   205:7
**stories**   335:15
**straight**   275:14
**strategic**   66:8,25
80:16,19 90:23
122:5
**strategies**   49:25
83:13 308:25
309:7
**strategy**   50:1 81:1
**stream**   4:6
**streamline**   129:6
**street**   3:5,18 4:12
116:13
**stress**   226:5,9
**strike**   82:24
115:14 183:20
205:21 213:5
222:11 269:16
285:7 287:12
293:5 294:2 300:8
303:17 304:23
308:12 326:1

**strip**   227:25
**strong**   297:1
**structure**   151:5,6
151:14 279:1,2
**structured**   269:24
270:6
**stuck**   266:3
**student**   40:19
**students**   73:3
326:7,8,14
**studied**   40:22
**study**   42:10 84:1
94:22
**studying**   94:25
**stuff**   89:24
**sub**   64:13 119:16
126:18,22,24
129:7 131:6 136:4
136:14,15,24
138:4,13,24 139:3
141:12,16,20
143:1 148:14
156:2 188:19
299:10,11 302:13
**subcommittee**
66:16,18,20,23
80:14 87:5,6
**subcommittees**
66:7 87:4 121:22
122:2
**subject**   262:17
263:11 264:1
286:22
**submission**   46:6
**submit**   41:17 46:5
47:6,7 147:8,9,11
147:12 159:7
292:16 323:8
**submitted**   47:10
47:11 117:15
244:22

**subparts**   124:2
**subscribed**   343:10
344:14 345:21
**subsequently**   66:1
**substance**   31:15
58:13 130:3,7
131:20 132:7,16
133:2,13,17 136:1
148:12 164:25
165:15,25 166:3
173:24 174:2
176:11 223:2
282:22 289:10
**substances**   272:20
**substantive**   21:8
131:14 295:11
**substitute**   224:16
**succeeded**   57:6
**successes**   214:3
301:21
**successful**   51:8
214:6 245:23
**suffers**   220:1
226:21
**suggestion**   65:10
**suggestions**   53:15
64:24 65:1
**suing**   171:12
**suite**   1:22 2:8,12
2:17 4:13 342:2
**summarized**
130:17
**summarizes**   32:13
**summarizing**
139:4
**summary**   130:18
158:12 159:24,25
160:3,6 262:7,24
263:5
**summer**   87:17
102:8

**summertime**
99:22,23
**summit**   1:9 133:7
209:13 210:1,19
260:5,6 263:25
296:5,8
**super**   160:23
**superior**   342:1
**supervised**   276:24
**supervisor**   49:1
51:23 63:16 65:11
66:12 88:16 91:16
94:7,7,18 98:18
99:2 107:7 119:19
119:20,22,23
142:22 143:18
144:14 147:24
148:3,4 150:5
156:17 157:16
158:23 180:12,13
181:20 182:1
201:12 203:9,10
204:24 215:12,13
245:11 259:11
276:13,16 297:1
299:3 318:9
**supervisor's**   295:2
**supplemental**   36:2
81:13 123:16,18
147:8,10 206:8
243:7 280:24
281:1,17
**supply**   46:17
250:9
**support**   61:6
205:1 312:5,6
**supposed**   46:10,12
68:23 70:7,8
79:23 111:3 119:6
123:1 131:17
149:12 235:20

245:18 300:20,23
**sure** 11:20 17:5
22:8 25:18 29:22
30:23 33:8 35:6
35:10,13 40:12
51:7 53:13 58:11
60:16 63:1 64:9
64:20 66:3,6 69:5
70:23 72:5 73:4
75:7 76:10 78:8
79:22 80:11,18
84:21 95:9 100:4
100:9 109:19
110:11 119:18
121:7 123:2
124:21 132:22
133:15 144:7
156:13 158:7,16
158:18 161:5
168:6 173:11
176:15 178:7
182:12 183:11
188:18 189:1
192:23 194:24
197:20 198:5
203:18 205:4
207:22 225:22
226:2 227:22
229:13 261:21
264:22 271:3
276:2 284:3
285:23 289:20
290:20 292:11
296:25 297:8
302:18,23 303:1,1
303:13 307:17
308:6 309:25
310:10 315:7,19
315:21 318:13
319:9,18,24 320:4
330:6 335:13

**surgery** 167:15
168:18 169:5
174:22 257:19
**surmised** 337:16
**surveillance** 34:14
320:21
**surveys** 238:14
**swipe** 329:13
**switch** 38:17
251:11 252:23
316:24 317:1
**switching** 43:4,9
43:10,15
**sworn** 11:11
340:10 343:10,13
344:14,18 345:21
**symbol** 150:24
**syndromic** 320:21
**synenberg** 96:22
**synthetic** 101:17
103:15
**synthetically**
100:13,14
**system** 35:18
67:11 328:19,19
329:13,13,22
330:4
**systems** 50:3,15

**t**

**t** 4:3 266:22
**tab** 194:21 195:1
196:24 197:4,23
**table** 311:16
**take** 21:2,4 38:21
39:24 67:20,23
77:11,13 84:7
85:24 87:13 96:18
124:20 160:13,18
161:9 167:22,25
168:16,17,21,23
182:10 200:21

210:3 224:17,20
226:8 235:9
239:24 263:24
273:24 277:22,22
291:5 298:13
303:14 307:8
314:21 316:24
317:3,4 319:15
321:21 333:2,19
334:7
**taken** 1:21 87:11
135:20 171:21
190:9 219:18
340:19 342:11
**takes** 205:1
**talk** 13:13 56:24
59:24 85:19 90:16
91:8,16 115:8
120:20 138:24
185:21 205:19
214:2,4 268:10
271:17 298:11
**talked** 60:8 83:12
83:15 85:17,18
89:5,6,10 97:3,23
156:14 187:8
243:6 271:14
273:6 290:13
309:18 315:4
324:1
**talking** 120:21,24
191:18 234:24
255:22 256:2
312:11 321:16
330:9 336:5
**talks** 114:16 141:8
141:9 314:18
**target** 69:5
**targeted** 217:25
**task** 6:18,20 40:4
55:25 56:19,21,22

64:9 66:7 80:19
85:17,18,19 86:23
86:24 87:22 88:11
88:15,23 89:1,19
90:9,22 92:6,8
93:8,15,23,25 94:1
94:11,14 95:6,8,13
95:23 96:3,8,12
108:12 109:5
110:8,24 111:7,21
112:7,12 114:16
118:1 120:17,22
120:25 123:21,22
124:5,17 125:9,18
125:20,24 126:9
126:12,13,15
127:6,22 128:9,21
129:12 130:14,16
130:19,23 131:13
131:20 132:3,7,16
132:21,23,24
133:1,6,7,9 134:2
134:9 137:4,19,22
137:24 138:2,5,20
139:4 140:14,20
141:6 142:5,7,11
143:2,6,19 144:1
144:10,25 145:24
146:6 147:23
148:20 149:14,21
149:24 150:5,8,21
150:24 151:6,10
151:13,17 152:3,7
152:10 153:25
154:9,21 155:10
156:6,12,14 157:3
157:11,19 158:9
165:10,12 180:9
181:11,16 182:6
182:14,19 183:20
183:24,25 184:6,8

184:10,12,21
185:7,13 187:9,14
187:19,20,24,25
188:9 189:8,11,16
190:19,20 191:1,3
191:21 196:11
199:5 201:7 202:4
202:13,17,25
203:1,22,25 204:3
204:19,22 205:8
208:12 216:11,14
229:2 231:4 233:8
233:24 236:11,19
237:5,19 239:7
240:1 257:23
258:19,21 259:19
259:22,23 260:9
261:16,19,22
262:6,20 264:23
265:1,10,12
267:23 268:2,3
269:6 271:7,20
272:21 282:17
284:2,13 295:19
296:12,23 297:10
297:12,17 298:15
300:3,5,25 302:10
302:16,23 303:7
305:20 306:23
308:22,22 318:1
319:8,13 323:6,11
323:25 324:8,23
325:7,24 327:6,24
**tasked** 34:24
35:22 47:21 50:8
79:12 111:1
144:12 198:25
286:17 315:15
**tasks** 64:12 87:8
**team** 65:5 200:8

**tech** 322:20
323:13
**technically** 182:5
324:13
**telephone** 3:4,8,13
4:6,11 10:23
**television** 153:23
228:8,11,24
**tell** 14:17 15:9,11
30:13,22 39:22
46:9 63:12 64:17
78:2 79:21 97:22
101:14,17 104:6
104:25 105:5,6,8
117:1,2 159:18
194:15 204:7
241:20 250:2
280:3 291:8
297:15 306:9
315:5 319:23
**telling** 61:6 76:7
123:15 232:7
234:13
**tells** 70:14 104:8
278:7
**ten** 36:9 47:18
50:8 62:2,6 163:5
163:6 236:17
**tentative** 296:17
**tenth** 90:10,12
**term** 136:20
217:12
**terminology**
103:15 217:22
218:7 326:2
**terms** 92:17 120:6
160:25 228:20
**terrible** 251:5
258:20 266:18
327:2

**terry** 27:12,25
28:7,20,25
**tertiary** 36:18
**testified** 78:17
88:18 109:11
123:5 136:5 225:2
298:8 320:11
321:24 323:4
330:17 336:22
**testify** 173:9,11,23
173:24 333:3,8,20
333:24 334:8
335:20 340:10
**testimony** 14:19
14:23 15:1 75:14
172:6 256:13
289:23 336:4
340:12,16 343:6,7
344:6,9,12
**testing** 227:24,25
**teva** 3:7 10:17
11:3 251:22
254:13,17
**thank** 11:19 68:6
106:13 162:8
172:11 245:6
262:12 264:8,9
266:23 267:1
317:11,15 320:25
321:6 329:4
332:13,17 338:18
338:20
**thanks** 253:5
**theft** 23:6
**theme** 135:17
**therapy** 42:13
**thing** 61:5 123:7
138:21 150:13
152:24 154:3,25
175:14 187:6
192:9 208:20

226:25 255:8
270:5,21 289:7
301:3 305:15,16
306:25 336:2
**things** 45:4 84:6
96:8 119:2 140:21
141:1,23 144:18
175:7 178:17
183:7 184:13
199:7 200:10
208:10 228:6,7,10
235:25 241:3
245:24 275:25
296:14 301:17
302:3 328:5
**think** 43:22 52:17
67:22 70:7 74:24
75:1 76:20 84:12
85:10 86:7 99:21
108:14,18 112:13
112:22 122:10,13
127:16 128:7,23
130:6 148:18
155:6 160:22
168:11 169:19
170:2,5,6,12
171:23 174:5,13
174:19 182:22
183:2 186:1
188:11 190:15
191:13 192:20
194:8,18 208:14
226:13,14 227:7
234:18,25 237:16
239:18 241:3,15
241:18 247:8
254:4 255:19
256:7,22 263:19
266:25 267:10
268:22 271:13
272:17 273:5,12

275:25 276:1
284:24 285:1
290:5 295:24
296:1 297:24
307:4 309:11,12
312:16 313:17,20
314:1,3 316:22
317:21 322:2
325:10 326:18
328:10 329:4
336:2,11
**thinking** 119:14
120:14 142:15
296:2
**third** 42:8
**thirty** 3:10 342:19
**thoroughly** 127:24
128:5 129:19,20
130:7 197:1
**thought** 77:20,23
78:3,12,12,17,20
78:24 89:20
101:22 128:19,25
142:17 143:15
161:9 175:13,22
188:23 195:5
231:8,10,14
246:25 262:10
267:14 313:13
**thoughts** 78:21
**three** 12:11 32:3
33:8 47:18 51:17
51:19 79:17
114:24 141:15
182:19 213:12
243:3 262:25
263:4 276:9,9
277:2,3 299:15
307:7
**throw** 17:17

**throwing** 228:6
**tie** 305:17
**tied** 30:20 329:17
**tier** 220:23
**till** 220:10
**time** 10:2 12:14
16:12 17:1 18:1
34:7 37:7,13,14
39:9,24 40:14
53:2 55:1 61:2,3
87:12,25 90:19
94:24 95:1 104:15
119:11,14,23
122:22 123:7,7
124:22 138:12,19
139:10 148:5,17
148:20 149:2,10
149:19 151:21
155:2 159:5
160:15 178:5,9
188:16 189:23,24
190:9 191:7,11
194:22 197:2
198:24 203:4
211:19,20 217:5
225:7 233:23
234:2,16 236:10
236:18,20,22,23
237:4 240:23
242:24 252:19
257:15,18 269:13
279:10,13,18
282:19 283:1
289:19 297:20
298:6 307:6,22
309:19 310:1,2
315:25 317:22
322:8,14 328:9,12
328:15,20,25
329:23,24 330:1,5
330:19,23 331:2

332:1 335:9
338:19 340:19
**timeline** 134:18,19
135:4,5
**times** 32:3 39:9
62:1 71:24 94:6
320:12
**timing** 160:25
**tina** 146:21 215:7
**tired** 310:8
**title** 58:21 66:9,11
98:14 100:1 178:7
259:9 267:5
302:10 313:16
**titled** 106:3 126:11
145:19 209:2
**titles** 72:5
**tobin** 261:24 262:1
262:9 296:10
**today** 14:9,13,23
15:1 75:14 179:19
194:7 225:1
241:20 250:1
256:14 265:9
271:15 275:6
278:1 288:20
304:20 317:13
320:12 323:5
324:1 325:9 326:2
327:21 328:8
330:10,17 332:20
333:8 334:1,12,16
335:7 336:5,12,18
338:19
**today's** 10:1 15:19
15:21 17:9
**told** 14:20 15:6
51:3 101:22
102:23,25 103:1,7
103:9,12,20 159:2
175:22 179:2

194:3 208:10
236:4 262:4,5
268:17 300:20,22
**tom** 15:8,9,15
17:21 51:21
**tomorrow** 160:17
318:6
**tool** 290:10 293:17
**top** 18:6 42:6,9
84:24 86:7 193:16
194:15 196:1
209:2 241:18,22
245:21 254:5
272:18 275:9
309:17 334:20
**topic** 45:7 76:13
76:15 101:8
249:23 263:17
264:9 326:1
**topics** 252:5
263:20
**total** 105:13
**touched** 164:21
322:2
**tower** 4:13
**town** 160:17 287:1
**track** 153:3
217:23 248:11
249:24 329:24
**tracked** 215:7
**tracks** 35:5 51:5,7
67:12 223:23
**traffic** 266:3
**train** 161:8 188:23
**trained** 77:10
219:17
**training** 37:24
46:24 67:9 77:24
219:18 285:24
286:3,11,16,17,21
288:16 289:8

Page 55

309:5 326:13
**trainings** 69:17
72:22 183:10,12
289:9
**transcribed**
340:15 343:7
**transcript** 5:1
339:3,6,9,11
342:11,16 343:5
343:12 344:5,11
344:17
**transcription**
340:16
**transition** 94:17
336:3
**traumatic** 31:10
213:13 220:24
**treat** 166:16
**treatment** 37:15
87:5 135:22 163:1
163:2 183:9
238:21
**trend** 190:2,4
**trends** 63:5 112:3
112:3 190:11
**trial** 173:9,22
**tried** 190:11 195:5
**trouble** 163:17
**true** 26:12 228:10
331:6 340:16
**truth** 14:17 154:5
234:13 340:10,11
340:11
**truthful** 14:23,25
**try** 13:5,8,15 14:7
82:7 86:19 176:7
178:14 236:22,25
252:7 284:1
303:15 307:22
310:10 317:20

**trying** 30:16 99:19
155:18,19,21
186:23 191:15
235:23 236:1,8
247:1 264:3
278:12 309:11
326:18
**tucker** 2:16 10:15
**tuckerellis.com**
2:19
**turn** 150:23
**turning** 208:25
**twice** 94:5
**two** 20:15 31:4,5
54:6,10 67:15
96:20 114:23
120:19 141:4
142:9 168:22
190:25 191:14
192:16 194:11
199:25 201:23
202:10 212:21
258:5 267:10
276:1 290:5,15,24
300:15 302:8
323:17 326:17
327:25 328:17
330:15
**type** 44:8 110:2
272:13 312:5,7
**types** 103:16
254:16 255:13
272:20
**typically** 217:5

**u**

**u** 290:11
**u.s.** 260:13 308:8
318:4
**ultimately** 91:20
**um** 27:10 29:7
36:13 44:14 49:9

56:17 57:1 61:15
61:23 73:11 74:12
95:3 104:4 105:4
106:25 109:15
110:14 120:23
121:2 123:9
128:13 129:15
145:11 151:22
168:1 173:4
175:24 201:9
203:12 209:3
214:18 215:15
224:1,13 238:3,9
238:12 253:1
256:16 267:21
275:10,12 277:6
280:8 284:23
285:4 294:10
309:16 327:16
**unclear** 13:4
**underinsured**
270:20
**underneath** 26:15
27:8 29:3 276:7
276:18 277:1,4,5
**understand** 13:7
14:12,15,18 25:13
72:19 73:9,18,20
75:12,19 85:15
86:20 88:19 108:2
109:13,21,22
110:9,16 111:8
112:14 113:11
116:16 119:21
128:20 135:8
179:15 185:14,16
186:8,13 187:20
187:25 189:6,10
190:6,9 211:23
219:24 222:7
230:6,15 236:2

240:4,6,13 252:12
269:8 277:9 279:1
280:7 305:6 306:3
310:9 314:20,23
**understanding**
56:2 70:9,14
71:11 100:10,12
100:14 104:5
107:11,15,18
111:4 114:15
115:4 125:25
144:1 151:7,9
180:19 184:5
191:9 203:21,23
204:9 219:13
253:12,14,24
258:14 269:1
276:23 288:13,19
291:14 293:14,15
304:25 305:7
306:1,4 308:1
315:5 329:21
333:16
**understood**
252:16 336:4
**undertake** 199:4
**undertaken**
183:22 184:24
186:6,13 187:19
190:5 207:12
208:15 240:3,9
**undertakes** 217:25
**undertaking**
188:20
**unexpected** 24:6
**unfortunately**
47:23
**uninsured** 270:20
**united** 1:1 141:5
308:2 314:17

**university** 288:22
326:7
**untrue** 310:13
**update** 192:18
194:6 195:17
197:6 199:22
200:19 216:8
303:16
**updated** 191:16
194:5,11,12 195:5
195:9,12,15,16
196:23 197:14
199:11,20,20
201:1,5 242:9,17
273:12 323:7
324:19
**updates** 64:22
216:2
**updating** 193:20
**upload** 191:6,13
192:7,8 200:11
201:14 295:8,12
322:22 323:15
**uploaded** 19:2,7
146:2,4,6 192:3,10
200:10 201:18,20
202:10 294:24
295:4,13
**uploads** 201:11
**upper** 140:15
**usa** 254:14
**usage** 68:22 72:23
73:4 79:5 247:17
247:19 248:22
334:25 335:3
**use** 14:10 28:16
30:20 31:14,15
41:21 43:7 67:11
69:21 81:2 95:15
103:13 105:14,24
120:1 173:9,12

183:9 211:16
247:18 248:16,24
263:9 271:19
310:20,24 326:23
**useful** 95:5,7
**user** 335:23
**uses** 99:2
**usually** 49:21
247:3
**utilize** 38:21 68:25
**utilized** 98:18,19
129:2 286:19
**utilizing** 69:2

## v

**v** 1:10,11,13
266:22,25 342:6
343:3 344:3
**vacated** 176:10
**valid** 35:7,11
334:9
**validate** 315:21
**validation** 34:23
147:12 206:11
243:7 315:8
320:21,24 331:25
**varies** 234:5,7,14
**various** 32:13
49:15
**vast** 122:22 149:24
**vendor** 323:8,16
**venues** 84:18
**verbally** 105:12,17
253:2
**verbatim** 134:21
135:12 268:19
**verbiage** 247:23
263:9
**verification** 22:11
**verifying** 148:8
**veritext** 4:6 342:1
342:7 345:1

**version** 19:25
148:2
**versus** 116:17
334:14,14
**videographer** 4:16
10:1,22 67:24
68:2 124:24 125:2
161:10 162:1
216:17,19 224:21
224:23 251:12,15
317:6,9 338:21
**videotaped** 1:16
**view** 43:9 74:13
75:1,19,21 76:3
77:1,2,3,6,15,16
182:13,16 189:12
221:16 229:24,25
230:1,4,8,12,13,17
230:19,21,22
248:7,15,25 249:3
**viewing** 238:21
**vince** 1:17 5:6 6:5
11:9,14,16,23
19:13,14,20 24:25
41:4 45:12 51:20
51:22,24 52:24
55:8,20,24 56:16
63:16 66:14 68:5
69:13 97:25 117:5
125:8 134:1
147:24 148:3
149:9,18 151:25
159:2 162:5
244:17 251:17,19
261:25 273:17,24
276:16 278:18
317:12,16,18
319:19 338:2
340:9 342:8 343:4
343:9 344:4,13
345:20

**vincent** 91:7
**violent** 238:20
**virtual** 4:6
**visible** 28:9,11
74:11,18 86:19
110:25
**visiting** 55:13
**visits** 53:13 55:3
**volunteered** 37:7
**volunteers** 282:17

## w

**wacker** 3:14 4:3
**wait** 201:4 224:18
309:24
**waived** 171:24
342:13,21
**waiver** 170:10
**walgreens** 333:15
333:20
**walk** 276:4
**wallace** 278:20
**walmart** 2:20
10:21 333:15,20
**want** 38:2 61:2
67:19 79:18 131:5
131:6 133:10
136:2,6,17 137:3,7
137:19 153:2
160:8,12,13,19,24
168:16 170:23
172:8,9 188:24
192:1 223:10
224:17,19 236:17
251:9 258:2,12
276:4 279:15
286:18 290:18
291:7 307:9
315:20 316:25
324:10 331:18
332:9

**wanted** 23:22
54:12 61:1 122:3
127:11 128:1
129:1,4,6,24 133:5
135:17 136:3,13
136:23 224:19
235:8 268:14,22
288:11 307:14
**wants** 50:19 94:13
170:13,14 172:19
**warm** 99:20
**warning** 292:25
314:18
**washington** 3:19
4:8,13
**watched** 226:25
227:3,8 286:16
**water** 178:16
**watson** 254:23
**way** 75:5 76:3
77:23 83:2 110:5
113:18 127:3
138:12 172:18
173:21 177:20
199:24 209:1
219:17 222:25
230:16 279:3
296:10 317:2
325:20
**ways** 95:11
**wc.com** 3:20
**we've** 31:16 34:24
67:1,17 68:8
83:12,15 155:18
155:19 159:6
262:11 307:3
321:15 330:9
**web** 200:8 322:19
323:13
**website** 145:10,20
146:2 190:21,23

191:1,17,20,22,24
192:23 193:2,9,12
194:9,14,17
196:12 198:15,19
199:5,15 200:3,5,7
200:10 201:1,5,7
201:15 216:5,7
268:2,3 303:23
322:22 323:1,2,11
323:12,19,21,24
324:8,8,9,22
**websites** 190:25
200:1 202:10
314:12 323:17
**weeds** 237:12
**week** 28:5 119:1
234:4,5,5,8,15,15
234:21,22 235:14
**weekly** 28:4 53:4,8
118:23
**weeks** 167:14
**weighing** 260:11
**welcome** 68:5
162:7
**wellness** 29:5,10
39:13 152:25
178:10,12,15
279:20
**wendy** 3:9 10:16
251:21
**wendy.feinstein**
3:11
**went** 84:14 94:18
99:20 146:16
174:20 175:12
189:4 192:22
227:10,19 263:4
286:16 310:18
331:14
**west** 3:5,9,14 4:3
10:16 251:21

**western** 20:15
54:14 79:25 326:6
**whereof** 341:5
**whiddon** 2:4
**wilcox** 1:21
**williams** 3:17
**willing** 164:3
262:12
**wilson** 2:11 226:12
230:20 232:12
237:7 239:20
240:5 241:10
245:4,6,8 248:21
253:17 257:2
268:5 270:14
272:10,24 280:13
281:9 283:4,14
284:15 288:6
295:23 301:11
303:11 305:3
307:3,13 309:23
310:6,15 314:8
332:6 333:23
338:16
**wise** 220:12
331:13
**wish** 189:4
**withdraw** 166:18
**withdrawal** 311:5
**witness** 49:11
61:25 113:8
128:15 140:13,17
145:13 151:24
163:23 164:1
170:24 171:5
172:2,9,22 173:19
203:14 214:20
215:17 224:3,15
307:6,12,15,19
317:15 338:20
339:2 340:9,13,14

340:17 341:5
342:8 343:1,4,11
344:1,4,15
**woman** 326:23
**women** 144:22
269:25 270:20
311:2
**wonderful** 137:13
**wooster** 20:10,11
20:12,13
**word** 129:22
133:19,19 198:4,5
199:24 211:2
**wording** 117:1
**words** 57:11 62:6
108:21 121:9
335:4
**work** 6:16 20:20
21:6 24:1,3,11,12
29:10 30:14 31:17
35:9 37:23,24
38:1 46:19 50:7
50:11 60:3,14,23
62:8 80:9,15,17
82:9 83:17,19,20
86:12 89:18 90:21
93:19 116:25
117:7,15,19,20,21
118:18,19,21,22
120:4,9 122:1,2,20
126:18 131:7,8,17
136:22,24 139:9
139:14 141:18
145:3,24 146:16
147:9 148:6 155:1
155:15 162:10
176:18 178:10,12
178:15 183:2,4
191:14 200:20
210:18 211:7,17
214:2 215:2,5,6,10

215:20 216:4,6,9
217:11 218:19,20
221:25 233:6
235:24 236:13
240:19 242:20
244:8,13 247:15
262:19 264:10
269:4 271:5
274:23 278:17
279:18 281:12
283:9,13,21
284:11,13 297:23
303:8 308:21
321:25 329:9,19
**worked**   18:13,15
21:25 29:11 30:16
33:23 86:19 88:18
144:5 152:21
176:18 177:8
178:10 191:5
211:9 270:2
291:16 305:22
337:25
**worker**   21:13 70:6
84:9 312:21
**working**   35:8
48:23 52:1 60:24
61:20 78:14,18
85:1 88:20,21
119:11 124:7,17
126:6,7 139:22
142:2 178:20
191:19 193:5
198:7 202:13,16
241:2 242:23
243:1 247:16
269:7 279:4,11
306:2 316:12
**works**   237:13
241:14 317:2
320:9

**world**   213:17
**wow**   135:18
**write**   40:24 42:22
57:4 103:19
142:14,18 143:10
217:21 227:18
239:3,11 246:7
287:6 300:18
**writing**   40:11
43:21 56:21 58:1
58:9 126:9,23
221:23 239:12
293:18
**written**   58:2
143:20 144:2,11
144:17 145:24
149:12 185:5
221:24 227:17
257:1 289:4
295:21 300:1
310:23 312:1
313:8 326:11
**wrong**   31:1 47:16
160:15 211:2
278:6 329:18
336:24
**wrote**   246:6
311:11
**www**   324:2
**www.ccbh.net**
323:22

**y**

**yeah**   16:7 22:15
27:14 33:16 38:11
49:6 52:23 60:16
66:21 95:6,24
99:24 139:19
147:21 192:25
239:8 243:6 263:2
272:15 284:9
330:16

**year**   29:14 30:13
32:15 33:7 36:8
47:8,13,14,17,24
48:3,16 52:3,6
54:20,25 55:1
60:6 63:23,25
71:24 74:10 83:23
87:9 90:22 92:3
92:21 104:20
120:7 123:18
126:2,4,10,25
127:3 134:16
136:3,7,13,18
137:25,25 139:14
141:13 144:8
149:4 151:11
155:5 157:14
158:13 160:15
180:10 182:19
186:18,19,21
194:4 198:1
206:24 207:6
212:2 218:7 220:7
220:7,9,18 227:13
265:14 266:12
283:15 288:8
289:13 292:2
297:13,14 309:19
310:2 316:7 318:8
330:5 331:12,15
332:12
**year's**   227:17
**yearly**   81:11
**years**   12:11 20:15
33:8 36:9 41:15
52:22 56:1 58:15
92:11 105:25
132:4 138:1 163:5
163:6 189:21,23
189:24 202:11
218:5,8 239:24,24

257:20 283:16
298:22 305:10
328:22
**yep**   39:3
**yeses**   253:3
**yesterday**   15:24
17:13 60:7 89:10
**york**   3:5,5
**younger**   31:10,13
**youtube**   227:6

**z**

**zachary**   3:13 11:2
**zachary.lazar**
3:15
**zoller**   3:4 11:6,6

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.