Highly Confidential - Subject to Further Confidentiality Review

Page 420

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | |
| | : | |
| APPLIES TO ALL CASES | : | NO. |
| | : | 1:17-MD-2804 |
| | : | |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VOLUME II

- - -

December 6, 2018

- - -

        Continued videotaped deposition of
GARY J. VORSANGER, Ph.D., M.D., taken
pursuant to notice, was held at the law
offices of Drinker Biddle & Reath, 105
College Road East, Princeton, New Jersey,
beginning at 9:20 a.m., on the above
date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 421

```
 1    APPEARANCES:
 2
         SIMMONS HANLY CONROY, LLC
 3       BY:   JAYNE CONROY, ESQ.
         112 Madison Avenue
 4       7th Floor
         New York, New York 10016
 5       (212) 784-6400
         jconroy@simmonsfirm.com
 6
            - and -
 7
         SIMMONS HANLY CONROY, LLC
 8       BY:  SARAH BURNS, ESQ.
         One Court Street
 9       Alton, Illinois 62002
         (618) 259-2222
10       Sburns@simmonsfirm.com
         Representing the Plaintiffs
11
12       O'MELVENY & MYERS, LLP
         BY:   CHARLES LIFLAND, ESQ.
13       400 South Hope Street, 18th Floor
         Los Angeles, California 90071
14       (213) 430-6665
         clifland@omm.com
15
            - and -
16
         O'MELVENY & MYERS, LLP
17       BY:  VINCENT S. WEISBAND, ESQ.
         Times Square Tower
18       7 Times Square
         New York, New York 10036
19       (212) 326-2000
         vweisband@omm.com
20       Representing the Defendants, Janssen
         and Johnson & Johnson
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 422

```
 1      APPEARANCES:  (Cont'd.)
 2
        PIETRAGALLO GORDON ALFANO BOSICK &
 3      RASPANTI, LLP
        BY:  ALEXANDER M. OWENS, ESQ.
 4      1818 Market Street, Suite 3402
        Philadelphia, Pennsylvania 19103
 5      (215) 320-6200
        amo@pietragallo.com
 6      Representing the Defendant, Cardinal
        Health
 7
 8      TELEPHONIC APPEARANCES:
 9
        WEISMAN KENNEDY & BERRIS CO LPA
10      BY:  DANIEL P. GOETZ, ESQ.
        1600 Midland Building
11      101 W. Prospect Avenue
        Cleveland, Ohio 44115
12      (216) 781-1111
        dgoetz@weismanlaw.com
13      Representing the Plaintiffs
14
        ALLEGAERT, BERGER & VOGEL, LLP
15      BY:  MICHAEL S. VOGEL, ESQ.
        BY:  LOUIS A. CRACO, JR., ESQ.
16      111 Broadway, 20th Floor
        New York, New York 10006
17      (212) 616-7060
        mvogel@abv.com
18      lcraco@abv.com
        Representing the Defendant,
19      Rochester Drug Corporation
20
        COVINGTON & BURLING, LLP
21      BY:  LAUREN C. DORRIS, ESQ.
        850 10th Street, NW
22      Washington, DC 20001
        (202) 662-6000
23      ldorris@cov.com
        Representing the Defendant, McKesson
24      Corporation
```

Highly Confidential - Subject to Further Confidentiality Review

Page 423

```
1        TELEPHONIC APPEARANCES:   (Cont'd.)
2
         JACKSON KELLY, PLLC
3        BY:  GRETCHEN M. CALLAS, ESQ.
         500 Lee Street East
4        Suite 1600
         Charleston West Virginia 25301
5        (304) 340-1169
         Gcallas@jacksonkelly.com
6        Representing the Defendant,
         AmerisourceBergen
7
8        ARNOLD PORTER KAYE SCHOLER, LLP
         BY:  RYAN Z. WATTS, ESQ.
9        601 Massachusetts Avenue, NW
         Washington, DC 20001
10       (202) 942-6609
         Ryan.watts@arnoldporter.com
11       Representing the Defendants, Endo
         Health Solutions Endo
12       Pharmaceuticals, Inc.; Par
         Pharmaceutical Companies, Inc. f/k/a
13       Par Pharmaceutical Holdings, Inc.
14
         FOX ROTHSCHILD, LLP
15       BY:  JACOB S. PERSKIE, ESQ.
         1301 Atlantic Avenue
16       Midtown Building, Suite 400
         Atlantic City, New Jersey 08401
17       (609) 348-4515
         Jperskie@foxrothschild.com
18       Representing the Defendant, Validus
         Pharmaceuticals
19
20       WILLIAMS & CONNOLLY, LLP
         BY:  JOSEPH S. BUSHUR, ESQ.
21       725 12th Street, NW
         Washington, D.C. 20005
22       (202) 434-5148
         Jbushur@wc.com
23       Representing the Defendant, Cardinal
         Health
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 424

```
 1      TELEPHONIC APPEARANCES:  (Cont'd.)
 2
        HUGHES HUBBARD & REED, LLP
 3      BY:  TINA M. SCHAEFER, ESQ.
        2345 Grand Boulevard
 4      Kansas City, Missouri 64108
        (816) 709-4159
 5      tina.schaefer@hugheshubbard.com
        Representing the Defendant, UCB,
 6      Inc.
 7
        JONES DAY
 8      BY:  RICHARD M. BRODSKY, ESQ.
        150 West Jefferson Street
 9      Suite 2100
        Detroit, Michigan 48226-4438
10      (313) 733-3939
        rbrodsky@jonesday.com
11      Representing the Defendant, Walmart
12
        CLARK MICHIE, LLP
13      BY:  BRUCE CLARK, ESQ.
        103 Carnegie Center, Suite 300
14      Princeton, New Jersey 08540
        (609) 423-2144
15      bruce.clark@clarkmichie.com
        Representing the Defendant, Pernix
16
17      ALSO PRESENT:
18
        VIDEOTAPE TECHNICIAN:
19
            Dan Holmstock
20
21
22
23
24
```

```
 1                      -  -  -
 2                   I N D E X
 3                      -  -  -
 4

    Testimony of:
 5
                 GARY J. VORSANGER, Ph.D., M.D.
 6
 7        By Ms. Conroy     431, 603, 706
 8        By Mr. Lifland        470, 704
 9
10
11                      -  -  -
12                  E X H I B I T S
13                      -  -  -
14
15   NO.            DESCRIPTION           PAGE
16   Janssen
     Vorsanger-12 Slide Deck             431
17                Risk Management
                  Plan for Our
18                Products
                  5/9/05
19                JAN-MS-02321524
20   Janssen
     Vorsanger-13 An Observational       488
21                Study of Health-Related
                  Quality of Life and
22                Pain Outcomes in Chronic
                  Low Back Pain Patients
23                Treated with Fentanyl
                  Transdermal System
24                (Kosinski)
```

Page 426

```
 1                     -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                     -  -  -
 4
 5    NO.            DESCRIPTION           PAGE
 6    Janssen
      Vorsanger-14 Duragesic Risk          540
 7                 Management Overview
                   Slide Deck
 8                 4/20/07
                   JAN-MS-02305132
 9
      Janssen
10    Vorsanger-15 Duragesic Fourth        552
                   Risk Management Plan
11                 Progress Report
                   JAN-MS-00151777
12
      Janssen
13    Vorsanger-16 Cumulative Review       559
                   Of Iatrogenic Addiction
14                 Associated with the Use
                   Of Transdermal Duragesic
15                 Fentanyl Patch
                   9/6/06
16                 JAN-MS-02754767-83
17    Janssen
      Vorsanger-17 What Percentage of      562
18                 Chronic Nonmalignant
                   Pain Patients Exposed
19                 To Chronic Opioid
                   Analgesic Therapy
20                 Develop Abuse/Addiction
                   And/or Aberrant Drug
21                 Related Behaviors?  A
                   Structured Evidence
22                 Based Review
                   (Fishbain)
23
24
```

Page 427

```
 1                    -  -  -
 2          E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5    NO.          DESCRIPTION          PAGE
 6    Janssen
      Vorsanger-18 Cochrane Library     562
 7                 Long-Term Opioid
                   Management for
 8                 Chronic Noncancer pain
                   (Review)
 9
10    Janssen
      Vorsanger-19 Highlights of        570
11                 Prescribing Information
                   Duragesic, Fentanyl
12                 Transdermal System
                   01/18
13
      Janssen
14    Vorsanger-20 Evaluation of the    582
                   Tamper-Resistant
15                 Properties of
                   Tapentadol
16                 Extended-Release Tablets
                   Results of In Vitro
17                 Laboratory Analysis
                   (Galia)
18
      Janssen
19    Vorsanger-21 Risk Evaluation and  585
                   Mitigation Strategy, REMS,
20                 For NDA 2003533
                   Nucynta ER Tapentadol
21                 Tablets, 8/25/11
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 428

```
 1                      -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5    NO.            DESCRIPTION              PAGE
 6    Janssen
      Vorsanger-22 Nucynta Extended          596
 7                 Release Fourth Safety
                   Surveillance Plan
 8                 Progress Report
                   12/2/13
 9                 JAN-MS-00228548
10    Janssen
      Vorsanger-23 E-mail Thread             661
11                 2/6/13
                   Subject, More Project
12                 Deliverables Needed
                   & Attachment Totality
13                 Close Out
                   JAN-MS-02057424-30
14
      Janssen
15    Vorsanger-24 E-mail Thread             696
                   2/21/03
16                 Subject, Final
                   Preference Paper
17                 JAN-MS-02103693-94
18    Janssen
      Vorsanger-25 E-mail, 6/2/14            699
19                 Subject, Draft Pain
                   Week Poster Abstract
20                 Withdrawal
                   Dependence and
21                 Abuse 28 May 2014
                   JAN-MS-02077691-725
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 429

```
 1                    -  -  -
 2          E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5     NO.            DESCRIPTION            PAGE
 6     Janssen

       Vorsanger-26 E-mail Thread          708
 7                   1/16/14
                     Subject, Can
 8                   You Assist?
                     & Attachment
 9                   HCC Promotional Speaker
                     Bureau Training
10                   JAN-MS-00606393-94
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 430

```
 1                        -  -  -
 2            DEPOSITION SUPPORT INDEX
 3                        -  -  -
 4
 5    Direction to Witness Not to Answer
 6    PAGE    LINE
      None.
 7
 8    Request for Production of Documents
 9    PAGE    LINE
      None.
10
11    Stipulations
12    PAGE    LINE
      None.
13
14    Questions Marked
15    PAGE    LINE
      None.
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 431

```
 1              THE VIDEOGRAPHER:  The time

 2         is 9:20 a.m. December 6, 2018.

 3         This is Video 1, Volume II of the

 4         continued videotaped deposition of

 5         Dr. Gary Vorsanger.

 6              A reminder to the witness.

 7         You're still under oath.  Counsel,

 8         you may proceed.

 9              -   -   -

10         ... GARY J. VORSANGER, Ph.D. M.D.,

11    having been previously sworn, was

12    examined and testified as follows:

13              -   -   -

14         CONTINUED EXAMINATION

15              -   -   -

16    BY MS. CONROY:

17         Q.    Good morning, Doctor.

18         A.    Good morning.

19         Q.    Let me pass to you what I've

20    marked as Exhibit 12.

21              (Document marked for

22         identification as Exhibit

23         Janssen-Vorsanger-12.)

24    BY MS. CONROY:
```

Page 432

```
 1          Q.    This Exhibit 12 was a native
 2   production.  The number is
 3   JAN-MS-02321524.
 4              And it doesn't have a cover
 5   e-mail that I could find.  It was in your
 6   custodial file, Doctor.  And it's
 7   entitled -- appears to be a PowerPoint
 8   entitled "risk management plan for our
 9   products," May 9th of 2005.
10              If you turn to Page 2 of the
11   slide deck there's a graphic.  It says,
12   "What are our goals and intent?  Risk
13   management" -- "risk management
14   strategy."
15              Does this document look
16   familiar to you, Doctor?
17          A.    Yes, it does.
18          Q.    Would you have prepared the
19   slide deck?
20          A.    I would have provided the
21   materials for the content of it.  I may
22   or may not have been the one that
23   actually did the PowerPoint presentation.
24          Q.    I see in the lower left-hand
```

Page 433

1    corner, it has RMP, and then across JOMPC

2    Do you know what that stands for?

3           A.    The RMP would be the rim

4    plan.  And I don't recall what JOPC (sic)

5    is.

6           Q.    As we go through this, if --

7    if it rings a bell what JOPC means --

8    JOMPC, would you let me know?

9           A.    Yeah.

10          Oh, I didn't see the M.  It

11   was -- I think it's Janssen Ortho-McNeil

12   Pharmaceutical.

13          Q.    Great.  Okay.  And I think

14   we saw on your CV yesterday at some

15   point, that's the way, your title had

16   Janssen Ortho-McNeil in it?

17          A.    Yes, yes, that's correct.

18          Q.    At this period of time were

19   you -- was the company and yourself

20   trying to determine whether to have a

21   risk management plan?

22          A.    So there were activities

23   going on to monitor as an -- on an

24   ongoing basis.  They were --

Page 434

1   pharmacovigilance programs and there were

2   analysis that the company were

3   undertaking.  In 2005 I had already

4   started to look at initiating other pilot

5   programs, but we were interested in

6   having it formalized a little bit to have

7   a more specific risk management

8   program -- a risk management plan by a

9   risk management team that could begin to

10  address that.

11          Q.    Were there other risk

12  management plans in place at the company,

13  do you know?

14          A.    We -- we had some pilot

15  programs going on.  And there were

16  activities that were going on.

17          Q.    Okay.  And what -- the pilot

18  programs, what drugs did they involve?

19          A.    They were involved with the

20  Duragesic transdermal fentanyl system.

21          Q.    If you turn the page to

22  Page 3, please, which is strategic

23  imperatives.  And the number one

24  strategic imperative is to ensure patient

Page 435

1    access to our meds.  Do you see that?

2            A.    Yes.

3            Q.    And this would -- the way

4    you would do that I guess, if I'm -- if I

5    understand the way this slide works, is

6    that to ensure patient access to meds,

7    you would provide educational materials

8    to healthcare professionals.  Do you

9    agree?

10           A.    Yes.

11           Q.    And that you would ensure

12   supply chain integrity?

13           A.    The resupply chain integrity

14   would be ensured by the company.

15           Q.    What does that mean?

16           A.    That means that the people

17   responsible at the company for supply

18   chain integrity would be -- have

19   processes in place to do that type of

20   work.

21           Q.    Would that be you or someone

22   else?

23           A.    It would be someone else.

24           Q.    And what departments if you

Page 436

1    know?

2         A.    The -- at Janssen there's a
3    supply chain group and there's a trade
4    group, and they are responsible for the
5    supply chain activities.

6         Q.    Supply group and a trade
7    group?

8         A.    Yes.

9         Q.    And would you be working
10   with them to formulate this risk
11   management strategy?

12        A.    They would be -- they would
13   have put together their plan and the
14   processes that they have in place and
15   that that information would be brought
16   into and shared with this -- the other
17   group of people.  So it would be
18   individuals like myself in the medical
19   group and other people from regulatory.
20   And the supply folks responsible for
21   supply chain would bring their
22   information to it as well.

23        Q.    And then together you would
24   work on the risk management plan?

Page 437

1           A.    Yes.

2           Q.    Do you recall any of the

3     individuals from either supply or trade

4     that would have worked on the risk

5     management plan?

6           A.    Not at this time.

7           Q.    Then the second imperative

8     is to limit abuse and diversion of our

9     products.  That would be done through

10    education.  Would you agree?

11          A.    Yes.

12          Q.    Timely identification and

13    follow-up.

14                Identification of what?

15          A.    If there were any events

16    that were related to abuse and diversion

17    that we became aware of, that we would

18    ensure that those were followed up and we

19    had all of the information and what

20    happened.  And then through that, we

21    would begin to see whether we could

22    modify our educational process to address

23    those issues as they came up.

24          Q.    And who would be responsible

Page 438

1  for that follow-up?

2          A.    It would be depending on the

3  nature of what had happened, whether it

4  would be -- you know, if there was

5  something that -- for example, diversion

6  would be an illegal activity and that

7  would be turned over to ensure that the

8  right people followed up on that illegal

9  activity.

10         Q.    Would they be -- would

11  follow-up be initially done by internal

12  J&J individuals?

13         A.    It certainly could have

14  been.  And then if the authorities needed

15  to be brought in as well, then that would

16  happen as well.

17         Q.    So it was contemplated at

18  this time that you may, in fact, have to

19  go outside the company for follow-up?

20         A.    For something like

21  diversion, which as I mentioned is an

22  illegal activity, it would be discussed

23  and a determination would be made, yes.

24         Q.    And what is your

Page 439

1    understanding of diversion, what would --

2    what would -- well, how would you define

3    diversion?

4         A.    Well, the product was

5    diverted from the normal way in which it

6    would be used by distributors,

7    pharmacists, et cetera.  That it was

8    rather for illegal use.

9         Q.    And who -- who in the group

10   would identify if diversion took place?

11        A.    It would have been

12   individuals responsible for the supply

13   chain integrity.  They would just report

14   that to the group.  And then they would,

15   as I mentioned earlier, have processes in

16   how they would deal with it.

17        Q.    So that would be supply and

18   trade?

19        A.    Yes.

20        Q.    And your identification of

21   just diversion, just so that I

22   understand, it would be drugs that would

23   be routed for illegal use from either a

24   distributor or a pharmacy?

Page 440

1          A.    That would be one way.  If
2     we became aware for example, if other
3     places where diversion was occurring, we
4     would follow up as needed.
5          Q.    And how would you hear about
6     diversion?
7          A.    Well, the supply chain
8     individuals would hear about it through
9     their process as well.  If we were aware
10    that there was diversion going on in an
11    area, then we might send investigators in
12    to understand the nature of that
13    diversion.
14         Q.    And would you learn about
15    diversion -- or is one way that you would
16    learn about diversion from some of the
17    data that was being collected at Johnson
18    & Johnson?
19         A.    Potentially some of the
20    information as I already mentioned from
21    them, and then if there was information
22    that would be coming in later on through
23    groups like RADARS.  That would have been
24    coming at a later date.

Highly Confidential - Subject to Further Confidentiality Review

Page 441

1          Q.    And I think we saw -- we saw

2     yesterday a document that had some data

3     from IMS that could identify hotspots and

4     such.  Would that be one of the ways that

5     you -- or that maybe not you yourself,

6     but supply or trade could identify areas

7     of diversion?

8          A.    Whatever the --

9               MR. LIFLAND:  Object to the

10         form of the question.

11              THE WITNESS:  That would be,

12         again through the supply chain

13         individuals making those types of

14         determinations.  It wouldn't be

15         something that medical

16         specifically would be addressing.

17    BY MS. CONROY:

18         Q.    Do -- did supply and trade

19    have access to the IMS data?

20         A.    I don't know.

21         Q.    You did -- you had access to

22    IMS data?

23         A.    Not directly.

24         Q.    Who did?

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1          A.    There were other groups

2     for -- the outcomes research for example,

3     may have had that.  Other groups within

4     the company that may have used that.

5     That may have been for different

6     purposes, not as you are suggesting for

7     diversion but for other types of

8     analysis.

9          Q.    Did you have any -- did you

10    yourself have any restrictions if you

11    wanted to see particular data from IMS?

12         A.    No.

13         Q.    And that was true throughout

14    the time at Johnson & Johnson?

15         A.    Yes.  If there was a request

16    for particular data, yes.

17         Q.    And then if you look at the

18    Imperative Number 3, "Ensure the

19    integrity of our products after

20    manufacturing," and that's done with the

21    bullet point, "Extend quality control of

22    our products using newest" -- "newest"

23    technologies."

24               What does that mean?

Page 443

1          A.    Again, these were the other

2   individuals involved in the manufacturing

3   process.  And whatever processes they had

4   in place for quality control, which were

5   accepted by the company.

6          Q.    And then partnering along

7   the entire supply chain.  Maybe that's

8   part of the first bullet point.  Do you

9   know?

10          A.    I'm not sure.

11          Q.    Okay.  But the -- but

12   quality control would be extended

13   throughout the entire supply chain.  Is

14   that fair to say?

15          A.    Yes.

16          Q.    If you go to Page 12.  This

17   slide says, "Unification of findings,

18   pulling it all together."  And then the

19   first bullet point is "information from

20   active surveillance and passive

21   surveillance and supply chain

22   distribution sources submitted to members

23   of the internal advisory board."

24                Now, you told me supply

Page 444

1   chain distribution, that would be supply

2   and trade, correct?

3          A.    They would have those

4   responsibilities.

5          Q.    And active surveillance, who

6   would have that responsibility?

7          A.    So in order to answer your

8   question we have to go back and look at

9   the composition of that.  So active

10  surveillance would be done initially by

11  the risk management team.  That would --

12  I'm trying to find the right slide to go

13  through that with you.

14         Q.    Okay.

15         A.    And those would be -- I

16  think it's -- it's not labeled -- RMP

17  strategy, building the plan.

18         Q.    I see it.  Okay.

19         A.    Yes.  So first, risks would

20  be identified again by management or the

21  assessment.  And as we'd be going through

22  our clinical studies, our in vitro and

23  nonclinical studies and clinical abuse

24  liability.  Some of the assessments that

Page 445

1   we would be making.

2                    And then the people who

3   would initially be reviewing some of that

4   would be from the risk management team.

5   And individuals who sat on the risk

6   management team were people involved in

7   product labeling from our regulatory

8   group.  They'd have other ways in which

9   that would be done for education and

10  promotional activities to make sure that

11  we have that.  There would be

12  surveillance ongoing and there were two

13  types of surveillance:  Active and

14  passive surveillance.  And I can explain

15  those.

16          Q.    Yes.  I would like you to.

17          A.    And we talked about

18  already -- about the supply chain --

19  supply chain.

20          Q.    Yes.

21          A.    So passive surveillance

22  would be nothing -- it's nothing really

23  passive about passive surveillance.  It's

24  an entity and activities that would be

Page 446

1    going on through our pharmacovigilance

2    group.  And passive refers to the fact

3    that the information would be coming

4    through the company either through

5    MedWatch forms or through people calling

6    in about adverse events.

7                   The active surveillance is

8    an activity where we would go out and

9    gain that information, and that would be

10   through groups like RADARS and Inflexxion

11   and getting that type of information.

12   And those data would be reviewed by the

13   risk management team.

14        Q.    And would the risk

15   management team -- is that who would be

16   responsible for surveillance or would

17   there be a different group?

18        A.    Yeah, so the risk management

19   team would be reviewing the data coming

20   in from RADARS and from Inflexxion.  They

21   would also be discussing or be talking to

22   the source from passive surveillance as

23   well.  And that information would be

24   reviewed and discussed and shared with

Page 447

1    the internal advisory board, which was

2    senior level individuals at Janssen, and

3    discuss the activities, what was

4    happening, if there were any concerns so

5    that senior leadership would be able to

6    get involved quickly as needed.

7          Q.    And does that mean when I

8    look over here on the left-hand side

9    where it says management, would that be

10   the internal advisory team?

11         A.    That's -- yes.  Management

12   would be the internal advisory team.  And

13   then the changes that the management

14   might discuss and decide on would be

15   changes to the product labeling if that

16   was appropriate, modifications of our

17   educational systems as needed to address

18   this, ensure that our launch and

19   promotional activities were correctly

20   reflecting what we knew.  And then

21   continue up with our surveillance, I've

22   already discussed.  And distribution and

23   supply chain we already discussed.

24         Q.    You may have told me this

Page 448

1    and I missed it.  On the right-hand side,

2    assessment of the risks.  Who is doing

3    the assessment of the risks, what team

4    members?

5            A.    I'm sorry.  Oh, yes.  So

6    those would be the activities by the risk

7    management team.

8            Q.    Okay.

9            A.    Yes.

10           Q.    Would that also be the

11   internal advisory team?

12           A.    So the internal advisory

13   team would receive the initial findings

14   from the risk management team and

15   certainly have an opportunity to review

16   the information themselves to make their

17   own determination.

18           Q.    I see.  Okay.  So let's go

19   back to Slide 12 where it says, "Putting

20   it all together."  And now I think it

21   makes more sense.  So information from

22   active surveillance and passive

23   surveillance and supply chain

24   distribution would be submitted to

Highly Confidential - Subject to Further Confidentiality Review

Page 449

1    members of the internal advisory board.

2    And that was when it makes its way back

3    up to management, correct?

4         A.    Yes.

5         Q.    Identical information is

6    given to the external advisory board.

7    Who is that?

8         A.    So the external advisory

9    board were a group of individuals outside

10   the company, with knowledge and expertise

11   in different areas that would help guide

12   us on appropriate tactics to take if we

13   became aware of addiction.

14              And there was -- so -- and I

15   think we just -- so that's the -- if you

16   want more information I can discuss that.

17        Q.    Okay.  How were they chosen?

18        A.    They were chosen based on

19   their background and expertise.  So we

20   wanted to have an individual who had

21   expertise in FDA activities and

22   appropriate product labeling.  We wanted

23   an individual with experience with DEA.

24   We also wanted someone who had background

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1    in pain management who is a pain expert.

2              Because active surveillance

3    was a -- some new methodology, we wanted

4    someone who had experience in signal

5    detection methodology.  So that would be

6    an individual who could help us

7    understand what's a signal and what's not

8    a signal and then help us begin to think

9    about that.

10             And the other person that we

11   added on was bioethicist because we

12   wanted to get an outside opinion on some

13   of the activities we're doing and see --

14   and kind of checking with them as well.

15        Q.    And that would -- that would

16   be the external advisory board, those --

17   those individuals --

18        A.    Yes.

19        Q.    -- that had those skills?

20             And who would -- who would

21   be choosing those individuals?

22        A.    Those were individuals that

23   I selected in discussion with other

24   people in the company.  But again based

Highly Confidential - Subject to Further Confidentiality Review

Page 451

1   on their background and expertise.

2          Q.     Had anything like that been

3   done at Johnson & Johnson prior to this?

4          A.     Not to my knowledge.

5          Q.     And then I see that each

6   board, the internal board and the

7   external board makes an independent

8   assessment of the information to

9   determine if there is an actionable

10  signal.

11         A.     Yes.

12         Q.     Do you agree with that?

13         A.     Yes.

14         Q.     And then in the event they

15  disagree, the more conservative

16  recommendation is followed.  I take it at

17  some point each -- the internal and

18  external boards learns of each other's

19  decisionmaking process, and the more

20  conservative approach is taken?

21         A.     Yes.

22         Q.     Was there anyone that would

23  preside over both boards?

24         A.     So I -- I presided over the

Page 452

1  external review committee and was

2  responsible also for the risk management

3  team and we interacted with the internal

4  review committee as we've described.

5      Q.    Okay.  Is this structure

6  still in place?

7      A.    I don't know at this point.

8      Q.    Was it in place when you

9  left the company?

10     A.    The risk management team, to

11  the best of my knowledge, had been

12  superseded by a different team, but some

13  of its elements that you have seen here

14  were taken on by that team.

15     Q.    And who headed up that team,

16  the one that took over?

17     A.    That was, I believe headed

18  up by the pharmacovigilance group.

19     Q.    And so did the pharmaco --

20  did the pharmacovigilance team keep an

21  external and an internal structure?

22     A.    The external structure was

23  continued for a while, but I don't know

24  whether it was part of the team that was

Page 453

1    run by the pharmacovigilance group.

2           Q.     Do you recall approximately

3    when it switched to the pharmacovigilance

4    group?

5           A.     I don't recall.

6           Q.     And do you recall any of the

7    individuals who were on the external

8    board?

9           A.     Yes.

10          Q.     And who were they or who do

11   you remember?

12          A.     Right, so the person who was

13   -- had acute -- very knowledgeable about

14   FDA activities and product labeling, the

15   person was Dr. Cynthia McCormick, former

16   head of -- director of the anesthetics

17   and critical care.  I'm paraphrasing the

18   title of the FDA group.  The name of the

19   group is probably a little -- may be a

20   little bit different from that.

21          Q.     Okay.

22          A.     The person from DEA who

23   participated on the external advisory

24   board was Mr. Frank Sapienza.  The pain

Page 454

1    specialist who we had was Dr. James Otis

2    up in Boston.  The person that helped us

3    with signal detection methodology, we

4    talked about active surveillance and

5    those things, I'm blocking on her name

6    right now.  And the last person was the

7    bioethicist, and that was Dr. Art Kaplan.

8            Q.    Dr. Art Kaplan?

9            A.    Yes.

10           Q.    With a K?

11           A.    Yes.

12           Q.    And it was a woman -- is she

13   a physician for the signal detection, do

14   you recall?

15           A.    Yes.  I'm blocking on her

16   name though.  Yes.

17           Q.    If you can turn to Slide 23.

18           A.    Oh I remember now.

19   Dr. Annette Stemhagen.

20           Q.    Stemhagen?

21           A.    Stemhagen.  I believe --

22           Q.    Stemhagen.

23           A.    Yes, I believe that's her

24   last name.

Page 455

1          Q.    Okay.  Actually Slide 22

2    might make it a little easier to talk

3    about.  Education would be one of the

4    ways that risk management would get

5    information out to the field; is that

6    correct?

7          A.    Yes.

8          Q.    And one would be approved

9    information from the label going directly

10   to the healthcare professionals through

11   continuing medical education.  Do you see

12   that?

13         A.    Yes.

14         Q.    And you agree that was one

15   way?

16         A.    Yes.

17         Q.    And information obtained as

18   the result of findings from the supply

19   chain distribution could also be

20   communicated through lectures on abuse

21   and diversion.

22               Do you see that?

23         A.    Yes.

24         Q.    Would those be CME lectures

Highly Confidential - Subject to Further Confidentiality Review

Page 456

1    or something else?

2          A.    This is under the category

3    of CME, so presumably it would be a

4    discussion under CME.

5          Q.    And it says launch

6    promotional materials would have no

7    impact on CME.  What do you mean by that?

8          A.    This was a separation of

9    promotional activities from CME.

10         Q.    So CME would not have the

11   same restrictions?

12         A.    CME would not have the same

13   restrictions that we would have.

14   Whatever the guidelines for CME are,

15   those are the ones that the company would

16   follow.  But promotional materials would

17   not be part of CME discussion.

18         Q.    Okay.  And then if you turn

19   to Slide 23, this is the -- this is now

20   separate.  This is the promotional piece,

21   correct?

22         A.    Yes.

23         Q.    And approved information as

24   a result of labeling change would be

Page 457

1    directly transmitted to healthcare

2    professionals through promotional

3    activities.  That would be, for example,

4    by sales representatives, correct?

5            A.    Yes.

6            Q.    And then information

7    obtained through surveillance of supply

8    chain distribution might be communicated

9    in general discussions on abuse and

10   diversion.  How would -- that would be

11   considered promotion, correct?

12           A.    So the information would

13   need to be disseminated according to the

14   company processes for formal promotional

15   material and how to make that -- so it

16   was an awareness about those types of

17   activities.

18           Q.    And would those -- would

19   this be general discussions on abuse and

20   diversion through the supply chain?

21           A.    The -- the way I read this

22   would be the information obtained through

23   the surveillance of supply chain

24   distribution might be communicated in

Page 458

1    general discussions in abuse and

2    diversion.  So if we became knowledgeable

3    about certain types of diversion, then we

4    would discuss where it might be

5    appropriate to share that with healthcare

6    providers so that they are aware of these

7    types of things, these activities were

8    going on.

9         Q.    Okay.  And then this has

10   just the same as the other slide.  "This

11   CME-related education is completely

12   independent and separate of the

13   promotional materials"?

14        A.    Correct.

15        Q.    Go to Slide 32, the

16   distribution supply chain.  Would this

17   be -- this would be the responsibility of

18   trade and supply?

19        A.    Yeah, I just need a moment

20   to get there.

21        Q.    Oh, I'm sorry.

22        A.    All right.  Are you on

23   Slide 31?

24        Q.    32.

Page 459

1          A.    32.

2                Yes.  And I'm sorry, what

3    was your question?

4          Q.    This would be supply and

5    trade that would deal with these issues?

6          A.    Yes.

7          Q.    But there would be oversight

8    from the internal and the external

9    committees?

10         A.    Well, the -- the -- as I had

11   mentioned earlier, that the -- the groups

12   responsible at the company for the supply

13   chain activities or supply chain

14   integrity would do what they do.  The

15   information that they obtained would be

16   presented to the risk management team to

17   have an understanding about supply chain

18   integrity.

19         Q.    Okay.  So when we take a

20   look at the second bullet point,

21   "Implement following measures to prevent

22   diversion.  Obtain proof of identity from

23   customers.  Maintain retrievable receipts

24   and distribution records.  Report to DEA

Page 460

1    on suspicious orders.  Register with DEA.

2    And provide controls and procedures to

3    guard against theft and diversion."

4              Would that initially be the

5    responsibility of either supply or trade

6    at Johnson & Johnson?

7         A.    Yes.  The people responsible

8    for the supply chain, this would be some

9    of the activities that they would

10   undertake.

11        Q.    And if there was some

12   recognition that something had to change

13   within -- within these responsibilities,

14   is that something that would then be

15   discussed with the risk management

16   individuals and -- and some sort of a

17   change to the risk management plan?

18        A.    Well, the discussion would

19   be within that group of what was the

20   issue, how did they intend to address it

21   and what had happened.

22              The -- the information of

23   what had happened would then be

24   communicated to the risk management team.

Page 461

1    This is what happened.  These were the --

2    what they did to mitigate whatever

3    happened, and we would be -- might -- we

4    might be informed if something happened

5    or not.

6         Q.    And then would it be true

7    that there would be, if there was some

8    discussion about how to change a policy

9    or procedure within supply and trade,

10   would that be then discussed in the

11   internal board as well as the external

12   board and maybe a decision would be made

13   and the more conservative approach taken?

14        A.    Well, the -- the supply

15   chain group would make their decisions on

16   what they want to do.  And they would

17   communicate it to the risk management

18   team.  That would then be discussed with

19   the -- the two groups and then the -- the

20   internal review committee is senior

21   management, so they would certainly be

22   interacting with senior management from

23   the supply chain side to come up with

24   what needed to happen.

Page 462

1           If they needed additional

2     information or input from individuals

3     outside the company, then they would

4     certainly check with the external review

5     committee.

6           Q.    Would the external review

7     committee be looking at this at the same

8     time if there was some issue that came

9     up, or would they only look at it if the

10    internal team needed some assistance?

11          A.    It would depend on what

12    happened.  And in point of fact, we never

13    saw this, so it's really hypothetical at

14    this point.

15          But depending on the nature

16    of what had happened, if we felt we

17    needed to get it out to everybody, then

18    certainly as I described it here, the

19    information would be available to both

20    the internal review committee and the

21    external review committee.

22          Q.    Do you recall any incident

23    or event of any sort that -- that

24    required that this process take place,

Page 463

1    that there be a decision made by the

2    internal board and the external board and

3    then you sort of had to broker the -- the

4    decisionmaking to the more conservative

5    approach?

6           A.    We -- for activities that

7    took place at the RM -- for the risk

8    management team to look at, that would

9    have been, again, discussed with the

10   internal review committee.  The external

11   review committee, we didn't have a lot of

12   opportunity where we needed to, but we

13   did check with them with certain types of

14   decisions that we wanted to make, to get

15   their thinking and feedback for product

16   development.  That was where -- that was

17   a major -- that was a role that they

18   worked with us.

19          Q.    With product development?

20          A.    With certain product

21   development decisions, yeah.

22          Q.    Product development

23   decisions and how that would coincide

24   with a risk management plan?

Page 464

1          A.    Yes.

2          Q.    Was there anyone from the

3    legal department on any of those teams?

4          A.    So there was a member of the

5    legal department on the internal review

6    committee, the management, the management

7    team, yes.

8          Q.    And was this -- was this

9    just called the internal review team or

10   was it the risk management plan internal

11   review team or?

12         A.    Well, the -- this was our

13   risk management plan, and then this would

14   have been the internal review committee

15   as part of that plan.

16         Q.    Then if you look at

17   Slide 33, distribution supply chain.

18   Monitoring IMS data.  Total sales from

19   IMS versus total sales from Janssen

20   Ortho-McNeil, as a means of assuring

21   checks and balances.  Do you see that?

22         A.    Yes.

23         Q.    Would this be something by

24   either supply or trade?

Page 465

1           A.     That would be something that

2     I would assume to be the case.

3           Q.     Okay.  I think I asked you

4     before.  You don't know one way or the

5     other whether supply or trade was -- had

6     the ability to monitor IMS data?

7           A.     I don't know.

8           Q.     The slide would suggest they

9     could, correct?

10          A.     Yes, because -- yes.

11          Q.     If you look to Page 40.

12    Launch promotion.  First bullet.

13    Labeling changes directly affect

14    promotion.

15                 We talked about that.  It's

16    fairly obvious, correct?

17          A.     Yes.

18          Q.     Educational materials

19    related to clinical trials and related

20    products would impact on promotional

21    activities.  That's because you could

22    only -- there -- there would be

23    particular standards and rules you would

24    have to go by with respect to what you

Page 466

1    could -- what you could promote from

2    clinical trials and related products,

3    correct?

4            A.    Yes.

5            Q.    And then the third bullet

6    point.  Surveillance, distribution supply

7    chain findings definitely will impact on

8    promotional activities.

9                 What's meant by that?

10           A.    If we were finding that

11   there was diversion or activities that

12   were going on, if people were abusing the

13   product, then we would want to make sure

14   that there was a way through appropriate

15   processes and means that those were

16   addressed in materials that -- that could

17   be discussed at a promotional venue.

18                So the healthcare provider

19   would become aware of the types of things

20   that they need to look for, in talking

21   about that.

22           Q.    So this would be -- this

23   would be an avenue to get information out

24   to healthcare providers about what you

Highly Confidential - Subject to Further Confidentiality Review

Page 467

1   were -- or what your company and -- and

2   the individuals at your company were

3   seeing with abuse and diversion?

4           A.    Yes.  There were compliant

5   processes.

6           Q.    I'm sorry.  What does that

7   mean, there was compliant processes?

8           A.    Well, the promotional

9   activities done in a compliant manner,

10  whatever those processes would be.

11          Q.    Oh, I see.  Okay.

12                And are you familiar, as you

13  sit here today, with any promotion --

14  promotional materials that provided

15  information on abuse and diversion to

16  healthcare providers?

17          A.    So I'm currently not at the

18  company, so I'm not aware of what types

19  of promotional materials that they use

20  now.

21          Q.    Were you aware of -- did it

22  ever happen, were there promotional

23  materials concerning abuse and diversion

24  to healthcare providers while you were at

Highly Confidential - Subject to Further Confidentiality Review

Page 468

1   the company?

2          A.    Well, the -- as part of the

3   information that would be distributed, a

4   product package insert would have the

5   information around abuse and diversion of

6   opoid analgesics and controlled

7   substances, C-IIs.

8          Q.    Do you recall any other

9   promotional activity other than the

10  package insert that would have provided

11  information developed from the risk

12  management program about abuse and

13  diversion that could be provided to

14  healthcare providers?

15         A.    The risk management program

16  that we had was really predominately

17  surveillance, and during this period of

18  time we didn't see a lot of those types

19  of activities.  So they didn't translate

20  necessarily into promotional materials.

21  But we wanted to make sure that we had

22  that available if we began to become

23  aware of it.

24         Q.    Okay.  So the -- the process

Page 469

1   was in place, but it wasn't something

2   that you actually saw and -- and resulted

3   in such promotional materials?

4          A.    Yes.

5          Q.    And that was true -- at

6   least that's your understanding until

7   you -- until you left the company?

8          A.    While I was still involved

9   in promotional activities.

10         Q.    You can put that exhibit

11  away.

12              MR. LIFLAND:  Where are we

13         time-wise?

14              THE VIDEOGRAPHER:  We are

15         exactly at 37 minutes.  So 7 hours

16         1 minute.

17              MS. CONROY:  Oh okay.  So do

18         you want to take a --

19              MR. LIFLAND:  Yeah, let's

20         take a break.  Try to be back by

21         10:30.

22              THE VIDEOGRAPHER:  The time

23         is 9:57 a.m.  We are going off the

24         record.

Page 470

1                  (Short break.)

2                  THE VIDEOGRAPHER:  The time

3          is 11:05 a.m.  And we are back on

4          record.

5                     -  -  -

6                  EXAMINATION

7                     -  -  -

8    BY MR. LIFLAND:

9          Q.    Good morning, Dr. Vorsanger.

10         A.    Good morning.

11         Q.    I'd like to ask you just a

12   few preliminary questions before we get

13   into the main part of the examination

14   regarding your responsibilities at

15   Janssen.

16                  While you were at Janssen,

17   did you have primary responsibility for

18   the sales of Janssen products?

19         A.    No, I did not.

20         Q.    Who had that responsibility

21   at Janssen?

22         A.    That would have been the

23   sales force.

24         Q.    And did you have primary

Highly Confidential - Subject to Further Confidentiality Review

Page 471

1    responsibility for the marketing of

2    Janssen products?

3              A.    No, I did not.

4              Q.    And who had that

5    responsibility?

6              A.    That would have been the

7    marketing group.

8              Q.    And did you have primary

9    responsibility for compliance, including

10   compliance with FDA and DEA requirements?

11             A.    No, I did not.

12             Q.    And who had that

13   responsibility?

14             A.    Those responsibilities would

15   have been from the compliance group.

16             Q.    Let me mark as an exhibit --

17   I don't need to mark it.  It's been

18   marked.

19                   Let me just have you get out

20   your curriculum vitae that was marked as

21   Exhibit 2 yesterday.

22                   I'd like to just go over

23   very quickly your background and training

24   and so feel free to refer to this, if you

Page 472

1    need it.  But can you give us just a

2    general description of your education and

3    training starting with college?

4            A.    Yes.  So I attended -- I

5    attended the State University of New York

6    Stony Brook.  I believe it's now called

7    Stony Brook University.

8                 After I completed my B.S., I

9    went to New York University where I

10   completed the New York equivalent to a

11   master's degree.  And then that was

12   continued on when I was at the City

13   University of New York, culminating in me

14   getting my -- and obtaining my Ph.D. from

15   the City University of New York.

16           Q.    And what was your Ph.D. in?

17           A.    My Ph.D. was in the area of

18   human genetics.

19           Q.    And then did you go onto

20   medical school after that?

21           A.    I did.

22           Q.    And can you tell us about

23   your medical school training?

24           A.    Yeah.  I attended medical

Page 473

1    school at the Mount Sinai School of

2    Medicine in New York City.  And after I

3    completed my M.D. degree, I went on to do

4    a residence -- an internship and

5    residencies at Montefiore Hospital and

6    Medical Center.

7            Q.    And briefly, what does

8    internal medicine entail?

9            A.    So internal medicine is a

10   medical doctor that takes general medical

11   care and may be responsible for diseases

12   like heart disease or lung disease and

13   similar types of diseases.

14           Q.    And did you get experience,

15   for example, treating patients in the

16   clinical setting?

17           A.    Yes, I did.

18           Q.    And emergency room setting?

19           A.    I treated patients in --

20   certainly in the emergency room and

21   patients on the wards as well.

22           Q.    And did you have any

23   occasion during this time, and if you

24   want to take a look at your -- we can put

Page 474

1    a time frame on it.  I think it's in the

2    mid-'80s, to prescribe opioid pain

3    relievers?

4          A.    So I would have prescribed

5    opioid pain relievers -- relievers as

6    part of my -- my activities in the

7    emergency room if patients came in with

8    sprains or other types of medical

9    conditions that would be appropriate for

10   an opioid analgesic.

11         Q.    And after your internal

12   medicine training, did you have

13   additional medical training after that?

14         A.    I did.

15         Q.    Can you describe that?

16         A.    Yes.  After I completed my

17   internal medicine training, which

18   culminated me being board-certified in

19   internal medicine.  I had gone on to do

20   other residency in anesthesiology up in

21   Boston at the Massachusetts General

22   Hospital.

23         Q.    And can you describe

24   generally what's involved in an

Highly Confidential - Subject to Further Confidentiality Review

Page 475

1    anesthesiology residency?

2           A.    So I learned about the

3    practice of anesthesia, had to administer

4    anesthetics to people as they undergo

5    surgical procedures, and used a variety

6    of -- how to appropriately use a variety

7    of different medications to perform those

8    anesthetics.

9           Q.    And do the anesthetics

10   include opioid products?

11          A.    Yes, they do.

12          Q.    Can you describe some of

13   those and how they were used?

14          A.    So I have experience using

15   intravenous fentanyl for a number of

16   patients.  Fentanyl is a potent pain

17   medication.  It's used as an analgesic as

18   well as an anesthetic, and used

19   intravenous morphine as well.

20          Q.    What's the difference

21   between anesthesia and analgesia, just

22   for my information?

23          A.    So analgesia is control of

24   pain.  Reduction in pain.  And anesthesia

Page 476

1    is absence of pain.

2              So when you go in for

3    surgery and you think of patients going

4    and getting off to sleep so they have no

5    pain during the procedure, that would be

6    more of an anesthesia, anesthetic.

7         Q.    And you said you did your

8    residency in anesthesia at Mass. General?

9         A.    That's correct.

10        Q.    And are you board certified

11   in any area?

12        A.    Yes, I am.  I'm board

13   certified as an anesthesiologist, and as

14   I already mentioned, I'm board certified

15   in internal medicine.

16        Q.    And after your residency,

17   where did you go to work?

18        A.    So I was invited to come on

19   staff as an anesthesiologist at

20   Massachusetts General Hospital.  I was

21   there from 1993 to 1990 -- sorry, from

22   1990 to 1993.

23              And in 1993 I then went on

24   to take a private practice physician as a

Page 477

1   staff anesthesiologist at Concord

2   Hospital, in Concord, New Hampshire.

3         Q.    And can -- can you describe

4   briefly what your work entailed in those

5   positions?

6         A.    Right.  So the -- most of my

7   work involved administering anesthetics

8   and -- and providing anesthesia for

9   surgical procedures, both at the

10  Massachusetts General Hospital, as well

11  as at Concord Hospital.

12        Q.    And that would include work

13  with opioid products?

14        A.    Yes, a considerable amount.

15        Q.    And which ones?

16        A.    Really mostly fentanyl and

17  other fentanyl-type products.  And some

18  morphine as well.

19        Q.    And what did you do after

20  your work as an anesthesiologist?

21        A.    So after my time at Concord

22  Hospital, and I -- we discussed the years

23  of 1993 to 1995, I transitioned over to

24  the pharmaceutical industry and worked at

Page 478

1    Astra USA.

2         Q.    And briefly, what did you do

3    for Astra?

4         A.    I was a medical advisor at

5    Astra USA, and I provided a medical

6    expertise then for -- for a number of

7    their local anesthetics; local

8    anesthetics would be medications like

9    novocaine.

10        Q.    And how long were you at

11   Astra?

12        A.    I was at Astra for several

13   years.  I left Astra in -- let me -- let

14   me just check and -- and see.  I was at

15   Astra from 1995 to 1997.  And then in

16   1997 to 2000 I worked at another company

17   called Parexel International.

18        Q.    And what was Parexel?

19        A.    Parexel is a -- is a

20   contract research organization.

21        Q.    And what is a contract

22   research organization?

23        A.    A contract research

24   organization is a company that provides

Page 479

1   services to -- mostly to the

2   pharmaceutical industry but others as

3   well.  So companies may require

4   additional support to run clinical

5   trials, to analyze data, et cetera.  And

6   so a contract research organization, part

7   of their responsibilities would be to

8   provide that information -- those

9   services to a pharmaceutical company.

10          Q.    And why did you make the

11  change to go from the pharmaceutical

12  company Astra to the contract research

13  organization Parexel?

14          A.    I was really interested to

15  learn about how clinical trials are done,

16  how are they -- how do you write a

17  protocol well.  How do you initiate a

18  study, execute a study, analyze the data,

19  do safety monitoring.  And my feeling was

20  that one of the best ways to do that was

21  at a contract research organization,

22  where you really get the whole spectrum

23  of -- of clinical trials.

24                  The other reason why I

Highly Confidential - Subject to Further Confidentiality Review

Page 480

1    wanted to go was because I had an

2    opportunity to see how different

3    companies perform clinical studies and

4    how they ran them, as opposed to being at

5    a single company, where you can learn a

6    great deal of information, I would then

7    have an opportunity to see how different

8    companies conducted their clinical

9    trials.

10          Q.    Did you have an opportunity

11   to work with Janssen Pharmaceuticals when

12   you were at Parexel?

13          A.    I did.

14          Q.    And can you explain what the

15   product was that you were working on?

16          A.    Yes.  So Janssen was

17   developing a pain control system.  The

18   system was designed to be used in

19   hospital for the administration of

20   fentanyl for the treatment of

21   postoperative pain.  And I had worked

22   with Janssen at that time to help develop

23   their protocols and go through study

24   design with them as well.

Page 481

1              I also advised them on

2      another medication.  I believe it was

3      Risperdal.

4          Q.    Okay.  And this fentanyl

5      system that you referred to, is that a

6      patch system?

7          A.    No.  That's a liquid that

8      would be given -- normally that -- yeah,

9      I misspoke.  That is a patch-type system.

10     So, as opposed to IV PCA that people may

11     have experience with where they push a

12     button, this was a system that did not

13     require any kind of intravenous

14     admission, there was no IV required.

15              The patient pushed the

16     button and the way it was set up, it

17     would set up an electronic charge and the

18     fentanyl would then diffuse across the

19     scan into the bloodstream.

20         Q.    Do you know whether Janssen

21     ever brought that product to market?

22         A.    Janssen did not bring the

23     product to market as far as I know.

24         Q.    And did there come a time

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1    when you went to work directly for

2    Janssen?

3            A.    Yes.  I was at Parexel for a

4    period of time, and in October of 2000 a

5    position became available in the U.S.

6    medical affairs group at Janssen.  And I

7    saw a -- I started working at Janssen as

8    an employee.

9            Q.    And what kinds of products

10   did you work on at Janssen?

11           A.    I worked on controlled --

12   C-II controlled substances.

13           Q.    And which products?

14           A.    I worked on Duragesic, a

15   transdermal fentanyl product, and

16   tapentadol.

17           Q.    What was your position, what

18   group in Janssen did you come into?

19           A.    So I was in the U.S. medical

20   affairs group.  And that had -- the

21   functions were very similar.  At one

22   point I was also in the scientific

23   affairs group as well.  But the

24   responsibilities were the same.  And the

Page 483

1    other product that I had worked on at

2    Janssen as well, which was an opioid but

3    not a -- not a C -- not a controlled

4    substance at the time was tramadol.

5            Q.    Who did you work with there?

6            A.    I worked in the U.S. medical

7    affairs group, and one of the people I

8    reported into was Dr. Bruce Moskovitz.  I

9    worked with pharmacists, other

10   physicians, a variety of different people

11   from the company.

12           Q.    And in general, what were

13   your responsibilities in the medical

14   affairs group?

15           A.    So in the medical affairs

16   group, our responsibility is to work with

17   healthcare providers to understand

18   specifically what their data needs might

19   be, to ensure -- from our point of view,

20   ensure safe and effective use of our

21   compounds.  So we would understand what

22   are the types of data that they would

23   find compelling.  And I was responsible

24   for developing protocols for clinical

Page 484

1    trials.  Some of my early

2    responsibilities included working on two

3    clinical trials that were already

4    underway.

5              I also partnered with other

6    individuals in the company who were doing

7    work in the outcomes research groups,

8    worked with the regulatory affairs group

9    as well.  And also provided medical

10   expertise to the medical information

11   group.

12             Q.    And what about in the field

13   of safety monitoring and surveillance?

14             A.    So I was certainly partnered

15   with the pharmacovigilance group to do

16   safety monitoring as well, and review

17   data on our opioid analgesics.  In

18   addition, I worked at the company to

19   develop an acute surveillance program to

20   monitor, as part of safety monitoring for

21   our prescription opioid analgesics.

22             Q.    You mentioned that the two

23   Schedule II products you worked on were

24   Duragesic and Nucynta, and I take it that

Highly Confidential - Subject to Further Confidentiality Review

Page 485

1    you worked on both -- both formulations
2    of Nucynta, the immediate and extended
3    release?
4           A.    Yes, that's correct.
5           Q.    And was -- was Duragesic --
6    were they all approved products at the
7    time you joined Janssen in 2000?
8           A.    That's right.  Duragesic had
9    been on the market since 1990 and I had
10   joined approximately ten years later in
11   2000.
12          Q.    And how about Nucynta, the
13   Nucynta products?
14          A.    Now, there was discussion
15   about Nucynta, but I was not specifically
16   involved in that.  And then Nucynta --
17   the -- the immediate release formulation,
18   Nucynta, which I some -- will be
19   referring to as Nucynta IR, but it's
20   actually called Nucynta, didn't come on
21   the market 2000 -- until 2009.
22          Q.    And what about the
23   extended-release product?
24          A.    The extended-release I

Page 486

1   believe came on -- was available in the

2   U.S. market two years later, in 2011.

3          Q.    All right.  Let's go back.

4   You mentioned that when you started there

5   were -- on the Duragesic product, there

6   were some ongoing postapproval clinical

7   trials that you worked on.

8               What did you do with regard

9   to those?

10         A.    So those studies were really

11  wrapping up.  I was involved in data

12  collecting.  Analyzing the data, looking

13  at adverse events as part of safety

14  monitoring, and then working on

15  developing a publication plan to provide

16  that information to prescribers, and

17  others.

18         Q.    Did -- did the company have

19  a procedure or standard procedure

20  regarding publication of data coming out

21  of its clinical trials, postmarketing

22  clinical trials or outcomes research?

23         A.    Yes, it did.

24               MS. CONROY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 487

1    BY MR. LIFLAND:

2            Q.    Can you describe what that

3    was?

4            A.    Yes.  So there -- there was

5    a procedure in place that the studies

6    that were undertaken would be published

7    and the information would be -- would be

8    published in a number of different ways.

9    It may be as part of a poster

10   presentation of the clinical data.  Or it

11   may be data which would be reviewed by

12   professional societies, peer reviewed for

13   presentation at scientific meetings.

14           In addition, the information

15   would be submitted to journals with peer

16   review and published in those journals as

17   well.

18           Q.    Let me have --

19           MR. LIFLAND:  I'm going to

20       mark as Defendant's Exhibit -- do

21       we just do it 1?

22           MS. CONROY:  It's right

23       there.  It's --

24           MR. LIFLAND:  Oh, okay.

Page 488

1           MS. CONROY:  I think it's

2      just --

3           MR. LIFLAND:  Vorsanger, I'm

4      sorry.

5           MS. CONROY:  Yes.

6           MR. LIFLAND:  Vorsanger

7      Exhibit 13.

8           (Document marked for

9      identification as Exhibit

10      Janssen-Vorsanger-13.)

11  BY MR. LIFLAND:

12      Q.    I've marked as Exhibit 13 an

13  article entitled An Observational Study

14  of Health-Related Quality of Life and

15  Pain Outcomes in Chronic Low Back Pain

16  Patients Treated With Fentanyl

17  Transdermal System.

18           Do you recognize this?

19      A.    I do.

20      Q.    And can you explain what it

21  is?

22      A.    Yes.  So there were two

23  ongoing clinical studies that I had

24  picked up when I started at Janssen in

Page 489

1    October of 2000.  One was a study

2    comparing Duragesic, the transdermal

3    fentanyl system, to OxyContin, looking at

4    patient preference.  And the other one

5    compared Percocet to Duragesic; again,

6    the same endpoint of patient preference.

7    And there was a number of different

8    outcomes, instruments, that were in both

9    of those studies as part of the clinical

10   trials.  And this publication looks at

11   data from both of those studies combined,

12   looking at health-related quality of life

13   and pain outcomes measures for those two

14   studies.

15            Q.    And is this an example of

16   data that Janssen submitted for

17   publication that had been gathered in a

18   postmarketing clinical trial?

19            A.    Yes, that's correct.

20            Q.    And you're the last listed

21   author on that document?

22            A.    Yes.

23            Q.    And can you just briefly

24   describe what the conclusion of this

1  analysis was?

2          A.    So this, as I mentioned, the

3  data came from two sources.  We discussed

4  that.  And our conclusion was that

5  chronic low back pain patients who

6  chronically used short acting opioids

7  favored -- demonstrated a tremendous

8  health-related quality of life burden.

9               And there were favorable

10  health-related quality of life outcomes

11  were observed among patients who reported

12  pain relief.

13              So people who were starting

14  on pain medications with chronic low back

15  pain, there's a significant amount of

16  burden to them by having those painful

17  conditions.

18          Q.    And is this journal that --

19  is this a peer-reviewed journal?

20          A.    Yes, it is.  Current Medical

21  Research and Opinion is a peer-reviewed

22  journal.

23          Q.    Can you describe what peer

24  review is?

Page 491

1          A.    So with a peer-reviewed

2     journal the material is prepared by

3     individuals who may be physicians or

4     other investigators and is sent to the

5     journal where it's reviewed either by

6     people with a background -- they may be

7     physicians, scientists, Ph.D.s, et

8     cetera, to review that to make that the

9     quality of the articles are such and it's

10    appropriate for the journal.

11               So it's not just accepted

12    but it goes through a review process to

13    ensure that the article is, as I

14    mentioned, of sufficient quality and

15    appropriate for the journal.

16          Q.    And you also mentioned that

17    there is a peer review process that goes

18    along with publishing data in poster

19    format at annual meetings of medical

20    societies.  Can you describe that?

21          A.    Yes.  So a similar type of

22    process would be in place.  Investigators

23    who have done clinical studies and others

24    would submit it to a professional

Page 492

1    society.  And they may be individuals

2    that the professional societies called

3    upon to review the posters for quality

4    and content and then make a decision that

5    that would be appropriate to display at a

6    scientific meeting or present the

7    information at a scientific meeting.

8         Q.    You also mentioned that you

9    worked with outcomes research, the

10   outcomes research group at Janssen.

11        A.    Yes.

12        Q.    Can you describe what

13   outcomes research is?

14        A.    So outcomes research, the

15   type of work that they do may be usual

16   care type studies.  And those would be

17   studies to understand how patients are

18   treated in a typical real world setting.

19   Those studies may begin to gain

20   information on how patients use certain

21   types of drugs, how they function in the

22   medical system, who are the individuals

23   that take care of them.  Those would be

24   some of the other examples.

Highly Confidential - Subject to Further Confidentiality Review

Page 493

```
 1                    They may look at databases

 2   and analyze those for certain types of

 3   information as well.

 4                    Those studies are really

 5   quite important for us clinically.  They

 6   differ from controlled clinical trials,

 7   which in some ways they have more rigor,

 8   but there are more inclusion/exclusion

 9   criteria.  So the patient population is

10   more homogenous in a controlled clinical

11   trial as opposed to real world evidence

12   study or the type of information that the

13   outcomes research groups do where it's

14   more information on other types of --

15   different types of patients that wouldn't

16   necessarily be included in, like, a

17   placebo-controlled-type study.

18        Q.    Let me go back now and ask

19   you a few more specific questions about

20   the medications in question starting with

21   Duragesic.

22                    What is Duragesic?

23        A.    Duragesic is a patch.  And

24   the -- and the opioid pain medication in
```

Page 494

1    the patch, there's pain medication in the

2    patch.  It's a potent opioid called

3    fentanyl.  It's a morphine-like drug.

4    And the medication in the patch then

5    diffuses or goes across the skin.  And

6    then into the bloodstream and then goes

7    around and that medication will go to the

8    nervous system, to the brain, to provide

9    pain control.

10           Q.    And what is fentanyl?

11           A.    Fentanyl is an opioid pain

12    medication.  It's a potent opioid.

13           Q.    And you described -- is

14    this, the fentanyl that's in the patch,

15    the same medication that you described in

16    relation to your anesthesia work?

17           A.    Yes.  So it's a

18    pharmaceutical grade fentanyl.  The work

19    that I did in the operating room would be

20    administering fentanyl intravenously.

21    This is a -- fentanyl that's in the

22    fentanyl patch is pharmaceutical grade

23    fentanyl.  It's prepared according to

24    very -- very precise, very strict ways in

Page 495

1    terms of it -- to be done.  Yes.

2          Q.    Have you heard of illegally

3    manufactured street fentanyl?

4          A.    I have.

5          Q.    Is that the same thing as

6    pharmaceutical grade fentanyl?

7          A.    Those are very different.

8    Those are made typically in an illegal

9    laboratory.  There's really no control

10   about those types of -- that type of

11   fentanyl.  And that fentanyl can be mixed

12   with drugs like heroin.  It's the same

13   type of illegal opioid in a manner

14   similar to heroin.

15         Q.    What are the advantages of

16   the patch delivery or the benefits of the

17   patch delivery system incorporated in

18   Duragesic?

19              MS. CONROY:  Objection.

20              THE WITNESS:  Some of the

21         advantages are you have

22         pharmaceutical grade fentanyl

23         that's in a delivery system that's

24         administered or delivered in a

Page 496

1           very controlled way.

2                So we have a good

3           understanding that the amount of

4           fentanyl would be delivered to a

5           patient over a period of time, and

6           then for careful -- for patients

7           that are carefully selected for

8           appropriate use, the drug

9           certainly has been shown to be

10          safe and effective in that patient

11          population.

12   BY MR. LIFLAND:

13          Q.    Are there other advantages

14   or other benefits for the patient?

15          A.    Yes.  So the patch delivery

16   system allows for fentanyl to be

17   delivered up to 72 hours.  We recognize

18   that's not true for all patients.  For

19   some patients, a small number may require

20   the patch to be changed in less than

21   72 hours, in 48 hours.  And our package

22   insert is already labeled for such.

23          Q.    What are the benefits of a

24   72-hour delivery system?

Page 497

1         A.    So if patients are using

2    other medications, like short-acting

3    opioids, there's a phenomena we see

4    clinically sometimes referred to as clock

5    watching where the patients waiting to

6    get to the end of the dose and they're

7    looking at their clock to see when they

8    can get another dose of the medication.

9    By having a delivery system that provides

10   continuous analgesia, continuous control

11   of the pain for a period of time,

12   patients don't have to be preoccupied

13   thinking about that.  The medication is

14   available for them over that period of

15   time.

16         Q.    Are there other benefits?

17         A.    The other benefits was that

18   there may be -- would be the design

19   itself.  Certainly we know that the

20   controlled delivery system that we were

21   talking about has a certain amount of

22   opioid delivered over a period -- period

23   of time.  And that slow rate of

24   introduction into the nervous system or

Page 498

1    controlled rate into the nervous system

2    may be a benefit insofar as people who

3    would seek to abuse the drug or divert

4    the system or divert it, would be less

5    inclined to use the system because

6    they're more interested in a quick high,

7    quick euphoria by having it injected.

8            Q.    Which patients are

9    appropriate for Duragesic?

10           A.    So Duragesic is appropriate

11   for patients that have chronic pain that

12   can't be treated by other medical

13   products that might be available like an

14   ibuprofen and other types of medications

15   and will require an opioid analgesic for

16   an extended period of time.

17           Q.    And is there a limitation as

18   to the kinds of chronic pain that might

19   be treated?

20           A.    No.  The indication that we

21   have is for chronic pain regardless of

22   the cause, as long as the requirement is

23   that they need an opioid analgesic for an

24   extended period of time, because this is

Page 499

1    a very strong medication.

2         Q.    Should patients be started

3    on Duragesic as a first line pain

4    therapy?

5         A.    No.  So the requirements are

6    that patients need to be opioid tolerant.

7    What that means is that patients need to

8    be on the opioid pain medications and be

9    on a certain amount in order for them to

10   be able to go onto start the Duragesic,

11   working -- using the Duragesic patch.

12        Q.    And you started to speak

13   about ways in which the patch delivery

14   system might affect the attractiveness of

15   the product to people who want to abuse

16   opioids.

17        A.    Yes.

18        Q.    Can you elaborate on that?

19        A.    Yes.  So for people who want

20   to abuse opioid pain medications, the

21   addicts and people who want to abuse it

22   are looking for a quick high.  They want

23   to have a quick onset of the medication

24   to get the euphoria that they're looking

Highly Confidential - Subject to Further Confidentiality Review

Page 500

1    for.

2                By the design of the system,

3    you have a controlled-release of

4    pharmaceutical grade fentanyl that goes

5    in and again takes time to get what's

6    called a steady-state where we have a

7    blood level.  So for people who want

8    to -- again, for the fast high that we've

9    just been talking about, this type of a

10   system would not be desirable -- used

11   typically by putting it on the skin.

12               If these individuals wanted

13   to get to the fentanyl, they would have

14   to go and break -- they would have to

15   break in and get the fentanyl which is

16   mixed with a gel in the Duragesic system.

17               So they would then have

18   fentanyl and be using an uncontrolled

19   amount of fentanyl, which could lead to

20   overdose, respiratory depression, and

21   death.  And it's also as they administer

22   that fentanyl they would also have other

23   products that are in the gel, and those

24   would be mixed with the fentanyl and

Highly Confidential - Subject to Further Confidentiality Review

Page 501

1    there could be problems with that as

2    well.

3              So there were really two --

4    two ways in which the system would not be

5    desirable to people who were addicted to

6    opioid medications or would seek to abuse

7    them.

8         Q.    Is there still a potential

9    for abuse of the product?

10        A.    Yes.  It's a controlled

11   substance, it's a C-II.  And as with

12   other C-IIs, there is a potential for

13   abusing the medication.

14        Q.    And when you started in the

15   2000, 2001 time frame, did Janssen have

16   information about the extent to which the

17   product was being abused in the real

18   world?

19        A.    Yes.  We had

20   pharmacovigilance data that had been

21   going on since the product was approved

22   in the 1990s.  So we certainly had those

23   as ongoing activities as well.

24        Q.    And are you familiar with a

Highly Confidential - Subject to Further Confidentiality Review

Page 502

 1    report by Pinney Associates?

 2             A.    Yes.  So that was a report

 3    that came out about a year later.  It

 4    was -- maybe less.  In 2001.  I had

 5    started in 2000.

 6                   The Pinney report described

 7    the ongoing safety for Duragesic.  And in

 8    fact, noted low rates of abuse and the

 9    product was well tolerated.  But Pinney

10    was aware of the fact that another

11    delivery system for another type of

12    patch, called the matrix patch, was being

13    considered by different companies.  And

14    there was a concern that the matrix patch

15    may have abusability that might be

16    different from the reservoir or Duragesic

17    patch.

18             Q.    Did they have any

19    conclusions as to the reservoir patch?

20             A.    They concluded that the

21    reservoir patch was safe and that there

22    were low mentions of abuse with the

23    reservoir system.

24             Q.    Let me show you an exhibit

Highly Confidential - Subject to Further Confidentiality Review

Page 503

1    that was marked yesterday.  This is also

2    from the early 2000s.  I believe it's

3    Exhibit 9.

4                  And can you tell us again

5    briefly what Exhibit 9 is?

6          A.    So Exhibit 9 is a copy of

7    the summary of an advisory board that we

8    convened in November of 2003.  It was the

9    advisory board -- a key opinion leader

10   advisory board, defining relative abuse

11   liability.

12         Q.    And were you -- were you

13   involved in convening this advisory

14   board?

15         A.    Yes, I was the

16   representative from the company who

17   reached out to Dr. Sacoor and Dr. Nat

18   Katz to put this advisory board together.

19         Q.    And can you explain what was

20   the purpose of convening this advisory

21   board?

22         A.    Yes.  So in the 2003 time

23   frame and even before that, we were

24   concerned about more mentions of abuse

Page 504

1    that was going on in the -- in the media.

2                    We had good information at

3    that time that the Duragesic system was

4    safe, it was effective, and there were

5    low mentions of -- low mentions of abuse

6    that we had seen.  Low abusability.

7                    We were thinking about

8    developing a follow-on product to

9    Duragesic.  And one of the things we

10   wanted to understand is what were the

11   types of studies that would need to be

12   done to really understand how you can

13   characterize the abusability of a

14   specific product.  And we wanted to

15   understand how we could differentiate our

16   product from other types of opioid

17   analgesics where more abuse was -- was at

18   least being reported in the mainstream.

19          Q.    And how did you go about

20   selecting the people for this advisory

21   board.  And maybe begin your answer just

22   by explaining what an advisory board is

23   and how Janssen uses them.

24          A.    Right.  So an advisory board

Page 505

1    is a meeting where a company would invite

2    individuals, experts with certain

3    knowledge that we wanted to learn more

4    about a specific condition.  So in this

5    case we were very, very interested as I

6    mentioned in understanding more about how

7    do we talk about the different

8    liability -- abuse liability for

9    different compounds and how do we -- are

10   able to see -- what type of studies would

11   we need to have to show the FDA and

12   others that our products that we were

13   thinking about developing might be

14   different from other compounds.  And to

15   ensure that we continued to have the same

16   type of safety profile and low

17   abusability that we had seen with the

18   Duragesic system.

19              So we had reached out to

20   Dr. Sacoor to help us, and -- and Dr.

21   Katz to come up and invite the right

22   people, and there was a system that was

23   set up was based on individuals'

24   background, publications, and their

Page 506

1    clinical experience.  We had people from

2    all different areas that could help us

3    begin to understand the types of studies

4    that we would need for abuse liability.

5         Q.    And if you'll turn to

6    Page 5.  Going to Page 7 of the document.

7         A.    Yes.

8         Q.    That -- that would be the

9    Bates numbers that end in 462 through

10   464.

11        A.    Correct.

12        Q.    Is this the list of advisors

13   that were invited as a result of that

14   process?

15        A.    Yes, it is.  We were

16   interested, my request to Dr. Sacoor and

17   Dr. Katz, was to have some of the best

18   minds that we had in the U.S. to

19   basically help us understand the types of

20   studies that we would need.  So these

21   were the individuals, and they came from

22   a variety of different backgrounds.

23             People from former DEA.

24   People with expertise in epidemiology.

Page 507

1    Opioid abuse.  We had people who were

2    clinical trial -- trialists.  People who

3    had experience managing patients with

4    different types of painful conditions.

5         Q.    And I think we might have

6    skipped over.  But who were Dr. Sacoor

7    and Dr. Katz?

8         A.    So Dr. Sacoor runs a

9    company -- ran a company at that time

10   that convened advisory boards.  And

11   Dr. Nathaniel Katz is someone who is a

12   pain specialist and has expertise and

13   interest in this area of abuse as well.

14        Q.    And did the advisory board

15   discuss the -- the data that was

16   available at that time that reflected on

17   the -- the abuse reports on Duragesic and

18   the abuse for Duragesic?

19        A.    Yes.  Yes, they did.  That

20   would have been an important starting

21   point, was to get external confirmation

22   of what we were understanding, not only

23   from the Pinney report that we had talked

24   about in 2001, but to really understand

Page 508

1    what other experts were thinking.

2                   And the conclusion that they

3    had come up with, which was consistent

4    with our findings from our

5    pharmacovigilance data and other sources,

6    was that there were low mentions of abuse

7    of the Duragesic system as a starting

8    point.  And certainly that was in many

9    ways comforting to us because that was

10   our understanding as well.

11         Q.    And if you'll turn to

12   Page 149 of the document.  Bates ending

13   606.  Is that the discussion that you

14   were describing there?

15         A.    Yes, it is.

16         Q.    In the first sentence there

17   it says, "We heard in the discussion over

18   and over again the statement that we know

19   that Duragesic has a lower abuse

20   potential than a lot of other opioids."

21                   And then -- well, is that a

22   statement that you agreed with?

23         A.    Yes, I do.

24         Q.    And then there are

Page 509

1    several -- there's discussion of some of

2    the indicators for that?

3              A.    Yes.

4              Q.    One is DAWN data.  Can you

5    explain what that is?

6              A.    Yes.  So in response to how

7    do we know that, there were several

8    indicators.  As you mentioned first was

9    the DAWN data.

10              When we do a request for

11    specific forms of fentanyl abuse in DAWN,

12    it -- if it was very, very low in the mid

13    1990s, it began to creep up at the end of

14    the '90s.  And in 2001 data it showed

15    that approximately half of the fentanyl

16    mentions were Duragesic.  But the actual

17    totals were still very small.  And when

18    you compare that with any of the other

19    opioids it just doesn't even belong in

20    the same pattern.

21              So there's one indicator.

22    The second --

23              Q.    Let me -- before you get to

24    the second one.  The statement that half

Page 510

1    of the fentanyl mentioned in DAWN was

2    Duragesic, does that indicate that the

3    other half of the fentanyl mentions are

4    something else?

5         A.    Yes, it could be from

6    illegal fentanyl, or if there were other

7    formulations of fentanyl as well.

8         Q.    Okay.  And the second

9    indicator?

10        A.    The second indicator would

11   be the NFLIS which shows extremely low

12   figures suggesting that there's little or

13   no secondary market on the street with

14   this material of any sort.  We don't have

15   it differentiated into Duragesic versus

16   other products.

17        Q.    And is the third indicator

18   mentioned?

19        A.    Yes.  The third indicator

20   would be the toxic exposure surveillance

21   system which tracks over two million

22   exposures to toxic substances every year

23   in 39 states and 3 territories, and picks

24   up 99.8 percent of the population in the

Highly Confidential - Subject to Further Confidentiality Review

Page 511

1    U.S.

2         Q.    And is this conclusion

3    consistent with what the company saw in

4    its routine pharmacovigilance data?

5         A.    Yes, it is.

6         Q.    And can you explain what

7    that pharmacovigilance data is?

8         A.    So the pharmacovigilance

9    data is data that would be analyzed by

10   our pharmacovigilance group, the people

11   with expertise in understanding

12   information, safety information that came

13   in.  And they would analyze information

14   coming in for Duragesic, looking at

15   adverse events such as abuse, misuse,

16   addiction, et cetera.

17             And when those type of

18   analysis were done by these experts at

19   the company, they found -- their findings

20   were consistent with what's reported

21   here.

22        Q.    Now, you mentioned that one

23   of the purposes of this Ad Board was to

24   discuss studies that might be important

Page 512

1    or appropriate to do around a new

2    generation product that Janssen was

3    considering.

4           A.    Yes, that's correct.

5           Q.    Can you explain what that

6    product was?

7           A.    Yes.  So the follow-on

8    product that we were considering for the

9    Duragesic system was a matrix-type

10   system.

11              We were mindful of the

12   Pinney report in 2001, that Pinney had

13   raised concerns.  But have indicated that

14   they were comfortable about the safety

15   profile and the low rates of abuse of the

16   Duragesic system.  But the 2001 report

17   did raise concerns about a matrix-type

18   system, which is another type of patch.

19   It's an adhesive with this pharmaceutical

20   grade fentanyl embedded in the adhesive.

21              So Janssen was -- was

22   mindful of the Pinney report and

23   developed a follow -- was thinking about

24   developing a follow-on product.  The

Highly Confidential - Subject to Further Confidentiality Review

Page 513

1    follow-on product was called AP-48.  And

2    it had a matrix-type system that I just

3    described, but it also contained a

4    medication called -- which was an opioid

5    antagonist called naltrexone.

6                   The way an opioid antagonist

7    works is it blocks the effect of the

8    opioid.  The AP-48 system was set up such

9    that if you didn't tamper with the system

10   and just -- the design was just to put it

11   on the skin for a person with pain, they

12   would not be exposed to the naltrexone.

13   They would just receive the fentanyl.

14   But then we ran into some --

15            Q.    What was the naltrexone

16   there for?

17            A.    It was there so if someone

18   sought to abuse or divert the product and

19   when they tampered with it the naltrexone

20   would mix with the fentanyl and negate

21   the effects of the opioid analgesic.  So

22   it was designed to ensure that the

23   product would not be tampered with by

24   people who seek to do that.

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1          Q.    And was the company able to

2    bring that product to market, the AP-48

3    product?

4          A.    No, unfortunately not.

5    There were some technical issues related

6    to it.  We found that there was a small

7    amount of naltrexone that was leaking

8    into the -- was found its way into the

9    bloodstream to the test patients.  And

10   the company then abandoned the idea of

11   going forward with that system.

12         Q.    And did that affect the need

13   to do the study proposals that were

14   discussed in this report?

15         A.    Yes, quite a lot.  Because a

16   lot of the studies, as I mentioned

17   earlier, were designed to understand what

18   types of studies would need to be done to

19   differentiate that and to understand the

20   abuse liability of a follow-on system for

21   Duragesic.  So once we saw that we were

22   not able to develop this, then a lot of

23   studies would not -- would not need to be

24   done basically.

Page 515

1          Q.    Did the company go forward

2     with any studies or activities around the

3     question of abuse after this report that

4     we discussed here?

5          A.    Yes, we did.

6          Q.    And can you describe that?

7          A.    Yes.  So there were two

8     studies that were done that came out

9     directly from the advisory board designed

10    to provide more information to us to

11    differentiate the Duragesic system from

12    this matrix system that we've been

13    discussing.

14              One study was a likability

15    study that was done by Inflexxion.  And

16    the likability study was designed to

17    understand how people who would tend to

18    abuse opioids would like different types

19    of pain systems.  So various opioid

20    medications were there, including the

21    Duragesic system and a matrix system.

22    And addicts were asked which type of --

23    which type of opioids did they prefer,

24    which ones did they like.

Page 516

1              Both patch systems rated

2    very low.  The Duragesic system was the

3    lowest of all the medications that were

4    studied, and the medications were studied

5    which were common opioid pain

6    medications.

7              The matrix system was a

8    little bit higher than that, but again

9    both tend to be low on the spectrum.

10             The second study we looked

11   at is the ease of which fentanyl could be

12   removed from both the matrix -- a matrix

13   system and from the Duragesic patch.  And

14   that demonstrated that there was a

15   difference between those two delivery

16   systems, the Duragesic and the matrix

17   system, again, both being fentanyl

18   delivery systems by patch.

19             And so we had this

20   additional data that we wanted to

21   understand that there looked like there

22   may be a difference between the Duragesic

23   reservoir system and the matrix system

24   with respect to abusability.

Page 517

```
1          Q.    Did you provide the results
2    of these studies to the FDA?
3          A.    Yes, we did.  So these two
4    studies were shared as part of a
5    Citizen's Petition which was shared with
6    the FDA.
7          Q.    And in the area of
8    monitoring, were there any changes that
9    were made with regard to that as a result
10   of this Ad Board?
11         A.    Yes.  So as a result of the
12   Ad Board it was clear that we wanted to
13   begin to step up and do additional
14   monitoring.  So in the 2004 time range or
15   thereabouts, and the years are -- I don't
16   want to be held specifically to the
17   years, but thereabouts, we began to
18   institute certain pilot programs to
19   understand how we could monitor for
20   abuse, in addition to continuing the
21   types of pharmacovigilance data that we
22   had been doing since the product launch.
23               These were what I had
24   referred to earlier as the acute
```

Page 518

```
1   surveillance, we call -- the active

2   surveillance programs.  I had looked at a

3   number of pilot programs, working with

4   groups like Bensinger Dupont.  And

5   knowledgeable individuals to develop

6   types of programs.

7          Q.    And you had mentioned that

8   the company had a concern about the

9   matrix patch as compared to the reservoir

10  patch.

11         A.    Yes.

12         Q.    And that information

13  provided -- had been provided to the FDA.

14              Did the FDA approve the

15  introduction of matrix patches in the

16  United States?

17         A.    Yes, they did.  We were

18  concerned from the -- some of the

19  studies -- based on some of the studies

20  that we talked about that having these

21  types of patches, which would have more

22  fentanyl in them than the Duragesic

23  system would be coming to the U.S.

24  market.
```

Page 519

1                   We communicated that to FDA.

2     FDA approved those products and

3     instituted -- had a surveillance program,

4     a risk management plan that would be

5     asked for the extended-release opioid

6     analgesics.

7           Q.    And did there come a time

8     when Janssen introduced its own matrix

9     patch to replace the reservoir patch?

10          A.    Yes, there was.

11          Q.    And can you explain how that

12    came about?

13          A.    Right.  So what -- Janssen

14    did introduce a matrix patch.  The patch

15    was introduced in 2008.

16                The -- part of -- some of

17    the reasons why the patch was introduced

18    is we were having manufacturing

19    difficulties with the Duragesic system,

20    the reservoir system.  And in order to

21    fix the problem, the matrix patch would

22    be the best way to do that, rather than

23    try and work on fixing the reservoir

24    system.

Page 520

1          So we felt at that time that

2   we had enough information about the abuse

3   of a matrix patch that we felt

4   comfortable introducing it into the U.S.

5   in 2008.

6          Q.   Did the company have data at

7   that time to look at that it didn't have

8   before?

9          A.   Yes.  So we had RADARS data.

10  We became a scriber to RADARS in 2006.

11  And we had been working with them since

12  that time.  We actually had asked RADARS,

13  because the generic matrix systems had

14  come on the market around 2005 or

15  thereabouts, to see if they could provide

16  information to distinguish our Duragesic

17  transdermal system from the matrix

18  system.

19          We certainly looked at those

20  type of data.  We tend to go back to look

21  at our pharmacovigilance data.  And we

22  also had the information that was

23  available for real world use of the

24  generic matrix patches and all of that

Page 521

1    data when we look at it taken together,

2    suggested that there tended to still be

3    low rates of abuse.  And we felt

4    comfortable at that point introducing a

5    matrix system at that time.

6              Of course the understanding

7    was that we would continue to do our

8    pharmacovigilance work in addition to

9    doing the types of active surveillance

10   programs that we had put in place for

11   Duragesic.

12        Q.   Let me -- let's talk a

13   little bit more about those active

14   surveillance programs.  I would like to

15   start, I think, with the document that

16   was marked this morning as Exhibit 12.

17   This is a PowerPoint presentation dated

18   May 9, 2005 entitled "Risk Management

19   Plan For Our Products."

20        A.   Yes.

21        Q.   Do you recognize this

22   document?

23        A.   I do.

24        Q.   And this is a document that

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1    you were involved in the preparation?

2          A.    Yes.

3          Q.    And generally it describes

4    what?

5          A.    So this was a risk

6    management strategy that we had in place

7    and Janssen had set in motion, a risk

8    management plan that we would -- we would

9    use.  And this plan was put in place

10   really as an outcome of some of the work

11   that we had been talking about, the

12   advisory board and some of the other data

13   that we had to look at, prior to being

14   required by the FDA to do such program.

15         Q.    But the FDA had requested

16   this?

17         A.    The FDA later on had

18   requested a risk management program and

19   the types of work that we were looking in

20   here was ultimately folded in that

21   program, yes.

22         Q.    So let me -- bear with me

23   one moment until I find the right page.

24   Let's turn to Page 11.

Highly Confidential - Subject to Further Confidentiality Review

Page 523

1                   I'm going to focus now on

2      the surveillance pieces of this.

3             A.    Yes.

4             Q.    This is a flowchart that

5      generally describes how the plan works?

6             A.    Correct.

7             Q.    And under surveillance there

8      are two kinds of surveillance.  The first

9      is -- well, let's talk passive

10     surveillance first.  What does that refer

11     to?

12            A.    So the passive surveillance

13     were the type of activities, some of

14     which would be conducted by the

15     pharmacovigilance group at Janssen, and

16     they would be analyzing how adverse

17     events that we -- might be coming into

18     the company either through healthcare

19     providers calling in or customer --

20     consumers calling in.

21            Q.    And the active surveillance?

22            A.    Passive surveillance.

23            Q.    And what about active

24     surveillance?

Page 524

1          A.     Active surveillance was --

2    would be data that would be coming in

3    from programs such as RADARS and later on

4    Inflexxion.

5          Q.    And then there's a flowchart

6    that shows, "How this gets reviewed."

7          A.    Yes.

8          Q.    And there's a reference to

9    an internal advisory board.  What was

10   that?

11         A.    Yes, so the internal

12   advisory board was made -- was comprised

13   of individuals from our senior management

14   group which would be for the various

15   functions that would be initially taken

16   in by the risk management team.  So for

17   example, if there was somebody from

18   regulatory affairs on the risk management

19   team, an internal advisory board member

20   might be a VP level position in

21   regulatory affairs.  So these were senior

22   leaders in the company who were

23   responsible for, again, as part of the

24   activities related to the product.

Page 525

1          Q.    And then there is a

2    reference to an external advisory board?

3          A.    Yes.

4          Q.    What's that?

5          A.    Yes.

6          Q.    And can you explain what

7    that was?

8          A.    Yes.  So when I set this

9    program up initially, the risk management

10   team again were the individuals

11   responsible day-to-day for caring for --

12   ensure that the products would be used

13   safely and effectively, providing that

14   type of information.

15         Q.    So I guess we skipped that

16   step.  That's the risk management team?

17         A.    Right.

18         Q.    That's the group that puts

19   all this together when it's collected?

20         A.    Precisely.  Those would be

21   the people who would get the initial

22   information coming in that we would have,

23   both -- from the various functions that

24   they have.  And they would look at it and

Page 526

1   decide if there were any types of signals

2   or anything that may be concerning that

3   showed that there may be issues related

4   to abuse or -- with a compound.

5        Q.    And they give it to the

6   internal advisory board as you just

7   described and --

8        A.    That's correct.

9        Q.    -- the external advisory

10  board.  So you were describing what the

11  external advisory board does?

12       A.    Yes.  So the external -- it

13  became clear that we wanted to have

14  individuals outside the company who could

15  help us to begin to look at those types

16  of activities and to kind of guide us

17  with that.  So the external advisory

18  board was created for individuals outside

19  the company who -- who had brought with

20  background a variety of different types

21  of expertise.

22            We -- as I had mentioned

23  this morning, one individual, someone who

24  was well knowledgeable with FDA

Page 527

1   procedures, well knowledgeable with

2   labeling and could help us with those

3   types of activities.  And I identified

4   Cynthia -- Dr. Cynthia McCormick, who

5   formally headed up anesthetics and

6   critical care.  And I had commented this

7   morning that that's not the complete name

8   of that group, but that is the group that

9   she headed up at FDA.

10              We also had somebody who was

11  former DEA and the person there was, as

12  I'd mentioned, this morning was Mr. Frank

13  Sapienza.  I wanted to make sure we had

14  a -- someone who was a pain specialist on

15  there, who was in current clinical

16  practice and could provide input to us

17  about not only our own opioids but trends

18  that might be going on in the market,

19  that we may have to come, to make sure we

20  have the best, most up-to-date

21  information.

22              And Dr. James Otis who's up

23  in Boston is a pain specialist, who was a

24  member of the external advisory board.

Page 528

1              I -- I had also mentioned

2    that with active surveillance, the

3    methodology was relatively new, the

4    passive surveillance looking at adverse

5    events by groups like our

6    pharmacovigilance group, those were

7    well-established techniques.  For active

8    surveillance, there was more information

9    that might be needed.  So we had someone

10   with expertise in signal detection

11   methodology who could help us comment and

12   provide a framework on what we were

13   looking at, and Dr. Stemhagen had that

14   role.

15              And I also wanted to have a

16   bioethicist who could help us with -- to

17   make sure that we were on the right track

18   and our decisions were kind of checked

19   with someone outside the company to make

20   sure that we felt that we were doing the

21   right thing for our patients.

22        Q.   And what was the process for

23   them making decision, you've got these

24   two boards who got the information?

Page 529

1          A.    So the information would

2    come in and initially be reviewed by the

3    risk management team.  And that team was

4    comprised of people from a variety of

5    different functions.  There was somebody

6    from medical affairs, myself was on that.

7    We had someone from regulatory.  And from

8    a number of different functions in the

9    company who would have had those

10   responsibilities.

11              They would be reviewing

12   data, it may be pharmacovigilance data or

13   RADARS data.  And decide whether we

14   thought that there was some type of a --

15   if there was a signal that we would then

16   decide that that would need be shared

17   with the internal advisory group, as well

18   as the external advisory board group.

19          Q.    And from that process would

20   come recommendations for action if

21   needed?

22          A.    Yes, that's correct.

23          Q.    And was this information --

24   well, let me ask you.  How -- how often

Page 530

1    did the advisory boards meet?

2         A.    So the internal -- my

3    recollection was the internal advisory

4    board, I think we had scheduled was a

5    quarterly meeting on a regular basis.

6    But -- but those -- then we could convene

7    ad hoc meetings, if there was something

8    serious that came up.

9               So we had constant

10   surveillance.  If the RMT had noticed

11   something, then we could convene an

12   internal advisory board at any time.  But

13   they would -- also the plan was to have

14   scheduled advisory boards, for updates to

15   a quarterly basis.

16              To the external advisory

17   board, I met with them, I think

18   quarterly.

19        Q.    And was this information

20   also provided to the Food and Drug

21   Administration, the -- the results of

22   this risk management surveillance?

23              MS. CONROY:  Objection.

24              THE WITNESS:  So the RADARS

Page 531

```
1              data, and the Inflexxion data,

2              were provided to the FDA and

3              updates on reports, yeah, so that

4              information was provided to them.

5              And the pharmacovigilance data

6              that would be looked at would be

7              part of the annual safety updates,

8              and other types of reports that

9              would be sent to FDA, you know,

10             per policy.

11  BY MR. LIFLAND:

12             Q.    Let me ask you to turn to --

13  I had it a minute ago.  Okay.  Page 10.

14  There's a reference here to the

15  independent external advisory board, the

16  structure was built on the learnings from

17  Ultram, Ultracet, Duragesic, Concerta

18  models.  Can you explain that, please?

19             A.    Yes.  So Janssen had worked

20  to create an advisory board.  The -- it

21  was -- for -- for tapentadol -- for

22  tramadol, sorry, the independent steering

23  committee.  And that was built working

24  with individuals with an expertise around
```

Page 532

1    abuse and those methodologies were

2    actually developed along with these --

3    these individuals by Janssen for

4    monitoring tramadol.

5              So the Ultram and Ultracet,

6    that type of information, we had learned

7    what are the types of methodologies that

8    would be available.

9              The Duragesic, we had

10   information from groups like Pinney

11   Associates and others and had really

12   reached out to work with them to gain

13   knowledge from external experts in the

14   area of abuse to kick off with that.

15             And from Concerta, which was

16   another medication, groups like Bensinger

17   Dupont had provided information to them

18   as well.  So we reached out to the very

19   best people that we had with expertise in

20   abuse in the U.S. to provide that type of

21   information.  And so the idea of an

22   external advisory board providing that

23   type of information to the company was

24   one built on some behalf of some of our

Page 533

1    other products.

2          Q.    Let me ask you to turn to

3    Page 25.  Exhibit 12.

4                This is a slide which gives

5    more detail on the surveillance divided

6    into the passive and the active.

7                And passive starts with

8    MedWatch?

9          A.    Yes.

10         Q.    Can you explain what that

11   is?

12         A.    So the MedWatch forms would

13   be forms that health care providers could

14   send in, or consumers could use to

15   provide information on adverse events for

16   our products.  This is the information as

17   I mentioned earlier that would be some of

18   the work that would be analyzed by our

19   pharmacovigilance group.

20               They, and other individuals

21   in the company also looked at other types

22   of information including governmental

23   databases, DAWN, which looked at people

24   presenting to an emergency room,

Page 534

1    potentially with drug overdose.  And

2    tests and other systems as well.  So

3    those were some of the -- that was some

4    of the information used for passive

5    surveillance.  And again I discussed, as

6    I discussed earlier today, passive

7    surveillance was information coming into

8    the company.  But looking here is another

9    example of databases that we went out to

10   look at.

11              Active surveillance was

12   really more going out and getting

13   information from a number of different

14   sources.

15        Q.    Do you know what these --

16   what these three programs were that are

17   identified here?

18        A.    For active surveillance?

19        Q.    Yes.

20        A.    Yes.  So -- so these were

21   for survey information individuals which

22   we described as on the ground, key

23   informant or sentinel networks.  So these

24   would be -- key informant would be some

Page 535

1    of the programs for example, that we

2    would hear about from individuals who

3    worked with people who abused and

4    diverted these products and what they

5    were hearing about the products, or other

6    types of information.  This may have come

7    early on and from, again, people like the

8    Bensinger Dupont program and some of the

9    other programs as well.  Former DEA or

10   other people who were knowledgeable about

11   abuse and the various products that were

12   out there.

13            We had also set up two

14   individual programs.  I wanted to make

15   sure that any information that was coming

16   in from the media, which may, or not

17   necessarily have been picked up from our

18   passive surveillance systems, we would

19   become aware of as soon as it was

20   available.  So we had individuals

21   searching the media looking for any

22   mentions of our product, for Duragesic.

23                In addition, we felt that

24   internet monitoring would be another

Page 536

1    place that we could begin to see how

2    addicts or people who are abusing

3    products might be discussing how they do

4    that.  And that type of monitoring would

5    not be part of a passive surveillance

6    program.  So this is really extending our

7    surveillance methodology to places that

8    we were not before to get a more robust

9    picture of how our products could

10   potentially be abused.

11        Q.    And who did the internet

12   monitoring?

13        A.    So the internet monitoring

14   was conducted by Pinney Associates.  We

15   had reached out to them to do that.

16        Q.    And when you mentioned

17   earlier that you had started putting in

18   place these programs after the 2003 Ad

19   Board, is this what you were talking

20   about?

21        A.    Yes.  That's correct.  Yes.

22        Q.    Now, I'd like to ask you to

23   turn to Slide 30.  And there is a

24   reference here to a word on RADARS.  Can

Highly Confidential - Subject to Further Confidentiality Review

Page 537

1    you explain what RADARS was and why we

2    were talking about it at this point?

3         A.    Yes.  So RADARS is -- was

4    set up to monitor for abuse and diversion

5    of OxyContin initially.

6              The -- and as I had

7    mentioned, the -- the scientists and

8    people who participated in RADARS who

9    collected information around abuse were

10   individuals, scientists who had worked on

11   the independent steering committee for

12   tramadol and had developed those

13   methodologies and expertise and brought

14   those to bear in the RADARS system.  We

15   were -- became very interested in RADARS

16   when we learned that RADARS which had

17   been done -- was set up by Purdue, was

18   now being -- going to be made available

19   through Denver Health and that other

20   pharmaceutical companies could

21   participate in the RADARS program.

22              And because we had expertise

23   and knowledge on the methodology, as I

24   indicated, this was something -- this was

Page 538

1    a program that we wanted to -- RADARS

2    was, you know, could quantify some of

3    these types of analysis.  We were very

4    interested more so than some of the

5    descriptive analysis in the earlier

6    program.  So this was something that --

7    that we were interested in.

8              I made the note here that

9    RADARS is not a risk management program.

10   It's something that provides information

11   to us and -- to us.  And the last point

12   says it's a surveillance tool, part of

13   the data risk management program that

14   would be used.

15             So the company would have a

16   better understanding of what RADARS --

17   the type of information RADARS would be

18   providing for us.

19        Q.    Did the company eventually

20   go forward with incorporating RADARS into

21   the Duragesic surveillance?

22        A.    Yes.  As a matter of fact,

23   that was done as soon as we had the -- as

24   soon as we were able to join RADARS, we

Page 539

1  did and then the Duragesic system was

2  rolled into that.  Subsequently also

3  rolled tramadol into that, and then

4  tapentadol after that.

5            MR. LIFLAND:  It's now

6            12:09.  Would you folks like to

7            take a break for lunch?

8            MS. CONROY:  It's totally up

9            to you.  Whatever you want to do.

10           MR. LIFLAND:  Why don't we

11           do that.

12           THE VIDEOGRAPHER:  The time

13           is 12:11 p.m.  We are going off

14           the record.

15           (Lunch break.)

16           THE VIDEOGRAPHER:  The time

17           is 1:17 p.m., and we are back on

18           the record.

19  BY MR. LIFLAND:

20      Q.    Good afternoon,

21  Dr. Vorsanger.

22      A.    Good afternoon.

23      Q.    I've placed before you what

24  I have marked as Exhibit Number 14.

Page 540

1              (Document marked for

2              identification as Exhibit

3              Janssen-Vorsanger-14.)

4              MR. LIFLAND:  And the Bates

5              number is JAN-MS-02305132.  And

6              it's -- that's a cover sheet for a

7              natively provided file which is a

8              PowerPoint entitled Duragesic Risk

9              Management Overview, April 20,

10             2007.

11   BY MR. LIFLAND:

12             Q.    Do you recognize this

13   document?

14             A.    Yes, I do.

15             Q.    And is it a description of

16   the risk management plan that we were

17   just discussing as it was being

18   implemented in 2007?

19             A.    Yes.

20             Q.    And we've already gone over,

21   I think, the various elements that are

22   described in here.  But I wanted to focus

23   on what we left off with, which was the

24   incorporation of the RADARS system into

Highly Confidential - Subject to Further Confidentiality Review

Page 541

1    the plan.

2           A.    Right.

3           Q.    And if you'll turn to

4    page -- unfortunately it doesn't have

5    pages.  But if you flip to, it looks like

6    it's about seven pages from the end, and

7    you'll see there's a slide that says,

8    "Active surveillance."

9           A.    With the three bullets on

10   it?

11          Q.    Yes.

12          A.    Okay.

13          Q.    Okay.  The first of those is

14   RADARS, correct?

15          A.    Yes.

16          Q.    And you said that that was a

17   surveillance resource that the company

18   incorporated into the plan when it became

19   available from Denver Health; is that

20   correct?

21          A.    That's correct.

22          Q.    And if you'll turn -- that

23   was around what time, what year?

24          A.    Around 2006.

Page 542

1          Q.    And I think as we saw in the

2    earlier slide deck, RADARS had been

3    maintained earlier as a proprietary

4    service that was operated by Purdue?

5          A.    Yes.

6          Q.    When you incorporated RADARS

7    into the system, did you -- did you

8    purchase the earlier data that RADARS had

9    collected?

10          A.    Yes.  When we started doing

11    surveillance with RADARS for Duragesic I

12    was interested in finding out what

13    information, what was available, around

14    the fentanyl products that were done

15    prior to us starting our subscription.

16    So we did have information that we did

17    purchase from them.

18          Q.    And if you'll take a look at

19    the next few slides.  Well, let's start

20    with the next slide actually.  The one

21    that says, "Active surveillance RADARS."

22          A.    Yes.

23          Q.    Let me make an attempt here

24    to put it on the screen.

Highly Confidential - Subject to Further Confidentiality Review

Page 543

1              This lists the various

2      elements of the RADARS system.  Can you

3      give a brief explanation of what those

4      are?

5              A.    So the key informant network

6      was a network I believe that was

7      developed by Dr. Ted Cicero.  And these

8      were individuals who worked with people

9      who abused products and they were gaining

10     information about specific products in

11     the form of a survey questionnaire.  And

12     those were -- those data were brought in

13     and analyzed as part of one of the

14     components of the RADARS system.

15              The second one was a law

16     enforcement network run by Dr. Inciardi.

17     And I believe this was information

18     collected from individuals working in law

19     enforcement capacities from what they may

20     have heard about drug seizures, heard

21     other -- in areas where law enforcement

22     became aware of different types of opioid

23     analgesics and other medications that may

24     have been gotten involved because of

Highly Confidential - Subject to Further Confidentiality Review

Page 544

1    illegal-type activities.

2              The AATOD, the American

3    Association For Treatment of Opioid

4    Dependence looked at individuals coming

5    in, I believe, on methadone maintenance,

6    and having an understanding of those

7    types -- of that type of activity and

8    what are the -- what are the medications

9    that those individuals may have been

10   using and abusing, and the poison control

11   network was part of the U.S. poison

12   control network.

13        Q.   All right.  If you can turn

14   to the next few slides.

15        A.   By the way, we have one more

16   that was -- that may have been added

17   later, which is the college survey.

18   College survey.

19        Q.   Can you explain what that

20   is?

21        A.   The college survey, I think,

22   looked at the use of medications by

23   college students, not for whom the drugs

24   were prescribed.  So for recreational

Page 545

1    use.

2         Q.    If you could turn to the

3    next few slides.  Do these slides depict

4    the information that you purchased as the

5    earlier RADARS data from the period prior

6    to 2006?

7         A.    Yes.  These are -- these are

8    data coming from the different networks

9    that we just discussed.

10        Q.    All right.  Let me put the

11   first one up on the screen.  This is key

12   informant data.  Can you describe here

13   where fentanyl shows up on this?

14        A.    Yes.  So on this slide,

15   fentanyl is the green line which you can

16   see at the bottom, and captures fentanyl

17   cases.  And this would be Duragesic as

18   well as other forms of fentanyl,

19   including illegal fentanyl.  And you can

20   see from the time frame of the first

21   quarter of 2002 through the first quarter

22   of 2005, for this period of time, again

23   it is predating our time joining the

24   RADARS system.  So these are RADARS data

Page 546

1    indicating again the average number of

2    cases of drugs and responding information

3    for this time frame.

4          Q.    Let's look at the next

5    slide, which is the law enforcement

6    network data from RADARS --

7          A.    Yep.

8          Q.    -- for 2002 through 2004.

9    Can you explain what you see there?

10         A.    Yes.  So here again, as we

11   look at it, fentanyl is the green line,

12   which you can see.  And there's some

13   variation that you can see if you look at

14   1Q '02, a little -- a little blip up and

15   then down, and generally a fairly stable

16   pattern which is very similar to what we

17   had seen on the previous slide.

18         Q.    And again does this include

19   all forms of fentanyl?

20         A.    Yes.  Same as what we had

21   mentioned before.  It would be all forms

22   of fentanyl including Duragesic, other

23   forms of fentanyl, and illicit fentanyl.

24         Q.    Let's take a look at the

Page 547

1    next slide, which is what you called the

2    AATOD?

3          A.    Yes.

4          Q.    And I can't remember what

5    that stands for.  Maybe you can explain

6    what the slide shows.

7          A.    The AATOD was the American

8    Association for the Treatment of Opioid

9    Dependence.  And these would be

10   individuals presenting to methadone

11   maintenance.  And you can see the AATOD

12   report, "Drug most commonly abused in

13   prior month prior at admission to

14   methadone maintenance program."  N is one

15   thousand.  And you can see that -- the

16   green once again is fentanyl.  And to

17   clarify, that would be different forms of

18   fentanyl that would be included in that.

19         Q.    And it's the -- one of the

20   lower ones on the chart?

21              MS. CONROY:  Objection.

22              THE WITNESS:  Yes.

23         Buprenorphine is the lowest.

24         Palladone above is that, and

Page 548

1              fentanyl would be the third.

2     BY MR. LIFLAND:

3         Q.    Turning a couple pages

4     forward to -- well, let's look at the

5     poison control data slide, which is a

6     little further forward.

7         A.    Yes.

8         Q.    Keep going I think.  Well,

9     let me -- the one with the map of the

10    United States, let's take a look at that,

11    please.

12        A.    Okay.

13        Q.    What does this show?

14        A.    This says, "The 38 poison

15    control centers serving over 200 million

16    people are currently enrolling or in

17    paperwork stage."  Is that the slide that

18    you're referring to?

19        Q.    Yeah.

20        A.    All right.  So one of the

21    things that we like very much about

22    RADARS is that for the poison control

23    information, we can get information down

24    to a three digit zip code.  So I was

Page 549

1   talking about -- earlier this morning

2   about quantification and being able to

3   identify areas where we may witness

4   abuse.  And this shows a map of the

5   United States covering the centers at

6   that time.

7          Q.    And if you turn to the next

8   slide, at the chart of poison control

9   data.

10         A.    Yes.

11         Q.    Can you explain what we see

12  there?

13         A.    Right.  These are

14  intentional exposure rated by quarter for

15  all sites combined.  And then looking at

16  it for the first quarter of '03 to the

17  second quarter of '05.  And there are

18  some footnotes about what originally the

19  number of sites, et cetera, and

20  describing what they mean by some of

21  these compounds.

22               The fentanyl mentions here

23  are in the green line as we discussed.

24  And again, what you can see, following

Page 550

1    along is a stable pattern.

2           Q.    And where do they -- where

3    do they show in relationship to the

4    others?

5           A.    So if you look at the green

6    line on this, this is the third from the

7    bottom.  The other ones would be

8    hydromorphone, which below that, and on

9    the line would be hydrocodone.

10          Q.    Future --

11          A.    And there's -- by the way,

12   it's important when you talk about --

13   these are rates per 100,000 population,

14   which you have on the -- under the axis.

15          Q.    And what's the importance of

16   that?

17          A.    To know what the number of

18   people that we're talking about, per

19   population, for the denominator.

20          Q.    And if you could turn, I

21   think, two slides down.  There's a slide

22   that's entitled "How Well Does the J&J

23   RMP Work?"

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 551

1        Q.    "The fentanyl-tainted heroin

2    story."  Do you remember that?

3        A.    Yes, I do.

4        Q.    Can you explain.

5        A.    Yes.  I had received a call

6    from RADARS indicating that there were

7    mentions of fentanyl abuse in some of the

8    major cities in the United States.  And

9    one of the questions that we -- and the

10   report says, is we indicated that heroin

11   addicts were dying of heroin containing

12   fentanyl in 2006.

13              We were concerned about the

14   fact, was this fentanyl coming from our

15   Duragesic patches?

16              Our media monitoring

17   program, which I described, and poison

18   control, detected the signal at the

19   initial outbreak, when they first

20   became -- this information first became

21   available to us.

22              The company dispatched a

23   former DEA -- an individual who worked at

24   DEA to investigate it on our behalf and

Page 552

1    could ascertain that the fentanyl was

2    shown to be obtained from a clandestine

3    lab in Mexico and was illegal fentanyl.

4    And that fentanyl was prepared, as I

5    mentioned earlier, and was different from

6    the fentanyl in the Duragesic patch,

7    different from the pharmaceutical grade

8    fentanyl.

9                So they were able to

10   distinguish two types of fentanyl.  This

11   illegal fentanyl on the street was not

12   from the Duragesic patch.  And this is a

13   really good example of how our active

14   surveillance was able to inform us of a

15   problem, again, rather than waiting to

16   hear about this later on and maybe

17   picking it up through other

18   methodologies.

19                MR. LIFLAND:  I'm going to

20        mark the next exhibit.

21                (Document marked for

22        identification as Exhibit

23        Janssen-Vorsanger-15.)

24

Page 553

1    BY MR. LIFLAND:

2         Q.    Dr. Vorsanger, I've marked

3    as Exhibit 15, a document which is

4    Bates-stamped JAN-MS-00151777 and

5    attached is a natively provided copy of a

6    document entitled "Duragesic (Fentanyl

7    Transdermal System) Fourth Risk

8    Management Plan Progress Report."

9              And I don't think we need to

10   spend a lot of time on this, because

11   we've already spoken about most of the

12   aspects of the risk management plan.  But

13   just when you had mentioned that the

14   information was provided to the FDA, do

15   you recognize what this is?

16        A.    I'm sorry.  I didn't hear

17   the last.

18        Q.    Do you recognize the

19   document?

20        A.    Yes, I do.

21        Q.    Can you tell us what it is?

22        A.    So this is -- as you

23   describe it, this is a plan describing

24   the fourth risk management plan progress

Page 554

1    report, and it would contain information

2    from all the elements of the plan

3    including information coming from our

4    passive surveillance programs that we

5    talked about, our active surveillance

6    programs and other elements of the risk

7    management plan as well.

8              Q.    And if you look on the

9    second page -- I'm sorry.  It would be

10   the first page of the actual document.

11   It lists the various people from the

12   company who are listed as authors of the

13   report.

14             A.    Yes, that's correct.

15             Q.    Do you see that?

16             A.    Yes.

17             Q.    And can you quickly run down

18   what the functions are of those people?

19             A.    Yes.  So Dr. Gooch was a --

20   is a pharmacovigilance scientist.

21   Dr. Kwong, I believe, was a physician

22   working in the pharmacovigilance group.

23   Dr. Naim, I believe, was also working in

24   that.  And Dr. Woods was a risk

Page 555

1    management fellow.  Dr. Moskovitz was the

2    person to whom I reported into.  He's a

3    physician.  Michael Kaufman is director

4    of regulatory affairs.  Myself.  Michael

5    Levitt was a compliance manager in the

6    global pharmaceutical supply group.  And

7    Scott Trembley was a product director at

8    -- in marketing at Ortho-McNeil for

9    Duragesic.

10        Q.    And this was a group that

11   was responsible for various different

12   elements that made up the totality of the

13   plan?

14        A.    Yes, that's correct.

15        Q.    And were reports in this

16   format sent periodically to the FDA?

17        A.    Yes, they were.  These were,

18   per the FDA, a process in terms of when

19   they wanted to receive this type of

20   information from pharmaceutical

21   companies.

22        Q.    And let me just ask you to

23   turn to Page 32 which describes some

24   information that's drawn from the IMS

Page 556

1    Health database.

2            A.    Yes.

3            Q.    Does this refresh your

4    memory on how this information was

5    incorporated into the risk management

6    plan?

7            A.    Right.  So this was a review

8    of IMS Health data.  A company called RTI

9    Health Solutions was retained by J&J to

10   access the IMS Health data -- LRx

11   database which was the database that

12   contained this information, and provide

13   information of different types of

14   information.

15               If you look at the

16   methodology it discusses how it was done.

17   That the -- this LRx database captures

18   approximately half of all retail

19   transactions in the U.S. and represents

20   data assembled from a variety of

21   different sources including chain and

22   independent retail pharmacies, mass

23   merchants, grocers, and system vendors.

24   The captive data are captured over 150

Page 557

1   million unique patients and approximately

2   a million subscribers and looked at the

3   different types of information, study

4   population so you can see as you go down.

5              And these provided some

6   demographics in terms of how the products

7   were used, who would be prescribing it,

8   the recipients of the products, et

9   cetera.

10             The study population

11  described patients in the IMS LRx

12  database were included in the current

13  dataset for analysis if they were

14  dispensed a prescription narcotic

15  analgesic.  And if they didn't have it

16  during the time period they weren't

17  included.

18             And it then talks a little

19  bit then about the variables of interest.

20  And there's a summary of results, talking

21  about that as well.

22        Q.   Now, the purpose of this

23  whole plan was what?

24        A.   To provide information

Page 558

```
1    around how our product is used, to
2    capture information from the various
3    elements of our risk management program
4    to ensure safe -- and our products were
5    used safely -- safely and effectively.
6         Q.    And to the best of your
7    knowledge, what did the company see in
8    terms of safety signals over the years
9    that the company tracked this information
10   using this risk management plan?
11        A.    To the best of my
12   recollection, we observed low mentions of
13   abuse for Duragesic during the time that
14   we -- as we were tracking it.
15        Q.    We're done with it.
16        A.    Okay.
17        Q.    Yesterday you were asked
18   some questions on the topic of iatrogenic
19   addiction and what information did the
20   company have on that subject.
21        A.    Yes.
22        Q.    Do you remember that?
23             MR. LIFLAND:  I'm going to
24        mark as Exhibit 16, a report
```

Page 559

1          entitled Cumulative Review of the

2          Iatrogenic Addiction Associated

3          With the Use of Transdermal

4          Duragesic Fentanyl Patch.  It's

5          dated September 6, 2006.  It is

6          Bates Number JAN-MS-02754767

7          through 783.

8               (Document marked for

9          identification as Exhibit

10          Janssen-Vorsanger-16.)

11  BY MR. LIFLAND:

12          Q.   Dr. Moskovitz --

13  Dr. Moskovitz.

14               Dr. Vorsanger, can you tell

15  me what this document is?

16          A.   I'm sorry?

17          Q.   Can you explain what this

18  document is?

19          A.   Yes.  So the company had

20  been asked by the FDA to, on April 26th

21  of 2006, to provide comments -- FDA

22  provided comments to the company

23  regarding a proposal, we talked about a

24  risk minimizations plan.  And one of the

Page 560

1    recommendations that had been made by the

2    FDA was to revise the company core data

3    sheet to reflect current data and -- and

4    medical understanding of iatrogenic

5    addiction.

6              So in beginning to do that,

7    the company went back and looked at the

8    mentions of addiction that we had in our

9    databases to see whether the information

10   reflected in the company core data sheet

11   was accurate.

12             And in doing so, we looked

13   at, on Table 1, if you look at the

14   fentanyl patches exposure from the time

15   of launch to 2005.  So this was data,

16   again, from the time the product was

17   first introduced into the U.S.

18   marketplace until June 2005.  And when

19   they had information from -- both from

20   the fentanyl matrix patch, and that would

21   have been used in Europe at the time, and

22   the fentanyl reservoir patch that we've

23   been speaking about.

24             If you look at the total

Highly Confidential - Subject to Further Confidentiality Review

Page 561

1    number of patient days from which these
2    data are derived, it's one million six
3    hundred and eleven -- sorry,
4    1,611,158,440 patients days.  And if you
5    look at the number of mentions of
6    addiction that came up, the number was --
7    a review had indicated 103 cases that
8    were reported of drug dependence
9    associated with chronic use of
10   transdermal fentanyl patches.
11             Again, that number may be
12   underreported, but still it's a
13   relatively low number.
14             So the numerator being 103,
15   and as I already indicated that number
16   could be -- could be higher, because of
17   the underreporting which I just commented
18   on.  But the denominator would be quite
19   large.  Again, the 1 billion 611 thousand
20   plus patient days.  And we concluded with
21   that, that that would be a number that
22   was quite low, and therefore, the
23   statement about it being rare was
24   supported by our analysis of our own

Highly Confidential - Subject to Further Confidentiality Review

Page 562

1   data.

2              MR. LIFLAND:  Let me mark as

3         the next exhibits, two articles

4         that I believe you mentioned

5         yesterday on this topic.

6              (Document marked for

7         identification as Exhibit

8         Janssen-Vorsanger-17.)

9              (Document marked for

10        identification as Exhibit

11        Janssen-Vorsanger-18.)

12             MR. LIFLAND:  I'll mark as

13        Exhibit 17 an article by Fishbain

14        entitled What Percentage of

15        Chronic Nonmalignant Pain Patients

16        Exposed to Chronic Opioid

17        Analgesic Therapy Developed

18        Abuse/Addiction And/Or Aberrant

19        Drug-Related Behaviors:  A

20        Structured Evidence-Based Review.

21             And at the same time let me

22        mark as Exhibit 18 a Cochrane

23        Library document from the Cochrane

24        Library Database of Systematic

Page 563

1          Reviews, entitled Long-Term Opioid

2          Management For Chronic Noncancer

3          Pain (Review).

4     BY MR. LIFLAND:

5          Q.     Dr. Vorsanger, are these the

6     two articles that you mentioned yesterday

7     in your testimony addressing the question

8     of incidence of addiction in pain

9     patients prescribed --

10          A.     Yes, they are.

11          Q.     -- opioid therapy?

12          A.     Yes, they are.

13          Q.     And can you, starting with

14     the Fishbain article, just describe

15     generally, and it can be at a high level,

16     we can all read the articles.

17              But just generally what the

18     authors did for their analysis --

19          A.     Sure.

20          Q.     -- and what their conclusion

21     was.

22              MS. CONROY:  Objection.

23              THE WITNESS:  So I wanted to

24          clarify, I had said yesterday I

Page 564

1           didn't have the article in front

2           of me, the date that I had given,

3           I want to correct now, it's

4           actually 2008.  I may have

5           mentioned it as 2010, so we can --

6           we can correct that now, given

7           that the article is here.

8               But this is an article

9           that -- it was a review article.

10          And what the authors did was to

11          collect the very best information

12          that they can on what the

13          published literature was at the

14          time.

15              Again, defining the

16          different types of studies that

17          they were interested in looking

18          at, abuse addiction, aberrant

19          drug-related behavior, and people

20          with chronic pain patients who

21          were being treated with chronic

22          opioid analgesia therapy.

23              And they talk about

24          specifically the criteria that

Page 565

```
1        they use and which studies were
2        included or not included,
3        depending on the types of analysis
4        that they wanted to do.  And
5        studies may have either been used
6        or not used depending on the
7        number of subjects and whether
8        they were relevant or not.
9             And in this first article,
10       if you look at the results, again
11       this is the Fishbain article I'm
12       looking at.  The reports that they
13       had talked about a quality score,
14       and they go in to talk about how
15       they calculated the quality score.
16       The quality score is greater than
17       65 percent.  And for the abuse
18       addiction grouping there were 24
19       studies, well over 2500 patients,
20       with chronic -- chronic pain
21       patients.  And -- and they
22       calculated -- exposed for a
23       calculated abuse addiction rate of
24       approximately 3.25 percent.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 566

1                    The second study was a study

2           that was purported -- in -- it was

3           reported in the Cochrane Database

4           of Systematic Reviews from the

5           Cochrane Library.

6                    Just by way of background,

7           the Cochrane Library, this is a

8           very prestigious group and tends

9           to do very careful analysis on the

10          type of studies that -- that they

11          have done.

12                   The title of this was

13          Long-Term Opioid Management For

14          Chronic Noncancer Pain.

15                   This was also a review

16          article.  I mentioned the senior

17          author -- the last author is

18          Dr. Chou.  This is the article

19          that I was talking about.  And

20          this article, again, was published

21          in 2010.  So I think that date may

22          have been incorrect from what I

23          had said.

24                   This was a review article, a

Page 567

1          compilation of what the best

2          information they had at the time.

3          They had certain criterias on how

4          they looked at different types of

5          evidence, whether they were

6          randomized controlled clinical

7          trial, other types of evidence,

8          and went through and talked about

9          it.

10              And the main result, they

11         said they reviewed 26 studies with

12         27 treatment groups, for a total

13         of 4,893 participants.  They talk

14         about the different types of

15         opioid analgesics they had and the

16         types of analysis that they had

17         done looking at it.

18              Their conclusion here was,

19         they said, "Signs of opioid

20         addiction were reported in

21         0.27 percent of participants in

22         the studies that reported that

23         outcome."

24              So not every study did, but

Page 568

1          did those where they were looking

2          at it.

3               "All three modes of

4          administration were associated

5          with clinically significant

6          reductions in pain."

7               And then goes on to talk a

8          little bit about the analgesia and

9          some other things as well.

10              The authors' conclusion, and

11         I'd like to actually go down to

12         the one with the plain language

13         summary.  I think that might be

14         helpful for us.

15              And this is a quote from the

16         article.  "The findings of this

17         systematic review suggest that

18         proper management of a type of

19         strong pain killer, opioids, in

20         well-selected patients with no

21         history of substance addiction or

22         abuse can lead to long-term pain

23         benefit for some patients with a

24         very small, although not zero,

Page 569

```
1          risk of developing addiction,

2          abuse or other serious side

3          effects."  And they talk about,

4          "However, the evidence supporting

5          this conclusion is weak.  And

6          long-term studies are needed to

7          identify the patients who are most

8          likely to benefit from treatment."

9               And I want to make sure that

10         we're clear that weak doesn't mean

11         bad.  Weak talks about levels of

12         evidence.  And certain types of

13         studies have stronger levels of

14         evidence than other.

15              But the other types, even

16         the studies that may have

17         potentially been described here

18         with the term "weak," may be

19         clinically quite informative and

20         would be of interest to the people

21         who care for patients who are --

22         who are prescribing these types of

23         medications.

24              MR. LIFLAND:  Let me mark as
```

Page 570

```
1           the next exhibit, which will be 18

2           (sic).  This is a copy of the

3           current labeling for Duragesic.

4               (Document marked for

5           identification as Exhibit

6           Janssen-Vorsanger-19.)

7               MR. LIFLAND:  I think this

8           is again straight from the website

9           of the FDA.  So I'll get the Bates

10          number, but it's the current

11          labeling.

12              I'm sorry, 19.

13  BY MR. LIFLAND:

14          Q.   Yesterday, Doctor, you were

15  asked some questions about the term

16  "pseudoaddiction."  You mentioned the

17  concept is embodied in the current class

18  labeling --

19          A.   Yes.

20          Q.   -- for Schedule II opioid

21  pain relievers in the drug and dependence

22  section.  I wanted to point you to that

23  section and just ask you to explain that

24  a little bit more specifically.  Page 31
```

Page 571

1    is where that section starts.

2         A.    So on Section 9 of the

3    product package insert, drug abuse and

4    drug dependence, under Section 9.2, there

5    is a discussion about drug-seeking

6    behavior.  And goes onto talk about,

7    "Drug-seeking behavior is very common in

8    persons with substance use disorders.

9    Drug-seeking tactics include," and they

10   go on to discuss what those might look

11   like.

12             The doctor shopping, which

13   they go on to talk about, "Visiting

14   multiple prescribers to obtain additional

15   prescriptions is common among drug users

16   and people suffering from untreated

17   addiction.

18             "Preoccupation with

19   achieving adequate pain relief can be

20   appropriate behavior in a patient with

21   poor pain control."

22             So while there's discussion

23   about the types of drug-seeking behavior,

24   some of which may be aberrant

Page 572

1   drug-seeking behavior, the package insert

2   goes on to talk about what I had just

3   described, that sometimes preoccupation

4   when looking for this type of pain relief

5   can be appropriate for patients with

6   inadequate analgesia or poor pain

7   control.

8              And this would be an example

9   of the description of behavior described

10  under the term "pseudoaddiction."

11      Q.    Let me switch gears now and

12  move on to tapentadol, which is the

13  second Schedule II product that you

14  indicated you worked on at Janssen.

15             The brand name for

16  tapentadol is Nucynta, in the case of the

17  immediate-release version, correct?

18      A.    Yes.

19      Q.    And Nucynta ER, in the case

20  of the extended-release version?

21      A.    Correct.

22      Q.    And maybe to be -- we can

23  try to keep it straight by referring to

24  the immediate release as Nucynta IR,

Page 573

1  we'll try to keep it straight as best we

2  can.

3        A.    So we'll use that for our

4  shorthand today, but the correct name for

5  immediate release is Nucynta, as you

6  indicated.

7        Q.    So what were your

8  responsibilities for Nucynta?

9        A.    So I was initially

10  responsible for the immediate release

11  formulation.  And I was involved in

12  postapproval information related to the

13  product.  So I interacted with healthcare

14  providers and others to understand the

15  type of information that they would need

16  to help ensure that our product was used

17  safe and as prescribed.

18              And, again, working

19  specifically with individuals, looking at

20  the types of data they had, as I

21  mentioned, and deciding what clinical

22  studies might be needed.  These might be

23  controlled clinical trials.  In addition

24  working with the outcomes research group

Page 574

1   as we talked about for the type of real

2   world evidence that that group can

3   provide to prescribers requiring or

4   requesting this type of information,

5   working with our epidemiology group for

6   similar types of requests for

7   information, our regulatory affairs

8   group, and with our medical information

9   group to ensure that the information that

10  we have would be scientifically

11  up-to-date.

12             In addition, I continued the

13  work that I had done for Duragesic with

14  my acute surveillance programs.  So we

15  started monitoring for abuse of Nucynta

16  IR, Nucynta, before the product actually

17  came on the market.

18             I was interested in

19  understanding what I would say would be a

20  baseline levels of abuse in the

21  marketplace, before we were introducing

22  an immediate release opioid.

23             So we collected that data,

24  and RADARS provided that information, and

Page 575

1   when the immediate release formulation

2   became available and was in the U.S.

3   marketplace, we would have that data.  We

4   can track it longitudinally.

5           Q.    Okay.  What is Nucynta?

6           A.    Nucynta is a centrally

7   acting opioid analgesic.  It is an opioid

8   analgesic.  It's a controlled substance.

9   It has -- it's -- although the exact

10  mechanism is unknown, from the

11  preclinical studies it's believed to have

12  two mechanisms of action, an opioid

13  effect like the other opioids that we had

14  been speaking about.  In addition to that

15  it has a second mechanism which is

16  norepinephrine reuptake inhibition.  And

17  it's believed that both those mechanisms

18  contribute to the pain control properties

19  for Nucynta.

20          Q.    And what did the company

21  believe were the potential -- was the

22  potential significance of the dual

23  mechanism of action?

24                MS. CONROY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 576

1            THE WITNESS:  So the

2            hypothesis was because of the dual

3            mechanism, that there -- and that

4            there may have been less -- not as

5            strong an opioid analgesic as

6            other opioid analgesics, such as

7            morphine or other compounds, that

8            we -- the hypothesis is we might

9            expect to see less abuse and

10            potentially less euphoria from

11            the -- again, that would certainly

12            need to be tested.

13  BY MR. LIFLAND:

14       Q.    And did you receive

15  information after the product was

16  marketed that informed that question?

17            MS. CONROY:  Objection.

18            THE WITNESS:  Yes.  So we --

19            after the immediate release

20            formulation was available, again,

21            in the U.S. for a short period of

22            time, we became aware of reports

23            from the sales force that

24            healthcare providers who were

Page 577

```
1          treating patients who had

2          previously been treated with

3          Oxycodone or other opioids when

4          they were switched to Nucynta,

5          patients initially felt that the

6          drug wasn't working, they weren't

7          getting an analgesic effect,

8          although the drugs were being used

9          as prescribed, as defined, as

10         discussed in the product package

11         insert.

12              So I had said to them, do we

13         know whether they -- when they had

14         made this complaint or concern

15         about the inadequate analgesia,

16         had they actually measured levels

17         of pain before and after using the

18         medication?

19              We went back and in fact

20         they had.  So they were able to

21         report a reduction in pain

22         intensity, which is a measure

23         showing analgesia control, that

24         patients were getting some kind of
```

Page 578

```
 1          analgesic benefit.  But the

 2          patients were not experiencing

 3          euphoria that they may have

 4          perceived on some other opioids.

 5               So this was anecdotal

 6          information.  But it was

 7          interesting at least in the

 8          beginning that, again, using the

 9          drug as prescribed, presumably,

10          that we were getting these

11          reports.

12   BY MR. LIFLAND:

13          Q.    Now, Nucynta was a new

14   molecule, correct?

15          A.    Yes.

16          Q.    And what was the form of

17   administration?

18          A.    It was an oral medication.

19          Q.    So it's a pill?

20          A.    It's a pill, yes.

21          Q.    And what were the

22   indications for the product?

23          A.    So the immediate release was

24   used for acute pain, where other form --
```

Page 579

1    and would be appropriate -- and with the

2    appropriate use, again, where other forms

3    to treat a person's pain -- and I'm

4    paraphrasing from the product label --

5    where other forms of pain relief would

6    not -- would not be adequate and patients

7    would be appropriate, again, for opioid

8    analgesic.

9                The extended-release, again

10    paraphrasing from the label, was that for

11    individuals for whom lesser methods of

12    pain control were not working in patients

13    where it would be appropriate for opioid

14    analgesics to be used for an extended

15    period of time.

16         Q.    Do you remember the years in

17    which the products were introduced?

18         A.    I believe that the immediate

19    release form of tapentadol, Nucynta, was

20    introduced to the U.S. market in 2009 and

21    the extended-release was introduced in

22    2011.

23         Q.    And were there additional

24    steps relating to abuse or safety taken

Page 580

1    with respect to the release of the

2    extended-release indication?

3         A.    Yes.  So from the time the

4    company was planning to introduce the

5    extended-release formulation, there was

6    an intent that that formulation would

7    contain a coating that would have abuse

8    deterrent properties.  Understanding that

9    we were introducing a long-acting opioid

10   into the marketplace, we wanted to try

11   and have that -- that needed to be a

12   requirement to have that available.

13        Q.    And was the product released

14   with such a coating?

15        A.    The product was released

16   with this coating, yes.

17        Q.    And did the company do

18   testing related to that?

19        A.    Yes, it did.  The -- there

20   was testing that was done by Grünenthal

21   and some of their scientists to see the

22   abusability of this -- of this abuse --

23   this coating that may have

24   abuse-deterrent properties.  And there

Highly Confidential - Subject to Further Confidentiality Review

Page 581

1   were a number of studies that attempted

2   to take this -- the pill and smash it

3   with a hammer, and when doing so, it --

4   it compressed into a format that

5   really -- where the drug could not be

6   easily extracted.

7                    There were studies used with

8   something like a Waring blender, a

9   blender, and when the -- a product was

10  put in, the blender blades were broken.

11                   So this was resistant to the

12  typical types of abuse methodologies that

13  people -- addicts or people who sought to

14  abuse, might try with this type of drug.

15  And it could not be broken down without

16  dental damage.  So it was not something

17  that they could bite down to -- to do

18  that as well.

19                   MR. LIFLAND:  I'm going to

20           mark as Exhibit 20 an article

21           entitled Evaluation of the Tamper

22           Resistant Properties of Tapentadol

23           Extended-Release Tablets:  Results

24           of in Vitro Laboratory Analyses.

Page 582

```
 1              (Document marked for

 2         identification as Exhibit

 3         Janssen-Vorsanger-20.)

 4    BY MR. LIFLAND:

 5         Q.    Have you seen this article

 6    before, Doctor?

 7         A.    Yes, I have.

 8         Q.    In fact, you are listed as

 9    an author on the article; is that

10    correct?

11         A.    Yes, that's correct.

12         Q.    And can you explain what it

13    is?

14         A.    So there was an attempt to

15    do various analysis in the laboratory to

16    understand using, as I had mentioned

17    previously, the types of methods that

18    people who wanted to get opioid for abuse

19    or -- purposes of, you know, for abuse,

20    might do this.

21              And so they tried to crush

22    the tablets as we talked about.  They --

23    to try to -- the -- and as I said, they

24    used two metal spoons.  Minimal
```

Page 583

1    deformation, they'll pulverize and break

2    it with a pill crusher.

3              Slight deformation,

4    deformation with the standardized

5    Pharmacopeia, breaking forces and other

6    types of tests that went on as well.

7              Intact tablets were also

8    completely resistant to extraction in

9    most organic solvents tested.  In eight

10   solvents the amount of drug extracted

11   increased with time.  Hammer tablets were

12   less resistant to extraction but required

13   vigorous shaking over extended periods of

14   time to release greater than half of the

15   active ingredients.

16             So again, these were a

17   number of different ways tested in the

18   laboratory.  And the conclusion that we

19   had was in vitro results from tamper --

20   tampering attempts presented here and

21   demonstrated that tapentadol ER tablets

22   were resistant to these forms of physical

23   manipulation.  Tapentadol ER tablets were

24   also generally resistant to dissolution

Page 584

1    in most solvents.  Developing tamper

2    resistant formulations is an important

3    step in strategies to mitigate opioid

4    abuse.

5         Q.    And these data were

6    published in, what's the name of the

7    journal?

8         A.    Yes, this is a peer-reviewed

9    journal.  The Journal of Opioid

10   Management.  These were published in June

11   of 2014.

12        Q.    Are you familiar with the

13   term "REMS"?

14        A.    Yes.

15        Q.    What does that stand for?

16        A.    I believe it's risk

17   evaluation and mitigation strategy.

18        Q.    And was there a REMS

19   associated with Nucynta extended-release?

20        A.    Yes.  When -- at the time

21   around when the product was going to be

22   approved, the FDA had asked the company

23   and then we had instituted a REMS for the

24   extended-release.

Highly Confidential - Subject to Further Confidentiality Review

Page 585

1              (Document marked for

2              identification as Exhibit

3              Janssen-Vorsanger-21.)

4              MR. LIFLAND:  I'm going to

5              mark as Exhibit 21 a copy of a

6              document Bates stamped

7              JAN-MS-01489228 through, excuse

8              me, 274, entitled Risk Evaluation

9              and Mitigation Strategy REMS For

10             NDA 2003533 Nucynta ER Tapentadol

11             Tablets, dated August 25, 2011.

12     BY MR. LIFLAND:

13             Q.    Do you recognize this

14     document, Dr. Vorsanger?

15             A.    Yes, I do.

16             Q.    And can you explain what it

17     is?

18             A.    So this is the REMS for the

19     Nucynta ER tablets.  We talked about them

20     being oral analgesic.  It describes the

21     goal of the REMS, the REMS elements, the

22     medication guide, the elements to ensure

23     safe use.

24                   And then how that would be

Highly Confidential - Subject to Further Confidentiality Review

Page 586

1    implemented in the timetable for

2    submission of assessments.  And the

3    requirements again are the type of

4    document.  It goes on to talk a little

5    bit about a medication guide for patients

6    in the next section.

7              So that prescribers,

8    healthcare professionals can communicate

9    what Nucynta ER is, to discuss whether

10   this might be the right drug for them,

11   and talk about their -- talk about their

12   medical conditions and talk about what

13   medications they should not be taking

14   with Nucynta ER, such as a monoamine

15   oxidase inhibitor, MAOI, et cetera.

16              And swallow it whole.  We

17   talked about the why that would be.  It

18   talks about some of the more common side

19   effects that you can expect.  And

20   certain -- talking about here, it's

21   specifically talking a little bit about

22   constipation and talking to your doctor.

23              The idea is, talking to your

24   doctor about your medical conditions and

Page 587

1    work with them to ensure that you're

2    using their product safely.

3         Q.    So that's the Patient

4    Medication Guide --

5         A.    Yes.

6         Q.    -- and you described that's

7    one element of the REMS.

8         A.    Yes.

9         Q.    What are the other elements

10   of the REMS?

11        A.    So another one talks about

12   a -- a healthcare provider letter that

13   talks about, which we have follows that,

14   and talks about how to use safe and

15   effective use of the product.

16        Q.    And let me direct -- when

17   you say a healthcare provider letter,

18   what's that?

19        A.    So these would be -- these

20   are individuals who would be prescribing

21   the medication for patients.

22        Q.    And this would be a letter

23   that would be sent by the company to

24   those prescribers?

Page 588

1          A.     That's correct, yes.

2          Q.     And does it indicate here

3    what's included with that letter?

4          A.     I'm sorry?

5          Q.     Can you tell me what's

6    included with that letter according to

7    this?

8          A.     Right.

9          Q.     Take a look at the second

10   page I think.

11         A.     So it talks -- so the

12   information again talks about the goals

13   of the REMS.  It talks about how -- the

14   reviews, how it's contraindicated, it's

15   not intended.  In addition, what would be

16   included in that would be full

17   prescribing information, again to talk

18   about safe and effective use of it.

19              It goes on to talk about the

20   sections on safe administration on

21   Page 18.

22         Q.     Take a look at the bottom of

23   2 and 3.  Does that describe what's

24   included in the initial mailing?

Page 589

1          A.     I'm sorry.

2          Q.     The bottom of Page 2, going

3     onto Page 3.

4          A.     Yes.  So the mailings will

5     include the following, as I started to

6     describe, a copy of the full prescribing

7     information.  The ER medication guide, we

8     talked a little bit about that.  The

9     prescribing information.  A guide for

10    healthcare professionals on how to use

11    the product, and a Nucynta ER education

12    confirmation form.

13         Q.     Okay.  Well, let's just take

14    those one by one.  The prescribing

15    information, is that the same thing as

16    the package insert?

17         A.     Yes.

18         Q.     And that would be the FDA

19    approved labeling --

20         A.     Yes.

21         Q.     -- for the product?

22         A.     Correct.

23         Q.     And then the medication

24    guide was what you just described a few

Page 590

1    moments ago?

2         A.    That's correct.

3         Q.    That's information for

4    patients?

5         A.    Yes.

6         Q.    And then the third thing is

7    Prescribing Nucynta ER Healthcare

8    Professional Education Program, a Guide

9    For Healthcare Professionals Who Intend

10   to Prescribe Nucynta ER.  And that's, I

11   believe if you want to look at it,

12   there's a copy of that that's included as

13   Appendix 3 to this.  Appendix 2 is the

14   healthcare letters.  Appendix 3.

15              And maybe you could explain

16   what -- what that is and what's the

17   intention of that.

18        A.    So this was an intent to

19   provide important information and would

20   supplement, and be in addition to the

21   product package insert for healthcare

22   providers on how to use -- again, how to

23   use the product safe and effectively.

24              It talks about the black box

Page 591

1   warning for the product; you see on

2   Page 22.  Has an -- and then you see a

3   table of contents on Page 24.  General

4   opioid uses, risks, and risk factors.  It

5   talks about Section 3, Nucynta ER risks

6   and proper patient selection, dosing

7   administration and patient counseling.

8            So this is a nice summary, a

9   guide, an easy quick go-to bit of

10  information for healthcare professionals

11  who would be prescribing this medication

12  for their patients.

13       Q.    And the focus here is on the

14  benefit risk information?

15       A.    Correct.  I'm talking about

16  the benefits of the product as well as

17  the risks of the product.

18       Q.    What about the last piece,

19  Appendix 4?

20       A.    Appendix 4 is an educational

21  Nucynta ER education confirmation form.

22  And after a healthcare provider has gone

23  through and has read the REMS, they have

24  an option of sending this information in,

Page 592

1    that they confirm that they had actually

2    completed it.  And it says, "The purpose

3    of this form is to inform you we have

4    read the REMS educational materials in

5    Nucynta ER, understand the major risks

6    associated with Nucynta ER, and know how

7    to appropriately educate patients to whom

8    Nucynta ER is prescribed."

9              And these -- this would be

10   information about the prescriber, their

11   DEA number, their affiliation, et cetera.

12   And this could be sent to the company for

13   us to understand how people are using the

14   REMS information we send.

15             We provide free educational

16   material around the REMS as well.  So we

17   provided a variety of different

18   educational venues to fit in to be able

19   to learn about the REMS.

20        Q.    Now, going back to the cover

21   page of the exhibit.  This indicates that

22   the REMS is specifically for Nucynta ER;

23   is that correct?

24        A.    Yes.

Page 593

1           Q.    And how long did that remain
2     in effect?
3           A.    This was in effect until the
4     classwide REMS was introduced.
5           Q.    What's the classwide REMS?
6           A.    The classwide REMS was a
7     REMS that the FDA put in place for all
8     the extended-release opioids so that
9     there was a commonality in terms of
10    identifying the risks for prescribers and
11    the other types of information that they
12    would need.
13                So this was a
14    product-specific REMS, which was placed
15    by REMS that would be used classwide.
16          Q.    Now, this REMS, as you just
17    described it, covers the educational
18    elements --
19          A.    Yes.
20          Q.    -- of risk management.
21                Were there further programs
22    the company implemented with regard to
23    this surveillance side that you had
24    mentioned earlier?

Page 594

1          A.    Yes.

2          Q.    Can you describe those?

3          A.    So when Nucynta was getting

4    ready -- we were -- when this product was

5    going to be marketed we decided that we

6    wanted additional support above and

7    beyond what we had been doing.  We had

8    the RADARS programs running for

9    Duragesic.  We talked about that.  We

10   wanted to add programs for Nucynta so we

11   had contracted with Inflexxion to bring

12   on some of those programs as well.

13              (Document marked for

14         identification as Exhibit

15         Janssen-Vorsanger-22.)

16              MR. LIFLAND:  I will mark as

17         the next Exhibit 22 a document

18         entitled "Nucynta Tapentadol

19         Extended-Release Fourth Safety

20         Surveillance Progress Report."

21         It's dated December 2013.

22   BY MR. LIFLAND:

23         Q.    Can you explain what this

24   document is, Dr. Vorsanger?

Page 595

1          A.    Yes.  So this is for Nucynta

2     ER.  The fourth safety surveillance

3     progress report, dated, as we had

4     mentioned, the 2nd of December 2013.

5          Q.    This would be an example of

6     a report to the FDA of the surveillance

7     data collected for tapentadol?

8          A.    Correct.

9          Q.    And if we look at the table

10    of contents starting on Page 8.

11         A.    It describes the elements

12    that would be part of the surveillance

13    plan that we have in place.

14         Q.    And those are -- those

15    parallel pretty closely to what we've

16    already talked about was in place or

17    still was in place for Duragesic,

18    correct?

19         A.    Yes.  That's correct.

20         Q.    So there would be the

21    passive surveillance activities, the

22    company's database of adverse event

23    reports, the FDA's database of adverse

24    events reports --

Page 596

1          A.    Yes.  So --

2          Q.    -- the RADARS, and then in

3    the active there would be the RADARS

4    system, that starts on page --

5          A.    Correct.

6          Q.    -- it looks like 68 of the

7    table of contents.

8          A.    Yes.

9          Q.    So those are -- are those

10   the same programs that you described

11   previously --

12         A.    Yes, they are.

13         Q.    -- for Duragesic.  You

14   mentioned there was something new, the

15   college survey program.  Is that 78?

16         A.    That's on Page 77 and 78,

17   and we discussed this --

18         Q.    Can you describe what that

19   is?

20         A.    Yes.  So the programs that I

21   had already described we talked about.

22   The college survey program was an intent

23   to expand our activities for surveillance

24   and to try and understand abuse in

Page 597

```
1    various groups.  So here was another

2    group where there might have been a lot

3    of experimentation.  And we wanted to

4    understand to see whether our products

5    would be ones that would of interest to

6    college students.

7              So RADARS has another

8    network, called the -- again, the college

9    survey program.  And we were able to

10   subscribe and provide data -- get data

11   around our drug for the college survey

12   program.

13        Q.    And if we go down further,

14   the table of contents, there's a

15   reference to what you just mentioned,

16   which was the NAVIPPRO systems programs.

17   Can you describe what those were?

18        A.    Yes.

19        Q.    And if you want to refer to

20   it, they start, it looks like, on Page 80

21   of the report.

22        A.    Yeah.  So we mentioned, and

23   it's described here as part of external

24   product-specific surveillance activities
```

Page 598

1    involving external databases.  And this

2    is NAVIPPRO, which we were talking about.

3    And these were reports coming in from

4    Inflexxion, which was running the system.

5    One was from the ASIMV, Addiction Survey

6    Indexed Multi-Media Version.  This was a

7    computerized version of the addiction

8    severity index.  We talked a little bit

9    about that I believe yesterday.  And

10   provided information for people coming in

11   for opioid treatment.

12             There was also a program

13   called the teen chat, which talked about

14   potential abuse in a teenage group,

15   because the data that we had before from

16   RADARS didn't specifically address the

17   teenage population.  So by adding this

18   dataset, we were getting more information

19   about our products, where -- the

20   teenagers who might be potentially

21   abusing our product as well.

22             We also had Inflexxion, and

23   we talked -- and the data for that, for

24   ER, are here.

Highly Confidential - Subject to Further Confidentiality Review

Page 599

1                We also had Inflexxion take

2     over our internet monitoring, web-based

3     monitoring and get us a quantification of

4     the number of mentions of abuse of our

5     product as discussed amongst people on

6     the internet who might be abusing our

7     products.

8                So this was a nice

9     additional monitoring on top of the other

10    active surveillance monitoring that we

11    had in place.

12        Q.    And do you recall the

13    overall results of the surveillance that

14    were -- was conducted under this program

15    for both the immediate release and the

16    extended-release versions of Nucynta?

17        A.    Yes.  To the best of my

18    recollection, when we look at the data in

19    its totality, which would be the RADARS

20    data, all of the Inflexxion data, the

21    internet monitoring that was going on

22    that we talked about, our

23    pharmacovigilance data, all of that

24    suggested low mentions of abuse for

Highly Confidential - Subject to Further Confidentiality Review

Page 600

1   tapentadol.

2         Q.    And did you work with the

3   people at RADARS and Inflexxion to

4   publish that data?

5         A.    Yes.  There's a publication

6   that I have, and it's entitled something

7   like -- I'm paraphrasing on the title,

8   31 months of RADARS data or thereabouts

9   for the immediate release form of

10  Nucynta.

11        Q.    And did you work with the

12  proprietors of RADARS on those

13  publications?

14        A.    Yes.

15        Q.    Can you describe how that

16  works?

17        A.    So RADARS had done the

18  analysis.  And we thought it was

19  appropriate for them, if they had agreed,

20  that publications would be a valuable

21  activity.  This was a new opioid, and it

22  would be of interest in the scientific

23  community -- we agreed with it -- to

24  publish this type of data.

Page 601

1              But they had full authorship

2    control.  We just made sure that the

3    information around Nucynta was accurate

4    and fair balanced, but the information

5    and the conclusions based on the RADARS

6    data was under the control of the RADARS

7    authors.

8         Q.    And what were those

9    conclusions?

10        A.    Their -- what were -- I'm

11   sorry.

12        Q.    What were those conclusions?

13        A.    The conclusions were that in

14   the 30 or 31 months that it had been

15   monitored, rates of abuse were low, but

16   very importantly that ongoing monitoring

17   should continue.

18        Q.    And did the company do that?

19        A.    Yes, we are.  So we are

20   continuing -- well, I'm not at the

21   company anymore, but those programs, as

22   far as I know, are still in place and

23   continued well after that publication.

24              We believe that ongoing

Highly Confidential - Subject to Further Confidentiality Review

Page 602

1    monitoring is vital to -- to ensure that

2    we understand the abuse of the product.

3                MR. LIFLAND:  I have no

4           further questions.  Do you want to

5           take a break?

6                MS. CONROY:  Yeah, just five

7           minutes.

8                MR. LIFLAND:  Okay.

9                THE VIDEOGRAPHER:  The time

10          is 2:19 p.m.  We are going off the

11          record.

12               (Short break.)

13               THE VIDEOGRAPHER:  The time

14          is 2:31 p.m.  We are back on the

15          record.

16               MS. CONROY:  Just for the

17          record, I know that we have an

18          outstanding request for

19          Dr. Vorsanger's personnel records.

20          And I understand that it's going

21          to be taken up by the court.  I

22          just want to put that on the

23          record, that we don't have that

24          personnel file for...

Highly Confidential - Subject to Further Confidentiality Review

Page 603

```
 1            MR. LIFLAND:  I'm happy to
 2       meet and confer about that.  And I
 3       think we should before we take it
 4       up with the court, but let's -- I
 5       understand the request.
 6            MS. CONROY:  I didn't mean
 7       that we would avoid a meet and
 8       confer.  I think it's already in
 9       the works.
10            MR. LIFLAND:  Yeah.
11            -  -  -
12            EXAMINATION
13            -  -  -
14   BY MS. CONROY:
15       Q.   Dr. Vorsanger, where would I
16   find the media reviews and the internet
17   monitoring reports that are referenced as
18   a part of the risk management team
19   documents?
20       A.   Those would have been
21   reports that would be submitted to
22   Janssen, and so they would be at Janssen.
23       Q.   Would they have been
24   something that you would have seen when
```

Page 604

1    they were submitted to Janssen?

2         A.    Yes.

3         Q.    Would there be a particular

4    department or file, how would I find

5    those documents?

6         A.    Well, I worked in the

7    medical affairs department, in the -- the

8    U.S. medical affairs department in the

9    analgesia group.  I'm not sure exactly

10   how they were filed at that point, but

11   that's -- we were the people who were

12   looking at that type of information.

13        Q.    Okay.  So they would be --

14   so the risk management team documents

15   would be in the medical affairs

16   department documents?

17        A.    Presumably.  I had not gone

18   back to look at them.  But we convened

19   those meetings and some of them we had

20   minutes on.  And your question, which was

21   about the internet monitoring and the

22   media monitoring, and those reports would

23   have come in, would have been reviewed by

24   myself, other members of my team.  So

Page 605

1    that would be a place to start to look.

2    I don't have an exact location to tell

3    you.

4         Q.    No, I understand.  That

5    would be a place to start.

6         A.    It might be a starting

7    point, yes.

8         Q.    And you understand -- you

9    believe that there are minutes of the

10   quarterly meetings as well?

11        A.    There -- I believe that

12   there are minutes from the risk

13   management team.  The quarterly review

14   that we talked about for the internal

15   review committee, we had one meeting.  I

16   think the decision was made after we

17   had -- we had not, as I have testified

18   today, we had low mentions of abuse for

19   our products.  And I think the decision

20   was made by the senior leadership that

21   there was a reason for them to go and

22   hear something they were interested in

23   it, that we would agree that the people

24   whom reported -- reported into them, who

Page 606

1   were part of the risk management team,

2   would inform them if there was something

3   that our senior leadership needed to see.

4   The external review committee we met

5   with -- I met with on a quarterly basis,

6   and I don't recall whether we kept

7   minutes for them or not.  But those

8   meetings did take place in a Marriott in

9   Philadelphia, as I think, I believe I had

10  testified.

11       Q.   And approximately how many

12  years did that go on, do you believe,

13  where you had quarterly meetings of the

14  external review board?

15       A.   I don't remember.  That went

16  on -- I did that for a while.  And then I

17  believe there was another physician at

18  the company who -- who ran those -- I

19  don't know when they ended.  So I can't

20  give you an end date.

21       Q.   Do you have a memory that

22  there was more than one or two meetings?

23       A.   Yes.  We met quarterly for a

24  while, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 607

1          Q.    At the very end of your

2   questioning by Mr. Lifland, you said that

3   monitoring is vital to understand the

4   abuse of our products.

5               Do you recall that?

6          A.    Yes.

7          Q.    Would you also agree that

8   understanding the risk of addiction in

9   chronic pain patients that are prescribed

10  Janssen's products is also vital to know?

11         A.    It's important to understand

12  it.

13         Q.    Would you --

14         A.    Yes.

15         Q.    You would agree it's vital?

16         A.    I would -- it's quite

17  important, yes.

18         Q.    Has Johnson & Johnson or

19  Janssen ever been convicted of a crime?

20              MR. LIFLAND:  Object to the

21         form of the question.

22              THE WITNESS:  I don't know.

23  BY MS. CONROY:

24         Q.    Did you go home -- did you

Page 608

1    go to your home last night or did you

2    stay nearby?

3           A.    I went home.

4           Q.    When you were -- you were

5    asked some questions yesterday by me, but

6    today by Mr. Lifland about when you were

7    in practice and your use of opioids in

8    the ER.  Do you recall that?

9           A.    Yes.

10          Q.    And when you were using the

11   opioids in the ER, was that for acute

12   pain?

13          A.    Yes.

14          Q.    And when you were using it

15   in surgeries as you were describing, that

16   was -- you were using opioids to put

17   people to sleep, correct?

18          A.    I was using opioids both as

19   a pain medication and as for an

20   anesthetic.  You're talking about

21   anesthesia and analgesia.

22          Q.    Yes.  Did you use it as an

23   analgesic when you were prescribing it

24   for something other than acute pain?

Page 609

1         A.    My use of it in the

2    treatment of chronic pain was quite

3    limited, as I had indicated and testified

4    yesterday.  Most of my experience with

5    fentanyl was in the acute pain setting in

6    the operating room.

7         Q.    And would it be fair to say

8    that when you used it as an analgesic for

9    long-term pain, that would be in a

10   hospital setting?

11        A.    So as I had just mentioned,

12   my use of it in the long-term -- for

13   chronic pain was quite limited.  So I did

14   not do -- I didn't do much in the way of

15   prescribing for that.  My predominant use

16   of the medication was in the operating

17   room setting.

18        Q.    To put people to sleep?

19        A.    Or if they were having,

20   let's say, a nerve block where they may

21   have needed some supplemental pain

22   medication and would have provided some

23   additional pain control or some

24   analgesia.

Highly Confidential - Subject to Further Confidentiality Review

Page 610

1          Q.    And that would have been via

2    intravenous --

3          A.    Correct.

4          Q.    -- delivery?

5                You also discussed with

6    Mr. Lifland, the -- your ability when you

7    were at Parexel to -- for want of a

8    better term, evaluate different companies

9    so that you could decide where you might

10   go in the future?

11         A.    I had an opportunity to see

12   how different companies conducted their

13   clinical trials.  And yes.  And that was

14   something that was helpful to me about

15   where I might want to have my next

16   employment.

17         Q.    And the companies that you

18   were able to evaluate were Janssen and

19   Endo; is that correct?

20         A.    I don't remember Endo.

21   Janssen I remember best.  That's where I

22   wound up.  I don't remember the other

23   companies.  But I remember looking at

24   different types of clinical studies.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 611

1    talked to you about work that I had done

2    for a cardiac medication, carvedilol.  I

3    don't remember the manufacturer of that.

4    Different companies.

5         Q.    But the only company that

6    you actually have a memory of is Janssen?

7         A.    The strongest memory is

8    Janssen.

9         Q.    You marked -- we marked as

10   Exhibit -- or Mr. Lifland marked as

11   Exhibit 17 the Fishbain article that you

12   discussed yesterday.  I think you might

13   want to pull it out.  I'm going to ask

14   you a couple questions about it.  17.

15   17.

16             THE WITNESS:  I don't know

17        if I have it in the file here.

18             THE COURT REPORTER:  It's in

19        order.  I put them in order.

20             THE WITNESS:  Oh, you did.

21        Thank you.

22             MS. CONROY:  She's way ahead

23        of us.

24             MR. LIFLAND:  It better be

Page 612

```
 1          in the file or else we're all --
 2                  THE WITNESS:  That's a very
 3          good -- okay.
 4   BY MS. CONROY:
 5          Q.   Do you know anything about
 6   the journal that this was published in,
 7   Pain Medicine?
 8          A.   I don't understand your
 9   question.
10          Q.   Are you familiar with this
11   publication Pain Medicine?  Do you see up
12   in the top right-hand corner, it says
13   Pain Medicine, Volume IX?
14          A.   I'm familiar with the
15   journal Pain Medicine.
16          Q.   Okay.  Have you ever
17   published in it before?
18          A.   I don't remember.  I don't
19   recall.
20          Q.   Okay.  Are you familiar with
21   any -- or let me -- let me ask you, do
22   you know Dr. Fishbain?
23          A.   Not personally.  Just by
24   reputation.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 613

```
1           Q.    What about Brandly Cole?

2           A.    I don't know Brandly Cole.

3           Q.    John Lewis?

4           A.    I do not know John Lewis.

5           Q.    Hubert Rosomoff?

6           A.    I do not know that person.

7           Q.    R. Steele Rosomoff?

8           A.    I don't know that person

9    either.

10          Q.    Do you know if they have any

11   affiliations with any pharmaceutical

12   companies?

13          A.    I don't know if they have

14   any affiliations with pharmaceutical

15   companies.

16          Q.    That's not something that

17   you've looked into?

18          A.    That's not -- I'm sorry.  I

19   didn't hear you, Counsel.

20          Q.    That's not something that

21   you looked into?

22          A.    Typically there would be

23   some kind of a statement talking about

24   potential conflicts that would be listed
```

Page 614

1    someplace in the article.  So I'm aware

2    of the fact that that type of information

3    is called out to ensure transparency.

4           Q.    I didn't see it in this

5    article.  Do you see any kind of a

6    callout about that in this article?

7           A.    I don't recollect that.  But

8    I didn't specifically look for it when I

9    was reviewing the article.

10          Q.    Does that ever make a

11   difference to you when you're using or

12   relying on a published article, whether

13   or not there are affiliations with

14   different entities?

15          A.    I look to see where it's

16   coming from.  And I like to -- I look to

17   see who is funding it.  My primary focus

18   is on the quality of the article and the

19   conclusions based upon the -- drawn on

20   the data.

21          Q.    You don't know who did or if

22   this article was funded?  You don't know

23   one way or another?

24          A.    I don't have the information

Page 615

1    on the article to comment.

2           Q.    The very first line of the

3    article says, "Design:  This is a

4    structured evidence-based review."

5                You are trained in clinical

6    studies and the like.  What is a

7    structured evidence-based review?

8           A.    So this is a review article,

9    it's structured and it's discussing the

10   design of it.  And it's evidence-based

11   looking at the types of information that

12   you would -- to come up with the

13   conclusions that they have.

14          Q.    What does it mean structured

15   evidence-based review?

16          A.    I think what they're

17   referring to is they have predefined in

18   advance the nature of the review, how

19   they collected the data, how the studies

20   were identified, literature searchers,

21   the search terms that we used and talked

22   about -- and evaluated the studies in

23   terms of the, you know, how the data were

24   collected, which -- who was included and

Page 616

1    who was not included.

2         Q.    Have you ever heard that

3    term before, structured evidence-based

4    review?

5         A.    It's not one that I'm very

6    familiar with, but I think based on the

7    way it was -- based on how the article

8    was written and the information in there,

9    I think that's what that means.

10        Q.    Have you ever contacted the

11   authors to determine if that's what they

12   meant?

13        A.    No, I have not.

14        Q.    Have you ever seen any

15   reference to a structured evidence based

16   review in any other article that you have

17   reviewed in your career?

18        A.    I'd have to think about

19   that.

20        Q.    Are you familiar with the

21   JAMA article that talks about the ranking

22   of forms of evidence?

23        A.    Yes.

24        Q.    You're familiar with that?

Page 617

1          A.     I am.

2          Q.     And where would you rank a

3    structured evidence-based review?

4          A.     The level of evidence would

5    be lower than a placebo-controlled trial

6    which represents the highest level of

7    evidence.

8          Q.     And what would this be

9    higher than?

10          A.     This might be higher than a

11    case-control study or individual case

12    mentions.

13          Q.     So case series or an

14    individual case?

15          A.     Mm-hmm.  And I believe, I

16    think -- I have to take a look again,

17    Counsel, but I think they talk a little

18    bit about -- if I can look at it for a

19    moment.

20          Q.     Oh, absolutely.

21          A.     They describe the -- I'm not

22    familiar with the categorization system,

23    but they do talk about it and various

24    types of ways of looking at the data.

Page 618

1   And they are described on Page 447.

2           Q.    You are looking on the

3   right-hand column of 447?

4           A.    Correct, yes.

5           Q.    This article was written in

6   2008, it looks like.  And they calculated

7   an abuse addiction rate of 3.27 percent

8   in the 24 -- in 24 of the studies,

9   correct.

10          A.    Let me look for the number

11  again.

12          Q.    It's right on the -- on the

13  front page.

14          A.    Yes.  I'd like to find the

15  reference.

16          Q.    Sure.

17          A.    Yes, 3.27 percent.

18          Q.    Do you know at this time,

19  2008, how many individuals were

20  prescribed chronic -- opioids for chronic

21  pain in the United States?

22          A.    I don't know.

23          Q.    Is that -- that information

24  is available, correct?

Page 619

1          A.    I don't know the answer to

2     that.

3          Q.    IMS would have that

4     information?

5          A.    Well, I don't know if they

6     would have all the information

7     longitudinally since 2008.  They would be

8     collecting information on people who were

9     treated with opioid pain medications.

10         Q.    Right.  And that's what I'm

11    talking about, there would be a way --

12    the data exists to determine approximate

13    how many individuals in the United States

14    have been prescribed opioid pain, opioid

15    medication for chronic pain?

16         A.    I'm not sure what the

17    starting point would be to be able to

18    answer your question.  When would that

19    begin?  Do you have an idea of what that

20    might look like.  So you can look at the

21    end date, which would be 2008.  But I'm

22    not sure what you might think about for

23    the starting point.  So you can say over

24    what period of time, since when, starting

Page 620

```
 1   from when.
 2          Q.    Okay.  And is there a
 3   starting point for the 3.27 percent?
 4          A.    They talk about how they do
 5   their -- go about doing their literature
 6   searches, and that -- they go on to talk
 7   about that.  And that's under methods in
 8   the methods section.  They talk about the
 9   years.  And so you can then begin to
10   understand how they did it from what the
11   starting points were.  But if I -- and
12   I'm reading on Page 447.  It's -- it's
13   kind of in the first paragraph starting
14   with the word for.  And the line would
15   be -- I think it's about Line 13
16   approximately.
17          Q.    For details?
18          A.    "For the following journals
19   the following years were reviewed."
20   Pain, and they talk about what years,
21   1975 through 2006.  I won't go through
22   all of them.  But they at least define a
23   starting point of their search parameters
24   for what years it would be.
```

Page 621

1          Q.    And do you know what

2    medications -- what opioid medications

3    were available during those years?

4          A.    I'd have to look and see.  I

5    don't have it off the top of my head.

6          Q.    Do you know if the authors

7    of this article did that?

8          A.    They would have looked for

9    published studies that would have come

10   out during that time period where those

11   medications would presumably have been

12   available in the U.S. marketplace to be

13   able to study it.

14         Q.    Okay.  But you don't know?

15         A.    I don't have the information

16   offhand.

17         Q.    Is it anything that you ever

18   looked at?

19         A.    I'm sorry, I don't

20   understand the question.

21         Q.    Have you ever gone back and

22   looked to see which drugs were available

23   for any of these studies that were

24   reviewed by Dr. Fishbain?

Highly Confidential - Subject to Further Confidentiality Review

Page 622

1         A.    I -- I didn't go in -- look

2    specifically to look at the Journal of

3    Pain, for example, for the 19 -- between

4    1975 and 2006 to see what products they

5    were studying specifically.

6         Q.    Have you ever collected the

7    studies that were reviewed by

8    Dr. Fishbain and the others?

9         A.    I'm sorry, I don't

10   understand the question.

11        Q.    Dr. Fishbain and the other

12   authors collected a group of studies,

13   correct?

14        A.    Yes, they did.

15        Q.    There were 67 reports, he

16   talks about, in the results?

17        A.    Correct.

18        Q.    Did you ever take a look at

19   those 67 reports?

20        A.    I did not.

21        Q.    Did any one on your staff do

22   that?

23        A.    Not to the best of my

24   knowledge.

Page 623

1        Q.    So you didn't go and -- and

2  collect those to determine the quality of

3  this article, this review article by

4  Dr. Fishbain?

5        A.    To basically go back and

6  reproduce what they did to see if I can

7  reproduce their conclusions.  Is that

8  what you're asking me?

9        Q.    That would be part of it.

10       A.    I have not done that, no.  I

11  would have not had a reason to do that.

12  I think the investigators did what I

13  believe to be a thorough article which

14  was well controlled to the extent that we

15  talk about control and describe their

16  methodology.  If this wasn't a

17  well-described methodology, then I would

18  throw the article out and say I didn't --

19  I couldn't understand how they did it,

20  what the patient populations were, and

21  the consequence it would not be an

22  article that I would say I find this data

23  compelling.

24       Q.    Did you -- do you have any

Page 624

1   plans to do that, to review the 67

2   reports?

3          A.    Not specifically unless I

4   need to go into more detail to do that,

5   in which case it might be something that

6   I might do.  But I don't have a specific

7   plan right now to answer your question.

8          Q.    Okay.  If you could take a

9   look at Exhibit 18, which is the Cochrane

10  analysis.  Doctor, I looked through your

11  custodial files in preparation for this

12  deposition and I did not find a copy of

13  either the Cochrane analysis or the

14  Fishbain analysis.

15             Do you believe you had those

16  available to you while you were at

17  Janssen?

18         A.    I'm not sure whether I had

19  looked at them or not, but -- while I was

20  at Janssen.

21         Q.    So it's possible that you

22  reviewed both the, in red, both the

23  Fishbain and the Cochrane analysis after

24  you left Janssen?

Highly Confidential - Subject to Further Confidentiality Review

Page 625

1          A.     Yes.

2          Q.     Is that -- is that likely

3    that that's what happened?

4          A.     I believe the Cochrane

5    article that we're looking at now is

6    something that I did look at later on.

7          Q.     What about Dr. Fishbain's

8    article?

9          A.     I don't recall that I had

10   seen that before.  But as I had commented

11   earlier, the Cochrane Library and its

12   systematic review of databases is of

13   interest to me.  And these are high

14   quality analysis, they're known for that.

15   So given my interest in long-term opioid

16   management, in this area of noncancer

17   pain, or noncancer -- and this may have

18   been something that I had looked at.  But

19   I don't recall whether I specifically

20   read it what I had read at Janssen.

21         Q.     But you have looked at it

22   since you left Janssen?

23         A.     I have read -- looked at it

24   very briefly, I skimmed it subsequently.

Page 626

1          Q.    And as you sit here today,

2    you have no memory of reading it while

3    you were at Janssen, either Cochrane or

4    Dr. Fishbain?

5          A.    I can't comment on whether I

6    did.  I said I don't recall whether I did

7    or didn't.  So that would -- that would

8    be how I would describe it.  I might

9    have, I might not.

10         Q.    And since I didn't find any

11   copies or references in any of your files

12   at Janssen, from -- from your years at

13   Janssen, would it have been your usual

14   practice to have some reference to the

15   articles or print them out or ask someone

16   on your staff to do that?

17              MR. LIFLAND:  Object to the

18         form of the question.

19              THE WITNESS:  I didn't

20         retain a lot of them.  I may have

21         read the article, in which case

22         afterwards I discarded it.  I was

23         not someone who routinely kept a

24         lot of articles.  So I might have

Page 627

1              easily read it and then discarded

2              it.  It was not my practice to

3              retain a lot of articles.

4    BY MS. CONROY:

5              Q.    Which articles was it your

6    practice to retain?

7              A.    If I was writing a paper,

8    then I would certainly want to have that.

9    After the paper was -- was accepted, then

10   I would have the references, I might hold

11   onto it for a brief period of time.  But

12   from a document management perspective,

13   there's so many articles that one could

14   read that it would become problematic to

15   collect them and even more difficult

16   sometimes to retrieve them.

17             Q.    And you are talking about

18   both in print and electronically?

19             A.    Well, electronic was

20   slightly easier to use.  But in print,

21   yes.

22             Q.    If you could turn to Page 2

23   of the Cochrane article.  And up there --

24   well, let's look at the plain language

Highly Confidential - Subject to Further Confidentiality Review

Page 628

1    summary.

2              It says, "The findings of

3    this systemic review suggest that proper

4    management of a type of strong painkiller

5    (opioid) in well-selected patients with

6    no history of substance addiction or

7    abuse can lead to long-term pain relief

8    for some patients with a very small,

9    though not zero risk of developing

10   addiction, abuse or other serious side

11   effects."

12             Do you see that?

13        A.   Yes.

14        Q.   And I think we saw in the Ad

15   Board documents when you were speaking

16   with a number of experts that you had

17   selected when you were at Janssen, that

18   in order for a patient to have no history

19   of substance addiction or abuse, we're

20   actually even talking about even no

21   history of a teenager at a party

22   having -- who is underage and drinking or

23   taking recreational drugs, correct?

24        A.   I'd need to see that

Highly Confidential - Subject to Further Confidentiality Review

Page 629

1    reference from the advisory board.  If

2    you would pull that up I would like to

3    review it.

4            Q.    I will do that.  Let me ask

5    you a couple of questions so we don't

6    take too much time.  I have it in my

7    stack here so...

8                 Do you recall -- do you

9    recall in the Ad Board the discussion of

10   what prior substance addiction or abuse

11   would look like?

12           A.    I don't recall the reference

13   that you're talking about, no.  So I'd

14   like to see it.

15           Q.    Okay.  I will show it to

16   you.

17           A.    Yes, ma'am.

18           Q.    What is your understanding,

19   without looking at that, what is just

20   your general understanding of a history

21   of substance addiction or abuse?

22           A.    So individuals with a

23   history of substance abuse or addiction

24   would certainly manifest -- or

Page 630

1    potentially manifest higher rates of

2    addiction compared to people who don't

3    have that.  And I think that was

4    summarized nicely here.

5           Q.    Give it -- what does it

6    mean, what does it mean to have a history

7    of substance abuse?  Give me some

8    examples.

9           A.    Some -- so someone who had a

10   history of alcohol abuse might be an

11   example.  Someone who had a history of

12   let's say using illegally opioid

13   analgesics, marijuana.  Those most --

14   those would be examples of history of

15   substance abuse.

16          Q.    And would it matter if

17   someone had used marijuana in the past,

18   would that be considered a history of

19   abuse?

20          A.    I think it would be

21   depending on how they were using it and

22   what the circumstances were.  Some -- we

23   know that there's some experimentation.

24   People may use it a few times and not.

Page 631

1   And I think that would be different from

2   somebody who would use it perhaps more

3   chronically.  And really -- and then

4   those people might be looked at

5   differently in terms of risk.  But I need

6   to look at that in the literature to

7   confirm what I've just said.

8           Q.    Okay.  Do you know

9   whether -- do you know what criteria

10  was -- was used in the Cochrane analysis

11  with respect to the length of time

12  someone may have used marijuana, whether

13  it was recreational or more chronic?

14          A.    I'm sorry, did you finish

15  your question?

16          Q.    I did finish.

17          A.    Yeah, I'd have to go back

18  and look at the article in more detail.

19  I provided the summary today, for

20  purposes of today, but I have to go back

21  and look in more detail.

22          Q.    Do you have any idea of the

23  number of patients with a history of

24  addiction or abuse in the United States?

Highly Confidential - Subject to Further Confidentiality Review

Page 632

1           A.    Do you mean -- could you
2    clarify your question for me a little
3    bit?
4           Q.    Well, do you have any -- do
5    you have any ballpark idea of how many
6    individuals there are in the United
7    States that have a history of substance
8    addiction or abuse?
9           A.    I'm still not understanding
10   your question.  Do you mean each
11   category?  I'm -- I'm not understanding
12   what you're asking.
13          Q.    I'm just asking, do you have
14   any idea -- well, let me ask -- let me
15   break it down.  Do you have any idea of
16   the number of people in the United States
17   who have addiction to alcohol?
18          A.    I don't have that number.
19          Q.    Do you have any idea how
20   many individuals in the United States
21   have used marijuana recreationally?
22          A.    I do not have that number.
23          Q.    I'll show you what's in the
24   ad.  We won't take the time to find it.

Page 633

1    Can you turn to Page 24, please.  Do you

2    see there's a reference under the

3    author's conclusions, there is a

4    reference here in the -- kind of in the

5    middle, "Because most studies screened

6    out potential participants with histories

7    of substance abuse or addiction, the

8    rates of addiction reported in these

9    studies are only generalizable to

10   patients without a history of

11   addictive/abusive behaviors."

12                 Do you see that?

13        A.    Yes.  I'd like to read a

14   little bit above and beyond, if I can.

15   But I do see that.  If you can give me

16   one moment, please.

17        Q.    Yeah.  Take your time.

18        A.    Yes, I see that.

19        Q.    Do you agree with that

20   statement?

21        A.    I agree with the statement

22   that most studies screen out potential

23   participants with substance abuse.

24        Q.    Do you agree that the rates

Page 634

1    of addiction reported in these studies

2    are only generalizable to patients

3    without a history of addictive/abusive

4    behaviors, or do you believe they could

5    be used more generally than that?

6         A.    Can you explain what you

7    mean by used more generally?

8         Q.    Well, do you agree with the

9    statement as it's written?

10        A.    We're talking about

11   iatrogenic addictions.  So are you

12   talking about addiction in general, or

13   are you talking about iatrogenic

14   addiction?

15        Q.    What do you understand this

16   study to be talking about?

17        A.    They're talking about

18   iatrogenic addiction.

19        Q.    So do you agree --

20        A.    But your question was about

21   it being generalizable.  I don't know if

22   you're talking about addiction in general

23   or iatrogenic addiction.  That's why I

24   asked the question.

Highly Confidential - Subject to Further Confidentiality Review

Page 635

1          Q.    If you take a look at the

2     sentence in the author's conclusion, I'm

3     asking if you agree with that sentence.

4          A.    Yes, I do.

5          Q.    A little bit further down it

6     says, after the Fishbain reference, it

7     says, "Given the complexity of

8     definitively diagnosing opioid addiction

9     and in the interest of capturing the

10    overall effect of opioid therapy on the

11    quality of life, we sought to analyze

12    health-related quality of life outcomes

13    in this review."  And they say, "See

14    Ballantyne 2006."

15               Do you see that?

16         A.    Yes.

17         Q.    Do you know Dr. Ballantyne?

18         A.    I do.

19         Q.    How do you know her?

20         A.    Her and I worked together at

21    Mass General.

22         Q.    Are you in contact with her?

23         A.    I am not.

24         Q.    Were you while you were at

Highly Confidential - Subject to Further Confidentiality Review

Page 636

1    Janssen?

2          A.    No.  I might have seen her

3    in a meeting once to say hello, but I was

4    not in contact with her.

5          Q.    Have you read her 2006

6    article?

7          A.    I don't recall.  I might

8    have.

9          Q.    Doctor, the 2003 Ad Board

10   that you worked on, that set out a wide

11   spectrum of possible clinical trials and

12   outcome research that could be done at

13   Janssen, correct?

14         A.    Yes.

15         Q.    And AP 48 was just -- was

16   just one area that could use some further

17   research, correct?

18         A.    Yes.

19         Q.    One of the other areas was

20   studies that could determine the risk of

21   iatrogenic addiction, correct?

22         A.    I believe that was another

23   study that could -- there was a

24   discussion about that.

Highly Confidential - Subject to Further Confidentiality Review

Page 637

1          Q.    And there was some -- there
2     was some, for want of a better word,
3     fleshing out of what that type of a study
4     would look like, what the criteria might
5     be?
6          A.    There was discussion about
7     what potential study might look like.
8          Q.    And there were studies
9     discussed to determine the best screening
10    methods for patients to minimize misuse
11    with respect to taking opioids for
12    chronic pain?
13         A.    Yes.  I believe there was
14    discussion on that.
15         Q.    And there was discussion
16    about studies to determine the rate and
17    type of misuse and abuse in chronic pain
18    populations using the addiction survey
19    index.  Do you recall those?
20         A.    There was discussion by the
21    participants about that, yes.
22         Q.    And part of the two-day Ad
23    Board meeting was, not only was there
24    discussion -- and I think they were

Page 638

1    called icebreakers, where there was

2    discussion with the experts and yourself

3    and other -- other individuals from

4    Janssen.  But then there was some

5    breakout sessions where the experts in

6    particular areas worked out what a study

7    would look like.  They did a work plan

8    for a study?

9          A.    Preliminary discussion on

10   design.  The studies weren't powered

11   statistically, to the best of my

12   knowledge, to how large they would be.

13   And the endpoints were hypothetical

14   endpoints.  And those were not, to the

15   best of my knowledge, validated endpoints

16   in clinical trials which would need --

17   would have needed to have been done to

18   use them to make the conclusions.

19         Q.    Well, certainly.  But the

20   design of what those studies could look

21   like was discussed, correct?

22         A.    Potential design, yes.

23         Q.    And that was the same for

24   the AP 48 studies.  The design was

Page 639

1    discussed, but the endpoints had not been

2    validated at that point?

3         A.    No.  But I don't recall

4    whether we had statistical discussions to

5    calculate the number of patients that

6    would be needed to address those

7    endpoints.

8         Q.    Do you think you did for AP

9    48 at that time?

10        A.    Not at the Ad Board.

11        Q.    Right.  And at the Ad Board,

12   you had not worked out any of those

13   statistics?

14        A.    Correct, because the goal of

15   the Ad Board was to understand the types

16   of information that we would need to have

17   in a -- in a clinical trial to be able to

18   make the types of statements we had

19   around abuse liability for the compound.

20        Q.    Correct.  And that's why you

21   were looking at the risk of iatrogenic

22   addiction and screening methods and

23   studies to look at the rate of misuse in

24   the chronic pain population, using an

Page 640

1    addiction survey index, as well as

2    likability studies and tamper issues with

3    AP 48, correct?

4          A.    Yes.

5          Q.    So the -- the discussions at

6    the Ad Board in November of 2003 had

7    broad applicability to all of Janssen's

8    opioid products, correct?

9                MR. LIFLAND:  Object to the

10               form of the question.

11               THE WITNESS:  I'm sorry.  I

12               don't -- really, I don't

13               understand the question.

14   BY MS. CONROY:

15         Q.    The Ad Board was not set up

16   to just discuss issues with respect to

17   iatrogenic addiction in AP 48, it would

18   have addressed those issues across all of

19   Janssen's opioid products?

20         A.    But we would have had

21   information on iatrogenic addiction for

22   Duragesic from the analysis that I

23   presented -- that was later.  That was in

24   2006.  But we did have information on

Highly Confidential - Subject to Further Confidentiality Review

Page 641

1    patient exposures.  We did have

2    information from our pharmacovigilance

3    group on the number of reports.  And I

4    did acknowledge that that number may be

5    low.

6                 So there were data being

7    compiled on patient exposures and a risk

8    of a addiction.  So iatrogenic addiction

9    was something that was being monitored in

10   the sense of knowing how many patients

11   were getting addicted based on reports

12   people were having.  So those were in --

13   for in-line marketed products we would

14   have had that information.  For products

15   that were in development however, the

16   analysis would necessarily have to be

17   different because we didn't have actual

18   exposures.

19        Q.    You discussed those -- those

20   data points at the Ad Board, correct?

21        A.    Well, we did.  But those

22   were for clinical studies for products

23   that were in development.  Not for actual

24   products.  So if I understand your

Page 642

1    question, Counsel, you said, wouldn't

2    that have been something that would have

3    been used for all the Janssen products.

4    And my response would be no, not for the

5    marketed products.  Those are

6    methodologies that could be used for

7    product in development.

8        Q.    Well, you did go forward

9    with the studies with respect to the

10   surveillance, such as RADARS and some of

11   the -- and the Inflexxion data?  That

12   wasn't just for AP 48?

13       A.    No.  That's different,

14   right.  We were talking about -- we

15   provided -- we were looking at iatrogenic

16   addiction with our pharmacovigilance

17   data, and I presented the results from

18   2006.

19            We were absolutely doing

20   abuse surveillance with our RADARS and

21   subsequently our Inflexxion data.

22       Q.    So you don't believe that

23   the studies that were discussed at the Ad

24   Board concerning iatrogenic addiction or

Highly Confidential - Subject to Further Confidentiality Review

Page 643

1    screening methods for patients would have

2    any applicability, for example, to a

3    Duragesic patient?

4          A.    No, I didn't make that

5    statement.  I made -- the statement that

6    I made was for marketed products and the

7    different analysis that would need to be

8    done.  And the -- not -- that only the

9    studies that were recommended during our

10   advisory board would be used.

11             We had actual data on

12   patients receiving the product.  And we

13   used that data to make certain

14   assumptions.  And those -- as I testified

15   this morning, those rates were low, and

16   we were able to be confident that the

17   information that we had presented that

18   was in the package insert was correct.

19         Q.    So by 2006 then, you believe

20   that you did not need to do any further

21   investigation or study with respect to

22   the rates of iatrogenic addiction --

23         A.    No, I --

24         Q.    -- in chronic pain patients

Highly Confidential - Subject to Further Confidentiality Review

Page 644

1    taking --

2           A.    No.

3           Q.    -- Janssen opioids?

4           A.    I don't believe I testified

5    to that.  I think what I had testified

6    was we were interested in doing

7    monitoring on an ongoing basis.  We felt

8    it was appropriate that our medications

9    be monitored continually.  So we were in

10   a position that using the similar types

11   of data that we reported to FDA in 2006,

12   that that type of monitoring certainly

13   can be done at any point in time, where

14   we would look at our mentions of -- that

15   we received of abuse and look at the

16   number of patient days exposure, similar

17   to what I had presented earlier.

18          Q.    And do you believe that that

19   data tracks iatrogenic addiction?

20          A.    Yes.  These would have been

21   exposures.  So these would have been --

22   the data that we're talking about that I

23   presented from our 2006 study that we

24   submitted to FDA would have been

Page 645

```
1    iatrogenic addiction because there --
2    patient exposures, there were patients
3    treated with transdermal fentanyl, either
4    for the matrix system or the reservoir
5    system as I presented earlier today.
6           Q.    What about Nucynta?  Do you
7    have accurate data with respect to
8    iatrogenic addiction rate?
9           A.    I don't know if those data
10   were captured or not.  I don't recall.
11   But those type of analyses would have
12   been fairly easy to do, in a manner
13   similar to the types that we did for
14   Duragesic.
15          Q.    But they haven't been done
16   by Janssen?
17          A.    Well, I don't -- I don't
18   know.  My -- my testimony was that I
19   don't recall seeing it.  I don't know
20   that they were not done.
21                As part of the usual
22   pharmacovigilance-type work, we would
23   have looked at the number of patients
24   where the reports of addiction were given
```

Page 646

1    to the company.  So those type of data

2    were being looked at regularly as part of

3    the adverse events that we received from

4    healthcare providers or from patients.

5    Looking at mentions of addiction,

6    mentions of abuse and other types of

7    adverse events.

8         Q.    And you're also collecting

9    it from the -- I don't recall the

10   acronym, but the methadone clinics, that

11   data?

12        A.    Yes.

13        Q.    You -- you would agree with

14   me that adverse event data, MedWatch

15   data, is typically underreported,

16   correct?

17        A.    I'm not following your

18   question.  First we were talking about

19   the AATOD data which would have been a

20   survey data.  And then you asked me

21   another part of the question about

22   adverse event reporting.  So I apologize,

23   I'm not following you.

24        Q.    The -- the -- what do you

Page 647

1    call it, the AATOD data?

2          A.    Yes.

3          Q.    That is tracking individuals

4    who are in methadone clinics, correct?

5          A.    Yes.

6          Q.    So those are individuals

7    that have -- that are in a clinic for an

8    actual addiction, correct?

9          A.    Yes.  Those are

10   de-identified data on patients presenting

11   to a clinic for methadone maintenance.

12         Q.    And then adverse event data

13   that you're discussing that goes to the

14   FDA, that's -- that comes from all sorts

15   of places, correct?

16         A.    So the adverse event data

17   that we pull to the FDA, we talked about

18   that, it could come from MedWatch forms,

19   it could come from healthcare providers.

20   It could come from consumers that use our

21   products.  It could come from a wide

22   range of individuals.

23         Q.    And would you agree with me

24   that there are published studies that

Highly Confidential - Subject to Further Confidentiality Review

Page 648

1    talk about the underreporting of adverse

2    events to MedWatch and others collected

3    by the FDA?

4            A.    Yes.

5            Q.    But you believe using the

6    AATOD and MedWatch data, that is -- that

7    is satisfactory to determine the rate of

8    iatrogenic addiction in patients

9    prescribed opioids for chronic pain?

10           A.    No.  I think the AATOD data

11   was again, individuals coming in for

12   methadone maintenance who may have been

13   on a variety of medications.  So they

14   may -- these people are individuals who

15   are abusing medications.  So they may

16   have been on combination therapy.  They

17   may have been on benzodiazapines or other

18   drugs as well.

19                 The iatrogenic addiction

20   data that I had referred to came from

21   information coming into our

22   pharmacovigilance, coming into the

23   company through the passive surveillance

24   program.

Page 649

1          Q.    Do you believe there's any

2    current need for a study to determine the

3    rate of iatrogenic addiction in chronic

4    pain patients taking opioids?

5          A.    I think a study like that

6    would be a difficult study to do.  I

7    think we'd need to understand what

8    patients we would be looking at, what

9    drugs we would be looking at.

10               FDA in its -- the REMS

11   requirements, looking at the types of

12   drugs, the types of studies that they

13   were interested.  My understanding is

14   they were looking at entities like

15   hyperalgesia and some other things as

16   well.  So a study on iatrogenic addiction

17   certainly could be one that might be of

18   interest to the FDA.  So I would be

19   interested in knowing if such a study was

20   required by FDA for the REMS

21   participants.  And I don't know whether

22   it was or was not.

23          Q.    The experts at the Ad Board

24   believed there was a need for a study to

Page 650

1    determine the rate of iatrogenic

2    addiction, correct?

3         A.    Yes.  That was in 2003.  The

4    current requirements to set up with the

5    REMS, again as we talked about, where the

6    FDA had decided on what studies they

7    would need to gain more information about

8    opioid analgesics, so I would defer to

9    the FDA requests for the type of data

10   that they feel would be pressing to get

11   more information.

12              There's certainly a concern

13   about addiction as you voiced today and

14   what would be the best types of studies.

15   They would be in a position to guide the

16   industry as a whole to begin to look at

17   those types of studies potentially.

18         Q.    While you were at Janssen,

19   would it be fair to say then that you did

20   not believe, at least after the Ad Board

21   in 2003, that there wasn't a need -- that

22   there was a need for Janssen to perform

23   any sort of a study to determine the rate

24   of iatrogenic addiction in pain patients

Page 651

1    prescribed opioids?

2           A.    So I think we had ongoing

3    analysis of our patients treated with our

4    products, to understand rates of

5    addiction.  And I think they did a good

6    job and continued to do a good job

7    certainly up until when I had -- when I

8    was knowledgeable before I left, that we

9    monitored for abuse and addiction for our

10   patients.

11          Q.    So you don't believe you

12   needed it?

13          A.    I think -- and I think --

14   and if I'm understanding your question

15   correctly, you asked do we -- do I think

16   there's a need for studies looking at

17   iatrogenic addiction.  Those may be

18   industry spun -- studies for the

19   industry.  I think our company did a good

20   job using the accepted methodologies

21   looking at iatrogenic addiction at the

22   time.

23          Q.    So you don't think it was

24   necessary for Janssen to do that sort of

Page 652

1    a study?

2           A.    I think we had those data

3    covered through the current

4    methodologies.

5           Q.    So you knew the answer?

6           A.    I'm sorry?

7           Q.    So you knew the answer?

8           A.    We believe we had the answer

9    for it.

10          Q.    You were -- one of the

11   exhibits marked early was Exhibit 13,

12   which was your study, observational study

13   of health-related quality of life and

14   pain outcomes in chronic low back pain

15   patients treated with fentanyl

16   transdermal system.

17          A.    Excuse me, yes.

18          Q.    13.

19          A.    Yes.  Let me find it.  Okay.

20          Q.    Is there a reason why you

21   did not include an addiction endpoint in

22   this study?

23          A.    There was not an addiction

24   endpoint that we would have had in the

Page 653

1    clinical trial.  So consequence --

2    consequently we wouldn't have had the

3    data we would be able to publish in this

4    article.

5            Q.    So it was not asked during

6    the clinical study?

7            A.    To the best of my knowledge,

8    it was not.

9            Q.    Do you know for sure?

10           A.    I am fairly certain that we

11   did not ask the question.

12           Q.    Do you know if there were

13   any questions with respect to dependence

14   or abuse?

15           A.    That would have been

16   information that may have been identified

17   in conversations between the

18   investigators and their patients in the

19   clinical trials.  Which would -- that

20   would have been part of the ongoing care

21   that investigators would have given for

22   their patients in clinical studies.

23           Q.    Do you know what the

24   preselection criteria was for the

Page 654

1    individuals in the clinical study that

2    was used for your observational study?

3           A.    These -- these refer back to

4    the two clinical trials.  I would need to

5    look at the protocols and refer back to

6    be able to answer that question.

7           Q.    If it had, if -- if those --

8    if those clinical studies had described

9    some of that data with respect to either

10   dependence or abuse or addiction, would

11   you have included it in this article?

12          A.    Yes.  It would have been

13   part of the adverse events.  It may not

14   have been in this article, but it would

15   have been in part of the publications

16   we -- that we were interested in putting

17   out for the -- for this particular trial.

18   Because it would have been important

19   adverse events that we would have wanted

20   to report on.

21          Q.    You spoke about Exhibit 16,

22   which is the cumulative review of

23   iatrogenic addiction associated with the

24   use of the transdermal Duragesic patch.

Page 655

1    We spoke about that a little bit earlier.

2    I just want to ask you one question about

3    it.  You -- you talked about the 103

4    events in a billion 611 patient hours?

5          A.    I believe it was patient

6    days.

7          Q.    Patient days.  That's not --

8    so --

9          A.    Days on drug therapy.

10         Q.    Do you know how many

11   patients?  It's not 103 events with a

12   denominator of a billion 611, correct?

13         A.    Well, the patient days would

14   be the number of exposures that we were

15   talking about.  And patient days is a

16   typical methodology that FDA has to

17   understand patient exposures for a

18   specific medication.

19              As I had provided in my

20   testimony earlier today, I had indicated

21   that the 103 number is likely a low

22   number.  Because we know there's

23   underreporting, and you had made that

24   point as well.

Page 656

1               But even with the
2    denominator being so large, that even if
3    the numerator were double or triple in
4    size, the number would still be quite
5    small and that the -- the statement of
6    events being rare, I think is still a
7    reasonable statement, even if we were off
8    by a factor of five, where the numerator
9    would be much larger, again the
10   denominator being so large that the risk
11   of iatrogenic addiction would still be,
12   in my opinion, quite low.  And I would
13   still agree with the statement of rare.
14           Q.    Okay.  I didn't ask you
15   that, but thank you.
16           A.    No, you didn't.
17           Q.    When we are talking about
18   patient days, we are talking about every
19   day that a patient takes the medication,
20   correct?
21           A.    A day that the patient's on
22   the medication.
23           Q.    Right.  And the 103 events
24   are related to a diagnosis or an event or

Page 657

1    report of an adverse event on one day?

2           A.    I'd have to go look and see

3    how that was defined.  Sometime --

4    whether this was a single event or

5    multiple events and how this would be

6    collected.

7           Q.    Because the number of

8    patient days does not correspond to the

9    number of patients that are on the drug,

10   correct?

11          A.    It's -- that's right.  We

12   have a person who might be on the drug

13   for a number of days, and those would be

14   days of exposure, or a likelihood that

15   they would have been able to be in a

16   position where they would have had the

17   adverse event.

18          Q.    So the denominator -- if

19   you're talking about the number of

20   patients who had an adverse event, the

21   denominator would be the number of

22   patients, correct?

23          A.    Well, the number of times

24   that people would have had an opportunity

Page 658

1    to have the exposure, that's why this is

2    recorded as patient days.  Beyond the

3    drug, basically have an opportunity to

4    have the event.  So it's not only the

5    total number of patients, but it's the

6    individuals that are actually on the

7    medication at the time.

8              So as I had already just

9    stated and I apologize for being

10   redundant, patient days is one of the

11   ways we look at this.

12        Q.    Correct.  But --

13        A.    And again, this was a

14   request that FDA had to us in terms of

15   how we would look at the data.

16        Q.    Do you know how many

17   patients had 103 events?

18        A.    I don't know.

19        Q.    Or is that knowable?

20        A.    I don't know if it's

21   knowable.  I do not know it.

22        Q.    That's not something you've

23   looked at?

24        A.    No.  This was an analysis

Page 659

1    done by other individuals.  And so I

2    don't know.

3         Q.    You were shown Exhibit 19,

4    which was the Duragesic label.  And my

5    question is just that the term

6    "pseudoaddiction" does not appear in this

7    label, correct?

8         A.    That is correct.

9         Q.    The FDA would not allow you

10   to use that term, correct?

11             MR. LIFLAND:  Object to the

12        form of the question.

13             THE WITNESS:  That term was

14        not included in the product label.

15   BY MS. CONROY:

16        Q.    And that's because the FDA

17   would not approve the product label with

18   that term in it, correct?

19        A.    We had --

20             MR. LIFLAND:  Object to the

21        form of the question.

22             THE WITNESS:  We had been in

23        communication with the FDA about

24        the use of the label --

Page 660

1          pseudoaddiction in the label.  And

2          after discussion, FDA had not

3          included it.  So I don't know

4          whether they allowed or didn't

5          allow it.  But the fact is, it's

6          not in the label.

7    BY MS. CONROY:

8          Q.    Okay.  Would you agree with

9    me that Janssen at least at some point in

10   the negotiation wanted the term

11   pseudoaddiction in the label?

12         A.    No.  I think the idea was we

13   asked whether pseudoaddiction in the

14   label would be appropriate because the

15   label had been modified to include

16   individuals engaged in drug-seeking

17   behavior.  And our position was that, as

18   we've indicated earlier, and -- was that

19   there are people who may have legitimate

20   reasons for needing the medications.

21              FDA agreed with the premise

22   that there may be individuals who

23   manifest drug-seeking behavior who are

24   not necessarily doing that with ill

Page 661

1    intent.

2                   And I use that as evidence

3    because in the product label, as we

4    talked about, that type of behavior is

5    described.

6         Q.    Correct.  But you were not

7    allowed to use the word "pseudoaddiction"

8    in the label?

9         A.    FDA -- in our communications

10   back and forth, pseudoaddiction was not

11   something that was used in the label.

12        Q.    Would you agree with me that

13   you can become addicted to a chronic

14   opioid pain medication even if you don't

15   crush it or shoot it up or otherwise

16   alter the pill or the patch?  You can

17   still become addicted?

18        A.    Yes.

19        Q.    I think you referenced --

20   well, let me -- let me mark as Exhibit 23

21   a document that I think you were

22   referring to.  Tell me if not.

23                   (Document marked for

24             identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

Page 662

1          Janssen-Vorsanger-23.)

2    BY MS. CONROY:

3          Q.    Doctor, this is a document

4    concerning a pain coalition.  Are you

5    familiar with what that was?

6          A.    I am.

7          Q.    And what was the pain

8    coalition?  Or let me identify the

9    document first.  So this is Exhibit 23.

10   JAN-MS-02057424 through 435.

11          What was the pain coalition?

12         A.    We were interested in

13   understanding the challenges that people

14   who took care of patients with pain were

15   facing at the time.

16          So we put together a

17   committee, a pain coalition comprised of

18   a number of different types of people.

19   We had people with expertise in pain

20   management.  We had -- I believe we had

21   nurses who attended, who would take care

22   of patients or who provide analgesia for

23   patients.  I had -- there were two people

24   on the pain coalition who actually had

Page 663

1    chronic painful conditions.  So a variety

2    of different people got together to share

3    their experiences with taking pain

4    medications or with their diseases of

5    pain.

6          Q.    If you take a look at --

7    there aren't any -- in the very first few

8    pages there's a PowerPoint attached to

9    this.  And there are some coalition

10   members that are listed here.

11         A.    Yeah.  I'm still getting

12   there.  Say -- you wanted -- PowerPoint,

13   okay.

14         Q.    Yeah.  It says, "Imagine the

15   Possibilities Pain Coalition."

16         A.    Yes.

17         Q.    "Next Step Slides."  And

18   then there are some individuals that are

19   referenced here.  You are mentioned, some

20   other Janssen individuals.

21         A.    Under coalition members

22   you're referring?

23         Q.    Yes.

24         A.    Okay.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 664

1          Q.    And where it says at the

2    bottom, "Payer sector representation

3    forthcoming."

4          A.    Yes.

5          Q.    "Geisinger, Medco and

6    B/Horizon."  Do you know who they are?

7          A.    I'm not seeing --

8          Q.    It's the one that has Gary

9    Baker on the top?

10          A.    Yes.  I saw patient (sic)

11    sector representation following.  But I

12    didn't see a reference for the other

13    entities that you just said.  I don't see

14    it on the slide.

15          Q.    Just let me see what

16    you're -- keep going.  Look on the slide

17    earlier than that.

18          A.    Oh, it's on this one.

19          Q.    Yeah?

20          A.    I'm sorry.  Okay.  So I

21    thought it was the members.  So the

22    coalition follow-up -- members follow-up.

23          Q.    Okay.

24          A.    Okay, yes.

Page 665

```
 1              Q.     Do you know who Geisinger
 2    is?
 3              A.     I do.
 4              Q.     Who is that?
 5              A.     It's a group that is
 6    involved in healthcare.  And we -- as I
 7    mentioned we wanted to have different --
 8    representation from different people who
 9    care for patients with pain.  So
10    individual in the Geisinger group who may
11    have had pain, and also we were
12    interested in some of the other people
13    who were involved in providing pain med
14    for people with pain -- use of their pain
15    medications.
16              Q.     Was Geisinger connected or
17    affiliated with Johnson & Johnson or
18    Janssen?
19              A.     I don't know.  I don't know
20    what their affiliation or relationship
21    was.  Our intent on having someone from
22    Geisinger is as I just explained.
23              Q.     Medco, what's that?
24              A.     I don't remember.
```

Page 666

1          Q.    Do you remember what

2     B/Horizon was?

3          A.    I don't.

4          Q.    If you flip through the

5     document.  And now, we'll start to see,

6     after you get through the first few

7     pages.  In the lower right-hand side in

8     the black box, there's a little number.

9          A.    Yes.

10         Q.    I think there's a three on

11    the one that you're looking at right now?

12         A.    I do.

13         Q.    Turn the page to Page 4.

14         A.    Okay.

15              MR. LIFLAND:  Sorry.  Give

16         me a second.

17              MS. CONROY:  Keep going.

18         No, way too far.  Keep going back.

19              MR. LIFLAND:  I don't see

20         any numbers.  I see 12.

21              MS. CONROY:  Go to 4.

22              MR. LIFLAND:  Okay, thank

23         you.

24    BY MS. CONROY:

Highly Confidential - Subject to Further Confidentiality Review

Page 667

1          Q.    Do you see where it says,
2     "Coalition's first goals"?
3          A.    Yes.
4          Q.    And were you the author of
5     that?  Were you the one that determined
6     the goal?
7          A.    These, I believe, would have
8     been goals that would have been decided
9     upon by the participants in the
10    coalition.
11         Q.    So it would have been the
12    group that we saw above, would have come
13    up with this coalition's first goals?
14         A.    It would have been the
15    people who were defined as coalition
16    members that we have listed at the
17    bottom.
18         Q.    If you look a little bit
19    above that, the top areas to focus on,
20    "Targeted, effective communication to
21    healthcare professionals."  And that
22    would be communication to medical
23    schools, existing professionals and
24    specialists in pain.

Page 668

1               Do you see that?

2          A.   Yes.

3          Q.   Anything different about

4     that, or is that typically an audience

5     for communication on Janssen products?

6          A.   This is not unusual.  This

7     would have been the recommendations of

8     the members of the pain coalition.

9          Q.   What about where, in the

10    middle, it says, "Inform public attitude,

11    social media, trusted websites, hit media

12    that hit bigger footprints with younger

13    audiences.  Focus on living with pain."

14               Is there a reason that were

15    you looking to a younger audience?

16          A.   I don't recall the reason at

17    the moment.  But, again, this would have

18    been information that would have been --

19    this would have -- this would have been

20    guidance from the various members.

21          Q.   And you were one of the

22    members?

23          A.   I was along with the other

24    people whom are listed as coalition

Page 669

1    members.  Yes.

2           Q.    Okay.  If you can turn to

3    Page 19.  You see where it says, "Top

4    issues in pain management"?

5           A.    I'm sorry.  I'm still

6    getting there.

7           Q.    Sorry.

8           A.    Yes.

9           Q.    There are three teams listed

10   here?

11          A.    That's correct.

12          Q.    Do you know which team you

13   were on?

14          A.    I don't recall.

15          Q.    Okay.  Under Team 3 it says,

16   "Payer systems, add a member from here to

17   this team, and the impact of healthcare

18   reform."

19                Do you know if a member was

20   added at any point?

21          A.    My recollection is that

22   there was somebody who ultimately was

23   added.  But I don't know who that person

24   was.

Highly Confidential - Subject to Further Confidentiality Review

Page 670

1           Q.    Okay.  And if you look under

2      Team 1?

3           A.    Yes.

4           Q.    There's a prevention

5      section.  Is that the prevention of pain?

6           A.    Yes.

7           Q.    And it says, "Potentially

8      work with professional athletes,

9      targeting kids to approach pain

10     management more proactively."

11              Do you see that?

12          A.    Yes.

13          Q.    Do you know which of the

14     members was working on that?

15          A.    No, because we didn't have a

16     list of who it would be.  So we

17     identified top issues in pain management

18     from the coalition, and then listed out

19     some of the objectives for each of the

20     teams.  And people could sign up for what

21     they have.  But I don't know who was on

22     each of the teams at this point.  I don't

23     remember.

24          Q.    Do you know if there were

Highly Confidential - Subject to Further Confidentiality Review

Page 671

1    meeting minutes or anything like that

2    with respect to this pain coalition?

3            A.    I don't recall.

4            Q.    Was it -- was the pain

5    coalition something that was within the

6    medical affairs department?

7            A.    Not specifically.  I was

8    involved in it, helped organize it.

9    Robyn Kohn who was my co-chair was

10   someone who was in the advocacy group.

11   So we had this type of involvement, but

12   there were people -- it was -- there were

13   other people within the company that were

14   involved as well.

15           But I think this was an

16   activity run mostly through medical

17   affairs.

18           Q.    Okay.  The advocacy group,

19   is that a marketing group?

20           A.    The advocacy group is a

21   group that provides information I believe

22   to groups as requested for that type of

23   information.  But I don't have their

24   charter.  And I don't remember what they

Highly Confidential - Subject to Further Confidentiality Review

Page 672

1    are doing.  So I want to be careful not

2    to answer that.  Because I'm not sure.

3              Q.    Okay.

4              A.    Yeah.

5              Q.    But you do recall that it

6    was called the advocacy group?

7              A.    Yes, I do.

8              Q.    So they would be somewhere

9    on an organizational chart?

10             A.    Presumably.

11             Q.    Okay.  If you can turn to

12   Page 29.  I'm sorry, 28.  You're free

13   to -- if you need to look at any of the

14   earlier slides, that's fine.  But there's

15   the public -- Slide 28 is the public

16   health outreach.  And we are talking here

17   about, this is a callout of the section

18   that we saw in the previous slide

19   concerning the prevention of pain.

20             Do you see that?

21             A.    Yes.

22             Q.    And the -- it says, "Focus

23   on athletes, young, old, professional.

24   Work with trainers, young, old

Highly Confidential - Subject to Further Confidentiality Review

Page 673

1    professional.  And work with groups like

2    the NFL."

3                  That's the National Football

4    League, correct?

5            A.    Yes.

6            Q.    -- "to destigmatize pain

7    treatment and better understand abuse."

8                  Do you see that?

9            A.    Yes.

10           Q.    Do you know if there was a

11   focus on athletes for pain management?

12           A.    I don't recall.

13           Q.    Who would know that?

14           A.    I don't know.  I don't

15   know -- I don't know if there are

16   minutes, et cetera.  I think -- I don't

17   know.

18           Q.    Okay.  Do you know if there

19   was any work done with the NFL to

20   destigmatize pain treatment?

21           A.    No, I think this was

22   aspirational.

23           Q.    I don't know how I'm going

24   to get you here.  If you go to Page 37,

Highly Confidential - Subject to Further Confidentiality Review

Page 674

1    and then there's a native -- okay, you

2    found it.  That logo.  Turn the page, go

3    to the next one.  And it says Meeting

4    Number 2, October 12th of 2011.

5              A.    Excuse me.

6              Q.    So this appears to be a

7    second meeting of the group.  Do you see

8    that?

9              A.    Yes.

10             Q.    And is it your memory that

11   there was more than one meeting of the

12   group?

13             A.    I remember a second meeting

14   which comes to mind now as I'm looking at

15   it.

16             Q.    Okay.  And it says, "Welcome

17   new members and expanded communities."

18   Do you see that, Bob, Scott, Pam and

19   Phyllis?

20             A.    Yes.

21             Q.    Do you know who they are, do

22   you remember?

23             A.    I'm not certain.

24             Q.    And at the bottom of that

Page 675

1    page it says, "Explored private and

2    public funding sources."  Do you have any

3    recollection that that was done?

4            A.    I don't know.  I don't have

5    a recollection of whether that was done.

6            Q.    If you turn the page, and

7    I'm looking for media outreach

8    initiatives which is maybe two pages on.

9    Reaching out to youth.  Reach early,

10   elementary school level, via respected

11   channels, for example coaches.  Deliver a

12   practical message.  Pain is your body

13   telling you something important.

14              Do you see that?

15           A.    On the next page, I'm sorry.

16           Q.    Do you see it?

17           A.    Yes.

18           Q.    Do you agree with that, that

19   pain is your body telling you something

20   important?

21           A.    Yes.

22           Q.    If you go a couple of more

23   pages to where you see at the top, "Pain

24   policy, advocacy sub-team platform," at

Highly Confidential - Subject to Further Confidentiality Review

Page 676

1    the top.

2           A.    Yes.

3           Q.    And the bullet point says,

4    "Chronic pain is the number one public

5    health problem."

6                 Do you see that?

7           A.    Yes.

8           Q.    Do you agree with that?

9           A.    I don't know if it's the

10   number one public health problem.  It's

11   certainly an important public health

12   problem.

13          Q.    Okay.  It says, "The

14   priority area of focus.  An epidemic of

15   pain versus an epidemic of addiction."

16                Do you see that?

17          A.    Yes.

18          Q.    Do you agree that there is

19   an epidemic of addiction in the United

20   States?

21          A.    I think there's an epidemic

22   of abuse.  And I -- there may be people

23   who are addicted, I'm not sure.  I'd have

24   to think a little bit about that.

Page 677

1          Q.    Okay.  What about an

2    epidemic of pain?

3          A.    I think there was -- in

4    2011, I think there was a sense that pain

5    was undertreated and that individuals

6    had -- who deserved legitimate treatment

7    for their pain was something that would

8    need to be addressed.

9          Q.    Do you think it was an

10   epidemic?

11         A.    I'm not sure exactly whether

12   it -- whether it was a criteria that

13   would fit for epidemic or not.  And

14   again, some of this may have been

15   aspirational or perceptions.  I don't

16   have the -- I don't have the supporting

17   framework to understand what -- what we

18   were meaning by these statements.

19         Q.    Okay.  If you keep going a

20   few pages, there's a third meeting in

21   February of 2012.  There's a meeting

22   summary.  Do you see that?

23         A.    I see February 2012 meeting

24   summary.

Highly Confidential - Subject to Further Confidentiality Review

Page 678

1          Q.     Okay.

2          A.     Yeah.

3          Q.     And is it your memory that

4    you would have still been a part of this

5    pain coalition as of the third meeting in

6    February of 2012?

7          A.     Quite possibly.  I can't --

8    I don't recall if I was at the entire

9    meeting, but I was involved with the pain

10   coalition.

11         Q.     Okay.  And so you would

12   have -- you would have received -- the

13   slides either would have been available

14   and watching them when they were shown or

15   you would have received copies of them?

16         A.     We would have had some --

17   some information around this meeting.

18         Q.     If you keep turning the

19   pages, you'll get to the fourth meeting.

20         A.     You had asked a question

21   earlier, counselor, about epidemics,

22   et cetera, and I think what's important,

23   we focus -- when we talk about this

24   relieving pain, the Institute of Medicine

Page 679

1    report.  Because that was a blueprint for

2    pain management in the U.S., and a number

3    of the issues related to pain prevention

4    as a public health issue.  And

5    communicating with public and policy

6    members, state legislators, some of those

7    were things that came out from the IOM

8    report.  So I want to make sure that it's

9    clear for the record that this types of

10   thinks -- thinking was based on a

11   government-generated document.

12           Q.    When was the Institute of

13   Medicine report issued?

14           A.    I'd have to look and see

15   when that is.  But it -- the title is --

16   it's easily findable from the Institute

17   of Medicine report.  And I think it was a

18   blueprint for the -- I'm paraphrasing the

19   title.

20                 But that -- that addresses a

21   number of the thinking for the committee

22   members around what we had hoped to

23   accomplish.

24           Q.    Do you know if that

Page 680

1    Institute of Medicine report was issued

2    prior to the pain coalition getting

3    together?

4              A.    I don't remember the timing.

5              Q.    Okay.  If you keep --

6              A.    But I do remember that one

7    of the members of the pain coalition was,

8    I believe, a participant in the IOM

9    report.  And would have been able to

10    inform us certainly about the report and

11    its findings.  And that was one of the

12    reasons why we had this cross-functional

13    team of individuals participating in it.

14              Q.    Do you remember -- do you

15    remember that person's name?

16              A.    I believe it was Dr. Richard

17    Payne.  And if you search the blueprints

18    for Payne -- I don't know what the title

19    is.  It's the IOM report.  I believe that

20    Dr. Payne was one of the participants and

21    a contributor.

22              Q.    And was he -- was he paid

23    for his time on the pain coalition, do

24    you remember?

Page 681

1          A.     I don't recall.

2          Q.     Do you know if anyone was,

3    who was not a Janssen employee?

4          A.     I don't recall the specifics

5    around the funding.  The company was

6    interested in not having it come

7    specifically from Janssen, which is why

8    you had called out public or private

9    funding.  And it was -- the intent was to

10   not have it necessarily come from a

11   pharmaceutical company, but to have

12   independent funding.  That was something

13   that was aspirational.  And I believe we

14   thought that it would be something that

15   might take time to develop.  So Janssen

16   was involved initially, but again with

17   the idea of handing it off to a more --

18   to a different organization that would be

19   funding it.

20         Q.     Do you know if that ever

21   happened?

22         A.     I don't know if the

23   coalition was around that long to enable

24   it to happen.  I don't know.

Page 682

1          Q.    Okay.  You can put that

2    document away.

3                Doctor, at the start of the

4    direct examination by Mr. Lifland today,

5    you said that you did not have primary --

6    primary responsibility for marketing or

7    for sales or for compliance.  Do you

8    recall that testimony?

9          A.    I do.

10         Q.    You were involved, however,

11   with marketing, sales and compliance.  So

12   what you did touched on those areas,

13   correct?

14               MR. LIFLAND:  Object to the

15               form of the question.

16               THE WITNESS:  Some of my

17               activities at the company were in

18               a position that I would have

19               interacted with people on those --

20               you know, but again as you stated

21               those were not my primary

22               responsibilities.

23   BY MS. CONROY:

24         Q.    Correct.  Your primary

Page 683

1    responsibility was medical affairs.

2            A.    Yes, that's correct.

3            Q.    You did sit on the

4    promotional review committee, correct?

5            A.    Yes.

6            Q.    And what years did you sit

7    on that?

8            A.    I don't have -- I don't have

9    the data, the time I was on it.

10           Q.    Did you tell me this?  I

11   don't remember.  Was it a couple of

12   years?

13           A.    Yes.  It was -- I don't

14   remember how long it was.  It was years.

15   But I don't remember how many years.  And

16   I don't remember when I started on it.

17   And I don't remember when I finished

18   serving on it.

19           Q.    You had testified in

20   response to some questions by Mr. Lifland

21   that abusers are looking for a, quote,

22   quick high.  Do you remember that?

23           A.    I do.

24           Q.    What studies support the

Page 684

1    fact that an abuser is looking for a

2    quick high as opposed to a higher dose

3    for pain -- for a pain problem or to

4    avoid withdrawal syndromes?

5         A.    I don't have specific

6    studies that I can give you offhand

7    today.  I think when we talked to our

8    experts and individuals who are

9    knowledgeable, the general teaching and

10   what people understand, is that, as I

11   testified earlier, the faster the

12   medication can reach the central nervous

13   system, the more potentially desirable it

14   would be for people who abuse these

15   products.

16        Q.    But do you know if they feel

17   a high or if they're feeling withdrawal?

18        A.    I don't understand your

19   question.  I'm sorry.

20        Q.    Looking for a faster

21   medication to hit the central nervous

22   system, correct?

23        A.    Yes.

24        Q.    That's what we're

Highly Confidential - Subject to Further Confidentiality Review

Page 685

1    discussing?

2            A.    Yes.

3            Q.    Do you know if the desire

4    for that faster medication to hit the

5    central nervous system is to experience a

6    high or to avoid the lows of withdrawal?

7            A.    It may be both.

8            Q.    Do you know of any evidence

9    that chronic pain patients taking opioid

10   medication are experiencing quick highs?

11           A.    I do not.  You mean using

12   the medications as prescribed to treat

13   their chronic pain?

14           Q.    Yes.

15           A.    I'm not aware of any study

16   like this.

17           Q.    Are you aware of any

18   evidence of chronic pain medications

19   taking opioids who misuse their

20   products -- misuse the products taking it

21   for a quick high?

22           A.    Not that I'm aware of.

23   There may be.  No.  Not that I'm aware

24   of.

Page 686

1          Q.    Do you know if there are

2    any -- any studies looking at chronic

3    pain patients taking opioid medications

4    who misuse those opioid medications that

5    are looking to escape withdrawal --

6    withdrawal symptoms?

7          A.    So that would be a study

8    where an endpoint would have been asking

9    the people why they were taking the

10   medications.  And I'm not aware of that

11   type of study where those type of

12   endpoints would have been predefined in

13   the study to be able to answer that

14   question.

15         Q.    So you're not aware of a

16   study with predefined endpoints of either

17   a quick high or avoidance of withdrawal?

18         A.    Where participants would

19   have been asked those questions, no.  For

20   both of those two questions, no.

21         Q.    You mentioned Dr. Cynthia

22   McCormick sat on the external advisory

23   board.  Do you recall that testimony?

24         A.    Yes.

Page 687

1          Q.     And when she was on the

2     external advisory board at Janssen, was

3     she still at the FDA?

4          A.     No, she was not.

5          Q.     And was she paid for her

6     time on the external advisory board?

7          A.     I believe she was.  She was

8     a consultant to the company.

9          Q.     Okay.  Do you know if there

10    was a separate payment for the external

11    advisory board or would that have been

12    covered in a consultancy agreement?

13         A.     I don't remember the

14    specifics around how it was done.

15         Q.     Do you know if she had to

16    get permission from the FDA to enter into

17    a consulting agreement with Johnson &

18    Johnson, Janssen?

19         A.     I don't know the answer to

20    that question.

21         Q.     And would you remind me.  Do

22    you have a memory of the external

23    advisory board actually meeting?

24         A.     Yeah.  The external review

Page 688

1    committee met quarterly in Philadelphia,

2    which I had testified to.

3            Q.    You did tell me that.  Thank

4    you.

5            MS. CONROY:  Let me -- let's

6            take a quick break.  I want to

7            find that reference in the Ad

8            Board for you.

9            THE VIDEOGRAPHER:  The time

10           is 3:52 p.m.  Going off the

11           record.

12              (Short break.)

13           THE VIDEOGRAPHER:  The time

14           is 4:03 p.m.  We are back on the

15           record.

16   BY MS. CONROY:

17           Q.    Doctor, during the break I

18   wanted to see if I could find in the Ad

19   Board summary the reference to the

20   discussion about selection of patients

21   for opioid treatment.

22              And if you could turn to

23   Page 39, please, of Exhibit 9.  And if

24   we -- are you there?  At the bottom of

Highly Confidential - Subject to Further Confidentiality Review

Page 689

1    the page it's talking about, this is the

2    section that was discussing various

3    epidemiological studies that could be

4    conducted.  And if you look at the bottom

5    of Page 39, it says how to define -- how

6    to define the population to follow up in

7    an epidemiological study.  And then, as

8    you continue to go through this, and

9    you're free to look, if you want to, but

10   on Page 40, it says you could use

11   screens, screen a large number of people,

12   if we had a good screening instrument for

13   vulnerability.  Do you see that?

14        A.    I don't see it yet.

15        Q.    Okay.  Right before -- at

16   the bottom it says, "An ethical

17   issue/dilemma," on 40.  And then right

18   above it talks about a good screening --

19        A.    Yeah.  Let me look at the

20   answer above that if I might.

21        Q.    Sure.

22        A.    Okay.  I see the statement

23   about, "So maybe then you could use

24   screens for example," that's the one

Highly Confidential - Subject to Further Confidentiality Review

Page 690

1    you're referring to?

2           Q.    Well, I just wanted to

3    orient you in -- into the section and

4    what we're discussing is how you would

5    either identify high risk individuals,

6    individuals who are at risk for addiction

7    if they are given opioids for chronic

8    pain, or to assist in the preselection of

9    patients for opioid treatment.  You -- so

10   I was just trying to orient you.

11          A.    I see.

12          Q.    Okay.  Do you recall

13   discussions about how to determine or how

14   to screen for the proper or appropriate

15   patients for opioid treatment?

16          A.    Do you mean by recall,

17   recall from the conversation in the

18   advisory board?

19          Q.    Yes.

20          A.    Yes, I have some

21   recollection of this discussion.

22          Q.    Okay.  Then if you turn to

23   Page 42.  At the bottom it says B-4 H,

24   how to identify high risk people.  Do you

Page 691

1    see that?

2          A.    Yes.

3          Q.    And it says, "Most of the

4    studies show that people that do become

5    dependent on prescription opiates had a

6    childhood or an adolescent onset of some

7    other kind of substance abuse.  They are

8    marijuana abusers, et cetera, not just

9    users."

10               Do you see that?

11         A.    Yes.

12         Q.    And do you have an

13   understanding of the extent to which

14   preselection would include individuals

15   who use marijuana?

16         A.    I would need to understand

17   what they mean by this statement.  And

18   it -- so there's not enough information

19   for me to talk about the distinction

20   between -- I understand the terms but I

21   don't understand the context.  So

22   substance abuser, I understand, versus a

23   casual user.  In this case just users.

24         Q.    Okay.  Have you ever looked

Page 692

1    into the issue of whether or not an

2    individual who suffers from depression

3    could potentially be at higher risk for

4    addiction if prescribed opioids for pain?

5         A.    I'm aware of the fact that

6    people who may have psychiatric disorders

7    may be at higher risk for issues and

8    problems with opioid therapy.

9         Q.    And have you been -- has

10   that been fairly well known since your

11   time at Janssen, or is that something

12   more recent?

13        A.    It's something that's been

14   known for sometime.  I don't know how

15   long it would be, to precisely answer

16   your question.

17        Q.    Okay.  You can put that

18   away.

19             Earlier today during

20   questioning by Mr. Lifland, you talked

21   about publications.  And you said there

22   was a procedure in place that studies

23   that were undertaken would be published.

24   Do you recall that?

1           A.    As part of their -- the --

2     the company had a policy, I don't know if

3     it was a procedure.  The company had a

4     policy that studies that were undertaken

5     would be published.

6           Q.    And I just want to

7     understand that a little bit more.

8                 Would they be -- would there

9     be an attempt to have them published in a

10    peer-reviewed publication first, or are

11    we talking about published online or --

12    what -- what do you mean by published?

13          A.    So the intent would be to

14    have the data presented in a

15    peer-reviewed article -- a peer-reviewed

16    journal, or presented at a -- at a

17    professional meeting where the

18    information would be peer reviewed.

19                But just to clarify, make

20    sure that I understand your statement,

21    the online journals are -- are frequently

22    peer reviewed.

23          Q.    I guess my question more

24    was, is it true that every study

Page 694

1    undertaken at Janssen would ultimately be

2    published somewhere?

3         A.    This would be an attempt to

4    try and publish it someplace.  The study

5    may not always be accepted, but it would

6    be submitted for some type of

7    publication, presentation in a meeting or

8    the like.

9         Q.    And it would just --

10   every -- every study would be published,

11   it would just be a difference with

12   respect to the level of peer review or

13   whatever it might be, where that study

14   might be accepted?

15        A.    I'm not understanding your

16   question.

17        Q.    Well, what if -- what if a

18   study is submitted to three different

19   journals and it is not accepted?  Would

20   that study then be published in a poster,

21   for example, at an American Pain

22   Management conference or would there be

23   some attempt to have it published

24   somewhere?

Page 695

1          A.     Yes.

2          Q.     Were there ever situations

3    where it was impossible to get something

4    published?

5          A.     With one of our studies --

6    actually, for two of our studies the

7    primary endpoint data, we submitted it to

8    multiple journals to be published and

9    they were rejected.  We did present that

10   in an abstract poster at a professional

11   meeting.  As I've just indicated, it is

12   part of our responsibility to disseminate

13   this type of information to the public.

14              And then additional

15   information was published on some of the

16   secondary endpoints, so for example the

17   article that I presented, that we

18   discussed today on quality of life.

19         Q.     Okay.  And what were -- what

20   were the topics.  Did you say there were

21   two of those that you're aware of?

22         A.     Yeah, I referenced those two

23   studies.  The study looking at patient

24   preference compared to OxyContin and the

Page 696

1    study comparing patient preference to

2    Percocet, those two study.

3           Q.     Patient preference with

4    reference to -- I couldn't hear you.

5           A.     There were two studies that

6    we talk about.  One was a patient

7    preference comparing transdermal fentanyl

8    to OxyContin, extended-release oxycodone,

9    and a second study with a very similar

10   design comparing the use of transdermal

11   fentanyl to Percocet for patient

12   preference.

13          Q.     And both of those were

14   presented via poster?

15          A.     That's my recollection.  I

16   don't know if those are separate posters

17   or one posters.  I don't remember how it

18   was.  But it was disseminated through a

19   poster or an abstract.  That would have

20   been submitted to a professional society.

21                 (Document marked for

22                 identification as Exhibit

23                 Janssen-Vorsanger-24.)

24   BY MS. CONROY:

Page 697

1            Q.    Let me show you what I've

2    marked as Exhibit 24.  Exhibit 24 is an

3    e-mail with a manuscript attached dated

4    February 21st, 2003.  JAN-MS-02103693.

5                  Doctor, do you know if the

6    manuscript that's attached -- you are an

7    author and Dr. Nat Katz is an author as

8    well as others.  "Patient preference for

9    treatment and difficulty with its

10   interpretation:  Result of two randomized

11   controlled clinical trials."

12                 Do you know if this

13   manuscript was published?

14           A.    I don't know.

15           Q.    Would it be your

16   anticipation or would you have expected

17   that it would be published somewhere?

18           A.    Yes.  It looked like it was

19   being prepared for publication.

20           Q.    Do you have any -- I could

21   not find it, looking at it under this

22   title.  Do you recall whether or not this

23   title changed?

24           A.    I don't know.  I don't know

Page 698

1    whether it would have been submitted and

2    rejected, in which case, if you had done

3    a search by the title, you would not have

4    found it.

5         Q.    And so if it was -- if this

6    was -- how would I find outfit was

7    submitted and rejected?  Where would that

8    information be?

9         A.    That would have been part of

10   the processes at Janssen where they would

11   have identified where they submitted it

12   and the outcome, what happened to it.

13        Q.    And what department would

14   that be at Janssen?

15        A.    It might have been something

16   that came out of medical affairs, but I

17   don't know where that would be today.

18        Q.    Okay.  Would medical affairs

19   keep track of publications, what was --

20   what was in print, what was approved for

21   publication, that sort of thing?

22        A.    So publication strategy

23   might have been done through medical

24   affairs.  How the company is currently

Page 699

1    tracking publications, I can't comment.

2    I simply don't know.  And I don't know

3    what type of processes would be in place

4    to identify what was submitted and

5    rejected at this time.  At this -- you

6    know, 15 years ago.

7            Q.    Okay.  Do you believe it was

8    within your -- do you believe it was

9    within medical affairs or someplace else

10   at Janssen that would keep track of

11   whether or not articles were published?

12           A.    So medical affairs articles

13   may have been tracked by personnel in

14   medical affairs as part of the

15   publication plan.  But I don't know

16   15 years ago, you know, how we would have

17   been able to answer your question.

18                 Again, it looked like it was

19   formatted, or close to it, for

20   submission.  So it looked like there was

21   an intent to submit to article at some

22   point.

23           Q.    You can put that one away.

24                 (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

Page 700

1            identification as Exhibit

2            Janssen-Vorsanger-25.)

3       BY MS. CONROY:

4            Q.    We'll mark as Exhibit 25

5       JAN-MS-02077691 through 725 this is an

6       e-mail from you to Hany Rofael dated

7       June 2nd, 2014, with draft "Pain week

8       poster abstract:  Withdrawal, dependance

9       and abuse."

10            Is this an example of

11       something that made its way to a poster?

12       Do you know?

13            A.    I don't know if this was

14       material that would have been presented

15       at a professional meeting.  This looks

16       like it's set up here for a submission to

17       a journal.  And it says Journal of Opioid

18       Management, TBD, high impact pain journal

19       with broad reach.  So the intent was we

20       thought this would be information that

21       would be clinically valuable to a number

22       of different people.  And once we have

23       the information, we would typically look

24       to decide what would be the best and most

Page 701

1    appropriate journal.  It looks like at

2    this time we thought that this would be a

3    journal that would be appropriate.

4          Q.    Take a look at -- you have

5    to go by the Bates number, 724.  It's at

6    the very end.

7          A.    I'm sorry, I'm not seeing

8    that.

9          Q.    724.  It's the second to the

10   last page of the document.

11         A.    Oh, okay.

12         Q.    And this is a -- you wrote

13   this article, correct?  Or you were one

14   of the authors?

15         A.    I was one of the authors.

16         Q.    The very end of the article

17   says, "Can a chronic pain patient become

18   addicted to opioid drugs?"

19               Do you see that?

20         A.    Yes.

21         Q.    And in the middle of that --

22   actually, the final sentence of the

23   article, "In a review of 24,000 patients

24   who were medically prescribed opioids,

Page 702

1    only seven could be found who got into

2    trouble with them.  So a chronic pain

3    patient becoming addicted to opioid

4    medications is definitely the exception

5    rather than the rule."

6                    Do you see that?

7         A.    Yes.

8         Q.    Do you know what is -- what

9    the citations for the 24,000 patients who

10   were medically prescribed opioids with

11   only seven who could be found who got

12   into trouble with them?

13        A.    I don't.  And this looks

14   like a draft for the reasons that we're

15   still trying to determine what the

16   appropriate journal would be.  So there

17   may be more information that we have --

18   than we have here.

19        Q.    Does that ring any bells

20   with you?  That's a fairly large study,

21   24 thousand patients, with respect to

22   addiction to prescribed opioids.  Does

23   that ring any bells?

24        A.    The study that might have

Page 703

1   been cited by this doesn't jump out at me

2   at the moment.

3           Q.    If the study -- if this

4   article was published, that would be

5   cited, correct?

6           A.    If the final draft was

7   published, this may or may not be in, we

8   would need to look and see under a

9   different type -- under further review,

10  whether this was appropriate or not or

11  whether it was there or not.

12          Q.    Sure.  But if it was there,

13  it would be typical that there would be a

14  citation for something like that, where

15  there's actually data presented, correct?

16          A.    For -- when this type of a

17  statement is made, it's typically

18  referenced.

19                MS. CONROY:  That's all I

20          have.  Thank you.

21                THE VIDEOGRAPHER:  Off the

22          record switch?  Or do you want to

23          stay there?

24                MR. LIFLAND:  I can do it

Page 704

1          here.  I've only got about three
2          or four very quick questions.
3                    -  -  -
4                 EXAMINATION
5                    -  -  -
6  BY MR. LIFLAND:
7          Q.    Let's go back and pull out
8  Exhibit 23.  This is the e-mail that
9  attaches the Imagine the Possibilities
10 Pain Coalition.
11         A.    Yes.
12         Q.    And my question is, did
13 Janssen continue with this initiative
14 after the meetings that are described in
15 these --
16         A.    No, they did not.  The
17 e-mail documentation here indicates that
18 we -- that this -- this pivotal program
19 was terminated.
20         Q.    And you're referring to the
21 Bates stamp number JAN-MS-02057429?
22         A.    Yes, that's correct.
23         Q.    And what does it say there?
24         A.    At the bottom it says, "A

Page 705

1    decision to discontinue the Imagine The

2    Possibilities Pain Coalition was rendered

3    in December 2012 resulting from a lack of

4    available resources to continue funding

5    the initiative."

6         Q.    Just a few quick questions

7    about the promotional review committee on

8    which you sat.  Were you representing

9    marketing on the promotional review

10   committee?

11        A.    No, I was not.

12        Q.    Were you representing sales

13   on the promotional review committee?

14        A.    No, I was not.

15        Q.    Were you representing

16   compliance on the promotional review

17   committee?

18        A.    No, I was not.

19        Q.    And in fact, there was

20   another compliance officer who sat on the

21   committee?

22        A.    That is correct.

23        Q.    You were representing

24   medical affairs?

Page 706

1          A.    Correct.

2          Q.    And what was your role as

3    the representative of medical affairs?

4          A.    My role as the

5    representative for medical affairs on the

6    promotional review committee was to

7    ensure medical -- help to ensure medical

8    accuracy of the information that was

9    being developed.

10              MR. LIFLAND:  No further

11         questions.

12                   -  -  -

13              EXAMINATION

14                   -  -  -

15    BY MS. CONROY:

16         Q.    Doctor, do you recall in

17    January of 2014, I'll show it -- it

18    appears -- or I may be able to find

19    copies of it.  January 16, 2014.  You

20    probably have it there, I think.

21              An e-mail.  You were asked

22    some questions by Martha Popsner and Amit

23    Patel about promotional speaker bureau

24    training.  Do you recall being involved

Page 707

```
1    in promotional speaker bureau training

2    sessions?

3         A.    Yes.

4         Q.    And they had asked you about

5    upcoming speaker training for Nucynta and

6    they had questions concerning the

7    presentation of some materials.

8               And I'll put -- I'll wait to

9    put something.  I have some writing on

10   this document, so I'll wait until we have

11   a clean copy.

12              I don't know if you can see

13   it.  But the question is -- of course you

14   can't see it.

15              I'll read you the e-mail.

16   "Hi Gary.  I'm wondering if you would

17   mind reviewing a slide Amit and I

18   developed for the upcoming speaker

19   training this weekend on comparative

20   claims for Nucynta and Nucynta ER.  You

21   are so familiar with this audience, more

22   than Amit and I, and we value your

23   opinion on the presentation of this

24   information."
```

Highly Confidential - Subject to Further Confidentiality Review

Page 708

1             And then you respond:  "The

2    statements contained within the

3    directive" -- I'm sorry.

4             "The statements contained

5    within reflect the direction that the

6    company has been given our speakers."

7             So let me have a copy of

8    this now.  Let me pass this to you as

9    Exhibit 26.

10            (Document marked for

11        identification as Exhibit

12        Janssen-Vorsanger-26.)

13   BY MS. CONROY:

14        Q.    And what I'm going to ask

15   you about is the attachment.  It's

16   JAN-MS-00606393 with a native file 6394.

17            And my question with respect

18   to this final page where you apparently

19   review the -- the comparative efficacy

20   and safety claims concerning Nucynta ER

21   and Oxycodone CR, you were -- you were in

22   a position to advise your colleagues with

23   respect to what types of comparative

24   statements could be made at a speakers

Page 709

1   bureau training facility, correct?

2          A.    I'd like -- I'd like to read

3   the document.

4          Q.    Yeah.  Go right ahead.

5          A.    I'm sorry, I'm -- I'm not

6   sure what your question is at this point.

7          Q.    You were -- you were well

8   versed enough in this subject to be able

9   to respond to Ms. Popsner and Mr. -- or

10  maybe it's Ms. or Mrs. or Mr. Patel, with

11  respect to questions they had about what

12  could be said at a promotional speakers

13  bureau training conference.

14         A.    They asked me questions

15  about the type of information that could

16  be included as part of healthcare

17  compliance guidance for the meeting.  And

18  the information that was discussed was

19  that what we have down here, is it

20  permissible to make efficacy and safety

21  comparisons between Nucynta and Oxycodone

22  IR or Nucynta ER or Oxycodone ER, and the

23  direction was the Oxycodone CR was used

24  for assay sensitivity and these were not

Page 710

1    active comparators in the clinical

2    studies and they were not designed for

3    head to head, therefore, it's not

4    appropriate to make comparisons between

5    the efficacy and safety as part of these

6    activities.

7          Q.    Correct.  And even though

8    you were not primarily responsible for

9    marketing or for sales or for compliance,

10   you were able to provide the company

11   direction to individuals that were

12   working on training the speakers bureau?

13         A.    This is based on the

14   clinical trial design and the medical

15   aspects of it, which was my -- what was

16   my function in medical affairs.

17         Q.    Right.

18         A.    So they would have had to

19   opine on the approach from a compliance

20   perspective.  Because, one, these were

21   regulatory and compliance officers.  I

22   couldn't give them that.  I can just say

23   that the way this was described was

24   consistent with the company's approach on

Page 711

1    how to describe the clinical data.

2         Q.    Well, let's take a look at

3    your response to them.  It's not about

4    the clinical trial.  It says, "The

5    statements contained within reflect the

6    direction that the company has been given

7    our speakers."

8         A.    Right.  So clinically these

9    were not head-to-head studies.  They

10   weren't statistically powered and

11   prespecified to look at differences in

12   efficacy and tolerability between the

13   doses of tapentadol selected.  Despite

14   this, we have opted to just discuss the

15   primary efficacy endpoint and make

16   statements relating to tapentadol and

17   placebo and that Oxycodone was used for

18   assay sensitivity.

19              So as someone with

20   experience in clinical trial, explaining

21   to them on study design on how it would

22   be done, this would be appropriate to

23   inform them.  The decisions on what they

24   would communicate through healthcare

Page 712

1    compliance guidelines would have been the

2    responsibilities of the compliance

3    officer.

4         Q.    I understand that would be

5    the final arbiter of the compliance, but

6    you were -- you were well versed and

7    understood what it would be appropriate

8    to say or not say to a speaker, correct?

9         A.    Based on the data and the --

10   and the extent of what the data could or

11   could not be used.

12        Q.    Right.  You would understand

13   what could be said to a speaker with --

14   you would understand what could or could

15   not be used when speaking to key opinion

16   leaders or speakers?

17        A.    About clinical studies.  Not

18   about necessarily what would be

19   appropriate from a compliance or

20   regulatory perspective.

21        Q.    Correct.  My point is, that

22   you did understand what could be used

23   from clinical studies with respect to

24   promotional materials or speaking to key

Page 713

1    opinion leaders or speakers that were on

2    a bureau?

3            A.    I'm still not -- I'm not

4    exactly understanding the point that

5    you're trying to make.  As someone in

6    medical affairs which was knowledgeable

7    about the studies, speaking with

8    individuals who may not have that degree

9    of trial expertise was explaining how the

10   data would be analyzed and how the data

11   would be used.  It's not -- I'm not

12   totally --

13           Q.    So you did not have an

14   understanding of what would or would not

15   be appropriate to be said either to sales

16   representatives, to healthcare

17   professionals or to key opinion leaders,

18   you would only be able to tell compliance

19   what the results of the clinical trial

20   were?

21           A.    That would be the primary

22   focus.  They would need to see -- they

23   would need to understand what was

24   permissible or not permissible by the

Page 714

1    rules for FDA.  But I would certainly be

2    in a position, as I did -- I believe I

3    did here, is to explain the results of

4    the clinical study.

5            Q.    What did you mean when you

6    said, "The statements contained within

7    reflect the direction that the company

8    has been given our speakers"?

9            A.    Right.  So the first part of

10   it would say, is it permissible to make

11   efficacy and safety comparisons between

12   Nucynta and Oxycodone IR and Nucynta and

13   Oxycodone CR and the company's position

14   was, as it's stated here, that Oxycodone

15   was included for assay sensitivity and

16   these were not active comparators in the

17   clinical study, which is correct.  And

18   the studies were not designed to make

19   head-to-head comparisons which is also

20   correct.  Therefore it's not appropriate

21   to make comparisons between the efficacy

22   and safety of Nucynta and Oxycodone IR or

23   Nucynta ER and Oxycodone ER.  So these

24   were statements that if people were out

Page 715

1    talking about our products, we wanted to

2    make sure that they weren't overstating

3    the efficacy that we had which was

4    appropriate.  Those would have been

5    direction, as you know, from FDA, to make

6    sure that the data are fair balanced and

7    completely reflect what we actually did.

8                    And there are examples here

9    that talk about what you could not say.

10   So these are examples of inappropriate

11   comparisons based on some of the clinical

12   trials.

13        Q.    Did you or did you not

14   understand what was appropriate to be

15   said out to healthcare professionals or

16   to individuals on a speakers bureau about

17   the results of clinical trials?

18        A.    Yes.  The clinical trial

19   data, I understand what you could explain

20   what the studies did or did not say, and

21   that could communicate in peer -- in

22   conversation with these peer-to-peer

23   individuals.

24        Q.    I didn't hear the very end

Page 716

1   of your answer.

2        A.    Yeah, so yes, the results of

3   clinical trials I did understand, and

4   would communicate the results of those

5   studies in a conversation with our

6   speakers.

7        Q.    And you understand the

8   rules -- you understood the rules, you

9   understood what you could say and what

10  you could not say?

11       A.    Based on FDA direction on

12  what we were allowed to say on levels of

13  efficacy.

14       Q.    So it was more than just an

15  understanding of the clinical trial

16  results.  You also, as someone in medical

17  affairs, had an understanding of what --

18  what was appropriate and not appropriate

19  to say about clinical trials?

20       A.    I could certainly weigh in,

21  but I was not the ultimate arbiter.  That

22  would have been through regulatory

23  affairs.

24       Q.    Correct.  Ms. Popsner did

Highly Confidential - Subject to Further Confidentiality Review

Page 717

```
 1   not contact regulatory affairs?
 2           A.     She is regulatory affairs.
 3           Q.     So regulatory affairs came
 4   to you?
 5           A.     Regulatory affairs came to
 6   me to ensure that there was -- that what
 7   they were saying was clinically correct.
 8           Q.     Do you recall any other
 9   times that they came to you for
10   assistance?
11           A.     They came to me for
12   assistance as part of members of the
13   promotional review committee where they
14   wanted to have a better understanding of
15   what the data actually meant and
16   potentially what the clinical
17   implications of those data would be.  So
18   my role as a medical reviewer and
19   somebody from medical affairs was to
20   provide that type of expertise to explain
21   what some of the clinical trial data
22   mean.
23           Q.     Would this have been
24   something that arose out of the
```

Page 718

1    promotional review committee or would

2    this have been outside that?

3         A.    This would have been

4    something that would have been reviewed

5    by the promotional review committee as

6    part of the materials that would have

7    been shared as part of speaker training.

8         Q.    So the -- whatever this

9    slide is or whether it was part of a

10   slide deck, the promotional review

11   committee would review this slide deck?

12        A.    Yes.

13        Q.    And I'm not suggesting, you

14   don't know the years that you were on it,

15   so you don't know if you would have

16   reviewed this anyway, correct?

17        A.    Yes.  Moreover -- yes, I

18   don't know exactly when this was done.

19   And it's associated with an e-mail, but

20   this is something that I probably --

21   likely would have seen.

22             MS. CONROY:  Okay.  I have

23        no further questions.  Thanks.

24             MR. LIFLAND:  I think we're

Highly Confidential - Subject to Further Confidentiality Review

Page 719

1        done.

2                THE VIDEOGRAPHER:  Okay.

3        The time is 4:36 p.m., December 6,

4        2018.  Going off the record,

5        completing the videotaped

6        deposition.

7                    (Excused.)

8                    (Deposition concluded at

9        approximately 4:36 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 720

```
 1
 2                    CERTIFICATE
 3
 4
 5          I HEREBY CERTIFY that the
      witness was duly sworn by me and that the
 6    deposition is a true record of the
      testimony given by the witness.
 7
           It was requested before
 8    completion of the deposition that the
      witness, GARY VORSANGER, Ph.D., M.D.,
 9    have the opportunity to read and sign the
      deposition transcript.
10
11
12    _____
      MICHELLE L. GRAY,
13    A Registered Professional
      Reporter, Certified Shorthand
14    Reporter, Certified Realtime
      Reporter and Notary Public
15    Dated:  December 11, 2018
16
17
18          (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 721

1                INSTRUCTIONS TO WITNESS

2

3                Please read your deposition

4       over carefully and make any necessary

5       corrections.  You should state the reason

6       in the appropriate space on the errata

7       sheet for any corrections that are made.

8                After doing so, please sign

9       the errata sheet and date it.

10               You are signing same subject

11      to the changes you have noted on the

12      errata sheet, which will be attached to

13      your deposition.

14               It is imperative that you

15      return the original errata sheet to the

16      deposing attorney within thirty (30) days

17      of receipt of the deposition transcript

18      by you.  If you fail to do so, the

19      deposition transcript may be deemed to be

20      accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 722

```
 1                   -  -  -  -  -  -

                      E  R  R  A  T  A

 2                   -  -  -  -  -  -

 3

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6         REASON:  _____

 7    ____   ____   _____

 8         REASON:  _____

 9    ____   ____   _____

10         REASON:  _____

11    ____   ____   _____

12         REASON:  _____

13    ____   ____   _____

14         REASON:  _____

15    ____   ____   _____

16         REASON:  _____

17    ____   ____   _____

18         REASON:  _____

19    ____   ____   _____

20         REASON:  _____

21    ____   ____   _____

22         REASON:  _____

23    ____   ____   _____

24         REASON:  _____
```

Highly Confidential - Subject to Further Confidentiality Review

Page 723

```
 1
 2            ACKNOWLEDGMENT OF DEPONENT
 3
 4            I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 420 - 724, and that the
 7    same is a correct transcription of the
 8    answers given by me to the questions
 9    therein propounded, except for the
10    corrections or changes in form or
11    substance, if any, noted in the attached
12    Errata Sheet.
13
14
15    _____
16     GARY VORSANGER, Ph.D., M.D.       DATE
17
18
19    Subscribed and sworn
      to before me this
20    _____ day of _____, 20_____.
21    My commission expires:_____
22

      _____
23    Notary Public
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 724

```
 1                    LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```