Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3
      IN RE: NATIONAL        )
 4    PRESCRIPTION           )  MDL No. 2804
      OPIATE LITIGATION      )
 5    _____   )  Case No.
                             )  1:17-MD-2804
 6                           )
      THIS DOCUMENT RELATES  )  Hon. Dan A.
 7    TO ALL CASES           )  Polster
 8
              THURSDAY, JANUARY 17, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                   - - -
12          Videotaped deposition of Kevin
13    Webb, Fact Deposition, Volume I, held at the
14    offices of STINSON LEONARD STREET LLP, 7700
15    Forsyth Boulevard, Suite 1000, St. Louis,
16    Missouri, commencing at 2:36 p.m., on the
17    above date, before Carrie A. Campbell,
18    Registered Diplomate Reporter and Certified
19    Realtime Reporter.
20
21
22                   - - -
          GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
25
```

Highly Confidential – Subject to Further Confidentiality Review

## Page 2

A P P E A R A N C E S :

KELLER ROHRBACK LLP
BY: DEAN KAWAMOTO
  dkawamoto@kellerrohrback.com
  GARY GOTTO
  ggotto@kellerrohrback.com
  CHANELE REYES
  creyes@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900
Counsel for MDL Plaintiffs

BRANSTETTER STRANCH & JENNINGS, PLLC
BY: JAMES G. STRANCH, III
  jims@bsjfirm.com
  SEAMUS KELLY
  seamusk@bsjfirm.com
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
Counsel for the Tennessee Action

ARMSTRONG TEASDALE, LLP
BY: SARAH E. HARMON
  sharmon@armstrongteasdale.com
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
(314) 621-5070
Counsel for Cardinal Health, Inc.

COVINGTON & BURLING LLP
BY: RYAN ROBERTS
  rroberts@cov.com
  (VIA TELECONFERENCE)
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
Counsel for McKesson Corporation

## Page 3

JACKSON KELLY PLLC
BY: JAMES D. JOHNSON
  jdjohnson@jacksonkelly.com
  (VIA TELECONFERENCE)
221 NW Fifth Street
Evansville, Indiana 47708
(812) 422-9444
Counsel for AmerisourceBergen

JONES DAY
BY: LOUIS P. GABEL
  lpgabel@jonesday.com
150 West Jefferson Avenue, Suite 2100
Detroit, Michigan 48226-4438
(614) 469-3939
Counsel for Walmart

ROPES & GRAY LLP
BY: BRIEN T. O'CONNOR
  brien.o'connor@ropesgray.com
  JOSH GOLDSTEIN
  joshua.goldstein@ropesgray.com
800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000
Counsel for Mallinckrodt

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: PHILIP A. GIORDANO
  Philip.Giordano@arnoldporter.com
  (VIA TELECONFERENCE)
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Counsel for Endo Pharmaceuticals
Inc., and Endo Health Solutions Inc.

VIDEOGRAPHER:
  JAMES ARNDT,
  Golkow Litigation Services
        – – –

## Page 4

INDEX

                                    PAGE
APPEARANCES................................. 2
EXAMINATIONS
  BY MR. GOTTO.............................. 7

        EXHIBITS
No.    Description              Page
        No exhibits proffered

## Page 5

1    VIDEOGRAPHER: We are now on    14:36:03
2  the record. My name is James Arndt.    14:36:04
3  I'm a videographer for Golkow    14:36:06
4  Litigation Services.    14:36:07
5    Today's date is January 17,    14:36:07
6  2019, and the time is 2:36 p.m.    14:36:11
7    This video deposition is being    14:36:13
8  held in St. Louis, Missouri, in the    14:36:16
9  matter of the National Prescription    14:36:18
10  Opiate Litigation, for the United    14:36:21
11  States District Court for the Northern    14:36:23
12  District of Ohio, Eastern Division.    14:36:25
13    The deponent is Kevin Webb.    14:36:25
14    Will counsel please identify    14:36:27
15  themselves.    14:36:29
16    MR. GOTTO: Gary Gotto, Keller    14:36:30
17  Rohrback, LLP, for the plaintiffs.    14:36:33
18    MS. REYES: Chanele Reyes,    14:36:33
19  Keller Rohrback, for the plaintiffs.    14:36:34
20    MR. KAWAMOTO: Dean Kawamoto,    14:36:35
21  Keller Rohrback, for the plaintiffs.    14:36:38
22    MR. KELLY: Seamus Kelly,    14:36:39
23  Branstetter, Stranch and Jennings, for    14:36:39
24  the Tennessee plaintiffs.    14:36:39
25    MR. STRANCH: Jim Stranch from    14:36:43

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1   same firm, same plaintiffs.          14:36:44
2        MR. GABEL: Louis Gabel from      14:36:45
3   Jones Day on behalf of Walmart.       14:36:48
4        MS. HARMON: Sarah Harmon with    14:36:49
5   Armstrong Teasdale on behalf of       14:36:53
6   Cardinal Health.                      14:36:54
7        MR. GOLDSTEIN: Josh Goldstein,   14:36:55
8   Ropes & Gray, on behalf of the        14:36:56
9   witness, Mallinckrodt, LLC, and SpecGx 14:36:57
10  LLC.                                  14:37:00
11       MR. O'CONNOR: Brien O'Connor     14:37:01
12  from Ropes & Gray on behalf of the    14:37:02
13  witness, Kevin Webb, Mallinckrodt,    14:37:04
14  LLC, and SpecGx, LLC.                 14:37:06
15       VIDEOGRAPHER: Will attorneys     14:37:09
16  present by phone please introduce     14:37:09
17  themselves?                           14:37:12
18       MR. ROBERTS: Ryan Roberts,       14:37:15
19  Covington & Burling, on behalf of     14:37:16
20  McKesson.                             14:37:18
21       MR. JOHNSON: Jim Johnson,        14:37:18
22  Jackson Kelly, on behalf of           14:37:20
23  AmericanBerg -- AmeriBergenSource     14:37:23
24  {sic}.                                14:37:28
25       VIDEOGRAPHER: Our court          14:37:28

Page 7

1   reporter is Carrie Campbell, and she  14:37:29
2   will now swear in the witness.        14:37:31
3
4          KEVIN WEBB,
5   of lawful age, having been first duly sworn
6   to tell the truth, the whole truth and
7   nothing but the truth, deposes and says on
8   behalf of the Plaintiffs, as follows:
9                                         14:37:39
10       DIRECT EXAMINATION               14:37:39
11  QUESTIONS BY MR. GOTTO:               14:37:39
12     Q.   Good afternoon, Mr. Webb.     14:37:40
13     A.   Good afternoon.               14:37:41
14     Q.   My name is Gary Gotto, as I   14:37:42
15  just shared. I'm with the law firm Keller 14:37:44
16  Rohrback representing plaintiffs in this  14:37:46
17  matter.                               14:37:47
18       Thank you for taking the time    14:37:48
19  this afternoon to give us a head start on 14:37:49
20  your personal deposition so we can perhaps 14:37:53
21  get done earlier tomorrow than we otherwise 14:37:55
22  would have been able to.              14:38:01
23       I know you testified earlier     14:38:01
24  today with respect to what you did to prepare 14:38:03
25  for your 30(b)(6) testimony.          14:38:04

Page 8

1        Did you engage in any other      14:38:08
2   preparation for your individual testimony, 14:38:11
3   other than the preparation you've already 14:38:12
4   described in the context of your 30(b)(6)? 14:38:14
5     A.   No, nothing.                   14:38:17
6     Q.   Okay. Have you ever given a    14:38:19
7   deposition before today?              14:38:21
8     A.   I have.                        14:38:23
9     Q.   And on how many occasions?     14:38:24
10    A.   One.                           14:38:27
11    Q.   Okay. And what did it pertain  14:38:28
12  to?                                   14:38:29
13    A.   It pertained to -- well, I     14:38:29
14  don't even know the context. It was with 14:38:36
15  Restoril, one of our -- one of our    14:38:38
16  nonpromoted pharmaceutical products, on 14:38:40
17  pricing. I don't know if it was pricing, 14:38:45
18  but -- do you remember the context of it? 14:38:47
19       It was -- I think it had to do   14:38:48
20  with a pricing issue, but this was six years 14:38:50
21  ago.                                  14:38:51
22    Q.   Okay. It was a                 14:38:52
23  Mallinckrodt-related matter --        14:38:53
24    A.   It was a Mallinckrodt-related  14:38:54
25  matter, yes, sir.                     14:38:56

Page 9

1     Q.   Okay. And your -- what was the 14:38:57
2   nature of your knowledge as to matters that 14:38:58
3   were at issue in that litigation as far as 14:39:03
4   you know?                             14:39:04
5     A.   At that time, I was the product 14:39:05
6   manager, senior product manager, of the 14:39:07
7   brand.                                14:39:08
8     Q.   Okay. And what was the brand?  14:39:08
9     A.   Restoril.                      14:39:09
10    Q.   And what type of medication is 14:39:10
11  that?                                 14:39:11
12    A.   Restoril is a sleep aid, a     14:39:11
13  temazepam.                            14:39:18
14    Q.   Okay. Okay. So apart from      14:39:18
15  that deposition, have you otherwise ever 14:39:37
16  testified under oath?                 14:39:39
17    A.   No.                            14:39:40
18    Q.   Okay. Can you briefly describe 14:39:40
19  for me your post-high school education? 14:39:45
20    A.   Education?                     14:39:47
21    Q.   Yeah.                          14:39:49
22    A.   Let's see. Post-high school.   14:39:50
23  I graduated from St. Louis University in 14:39:54
24  1987, and then I graduated with a master's, 14:40:00
25  an MBA, from the University of        14:40:02

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  Illinois-Springfield in 1990 -- 1997.        14:40:05
2      Q.   And what was your undergraduate    14:40:10
3  major?                        14:40:14
4      A.   It was a bachelor of science in    14:40:14
5  behavioral sciences.                14:40:16
6      Q.   Apart from your bachelor's       14:40:18
7  degree and your MBA, any other degrees that   14:40:23
8  you hold?                      14:40:26
9      A.   No.                 14:40:26
10     Q.   Any other professional          14:40:27
11 certifications?                   14:40:31
12     A.   No.                 14:40:31
13     Q.   Any other licenses?           14:40:32
14     A.   No.                 14:40:33
15     Q.   Have you, again, apart from      14:40:34
16 your coursework leading up to your bachelor's  14:40:45
17 degree and your MBA, otherwise taken any      14:40:48
18 other non-degree-related coursework?         14:40:51
19     A.   From a institution of higher      14:40:54
20 learning or just in -- for personal        14:41:00
21 advancement?                    14:41:02
22     Q.   Well, let's start with          14:41:03
23 institution of higher learning.           14:41:05
24     A.   No.                 14:41:08
25     Q.   Okay.                 14:41:10

Page 11

1      A.   I'm just trying to think. No.    14:41:10
2  I mean, nothing that would have been through  14:41:12
3  a university or college.              14:41:14
4      Q.   Okay. Have you taken any --      14:41:16
5  engaged in any coursework related to your    14:41:19
6  professional activities?              14:41:23
7      A.   There would have been          14:41:23
8  presentations, skill classes. We -- those --  14:41:29
9  I mean, and what they were, I don't know. I   14:41:37
10 mean, this was years ago.             14:41:38
11     Q.   Okay. Did any of your          14:41:39
12 undergraduate coursework relate in any way to  14:41:42
13 pharmaceuticals?                  14:41:45
14     A.   No.                 14:41:46
15     Q.   Okay. How about to the         14:41:46
16 Controlled Substances Act?             14:41:50
17     A.   No.                 14:41:50
18     Q.   And any of the work in         14:41:51
19 connection with your MBA relate in any way to  14:41:57
20 pharmaceuticals?                  14:41:59
21     A.   No.                 14:41:59
22     Q.   Or the Controlled Substances     14:42:00
23 Act?                        14:42:01
24     A.   No.                 14:42:01
25     Q.   Okay. Describe for me, if you    14:42:01

Page 12

1  would, your employment after graduating     14:42:11
2  college and up until the time you got your    14:42:15
3  MBA.                        14:42:18
4      A.   Let's see. Following college,    14:42:19
5  I spent a few months at a financial firm. I   14:42:28
6  don't remember who that was. I don't        14:42:39
7  remember who it was. It was -- it was a --    14:42:40
8  it was a -- it was a warehouse position. It   14:42:43
9  was not even -- it was not in finances,      14:42:49
10 believe me.                    14:42:50
11         And then from there, I took a     14:42:52
12 job with -- and that was -- at the time was   14:42:55
13 McDonnell Douglas, which is now Boeing       14:42:58
14 aircraft, and I worked there for           14:43:02
15 approximately three years as what we would    14:43:04
16 call a business analyst. I was a project     14:43:05
17 planner/analyst working with engineers.      14:43:10
18         From there I went to a company    14:43:12
19 called Jordan and Associates here in        14:43:18
20 St. Louis. It was a small consulting firm    14:43:20
21 focusing on record retention. So it was a    14:43:23
22 sales position.                  14:43:26
23         From there, then I went to a     14:43:28
24 company called Option Care. Option Care is    14:43:34
25 a -- was a home infusion company.          14:43:38

Page 13

1          And then from there I was --     14:43:45
2  took on a position as a marketing manager at  14:43:46
3  Memorial Hospital in Springfield, Illinois,   14:43:50
4  at which point then I started and did my MBA.  14:43:54
5      Q.   Okay. And you used the term     14:43:57
6  "home infusion." I'm not familiar with that.  14:44:03
7          What's the nature of that --     14:44:04
8      A.   Home care services. It was a     14:44:06
9  home care company that would -- it was       14:44:07
10 operated out of a small retail pharmacy that  14:44:10
11 would develop medical products, compounded    14:44:14
12 medical products, for home delivery, use at   14:44:19
13 home. Home antibiotics, extended          14:44:23
14 antibiotics, feeding -- enteral nutrition,    14:44:26
15 feeding nutrition.                 14:44:29
16         So someone who's been          14:44:31
17 discharged from a hospital but is still in    14:44:33
18 need of a clinical -- or a therapeutic need,  14:44:35
19 instead of keeping them in the hospital, they  14:44:36
20 would treat them at home.             14:44:39
21     Q.   Okay. Okay. And describe for     14:44:39
22 me, if you would, your employment after      14:44:41
23 obtaining your MBA.                 14:44:44
24     A.   Following that, I went to a      14:44:45
25 company called -- what is now            14:44:49

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  Sanofi pharmaceut -- I went into          14:44:52
2  pharmaceuticals.  That was -- so I started    14:44:55
3  with a company called Sanofi -- at the time   14:44:58
4  it was Pasteur Mérieux Connaught -- as a      14:45:00
5  sales rep in the central Illinois territory,  14:45:03
6  which would have been around the Springfield, 14:45:09
7  Illinois, area.                14:45:11
8        From there I was promoted into     14:45:12
9  a position, what we call an insider, an       14:45:15
10 in-house sales manager.  These were managing  14:45:18
11 phone representatives, sales representatives,  14:45:22
12 who managed a bank of calls, phones -- phones  14:45:24
13 that would call into small physician offices.  14:45:28
14       From there, then I was promoted    14:45:32
15 to a district or field manager where I came   14:45:34
16 back to the St. Louis area, and I had         14:45:37
17 responsibility for several states of field    14:45:42
18 representatives.              14:45:45
19       And then from there I was         14:45:46
20 promoted back to our home office as a -- into  14:45:47
21 product management, so as a product -- an     14:45:51
22 associate product manager, and then promoted  14:45:54
23 to a product manager.          14:45:56
24       And then how far am I going?        14:46:01
25       I'm up -- then I'm going to be      14:46:03

Page 15

1  leaving the company at that point because     14:46:04
2  I -- from there I then went to -- I left      14:46:05
3  there and came to work for Mallinckrodt in    14:46:07
4  2007.                    14:46:10
5     Q.   Okay.  So just a couple more     14:46:10
6  questions about your time at --             14:46:16
7     A.   Sanofi.              14:46:19
8     Q.   -- Sanofi.  Not Sanofi?         14:46:20
9     A.   Some call it Sanofi.  I always   14:46:24
10 called it Sanofi.             14:46:28
11    Q.   Okay.                14:46:29
12    A.   Like the Santa Fe Trail.        14:46:29
13    Q.   So what were the nature of the   14:46:29
14 products that you had responsibility for at   14:46:31
15 Sanofi?                  14:46:36
16    A.   They were biologicals,          14:46:36
17 vaccines, pediatric vaccines.               14:46:39
18    Q.   So no controlled substances      14:46:41
19 under the Controlled Substances Act?          14:46:42
20    A.   No.                 14:46:43
21    Q.   So you joined Mallinckrodt in    14:46:44
22 2007, I believe you indicated?              14:46:51
23    A.   Correct.             14:46:52
24    Q.   And what was your reason for     14:46:53
25 leaving Sanofi to join Mallinckrodt?          14:46:55

Page 16

1     A.   My wife's parents had taken      14:46:58
2  ill.  They're from central Illinois, and we   14:47:00
3  were living on the East Coast, and she wanted 14:47:02
4  to come home.               14:47:04
5     Q.   Okay.  So when you joined        14:47:05
6  Mallinckrodt, what was -- what position did   14:47:07
7  you take?                 14:47:08
8     A.   I came in as a senior project    14:47:08
9  manager.  I was put in -- I had              14:47:15
10 responsibility then for two products:         14:47:16
11 Tofranil-PM, which is an antidepressant, and  14:47:23
12 Restoril, which is temazepam, which is a      14:47:27
13 sleep aid.                14:47:33
14    Q.   And how long did you hold the     14:47:34
15 senior product manager position at           14:47:38
16 Mallinckrodt?               14:47:40
17    A.   Until 2009.            14:47:40
18    Q.   And during that period, to whom   14:47:42
19 did you report?              14:47:46
20    A.   A gentleman by the name of Rod   14:47:46
21 Novak.                   14:47:49
22    Q.   And describe for me, if you      14:47:50
23 would, generally, your duties as a senior     14:47:59
24 product manager at Mallinckrodt.             14:48:04
25    A.   The senior product manager       14:48:05

Page 17

1  would be responsible for development of the   14:48:06
2  sales material for the sales force,           14:48:09
3  forecasting, inventory, making sure we have   14:48:16
4  enough product available, messaging around    14:48:18
5  what is it that we want to be saying in the   14:48:25
6  medical community.            14:48:26
7     Q.   Okay.  Were any of the products  14:48:30
8  that you had responsibility for as a senior   14:48:36
9  product manager scheduled under the          14:48:38
10 Controlled Substances Act?                  14:48:41
11    A.   Restoril was a C -- Restoril     14:48:43
12 was a C-IV product.  Tofranil-PM is an        14:48:49
13 antidepressant.  I would say it was a C-III,  14:48:55
14 but I'd have to be -- I'd have to refresh my  14:48:57
15 memory on that.             14:48:59
16    Q.   Okay.  In your role as senior    14:49:00
17 product manager, did you have occasion to     14:49:02
18 become familiar with any of the regulatory    14:49:05
19 requirements imposed by the Controlled        14:49:08
20 Substances Act over the products that you had 14:49:12
21 responsibility for?           14:49:13
22    A.   The -- not that I'm aware of.    14:49:14
23 I mean, and I say that to the extent that     14:49:23
24 the -- any of the marketing efforts that we   14:49:25
25 would have been engaged with would have been  14:49:29

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 coordinated through our med/legal review 14:49:31
2 process. 14:49:34
3 And so had they then shared 14:49:35
4 with me, in the process of taking any of our 14:49:38
5 material through the review process to be 14:49:39
6 approved for distribution, they then may have 14:49:41
7 shared with that, but I did not have 14:49:43
8 anything -- any personal, firsthand training 14:49:44
9 on the Controlled Substances Act. 14:49:47
10 Q. Okay. Did you have any 14:49:48
11 responsibilities as a senior product manager 14:49:53
12 that pertained to the monitoring of orders to 14:49:56
13 determine if they were suspicious under the 14:50:01
14 Controlled Substances Act? 14:50:03
15 A. No. 14:50:04
16 Q. Do you know if anyone had such 14:50:04
17 responsibility with respect to orders for 14:50:10
18 products that you had responsibility for as 14:50:13
19 senior product manager? 14:50:15
20 A. The individual that was leading 14:50:16
21 our review process at the time -- I don't 14:50:22
22 know if these products fell in under that, 14:50:28
23 but it was Jason Jones who would be 14:50:31
24 coordinating and reviewing the release of 14:50:34
25 orders. 14:50:36

Page 19

1 Q. As senior product manager, did 14:50:37
2 you interact in any way with Jim Rausch? 14:50:46
3 A. No. 14:50:49
4 Q. How about Cathy Stewart? 14:50:49
5 A. I'm trying to place -- I'm 14:50:52
6 trying to see my memory of Cathy Stewart was. 14:50:57
7 Can you remind me what 14:51:01
8 department she was in? 14:51:02
9 Q. I believe she was in customer 14:51:04
10 service. 14:51:06
11 A. No. And if I did, it was just 14:51:07
12 through e-mail. But I can't even draw a 14:51:10
13 recollection of who she is. 14:51:13
14 Q. Fair enough. 14:51:13
15 How about Karen Harper? 14:51:14
16 A. Karen Harper. What department? 14:51:17
17 Q. I believe compliance. 14:51:19
18 A. Oh, yes. Yes, I would -- well, 14:51:21
19 no, I know Karen, yes, but she is involved 14:51:26
20 with our opioid DEA compliance. I would not 14:51:29
21 have dealt with her at that time. 14:51:32
22 Q. Okay. How about Kate 14:51:33
23 Muhlenkamp? Or you may have known her by the 14:51:39
24 name Kate Neely. 14:51:41
25 A. Yeah, she was the -- she was on 14:51:43

Page 20

1 the generics side of the business. No. 14:51:44
2 Q. How about Ginger Collier? 14:51:45
3 A. I knew who she was, but I did 14:51:47
4 not have interaction with her, no. 14:51:49
5 Q. So fair -- am I understanding 14:51:52
6 correctly the products you had responsibility 14:52:06
7 for as senior product manager were branded 14:52:08
8 products? Is that correct? 14:52:10
9 A. Correct. These were detailed 14:52:11
10 by our sales force. 14:52:14
11 Q. Okay. And who had -- who had 14:52:15
12 senior responsibility for marketing with 14:52:18
13 respect to those products? 14:52:21
14 A. That would have been my boss, 14:52:21
15 Rod Novak. 14:52:24
16 Q. Okay. I think you indicated 14:52:24
17 you had the senior product manager position 14:52:33
18 until 2009. 14:52:37
19 Did you take a new position at 14:52:37
20 that point? 14:52:39
21 A. I did. 14:52:39
22 Q. What was that? 14:52:40
23 A. I was promoted to product 14:52:40
24 director. I had responsibility for a new 14:52:43
25 product of ours that we brought in, acquired, 14:52:45

Page 21

1 called PENNSAID, which is an NSAID, a topical 14:52:48
2 NSAID. 14:52:53
3 Q. I'm sorry, a topical -- 14:52:54
4 A. It's a topical NSAID. 14:52:55
5 Q. Okay. And what were your 14:52:58
6 responsibilities as product director? 14:53:00
7 A. Very similar to the senior 14:53:01
8 product manager. You would be responsible 14:53:03
9 for all aspects of the brand: messaging, 14:53:05
10 material, inventory, packaging. 14:53:09
11 Q. And to whom did you report as 14:53:11
12 product -- at product director? 14:53:14
13 A. I still reported to Rod Novak. 14:53:15
14 Q. And for how long did you hold 14:53:17
15 the product director position? 14:53:28
16 A. Approximately mid-2013. 14:53:29
17 Q. As product director, did you 14:53:31
18 have occasion to become familiar with any of 14:53:39
19 the regulatory requirements imposed by the 14:53:41
20 Controlled Substances Act over any product 14:53:43
21 for which you had responsibility? 14:53:45
22 A. No, it was not a controlled 14:53:47
23 substance. 14:53:50
24 Q. Okay. And am I understanding 14:53:50
25 your testimony that your job responsibilities 14:53:55

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  as product director were very similar to what  14:53:58
2  those responsibilities had been as senior  14:54:03
3  product manager?  Is that fair?  14:54:05
4      A.   It's very similar.  I mean,  14:54:06
5  when I was senior product director, senior  14:54:08
6  product manager, I was an in of one, so  14:54:12
7  titles didn't mean -- you're doing the job,  14:54:15
8  and so it was -- we were very thin-staffed.  14:54:17
9      Q.   Okay.  So mid-2013, you took a  14:54:23
10  new position?  14:54:26
11      A.   Correct.  14:54:27
12      Q.   And what was that?  14:54:28
13      A.   I was -- I took on  14:54:28
14  responsibility for what -- leading up or  14:54:31
15  starting our advocacy department.  14:54:34
16          So at that point I moved out  14:54:39
17  from under our commercial team, and my  14:54:41
18  responsibility then was moved into -- head  14:54:44
19  count was moved into our government affairs,  14:54:47
20  public policy, communications department.  14:54:50
21      Q.   And for -- and I'm sorry, what  14:54:52
22  was your title when you moved to the new  14:55:02
23  position?  14:55:04
24      A.   Director of advocacy.  14:55:05
25      Q.   And for how long did you hold  14:55:07

Page 23

1  that position?  14:55:12
2      A.   Let's see.  It's 2019.  Until  14:55:13
3  end of 2016?  End of 2016.  14:55:22
4      Q.   Okay.  As director of advocacy,  14:55:28
5  to whom did you report?  14:55:34
6      A.   At that time my manager was  14:55:36
7  Derek Naten within government affairs.  14:55:39
8      Q.   Okay.  And did you report to  14:55:42
9  him during the entire time you were director  14:55:48
10  of advocacy?  14:55:51
11      A.   Yes.  14:55:51
12      Q.   Okay.  What was your reason for  14:55:53
13  moving from the product director to director  14:55:54
14  of advocacy position?  14:55:56
15      A.   I was asked to do so by the  14:55:58
16  company.  We -- at that time Mallinckrodt was  14:56:02
17  in the process of spinning out from under  14:56:04
18  Covidien.  We wanted to -- we needed an  14:56:06
19  organization -- we needed an individual to --  14:56:11
20  from a patient -- or a public engagement, so  14:56:13
21  they asked if I would lead that effort  14:56:20
22  with -- as representative of Mallinckrodt  14:56:25
23  with associations and organizations.  14:56:28
24          And the advocacy department was  14:56:33
25  charged then with advancing and looking for  14:56:34

Page 24

1  ways to address appropriate, safe use,  14:56:36
2  balanced pain management.  My focus at that  14:56:40
3  time is looking at how to advance multimodal  14:56:43
4  analgesia, minimize use of opioids, patient  14:56:50
5  safety, appropriate safe use of opioids and  14:56:53
6  disposal of opioids.  14:56:58
7      Q.   And I think you indicated that  14:56:59
8  when you took the position, the advocacy  14:57:05
9  position, you were starting up that function  14:57:07
10  at Mallinckrodt.  14:57:11
11          So was -- did that position not  14:57:11
12  exist before you took it?  14:57:15
13      A.   Not -- not -- not in a -- in an  14:57:16
14  official capacity.  The -- any type of  14:57:20
15  engagement that the company may have had at  14:57:23
16  that time prior to that was with third-party  14:57:25
17  organizations.  Would have been  14:57:30
18  compartmentalized through either medical  14:57:32
19  affairs, communications.  But it was not a  14:57:34
20  structured process, meaning that it wasn't a  14:57:41
21  defined responsibility.  14:57:46
22      Q.   Okay.  And if I understood your  14:57:46
23  testimony a few moments ago, the creation of  14:57:56
24  the position wasn't somehow related to the  14:58:00
25  Covidien/Mallinckrodt transaction that was  14:58:03

Page 25

1  going on at the time.  14:58:06
2          Did I understand you correctly?  14:58:07
3      A.   Mallinckrodt was spinning out  14:58:09
4  from under Covidien at the time, and we were  14:58:10
5  going to be a, as we are now, a separate --  14:58:13
6  an independent company.  So it was a new  14:58:16
7  company to the extent of relationships.  And  14:58:19
8  we had been known as an identity of Covidien,  14:58:22
9  so we had to reestablish the Mallinckrodt  14:58:25
10  brand.  14:58:27
11      Q.   Okay.  So the types of  14:58:28
12  responsibilities you were to have as the  14:58:34
13  director of advocacy at Mallinckrodt, had  14:58:36
14  there been someone who had similar  14:58:39
15  responsibilities at Covidien?  14:58:42
16      A.   Within the Covidien parent  14:58:43
17  company, I don't know.  I mean, they -- we  14:58:47
18  didn't interact with them.  I mean, within --  14:58:51
19  Mallinckrodt, as the pharmaceutical division  14:58:53
20  of Covidien, as I mentioned, those would have  14:58:55
21  been handled through medical affairs,  14:58:58
22  Mallinckrodt medical affairs.  14:59:01
23      Q.   Okay.  So you said you were  14:59:03
24  asked to take the position.  14:59:08
25          Who -- by whom were you asked?  14:59:09

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    A.   The leadership -- senior          14:59:12
2  leadership of the company.               14:59:14
3    Q.   And who -- by name, who was       14:59:15
4  that?                                    14:59:17
5    A.   Specifically that was Terry       14:59:17
6  Terifay, and he was the vice president of  14:59:20
7  marketing.                               14:59:24
8    Q.   Were you given a formal job       14:59:26
9  description?                             14:59:31
10   A.   No.                               14:59:31
11   Q.   At least not a written --         14:59:36
12   A.   Yeah, there was no -- just it     14:59:38
13  was do the good work you're doing here, do it  14:59:42
14  out there.                              14:59:44
15   Q.   Okay.  Were you provided with a   14:59:45
16  staff to assist you?                    14:59:51
17   A.   No.                               14:59:52
18   Q.   Were you provided with any        14:59:53
19  specific objectives or goals?           15:00:02
20   A.   Not to the extent of -- it was    15:00:05
21  an -- it was very uncharted territory,  15:00:13
22  meaning that we -- it was more -- the primary  15:00:18
23  objective was establish Mallinckrodt as a  15:00:20
24  presence, so -- as an entity in the medical  15:00:23
25  community with patient groups so people knew  15:00:27

Page 27

1  who Mallinckrodt was.                    15:00:30
2        So a lot of it was just meet      15:00:31
3  and greet.  This is who we are.  We're   15:00:32
4  working on preventing opioid issues,     15:00:35
5  diversion, get rid of unused opioids type of  15:00:38
6  things.                                  15:00:41
7    Q.   Okay.  So prior to taking the     15:00:42
8  director of advocacy position, if I      15:00:43
9  understood your testimony earlier correctly,  15:00:46
10  you didn't have any responsibility for any of  15:00:50
11  Mallinckrodt's opioid business; is that  15:00:52
12  correct?                                15:00:54
13   A.   No.  I mean, I did have           15:00:54
14  responsibility -- or during that         15:00:57
15  transitionary period from PENNSAID to the  15:01:00
16  advocacy, before advocacy has -- that -- 15:01:01
17  before that was established within -- as a  15:01:04
18  department within the company, I worked for  15:01:06
19  about two, three months on the Xartemis  15:01:09
20  product, but that was as a placeholder only.  15:01:14
21   Q.   And what do you mean when you     15:01:16
22  say it was "a placeholder only"?         15:01:18
23   A.   It was -- I was reporting in      15:01:19
24  to -- continued to report in to Rod Novak,  15:01:21
25  but it was just being part of that project  15:01:24

Page 28

1  team and just contributing where I can.  But  15:01:28
2  I didn't have any direct responsibility of --  15:01:32
3  charged with any direct responsibility for  15:01:35
4  the brand.                               15:01:37
5    Q.   Okay.  So there's -- and is       15:01:38
6  this in the mid-2013 time frame?         15:01:41
7    A.   Yeah, that was all in that        15:01:44
8  transitionary period.  It was very fluid.  15:01:46
9    Q.   Okay.  So prior to mid-2013,      15:01:49
10  though, and this transitionary period that  15:01:50
11  you're describing, you hadn't had any    15:01:53
12  responsibilities with respect to any aspect  15:01:55
13  of Mallinckrodt's opioid, whether branded or  15:01:56
14  generic, business, correct?             15:01:58
15   A.   Correct.                          15:01:59
16   Q.   So is it fair to say             15:02:00
17  that part of the transition into taking the  15:02:03
18  director of advocacy position was to     15:02:07
19  familiarize yourself with Mallinckrodt's both  15:02:11
20  branded and generic opioid business?     15:02:15
21   A.   Not with the generics.  I mean,   15:02:18
22  at that point it wasn't any specific brand.  15:02:20
23  It wasn't a branded or a generic.  It was  15:02:23
24  advancing Mallinckrodt's initiatives to  15:02:25
25  dispose of unused opioids, regardless whether  15:02:28

Page 29

1  they were branded or generic.            15:02:31
2    Q.   Okay.  So as -- at least          15:02:32
3  initially when you became director of    15:02:34
4  advocacy, were your -- were your         15:02:35
5  responsibilities focused on the opioid   15:02:39
6  disposal issue?                          15:02:43
7    A.   Correct, yes.                     15:02:45
8    Q.   Okay.  And so you weren't         15:02:46
9  otherwise involved in advocacy related to  15:02:47
10  other products that Mallinckrodt offered; is  15:02:52
11  that fair?                              15:02:55
12   A.   They -- we had a product          15:02:55
13  called -- let's see.  We were part of that  15:02:59
14  advocacy initiative that was for multimodal  15:03:01
15  analgesia, which was again expanding -- we  15:03:04
16  made -- manufacture a full complement of  15:03:08
17  analgesics.  So we were trying to -- we were  15:03:12
18  looking at MMA as a way to help educate the  15:03:17
19  community, whether it being patients,    15:03:24
20  groups -- not patients, but patient groups  15:03:26
21  and/or providers regarding multimodal    15:03:28
22  approach to pain that doesn't rely strictly  15:03:32
23  or specifically on prescribing a opioid.  15:03:35
24   Q.   Okay.  Prior to the mid-2013      15:03:39
25  time period, if I understood your earlier  15:03:49

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    testimony correctly, you didn't have any          15:03:53
2    responsibilities at Mallinckrodt for any          15:03:56
3    analgesic products, correct?                      15:03:59
4        A.    Correct.                      15:04:00
5        Q.    Okay.  Did you have, prior to          15:04:01
6    mid-2013, familiarity with the -- what you        15:04:07
7    described as the MMA concept and                  15:04:11
8    Mallinckrodt's promotion of that concept?         15:04:16
9        A.    I was familiar with the -- yes,         15:04:18
10   the medications for that, but in my capacity      15:04:20
11   with advocacy, since I was not in a               15:04:22
12   commercial realm, I was in policy, government     15:04:26
13   affairs, we weren't advocating any particular     15:04:28
14   product, but the notion and the therapeutic       15:04:31
15   value proposition of MMA.                         15:04:35
16       Q.    Okay.  I'm just trying to               15:04:37
17   understand how you came to develop sufficient     15:04:38
18   familiarity with the MMA concept and              15:04:41
19   Mallinckrodt's related products to                15:04:45
20   effectively perform your advocacy position.       15:04:47
21          So that's really what I'm                  15:04:51
22   trying to get at here, is just how you came       15:04:52
23   to an understanding of what -- what               15:04:54
24   Mallinckrodt's position was and what you were     15:04:57
25   trying to advocate for.                           15:04:59

Page 31

1        A.    Yeah, we would -- my role would         15:05:00
2    work closely with the product teams, medical     15:05:03
3    affairs, so I was integrated into the aspects    15:05:06
4    of the business that would have clinical         15:05:09
5    content, clinical knowledge, then also brand     15:05:11
6    awareness.                                        15:05:15
7        Q.    Okay.  So which products were          15:05:16
8    of particular interest to you in terms of the    15:05:24
9    advocacy role and the MMA initiative?            15:05:27
10       A.    Well, the notion of MMA is to          15:05:31
11   reduce, significantly reduce, the amount of      15:05:35
12   opioids that you're using, but then also have   15:05:38
13   adjunctive therapy or add-on therapy that was   15:05:41
14   either an ibuprofen or an NSAID or, in some      15:05:44
15   cases if it's -- if it's a pharmacological      15:05:49
16   treatment.                                        15:05:54
17          So we made those products, so            15:05:54
18   it wasn't to say that we had any particular      15:05:56
19   product.                                          15:05:59
20          We recognize that MMA,                    15:05:59
21   particularly within hospitals, if you need to   15:06:01
22   start a patient on an opioid, let's see how     15:06:05
23   we can continue to advance MMA as -- it was a   15:06:09
24   beginning -- it was a beginning -- an area      15:06:13
25   that the medical community was starting to       15:06:14

Page 32

1    get interest in.  And so what we were trying     15:06:17
2    to do is figure out, you know, how do we         15:06:20
3    create awareness regarding MMA, regardless of   15:06:23
4    the product's pharmacological treatment, but    15:06:27
5    then also the whole notion of a balanced        15:06:29
6    approach to pain, which could be beyond just    15:06:31
7    pharmacological treatment.  It could be other   15:06:33
8    types of therapies such as massage therapy or   15:06:35
9    chiropractic medicine.                           15:06:38
10          So the whole notion of a                  15:06:39
11   wholistic approach to medicine and managing     15:06:40
12   pain was what we were trying to advance.         15:06:43
13       Q.    Okay.  And so was there a              15:06:45
14   difference then between the wholistic concept   15:06:47
15   that you just described and the MMA concept?    15:06:50
16       A.    There would be.  They would be        15:06:52
17   part and parcel of the same, though.  The       15:06:54
18   wholistic approach to medicine -- to pain was   15:06:58
19   more than just -- was treatment beyond just     15:07:00
20   pharmacological treatment, pharmaceuticals.     15:07:02
21   That was -- that's a balanced approach.         15:07:06
22   Multimodal analgesia is just that; it's a       15:07:07
23   combination of different analgesics.            15:07:10
24       Q.    Okay.  And do you know when           15:07:13
25   Mallinckrodt first began to develop the -- or   15:07:17

Page 33

1    to promote the concept of MMA?                   15:07:22
2        A.    It was right around that time         15:07:26
3    of 2013 when I came into advocacy, as well     15:07:28
4    2012.                                            15:07:33
5        Q.    Okay.  So prior to you becoming       15:07:33
6    involved in the advocacy function, who at      15:07:37
7    Mallinckrodt was, if you know, was involved    15:07:39
8    in promoting the MMA concept?                   15:07:46
9        A.    That would have been coming out      15:07:49
10   of our clinical team and our commercial team    15:07:50
11   that was driving that, with the health care    15:07:53
12   providers at the time within hospitals.         15:07:56
13       Q.    And do you know what the              15:07:59
14   impetus was at Mallinckrodt for developing     15:08:00
15   that MMA initiative?                             15:08:04
16       A.    Well, I do not know.                  15:08:06
17       Q.    Okay.                      15:08:12
18       A.    Excuse me.                  15:08:12
19       Q.    You understood, though, when         15:08:13
20   you moved into the advocacy position that one   15:08:18
21   of your objectives would be to foster the      15:08:22
22   development of the MMA initiative, correct?     15:08:24
23       A.    For awareness of, yes.               15:08:27
24       Q.    What --                     15:08:30
25       A.    Awareness with the health care       15:08:30

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 providers, surgeon -- or there are physicians 15:08:32
2 that -- that were -- may not have been 15:08:36
3 familiar with the concept, so we would work 15:08:41
4 through -- with medical affairs to create 15:08:43
5 awareness of what MMA is. 15:08:45
6   Q.   Okay. And the MMA concept as 15:08:47
7 it existed when you moved into the advocacy 15:08:52
8 position, to the extent it's multimodal 15:08:55
9 analgesics, did Mallinckrodt manufacture all 15:09:01
10 of the different analgesic products that 15:09:04
11 would go into this multimodal approach? 15:09:06
12   A.   We were manufacturer of the 15:09:10
13 products, but there were -- it could be any 15:09:11
14 product that was -- that we -- that were -- 15:09:13
15 that was conceptually part of an MMA. So 15:09:15
16 that's why we didn't advocate any particular 15:09:17
17 product, because there are manufacturers out 15:09:20
18 there of MMA products that we did not 15:09:22
19 manufacture. 15:09:24
20       But we believed in the concept 15:09:25
21 of MMA, and that's what we were trying to 15:09:26
22 advance. 15:09:28
23   Q.   Was there -- were there medical 15:09:28
24 or scientific studies that -- that had been 15:09:34
25 performed that -- that were the underpinnings 15:09:38

Page 35

1 of the MMA initiative at the time you moved 15:09:41
2 into this position? 15:09:44
3   A.   There were. 15:09:44
4   Q.   And can you describe for me 15:09:45
5 generally what the -- what the general 15:09:49
6 description of this multimodal approach would 15:09:55
7 be? 15:09:57
8   A.   The general concept, again, 15:09:57
9 we're focusing the effort within hospitals, 15:10:01
10 surgical procedures. So if you -- when 15:10:05
11 patients who undergo a surgical procedure, if 15:10:11
12 you start them on an opioid at the beginning 15:10:14
13 of the surgery and you then continue them on 15:10:16
14 an opioid following surgery, data suggests 15:10:19
15 that those patients who are in the hospital 15:10:24
16 tend to have a greater experience of adverse 15:10:25
17 events or episodes within the hospital that 15:10:29
18 potentially could lead to an adverse event 15:10:32
19 such as a fall or drowsiness. 15:10:34
20       The journal -- clinical 15:10:37
21 journals and studies at the time were showing 15:10:40
22 that if you can introduce a multimodal 15:10:41
23 approach to pain, pre and postop, that you 15:10:44
24 can minimize then the amount of time you 15:10:50
25 would have to keep a patient following 15:10:51

Page 36

1 surgery on some type of analgesic, which then 15:10:54
2 led to less adverse events, shorter hospital 15:10:57
3 stays, more rapid recovery at home. 15:11:01
4   Q.   Okay. And what were the -- can 15:11:05
5 you describe generally for me the steps that 15:11:17
6 you took in your advocacy role to try to 15:11:21
7 promote this MMA initiative? 15:11:25
8   A.   Well, there were several -- 15:11:27
9 just trying to understand how -- how would 15:11:32
10 you communicate that out, I mean, 15:11:34
11 understand -- you know, what is it that we 15:11:37
12 want to say, "we" meaning what does the 15:11:39
13 science support. How would you support -- 15:11:44
14 how would you communicate that out. How do 15:11:45
15 you create awareness regarding MMA. 15:11:47
16       So we would look to partner 15:11:49
17 with professional organizations. There's a 15:11:51
18 group called ERISA, E-R-I-S-A. I forget what 15:11:55
19 the acronym -- but it was anesthesiologists, 15:12:05
20 and understand -- you know, helping them 15:12:09
21 understand that, you know, during the pre -- 15:12:11
22 pre and postop pain about the concept of MMA. 15:12:13
23       We would partner with hospital 15:12:16
24 associations, hospitals, and those who were 15:12:19
25 doing MMA and were generating -- had positive 15:12:21

Page 37

1 results. How could we replicate that. How 15:12:26
2 could we bring that knowledge to other 15:12:28
3 hospitals. How could we create awareness 15:12:31
4 that -- with providers that there are 15:12:37
5 potentially several ways of managing pain 15:12:43
6 that didn't have to require an opioid. 15:12:45
7   Q.   And you also described this 15:12:47
8 wholistic or balanced approach to pain 15:12:54
9 management. 15:12:57
10   A.   Uh-huh. 15:12:57
11   Q.   Did you also understand that to 15:12:58
12 be part of your responsibility in the 15:13:00
13 advocacy role, to advocate for that sort of 15:13:02
14 approach to pain management? 15:13:05
15   A.   That was the impetus behind the 15:13:06
16 Alliance for Pain Management, recognizing 15:13:09
17 that not every patient needed a 15:13:12
18 pharmacological treatment, and so how -- how 15:13:14
19 could patients who needed -- and/or the 15:13:17
20 patient would want to have a treatment beyond 15:13:21
21 an opioid, have access to it. What were the 15:13:23
22 barriers to treatment, insurance companies, 15:13:28
23 others. 15:13:31
24   Q.   And had anyone at 15:13:32
25 Mallinckrodt -- well, when did Mallinckrodt's 15:13:36

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  efforts in advancing the wholistic or        15:13:41
2  balanced approach begin?                      15:13:44
3      A.   That 2012 time frame.                15:13:46
4      Q.   Okay.  And so prior to your          15:13:50
5  taking the advocacy position, who at          15:13:52
6  Mallinckrodt was involved in advancing the    15:13:55
7  wholistic or balanced approach to pain        15:13:57
8  management?                                   15:14:00
9      A.   That would have been our             15:14:00
10 medical affairs team.                         15:14:01
11     Q.   And who individually would have      15:14:02
12 been involved in that?                        15:14:04
13     A.   One of the individuals               15:14:05
14 mentioned earlier, John -- John Decker.       15:14:06
15     Q.   Okay.  And so when you took the      15:14:11
16 advocacy position, did you understand your    15:14:13
17 your objectives or goals to be to -- to       15:14:15
18 advance the wholistic or balanced approach to 15:14:20
19 pain management?                              15:14:26
20     A.   Yes.                                 15:14:27
21     Q.   And I think you indicated the        15:14:27
22 Alliance was one of the steps to take in that 15:14:28
23 regard?                                       15:14:32
24     A.   Uh-huh, correct.                     15:14:33
25     Q.   Were there other steps that you      15:14:33

Page 39

1  took in that regard?                          15:14:35
2      A.   That's around the same time we       15:14:36
3  started our medication disposal pouch         15:14:38
4  initiative as well in order to work with      15:14:40
5  community groups to rid homes of unused       15:14:43
6  opioids, to keep them from being diverted out 15:14:46
7  of their home medicine cabinet.               15:14:48
8      Q.   Okay.  And I certainly               15:14:50
9  understand that -- that program as a          15:14:52
10 diversion interdiction program.               15:14:54
11          Did you also view that as part       15:14:58
12 of the balanced or wholistic pain management  15:14:59
13 initiative?                                   15:15:03
14     A.   No.  No, we did not.  But it         15:15:03
15 was part and parcel to the broader advocacy   15:15:05
16 platform of Mallinckrodt's corporate -- of    15:15:08
17 our corporate social responsibility           15:15:11
18 stewardship program.                          15:15:14
19          So I was charged with, you           15:15:15
20 know, how do you -- how do we continue to     15:15:17
21 advance that, our corporate social            15:15:19
22 responsibility.  That includes MMA, safe      15:15:22
23 disposal, collaboration, working with law     15:15:25
24 enforcement to -- for example, we make -- we  15:15:29
25 make placebo products available for law       15:15:35

Page 40

1  enforcement.  We make a GPS tracking system   15:15:37
2  available to retail pharmacies if there's a   15:15:40
3  concern or risk of theft, burglary in the     15:15:43
4  pharmacy.                                     15:15:48
5          And so Mallinckrodt, as part of      15:15:48
6  our broader platform, which I was leading,    15:15:49
7  is, like, what are all the things we can do   15:15:52
8  to be good stewards in patient safety,        15:15:54
9  community safety, advancing alternatives to   15:15:59
10 opioids.                                      15:16:01
11     Q.   So you kind of identified three      15:16:01
12 broad areas of interest:  patients safety,    15:16:15
13 community safety and advancing alternatives   15:16:19
14 to opioids.                                   15:16:21
15          Were there any other similar         15:16:22
16 sort of broad areas of advocacy that you were 15:16:25
17 pursuing when you -- when you first took the  15:16:28
18 advocacy directorship?                        15:16:32
19     A.   That was enough.                     15:16:34
20     Q.   Okay.  Okay.  So focusing --         15:16:37
21 just trying to understand what the steps you  15:16:40
22 then took to try to pursue each of those, in  15:16:43
23 terms of alternatives to opioids, you've      15:16:47
24 already testified about the MMA initiative.   15:16:50
25 You testified about the balanced pain         15:16:53

Page 41

1  management initiative.                        15:16:55
2      A.   Uh-huh.                              15:16:56
3      Q.   Were there other steps you took      15:16:57
4  in pursuit of the promoting alternatives to   15:16:59
5  opioid dimension of your -- of your advocacy? 15:17:03
6      A.   Promoting opioids or promoting       15:17:05
7  MMA?  I'm sorry, promoting --                 15:17:09
8      Q.   I thought you -- I thought one       15:17:11
9  of the areas was promoting alternatives to    15:17:12
10 opioids.                                      15:17:13
11     A.   That would be the MMA.  I'm          15:17:14
12 sorry.                                        15:17:14
13     Q.   Right.                               15:17:14
14     A.   That would be the -- the MMA         15:17:15
15 platform, no, it was -- it was working --     15:17:20
16 that would have been it, I mean, just trying  15:17:23
17 to understand how do we advance conceptually  15:17:24
18 MMA.                                          15:17:26
19     Q.   Okay.                                15:17:27
20     A.   I mean, it's -- that may sound       15:17:27
21 simplistic on its surface.  It was very       15:17:30
22 difficult for physicians who were used to     15:17:32
23 treating, managing surgery pre and postop one 15:17:36
24 way and getting them to introduce a new       15:17:41
25 concept.  It's not an easy task.              15:17:43

Highly Confidential – Subject to Further Confidentiality Review

Page 42

1    Q.   Okay.  And the balanced pain --      15:17:47
2    balanced pain management --              15:17:50
3    A.   Uh-huh.                    15:17:52
4    Q.   -- approach, that was also part    15:17:52
5    of the promotion of alternatives to opioids    15:17:54
6    or not?                        15:17:57
7    A.   It was -- it was part of it.      15:17:57
8    It was broader than just alternatives to    15:17:59
9    opioids, though.  It was broad -- it was --    15:18:01
10   the only part we had with opioids in the    15:18:04
11   Alliance for Balanced Pain Management was    15:18:06
12   when an opioid needed to be disposed of, when    15:18:10
13   it was no longer needed, how is {sic} we, as    15:18:13
14   a community, working together to help get    15:18:15
15   word out that we need to dispose of unused    15:18:18
16   opioids to prevent them from being diverted    15:18:21
17   into the community.                15:18:23
18   Q.   Okay.  So the disposal of        15:18:24
19   unused opioids was part of Mallinckrodt's    15:18:33
20   focus as part of the Alliance for Balanced    15:18:37
21   Pain Management, correct?            15:18:40
22   A.   It was -- it was part of that,    15:18:41
23   yeah.  And so we were -- we would -- for    15:18:44
24   example, many of those groups were the groups    15:18:46
25   that we would partner with to help        15:18:48

Page 43

1    communicate out the importance of disposal.    15:18:51
2    Q.   Okay.  In terms of the Alliance    15:18:53
3    for Balanced Pain Management, did        15:18:55
4    Mallinckrodt play any other roles as part of    15:18:56
5    that organization or group?            15:18:59
6    A.   Well, as I shared, we started    15:19:01
7    the group, and as a member we -- I was one of    15:19:04
8    a member of the steering committee.  So we --    15:19:08
9    that program was managed under the        15:19:13
10   Mallinckrodt -- auspices of Mallinckrodt, and    15:19:15
11   then for about 18 months to two years before    15:19:18
12   we turned it over to another third-party    15:19:21
13   group, 501(c), to manage.            15:19:23
14   Q.   Okay.  And whose idea was it to    15:19:26
15   start the Alliance?                15:19:28
16   A.   That was mine.            15:19:31
17   Q.   Okay.  And did you discuss it    15:19:32
18   at anyone {sic} with Mallinckrodt before    15:19:34
19   trying to enlist other organizations to    15:19:36
20   become part of it?                15:19:40
21   A.   Yes, I did.            15:19:40
22   Q.   Who did you discuss it with?    15:19:41
23   A.   It would have been discussed    15:19:42
24   with senior leadership, legal, medical, my    15:19:44
25   chain of command.  So the organization was    15:19:48

Page 44

1    supportive of it.                15:19:52
2    Q.   Okay.  And what was your        15:19:53
3    rationale as you -- when you came up with the    15:19:54
4    idea and raised it with others at        15:19:57
5    Mallinckrodt?                    15:20:00
6    A.   The rationale behind that is    15:20:00
7    the understanding that in order to        15:20:02
8    effectively address the opioid epidemic, it    15:20:06
9    requires all participants.  This is an issue    15:20:10
10   that a manufacturer or any one entity cannot    15:20:14
11   address on their own.  So it requires a    15:20:17
12   collective effort that all of us need to be    15:20:19
13   involved, whether it be physicians,        15:20:22
14   pharmacists, manufacturers, patient groups,    15:20:24
15   all have a responsibility to align and    15:20:27
16   advance in the interest of public safety the    15:20:31
17   importance of disposing of unused        15:20:35
18   medications.                    15:20:38
19   Q.   Okay.  And once you got support    15:20:38
20   at Mallinckrodt for that idea, how did you    15:20:47
21   then go about enlisting others to become    15:20:49
22   involved in the Alliance?            15:20:52
23   A.   We would reach out to groups    15:20:53
24   who we felt had a vested interest in this.    15:20:55
25   May not necessarily have been their mission    15:20:59

Page 45

1    but yet may have a constituent that would be    15:21:01
2    affected by unused opioids, having them    15:21:05
3    around.  Or patient groups or groups that    15:21:06
4    were heavily interested in community safety    15:21:10
5    partnership.                    15:21:15
6    And so we would look at and        15:21:16
7    say, you know, who has similar missions,    15:21:17
8    similar interests in this area, and we'd    15:21:19
9    reach out to them.  We would share the vision    15:21:21
10   of it.  And we were transparent and say, this    15:21:25
11   is what it is, this is what it's not, and    15:21:28
12   it's a voluntary position.  Do you want to be    15:21:34
13   part of it, and they would say yes or no.    15:21:34
14   Q.   Okay.  Prior to the Alliance,    15:21:36
15   had Mallinckrodt engaged in any other        15:21:43
16   initiatives to address the need for disposal    15:21:46
17   of unused opioids?                15:21:51
18   A.   We were working with what we    15:21:52
19   called NADDI, the National Association of    15:21:58
20   Drug Diversion Investigators, where we would    15:22:03
21   purchase and donate to NADDI drug        15:22:06
22   disposal boxes, these are at a drug kiosk,    15:22:08
23   that patients then could take to their local    15:22:10
24   police station.                    15:22:12
25   And so we would donate -- we    15:22:13

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  would provide them to NADDI. NADDI then        15:22:14
2  would work with local law enforcement through  15:22:15
3  a grant process that the -- the local law      15:22:18
4  enforcement would request one of these drug    15:22:22
5  disposal bins, and NADDI then would make it    15:22:25
6  available as they were.                        15:22:28
7     Q.    And so what sort of                   15:22:30
8  organization was NADDI?                        15:22:31
9     A.    NADDI is a third-party                15:22:33
10 organization. Its membership's comprised of   15:22:35
11 law enforcement, sheriffs, county, law         15:22:40
12 enforcement.                                   15:22:46
13    Q.    And so Mallinckrodt would make        15:22:46
14 boxes available to NADDI for NADDI to then     15:22:47
15 make available --                              15:22:50
16    A.    To a local police station or          15:22:52
17 sheriff's office.                              15:22:53
18    Q.    Okay. And do you know when            15:22:54
19 Mallinckrodt first began making the boxes      15:22:59
20 available to NADDI?                            15:23:02
21    A.    I want to -- it was before            15:23:03
22 advocacy started, and I want to say that that  15:23:06
23 program started around 2010.                   15:23:09
24    Q.    Okay. Apart from that program         15:23:11
25 of making boxes available to NADDI, prior to   15:23:14

Page 47

1  the Alliance for Balanced Pain Management,     15:23:18
2  were there any other initiatives at            15:23:21
3  Mallinckrodt of which you're aware to address  15:23:23
4  the need for disposal of unused opioids?       15:23:26
5     A.    Disposal? Well, we had the red        15:23:30
6  flags video that we talked about. We've        15:23:35
7  always -- we had a significant -- and I --     15:23:41
8  I'm not -- can't speak to -- I -- the          15:23:43
9  suspicious order monitoring program.           15:23:45
10       We had -- we worked with law             15:23:50
11 enforcement to dispose of it. We made          15:23:51
12 available the placebos and the GPS tracking    15:23:53
13 systems within bottles.                        15:23:57
14       We were also then addressing             15:23:59
15 through a variation of REMS, risk evaluation   15:24:03
16 mitigation strategy -- Mallinckrodt's          15:24:08
17 developed and funded a program called          15:24:10
18 REMEDIES. REMEDIES was a program that was      15:24:15
19 offered to physicians in conjunction with      15:24:17
20 their REMS training that was designed to       15:24:21
21 measure outcomes in physician behavior and     15:24:24
22 whether they were -- either reduced or         15:24:27
23 changed the way they prescribed opioids and    15:24:30
24 how they were educating patients regarding     15:24:32
25 safe disposal and did they start doing that.   15:24:36

Page 48

1  And it had a measurement on the back end of    15:24:38
2  it to see if it actually -- where it was       15:24:40
3  effective.                                     15:24:42
4     Q.    And who at Mallinckrodt was           15:24:42
5  involved in that program?                      15:24:43
6     A.    That was -- that was through          15:24:44
7  our medical affairs department.                15:24:47
8     Q.    I want to focus just for              15:24:49
9  another moment on this concept of disposal of  15:24:54
10 unused opioids, because I asked you about it   15:24:59
11 a moment ago, and I think a number of things   15:25:00
12 you answered, at least to me, as I understood  15:25:02
13 them, dealt with diversion interdiction as     15:25:06
14 compared to disposal of unused opioids.        15:25:10
15       For example, the suspicious              15:25:12
16 order monitoring program, I mean, that didn't  15:25:14
17 really deal directly with disposal of unused   15:25:19
18 opioids, correct?                              15:25:23
19    A.    Same thing.                           15:25:24
20       MR. O'CONNOR: Can you repeat             15:25:26
21    that, please?                               15:25:28
22 QUESTIONS BY MR. GOTTO:                        15:25:28
23    Q.    Sure.                                 15:25:29
24       My question -- the suspicious            15:25:29
25 order monitoring program at Mallinckrodt,      15:25:30

Page 49

1  that did not deal directly with the issue of   15:25:32
2  disposal of unused opioids, did it?            15:25:33
3       MR. O'CONNOR: I will object.             15:25:37
4       But you can answer as best you           15:25:39
5    know.                                        15:25:41
6       THE WITNESS: No, not -- not to           15:25:41
7    the extent to which we designed the         15:25:43
8    program to dispose of unused             15:25:45
9    medications in the patient's home.       15:25:47
10 QUESTIONS BY MR. GOTTO:                        15:25:49
11    Q.    Okay. And the red flags video        15:25:49
12 that you mentioned, did that deal with the     15:25:51
13 disposal of unused opioids?                    15:25:54
14    A.    To the disposal end, no.             15:25:55
15    Q.    Okay.                                 15:25:56
16    A.    It was just part of the larger       15:25:56
17 collection of what we were doing.              15:25:58
18    Q.    Sure, I understand. I'm just         15:25:59
19 trying to focus on the disposal --            15:26:01
20    A.    Disposal, uh-huh.                     15:26:01
21    Q.    -- issue for the moment.             15:26:04
22       And you also mentioned making           15:26:04
23 placebos available to law enforcement.         15:26:06
24       That didn't deal directly with          15:26:08
25 disposal of unused opioids, correct?           15:26:10

Highly Confidential – Subject to Further Confidentiality Review

Page 50

1     A.   No.           15:26:12
2     Q.   And the GPS tracking, did that   15:26:12
3 deal with disposal of unused opioids?   15:26:14
4     A.   No.           15:26:19
5     Q.   Okay.  All right.  So focusing   15:26:19
6 simply on the disposal of unused opioids   15:26:20
7 issue prior to the Alliance, understand there   15:26:23
8 was the program of making the boxes available   15:26:27
9 to NADDI, were there any other initiatives or   15:26:30
10 programs at Mallinckrodt that you're aware   15:26:33
11 of?                 15:26:35
12     A.   We had the CARES Alliance   15:26:35
13 program, but I don't know -- I'd have to look   15:26:43
14 into it.  I know there were several pieces in   15:26:46
15 there.  I don't know if any of the pieces had   15:26:48
16 to do specifically with disposal.  I'd have   15:26:49
17 to refresh my memory on that.   15:26:52
18     Q.   Okay.  So going back now, a few   15:26:59
19 minutes ago you had described sort of three   15:27:01
20 broad areas of initiative in your advocacy   15:27:04
21 role:  the reduction of use of opioids, the   15:27:09
22 community safety and patient safety.   15:27:12
23         And we've talked about a few   15:27:16
24 things now.  We've talked about MMA.  We've   15:27:17
25 talked about the Alliance.  We've talked   15:27:19

Page 51

1 about providing placebos to law enforcement.   15:27:22
2 We've talked about the suspicious order   15:27:26
3 monitoring program.       15:27:30
4         In terms of promotion of   15:27:31
5 community safety, are there other initiatives   15:27:32
6 that you oversaw or promoted as part of your   15:27:37
7 advocacy role?        15:27:39
8     A.   We would then actually get --   15:27:40
9 conduct community events, and so we would do   15:27:43
10 programs that we would partner with a   15:27:50
11 third-party group, Summit County, Lee County,   15:27:53
12 Summit County Health Department, local YMCAs.   15:27:57
13 We would partner with Knights of Columbus.   15:28:01
14 So groups that we felt would take -- could   15:28:04
15 take charge, we would donate the pouches to   15:28:06
16 them, and then they could then host a   15:28:11
17 community event to create awareness regarding   15:28:12
18 the importance of safe disposal.   15:28:15
19     Q.   Okay.  Were there other aspects   15:28:18
20 of these type of community events apart --   15:28:21
21 from Mallinckrodt's perspective, apart from   15:28:25
22 providing the disposal pouches and   15:28:27
23 information about the importance of disposal?   15:28:29
24     A.   No.           15:28:31
25     Q.   Okay.  And I think the third   15:28:32

Page 52

1 broad area you described earlier was patient   15:28:37
2 safety.             15:28:40
3         Again, apart from the   15:28:41
4 initiatives we've already discussed, were   15:28:42
5 there any other initiatives that you oversaw   15:28:43
6 or promoted in your advocacy role aimed at   15:28:46
7 promoting patient safety?   15:28:49
8     A.   No.  Nothing comes to mind.   15:28:50
9     Q.   Okay.  And I think you   15:28:53
10 indicated you held the director of advocacy   15:28:56
11 position until the end of 2016.   15:28:58
12         Did you take a different   15:29:00
13 position at that point?     15:29:02
14     A.   Well, I still have the advocacy   15:29:03
15 title.              15:29:05
16     Q.   Okay.         15:29:05
17     A.   But was added, then, government   15:29:05
18 affairs.             15:29:09
19     Q.   Okay.  And government affairs,   15:29:10
20 what does that mean generally?   15:29:11
21     A.   Government affairs broadened   15:29:12
22 the responsibility to include engagement at a   15:29:16
23 federal and state level with legislators,   15:29:18
24 policymakers.         15:29:22
25     Q.   Okay.  And so prior to 2017,   15:29:23

Page 53

1 did you not have responsibility in those   15:29:27
2 areas?              15:29:28
3     A.   No.  I engaged in it, but I did   15:29:29
4 not have responsibility for it.  I was party   15:29:31
5 to it.             15:29:35
6     Q.   Okay.  And so who had   15:29:35
7 responsibility for it during the period you   15:29:37
8 engaged in it but didn't have responsibility   15:29:38
9 for it?            15:29:40
10     A.   That would have been my boss,   15:29:40
11 Derek Naten.        15:29:44
12        MR. GOTTO:  Okay.  Okay.  I   15:29:45
13 think that's probably a good place to   15:29:47
14 stop for today.  Let's go off the   15:29:48
15 record.          15:29:50
16        VIDEOGRAPHER:  We are going off   15:29:50
17 the record at 3:29 p.m.     15:29:51
18     (Off the record at 3:29 p.m.)   15:29:54
19        - - - - - - -
20
21
22
23
24
25

Page 54

## CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Kevin Webb, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Notary Public
Dated: January 22, 2019

Page 55

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 56

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Kevin Webb, FACT          DATE

Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____

Notary Public

Page 57

– – – – – – –
ERRATA
– – – – – – –

PAGE   LINE   CHANGE/REASON

_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____

Highly Confidential - Subject to Further Confidentiality Review

Page 58

```
1        _ _ _ _ _ _ _
         LAWYER'S NOTES
2        _ _ _ _ _ _ _
3    PAGE  LINE
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25
```