Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

     IN RE: NATIONAL        )
 4   PRESCRIPTION           )  MDL No. 2804
     OPIATE LITIGATION      )
 5   _____   )  Case No.
                            )  1:17-MD-2804
 6                          )
     THIS DOCUMENT RELATES  )  Hon. Dan A.
 7   TO ALL CASES           )  Polster
 8
                  THURSDAY, JANUARY 17, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                     - - -
12             Videotaped deposition of Kevin Webb
13   30(b)(6), held at the offices of STINSON
14   LEONARD STREET LLP, 7700 Forsyth Boulevard,
15   Suite 1000, St. Louis, Missouri, commencing
16   at 9:06 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter and Certified Realtime Reporter.
19
20
21
22                     - - -
             GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
25
```

Page 2

```
 1          A P P E A R A N C E S :
 2
 3      KELLER ROHRBACK LLP
        BY: DEAN KAWAMOTO
 4          dkawamoto@kellerrohrback.com
            GARY GOTTO
 5          ggotto@kellerrohrback.com
            CHANELE REYES
 6          creyes@kellerrohrback.com
        1201 Third Avenue, Suite 3200
 7      Seattle, Washington 98101
        (206) 623-1900
 8      Counsel for MDL Plaintiffs
 9
10      BRANSTETTER STRANCH & JENNINGS, PLLC
        BY: JAMES G. STRANCH, III
11          jims@bsjfirm.com
            SEAMUS KELLY
12          seamusk@bsjfirm.com
        223 Rosa L. Parks Avenue, Suite 200
13      Nashville, Tennessee 37203
        (615) 254-8801
14      Counsel for the Tennessee Action
15
16      ARMSTRONG TEASDALE, LLP
        BY: SARAH E. HARMON
17          sharmon@armstrongteasdale.com
        7700 Forsyth Boulevard, Suite 1800
18      St. Louis, Missouri 63105
        (314) 621-5070
19      Counsel for Cardinal Health, Inc.
20
21      COVINGTON & BURLING LLP
        BY: RYAN ROBERTS
22          rroberts@cov.com
            (VIA TELECONFERENCE)
23      850 Tenth Street, NW
        Washington, DC 20001-4956
24      (202) 662-6000
        Counsel for McKesson Corporation
25
```

Page 3

```
 1      JACKSON KELLY PLLC
        BY: JAMES D. JOHNSON
 2          jdjohnson@jacksonkelly.com
            (VIA TELECONFERENCE)
 3      221 NW Fifth Street
        Evansville, Indiana 47708
 4      (812) 422-9444
        Counsel for AmerisourceBergen
 5
 6
 7      JONES DAY
        BY: LOUIS P. GABEL
 8          lpgabel@jonesday.com
        150 West Jefferson Avenue. Suite 2100
 9      Detroit, Michigan 48226-4438
        (614) 469-3939
10      Counsel for Walmart
11
        ROPES & GRAY LLP
12      BY: BRIEN T. O'CONNOR
            brien.o'connor@ropesgray.com
13          JOSHUA GOLDSTEIN
            joshua.goldstein@ropesgray.com
14      800 Boylston Street
        Boston, Massachusetts 02199-3600
15      (617) 951-7000
        Counsel for Mallinckrodt
16
17
18      ARNOLD & PORTER KAYE SCHOLER, LLP
        BY: PHILIP A. GIORDANO
19          Philip.Giordano@arnoldporter.com
            (VIA TELECONFERENCE)
20      601 Massachusetts Avenue, NW
        Washington, DC 20001-3743
21      (202) 942-5000
        Counsel for Endo Pharmaceuticals
22      Inc., and Endo Health Solutions Inc.
23
        VIDEOGRAPHER:
24          JAMES ARNDT,
            Golkow Litigation Services
25              - - -
```

Page 4

```
 1                    INDEX
 2                                  PAGE
 3      APPEARANCES.................................   2
 4      EXAMINATIONS
 5        BY MR. KAWAMOTO..........................  10
 6        BY MR. KELLY.............................. 157
 7
 8                  EXHIBITS
 9      No.   Description           Page
10      Mallinckrodt   Amended Notice of Deposition    11
        Webb 1         Pursuant to Rule 30(b)(6)
11                     and Document Request
                       Pursuant to Rule 30(b)(6)
12                     and Rule 34 to Defendants
                       Mallinckrodt PLC,
13                     Mallinckrodt LLC and SpecGx
                       LLC
14
        Mallinckrodt   E-mail(s),              41
15      Webb 2         MNK-T1_0002159712 -
                       MNK-T1_0002159716
16
        Mallinckrodt   E-mail(s),              49
17      Harper 3       MNK-T1_0002183036 -
                       MNK-T1_0002183043
18
        Mallinckrodt   E-mail(s),              56
19      Webb 4         MNK-T1_0001786889 -
                       MNK-T1_0001786899
20
        Mallinckrodt   E-mail(s),              58
21      Webb 5         MNK-T1_0002248914 -
                       MNK-T1_0002248914 -
22                     MNK-T1_0002248920
23      Mallinckrodt   "Why wrestle with chronic    60
        Webb 6         pain,"
24                     MNK-T1_0000243238
25
```

Page 5

```
 1      Mallinckrodt   "What will your patients be    61
        Webb 7         doing when time runs out on
 2                     their chronic pain
                       medicine,"
 3                     MNK-T1_0000093384
 4      Mallinckrodt   "What will your patients be    62
        Harper 8       doing when time runs out on
 5                     their chronic pain
                       medicine,"
 6                     MNK-T1_00000999355
 7      Mallinckrodt   Exalgo: A Clinical           63
        Webb 9         Overview,
 8                     MNK-T1_0000093326 -
                       MNK-T1_0000093327
 9
10      Mallinckrodt   Now may be the time for a      64
        Webb 10        switch,
11                     MNK-T1_0000089968 -
                       MNK-T1_0000089968 -
12      Mallinckrodt   "Whole Story Sales Aid/Leave   67
        Webb 11        Behind Implementation
13                     Guide,"
                       MNK-T1_0000095581 -
14                     MNK-T1_0000095590
15      Mallinckrodt   Mallinckrodt Promotional       71
        Webb 12        Communications Tactical
16                     Plan,
                       MNK-T1_0000180030 -
17                     MNK-T1_0000180064
18      Mallinckrodt   Examples of Education and      78
        Webb 13        Enabling Tools,
19                     MNK-T1_0000089968 -
20      Mallinckrodt   Exalgo Proposed Risk           81
        Webb 14        Mitigation Strategy,
21                     Including Exalgo Risk
                       Evaluation and Mitigation
22                     Strategies, REMS,
                       MNK-T1_0000548549 -
23                     MNK-T1_0000548636
24
25
```

Page 6

1  Mallinckrodt   CARES Alliance Tools Catalog   83
   Webb 15        and Order Form,
2                 MNK-T1_0001493093 -
                  MNK-T1_0001493105
3
4  Mallinckrodt   Defeat Chronic Pain Now!,     99
   Webb 16        Galer & Argoff
5  Mallinckrodt   E-mail(s),                    110
   Webb 17        MNK-T1_0004204631
6
   Mallinckrodt   E-mail(s),                    116
7  Webb 18        MNK-T1_0000876836 -
                  MNK-T1_0000876838
8
   Mallinckrodt   E-mail(s),                    123
9  Webb 19        MNK-T1_0000866405 -
                  MNK-T1_0000866407
10
   Mallinckrodt   E-mail(s),                    125
11 Webb 20        MNK-T1_0000864164 -
                  MNK-T1_0000864168
12
   Mallinckrodt   Mallinckrodt Master          139
13 Webb 21        Stakeholder List,
                  MNK-T1_0000860223 -
14                MNK-T1_0000860232
15 Mallinckrodt   E-mail(s),                   161
   Webb 22        MNK_TNSTA04423166 -
16                MNK_TNSTA04423167;
                  MNK_TNSTA04423170'
17
   Mallinckrodt   E-mail(s),                   165
18 Webb 23        MNK_TNSTA00198469 -
                  MNK_TNSTA00198470
19
   Mallinckrodt   FY13 Speaker Program Spend   169
20 Webb 24        Report 5-10-13, Modified to
                  Show TN Only,
21                MNK_TNSTA00184173
22 Mallinckrodt   FY13 Speaker Program Spend   170
   Webb 25        Report by Region as of
23                6-22-13, Modified to Show TN
                  Only,
24                MNK_TNSTA00184232
25

Page 7

1  Mallinckrodt   E-mail(s),                   172
   Webb 26        MNK-T1_0006524864 -
2                 MNK-T1_0006524865
3  Mallinckrodt   Advocacy: Pain Franchise     178
   Webb 27        Commitments, March 20, 2015,
4                 MNK_TNSTA01002290
5  Mallinckrodt   E-mail(s),                   179
   Webb 28        MNK_TNSTA00155119 -
6                 MNK_TNSTA00155122
7      (Exhibits attached to the deposition.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1       VIDEOGRAPHER:  We are now on      08:57:13
2  the record.  My name is James Arndt.       09:06:41
3  I am a videographer for Golkow        09:06:43
4  Litigation Services.        09:06:45
5       Today's date is January 17,      09:06:45
6  2019, and the time is 9:06 a.m.       09:06:49
7       This video deposition is being   09:06:51
8  held in St. Louis, Missouri, in the  09:06:54
9  matter of the National Prescription  09:06:55
10 Opiate Litigation for the United     09:06:59
11 States District Court for the Northern   09:07:00
12 District of Ohio, Eastern Division.  09:07:02
13      The deponent is Kevin Webb.      09:07:02
14      Will counsel please identify     09:07:05
15 themselves.        09:07:07
16      MR. KAWAMOTO:  Dean Kawamoto,    09:07:07
17 Keller Rohrback, for the plaintiffs.  09:07:09
18      MS. REYES:  Chanele Reyes,       09:07:13
19 Keller Rohrback, for the plaintiffs.  09:07:14
20      MR. GOTTO:  Gary Gotto, Keller   09:07:15
21 Rohrback, for the plaintiffs.        09:07:17
22      MR. KELLY:  Seamus Kelly,        09:07:18
23 Branstetter, Stranch and Jennings for   09:07:20
24 the Tennessee plaintiffs.        09:07:21
25      MR. STRANCH:  Jim Stranch from   09:07:22

Page 9

1  the same firm, same clients.         09:07:23
2       MR. GABEL:  Louis Gabel from     09:07:26
3  Jones Day representing Walmart.       09:07:28
4       MS. HARMON:  Sarah Harmon with   09:07:30
5  Armstrong Teasdale representing       09:07:31
6  Cardinal Health.        09:07:33
7       MR. GOLDSTEIN:  Joshua      09:07:33
8  Goldstein with Ropes & Gray on behalf   09:07:35
9  of the witness, Mallinckrodt, LLC and   09:07:37
10 SpecGx, LLC.        09:07:40
11      MR. O'CONNOR:  Brien O'Connor,   09:07:42
12 Ropes & Gray, on behalf of the        09:07:43
13 witness, Kevin Webb, Mallinckrodt,   09:07:44
14 LLC, and SpecGx, LLC.        09:07:47
15      VIDEOGRAPHER:  Will attorneys    09:07:51
16 present by phone please identify      09:07:52
17 themselves?        09:07:54
18      MR. ROBERTS:  Ryan Roberts from   09:07:54
19 Covington & Burling on behalf of      09:07:57
20 McKesson.        09:07:58
21      MR. JOHNSON:  Jim Johnson on     09:07:59
22 behalf of ABDC from Jackson Kelly.    09:08:01
23      VIDEOGRAPHER:  The court         09:08:08
24 reporter is Carrie Campbell and she   09:08:08
25 will now swear in the witness.        09:08:10

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1                KEVIN WEBB,
2    of lawful age, having been first duly sworn
3    to tell the truth, the whole truth and
4    nothing but the truth, deposes and says on
5    behalf of the Plaintiffs, as follows:
6                                     09:08:16
7        DIRECT EXAMINATION              09:08:16
8    QUESTIONS BY MR. KAWAMOTO:          09:08:17
9        Q.   Good morning, Mr. Webb.     09:08:18
10       A.   Good morning.               09:08:19
11       Q.   Thank you for being here today.   09:08:19
12           As you're aware, you're going    09:08:20
13   to be testifying in two different capacities.   09:08:23
14   Today you're going to be testifying on behalf   09:08:25
15   of Mallinckrodt as a 30(b)(6) witness, and   09:08:27
16   then tomorrow you'll be testifying in your   09:08:30
17   individual capacity.                 09:08:32
18           Is this consistent with your   09:08:33
19   understanding, sir?                  09:08:34
20       A.   Yes.                        09:08:35
21       Q.   Okay.  Have you ever testified   09:08:36
22   as a 30(b)(6) designee before?       09:08:38
23       A.   No.                         09:08:40
24       Q.   Okay.  And you understand that   09:08:41
25   today you're going to be testifying on behalf   09:08:43

Page 11

1    of the company, correct?            09:08:45
2        A.   Correct.                    09:08:45
3        Q.   Now, is it also your         09:08:46
4    understanding that as Mallinckrodt's 30(b)(6)   09:08:51
5    designee for certain topics you had an   09:08:54
6    obligation to educate yourself as to each   09:08:57
7    topic?                              09:08:59
8        A.   Yes.                        09:09:00
9        Q.   And did you, in fact, do so?   09:09:00
10       A.   Yes.                        09:09:01
11       Q.   So I would like to mark this as   09:09:02
12   Exhibit 1.                          09:09:09
13           (Mallinckrodt-Webb Exhibit 1   09:09:10
14       marked for identification.)      09:09:10
15   QUESTIONS BY MR. KAWAMOTO:          09:09:10
16       Q.   And so, Mr. Webb, I'm handing   09:09:15
17   you Exhibit 1, which is a color-coded copy of   09:09:15
18   the amended notice of deposition.  You'll see   09:09:20
19   that it's got different colors for different   09:09:24
20   topics.                             09:09:26
21           The topics that I understand   09:09:26
22   you'll be testifying on or you're prepared to   09:09:28
23   testify on today are in green.      09:09:31
24       A.   Okay.                       09:09:34
25       Q.   And so I would like you to   09:09:34

Page 12

1    do -- and, you know, we've negotiated some of   09:09:35
2    these topics with your counsel so there have   09:09:37
3    been some modifications in terms of, you   09:09:39
4    know, what you're testifying to as opposed to   09:09:42
5    what others are.                    09:09:44
6           But what I would like to do is   09:09:45
7    once you get the notice, I would like to go   09:09:47
8    through the exhibit with you.       09:09:50
9           So turning to Topic 2, sir, and   09:09:57
10   I think that's on page 5?           09:10:02
11       A.   Uh-huh, yes.                09:10:07
12       Q.   Can you read the green portion   09:10:08
13   of that topic?                      09:10:11
14       A.   Do you want me to read it out   09:10:12
15   loud or just --                     09:10:14
16       Q.   Read it out loud, please.    09:10:15
17       A.   Read it out loud.           09:10:17
18           Topic 2, "The role of         09:10:20
19   wholesalers, distributors and pharmacies,   09:10:21
20   including but not limited to defendants, in   09:10:24
21   the supply chain of your opioid products and   09:10:26
22   responsibilities of each with respect to   09:10:29
23   marketing, sales, supply."          09:10:31
24       Q.   And are you prepared to testify   09:10:35
25   on that topic today?                09:10:37

Page 13

1        A.   Yes.                        09:10:38
2        Q.   And what did you do to        09:10:38
3    prepare for -- or what did you do to prepare   09:10:40
4    to testify on that topic?           09:10:42
5        A.   I met with my counsel.       09:10:43
6        Q.   Okay.  Did you review any     09:10:44
7    documents in connection with that topic, sir?   09:10:50
8        A.   I don't recall if I reviewed   09:10:51
9    any documents pertaining to this topic.   09:10:53
10       Q.   Okay.  Did you review documents   09:10:55
11   in preparation for this 30(b)(6) deposition?   09:10:56
12       A.   Yes.                        09:10:59
13       Q.   And were those documents       09:10:59
14   provided by counsel?                09:11:02
15       A.   Yes.                        09:11:03
16       Q.   Did you review any documents   09:11:03
17   that were not provided by counsel?   09:11:04
18       A.   No.                         09:11:06
19       Q.   How many times did you meet   09:11:06
20   with your counsel regarding either today's   09:11:09
21   deposition or tomorrow's deposition?   09:11:13
22       A.   Three.                      09:11:15
23       Q.   Okay.  And do you recall      09:11:16
24   roughly when they were?             09:11:18
25       A.   Yesterday and there were, let's   09:11:19

Page 14

1  see, two times -- there was one time in          09:11:25
2  December and then -- I'm losing track.  I         09:11:29
3  don't think I met in January.  So it was          09:11:33
4  either late -- mid to late December or early      09:11:36
5  January.  I have to -- I think we're still        09:11:38
6  locking in on the date.                           09:11:39
7       Q.   And going to the December              09:11:41
8  meeting, do you recall how long the meeting       09:11:42
9  lasted for?                                        09:11:44
10      A.   It was a full day.  It was             09:11:45
11 eight hours.                                       09:11:46
12      Q.   And do you recall which of your        09:11:47
13 counsel were present?                              09:11:53
14      A.   Well, Brien was part of the            09:11:53
15 meeting in and out.  We had Andrew.  I            09:11:56
16 can't -- I don't know Andrew's last name.          09:12:02
17 And then William.  And I don't know if Cassie     09:12:04
18 is an attorney or not.                             09:12:09
19      MR. O'CONNOR:  She is.                      09:12:12
20      THE WITNESS:  And Cassie.                    09:12:12
21 QUESTIONS BY MR. KAWAMOTO:                         09:12:13
22      Q.   And did you meet with anyone           09:12:14
23 else present other than your four lawyers?        09:12:15
24      A.   When I was meeting with them in        09:12:18
25 their offices yesterday, no.                       09:12:20

Page 15

1       Q.   No, I'm sorry.                         09:12:23
2            In terms of the December               09:12:24
3  meeting, was anyone else present other than      09:12:25
4  the four lawyers you've identified?               09:12:27
5       A.   No.                                     09:12:29
6       Q.   Okay.  Turning to the meeting          09:12:30
7  that you believed occurred in early January,     09:12:32
8  how long did that last for?                        09:12:34
9       A.   That would have been an               09:12:35
10 eight-hour as well.                               09:12:38
11      Q.   And who was present for that          09:12:38
12 meeting?                                           09:12:40
13      A.   The same individuals.  They            09:12:40
14 weren't present the entire time, but in and      09:12:41
15 out.                                               09:12:44
16      Q.   Understood.                            09:12:45
17           And then for the meeting               09:12:45
18 yesterday, roughly how long did that last        09:12:46
19 for?                                               09:12:50
20      A.   That was a full day as well.          09:12:50
21 That was from 9 until 5.                           09:12:52
22      Q.   And who was present for that?         09:12:53
23      A.   The same -- Josh was present as       09:12:55
24 well, to my right, and Brien and Cassie.          09:12:57
25      Q.   Have you talked to anyone else        09:13:02

Page 16

1  other than your lawyers in terms of preparing    09:13:04
2  for these depositions?                             09:13:08
3       A.   For Item Number 2 or for the          09:13:09
4  deposition in general?                             09:13:12
5       Q.   Well, actually that's a good          09:13:13
6  point.  Why don't we go through the topics       09:13:15
7  and then I'll ask that question.                   09:13:18
8       A.   Okay.                                   09:13:18
9       Q.   But for Topic Number 2, you           09:13:20
10 haven't spoken to anyone other than your         09:13:22
11 counsel?                                           09:13:24
12      A.   Correct.                               09:13:24
13      Q.   Okay.  Can you read the green         09:13:24
14 portions of Topic 3?                               09:13:26
15      A.   Topic 3, "Warning letter sent         09:13:27
16 to you by the FDA and any other                   09:13:30
17 communications between you and the FDA            09:13:33
18 regarding your marketing -- your opioid          09:13:36
19 products, your responses to these letters,        09:13:42
20 all subsequent actions you took in response      09:13:44
21 to those communications and all budgets for      09:13:46
22 such actions by year."                             09:13:48
23      Q.   Okay.  What did you do to             09:13:51
24 prepare to testify on this topic?                  09:13:53
25      A.   I reviewed this particular            09:13:58

Page 17

1  issue with counsel.                                09:13:59
2       Q.   And did you speak to anyone           09:14:00
3  else other than your counsel regarding this      09:14:02
4  topic?                                             09:14:04
5       A.   No.                                     09:14:04
6       Q.   Do you recall reviewing any           09:14:04
7  documents relating to this topic?                 09:14:06
8       A.   There was not a document I            09:14:06
9  recall of other than the topic being             09:14:09
10 discussed, and if there was a document, I        09:14:11
11 don't recall seeing any particular document.     09:14:15
12      Q.   Okay.  Can you read Topic             09:14:16
13 Number 4, the green portions of it?               09:14:18
14      A.   Number 4, "Your interactions         09:14:20
15 with the DEA or FDA regarding the scheduling     09:14:23
16 of controlled substances or the distribution     09:14:26
17 of controlled substances, including              09:14:29
18 compliance, regulatory and administrative        09:14:31
19 actions, communications and penalties."           09:14:34
20      Q.   And I guess I should modify           09:14:36
21 that.  You're not going to speak as to the       09:14:37
22 DEA --                                             09:14:40
23      A.   Okay.                                   09:14:40
24      Q.   -- I believe.                          09:14:41
25           So with respect to that topic         09:14:42

Page 18

1    and the FDA, are you prepared to testify on    09:14:44
2    that topic?                              09:14:46
3        A.    Yes.                           09:14:47
4        Q.    And what did you do to prepare    09:14:47
5    for that topic?                          09:14:50
6        A.    Met with counsel.               09:14:50
7        Q.    Do you recall reviewing any      09:14:51
8    documents?                               09:14:53
9        A.    No.                            09:14:53
10       Q.    Did you speak with anyone else    09:14:53
11   other than counsel regarding this topic?    09:14:55
12       A.    No.                            09:14:56
13       Q.    Can you please read Topic        09:15:00
14   Number 8?                                09:15:03
15       A.    Number 8, "All actions you      09:15:03
16   took, if any, after the CDC declared an    09:15:05
17   opioid epidemic in 2011 and introduced    09:15:09
18   guidelines to help reduce opioid prescribing    09:15:13
19   to reduce the amount of opioids prescribed,    09:15:16
20   reduce supply of opioids to the market,    09:15:20
21   dedicated -- sorry, reeducate prescribing    09:15:28
22   physicians and the public about the opioid    09:15:32
23   epidemic declared by the CDC or the dangers    09:15:36
24   of opioids and all budgets for such efforts    09:15:40
25   by year from 2011 to the present."       09:15:41

Page 19

1        Q.    And are you prepared to testify    09:15:43
2    on that topic?                           09:15:44
3        A.    Yes.                           09:15:45
4        Q.    What did you do to prepare for    09:15:47
5    that topic?                              09:15:49
6        A.    Met with counsel.               09:15:49
7        Q.    Okay.  Did you speak to anyone    09:15:50
8    else?                                    09:15:52
9        A.    No.                            09:15:52
10       Q.    Did you review any documents?    09:15:52
11       A.    I do not recall any documents    09:15:54
12   that we reviewed for this particular topic.    09:15:56
13       Q.    Okay.  Do you have personal      09:15:58
14   knowledge of this topic?                 09:16:00
15       A.    In my professional capacity?    09:16:01
16       Q.    Well, I would assume it's from    09:16:06
17   your professional capacity --            09:16:08
18       A.    Yes, I'm aware -- I'm aware of    09:16:09
19   the -- yes, I'm aware of the CDC declaring an    09:16:13
20   opioid epidemic.                         09:16:17
21       Q.    And you're aware of what steps    09:16:17
22   Mallinckrodt took, if any, in response to    09:16:19
23   that?                                    09:16:21
24       A.    Yes.                           09:16:21
25       Q.    Actually going back to Topic 4,    09:16:21

Page 20

1    the interactions with the FDA, if you could    09:16:23
2    quickly glance at that.                  09:16:27
3        A.    Okay.                          09:16:29
4        Q.    Do you have personal knowledge    09:16:29
5    of that topic, sir?                      09:16:31
6        A.    Well, I'm aware of -- I've not    09:16:34
7    personally dealt with this, but I'm aware of    09:16:43
8    what the company was doing.  Or I'm aware of    09:16:45
9    our company's position, I should say, on    09:16:47
10   this.                                    09:16:49
11       Q.    And you are aware based on your    09:16:49
12   personal, professional involvement, or are    09:16:52
13   you aware based on your conversations with    09:16:55
14   counsel?                                 09:16:58
15       A.    Well, I'm aware of the -- yes,    09:16:58
16   I'm aware of -- I'm aware of the company's    09:17:07
17   position on that --                      09:17:09
18       Q.    And you have that --            09:17:10
19       A.    -- through counsel.             09:17:11
20       Q.    I'm sorry, just to clarify the    09:17:12
21   record.                                  09:17:14
22            Your knowledge regarding this    09:17:14
23   topic, is that based on your professional    09:17:16
24   involvement with this topic, or is that based    09:17:19
25   on knowledge that you obtained from counsel?    09:17:22

Page 21

1        A.    The -- I was not -- well,       09:17:25
2    the -- there was -- well, we'll get into that    09:17:34
3    as far as what the involvement was because    09:17:36
4    there was no involvement.                09:17:37
5            But I'm aware of what the        09:17:38
6    company's position was and then through my --    09:17:39
7    through counsel of what the company -- what    09:17:42
8    Mallinckrodt had done, our position on this.    09:17:44
9        Q.    And your awareness of that       09:17:47
10   position comes from counsel?             09:17:50
11       A.    Correct.                       09:17:52
12       Q.    So same question with Topic 3,    09:17:52
13   do you have personal knowledge of that topic?    09:17:57
14       A.    I have -- that -- that         09:17:59
15   awareness of that particular issue came      09:18:03
16   through counsel.                         09:18:05
17       Q.    Okay.  And Topic Number 2?      09:18:06
18       A.    I am aware of -- I have         09:18:09
19   personal, professional awareness of it as    09:18:11
20   well as engagement through counsel.       09:18:16
21       Q.    Okay.  I believe we can now     09:18:17
22   skip to Topic 23, sir.  So that's going to be    09:18:33
23   on page 9.                               09:18:39
24       A.    Okay.                          09:18:41
25       Q.    Can you please read that?       09:18:41

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    A.   23, "The surveys, focus groups,   09:18:43
2 market research or other similar research or   09:18:47
3 investigation that you performed, had   09:18:50
4 performed on your behalf or that you received   09:18:52
5 or reviewed regarding physician or public   09:18:55
6 perceptions of the safety, efficacy and/or   09:18:58
7 addictive nature of your opioid products,   09:19:01
8 other opioid products or opioids and your use   09:19:03
9 of focus groups, research or investigations   09:19:07
10 in developing the sales and marketing   09:19:10
11 strategy and/or a strategy on how to affect,   09:19:12
12 change or influence those perceptions."   09:19:16
13    Q.   And are you prepared to testify   09:19:19
14 on that topic, sir?   09:19:21
15    A.   Yes.   09:19:22
16    Q.   Did you review any documents in   09:19:23
17 connection with that topic?   09:19:24
18    A.   We reviewed documents, but I   09:19:24
19 don't know specifically if they were -- what   09:19:27
20 they were pertaining to.   09:19:28
21    Q.   Did you have any conversations   09:19:29
22 other than with your counsel regarding that   09:19:30
23 topic?   09:19:32
24    A.   I did.   09:19:32
25    Q.   And who were those   09:19:34

Page 23

1 conversations with?   09:19:35
2    A.   For this particular aspect, I   09:19:36
3 had a phone call with -- who was then at the   09:19:40
4 time our head of our market research,   09:19:45
5 Ms. Tammy Fraley.   09:19:46
6    Q.   And what do you recall about   09:19:52
7 that conversation?   09:19:57
8    A.   We discussed the mechanics and   09:19:57
9 the processes of market research.   09:20:01
10    Q.   Did she provide you with any   09:20:05
11 documents to review?   09:20:07
12    A.   No.   09:20:09
13    Q.   Did she identify any documents   09:20:09
14 for you?   09:20:11
15    A.   No.   09:20:11
16    Q.   Do you have any personal   09:20:11
17 knowledge of this topic?   09:20:13
18    A.   Yes.   09:20:14
19    Q.   And is that from your   09:20:15
20 professional -- your professional   09:20:17
21 responsibilities at Mallinckrodt?   09:20:19
22    A.   Yes.   09:20:20
23    Q.   And could you please read   09:20:21
24 Topic 24?   09:20:34
25    A.   24, "All direct or indirect   09:20:34

Page 24

1 donations or payments concerning opioids or   09:20:40
2 opioids products to, A, lobbyist; B, persons   09:20:43
3 or entities named in the complaint; or C,   09:20:47
4 persons you disseminated information about   09:20:51
5 prescription opioids to prescribers or the   09:20:53
6 public on your behalf and the identity of all   09:20:56
7 persons responsible for such donations or   09:20:59
8 payments."   09:21:01
9    Q.   And do you have personal   09:21:02
10 knowledge of that topic?   09:21:03
11    A.   Yes.   09:21:04
12    Q.   Okay.  What did you do to   09:21:05
13 prepare for that topic?   09:21:06
14    A.   Met with counsel.   09:21:08
15    Q.   Do you recall reviewing any   09:21:09
16 documents in connection with this topic?   09:21:18
17    A.   Yes, I review -- we did review   09:21:20
18 documents pertaining to this.   09:21:21
19    Q.   And are those documents the   09:21:24
20 basis of your testimony?   09:21:26
21    A.   They would be an element of it.   09:21:27
22    Q.   Okay.  Do you recall the   09:21:31
23 general nature of the documents you reviewed?   09:21:36
24    A.   I remember one document in   09:21:38
25 particular.  It was -- yes.   09:21:40

Page 25

1    Q.   Okay.  And what was that   09:21:43
2 document?   09:21:45
3    A.   It was a financial --   09:21:45
4    MR. O'CONNOR:  Objection.  I'm   09:21:47
5   going to instruct him not to answer if   09:21:49
6   it's a document provided by counsel,   09:21:52
7   work product privilege.   09:21:54
8    MR. KAWAMOTO:  Okay.   09:21:56
9 QUESTIONS BY MR. KAWAMOTO:   09:21:58
10    Q.   Okay.  Can you describe the   09:21:58
11 nature of the document?  Was it an e-mail?   09:22:04
12 Was it a PowerPoint?  Was it a spreadsheet?   09:22:06
13    MR. O'CONNOR:  Same objection.   09:22:10
14   I'm going to direct him not to answer.   09:22:12
15 QUESTIONS BY MR. KAWAMOTO:   09:22:15
16    Q.   Other than that one document,   09:22:24
17 do you recall reviewing any other documents?   09:22:25
18    A.   No.   09:22:27
19    Q.   Can you -- well, I'll try to   09:22:27
20 truncate this.   09:22:38
21    For Topic 25, can you read that   09:22:39
22 to yourself?   09:22:42
23    A.   To myself or read it out loud?   09:22:42
24    Q.   Just read it to yourself --   09:22:44
25    A.   Okay.  Thank you.   09:22:44

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.    -- and let me know when you're    09:22:45
2    done.    09:22:46
3    A.    Okay.  Thank you.    09:22:47
4    Q.    Are you prepared to testify on    09:23:09
5    Topic 25?    09:23:11
6    A.    Yes.    09:23:11
7    Q.    And what did you do to prepare    09:23:12
8    to testify on that topic?    09:23:13
9    A.    Met with counsel.    09:23:14
10    Q.    Do you have any personal    09:23:15
11    knowledge of Topic 25?    09:23:16
12    A.    Yes.    09:23:17
13    Q.    And what is that personal    09:23:19
14    knowledge?    09:23:27
15        Well, strike that.  Let me    09:23:33
16    rephrase it.    09:23:34
17        I take it your personal    09:23:35
18    knowledge is from your professional    09:23:36
19    responsibilities at Mallinckrodt?    09:23:38
20    A.    Correct.    09:23:39
21    Q.    Can you read Topic 26 to    09:23:39
22    yourself?    09:23:48
23        Well, I'm sorry, actually, let    09:23:48
24    me -- do you recall reviewing any documents    09:23:50
25    in connection with Topic 25?    09:23:52

Page 27

1    A.    No.    09:23:54
2    Q.    Okay.  Can you review -- did    09:23:57
3    you speak to anyone other than counsel about    09:24:01
4    Topic 25?    09:24:03
5    A.    Yes.    09:24:04
6    Q.    Who did you speak to?    09:24:04
7    A.    I spoke, through a conference    09:24:06
8    call, with my colleague, Derek Naten, in our    09:24:09
9    government affairs team.    09:24:13
10    Q.    And when you say your    09:24:16
11    "government affairs team," who is on that    09:24:18
12    team?    09:24:21
13    A.    That would be myself, that    09:24:21
14    would be Derek and his manager or boss, Mark    09:24:22
15    Tyndall.    09:24:32
16    Q.    And what do you recall about    09:24:32
17    that conversation?    09:24:34
18        MR. O'CONNOR:  You can go    09:24:39
19    ahead.    09:24:40
20        THE WITNESS:  It was the nature    09:24:40
21    of understanding what lobbying efforts    09:24:41
22    may have taken place prior to me    09:24:45
23    joining the department.    09:24:47
24    QUESTIONS BY MR. KAWAMOTO:    09:24:47
25    Q.    And when did you join the    09:24:49

Page 28

1    department?    09:24:51
2    A.    2000 and -- 2013.    09:24:51
3    Q.    And how far back did those    09:24:58
4    conversations go in terms of -- well, strike    09:25:04
5    that.    09:25:08
6        Do you recall the time frame    09:25:08
7    that you discussed in terms of the lobbying    09:25:13
8    efforts with Mr. Naten and Mr. Tyndall?    09:25:15
9    A.    Yes.    09:25:17
10    Q.    What was that time frame?    09:25:18
11    A.    Roughly beginning 2011, '12    09:25:19
12    time frame.    09:25:23
13    Q.    Did you do anything to prepare    09:25:25
14    yourself -- did you do anything to prepare to    09:25:33
15    testify regarding this topic for the time    09:25:35
16    period prior to 2011?    09:25:38
17    A.    Other than meeting with    09:25:40
18    counsel, no.    09:25:42
19    Q.    And if I could go back to    09:25:43
20    Topic 24, other than counsel, did you have    09:25:56
21    any conversations with anyone regarding this    09:25:58
22    topic?    09:26:00
23    A.    The -- not -- not for 24.  The    09:26:00
24    only question we had with lobbying was on    09:26:18
25    Topic 25.    09:26:21

Page 29

1    Q.    And you indicated that, I    09:26:22
2    guess, you had a question regarding lobbying.    09:26:29
3        What was that question?    09:26:30
4    A.    I was asking Derek if he    09:26:32
5    knew --    09:26:35
6        MR. O'CONNOR:  Objection.    09:26:35
7        You can go ahead.    09:26:37
8        THE WITNESS:  I was asking    09:26:37
9    Derek if he knew of any lobbying    09:26:39
10    effort that Mallinckrodt may have    09:26:41
11    engaged in prior to me joining the    09:26:42
12    department in 2013.    09:26:45
13    QUESTIONS BY MR. KAWAMOTO:    09:26:47
14    Q.    Okay.  Can you review Topic 26?    09:26:48
15    A.    Review or read?    09:26:52
16    Q.    Read, to yourself.    09:26:55
17    A.    To myself, all right.  Thank    09:26:58
18    you.    09:27:00
19        Okay.    09:27:44
20    Q.    Are you prepared to testify on    09:27:45
21    Topic 26?    09:27:47
22    A.    Yes.    09:27:47
23    Q.    What did you do to prepare for    09:27:48
24    that topic?    09:27:50
25    A.    Met with counsel.    09:27:50

Highly Confidential - Subject to Further Confidentiality Review

| Page 30 |
|---|

1   Q.   Do you have any personal        09:27:51
2   knowledge of that topic?             09:27:52
3   A.   Yes.                            09:27:53
4   Q.   Other than counsel, did you     09:27:54
5   have any conversations regarding this topic?   09:28:00
6   A.   No.                             09:28:02
7   Q.   Do you recall reviewing any     09:28:02
8   documents in connection with this topic?   09:28:06
9        MR. O'CONNOR:  You --           09:28:09
10       THE WITNESS:  We reviewed       09:28:13
11   documents, but I can't recall the   09:28:14
12   nature of those documents.          09:28:15
13  QUESTIONS BY MR. KAWAMOTO:           09:28:16
14   Q.   Did you review more than one   09:28:22
15   document?                           09:28:23
16   A.   Yes, at the time, but I do not 09:28:24
17   know which documents those were or how many   09:28:27
18   documents they were.                09:28:30
19   Q.   Okay.  Can you read Topic 30 to 09:28:31
20   yourself?                           09:28:38
21   A.   Okay.                          09:28:39
22   Q.   Are you prepared to testify on 09:29:15
23   this topic?                         09:29:16
24   A.   Yes.                           09:29:17
25   Q.   What did you do to prepare to  09:29:18

| Page 31 |
|---|

1   testify?                            09:29:19
2   A.   Met with counsel.              09:29:20
3   Q.   Do you have any personal       09:29:22
4   knowledge of this topic?            09:29:23
5   A.   Yes.                           09:29:24
6   Q.   Other than counsel, did you    09:29:24
7   have conversations with anyone else relating   09:29:34
8   to this topic?                      09:29:35
9   A.   No.                            09:29:36
10   Q.   Do you recall reviewing any    09:29:36
11   documents relating to this topic?   09:29:37
12   A.   No.                            09:29:39
13   Q.   Can you read Topic 32 to       09:29:39
14   yourself?                           09:29:54
15   A.   Okay.                          09:29:54
16   Q.   What did you do to prepare for 09:30:19
17   this topic?                         09:30:20
18   A.   Met with counsel.              09:30:21
19   Q.   Do you have any personal       09:30:22
20   knowledge of this topic?            09:30:24
21   A.   Yes.                           09:30:25
22   Q.   Other than counsel, did you    09:30:25
23   speak with anyone else --           09:30:32
24   A.   No.                            09:30:33
25   Q.   -- regarding this topic?       09:30:33

| Page 32 |
|---|

1   A.   No.                            09:30:34
2   Q.   Do you recall reviewing any    09:30:35
3   documents related to this topic?    09:30:36
4   A.   No.                            09:30:38
5   Q.   Can you review topic -- or can 09:30:40
6   you read Topic 33 to yourself?       09:30:47
7   A.   Okay.                          09:30:49
8   Q.   Are you prepared to testify on 09:31:03
9   this topic?                         09:31:04
10   A.   Yes.                           09:31:05
11   Q.   What did you do to prepare?    09:31:05
12   A.   Reviewed, met with counsel.    09:31:07
13   Q.   And when you say "reviewed,"   09:31:09
14   what do you mean by that?            09:31:12
15   A.   Met with counsel.              09:31:12
16   Q.   Okay.  Other than counsel, did 09:31:13
17   you talk to anyone else about this topic?   09:31:17
18   A.   No.                            09:31:19
19   Q.   Do you recall reviewing any    09:31:19
20   documents related to this topic?    09:31:21
21       MR. O'CONNOR:  Do you recall    09:31:25
22   any?                                09:31:26
23       THE WITNESS:  Yes.             09:31:26
24  QUESTIONS BY MR. KAWAMOTO:           09:31:27
25   Q.   Okay.  Can you generally       09:31:28

| Page 33 |
|---|

1   describe those -- those documents?   09:31:29
2       MR. O'CONNOR:  Objection.       09:31:31
3   Instruct not to answer to the extent 09:31:32
4   that the documents were provided by  09:31:35
5   counsel on work product privilege.   09:31:38
6  QUESTIONS BY MR. KAWAMOTO:           09:31:42
7   Q.   Were there any documents that  09:31:42
8   you recall reviewing that were not provided   09:31:44
9   by counsel?                         09:31:45
10   A.   No.                            09:31:45
11   Q.   Do you recall how many         09:31:46
12   documents you reviewed?             09:31:49
13       MR. O'CONNOR:  You can answer   09:31:54
14   that.                               09:31:54
15       THE WITNESS:  One.             09:31:55
16  QUESTIONS BY MR. KAWAMOTO:           09:31:56
17   Q.   Can you review Topic 34?       09:31:59
18   A.   Okay.                          09:32:02
19   Q.   Are you prepared to testify on 09:32:42
20   this topic?                         09:32:44
21   A.   Yes.                           09:32:45
22   Q.   What did you do to prepare for 09:32:45
23   this topic?                         09:32:46
24   A.   Met with counsel.              09:32:47
25   Q.   Do you have any personal       09:32:48

Page 34

1  knowledge of this topic?                    09:32:49
2      A.    Yes.                              09:32:50
3      Q.    Do you recall reviewing any       09:32:51
4  documents in connection with this topic?    09:32:53
5          MR. O'CONNOR:  You can answer       09:32:57
6  that.                                       09:32:58
7          THE WITNESS:  Yes.                  09:32:58
8  QUESTIONS BY MR. KAWAMOTO:                   09:32:59
9      Q.    Do you recall how many            09:33:00
10 documents?                                   09:33:01
11         MR. O'CONNOR:  All right.  I'm       09:33:02
12 going to instruct not to answer to the      09:33:02
13 extent that the documents were              09:33:04
14 provided by counsel.                        09:33:05
15         MR. KAWAMOTO:  And is your          09:33:08
16 objection as to the question of how         09:33:09
17 many, does it cover that?                   09:33:12
18         MR. O'CONNOR:  I'll let him         09:33:13
19 answer for how many and then I'll           09:33:15
20 listen for the next question.               09:33:16
21 Go ahead.                                   09:33:17
22         Do you recall how many              09:33:17
23 documents?                                  09:33:19
24         THE WITNESS:  One.                  09:33:21
25

Page 35

1  QUESTIONS BY MR. KAWAMOTO:                   09:33:22
2      Q.    And for the sake of the record,   09:33:23
3  can you generally describe that document?   09:33:24
4          MR. O'CONNOR:  Objection.           09:33:26
5  Objection.  I instruct not to answer        09:33:27
6  on work product.                            09:33:30
7  QUESTIONS BY MR. KAWAMOTO:                   09:33:31
8      Q.    Can you read Topic 36 to          09:33:38
9  yourself?                                    09:33:41
10     A.    Okay.                             09:33:41
11     Q.    I'm sorry, going back to          09:33:56
12 Topic 34 very quickly, did you have any     09:33:57
13 conversations with anyone else other than   09:33:59
14 your counsel regarding this topic?          09:34:00
15     A.    No.                               09:34:02
16     Q.    Then for Topic 36, what did you   09:34:04
17 do to prepare for this topic?               09:34:08
18     A.    Met with counsel.                 09:34:10
19     Q.    Okay.  Do you have any personal   09:34:11
20 knowledge of this topic?                    09:34:14
21     A.    Yes.                              09:34:15
22     Q.    Did you have any conversations    09:34:15
23 with anyone other than counsel regarding this 09:34:20
24 topic?                                      09:34:22
25     A.    No.                               09:34:22

Page 36

1      Q.    Do you recall reviewing any       09:34:22
2  documents relating to this topic?           09:34:24
3      A.    No.                               09:34:26
4      Q.    Okay.  Thank you.  You can put    09:34:26
5  that exhibit aside.                         09:34:42
6      A.    Thank you.                        09:34:43
7      Q.    So I would like to start with     09:34:44
8  Topics Number 26 and Topic Number 30.  And if 09:34:58
9  you need to -- yeah, if you need to review  09:35:03
10 Exhibit 1, please feel free to do so.       09:35:08
11     A.    I'm sorry, Topic 26 --            09:35:14
12     Q.    Topic 26 and Topic Number 30.     09:35:16
13     A.    Okay.                             09:35:21
14     Q.    Okay.  Now, when Mallinckrodt     09:35:23
15 developed marketing and advertising         09:35:44
16 materials, this was on a national basis, was 09:35:47
17 it not?                                      09:35:49
18         MR. O'CONNOR:  Objection.           09:35:50
19         You can answer.                     09:35:51
20         THE WITNESS:  Yes.                  09:35:52
21 QUESTIONS BY MR. KAWAMOTO:                   09:35:52
22     Q.    Okay.  So Mallinckrodt would      09:35:53
23 not have developed special ads for a specific 09:35:57
24 state?                                       09:36:00
25         For example, they would not         09:36:01

Page 37

1  have developed Ohio-specific advertising,    09:36:02
2  would they have?                             09:36:04
3          MR. O'CONNOR:  Objection to the     09:36:04
4  form.                                        09:36:05
5          You can answer.                     09:36:09
6          THE WITNESS:  Correct, we would     09:36:09
7  not.                                         09:36:10
8  QUESTIONS BY MR. KAWAMOTO:                   09:36:10
9      Q.    Okay.  And how did Mallinckrodt   09:36:11
10 make decisions regarding how to distribute  09:36:20
11 the advertisements and the marketing        09:36:22
12 materials that it developed?                09:36:24
13         MR. O'CONNOR:  Objection.           09:36:25
14         THE WITNESS:  We would -- the       09:36:26
15 material would have been distributed        09:36:29
16 through our sales force.                    09:36:31
17 QUESTIONS BY MR. KAWAMOTO:                   09:36:32
18     Q.    And how would the sales force     09:36:35
19 go about distributing that material?        09:36:36
20         MR. O'CONNOR:  Objection.           09:36:39
21         THE WITNESS:  They would be         09:36:40
22 provided to them by the company.            09:36:41
23 QUESTIONS BY MR. KAWAMOTO:                   09:36:42
24     Q.    Okay.  Would you use print        09:36:42
25 advertising?                                 09:36:46

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1      MR. O'CONNOR: Would you ask     09:36:49
2   the question again, I'm sorry?     09:36:50
3   QUESTIONS BY MR. KAWAMOTO:          09:36:52
4      Q.   Fair enough, let me rephrase   09:36:53
5   that.               09:36:54
6          Did you ever run advertisements   09:36:54
7   in newspapers?            09:36:55
8      A.   Can you define "newspapers"?   09:36:56
9      Q.   Any print medium that gets   09:37:05
10   distributed to the general public or a   09:37:07
11   segment of the general public?       09:37:10
12     A.   General public, no.       09:37:11
13     Q.   Okay.  What about any materials   09:37:12
14   that were distributed to potential patients?   09:37:19
15         MR. O'CONNOR: Objection.     09:37:23
16         THE WITNESS: No.        09:37:24
17   QUESTIONS BY MR. KAWAMOTO:          09:37:24
18     Q.   Did you ever run any ads in   09:37:34
19   magazines?              09:37:35
20     A.   Can you define "magazines,"   09:37:35
21   though?  Which type of magazines?      09:37:39
22     Q.   Well, let's start with      09:37:42
23   magazines that the general public would read.   09:37:44
24     A.   I'm not aware of any ads.    09:37:50
25   Generally we would not run what we would   09:37:53

Page 39

1   consider direct-to-consumer advertising, no.   09:37:56
2      Q.   Would you run advertisements in   09:37:58
3   medical journals?          09:38:01
4      A.   Yes.              09:38:02
5      Q.   So with respect to -- and I   09:38:02
6   want to cabin this to Mallinckrodt's opioid   09:38:07
7   products, both branded and generic, with   09:38:09
8   respect to direct-to-consumer advertising,   09:38:13
9   did Mallinckrodt engage in any       09:38:16
10   direct-to-consumer advertising for its opioid   09:38:19
11   products?              09:38:20
12     A.   No.              09:38:21
13     Q.   And your basis for that      09:38:21
14   response is -- well, strike that.      09:38:32
15         What is your basis for saying   09:38:36
16   that Mallinckrodt did not do any       09:38:38
17   direct-to-consumer advertising?      09:38:40
18         Do you have -- is that your   09:38:42
19   personal knowledge?          09:38:43
20     A.   That is both my personal and my   09:38:44
21   understanding of our -- of our advertising --   09:38:47
22   of our marketing campaigns.        09:38:49
23     Q.   Did Mallinckrodt market to   09:38:51
24   health care professionals?        09:38:59
25     A.   Yes.              09:39:00

Page 40

1      Q.   And how did it do so?      09:39:01
2      A.   They -- we would provide, as I   09:39:05
3   mentioned, journal ads, we would provide our   09:39:14
4   sales force approved sales aids, and we would   09:39:16
5   participate in trade shows for health care   09:39:27
6   providers.              09:39:33
7      Q.   So I have journal ads, I have   09:39:34
8   materials distributed by your sales force,   09:39:38
9   and I have trade shows.        09:39:41
10         Are there any other categories?   09:39:42
11     A.   We would do education seminars   09:39:43
12   with our physicians.          09:39:54
13     Q.   And when you say "with your   09:39:57
14   physicians," what do you mean by that?      09:40:00
15     A.   With physicians to the medical   09:40:02
16   community.              09:40:04
17     Q.   And when you say "education   09:40:04
18   seminars," are you referring to CE,      09:40:12
19   continuing education?          09:40:14
20     A.   No, we would -- well, through   09:40:15
21   marketing -- I just wanted to clarify,      09:40:19
22   though, marketing would not participate in CE   09:40:21
23   programs, continuing education programs.  I   09:40:24
24   cannot speak to what medical affairs was   09:40:27
25   doing.              09:40:28

Page 41

1      Q.   But marketing would participate   09:40:29
2   in the education seminars that you just   09:40:32
3   mentioned?              09:40:34
4      A.   On-label education programs,   09:40:34
5   yes.               09:40:36
6      Q.   And all four of these channels   09:40:36
7   would have been deployed pursuant to a   09:40:45
8   national strategy or a national campaign; is   09:40:49
9   that fair?              09:40:51
10     A.   Correct.            09:40:51
11     Q.   And so these -- these national   09:40:52
12   strategies or national campaigns would have   09:40:56
13   included Ohio, would it not?        09:40:58
14     A.   Yes.              09:40:59
15         (Mallinckrodt-Webb Exhibit 2   09:41:12
16   marked for identification.)        09:41:13
17   QUESTIONS BY MR. KAWAMOTO:          09:41:13
18     Q.   Okay.  So I would like to mark   09:41:32
19   this as Exhibit 2.          09:41:33
20         So, Mr. Webb, I've handed you   09:41:57
21   an e-mail that also had an attachment to it.   09:41:58
22   The attachment is stapled to the back of the   09:42:02
23   e-mail.               09:42:04
24         The e-mail is Bates         09:42:05
25   number 2159712, and the attachment is   09:42:08

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  2159713.                                        09:42:11
2        Could you please review that      09:42:15
3  for me?                                       09:42:16
4    A.   Okay.                              09:42:16
5    Q.   Now, the attachment is a pain    09:42:44
6  management pocket card set.              09:42:49
7        Are you familiar with the pain    09:42:51
8  management pocket card set?              09:42:53
9    A.   I am not.                         09:42:55
10   Q.   Do you know what is -- what --    09:42:56
11 well, strike that.                       09:43:00
12       What is the purpose of this        09:43:01
13 pocket card set?                         09:43:06
14       MR. O'CONNOR: Objection.           09:43:07
15       THE WITNESS: I would have -- I     09:43:12
16 have never seen this piece before in     09:43:15
17 my life, so I would have to review it.   09:43:16
18 QUESTIONS BY MR. KAWAMOTO:               09:43:18
19   Q.   Okay. Well, let me ask this:      09:43:19
20 Why was -- why was this pocket card set  09:43:24
21 created?                                 09:43:27
22       MR. O'CONNOR: Objection.           09:43:27
23       THE WITNESS: I don't know. I       09:43:28
24 mean, I have not seen this piece, and    09:43:32
25 I don't know to what purpose it          09:43:34

Page 43

1  serves.                                  09:43:36
2  QUESTIONS BY MR. KAWAMOTO:               09:43:36
3    Q.   Now, the e-mail indicates that    09:43:43
4  the pocket cards were for the national   09:43:44
5  account managers.                        09:43:48
6        Do you see that, sir?              09:43:48
7    A.   Yes.                              09:43:49
8    Q.   Okay. And the e-mail indicates    09:43:49
9  that they were to be handed out at trade 09:43:52
10 shows and distributed to customers.      09:43:55
11       Do you know what the reference     09:43:57
12 to "customers" means?                    09:43:59
13       MR. O'CONNOR: Objection.           09:44:00
14       THE WITNESS: The -- my             09:44:01
15 understanding of the national account    09:44:06
16 managers, the NAMs, the customers are    09:44:08
17 the wholesalers and distributors.        09:44:11
18 QUESTIONS BY MR. KAWAMOTO:               09:44:13
19   Q.   Okay. And I guess they would      09:44:27
20 be handed out at trade shows.            09:44:29
21       So if trade shows were -- if a     09:44:32
22 trade show were to occur in Ohio, presumably 09:44:33
23 this material would have been handed out 09:44:35
24 there?                                   09:44:37
25       MR. O'CONNOR: Objection.           09:44:37

Page 44

1        THE WITNESS: We -- we --           09:44:38
2  Mallinckrodt would have made the same    09:44:41
3  material available to the trade shows    09:44:42
4  regardless of where it was held.         09:44:45
5  QUESTIONS BY MR. KAWAMOTO:               09:44:46
6    Q.   Okay. Now, do you know if this    09:44:46
7  pain management pocket card set was -- was 09:45:04
8  distributed, was actually distributed?   09:45:07
9    A.   I would not know that.            09:45:08
10   Q.   Okay. Do you have any basis to    09:45:09
11 believe that it was not distributed at trade 09:45:13
12 shows?                                   09:45:15
13   A.   I do not.                         09:45:15
14   Q.   Okay. And you would consider      09:45:16
15 this pain management pocket card set to be 09:45:31
16 marketing material, would you not?       09:45:33
17       MR. O'CONNOR: Objection.           09:45:35
18       THE WITNESS: I would --            09:45:35
19 without having to review the piece, I    09:45:48
20 wouldn't -- I wouldn't know if this      09:45:52
21 falls under patient education or         09:45:52
22 marketing material.                      09:45:55
23 QUESTIONS BY MR. KAWAMOTO:               09:45:56
24   Q.   But it was designed to be         09:45:59
25 distributed outside of Mallinckrodt to inform 09:46:00

Page 45

1  people regarding opioid products; is that 09:46:05
2  fair?                                    09:46:08
3        MR. O'CONNOR: Objection.           09:46:08
4        THE WITNESS: I can't speculate     09:46:09
5  what it was informing them of opioid     09:46:11
6  products.                                09:46:15
7  QUESTIONS BY MR. KAWAMOTO:               09:46:16
8    Q.   Well, the national account        09:46:18
9  managers were involved with the sale of both 09:46:20
10 opioid -- I'm sorry, strike that.        09:46:24
11       The national account managers      09:46:25
12 were involved with the sale of both branded 09:46:26
13 and generic opioid products, were they not? 09:46:28
14   A.   This -- this group, this was      09:46:34
15 a -- for our generics team, and that was 09:46:40
16 generic opioids only.                    09:46:42
17   Q.   Okay. So these marketing --       09:46:43
18 well, these materials presumably relate to 09:46:48
19 generic opioids then, based on this e-mail? 09:46:50
20   A.   I would have --                   09:46:53
21       MR. O'CONNOR: Objection.           09:46:53
22       THE WITNESS: Sorry.                09:46:54
23 I would have to review the               09:46:55
24 piece to specify whether it was brands   09:46:56
25 or generics.                             09:46:58

Page 46

```
 1   QUESTIONS BY MR. KAWAMOTO:              09:46:59
 2      Q.   Okay.  Well, could you review   09:46:59
 3   the first page then?                    09:47:01
 4      A.   Okay.                           09:47:03
 5      Q.   So does this material relate to 09:47:48
 6   branded or generic products?            09:47:50
 7      A.   Well, since it would relate to  09:47:52
 8   opioids in general, a general class of  09:47:59
 9   opioids.                                09:48:03
10      Q.   Okay.  So that would -- and     09:48:03
11   that would include both branded and generic  09:48:04
12   products for Mallinckrodt, that class of 09:48:07
13   opioids?                                09:48:10
14          MR. O'CONNOR:  Objection.        09:48:10
15          THE WITNESS:  Well, since        09:48:11
16      there's no branding on it and it was 09:48:11
17      not used by a brand national account 09:48:15
18      manager, my personal opinion is it   09:48:18
19      pertains only to generic opioids.    09:48:21
20   QUESTIONS BY MR. KAWAMOTO:              09:48:23
21      Q.   Okay.  And who was the target   09:48:24
22   audience for this information?          09:48:28
23      A.   You would have to ask the       09:48:30
24   person who put this together.  I don't know.  09:48:31
25      Q.   Was one of the purposes of this 09:48:33
```

Page 47

```
 1   material to educate doctors?            09:48:42
 2          MR. O'CONNOR:  Objection.        09:48:43
 3          THE WITNESS:  The national       09:48:44
 4      account managers did not call on     09:48:46
 5      physicians.  They only called on --  09:48:48
 6      their customers were wholesalers and 09:48:50
 7      distributors.                        09:48:52
 8   QUESTIONS BY MR. KAWAMOTO:              09:48:52
 9      Q.   But wholesalers and             09:48:53
10   distributors could have provided this   09:48:54
11   information to their customers, which would  09:48:56
12   have included doctors and pharmacists?   09:48:59
13          MR. O'CONNOR:  Objection.        09:49:01
14          THE WITNESS:  I do not know how  09:49:02
15      the wholesalers or distributors would 09:49:04
16      use this piece.                      09:49:07
17   QUESTIONS BY MR. KAWAMOTO:              09:49:08
18      Q.   But presumably wholesalers and  09:49:08
19   distributors would use this information to 09:49:10
20   encourage sales of their products, would they  09:49:12
21   not?                                    09:49:14
22          MR. O'CONNOR:  Objection.        09:49:14
23          THE WITNESS:  The sales of       09:49:15
24      their products?                      09:49:17
25
```

Page 48

```
 1   QUESTIONS BY MR. KAWAMOTO:              09:49:18
 2      Q.   Well, the sales of              09:49:18
 3   Mallinckrodt's products that they were in 09:49:20
 4   charge of distributing.                 09:49:21
 5          MR. O'CONNOR:  Objection.        09:49:24
 6          THE WITNESS:  My understanding   09:49:24
 7      of the national account -- the       09:49:26
 8      wholesalers is that they did not     09:49:28
 9      specifically identify any one        09:49:30
10      particular manufacturer's products.  09:49:32
11      They had -- they had a basket of     09:49:36
12      products that they would make        09:49:39
13      available to their customers and --  09:49:41
14      but to my knowledge, they were not in 09:49:44
15      a position advocating one product over 09:49:46
16      another.                             09:49:49
17   QUESTIONS BY MR. KAWAMOTO:              09:49:49
18      Q.   Well, so why is Mallinckrodt    09:49:49
19   providing this information to wholesalers and 09:49:50
20   distributors?                           09:49:52
21          MR. O'CONNOR:  Objection.        09:49:53
22          THE WITNESS:  You would have to  09:49:53
23      ask the person who put this together. 09:50:00
24   QUESTIONS BY MR. KAWAMOTO:              09:50:03
25      Q.   Who reviewed the information in 09:50:04
```

Page 49

```
 1   this -- in this -- in these -- in these 09:50:06
 2   cards?                                  09:50:08
 3      A.   The -- well, this would have    09:50:08
 4   been reviewed and approved by our -- what we 09:50:13
 5   call our medical/legal review board.    09:50:16
 6      Q.   So what steps, if any, were     09:50:24
 7   taken to ensure this information was    09:50:26
 8   accurate?                               09:50:29
 9      A.   Well, each representative for   09:50:29
10   that -- that review board or review     09:50:30
11   committee, who is comprised of a physician, 09:50:33
12   an attorney and someone from our regulatory 09:50:36
13   compliance team, would review it for medical 09:50:41
14   accuracy, legal accuracy and general FDA 09:50:43
15   compliance.                             09:50:45
16      Q.   And Mallinckrodt would agree    09:50:46
17   that's very important that the information in 09:50:48
18   this pocket card set be accurate, would it 09:50:50
19   not?                                    09:50:54
20          MR. O'CONNOR:  Objection.        09:50:54
21          THE WITNESS:  Accurate to --     09:50:54
22      yes, it would be accurate.           09:50:57
23          (Mallinckrodt-Webb Exhibit 3     09:51:24
24      marked for identification.)          09:51:25
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 50

```
1   QUESTIONS BY MR. KAWAMOTO:              09:51:25
2       Q.   Okay.  I would like to mark    09:51:25
3   this as Exhibit 3.                      09:51:37
4            So I've handed you an e-mail    09:51:50
5   and two attachments to that e-mail.  The   09:51:52
6   e-mail is Bates numbered 2183036 and the   09:51:58
7   attachments are 2183038 and 2183040.    09:52:02
8       MR. GIORDANO:  Counsel, this is     09:52:28
9   Philip Giordano from Arnold & Porter    09:52:30
10      for Par and Endo companies.          09:52:32
11           Could you read the full Bates   09:52:33
12      number into the record just so we're   09:52:35
13      able to follow along on the phone?   09:52:37
14      Because we can't see the exhibit.    09:52:39
15           Thank you.                       09:52:40
16      MR. KAWAMOTO:  Sure.  By full        09:52:41
17      Bates number, I take it you mean     09:52:42
18      MNK-T1_2183036?                       09:52:45
19      MR. GIORDANO:  That's exactly        09:52:50
20      right.  Thank you very much.         09:52:51
21  QUESTIONS BY MR. KAWAMOTO:               09:52:52
22      Q.   Okay.  So the e-mail is         09:52:52
23  MNK-T1_2183036.                           09:52:54
24           The attachment is -- the first  09:52:58
25  attachment is MNK-T1_2183038.            09:52:59
```

Page 51

```
1            And then the next attachment is   09:53:05
2   MNK-T1_2183040.                           09:53:07
3            So this is an e-mail chain       09:53:36
4   involving LouAnn Randall and John Decker.   09:53:40
5            Who is John Decker?              09:53:41
6       A.   John Decker was from our         09:53:44
7   medical affairs team.  I have to look exactly   09:53:46
8   what his title was, but John was responsible   09:53:51
9   for physician education -- not education   09:53:56
10  material, but just trade journals and -- was   09:54:05
11  publication planning is the correct title.   09:54:08
12      Q.   And when you say "trade          09:54:12
13  journals and publication planning," what do   09:54:19
14  you mean by that?                          09:54:22
15      A.   Looking at what clinical         09:54:23
16  articles are in the journals, the         09:54:26
17  professional journals, understanding, as   09:54:29
18  Mallinckrodt was producing clinical studies,   09:54:34
19  how they would be published and how they   09:54:36
20  would be put into the -- made available to   09:54:39
21  physicians.                                09:54:42
22      Q.   And the attachment to this       09:54:43
23  e-mail, the e-mail references these as "two   09:54:45
24  pieces that we've done on pain," and one is   09:54:48
25  entitled "The Oxford American pocket cards on   09:54:52
```

Page 52

```
1   breakthrough pain," and otbis is "the pain   09:54:56
2   management prospect set" that looks very   09:55:00
3   similar to what we viewed in Exhibit 2.   09:55:01
4       A.   Uh-huh.                           09:55:04
5       Q.   Do you know how these materials   09:55:04
6   would have been distributed?              09:55:06
7       MR. O'CONNOR:  Objection.             09:55:08
8       THE WITNESS:  Well, since             09:55:09
9       they're -- I mean, these are          09:55:21
10      repurposing of pieces.  It was our    09:55:22
11      generics sales team, it was a piece   09:55:28
12      for our generics -- so our generics   09:55:30
13      did not call on physicians.           09:55:33
14           So I can speculate that it       09:55:35
15      would be made available through the   09:55:39
16      trade shows and through trade         09:55:41
17      channels.                              09:55:45
18      MR. O'CONNOR:  I'll object.           09:55:45
19      Well, I would object to any           09:55:49
20      speculation.                           09:55:52
21  QUESTIONS BY MR. KAWAMOTO:               09:55:52
22      Q.   So you have no reason to         09:55:55
23  believe that these materials would not have   09:55:56
24  been distributed into Ohio?               09:56:00
25      A.   Correct.                          09:56:02
```

Page 53

```
1       MR. O'CONNOR:  Objection.             09:56:03
2       THE WITNESS:  Oh, I'm sorry.          09:56:05
3       MR. O'CONNOR:  That's all             09:56:07
4       right.                                 09:56:08
5   QUESTIONS BY MR. KAWAMOTO:               09:56:08
6       Q.   And then on the back page with   09:56:17
7   Bates number MNK-T1_2183037, I'm referring   09:56:20
8   you to the back page of the e-mail, the very   09:56:24
9   bottom e-mail there's a reference to the   09:56:26
10  continuing education programs.            09:56:29
11           Do you know what materials       09:56:31
12  would have been created for the continuing   09:56:32
13  education programs?                        09:56:35
14      MR. O'CONNOR:  Objection.             09:56:35
15      THE WITNESS:  I'm sorry, you're       09:56:36
16      looking at the e-mail, not the piece.   09:56:40
17      Okay.  I'm sorry, can you             09:56:41
18      repeat your question?                 09:56:43
19  QUESTIONS BY MR. KAWAMOTO:               09:56:44
20      Q.   The e-mail at the very bottom    09:56:44
21  says, "Jessica, would you be involved in the   09:56:46
22  continuing education programs?"            09:56:49
23           So my question is do you know    09:56:50
24  what materials would have been prepared for   09:56:51
25  the continuing education programs?         09:56:52
```

Page 54

1    MR. O'CONNOR: Objection.          09:56:54
2       THE WITNESS: Well, continuing      09:56:56
3    education programs can vary. I mean,      09:57:00
4    it was -- there is no -- it would --    09:57:01
5    there's not a core set of just       09:57:13
6    material that's available, standard      09:57:16
7    set of material.          09:57:18
8    QUESTIONS BY MR. KAWAMOTO:           09:57:19
9       Q.   And the target audience of the   09:57:20
10   continuing education program would have been   09:57:21
11   physicians, would it not?          09:57:23
12      A.   Not necessarily.        09:57:25
13      Q.   Who would have been the target    09:57:27
14   audience for a continuing education -- for   09:57:30
15   your continuing education programs?       09:57:32
16      A.   It would have been any health    09:57:34
17   care professional who was required to      09:57:36
18   continue, as part of their license, to    09:57:38
19   receive continuing education.        09:57:39
20      Q.   So not only doctors, but      09:57:41
21   nurses, pharmacists, others as well?       09:57:43
22      A.   Correct.          09:57:45
23      Q.   Okay. Now, you indicated that    09:57:46
24   this material was being repurposed, correct?   09:57:49
25      A.   Correct.          09:57:52

Page 55

1       Q.   Okay. By "repurposed," you     09:57:53
2    mean that this material or some -- well,    09:57:55
3    strike that.          09:57:58
4       So these -- so these pain cards     09:57:58
5    are being repurposed in the context of the   09:58:02
6    continuing education program, correct?      09:58:05
7       A.   Repurposed to the extent that    09:58:06
8    we are not changing any of the content of    09:58:10
9    this material.          09:58:12
10      Meaning that that first piece,     09:58:16
11   the Oxford American pocket cards, that is not   09:58:18
12   our material, but we would put "Compliments   09:58:22
13   of Mallinckrodt" on there.        09:58:25
14      Q.   And the same with the pain      09:58:26
15   management pocket card set?          09:58:30
16      A.   That would be my understanding   09:58:31
17   of that piece as well.          09:58:32
18      Q.   And these -- I'm sorry, go     09:58:33
19   ahead.          09:58:36
20      A.   But again, I'm not familiar    09:58:36
21   with that piece or the piece before that, but   09:58:37
22   there's a lot of content on here, so I've    09:58:39
23   never seen that piece.          09:58:43
24      Q.   And based on the e-mail,      09:58:43
25   though, these would have been used -- both of   09:58:45

Page 56

1    these pieces would have been used in the    09:58:47
2    context of the continuing education programs?   09:58:48
3       A.   That would be my understanding.   09:58:50
4       (Mallinckrodt-Webb Exhibit 4      09:59:10
5    marked for identification.)        09:59:11
6    QUESTIONS BY MR. KAWAMOTO:           09:59:11
7       Q.   Okay. So I believe we're up to   09:59:11
8    Exhibit 4.          09:59:22
9       So, sir, I've handed you       09:59:34
10   Exhibit 4. It's an e-mail with an       09:59:36
11   attachment, and the e-mail starts with Bates   09:59:39
12   number MNK-T1_1786889 and the attachment     09:59:42
13   starts with MNK-T1_1786865.        09:59:48
14      A.   Okay.          10:02:39
15      Q.   So this e-mail was actually two   10:02:40
16   e-mail chains combined. The first e-mail    10:02:43
17   chain is from 2008, and then the second     10:02:46
18   e-mail chain is from 2010.        10:02:48
19      I would like to focus on the      10:02:50
20   e-mail chain from 2010.          10:02:51
21      The subject is the       10:02:53
22   ASPE-endorsed pain pocket guide and Exalgo    10:02:59
23   opportunity.          10:03:02
24      Do you know what ASPE is?       10:03:02
25      A.   That's the American Society of   10:03:04

Page 57

1    Pain Educators.          10:03:07
2       Q.   Okay. And they reference their   10:03:07
3    pain pocket guide, which is attached to this   10:03:10
4    e-mail at Bates number MNK-T1_1786865.     10:03:13
5       Do you know how this pocket      10:03:26
6    guide was distributed?          10:03:28
7       A.   This -- from what I'm gleaning   10:03:29
8    from the e-mail, it appears that it would be   10:03:37
9    distributed by our sales force.        10:03:40
10      Q.   Okay. Do you have any reason    10:03:41
11   to believe that this pocket guide would not   10:03:42
12   have been distributed into Ohio?       10:03:46
13      A.   No.          10:03:47
14      Q.   Okay. And the e-mail at the    10:03:48
15   bottom of MNK-T1_1786889, the bottom of that   10:03:56
16   page, references an order for 25,000 pocket   10:04:01
17   guides.          10:04:04
18      Do you see that?        10:04:04
19      A.   I do.          10:04:04
20      Q.   Okay. Do you have any reason    10:04:06
21   to believe that Mallinckrodt did not actually   10:04:07
22   end up purchasing 25,000 pocket guides?      10:04:09
23      A.   I do not.          10:04:13
24      Q.   Okay. Now, focusing on the     10:04:14
25   pocket guide, is this pocket guide designed   10:04:25

Page 58

1 for use with generic opioid products, branded 10:04:28
2 opioid products, or is it just opioid 10:04:32
3 products in general? 10:04:35
4 MR. O'CONNOR: Objection. 10:04:36
5 THE WITNESS: The piece itself 10:04:38
6 speaks to the class of opioids. The 10:04:44
7 use of the piece would have been 10:04:48
8 through our sales aids -- or excuse 10:04:50
9 me, our sales reps. 10:04:52
10 QUESTIONS BY MR. KAWAMOTO: 10:04:53
11 Q. And when you say "speaks to the 10:04:54
12 class of opioids," you're referring -- well, 10:04:56
13 you're referring to a class of opioids that 10:04:59
14 would include both Mallinckrodt-branded and 10:05:00
15 generic products, fair? 10:05:04
16 MR. O'CONNOR: Objection. 10:05:05
17 THE WITNESS: It would 10:05:06
18 include -- it would include all 10:05:09
19 opioids, yes, sir. 10:05:10
20 (Mallinckrodt-Webb Exhibit 5 10:05:38
21 marked for identification.) 10:05:38
22 QUESTIONS BY MR. KAWAMOTO: 10:05:38
23 Q. I would like to mark this as 10:05:38
24 Exhibit 5. 10:05:42
25 So, Mr. Webb, I am handing you 10:05:45

Page 59

1 Exhibit 5. It starts with Bates number 10:05:48
2 MNK-T1_2248914. It has an attachment which 10:05:48
3 is MNK-T1_2248919. 10:05:56
4 This is essentially just the 10:06:00
5 2008 -- 10:06:03
6 A. I haven't seen the piece yet so 10:06:04
7 if you can just hold on. 10:06:07
8 Thank you. Okay. I'm sorry. 10:06:14
9 Q. This is essentially -- or this 10:06:15
10 is the 2008 portion of the longer e-mail 10:06:17
11 chain that you just reviewed in Exhibit 4. 10:06:21
12 A. Okay. 10:06:24
13 Q. And its attachment appears to 10:06:25
14 be the 2008 pain pocket guide put out by the 10:06:28
15 ASPE. 10:06:33
16 MR. O'CONNOR: Objection. 10:06:40
17 THE WITNESS: Okay. I'm sorry, 10:06:57
18 was there a question pending? 10:06:59
19 QUESTIONS BY MR. KAWAMOTO: 10:07:01
20 Q. Yes. 10:07:02
21 Do you know how this pain -- 10:07:03
22 well, strike that. 10:07:04
23 How was this pocket guide 10:07:04
24 distributed by Mallinckrodt? 10:07:08
25 A. This would have been 10:07:08

Page 60

1 distributed through our sales force as well. 10:07:09
2 Q. And do you have any reason to 10:07:11
3 believe that this wouldn't have been 10:07:12
4 distributed in Ohio? 10:07:14
5 A. No, I do not. 10:07:16
6 Q. And what steps did Mallinckrodt 10:07:18
7 take to ensure that the information in this 10:07:23
8 pain pocket guide was accurate? 10:07:26
9 A. Any material -- any material 10:07:28
10 that would go through our sales force is 10:07:34
11 filed with the FDA for approval for use, and 10:07:36
12 that would have gone through our same 10:07:39
13 medical/legal compliance review board. 10:07:44
14 (Mallinckrodt-Webb Exhibit 6 10:07:49
15 marked for identification.) 10:07:56
16 QUESTIONS BY MR. KAWAMOTO: 10:07:56
17 Q. So I'm handing you what's been 10:08:17
18 marked as Exhibit 6. Bears a Bates number 10:08:18
19 MNK-T1_243238. 10:08:26
20 A. Okay. 10:09:56
21 Q. So this document appears to be 10:09:56
22 an advertisement that cover pages -- depicts 10:09:58
23 a pictures of a wrestler and it says, "Why 10:10:03
24 wrestle with chronic pain?" 10:10:06
25 Is this an example of an opioid 10:10:09

Page 61

1 product ad? 10:10:11
2 A. This piece in particular you're 10:10:13
3 asking me about? 10:10:16
4 Q. Yes. 10:10:17
5 A. No, this is what we would 10:10:18
6 customer our master sales aid. 10:10:21
7 Q. I'm sorry, a what -- a master 10:10:22
8 sales aid? 10:10:25
9 A. A master sales aid. That's a 10:10:25
10 piece used by the sales force. 10:10:29
11 Q. And so this would have been 10:10:31
12 provided to health care professionals, would 10:10:32
13 it not? 10:10:33
14 A. Correct. 10:10:34
15 Q. And this would have been 10:10:34
16 provided to, among others, health care 10:10:35
17 professionals in Ohio, correct? 10:10:37
18 A. Correct. 10:10:39
19 Q. Okay. Thank you. Put that 10:10:41
20 aside. 10:10:50
21 (Mallinckrodt-Webb Exhibit 7 10:10:50
22 marked for identification.) 10:10:51
23 QUESTIONS BY MR. KAWAMOTO: 10:10:51
24 Q. I think this is now Exhibit 7. 10:11:00
25 So I've handed you what's 10:11:02

Page 62

1    marked as Exhibit 7. Its Bates number is      10:11:07
2    MNK-T1_93384. And it is --                    10:11:10
3         A.   Okay.                    10:12:04
4         Q.   Okay. So this -- is this an      10:12:05
5    example of a -- well, strike that.         10:12:07
6         So this document is captioned,        10:12:09
7    "What will your patients be doing when time   10:12:12
8    runs out on their chronic pain medicine?" It  10:12:15
9    includes a picture of tennis shoes and what   10:12:17
10   appears to be a leash.                 10:12:19
11        I take it, is this another        10:12:21
12   example of a master sales aid?          10:12:23
13        A.   This would be an example of      10:12:24
14   what would constitute a sales aid.        10:12:26
15        Q.   Okay. And was this sales aid    10:12:27
16   distributed by your sales force to health    10:12:31
17   care professionals?               10:12:34
18        A.   Yes.                 10:12:34
19        Q.   And it would have included     10:12:35
20   health care professionals in Ohio, would it  10:12:36
21   not?                         10:12:38
22        A.   Correct.                 10:12:38
23        (Mallinckrodt-Webb Exhibit 8    10:12:46
24        marked for identification.)       10:12:47
25

Page 63

1    QUESTIONS BY MR. KAWAMOTO:              10:12:47
2         Q.   This is going to be Exhibit 8.  10:12:58
3         I've handed you a document        10:13:00
4    Bates numbered MNK-T1_999355.           10:13:05
5         A.   Okay.                 10:13:29
6         Q.   And is this another example of  10:13:29
7    a sales aid?                    10:13:31
8         A.   Master sales aid.           10:13:32
9         Q.   Master sales aid.           10:13:34
10        What's the difference between a   10:13:36
11   master sales aid and a sales said?       10:13:37
12        A.   The master sales aid is the    10:13:40
13   primary document that would a -- a sales rep  10:13:42
14   would use in the field. A sales aid then     10:13:45
15   would be any shorter, smaller pieces      10:13:46
16   truncated.                    10:13:50
17        Q.   Okay.                 10:13:50
18        A.   Similar messaging, though.     10:13:51
19        Q.   So this master sales aid would  10:13:52
20   have distributed by your sales force,      10:13:54
21   including to health care professionals in    10:13:56
22   Ohio, correct?                 10:13:57
23        A.   Correct.                 10:13:58
24        (Mallinckrodt-Webb Exhibit 9    10:14:14
25        marked for identification.)       10:14:14

Page 64

1                          10:14:14
2    QUESTIONS BY MR. KAWAMOTO:              10:14:14
3         Q.   This is Exhibit 9. I've handed  10:14:21
4    you a document Bates number MNK-T1_93326, and  10:14:42
5    the document is entitled, "Exalgo, a clinical  10:14:50
6    overview."                    10:14:53
7         A.   Okay.                 10:14:54
8         Q.   Is this another sales aid?     10:14:54
9         A.   This would be a sales aid,     10:14:56
10   correct.                      10:14:57
11        Q.   Okay. And so it would have     10:14:58
12   been distributed by your sales force to      10:15:00
13   health care professionals in Ohio; is that    10:15:03
14   fair?                         10:15:06
15        A.   Correct.                 10:15:06
16        Q.   Okay. Put that aside.        10:15:10
17        (Mallinckrodt-Webb Exhibit 10   10:15:12
18        marked for identification.)       10:15:13
19   QUESTIONS BY MR. KAWAMOTO:              10:15:13
20        Q.   This would be Exhibit 10.      10:15:27
21        So I've handed you a document     10:15:38
22   Bates numbered MNK-T1_89968, and it -- it's   10:15:39
23   a -- the cover of the document is captioned,  10:15:46
24   "Now may be the time for a switch," and it    10:15:50
25   indicates someone pulling their face off with  10:15:52
   a face underneath it.              10:15:55

Page 65

1         A.   Correct. Uh-huh.           10:15:59
2         Q.   Is this another example of a   10:16:00
3    sales aid?                    10:16:02
4         A.   Correct.                 10:16:02
5         Q.   And so this would have been    10:16:03
6    distributed by your sales force to health    10:16:05
7    care professionals in Ohio?            10:16:09
8         A.   Correct.                 10:16:10
9         Q.   And so these materials were not  10:16:12
10   distributed directly to patients?        10:16:15
11        A.   No, they were not.          10:16:16
12        Q.   Would this -- would this sales  10:16:19
13   aid have been included or placed in a medical  10:16:22
14   journal?                      10:16:26
15        A.   I cannot speak to this piece   10:16:26
16   particularly, if it was placed in a journal.  10:16:31
17   I would have to see the journal.         10:16:34
18        So I know we did journal ads,     10:16:35
19   but I don't recall if this particular piece   10:16:36
20   was a journal ad itself.             10:16:39
21        Q.   But a piece similar to this    10:16:40
22   could -- well, strike that.            10:16:43
23        Would the journal ads have been   10:16:44
24   similar to the sales ads that we have been    10:16:49
25   reviewing the past few minutes?         10:16:52

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    MR. O'CONNOR: Objection.    10:16:54
2    THE WITNESS: No.    10:16:54
3    QUESTIONS BY MR. KAWAMOTO:    10:16:57
4    Q.    In what way would they have    10:16:58
5    been different?    10:17:00
6    A.    The material that we were    10:17:00
7    reviewing as far as the sales material    10:17:02
8    contain greater clinical content.    10:17:05
9        A journal ad is generally for    10:17:10
10   name placement and brand -- brand awareness.    10:17:13
11   It may give some piece of information    10:17:18
12   regarding -- but it wouldn't be to the level    10:17:20
13   of the detail that you would see in a sales    10:17:22
14   aid or a master sales aid.    10:17:24
15       Q.    And its purpose would have been    10:17:25
16   to raise awareness among health care    10:17:27
17   professionals regarding Mallinckrodt's    10:17:30
18   branded products?    10:17:32
19       MR. O'CONNOR: Objection.    10:17:33
20       THE WITNESS: Correct.    10:17:33
21   QUESTIONS BY MR. KAWAMOTO:    10:17:34
22       Q.    Would it have -- would you also    10:17:35
23   have had journal ads designed to raise    10:17:37
24   awareness among health care professionals of    10:17:39
25   Mallinckrodt's generic products?    10:17:42

Page 67

1        MR. O'CONNOR: Objection.    10:17:43
2        THE WITNESS: I cannot -- I'm    10:17:44
3    not aware of any journal ads for --    10:17:48
4    for generic opioids, but if they were    10:17:51
5    placed, they would be placed in    10:17:53
6    articles -- or excuse me, publications    10:17:57
7    targeting their customers, which would    10:17:58
8    have been wholesalers and    10:18:01
9    distributors, not to health care    10:18:02
10   providers.    10:18:04
11   QUESTIONS BY MR. KAWAMOTO:    10:18:07
12       Q.    And did Mallinckrodt ever run    10:18:08
13   journal ads raising awareness for its opioid    10:18:09
14   products generally, so essentially unbranded    10:18:14
15   advertising?    10:18:19
16       A.    No.    10:18:20
17       (Mallinckrodt-Webb Exhibit 11    10:18:23
18       marked for identification.)    10:18:24
19   QUESTIONS BY MR. KAWAMOTO:    10:18:24
20       Q.    Okay. So I believe this is    10:18:24
21   Exhibit 11 now.    10:18:43
22       So I've handed you a document    10:18:49
23   that's Bates numbered MNK-T1_95581, and it's    10:18:51
24   titled "Whole Story Sales Aid/Leave Behind    10:19:01
25   Implementation Guide."    10:19:09

Page 68

1    A.    Okay.    10:19:29
2    Q.    What is this document?    10:19:29
3    A.    This -- this document is used    10:19:31
4    as a sales training document.    10:19:38
5    Q.    And when you say "sales    10:19:40
6    training document," what do you mean by that?    10:19:42
7    A.    The piece, as entitled -- this    10:19:44
8    piece is referencing the -- once you get the    10:19:48
9    whole story, that would have been the detail    10:19:52
10   aid or the sales aid, and it's designed as a    10:19:54
11   leave-behind, meaning it's intended and    10:19:58
12   designed to be left with the physician or the    10:20:01
13   health care provider.    10:20:04
14       Implementation guide is    10:20:05
15   training -- would be used by our sales    10:20:06
16   department on educating the sales force on    10:20:08
17   appropriate messaging and fair balance.    10:20:12
18       Q.    So we're looking -- this    10:20:14
19   document is the implementation guide, so it's    10:20:15
20   essentially training the sales force    10:20:17
21   regarding -- based on the leave-behind; is    10:20:21
22   that fair?    10:20:28
23       A.    Correct.    10:20:28
24       Q.    And what was it training the    10:20:28
25   sales force to do?    10:20:31

Page 69

1        MR. O'CONNOR: Objection.    10:20:33
2        THE WITNESS: It was training    10:20:35
3    the sales force on the appropriate use    10:20:36
4    of how to position this piece through    10:20:38
5    the important safety information and    10:20:40
6    the clinical content therein.    10:20:42
7    QUESTIONS BY MR. KAWAMOTO:    10:20:44
8        Q.    And so all of Mallinckrodt's    10:20:45
9    sales reps, including its Ohio sales reps,    10:20:46
10   would have received this training?    10:20:50
11       A.    They should have received all    10:20:52
12   the training, yes.    10:20:54
13       Q.    And so would it be fair to    10:20:59
14   characterize this in some ways as a script    10:21:01
15   for the -- for the sales force so that they    10:21:04
16   could understand how to position this piece?    10:21:06
17       A.    I would not characterize it as    10:21:08
18   a script. I would characterize it as a piece    10:21:11
19   to draw reference to that when they are    10:21:14
20   speaking to an element of the content, that    10:21:18
21   they had -- they were trained on what should    10:21:21
22   be said, how -- how to position this with    10:21:24
23   physicians so that they stay on label.    10:21:29
24       Q.    And in terms of positioning, is    10:21:30
25   that another way of saying -- well, strike    10:21:34

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    that.                        10:21:36
2           What do you mean by        10:21:36
3    "positioning"?                   10:21:38
4    A.    Present.                   10:21:39
5    Q.    So it would have been important   10:21:40
6    for the sales force to stay on message,   10:21:43
7    correct?                        10:21:45
8           MR. O'CONNOR: Objection.    10:21:46
9           THE WITNESS: On label.     10:21:46
10   QUESTIONS BY MR. KAWAMOTO:          10:21:48
11   Q.    And when you say stay "on      10:21:50
12   label," what do you mean by that?      10:21:52
13   A.    The FDA-approved label within   10:21:54
14   our package insert, what we can say about the  10:21:57
15   product.                        10:22:01
16   Q.    So in -- well, strike that.    10:22:01
17          So does this implementation   10:22:04
18   guide provide guidance to the sales force as  10:22:06
19   to what they can say and what they are not  10:22:10
20   supposed to say?                 10:22:13
21          MR. O'CONNOR: Objection.    10:22:13
22          THE WITNESS: This would be --  10:22:14
23   well, I want to clarify your question  10:22:21
24   when you say what not to say.        10:22:24
25          We're teaching the sales force  10:22:26

Page 71

1           on what they can say, what they should  10:22:28
2    be saying.                      10:22:31
3    QUESTIONS BY MR. KAWAMOTO:          10:22:31
4    Q.    And so presumably they should   10:22:32
5    not be ad-libbing or saying things that are  10:22:32
6    not in this implementation guide; is that  10:22:35
7    correct?                        10:22:39
8           MR. O'CONNOR: Objection.    10:22:39
9    Objection.                      10:22:40
10          THE WITNESS: That is correct.  10:22:40
11          (Mallinckrodt-Webb Exhibit 12   10:22:40
12   marked for identification.)          10:22:40
13   QUESTIONS BY MR. KAWAMOTO:          10:22:40
14   Q.    I'm going to hand you          10:22:42
15   Exhibit 12 now.                   10:23:16
16   A.    Thank you.                  10:23:17
17   Q.    So Exhibit 12 is a PowerPoint.  10:23:17
18   It's Bates numbered MNK-T1_180030.      10:23:22
19   A.    Okay.                     10:24:24
20   Q.    Okay. So what is the -- what   10:24:24
21   is a promotional communications tactical  10:24:28
22   plan?                          10:24:32
23   A.    Can I answer?               10:24:32
24          MR. O'CONNOR: Yeah, I'm sorry,  10:24:36
25   would you repeat that?              10:24:38

Page 72

1    QUESTIONS BY MR. KAWAMOTO:          10:24:38
2    Q.    Sure.                     10:24:39
3           What is a promotional         10:24:39
4    communications tactical plan? That's the  10:24:41
5    title of this document.             10:24:42
6           MR. O'CONNOR: Objection.     10:24:44
7           But you can answer.          10:24:44
8           THE WITNESS: This will be a    10:24:47
9    document, it's an internal document,    10:24:48
10   generally put together by the product  10:24:50
11   director or the product manager to     10:24:52
12   walk the organization through the      10:24:56
13   launch plan once the product is        10:25:01
14   approved from approval to first        10:25:04
15   detailing the product.              10:25:08
16   QUESTIONS BY MR. KAWAMOTO:          10:25:08
17   Q.    And you see the slide on        10:25:12
18   pages 2 and 3 that are titled "positioning"  10:25:15
19   and "positioning statement."          10:25:20
20   A.    I do.                     10:25:22
21   Q.    What is that?               10:25:23
22   A.    The positioning statement is    10:25:26
23   a -- the mindset of what we would want the  10:25:32
24   physician or how we would want the product to  10:25:37
25   be viewed in the marketplace by the health  10:25:40

Page 73

1    care provider.                   10:25:43
2    Q.    And so is this the sales       10:25:44
3    message to the health care professionals?  10:25:47
4    A.    No, it is not a sales message.  10:25:48
5    Q.    So when you say that it is --   10:25:53
6    this is the mindset of what you would want  10:25:58
7    the physician -- well, I'm sorry, strike  10:26:00
8    that.                          10:26:02
9           I believe you indicated that   10:26:02
10   the position -- "the positioning statement is  10:26:11
11   a mindset of what we would want the physician  10:26:12
12   or how we would want the product to be viewed  10:26:14
13   in the marketplace."                10:26:16
14          And so how -- how would you go  10:26:18
15   about achieving that?               10:26:21
16   A.    That then would be achieved     10:26:22
17   through our sales material or our sales aid.  10:26:26
18   Q.    And so your sales material were  10:26:28
19   designed to convince or persuade the health  10:26:30
20   care professionals -- well, strike that.  10:26:35
21          So the goal of your sales and   10:26:41
22   marketing was to persuade the health care --  10:26:48
23   the health care professionals of your  10:26:52
24   positioning statement; is that correct?  10:26:55
25          MR. O'CONNOR: Objection.     10:26:57

Page 74

1    THE WITNESS: It would -- it          10:26:58
2    would be -- the mindset of the -- of       10:27:07
3    what we would want the product to          10:27:09
4    be -- to connotate to a physician, to      10:27:12
5    a health care provider.          10:27:15
6    QUESTIONS BY MR. KAWAMOTO:               10:27:16
7    Q.   And the way you would achieve      10:27:16
8    that goal in terms of the appropriate mindset  10:27:17
9    for the health care professional is through   10:27:20
10   your sales and marketing efforts, that's my   10:27:22
11   question?          10:27:26
12       MR. O'CONNOR: Objection.      10:27:26
13       THE WITNESS: Correct.       10:27:27
14       MR. O'CONNOR: It's almost      10:27:37
15   10:30. We've been going for a bit.      10:27:40
16       Do you want to take a break      10:27:42
17   now?          10:27:43
18       MR. KAWAMOTO: Yeah, why don't   10:27:43
19   we take a break now.          10:27:44
20       VIDEOGRAPHER: We're going off   10:27:44
21   the record at 10:27 a.m.          10:27:45
22   (Off the record at 10:27 a.m.)    10:27:47
23       VIDEOGRAPHER: We're back on     10:49:37
24   the record at 10:49 a.m.          10:49:38
25

Page 75

1    QUESTIONS BY MR. KAWAMOTO:               10:49:40
2    Q.   So, Mr. Webb, during the past    10:49:40
3    hour we've looked at master sales aids, sales  10:49:43
4    aids, leave-behinds, you know, various     10:49:49
5    marketing and advertising materials.      10:49:51
6        What was the general process     10:49:53
7    for developing these materials?      10:49:55
8    A.   The -- each of the sales       10:49:56
9    aids -- any of the marketing material for    10:50:05
10   the -- actually, it would be for the master   10:50:10
11   sales aid. So as a reminder of that, the     10:50:13
12   other sales aids fall -- are a variation of   10:50:15
13   the master sales aid. So the process I'm     10:50:18
14   going to be speaking to would generally be    10:50:20
15   the main sales aid or the master sales aid.   10:50:23
16       We would do market research      10:50:26
17   with physicians. Market research were     10:50:31
18   directed by our market research department,   10:50:36
19   which is separate from our marketing      10:50:39
20   department. The -- that individual then     10:50:43
21   would contract out with a third-party group   10:50:45
22   to develop the market research programs, such  10:50:48
23   as individual one-on-ones with physicians    10:50:56
24   through a third party or through some kind of  10:50:59
25   focus group.          10:51:02

Page 76

1        And so we would then take      10:51:03
2    messaging or variations of messaging from the  10:51:08
3    label to the physicians. We would look at    10:51:10
4    different pictures or concepts that were     10:51:12
5    developed by an ad agency for us.      10:51:15
6        That then would be -- would     10:51:22
7    research with the physicians what piece or    10:51:25
8    what message resonated with the physicians or  10:51:27
9    they would need -- information reported back   10:51:29
10   through our market research team back to the   10:51:30
11   product director or the product team.      10:51:32
12       That then would go into a sales   10:51:35
13   aid, sales development material, sales aid.   10:51:38
14   That sales aid will often go back to a      10:51:42
15   physician through market research. The      10:51:45
16   physician then would get -- or perspective or  10:51:47
17   insight from the physician on the -- just the  10:51:52
18   master sales aid as far as the message flow.  10:51:54
19       And then once we felt that --    10:51:56
20   the market team felt that they were in a good  10:51:58
21   place with the sales aid, they would then     10:52:01
22   lock it down and move into production and     10:52:04
23   distribution.          10:52:09
24   Q.   And this was all being done on   10:52:09
25   a national level, correct?          10:52:10

Page 77

1    A.   Well --          10:52:12
2        MR. O'CONNOR: Objection.      10:52:14
3        THE WITNESS: National level to  10:52:15
4    the extent it's developing one piece.      10:52:17
5    QUESTIONS BY MR. KAWAMOTO:               10:52:19
6    Q.   Okay. And so there's no       10:52:19
7    difference in the marketing materials or     10:52:22
8    advertisements that would have been      10:52:26
9    distributed and used in Ohio as opposed to    10:52:28
10   anywhere else in the country from      10:52:32
11   Mallinckrodt?          10:52:34
12       MR. O'CONNOR: Objection.      10:52:34
13   Objection.          10:52:35
14       THE WITNESS: Well, I mean, to   10:52:35
15   say which pieces were used in Ohio,      10:52:36
16   I'm not aware of, but I would not have      10:52:37
17   any to suspect that the pieces that we      10:52:41
18   developed for the nation would not be      10:52:43
19   used in Ohio.          10:52:44
20   QUESTIONS BY MR. KAWAMOTO:               10:52:44
21   Q.   Okay. And in terms of the      10:52:45
22   training for the sales force, that was also    10:52:49
23   done via a national program, correct?      10:52:53
24   A.   All of our sales forces would   10:52:56
25   have gone through the sale training, same     10:53:00

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  sales training.             10:53:03
2      Q.  So there's no reason to -- both   10:53:03
3  the messaging -- well, strike that.    10:53:05
4      The message from the Ohio sales   10:53:06
5  force would not have been different than the  10:53:09
6  message from the sales force in any other   10:53:12
7  part of the country, would that --     10:53:15
8      MR. O'CONNOR: Objection to   10:53:17
9  scope. And objection to form, both.   10:53:17
10     THE WITNESS: Can I answer?   10:53:22
11     MR. O'CONNOR: Yes, you can   10:53:24
12  answer. Yeah.           10:53:28
13     THE WITNESS: The -- I have no   10:53:29
14  reason to suspect that the sales force   10:53:31
15  in Ohio would have been trained any    10:53:35
16  differently than the entire national   10:53:37
17  sales force.           10:53:39
18     (Mallinckrodt-Webb Exhibit 13   10:53:49
19  marked for identification.)      10:53:49
20  QUESTIONS BY MR. KAWAMOTO:     10:53:49
21      Q.  Okay. So I would like to hand  10:53:56
22  you what's now marked as Exhibit 13.   10:53:58
23      So, sir, I've handed you a    10:54:24
24  document Bates numbered MNK-T1_98099.   10:54:25
25      A.  Uh-huh.         10:54:31

Page 79

1      Q.  On the document it indicates  10:54:31
2  it's part of the CARES Alliance, which is   10:54:33
3  trademarked.           10:54:35
4      What is the CARES Alliance?   10:54:36
5      A.  Go ahead?        10:54:38
6      CARES Alliance is an alliance   10:54:43
7  or coalition that was developed by    10:54:48
8  Mallinckrodt to help educate physicians or  10:54:51
9  health care providers on the appropriate use  10:54:59
10  and prescribing of opioids.      10:55:02
11     Q.  And this -- this slide or this  10:55:05
12  document references education and enabling  10:55:12
13  tools.             10:55:16
14      What were those?      10:55:16
15     A.  The CARES Alliance had a -- a  10:55:18
16  series of material or pieces that were   10:55:25
17  used -- that were distributed to the -- to  10:55:28
18  physicians and made available to them to --  10:55:31
19  and/or pharmacists, so it was health care   10:55:34
20  professionals -- to help identify how to use,  10:55:37
21  appropriately prescribe and how to assess   10:55:41
22  patients for appropriate use of opioids.   10:55:48
23     Q.  And one of the categories of   10:55:49
24  education -- I'm sorry, strike that.   10:55:52
25      One of the categories of    10:55:54

Page 80

1  education and enabling tools is patients.   10:55:55
2      Do you see that box?     10:55:58
3      A.  I do.          10:56:00
4      Q.  I take it the tools identified  10:56:00
5  in that box would have been provided to   10:56:05
6  patients?            10:56:07
7      MR. O'CONNOR: Objection.    10:56:08
8     THE WITNESS: These would have   10:56:09
9  been provided to patients via their   10:56:12
10    health care provider.       10:56:14
11  QUESTIONS BY MR. KAWAMOTO:     10:56:15
12     Q.  Okay. And you'll see in the   10:56:15
13  box, one of the -- one of the tools is a   10:56:18
14  Defeat Chronic Pain Now book.     10:56:24
15      Do you see that?      10:56:24
16      A.  I do.          10:56:24
17      Q.  Okay. Are you familiar with   10:56:26
18  that book?           10:56:27
19      A.  I would have to look at the   10:56:29
20  pieces. I'm aware of the pieces, but I   10:56:32
21  couldn't tell you what specifically that   10:56:36
22  piece was without seeing it.     10:56:38
23      Q.  Okay. But I take it    10:56:39
24  Mallinckrodt would have reviewed that   10:56:40
25  publication before identifying it as a tool  10:56:42

Page 81

1  for patients, correct?        10:56:44
2      MR. O'CONNOR: Objection.    10:56:45
3     THE WITNESS: Yes.      10:56:47
4  QUESTIONS BY MR. KAWAMOTO:     10:56:48
5     Q.  Okay. And so Mallinckrodt   10:56:49
6  presumably concluded that that Defeat Chronic  10:56:51
7  Pain Now book was accurate, correct?   10:56:54
8      MR. O'CONNOR: Objection.    10:56:56
9     THE WITNESS: That piece would   10:56:57
10    have been reviewed by our medical,   10:56:59
11    legal and regulatory team, yes.   10:57:02
12     (Mallinckrodt-Webb Exhibit 14   10:57:15
13  marked for identification.)      10:57:15
14  QUESTIONS BY MR. KAWAMOTO:     10:57:15
15     Q.  So I've just handed you a   10:57:39
16  document entitled "Exalgo proposed risk   10:57:41
17  mitigation strategy, including Exalgo risk   10:57:45
18  evaluation and mitigation strategies, REMS,"  10:57:48
19  and the Bates number for this is    10:58:08
20  MNK-T1_548549.          10:57:54
21      And I just have questions about  10:57:55
22  the -- it's a fairly lengthy document. So I  10:57:58
23  just have questions about the first page and  10:58:02
24  then Table 4, which I believe is on -- I   10:58:04
25  believe that is on page -- it's page 12 of   10:58:16

Page 82

1    the document and it's Bates number 548560.    10:58:25
2    A.    Okay.    10:58:42
3    Q.    So what is a REMS?    10:58:42
4    A.    REMS is an FDA requirement they    10:58:44
5    put in place, I believe it was 2012, for    10:58:51
6    long-acting opioids.  It stands for risk    10:58:57
7    evaluation mitigation strategy.    10:59:01
8    Q.    Okay.  And you'll see on    10:59:05
9    page 12 under Table 4, it's general opioid    10:59:08
10   risk mitigation tools and activities.    10:59:11
11        So what is the purpose of that    10:59:16
12   table?    10:59:17
13        Meaning why --    10:59:24
14        MR. O'CONNOR:  So --    10:59:26
15   QUESTIONS BY MR. KAWAMOTO:    10:59:26
16   Q.    Let me rephrase.    10:59:26
17        Meaning why is this table    10:59:27
18   included in this REMS document?    10:59:29
19        MR. O'CONNOR:  Objection.    10:59:30
20        THE WITNESS:  Well, first of    10:59:31
21   all, I'm not familiar -- I have not    10:59:32
22   seen this particular document.    10:59:33
23        The -- this is a listing,    10:59:38
24   though, that we would provide that    10:59:48
25   would outline or list all of the    10:59:50

Page 83

1    various materials that Mallinckrodt    10:59:52
2    would be using to appropriately    10:59:57
3    educate physicians or inform    10:59:58
4    physicians regarding the use of    11:00:00
5    Exalgo.    11:00:02
6    QUESTIONS BY MR. KAWAMOTO:    11:00:03
7    Q.    And so these would have been    11:00:03
8    materials that were being used to satisfy the    11:00:05
9    REMS requirement by the FDA; is that correct?  11:00:09
10        MR. O'CONNOR:  Objection.    11:00:12
11        THE WITNESS:  Yeah, the REMS    11:00:14
12   was an FDA-required document, yes.  So    11:00:16
13   this was laying out to FDA, these    11:00:19
14   are the various documents that we used    11:00:20
15   within our REMS program.    11:00:22
16   QUESTIONS BY MR. KAWAMOTO:    11:00:23
17   Q.    And one of the documents    11:00:24
18   identified is the Defeat Chronic Pain Now    11:00:25
19   book.    11:00:27
20        Do you see that?    11:00:27
21   A.    I do.    11:00:28
22        (Mallinckrodt-Webb Exhibit 15    11:00:43
23   marked for identification.)    11:00:43
24   QUESTIONS BY MR. KAWAMOTO:    11:00:43
25   Q.    Okay.  I believe we're up to    11:00:43

Page 84

1    Exhibit 15.    11:00:52
2        So I've handed you a document.    11:00:59
3    It's Bates numbered MNK-T1_1493093.  The    11:01:16
4    title is "CARES Alliance tools, catalog and    11:01:22
5    order form."    11:01:26
6    A.    Uh-huh.  Yes.    11:01:46
7    Q.    So what is this document?    11:01:47
8    A.    This is -- I don't know if this    11:01:48
9    is a -- this was a document that we would    11:01:59
10   make available to health care providers that  11:02:01
11   provides him or her a listing of all the    11:02:05
12   available education material on patient    11:02:08
13   safety that's available through CARES    11:02:12
14   Alliance.    11:02:14
15   Q.    And so this would have been a    11:02:14
16   listing of materials for physicians to    11:02:17
17   provide to their patients in part, correct?  11:02:19
18        MR. O'CONNOR:  Objection.    11:02:23
19        THE WITNESS:  No.  I mean,    11:02:24
20   there's -- there's also pieces,    11:02:27
21   information here that's specific to    11:02:29
22   just physicians that would not be    11:02:32
23   patient material.    11:02:33
24   QUESTIONS BY MR. KAWAMOTO:    11:02:34
25   Q.    If I could direct your    11:02:34

Page 85

1    attention to page 13 of this document, Bates  11:02:35
2    number 1493099?    11:02:38
3    A.    Uh-huh, yes.    11:02:41
4    Q.    That -- the title for that is    11:02:42
5    "patient tools."    11:02:45
6        Do you see that?    11:02:46
7    A.    I see that.    11:02:46
8    Q.    Okay.  So I take it these would  11:02:48
9    have been materials for health care -- for    11:02:52
10   health care professionals to provide to their  11:02:55
11   patients?    11:02:58
12        MR. O'CONNOR:  Objection.    11:02:59
13        THE WITNESS:  This would have    11:03:00
14   been -- well, I -- since it's under    11:03:04
15   the patient tools category, I would    11:03:07
16   assume then, yes, that would be    11:03:09
17   available for patients.    11:03:11
18   QUESTIONS BY MR. KAWAMOTO:    11:03:12
19   Q.    Okay.  And there's a    11:03:12
20   description of the various tools.    11:03:15
21        Do you see that as well?    11:03:16
22   A.    Yes.    11:03:17
23   Q.    Okay.  And Mallinckrodt    11:03:19
24   prepared this catalog and order form?    11:03:21
25        MR. O'CONNOR:  Objection.    11:03:23

Highly Confidential - Subject to Further Confidentiality Review

Page 86

```
1        THE WITNESS: Yes.           11:03:24
2  QUESTIONS BY MR. KAWAMOTO:        11:03:35
3     Q.  Now, I would like to direct  11:03:44
4  your attention back to Exhibit 2.   11:03:46
5        Do you have that handy?       11:03:49
6        And I would like to focus your  11:04:03
7  attention on the Bates number -- well, on the  11:04:04
8  pain management card.               11:04:08
9        Do you see that?              11:04:09
10    A.  I do.                        11:04:10
11    Q.  So do you see the box that says  11:04:11
12  "treat"?                           11:04:13
13    A.  I'm sorry, where are you?  What  11:04:16
14  box?                               11:04:23
15    Q.  There's a box on the pain    11:04:23
16  management card and it says "treat."  11:04:25
17        And actually, why don't I use  11:04:27
18  the Elmo.  That might make things a little  11:04:28
19  better, assuming I can get over there.  11:04:32
20        So if I could direct your    11:04:40
21  attention, do you see that statement that I'm  11:04:41
22  starring right over there?          11:04:44
23    A.  Yes, I'm sorry, yes.  Okay.  11:04:45
24    Q.  Okay.  So can you read that   11:04:47
25  statement into the record?  Just that  11:04:50
```

Page 87

```
1  sentence or phrase.                 11:04:51
2     A.  Under "treat"?               11:04:53
3     Q.  Yes, please.                 11:04:54
4     A.  The first bullet?            11:04:55
5     Q.  Yes, please.                 11:04:56
6     A.  "With older adults, start dose  11:04:57
7  low, go slow, but go."              11:05:00
8     Q.  Okay.  And I take it         11:05:03
9  Mallinckrodt agrees with that statement?  11:05:05
10        MR. O'CONNOR:  Objection.     11:05:07
11        THE WITNESS:  This is a piece  11:05:08
12     that Mallinckrodt would have reviewed  11:05:16
13     and approved.                   11:05:17
14  QUESTIONS BY MR. KAWAMOTO:         11:05:18
15     Q.  Okay.  So Mallinckrodt believes  11:05:18
16  that that statement is an accurate one?  11:05:20
17        MR. O'CONNOR:  Objection.     11:05:23
18  QUESTIONS BY MR. KAWAMOTO:         11:05:23
19     Q.  "With older adults, start dose  11:05:24
20  low, go slow, but go," correct?    11:05:27
21        MR. O'CONNOR:  Objection.     11:05:30
22        THE WITNESS:  I would have to  11:05:30
23     defer to our clinical team.  I'm not a  11:05:31
24     clinician.                      11:05:37
25
```

Page 88

```
1  QUESTIONS BY MR. KAWAMOTO:         11:05:37
2     Q.  But in the course of preparing  11:05:38
3  for this 30(b)(6), you don't have any reason  11:05:39
4  to believe that Mallinckrodt believes that  11:05:41
5  statement is inaccurate, do you?   11:05:43
6        MR. O'CONNOR:  Objection.     11:05:45
7        THE WITNESS:  No.             11:05:45
8  QUESTIONS BY MR. KAWAMOTO:         11:05:45
9     Q.  And given the review process  11:05:47
10  for this document, it would be your  11:05:49
11  expectation that Mallinckrodt agreed that the  11:05:52
12  statement is accurate; is that fair?  11:05:54
13        MR. O'CONNOR:  Objection.     11:05:56
14        THE WITNESS:  Correct.        11:05:56
15  QUESTIONS BY MR. KAWAMOTO:         11:05:57
16     Q.  Okay.  And what steps were    11:05:58
17  taken to ensure the accuracy of that bullet  11:06:04
18  point?                             11:06:07
19     A.  This would have been head --  11:06:07
20  would have been reviewed by our medical team,  11:06:10
21  our medical professional.          11:06:13
22     Q.  And do you know who that would  11:06:15
23  have been?                         11:06:17
24     A.  No.                         11:06:17
25     Q.  Okay.  And what are the      11:06:19
```

Page 89

```
1  scientific or medical studies that support  11:06:24
2  that statement?                    11:06:25
3     A.  Well, I would have to refer to  11:06:28
4  the footnote, the reference, Dr. Gupta.  I  11:06:32
5  would have to look at the notes on who --  11:06:37
6  where the piece was originating.   11:06:39
7        I would have to look at -- I   11:06:55
8  would have to look at what IS 8 is.  I don't  11:06:56
9  know if that's an organization.    11:07:01
10        But the author would be Gupta,  11:07:02
11  and I would defer to -- assuming that's a  11:07:03
12  Dr. Gupta, but whoever Gupta is.   11:07:08
13     Q.  And you're getting Gupta from  11:07:09
14  the author, which -- Ruchir Gupta, 2014?  11:07:11
15     A.  Correct.                     11:07:12
16     Q.  Okay.  But you don't --      11:07:13
17  Mallinckrodt doesn't know what basis  11:07:18
18  Dr. Gupta had for that statement, does it?  11:07:21
19        MR. O'CONNOR:  Objection.     11:07:23
20        THE WITNESS:  The availability  11:07:24
21     of any our material would have been  11:07:28
22     peer-reviewed and that -- we would  11:07:31
23     have found -- we would have been --  11:07:34
24     utilized a peer-reviewed piece that  11:07:35
25     was accepted at the time for medical  11:07:37
```

Page 90

1    accuracy.                    11:07:39
2    QUESTIONS BY MR. KAWAMOTO:            11:07:40
3        Q.   But based on your preparation   11:07:40
4    for this -- for this 30(b)(6) and based on   11:07:44
5    your personal knowledge, you can't identify   11:07:48
6    any scientific or medical studies that   11:07:52
7    support this statement; is that accurate?   11:07:54
8        A.   Not from looking at just this   11:07:56
9    piece, no.                   11:07:58
10       Q.   Directing your attention to the   11:07:59
11   bullet point that's four down, it says, "Two   11:08:05
12   drugs of the same class."            11:08:08
13            Do you see that?          11:08:13
14       A.   Discuss --                11:08:14
15       Q.   I'm sorry, let me --         11:08:16
16       A.   Oh, yeah, I do. "Two drugs,"   11:08:18
17   yes, yes, uh-huh.                11:08:20
18       Q.   Can you please read that into   11:08:21
19   the record?                  11:08:22
20       A.   "Two drugs of the same class,   11:08:23
21   e.g., NSAIDS, should not generally be given   11:08:26
22   concurrently. However, long- and           11:08:30
23   short-acting opioids may be prescribed   11:08:33
24   together."                   11:08:36
25       Q.   And does Mallinckrodt agree   11:08:37

Page 91

1    with that statement?             11:08:39
2        A.   I would not have any reason to   11:08:39
3    suspect that we would not.           11:08:44
4        Q.   Okay. And what steps were   11:08:45
5    taken to ensure the accuracy of that   11:08:48
6    statement?                   11:08:49
7        A.   That piece -- this piece, that   11:08:50
8    statement would have been reviewed by our   11:08:53
9    clinical review.                 11:08:55
10       Q.   And what are the scientific or   11:08:56
11   medical studies that support that statement?   11:08:57
12       A.   I would have to defer to   11:09:00
13   Gupta's studies, resources.          11:09:06
14       Q.   But you're not aware, based on   11:09:08
15   your preparation for this 30(b)(6) or your   11:09:10
16   personal knowledge, of what materials, if   11:09:13
17   any, that Dr. Gupta relied on?           11:09:15
18       A.   Not offhand, no.            11:09:18
19       Q.   Okay. And do you, in fact,   11:09:19
20   know that Ruchir Gupta is a doctor?   11:09:21
21       A.   I do not personally, no.      11:09:26
22       Q.   Okay. Directing your attention   11:09:28
23   to the box below "treat," it says "monitor."   11:09:30
24            Do you see that? Right there?   11:09:32
25       A.   Uh-huh. Yes, I do.          11:09:36

Page 92

1        Q.   Okay. So could you please read   11:09:39
2    the statement that says "Most" -- that starts   11:09:41
3    with "Most opioid."             11:09:43
4        A.   "Most opioid analgesics have no   11:09:46
5    analgesic" -- I'm sorry, I have to --   11:09:49
6            "Most opioid analgesics have no   11:09:55
7    analgesic ceiling dose. Titrate to relief   11:09:59
8    and assess for adverse effects."         11:10:04
9        Q.   Okay. Does Mallinckrodt agree   11:10:07
10   with that statement?             11:10:09
11       A.   I have no reason to suspect we   11:10:10
12   would not agree with it.             11:10:11
13       Q.   Okay. And what are the   11:10:12
14   scientific or medical studies that support   11:10:15
15   that statement?                 11:10:17
16       A.   For this particular piece, I   11:10:17
17   would have to refer to Gupta.         11:10:21
18       Q.   Do you see the bullet   11:10:23
19   underneath that that says -- that starts with   11:10:28
20   "Addiction rarely occurs"?           11:10:32
21       A.   Yes.                    11:10:34
22       Q.   Could you please read that into   11:10:35
23   the record?                  11:10:36
24       A.   It reads, "Addiction rarely   11:10:36
25   occurs unless there is a" -- something of   11:10:40

Page 93

1    abuse, I can't -- there's a --         11:10:47
2        Q.   Well, it's HHX, is that   11:10:49
3    history?                    11:10:50
4        A.   History, yes, that would be   11:10:51
5    history.                    11:10:52
6        Q.   Okay.                   11:10:52
7        A.   "Addiction rarely occurs unless   11:10:52
8    there's a history of abuse."           11:10:56
9        Q.   Okay. Does Mallinckrodt agree   11:10:57
10   with that statement?             11:10:58
11       A.   I have no reason to suspect   11:10:59
12   that we would not agree with that statement.   11:11:02
13       Q.   Okay. And what are the   11:11:04
14   scientific or medical studies that support   11:11:06
15   that statement?                 11:11:07
16       A.   I would defer to Gupta.      11:11:09
17       Q.   And when you say you "would   11:11:11
18   defer to Gupta," just to be clear, you're not   11:11:15
19   aware of what studies or what basis Mr. Gupta   11:11:17
20   has for these statements, do you?        11:11:20
21       A.   Since I'm not familiar with   11:11:22
22   this piece, I have not seen it in its   11:11:25
23   entirety, I do not know if there's another   11:11:29
24   page or another piece of it that lists any   11:11:31
25   references. I have not --            11:11:33

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    So I have no reason to suspect    11:11:34
2  no, but I have not seen the entire document.    11:11:36
3    Q.    And you don't know anything    11:11:38
4  about Mr. Gupta or his qualifications?    11:11:39
5    A.    Or Dr. Gupta.    11:11:42
6    Q.    Okay.  Do you see the box at    11:11:45
7  the top again -- let me try to point that    11:11:50
8  out.  It's right up there.    11:11:53
9    A.    Uh-huh.  I do.  Called    11:11:55
10  "breakthrough."    11:11:57
11    Q.    "Breakthrough pain management."    11:11:57
12    Can you please read the first    11:12:00
13  bullet point?    11:12:06
14    A.    "Use long-acting opioids around    11:12:07
15  the clock for baseline management of    11:12:10
16  persistent pain."    11:12:13
17    Q.    And can you please read the    11:12:14
18  second bullet point?    11:12:16
19    A.    "Use short-acting opioids, PRN,    11:12:16
20  parenthesis, rescue, close parenthesis, for    11:12:20
21  breakthrough pain."    11:12:24
22    Q.    Okay.  I take it Mallinckrodt    11:12:25
23  agrees with both of those statements?    11:12:31
24    MR. O'CONNOR:  Objection.    11:12:33
25    THE WITNESS:  I would not have    11:12:34

Page 95

1  reason to suspect we do not.    11:12:37
2  QUESTIONS BY MR. KAWAMOTO:    11:12:39
3    Q.    Okay.  But you're not aware of    11:12:39
4  the -- any medical studies or scientific    11:12:41
5  studies that support those statements?    11:12:45
6    A.    As contained within this piece,    11:12:48
7  I am not.    11:12:49
8    Q.    Okay.  Thank you.    11:12:51
9    Can you please take a look at    11:13:27
10  Exhibit 5 for me?    11:13:28
11    If I could direct your    11:13:52
12  attention to the guidelines pocket card, the    11:13:53
13  attachment.    11:13:58
14    A.    Uh-huh.    11:13:59
15    Q.    And do you see Table 5?    11:13:59
16    It's going to be on page Bates    11:14:01
17  number 2248920.    11:14:04
18    A.    Okay.    11:14:09
19    Q.    Can you please read the very    11:14:09
20  last bullet point in that table?    11:14:14
21    A.    Let's see, under "patients"?    11:14:17
22    Q.    I'm sorry, under Table 5,    11:14:21
23  Principles of Pain Management with Opioids.    11:14:23
24    A.    Yes.    11:14:26
25    Oh, that first paragraph up --    11:14:27

Page 96

1    Q.    That first -- that first --    11:14:29
2  well, there's a table and then it says,    11:14:30
3  "acute pain, eudynia," underneath that.    11:14:32
4    A.    I'm sorry, where is it at?    11:14:36
5    Q.    Let me.  So it's right up    11:14:38
6  there.    11:14:40
7    Do you see that?    11:14:40
8    A.    Uh-huh, I see that table.    11:14:40
9    Q.    Okay.  And then do you see the    11:14:42
10  very bottom bullet point under that table?    11:14:43
11    A.    This one which I'm referring    11:14:47
12  to?    11:14:49
13    Q.    Yes.    11:14:50
14    A.    Yes.    11:14:50
15    Q.    Okay.  Can you please read that    11:14:50
16  into the record?    11:14:52
17    A.    The bullet reads, "Risk of    11:14:52
18  addiction rare, see Table 7, closed    11:14:55
19  parentheses."    11:14:58
20    Q.    Okay.  And review Table 7, if    11:14:59
21  you would like to, but I guess my question is    11:15:05
22  does Mallinckrodt agree with that statement?    11:15:07
23    MR. O'CONNOR:  Objection.    11:15:10
24    THE WITNESS:  I would have no    11:15:15
25  reason to suspect we do not.    11:15:17

Page 97

1  QUESTIONS BY MR. KAWAMOTO:    11:15:19
2    Q.    And what are the medical or    11:15:20
3  scientific studies that support the statement    11:15:21
4  that risk of addiction is rare?    11:15:25
5    A.    I would have to refer to    11:15:25
6  Table 7, and then the publication,    11:15:31
7  peer-reviewed publication, entitled --    11:15:36
8  adapted from "Public Policy Statement on the    11:15:39
9  Rights and Responsibilities of Physicians in    11:15:42
10  the Use of Opioids for the Treatment of Pain"    11:15:44
11  from the American Society of Addiction    11:15:46
12  Medicine, published 1997.    11:15:49
13    Q.    And so is that the -- well,    11:15:52
14  strike that.    11:15:56
15    Is that a -- that says it's a    11:15:56
16  public policy statement, though.    11:16:01
17    That's not a medical or    11:16:03
18  scientific study, is it?    11:16:04
19    A.    Well, that would be --    11:16:06
20    MR. O'CONNOR:  Objection.    11:16:10
21    THE WITNESS:  So I'm not    11:16:11
22  familiar with that piece, but it's a    11:16:12
23  public policy statement put out by a    11:16:16
24  health care professional association.    11:16:19
25

Page 98

```
1   QUESTIONS BY MR. KAWAMOTO:            11:16:22
2       Q.   Okay.  Other than that public    11:16:24
3   policy statement, are you aware of any other  11:16:26
4   scientific or medical studies that support    11:16:27
5   the statement that the risk of addiction is   11:16:30
6   rare?                                 11:16:32
7           MR. O'CONNOR:  Objection.     11:16:33
8           THE WITNESS:  As is presented  11:16:34
9       in this piece, I'm only aware of that  11:16:37
10      one that's referenced as the footnote  11:16:40
11      as the reference source.          11:16:42
12  QUESTIONS BY MR. KAWAMOTO:            11:16:42
13      Q.   Moving beyond this piece and   11:16:43
14  taking that -- just taking the statement "the  11:16:45
15  risk of addiction is rare," are you aware of   11:16:47
16  any medical or scientific studies that        11:16:50
17  support that statement?               11:16:54
18      A.   I have not -- I have not been   11:16:55
19  briefed on any additional documents that      11:17:02
20  would be supportive of that document.  I'm    11:17:03
21  not aware of it, but I'm not saying that they  11:17:05
22  don't.  I've not seen it.             11:17:07
23      Q.   But in the course of preparing  11:17:08
24  for this 30(b)(6) deposition and in the       11:17:09
25  course of preparing for these topics, you are  11:17:13
```

Page 99

```
1   not aware of any scientific or medical    11:17:15
2   studies that support the -- that statement,  11:17:18
3   "the risk of addiction is rare," other than   11:17:21
4   what you've identified for me, which is the   11:17:24
5   public policy statement; is that accurate?    11:17:27
6           MR. O'CONNOR:  Objection.     11:17:28
7           THE WITNESS:  Top of mind, no,  11:17:28
8       I'm not aware of any other documents.  11:17:34
9           (Mallinckrodt-Webb Exhibit 16  11:18:37
10      marked for identification.)        11:18:38
11  QUESTIONS BY MR. KAWAMOTO:            11:18:38
12      Q.   Okay.  So I've handed you      11:18:46
13  Exhibit 16, which is an excerpt of the Defeat  11:18:49
14  Chronic Pain Now book, which we've discussed   11:18:54
15  previously.                           11:18:55
16          And because it's an excerpt,   11:18:57
17  it's obviously not the full book, so please    11:19:07
18  take the time you need to review the excerpt   11:19:13
19  that I've provided you.               11:19:15
20      A.   Okay.                        11:20:36
21      Q.   Okay.  So directing your       11:20:37
22  attention to page 174.                11:20:47
23          Do you see the very top of the  11:20:57
24  paragraph right underneath "who is     11:20:58
25  appropriate for opioid medication"?   11:21:00
```

Page 100

```
1       A.   I do.                        11:21:01
2       Q.   Could you please read those    11:21:02
3   first two sentences into the record?   11:21:04
4       A.   "It is currently recommended   11:21:08
5   that every chronic pain patient suffering     11:21:12
6   from moderate to severe pain be viewed as a   11:21:14
7   potential candidate for opioid therapy.  The  11:21:19
8   only issue concerns when the patient should   11:21:21
9   be prescribed an opioid."             11:21:25
10      Q.   Okay.  Does Mallinckrodt agree  11:21:28
11  with that statement?                  11:21:30
12          MR. O'CONNOR:  Objection.     11:21:31
13          THE WITNESS:  I would have no   11:21:32
14      reason to suspect why we would not.  11:21:34
15  QUESTIONS BY MR. KAWAMOTO:            11:21:35
16      Q.   Okay.  And what are the medical  11:21:36
17  and/or scientific studies that support that   11:21:42
18  statement?                            11:21:44
19      A.   I would have to defer to       11:21:46
20  Dr. Argoff and Dr. Galer in their research    11:21:48
21  and -- though it's not available here in this  11:21:51
22  excerpt, but there would be an index or a     11:21:57
23  listing of their references.          11:22:01
24      Q.   So Mallinckrodt didn't take any  11:22:02
25  other independent review to ensure the        11:22:05
```

Page 101

```
1   accuracy of this statement other than     11:22:09
2   whatever basis Dr. Galer -- Dr. Galer and     11:22:12
3   Dr. Argoff had?                       11:22:20
4           MR. O'CONNOR:  Yeah, objection  11:22:21
5       to scope.  Outside the scope.      11:22:22
6           Can you let us know which      11:22:24
7       one -- which topic?               11:22:26
8           MR. KAWAMOTO:  Sure, because   11:22:28
9       be Topic 30, which I believe is --  11:22:29
10          MR. O'CONNOR:  No, I see it.   11:22:34
11      I think this question is          11:22:36
12      outside the scope.                11:22:37
13          MR. KAWAMOTO:  Okay.          11:22:38
14          MR. O'CONNOR:  But go ahead,   11:22:39
15      answer as best you can.           11:22:40
16          THE WITNESS:  This piece would  11:22:42
17      have been reviewed by our medical  11:22:44
18      team.                             11:22:45
19  QUESTIONS BY MR. KAWAMOTO:            11:22:46
20      Q.   And what would that review have  11:22:48
21  entailed?                             11:22:51
22          MR. O'CONNOR:  Objection to    11:22:51
23      scope.                            11:22:54
24          You can answer as best you can.  11:22:54
25          THE WITNESS:  We would have had  11:22:57
```

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    a health care professional review this   11:22:58
2    piece and, to the best of their   11:22:59
3    ability, agree with the clinical   11:23:02
4    content.   11:23:04
5    QUESTIONS BY MR. KAWAMOTO:   11:23:04
6        Q.   Okay.  But based on your   11:23:04
7    review -- well, based on your preparation for   11:23:09
8    this topic, Topic 30, and your personal   11:23:12
9    knowledge, you cannot identify any medical   11:23:16
10   studies or scientific studies that support   11:23:21
11   the statement you just read into the record;   11:23:24
12   is that accurate?   11:23:26
13       MR. O'CONNOR:  Objection.   11:23:27
14       THE WITNESS:  I cannot name   11:23:27
15   them off the top of my head, but nor   11:23:30
16   have I been able to see them as they   11:23:32
17   would be as a reference for Dr. Galer   11:23:34
18   or Dr. Argoff.   11:23:36
19   QUESTIONS BY MR. KAWAMOTO:   11:23:37
20       Q.   Okay.  Well -- and this   11:23:38
21   statement doesn't appear to have any   11:23:42
22   reference or footnote attributed to it, does   11:23:44
23   it, sir?   11:23:46
24       A.   I do not see one.   11:23:47
25       MR. O'CONNOR:  Objection.   11:23:49

Page 103

1        Objection.   11:23:51
2        That's all right.   11:23:51
3    QUESTIONS BY MR. KAWAMOTO:   11:23:52
4        Q.   I'm sorry, what --   11:23:53
5        A.   No, I don't see a reference for   11:23:53
6    that particular statement.   11:23:56
7        Q.   Thank you.   11:23:57
8        So directing your attention to   11:24:08
9    page 176.   11:24:11
10       A.   Okay.   11:24:17
11       Q.   Do you see the sentence in the   11:24:18
12   middle of the second paragraph that states --   11:24:21
13   that starts with, "When chronic pain"?   11:24:25
14       MR. O'CONNOR:  Which side of   11:24:31
15   the page are you on?   11:24:33
16       MR. KAWAMOTO:  Page 176, the   11:24:33
17   text.   11:24:35
18       MR. O'CONNOR:  On the right   11:24:35
19   side?   11:24:39
20       MR. KAWAMOTO:  The right side.   11:24:39
21       THE WITNESS:  Yes, I do, "when   11:24:39
22   chronic pain."   11:24:42
23   QUESTIONS BY MR. KAWAMOTO:   11:24:42
24       Q.   Can you please read that   11:24:43
25   statement into the record?   11:24:44

Page 104

1        A.   Just that one sentence?   11:24:44
2        Q.   Yes, please.   11:24:45
3        A.   "When chronic pain patients   11:24:46
4    take opioids to treat their pain, they rarely   11:24:48
5    develop a true addiction and drug craving."   11:24:50
6        Q.   Does Mallinckrodt agree with   11:24:53
7    that statement?   11:24:55
8        A.   I have no reason to suspect   11:24:56
9    that we would not agree with it.   11:24:57
10       Q.   And based on your preparation   11:25:00
11   for Topic Number 30 and your personal   11:25:02
12   knowledge, can you identify any scientific or   11:25:05
13   medical studies that support that statement?   11:25:09
14       Strike that.   11:25:12
15       Based on your preparation for   11:25:12
16   this topic and your personal knowledge, can   11:25:14
17   Mallinckrodt identify any scientific or   11:25:16
18   medical studies that support that statement?   11:25:19
19       MR. O'CONNOR:  Objection.   11:25:20
20       THE WITNESS:  For that point, I   11:25:21
21   would have to -- I'm not aware.  I   11:25:25
22   would have to defer to our medical   11:25:27
23   affairs or clinical team.   11:25:28
24   QUESTIONS BY MR. KAWAMOTO:   11:25:33
25       Q.   Okay.  Can you turn to   11:25:36

Page 105

1    page 177?   11:25:37
2        Do you see the paragraph that   11:25:46
3    begins with "the bottom line"?   11:25:48
4        A.   Uh-huh.   11:25:50
5        Q.   Can you please read that into   11:25:51
6    the record?   11:25:53
7        A.   "The bottom line:  Only rarely   11:25:53
8    does opioid medication cause a true addiction   11:25:58
9    when prescribed appropriately to a chronic   11:26:01
10   pain patient who does not have a prior   11:26:05
11   history of addiction."   11:26:07
12       Q.   Does Mallinckrodt agree with   11:26:09
13   that statement?   11:26:10
14       A.   I would have no reason to   11:26:12
15   suspect we would -- we would not disagree --   11:26:14
16   or we would not agree.   11:26:17
17       Q.   And can you identify any   11:26:18
18   scientific or medical studies that support   11:26:20
19   that statement?   11:26:22
20       A.   I am not aware of any, but I   11:26:23
21   would have to refer to our -- defer to our   11:26:25
22   clinical team.   11:26:28
23       Q.   On the next -- on the last page   11:26:29
24   of this excerpt, there is a Q&A with   11:26:32
25   Dr. Argoff and Dr. Galer.   11:26:34

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1      Do you see that?       11:26:38
2    A.   I do.              11:26:38
3    Q.   And do you see the very last   11:26:39
4  paragraph that starts with "here are the   11:26:40
5  facts"?                 11:26:41
6    A.   I do.              11:26:42
7    Q.   Can you please read that into   11:26:42
8  the record?              11:26:43
9    A.   The entire paragraph?   11:26:44
10   Q.   Yes, please.       11:26:45
11   A.   "Here are the facts:  It is   11:26:46
12 very uncommon for a person with chronic pain  11:26:49
13 to become addicted to narcotics if,   11:26:51
14 parentheses, 1, he doesn't have prior history  11:26:55
15 of any addiction, and in parentheses, 2,   11:26:59
16 number 2, he only takes the medication to   11:27:03
17 treat pain.  Studies have shown that chronic  11:27:06
18 pain patients can experience significant pain  11:27:09
19 relief with tolerable side effects from   11:27:12
20 opioid narcotic medication when taken daily   11:27:17
21 and no addiction.  We definitely would try   11:27:20
22 this type of treatment for our patients in   11:27:23
23 your situation."           11:27:25
24   Q.   Does Mallinckrodt agree with   11:27:27
25 that statement?            11:27:28

Page 107

1    A.   I would have no reason to   11:27:30
2  suspect we would not, but I would add that,   11:27:35
3  you know, this is a physician giving advice   11:27:38
4  to a patient, so I -- I think this situation   11:27:40
5  might be a little bit unique.   11:27:43
6    Q.   Well, unique in what way, sir?   11:27:45
7    A.   Well, I mean, it's a Q&A advice   11:27:48
8  provided by two physicians to a hypothetical   11:27:50
9  patient.                 11:27:53
10      But I would -- again, I would   11:27:58
11 defer to our clinical team whether they would  11:27:59
12 agree with that statement or not.   11:28:03
13   Q.   Okay.  But to be clear for the   11:28:04
14 record, this is -- this is included in the   11:28:06
15 Defeat Chronic Pain Now publication, correct?  11:28:09
16   A.   Correct.           11:28:11
17   Q.   And that was a publication that  11:28:11
18 Mallinckrodt reviewed, correct?   11:28:12
19   A.   Correct.           11:28:14
20   Q.   And that's a publication that   11:28:14
21 Mallinckrodt recommended be distributed by   11:28:16
22 health care providers to their patients; is   11:28:19
23 that correct?              11:28:22
24      MR. O'CONNOR:  Objection.  It's   11:28:22
25   outside the scope and to form.   11:28:25

Page 108

1      THE WITNESS:  Answer?   11:28:26
2      MR. O'CONNOR:  You can go ahead   11:28:29
3   based on what you know.     11:28:30
4      THE WITNESS:  We made it   11:28:31
5   available for distribution.   11:28:33
6  QUESTIONS BY MR. KAWAMOTO:   11:28:34
7    Q.   And are you aware of any   11:28:35
8  medical or scientific studies that support   11:28:36
9  that statement, that paragraph?   11:28:38
10     MR. O'CONNOR:  Objection.  It's   11:28:40
11   outside the scope.         11:28:43
12     THE WITNESS:  I personally am   11:28:43
13   not aware.               11:28:46
14 QUESTIONS BY MR. KAWAMOTO:   11:28:47
15   Q.   Now, if I could direct your   11:28:49
16 attention to Exhibit 12 again.   11:29:12
17   A.   Okay.              11:29:24
18   Q.   And this is the slide -- and I   11:29:25
19 would like to direct your attention to page 3  11:29:28
20 of this PowerPoint and the slide that says   11:29:29
21 "Positioning Statement."    11:29:34
22      Do you see that?       11:29:36
23   A.   I do.              11:29:36
24   Q.   In particular, do you see the   11:29:36
25 bullet point that begins with "that"?   11:29:38

Page 109

1    A.   I do.              11:29:40
2    Q.   Can you please read that into   11:29:40
3  the record?              11:29:41
4    A.   It reads, "That provides   11:29:43
5  fast-acting and long-lasting pain relief   11:29:46
6  without concerns about abuse."   11:29:48
7    Q.   Okay.  I assume that is a   11:29:51
8  statement that Mallinckrodt would agree with   11:29:53
9  as that is its positioning statement for -- I  11:29:56
10 believe it's Xartemis, correct?   11:30:00
11     MR. O'CONNOR:  Objection.   11:30:03
12     THE WITNESS:  I would not   11:30:04
13   suspect a reason why we would not   11:30:04
14   disagree -- or we would not agree with   11:30:06
15   that.                   11:30:07
16 QUESTIONS BY MR. KAWAMOTO:   11:30:07
17   Q.   What are the scientific or   11:30:08
18 medical studies that support that statement?  11:30:10
19     MR. O'CONNOR:  Objection to   11:30:13
20   scope and form.          11:30:17
21     THE WITNESS:  I would have to   11:30:18
22   defer to the author that put this   11:30:19
23   slide deck together.  I don't know   11:30:21
24   where that information would have been   11:30:23
25   taken from, but without having the   11:30:26

## Page 110

1    context of how it was derived.          11:30:27
2    QUESTIONS BY MR. KAWAMOTO:              11:30:29
3        Q.   Well, are you aware of any      11:30:30
4    scientific or medical studies that support   11:30:32
5    the statement that Xartemis provides     11:30:34
6    fast-acting and long-lasting pain relief   11:30:37
7    without concerns about abuse?           11:30:39
8        MR. O'CONNOR:   Objection.         11:30:41
9        THE WITNESS:   Off the top of my    11:30:42
10   head, no, I'm not.                       11:30:42
11   QUESTIONS BY MR. KAWAMOTO:              11:30:44
12       Q.   So I would like to move now to   11:31:07
13   Topic 25, and please feel free to consult   11:31:10
14   deposition notice if you want to see what   11:31:14
15   that topic is.                           11:31:16
16       A.   Okay.                          11:31:22
17       (Mallinckrodt-Webb Exhibit 17      11:31:37
18       marked for identification.)        11:31:38
19   QUESTIONS BY MR. KAWAMOTO:              11:31:38
20       Q.   I would like to mark this as   11:31:39
21   Exhibit 17.                              11:31:40
22       So this is an e-mail chain          11:31:41
23   Bates numbered MNK-T1_4204631.          11:32:14
24       A.   Uh-huh, yes.                   11:32:27
25       Q.   Okay.  And do you see the top   11:32:28

## Page 111

1    that says, "We'll need to be creative.    11:32:30
2    Stopping prescription limits will be a long   11:32:34
3    shot."                                   11:32:35
4        That's an e-mail from Derek        11:32:36
5    Naten to yourself?                       11:32:37
6        A.   Correct.                       11:32:39
7        Q.   Who is Derek Naten?            11:32:39
8        A.   Derek at the time was -- let's   11:32:42
9    see, when was this written, the date?  2014,   11:32:45
10   he was my boss.                          11:32:48
11       Q.   Okay.  And so Mallinckrodt was   11:32:49
12   opposed to prescription limits; is that   11:32:52
13   correct?                                 11:32:56
14       MR. O'CONNOR:   Objection.         11:32:56
15       THE WITNESS:   We've never, to    11:32:57
16   my knowledge, acted or engaged to        11:33:05
17   anything to suggest that we would try   11:33:09
18   to limit prescribing behavior of        11:33:10
19   physicians.                              11:33:13
20   QUESTIONS BY MR. KAWAMOTO:              11:33:23
21       Q.   I'm sorry, I'm a little unclear   11:33:23
22   with your testimony because the -- the   11:33:25
23   prescription limits would be legislation that   11:33:27
24   would place limitations on prescribing   11:33:31
25   behavior, correct?                       11:33:33

## Page 112

1        MR. O'CONNOR:   Objection.         11:33:34
2        THE WITNESS:   I'm trying to      11:33:34
3    read, let's see, the article itself,    11:33:37
4    as far as the JAMA of Psychiatry.       11:33:39
5        Uh-huh.                            11:34:02
6    QUESTIONS BY MR. KAWAMOTO:              11:34:03
7        Q.   Okay.  And to sort of try to   11:34:03
8    trace this -- the e-mail chain, the bottom   11:34:04
9    e-mail is an e-mail from you where you say,   11:34:09
10   "Gents, in follow-up to our discussion last   11:34:12
11   night, new article published in JAMA of   11:34:15
12   Psychiatry shows jump in heroin use with   11:34:17
13   white suburbanites.  Speaks as to why the   11:34:18
14   state legislators are now clamoring for a   11:34:21
15   solution.  Interesting that New York unveiled   11:34:24
16   25 bills to manage heroin increase."     11:34:26
17       Do you see that?                   11:34:28
18       A.   I do.                         11:34:28
19       Q.   Okay.  The next sentence says,   11:34:29
20   "While last evening during dinner we were   11:34:32
21   discussing the importance of increasing   11:34:35
22   access, may be a win is just keeping the   11:34:38
23   riders off that limit a physician to how many   11:34:40
24   days they can prescribe for."            11:34:42
25       So that indicates that             11:34:43

## Page 113

1    Mallinckrodt is opposed to riders that would   11:34:44
2    limit a physician with respect to how many   11:34:48
3    days they can prescribe for; is that     11:34:50
4    accurate?                                11:34:52
5        MR. O'CONNOR:   Objection.         11:34:52
6        THE WITNESS:   I would -- the     11:34:53
7    statement is more of an internal        11:34:57
8    discussion of -- for discussion point.   11:34:58
9    We never acted on anything at a         11:35:02
10   lobbying level to suggest that we were   11:35:05
11   trying to prevent physicians from       11:35:06
12   prescribing.                            11:35:08
13   QUESTIONS BY MR. KAWAMOTO:              11:35:08
14       Q.   But your internal view is that   11:35:09
15   Mallinckrodt was opposed to prescription   11:35:11
16   limits?                                  11:35:15
17       MR. O'CONNOR:   Objection.         11:35:15
18       THE WITNESS:   I would have to    11:35:16
19   look at this in the context, though,    11:35:17
20   of the articles.                        11:35:19
21       We never acted on any of that.     11:35:21
22   QUESTIONS BY MR. KAWAMOTO:              11:35:23
23       Q.   Well, regardless of whether    11:35:25
24   Mallinckrodt acted on it -- well, strike   11:35:28
25   that.                                    11:35:32

Page 114

1    So when Derek Naten says,    11:35:32
2  "We'll need to be creative. Stopping    11:35:34
3  prescription limits will be a long shot,"    11:35:36
4  what did he mean by "we'll need to be    11:35:38
5  creative"?    11:35:42
6       MR. O'CONNOR: Objection.    11:35:42
7       THE WITNESS: I don't know.    11:35:43
8  QUESTIONS BY MR. KAWAMOTO:    11:35:44
9    Q.  Well, what did you understand    11:35:44
10 him to mean?    11:35:45
11   A.  Well, I would have to -- I    11:35:46
12 don't know. I don't know if we've ever    11:35:53
13 responded to this e-mail.    11:35:55
14   Q.  Okay. Internally why was    11:35:57
15 Mallinckrodt opposed to prescription limits?    11:36:06
16 Regardless of whether they acted on it, as    11:36:09
17 you said, why were they opposed to it?    11:36:12
18       MR. O'CONNOR: Objection to    11:36:14
19   scope and to form.    11:36:15
20       THE WITNESS: We were -- we    11:36:17
21   were -- we were looking for ways to    11:36:22
22   increase access to addiction treatment    11:36:24
23   for those who had a heroin or a    11:36:29
24   substance abuse disorder.    11:36:31
25       I'm not -- I don't recall any    11:36:34

Page 115

1    discussions beyond what you're showing    11:36:36
2    me of what we would have done    11:36:38
3    otherwise to prevent prescribing    11:36:39
4    limits on physicians.    11:36:44
5  QUESTIONS BY MR. KAWAMOTO:    11:36:45
6    Q.  Now, when you say "increase    11:36:45
7  access to" -- I'm sorry, when you say    11:36:47
8  "increase access to addiction treatment,"    11:36:50
9  would that have including increasing access    11:36:52
10 to methadone or Methadose?    11:36:54
11      MR. O'CONNOR: Objection.    11:36:56
12      THE WITNESS: Methadose, to the    11:36:58
13   extent it's being dispensed in an    11:37:00
14   opioid treatment program.    11:37:02
15 QUESTIONS BY MR. KAWAMOTO:    11:37:03
16   Q.  Okay. And Mallinckrodt was a    11:37:04
17 leading manufacturer of Methadose, was it    11:37:09
18 not?    11:37:11
19   A.  It's a generic product.    11:37:11
20   Q.  Mallinckrodt -- well, I    11:37:13
21 understand that it's a generic product, but    11:37:17
22 Mallinckrodt was a leading manufacturer of    11:37:19
23 that generic product, correct?    11:37:21
24   A.  We are a manufacturer of that    11:37:23
25 product, yes.    11:37:25

Page 116

1       (Mallinckrodt-Webb Exhibit 18    11:37:40
2   marked for identification.)    11:37:41
3  QUESTIONS BY MR. KAWAMOTO:    11:37:41
4    Q.  Okay. So this is an e-mail    11:37:41
5  chain Bates numbered MNK-T1_867636.    11:38:04
6    A.  Okay.    11:39:13
7    Q.  So this is an e-mail chain    11:39:13
8  between you and Mike Ybarra.    11:39:14
9       Who is Mr. Ybarra?    11:39:17
10   A.  Dr. Ybarra is at the -- head of    11:39:18
11 the medical affairs team at PhRMA, the trade    11:39:24
12 group.    11:39:29
13   Q.  And what is PhRMA?    11:39:29
14   A.  The Pharmaceutical Research    11:39:31
15 Manufacturers Association.    11:39:34
16   Q.  Would you consider them to be    11:39:34
17 one of the more important trade groups with    11:39:42
18 respect to pharmaceuticals?    11:39:44
19   A.  Well, they are the trade    11:39:45
20 organization for the pharmaceutical industry.    11:39:48
21 I would not speculate as to the level of    11:39:51
22 their importance, though.    11:39:53
23   Q.  And this concerns AMA    11:39:54
24 Resolution 707, does it not?    11:40:01
25   A.  This was a cut and paste from    11:40:03

Page 117

1  Mike to me regarding Resolution 707.    11:40:08
2    Q.  Okay. And PhRMA and    11:40:11
3  Mallinckrodt opposed AMA Resolution 707, did    11:40:15
4  they not?    11:40:19
5       MR. O'CONNOR: Objection.    11:40:19
6   Form.    11:40:21
7       THE WITNESS: I don't recall to    11:40:21
8    the extent of Mallinckrodt never    11:40:23
9    engaged in this particular issue.    11:40:26
10   This was -- PhRMA was sending to us,    11:40:29
11   but Mallinckrodt never took a position    11:40:33
12   on this.    11:40:34
13 QUESTIONS BY MR. KAWAMOTO:    11:40:35
14   Q.  So the statement -- well,    11:40:49
15 strike that.    11:40:51
16      So with respect to AMA    11:40:51
17 medical -- I'm sorry, with respect to AMA    11:40:55
18 Resolution 707, did Mallinckrodt agree with    11:40:57
19 the resolution?    11:41:00
20      MR. O'CONNOR: Objection.    11:41:02
21      THE WITNESS: I'm not aware if    11:41:03
22   Mallinckrodt ever agreed with it.    11:41:07
23 QUESTIONS BY MR. KAWAMOTO:    11:41:08
24   Q.  What was the basis for    11:41:09
25 Mallinckrodt's disagreement with the    11:41:10

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    resolution?                          11:41:11
2          MR. O'CONNOR: Objection.       11:41:12
3          THE WITNESS: I'm not -- I      11:41:14
4    don't have reason to suspect we agreed   11:41:17
5    or disagreed. We never acted on it.  11:41:18
6    QUESTIONS BY MR. KAWAMOTO:              11:41:21
7        Q.   So do you see the part of the   11:41:42
8    e-mail where Mike Ybarra says, "Cut and paste   11:41:45
9    below are PhRMA activities around drug abuse   11:41:48
10   and Resolution 707, which we are opposing.   11:41:51
11   Any help reaching out to groups on 707 would   11:41:52
12   be much appreciated."                11:41:55
13         And in your response to him on   11:41:56
14   that point is, "We'll be reaching out to   11:41:58
15   groups regarding 707. Are you okay if we put   11:42:00
16   your name as contact in the event that they   11:42:03
17   have any questions or want to coordinate with   11:42:06
18   you if they're attending the AMA conference   11:42:07
19   next week?"                          11:42:09
20         Did I read that accurately?    11:42:10
21       A.   You did.                    11:42:12
22       Q.   So why are you reaching out to   11:42:13
23   groups regarding 707 if you don't agree with   11:42:15
24   PhRMA's position on the resolution?   11:42:18
25         Strike that.                   11:42:20

Page 119

1          Why are you reaching out to   11:42:20
2    groups regarding 707 if you don't agree with   11:42:21
3    PhRMA's opposition to Resolution 707?   11:42:25
4          MR. O'CONNOR: Objection.       11:42:28
5    Form.                              11:42:29
6          THE WITNESS: Well, the         11:42:29
7    statement above also reads, "We're     11:42:30
8    vetting internally."                 11:42:33
9          So I do not recall if we ever   11:42:36
10   reached out to any of these other     11:42:38
11   groups as well.                      11:42:39
12   QUESTIONS BY MR. KAWAMOTO:              11:42:40
13       Q.   So one of the statements in the   11:43:02
14   resolution is "Whereas in 2010,        11:43:03
15   16,660 people -- 65 people died from   11:43:08
16   opioid-related overdoses, a fourfold increase   11:43:11
17   from 1999, when only 4,030 such deaths   11:43:15
18   occurred. And further, the number of opioid   11:43:17
19   prescriptions written has doubled from   11:43:19
20   109 million in 1998 to 259 million in 2012.   11:43:22
21   And some authors estimate that there are 12   11:43:25
22   deaths annually in the US per a hundred   11:43:28
23   thousand patients on opioid medications. And   11:43:31
24   further, of the 22,767 deaths in the US   11:43:34
25   related to pharmaceutical overdose, more than   11:43:38

Page 120

1    71 percent were due to opioid pain      11:43:40
2    relievers."                          11:43:43
3          Do you disagreement with that   11:43:44
4    statement, sir?                      11:43:46
5          MR. O'CONNOR: Objection.       11:43:47
6    QUESTIONS BY MR. KAWAMOTO:              11:43:48
7        Q.   I'm sorry, strike that.      11:43:48
8          Does Mallinckrodt disagree with   11:43:49
9    that statement?                      11:43:50
10         MR. O'CONNOR: Objection to     11:43:50
11   form and scope.                      11:43:51
12         THE WITNESS: The source of     11:43:52
13   that statement is the CDC. I have no   11:43:55
14   reason to suspect that we would       11:43:56
15   disagree with it.                    11:43:58
16   QUESTIONS BY MR. KAWAMOTO:              11:43:59
17       Q.   Okay. Well, what about the   11:43:59
18   statement above that, "Whereas there has been   11:44:01
19   an explosion of opioid use and abuse in the   11:44:03
20   United States, and this increase in the this   11:44:06
21   use and abuse of the pain medications closely   11:44:07
22   mirrors the broad and diffuse promulgation of   11:44:09
23   pain as the fifth vital sign, which became a   11:44:12
24   Joint Commission standard in 2001."   11:44:14
25         Does Mallinckrodt disagree with   11:44:16

Page 121

1    that statement?                      11:44:17
2          MR. O'CONNOR: Objection.       11:44:18
3    Scope and form.                      11:44:19
4          THE WITNESS: I would have no   11:44:20
5    reason to suspect that Mallinckrodt   11:44:23
6    would disagree with that.            11:44:25
7    QUESTIONS BY MR. KAWAMOTO:              11:44:26
8        Q.   Okay. Now, the statement below   11:44:27
9    it, "Whereas in the majority of cases, pain   11:44:29
10   is a symptom of underlying pathology and not   11:44:32
11   a disease itself, further identification and   11:44:34
12   treatment of the underlying cause should be   11:44:36
13   the focus of care rather than pursuing the   11:44:38
14   treatment of pain without primary regard to   11:44:41
15   source."                            11:44:42
16         Do you have any reason to       11:44:43
17   believe that Mallinckrodt disagrees with that   11:44:44
18   statement?                          11:44:47
19         MR. O'CONNOR: Objection. Form   11:44:47
20   and scope.                          11:44:49
21         THE WITNESS: I would have to   11:45:00
22   defer to our medical professionals,   11:45:01
23   but I would have no reason to suspect   11:45:03
24   or think why we would disagree with   11:45:05
25   it.                                 11:45:06

Page 122

1  QUESTIONS BY MR. KAWAMOTO:        11:45:07
2      Q.   Okay.  The next statement is     11:45:07
3  "Whereas the push to the public that all pain   11:45:08
4  is bad and should be managed to the point of    11:45:08
5  eradication or total resolution has led to      11:45:16
6  inappropriate pain management practices by      11:45:17
7  clinicians and demand by patients, and          11:45:19
8  whereas by pushing pain as a fifth vital        11:45:22
9  sign, the medical culture has been changed by   11:45:24
10  altering physician, but more importantly,       11:45:28
11  patient behavior, and this increased focus on   11:45:30
12  pain and its eradication has led to the         11:45:32
13  diffuse overuse of opioids."                    11:45:35
14      Does Mallinckrodt agree with      11:45:38
15  that statement?                       11:45:40
16      MR. O'CONNOR:  Objection to       11:45:40
17      scope and form.                   11:45:42
18      THE WITNESS:  I would not know.   11:45:43
19  I would not know if we would -- I do            11:45:44
20  not have a reason to suspect, but I   11:45:46
21  would have to defer and research that  11:45:48
22  more.                                 11:45:50
23  QUESTIONS BY MR. KAWAMOTO:            11:45:50
24      Q.   Okay.  But based on your     11:45:51
25  preparation for Topic Number 25 and your       11:45:59

Page 123

1  personal knowledge based on your professional   11:46:02
2  responsibilities, you don't have any reason     11:46:05
3  to believe that Mallinckrodt disagrees with     11:46:06
4  those statements that we just reviewed?         11:46:08
5      MR. O'CONNOR:  Objection.  Form   11:46:10
6      and scope.                        11:46:11
7      THE WITNESS:  I would not have    11:46:11
8      a reason to suspect we would disagree  11:46:15
9      with it.                          11:46:16
10      (Mallinckrodt-Webb Exhibit 19    11:46:49
11      marked for identification.)       11:46:50
12  QUESTIONS BY MR. KAWAMOTO:            11:46:50
13      Q.   Okay.                        11:46:50
14      A.   Okay.                        11:48:14
15      Q.   So this is an e-mail chain   11:48:15
16  Bates numbered MNK-T1_866405.         11:48:18
17      And I would like to direct your  11:48:25
18  attention to the VA task force.  It's an        11:48:27
19  e-mail from Steven LaPierre dated Tuesday,      11:48:32
20  November 24th, and it's in the middle of        11:48:38
21  page 866406.                          11:48:42
22      Do you see that?                  11:48:42
23      A.   I do.                        11:48:43
24      Q.   And do you see the first     11:48:45
25  paragraph, sir?                       11:48:52

Page 124

1      A.   Yes.                          11:48:55
2      Q.   And do you see the part where  11:48:55
3  it says, "Attached is a sign-on letter from     11:48:57
4  the US Pain Foundation expressing support for   11:48:59
5  efforts to improve the quality of VA pain       11:49:01
6  care and the need for patient-centered,         11:49:04
7  individualized interdisciplinary, balanced      11:49:06
8  treatment options, as well as concerns about   11:49:09
9  the need for updating the current VA            11:49:11
10  standards and the required adoption of the      11:49:13
11  draft CDC opioid prescribing guidelines."       11:49:14
12      With respect to concerns about   11:49:19
13  the draft CDC -- well, taking a step back.      11:49:20
14      Do you know if Mallinckrodt      11:49:25
15  signed this letter?                   11:49:26
16      A.   I'm not aware.               11:49:26
17      Q.   Did Mallinckrodt have concerns  11:49:28
18  about the draft CDC opioid prescribing          11:49:31
19  guidelines?                           11:49:34
20      MR. O'CONNOR:  Objection.         11:49:34
21      Scope and form.                   11:49:35
22      THE WITNESS:  We did not have    11:49:36
23      concerns regarding the prescribing  11:49:40
24      guidelines.                       11:49:42
25

Page 125

1  QUESTIONS BY MR. KAWAMOTO:            11:49:42
2      Q.   Okay.  So you didn't take --  11:49:42
3  Mallinckrodt did not take any lobbying or       11:49:44
4  legislative action to try to modify or change   11:49:50
5  the draft prescribing guidelines?              11:49:53
6      MR. O'CONNOR:  Objection.         11:49:55
7      THE WITNESS:  We did not.         11:49:56
8  QUESTIONS BY MR. KAWAMOTO:            11:49:57
9      Q.   Okay.  The very top e-mail is  11:49:58
10  from Mark to you, and it says, "We should       11:50:02
11  look at whether the legislation provides us a   11:50:06
12  vehicle for pushing MMA."              11:50:08
13      What is "MMA"?                    11:50:11
14      A.   MMA stands for multimodal    11:50:12
15  analgesia.  It is a acronym -- or the science   11:50:15
16  behind that is to use pain relievers other      11:50:20
17  than opioids.                         11:50:23
18      Q.   Okay.  And when he says, "Ray  11:50:25
19  may have some thoughts," who is Ray?   11:50:29
20      A.   Ray would be our federal      11:50:31
21  lobbyist in Washington, DC, Ray Downs.          11:50:32
22      Q.   Thank you.                    11:50:36
23      (Mallinckrodt-Webb Exhibit 20    11:50:52
24      marked for identification.)       11:50:52
25

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  QUESTIONS BY MR. KAWAMOTO:          11:50:52
2      Q.   I would like to mark this as     11:51:32
3  Exhibit 20.                    11:51:34
4          Okay.  So this is an e-mail       11:51:39
5  chain between you and Mark and Derek, and    11:51:41
6  it's Bates numbered MNK-T1_864164.       11:51:44
7      A.   Correct.             11:51:52
8      Q.   At the bottom of this e-mail      11:51:52
9  chain there are the CDC draft guidelines for  11:51:54
10 opioid prescribing.             11:51:57
11         Do you see that?          11:51:57
12     A.   I do.                11:51:57
13     Q.   Okay.  And just to be clear,      11:51:58
14 you agree with -- Mallinckrodt agreed with    11:52:00
15 these draft guidelines?             11:52:03
16         MR. O'CONNOR:  Objection.       11:52:05
17         THE WITNESS:  We -- we had no     11:52:06
18     issues with the draft guidelines.  We   11:52:09
19     saw an opportunity to include more --   11:52:14
20     an opportunity to include more         11:52:18
21     regarding MMA, multi-modal approach.   11:52:19
22 QUESTIONS BY MR. KAWAMOTO:          11:52:24
23     Q.   Okay.  But for example, the       11:52:26
24 first paragraph for the draft guidelines is,  11:52:26
25 "Nonpharmacological therapy and non opioid    11:52:27

Page 127

1  pharmacological therapy are preferred for    11:52:30
2  chronic pain.  Providers should only consider 11:52:32
3  aiding opioid therapy if expected benefits   11:52:34
4  for both pain and function are anticipated to 11:52:36
5  outweigh risks."                11:52:38
6          Mallinckrodt agrees with that    11:52:40
7  statement?                   11:52:42
8      A.   Yes.                11:52:42
9          MR. O'CONNOR:  Objection.       11:52:43
10 QUESTIONS BY MR. KAWAMOTO:          11:52:43
11     Q.   Okay.  And then underneath that  11:52:44
12 it says, "Before starting long-term opioid    11:52:45
13 therapy, providers should establish treatment 11:52:47
14 goals with all patients, including realistic  11:52:50
15 goals for pain and function.  Providers       11:52:53
16 should continue opioid therapy only if        11:52:55
17 there's clinically meaningful improvement in  11:52:57
18 pain and function that outweighs risk to      11:52:59
19 patient safety."                11:53:02
20         Mallinckrodt agrees with that    11:53:03
21 statement?                   11:53:05
22         MR. O'CONNOR:  Objection.       11:53:06
23         THE WITNESS:  Correct.         11:53:06
24 QUESTIONS BY MR. KAWAMOTO:          11:53:06
25     Q.   Underneath that it says,         11:53:07

Page 128

1  "Before starting and periodically during      11:53:07
2  opioid therapy, providers should discuss with 11:53:09
3  patients risks and realistic benefits of      11:53:12
4  opioid therapy and patient and provider       11:53:15
5  responsibilities for managing therapy."       11:53:16
6          Mallinckrodt agrees with that    11:53:19
7  statement?                   11:53:24
8          MR. O'CONNOR:  Objection.       11:53:24
9          THE WITNESS:  Yes.            11:53:24
10 QUESTIONS BY MR. KAWAMOTO:          11:53:26
11     Q.   Underneath that it says, "When   11:53:26
12 starting opioid therapy, providers should     11:53:26
13 prescribe short-acting opioids instead of     11:53:28
14 extended release, long-acting opioids."       11:53:29
15         That's a statement Mallinckrodt  11:53:32
16 agrees with?                   11:53:33
17         MR. O'CONNOR:  Objection.       11:53:34
18     Scope of this whole line and objection 11:53:35
19     to form.                 11:53:37
20         THE WITNESS:  Yes, I would --    11:53:38
21     yes, I would agree with that.       11:53:40
22 QUESTIONS BY MR. KAWAMOTO:          11:53:42
23     Q.   Okay.  Underneath that it says,  11:53:42
24 "When opioids are started, providers should   11:53:48
25 prescribe the lowest possible effective       11:53:50

Page 129

1  dosage.  Providers should implement           11:53:52
2  additional precautions when increasing dosage 11:53:54
3  to 50 or greater milligrams per day in        11:53:56
4  morphine equivalence and should avoid         11:53:58
5  increasing dosages to 90 or greater           11:54:00
6  milligrams per day in morphine equivalence."  11:54:03
7          That's a statement that          11:54:06
8  Mallinckrodt agrees with?            11:54:07
9          MR. O'CONNOR:  Objection to      11:54:08
10     scope.                   11:54:09
11         THE WITNESS:  I would have no    11:54:10
12     reason to suspect we would not.      11:54:11
13 QUESTIONS BY MR. KAWAMOTO:          11:54:12
14     Q.   Okay.  Now, the statement        11:54:12
15 that's paragraph number 6, "Long-term opioid  11:54:26
16 use often begins with treatment of acute      11:54:29
17 pain.  When opioids are used for acute pain,   11:54:31
18 providers should prescribe the lowest         11:54:33
19 effective dose of short-acting opioids and    11:54:35
20 should prescribe no greater quantity than     11:54:37
21 needed for the expected duration of pain      11:54:39
22 severe enough to require opioids.  Three or   11:54:42
23 four -- three or fewer days will usually be   11:54:44
24 sufficient for nontraumatic pain not related  11:54:46
25 to major surgery."               11:54:49

Page 130

1    That's a statement that        11:54:50
2  Mallinckrodt agrees with?        11:54:51
3        MR. O'CONNOR: Objection.     11:54:52
4  Scope and form.                  11:54:53
5        THE WITNESS: I have no reason  11:54:54
6  to suspect we would not.          11:54:55
7        MR. KAWAMOTO: Could we quickly  11:54:59
8  go off the record?               11:55:09
9        VIDEOGRAPHER: We're going off  11:55:10
10  the record at 11:55 a.m.          11:55:11
11    (Off the record at 11:55 a.m.)  11:55:12
12        VIDEOGRAPHER: We're back on    12:13:09
13  the record at 12:13 p.m.          12:13:12
14  QUESTIONS BY MR. KAWAMOTO:                12:13:13
15    Q.   So, Mr. Webb, we had spoke    12:13:15
16  earlier about various medical and scientific  12:13:18
17  studies, and so I just want to make sure that  12:13:20
18  the record is clear.              12:13:23
19        Topic 30 states, "whether from  12:13:26
20  2007 onward, you or anyone on your behalf or  12:13:29
21  any trade organization, group or professional  12:13:32
22  association of which you were a member or    12:13:33
23  sponsor made any of the following      12:13:35
24  representations or similar statements through  12:13:38
25  either branded or unbranded marketing. And    12:13:40

Page 131

1  if the answer is yes, the specific basis for   12:13:42
2  each such representation or statement. And     12:13:44
3  these include, A, the risk of addiction from   12:13:47
4  chronic opioid therapy is low; to the extent   12:13:49
5  there is a risk of addiction, it can be        12:13:52
6  easily identified and managed; signs of        12:13:54
7  addictive behavior or pseudoaddiction          12:13:56
8  requiring more opioids; opioid withdrawal can  12:13:59
9  be avoided by tapering; opioid doses can be    12:14:02
10  increased without limit of greater risk;       12:14:03
11  long-term opioid use includes functioning;     12:14:06
12  alternative forms of pain relief pose greater  12:14:10
13  risk than opioids; and new formulations of     12:14:11
14  certain opioids successfully deter abuse."     12:14:13
15        And you've been designated by     12:14:16
16  Mallinckrodt to provide testimony on          12:14:18
17  Topic Number 30, which means that you          12:14:20
18  prepared for this topic; is that correct?      12:14:23
19    A.   Correct.                    12:14:24
20    Q.   Okay. And in the course of     12:14:25
21  preparing for this topic, I believe you        12:14:26
22  previously testified that you spoke to your    12:14:29
23  counsel, but that you didn't review any        12:14:31
24  documents relating to this topic.              12:14:33
25        Is that also correct?            12:14:35

Page 132

1    A.   Well, I -- in the course of    12:14:36
2  meeting with counsel, we reviewed certain      12:14:39
3  documents, but I do not recall which           12:14:40
4  documents they were specifically.              12:14:42
5    Q.   Okay. And you don't recall      12:14:45
6  reviewing any documents relating to this       12:14:46
7  topic?                           12:14:49
8    A.   Nothing comes to mind.          12:14:50
9    Q.   So you didn't recall reviewing   12:14:52
10  any documents that were either studies or     12:14:53
11  that made reference to studies relating to    12:14:56
12  these statements identified in                12:14:59
13  Topic Number 30, do you?          12:15:01
14    A.   I'm not aware.                 12:15:03
15    Q.   Okay.                        12:15:04
16    A.   Or recall.                    12:15:04
17    Q.   Now, you didn't independently  12:15:05
18  undertake to -- sorry, strike that.            12:15:07
19        You didn't independently         12:15:10
20  attempt to locate documents relating to these  12:15:13
21  topics, including Topic 30, did you?          12:15:15
22    A.   You mean did I act on my own to  12:15:18
23  do that?                         12:15:20
24    Q.   Yes, you didn't undertake any    12:15:21
25  independent efforts to identify documents to   12:15:23

Page 133

1  review?                          12:15:24
2    A.   No.                          12:15:24
3    Q.   So you relied on your counsel    12:15:25
4  to provide you with the relevant documents?    12:15:26
5        MR. O'CONNOR: Objection.         12:15:29
6        But go ahead.                    12:15:31
7        THE WITNESS: Yes, the relevant   12:15:33
8  context.                         12:15:34
9  QUESTIONS BY MR. KAWAMOTO:                12:15:34
10    Q.   And so if there were documents    12:15:34
11  that related to Topic 30, for example,        12:15:36
12  documents that would provide the specific     12:15:38
13  basis for the various representations or      12:15:40
14  statements below, you would expect counsel to  12:15:42
15  have provided those to you; is that correct?  12:15:44
16        MR. O'CONNOR: Objection.         12:15:46
17        THE WITNESS: Yes, if they're      12:15:47
18  aware of them.                   12:15:50
19  QUESTIONS BY MR. KAWAMOTO:                12:16:00
20    Q.   Okay. Now, if I could direct     12:16:01
21  your attention back to Exhibit 16. I think    12:16:02
22  it's the Defeat Chronic Pain Now excerpt.     12:16:04
23        And it's page 176.              12:16:20
24        And this is a statement that      12:16:30
25  relates to the risk of addiction. It's,       12:16:32

Page 134

1    "When chronic pain patients take opioids to    12:16:34
2    treat their pain, they rarely develop a true    12:16:36
3    addiction and drug craving."    12:16:38
4        What is meant by a "true    12:16:41
5    addiction"?    12:16:43
6        A.   I'm sorry, where are you at on    12:16:44
7    this page?    12:16:46
8        Q.   Sure, it's page 176 and it's    12:16:47
9    the middle paragraph.    12:16:49
10       A.   When chronic -- sorry.    12:16:51
11       Q.   Yes.    12:16:52
12           The sentence reads, "When    12:16:52
13   chronic pain patients take opioids to treat    12:16:54
14   their pain, they rarely develop a true    12:16:56
15   addiction and drug craving."    12:16:58
16           Do you see that sentence?    12:17:00
17       A.   I do.    12:17:00
18       Q.   Okay.  What is meant by a "true    12:17:01
19   addiction"?    12:17:02
20       MR. O'CONNOR:  Objection.    12:17:03
21       THE WITNESS:  You know, I would    12:17:07
22   have to -- again, I'm not a clinician.    12:17:09
23   I would have to defer to a health care    12:17:10
24   professional regarding what is    12:17:13
25   considered a true addiction.    12:17:14

Page 135

1    QUESTIONS BY MR. KAWAMOTO:    12:17:18
2        Q.   Okay.    12:17:18
3        A.   So I...    12:17:18
4        So I would like now to cover    12:17:34
5    Topic Number 24.  And Topic Number 24 deals    12:17:50
6    with "all direct or indirect donations or    12:17:52
7    payments concerning opioids or opioid    12:17:55
8    products to lobbyists, persons or entities    12:17:57
9    named in the complaint or persons who    12:18:00
10   disseminated information about prescription    12:18:02
11   opioids to prescribers or the public on your    12:18:04
12   behalf and the identity of all persons    12:18:06
13   responsible for such donations or payments."    12:18:09
14           Are you familiar with the term    12:18:11
15   "KOL" or a "key opinion leader"?    12:18:15
16       A.   I am.    12:18:19
17       Q.   Did Mallinckrodt ever make    12:18:19
18   payments to KOLs?    12:18:21
19       A.   Yes.    12:18:22
20       Q.   Okay.  What were KOLs paid for?    12:18:23
21           Well, strike that.    12:18:28
22           Why did Mallinckrodt make    12:18:28
23   payments to KOLs?    12:18:30
24       MR. O'CONNOR:  Objection.    12:18:32
25       THE WITNESS:  We were asking    12:18:32

Page 136

1    that individual to take time out of    12:18:34
2    his or her schedule to -- either to    12:18:36
3    conduct an education seminar with    12:18:40
4    other physicians, to --    12:18:42
5        MR. GIORDANO:  Pardon me,    12:18:45
6    counsel, can you move the microphone?    12:18:48
7    The shuffling of papers...    12:18:56
8        THE WITNESS:  Okay.  We would    12:19:00
9    provide KOLs a rate that would    12:19:03
10   compensate them for taking time for    12:19:07
11   their -- either being out of their    12:19:10
12   practice or for their knowledge and    12:19:11
13   content, their experience of managing    12:19:15
14   pain.    12:19:17
15   QUESTIONS BY MR. KAWAMOTO:    12:19:17
16       Q.   So you paid KOLs for giving    12:19:18
17   seminars.    12:19:22
18           Did you ever pay them for doing    12:19:23
19   research?    12:19:25
20       A.   I'm not aware of any payments    12:19:26
21   to physicians for research, clinical    12:19:33
22   research.  All clinical research would have    12:19:38
23   been handled out of our medical affairs team,    12:19:40
24   and I would imagine -- I don't know how they    12:19:43
25   paid the researchers.  I don't know if a    12:19:44

Page 137

1    researcher is considered a KOL or not.    12:19:47
2        Q.   Okay.  Were KOLs ever paid for    12:19:49
3    writing articles?    12:19:53
4        A.   I'm not aware of any payments    12:19:54
5    to a KOL for writing an article.    12:20:00
6        Such as that would be a    12:20:02
7    clinical article?    12:20:03
8        Q.   Well, any type of article,    12:20:04
9    either a clinical article, an opinion piece,    12:20:06
10   a public policy statement.    12:20:08
11           Did Mallinckrodt ever pay a KOL    12:20:10
12   for writing something?    12:20:11
13       A.   I -- I'm not aware of any.  I    12:20:13
14   don't have any firsthand knowledge of paying    12:20:17
15   a KOL to write an article.    12:20:18
16       Q.   Okay.  What was the -- well,    12:20:20
17   let's take 2011.    12:20:24
18           What was the annual budget for    12:20:29
19   KOLs in 2011?    12:20:31
20       A.   I don't have -- I do not have    12:20:33
21   a -- that would have been paid for -- let's    12:20:39
22   see.    12:20:44
23           That budget would have probably    12:20:44
24   come out of our medical affairs team, and at    12:20:45
25   this time I don't know what that budget would    12:20:49

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  have been.                    12:20:51
2      Q.    Okay.  Are you aware of what    12:20:51
3  the KOL budget would have been for any of the  12:20:52
4  years at issue in this litigation, which I    12:20:56
5  believe is from 1995 to present?    12:20:58
6      A.    I have not seen any budget    12:21:01
7  numbers that we paid KOLs for what -- for    12:21:03
8  those time periods.    12:21:07
9      Q.    Okay.  Do you know if such a    12:21:09
10 record exists?    12:21:12
11         Well, strike that.    12:21:14
12         If I wanted to identify by year    12:21:14
13 the budget for KOLs, where would I look?    12:21:20
14     A.    Well, there would be a    12:21:24
15 financial transaction obviously.  There would  12:21:27
16 be a -- legal would have it.  We would have    12:21:32
17 that KOL under a contract.  And then    12:21:34
18 financial -- there would be a financial trail  12:21:40
19 as far as the -- the event and then what that  12:21:43
20 individual physician was paid, the amount.    12:21:46
21     Q.    Okay.  Was -- were these    12:21:49
22 expenditures also tracked on an aggregate    12:21:52
23 basis by Mallinckrodt?    12:21:54
24     A.    As far as the total to each    12:21:56
25 individual physician?    12:21:58

Page 139

1      Q.    Or the total overall.    12:21:59
2         So if I wanted to know what the   12:22:01
3  total payments to KOLs in, let's say, 2013    12:22:02
4  amounted to, where would I go to get that    12:22:07
5  information?    12:22:11
6      A.    The marketing team may --    12:22:11
7  generally is -- will have a -- an    12:22:13
8  understanding of -- when they lay out their    12:22:16
9  marketing campaign, they would itemize a line  12:22:19
10 item for budget, for KOLs, for speaker    12:22:24
11 programs.  That doesn't necessarily mean that  12:22:26
12 that was the amount that was actually paid,    12:22:29
13 though, to them.  They're -- they would be    12:22:31
14 putting money into a budget or to a    12:22:33
15 placeholder.    12:22:35
16     Q.    And as a 30(b)(6) designee for   12:22:36
17 this topic though, you're not aware of what    12:22:41
18 the aggregate payments were on a yearly basis  12:22:45
19 for KOLs, are you?    12:22:48
20     A.    No, I am not.    12:22:49
21         (Mallinckrodt-Webb Exhibit 21    12:23:36
22     marked for identification.)    12:23:36
23 QUESTIONS BY MR. KAWAMOTO:    12:23:37
24     Q.    Okay.  So I would like to    12:23:38
25 designate this as I think Exhibit 21.    12:23:38

Page 140

1         So this is a document, it's    12:24:23
2  Bates numbered MNK-T1_860223.  It appears to  12:24:25
3  be a document that was put together for    12:24:29
4  Mallinckrodt by APCO.    12:24:32
5      A.    Uh-huh, yes.    12:24:37
6      Q.    Who is APCO or what is APCO?    12:24:38
7      A.    I know -- I would have to refer  12:24:40
8  back to their acronym.  I'm looking for it    12:24:42
9  myself.  The -- they were in one of those    12:24:45
10 pieces, I believe, that we looked at earlier.  12:24:49
11     Q.    And what -- well, let me    12:24:52
12 rephrase that question.    12:24:54
13         What did APCO do for    12:24:55
14 Mallinckrodt?    12:24:56
15     A.    APCO would --    12:24:57
16         THE WITNESS:  First of all, can  12:25:00
17 I answer?    12:25:01
18         MR. O'CONNOR:  Yeah.    12:25:01
19         THE WITNESS:  APCO would be a   12:25:03
20 third-party group that would be    12:25:04
21 contracted out by our medical affairs    12:25:05
22 team to identify KOLs in the space of    12:25:07
23 this particular -- in this case, pain    12:25:12
24 management or organizations.    12:25:16
25

Page 141

1  QUESTIONS BY MR. KAWAMOTO:    12:25:18
2      Q.    And so these are all pain    12:25:19
3  management organizations that they've    12:25:20
4  identified; is that fair?    12:25:21
5         MR. O'CONNOR:  Objection.    12:25:23
6         THE WITNESS:  These would be    12:25:23
7  the known pain organizations that they    12:25:25
8  would have identified.    12:25:30
9  QUESTIONS BY MR. KAWAMOTO:    12:25:31
10     Q.    And do you know what criteria    12:25:32
11 APCO was using for these organizations, or    12:25:33
12 does it -- does it appear to be all of the    12:25:37
13 pain management organizations broken into    12:25:39
14 different categories?    12:25:41
15         MR. O'CONNOR:  Objection to    12:25:42
16 scope and to form.    12:25:44
17         THE WITNESS:  The -- APCO    12:25:46
18 would -- when someone is doing a KOL    12:25:51
19 mapping exercise, they would look at a    12:25:55
20 variety of pieces of information    12:25:57
21 available in the public domain, how    12:25:58
22 well-published, how often published,    12:26:00
23 where are they published, what their    12:26:03
24 affiliation is with any particular    12:26:05
25 institution, positions within any type    12:26:09

Page 142

1    of organizations.                    12:26:12
2         So what they're looking for are    12:26:12
3    physicians that would be thought        12:26:15
4    leaders in their respective fields.    12:26:16
5    QUESTIONS BY MR. KAWAMOTO:              12:26:20
6         Q.   And would these organizations    12:26:20
7    have been ones where Mallinckrodt could    12:26:22
8    become a member of the organization?    12:26:25
9         MR. O'CONNOR: Objection to       12:26:26
10   scope.                               12:26:27
11        THE WITNESS: Well, how would    12:26:28
12   you define "member of the           12:26:30
13   organization"?                      12:26:31
14   QUESTIONS BY MR. KAWAMOTO:              12:26:32
15        Q.   Well, are these -- are these    12:26:32
16   associations that Mallinckrodt could join?    12:26:37
17        MR. O'CONNOR: Objection.        12:26:38
18        THE WITNESS: Most of these      12:26:39
19   would be professional organizations,    12:26:41
20   so you would need a professional    12:26:44
21   designation to join as a member.    12:26:45
22   QUESTIONS BY MR. KAWAMOTO:              12:26:47
23        Q.   Okay. So taking a look at this    12:26:49
24   list, can you identify for me any    12:26:53
25   associations or organizations that    12:26:55

Page 143

1    Mallinckrodt would have joined?        12:26:57
2         A.   Well, I guess I need to       12:26:59
3    clarify. When you -- when you say "joined,"    12:27:06
4    as a member of that organization?    12:27:09
5         Q.   As a member.                 12:27:10
6         A.   As dues-paying member?       12:27:11
7         Q.   Yes, Mallinckrodt would not be    12:27:13
8    a dues-paying member of any of these    12:27:14
9    organizations?                      12:27:16
10        MR. O'CONNOR: Objection to       12:27:16
11   scope.                               12:27:18
12        THE WITNESS: Not as a -- not    12:27:18
13   as an organization.                 12:27:19
14   QUESTIONS BY MR. KAWAMOTO:              12:27:21
15        Q.   Okay. Do you know if        12:27:21
16   Mallinckrodt made payments to any of these    12:27:22
17   organizations?                      12:27:25
18        MR. O'CONNOR: Objection to       12:27:26
19   scope.                               12:27:28
20        THE WITNESS: Yes.               12:27:29
21   QUESTIONS BY MR. KAWAMOTO:              12:27:29
22        Q.   Okay. Could you please       12:27:30
23   identify for me which organizations that    12:27:32
24   Mallinckrodt made payments to?    12:27:35
25        A.   Uh-huh. I will identify those    12:27:36

Page 144

1    that I --                           12:27:42
2         MR. O'CONNOR: Objection to       12:27:42
3    scope.                               12:27:44
4         THE WITNESS: -- that I believe    12:27:44
5    we made payments to, but I can't speak    12:27:46
6    to the totality of it.              12:27:49
7    QUESTIONS BY MR. KAWAMOTO:              12:27:50
8         Q.   Uh-huh. Understood.         12:27:51
9         A.   Start by going down the list?    12:27:53
10        Q.   Yes.                        12:27:56
11        A.   Starting with patient       12:27:56
12   organizations?                      12:27:57
13        Q.   Yes, please.                12:27:58
14        A.   I'm not aware of the first one.    12:27:59
15   By right of the fact that we engaged an RPO    12:28:05
16   to do this, I assume we made a payment to    12:28:09
17   them.                               12:28:11
18        American Chronic Pain           12:28:12
19   Association. I would have to -- I would have    12:28:20
20   to verify that.                     12:28:21
21        American Pain Foundation, yes.    12:28:24
22        CLAAD, I would have to look      12:28:26
23   back. I would have to be refreshed on CLAAD.    12:28:35
24        CADCA, yes.                     12:28:37
25        The American Foundation -- I'm    12:28:39

Page 145

1    not familiar with the Drug Free America    12:28:44
2    Foundation.                         12:28:47
3         Interstitial Association, I'm    12:28:47
4    not familiar with that group.       12:28:52
5         Learn to Cope, I'm not familiar    12:28:54
6    with.                               12:28:56
7         The National Coalition Against    12:28:57
8    Prescription Drug Abuse, I'm not familiar    12:29:03
9    with that one.                      12:29:09
10        National Family Partnership,    12:29:10
11   I'm not familiar with.              12:29:12
12        Fibromyalgia and Chronic Pain    12:29:13
13   Association, I'm assuming that's one group,    12:29:17
14   I'm not familiar with them.         12:29:19
15        National Fibromyalgia          12:29:20
16   Association, I'm not familiar with.    12:29:23
17        National Hospice and Palliative    12:29:24
18   Care Association, I'm not familiar with them.    12:29:28
19        National Patient Safety        12:29:30
20   Foundation, yes, we did.            12:29:32
21        National Women's Health        12:29:33
22   Network, I'm not familiar with them.    12:29:37
23        Power of Pain Foundation, I'm    12:29:40
24   not familiar with.                  12:29:43
25        Project Lazarus, yes.           12:29:43

Page 146

1    Ryan's Cause, I'm not familiar    12:29:45
2  with.                              12:29:47
3    Save the Michaels of the World,   12:29:48
4  I'm not familiar with.              12:29:50
5    Society for Women's Health        12:29:51
6  Research, yes, we did.             12:29:54
7    Steve Rummler Hope Foundation,    12:29:55
8  I'm not familiar with.              12:29:59
9    The Partnership for Drug Free,    12:30:00
10 yes, we did.                       12:30:02
11    Triumph Over Pain Foundation,    12:30:03
12 I'm not familiar with.              12:30:07
13    US Pain Foundation, yes, we      12:30:07
14 did.                               12:30:10
15    Of the provider                  12:30:10
16 organizations --                   12:30:14
17    Q.  Well, actually, going back to  12:30:14
18 the patient organizations, for the ones  12:30:16
19 you've identified, can you -- well, what was  12:30:18
20 the payment amount?                 12:30:21
21    MR. O'CONNOR: Objection to --    12:30:23
22 objection to scope.                12:30:25
23    Are you still on Topic 24?       12:30:26
24 This appears to be outside the scope  12:30:29
25 of that, and just a bit ago you     12:30:30

Page 147

1  identified it.                     12:30:34
2    MR. KAWAMOTO: Okay. I think      12:31:43
3  this falls within Topics 24 and 25 at  12:31:43
4  a minimum. So, I mean --            12:31:52
5    MR. O'CONNOR: By 24 are you      12:31:54
6  refer -- which A, B are you         12:31:56
7  referring -- just help me out here, A,  12:31:59
8  B or C? Which?                     12:32:01
9    MR. KAWAMOTO: Well, I think it    12:32:04
10 would fall under either -- I mean,   12:32:04
11 some of these may be persons or      12:32:05
12 entities named in the complaint, but I  12:32:07
13 think it's person who disseminated   12:32:07
14 information about prescription opioids  12:32:09
15 to prescribers or the public on your  12:32:10
16 behalf and the identity of all persons  12:32:12
17 responsible for such donations or    12:32:14
18 payments. So I would --             12:32:16
19    MR. O'CONNOR: On our behalf,     12:32:19
20 I'll focus there and I'll take a look  12:32:21
21 at 25 as you go on, but I think you're  12:32:23
22 outside 24, and I'll take a look here  12:32:25
23 at 25. Lobbying efforts, governmental  12:32:33
24 affairs, okay.                     12:32:36
25    All right. Why don't you go      12:32:40

Page 148

1  ahead.                             12:32:42
2  QUESTIONS BY MR. KAWAMOTO:          12:32:44
3    Q.  And so can you -- for the     12:32:44
4  organizations you've identified, how much  12:32:46
5  money did you give them?            12:32:49
6    MR. O'CONNOR: Objection to       12:32:51
7  scope.                             12:32:53
8    THE WITNESS: I would have to      12:32:53
9  review the financial documents.     12:32:56
10 QUESTIONS BY MR. KAWAMOTO:          12:32:58
11    Q.  And what documents would those  12:32:58
12 be?                                12:33:00
13    A.  Well, those would be the budget  12:33:00
14 documents that we discussed earlier, the fact  12:33:04
15 that we would have identified a group that we  12:33:07
16 would -- as we laid out our budget, and then  12:33:09
17 also look at then the -- through finance what  12:33:12
18 actually -- what groups we actually funded.  12:33:15
19    Q.  And so if I wanted to see the  12:33:17
20 overall spend on patient organizations for  12:33:19
21 any given year, let's say 2012, where would I  12:33:22
22 go to find that information?         12:33:26
23    MR. O'CONNOR: Objection.         12:33:27
24 Scope.                             12:33:28
25    THE WITNESS: Finance, our         12:33:28

Page 149

1  finance department. They would have  12:33:32
2  an accurate.                       12:33:38
3  QUESTIONS BY MR. KAWAMOTO:          12:33:39
4    Q.  And would these records        12:33:39
5  identify the aggregate amount?      12:33:41
6    MR. O'CONNOR: Objection.         12:33:42
7    THE WITNESS: For the year?        12:33:43
8  QUESTIONS BY MR. KAWAMOTO:          12:33:46
9    Q.  Yes, for the year.            12:33:46
10    A.  They would show a line item    12:33:47
11 payment and an aggregate total.      12:33:50
12    Q.  Okay. And they would also     12:33:51
13 break it down by group as well; is that  12:33:52
14 correct?                           12:33:54
15    MR. O'CONNOR: Objection.         12:33:54
16 QUESTIONS BY MR. KAWAMOTO:          12:33:54
17    Q.  Is that your understanding?   12:33:55
18    A.  That would be my understanding,  12:33:56
19 correct.                           12:33:57
20    Q.  But as you sit here today, you  12:33:58
21 don't have that information available to you?  12:34:01
22    A.  No, I do not have that         12:34:05
23 information in front of me.          12:34:07
24    Q.  Okay. And so essentially the   12:34:11
25 same inquiry for the provider organizations,  12:34:19

Page 150

1　can you identify which of these you provided　12:34:22
2　funds to?　12:34:24
3　　　　MR. O'CONNOR: Objection.　12:34:28
4　Scope.　12:34:29
5　　　　THE WITNESS: The Academy of　12:34:29
6　Managed Care Pharmacy, I'm not　12:34:36
7　familiar with.　12:34:37
8　　　　American Academy of Family　12:34:37
9　Physicians, yes.　12:34:40
10　　　　American Academy of Family　12:34:41
11　Surgeons, I'm not familiar with or　12:34:44
12　unknown.　12:34:46
13　　　　The American Academy -- do you　12:34:47
14　want me just go through the ones　12:34:49
15　identified or do you want me to read　12:34:51
16　them to say yes or no?　12:34:52
17　QUESTIONS BY MR. KAWAMOTO:　12:34:53
18　　Q.　Just the ones you can identify.　12:34:54
19　　A.　Okay.　12:34:55
20　　　　The American -- number 7, the　12:34:57
21　American Academy of Nurse Anesthetists.　12:35:04
22　　Q.　Okay.　12:35:09
23　　A.　Number 9, American Academy of　12:35:09
24　Pain Management.　12:35:11
25　　　　Number 10, the American Academy　12:35:11

Page 151

1　of Pain Medicine.　12:35:15
2　　　　Number 11, the American Academy　12:35:15
3　of Physical Medicine and Rehabilitation.　12:35:24
4　　　　Number 13, the American College　12:35:24
5　of Emergency Room Physicians.　12:35:34
6　　　　Number 18, the American Medical　12:35:34
7　Association.　12:35:48
8　　　　Number 22, the American Pain　12:35:48
9　Society.　12:36:02
10　　　　Number 24, the American Society　12:36:02
11　for Pain Management Nursing.　12:36:10
12　　　　Number 25, American Society of　12:36:10
13　Addiction Medicine.　12:36:14
14　　　　Number 29, the American Society　12:36:15
15　of Pain Educators.　12:36:30
16　　　　The Inter -- number 33, the　12:36:30
17　International Association for the Study of　12:36:45
18　Pain.　12:36:45
19　　　　Number 38, the Pharmaceutical　12:36:48
20　Research and Manufacturers of America.　12:37:03
21　　　　That's all that I'm familiar　12:37:07
22　with.　12:37:09
23　　Q.　And I take it, as with the　12:37:09
24　previous list, you don't have any -- any　12:37:10
25　recollection of the amounts or time period,　12:37:15

Page 152

1　but the finance department would have that?　12:37:17
2　　　　MR. O'CONNOR: Objection to　12:37:19
3　form and scope.　12:37:21
4　　　　THE WITNESS: I would have to　12:37:21
5　defer to them.　12:37:23
6　QUESTIONS BY MR. KAWAMOTO:　12:37:23
7　　Q.　Then what about the academic　12:37:27
8　research institutions?　12:37:29
9　　　　MR. O'CONNOR: Objection.　12:37:30
10　　　　THE WITNESS: I'm not familiar　12:37:34
11　with any of those groups.　12:37:45
12　QUESTIONS BY MR. KAWAMOTO:　12:37:47
13　　Q.　And then what about the　12:37:48
14　government agencies or organizations?　12:37:50
15　　　　MR. O'CONNOR: Objection. Form　12:37:52
16　and scope.　12:37:54
17　　　　THE WITNESS: Number 7,　12:37:55
18　National Association of Drug Diversion　12:38:06
19　Investigators.　12:38:07
20　　　　That's all.　12:38:07
21　　　　MR. KAWAMOTO: Okay. Thank　12:38:13
22　you.　12:38:13
23　　　　So why don't we take a break　12:38:14
24　for lunch, and then I'll see how much　12:38:17
25　additional questions I have after　12:38:23

Page 153

1　that.　12:38:24
2　　　　VIDEOGRAPHER: We're going off　12:38:26
3　the record at 12:38 p.m.　12:38:27
4　　　　(Off the record at 12:38 p.m.)　12:38:29
5　　　　VIDEOGRAPHER: We are back on　13:35:42
6　the record at 1:35 p.m.　13:35:47
7　QUESTIONS BY MR. KAWAMOTO:　13:35:48
8　　Q.　So, Mr. Webb, I would like to　13:35:49
9　turn to Topic 32, which is "your coordination　13:35:54
10　or communications with any defendant in this　13:35:56
11　action, including, but not limited to, your　13:35:58
12　participation in any industry groups or　13:36:01
13　professional societies or any defendant in　13:36:02
14　this matter is a member relating or --　13:36:04
15　relating or referring to pain care, the sale　13:36:06
16　of opioids, the marketing or promotion of　13:36:09
17　opioids, regulations, rules or laws affecting　13:36:12
18　the sale, promotion and marketing of opioids　13:36:16
19　and the potential for abuse and diversion of　13:36:19
20　opioids."　13:36:21
21　　　　And within that topic, I would　13:36:22
22　like to focus on the Anti-Diversion Industry　13:36:23
23　Working Group.　13:36:27
24　　　　Are you familiar with that　13:36:27
25　entity or that group?　13:36:30

Page 154

1    A.   I have a working knowledge of    13:36:32
2   that group.                            13:36:35
3    Q.   Okay.  And what is that working   13:36:35
4   knowledge?                             13:36:37
5    A.   That it's a working group         13:36:37
6   that -- of third party -- do you want me to   13:36:40
7   keep talking?                          13:36:53
8    Q.   Thanks.                          13:37:04
9    A.   It's a group of organizations     13:37:04
10  come together, Mallinckrodt being one of    13:37:06
11  them -- I want to say that one of the       13:37:08
12  wholesalers, I believe AmerisourceBergen,   13:37:12
13  part of it as well -- that looked at trying   13:37:14
14  to understand how the industry can help     13:37:17
15  prevent diversion from occurring.       13:37:21
16   Q.   And what did that group end       13:37:23
17  up -- what concrete steps did that group end   13:37:26
18  up taking to attempt to reduce diversion?   13:37:29
19   A.   One of the -- one of the          13:37:32
20  deliverables that came out of that working   13:37:35
21  group was a product called a Red Flags video,   13:37:36
22  and that Red Flags video was then used with   13:37:41
23  retail -- designed to be used with retail   13:37:45
24  pharmacists or to show to retail pharmacists   13:37:48
25  to help educate pharmacists on red flags or   13:37:50

Page 155

1   warning signs that they should look for if   13:37:54
2   they suspect or want -- or think that a   13:37:56
3   patient may be a drug seeker or who may be in   13:37:58
4   front of the pharmacy and have maybe a   13:38:02
5   fraudulent prescription, how do identify   13:38:05
6   those patients, individuals.           13:38:06
7    Q.   And other than that video, were   13:38:07
8   there any other deliverables?          13:38:11
9    A.   That's the only deliverable I'm   13:38:12
10  aware.  I'm not saying that there were not   13:38:14
11  others, but I don't know what else came out   13:38:17
12  of that group.                         13:38:18
13   Q.   Okay.  And based on your         13:38:18
14  preparation for this topic, is one of the   13:38:19
15  things or one of the -- one of the -- one of   13:38:22
16  the things you reviewed this Anti-Diversion   13:38:26
17  Industry Working Group?                13:38:32
18   A.   We -- well, we did not            13:38:32
19  specifically discuss that with counsel.  I   13:38:35
20  mean, other than --                    13:38:37
21      THE WITNESS:  I'm sorry.           13:38:39
22      MR. O'CONNOR:  Yeah, just          13:38:39
23   direct you not to reveal              13:38:40
24   communications with counsel, but,     13:38:42
25   yeah, go ahead.                       13:38:44

Page 156

1   QUESTIONS BY MR. KAWAMOTO:             13:38:45
2    Q.   But it's your understanding and   13:38:45
3   based on a reasonable inquiry, that other   13:38:47
4   than this Red Flags video, you're not aware   13:38:50
5   of any other deliverables that this -- this   13:38:52
6   group ever produced?                   13:38:54
7      MR. O'CONNOR:  Objection.           13:38:57
8      But you can answer.                 13:38:58
9      THE WITNESS:  I am aware that       13:39:02
10   that video took a lot of coordination   13:39:04
11   to produce and to put together and    13:39:05
12   disseminate, but I'm not aware of what   13:39:07
13   else may have come out of that group.   13:39:10
14  QUESTIONS BY MR. KAWAMOTO:             13:39:11
15   Q.   Okay.  And how long -- is that   13:39:12
16  group still in existence?              13:39:13
17   A.   I do not know if that -- my      13:39:14
18  understanding is that group still is, but I'm   13:39:19
19  not sure if they're still meeting, though.   13:39:20
20   Q.   Okay.  And do you recall        13:39:22
21  roughly how long or how much time it took to   13:39:23
22  create this video?                     13:39:26
23   A.   No, I do not know.  That video   13:39:27
24  was -- that video was put together -- no, I   13:39:32
25  do not know.                           13:39:39

Page 157

1    Q.   Okay.  Do you have any sense of   13:39:39
2   how much it cost to create the video?   13:39:41
3    A.   No, I do not.                    13:39:44
4      MR. KAWAMOTO:  Okay.  Nothing       13:39:49
5   further.                               13:39:51
6      MR. O'CONNOR:  Okay.               13:39:52
7      VIDEOGRAPHER:  We're going off      13:39:54
8   the record at 1:39 p.m.                13:39:55
9      (Off the record at 1:39 p.m.)       13:39:58
10      VIDEOGRAPHER:  We're back on       13:41:42
11   the record at 1:41 p.m.               13:41:49
12      CROSS-EXAMINATION               13:41:51
13  QUESTIONS BY MR. KELLY:                13:41:52
14   Q.   Good afternoon, Mr. Webb.  My   13:41:53
15  name is Seamus Kelly.  I'm representing   13:41:54
16  plaintiffs in the Tennessee lawsuits that   13:41:56
17  have been cross-noticed in this deposition.   13:41:58
18      MR. KELLY:  As laid out in our     13:42:01
19   previous deposition records where     13:42:02
20   we've been cross-noticed, I would     13:42:04
21   first like to object to the deposition   13:42:06
22   on behalf of our clients due to       13:42:08
23   Mallinckrodt's failures to comply with   13:42:09
24   the state and federal cooperation     13:42:11
25   protocol.                             13:42:14

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    MR. O'CONNOR: I -- we disagree    13:42:17
2    with that assertion, but you can go    13:42:20
3    ahead.    13:42:24
4    MR. KELLY: Thank you.    13:42:24
5    QUESTIONS BY MR. KELLY:    13:42:25
6    Q.    Mr. Webb, did you do any    13:42:29
7    specific preparation based on a separate    13:42:32
8    lawsuit in Tennessee?    13:42:34
9    A.    No.    13:42:35
10    Q.    Okay. Looking back on your    13:42:38
11    testimony today, there were several times    13:42:43
12    where it was specified that certain materials    13:42:46
13    would have been distributed in Ohio.    13:42:50
14    Would you say the same for    13:42:54
15    Tennessee?    13:42:56
16    MR. O'CONNOR: Objection.    13:42:56
17    THE WITNESS: I would say that    13:42:58
18    the material was available for    13:43:02
19    national distribution, but to say    13:43:04
20    whether material went to Ohio or    13:43:06
21    Tennessee, I have no knowledge that it    13:43:08
22    would not.    13:43:10
23    QUESTIONS BY MR. KELLY:    13:43:13
24    Q.    Okay. Looking at Topic 2, "the    13:43:14
25    role of wholesalers, distributors and    13:43:19

Page 159

1    pharmacies, including, but not limited to,    13:43:21
2    defendants in the supply chain for your    13:43:26
3    opioid products and the responsibilities of    13:43:28
4    each with respect to marketing, sales and    13:43:30
5    supply," did Mallinckrodt's generics detail    13:43:32
6    pharmacies in Tennessee?    13:43:40
7    MR. O'CONNOR: Objection to the    13:43:44
8    form.    13:43:46
9    THE WITNESS: I'm not aware of    13:43:47
10    our generics team detailing --    13:43:48
11    specifically detailing pharmacists in    13:43:51
12    Tennessee.    13:43:53
13    QUESTIONS BY MR. KELLY:    13:43:53
14    Q.    Okay. Are you aware of them    13:43:54
15    detailing pharmacies in general?    13:43:56
16    A.    No.    13:43:58
17    Q.    And are you aware of    13:43:59
18    Mallinckrodt detailing pharmacies regarding    13:44:03
19    branded opioid products?    13:44:06
20    A.    The -- for a period there, and    13:44:09
21    I don't know what time it was, but    13:44:12
22    pharmacists were included in our call plan as    13:44:15
23    far as stocking with our branded sales force.    13:44:20
24    Q.    And with Topic 3, specifically    13:44:22
25    "warning letters sent to you by the FDA and    13:44:30

Page 160

1    any other communications between you and the    13:44:33
2    FDA regarding your marketing of your opioid    13:44:35
3    products, your response to these letters, all    13:44:38
4    subsequent actions you took in response to    13:44:41
5    those communications and all budgets for any    13:44:43
6    such actions by year," was -- were any of    13:44:45
7    these budgets state specific?    13:44:49
8    A.    I'm not aware of any letters    13:44:51
9    from the FDA regarding a specific state.    13:44:56
10    Q.    Okay. But the question is were    13:44:59
11    budgets -- budget -- or responses to FDA    13:45:04
12    letters, were there budgets that were state    13:45:09
13    specific?    13:45:11
14    A.    No.    13:45:12
15    Q.    Regarding Topic 8, and this,    13:45:13
16    again, is "actions taken by Mallinckrodt    13:45:32
17    after the CDC declared an opioid epidemic in    13:45:34
18    2011," were there changes to Mallinckrodt's    13:45:37
19    opioid allocations in Tennessee?    13:45:43
20    A.    Not to my knowledge.    13:45:46
21    Q.    Did Mallinckrodt do anything    13:45:47
22    differently in Tennessee after the CDC    13:45:51
23    declared an opioid epidemic?    13:45:53
24    MR. O'CONNOR: Objection.    13:45:55
25    THE WITNESS: No.    13:45:56

Page 161

1    QUESTIONS BY MR. KELLY:    13:45:59
2    Q.    Did Mallinckrodt have an    13:46:01
3    initiative to distribute bags for opioid    13:46:02
4    disposal?    13:46:04
5    A.    We did. Our medication    13:46:05
6    disposal pouch initiative.    13:46:09
7    Q.    And do you recall Tennessee    13:46:10
8    being included in that?    13:46:12
9    MR. O'CONNOR: Objection.    13:46:17
10    But go ahead.    13:46:17
11    THE WITNESS: I'm not -- I do    13:46:18
12    not specifically recall if Tennessee    13:46:21
13    was or was not included or excluded.    13:46:22
14    We did several national programs,    13:46:26
15    though, with retail pharmacies, and    13:46:29
16    they may have been, through their    13:46:31
17    distribution network, had bags    13:46:33
18    distributed to Tennessee.    13:46:34
19    (Mallinckrodt-Webb Exhibit 22    13:46:38
20    marked for identification.)    13:46:38
21    QUESTIONS BY MR. KELLY:    13:46:38
22    Q.    This is Exhibit 22, and it's    13:46:46
23    Bates stamped MNK_TNSTA04423166.    13:46:47
24    A.    Uh-huh. Okay.    13:47:02
25    Q.    Does that refresh your memory?    13:47:34

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    A.   I'm familiar with this, yes.   13:47:36
2    Q.   Okay.  So it -- is it correct   13:47:37
3  that Tennessee was a priority state for this   13:47:42
4  bag initiative?   13:47:45
5    A.   The -- well, the intent was to   13:47:46
6  distribute bags.  These are the medication   13:47:51
7  disposal pouches that were made available to   13:47:54
8  patients to neutralize and chemically --   13:47:57
9  chemically neutralize and then safely dispose   13:48:00
10  and get rid of unwanted or unused   13:48:02
11  medications, opioids, from their home.   13:48:05
12       This program was in   13:48:07
13  collaboration with Good Neighbor pharmacies.   13:48:09
14  Good Neighbor pharmacies provided us a list   13:48:13
15  of where their pharmacies were.  We wanted to   13:48:15
16  specifically provide pouches to what we would   13:48:19
17  consider the Appalachian area.  This was an   13:48:23
18  attempt to identify what states might be   13:48:28
19  within that geographical area.   13:48:30
20    Q.   All right.  And looking   13:48:32
21  specifically at your response at the top of   13:48:36
22  this e-mail --   13:48:38
23    A.   Uh-huh.   13:48:39
24    Q.   -- is it accurate to say that   13:48:39
25  you were highlighting the Appalachian region   13:48:43

Page 163

1  for this initiative?   13:48:46
2       MR. O'CONNOR:  Objection.   13:48:47
3  Speaks for itself.  Form.   13:48:49
4       THE WITNESS:  We wanted to put   13:48:50
5    the pouches into communities and   13:48:53
6    states we thought would have the   13:48:55
7    greatest value.   13:48:56
8  QUESTIONS BY MR. KELLY:   13:48:57
9    Q.   Okay.  And what is your   13:48:57
10  understand -- what is the Appalachian region?   13:48:59
11    A.   Well, it's defined as   13:49:02
12  obviously -- well, those states that are --   13:49:04
13  in which the Appalachian mountains run   13:49:07
14  through.   13:49:12
15    Q.   Okay.  And at this time you   13:49:12
16  were targeting those states for this   13:49:14
17  initiative?   13:49:15
18    A.   For this initiative, partnering   13:49:18
19  through the Good Neighbor pharmacies.  We   13:49:20
20  wanted to try to get as many pouches into   13:49:23
21  these states as we could, through Good   13:49:25
22  Neighbor pharmacies, though.   13:49:31
23    Q.   And why was Ohio not a priority   13:49:32
24  state?   13:49:35
25    A.   It's not that --   13:49:36

Page 164

1       MR. O'CONNOR:  Objection.   13:49:37
2       But go ahead.   13:49:37
3       THE WITNESS:  It's not that it   13:49:38
4    wasn't a priority state.  We already   13:49:40
5    had a pouch event or several -- at   13:49:42
6    least two pouch events already taking   13:49:44
7    place in Ohio, particularly Summit   13:49:46
8    County, through partnership with   13:49:49
9    community leaders.  So we wanted to --   13:49:51
10    an attempt to make as many pouches   13:49:55
11    available in places around the country   13:49:57
12    as we could without putting too many   13:49:58
13    into one particular area.   13:50:00
14  QUESTIONS BY MR. KELLY:   13:50:04
15    Q.   But the focus was on the   13:50:04
16  Appalachia?   13:50:06
17    A.   For this particular campaign,   13:50:07
18  yes, but we had distributed over 2 million   13:50:09
19  pouches, so we wanted to hold -- through our   13:50:12
20  entire campaign, so we wanted to make sure   13:50:17
21  that we could be a value to as many states as   13:50:19
22  we could.   13:50:23
23       These were donated free of   13:50:23
24  charge, by the way.   13:50:26
25    Q.   So -- strike that.   13:50:27

Page 165

1       (Mallinckrodt-Webb Exhibit 23   13:50:31
2    marked for identification.)   13:50:32
3  QUESTIONS BY MR. KELLY:   13:50:32
4    Q.   I'm going to hand you another   13:50:32
5  exhibit.  This is Exhibit 23.   13:50:33
6       And Exhibit 23 is Bates stamped   13:50:42
7  MNK_TNSTA00198469, with an attachment that is   13:50:47
8  MNK_TNSTA00198470.   13:50:58
9    A.   Okay.  I'm familiar.   13:52:40
10    Q.   Okay.  Thanks.   13:52:41
11       I would like you to look at   13:52:42
12  page 5 of the attachment.   13:52:44
13    A.   Okay.   13:52:50
14    Q.   If you could read point   13:52:51
15  number 2 for me?   13:52:56
16    A.   Point number 2, "Target 19   13:52:57
17  states with an asterisk that currently do not   13:53:01
18  include methadone as a covered medication   13:53:05
19  treatment option to ensure SUD, which is   13:53:07
20  substance use disorder, patients have access   13:53:12
21  to a full range of effective medications, in   13:53:15
22  parentheses, purple states."   13:53:17
23    Q.   Okay.  In looking to the map to   13:53:18
24  the right, which -- do you see that Tennessee   13:53:21
25  is indicated to be one of those states that   13:53:27

Page 166

1    two or few are covered?                13:53:29
2        A.   Correct.                       13:53:33
3        Q.   And what do you understand that  13:53:33
4    to mean?                                13:53:34
5        A.   This -- this map was provided   13:53:35
6    by the National Drug Abuse Treatment System  13:53:37
7    survey data as far as patients who have a  13:53:40
8    substance use disorder access to addiction  13:53:48
9    treatment, clinics, there are three-FDA   13:53:51
10   approved medications, Vivitrol is their   13:53:54
11   tradename, Suboxone and methadone or      13:53:58
12   Methadose.                              13:54:02
13          Those states that are in         13:54:03
14   purple, our understanding is that they   13:54:04
15   have -- patients who have a substance abuse  13:54:06
16   disorder have access to only two or fewer MAT  13:54:08
17   medications to treat.                   13:54:13
18       Q.   Okay.  So would that make       13:54:14
19   Tennessee one of the 19 targeted states?  13:54:16
20       A.   It was identified as a state,   13:54:19
21   correct.                                13:54:21
22       Q.   Okay.                          13:54:22
23       A.   But doesn't mean that we acted  13:54:22
24   on anything in Tennessee.               13:54:24
25       Q.   And if you turn to page 16?     13:54:32

Page 167

1        A.   Okay.                          13:54:46
2        Q.   Do you know why Tennessee was    13:54:46
3    not one of the ten states targeted?     13:54:50
4        A.   The -- recognize --            13:54:53
5           THE WITNESS:  Can I go ahead?     13:54:56
6           MR. O'CONNOR:  Yeah, objection,   13:54:58
7    scope.                                  13:54:59
8           But you can go ahead.            13:54:59
9           THE WITNESS:  Recognizing         13:55:00
10   that -- but for sake of clarification,   13:55:07
11   we were not able to engage in any        13:55:09
12   states, so this is a plan.  This was a   13:55:11
13   plan that we had identified.  Our        13:55:14
14   efforts for addiction treatment were     13:55:17
15   placed at a federal level.              13:55:19
16          But these ten states, we had     13:55:20
17   contract counsel in these states, so     13:55:24
18   this was a legislative approach to       13:55:26
19   eliminate barriers to treatment that     13:55:28
20   the state may or may not have had in     13:55:30
21   place and we needed to do more           13:55:32
22   diligence on, we would have needed       13:55:34
23   help through contract counsel or         13:55:36
24   lobbyists, and these were the states     13:55:39
25   that we had, for the most part,          13:55:41

Page 168

1        contract lobbyists and lobbyists in.  13:55:43
2    QUESTIONS BY MR. KELLY:                 13:55:45
3        Q.   All right.  So at this point    13:55:45
4    there was no longer a focus on Appalachia?  13:55:46
5           MR. O'CONNOR:  Objection.         13:55:49
6    Scope.                                  13:55:50
7           THE WITNESS:  No, I think         13:55:51
8    what -- you're conflating the two        13:55:52
9    initiatives.                            13:55:55
10          We had a medication pouch         13:55:56
11   disposal initiative, which was in        13:55:57
12   partnership with communities to help     13:56:00
13   rid homes who have unused opioids and    13:56:02
14   to keep them from being misused or       13:56:07
15   diverted, to safely dispose of them,     13:56:09
16   they were chemically neutralized.  So    13:56:11
17   we were purchasing pouches through       13:56:14
18   another third-party group, another       13:56:16
19   manufacturer, and then donating them     13:56:18
20   to community groups.  That was the       13:56:19
21   Appalachia effort that we were working   13:56:21
22   with Good Neighbor pharmacies.           13:56:23
23          This particular initiative that  13:56:25
24   we're referring to was states that we    13:56:28
25   have identified or made -- we were       13:56:29

Page 169

1    made aware of through the federal        13:56:31
2    government that had barriers to access   13:56:32
3    of getting people into treatment who     13:56:35
4    had a substance abuse disorder.  We      13:56:37
5    were working collaboratively to          13:56:39
6    identify where and what those barriers   13:56:40
7    were and how we can help remove them     13:56:42
8    to expand treatment.                    13:56:44
9    QUESTIONS BY MR. KELLY:                 13:56:46
10       Q.   I would like to move to         13:57:00
11   Topic 24.  And earlier you were discussing  13:57:01
12   speaker series.                         13:57:20
13          I'm going to pass you an          13:57:24
14   exhibit.                                13:57:26
15          (Mallinckrodt-Webb Exhibit 24    13:57:27
16   marked for identification.)             13:57:27
17   QUESTIONS BY MR. KELLY:                 13:57:27
18       Q.   And this is Exhibit 24.  It is  13:57:39
19   MNK_TNSTA00184173.                      13:57:42
20          And I will -- I'll let you know   13:57:56
21   that we did slightly modify this spreadsheet  13:57:59
22   that was in your custodial file where it just  13:58:02
23   excludes all states except for Tennessee.  13:58:05
24          And were documents such as this  13:58:27
25   used for tracking speaker series?        13:58:29

Page 170

1    MR. O'CONNOR: Objection to    13:58:33
2  scope.                          13:58:34
3    THE WITNESS: We would -- I    13:58:40
4  can't speak to this particular  13:58:41
5  document, but documents that we would  13:58:42
6  have -- any time a speaker -- a  13:58:45
7  speaker event was taking place, as  13:58:46
8  part of the PhRMA guidelines, we were  13:58:49
9  required to track and identify, excuse  13:58:52
10 me, which -- for the Sunshine    13:58:54
11 reporting, which physicians or health  13:58:56
12 care providers attended. So there  13:58:58
13 would be a sign-in sheet.        13:58:59
14 QUESTIONS BY MR. KELLY:          13:59:00
15   Q.   And were there ever       13:59:05
16 nonprescribers that would attend these  13:59:07
17 meetings?                       13:59:09
18   A.   Well, I'm not saying that they  13:59:09
19 were never. Sometimes a physician would  13:59:14
20 bring his or her nurse. But we -- at the  13:59:16
21 time of making the education material or  13:59:21
22 program available, we would state that this  13:59:24
23 was for health care professionals or  13:59:27
24 physicians only.                13:59:29
25   (Mallinckrodt-Webb Exhibit 25  13:59:31

Page 171

1  marked for identification.)      13:59:32
2  QUESTIONS BY MR. KELLY:          13:59:32
3    Q.   Okay. I'm going to pass you  13:59:33
4  what will be marked Exhibit 25. This exhibit  13:59:36
5  is Bates number MNK_TNSTA00184232.  13:59:50
6    And similarly, this is another  13:59:59
7  spreadsheet from your custodial file that  14:00:13
8  we've modified to the extent that we excluded  14:00:16
9  any states that were not Tennessee.  14:00:18
10   A.   Okay.                     14:00:26
11   Q.   And are these documents that  14:00:28
12 are normally kept in the course of  14:00:31
13 Mallinckrodt's business of scheduling speaker  14:00:33
14 series?                         14:00:36
15   A.   This would be a tracking tool,  14:00:36
16 yes, that we would -- this would be a  14:00:38
17 tracking tool that we would use internally to  14:00:43
18 identify which events were taking place in  14:00:46
19 which state by which representative.  14:00:49
20   Q.   Okay. And looking at column O,  14:00:52
21 it's labeled HONR.               14:00:58
22   To your understanding, is that  14:01:02
23 an honorarium?                  14:01:04
24   A.   That would be my interpretation  14:01:06
25 of it, correct.                 14:01:08

Page 172

1    Q.   Okay. What is an outcome    14:01:10
2  study?                          14:01:29
3    A.   Can you use it in the context  14:01:29
4  of -- a specific example?        14:01:34
5    (Mallinckrodt-Webb Exhibit 26  14:01:38
6  marked for identification.)      14:01:39
7  QUESTIONS BY MR. KELLY:          14:01:39
8    Q.   Sure, I can pass you what will  14:01:39
9  be Exhibit 26, which is MNK-T1_0006524864.  14:01:41
10   MR. O'CONNOR: Are you still on  14:02:03
11 Topic 24?                       14:02:04
12   MR. KELLY: I am, yes.          14:02:05
13   THE WITNESS: Okay.            14:02:08
14 QUESTIONS BY MR. KELLY:          14:02:40
15   Q.   And the question I had asked  14:02:41
16 you is what is an outcome study?  14:02:42
17   THE WITNESS: Go ahead.        14:02:45
18   MR. O'CONNOR: Yeah.           14:02:46
19   THE WITNESS: The intent of an  14:02:46
20 outcome study is to determine whether  14:02:48
21 we -- to measure whether we accomplish  14:02:49
22 a result or not.                14:02:52
23 QUESTIONS BY MR. KELLY:          14:02:53
24   Q.   Okay. And here you're seeking  14:02:54
25 someone for an outcome study to determine  14:02:58

Page 173

1  what causes a change in patient's behavior to  14:03:00
2  dispose of unused or unneeded prescription  14:03:03
3  opioids?                        14:03:06
4    MR. O'CONNOR: Objection to the  14:03:06
5  scope.                          14:03:08
6    THE WITNESS: Correct. Yeah.   14:03:09
7    This study, when we were        14:03:11
8  looking through our medication pouch  14:03:15
9  disposal initiative, again, to go into  14:03:18
10 patients' homes to dispose of unused  14:03:20
11 medications, we tried to understand,  14:03:22
12 through messaging, what we would say  14:03:25
13 when these pouches would be        14:03:27
14 distributed through community events  14:03:28
15 to what would actually cause a patient  14:03:30
16 to willing dispose of their unused  14:03:32
17 opioids so that we could be more  14:03:35
18 effective in how these pouches would  14:03:37
19 be used.                        14:03:40
20 QUESTIONS BY MR. KELLY:          14:03:40
21   Q.   And did Mallinckrodt pay  14:03:41
22 researchers for such a study?    14:03:44
23   A.   We -- there were times that we  14:03:45
24 did, yes, pay researchers for studies in the  14:03:47
25 interest of understanding patient outcomes  14:03:51

Page 174

1  and whether they're using them or not.   14:03:54
2      Q.   What is the Alliance for   14:03:56
3  Balanced Pain Management?   14:04:00
4          MR. O'CONNOR: Objection.   14:04:00
5  Scope.   14:04:03
6          THE WITNESS: The Alliance for   14:04:07
7  Balanced Pain Management is an   14:04:09
8  organization or a coalition that was   14:04:09
9  developed by Mallinckrodt in full   14:04:11
10 disclosure with all the participants   14:04:13
11 of stakeholder or patient groups that   14:04:16
12 have come together to identify ways in   14:04:20
13 which we could expand access to a   14:04:25
14 multimodal approach to pain as opposed   14:04:28
15 to having to rely on opioids and how   14:04:32
16 do we advance patient safety to   14:04:34
17 dispose of unused opioids in the home   14:04:36
18 once they're prescribed.   14:04:38
19 QUESTIONS BY MR. KELLY:   14:04:41
20     Q.   And you said this was in full   14:04:42
21 disclosure to all participants.   14:04:44
22         Does this organization publish   14:04:47
23 information?   14:04:50
24     A.   This organization did not   14:04:51
25 publish -- well, did not publish anything in   14:04:55

Page 175

1  its own name. These were organizations that   14:04:57
2  were brought together with their -- with   14:05:01
3  their full awareness that Mallinckrodt is   14:05:04
4  funding and supporting this initiative. This   14:05:06
5  program has now since been turned over to a   14:05:09
6  nonprofit organization to manage.   14:05:11
7      Q.   Does the -- would a member of   14:05:14
8  the public know that it was funded by   14:05:17
9  Mallinckrodt?   14:05:20
10         MR. O'CONNOR: Objection.   14:05:24
11         But you can answer.   14:05:24
12         THE WITNESS: We did not --   14:05:25
13 no -- no material was distributed to   14:05:30
14 the public under the Alliance for   14:05:32
15 Balanced Pain Management's name, but   14:05:34
16 it had a website and there was not any   14:05:37
17 way -- we were not trying to prevent   14:05:39
18 anyone from that information.   14:05:41
19 QUESTIONS BY MR. KELLY:   14:05:43
20     Q.   Did it disclose that   14:05:44
21 information on the website?   14:05:45
22         MR. O'CONNOR: Objection.   14:05:46
23         THE WITNESS: I would have to   14:05:47
24 look at the website.   14:05:47
25

Page 176

1  QUESTIONS BY MR. KELLY:   14:05:48
2      Q.   Okay. Are you -- are you still   14:05:48
3  on the steering committee for this   14:05:52
4  organization?   14:05:54
5          MR. O'CONNOR: Objection.   14:05:54
6          THE WITNESS: I am.   14:05:55
7  QUESTIONS BY MR. KELLY:   14:05:56
8      Q.   And who is Bob Twillman?   14:05:57
9          MR. O'CONNOR: Objection.   14:06:00
10         THE WITNESS: Bob Twillman --   14:06:00
11 Dr. Twillman is the executive director   14:06:04
12 of what is now, I believe, the -- at   14:06:06
13 the time it was the American Academy   14:06:10
14 of Pain Management.   14:06:13
15 QUESTIONS BY MR. KELLY:   14:06:13
16     Q.   And is he involved in the   14:06:13
17 alliance for pain -- or sorry, the Alliance   14:06:15
18 for Balanced Pain Management?   14:06:22
19     A.   He was. I cannot speak to   14:06:22
20 whether he is or not. Since we turned it   14:06:25
21 over, I don't have visibility to the   14:06:27
22 membership of who is in it or not.   14:06:28
23     Q.   Okay. What is CPOP?   14:06:31
24         MR. O'CONNOR: Objection.   14:06:44
25         THE WITNESS: CPOP is the   14:06:45

Page 177

1  Collaborative for Effective   14:06:47
2  Prescription Opioid Policies, which is   14:06:49
3  an organization based in Washington,   14:06:53
4  DC, where -- similar scope to identify   14:06:55
5  how, as third-party groups, we can   14:06:58
6  continue to advance patient safety and   14:07:01
7  effective opioid prescribing.   14:07:03
8  QUESTIONS BY MR. KELLY:   14:07:04
9      Q.   And who is the leadership of   14:07:05
10 CPOP?   14:07:06
11         MR. O'CONNOR: Objection.   14:07:07
12         THE WITNESS: The meeting --   14:07:08
13 the coalition was convened by Trust   14:07:11
14 for America's Health, the Community   14:07:13
15 Anti-Drug Coalitions of America and   14:07:17
16 former-Representative Mary Bono.   14:07:20
17 QUESTIONS BY MR. KELLY:   14:07:22
18     Q.   And the Community of Anti-Drug   14:07:22
19 Alliances of America, is that --   14:07:24
20     A.   CADCA, the community -- the   14:07:26
21 Community Anti-Drug Coalitions of America,   14:07:28
22 run by General Dean.   14:07:30
23     Q.   And who funds CPOP?   14:07:33
24         MR. O'CONNOR: Objection.   14:07:35
25         THE WITNESS: Mallinckrodt is a   14:07:36

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    funder of CPOP, a funder, but I do not          14:07:39
2    know their other funders, if they have          14:07:43
3    any.                            14:07:45
4    QUESTIONS BY MR. KELLY:                  14:07:47
5    Q.   So is Mallinckrodt their              14:07:47
6    primary funder?                        14:07:49
7         MR. O'CONNOR:  Objection.            14:07:50
8         THE WITNESS:  We are a funder,       14:07:50
9    but I do not have visibility, nor do I      14:07:52
10   know their total budget.                  14:07:54
11   QUESTIONS BY MR. KELLY:                  14:07:55
12   Q.   And does Mallinckrodt sponsor         14:07:55
13   CADCA to an extent?                     14:07:57
14        MR. O'CONNOR:  Objection.            14:07:58
15        THE WITNESS:  We do.               14:07:59
16        (Mallinckrodt-Webb Exhibit 27        14:08:21
17   marked for identification.)                14:07:59
18   QUESTIONS BY MR. KELLY:                  14:07:59
19   Q.   I have another exhibit for you.        14:08:01
20   It's 27.  This is Bates stamped            14:08:10
21   MNK_TNSTA01002290.                     14:08:17
22        MR. O'CONNOR:  Are you still on       14:08:57
23   Topic 24?                         14:08:59
24        MR. KELLY:  I am, yes.             14:09:00
25        THE WITNESS:  Okay.               14:09:26

Page 179

1    QUESTIONS BY MR. KELLY:                  14:09:28
2    Q.   Do you recognize that document?        14:09:28
3    A.   I do.                        14:09:29
4    Q.   And is it accurate?                14:09:30
5         MR. O'CONNOR:  Objection.            14:09:31
6         THE WITNESS:  I mean, it's          14:09:35
7    accurate as to the best of the ability      14:09:36
8    for me to remember what's on there.        14:09:38
9    QUESTIONS BY MR. KELLY:                  14:09:39
10   Q.   Okay.  Did Mallinckrodt have          14:09:39
11   any expectations in return for funding these 14:09:43
12   programs?                         14:09:46
13        MR. O'CONNOR:  Objection to the       14:09:47
14   scope and the form.                    14:09:50
15        But go ahead.                    14:09:51
16        THE WITNESS:  No.  No.             14:09:54
17        These programs were managed         14:09:56
18   through our advocacy initiatives to        14:09:57
19   expand access to patient treatment or      14:10:02
20   to -- safe use for opioids.  At no        14:10:05
21   time was any particular opioid or         14:10:07
22   advancement of opioids discussed         14:10:12
23   within any of these organizations.        14:10:13
24        (Mallinckrodt-Webb Exhibit 28        14:10:15
25   marked for identification.)                14:10:16

Page 180

1    QUESTIONS BY MR. KELLY:                  14:10:16
2    Q.   Okay.  I give you Exhibit 28,        14:10:16
3    which is Bates stamped MNK_TNSTA00155119.    14:10:18
4    A.   Thank you.  Okay.               14:10:44
5    Q.   Would you say -- can you read         14:11:28
6    the second paragraph of your response in this 14:11:34
7    e-mail?                          14:11:37
8    A.   This paragraph is in context to       14:11:37
9    the radio interview between Dr. Twillman and  14:11:44
10   Dr. Kolodny, and I state, "You'll notice that 14:11:49
11   Bob's delivery of stats, or statistics,      14:11:55
12   suggest pain patients have encountered access 14:11:58
13   challenges as a result of the recent        14:12:00
14   restrictions put in place at the federal and  14:12:02
15   state level was less than overwhelming.  As   14:12:04
16   originators of the alliance, I would like to  14:12:08
17   provide our alliance members some impactful   14:12:10
18   stats that support the message so that we     14:12:14
19   don't encounter these types of misses again."  14:12:15
20   Q.   Would that be an accurate          14:12:18
21   expression of Mallinckrodt's position?       14:12:20
22        MR. O'CONNOR:  Objection.            14:12:22
23        THE WITNESS:  I do not want to       14:12:29
24   say this is an accurate representation      14:12:30
25   of Mallinckrodt's position.  This was      14:12:30

Page 181

1    my statement to provide to the           14:12:32
2    alliance members.                     14:12:33
3    QUESTIONS BY MR. KELLY:                  14:12:41
4    Q.   Is it consistent with              14:12:41
5    Mallinckrodt's position?                 14:12:42
6         MR. O'CONNOR:  Objection.            14:12:43
7         THE WITNESS:  Mallinckrodt has       14:12:44
8    always advocated and taken positions       14:12:50
9    that patients should have access to        14:12:51
10   appropriate pain management, so this       14:12:53
11   statement of the statistics would be       14:12:57
12   consistent with Mallinckrodt's           14:13:00
13   understanding that patients who need       14:13:02
14   appropriate pain management should         14:13:04
15   have access to it.                    14:13:07
16   QUESTIONS BY MR. KELLY:                  14:13:14
17   Q.   Has CPOP held any events?           14:13:19
18        MR. O'CONNOR:  Objection.            14:13:26
19        THE WITNESS:  Can you specify,       14:13:27
20   when you say "events," what type of        14:13:29
21   events?                          14:13:31
22   QUESTIONS BY MR. KELLY:                  14:13:32
23   Q.   Sure, they -- have they done         14:13:32
24   any informational presentations?          14:13:33
25        MR. O'CONNOR:  Objection.            14:13:35

Page 182

1 THE WITNESS: To whom are you 14:13:35
2 referring to? To who -- 14:13:38
3 QUESTIONS BY MR. KELLY: 14:13:40
4 Q. Have they held any events that 14:13:40
5 are meant to inform? 14:13:42
6 MR. O'CONNOR: Objection. 14:13:48
7 THE WITNESS: To my knowledge, 14:13:48
8 they have not had patient events. 14:13:49
9 They've had meetings at various 14:13:51
10 conferences with third-party groups 14:13:58
11 that would be interested in 14:13:59
12 participating and being part of the 14:14:01
13 CPOP organization. 14:14:03
14 QUESTIONS BY MR. KELLY: 14:14:04
15 Q. Do you recall a presentation in 14:14:04
16 Nashville that was organized by CPOP? 14:14:06
17 MR. O'CONNOR: Objection. 14:14:09
18 THE WITNESS: I recall there 14:14:10
19 was an event in Nashville, but I'm 14:14:16
20 not -- I do not recall who the 14:14:19
21 organizer was. I don't know if it was 14:14:20
22 CPOP or not. 14:14:21
23 QUESTIONS BY MR. KELLY: 14:14:22
24 Q. Do you recall CPOP holding a 14:14:23
25 presentation -- or organizing a presentation 14:14:25

Page 183

1 on behalf of Axial Healthcare? 14:14:27
2 MR. O'CONNOR: Objection. 14:14:30
3 THE WITNESS: I would not. I 14:14:31
4 mean, nothing comes to mind. 14:14:37
5 QUESTIONS BY MR. KELLY: 14:14:38
6 Q. How many -- how many of these 14:14:41
7 informational sessions for stakeholders would 14:14:43
8 you say that CPOP has held? 14:14:46
9 MR. O'CONNOR: Objection. 14:14:48
10 THE WITNESS: I wouldn't know 14:14:49
11 the number. 14:14:51
12 QUESTIONS BY MR. KELLY: 14:14:52
13 Q. Is it -- could it be one? 14:14:53
14 A. It would -- 14:14:57
15 MR. O'CONNOR: Objection. 14:14:58
16 THE WITNESS: It would be at 14:14:58
17 least one. 14:14:59
18 QUESTIONS BY MR. KELLY: 14:14:59
19 Q. Okay. Do you recall CPOP 14:15:00
20 putting on a presentation that focused on 14:15:12
21 neonatal abstinence syndrome? 14:15:16
22 MR. O'CONNOR: Objection. 14:15:20
23 THE WITNESS: I do not know. 14:15:20
24 I'm not aware of it. 14:15:21
25

Page 184

1 QUESTIONS BY MR. KELLY: 14:15:22
2 Q. All right. Moving to Topic 26, 14:15:40
3 earlier you testified in this area quite some 14:15:48
4 time, so I just had some things I wanted to 14:15:52
5 clarify. 14:15:54
6 How does Mallinckrodt define 14:15:54
7 health care providers? 14:15:57
8 A. A health care provider would 14:16:03
9 be, in our opinion, someone who has a 14:16:04
10 professional designation. 14:16:06
11 Q. Okay. Would pharmacists be 14:16:08
12 considered health care providers? 14:16:10
13 A. Yes. 14:16:12
14 Q. And earlier you referenced some 14:16:12
15 materials being distributed at trade shows. 14:16:22
16 Did prescribers attend trade 14:16:26
17 shows? 14:16:29
18 MR. O'CONNOR: Objection. 14:16:31
19 Scope. 14:16:32
20 THE WITNESS: I recall that I 14:16:35
21 spoke to material being distributed at 14:16:36
22 trade shows in both the generic and 14:16:37
23 the brand. 14:16:40
24 Could you specify which trade 14:16:40
25 show? 14:16:42

Page 185

1 QUESTIONS BY MR. KELLY: 14:16:43
2 Q. In general, do prescribers 14:16:43
3 attend trade shows? 14:16:45
4 MR. O'CONNOR: Objection. 14:16:48
5 THE WITNESS: My understanding 14:16:49
6 of prescribers would attend -- we 14:16:50
7 used the broad term "trade shows." 14:16:55
8 They would attend trade shows 14:16:57
9 or organizations of their professional 14:16:59
10 associations, they would attend those 14:17:02
11 show -- trade shows, but I can't speak 14:17:03
12 to what other trade shows they may or 14:17:05
13 may not attend. 14:17:09
14 QUESTIONS BY MR. KELLY: 14:17:10
15 Q. Is Pain Week a trade show? 14:17:10
16 A. I would classify Pain Week as a 14:17:12
17 trade show. 14:17:16
18 Q. Does Mallinckrodt -- does 14:17:16
19 Mallinckrodt's branded organization attend 14:17:20
20 Pain Week? 14:17:24
21 A. We have. 14:17:24
22 Q. And does Mallinckrodt's 14:17:26
23 generics department attend Pain Week? 14:17:31
24 A. I'm not aware that they would. 14:17:33
25 They would have no reason to, but I can't say 14:17:37

Page 186

1  that they've never been at a Pain Week trade   14:17:39
2  show.                                          14:17:41
3      Q.    Does Mallinckrodt distribute        14:17:41
4  materials at Pain Week?                        14:17:43
5      A.    Within the -- within the            14:17:45
6  confines of our -- of our company booth.       14:17:47
7      Q.    Are there any trade shows where      14:17:56
8  Mallinckrodt's generics department presents    14:18:00
9  or provides materials that prescribers         14:18:03
10  attend?                                       14:18:05
11      A.    The generics team would pre --     14:18:06
12  would have a, Mallinckrodt booth, at          14:18:12
13  generally the wholesaler trade shows, the     14:18:17
14  HDA, larger wholesaler, distributor trade     14:18:22
15  shows. I'm not aware if they would attend     14:18:26
16  any pharmacy or pharmacist trade shows, but   14:18:27
17  they should not be attending any physician    14:18:30
18  trade shows, but I can't say that they        14:18:33
19  wouldn't, that they've never done it before.  14:18:35
20      MR. KELLY:  Can we take a quick           14:18:52
21  break?                                        14:18:53
22      MR. O'CONNOR:  Sure.                      14:18:53
23      VIDEOGRAPHER:  We're going off            14:18:54
24  the record at 2:18 p.m.                       14:18:55
25      (Off the record at 2:18 p.m.)            14:18:57

Page 187

CERTIFICATE

        I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
of the examination, Kevin Webb, was duly
sworn by me to testify to the truth, the
whole truth and nothing but the truth.
        I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.

        I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.

CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
Notary Public
Dated:  January 22, 2019

Page 188

INSTRUCTIONS TO WITNESS

        Please read your deposition over
carefully and make any necessary corrections.
You should state the reason in the
appropriate space on the errata sheet for any
corrections that are made.
        After doing so, please sign the
errata sheet and date it.  You are signing
same subject to the changes you have noted on
the errata sheet, which will be attached to
your deposition.
        It is imperative that you return
the original errata sheet to the deposing
attorney within thirty (30) days of receipt
of the deposition transcript by you.  If you
fail to do so, the deposition transcript may
be deemed to be accurate and may be used in
court.

Page 189

ACKNOWLEDGMENT OF DEPONENT

        I,_____, do
hereby certify that I have read the foregoing
pages and that the same is a correct
transcription of the answers given by me to
the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
Kevin Webb 30(b)(6)          DATE

Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____

Notary Public

Page 190

```
1        _ _ _ _ _ _ _
             ERRATA
2        _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```

Page 191

```
1        _ _ _ _ _ _ _
           LAWYER'S NOTES
2        _ _ _ _ _ _ _
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```