Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4                         - - -

5    In re:                    :

                               :

6    National Prescription  :  Case No.

     Opiate Litigation      :  1:17-MD-2804-DAP

7                              :

     This Document Applies  :

8    to:  All Actions       :

9                         - - -

10           Video Rule 30(b)(6) Deposition of

11              Ohio Department of Medicaid

12              By and Through its Designee:

13                DONALD P. WHARTON, M.D.

14              (Called by the Defendants)

15           Sheraton Columbus Capitol Square

16                 75 East State Street

17                   Columbus, Ohio

18            Wednesday, November 14, 2018

19                     8:45 a.m.

20                         - - -

21

22

23

24                    Reported by:

             Linda D. Riffle, RDR, CRR, CRC,

25     and Notary Public in and for the State of Ohio

```
                                                  Page 2
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         Linda Singer, Esq.
           Motley Rice LLC
 4         401 9th Street NW, Suite 1001
           Washington, D.C.  20004
 5         (202) 386-9262
           Fax:  (202) 386-9622
 6         lsinger@motleyrice.com
 7    ON BEHALF OF THE PLAINTIFF CUYAHOGA COUNTY:
 8         Hunter J. Shkolnik, Esq.
           Napoli Shkolnik PLLC
 9         360 Lexington Avenue, 11th Floor
           New York, New York  10017
10         (212) 397-1000
           hunter@napolilaw.com
11
      ON BEHALF OF THE DEFENDANT McKESSON CORPORATION:
12
           Ron Dove, Esq.
13         Covington & Burling LLP
           One CityCenter
14         850 Tenth Street, NW
           Washington, D.C.  20001-4956
15         (202) 662-5685
           rdove@cov.com
16         (202) 662-5965
           ahan@cov.com
17
      ON BEHALF OF THE DEFENDANTS CVS INDIANA LLC AND
18    CVS RX SERVICES:
19         Steven N. Herman, Esq.
           Zuckerman Spaeder LLP
20         1800 M Street NW, Suite 1000
           Washignton, D.C.  20036-5807
21         (202) 778-1883
           sherman@zuckerman.com
22
23
24
25
```

1
     APPEARANCES (continued):

2
     ON BEHALF OF THE DEFENDANT WALMART:

3
          Lisa Gates, Esq.
4         Jones Day
          North Point
5         901 Lakeside Avenue
          Cleveland, Ohio  44114-1190
6         (216) 586-7154
          Fax:  (216) 579-0212
7         lgates@jonesday.com
8    ON BEHALF OF THE DEFENDANT PRESCRIPTION SUPPLY,
     INC.:
9
          William M. Shackelford, Esq.
10        Pelini, Campbell & Williams, LLC
          Bretton Commons
11        8040 Cleveland Avenue NW, Suite 400
          North Canton, Ohio  44720
12        (330) 305-6400
          Fax:  (330) 305-0042
13        wms@pelini-law.com
14   ON BEHALF OF THE DEFENDANT CARDINAL HEALTH:
15        Colleen McNamara, Esq.
          Williams & Connolly LLP
16        725 Twelfth Street, NW
          Washington, D.C.  20005
17        (202) 434-5186
          Fax:  (202) 434-5029
18        cmcnamara@wc.com
19   ON BEHALF OF THE DEFENDANT ALLERGAN FINANCE:
20        Timothy W. Knapp, Esq.
          Kirkland & Ellis LLP
21        300 North LaSalle
          Chicago, Illinois  60654
22        (312) 862-7426
          Fax:  (312) 862-2200
23        timothy.knapp@kirkland.com
24
25

```
                                                      Page 4
 1   APPEARANCES (continued):
 2   ON BEHALF OF THE OHIO DEPARTMENT OF MEDICAID AND
     THE DEPONENT:
 3
         Mike DeWine, Esq.
 4       Ohio Attorney General
 5       By:  Morgan Linn, Esq.
              Assistant Attorney General
 6            30 East Broad Street, 26th Floor
              Columbus, Ohio  43215
 7            (614) 752-6447
              morgan.linn@ohioattorneygeneral.gov
 8
         Brianne Brown, Esq.
 9       Chief Legal Counsel
         Julie Babtist, Esq.
10       Senior Legal Counsel
         Ohio Department of Medicaid
11       Lazarus Building
         50 West Town Street, Suite 400
12       Columbus, Ohio  43215
         (614) 752-4274
13       Brianne.Brown@medicaid.ohio.gov
         (614) 752-5573
14       Julie.Babtist@medicaid.ohio.gov
15   ON BEHALF OF THE DEFENDANTS JANSSEN
     PHARMACEUTICALS, INC. AND JOHNSON & JOHNSON:
16
         Brenda A. Sweet, Esq.  (via telephone)
17       Tucker Ellis, LLP
         950 Main Avenue, Suite 1100
18       Cleveland, Ohio  44113-7213
         (216) 696-2493
19       Fax:  (216) 592-5009
         brenda.sweet@tuckerellis.com
20
     ON BEHALF OF THE DEFENDANTS HBC SERVICE COMPANY:
21
         Elly Heller-Toig, Esq.  (via telephone)
22       Marcus & Shapira LLP
         One Oxford Centre, 35th Floor
23       Pittsburgh, Pennsylvania  15219
         (412) 338-5227
24       Fax:  (412) 391-8758
         ehtoig@marcus-shapira.com
25
```

```
 1   APPEARANCES (continued):
 2   ON BEHALF OF THE DEFENDANTS AMERISOURCEBERGAN
     CORPORATION AND AMERISOURCEBERGAN DRUG
 3   CORPORATION:
 4       Molly Q. Campbell, Esq.  (via telephone)
         Reed Smith
 5       1301 K Street, Suite 1000 - East Tower
         Washington, D.C.  20005
 6       (202) 414-9173
         Fax:  (202) 414-9299
 7       mqcampbell@reedsmith.com
 8   ALSO PRESENT:
 9        ON BEHALF OF THE DEFENDANT TEVA
          PHARMACEUTICALS USA:
10
             Richard Hand
11           Law Clerk
             Morgan, Lewis & Bockius, LLP
12           1111 Pennsylvania Avenue NW
             Washington, D.C.  20004-2541
13           (202) 739-5123
             Fax:  (202) 739-3001
14           richard.hand@morganlweis.com
15       Shaun Crum
          Videographer
16
                              - - -
17
18
19
20
21
22
23
24
25
```

Page 6

1                S T I P U L A T I O N S

2                         - - -

3           It is stipulated by and among counsel

4    for the respective parties that the video

5    deposition of Donald P. Wharton, M.D., a 30(b)(6)

6    witness herein, called by the Defendants for

7    examination under the applicable rules of Federal

8    Civil Court Procedure, may be taken at this time

9    by the Notary pursuant to notice; that said video

10   deposition may be reduced to writing in stenotype

11   by the Notary, whose notes may thereafter be

12   transcribed out of the presence of the witness;

13   that proof of the official character and

14   qualification of the court reporter is waived;

15   that the witness may sign the transcript of their

16   video deposition before a Notary other than the

17   Notary taking their video deposition; said

18   transcript of their video deposition to have the

19   same force and effect as though the witness had

20   signed the transcript of their video deposition

21   before the Notary taking it.

22                         - - -

23

24

25

Page 7

```
1                     I N D E X
2                      - - -
3    WITNESS                                    PAGE
4    Donald P. Wharton, M.D.
       Examination by Mr. Dove                   14
5      Examination (continued) by Mr. Dove      189
       Examination by Ms. Han                   300
6      Examination by Mr. Knapp                 303
       Examination by Mr. Herman                314
7      Examination by Ms. Singer                319
       Examination by Mr. Shkolnik              357
8      Further examination by Mr. Dove          373
9                      - - -
10   DEPOSITION EXHIBITS                       MARKED
11    1    November 9, 2018, letter to Mr. John   22
            Alten and Mr. Ron Dove from Morgan A.
12          Linn
13    2    Subpoena to Testify at a Deposition    23
            in a Civil Action
14
      3    Attachment A to Subpoena on the Ohio   25
15          Department of Medicaid
16    4    Opioids in Ohio Medicaid:  Review of   62
            Extreme Use and Prescribing
17
      5    The Opioid Crisis:  The impact on the  79
18          Medicaid population is stretching the
            state's safety net
19
      6    Ohio Department of Medicaid           120
20          Fee-for-Service Pharmacy Claims
            Review Provider Manual
21
      7    Oho Medicaid NCPDP Version D.0 Payer  129
22          Sheet
23    8    Building Dynamic and Functional       175
            Interagency Collaboration
24
25
```

Page 8

```
 1              I N D E X (continued)
 2                    - - -
 3   DEPOSITION EXHIBITS                     MARKED
 4    9      Drug Utilization Review Board web      191
             page
 5
      10     Ohio Department of Medicaid (ODM)      206
 6           Drug Utilization Review (DUR) Board
             Quarterly Meeting, November 14, 2017
 7
      11     Ohio Attorney General's Insurer Task   221
 8           Force on Opioid Reduction Report and
             Recommendations
 9
      12     November 1, 2017, letter to Dear       257
10           State Medicaid Director from Brian
             Neale
11
      13     Timeline:  Collective Action to        278
12           Address the Opioid Crisis in Ohio
             2011-2015
13           National Prescription Opiate
             Litigation Ohio Department of
14           Medicaid 000168 through 000169.
15    14     ODM Initiatives                        291
             National Prescription Opiate
16           Litigation Ohio Department of
             Medicaid 000002 through 000014
17
      15     October 18, 2017, letter to Mary       301
18           Applegate, MD, from Shawn A. Ryan,
             MD, MBA, FASM; Robyn Chatman, MD,
19           MPH, FAAFP; Lori Criss, MSW, LSW;
             Janet Shaw; and Kelly J. Clark, MD,
20           MBA, DFAPA, DFASAM
21                    - - -
22   OBJECTIONS BY                      PAGE LINE
23    Mr. Shkolnik                        30   14
      Mr. Shkolnik                        65    6
24    Mr. Shkolnik                        66    3
      Mr. Shkolnik                        75    5
25    Mr. Shkolnik                        75   16
```

```
                                                    Page 9

 1
                    I N D E X  (continued)
 2
                          -  -  -
 3
        OBJECTIONS BY                        PAGE LINE
 4
        Ms. Linn                              76   15
 5      Mr. Shkolnik                          87   11
        Mr. Shkolnik                         104   10
 6      Ms. Singer                           121    1
        Mr. Shkolnik                         124    4
 7      Mr. Shkolnik                         130    6
        Mr. Shkolnik                         131   19
 8      Mr. Shkolnik                         137   20
        Mr. Shkolnik                         144   10
 9      Mr. Shkolnik                         159   18
        Mr. Shkolnik                         161    9
10      Mr. Shkolnik                         164   11
        Mr. Shkolnik                         167   12
11      Mr. Shkolnik                         168   24
        Mr. Shkolnik                         171   18
12      Mr. Shkolnik                         173   14
        Mr. Shkolnik                         174    1
13      Mr. Shkolnik                         181   10
        Mr. Shkolnik                         182   13
14      Mr. Shkolnik                         182   25
        Ms. Singer                           213   25
15      Mr. Shkolnik                         214   12
        Mr. Shkolnik                         215    5
16      Mr. Shkolnik                         215   16
        Ms. Singer                           215   24
17      Ms. Linn                             216    1
        Ms. Singer                           217   11
18      Mr. Shkolnik                         218    3
        Ms. Singer                           218   12
19      Ms. Singer                           219    1
        Mr. Shkolnik                         219    5
20      Ms. Linn                             222    1
        Mr. Shkolnik                         225   10
21      Mr. Shkolnik                         227   18
        Ms. Singer                           228   17
22      Ms. Singer                           229   15
        Mr. Shkolnik                         230   16
23      Ms. Linn                             232   15
        Mr. Shkolnik                         232   16
24      Mr. Shkolnik                         235   20
        Ms. Singer                           255    5
25      Ms. Linn                             259    8
```

```
 1                I N D E X  (continued)
 2                     - - -
 3    OBJECTIONS BY                      PAGE LINE
 4    Mr. Shkolnik                       259    8
      Ms. Singer                         259   17
 5    Mr. Shkolnik                       259   18
      Ms. Linn                           259   19
 6    Mr. Shkolnik                       261    4
      Mr. Shkolnik                       261   12
 7    Mr. Shkolnik                       274    9
      Ms. Singer                         274   18
 8    Mr. Shkolnik                       275   10
      Ms. Singer                         290    8
 9    Ms. Singer                         290   20
      Ms. Singer                         306   13
10    Ms. Linn                           306   20
      Ms. Singer                         307    1
11    Mr. Linn                           307    2
      Mr. Shkolnik                       307    3
12    Ms. Singer                         307   23
      Ms. Singer                         308   13
13    Mr. Shkolnik                       309   21
      Ms. Singer                         310   10
14    Ms. Singer                         310   19
      Ms. Singer                         311    6
15    Ms. Singer                         312   16
      Ms. Singer                         313   23
16    Mr. Herman                         325   10
      Mr. Knapp                          341   22
17    Ms. Gates                          341   23
      Mr. Knapp                          354   15
18    Mr. Knapp                          354   20
      Mr. Dove                           354   21
19    Mr. Knapp                          355   24
      Mr. Herman                         356    7
20    Mr. Herman                         358   10
      Mr. Herman                         359   12
21    Mr. Herman                         360   10
      Mr. Knapp                          363   11
22    Mr. Dove                           365   19
      Ms. Gates                          367    8
23    Mr. Herman                         367   25
      Ms. Gates                          368   11
24    Mr. Dove                           368   22
      Mr. Knapp                          368   23
25    Mr. Herman                         368   24
```

Page 11

1                   P R O C E E D I N G S

2                           -  -  -

3                 Wednesday, November 14, 2018

4                       Morning Session

5                           -  -  -

6            THE VIDEOGRAPHER:  The date is

7    November 14th, 2018.  We are on the record at

8    8:45 a.m.

9                 This is the deposition of Dr. Donald

10   Wharton in the matter of In Re:  National

11   Prescription Opiate Litigation in the United

12   States District Court, Northern District of Ohio,

13   Eastern Division.

14                 Will counsel please state appearances

15   for the record.

16            MR. DOVE:  Sure.  This is Ron Dove.  I'm

17   a lawyer from the law firm of Covington & Burling

18   on behalf of McKesson Corporation.

19            MS. HAN:  This is Anna Han from

20   Covington & Burling, also on behalf of McKesson

21   Corporation.

22            MR. HERMAN:  Steve Herman from Zuckerman

23   Spaeder on behalf of CVS Indiana, LLC, and CVS Rx

24   Services.

25            MS. GATES:  Lisa Gates from Jones Day on

Page 12

1   behalf of Walmart.

2          MR. SHACKELFORD:  Bill Shackelford with

3   Pelini, Campbell & Williams on behalf of

4   Prescription Supply, Inc.

5          MR. KNAPP:  Tim Knapp of Kirkland &

6   Ellis on behalf of Allergan Finance.

7          MS. SINGER:  Linda Singer, Motley Rice,

8   on behalf of Plaintiffs.

9          MR. SHKOLNIK:  Hunter Shkolnik, Napoli

10  Shkolnik, on behalf of Plaintiffs.  Good morning.

11         MS. BROWN:  Bri Brown, Chief Legal

12  Counsel of the Ohio Department of Medicaid.

13         MS. BABTIST:  Julie Babtist, Senior

14  Legal Counsel of the Ohio Department of Medicaid.

15         MS. LINN:  Morgan Linn, Ohio Attorney

16  General's office, representing the Department of

17  Medicaid.

18         THE VIDEOGRAPHER:  Will counsel on the

19  phone please state appearances for the record.

20         MS. HELLER-TOIG:  Elly Heller-Toig of

21  Marcus & Shapira for HBC Service Company.

22         MS. CAMPBELL:  Molly Campbell from Reed

23  Smith on behalf of AmerisourceBergen Corporation,

24  AmerisourceBergen Drug Corporation.

25         MS. SWEET:  Brenda Sweet of Tucker Ellis

Page 13

1    LLP on behalf of Janssen Pharmaceuticals, Inc.,

2    and Johnson & Johnson.

3              THE VIDEOGRAPHER:  And will the court

4    reporter please swear in the witness.

5              THE COURT REPORTER:  Raise your right

6    hand, please.

7              Do you solemnly swear or affirm the

8    testimony you give will be the truth, the whole

9    truth, and nothing but the truth?

10             DR. WHARTON:  I do.

11                            - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          DONALD P. WHARTON, M.D.,

2    of lawful age, being by me first duly placed

3    under oath, as prescribed by law, was examined

4    and testified as follows:

5                    EXAMINATION

6    BY MR. DOVE:

7        Q.   Good morning, Dr. Wharton.  As I said,

8    my name is Ron Dove, and I'm with the law firm of

9    Covington & Burling.  And I represent McKesson

10   Corporation, which is one of the Defendants in

11   this case.

12          Would you please state and spell your

13   name for the record.

14       A.   Yes.  It's Donald P. Wharton,

15   W-h-a-r-t-o-n.

16       Q.   And where are you currently employed?

17       A.   The Ohio Department of Medicaid.

18       Q.   And is it okay if I refer to the Ohio

19   Department of Medicaid as "ODM" or "Ohio

20   Medicaid"?

21       A.   Yes.

22       Q.   Dr. Wharton, have you been deposed

23   before?

24       A.   Yes.

25       Q.   About how many times?

Page 15

1      A.    I'm not sure.  Four or five.

2      Q.    Okay.  And what types of cases have you

3   been deposed in?

4      A.    Malpractice cases.

5      Q.    And did -- did any of those cases

6   involve opioids?

7      A.    No.

8      Q.    And on be- -- on behalf of whom were you

9   deposed in those cases?

10     A.    Usually, my patients.  In fact, always

11  my patients.  These were patients of mine who

12  were suing specialists, typically.

13     Q.    So they were suing specialists, and you

14  were -- you were testifying on behalf of your

15  patients?

16     A.    Correct.

17     Q.    Okay.  So, you know, you've been deposed

18  before, but let me just remind you of the ground

19  rules of the deposition.

20     A.    Uh-huh.

21     Q.    First, you understand that you are

22  testifying today under oath and that your

23  testimony will have the same effect as if you

24  were testifying under oath in a court of law; is

25  that correct?

1       A.    Uh-huh.  Uh-huh.

2       Q.    And I'll do my best to ask questions

3    that you can understand, but if you do not

4    understand one of my questions, just ask me to

5    rephrase it, and I'll do my best to -- to

6    clarify.  Okay?

7       A.    Sure.

8       Q.    And if I ask you a -- if I ask you a

9    question and you give me an answer, then I'm

10   going to take it that that is a sign that you

11   understood my question.  Okay?

12      A.    Uh-huh.

13      Q.    And you understand that the court

14   reporter is typing your answers to my questions,

15   so it's important for you to answer audibly by

16   saying "yes" or "no" or giving an answer rather

17   than nodding or saying "uh-huh"?

18      A.    Yes.

19      Q.    Okay.  And it's also important that we

20   take turns speaking because if we both speak at

21   the same time, then the court reporter can't

22   record what we're saying.  Fair enough?

23      A.    Fair.

24      Q.    And your counsel may have objections to

25   my questions, but unless counsel instructs you

1    not to answer, you are obligated to answer the

2    question once counsel has made the objection for

3    the record.  Okay?

4        A.   Okay.

5        Q.   And, finally, if at any point you need a

6    break, just tell me, and we can take a break.

7    All I ask is that you answer the question that's

8    pending before we take the break.  Okay?

9        A.   Okay.

10       Q.   Is there any reason why you cannot give

11   complete and truthful testimony today?

12       A.   No.

13       Q.   And are there any medications you are

14   taking or illness or condition that would make it

15   difficult for you to give complete and truthful

16   information?

17       A.   No.

18       Q.   What did you do today to prepare --

19   excuse me.  What did you do to prepare for

20   today's deposition?

21       A.   So I reviewed the documents -- or at

22   least some of the documents that were sent

23   regarding the suit and also have reviewed our

24   activity -- Medicaid's activity around opioid

25   treatment over the past several years.

Page 18

1      Q.    Did you meet with anyone?

2      A.    Yes.

3      Q.    Who did you meet with?

4      A.    Our attorneys.

5      Q.    And who are your attorneys?

6      A.    These three right here.

7      Q.    Okay.  That's the three attorneys who

8  identified themselves --

9      A.    Yes.

10     Q.    -- as representing Ohio Medicaid?

11     A.    Yes.

12     Q.    Okay.  And did you meet with anyone

13  else?

14     A.    Yeah.  What was the gentleman's name

15  yesterday?  I don't recall.

16     Q.    If you don't remember --

17     A.    I don't recall.

18     Q.    -- you don't remember.

19     A.    I'm sorry.

20     Q.    But you met with another gentleman?

21     A.    Yes.  A plaintiff's attorney.  I don't

22  remember his name.  I'm sorry.

23     Q.    Okay.

24     A.    Was it -- I'm not allowed to ask them.

25  I don't know.

```
                                              Page 19
 1        Q.    Okay.  So you -- you met with --
 2        A.    Joe maybe?  Joe.  Thank you.
 3        Q.    You met with your -- the three attorneys
 4   from the Ohio Department of Medicaid that are
 5   here today --
 6        A.    Yes.
 7        Q.    -- plus a plaintiff's attorney who you
 8   think --
 9        A.    Named Joe.
10        Q.    -- named Joe?
11        A.    Yes.
12        Q.    Okay.  And about how many times did you
13   meet with these attorneys?
14        A.    Twice.
15        Q.    And when was that?
16        A.    Yesterday and last Friday.
17        Q.    And for about how long did you meet?
18        A.    An hour.
19        Q.    Each day?
20        A.    I believe so.
21        Q.    Did you review -- you said you reviewed
22   some documents, the documents that were produced
23   in this litigation, also some -- some background
24   information about opioids.  Did you review any
25   deposition transcripts?
```

Page 20

```
 1        A.    No.
 2        Q.    Did you review any online information or
 3   websites?
 4        A.    No.
 5        Q.    Was there anyone with you when you were
 6   reviewing the documents?
 7        A.    No.
 8        Q.    Other than what we've talked about, did
 9   you do anything else to prepare for today's
10   deposition?
11        A.    No.
12        Q.    Did you talk to any employees of Ohio
13   Department of Medicaid?
14        A.    Yes, one of my pharmacists, to get some
15   details on our -- some of the things that we've
16   done to decrease opioid prescribing in Ohio.
17        Q.    And who was that pharmacist that you
18   talked to?
19        A.    Michelle Barger.
20        Q.    Other than Michelle Barger, did you talk
21   to any other employees of the Ohio Department of
22   Medicaid?
23        A.    No.
24        Q.    No?
25              When were you first told that you would
```

1   be asked to give testimony in this case?

2        A.   Last week.

3        Q.   Last week.

4        A.   Uh-huh.

5        Q.   Okay.  Do you have an understanding what

6   this case is about?

7        A.   Yes.

8        Q.   What's your understanding?

9        A.   My understanding is this is a -- I'm

10  sorry for my legalese, I'm not an attorney -- but

11  almost like a class-action suit.  Many -- many

12  suits put together into a single case where there

13  are five test cases, and this happens to be

14  regarding two cases in Summit and Cuyahoga

15  County, where the plaintiffs are accusing certain

16  pharmaceutical industry stakeholders of, perhaps,

17  allowing the opioid epidemic to occur.

18       Q.   Do you have any -- any further

19  understanding of the nature of the allegations in

20  the case other than you just described?  When you

21  said -- for example, when you said "perhaps

22  allowing the opioid epidemic to occur," do you

23  understand any further about the allegations?

24       A.   I'm not sure I understand your question.

25  I'm . . .

Page 22

1      Q.   What do you understand the allegations
2   of this case to be?
3      A.   That -- that would be my understanding,
4   what I -- what I've just said.  I -- I mean, I --
5   I don't know the detail.  I don't know the
6   specifics of each case.
7      Q.   Okay.  Dr. Wharton, I'd like to mark as
8   Exhibit 1 --
9                          - - -
10          Thereupon, Deposition Exhibit 1 was
11          marked for purposes of identification.
12                          - - -
13   BY MR. DOVE:
14      Q.   I'd like to mark as Exhibit 1 a
15   November 9th letter from Morgan Linn designating
16   you as the Ohio Medicaid witness.
17          MR. SHKOLNIK:  Going forward, can
18   Plaintiffs have just one copy of whatever is
19   made?  Thank you.
20          MR. DOVE:  Yes.  That's our intention
21   here.
22          MR. SHKOLNIK:  Thank you so much.
23          MR. DOVE:  Uh-huh.
24          MR. SHKOLNIK:  I appreciate that.
25   BY MR. DOVE:

Page 23

1     Q.   So, Dr. Wharton, the court reporter has

2   handed you what has been marked for

3   identification as Exhibit 1.  And, again, it's a

4   letter designating you as the Ohio Department of

5   Medicaid's witness in response to a subpoena for

6   deposition testimony.  Do you see that?

7     A.   I do.

8     Q.   Have you seen this document before?

9     A.   I have not.

10     Q.   Do you understand that Ohio Medicaid has

11   designated you as its representative for the

12   subpoena topics that are listed at the end of

13   this letter?  And feel free to take a moment to

14   look at -- look at the letter.

15     A.   I have seen these topics, yes.

16     Q.   And so it's your understanding that

17   you've been designated to testify about these

18   topics --

19     A.   That is --

20     Q.   -- correct?

21     A.   That is correct.

22                      - - -

23          Thereupon, Deposition Exhibit 2 was

24          marked for purposes of identification.

25                      - - -

Page 24

1    BY MR. DOVE:

2        Q.    I now hand you a document that we've

3    marked as Exhibit 2.

4            MR. SHKOLNIK:   Thank you.

5    BY MR. DOVE:

6        Q.    And ask you to take a look at that.

7            This is a subpoena which includes an

8    Attachment A.  Do you see that?

9        A.    Yes.

10       Q.    Have you seen this document before?

11       A.    Yes.

12       Q.    And what do you understand it to be?

13       A.    I understand this to be -- I understand

14   it a -- not a request -- a -- a hard request for

15   me to be here and testify today and a list of

16   definitions.

17       Q.    Okay.  And you see in Attachment A there

18   is a list of topics for examination?

19       A.    Uh-huh.

20       Q.    Is that a yes?

21       A.    Yes.  I'm sorry.

22       Q.    And are -- are these the topics you are

23   here today to testify about on behalf of Ohio

24   Medicaid as modified by the November 9th letter

25   that we just looked at that's been marked as

Page 25

1   Exhibit 1?

2        A.   Yes, I believe so.  Yes.

3        Q.   And do you see that one of the topics,

4   Topic 8, is "The subject matter of the document

5   requests served on Ohio Medicaid by McKesson

6   Corporation on July 17th, 2018"?  Do you see

7   that?

8        A.   I do.

9        Q.   I'd like to hand you now another

10  document which we're going to mark as Exhibit 3.

11                        - - -

12            Thereupon, Deposition Exhibit 3 was

13            marked for purposes of identification.

14                        - - -

15  BY MR. DOVE:

16       Q.   And I can represent to you that this

17  document contains the document requests that were

18  served on Ohio Medicaid on July 17th.  Have you

19  seen this document before?

20       A.   I have not.

21       Q.   But as I understand it, based on

22  counsel's November 9th letter, you're here today

23  to testify about the documents that have actually

24  been produced by ODM in response to these

25  document requests; is that correct?

1      A.    That is correct.  And I was given a list

2   as well as copies of the documents that were

3   sent.

4      Q.    Okay.  Okay.  I think we're through with

5   that exhibit.

6           I'd like to now turn to just some

7   background questions.  First, your -- your

8   educational background.  Where did you get your

9   undergraduate degree?

10     A.    Bluffton University in Ohio.

11     Q.    And what was your degree in?

12     A.    Molecular biology.

13     Q.    And when did you receive it?

14     A.    Oh, jeez.  '84.  1984.

15     Q.    And did you continue straight to medical

16  school after undergrad?

17     A.    No.  I took one year off.

18     Q.    And what did you do during that year?

19     A.    I worked in a medical laboratory.

20     Q.    And what -- what did you do at the lab?

21     A.    I did chemistry profiles and complete

22  blood counts, worked as a lab assistant.

23     Q.    Did any of your work involve opioids?

24     A.    No.

25     Q.    What did you do after your work in the

Page 27

1   medical lab?
2       A.   I attended Wright State University
3   School of Medicine.
4       Q.   And I take it you graduated from there?
5       A.   In 1989.
6       Q.   And did you have any -- have you had any
7   other education after that -- or formal education
8   after graduating from med school?
9       A.   Uh-huh.  So I participated in a
10  three-year residency program at Miami Valley
11  Hospital in Dayton, Ohio, in family practice.
12      Q.   And then after your -- your residency
13  was completed, what did you do next?
14      A.   So I practiced medicine in a community
15  outside of Dayton, Ohio, a rural community, for
16  approximately 20 years.
17      Q.   As a family practitioner?
18      A.   Correct.
19      Q.   Okay.  Let me go back to your medical
20  school days for a moment.  So did you -- in
21  medical school, did you learn anything about
22  opioids?
23      A.   Yes.
24      Q.   What type of information -- I don't --
25  actually, I don't need all the details of all

Page 28

```
 1    this, but just in general, what type of
 2    information did you learn about opioids in
 3    medical school?
 4         A.    The mode of action.  We learned names,
 5    doses, administration routes, et cetera.  We
 6    learned, you know, some about appropriate use of
 7    opioids.  I guess basic pharmacology.
 8         Q.    Did you -- did you learn anything at
 9    that time about the addictive qualities of
10    opioids?
11         A.    Yes.
12         Q.    And what did you learn about the
13    addictive qualities?
14         A.    Simply that there was the potential both
15    for tolerance and addiction with prolonged use of
16    those medications.
17         Q.    What do you understand an opioid to be?
18    Just if you were to define it.  Not in a
19    scientific sense, but, I mean --
20         A.    Yeah.
21         Q.    -- if a -- if a patient were to ask you,
22    "What's an opioid?"
23         A.    It's a powerful analgesic.  It's a drug
24    used to treat pain.
25         Q.    And are there some kinds of opioids that
```

Page 29

1   people in the community legitimately possess and

2   use?

3       A.   Yes.

4       Q.   And can you provide some examples?

5       A.   Pain medications such as Vicodin or any

6   of the -- any of the oral medications, IV

7   medications, perhaps, in hospitals, even patches

8   and so forth that are used for chronic pain.

9   Many, many types of opioids are available to --

10  you know, for use in the community very

11  legitimately for chronic pain, especially when

12  associated with surgical procedures for short

13  periods of time, and perhaps even longer periods

14  of time for people who have diseases that are

15  likely to lead to death, so -- such as hospice

16  patients and so forth.

17      Q.   Are there some opioids that, in your

18  view, have no legitimate medical use, such as

19  heroin --

20      A.   Yes.

21      Q.   -- something like --

22           Can you list a couple of the -- of those

23  types of opioids that you think have no

24  legitimate use?

25      A.   Heroin would be the -- would be the top

Page 30

1    one that would come to mind as well as some of

2    the street forms of fentanyl and -- and -- and

3    there are certainly ways that legitimate drugs

4    could be abused by individuals who don't

5    necessarily need them for pain.

6        Q.   But in your view, I take it that, you

7    know, all prescription opioids have some

8    legitimate uses?

9        A.   Sure.  I think that's fair.

10       Q.   We talked about the addictive qualities

11   of opioids.  How about the standard of care for

12   pain management?  Did you learn anything about

13   that in medical school?

14            MR. SHKOLNIK:  Objection to form.

15            THE WITNESS:  I missed that.

16   BY MR. DOVE:

17       Q.   He objected to form.

18       A.   Oh, okay.

19       Q.   It's for the record.

20       A.   So, yeah, of course, we learned that in

21   medical school.  The -- and what is your question

22   exactly?  I'm sorry.

23       Q.   I guess, well, first, just did you learn

24   anything about the standard for pain -- for --

25   standard of care for pain management in medical

Page 31

1  school?

2      A.   Yes.

3      Q.   And -- and, again, just generally --

4      A.   Yes.

5      Q.   -- what did you learn about the standard

6  of care for pain management?

7      A.   So the standard of care for using

8  opioids, specifically for pain management, is

9  they are supposed to be used for short-term use.

10  They're not typically -- were not typically used

11  for long-term pain unless the pain was absolutely

12  very severe.

13          The risk of building up a tolerance to

14  pain over time or a tolerance to the medication

15  over time and the risk of addiction was high.  So

16  kind of weighing the risks and benefits, if you

17  will, of the use of the medication versus the

18  necessity of pain management.

19      Q.   And has -- you know -- and that was your

20  understanding back in med school?

21      A.   Uh-huh.

22      Q.   And has that -- your understanding of

23  the standard of care for pain management changed

24  over time?

25      A.   Interestingly, no, although I have --

Page 32

```
 1  well, I would say my -- mine has not changed over
 2  time.  I still believe that, yes.
 3      Q.   And you said, "Interestingly, no."  I
 4  mean, was there something that -- that -- that
 5  came to mind, like some -- some reason why you --
 6  you --
 7      A.   The --
 8      Q.   -- paused?
 9      A.   There was a period of time in the '90s
10  when pain management went through a bit of an
11  evolution.  And I do recall pharmaceutical reps
12  coming to my office and -- and telling me that if
13  a person truly has pain, that you are not going
14  to addict them by prescribing opioids.  I do
15  recall that.
16          There was also a shift in -- I recall
17  "pain is the fifth vital sign," I believe, was
18  kind of the -- the theme where we actually used
19  little smiley faces and frowny faces to measure a
20  person's pain.  And so there was much more focus
21  on pain management.  I would say this was
22  probably in the early to mid-'90s.
23          And during that time, some doctors I
24  know, doctors that I worked with, in fact, did
25  probably increase their prescribing of these
```

1  opioids during that time.  I did not.

2         MS. LINN:  And I would just like to note

3  that response is, obviously, Dr. Wharton's

4  personal --

5         THE WITNESS:  Personal.

6         MS. LINN:  -- response because that's

7  not within the range of 2013 --

8         THE WITNESS:  ODM.

9         MS. LINN:  -- to present.  So that's not

10  on behalf of the Department of Medicaid.

11         MR. DOVE:  Fair enough.

12         THE WITNESS:  Thank you.

13  BY MR. DOVE:

14     Q.   Did you learn, during school or early in

15  your career, that there were alternative

16  treatments for pain other than opioids?

17     A.   Yes.

18     Q.   What types of alternative treatments are

19  there?

20     A.   Nonsteroidal anti-inflammatory

21  medicines, nonopioid pain medicines such as

22  acetaminophen, physical therapy, perhaps

23  chiropractic, and some alternative medicines

24  also.

25     Q.   After you received your degrees and you

Page 34

1  said you had a residency at Miami Valley
2  Hospital, that you then practiced medicine for 20
3  years as a family practitioner.  In -- in what
4  area was that?  I mean, what geographic area was
5  that?
6       A.   Brookville, Ohio.
7       Q.   Okay.
8       A.   Outside of Dayton.
9       Q.   And then after you did that, what did
10  you do next?
11       A.   I became a hospitalist at Upper Valley
12  Medical Center.
13       Q.   And about when did that job begin?
14       A.   2011, 2012.  In that range, I believe.
15       Q.   And when you say you were a hospitalist,
16  what were your responsibilities as a hospitalist
17  at Upper Valley Medical Center?
18       A.   So I managed a -- inpatient patients, up
19  to about 20 patients a day, typically, I would
20  see in the hospital.
21       Q.   Okay.
22       A.   Just all inpatient work.  No outpatient
23  at that point.
24       Q.   Did you have administrative
25  responsibilities?

1      A.    So I did.  I developed some.  Our chief

2  medical officer left the organization while I was

3  a hospitalist there, and I became the -- I became

4  the interim medical director for utilization

5  management for Upper Valley Medical Center.  So

6  I -- I actually worked to -- worked with --

7  worked directly with the insurance companies for

8  payment purposes around utilization management

9  for -- for -- in -- for Upper Valley Medical

10 Center.

11     Q.    So you said you worked directly with

12 insurance companies for payment purposes --

13     A.    Uh-huh.

14     Q.    -- I guess in connection with

15 utilization management.  What -- what -- what

16 types of things did you do in that role?

17     A.    So if an insurance company would deny

18 payment for a certain service or a certain

19 admission, I would have a discussion with the

20 insurance company's medical director justifying

21 the use of that service or that admission.

22     Q.    So how long did you work, then, as a

23 hospitalist at Upper Valley Medical Center?

24     A.    Approximately two years.

25     Q.    What did you do after that?

1      A.   I joined CareSource, which is a managed
2  care organization, a Medicaid managed care
3  organization, in Dayton, Ohio.
4      Q.   And what were your responsibilities in
5  that position?
6      A.   My original role was utilization
7  management.  And so I was on the other side.  I
8  was on the insurance side of that process.  And
9  that evolved over my four years at CareSource.  I
10  became the Ohio medical director for CareSource
11  and became vice president in charge of quality
12  and behavioral health for CareSource.
13      Q.   Now, you said CareSource is one -- and
14  we'll talk about this later -- but is one of the
15  managed care organizations for Medicaid?
16      A.   That's correct.
17      Q.   And did your responsibilities -- did you
18  have direct interactions with Medicaid?
19      A.   Yes.
20      Q.   And what were the nature of those
21  interactions when you worked at CareSource?
22      A.   So the Ohio Department of Medicaid pays
23  CareSource.  And so our interactions had to do
24  with clinical processes, clinical programs that
25  were set up, usually by Dr. Applegate.

1   Dr. Applegate was the medical director for

2   CareSource -- or for ODM, still is.  And so we

3   had monthly meetings with Dr. Applegate.  All of

4   the medical directors from the five plans would

5   meet with her on a monthly basis.  We would share

6   notes, work on program -- programatic things

7   together as plans.

8       Q.   Did any of your work at CareSource

9   relate to -- to reimbursement for prescription

10  opioids?

11      A.   Yes.

12      Q.   And in what way?

13      A.   Well, in several ways.  As a utilization

14  management doctor, there were cases of expensive

15  utilization of opioids that would -- that would

16  cross my desk.  And I would need to sometimes

17  reach out to a provider to understand why,

18  perhaps, he was using the drugs he was using and

19  the quantities he was using.  That would be --

20      Q.   Were you involved in any --

21      A.   -- an example.

22      Q.   Were you -- were you involved in any

23  initiatives, either that O- -- that Ohio Medicaid

24  was undertaking or that CareSource was

25  undertaking, with regard to the use of opioids?

1     A.   I would -- yes.  To -- I think that all

2   of us recognized -- and when I say "all of us,"

3   I'm talking about the five plans and

4   Dr. Applegate -- I think that we recognized the

5   need for some intervention probably 2016, 2015,

6   somewhere in that range.  And we also decided

7   that perhaps working together as a group of plans

8   and -- and the department might be helpful.  And

9   so we did initiate some processes.

10           I think the first one that we had

11   anything to do with as far as when I was still at

12   CareSource had to do with limiting the -- let me

13   think here.  Hold on.  -- limiting the number of

14   opioid prescriptions per month that a patient

15   could get.  And if they went above five

16   prescriptions per month, they would need a prior

17   authorization to get that filled.  I believe that

18   was the first -- the first initiative that we

19   worked on together.

20     Q.   Do you recall any others off the top of

21   your head?

22     A.   There have been several since.

23   Certainly --

24     Q.   We'll get to the ones --

25     A.   Okay.

1      Q.    -- when you -- when you came to Ohio

2    Medicaid.

3      A.    Yeah.

4      Q.    But while you were at CareSource, was

5    there any initiative --

6      A.    The -- the -- yeah.  Absolutely.  And

7    this one -- this one, actually, I wasn't directly

8    involved with but I am aware of.  This had to do

9    with the identification of members who had

10   extremely high use of opioids, very high MEDs.  I

11   think we were looking at 400 MEDs or above.  We

12   identified those individuals and then identified

13   the physician who was prescribing those very high

14   doses of medications.

15         And had an escalating communication plan

16   associated with those individuals starting with a

17   letter asking them to kind of explain themselves,

18   what their treatment plan was, why this patient

19   was on this much medicine, is there a weaning

20   opportunity perhaps, and what the long-term care

21   plan was.

22         If we did not get a response or if we

23   didn't see any change in the prescribing

24   behavior, that would escalate to a series of

25   phone calls from one of our medical directors and

Page 40

1  could eventually lead to actually disenrolling
2  that provider from the CareSource team of
3  providers if there was continued non- --
4  nonadherence, noncompliance with those
5  recommendations or without -- without sufficient
6  need to continue, should I say?
7      Q.   And did you coordinate with Ohio
8  Department of Medicaid?
9      A.   No.  That was an internal CareSource
10  process.
11      Q.   And you said you were able to identify
12  patients and identify providers.  How -- how were
13  you able to identify these problematic parents or
14  providers?
15      A.   Through claims.
16      Q.   Through claims data?
17      A.   Uh-huh.
18      Q.   Okay.  So -- so you -- you worked at
19  CareSource, then, from when to when?
20      A.   So let me just think here.  2012 to '16,
21  I believe.
22      Q.   And then what did you do starting in
23  2016?
24      A.   Actually, it was 2017.  My bad.  2017, I
25  joined the Ohio Department of Medicaid.  Was it

1   '16?  I'm blocking.

2       Q.   I think it was 2017, according to our

3   records.

4       A.   Yeah.  I think it was 2- -- I'm sorry.

5   Yeah.

6       Q.   Yeah.

7       A.   It was 2- -- 2017.  Time flies.

8       Q.   Uh-huh.

9       A.   So I joined the Ohio Department of

10  Medicaid at that point.

11      Q.   And what led you to join the Ohio

12  Department of Medicaid?

13      A.   So I had interacted with Dr. Applegate

14  frequently in my job at CareSource.  I

15  appreciated her, appreciated the work she did and

16  the leadership she provided.  And she offered me

17  a job, so . . .

18      Q.   Okay.  We'll -- we'll turn to your, sort

19  of, role at Ohio Medicaid in a minute.  First, I

20  wanted to double back a little bit to your work

21  as a medical doctor.

22           You're -- you -- you -- you remain

23  currently a licensed medical doctor in the state

24  of Ohio; is that correct?

25      A.   That is correct.

Page 42

1     Q.   And you've held that license since 1991?

2     A.   1989.

3     Q.   Since 1989.

4     A.   Yeah.

5     Q.   Okay.

6     A.   1990, actually, because I think the

7  second year of medical school we were -- or third

8  year of medical school.

9     Q.   And then -- and you were -- as you

10  already testified, I think you -- you were -- you

11  were a family practitioner.

12     A.   Right.

13     Q.   You started out at Miami Valley

14  Hospital, correct?

15     A.   That's correct.

16     Q.   And so you've written prescriptions

17  before, correct?

18     A.   Yes.

19     Q.   And you've written prescriptions for

20  prescription opioids before, correct?

21     A.   Yes.

22     Q.   I mean, can -- you know, again, can you

23  give a sense, just for a layperson here, you

24  know, I mean, how -- in a -- in a family -- as a

25  family practitioner, I mean, how frequently are

1    you prescribing opioids and for what purposes?   I

2    mean, just as a general statement.

3        A.    So I think -- it's very, very hard to

4    remember exact numbers or percentages --

5        Q.    Understood.

6        A.    -- but, you know, to -- I would say that

7    I probably wrote an opioid prescription three

8    times a week.  Two, three times a week, perhaps.

9        Q.    And, you know, again, for what general

10   purposes would you write these opioid

11   prescriptions?

12       A.    Severe injuries, sprains, strains,

13   perhaps severe dental pain, some infections.  I

14   mean, just pain in general.  But, typically, I

15   mean, I had a very few patients that I managed on

16   long-term opioids who came to me already on them.

17   I typically did not initiate opioids for chronic

18   pain.

19            In fact, I had a -- a little spiel that

20   I constantly gave patients about opioids that --

21   you know, that long-term pain is -- opioids are

22   not necessarily the best call for any pain that's

23   likely to be there for a long period of time,

24   such as low back pain or, you know, ongoing types

25   of pain.

1          So, typically, it was acute pain.

2     Typically, it was a pain that was self-limited, I

3     knew it was going to heal.  But during that

4     healing process, they would need some pain

5     medications.  So that was the more -- most

6     typical of the opioid prescribing.

7          Q.   You know, on occasion, would you

8     prescribe an opioid for long-term chronic pain

9     if -- if nothing else was working or --

10         A.   In hospice patients.  If I had

11    patients -- I also saw patients in the nursing

12    home.  I usually managed about 60 to 70 patients

13    in Brookhaven; it's our local nursing home.  I

14    managed a lot of hospice patients, a lot of

15    patients who had terminal illness and pain.  And

16    in those situations, comfort was key.  And so I

17    would use chronic opioids in those cases.

18          And, occasionally, I would inherit a

19    patient or I would get a patient who was already

20    on chronic opioids.  And I would maintain that

21    and sometimes try to wean them slowly.

22    Sometimes, successfully; sometimes, not.  But

23    that was a difficult situation.  But the vast

24    majority of my opioid prescribing was for acute

25    pain and/or chronic pain in -- in the case of a

Page 45

1   terminal illness.

2       Q.   Did you ever refuse to prescribe an

3   opioid to someone who asked for one?

4       A.   Many times.

5       Q.   And -- and why would you refuse?

6       A.   Typically, because what they -- one of

7   two reasons.  One, it appeared that they were

8   simply drug seeking.  They were doctor shopping

9   or drug seeking.

10           Or, two, they had what I considered

11  chronic pain.  And -- and I would try to steer

12  them towards more -- safer long-term treatment

13  programs.

14      Q.   And were there ever any instances when

15  you prescribed an opioid and learned later that

16  the patient was addicted to the drug or was

17  selling the drug to others?

18      A.   Yes.

19      Q.   And what did you do in those

20  circumstances?

21      A.   Those patients usually got a letter

22  saying that they're not welcome back in my

23  office.  I had a police officer, in fact, who had

24  that happen.  So it was -- yeah.  Yeah.  We did

25  hear that -- we did hear those cases.

1          MS. LINN:  Ron, how much longer do you

2    anticipate going into Dr. Wharton's background?

3    Just --

4          MR. DOVE:  This -- I think that might

5    actually be the last --

6          MS. LINN:  Okay.

7          MR. DOVE:  -- question.

8          MS. LINN:  Okay.

9          MR. DOVE:  Let's see.  I want to talk a

10   little bit about your work at Ohio Department of

11   Medicaid, but that's --

12         MS. LINN:  Sure.  Yeah.  Just --

13         MR. DOVE:  Yeah.  So that's what we're

14   doing now.

15   BY MR. DOVE:

16      Q.   So let's shift gears here.  When did you

17   begin working at the Ohio Department of Medicaid?

18      A.   A little over two years ago.  Has it

19   been a year -- I think May of '17.  Is that

20   right?

21      Q.   May of 2017?

22      A.   All right.

23      Q.   Sounds right to me --

24      A.   You're going to have to --

25      Q.   -- based on our records.  Yes.

Page 47

1       A.    Yeah.

2       Q.    And what was your position initially?

3       A.    So assistant medical director.

4       Q.    And is that still your current position?

5       A.    Yes.

6       Q.    And who do you report to?

7       A.    Dr. Mary Applegate, the medical

8    director.

9       Q.    And you've reported to her for the

10   entire time?

11      A.    Correct.

12      Q.    And do you report to anyone else?

13      A.    No.

14      Q.    And what are your responsibilities as

15   the assistant medical director?

16      A.    So all things assigned by Dr. Applegate.

17   I think that my biggest buckets, if you will, of

18   responsibility are all things pharmacy.  The

19   pharmacy team reports up through me, as well as

20   the dental benefit at Medicaid also reports up

21   through me.

22            I have an advisory role in many other

23   things, legislative things as well as policy

24   work, behavioral health issues and redesign.

25   I've been called in to act as a -- as a clinical

Page 48

1    advisor in those areas also.

2        Q.   Okay.  So let's, I guess, take those one

3    at a time.  So you say you're responsible for all

4    things pharmacy.  Do you supervise any employees

5    in that area -- particular area?

6        A.   Yes.  I have three pharmacists.

7        Q.   And what are their names?

8        A.   Baran -- Baron -- Scott Baran,

9    B-a-r-a-n; Michelle Barger, B-a-r-g-e-r; and

10   Tracey Archibald.

11       Q.   And what is Scott Baran's role?

12       A.   He's brand new.  He just started

13   approximately a week ago.  His role will be

14   managing -- looking over the managed care plans

15   and how they manage their pharmacy benefit.

16       Q.   And Michelle Barger, how long has she

17   been there and what's her role?

18       A.   Michelle has been there a little over a

19   year also.  And her role is -- has a lot to do

20   with our relationship with Change Healthcare

21   which is our PBA.  They manage our

22   fee-for-service benefit.  And she also runs our

23   DUR committee and board.

24       Q.   And then Tracey Archibald, how long has

25   she been there and what are her responsibilities?

1      A.    She is our pharmacy manager.  She

2    actually oversees the other two.  She's also been

3    there about a year and a half.  And her role is

4    oversight of the other pharmacists as well as

5    kind of a more holistic overview of the -- of the

6    entire department, so . . .

7      Q.    I'm assuming, but tell me if I'm wrong,

8    that your role overseeing the dental area does

9    not really relate to opioids.  Is that fair?  I

10    mean, I know you take opioids sometimes if you

11    have a wisdom tooth extraction or something like

12    that but . . .

13      A.    I would say, yes, in most cases, that's

14    true.  We did develop a dental episode in which

15    we have started to measure dental prescribing of

16    opioids associated with dental extraction.  And

17    so that's really the first time that we have

18    involved opioids specifically with the dental

19    program.

20      Q.    I guess -- but in those circumstances,

21    would the prescribing of opioids in that

22    connection still go -- work its way through the

23    pharmacy side or --

24      A.    Uh-huh.

25      Q.    Yes?

Page 50

1      A.    Uh-huh.  Yeah.

2      Q.    I mean, how many employees do you manage

3   on the dental side?

4      A.    Just one.

5      Q.    Just one?

6      A.    One part-time dentist.

7      Q.    Okay.

8      A.    Yeah.

9      Q.    And then on -- you -- you noted you also

10  have an advisory role in -- in certain policy

11  areas or --

12     A.    Uh-huh.

13     Q.    -- ad hoc initiatives.  Do you supervise

14  anybody in that connection?

15     A.    No.

16     Q.    No?

17     A.    I'm sorry.

18     Q.    Are you involved with any boards,

19  councils, or committees as part of your role at

20  Ohio Medicaid?

21     A.    Boards, councils, or committees.  I'm --

22  I'm not sure --

23     Q.    Like the drug utilization review board

24  or --

25     A.    Well, sure.

1       Q.    -- the pharmacy therapeutics --

2       A.    Yeah.

3       Q.    -- committee anything like that?  I

4  mean --

5       A.    Sure.  Yeah.

6       Q.    So what committees are you involved in?

7       A.    Yeah.  The pharmacy and therapeutics and

8  the DUR committee, yeah.  I would be involved in

9  both of those at a high level.  I don't get into

10  the weeds.  My -- my staff actually runs those

11  meetings and so forth.  But, certainly, at a

12  directional, at a high level, I'm involved with

13  those.

14       Q.    Just a couple questions about the -- a

15  few questions about the document production in

16  this case.  And maybe you're not the right person

17  to answer these, but I'll give it a shot.

18            Have you been asked to collect any

19  documents in connection with the ODM document

20  subpoena that we previously marked --

21       A.    Not pers- --

22       Q.    -- as --

23       A.    No.

24       Q.    No?

25       A.    Not --

Page 52

1      Q.    Okay.

2      A.    -- personally, no.

3      Q.    So none of the documents that have been

4   produced in this case have come from your

5   personal files; is that correct?

6      A.    That's correct.

7      Q.    If one were to look in your personal

8   files, are there likely documents relating to

9   opioids in those files?

10      A.    Other than what you have, probably not.

11   I can't -- I mean, I don't maintain a paper file.

12   There might be e-mails and so forth discussing

13   opioids, but that would be it.

14      Q.    How about ODM -- ODM more generally?

15   Has it been asked to collect documents in

16   connection with the document subpoena?

17      A.    I don't understand that question.

18      Q.    I am sort of asking you now in your

19   capacity as the representative of Ohio Medicaid,

20   has Ohio Medicaid been asked to collect documents

21   in connection with the document subpoena that was

22   previously marked?

23      A.    Yes, I think so.  I mean, you're --

24   that's what you're looking at there, right?

25   Is --

1     Q.   Yes.

2     A.   I'm trying to understand your question.

3     Q.   Yes.

4     A.   Yeah.  Okay.

5     Q.   So, well, let me ask the follow-up.  You

6  know, which --

7     A.   I'm sorry.

8     Q.   So if -- if Ohio Medicaid has been asked

9  to -- to look for and produce certain documents

10  in connection with the subpoena that was

11  previously marked, do you know which employees

12  have been asked to gather those documents?

13     A.   I do not.

14     Q.   Do you know what types of documents

15  they -- those employees have been asked to

16  gather?

17     A.   Yes.  I have had examples of those

18  documents.  I have seen those.

19     Q.   Do you know whether the employees who

20  were asked to gather the documents have finished

21  their collection of those documents?

22     A.   I believe so.

23     Q.   But you don't know the names of the

24  employees who were asked?

25     A.   I assume it's my legal team, but I --

Page 54

1    I'm -- that's an assumption.  I don't know.

2        Q.   Do you know if all responsive doc- --

3    all documents in Ohio Medicaid's possession that

4    are responsive to the subpoena that was

5    previously marked have been produced in this

6    litigation?

7        A.   I have been told so.

8            MS. LINN:  Ron, could you clarify that

9    last question?  Because we -- you had your

10   original subpoena and then we kind of narrowed

11   the scope.

12           MR. DOVE:  Right.

13           MS. LINN:  Were --

14           MR. DOVE:  I'm just trying to get -- I

15   mean, my understanding is that document

16   production and review is still ongoing, at least

17   to a certain extent, based on our communications.

18   I also understand that, you know, claims data has

19   not been -- is still, you know --

20           MS. LINN:  Sure.

21           MR. DOVE:  -- has not been produced.  So

22   there are still things that are outstanding.

23           It may be that Dr. Wharton is not the

24   right person to answer these questions.  I just

25   want to be -- want to make sure --

1              MS. LINN:  Right.  Right.  I mean --

2              MR. DOVE:  -- clearly.

3              MS. LINN:  -- I can answer them but,

4     obviously, I don't want to testify, so I don't

5     know --

6              MR. DOVE:  I would be fine if not

7     testifying, but just maybe for the record --

8              MS. LINN:  Yeah.

9              MR. DOVE:  -- to clarify the record --

10             MS. LINN:  Yes.

11             MR. DOVE:  -- where Ohio Medicaid

12    feels --

13             MS. LINN:  Where we're at.

14             MR. DOVE:  -- that it is on this on

15    document production.

16             MS. LINN:  For purposes of the record,

17    there's still claims data we have discussed that

18    needs to be produced.  There's -- that's, I

19    believe, more categories, more fields of data,

20    more queries are being created right now for the

21    Department of Medicaid to run.  So that is still

22    ongoing.

23             There were also documents in response to

24    different reports that you submitted in a

25    follow-up request that I am still talking with my

Page 56

1   client regarding whether we would be able to

2   produce those or whether those documents fall

3   under some privilege.

4          Everything else, we believe, has been

5   produced subject to the limits that we've set or

6   any privileges that we have -- we've raised.

7          MR. DOVE:  Okay.  And so -- and that's

8   fine for the record.  And we can, obviously,

9   continue our discussions --

10          MS. LINN:  Okay.

11          MR. DOVE:  -- on that point - --

12          MS. LINN:  Okay.

13          MR. DOVE:  -- outside the deposition.

14   BY MR. DOVE:

15     Q.   All right.  New topic.  Dr. Wharton, how

16   is the Ohio Department of Medicaid organized?

17   Again, I'm not asking for the specifics of every

18   division, all the structure.  But just in

19   general, how is it organized?

20     A.   So it's -- our director reports

21   directly -- I mean, the -- the Medicaid director

22   reports to the Governor.  Dr. Applegate, my boss,

23   reports to our director, Barbara Sears.  I report

24   to Dr. Applegate.

25          There are 600-some employees, multiple

Page 57

1  TOs that are available publicly, I believe,

2  so . . .

3       Q.   And I take it Medicaid is -- you know,

4  I've seen some flowcharts -- is broken into

5  different sections --

6       A.   Correct.

7       Q.   -- and divisions --

8       A.   Correct.

9       Q.   -- correct?

10           Which divisions of ODM are relevant to

11  the topics you've been identified to address

12  today?  I'm trying to narrow that down.

13       A.   Uh-huh.  Health innovation and quality

14  is the division that -- that I work in.  So I --

15  I -- well, yeah.

16       Q.   So --

17       A.   Does that --

18       Q.   -- does health innovation --

19       A.   -- answer your question?

20       Q.   Well -- well, maybe.  I mean, I just

21  want to make sure there aren't any others.  So

22  we -- health innovation and quality --

23       A.   Uh-huh.

24       Q.   -- is one.  Are there -- are there other

25  divisions of -- of Medicaid or sections of

Page 58

1   Medicaid that work on issues that relate to

2   opioids?

3        A.   Yes.

4        Q.   And what would those divisions be?

5        A.   Our policy division, managed care

6   division.

7        Q.   Any others?

8        A.   Those would be the ones that come to

9   mind.

10       Q.   How about the state CHIP program?  Is

11  that a different --

12       A.   Yeah.

13       Q.   -- division or is that within one of

14  these?

15       A.   That's -- yeah.  The CHIP program is

16  just -- I mean, that's what Medicaid is.

17  That's -- CHIP is -- that's not a -- that's not a

18  department.  We all work on CHIP, so . . .

19       Q.   So, again, just generally, the -- you

20  know, the health innovation and quality division,

21  what -- what is it responsible for?

22       A.   So I would say moving Medicaid forward

23  in population health innovations by looking at

24  different incentives, looking at programs,

25  looking at opportunities to innovate, perhaps

Page 59

1   change payment models, to incentivize certain

2   behaviors, to find better ways to manage the

3   benefit to help our members be healthier.

4       Q.   And in the health innovation and quality

5   division, is that where the work gets done with

6   regard to, you know, sort of the day-to-day

7   prescriptions that come in and out and the

8   processing of data related to that and review of

9   data?  Is that all within the health innovation

10  and quality division, or is that another

11  division?

12      A.   Because pharmacy falls within health

13  innovation and quality, then I would have to say

14  yes.  We don't actually do the day-to-day work.

15  We have a PBA, pharmacy benefit administrator,

16  that actually does the nuts-and-bolts pharmacy

17  point-of-service work and so forth.

18      Q.   But -- and we'll talk about this more

19  later, but --

20      A.   Uh-huh.

21      Q.   -- but at least to the extent there's --

22  there's oversight of the PBA --

23      A.   Yes.

24      Q.   -- and interaction with the PBA, that's

25  all with -- that's within the health innovation

Page 60

1    and quality division?

2         A.    Correct.

3         Q.    How about the policy division?  What's

4    the -- what is their responsibility?

5         A.    So their policy -- their -- their --

6    their role is mainly defining policy.  They --

7    they look at -- they decide what is covered and

8    what is not, what is -- you know, what is a

9    reasonable payment for a specific service.  They

10   look at OAC and ORC.  They build -- they build

11   the rules that kind of govern the Medicaid

12   benefit.

13        Q.    And who's the head of that division?

14        A.    Ogby.  I don't know Ogby's last name.

15   Ogby something.  Sorry.

16        Q.    Okay.  And so when you're doing

17   policy-related work, are you interacting with

18   Ogby?  Are you still interacting with

19   Dr. Applegate?  I mean, what -- I'm just trying

20   to figure out how that works.

21        A.    Perhaps, both.  You know, it depends on

22   the -- on the -- the topic, or one of Ogby's

23   staff.

24        Q.    Okay.  And then, finally, the managed

25   care division.  What do they do?

1    A.   So they oversee the five managed care

2  plans.  They -- they own the relationship between

3  the managed care plans, most communications,

4  expectations.  The provider agreement or contract

5  between the Department of Medicaid and the plans

6  would -- would fall under their responsibility.

7    Q.   And who heads the managed care division?

8    A.   Patrick Stephan.

9    Q.   And to the extent the managed care plans

10 are dealing with, you know, pharmacy

11 reimbursement, pharmacy utilization review, that

12 sort of thing, is that -- is the oversight and

13 management and interactions with that, is that --

14 does that occur within the managed care division

15 or does it occur within the health innovation and

16 quality division?

17   A.   I would say both.  It's collaborative.

18   Q.   And do you know how long Pat- -- you

19 said -- what was the name of the head person --

20 head of the managed care division?  Patrick?

21   A.   Stephan.

22   Q.   Stephan.  How long -- do you have a

23 sense of how long he's been with Medicaid?

24   A.   I do not know.

25   Q.   And how about Ogby?  Do you -- do you

Page 62

1    know how long he's been --

2         A.    I do not know, huh-uh.

3         Q.    Have they both been there the entire

4    time you've been there?

5         A.    Yes.

6         Q.    I'd like to now mark as an exhibit -- or

7    as Exhibit 4 a document entitled -- well, a

8    document from the U.S. Department of Health &

9    Human Services Office of Inspector General dated

10   July 2018 entitled "Opioids in Ohio Medicaid:

11   Review of Extreme Use and Prescribing."

12                     - - -

13             Thereupon, Deposition Exhibit 4 was

14             marked for purposes of identification.

15                     - - -

16   BY MR. DOVE:

17        Q.    Dr. Wharton, do you recognize this

18   document?

19        A.    I do.

20        Q.    And what is this document?

21        A.    This was a report from the Office of

22   Inspector General regarding Ohio opioid use.

23        Q.    And you've seen this report before?

24        A.    It has been several months, but, yes, I

25   did see this report.

1      Q.    And did you have any involvement in the

2  creation of this report?

3      A.    No.

4      Q.    Do you know if ODM had any involvement

5  in the creation of this report?

6      A.    I believe there may have been data

7  requests from ODM.

8      Q.    Any other involvement?

9      A.    Not to my knowledge.

10     Q.    If you could, I guess, turn to the third

11 page of this exhibit.  And I would direct your

12 attention to the first paragraph.  And in

13 particular, do you see there in the -- I guess

14 the second sentence where it says that nearly

15 3.5 million people were enrolled in Ohio Medicaid

16 between June 2016 and May 2017?

17     A.    Yes, I do.

18     Q.    Okay.  And does that sound accurate to

19 you?

20     A.    Yes.

21     Q.    And do you also see in that paragraph

22 where it says that 16 percent of those folks

23 received opioids during that time period?  Does

24 that seem right to you?

25     A.    It's -- you want my opinion?  I mean --

1      Q.   Well, do you have any reason to doubt --

2      A.   No.

3      Q.   -- that -- that number?

4      A.   No.  I have no reason to doubt that

5   number.

6      Q.   And on the same page, if you look to --

7   to the -- to the last paragraph where it says

8   that the -- beginning "The majority of opioids

9   prescribed to Ohio Medicaid beneficiaries

10  (82 percent) were Schedule II or Schedule III

11  controlled substances, meaning they have the

12  highest potential for abuse among legal available

13  drugs."  Do you see that?

14     A.   Yes.

15     Q.   And -- and -- and would you agree that

16  ODM is aware of that fact?

17     A.   Yes.

18     Q.   And do you know when ODM became aware of

19  the fact that the -- that these opioids have the

20  highest potential for abuse among legally

21  available drugs?

22     A.   Say that again.

23     Q.   Yeah.

24     A.   Sorry.

25     Q.   I'll reword the question.  I'm not sure

Page 65

1   if it's clear.

2           Do you -- do you know when ODM became

3   aware that -- that the opioids prescribed to Ohio

4   Medicaid beneficiaries had the highest potential

5   for abuse among legally available drugs?

6           MR. SHKOLNIK:  Objection to form.

7           THE WITNESS:  No.

8   BY MR. DOVE:

9      Q.   Certainly -- has ODM been aware of that

10  fact since you've been at -- at ODM?

11     A.   Yes.  Yes.

12     Q.   If you could turn to Page 5 of this

13  document.  I direct your attention to, I guess,

14  the -- the third paragraph there.  It says that

15  "Between June 2016 and May 2017, 4,754 Medicaid

16  beneficiaries received high amounts of opioids.

17  This did not include beneficiaries who had cancer

18  or were hos- -- or who were in hospice care --

19  care during our study period and does not include

20  prescriptions used for medication-assisted

21  treatment of opioid use disorder."

22          Do you see that?

23     A.   Yes.

24     Q.   Would you agree that ODM is aware of the

25  fact of the state -- is aware of the factual

Page 66

1    accuracy of the statement I just read?

2        A.   Yes.

3             MR. SHKOLNIK:  Objection to form.

4    BY MR. DOVE:

5        Q.   Do you -- do you know when -- well,

6    strike that.

7             So if ODM was aware that between June

8    2016 and May 2017 there were over 4,700 Medicaid

9    beneficiaries who received high amounts of

10   opioids, I mean, how would they have received

11   notice of that?  I mean, how would they have

12   become aware of that statistic?

13       A.   Through this report.  I'm not sure we

14   would have had -- I don't know if we had

15   knowledge of that number prior to this report.  I

16   don't believe -- I don't know.  I don't know the

17   answer to that.

18       Q.   Would -- did ODM know -- even if they

19   didn't know the precise number, do you think ODM

20   knew that there were hundreds, if not thousands,

21   of Medicaid beneficiaries who were receiving high

22   amounts of opioids prior to the publication of

23   this report?

24       A.   Yes.

25       Q.   And how would ODM have become aware of

Page 67

1    that, that fact?

2        A.    I'm not sure that they would become

3    aware if they didn't look for that fact.   In

4    other words, early on -- I mean, let me just back

5    up just a little and say that --

6        Q.    Sure.

7        A.    -- a lot of this is done at the managed

8    care level.   About 90 percent of Medicaid members

9    are actually managed by our managed care plans.

10   And what the managed care plans knew or didn't

11   know about these patients, I don't know.   I'm not

12   aware.

13            Of the fee-for-service patients, the

14   10 percent that we actually manage, this kind of

15   information would be available through an

16   analysis of the data, but it would have to be an

17   analysis that we looked for.   Prior to me being

18   at Ohio Department of Medicaid, I'm not sure that

19   anyone looked.   I don't know the answer if

20   anybody looked for that specific data prior to

21   me.

22       Q.    But once you came on board at Ohio

23   Medicaid, is that the sort of thing that you've

24   said, "Hey, we're going to -- we're going to

25   start looking for this type of data"?

1      A.    Yeah.   This all kind of happened at the

2    same time.  So yeah.  This was -- this was when

3    it was really becoming a very public issue.

4      Q.    And so --

5      A.    Correct.

6      Q.    -- what do you do now to -- at ODM --

7    again, you don't know whether ODM looked at it in

8    years prior, but --

9      A.    Uh-huh.

10     Q.    -- once you came on board, you started

11   looking for this type of information.  How -- how

12   does ODM go about looking for, you know,

13   determining which beneficiaries are receiving

14   unusually high amounts of opioids?

15     A.    So we have -- Change Healthcare is our

16   pharmacy benefit administrator.  Part of their

17   role in administering that benefit is doing some

18   degree of data analysis for us.  And so we have

19   developed quarterly reports that include opioid

20   utilization statistics among that 10 percent of

21   fee-for-service Medicaid members that we manage.

22          Again, the plans also have similar

23   processes in place, I would assume, but that's

24   not -- that's not something that I would have

25   access to.

Page 69

1       Q.   Well, and we can -- we're going to cover

2    that, I think, a little later.  But you say the

3    plans would have access to that, you assume.

4    Don't -- don't -- do the plans --

5       A.   Of their own data.

6       Q.   Do the plans report to Ohio Medicaid any

7    information about opioid use within the plans for

8    Medicaid benefic- -- you know, Medicaid members?

9       A.   Not to my knowledge.

10            So let me say -- let me back up a

11   little.  We do get their claims after the fact,

12   but there is a three- or four-month claims lag.

13   But we do get their encounters and their claims.

14   So we would have access to the plans' claims

15   also.

16       Q.   So if ODM wanted to, and maybe they do

17   do this, but if -- if --

18       A.   Uh-huh.

19       Q.   -- if not -- if -- if you have access to

20   the -- the encounter data or the OD- -- you could

21   analyze that data as well, correct?

22       A.   Correct.

23       Q.   But at least for now, you're -- you're

24   limiting the analysis to the 10 percent

25   fee-for-service --

1      A.   Well, that's what we --

2      Q.   -- claims?

3      A.   -- impact directly.  That's correct.

4      Q.   If we could just, you know, stay with

5   the same exhibit.  If you could turn to Page 11.

6   In this gray box where it gives an example of

7   prescribers who prescribed to beneficiaries with

8   extreme amounts, and, you know, looking at the

9   first paragraph in that gray box, it describes a

10   nurse practitioner who ordered 26 opioid

11   prescriptions for a single beneficiary and 260

12   total prescriptions for beneficiaries receiving

13   opioids in extreme amounts.  Do you see that?

14      A.   I do.

15      Q.   You know, was ODM aware of this

16   particular nurse practitioner?  Again, not

17   getting into names or specific information, but

18   just is ODM aware of this nurse practitioner?

19      A.   I don't know.

20      Q.   Same question as to the second instance

21   here.  It says that -- describes a physician

22   specializing in psychiatry and neurology who

23   ordered -- who prescribed 52 opioid prescriptions

24   for a single beneficiary, 39 for another, and 352

25   for beneficiaries who received extreme amounts of

1  opioids.  Do you see that?

2       A.   I do.

3       Q.   And was ODO -- ODM aware of this

4  particular physician?

5       A.   I do not know.

6       Q.   I guess looking back -- I missed

7  something here.  Looking back at Page -- Page 1,

8  the last -- last paragraph there where it says,

9  you know, "Prescribers play a crucial role in

10 ensuring that beneficiaries receive appropriate

11 amounts of opioids."  Do you see that?

12      A.   Yes.

13      Q.   And would you agree with that statement,

14 that prescribers play a crucial role in ensuring

15 that beneficiaries receive appropriate amounts of

16 opioids?

17      A.   Yes.

18      Q.   In ODM's view, what is an appropriate

19 amount of opioids for a given patient?

20      A.   I'm not sure that ODM has a view or a

21 policy regarding that directly.  I think that

22 that falls more into a realm of other agencies,

23 such as the pharmacy and license -- or medical

24 boards.  That would not be something that we

25 would -- we would necessarily -- I would say the

Page 72

1    least-effective dose is what we would -- what I

2    personally -- this is not ODM -- I would

3    personally say the least effective dose.  But

4    what O- -- ODM doesn't have a policy regarding

5    this.

6         Q.   So the -- so -- so just so I understand,

7    so the policy as to an appropriate amount of

8    opioids that Medicaid is going to reimburse,

9    that's not set within Medicaid?  That's set by

10   other bodies?

11        A.   So we do and have recently set

12   prescribing limits.  This is some of the work

13   that we've done with the plans where all five

14   plans and Medicaid have worked together to set

15   standardized prescribing -- not -- not

16   necessarily prescribing limits, but reimbursement

17   limits.  In other words, we will only reimburse

18   certain amounts without a prior authorization.

19   And we based those numbers on the guidance of the

20   state medical board and the state pharmacy

21   board's pain management guidelines, opioid use

22   guidelines.

23        Q.   Okay.  What is a doctor -- what is the

24   doctor's role in determining the appropriate

25   amount of opioids for a given patient?

Page 73

1      A.    He's the prescriber.

2      Q.    Uh-huh.  And so he has a -- obviously, a

3  role to play, a crucial role, as we talked

4  about --

5      A.    Yes.

6      Q.    -- correct?

7      A.    Yes.

8      Q.    And what -- what does he do to fulfill

9  that role?

10      A.    He should evaluate the patient, assess

11  the degree of pain, assess the chronicity of the

12  pain, weigh the risks and the benefits of various

13  treatment options, and prescribe safely.

14      Q.    Is the pharmaceutical manufacturer

15  involved in that decision?

16      A.    Shouldn't be.

17      Q.    But you think that the pharmaceutical

18  manufacturers are directly involved in that

19  decision?

20      A.    If the pharmaceutical manufacturers are

21  marketing in a way that might coerce -- not

22  coerce -- might convince the physician to

23  prescribe otherwise.

24      Q.    But, again, in the end, it's the -- it's

25  the prescriber that prescribes, correct?

1      A.    That is correct.

2      Q.    Sticking with this document for just

3  another minute or two.  If you could look at

4  Page 6, please.  In the second full paragraph, it

5  says that ". . . Beneficiaries may receive

6  opioids for legitimate purposes such as chronic

7  pain management . . . ."  Do you see that?

8      A.    I do.

9      Q.    Is it ODM's position that prescription

10  opioids may be legitimately prescribed for the

11  treatment of chronic pain?

12      A.    In certain circumstances.  So it's -- I

13  don't know that we have a position, per se, but

14  we recognize the fact that there are certain

15  situations where chronic pain management will

16  require opioids.

17      Q.    And that's true despite the risks that

18  are -- you know, that we've talked about and are

19  referenced in this exhibit?

20      A.    Yes.

21      Q.    Even the risk of opioid misuse, correct?

22      A.    Explain that.

23      Q.    Well, I'm just saying that -- that it's

24  true that there are certain times when you're

25  balancing the -- the risks and the benefits that

1    it's ODM's position that prescription opioids may

2    be legitimately prescribed for the treatment of

3    chronic pain in certain circumstances --

4         A.   Yeah, but never in the case --

5              MR. SHKOLNIK:  Objection to form.

6              THE WITNESS:  -- of misuse.

7    BY MR. DOVE:

8         Q.   What I --

9         A.   I don't --

10        Q.   I understand never in the case of

11   misuse.  But isn't --

12        A.   Oh.

13        Q.   I thought you testified earlier that

14   there's always some risk of misuse in prescribing

15   an opioid.

16             MR. SHKOLNIK:  Objection to form.

17   BY MR. DOVE:

18        Q.   Is that fair?

19        A.   There's always a chance, yes, or

20   very frequently a chance.

21        Q.   And my question is just:  Nevertheless,

22   despite that chance, there are circumstances

23   where it's ODM's position that prescription

24   opioids may be legitimately prescribed for the

25   treatment of chronic pain?

1      A.   We understand that need, yes.

2      Q.   I guess -- let's see here.  I think this

3   is the last question on this document.  If you

4   could turn to Page 2, first full paragraph.  Is

5   it -- is it accurate to say that the state plays

6   an important role in ensuring that beneficiaries

7   receive appropriate amounts of -- of opioids?

8   And this paragraph talks about a number of

9   efforts and initiatives.

10          And -- and my question is:  Do you --

11   would you agree that the state plays an important

12   role in ensuring that beneficiaries receive an

13   appropriate amount of opioids?

14      A.   Yes.

15          MS. LINN:  I'm going to object because

16   he only speaks for ODM, he doesn't speak for the

17   State of Ohio.  So his -- his response would only

18   be does ODM play a role.

19          MR. DOVE:  Yeah.  Well, let me reask

20   that.  That's a fair point.

21   BY MR. DOVE:

22      Q.   So would you agree, then, that -- is it

23   accurate to say that ODM plays an important role

24   in ensuring that beneficiaries receive an

25   appropriate amount of opioids?

1      A.   Yes.

2      Q.   And I guess I -- just -- just so I

3   understand, what -- do you -- in your own mind,

4   do you see a distinction between the Ohio

5   Department of Medicaid and the State of Ohio?

6      A.   Well, sure.

7      Q.   Sure.  So what's the -- in your own

8   mind -- so is it possible that the Ohio

9   Department of Medicaid would do something that

10  Ohio -- the State of Ohio would -- Ohio did --

11  also did not support?  I guess I just -- I

12  visualize this as it's a -- it's an organ of the

13  State of Ohio, so how could they be distinct?

14     A.    I think that the distinction just lies

15  in the roles.  You know, one, on the -- on the

16  front end, we don't design the guidelines or the

17  scope of practice.  We -- that's not our --

18  that's not our role.  We don't necessarily, you

19  know, do the licensure boards' -- you know,

20  that's their -- the role of actually defining

21  what is appropriate prescribing and so forth or

22  appropriate behavior of providers belongs to

23  them.  And on the other side, we're not a police

24  force.  So we don't necessarily have that -- that

25  ability to do law enforcement.

Page 78

1           So, you know, our role is somewhere in

2    between where we try to manage.  We can control

3    what we pay for and what we don't pay for, what

4    we require prior authorization for.  So we have

5    some levers that we can pull.  But I would say

6    that there are other state agencies that have to

7    work in consort, and we each have our own role

8    within that process.

9         Q.   You mentioned earlier that -- that --

10   that ODM may have provided some data in

11   connection with this -- this particular exhibit,

12   this -- this particular OIG report; is that

13   correct?

14        A.   Yes.

15        Q.   And -- and the data provided in this

16   report, did it come from the state's own Medicaid

17   data?

18        A.   I don't know.

19        Q.   I'm just -- looking back here, and I

20   think I've got this right, but Page 15, it talks

21   about the methodology.  And it says here "We" --

22   top paragraph, "We base this data brief on an

23   analysis of Ohio's Transformed Medicaid

24   Statistical Information System (T-MSIS)

25   prescription drug records."

1            And are those drug records housed at

2      Ohio Medicaid?

3           A.    I don't know.

4           Q.    Do you know -- I'm assuming your answer

5      may be "I don't know" to this, but let me ask it,

6      you know.  How long has the state been collecting

7      the T-MSIS data analyzed in this report?

8           A.    I don't know.

9                 MR. DOVE:  I'd like to mark as our next

10     exhibit Exhibit 5, a document from the Ohio

11     Auditor of State entitled "The Opioid Crisis:

12     The impact on the Medicaid population is

13     stretching the state's safety net."

14                          - - -

15            Thereupon, Deposition Exhibit 5 was

16            marked for purposes of identification.

17                          - - -

18     BY MR. DOVE:

19          Q.    Dr. Wharton, I'd ask you to take a look

20     at this document and ask -- and let me know do

21     you -- have you -- do you recognize this

22     document?

23          A.    Yes.

24          Q.    What is this document?

25          A.    This is a -- a report from the Ohio

1  Auditor of State regarding opioids in Ohio.

2      Q.   And was ODM involved in the preparation

3  of this report?

4      A.   No.

5      Q.   So I --

6      A.   Perhaps data, again, so . . .

7      Q.   So were you personally involved in the

8  creation of this report?

9      A.   No.

10     Q.   I direct your attention to Page 2, the

11 executive summary.  In looking at the -- the

12 first bullet point in the executive summary, it

13 states that "The total Medicaid costs for opioid

14 prescriptions in Ohio jumped 255 percent between

15 2013 and 2016, from just over 40 million to just

16 under 240 million."  Do you see that?

17     A.   I do.

18     Q.   Do you have any reason to doubt the

19 accuracy of those statistics?

20     A.   No.

21     Q.   Do you know what percentage of opioid

22 prescriptions in Ohio are currently reimbursed by

23 Medicaid?

24     A.   A large number, but I don't know the

25 exact percentage.

Page 81

1      Q.   Do you have a sense of what the
2  percentage -- and, again, I understand you may
3  not have a precise percentage but just a general
4  percentage -- of Ohioans who are covered by
5  Medicaid, what percentage of those folks have an
6  opioid abuse disorder?
7      A.   10 to 15 percent.
8      Q.   And are the vast majority of those
9  individuals currently receiving treatment for
10 opioid abuse?
11     A.   The vast majority are not.
12     Q.   Are not.
13     A.   Correct.  Well, the majority are not.
14 I'm not sure it's a vast majority.
15     Q.   If you could turn to Page 3 of this
16 exhibit, first paragraph.  About midway through
17 the paragraph it says that "While the -- the
18 opioid epidemic continues, the Ohio Board of
19 Pharmacy reported that opioid prescribing in Ohio
20 declined for a fourth consecutive year in 2016."
21 And --
22     A.   I'm sorry.  Where are you?
23     Q.   I'm sorry.  So I'm on Page 3.
24     A.   Uh-huh.
25     Q.   First paragraph.

```
                                               Page 82
 1       A.   Yes.

 2       Q.   Midway through the paragraph.

 3       A.   Okay.

 4       Q.   And just so --

 5       A.   Okay.

 6       Q.   So I'll --

 7       A.   Go ahead.

 8       Q.   -- read it again.  So "While the opioid

 9  epidemic continues, the Ohio Board of Pharmacy

10  reported that opioid prescribing in Ohio declined

11  for a fourth consecutive year in 2016.  Between

12  2012 and 2016, the total number of opioids

13  dispensed to Ohio patients decreased by

14  162 million doses to [sic] 24- -- 20.4 percent."

15            Do you see that?

16       A.   I do.

17       Q.   Does that comport with your

18  understanding of opioid -- opioid prescribing in

19  Ohio?

20       A.   Yes.

21       Q.   And has this decreased opioid

22  prescribing had an impact on Ohio Medicaid?

23       A.   Yes.

24       Q.   How so?

25       A.   So that decreased prescribing is a goal.
```

Page 83

1    And, you know, certainly trying to at least

2    mitigate harm caused by prescription opioids, I

3    would say that that's a successful outcome.  And

4    my guess is it would continue to decrease as time

5    has gone on.

6        Q.   How do you reconcile that statement that

7    we just read with the statement on Page 2 that we

8    read earlier that "The total Medicaid cost for

9    opioid prescriptions in Ohio jumped 255 percent

10   between 2013 and 2016, from just over 40 million

11   to just under 240 million"?  You know, how did

12   the cost increase so dramatically while the

13   number of opioids or the -- prescribed decreased?

14       A.   I could only speculate.  I don't know

15   the answer to that.

16       Q.   Okay.  I mean, have reimbursement rates

17   changed over this time period in a way that might

18   impact that?

19       A.   Yes, probably.

20       Q.   Have prices changed in a way that might

21   impact that?

22       A.   Perhaps, I think, yeah.

23       Q.   In the third paragraph of this same

24   Page 3, near the end, I guess the second-to-last

25   sentence, it says, "Between 2010 and 2016, the

Page 84

1    percent of Medicaid members with at least one

2    filled opioid prescription increased by

3    42 percent."  Does that comport with your

4    understanding?

5         A.   I have no reason to doubt it.

6         Q.   How is this increase reconciled with the

7    overall decreasing number of opioid

8    prescriptions?

9         A.   Well, differences in years, for one.

10   The -- the first example you gave was simply four

11   quarters of -- starting in 20- -- ending in 2016,

12   so this is a much longer time period.  I'm not

13   sure you're comparing apples to apples.

14        Q.   Anything else come to mind as to why

15   that might be a difference?

16        A.   No.

17        Q.   Dr. Wharton, if you could turn to

18   Page 13 of this exhibit, and in -- in particular,

19   Chart 5.  And it -- it -- there at the beginning

20   where it describes what Chart 5 is, it says that

21   "Chart 5 compares 2015 patterns of short term

22   opioid use of Medicaid members to the

23   commercially insured population."

24             And then going down a little bit, it

25   says, "Over 99 percent of Medicaid prescriptions

Page 85

1   were 30 days or under compared to approximately

2   74 percent of the commercially insured

3   population."

4           Do you see that statement?

5       A.   Yes.

6       Q.   And is ODM aware of this data from 2015?

7       A.   From this report.

8       Q.   Yes?

9       A.   Uh-huh.

10      Q.   And do you -- to what does ODM -- to

11  what would ODM -- does -- to what does ODM

12  attribute this difference between the 99 percent

13  of Medicaid prescriptions were 30 days or under

14  compared to the 74 percent of commercially

15  insured population?

16      A.   We've not done a deep dive, so I don't

17  know what's behind it, but we're encouraged by

18  it.

19      Q.   And why are you encouraged?

20      A.   Shorter prescriptions, less likely to

21  become problematic.  More likely being prescribed

22  for acute -- acute pain issues.

23      Q.   On the -- on the same page, Chart 6 --

24  and feel free if you need more time to --

25      A.   Uh-huh.

1      Q.    -- to review any of this.  But Chart 6

2   compares prescription regimens among the Medicaid

3   population and the commercially insured

4   population.  And do you see there that,

5   essentially, zero percent of the Medicaid

6   population receives long-duration opioids -- I

7   guess defined as over 90 days -- while 45 percent

8   of the commercially insured population receives

9   those type of opioids.  Do you see that?

10      A.   I do.

11      Q.   To what do you attribute this

12   difference?

13      A.    Different populations.  I mean,

14   that's -- that's really the only -- different

15   population, different needs.  Perhaps different

16   providers.  I mean, there's a lot of

17   possibilities.

18      Q.   What -- I mean, when you're -- I don't

19   know if you can generalize here or not, but --

20   but in characterizing the Medicaid population

21   versus the commercially insured population, what

22   are the distinctions that you see?

23      A.    The largest distinction is -- is

24   poverty --

25      Q.   Uh-huh.

```
                                          Page 87
 1      A.    -- is the presence of poverty.  And --
 2   and other distinctions could be the type of
 3   providers they see.  They may be seeing FQHCs
 4   or -- or clinics as opposed to, you know, the
 5   more commercial physician groups.
 6      Q.    So do you think these differences are
 7   driven at all by Medicaid policy versus, you
 8   know, reimbursement policies, drug utilization
 9   policies versus commercially insured, or do you
10   have any sense of that?
11           MR. SHKOLNIK:  Objection to form.
12           THE WITNESS:  So in -- in 2015, those --
13   those differences -- these are statewide Medicaid
14   averages, which means this isn't fee for service.
15   This also includes our managed care plans.  It
16   may have something to do with some of the managed
17   care policies and some of the managed care work
18   around opioids early on.
19   BY MR. DOVE:
20      Q.    Okay.  In the -- the paragraph about
21   Chart 6 above the two charts, the statement's
22   made that -- there at the end, it says, last two
23   sentences, "In October of 2013, Ohio issued
24   guidelines for prescribing opioids for treatment
25   of chronic non-terminal pain.  These guidelines
```

1   may be contributing to the differences noted."

2   Do you agree with that?

3       A.   Yes.

4       Q.   What guidelines are being referred to

5   here?

6       A.   So that would be the licensure board

7   guidelines.

8       Q.   And what -- what are the nature of those

9   guidelines?

10      A.   The guidelines are, essentially, for

11  giving guidance to providers on what type of

12  documentation and what type of thought process

13  needs to go into long-term prescribing of opioids

14  and may have had an impact on this.

15      Q.   What about the guidelines do you think

16  might account for the differences?

17      A.   The fact that there are guidelines might

18  account for some of the difference.  The fact

19  that physicians know that there are -- that there

20  are licensure rules in place regarding the

21  prescribing.  What's surprising is -- is why

22  wouldn't that also -- why wouldn't that also

23  change the commercial?

24      Q.   Uh-huh.  Uh-huh.

25      A.   So why did it only impact Medicaid?

Page 89

1   Those guidelines don't apply just to Medicaid
2   patients.
3       Q.   Do you know when these guidelines were
4   enacted?  It may say that.
5       A.   2013.
6       Q.   Yeah.  Okay.  For the record, 2013.
7   Okay.
8           Do you know how much Ohio Medicaid spent
9   in 2017 on treating opioid abuse addiction?
10      A.   I do not.
11      Q.   Do you have a general sense of that?
12      A.   A lot.
13      Q.   A lot.  Okay.
14      A.   No, I don't.
15      Q.   And do you know per person?  Any sort of
16  statistic off the top of your head that you've
17  heard on that?
18      A.   Yeah.  I've heard the per member, but I
19  don't -- I don't recall the number.  I'm sorry.
20      Q.   Okay.  And, again, feel free, I'm -- I'm
21  happy to keep -- keep rolling here, but if you
22  need a break or any -- anyone needs a break, just
23  let me know.
24      A.   I'm good for now.
25      Q.   Okay.

1      A.    Thanks.

2      Q.    All right.  Well, let's keep rolling.

3  Different topic.  We'll talk a bit about ODM's

4  relationship with its different vendors.

5            Has ODM utilized outside vendors to

6  administer pharmacy benefits or process

7  prescription drug claims?

8      A.    Yes.

9      Q.    Which vendors has ODM used?  And I

10  under- -- I understand -- and counsel can correct

11  me if I'm wrong -- but your testimony is limited

12  to 2013 to the present?

13            MS. LINN:  Uh-huh.

14            MR. DOVE:  Is that correct?

15            MS. LINN:  Uh-huh.

16  BY MR. DOVE:

17      Q.    Okay.  So from 2013 on --

18      A.    Uh-huh.

19      Q.    -- what vendors has ODM used to

20  administer -- to help it administer pharmacy

21  benefits or process prescription drug claims?

22      A.    So approximately 90 percent of Medicare

23  members are under the managed care plans.  Each

24  of the managed care plans then also hire a

25  pharmacy benefit manager.  And so that would be

Page 91

1    one step removed from any control that we have.
2           Then 10 percent of fee-for-service
3    Medicaid has used two:  the first being Xerox,
4    the second being Change Healthcare, formerly
5    Goold, I believe.  And I think that transition
6    happened about three or four years ago from Xerox
7    to Goold which then became Change Healthcare.
8           They're actually a pharmacy benefit
9    administrator, which means, unlike a PBM, the PBA
10   actually does the point-of-service or the
11   point-of-sale work.  They do rebate work and a
12   lot of our analytics.  But we maintain our
13   pharmacy network, and we also make payments
14   directly to the pharmacies from Medicaid.  So
15   when we get a claim, the claim actually comes
16   back to Medicaid, and we pay that claim in a
17   pass-through -- in a pass-through model.
18        Q.   Okay.  A lot to unpack there, so let's
19   get started.
20        A.   Okay.
21        Q.   Let's see here.  What -- let's start
22   with the Xerox and Change Healthcare.  I take it
23   Xerox and Change Healthcare, while they were
24   operating at different times, essentially,
25   perform the same role --

Page 92

1      A.   Yes.

2      Q.   -- as a PBA, correct?

3      A.   Correct.

4      Q.   Okay.

5      A.   To my -- I wasn't here then, but to my

6  knowledge, yes.

7      Q.   Who at Ohio -- the Ohio Department of

8  Medicaid has the most -- or is responsible for

9  the interaction with Change Healthcare?

10      A.   That would be us.  That's my pharmacy

11  team:  myself, Tracey Archibald, and Michelle.

12      Q.   Okay.  And -- and who among that group

13  would you say is the most knowledgeable about the

14  Change Healthcare relationship?

15      A.   Probably Tracey.

16      Q.   And what -- could you describe what her

17  role is vis-a-vis Change Healthcare?

18      A.   She meets with Change Healthcare several

19  times a week.  They -- she oversees the

20  contracts.  She's the contract administrator.

21  She ensures that all of the deliverables that

22  Change Healthcare -- all of the reports and so

23  forth are done in a timely manner.  They work

24  together to do the DUR and P&T committee

25  processes.  They look at formulary issues.  They

Page 93

1    look at putting out fires when they happen.  Some

2    utilization management questions could arise

3    occasionally.  So just everything.  Anything and

4    everything that has to do with the pharmacy

5    benefit.

6        Q.   And does Tracey have direct access or

7    I'll say -- does Tracey have direct access to the

8    encounter data that we talked about or referenced

9    earlier?

10           Maybe that's -- let me strike that

11   question.  That's confusing.

12       A.   Thank you.

13       Q.   Because I think the MC- -- I think

14   that's confusing.

15       A.   I'm not sure I would be helpful.

16       Q.   Yeah.  I'll -- let me -- I'll get into

17   that in a bit.

18           So let me just first complete the loop.

19   So in addition to you've got Xerox and Change

20   Healthcare for the fee for service.  And then

21   we've got managed care organizations, who each of

22   which hires their own PBM --

23       A.   Correct.

24       Q.   -- is that correct?

25           Are there any other vendors that Ohio

1    Medicaid deals with, you know, perhaps in

2    connection with data analysis or anything else

3    that is relevant to the -- the opioid issues

4    that -- that you are addressing today?

5        A.   Gosh.  I can't think of any.

6        Q.   So just as an example, if you were to

7    decide, you know, I really want to do -- we need

8    to do an analysis of opioid prescribing based on

9    the data we, at ODM, have access to --

10       A.   Uh-huh.

11       Q.   -- who would you ask to do that

12   analysis?  I mean, is it somebody in-house or is

13   it an outside --

14       A.   It would be Change Healthcare.

15       Q.   It would be Change Healthcare?

16       A.   Uh-huh.

17       Q.   Okay.

18       A.   Most likely.  Yeah.

19       Q.   And is there a person at Change

20   Healthcare that is sort of the -- the liaison,

21   the person who's -- who's responsible for the

22   Ohio Medicaid business?

23       A.   They have a team, actually.

24       Q.   Okay.  And -- and who are the -- the

25   members of that team?

Page 95

```
 1       A.   Jill and Ben.  I'm sorry.  I don't know
 2   their last names.
 3       Q.   Jill and Ben.
 4       A.   Yeah.
 5       Q.   Okay.
 6       A.   And the -- yeah.
 7       Q.   Okay.
 8       A.   There's one more.  I'm just blocking on
 9   names.  I'm sorry.
10       Q.   But those are the folks that Tracey or
11   you --
12       A.   Interact with.
13       Q.   -- interact with?
14       A.   Uh-huh.
15       Q.   Okay.  And you mentioned that ODM has
16   retained certain managed care organizations to
17   assist with pharmacy claims, correct?
18       A.   Say that again.
19       Q.   Has ODM retained any managed care
20   organizations to assist with pharmacy claims?
21   Maybe I'm formulating the question wrong.
22       A.   Yeah.  So ODM has contracted with five
23   managed care plans to -- to really look at the
24   entire medical benefit, including the pharmacy
25   benefit aspect.
```

Page 96

1      Q.   And could you -- who -- who are the --
2   the managed care organizations that ODM has
3   contracted with?
4      A.   CareSource.
5      Q.   CareSource.
6      A.   Molina.
7      Q.   Molina.
8      A.   Paramount.
9      Q.   Paramount.
10     A.   UnitedHealthcare and Buckeye.
11     Q.   And what determines whether a -- a
12  Medicaid beneficiary is on fee for service or
13  works with one of these MCOs?  Is that up to the
14  Medicare beneficiary, or is there some guidelines
15  that come into play?
16     A.   Yes to both.  People are auto assigned
17  to the plans if they don't have a preference.  If
18  they have a preference, then they could either
19  choose a plan -- I'm not sure if the choice to
20  fee for service is still open.  It was at one
21  time.  But we are moving towards a managed care
22  model, so we're moving away from the
23  fee-for-service model in general.
24     Q.   So you -- you envision a time when there
25  will be no more fee for service, it will all be

1   managed care?

2       A.   We would like to -- I mean, I -- I -- we

3   don't know.

4       Q.   Okay.

5       A.   I mean, it could happen.  That's

6   possible.

7       Q.   But right now, if you wanted -- the

8   members that are fee for service, that's by

9   choice, or is that by assignment?

10      A.   They tend to be in populations who are

11  waiver populations.  I would say the

12  fee-for-service population, in general, are much

13  sicker, have more medical needs than those who

14  are in the managed care side of things.  A lot of

15  waiver populations or folks who are in nursing

16  homes and so forth.

17      Q.   Okay.  What is the role -- and I'm --

18  I'm assuming the role of all the MCOs is the same

19  in the sense of, you know, what -- what's their

20  role with regard to the -- the pharmacy benefit

21  aspect of things.

22      A.   Correct.

23      Q.   So it's to say -- so what -- what do

24  they -- you know, they administer -- they do

25  everything?  I mean --

1      A.    Uh-huh.

2      Q.    -- is that the --

3      A.    Uh-huh.  So I -- I would say the plans

4   do it differently.  Different plans have, you

5   know, different responsibilities that they do

6   internally versus what they contract out to their

7   PBMs.  But, in general, all of the plans use PBM

8   for point-of-service work.  All of the plans, I

9   believe, also use the PBMs for their rebate

10  adjudication and so forth, all of their claims

11  adjudication.  The -- some plans do more work

12  internally.  They do -- might do special projects

13  regarding opioids or around adherence to

14  medication regimens, specific MTM -- medical --

15  medication therapy management -- programs where

16  they pay pharmacists to do a little extra work

17  around specific -- specific problems, so . . .

18      Q.    And you said each MCO has its own PBM.

19  Do you know the PBM that is associated with each

20  MCO?

21      A.    I do.

22      Q.    Okay.  So for CareSource, who is their

23  PBM?

24      A.    CVS Caremark.

25      Q.    Molina?

1      A.    CVS Caremark.

2      Q.    Paramount?

3      A.    CVS Caremark.

4      Q.    UnitedHealthcare?

5      A.    Optim.

6      Q.    Optim.  And Buckeye?

7      A.    CVS Caremark.

8      Q.    And does -- does ODM have direct

9  communication with these PBMs, or is the

10  communication with the MCO, or both?

11      A.    With the MCO only.

12      Q.    And do the MCOs share certain data with

13  ODM?

14      A.    Claims data.

15      Q.    Okay.  So they -- so -- so they will

16  share claims data.

17      A.    Yeah.

18      Q.    And you said, I think, earlier that

19  claims data is -- they share it a few months

20  after the fact, or how does it work?

21      A.    It can be.  I mean, it depends on when

22  the actual claim happens.  So -- but, yeah,

23  they -- they share the administrative data, the

24  encounter data specifically.  Right.  And it

25  depend -- I mean, sometimes, claims happen

1    promptly; sometimes, a provider may not get a

2    claim in for several months.  And so to be

3    accurate, we usually wait for all the claims to

4    kind of reach a point where we feel that the vast

5    majority of claims are countable, if you will.

6        Q.    And so they -- they share this claims --

7    the MCO shares this claims data with ODM, and

8    then does -- does ODM store this claims data in

9    its systems?

10       A.    Yes.

11       Q.    And the -- sort of the -- the word

12   that's used for this claims data from the MCOs is

13   called encounter data?

14       A.    Uh-huh.

15       Q.    Yes?

16       A.    Uh-huh.  Yes.

17       Q.    And then the word used for the claims

18   data for -- from the fee-for-service program, is

19   that also called encounter data, or do you just

20   call that claims data?

21       A.    Either.

22       Q.    Either?

23       A.    Yeah.

24       Q.    Okay.  But bottom line is that the --

25   the data that's provided is the same type of

Page 101

1   data --

2        A.   Correct.

3        Q.   -- is that fair?

4             And just -- and we'll go into this in a

5   little more detail later, but -- so -- but,

6   basically, for every claim, there's going to be

7   data that will identify a prescriber, correct?

8        A.   Correct.

9        Q.   A dispensing pharmacy, correct?

10       A.   Correct.

11       Q.   A drug code, correct?

12       A.   Yes.

13       Q.   And various other information about

14  the -- the drug that's being dispensed, correct?

15       A.   Correct.  As well as financial.

16       Q.   And financial --

17       A.   -- data.

18       Q.   -- information.

19       A.   Right.

20       Q.   All right.  So we've talked about the

21  MCOs.  Well, let me -- I guess to -- I'll just

22  kind of drive it.  We've got to get some names

23  here.

24            So for CareSource, is there a contact at

25  CareSource that is the -- sort of the client

```
                                                  Page 102
 1    relationship liaison with ODM?
 2         A.    There is.  Each of the plans have one,
 3    and I don't know them --
 4         Q.    Okay.
 5         A.    -- personally.  So, I mean, I -- I don't
 6    know who they all are.  But each one has a -- has
 7    a contact, yes.
 8         Q.    Okay.  And, again, the person at ODM in
 9    your division that works with the MCOs most
10    closely is?
11         A.    Myself and Tracey --
12         Q.    Okay.
13         A.    -- both.  As far as pharmacy issues.
14         Q.    Right.  Right.
15         A.    Correct.
16         Q.    All right.  So we've talked about MCOs.
17    What about third-party administrators?  Do you
18    work with any -- does ODM work with any
19    particular TPAs?
20         A.    So are you talking about TPAs employed
21    by the plans?
22         Q.    I'm talking about -- well, let's start
23    first with TPAs employed by O- -- ODM directly.
24         A.    So yes.
25         Q.    And who is that?
```

1        A.    Are you being specific to pharmacy or --

2        Q.    I'm being specific --

3        A.    -- are we --

4        Q.    -- to pharmacy, yes.  I'm sorry.

5        A.    So no.  Just Change Healthcare --

6        Q.    Okay.

7        A.    -- specific to pharmacy.

8        Q.    Okay.  How about for the managed care

9   organizations that we talked about?  Are you --

10  we -- we've talked about the PBMs that they use.

11  Do they -- are you aware of any third-party

12  administrators that those MCOs used in relation

13  to pharmacy?

14       A.    So I would say the only one that I can

15  think of offhand would be OutcomesMTM.  I think

16  four of the five plans use them to administer

17  their MTM -- medication therapy management --

18  programs.  There are probably others, but I'm

19  not -- the plans, so . . .

20       Q.    Gotcha.

21       A.    Yeah.

22       Q.    What about fiscal agents?  Are there any

23  fiscal agents that -- other than any of the

24  entities that we've already mentioned, are there

25  any fiscal agents that ODM has contracted with to

Page 104

1    assist with its --

2        A.   Actuaries.  Is that a fiscal agent?  I'm

3    assuming that's an actuary.  So Milliman --

4        Q.   It might be an actuary or just folks

5    who -- who work with the reimbursement data and

6    the -- you know, and -- and pharmacy

7    reimbursement data and sort of crunch those

8    numbers for use in different reports.

9        A.   Milliman.

10            MR. SHKOLNIK:  Objection to form.

11   BY MR. DOVE:

12       Q.   Sorry?

13       A.   Milliman.

14       Q.   Milliman?

15       A.   Milliman.  Yeah.  Yeah.  We have worked

16   with them on some pharmacy issues in the past.

17       Q.   And what types of issues have you worked

18   with them on?

19       A.   They actually review the pharmacy

20   expenditures in total for ODM and they help our

21   finance people set the rates they pay managed

22   care organizations.  They may also do some

23   special projects for us here and there.

24       Q.   Other than all the different entities

25   we've already talked about, is there anybody else

Page 105

1    that comes to mind as a -- a vendor or -- or

2    contractor that ODM uses that may be relevant to

3    opioid issues?

4        A.   No.

5             MR. DOVE:  All right.  I guess I think

6    this is probably a good time for a short break.

7    Off the record.

8             THE VIDEOGRAPHER:  Going off the record

9    at 10:32 a.m.

10            (Recess taken.)

11            (Ms. McNamara enters the conference

12             room.)

13            THE VIDEOGRAPHER:  We're back on the

14   record at 10:46 a.m.

15   BY MR. DOVE:

16       Q.   Dr. Wharton, I wanted to -- before

17   diving into each of the topics of examination,

18   I -- I wanted to go back to something you had

19   said earlier with regard to your preparation for

20   the deposition.  Now, you had mentioned that you

21   had met with Joe, the plaintiff's attorney, on at

22   least one occasion; is that correct?

23       A.   Correct.

24       Q.   Was he actually there for both meetings

25   that you mentioned or just one?

1      A.    Just one.

2      Q.    And which meeting was that?

3      A.    That would have been the later of the

4   two meetings.

5      Q.    Okay.

6           MS. LINN:  If I could interject.  If

7   you're going to ask anything, he -- it's,

8   obviously, not a plaintiff's attorney in this

9   lawsuit.  And there is a common interest

10  agreement with the attorney general's office, so

11  any kind of conversations would be

12  attorney-client privileged.

13          MR. DOVE:  Okay.  So it's -- it's the --

14  just so I understand, because I was actually

15  about to ask you --

16          MS. LINN:  Sure.

17          MR. DOVE:  -- what Joe the plaintiff's

18  attorney told you and what was discussed --

19          MS. LINN:  Uh-huh.

20          MR. DOVE:  -- because we -- I think

21  our -- our view was that that would not be a -- a

22  privileged conversation.  But if you're going to

23  instruct the witness not to answer, I don't want

24  to waste time on it.  So --

25          MS. LINN:  Sure.

Page 107

1          MR. DOVE:  So, what -- again, what's

2    your basis for asserting that -- that there is a

3    privilege here?

4          MS. LINN:  Sure.  The -- it's -- the

5    privilege is common interest.  The attorney

6    general's office signed a common interest

7    agreement because they're being represented by

8    this special counsel in an adjacent lawsuit in, I

9    believe, the Madison County Court of Common

10   Pleas, suing, I think, some of the same

11   defendants.

12         So we -- we did -- we executed a common

13   interest agreement.  And so in this capacity that

14   Joe spoke with Dr. Wharton, he was acting as

15   special counsel as an AAG.

16         MR. DOVE:  Okay.

17         MR. KNAPP:  Can I -- can I follow up on

18   that?  This is Tim Knapp for Allergan.

19         So your position is that the individual

20   that you all met with is not counsel in the

21   federal MDL?

22         MS. LINN:  Yes.  That's -- that is

23   correct.

24         MR. KNAPP:  It's not Mr. Rice?

25         MS. LINN:  No.

Page 108

1              MR. KNAPP:  Okay.

2              MS. LINN:  That's correct.

3              MR. HERMAN:  What -- what -- sorry.

4     This is Steve Herman from CVS.

5              What is Joe the plaintiff's attorney's

6     full name?  That might be helpful.

7              MS. LINN:  It's like Joe the plumber.

8     Joseph Callow.

9     BY MR. DOVE:

10        Q.   Okay.  Dr. Wharton, I would now like to

11    turn to the first topic that was listed in the

12    subpoena and in the November 9th letter, which is

13    ODM's policies, procedures, and practices for

14    processing, tracking, and adjudicating claims for

15    reimbursement for prescription opioids.

16             First, just to set the stage, how -- how

17    are Medicaid claims processed?  I mean, could you

18    just walk us through the -- the various steps in

19    how a Medicaid pharmacy claim is processed, you

20    know, starting from when the doctor writes the

21    prescription?

22        A.   Uh-huh.  Sure.  So a prescription is

23    written.  It is handed to a -- a patient or

24    called in to a pharmacy.  That prescription is

25    filled by the pharmacist.  The pharmacist submits

1  a claim at the time of service through a --

2  through a computerized system.  That system

3  generates a claim, and it also quickly will do a

4  scan to see if there are any edits that might

5  cause that claim to reject or require a prior

6  authorization.

7          If not, the claim is basically

8  adjudicated on the spot.  The patient gets their

9  medication.  The Ohio Department of Medicaid gets

10  a bill, and Ohio Department of Medicaid then pays

11  or reimburses the pharmacy for that claim.

12      Q.   And -- and so that's if -- if a claim is

13  approved.  If a claim is not approved, what

14  happens?

15      A.   So it might require a prior

16  authorization, in which case the -- there might

17  be a rejection at the time of sale and a request

18  to the provider to provide more information to

19  our PBA, who would then take that additional

20  information and decide whether there is truly

21  medical necessity for that claim or not and

22  whether it should still be covered.

23          MS. LINN:  Could I just clarify that,

24  Dr. Wharton, you're testifying for fee for

25  service?

Page 110

1           THE WITNESS:  Correct.

2           MS. LINN:  As opposed to the managed

3    care plan for claims processing?

4           MR. DOVE:  Fair enough.

5    BY MR. DOVE:

6        Q.  So that was for fee for service.  And

7    I -- and I -- and let me just sort of recap that,

8    make sure I've got it, and then we'll talk about

9    managed care.

10          So doctor writes the prescription,

11   patient takes the prescription to the pharmacy.

12   The pharmacy enters the information into its

13   computer system.  That computer system then

14   communicates with Ohio Medicaid's computer

15   system?

16       A.  Actually, there's a couple steps in

17   between.  I'm not familiar with all of the

18   systems.  There are --

19       Q.  Okay.

20       A.  There are -- in general, I think that's

21   accurate.  Yes.  There's -- there's -- there's

22   interaction with the edits from the -- from the

23   ODM system that would come into play that would

24   also look at eligibility and so forth.  So, yes,

25   there is an interaction there with the ODM

1    system.

2         Q.    And so -- and there's -- and is this --

3    is this computer system actually physically

4    located in ODM headquarters or somewhere -- an

5    ODM property somewhere?

6         A.    I don't think so, but --

7         Q.    Okay.

8         A.    -- I don't know.  I'm not sure.  I -- I

9    suspect it's a state system --

10        Q.    Okay.

11        A.    -- elsewhere.

12        Q.    But in any event, so the computer system

13   communicates with, that certain criteria are

14   analyzed --

15        A.    Uh-huh.  Uh-huh.

16        Q.    -- and the claim is either approved or

17   it's not?

18        A.    Right.

19        Q.    As you -- and then reimbursement

20   happens --

21        A.    Correct.

22        Q.    -- as appropriate?

23        A.    Correct.

24        Q.    How does that process differ with regard

25   to the managed care entities that work with

Page 112

1    Medicaid?

2        A.    So the system is identical, actually, up

3    and to the point of payment where at ODM, on

4    the -- on the fee-for-service side, we pay the

5    pharmacy directly.  On the plan side, the PBM

6    actually makes a payment to the pharmacy.

7        Q.    And at the point when the -- when the

8    claim -- when the pharmacy enters the information

9    in their computer system and it communicates --

10       A.    Uh-huh.

11       Q.    -- when you're dealing with a manu- --

12   with an MCO, is it communicating with the MCO's

13   computer system or its PBM's computer system, or

14   is it still communicating with ODM's computer

15   system?  Make sense?

16       A.    Probably both.  And I suspect there's

17   a -- I don't know -- I don't know if it's

18   serially or at the -- you know, or at the same

19   time.  But, yeah, both.  It would have -- because

20   it would have to -- you would have to have both

21   the eligibility stuff from -- from ODM as well as

22   whatever criteria around that claim edit that

23   each plan might have in place.  So you would have

24   to have some interaction with both systems.

25       Q.    And is the process any different when a

Page 113

1    claim is made for a controlled substance, such as

2    a prescription opioid?

3         A.   So the process would be different from

4    the pharmacist's point of view because he also

5    has to access OARRS and see what other

6    prescriptions this patient might have been

7    getting at other pharmacies from other providers

8    and so forth.

9         Q.   And when you -- and we're going to talk

10   a little bit more -- more about OARRS later.  For

11   the court reporter, that's an acronym that's

12   O-A-R-R-S, is that --

13        A.   Yeah.

14        Q.   -- right?

15        A.   It's the -- Ohio's -- oh, gosh.  It's --

16   it's the -- it's a database of all of the

17   scheduled medications that are prescribed in the

18   state of Ohio --

19        Q.   Okay.

20        A.   -- essentially.

21        Q.   But when we --

22        A.   It is maintained.

23        Q.   When we use the word "OARRS," we mean

24   O-A-R-R-S?

25        A.   Correct.  And I forget what all that

Page 114

1    stands for.

2        Q.    And much of the process we just talked

3    about is computerized, correct?

4        A.    Yes.

5        Q.    And is it -- and am I correct that it's

6    virtually instantaneous how quick -- I mean --

7        A.    Uh-huh.

8        Q.    -- this -- this happens pretty quickly,

9    correct?

10       A.    Yes.   In cases where prior authorization

11   is not necessary, it's instantaneous.

12       Q.    And who at ODM is the person most

13   knowledgeable about this process we just

14   discussed?

15       A.    The point-of-service process?

16       Q.    Just the -- yeah.   Sort of the -- the --

17   just the -- the process from -- in which a

18   prescription gets dispensed and then is

19   reimbursed.

20       A.    Probably Tracey.   She's a -- she's a

21   retail pharmacist prior to us, so she -- she gets

22   it from both ends.

23       Q.    And was ODM involved in it -- I mean, we

24   talked earlier about the vendors that are

25   involved in -- in this process.   You know, was

Page 115

1   ODM involved in developing this electronic claims

2   processing system in any way?

3        A.   I don't know.

4        Q.   Does ODM have any oversight

5   responsibilities with regard to this claims

6   processing system?

7        A.   Yes.

8        Q.   And what are those responsibilities?

9        A.   We define those edits that we were

10  talking about that would cause a claim to deny,

11  and we pay the bills.

12       Q.   Anything else?

13       A.   We hold our third -- our PBA accountable

14  for certain standards regarding adjudication

15  timelines and prior authorization timelines and

16  so forth.

17       Q.   And you've -- do you conduct audits of

18  the PBA?

19       A.   Yes.

20       Q.   Yes?

21       A.   Yes.

22       Q.   And how frequently do you conduct those

23  audits?

24       A.   I'm not sure.

25       Q.   Since you've been --

Page 116

1      A.    Two years.  I think it's every two
2   years.
3      Q.    Every two years?
4      A.    I think so, yeah.
5      Q.    And how about the MCOs?  Do you audit
6   the MCOs as well?
7      A.    That would be outside of my knowledge.
8   I'm not sure.
9      Q.    Okay.
10      A.    I'm not -- are you asking specifically
11   the plan --
12      Q.    Well, specifically as it --
13      A.    -- the plan or the PBM?
14      Q.    I'm just trying to -- well, it could
15   be -- I guess I should ask it for PBM as well.
16   I'm just trying to get a sense as whether, as
17   part of ODM's oversight responsibilities, does
18   it --
19      A.    There are --
20      Q.    -- do audits?
21      A.    -- definite audits of the plans.
22   Whether there's audit of the PBM, I'm not sure.
23      Q.    Okay.
24      A.    I'm -- I don't know.
25      Q.    I believe earlier you testified that

1  prescription opioids may -- you know, may, on
2  occasion, be legitimately prescribed for chronic
3  pain; is that correct?
4      A.   Yes.
5      Q.   How does ODM determine whether a
6  particular claim is legitimate?
7      A.   I'm not sure we can.  I don't think we
8  can.
9      Q.   And why not?
10     A.   It's not an easy thing -- that would --
11  well, why -- how could we?  I mean, we don't know
12  when that prescription goes home with a
13  patient -- when that bottle of medicine goes home
14  with a patient, how can I be sure from any kind
15  of data perspective that that medication is being
16  used for its intended purpose?
17     Q.   So in your view, there's nothing that
18  ODM can really do to determine whether a
19  particular claim is -- is legitimate or medically
20  necessary?
21     A.   That's correct.  I mean, if we look at a
22  claim-by-claim basis, that is very true.  It is
23  very difficult.  That would be a law enforcement
24  issue, not an ODM issue.
25     Q.   And I think we touched on this a bit

Page 118

1  earlier, but just to be clear:  What types of

2  information are included in the prescription drug

3  claim that's submitted by the pharmacy?

4       A.   We kind of went through that already.

5  It's basically the patient's name --

6       Q.   Okay.

7       A.   -- the patient's ID number, pharmacy

8  name, the actual prescription number or the drug

9  ingredient number, any additional dispensing fees

10  might be on there, the -- certainly the fees for

11  the ingredient itself would be part of that

12  claim, days supply, and directions and use.

13       Q.   And -- and maybe you said this, but the

14  name of the prescriber also?

15       A.   And the name of the prescriber, yes.

16       Q.   In operating this claims processing

17  system, who decides what information that the

18  claimant is supposed to -- is supposed to provide

19  to ODM?  Is that -- you know, who defines that?

20  Is that the vendor?  Is that ODM?

21       A.   There are -- there's actually national

22  standards for that -- for that information.  And

23  I believe -- see, I'm forgetting the acronym now.

24  I'm sorry.  I'm not good with acronyms.  But

25  there is a group -- there is a federal

1    organization that actually defines those

2    encounter inputs.

3        Q.   And does ODM continue to monitor the

4    rules regarding the information that claimants

5    must submit when seeking reimbursement?  Is that

6    something you continue to monitor?

7        A.   I'm not sure monitor is the right word,

8    but I suspect that if things are missing, that

9    the claim would not go through.  So that might

10   hold up the claim if we don't have required

11   information.

12       Q.   And can you ever think of a circumstance

13   where ODM decided, "Hey, we need pharmacies to

14   also submit this information with every claim.

15   Let's make that happen"?  Or is it -- does it not

16   work that way?

17       A.   So it would have to be -- it would have

18   to fall within those national standards.  So, in

19   other words, that -- those national encounter

20   standards that are out there.  To -- to deviate

21   outside of those would be very difficult.

22           MR. DOVE:  Okay.  I'd like to mark as

23   Exhibit 6 a document entitled "Ohio Department of

24   Medicaid Fee-for-Service Pharmacy Claims Review

25   Provider Manual."

```
 1                         - - -
 2          Thereupon, Deposition Exhibit 6 was
 3          marked for purposes of identification.
 4                         - - -
 5          MR. SHKOLNIK:  Exhibit 6, did you say?
 6          MS. LINN:  This, I think, is 6.  Yes.
 7   BY MR. DOVE:
 8      Q.   I ask, Dr. Wharton, if you could look at
 9   that and -- and tell us whether you recognize
10   this document.
11      A.   So I have not seen this document before,
12   but I recognize it as a provider manual regarding
13   Change Healthcare.
14      Q.   If I could ask you to turn to Page 4,
15   please.  And on Page 4, there's a section
16   entitled "Concurrent Claims Review Algorithms."
17   Do you see that?
18      A.   Yes.
19      Q.   And there's a bulleted list underneath
20   that.  Do you see that?
21      A.   Yes.
22      Q.   Is that bulleted list all of the
23   criteria that are considered when deciding to
24   approve or deny a claim?
25      A.   Are you --
```

Page 121

1          MS. SINGER:  Objection as to form.

2          THE WITNESS:  -- asking is this a

3    complete list?  I'm --

4    BY MR. DOVE:

5      Q.   I guess I'm asking -- well --

6      A.   It is what you say, but I'm not sure

7    that it -- I'm not sure that it documents every

8    eventuality.

9      Q.   Okay.  So it's -- it's a -- it's a list

10   of certain criteria, but you're not sure whether

11   it lists --

12     A.   Right.

13     Q.   -- all the criteria, correct?

14     A.   That's correct.

15     Q.   All right.  Do you know for how long --

16   you know, are these the current -- do you know if

17   these are the current criteria -- or if these are

18   current criteria that are used as part of the

19   concurrent claims review?

20     A.   I do not know.

21     Q.   Are ODM's claims processing criteria

22   different for different drugs?

23     A.   Yes.

24     Q.   How so, in -- in general?  What -- what

25   are the types of differences?

1     A.   Some drugs may have specific

2  restrictions on quantity limits or age limits of

3  the -- of the patient.  Maybe certain drugs may

4  have limitations on -- on -- on gender and so

5  forth.  Depending on the use of the drug, the

6  need of -- you know, and the patient's needs for

7  that medication.  So there are both clinical --

8  mostly clinical edits, I would say, that, in

9  other words, there's some edit that, for the

10  safety of the individual receiving the drug,

11  we're not going to allow a prescription to go

12  through that could be potentially harmful or

13  outside of its scope.

14     Q.   Does ODM continue to monitor the claims

15  processing criteria to assess whether they need

16  to be updated in any way?

17     A.   Yes.

18     Q.   And how often does ODM review these

19  criteria?

20     A.   So these criteria would be reviewed,

21  actually, annual -- annually through our P&T

22  committee and also updated quarterly again

23  through P&T as new drugs are added to the

24  formulary.

25     Q.   If a claim is denied, does ODM ever

Page 123

1    report it to anyone besides the patient, the

2    pharmacist, or the prescriber?

3         A.    Change Healthcare does.  We do not.

4         Q.    Okay.  And -- and who does -- when a

5    claim is denied, who does -- who does Change

6    Healthcare report it to?

7         A.    Typically, the -- well, it depends on

8    the reason for denial, but, typically, the

9    provider and the patient.

10        Q.    Okay.  I'd now like to turn to the

11   second topic on the subpoena list, which is "Data

12   ODM collected or had access to relating to the

13   prescribing, dispensing, or reimbursement of

14   Prescription Opioids and/or alternative

15   Treatments . . . ."

16            And, you know, maybe one way to

17   streamline this is just to sort of ask you

18   straight out:  I mean, what sorts of data does

19   ODM collect or have access to relating to the

20   prescribing of drugs, including opioids and

21   alternative drug treatments?

22            I'm going to walk through these.  First,

23   the prescribing of drugs, then the dispensing of

24   drugs, and then the reimbursement of drugs.  I

25   just want to get a sort of list of the data sets

Page 124

1    that ODM either collects itself or has access to

2    under -- pursuant to contract.

3         A.   Okay.

4              MR. SHKOLNIK:  Objection to form.

5              THE WITNESS:  So the data that we

6    collect, first of all, let me say doesn't

7    necessarily always reflect prescribing as much as

8    it does dispensing.  Remember, our data that we

9    have is claims data, which means this is a

10   prescription that has been approved and paid for

11   to -- to actually build an encounter around.

12             And so our encounter data has to do with

13   what's dispensed and reimbursed, not necessarily

14   do we know what may have been prescribed and

15   denied directly.  Change Healthcare may keep that

16   data.  That's not something that -- that ODM

17   would necessarily see unless we asked.

18   BY MR. DOVE:

19        Q.   Let me just stop you there for a moment.

20        A.   Uh-huh.

21        Q.   So you say that Change Healthcare may

22   keep that data and ODM wouldn't see unless you

23   asked.  I mean, you have a right under the

24   contract --

25        A.   Uh-huh.

1       Q.   -- to ask for that data, correct?

2       A.   For denials, yes.  We would be able to

3  see denials.

4       Q.   And does that hold true also in the

5  managed care side?  I mean, do you have the right

6  to see -- if you wanted to access PBM data

7  relating to denials or any -- or anything else,

8  do you have the right under the contract to

9  access it?

10      A.   So that would not -- I mean, for ODM?

11      Q.   Yes.

12      A.   No.  So -- so that's -- would the --

13  would the individual managed care plans have a

14  relationship with their PBM where they could ask

15  for that data?  Perhaps.  I don't know the answer

16  to that.  But ODM could not ask their PBM for

17  that data.

18      Q.   Could ODM ask their managed care

19  organization for that data?

20      A.   Yes.  And depending on their

21  relationship with their PBM, we may or may not be

22  able to get it.  I -- that's not something that

23  I'm familiar with, so . . .

24      Q.   All right.  So going back to trying

25  to -- again, I'm just trying to get a list of

Page 126

1    the -- the data sets that ODM either -- you know,

2    either possesses or has access to that relate to

3    the prescribing, dispensing, or reimbursement of

4    opioids or alternative treatments.

5             You've mentioned the claims data -- the

6    claims data or the encounter data, which, as I

7    understand, is provided by either the managed --

8        A.    Care.

9        Q.    -- care organizations, or for fee for

10   service, you have that information anyway.

11       A.    Right.

12       Q.    In addition to that -- that universe of

13   data, what other data does ODM have access to

14   relating to the prescribing, dispensing, or

15   reimbursement of opioids?

16       A.    Well, we've already talked about the

17   elements of that data and -- what other data?  So

18   we do have access to OARRS.  We can look at OARRS

19   data.  OARRS has some reports available to us

20   recently.

21            What else regarding opioids?  We can get

22   some vital statistic data, including death data,

23   from the department of health.  Let's see.  Those

24   are the ones that come to mind.

25       Q.    Have you ever heard of MSIS data,

```
 1   M-S-I-S?
 2        A.   I've not heard that acronym before, so
 3   I'm not sure what that refers to.
 4        Q.   Okay.
 5        A.   It appears --
 6        Q.   And how --
 7        A.   -- our repository for pharmaceutical
 8   data within our -- the DAS system, but I don't --
 9   I'm not familiar with the -- with the technical
10   terminology of that.
11        Q.   How about MAX data?  Is that data that
12   you have access to?  Have you ever heard of that?
13        A.   M-A-X?
14        Q.   M-A-X, yes.
15        A.   I'm not familiar with that either.
16        Q.   Are you familiar with the National
17   Council for Prescription Drug Programs or NCPDP?
18        A.   Thank you.  That's what I was trying
19   to --
20        Q.   I thought that was probably right.
21        A.   Thank you.
22        Q.   All right.
23        A.   Yes, I am.
24        Q.   This is exciting stuff I'm about ready
25   to get into.
```

Page 128

1      A.    Thank you.

2      Q.    And so you're aware that the NCPDP sets

3   data interchange standards for prescription drug

4   claims?

5      A.    Yes.

6      Q.    And -- and what's your understanding of

7   the role of NCPDP standards in the reimbursement

8   process?

9      A.    So they basically standardize the

10  interface between the retail pharmacies and the

11  PBMs in a way that any PBM that has that

12  point-of-service interface would be able to

13  understand.  It standardizes the data,

14  standardizes the reporting, and defines exactly

15  what needs to be on an encounter --

16     Q.    So --

17     A.    -- or on a claim.

18     Q.    And so almost --

19     A.    So --

20     Q.    -- by definition, does ODM's electronic

21  processing system comply with NCPDP --

22     A.    Yes.

23     Q.    -- standards?

24     A.    Yes.

25     Q.    Yes?

Page 129

1      A.   Yes.

2      Q.   All right.

3           MR. DOVE:  I would like to mark as

4  Exhibit 7 a document entitled "Ohio Medicaid

5  NCPDP Version D.0 Payer Sheet."

6                     - - -

7           Thereupon, Deposition Exhibit 7 was

8           marked for purposes of identification.

9                     - - -

10          THE WITNESS:  Thank you.

11  BY MR. DOVE:

12     Q.   Just ask you to take a look at this

13  document, and if you could tell me whether you

14  recognize what this document is.

15     A.   Yeah, I have never seen this before.

16     Q.   I -- I can represent to you that this is

17  an ODM payer sheet that we located online in

18  preparing for this deposition.  And it references

19  the NCPDP --

20     A.   Uh-huh.

21     Q.   -- standards that we just talked about.

22  I mean, do you know what the purpose of a payer

23  sheet is, Dr. Wharton?

24     A.   So I would assume that this defines the

25  elements of a -- of an encounter for a pay -- for

Page 130

1  a provider.  That's my assumption.

2      Q.   In other words, the data that is -- is

3  required to be input into a transaction or --

4      A.   Request claim, billing claim,

5  rebill . . .

6          MR. SHKOLNIK:  Objection to the form.

7          THE WITNESS:  . . . payer sheets.

8          So, no, I'm going to back up on that.

9  BY MR. DOVE:

10     Q.   Okay.

11     A.   I am not sure what this -- what the

12 intention of this is.

13     Q.   So bottom line is you -- you've not seen

14 this document before and you do not know --

15     A.   What it is.

16     Q.   -- its purpose?

17     A.   That is correct.

18     Q.   Do you know who at ODM might be able to

19 answer that question?

20     A.   Deb Hoffine.

21     Q.   Deb Hoffine?

22     A.   Hoffine.  H-o-f-f-i-n-e, I think, is

23 how --

24     Q.   Okay.

25     A.   -- she spells her name.

Page 131

1      Q.   And what's her role at ODM?

2      A.   She is our data person.

3      Q.   Okay.

4      A.   She's the one that would understand all

5   of this.

6      Q.   Okay.  I've spoken to some of your data

7   people.  Very nice.

8      A.   She's who I would ask --

9      Q.   Okay.

10     A.   -- "What is this?"

11     Q.   Okay.  And so what does ODM do with the

12  data submitted by the pharmacy after the claim

13  has been approved or denied?  I mean, I know you

14  said we -- you have the data or you have access

15  to it.  I mean, do you -- is there a place that

16  it's stored, I mean, or collected?  I mean, what

17  happens after the -- you know, where does the

18  data go?

19          MR. SHKOLNIK:  Objection to form.

20          THE WITNESS:  So, yes, it is stored, but

21  where and how, that's -- that's beyond me.

22  That's -- I don't understand the technical

23  storage issues.  We have some kind of a data

24  warehouse, I'm sure, where this is maintained.

25  BY MR. DOVE:

Page 132

1      Q.   Okay.  Do you -- does ODM run any

2   analyses on the data after the reimbursement

3   decision has been made?

4      A.   Sure.  Yes.

5      Q.   What sorts of analyses might -- does ODM

6   run?

7      A.   So ODM may do any kind of a special --

8   if we had a special project.  If we had something

9   that -- you know, a quality improvement project,

10   let's say, we might look at very specific aspects

11   of this data.  We do have several analysts that

12   can help us pull appropriate data.  If we want to

13   report certain outcomes or certain trends or

14   changes in prescribing, we could ask for those

15   types of things.

16      Q.   So you said you have certain analysts

17   who can -- who can do these sorts of analyses.

18   Who -- who are those folks?

19      A.   So they would be -- they would work also

20   under Dr. Applegate.  And I don't know all their

21   names.  There's maybe seven or eight of them.

22      Q.   But -- but the bottom line is if -- if

23   ODM wants to -- you know, to do some sort of

24   analyses of the data --

25      A.   Uh-huh.

Page 133

1          Q.    -- ODM has the capacity to conduct that

2     analysis --

3          A.    Uh-huh.

4          Q.    -- in-house?

5          A.    Yes.

6          Q.    Yes?

7          A.    But most pharmacy data analysis,

8     remember, is going to happen probably from Change

9     Healthcare.  That's part of our relationship with

10    them.

11         Q.    Okay.  So some --

12         A.    So --

13         Q.    So sometimes, you might do an analysis

14    in-house --

15         A.    Uh-huh.

16         Q.    -- but sometimes, you might also --

17         A.    Ask Change --

18         Q.    -- ask Change Healthcare to do an

19    analysis?

20         A.    Yes.

21         Q.    And they -- they have the capacity,

22    correct?

23         A.    That's correct.

24         Q.    Okay.  Has ODM ever conducted an

25    analysis to determine, you know, whether

1    particular pharmacies are reimbursed for an

2    unusually high volume of opioid prescriptions?

3         A.    Not to my knowledge.

4         Q.    Has ODM ever conducted analyses on

5    whether their particular doctors are prescribing

6    an unusually high volume of opioids compared to

7    other doctors in your system?

8         A.    Yeah.  In 2017, we did do an analysis of

9    patients getting over 400 MEDs of opioids, and we

10   identified the doctors who were prescribing those

11   and did send letters.  And I've talked to you

12   previously about some of the plans' work around

13   that also, so -- but, yes, ODM, through our DUR

14   board, actually, did the one in 2017 around 400

15   MEDs.

16        Q.    And when you said that the -- the ODM --

17   ODM did the analysis, was that done in-house, or

18   was that contracted out to somebody else?

19        A.    So I am thinking that Change Healthcare

20   probably did that analysis.

21        Q.    Could ODM, if it wanted to, investigate

22   and analyze whether particular pharmacies are

23   reimbursed for an unusually high volume of opioid

24   prescriptions?

25        A.    Could we?  Yes.  Would we?  I'm not sure

1   what we would necessarily learn from that.  I'm

2   not sure that that's something that I would

3   necessarily know what to do with.

4        Q.   And why is that?

5        A.   There's just so much -- there's

6   variation.  Is it a pharmacy that mainly works in

7   nursing homes or works with hospice patients?

8   There's -- I mean, I just -- it would -- it would

9   just not necessarily be something that -- I'm not

10  sure that it's something that I would know what

11  to do with.  That's -- I'm not sure that's

12  something I would -- I would ask for.

13            Perhaps -- and I -- and I would think

14  that that type of analysis might come from other

15  sources.  In other words, if we had some third

16  party who maybe had some concerns or worries

17  about a specific pharmacy, then perhaps I -- we

18  might want to look into that.  But understand

19  that when we start getting into, like,

20  investigational stuff, we tend to push that off

21  to SURS.  That's our -- that's the internal team

22  that actually does that work.

23            And so, you know, we're not law

24  enforcement.  That's -- that's not our role.  And

25  if we suspect that there is some diversion or

1   some wrongdoing, some bad things going on, we

2   would take our suspicions probably and give that

3   to an entity within our organization that would

4   actually do that investigation, in which case we

5   usually lose sight of that.  We -- we don't

6   necessarily get follow-up on those, so . . .

7       Q.   But you can't see of any particular

8   reason why ODM would need to analyze whether

9   there are particular pharmacies that are

10  reimbursing for an unusually high volume of

11  opioid prescriptions?

12      A.   It's probably been done.  I don't know,

13  but it's probably been done.  And perhaps as part

14  of that, you know, program integrity group,

15  that -- or the SURS group.  I mean, that --

16  that's -- it may have been done.  I don't know.

17  But it's not something that I would do in my

18  role.

19      Q.   I think we -- we've talked about --

20           MS. LINN:  Just to clear up for the

21  record, what does SURS stand for?  It's -- it's

22  an acronym?  Okay.  It's S-U-R-S?

23           MR. DOVE:  S-U-R-S?

24           MS. LINN:  Uh-huh.

25  BY MR. DOVE:

Page 137

1      Q.   Do you know what it stands for --

2      A.   No.

3      Q.   -- Dr. Wharton?

4           MS. BABTIST:  Surveillance and

5    utilization review.

6           THE WITNESS:  Thank you.  Surveillance

7    and utilization review.

8    BY MR. DOVE:

9      Q.   Surveillance and utilization review.

10     A.   Thank you.

11     Q.   We talked earlier about the OARRS data,

12   which I can tell you is Ohio Automated Rx

13   Reporting System.

14     A.   Thank you.

15     Q.   My understanding is that OARRS is a

16   system to track the dispensing and personal

17   furnishing of controlled prescription drugs to

18   patients.  Is that your understanding as well?

19     A.   Yes.

20          MR. SHKOLNIK:  Object to form.

21          THE WITNESS:  Yes.

22   BY MR. DOVE:

23     Q.   And practitioners and pharmacists who

24   dispense controlled substances like opioids are

25   required to report that information to OARRS,

1   correct?

2        A.   Correct.  Uh-huh.

3        Q.   And the -- the information they report

4   would include the patient identifying

5   information, correct?

6        A.   Yes.

7        Q.   It would include the prescriber

8   identifying information, correct?

9        A.   Yes.

10       Q.   It would include the opioid's

11  identifying information, correct?

12       A.   Uh-huh.  Yes.

13       Q.   Yes.

14       A.   Sorry.

15       Q.   And it would include information about

16  the quantity and dosage -- dosage prescribed,

17  correct?

18       A.   That's correct.

19       Q.   And can ODM look at a patient's profile

20  in OARRS?

21       A.   Yes.

22       Q.   Who from ODM would be permitted to

23  access OARRS?

24       A.   To my knowledge, only my pharmacists and

25  myself and Dr. Applegate.

Page 139

1      Q.    Can ODM look at a doctor's profile on

2    OARRS?

3      A.    Not sure.

4      Q.    Can ODM look at a pharmacist's profile

5    on OARRS?

6      A.    I'm not sure.

7      Q.    As a practical matter, how does ODM

8    access the OARRS database?

9      A.    As a practical matter, we rarely do.

10   And so, typically, when we do access OARRS, it's

11   regarding a -- an individual patient when we're

12   considering options regarding case management or

13   something along those lines.

14     Q.    And you say you -- you -- ODM rarely

15   accesses this database.  Why is that?  Why not

16   use it more frequently?

17     A.    It hasn't been terribly user friendly

18   until more recently.  And so having patient-level

19   data is nice, but we hadn't have -- we hadn't had

20   much in the way of reports from OARRS that would

21   be actionable, that's -- that are broader than

22   something patient -- patient level.  And so,

23   again, looking at single-patient reports have

24   limited usefulness to us.

25     Q.    Have you personally ever accessed OARRS

Page 140

1    during your tenure at ODM?

2        A.    Not at ODM.  I have at CareSource.

3        Q.    So it's not just ODM that can access

4    OARRS, you know.  So -- so MCOs can also access

5    OARRS?

6        A.    The medical directors and pharmacists

7    at -- at the plans can also, yes.

8        Q.    And can commercial insurers access

9    OARRS?

10       A.    Don't know.

11       Q.    And -- and I think you said the primary

12   reason why you rarely use OARRS is you know --

13   well, there may be more than one reason, but --

14   but one reason is that it's just not terribly

15   user friendly; is that correct?

16       A.    Yes.

17       Q.    So the -- the data that you're seeking

18   is there, it's just not easy to use?  Is that

19   right?

20       A.    Or easy for us to access.  That's

21   correct.

22       Q.    Have you heard about -- ever heard about

23   the DEA's ARCOS database?

24       A.    No.

25       Q.    Are you aware that -- how about the Ohio

1    Board of Pharmacy?  Do they have a database of

2    licensing records?

3         A.   Yes, I'm sure they do.

4         Q.   Does ODM collaborate with the Ohio

5    department -- or the Ohio Board of Pharmacy to

6    monitor licensing records and identify

7    problematic pharmacies?

8         A.   So that would be outside of us, but I do

9    believe that our credentialing folks in ODM do

10   monitor licensure issues.  And when licensure

11   actions are taken, they have the ability to then

12   decredential them from a Medicaid perspective so

13   that we no longer would pay them for their

14   services.

15        Q.   And does that ever happen in practice --

16        A.   Sure.

17        Q.   -- where somebody gets decredentialed?

18        A.   I believe so.  I don't know of specific

19   cases, but, yes, I would think so.

20        Q.   And who are the folks that would -- that

21   do this -- that monitor the licensing?  Is it --

22   do you know a name or --

23        A.   It's our credentialing department.  I

24   don't know --

25        Q.   Credentialing department?

Page 142

1      A.    Yeah.  I don't know the names.

2      Q.    Okay.

3      A.    I'm sorry.

4      Q.    How about with regard to -- I don't know

5   if it's the board of medicine or the Ohio medical

6   board.

7      A.    Uh-huh.

8      Q.    Does ODM collaborate with, I guess, the

9   Ohio medical board to monitor licensing records

10  and identify problematic physicians?

11     A.    Yes.

12     Q.    And what does ODM do in that regard?

13     A.    Same.  I mean, it's basically when a --

14  when a physician has a licensure issue and that

15  licensure issue -- issue leads to them perhaps

16  losing or having their license suspended in the

17  state of Ohio, we would also, then, decredential

18  them from a provider point of view.

19     Q.    Does it ever work the opposite way where

20  ODM has a suspicion about a particular prescriber

21  and so ODM contacts the board of medicine and

22  say, "Hey, we have a -- we have an issue here"?

23     A.    So, again, that would be outside of what

24  I do, but perhaps if we identified somebody in a

25  DUR process or some other process that went to

Page 143

1   SURS or to program integrity, they may then

2   contact licensure boards and recommend certain

3   actions be taken or at least investigated by that

4   board.

5        Q.   Do you --

6        A.   But that would be --

7        Q.   -- recall --

8        A.   -- outside of me.

9        Q.   Well, when you say outside of you, do

10  you recall any instance where ODM has identified

11  such a prescriber and has -- and has, you know,

12  said -- transferred it to another entity to kind

13  of take it from there?

14       A.   Yes.

15       Q.   And, again, without getting into the

16  particular name -- name or names, I mean, how

17  does that process work?

18       A.   As I said, the -- the case is

19  identified.  It is sent on to our SURS people.

20  And at that point in time, they take it and run

21  with it.  In one particular -- I mean, I -- there

22  are cases where they may reach back and ask for

23  more information occasionally, but for the most

24  part, the follow-up on that is not something that

25  I would have any access to.  I would not know

Page 144

1    what kind of follow-up happened, whether that

2    went to a licensure board, whether they were

3    decredentialed.  That would happen outside of my

4    department.

5        Q.   Does ODM interact with local law

6    enforcement to help it identify pharmacies,

7    doctors, or patients that are unlawfully

8    dispensing, prescribing or distributing opioids?

9        A.   I have not seen that happen.

10            MR. SHKOLNIK:  Just note an objection.

11   It seems like you're going far afield of this

12   topic.  Are you moving to a new topic?  Doctor

13   licensing, pharmacy licensing.

14            MS. LINN:  Seems like Topics -- what?

15   -- 5?

16            MR. SHKOLNIK:  I'd just like to keep

17   track.

18            MS. LINN:  Or 4.

19            MR. DOVE:  I think it's in that topic.

20   I think we're covered, but I am moving to another

21   topic, so . . .

22            MR. SHKOLNIK:  Thank you.

23   BY MR. DOVE:

24       Q.   Just a cleanup point.  Does Ohio

25   Medicaid cover pharmacy benefits for

Page 145

1   beneficiaries who are eligible for Medicare

2   Part D?

3        A.   Say that again.

4        Q.   Does Ohio Medicaid cover pharmacy

5   benefits for beneficiaries who are eligible for

6   Medicare Part D?

7        A.   Eligible or enrolled?  If they're

8   enrolled --

9        Q.   Good question.

10       A.   -- in Part D --

11       Q.   Yeah.

12       A.   -- no.

13       Q.   So if they're enrolled in Part D, no.

14  But if they're not enrolled in Part D, yes?

15       A.   Perhaps.

16       Q.   Perhaps.

17       A.   Uh-huh.

18       Q.   Okay.  I'd like to now turn to Topic 3,

19  which is "The status or placement of Prescription

20  Opioids on Medicaid drug formularies . . . ."

21            Dr. Wharton, who decides what

22  prescription opioids get placed on the Medicaid

23  formulary or preferred drug list?

24       A.   So just a point of definition.

25       Q.   Sure.

Page 146

1      A.   Our -- our formulary includes any drug

2    that's part of the national rebate system.  And

3    so we have to have some access to any drug; so,

4    basically, all drugs are -- are on the formulary.

5    Our preferred drug list is actually a

6    collaborative process.

7            We start with a clinical review through

8    our P&T committee.  The P&T committee will review

9    the facts around a specific agent and make a

10   recommendation on its inclusion as a preferred

11   drug or not.  And that recommendation goes to our

12   director.  And the director makes the final

13   decision, then, whether a drug would be on the

14   preferred drug list or on -- or not.

15     Q.   What criteria are considered in

16   determining the placement of a particular

17   prescription opioid?  You know, whether it's on

18   the preferred drug list or not.

19     A.   So the P&T committee's criteria is

20   purely clinical.  They review clinical data,

21   studies, research about that particular

22   medication.  They -- they make their

23   recommendation not on value or on any financial

24   aspect.  We take their clinical recommendation

25   and try to assign value and -- by looking at some

1  of the financial aspects of the medication, the

2  cost if you will.

3          And so by weighing clinical benefits and

4  financial benefits, we then choose the agents

5  that seem to bring the most value to our members

6  and to our -- Medicaid in general.  And those are

7  the recommendations, then, we make to the

8  director, who ends up making the final choice.

9      Q.   So let's -- let's talk about each of

10  those aspects of the process.  Let's start with

11  the -- the pharmacy and therapeutics committee or

12  the P&T committee.  I -- I think you testified

13  that they -- they're not really looking at the

14  cost component.  They're looking at the clinical

15  data and making --

16      A.   Uh-huh.

17      Q.   -- a determination.  I mean, what --

18      A.   Uh-huh.

19      Q.   I mean, what are they balancing?  I

20  mean, what -- what makes -- what are they -- what

21  are they assessing on the P&T committee?

22      A.   Well, for an example, you know, a new

23  drug comes.  There are three other drugs in this

24  family and a new drug comes to market.  The P&T

25  committee will evaluate that drug's pros and cons

1   compared to the existing agents on the -- on
2   the -- on our formulary on our preferred drug
3   list.
4           So they'll look at this drug for:  Is
5   there -- is there some clinical benefit?  Is
6   there some outcome that's better than other
7   drugs?  Is it -- is it more convenient?  Is it
8   more likely to be adhered to or taken properly?
9   Is it safer?
10          You know, they look at all the clinical
11  data that is available regarding this drug's
12  usefulness to add on to the formulary.  If they
13  don't see anything clinically superior, they may
14  recommend that it be nonpreferred.  They may say,
15  "Look, this -- this is a me too.  This is
16  something we've already got two other, three
17  other agents.  We're not going to recommend this
18  new agent be preferred."
19          They may decide because it's once a day
20  and our other is twice a day, that perhaps
21  there's a value there, and maybe they might
22  recommend that that be moved towards a preferred
23  status.
24      Q.  And who all -- you know, who all is
25  involved in this process?  You've got this

1    committee, and I take it presentations are

2    made --

3         A.    That's right.

4         Q.    -- as part of the committee.  How does

5    that work in practice?

6         A.    Yes.  So in practice, we have ten

7    committee members.  It's a group of physicians

8    and pharmacists from across the state, many

9    representing organizations in the state.  So,

10   hopefully, these are often leaders in the

11   community or in their -- in their professional

12   communities.

13            They are given a presentation.

14   Typically, the -- the presentation begins with

15   outside stakeholders.  That could be

16   manufacturers or other stakeholders that have

17   some interest in having this drug approved.  They

18   usually, you know, make their case.

19            A case then is also presented by Change

20   Healthcare and their research is also submitted.

21   And -- their research of the research, I should

22   say, is submitted.

23            And -- and then a vote is taken.  You

24   know, do we want this on -- on the preferred drug

25   list or not based on what you've heard.

1      Q.    And does this preferred drug list apply

2  to both fee for service and for the managed

3  care --

4      A.    Only --

5      Q.    -- drug list?

6      A.    -- fee for service.

7      Q.    Only fee for service?

8      A.    Each plan has their own P&T committee.

9  And so each plan does this same process

10  internally for their own preferred drug lists.

11  So each plan maintains their own preferred drug

12  list.

13      Q.    And so there may be some differences in

14  preferred drug lists between different managed

15  care organizations or managed care organizations

16  and ODM fee --

17      A.    Correct.

18      Q.    -- for service?

19            Do you know what the federal drug rebate

20  program is?

21      A.    Yes.

22      Q.    What is it?

23      A.    The federal drug rebate program is a

24  program whereby a manufacturer is essentially

25  rebating Medicaid programs to -- between the --

1  sorry for the terminology -- the sticker price of
2  a drug, rebating it to meet best price that that
3  drug is available for.
4        And so it's -- it's a after-the-sale
5  rebate.  So, in other words, a sale happens, a
6  drug is prescribed, a claim is made, a claim is
7  submitted to the manufacturer, and the
8  manufacturer then rebates a portion of the cost
9  to -- in the case of federal rebates, to ODM
10  directly.  And that does include both the plans
11  and the fee-for-service medications.
12      Q.   Okay.  And in -- in addition to the
13  federal drug rebate program, does Ohio have a
14  state drug rebate program in which it requires
15  additional rebates for preferred placement on the
16  formulary?
17      A.   Not that I'm aware of.
18      Q.   So there's no Ohio state supplemental
19  rebate program?
20      A.   Supplemental rebates are manufacturer.
21  And we're actually part of a consortium of states
22  that negotiate those supplemental rebates.  That
23  would be Sovereign States -- SSDC.  I forget what
24  that stands for.  Sovereign States something.
25  It's a consortium of -- I'm really bad with

Page 152

1    acronyms.  I apologize.  So . . .

2        Q.   But state supplemental rebates for -- I

3    mean, how does -- do supplemental rebates play

4    into this process of determining what drugs go on

5    the preferred drug list?

6        A.   So that -- that -- those numbers are

7    very, very proprietary.  We can't share any of

8    those rebate numbers with anyone.  However, to

9    answer your question, yes, we do look at the

10   total net cost of a drug when adding them to the

11   preferred drug list, not just the sticker price.

12   So we would factor in those rebates internally

13   while making those recommendations to the

14   director.

15       Q.   I mean, if -- if a manufacturer pays a

16   supplemental rebate, does the drug typically get

17   placed on the preferred drug list?

18       A.   Say this again.

19       Q.   If a -- if a manufacturer pays a

20   supplemental rebate --

21       A.   Yes.

22       Q.   -- does that drug -- for a particular

23   drug, does that drug typically get placed on the

24   preferred drug list?

25       A.   No.  Depends on the amount of that

                                                    Page 153

1    supplemental rebate and how that would still

2    compare to prices of other similar agents.  The

3    total net price.

4         Q.    Just spend a moment on just -- on, you

5    know -- on what a preferred drug list is and how

6    it works.  I mean --

7         A.    Uh-huh.

8         Q.    -- you know, my understanding is you

9    kind of -- you take a list of -- of all national

10   drug codes, NDCs, available to Medicare

11   beneficiaries, and you then segregate those into

12   therapeutic classes, correct?

13        A.    Uh-huh.

14        Q.    And then within each therapeutic class,

15   certain of those drugs are preferred and certain

16   of them are not preferred; is that correct?

17        A.    Correct.  That is correct.

18        Q.    Okay.  Who determines what -- which

19   drugs go into which therapeutic classes, if you

20   know?

21        A.    So I believe that that is actually

22   standardized for us through either Medi-Span or

23   First Databank, one of those two organizations --

24        Q.    Okay.

25        A.    -- probably come up with those lists.

1    Q.   So do you know if -- if the therapeutic
2  classes in ODM's preferred drug list changed over
3  time?
4    A.   Certainly, new drugs being added
5  would -- do you mean the classes themselves?
6    Q.   Have the classes themselves evolved over
7  time?  Do you know?
8    A.   I can only talk for the last couple of
9  years, so I don't think so.  I haven't seen them
10  change.
11    Q.   Okay.
12    A.   So . . .
13    Q.   As a general rule, Dr. Wharton, are
14  extended-release opioids preferred over
15  immediate-release opioids for purposes of the
16  preferred drug list?
17    A.   No.
18    Q.   And why not?
19    A.   Why -- actually, we have an edit around
20  extended-released opioids which requires a
21  clinical PA for any new start on those
22  medications.  And the thinking there is, is we
23  would like to know why they are being used, is
24  this a case of chronic pain management that
25  actually would require other documentation for us

1  to approve it, versus is this being used for an
2  acute pain when the short-acting opioids would be
3  more appropriate.
4      Q.   Are you aware that some studies maintain
5  that extended-release opioids are designed with
6  properties to deter abuse, making it more
7  difficult to manipulate the drug?
8      A.   Yes.
9      Q.   Is abuse-deterrent properties a factor
10  that would favor a drug being preferred?
11      A.   It has, yes.  In fact, we've just
12  recently preferred a -- an opioid deterrent use
13  drug.
14      Q.   Has ODM added any extended-release
15  opioids to your preferred drug list?
16      A.   Yes.
17      Q.   Do you know which ones?
18      A.   I do not.
19      Q.   Okay.
20      A.   It's a generic.
21      Q.   But as I believe you just testified, ODM
22  doesn't prefer all extended-release opioids over
23  all immediate-release opioids, correct?
24      A.   That is -- that is correct.  I think.
25      Q.   Yeah.

1      A.    If I -- if I'm understanding your
2   question.
3      Q.    I'm not trying to trick you.  Yeah.
4      A.    Yeah.  If I'm understanding your
5   question, so . . .
6      Q.    Okay.  So the P&T committee makes
7   recommendations on the preferred drug list.  What
8   about the drug utilization review board?  Do they
9   play a role in this?
10     A.    No.  Not in -- not in actually the
11  choice of medications for the preferred drug
12  list.  They do not.
13     Q.    Okay.  Has ODM ever removed drugs from a
14  preferred drug list?
15     A.    Yes.
16     Q.    How often does that happen?  Is it -- is
17  it rare, or it happens from time to time?
18  What -- how would you characterize that?
19     A.    I would say that's -- I mean, I've only
20  seen it happen a couple of times.  I'm going to
21  guess that that's fairly rare.  Usually, when a
22  drug is replaced by a new generic or some other
23  new agent that has superior clinical or -- or
24  economic value.
25     Q.    Is the likelihood of a drug to be abused

1    a consideration for whether to add or remove it

2    from the preferred drug list?

3         A.    A factor, yes.

4         Q.    How about risk of addiction?  Is that a

5    factor?

6         A.    In the case of opioids, the risk of

7    addiction is with all of them.  I'm not sure that

8    that's a factor that would play into that

9    decision regarding opioids specifically.

10        Q.    Is part of the purpose of the preferred

11   drug list to influence prescribing behavior?

12        A.    Yes.

13        Q.    Is that because, all things being equal,

14   physicians would prefer to prescribe drugs from

15   the preferred list to avoid the time and

16   paperwork associated with prior authorization?

17        A.    As a practicing physician, I will say

18   yes.

19        Q.    Is it also because the drugs on the

20   preferred drug list might be cheaper for the

21   patient?

22        A.    No.

23        Q.    No.

24        A.    No.  No.  Medicaid patients don't have a

25   copay or any cost associated with their

1    prescriptions.

2        Q.    Has ODM observed any change in

3    prescribing practices now that long-acting

4    opioids require prior authorization?

5        A.    Yes.

6        Q.    And what -- what are those changes?

7        A.    A decrease in utilization.

8        Q.    In addition to the preferred drug list,

9    is there anything ODM does that would encourage

10   or discourage access to a particular drug?

11       A.    So I would just say in claim -- in

12   the -- in the process of claim edits,

13   standardized claim edits --

14       Q.    Uh-huh.

15       A.    -- that we've talked about previously

16   where certain quantities, certain MEDs, certain

17   daily durations of treatment would trigger a

18   denial or a request for a prior authorization,

19   actually.  And so that request for prior

20   authorization would then require the provider to

21   justify his prescribing outside of, basically,

22   the guidelines that are established by the

23   medical board and the pharmacy board in Ohio,

24   so . . .

25       Q.    Does ODM collect and retain data

Page 159

1    tracking rebates?

2        A.    Yes.  Actually, I'm -- let me back up

3    and --

4        Q.    Okay.

5        A.    I'm not sure that we do -- yeah, I'm

6    sure we do.  We do.  Yes.

7        Q.    Okay.  And where is that data kept?

8        A.    I would say both in Change Healthcare

9    and in our internal systems.

10       Q.    And who is the person at ODM most

11   knowledgeable about that data?

12       A.    What part of that data?

13       Q.    I mean, the rebate data -- if one were

14   to do an analysis of net cost, for example, of a

15   particular drug, I mean, who -- who -- who's the

16   person who would know the most about how that

17   works and do that?

18             MR. SHKOLNIK:  Objection to form.

19             THE WITNESS:  Myself or Tracey --

20   BY MR. DOVE:

21       Q.    Okay.

22       A.    -- probably.

23       Q.    Using the data in your possession --

24   strike that.

25             Using this rebate data, would it be

Page 160

1    possible to calculate the rebates received for

2    each opioid by National Drug Code and by quarter?

3        A.   Yes.

4        Q.   How about the total dollar amount of

5    rebates received for prescription opioids during

6    a particular year?  Would it be possible to

7    calculate that?

8        A.   Yes.

9        Q.   New topic.  I want to talk for a few

10   minutes about alternatives to opioids.  We

11   touched on that earlier.  I want to dig into that

12   a little bit deeper.

13            Is -- is ODM aware that there are

14   treatments available for chronic pain other than

15   prescription opioids?

16       A.   Of course.  Yes.

17       Q.   And one of those options is nonopioid

18   analgesics like Tylenol, correct?

19       A.   Yes.

20       Q.   Second is nonsteroidal anti-inflammatory

21   drugs like ibuprofen or aspirin, correct?

22       A.   Correct.

23       Q.   A third is tricyclic antidepressants,

24   right?

25       A.   Yes, perhaps.

Page 161

1      Q.    A fourth is antiepileptic medications,

2   correct?

3      A.    Occasionally, yes.

4      Q.    A fifth is corticosteroids, right?

5      A.    Yes.

6      Q.    Another is physical therapy --

7      A.    Correct.

8      Q.    -- right?

9            MR. SHKOLNIK:  Just note my objection.

10  Which topic are we covering now, please, just so

11  we can keep track?

12           MR. DOVE:  I think we're -- the same

13  topic.  Talking about alternative treatments.

14           MR. SHKOLNIK:  3?  Does No. 3 have a --

15  "status or placement of all Prescription Opioids

16  on all Drug Formularies available to Medicaid

17  beneficiaries in Plaintiff Jurisdictions,

18  including any changes made to such

19  formularies . . . ."

20           THE WITNESS:  So, we're --

21           MR. SHKOLNIK:  Is that the topic that

22  we're covering, or was there a new one?

23           MR. DOVE:  We're talking about

24  alternative treatments.  And sorry if I -- I may

25  be -- I may have jumped into the next topic and

1    not noted it.  I'm sorry.  But, yeah, it's

2    definitely covered by our topics.

3            MR. SHKOLNIK:  Yeah.  I just want to

4    make sure we're keeping track of topics here.

5    That's all.

6            MR. DOVE:  Sure.

7    BY MR. DOVE:

8        Q.   All right.  So just continuing our list.

9    Physical therapy is another --

10       A.   Yes.

11       Q.   -- alternative treatment?  Yes?

12       A.   Yes.

13       Q.   Are there -- acupuncture?  How about

14   that?  Is that an alternative?

15       A.   Yes.

16       Q.   Are there any other alternatives that

17   come to mind?

18       A.   Chiropractic.

19       Q.   Chiropractic.

20       A.   Uh-huh.

21       Q.   Anesthetics?

22       A.   Yes.  Injections.  Yes.

23       Q.   And I take it there are also alternative

24   treatment options for -- various treatment

25   options for opioid addiction, correct?

Page 163

1     A.    Correct.

2     Q.    Drug rehabilitation programs is one,

3  right?

4     A.    Yes.  Yes.

5     Q.    How about anti-addiction drugs?

6     A.    Yes.

7     Q.    Drugs like buprenorphine and methadone

8  that alleviate the symptoms of withdrawals and

9  cravings, correct?

10    A.    Yes.

11    Q.    And drugs like Naltrexone, which block

12  opioid receptors, correct?

13    A.    Correct.

14    Q.    All right.  Are there other

15  alternatives, treatment options for opioid

16  addiction that you're aware of?

17    A.    Well, certainly, MAT,

18  medication-assisted therapy, is just that.  It's

19  medication-assisted therapy.  There needs to also

20  be a behavioral health component to that, some

21  kind of counseling and so forth associated with

22  it, so . . .

23    Q.    Does ODM offer reimbursement for all of

24  these alternative treatment options when an

25  individual is diagnosed with chronic pain or

1  opioid addiction?

2      A.   All of those treatment options that you

3  listed?

4      Q.   Yes.

5      A.   Before you asked me about MAT?

6      Q.   Yes.

7      A.   I think so.  I had -- I don't remember

8  the entire list.  Do you have that in front --

9  can you go through the list again?

10     Q.   I'll --

11          MR. SHKOLNIK:  I'm sorry.  Just note my

12  objection that you're going way far afield of

13  the -- the 30(b)(6) notice.  There's a reference

14  to alternative treatments, but just data

15  collected, not going into the substance of these

16  alternative treatments.  So we -- note our

17  objection.  This is way outside the -- the agreed

18  categories.

19  BY MR. DOVE:

20     Q.   You may answer.

21     A.   Can you go through the list again for

22  me, please?

23     Q.   Sure.  So does Medicaid -- Ohio

24  Medicaid, does it offer reimbursement for -- I'll

25  just go through each one again:  nonopioid

1    analgesics?

2        A.    Yes.

3        Q.    For nonsteroidal anti-inflammatory

4    drugs?

5        A.    Yes.

6        Q.    For tricyclic antidepressants?

7        A.    Yes.

8        Q.    For antiepileptic medications?

9        A.    Yes.

10       Q.    For corticosteroids?

11       A.    Yes.

12       Q.    For physical therapy?

13       A.    Yes.

14       Q.    For chiropractic -- --

15       A.    Yes.

16       Q.    -- services?

17             For acupuncture?

18       A.    Yes.

19       Q.    For anesthetics?

20       A.    Yes.

21       Q.    For drug rehabilitation programs?

22       A.    Yes.  Yes.

23       Q.    For buprenorphine and methadone?

24       A.    Yes.

25       Q.    For Naltrexone?

Page 166

1      A.    Yes.

2      Q.    Are there any alternative treatments

3  that -- that -- that you're aware of that

4  Medicaid -- Ohio Medicaid is not currently

5  reimbursing for?

6      A.    I can't think of any evidence-based

7  treatments that we're not reimbursing for for

8  pain control.

9      Q.    And has Ohio Medicaid been reimbursing

10  for all the treatments I just mentioned since the

11  time you've been at Ohio Medicaid?

12      A.    Yes.

13      Q.    And did Ohio Medicaid reimburse for

14  these -- or strike that.

15            Did -- when you worked for CareSource,

16  did CareSource reimburse for all of these

17  treatments?

18      A.    Yes.  I will say that during my time at

19  CareSource, acupuncture was added --

20      Q.    Okay.

21      A.    -- so . . .

22      Q.    Does ODM afford these alternative

23  treatments preferred status over opioids?

24      A.    Adjudicated in different ways, so

25  there's -- they're not compared.  I mean, I --

Page 167

1    I'm not sure I understand your question.

2         Q.    Well, for example, if a --

3         A.    They're not -- these would never make a

4    preferred drug list, necessarily, along with

5    opioids.  Is that what -- they're --

6         Q.    Well, I'm just -- I'm just -- I guess

7    I'm trying to get a sense of whether Ohio

8    Medicaid has a system in place where it would

9    require a doctor to -- it wouldn't reimburse for

10   an opioid until the patient had already tried an

11   alternative treatment.

12              MR. SHKOLNIK:  Objection to form.

13              THE WITNESS:  Not true.  I mean, so --

14   so when we -- we have preferred drugs from that

15   list that you just gave --

16   BY MR. DOVE:

17        Q.    Uh-huh.

18        A.    -- and we have nonpreferred drugs in

19   that list that you just gave.  We have preferred

20   opioids; we have nonpreferred opioids.  They're

21   going to be adjudicated on a case-by-case basis.

22        Q.    So, basically, if a doctor writes a

23   script for an opioid, you're just going to look

24   at -- Ohio Medicaid isn't going to look to see

25   whether, hey, we're going to -- we'll -- we'd

1  prefer an alternative treatment to this opioid?

2      A.   So in Change Healthcare's process, if an

3  opioid -- for instance, a new patient gets a

4  long-acting opioid or a duration of a

5  short-acting opioid that's outside of our edits,

6  they will require a prior authorization.  And

7  prior -- part of that prior authorization process

8  may involve a peer-to-peer where a Change

9  Healthcare provider will talk to the provider and

10  ask those very questions:  "What are you doing

11  from a conservative point of view?  What have you

12  done?  Why are you going to this chronic pain

13  opioid situation?  What have you tried and failed

14  in the conservative realm?"  But we don't have

15  anything in our system to actually pull those out

16  unless those edits are -- are breached

17  beforehand.

18      Q.   Why not, like, always require prior

19  authorization for opioids to -- to allow that

20  process to play out where you would -- where the

21  doctor would consider -- to force the doctor to

22  consider alternative treatments?

23      A.   It's a thought but --

24          MR. SHKOLNIK:  Objection.  You're asking

25  about personal or --

Page 169

1           MR. DOVE:  I'm asking for --

2           MR. SHKOLNIK:  -- ODM?

3           MR. DOVE:  -- for ODM.

4   BY MR. DOVE:

5        Q.    You know, why doesn't ODM do that?

6        A.    It would be a huge amount of prior

7   authorizations.  It would be a huge burden for

8   our providers.  And it might limit access to

9   needed opioids in cases where opioids are

10  absolutely necessary.

11          I think that we have to try to walk a

12  fine line between managing opioids and not

13  overmanaging opioids to make sure that we are not

14  making it so hard for providers to provide any

15  opioids to anybody.  You know, the next time

16  you've got a toothache you're going to want

17  some -- some Vicodin, my guess.  So, you know,

18  bottom line is everybody -- there is a -- there

19  is a legitimate need for pain management that

20  requires opioid use.  We don't want to step on

21  that.  We don't want to make it that intrusive

22  into physicians' practices.

23          And, frankly, we don't have the manpower

24  to do those -- that number of prior

25  authorizations.  That would be a massive number

Page 170

1   of prior authorizations that ODM would have to

2   adjudicate.  It would just not be operationally

3   practical to do that.

4       Q.   Has ODM looked at studies or surveys or

5   analyses or comparing the cost of reimbursing for

6   opioids with the cost of reimbursing for

7   alternative treatment options?

8       A.   We are, in the present -- at the present

9   time, collecting that -- that information.  We

10  have not had any results, to my knowledge.

11      Q.   Does ODM know whether the costs of

12  reimbursing for opioids net of rebates was less

13  than the cost of reimbursing for alternative

14  treatments?

15      A.   So the problem with that thinking is

16  that -- the answer to your question briefly is:

17  Yes.  The opioids are cheap, typically, compared

18  to some of these alternative treatments.  But the

19  long-term outcomes associated with opioid

20  addictions are, obviously, much more expensive.

21           And so, you know, trying to weigh

22  long-term harm, not just short-term.  And

23  that's -- that's the difficulty here is, you

24  know, is it cheaper to pay physical therapy or

25  Vicodin?  Vicodin, by far.  Right?  But in the

1    long run, are we going to save money by not

2    producing another addict?  And I will always

3    argue that it's cheaper to avoid an addict than

4    to treat one.  And so, you know, my -- our sense

5    is, is that our long-term benefits of opioid

6    reduction are probably going to outweigh things,

7    but it's not going to show up anytime soon.

8        Q.   Okay.  New topic.  Topic -- now I'd like

9    to turn to the fourth topic on the subpoena list,

10   which is identification by ODM of suspicious

11   pharmacies, providers, or patients.

12            And we've touched on some of this, so

13   I'll try not to repeat or keep the repetition

14   to -- to a minimum here.

15            In general, how does ODM identify

16   pharmacies that are diverting or dispensing too

17   many opioids?

18            MR. SHKOLNIK:  Objection to form.

19            THE WITNESS:  We do not.

20   BY MR. DOVE:

21       Q.   How does ODM identify doctors and other

22   health care providers who are diverting or

23   overprescribing opioids?

24       A.   We do not.  Although, we can look at

25   providers with very high prescribing patterns,

1  but in no means does that necessarily identify

2  him as a problem provider.  There's, obviously,

3  a -- there's a deeper analysis that needs to

4  happen, even an on-site visit to this doctor's

5  office, to look at his practice, see what kind of

6  a practice he has, what kind of patterns of

7  documentation and -- and patients, frankly, that

8  he sees.  So we don't have a way of just looking

9  at data to identify those providers.

10      Q.   How -- in general, how does ODM identify

11  patients who are diverting opioids?

12      A.   We don't.  Same -- same reason.  You

13  know, we -- we know that people who are using

14  very high doses of opioids are one of two sets of

15  people, either people who have developed an

16  extremely high tolerance to these opioids, have

17  very severe pain and very high pain requirements,

18  or they're diverting.  We know that one of those

19  two things is true.  But from the data, there's

20  no way to separate them.

21      Q.   And then, finally, how does ODM identify

22  patients who have become addicted to opioids?

23      A.   Usually, by claims associated with an

24  emergency room visit for an overdose or by a

25  diagnosis code given by a provider -- family doc,

1    perhaps -- who uses opioid dependence as one of

2    his diagnoses on his -- on his claim.

3             Sometimes, by looking at the presence of

4    MAT, medication-assisted therapy, drugs, in their

5    claims data.

6        Q.    So just -- just to summarize so I

7    understand, so -- and this topic, again, is

8    "identification by ODM of suspicious pharmacies,

9    providers, or patients."  If I -- I think,

10   basically, what you're telling me is, in general,

11   ODM doesn't -- does not identify suspicious

12   pharmacies, providers, or patients.  Is that a

13   fair summary?

14            MR. SHKOLNIK:  Objection to form.

15            THE WITNESS:  We do not identify

16   individual, that's correct.  We -- we can

17   identify outliers, but we cannot identify them as

18   definitely problematic or definitely diverting.

19   That is correct.

20   BY MR. DOVE:

21       Q.    And again, just -- you know, why not?  I

22   mean, it's -- obviously, this is a critical issue

23   to try to identify suspicious pharmacies,

24   providers, or patients.  I mean, what's the

25   reason that ODM is not able to do that?

Page 174

1          MR. SHKOLNIK:  Objection to form.

2          THE WITNESS:  Because we're not law

3     enforcement.  We don't have people in the street

4     to follow John Smith home to see what he does

5     with his big bottle of morphine.  I -- we just

6     don't -- that's not our role.  That's not our --

7     that's not what we do at Medicaid.

8          We have a prescription from a licensed

9     physician for a drug.  The prescription is legal,

10    it meets our requirements or passed the PA.  And

11    so it -- you know, we have to assume that -- that

12    John needs that medicine, that he's in a lot of

13    pain or something's wrong.  We can't deny him the

14    prescription, which is really our only lever, is

15    to say, "We're not going to pay for that."

16         Well, what if he really needs it?  We

17    can't do that.  We don't know.  And unless we're

18    on the street following him down the road and

19    actually look at what he does with his bottle of

20    pills, we have no way of knowing he's actually

21    diverting those medications or he actually needs

22    them.

23    Q.   I would like to present to the witness

24    Exhibit -- what we'll mark as Exhibit 8, which is

25    a presentation titled "Building Dynamic and

1  Functional Interagency Collaboration," authored,

2  I guess, by Barbara Sears, Director, Ohio

3  Department of Medicaid, dated August 9th, 2017.

4                        - - -

5            Thereupon, Deposition Exhibit 8 was

6            marked for purposes of identification.

7                        - - -

8  BY MR. DOVE:

9      Q.   Dr. Wharton, if you could take a look at

10  this document and tell me if you recognize it.

11      A.   I have seen these slides, yes.

12      Q.   Were you involved in the creation of

13  this presentation?

14      A.   No.  Well -- no.

15      Q.   If you could please turn to the sixth

16  page of this document.

17      A.   Are they numbered?

18      Q.   They are not.  It's the page that is

19  entitled "Ohio Automated Rx Reporting System

20  (OARRS) Data."

21      A.   Okay.

22      Q.   And then there's a subtitle over -- over

23  a graph entitled "Number of Doctor Shoppers by

24  Year."  Do you see that?

25      A.   Yes.

1      Q.   And is -- is the source of this

2   doctor-shopping data OARRS?

3      A.   Yes.

4      Q.   Is doctor-shopping data regularly

5   received by Ohio Medicaid from OARRS?

6      A.   I don't know.

7      Q.   Do you know how Ohio Medicaid received

8   this data for purposes of this presentation?

9      A.   I believe OARRS did a presentation of

10   some of the reports that they had put together

11   and this was included.

12      Q.   Does Ohio Medicaid have more recent

13   doctor-shopping data than the 2015 listed in this

14   chart?

15      A.   I do not know.

16      Q.   Is it possible to disaggregate OARRS

17   data by jurisdiction within Ohio?  Do you know

18   that?

19      A.   I do not know.

20      Q.   Do you know whether Ohio Medicaid has

21   attempted to conduct any kind of disaggregation

22   of this data?

23      A.   I am not aware of that.

24      Q.   So you're not aware whether Ohio

25   Medicaid has attempted to conduct any

Page 177

1   disaggregation of data for the plaintiff

2   jurisdictions in this case:  Summit County,

3   Cuyahoga County, Cleveland, Akron?

4        A.   Not that I'm aware of.

5        Q.   What does Ohio Medicaid attribute the

6   reported decrease in doctor shoppers to?

7        A.   I believe OARRS is taking credit for

8   this, not Ohio Medicaid, so . . .

9        Q.   So do you think -- is there anything --

10  OARRS may be taking credit for it.  Do you -- is

11  there anything Ohio Medicaid's doing that you

12  think -- or that Ohio Medicaid believes is

13  responsible for the decrease in doctor shoppers?

14       A.   Looking -- seeing that this data ends in

15  2015, I am going to think not.  Our claims edits

16  started after that, so . . .

17       Q.   Could -- if you could just, I guess,

18  turn to the next page, which is entitled the

19  "Number of opioid solid doses dispensed to Ohio

20  patients."

21            Is the source of this data also OARRS?

22  Do you know?

23       A.   So I believe this is actually Medicaid

24  data.

25       Q.   Do you know the --

1      A.   I think.  Honestly, I think, but I'm not

2   sure.

3      Q.   So do you --

4      A.   It's not -- it's not labeled so I

5   shouldn't -- I don't know.

6      Q.   Do you know whether this data has been

7   produced -- the data that's the source of this

8   chart has been produced in this litigation?

9      A.   I don't know.  So -- I'm -- I'm not sure

10  of the source, so I don't know.

11     Q.   Is there -- is there any reason to

12  believe -- do you have -- do you have any reason

13  to believe that the data represented in this

14  chart is in- -- is inaccurate?

15     A.   No.

16     Q.   To what does Ohio Medicaid attribute the

17  reported decrease in solid opioid dose -- doses

18  dispensed to Ohio patients?

19     A.   So Ohio Medicaid -- this is my opinion,

20  not Ohio Medicaid's opinion.  I think it has to

21  do with OARRS publicity and teaching of -- of

22  physicians, education of physicians.  Different

23  thinking around opioids caused by a lot of the

24  publicity of the opioid crisis and as well as the

25  different state initiatives associated with this.

1   So I'm not sure that that's an ODM -- an ODM

2   opinion, but it's my opinion, so . . .

3       Q.   Is it -- and maybe I just don't

4   understand this.  But is it necessarily true that

5   a decrease in solid opioid doses dispensed, as

6   indicated in this data, represents a decrease in

7   prescription opioid use in Ohio?

8       A.   I would say that what this represents is

9   a decrease, yes, in the prescribing of opioid

10  doses.  But, more importantly, a decrease in the

11  number of opioids that are in grandma's medicine

12  chest being unused or being used for purposes

13  other than intended.

14      Q.   Is ODM involved in educating the public

15  about the risk of opioids?

16      A.   So collaboratively with other agencies,

17  yes.

18      Q.   And how -- how does that happen?

19      A.   Through -- through -- specifically, I

20  mean, I guess the -- the way that it's happened,

21  at least that I'm familiar with, is through the

22  GCOAT process, the -- the Governor's Committee on

23  Opioid Addiction and Treatment.  I got one.

24  So -- so that -- so through the GCOAT, I think,

25  working collaboratively -- collaboratively with

Page 180

1   other agencies, doing public service

2   announcements and so forth.

3          We also did both member -- we do

4   member -- member-facing mailings and that type of

5   thing.  And we actually did one recently that

6   talked a little bit about opioids and about some

7   of the new prescribing guidelines around opioids,

8   opioid alternatives, and so forth, that actually

9   went to our members.

10         So all the plans also have

11  communication, and so they probably have unique

12  things that they are doing.  So perhaps even more

13  robust than ours in some cases.

14     Q.   And these communication efforts are

15  directed at the public, also prescribers, also

16  providers; is that correct?

17     A.   Correct.  And so -- so I think that,

18  typically, it's our membership as opposed to the

19  public, but, yeah.

20     Q.   How, if at all, is ODM able to ensure

21  that prescribers are following appropriate opioid

22  prescribing guidelines?

23     A.   By setting the standardized claim limits

24  across all plans that we've previously discussed.

25  It doesn't ensure anything, but it certainly

Page 181

1    increases the probability that we're going to
2    capture outlying prescribing habits and have that
3    prescriber defend his -- his prescribing that
4    would be outside of the guidelines or outside of
5    the claim edits.
6        Q.    Is it ODM's understanding that it is
7    improper or unlawful for a doctor to prescribe a
8    greater quantity of a drug than is recommended by
9    standards such as from the state or the CDC?
10              MR. SHKOLNIK:  Objection to the form.
11              THE WITNESS:  So --
12              MS. SINGER:  Also off topics.
13              THE WITNESS:  -- improper is one thing,
14    illegal is another.
15    BY MR. DOVE:
16        Q.    Okay.  We can take them both separately.
17    That's fine.
18        A.    So -- so I think that a provider does
19    have a certain responsibility to be aware of and
20    to be compliant with the guidelines associated
21    with his licensure.  Now, those guidelines,
22    enforcement varies, I would say, probably,
23    somewhat.
24              And so, you know, is it illegal to
25    actually, for instance, prescribe?  No.  Usually,

1   there are -- in the guidelines, there are

2   caveats, for instance, that may say unless you do

3   this, this, this, and document this, this, and

4   that.  And so as long as those documentation

5   guidelines are performed, they could definitely

6   exceed our edits in Medicaid, but the expectation

7   is in -- in a chart review from a legal entity,

8   yes, I would expect that they would be compliant

9   with those guidelines, so . . .

10      Q.   Is it ODM's understanding that it is

11   improper for a doctor to write a prescription

12   that is not medically necessary?

13            MR. SHKOLNIK:  Objection.  Outside the

14   scope of the topics.

15            THE WITNESS:  Yes.

16   BY MR. DOVE:

17      Q.   Is it ODM's understanding that it is

18   unlawful for a doctor to write a prescription

19   that is not medically necessary?

20      A.   I don't know.  I guess that would depend

21   on the type of prescription.

22      Q.   How, if at all, is ODM able to identify

23   whether patients are using opioids during

24   pregnancy?

25            MS. SINGER:  Objection.  Outside the

Page 183

1    topics.

2            THE WITNESS:  Claims.  So we would have

3    claims.  Claims both for pregnancy and opioid use

4    at the same time, concurrently.

5    BY MR. DOVE:

6        Q.   Is that something that ODM is

7    monitoring?

8        A.   We have -- historically, no.  But we do

9    have a process moving forward that -- I'm going

10   to say no.  Let me just say that.  No.

11       Q.   Okay.

12       A.   Not presently.

13       Q.   And why not?  Last question before

14   lunch.  Why not?

15       A.   Opioids during pregnancy.  I'm just not

16   aware of anything that we're doing.  I don't --

17   I'm not aware of any -- any look into that.  I

18   have to think about that, though.  So let me

19   qualify that and come back to it.  Let me -- can

20   I think about that --

21       Q.   Sure.

22       A.   -- for a minute just to . . .

23       Q.   Sure.

24       A.   The why not is a good question if -- if

25   we're not.  And could we actually implement that

1   or make that actionable in some way?  Okay.

2   Yeah.  I don't think so, and I don't know why

3   not.  So those are my answers.

4           MR. DOVE:  All right.  This is a good

5   breaking spot for me.  I'm happy to go to another

6   topic or section if folks prefer a later lunch,

7   but it looks like a --

8           MS. LINN:  It's up to you.

9           THE WITNESS:  How much longer do we

10  have?  Is this going to be a bit longer?

11          MS. SINGER:  Don't look at me.

12          THE WITNESS:  Huh?

13          MS. SINGER:  Don't look at me.

14          MR. DOVE:  I -- I -- a bit longer.  I

15  mean, definitely, we're not going to finish

16  before lunch.

17          THE WITNESS:  We've got a couple of

18  hours?

19          MS. LINN:  Can't go over seven.

20          MR. DOVE:  Yeah.  Definitely.

21  Definitely.  Yeah.  We're limited by seven hours

22  but --

23          MR. SHKOLNIK:  We have some --

24          MS. SINGER:  Yeah.

25          MR. SHKOLNIK:  -- follow-up as well

                                    Page 185

1   so --

2           MR. DOVE:  So seven hours plus whatever

3   follow-up they have.  That sort of --

4           MR. SHKOLNIK:  We're going to be very

5   short, but we just need a little bit of time.

6           MS. SINGER:  Or brief.  Don't use short.

7           THE WITNESS:  Brief.

8           MS. LINN:  And some of it you've already

9   gotten into.  I don't know.  This kind of feels

10  like the topics have been fluid, so I don't --

11          MR. DOVE:  We, basically, have two more

12  topics to go through, then I've got some

13  documents that I may or may not go through

14  depending on what the state's position is with

15  regard to that.  I mean, I could ask that now

16  because it may help in planning.

17          MS. LINN:  Sure.

18          MR. HERMAN:  Do we want to go off the

19  record?

20          MR. DOVE:  Fair point.  Let's go off the

21  record.

22          MR. SHKOLNIK:  How about we stay on the

23  record for the statement but not for the time on

24  the -- the video, just so we have a record of

25  this?  That's all.  We don't want to -- we're not

                                        Page 186
 1   holding it against you in terms of your --
 2   your -- your questioning time, but I'd just like
 3   to have a record regarding documents.
 4            MR. DOVE:  Fair enough.  So -- so my
 5   question is --
 6            THE VIDEOGRAPHER:  I'm sorry.  Did you
 7   want to go off the video record?
 8            MR. SHKOLNIK:  Off the video record.
 9            THE VIDEOGRAPHER:  Going off the video
10   record at 12:21 p.m.
11                        - - -
12            (Thereupon, the following proceedings
13             were held off the video record.)
14            MR. SHKOLNIK:  Thank you.
15            MR. DOVE:  My question is:  There are a
16   number of documents produced by Ohio Medicaid
17   that are from years prior to 2013.  And so we
18   have some questions about those documents, but we
19   also understand that the scope is being limit --
20   on one hand, the scope is being limited, but on
21   the other hand, he's -- the witness is prepared
22   to testify about the documents that have been
23   produced, some of which predate 2013.
24            So the question is:  Are you going to
25   object, instruct the witness not to answer

Page 187

1    questions about documents that predate 2013 that

2    have been produced by Ohio Medicaid?

3              MS. LINN:  Well, they've been produced

4    by Medicaid, but they were a part of Job and

5    Family Services, so I don't even -- I would

6    object to it because it's not within the 2013 to

7    2018.  And I don't even think that Dr. Wharton

8    could actually -- like, he's not going to be of

9    any benefit to you.  He won't be able to comment

10   on those because that was before the existence of

11   Ohio Medicaid as a separate stand-alone agency.

12             So I mean, to save everybody time, I

13   would say don't go through those because I would

14   object and instruct him not to respond.  And then

15   we can talk later as to who you think, you know,

16   might be the relevant person to question about

17   those documents.  It's just kind of like -- it's

18   a weird -- it's a -- the two agencies existed

19   and -- well, it was Job and Family Services and

20   then the separation in 2013.  And I just don't

21   think, for the purposes of today, we can hold

22   Dr. Wharton accountable for those pre-2013

23   documents.

24             MR. DOVE:  Okay.  Thank you.

25             MS. LINN:  Uh-huh.

1          MR. DOVE:  All right.  We can go off the

2   record totally.

3            (Luncheon recess taken.)

4                    - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 189

1                P R O C E E D I N G S

2                        - - -

3            Wednesday, November 14, 2018

4                 Afternoon Session

5                        - - -

6          (Thereupon, the video record resumed.)

7          THE VIDEOGRAPHER:  Back on the record at

8    1:16 p.m.

9                        - - -

10             EXAMINATION (continued)

11   BY MR. DOVE:

12       Q.   Dr. Wharton, you mentioned during the

13   break that -- that you had an answer you would

14   like to elaborate on or amend.

15       A.   Sure.

16       Q.   Please do so.

17       A.   Thank you.  Yeah.  You asked

18   specifically about pregnant moms and any

19   association with opioids that -- that we might

20   identify.  And -- and I misspoke -- or I forgot.

21   We actually do have a program called MOMS.  MOMS

22   is the maternal opioid -- Medicaid Opioid

23   Maternal Support.  Hey, I think I -- I think

24   that's it.

25             And the MOMS program actually recognizes

Page 190

1    moms who have opioid addiction problems.  I

2    believe that they're actually identified from

3    claims.  I'm not sure if those claims would

4    include pharmacy claims or opioids or medical

5    claims for opioid addiction.

6           But the MOMS group does enroll MOMS into

7    special treatments, perhaps -- well, unique case

8    management opportunities, and perhaps housing

9    opportunities, around the state when they have

10   these issues combined being pregnant and on

11   opioids.  So I had forgotten that.  I knew there

12   was something going on.  I just couldn't remember

13   what it was.

14       Q.   And do you know when this MOMS program

15   came to be?

16       A.   I am thinking -- I was still at

17   CareSource at the time, and so probably about

18   three years ago, two to three years ago.

19       Q.   All right.  Dr. Wharton, I'd now like to

20   turn to the fifth topic on the subpoena list.

21       A.   Certainly.

22       Q.   "Prospective, retrospective, or other

23   utilization reviews by ODM of Prescription

24   Opioids . . . ."

25           First off, what is prospective drug

Page 191

1   utilization review?

2       A.   That seems like a contradiction in

3   terms.  "Review" and "prospective" seem to be

4   contradictory.  So I don't know.  I've not heard

5   "prospective review."  I don't know what that

6   would be.  I don't know what that refers to.

7       Q.   Let me show you an exhibit --

8       A.   Okay.

9       Q.   -- that we are going to mark as

10  Exhibit 9.

11                      - - -

12           Thereupon, Deposition Exhibit 9 was

13           marked for purposes of identification.

14                      - - -

15  BY MR. DOVE:

16      Q.   And I can represent to you that -- well,

17  this is a document that is titled "Drug" --

18           MS. SINGER:  Could we get a copy?

19           MR. DOVE:  Uh-huh.

20           MS. SINGER:  Thanks.

21  BY MR. DOVE:

22      Q.   "Drug Utilization Review Board."  And I

23  can also represent to you that this is -- this is

24  the Drug Utilization Review Board Web page.

25      A.   Okay.

1      Q.    We located this on ODM's website in

2    preparing for this deposition.

3            So do you recognize this document?

4      A.    I do not.

5      Q.    Do you see that under the -- under the

6    heading "The Three Phases of DUR" --

7      A.    I do.

8      Q.    -- that they -- the first page is titled

9    "Prospective"?

10     A.    Uh-huh.

11     Q.    And if you take a moment to -- to look

12   at the description there, but my question for you

13   is:  What role does ODM play with respect to

14   prospective drug utilization review?

15     A.    So, realistically, it would appear that

16   our web-based point of sale or point-of-service

17   system could alert, potentially, pharmacists to

18   things that would need to be discussed regarding

19   certain medications.  I've not taken that -- I've

20   not seen that before as part of the DUR process,

21   but nonetheless, that's where it's listed here.

22            And so I would see a case for that

23   where -- we've described claim edits before where

24   we will stop payment on a specific medication if

25   prior authorization is necessary.  There are

1    cases where there are -- I'm going to call them a

2    soft edit.  And a soft edit is where the

3    pharmacist is required to answer a question,

4    perhaps "Is there any chance you could be

5    pregnant?"  And that -- that has to be answered

6    first before the claim will move forward.  So

7    that's what -- that's what I think this is

8    probably referring to.

9         Q.    Does ODM contract with a vendor to

10   operate the point-of-sale system or is that

11   managed in-house by ODM?

12        A.    That would be Change Healthcare.

13        Q.    And does ODM's prospective drug

14   utilization review, as defined by this document,

15   cover both patients in the fee-for-service

16   program and those who are not -- who are -- and

17   those who are part of managed care plans?

18        A.    So this describes Ohio pharmacy law

19   requiring all pharmacies -- all pharmacists to do

20   this.  And so assuming that that is true, which

21   I'm -- I don't -- I'm not familiar with that law,

22   that would also seem to indicate that the plans

23   also are engaged in this process.

24        Q.    When the point-of-sale system identifies

25   a potential problem -- for example, abuse or

Page 194

1    misuse -- is a record created within the ODM

2    system?

3        A.    I'm not sure.  It would be in the Change

4    system, most likely.  Change Healthcare.

5        Q.    Do you know how many prescriptions were

6    flagged by the point-of-sale system as

7    problematic in the past year?

8        A.    I do not.

9        Q.    How would we determine that answer?

10       A.    We would have to ask Change Healthcare.

11       Q.    Even with this prospective utilization

12   review, does the dispensing pharmacist ultimately

13   have the ability to make the final decision about

14   whether a patient can receive a prescribed

15   medication?

16       A.    Yes.  Although, there might be payment

17   implications if he provides a medication outside

18   of those standards.  So there -- he may not be

19   reimbursed.  So if there is a hard edit and he

20   decides to bypass that edit, chances are he's not

21   going to be paid.

22       Q.    If the -- if the point-of-sale system

23   identifies a medication problem --

24       A.    Uh-huh.

25       Q.    -- can the pharmacist override it and

1   still issue the prescription?

2       A.   In some cases.

3       Q.   Okay.

4       A.   Yes.

5       Q.   And are records kept of those instances

6   where a pharmacist decides to override --

7       A.   I don't know.

8       Q.   -- the system?

9       A.   I -- I'm not sure.

10      Q.   If the point-of-sale system does not

11  identify a medication problem, must the

12  pharmacist dispense the medication?

13      A.   I don't think so.  I'm not a pharmacist,

14  so I'm -- this is my opinion, but I don't think

15  so.  I think a pharmacist can use his own

16  professional judgment on what he dispenses and

17  does not.

18      Q.   If the point-of-sale system does not

19  identify a potential problem but the dispensing

20  pharmacist does, does the pharmacist create a

21  record that the drug was not dispensed or --

22  actually, strike that question.

23      A.   Yeah.  Makes sense.

24      Q.   Does ODM have any other systems to track

25  or assess prospective drug utilization?

1      A.   No, I don't think so.

2      Q.   I now turn your attention to the second

3   phase entitled "Retrospective" DUR.  Do you see

4   that?

5      A.   Yes.

6      Q.   What is retrospective drug utilization

7   review?

8      A.   It's -- retrospective drug utilization

9   review is just a process whereby after a patient

10   has received a medication, some analysis is done

11   to determine if the prescription was appropriate

12   in one manner or another for the patient and the

13   patient's needs.

14      Q.   And who at ODM conducts retrospective

15   drug utilization review?

16      A.   At ODM, for our fee-for-service members,

17   our DUR committee does so.

18      Q.   And how about for your managed care --

19      A.   Each managed care --

20      Q.   -- folks?

21      A.   -- plan maintains their own drug

22   utilization review process.

23      Q.   And does ODM have access to any data

24   relating to the drug utilization review processes

25   of its managed care plans?

1      A.    We have access to all managed care

2   records that -- including that, but we don't

3   necessarily have them.  We would ask for them.

4      Q.    Have you personally ever conducted

5   retrospective drug utilization review?

6      A.    Have I personally . . .

7            With my ODM experience --

8      Q.    Yes.

9      A.    -- specifically?

10     Q.    At ODM, yes.

11     A.    No, I have not.  No.

12     Q.    Have you served on the drug utilization

13  review committee?

14     A.    No.  I have attended the meetings,

15  though.

16     Q.    Do you know how members are selected for

17  the DUR committee?

18     A.    By invitation, but I'm not sure -- I'm

19  not sure of the number and process completely.  I

20  know we have a few openings.

21     Q.    Sounds good.  I like Columbus.

22           Do you -- I mean, what types of

23  individuals serve on the DUR committee?

24     A.    Providers.  Usually, physicians, nurse

25  practitioners, pharmacists.

Page 198

1      Q.    Okay.  What are the responsibilities of

2  the DUR committee?

3      A.    So they will do, actually, several

4  things.  First of all, they identify potential --

5  potential problems that they might identify or

6  be -- or actually be recommended by Change

7  Healthcare or others that they would look at

8  certain data, you know, perhaps look at certain

9  outcomes associated with asthma inhaler

10  utilization or blood pressure control or

11  something along those lines.  They might look at

12  something like duplicative therapies, finding

13  cases where two drugs of the same category are

14  being given.

15        They actually try to identify problems

16  within the data.  And once the data problems are

17  identified, they have some type of intervention.

18  Typically, it's educational.  It has to do with

19  educating the providers regarding that problem.

20  That could be letters and/or phone calls.  And

21  our DUR committee takes part in that process.

22        They do maybe a half a dozen topics per

23  year.  They also kind of make sure -- something

24  we haven't talked about is our -- our lock-in

25  program, if you will, which is called CSP.  That

Page 199

1    lock-in program is associated -- this -- these

2    are patients who have had four prescriptions --

3    sorry.  Let me get this straight.  -- four

4    providers or four pharmacies prescribing opioids

5    or eight -- or maybe it's 16 -- 16 prescriptions

6    in a 90-day period, I believe.  Or, no, it's 12.

7    It's 12 prescriptions in a 90-day period.

8            So if any one of those three things are

9    true, they are actually put into our lock-in

10   program.  The DUR committee has a role in

11   reviewing each of those cases to make sure that

12   they're appropriate for lock-in.  In other words,

13   they look at the -- what medical information and

14   claims information that we have on these members

15   to be sure there's not a cancer diagnosis or some

16   reason that might explain that utilization

17   pattern.

18       Q.   How about the DUR board?  That's

19   something different than DUR committee, correct?

20       A.   Committee.  Yeah.  The DUR committee

21   does the work, the DUR board gets the credit.

22       Q.   Okay.

23       A.   So the DUR board is the group that

24   actually does the work of selecting topics and

25   are kind of kept up to date on -- on current

```
                                           Page 200
 1   events, if you will, through Medicaid, so . . .
 2        Q.    And have you ever served on the DUR
 3   board?
 4        A.    I do not.  I have attended meetings, but
 5   I do not serve on the board directly.
 6        Q.    In the -- the second paragraph under the
 7   retrospective phase, it states, "By utilizing
 8   patient profiles generated from Medicaid paid
 9   claims data, monthly reviews are performed by the
10   DUR Committee according to criteria approved by
11   the DUR Board."  And I think that's what we just
12   talked about.
13        A.    Uh-huh.
14        Q.    And I guess my question for you is:
15   What are the criteria approved by the DUR board?
16   What does that mean?
17        A.    So I am thinking that the criteria is
18   going to vary from case to case depending on what
19   topic they're looking at.  So the DUR committee
20   is establishing some criteria for the definition
21   of the problem.
22        Q.    And are those criteria listed anywhere,
23   written down anywhere?
24        A.    Perhaps in the minutes of the DUR board.
25        Q.    And did these criteria change over time?
```

1      A.    Again, they're going to be focused on

2   whatever topic the DUR board is recommending at

3   the time.

4      Q.    Are all claims data from the preceding

5   month used to generate the patient profiles?  In

6   other words, is -- is the data used to generate

7   the patient profiles for this process, is it

8   complete or is it selective?  Is there, like, a

9   sampling process that goes on?  Do you know?

10     A.    So recall, this is our

11  fee-for-service --

12     Q.    Right.

13     A.    -- population.  And -- and so what that

14  sampling process looks like I'm not exactly sure.

15  It would be claims data retrospective.  And I

16  don't know if there's -- I suspect that may vary

17  also depending on the topic that we're looking

18  at.  You know, for instance, diabetic control, we

19  may want to look at a longer time period than,

20  you know, asthma controllers or something.  So

21  I -- I'm not sure that that's consistent, that

22  time frame of -- of the data pool.

23     Q.    And during your time at Ohio Medicaid,

24  has -- has opioids ever been a topic -- a

25  specific topic, designated for -- for drug

Page 202

1    utilization review?

2         A.   So as I -- as I took the job --

3    literally, as I took the job in -- in 2017, there

4    were -- there was a DUR process going on for

5    400 MED -- providers of patients who were getting

6    400 MED or more and an education process going on

7    associated with that.

8         Q.   And, again, "MED" is morphine equivalent

9    dose?

10        A.   Correct.

11        Q.   Okay.  And are the results of that drug

12   utilization review process for those 400 MED

13   providers, are they saved within ODM's system?

14        A.   Say this again.  Are --

15        Q.   Are the -- are the results of that DUR

16   process for these 400 MED providers, are they --

17   are those results and that data saved within the

18   ODM system?

19        A.   So I'm not sure what you mean by

20   "results" exactly.  Is that -- I mean, is that --

21        Q.   Well --

22        A.   So --

23        Q.   -- there was a --

24        A.   Go ahead.

25        Q.   I mean, what was the out- -- I mean,

                                      Page 203

1    there's an outcome, I assume, from this review;

2    is that correct?

3         A.    Uh-huh.  So, typically, there will be a

4    re-review in a year to see if things have

5    changed, so . . .

6         Q.    But -- but, you know, once there's a

7    review that's done, I'm assuming there's some

8    outcome, like a list of patients --

9         A.    Yes.  Yes.

10        Q.    -- or a list of providers.

11        A.    Yes.

12        Q.    Is -- is that outcome saved in ODM's

13   computer systems?

14        A.    I would say yes.  I would hope so.

15   Yeah.

16        Q.    And do you know if -- if those have been

17   produced in this litigation?

18        A.    I do not.  Since that would contain

19   specific member information, I'm not sure how

20   much of that could be produced but . . .

21        Q.    Okay.  Now, you talked about making some

22   interventions, and I guess you said sending

23   letters and making phone calls to the provider in

24   certain circumstances.  I mean, once -- once

25   you've done that, what are the provider's roles

Page 204

1   and responsibilities after being notified that a

2   patient should receive interventions?

3       A.   Well, ideally, they change that pattern

4   of -- of prescribing, they fix the problem.  If

5   it's a duplicative prescription, they cancel one.

6   You know, the idea is that we're trying to

7   educate them to a potential prescribing problem,

8   and that education would then -- then allow them

9   to adjust or make changes.

10      Q.   And you said you go back, then, after

11  12 months and see if --

12      A.   Uh-huh.

13      Q.   -- anything's happened?

14      A.   Uh-huh.

15      Q.   Yes?

16      A.   Uh-huh.

17      Q.   And do you record, you know, success

18  stories as part of your -- or failures as part of

19  your process?

20      A.   Yes, I would assume so.  I have not seen

21  that, but, yes.

22      Q.   Okay.  Who at ODM would have the most

23  knowledge of the sort of drug utilization review

24  process?

25      A.   Probably Tracey.

Page 205

1      Q.   Tracey.

2      A.   Uh-huh.

3      Q.   I guess, now, let's go to the last phase

4  here.  It's called "Concurrent" drug utilization

5  review.  Do you see that?

6      A.   Yes, I do.

7      Q.   What is concurrent drug utilization

8  review?

9      A.   So my understanding of a concurrent

10 review is some process that would avoid immediate

11 harm by some combination of medications or some

12 medication to a specific individual.

13     Q.   It says in this section that "Ohio's DUR

14 program identifies Medicaid recipients who are at

15 high risk of drug-induced illness . . . ."

16          How are patients identified as being at

17 high risk of drug-induced illness?  What -- you

18 know, what's the criteria used for that?

19     A.   So the criteria would vary depending on

20 the -- the drug category.

21     Q.   Okay.

22     A.   I think that, you know, essentially, you

23 know, for instance, lately, there's been a lot of

24 discussion around the concurrent use of opioids,

25 benzodiazepines, and muscle relaxers being

1    together, putting people at very high risk of --

2    of bad outcomes.  And so we're putting edits in

3    place to identify those things.  We may already

4    have those edits in place, actually.  And --

5    which would cause a prior authorization review on

6    any refills on those -- those categories.

7        Q.   Okay.  I believe you testified that you

8    sometimes attend drug utilization review board

9    meetings.

10       A.   Uh-huh.

11       Q.   Yes?

12       A.   Uh-huh.

13            MR. DOVE:  I'll ask the court reporter

14   to mark as Exhibit 10 a document entitled "Ohio

15   Department of Medicaid Drug Utilization Review

16   Board Quarterly Meeting, November 14th, 2017."

17                      -  -  -

18            Thereupon, Deposition Exhibit 10 was

19            marked for purposes of identification.

20                      -  -  -

21   BY MR. DOVE:

22       Q.   Dr. Wharton, I would ask you if you

23   recognize this document.

24       A.   Yes.  I recognize that as the meeting

25   minutes.

1     Q.    The meeting minutes for November 14th,
2   2017?
3     A.    Correct.
4     Q.    And you -- you attended this particular
5   meeting, correct?
6     A.    Apparently so.  My name is on there.
7     Q.    If you could turn to the second page of
8   this document to the heading in italics that says
9   "P&T Recommendations" under "New Business."  Do
10  you see that?
11    A.    Yes.
12    Q.    In the middle of that first paragraph,
13  it states that "The P&T Committee also
14  recommended that all buprenorphine products be
15  preferred and for PA to be -- for PA to be
16  removed.  ODM did not accept this recommendation
17  but will allow a 7-day window without PA."  Do
18  you see that?
19    A.    Yes.
20    Q.    Why did ODM not accept the
21  recommendation?
22    A.    We did not feel that we had all of
23  the -- we had worked out the safe -- we have
24  since done so, by the way.  And so just recently,
25  that has occurred.  At that time, we were not

1   prepared to ensure our members' safety with

2   that -- with opening that up in that way.  We had

3   to do some -- a little bit of work around our

4   edits and so forth to make sure that this was

5   done in a safe way --

6       Q.   By --

7       A.   -- as opposed to just blanket allowing

8   all of these to be paid for at once.

9       Q.   But now the -- all -- all buprenorphine

10  products are part of the preferred list?

11      A.   Yes, with the appropriate safety edits.

12  Correct.

13      Q.   Are there other opioid-related

14  recommendations that ODM has not accepted from

15  the P&T committee since you've been there?

16      A.   No.

17      Q.   Are there any opioid-related

18  recommendations that ODM has accepted from the

19  P&T committee since you've been there?

20      A.   Yes.

21      Q.   And what are those?

22      A.   The most recent that I can recall was

23  the addition of a abuse deterrent agent on the

24  preferred drug list.

25      Q.   Any others that you can recall?

1     A.   I'm sure there have been others.  I
2  can't recall any offhand, though.
3     Q.   Do you see the --
4     A.   It's actually rare that we don't follow
5  the P&T committee recommendations.
6     Q.   Do you see the heading in italics
7  "Opioid Reporting" -- "Reporting"?
8     A.   Yes.
9     Q.   At the end of that section, it says that
10  "Dr. Wharton is studying the changes."  What
11  changes is this referring to?
12     A.   So this has to do with the -- the
13  standardized place -- the standardized edits on
14  opioids.  This was -- this was in October of '17,
15  so this would have been our earlier edits around
16  long-acting opioids, and also the less than five
17  opioid prescriptions in a month.  So those
18  edits -- and so it looks like we were looking at
19  total prescribing just to see if this had an
20  impact on the number of solid doses being
21  prescribed.
22     Q.   And have -- I mean, have you learned
23  anything from studying the changes?
24     A.   It was effective.  We did see a -- a --
25  a drop in prescribing, which is our -- which was

Page 210

1    our goal.

2         Q.   And the -- and -- and is this study of

3    these changes documented anywhere?

4         A.   I am not sure.  Maybe.  Perhaps.  I

5    mean, that might be -- that might have been a

6    one-off analysis that we did.  And I -- honestly,

7    I wouldn't even know where to look for it, but I

8    can try.  So I -- I don't -- I don't know.

9         Q.   Okay.  I mean, where -- if -- if there

10   were such a document -- documentation of those --

11   of that study, I mean, whose files would it

12   probably be in?

13        A.   Mine or Tracey's probably.

14        Q.   Does ODM provide drug utilization

15   information to CMS?

16        A.   Say this again.  Sorry.

17        Q.   Excuse me.  Does ODM provide drug

18   utilization information to CMS for --

19        A.   I believe --

20        Q.   And I've got an example.  The Medicaid

21   drug utilization review annual report.

22        A.   Yes.

23        Q.   And what's the nature of the information

24   provided to CMS?

25        A.   So that particular report I'm not

Page 211

1    familiar with.  I've not been part of the

2    gathering of that data.  We also send all of our

3    encounter data to CMS.

4         Q.    So you send your encounter data to CMS.

5    What -- any other data that you -- that ODM sends

6    to CMS?

7         A.    Honestly, there are probably many

8    reports that we send to CMS.  I'm not familiar

9    with all of those.

10        Q.    Are there any reports specifically

11   relating to opioids that you recall sending to

12   CMS?

13        A.    Not that I'm aware of.

14        Q.    All right.  New topic.  I'd now like to

15   turn, Dr. Wharton, to Topic 7 on the subpoena

16   list, which is actually the sixth topic listed in

17   your counsel's November 9th letter, and that's

18   Ohio Medicaid's knowledge of and actions taken in

19   response to the opioid crisis.

20              So I guess my first question is -- is:

21   Sir, is there an opioid abuse problem in Ohio?

22        A.    Yes.

23        Q.    Is there an opioid abuse problem in

24   Cuyahoga County?

25        A.    Yes.

Page 212

1       Q.   Cleveland?

2       A.   Yes.

3       Q.   Summit County?

4       A.   Yes.

5       Q.   And Akron?

6       A.   Yes.

7       Q.   When did ODM first become aware of an

8   opioid abuse problem in any of these

9   jurisdictions?

10      A.   I'm not sure that I could identify a

11  specific date and time.  I think it's been an

12  evolution.  I think that we have become more and

13  more aware as the problem escalated.  And so, in

14  general, I would say 2015, 2016, somewhere about

15  the same time that we were seeing lots and lots

16  of opioid overdoses.

17      Q.   But prior to that time, there -- there

18  really wasn't an awareness of an opioid crisis in

19  Ohio?

20      A.   I wouldn't have -- I don't -- I'm not

21  sure we would have called it a crisis then.  I

22  think -- I think, perhaps, that we all knew that

23  there were overprescribing of opioids going on,

24  but I'm not sure when it kind of reached that

25  level of crisis.  Right?

Page 213

1      Q.   Well, let -- let's take out the word
2  "crisis" for a moment.  Let's say, you know, when
3  did ODM first become aware that there was an
4  opioid abuse problem in Ohio?  And I understand
5  there's an evolution.  But can you give me a
6  general sense of when ODM started to understand
7  we've got a problem here with opioid abuse?
8      A.   I cannot.  I -- I don't know.  I mean,
9  that's -- that's a very subjective question.  I
10  don't know how to even answer that truthfully.  I
11  don't know.  I mean, we're -- we're the -- we --
12  I mean, we've been aware that opioids are a
13  problem for -- since opioids have existed.  So, I
14  mean, I'm not -- I'm not sure, again, where --
15  when does it rise to a public health issue and a
16  crisis?  That's -- that's a more difficult
17  question.
18      Q.   Do you think the -- that the opioid
19  crisis in Ohio -- or, excuse me, the opioid --
20  well, do you think that the opioid abuse problem
21  in Ohio has a single cause -- cause or multiple
22  causes?
23      A.   Multiple.
24      Q.   And what are those causes?
25           MS. SINGER:  Objection.  I think this is

Page 214

1    beyond the scope.

2            THE WITNESS:  I couldn't -- I mean,

3    there's -- there's dozens.  I mean, what are the

4    causes?  Poverty.  Availability.  Pain.  Legal --

5    lack of -- lack of, perhaps, legal intervention.

6    I don't know.  I mean -- but I think the biggest

7    cause is, if I really think about it, it's --

8    it's a combination of poverty, hopelessness, and

9    the availability of the drug.  I guess those

10   would be my -- my biggest things that I would

11   hang my hat on.

12           MR. SHKOLNIK:  Just note my objection.

13   Outside the scope of the 30(b)(6) and if it's his

14   personal opinion.

15           THE WITNESS:  It is.

16           MR. SHKOLNIK:  It is?

17           THE WITNESS:  It is personal opinion.

18           MR. SHKOLNIK:  Thank you.

19   BY MR. DOVE:

20       Q.   So that's your personal opinion?

21       A.   Yes.

22       Q.   Okay.  So let me step back, then.

23       A.   Yes.

24       Q.   And, again, the topic is ODM's knowledge

25   of and actions taken in response to the opioid

Page 215

1    crisis.

2            Does -- does ODM have a position as to

3    the cause of the opioid -- causes of the opioid

4    abuse problem in Ohio?

5            MR. SHKOLNIK:  Note my objection.  The

6    topic is knowledge of and actions taken.  There

7    is no topic here about cause or -- or opinion as

8    to the cause on behalf of ODM.

9            THE WITNESS:  And I am not answer -- I

10   don't -- I don't know the answer.  I don't know

11   if ODM has an opinion.

12   BY MR. DOVE:

13      Q.   Do you think that ODM attacked the

14   opioid abuse problem as quickly and as

15   intensively as it should have done?

16           MR. SHKOLNIK:  Note my objection to

17   form.

18           THE WITNESS:  Are you asking for my

19   opinion?

20   BY MR. DOVE:

21      Q.   I guess I'm asking -- A, I'm asking --

22   let's do it both ways.  First, I'm asking for

23   your personal opinion, yes.

24           MS. SINGER:  Objection.  Again, beyond

25   the scope.

1              MS. LINN:  Yeah.  I mean, it -- he can

2      answer, but that's not within the scope of -- of

3      why he's here, you know.  That's one of the

4      topics, and that -- all we care about for

5      relevance would be what -- what ODM thinks.

6              THE WITNESS:  Personal opinion, we all

7      could have done better.

8              MR. HERMAN:  For the record, I do

9      believe that is within the scope of the topics.

10     It's -- one of the topics is ". . . actions taken

11     by Ohio Medicaid in response to the opioid

12     crisis."  I believe that's the topic we're on.

13             MR. DOVE:  Yeah, I'm just -- I've

14     been -- I was --

15             MS. LINN:  It was his personal opinion.

16     That was what I was stating my objection to.

17             MR. SHKOLNIK:  For the record, that was

18     our objection as well.

19             MR. HERMAN:  I also believe that the

20     cause is within the scope of that topic.

21             MR. DOVE:  I misunderstood the

22     objection.  So the objection is just him -- you

23     don't have any problems with questioning

24     regarding this issue; it's just you're concerned

25     about asking about personal opinion?

Page 217

1              MS. SINGER:  He can -- he can respond to

2     the actions taken, that is clearly the scope, but

3     not his own personal opinion.  He's here as a

4     30(b)(6) witness.

5              MR. DOVE:  Okay.  So objection noted.  I

6     mean, we have -- we agree to disagree.

7     BY MR. DOVE:

8       Q.   In ODM's view, what government agencies

9     have responsibility for attacking the problem of

10    opioid abuse in Ohio?

11             MS. SINGER:  Objection as to form.

12             THE WITNESS:  In ODM's view, I think it

13    would be easier to find agencies that don't have

14    some responsibility.  I mean, I think that every

15    agency -- probably just about every agency has

16    some responsibility in -- in at least -- at least

17    analyzing the problem, figuring out what they can

18    do, what can we do to help.  I think that's

19    something that we all feel -- you know, as state

20    employees, we all feel that, you know, this is

21    something we all want to help with.

22    BY MR. DOVE:

23      Q.   And so when you said earlier that "We

24    all could have done better," that's who you were

25    referring to, the -- to the different agencies of

1    government that all have some responsibility?

2        A.    Manufacturers --

3            MR. SHKOLNIK:  Objection.

4            THE WITNESS:  -- distributors,

5    pharmacies, physicians, physician groups,

6    licensure.  Yes.  I think that everybody has

7    some -- some -- could do better.

8    BY MR. DOVE:

9        Q.    Do you think that Ohio has a problem

10   today with prescription opioid abuse as opposed

11   to just opioid abuse generally?

12           MS. SINGER:  Objection.  Beyond the

13   scope of the topics.

14           THE WITNESS:  Yes.

15   BY MR. DOVE:

16       Q.    In what way?

17       A.    I think that more opioids are prescribed

18   than are used for the purposes that they're

19   intended to be used for.  And then I think in an

20   ideal world, we are prescribing the opioids that

21   are necessary for their purpose and no more.

22       Q.    Was there ever a time, in your view,

23   when the abuse of prescription opioids was not a

24   problem?

25           MS. SINGER:  Again, note a continuing

1  objection to this topic.  And also, are you

2  asking as -- his view -- ODM's view or the

3  witness's personal view here?

4          MR. SHKOLNIK:  And time frame.

5  Objection to outside of 2013 --

6          THE WITNESS:  Are you asking as my --

7  my -- as a physician or as an ODM --

8  BY MR. DOVE:

9      Q.   I'm asking as a physician, you know, was

10  there ever a time when abuse of prescription

11  opioids was not a problem, in your view?

12      A.   Before opioids were available.

13      Q.   Before prescription opioids were

14  available?

15      A.   (Nods head.)

16      Q.   But -- so since prescription opioids

17  have become available, there's been a problem

18  with abuse, correct?

19      A.   I would -- I would probably say, yes,

20  that that's probably true.  There's all -- yeah.

21  There's that potential.

22      Q.   Yeah.  Does ODM have a position as to

23  whether -- as to what is a bigger problem today:

24  prescription opioid abuse versus heroin and

25  fentanyl abuse?

Page 220

1      A.   Yeah, I think we've actually made great
2   progress in decreasing the amount of prescription
3   opioid issues that are out there.  We've
4   decreased prescribing substantially.  We're
5   seeing many less deaths associated with
6   prescription opioids.  Most -- the majority of
7   overdose deaths now are fentanyl related.  And so
8   I would say, yes, the -- there has been a shift
9   towards those illegal opioids.
10      Q.   Has ODM authored, coauthored, or
11   commissioned any reports regarding the opioid
12   crisis or opioid misuse?
13      A.   I'm not sure.  I don't know.  I mean,
14   you showed me a slide set from my director.  Is
15   that what you're talking about, in those?
16      Q.   No.  I'm just -- I'm just trying to get
17   a list of all the reports that you're aware of
18   that ODM has authored, coauthored, or
19   commissioned regarding the opioid crisis or
20   opioid misuse.
21      A.   I don't have those on the top of my
22   head, so I just don't -- I don't know how to
23   answer that.  I don't know --
24      Q.   Okay.
25      A.   -- the answer to the question.

Page 221

1          MR. DOVE:  Okay.  I'd like to introduce

2     as Exhibit 11 a document entitled "Ohio Attorney

3     General's Insurer Task Force on Opioid Reduction

4     Report and Recommendations" dated June 2018.

5                         - - -

6          Thereupon, Deposition Exhibit 11 was

7          marked for purposes of identification.

8                         - - -

9     BY MR. DOVE:

10     Q.   If you could take a look at this report,

11     Dr. Wharton, and tell me whether you've ever seen

12     this report before.

13          MS. LINN:  Ron, is this something that

14     we directed you to a website to obtain or --

15          MR. DOVE:  This is something we located

16     online in preparing for the deposition.

17          MS. LINN:  Okay.

18          THE WITNESS:  So I knew of this report's

19     existence.  I have not seen it.  We were not on

20     the task force.

21          MS. LINN:  And I'd just like to note in

22     my topics I said that he could testify to subject

23     matter of documents produced by ODM, and this was

24     not produced by ODM in response to discovery.  So

25     to the extent he can testify to this, okay, but I

Page 222

1   just wanted to put that objection on the record.

2          MR. DOVE:  Right.  I mean, it's our view

3   that we're entitled to ask the witness about any

4   document that we -- we want to as long as it

5   relates to the subject matter of our 30(b)(6) and

6   that the Task Force on Opioid Reduction would

7   clearly relate to the -- the topic on ODM's

8   knowledge of and actions taken in response to

9   the -- to the opioid --

10          MS. LINN:  Okay.

11          MR. DOVE:  -- crisis.

12          MS. LINN:  To the extent he's able to.

13          MR. DOVE:  To the extent he's able to --

14          MS. LINN:  Sure.

15          MR. DOVE:  -- to -- to testify.

16   BY MR. DOVE:

17      Q.   So, Dr. Wharton, do you know whether ODM

18   had a role in the creation of this task force

19   report?

20      A.   No.

21      Q.   No, it did not, or no, you do not know?

22      A.   Not to my knowledge, it -- it did not

23   have a role.

24      Q.   Did ODM's managed care organizations

25   have a role in this report?

Page 223

1      A.   Yes.  Some of them are listed here.

2      Q.   And which one -- which ODM managed care

3   organizations were members of the task force?

4      A.   Buckeye, CareSource, Molina, Paramount,

5   and possibly UnitedHealthcare.

6           MS. SINGER:  Just to clarify for the

7   record, Dr. Wharton, are you testifying from your

8   personal knowledge?

9           THE WITNESS:  I am testifying from

10   what's written here.  And I -- but I was aware

11   that the plans were involved in a task force

12   after the fact, so . . .

13   BY MR. DOVE:

14      Q.   So, Dr. Wharton, I think you -- you may

15   have testified you weren't sure exactly if or how

16   ODM was involved in this insurer task force

17   opioid reduction report.  We do know that its

18   managed care organizations were involved here.

19           We also know, if you look at the -- on

20   Page 3 of this document, there is a reference to

21   ODM where it notes -- I'm trying to find it

22   here --

23           MR. SHKOLNIK:  Last paragraph.

24           MR. DOVE:  Yes.  Thank you.

25   BY MR. DOVE:

1       Q.    The last paragraph, it says that "Ohio

2    health insurers have a -- bear a significant

3    portion of the financial burden of opioid abuse.

4    For example, from 2014 to 2016, the Ohio

5    Department of Medicaid spent $462 million on

6    treatment and counseling services for opioid

7    abusers and more than 110 million on medications

8    used to treat opioid abuse."  Do you see that?

9       A.    I do.

10      Q.    And does that suggest to you that --

11   that at least the Ohio Department of Medicaid

12   provided data to the task force for use in this

13   report?

14      A.    I have no idea where they got the data.

15   I -- I don't know.

16      Q.    Okay.  I'd like to walk through -- this

17   report contains a series of recommendations that

18   are -- recommendations from this insurer task

19   force.  I want to walk through those with you and

20   ask you a few questions.

21           So the first one on Page 4,

22   Recommendation No. 1 states, "Insurers should

23   cover and encourage, where appropriate, the use

24   of both nonopioid pain medications and

25   nonpharmacological treatments for pain."  Do you

Page 225

1   see that?

2       A.   Uh-huh.  Yes.  I'm sorry.

3       Q.   Does ODM agree with that recommendation?

4       A.   Yes.

5       Q.   Is ODM currently abiding by that

6   recommendation?

7       A.   Yes.

8       Q.   When did ODM begin abiding by this

9   recommendation?

10          MS. SINGER:  Objection to the extent

11  it -- it precedes 2013.

12          THE WITNESS:  I don't know.  I mean,

13  I -- I suspect ODM was doing this prior to this

14  recommendation.  So when did we start?  I mean,

15  it's -- I guess I'm not sure I understand that

16  question.

17  BY MR. DOVE:

18      Q.   Yeah.  I mean, that -- that's the

19  question.  When did ODM --

20      A.   Prior to this recommendation --

21      Q.   At some point -- at some point -- I

22  mean, it's a recommendation here suggesting that

23  at least some insurers on the task force or some

24  insurers do not abide by that recommendation.  So

25  I am just asking whether ODM abides by it.  And I

Page 226

1    believe you said yes.

2            And so my question was:  Do you know

3    when ODM began abiding by this recommendation?

4        A.   It's a very general recommendation that

5    could be interpreted many ways.  And my -- my --

6    you know, my -- my statement would simply be:

7    Yeah, we've -- we've always done this.  At least

8    since I've been around, so . . .

9        Q.   Okay.  In the second paragraph under

10   that recommendation, second sentence, it says

11   that "Managed Care Organizations should work with

12   the Department of Medicaid to review their

13   contracts and policies to determine the

14   appropriate coverage for nonopioid therapies."

15   Do you see that?

16       A.   Uh-huh.  I do.

17       Q.   Is that something that's taking place?

18       A.   So it has.  And I think that, certainly,

19   acupuncture was one of the things that we're --

20   that we have started to pay for.  And as time

21   goes on, we're expanding the indications for

22   acupuncture.  We're looking at other modalities

23   for pain.  We're trying to make sure that we

24   don't have unnecessary edits in place or

25   unnecessary barriers in place for our members to

Page 227

1   get necessary treatments and so forth.  And so

2   it's an ongoing process.

3          And -- and as pain management, in

4   general, evolves, you know, we hope to be on the

5   cutting edge of that, so . . .

6      Q.   Do you see at the end of that paragraph,

7   the third -- I think it's the end of the third

8   paragraph under "Recommendation 1," it says that

9   ". . . there is an incentive for providers to

10  treat pain in the cheapest way -- like an opioid

11  prescription -- rather than exploring a nonopioid

12  medication or therapy."

13         And I believe you touched on this

14  earlier, but would you agree that there -- there

15  is an incentive for -- to go with the cheapest

16  way rather than the nonopioid medication or

17  therapy?

18         MR. SHKOLNIK:  Objection to form.

19         THE WITNESS:  So I guess I would

20  disagree a little in that, you know, for a

21  provider of a patient who has good health

22  coverage, the incentive is more around

23  simplicity, often, than price.  I think that it's

24  much easier for a provider to write a

25  prescription and send somebody out the door than

Page 228

1  it is to have a discussion with them about the

2  dangers of opioids and alternative therapies.

3       And so I would say, you know, I'm not

4  aware of any specific incentives for providers

5  financially to treat with opioids versus other

6  things other than the incentive of getting out of

7  that room and into the next room to see the next

8  patient.

9  BY MR. DOVE:

10     Q.   Are there incentives for insurers -- or,

11 well, let me -- such as ODM to reimburse in --

12 reimburse in the cheapest way, if you will, such

13 as an opioid prescription, rather than

14 reimbursing for something that's more expensive,

15 such as a nonopioid medication or therapy?

16     A.   So if those --

17          MS. SINGER:  Objection.  How does this

18 relate to the topics?

19 BY MR. DOVE:

20     Q.   You may answer.

21     A.   So, yeah, I don't under- -- I don't

22 understand what you mean by "incentives."  I

23 mean, are you asking if there are barriers in

24 place to do the more expensive treatment or --

25     Q.   Well, actually, I'm trying to get a

Page 229

1    sense -- and you -- we've talked about this a

2    little bit about -- and you talk about the

3    balancing.

4        A.    Uh-huh.

5        Q.    And certainly there's an objective to

6    reduce the amount of opioid reimbursement, yet,

7    it continues.  And some of that as -- you've

8    talked about as being legitimate, but is it

9    possible that some of that is also because

10   it's -- the incentives are such that it's -- it's

11   cheaper for the Medicaid agency to reimburse for

12   opioids than it would be to reimburse for, say,

13   drug therapy or reimburse for some other

14   alternative treatment that's more expensive?

15           MS. SINGER:  Objection.  Again, this is

16   beyond the scope of the topics.  And if there's

17   an argument that it relates to them, I'd like to

18   hear it.

19           MR. KNAPP:  I think the objections are

20   limited to form and foundation.

21           MS. SINGER:  And scope for 30(b)(6)

22   testimony.

23           MR. KNAPP:  That's fine.  So I don't

24   think every time, you need to represent that it's

25   outside the scope.  You don't represent this

Page 230

1   witness.

2           MS. SINGER:  I don't, and I represent a

3   party in this case, and I have the same right to

4   speak as you do.

5           MR. DOVE:  I'd like to keep the

6   objections to form, if we could.

7   BY MR. DOVE:

8       Q.   Go ahead.

9       A.   Could you please repeat the question?  I

10  lost -- lost the question.

11      Q.   Are there incentives --

12          MR. DOVE:  I guess it might be easiest

13  if you could -- if you mind reading it back or I

14  can read it from the . . .

15          (Question read back as requested.)

16          MR. SHKOLNIK:  Note my objection to the

17  form of that -- I guess it's a question -- and

18  whether or not it's for ODM or personal.  I just

19  want that on the record.

20          THE WITNESS:  So if I understand your

21  question --

22  BY MR. DOVE:

23      Q.   Yeah.

24      A.   -- appropriately, let me just answer as

25  I've -- as I've said before.  I think that there

Page 231

1    are long-term costs associated with opioids and

2    there are short-term costs.  It doesn't make a

3    lot of sense to save a penny now and spend $10

4    later.  And so, you know, as -- as an insurer,

5    you know, we're thinking of our members first.

6    We want -- we want them to be healthy.

7           I don't know of any incentive to

8    prescribe opioids in a way that might cause a

9    member harm, have them become addicted and

10   tolerant to that pain medication, when we can

11   actually avoid that, provide other services, and

12   remove barriers associated with those other

13   services, make it easier for our providers to get

14   those other services to our members, and avoid

15   those long-term costs.

16          So, yes, opioids are cheaper, but we're

17   not incentivized to use them.  If anything, the

18   opposite is true.  We're trying to incentivize to

19   move away from that.  And, in fact, what we're

20   really trying to look at long term is outcomes.

21   Is how do we -- how do we define an outcome?  How

22   do we define some way -- some value-based way to

23   align incentives so that a provider actually will

24   be reimbursed for doing the right thing more than

25   just seeing that next patient in a

Page 232

1    fee-for-service kind of mill.  So if that helps.

2        Q.   I think it helps.  I guess I'm trying to

3    get back to the recommendation, though.  I mean,

4    there -- there's a reason why this

5    recommendation's being made, and there's

6    certainly a reason -- there must be a sense that

7    insurers are -- or have incentives to reimburse

8    for opioids over nonopioid pain medications and

9    nonpharmacological treatments for pain or else

10   this wouldn't be an issue or a recommendation.

11           I'm just trying to get at a sense of

12   why -- you know, what this means when it talks

13   about incentives for, you know, providing a

14   cheaper way.

15           MS. LINN:  I'm going to object.

16           MR. SHKOLNIK:  Object to form.  It's a

17   speech, not a question.

18           MS. LINN:  And I'm going to object

19   because, again, this is not ODM's record.  You

20   know, I think that Dr. Wharton has spoken to what

21   ODM's stance on this is and has given his opinion

22   to your question.

23   BY MR. DOVE:

24       Q.   Go ahead.  Yeah.

25       A.   Yeah.  I don't know what's behind this

Page 233

1  recommendation.  I don't know what he's trying to

2  say here.  I -- I can only guess.  But the

3  incentive he's talking about is to providers.

4  And I'm just going to say that there are no

5  financial incentives that I know of, unless

6  manufacturers are providing them, to providers

7  for prescribing opioids.  And so I don't -- I

8  don't -- I don't know what that is all about.

9       We don't incentivize in any way the

10 prescribing of opioids to -- by providers.  I --

11 I -- so if providers have an incentive, it's not

12 so much -- and this is back to my original point.

13 It's not so much any financial incentive from us

14 other than the fact that prescribing opioids is

15 quick and easy and I get in and out of the room

16 in a hurry.  It's simplicity more than price or

17 any financial incentive to do so.

18   Q.   So just last question on this

19 recommendation, we'll move on.

20       You know, so when it says in here -- I

21 know folks have objected about the scope.  It

22 talks specifically about how ". . . Managed Care

23 Organizations should work with the Department of

24 Medicaid to review their contracts and

25 policies . . . ."

Page 234

1       A.    Where are you?  Where are you?

2       Q.    This is, I'm sorry, on the second

3   paragraph.

4       A.    Second paragraph, Page 4.

5       Q.    Page 4 under the Recommendation No. 1.

6       A.    Okay.

7       Q.    It talks about how ". . . Managed Care

8   Organizations should work with the Department of

9   Medicaid to review their contracts and policies

10  to determine the appropriate coverage for

11  nonopioid therapies."  That suggests that there's

12  some improvement that could be made, does it not?

13      A.    It makes a recommendation that we're

14  already doing.  I mean, that's something that

15  we're already working with the plans to do just

16  that thing.  That's -- that's acupuncture

17  dealing -- again, we're one of the first states

18  in -- in the country to pay for acupuncture

19  under -- before this was ever published, so . . .

20      Q.    So ODM believes it can do better and is

21  taking steps to do better, correct?

22      A.    Correct.

23      Q.    Let's turn now to the second

24  recommendation on Page 5.  That recommendation

25  states, "Insurers should identify and develop

Page 235

1   targeted education efforts for clinicians who
2   prescribe high volumes of opioids compared with
3   peers in their clinical specialty."  Do you see
4   that?
5        A.   I'm sorry.  What page were you on again?
6        Q.   I'm sorry.  We're on Page --
7             MS. LINN:  Very top.
8   BY MR. DOVE:
9        Q.   Page 5.  Top of Page 5, Recommendation
10  No. 2.
11       A.   Okay.
12       Q.   Again, it says, "Insurers should
13  identify and develop targeted education efforts
14  for clinicians who prescribe high volumes of
15  opioids compared with peers in their clinical
16  specialty."  Do you see that?
17       A.   Yeah.
18       Q.   Is ODM currently abiding by this
19  recommendation?
20            MR. SHKOLNIK:  Objection to form.
21            THE WITNESS:  So I've given two examples
22  where -- one example where our DUR committee did
23  just that, and another example where one of our
24  managed care organizations also did something
25  similar.  So, yes, we were doing this, again,

Page 236

1    prior to this publication.

2        Q.    And do you know when ODM began

3    identifying and developing targeted education

4    efforts for clinicians who prescribe high volumes

5    of opioids compared with peers in their clinical

6    specialty, when that began?

7        A.    It would have been in 2017.

8        Q.    In 2017?

9        A.    Uh-huh.   2016 for the managed care

10   organization.

11       Q.    In the -- in the first paragraph,

12   second-to-last sentence, it says that

13   "Insure-" -- of that Recommendation No. 2, first

14   paragraph, second-to-last sentence, it says that

15   "Insurers have easy access to a large volume of

16   prescription data and are in a position to use

17   that information to address the problem of

18   overprescribing."  Do you see that?

19       A.    Yeah.

20       Q.    And do you agree with that statement?

21       A.    Yes.

22       Q.    And would you agree that ODM has easy

23   access to a large volume of prescription data and

24   are in a position to use that information to

25   address the problem of overprescribing?

Page 237

1      A.    To some degree, yes.

2      Q.    I'd like to move now to Recommendation

3  No. 3 on -- on -- also on Page 5.  It says that

4  "Insurers should ensure that providers in their

5  networks are aware of and follow applicable

6  opioid prescribing guidelines" --

7      A.    Where are you at?  I'm sorry.

8      Q.    I'm sorry.  I'm on -- still on the same

9  page, and it's Recommendation No. 3.

10      A.    Okay.  Gotcha.

11      Q.    And it says, "Insurers should ensure

12  that providers in their networks are aware of and

13  follow applicable opioid prescribing guidelines,

14  which should be more uniform to reduce the amount

15  of opioids prescribed."  Do you see that?

16      A.    Yes.

17      Q.    And is ODM currently following this

18  recommendation?

19      A.    Yes.

20      Q.    And when did ODM begin to follow this

21  recommendation?

22      A.    October of 2017.

23      Q.    You seem so firm on the date of that.  I

24  -- what -- what causes -- I was like, "Oh, okay."

25  What causes you to be so firm on the date of when

Page 238

1   ODM began following Recommendation No. 3?

2        A.    Because I led that project.

3        Q.    Okay.

4        A.    So . . .

5        Q.    So -- so prior to that date, ODM was not

6   ensuring that providers in their networks were

7   aware of and following applicable opioid

8   prescribing guidelines; is that correct?

9        A.    The guidelines, actually, were -- there

10  were only chronic disease guidelines prior to

11  that time.  So those -- those guidelines actually

12  happened in 2017 that we're -- that we're

13  discussing.

14       Q.    Let's turn now to Recommendation No. 4,

15  which is on Page 6.  This states that "Insurers

16  should develop targeted prevention efforts aimed

17  at reducing the number of opioid prescriptions

18  written for adolescents and young adults who are

19  'opioid-naïve.'"  Do you see that?

20       A.    Agree.  Yes.

21       Q.    And is that -- does ODM currently follow

22  that recommendation?

23       A.    I believe so, yes.

24       Q.    And do you know when ODM began following

25  that recommendation?

Page 239

1    A.    First of all, the opioid-naïve issue

2  are -- that's part of our edits for both

3  short-acting and long-acting opioids that we have

4  previously talked about.

5         In addition to that, ODM is working with

6  Comprehensive Primary Care, the CPC, which is a

7  payment innovation model across the state of Ohio

8  involving a little over half of our membership in

9  an effort to enhance school-based therapy where

10  we are literally encouraging our FQHCs and our

11  primary care providers to -- to put offices

12  directly in schools where our children are.

13         One of the biggest problems that we have

14  with this particular group of patients is

15  engagement.  They're not engaged in the health

16  care system.  But most of them do go to school.

17  So by taking health care to where they are, we're

18  hopeful that we can address these kinds of

19  problems at the school and -- and actually,

20  hopefully, be a little preemptive.

21         Again, you know, we want to try to catch

22  them young before.  And we're also looking at --

23  at metrics that might identify these kids in

24  advance.  We're looking at adverse childhood

25  events that may have occurred.  We're looking at

                                                    Page 240

1    children who smoke.  We find that kids who smoke

2    early tend to use other drugs later.

3           So there's just a lot of things that

4    we're looking at right now.  We're not there yet,

5    but it's something that we're definitely working

6    on and focused on because we think that's our

7    greatest opportunity, our bang for the buck, for

8    prevention.

9      Q.    Okay.  So that particular program is one

10   you're looking at but haven't started yet?

11     A.    So some of the things that I talked

12   about, we have started.

13     Q.    Okay.

14     A.    For instance, those opioid edits around

15   opioid-naïve individuals, so we've already done

16   that.

17           But, yes, the school-based initiative is

18   really just getting under way.  We have maybe

19   between six and ten good, mature school-based

20   systems already going across the state of Ohio.

21   And we're trying to expand that exponentially and

22   quickly because we see great value there.

23     Q.    When did the -- the opioid edits change

24   come -- come to be?

25     A.    October of 2017.

                                        Page 241

1        Q.    Okay.  Big date.  Okay.

2              Why don't we go on to the next page,

3    Page 7, where there's another recommendation.

4    Recommendation No. 5 is that "Insurers should

5    develop targeted 'first-fill' education

6    programs."  Do you see that?

7        A.    Yes.

8        Q.    And is that a recommendation that --

9    that ODM has implemented?

10       A.    I don't believe so.

11       Q.    And you --

12       A.    The plans may -- some of the plans may

13   have programs around this, but I don't believe

14   ODM does, for our fee for service.

15       Q.    Do you know if ODM has -- has any plans

16   to implement Recommendation No. 5?

17       A.    Yes.

18       Q.    And -- and what are those plans?

19       A.    It's actually through an -- the MTM

20   program that we have with the plans.  We also

21   want to institute an MTM program with our

22   fee-for-service members.  That medication therapy

23   management will literally pay a pharmacist for

24   this type of intervention.

25       Q.    Uh-huh.

Page 242

1      A.   And so that -- yes.  That's -- that's

2   where we hope to move that forward.

3           We're also beefing up the MTM

4   requirements that the plans have in their

5   provider agreement.  Right now, only four out of

6   five of our plans have a robust MTM program.  So

7   we want to set a basement MTM expectation that

8   all of our managed care plans will have to reach.

9   And targeted population health efforts like this

10  will be part of that basement recommendation or

11  requirement.

12      Q.   I guess the last recommendation in this

13  section of this report is Recommendation No. 6 on

14  the same page.  It says, "Insurers should work

15  together to develop communication strategies and

16  use easy-to-understand language to educate the

17  public about the risks of opioids."

18          Is that a recommendation that ODM has

19  implemented?

20      A.   For our members.  I'm not sure that

21  we've done a lot for the public in general, but I

22  would say that, yes, for our members, we have.

23      Q.   And when did -- was that recommendation

24  implemented?

25      A.   So I don't know the earliest that that

Page 243

1    would have happened, but I am aware of one that

2    happened in October of '17, so . . .

3        Q.   All right.  We're getting through these.

4        A.   Good.

5        Q.   In the next -- you can anticipate my

6    questions.

7             All right.  So Page 8.  These are a

8    different sort of recommendation.  These are

9    intervention recommendations.  And Recommendation

10   No. 7 is that "Insurers should educate

11   prescribers about tapering guidelines for

12   patients who use opioids to treat chronic pain,

13   and encourage prescribers, as appropriate, to

14   reduce a patient's dependence on opioids."

15            Do you see that?

16       A.   I do.

17       Q.   Is this a recommendation that ODM has

18   implemented?

19       A.   It is not.

20       Q.   And does ODM have any plans to implement

21   this recommendation?

22       A.   Not to my knowledge.  If you'll recall,

23   most of our members don't -- aren't on chronic

24   medications.  Most of the problem that we have is

25   with short-term prescriptions, so . . .

Page 244

1          But -- so, no, I don't know of any --
2    any -- any plan to do that specific provider
3    education, except in cases where we may run
4    across providers who are really outside of the --
5    of the norm.
6          Q.    Recommendation No. 8 on that same page
7    is that "Insurers should create, use, and
8    continually refine 'lock-in' programs to reduce
9    the practice of doctor or pharmacy 'shopping' by
10   patients who are seeking opioids."
11          I believe you did -- you testified
12   earlier this afternoon about there is a lock-in
13   program in place for ODM; is that correct?
14        A.    Yes.
15        Q.    And is that a program that is being
16   constantly refined?
17        A.    Uh-huh.
18        Q.    Yes?
19        A.    Yes.
20        Q.    And do you know when the lock-in program
21   was put in place by ODM?
22        A.    I think 2015.  I was at CareSource at
23   the time, so I'm thinking 2015 probably.
24        Q.    But, again, prior to -- prior to 2015,
25   there was no lock-in program in place?

Page 245

1      A.    So the lock-in program was actually
2  instituted by all the managed care plans first.
3      Q.    Uh-huh.
4      A.    ODM for fee for service actually started
5  in 2017, just to be clear.
6            And so approximately 4,000 members are
7  now in the CSP.  We call it CSP, it's coordinated
8  services program, which is our lock-in program.
9  I think I've given you the -- the rationale
10  for --
11      Q.    Okay.
12      A.    -- for inclusion on that.  They get
13  specific case management activities.  They're
14  locked in to a specific pharmacy.  One plan also
15  locks them into a specific provider.  The idea is
16  to decrease -- and it actually has had a
17  significant impact on those members' utilization
18  of opioids.
19      Q.    Moving on --
20      A.    And -- oh.
21      Q.    Sorry.
22      A.    As far as the evolution, we have updated
23  our guidelines.  As of January 1st, we will have
24  new guidelines going in place.  Where before, we
25  had the four prescriptions from four different

Page 246

1    providers, four different pharmacies, 12 opioid

2    prescriptions in a three-month period, we

3    actually have a much more refined and robust set

4    of guidelines that, hopefully, will expand that

5    population moving forward as of January 1st.  So

6    that's the evolution of that.  But it's a good

7    program.

8           Go ahead.

9       Q.   I guess moving on to Page 9.

10   Recommendation No. 9, "Insurers should use

11   multidisciplinary teams, when -- when

12   appropriate, to coordinate care for members with

13   opioid-use disorder."

14          Is that a recommendation that ODM has

15   implemented?

16      A.   Yes, from our managed care side.  And on

17   the managed care side, that's an expectation.  We

18   have a high-risk designation that opioid addicted

19   individuals would fit.  The managed care plans

20   are required to case manage the worst of those,

21   and that would include a multidisciplinary team,

22   including their providers, their case managers,

23   families, support, and others, as necessary,

24   in -- in working with their care.

25          Now, moving forward, there has been a

Page 247

1    behavioral health redesign in Ohio that has moved

2    our behavioral health programs into managed care.

3    And there is an effort right now in moving that

4    forward also to integrate behavioral health into

5    primary care and to have the behavioral health

6    practitioner and the primary care doctors working

7    together to help this unfortunate group of

8    patients, so . . .

9        Q.   And that's -- as I understand it, that's

10   all on the managed care side?  No?

11       A.   Yes.

12       Q.   Yes.

13       A.   Yes.

14       Q.   Okay.  And when did that begin?  I mean,

15   let's talk about the managed care side.  So when

16   did that program begin?

17       A.   So the case management program, in

18   general, the high-risk case management --

19       Q.   Yeah.

20       A.   -- probably began in, I'm just going to

21   guess -- I mean, this is a guess -- '13 or '14,

22   so quite a ways back.

23       Q.   Okay.

24       A.   So.

25       Q.   What about on the fee-for-service side?

```
                                        Page 248
 1   Has Medicaid implemented Recommendation No. 9?
 2        A.   Other than our lock-in program, not.  So
 3   for those members who are in our -- our CSP
 4   program, yeah, there is -- there is somewhat of
 5   that going on, but not -- but not to this -- not
 6   to the same degree that we see in plans.
 7        Q.   Going on, Recommendation No. 10, which
 8   is also on Page 9, it says that "Insurers should
 9   direct obstetricians and gynecologists in their
10   network to screen pregnant patients for opioid
11   use throughout pregnancy."  I know we talked
12   about this previously to some extent.
13           Is this a recommendation that ODM has
14   implemented?
15        A.   Yeah, I would say the word "direct"
16   is -- isn't -- we -- we -- we are incentivizing
17   that activity, as opposed to directing, so . . .
18        Q.   And -- and when did that incentivizing
19   begin?
20        A.   That would have been right before I
21   joined ODM.  I'm thinking 2016 probably.
22        Q.   Lots of recommendations here.  I'm
23   moving as quickly as I can.
24           Okay.  Page 10, Recommendation 11,
25   "Insurers should accept a standard authorization
```

Page 249

1    form for disclosure and use of protected health

2    information to better coordinate the care of its

3    members."  That -- is this a recommendation that

4    ODM has implemented?

5         A.   It has been developed.  It has not been

6    rolled out yet.  But that form has been

7    developed, and we are hoping to roll that out

8    along with the behavioral health care

9    coordination piece that I mentioned earlier.  And

10   so there -- there is some legislative delay going

11   on there, so-- but yes, we would like to get that

12   done.  We have -- again, we have built the form.

13   It's just a matter of making it out -- getting it

14   out there.

15        Q.   Recommendation No. 12 on the same page,

16   "Insurers should help government partners to

17   coordinate substance-use treatment for members

18   who are preparing to re-enter the community after

19   a period of incarceration."

20        A.   Great stuff.

21        Q.   Yeah.  Is this -- is this a

22   recommendation that -- that either ODM has

23   implemented or is involved with in some way?

24        A.   Yes.  So in, I'm thinking, 2015, 2016,

25   ODM required our managed care plans to actually

Page 250

1   engage people incarcerated in the Ohio prison

2   system, to -- to actually engage with them about

3   a month prior to their discharge to make sure

4   that they sign up for one of the managed care

5   plans.

6           And that managed care plan would then

7   assign them a case manager who would help them

8   transition from corrections to freedom and make

9   sure that all of the necessary medical

10  appointments and follow-up were -- were scheduled

11  and attended as best they can.  You know, taking

12  away barriers in transportation and so forth just

13  to make sure that that happens.

14          That process has been going on for a

15  couple of years.  It's been fairly successful.

16  And lately, we have been working on trying to get

17  Vivitrol actually prescribed by prison personnel

18  prior to release so that when the people are

19  released, they won't be tempted to just go out

20  and use again.  And so that process is evolving.

21  So we have been doing that.

22      Q.   So in this section of this

23  recommendation -- and I think you touched on

24  this -- but in -- in the bottom two paragraphs on

25  Page 10, it does talk a little bit about

Page 251

1   Medicaid.  And it says in the first sentence

2   ". . . that it is no longer necessary to

3   terminate Medicaid for those who are

4   incarcerated.  Incarcerated individuals who are

5   able to remain on" --

6        A.   What page are you --

7        Q.   I'm sorry.  I'm still on Page 10.

8        A.   Yeah.  Where are you?

9        Q.   And the bottom two paragraphs under

10  Recommendation 12.  All right?

11       A.   Okay.

12       Q.   And I'll go --

13       A.   Gotcha.  I'm sorry.

14       Q.   I'll read the third paragraph.  "First,

15  the task force notes that it is no longer

16  necessary to terminate Medicaid for those who are

17  incarcerated.  Incarcerated individuals are able

18  to remain on Medicaid with limited coverage, and

19  their full benefits return following release."

20            Is that your understanding of how this

21  works?

22       A.   Yeah, that's actually news to me.  It

23  was my understanding that when they were

24  incarcerated, they lost their Medicaid coverage.

25  And so I'm not sure that I -- I was not aware of

                                              Page 252

1    this.

2         Q.    And the second sentence of that

3    paragraph, then, it goes on to say that "To

4    reduce the possibility of treatment delays or

5    interruption upon an inmate's release, the Ohio

6    department of Medicaid and county Job and Family

7    Service workers should not list incarcerated

8    members in terminated status."  Do you see that?

9         A.    Uh-huh.

10        Q.    And do you -- does ODM agree that it

11   should not list incarcerated members in

12   terminated status?

13        A.    If that's the law, absolutely.  I think

14   that would be helpful.

15        Q.    All right.  I'll read, just for

16   completeness, Page 11.  I'll read this

17   recommendation, though I'm not sure what ODM can

18   do about it.

19             Recommendation 13 states that "The

20   General Assembly should amend state statute so

21   that commercial insurance companies have access

22   to prescription information contained in the Ohio

23   Automated Rx Reporting System."  Do you see that?

24        A.    Yes.

25        Q.    Does ODM have a position one way or

Page 253

1   another on whether this recommendation should be

2   adopted?

3        A.   I don't know.

4        Q.   Moving to the last couple of

5   recommendations.  On Page 12, these are treatment

6   recommendations.  Recommendation 14 states that

7   "Insurers should eliminate or expedite prior

8   authorizations for accessing Medication Assisted

9   Treatment (MAT)."

10       A.   Uh-huh.

11       Q.   Has ODM implemented this recommendation?

12       A.   Yes.  Well, January 1st, it will be

13   implemented.

14       Q.   And January 1st, 2019, this is

15   implemented?

16       A.   Correct.

17       Q.   And do you agree that that's a good --

18       A.   Yes.

19       Q.   -- development?

20            Finally, Recommendation 15, "Insurers

21   should increase reimbursement rates to adequately

22   cover the cost of providing substance-use

23   disorder treatment."

24            Does ODM have a position whether

25   reimbursement rates should be increased to

1   adequately cover the cost of providing

2   substance-use disorder treatment?

3       A.   I'm not sure.

4       Q.   Do you believe that increasing

5   reimbursement rates would allow ODM to provide

6   greater coverage for the cost of providing

7   substance use disorder treatment?

8       A.   Again I'm not sure.  I'm not sure

9   that -- I don't know where our reimbursement

10  rates are compared to the acquisition costs from

11  providers' point of view, and that's something

12  that we would have to study.  So I'm not -- I

13  don't -- I'm not aware of that.

14      Q.   Okay.  All right.  I think we are done

15  with that exhibit.

16          THE WITNESS:  Can I take a bathroom

17  break?

18          MR. DOVE:  Yes.  Good time for a break.

19  Let's do that.

20          THE VIDEOGRAPHER:  Off the record at

21  2:39.

22          (Recess taken.)

23          THE VIDEOGRAPHER:  Back on the record at

24  2:52 p.m.

25  BY MR. DOVE:

Page 255

1      Q.   Dr. Wharton, I want to talk for a minute

2  or two about the Section 1- -- 1115 waiver at --

3  Ohio submitted a waiver for Medicaid expansion in

4  April 2018; is that correct?

5          MS. SINGER:  Objection.  Beyond the

6  scope of the topics.

7          THE WITNESS:  So the 1115 waiver for

8  Medicaid expansion.

9  BY MR. DOVE:

10     Q.   That's correct.

11     A.   Are you talking about the opioid waiver?

12  What -- I'm not --

13     Q.   Let me -- let's do it -- let's start

14  with the exhibit.

15     A.   Yeah.  Yeah.

16     Q.   Okay.

17     A.   Let's do that.  I'm not sure -- I'm not

18  sure of the waiver you're speaking of.

19     Q.   Okay.

20     A.   Of which you speak.

21     Q.   All right.

22          THE VIDEOGRAPHER:  Doctor, I'm sorry.

23  Can I please have you clip your microphone back

24  on?

25          THE WITNESS:  Oh, so sorry.

1          MR. SHKOLNIK:  Just so the record's

2     clear, which topic are we on so that --

3          MR. DOVE:  We remain on the same --

4          MR. SHKOLNIK:  Okay.

5          MR. DOVE:  -- topic.

6          MR. SHKOLNIK:  Appreciate it.

7          MR. DOVE:  Uh-huh.

8          MS. SINGER:  Which is which topic?

9          MR. DOVE:  This is -- it's Topic No. 7.

10         MR. SHKOLNIK:  Which is 6?

11         MS. LINN:  6 on my letter.

12         MR. DOVE:  Which is 6 on the letter.

13    Thanks for confusing us.

14         It's 7 -- yes, it's the topic of -- of

15    ODM's knowledge of and actions taken in response

16    to the opioid crisis.

17    BY MR. DOVE:

18       Q.  All right.  Dr. Wharton, I'd like to

19    hand you an exhibit which is marked Exhibit 12.

20    It's a letter from CMS dated November 1st, 2017.

21    And it is -- it states that it's regarding

22    strategies to address the opioid epidemic.

23       A.  Okay.

24                           - - -

25

Page 257

1              Thereupon, Deposition Exhibit 12 was

2              marked for purposes of identification.

3                          - - -

4    BY MR. DOVE:

5         Q.    Do you recognize this document,

6    Dr. Wharton?

7         A.    I have not seen this letter, no.

8         Q.    And do you know whether the ODM director

9    received this letter in November 2017?

10        A.    I would not know that, no.

11        Q.    Would you assume that she --

12        A.    Yes.

13        Q.    -- she had?

14              What is a Section 1115 waiver?

15        A.    An 1115 waiver is the -- the method that

16   Medicaid programs use to deviate from typical CMS

17   requirements around a Med- -- their Medicaid

18   program.

19        Q.    Has ODM considered submitting a

20   Section 1115 waiver to assist with combatting the

21   opioid crisis?

22        A.    Yes.

23        Q.    And why has it done that?

24        A.    To help remove some barriers that exist

25   around opioid treatment and to standardize the

1   delivery and payment system from -- from a mental

2   health/behavioral health perspective for opioid

3   treatment specifically, and to align those with

4   ASAM, the American Society of Addiction Medicine,

5   guidelines.

6       Q.   And has the -- that waiver application

7   been submitted yet?

8       A.   I do not know.

9       Q.   Has that waiver application been

10  completed?

11      A.   I believe so.  And I believe it's been

12  submitted, but I'm not a hundred percent sure.

13      Q.   And were you involved in the creation of

14  that waiver application?

15      A.   Only in a peripheral advisory way.

16      Q.   Who all has been involved in the

17  creation of the waiver application -- or who --

18  who -- who are the people principally involved in

19  the creation of the waiver application?

20      A.   So that's a pretty large group of people

21  that includes leadership at ODM, Jim Tassie and

22  others, as well as Mental Health & Addiction

23  Services, a separate agency, in collaboration.

24      Q.   Are you aware that about 20 other states

25  have already submitted an 1115 waiver in response

Page 259

1  to the opioid crisis?

2      A.   I am not.  I am now.

3      Q.   You know, let's assume that that's a

4  true statement.  Would you agree that most of

5  those other 20 states have not experienced the

6  same severity of the opioid crisis as Ohio has?

7          MS. LINN:  Objection.

8          MR. SHKOLNIK:  Objection.

9          THE WITNESS:  I don't know.  I don't

10  know what other states they are and I wouldn't

11  know about their internal problems.

12  BY MR. DOVE:

13      Q.   So -- so you think it's possible that --

14  that O- -- that Ohio's opioid -- the severity of

15  Ohio's opioid crisis could be less severe than

16  other states?

17          MS. SINGER:  Objection.

18          MR. SHKOLNIK:  Objection.

19          MS. LINN:  Objection.

20          THE WITNESS:  Potentially.  Some other

21  states; not 20.

22  BY MR. DOVE:

23      Q.   Are there any steps that ODM has taken

24  to achieve the same outcomes as a Section 1115

25  waiver would?

1      A.    Some of which we've already spoken to,

2    which is kind of the standardization of MAT

3    across the -- the plans.  I think that the idea

4    of removing barriers to treatment whenever

5    possible, you know, has been kind of a theme for

6    the past year or so, trying to make treatment

7    available to as many as -- as at all possible

8    when appropriate and safe.

9           I think that our behavioral health

10    redesign and our behavioral health carve-in has

11    had also some of the same goals, which is having

12    the managed care plans work with the behavioral

13    health providers specifically, and also the

14    integration of behavioral health into primary

15    care entities across the state, you know, trying

16    to, again, get a much more robust panel of -- of

17    providers out there and having a more

18    standardized, quality-based, outcome-based system

19    in place for our providers as far as payment and

20    delivery of service goes.

21      Q.    Did -- you don't -- strike that.

22           Did ODM participate in the Medicaid

23    Innovation Accelerator Program, or IAP, to -- to

24    better identify individuals with substance use

25    disorders, expand treatment coverage, or enhance

Page 261

1   services for those with substance abuse

2   disorders?

3       A.   I am not familiar --

4            MR. SHKOLNIK:  Objection to form.

5            THE WITNESS:  I'm not familiar with that

6   program, no.

7   BY MR. DOVE:

8       Q.   Was ODM aware that the IAP provided

9   technical assistance, such as data analysis, to

10  states seeking to reform their Medicaid delivery

11  systems?

12           MR. SHKOLNIK:  Objection to form.

13           THE WITNESS:  No, I don't know.

14  BY MR. DOVE:

15      Q.   So I take it you don't know whether ODM

16  intends to participate in the Innovation

17  Accelerator Program?

18      A.   I do not.

19      Q.   Okay.  I'd like to go back to what has

20  been previously marked as Exhibit 8, which is

21  this presentation from the ODM director on

22  "Building Dynamic and Functional Interagency

23  Collaboration."

24           And I -- I'd like you to turn, if you

25  would, to Page 5 -- or I should say the fifth

Page 262

1    page of this exhibit where it -- which that slide

2    is entitled "Collective Action to Address Opioid

3    Crisis (2011-2017)."  Do you see that?

4        A.   Yes.

5        Q.   Do you see the first bullet on this

6    slide is "Medicaid Expansion"?

7        A.   Yes.

8        Q.   What was ODM's reasoning behind using

9    Medicaid expansion to address the opioid crisis?

10       A.   I think that it demonstrates a very

11   large unmet need in Ohio.  A very large

12   percentage of the patients who are covered by

13   Medicaid expansion had opioid use disorder.  And

14   we were able to provide services to that group of

15   people who would not otherwise have had access to

16   treatment.

17       Q.   And when did this ex- -- when did the

18   expansion take place again?  Do you remember?

19       A.   Was it 2016 maybe, I'm thinking?  '16.

20   I'm -- it's a best guess.

21       Q.   Do you know if there are plans to

22   further expand Medicaid as part of addressing the

23   opioid crisis?

24       A.   I do not know.

25       Q.   Moving farther down this list of

Page 263

1  bullets, the second one there, it -- it says,

2  "GCOAT established."  Do you see that?

3     A.   Yes.

4     Q.   Who -- what is GCOAT?

5     A.   You know, I'm not good with those.  The

6  Governor's Committee -- the Governor's --

7     Q.   Actually, I'm going to help you out.

8     A.   Help me out.  Help me out.

9     Q.   The previous slide --

10     A.   Oh, good.

11     Q.   -- if you look at that, I should have

12  told you that.

13     A.   That's it.  The Governor's Cabinet

14  Opiate Action Team.

15     Q.   All right.  Who from ODM is involved in

16  the Governor's Cabinet Opiate Action Team?

17     A.   Members of the health and innovation

18  team.  Actually, she's no longer with ODM, so I'm

19  not sure who her replacement will be, but her

20  name was Melinda.

21     Q.   So it's -- it's not you?

22     A.   It is not me.

23     Q.   Okay.

24     A.   That is correct.

25     Q.   Not you.

Page 264

1        Do you know what ODM's role is in the

2    Governor's Cabinet Opiate Action Team?

3        A.   So we were just one of many agencies who

4    were involved in a discussion and planning on

5    kind of a collaborative interagency approach

6    towards the opioid crisis.

7        Q.   Okay.  While we're on this topic of the

8    Governor's Cabinet Opioid Action Team, if you

9    could turn to the second-to-the-last page of this

10   exhibit, it's entitled "GCOAT:  Future directions

11   to consider within Medicaid."  Do you see that?

12       A.   Yes.

13       Q.   Looking through those bullet points, are

14   any of these actions currently being taken?

15       A.   By Medicaid?

16       Q.   By Medicaid that are listed here.

17       A.   So the second and the fourth, we've

18   already discussed, bullet point.  We've talked

19   about schools.  Those would be the ones so far.

20   So second, fourth, and sixth -- no -- fifth.

21       Q.   And we've -- and we've already discussed

22   all of those --

23       A.   Uh-huh.

24       Q.   -- bullets?

25       A.   Uh-huh.  Uh-huh.

Page 265

1      Q.   So let's talk about the ones that ODM is

2   not currently pursuing.  So the first bullet,

3   "Leveraging OARRS, including predictive

4   analytics, dashboard for related metrics from

5   multiple sources," do you know what that refers

6   to?

7      A.   So there has been work on a dashboard.

8   I am not sure where that is, where that has

9   landed.  Certainly, the idea of using predictive

10  analytics, we -- we have talked a little bit

11  about already, trying to identify children

12  specifically who might be at risk for opioid use

13  disorder at some point.  So I guess in some ways,

14  we are.

15         But I think the first point, "Leveraging

16  OARRS," we're using data other than OARRS to do

17  some of that also.  And so the idea -- what

18  I'm -- what I'm not aware of is where we're

19  actually leveraging that OARRS data to do these

20  things.

21     Q.   What is meant by a "dashboard for all

22  related metrics"?  What -- what do you understand

23  that to mean?

24     A.   A simplified graphic representation of

25  what's happening as far as outcomes, prescribing,

Page 266

1    opioid -- opioid use trends, and so forth.

2    Something that's supposed to be simple and quick.

3        Q.   The last bullet, "Sustainability

4    including value-based purchasing," what does that

5    mean?

6        A.   So I'm not exactly sure what that means,

7    but I have a feeling it has to do with something

8    that ODM is exploring, and that is paying for

9    medications in a new way that actually includes

10   some kind of an outcome metric.  In other words,

11   if we're going to pay this much for this medicine

12   and it doesn't do what it's supposed to do, that

13   perhaps we should pay less for that medicine.

14           And so it's a way of negotiating with

15   manufacturers specifically who have the newest,

16   latest, and greatest who make these promises

17   that, yes, we'll pay for that if you can actually

18   meet a certain goal, a certain outcome metric.

19   If they don't, they basically bump up their

20   rebates to us to make up for that.  And so it's

21   kind of a -- a new way of contracting with

22   pharmacies.  So I think that that's -- or

23   pharmacy manufacturers.

24       Q.   So, again, that's not in place yet, but

25   that's --

Page 267

1        A.    That is something we're looking at.

2        Q.    -- for the future something you're

3   looking at?

4        A.    Absolutely.

5        Q.    Gotcha.

6        A.    Oklahoma is doing it.

7        Q.    So let's, then, I guess go back to the

8   fifth page again where -- the list of bullet

9   points on collective action.  Next bullet is

10  "Medicaid covered MAT."

11       A.    Uh-huh.

12       Q.    And we -- as we talked about, "MAT" is

13  medication-assisted treatment, correct?

14       A.    Correct.

15       Q.    And when did -- again, did Medicaid

16  begin covering MAT?

17       A.    So we've been covering it for many

18  years.  I mean, I -- before me.  But we actually

19  took all the barriers off of it as of January 1st

20  of this coming year where, essentially, the

21  only -- the only edits that we have in place to

22  stop a prescription from filling would be a

23  safety edit:  too much, wrong sex, wrong age, or

24  whatever, so . . .

25       Q.    And is -- is all MAT -- I think you

Page 268

1   said -- all -- as of January --

2        A.    Uh-huh.

3        Q.    -- of next year, all MAT will be covered

4   by Medicaid?

5        A.    We already do cover each category.  We

6   have -- we cover Vivitrol --

7        Q.    Uh-huh.

8        A.    -- without any prior authorization.  The

9   short-acting buprenorphine products are the --

10  are the ones that we will be preferring all

11  agents.  So if it's a short-acting buprenorphine,

12  we will basically put all of those in a preferred

13  status, which means there's no prior

14  authorization necessary unless they exceed

15  recommended dosage, duration, or if it's given to

16  somebody under 13, or things like that.  Safety

17  edits, if you will.

18           Long-acting buprenorphine products, we

19  do have edits on those because we -- the

20  literature shows that you should use short-acting

21  agents first --

22       Q.    Uh-huh.

23       A.    -- and make sure that they are tolerated

24  well before you go to a long-acting.  So we have

25  that edit in place for the long-acting

Page 269

1    buprenorphine.  Again, it's for safety.

2            And methadone, we have always covered,

3    so . . .

4        Q.    And there are beneficiaries, as I

5    understand it, that take opioids and MAT

6    concurrently; is that right?

7        A.    We see that as a problem.

8        Q.    I read somewhere in one of the P&T

9    committee minutes, I believe, that ODM pharmacy

10   students are working on a project to identify

11   these beneficiaries.

12       A.    Uh-huh.

13       Q.    Is that right?

14       A.    Uh-huh.  And call the physicians

15   involved with the prescribing, right.

16       Q.    And what are the goals of that project

17   and the challenges?

18       A.    To educate the providers who are writing

19   the opioid prescriptions that this member is in

20   MAT and probably should not be getting concurrent

21   opioids.

22       Q.    Okay.  Have we -- have we seen any

23   results from this study yet?

24       A.    No.

25       Q.    No?

Page 270

1       A.    No.

2       Q.    Okay.  Continuing down the list of

3    bullets, the next bullet is "'Pill Mill' law

4    signed to shut down illegal operations."

5             What is a pill mill?

6       A.    So pill mills actually -- these are

7    providers who provide very large amounts of

8    opioids without necessarily following guidelines

9    and not necessarily in a way that would be

10   consistent with any type of medical necessity.

11   You know, I think of a pill mill as -- as a

12   family doc who sees 300 patients a day, writes

13   300 prescriptions for opioids, and charges cash,

14   doesn't take insurance.  It's -- it's kind of

15   that -- literally, a mill-type operation where

16   they're basically just raking in money in -- in

17   exchange for opioid prescriptions.

18      Q.    So when you say that they're -- they're

19   dispensing prescriptions without reference to

20   medical necessity, what -- what do you -- how do

21   you define medical necessity?  What does that

22   mean in that context?

23      A.    That you actually do a physical exam,

24   perhaps.  That you actually look at the patient

25   and ascertain whether or not they actually need

Page 271

1    this medicine as opposed to they walk in and say,

2    "I have horrible pain.  Give me a pill."

3           So that there's actually a -- a process

4    of evaluating the patient appropriately and then

5    documenting that evaluation along with your

6    assessment and plan.  You know, what is your plan

7    for that patient's pain long term?  Often, these

8    pill mills, documentation would be very, very

9    iffy, at best, because they were seeing so many

10   patients.

11          Now, this happened long before my --

12   this would -- this would have been in the -- in

13   the late '90s, I'm thinking, a long time ago.

14   So --

15       Q.   You mean when the pill mill law came to

16   be?

17       A.   I believe so.  Yeah.  Yeah.  This was

18   something that was -- that predates my experience

19   in managed care, so . . .

20       Q.   Okay.  Because I was going to ask you:

21   What role did ODM play in the passage of the law.

22       A.   I --

23       Q.   But you do not know?

24       A.   I don't know.

25       Q.   Okay.  Has ODM ever identified a pill

                                        Page 272

1    mill?

2        A.    So according to -- I mean, if -- if the

3    law's being enforced, there shouldn't be any more

4    pill mills.  So, no, to -- not to my knowledge.

5    Not that I know of.

6        Q.    What has ODM done to ensure compliance

7    with the pill mill law?

8        A.    Again, that predates me, so I -- I

9    don't -- I am not sure that -- other than

10   providing data where -- where data would be

11   requested by -- by a law enforcement authority of

12   some kind.  If we were getting -- if we happened

13   to get some, again, third-party discussion,

14   concern, you know, "I think so-and-so has a pill

15   mill.  He's prescribing those things," we might

16   do an analysis and move that on up to our SURs

17   department for evaluation.

18       Q.    But -- but as I understand, ODM's role

19   is reactive.  I mean, if somebody says -- comes

20   to you with an issue, you may give them data, as

21   opposed to proactive.  ODM's not out looking for

22   pill mills; is that fair?

23       A.    Not by ourselves.  I mean, if -- I think

24   if we look at, like, PIG Rx, some of the work

25   that they're doing, I think that there is some

1    proactivity there.  But we're -- we are not

2    leading that necessarily.  That's something that

3    we are doing in conjunction with the -- with

4    others.

5        Q.    Would noncompliance with the pill mill

6    law affect whether a treatment program or

7    provider would be able to be reimbursed by

8    Medicaid?

9        A.    If that noncompliance impacted his

10   licensure in some way, absolutely.

11       Q.    But only if it impacted licensure?

12       A.    It would, I would hope, but -- yeah, I

13   think so.

14       Q.    I'm not -- so, obviously, if it impacts

15   licensure, it affects the -- it affects whether

16   the treatment -- whether the program or provider

17   be able to be reimbursed by Medicaid.  What if

18   it's -- it hasn't impacted licensure yet but

19   there's --

20       A.    Yeah.

21       Q.    -- litigation or news articles or things

22   like that --

23       A.    So if the attorney general's --

24       Q.    -- that if I am a pill mill, what

25   happens?

Page 274

1      A.   -- office calls us up and says, "Hey,

2   we're looking into this case.  This is what's

3   going on.  We think you should stop paying for

4   that -- for that provider," yeah, we would

5   probably try to stop paying for that provider.

6      Q.   Did you ever become aware of Department

7   of Justice or DEA investigations into

8   e-pharmacies or pill mills?

9           MR. SHKOLNIK:  Objection to form.

10          THE WITNESS:  No.

11   BY MR. DOVE:

12      Q.   Did ODM ever communicate with the DOJ or

13   DEA to confirm that you were not reimbursing

14   claims from pharmacies that were being

15   investigated or charged for running an illegal

16   Internet pharmacy or pill mill?

17      A.   I do not --

18          MS. SINGER:  Objection --

19          THE WITNESS:  -- know.

20          MS. SINGER:  -- as to form.

21   BY MR. DOVE:

22      Q.   You do not know?

23      A.   I do not know.

24      Q.   Did ODM -- or has ODM ever reviewed

25   public sources and become aware that a pharmacy

Page 275

1   it was servicing was being charged as a pill

2   mill?

3       A.   I am unaware of any of those.  I have

4   been aware of providers under investigation,

5   though, from public information.

6       Q.   Uh-huh.  Is it possible that ODM may

7   have reimbursed claims from pharmacies that were

8   being investigated or charged as pill mills?

9       A.   Yes.

10          MR. SHKOLNIK:  Objection to form.

11  BY MR. DOVE:

12      Q.   Did ODM do anything to check and confirm

13  that it was not reimbursing claims from illegal

14  Internet pharmacies or pill mills?

15      A.   I'm not sure.  I don't know.

16      Q.   Okay.  Moving down the list, this one I

17  think you've talked a lot about already,

18  "Behavioral Health Redesign."  I don't need you

19  to go in and -- am I correct that this is a

20  subject of your earlier testimony?

21      A.   Uh-huh.  Correct.

22      Q.   Just remind, when did the behavioral

23  health redesign begin?

24      A.   So it actually started as long as eight

25  years ago --

Page 276

1      Q.    Okay.

2      A.    -- in planning.  It was actually

3 instituted January 1st of '18.  And carve-in,

4 which is the end stage of redesign, which is

5 literally moving behavioral health from fee for

6 service to the managed care organizations, was

7 July 1st of 2018.  So redesign was literally just

8 a redesign of delivery service codes and payments

9 to behavioral health providers to kind of update

10 them from a very antiquated system that was

11 previously being used.

12     Q.    And so my next question is:  What

13 prompted this redesign?  It had something to do

14 with --

15     A.    It's --

16     Q.    -- antiquated system?

17     A.    Yeah.  Yeah.  I think they had a total

18 of 12 codes that they were coding everything by,

19 and we now have over a hundred for them; so we've

20 complicated their lives.

21     Q.    Okay.

22     A.    But we now know what they're doing,

23 so . . .

24     Q.    Uh-huh.  All right.  Moving to the next

25 bullet, "Opioid prescribing guidelines and

1    limits."  I believe, again, this is -- you've

2    discussed earlier what these are.  Was ODM -- and

3    just to confirm, was ODM involved in drafting

4    these guidelines and limits?

5        A.   So as far as the guidelines are

6    concerned, my boss, Dr. Applegate, was involved

7    as an advisor to the medical and pharmacy boards

8    in -- in helping draft those limits -- those

9    guidelines, I mean.

10            The limits were actually done

11   internally -- internally.  Those are the claim

12   edits that we have previously talked about, the

13   standard claim edits across all plans and fee for

14   service.

15       Q.   And -- and when did prescribing

16   guidelines and limits take place?  When did

17   that --

18       A.   So they're on the timeline that we --

19   they've -- that was provided to you, if you have

20   that timeline.  I don't have that in front of me,

21   so I don't know the exact dates.

22       Q.   Oh, I think actually -- yeah, we do

23   actually have that.

24       A.   So all of those limits, I think, are on

25   that timeline.  The different guidelines.

Page 278

1      Q.    The different guidelines --

2      A.    Yes.

3      Q.    -- occurred at different times?

4      A.    Correct.  Correct.

5      Q.    Why don't we just -- and are these

6   guidelines and limits both for adults and for

7   children?

8      A.    Yes.

9           MR. DOVE:  I'd like to mark as

10  Exhibit 13 a document called "Timeline:

11  Collective Action to Address the Opioid Crisis in

12  Ohio 2011 to 2015."

13                        - - -

14           Thereupon, Deposition Exhibit 13 was

15           marked for purposes of identification.

16                        - - -

17           THE WITNESS:  Thank you.

18           MR. DOVE:  And this has a Bates number

19  on it, but my -- I am going to ask my -- my

20  colleague to read that into the record.

21           MS. HAN:  It's Bates-stamped by the Ohio

22  Department of Medicaid, it says "National

23  Prescription Opiate Litigation Ohio Department of

24  Medicaid 000168" through "-169."

25           MR. DOVE:  Thanks.

Page 279

1    BY MR. DOVE:

2        Q.   Is this the -- Dr. Wharton, is this the

3    timeline you were just referring to in your

4    answer?

5        A.   Yes.

6        Q.   And who created this timeline?

7        A.   I believe this was a collaborative

8    effort of multiple people.  I know that

9    Dr. Applegate helped with this, perhaps others.

10   I -- I don't know, to be honest.

11       Q.   So I believe earlier you testified that,

12   at least from your perspective, that the opioid

13   crisis began in sort of the 2015, '16 time

14   period; is that right?

15       A.   I'm going to say that that's when it

16   really -- that's when the deaths associated with

17   opioids really started hitting the papers, really

18   became kind of a public problem that everybody

19   needed to deal with.  So, yeah, clearly, there

20   was an opioid problem long before that, but I

21   think that's when it became very public.

22       Q.   But at least -- you'd agree that this

23   document suggests that the opioid crisis began at

24   least as early as 2011, correct?

25       A.   And, again, I guess it depends on the

Page 280

1   definition of "crisis."

2        Q.    Right.

3        A.    I don't -- I don't --

4        Q.    Right.

5        A.    Yes, there was a problem in 2011.  Even

6   before that.  Right.

7        Q.    Let's go back to Exhibit 8, the fifth

8   page.  The next bullet after "Opioid prescribing

9   guidelines and limits" is "Naloxone programs."

10  Do you see that?

11       A.    Yes.

12       Q.    Are -- just to confirm, are naloxone

13  programs reimbursable by ODM?

14       A.    Yes.

15       Q.    And since -- since when?

16       A.    So I believe naloxone has been covered

17  in some form for a long time.  I mean, I -- I

18  don't know since when for --

19       Q.    Are there limits to how much can be

20  reimbursed for naloxone, do you know?

21       A.    I don't believe so.  I'm not sure.

22       Q.    Do you have a sense of how much ODM

23  spent on reimbursement of naloxone programs in

24  2017?

25       A.    I saw the number somewhere, but I don't

Page 281

1   recall it, so I do not know.

2       Q.   Okay.  I mean, do you have a very

3   general sense or --

4       A.   A lot.

5       Q.   A lot.  Okay.

6       A.   That's -- but I don't know how much, no.

7       Q.   The next bullet is "Drug courts."  Do

8   you see that?

9       A.   Yes.

10      Q.   Is ODM involved in drug courts?

11      A.   Yes.

12      Q.   How is ODM involved?

13      A.   We've actually been invited to actually

14  attend several counties' drug courts and offer

15  assistance when our members were involved in drug

16  courts.  One of the -- one of our early

17  interventions -- the drug courts seem to favor

18  Vivitrol or Naltrexone --

19      Q.   Uh-huh.

20      A.   -- as treatment.  And so early on, one

21  of the drug courts' concerns was the fact that

22  this often required a prior authorization, or at

23  least it did then.  And part of our collaboration

24  with them was to take that prior authorization

25  off of Naltrexone for drug court-involved

Page 282

1    members.

2          I think that as part of that, in return,

3    especially for those in the managed care

4    programs, the drug courts would give us -- would

5    identify our members for us who were involved in

6    the drug courts so that we could also institute

7    kind of wraparound treatment, including case

8    management, care coordination, and so forth, and

9    help them get involved in the treatments and

10   break down barriers of treatments.  So -- so the

11   idea was to be collaborative with the courts and

12   to get those folks what they needed.

13      Q.   Do you know if Medicaid has been

14   involved in the drug courts in the plaintiff

15   jurisdictions here, either Cuyahoga County or

16   Summit County or Cleveland?

17      A.   I -- I'm not a hundred percent sure.  I

18   do not know.  I believe there were 20, 25

19   counties involved.  I don't know if those

20   counties were included.

21      Q.   If a Medicaid beneficiary is ordered to

22   participate in treatment by a drug court, would

23   the treatment be reimbursable by ODM?

24      A.   Yes.

25      Q.   Would it depend at all on the type of

Page 283

1    treatment?

2        A.    No.   Although, 98 percent of the time,

3    they were recommending Vivitrol.

4        Q.    Next bullet on this list in Exhibit 8 is

5    "Episodes of Care."  How is ODM involved in

6    episodes of care?  Or, first of all, what are

7    episodes of care?

8        A.    Darn.

9        Q.    Sorry.

10       A.    All right.  This is a big topic --

11       Q.    Yeah.

12       A.    -- and this might take a while, so I

13   apologize.

14            So episodes of care is a -- is a payment

15   reform model.

16       Q.    Okay.

17       A.    And so it involves specialists and

18   hospitals.  And, essentially -- let me try to

19   shorten this -- we try to identify a principal

20   accountable provider that is associated with a

21   very specific event.  That event might be a

22   asthma attack and they go to the emergency room,

23   or it might be the delivery of a child, or a hip

24   or a knee replacement.

25            And so we identify an event.  We

Page 284

1   identify a principal accountable provider.  The

2   episode, basically, defines that triggering

3   event, whatever that is.

4        Q.   Uh-huh.

5        A.   And then we define a pre-trigger window,

6   a post-trigger window.  And we add up all of the

7   expenses associated with that event.  Okay?  And

8   we do a lot of exclusions and risk stratification

9   and -- and other magic.

10           And, basically, we stratify providers

11  based on an average of their episode performance.

12  And we essentially identify the top 10 percent

13  spenders and the bottom whatever's 20 -- 15 to 20

14  percent of -- of spenders.  We take money from

15  the expensive providers, and we give it to the

16  less-expensive providers.

17           However, we also build in -- I know,

18  pretty neat.  Huh?

19       Q.   Yeah.

20       A.   So -- so we also build in quality

21  metrics that, basically, are gateways to receive

22  that -- that income, that money from -- to -- for

23  being a more efficient provider, if you will.

24           And so what we don't want is efficiency

25  devoid of quality.  Right?  And so the way that

Page 285

1    episodes of care kind of go with the opioid issue

2    is that one of the quality metrics that we've

3    tied to payment is how a provider performs on his

4    prescribing -- prescribing of opioids around that

5    episode.  We have episodes for low back pain, for

6    headaches, for dental.  We've talked about

7    previously for dental extraction.

8         So -- so, basically, what we're looking

9    at is how -- how much opioids were the patients

10   getting before this episode and how much were

11   they prescribed after.  And it's just a

12   measurement that we've never really looked at

13   before to see if these episodes of care, these

14   specialists, these hospitals or whoever the

15   primary accountable provider is, how -- what

16   their prescribing patterns look like.

17        One of the episodes, I do believe, also

18   has the concurrent use of benzodiazepines with --

19   or no -- yeah, it was benzodiazepines and

20   opioids.  I think it might have been headache.

21   So those kinds of things, basically, those are

22   quality metrics that we look at.  We -- we look

23   at kind of what we would consider best practice.

24   And we set a threshold that, pretty much, a

25   provider has to meet in order to gain share in

Page 286

1    this whole episode payment process.

2         Q.    And it --

3         A.    Is that helpful?

4         Q.    That is helpful.

5         A.    I hope that made sense.

6         Q.    Thank you.  Yeah.  No.  I -- one I have

7    is:  So you -- you know, you do all this, it

8    looks like -- you know, it sounds like quality --

9    as you defined, quality metrics --

10        A.    Uh-huh.

11        Q.    -- outcomes.  I mean, are these -- are

12   these recorded anywhere?  Like, is there a report

13   that lists that, you know, here are the

14   physician -- or here are the -- you know, here

15   are the folks who are above, here are the folks

16   that are below?  I mean, how is that

17   information --

18        A.    So it's a -- it's a process in

19   evolution.  Those -- those -- right now, we

20   have -- we actually have -- and I -- I guess I

21   should have mentioned this earlier, but we

22   have -- McKinsey is -- is our consultant who's

23   actually helping with this.  They're also doing

24   all the -- the analytics and so forth.  They are

25   looking at -- at these outcomes.  They will be

Page 287

1    finished at ODM in March.  And so we're learning

2    to take these episodes over ourselves right now.

3    I think that, you know, McKinsey does have, you

4    know, all the data regarding these things.

5        Q.   Uh-huh.

6        A.   Now, most of these episodes are -- we

7    only have three episodes out of 43 that are

8    actually in production right now.  We have

9    asthma, COPD, and childbirth, perinatal.  So

10   those three episodes are the only ones that are

11   actually active and -- and are participated in

12   this financial shifting.

13       Q.   Right.  Right.

14       A.   The other 43 will be phased in

15   throughout the next several years.  And so --

16       Q.   And among those 43 are the opioids?

17       A.   Headache and --

18       Q.   Headache.

19       A.   Yes.  Dental and back pain, orthopedic

20   procedures.  You know, we're looking at opioids

21   on some orthopedic procedures also, knee

22   replacements, things like that.

23       Q.   And even though those haven't been

24   phased in yet, has McKinsey provided you with

25   sort of reports or preliminary --

1      A.    Yes.

2      Q.    -- reports?

3      A.    Yes.

4      Q.    And have those been produced in this

5   litigation to the extent they relate to opioids?

6   Do you know?

7      A.    I don't think so.

8      Q.    What sort -- you know, just this will be

9   a discussion with the lawyers, but in what -- you

10  know, if we were to go looking for these, in

11  what -- in what form -- where would -- where

12  could we find these McKinsey reports that relate

13  to opioids?

14     A.    So they would be -- they would be

15  reports that McKinsey has produced to help us set

16  those thresholds.  So they'll be looking at

17  historical Medicaid data associated with that

18  diagnosis --

19     Q.    Uh-huh.

20     A.    -- and the opioid use for that specific

21  diagnosis.

22     Q.    And when did this McKinsey project

23  begin?

24     A.    Guessing, 2016, something like that.  A

25  couple years ago.

1      Q.   And just -- just so I'm clear, just

2   doubling back for a second, we talked about drug

3   courts.  When did that drug courts initiative

4   begin?  I just want to get the dates.

5      A.   I'm going to say 2016 also.

6      Q.   Okay.

7      A.   It's a guess.  Close guess.

8      Q.   Final bullet, "21st Century Cures Act."

9   What -- what's that about?

10      A.   And I -- I don't know.

11      Q.   Okay.

12      A.   I'm not familiar with that.

13           MS. LINN:  Where are we on time?

14           THE VIDEOGRAPHER:  We're right around

15   five and a half hours.

16           MS. LINN:  Five and a half.

17           MR. SHKOLNIK:  Feels longer.

18           THE WITNESS:  You should sit here.

19           MR. DOVE:  That's right.

20           MR. SHKOLNIK:  He said I should be

21   sitting there.

22           MR. DOVE:  We'd like you to sit there,

23   actually.

24           MR. SHKOLNIK:  No, he's doing as well as

25   I would.

Page 290

1    BY MR. DOVE:

2        Q.    All right.   You can -- let's set that

3    exhibit aside.   I'm going to talk for a moment

4    about civil monetary penalty grant projects.

5             To your knowledge, is opioid abuse or

6    misuse a problem in nursing facilities, including

7    in plaintiff jurisdictions?

8             MS. SINGER:   Objection.   Beyond the

9    scope of the topics.

10            THE WITNESS:   Can you repeat the

11   question?

12   BY MR. DOVE:

13       Q.    Sure.   To your knowledge, is opioid

14   abuse or misuse a problem in nursing facilities,

15   including in plaintiff jurisdictions?

16       A.    Potentially.

17       Q.    If a nursing facility had a problem with

18   opioid abuse or misuse, what recourse does ODM

19   have, if any?

20            MS. SINGER:   Objection.

21            THE WITNESS:   Like other providers, they

22   would have licensure sanctions that we would be

23   hearing about, and we would -- we would

24   decredential them.

25   BY MR. DOVE:

Page 291

1       Q.   Do you know if any nursing facilities

2  have been fined by ODM for opioid abuse or

3  misuse?

4       A.   I do not know.

5       Q.   Do you know what civil monetary penalty

6  projects are?

7       A.   I do not.

8            MR. DOVE:  I'm going to mark as

9  Exhibit 14 a document entitled O- -- well, it

10  looks like it's entitled "ODM Initiatives."

11                      - - -

12            Thereupon, Deposition Exhibit 14 was

13            marked for purposes of identification.

14                      - - -

15  BY MR. DOVE:

16       Q.   And this bears the -- the Bates label

17  Ohio Department of Medicaid 000002 through

18  000014.

19            Do you recognize this document,

20  Dr. Wharton?

21       A.   I have not previously seen this, no.

22  But I recognize it as work -- or at least some of

23  the initiatives that we have talked about.

24       Q.   But you don't know who created this

25  document?

Page 292

1      A.    I do not.

2      Q.    All right.  I --

3      A.    I see my boss's work here.

4      Q.    You see this -- this looks like --

5      A.    It looks --

6      Q.    -- Dr. Applegate?

7      A.    Kind of.  Yeah.  This might have been

8  part of GCOAT, perhaps.  I'm not sure.

9      Q.    You will be pleased to know that I'm not

10 going to walk through all these initiatives.  I

11 just wanted to --

12     A.    Thank you.

13     Q.    If you could -- after looking at the

14 document, could you describe in general what you

15 believe this document represents?

16     A.    So this looks like a list of initiatives

17 and some discussion of what it is and where it is

18 along its development path.

19     Q.    Dr. Wharton, during your -- you can put

20 that exhibit aside.

21           During your tenure, has ODM interacted

22 with outside agencies or groups to combat the

23 problem of opioid overprescription, abuse, and

24 diversion?

25     A.    Outside of the state of Ohio?

Page 293

1       Q.   No.  Just outside of ODM.

2       A.   Yes.

3       Q.   And I just want to run through a list

4    and -- and --

5       A.   Sure.

6       Q.   -- ask you about those.  Has ODM

7    interacted with pharmacies in connection with --

8    to combat the problem of opioid overprescription,

9    abuse, and diversion?

10      A.   With discrete pharmacies?

11      Q.   Yes, discrete pharmacies.

12      A.   I'm not sure.

13      Q.   Nothing comes to mind?

14      A.   (Shakes head.)

15      Q.   How about the State Board of Pharmacy?

16   Has ODM interacted with the state board of

17   pharmacy regarding the opioid crisis?

18      A.   Yes.

19      Q.   In what way?

20      A.   By helping them develop guidelines that

21   are also part of the PIG Rx process.  We've

22   discussed OARRS with them and potential uses for

23   OARRS data.

24      Q.   And are you personally involved in these

25   interactions?

Page 294

1      A.    Occasionally.

2      Q.    You mentioned PIG Rx a couple times.

3  What is PIG Rx?

4      A.    PIG Rx is Program Integrity Group, I

5  think.  It is a part of -- I -- I believe it's

6  led by someone from the attorneys general office

7  who involves Medicaid, department of pharmacy,

8  and sometimes others in looking for fraud, waste,

9  and abuse.

10     Q.    Has ODM interacted with individual

11  doctors and health care providers to combat the

12  problem of opioid overprescription, abuse, and

13  diversion?

14     A.    Yes.

15     Q.    In what way?

16     A.    Through our DUR process that I've

17  previously described.

18     Q.    Anything else?

19     A.    Discussion with individual doctors

20  regarding individual patients that I personally

21  had.

22     Q.    Has ODM interacted with patients and

23  beneficiaries to combat the problem of opioid

24  overprescription, abuse, and diversion?

25     A.    Yes.

Page 295

1          Q.    In what way?

2          A.    Through our CSP program, our lock-in

3     program, through the plans, through case

4     management, care coordination activities.

5          Q.    How about PBMs?  Has ODM interacted with

6     PBMs to combat the problem of opioid

7     overprescription, abuse, and diversion?

8          A.    Yes.

9          Q.    In what ways?

10         A.    In our case, it's a PBA through Change

11    Healthcare.  We -- any of the point-of-service

12    edits that we've previously discussed are done

13    through them.  We also -- they help us with our

14    DUR process as well as our P&T Committee

15    processes.  They implement our policies in our

16    pharmacy, essentially.

17         Q.    Other than the Change Healthcare, has

18    ODM interacted directly with any PBMs?

19         A.    So not around opioids.  Let me say that.

20         Q.    How about drug manufacturers?  Has ODM

21    interacted with any particular drug manufacturers

22    regarding ways to combat the problem of opioid

23    overprescription, abuse, and diversion?

24         A.    We occasionally have -- manufacturer

25    reps will visit us to let us know of a new and

Page 296

1    exciting product that they have for us.  But
2    other than that, no.
3        Q.   How about a -- drug wholesalers or
4    distributors?  Has ODM interacted with any
5    wholesalers or distributors to combat the problem
6    of opioid overprescription, abuse, and diversion?
7        A.   Not to my knowledge.
8        Q.   How about federal government agencies
9    and law enforcement?  Have -- has ODM interacted
10   with -- and I'll list the DEA, for example -- in
11   connection with the problem of -- of opioid
12   overprescription, abuse, and diversion?
13       A.   No, not that I know of.
14       Q.   How about FDA?
15       A.   I'm not sure.  I don't think so.
16       Q.   How about CMS?
17       A.   So we have had discussions around the
18   1115 waiver with CVS -- or CMS.
19       Q.   Any other interactions with CMS relating
20   to the opioid crisis that you know of?
21       A.   Not that I'm aware of, but I'm -- that
22   probably has happened in the past.
23       Q.   How about OIG?
24       A.   So you saw -- we saw the OI- -- did
25   you --

Page 297

1        Q.    Right.

2        A.    The OIG report that we saw.

3        Q.    Uh-huh.

4        A.    So we did get the report.  And I believe

5    that we did also craft a response to that

6    report -- report, but I'm not sure otherwise what

7    communications went on between us and -- or them

8    and our leadership.

9        Q.    So you said you believe you crafted a

10   response to that report.  Do you know if that's

11   been produced in this litigation?

12       A.    I do not know.

13       Q.    I certainly would ask if -- if a

14   response was prepared, that -- that that be

15   produced.

16            MS. LINN:  Uh-huh.

17   BY MR. DOVE:

18       Q.    How about the DOJ?  Have you been in

19   communication with the Department of Justice

20   about the opioid abuse problem in Ohio?

21       A.    No, not that I'm aware of.

22       Q.    And how about --

23       A.    No.

24       Q.    -- the CDC?

25       A.    Not that I am aware of.

1     Q.   You mentioned earlier that -- I believe

2  you mentioned earlier that you do interact from

3  time to time with state and local agencies and

4  law enforcement; is that correct?

5     A.   Uh-huh.

6     Q.   Just in general, what -- what's the

7  nature of those interactions as they relate to

8  the opioid problem?

9     A.   Well, we've already talked about a lot

10  of collaborative work trying to get policies and

11  procedures in place, to share information, you

12  know, those types of things, so it's just -- it's

13  high-level policy.

14     Q.   Okay.  And I take it from your earlier

15  testimony that there's also some interaction

16  between ODM and sort of policy makers, government

17  officials within legislative or administrative

18  bodies with regard to opioid policy?

19     A.   Yes.

20     Q.   And, again, just in a sentence or two,

21  what -- what's the nature of those interactions?

22     A.   Usually, it's -- it's supportive.  It's

23  advisory.  You know, they're asking for advice or

24  policies or guidelines.  We're just trying to

25  be -- we try to be helpful.  We -- they may have

Page 299

1    data requests from us to support something

2    they're doing, so . . .

3         Q.   Okay.  I'm just going to list quickly

4    here a list of industry trade groups and

5    associations and ask you if -- if for any of

6    these ODM has had interactions relating to the

7    opioid abuse problem in Ohio.

8              Health Care Distribution Management

9    Association?

10        A.   Not to my knowledge.

11        Q.   Health Care Distribution Alliance?

12        A.   Not to my knowledge.

13        Q.   Pain Care Forum?

14        A.   Not to my knowledge.

15        Q.   National Association of Chain Drug

16   Stores?

17        A.   Not to my knowledge.

18        Q.   Pharmaceutical Research and

19   Manufacturers of America, also known as PhRMA?

20        A.   They have offered their assistance to

21   us.

22        Q.   And have you accepted their offer?

23        A.   It just happened last week.

24        Q.   Okay.

25        A.   So -- so not yet.

1      Q.    How about the Ohio Pharmacists

2  Association?

3      A.    Not specific to opioids.

4      Q.    The American Society of Consultant

5  Pharmacists?

6      A.    No, not to my knowledge.

7      Q.    And the American Pharmacists

8  Association?

9      A.    Not to my knowledge.

10      Q.    I'm on my last page here.  So not only

11  are we on my last page, I think -- I don't

12  believe I have any further questions.  I know my

13  colleague has a question or two here, and then it

14  may be that other folks in the room have a --

15  some questions.  But thank you, Dr. Wharton.

16      A.    Thank you.

17          MR. KNAPP:  Just to make a record, I

18  have a handful, likely less than five minutes of

19  follow-up questions on behalf of the

20  manufacturers.

21          MS. LINN:  Okay.

22                  - - -

23                EXAMINATION

24  BY MS. HAN:

25      Q.    Dr. Wharton, my name is Anna Han, and I

1  also represent McKesson Corporation.  Just a

2  couple of brief questions.

3          ODM currently doesn't require managed

4  care organizations to use its preferred drug

5  list; is that correct?

6      A.    Correct.

7      Q.    Is it correct that managed care

8  organizations will begin to follow ODM's

9  preferred drug list starting January 1st, 2019?

10     A.    In certain categories, that is correct.

11     Q.    And what categories are those?

12     A.    MAT, hepatitis C treatment, and diabetes

13 drugs, insulin and noninsulin.

14     Q.    And is that requirement a provision of

15 the agreements between the managed care

16 organizations and ODM?

17     A.    Yes.

18          MS. HAN:  I'd like to ask the court

19 reporter to mark as Exhibit 15 this letter

20 directed to Dr. Applegate from various medical

21 and health organizations.

22                      - - -

23          Thereupon, Deposition Exhibit 15 was

24          marked for purposes of identification.

25                      - - -

Page 302

1   BY MS. HAN:

2       Q.   Do you recognize this document?

3       A.   So this is from a little over a year

4   ago.  So I think I did see this, yes.

5       Q.   And you'll see on the last page you are

6   listed as a person who was cc'd on this letter.

7       A.   Okay.

8       Q.   On the second page in the first full

9   paragraph -- excuse me.  On the third page in the

10  first full paragraph.

11      A.   Third page, first paragraph.

12      Q.   The first full paragraph, yes.

13      A.   Okay.

14      Q.   It starts with, "With these examples in

15  mind" --

16      A.   All right.

17      Q.   -- "we strongly encourage ODM to amend

18  the next revision of its provider agreement with

19  the MCOs to require use of evidence-based

20  criteria . . . when setting operational,

21  utilization management, and reimbursement

22  policies for addiction treatment services."

23      A.   Yes.

24      Q.   And those evidence-based criteria were

25  published by various organizations --

Page 303

1      A.    Uh-huh.

2      Q.    -- listed.

3            Did ODM follow this recommendation?

4      A.    Some of them, yes.

5      Q.    In what ways?

6      A.    For instance, taking away barriers,

7   standardizing MAT treatment throughout.  We are

8   looking at the 1115 waiver, which would also

9   standardize utilization management practices for

10  behavioral health practitioners under ASAM

11  guidelines.  So we are moving in that direction.

12  We have not completely implemented them yet.

13     Q.    What have the effects been of those

14  changes that you just mentioned?

15     A.    So those -- those are pending changes.

16  So there's been no impact so far.

17           MS. HAN:  Those are all the questions

18  that I have.

19           MS. LINN:  Anybody else?

20           MR. KNAPP:  Yeah.  I'd like to jump in.

21  Should I grab the mic?

22                      - - -

23                  EXAMINATION

24  BY MR. KNAPP:

25     Q.    Good afternoon, Dr. Wharton.  My name is

Page 304

1  Tim Knapp.  I represent Allergan.  I know it's
2  been a long day, so I'll try to be -- be brief
3  here.
4        A.    Thank you.
5        Q.    My first question is:  Have you spoken
6  with Ms. Singer and Mr. Shkolnik prior to today?
7        A.    I don't believe so, no.
8        Q.    Okay.  We talked a bit about the
9  preferred drug list that ODM has.  To your
10  knowledge, have any extended release or
11  long-acting opioids been removed from ODM's
12  preferred drug list in the last five years?
13        A.    Repeat that again.  I'm sorry.
14        Q.    So to your knowledge, have any
15  extended-release, long-acting opioids been
16  removed from ODM's preferred drug list in the
17  last five years?
18        A.    I don't know the answer to that, but I
19  know that the long-acting opioids now are not on
20  the preferred drug list.  So when that happened,
21  when they were removed, I don't know.  I know
22  that in early 2017, the decision was made to
23  require prior authorization for all
24  long-acting --
25        Q.    And -- and that was --

Page 305

1      A.   -- agents.

2      Q.   -- my question was --

3      A.   Yes.

4      Q.   -- to follow up --

5      A.   Right.

6      Q.   -- was:  The decision to remove the

7    drugs from the preferred drug list, did that

8    correspond with the decision to require prior

9    authorization for those particular medications?

10      A.   I would assume so, yes.

11      Q.   Okay.  And so the decision to remove the

12   extended-release, long-acting opioids was based

13   on a policy decision that you would require prior

14   authorization for those opioids; is that right?

15      A.   That sounds correct.  Although, they may

16   have been removed prior.  I don't know the answer

17   to that.  So -- but, yes, to answer your

18   question.  If there were any still on a preferred

19   drug list at that time, they would have been

20   removed based on that policy.

21      Q.   To your knowledge, were any extended

22   release or long-acting opioids removed from a --

23   from ODM's preferred drug list based upon any

24   alleged misconduct by any manufacturer?

25      A.   Not to my knowledge.  I don't -- I don't

1    know all of the reasons behind that, so no.

2        Q.   Now, when we -- we talked a bit about

3    your background prior to jumping into the topics.

4    And one of the things that you referenced is that

5    when you were in private practice in the '90s,

6    sales reps came to visit you and marketed

7    prescription opioids to you.  Do you recall that

8    testimony?

9        A.   Very well.

10       Q.   And do you recall approximately how

11   often or how many sales reps visited you?

12       A.   No.

13            MS. SINGER:  Objection.  This is beyond

14   the scope.

15            THE WITNESS:  It was a long time ago so,

16   no, I don't.

17   BY MR. DOVE:

18       Q.   Was -- was it more than one?

19       A.   Yes.

20            MS. LINN:  Objection.  Beyond the scope.

21   BY MR. KNAPP:

22       Q.   And you -- you testified that those

23   sales reps visiting you had absolutely no impact

24   on your prescribing behavior with respect to

25   prescription opioids; is that right?

                                                    Page 307

1            MS. SINGER:  Objection as to form.

2            MS. LINN:  I'm going to object to --

3            MR. SHKOLNIK:  Outside the scope.

4            MS. LINN:  -- this is outside the scope.

5    This is Dr. Wharton personally testifying.

6            THE WITNESS:  That is correct.

7    BY MR. KNAPP:

8        Q.   That is correct that the visits from

9    sales reps had no impact on your prescribing

10   behavior?

11       A.   So let me say that they did cause me to

12   study the issue a bit, to read into a little bit

13   of some of the asser- -- assertations --

14   assertions that they were making regarding the

15   nonaddict- -- -addictive nature of opioids in the

16   case of severe pain.  So I -- I -- it did make me

17   think.  It didn't change my prescribing habits.

18   So that is correct.

19       Q.   So, for example, you didn't write any

20   prescriptions based upon something that a sales

21   rep said to you that you otherwise would not have

22   written; is that right?

23            MS. SINGER:  Continuing objection to

24   this line of questioning.

25            THE WITNESS:  Yes, that is correct.

Page 308

1    In -- in the opioid, yes, that is correct.

2    BY MR. DOVE:

3         Q.   With respect to prescription opioids.

4         A.   Yes.

5         Q.   Got it.

6              Are you aware of any doctor who has -- a

7    specific doctor who has written a prescription

8    opioid prescription based upon a statement that

9    was made by a sales representative that they

10   otherwise would not have written but for the

11   statement that was made by a sales

12   representative?

13             MS. SINGER:  Objection.  This is --

14             THE WITNESS:  Very well.  I know a

15   physician very well.  And this was a physician,

16   actually, that I shared call with.  And he and I,

17   actually, went round and around about this very

18   topic.  I -- I shared weekend call with an

19   individual from a neighboring community who

20   prescribed a lot of these opioid prescriptions.

21   And, in fact, his patients would frequently call

22   me on the weekends for refills.

23             So he and I had a very long discussion

24   about why it is that he was prescribing in the

25   manner he was.  And he basically said the same

Page 309

1    thing, that, "No.  These people have real pain.

2    I'm a pain management doctor."  He was not.  He

3    was a family practice doctor.  But that, you

4    know, regardless, he had clearly bought into the

5    idea that, you know, pain is the fifth vital sign

6    and had to be dealt with aggressively.  And he

7    quickly got a reputation as a doctor who says

8    "yes" to those drugs.

9           We had to end our relationship, in fact,

10   because I refused to refill the medications that

11   his patients were asking for on the weekends.  So

12   to answer your question, yes.

13   BY MR. KNAPP:

14      Q.   And what -- what is the name of that

15   doctor?

16      A.   I can't give you that name.  I'm not

17   going to tell you that.

18      Q.   What's the basis for -- for not

19   answering the question?

20      A.   I simply --

21           MR. SHKOLNIK:  Objection.

22           THE WITNESS:  -- don't want to get --

23           MR. SHKOLNIK:  Beyond the scope.

24           THE WITNESS:  I don't want him to get in

25   trouble.  I don't want to cause any problems with

Page 310

1   this physician.

2   BY MR. KNAPP:

3       Q.   Now, with this -- this physician that

4   you're refusing to identify, to your knowledge,

5   did he believe that the -- the prescriptions that

6   he was writing were medically necessary for the

7   patients --

8       A.   Yes.

9       Q.   -- that he was writing them for?

10           MS. SINGER:  Objection.

11           THE WITNESS:  Yes.

12           MS. SINGER:  Form.  Scope.

13  BY MR. KNAPP:

14      Q.   So you're not aware of a patient -- of

15  a -- of a physician who has written medically

16  unnecessary prescriptions for prescription

17  opioids based upon statements that were made by

18  sales representatives, are you?

19           MS. SINGER:  Objection.

20           THE WITNESS:  So his -- his motivation

21  was one of compassion, I do believe that.  He did

22  not know how to say no to his patients.  So, you

23  know, to answer your question was it appropriate

24  or not, was he influenced by -- by pharma, by the

25  manufacturers, drug rep?  Perhaps; perhaps not.

Page 311

1  But the bottom line is it was -- was it medically

2  necessary?  He thought it was.

3      Q.   And do you know which manufacturers'

4  representatives visited this particular

5  physician?

6          MS. SINGER:  Continuing objection.

7          THE WITNESS:  No.

8  BY MR. KNAPP:

9      Q.   And to clarify, this was back in the

10  '90s?

11     A.   Yes.

12     Q.   And when did you cease your relationship

13  with this particular doctor?

14     A.   In the '90s.

15     Q.   Approximately when in the '90s?

16     A.   Oh, gosh.  I don't remember.  Honestly,

17  I don't remember.

18     Q.   Any other doctors that you can identify

19  that you're aware of specifically that you

20  believe wrote prescriptions for prescription

21  opioids that -- well, strike that.  Any doctors

22  that you can identify specifically that wrote

23  prescriptions that were medically unnecessary?

24     A.   That I knew personally?

25     Q.   That you can identify sitting here

1    today.

2        A.    No.

3        Q.    Now --

4        A.    I read the book "Dreamland," though.

5        Q.    The answer is, no, you can't --

6        A.    No, I don't.

7        Q.    -- identify anyone sitting here today?

8        A.    No.  No.

9        Q.    Now -- and you're also not aware of any

10   opioid prescriptions that ODM reimbursed that

11   were written -- strike that.

12           You're not aware of any opioid

13   prescriptions that ODM reimbursed that were not

14   medically necessary for the patient that they

15   were written for?

16           MS. SINGER:  Objection.

17           THE WITNESS:  I would have no way of

18   knowing that.

19           MS. SINGER:  Beyond the scope.

20   BY MR. KNAPP:

21       Q.    And if ODM was aware of a prescription

22   that was written that was not medically necessary

23   for the patient, that prescription would not have

24   been reimbursed, correct?

25       A.    I think even beyond that.  I think that

Page 313

1   we would probably send that for further

2   investigation, so . . .

3       Q.   And can you -- sitting here today, can

4   you identify any such prescriptions that were

5   sent for further investigation?

6       A.   Yes.

7       Q.   And where would those be documented?

8       A.   So this is an ongoing legal case that I

9   really can't talk about.  I have federal

10  investigators involved with this case.

11      Q.   And is this a -- so the case that you're

12  referring to is a currently ongoing case?

13      A.   Uh-huh.

14      Q.   Do you know where this case -- where --

15  where is this case based out of?  Is it in one

16  of -- is it in either Summit County or Cuyahoga

17  County, to your knowledge?

18      A.   It is not.

19      Q.   Any other examples that you can think of

20  where a claim was submitted for a medically

21  unnecessary prescription opioid that was reported

22  outside of the Department of Medicaid?

23           MS. SINGER:  Objection.

24           THE WITNESS:  I cannot.

25           MR. KNAPP:  I have nothing further.

```
 1   Thank you.
 2           THE WITNESS:  Thank you.
 3           MR. HERMAN:  I have a few questions.
 4                   - - -
 5                 EXAMINATION
 6   BY MR. HERMAN:
 7       Q.   Hello.  I'm Steve Herman.  I'm
 8   representing CVS Indiana LLC and CVS RX Services.
 9   And I just have a few questions for you,
10   hopefully quick.  I know it's been a long day.
11       A.   Thank you.
12       Q.   So can you just briefly explain to me
13   what claims editing is?
14       A.   So a claim edit would simply be
15   something that would stop a claim from being
16   adjudicated at the point of service.
17       Q.   Okay.
18       A.   So the claim edit would be something
19   that is a process whereby if -- if Y, then Z.
20   If -- if X, then needs prior authorization.  So
21   it's a -- it's just a way that we, at the point
22   of service, can stop payment and ask for more
23   information.
24       Q.   Okay.  And when did the Ohio Department
25   of Medicaid start doing claims editing for
```

Page 315

1    prescription opioids?

2        A.    So I -- claims edits have been -- I

3    mean, ever since there have been PBMs, I am going

4    to guess, that there are certain things that

5    would trigger an edit as long as there have been

6    PBMs doing what PBMs do.

7        Q.    Okay.  All right.  So since we're

8    focused on the time period for --

9        A.    Yes.

10       Q.    -- 2013 to 2018 --

11       A.    Yeah.

12       Q.    -- I believe it is, can you tell me how

13   the claims editing process for prescription

14   opioids has changed over that time period?

15       A.    So I think that we have evolved our

16   edits to look like the prevailing guidelines.  In

17   other words, we want to somewhat enforce the

18   guidelines with our edits as much as possible.

19   Or in some cases, we release edits to allow

20   better access to drugs.  In the case of MAT.

21           So it's an evolutionary process.  We

22   examine where those edits are, what things are

23   going through, what things are not, what barriers

24   they may provide, what barriers we don't want to

25   have in place.  So there's a constant evolution

Page 316

1  of those edits, a changing of those edits based
2  on -- based on changes in -- in priorities.
3      Q.    Okay.  So excluding MATs for a second,
4  so if I were to look at -- and I'm going to try
5  to streamline this -- Exhibit 13, would -- you
6  talked about how a lot of the editing is tied to
7  guidelines.  So as there have been new guidelines
8  introduced, has the Department of Medicaid's
9  claims editing -- you used the word "evolved" --
10     A.    Yes.
11     Q.    -- so I'll stick with that.
12     A.    Yeah.
13     Q.    Okay.  And has it generally become more
14  restrictive around prescription opioids?
15     A.    Yes.
16     Q.    Why?
17     A.    So there was a study recently that --
18  this was actually -- I think it was a
19  post-c-section study that, basically, found that
20  about 45 percent of prescription opioids that
21  were prescribed in women with c-sections were not
22  used for that purpose.  And I think, in general,
23  our idea is, is that the fewer pills we have in
24  grandma's cabinet or mom's cabinet, the better,
25  to try to keep those excess prescription -- that

1  excess prescribing minimized.

2           And so trying to decrease the quantity

3  of medications given, and -- and recognizing that

4  much of that is just from convenience.  A surgeon

5  will prescribe more than he really needs to so he

6  doesn't get called in the middle of the night for

7  more or over the weekend for more.

8           And is that really appropriate or not?

9  We think, in many cases, that's not.  So we think

10  that there's a lot of systemic overprescribing

11  going on.  And the idea of some of this more

12  restrictive editing is to literally decrease the

13  number of pills that are prescribed so that less

14  pills make it to the street through diversion,

15  through some child or some adolescent finding

16  them in -- in a medicine chest somewhere and

17  taking them, hurting themselves or others.

18      Q.   Okay.  So is it fair to say that -- I --

19  I think you pointed to a study.  Is it fair to

20  say as your understanding of how opioids are

21  prescribed and used, you put in place more

22  monitoring at the point of sale?

23      A.   Yes.

24      Q.   And if I recall correctly, you said your

25  point-of-sale system, it's a fairly automated

Page 318

1  system?

2       A.    That's correct.

3       Q.    Is it a computer system?

4       A.    Yes.

5       Q.    An algorithm of some sort?

6       A.    Yes.

7             MR. HERMAN:  Okay.  Thank you.  I don't

8  have any other questions.

9             MS. SINGER:  Anybody else on defense

10  side?

11            (No response.)

12            MS. SINGER:  Okay.  If we can, do you

13  mind if we take five, ten minutes?  We'll move

14  over there --

15            MS. LINN:  Sure.

16            MS. SINGER:  -- let you get some air.

17            MS. LINN:  Sure.

18            THE WITNESS:  Okay.  Sure.

19            MS. LINN:  Sounds good.

20            THE VIDEOGRAPHER:  Off the record at

21  4:09 p.m.

22            (Recess taken.)

23            THE VIDEOGRAPHER:  Back on the record at

24  4:22 p.m.

25                        - - -

Page 319

1                      EXAMINATION
2  BY MS. SINGER:
3       Q.   Dr. Wharton, I'm Linda Singer on behalf
4  of Plaintiffs.
5            MS. SINGER:  So one thing I just wanted
6  to say on the record.  Mr. Dove and I spoke about
7  this before the deposition, but I just want to
8  make sure it's on the record.  It's our
9  understanding that ODM has produced some set of
10  claims data to Defendants.  Those have not been
11  produced to Plaintiffs.  It's my understanding
12  Mr. Dove says it's a test set, but we do want to
13  put on the record that we don't have it, and we
14  think that's not appropriate.  And we'd ask
15  Defendants to provide us with that information.
16            MR. DOVE:  I guess let me, I guess, put
17  on the record a response to that.  That's
18  correct.  The -- the claims data test set was
19  produced.  It had issues, and so we immediately
20  notified the department.  And they are in the
21  process of providing a -- a data set that was
22  responsive to our request.  We obviously did not
23  ask any questions relating to that data set in
24  the deposition.
25            If the Plaintiffs still insist on having

```
 1   that, we'd be happy to produce it, but we did
 2   not -- it was just immediately clear to us that
 3   it was not responsive.  And so that's the reason
 4   for what we did.
 5           MS. SINGER:  So we all --
 6           SPEAKER VIA TELEPHONE:  The camera is no
 7   longer pointed at Dr. Wharton, but, rather, at
 8   some woman.
 9           MS. LINN:  Hi.
10           MS. BROWN:  Some woman.
11           MS. LINN:  Some woman.
12           MS. SINGER:  We won't even say anything.
13           MS. LINN:  At least I'm somebody today.
14           MS. SINGER:  So, for the record, we
15   would ask that that be done.
16           My understanding is that's de-identified
17   data, Ms. Linn --
18           MS. LINN:  Yes.
19           MS. SINGER:  -- is that correct?
20           MS. LINN:  Yes.
21           MS. SINGER:  Okay.  All right.  So --
22           Can I take the exhibits from you,
23   please.
24           MR. SHKOLNIK:  They should be in order.
25           MS. SINGER:  Here.  I'll take this one.
```

```
                                            Page 321
 1    BY MS. SINGER:
 2        Q.   All right.  Dr. Wharton, I want to start
 3    with the OIG report.
 4        A.   Okay.
 5        Q.   I promise you we're not going through
 6    bullet by bullet.  It may feel that way.  But I
 7    want to start with Page 1.
 8             Counsel pointed you during --
 9             MS. GATES:  What exhibit, please?
10             THE WITNESS:  4.
11             MS. SINGER:  4.
12    BY MS. SINGER:
13        Q.   -- pointed you towards Page 2 and had
14    you affirm the line that said "States also play
15    an important role in ensuring that beneficiaries
16    receive appropriate amount of opioids."
17             I want to direct you to the paragraph
18    before that on Page 1 to which the "also" refers.
19    Can you read the first line of the paragraph
20    beginning "Prescribers play a crucial
21    role . . . ."
22        A.   "Prescribers play a crucial role in
23    ensuring that beneficiaries receive appropriate
24    amounts of opioids."
25        Q.   Is it ODM's position that is an accurate
```

1  statement, that prescription -- prescribers play

2  a crucial role?

3      A.   Yes.

4      Q.   And, ultimately, prescribers decide

5  whether to use opioids that ODM covers; is that

6  correct?

7      A.   Correct.

8      Q.   And prescribers decide which patients to

9  prescribe opioids to?

10      A.   Yes.

11      Q.   At what dose?

12      A.   Correct.

13      Q.   And at -- for what duration of time?

14      A.   Yes.

15      Q.   All of those are prescriber decisions,

16  correct?

17      A.   That is correct.

18      Q.   All right.  And in this report, counsel

19  also directed you to the discussion of patients

20  who are on or members who are on more than 120

21  MED per day, M-E-D per day.

22      A.   Okay.

23      Q.   I think that is at Page -- I don't know.

24          MR. HERMAN:  5.

25          MS. SINGER:  Excuse me?

Page 323

1           MR. HERMAN:  5.

2           MS. SINGER:  Thank you.

3  BY MS. SINGER:

4      Q.   So 4,754 patients.  Do you see that

5  number, which is right in the middle of the page?

6  "Between June 2016 and May 2017" --

7      A.   Yes.

8      Q.   -- "4,754 Medicaid beneficiaries

9  received high amounts of opioids . . . ."

10          Does that number seem accurate to you?

11 Or if you don't --

12     A.   Yes.

13     Q.   -- have a --

14     A.   I do.  And, in fact, I think it's --

15 it's almost low.  I mean, I -- it's -- it's --

16 like when you think of -- what? -- 3 --

17 3 1/2 million members, 4,000, that seems like, if

18 anything, it might be a low number.  So --

19     Q.   And that's --

20     A.   -- that's --

21     Q.   -- exactly where I was going with this.

22     A.   Yeah.

23     Q.   So how many individuals are enrolled in

24 Ohio's Medicaid program?

25     A.   3 1/2 million, I think.

Page 324

1      Q.   And do you know --

2      A.   3 million.

3      Q.   -- roughly how many of those -- how many

4  of those members received opioid prescriptions?

5      A.   No.  I'm not sure.  I think we read

6  somewhere in one of these attachments or one of

7  these that it was -- was it 40 percent, I

8  think --

9      Q.   So if you --

10      A.   -- or something?

11      Q.   -- look at Page 3 --

12      A.   Yes.

13      Q.   -- first paragraph on that page, third

14  line, it lists five hundred and --

15      A.   Five thirty-nine.

16      Q.   -- thirty-nine thousand eight hundred

17  and ten.

18      A.   Yeah 16 --

19      Q.   Does that also seem --

20      A.   --  percent.

21      Q.   Okay.  Receive opioids.

22           So 4,754 members on more than 120 MED a

23  day.  Now, I became a lawyer because I can't do

24  math, but that seems like less than 1 percent.

25      A.   I would agree.

Page 325

1      Q.    Okay.

2      A.    Yeah.

3      Q.    And the report notes on Page 6 that ODM

4   has taken steps to reduce high-dose opioid use,

5   and you recounted those.

6           Is it correct that ODM has taken

7   significant efforts to reduce high-dose use among

8   its members?

9      A.    Yes.

10          MR. HERMAN:  Object to form.

11  BY MS. SINGER:

12     Q.    And can -- can a prescriber, in ODM's

13  opinion, simply stop prescribing opioids to a

14  patient who has been on high-dose opioids for any

15  period of time?

16     A.    Absolutely not.

17     Q.    Why not?

18     A.    Withdrawal.

19     Q.    And what does that mean?

20     A.    So, simply put, if you -- if you stop a

21  medication that's been being delivered for a long

22  period of time too abruptly, that patient will go

23  into a very severe withdrawal and become very

24  ill.  And so bottom line is any effort to

25  decrease that needs to be a slow wean.  It can't

Page 326

1  be something that happens overnight.

2      Q.   And when patients are weaned from

3  opioids --

4      A.   Uh-huh.

5      Q.   -- I think you said that's not always

6  successful --

7      A.   That's correct.

8      Q.   -- is that correct?

9          And what happens for a patient who's cut

10  off from prescription opioids?

11      A.   So that's something -- it's -- I'm --

12  they -- they -- they find other sources of

13  opioids.  They go to the street.  They find

14  fentanyl or heroin or other illicit forms of

15  their drugs.

16      Q.   And is that something that ODM has

17  observed over your tenure there?

18      A.   So it's something that I -- actually was

19  the end of my last story, why are we doing this.

20  And -- and I kind of, you know, mentioned a

21  scenario about grandma's medicine chest and those

22  excess pills.  That's what we're concerned about

23  it leading to.

24          Even those kids who have access to those

25  excess pills that are in grandma's medicine

Page 327

1    chest -- which most heroin addicts, fentanyl

2    addicts, start with prescription medicines and

3    evolve to the IV illicit drug use.  And so with

4    that in -- in mind, that's the "why" we're doing

5    this.  That's why we're clamping down on these

6    medications as much as we can.

7        Q.  And that connection, again, between

8    prescription opioids and other elicit opioids, is

9    something that you don't seem to have any

10   doubt --

11       A.  None --

12       Q.  -- occurs?

13       A.  -- whatsoever.  It's --

14       Q.  Okay.

15       A.  Yeah.

16       Q.  And then the report, again still at

17   Exhibit 4, Page 9, notes that ODM "has taken

18   steps to identify and stop doctor shopping."

19       A.  Yes.

20       Q.  Again, you've talked about these, but

21   one of the things the report notes is that ODM

22   has required pharmacies to check the OARRS --

23       A.  Uh-huh.

24       Q.  -- the State's PDMP, if it believes a

25   beneficiary is doctor shopping; is that accurate?

Page 328

1      A.   Yes.

2      Q.   And you talked about the lock-in program

3  as well?

4      A.   Yes.

5      Q.   At Page 10, the report talks about 26

6  prescribers statewide right at the top of

7  Page 10 --

8      A.   Yes.

9      Q.   -- who ordered opioids for 5

10  beneficiaries who received extreme amounts, and

11  26 prescribers who ordered opioids for at least 4

12  beneficiaries who appeared to be doctor shopping.

13      A.   Uh-huh.

14      Q.   Is that consistent with what you

15  understand the data has shown?

16      A.   Uh-huh.

17      Q.   And what percentage of the total

18  providers who provide services to Medicaid

19  enrollees does 26 providers represent?

20      A.   I'm not really good at math either, but

21  I would also agree it's less than 1 percent.

22      Q.   And then on Page 13, the report notes

23  that subsequent to this report coming out, Ohio

24  took further steps or ODM took further steps to

25  strengthen prescribing controls by limiting the

1    length of acute care opioid prescriptions to

2    seven days for adults and five days for minors;

3    is that correct?

4         A.   That is.

5         Q.   And mandated that certain managed care

6    beneficiaries be enrolled in lock-in, which you

7    also talked about --

8         A.   Yes.

9         Q.   -- CSP.

10        A.   Yes.

11        Q.   All right.  And those were both steps

12   you took at ODM --

13        A.   Uh-huh.

14        Q.   -- to deal with that problem?

15        A.   That's correct.

16        Q.   All right.  You talked in your long

17   session this morning and afternoon about coverage

18   for MAT.

19        A.   Yes.

20        Q.   In addition to covering MAT, does ODM

21   also provide coverage for therapy --

22        A.   Yes.

23        Q.   -- to assist people going through

24   treatment for opioid use disorder?

25        A.   That's considered the evidence-based

1  practice that we want to see.  We don't want just

2  MAT.  We would like to see that combined with

3  some kind of therapy.  Absolutely.

4      Q.   Okay.  And I think you noted that a

5  small fraction of Medicaid members take advantage

6  of MAT and OUD treatment.

7      A.   So I'm not sure about that.  I don't --

8  I don't recall saying that.

9      Q.   I think you said the majority are not

10  getting treatment.  Does that --

11      A.   That's correct.

12      Q.   Okay.

13      A.   That's -- oh, I see what you're saying.

14  I didn't -- I didn't understand your terminology

15  "takes advantage of" so --

16      Q.   Fair enough.

17      A.   Gotcha.

18      Q.   It's a poor word choice.

19      A.   Gotcha.  Okay.

20      Q.   So the majority are not -- the majority

21  of Medicaid members --

22      A.   Yeah.  Are --

23      Q.   -- in Ohio with OUD diagnoses are not

24  getting --

25      A.   Treatment.

Page 331

1     Q.    --treatment --

2     A.    At this time.

3     Q.    -- for their OUD?

4     A.    That is correct.

5     Q.    And I wanted to ask you about the

6  reasons beyond ODM's coverage that someone with a

7  diagnosis of OUD might not get treatment for OUD.

8     A.    I think there's a myriad of reasons.  I

9  think denial is a big part of it.  The fact that

10 they still have easy access, perhaps, to cheap

11 and inexpensive street drugs.  Perhaps they still

12 have access to prescription drugs, they're still

13 being prescribed and -- and sold on the street.

14 Perhaps they don't see a reason for treatment at

15 this time.  Perhaps they don't want to get better

16 in some cases.

17          I think there's probably a lot of

18 reasons why they're not -- perhaps they're just

19 not engaged in the health care system at all yet.

20 You know, they're -- maybe they haven't had that

21 scare or that overdose or -- or whatever it is

22 that motivates that 10 or 15 percent that are

23 getting treatment to actually get the help they

24 need.

25     Q.    And is it ODM --

1          MS. LINN:  Can I -- I'm sorry.  I don't

2    mean to cut you off, but to clarify, he's

3    testifying to fee-for-service Medicaid as opposed

4    to the managed care, so . . .

5          THE WITNESS:  Good point.

6          MS. SINGER:  Okay.  Thank you for that.

7          MS. LINN:  Uh-huh.

8    BY MS. SINGER:

9      Q.   Is it ODM's experience that -- that part

10   of the -- the symptom of the disease of OUD is

11   often an inability to recognize the need for

12   treatment or to seek access to that treatment?

13     A.   That's correct.

14     Q.   And the take-up rate for --

15         MR. HERMAN:  I -- excuse me.

16   BY MS. SINGER:

17     Q.   -- MAT is also very low?

18     A.   That's correct.

19         MR. HERMAN:  I ask -- I'm sorry.  I

20   didn't mean to interrupt the question.

21         MS. SINGER:  Go ahead.

22         MR. HERMAN:  I just ask that you slow

23   down a little bit so that we have a chance to

24   object.

25         MS. SINGER:  I think eight hours into

Page 333

1    today gets a little harder to do, but I hear your

2    point.

3    BY MS. SINGER:

4        Q.   You were also asked earlier about why

5    the costs for opioid prescriptions that ODM

6    covered went up.  And I think there was some

7    conversation about whether that could be price

8    related.  Could the increase in -- in costs for

9    opioid prescribing also relate to Medicaid

10   expansion?  And if you don't know, you don't

11   know.

12       A.   Yeah, I really don't know that.  But it

13   could because that -- I mean, actually, that

14   could be a -- in fact, now that you mention it,

15   that's probably a big part of it.  It -- it's

16   just a simple increase in the number of patients

17   who are in Medicaid.  It's a good -- great point.

18   So, yeah, that absolutely could play part of

19   the --

20       Q.   Okay.

21       A.   -- be part of the issue.

22       Q.   Okay.

23       A.   Thank you.

24       Q.   And I want -- are you --

25            MS. SINGER:  Do you want to cover

Page 334

1    that --

2            MR. SHKOLNIK:  Yeah.

3            MS. SINGER:  Or want me to.

4            MR. SHKOLNIK:  Go ahead.

5    BY MS. SINGER:

6        Q.   Okay.  So I want to turn to Exhibit 3?

7            MR. SHKOLNIK:  5.

8            MS. SINGER:  5.  Your writing is

9    terrible.

10   BY MS. SINGER:

11       Q.   The Opioid Crisis, the auditor's report.

12   And at Page 4, the report notes that the

13   percentage of Medicaid members who filled at

14   least one opioid prescription was below the rate

15   found in commercially insured members.  Does --

16       A.   Correct.

17       Q.   -- ODM agree with that statement?

18       A.   Yes.

19       Q.   Okay.  And it also notes at Bullet 4

20   that ". . . Medicaid opioid prescriptions in 2015

21   were for low dosage and short duration."

22       A.   Uh-huh.  Yes.

23       Q.   Is that something ODM also agrees with?

24       A.   Yes.

25       Q.   And at Page 4, it notes that a higher

Page 335

1   percent -- I'm sorry.  Bottom bullet on Page 4,

2   it notes that a "Higher percentage of Medicaid

3   members received medication-assisted treatment

4   within six months of diagnosis in 2016 compared

5   to 2010."  Does ODM also agree with that?

6        A.   Yes.

7        Q.   So is it fair to say that what this

8   report also found is that ODM had been successful

9   in bringing down the rate, dosage, duration of

10  opioid prescribing?

11       A.   Yes.

12       Q.   And also increasing access to MAT and

13  addiction treatment?

14       A.   Yes.

15       Q.   And Page 15, go to that last point --

16  slow is not one of my good speeds, but I'll --

17  I'll work on it -- it notes in the language under

18  "Chart 8," the bottom two lines, that medi- --

19  ". . . the unique individuals receiving

20  medication-assisted treatment increased from

21  about 6,500 to almost 48,000 . . ." members.  Is

22  that accurate from ODM's perspective?

23       A.   I'm -- I'm looking at the wrong graph, I

24  think.  Which one?

25       Q.   No, you're -- so it's the language --

Page 336

1      A.   Okay.  Gotcha.

2      Q.   -- two lines --

3      A.   Gotcha.

4      Q.   -- up from the chart.

5      A.   Yes, that is correct.

6      Q.   Okay.  And then at Page 16, to go back

7   to our earlier point, in the last three lines

8   under "Conclusion," it says, "The prescription

9   data does show that Medicaid population receives

10  lower doses and for shorter durations than

11  commercially insured population."  We covered

12  that, that's correct.  Yes?

13     A.   Yes.

14     Q.   And then it also says, "The increases in

15  2014 data should be reviewed in context of Ohio's

16  expansion of the Medicaid program beginning -- at

17  the beginning of 2014."  Does that --

18     A.   Yes.

19     Q.   -- clarify your earlier response as to

20  why --

21     A.   It certainly does.

22     Q.   -- there was an increase in coverage for

23  opioid prescriptions?

24     A.   Yes.

25     Q.   Okay.

1      A.    Time flies.  I didn't realize it was

2    2014 when Medicaid expansion happened.

3      Q.    In dog years.

4      A.    Yes.

5      Q.    You talked at some length about ODM's

6    supervision of managed care plans, correct?

7      A.    Uh-huh.  Yes.

8      Q.    And your oversight and the performance

9    of managed care plans is governed by a provider

10   agreement --

11     A.    Correct.

12     Q.    -- is that correct?  And that spells out

13   their obligations --

14     A.    Correct.

15     Q.    -- and the guidelines under which they

16   have to perform services --

17     A.    Yes.

18     Q.    -- is that correct?

19           And that structure of using private

20   managed care plans, is that something that is

21   different in Ohio than in other states, to your

22   knowledge?

23     A.    Some states don't.  Some states only

24   have straight Medicaid.  I would say the majority

25   of states, though, use some kind of managed care

Page 338

1    arrangement.

2        Q.    And do you know if there's anything

3    different about how Ohio supervises or interacts

4    with those managed care providers than in other

5    states?  If you know.

6        A.    So I would -- you know, I -- I've heard

7    that if you see one Medicaid program, you've seen

8    one Medicaid program.  There's -- there are

9    differences, I'm sure.  But there are also a lot

10   of similarities.  And we're all struggling with a

11   lot of the same issues right now.  So I -- I

12   think that there are both, there are similarities

13   and differences.

14       Q.    Fair enough.  Including with respect to

15   the oversight of managed care --

16       A.    Absolutely.

17       Q.    -- providers and plans?

18       A.    Yes.

19       Q.    Okay.  So just to make sure we

20   understand the role of ODM in providing coverage,

21   ODM is -- is like an insurance company or a

22   third-party payer, like Aetna, or a

23   pharmaceutical benefit management company like

24   Caremark, meaning that you're not practicing

25   medicine, right?

1    A.   That's correct.
2    Q.   And you're not deciding -- I'm sorry.
3  You -- you are deciding which drugs and
4  treatments that the state is going to cover for
5  its Medicaid enrollees?
6    A.   That's correct.
7    Q.   And so you're -- you're a check writer?
8    A.   We are an insurance plan, yes.
9    Q.   Okay.
10    A.   Yes.
11    Q.   And you are not, in that capacity,
12  making a judgment about whether a particular
13  opioid is appropriate for a particular patient --
14    A.   No.
15    Q.   -- is that correct?
16    A.   That is -- that is correct.
17    Q.   You're not looking at the risk/benefit
18  calculus that you talked about earlier for any
19  particular patient; is that right?
20    A.   That is correct.
21    Q.   And you -- you rely on prescribers to
22  make appropriate decisions on treatments for
23  patients based on the information they have; is
24  that correct?
25    A.   That is correct.

Page 340

1      Q.    All right.  And so ODM's role in the

2   kinds of edits and changes you were talking about

3   are in setting policies --

4      A.    Uh-huh.

5      Q.    -- is that correct?

6      A.    Yes.

7      Q.    Meaning that you shouldn't get two long

8   acted -- acting -- two long-acting opioids,

9   correct?

10     A.    Correct, yes.

11     Q.    Or that you shouldn't get an opioid and

12  a benzodiazepine at the same time?

13     A.    Correct.

14     Q.    But that's the level at which you are

15  overseeing the provision of treatment and care to

16  Medicaid enrollees; is that correct?

17     A.    Yes.

18     Q.    Okay.  So we talked at some length also

19  about the response to the opioid epidemic in

20  Ohio.  And counsel referred to it as an opioid

21  abuse epidemic.

22     A.    Uh-huh.

23     Q.    Is that how you would describe it?  Is

24  it an epidemic of opioid abuse, or opioid use, or

25  something else?

Page 341

1        A.    That's a tough one.  I'm not -- I'm not

2    sure.  I mean, I think that -- I think in many

3    ways, this began as truly an opioid

4    overprescribing epidemic, and it evolved into an

5    abuse epidemic.  I -- I -- I guess -- I guess

6    that's how I'm kind of seeing this.  I think that

7    having easy access to prescription opioids and

8    then subsequently street opioids has really kind

9    of driven -- was kind of that perfect storm

10   that's allowed this to progress.  And so I -- I

11   guess I'm struggling with that terminology a

12   little bit but . . .

13       Q.    Okay.  And is the -- that transition

14   that happened a result of something you talked

15   about earlier, which is that population of people

16   who are dependent or addicted to opioids in the

17   grandma's medicine cabinet problem?

18       A.    Uh-huh.

19       Q.    The demand and the supply.  Is that --

20       A.    Sure.

21       Q.    Is that what marked that path forward --

22            MR. KNAPP:  Objection.

23            MS. GATES:  Objection to form.

24   BY MS. SINGER:

25       Q.    -- from use to abuse?

Page 342

1          MR. KNAPP:  And foundation.

2          THE WITNESS:  So I would say that what

3    that caused -- I mean, I -- I think of it almost

4    like a balloon:  You squeeze it here; it's going

5    to blow up over here.  I think that -- yeah.  I

6    think that when we close the pill mills and we

7    shut off supply and we turn down prescribing and

8    we set limits, that some members are going to

9    want to move to less-safe alternatives.

10          Therefore, treatment has to -- has to be

11   very aggressive during this time.  You know, I

12   feel like, you know -- you know, we have a

13   responsibility to -- you know, as we do one

14   thing, to -- to maybe address that -- that

15   bubble, that balloon that's happened over here

16   the best we can.

17   BY MS. SINGER:

18       Q.   And do you feel like ODM has been doing

19   that best you can?

20       A.   I do.  I do.  Yeah.

21       Q.   And you've talked at length about the

22   steps ODM has taken on both sides of that

23   balloon.  I guess balloon doesn't really have a

24   side?

25       A.   I know.

Page 343

1      Q.    -- but --

2      A.    Yeah.  A long balloon.

3      Q.    But what is -- and I don't want to put

4  words in your mouth.  What is the opioid epidemic

5  in Ohio like to which you are responding as a

6  state official?

7      A.    What it involves is -- I mean, this --

8  this is personal for me.  This is personal.  I

9  have a family member who is an opioid epidemic.

10 So what this is, it's --

11     Q.    Sorry.

12     A.    -- people.  It's people.  It's families.

13 It's families that are losing their loved ones,

14 losing their children.  It's -- it's mothers, you

15 know, crying because they can't get ahold of

16 their child.  They can't get their child back on

17 track, and the child is using and -- and

18 overdosing and -- and -- and just doesn't seem to

19 be anywhere near reality.

20          It's -- it's real faces.  It's real

21 people.  And it's real disturbing.  It's

22 something that, unless you experience it

23 personally in your friends or family and you see

24 the impact, most people don't have a clue how

25 disruptive and how horrible this disease is.

Page 344

1    And -- and so, yeah, we -- we want to do all we

2    can.

3        Q.   Very sorry for that.

4        A.   Thank you.

5        Q.   So that's -- I want to make sure,

6    building on what you just said, that we have a

7    complete record of the kinds of things that ODM

8    has done and that the other state agencies that

9    you've talked about have done.  So I am going to,

10   not too quickly, read a list and --

11       A.   Is this one of our exhibits?

12       Q.   No.  It's one I made myself.

13       A.   Oh.  All right.

14       Q.   So I just want you to go through and

15   tell me if there's anything here that doesn't

16   belong on the list of things that you've done.

17   Am I making something up that you didn't do?

18       A.   Specific to ODM?

19       Q.   It's going to be ODM and the State of

20   Ohio to the extent you know.

21       A.   Okay.

22       Q.   Okay.  So you talked about the opioid

23   prescribing guidelines and the efforts to educate

24   prescribers and get them to conform to best

25   practices in opioid prescribing.

Page 345

1      A.   Yes.

2      Q.   Is that on the list?

3      A.   Yes.

4      Q.   Now you, in your timeline -- do you

5   remember what exhibit?

6           MR. SHKOLNIK:  I'll get it.

7      Q.   It was one of the late exhibits.

8           -- talked about the guidelines on

9   chronic pain.

10      A.   Uh-huh.

11      Q.   And I think you described that as

12   happening in 2017.  And I want you to look at the

13   timeline.

14           MR. SHKOLNIK:  Exhibit 13.

15           THE WITNESS:  I'm looking for it.  Hang

16   on.

17           So there were two sets of chronic pain

18   guidelines:  one early set and one later set.

19   BY MS. SINGER:

20      Q.   Okay.

21      A.   So the more recent one, I believe, was

22   2017, but I think there might have been one maybe

23   in 2012 or 2013.  And I haven't seen my guideline

24   yet, but I'm thinking --

25      Q.   Okay.

Page 346

1      A.    -- that that's the case.

2      Q.    So if you look at 13 and look at 2013 --

3      A.    Yeah.

4      Q.    -- will you let us know if that

5  refreshes your recollection?

6      A.    I'm looking for it.  Here we go.

7      Q.    Above the line.

8      A.    There we go.  2013.

9      Q.    Okay.

10      A.    Okay.

11      Q.    And so is it correct that there was a

12  prescribing guideline focused on chronic pain in

13  2013?

14      A.    Yes.

15      Q.    Okay.  And there were also prescribing

16  guidelines for acute pain, correct?

17      A.    Later.

18      Q.    Okay.  For --

19      A.    Yes.

20      Q.    -- emergency rooms?

21      A.    Yes.

22      Q.    Were there any other guidelines -- I'm

23  looking at my list.  I think -- I think those are

24  the major ones, correct?

25      A.    I believe so.

Page 347

1       Q.   And those were rolled out between 2012
2  and 2016 --
3       A.   Uh-huh.
4       Q.   -- along with the revised chronic pain
5  guideline in 2017?
6       A.   Correct.
7       Q.   Okay.  And then there were efforts to
8  educate parents and teenagers about using
9  opioids; is that correct?
10      A.   Yes.
11      Q.   The state required school districts to
12  provide education in schools about opioid abuse?
13      A.   Okay.
14      Q.   Required --
15      A.   Yes.
16      Q.   -- prescribers to register for OARRS; is
17  that correct?
18      A.   Yes.
19      Q.   And to check it for -- before --
20      A.   Yes.
21      Q.   -- prescribing opioids; is that correct?
22      A.   Yes.
23      Q.   Is that something that every state does,
24  by the way?
25      A.   No.

Page 348

1      Q.   And Ohio also linked OARRS to electronic
2  health records --
3      A.   Yes.
4      Q.   -- is that correct?
5      A.   Yes.
6      Q.   And connected OARRS to other states'
7  records so you could see --
8      A.   Yes.
9      Q.   -- if people were crossing state lines?
10      A.   Yes.
11      Q.   And did you also link ODM or another
12  state agency OARRS to overdose records?
13      A.   Yes.
14      Q.   And has Ohio instituted informed consent
15  for prescriptions to minors as a way of trying to
16  bring down that --
17      A.   Yes.
18      Q.   -- prescribing?
19      A.   I believe so.
20      Q.   You mentioned that Ohio became one of
21  the first states to cover acupuncture --
22      A.   Uh-huh.
23      Q.   -- as an alternative to opioids; is that
24  correct?
25      A.   That is correct.

Page 349

1      Q.    And you have funded and publicized drug

2  take-back programs?

3      A.    Uh-huh, yes.

4      Q.    It goes by a name I can't remember.

5            You funded drug courts to provide

6  treatment to opioid-related offenders?

7      A.    Yes.

8      Q.    And is it also true that you funded

9  addiction treatment and made MAT and therapy more

10  accessible, both through Medicaid and outside of

11  Medicaid?

12      A.    Yes.

13      Q.    You talked earlier about expanding

14  Medicaid, which made access to addiction

15  treatment --

16      A.    Yes.

17      Q.    -- more readily available?

18      A.    Yes.

19      Q.    And you expanded treatment within state

20  prisons and upon inmates' release?

21      A.    Yes.

22      Q.    The board of medicine has suspended

23  licenses of doctors who were found to have

24  inappropriately prescribed opioids?

25      A.    Yes.

Page 350

1        Q.    The state, in dealing with the kinds of

2    fentanyl migration you've talked about, has

3    banned certain synthetic opioids; is that

4    correct?

5        A.    Yes.

6        Q.    You've armed state troopers with

7    naloxone?

8        A.    Yes.

9        Q.    You've passed a Good Samaritan law?

10       A.    Yes.

11       Q.    And what's the purpose of that law?

12       A.    To hold anybody non-liable if something

13   should happen associated with the Naloxone

14   administration --

15       Q.    So is that --

16       A.    -- so . . .

17       Q.    -- basically to -- to encourage --

18       A.    Yes.

19       Q.    -- people and enable them to assist

20   someone who's --

21       A.    Uh-huh.

22       Q.    -- overdosing --

23       A.    Uh-huh.

24       Q.    -- and keep that from becoming fatal?

25       A.    Yes.

1      Q.    You've enabled pharmacies to have

2   naloxone available --

3      A.    Yes.

4      Q.    -- if someone overdoses there?

5      A.    Yes.

6      Q.    The state has created Project DAWN,

7   which also distributes naloxone; is that correct?

8      A.    Yes.

9      Q.    You've created and Medicaid covers

10  programs to screen and refer patients with

11  addiction into treatment; is that correct?

12     A.    Uh-huh.

13     Q.    You've provided recovery housing so

14  people have a safe and supportive place to pursue

15  addiction treatment?

16     A.    That's true, yes.

17     Q.    And you've conducted reviews of

18  high-risk prescribing?

19     A.    Yes.

20     Q.    You've placed limits on refills and

21  quantities for opioid prescriptions?

22     A.    Correct.

23     Q.    You've intervened in particular

24  instances where you thought there were

25  problematic patterns of prescribing?

Page 352

1        A.    Correct.

2        Q.    That's a pretty long list.  What am I

3   forgetting that's really important to you?

4        A.    I think that also -- I think the part

5   that we didn't really talk about was really

6   the -- all the work that the plans are doing

7   regarding case management and care coordination

8   with this population.  Really spending a lot of

9   time and effort on the streets, out where these

10  people are, trying to develop relationships with

11  them through their care coordinators, and get

12  them into treatment when possible.  I -- so I

13  think that our care coordination efforts are also

14  a part of this.

15            I briefly suggested our MOMS program

16  that we have around --

17       Q.    Of course.

18       A.    -- opiates and pregnant moms.  And, you

19  know, trying to -- understand, there, we're

20  actually treating two patients, not one.  Right?

21  That this is -- this is a mother and a child, a

22  future Medicaid member, that we're also trying to

23  avoid problems with after the birth.  And so, you

24  know, I think that that's an important thing

25  that -- that we've done also.

Page 353

1          So, you know, I'm -- I'm actually pretty
2    proud of -- of all the work that we've done.
3    We've --we've accomplished some, but I still know
4    we have more to do.  This is a big problem, and
5    it's -- and it's -- it's going to be a big
6    solution, so . . .
7         Q.   Okay.  So let's turn briefly to some of
8    the meetings we talked about.  The P&T committee
9    --
10        A.   Uh-huh.
11        Q.   -- and the DUR committee or DUR board?
12        A.   Sure.
13             MR. DOVE:  Counsel, let me just remind
14   you, under the deposition protocol, we're
15   entitled to a minute-by-minute recross.
16             MS. SINGER:  Thank you.
17             MR. DOVE:  Just so you're aware of where
18   we are going in the afternoon.
19             MS. SINGER:  Thank you.
20   BY MS. SINGER:
21        Q.   So are drug company representatives
22   typically at D- -- P&T committee meetings?
23        A.   Yes.
24        Q.   And does that include companies that
25   make and market opioids, who come to these P&T

Page 354

1    committee meetings, to your knowledge?

2        A.   I would assume so, but I don't know that

3    for a fact.  I have -- I don't -- I couldn't

4    identify one.

5        Q.   Okay.

6        A.   So . . .

7        Q.   And is it typically the case that these

8    companies -- these companies make presentations

9    about drugs?

10       A.   Uh-huh, yes.

11       Q.   And is the goal of those presentations

12   to try to make sure they're on the preferred drug

13   list?

14       A.   Of course.  Yes.

15           MR. KNAPP:  Objection to form.

16           THE WITNESS:  Yes.

17   BY MS. SINGER:

18       Q.   Why don't you tell me what the purpose

19   is of -- of their presentations just to --

20           MR. KNAPP:  Objection --

21           MR. DOVE:  Objection.

22           MR. KNAPP:  -- to foundation and form.

23           THE WITNESS:  So the purpose is -- the

24   purpose is to see that their drug is on the

25   preferred drug list and, therefore, having less

Page 355

1   administrative barriers towards getting that drug

2   for their providers --

3   BY MS. SINGER:

4        Q.   Okay.

5        A.   -- who want to prescribe it.

6        Q.   And in any of the -- and are you

7   typically at P&T committee meetings?

8        A.   Most of them, yes.

9        Q.   Okay.  And during your time at ODM and

10  speaking for ODM, have you ever seen in any of

11  these meetings someone from a pharmaceutical

12  company suggest that ODM restrict its coverage of

13  opioids?

14       A.   Somebody from a manufacturer?

15       Q.   (Nods head.)

16       A.   No, I have not.

17       Q.   Have -- have they ever suggested limits

18  on dose or duration of use for -- of coverage for

19  opioids?

20       A.   I have not heard that, no.

21       Q.   Okay.  Have they ever made presentations

22  on what ODM can do to address the opioid

23  epidemic?

24            MR. KNAPP:  Objection to form.

25            THE WITNESS:  Not to my knowledge.

1    BY MS. SINGER:

2        Q.    And has a manufacturer or distributor of

3    opioids ever, at these meetings or otherwise, to

4    your knowledge, reported to ODM suspicious

5    prescribing or orders of opioids?

6        A.    No.

7              MR. HERMAN:  Objection to form.

8    BY MS. SINGER:

9        Q.    I didn't hear.

10       A.    Not to my knowledge.

11       Q.    Okay.  So earlier, I think over our

12   objections, you talked about how your knowledge

13   of opioids being addictive is something you knew

14   as a new doctor.  Based on your knowledge and

15   experience, was it foreseeable that the increased

16   prescribing and use of opioids would lead to more

17   addiction in Ohio?

18             MR. KNAPP:  Foundation.

19             MS. LINN:  This would be Dr. Wharton

20   testifying in his, you know, personal capacity,

21   not on behalf of ODM.

22             MS. SINGER:  You know what?

23             MS. LINN:  This is outside the scope.

24             MS. SINGER:  I'll withdraw it then.

25   I'll withdraw it.

Page 357

```
 1           THE WITNESS:  What was --
 2  BY MS. SINGER:
 3      Q.   What?
 4      A.   Okay.  Yeah, I -- I think that's a
 5  crystal ball.  I don't know.  I -- I'm not sure
 6  that I would have foreseen that.
 7      Q.   Okay.
 8      A.   I don't know.
 9      Q.   I'll -- withdrawn.
10      A.   Okay.
11           MR. KNAPP:  I think we have an answer --
12           MS. SINGER:  I think that's it that I
13  have.
14           MR. KNAPP:  -- on the record.
15           MS. SINGER:  Excuse me?
16           MR. KNAPP:  I think we got an answer on
17  the record to that question.
18           MS. SINGER:  Yes.  It was also
19  withdrawn.  We can fight about it later.
20           MR. KNAPP:  Yeah.
21           MS. SINGER:  Go ahead.
22                      - - -
23                   EXAMINATION
24  BY MR. SHKOLNIK:
25      Q.   Dr. Wharton, let me apologize.  I never
```

```
                                       Page 358
 1   did introduce myself earlier.  My name is Hunter
 2   Shkolnik.  I represent Cuyahoga County, one of
 3   the individual counties that have brought suit
 4   against the manufacturers and distributors.
 5            I'm just going to ask some -- some -- a
 6   few follow-up questions, but let me ask it -- let
 7   me ask this one question:  Would it be fair to
 8   say ODM inherited an epidemic problem when --
 9   when you -- when it first came into being?
10            MR. HERMAN:  Object to form.
11            THE WITNESS:  Yeah, I would -- so I --
12   because of the evolution of what ODM is, yes.  I
13   think when this problem started, ODM was a bill
14   payer.  I mean, we -- we did claims.  We got a
15   bill, we paid it.  That was ODM's role.  And as
16   ODM's role increased, this problem started to
17   show itself also.  So I would -- yes, I think
18   that's an accurate statement.
19   BY MR. SHKOLNIK:
20       Q.   And -- and from the time -- excuse me --
21   from the time that ODM had been in existence as
22   something more than a, quote, bill payer --
23       A.   Yeah.
24       Q.   -- would it be fair to say that steps
25   were -- were -- were being put in place to try to
```

Page 359

1    address the opioid epidemic that was in

2    existence?

3         A.    Both within ODM and outside in other

4    agencies in the state.

5         Q.    And that was going to be my follow-up.

6    But didn't the state of --

7         A.    Yes.

8         Q.    -- Ohio as well as outside agencies and

9    all -- all start stepping up to try to deal with

10   this epidemic that was in existence?

11        A.    Yes.

12             MR. HERMAN:  Object to form.  Outside

13   the scope.

14             THE WITNESS:  (Nods head.)

15   BY MR. SHKOLNIK:

16        Q.    And, in fact, counsel asked you

17   questions about Exhibit No. 4 right at the

18   beginning of this deposition.  That was the

19   Office of Inspector General, the "Opioids in Ohio

20   Medicaid:  Review of Extreme Use and

21   Prescribing," and it was dated July 2018.

22             In looking at this document, first, had

23   you seen this before today?

24        A.    Yes.

25        Q.    And -- and would it be fair to say that

Page 360

1    this is a document that looked at the opioid

2    crisis in Ohio, not just looking at 2018 when the

3    report was written, but looking back?

4         A.   That's correct.

5         Q.   And -- and would it be fair to say that

6    the Office of Inspector General had the

7    opportunity to look at the epidemic in Ohio as it

8    progressed as well as ODM's intervention to try

9    to deal with it from its existence?

10              MR. HERMAN:  Object to form.

11              THE WITNESS:  So I would say they --

12   they acknowledged that partially.  But as you

13   went through a long list, they certainly didn't

14   acknowledge everything that we have done, so --

15   but thank you.

16   BY MR. SHKOLNIK:

17        Q.   And -- and counsel, in -- in the earlier

18   questioning, didn't -- didn't address your

19   attention to Page 19, which was the appendix,

20   that went through in great detail what Ohio had

21   done, has done, to deal with the opioid epidemic.

22   Could you turn to Page 19 and 20, ending in 21?

23        A.   Uh-huh.

24        Q.   And -- and Ms. Singer asked you some of

25   these kind of general questions, but in looking

Page 361

1   at Appendix A attached to the Office of Inspector

2   General's report for July of 2018, would it be

3   fair to say that it -- it outlined in great

4   detail the steps that Ohio has taken to deal with

5   the epidemic that -- using, I think, your words

6   before -- that ODM had inherited at the time of

7   its inception?

8        A.   They did a pretty good job, yes.

9        Q.   And, in fact, they -- they talked about

10  the 2012 emergency department acute care

11  intervention, did they not?

12       A.   Yes.

13       Q.   And they also talked about what

14  prescribers must do for chronic and nonterminal

15  pain for 2013, correct?

16       A.   Uh-huh.  Correct.

17       Q.   And they also talked about what was done

18  in January of 2016 regarding acute pain outside

19  of an emergency department, correct?

20       A.   Yes.

21       Q.   And they also talked about what Ohio did

22  in -- in terms of -- in the January 2015 time

23  frame, requirements for checking PDMP for

24  prescribers and pharmacists, correct?

25       A.   That is correct.

Page 362

1      Q.    And, in fact, they didn't just list
2   them; they actually said what had to be done
3   under each one of these items --
4      A.    Uh-huh.
5      Q.    -- these items, correct?
6      A.    That is correct.
7      Q.    And then they also pointed out that --
8   that Ohio took steps geared towards prevention,
9   did they not?
10      A.    Yes.
11      Q.    And, in fact, they listed the 2011 pill
12   mill bill --
13      A.    Uh-huh.
14      Q.    -- correct?
15      A.    (Nods head.)
16      Q.    They also identified publishing opioid
17   prescribing guidelines, opioid prescription for
18   acute pain limited to seven days for adults and
19   five days for minors in 2017, statewide youth
20   drug prevention initiative, school districts
21   required to provide education on opioid abuse,
22   and the lock-in program, correct?
23      A.    Correct.
24      Q.    Now, this is a fairly comprehensive set
25   of steps starting in 2011 right through to 2017,

Page 363

1   quote, geared towards prevention, correct?

2      A.   Yes.

3      Q.   You -- you, as a physician, and you, on

4   behalf of ODM, did you support -- do you support

5   all of those steps towards prevention?

6      A.   Yes.

7      Q.   Will this correct the opioid epidemic

8   overnight --

9      A.   No.

10     Q.   -- or will this take time?

11          MR. KNAPP:  Objection to form and

12   foundation.

13          THE WITNESS:  Yes, it will take tame.

14   BY MR. SHKOLNIK:

15     Q.   Is this -- is this the -- sort of the

16   elements or the -- the building blocks towards

17   dealing with the epidemic?

18     A.   Yes.

19          MR. KNAPP:  Form and foundation.

20   BY MR. SHKOLNIK:

21     Q.   Now, they also went on to -- to talk

22   about what Ohio actions were geared towards

23   detection; am I correct?

24     A.   Yes.

25     Q.   And they said:  Ohio Medicaid

1 Prescription Drug Program Integrity Group brought
2 together representatives from multistate agencies
3 to analyze data, identify fraudulent Medicaid
4 prescribers for potential administrative or legal
5 actions.
6     A.   Yeah.
7     Q.   Is that something you did?
8     A.   Yeah.
9     Q.   Why would you do that?  Why would --
10     A.   To --
11     Q.   -- ODM want that?
12     A.   To help fix the problem.
13     Q.   Ohio agencies collaborating with
14 Department of Justice Opioid Fraud and Abuse
15 Detection Unit to identify fraudulent Medicare
16 prescribers is that something O- -- ODM did?
17     A.   Something ODM participated in.
18     Q.   And, once again, that's to try to stop
19 the pills, correct?
20     A.   That's right.
21     Q.   Ohio also had actions geared towards
22 enforcement.  I'm not going to read them all,
23 but -- but the listing here between the Board of
24 Pharmacy, as well as drug interdiction 2016,
25 2018, as well as seizures of pills, are these

Page 365

1    also steps that Ohio took to try to stem this

2    opioid epidemic?

3         A.    Uh-huh.  Yes.

4         Q.    How about Ohio's actions geared toward

5    treatment?  MAT and alternative pain solutions,

6    naloxone --

7         A.    Yes.

8         Q.    -- other MAT, court systems with

9    specialized approaches and expanded treatment for

10   state prisons.  Is that all steps the State of

11   Ohio took to try to deal with this epidemic?

12        A.    Yes.

13        Q.    Now, you were asked questions by counsel

14   earlier today about the Ohio Attorney General's

15   insurer task force on opioid reduction.  Did --

16   did you participate in this -- this task force,

17   or was this some -- a task force unrelated to

18   your -- your actual duties?

19             MR. DOVE:  Objection.  Asked and

20   answered.

21             MR. SHKOLNIK:  I never asked it.

22             THE WITNESS:  We were not invited.  We

23   didn't know about it until the very last meeting,

24   and we were aware of it at that point.  So, no,

25   we were not involved with the production of

Page 366

1   that -- that --

2   BY MR. SHKOLNIK:

3       Q.   It --

4       A.   -- that task force --

5       Q.   Did you have a chance --

6       A.   -- report.

7       Q.   -- to see that report, though, between

8   then and now?

9       A.   This is the first I've seen it.

10      Q.   Well, let me turn your attention to

11  Page 17 of the -- of the document.  And,

12  apparently, there was a PowerPoint slide deck

13  that was utilized at some point.

14           Had you ever seen the PowerPoint slide

15  deck before today?

16      A.   No.

17      Q.   There's an interesting PowerPoint slide,

18  Page 17, the top, and it -- it -- the heading is

19  "Opioid - transitions."  Do you see that there?

20      A.   Yes.

21      Q.   And -- and we have some boxes and we

22  have arrows.  And -- and correct me if I'm -- if

23  I'm misinterpreting this, and then let me ask you

24  some questions.

25           It starts off with "Oral medication

1    opioid use," and there's an arrow down to "Oral

2    non-medic- -- medical opioid use," correct?

3         A.    Uh-huh.

4         Q.    And -- and from your experience, sir, is

5    that something that is seen as one of the

6    elements leading to the opioid epidemic?

7         A.    Yes.

8              MS. GATES:    Objection.    Foundation;

9    form.

10   BY MR. SHKOLNIK:

11        Q.    And then we see an arrow to the right.

12   So now it goes "Opioid medical," "Opioid" -- I'm

13   sorry -- "Oral medical opioid use," arrow down to

14   "Oral non-medical opioid use," and then we have

15   an arrow to "Opioid injection initiation."  Am I

16   reading that correctly?

17        A.    Yes.

18        Q.    But we have a little kind of a -- an

19   insert box there with an arrow into the

20   transition between oral nonmedical and opioid

21   injection.  And correct me if I'm misreading

22   that, but does it say, "50 to 75 percent of

23   heroin users used oral non-medical opioids

24   first"?  Did I read that correct?

25             MR. HERMAN:    Objection.    Foundation;

1  form.

2          THE WITNESS:  Yes, you did.  And that is

3  that group of people that I'm worried about

4  through grandma's medicine chest.  That's

5  correct.

6  BY MR. SHKOLNIK:

7      Q.   And -- and also could some of those

8  people be people who were overprescribed

9  themselves?

10     A.   Yes.  Perhaps.

11         MS. GATES:  Objection.  Foundation.

12         THE WITNESS:  Perhaps.

13  BY MR. SHKOLNIK:

14     Q.   And -- and so earlier in your testimony,

15  you were talking about the transitions and -- and

16  the risks and the population regarding

17  prescriptions themselves.  Could you tell the

18  court and jury:  What is the significance of too

19  many pills in the marketplace as it relates to

20  addiction and potential for -- for transition

21  into illegal opioid use?

22         MR. DOVE:  Objection.  Form.

23         MR. KNAPP:  Objection.

24         MR. HERMAN:  Objection.  Outside the

25  scope.

1         THE WITNESS:  So I believe that young

2    users often -- I mean, nobody wants to start

3    shooting up drugs.  I mean, that's not how this

4    process typically starts.  And so, usually, it

5    starts with something quick and easy.  "Let's

6    take a couple pills at a party."  "Oh, I really

7    like that.  Let's take a couple more pills or" --

8              And after a while, you start to get used

9    to that pain-gone sensation or that high that

10   goes along with those opioids.  And, eventually,

11   when those pills become expensive, hard to get,

12   you're using a lot and it -- and they're just

13   hard to get enough to keep that buzz going, then

14   they evolve.  "Well, we can get this heroin

15   really cheap."

16             And I think that's the -- that's a

17   pretty typical thing.  I don't think most people

18   think when they start using pills that they're

19   just going to progress to those needles.  But

20   I -- I think that that's -- that's more common

21   than not.

22      Q.   Now, just one -- one --

23             MS. LINN:  Can I -- I'm sorry.  Just to

24   put on the record that that was outside the

25   capacity of Dr. Wharton as an ODM rep; that was

                                                    Page 370

1    his personal.

2            THE WITNESS:  That's correct.

3            MR. SHKOLNIK:  I understand.

4            THE WITNESS:  Personal experience.

5            MR. SHKOLNIK:  I -- I was just asking as

6    a follow-up to the questions posed by counsel

7    regarding personal opinions.

8            MS. LINN:  Sure.

9    BY MR. SHKOLNIK:

10       Q.   You know, I just want to go back to

11   Exhibit 4 one -- one time.  There's a couple of

12   graphs in there and I just want to -- or not

13   graphs.  They're -- they're actually maps.  If

14   you could turn to Page 23, there's an Exhibit

15   B-4, and it appears to be a map that's c a

16   legend.  And -- and it talks about -- and there's

17   red.  And I think Cuyahoga, Franklin, and Lucas

18   Counties are highlighted in red.

19           Did you have a chance to see that?

20       A.   Yes.

21       Q.   Now, could you tell us what that -- what

22   that refers to, if you would?

23       A.   So it appears to be the counties with

24   the high -- with the largest number of

25   beneficiaries who are receiving high doses of

Page 371

1    opioids.

2       Q.    And if we could turn to the next page,

3    please, Exhibit B-5.  And we have, once again,

4    red on the map.  And it appears to be the map of

5    the state of Ohio and certain counties in red,

6    one of which is Cuyahoga, another of which is

7    Summit.

8            Could you tell us what we're looking at

9    here in these highlighted red areas, please?

10      A.    This represents the largest number of

11   beneficiaries with extreme amounts of opioids.

12           MR. SHKOLNIK:  Thank you, sir.  I

13   have -- I have no further questions.

14           MS. LINN:  Reference?

15           THE WITNESS:  Page 24.

16           MR. DOVE:  We'd like to take a

17   five-minute break just so we can consult.  We're

18   entitled under the protocol -- other deposition

19   protocol to an equal time of this

20   cross-examination.  I'm not saying we're going to

21   use it, but we need to at least consult for five

22   minutes.

23           MS. LINN:  Where are we on time?

24           THE VIDEOGRAPHER:  We're at 6 hours and

25   52 minutes.

Page 372

1          MS. LINN:  Okay.  I mean, I understand

2     the protocol.  I was given the protocol.  But

3     we're a nonparty.  And I would like to stick, you

4     know, to the seven hours.  Maybe out of the

5     goodness of your heart, if you want to not have

6     this leak into a second day, we could push

7     through.

8          THE WITNESS:  I would much prefer this

9     not go into the second day.  Thank you.

10         MS. LINN:  Okay.

11         MR. DOVE:  And it may be we have --

12         MS. LINN:  Okay.  Yeah.

13         MR. DOVE:  -- very little, but let's

14    just take five minutes to consult.

15         MS. LINN:  Yeah.

16         MR. DOVE:  Thank you.

17         THE VIDEOGRAPHER:  Off the record at

18    5:09 p.m.

19         (Recess taken.)

20         THE VIDEOGRAPHER:  Back on the record at

21    5:17 p.m.

22         MS. LINN:  Looks like there's seven

23    minutes left -- or eight minutes left of the --

24    the seven hours, and we're going to stick to

25    that.  Dr. Wharton, his foot is bothering him,

Page 373

1   his wife is here.  So with that being said, go

2   for it.

3              MR. DOVE:  Sure.

4                         - - -

5                  FURTHER EXAMINATION

6   BY MR. DOVE:

7       Q.   Dr. Wharton, I just have one or two

8   questions.  You test- --

9       A.   Certainly.

10      Q.   You just testified that it was your

11  personal opinion that most heroin addicts start

12  with prescription pill -- prescription opioid

13  medication; is that -- is that right?

14      A.   Yes.

15      Q.   And you haven't personally studied that

16  issue, have you?

17      A.   I've read about it, yes.

18      Q.   Have you -- but have you personally --

19      A.   Have I --

20      Q.   -- studied it?

21      A.   -- tried heroin?

22      Q.   No, no, no.  Have you personally studied

23  the issue of -- of -- studied whether most heroin

24  addicts became heroin addicts because they

25  started with a legitimate prescribed opioid

Page 374

1   medication.

2       A.   So a legitimate medication, maybe not

3   prescribed to them, but I will say that most

4   opioid -- and -- and this is just -- this is

5   common knowledge.  This is not anything I've

6   studied or -- it's -- we've read this.  It was in

7   one of these reports -- that most heroin addicts

8   start with prescription opioid orally before they

9   move to IV drugs --

10      Q.   But you're not --

11      A.   -- including --

12      Q.   -- saying that most heroin addicts start

13  with a legitimately prescribed --

14      A.   No, I'm not saying that at all.

15      Q.   -- opioid?

16      A.   Well -- well, it had to be legitimately

17  prescribed, but whether it was not -- it might

18  have not been prescribed for them.  It was

19  prescribed to somebody or it wouldn't be on the

20  street.

21      Q.   I see.  So in -- and just to tie the

22  loop here, so you say that you -- you've read

23  reports or, you know, had other bases for this.

24  I mean, what -- what do you recall as a basis for

25  this opinion?  I mean, any particular reports?

Page 375

1    Anything that you remember?

2         A.    I don't -- I've -- I've read this

3    several times in multiple pieces of literature,

4    so I -- I don't -- I don't know of any specific

5    report that points to that other than the one we

6    just read.  So the -- that said the -- use -- 50

7    to 75 percent of heroin addicts start with

8    prescription opioids.

9         Q.    And you believe that the heroin

10   addiction problem, you know, that -- that some of

11   the blame for that might also relate to the

12   Mexican cartels?

13        A.    Yes.

14        Q.    Do you believe that the -- the fentanyl

15   addiction problem, some of that may relate to --

16   to -- to some China importation of fentanyl?

17        A.    If that weren't available, that

18   escalation wouldn't happen.  That's correct.

19             MR. DOVE:  All right.  I have no further

20   questions.

21             MR. HERMAN:  No further questions.

22             MR. KNAPP:  I'm good.

23             MR. SHKOLNIK:  I have two hours' worth.

24   No.  Thank you so much for your time.

25             THE VIDEOGRAPHER:  Off the record at

1   5:20 p.m.

2           MS. LINN:  He'll review.

3           (Signature not waived.)

4                    - - -

5           (Thereupon, the video deposition was

6            concluded at 5:20 p.m. on Wednesday,

7            November 14, 2018.)

8                    - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 377

1                    C E R T I F I C A T E
2                         - - -
3    State of Ohio,              :
                                   SS:
4    County of Franklin,         :
5                         - - -
6           I, Linda D. Riffle, Registered Diplomate
     Reporter, Certified Realtime Reporter, Certified
7    Realtime Captioner, and Notary Public in and for
     the State of Ohio, hereby certify that the
8    foregoing is a true and accurate transcript of
     the deposition testimony, taken under oath on the
9    date hereinbefore set forth, of Donald P.
     Wharton, M.D.
10          I further certify that I am neither
     attorney or counsel for, nor related to or
11   employed by any of the parties to the action in
     which the deposition was taken; and further that
12   I am not a relative or employee of any attorney
     or counsel employed in this case, nor am I
13   financially interested in the action; and further
     that I am not under a contract as defined in Ohio
14   Civil Rule 28(D).
15
16
17                        Linda D. Riffle,
                          Registered Diplomate
18                        Reporter, Certified
                          Realtime Reporter,
19                        Certified Realtime
                          Captioner, and Notary
20                        Public in and for the
                          State of Ohio
21
     My Commission Expires:  July 26, 2021
22
                          - - -
23
24
25

1                    Veritext Legal Solutions
                        1100 Superior Ave
2                          Suite 1820
                     Cleveland, Ohio 44114
3                    Phone: 216-523-1313
4
    November 19, 2018
5
    To: Morgan A. Linn, Esq.
6
    Case Name: In Re: National Prescription Opiate Litigation v.
7
    Veritext Reference Number: 3108518
8
    Witness:  Donald P. Wharton, M.D.      Deposition Date:  11/14/2018
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 379

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3108518
CASE NAME: National Prescription Opiate Litigation
DATE OF DEPOSITION: 11/14/2018
WITNESS' NAME: Donald P. Wharton, M.D.
    In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have made no changes to the testimony
as transcribed by the court reporter.


_____        _____
Date                    Donald P. Wharton, M.D.
    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

    They have read the transcript;
    They signed the foregoing Sworn
    Statement; and
    Their execution of this Statement is of
    their free act and deed.

    I have affixed my name and official seal

this _____ day of_____, 20____.

            _____
            Notary Public
            _____
            Commission Expiration Date

```
 1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 3108518
 3      CASE NAME: National Prescription Opiate Litigation
        DATE OF DEPOSITION: 11/14/2018
 4      WITNESS' NAME: Donald P. Wharton, M.D.
 5          In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7          I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9          I request that these changes be entered
    as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                   Donald P. Wharton, M.D.
14
            Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18          in the appended Errata Sheet;
            They signed the foregoing Sworn
19          Statement; and
            Their execution of this Statement is of
20          their free act and deed.
21          I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23          _____
            Notary Public
24
            _____
25          Commission Expiration Date
```

Page 381

1                    ERRATA SHEET

              VERITEXT LEGAL SOLUTIONS MIDWEST

2               ASSIGNMENT NO: 11/14/2018

3      PAGE/LINE(S) /        CHANGE        /REASON

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19

       _____      _____

20     Date                   Donald P. Wharton, M.D.

21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22     DAY OF _____, 20_____ .

23                   _____

                     Notary Public

24

                     _____

25                   Commission Expiration Date

**[& - 2013]**                                                                        Page 1

**&**

**&**   2:13 3:10,15,20
 4:15,22 5:11
 11:17,20 12:3,5,21
 13:2 14:9 62:8
 258:22

**0**

**000002**   8:16
 291:17
**000014**   8:16
 291:18
**000168**   8:14
 278:24
**000169**   8:14

**1**

**1**   7:11 8:9 9:6,12
 9:17,19,20 10:10
 22:8,10,14 23:3
 25:1 71:7 224:22
 227:8 234:5 255:2
 321:7,18 324:24
 328:21
**1/2**   323:17,25
**10**   8:5 9:5,8,13,20
 10:8,13,16,20,21
 67:14 68:20 69:24
 81:7 91:2 206:14
 206:18 231:3
 248:7,24 250:25
 251:7 284:12
 328:5,7 331:22
**1000**   2:20 5:5
**1001**   2:4
**10017**   2:9
**104**   9:5
**10:32**   105:9
**10:46**   105:14
**11**   8:7 9:5,10,17
 10:21,23 70:5
 221:2,6 248:24

252:16
**11/14/2018**   378:8
 379:3 380:3 381:2
**110**   224:7
**1100**   4:17 378:1
**1111**   5:12
**1115**   255:2,7
 257:14,15,20
 258:25 259:24
 296:18 303:8
**11th**   2:9
**12**   8:9 9:10,15,18
 10:6,20 199:6,7
 204:11 246:1
 249:15 251:10
 253:5 256:19
 257:1 276:18
**120**   7:19 322:20
 324:22
**121**   9:6
**124**   9:6
**129**   7:21
**12:21**   186:10
**13**   8:11 9:13 10:9
 10:12 84:18
 247:21 252:19
 268:16 278:10,14
 316:5 328:22
 345:14 346:2
**130**   9:7
**1301**   5:5
**131**   9:7
**137**   9:8
**14**   1:18 7:4 8:6,15
 8:23 9:12 11:3
 189:3 247:21
 253:6 291:9,12
 376:7
**144**   9:8
**14th**   11:7 206:16
 207:1

**15**   8:17 9:4,22,23
 10:17 78:20 81:7
 253:20 284:13
 301:19,23 331:22
 335:15
**15219**   4:23
**159**   9:9
**16**   8:25 9:16,22,23
 10:15 40:20 41:1
 63:22 199:5,5
 262:19 279:13
 324:18 336:6
**161**   9:9
**162**   82:14
**164**   9:10
**167**   9:10
**168**   9:11
**169**   278:24
**17**   9:21 10:4 46:19
 209:14 243:2
 366:11,18
**17027**   377:16
**171**   9:11
**173**   9:12
**174**   9:12
**175**   7:23
**17th**   25:6,18
**18**   8:17 9:9,11,21
 10:5,7 276:3
**1800**   2:20
**181**   9:13
**182**   9:13,14
**1820**   378:2
**189**   7:5
**19**   9:7 10:5,14,22
 360:19,22 378:4
**191**   8:4
**1984**   26:14
**1989**   27:5 42:2,3
**1990**   42:6

**1991**   42:1
**1:16**   189:8
**1:17**   1:6
**1st**   245:23 246:5
 253:12,14 256:20
 267:19 276:3,7
 301:9

**2**

**2**   7:13 10:11 23:23
 24:3 41:4,7 76:4
 80:10 83:7 235:10
 236:13 321:13
**20**   9:8,24 10:9,10
 10:18 27:16 34:2
 34:19 84:11
 258:24 259:5,21
 282:18 284:13,13
 360:22 379:16
 380:22 381:22
**20.4**   82:14
**20001-4956**   2:14
**20004**   2:4
**20004-2541**   5:12
**20005**   3:16 5:5
**20036-5807**   2:20
**2010**   83:25 335:5
**2011**   34:14 278:12
 279:24 280:5
 362:11,25
**2011-2015**   8:12
**2011-2017**   262:3
**2012**   34:14 40:20
 82:12 345:23
 347:1 361:10
**2013**   33:7 80:15
 83:10 87:23 89:5
 89:6 90:12,17
 186:17,23 187:1,6
 187:20,22 219:5
 225:11 315:10
 345:23 346:2,8,13

361:15
**2014** 224:4 336:15
336:17 337:2
**2015** 38:5 84:21
85:6 87:12 176:13
177:15 212:14
244:22,23,24
249:24 278:12
279:13 334:20
361:22
**2016** 38:5 40:23
63:16 65:15 66:8
80:15 81:20 82:11
82:12 83:10,25
84:11 212:14
224:4 236:9
248:21 249:24
262:19 288:24
289:5 323:6 335:4
347:2 361:18
364:24
**2017** 8:6,9,17
40:24,24 41:2,7
46:21 63:16 65:15
66:8 89:9 134:8
134:14 175:3
202:3 206:16
207:2 236:7,8
237:22 238:12
240:25 245:5
256:20 257:9
280:24 304:22
323:6 345:12,22
347:5 362:19,25
**2018** 1:18 7:11
11:3,7 25:6 62:10
187:7 189:3 221:4
255:4 276:7
315:10 359:21
360:2 361:2
364:25 376:7

378:4
**2019** 253:14 301:9
**202** 2:5,5,15,16,21
3:17,17 5:6,6,13
5:13
**2021** 377:21
**206** 8:5
**21** 10:13,18 360:22
**212** 2:10
**213** 9:14
**214** 9:15
**215** 9:15,16,16
**216** 3:6,6 4:18,19
9:17
**216-523-1313**
378:3
**217** 9:17
**218** 9:18,18
**219** 9:19,19
**21st** 289:8
**22** 7:11 10:16,24
**221** 8:7
**222** 9:20
**225** 9:20
**227** 9:21
**228** 9:21
**229** 9:22
**23** 7:13 10:12,15
10:17,24 370:14
**230** 9:22
**232** 9:23,23
**235** 9:24
**24** 9:11,16 10:19
10:25 82:14
371:15
**240** 80:16 83:11
**25** 7:14 9:14,14
10:23 282:18
**255** 9:24 80:14
83:9

**257** 8:9
**259** 9:25 10:4,4,5,5
**26** 70:10 328:5,11
328:19 377:21
**260** 70:11
**261** 10:6,6
**26th** 4:6
**274** 10:7,7
**275** 10:8
**278** 8:11
**28** 377:14
**2804** 1:6
**290** 10:8,9
**291** 8:15
**2:39** 254:21
**2:52** 254:24

**3**

**3** 7:14 8:24 9:18
10:11 25:10,12
81:15,23 83:24
145:18 161:14,14
223:20 237:3,9
238:1 323:16,17
323:25 324:2,11
334:6
**3.5** 63:15
**30** 1:10 4:6 6:5
8:23 85:1,13
164:13 214:13
217:4 222:5
229:21
**300** 3:21 7:5
270:12,13
**301** 8:17
**303** 7:6
**305-0042** 3:12
**305-6400** 3:12
**306** 10:9,10
**307** 10:10,11,11,12
**308** 10:12

**309** 10:13
**310** 10:13,14
**3108518** 378:7
379:2 380:2
**311** 10:14
**312** 3:22,22 10:15
**313** 10:15
**314** 7:6
**319** 7:7
**325** 10:16
**330** 3:12,12
**338-5227** 4:23
**341** 10:16,17
**352** 70:24
**354** 10:17,18,18
**355** 10:19
**356** 10:19
**357** 7:7
**358** 10:20
**359** 10:20
**35th** 4:22
**360** 2:9 10:21
**363** 10:21
**365** 10:22
**367** 10:22,23
**368** 10:23,24,24,25
**373** 7:8
**386-9262** 2:5
**386-9622** 2:5
**39** 70:24
**391-8758** 4:24
**397-1000** 2:10

**4**

**4** 7:16 9:6 10:6
62:7,13 120:14,15
144:18 224:21
234:4,5 238:14
321:10,11 327:17
328:11 334:12,19
334:25 335:1
359:17 370:11,15

**[4,000 - abuse]**

**4,000**   245:6 323:17
**4,700**   66:8
**4,754**   65:15 323:4
   323:8 324:22
**40**   80:15 83:10
   324:7
**400**   3:11 4:11
   39:11 134:9,14
   202:5,6,12,16
**401**   2:4
**412**   4:23,24
**414-9173**   5:6
**414-9299**   5:6
**42**   84:3
**43**   287:7,14,16
**43215**   4:6,12
**434-5029**   3:17
**434-5186**   3:17
**44113-7213**   4:18
**44114**   378:2
**44114-1190**   3:5
**44720**   3:11
**45**   86:7 316:20
**462**   224:5
**48,000**   335:21
**4:09**   318:21
**4:22**   318:24

**5**

**5**   7:17 8:24 9:15
   9:19,24 65:12
   79:10,15 84:19,20
   84:21 144:15
   234:24 235:9,9
   237:3 241:4,16
   261:25 322:24
   323:1 328:9 334:7
   334:8 371:3
**50**   4:11 367:22
   375:6
**52**   70:23 371:25

**579-0212**   3:6
**586-7154**   3:6
**592-5009**   4:19
**5:09**   372:18
**5:17**   372:21
**5:20**   376:1,6

**6**

**6**   1:10 6:5 7:19
   8:23 9:7 10:14
   74:4 85:23 86:1
   87:21 119:23
   120:2,5,6 164:13
   214:13 217:4
   222:5 229:21
   238:15 242:13
   256:10,11,12
   325:3 371:24
**6,500**   335:21
**60**   44:12
**600**   56:25
**60654**   3:21
**614**   4:7,12,13
**62**   7:16
**65**   8:23
**66**   8:24
**662-5685**   2:15
**662-5965**   2:16
**696-2493**   4:18

**7**

**7**   7:21 10:19 129:4
   129:7 207:17
   211:15 241:3
   243:10 256:9,14
**70**   44:12
**725**   3:16
**739-3001**   5:13
**739-5123**   5:13
**74**   85:2,14
**75**   1:16 8:24,25
   367:22 375:7

**752-4274**   4:12
**752-5573**   4:13
**752-6447**   4:7
**76**   9:4
**778-1883**   2:21
**79**   7:17

**8**

**8**   7:23 9:25 10:4,8
   10:22 25:4 174:24
   175:5 243:7 244:6
   261:20 280:7
   283:4 335:18
**8040**   3:11
**82**   64:10
**84**   26:14
**850**   2:14
**862-2200**   3:22
**862-7426**   3:22
**87**   9:5
**8:45**   1:19 11:8

**9**

**9**   7:11 8:4 9:9 10:7
   191:10,12 246:9
   246:10 248:1,8
   327:17
**90**   67:8 86:7 90:22
   199:6,7
**901**   3:5
**90s**   32:9,22 271:13
   306:5 311:10,14
   311:15
**950**   4:17
**98**   283:2
**99**   84:25 85:12
**9th**   2:4 22:15
   24:24 25:22
   108:12 175:3
   211:17

**a**

**a.m.**   1:19 11:8
   105:9,14
**aag**   107:15
**abide**   225:24
**abides**   225:25
**abiding**   225:5,8
   226:3 235:18
**ability**   77:25
   141:11 194:13
**able**   40:11,13 56:1
   125:2,22 128:12
   130:18 173:25
   180:20 182:22
   187:9 222:12,13
   251:5,17 262:14
   273:7,17
**abruptly**   325:22
**absolutely**   31:11
   39:6 169:10
   252:13 267:4
   273:10 306:23
   325:16 330:3
   333:18 338:16
**abuse**   64:12,20
   65:5 81:6,10 89:9
   155:6,9 193:25
   208:23 211:21,23
   212:8 213:4,7,20
   215:4,14 217:10
   218:10,11,23
   219:10,18,24,25
   224:3,8 261:1
   290:5,14,18 291:2
   292:23 293:9
   294:9,12,24 295:7
   295:23 296:6,12
   297:20 299:7
   340:21,24 341:5
   341:25 347:12
   362:21 364:14

**abused** 30:4
　156:25
**abusers** 224:7
**accelerator** 260:23
　261:17
**accept** 207:16,20
　248:25
**accepted** 208:14
　208:18 299:22
**access** 68:25 69:3
　69:14,19 93:6,7
　94:9 113:5 123:12
　123:19 124:1
　125:6,9 126:2,13
　126:18 127:12
　131:14 138:23
　139:8,10 140:3,4,8
　140:20 143:25
　146:3 158:10
　169:8 196:23
　197:1 236:15,23
　252:21 262:15
　315:20 326:24
　331:10,12 332:12
　335:12 341:7
　349:14
**accessed** 139:25
**accesses** 139:15
**accessible** 349:10
**accessing** 253:8
**accomplished**
　353:3
**account** 88:16,18
**accountable**
　115:13 187:22
　283:20 284:1
　285:15
**accuracy** 66:1
　80:19
**accurate** 63:18
　76:5,23 100:3

110:21 321:25
　323:10 327:25
　335:22 358:18
　377:8
**accusing** 21:15
**acetaminophen**
　33:22
**achieve** 259:24
**acknowledge**
　360:14 379:11
　380:16
**acknowledged**
　360:12
**acquisition** 254:10
**acronym** 113:11
　118:23 127:2
　136:22
**acronyms** 118:24
　152:1
**act** 47:25 289:8
　379:14 380:20
**acted** 340:8
**acting** 107:14
　155:2 158:3 168:4
　168:5 209:16
　239:3,3 268:9,11
　268:18,20,24,25
　304:11,15,19,24
　305:12,22 340:8,8
**action** 7:13 8:11
　21:11 28:4 262:2
　263:14,16 264:2,8
　267:9 278:11
　377:11,13
**actionable** 139:21
　184:1
**actions** 1:8 141:11
　143:3 211:18
　214:25 215:6
　216:10 217:2
　222:8 256:15

264:14 363:22
　364:5,21 365:4
**active** 287:11
**activities** 245:13
　295:4
**activity** 17:24,24
　248:17
**actual** 99:22 118:8
　365:18
**actuaries** 104:2
**actuary** 104:3,4
**acupuncture**
　162:13 165:17
　166:19 226:19,22
　234:16,18 348:21
**acute** 44:1,24
　85:22,22 155:2
　329:1 346:16
　361:10,18 362:18
**ad** 50:13
**add** 148:12 157:1
　284:6
**added** 122:23
　154:4 155:14
　166:19
**addict** 32:14 171:2
　171:3
**addicted** 45:16
　172:22 231:9
　246:18 341:16
**addiction** 28:15
　31:15 89:9 157:4
　157:7 162:25
　163:5,16 164:1
　179:23 190:1,5
　258:4,22 302:22
　335:13 349:9,14
　351:11,15 356:17
　368:20 375:10,15
**addictions** 170:20

**addictive** 28:9,13
　30:10 307:15
　356:13
**addicts** 327:1,2
　373:11,24,24
　374:7,12 375:7
**adding** 152:10
**addition** 93:19
　126:12 151:12
　158:8 208:23
　239:5 329:20
**additional** 109:19
　118:9 151:15
**address** 8:12
　57:11 236:17,25
　239:18 256:22
　262:2,9 278:11
　342:14 355:22
　359:1 360:18
　378:15
**addressing** 94:4
　262:22
**adequately** 253:21
　254:1
**adhered** 148:8
**adherence** 98:13
**adjacent** 107:8
**adjudicate** 170:2
**adjudicated** 109:8
　166:24 167:21
　314:16
**adjudicating**
　108:14
**adjudication**
　98:10,11 115:14
**adjust** 204:9
**administer** 90:6
　90:20,20 97:24
　103:16
**administering**
　68:17

**administration**
28:5 350:14
**administrative**
34:24 99:23
298:17 355:1
364:4
**administrator**
59:15 68:16 91:9
92:20
**administrators**
102:17 103:12
**admission** 35:19
35:21
**adolescent** 317:15
**adolescents**
238:18
**adopted** 253:2
**adults** 238:18
278:6 329:2
362:18
**advance** 239:24
**advantage** 330:5
330:15
**adverse** 239:24
**advice** 298:23
**advisor** 48:1 277:7
**advisory** 47:22
50:10 258:15
298:23
**aetna** 338:22
**affect** 273:6
**affirm** 13:7 321:14
**affixed** 379:15
380:21
**afford** 166:22
**afield** 144:11
164:12
**afternoon** 189:4
244:12 303:25
329:17 353:18

**age** 14:2 122:2
267:23
**agencies** 71:22
78:6 179:16 180:1
187:18 217:8,13
217:25 264:3
292:22 296:8
298:3 344:8 359:4
359:8 364:2,13
**agency** 187:11
217:15,15 229:11
258:23 348:12
**agent** 104:2 146:9
148:18 156:23
208:23
**agents** 103:22,23
103:25 147:4
148:1,17 153:2
268:11,21 305:1
**aggressive** 342:11
**aggressively** 309:6
**ago** 46:18 48:13
91:6 190:18,18
271:13 275:25
288:25 302:4
306:15
**agree** 64:15 65:24
71:13 76:11,22
88:2 217:6 225:3
227:14 236:20,22
238:20 252:10
253:17 259:4
279:22 324:25
328:21 334:17
335:5
**agreed** 164:17
**agreement** 61:4
106:10 107:7,13
242:5 302:18
337:10

**agreements**
301:15
**agrees** 334:23
**ahan** 2:16
**ahead** 82:7 202:24
230:8 232:24
246:8 332:21
334:4 357:21
**ahold** 343:15
**aimed** 238:16
**air** 318:16
**akron** 177:3 212:5
**alert** 192:17
**algorithm** 318:5
**algorithms** 120:16
**align** 231:23 258:3
**allegations** 21:19
21:23 22:1
**alleged** 305:24
**allergan** 3:19 12:6
107:18 304:1
**alleviate** 163:8
**alliance** 299:11
**allow** 122:11
168:19 204:8
207:17 254:5
315:19
**allowed** 18:24
341:10
**allowing** 21:17,22
208:7
**alten** 7:11
**alternative** 33:15
33:18,23 123:14
123:21 126:4
161:13,24 162:11
162:14,23 163:24
164:14,16 166:2
166:22 167:11
168:1,22 170:7,13
170:18 228:2

229:14 348:23
365:5
**alternatives**
160:10 162:16
163:15 180:8
342:9
**amend** 189:14
252:20 302:17
**america** 299:19
**american** 258:4
300:4,7
**amerisourceberg...**
5:2,2
**amerisourceberg...**
12:23,24
**amount** 71:19
72:7,25 76:13,25
152:25 160:4
169:6 220:2 229:6
237:14 321:16
**amounts** 65:16
66:9,22 68:14
70:8,13,25 71:11
71:15 72:18 76:7
270:7 321:24
323:9 328:10
371:11
**analgesic** 28:23
**analgesics** 160:18
165:1
**analyses** 132:2,5
132:17,24 134:4
170:5
**analysis** 67:16,17
68:18 69:24 78:23
94:2,8,12 133:2,7
133:13,19,25
134:8,17,20
135:14 159:14
172:3 196:10
210:6 261:9

[analysis - aspirin]

Page 6

272:16
**analysts** 132:11,16
**analytics** 91:12
265:4,10 286:24
**analyze** 69:21
134:22 136:8
364:3
**analyzed** 79:7
111:14
**analyzing** 217:17
**anesthetics** 162:21
165:19
**anna** 11:19 300:25
**announcements**
180:2
**annual** 122:21
210:21
**annually** 122:21
**answer** 16:9,15,16
17:1,1,7 51:17
54:24 55:3 57:19
66:17 67:19 79:4
83:15 106:23
125:15 130:19
152:9 164:20
170:16 186:25
189:13 193:3
194:9 213:10
215:9,10 216:2
220:23,25 228:20
230:24 279:4
304:18 305:16,17
309:12 310:23
312:5 357:11,16
**answered** 193:5
365:20
**answering** 309:19
**answers** 16:14
184:3
**anti** 33:20 160:20
163:5 165:3

**anticipate** 46:2
243:5
**antidepressants**
160:23 165:6
**antiepileptic** 161:1
165:8
**antiquated** 276:10
276:16
**anybody** 50:14
67:20 104:25
169:15 303:19
318:9 350:12
**anything's** 204:13
**anytime** 171:7
**anyway** 126:10
**apologize** 152:1
283:13 357:25
**apparently** 207:6
366:12
**appear** 192:15
379:11 380:15
**appearances** 2:1
3:1 4:1 5:1 11:14
12:19
**appeared** 45:7
328:12
**appears** 127:5
370:15,23 371:4
**appended** 380:11
380:18
**appendix** 360:19
361:1
**applegate** 8:18
36:25 37:1,3 38:4
41:13 47:7,16
56:22,24 60:19
132:20 138:25
277:6 279:9 292:6
301:20
**apples** 84:13,13

**applicable** 6:7
237:5,13 238:7
**application** 258:6
258:9,14,17,19
**applies** 1:7
**apply** 89:1 150:1
**appointments**
250:10
**appreciate** 22:24
256:6
**appreciated** 41:15
41:15
**approach** 264:5
**approaches** 365:9
**appropriate** 28:6
71:10,15,18 72:7
72:24 76:7,13,25
77:21,22 111:22
132:12 155:3
180:21 196:11
199:12 208:11
224:23 226:14
234:10 243:13
246:12 260:8
310:23 317:8
319:14 321:16,23
339:13,22
**appropriately**
230:24 271:4
**approve** 120:24
155:1
**approved** 109:13
109:13 111:16
124:10 131:13
149:17 200:10,15
**approximately**
27:16 35:24 48:13
85:1 90:22 245:6
306:10 311:15
**april** 255:4

**archibald** 48:10
48:24 92:11
**arcos** 140:23
**area** 34:4,4 48:5,5
49:8
**areas** 48:1 50:11
371:9
**argue** 171:3
**argument** 229:17
**armed** 350:6
**arrangement**
338:1
**arrow** 367:1,11,13
367:15,19
**arrows** 366:22
**articles** 273:21
**asam** 258:4 303:10
**ascertain** 270:25
**aside** 290:3 292:20
**asked** 21:1 45:3
51:18 52:15,20
53:8,12,15,20,24
124:17,23 164:5
189:17 333:4
359:16 360:24
365:13,19,21
**asking** 39:17
52:18 56:17
116:10 121:2,5
168:24 169:1
215:18,21,21,22
216:25 219:2,6,9
225:25 228:23
298:23 309:11
370:5
**aspect** 95:25 97:21
146:24
**aspects** 132:10
147:1,10
**aspirin** 160:21

assembly  252:20
asser  307:13
assertations
   307:13
asserting  107:2
assertions  307:14
assess  73:10,11
   122:15 195:25
assessing  147:21
assessment  271:6
assign  146:25
   250:7
assigned  47:16
   96:16
assignment  97:9
   379:2 380:2 381:2
assist  95:17,20
   104:1 257:20
   329:23 350:19
assistance  261:9
   281:15 299:20
assistant  4:5 26:22
   47:3,15
assisted  65:20
   163:18,19 173:4
   253:8 267:13
   335:3,20
associated  29:12
   39:16 49:16 98:19
   157:16,25 163:21
   170:19 172:23
   178:25 181:20
   198:9 199:1 202:7
   220:5 231:1,12
   279:16 283:20
   284:7 288:17
   350:13
association  189:19
   299:9,15 300:2,8
associations  299:5

assume  53:25
   68:23 69:3 129:24
   174:11 203:1
   204:20 257:11
   259:3 305:10
   354:2
assuming  49:7
   79:4 97:18 104:3
   193:20 203:7
assumption  54:1
   130:1
asthma  198:9
   201:20 283:22
   287:9
attached  361:1
   380:7
attachment  7:14
   24:8,17
attachments  324:6
attack  283:22
attacked  215:13
attacking  217:9
attempted  176:21
   176:25
attend  206:8
   281:14
attended  27:2
   197:14 200:4
   207:4 250:11
attention  63:12
   65:13 80:10 196:2
   360:19 366:10
attorney  4:4,5 8:7
   12:15 18:21 19:7
   21:10 105:21
   106:8,10,12,18
   107:5 221:2
   273:23 365:14
   377:10,12
attorney's  108:5

attorneys  18:4,5,7
   19:3,13 294:6
attribute  85:12
   86:11 177:5
   178:16
audibly  16:15
audit  116:5,22
auditor  79:11 80:1
auditor's  334:11
audits  115:17,23
   116:20,21
august  175:3
authored  175:1
   220:10,18
authority  272:11
authorization
   38:17 72:18 78:4
   109:6,16 114:10
   115:15 157:16
   158:4,18,20 168:6
   168:7,19 192:25
   206:5 248:25
   268:8,14 281:22
   281:24 304:23
   305:9,14 314:20
authorizations
   169:7,25 170:1
   253:8
authorize  380:11
auto  96:16
automated  137:12
   175:19 252:23
   317:25
availability  214:4
   214:9
available  29:9
   57:1 64:12,21
   65:5 67:15 126:19
   148:11 151:3
   153:10 160:14
   161:16 219:12,14

219:17 260:7
   349:17 351:2
   375:17
ave  378:1
avenue  2:9 3:5,11
   4:17 5:12
average  284:11
averages  87:14
avoid  157:15
   171:3 205:10
   231:11,14 352:23
aware  39:8 64:16
   64:18 65:3,9,24,25
   66:7,12,25 67:3,12
   70:15,18 71:3
   85:6 103:11 128:2
   140:25 151:17
   155:4 160:13
   163:16 166:3
   176:23,24 177:4
   181:19 183:16,17
   211:13 212:7,13
   213:3,12 220:17
   223:10 228:4
   237:5,12 238:7
   243:1 251:25
   254:13 258:24
   261:8 265:18
   274:6,25 275:4
   296:21 297:21,25
   308:6 310:14
   311:19 312:9,12
   312:21 353:17
   365:24
awareness  212:18

                b

b  1:10 6:5 48:9,9
   164:13 214:13
   217:4 222:5
   229:21 370:15
   371:3

**babtist** 4:9 12:13
12:13 137:4
**back** 27:19 31:20
41:20 43:24 45:22
67:4 69:10 71:6,7
78:19 91:16
105:13,18 125:24
130:8 143:22
159:2 183:19
189:7 204:10
214:22 230:13,15
232:3 233:12
247:22 254:23
255:23 261:19
267:7 280:7 285:5
287:19 289:2
311:9 318:23
336:6 343:16
349:2 360:3
370:10 372:20
378:15
**background** 19:23
26:7,8 46:2 306:3
**bad** 40:24 136:1
151:25 206:2
**balancing** 74:25
147:19 229:3
**ball** 357:5
**balloon** 342:4,15
342:23,23 343:2
**bang** 240:7
**banned** 350:3
**baran** 48:8,8
**baran's** 48:11
**barbara** 56:23
175:2
**barger** 20:19,20
48:9,16
**baron** 48:8
**barriers** 226:25
228:23 231:12

250:12 257:24
260:4 267:19
282:10 303:6
315:23,24 355:1
**base** 78:22
**based** 25:21 46:25
54:17 72:19 94:8
149:25 166:6
192:16 231:22
239:9 240:17,19
260:18,18 266:4
284:11 302:19,24
305:12,20,23
307:20 308:8
310:17 313:15
316:1,2 329:25
339:23 356:14
**basement** 242:7
242:10
**bases** 374:23
**basic** 28:7
**basically** 101:6
109:7 118:5 128:9
142:13 146:4
158:21 167:22
173:10 185:11
266:19 268:12
270:16 284:2,10
284:21 285:8,21
308:25 316:19
350:17
**basis** 37:5 107:2
117:22 167:21
309:18 374:24
**bates** 278:18,21
291:16
**bathroom** 254:16
**bear** 224:2
**bears** 291:16
**becoming** 68:3
350:24

**beefing** 242:3
**began** 226:3 236:2
236:6 238:1,24
247:20 279:13,23
341:3
**beginning** 64:8
84:19 321:20
336:16,17 359:18
**begins** 149:14
**behalf** 2:2,7,11,17
3:2,8,14,19 4:2,15
4:20 5:2,9 11:18
11:20,23 12:1,3,6
12:8,10,23 13:1
15:8,14 24:23
33:10 215:8
300:19 319:3
356:21 363:4
**behavior** 39:24
77:22 157:11
306:24 307:10
**behavioral** 36:12
47:24 163:20
247:1,2,4,5 249:8
258:2 260:9,10,12
260:14 275:18,22
276:5,9 303:10
**behaviors** 59:2
**believe** 19:20 25:2
32:2,17 34:14
38:17 40:21 53:22
55:19 56:4 57:1
63:6 66:16 91:5
98:9 107:9 116:25
118:23 141:9,18
153:21 155:21
176:9 177:7,23
178:12,13 190:2
199:6 206:7
210:19 216:9,12
216:19 226:1

227:13 238:23
241:10,13 244:11
254:4 258:11,11
269:9 271:17
277:1 279:7,11
280:16,21 282:18
285:17 292:15
294:5 297:4,9
298:1 300:12
304:7 310:5,21
311:20 315:12
345:21 346:25
348:19 369:1
375:9,14
**believes** 177:12
234:20 327:24
**belong** 344:16
**belongs** 77:22
**ben** 95:1,3
**benefic** 69:8
**beneficiaries** 64:9
65:4,16,17 66:9,21
68:13 70:7,12,25
71:10,15 74:5
76:6,12,24 145:1,5
153:11 161:17
269:4,11 294:23
321:15,23 323:8
328:10,12 329:6
370:25 371:11
**beneficiary** 70:11
70:24 96:12,14
282:21 327:25
**benefit** 47:20
48:15,22 59:3,15
60:12 68:16,17
90:25 91:8 93:5
95:24,25 97:20
148:5 187:9
338:23 339:17

**benefits** 31:16
73:12 74:25 90:6
90:21 144:25
145:5 147:3,4
171:5 251:19
**benzodiazepine**
340:12
**benzodiazepines**
205:25 285:18,19
**best** 16:2,5 43:22
151:2 250:11
262:20 271:9
285:23 342:16,19
344:24
**better** 59:2 148:6
216:7 217:24
218:7 234:20,21
249:2 260:24
315:20 316:24
331:15
**beyond** 131:21
214:1 215:24
218:12 229:16
255:5 290:8
306:13,20 309:23
312:19,25 331:6
**big** 174:5 241:1
283:10 331:9
333:15 353:4,5
**bigger** 219:23
**biggest** 47:17
214:6,10 239:13
**bill** 12:2 109:10
358:13,15,22
362:12
**billing** 130:4
**bills** 115:11
**biology** 26:12
**birth** 352:23
**bit** 32:10 41:20
46:10 84:24 90:3

93:17 113:10
117:25 160:12
180:6 184:10,14
185:5 208:3 229:2
250:25 265:10
304:8 306:2
307:12,12 332:23
341:12
**blame** 375:11
**blanket** 208:7
**block** 163:11
**blocking** 41:1 95:8
**blocks** 363:16
**blood** 26:22
198:10
**blow** 342:5
**bluffton** 26:10
**board** 8:4,6 48:23
50:23 67:22 68:10
72:20 81:18 82:9
88:6 134:14 141:1
141:5 142:5,6,9,21
143:4 144:2 156:8
158:23,23 191:22
191:24 199:18,21
199:23 200:3,5,11
200:15,24 201:2
206:8,16 293:15
293:16 349:22
353:11 364:23
**board's** 72:21
**boards** 50:18,21
71:24 77:19 143:2
277:7
**bockius** 5:11
**bodies** 72:10
298:18
**bolts** 59:16
**book** 312:4
**boss** 56:22 277:6

**boss's** 292:3
**bothering** 372:25
**bottle** 117:13
174:5,19
**bottom** 100:24
130:13 132:22
169:18 250:24
251:9 284:13
311:1 325:24
335:1,18
**bought** 309:4
**box** 70:6,9 367:19
**boxes** 366:21
**brand** 48:12
**breached** 168:16
**break** 17:6,6,8
89:22,22 105:6
189:13 254:17,18
282:10 371:17
**breaking** 184:5
**brenda** 4:16 12:25
**brenda.sweet** 4:19
**bretton** 3:10
**bri** 12:11
**brian** 8:10
**brianne** 4:8
**brianne.brown**
4:13
**brief** 78:22 185:6
185:7 301:2 304:2
**briefly** 170:16
314:12 352:15
353:7
**bring** 147:5
348:16
**bringing** 335:9
**broad** 4:6
**broader** 139:21
**broken** 57:4
**brookhaven** 44:13

**brookville** 34:6
**brought** 358:3
364:1
**brown** 4:8 12:11
12:11 320:10
**bubble** 342:15
**buck** 240:7
**buckets** 47:17
**buckeye** 96:10
99:6 223:4
**build** 60:10,10
124:11 284:17,20
**building** 4:11 7:23
31:13 174:25
261:22 344:6
363:16
**built** 249:12
**bullet** 80:12 262:5
264:13,18 265:2
266:3 267:8,9
270:3 276:25
280:8 281:7 283:4
289:8 321:6,6
334:19 335:1
**bulleted** 120:19,22
**bullets** 263:1
264:24 270:3
**bump** 266:19
**buprenorphine**
163:7 165:23
207:14 208:9
268:9,11,18 269:1
**burden** 169:7
224:3
**burling** 2:13 11:17
11:20 14:9
**business** 94:22
207:9
**buzz** 369:13
**bypass** 194:20

**c**

c 11:1 189:1
301:12 316:19,21
370:15 377:1,1
ca 378:25
cabinet 263:13,16
264:2,8 316:24,24
341:17
calculate 160:1,7
calculus 339:18
call 43:22 100:20
193:1 245:7
269:14 308:16,18
308:21
called 1:14 6:6
47:25 100:13,19
108:24 189:21
198:25 205:4
212:21 278:10
317:6
callow 108:8
calls 39:25 198:20
203:23 274:1
camera 320:6
campbell 3:10 5:4
12:3,22,22
cancel 204:5
cancer 65:17
199:15
canton 3:11
capacity 52:19
107:13 133:1,21
339:11 356:20
369:25
capitol 1:15
captioner 377:7
377:19
capture 181:2
cardinal 3:14
care 30:11,25 31:6
31:7,23 36:2,2,15

39:20 48:14 58:5
60:25 61:1,3,7,9
61:14,20 65:18,19
67:8,9,10 87:15,17
87:17 90:23,24
93:21 95:16,19,23
96:2,21 97:1,14
103:8 104:22
110:3,9 111:25
125:5,13,18 126:8
126:9 150:3,15,15
171:22 193:17
196:18,19,25
197:1 216:4
222:24 223:2,18
226:11 233:22
234:7 235:24
236:9 239:6,11,16
239:17 242:8
245:2 246:12,16
246:17,19,24
247:2,5,6,10,15
249:2,8,25 250:4,6
260:12,15 271:19
276:6 282:3,8
283:5,6,7,14 285:1
285:13 294:11
295:4 299:8,11,13
301:4,7,15 329:1,5
331:19 332:4
337:6,9,20,25
338:4,15 340:15
352:7,11,13
361:10
career 33:15
caremark 98:24
99:1,3,7 338:24
caresource 36:1,9
36:10,12,13,21,23
37:2,8,24 38:12
39:4 40:2,9,19

41:14 96:4,5
98:22 101:24,25
140:2 166:15,16
166:19 190:17
223:4 244:22
cartels 375:12
carve 260:10
276:3
case 1:6 14:11
21:1,6,12,20 22:2
22:6 44:25 51:16
52:4 75:4,10
109:16 136:4
139:12 143:18
149:18,19 151:9
154:24 157:6
167:21,21 177:2
190:7 192:22
200:18,18 230:3
245:13 246:20,22
247:17,18 250:7
274:2 282:7 295:3
295:10 307:16
313:8,10,11,12,14
313:15 315:20
346:1 352:7 354:7
377:12 378:6
379:3 380:3
cases 15:2,4,5,9
21:13,14 37:14
44:17 45:25 49:13
114:10 141:19
143:22 169:9
180:13 193:1
195:2 198:13
199:11 244:3
315:19 317:9
331:16
cash 270:13
catch 239:21

categories 55:19
164:18 206:6
301:10,11
category 198:13
205:20 268:5
cause 109:5
115:10 206:5
213:21,21 214:7
215:3,7,8 216:20
231:8 307:11
309:25
caused 83:2
178:23 342:3
causes 213:22,24
214:4 215:3
237:24,25
caveats 182:2
cc'd 302:6
cdc 181:9 297:24
cease 311:12
center 34:12,17
35:5,10,23
centre 4:22
century 289:8
certain 21:15
35:18,18 50:10
53:9 54:17 59:1
72:18 74:12,14,24
75:3 95:16 99:12
111:13 115:14
121:10 122:3
132:13,13,16
143:2 153:15,15
158:16,16,16
181:19 192:19
198:8,8 203:24
266:18,18 301:10
315:4 329:5 350:3
371:5
certainly 30:3
38:23 51:11 65:9

83:1 118:10 154:4
163:17 180:25
190:21 226:18
229:5 232:6 265:9
297:13 336:21
360:13 373:9
**certificate** 380:11
**certification** 379:1
380:1
**certified** 377:6,6
377:18,19
**certify** 377:7,10
**cetera** 28:5
**chain** 299:15
**challenges** 269:17
**chance** 75:19,20
75:22 193:4
332:23 366:5
370:19
**chances** 194:20
**change** 39:23
48:20 59:1 68:15
88:23 91:4,7,22,23
92:9,14,17,18,22
93:19 94:14,15,19
103:5 120:13
123:3,5 124:15,21
133:8,17,18
134:19 149:19
154:10 158:2
159:8 168:2,8
193:12 194:3,4,10
198:6 200:25
204:3 240:23
295:10,17 307:17
378:13,14 380:8
381:3
**changed** 31:23
32:1 83:17,20
154:2 203:5
315:14

**changes** 132:14
158:6 161:18
204:9 209:10,11
209:23 210:3
303:14,15 316:2
340:2 378:12
379:7 380:7,9
**changing** 316:1
**character** 6:13
**characterize**
156:18
**characterizing**
86:20
**charge** 36:11
**charged** 274:15
275:1,8
**charges** 270:13
**chart** 84:19,20,21
85:23 86:1 87:21
176:14 178:8,14
182:7 335:18
336:4
**charts** 87:21
**chatman** 8:18
**cheap** 170:17
331:10 369:15
**cheaper** 157:20
170:24 171:3
229:11 231:16
232:14
**cheapest** 227:10
227:15 228:12
**check** 275:12
327:22 339:7
347:19
**checking** 361:23
**chemistry** 26:21
**chest** 179:12
317:16 326:21
327:1 368:4

**chicago** 3:21
**chief** 4:9 12:11
35:1
**child** 283:23
317:15 343:16,16
343:17 352:21
**childbirth** 287:9
**childhood** 239:24
**children** 239:12
240:1 265:11
278:7 343:14
**china** 375:16
**chip** 58:10,15,17
58:18
**chiropractic** 33:23
162:18,19 165:14
**choice** 96:19 97:9
147:8 156:11
330:18
**choose** 96:19
147:4
**chronic** 29:8,11
43:17 44:8,17,20
44:25 45:11 74:6
74:11,15 75:3,25
87:25 117:2
154:24 160:14
163:25 168:12
238:10 243:12,23
345:9,17 346:12
347:4 361:14
**chronicity** 73:11
**circumstance**
119:12
**circumstances**
45:20 49:20 74:12
75:3,22 203:24
**citycenter** 2:13
**civil** 6:8 7:13
290:4 291:5
377:14 379:5

380:5
**claim** 91:15,15,16
99:22 100:2 101:6
108:19 109:1,3,5,7
109:11,12,13,21
111:16 112:8,22
113:1 115:10
117:6,19,22,22
118:3,12 119:9,10
119:14 120:24
122:25 123:5
128:17 130:4,4
131:12 151:6,6
158:11,12,13
173:2 180:23
181:5 192:23
193:6 277:11,13
313:20 314:14,15
314:18
**claimant** 118:18
**claimants** 119:4
**claims** 7:20 40:15
40:16 54:18 55:17
69:11,12,13,14
70:2 90:7,21
95:17,20 98:10
99:14,16,19,25
100:3,5,6,7,8,12
100:17,20 108:14
108:17 110:3
115:1,5 118:16
119:24 120:16
121:19,21 122:14
124:9 126:5,6
128:4 172:23
173:5 177:15
183:2,3,3 190:3,3
190:4,5 199:14
200:9 201:4,15
274:14 275:7,13
314:13,25 315:2

[claims - company]

315:13 316:9
319:10,18 358:14
**clamping** 327:5
**clarify** 16:6 54:8
55:9 109:23 223:6
311:9 332:2
336:19
**clark** 8:19
**class** 21:11 153:14
**classes** 153:12,19
154:2,5,6
**cleanup** 144:24
**clear** 65:1 118:1
136:20 245:5
256:2 289:1 320:2
**clearly** 55:2 217:2
222:7 279:19
309:4
**clerk** 5:11
**cleveland** 3:5,11
4:18 177:3 212:1
282:16 378:2
**client** 56:1 101:25
106:12
**clinical** 36:24,24
47:25 122:7,8
146:7,20,20,24
147:3,14 148:5,10
154:21 156:23
235:3,15 236:5
**clinically** 148:13
**clinicians** 235:1,14
236:4
**clinics** 87:4
**clip** 255:23
**close** 289:7 342:6
**closely** 102:10
**clue** 343:24
**cmcnamara** 3:18
**cms** 210:15,18,24
211:3,4,6,8,12

256:20 257:16
296:16,18,19
**coauthored**
220:10,18
**code** 101:11 160:2
172:25
**codes** 153:10
276:8,18
**coding** 276:18
**coerce** 73:21,22
**collaborate** 141:4
142:8
**collaborating**
364:13
**collaboration** 7:23
175:1 258:23
261:23 281:23
**collaborative**
61:17 146:6 264:5
279:7 282:11
298:10
**collaboratively**
179:16,25,25
**colleague** 278:20
300:13
**collect** 51:18 52:15
52:20 123:19
124:6 158:25
**collected** 123:12
131:16 164:15
**collecting** 79:6
170:9
**collection** 53:21
**collective** 8:11
262:2 267:9
278:11
**collects** 124:1
**colleen** 3:15
**columbus** 1:15,17
4:6,12 197:21

**combat** 292:22
293:8 294:11,23
295:6,22 296:5
**combatting**
257:20
**combination**
205:11 214:8
**combined** 190:10
330:2
**come** 30:1 52:4
58:8 59:7 78:16
84:14 96:15
110:23 126:24
135:14 153:25
162:17 183:19
240:24,24 353:25
**comes** 91:15 105:1
147:23,24 272:19
293:13
**comfort** 44:16
**coming** 32:12
267:20 328:23
**comment** 187:9
**commercial** 87:5
88:23 140:8
252:21
**commercially**
84:23 85:2,14
86:3,8,21 87:9
334:15 336:11
**commission**
377:21 379:19
380:25 381:25
**commissioned**
220:11,19
**committee** 48:23
51:3,8 92:24
122:22 146:8,8
147:11,12,21,25
149:1,4,7 150:8
156:6 179:22

196:17 197:13,17
197:23 198:2,21
199:10,19,20,20
200:10,19 207:13
208:15,19 209:5
235:22 263:6
269:9 295:14
353:8,11,22 354:1
355:7
**committee's**
146:19
**committees** 50:19
50:21 51:6
**common** 106:9
107:5,6,9,12
369:20 374:5
**commons** 3:10
**communicate**
274:12
**communicates**
110:14 111:13
112:9
**communicating**
112:12,14
**communication**
39:15 99:9,10
180:11,14 242:15
297:19
**communications**
54:17 61:3 297:7
**communities**
149:12
**community** 27:14
27:15 29:1,10
149:11 249:18
308:19
**companies** 35:7,12
252:21 353:24
354:8,8
**company** 4:20
12:21 35:17

    

338:21,23 353:21
355:12
**company's** 35:20
**compare** 153:2
**compared** 85:1,14
134:6 148:1
166:25 170:17
235:2,15 236:5
254:10 335:4
**compares** 84:21
86:2
**comparing** 84:13
170:5
**compassion**
310:21
**complete** 17:11,15
26:21 93:18 121:3
201:8 344:7
**completed** 27:13
258:10 378:15
**completely** 197:19
303:12
**completeness**
252:16
**compliance** 272:6
**compliant** 181:20
182:8
**complicated**
276:20
**comply** 128:21
**component** 147:14
163:20
**comport** 82:17
84:3
**comprehensive**
239:6 362:24
**computer** 110:13
110:13,14 111:3
111:12 112:9,13
112:13,14 203:13
318:3

**computerized**
109:2 114:3
**concern** 272:14
**concerned** 216:24
277:6 326:22
**concerns** 135:16
281:21
**concluded** 376:6
**conclusion** 336:8
**concurrent** 120:16
121:19 205:4,7,9
205:24 269:20
285:18
**concurrently**
183:4 269:6
**condition** 17:14
**conduct** 115:17,22
133:1 176:21,25
**conducted** 133:24
134:4 197:4
351:17
**conducts** 196:14
**conference** 105:11
**confirm** 274:13
275:12 277:3
280:12
**conform** 344:24
**confusing** 93:11
93:14 256:13
**conjunction** 273:3
**connected** 348:6
**connection** 35:14
49:22 50:14 51:19
52:16,21 53:10
78:11 94:2 293:7
296:11 327:7
**connolly** 3:15
**cons** 147:25
**consecutive** 81:20
82:11

**consent** 348:14
**conservative**
168:11,14
**consider** 168:21
168:22 264:11
285:23
**consideration**
157:1
**considered** 45:10
120:23 146:15
257:19 329:25
**considering**
139:12
**consistent** 201:21
270:10 328:14
**consort** 78:7
**consortium**
151:21,25
**constant** 315:25
**constantly** 43:20
244:16
**consult** 371:17,21
372:14
**consultant** 286:22
300:4
**contact** 101:24
102:7 143:2
**contacts** 142:21
**contain** 203:18
**contained** 252:22
**contains** 25:17
224:17
**context** 270:22
336:15
**continually** 244:8
**continue** 26:15
40:6 56:9 83:4
119:3,6 122:14
**continued** 3:1 4:1
5:1 7:5 8:1 9:1
10:1 40:3 189:10

**continues** 81:18
82:9 229:7
**continuing** 162:8
218:25 270:2
307:23 311:6
**contract** 61:4
92:20 98:6 124:2
124:24 125:8
193:9 377:13
**contracted** 95:22
96:3 103:25
134:18
**contracting**
266:21
**contractor** 105:2
**contracts** 92:20
226:13 233:24
234:9
**contradiction**
191:2
**contradictory**
191:4
**contributing** 88:1
**control** 78:2 91:1
166:8 198:10
201:18
**controlled** 64:11
113:1 137:17,24
**controllers** 201:20
**controls** 328:25
**convenience** 317:4
**convenient** 148:7
**conversation**
106:22 333:7
**conversations**
106:11
**convince** 73:22
**coordinate** 40:7
246:12 249:2,17
**coordinated** 245:7

**coordination**
249:9 282:8 295:4
352:7,13
**coordinators**
352:11
**copay** 157:25
**copd** 287:9
**copies** 26:2
**copy** 22:18 191:18
**corporation** 2:11
5:2,3 11:18,21
12:23,24 14:10
25:6 301:1
**correct** 15:16,25
23:20,21 25:25
26:1 27:18 36:16
41:24,25 42:14,15
42:17,20 47:11
52:5,6 57:6,8,9
60:2 68:5 69:21
69:22 70:3 73:6
73:25 74:1,21
78:13 81:13 90:10
90:14 92:2,3
93:23,24 95:17
97:22 101:2,7,8,9
101:10,11,14,15
102:15 105:22,23
107:23 108:2
110:1 111:21,23
113:25 114:3,5,9
117:3,21 121:13
121:14 125:1
130:17 133:22,23
138:1,2,5,8,11,17
138:18 140:15,21
150:17 153:12,16
153:17,17 155:23
155:24 160:18,21
160:22 161:2,7
162:25 163:1,9,12

163:13 173:16,19
180:16,17 199:19
202:10 203:2
207:3,5 208:12
219:18 234:21,22
238:8 244:13
253:16 255:4,10
263:24 267:13,14
275:19,21 278:4,4
279:24 298:4
301:5,6,7,10
305:15 307:6,8,18
307:25 308:1
312:24 318:2
319:18 320:19
322:6,7,12,16,17
325:6 326:7,8
329:3,15 330:11
331:4 332:13,18
334:16 336:5,12
337:6,11,12,14,18
339:1,6,15,16,20
339:24,25 340:5,9
340:10,13,16
346:11,16,24
347:6,9,17,21
348:4,24,25 350:4
351:7,11,22 352:1
360:4 361:15,16
361:19,24,25
362:5,6,14,22,23
363:1,7,23 364:19
366:22 367:2,21
367:24 368:5
370:2 375:18
**corrections** 250:8
378:12 380:17
**correctly** 317:24
367:16
**correspond** 305:8

**corticosteroids**
161:4 165:10
**cost** 83:8,12 147:2
147:14 151:8
152:10 157:25
159:14 170:5,6,13
253:22 254:1,6
**costs** 80:13 170:11
231:1,2,15 254:10
333:5,8
**council** 127:17
**councils** 50:19,21
**counsel** 4:9,10 6:3
11:14 12:12,14,18
16:24,25 17:2
90:10 107:8,15,20
321:8 322:18
340:20 353:13
359:16 360:17
365:13 370:6
377:10,12
**counsel's** 25:22
211:17
**counseling** 163:21
224:6
**countable** 100:5
**counties** 281:14
282:19,20 358:3
370:18,23 371:5
**country** 234:18
**counts** 26:22
**county** 2:7 21:15
107:9 177:2,3
211:24 212:3
252:6 282:15,16
313:16,17 358:2
377:4 379:10
380:15
**couple** 29:22
51:14 110:16
154:8 156:20

184:17 250:15
253:4 288:25
294:2 301:2 369:6
369:7 370:11
**course** 30:20
160:16 352:17
354:14
**court** 1:1 6:8,14
11:12 13:3,5
15:24 16:13,21
23:1 107:9 113:11
206:13 281:25
282:22 301:18
365:8 368:18
379:7
**courts** 281:7,10,14
281:16,17,21
282:4,6,11,14
289:3,3 349:5
**cov.com** 2:15,16
**cover** 69:1 144:25
145:4 193:15
224:23 253:22
254:1 268:5,6
333:25 339:4
348:21
**coverage** 226:14
227:22 234:10
251:18,24 254:6
260:25 329:17,21
331:6 336:22
338:20 355:12,18
**covered** 60:7 81:4
109:22 144:20
162:2 262:12
267:10 268:3
269:2 280:16
333:6 336:11
**covering** 161:10
161:22 267:16,17
329:20

covers  322:5 351:9
covington  2:13
  11:17,20 14:9
cpc  239:6
craft  297:5
crafted  297:9
cravings  163:9
crc  1:24
create  195:20
  244:7
created  55:20
  194:1 279:6
  291:24 351:6,9
creation  63:2,5
  80:8 175:12
  222:18 258:13,17
  258:19
credentialing
  141:9,23,25
credit  177:7,10
  199:21
crisis  7:17 8:12
  79:11 178:24
  211:19 212:18,21
  212:25 213:2,16
  213:19 215:1
  216:12 220:12,19
  222:11 256:16
  257:21 259:1,6,15
  262:3,9,23 264:6
  278:11 279:13,23
  280:1 293:17
  296:20 334:11
  360:2
criss  8:19
criteria  111:13
  112:22 120:23
  121:10,13,17,18
  121:21 122:15,19
  122:20 146:15,19
  200:10,15,17,20

200:22,25 205:18
  205:19 302:20,24
critical  173:22
cross  37:16 371:20
crossing  348:9
crr  1:24
crucial  71:9,14
  73:3 321:20,22
  322:2
crum  5:15
crunch  104:7
crying  343:15
crystal  357:5
csp  198:25 245:7,7
  248:3 295:2 329:9
cures  289:8
current  47:4
  121:16,17,18
  199:25
currently  14:16
  41:23 80:22 81:9
  166:4 225:5
  235:18 237:17
  238:21 264:14
  265:2 301:3
  313:12
cut  326:9 332:2
cutting  227:5
cuyahoga  2:7
  21:14 177:3
  211:24 282:15
  313:16 358:2
  370:17 371:6
cvs  2:17,18 11:23
  11:23 98:24 99:1
  99:3,7 108:4
  296:18 314:8,8

**d**

d  1:24 7:1 8:1 9:1
  10:1 11:1 145:2,6
  145:10,13,14

189:1 322:21
  353:22 377:6,14
  377:17
d.0  7:21 129:5
d.c.  2:4,14,20 3:16
  5:5,12
daily  158:17
dangers  228:2
dap  1:6
darn  283:8
das  127:8
dashboard  265:4
  265:7,21
data  40:16 54:18
  55:17,19 59:8,9
  63:6 67:16,20,25
  68:18 69:5,20,21
  78:10,15,17,22
  79:7 80:6 85:6
  93:8 94:2,9 99:12
  99:14,16,19,23,24
  100:7,8,12,13,18
  100:19,20,25
  101:1,7,17 104:5,7
  117:15 123:11,18
  123:25 124:5,8,9
  124:12,16,22
  125:1,6,15,17,19
  126:1,5,6,6,13,13
  126:17,17,19,22
  126:22,25 127:8
  127:11,11 128:3
  128:13 130:2
  131:2,6,12,14,18
  131:23 132:2,11
  132:12,24 133:7
  137:11 139:19
  140:17 146:20
  147:15 148:11
  158:25 159:7,11
  159:12,13,23,25

164:14 172:9,19
  173:5 175:20
  176:2,4,8,13,17,22
  177:1,14,21,24
  178:6,7,13 179:6
  196:23 198:8,16
  198:16 200:9
  201:4,6,15,22
  202:17 211:2,3,4,5
  224:12,14 236:16
  236:23 261:9
  265:16,19 272:10
  272:10,20 287:4
  288:17 293:23
  299:1 319:10,18
  319:21,23 320:17
  328:15 336:9,15
  364:3
databank  153:23
database  113:16
  139:8,15 140:23
  141:1
date  11:6 199:25
  212:11 237:23,25
  238:5 241:1 377:9
  378:8 379:3,9,19
  380:3,13,25
  381:20,25
dated  62:9 175:3
  221:4 256:20
  359:21
dates  277:21 289:4
dawn  351:6
day  3:4 11:25
  19:19 34:19 59:6
  59:6,14,14 148:19
  148:20 199:6,7
  207:17 270:12
  304:2 314:10
  322:21,21 324:23
  372:6,9 379:16

380:22 381:22
**days**  27:20 85:1,13
  86:7 118:12 329:2
  329:2 362:18,19
  378:18
**dayton**  27:11,15
  34:8 36:3
**de**  320:16
**dea**  274:7,13
  296:10
**dea's**  140:23
**deal**  279:19
  329:14 359:9
  360:9,21 361:4
  365:11
**dealing**  61:10
  112:11 234:17
  350:1 363:17
**deals**  94:1
**dealt**  309:6
**dear**  8:9 378:10
**death**  29:15
  126:22
**deaths**  220:5,7
  279:16
**deb**  130:20,21
**decide**  60:7 94:7
  109:20 148:19
  322:4,8
**decided**  38:6
  119:13
**decides**  118:17
  145:21 194:20
  195:6
**deciding**  120:23
  339:2,3
**decision**  73:15,19
  132:3 146:13
  157:9 194:13
  304:22 305:6,8,11
  305:13

**decisions**  322:15
  339:22
**deck**  366:12,15
**declined**  81:20
  82:10
**decrease**  20:16
  83:4 158:7 177:6
  177:13 178:17
  179:5,6,9,10
  245:16 317:2,12
  325:25
**decreased**  82:13
  82:21,25 83:13
  220:4
**decreasing**  84:7
  220:2
**decredential**
  141:12 142:17
  290:24
**decredentialed**
  141:17 144:3
**deed**  379:14
  380:20
**deemed**  378:19
**deep**  85:16
**deeper**  160:12
  172:3
**defend**  181:3
**defendant**  2:11
  3:2,8,14,19 5:9
**defendants**  1:14
  2:17 4:15,20 5:2
  6:6 14:10 107:11
  319:10,15
**defense**  318:9
**define**  28:18 115:9
  231:21,22 270:21
  284:5
**defined**  86:7
  193:14 286:9
  377:13

**defines**  118:19
  119:1 128:14
  129:24 284:2
**defining**  60:6
  77:20
**definite**  116:21
**definitely**  162:2
  173:18,18 182:5
  184:15,20,21
  240:5
**definition**  128:20
  145:24 200:20
  280:1
**definitions**  24:16
**degree**  26:9,11
  68:18 73:11 237:1
  248:6
**degrees**  33:25
**delay**  249:10
**delays**  252:4
**deliverables**  92:21
**delivered**  325:21
**delivery**  258:1
  260:20 261:10
  276:8 283:23
**demand**  341:19
**demonstrates**
  262:10
**denial**  123:8
  158:18 331:9
**denials**  125:2,3,7
**denied**  122:25
  123:5 124:15
  131:13
**dental**  43:13 47:20
  49:8,14,15,16,18
  50:3 285:6,7
  287:19
**dentist**  50:6
**deny**  35:17 115:10
  120:24 174:13

**department**  1:11
  4:2,10 7:15,19 8:5
  8:13,16 12:12,14
  12:16 14:17,19
  19:4 20:13,21
  23:4 33:10 36:22
  38:8 40:8,25 41:9
  41:12 46:10,17
  49:6 55:21 56:16
  58:18 61:5 62:8
  67:18 77:5,9 92:7
  109:9,10 119:23
  126:23 141:5,23
  141:25 144:4
  175:3 206:15
  224:5,11 226:12
  233:23 234:8
  252:6 272:17
  274:6 278:22,23
  291:17 294:7
  297:19 313:22
  314:24 316:8
  319:20 361:10,19
  364:14 378:22
**depend**  99:25
  182:20 282:25
**dependence**  173:1
  243:14
**dependent**  341:16
**depending**  122:5
  125:20 185:14
  200:18 201:17
  205:19
**depends**  60:21
  99:21 123:7
  152:25 279:25
**deponent**  4:2
**deposed**  14:22
  15:3,9,17
**deposition**  1:10
  6:5,10,16,17,18,20

7:10,13 8:3 11:9
15:19 17:20 19:25
20:10 22:10 23:6
23:23 25:12 56:13
62:13 79:15
105:20 120:2
129:7,18 175:5
191:12 192:2
206:18 221:6,16
257:1 278:14
291:12 301:23
319:7,24 353:14
359:18 371:18
376:5 377:8,11
378:8,11 379:1,3
380:1,3
**describe** 92:16
292:14 340:23
**described** 21:20
192:23 294:17
345:11
**describes** 70:9,21
84:20 193:18
**description** 192:12
**design** 77:16
**designated** 23:11
23:17 201:25
**designating** 22:15
23:4
**designation**
246:18
**designed** 155:5
**designee** 1:12
**desk** 37:16
**despite** 74:17
75:22
**detail** 22:5 101:5
360:20 361:4
**details** 20:15
27:25

**detection** 363:23
364:15
**deter** 155:6
**determination**
147:17
**determine** 117:5
117:18 133:25
194:9 196:11
226:13 234:10
**determines** 96:11
153:18
**determining** 68:13
72:24 146:16
152:4
**deterrent** 155:9,12
208:23
**develop** 49:14
234:25 235:13
238:16 241:5
242:15 293:20
352:10
**developed** 35:1
68:19 172:15
249:5,7
**developing** 115:1
236:3
**development**
253:19 292:18
**deviate** 119:20
257:16
**devoid** 284:25
**dewine** 4:3
**dfapa** 8:20
**dfasam** 8:20
**diabetes** 301:12
**diabetic** 201:18
**diagnosed** 163:25
**diagnoses** 173:2
330:23
**diagnosis** 172:25
199:15 288:18,21

331:7 335:4
**differ** 111:24
**difference** 84:15
85:12 86:12 88:18
**differences** 84:9
87:6,13 88:1,16
121:25 150:13
338:9,13
**different** 55:24
57:5 58:11,24
86:13,14,15,15
90:3,4 91:24 98:4
98:5 104:8,24
112:25 113:3
121:22,22 150:14
166:24 178:22,25
199:19 217:25
243:8 245:25
246:1 277:25
278:1,3 337:21
338:3
**differently** 98:4
**difficult** 17:15
44:23 117:23
119:21 155:7
213:16
**difficulty** 170:23
**dig** 160:11
**diplomate** 377:6
377:17
**direct** 36:18 63:11
65:13 80:10 93:6
93:7 99:8 248:9
248:15 321:17
**directed** 180:15
221:14 301:20
322:19
**directing** 248:17
**direction** 303:11
**directional** 51:12

**directions** 118:12
264:10
**directly** 35:7,11
39:7 56:21 70:3
71:21 73:18 91:14
102:23 112:5
124:15 151:10
200:5 239:12
295:18
**director** 8:10 35:4
35:20 36:10 37:1
47:3,8,15 56:20,21
56:23 146:12,12
147:8 152:14
175:2 220:14
257:8 261:21
**directors** 37:4
39:25 140:6
**disaggregate**
176:16
**disaggregation**
176:21 177:1
**disagree** 217:6
227:20
**discharge** 250:3
**disclosure** 249:1
**discourage** 158:10
**discovery** 221:24
**discrete** 293:10,11
**discussed** 55:17
106:18 114:14
180:24 192:18
264:18,21 277:2
293:22 295:12
**discussing** 52:12
238:13
**discussion** 35:19
205:24 228:1
264:4 272:13
288:9 292:17
294:19 308:23

322:19
**discussions** 56:9
296:17
**disease** 238:10
332:10 343:25
**diseases** 29:14
**disenrolling** 40:1
**disorder** 65:21
81:6 246:13
253:23 254:2,7
262:13 265:13
329:24
**disorders** 260:25
261:2
**dispense** 137:24
195:12
**dispensed** 82:13
101:14 114:18
124:13 177:19
178:18 179:5
195:21
**dispenses** 195:16
**dispensing** 101:9
118:9 123:13,23
124:8 126:3,14
137:16 144:8
171:16 194:12
195:19 270:19
**disruptive** 343:25
**distinct** 77:13
**distinction** 77:4,14
86:23
**distinctions** 86:22
87:2
**distributes** 351:7
**distributing** 144:8
**distribution** 299:8
299:11
**distributor** 356:2
**distributors** 218:4
296:4,5 358:4

**district** 1:1,2
11:12,12
**districts** 347:11
362:20
**disturbing** 343:21
**dive** 85:16
**diversion** 135:25
292:24 293:9
294:13,24 295:7
295:23 296:6,12
317:14
**diverting** 171:16
171:22 172:11,18
173:18 174:21
**diving** 105:17
**division** 1:3 11:13
56:18 57:14 58:5
58:6,13,20 59:5,10
59:11 60:1,3,13,25
61:7,14,16,20
102:9
**divisions** 57:7,10
57:25 58:4
**doc** 54:2 172:25
270:12
**doctor** 37:14
41:21,23 45:8
72:23 108:20
110:10 144:12
167:9,22 168:21
168:21 175:23
176:2,4,13 177:6
177:13 181:7
182:11,18 244:9
255:22 308:6,7
309:2,3,7,15
311:13 327:18,25
328:12 356:14
**doctor's** 72:24
139:1 172:4

**doctors** 32:23,24
134:5,7,10 144:7
171:21 247:6
294:11,19 311:18
311:21 349:23
**document** 1:7 23:8
24:2,10 25:4,10,17
25:17,19,25 51:15
51:19 52:16,21
54:15 55:15 62:7
62:8,18,20 65:13
74:2 76:3 79:10
79:20,22,24
119:23 120:10,11
129:4,13,14
130:14 175:10,16
182:3 191:17
192:3 193:14
206:14,23 207:8
210:10 221:2
222:4 223:20
257:5 278:10
279:23 291:9,19
291:25 292:14,15
302:2 359:22
360:1 366:11
**documentation**
88:12 154:25
172:7 182:4
210:10 271:8
**documented** 210:3
313:7
**documenting**
271:5
**documents** 17:21
17:22 19:22,22
20:6 25:23 26:2
51:19 52:3,8,15,20
53:9,12,14,18,20
53:21 54:3 55:23
56:2 121:7 185:13

186:3,16,18,22
187:1,17,23
221:23
**dog** 337:3
**doing** 46:14 60:16
68:17 168:10
177:11 180:1,12
183:16 225:13
231:24 234:14
235:25 250:21
267:6 272:25
273:3 276:22
286:23 289:24
299:2 314:25
315:6 326:19
327:4 342:18
352:6
**doj** 274:12 297:18
**dollar** 160:4
**donald** 1:13 6:5
7:4 11:9 14:1,14
377:9 378:8 379:4
379:9 380:4,13
381:20
**door** 227:25
**dosage** 138:16,16
268:15 334:21
335:9
**dose** 72:1,3 178:17
202:9 322:11
325:4,7,14 355:18
**doses** 28:5 39:14
82:14 172:14
177:19 178:17
179:5,10 209:20
336:10 370:25
**double** 41:20
**doubling** 289:2
**doubt** 64:1,4 80:18
84:5 327:10

**dove** 2:12 7:4,5,8
7:11 10:18,22,24
11:16,16 14:6,8
22:13,20,23,25
24:1,5 25:15
30:16 33:11,13
46:4,7,9,13,15
54:12,14,21 55:2,6
55:9,11,14 56:7,11
56:13,14 62:16
65:8 66:4 75:7,17
76:19,21 79:9,18
87:19 90:14,16
104:11 105:5,15
106:13,17,20
107:1,16 108:9
110:4,5 119:22
120:7 121:4
124:18 129:3,11
130:9 131:25
136:23,25 137:8
137:22 144:19,23
159:20 161:12,23
162:6,7 164:19
167:16 169:1,3,4
171:20 173:20
175:8 181:15
182:16 183:5
184:4,14,20 185:2
185:11,20 186:4
186:15 187:24
188:1 189:11
191:15,19,21
206:13,21 214:19
215:12,20 216:13
216:21 217:5,7,22
218:8,15 219:8
221:1,9,15 222:2
222:11,13,15,16
223:13,24,25
225:17 228:9,19

230:5,7,12,22
232:23 235:8
254:18,25 255:9
256:3,5,7,9,12,17
257:4 259:12,22
261:7,14 274:11
274:21 275:11
278:9,18,25 279:1
289:19,22 290:1
290:12,25 291:8
291:15 297:17
306:17 308:2
319:6,12,16
353:13,17 354:21
365:19 368:22
371:16 372:11,13
372:16 373:3,6
375:19
**dozen** 198:22
**dozens** 214:3
**dr** 11:9 13:10 14:7
14:22 22:7 23:1
33:3 36:25 37:1,3
38:4 41:13 46:2
47:7,16 54:23
56:15,22,24 60:19
62:17 79:19 84:17
105:16 107:14
108:10 109:24
120:8 129:23
132:20 137:3
138:25 145:21
154:13 175:9
187:7,22 189:12
190:19 206:22
209:10 211:15
221:11 222:17
223:7,14 232:20
255:1 256:18
257:6 277:6 279:2
279:9 291:20

292:6,19 300:15
300:25 301:20
303:25 307:5
319:3 320:7 321:2
356:19 357:25
369:25 372:25
373:7
**draft** 277:8
**drafting** 277:3
**dramatically**
83:12
**dreamland** 312:4
**drive** 101:22
**driven** 87:7 341:9
**drop** 209:25
**drug** 5:2 8:4,6
12:24 28:23 45:8
45:9,16,17 50:23
78:25 79:1 87:8
90:7,21 101:11,14
118:2,8 122:5,10
123:21 127:17
128:3 145:20,23
146:1,3,5,11,13,14
146:18 147:23,24
148:2,4 149:17,24
150:1,5,10,11,14
150:19,23 151:2,3
151:6,13,14 152:5
152:10,11,16,17
152:22,23,23,24
153:5,10 154:2,16
155:7,10,13,15
156:7,8,11,14,22
156:25 157:2,11
157:20 158:8,10
159:15 160:2
161:16 163:2
165:21 167:4
174:9 181:8
190:25 191:17,22

191:24 192:14
193:13 195:21,25
196:6,8,15,21,24
197:5,12 201:25
202:11 204:23
205:4,7,15,17,20
206:8,15 208:24
210:14,17,21
214:9 229:13
281:7,10,14,15,17
281:21,25 282:4,6
282:14,22 289:2,3
295:20,21 296:3
299:15 301:4,9
304:9,12,16,20
305:7,19,23
310:25 327:3
349:1,5 353:21
354:12,24,25
355:1 362:20
364:1,24
**drug's** 147:25
148:11
**drugs** 30:3 37:18
64:13,21 65:5
121:22 122:1,3,23
123:20,23,24,24
137:17 146:4
147:23 148:7
152:4 153:15,19
154:4 156:13
157:14,19 160:21
163:5,7,11 165:4
167:14,18 173:4
198:13 240:2
301:13 305:7
309:8 315:20
326:15 331:11,12
339:3 354:9 369:3
374:9

**[duly - encourage]** Page 20

duly 14:2
duplicative 198:12
204:5
dur 8:6 48:23 51:8
92:24 134:13
142:25 192:6,20
196:3,17 197:17
197:23 198:2,21
199:10,18,19,20
199:21,23 200:2
200:10,11,15,19
200:24 201:2
202:4,15 205:13
235:22 294:16
295:14 353:11,11
duration 86:6
168:4 268:15
322:13 334:21
335:9 355:18
durations 158:17
336:10
duties 365:18
dynamic 7:23
174:25 261:22

**e**

e 7:1 8:1 9:1 10:1
11:1,1 48:9 52:12
130:22 189:1,1
274:8 322:21
377:1,1
earlier 75:13 78:9
83:8 93:9 99:18
105:19 114:24
116:25 118:1
137:11 160:11
209:15 217:23
227:14 244:12
249:9 275:20
277:2 279:11
286:21 298:1,2,14
333:4 336:7,19

339:18 341:15
349:13 356:11
358:1 360:17
365:14 368:14
earliest 242:25
early 32:22 33:14
67:4 87:18 240:2
279:24 281:16,20
304:22 345:18
easier 217:13
227:24 231:13
easiest 230:12
east 1:16 4:6 5:5
eastern 1:3 11:13
easy 117:10
140:18,20 233:15
236:15,22 242:16
331:10 341:7
369:5
economic 156:24
edge 227:5
edit 112:22 122:9
154:19 193:2,2
194:19,20 267:23
268:25 314:14,18
315:5
editing 314:13,25
315:13 316:6,9
317:12
edits 109:4 110:22
115:9 122:8
158:12,13 168:5
168:16 177:15
181:5 182:6
192:23 206:2,4
208:4,11 209:13
209:15,18 226:24
239:2 240:14,23
267:21 268:17,19
277:12,13 295:12
315:2,16,18,19,22

316:1,1 340:2
educate 204:7
242:16 243:10
269:18 344:23
347:8
educating 179:14
198:19
education 27:7,7
178:22 202:6
204:8 235:1,13
236:3 241:5 244:3
347:12 362:21
educational 26:8
198:18
effect 6:19 15:23
effective 72:1,3
209:24
effects 303:13
efficiency 284:24
efficient 284:23
effort 239:9 247:3
279:8 325:24
352:9
efforts 76:9
180:14 235:1,13
236:4 238:16
242:9 325:7
344:23 347:7
352:13
ehtoig 4:24
eight 132:21 199:5
275:24 324:16
332:25 372:23
either 37:23 96:18
100:21,22 111:16
124:1 126:1,2,7
127:15 153:22
172:15 249:22
282:15 313:16
328:20

elaborate 189:14
electronic 115:1
128:20 348:1
elements 126:17
129:25 363:16
367:6
elicit 327:8
eligibility 110:24
112:21
eligible 145:1,5,7
eliminate 253:7
ellis 3:20 4:17 12:6
12:25
elly 4:21 12:20
email 378:17
emergency 172:24
283:22 346:20
361:10,19
employed 14:16
102:20,23 377:11
377:12
employee 377:12
employees 20:12
20:21 48:4 50:2
53:11,15,19,24
56:25 217:20
enable 350:19
enabled 351:1
enacted 89:4
enclosed 378:11
encounter 69:20
93:8 99:24 100:13
100:19 119:2,19
124:11,12 126:6
128:15 129:25
211:3,4
encounters 69:13
encourage 158:9
224:23 243:13
302:17 350:17

encouraged 85:17
85:19
encouraging
239:10
ends 114:22 147:8
177:14
enforce 315:17
enforced 272:3
enforcement
77:25 117:23
135:24 144:6
174:3 181:22
272:11 296:9
298:4 364:22
engage 250:1,2
engaged 193:23
239:15 331:19
engagement
239:15
enhance 239:9
260:25
enroll 190:6
enrolled 63:15
145:7,8,13,14
323:23 329:6
enrollees 328:19
339:5 340:16
ensure 180:20,25
208:1 237:4,11
272:6
ensures 92:21
ensuring 71:10,14
76:6,12,24 238:6
321:15,23
enter 249:18
entered 380:9
enters 105:11
110:12 112:8
entire 47:10 49:6
62:3 95:24 164:8
379:5 380:5

entities 103:24
104:24 111:25
260:15
entitled 62:7,10
79:11 119:23
120:16 129:4
175:19,23 177:18
196:3 206:14
221:2 222:3 262:2
264:10 291:9,10
353:15 371:18
entity 136:3
143:12 182:7
envision 96:24
epidemic 21:17,22
81:18 82:9 256:22
340:19,21,24
341:4,5 343:4,9
355:23 358:8
359:1,10 360:7,21
361:5 363:7,17
365:2,11 367:6
episode 49:14
284:2,11 285:5,10
286:1
episodes 283:5,6,7
283:14 285:1,5,13
285:17 287:2,6,7
287:10
equal 157:13
371:19
equivalent 202:8
errata 378:13,18
380:7,10,18 381:1
escalate 39:24
escalated 212:13
escalating 39:15
escalation 375:18
especially 29:11
282:3

esq 2:3,8,12,19 3:3
3:9,15,20 4:3,5,8,9
4:16,21 5:4 378:5
essentially 86:5
88:10 91:24
113:20 150:24
205:22 267:20
283:18 284:12
295:16
established 158:22
263:2
establishing
200:20
et 28:5
evaluate 73:10
147:25
evaluating 271:4
evaluation 271:5
272:17
event 111:12
283:21,21,25
284:3,7
events 200:1
239:25
eventuality 121:8
eventually 40:1
369:10
everybody 169:18
187:12 218:6
279:18
evidence 166:6
302:19,24 329:25
evolution 32:11
212:12 213:5
245:22 246:6
286:19 315:25
358:12
evolutionary
315:21
evolve 327:3
369:14

evolved 36:9 154:6
315:15 316:9
341:4
evolves 227:4
evolving 250:20
ex 262:17
exact 43:4 80:25
277:21
exactly 30:22
128:14 201:14
202:20 223:15
266:6 323:21
exam 270:23
examination 6:7
7:4,5,5,6,6,7,7,8
14:5 24:18 105:17
189:10 300:23
303:23 314:5
319:1 357:23
371:20 373:5
examine 315:22
examined 14:3
example 21:21
37:21 70:6 84:10
94:6 147:22
159:14 167:2
193:25 210:20
224:4 235:22,23
296:10 307:19
examples 29:4
53:17 235:21
302:14 313:19
exceed 182:6
268:14
excess 316:25
317:1 326:22,25
exchange 270:17
exciting 127:24
296:1
excluding 316:3

exclusions 284:8
excuse 17:19
  210:17 213:19
  302:9 322:25
  332:15 357:15
  358:20
executed 107:12
  380:10
execution 379:14
  380:19
executive 80:11,12
exhibit 22:8,10,14
  23:3,23 24:3 25:1
  25:10,12 26:5
  62:6,7,13 63:11
  70:5 74:19 78:11
  79:10,10,15 81:16
  84:18 119:23
  120:2,5 129:4,7
  174:24,24 175:5
  191:7,10,12
  206:14,18 221:2,6
  254:15 255:14
  256:19,19 257:1
  261:20 262:1
  264:10 278:10,14
  280:7 283:4 290:3
  291:9,12 292:20
  301:19,23 316:5
  321:9 327:17
  334:6 345:5,14
  359:17 370:11,14
  371:3
exhibits 7:10 8:3
  320:22 344:11
  345:7
exist 257:24
existed 187:18
  213:13
existence 187:10
  221:19 358:21

359:2,10 360:9
existing 148:1
expand 240:21
  246:4 260:25
  262:22
expanded 349:19
  365:9
expanding 226:21
  349:13
expansion 255:3,8
  262:6,9,13,18
  333:10 336:16
  337:2
expect 182:8
expectation 182:6
  242:7 246:17
expectations 61:4
expedite 253:7
expenditures
  104:20
expenses 284:7
expensive 37:14
  170:20 228:14,24
  229:14 284:15,16
  369:11
experience 197:7
  271:18 332:9
  343:22 356:15
  367:4 370:4
experienced 259:5
expiration 379:19
  380:25 381:25
expires 377:21
explain 39:17
  74:22 199:16
  314:12
exploring 227:11
  266:8
exponentially
  240:21

extended 154:14
  154:20 155:5,14
  155:22 304:10,15
  305:12,21
extent 54:17 59:21
  61:9 221:25
  222:12,13 225:10
  248:12 288:5
  344:20
extra 98:16
extraction 49:11
  49:16 285:7
extreme 7:16
  62:11 70:8,13,25
  328:10 359:20
  371:11
extremely 39:10
  172:16

**f**

f 130:22,22 377:1
faafp 8:19
faces 32:19,19
  343:20
facilities 290:6,14
  291:1
facility 290:17
facing 180:4
fact 15:10 32:24
  43:19 45:23 64:16
  64:19 65:10,25
  67:1,3 69:11
  74:14 88:17,18
  99:20 155:11
  223:12 231:19
  233:14 281:21
  308:21 309:9
  323:14 331:9
  333:14 354:3
  359:16 361:9
  362:1,11

factor 152:12
  155:9 157:3,5,8
facts 146:9
factual 65:25
failed 168:13
failures 204:18
fair 16:22,23 30:9
  33:11 49:9 75:18
  76:20 101:3 110:4
  173:13 185:20
  186:4 272:22
  317:18,19 330:16
  335:7 338:14
  358:7,24 359:25
  360:5 361:3
fairly 156:21
  250:15 317:25
  362:24
fall 56:2 61:6
  119:18
falls 59:12 71:22
familiar 110:17
  125:23 127:9,15
  127:16 179:21
  193:21 211:1,8
  261:3,5 289:12
families 246:23
  343:12,13
family 27:11,17
  34:3 42:11,24,25
  147:24 172:25
  187:5,19 252:6
  270:12 309:3
  343:9,23
far 38:11 102:13
  144:11 164:12
  170:25 245:22
  260:19 264:19
  265:25 277:5
  303:16

**farther** 262:25
**fasm** 8:18
**fatal** 350:24
**favor** 155:10
281:17
**fax** 2:5 3:6,12,17
3:22 4:19,24 5:6
5:13
**fda** 296:14
**federal** 6:7 107:21
118:25 150:19,23
151:9,13 296:8
313:9
**fee** 7:20 48:22
67:13 68:21 69:25
87:14 91:2 93:20
96:12,20,23,25
97:8,12 100:18
109:24 110:6
112:4 119:24
126:9 150:2,6,7,16
151:11 193:15
196:16 201:11
232:1 241:14,22
245:4 247:25
276:5 277:13
332:3
**feel** 23:13 85:24
89:20 100:4
207:22 217:19,20
321:6 342:12,18
**feeling** 266:7
**feels** 55:12 185:9
289:17
**fees** 118:9,10
**fentanyl** 30:2
219:25 220:7
326:14 327:1
350:2 375:14,16
**fewer** 316:23

**fields** 55:19
**fifth** 32:17 161:4
190:20 261:25
264:20 267:8
280:7 309:5
**fight** 357:19
**figure** 60:20
**figuring** 217:17
**file** 52:11
**files** 52:5,8,9
210:11
**fill** 241:5
**filled** 38:17 84:2
108:25 334:13
**filling** 267:22
**final** 146:12 147:8
194:13 289:8
**finally** 17:5 60:24
172:21 253:20
**finance** 3:19 12:6
104:21
**financial** 101:15
101:16 146:23
147:1,4 224:3
233:5,13,17
287:12
**financially** 228:5
377:13
**find** 59:2 217:13
223:21 240:1
288:12 326:12,13
378:11
**finding** 198:12
317:15
**fine** 55:6 56:8
169:12 181:17
229:23
**fined** 291:2
**finish** 184:15
**finished** 53:20
287:1

**fires** 93:1
**firm** 11:17 14:8
237:23,25
**first** 14:2 15:21
20:25 26:7 30:23
38:10,18,18 41:19
49:17 63:12 70:9
76:4 80:12 81:16
81:25 84:10 91:3
93:18 102:23
108:11,16 123:22
124:6 153:23
190:25 192:8
193:6 198:4
207:12 211:20
212:7 213:3
215:22 224:21
231:5 234:17
236:11,13 239:1
241:5 245:2 251:1
251:14 262:5
265:2,15 268:21
283:6 302:8,10,11
302:12 304:5
321:19 324:13
348:21 358:9
359:22 366:9
367:24
**fiscal** 103:22,23,25
104:2
**fit** 246:19
**five** 15:1 21:13
37:4 38:3,15 61:1
72:13 95:22
103:16 209:16
242:6 289:15,16
300:18 304:12,17
318:13 324:14,15
329:2 362:19
371:17,21 372:14

**fix** 204:4 364:12
**flagged** 194:6
**flies** 41:7 337:1
**floor** 2:9 4:6,22
**flowcharts** 57:4
**fluid** 185:10
**focus** 32:20
**focused** 201:1
240:6 315:8
346:12
**folks** 63:22 81:5
95:10 97:15 104:4
132:18 141:9,20
184:6 196:20
233:21 282:12
286:15,15 300:14
**follow** 53:5 55:25
107:17 136:6
143:24 144:1
174:4 184:25
185:3 209:4 237:5
237:13,20 238:21
250:10 300:19
301:8 303:3 305:4
358:6 359:5 370:6
**following** 174:18
180:21 186:12
237:17 238:1,7,24
251:19 270:8
**follows** 14:4
**foot** 372:25
**force** 6:19 8:8
77:24 168:21
221:3,20 222:6,18
223:3,11,16
224:12,19 225:23
251:15 365:15,16
365:17 366:4
**foregoing** 377:8
379:13 380:18

**foreseeable** 356:15
**foreseen** 357:6
**forget** 113:25
  151:23
**forgetting** 118:23
  352:3
**forgot** 189:20
**forgotten** 190:11
**form** 30:14,17
  65:6 66:3 75:5,16
  87:11 104:10
  121:1 124:4 130:6
  131:19 137:20
  159:18 167:12
  171:18 173:14
  174:1 181:10
  215:17 217:11
  227:18 229:20
  230:6,17 232:16
  235:20 249:1,6,12
  261:4,12 274:9,20
  275:10 280:17
  288:11 307:1
  310:12 325:10
  341:23 354:15,22
  355:24 356:7
  358:10 359:12
  360:10 363:11,19
  367:9 368:1,22
**formal** 27:7
**formerly** 91:4
**forms** 30:2 326:14
**formularies**
  145:20 161:16,19
**formulary** 92:25
  122:24 145:23
  146:1,4 148:2,12
  151:16
**formulating** 95:21
**forth** 29:8,16
  51:11 52:12 59:17

77:21 92:23 97:16
98:10 110:24
113:8 115:16
122:5 163:21
180:2,8 208:4
227:1 250:12
266:1 282:8
286:24 377:9
**forum** 299:13
**forward** 22:17
  58:22 183:9 193:6
  242:2 246:5,25
  247:4 341:21
  378:15
**found** 316:19
  334:15 335:8
  349:23
**foundation** 229:20
  342:1 354:22
  356:18 363:12,19
  367:8,25 368:11
**four** 15:1 36:9
  69:12 84:10 91:6
  103:16 199:2,3,4
  242:5 245:25,25
  246:1
**fourth** 81:20 82:11
  161:1 171:9
  264:17,20
**fqhcs** 87:3 239:10
**fraction** 330:5
**frame** 201:22
  219:4 361:23
**franklin** 370:17
  377:4
**frankly** 169:23
  172:7
**fraud** 294:8
  364:14
**fraudulent** 364:3
  364:15

**free** 23:13 85:24
  89:20 379:14
  380:20
**freedom** 250:8
**frequently** 41:14
  42:25 75:20
  115:22 139:16
  308:21
**friday** 19:16
**friendly** 139:17
  140:15
**friends** 343:23
**front** 77:16 164:8
  277:20
**frowny** 32:19
**fulfill** 73:8
**full** 74:4 76:4
  108:6 251:19
  302:8,10,12
**functional** 7:23
  175:1 261:22
**funded** 349:1,5,8
**furnishing** 137:17
**further** 7:8 21:18
  21:23 262:22
  300:12 313:1,5,25
  328:24,24 371:13
  373:5 375:19,21
  377:10,11,13
**future** 264:10
  267:2 352:22

**g**

**g** 11:1 48:9 189:1
**gain** 285:25
**gates** 3:3 10:17,22
  10:23 11:25,25
  321:9 341:23
  367:8 368:11
**gateways** 284:21
**gather** 53:12,16,20

**gathering** 211:2
**gcoat** 179:22,24
  263:2,4 264:10
  292:8
**geared** 362:8
  363:1,22 364:21
  365:4
**gears** 46:16
**gender** 122:4
**general** 4:4,5 28:1
  43:2,9,14 56:19
  62:9,22 81:3
  89:11 96:23 97:12
  98:7 110:20
  121:24 147:6
  154:13 171:15
  172:10 173:10
  212:14 213:6
  226:4 227:4
  242:21 247:18
  252:20 281:3
  292:14 294:6
  298:6 316:22
  359:19 360:6,25
**general's** 8:7
  12:16 106:10
  107:6 221:3
  273:23 361:2
  365:14
**generalize** 86:19
**generally** 31:3
  52:14 58:19
  218:11 316:13
**generate** 201:5,6
**generated** 200:8
**generates** 109:3
**generic** 155:20
  156:22
**gentleman** 18:20
**gentleman's** 18:14

**geographic** 34:4
**getting** 70:17
  113:7 134:9
  135:19 143:15
  202:5 228:6
  240:18 243:3
  249:13 269:20
  272:12 285:10
  330:10,24 331:23
  355:1
**give** 13:8 16:9
  17:10,15 21:1
  42:23 51:17 136:2
  213:5 271:2
  272:20 282:4
  284:15 309:16
**given** 26:1 71:19
  72:25 149:13
  172:25 198:14
  232:21 235:21
  245:9 268:15
  317:3 372:2
**gives** 70:6
**giving** 16:16 88:11
**go** 27:19 49:22
  68:12 82:7 88:13
  101:4 105:18
  119:9 122:11
  131:18 152:4
  153:19 164:9,21
  164:25 184:5,19
  185:12,13,18,20
  186:7 187:13
  188:1 202:24
  204:10 205:3
  227:15 230:8
  232:24 239:16
  241:2 246:8
  250:19 251:12
  261:19 267:7
  268:24 275:19

  280:7 283:22
  285:1 288:10
  325:22 326:13
  332:21 334:4
  335:15 336:6
  344:14 346:6,8
  357:21 370:10
  372:9 373:1
**goal** 82:25 210:1
  266:18 354:11
**goals** 260:11
  269:16
**goes** 117:12,13
  146:11 201:9
  226:21 252:3
  260:20 349:4
  367:12 369:10
**going** 16:10 22:17
  25:10 32:13 44:3
  46:2,24 67:24,24
  69:1 72:8 76:15
  84:24 101:6 105:8
  106:7,22 113:9
  122:11 123:22
  125:24 130:8
  133:8 136:1
  144:11 148:17
  156:20 164:12,15
  167:21,23,24,25
  168:12 169:16
  171:1,6,7 174:15
  177:15 181:1
  183:9 184:10,15
  185:4 186:9,24
  187:8 190:12
  191:9 193:1
  194:21 200:18
  201:1 202:4,6
  212:23 232:15,18
  233:4 240:20
  245:24 247:20

  248:5,7 249:10
  250:14 263:7
  266:11 271:20
  274:3 278:19
  279:15 289:5
  290:3 291:8
  292:10 299:3
  307:2 309:17
  315:3,23 316:4
  317:11 321:5
  323:21 329:23
  339:4 342:4,8
  344:9,19 353:5,18
  358:5 359:5
  364:22 369:13,19
  371:20 372:24
**good** 12:10 14:7
  89:24 105:6
  118:24 145:9
  183:24 184:4
  197:21 227:21
  240:19 243:4
  246:6 253:17
  254:18 263:5,10
  303:25 318:19
  328:20 332:5
  333:17 335:16
  350:9 361:8
  375:22
**goodness** 372:5
**goold** 91:5,7
**gosh** 94:5 113:15
  311:16
**gotcha** 103:20
  237:10 251:13
  267:5 330:17,19
  336:1,3
**gotten** 185:9
**govern** 60:11
**governed** 337:9

**government** 217:8
  218:1 249:16
  296:8 298:16
**governor** 56:22
**governor's** 179:22
  263:6,6,13,16
  264:2,8
**grab** 303:21
**graduated** 27:4
**graduating** 27:8
**grandma's** 179:11
  316:24 326:21,25
  341:17 368:4
**grant** 290:4
**graph** 175:23
  335:23
**graphic** 265:24
**graphs** 370:12,13
**gray** 70:6,9
**great** 220:1 240:22
  249:20 333:17
  360:20 361:3
**greater** 181:8
  254:6
**greatest** 240:7
  266:16
**ground** 15:18
**group** 38:7 92:12
  118:25 136:14,15
  149:7 190:6
  199:23 239:14
  247:7 258:20
  262:14 294:4
  364:1 368:3
**groups** 87:5 218:5
  292:22 299:4
**guess** 28:7 30:23
  35:14 48:2 49:20
  63:10,13 65:13
  71:6 76:2 77:2,11
  83:4,24 86:7

101:21 105:5
116:15 121:5
142:8 156:21
167:6 169:17
175:2 177:17
179:20 182:20
200:14 203:22
205:3 211:20
214:9 215:21
225:15 227:19
230:12,17 232:2
233:2 242:12
246:9 247:21,21
262:20 265:13
267:7 279:25
286:20 289:7,7
315:4 319:16,16
341:5,5,11 342:23
**guessing** 288:24
**guidance** 72:19
88:11
**guideline** 345:23
346:12 347:5
**guidelines** 72:21
72:22 77:16 87:24
87:25 88:4,7,9,10
88:15,17 89:1,3
96:14 158:22
180:7,22 181:4,20
181:21 182:1,5,9
237:6,13 238:8,9
238:10,11 243:11
245:23,24 246:4
258:5 270:8
276:25 277:4,5,9
277:16,25 278:1,6
280:9 293:20
298:24 303:11
315:16,18 316:7,7
337:15 344:23
345:8,18 346:16

346:22 362:17
**gynecologists**
248:9

**h**

**h** 14:15 130:22
**habits** 181:2
307:17
**half** 49:3 198:22
239:8 289:15,16
**han** 7:5 11:19,19
278:21 300:24,25
301:18 302:1
303:17
**hand** 5:10 13:6
24:2 25:9 186:20
186:21 256:19
**handed** 23:2
108:23
**handful** 300:18
**hang** 214:11
345:15
**happen** 45:24 93:1
97:5 99:25 119:15
133:8 141:15
144:3,9 156:16,20
172:4 179:18
350:13 375:18
**happened** 68:1
91:6 144:1 179:20
204:13 238:12
243:1,2 271:11
272:12 296:22
299:23 304:20
337:2 341:14
342:15
**happening** 265:25
345:12
**happens** 21:13
99:22 109:14
111:20 114:8
131:17 151:5

156:17 250:13
273:25 326:1,9
**happy** 89:21 184:5
320:1
**hard** 24:14 43:3
169:14 194:19
369:11,13
**harder** 333:1
**harm** 83:2 170:22
205:11 231:9
**harmful** 122:12
**hat** 214:11
**hbc** 4:20 12:21
**he'll** 376:2
**head** 38:21 60:13
61:19,20 89:16
219:15 220:22
293:14 355:15
359:14 362:15
**headache** 285:20
287:17,18
**headaches** 285:6
**heading** 192:6
207:8 209:6
366:18
**headquarters**
111:4
**heads** 61:7
**heal** 44:3
**healing** 44:4
**health** 3:14 36:12
47:24 57:13,18,22
58:20,23 59:4,9,12
59:25 61:15 62:8
126:23 163:20
171:22 213:15
224:2 227:21
239:15,17 242:9
247:1,2,4,5 249:1
249:8 258:2,2,22
260:9,10,13,14

263:17 275:18,23
276:5,9 294:11
299:8,11 301:21
303:10 331:19
348:2
**healthcare** 48:20
68:15 91:4,7,22,23
92:9,14,17,18,22
93:20 94:14,15,20
103:5 120:13
123:3,6 124:15,21
133:9,18 134:19
149:20 159:8
168:9 193:12
194:4,10 198:7
295:11,17
**healthcare's** 168:2
**healthier** 59:3
**healthy** 231:6
**hear** 45:25,25
229:18 333:1
356:9
**heard** 89:17,18
126:25 127:2,12
140:22,22 149:25
191:4 338:6
355:20
**hearing** 290:23
**heart** 372:5
**held** 42:1 186:13
**heller** 4:21 12:20
12:20
**hello** 314:7
**help** 59:3 90:20
104:20 132:12
144:6 185:16
217:18,21 247:7
249:16 250:7
257:24 263:7,8,8
282:9 288:15
295:13 331:23

364:12
**helped** 279:9
**helpful** 38:8 93:15
  108:6 252:14
  286:3,4 298:25
**helping** 277:8
  286:23 293:20
**helps** 232:1,2
**hepatitis** 301:12
**hereinbefore**
  377:9
**herman** 2:19 7:6
  10:16,19,20,20,21
  10:23,25 11:22,22
  108:3,4 185:18
  216:8,19 314:3,6,7
  318:7 322:24
  323:1 325:10
  332:15,19,22
  356:7 358:10
  359:12 360:10
  367:25 368:24
  375:21
**heroin** 29:19,25
  219:24 326:14
  327:1 367:23
  369:14 373:11,21
  373:23,24 374:7
  374:12 375:7,9
**hey** 67:24 119:13
  142:22 167:25
  189:23 274:1
**hi** 320:9
**high** 31:15 39:10
  39:10,13 51:9,12
  65:16 66:9,21
  68:14 134:2,6,23
  136:10 171:25
  172:14,16,17
  205:15,17 206:1
  235:2,14 236:4

246:18 247:18
  298:13 323:9
  325:4,7,14 351:18
  369:9 370:24,25
**higher** 334:25
  335:2
**highest** 64:12,20
  65:4
**highlighted**
  370:18 371:9
**hip** 283:23
**hire** 90:24
**hires** 93:22
**historical** 288:17
**historically** 183:8
**hitting** 279:17
**hoc** 50:13
**hoffine** 130:20,21
  130:22
**hold** 38:13 115:13
  119:10 125:4
  187:21 350:12
**holding** 186:1
**holistic** 49:5
**home** 44:12,13
  117:12,13 174:4
**homes** 97:16 135:7
**honest** 279:10
**honestly** 178:1
  210:6 211:7
  311:16
**hope** 203:14 227:4
  242:2 273:12
  286:5
**hopeful** 239:18
**hopefully** 149:10
  239:20 246:4
  314:10
**hopelessness**
  214:8

**hoping** 249:7
**horrible** 271:2
  343:25
**hos** 65:18
**hospice** 29:15
  44:10,14 65:18
  135:7
**hospital** 27:11
  34:2,20 42:14
**hospitalist** 34:11
  34:15,16 35:3,23
**hospitals** 29:7
  283:18 285:14
**hour** 19:18
**hours** 184:18,21
  185:2 289:15
  332:25 371:24
  372:4,24 375:23
**house** 94:12 133:4
  133:14 134:17
  193:11
**housed** 79:1
**housing** 190:8
  351:13
**huge** 169:6,7
**huh** 15:20 16:1,1
  16:12,17 21:4
  22:23 24:19 27:9
  31:21 35:13 40:17
  41:8 49:24 50:1
  50:12 57:13,23
  59:20 62:2 68:9
  69:18 73:2 81:24
  85:9,25 86:25
  88:24,24 90:13,15
  90:18 94:10,16
  95:14 98:1,3
  100:14,16 106:19
  108:22 111:15,15
  112:10 114:7
  124:20,25 129:20

132:25 133:3,15
  136:24 138:2,12
  142:7 145:17
  147:16,18 153:7
  153:13 158:14
  162:20 167:17
  184:12 187:25
  191:19 192:10
  194:24 200:13
  203:3 204:12,14
  204:16 205:2
  206:10,12 225:2
  226:16 229:4
  236:9 241:25
  244:17 245:3
  252:9 253:10
  256:7 264:23,25
  264:25 267:11
  268:2,7,22 269:12
  269:14 275:6,21
  276:24 281:19
  284:4,18 286:10
  287:5 288:19
  297:3,16 298:5
  303:1 313:13
  326:4 327:23
  328:13,16 329:13
  332:7 334:22
  337:7 340:4,22
  341:18 345:10
  347:3 348:22
  349:3 350:21,23
  351:12 353:10
  354:10 360:23
  361:16 362:4,13
  365:3 367:3
**human** 62:9
**hundred** 258:12
  276:19 282:17
  324:14,16

hundreds 66:20
hunter 2:8,10 12:9
  358:1
hurry 233:16
hurting 317:17

**i**

iap 260:23 261:8
ibuprofen 160:21
idea 204:6 224:14
  245:15 260:3
  265:9,17 282:11
  309:5 316:23
  317:11
ideal 218:20
ideally 204:3
identical 112:2
identification
  22:11 23:3,24
  25:13 39:9 62:14
  79:16 120:3 129:8
  171:10 173:8
  175:6 191:13
  206:19 221:7
  257:2 278:15
  291:13 301:24
identified 18:8
  39:12,12 57:11
  134:10 142:24
  143:10,19 190:2
  198:17 205:16
  271:25 320:16
  362:16
identifies 193:24
  194:23 205:14
identify 40:11,12
  40:13 101:7 141:6
  142:10 144:6
  171:15,21 172:1,9
  172:10,21 173:11
  173:15,17,17,23
  182:22 189:20

195:11,19 198:4,5
  198:15 206:3
  212:10 234:25
  235:13 239:23
  260:24 265:11
  269:10 282:5
  283:19,25 284:1
  284:12 310:4
  311:18,22,25
  312:7 313:4
  327:18 354:4
  364:3,15
identifying 138:4
  138:8,11 236:3
iffy 271:9
ii 64:10
iii 64:10
illegal 181:14,24
  220:9 270:4
  274:15 275:13
  368:21
illicit 326:14 327:3
illinois 3:21
illness 17:14 44:15
  45:1 205:15,17
immediate 154:15
  155:23 205:10
immediately
  319:19 320:2
impact 7:17 70:3
  79:12 82:22 83:18
  83:21 88:14,25
  209:20 245:17
  303:16 306:23
  307:9 343:24
impacted 273:9,11
  273:18
impacts 273:14
implement 183:25
  241:16 243:20
  295:15

implemented
  241:9 242:19,24
  243:18 246:15
  248:1,14 249:4,23
  253:11,13,15
  303:12
implications
  194:17
important 16:15
  16:19 76:6,11,23
  321:15 352:3,24
importantly
  179:10
importation
  375:16
improper 181:7
  181:13 182:11
improvement
  132:9 234:12
inability 332:11
inaccurate 178:14
inappropriately
  349:24
incarcerated
  250:1 251:4,4,17
  251:17,24 252:7
  252:11
incarceration
  249:19
incentive 227:9,15
  227:22 228:6
  231:7 233:3,11,13
  233:17
incentives 58:24
  228:4,10,22
  229:10 230:11
  231:23 232:7,13
  233:5
incentivize 59:1
  231:18 233:9

incentivized
  231:17
incentivizing
  248:16,18
inception 361:7
include 65:17,19
  68:19 138:4,7,10
  138:15 151:10
  190:4 246:21
  353:24
included 118:2
  176:11 282:20
  378:13
includes 24:7
  87:15 146:1
  258:21 266:9
including 95:24
  123:20 126:22
  161:18 197:2
  246:22 265:3
  266:4 282:7 290:6
  290:15 338:14
  374:11
inclusion 146:10
  245:12
income 284:22
incorporated
  380:12
increase 32:25
  83:12 84:6 253:21
  333:8,16 336:22
increased 84:2
  253:25 335:20
  356:15 358:16
increases 181:1
  336:14
increasing 254:4
  335:12
indiana 2:17 11:23
  314:8

indicate 193:22
indicated 179:6
indicating 378:13
indications 226:21
individual 107:19
122:10 125:13
139:11 163:25
173:16 205:12
294:10,19,20
308:19 358:3
individuals 30:4
39:12,16 81:9
197:23 240:15
246:19 251:4,17
260:24 323:23
335:19
induced 205:15,17
industry 21:16
299:4
inexpensive
331:11
infections 43:13
inflammatory
33:20 160:20
165:3
influence 157:11
influenced 310:24
information 17:16
19:24 20:2 27:24
28:2 67:15 68:11
69:7 70:17 78:24
101:13,18 109:18
109:20 110:12
112:8 118:2,17,22
119:4,11,14
126:10 137:25
138:3,5,8,11,15
143:23 170:9
199:13,14 203:19
210:15,18,23
236:17,24 249:2

252:22 275:5
286:17 298:11
314:23 319:15
339:23
informed 348:14
ingredient 118:9
118:11
inhaler 198:9
inherit 44:18
inherited 358:8
361:6
initially 47:2
initiate 38:9 43:17
initiation 367:15
initiative 38:18
39:5 240:17 289:3
362:20
initiatives 8:15
37:23 50:13 76:9
178:25 291:10,23
292:10,16
injection 367:15
367:21
injections 162:22
injuries 43:12
inmate's 252:5
inmates 349:20
innovate 58:25
innovation 57:13
57:18,22 58:20
59:4,9,13,25 61:15
239:7 260:23
261:16 263:17
innovations 58:23
inpatient 34:18,22
input 130:3
inputs 119:2
insert 367:19
insist 319:25
inspector 62:9,22
359:19 360:6

361:1
instance 70:20
143:10 168:3
181:25 182:2
201:18 205:23
240:14 303:6
instances 45:14
195:5 351:24
instantaneous
114:6,11
institute 241:21
282:6
instituted 245:2
276:3 348:14
instruct 106:23
186:25 187:14
instructs 16:25
insulin 301:13
insurance 35:7,12
35:17,20 36:8
252:21 270:14
338:21 339:8
insure 236:13
insured 84:23 85:2
85:15 86:3,8,21
87:9 334:15
336:11
insurer 8:7 221:3
223:16 224:18
231:4 365:15
insurers 140:8
224:2,22 225:23
225:24 228:10
232:7 234:25
235:12 236:15
237:4,11 238:15
241:4 242:14
243:10 244:7
246:10 248:8,25
249:16 253:7,20

integrate 247:4
integration 260:14
integrity 136:14
143:1 294:4 364:1
intended 117:16
179:13 218:19
intends 261:16
intensively 215:15
intention 22:20
130:12
interact 95:12,13
144:5 298:2
interacted 41:13
292:21 293:7,16
294:10,22 295:5
295:18,21 296:4,9
interacting 60:17
60:18
interaction 59:24
92:9 110:22,25
112:24 298:15
interactions 36:18
36:21,23 61:13
293:25 296:19
298:7,21 299:6
interacts 338:3
interagency 7:23
175:1 261:22
264:5
interchange 128:3
interdiction
364:24
interest 106:9
107:5,6,13 149:17
interested 377:13
interesting 366:17
interestingly
31:25 32:3
interface 128:10
128:12

**interim** 35:4
**interject** 106:6
**internal** 40:9
  135:21 159:9
  259:11
**internally** 98:6,12
  150:10 152:12
  277:11,11
**internet** 274:16
  275:14
**interpreted** 226:5
**interrupt** 332:20
**interruption** 252:5
**intervened** 351:23
**intervention** 38:5
  198:17 214:5
  241:24 243:9
  360:8 361:11
**interventions**
  203:22 204:2
  281:17
**introduce** 221:1
  358:1
**introduced** 316:8
**intrusive** 169:21
**investigate** 134:21
**investigated** 143:3
  274:15 275:8
**investigation**
  136:4 275:4 313:2
  313:5
**investigational**
  135:20
**investigations**
  274:7
**investigators**
  313:10
**invitation** 197:18
**invited** 281:13
  365:22

**involve** 15:6 26:23
  168:8
**involved** 37:20,22
  39:8 49:18 50:18
  51:6,8,12 73:15,18
  80:2,7 114:23,25
  115:1 148:25
  175:12 179:14
  223:11,16,18
  249:23 258:13,16
  258:18 263:15
  264:4 269:15
  277:3,6 281:10,12
  281:15,25 282:5,9
  282:14,19 283:5
  293:24 313:10
  365:25
**involvement** 63:1
  63:4,8
**involves** 283:17
  294:7 343:7
**involving** 239:8
**issue** 68:3 117:24
  117:24 142:14,15
  142:15,22 173:22
  195:1 213:15
  216:24 232:10
  239:1 272:20
  285:1 307:12
  333:21 373:16,23
**issued** 87:23
**issues** 47:24 58:1
  85:22 92:25 94:3
  102:13 104:16,17
  105:3 131:23
  141:10 190:10
  220:3 319:19
  338:11
**italics** 207:8 209:6
**items** 362:3,5

**iv** 29:6 327:3
  374:9

## j

**j** 2:8 8:19
**janet** 8:19
**janssen** 4:15 13:1
**january** 245:23
  246:5 253:12,14
  267:19 268:1
  276:3 301:9
  361:18,22
**jeez** 26:14
**jill** 95:1,3
**jim** 258:21
**job** 34:13 41:14,17
  187:4,19 202:2,3
  252:6 361:8
**joe** 19:2,2,9,10
  105:21 106:17
  107:14 108:5,7
**john** 7:11 174:4,12
**johnson** 4:15,15
  13:2,2
**join** 41:11
**joined** 36:1 40:25
  41:9 248:21
**jones** 3:4 11:25
**jonesday.com** 3:7
**joseph** 108:8
**judgment** 195:16
  339:12
**julie** 4:9 12:13
**julie.babtist** 4:14
**july** 25:6,18 62:10
  276:7 359:21
  361:2 377:21
**jump** 303:20
**jumped** 80:14
  83:9 161:25
**jumping** 306:3

**june** 63:16 65:15
  66:7 221:4 323:6
**jurisdiction**
  176:17
**jurisdictions**
  161:17 177:2
  212:9 282:15
  290:7,15
**jury** 368:18
**justice** 274:7
  297:19 364:14
**justify** 158:21
**justifying** 35:20

## k

**k** 5:5
**keep** 89:21,21 90:2
  124:15,22 144:16
  161:11 171:13
  230:5 316:25
  350:24 369:13
**keeping** 162:4
**kelly** 8:19
**kept** 159:7 195:5
  199:25
**key** 44:16
**kids** 239:23 240:1
  326:24
**kind** 31:16 32:18
  39:17 49:5 54:10
  60:11 67:14 68:1
  100:4 101:22
  106:11 117:14
  118:4 131:23
  132:7 143:12
  144:1 153:9
  163:21 172:5,6
  176:21 185:9
  187:17 198:23
  199:25 212:24
  232:1 260:2,5
  264:5 266:10,21

270:14 272:12
276:9 279:18
282:7 285:1,23
292:7 326:20
330:3 337:25
341:6,8,9 360:25
367:18
**kinds** 28:25
239:18 285:21
340:2 344:7 350:1
**kirkland** 3:20 12:5
**kirkland.com** 3:23
**knapp** 3:20 7:6
10:16,17,18,19,21
10:24 12:5,5
107:17,18,24
108:1 229:19,23
300:17 303:20,24
304:1 306:21
307:7 309:13
310:2,13 311:8
312:20 313:25
341:22 342:1
354:15,20,22
355:24 356:18
357:11,14,16,20
363:11,19 368:23
375:22
**knee** 283:24
287:21
**knew** 44:3 66:20
67:10 190:11
212:22 221:18
311:24 356:13
**know** 15:17 18:25
22:5,5 28:6 29:10
30:7 31:19 32:24
42:22,24 43:6,9,21
43:24 44:7 49:10
53:6,11,14,19,23
54:1,2,18,19 55:5

57:3 58:20 59:6
60:8,14,21 61:10
61:18,24 62:1,2
63:4 64:18 65:2
66:5,14,16,16,18
66:19 67:11,11,19
68:7,12 69:8 70:4
70:8,15,19 71:5,9
74:13,18 77:15,19
77:19 78:1,18
79:3,4,5,6,8,20
80:21,24 83:1,11
83:14 85:17 86:19
87:4,8 88:19 89:3
89:8,15,23 94:1,7
95:1 97:3,19,24
98:5,19 102:3,6
104:6 108:20
111:8 112:17,17
112:18 114:25
115:3 116:24
117:1,11 118:19
121:15,16,16,20
122:6 123:16
124:14 125:15
126:1 129:22
130:14,18 131:13
131:17 132:9,20
132:23 133:25
135:3,10,23
136:12,14,16
137:1 140:4,10,12
141:18,22,24
142:1,4 143:11,25
146:17 147:22
148:10,24 149:18
149:24 150:19
153:5,8,20 154:1,7
154:23 155:17
159:16 169:5,15
169:17 170:11,21

170:24 171:4
172:13,13,18
173:21 174:11,17
176:6,7,15,17,19
176:20 177:22,25
178:5,6,9,10
181:24 182:20
184:2 185:9
187:15 190:14
191:4,5,6 194:5
195:7 197:16,20
198:8 201:9,16,18
201:20 203:6,16
204:6,17 205:18
205:22,23 210:7,8
213:2,8,10,11
214:6 215:10,10
216:3 217:19,20
219:9 220:13,22
220:23 222:17,21
223:17,19 224:15
225:12 226:2,6
227:4,20 228:3
231:4,5,7 232:12
232:13,20,25
233:1,5,8,20,21
236:2 238:24
239:21 241:15
242:25 244:1,20
248:11 250:11
253:3 254:9 257:8
257:10 258:8
259:3,9,10,11
260:5,15 261:13
261:15 262:21,24
263:5 264:1 265:5
270:11 271:6,23
271:24 272:5,14
274:19,22,23
275:15 276:22
277:21 279:8,10

280:18,20 281:1,6
282:13,18,19
284:17 286:7,8,13
286:14 287:3,4,20
288:6,8,10 289:10
291:1,4,5,24 292:9
295:25 296:13,20
297:10,12 298:12
298:23 300:12
304:1,18,19,21,21
305:16 306:1
308:14 309:4,5
310:22,23 311:3
313:14 314:10
322:23 324:1
326:20 331:20
333:10,11,12
338:2,5,6 342:11
342:12,12,13,25
343:15 344:20
346:4 352:19,24
353:1,3 354:2
356:20,22 357:5,8
365:23 370:10
372:4 374:23
375:4,10
**knowing** 174:20
312:18
**knowledge** 63:9
66:15 69:9 92:6
116:7 134:3
138:24 170:10
204:23 211:18
214:24 215:6
222:8,22 223:8
243:22 256:15
272:4 290:5,13
296:7 299:10,12
299:14,17 300:6,9
304:10,14 305:21
305:25 310:4

313:17 337:22
354:1 355:25
356:4,10,12,14
374:5
**knowledgeable**
92:13 114:13
159:11
**known** 299:19

**l**

**l** 6:1
**lab** 26:20,22 27:1
**label** 291:16
**labeled** 178:4
**laboratory** 26:19
**lack** 214:5,5
**lag** 69:12
**lakeside** 3:5
**landed** 265:9
**language** 242:16
335:17,25
**large** 80:24 236:15
236:23 258:20
262:11,11 270:7
**largest** 86:23
370:24 371:10
**lasalle** 3:21
**late** 271:13 345:7
**lately** 205:23
250:16
**latest** 266:16
**law** 5:11 11:17
14:3,8 15:24
77:25 117:23
135:23 144:5
174:2 193:18,21
252:13 270:3
271:15,21 272:7
272:11 273:6
296:9 298:4 350:9
350:11

**law's** 272:3
**law.com** 3:13
**lawful** 14:2
**lawsuit** 106:9
107:8
**lawyer** 11:17
324:23
**lawyers** 288:9
**layperson** 42:23
**lazarus** 4:11
**lead** 29:15 40:1
356:16
**leaders** 149:10
**leadership** 41:16
258:21 297:8
**leading** 273:2
326:23 367:6
**leads** 142:15
**leak** 372:6
**learn** 27:21 28:2,8
28:12 30:12,23
31:5 33:14 135:1
**learned** 28:4,6
30:20 45:15
209:22
**learning** 287:1
**led** 41:11 238:2
294:6
**left** 35:2 372:23,23
**legal** 4:9,10 12:11
12:14 53:25 64:12
174:9 182:7 214:4
214:5 313:8 364:4
378:1 381:1
**legalese** 21:10
**legally** 64:20 65:5
**legend** 370:16
**legislative** 47:23
249:10 298:17
**legitimate** 29:18
29:24 30:3,8 74:6

117:6,19 169:19
229:8 373:25
374:2
**legitimately** 29:1
29:11 74:10 75:2
75:24 117:2
374:13,16
**length** 329:1 337:5
340:18 342:21
**letter** 7:11 8:9,17
22:15 23:4,13,14
24:24 25:22 39:17
45:21 108:12
211:17 256:11,12
256:20 257:7,9
301:19 302:6
378:19
**letters** 134:11
198:20 203:23
**level** 51:9,12 67:8
139:18,22 212:25
298:13 340:14
**lever** 174:14
**leveraging** 265:3
265:15,19
**levers** 78:5
**lewis** 5:11
**lexington** 2:9
**lgates** 3:7
**liable** 350:12
**liaison** 94:20
102:1
**license** 42:1 71:23
142:16
**licensed** 41:23
174:8
**licenses** 349:23
**licensing** 141:2,6
141:21 142:9
144:13,13

**licensure** 77:19
88:6,20 141:10,10
142:14,15 143:2
144:2 181:21
218:6 273:10,11
273:15,18 290:22
**lies** 77:14
**likelihood** 156:25
**limit** 169:8 186:19
**limitations** 122:4
**limited** 44:2 90:11
139:24 184:21
186:20 229:20
251:18 362:18
**limiting** 38:12,13
69:23 328:25
**limits** 56:5 72:12
72:16,17 122:2,2
180:23 277:1,4,8
277:10,16,24
278:6 280:9,19
342:8 351:20
355:17
**linda** 1:24 2:3 12:7
319:3 377:6,17
**line** 8:22 9:3 10:3
100:24 130:13
132:22 169:12,18
307:24 311:1
321:14,19 324:14
325:24 346:7
378:13 380:7
381:3
**lines** 139:13
198:11 335:18
336:2,7 348:9
**link** 348:11
**linked** 348:1
**linn** 4:5 7:12 9:4
9:17,20,23,25 10:5
10:10,11 12:15,15

22:15 33:2,6,9
46:1,6,8,12 54:8
54:13,20 55:1,3,8
55:10,13,16 56:10
56:12 76:15 90:13
90:15 106:6,16,19
106:25 107:4,22
107:25 108:2,7
109:23 110:2
120:6 136:20,24
144:14,18 184:8
184:19 185:8,17
187:3,25 216:1,15
221:13,17,21
222:10,12,14
232:15,18 235:7
256:11 259:7,19
289:13,16 297:16
300:21 303:19
306:20 307:2,4
318:15,17,19
320:9,11,13,17,18
320:20 332:1,7
356:19,23 369:23
370:8 371:14,23
372:1,10,12,15,22
376:2 378:5
**lisa** 3:3 11:25
**list** 24:15,18 26:1
29:22 120:19,22
121:3,9 123:11,25
125:25 145:23
146:5,14,18 148:3
149:25 150:1,5,12
152:5,11,17,24
153:5,9 154:2,16
155:15 156:7,12
156:14 157:2,11
157:15,20 158:8
162:8 164:8,9,21
167:4,15,19 171:9

190:20 203:8,10
208:10,24 211:16
220:17 252:7,11
262:25 267:8
270:2 275:16
283:4 292:16
293:3 296:10
299:3,4 301:5,9
304:9,12,16,20
305:7,19,23
344:10,16 345:2
346:23 352:2
354:13,25 360:13
362:1
**listed** 23:12
108:11 164:3
176:13 192:21
200:22 211:16
223:1 264:16
302:6 303:2
362:11 380:7,17
**listing** 364:23
380:7
**lists** 121:11 150:10
150:14 153:25
286:13 324:14
**literally** 202:3
239:10 241:23
270:15 276:5,7
317:12
**literature** 268:20
375:3
**litigation** 1:6 8:13
8:16 11:11 19:23
54:6 178:8 203:17
273:21 278:23
288:5 297:11
378:6 379:3 380:3
**little** 32:19 41:20
43:19 46:10,18
48:18 67:5 69:2

69:11 84:24 98:16
101:5 113:10
160:12 180:6
185:5 208:3
227:20 229:2
239:8,20 250:25
265:10 302:3
307:12 332:23
333:1 341:12
367:18 372:13
**lives** 276:20
**llc** 2:3,17 3:10
11:23 314:8
**llp** 2:13,19 3:15,20
4:17,22 5:11 13:1
**local** 44:13 144:5
298:3
**located** 111:4
129:17 192:1
221:15
**lock** 198:24 199:1
199:9,12 244:8,12
244:20,25 245:1,8
248:2 295:2 328:2
329:6 362:22
**locked** 245:14
**locks** 245:15
**long** 19:17 31:11
35:22 39:20 43:16
43:21,23 44:8
45:12 48:16,24
61:18,22,23 62:1
79:6 86:6 88:13
121:15 158:3
168:4 170:19,22
171:1,5 182:4
209:16 222:4
231:1,15,20 239:3
268:18,24,25
271:7,11,13
275:24 279:20

280:17 304:2,11
304:15,19,24
305:12,22 306:15
308:23 314:10
315:5 325:21
329:16 340:7,8
343:2 352:2
360:13
**longer** 29:13 46:1
84:12 141:13
184:9,10,14
201:19 251:2,15
263:18 289:17
320:7
**look** 23:14,14 24:6
52:7 53:9 60:7,10
64:6 67:3 74:3
79:19 92:25 93:1
95:23 110:24
117:21 120:8
126:18 129:12
132:10 135:18
138:19 139:1,4
148:4,10,15 152:9
167:23,24 171:24
172:5 174:19
175:9 183:17
184:11,13 192:11
198:7,8,11 199:13
201:19 210:7
221:10 223:19
231:20 263:11
270:24 272:24
285:16,22,22
315:16 316:4
324:11 345:12
346:2,2 360:7
**looked** 24:25
67:17,19,20 68:7
170:4 285:12
360:1

**looking** 39:11
48:14 52:24 58:23
58:24,25 67:25
68:11,12 70:8
71:6,7 78:19
80:11 139:23
146:25 147:13,14
172:8 173:3
177:14 200:19
201:17 209:18
226:22 239:22,24
239:25 240:4,10
264:13 267:1,3
272:21 274:2
285:8 286:25
287:20 288:10,16
292:13 294:8
303:8 335:23
339:17 345:15
346:6,23 359:22
360:2,3,25 371:8
**looks** 184:7 201:14
209:18 286:8
291:10 292:4,5,16
372:22
**loop** 93:18 374:22
**lori** 8:19
**lose** 136:5
**losing** 142:16
343:13,14
**lost** 230:10,10
251:24
**lot** 44:14,14 48:19
67:7 86:16 89:12
89:13 91:12,18
97:14 174:12
178:23 205:23
231:3 240:3
242:21 275:17
281:4,5 284:8
298:9 308:20

316:6 317:10
331:17 338:9,11
352:8 369:12
**lots** 212:15,15
248:22
**loved** 343:13
**low** 43:24 285:5
323:15,18 332:17
334:21
**lower** 336:10
**lsinger** 2:6
**lsw** 8:19
**lucas** 370:17
**lunch** 183:14
184:6,16
**luncheon** 188:3

**m**

**m** 2:20 3:9 127:1
127:13,14 322:21
**m.d.** 1:13 6:5 7:4
14:1 377:9 378:8
379:4,9 380:4,13
381:20
**madam** 378:10
**madison** 107:9
**magic** 284:9
**mailings** 180:4
**mails** 52:12
**main** 4:17
**maintain** 44:20
52:11 91:12 155:4
**maintained**
113:22 131:24
**maintains** 150:11
196:21
**major** 346:24
**majority** 44:24
64:8 81:8,11,13,14
100:5 220:6 330:9
330:20,20 337:24

**makers** 298:16
**making** 147:8,15
152:13 155:6
169:14 203:21,23
249:13 307:14
339:12 344:17
**malpractice** 15:4
**manage** 48:15,21
50:2 59:2 67:14
68:21 78:2 246:20
**managed** 34:18
36:1,2,15 43:15
44:12,14 48:14
58:5 60:24 61:1,3
61:7,9,14,20 67:7
67:9,9,10 87:15,16
87:17 90:23,24
93:21 95:16,19,23
96:2,21 97:1,14
103:8 104:21
110:2,9 111:25
125:5,13,18 126:7
150:2,14,15
193:11,17 196:18
196:19,25 197:1
222:24 223:2,18
226:11 233:22
234:7 235:24
236:9 242:8 245:2
246:16,17,19
247:2,10,15
249:25 250:4,6
260:12 271:19
276:6 282:3 301:3
301:7,15 329:5
332:4 337:6,9,20
337:25 338:4,15
**management**
30:12,25 31:6,8,18
31:23 32:10,21
35:5,8,15 36:7

37:14 61:13 72:21
74:7,15 93:2
98:15 103:17
139:12 154:24
169:19 190:8
227:3 241:23
245:13 247:17,18
282:8 295:4 299:8
302:21 303:9
309:2 338:23
352:7
**manager** 49:1
90:25 250:7
**managers** 246:22
**managing** 48:14
169:12
**mandated** 329:5
**manipulate** 155:7
**manner** 92:23
196:12 308:25
**manpower** 169:23
**manu** 112:11
**manual** 7:20
119:25 120:12
**manufacturer**
73:14 150:24
151:7,8,20 152:15
152:19 295:24
305:24 355:14
356:2
**manufacturers**
73:18,20 149:16
218:2 233:6
266:15,23 295:20
295:21 299:19
300:20 310:25
311:3 358:4
**map** 370:15 371:4
371:4
**maps** 370:13

**march** 287:1
**marcus** 4:22,24
  12:21
**mark** 22:7,14
  25:10 62:6 79:9
  119:22 129:3
  174:24 191:9
  206:14 278:9
  291:8 301:19
**marked** 7:10 8:3
  22:11 23:2,24
  24:3,25 25:13
  51:20 52:22 53:11
  54:5 62:14 79:16
  120:3 129:8 175:6
  191:13 206:19
  221:7 256:19
  257:2 261:20
  278:15 291:13
  301:24 341:21
**market** 147:24
  353:25
**marketed** 306:6
**marketing** 73:21
**marketplace**
  368:19
**mary** 8:17 47:7
**massive** 169:25
**mat** 163:17 164:5
  173:4 253:9 260:2
  267:10,12,16,25
  268:3 269:5,20
  301:12 303:7
  315:20 329:18,20
  330:2,6 332:17
  335:12 349:9
  365:5,8
**maternal** 189:22
  189:23
**math** 324:24
  328:20

**mats** 316:3
**matter** 11:10 25:4
  139:7,9 221:23
  222:5 249:13
**mature** 240:19
**max** 127:11
**mba** 8:18,20
**mc** 93:13
**mckesson** 2:11
  11:18,20 14:9
  25:5 301:1
**mckinsey** 286:22
  287:3,24 288:12
  288:15,22
**mcnamara** 3:15
  105:11
**mco** 98:18,20
  99:10,11 100:7
  112:12
**mco's** 112:12
**mcos** 96:13 97:18
  99:12 100:12
  101:21 102:9,16
  103:12 116:5,6
  140:4 302:19
**md** 1:6 8:18,18,18
  8:19
**mdl** 107:21
**mean** 22:4 28:19
  32:4 34:4 42:22
  42:24,25 43:2,14
  43:15 49:10 50:2
  51:4 52:11,23
  54:15 55:1 56:21
  57:20 58:16 60:19
  63:25 66:10,11
  67:4 83:16 86:13
  86:16,18 94:12
  97:2,5,25 99:21,25
  102:5 108:17
  113:23 114:6,23

117:11,21 123:18
124:23 125:5,10
129:22 131:13,15
131:16,16 135:8
136:15 142:13
143:16,21 147:17
147:19,20 152:3
152:15 153:6
154:5 156:19
159:13,15 166:25
167:13 173:22,24
179:20 184:15
185:15 187:12
197:22 200:16
202:19,20,25,25
203:24 209:22
210:5,9,11 213:8
213:11,12,14
214:2,3,6 216:1
217:6,14 220:13
222:2 225:12,14
225:18,22 228:22
228:23 232:3
234:14 247:14,21
265:23 266:5
267:18 270:22
271:15 272:2,19
272:23 277:9
280:17 281:2
286:11,16 315:3
323:15 325:19
332:2,20 333:13
341:2 342:3 343:7
358:14 369:2,3
372:1 374:24,25
**meaning** 64:11
338:24 340:7
**means** 87:14 91:9
124:9 172:1
232:12 266:6
268:13

**meant** 265:21
**measure** 32:19
  49:15
**measurement**
  285:12
**med** 27:8 31:20
  202:5,6,8,12,16
  257:17 322:21
  324:22
**medi** 153:22
  335:18
**medic** 367:2
**medicaid** 1:11 4:2
  4:10 7:15,16,18,19
  7:21 8:5,10,14,16
  12:12,14,17 14:17
  14:19,20 18:10
  19:4 20:13,22
  22:16 23:10 24:24
  25:5,18 33:10
  36:2,15,18,22
  37:23 39:2 40:8
  40:25 41:10,12,19
  46:11,17 47:20
  50:20 52:19,20
  53:8 55:11,21
  56:16,21 57:3,25
  58:1,16,22 60:11
  61:5,23 62:10
  63:15 64:9 65:4
  65:15 66:8,21
  67:8,18,23 68:21
  69:6,8,8 72:8,9,14
  77:5,9 78:16,23
  79:2,12 80:13,23
  81:5 82:22 83:8
  84:1,22,25 85:13
  86:2,5,20 87:7,13
  88:25 89:1,8 91:3
  91:14,16 92:8
  94:1,22 96:12

108:17,19 109:9
109:10 112:1
119:24 129:4
141:12 144:25
145:4,20,22 147:6
150:25 157:24
161:16 164:23,24
166:4,4,9,11,13
167:8,24 174:7
175:3 176:5,7,12
176:20,25 177:5,8
177:12,23 178:16
178:19 182:6
186:16 187:2,4,11
189:22 200:1,8
201:23 205:14
206:15 210:20
216:11 224:5,11
226:12 229:11
233:24 234:9
248:1 251:1,3,16
251:18,24 252:6
255:3,8 257:16,17
260:22 261:10
262:6,9,13,22
264:11,15,16
267:10,15 268:4
273:8,17 278:22
278:24 282:13,21
288:17 291:17
294:7 313:22
314:25 323:8,24
328:18 330:5,21
332:3 333:9,17
334:13,20 335:2
336:9,16 337:2,24
338:7,8 339:5
340:16 349:10,11
349:14 351:9
352:22 359:20
363:25 364:3

**medicaid's** 17:24
23:5 54:3 110:14
177:11 178:20
211:18 316:8
**medicaid.ohio.gov**
4:13,14
**medical** 26:15,19
27:1,19,21 28:3
29:18 30:13,21,25
34:12,17 35:2,4,5
35:9,20,23 36:10
37:1,4 39:25
41:21,23 42:7,8
47:3,7,15 71:23
72:20 95:24 97:13
98:14 109:21
140:6 142:5,9
158:23 190:4
199:13 250:9
270:10,20,21
277:7 301:20
367:2,12,13,14,23
**medically** 117:19
182:12,19 310:6
310:15 311:1,23
312:14,22 313:20
**medicare** 90:22
96:14 145:1,6
153:10 364:15
**medication** 31:14
31:17 65:20 98:14
98:15 103:17
109:9 117:15
122:7 146:22
147:1 163:18,19
173:4 192:24
194:15,17,23
195:11,12 196:10
205:12 227:12,16
228:15 231:10
241:22 253:8

267:13 325:21
335:3,20 366:25
373:13 374:1,2
**medications** 17:13
28:16 29:5,6,7
39:14 44:5 113:17
151:11 154:22
156:11 161:1
165:8 174:21
192:19 205:11
224:7,24 232:8
243:24 266:9
305:9 309:10
317:3 327:6
**medicine** 27:3,14
34:2 39:19 117:13
142:5,21 174:12
179:11 258:4
266:11,13 271:1
317:16 326:21,25
338:25 341:17
349:22 368:4
**medicines** 33:21
33:21,23 327:2
**meds** 39:10,11
134:9,15 158:16
**meet** 18:1,3,12
19:13,17 37:5
151:2 266:18
285:25
**meeting** 8:6 106:2
206:16,24 207:1,5
365:23
**meetings** 37:3
51:11 105:24
106:4 197:14
200:4 206:9 353:8
353:22 354:1
355:7,11 356:3
**meets** 92:18
174:10

**melinda** 263:20
**member** 89:18
180:3,4,4 203:19
231:9 269:19
343:9 352:22
**members** 39:9
59:3 67:8 68:21
69:8 84:1,22
90:23 94:25 97:8
147:5 149:7 180:9
196:16 197:16
199:14 208:1
223:3 226:25
231:5,14 241:22
242:20,22 243:23
245:6,17 246:12
248:3 249:3,17
252:8,11 263:17
281:15 282:1,5
322:20 323:17
324:4,22 325:8
330:5,21 334:13
334:15 335:3,21
342:8
**membership**
180:18 239:8
**mental** 258:1,22
**mention** 333:14
**mentioned** 78:9
95:15 103:24
105:20,25 126:5
166:10 189:12
249:9 286:21
294:2 298:1,2
303:14 326:20
348:20
**met** 18:20 19:1,3
105:21 107:20
**methadone** 163:7
165:23 269:2

**method** 257:15
**methodology** 78:21
**metric** 266:10,18
**metrics** 239:23 265:4,22 284:21 285:2,22 286:9
**mexican** 375:12
**miami** 27:10 34:1 42:13
**mic** 303:21
**michelle** 20:19,20 48:9,16,18 92:11
**microphone** 255:23
**mid** 32:22
**middle** 207:12 317:6 323:5
**midway** 81:16 82:2
**midwest** 378:17 381:1
**migration** 350:2
**mike** 4:3
**mill** 232:1 270:3,5 270:11,15 271:15 272:1,7,15 273:5 273:24 274:16 275:2 362:12
**milliman** 104:3,9 104:13,14,15
**million** 63:15 80:15,16 82:14 83:10,11 224:5,7 323:17,25 324:2
**mills** 270:6 271:8 272:4,22 274:8 275:8,14 342:6
**mind** 30:1 32:5 58:9 77:3,8 84:14 105:1 126:24

162:17 230:13 293:13 302:15 318:13 327:4
**mine** 15:11 32:1 210:13
**minimized** 317:1
**minimum** 171:14
**minors** 329:2 348:15 362:19
**minute** 41:19 74:3 183:22 255:1 353:15,15 371:17
**minutes** 160:10 200:24 206:25 207:1 269:9 300:18 318:13 371:22,25 372:14 372:23,23
**misconduct** 305:24
**misinterpreting** 366:23
**misreading** 367:21
**missed** 30:15 71:6
**missing** 119:8
**misspoke** 189:20
**misunderstood** 216:21
**misuse** 74:21 75:6 75:11,14 194:1 220:12,20 290:6 290:14,18 291:3
**mitigate** 83:2
**modalities** 226:22
**mode** 28:4
**model** 91:17 96:22 96:23 239:7 283:15
**models** 59:1
**modified** 24:24

**molecular** 26:12
**molina** 96:6,7 98:25 223:4
**molly** 5:4 12:22
**mom's** 316:24
**moment** 23:13 27:20 124:19 153:4 192:11 213:2 290:3
**moms** 189:18,21 189:21,25 190:1,6 190:6,14 352:15 352:18
**monetary** 290:4 291:5
**money** 171:1 270:16 284:14,22
**monitor** 119:3,6,7 122:14 141:6,10 141:21 142:9
**monitoring** 183:7 317:22
**month** 38:14,16 69:12 201:5 209:17 246:2 250:3
**monthly** 37:3,5 200:9
**months** 62:24 99:19 100:2 204:11 335:4
**morgan** 4:5 5:11 7:11 12:15 22:15 378:5
**morgan.linn** 4:7
**morganlweis.com** 5:14
**morning** 11:4 12:10 14:7 329:17
**morphine** 174:5 202:8

**mother** 352:21
**mothers** 343:14
**motivates** 331:22
**motivation** 310:20
**motley** 2:3 12:7
**motleyrice.com** 2:6
**mouth** 343:4
**move** 193:6 231:19 233:19 237:2 242:2 272:16 318:13 342:9 374:9
**moved** 148:22 247:1
**moving** 58:22 96:21,22 144:12 144:20 183:9 245:19 246:5,9,25 247:3 248:23 253:4 262:25 275:16 276:5,24 303:11
**mph** 8:19
**mqcampbell** 5:7
**msis** 78:24 79:7 126:25
**msw** 8:19
**mtm** 98:14 103:17 241:19,21 242:3,6 242:7
**multidisciplinary** 246:11,21
**multiple** 56:25 213:21,23 265:5 279:8 375:3
**multistate** 364:2
**muscle** 205:25
**myriad** 331:8

**n**

**n** 2:19 6:1 7:1 8:1
9:1 10:1 11:1
14:15 48:9 130:22
189:1
**naloxone** 280:9,12
280:16,20,23
350:7,13 351:2,7
365:6
**naltrexone** 163:11
165:25 281:18,25
**name** 14:8,13
18:14,22 60:14
61:19 108:6 118:5
118:8,14,15
130:25 141:22
143:16,16 207:6
263:20 300:25
303:25 309:14,16
349:4 358:1 378:6
379:3,4,15 380:3,4
380:21
**named** 19:9,10
**names** 28:4 48:7
53:23 70:17 95:2
95:9 101:22
132:21 142:1
143:16
**napoli** 2:8 12:9
**napolilaw.com**
2:10
**narrow** 57:12
**narrowed** 54:10
**national** 1:6 8:13
8:15 11:10 118:21
119:18,19 127:16
146:2 153:9 160:2
278:22 299:15
378:6 379:3 380:3
**nature** 21:19
36:20 88:8 210:23

298:7,21 307:15
**naïve** 238:19
239:1 240:15
**ncpdp** 7:21 127:17
128:2,7,21 129:5
129:19
**ndcs** 153:10
**neale** 8:10
**near** 83:24 343:19
**nearly** 63:14
**neat** 284:18
**necessarily** 30:5
43:22 71:25 72:16
77:18,24 124:7,13
124:17 135:1,3,9
136:6 167:4 172:1
179:4 197:3 270:8
270:9 273:2
**necessary** 114:11
117:20 169:10
182:12,19 192:25
218:21 227:1
246:23 250:9
251:2,16 268:14
310:6 311:2
312:14,22
**necessity** 31:18
109:21 270:10,20
270:21
**need** 17:5 27:25
30:5 37:16 38:5
38:16 40:6 44:4
76:1 85:24 89:22
94:7 119:13 122:6
122:15 136:8
169:19 185:5
192:18 229:24
262:11 270:25
275:18 331:24
332:11 371:21

**needed** 169:9
279:19 282:12
**needles** 369:19
**needs** 55:18 86:15
88:13 89:22 97:13
122:6 128:15
163:19 172:3
174:12,16,21
196:13 314:20
317:5 325:25
**negotiate** 151:22
**negotiating** 266:14
**neighboring**
308:19
**neither** 377:10
**net** 7:18 79:13
152:10 153:3
159:14 170:12
**network** 91:13
248:10
**networks** 237:5,12
238:6
**neurology** 70:22
**never** 75:4,10
129:15 167:3
285:12 357:25
365:21
**nevertheless** 75:21
**new** 2:9,9 48:12
56:15 122:23
144:12 147:22,24
148:18 154:4,21
156:22,23 160:9
161:22 168:3
171:8 180:7 207:9
211:14 245:24
266:9,21 295:25
316:7 356:14
**newest** 266:15
**news** 251:22
273:21

**nice** 131:7 139:19
**night** 317:6
**nine** 324:15,16
**nodding** 16:17
**nods** 219:15
355:15 359:14
362:15
**non** 40:3 87:25
350:12 367:2,14
367:23
**nonaddict** 307:15
**nonadherence**
40:4
**noncompliance**
40:4 273:5,9
**noninsulin** 301:13
**nonmedical**
367:20
**nonopioid** 33:21
160:17 164:25
224:24 226:14
227:11,16 228:15
232:8 234:11
**nonparty** 372:3
**nonpharmacolo...**
224:25 232:9
**nonpreferred**
148:14 167:18,20
**nonsteroidal**
33:20 160:20
165:3
**nonterminal**
361:14
**norm** 244:5
**north** 3:4,11,21
**northern** 1:2
11:12
**notarized** 378:14
**notary** 1:25 6:9,11
6:16,17,21 377:7
377:19 378:25

379:10,18 380:15
380:23 381:23
**note** 33:2 144:10
161:9 164:11,16
214:12 215:5,16
218:25 221:21
230:16 378:12
**noted** 50:9 88:1
162:1 217:5 330:4
**notes** 6:11 37:6
223:21 251:15
325:3 327:17,21
328:22 334:12,19
334:25 335:2,17
**notice** 6:9 66:11
164:13
**notified** 204:1
319:20
**november** 1:18
7:11 8:6,9 11:3,7
22:15 24:24 25:22
108:12 189:3
206:16 207:1
211:17 256:20
257:9 376:7 378:4
**number** 38:13
64:3,5 66:15,19
76:8 80:24 82:12
83:13 84:7 89:19
118:7,8,9 169:24
169:25 175:23
177:19 179:11
186:16 197:19
209:20 238:17
278:18 280:25
317:13 323:5,10
323:18 333:16
370:24 371:10
378:7,13
**numbered** 175:17

**numbers** 43:4
72:19 104:8 152:6
152:8 380:7
**nurse** 70:10,16,18
197:24
**nursing** 44:11,13
97:15 135:7 290:6
290:14,17 291:1
**nuts** 59:16
**nw** 2:4,14,20 3:11
3:16 5:12

**o**

**o** 6:1 11:1 14:15
37:23 72:4 102:23
113:12,24 130:22
189:1 259:14
291:9 364:16
**oac** 60:10
**oarrs** 113:5,10,23
126:18,18,19
137:11,15,25
138:20,23 139:2,5
139:8,10,20,25
140:4,5,9,12
175:20 176:2,5,9
176:16 177:7,10
177:21 178:21
265:3,16,16,19
293:22,23 327:22
347:16 348:1,6,12
**oath** 14:3 15:22,24
377:8
**object** 76:15
137:20 186:25
187:6,14 232:15
232:16,18 307:2
325:10 332:24
358:10 359:12
360:10
**objected** 30:17
233:21

**objection** 17:2
30:14 65:6 66:3
75:5,16 87:11
104:10 121:1
124:4 130:6
131:19 144:10
159:18 161:9
164:12,17 167:12
168:24 171:18
173:14 174:1
181:10 182:13,25
213:25 214:12
215:5,16,24
216:16,18,22,22
217:5,11 218:3,12
219:1,5 222:1
225:10 227:18
228:17 229:15
230:16 235:20
255:5 259:7,8,17
259:18,19 261:4
261:12 274:9,18
275:10 290:8,20
306:13,20 307:1
307:23 308:13
309:21 310:10,19
311:6 312:16
313:23 341:22,23
354:15,20,21
355:24 356:7
363:11 365:19
367:8,25 368:11
368:22,23,24
**objections** 8:22
9:3 10:3 16:24
229:19 230:6
356:12
**objective** 229:5
**obligated** 17:1
**obligations** 337:13

**observed** 158:2
326:17
**obstetricians**
248:9
**obtain** 221:14
**obviously** 33:3
55:4 56:8 73:2
106:8 170:20
172:2 173:22
273:14 319:22
**occasion** 44:7
105:22 117:2
**occasionally** 44:18
93:3 143:23 161:3
294:1 295:24
**occur** 21:17,22
61:14,15
**occurred** 207:25
239:25 278:3
**occurs** 327:12
**october** 8:17 87:23
209:14 237:22
240:25 243:2
**od** 69:20
**odm** 8:5,15 14:19
25:24 33:8 37:2
51:19 52:14,14
57:10 63:4,7
64:16,18 65:2,9,10
65:24 66:7,18,19
66:25 68:6,7,12
69:16 70:15,18
71:3,20 72:2,4
76:16,18,23 78:10
80:2 85:6,10,11,11
90:5,9,19 94:9
95:15,19,22 96:2
99:8,13 100:7,8
102:1,8,18,23
103:25 104:20
105:2 110:23,25

111:4,5 112:3,21
114:12,23 115:1,4
117:5,18,24
118:19,20 119:3
119:13 122:14,18
122:25 123:12,19
124:1,16,22
125:10,16,18
126:1,13 129:17
130:18 131:1,11
132:1,5,7,23 133:1
133:24 134:4,13
134:16,17,21
136:8 138:19,22
139:1,4,7,14 140:1
140:2,3 141:4,9
142:8,12,20,21
143:10 144:5
150:16 151:9
155:14,21 156:13
158:2,9,25 159:10
160:13 163:23
166:22 169:2,3,5
170:1,4,11 171:10
171:15,21 172:10
172:21 173:8,11
173:25 179:1,1,14
180:20 182:22
183:6 190:23
192:13 193:9,11
194:1 195:24
196:14,16,23
197:7,10 202:18
204:22 207:16,20
208:14,18 210:14
210:17 211:5
212:7 213:3,6
215:2,8,11,13
216:5 219:7,22
220:10,18 221:23
221:24 222:17

223:2,16,21 225:3
225:5,8,13,19,25
226:3 228:11
230:18 234:20
235:18 236:2,22
237:17,20 238:1,5
238:21,24 239:5
241:9,14,15
242:18 243:17,20
244:13,21 245:4
246:14 248:13,21
249:4,22,25
252:10,17,25
253:11,24 254:5
257:8,19 258:21
259:23 260:22
261:8,15,21
263:15,18 265:1
266:8 269:9
271:21,25 272:6
274:12,24,24
275:6,12 277:2,3
280:13,22 281:10
281:12 282:23
283:5 287:1
290:18 291:2,10
292:21 293:1,6,16
294:10,22 295:5
295:18,20 296:4,9
298:16 299:6
301:3,16 302:17
303:3 304:9
312:10,13,21
319:9 322:5 325:3
325:6 326:16
327:17,21 328:24
329:12,20 331:25
333:5 334:17,23
335:5,8 338:20,21
342:18,22 344:7
344:18,19 348:11

355:9,10,12,22
356:4,21 358:8,12
358:13,21 359:3
361:6 363:4
364:11,16,17
369:25
**odm's** 71:18 74:9
75:1,23 90:3
108:13 112:14
116:17 121:21
128:20 154:2
181:6 182:10,17
192:1 193:13
202:13 203:12
214:24 217:8,12
219:2 222:7,24
232:19,21 256:15
262:8 264:1
272:18,21 301:8
304:11,16 305:23
321:25 325:12
331:6 332:9
335:22 337:5
340:1 358:15,16
360:8
**odo** 71:3
**offenders** 349:6
**offer** 163:23
164:24 281:14
299:22
**offered** 41:16
299:20
**offhand** 103:15
209:2
**office** 12:16 32:12
45:23 62:9,21
106:10 107:6
172:5 274:1 294:6
359:19 360:6
361:1

**officer** 35:2 45:23
**offices** 239:11
**official** 6:13 343:6
379:15 380:21
**officials** 298:17
**ogby** 60:14,15,18
61:25
**ogby's** 60:14,22
**oh** 26:14 30:18
75:12 113:15
237:24 245:20
255:25 263:10
277:22 311:16
330:13 344:13
369:6
**ohio** 1:2,11,17,25
3:5,11 4:2,4,6,10
4:12,18 7:14,16,19
8:5,7,12,13,16
11:12 12:12,14,15
14:17,18,19 18:10
19:4 20:12,16,21
22:16 23:4,10
24:23 25:5,18
26:10 27:11,15
34:6 36:3,10,22
37:23 39:1 40:7
40:25 41:9,11,19
41:24 46:10,17
50:20 52:19,20
53:8 54:3 55:11
56:16 62:10,22
63:15 64:9 65:3
67:18,22 69:6
76:17 77:4,5,8,10
77:10,10,13 79:2
79:10,25 80:1,14
80:22 81:18,19
82:9,10,13,19,22
83:9 87:23 89:8
92:7,7 93:25

| | | | |
|---|---|---|---|
| 94:22 109:9,10 | ohio's 78:23 | 151:12 153:18,24 | 338:19 339:9 |
| 110:14 113:18 | 113:15 205:13 | 154:11 155:19 | 340:18 341:13 |
| 119:23 129:4 | 259:14,15 323:24 | 156:6,13 159:4,7 | 344:21,22 345:20 |
| 137:12 140:25 | 336:15 365:4 | 159:21 166:20 | 345:25 346:9,10 |
| 141:4,5 142:5,9,17 | ohioans 81:4 | 171:8 175:21 | 346:15,18 347:7 |
| 144:24 145:4 | ohioattorneygen... | 181:16 183:11 | 347:13 353:7 |
| 151:13,18 158:23 | 4:7 | 184:1 187:24 | 354:5 355:4,9,21 |
| 164:23 166:4,9,11 | oho 7:21 | 191:8,25 195:3 | 356:11 357:4,7,10 |
| 166:13 167:7,24 | oi 296:24 | 198:1 199:22 | 372:1,10,12 |
| 175:2,19 176:5,7 | oig 78:12 296:23 | 202:11 203:21 | oklahoma 267:6 |
| 176:12,17,20,24 | 297:2 321:3 | 204:22 205:21 | once 17:2 67:22 |
| 177:5,8,11,12,19 | okay 14:18 15:2 | 206:7 210:9 | 68:10 148:19 |
| 178:16,18,19,20 | 15:17 16:6,11,19 | 214:22 217:5 | 198:16 203:6,24 |
| 179:7 186:16 | 17:3,4,8,9 18:7,12 | 220:24 221:1,17 | 203:24 208:8 |
| 187:2,11 193:18 | 18:23 19:1,12 | 221:25 222:10 | 364:18 371:3 |
| 201:23 206:14 | 21:5 22:7 24:17 | 224:16 226:9 | ones 38:24 58:8 |
| 211:18,21 212:19 | 26:4,4 27:19 | 234:6 235:11 | 126:24 155:17 |
| 213:4,19,21 215:4 | 30:18 34:7,21 | 237:10,24 238:3 | 264:19 265:1 |
| 216:11 217:10 | 38:25 40:18 41:18 | 240:9,13 241:1,1 | 268:10 287:10 |
| 218:9 221:2 224:1 | 42:5 46:6,8 48:2 | 245:11 247:14,23 | 343:13 346:24 |
| 224:4,11 239:7 | 50:7 52:1 53:4 | 248:24 251:11 | ongoing 43:24 |
| 240:20 247:1 | 56:7,10,12 60:16 | 254:14 255:16,19 | 54:16 55:22 227:2 |
| 250:1 252:5,22 | 60:24 63:18 72:23 | 256:4,23 261:19 | 313:8,12 |
| 255:3 259:6 | 82:3,5 83:16 | 263:23 264:7 | online 20:2 129:17 |
| 262:11 278:12,21 | 87:20 89:6,7,13,20 | 269:22 270:2 | 221:16 |
| 278:23 291:17 | 89:25 90:17 91:18 | 271:20,25 275:16 | open 96:20 |
| 292:25 297:20 | 91:20 92:4,12 | 276:1,21 281:2,5 | opening 208:2 |
| 299:7 300:1 | 94:17,24 95:5,7,15 | 283:16 284:7 | openings 197:20 |
| 314:24 328:23 | 97:4,17 98:22 | 289:6,11 298:14 | operate 193:10 |
| 330:23 337:21 | 99:15 100:24 | 299:3,24 300:21 | operating 91:24 |
| 338:3 340:20 | 102:4,8,12 103:6,8 | 302:7,13 304:8 | 118:16 |
| 343:5 344:20 | 106:5,13 107:16 | 305:11 314:17,24 | operation 270:15 |
| 348:1,14,20 | 108:1,10 110:19 | 315:7 316:3,13 | operational |
| 356:17 359:8,19 | 111:7,10 113:19 | 317:18 318:7,12 | 302:20 |
| 360:2,7,20 361:4 | 116:9,23 118:6 | 318:18 320:21 | operationally |
| 361:21 362:8 | 119:22 121:9 | 321:4 322:22 | 170:2 |
| 363:22,25 364:13 | 123:4,10 124:3 | 324:21 325:1 | operations 270:4 |
| 364:21 365:1,11 | 127:4 130:10,24 | 327:14 330:4,12 | opiate 1:6 8:13,15 |
| 365:14 371:5 | 131:3,6,9,11 132:1 | 330:19 332:6 | 11:11 263:14,16 |
| 377:3,7,13,20 | 133:11,24 136:22 | 333:20,22 334:6 | 264:2 278:23 |
| 378:2 | 142:2 145:18 | 334:19 336:1,6,25 | 378:6 379:3 380:3 |

[opiates - opioids]

| | | | |
|---|---|---|---|
| **opiates** 352:18 | 217:10 218:10,11 | 364:14 365:2,15 | 171:23 172:11,14 |
| **opinion** 63:25 | 219:24 220:3,11 | 366:19 367:1,2,6 | 172:16,22 178:23 |
| 178:19,20 179:2,2 | 220:12,19,20 | 367:12,12,13,14 | 179:11,15 180:6,7 |
| 195:14 214:14,17 | 221:3 222:6,9 | 367:15,20 368:21 | 182:23 183:15 |
| 214:20 215:7,11 | 223:17 224:3,6,8 | 373:12,25 374:4,8 | 189:19 190:4,11 |
| 215:19,23 216:6 | 227:10 228:13 | 374:15 | 190:24 199:4 |
| 216:15,25 217:3 | 229:6 237:6,13 | **opioid's** 138:10 | 201:24 205:24 |
| 232:21 325:13 | 238:7,17,19 239:1 | **opioids** 7:16 15:6 | 209:14,16 211:11 |
| 373:11 374:25 | 240:14,15,23 | 19:24 26:23 27:22 | 212:23 213:12,13 |
| **opinions** 370:7 | 246:1,13,18 | 28:2,7,10,25 29:9 | 218:17,20,23 |
| **opioid** 7:17 8:8,12 | 248:10 255:11 | 29:17,23 30:7,11 | 219:11,12,13,16 |
| 17:24 20:16 21:17 | 256:16,22 257:21 | 31:8 32:14 33:1 | 220:6,9 228:2,5 |
| 21:22 28:17,22 | 257:25 258:2 | 33:16 37:10,15,25 | 229:12 231:1,8,16 |
| 38:14 43:7,10 | 259:1,6,14,15 | 39:10 42:20 43:1 | 232:8 233:7,10,14 |
| 44:6,8,24 45:3,15 | 262:2,9,13,23 | 43:16,17,20,21 | 235:2,15 236:5 |
| 62:22 65:21 68:19 | 264:6,8 265:12 | 44:17,20 49:9,10 | 237:15 239:3 |
| 69:7 70:10,23 | 266:1,1 269:19 | 49:16,18,21 52:9 | 242:17 243:12,14 |
| 72:21 74:21 75:15 | 270:17 276:25 | 52:13 58:2 62:10 | 244:10 245:18 |
| 79:11 80:13,21 | 278:11 279:12,20 | 63:23 64:8,19 | 269:5,21 270:8,13 |
| 81:6,10,18,19 82:8 | 279:23 280:8 | 65:3,16 66:10,22 | 279:17 285:4,9,20 |
| 82:10,18,18,21 | 285:1 288:20 | 68:14 70:13 71:1 | 287:16,20 288:5 |
| 83:9 84:2,7,22 | 290:5,13,18 291:2 | 71:11,16,19 72:8 | 288:13 295:19 |
| 89:9 94:3,8 105:3 | 292:23 293:8,17 | 72:25 74:6,10,16 | 300:3 304:11,15 |
| 113:2 134:2,23 | 294:12,23 295:6 | 75:1,24 76:7,13,25 | 304:19 305:12,14 |
| 136:11 146:17 | 295:22 296:6,11 | 80:1 82:12 83:2 | 305:22 306:7,25 |
| 155:12 160:2 | 296:20 297:20 | 83:13 86:6,9 | 307:15 308:3 |
| 162:25 163:12,15 | 298:8,18 299:7 | 87:18,24 88:13 | 310:17 311:21 |
| 164:1 167:10,23 | 308:1,8,20 312:10 | 98:13 108:15 | 315:1,14 316:14 |
| 168:1,3,4,5,13 | 312:12 313:21 | 117:1 123:14,20 | 316:20 317:20 |
| 169:20 170:19 | 324:4 325:4 329:1 | 126:4,15,21 134:6 | 321:16,24 322:5,9 |
| 171:5 173:1 | 329:24 333:5,9 | 134:9 137:24 | 323:9 324:21 |
| 177:19 178:17,24 | 334:11,14,20 | 144:8 145:20,22 | 325:13,14 326:3 |
| 179:5,7,9,23 180:8 | 335:10 336:23 | 154:14,15,20 | 326:10,13 327:8,8 |
| 180:21 183:3 | 339:13 340:11,19 | 155:2,5,15,22,23 | 328:9,11 340:8 |
| 189:22,22 190:1,5 | 340:20,24,24 | 157:6,9 158:4 | 341:7,8,16 347:9 |
| 208:13,17 209:7 | 341:3 343:4,9 | 160:5,10,15 | 347:21 348:23 |
| 209:17 211:19,21 | 344:22,25 347:12 | 161:15 166:23 | 349:24 350:3 |
| 211:23 212:8,16 | 349:6 351:21 | 167:5,20,20 | 353:25 355:13,19 |
| 212:18 213:4,7,18 | 355:22 359:1 | 168:19 169:9,9,12 | 356:3,5,13,16 |
| 213:19,20 214:25 | 360:1,21 362:16 | 169:13,15 170:6 | 359:19 367:23 |
| 215:3,3,14 216:11 | 362:17,21 363:7 | 170:12,17 171:17 | 369:10 371:1,11 |

375:8
**opportunities**
  58:25 190:8,9
**opportunity** 39:20
  240:7 360:7
**opposed** 87:4
  110:2 180:18
  208:7 218:10
  248:17 271:1
  272:21 332:3
**opposite** 142:19
  231:18
**optim** 99:5,6
**options** 73:13
  139:12 160:17
  162:24,25 163:15
  163:24 164:2
  170:7
**oral** 29:6 366:25
  367:1,13,14,20,23
**orally** 374:8
**orc** 60:10
**order** 285:25
  320:24
**ordered** 70:10,23
  282:21 328:9,11
**orders** 356:5
**organ** 77:12
**organization** 35:2
  36:2,3 119:1
  125:19 136:3
  236:10
**organizations**
  36:15 93:21 95:16
  95:20 96:2 103:9
  104:22 126:9
  149:9 150:15,15
  153:23 222:24
  223:3,18 226:11
  233:23 234:8
  235:24 276:6

301:4,8,16,21
302:25
**organized** 56:16
  56:19
**original** 36:6
  54:10 233:12
**orthopedic** 287:19
  287:21
**oud** 330:6,23
  331:3,7,7 332:10
**outcome** 83:3
  148:6 203:1,8,12
  231:21 260:18
  266:10,18
**outcomes** 132:13
  170:19 198:9
  206:2 231:20
  259:24 265:25
  286:11,25
**outcomesmtm**
  103:15
**outliers** 173:17
**outlined** 361:3
**outlying** 181:2
**outpatient** 34:22
**outside** 27:15 34:8
  56:13 90:5 94:13
  116:7 119:21
  122:13 141:8
  142:23 143:8,9
  144:3 149:15
  158:21 164:17
  168:5 181:4,4
  182:13,25 194:17
  214:13 219:5
  229:25 244:4
  292:22,25 293:1
  307:3,4 313:22
  349:10 356:23
  359:3,8,12 361:18
  368:24 369:24

**outstanding** 54:22
**outweigh** 171:6
**overall** 84:7
**overdose** 172:24
  220:7 331:21
  348:12
**overdoses** 212:16
  351:4
**overdosing** 343:18
  350:22
**overmanaging**
  169:13
**overnight** 326:1
  363:8
**overprescribed**
  368:8
**overprescribing**
  171:23 212:23
  236:18,25 317:10
  341:4
**overprescription**
  292:23 293:8
  294:12,24 295:7
  295:23 296:6,12
**override** 194:25
  195:6
**oversee** 61:1
**overseeing** 49:8
  340:15
**oversees** 49:2
  92:19
**oversight** 49:4
  59:22 61:12 115:4
  116:17 337:8
  338:15
**overview** 49:5
**oxford** 4:22

|  p  |
|---|

**p** 1:13 6:1,5 7:4
  11:1 14:1,14
  189:1 377:9 378:8

379:4,9 380:4,13
381:20
**p&t** 92:24 122:21
  122:23 146:8,8,19
  147:12,21,24
  150:8 156:6 207:9
  207:13 208:15,19
  209:5 269:8
  295:14 353:8,22
  353:25 355:7
**p.m.** 186:10 189:8
  254:24 318:21,24
  372:18,21 376:1,6
**pa** 154:21 174:10
  207:15,15,17
**page** 7:3 8:4,22
  9:3 10:3 63:11
  64:6 65:12 70:5
  71:7,7 74:4 76:4
  78:20 80:10 81:15
  81:23 83:7,24
  84:18 85:23
  120:14,15 175:16
  175:18 177:18
  191:24 192:8
  207:7 223:20
  224:21 234:4,5,24
  235:5,6,9,9 237:3
  237:9 238:15
  241:2,3 242:14
  243:7 244:6 246:9
  248:8,24 249:15
  250:25 251:6,7
  252:16 253:5
  261:25 262:1
  264:9 267:8 280:8
  300:10,11 302:5,8
  302:9,11 321:7,13
  321:18 322:23
  323:5 324:11,13
  325:3 327:17

328:5,7,22 334:12
334:25 335:1,15
336:6 360:19,22
366:11,18 370:14
371:2,15 378:13
378:15 380:7
381:3
**paid**  124:10
194:21 200:8
208:8 358:15
**pain**  28:24 29:5,8
29:11 30:5,12,24
30:25 31:6,8,11,11
31:14,18,23 32:10
32:13,17,20,21
33:16,21 43:13,14
43:18,21,22,24,25
44:1,2,4,8,15,25
44:25 45:11 72:21
73:11,12 74:7,11
74:15 75:3,25
85:22 87:25 117:3
154:24 155:2
160:14 163:25
166:8 168:12
169:19 172:17,17
174:13 214:4
224:24,25 226:23
227:3,10 231:10
232:8,9 243:12
271:2,7 285:5
287:19 299:13
307:16 309:1,2,5
345:9,17 346:12
346:16 347:4
361:15,18 362:18
365:5 369:9
**panel**  260:16
**paper**  52:11
**papers**  279:17

**paperwork**  157:16
**paragraph**  63:12
63:21 64:7 65:14
70:9 71:8 74:4
76:4,8 78:22
81:16,17,25 82:2
83:23 87:20 200:6
207:12 223:23
224:1 226:9 227:6
227:8 234:3,4
236:11,14 251:14
252:3 302:9,10,11
302:12 321:17,19
324:13
**paragraphs**
250:24 251:9
**paramount**  96:8,9
99:2 223:4
**parents**  40:13
347:8
**part**  50:6,19 68:16
116:17 118:11
121:18 133:9
136:13 143:24
145:2,6,10,13,14
146:2 149:4
151:21 157:10
159:12 168:7
187:4 192:20
193:17 198:21
204:18,18 208:10
211:1 239:2
242:10 262:22
281:23 282:2
292:8 293:21
294:5 331:9 332:9
333:15,18,21
352:4,14 380:9
**partially**  360:12
**participate**  260:22
261:16 282:22

365:16
**participated**  27:9
287:11 364:17
**particular**  48:5
63:13 70:16 71:4
78:11,12 84:18
102:19 117:6,19
134:1,5,22 136:7,9
142:20 143:16,21
146:16,21 152:22
158:10 159:15
160:6 207:4
210:25 239:14
240:9 295:21
305:9 311:4,13
339:12,13,19
351:23 374:25
**parties**  6:4 377:11
**partners**  249:16
**party**  102:17
103:11 135:16
230:3 272:13
338:22 369:6
**pass**  91:17,17
**passage**  271:21
**passed**  174:10
350:9
**pat**  61:18
**patches**  29:7
**path**  292:18
341:21
**patient**  28:21
38:14 39:18 44:19
44:19 45:16 71:19
72:25 73:10
108:23 109:8
110:11 113:6
117:13,14 122:3
123:1,9 138:4
139:11,18,22,22
139:23 157:21

167:10 168:3
194:14 196:9,12
200:8 201:5,7
204:2 227:21
228:8 231:25
270:24 271:4
310:14 312:14,23
325:14,22 326:9
339:13,19
**patient's**  118:5,7
122:6 138:19
196:13 243:14
271:7
**patients**  15:10,11
15:11,15 29:16
34:18,19 40:12
43:15,20 44:10,11
44:11,12,14,15
45:21 67:11,13
82:13 89:2 134:9
135:7 137:18
144:7 157:24
171:11 172:7,11
172:22 173:9,12
173:24 177:20
178:18 182:23
193:15 199:2
202:5 203:8
205:16 239:14
243:12 244:10
247:8 248:10
262:12 270:12
271:10 285:9
294:20,22 308:21
309:11 310:7,22
322:8,19 323:4
326:2 333:16
339:23 351:10
352:20
**patrick**  61:8,20

**pattern** 199:17
204:3
**patterns** 84:21
171:25 172:6
285:16 351:25
**paused** 32:8
**pay** 78:3,3 91:16
98:16 104:21
112:4 115:11
129:25 141:13
170:24 174:15
226:20 234:18
241:23 266:11,13
266:17
**payer** 7:21 129:5
129:17,22 130:7
338:22 358:14,22
**paying** 266:8
274:3,5
**payment** 35:8,12
35:18 59:1 60:9
112:3,6 192:24
194:16 239:7
258:1 260:19
283:14 285:3
286:1 314:22
**payments** 91:13
276:8
**pays** 36:22 109:10
152:15,19
**pba** 48:21 59:15
59:22,24 91:9
92:2 109:19
115:13,18 295:10
**pbm** 91:9 93:22
98:7,18,19,23
112:5 116:13,15
116:22 125:6,14
125:16,21 128:11
**pbm's** 112:13

**pbms** 98:7,9 99:9
103:10 128:11
295:5,6,18 315:3,6
315:6
**pdmp** 327:24
361:23
**peer** 168:8,8
**peers** 235:3,15
236:5
**pelini** 3:10,13 12:3
**penalty** 290:4
291:5
**pending** 17:8
303:15
**pennsylvania** 4:23
5:12
**penny** 231:3
**people** 29:1,14
63:15 96:16
104:21 131:7
143:19 172:13,15
172:15 174:3
206:1 250:1,18
258:18,20 262:15
279:8 309:1
329:23 341:15
343:12,12,21,24
348:9 350:19
351:14 352:10
368:3,8,8 369:17
**percent** 63:22
64:10 67:8,14
68:20 69:24 80:14
81:7 82:14 83:9
84:1,3,25 85:2,12
85:14 86:5,7
90:22 91:2 258:12
282:17 283:2
284:12,14 316:20
324:7,20,24
328:21 331:22

335:1 367:22
375:7
**percentage** 80:21
80:25 81:2,3,4,5
262:12 328:17
334:13 335:2
**percentages** 43:4
**perfect** 341:9
**perform** 91:25
337:16
**performance**
284:11 337:8
**performed** 182:5
200:9
**performs** 285:3
**perinatal** 287:9
**period** 32:9 43:23
63:23 65:19 83:17
84:12 199:6,7
201:19 246:2
249:19 279:14
315:8,14 325:15
325:22
**periods** 29:13,13
**peripheral** 258:15
**permitted** 138:22
**pers** 51:21
**person** 32:13
51:16 54:24 61:19
89:15 94:19,21
102:8 114:12
131:2 159:10,16
187:16 302:6
**person's** 32:20
**personal** 33:4,5
52:5,7 137:16
168:25 214:14,17
214:20 215:23
216:6,15,25 217:3
219:3 223:8
230:18 343:8,8

356:20 370:1,4,7
373:11
**personally** 52:2
72:2,3 80:7 102:5
139:25 197:4,6
293:24 294:20
307:5 311:24
343:23 373:15,18
373:22 379:11
380:15
**personnel** 250:17
**perspective**
117:15 141:12
258:2 279:12
335:22
**pharma** 310:24
**pharmaceutical**
21:16 32:11 73:14
73:17,20 127:7
299:18 338:23
355:11
**pharmaceuticals**
4:15 5:9 13:1
**pharmacies** 91:14
113:7 119:13
128:10 134:1,22
136:9 141:7 144:6
171:11,16 173:8
173:12,23 193:19
199:4 218:5 246:1
266:22 274:8,14
275:7,14 293:7,10
293:11 327:22
351:1
**pharmacist** 20:17
108:25,25 114:21
123:2 193:3
194:12,25 195:6
195:12,13,15,20
195:20 241:23

**pharmacist's**
113:4 139:4
**pharmacists** 20:14
48:6 49:4 98:16
137:23 138:24
140:6 149:8
192:17 193:19
197:25 300:1,5,7
361:24
**pharmacology**
28:7
**pharmacy** 7:20
47:18,19 48:4,15
49:1,23 51:1,7
59:12,15,16 61:10
61:11 68:16 71:23
72:20 81:19 82:9
90:6,20,25 91:8,13
92:10 93:4 95:17
95:20,24 97:20
101:9 102:13
103:1,4,7,13 104:6
104:16,19 108:19
108:24 109:11
110:11,12 112:5,6
112:8 118:3,7
119:24 131:12
133:7 135:6,17
141:1,5 144:13,25
145:4 147:11
158:23 190:4
193:18 244:9
245:14 266:23
269:9 274:16,25
277:7 293:15,17
294:7 295:16
364:24
**phase** 196:3 200:7
205:3
**phased** 287:14,24

**phases** 192:6
**phone** 12:19 39:25
198:20 203:23
378:3
**phrma** 299:19
**physical** 33:22
161:6 162:9
165:12 170:24
270:23
**physically** 111:3
**physician** 39:13
70:21 71:4 73:22
87:5 142:14
157:17 174:9
218:5 219:7,9
286:14 308:15,15
310:1,3,15 311:5
363:3
**physicians** 88:19
142:10 149:7
157:14 169:22
178:22,22 197:24
218:5 269:14
**piece** 249:9
**pieces** 375:3
**pig** 272:24 293:21
294:2,3,4
**pill** 270:3,5,6,11
271:2,8,15,25
272:4,7,14,22
273:5,24 274:8,16
275:1,8,14 342:6
362:11 373:12
**pills** 174:20
316:23 317:13,14
326:22,25 364:19
364:25 368:19
369:6,7,11,18
**pittsburgh** 4:23
**place** 68:23 88:20
112:23 131:15

167:8 206:3,4
209:13 226:17,24
226:25 228:24
244:13,21,25
245:24 260:19
262:18 266:24
267:21 268:25
277:16 298:11
315:25 317:21
351:14 358:25
**placed** 14:2
145:22 152:17,23
351:20
**placement** 145:19
146:16 151:15
161:15
**plaintiff** 2:7
161:17 177:1
282:14 290:7,15
**plaintiff's** 18:21
19:7 105:21 106:8
106:17 108:5
**plaintiffs** 2:2 12:8
12:10 21:15 22:18
319:4,11,25
**plan** 39:15,18,21
96:19 110:3 112:5
112:23 116:11,13
150:8,9,11 196:21
244:2 245:14
250:6 271:6,6
339:8
**planning** 185:16
264:4 276:2
**plans** 37:4,7 38:3
38:7 48:14 61:2,3
61:5,9 67:9,10
68:22 69:3,4,6,7
69:14 72:13,14
87:15 90:23,24
95:23 96:17 98:3

98:4,7,8,11 102:2
102:21 103:16,19
116:21 125:13
134:12 140:7
151:10 180:10,24
193:17,22 196:25
223:11 234:15
241:12,12,15,18
241:20 242:4,6,8
243:20 245:2
246:19 248:6
249:25 250:5
260:3,12 262:21
277:13 295:3
337:6,9,20 338:17
352:6
**play** 71:9,14 73:3
76:18 96:15
110:23 152:3
156:9 157:8
168:20 192:13
271:21 321:14,20
321:22 322:1
333:18
**plays** 76:5,11,23
**pleas** 107:10
**please** 11:14 12:19
13:4,6 14:12 74:4
120:15 161:10
164:22 175:15
189:16 230:9
255:23 320:23
321:9 371:3,9
378:11,11
**pleased** 292:9
**pllc** 2:8
**plumber** 108:7
**plus** 19:7 185:2
**point** 3:4 17:5
34:23 41:10 56:11
59:17 76:20 80:12

91:10,11 98:8
100:4 112:3,7
113:4 114:15
128:12 142:18
143:20 144:24
145:24 168:11
185:20 192:16,16
193:10,24 194:6
194:22 195:10,18
225:21,21 233:12
254:11 264:18
265:13,15 295:11
314:16,21 317:22
317:25 332:5
333:2,17 335:15
336:7 365:24
366:13
**pointed** 317:19
320:7 321:8,13
362:7
**points** 264:13
267:9 375:5
**police** 45:23 77:23
**policies** 87:8,9,17
108:13 226:13
233:25 234:9
295:15 298:10,24
302:22 340:3
**policy** 47:23 50:10
58:5 60:3,5,6,17
71:21 72:4,7 87:7
298:13,16,18
305:13,20
**pool** 201:22
**poor** 330:18
**population** 7:18
58:23 79:12 84:23
85:3,15 86:3,4,6,8
86:15,20,21 97:12
201:13 242:9
246:5 336:9,11

341:15 352:8
368:16
**populations** 86:13
97:10,11,15
**portion** 151:8
224:3
**posed** 370:6
**position** 36:5 47:2
47:4 74:9,13 75:1
75:23 107:19
185:14 215:2
219:22 236:16,24
252:25 253:24
321:25
**possess** 29:1
**possesses** 126:2
**possession** 54:3
159:23
**possibilities** 86:17
**possibility** 252:4
**possible** 77:8 97:6
160:1,6 176:16
229:9 259:13
260:5,7 275:6
315:18 352:12
**possibly** 223:5
**post** 284:6 316:19
**potential** 28:14
64:12,20 65:4
193:25 195:19
198:4,5 204:7
219:21 293:22
364:4 368:20
**potentially** 122:12
192:17 259:20
290:16
**poverty** 86:24
87:1 214:4,8
**powerful** 28:23
**powerpoint**
366:12,14,17

**practical** 139:7,9
170:3
**practice** 27:11
77:17 141:15
149:5,6 172:5,6
244:9 285:23
306:5 309:3 330:1
**practiced** 27:14
34:2
**practices** 108:13
158:3 169:22
303:9 344:25
**practicing** 157:17
338:24
**practitioner** 27:17
34:3 42:11,25
70:10,16,18 247:6
**practitioners**
137:23 197:25
303:10
**pre** 187:22 284:5
**precedes** 225:11
**preceding** 201:4
**precise** 66:19 81:3
**predate** 186:23
187:1
**predates** 271:18
272:8
**predictive** 265:3,9
**preemptive**
239:20
**prefer** 155:22
157:14 168:1
184:6 372:8
**preference** 96:17
96:18
**preferred** 145:23
146:5,10,14,18
148:2,18,22
149:24 150:1,10
150:11,14 151:15

152:5,11,17,24
153:5,15,16 154:2
154:14,16 155:10
155:12,15 156:7
156:11,14 157:2
157:10,15,20
158:8 166:23
167:4,14,19
207:15 208:10,24
268:12 301:4,9
304:9,12,16,20
305:7,18,23
354:12,25
**preferring** 268:10
**pregnancy** 182:24
183:3,15 248:11
**pregnant** 189:18
190:10 193:5
248:10 352:18
**preliminary**
287:25
**preparation** 80:2
105:19
**prepare** 17:18,19
20:9
**prepared** 186:21
208:1 297:14
**preparing** 129:18
192:2 221:16
249:18
**prescribe** 44:8
45:2 73:13,23
157:14 181:7,25
231:8 235:2,14
236:4 317:5 322:9
355:5
**prescribed** 14:3
45:15 64:9 65:3
70:7,23 74:10
75:2,24 83:13
85:21 113:17

117:2 124:14
138:16 151:6
194:14 209:21
218:17 237:15
250:17 285:11
308:20 316:21
317:13,21 331:13
349:24 373:25
374:3,13,17,18,19
**prescriber** 73:1,25
101:7 118:14,15
123:2 138:7
142:20 143:11
181:3 322:15
325:12
**prescribers** 70:7
71:9,14 180:15,21
243:11,13 321:20
321:22 322:1,4,8
328:6,11 339:21
344:24 347:16
361:14,24 364:4
364:16
**prescribes** 73:25
**prescribing** 7:16
20:16 32:14,25
39:13,23 43:1
44:6,24 49:15,21
62:11 72:12,15,16
75:14 77:21 81:19
82:10,18,22,25
87:24 88:13,21
94:8 123:13,20,23
124:7 126:3,14
132:14 134:5,10
144:8 157:11
158:3,21 171:25
179:9 180:7,22
181:2,3 199:4
204:4,7 209:19,25
218:20 220:4

233:7,10,14 237:6
237:13 238:8
265:25 269:15
272:15 276:25
277:15 280:8
285:4,4,16 306:24
307:9,17 308:24
317:1 325:13
328:25 333:9
335:10 342:7
344:23,25 346:12
346:15 347:21
348:18 351:18,25
356:5,16 359:21
362:17
**prescription** 1:6
3:8 8:13,15 11:11
12:4 30:7 37:9
42:20 43:7 74:9
75:1,23 78:25
83:2 84:2 86:2
90:7,21 108:15,21
108:22,24 110:10
110:11 113:2
114:18 117:1,12
118:2,8 122:11
123:14 124:10
127:17 128:3
137:17 145:19,22
146:17 160:5,15
161:15 174:8,9,14
179:7 182:11,18
182:21 190:23
195:1 196:11
204:5 218:10,23
219:10,13,16,24
220:2,6 227:11,25
228:13 236:16,23
252:22 267:22
278:23 306:7,25
308:3,7,8 310:16

311:20 312:21,23
313:21 315:1,13
316:14,20,25
322:1 326:10
327:2,8 331:12
334:14 336:8
341:7 362:17
364:1 373:12,12
374:8 375:8 378:6
379:3 380:3
**prescriptions**
38:14,16 42:16,19
43:11 59:7 65:20
70:11,12,23 80:14
80:22 83:9 84:8
84:25 85:13,20
113:6 134:2,24
136:11 158:1
194:5 199:2,5,7
209:17 238:17
243:25 245:25
246:2 269:19
270:13,17,19
307:20 308:20
310:5,16 311:20
311:23 312:10,13
313:4 324:4 329:1
333:5 334:20
336:23 348:15
351:21 368:17
**presence** 6:12 87:1
173:3
**present** 5:8 33:9
90:12 170:8,8
174:23
**presentation**
149:13,14 174:25
175:13 176:8,9
261:21
**presentations**
149:1 354:8,11,19

355:21
**presented** 149:19
**presently** 183:12
**president** 36:11
**pressure** 198:10
**pretty** 114:8
258:20 284:18
285:24 352:2
353:1 361:8
369:17
**prevailing** 315:16
**prevention** 238:16
240:8 362:8,20
363:1,5
**previous** 263:9
**previously** 51:20
52:22 53:11 54:5
134:12 158:15
180:24 239:4
248:12 261:20
276:11 277:12
285:7 291:21
294:17 295:12
**price** 151:1,2
152:11 153:3
227:23 233:16
333:7
**prices** 83:20 153:2
**primary** 140:11
239:6,11 247:5,6
260:14 285:15
**principal** 283:19
284:1
**principally** 258:18
**prior** 38:16 66:15
66:22 67:17,20
68:8 72:18 78:4
109:5,15 114:10
114:21 115:15
157:16 158:4,18
158:19 168:6,7,7

168:18 169:6,24
170:1 186:17
192:25 206:5
212:17 225:13,20
236:1 238:5,10
244:24,24 250:3
250:18 253:7
268:8,13 281:22
281:24 304:6,23
305:8,13,16 306:3
314:20
**priorities** 316:2
**prison** 250:1,17
**prisons** 349:20
365:10
**private** 306:5
337:19
**privilege** 56:3
107:3,5
**privileged** 106:12
106:22
**privileges** 56:6
**proactive** 272:21
**proactivity** 273:1
**probability** 181:1
**probably** 32:22,25
38:5 43:7 52:10
83:19 92:15
103:18 105:6
112:16 114:20
127:20 133:8
134:20 136:2,12
136:13 153:25
159:22 171:6
180:11 181:22
190:17 193:8
204:25 210:12,13
211:7 217:15
219:19,20 244:23
247:20 248:21
269:20 274:5

296:22 313:1
331:17 333:15
**problem** 170:15
172:2 193:25
194:23 195:11,19
198:19 200:21
204:4,7 211:21,23
212:8,13 213:4,7
213:13,20 215:4
215:14 217:9,17
218:9,24 219:11
219:17,23 236:17
236:25 243:24
269:7 279:18,20
280:5 290:6,14,17
292:23 293:8
294:12,23 295:6
295:22 296:5,11
297:20 298:8
299:7 329:14
341:17 353:4
358:8,13,16
364:12 375:10,15
**problematic** 40:13
85:21 141:7
142:10 173:18
194:7 351:25
**problems** 98:17
190:1 198:5,15,16
216:23 239:13,19
259:11 309:25
352:23
**procedure** 6:8
379:5 380:5
**procedures** 29:12
108:13 287:20,21
298:11
**proceedings**
186:12
**process** 36:8 40:10
44:4 78:8 88:12

90:6,21 111:24
112:25 113:3
114:2,13,15,17,25
128:8 142:25,25
143:17 146:6
147:10 148:25
150:9 152:4
158:12 168:2,7,20
179:22 183:9
192:20 193:23
196:9,22 197:19
198:21 201:7,9,14
202:4,6,12,16
204:19,24 205:10
227:2 250:14,20
271:3 286:1,18
293:21 294:16
295:14 314:19
315:13,21 319:21
369:4
**processed** 108:17
108:19
**processes** 36:24
38:9 68:23 92:25
196:24 295:15
**processing** 59:8
108:14 110:3
115:2,6 118:16
121:21 122:15
128:21
**produce** 53:9 56:2
320:1
**produced** 19:22
25:24 52:4 54:5
54:21 55:18 56:5
178:7,8 186:16,23
187:2,3 203:17,20
221:23,24 288:4
288:15 297:11,15
319:9,11,19

**producing** 171:2
**product** 296:1
**production** 51:15
54:16 55:15 287:8
365:25 378:15,17
378:22
**products** 207:14
208:10 268:9,18
**professional**
149:11 195:16
**profile** 138:19
139:1,4
**profiles** 26:21
200:8 201:5,7
**program** 27:10
37:6 49:19 58:10
58:15 100:18
136:14 143:1
150:20,23,24
151:13,14,19
189:21,25 190:14
193:16 198:25
199:1,10 205:14
240:9 241:20,21
242:6 244:13,15
244:20,25 245:1,8
245:8 246:7
247:16,17 248:2,4
257:18 260:23
261:6,17 273:6,16
294:4 295:2,3
323:24 328:2
336:16 338:7,8
352:15 362:22
364:1
**programatic** 37:6
**programs** 36:24
45:13 58:24 98:15
103:18 127:17
150:25 163:2
165:21 241:6,13

244:8 247:2
257:16 280:9,13
280:23 282:4
349:2 351:10
**progress** 220:2
341:10 369:19
**progressed** 360:8
**project** 132:8,9
238:2 269:10,16
288:22 351:6
**projects** 98:12
104:23 290:4
291:6
**prolonged** 28:15
**promise** 321:5
**promises** 266:16
**prompted** 276:13
**promptly** 100:1
**proof** 6:13
**properly** 148:8
**properties** 155:6,9
**property** 111:5
**proprietary** 152:7
**pros** 147:25
**prospective**
190:22,25 191:3,5
192:9,14 193:13
194:11 195:25
**protected** 249:1
**protocol** 353:14
371:18,19 372:2,2
**proud** 353:2
**provide** 29:4
109:18 118:18
169:14 210:14,17
231:11 254:5
262:14 270:7
315:24 319:15
328:18 329:21
347:12 349:5
362:21

**provided** 41:16
78:10,15 100:25
126:7 210:24
224:12 261:8
277:19 287:24
351:13
**provider** 7:20
37:17 40:2 61:4
100:1 109:18
119:25 120:12
123:9 130:1
142:18 158:20
168:9,9 172:2,25
181:18 203:23
227:21,24 231:23
242:5 244:2
245:15 273:7,16
274:4,5 283:20
284:1,23 285:3,15
285:25 302:18
337:9
**provider's** 203:25
**providers** 40:3,12
40:14 77:22 86:16
87:3 88:11 113:7
169:8,14 171:11
171:22,25 172:9
173:9,12,24
180:16 197:24
198:19 199:4
202:5,13,16
203:10 227:9
228:4 231:13
233:3,6,10,11
237:4,12 238:6
239:11 244:4
246:1,22 254:11
260:13,17,19
269:18 270:7
275:4 276:9
284:10,15,16

290:21 294:11
328:18,19 338:4
338:17 355:2
**provides** 194:17
**providing** 232:13
233:6 253:22
254:1,6 272:10
319:21 338:20
**provision** 301:14
340:15
**psychiatry** 70:22
**public** 1:25 68:3
179:14 180:1,15
180:19 213:15
242:17,21 274:25
275:5 279:18,21
377:7,20 379:10
379:18 380:15,23
381:23
**publication** 66:22
236:1
**publicity** 178:21
178:24
**publicized** 349:1
**publicly** 57:1
**published** 234:19
302:25
**publishing** 362:16
**pull** 78:5 132:12
168:15
**purchasing** 266:4
**purely** 146:20
**purpose** 117:16
129:22 130:16
157:10 218:21
316:22 350:11
354:18,23,24
**purposes** 22:11
23:24 25:13 35:8
35:12 43:1,10
55:16 62:14 74:6

79:16 120:3 129:8
154:15 175:6
176:8 179:12
187:21 191:13
206:19 218:18
221:7 257:2
278:15 291:13
301:24
**pursuant** 6:9
124:2
**pursue** 351:14
**pursuing** 265:2
**push** 135:20 372:6
**put** 21:12 176:10
199:9 222:1
239:11 244:24
268:12 292:19
317:21 319:13,16
325:20 343:3
358:25 369:24
**putting** 93:1 206:1
206:2

**q**

**qualification** 6:14
**qualify** 183:19
**qualities** 28:9,13
30:10
**quality** 36:11
57:13,22 58:20
59:4,10,13 60:1
61:16 132:9
260:18 284:20,25
285:2,22 286:8,9
**quantities** 37:19
158:16 351:21
**quantity** 122:2
138:16 181:8
317:2
**quarter** 160:2
**quarterly** 8:6
68:19 122:22

206:16
**quarters** 84:11
**queries** 55:20
**question** 16:9,11
17:2,7 21:24
30:21 46:7 52:17
53:2 54:9 57:19
64:25 70:20 75:21
76:3,10 93:11
95:21 130:19
145:9 152:9 156:2
156:5 167:1
170:16 183:13,24
186:5,15,24
187:16 192:12
193:3 195:22
200:14 211:20
213:9,17 220:25
225:16,19 226:2
230:9,10,15,17,21
232:17,22 233:18
276:12 290:11
300:13 304:5
305:2,18 309:12
309:19 310:23
332:20 357:17
358:7
**questioning** 186:2
216:23 307:24
360:18
**questions** 16:2,4
16:14,25 26:7
51:14,15 54:24
93:2 168:10
186:18 187:1
224:20 243:6
300:12,15,19
301:2 303:17
314:3,9 318:8
319:23 358:6
359:17 360:25

365:13 366:24
370:6 371:13
373:8 375:20,21
**quick** 114:6
233:15 266:2
314:10 369:5
**quickly** 109:3
114:8 215:14
240:22 248:23
299:3 309:7
344:10
**quite** 247:22
**quote** 358:22
363:1

**r**

**r** 11:1 14:15 48:9,9
48:9 113:12,12,24
113:24 136:22,23
189:1 377:1
**raise** 13:5
**raised** 56:6
**raking** 270:16
**range** 33:7 34:14
38:6
**rare** 156:17,21
209:4
**rarely** 139:9,14
140:12
**rate** 332:14 334:14
335:9
**rates** 83:16 104:21
253:21,25 254:5
254:10
**rationale** 245:9
**rdove** 2:15
**rdr** 1:24
**reach** 37:17 100:4
143:22 242:8
**reached** 212:24
**reactive** 272:19

**read** 66:1 82:8
83:7,8 230:14,15
251:14 252:15,16
269:8 278:20
307:12 312:4
321:19 324:5
344:10 364:22
367:24 373:17
374:6,22 375:2,6
379:5,6,12 380:5,6
380:17
**readily** 349:17
**reading** 230:13
367:16 378:19
**ready** 127:24
**real** 309:1 343:20
343:20,21
**realistically**
192:15
**reality** 343:19
**realize** 337:1
**really** 49:9,17 68:3
86:14 94:7 95:23
117:18 147:13
151:25 174:14,16
212:18 214:7
231:20 240:18
244:4 279:16,17
279:17 285:12
313:9 317:5,8
328:20 333:12
341:8 342:23
352:3,5,5,8 369:6
369:15
**realm** 71:22
168:14
**realtime** 377:6,7
377:18,19
**reask** 76:19
**reason** 17:10 32:5
64:1,4 80:18 84:5

123:8 136:8
140:12,13,14
172:12 173:25
178:11,12 199:16
232:4,6 320:3
331:14 378:14
380:8 381:3
**reasonable** 60:9
**reasoning** 262:8
**reasons** 45:7 306:1
331:6,8,18
**rebate** 91:11 98:9
146:2 150:19,23
151:5,13,14,19
152:8,16,20 153:1
159:13,25
**rebates** 151:8,9,15
151:20,22 152:2,3
152:12 159:1
160:1,5 170:12
266:20
**rebating** 150:25
151:2
**rebill** 130:5
**recall** 18:15,17
32:11,15,16 38:20
89:19 143:7,10
201:10 208:22,25
209:2 211:11
243:22 281:1
306:7,10 317:24
330:8 374:24
**recap** 110:7
**receipt** 378:18
**receive** 26:13
71:10,15 74:5
76:7,12,24 194:14
204:2 284:21
321:16,23 324:21
**received** 33:25
63:23 65:16 66:9

66:10 70:25 160:1
160:5 176:5,7
196:10 257:9
323:9 324:4
328:10 335:3
**receives** 86:6,8
336:9
**receiving** 66:21
68:13 70:12 81:9
122:10 335:19
370:25
**receptors** 163:12
**recess** 105:10
188:3 254:22
318:22 372:19
**recipients** 205:14
**recognize** 62:17
74:14 79:21 120:9
120:12 129:14
175:10 192:3
206:23,24 257:5
291:19,22 302:2
332:11
**recognized** 38:2,4
**recognizes** 189:25
**recognizing** 317:3
**recollection** 346:5
**recommend** 143:2
148:14,17,22
**recommendation**
146:10,11,23,24
207:16,21 224:22
225:3,6,9,14,20,22
225:24 226:3,4,10
227:8 232:3,10
233:1,19 234:5,13
234:24,24 235:9
235:19 236:13
237:2,9,18,21
238:1,14,22,25
241:3,4,8,16

242:10,12,13,18
242:23 243:8,9,17
243:21 244:6
246:10,14 248:1,7
248:13,24 249:3
249:15,22 250:23
251:10 252:17,19
253:1,6,11,20
303:3
**recommendation's**
232:5
**recommendations**
8:8 40:5 147:7
152:13 156:7
207:9 208:14,18
209:5 221:4
224:17,18 243:9
248:22 253:5,6
**recommended**
181:8 198:6
207:14 268:15
**recommending**
201:2 283:3
**reconcile** 83:6
**reconciled** 84:6
**record** 11:7,15
12:19 14:13 16:22
17:3 30:19 55:7,9
55:16 56:8 89:6
105:7,8,14 136:21
185:19,21,23,24
186:3,7,8,10,13
188:2 189:6,7
194:1 195:21
204:17 216:8,17
222:1 223:7
230:19 232:19
254:20,23 278:20
300:17 318:20,23
319:6,8,13,17
320:14 344:7

357:14,17 369:24
372:17,20 375:25
380:9
**record's** 256:1
**recorded** 286:12
**records** 41:3 46:25
78:25 79:1 141:2
141:6 142:9 195:5
197:2 348:2,7,12
**recounted** 325:5
**recourse** 290:18
**recovery** 351:13
**recross** 353:15
**red** 370:17,18
371:4,5,9
**redesign** 47:24
247:1 260:10
275:18,23 276:4,7
276:8,13
**reduce** 229:6
237:14 243:14
244:8 252:4 325:4
325:7
**reduced** 6:10
**reducing** 238:17
**reduction** 8:8
171:6 221:3 222:6
223:17 365:15
**reed** 5:4 12:22
**reedsmith.com**
5:7
**refer** 14:18 351:10
**reference** 164:13
223:20 270:19
371:14 378:7
379:2 380:2
**referenced** 74:19
93:8 306:4 379:11
380:15
**references** 129:18

**referred** 88:4
340:20
**referring** 193:8
209:11 217:25
279:3 313:12
**refers** 127:3 191:6
265:5 321:18
370:22
**refill** 309:10
**refills** 206:6
308:22 351:20
**refine** 244:8
**refined** 244:16
246:3
**reflect** 124:7
**reform** 261:10
283:15
**refreshes** 346:5
**refuse** 45:2,5
**refused** 309:10
**refusing** 310:4
**regard** 37:25 59:6
97:20 105:19
111:24 115:5
142:4,12 185:15
298:18
**regarding** 17:23
21:14 56:1 62:22
71:21 72:4 80:1
88:20 98:13
115:14 119:4
120:12 126:21
139:11,12 148:11
157:9 186:3
192:18 198:19
216:24 220:11,19
256:21 287:4
293:17 294:20
295:22 307:14
352:7 361:18
368:16 370:7

**regardless** 309:4

**regimens** 86:2
98:14

**register** 347:16

**registered** 377:6
377:17

**regularly** 176:4

**rehabilitation**
163:2 165:21

**reimbursable**
280:13 282:23

**reimburse** 72:8,17
166:13,16 167:9
228:11,12 229:11
229:12,13 232:7

**reimbursed** 80:22
114:19 124:13
134:1,23 194:19
231:24 273:7,17
275:7 280:20
312:10,13,24

**reimbursement**
37:9 61:11 72:16
83:16 87:8 104:5
104:7 108:15
111:19 119:5
123:13,24 126:3
126:15 128:7
132:2 163:23
164:24 229:6
253:21,25 254:5,9
280:23 302:21

**reimburses** 109:11

**reimbursing**
136:10 166:5,7,9
170:5,6,12,13
228:14 274:13
275:13

**reject** 109:5

**rejection** 109:17

**relate** 37:9 49:9
58:1 126:2 222:7
228:18 288:5,12
298:7 333:9
375:11,15

**related** 59:8 60:17
208:13,17 220:7
265:4,22 333:8
349:6 377:10

**relates** 222:5
229:17 368:19

**relating** 52:8
123:12,19 125:7
126:14 196:24
211:11 296:19
299:6 319:23

**relation** 103:12

**relationship** 48:20
61:2 90:4 92:14
102:1 125:14,21
133:9 309:9
311:12

**relationships**
352:10

**relative** 377:12

**relaxers** 205:25

**release** 154:14,15
155:5,14,22,23
250:18 251:19
252:5 304:10,15
305:12,22 315:19
349:20

**released** 154:20
250:19

**relevance** 216:5

**relevant** 57:10
94:3 105:2 187:16

**rely** 339:21

**remain** 41:22
251:5,18 256:3

**remember** 18:16
18:18,22 43:4
124:8 133:8 164:7
190:12 262:18
311:16,17 345:5
349:4 375:1

**remind** 15:18
275:22 353:13

**remove** 157:1
231:12 257:24
305:6,11

**removed** 91:1
156:13 207:16
304:11,16,21
305:16,20,22

**removing** 260:4

**rep** 307:21 310:25
369:25

**repeat** 171:13
230:9 290:10
304:13

**repetition** 171:13

**rephrase** 16:5

**replaced** 156:22

**replacement**
263:19 283:24

**replacements**
287:22

**report** 8:8 47:6,12
56:23 62:21,23,25
63:2,5 66:13,15,23
69:6 78:12,16
79:7,25 80:3,8
85:7 123:1,6
132:13 137:25
138:3 210:21,25
221:4,10,12
222:19,25 223:17
224:13,17 242:13
286:12 297:2,4,6,6
297:10 321:3

**322**:18 325:3
327:16,21 328:5
328:22,23 334:11
334:12 335:8
360:3 361:2 366:6
366:7 375:5

**report's** 221:18

**reported** 1:24 47:9
81:19 82:10 177:6
178:17 313:21
356:4

**reporter** 6:14 13:4
13:5 16:14,21
23:1 113:11
206:13 301:11
377:6,6,18,18
379:7

**reporting** 128:14
137:13 175:19
209:7,7 252:23

**reports** 47:19,20
55:24 56:20,22,23
68:19 92:22 104:8
126:19 139:20,23
176:10 211:8,10
220:11,17 287:25
288:2,12,15 374:7
374:23,25

**repository** 127:7

**represent** 14:9
25:16 129:16
191:16,23 229:24
229:25 230:2
301:1 304:1
328:19 358:2

**representation**
265:24

**representative**
23:11 52:19 308:9
308:12

**representatives** 310:18 311:4 353:21 364:2
**represented** 107:7 178:13
**representing** 12:16 18:10 149:9 314:8
**represents** 179:6,8 292:15 371:10
**reps** 32:11 295:25 306:6,11,23 307:9
**reputation** 309:7
**request** 24:14,14 55:25 109:17 130:4 158:18,19 319:22 380:9,11
**requested** 230:15 272:11
**requests** 25:5,17 25:25 63:7 299:1
**require** 74:16 78:4 109:5,15 154:25 158:4,20 167:9 168:6,18 301:3 302:19 304:23 305:8,13
**required** 119:10 130:3 137:25 193:3 246:20 249:25 281:22 327:22 347:11,14 362:21 378:25
**requirement** 242:11 301:14
**requirements** 172:17 174:10 242:4 257:17 361:23
**requires** 151:14 154:20 169:20

**requiring** 193:19
**research** 146:21 149:20,21,21 299:18
**residency** 27:10 27:12 34:1
**respect** 192:13 306:24 308:3 338:14
**respective** 6:4
**respond** 187:14 217:1
**responding** 343:5
**response** 23:5 25:24 33:3,6 39:22 55:23 76:17 211:19 214:25 216:11 221:24 222:8 256:15 258:25 297:5,10 297:14 318:11 319:17 336:19 340:19
**responsibilities** 34:16,25 36:4,17 47:14 48:25 98:5 115:5,8 116:17 198:1 204:1
**responsibility** 47:18 60:4 61:6 181:19 217:9,14 217:16 218:1 342:13
**responsible** 48:3 58:21 92:8 94:21 177:13
**responsive** 54:2,4 319:22 320:3
**restrict** 355:12
**restrictions** 122:2

**restrictive** 316:14 317:12
**result** 341:14
**results** 170:10 202:11,15,17,20 269:23
**resumed** 189:6
**retail** 114:21 128:10
**retain** 158:25
**retained** 95:16,19
**retrospective** 190:22 196:3,6,8 196:14 197:5 200:7 201:15
**return** 251:19 282:2
**returned** 378:18
**review** 7:16,20 8:4 8:6 19:21,24 20:2 50:23 54:16 59:8 61:11 62:11 86:1 104:19 119:24 120:16 121:19 122:18 137:5,7,9 146:7,8,20 156:8 182:7 191:1,3,5,22 191:24 192:14 193:14 194:12 196:7,9,15,22,24 197:5,13 202:1,12 203:1,4,7 204:23 205:5,8,10 206:5,8 206:15 210:21 226:12 233:24 234:9 359:20 376:2 378:12 379:1 380:1
**reviewed** 17:21,23 19:21 122:20 274:24 336:15

**reviewing** 20:6 199:11
**reviews** 190:23 200:9 351:17
**revised** 347:4
**revision** 302:18
**reword** 64:25
**rice** 2:3 12:7 107:24
**richard** 5:10
**richard.hand** 5:14
**riffle** 1:24 377:6 377:17
**right** 13:5 18:6 42:12 46:20,22,23 51:16 52:24 54:12 54:24 55:1,1,20 56:15 63:24 78:20 90:2 97:7 99:24 101:19,20 102:14 102:14,16 105:5 111:18 113:14 119:7 121:12,15 124:23 125:5,8,24 126:11 127:20,22 129:2 140:19 149:3 160:24 161:4,8 162:8 163:3,14 170:25 184:4 188:1 190:19 201:12 211:14 212:25 222:2 230:3 231:24 240:4 242:5 243:3,7 247:3 248:20 251:10 252:15 254:14 255:21 256:18 263:15 269:6,13,15 276:24 279:14

280:2,4,6 283:10
284:25 286:19
287:2,8,13,13
289:14,19 290:2
292:2 297:1
302:16 305:5,14
306:25 307:22
315:7 320:21
321:2 322:18
323:5 328:6
329:11,16 338:11
338:25 339:19
340:1 344:13
352:20 359:17
362:25 364:20
367:11 373:13
375:19
**rise**  213:15
**risk**  31:13,15
74:21 75:14 157:4
157:6 179:15
205:15,17 206:1
246:18 247:18
265:12 284:8
339:17 351:18
**risks**  31:16 73:12
74:17,25 242:17
368:16
**road**  174:18
**robust**  180:13
242:6 246:3
260:16
**robyn**  8:18
**role**  35:16 36:6
41:19 47:22 48:11
48:13,17,19 49:3,8
50:10,19 60:6
68:17 71:9,14
72:24 73:3,3,9
76:6,12,18,23
77:18,20 78:1,7

91:25 92:17 97:17
97:18,20 128:7
131:1 135:24
136:18 156:9
174:6 192:13
199:10 222:18,23
222:25 264:1
271:21 272:18
321:15,21,22
322:2 338:20
340:1 358:15,16
**roles**  77:15 203:25
**roll**  249:7
**rolled**  249:6 347:1
**rolling**  89:21 90:2
**ron**  2:12 7:11
11:16 14:8 46:1
54:8 221:13
**room**  105:12
172:24 228:7,7
233:15 283:22
300:14
**rooms**  346:20
**roughly**  324:3
**round**  308:17
**routes**  28:5
**rule**  1:10 154:13
377:14
**rules**  6:7 15:19
60:11 88:20 119:4
379:5 380:5
**run**  55:21 132:1,6
143:20 171:1
244:3 293:3
**running**  274:15
**runs**  48:22 51:10
**rural**  27:15
**rx**  2:18 11:23
137:12 175:19
252:23 272:24
293:21 294:2,3,4

314:8
**ryan**  8:18

**s**

**s**  6:1,1 11:1 113:12
113:24 127:1,1
136:22,22,23,23
189:1 378:15
380:8,8 381:3
**safe**  207:23 208:5
260:8 342:9
351:14
**safely**  73:13
**safer**  45:12 148:9
**safety**  7:18 79:13
122:10 208:1,11
267:23 268:16
269:1
**sale**  91:11 109:17
151:4,5 192:16
193:10,24 194:6
194:22 195:10,18
317:22,25
**sales**  306:6,11,23
307:9,20 308:9,11
310:18
**samaritan**  350:9
**sampling**  201:9,14
**sanctions**  290:22
**save**  171:1 187:12
231:3
**saved**  202:13,17
203:12
**saw**  44:11 280:25
296:24,24 297:2
**saying**  16:16,17,22
45:22 74:23 330:8
330:13 371:20
374:12,14
**says**  63:14,22 64:7
65:14 70:21 71:8
74:5 78:21 81:17

83:25 84:20,25
87:22 205:13
207:8 209:9 224:1
226:10 227:8
233:20 235:12
236:12,14 237:3
237:11 242:14
248:8 251:1 263:1
272:19 274:1
278:22 309:7
319:12 336:8,14
**scan**  109:4
**scare**  331:21
**scenario**  326:21
**schedule**  64:10,10
**scheduled**  113:17
250:10
**school**  26:16 27:3
27:8,20,21 28:3
30:13,21 31:1,20
33:14 42:7,8
239:9,16,19
240:17,19 347:11
362:20
**schools**  239:12
264:19 347:12
**scientific**  28:19
**scope**  54:11 77:17
122:13 182:14
186:19,20 214:1
214:13 215:25
216:2,9,20 217:2
218:13 229:16,21
229:25 233:21
255:6 290:9
306:14,20 307:3,4
309:23 310:12
312:19 356:23
359:13 368:25
**scott**  48:8,11

**screen** 248:10
 351:10
**script** 167:23
**se** 74:13
**seal** 379:15 380:21
**sears** 56:23 175:2
**second** 42:7 63:14
 70:20 74:4 83:24
 91:4 123:11
 160:20 196:2
 200:6 207:7 226:9
 226:10 234:2,4,23
 236:12,14 252:2
 263:1 264:9,17,20
 289:2 302:8 316:3
 372:6,9
**section** 120:15
 184:6 205:13
 209:9 242:13
 250:22 255:2
 257:14,20 259:24
 316:19
**sections** 57:5,25
 316:21
**see** 23:6 24:8,17
 25:3,6 34:20
 39:23 46:9 62:25
 63:13,21 64:13
 65:22 70:13 71:1
 71:11 74:7 76:2
 77:4 80:16 82:15
 85:4 86:4,9,22
 87:3 91:21 109:4
 113:5 118:23
 120:17,20 124:17
 124:22 125:3,6
 126:23 136:7
 148:13 167:24
 172:5 174:4
 175:24 192:5,22
 196:3 203:4

204:11 205:5
 207:10,18 209:3,6
 209:19,24 224:8
 225:1 226:15
 227:6 228:7 235:3
 235:16 236:18
 237:15 238:19
 240:22 241:6
 243:15 248:6
 252:8,23 262:3,5
 263:2 264:11
 269:7 280:10
 281:8 285:13
 292:3,4 302:4,5
 323:4 330:1,2,13
 331:14 338:7
 343:23 348:7
 354:24 366:7,19
 367:11 370:19
 374:21
**seeing** 87:3 177:14
 212:15 220:5
 231:25 271:9
 341:6
**seek** 332:12
**seeking** 45:8,9
 119:5 140:17
 244:10 261:10
**seen** 23:8,15 24:10
 25:19 53:18 57:4
 62:23 120:11
 129:15 130:13
 144:9 154:9
 156:20 175:11
 192:20 204:20
 221:11,19 257:7
 269:22 291:21
 338:7 345:23
 355:10 359:23
 366:9,14 367:5

**sees** 172:8 270:12
**segregate** 153:11
**seizures** 364:25
**selected** 197:16
**selecting** 199:24
**selective** 201:8
**self** 44:2
**selling** 45:17
**send** 134:11 211:2
 211:4,8 227:25
 313:1
**sending** 203:22
 211:11
**sends** 211:5
**senior** 4:10 12:13
**sensation** 369:9
**sense** 28:19 42:23
 61:23 81:1 87:10
 89:11 97:19
 112:15 116:16
 167:7 171:4
 195:23 213:6
 229:1 231:3 232:6
 232:11 280:22
 281:3 286:5
**sent** 17:22 26:3
 143:19 313:5
**sentence** 63:14
 83:25 226:10
 236:12,14 251:1
 252:2 298:20
**sentences** 87:23
**separate** 172:20
 187:11 258:23
**separately** 181:16
**separation** 187:20
**serially** 112:18
**series** 39:24
 224:17
**serve** 197:23 200:5

**served** 25:5,18
 197:12 200:2
**service** 4:20 7:20
 12:21 35:18,21
 48:22 59:17 60:9
 67:13 68:21 69:25
 87:14 91:2,10
 93:20 96:12,20,23
 96:25 97:8,12
 98:8 100:18 109:1
 109:25 110:6
 112:4 114:15
 119:24 126:10
 128:12 150:2,6,7
 150:18 151:11
 180:1 192:16
 193:15 196:16
 201:11 232:1
 241:14,22 245:4
 247:25 252:7
 260:20 276:6,8
 277:14 295:11
 314:16,22 332:3
**services** 2:18
 11:24 62:9 141:14
 165:16 187:5,19
 224:6 231:11,13
 231:14 245:8
 258:23 261:1
 262:14 302:22
 314:8 328:18
 337:16
**servicing** 275:1
**session** 11:4 189:4
 329:17
**set** 36:25 56:5 72:9
 72:9,11,14 104:21
 108:16 220:14
 242:7 246:3
 285:24 288:15
 290:2 319:9,12,18

319:21,23 342:8
345:18,18 362:24
377:9
**sets**  123:25 126:1
128:2 172:14
345:17
**setting**  180:23
302:20 340:3
**seven**  132:21
184:19,21 185:2
329:2 362:18
372:4,22,24
**severe**  31:12 43:12
43:13 172:17
259:15 307:16
325:23
**severity**  259:6,14
**sex**  267:23
**shackelford**  3:9
12:2,2
**shakes**  293:14
**shapira**  4:22 12:21
**shapira.com**  4:24
**share**  37:5 99:12
99:16,19,23 100:6
152:7 285:25
298:11
**shared**  308:16,18
**shares**  100:7
**shaun**  5:15
**shaw**  8:19
**shawn**  8:18
**sheet**  7:22 129:5
129:17,23 378:13
380:7,10,18 381:1
**sheets**  130:7
**sheraton**  1:15
**sherman**  2:21
**shift**  32:16 46:16
220:8

**shifting**  287:12
**shkolnik**  2:8,8 7:7
8:23,23,24,24,25
9:5,5,6,7,7,8,8,9,9
9:10,10,11,11,12
9:12,13,13,14,15
9:15,16,18,19,20
9:21,22,23,24 10:4
10:5,6,6,7,8,11,13
12:9,9,10 22:17,22
22:24 24:4 30:14
65:6 66:3 75:5,16
87:11 104:10
120:5 124:4 130:6
131:19 137:20
144:10,16,22
159:18 161:9,14
161:21 162:3
164:11 167:12
168:24 169:2
171:18 173:14
174:1 181:10
182:13 184:23,25
185:4,22 186:8,14
214:12,16,18
215:5,16 216:17
218:3 219:4
223:23 227:18
230:16 232:16
235:20 256:1,4,6
256:10 259:8,18
261:4,12 274:9
275:10 289:17,20
289:24 304:6
307:3 309:21,23
320:24 334:2,4,7
345:6,14 357:24
358:2,19 359:15
360:16 363:14,20
365:21 366:2
367:10 368:6,13

370:3,5,9 371:12
375:23
**shooting**  369:3
**shoppers**  175:23
177:6,13
**shopping**  45:8
176:2,4,13 244:9
327:18,25 328:12
**short**  29:12 31:9
84:21 105:6 155:2
168:5 170:22
185:5,6 231:2
239:3 243:25
268:9,11,20
334:21
**shorten**  283:19
**shorter**  85:20
336:10
**shot**  51:17
**show**  171:7 191:7
336:9 358:17
**showed**  220:14
**shown**  328:15
378:16
**shows**  268:20
**shut**  270:4 342:7
**sic**  82:14
**sicker**  97:13
**side**  36:7,8 49:23
50:3 77:23 97:14
112:4,5 125:5
246:16,17 247:10
247:15,25 318:10
342:24
**sides**  342:22
**sight**  136:5
**sign**  6:15 16:10
32:17 250:4 309:5
**signature**  376:3
377:16 378:14

**signed**  6:20 107:6
270:4 379:13
380:18
**significance**
368:18
**significant**  224:2
245:17 325:7
**signing**  378:19
**similar**  68:22
153:2 235:25
**similarities**  338:10
338:12
**simple**  266:2
333:16
**simplicity**  227:23
233:16
**simplified**  265:24
**simply**  28:14 45:8
84:10 226:6
309:20 314:14
325:13,20
**sincerely**  378:21
**singer**  2:3 7:7 9:6
9:14,16,17,18,19
9:21,22,24 10:4,7
10:8,9,9,10,12,12
10:13,14,14,15,15
12:7,7 121:1
181:12 182:25
184:11,13,24
185:6 191:18,20
213:25 215:24
217:1,11 218:12
218:25 223:6
225:10 228:17
229:15,21 230:2
255:5 256:8
259:17 274:18,20
290:8,20 304:6
306:13 307:1,23
308:13 310:10,12

310:19 311:6
312:16,19 313:23
318:9,12,16 319:2
319:3,5 320:5,12
320:14,19,21,25
321:1,11,12
322:25 323:2,3
325:11 332:6,8,16
332:21,25 333:3
333:25 334:3,5,8
334:10 341:24
342:17 345:19
353:16,19,20
354:17 355:3
356:1,8,22,24
357:2,12,15,18,21
360:24
**single**  21:12 70:11
70:24 139:23
213:21
**sir**  211:21 367:4
371:12 378:10
**sit**  289:18,22
**site**  172:4
**sitting**  289:21
311:25 312:7
313:3
**situation**  44:23
168:13
**situations**  44:16
74:15
**six**  240:19 335:4
**sixth**  175:15
211:16 264:20
**slide**  220:14 262:1
262:6 263:9
366:12,14,17
**slides**  175:11
**slow**  325:25
332:22 335:16

**slowly**  44:21
**small**  330:5
**smiley**  32:19
**smith**  5:4 12:23
174:4
**smoke**  240:1,1
**society**  258:4
300:4
**soft**  193:2,2
**sold**  331:13
**solemnly**  13:7
**solid**  177:19
178:17 179:5
209:20
**solution**  353:6
**solutions**  365:5
378:1 381:1
**somebody**  94:12
134:18 141:17
142:24 227:25
268:16 272:19
320:13 355:14
374:19
**something's**
174:13
**somewhat**  181:23
248:4 315:17
**soon**  171:7
**sorry**  18:19,22
21:10 24:21 30:22
41:4 50:17 53:7
60:15 64:24 81:22
81:23 89:19 95:1
95:9 103:4 104:12
108:3 118:24
138:14 142:3
151:1 161:24
162:1 164:11
186:6 199:3
210:16 225:2
234:2 235:5,6

237:7,8 245:21
251:7,13 255:22
255:25 283:9
304:13 332:1,19
335:1 339:2
343:11 344:3
367:13 369:23
**sort**  41:18 52:18
59:6 61:12 67:23
89:15 94:20
100:11 101:25
104:7 110:7
114:16 123:17,25
132:23 185:3
204:23 243:8
279:13 287:25
288:8 298:16
318:5 363:15
**sorts**  123:18 132:5
132:17
**sound**  63:18
**sounds**  46:23
197:21 286:8
305:15 318:19
**source**  176:1
177:21 178:7,10
**sources**  135:15
265:5 274:25
326:12
**sovereign**  151:23
151:24
**spaeder**  2:19
11:23
**span**  153:22
**speak**  16:20 76:16
230:4 255:20
**speaker**  320:6
**speaking**  16:20
255:18 355:10
**speaks**  76:16

**special**  98:12
104:23 107:8,15
132:7,8 190:7
**specialists**  15:12
15:13 283:17
285:14
**specialized**  365:9
**specializing**  70:22
**specialty**  235:3,16
236:6
**specific**  60:9 67:20
70:17 98:14,17,17
103:1,2,7 122:1
132:10 135:17
141:18 146:9
192:24 201:25
203:19 205:12
212:11 228:4
244:2 245:13,14
245:15 283:21
288:20 300:3
308:7 344:18
375:4
**specifically**  31:8
49:18 99:24
116:10,12 157:9
179:19 189:18
197:9 211:10
233:22 258:3
260:13 265:12
266:15 311:19,22
**specifics**  22:6
56:17
**speculate**  83:14
**speech**  232:17
**speeds**  335:16
**spell**  14:12
**spells**  130:25
337:12
**spend**  153:4 231:3

spenders 284:13
284:14
spending 352:8
spent 89:8 224:5
280:23
spiel 43:19
spoke 107:14
319:6
spoken 131:6
232:20 260:1
304:5
spot 109:8 184:5
sprains 43:12
square 1:15
squeeze 342:4
ss 377:3
ssdc 151:23
staff 51:10 60:23
stage 108:16 276:4
stakeholders
21:16 149:15,16
stamped 278:21
stance 232:21
stand 136:21
187:11
standard 30:11,24
30:25 31:5,7,23
248:25 277:13
standardization
260:2
standardize 128:9
257:25 303:9
standardized
72:15 153:22
158:13 180:23
209:13,13 260:18
standardizes
128:13,14
standardizing
303:7

standards 115:14
118:22 119:18,20
128:3,7,23 129:21
181:9 194:18
stands 114:1 137:1
151:24
start 67:25 91:21
102:22 135:19
146:7 147:10
154:21 225:14
255:13 314:25
321:2,7 327:2
359:9 369:2,8,18
373:11 374:8,12
375:7
started 42:13
48:12 49:15 68:10
91:19 177:16
213:6 226:20
240:10,12 245:4
275:24 279:17
358:13,16 373:25
starting 39:16
40:22 84:11
108:20 301:9
362:25
starts 302:14
366:25 369:4,5
state 1:16,25 8:10
11:14 12:19 14:12
27:2 41:23 58:10
65:25 72:20,20
76:5,11,17 77:5,10
77:13 78:6 79:6
79:11 80:1 111:9
113:18 142:17
149:8,9 151:14,18
152:2 178:25
181:9 190:9
217:19 239:7
240:20 252:20

260:15 292:25
293:15,16 298:3
339:4 343:6 344:8
344:19 347:11,23
348:9,12 349:19
350:1,6 351:6
359:4,6 365:10,10
371:5 377:3,7,20
379:10 380:15
state's 7:18 78:16
79:13 185:14
327:24
statement 43:2
66:1 71:13 83:6,7
85:4 185:23 226:6
236:20 259:4
308:8,11 322:1
334:17 358:18
379:13,14 380:19
380:19
statement's 87:21
statements 310:17
states 1:1 11:12
80:13 151:21,23
151:24 200:7
207:13 224:22
234:17,25 238:15
252:19 253:6
256:21 258:24
259:5,10,16,21
261:10 321:14
337:21,23,23,25
338:5 348:6,21
statewide 87:13
328:6 362:19
stating 216:16
statistic 66:12
89:16 126:22
statistical 78:24
statistics 68:20
80:19

status 145:19
148:23 161:15
166:23 252:8,12
268:13
statute 252:20
stay 70:4 185:22
steer 45:11
stem 365:1
stenotype 6:10
step 91:1 169:20
214:22
stephan 61:8,21
61:22
stepping 359:9
steps 108:18
110:16 234:21
259:23 325:4
327:18 328:24,24
329:11 342:22
358:24 361:4
362:8,25 363:5
365:1,10
steve 11:22 108:4
314:7
steven 2:19
stick 316:11 372:3
372:24
sticker 151:1
152:11
sticking 74:2
stipulated 6:3
stop 124:19
192:24 267:22
274:3,5 314:15,22
325:13,20 327:18
364:18
storage 131:23
store 100:8
stored 131:16,20
stores 299:16

stories  204:18
storm  341:9
story  326:19
straight  26:15
  123:18 199:3
  337:24
strains  43:12
strategies  242:15
  256:22
stratification
  284:8
stratify  284:10
streamline  123:17
  316:5
street  1:16 2:4,14
  2:20 3:16 4:6,11
  5:5 30:2 174:3,18
  317:14 326:13
  331:11,13 341:8
  374:20
streets  352:9
strengthen  328:25
stretching  7:18
  79:13
strike  66:6 93:10
  159:24 166:14
  195:22 260:21
  311:21 312:11
strongly  302:17
structure  56:18
  337:19
struggling  338:10
  341:11
students  269:10
studied  373:15,20
  373:22,23 374:6
studies  146:21
  155:4 170:4
study  65:19 210:2
  210:11 254:12
  269:23 307:12

316:17,19 317:19
studying  209:10
  209:23
stuff  112:21
  127:24 135:20
  249:20
subject  25:4 56:5
  221:22 222:5
  275:20
subjective  213:9
submit  119:5,14
submits  108:25
submitted  55:24
  118:3 131:12
  149:20,22 151:7
  255:3 258:7,12,25
  313:20
submitting  257:19
subpoena  7:13,14
  23:5,12 24:7
  51:20 52:16,21
  53:10 54:4,10
  108:12 123:11
  171:9 190:20
  211:15
subscribed  379:10
  380:14 381:21
subsequent  328:23
subsequently
  341:8
substance  113:1
  164:15 249:17
  253:22 254:2,7
  260:24 261:1
substances  64:11
  137:24
substantially
  220:4
subtitle  175:22
success  204:17

successful  83:3
  250:15 326:6
  335:8
successfully  44:22
sufficient  40:5
suggest  224:10
  355:12
suggested  352:15
  355:17
suggesting  225:22
suggests  234:11
  279:23
suing  15:12,13
  107:10
suit  17:23 21:11
  358:3
suite  2:4,20 3:11
  4:11,17 5:5 378:2
suits  21:12
summarize  173:6
summary  80:11
  80:12 173:13
summit  21:14
  177:2 212:3
  282:16 313:16
  371:7
superior  148:13
  156:23 378:1
supervise  48:4
  50:13
supervises  338:3
supervision  337:6
supplemental
  151:18,20,22
  152:2,3,16,20
  153:1
supply  3:8 12:4
  118:12 341:19
  342:7
support  77:11
  189:23 246:23

299:1 363:4,4
supportive  298:22
  351:14
supposed  31:9
  118:18,18 266:2
  266:12
sure  11:16 15:1
  16:7 21:24 30:9
  46:12 50:22,25
  51:5 54:20,25
  57:21 64:25 66:13
  67:2,6,18 71:20
  77:6,7 81:14
  84:13 93:15 96:19
  106:16,25 107:4
  108:22 110:8
  111:8 115:24
  116:8,22 117:7,14
  119:7 121:6,7,10
  127:3 130:11
  131:24 132:4
  134:25 135:2,10
  135:11 139:3,6
  141:3,16 145:25
  157:7 159:5,6
  162:4,6 164:23
  167:1 169:13
  178:2,9 179:1
  183:21,23 185:17
  189:15 190:3
  194:3 195:9
  197:18,19 198:23
  199:11,15 201:14
  201:21 202:19
  203:19 208:4
  209:1 210:4
  212:10,21,24
  213:14 220:13
  222:14 223:15
  225:15 226:23
  242:20 250:3,9,13

251:25 252:17
254:3,8,8 255:17
255:18 258:12
263:19 265:8
266:6 268:23
272:9 275:15
280:21 282:17
290:13 292:8
293:5,12 296:15
297:6 318:15,17
318:18 319:8
324:5 330:7 338:9
338:19 341:2,20
344:5 353:12
354:12 357:5
370:8 373:3
**surgeon**  317:4
**surgical**  29:12
**surprising**  88:21
**surs**  135:21
136:15,21 143:1
143:19 272:16
**surveillance**  137:4
137:6,9
**surveys**  170:4
**suspect**  111:9
112:16 119:8
135:25 201:16
225:13
**suspended**  142:16
349:22
**suspicion**  142:20
**suspicions**  136:2
**suspicious**  171:10
173:8,11,23 356:4
**sustainability**
266:3
**swear**  13:4,7
**sweet**  4:16 12:25
12:25

**sworn**  379:10,13
380:14,18 381:21
**symptom**  332:10
**symptoms**  163:8
**synthetics**  350:3
**system**  78:24
109:2,2 110:13,13
110:15,23 111:1,3
111:9,12 112:2,9
112:13,13,15
115:2,6 118:17
127:8 128:21
134:7 137:13,16
146:2 167:8
168:15 175:19
192:17 193:10,24
194:2,4,6,22 195:8
195:10,18 202:13
202:18 239:16
250:2 252:23
258:1 260:18
276:10,16 317:25
318:1,3 331:19
**systemic**  317:10
**systems**  100:9
110:18 112:24
159:9 195:24
203:13 240:20
261:11 365:8

**t**

**t**  6:1,1 14:15 78:24
79:7 377:1,1
**take**  16:10,20 17:6
17:8 23:13 24:6
27:4 30:6 48:2
49:10 57:3 79:19
91:22 109:19
129:12 136:2
143:13,20 146:24
149:1 153:9
162:23 175:9

181:16 192:11
213:1 221:10
254:16 261:15
262:18 269:5
270:14 277:16
281:24 283:12
284:14 287:2
298:14 318:13
320:22,25 330:5
332:14 349:2
363:10,13 369:6,7
371:16 372:14
**taken**  6:8 105:10
141:11 143:3
148:8 149:23
188:3 192:19
211:18 214:25
215:6 216:10
217:2 222:8
254:22 256:15
259:23 264:14
318:22 325:4,6
327:17 342:22
361:4 372:19
377:8,11
**takes**  110:11
198:21 330:15
**talk**  20:12,20
36:14 46:9 59:18
90:3 110:8 113:9
147:9 154:8 160:9
168:9 187:15
229:2 247:15
250:25 255:1
265:1 290:3 313:9
352:5 363:21
**talked**  20:8,18
30:10 73:3 74:18
93:8 101:20
102:16 103:9,10
104:25 114:2,24

126:16 129:21
134:11 136:19
137:11 158:15
180:6 198:24
200:12 203:21
229:1,8 239:4
240:11 248:11
264:18 265:10
267:12 275:17
277:12 285:6
289:2 291:23
298:9 304:8 306:2
316:6 327:20
328:2 329:7,16
337:5 339:18
340:18 341:14
342:21 344:9,22
345:8 349:13
350:2 353:8
356:12 361:9,13
361:17,21
**talking**  38:3 55:25
102:20,22 115:10
161:13,23 220:15
233:3 255:11
340:2 368:15
**talks**  76:8 78:20
232:12 233:22
234:7 328:5
370:16
**tame**  363:13
**tapering**  243:11
**targeted**  235:1,13
236:3 238:16
241:5 242:9
**task**  8:7 221:3,20
222:6,18 223:3,11
223:16 224:12,18
225:23 251:15
365:15,16,17
366:4

tassie 258:21
teaching 178:21
team 40:2 47:19
53:25 92:11 94:23
94:25 135:21
246:21 263:14,16
263:18 264:2,8
teams 246:11
technical 127:9
131:22 261:9
teenagers 347:8
telephone 4:16,21
5:4 320:6
tell 17:6 49:7
120:9 129:13
137:12 175:10
221:11 309:17
315:12 344:15
354:18 368:17
370:21 371:8
telling 32:12
173:10
tempted 250:19
ten 149:6 240:19
318:13 324:17
tend 97:10 135:20
240:2
tenth 2:14
tenure 140:1
292:21 326:17
term 31:9,11
39:20 43:16,21
44:8 45:12 84:21
88:13 170:19,22
170:22 171:5
231:1,2,15,20
243:25 271:7
terminal 44:15
45:1 87:25
terminate 251:3
251:16

terminated 252:8
252:12
terminology
127:10 151:1
330:14 341:11
terms 186:1 191:3
361:22
terrible 334:9
terribly 139:17
140:14
test 21:13 319:12
319:18 373:8
testified 14:4
42:10 75:13
116:25 147:12
155:21 206:7
223:15 244:11
279:11 306:22
373:10
testify 7:13 23:17
24:15,23 25:23
55:4 186:22
221:22,25 222:15
testifying 15:14,22
15:24 55:7 109:24
223:7,9 307:5
332:3 356:20
testimony 13:8
15:23 17:11 21:1
23:6 90:11 229:22
275:20 298:15
306:8 368:14
377:8 379:6,7
380:6,9,12
teva 5:9
thank 19:2 22:19
22:22 24:4 33:12
93:12 127:18,21
128:1 129:10
137:6,10,14
144:22 186:14

187:24 189:17
214:18 223:24
278:17 286:6
292:12 300:15,16
304:4 314:1,2,11
318:7 323:2 332:6
333:23 344:4
353:16,19 360:15
371:12 372:9,16
375:24
thanks 90:1
191:20 256:13
278:25
theme 32:18 260:5
therapeutic
153:12,14,19
154:1
therapeutics 51:1
51:7 147:11
therapies 198:12
226:14 228:2
234:11
therapy 33:22
98:15 103:17
161:6 162:9
163:18,19 165:12
170:24 173:4
227:12,17 228:15
229:13 239:9
241:22 329:21
330:3 349:9
thing 61:12 67:23
117:10 180:5
181:13 231:24
234:16 309:1
319:5 342:14
352:24 369:17
things 20:15 35:16
37:6 47:16,18,23
47:23 48:4 54:22
97:14,21 119:8

132:15 136:1
157:13 171:6
172:19 180:12
192:18 198:4
199:8 203:4 206:3
214:10 226:19
228:6 240:3,11
265:20 268:16
272:15 273:21
285:21 287:4,22
298:12 306:4
315:4,22,23
327:21 344:7,16
think 19:8 26:4
29:23 30:9 38:1,4
38:10,13 39:11
40:20 41:2,4 42:6
42:10 43:3 46:4
46:19 47:17 52:23
66:19 69:2 71:21
73:17 76:2 77:14
78:20 83:22 87:6
88:15 91:5 93:13
93:13 94:5 99:18
103:15,15 105:5
106:20 107:10
110:20 111:6
116:1,4 117:7,25
119:12 120:6
130:22 135:13
136:19 140:11
141:19 144:19,20
147:12 154:9
155:24 161:12
164:7 166:6
169:11 173:9
177:9,12,15 178:1
178:1,20 179:24
180:17 181:18
183:18,20 184:2
187:7,15,21

189:23,23 193:7
195:13,14,15
196:1 200:11
205:22 212:11,12
212:22,22 213:18
213:20,25 214:6,7
215:13 217:12,14
217:18 218:6,9,17
218:19 220:1
223:14 226:18
227:7,23 229:19
229:24 230:25
232:2,20 240:6
244:22 245:9
250:23 252:13
254:14 259:13
260:3,9 262:10
265:15 266:22
267:25 270:11
272:14,23,25
273:13 274:3
275:17 276:17
277:22,24 279:21
282:2 285:20
287:3 288:7 294:5
296:15 300:11
302:4 307:17
312:25,25 313:19
315:15 316:18,22
317:9,9,19 319:14
322:23 323:14,16
323:25 324:5,8
326:5 330:4,9
331:8,9,17 332:25
333:6 335:24
338:12 341:2,2,6
342:3,5,6 345:11
345:22 346:23,23
352:4,4,13,24
356:11 357:4,11
357:12,16 358:13

358:17 361:5
369:16,17,18,20
370:17
thinking  134:19
154:22 170:15
178:23 190:16
200:17 231:5
244:23 248:21
249:24 262:19
271:13 345:24
thinks  216:5
third  42:7 63:10
65:14 83:23
102:17 103:11
115:13 135:15
160:23 227:7,7
251:14 272:13
302:9,11 324:13
338:22
thirty  324:15,16
378:18
thought  75:13
88:12 127:20
168:23 311:2
351:24
thousand  324:16
thousands  66:20
three  18:6,7 19:3
27:10 43:7,8 48:6
69:12 91:6 147:23
148:16 190:18,18
192:6 199:8 246:2
287:7,10 336:7
threshold  285:24
thresholds  288:16
tie  374:21
tied  285:3 316:6
tim  12:5 107:18
304:1
time  6:8 16:21
28:9 29:13,14

31:14,15,24 32:2,9
32:23 33:1 41:7
43:23 47:10 48:3
49:17 50:6 62:4
63:23 68:2 83:4
83:17 84:12 85:24
96:21,24 105:6
106:24 109:1,17
112:19 143:20
154:3,7 156:17,17
157:15 166:11,18
169:15 170:9
183:4 185:5,23
186:2 187:12
190:17 200:25
201:3,19,22,23
207:25 212:11,15
212:17 218:22
219:4,10 226:20
229:24 238:11
244:23 254:18
271:13 279:13
280:17 283:2
289:13 298:3,3
305:19 306:15
315:8,14 322:13
325:15,22 331:2
331:15 337:1
340:12 342:11
352:9 355:9
358:20,21 361:6
361:22 363:10
370:11 371:19,23
375:24
timeline  8:11
277:18,20,25
278:10 279:3,6
345:4,13
timelines  115:15
115:15

timely  92:23
times  14:25 19:12
43:8,8 45:4 74:24
91:24 92:19
156:20 278:3
294:2 375:3
timothy  3:20
timothy.knapp
3:23
titled  174:25
191:17 192:8
today  15:22 17:11
17:18 19:5 24:15
24:23 25:22 57:12
94:4 187:21
218:10 219:23
304:6 312:1,7
313:3 320:13
333:1 359:23
365:14 366:15
today's  17:20 20:9
toig  4:21 12:20,20
told  20:25 54:7
106:18 263:12
tolerance  28:15
31:13,14 172:16
tolerant  231:10
tolerated  268:23
tooth  49:11
toothache  169:16
top  29:25 38:20
78:22 89:16
220:21 235:7,9
284:12 328:6
366:18
topic  25:4 56:15
60:22 90:3 108:11
123:11 144:12,12
144:19,21 145:18
160:9 161:10,13
161:21,25 171:8,8

171:9 173:7 184:6
190:20 200:19
201:2,17,24,25
211:14,15,16
214:24 215:6,7
216:12,20 219:1
222:7 256:2,5,8,9
256:14 264:7
283:10 308:18
**topics**  23:12,15,18
24:18,22 25:3
57:11 105:17
144:14 162:2,4
181:12 182:14
183:1 185:10,12
198:22 199:24
216:4,9,10 218:13
221:22 228:18
229:16 255:6
290:9 306:3
**tos**  57:1
**total**  70:12 80:13
82:12 83:8 104:20
152:10 153:3
160:4 209:19
276:17 328:17
**totally**  188:2
**touched**  117:25
160:11 171:12
227:13 250:23
**tough**  341:1
**tower**  5:5
**town**  4:11
**tpas**  102:19,20,23
**tracey**  48:10,24
92:11,15 93:6,7
95:10 102:11
114:20 159:19
204:25 205:1
**tracey's**  210:13

**track**  137:16
144:17 161:11
162:4 195:24
343:17
**tracking**  108:14
159:1
**trade**  299:4
**transaction**  130:3
**transcribed**  6:12
379:7
**transcript**  6:15,18
6:20 377:8 378:11
378:12 379:5,12
380:5,11,17
**transcripts**  19:25
**transferred**
143:12
**transformed**
78:23
**transition**  91:5
250:8 341:13
367:20 368:20
**transitions**  366:19
368:15
**transportation**
250:12
**treat**  28:24 171:4
224:8 227:10
228:5 243:12
**treating**  89:9
352:20
**treatment**  17:25
39:18 45:12 65:21
73:13 74:11 75:2
75:25 81:9 87:24
158:17 162:11,24
162:24 163:15,24
164:2 167:11
168:1 170:7
179:23 224:6
228:24 229:14

249:17 252:4
253:5,9,23 254:2,7
257:25 258:3
260:4,6,25 262:16
267:13 273:6,16
281:20 282:7,22
282:23 283:1
301:12 302:22
303:7 329:24
330:6,10,25 331:1
331:7,14,23
332:12,12 335:3
335:13,20 340:15
342:10 349:6,9,15
349:19 351:11,15
352:12 365:5,9
**treatments**  33:16
33:18 123:15,21
126:4 160:14
161:13,24 164:14
164:16 166:2,7,10
166:17,23 168:22
170:14,18 190:7
224:25 227:1
232:9 282:9,10
339:4,22
**trends**  132:13
266:1
**trick**  156:3
**tricyclic**  160:23
165:6
**tried**  167:10
168:13 373:21
**trigger**  158:17
284:5,6 315:5
**triggering**  284:2
**troopers**  350:6
**trouble**  309:25
**true**  49:14 74:17
74:24 117:22
125:4 167:13

172:19 179:4
193:20 199:9
219:20 231:18
259:4 349:8
351:16 377:8
**truly**  32:13 109:20
341:3
**truth**  13:8,9,9
**truthful**  17:11,15
**truthfully**  213:10
**try**  44:21 45:11
78:2 146:25
169:11 171:13
173:23 198:15
210:8 239:21
274:5 283:18,19
298:25 304:2
316:4,25 354:12
358:25 359:9
360:8 364:18
365:1,11
**trying**  53:2 54:14
57:12 60:19 83:1
116:14,16 125:24
125:25 127:18
156:3 167:7
170:21 204:6
220:16 223:21
226:23 228:25
231:18,20 232:2
232:11 233:1
240:21 250:16
260:6,15 265:11
298:10,24 317:2
348:15 352:10,19
352:22
**tucker**  4:17 12:25
**tuckerellis.com**
4:19
**turn**  26:6 41:18
63:10 65:12 70:5

76:4 81:15 84:17
108:11 120:14
123:10 145:18
171:9 175:15
177:18 190:20
196:2 207:7
211:15 234:23
238:14 261:24
264:9 334:6 342:7
353:7 360:22
366:10 370:14
371:2
**turns** 16:20
**twelfth** 3:16
**twice** 19:14 148:20
**two** 21:14 35:24
43:8 45:7,10
46:18 49:2 74:3
87:21,22 91:3
106:4 116:1,1,3
148:16 153:23
172:14,19 185:11
187:18 190:18
198:13 235:21
250:24 251:9
255:2 298:20
300:13 335:18
336:2 340:7,8
345:17 352:20
373:7 375:23
**tylenol** 160:18
**type** 27:24 28:1
67:25 68:11 86:9
87:2 88:11,12
100:25 135:14
180:4 182:21
198:17 241:24
270:10,15 282:25
**types** 15:2 29:9,23
33:18 35:16 43:24
53:14 104:17

118:1 121:25
132:15 197:22
298:12
**typical** 44:6
257:16 369:17
**typically** 15:12
31:10,10 34:19
43:14,17 44:1,2
45:6 123:7,8
139:10 149:14
152:16,23 170:17
180:18 198:18
203:3 353:22
354:7 355:7 369:4
**typing** 16:14

**u**

**u** 6:1 136:22,23
**u.s.** 62:8
**uh** 15:20 16:1,1,12
16:17 21:4 22:23
24:19 27:9 31:21
35:13 40:17 41:8
49:24 50:1,12
57:13,23 59:20
62:2 68:9 69:18
73:2 81:24 85:9
85:25 86:25 88:24
88:24 90:13,15,18
94:10,16 95:14
98:1,3 100:14,16
106:19 108:22
111:15,15 112:10
114:7 124:20,25
129:20 132:25
133:3,15 136:24
138:2,12 142:7
145:17 147:16,18
153:7,13 158:14
162:20 167:17
187:25 191:19
192:10 194:24

200:13 203:3
204:12,14,16
205:2 206:10,12
225:2 226:16
229:4 236:9
241:25 244:17
245:3 252:9
253:10 256:7
264:23,25,25
267:11 268:2,7,22
269:12,14 275:6
275:21 276:24
281:19 284:4
286:10 287:5
288:19 297:3,16
298:5 303:1
313:13 326:4
327:23 328:13,16
329:13 332:7
334:22 337:7
340:4,22 341:18
345:10 347:3
348:22 349:3
350:21,23 351:12
353:10 354:10
360:23 361:16
362:4,13 365:3
367:3
**ultimately** 194:12
322:4
**unaware** 275:3
**undergrad** 26:16
**undergraduate**
26:9
**underneath**
120:19
**understand** 15:21
16:3,4,13 21:23,24
22:1 23:10 24:12
24:13,13 25:21
28:17 37:17 52:17

53:2 54:18 72:6
75:10 76:1 77:3
81:2 90:10 106:14
126:7 128:13
131:4,22 135:18
167:1 173:7 179:4
186:19 213:4,6
225:15 228:22
230:20 242:16
247:9 265:22
269:5 272:18
328:15 330:14
338:20 352:19
370:3 372:1
**understanding**
21:5,8,9,19 22:3
23:16 31:20,22
54:15 82:18 84:4
128:6 137:15,18
153:8 156:1,4
181:6 182:10,17
205:9 251:20,23
317:20 319:9,11
320:16
**understood** 16:11
43:5
**undertaking** 37:24
37:25
**unfortunate** 247:7
**uniform** 237:14
**unique** 180:11
190:7 335:19
**unit** 364:15
**united** 1:1 11:11
**unitedhealthcare**
96:10 99:4 223:5
**universe** 126:12
**university** 26:10
27:2
**unlawful** 181:7
182:18

| | | | |
|---|---|---|---|
| unlawfully 144:7 | 325:4,7 327:3 | utilizing 200:7 | videographer 5:15 |
| unmet 262:11 | 329:24 337:25 | **v** | 11:6 12:18 13:3 |
| unnecessary | 340:24 341:25 | | 105:8,13 186:6,9 |
| 226:24,25 310:16 | 355:18 356:16 | v 378:6 | 189:7 254:20,23 |
| 311:23 313:21 | 359:20 367:1,2,13 | valley 27:10 34:1 | 255:22 289:14 |
| unpack 91:18 | 367:14 368:21 | 34:11,17 35:5,9,23 | 318:20,23 371:24 |
| unrelated 365:17 | 371:21 375:6 | 42:13 | 372:17,20 375:25 |
| unused 179:12 | usefulness 139:24 | value 146:23,25 | view 29:18 30:6 |
| unusually 68:14 | 148:12 | 147:5 148:21 | 71:18,20 106:21 |
| 134:2,6,23 136:10 | user 139:17 | 156:24 231:22 | 113:4 117:17 |
| update 276:9 | 140:15 | 240:22 266:4 | 142:18 168:11 |
| updated 122:16,22 | users 367:23 369:2 | variation 135:6 | 217:8,12 218:22 |
| 245:22 | uses 30:8 105:2 | varies 181:22 | 219:2,2,3,11 222:2 |
| upper 34:11,17 | 173:1 293:22 | various 73:12 | 254:11 |
| 35:5,9,23 | usually 15:10 | 101:13 108:18 | virtually 114:6 |
| usa 5:9 | 36:25 44:12 45:21 | 162:24 301:20 | vis 92:17,17 |
| use 7:16 28:6,15 | 100:3 136:5 | 302:25 | visit 172:4,24 |
| 29:2,10,18,24 31:9 | 149:18 156:21 | vary 200:18 | 295:25 306:6 |
| 31:17 35:21 37:25 | 172:23 181:25 | 201:16 205:19 | visited 306:11 |
| 39:10 44:17 62:11 | 197:24 298:22 | vast 44:23 81:8,11 | 311:4 |
| 62:22 65:21 69:7 | 369:4 | 81:14 100:4 | visiting 306:23 |
| 72:21 84:22 98:7 | utilization 8:4,6 | vendor 105:1 | visits 307:8 |
| 98:9 103:10,16 | 35:4,8,15 36:6 | 118:20 193:9 | visualize 77:12 |
| 104:8 113:23 | 37:13,15 50:23 | vendors 90:4,5,9 | vital 32:17 126:22 |
| 118:12 122:5 | 61:11 68:20 87:8 | 90:19 93:25 | 309:5 |
| 139:16 140:12,18 | 93:2 137:5,7,9 | 114:24 | vivitrol 250:17 |
| 155:12 169:20 | 156:8 158:7 | veritext 378:1,7 | 268:6 281:18 |
| 179:7 183:3 185:6 | 190:23 191:1,22 | 381:1 | 283:3 |
| 195:15 205:24 | 191:24 192:14 | veritext.com. | volume 134:2,6,23 |
| 224:12,23 231:17 | 193:14 194:11 | 378:17 | 136:10 236:15,23 |
| 236:16,24 240:2 | 195:25 196:6,8,15 | version 7:21 129:5 | volumes 235:2,14 |
| 242:16 243:12 | 196:22,24 197:5 | versus 31:17 86:21 | 236:4 |
| 244:7 246:10,13 | 197:12 198:10 | 87:7,9 98:6 155:1 | vote 149:23 |
| 248:11 249:1,17 | 199:16 202:1,12 | 219:24 228:5 | **w** |
| 250:20 253:22 | 204:23 205:4,7 | vice 36:11 | |
| 254:2,7 257:16 | 206:8,15 210:14 | vicodin 29:5 | w 3:20 14:15 |
| 260:24 262:13 | 210:18,21 245:17 | 169:17 170:25,25 | wait 100:3 |
| 265:12 266:1 | 302:21 303:9 | video 1:10 6:4,9 | waived 6:14 376:3 |
| 268:20 285:18 | utilized 90:5 | 6:16,17,18,20 | 378:19 |
| 288:20 301:4 | 366:13 | 185:24 186:7,8,9 | waiver 97:11,15 |
| 302:19 322:5 | | 186:13 189:6 | 255:2,3,7,11,18 |
| | | 376:5 | 257:14,15,20 |

258:6,9,14,17,19
258:25 259:25
296:18 303:8
**walk** 108:18
123:22 169:11
224:16,19 271:1
292:10
**walmart** 3:2 12:1
**want** 46:9 54:25
54:25 55:4 57:21
63:25 94:7 106:23
123:25 132:12
135:18 149:24
160:9,11 162:3
169:16,20,21
185:18,25 186:7
201:19 217:21
222:4 224:19
230:19 231:6,6
239:21 241:21
242:7 255:1
284:24 289:4
293:3 309:22,24
309:25 315:17,24
319:7,12 321:2,7
321:17 330:1,1
331:15 333:24,25
334:3,6 342:9
343:3 344:1,5,14
345:12 355:5
364:11 370:10,12
372:5
**wanted** 41:20
69:16 97:7 105:16
105:18 125:6
134:21 222:1
292:11 319:5
331:5
**wants** 132:23
369:2

**warehouse** 131:24
**washignton** 2:20
**washington** 2:4,14
3:16 5:5,12
**waste** 106:24
294:8
**way** 37:12 49:22
73:21 83:17,20
115:2 119:16
122:16 123:16
128:11 139:20
142:19 164:12,17
172:8,20 174:20
179:20 184:1
207:24 208:2,5
218:16 227:10,16
228:12 231:8,22
231:22 232:14
233:9 240:18
249:23 252:25
258:15 266:9,14
266:21 270:9
273:10 284:25
293:19 294:15
295:1 312:17
314:21 321:6
347:24 348:15
**ways** 30:3 37:13
59:2 166:24
215:22 226:5
247:22 265:13
295:9,22 303:5
341:3
**wc.com** 3:18
**we've** 20:8,15 24:2
56:5,6 72:13
74:18 85:16 93:21
101:20,22 102:16
103:10,24 104:25
126:16 136:19
148:16 155:11

158:15 171:12
180:24 184:17
192:23 213:7,12
220:1,3 226:7,7
229:1 240:15
242:21 260:1
264:17,18,21,21
267:17 276:19
281:13 285:2,6,12
293:21 295:12
298:9 352:25
353:2,3,3 374:6
**wean** 44:21 325:25
**weaned** 326:2
**weaning** 39:19
**web** 8:4 191:24
192:16
**website** 192:1
221:14
**websites** 20:3
**wednesday** 1:18
11:3 189:3 376:6
**weeds** 51:10
**week** 21:2,3 43:8,8
48:13 92:19
299:23
**weekend** 308:18
317:7
**weekends** 308:22
309:11
**weigh** 73:12
170:21
**weighing** 31:16
147:3
**weird** 187:18
**welcome** 45:22
**went** 32:10 38:15
118:4 142:25
144:2 180:9 297:7
308:17 333:6
360:13,20 363:21

**west** 4:11
**wharton** 1:13 6:5
7:4 11:10 13:10
14:1,7,14,22 22:7
23:1 54:23 56:15
62:17 79:19 84:17
105:16 107:14
108:10 109:24
120:8 129:23
137:3 145:21
154:13 175:9
187:7,22 189:12
190:19 206:22
209:10 211:15
221:11 222:17
223:7,14 232:20
255:1 256:18
257:6 279:2
291:20 292:19
300:15,25 303:25
307:5 319:3 320:7
321:2 356:19
357:25 369:25
372:25 373:7
377:9 378:8 379:4
379:9 380:4,13
381:20
**wharton's** 33:3
46:2
**whatever's** 284:13
**whatsoever**
327:13
**wholesalers** 296:3
296:5
**wife** 373:1
**william** 3:9
**williams** 3:10,15
12:3
**window** 207:17
284:5,6

wisdom 49:11
withdraw 356:24
  356:25
withdrawal
  325:18,23
withdrawals
  163:8
withdrawn 357:9
  357:19
witness 6:6,12,15
  6:19 7:3 13:4
  22:16 23:5 30:15
  33:5,8,12 65:7
  75:6 87:12 106:23
  110:1 121:2 124:5
  129:10 130:7
  131:20 137:6,21
  159:19 161:20
  167:13 171:19
  173:15 174:2,23
  181:11,13 182:15
  183:2 184:9,12,17
  185:7 186:21,25
  214:2,15,17 215:9
  215:18 216:6
  217:4,12 218:4,14
  219:6 221:18
  222:3 223:9
  225:12 227:19
  230:1,20 235:21
  254:16 255:7,25
  259:9,20 261:5,13
  274:10,19 278:17
  289:18 290:10,21
  306:15 307:6,25
  308:14 309:22,24
  310:11,20 311:7
  312:17 313:24
  314:2 318:18
  321:10 332:5
  342:2 345:15

354:16,23 355:25
357:1 358:11
359:14 360:11
363:13 365:22
368:2,12 369:1
370:2,4 371:15
372:8 378:8,11
379:1,4,11 380:1,4
380:15
witness's 219:3
witness' 378:14
wms 3:13
woman 320:8,10
  320:11
women 316:21
word 100:11,17
  113:23 119:7
  213:1 248:15
  316:9 330:18
words 67:4 72:17
  119:19 122:9
  130:2 135:15
  151:5 199:12
  201:6 266:10
  315:17 343:4
  361:5
work 26:23,25
  34:22 35:22 37:6
  37:8 41:15,20
  46:10 47:24 49:22
  57:14 58:1,18
  59:5,14,17 60:17
  72:12 78:7 87:17
  91:11,11 92:23
  98:8,11,16 99:20
  102:18,18 104:5
  111:25 119:16
  132:19 134:12
  135:22 142:19
  143:17 149:5
  199:21,24 208:3

226:11 233:23
234:8 242:14
260:12 265:7
272:24 291:22
292:3 298:10
335:17 352:6
353:2
worked 26:19,22
  32:24 35:6,6,7,11
  36:21 38:19 40:18
  72:14 104:15,17
  166:15 207:23
workers 252:7
working 38:7 44:9
  46:17 179:25
  234:15 239:5
  240:5 246:24
  247:6 250:16
  269:10
works 60:20 96:13
  102:9 135:6,7
  153:6 159:17
  251:21
world 218:20
worried 368:3
worries 135:16
worst 246:20
worth 375:23
wraparound
  282:7
wright 27:2
write 43:10 182:11
  182:18 227:24
  307:19
writer 339:7
writes 108:20
  110:10 167:22
  270:12
writing 6:10
  269:18 310:6,9
  334:8

written 42:16,19
  108:23 200:23
  223:10 238:18
  307:22 308:7,10
  310:15 312:11,15
  312:22 360:3
wrong 49:7 90:11
  95:21 174:13
  267:23,23 335:23
wrongdoing 136:1
wrote 43:7 311:20
  311:22

## x

x 7:1 8:1 9:1 10:1
  127:13,14 314:20
xerox 91:3,6,22,23
  93:19

## y

y 314:19
yeah 18:14 28:20
  30:20 39:3,6 41:4
  41:5,6 42:4 45:24
  45:24 46:12,13
  47:1 50:1,8 51:2,5
  51:7,8 53:4 55:8
  57:15 58:12,15
  64:23 68:1,2 75:4
  76:19 83:22 89:6
  89:18 93:16 94:18
  95:4,6,22 99:17,22
  100:23 103:21
  104:15,15 112:19
  113:13 114:16
  116:4 129:15
  134:8 142:1
  145:11 155:25
  156:3,4 159:5
  162:1,3 180:19
  184:2,20,21,24
  189:17 195:23

199:20 203:15
216:1,13 219:20
219:22 220:1
225:18 226:7
228:21 230:23
232:24,25 235:17
236:19 247:19
248:4,15 249:21
251:8,22 255:15
255:15 271:17,17
273:12,20 274:4
276:17,17 277:22
279:19 283:11
284:19 285:19
286:6 292:7
303:20 315:11
316:12 323:22
324:18 325:2
327:15 330:22
333:12,18 334:2
342:5,20 343:2
344:1 346:3 357:4
357:20 358:11,23
364:6,8 372:12,15
**year**   26:17,18
27:10 42:7,8
46:19 48:19 49:3
81:20 82:11 160:6
175:24 194:7
198:23 203:4
260:6 267:20
268:3 302:3
**years**   17:25 27:16
34:3 35:24 36:9
46:18 68:8 84:9
91:6 116:1,2,3
154:9 186:17
190:18,18 250:15
267:18 275:25
287:15 288:25
304:12,17 337:3

**yesterday**   18:15
19:16
**york**   2:9,9
**young**   238:18
239:22 369:1
**youth**   362:19

**z**

**z**   314:19
**zero**   86:5
**zuckerman**   2:19
11:22
**zuckerman.com**
2:21