Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION  |   MDL No. 2804
                                  |
 4   OPIATE LITIGATION            |   Case No. 17-MD-2804
                                  |
 5   This Document Relates to:    |   Judge Dan A. Polster
                                  |
 6   The County of Summit, Ohio,  |
     et al., v.                   |
 7   Purdue Pharma L.P., et al.   |
     Case No. 17-op-45004         |
 8                                |
     The County of Cuyahoga v.    |
 9   Purdue Pharma L.P., et al.   |
     Case No. 18-op-45090         |
10                                |
     City of Cleveland, Ohio v.   |
11   Purdue Pharma L.P., et al.   |
     Case No. 18-op-45132         |
12                                |
13
                 Thursday, December 13, 2018
14
                         - - -
15
           HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                 CONFIDENTIALITY REVIEW
17
                         - - -
18
          Videotaped deposition of PATRICIA WILLIAMS,
19      held at Foley & Lardner LLP, One Biscayne Tower,
        2 Biscayne Boulevard, Suite 1900, Miami, Florida,
20      commencing at 9:22 a.m., on the above date,
        before Susan D. Wasilewski, Registered
21      Professional Reporter, Certified Realtime
        Reporter, Certified Realtime Captioner.
22
                         - - -
23
                 GOLKOW LITIGATION SERVICES
24          877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2      WEITZ & LUXENBERG
        BY:  ELLEN RELKIN, ESQUIRE
 3           ADAM L. STOLTZ, ESQUIRE
        700 Broadway
 4      New York, New York 10003
        (212) 558-5526
 5      erelkin@weitzlux.com
        astoltz@weitzlux.com
 6      Representing the Plaintiffs
 7

        FOLEY & LARDNER LLP
 8      BY:  KATY E. KOSKI, ESQUIRE
        111 Huntington Avenue
 9      Boston, Massachusetts 02199
        (617) 342-4000
10      kkoski@foley.com
        Representing Anda, Inc., and the witness
11

12      WILLIAMS & CONNOLLY LLP
        BY:  JULI ANN LUND, ESQUIRE
13      725 Twelfth Street, N.W.
        Washington, D.C. 20005
14      (202) 434-5239
        jlund@wc.com
15      Representing Cardinal Health, Inc.
16

        REED SMITH LLP
17      BY:  CRISTINA CÁRDENAS, ESQUIRE
        1001 Brickell Bay Drive, Suite 900
18      Miami, Florida 33131
        (786) 747-0207
19      ccardenas@reedsmith.com
        Representing AmerisourceBergen Corporation and
20      AmerisourceBergen Drug Corporation
21

        JONES DAY
22      BY:  CHRISTOPHER M. LOMAX, ESQUIRE
        600 Brickell Avenue, Suite 3300
23      Miami, Florida 33131
        (305) 714-9700
24      clomax@jonesday.com
        Representing Walmart
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2       MARCUS & SHAPIRA LLP
         BY:  JAMES F. ROSENBERG, ESQUIRE
 3       One Oxford Centre, 35th Floor
         Pittsburgh, Pennsylvania 15219
 4       (412) 471-3490
         rosenberg@marcus-shapira.com
 5       Representing HBC Service Company
 6
 7       ARNOLD & PORTER
         BY:  ZENO HOUSTON, ESQUIRE
 8       250 West 55th Street
         New York, New York 10019-9710
 9       (212) 836-8000
         zeno.houston@arnoldporter.com
10       Representing Endo Health Solutions Inc., Endo
         Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
11       Par Pharmaceutical Companies, Inc.,
         (f/k/a Par Pharmaceutical Holdings, Inc.)
12
13
         COVINGTON & BURLING LLP
14       BY:  MICHELLE Y. YOCUM  ESQUIRE
         One CityCenter, 850 Tenth Street, NW
15       Washington, DC 20001-4956
         (202) 662-6000
16       myocum@cov.com
         Representing McKesson Corporation
17
18
     ALSO PRESENT:
19
         ANTHONY BARBARO, Videographer
20
         BURTON KING, Weitz & Luxenberg
21
         SHA'HUNI ROBINSON, Weitz & Luxenberg
22
23
24
25
```

```
 1                          - - -
 2                        I N D E X
 3                          - - -
 4   Testimony of:  PATRICIA WILLIAMS              PAGE
 5        DIRECT EXAMINATION BY MS. RELKIN............ 10
 6
 7

                        E X H I B I T S
 8
                  (Attached to the transcript)
 9
                ANDA-WILLIAMS DEPOSITION EXHIBITS      PAGE
10
     Exhibit 1    Curriculum Vitae - Patricia L.      16
11                Williams
12   Exhibit 2    Slide Presentation -                49
                  Anda_Opioid_MDL_0000711452 through
13                711470
14   Exhibit 3    E-mail - Subject: Tussionex Item    85
                  201545
15                Anda_Opioids_MDL_0000107802 through
                  107803
16
     Exhibit 4    E-mail - Subject: C2 Promo with Teva  90
17                Fentanyl Patches...
                  Anda_Opioids_MDL_0000610875
18
     Exhibit 5    E-mail - Subject: Actavis Match to   94
19                Anda
                  Anda_Opioids_MDL_0000082451 through
20                82456
21   Exhibit 6    E-mail - Subject: May Marketing      95
                  Driver
22                Anda_Opioids_MDL_0000712121
23   Exhibit 7    E-mail - Subject: CII Actavis Credits  100
                  Anda_Opioids_MDL_0000629163 through
24                629165
25
```

```
 1              E X H I B I T S
 2         (Attached to the transcript)
 3    WILLIAMS DEPOSITION EXHIBITS              PAGE
 4   Exhibit 8   E-mail - Subject: Giant Eagle Stores  111
                 list FINAL Actavis Oxycodone CR &
 5               Fentanyl Patch for Giant Eagle from
                 Anda
 6               Anda_Opioids_MDL_0000630034 through
                 630042
 7
     Exhibit 9   E-mail - Subject: Success Story - Oxy  118
 8               CR Made my Day!!
                 Anda_Opioids_MDL_0000629292
 9
     Exhibit 10  E-mail - Subject: PRODUCT UPDATE:      122
10               Re-launch of Generic Oxycontin CR
                 (Oxycodone CR 10, 20, 40, 80mg) from
11               Actavis
                 Anda_Opioids_MDL_0000635640 through
12               635645
13   Exhibit 11  E-mail - Subject: Launch of Generic   129
                 Ultram ER Tomorrow
14               Anda_Opioids_MDL_0000635385 through
                 635387
15
     Exhibit 12  E-mail - Subject: PRODUCT UPDATE:      131
16               Re-launch of Generic Oxycontin CR
                 (Oxycodone CR 10, 20, 40, 80mg) from
17               Actavis
                 Anda_Opioids_MDL_0000635359 through
18               635369
19   Exhibit 13  E-mail - Subject: PRODUCT UPDATE:      136
                 Re-launch of Generic Oxycontin CR
20               (Oxycodone CR 10, 20, 40, 80mg) from
                 Actavis
21               Anda_Opioids_MDL_0000610604 through
                 610114
22
     Exhibit 14  E-mail - Subject: July Marketing      140
23               Driver
                 Anda_Opioids_MDL_0000619354 through
24               619357
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1               E X H I B I T S
  2           (Attached to the transcript)
  3    WILLIAMS DEPOSITION EXHIBITS              PAGE
  4    Exhibit 15   E-mail - Subject: CII Products    143
               Available in Florida Warehouse 20
  5            Anda_Opioids_MDL_0000111359 through
               111361
  6
       Exhibit 16   E-mail - Subject:  Launch Snapshot -   148
  7            Suboxone Tabs Day 1
               Anda_Opioids_MDL_0000849833 through
  8            849834
  9    Exhibit 17   E-mail - Subject: Walgreens - Screen    156
               Shot - Control Limits
 10            Anda_Opioids_MDL_0000566549 through
               566551
 11
       Exhibit 18   E-mail - Subject: Cust. # 206975 Van    170
 12            Buren Pharm.
               Anda_Opioids_MDL_0000711549 and
 13            711550
 14    Exhibit 19   E-mail - Subject: 360387 - Schaeper's   178
               Pharmacy
 15            Anda_Opioids_MDL_0000560415 through
               560417
 16
       Exhibit 20   E-mail - Subject: Remedy - Control    185
 17            Requests
               Anda_Opioids_MDL_0000133286 and
 18            133287
 19    Exhibit 21   E-mail - Subject: acct# 206671       193
               Anda_Opioids_MDL_0000109644 and
 20            109654
 21    Exhibit 22   E-mail - Subject: TPS # 457843       197
               Anda_Opioids_MDL_000072179
 22
       Exhibit 23   E-mail - Subject: STATUS UPDATE:    200
 23            Collect Dispensing Data - Shared
               Accounts (Buying Groups)
 24            Anda_Opioids_MDL_0000554323
 25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      E X H I B I T S
 2               (Attached to the transcript)
 3    WILLIAMS DEPOSITION EXHIBITS                      PAGE
 4    Exhibit 24   E-mail - Subject: EPIC & IPA NJ-      206
                   Required Information
 5                 Anda_Opioids_MDL_0000708146 through
                   708148
 6
      Exhibit 25   E-mail - Subject: Customer            216
 7                 Questionnaire Meeting: Follow-Up Info
                   Anda_Opioids_MDL_0000607225 and
 8                 607226
 9    Exhibit 26   E-mail - Subject: Control limit       222
                   review for account 477066
10                 Anda_Opioids_MDL_0000109496
11    Exhibit 27   E-mail - Subject: CII Order: CHESTNUT 227
                   AID PHARMACY, Ship To: 210320, Over
12                 the Limit, Status: Closed
                   Anda_Opioids_MDL_0000283889 and
13                 203890
14    Exhibit 28   E-mail - Subject: Customer's Not      234
                   Actively Purchasing Controls (July 12
15                 thru Jan 13)
                   Anda_Opioids_MDL_0000090024 and 90025
16
      Exhibit 29   E-mail - Subject: Accounts Shut Off   236
17                 From Controls This Week
                   Anda_Opioids_MDL_0000711564 through
18                 711567
19    Exhibit 30   E-mail - Subject: 802433 - drug Store 244
                   Columbus Ohio
20                 Anda_Opioids_MDL_0000070549 and 70550
21    Exhibit 31   E-mail - Subject: Customer # 404255   247
                   Anda_Opioids_MDL_0000107989
22
      Exhibit 32   E-mail - Subject: LIMIT INCREASE ACCT 249
23                 51180
                   Anda_Opioids_MDL_0000109372 through
24                 109374
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2              (Attached to the transcript)
 3      WILLIAMS DEPOSITION EXHIBITS                    PAGE
 4   Exhibit 33   E-mail - Subject: React  To Be Pulled  258
                  from Remedy
 5                Anda_Opioids_MDL_0000070803 and 70804
 6   Exhibit 34   E-mail - Subject: Keep Informed        262
                  Status Completion on Opportunity for
 7                COX PHARMACY #2 INC : 180217 :
                  Control Limit Increase Order Pending
 8                Anda_Opioids_MDL_0000134040 through
                  1304042
 9
     Exhibit 35   E-mail - Subject: (No subject)         266
10                Anda_Opioids_MDL_0000107933 and
                  107934
11
     Exhibit 36   E-mail - Subject: Pharmacy Sales-Data  269
12                Required (Follow up)
                  Anda_Opioids_MDL_0000559434 through
13                559437
14   Exhibit 37   E-mail - Subject: Know your customer   274
                  (KYC) - Revised Form Attached
15                Anda_Opioids_MDL_0000622234 through
                  622236
16
     Exhibit 38   E-mail - Subject: Pill mills JDE @     277
17                59213 BEST CARE PHARMACY INC
                  Anda_Opioids_MDL_0000622647 through
18                622649
19   Exhibit 39   E-mail - Subject: Act 404329-Memorial  281
                  Medical
20                Anda_Opioids_MDL_0000105787 through
                  105789
21
     Exhibit 40   E-mail - Subject: Exporters            287
22                Anda_Opioids_MDL_0000109029 and
                  109030
23
     Exhibit 41   Spreadsheets                           293
24                Anda_Opioids_MDL_000109031 and 109039
                  ** NOT ATTACHED TO TRANSCRIPT **
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2            THE VIDEOGRAPHER:  We are now on the record.

 3       My name is Anthony Barbaro.  I am a videographer

 4       for Golkow Litigation Services.  Today's date is

 5       December 13th, 2018, and the time is 9:22 a.m.

 6            This video deposition is being held at

 7       2 South Biscayne Boulevard, Suite 1900, Miami,

 8       Florida, 33131, in the matter of Re: National

 9       Prescription Opiate Litigation being heard before

10       the United States District Court, Northern

11       District of Ohio, Eastern Division.

12            The deponent today is Patricia Williams.

13            Counsel, would you please identify

14       yourselves for the record.

15            MS. RELKIN:  Ellen Relkin from Weitz &

16       Luxenberg for the plaintiffs.

17            MR. STOLTZ:  Adam Stoltz of Weitz &

18       Luxenberg for the plaintiffs.

19            MS. KOSKI:  Katy Koski, Foley & Lardner, for

20       Anda, Inc., and the witness.

21            MS. LUND:  Juli Ann Lund from Williams &

22       Connolly on behalf of Cardinal Health.

23            MR. LOMAX:  Christopher Lomax from Jones Day

24       on behalf of Walmart.

25            MS. CARDENAS:  Cristina Cardenas, Reed
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Smith, on behalf of AmerisourceBergen.

 2            MS. RELKIN:  There are also two paralegals

 3        from our firm.  Do you want them to announce?

 4            MS. KOSKI:  That's okay.  And on the phone,

 5        can you please enter your appearances?

 6            MS. YOCUM:  Michelle Yocum from Covington

 7        Burling on behalf of McKesson.

 8            MR. HOUSTON:  Zeno Houston, Arnold & Porter,

 9        appearing on behalf of the Endo and Par

10        defendants.

11            THE VIDEOGRAPHER:  The court reporter is

12        Susan Wasilewski, and she will now swear in the

13        witness.

14            THE COURT REPORTER:  Ma'am, would you raise

15        your right hand?

16            Do you solemnly swear or affirm the

17        testimony you're about to give will be the truth,

18        the whole truth, and nothing but the truth?

19            THE WITNESS:  I do.

20            THE COURT REPORTER:  Thank you.

21            PATRICIA WILLIAMS, called as a witness by

22        the Plaintiffs, having been duly sworn, testified as

23        follows:

24                      DIRECT EXAMINATION

25        BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.

 2      A.   Good morning.

 3      Q.   Good morning, Ms. Williams.  We met off the

 4   record.  I'm Ellen Relkin.  I'll be asking you some

 5   questions today.  I'm just going to go over some

 6   basic rules before we get into the testimony.

 7           First, it's important that you understand my

 8   question.  So if for any reason you don't, just tell

 9   me and I'll be happy to rephrase it.  If you want to

10   have the court reporter read the question back, she

11   can do that.  It's kind of magical technology.  It's

12   been around forever and it still works.

13           If you need a break for any reason, just let

14   us know.

15      A.   Okay.

16      Q.   It's assumed that if you answer the

17   question, you understand it.  That's why if you

18   don't understand it, make sure you request a reread

19   or an explanation.

20           Also, I do have a tendency to pause while

21   I'm talking sometimes so -- and natural conversation

22   is often you know where the question is going so the

23   witness chimes in the answer before the question is

24   all out and then the record gets really messy.

25      A.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So give a second for me to be done before

 2   you answer.

 3        A.   Okay.

 4        Q.   And also this way your counsel can have time

 5   to object if she chooses to.

 6             All right.  Are you on any medications that

 7   would impact your ability to understand any

 8   questions or give clear answers?

 9        A.   No.

10        Q.   Okay.  Have you ever given a deposition

11   before?

12        A.   I'm not sure it would be called a

13   deposition.  I actually went to a -- like a mini

14   trial or arbitration several years ago when I was in

15   Anda.

16        Q.   What was that regarding?

17        A.   It was regarding a noncompete agreement.

18        Q.   Did it involve you as being -- as the person

19   at issue or you were just a witness?

20        A.   No, I was just a witness.

21        Q.   And what was the -- what was the noncompete?

22   It was between Anda and whom?

23        A.   It was between a former employee who had

24   signed a noncompete and had gone to work for another

25   company.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Who was that employee?

 2       A.   The name of that employee was Maria Alonzo.

 3       Q.   And what other company had she gone to?

 4       A.   I believe she went to Cardinal -- Cardinal,

 5   I believe.  I could be wrong.  I don't recall

 6   exactly.  It was several years ago.

 7       Q.   Got it.

 8            Now, you are no longer an employee of Anda;

 9   is that correct?

10       A.   That is correct.

11       Q.   But are you being represented by counsel

12   here?

13       A.   Yes, I am, by Katy.

14       Q.   And how did you come to get called, to learn

15   about appearing today?

16       A.   I received a call from the attorneys saying

17   that there was a --

18            MS. KOSKI:  Wait.  You can say you received

19       a call from the attorneys but don't discuss what

20       we discussed on the phone.

21            THE WITNESS:  Okay.  Okay.

22   BY MS. RELKIN:

23       Q.   Are you being paid for your time today?

24       A.   I'm not sure.  I believe so.

25       Q.   Okay.  And for any time in preparation your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    understanding is --

 2        A.   I'm sorry.  Not for my time at the

 3    deposition but the prep time, yes.

 4        Q.   And how much time did you spend in prep for

 5    the deposition?

 6        A.   Probably about six-and-a-half to seven hours

 7    yesterday, perhaps.

 8        Q.   So you met yesterday with counsel.  Did you

 9    meet any other days?

10        A.   No.

11        Q.   Okay.  And besides meeting with Katy, were

12    there any other attorneys you met with?

13        A.   Yes.  The other gentleman, Matt, I believe

14    is his name.  I forget his first name.  It's Katy's

15    partner.

16        Q.   And were there any other individuals in the

17    room?

18        A.   No.

19        Q.   Okay.  Did you review documents yesterday?

20        A.   There were a few documents, yes.

21        Q.   And did they help to refresh your

22    recollection?

23        A.   They did.

24        Q.   Can you categorize what type of documents

25    you reviewed?
```

1      A.   A few e-mails that had my name on it where I

2    had been copied, a couple e-mails that I had

3    written, and there was -- that was about it.

4      Q.   Separate from what you reviewed yesterday,

5    were you provided any documents to review before

6    coming in yesterday for preparation?

7      A.   No, ma'am.  No.

8      Q.   And about how many documents did you review?

9      A.   Yesterday?

10     Q.   Yes.

11     A.   Perhaps ten, in total.  I didn't count them

12   all.

13     Q.   Did they help refresh your recollection?

14     A.   Somewhat, uh-huh.

15     Q.   Okay.  So where do you work now?

16     A.   Right now I work for a company called The

17   CORE Group.

18     Q.   And is that in the food business, I

19   understand?

20     A.   It is.  It's a food broker.  I work as a --

21   I work from home, and I do sales support for them.

22     Q.   And your job before The CORE Group was at

23   Anda; is that right?

24     A.   That is correct.

25     Q.   Okay.  We'll mark your résumé as the first

Highly Confidential - Subject to Further Confidentiality Review

```
 1    exhibit.

 2            (Anda-Williams Exhibit 1 was marked for

 3    identification.)

 4    BY MS. RELKIN:

 5      Q.   I'm going to give you a copy of what we

 6    marked.

 7            MS. RELKIN:  Of course, Counsel.

 8            Sha'Huni, can you pass this to counsel on

 9      the other side?  Thank you.

10    BY MS. RELKIN:

11      Q.   Ms. Williams, is this a true and accurate

12    copy of your CV?

13      A.   Yes, ma'am.

14            MS. KOSKI:  That was an example of wait

15      until she finishes the question before you

16      answer, just to help the court reporter out.

17            THE WITNESS:  Oh, I'm sorry.

18    BY MS. RELKIN:

19      Q.   And is it fair to say education-wise you

20    have -- you have a degree -- is that an associate's

21    degree at Valencia Community College?

22      A.    I worked towards that degree.  I never

23    officially finished.  I was following the

24    curriculum.

25      Q.   Understood.  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1              So what does AA curriculum stand for?

2         A.   Associate's of Arts.

3         Q.   And you also indicate that SunTrust

4    University Management School.  So what did you study

5    there?

6         A.   SunTrust had a week-long management class

7    that they put upcoming managers and directors into

8    that hosted a variety of topics from dealing with

9    employees, HR issues, about the company, goals, how

10   to do performance reviews, you name it.  It kind of

11   covered the gamut of things a manager would be

12   responsible for.

13        Q.   And how long ago was that, approximately?

14        A.   Let's see.  I finished working for them in

15   2008.  I attended that when I -- I would say it was

16   probably around 2000, 2001.

17        Q.   So that was your -- your employment prior to

18   Anda?  Was that a bank?

19        A.   Correct.

20        Q.   SunTrust Bank?

21        A.   Correct.

22        Q.   And they sent you to that course?

23        A.   Yes.

24        Q.   And then you also said host of supervisory

25   management and call center-related courses.  That's

Highly Confidential - Subject to Further Confidentiality Review

```
 1    during your career?

 2        A.   Correct.

 3        Q.   So just focusing on your Anda time period,

 4    what type of courses did you go to while you were at

 5    Anda?

 6        A.   At Anda.  While I was at Anda, we went to

 7    two seminars -- two three-day seminars on two

 8    different occasions that were call center-related,

 9    having to do with productivity, measurements in call

10    centers, how to motivate and engage your employees.

11    It was a wide range of topics, and there were

12    options to attend varying segments throughout that

13    two- or three-day seminar.

14             So we picked topics.  There were a number of

15    us that went from Sun -- from Anda, and we kind of

16    divvied those topics out and kind of blitzed it to

17    make sure we had an opportunity to maximize our time

18    there.

19        Q.   And you shared what you learned with your

20    other coemployees?

21        A.   Correct.  Correct.

22        Q.   Who else went to the course?

23        A.   The other -- on different occasions -- I

24    remember that one of the very first seminars we went

25    to, Brian Witte was there.  I remember that there
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was, I believe, Paul Shermac was there.  I remember

 2    a member of our training team, Megan Talber, was

 3    there, and there -- Anita Isabella who was over our

 4    reporting area.

 5            So there was a group of us that went.

 6    Q.   And this was just generic to call centers?

 7    It was not specific to pharmaceutical industry?  Is

 8    that --

 9    A.   That is correct.

10    Q.   Did you ever attend any courses while you

11    were at Anda about the pharmaceutical industry?

12    A.   Courses -- not -- nothing -- that was

13    pertinent to call -- to call centers in a -- in a

14    pharmaceutical environment.

15            Is that what you're referring to?

16    Q.   Well, not just call centers.  Just while you

17    were at Anda did you go --

18    A.   Pharmaceuticals period?

19    Q.   Right.

20    A.   Other than the training that I sat through,

21    which was the same training that the new hires went

22    through.  I made sure that I attended all of that so

23    that I was very familiar with what the new hires

24    were experiencing in training.  But nothing beyond

25    that, and I -- in terms of formal training, I did
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have some time with members of varying departments

 2    throughout the company, so I learned about the

 3    pharmaceutical industry since I was obviously new to

 4    that industry as a whole.

 5        Q.   So with regard to the training that the new

 6    hires went through that you also sat in on, you

 7    described it as formal training.  Was it in a

 8    classroom type of setting?

 9        A.   Yes, it was.  Yes, it was.

10        Q.   Does Anda have a classroom within their --

11        A.   Yes, they do.

12        Q.   -- building?

13        A.   Yes, they do.

14        Q.   Again, you answered before --

15        A.   I apologize.

16        Q.   -- because I paused for a second.

17        A.   Okay.

18        Q.   And who ran that training program?

19        A.   The training manager.

20        Q.   Who was that?

21        A.   At the time, it was Megan Talber.

22        Q.   Does she work off of some written

23    curriculum?

24             MS. KOSKI:  Object to form.

25             THE WITNESS:  I'm sorry?
```

```
 1              MS. KOSKI:  You can answer.

 2              THE WITNESS:  Oh, okay.

 3       A.    There was formal curriculum that was

 4   available, yes.

 5       Q.    And you started at Anda in 2008.  So is that

 6   when you sat through the class?

 7       A.    That is correct.

 8       Q.    Did you sit through the class periodically

 9   over later years?

10       A.    I did.

11       Q.    And how many occasions, about?

12       A.    I would say probably three, maybe, for

13   varying topics that were being discussed.

14       Q.    Okay.  Do you recall any specific topics

15   where you came in over later years to sit in on the

16   program?

17       A.    There were times when I came in and actually

18   talked to all the new hire classes concerning what

19   to expect, how the goals would be set up, what to

20   expect from their managers, what to expect from me,

21   what kinds of things that they might go to a manager

22   for versus coming to me for.

23              They -- it allowed them to answer questions.

24   Many of them had questions about the incentive

25   program or compensation questions and so forth.  So
```

1    we were able to try to address those questions.

2       Q.   You know, I will turn back to that in a

3    minute.  I probably should -- just since I put your

4    résumé up, let me just for the record get the rest

5    of your background.

6            So when you were hired by Anda, it was in

7    2008?

8       A.   Correct.

9       Q.   What was the position you were hired for?

10      A.   I was hired for the director of inside

11   sales.

12      Q.   And what does inside sales mean?

13      A.   Inside sales was a group of sales

14   representatives that were on the telephone, and they

15   were selling all day long.  That was their job

16   responsibility.  They were not out in the field.

17   They were inside in a cubicle in a -- what I would

18   call a typical call center environment, probably 8X8

19   or 6X6 -- I don't know the exact measurement -- with

20   monitors in front of them.

21      Q.   And how many -- how many individuals were in

22   the inside sales group on the -- on the call center?

23      A.   Okay.  We had two different divisions.  I

24   was responsible for the pharmacy division, and then

25   there was another gentleman who was responsible for

Highly Confidential - Subject to Further Confidentiality Review

```
1    a division that we called Anda meds.  That was the

2    division that sold to the physician side of the

3    business.  You --

4        Q.   What you sold the physicians, though, were

5    pharmaceutical products?

6        A.   Pharmaceutical products, injectables, OTCs,

7    yes.

8        Q.   You were about to say something.  I cut you

9    off.

10       A.   You had asked how many employees that I

11   personally had.

12       Q.   Yes.

13       A.   It did fluctuate.  We were probably as low

14   as 60 -- 60, 65 at one point.  We did get to be

15   close to 75, 76.  So that number fluctuated as we

16   were bringing new hires in and people would

17   transition perhaps to other areas of the company.

18       Q.   And that was in your division, the pharmacy

19   division?

20       A.   That is correct.

21       Q.   Was there any educational requirement for

22   the new hires?

23       A.   They all needed to go through the new hire

24   training.

25       Q.   But prior to that, did they need a high
```

```
1    school diploma?  Did they need a college degree?

2    Were there any criteria for hiring a new hire?

3         MS. KOSKI:  Object to form.  You may answer.

4    A.   Yes, they -- a high school diploma was

5    required; obviously, some college was preferred; and

6    some sales experience was preferred.  However, we

7    did hire some folks without extensive sales

8    experience.

9    Q.   Okay.  Now let's go -- backing up with your

10   history, after you did some -- you did some

11   schooling at Valencia Community College?

12   A.   Correct.

13   Q.   How many -- how many semesters or courses?

14   A.   I had not quite 60 credits.

15   Q.   Is there any reason you didn't complete it?

16   A.   Yes.  I met my husband.  My husband obtained

17   full-time custody of his six-year-old daughter.  We

18   married, and I became a wife and a mom at the same

19   time and that was a full plate for me.

20   Q.   Got it.  Got it.

21        And then you went back to -- you went to the

22   workforce some years later?

23   A.   I was working the entire time.

24   Q.   So you were full-time mom and worked?

25   A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   I can relate.  We all can here, many of us.

 2           Then you went to SunTrust Bank; is that

 3   right?

 4      A.   That is correct.

 5      Q.   It looks like you had various jobs.  Why

 6   don't you -- I mean they are listed here on your

 7   résumé.  Your -- which was your first position?

 8      A.   The first position with SunTrust Bank was as

 9   an operations analyst in the correspondent banking

10   department.

11      Q.   And so did that have anything to do with

12   sales?

13      A.   No.

14      Q.   And obviously it had nothing to do with

15   pharmaceutical; is that right?

16      A.   That is correct.

17      Q.   And then you moved to what position?

18      A.   Then I moved to a position which was under

19   the marketing umbrella.  It was a new department

20   called relocation services.  We worked with realtors

21   and area building builders and developers to market

22   a program to help target people that were moving to

23   the area, to the Orlando area.  And we had a

24   relocation package that we mailed to them, and we

25   tried to secure their banking business before they
```

 1    actually arrived to make their transition for home

 2    buying that much easier.

 3        Q.   So when did you first get into the sales end

 4    of SunTrust Bank?

 5            MS. KOSKI:  Object to form.  Go ahead.

 6        A.   The sales role that I took on was first in

 7    the relocation services department.  We were

 8    actually promoting this program to area realtors.

 9            I had a number of sales reps that reported

10    to me.  These folks happened to be outside sales

11    reps.  These were not inside sales reps.  And they

12    were out, and I would accompany them on sales calls

13    that they were doing to their realtors in their

14    market, promoting this program, setting up

15    opportunities for them to discuss this program with

16    members of their staff so that they understood how

17    the program worked.

18            It was a free service that we offered to the

19    realtors, and that was really my first kind of

20    exposure into the sales arena.  Even though there

21    was not a cost involved in the sale, ultimately, I

22    became responsible for following up on those leads

23    and trying to sell banking services to those

24    individuals that we were targeting.

25        Q.   And the term you used, inside/outside,

Highly Confidential - Subject to Further Confidentiality Review

1    that's the same terminology that applies to Anda.

2    Is that a generic sales terminology?  "Inside"

3    meaning phone calls from the inside versus "outside"

4    meaning meeting with potential clients or customers

5    outside?  Is that fair to state?  Or if not, you

6    tell me.

7            MS. KOSKI:  Object to form.

8    A.    Let me --

9    Q.    Yeah.

10   A.    Let me clarify my understanding.

11   Q.    Let me have a cleaner question since I kind

12   of rambled there.

13   A.    Okay.

14   Q.    Can you explain your understanding of inside

15   sales versus outside sales?

16   A.    Certainly.

17           Outside sales are individuals whose primary

18   job responsibilities are out in the field, wherever

19   that field -- whatever that level of responsibility

20   takes them.

21   Q.    Right.

22   A.     In this case, it was a realtor offices,

23   development offices, and so forth, builders, what

24   have you.

25           Inside sales, in my vernacular, is people

```
1    that are sitting inside, normally on a telephone,

2    making either inbound or getting and receiving

3    inbound calls or they are making outbound calls.

4         So there is even a distinction when you get

5    into the call center sales arena of inbound or

6    outbound, but outbound sales -- excuse me.  Outside

7    sales normally means outside of the building.

8    Q.   Got it.

9         And that's the same whether it was during

10   your function at SunTrust Bank and at Anda?

11   A.   That is correct.

12   Q.   And when you said there is even a

13   distinction within sales, there is the outgoing

14   calls and the inbound calls.

15        Of the number of employees that you

16   supervised in the -- I guess the phone bank, what

17   was the breakout of inside versus outside?

18        MS. KOSKI:  Object to form.

19   BY MS. RELKIN:

20   Q.   Excuse me, strike that.

21        What was the breakout of inbound calls

22   versus outbound calls?

23   A.   While I worked for SunTrust?

24   Q.   No, no.  For Anda.

25   A.   Oh, for Anda.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I would estimate that it was approximately

 2    85 to 90 percent outbound and about 10 to 15 percent

 3    inbound.

 4       Q.   And outbound means that these were sales

 5    reps --

 6       A.   Sales reps.

 7       Q.   -- calling potential customers?

 8       A.   That is correct.

 9       Q.   Is that the same thing as cold call?

10       A.   A cold call is when you are calling someone

11    who has had no prior dealings with the organization.

12    They have no account relationship with us, there was

13    no tie to the company, and a cold call was placed to

14    try to get them to eventually buy something from us.

15       Q.   Right.  Right.

16              So that would be part of the 85 percent

17    outbounds including cold calls?

18       A.   Including cold calls.

19       Q.   So what percent of the outbound was cold

20    calls?

21       A.   That varied by individual, and if you will

22    allow me to explain.

23              New hires, when they were brought on board,

24    did almost exclusively 100 percent outbound calling

25    because they didn't have an established book of
```

1    business yet.  They were calling on people that had

2    been in our database for years and had been called

3    for years, but the relationship had not turned into

4    an account relationship.

5         The larger that a sales rep's book of

6    business became, the more time they spent dealing

7    with their actual customers and clients and a little

8    less time on the outbound cold calling side.

9         I always highlighted to them the importance

10   of never stop cold calling because the moment you

11   stop cold calling is when your book of business

12   could dry up overnight.  They could run into credit

13   issues.  They could run into an issue where the

14   pharmacy closed.  There were a number of reasons why

15   an account would stop buying from us.

16        So I told them it's important for them, to

17   be able to hit their goals, to always continue to do

18   some cold calling.

19        Some reps would only be ten calls a day

20   because that's all they had the time for.  Others

21   would designate certain days of the week where they

22   would maybe designate their mornings.  So it really

23   did vary by individual.

24   Q.   All right.  And then just to finish up your

25   résumé, the first exhibit.

Highly Confidential - Subject to Further Confidentiality Review

1    Your last position at SunTrust Bank, what --
2    what did that entail?
3    A.   My last position with SunTrust Bank was the
4    vice president slash -- and I did have two titles --
5    VP and customer service manager.
6    We had a group of employees there.  We had
7    100-seat capacity, and we had roughly about 100 on
8    the customer service side that were under me.  And,
9    again, that fluctuated sometimes between 90 to 110,
10   but I would say the 100 was around the average.
11   And then there was also a sales group that
12   was managed by another individual.
13   And the role of the group that I managed was
14   mainly inbound customer calls from SunTrust
15   customers.
16   Q.   And I skipped that you were a sales manager
17   for the loan by phone department --
18   A.   Correct.
19   Q.   -- for the bank.
20   A.   Correct.
21   Q.   Did that involve outbound calls?
22   A.   Yes.  Some inbound and outbound.
23   Q.   So the bank would call people saying --
24   trying to sell loans?
25   A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   All right.  We'll move on.
 2           MS. KOSKI:  We'll make a little pile in case
 3      you want to go back to something.
 4           THE WITNESS:  Okay.
 5           Can I just add something?  Is it --
 6           MS. KOSKI:  No.  You've got to wait for a
 7      question.  Thanks.
 8           THE WITNESS:  Okay.  All right.
 9  BY MS. RELKIN:
10      Q.   What was the circumstance of you leaving
11  Anda?
12      A.   I was called into a meeting on a Monday
13  morning with Chip Phillips; with Karen Martin, who
14  was the -- over HR at that location; and Tom
15  Pflepsen.  And Chip conducted the meeting.  He told
16  me that a restructuring was going on within the
17  company and that my position was being eliminated
18  and that he was going to be taking over the sales
19  floor.
20      Q.   That was Chip Phillips?
21      A.   Correct.
22      Q.   Did that coincide with Anda being acquired
23  by another company?
24      A.   We had not been acquired by another company
25  at that time.  We were still under Allergan at that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    time.
 2         Q.   Okay.  And when you were first hired by
 3    Anda, it was Watson?
 4         A.   That is correct.
 5         Q.   And was your -- were you employed by Watson
 6    as opposed to Anda or did you --
 7         A.   Correct.
 8         Q.   It was Anda?
 9         A.   (Nodding head.)
10         Q.   Your paychecks came from a payroll check
11    that said Anda?
12         A.   Correct.
13         Q.   What was your understanding of the
14    relationship with Watson?
15              MS. KOSKI:  Object to form.  You can answer.
16         A.   Okay.  My understanding of it was that
17    Watson was the owner, the -- of the wholly owned
18    subsidiary of Anda.  They were a manufacturer.
19    However, we were a distributor.
20         Q.   And you distributed -- strike that.
21              Anda distributed Watson's generic products;
22    is that correct?
23         A.   That is correct.
24         Q.   Watson was a generic manufacturer; is that
25    right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   They -- they did both, correct.  They had

 2   some brand items, and they had some generic items.

 3       Q.   And they made opioid products; is that

 4   right?

 5       A.   That is my understanding, yes.

 6       Q.   Do you recall which opioid products Watson

 7   made?

 8       A.   I don't recall at that time, no.

 9       Q.   Part of your responsibility was to direct

10   the sales force to sell opioid products made by

11   Watson; is that fair to state?

12            MS. KOSKI:  Object to form.

13       A.   I'd like to reclarify that statement,

14   because when we say "sell opioids," CIIs, which are

15   known as opioids, were not able to be keyed -- an

16   order could not be keyed by a sales rep.  There was

17   another process.

18       Q.   But to begin the process, to find a customer

19   who was interested in buying it, there were efforts

20   made by your sales force to contact pharmacies to

21   see if they were interested, understanding it still

22   had to go through some approval process; is that

23   right?

24       A.   That is -- that is correct.  However, when

25   we were approaching a customer about ordering and
```

1    dealing with us as a customer, it was for all their

2    generic needs.  It was not strictly for the opioids.

3        Q.  Is it your testimony that there were never

4    phone calls that were directed specifically to

5    promoting certain opioid products during certain

6    campaigns?

7            MS. KOSKI:  Object to form.  You may answer.

8        A.  There were some campaigns, for instance,

9    from -- on new launches of a new CII product where a

10   call would be placed specifically to educate the

11   customer that that product was now available.

12       Q.  And did it also educate the customer that

13   there were certain sales incentives, whether it was

14   coupons or discounts?

15           MS. KOSKI:  Object to form.

16       A.  We really didn't have anything in -- in

17   terms of coupons or incentives of that kind on a --

18   on a new market launch like that, normally, the

19   product comes out, and the role of the sales rep is

20   to educate the customer on what the product is and

21   what's available.

22       Q.  Educate and to try to get their purchase?

23       A.  And to try to get their purchase if they

24   qualified, if there was a need.

25       Q.  And separate from the new launch, there also

Highly Confidential - Subject to Further Confidentiality Review

```
 1   were certain promotional efforts to promote certain

 2   CII products where discounts were given; isn't that

 3   fair to state?

 4        MS. KOSKI:  Object to form.

 5   A.   Can you clarify what you mean by discounts?

 6   Q.   Ten percent off, certain promotional

 7   pricing.

 8   A.   I know that we had some -- I know that we

 9   had some marketing -- what we called marketing

10   drivers that we utilized outbound calling for -- to

11   encourage customers to use CSOS for their CII

12   ordering, but I don't remember them having a

13   discount -- at a discounted rate.  It could have

14   been, but I don't recall.

15   Q.   And why don't you just describe what CSOS

16   is.

17   A.   CSOS is -- it stands for controlled

18   substance ordering system, and it is a platform that

19   allows pharmacies to place their controlled

20   substance orders, mainly CIIs, directly through a

21   computer rather than using a paper CII form.

22   Q.   And marketing driver, what is that?

23   A.   Marketing driver was one of the elements of

24   our sales reps' monthly score card.  The score card

25   was meant to measure the entire performance of the
```

1    sales rep; not just the calls, but how long they

2    were on the phone, how many customers that they sold

3    to, whether they hit their generic goal for that

4    month.

5            And a marketing driver was introduced

6    through our marketing department for various

7    initiatives that the company wanted to use the sales

8    force to promote.

9        Q.   What percentage of time did the sales force

10   devote to calls involving CIIs as compared to other

11   pharmaceutical products?  Did marketing driver or

12   any part of the sales report break that out?

13           MS. KOSKI:  Object to form.

14       A.   There was no measurement of that to my

15   recollection.  That was a very, very, very small

16   percentage of times that were dedicated to that, any

17   kind of a CII initiative.

18           Our main focus was overall generics.  We

19   stocked over 11,000 SKUs of generic products.  That

20   was our business.

21       Q.   Of which some were opioids?

22       A.   Of which some were, correct.

23       Q.   And the profit margin on the CIIs was a

24   favorable profit margin, wasn't it?

25       A.   I cannot speak to that.  I had nothing to do

1    with pricing, nor involved in that.

2        Q.    During the various training programs that

3    took place in that special training room, did you

4    ever attend or come to learn of training where the

5    sales force or anyone else was educated about the

6    different CII products?

7            MS. KOSKI:  Object to form.

8        A.    Yes.

9        Q.    And what -- describe for me as best as you

10   can recall what was said at those meetings.

11           MS. KOSKI:  Object to form.

12       A.    There was a complete training on -- on CIIs,

13   who we sold to, who we didn't sell to, the different

14   types of control products, what the process was if a

15   customer wanted to order one.

16           We were real -- on the CII side, it was

17   really a service we provided because our sales reps

18   were not able to key those orders in.  The customer

19   had to fill out a form, send it to us, and the sales

20   floor did not touch that order.  It was handled by

21   another member of my department with different

22   access to enter that CII order into our TPS ordering

23   system.

24       Q.    Who was that?

25       A.    Latoya Samuels was the person who

```
 1    predominantly had that responsibility.

 2        Q.   But before it went to Latoya Samuels, a

 3    salesperson was interacting with the pharmacy

 4    customer, discussing the sale of CII products,

 5    correct?

 6        A.   They could have been, or it could have been

 7    that the customer had the CII form already, filled

 8    it out, and just sent it in to our warehouse; the

 9    sales rep did not touch that order.

10        Q.   Well, sales reps did touch some of the

11    orders.

12             What do you mean by "touch" an order?

13        A.   "Touch" -- okay.  What I mean by that, they

14    did not key the order into the system.

15        Q.   Just with their hands, they did not enter

16    it?

17        A.   They did not, correct.

18        Q.   But they still had communications with their

19    customer about it?

20        A.   Correct.  They would see that an order had

21    been processed.

22        Q.   Who -- who led that training program which

23    discussed the CIIs?

24             MS. KOSKI:  Object to form.

25        A.   I don't recall specifically who conducted
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    all of the sessions.  I do remember that our
 2    compliance department attended and was there most --
 3    for most of those trainings.  I can't say they were
 4    there for all of them because I did not personally
 5    attend all of those, but they were there at the ones
 6    that I was there.
 7            Megan, again, was our trainer, and she, with
 8    the compliance department, had put training together
 9    to make sure that our new hires and the entire floor
10    knew what our processes were.
11        Q.   Do you know whether Megan is still with the
12    company?
13        A.   She is not.
14        Q.   Do you know where she is now?
15        A.   North Carolina, I believe.
16        Q.   Do you know -- do you stay in touch with
17    her?
18        A.   Occasionally.
19        Q.   Where in North Carolina?
20        A.   I don't know the actual city.
21        Q.   And I think we have her last name on the
22    record, but what is it again?
23        A.   Talber.
24        Q.   And who does she work for now?
25        A.   I believe she's a stay-at-home mom, and she
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    homeschools her children.

 2       Q.   Do you have Facebook communications with

 3    her?

 4       A.   Occasionally.  Occasionally.

 5       Q.   What other former coemployees are you still

 6    in touch with?

 7            MS. KOSKI:  Object to form.

 8       A.   Former employees?

 9       Q.   Anyone you worked with.

10       A.   There is a couple of sales managers.

11       Q.   Who are they?

12       A.   Vickie Shalley.  Vickie Shalley-Held was

13    actually her hyphenated last name.

14       Q.   Where is she now?

15       A.   She is now a realtor.

16       Q.   Where?

17       A.   Better Homes and Garden Realty -- Better

18    Homes and Garden Real Estate.  I believe it's in

19    Plantation.

20       Q.   Florida?  Florida, right?

21       A.   Correct.

22       Q.   Anyone else besides Vickie?

23       A.   When you -- can you clarify what you mean by

24    stay in touch with?

25       Q.   Send a Christmas card --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   Oh.

2       Q.   -- speak to them intermittently, ever get

3    together intermittently, send an e-mail, Facebook

4    hellos.

5       A.   Every once in a while Vickie and I will chat

6    or I'll respond to something on Facebook.  Is it

7    every day, no.

8       Q.   Besides Vickie, from the date you left Anda,

9    did you ever get together physically with any of

10   your former coworkers?

11      A.   Yes.  I've gotten together with a couple:

12   my former boss, who was Kim Poropat.

13      Q.   Is she still there?

14      A.   No.

15      Q.   Where did she go?

16      A.   I don't believe she's working.

17      Q.   Did she leave around the same time you left?

18      A.   No.  She left maybe a year, year-and-a-half

19   later.

20      Q.   Do you know the circumstance of her leaving?

21      A.   I do not.

22      Q.   Besides  -- besides Kim Poropat, anyone

23   else?  Vickie and Kim.  Who else?

24      A.   That's --

25      Q.   Those are the only two people?
```

```
 1        A.   Megan every once in a while, but nobody on a

 2   regular basis.

 3        Q.   The training sessions you said compliance

 4   attended -- these are the training sessions

 5   regarding the CII opioid products -- did compliance

 6   speak at the program?

 7        A.   Yes.

 8        Q.   So when I heard "attendance," it seemed to

 9   me like more like they were in the audience, but

10   they were part of the presentation?

11        A.   They were -- they were -- they were there,

12   uh-huh.

13        Q.   So who spoke at the program?

14        A.   I recall Robert Brown speaking.

15        Q.   And how regular were these programs?  Was it

16   an annual thing or some other periodic basis?

17        A.   I don't remember that there was a set

18   schedule.  If we felt a refresher was needed, we

19   would go back and conduct a refresher.  That was

20   part of our ongoing business and protocol with

21   anything that we felt the floor needed a refresher

22   on.

23        Q.   Did -- besides Robert Brown presenting, who

24   else presented?  Megan and Robert Brown and who

25   else?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   I -- I believe at the session that I was at,
2    that I believe Emily Schultz was at as well, and
3    I -- I remember Mike Cochrane being there for a
4    short time, but I don't -- I cannot remember whether
5    he was there for the entire program.
6        Q.   How long was the program?
7        A.   I don't recall.  It was probably close to an
8    hour.
9        Q.   And were there handouts?
10       A.   I don't recall if there were handouts, but I
11   know we had screens and there were overheads that
12   were used for all of the -- it was an entire, like,
13   PowerPoint presentation that was put together.
14       Q.   Thank you.
15            MS. RELKIN:  Speaking of screens, this
16       screen is not on.  Is there a way to put that on
17       so everybody else can get the benefit of looking
18       at the exhibits?
19            THE VIDEOGRAPHER:  They have the monitors
20       there.
21            MS. RELKIN:  Oh, you all can see it?  Okay.
22   BY MS. RELKIN:
23       Q.   So there were PowerPoint slides?
24       A.   (Nodding head.)
25       Q.   Since you've been to more than one of them,
```

1    did they look like repeat slides, some of them, some

2    maybe new ones?

3          MS. KOSKI:  Object to form.

4     A.   I can't answer that.  They looked all

5    uniform.

6          MS. RELKIN:  I call for production of the

7          training slide PowerPoints.  We'll obviously

8          follow up.

9    BY MS. RELKIN:

10     Q.   Was there any discussion of the addictive

11    nature of CII pharmaceutical products during the

12    program?

13          MS. KOSKI:  Object to form.

14     A.   I believe it was discussed.  I just can't

15    say how much time was spent on it.

16     Q.   What do you recall being discussed?

17     A.   I recall being discussed who we could sell

18    to, who we could not sell to, the different levels

19    of products that were out there and the different

20    C -- well, there is a CII category, there's a CIII,

21    there's CIV.

22          But CII was really the opioids, so this was

23    really all-inclusive of mainly CIIs.

24     Q.   And what do you recall being instructed

25    about who you could not sell to?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Physicians.   We didn't sell to physicians.

 2   We didn't sell to wholesalers.   We didn't sell to

 3   pain management clinics.   We didn't sell to diet

 4   clinics.   There might have been some reference to

 5   repackagers.   Repackagers are people that take a

 6   product and then repackage it.   I believe that was

 7   the context of it.

 8       Q.    Why were those category of potential

 9   customers off-limits?

10           MS. KOSKI:   Object to form.

11       A.    That was a decision made by the management

12   team.

13       Q.    Did you have any understanding why you could

14   not sell to them?

15       A.    My understanding, that was a decision that

16   was made by the management team, that we were not

17   going to sell to physicians.

18       Q.    But did you have an understanding of why

19   they did not want or they decided not to sell to

20   physicians?   Did it have something to do with --

21       A.    I'm --

22           MS. KOSKI:   Let her finish.

23   BY MS. RELKIN:

24       Q.    -- risk of diversion?

25           MS. KOSKI:   Object to form.
```

```
 1    BY MS. RELKIN:

 2       Q.   Strike that.

 3            Sitting here, are you saying you have no

 4    understanding whatsoever of the basis for why a

 5    decision was made not to sell to physicians?

 6            MS. KOSKI:  Object to form.

 7       A.   I was not part of the discussion that went

 8    on as to why the physicians were not going to be

 9    sold to.  We were all aware as an organization and

10    individuals.  We read the papers.  We knew what was

11    going on.  And it was no surprise when that decision

12    was made, that we were not going to be selling to

13    them.  This was not our livelihood.  This was not

14    what we came to work to do every day, was

15    concentrate on CII sales.  We came to sell generic

16    products, and that's -- that was the focus of our

17    business.  This was a very small subset of what our

18    sales reps sold.

19       Q.   And when you say you knew what was going on,

20    you read the papers, are you talking about opioid

21    addiction?

22       A.   Correct.

23       Q.   And are you talking about pill mills?

24       A.   Correct.

25            MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. RELKIN:

 2        Q.   And what was your understanding of what a

 3    pill mill is?

 4        A.   Our understanding of a pill mill was

 5    physicians that were really doing some very

 6    questionable things and that were in essence

 7    creating lines of people waiting to get products

 8    that -- or scripts for products from a physician

 9    that was possibly doing unethical things.

10        Q.   And that there were patients or individuals

11    who were addicted who were searching out for --

12        A.   Searching out, correct.

13        Q.   -- for prescriptions?

14        A.   Correct.  Correct.

15        Q.   You said a decision was made not to sell to

16    physicians.  At some point prior to that, sales of

17    CII were made by Anda to physicians; is that right?

18            MS. KOSKI:  Object to form.

19        A.   My understanding is that yes.

20            Again, I didn't manage that side of the --

21    that side of the business.

22        Q.   So your side of the business was --

23        A.   Pharmacies.

24        Q.   -- strictly pharmacies?

25        A.   Independent pharmacies.  We didn't deal with
```

```
 1    the Walgreens or the CVSs or the larger chains.

 2    Those were all handled through our national account

 3    team.

 4        Q.   Vickie Mangus and others?

 5        A.   That is correct.

 6             MS. KOSKI:  Sorry, I hate to do this.  Can

 7    we take a quick break?

 8             MS. RELKIN:  Sure.

 9             THE VIDEOGRAPHER:  Off the record at 10:07.

10        (Recess from 10:07 a.m. until 10:16 a.m.)

11             THE VIDEOGRAPHER:  The time is 10:16 a.m.

12    We're now back on the video record.

13             (Anda-Williams Exhibit 2 was marked for

14    identification.)

15             MS. KOSKI:  Is this the one you want the

16    witness to have?

17             MS. RELKIN:  Oh, yeah.  There should be an

18    extra one there for you.

19             MS. LUND:  Can we put one on the Elmo maybe?

20             MS. RELKIN:  Yeah.  Which is the way to zoom

21    in?

22             THE VIDEOGRAPHER:  I gotcha here.  Do you

23    want to zoom in or zoom out?

24             MS. RELKIN:  Make it a little easier to

25    read, bigger.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Can anybody read that?  It's small, so --

2      okay.

3          MS. KOSKI:  She needs to see it if she

4      highlights something.  So I --

5    BY MS. RELKIN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2          MS. KOSKI:  You have to give a verbal

3      answer.

4      A.    Yes.

5      Q.    I neglected to give you that instruction.

6            Even though a nod of the head or "uh-huh" is

7      what we do in ordinary conversation, the court

8      reporter needs an oral answer.

9            Okay?

10     A.    Yes.

11     Q.    Thank you.  You got it.

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 8              MS. KOSKI:  Object to form.

 9      BY MS. RELKIN:

10          Q.   Okay.  What are some of the concerns that

11      might trigger a sales rep to notify their sales

12      manager or compliance about concerns about a

13      customer in the context of CII sales?

14              MS. KOSKI:  Object to form.

15          A.   In the context of CII sales, if they -- if

16      they saw changes in the patterns of the customer

17      ordering, they would see those -- those orders

18      coming through, they don't -- as we talked earlier,

19      they don't -- they didn't key them, but if they saw

20      unusual patterns, they normally would inquire what

21      was going on.

22              Sometimes there was a national account

23      initiative that was driving that.  Other times it

24      could have been the customer that was just -- they

25      were approved, but they hadn't been buying the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    controls and then they started buying the controls

 2    from us.

 3          There could have been a variety of reasons

 4    why they would have seen a change.

 5    Q.   And change in pattern, would that include an

 6    appreciable increase in the volume of opioids that

 7    were being requested for purchase?

 8    A.   Correct.

 9    Q.   And did it also include within the opioid

10    family if there was a surge in OxyContin or

11    fentanyl, that that would trigger concerns?

12          MS. KOSKI:  Object to form.

13    A.   Yes, I think that would fall in that same

14    category of any CII that was -- any pattern that was

15    outside of the customer's normal realm was something

16    we talked to them about making us aware of.

17    Q.   And when it was a new customer, so you

18    didn't know what their normal realm was, what were

19    your sales reps instructed to look for?

20          MS. KOSKI:  Object to form.

21    A.   We did not sell CIIses to brand new

22    customers until they had several months' worth of

23    history.  We needed to know a little bit more about

24    the pattern of their business before we would send

25    the request to the compliance department to see if

```
 1    they would turn on control purchases.

 2        Q.   So if a new customer called that was -- you

 3    had never sold to before and they were a pharmacy

 4    in -- pick a place, somewhere in Ohio -- that never

 5    sold -- you never sold to them before, what was

 6    required to do before you could provide them with

 7    the CII product?

 8        A.   We normally had -- we requested that they

 9    complete a questionnaire so that we could get to

10    know more about their business.  That questionnaire

11    was sent with the new account package that was

12    mailed out by the marketing department.  The sales

13    rep would request that packet get mailed from

14    marketing.  Marketing would send that packet out and

15    the know your customer -- I'm sorry, the question

16    your customer questionnaire was included in that

17    packet.

18            They would return that information back to

19    us, and we would get a copy of their DEA license and

20    their state license before we would be able to even

21    start the process of trying to open an account. The

22    new account process itself was several steps.

23        Q.   And would you get the DEA and state license

24    from them?

25        A.   We would get the DEA and state license from
```

Highly Confidential - Subject to Further Confidentiality Review

1    the pharmacy that was asking to open an account with

2    us, yes.

3         Q.   Okay.  And then what?

4              MS. KOSKI:  Object to form.

5         A.   In terms of what the next step in the new

6    account process would be?

7         Q.   Yes.

8         A.   Okay.  The sales rep would obtain those

9    documents, something called a load sheet was

10   completed by the sales rep that was putting all the

11   pertinent information that was required in our

12   system to load a new customer.  That was put on a

13   form and it was sent to our customer maintenance

14   department and to the compliance department with a

15   copy of the DEA license and the state license.

16        Q.   Okay.  And then what was the next step?

17        A.   Then we waited.

18        Q.   For?

19        A.   We had to wait for customer maintenance to

20   load all that information into the system as a new

21   record, and then it was compliance would do the

22   ultimate verification and approval to open up that

23   account.

24        Q.   Was there any minimum waiting period?

25             MS. KOSKI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   To open the account and start buying, once
 2   the account was open, they could start purchasing
 3   right away, but not CIIs.  Typically not CIIs.
 4            Typically we would get -- we would wait at
 5   least 90 days, if not longer, and we did not offer
 6   that.  It was not something that we were -- it was
 7   part of the sales rep's presentation as soon as a
 8   new account opened to, oh, we can sell you CIIs.
 9            It was really designed to open the account
10   so that we could get them to start buying generic
11   products from us.
12        Q.   So there never were situations where a sales
13   rep made a cold call to a pharmacy and said, yes, we
14   could use some oxy or some other CII and then steps
15   would be taken to get it to them?
16            MS. KOSKI:  Object to form.
17   BY MS. RELKIN:
18        Q.   Is that your testimony?
19        A.   That would have been a red flag, and that's
20   the way the reps were trained.  And that was even
21   touched on in this, even though it wasn't in
22   writing.  If you're getting a call out of the blue
23   from a customer who you've never -- who we've never
24   dealt with before and that's what their first
25   question to you is, that's a big red flag.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   What if it went the other way?  Were there

2    sales reps from Anda who, in their tasks, the

3    younger rookies who were making cold calls to get

4    new business, did they ever make cold calls to

5    pharmacies offering CIIs during these initial

6    overtures to the new company?

7        MS. KOSKI:  Object to form.

8        A.   That was not how they were trained.

9        Q.   Do you recall that ever occurring?

10       A.   I do not recall ever hearing it.  Since I

11   didn't hear every call that the sales reps made, I

12   can't vouch for every single call.

13       Q.   By the way, with regard to the calls that

14   the sales reps made, were they monitored or audited?

15       A.   Yes, they were.

16       Q.   What was the process for that?

17       A.   We used a system called Call Copy.  Call

18   Copy is a software program -- a monitoring software

19   program where calls are recorded, and we had a QA

20   department, quality assurance department, that fell

21   under the training umbrella.

22       Q.   And what percentage -- strike that.

23            Were all of the calls recorded?

24       A.   I can't say that they were all recorded

25   because, by law, there were a couple customers that
```

```
 1    had requested not to be mon -- to be recorded, and

 2    by law we had to comply with that.  But I would say

 3    a good 85 to 90 percent of the calls were recorded.

 4        Q.   And was that the salesperson, when they

 5    picked up the phone, they pushed a button to record,

 6    or how did that work?

 7        A.   It worked automatically, and they had to

 8    have a certain greeting that they had to use to

 9    disclose to the customer that they were on a

10    recorded line.  So their greeting would be:  Hello,

11    this is Patricia Williams.  I'm calling you today on

12    a recorded line.  Either how can I help you or can

13    we talk a little bit about your business today.

14        Q.   Got it.  If a customer said I don't want

15    this to be recorded, was that a red flag to you?

16        A.   A red flag?  It was not a red flag from the

17    standpoint of, oh, I wonder why.  It was a -- it was

18    just that we, legally, based on all the research

19    that had been done on the topic of recording, we

20    knew that we needed to take that next step and we

21    needed to be able to comply with that.

22             So it was more of a legal requirement that

23    we were obligated to follow.

24        Q.   But there was no concern that if a customer

25    was touchy about having the call recorded, that they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    may have been seeking CIIs inappropriately?

 2        A.   Not -- no, I don't recall that really being

 3    of a big concern.  The sales reps would try to

 4    educate the client or the customer as to why we did

 5    that.  It was for their coaching and development.

 6             Just because you have a sales rep doesn't

 7    mean that they are the perfect salesperson.  So we

 8    were constantly coaching, monitoring, developing,

 9    getting feedback from QA, going back to the sales

10    rep, saying, okay, you've positioned it this way; it

11    would have been better to maybe have positioned it a

12    different way.

13             You know, they weren't perfect people, and

14    we did our best to try to make them as professional

15    as we possibly could.

16        Q.   If there were -- if QA folks who were

17    monitoring the calls thought that there was

18    something inappropriate in which the reps were

19    conducting the calls, especially with regard to

20    CIIs, were they ever terminated?

21             MS. KOSKI:  Object to form.

22        A.   Was the employee ever terminated?

23        Q.   Yes.

24        A.   It would depend on what the context of the

25    call was.  Mainly, we used the coaching and feedback
```

1    as -- we used the tool of the QA feedback as helping

2    them to become better.  Maybe the way they said it

3    was technically -- technically right, but the way

4    they said it may have led the customer to have a

5    little bit different impression than what they

6    should have had.  And we would go back and help them

7    to rephrase that and fine-tune their sales pitch.

8        Q.   As you sit here, can you recall any

9    situations where an employee was terminated by Anda

10   because of inappropriate efforts to sell opioids to

11   customers?

12            MS. KOSKI:  Object to form.

13       A.   I cannot recall.

14       Q.   Sitting here, can you recall any employees

15   who were disciplined or schooled due to QA people or

16   others seeing that they were doing something

17   inappropriate in their efforts to sell CII opioids

18   to customers?

19            MS. KOSKI:  Object to form.

20       A.   Yes, I believe they were.

21       Q.   Can you tell me about what you recall?

22       A.   I -- I recall that we had a few reps that

23   just were not positioning our -- our position as a

24   company correctly.

25            When decisions were made to cut off a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customer from buying controlled substances, the way
 2    that they explained that to the customer may not
 3    have been as professional as it should have been or
 4    it may have led the customer to believe well, if I
 5    do this, I can do this, kind of thing. So when we
 6    caught that, we sat down.  We sat with the rep.  We
 7    coached them through a different kind of dialogue to
 8    have.
 9             I can remember some of the sales managers
10    having those conversations with them over a period
11    of time.  Do I remember a specific rep?  No, but I
12    know that those kinds of conversations and coaching
13    development opportunities did go on.
14       Q.   You can't recall any particular rep who was
15    disciplined for their --
16       A.   I cannot as I'm sitting here, no.
17       Q.   And let me just finish the question.
18       A.   I'm sorry.
19       Q.   You can't recall as you're sitting here any
20    individual rep -- sales rep who was disciplined by
21    Anda management for inappropriate conduct in
22    promoting or selling opioids to pharmacy customers?
23       A.   I cannot recall.
24       Q.   When you left the company, were you provided
25    with any severance?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And was that a package that they offered to

 3   you?

 4      A.   Yes.

 5      Q.   Was that offered to you during that same day

 6   when you had the meeting when you learned that your

 7   position was being -- what's the terminology -- the

 8   position was eliminated?

 9      A.   I was notified that there would be something

10   forthcoming, but I did not get it that day.

11      Q.   How soon afterwards did you get it?

12      A.   I actually got the package about two months

13   later.

14      Q.   Was there any intervention in between where

15   you sought counsel against the company?

16           MS. KOSKI:  Object to form.

17      A.   No.

18      Q.   Would you -- would you describe your leaving

19   the company to be that you left on good terms?

20      A.   Yes.

21      Q.   Do you have any pension with Anda or any of

22   its owners?

23      A.   No, ma'am.

24      Q.   Did they have a pension plan?

25      A.   No.  They had a 401(k).
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Who did you report to, starting -- it may

 2    have changed over time -- so when you joined the

 3    company?  Was that in 2008?

 4        A.   Yes.  I joined August the 4th, 2008.  At

 5    that time, I reported to Kim Bloom.  Her name is now

 6    Kim Poropat.  She reverted back to her maiden name

 7    after a divorce.  And I reported to her for

 8    approximately a year, year-and-a-half.

 9        Q.   Okay.  And then?

10        A.   And then I was promoted to executive

11    director of sale -- of inside sales.  Kim

12    transitioned to another role within the organization

13    and I started reporting to a Brian Witte, W-i-t-t-e.

14    And I remained reporting to Brian until the day that

15    I left.

16        Q.   Your compensation, was there a base pay and

17    a commission component?

18        A.   My base pay was -- there was a base, and

19    then there was an annual percentage component.  If

20    the company made plan, there were a number of

21    factors that had to have been met, and it could have

22    been up to 20 percent of my annual income if all of

23    those factors aligned.

24        Q.   Was that based by any metrics of sales from

25    your unit?
```

```
 1        A.   Yes, it was.

 2        Q.   What was the ratio between -- understanding

 3   that your commission could change over time, because

 4   it wasn't always the same --

 5        A.   Correct.  I was not a commission-based sales

 6   manager or director.  I was paid a salary.  I did

 7   not get commission on sales.

 8        Q.   Okay.  So what -- what would you refer to --

 9   we know the base pay is the regular.

10        A.   Correct.

11        Q.   And then this --

12        A.   It was an annual bonus.

13        Q.   It was a bonus?

14        A.   Correct.  It was an annual bonus.

15        Q.   And so was it generally your bonus was about

16   20 percent of your overall compensation package?

17        A.   I had the availability of going up to 20

18   percent if all of the metrics that I was held

19   accountable during that year were met and the

20   company made plan and there was a component, I

21   believe, originally at the Watson level and how well

22   Watson did as an organization as well.

23        Q.   You were with the company for, what, about

24   seven or eight years?

25        A.   I was hired on August the 4th of 2008, and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    my severance package date on there has that my

 2    ending date was June the 29th of 2015.

 3         Q.   Okay.  So during those years, how many of

 4    the years did you get to the 20 percent?  And if you

 5    don't get to the 20 percent bonus, what were the

 6    varying -- what were the lowest bonus that you got

 7    in any given year?

 8         MS. KOSKI:  Object to form; compound.

 9    BY MS. RELKIN:

10         Q.   Good point.  What was the lowest bonus you

11    had in any given year, if you can recall?

12         A.   I can't recall.  It fluctuated every year.

13         Q.   So --

14         A.   I remember a 9 percent.  I remember a 15

15    percent.  I remember nothing or very little.  I

16    don't -- I don't have those numbers memorized.

17         Q.   You got 20 percent at least one year?

18         A.   I believe so.  I believe so.

19         Q.   Were there stock options or stocks provided

20    as well?

21         A.   Yes, there were some stock options.

22         Q.   And the stock was with Watson?

23         A.   It was originally with Watson, and then

24    everything transitioned over to Actavis, and then

25    from Actavis it transitioned over to Allergan.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And do you have stock in Watson, Actavis,

2    and Allergan?

3    A.   No longer.

4    Q.   Did you -- when did you sell that stock?

5         MS. KOSKI:  Object to form.

6    A.   I exercised those options over a period of

7    years -- and I did hold onto a significant amount of

8    them and got rid of those in 2016.

9    Q.   Now Anda is owned by Teva; is that right?

10   A.   That is correct.

11   Q.   Do you have any stock in Teva?

12   A.   No.

13   Q.   And you talked about base pay and then the

14   bonus, which was the varying percentages?

15   A.   Varying, uh-huh.

16   Q.   On top of that, there would be stock

17   options; is that right?

18   A.   The -- there was a -- what was called a

19   long-term incentive was there were stock options,

20   part of the long-term incentive.  So some years

21   there would be some stock options offered to me and

22   other years there were not.

23        I was offered an initial group of shares as

24   well if I retained and stayed on with the company

25   for a period of time -- I think it was two years or

Highly Confidential - Subject to Further Confidentiality Review

 1    four years -- payable incrementally as I had

 2    longevity with the company.

 3        Q.   And when the company -- when Watson sold to

 4    Actavis, you kept your Watson stock options and then

 5    you also then got Actavis?  Is that how it worked?

 6        MS. KOSKI:  Object to form.

 7        A.   It had -- they had to all be converted over.

 8    They all were converted over, because at the time of

 9    the conversion, none of my stock options were

10    payable.

11        Q.   Got it.

12        A.   They weren't payable until future dates.

13    There was nothing payable to me immediately.

14        Q.   What was the approximate amount of your --

15    of the sale of all your options?

16        MS. KOSKI:  Object to form.

17        A.   Over the entire course of the time that I

18    was with the company?

19        Q.   Yes.  Until when you sold in 2016, yeah.

20        A.   Okay.  May I ask another -- another

21    question?

22        Q.   Sure.

23        A.   A clarifying question?

24             There was a price that the stock was given

25    to me at, and then there was the price that it was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    actually sold at if there was an appreciation time
 2    frame.  Okay.  Which of those numbers would you
 3    like?
 4        Q.   Why don't you give both, the best that you
 5    can recall.
 6        A.   I want to say that I had a total combined of
 7    about 3,000, maybe 3,200, shares over a period of
 8    time, and those did appreciate.  Because they were
 9    issued at all different amounts, from $35 up to over
10    $190, depending on what the share price was going
11    for, for which company we were under at that time.
12             And then, obviously, Allergan, which is when
13    it was finally sold -- when I actually sold the
14    majority -- I think I may have sold a few shares
15    right after year number four that I was with the
16    company, because I think that was the first time
17    that I was eligible to actually exercise the option.
18        Q.   Right.
19        A.   And I want to say then I maybe took what was
20    the equivalent of 100 shares, maybe 200 shares.  I
21    don't recall.  I'd have to look.
22        Q.   And then when you sold the bulk of them in
23    2016, how much did you receive?
24        A.   I netted about -- let me think here.  It was
25    about $600,000, I believe.
```

```
 1        Q.   In addition to the stock options, the base
 2   pay, and the annual bonus, you said there was a
 3   401(k).
 4             Did they match that as well?
 5        A.   Yes, they did.
 6        Q.   And up to what percent?
 7        A.   They matched like 2 percent.  I believe it
 8   was 2 or 3 percent, up to 6 percent, from what I can
 9   recall.  And I believe it did change.  I believe it
10   started out as 2 -- 2 percent, and then it -- I
11   believe it went to 3.
12        Q.   You said it went up to 3, not --
13        A.   I believe so.
14        Q.   -- not 6 percent?
15             MS. KOSKI:  Object to form.
16   BY MS. RELKIN:
17        Q.   If you put up to 3, they matched 3?
18        A.   Correct.
19        Q.   Got it.
20        A.   Sorry I didn't explain that correctly.
21        Q.   What was -- with regard to your bonus, what
22   was the highest bonus you received the year you hit
23   20 -- or the year or years -- or what amount of
24   money was that?
25             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   I don't recall the amount.

 2       Q.   Approximately.

 3       A.   I don't recall.  I know there -- I remember

 4   somewhere -- it was around $15,000.  I really don't

 5   recall the numbers.

 6       Q.   And your base pay was?

 7            MS. KOSKI:  Object to form.

 8       A.   I was hired in at $110,000.  My base pay

 9   when I left was 185.

10       Q.   And what was the severance that they

11   provided?

12       A.   Thirty-nine months.

13       Q.   So you got your base pay for 39 months?

14       A.   I apologize.  I'm so sorry.

15       Q.   That's a good deal.

16       A.   Please strike that.  It was for 9 months.

17   It was 39 weeks, not 39 months.

18       Q.   I would say that's very generous.

19            So you got nine months --

20       A.   Correct.

21       Q.   I'm sorry to have been intrusive, but this

22   is what we do.

23            Would you agree with the statement that

24   there is an inherent tension between Anda's desire

25   to sell and make profit and the responsibility to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ensure they were not selling to customers who were

 2    allowing controlled substances to get diverted?

 3           MS. KOSKI:  Object to form.

 4           Are you asking her opinion about that

 5      statement?

 6           MS. RELKIN:  Yes.

 7           MS. KOSKI:  Not a fact question but her

 8      opinion?

 9    BY MS. RELKIN:

10      Q.   In your experience as sales manager for

11    inside sales at Anda, did you perceive that there

12    was inherent tension between the goal of selling and

13    making profit for the company and the imperative to

14    avoid sales to inappropriate customers who might be

15    placing suspicious orders?

16           MS. KOSKI:  Object to form.

17      A.   Was there tension?  I don't consider it a

18    tension.  Were we all aware of our obligation?  Yes.

19    To do things ethically and to be an ethical member

20    of the community, absolutely.

21           Did we -- did I ever feel that the sale of

22    the CIIs inhibited my ability to reach my goals?

23    No, because it was a small portion of our business.

24           Our generic sales were what really drove our

25    business, and although CIIs were a part of that,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they didn't -- my goals were not given to me as
 2    you've got to hit this much in a CII goal on a
 3    monthly basis, on a yearly basis.  I was given a
 4    brand goal, I was given a generic goal.  Out of all
 5    the SKUs that we offered, that were -- those were my
 6    directives.
 7       Q.   Well, were there circumstances where one of
 8    your sales reps had a good customer who was a big
 9    purchaser of the other non-CIIs, but they also were
10    seeking more and more CII products that was of
11    concern?
12            MS. KOSKI:  Object to form.
13       A.   I recall that we had a number of sales reps
14    that were relaying what the customer wanted us to do
15    in terms of requesting -- we talked about
16    requesting, you know, control increases, and we had
17    processes for those and those were sent to the
18    compliance department to review.
19            It was the compliance department's decision
20    as to whether to approve those or not.  It was
21    communicated back as to whether those would be
22    approved or not, and that would then be communicated
23    back to the customer.
24       Q.   In those circumstances, you had sales reps
25    who were concerned that if they didn't provide their
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customers with the increase or the amount of opioids

 2    that they were seeking, that they would lose the

 3    customer business for all purposes; isn't that true?

 4        A.    That is true, yes.  They were very

 5    concerned.  The sales reps were paid a -- depending

 6    on whether they were a new hire or a more seasoned

 7    sales rep, were paid 9 -- the more seasoned sales

 8    reps were paid $9 an hour, and theirs was entirely

 9    almost commission based.  So an impact of a customer

10    leaving and taking not only the CII but all of their

11    generic business absolutely would have been of

12    concern to a sales rep.

13            However, that being said, they understood

14    that if something were to happen with that customer

15    and that customer ultimately resulted in something

16    further down the line happening to Anda, none of

17    them wanted to be in that position.  So they were

18    kind of torn.  They were torn to trying to be the

19    customer advocate but also making sure they did the

20    right thing for the company.

21        Q.    And some of them tried to push the envelope?

22        A.    Yes.  Salespeople try to do that, but those

23    are the ones that we had to constantly bring back

24    and remind them of what their job and

25    responsibilities were.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Isn't it fair to state that there are a

2    number of e-mails where the sales reps would

3    advocate to increase the limit because the customer

4    was an important customer to the company?

5         MS. KOSKI:   Object to form.

6    A.   There were customers that were not only

7    important to the customer -- to the company, they

8    were important to them and the sales rep and their

9    income.

10   Q.   And they advocated, please increase the

11   limit?

12   A.   They would.

13   Q.   Or please give us an extension on the

14   paperwork?

15   A.   They did that initially when these processes

16   of how to go about requesting the increase began,

17   but after a period of time and more education and

18   more knowledge about the subject, more understanding

19   of what was going on in the market, that became less

20   and less an issue.

21   Q.   When you say more understanding of what was

22   going on in the market, what do you mean?

23   A.   Meaning the abuse that was happening.

24        And we educated them at every opportunity

25   that we could of scenarios where a pharmacy had been

Highly Confidential - Subject to Further Confidentiality Review

```
1    shut down by the DEA, what that reason was, if we

2    knew it.  We used those as training opportunities so

3    that we really helped them to get a better

4    perspective.

5         They were very focused on them themselves,

6    and we needed to bring them up and bring that

7    understanding back to the role of the company, the

8    role they played within the company.

9    Q.   Chronologically, when you joined the

10   company, you're aware at that point there was a

11   problem with opioid abuse; is that fair to state?

12   A.   To be honest, no.  In 2008, I don't recall

13   that being something that I was dealing with in the

14   role that I had.

15        I was being charged with putting programs

16   together for the sales force under Kim Bloom's

17   direction.  I was putting recognition programs

18   together.  I was working with training on the

19   curriculum.  I was working with a lot of other

20   initiatives.  So there was no emphasis in my world

21   at the time on anything on CIIs.

22   Q.   When did you first become aware of opioid

23   abuse problems?

24        MS. KOSKI:  Object to form.

25        Are you asking her personally?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MS. RELKIN:  Yes.

 2     A.   I would say it would probably have started

 3     somewhere in the late 2009, 2010.  And the reason I

 4     say that is because the compliance team at that time

 5     started asking for more participation from our sales

 6     floor to help them in being those eyes and ears,

 7     helping them to get updated customer questionnaires.

 8          They had always used a customer

 9     questionnaire, but we wanted to get current ones and

10     make sure we were keeping them on a current basis.

11     And so the sales floor and sales reps were asked,

12     because of their role with the customer, to try to

13     help us in that initiative.
```

```
25     Q.   So it's your testimony that training began
```

1    when you were a new hire in 2008?

2        A.   Correct.

3        Q.   Was it less detailed?

4        A.   I think it was a little bit less detailed.

5    It was more about what CSOS was, what -- why would a

6    customer use CSOS, what was the process for ordering

7    a CII.

8             We were not forbidden from ordering and

9    fulfilling an order for a CII.  We did it every day

10   for our clients.  There were control limits in place

11   from the -- way before I started, and I'm sure they

12   probably are even more so now.  But those limits

13   were always in place.

14            So there could never be a time when the

15   sales rep just went willy-nilly and started, you

16   know, shooting tons of CII products out there.

17   There was always a limit to the amount of ordering

18   that that customer could do for any CII product.

19       Q.   You talked about the salespeople had their

20   regular wage was $9 an hour, and then they got

21   commission.  What was the typical breakout of how

22   much of their compensation was commission?

23            MS. KOSKI:  Object to form.

24       A.   I would say on the average, for a seasoned

25   representative, it was probably 90/10.  They had a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    very, very, very small base.  New hires were paid

 2    $15 an hour for the first two years unless their

 3    book of business grew substantially to the point we

 4    had -- I had a formula that I was able to utilize to

 5    determine when did it make sense to move them from

 6    what we called the rookie plan to become a

 7    full-fledged sales rep, actually graduate them, so

 8    to speak, or promote them to a full sales rep

 9    status, at which point they would earn the $9 and

10    their commission would be enough to sustain that

11    difference.

12       Q.   I see.

13            So the new hires started at $15?

14       A.   Correct.

15       A.   Because they had very little -- they had no

16    accounts.  They started with zero.  Zero accounts.

17    And then as their book of business grew -- some

18    sales floors -- just a little bit of call center

19    education.

20            Some call centers, the sales floor is

21    territorial about their accounts, meaning if I am a

22    sales rep and I have 100 accounts, I'm always going

23    to be worried that somebody is going to try to steal

24    my account.  That was not the way at Anda.  Anda

25    never operated under that type of feeling, as long
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as I was there.

 2           When you got an account and you opened that

 3    account and you cultivated that account, that

 4    account was yours.  And the only time that we would

 5    move that account was if there was some kind of

 6    major customer issue that -- interaction issue that

 7    happened between the customer and the sales rep

 8    where the customer physically asked for a change in

 9    their sales rep, or if the sales rep left the

10    company.

11           So to that end, they were encouraged to

12    continue to grow their book of business.

13      Q.   Did the sales force also get a bonus based

14    on performance?

15      A.   They did.  Theirs was a quarterly bonus

16    based on a variety of call center metrics:  talk

17    time, number of accounts that they had sold to, a

18    variety of --

19      Q.   Did any of the metrics that were used to

20    formulate their quarterly bonus give credit for

21    sales reps pointing out potential suspicious orders

22    for -- concerning customers?

23           MS. KOSKI:  Object --

24      Q.   -- with regard to opioids?

25           MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A.   No, ma'am.

 2     Q.   Was there any incentive provided to any of

 3   the employees at Anda to detect suspicious orders?

 4          MS. KOSKI:  Object to form.

 5     A.   An incentive?  No.  We didn't bring an

 6   incentive to bring something to our attention that

 7   we needed to have brought to our attention.

 8     Q.   You indicated there was no competition

 9   within the sales force, people respected each

10   other's customers.

11          Was there some point in time where you were

12   concerned about sales reps working after hours,

13   after the 9:00 shutdown?

14     A.   Yes.  Yes.

15     Q.   What was that about?

16     A.   We had -- we had about five or six sales

17   reps, and these were all senior sales reps, and our

18   senior sales reps were on salary versus a hourly

19   rate.  And we were just concerned that they were

20   staying there unsupervised.

21          We normally had a sales manager on every

22   night until 9:00 o'clock, but some of our senior

23   sales account managers liked to stay until 9:15,

24   9:30.

25          Technically our phones closed at
```

```
 1    9:00 o'clock.  So we wanted them really off the

 2    phone and leaving for the night and --

 3        Q.   Well, they weren't hourly.  They were

 4    salaried, and they were senior.

 5             So what was the concern?

 6        A.   The concern was that they were in a building

 7    alone and that there was no managerial supervision

 8    there, and we were -- all we did, we just asked them

 9    if they could please try to leave when the sales

10    manager left.

11             It wasn't a question of --

12             MS. KOSKI:  Just wait for another question.

13             THE WITNESS:  Okay.

14             MS. KOSKI:  Sorry to interrupt you.

15             THE WITNESS:  That's okay.

16             MS. KOSKI:  Question, answer; question,

17        answer.

18             MS. RELKIN:  We'll mark this as Exhibit 3.

19             (Anda-Williams Exhibit 3 was marked for

20        identification.)

21    BY MS. RELKIN:

22        Q.   Before I turn to this exhibit, were those

23    after hours sales calls recorded as part of the QA

24    system?

25        A.   All their calls were recorded regardless of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the time unless we had specifically taken that

 2    particular customer off of call recording.

 3       Q.   Was there any concern that the sales folks

 4    were spying on what was going on in compliance?

 5           MS. KOSKI:  Object to form.

 6       A.   In compliance?  I don't ever recall that.

 7    Compliance was at the very opposite end of the

 8    building from where sales was.

 9       Q.   Got it.  Okay.

10           So what we've marked as Exhibit 3 is

11    produced from your files, and it's

12    Anda_Opioids_MDL107802.

13           Let me know when you have a chance to look

14    at this.  We can start from the bottom.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 7      Q.   One more question about your employment

 8   situation.

 9           When you got a severance package, was there

10   a termination agreement?

11      A.   Yes.

12      Q.   Okay.  And was there a nondisparagement

13   clause in that?

14           MS. KOSKI:  Object to form.

15      A.   Nondisparagement?  Yes.

16      Q.   And what that means is that you weren't

17   supposed to say anything negative about the company;

18   is that right?

19      A.   Correct.  Uh-huh.

20      Q.   And were there any enforcement consequences

21   if you did say anything negative about the company?

22      A.   I would have to go back and re-read that

23   document.  I don't recall the consequences.

24      Q.   I'm going to be asking some questions about

25   promotional efforts and sales of CIIs.

Highly Confidential - Subject to Further Confidentiality Review

```
1            MS. RELKIN:  Could I have an exhibit

2        sticker?  We'll mark this as Exhibit 4.

3            (Anda-Williams Exhibit 4 was marked for

4        identification.)

5            MS. RELKIN:  Here's one more if somebody

6        needs it.

7    BY MS. RELKIN:

8        Q.   What I've marked as Exhibit 4 is stamped

9    Number 0610875 from Anda files, your custodial file.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3          MS. KOSKI:  Let her finish.

4          (Anda-Williams Exhibit 5 was marked for

5     identification.)

6          MS. RELKIN:  I'm sorry.  I didn't give the

7     witness -- can you pass --

8     BY MS. RELKIN:

9     Q.   I've just marked as Exhibit 5 a document

10    that was produced from your files, Number 08 --

11    just -- I'm just going to read the numbers,

24          And recognizing that you were not -- you

25    were not on the original e-mail chains, but I think

Highly Confidential - Subject to Further Confidentiality Review

```
1    you got looped in.

2            Do you see where you got looped in here?

3            MS. KOSKI:  Take your time if you need to

4       read the --

5            MS. RELKIN:  Yeah.

6            You know what, I'm going to come back to

7       this exhibit, okay?  So we'll just move on to

8       another exhibit, and we'll come back to this one.
```

███████████████████████████████████████

```
11           Okay?

12           MS. KOSKI:  Okie-dokie.  You can can just

13      set it aside.  She's saying she's not going to

14      ask you the questions.

15           THE WITNESS:  Right.

16           MS. RELKIN:  This will be Exhibit 6.

17           (Anda-Williams Exhibit 6 was marked for

18      identification.)

19   BY MS. RELKIN:

20      Q.   This has been marked as Exhibit 6.  It was

21      stamped from your files, Number 712121.  It's a

22      short e-mail.
```

█████████████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

20          MS. KOSKI:  Ellen, I think I set up lunch

21     today for 12:30.  It's only 11:30 now, but for

22     your planning purposes.

23          MS. RELKIN:  Okay.  Thank you.

24          (Anda-Williams Exhibit 7 was marked for

25   identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. RELKIN:

 2        Q.   This will be Exhibit 7.

 3            MS. KOSKI:  This is another double-sided

 4        exhibit.

 5    BY MS. RELKIN:

 6        Q.   So, Ms. Williams, what we've marked as

 7    Exhibit 7 is another document produced from your

 8    files stamped 629163, and it -- as counsel

 9    indicated, it is double-sided.  It's an e-mail chain

10    start with a forward of an e-mail.
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 7        Q.    Do you recall ever having an issue with

 8    Barry Koran about his approach to CII sales?

 9        A.    No, I do not recall.

10        Q.    Any other problem with Barry Koran?

11        A.    I had other issues with Barry Koran.  I

12    loved him, but we had a love/hate relationship.  I

13    wanted him on the phone more than what he was, and

14    he tended to want to do his own thing.

15             But in terms of trying to sell, he always

16    was selling to people who had the ability and had

17    the limit in place to be able to promote the item.

18    Whether the customer was buying from us or not, that

19    limit was in place.  It was assigned by compliance,

20    and that was our role.  Our role was to sell, and

21    CIIs were not off the table.

22             They, again -- he had -- certain customers

23    had -- certain sales reps had certain customers that

24    were buying their CIIs from a lot of other sources,

25    and our job was to try to get incremental sales.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     And if we could do it through generic sales, brand

2     sales, CII sales, that was a sales rep's job.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19     Q.  Even though your job and your department's

20    job was to sell product, with regard to the CII

21    sales, isn't it fair to state your job was also to

22    look for suspicious orders?

23        MS. KOSKI:  Object to form; mischaracterizes

24    her testimony.

25     A.  To look for suspicious orders?  That was

Highly Confidential - Subject to Further Confidentiality Review

```
1    primarily a compliance function because they

2    reviewed all the CII orders that went out before

3    they were shipped.

4        Q.    Right.  But we've talked about, know your

5    customer?

6        A.    Correct.

7        Q.    And that involved the sales force as well?

8        A.    Correct.  And if we -- if we saw something

9    or the sales reps were supposed to bring it to our

10   attention if they noticed something.  Again, that

11   was an education process.  It was happening over

12   time, 2008, 2009, 2010, we started seeing a

13   turnaround in how they were absorbing the

14   information and that became less of a question.

15       Q.    What became less of a question?

16       A.    What I mean less of a question, I mean less

17   of a reason for -- how could I -- I need to reword

18   that.

19            There were less instances of the sales reps

20   not diving into an issue, meaning if they saw

21   something like this, that they would start bringing

22   it to the attention of their manager.

23       Q.    You're saying over time --

24       A.    They were getting better and better at it.

25   At first it was, you know, it was a hit, it was a
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     hit to them if somebody was taken off of controls

2     and we continued to educate them about bringing

3     these things to our attention, letting us know if

4     there is something suspicious going on.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 5      Q.   Okay.  And in terms of -- you talked about

 6    the evolving nature over time of there's a greater

 7    awareness of the opioid epidemic over the years.  Is

 8    it fair to state that in 2010 the culture was such

 9    that as far as you know, there was no concern or

10    uproar over a seasoned sales rep saying he always

11    pushes oxy?

12      A.   Not at that time.

13      Q.   Okay.  Would you say that in later years

14    there would have been an uproar with that mentality?

15           MS. KOSKI:  Object to form.

16      Q.   Is that a yes?

17           MS. KOSKI:  I just objected to form.  You

18    can answer.

19      A.   Yes.

20           (Anda-Williams Exhibit 8 was marked for

21    identification.)

22    BY MS. RELKIN:

23      Q.   I've just marked as Exhibit 8 a document

24    numbered 630034, which is an e-mail -- well, it's a

25    series of e-mails and I'm going to primarily focus
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    on the e-mail from you, which is in the front of the

2    document, the first page of the document -- take it

3    back, it's not from you.  It's to you.  Strike that.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
17      Q.   Right.  Okay.  Thank you.

18           MS. KOSKI:  You still good?  Everyone good?

19           MS. RELKIN:  Yeah.  Is everyone good?  I

20      think we should just go straight through 12:30,

21      unless someone needs a break then this is a good

22      time.

23           MS. KOSKI:  So I did get a note that the

24      lunch will be here in a minute but it will wait

25      for us, so it's better for it to be here when you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      want a break --

 2           MS. RELKIN:  Yeah, right.

 3           MS. KOSKI: -- rather than it be late.

 4           MS. RELKIN:  Right.  So when you get the

 5      note it's here, you can let me know.

 6           MS. KOSKI:  I did.  It's here but you go to

 7      whenever --

 8           MS. RELKIN:  Oh, okay.

 9           MS. KOSKI:  Whenever you feel comfortable,

10      the lunch will be here.

11           MS. RELKIN:  Okay.

12           (Anda-Williams Exhibit 9 was marked for

13      identification.)

14   BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

15      Q.    And what is Remedy?

16      A.    Remedy was a call management system, but it

17   had many, many different uses.  It not only provided

18   the platform for keeping the agents on call

19   schedule, it gave the sales reps the ability to set

20   the call for a certain time.  Just a little bit of

21   additional education, the pharmacies that we called

22   on, typically, had time frames that they wanted --

23   that they requested to be called at.  I might want

24   to be called at 11:00 o'clock in the morning, I

25   might want to be called at 6:00 o'clock in the

1    evening.  Because they would accumulate orders at

2    their pharmacy all day long.  And so some pharmacies

3    would only want to be called once, some were twice,

4    sometimes were more than that, and that allowed them

5    to be able to then call that order in to their sales

6    rep.

7            So Remedy was able to be set up that allowed

8    the sells reps to schedule those calls at

9    appropriate times and then there was a list of all

10   the calls and all the times that they had scheduled.

11   So that it helped to keep them on track and moving

12   from one call to the next and they were encouraged

13   to make sure that their Remedy was full, so they had

14   a full day of calling so that they were productively

15   occupied throughout the day.

16       Q.   So it's basically a calendaring system for

17   the sales reps?

18       A.   It's kind of like that, correct, and it

19   served other functions down the road, we expanded

20   it.  It had a lot of functionality.  Most call

21   centers do utilize a call management system of some

22   kind and this was the solution that we used at Anda.

23       Q.   Do you know when those documents are

24   retained, the Remedy system?

25       A.   I believe so.

Highly Confidential - Subject to Further Confidentiality Review



12      Q.   But when you answered the question, you

13   understood what you were looking at, correct?

14      A.   Yes, I did.

15      Q.   Okay.  Thank you.

16           (Anda-Williams Exhibit 10 was marked for

17   identification.)

18           MS. KOSKI:  We're going to break soon for

19   lunch.  Are you okay?

20           THE WITNESS:  Sure.  I'm fine.  I'm fine.

21   BY MS. RELKIN:

22      Q.   Yeah, if you need a break, you let me know.

23           MS. KOSKI:  Oh, did you not get one?

24           MS. RELKIN:  Oh, whoops.  My bad.

25           MS. KOSKI:  I'm usually given the one with

Highly Confidential - Subject to Further Confidentiality Review

```
 1      the sticker.  It's easier to keep track.

 2          MS. RELKIN:  Right.  Right.  The sticker is

 3      here.

 4   BY MS. RELKIN:

 5      Q.   Okay.  So you take the time you need, but

 6   for identification purposes what's marked as

 7   Exhibit 10 is document number 635640, and it is

 8   several pages again, it's double-sided, it goes

 9   through page 645.  Much of it is just a large number

10   of e-mail addresses.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1     getting older folks to utilize the new technology.

2     We had some older pharmacists that just refused to

3     hardly even touch an e-mail or do anything of that

4     nature.  So getting them set up on CSOS was unheard

5     of.  They liked their paper, they liked to fill out

6     the paper, send it in, have the order fulfilled,

7     sent back to them and that's the way they proceeded.
```

```
15          Did I read that accurately?

16     A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
19        MS. RELKIN:  Do you want to break for lunch

20     and then I can keep going or -- consensus -- yes.

21        MS. KOSKI:  Looks like maybe.

22        MS. RELKIN:  Majority wins.

23        THE VIDEOGRAPHER:  Off the record at 12:09.

24      (Recess from 12:09 p.m. until 12:49 p.m.)

25        THE VIDEOGRAPHER:  We're now back on the
```

Highly Confidential - Subject to Further Confidentiality Review

1        video record at 12:49.  This is the beginning of

2        Media 2.

3            (Anda-Williams Exhibit 11 was marked for

4        identification.)

5        BY MS. RELKIN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6      Q.   Got it.

7           (Anda-Williams Exhibit 12 was marked for

8      identification.)

9      BY MS. RELKIN:

10     Q.   I am marking another exhibit as Exhibit 12.

11     Here is a copy, and this is stamped number 634359

12     also from your files and it's a multiple page

13     double-sided document ending in number 634369.  And

14     because -- well, the front of it indicates that it's

15     an e-mail from Brian Witte to Marc Falkin and are

16     you a recipient there?

17     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11        Q.    Okay.  That's it for this exhibit.

12              (Anda-Williams Exhibit 13 was marked for

13        identification.)

14        BY MS. RELKIN:

15        Q.    Another exhibit, this is -- is this 13?

16              MS. KOSKI:  Stretching exercises just to get

17        the exhibit.

18        Q.    We've marked as Exhibit 13, a document from

19        your files numbered 610604, and it goes through,

20        again, double-sided, and it goes through 614 and --

21              MS. KOSKI:  This is not the same --

22        A.    I think this is related to the same --

23              MS. KOSKI:  She can ask you --

24        A.    One is from Marc Falkin and one from Brian.

25              MS. KOSKI:  It looked similar to us but not

1          identical, different Bates number anyway.



Highly Confidential - Subject to Further Confidentiality Review



```
 8      Q.   Inventory-wise, but in terms of demand for

 9   OxyContin, from the time you were at Anda until you

10   left, did you ever see a drop that all of the sudden

11   there was less demand for oxy?

12           MS. KOSKI:  Object to form.

13      A.   I personally did not watch those -- those

14   trends, because that was handled by our compliance

15   team.  I just know we sold a lot less because we had

16   a lot of customers that either we decided to not

17   sell to anymore for whatever reason, or they never

18   returned questionnaires to us.  I can't -- I can't

19   say.

20      Q.   But in terms of the demand, you're not

21   suggesting that you had any reason to believe that

22   demand was diminishing for OxyContin?

23      A.   I can't speak to the demand because I don't

24   know what was going on.  We only saw one little

25   piece of the Anda side.
```



Highly Confidential - Subject to Further Confidentiality Review

2            (Anda-Williams Exhibit 14 was marked for

3      identification.)

4      BY MS. RELKIN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



25        Q.   That's it for that document.

Highly Confidential - Subject to Further Confidentiality Review

```
1              (Anda-Williams Exhibit 15 was marked for

2      identification.)

3      BY MS. RELKIN:
```





Highly Confidential - Subject to Further Confidentiality Review



```
12      Q.   You were there a long time, so there's a lot

13   of e-mails.  Sorry.

14           (Anda-Williams Exhibit 16 was marked for

15   identification.)

16   BY MS. RELKIN:

17      Q.   The next exhibit is 16.  That's for me.

18   That's for you.  Most of the e-mail -- most of it is

19   an address list.

20      A.   This is the same one that we covered before.

21      Q.   Is it?

22      A.   Uh-huh.

23      Q.   That's December 8th?

24           MS. LUND:  Copies?

25           MS. RELKIN:  Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. KOSKI:  Let me -- although I can still
 2       have a copy because Patricia's doing my job and
 3       her job here.  Is this voicemail the same date?
 4            THE WITNESS:  Yes.
 5       Q.   It's discussing the same thing, but here
 6    what I wanted to ask you about is you said voice
 7    mail, that wasn't the identical exhibit, just the
 8    same topic, right?
 9            MS. KOSKI:  It's the same Bates number.
10            MS. RELKIN:  My bad.  My bad.  Why don't
11       we -- can we just -- we'll just reuse Exhibit 16.
12       We will just destroy this.  There is no reason to
13       mark the same exhibit twice.  Okay.
14            MS. KOSKI:  Because I think it's identical
15       to Exhibit 10 that you already marked.
16            MS. RELKIN:  Okay.  Okay.
17    BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 6        Q.   All right.  So I'm going to reuse the

 7    Exhibit 16 stamp.

 8             MS. KOSKI:  Got it.

 9             MS. RELKIN:  Okay.

10             MS. KOSKI:  Just like it didn't happen.

11             (Anda-Williams Exhibit 16 was marked for

12    identification.)

13    BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   What was the average retention of a sales

 2   rep?

 3        A.   When I came on board with Anda, I was used

 4   to a retention in the SunTrust world of less than

 5   three years.  When I came to Anda, I was amazed at

 6   how long their people were in the position.  In

 7   fact, I almost made the comment, I remember one time

 8   to Kim Bloom saying, are we sure this is a good

 9   thing, because the average was seven-and-a-half

10   years.  That's uncall -- that's unheard of in sales.

11   Typically, it's one to two years.  That's an

12   industry standard.

13        And the fact that they were in the position

14   that long showed us a number of things:  That they

15   really liked what they were doing, they felt they

16   were being rewarded for it, they enjoyed the

17   position, and they wanted to keep doing it, and they

18   loved their customers.  And they continued to show

19   that longevity.

20        Q.   They make good money selling the

21   pharmaceutical products.

22        A.   They did, but they had to work for it, and

23   again, they had virtually very, very little base

24   commission, base pay.  Their base was very, very

25   low.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Right.  So their base was you said $9, and

 2    90 percent of their income would be --

 3      A.   Be commissions.

 4      Q.   That's -- per hour, that adds up.  If $9 was

 5    just 10 percent, that's a pretty good hourly wage.

 6      A.   Okay.

 7      Q.   Right?

 8      A.   Yeah.  And it depends on the size of the

 9    book that they had.

10      Q.   And did they also get stock options?

11      A.   No.

12      Q.   That's only for the managers?

13      A.   No.

14      Q.   You got stock options?

15      A.   I did.

16      Q.   Weren't you in management?

17      A.   I was.  Yeah.  I'm sorry.  Did I

18    misunderstand the question?

19      Q.   Yeah.  I said that was only for management?

20      A.   Correct.

21      Q.   Did you ever have any sales reps who said

22    that they had a moral or ethical problem promoting

23    opioid products?

24      A.   That came to me and expressed that?  No.

25      Q.   Did you hear about that anywhere in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    company?

2          MS. KOSKI:  Object to form.

3     A.   I do not recall.  It doesn't ring a bell.  I

4    would need something to jog my memory if something

5    like that happened, but it doesn't come top of mind.

6     Q.   And do you personally know anyone, or did

7    you know of anyone in the company, who lost a family

8    member or friend to opioid overdose?

9          MS. KOSKI:  I'm going to object.  I'm going

10         to instruct you not to answer, the relevance of

11         that question, that's just a harassing question.

12         MS. RELKIN:  It's discovery.

13         MS. KOSKI:  You don't have to answer that

14         question.  What's the relevance of someone else's

15         personal family member's health to the --

16         MS. RELKIN:  It's not generically health,

17         it's whether she knew anyone who --

18         MS. KOSKI:  Anyone in the world, what does

19         that have to do with this case?

20         MS. RELKIN:  Personal friends/family of her

21         or other folks in the company.

22         MS. KOSKI:  You don't have to answer that

23         question if you're not comfortable answering it.

24    A.   I don't recall anybody coming forward.

25         (Anda-Williams Exhibit 17 was marked for
```

Highly Confidential - Subject to Further Confidentiality Review

1    identification.)

2    BY MS. RELKIN:

3        Q.   It's kind of small font.  The good news is

4    the small font part on the top you don't have to

5    worry about because that was a different witness.

6    We'll focus on the larger font, which was your

7    e-mail.  So this is Exhibit 17, number 566549

8    through 550 -- no, through 551.  And the bigger font

9    is an e-mail relatively bigger font, do you see

10   that?

11       A.   Uh-huh.





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5      Q.   When -- have you ever come to learn of

6   specific orders being reported as suspicious?

7      A.   I was not involved in the process of doing

8   anything behind the scenes to that order.  The

9   compliance team reviewed it.  There were occasions

10   when if a sales rep saw something, sometimes they

11   would mention it to their sales manager and the

12   sales manager would call compliance.  Was that

13   happening every single order?  I can't say it was

14   but I -- if somebody went from wanting 100 oxys and

15   suddenly they wanted to order 1,000 and the sales

16   rep saw that, knowing -- and through all of our

17   education with them, they may pick up the phone and

18   say, hey, I'm not sure about this order, but at that

19   point we were instructed, let it go, let it go,

20   don't worry about it, we have compliance on the back

21   end watching all of this.

22      Q.   I appreciate that, but that's to compliance.

23   My question is if -- did you ever come to learn

24   whether compliance reported to the DEA?

25      A.   Oh, I have no idea.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Suspicious orders?
 2      A.   I have no idea, we were not privy to what
 3   they did with the DEA.
 4      Q.   So during all your years there, did you ever
 5   come to learn in any way that any particular
 6   customer order was reported to the DEA as being
 7   suspicious?
 8      A.   No, ma'am, I did not.
 9      Q.   Did you assume that there were some orders
10   that did get reported as being suspicious?
11           MS. KOSKI:  Object to form.  If you know.
12      A.   I can't say for sure.  I would hope that
13   some were.  We had some customers shut down from
14   controls, so I can only suspect that it did make it
15   either into the decision-making mode either strictly
16   on the Anda part or with assistance from the DEA.
17      Q.   And you would assume if a customer was shut
18   down by controls because their order tripped the red
19   flags it was too much, too much oxy, too much bad
20   combination, whatever?
21      A.   Correct.
22      Q.   You would assume that therefore it also got
23   reported to the DEA as a suspicious order, right?
24           MS. KOSKI:  Object to form; asked and
25           answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't know what compliance's requirements
 2   were with the DEA, so I really can't speak to that.
 3        Q.   Was that not discussed during those training
 4   sessions?
 5        A.   What was discussed in the training sessions
 6   was that they were in constant contact with the DEA.
 7   The form that they were in contact with, how it was
 8   conveyed, discussions, none of that where we shared
 9   any privileged information on.
10        Q.   Was there any time that you learned of the
11   DEA ever conducting an inspection at Anda?
12        A.   We always found out afterward, two, three
13   weeks, sometimes later we would find out that they
14   had been there.
15        Q.   Okay.  So there were occasions where they --
16        A.   We never knew ahead of time.
17        Q.   How many occasions do you recall that you
18   learned that DEA was there?
19        A.   I maybe heard two, three times, maybe, that
20   they -- we found out two to three weeks later, or
21   maybe the week later, that they had visited and it
22   would come up in conversation, not because it was a
23   general broadcast announcement to the -- you know,
24   to all the employees, which it was not.
25        Q.   And did you ever see someone from the DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Never.

 2      Q.   So it was more you heard again it was a

 3   scuttlebutt thing, DEA was here?

 4      A.   Not a scuttlebutt because every once in a

 5   while we would hear it from Robert Brown who had

 6   said, "Look, we were just visited by the DEA."

 7      Q.   And did they ask for documents --

 8      A.   I have no idea.  I have no idea how that

 9   interaction went.

10      Q.   During the time periods when the company was

11   being acquired, were there inspections?

12           MS. KOSKI:  Object to form.

13      A.   I do not know for a fact.  I would assume

14   that there would be if you're taking over a company,

15   you want to learn all the aspects of that company,

16   but what level of detail and what inspections were

17   done as part of that due diligence, I don't know.

18      Q.   You had no direct involvement in the

19   acquisitions; is that right?

20      A.   None.

21      Q.   Okay.  You were never interviewed by anyone

22   regarding acquisitions?

23      A.   Ung-ugh.

24      Q.   Did -- so when you started it was Watson?

25      A.   Correct.
```

```
 1      Q.   And then Actavis buys Watson; is that right?
 2           MS. KOSKI:  Object to form.
 3      A.   Watson, then Actavis, then Allergan, and
 4      then -- that was during my reign.  After I left,
 5      then Teva acquired them.
 6      Q.   Okay.  So during these transitions, did your
 7      job functions and the functions of your department
 8      change in any material way?
 9      A.   (Shaking head.)
10           MS. KOSKI:  You have to answer verbally.
11      Q.   No?
12      A.   No.
13      Q.   So there was no process change?
14      A.   As it relates to?
15      Q.   As a result of the acquisition by Actavis,
16      did you have to change any procedures because
17      Actavis liked things differently than Watson, for
18      example?
19      A.   On the sales floor, no, no.
20      Q.   It was all the same?
21      A.   We continued calling our customers just like
22      we did.  Customers would inquire about the
23      acquisition and obviously we shared the information
24      that we were given to share and, yes, it's going to
25      be happening but it's not going to impact the
```

Highly Confidential - Subject to Further Confidentiality Review

1    distribution side.  Anda really remained its own

2    unit through all of those transitions, so we were

3    really the least impacted.

4        Q.   What about in terms of promotional efforts

5    or change in priorities to promote Actavis generic

6    drugs over other companies' generics, opioids

7    specifically?

8        A.   I can't say there was any difference than

9    what we had experienced through Watson and then

10   with -- and then with Actavis and then with

11   Allergan.  I mean, obviously, since they owned us,

12   there was a propensity to try to move those products

13   through their main -- one of their main distribution

14   centers, which was Anda, but it didn't stop us from

15   continuing to carry over 100 manufacturers.  In the

16   last year that I was there, they brought in more

17   brands than the -- than the company had ever had in

18   terms of other manufacturers, other than Actavis or

19   Allergan.

20        (Anda-Williams Exhibit 18 was marked for

21   identification.)

22   BY MS. RELKIN:

23        Q.   Now I'm going to get into issues about

24   control, when they get turned on, when they get

25   turned off and then evolve into the issue of

Highly Confidential - Subject to Further Confidentiality Review

```
1    extensions.

2        A.   Okay.

3        Q.   Kind of all the continuum of the controlled

4    part as it relates to sales.

5        A.   Okay.

6        Q.   Recognizing that you're not in compliance.

7        A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 7        Q.   So sitting here, you don't know despite your

 8   years of service at Anda, whether it was required

 9   that when they discerned a suspicious order

10   concerning enough to shut off controls, whether they

11   also were required to report that to the DEA?

12             MS. KOSKI:   Object to form; asked and

13        answered.   Are you asking her a legal conclusion?

14             MS. RELKIN:   I'm asking her knowledge.

15             MS. KOSKI:   About a legal conclusion?

16             MS. RELKIN:   She worked in a regulated

17        industry, yeah.   It's not a legal conclusion.

18        It's guidelines and regulations governing her

19        industry.

20             MS. KOSKI:   So Special Master Collins

21        ordered that you can't ask questions about

22        someone's interpretation of the law.   I think

23        this question fairly calls for that.   You don't

24        have to answer.

25        Q.   I'm not asking for your interpretation.   I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    asking whether you were ever told by compliance at

 2    Anda whether, when they shut down controls, because

 3    it was a suspicious order, whether their protocol

 4    also included reporting it to the DEA?

 5        A.   They did --

 6             MS. KOSKI:  That's a different question.

 7        You can answer that one.

 8        A.   They did not share with us what their

 9    protocol was with the DEA.

10        Q.   And you didn't know one way or the other?

11        A.   (Shaking head.)

12             MS. KOSKI:  You have to answer out loud.

13        A.   I did not know, no.

14             MS. LUND:  Would this be a good time for a

15        break?

16             MS. RELKIN:  Sure.

17             THE VIDEOGRAPHER:  Off the record at 2:02.

18             (Recess from 2:02 p.m. until 2:14 p.m.)

19             THE VIDEOGRAPHER:  We're now back on the

20        video report at 2:14.

21             (Anda-Williams Exhibit 19 was marked for

22        identification.)

23                 (Discussion off the record.)

24    BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

17     Q.    Okay.

18          (Anda-Williams Exhibit 20 was marked for

19     identification.)

20     BY MS. RELKIN:



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
21      Q.   What is your understanding of, if you have

22   any, of when you were required to get dispense data

23   from customers for controlled substances?

24      A.   Whenever compliance asked us to.  Most of

25   the time that would come when we were being -- sales
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reps were submitting what's called an opportunity or
 2    that's a work order through a system called Remedy,
 3    we talked about Remedy a little bit earlier.  One of
 4    the functions in Remedy gave the sales reps an
 5    opportunity to submit to compliance a request for an
 6    increase, or for a family that they were not
 7    currently purchasing.  That Remedy opportunity went
 8    to the sales manager to ensure that it was being
 9    completed correctly before it went to compliance.
10    So the sales manager would review it, make sure the
11    dispense data was there.  If it was being requested,
12    or that the questionnaire was there, and then send
13    that on to compliance.  Compliance would then review
14    it, they get back to us and send the opportunity
15    back to the manager and to the sales rep and say
16    either it was approved, declined or we need more
17    information, please get us dispense data.
18       Q.   Do you know whether compliance was able to
19    get from IMS that dispense data on the particular
20    customers?
21           MS. KOSKI:  Object to form.
22       A.   I do not know.
23           (Anda-Williams Exhibit 21 was marked for
24    identification.)
25    BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
18              (Anda-Williams Exhibit 22 was marked for

19       identification.)

20       BY MS. RELKIN:

21          Q.   It's a little one.  Exhibit 22 is number

22       72179, and do you see that this is an e-mail from

23       you to Emily Schultz and Michael Cochrane on

24       March 8th, 2011?

25          A.   (Nodding head.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   Yes?

2      A.   Uh-huh.   Yes.
```



```
16          MS. KOSKI:  Slow down a little bit for the

17     reporter.

18          THE COURT REPORTER:  Thank you.

19          THE WITNESS:  So sorry.

20          MS. KOSKI:  Her fingers are smoking over

21     there.

22     A.   All right.

23          THE WITNESS:  Do you want me to repeat it

24     back?

25          THE COURT REPORTER:  Please.
```



Highly Confidential - Subject to Further Confidentiality Review

```
 3              (Anda-Williams Exhibit 23 was marked for

 4       identification.)

 5              MS. RELKIN:  This is one of these horizontal

 6       ones.  This is one that didn't have a Bates

 7       number, so we have a cover page up front.  The

 8       cover page was --

 9              MS. KOSKI:  Produced in native or something?

10              MS. RELKIN:  Yeah, I guess that must be the

11       reason, or it looks like actually the original,

12       it looks like it was slightly cut off on the

13       bottom, if that's how the document was as

14       produced.  So the document number is 554323 and

15       this is Exhibit 23.

16    BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review











Highly Confidential - Subject to Further Confidentiality Review

 8            MS. KOSKI:  Object to form.

 9       A.   Correct, but the questionnaire was there but

10    not the dispensing data.

11            (Anda-Williams Exhibit 24 was marked for

12    identification.)

13    BY MS. RELKIN:

14       Q.   Next document.  I've marked as Exhibit 24 a

15    document stamped 708146.

16            MS. KOSKI:  This seems to be a long one, if

17         you need a second.

18       A.   Yeah, it's tied to the one -- the e-mail

19    before.

20       Q.   Right.

21            MS. KOSKI:  I just said it was a long

22         e-mail, if she needs to look at it, it's got a

23         lot of pages.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

19      Q.    How many pharmacies did Epic encompass?

20      A.    Oh, goodness.  I don't know the exact

21   number, but it was several hundred.

22      Q.    And --

23      A.    And it could -- it could have even been

24   closer to 6, 700 maybe.  It was a very, very large

25   group.

 1       Q.   And you may have told me this, but where

 2   were the pharmacies?

 3       A.   Everywhere.  There were -- an opportunity

 4   for somebody to be an Epic member no matter where

 5   the pharmacy was.  There were some more

 6   regionalized.  Like, KPPA was the Keystone something

 7   of Pennsylvania, Keystone -- Keystone Consortium of

 8   Pennsylvania or something of that nature.  IPA was

 9   New Jersey, in and around New Jersey.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 7              (Anda-Williams Exhibit 25 was marked for

 8      identification.)

 9      BY MS. RELKIN:

10              MS. RELKIN:  You'll get -- yeah.

11              MS. KOSKI:  This is a long one to read.

12      BY MS. RELKIN:

13         Q.  I've marked as Exhibit 25 document number

14      607225, and it's a two-page document, goes to page

15      226.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
18          (Anda-Williams Exhibit 26 was marked for

19     identification.)

20     BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
4      Q.   You doing okay?

5      A.   I'm doing just great.

6           (Anda-Williams Exhibit 27 was marked for

7      identification.)

8      BY MS. RELKIN:
```

```
15          MS. RELKIN:  Okay.  I need a different

16     document.

17          MS. LUND:  The exhibit we have doesn't match

18     the Bates number you just read.

19          MS. RELKIN:  Yeah, yeah, yeah, yeah.  I

20     think I stamped -- what number do you have?

21          MS. KOSKI:  3889.

22          MS. RELKIN:  Do you all have 3889?

23          MS. LUND:  Uh-huh.

24          MS. RELKIN:  Okay.  And that's what -- what

25     I'm looking at doesn't -- that was just a goof.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Thank you.

 2            For the record, what was marked 7484 is not

 3       the exhibit.  I apologize.

 4    BY MS. RELKIN:

 5       Q.   Ms. Williams, you have the 3889?

 6       A.   Yes.

 7       Q.   Okay.  Good.  That's the right one.

 8       A.   Okay.

 9       Q.   Okay.

10            MS. KOSKI:  So why don't you just redo that,

11       identify what Exhibit 27 is --

12            MS. RELKIN:  Yes.

13            MS. KOSKI:  -- on the record.

14            MS. RELKIN:  It looks like if I just change

15       it to my marked -- does anybody have an extra

16       copy that doesn't have my markings on it?

17            MS. LUND:  You can use mine.

18            MS. RELKIN:  Thank you.

19            (Anda-Williams Exhibit 27 was marked for

20    identification.)

21    BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6        Q.    Are you familiar with the term kill --

7    "fill/kill"?

8        A.    Ung-ugh.

9        Q.    Huh.  Okay.  We heard about that from Vicki

10   Mangus.

11       A.    Fill/kill?

12       Q.    Fill/kill.

13       A.    Ung-ugh, no.

14             (Discussion off the record.)

15       A.    That might be a term that's used more on the

16   chain side, like the big chains, Walgreens and so

17   forth.

18             MS. KOSKI:  Don't guess.

19       A.    Yeah.  I don't know.

20       Q.    Did you have an understanding that when an

21   order exceeded limits, that it is permissible to

22   provide as much as was allowed under the limits and

23   just not send the remainder, as opposed to not

24   filling the complete order?

25       A.    I had seen this happen prior.  I can't

Highly Confidential - Subject to Further Confidentiality Review

```
 1    remember the customer name, but I did hear this

 2    happening before.  So I assume that this was the

 3    protocol that was followed on CIIs.

 4        Q.   But sitting here, do you know whether or not

 5    that was the protocol, or the desired protocol, or

 6    whether this was an aberration?

 7        A.   No.  That -- they would send up to the limit

 8    and then notify the sales rep accordingly.

 9        Q.   And would they -- would they also notify the

10    DEA?

11        A.   I don't know what their protocol was.  That

12    was done -- the -- these folks were in the

13    warehouse.  They were not sitting on the sales

14    floor, and these were -- at this particular time,

15    most of the controls were being shipped out of the

16    Ohio warehouse, so these folks weren't even sitting

17    in -- anywhere near us.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2          MS. KOSKI:  Got it.  My bad.  I couldn't

3      tell if you were looking at something else.

4          MS. RELKIN:  Sure.

5          (Anda-Williams Exhibit 28 was marked for

6      identification.)

7  BY MS. RELKIN:

8      Q.   Marked as Exhibit 28, a document stamped

9  90024 through 25.  And the first page of the e-mail

10 is from Sabrina -- on the bottom, from Sabrina Solis

11 to you and Christine Leon-Laurent, copied to other

12 managers.  Who is Christine Leon-Laurent?

13     A.   She was in national accounts.  She was the

14 operations manager.

15     Q.   Is that probably the Christine who Vicki

16 Mangus was mentioning?

17     A.   She's now Christine Johnson.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23          (Anda-Williams Exhibit 29 was marked for

24    identification.)

25          THE WITNESS:  Boy, we kill the trees, huh?

Highly Confidential - Subject to Further Confidentiality Review

```
1            MS. KOSKI:  It's double-sided.

2            MS. RELKIN:  This one is a single, but we

3       did mostly double.

4            We've marked as Exhibit 27 document 711564,

5       and this is a series of e-mails.

6            MS. ROBINSON:  This should be 29.

7            MS. RELKIN:  What did I say?

8            MS. ROBINSON:  27.

9            MS. RELKIN:  Thank you.  29.  Long day.  Bad

10      eyes.

11           MS. KOSKI:  Long e-mail.

12           MS. RELKIN:  Long e-mail.

13  BY MS. RELKIN:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Now, these -- some of these customers, when

 2    they didn't get the questionnaires and dispensing

 3    data in, they did get extensions?

 4        A.   Some of them did, yes.  If they indicated to

 5    us, "I'm sorry, I haven't gotten to it, I was on

 6    vacation," this, whatever, if the reason seemed

 7    plausible, we would ask for a two or three-day

 8    extension.  But after that, if it wasn't in our

 9    hands --

10        Q.   Some of the extensions were longer than two

11    or three days, weren't they?

12        A.   I'm sure there may have been some that may

13    have been a week, if somebody was on vacation for a

14    week.  That could have happened.

15        Q.   Some were 30 days?

16        A.   Rarely.

17        Q.   And when they got the extension, it wasn't

18    just a matter of not cutting off their controls, but

19    they were still receiving product; is that right?

20        A.   During the time that we were getting that

21    data in, correct.

22             MS. KOSKI:  Are you still doing okay?

23             THE WITNESS:  Uh-huh.  Is everybody else?

24             MS. KOSKI:  You have more energy than me.

25             THE WITNESS:  And I didn't even have coffee
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      today.

 2          MS. KOSKI:  I need more.
```

10      A.   I do not know.

11      Q.   This is just backing up a few days from that

12   week in December in 2011.

13          (Anda-Williams Exhibit 30 was marked for

14   identification.)

15   BY MS. RELKIN:

16      Q.   This is Number 30, and the stamp number is

17   70549 through 50.  And I probably should have shown

18   you this e-mail first, since it's a week earlier.

19   And this is a series of e-mails from you.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
16              (Anda-Williams Exhibit 31 was marked for

17      identification.)

18              MS. RELKIN:  We're getting there.

19              MS. KOSKI:  Getting there like a 7:40 flight

20      getting there or -- just wondering.

21              MS. RELKIN:  I will do my best.

22              MS. KOSKI:  Okay.

23              MS. RELKIN:  Mine is, like, 8:00 or 7:59.

24              MS. KOSKI:  Yeah.

25              MS. RELKIN:  So we're in the same boat.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           MS. KOSKI:  All right.  I'm here.  I can go

 2      later, but you have your time.

 3  BY MS. RELKIN:

 4      Q.   Okay.  So what we've marked as Exhibit 31,

 5  stamped 107989, is an e-mail from Patrick Cochrane

 6  to you regarding a customer number 404255.  Strike

 7  the -- yeah.  So that's the top of the e-mail, but

 8  the bottom of the e-mail --

 9      A.   Uh-huh.

10      Q.   -- that's from you to him.

11      A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

21          (Anda-Williams Exhibit 32 was marked for

22     identification.)

23     BY MS. RELKIN:

24          Q.   I'm showing you a document that's from the

25     next month, so what we've marked as Exhibit 32 is

Highly Confidential - Subject to Further Confidentiality Review

```
 1     stamped 109372, going to -- it's a three-page

 2     document.
```

```
 7               Donna Rochin, who was she?

 8       A.    She was one of the sales representatives out

 9     on the West Coast in our Corona office.

10       Q.    So she didn't report to you?

11       A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

18      Q.   And do you know if there were any issues

19   with Paul Ravinoff?

20      A.   Can you elaborate on what kind of issues?

21      Q.   Regarding controlled substances.

22      A.   Regarding controls?  I can't recall.  I

23   can't recall of anything where there was

24   documentation on him specifically regarding

25   controls.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Is he still with the company?

 2       A.   I do not know.

 3       Q.   Was he there when you left?

 4       A.   He was there when I left, yes.

 5       Q.   What about Wayne Tischler, any issues of

 6   concern that you were aware of?

 7       A.   No.

 8       Q.   Is he still with the company?

 9       A.   No, he is not.  He was laid off.

10       Q.   When was he laid off?

11       A.   I believe he was laid off about a year after

12   I was laid off.  I was laid off in 2015, so it would

13   have been around 2016.

14       Q.   What percentage of the force was laid off

15   during that time period?

16            MS. KOSKI:  Object to form.

17       A.   I don't know the percentage.  I just know

18   that most of the sales managers that used to report

19   to me are no longer there.

20       Q.   And a number of them were that -- was

21   that -- you were in '15.  The '16, that was the wave

22   when Teva acquired?

23       A.   There was -- my understanding was that there

24   was a wave in June, and then there was a wave in

25   July, and then there was a wave, I believe, in
```

```
 1    August or September.

 2         Q.   And that was under the Teva control at that

 3    point?

 4              MS. KOSKI:  Object to form.

 5         A.   I do not recall if Teva officially owned us

 6    at that point, but I believe it was in anticipation

 7    of them taking us over.

 8         Q.   Did you come to learn that, you know, Teva

 9    management came to the facility in Florida and, you

10    know, made management decisions as to staffing

11    and --

12         A.   No, I was not aware of that.

13         Q.   Okay.  By the way, on this --

14              MS. KOSKI:  I don't know how much longer you

15         have, but maybe a break if it's going to be a

16         long time.  I'm not pressuring you to make a --

17              MS. RELKIN:  No, I'm not -- I'm not wrapping

18         up in 10 minutes, so if you need a break --

19              MS. KOSKI:  Yeah.  Maybe let's take a

20         stretch break.

21              MS. RELKIN:  Okay.

22              MS. KOSKI:  We've been going for two hours.

23              THE VIDEOGRAPHER:  Off the record at 4:05.

24         (Recess from 4:05 p.m. until 4:18 p.m.)

25              THE VIDEOGRAPHER:  Now back on the video
```

Highly Confidential - Subject to Further Confidentiality Review

1          record at 4:18.

2      BY MS. RELKIN:

25              (Anda-Williams Exhibit 33 was marked for

Highly Confidential - Subject to Further Confidentiality Review

1      identification.)

2      BY MS. RELKIN:

3          Q.   We've marked as Exhibit 33 a document

4      stamped 70803.  And this is e-mails between you and

5      some of your colleagues in September of 2011.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3            (Anda-Williams Exhibit 34 was marked for

4     identification.)

5     BY MS. RELKIN:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
12          (Anda-Williams Exhibit 35 was marked for

13     identification.)

14     BY MS. RELKIN:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 7              (Discussion off the record.)

 8              (Anda-Williams Exhibit 36 was marked for

 9      identification.)

10      BY MS. RELKIN:
```





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

13      Q.   And was there a concern, when a company did

14   not provide the dispensing data, that there might be

15   reasons why they did not want to share that

16   information?

17           MS. KOSKI:  Object to form.  Concern by her,

18       by the witness?

19           MS. RELKIN:  By the company -- by the

20       pharmacies.  Strike that.

21      Q.   When a customer would not be compliant,

22   despite reminders and extensions, to not provide

23   dispensing data, did that trigger in your mind and

24   the compliance department, as far as you know,

25   greater concern about the prescribing -- the

Highly Confidential - Subject to Further Confidentiality Review

1    dispensing habits of those pharmacies?

2        A.    I would say as a general rule, yes.

3    However, per our prior conversations, we did have a

4    lot of pharmacies that didn't know how to pull

5    these -- the -- this data.  And so the emphasis we

6    were putting on it, the emphasis was there.  The

7    calls were being made.  The fact that the pharmacies

8    were not adhering to our requests became of greater

9    and greater concern.

22            (Anda-Williams Exhibit 37 was marked for

23    identification.)

24    BY MS. RELKIN:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



```
21        (Anda-Williams Exhibit 38 was marked for

22    identification.)

23    BY MS. RELKIN:

24        Q.   Speaking of financial risk, let's turn to

25    Exhibit 38, document number 622647 through 49, and
```

Highly Confidential - Subject to Further Confidentiality Review

1    this is an e-mail from June 10th of 2014.



13          MS. RELKIN:  Okay.  What do we do?

14          THE VIDEOGRAPHER:  Hit it again, the red

15    button.

16          MS. RELKIN:  Technology and me.  Sorry.

17    Sorry, everybody.

18              (Discussion off the record.)

19    BY MS. RELKIN:

20    Q.    And so you have a credit analyst at Anda who

21    checks the viability of the customers?

22    A.    We had a whole credit department.

23    Q.    Did any of the credit analysis to the

24    financial soundness of the companies get relayed to

25    the compliance department as a factor in assessing

Highly Confidential - Subject to Further Confidentiality Review

1    the legitimacy of the customers?

2         A.    I don't know what their protocol was.    I

3    know that they reviewed every account that was

4    opened and checked their credit worthiness.    Some

5    they requested credit applications for, for

6    customers that were applying for credit.    But what

7    their communication with compliance was, I don't

8    know.

13            Then Lori Lombardi, who was she?

14       A.    Lori Lombardi was a senior account manager

15    on the pharmacy side.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 8      Q.    Okay.

 9            MS. RELKIN:  I'm getting down to the wire.

10            MS. KOSKI:  Okay.

11            (Anda-Williams Exhibit 39 was marked for

12      identification.)

13      BY MS. RELKIN:

14      Q.    What we've marked as Exhibit 39 is document

15      number 1015787 through 789.  These are e-mails from

16      February -- January and February of 2012.

17            Starting on the bottom, the second page --

18      A.    I remember this.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
25        Q.   Was there any kinds of Listserv among
```

Highly Confidential - Subject to Further Confidentiality Review

1    managers of the different wholesalers, you

2    communicate to keep track of, you know, rogue or

3    sketchy potential buyers?

4        A.   Not that I saw, nor that I was privy to, but

5    I can't speak for compliance.

6        Q.   Okay.  Were you members of any professional

7    organization of other wholesale distributors where

8    you would meet with colleagues?

9        A.   I was not, but I know that Robert Brown was.

10       Q.   Do you know what organization he was a

11   member of?

12       A.   I do not know.  He just spoke of getting

13   together with peers.

20            MS. RELKIN:  All right.  I think I'm on the

21       last exhibit, and this one is going to require

22       pulling up the spreadsheet, so we need to use the

23       videographer's computer for that.  So anybody

24       who's streaming, if you're still there and

25       reading it, you're not going to be able to

Highly Confidential - Subject to Further Confidentiality Review

```
 1      stream, but you can still hear it.

 2          THE VIDEOGRAPHER:  Off the video record at

 3      5:03.

 4          (Recess from 5:03 p.m. until 5:06 p.m.)

 5          THE VIDEOGRAPHER:  Back on the record at

 6      5:06.

 7          (Anda-Williams Exhibit 40 was marked for

 8      identification.)

 9  BY MS. RELKIN:

10      Q.   What we've marked as Exhibit 40 is document

11      number 109029 through 30, 030.
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

10           THE VIDEOGRAPHER:  Off the record at 5:13.

11           (Recess from 5:13 p.m. until 5:22 p.m.)

12           THE VIDEOGRAPHER:  Back on the record at

13      5:22.

14           (Anda-Williams Exhibit 41 was marked for

15      identification.)

16      BY MS. RELKIN:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
16        Q.    Okay.  Who is Anita Isabella?

17        A.    She was the one who was from our database

18   management sales reporting area.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

```
 8           Is Stephanie Steele a sales rep?

 9      A.   Yes, she was.

10      Q.   She was in Weston, Florida?

11      A.   Yes, she was.
```

```
17      Q.   Is she still with the company, as far as you

18   know?

19      A.   I do not recall.

20      Q.   Was she with the company when you left?

21      A.   Christina?

22      Q.   Yeah.

23      A.   Yeah, she was with the company when I left.

24           MS. KOSKI:  The amount of time, Susan?

25           THE COURT REPORTER:  13 minutes -- 12
```

Highly Confidential - Subject to Further Confidentiality Review

1      minutes.

2           MS. RELKIN:  I'm just about finished with

3      that.

4                (Discussion off the record.)

5           MS. KOSKI:  What is it that you have on the

6      screen now?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          Given the time constraints, and it's been a

14      long day for us, I thank you very much,

15      Ms. Williams, and we're concluded.

16          MS. KOSKI:  No questions.  Any questions in

17      the room?

18          MS. LUND:  No questions.

19          MS. KOSKI:  Any question on the phone?

20              (No response.)

21          MS. KOSKI:  Hearing none, we're good.

22          THE VIDEOGRAPHER:  The time is 5 --

23          MS. KOSKI:  He said none.

24          THE VIDEOGRAPHER:  The time is 5:40 p.m.

25      This marks the end of the deposition.  We're now

Highly Confidential - Subject to Further Confidentiality Review

1          off the record.

2                  (Whereupon, the deposition concluded at

3      5:40 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2          I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby certify

 5    that, pursuant to notice, the deposition of PATRICIA

 6    WILLIAMS was duly taken on Thursday,

 7    December 13, 2018, at 9:22 a.m. before me.

 8          The said PATRICIA WILLIAMS was duly sworn by

 9    me according to law to tell the truth, the whole

10    truth and nothing but the truth and thereupon did

11    testify as set forth in the above transcript of

12    testimony.  The testimony was taken down

13    stenographically by me.  I do further certify that

14    the above deposition is full, complete, and a true

15    record of all the testimony given by the said

16    witness, and that a review of the transcript was

17    requested.

18

19    _____

20    Susan D. Wasilewski, RPR, CRR, CCP

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5    and make any necessary corrections.  You should

 6    state the reason in the appropriate space on the

 7    errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10    and date it.  It will be attached to your

11    deposition.

12

13          It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the deposition

16    transcript by you.  If you fail to do so, the

17    deposition transcript may be deemed to be accurate

18    and may be used in court.

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        - - - - - -

 2                        E R R A T A

 3                        - - - - - -

 4   PAGE    LINE    CHANGE

 5   _____   _____   _____

 6      REASON: _____

 7   _____   _____   _____

 8      REASON: _____

 9   _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, _____, do hereby

 4    acknowledge that I have read the foregoing pages, 1

 5    through 312, and that the same is a correct

 6    transcription of the answers given by me to the

 7    questions therein propounded, except for the

 8    corrections or changes in form or substance, if any,

 9    noted in the attached Errata Sheet.

10

11

12    _____      _____

13    PATRICIA WILLIAMS                              DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

25
```