Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

     *************************

 4

     IN RE:  NATIONAL          MDL No. 2804

 5   PRESCRIPTION OPIATE

     LITIGATION                 Case No.

 6                              1:17-MD-2804

     *************************

 7

     THIS DOCUMENT RELATES TO    Hon. Dan A. Polster

 8   ALL CASES

 9   *************************

10        HIGHLY CONFIDENTIAL - SUBJECT TO

11         FURTHER CONFIDENTIALITY REVIEW

12

13            VIDEOTAPED DEPOSITION OF

14           CURTIS WRIGHT, IV, M.D., M.P.H.

15

16           Wednesday, December 19th, 2018

17                  9:01 a.m.

18

19      Held At:

20           Grappone Conference Center

21           70 Constitution Avenue

22           Concord, New Hampshire

23

24   REPORTED BY:

25   Maureen O'Connor Pollard, RMR, CLR, CSR
```

Page 2

```
 1  APPEARANCES:
 2
 3  FOR THE PLAINTIFFS:
        LINDA SINGER, ESQ.
 4      JENNA N. FORSTER, ESQ.
        DAVID A. BENNER, ESQ.
 5          MOTLEY RICE LLC
            401 Ninth Street, NW, Suite 1001
 6          Washington, DC 20004
            202-386-9626
 7          lsinger@motleyrice.com
            jforster@motleyrice.com
 8          dbenner@motleyrice.com
 9  FOR THE TENNESSEE PLAINTIFFS:
        MICHAEL G. STEWART, ESQ.
10          BRANSTETTER, STRANCH & JENNINGS, PLLC
            223 Rosa L. Parks Avenue
11          Nashville, Tennessee 37203
            615-254-8801
12          mstewart@bsjfirm.com
13  FOR THE DEPONENT:
        GUY PETRILLO, ESQ.
14          PETRILLO KLEIN & BOXER LLP
            655 Third Avenue
15          New York, New York 10017
            212-370-0330
16          gpetrillo@pkbllp.com
17
18  FOR PURDUE PHARMA:
        MARINA SCHWARZ, ESQ.
19          DECHERT LLP
            1095 Avenue of the Americas
20          New York, New York 10036
            212-698-3500
21          marina.schwarz@dechert.com
                    -and-
22      ERIK W. SNAPP, ESQ.
            DECHERT LLP
23          35 West Wacker Drive
            Chicago, Illinois 60601
24          312-646-5800
            erik.snapp@dechert.com
25
```

Page 3

```
 1  APPEARANCES (Continued):
 2
 3  FOR McKESSON CORPORATION:
        ALISON DiCURCIO, ESQ. (Telephonically)
            COVINGTON & BURLING LLP
 4          One CityCenter
            850 Tenth Street, NW
 5          Washington, DC 20001-4956
            202-662-5518
 6          adicurcio@cov.com
 7
 8  FOR CARDINAL HEALTH, INC.:
        ANDREW C. McBRIDE, ESQ. (Telephonically)
            WILLIAMS & CONNOLLY LLP
 9          725 Twelfth Street, N.W.
            Washington, DC 20005
10          202-434-5452
            amcbride@wc.com
11
12  FOR VALIDUS PHARMACEUTICALS:
        MAURA BURKE, ESQ. (Telephonically)
13          FOX ROTHSCHILD, LLP
            2000 Market Street
14          Philadelphia, Pennsylvania 19103
            215-299-2000
15          mburke@foxrothschild.com
16
17  FOR AMERISOURCEBERGEN DRUG CORPORATION:
        RYAN BLAKE, ESQ. (Telephonically)
18          REED SMITH LLP
            Three Logan Square
19          1717 Arch Street, Suite 3100
            Philadelphia, Pennsylvania 19103
20          215-851-8100
            rblake@reedsmith.com
21
22  FOR WALMART:
        SCOTT QUELLHORST, ESQ.
23          JONES DAY
            77 West Wacker
24          Chicago, Illinois 60601
            312-782-3939
25          squellhorst@jonesday.com
```

Page 4

```
 1  APPEARANCES (Continued):
 2
 3  FOR UCB, INC.:
        TINA SCHAEFER, ESQ. (Telephonically)
            HUGHES HUBBARD & REED LLP
 4          2345 Grand Boulevard
            Kansas City, Missouri 64108
 5          816-709-4159
            tina.schaefer@hugheshubbard.co,
 6
 7
 8  FOR ABBOTT LABORATORIES AND ABBOTT LABORATORIES,
    INC.:
        JOHN MCCAULEY, ESQ. (Telephonically)
 9          VENABLE LLP
            750 East Pratt Street, Suite 900
10          Baltimore, Maryland 21202
            410-244-7400
11          jmccauley@venable.com
12
13  FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
    SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
    INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
14      ERIC SHAPLAND, ESQ. (Telephonically)
            ARNOLD & PORTER KAYE SCHOLER LLP
15          777 South Figueroa Street
            Los Angeles, CA 90017-5844
16          213.243.4238
            Eric.Shapland@arnoldporter.com
17
18
19  FOR ROCHESTER DRUG COOPERATIVE:
        LUCY ONYEFORO, ESQ. (Telephonically)
        LYNNE FISCHMAN UNIMAN, ESQ.
20      (Telephonically)
            ALLEGAERT BERGER & VOGEL LLP
21          111 Broadway
            New York, New York 10006
22          212-571-0550
            lonyeforo@abv.com
23          luniman@abv.com
24
    VIDEOGRAPHER:  David Kim
25
```

Page 5

```
 1                  INDEX
 2  EXAMINATION                          PAGE
 3  CURTIS WRIGHT, IV, M.D., M.P.H.
 4  BY MS. SINGER                         13
 5  BY MR. STEWART                       241
 6  BY MS. SINGER                        326
 7
 8
 9          E X H I B I T S
10  NO.        DESCRIPTION             PAGE
11  Purdue-Wright-1    Amended Notice of
                Deposition................  13
12
        Purdue-Wright-2    Dr. Wright's Curriculum
13              Vitae, Bates
                PPLPC013000116251 through
14              258......................   26
        Purdue-Wright-3    Executive Profile of
15              Curtis Wright, MD
                prepared by Heidrick &
16              Struggles, Bates
                ENDO-OPIOID-MDL-03004266
17              through 4276..............   58
18
        Purdue-Wright-4    Project Team Contact
19              Report, Bates
                PKY180764184 through 4186..   91
20
        Purdue-Wright-5    Documents Bates
21              PDD9520512001, and
                PDD9520512259 through
22              2310.....................    92
23
24
25
```

Page 6

Purdue-Wright-6    Criticisms and Allegations Potentially Requiring a Response in Connection with the Senate Finance Committee Inquiry, Bates PPLPC018000725809 through 5863...................    98

Purdue-Wright-7    FDA meeting minutes, Bates PKY180761078 through 1286...................    106

Purdue-Wright-8    9/15/94 message with attached FDA meeting minutes, Bates PDD7024302094 through 2104...................    108

Purdue-Wright-9    OxyContin Investigator's Brochure, May 1993, Bates PKY180919563 through 9618...    116

Purdue-Wright-10    11/11/93 memo, Bates PKY181876119 through 121...    121

Purdue-Wright-11    Project Team Contact Report, Bates PKY180723482 through 3484..    124

Purdue-Wright-12    Draft Meeting Minutes, 6/23/93, Bates PDD1701503232 through 3245...................    124

Purdue-Wright-13    7/1/93 Memorandum, Bates SHC-000007028 through 7032...................    138

Purdue-Wright-14    Medical Officer Review, OxyContin, Bates PDD1501090043 through 56...    141

Purdue-Wright-15    Project Team Contact Report, Bates SHC-000008168..............    148

Page 7

Purdue-Wright-16    OxyContin package insert, Bates PKY183226682 through 6689..............    155

Purdue-Wright-17    Document titled 8/2/95 Reder with attached package insert, Bates SHC-000004520 through 4545...................    157

Purdue-Wright-18    OxyContin meeting minutes, 4/23/01, Bates PKY180715570 through 5576..    161

Purdue-Wright-19    GAO Report, OxyContin Abuse and Diversion and Efforts to Address the Problem, Bates PDD8013180635 through 697..    169

Purdue-Wright-20    PowerPoint, Bates PKY180277573 through 7584..    171

Purdue-Wright-21    PowerPoint, Clinical Summation, Bates PPLPC01300068011............    175

Purdue-Wright-22    PowerPoint, Overall Medical Strategy for Purdue Opioid Products (Abuse and Diversion Resistance), Bates PDD8901212709 through 2728...................    180

Purdue-Wright-23    PowerPoint, Tamper-Resistance (What it is, What it isn't, What we need), Bates PPLPC01300094578............    185

Purdue-Wright-24    Sponsor Meeting Minutes, 5/14/97, Bates PKY180816855 through 6858..    193

Purdue-Wright-25    1/6/01 e-mail, Bates PDD8801176637 and 6638.....    201

Page 8

Purdue-Wright-26    Final Report - Top 200 Project, January 2004, Bates PPLPC01300103821 through 3827..............    203

Purdue-Wright-27    PowerPoint, Risk Identification, Risk Assessment and Management of Drug Formulation (A Regulated Company Perspective)...............    215

Purdue-Wright-28    PowerPoint, Data Analysis Program, 1Q2004 Update, Bates PPLPC01300106089....    217

Purdue-Wright-29    Dasgupta, et al paper, Association between non-medical and prescriptive usage of opioids...................    224

Purdue-Wright-31    Medical Officer Review, Integrated Summary of Safety, Bates PDD1501090033 through 42...    235

Purdue-Wright-32    Document titled E01_00005654, Opioid-X Hecon...................    247

Purdue-Wright-33    Document titled Researched Abuse, Diversion and Addiction-Related Surveillance (RADARS) System, Bates 8841350087...    252

Purdue-Wright-34    5/5/03 e-mail with attached RADARS System Report, Bates PPLPC01300094750 through 94788...................    253

Purdue-Wright-35    11/16/99 e-mail with attachment, Bates PPLPC01300014822 through 14828...................    254

Page 9

Purdue-Wright-36    2/14/01 e-mail, with attached OxyContin FDA Negotiations Issues Document, Bates PPLPC01300064640 through 64643...................    265

Purdue-Wright-37    Agenda for OxyContin Abuse/Diversion Meeting, 2/26/01, with attachment, Bates PKY180277491 and 492, 180715647, and 180715649 through 651......    270

Purdue-Wright-38    3/30/01 e-mail with attached Risk Management PowerPoint, Bates PPLPC01300067001..........    272

Purdue-Wright-39    Agreed Statement of Facts..    277

Purdue-Wright-40    3/3/01 Regulatory Agency Contact Report, Bates PPLP000666254 through 257..    284

Purdue-Wright-41    Document titled E513_00081940 with attached e-mail chain, Bates 8855931719 and 1720..    286

Purdue-Wright-42    E-mail chain with attachment, Bates PPLPC009000043479 through 3485...................    289

Purdue-Wright-43    E-mail with attached document, Risk Assessment, Management and Surveillance for Prescription Opioids, Bates PPLPC01300096643 through 670...................    291

Purdue-Wright-44    2/13/13 deposition transcript of Curtis Wright, MD, Bates PKY183393713 through 3804..    292

Page 10

Purdue-Wright-45  1/15/18 deposition
transcript of Curtis
Wright, MD, Bates
PKY183389474 through 512...  297

Purdue-Wright-46  Excerpt of a 3/25/04
deposition transcript of
Dr. Robert Reder, Bates
PKY183344430 through 432...  297

Purdue-Wright-47  E-mail chain, Bates
PPLPC013000032858 through
860......................  307

Purdue-Wright-48  E-mail chain, Bates
PPLPC013000040607 through
609......................  308

Purdue-Wright-49  Document titled
E513_00078820 with
attached e-mail chain,
Bates 8855884259 through
261......................  309

Purdue-Wright-50  Document titled
E513_00078832 with
attached e-mail chain,
Bates 8855931438 through
440......................  311

Purdue-Wright-51  Document titled
E513_0001962 1 with
attached e-mail chain,
Bates 8855318499, 8500
and 8005.................  311

Purdue-Wright-52  3/25/97 letter, Bates
PKY180423619 through 621...  313

Purdue-Wright-53  E-mail chain, Bates
8856452206 and 2207........  314

Purdue-Wright-54  Document titled
E513_00082129 with
attached e-mail chain,
Bates 8856491648...........  318

Page 11

Purdue-Wright-55  Excerpt of 8/28/15
deposition transcript of
Richard Sackler, MD,
Bates PPLPC019001253034,
3061 and 3062..............  320

Page 12

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  My name is David Kim, I'm a videographer for Golkow Litigation Services.

Today's date is December 19th, 2018, and the time is 9:01 a.m.

This video deposition is being held in Concord, New Hampshire in the matter of National Prescription Opiate Litigation, MDL 2804, for the U.S. District Court for the Northern District of Ohio, Eastern Division.

The deponent is Curtis Wright.

Counsel will be noted on the stenographic record.

The court reporter is Maureen Pollard, and will now swear in the witness.

CURTIS WRIGHT, IV, M.D., M.P.H., having been duly sworn, was examined and testified as follows:

MR. SNAPP:  May I make a statement on the record about the confidentiality protective order?

MS. SINGER:  Of course.

Page 13

MR. SNAPP:  Thank you.

I just want to confirm that everyone on the phone and in person agrees to be bound by the confidentiality protective order in the MDL or the applicable state cases.  If that is not the case, please speak up now.

Hearing nothing, please proceed. Thank you.

EXAMINATION

BY MS. SINGER:

Q.  All right.  Good morning, Dr. Wright. My name is Linda Singer, I'm an attorney for plaintiffs in the litigation.

Let me start by reminding you that you've been sworn in.  You're here pursuant to a deposition notice, is that correct?

A.  Yes, ma'am.

Q.  I'm going to show you what we've marked -- we'll work out the kinks.

I'm going to show you what we're going to mark as Exhibit 1.

(Whereupon, Purdue-Wright-1 was marked for identification.)

BY MS. SINGER:

Q.  Do you recognize -- and, Dr. Wright,

Page 14

1 do you recognize that notice?
2     A.  I think so.  It looks like the one I
3 received by e-mail.
4     Q.  Okay.  And have you prepared for your
5 testimony today with anybody?
6     A.  Yes.
7     Q.  And with whom did you prepare?
8     A.  With my attorneys, and with two
9 attorneys who I think represent Purdue.
10     Q.  And is that your attorney seated next
11 to you?
12     A.  Yes.
13     Q.  Okay.  And do you recall who from
14 Purdue you prepared with?
15     A.  Erik and Marina.
16     Q.  And about how much time did you spend
17 preparing for today's testimony?
18     A.  Several hours on four days.
19     Q.  Okay.  And you counted on your
20 fingers, is that because it's less than ten or
21 more than ten hours?
22     A.  Just to try to be right.
23     Q.  No, I appreciate that.
24         So do you recall roughly?  You said a
25 few hours?

Page 15

1         MR. SNAPP:  Several, he said.
2     A.  About 10 to 12 hours total.
3 BY MS. SINGER:
4     Q.  Okay.  Did you review any documents in
5 preparing to be here today?
6     A.  They presented me with a number of
7 documents.
8     Q.  Okay.  And "they" being your counsel
9 or Purdue's counsel?
10     A.  Both, I think.
11     Q.  Do you recall roughly how many
12 documents you received?
13     A.  No.  A lot.
14     Q.  Okay.  And one of the things I'll tell
15 you -- I know you've been deposed before, is
16 that correct?
17     A.  Yes, ma'am.
18     Q.  Okay.  So one thing I note that will
19 be important is, first of all, if you don't
20 understand a question, please let me know, I am
21 happy to rephrase it or repeat it.
22         And second is please, other than just
23 this moment, when you're answering please
24 respond verbally so it will be reflected in the
25 record.

Page 16

1     A.  Yes, ma'am.
2     Q.  Okay.  All right.  So you indicated --
3 I'm sorry.
4         Is there any reason that you can't
5 testify truthfully or accurately today?
6     A.  I know of no reason.
7     Q.  Okay.  And you said you've been
8 deposed before, correct?
9     A.  Yes, ma'am.
10     Q.  How many times, if you recall?
11     A.  I don't really remember.  I don't --
12 because I'm not sure exactly what the difference
13 is between deposition and other legal
14 interviews.
15     Q.  Okay.
16     A.  Two or three.
17     Q.  Okay.  And how long has it been since
18 you have testified in a deposition?
19     A.  Many years.  I don't know how many.
20     Q.  Okay.  Have you testified in any
21 depositions in the last two years?
22     A.  No, ma'am.
23     Q.  What about at trial, have you ever
24 testified at trial?
25     A.  Yes.

Page 17

1     Q.  And tell us about the context in which
2 you testified at trial.  What was the case?
3     A.  That was a case involving disulfiram
4 toxicity many years ago.
5     Q.  Okay.  And have you ever testified at
6 trial in any case relating to opioids?
7     A.  I don't remember any.
8     Q.  Okay.  Or in connection with your work
9 at Purdue Pharma?
10     A.  I don't think so, ma'am.
11     Q.  And the depositions that you were a
12 witness in, did those relate to opioids, or to
13 other matters?
14     A.  They related to opioids.
15     Q.  And can you recall the details of any
16 of those cases?
17     A.  Only vaguely.  One had something to do
18 with an insurance company and Purdue and their
19 insurance, I think.  And I never really knew
20 what the others were about.
21     Q.  Okay.  Do you recall if any of them
22 were personal injury cases?
23     A.  I don't think so.
24     Q.  Okay.  All right.  Let's turn to your
25 background.  So can you describe briefly your

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  medical training and background before joining
2  the FDA?
3  A.  Yes, ma'am.  I got my bachelors from
4  Haverford College.  Worked as a chemist at the
5  National Institutes of Mental Health.  Went to
6  night school, went to George Washington
7  University, did a -- got my MD degree.  Went --
8  I did a general rotating surgical internship at
9  Naval Hospital Portsmouth, I had joined the
10  Navy.  Served in the Navy for ten years -- eight
11  to ten years as a general medical officer.  Went
12  to Johns Hopkins University, did a masters in
13  public health and an occupational medicine
14  residency.  Then did a postdoctoral fellowship
15  in behavioral pharmacology of opioids.  Then sat
16  for and took the boards in clinical
17  pharmacology.  And I think that's it.
18  Q.  Do you have any specialized training
19  relating to addiction or addition medicine?
20  A.  Yes.  I was at one point an American
21  Society of Addiction Medicine certified
22  practitioner.  And during my time in the Navy I
23  served for two or three years as the medical
24  officer for the tri-service alcoholism recovery
25  facility that handled alcoholism and drug

Page 19

1  dependence.
2  Q.  Okay.  And any medical school training
3  relating to addiction or fellowship or anything
4  like that?
5  A.  Just the NIDA fellowship at Behavioral
6  Pharmacology Research Unit.
7  Q.  And when did you join the Food and
8  Drug Administration, or FDA?
9  A.  I think it was 1989.
10  Q.  And why did you move to the FDA?
11  Makes you smile?
12  A.  Well, my wife said that I either
13  needed to get a paying job and stop going to
14  school or we'd be moving into the park.  I had
15  three job opportunities at the time, and I
16  applied, and I chose the FDA.
17  Q.  And why, other than the paycheck and
18  your wife?
19  A.  It was more attractive than the other
20  two.  It looked more interesting.
21  Q.  And what were your responsibilities in
22  your first position at the FDA?
23  A.  I started as a junior medical officer
24  reviewing investigational new drug applications
25  and -- investigational new drug applications and

Page 20

1  new drug applications.
2  Q.  And how long did you do that for?
3  A.  I'm not sure.  At some point in there
4  I was promoted to senior medical officer.  I
5  don't quite remember when.  And I was also made
6  head of the drug abuse staff in our review
7  division.
8  Q.  And how long were you at the FDA?
9  A.  About eight to nine years.
10  Q.  And what were generally your
11  responsibilities over the course of your tenure?
12  A.  Review of investigational new drug
13  applications, applications to study new drugs.
14  Peer review of reviews that had been done by
15  other medical officers.  Consultative services
16  to other FDA departments related to drug abuse
17  issues.  On several occasion I was acting
18  division director.
19  Q.  For which division?
20  A.  This was the -- had different names at
21  different times.  It started as the pilot drug
22  evaluation staff, it was then HFD-170 of the
23  pilot drug evaluation division, then its name
24  changed, and I can't remember what they changed
25  it to.  It may have changed again, but it was

Page 21

1  all the same group of people.
2  Q.  Okay.  And your role in that division
3  covered the same responsibilities related to
4  reviewing and assessing new drug applications?
5  A.  Yes, ma'am.
6  Q.  And while you were at the FDA prior to
7  your involvement in OxyContin, were you involved
8  in the review or approval of any other opioid
9  drugs?
10  A.  Yes, ma'am.
11  Q.  Which drugs?
12  A.  I can tell you the ones I remember.
13  I'd have to look at a list to tell it.  But I
14  was involved with pretty much every opioid that
15  came through the division, was involved with,
16  and some NSAIDs.  I was involved with Duragesic.
17  I was involved with -- now, the ones I remember
18  were just a mixed bag of opioid products, some
19  military morphine, nasal morphine came in;
20  several controlled-release opioids, I'd have to
21  look up to remember which ones; one or two
22  NSAIDs; some dosage form amendments.  Just a
23  large collection of opioid drugs.
24  Q.  Do you remember roughly how many
25  opioids you had reviewed prior to OxyContin's

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  approval?
2      A.  I would have to guess.  I don't know.
3      Q.  Okay.  Count them on two hands, or do
4  you need more than that?
5      A.  If you count investigational new drug
6  applications, it would have been five or six, I
7  think.
8      Q.  And when did you leave the FDA, what
9  year?
10      A.  I think it was 1997.
11      Q.  And why did you leave?
12      A.  I had been passed over for division
13  director for the third or fourth time, and it
14  was becoming clear to me that I would -- that I
15  was -- it would be a long time before I was
16  promoted or had any additional responsibilities,
17  and an extremely attractive offer came in from a
18  pharmaceutical firm to be their chief medical
19  officer, and I accepted.
20      Q.  And do you know why you were passed
21  over for promotions at the FDA?
22      A.  Do you want an answer for now or from
23  then?
24      Q.  What you know now.
25      A.  I wasn't ready.  I did not have the

Page 23

1  personnel management skills to be a division
2  director.
3      Q.  And were you told anything by others
4  at FDA at the time you were passed over for
5  these positions?
6      A.  No.
7      Q.  It just passed?
8      A.  It just got turned down.
9      Q.  All right.  So you said you went to
10  join -- you had a very attractive offer at a
11  drug company.  What drug company was that?
12      A.  Adolor Pharmaceuticals.
13      Q.  And what kind of product did Adolor
14  make?
15      A.  They were working on an extremely
16  exciting product, it was a peripherally acting,
17  non-centrally acting opioid, so it had the
18  potential for giving analgesia without affecting
19  the brain and without giving euphoria.
20      Q.  Okay.  And do you know, at the time
21  you were at Adolor, were you aware if OxyContin
22  had become commercially successful at that
23  point?
24      A.  No, ma'am.
25      Q.  I'm sorry, it was a layered question.

Page 24

1      So were you not aware, or had it not
2  become?
3      MR. PETRILLO:  Objection to form.
4      A.  I was occupied full-time with my new
5  job, and I didn't -- I neither knew nor
6  particularly cared.
7  BY MS. SINGER:
8      Q.  And how long were you at Adolor?
9      A.  A year to a year and a half.
10      Q.  And why did you leave?
11      A.  There was a mixture of reasons that I
12  left Adolor.  We had some discouraging
13  information -- clinical trial results from our
14  lead compound.  I was living apart from my wife
15  and commuting to see her on weekends, which was
16  very exhausting.  We had great difficulty
17  finding a home in the Adolor area.  And my wife
18  told me that she had been contacted by a
19  recruiter and I needed to think about other
20  employment.
21      Q.  So a certain through-line here.
22      And did you -- were you recreated to
23  Purdue Pharma from Adolor?
24      A.  Yes, ma'am.
25      Q.  How did that response -- how did that

Page 25

1  opportunity come to you?
2      A.  A recruiter from a recruitment
3  company, I believe, I don't know whether he had
4  a company or whether he was independent,
5  contacted my home, and my wife talked to him.
6  And she thought I should talk to him, and I
7  didn't.  And he called again, and she suggested
8  very firmly that I talk to him.  And I talked
9  with him and met, we met with him.  And he and
10  she convinced me that I should interview at
11  Purdue.
12      Q.  And "she" is your wife, is that
13  correct?
14      A.  Yes, ma'am.
15      Q.  And do you remember when this was?
16      A.  Before -- all I remember is it was
17  before I went to Purdue.
18      Q.  And do you recall with whom at Purdue
19  you met before joining the company?
20      A.  Robert Reder.
21      Q.  And had you had any conversations with
22  Purdue prior to that time about joining Purdue
23  Pharma?
24      A.  No, ma'am.
25      Q.  No conversations while you were at the

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 FDA about moving to Purdue?
2     A. No, ma'am.
3     Q. All right. I'd like to show you
4 Exhibit 2.
5     (Whereupon, Purdue-Wright-2 was marked
6     for identification.)
7     MS. SINGER: This one we have enough
8 copies of.
9 BY MS. SINGER:
10     Q. So, Dr. Wright, do you recognize
11 Exhibit 2 titled "Curtis Wright IV, MD, MPH
12 Curriculum Vitae"?
13     A. Yes, ma'am.
14     Q. Okay. I'm going to read the document
15 number into the record. It's PPLPC013000116251.
16     And you recognize this as your
17 curriculum vitae?
18     A. This is one version of my curriculum
19 vitae.
20     Q. Did you prepare this version of your
21 curriculum vitae?
22     A. I believe so.
23     Q. Okay. I'd like to direct you to
24 Page 2, which is Bates number ending 52. And if
25 you look about two-thirds of the way down the

Page 27

1 page, Executive Director, Medical Research,
2 Purdue Pharma.
3     Do you see where I am?
4     A. Yes, ma'am.
5     Q. And does that refresh your
6 recollection as to when you joined Purdue?
7     A. If I got it right, it was around
8 12/98.
9     Q. Do you have any reason to believe you
10 got that wrong?
11     A. Only my general miserable problem with
12 dates.
13     Q. Fair enough. I share that fault.
14     All right. Your first position at
15 Purdue Pharma in 1998 or thereabouts was as
16 executive director of medical research, is that
17 correct?
18     A. Yes, ma'am.
19     Q. And what were your responsibilities as
20 executive director for medical research?
21     A. From what I remember, or what I wrote?
22     Q. Why don't we start with what you
23 remember.
24     A. Okay. I was given three new drug
25 appli -- potential new drug applications, or

Page 28

1 projects to work on. I had a transdermal, a
2 sustained-release opioid, and an opioid
3 antagonist combination.
4     Q. So all three were opioid drugs, is
5 that correct?
6     A. There's some dispute about how to call
7 the transdermal, but yes.
8     Q. Okay. And beyond your responsibility
9 for those three drug products, were there any
10 other tasks associated with your position?
11     A. Early on, no. Very quickly I began to
12 get questions from various people because of my
13 expertise in drug abuse and my previous
14 experience with the FDA.
15     Q. So it's fair to say that as with your
16 position at the FDA, you also consulted with
17 other people in the entity to give them your
18 advice and opinions and experience?
19     A. When they asked.
20     Q. Okay. And to whom did you report as
21 executive director of medical research?
22     A. Robert Reder.
23     Q. And did you have anyone who reported
24 to you?
25     A. Yes.

Page 29

1     Q. Who was that?
2     A. It changed at various times because
3 people came in. There was Serge Carpow, Bob
4 Colucci, then Christopher Breder, then Dan
5 Spyker, I'm moving forward in time, Douglas
6 Kramer, Nab Dasgupta, and my eventually my
7 secretary.
8     Q. That's okay. Don't worry, I won't put
9 you on the spot.
10     So about how many people worked for
11 you at any particular time?
12     A. Including the people that worked under
13 those people?
14     Q. Yes.
15     A. Nine to twelve.
16     Q. And was Dr. Reader your supervisor for
17 that entire period in that position? Did that
18 change at all?
19     A. I'm unsure.
20     Q. You don't remember that it changed?
21     A. Well, it did change. Dr. Reder was
22 replaced as head of medical -- of that --
23 whatever his title was by a Dr. Kramer.
24     Q. Different than the Dr. Kramer who
25 worked for you?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    A.   Yes, different Kramer.  And then I was
2  moved out of medical research in terms of
3  reporting to report to Dr. Haddox.
4    Q.   Okay.  And did that change in your
5  supervisor and the change in your position
6  happen at roughly the same time, or were they
7  separate events?
8    A.   They were separate events.
9    Q.   Okay.  And was your next position once
10  you moved as executive director of medical
11  research and medical affairs, or is that kind of
12  a continuation of the same job?
13    A.   Well, it's really hard to say because
14  I didn't move from one job to another and had a
15  new job and new reports and new
16  responsibilities.  I carried one of the products
17  all the way through until it was discontinued,
18  carried another one about halfway and it was
19  taken over by one of the new hires, and the
20  third product ballooned into a multiple product
21  product that I ended up being the medical
22  officer for.
23    Q.   Was that the naloxone project?
24    A.   That was the Opioid X program.
25    Q.   Okay.  Which was the one -- of the

Page 31

1  three products, the one that involved naloxone,
2  is that correct?
3    A.   More than Naloxone, but yes.
4    Q.   Okay.  So you kept those three drugs
5  even in this new position.  Did you take on any
6  additional responsibilities?
7    A.   Yes, ma'am.
8    Q.   And what were those?
9    A.   I was the lead on the research unit
10  that dealt with the -- I don't know how to
11  describe it -- statistical understanding of
12  OxyContin and other opioids' abuse and division.
13    Q.   And did that division or department
14  have a name?
15    A.   I'm not sure what it was.
16    Q.   Okay.  And was this in your position
17  in medical research and medical affairs, or was
18  this a change that happened when you became
19  executive director of risk assessment and health
20  policy?
21    A.   I would say it morphed into, from one
22  into the other.
23    Q.   Okay.  So it was -- I don't want to
24  put words into your mouth.  It was an evolution
25  rather than distinct jobs?

Page 32

1    A.   I can't answer from a personnel
2  perspective, because I did change who I reported
3  to at one point.  But in terms of my work, it
4  gradually included more and more abuse and
5  diversion issues and tamper-resistant opioid
6  development issues, and I just carried the drugs
7  along with that.
8    Q.   Okay.  And in this growing role with
9  respect to OxyContin and drug abuse and
10  tamper-resistance, that's the work in which you
11  reported to Dr. Haddox, is that correct?
12    A.   OxyContin wouldn't be correct to say
13  there, because the Opioid X programs were many
14  potential products other than OxyContin.  But,
15  and I'm not -- I'm not sure that reporting to
16  Dr. Haddox on the Opioid X program was right
17  because there was a team leader and a team for
18  the Opioid X, and that was Brianne Weingarten.
19    Q.   Okay.  And was Brianne Weingarten
20  between you and Dr. Haddox, or a separate line
21  of reporting?
22    A.   I would characterize it as a separate
23  line of reporting.
24    Q.   Okay.  And so Dr. Haddox was your
25  supervisor with respect to the drug abuse and

Page 33

1  assessment work that you talked about earlier,
2  is that accurate?
3    MR. PETRILLO:  Objection.
4    A.   I don't know how to answer that,
5  because I had a supervisor on paper, but
6  Dr. Haddox sometimes acted as my supervisor,
7  sometimes as my peer, and he was not supervisory
8  in the same way that Dr. Reder had been.
9  BY MS. SINGER:
10    Q.   And in what way was Dr. Haddox's
11  supervision different?
12    A.   He left the management issues
13  pertaining to the Opioid X program to Brianne.
14    Q.   Okay.  And so during this period we're
15  talking about with Opioid X and the drug abuse
16  related responsibilities, was your title
17  executive director of risk assessment and health
18  policy?
19    A.   I don't remember what my exact title
20  was.
21    Q.   Okay.  And are we talking about the
22  time period from 2004 until you left Purdue?
23    MR. PETRILLO:  Objection.
24    A.   I'm not good with dates, and this
25  process took place from the time that I came to

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1   Purdue until the time that I left Purdue.
2   BY MS. SINGER:
3       Q.  Okay.  And do you remember when you
4   left Purdue?
5       A.  I believe it was 2005.
6       Q.  Okay.  We may come back to that one.
7       You mentioned the three products that
8   you worked on over the course of your tenure at
9   Purdue.  Did any of those products precede to an
10  NDA submission to the FDA?
11      A.  One of them did, I think.
12      Q.  And NDA, just to make sure we're on
13  the same page, is a new drug application?
14      A.  A new drug application was filed for
15  after I left the company, or must have been
16  filed, I wasn't there, so I don't -- but it
17  couldn't have -- I believe that one of the
18  products came to the market.
19      Q.  Okay.  And which one was that?
20      A.  Transdermal buprenorphine patch.
21      Q.  Okay.  And would that have been
22  Butrans, do you know?
23      A.  I don't know the brand name, so I'm
24  not -- I can't be positive, but I think that
25  sounds right.

Page 35

1       Q.  Okay.  And what happened with the
2   other two drugs?  We can put Opioid X aside as I
3   know that is a longer story, but what about the
4   second drug?
5       MR. SNAPP:  Object to the form.
6       A.  The other drug was called Palladone,
7   and that development program was terminated.
8   BY MS. SINGER:
9       Q.  And why was it terminated?
10      A.  It was terminated as a management
11  decision, and I don't know exactly why.  I do
12  know that there were some technical problems
13  with the formulation that were discovered very
14  late in development.
15      Q.  And do you recall what those technical
16  problems were?
17      A.  I can't say that they were the
18  technical problems that caused the
19  discontinuation, but it was vulnerable to
20  alcohol, and if someone had been drinking
21  alcohol before taking their pill the
22  controlled-release properties could be
23  distorted.
24      Q.  Okay.  And when you joined Purdue --
25  and I'm sorry, so we've talked about the three

Page 36

1   drugs, one we've put aside.  Is there any other
2   drug whose development you were involved in at
3   Purdue?
4       A.  Excluding Opioid X?
5       Q.  Yes.
6       A.  Well, the ones I remember are the HXA
7   program, the transdermal buprenorphine program,
8   and Palladone.  Everything else I remember was
9   involved with Opioid X.
10      Q.  Okay.  And the HXA product was what?
11      A.  That was an early conceptualization of
12  a hydrocodone/naloxone combination.
13      Q.  What happened with that product?
14      A.  It was sucked up into Opioid X.
15      Q.  When you joined Purdue its principle
16  products were opioids, is that correct?
17      MR. SNAPP:  Object to the form.
18      A.  The product that I knew about most was
19  MS Contin, but Purdue had other products, but I
20  was not involved with them.
21      Q.  Is it fair to say that most of
22  Purdue's sales or revenue were related to
23  opioids, if you know?
24      MR. SNAPP:  Object to the form.
25      A.  I don't know.

Page 37

1   BY MS. SINGER:
2       Q.  All right.  I'd like to turn back to
3   Exhibit 2, your CV.  So looking at the middle
4   item, "Medical Research/Medical Affairs."  Do
5   you see where I am in the middle of Bates number
6   52?
7       A.  Mm-hmm.
8       Q.  Let me make sure I'm in the right
9   place.  So can you read aloud the first
10  paragraph under that item, "First executive
11  director"?
12      A.  Starting with "Responsible"?
13      Q.  "The first executive director of a
14  newly created position."
15      A.  "The first executive director of a
16  newly created position to rapidly and
17  proactively address and retard the urgent and
18  growing situation of abuse of the corporation's
19  largest selling prescription opioid analgesic."
20      Q.  Does that accurately describe your
21  duties in medical research and medical affairs?
22      A.  It's a little grander than I actually
23  was.
24      Q.  In what way?
25      A.  The actions that were -- my duties

Page 38

1  dealt mostly with the scientific and medical
2  side of addressing abuse and diversion.
3  Dr. Haddox, Dr. Schnoll, another person whose
4  name I've forgotten, dealt with the medical
5  practice side.
6      Q.  And by "medical practice," you mean
7  the practice of prescribers of the product, is
8  that correct?
9      A.  Yes, ma'am.
10     Q.  Okay.  And is it accurate to say that
11 you were the first executive director, and that
12 it was a newly created position?
13     A.  I think so.
14     Q.  And in scaling this back to something,
15 the not so grand and more accurate, did you have
16 any responsibility for managing how Purdue's
17 opioids were marketed?
18     A.  No, ma'am.
19     Q.  Did you have any responsibility or
20 authority with respect to where Purdue's opioids
21 were sold?
22     A.  No, ma'am.
23     Q.  Or how sales representatives were
24 compensated?
25     A.  No, ma'am.

Page 39

1      Q.  And you were not involved, I think as
2  you just said, in how prescribers were educated
3  on using Purdue's opioids, is that correct?
4      A.  I don't know if I was ever asked, and
5  if I was asked I would have given my opinion,
6  but I had no authority over the marketing of
7  Purdue's products.
8      Q.  And returning to your product
9  development work, did any of the products you
10 worked on have any relationship to addressing
11 the 12-hour duration, or something called end of
12 dose failure of OxyContin?
13     A.  Not that I remember.
14     Q.  And did any of them address something
15 we'll talk about later, but I think that you
16 described as the pharmacokinetic curve of
17 OxyContin?
18         MR. SNAPP:  Object to the form.
19     A.  I'm unclear what your real question
20 is.
21 BY MS. SINGER:
22     Q.  So did any of the new drugs you
23 developed seek to address the pharmacokinetic
24 curve or the -- metabolizing the processing of
25 OxyContin?

Page 40

1         MR. SNAPP:  Object to the form.
2      A.  I don't know how to answer that,
3  because one of the products was a once a day
4  product using a different opioid.  But I was not
5  involved with, except as part of the Opioid X
6  program, with any modifications of OxyContin.
7  BY MS. SINGER:
8      Q.  Okay.  All right.  Returning to
9  Exhibit 2, your CV, the third paragraph under
10 that same section on medical research and
11 medical affairs, the last sentence, "This role
12 included providing medical affairs" -- do you
13 see where I'm reading, Dr. Wright?
14     A.  Mm-hmm.
15     Q.  Can you read that sentence?
16     A.  "This role included providing Medical
17 Affairs direction and support in the development
18 of non-branded education and focus group topics
19 and concepts regarding reduced abuse liability
20 opioids."
21     Q.  And can you -- does that accurately
22 reflect one of your responsibilities?
23     A.  I think so.  I provided direction with
24 respect to medical affairs, but I had no power.
25     Q.  You don't what?

Page 41

1      A.  I didn't have any authority.
2      Q.  Tell me what you mean by that.
3      A.  And I'm not sure medical affairs is
4  the right word.  I provided extensive opinion
5  when asked about how to address abuse and
6  diversion issues.  I was asked on several
7  occasions how to deal with issues pertaining to
8  bad prescribers or bad pharmacies, and I
9  provided the best answers I could.
10     Q.  And who were you asked by?
11     A.  I don't remember.  There were multiple
12 inquiries that would come in over time, I'd be
13 doing my regular work and then someone would ask
14 something, and I would answer.
15     Q.  So -- and I may be reading something
16 into your comments, but there seems to be
17 something undertone that you offered opinions
18 but they weren't taken.  Is that true, or
19 unfair?
20         MR. SNAPP:  Object to the form.
21     A.  I was a voice.  There were many
22 voices.  Some voices had more experience in
23 dealing with physicians, Dr. Haddox for example.
24 My voice carried a lot of weight with respect to
25 formulations, pharmacology, new drug products.

Page 42

1 I don't think I carried as much weight with
2 respect to marketing because I didn't have any
3 experience in it.
4 BY MS. SINGER:
5 Q. But you did offer opinions on
6 marketing and on prescribing practices, is that
7 correct?
8 MR. SNAPP: Object to the form.
9 A. I wouldn't characterize it that way.
10 BY MS. SINGER:
11 Q. How would you characterize it?
12 A. When someone asked me a question with
13 respect to abuse, diversion, addiction, I gave
14 them my best opinion.
15 Q. And so although your voice didn't
16 carry as much weight with respect to
17 prescribers, do you remember your opinion that
18 you offered when asked on those issues?
19 MR. SNAPP: Object to the form.
20 A. I only remember specifically being
21 asked when there was a question about what would
22 help detail people identify potential problem
23 prescribers, prescribers who were prescribing
24 improperly or diverting, and we did some
25 analysis on that, and I remember giving an

Page 43

1 opinion about that.
2 BY MS. SINGER:
3 Q. And was that the Top 200 program?
4 A. I don't remember that name.
5 Q. Okay. And do you recall what opinion
6 you gave?
7 A. Yeah.
8 Q. And what was it?
9 A. That there were markers that would
10 identify a clinic where the detail person should
11 be concerned.
12 Q. And what were those markers?
13 A. I can't remember all of them now. But
14 they were relatively straightforward; does it
15 look like a medical office, is there a
16 receptionist and files, do the patients in the
17 waiting area look like a representative group of
18 medical patients, was there anything unusual
19 about the prescriber, were they interested in
20 products other than strictly opioids. The other
21 characteristics were things that you could look
22 up online.
23 Q. And do you recall roughly when you
24 offered those suggestions or indicators?
25 A. I can't remember.

Page 44

1 Q. Remembering your facility for dates.
2 Do you remember to whom you offered
3 those views?
4 A. It might have been Sally Riddle.
5 Q. And do you remember what, if anything,
6 happened as a result of your views?
7 A. I don't know.
8 Q. Okay. All right. And we were talking
9 a minute ago about your voice with respect to
10 marketing. Do you recall any opinions you
11 offered on Purdue's marketing?
12 MR. SNAPP: Object to the form.
13 A. I don't recall.
14 BY MS. SINGER:
15 Q. All right. So let's go back to your
16 CV, if we may, and you were reading a sentence
17 regarding your role, your direction and support
18 in the development of non-branded education. So
19 what was that work in particular?
20 A. At one -- I remember that project
21 because it was, I thought, a good one. At one
22 point, as part of Purdue's remediation program,
23 they developed, I think with an external party,
24 a program for adolescents, children, schools and
25 young adults, to deter experimentation with

Page 45

1 opioids, and it was probably the best program
2 I'd ever seen.
3 Q. And you described it as part of
4 Purdue's remediation efforts.
5 A. Well, that's what I would call it.
6 Q. Okay. And explain what you mean by
7 that.
8 A. When something happens you do what you
9 can to try to remediate it, to correct it, to
10 minimize the damage, to make it better. I mean,
11 after a hurricane you come in and try to both
12 repair the damage and to remediate it to prevent
13 future damage.
14 Q. And what was the -- what was the
15 underlying problem that you were trying to
16 remediate?
17 MR. SNAPP: Object to the form.
18 A. The rising abuse and diversion and
19 addiction to all opioids.
20 BY MS. SINGER:
21 Q. And do you remember what the time
22 frame was for this work?
23 A. It was when I was in my second --
24 well, I can't be sure, ma'am.
25 Q. And then the second part of that

Page 46

1 sentence in addition to the non-branded
2 education was "focus group topics and concepts
3 regarding reduced abuse liability opioids."
4 Correct?
5     A.  Yes, ma'am.
6     Q.  And what did that work involve?
7     A.  That was the Opioid X program.  There
8 were -- and I didn't run any focus groups, I had
9 input to the people who did.  There were
10 problems perceived as possible with
11 tamper-resistant and combination opioid
12 products.  The most -- the one I remember is why
13 should I prescribe a drug that's got something
14 in it that's not going to benefit my patient to
15 benefit a drug addict, and one of the questions
16 was, how did you talk about that?  How do you
17 convey to a physician that abuse and diversion
18 are inherent in these drugs, all of them, and
19 that that must be managed.  That's part of their
20 job.
21     Q.  So, and when you talk about the
22 question that was raised about prescribing a
23 product that has something designed for drug
24 addicts, I think you said, who was that question
25 or concern coming from?

Page 47

1     MR. SNAPP:  Object to the form.
2     A.  That question came up from multiple
3 parties.  I mean, within my own team, the
4 formulators, there were a number of people of
5 multiple disciplines who said why should a
6 patient take something that's not going to
7 benefit them directly?
8 BY MS. SINGER:
9     Q.  And what was the reason for including
10 the naltrexone?
11     MR. SNAPP:  Object to the form.
12     A.  I think -- naltrexone, help me out, I
13 don't understand your question.
14 BY MS. SINGER:
15     Q.  Sure.
16     So you've been talking about this
17 agent that was being added to opioids.  Is that
18 agent naltrexone?
19     A.  Naltrexone was one of the agents that
20 we considered for adding to opioids.  The
21 Opioid X program was very broad and had multiple
22 intellectual properties and ideas associated
23 with it, and one of them was adding naloxone and
24 one of them was adding naltrexone.  And there
25 were multiple ways to do that, and there were

Page 48

1 multiple technologies that were under
2 consideration.
3     Q.  And what was the purpose of these
4 various technologies?
5     A.  The primary mode of abuse of
6 controlled-release opioids is to crush the
7 tablet and destroy its controlled-release
8 properties, then to either snort it or put it in
9 a teaspoon and inject it.  And those are very
10 high risk activities, and we wondered and tried
11 to see if we could make it impossible to do
12 that.
13     Q.  And is it true, actually, that the
14 primary mode of abuse of controlled-release
15 opioids is taking them orally?
16     MR. SNAPP:  Object to the form.
17     A.  I actually can't answer that question
18 accurately.  Our concern with crushing,
19 dissolving, injecting was that those were high
20 lethality events, they could kill people.
21 BY MS. SINGER:
22     Q.  Okay.  I'm sorry, so there are -- is
23 it fair to say there are multiple ways to abuse
24 opioids?
25     A.  There are multiple ways to abuse

Page 49

1 opioid drugs.
2     Q.  And that includes taking more pills
3 than you're prescribed, or taking the pills more
4 frequently, is that correct?
5     MR. SNAPP:  Object to the form.
6     A.  You can take too much.
7 BY MS. SINGER:
8     Q.  And then -- sorry, go ahead.
9     A.  No, you could take too much.
10     Q.  Okay.  And then you're talking about
11 another way of abusing them, which is snorting
12 or injecting them, correct?
13     A.  Yes.
14     Q.  Okay.  And so link this back, please,
15 to the conversation about the other
16 technologies.  You were, I think, starting to
17 get there.
18     MR. SNAPP:  Object to the form.
19     MR. PETRILLO:  Same.  If you need
20 clarification, you can ask.
21     A.  What about the other technologies?
22 BY MS. SINGER:
23     Q.  So when I asked you the purpose of the
24 technologies, you started to explain that
25 opioids can be abused by crushing or snorting.

Page 50

1 So what was the role of these technologies with
2 respect to crushing and snorting and injecting
3 opioids?
4     A.  There were multiple goals, because
5 some of the technologies could accomplish some
6 things, some could accomplish other things.  One
7 branch of the technologies was intended to
8 essentially render the opioid inert if you
9 tampered with the pill.  Another branch of the
10 technologies was to make it physically very
11 difficult to tamper with the pill.  There was
12 another group of technologies that would make
13 tampering with the pill less lethal.  And
14 everything in-between.  We quickly discovered
15 when we were wrestling with this that
16 tamper-resistance or abuse of --
17 tamper-resistance is the best word, was not an
18 absolute, it was not a yes, no, could, or
19 couldn't.  There were grades.  Some technologies
20 were likely and very likely to prevent snorting.
21 Some technologies prevented injecting.  Some
22 technologies prevented injecting and rendered
23 the narcotic inert so that you couldn't get high
24 from it or get a narcotic effect.  There was
25 even one technology that was essentially

Page 51

1 uncrushable.  And all of these technologies were
2 potential ways to make abuse and diversion more
3 difficult.
4     Q.  And you started by saying that there
5 was resistance even among your own team to the
6 use of some of those technologies, is that
7 correct?
8     A.  Yes, ma'am.
9     Q.  And can you explain that again?
10     A.  Yes.  One objection that some of my
11 peers felt might come up is why should a patient
12 who is not abusing the drug be exposed to a
13 second drug that they don't need and don't want
14 to prevent abuse or diversion?
15     Q.  And what was your own view of that?
16     A.  Abuse and diversion are inevitable
17 with any class -- any strong opioid, any
18 Schedule II opioid.
19     Q.  Is OxyContin a Schedule II opioid, a
20 strong opioid?
21         MR. PETRILLO:  I don't think the
22 witness was finished.
23 BY MS. SINGER:
24     Q.  Finish and we'll come back to it.
25     A.  Limiting abuse and diversion, limiting

Page 52

1 a product's attractiveness for abuse and
2 diversion protects the patient, it protects the
3 doctor, it protects the product, it protects
4 society.
5         So from my perspective when asked why
6 should I -- you know, why is this essential for
7 a product, I would say abuse and diversion is
8 bad, it hurts people, and you need to address
9 it.
10     Q.  And I interrupted you inappropriately
11 to ask if OxyContin was a strong opioid.
12         MR. SNAPP:  Object to the form.
13     A.  OxyContin is a Schedule II opioid.
14 BY MS. SINGER:
15     Q.  And is that a strong opioid?  I think
16 you used that term, too.
17     A.  Pure mu agonist opioid is more
18 technically correct.
19     Q.  So when you said strong opioid before,
20 what do you mean?
21     A.  Pure mu agonist.
22     Q.  Okay.  Which is -- OxyContin is a pure
23 mu agonist?
24     A.  Practically speaking.  I don't know if
25 it activates any of the other receptors, but it

Page 53

1 is predominantly a mu agonist opioid.
2     Q.  You mentioned that there was an
3 outside group involved in the non-branded
4 education that you did.  Do you remember what
5 group that was?
6     A.  No, ma'am, I don't.
7     Q.  Who else worked with you on the
8 non-branded education, if you recall?
9     A.  I'm not even sure who worked with me.
10 I remember being asked to review it, and I
11 reviewed it.
12     Q.  Do you remember who asked you to
13 review it?
14     A.  No, ma'am.
15     Q.  And the focus group topics and
16 concepts regarding reduced abuse liability
17 opioids, who worked with you on the focus group
18 piece of that?
19     A.  I'm not certain there were focus
20 groups on that.  But that would have been
21 Brianne.
22     Q.  Brianne Weingarten?
23     A.  (Nodding in the affirmative).
24     Q.  And was there something else you could
25 have been referring to with the use of focus

Page 54

1 groups in your CV?
2 A. I don't remember now.
3 Q. All right. So we're going to move
4 forward to your role as executive director of
5 risk assessment and health policy at the top of
6 your CV.
7 One of the responsibilities you list
8 for that position is potential product
9 acquisitions. Was that part of your
10 responsibility?
11 A. Yes, ma'am.
12 Q. And did that include any role in a
13 project to inquire -- excuse me, a project to
14 acquire technology from Grunenthal?
15 A. I remember Grunenthal. I'm not
16 certain what -- I don't remember now what their
17 product was.
18 Q. Okay. Do you remember anybody from
19 Grunenthal with whom you worked or interacted?
20 A. I met them. I think we even presented
21 Opioid X to them. But I don't remember anybody
22 from Grunenthal.
23 Q. Okay. And do you remember what
24 happened with that presentation, or after that
25 presentation?

Page 55

1 MR. SNAPP: Object to the form.
2 A. I do not remember, ma'am.
3 BY MS. SINGER:
4 Q. And then in the same section of your
5 resume you talk about "systems to assess and
6 manage opioid drug abuse and diversion," which I
7 think is the second bullet point under the third
8 paragraph.
9 A. Yes, ma'am.
10 Q. Okay. Does that accurately describe
11 one of your responsibilities in the position?
12 (Witness reviewing document.)
13 A. Patient is a bit much. We didn't
14 actually do that much patient level work.
15 Q. And by "we," do you mean your
16 division?
17 A. Yes, ma'am.
18 Q. Okay. And then the third bullet
19 there, "Overall program." Do you see what I'm
20 referring to?
21 A. Mm-hmm.
22 Q. And do you know what that work
23 entailed?
24 A. That was our involvement with the
25 whole RADARS program. And one of the early

Page 56

1 disadvantages in trying to grapple with abuse
2 and diversion was the information systems that
3 initially existed measured things like DAWN
4 mentions or drug abuse warning system mentions
5 or emergency room visits by pharmaceutical
6 compound, hydrocodone, oxycodone, morphine, all
7 generic terms. So there was no information on
8 dosage form specific events, and there was no
9 information on geographical distribution, or
10 very limited.
11 The RADARS program was the first
12 attempt to try to find out which pharmaceutical
13 products were being abused and diverted, and
14 where that was located, and when it was.
15 Q. So it is the RADARS program that
16 you're talking about within this bullet item
17 here?
18 A. Yes, ma'am.
19 Q. And what was your involvement with
20 RADARS?
21 A. We, along with Sid Schnoll and David
22 Haddox, we provided technical ideas about how
23 you might do it.
24 Q. And apart from RADARS, you did have
25 other sources of information about abuse and

Page 57

1 adverse effects, is that correct?
2 MR. SNAPP: Object to the form.
3 A. There were other sources of
4 information.
5 BY MS. SINGER:
6 Q. And those included what?
7 A. Adverse event reports, direct contacts
8 to the company, safety reporting, published
9 literature. I'm not sure I got them all, but
10 there were a variety of ways.
11 Q. Okay. All right. Let's turn to
12 Exhibit 3.
13 Dr. Wright, if you need a break at any
14 point, please just --
15 MR. PETRILLO: Is now a good time for
16 a break?
17 MS. SINGER: Now is a fine time.
18 THE VIDEOGRAPHER: We are now going
19 off the record, and the time is 10:08 a.m.
20 (Whereupon, a recess was taken.)
21 THE VIDEOGRAPHER: We are now going
22 back on the record, and the time is 10:16 a.m.
23 BY MS. SINGER:
24 Q. All right. Dr. Wright, we're going to
25 show you Exhibit 3.

Page 58

1    (Whereupon, Purdue-Wright-3 was marked
2    for identification.)
3  BY MS. SINGER:
4    Q.  So Exhibit 3 is
5  ENDO-OPIOID_MDL-3004266, and it's title
6  Confidential Executive Profile, Curtis Wright,
7  MD.
8    Dr. Wright, do you recognize this
9  document?
10    A.  I do not recognize this document.
11    Q.  Were you aware of the firm of Heidrick
12  & Struggles?
13    A.  I am not aware of the firm of Heidrick
14  & Struggles.
15    Q.  Do you remember being considered or
16  approached for a position at Endo
17  Pharmaceuticals.  I saw a bell visibly go off.
18    A.  Yes, I remember.
19    Q.  When -- I'm not going to ask you when.
20    What did that involve?
21    A.  To the best of my recollection, Robert
22  Reder, after he left Purdue, went to Endo.  When
23  I was looking for a job I believe I interviewed
24  with Robert.
25    Q.  Understood.

Page 59

1    And you see a date here of April,
2  2005.  Does that seem to be about the right
3  timing?
4    A.  Well, I hadn't actually left Purdue
5  yet, I think.  As I remember it, the news of the
6  layoffs came during CPDD, sorry, a scientific
7  meeting, and that's generally held in June.
8    Q.  Okay.  So that would have been June of
9  2005?
10    A.  I think so.
11    Q.  And which layoffs are you referring
12  to?
13    A.  The layoffs that resulted in my
14  leaving Purdue.
15    Q.  And what was the extent of that
16  layoff?
17    A.  I don't know how big it was across the
18  whole company, but it was a -- it wiped out my
19  department.
20    Q.  The entire department?
21    A.  No, my half of it.
22    Q.  Your half was which half?
23    A.  The scientific -- essentially the
24  scientific research group, Dr. Kramer, Nab
25  Dasgupta, my secretary.  I think there was

Page 60

1  someone else in there, but I'm blanking on it at
2  the moment.  But I would be left as a department
3  -- a party of one.
4    Q.  Administer without a portfolio.
5    And the people who were let go, did
6  they have a common function within the
7  department, or what were their collective roles?
8    MR. SNAPP:  Object to the form.
9    A.  Doug Kramer was a medical officer.
10  Nab Dasgupta was a bachelor who was working on
11  his Ph.D who was a researcher in drug abuse.  My
12  secretary, who was our group's secretary.  I
13  don't know if the epidemiologist went then or
14  not, I think so.
15  BY MS. SINGER:
16    Q.  And who was the epidemiologist?
17    A.  I've forgotten her name.
18    Q.  Okay.  And so was that the part of
19  your department that worked on new drugs, or the
20  part that worked on drug abuse?
21    A.  Those were all people that worked on
22  drug abuse.
23    Q.  And were you given a reason for the
24  layoffs at the time?
25    A.  My understanding, which is just what I

Page 61

1  remember, was that there were financial
2  reversals within the company.
3    Q.  All right.  So looking at this
4  Exhibit 3, I want to direct you to Bates number
5  4268, which I think is Page 3, with 1998 to 2002
6  at the top.
7    Do you see where that is?
8    A.  Mm-hmm.
9    Q.  All right.  And if you can look at the
10  first bullet point, the very last sentence
11  starting "Transfer to Medical Affairs."  Let me
12  know when you've found that.
13    A.  Yes, ma'am.
14    Q.  Can you read that sentence out loud,
15  please?
16    A.  "Transfer to Medical Affairs to work
17  on Risk Management, a function that had not
18  existed in the firm before that time and for
19  which an urgent business need had arisen."
20    Q.  And is that an accurate statement of
21  your function and the circumstances?
22    A.  At this point in time I'm not certain
23  that it had not existed before.
24    Q.  Okay.
25    A.  And I've since learned that risk

Page 62

1 management has a specific meaning in both
2 business and in pharmaceuticals, and I'm not
3 certain that that is precisely correct either.
4     Q.  And what do you mean by that?
5     A.  From my perspective now, what I did
6 mostly was try to develop within medical
7 alternative products that would manage the risk
8 of abuse and diversion, and to provide
9 scientific and statistical methods that could do
10 the same.  But there was a whole other part of
11 risk management that I wasn't doing.
12     Q.  And was there someone else who was
13 doing that?
14     A.  Oh, yes, ma'am.
15     Q.  And who was that?
16     A.  Within medical, within the medical
17 group it would have been Dr. Haddox,
18 Dr. Schnoll, and all of the consultants that
19 they had external to the company that were
20 working on the product-specific reporting
21 systems.  There would have been -- I don't even
22 know all the other people that were involved,
23 but there were.
24     Q.  And do you remember who the external
25 consultants were?

Page 63

1     A.  No.
2     Q.  Okay.  And was there a person who held
3 your position before you?
4     A.  No, ma'am.
5     Q.  Okay.  And do you know what the
6 instigator or trigger was for creating your
7 position?
8     A.  I don't know for sure at the level of
9 senior management.
10     Q.  So you don't know who the person was?
11     A.  I have a strong suspicion.
12     Q.  And what is your suspicion?
13     A.  That Dr. David Haddox was instrumental
14 in setting up that group.
15     Q.  And on what do you base that?
16     A.  Well, he suddenly became my boss.  But
17 when I had started at Purdue there was nobody
18 with the epidemiological research/scientific
19 analysis functionality working in the medical
20 department, and suddenly that group appeared,
21 and it appeared as a result of Dr. Haddox and he
22 became my boss.  So that's what I base it on.  I
23 think he did it.
24     Q.  And was there a triggering event or
25 circumstance inside or outside the company that

Page 64

1 you think prompted it?
2     MR. SNAPP:  Object to the form.
3     A.  I may have had something to do with
4 it.
5 BY MS. SINGER:
6     Q.  In what way?
7     A.  Well, Dr. Haddox believed, as I did,
8 that all opioid drugs are vulnerable for the
9 development of an abuse and diversion problem,
10 all of them, and that when they happen they
11 happen fast, and you had to respond fast and you
12 had to do something about them.
13     And one of the things I do remember
14 early on was that Dr. Haddox said, Curt, how can
15 we convince them, how can we explain that when
16 this happens it will happen fast, and we need to
17 do something?  And so I provided him with
18 coaching on what might happen.
19     Q.  And when you talk about "them" in that
20 sentence who needed to be convinced, who are you
21 referring to?
22     A.  The company as a whole.
23     Q.  And when you say you gave him
24 coaching, what did that involve?
25     A.  I remember him asking me what could

Page 65

1 happen, and I told him what could happen,
2 because I'd seen it happen.
3     Q.  And what could happen?
4     MR. SNAPP:  Object to the form.
5     A.  The short -- there's a long answer,
6 and the short answer that's probably better is a
7 triggering event occurs that the company has to
8 analyze, interpret, and respond to in a
9 corrective way right away.
10 BY MS. SINGER:
11     Q.  And when you say you had seen it
12 before --
13     A.  I was -- yes.
14     Q.  -- what had you seen before?
15     A.  What was the question?
16     Q.  What had you seen before?
17     A.  When I was at the Food and Drug
18 Administration I was head of the drug abuse
19 group, so all of the various abuse, diversion,
20 crises that occurred during eight or nine years
21 came through my desk.
22     Q.  And when you say you had to -- there
23 would be a triggering event, you'd have to act
24 fast, is that because the speed, the scale of
25 what was going to happen, the lethality?  I

Page 66

1  mean, what are you talking about with that?
2      MR. SNAPP: Object to the form.
3      A.  When an event occurs, early on you
4  have the potential to stop it. When it's become
5  widespread it's too late, you then have to try
6  to do what you can.
7  BY MS. SINGER:
8      Q.  And did the event of the abuse and
9  diversion of opioids become widespread?
10     MR. PETRILLO: Object to form.
11     A.  I think it is evident that there is a
12 widespread problem with abuse, diversion and
13 addiction to all opioid drugs that we're in the
14 middle of right now.
15 BY MS. SINGER:
16     Q.  And when you talk in this Exhibit 3
17 about an urgent business need, what was that
18 urgent business need?
19     A.  A responsible company has to do
20 something.
21     Q.  To prevent that kind of harm?
22     A.  Prevent it --
23     MR. SNAPP: Object to the form.
24     A.  A company, from my perspective, that's
25 behaving properly anticipates what might happen,

Page 67

1  is ready to identify what does happen, is able
2  to analyze when that does -- what the event is
3  to find what's truly happening, and then has
4  thought about what they might do to correct it.
5  BY MS. SINGER:
6      Q.  And those are all hallmarks of a
7  responsible company, correct?
8      MR. SNAPP: Object to the form.
9      A.  I believe they're part of business
10 responsibility.
11 BY MS. SINGER:
12     Q.  And when you talk about what you had
13 seen in your years at FDA with other incidents
14 or epidemics of drug abuse, what were those?
15     A.  They were so mixed and varied, I can't
16 -- it's difficult to do on the spot.
17     Q.  So you've --
18     MR. PETRILLO: I'm sorry, were you
19 finished?
20     A.  Can you rephrase the question? Maybe
21 I can answer it.
22 BY MS. SINGER:
23     Q.  So turning to your point about the
24 incidence or abuse epidemics you had seen at
25 FDA, did any of them relate to opioids?

Page 68

1      A.  Yes.
2      Q.  Which opioids?
3      A.  Do you wish me to include those that
4  occurred at FDA that were historical that I had
5  to learn about as the part of my job, or those
6  that actually occurred when I was -- on my
7  watch?
8      Q.  Let's do both. So let's start with
9  the ones you learned about that preceded you.
10     A.  Okay. During the -- I'm not sure of
11 the time frame. There has always been an effort
12 to try to develop less abusable opioids. Some
13 of the less abusable opioids were the partial
14 agonist or mixed agonist/antagonist opioids,
15 these are things like Talwin. I'm blanking,
16 it's been too long. I used to know them by
17 heart.
18     Those were developed and were put in
19 lower schedules of the drug abuse scheduling
20 categories because it was believed and sometimes
21 hoped that they would have less abuse potential.
22 Some of them developed widespread abuse problems
23 and had to be rescheduled. Some of them
24 developed local outbreaks of abuse that had to
25 be controlled. Some of them developed sentinel

Page 69

1  cases that were so horrific that the company had
2  to respond because the case was so tragic.
3      And so there was always pressure to
4  schedule, up-schedule drugs, there were always
5  pressures to do something to try to intervene in
6  abuse and diversion outbreaks.
7      Q.  And that pressure came, in your
8  opinion and experience, from a desire to protect
9  patients and public health, is that right?
10     A.  Yes, ma'am.
11     Q.  Okay. So that's the historical piece
12 that you were talking about, is that right?
13     A.  I blurred because --
14     Q.  Okay.
15     A.  That is also the things that happened
16 on my watch, some of the things that happened on
17 my watch.
18     Q.  And those things would be known to a
19 responsible company that was making and
20 marketing opioids, correct?
21     MR. SNAPP: Object to the form.
22     A.  That's tricky, because during that
23 time, not now, it's been too long, but during
24 that time I was an expert on pharmaceutical
25 problems associated with abuse of opioids. I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  not sure that most pharmaceutical physicians
2  would have the breadth of knowledge that I had
3  at that time.
4  BY MS. SINGER:
5      Q.  That's all knowledge you brought with
6  you to Purdue when you joined in 1998, correct?
7          MR. SNAPP:  Object to the form.
8      A.  I brought what I could with me to
9  Purdue in 1998.  I was still subject to the
10 Ethics in Government Act and the confidentiality
11 requirements of the FDA, so there were things
12 that I knew about that were not in the public
13 domain that I could not talk to people at Purdue
14 about.
15 BY MS. SINGER:
16     Q.  But could you talk to people at Purdue
17 about the history and experience of drug abuse
18 and drug diversion with opioids?
19         MR. SNAPP:  Object to the form.
20     A.  I was perfectly free to do that.
21 BY MS. SINGER:
22     Q.  All right.  And did you do that?
23     A.  I did do that.
24     Q.  So let's go back to Exhibit 3.  At
25 Bates number 73, so turn forward if you would,

Page 71

1  it's the page that has "Spyker" at the top of
2  it.  And do you see about halfway down an item
3  -- a publication that starts "Reder R"?
4      A.  Mm-hmm.
5      Q.  What is that publication?
6      A.  It looks like an abstract presented at
7  CPDD.
8      Q.  And that's an abstract that you wrote
9  in 1993, correct, or co-wrote?
10     A.  I believe I was cited as one of the
11 authors.
12     Q.  Okay.  Do you see yourself listed as
13 one of the authors?
14     A.  Yes, I do, ma'am.
15     Q.  Okay.  And who were the other two
16 authors?
17     A.  Robert Reder and Bob Kaiko.
18     Q.  And were they both at Purdue Pharma?
19     A.  At that time I believe they were.
20     Q.  And is that typical to co-author
21 publications from regulated entities?  You were
22 at FDA at the time, they were at Purdue Pharma,
23 yes?
24         MR. SNAPP:  Object to the form.
25 BY MS. SINGER:

Page 72

1      Q.  Was that typical for an FDA official
2  to co-author an abstract with pharmaceutical
3  executives?
4          MR. SNAPP:  Object to the form.
5      A.  It depends on the division.  In some
6  divisions it was not quite typical, in other
7  divisions it would not happen.
8  BY MS. SINGER:
9      Q.  Okay.  And do you remember how this
10 abstract in particular arose?
11     A.  I don't remember the abstract at all.
12     Q.  Okay.  And moving down your list of
13 publications under the "Presentations At
14 Symposia and Scientific Meetings," do you see
15 the publication "Abuse Liability and Drug
16 Scheduling"?
17     A.  Yes, ma'am.
18     Q.  And is that a publication you still
19 have?  Would you have retained a copy of that?
20     A.  I don't think so.
21     Q.  Okay.  What about moving down that
22 page, "Beyond Compliance with FDA Regulations"?
23     A.  That looks like it occurred at Purdue.
24     Q.  Okay.
25     A.  Everything that I did at Purdue I left

Page 73

1  at Purdue.
2      Q.  Okay.  Now, once you left Purdue, you
3  did not go to Endo, is that correct?
4      A.  I did not go to Endo.
5      Q.  Where did you go?
6      A.  After I left Purdue, I attempted to
7  support myself as an independent consultant,
8  pharmaceutical consultant.  I was unsuccessful
9  in this.  I eventually was contacted by Dan Carr
10 who asked me to come work on one of his projects
11 that later became Javelin Pharmaceuticals.
12     Q.  Is Dan Carr a professor in Boston?
13     A.  Dan Carr is a professor in Boston, and
14 a well-recognized analgesic expert.
15     Q.  Were you still at Purdue when Purdue
16 pled guilty to a series of misdemeanors relating
17 to its misbranding?
18         MR. SNAPP:  Object to the form.
19     A.  When did that occur, do you know?
20 BY MS. SINGER:
21     Q.  2007.
22     A.  No, ma'am.
23     Q.  And when you were at Purdue, did you
24 interact directly with any member of the Sackler
25 family?

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    A.  Very rarely.  I interacted with them
2  socially on two or three occasions.  I had a
3  couple of conversations with Dr. Richard or
4  Dr. Kathy because they were wanting to ask me
5  questions about some new thing they were
6  interested in, and that's about it.
7    Q.  And do you remember the specifics of
8  any of those conversations?
9    A.  I can't be certain.  I think one of
10  them involved someone who was presenting a novel
11  inhaled analgesic.  The other one I don't
12  remember.
13    Q.  Okay.  And did you ever interact with
14  them in particular on Opioid X?
15    A.  Well, it depends on what you mean by
16  "interact with them."  We gave multiple
17  presentations on Opioid X, and I'm sure that
18  some of them the Sacklers were at because it was
19  the annual scientific meeting or they came, but
20  I was just giving my presentation.
21    Q.  And the annual scientific meeting was
22  what?
23    A.  At one point during the year, and I
24  don't remember when it was, we would present to
25  the Sacklers what had happened to the -- what

Page 75

1  was -- what had happened, what was under
2  development, future directions that we might go.
3  We just got an assignment, and we did our
4  assignment and presented it.
5    Q.  Okay.  And that's what you refer to
6  being the annual scientific meeting, it was a
7  meeting between officials in the company and the
8  Sackler family?
9    MR. SNAPP:  Object to the form.
10    A.  It was a pretty big show, because I
11  think it was also to some of the other employees
12  who weren't directly involved in the research,
13  so it was usually held in a large venue.  I
14  don't know how frequently for sure, but I know
15  about it because I inadvertently sat in the
16  Sackler family section and quickly got shooed
17  out.
18  BY MS. SINGER:
19    Q.  Were you aware -- or was Purdue, to
20  your knowledge, involved in the development of
21  any addiction treatment drugs during your
22  tenure?
23    MR. SNAPP:  Object to the form.
24    A.  I truly don't know, because we had for
25  a period a drug development -- a drug discovery

Page 76

1  unit, and I don't know all of the things that
2  they worked on down there.
3  BY MS. SINGER:
4    Q.  Was the drug discovery group Purdue
5  Research Center, or did it have a different
6  name?
7    A.  I was only there twice, and I'm not
8  sure I know what the proper title of that place
9  was.
10    Q.  Okay.  Did you receive any deferred
11  compensation when you left Purdue, any kind of
12  severance or...
13    A.  To my recollection, I received a
14  severance package when I left Purdue.
15    Q.  And are you being compensated for
16  preparing or testifying today?
17    A.  Not to my knowledge.
18    Q.  You should probably know.
19    And do you know if Purdue is paying
20  for your counsel?
21    A.  I hope Purdue is paying for my
22  counsel.
23    Q.  Fair enough.
24    All right.  Let's turn back to your
25  time at the FDA.  So I think you've already

Page 77

1  testified, if not I'll ask you again, you worked
2  on the new drug application for OxyContin,
3  correct?
4    A.  That is correct.
5    Q.  And had you been involved with
6  oxycodone related products before, oxycodone
7  products before?
8    A.  I don't remember.
9    Q.  And had you been involved in any
10  controlled-release product approval?
11    A.  Yes.
12    Q.  And had you ever been involved in
13  assessing or approving the controlled-release
14  version of an existing drug?
15    A.  Could you repeat the question?
16    Q.  Yes.
17    Had you ever been involved in
18  assessing or approving the controlled-release
19  version of an existing drug?
20    A.  Yes.
21    Q.  Do you remember which one that was?
22    A.  There were -- no.  There were a bundle
23  of opioid controlled-release forms that came
24  piling in, and I was involved -- would have been
25  involved with them, but I don't remember them

Page 78

1  one by one.
2      Q.  Do you recall what you were looking
3  for in deciding whether to approve OxyContin?
4      MR. SNAPP:  Object to the form.
5      MR. PETRILLO:  Objection.
6      Let me just direct you, Dr. Wright,
7  not to reveal any communications within FDA,
8  which I don't think you're permitted to do.
9      A.  I can speak of my own, for myself
10  personally.  I cannot speak for the FDA.  The
11  FDA speaks for the FDA.  When a -- there was
12  a -- I won't say fad.  But there was a period in
13  which controlled-release technology made
14  advances, and people brought in a variety of
15  drugs wishing to have controlled-release dosing,
16  and those were referred to as immediate-release
17  to controlled-release switches.
18      The important features that were
19  always looked at by me were what's the peak
20  concentration at the proposed dosing interval,
21  what's the trough concentration, are there any
22  safety hazards associated with the product that
23  are associated with its controlled-release
24  features, and where it needed to be, where
25  appropriate, what was the clinical efficacy

Page 79

1  outcomes and what were -- were there any
2  unanticipated safety outcomes.  That's what I
3  would look for.
4  BY MS. SINGER:
5      Q.  And can you just explain briefly the
6  difference between an immediate-release and a
7  controlled-release drug?
8      A.  Yes, I can.
9      Q.  Could you?
10      A.  An immediate-release drug, the
11  absorption is determined by the drug
12  theoretically dissolves immediately upon entry
13  into the stomach, and then is absorbed at a rate
14  that's determined by the transmission across the
15  stomach into the bloodstream and passage through
16  the liver and lungs.
17      For a controlled-release, the tablet
18  has some intrinsic property, tablet, patch,
19  lozenge, something you put in your mouth,
20  there's all kinds of different ways, has some
21  intrinsic property that slows the release and
22  delivers the drug over time.
23      Q.  Okay.  And you talked a minute ago
24  about looking at the peak concentration.  Can
25  you explain what that is?

Page 80

1      A.  When you -- yes, I can.
2      Q.  Please go ahead.
3      A.  When you take a drug you have -- we'll
4  assume you haven't taken it before, there's a
5  lag because you have to get into your stomach,
6  and then the blood level in your blood will
7  start to rise, it will reach a peak, and then it
8  will start to fall, and then it will fall to
9  subtherapeutic levels.
10      Q.  And why does the peak matter?
11      A.  Generally the speak is associated with
12  the peak effect and the peak toxicity.
13      Q.  Okay.  Meaning that's when you get the
14  benefit of the drug?
15      MR. SNAPP:  Object to the form.
16      A.  And the bad things.
17  BY MS. SINGER:
18      Q.  And then you talked about looking at
19  the trough, correct?  And why does the trough
20  matter to you?
21      A.  The trough is when the effect can wear
22  off, and the drug is no longer providing the
23  benefits to the patient.
24      Q.  Okay.  All right.  So you mentioned
25  before you're looking at the peak, you're

Page 81

1  looking at the trough, I think you also said,
2  correct me if I'm wrong, that you're looking at
3  efficacy.  When you were looking at the
4  efficacy, did you want to see that the
5  controlled-release had the same efficacy as the
6  immediate-release?
7      MR. SNAPP:  Object to the form.
8      A.  Desirable, but not necessary.
9  BY MS. SINGER:
10      Q.  Okay.  And did it matter from -- well,
11  at the time OxyContin was assessed and approved,
12  was there any discussion of what it would be
13  scheduled as?
14      MR. SNAPP:  Object to the form.
15      A.  You're asking about discussions that
16  took place within the Food and Drug
17  Administration, and that is privileged, I
18  believe.
19      However, oxycodone is a Schedule II
20  opioid, and I cannot imagine it ever being
21  anything but a Schedule II opioid.
22  BY MS. SINGER:
23      Q.  Okay.  Now, you were the medical
24  officer who also reviewed the studies Purdue
25  submitted with its application, correct?

Page 82

1    A.  No.

2    Q.  Did you review any of the studies?

3    A.  Yes, I reviewed all of them, but I was

4  not the primary reviewer on some of the studies.

5    Q.  And FDA doesn't conduct any of its own

6  studies in approving a drug, does it?

7       MR. SNAPP:  Object to the form.

8    A.  You're asking a question that extends

9  beyond my knowledge, because FDA does conduct

10  studies and it -- but it is not routine for

11  pharmaceutical company applications for -- well,

12  FDA does conduct studies.  The extent and

13  magnitude of studies that they conduct and when

14  they conduct them is beyond my knowledge because

15  it is so broad.

16  BY MS. SINGER:

17    Q.  Did FDA conduct any of its own studies

18  related to OxyContin?

19    A.  Prior to approval?

20    Q.  Yes.

21    A.  Not to my knowledge.

22    Q.  Did it conduct any studies after its

23  approval?

24    A.  If they occurred after '97, I wouldn't

25  know.

Page 83

1    Q.  Okay.  And in assessing and approving

2  OxyContin, the new drug application for

3  OxyContin, you relied on the studies that Purdue

4  submitted and the general literature, correct?

5       MR. SNAPP:  Object to the form.

6    A.  As a matter of policy we would have

7  relied upon the studies that were conducted by

8  the company, the reports of the division of

9  scientific investigations on the conduct of

10  those studies after they investigated them, our

11  general knowledge, the results of other -- other

12  science that the agency held that would tell

13  them about the safety or efficacy of a potential

14  product, general knowledge of the reviewers, and

15  I think that's about it.

16    Q.  Okay.  And as part of the approval

17  process you developed a package insert, correct?

18    A.  No.

19    Q.  Okay.  Correct --

20    A.  The company developed a package

21  insert.

22    Q.  Okay.  And you worked with Purdue on

23  various drafts of that package insert, is that

24  correct?

25    A.  Everyone involved would work with

Page 84

1  Purdue on various drafts.

2    Q.  And the original draft of the package

3  insert you said came from Purdue?

4    A.  Yes, although at that time it was

5  fairly common for us to provide companies with

6  an outline of what we were trying to move the

7  controlled substances package inserts towards.

8  They were very heterogenous because they covered

9  a 30, 40 year span, and some of them were very

10  good and some of them were very bad, and I was

11  directed by my division director.

12       MR. PETRILLO:  Objection.

13       If you can testify without talking

14  about conversations or directions from within

15  the FDA, that would be preferable.

16       THE WITNESS:  Yes, I'm sorry.

17       MR. PETRILLO:  If you want to testify

18  to what you actually did, that's fine.

19    A.  Okay.  I had for some reasons a goal

20  of trying to get a good package insert for all

21  the narcotics that were coming in for re-review

22  or new review.

23  BY MS. SINGER:

24    Q.  And what's a good package insert?

25    A.  One that has a reasonably -- has

Page 85

1  reasonably uniform language, is comprehensible,

2  is clear, and has easy to find sections in which

3  you can find specific information that you need

4  to know as a doctor.

5    Q.  Now, there is a separate division at

6  FDA that oversees some of the promotional

7  activities related to prescription drugs,

8  correct, that didn't fall in your division?

9    A.  No, there's the division of drug

10  advertising.

11    Q.  Okay.  Also known as DDMAC, correct?

12    A.  DDMAC.

13    Q.  And you weren't directly involved in

14  overseeing the promotion of OxyContin?

15       MR. SNAPP:  Object to the form.

16    A.  I was not directly involved in

17  overseeing the promotion of OxyContin.

18  BY MS. SINGER:

19    Q.  Okay.  And you seemed to hesitate.

20  Was there a reason for that?

21    A.  Yes.  DDMAC often used us as a

22  technical reference.

23    Q.  And were you a technical reference in

24  any of the promotion relating to OxyContin?

25       MR. SNAPP:  Object to the form.

Page 86

1    A. I think you're asking about -- I think
2  I can't answer that properly.
3  BY MS. SINGER:
4    Q. Okay. So as a matter of policy and
5  practice, the FDA's marketing oversight is
6  related to marketing or promotional pieces that
7  are distributed by a pharmaceutical company, is
8  that correct?
9        MR. SNAPP: Object to the form.
10    A. To my understanding, yes.
11  BY MS. SINGER:
12    Q. Okay. And the FDA does not have a
13  role in all of the different ways that a
14  prescription drug is promoted, correct?
15        MR. SNAPP: Object to the form.
16    A. I truly don't know. I know that we
17  have -- that the FDA had a division of drug
18  advertising. I do not know the breadth or
19  extent of their responsibilities or powers.
20  BY MS. SINGER:
21    Q. Okay. And do you have a view as to
22  who is responsible -- a view as to whether it's
23  a drug company's responsibility to ensure that
24  its marketing is accurate and fair and balanced?
25    A. My understanding of the regulations

Page 87

1  are that a drug company has a responsibility to
2  meet the DDMAC guidelines in marketing their
3  product.
4    Q. And that includes making sure that
5  their advertising is fair and balanced and
6  accurately conveys the risks and benefits of a
7  product?
8        MR. SNAPP: Object to the form.
9    A. It's hard to be accurate in answering
10  you because I didn't work in DDMAC, and I don't
11  know the extent to which their -- I don't know
12  their standards.
13  BY MS. SINGER:
14    Q. Fair enough.
15        Looking at it from the perspective of
16  the label, then, which is really where you were
17  working, is that correct?
18        MR. SNAPP: Object to the form.
19  BY MS. SINGER:
20    Q. The FDA -- the fact that there is an
21  FDA-approved label and package insert -- I'm
22  sorry, let's step back.
23        What is a package insert?
24    A. A package insert is the full labeling
25  information -- full prescribing information for

Page 88

1  a drug which should be reviewed by anybody who
2  prescribes it, and is a source document that is
3  used to assess the use, dosage, safety, and
4  special precautions involved in prescribing a
5  drug.
6    Q. And do you remember roughly how long
7  the package insert was for OxyContin, how many
8  pages?
9    A. Many.
10    Q. Can you count them on your fingers
11  again, or do we have to get extra hands?
12    A. It would depend on the typeface. But
13  20, 30.
14    Q. Pages?
15    A. (Nodding in the affirmative).
16    Q. Okay. And the fact that there is --
17  and the FDA approves the package insert,
18  correct?
19        MR. SNAPP: Object to the form.
20    A. It's difficult because I don't know
21  whether the FDA approves a package insert or
22  does not object to a package insert, but the FDA
23  certainly reviews a package insert.
24  BY MS. SINGER:
25    Q. Okay. And the fact that the FDA has

Page 89

1  reviewed or approved a package insert, whatever
2  the right term is, the right verb, that doesn't
3  prevent a company like Purdue from warning of
4  additional risks that become known to it, is
5  that correct?
6        MR. SNAPP: Object to the form.
7    A. That's a tough problem, because I
8  don't know if a company -- and it's come up. I
9  don't know if a company can provide additional
10  -- can change its package insert to provide
11  additional warnings without notifying the agency
12  and getting their lack of disapproval or
13  approval, whatever it is. I don't know for
14  sure.
15  BY MS. SINGER:
16    Q. You don't know. Okay. We'll leave it
17  there then.
18        There are other ways that a drug
19  company discloses risks to prescribers and
20  patients, correct, outside of the package
21  insert?
22        MR. SNAPP: Object to the form.
23    A. You're asking questions about DDMAC
24  practice that I -- that are beyond my expertise.
25  BY MS. SINGER:

Page 90

1    Q.  Okay.  So turning away from DDMAC, is
2  it fair to say that a pharmaceutical company is
3  responsible for ensuring that the drugs they
4  sell are safe and effective?
5       MR. SNAPP:  Object to the form.
6    A.  Again, that's tricky, because it's
7  safe and effective used as directed.  And the
8  goal of the whole FDA approval process is that
9  the product reaches the market safe and
10  effective used as directed.
11  BY MS. SINGER:
12    Q.  And that -- and is it fair to say that
13  there's an expectation that there's an alignment
14  between the indication and the use?
15       MR. SNAPP:  Object to the form.
16    A.  That is a -- no.  That is a painful
17  and sore point.  The FDA is federal, and it
18  regulates the pharmaceutical industry.  The
19  regulation of the practice of medicine devolves
20  to the individual states.  So it would not be
21  unusual for a medication to have off-label use
22  and off-label indications that are not
23  referenced in the package insert, but which are
24  used by physicians.
25  BY MS. SINGER:

Page 91

1    Q.  Off-label indicate -- actually we
2  don't need to go down that rabbit hole.
3       And a drug company in its outreach in
4  marketing a product interacts with healthcare
5  prescribers, healthcare providers about the use
6  of its drug, correct?
7       MR. SNAPP:  Object to the form.
8    A.  Yes, ma'am.
9  BY MS. SINGER:
10    Q.  And when we get into the regulation of
11  that we leave your area of expertise, correct?
12    A.  (Nodding in the affirmative).
13    Q.  Okay.  Let's turn to the next exhibit,
14  which is 1484.
15       (Whereupon, Purdue-Wright-4 was marked
16       for identification.)
17       MS. SINGER:  I think we're back down
18  to two of these.  Exhibit 4 is PKY180764184.
19  And it's titled Project Team Contact Report.
20  BY MS. SINGER:
21    Q.  And, Dr. Wright, I see you're looking
22  at it.  Is it familiar to you, this form of
23  document?
24       (Witness reviewing document.)
25    A.  No.  This is a company document.

Page 92

1    Q.  Okay.  "A company" meaning a Purdue
2  document?
3    A.  (Nodding in the affirmative).
4    Q.  Okay.  And if you can take a look at
5  the content of the discussion, and just read it
6  to yourself for a moment.
7       (Witness reviewing document.)
8    Q.  Do you recall the discussion that's
9  described in this project team contact report?
10    A.  No, I don't, ma'am.
11    Q.  Okay.  Do you recall talking to
12  Dr. Reder about osteoarthritis studies related
13  to OxyContin?
14    A.  This document says that I did.  I
15  don't remember.
16    Q.  Okay.  All right.  Let's turn to --
17       (Whereupon, Purdue-Wright-5 was marked
18       for identification.)
19  BY MS. SINGER:
20    Q.  Exhibit 5 is PDD 9520512001.  And it's
21  titled -- it is the second exhibit from the
22  deposition of you, Dr. Wright, July 25th of
23  2003, the font is really difficult, but I'd like
24  to direct you to Bates number 263.
25       All right.  Do you see your name as an

Page 93

1  FDA attendee in the middle of this page?
2    A.  Yes.
3       MR. SNAPP:  Do you think we could give
4  the witness the time to just look through the
5  document to make sure he knows what it is?
6       MS. SINGER:  If he needs it,
7  absolutely.
8       MR. SNAPP:  Thank you very much.
9       (Witness reviewing document.)
10  BY MS. SINGER:
11    Q.  All right.  Do you recognize this
12  document, Dr. Wright?
13    A.  (Nodding in the negative).
14    Q.  Okay.  Do you see --
15    A.  I'm sorry, I have to respond verbally.
16  I don't remember it now.
17    Q.  Okay.  Thank you for policing yourself
18  on that.
19       Do you see yourself in the middle of
20  Bates number 263 as an FDA attendee at this
21  meeting?
22    A.  Yes, I do, ma'am.
23    Q.  Okay.  And do you know who Ms. Emmet
24  is?
25    A.  She would have been a consumer safety

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  officer at the Food and Drug Administration.
2      Q.  Okay.  And do you see, if you look at
3  the first line on the paragraph, the bottom
4  paragraph that starts "Ms. Emmet began the
5  meeting with a strong recommendation that Purdue
6  Frederick participate in the Pilot Drug
7  Division's pilot management system for reviewing
8  drug development programs."
9          Do you see where I am?
10     A.  Yes.
11     Q.  What is the pilot drug division
12 project management system?
13     A.  It was how we handled new drug
14 applications or drug development programs with
15 companies when we could.
16     Q.  Okay.  And what was the pilot about
17 it?
18     A.  When I was hired into the FDA, I was
19 initially to go to the neuropharm division, but
20 between the time that I applied and I showed up
21 the drug class that I was working with had been
22 transferred to something called the pilot drug
23 evaluation staff, and that was a division that
24 reported directly to the center director and was
25 led by Dr. John Harter that was specifically

Page 95

1  tasked with improving the agency's effect -- the
2  Center for Drug's effectiveness in reviewing new
3  drug applications.
4      Q.  Okay.  And when you talk about the
5  center, just tell us which center it is.
6      A.  Center for Drugs.
7      Q.  Okay.  Is that also known as CDER?
8      A.  Yes, ma'am.
9      Q.  And it says here -- so do you know if
10 Purdue participated in the pilot drug division's
11 project management system in its application for
12 OxyContin?
13     A.  I believe they did.
14     Q.  Okay.  And if you move down this
15 paragraph, about four lines up it says "Each
16 interaction between FDA and PF should be
17 recorded and submitted to the IND (batching of
18 records may be done on a regular basis).  The
19 timelines for each of FDA's projects is reviewed
20 monthly at FDA, a meeting to which the PF
21 project manager is also invited.  PF is
22 responsible for keeping minutes of all meetings.
23 These will be official minutes unless FDA
24 disagrees."
25          Have I read that correctly?

Page 96

1      A.  You have read that correctly.
2      Q.  Okay.  And so PF is Purdue Frederick.
3  And the IND is what you talked about earlier,
4  the drug approval process?
5      A.  No, the IND is investigational new
6  drug application which is the document that
7  permits new drug studies to be started and done.
8      Q.  Okay.  So do you recall Purdue
9  submitting minutes of its meeting with FDA, and
10 you in particular?
11     A.  They would have gone to Ms. Emmet or
12 to the other consumer safety officer, and I may
13 or may not have seen them.  I don't remember any
14 of them.
15     Q.  Okay.  And do you know whether it was
16 the practice of Ms. Emmet or FDA to review these
17 minutes?
18     A.  It was my belief that they did.
19     Q.  And then while we're in this document,
20 let's turn the page to 265.  Right in the middle
21 of the page it says "Dr. Wright will send his
22 FDA's high dose opioid policy to facilitate our
23 generation of labeling with respect to the
24 warning section."
25          Do you see where I am?

Page 97

1      A.  I see where you are.
2      Q.  Okay.  And what is the FDA high dose
3  opioid policy?
4      A.  I don't know it by that name.  With, I
5  think it was -- I can't remember the product
6  but I think it was Duragesic, it was the first
7  time that a company submitted a request for a
8  high dose opioid that would be too high to give
9  to an opioid naive patient, someone who had not
10 received opioids before, that if by accident it
11 was prescribed or used for a patient that was
12 not -- did not have opioid tolerance, that they
13 could get sick or die.  And I was, as a reviewer
14 and as a doctor, very concerned about that.  And
15 I remember struggling with how to identify,
16 flag, package, think about, label such products
17 so that such accidents wouldn't happen.
18     Q.  Okay.  And so that's what you think is
19 expressed by the high dose policy?
20     A.  I think so.
21     Q.  Okay.  And do you know if there's an
22 official document that reflects it?
23     A.  I don't know.
24     Q.  And then let's turn to Exhibit 5 -- 6.
25

Page 98

1    (Whereupon, Purdue-Wright-6 was marked
2    for identification.)
3    BY MS. SINGER:
4    Q.  And Exhibit 6 is PPLPC018000725809
5    titled "Criticisms and Allegations Potentially
6    Requiring Response in Connection with the Senate
7    Finance Committee Inquiry."
8        Are you familiar with this document?
9    A.  No, I am not, ma'am.
10   Q.  Okay.  So I just want to turn to Bates
11   number 809 -- that's wrong.  5857.  And you see
12   the section -- I'll let you get there.  You have
13   your own heading, "Purdue did not improperly
14   influence Dr. Curtis Wright."
15       Do you see that?
16   A.  Yes.
17   Q.  And do you see halfway through the
18   page in the paragraph beginning "Critics," three
19   lines from the bottom of that paragraph, "Purdue
20   recorded all communications with Dr. Wright,
21   whether formal or informal, in internal contact
22   reports, and submitted summaries of such reports
23   to the FDA on a regular basis."
24       Do you see that?
25   A.  Yes, I do.

Page 99

1    Q.  Okay.  And does that seem consistent
2    with what we were just talking about with the
3    regulatory contact reports?
4        MR. PETRILLO:  Objection to form.
5    A.  I only know my side of communications
6    with Purdue and with other companies during that
7    period of time, and we simply never met with the
8    company alone and always had the consumer safety
9    officer with us.  So the consumer safety officer
10   should have had personal access to either the
11   communication as it was occurring and her notes,
12   or whatever notes the company may have written.
13   BY MS. SINGER:
14   Q.  Okay.  And that would have been
15   Ms. Emmet in this case?
16       MR. SNAPP:  Object to the form.
17   A.  Consumer safety officers sometimes
18   covered for each other and changed in the course
19   of a project, but it would have been whoever the
20   duty consumer safety officer was.
21   BY MS. SINGER:
22   Q.  Okay.  All right.  I want to turn back
23   to what was Exhibit 4, which is the project team
24   contact report, which is PKY180764184.  It's the
25   short one, Dr. Wright.  I may have given the

Page 100

1    wrong number.
2    A.  Okay.
3    Q.  Okay.  Is that Exhibit --
4    A.  4.
5    Q.  -- 4?  Okay.
6        All right.  And I know you didn't
7    recall this document, but I just want to see if
8    any of the content here refreshes your
9    recollection.  It says three lines down, "Of
10   greater importance is the fact Dr. Wright said
11   that for certain individuals in the division and
12   in the agency, the use (i.e., long-term) in
13   osteoarthritis is unwarranted."
14       Do you recall saying that to Purdue
15   Pharma?
16   A.  I don't recall it, but it is very
17   likely.
18   Q.  And what do you base that on?
19   A.  Our division -- as a matter of policy,
20   our division was very sensitive to claims for
21   therapeutic efficacy and osteoarthritis because
22   we also handled the non-steroidal
23   anti-inflammatory drugs, and that is a huge
24   issue with that class of drugs, and I can
25   readily believe that I made explicit statements

Page 101

1    to Purdue that this is not a drug for unselected
2    OA.
3    Q.  OA is?
4    A.  Osteoarthritis.
5    Q.  It goes on to say "The way the
6    protocols are written, it looks as if Purdue
7    Frederick is attempting to obtain labeling
8    claims for pain from osteoarthritis.  This will
9    be strongly resisted."
10       That strikes you as true as well?
11       MR. PETRILLO:  Objection.
12   A.  It is very typical of what we would
13   have said.
14   BY MS. SINGER:
15   Q.  Now, osteoarthritis, if you know, is a
16   fairly prevalent condition, is it not?
17       MR. SNAPP:  Object to the form.
18   A.  As with most medical conditions, it
19   depends on what you mean.  Osteoarthritis can be
20   my fingers are a little sore in the morning, and
21   osteoarthritis could be I can't walk, and I've
22   been out of it too long to know what the current
23   numbers are for severity by diagnosis.
24   Q.  Or prevalence, just what percentage of
25   the population has it?

Page 102

1    A.  Osteoarthritis is common.  Severe
2  osteoarthritis is less common.
3    Q.  And then if you keep going down this
4  page, it says single -- "and that Purdue
5  Frederick recognizes single-entity opioid use is
6  not appropriate except in a highly selected
7  subpopulation."
8    Do you see where that is?
9    A.  Yes, I do.
10    Q.  And does that seem accurate to you as
11  well?
12    MR. PETRILLO:  Objection.
13    MR. SNAPP:  Object to the form.
14    A.  I don't -- reading it now, I don't
15  know what Purdue recognized or didn't recognize.
16  BY MS. SINGER:
17    Q.  Okay.
18    A.  The statement that opioids are not --
19  single entity opioids are not for general use in
20  osteoarthritis is medically, to my opinion,
21  true.
22    Q.  Is what?
23    A.  To my opinion is medically true.
24    Q.  A single entity opioid is what?
25    A.  One which does not contain another

Page 103

1  analgesic agent.
2    Q.  Like acetaminophen, for instance?
3    A.  Like Tylenol or NSAIDs or...
4    Q.  And OxyContin is a single entity
5  opioid, correct?
6    A.  Yes, it is.
7    Q.  Okay.  So last line from this, if you
8  can look at, "If we wish to perform a long-term
9  study in osteoarthritis patients, we should
10  study highly selected patients.  Such a study
11  should include questionnaires and data
12  collection directed toward evaluation of abuse,
13  evaluation of diversion, increased use with time
14  (tolerance), efficacy and safety."
15    What do you understand this to mean?
16    MR. SNAPP:  Object to the form.
17    A.  If an indication, a label indication
18  in osteoarthritis is sought, then it's a big
19  job.
20  BY MS. SINGER:
21    Q.  Then it's a big?
22    A.  Job.  It's a much -- it is a much
23  bigger application.
24    Q.  Meaning the sponsor, the applicant,
25  has to submit --

Page 104

1    A.  The applicant has a much higher burden
2  of proof.
3    Q.  Okay.  And that would include a study,
4  correct?
5    A.  Well, that was our -- yes, that was
6  our opinion.  If this is an accurate document, I
7  don't see a reason why it's not, we said that
8  they needed to do a lot of safety work to -- and
9  efficacy work to promote the drug for any, but
10  highly selected cases of osteoarthritis.
11    Q.  Okay.
12    MR. SNAPP:  Is this a good time for a
13  break?
14    MS. SINGER:  Let me just finish this
15  document.
16    MR. SNAPP:  Absolutely.
17  BY MS. SINGER:
18    Q.  And the study included outcome
19  measures related to abuse, diversion, tolerance.
20  Let's stop with those three.  Do you know why
21  those would have been elements or outcomes on
22  which you were focused?
23    MR. SNAPP:  Object to the form.
24    A.  I know why now, if I can answer in the
25  present.

Page 105

1  BY MS. SINGER:
2    Q.  Sure.
3    A.  Abuse, diversion, tolerance, and
4  withdrawal are always issues with the chronic
5  use of opioids.
6    Q.  And you answered that now.  What would
7  your answer have been in 1993?
8    MR. SNAPP:  Object to the form.
9    A.  Okay.  To the best of my recollection,
10  abuse, diversion, tolerance, and withdrawal
11  would have been important questions about the
12  chronic use of any opioid.
13  BY MS. SINGER:
14    Q.  Okay.  Which seems confirmed by the
15  elements of this study?
16    MR. SNAPP:  Object to the form.
17    MS. SINGER:  All right.  I think now
18  is a good time for a break.
19    THE VIDEOGRAPHER:  We are now going
20  off the record, and the time is 11:24 a.m.
21    (Whereupon, a recess was taken.)
22    THE VIDEOGRAPHER:  We are now going
23  back on the record, and the time is 11:36 a.m.
24  BY MS. SINGER:
25    Q.  All right.  We're going to start with

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1　another exhibit, Dr. Wright. This way we go
2　home with less paper. So this is Exhibit
3　Number 7, it is PKY180761078. And please take a
4　minute and see if you recognize this document.
5　　　(Whereupon, Purdue-Wright-7 was marked
6　　　for identification.)
7　　　(Witness reviewing document.)
8　BY MS. SINGER:
9　　Q. The longer we're here today the
10　smaller the font gets. So I'm going to pose the
11　question, whenever you're ready to answer,
12　please do.
13　　　Do you recognize these to be minutes
14　of a meeting between Purdue Pharma and the FDA.
15　And if you don't recognize it, that's fine, too.
16　　A. I don't recognize this document.
17　　Q. Okay. I want you to turn to Bates
18　number 1088 and see if you are familiar with the
19　conversation described here.
20　　　So if you look at Paragraph 8 that
21　starts Dr. Lacouture, I'm sure I didn't say that
22　correctly, and it says -- it's talking about an
23　OA extension study, correct?
24　　A. What I read here is an extension study
25　that is proposed.

Page 107

1　　Q. Okay. And that's related to
2　OxyContin, correct?
3　　A. I believe so.
4　　Q. Okay. And it says here that you said
5　-- "Dr. Wright said that while these data are
6　valuable, he would not allow advertising for the
7　management of osteoarthritis. To promote in
8　this area we would need several more controlled
9　studies and then review of the data by at least
10　two FDA advisory panels."
11　　　Do you recall having that
12　conversation?
13　　A. I do not recall having that
14　conversation. It, however, sounds like me.
15　　Q. Okay.
16　　　MR. PETRILLO: I think you may be
17　blocking your mic.
18　BY MS. SINGER:
19　　Q. All right. And this is consistent
20　again with your prior remarks, that it would be
21　a heavy lift or a big load, or whatever phrase
22　you used previously?
23　　　MR. SNAPP: Object to the form.
24　　A. Was that a question?
25　BY MS. SINGER:

Page 108

1　　Q. Yes. Is that correct?
2　　　MR. SNAPP: Object to the form.
3　　A. What is written here, which says that
4　there would be a heavy data requirement, and
5　that it would likely be reviewed not only by the
6　drug abuse advisory committee but the arthritis
7　advisory committee is correct.
8　BY MS. SINGER:
9　　Q. Okay. All right. We're going to turn
10　to Exhibit 8.
11　　　(Whereupon, Purdue-Wright-8 was marked
12　　　for identification.)
13　BY MS. SINGER:
14　　Q. And Exhibit 8 is PDD7024302094.
15　　A. Is this the same? Does it come apart?
16　　　MR. PETRILLO: You keep that one.
17　BY MS. SINGER:
18　　Q. And it's titled "Author: Dr. James
19　Conover."
20　　　Do you recognize that name?
21　　A. I've heard the name before. I'm not
22　sure I know who James Conover is now.
23　　Q. Okay. Was he at Purdue, or FDA, if
24　you recall?
25　　A. I think he was company. I'm not sure

Page 109

1　he was Purdue.
2　　Q. Okay. All right. And the date of
3　this document is 9/15/94, correct?
4　　A. Mm-hmm.
5　　Q. And its subject is "FDA Meeting
6　Minutes," correct?
7　　A. Yes.
8　　Q. Okay. I want you to turn, if you
9　will, to Bates number 2102, just towards the end
10　of the document. If you look about halfway
11　down, why don't you read this time, if you
12　would, "Dr. Wright stated he had a little
13　trouble." Do you see where I am?
14　　A. Yes. "Dr. Wright stated he had a
15　little trouble with the claim 'the drug to start
16　with and stay with' because he was unsure of
17　titration with OxyContin tablets. He offered
18　the idea of marketing a 10-milligram IR
19　oxycodone tablet to have patients titrated on
20　first and then be switched to OxyContin."
21　　Q. Okay. You can stop there.
22　　　So do you recall this conversation?
23　　A. No, I do not.
24　　Q. Okay. And do you understand what this
25　language is referring to?

Page 110

1    A.  Well, I can only -- I mean, I can only
2  say what it says in this document, which is, I
3  think, is likely to be correct-ish.
4    Q.  Okay.
5    A.  The drug to start with and stay with
6  sounds like a marketing phrase, and it's not --
7  what it says here sounds like me, and most
8  physicians would start with an IR drug --
9    Q.  And IR is immediate-release?
10   A.  Immediate-release drug.
11     -- and then switch to a
12 controlled-release, unless the patient's
13 condition warranted going directly to a
14 controlled-release drug.
15   Q.  Okay.  And is it fair to say that
16 before OxyContin was launched you were concerned
17 about positioning OxyContin as the first opioid
18 to try?
19     MR. SNAPP:  Object to the form.
20   A.  I truly can't remember if I was
21 concerned with it at that time.
22 BY MS. SINGER:
23   Q.  Okay.  Let's move on to 185.  Oh,
24 we've done it before?
25     MS. FORSTER:  Exhibit 4.

Page 111

1     MS. SINGER:  Okay.
2  BY MS. SINGER:
3    Q.  All right.  Exhibit 4, if you could
4  pull that one back out, please.  If you could
5  look in the middle of the page here, "In
6  exclusion criteria, Dr. Wright suggested we have
7  an exclusion such as: patient excluded if he/she
8  has satisfactory management of pain with full
9  dose NSAID."
10     Do you see where I am?
11   A.  No.
12   Q.  It's right in the middle.
13   A.  Which page?
14   Q.  I'm sorry, it is Bates number 185.
15   A.  185.  Okay.  Thank you.  So it's that
16 paragraph "In exclusion criteria."
17     MS. SINGER:  Can whoever on the phone
18 be on mute, please?  We're getting a lot of
19 background noise.
20   A.  I see what you refer to.
21   Q.  Okay.  And do you recall that
22 conversation?
23   A.  No, I do not.
24   Q.  Okay.  And is it accurate to say your
25 view was that patients who were doing well on

Page 112

1  NSAIDs should be excluded from a start on
2  OxyContin?
3     MR. SNAPP:  Object to the form.
4    A.  It wasn't my view.  It was the WHO
5  analgesic ladder at the time.
6  BY MS. SINGER:
7    Q.  And can you explain that?
8    A.  The World Health Organization had some
9  guidelines for pain management, and that was --
10 we called it the WHO ladder, and it was intended
11 to guide physicians --
12     MS. SINGER:  Excuse me, Dr. Wright.
13     On the phone, please mute.  You're
14 interrupting the deposition.
15   A.  And the goal of it was to increase the
16 likelihood that the patients' benefits
17 outweighed the risks or adverse events.  And WHO
18 ladder has been subject to much controversy in
19 the pain management community, but it basically
20 is start with non-opioid drugs, add opioid
21 drugs, then go to the heavy opioid drugs.
22 BY MS. SINGER:
23   Q.  And in terms of your views, does that
24 seem like the right approach?
25     MR. PETRILLO:  Today?

Page 113

1    A.  Today, then, whenever?
2  BY MS. SINGER:
3    Q.  Why don't we start with today.
4    A.  Okay.  As modified by who the patient
5  is and what their condition is.  Ladders of that
6  type, stepped care paradigms, were extremely
7  popular back in the '70s and '80s, first do
8  this, then do this, then do this, then do this.
9  There was some controlled studies, which I can't
10 cite, I'm sorry, that showed that when
11 physicians were allowed to modify those stepped
12 care protocols the outcomes were better, because
13 if you had a patient who had mild osteoarthritis
14 you would start with a non-steroidal.  But if
15 you had a patient who had two knees that were so
16 damaged they couldn't walk, you wouldn't start
17 with -- necessarily start with a non-steroidal
18 in that case.
19   Q.  So again, please correct me because I
20 don't want to put words in your mouth, the
21 stepped ladder provides a baseline that should
22 be your starting guidepost, but you can vary
23 from that for particular patients where
24 warranted.  Is that accurate as to your views?
25   A.  Could you repeat that again?

Page 114

1  Q.  No.  But I can read it back.
2  A.  Okay.
3  Q.  Which is, correct me because I don't
4  want to put words in your mouth, the stepped
5  ladder provides a baseline that should be your
6  starting guidepost, but you can vary from that
7  for particular patients where warranted?
8  A.  With a change.  The general approach
9  in that period of time was to start with the WHO
10  ladder and modify as necessary to meet the needs
11  of your individual patient.
12  Q.  Okay.  And is that your view now or
13  then?
14  MR. SNAPP:  Object to the form.
15  A.  I decline to answer because there's
16  been an enormous amount of research in the use
17  of opioids for pain since that time, and I am
18  not familiar with all of that research and what
19  their findings have been.  In general I still
20  remain convinced that you should start with the
21  drug with the least risk and move up toward the
22  riskier drugs if you need them.
23  BY MS. SINGER:
24  Q.  Okay.  And the riskier drugs would be
25  the opioids?

Page 115

1  MR. SNAPP:  Object to the form.
2  A.  Not exactly.  There are -- there's --
3  there are patients for whom NSAIDs are much
4  riskier than opioids, and NSAIDs are subject to
5  dose duration limits that opioids are not.
6  People treat -- you're asking fairly
7  sophisticated medical management questions.
8  There are patients for whom NSAIDs are very
9  toxic indeed.  There are patients for whom
10  opioids are high risk indeed.  And your goal, if
11  you were a thoughtful physician, is to try to
12  evaluate each single patient and say how can I
13  manage their pain with the best chance of
14  getting them relief and the least chance of
15  hurting them or others.
16  BY MS. SINGER:
17  Q.  And again, just to make sure I
18  understand you, the idea is that the WHO ladder
19  is a guideline, you start with NSAIDs, you move
20  up the ladder to opioids, recognizing that for
21  some patients NSAIDs may not be the right
22  choice, and for patients with more severe
23  conditions opioids may be the right choice?
24  MR. SNAPP:  Object to the form.
25  A.  There's not uniformity of medical

Page 116

1  opinion on this topic, because it depends on
2  what the pain disease -- what pain condition
3  you're treating.  Some respond to NSAIDs
4  beautifully, some don't respond to opioids at
5  all.
6  And so the WHO guidelines were rough
7  general guidelines that said here's a framework
8  that you can hold on to, and you need to then
9  modify as you need to to practice medicine
10  properly.
11  BY MS. SINGER:
12  Q.  Okay.  On the same exhibit, it says --
13  sorry.  Let's leave this one for now.  Actually
14  sorry, let me see it again.  All right.  Let's
15  turn to 563, please.
16  So this is Exhibit 9.  It is
17  PKY180919563, it's titled "Investigator's
18  Brochure."
19  Dr. Wright, do you recognize this
20  document?
21  (Whereupon, Purdue-Wright-9 was marked
22  for identification.)
23  A.  No, I do not.
24  BY MS. SINGER:
25  Q.  Okay.  Do you know what an

Page 117

1  investigator's brochure is?
2  A.  Yes.
3  Q.  Okay.  What is an investigator's
4  brochure?
5  A.  An investigator's brochure is a
6  statement of what is known about the
7  investigational drug up to the point of the
8  start of the study, or sometimes beyond if it's
9  a long study, which is provided to the
10  investigator so that the investigator knows
11  everything that the company knows or thinks it
12  knows or hopes it knows about the
13  investigational drug before they decide to
14  enroll a patient in the study.
15  Q.  Okay.  And just to be clear, it's a
16  document provided by the company, the drug
17  sponsor, to the FDA, correct?
18  A.  It is -- the IND should include a copy
19  of the investigator's brochure.
20  Q.  Okay.  Which, again, is from the
21  company to the FDA?
22  A.  Yes.
23  MR. SNAPP:  Object to the form.
24  BY MS. SINGER:
25  Q.  Okay.  So if you can turn to Bates

Page 118

1  number 598, please. Now, I'm sorry just to
2  locate this document, it's titled "Oral
3  Controlled-Release Oxycodone Hydrochloride
4  Tablets" on the title page, correct?
5      A. Oral Controlled-Release Oxycodone
6  Hydrochloride Tablets.
7      Q. Under the title "OxyContin" which is
8  probably more descriptive?
9      A. Yes.
10     Q. So this is the investigator's brochure
11 for OxyContin, correct?
12     A. It appears to be.
13     Q. I'm sorry, now let's go to 598,
14 please. If you can look at the section under
15 "Abuse Liability of Oxycodone," please. And if
16 you look down, second paragraph, "The abuse and
17 illegal drug trafficking," and just read that to
18 yourself, please.
19         (Witness reviewing document.)
20 BY MS. SINGER:
21     Q. Just let me know whenever you're
22 ready.
23         And do you read this to talk about
24 prior diversion and abuse of Percodan?
25     A. I read this as a discussion of the

Page 119

1  abuse and diversion of Percodan.
2      Q. Okay. Which came from, according to
3  Purdue's report, "a liberal regulation of
4  oxycodone-containing compounds whereby 'street'
5  addicts could obtain Percodan more easily than
6  morphine," correct?
7          MR. SNAPP: Object to the form.
8      A. That's what it says.
9  BY MS. SINGER:
10     Q. Okay. And that "Percodan was easily
11 boiled into a solution by the 'street' addict
12 and strained for injection," correct?
13     A. Yes.
14     Q. Okay. And this is knowledge that
15 Purdue submitted to the FDA, correct?
16         MR. SNAPP: Object to the form.
17     A. Yes.
18 BY MS. SINGER:
19     Q. Yes, it was poorly worded.
20         This document reflects Purdue's
21 statement to the FDA about that history with
22 Percodan, correct?
23     A. No. This statement refers to Purdue's
24 statement to the investigators, a copy of which
25 is provided to the FDA.

Page 120

1      Q. Okay. And who are the investigators?
2      A. The people who conduct the clinical
3  studies for Purdue.
4      Q. Got it. Okay.
5          All right. So it is Purdue's
6  statement to the investigators doing the
7  clinical trials and to the FDA which receives a
8  copy, correct?
9          MR. SNAPP: Object to the form.
10     A. (Nodding in the affirmative).
11 BY MS. SINGER:
12     Q. You nodded.
13     A. I nodded. This document should have
14 been provided to every investigator who
15 conducted a Purdue clinical trial, and a copy
16 should have been submitted to the IND.
17     Q. Okay. By Purdue, correct?
18     A. By Purdue.
19         MR. SNAPP: Object to the form.
20 BY MS. SINGER:
21     Q. Okay. And on Page 599, the top of the
22 next page, if you can look at the bottom
23 sentence of the partial paragraph that starts
24 the page, "Furthermore, other studies have shown
25 that the incidence of iatrogenic addition to

Page 121

1  opioid analgesics is very low (see subsequent
2  discussion)."
3          Do you see that?
4      A. Yes.
5      Q. Okay. And if you move down the page,
6  "The incidence of narcotic addiction," very last
7  paragraph, "was obtained by the Boston
8  Collaborative Drug Surveillance Program from
9  their files on 39,946 hospitalized patients,"
10 and it cites Porter and Jick, 1980.
11         Are you familiar with that study?
12     A. I'm familiar with the name, and I've
13 looked at it in the past. I can't recall the
14 details of it at this time.
15     Q. Okay. Do you recall that it was a
16 letter to the editor?
17         MR. SNAPP: Object to the form.
18     A. That sounds familiar.
19 BY MS. SINGER:
20     Q. Okay. And do you recall that it was
21 review of hospitalized patients?
22     A. Yes.
23     Q. Okay. All right. Move on.
24         (Whereupon, Purdue-Wright-10 was
25         marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 BY MS. SINGER:
2     Q. Exhibit 10 is PKY181876119, and it is
3 titled "Regulatory Barriers to Effective Pain
4 Management."
5     I take it you don't recall having seen
6 this document, is that correct?
7     A. No, I don't remember this document at
8 all.
9     Q. Okay. Do you recognize the name
10 R. Kaiko?
11     A. Bob Kaiko.
12     Q. Kaiko.
13     A. Yes, Bob Kaiko was a scientist at
14 Purdue.
15     Q. What about M. Innaurato?
16     A. I have heard the name. I can't place
17 it with a face, and I don't know what he did.
18     Q. Okay. I want to direct you, if I
19 might, to Bates number 258 -- I'm sorry,
20 actually 257, which I think in the PKY is 120.
21     And the last paragraph talks about
22 "Perhaps even more importantly, with the
23 movement of our scheduled analgesics to
24 non-cancer pain (with the introduction of
25 DHCplus and the coming introduction of

Page 123

1 OxyContin), we cannot help but believe these
2 regulatory and legal barriers will pose
3 substantial impediments."
4     Do you see where I've read?
5     A. Yes.
6     Q. Do you recall Purdue ever talking to
7 you about moving OxyContin into the non-cancer
8 pain patient?
9     MR. SNAPP: Object to the form.
10     A. I don't remember Purdue talking about
11 that as a goal for OxyContin.
12 BY MS. SINGER:
13     Q. And did you ever become aware of that
14 as a goal for OxyContin?
15     MR. SNAPP: Object to the form.
16     A. Ever. In some of the previous
17 documents it -- I never looked -- I never
18 formulated it that way, I never -- I just don't
19 know.
20 BY MS. SINGER:
21     Q. And if you didn't formulate it that
22 way, was there a different way that you
23 formulated it?
24     A. If these documents --
25     MR. SNAPP: Object to the form.

Page 124

1     A. If these documents are accurate, I
2 made it very clear that we didn't want to see
3 narcotics as the primary therapy for unselected
4 patients with osteoarthritis. We didn't want to
5 see an osteoarthritis indication.
6     (Whereupon, Purdue-Wright-11 was
7     marked for identification.)
8 BY MS. SINGER:
9     Q. We're at Exhibit 11, PKY180723482,
10 titled Project Team Contact. We've done this
11 one. That's my fault. We've done this one. My
12 apologies. Let's go to 232.
13     (Whereupon, Purdue-Wright-12 was
14     marked for identification.)
15 BY MS. SINGER:
16     Q. So Exhibit 11 is going to be blank,
17 and we'll just move to Exhibit 12. And that is
18 PDD1701503232 titled Meeting Minutes.
19     And, Dr. Wright, do you see your name
20 listed as an FDA representative?
21     A. Yes, I do.
22     Q. Okay. And do you have any
23 recollection of a June 23rd, '93, 1993, meeting
24 with Purdue?
25     A. I don't have any recollection

Page 125

1 immediately. I'm trying to see if this
2 refreshes my recollection.
3     Q. Okay.
4     (Witness reviewing document.)
5     Q. If it's helpful, I can direct you to a
6 particular piece of this and see if that
7 refreshes your recollection. So if you want to
8 go, please, to Bates number 238. And if you
9 look at Section 2, "Nonclinical Toxicology."
10     Do you see where that is?
11     A. (Nodding in the affirmative).
12     Q. It says here that "It was also agreed
13 that oxycodone is an old drug in which the human
14 toxicity profile is well-known."
15     Do you see that sentence?
16     MR. SNAPP: Object to the form.
17     A. Yes, I see that.
18 BY MS. SINGER:
19     Q. And do you agree with that statement
20 that "oxycodone is an old drug in which the
21 human toxicity profile is well-known"?
22     A. Agree now, or agreed then?
23     Q. Start with now.
24     A. I agree.
25     Q. And did you agree back in 1993 when

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  this meeting happened?
2       MR. SNAPP:  Object to the form.
3       MR. PETRILLO:  Just for the record, it
4  doesn't appear that at this portion of the
5  meeting Dr. Wright was present, according to the
6  minutes.
7    A.  I don't remember the meeting, and I
8  don't know whether I was present or not.  You
9  were asking an independent question from my
10  clinical opinion.
11 BY MS. SINGER:
12   Q.  That's right.
13   A.  Both then and now I believe the
14  toxicity profile of oxycodone is well-known.
15   Q.  And do you believe that that's true at
16  all of the different dosage forms of oxycodone?
17       MR. SNAPP:  Object to the form.
18 BY MS. SINGER:
19   Q.  Meaning, in 1993 was the human
20  toxicity profile of OxyContin at 40 milligrams
21  well-known?
22       MR. SNAPP:  Object to the form.
23   A.  In -- I'm still not understanding what
24  is it that you want to know.
25 BY MS. SINGER:

Page 127

1    Q.  Whether there was a body of knowledge
2  or evidence about the toxicology of OxyContin at
3  40 milligrams when the drug was submitted for
4  approval.
5       MR. SNAPP:  Object to the form.
6    A.  I certainly believed so at the time.
7  BY MS. SINGER:
8    Q.  And do you believe that now?
9    A.  I don't know, because circumstances
10  have changed between then and now.
11   Q.  In what way?
12       MR. SNAPP:  Object to the form.
13   A.  Well, a lot of ways.  But in 1980,
14  '85, '90, the focus of safety as defined by the
15  agency for a pharmaceutical was safety used as
16  directed by a medical practitioner.  The notion
17  of pharmacoepidemiology, what are the safety
18  results in the population as vended and sold by
19  the population, was emerging but was not a fully
20  developed principle then, I don't think the
21  guidances on pharmacovigilance and
22  pharmacoepidemiology were fully developed then.
23  I don't know for sure what the timing was.
24       Today, by today's standards, what
25  happens when the drug interacts with a specific

Page 128

1  population matters and is considered as part of
2  the safety profile for a new drug.  At the time
3  I remember being concerned about abuse of
4  OxyContin, we all were, but we had no notion
5  that the society had changed to the point where
6  the 40 and the 80-milligram OxyContin products
7  would be so desirable for purposes of diversion.
8       I don't know if that's a long painful
9  answer to what you had to say.  Oxycodone we
10  knew about.  We knew what oxycodone safety was
11  like and what was likely to happen.  OxyContin,
12  the drug product as marketed, we weren't
13  thinking that way in 1990, '95.
14 BY MS. SINGER:
15   Q.  Okay.  If we can go back to Exhibit 12
16  for a moment, that's the one that's 232, maybe
17  the one we have right now.  And if you could
18  turn to Bates number 239, which is the next page
19  from where we were, and if you could look under
20  Paragraph 3, "Toxicology of Abuse."
21       Do you see that at the top of the
22  page?
23   A.  Mm-hmm.
24   Q.  And could you read that first
25  sentence, please?

Page 129

1    A.  "Toxicology of Abuse:  The FDA was
2  concerned about pulmonary microemboli and
3  granulomas which may occur when oral
4  preparations such as this are extracted and
5  injected intravenously by abusers."
6    Q.  You can stop there, just the first
7  sentence.
8       Do you recall having this conversation
9  with Purdue Pharma?
10   A.  Vaguely.  We always were concerned
11  about excipients.
12   Q.  About?
13   A.  Excipients.
14   Q.  And can you explain what that is?
15   A.  There were some products, and I cannot
16  remember their names, they were narcotics, where
17  the company used a binder for the tablets that
18  contained a variety of foreign materials called
19  excipients which held the tablet together.  Talc
20  in particular was particularly problematic
21  because if it was injected intravenously it
22  could cause significant granulomatous damage to
23  the lungs of abusers.
24   Q.  Okay.  So this reflects that the FDA
25  was talking to Purdue Pharma back in 1993 about

Page 130

1 the risks associated with injection of
2 OxyContin, is that correct?
3     MR. SNAPP: Object to the form.
4     A. It was -- yes, I think so.
5 BY MS. SINGER:
6     Q. Okay. And did the extended-release,
7 the controlled-release profile of OxyContin have
8 any impact on how the FDA or how you, how you,
9 assessed the risk or likelihood that users would
10 inject OxyContin?
11     MR. SNAPP: Object to the form.
12     A. Can you sharpen that up a little bit?
13 Because that is such a -- "have any," that is
14 such a vague question.
15 BY MS. SINGER:
16     Q. Did you think that the
17 controlled-release formulation would make it
18 more attractive for users to inject OxyContin?
19     A. I did not think that the
20 controlled-release formulation would make the
21 product more attractive. We were concerned
22 about the tablet size.
23     Q. Okay. What about the potency of the
24 tablets, did you think that that would have any
25 impact on the likelihood of intravenous use?

Page 131

1     A. I'm confused --
2     MR. SNAPP: Object to the form.
3     A. -- because you used the word
4 "potency." That has a specific technical
5 meaning.
6 BY MS. SINGER:
7     Q. Which I'm sure I didn't intend.
8     A. We were concerned about the amount of
9 drug in the tablet. A lot of drug in a tablet.
10     Q. Okay.
11     A. Make it attractive, a lot of drug.
12     Q. And is there a lot of drug at
13 80 milligrams of OxyContin?
14     A. There is a lot of drug --
15     MR. SNAPP: Object to the form.
16     A. -- at 80 milligrams of OxyContin,
17 80 milligrams.
18 BY MS. SINGER:
19     Q. And is there a lot at 40 milligrams?
20     MR. SNAPP: Object to the form.
21     A. Immediate-release opioids of the
22 period had 5, maybe 10 milligrams.
23 40 milligrams is four times as much.
24 BY MS. SINGER:
25     Q. Is it enough to produce euphoria --

Page 132

1     MR. SNAPP: Object to the form.
2 BY MS. SINGER:
3     Q. -- when injected?
4     A. That is so hard to answer, because it
5 depends on the state of opioid tolerance of the
6 individual. But for a naive user who has not
7 had any opioids, injecting 40 milligrams or
8 80 milligrams of oxycodone would be a very
9 strong dose, very strong, and severe.
10     Q. All right. And moving to the next
11 paragraph which is somewhat bolded, "As part of
12 the June 30 telephone conversation" -- do you
13 see where I am on 239, Dr. Hayes -- "between
14 Dr. Hayes and Dr. Tigner"?
15     A. Mm-hmm.
16     Q. "It was agreed that oxycodone HCl" --
17 is that OxyContin.
18     A. That's oxycodone hydrochloride, the
19 parent drug substance.
20     Q. Okay.
21     -- "is very soluble in water, a fact
22 which abusers would most likely learn very
23 quickly."
24     Do you remember this conversation --
25 did you ever hear about this conversation?

Page 133

1     A. I don't remember whether I heard about
2 it or not.
3     Q. And are you aware of the water
4 solubility of oxycodone hydrochloride?
5     A. Very much so.
6     Q. And was that something that you
7 thought about and discussed with Purdue Pharma
8 at the time?
9     MR. SNAPP: Object to the form.
10     A. I don't know if I discussed it or not,
11 because all drugs of that class that I know of,
12 the semi-synthetic narcotics of that era and
13 age, are water soluble, that they were developed
14 to be water soluble. Did I discuss with -- the
15 fact with Purdue that their drug could be cooked
16 and shot, injected for abuse? I'm almost
17 certain I didn't.
18 BY MS. SINGER:
19     Q. Okay. All right. If we could turn to
20 Bates number 3241, also the top of the page.
21     A. 3241?
22     Q. 3241. It's the next page, I think.
23 You'll see Paragraph 6, "Higher Dosage Strengths
24 - Adverse Event Profile Concerns." And can you
25 read aloud through "opioid tolerant patients

Page 134

1 only"? So the first two sentences, I believe.
2 A. "Because oxycodone IR 5 milligrams is
3 the current marketed product there is concern
4 about the adverse event profile of higher dosage
5 strengths (40, 80, 160) are administered to
6 opiate naive patients. Suggestion that PF
7 consider including a 'red triangle (opioid
8 tolerant only)' on the packaging of the 40, 80
9 and 160-milligram dosage strengths to indicate
10 that these dosage strengths be administered to
11 opioid tolerant patients only."
12 Q. You can stop there.
13 Do you remember that conversation?
14 A. Not specifically, but I remember the
15 red triangle.
16 Q. And what do you remember about that?
17 A. Okay. It was what we negotiated and
18 was launched under gesic, I mentioned earlier in
19 the discussion that we wanted some kind of
20 distinctive marking hopefully common across
21 manufacturers that indicated to prescribers that
22 this was a high strength.
23 Q. Okay. And what were your concerns at
24 higher dose strengths?
25 A. There would -- that someone would

Page 135

1 overdose.
2 Q. And do you know as we sit here what
3 the morphine equivalent dose of 40 milligrams of
4 OxyContin taken twice a day as directed is?
5 A. Not anymore. I used to.
6 Q. Okay. And do you recall thinking that
7 the 40, 80 and 160-milligram dosage strengths
8 should have that red triangle?
9 MR. SNAPP: Object to the form.
10 A. I do not recall that specifically.
11 This memorandum suggests that that's what I
12 thought at the time.
13 BY MS. SINGER:
14 Q. And does that seem accurate and
15 consistent with your beliefs?
16 A. Seems accurate and consistent with my
17 beliefs. Somewhere -- and I don't know whether
18 it would be 40 or 60 or whether it should just
19 be the 80 and 160, I wasn't certain, but I knew
20 that past a certain point those tablets should
21 be only going into opioid tolerant patients.
22 Q. If we can move down on the same page
23 to Paragraph 13, can you read what it says by
24 "Combination Product"?
25 A. Yes. Would you like me to?

Page 136

1 Q. Yes. Please.
2 A. "Combination product: PF should
3 consider an OxyContin Tablets/Naloxone
4 combination as a supplement to the NDA."
5 Q. So do you recall this conversation
6 with Purdue?
7 A. I don't recall it. I have no reason
8 to think I didn't do it.
9 Q. Okay. And why would -- why would you
10 have recommended to Purdue that it consider an
11 OxyContin/naloxone combination?
12 MR. SNAPP: Object to the form.
13 A. It is clear -- it was clear to us
14 then, it is clear to us now, it is clear to me
15 now that this product was vulnerable to
16 tampering and injection. If you made an
17 oxycodone/naloxone combination, the naloxone
18 would spoil the oxycodone by acting as an
19 antagonist, and it could not be injected.
20 Looking back, based on my experience
21 since that time, that was an easy thing to ask
22 for and an extraordinarily difficult thing to
23 do.
24 BY MS. SINGER:
25 Q. Understanding that, it certainly

Page 137

1 reflects an awareness back in 1993 that
2 injection was going to be a problem, correct?
3 MR. SNAPP: Object to the form.
4 A. Is that a question?
5 BY MS. SINGER:
6 Q. Yes.
7 MR. SNAPP: Object to the form.
8 A. Okay. Could you restate it, please,
9 simply?
10 BY MS. SINGER:
11 Q. Sure.
12 So the recommendation that Purdue
13 consider an OxyContin/naloxone combination
14 reflects a recognition that there was going to
15 be use by injection?
16 MR. SNAPP: Object to the form.
17 A. It's still a statement, not a
18 question.
19 BY MS. SINGER:
20 Q. Correct. Is that right?
21 MR. SNAPP: Object to the form.
22 A. From the earliest point through the
23 final approval of oxycodone, OxyContin, there
24 was never any illusions on the agency's part
25 that this was a product that could develop an

Page 138

1  abuse problem.  Never any question.
2        (Whereupon, Purdue-Wright-13 was
3        marked for identification.)
4  BY MS. SINGER:
5     Q.  So this is Exhibit 13, PDD 150 -- I'm
6  sorry, SHC-00007028.  And it is "Subject:  FDA
7  OxyContin Tablets Meeting."
8       Dr. Wright, are you familiar with this
9  document?
10     A.  I don't know that I've ever seen it.
11     Q.  Okay.  Do you see yourself listed
12  among the FDA attendees on the first page?
13     A.  Yes, I do.
14     Q.  Okay.  And can you see among the "To"
15  line here that this memo was circulated to M.D.
16  Sackler, R.R. Sackler, R.S. Sackler, K.A.
17  Sackler, J.D. Sackler?
18     A.  That's what the addressees say.
19     Q.  From your time at Purdue, was it
20  common to send the Sacklers information about
21  FDA meetings?
22      MR. SNAPP:  Object to the form.
23     A.  I don't know what was sent to the
24  Sacklers and what was not.
25  BY MS. SINGER:

Page 139

1     Q.  Okay.  Now, in the first paragraph on
2  the first page below the tos and attendance
3  lists, it describes the pilot division of the
4  FDA and the NDA process, is that correct?
5     A.  Yes.
6     Q.  Okay.  And was this pilot process
7  different from other opioid approvals you'd been
8  involved in before?
9     A.  No.
10     Q.  It was the same pilot process, is that
11  correct?
12     A.  Well, with a caveat.  The goal of the
13  pilot drug evaluation staff was to pilot new
14  approaches to the review process to improve its
15  quality and efficiency.  So therefore, as we
16  learned from one NDA to the next what worked and
17  what didn't work, or there were technical
18  changes in the technological environment so that
19  we could do things that we couldn't do before,
20  like use computers in the review process, use
21  telecommunications for meetings instead of
22  having them in face-by-face, we would
23  incorporate that.  So did it change over time?
24  Yes.  Was it the same process pretty much?  Yes.
25     Q.  Okay.  And are you aware that, or is

Page 140

1  it correct that OxyContin was what's called a
2  non-NME drug review?
3     A.  Yes.
4     Q.  Okay.  And can you explain what that
5  means?
6     A.  There are -- there's no official
7  difference between any of the kinds of
8  applications that are sent into the agency
9  except some of the more modern changes, but the
10  agency broadly split as a matter of policy drugs
11  into two classes.  New molecular entities that
12  had not been in man, that's an NME, or drugs
13  that had been in man in some form and had an
14  established toxicity record, non-NME.
15     Q.  And was the level of scrutiny or the
16  bar to approval different between NME and
17  non-NME drugs?
18     A.  Yes.
19     Q.  In what way?
20     A.  For a non-NME product you were looking
21  to look for unanticipated adverse events or,
22  say, the 1 percent level.  For an NME you were
23  looking at -- trying to look at, say, the tenth
24  of a percent level, you needed more patients,
25  longer studies, more time, more toxicology,

Page 141

1  ancillary studies of several different kinds to
2  look for unusual or unanticipated toxicity.  An
3  example would be that there's now screening for
4  certain kinds of cardiac effects that did not
5  exist at this time.
6      So an NME gets a lot longer period of
7  scrutiny, a lot longer period of tests, and a
8  lot more patients in the NDA.
9     Q.  So we can just do one more document,
10  and then if it's a good time to break for lunch.
11       (Whereupon, Purdue-Wright-14 was
12       marked for identification.)
13  BY MS. SINGER:
14     Q.  So Exhibit 14 is PDD1501090043 titled
15  "Medical Officer Review."  And do you recognize
16  this document?
17     A.  This looks like my medical officer
18  summary review of OxyContin.
19     Q.  Okay.  And you're listed as the
20  reviewer, correct?
21     A.  I'm listed as the reviewer in this
22  one.
23     Q.  Okay.  So if you can turn to -- I'm
24  sorry, the first page, so it starts halfway down
25  -- or it doesn't start, but halfway down the

Page 142

1    first page where it says "Background. Oxycodone
2    is an old opioid that's been on the market for
3    many years in pre-38, USP, brand and generic
4    immediate-release forms as a QID drug both
5    singly and in fixed combinations with NSAIDs."
6        So could you explain that sentence,
7    unpack some of those acronyms, please? So
8    pre-38.
9        A.   Pre-38, it was on -- some form of it
10   was on the market prior to 1938.
11       Q.   Okay.  And USP?
12       A.   The USP has a US Pharmacopeia standard
13   for the drug for purity and potency.
14       Q.   And so there's been both brand and
15   generic versions, correct?
16       A.   It says brand and generic.
17       Q.   And then a QID drug?
18       A.   Four times a day.
19       Q.   And then "singly and in fixed
20   combinations of NSAIDs" mean that they're both
21   single entity opioids and then combination
22   opioids, correct?
23       A.   That was my understanding at the time.
24       Q.   Okay.  So what you're saying here, and
25   again correct me as I know you will, that this

Page 143

1    is a drug that's been around for decades?
2        MR. SNAPP:  Object to the form.
3    BY MS. SINGER:
4        Q.   Correct?
5        A.   This is a drug that has been around
6    for decades.
7        Q.   Okay.  And let's turn to Bates number
8    45, so the next page.  The first paragraph of
9    text, "Both treatments appear to be similar with
10   respect to peak, trough, mean and extreme values
11   in clinical populations."
12       Do you see where I'm reading?
13       A.   Yes, ma'am.
14       Q.   Okay.  So both treatments, can you
15   explain what that's referring to?
16       A.   Immediate-release and
17   controlled-release oxycodone given in these
18   doses appeared to have similar peak and trough
19   concentrations.
20       Q.   Okay.  And those are the words we
21   talked about earlier, and what they mean in
22   terms of their significance?
23       A.   Those are words we've talked about
24   earlier.
25       Q.   Okay.  And extreme values?

Page 144

1        MR. SNAPP:  Object to the form.
2    BY MS. SINGER:
3        Q.   What does that mean?
4        A.   What is an extreme value?  When you're
5    doing a pharmacokinetic study and you're giving
6    the drug to individuals, some people will on
7    some occasions for some reason that we don't
8    understand have an extremely high value or an
9    extremely low value.  You look at those because
10   the extremely low value suggests the drug would
11   not be working.  And the extremely high value
12   suggests that the drug would be working too
13   well.
14       Q.   Okay.  And so can you explain -- what
15   you're saying in this sentence for the layperson
16   is that the peak trough, middle, and outliers
17   are relatively similar between immediate-release
18   and extended-release oxycodone?
19       MR. SNAPP:  Object to the form.
20       A.   What I'm saying at this point is the
21   peak trough and outliers appeared to be similar.
22   BY MS. SINGER:
23       Q.   Okay.  And then if we can turn to
24   Page 56, or Bates number 56.
25       MS. SINGER:  I have an extra copy if

Page 145

1    somebody wants it (handing).
2        Q.   Do you see the section titled "Rescue
3    Use (Supplemental Analgesic)"?
4        A.   What page again?
5        Q.   Bates number 56, very last page.
6        A.   Yes.  I see it.
7        Q.   And before I ask you about that, do
8    you recall what the dosing is for OxyContin?
9        MR. SNAPP:  Object to the form.
10       A.   I'd have to refer to the package
11   insert.
12   BY MS. SINGER:
13       Q.   Okay.  It may say so here.
14       All right.  So you can see the last
15   paragraph, "Overall Conclusion," can you read
16   the last sentence?  And you can read it out
17   loud.
18       A.   "This product has been shown to be as
19   good as current therapy, bu has not been shown
20   to have a significant advantage beyond reduction
21   in frequency of dosing."
22       Q.   And do you remember coming to that
23   conclusion?
24       A.   I don't remember it independently, but
25   I have no reason to doubt that I wrote this.

Page 146

1   Q.  Okay.  Okay.  And would it refresh
2   your recollection, and if it doesn't it doesn't,
3   that OxyContin is a 12-hour drug?
4        MR. SNAPP:  Object to the form.
5        A.  That's what it says here, BID drug.
6   BY MS. SINGER:
7        Q.  BID.  There you have it.
8            What does BID stand for?
9        A.  Twice a day, 12 hours.
10       Q.  So if you go back to Rescue Use, it
11  indicates at the last sentence there "Patients
12  used about 1 to 2 doses of rescue a day and
13  found it an important part of therapy."
14           Do you see where I'm reading?
15       A.  Yes.
16       Q.  What is a rescue dose?
17       A.  Okay.  A rescue dose of an
18  immediate-release analgesic, or any analgesic,
19  is used when the quality of pain control has
20  become unacceptable.  If you give somebody -- in
21  general, this is what I was taught.  If you give
22  somebody enough analgesic so that they never
23  have pain during the day, then there will be
24  times during the day when they are
25  inappropriately narcotized.  So it is considered

Page 147

1   a normal part of round-the-clock opioid therapy
2   to have both your round-the-clock drug and then
3   during episodes of breakthrough pain, which can
4   occur with toileting, mobility, having to get in
5   the car or out of the car to go to the hospital,
6   anything that might happen, you then can give
7   the immediate-release as part of the
8   breakthrough, as part of the treatment.
9        Q.  Okay.  I think that's all I have.
10       MS. SINGER:  We can take a break.
11       THE VIDEOGRAPHER:  We are now going
12  off the record, and the time is 12:39.
13           (Whereupon, a luncheon recess was
14           taken.)
15
16
17
18
19
20
21
22
23
24
25

Page 148

1            AFTERNOON SESSION
2
3        THE VIDEOGRAPHER:  We are now going
4   back on the record, and the time is 1:30 p.m.
5   BY MS. SINGER:
6        Q.  All right.  Dr. Wright, I'm just
7   reminding you you're still under oath as we
8   resume.  And we'll start with Exhibit 15.
9            (Whereupon, Purdue-Wright-15 was
10           marked for identification.)
11  BY MS. SINGER:
12       Q.  So Exhibit 15 is Bates number SHC-8168
13  and it's titled "Project Team Contact Report."
14           Is this document familiar to you,
15  Dr. Wright?
16       A.  I don't recognize this document.
17       Q.  Okay.  It indicates that it is the
18  record of a contact between Dr. Reder from
19  Purdue and you at FDA.
20           Does that seem right?
21       A.  That's what it says.
22       Q.  Okay.  And if you could take a moment,
23  the reason for the call indicates "Discuss
24  OC93-0704 - Package Insert Testing Study."
25           Do you recall the package insert

Page 149

1   testing study?
2        A.  I don't remember it at this time.  I
3   know what package insert testing studies are.
4        Q.  And what are they?
5        A.  It's where you take physicians who are
6   likely to prescribe the product and you give
7   them the package insert, and then you ask them
8   relevant questions about using the product.
9        Q.  Okay.  And that goes back to, I think,
10  and correct me if I'm wrong, your point earlier
11  that the goal of the package insert is to inform
12  prescribers about the uses, risks, benefits,
13  administration, all of those aspects of a
14  prescription drug, is that correct?
15           MR. SNAPP:  Object to the form.
16       A.  Do you wish me to restate it?
17  BY MS. SINGER:
18       Q.  Either agree with it or put it in
19  words that you can agree to.
20       A.  The package insert informs physicians
21  how to use the product.
22       Q.  Okay.  And it says here -- and this
23  relates to OxyContin, correct?
24       A.  It's an OC number, so that would be
25  the OxyContin.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    Q.   And can you read what it says about
2    the package insert testing study under the
3    "Results of a recent study showed"?
4    A.   "One half of the physicians did not
5    dose according to the package insert.
6    98 percent of the physicians ignored some of the
7    precautionary information in the package insert.
8    And a previously unrecognized disease/treatment
9    interaction was seen."
10   Q.   Go ahead, if you can finish out that
11   last sentence.
12   A.   "Because of our substantial database,
13   Dr. Wright would not anticipate major new
14   findings but asked that we continue the program
15   for now."
16   Q.   Okay.  So does this refresh your
17   recollection about this, conversation or this
18   study?
19   A.   It does not.
20   Q.   Okay.  Do you have any reason to
21   believe that that is not an accurate report
22   about that study?
23       MR. SNAPP:  Object to the form.
24   A.   I can't really say whether it's
25   accurate or not.  There are -- contact reports

Page 151

1    in the company report what the person on the
2    company side heard.  I don't know what I said.
3    BY MS. SINGER:
4    Q.   Although isn't this a report on a
5    study that Purdue conducted?
6    A.   Yes.
7    Q.   Okay.  So --
8    A.   Since I don't remember the
9    conversation, and I don't, I can't say whether
10   his characterization of my response is accurate
11   or inaccurate.
12   Q.   Okay.  So other than his
13   characterization of your response, do you have
14   any reason to disbelieve the account of the
15   package insert testing study that's included
16   here?
17       MR. SNAPP:  Object to the form.
18   A.   I have no reason to doubt that.
19   BY MS. SINGER:
20   Q.   Okay.  Do you know if this is a high
21   rate of non-compliance with the package insert?
22       MR. SNAPP:  Object to the form.
23   A.   It's been too long since I looked at
24   these.  Non-compliance with a package insert was
25   extremely common.  Sometimes it was pernicious,

Page 152

1    sometimes it was not.  To understand this, I'd
2    have to know what the non-compliance was, and if
3    it posed a threat to patients.
4    BY MS. SINGER:
5    Q.   Okay.  So we're going to go back, I
6    think it's Exhibit 4, but I'm just guessing.
7    14, sorry, Exhibit 14.  Your medical officer
8    report.
9    A.   It's half the medical officer report,
10   I think.
11   Q.   And do you want to explain what you
12   mean by that?  This is the report relating to --
13   A.   This is the integrated summary of
14   efficacy.  There should be somewhere a
15   integrated summary of safety.
16   Q.   Okay.  I want to return to the last
17   page of the document, 056, I think you read this
18   earlier.  But you wrote, "Care should be taken
19   to limit competitive promotion."
20       Have I read that accurately?
21   A.   Yes, ma'am.
22   Q.   And that was your conclusion?
23   A.   Yes, ma'am.
24   Q.   And finishing, I'm sorry, the next
25   sentence, "This product has been shown to be as

Page 153

1    good as current therapy, but has not been shown
2    to have a significant advantage beyond reduction
3    in frequency of dosing," correct?
4    A.   That's what it says.
5    Q.   And that's what you wrote?
6    A.   I'm pretty sure that's what I wrote.
7    It wasn't just me, that would have been me and
8    Doug Kramer at that point.  And I don't know if
9    this underwent another peer review, I just don't
10   remember, but it was two or three of us.
11   Q.   Okay.  And is this the same Doug
12   Kramer who was later at Purdue Pharma with you?
13   A.   Yes.
14   Q.   And so when you say no significant --
15   "has not been shown to have a significant
16   advantage beyond reduction in frequency of
17   dosing," that means no reduction in adverse
18   effects, correct?
19       MR. SNAPP:  Object to the form.
20   A.   I'd have to look at the integrated
21   summary of safety to reach that conclusion.  But
22   it says what it says, it's not any better than
23   conventional therapy.
24   BY MS. SINGER:
25   Q.   Okay.  So when you say "competitive

Page 154

1  promotion," should take care not to engage in
2  competitive promotion, that means that,
3  consistent with your medical officer review or
4  the medical officer review which you co-authored
5  or participated in, Purdue could not represent
6  that OxyContin was more effective than other
7  opioids, is that correct?
8      MR. SNAPP: Object to the form.
9      A. Based on the document that I see, what
10 that kind of language usually means is a signal
11 for DDMAC, for the division of drug advertising,
12 that since OxyContin was not tested against
13 other similar analgesics and shown to be better,
14 you can't make claims that it's better than
15 other opioid analgesics.
16 BY MS. SINGER:
17     Q. Okay. And would that include that it
18 was less likely to be abused than other opioid
19 analgesics?
20     MR. SNAPP: Object to the form.
21     A. That's a -- you asked a difficult
22 question because it doesn't have a yes or no
23 answer. At that time controlled-release dosage
24 forms which had a slower upsweep and onset were
25 viewed to pose less risk of dependence or abuse

Page 155

1  than immediate-release dosage forms. But that
2  is, in general, a safety issue, and there is
3  great reluctance to allow promotion on safety
4  unless there is a definitive proved safety
5  advantage.
6  BY MS. SINGER:
7      Q. Okay. And is there anything in your
8  memory or the medical officer report that
9  indicates that OxyContin -- that Purdue had
10 demonstrated that OxyContin had a proved safety
11 advantage?
12     MR. SNAPP: Object to the form.
13     MR. PETRILLO: Objection.
14     A. I'd have to look at the integrated
15 summary of safety before I could answer that.
16 BY MS. SINGER:
17     Q. All right. We'll try to pull that
18 out.
19     A. Okay.
20     Q. Okay. This is going to be taxing to
21 read, but this is Exhibit 16.
22     (Whereupon, Purdue-Wright-16 was
23     marked for identification.)
24 BY MS. SINGER:
25     Q. It's PKY183226682. Do you recognize

Page 156

1  this document, Dr. Wright?
2      A. It looks like an OxyContin package
3  insert, which version I don't know.
4      Q. And if you could look at the middle
5  column, and I have to get up close to see it --
6  sorry. Okay. We're actually going to go to
7  Bates number 687, please. All right. If you
8  look in the middle column under the heading
9  "Drug Abuse and Dependence."
10     Do you see where I'm reading?
11     A. Yes, ma'am.
12     Q. Okay. And can you read aloud the last
13 sentence, "Delayed absorption"?
14     MR. PETRILLO: Last sentence, first
15 paragraph?
16     MS. SINGER: Of that first paragraph,
17 "Delayed absorption, as provided by OxyContin
18 tablets."
19     A. "Delayed absorption, as provided by
20 OxyContin tablets, is believed to reduce the
21 abuse liability of a drug."
22 BY MS. SINGER:
23     Q. Okay. Do you know who proposed that
24 language?
25     A. I don't know.

Page 157

1      Q. Okay. All right. Exhibit 17.
2      (Whereupon, Purdue-Wright-17 was
3      marked for identification.)
4  BY MS. SINGER:
5      Q. Is SHC-4520, it's titled on the first
6  page "8/2/95 Reder."
7      A. Mm-hmm.
8      Q. Do you recognize that to be how Robert
9  Reder spelled his name?
10     A. I thought there were two E's.
11     Q. Okay. All right. Do you see on 4521,
12 the next page on the top it says "Reder
13 Version"?
14     A. "Reder Version."
15     Q. Okay. Have you ever seen this version
16 of the package insert before?
17     A. I can't remember.
18     Q. Okay. And I just want you to turn the
19 page to 4522, please. Do you recognize that
20 handwriting? And you can page through the
21 document and see if the handwriting is familiar
22 to you.
23     A. I don't know who that is.
24     Q. Is it your handwriting?
25     A. No, it is not.

Page 158

1     Q. Okay. And so if we can turn to Bates
2 number 4538, and can you see at line 580 there's
3 some handwritten text on the right margin?
4     A. Mm-hmm.
5     Q. And can you read, I know it's not
6 easy, can you decipher what is written there?
7 If you can't, I can do my best.
8     A. "Delayed new opioid activity as
9 provided by OxyContin tablets is believed to
10 reduce the abuse liability of a drug."
11     Q. Okay. Do you recall ever proposing
12 that language to Robert Reder?
13     A. I don't remember specifically doing
14 so, but I could have.
15     Q. Do you recall instances in which you
16 proposed or dictated language to Dr. Reder?
17     MR. SNAPP: Object to the form.
18     A. I recall instances in conferences with
19 sponsors that I have proposed language. I don't
20 know what I proposed to Robert or not.
21 BY MS. SINGER:
22     Q. Or whether?
23     A. Or whether.
24     Q. Okay. But you're certain this is not
25 your handwriting?

Page 159

1     MR. PETRILLO: Form.
2     A. No, that is not my handwriting.
3 BY MS. SINGER:
4     Q. Okay. We're going to return to
5 Exhibit 14, or not. Yes. So if you can turn to
6 Bates number 055.
7     A. I'm having trouble finding 14.
8     MR. PETRILLO: Sorry. Let's see.
9 Here you go.
10     A. And 055?
11 BY MS. SINGER:
12     Q. 055. And can you read out loud the
13 first sentence?
14     A. "There is a theoretical possibility
15 that the slower fall and slightly higher trough
16 might result in greater development of tolerance
17 and/or withdrawal phenomenon. This was not seen
18 in the database (see ISS), and the two daily
19 troughs appear adequate based on the divisional
20 experience with 'trough-less' opioid dosage
21 forms such as Duragesic."
22     Q. What was the basis of that theoretical
23 possibility? What gave rise to that
24 possibility?
25     MR. SNAPP: Object to the form.

Page 160

1     A. During my -- I'm having to reconstruct
2 what I might have thought at the time, is that
3 okay?
4 BY MS. SINGER:
5     Q. Absolutely.
6     A. During my postdoctoral fellowship I
7 looked -- I was doing research and reviewed the
8 literature on the development of tolerance to
9 opioids. Tolerance is a defensive reaction by
10 the body to administration of opioids, and it
11 develops in everybody who takes an opioid, who
12 has experienced an opioid effect, and it occurs
13 at different speeds depending upon most likely
14 the area under the curve of the concentration
15 exposure time. The longer the drug is in and
16 the higher the level of the drug, the more
17 tolerance you get. Changing the pharmacokinetic
18 profile from up, down, up, down, up, down to up,
19 down, up, down could theoretically alter the
20 development of tolerance.
21     Q. And do you know in what direction it
22 would alter the development of tolerance, if it
23 did?
24     MR. SNAPP: Object to the form.
25     A. A longer apparent half-life would be

Page 161

1 likely to increase the development of tolerance,
2 which is a good thing.
3 BY MS. SINGER:
4     Q. Okay. And when you talked about the
5 development of tolerance, you talked about the
6 area under the curve as duration, I think,
7 and --
8     A. Plasma concentration, time. So its
9 units are time and -- plasma concentration and
10 time.
11     Q. And does plasma concentration relate
12 to the dose?
13     A. Yes.
14     Q. Meaning the higher the dose --
15     A. The higher the plasma concentration.
16 Bigger doses should give a higher plasma
17 concentration.
18     Q. And thus, yield more tolerance,
19 correct?
20     A. Yes.
21     MR. SNAPP: Object to the form.
22 BY MS. SINGER:
23     Q. So Exhibit 18.
24     (Whereupon, Purdue-Wright-18 was
25     marked for identification.)

Page 162

1   BY MS. SINGER:
2       Q.   Which is PKY180175570.  If you turn to
3   the second page, 571, you'll see its title,
4   "OxyContin Meeting, April 23, 2001."  And
5   certainly take a moment to look through it, but
6   what I'd like you to tell me is whether this
7   seems to reflect the summary of a meeting
8   between Purdue Pharma, the FDA -- sorry, Purdue
9   Pharma and the FDA.
10          (Witness reviewing document.)
11      A.   This appears to reflect minutes of a
12  meeting held between the FDA and Purdue Pharma.
13      Q.   Okay.  And you're not listed as an
14  attendee at this meeting, correct?
15      A.   I am not listed as an attendee.
16      Q.   But if you look at the stamp on Bates
17  number 571, do you see a Received stamp?
18      A.   I do.
19      Q.   Does that indicate "Received May 14,
20  2001, Curt Wright"?
21      A.   Yes, it does.
22      Q.   And does that reflect a stamp that was
23  put on correspondence when you received it?
24      A.   I don't remember having correspondence
25  stamped when I received it.

Page 163

1       Q.   Could it be anyone else's?
2       A.   I don't know who stamped it and why my
3   name is on it.  I don't really know.
4       Q.   Okay.  Do you go by Curt?
5       A.   No.  I usually -- in the work
6   environment I'm usually Curtis.  My full name is
7   Curtis Wright.  I don't remember ever seeing a
8   stamp that looked like that before.
9       Q.   Okay.  Do you remember receiving this
10  document?
11      A.   No, I don't.
12      Q.   Do you remember hearing about a
13  meeting between Purdue and the FDA in April,
14  2001 at which concerns about OxyContin were
15  discussed?
16          MR. SNAPP:  Object to the form.
17      A.   I don't -- I was not kept very well
18  informed, nor should I have been not being on
19  the OxyContin team, of what was happening with
20  the FDA.  The only time I found out about it was
21  when somebody asked me some question.
22  BY MS. SINGER:
23      Q.   Okay.  Okay.  Let's turn, and we'll
24  talk about this from your experience, but --
25  sorry, too many pages.  All right.  If we can

Page 164

1   start with Bates number 572, please.
2       A.   Yes.
3       Q.   Okay.  Do you know Dr. McCormick?
4       A.   She was my division director for a
5   brief period of time.  I was her deputy in my
6   last few months at the FDA.
7       Q.   Okay.  And so if you look down, so
8   third paragraph you see Dr. Pollock listed.  Do
9   you remember, or did you know Dr. Pollock?
10      A.   I don't remember ever meeting
11  Dr. Pollock.
12      Q.   Okay.  At the bottom of that third
13  paragraph with Dr. Pollock, it notes that
14  MS Contin prescribing had remained relatively
15  constant, but OxyContin had increased ten fold.
16          Was that -- do you know that to be
17  true, or is it consistent with your
18  understanding of what happened to the sales of
19  MS Contin and OxyContin?
20          MR. SNAPP:  Object to the form.
21      A.   To be strictly accurate I'd have to
22  look at the data.  Sales of OxyContin did
23  increase at some point during this period quite
24  a bit.
25  BY MS. SINGER:

Page 165

1       Q.   Okay.  And then the next paragraph
2   talks about Dr. Hertz.  Did you work with
3   Dr. Hertz?
4       A.   No.
5       Q.   And do you know who she is?
6       A.   She -- I think at this point she was
7   on her way to becoming deputy director of the
8   division.
9       Q.   Which division is that?
10      A.   The analgesic division.
11      Q.   At FDA?
12      A.   At FDA.
13      Q.   Okay.  And it says here "OxyContin is
14  not necessarily the first opioid to be used and
15  it should not be an intermittent opioid."
16          Do you see that sentence?
17      A.   Yes.
18      Q.   And is that consistent with what you
19  were saying earlier about it being not
20  necessarily appropriate for all patients in the
21  first instance?
22          MR. SNAPP:  Object to the form.
23      A.   Since it's somebody else's comment I
24  can just say whether I agree with it or not.  I
25  agree with "OxyContin is not necessarily the

Page 166

1  first opioid to be used and it should not be
2  used as an intermittent opioid."
3  BY MS. SINGER:
4      Q.  Okay.  All right.  And then if you go
5  down to the last paragraph, "She would also like
6  to see educational efforts increased including
7  possibly a Medguide for patients on the risks of
8  overdose and the abuse of opioids as well as
9  risks for use by others than whom it was
10 prescribed."
11         Were you aware that that
12 recommendation was made to Purdue?
13     A.  If I was, I certainly don't remember
14 it now.
15     Q.  Okay.  And sitting here, do you agree
16 that that was a step that Purdue should have
17 considered --
18         MR. SNAPP:  Object to the form.
19 BY MS. SINGER:
20     Q.  -- in 2001?
21         MR. SNAPP:  Object to the form.
22     A.  If it's recommended by a senior
23 physician in the FDA, you certainly should
24 consider it.
25 BY MS. SINGER:

Page 167

1      Q.  And given your knowledge of abuse and
2  adverse effects from the abuse of an addiction
3  to OxyContin, does that also strike you as a
4  prudent recommendation?
5          MR. SNAPP:  Object to the form.
6      A.  It's amazing -- it's very difficult to
7  be -- to object to a well written, useful med
8  guide.  When you initiate a med guide is really
9  an agency decision.  I don't know of -- well,
10 I'm not familiar with writing a -- going through
11 the expense of writing a med guide voluntarily.
12 But a med guide is one of the first things the
13 agency pulls out of its toolbox when it
14 perceives an emerging problem.
15 BY MS. SINGER:
16     Q.  And then if you look at Bates number
17 574, Paragraph 3, do you recognize the name Tom
18 Abrams?
19     A.  Not at this time.
20     Q.  And it indicates here, the bottom of
21 that paragraph, "He also would like to see
22 nationwide market research from healthcare
23 practitioners to determine what the message is
24 the doctors are getting from our promotional
25 efforts."

Page 168

1          Do you see where that is?
2      A.  Hang on a second.  What paragraph is
3  that.
4      Q.  It's the second full paragraph that
5  starts "Tom Abrams interjected," and it's the
6  last line of that paragraph.
7      A.  Yes, I see it.
8      Q.  Okay.  Do you know if Purdue undertook
9  bringing in a nationwide market research firm to
10 conduct this research?
11     A.  I don't know.  I mean, I don't know
12 either way.
13     Q.  Okay.  Now, you talked earlier about
14 the surveillance that Purdue did, RADARS and
15 efforts like that.  Are you familiar with the
16 Top 100 Counties initiative at Purdue?
17     A.  No.
18     Q.  And did you ever become aware of Maine
19 as a hotspot, obviously not a county, but for
20 opioid abuse and diversion?
21         MR. PETRILLO:  Object to the form.
22     A.  Okay.  I became aware that upstate
23 Maine had a significant abuse and division
24 problem.
25 BY MS. SINGER:

Page 169

1      Q.  Do you remember when you became aware
2  of that?
3      A.  I'm not sure.
4      Q.  Okay.  I'll give you all these.  So
5  this is Exhibit 19.
6          (Whereupon, Purdue-Wright-19 was
7          marked for identification.)
8  BY MS. SINGER:
9      Q.  So it doesn't have a Bates number,
10 it's "Prescription Drugs.  OxyContin Abuse and
11 Diversion and Efforts to Address the Problem,"
12 dated December, 2003 by the GAO.
13         Do you recognize this document?
14     A.  I read it -- I recognize that I read
15 something like this at the time.
16     Q.  Okay.  And that would have been back
17 somewhere around December, 2003?
18     A.  2003.
19     Q.  Okay.  And if you could turn to
20 Page 10 of the report, please.
21     A.  Okay.
22     Q.  Do you see in the first full paragraph
23 on the report "After learning about the initial
24 reports"?
25     A.  I see that paragraph.

Page 170

1  Q. Do you mind reading that out loud,
2  please?
3  A. "After learning about the initial
4  reports of abuse and diversion of OxyContin in
5  Maine in 2000, Purdue formed a response team
6  made up of its top executives and physicians to
7  initiate meetings with federal and state
8  officials in Maine to gain an understanding of
9  the scope of the problem and to devise
10 strategies for preventing abuse and diversion."
11 Q. You can read one more sentence,
12 please.
13 A. "After these meetings, Purdue
14 distributed brochures to healthcare
15 professionals that described several steps that
16 could be taken to prevent prescription drug
17 abuse and diversion."
18 Q. And were you familiar with that effort
19 at Purdue Pharma?
20 A. I don't know if I was familiar at the
21 time. I don't remember it.
22 Q. Okay. Do you recall if you were
23 involved in any effort like that?
24 A. I could have been. I don't -- I
25 honestly don't remember.

Page 171

1  Q. Okay.
2  (Whereupon, Purdue-Wright-20 was
3  marked for identification.)
4  BY MS. SINGER:
5  Q. Exhibit 20 is PKY180277573, and it's a
6  PowerPoint titled "Protecting Patients' Rights
7  to Proper Pain Management - New England
8  Initiative."
9  Have you seen this document before,
10 this presentation?
11 A. I don't think so.
12 Q. Okay. And do you know who Robin Hogen
13 is?
14 A. I don't know his exact title, but I
15 knew where his office was in the building.
16 Q. Okay. And this is -- he's someone you
17 interacted with or worked with at Purdue?
18 A. On a limited number of times.
19 Q. Okay. And do you know if he was a
20 doctor or a scientist?
21 A. He was a -- I don't know what his
22 professional background was. He was a senior
23 executive in the company, and that's about as
24 much as I knew.
25 Q. Okay. So if you could turn to Bates

Page 172

1  number 579. Do you see the first slide,
2  "Preparation: Maine Strike Force"?
3  A. Mm-hmm.
4  Q. And under the third indented bullet of
5  internal personnel, do you see your name?
6  A. Yes, I do.
7  Q. Okay. And does that refresh your
8  recollection about anything you might have done
9  in connection with the Maine Strike Force?
10 A. No, because I don't think I did
11 anything. I mean, I can't identify anything
12 with respect to the Maine Strike Force.
13 Q. Okay. And I just want to turn you
14 back to the first page. I'm sorry, let's start
15 actually on the second page which is Bates
16 number 574. Under "Today's Situation" it
17 describes "Increased media exposure of diversion
18 and abuse of OxyContin in Maine." That's
19 something you recall, correct?
20 A. Yes.
21 Q. And "Numerous physician inquiries
22 about Purdue's plans to address abuse issue."
23 Was that something that you remember being
24 involved in or hearing about at Purdue?
25 A. That would have gone someplace other

Page 173

1  than me. That wouldn't have gone to my group.
2  Q. Okay. Do you remember hearing about
3  it?
4  A. We knew about the -- I knew about the
5  cases in Maine, and I knew about Maine's concern
6  about the cases. I don't know -- I don't know
7  how many physician inquiries we got or what the
8  physicians were saying.
9  Q. Okay. And what about the last bullet,
10 "Evidence of patient concern and reticence to
11 use drug," were you aware of that?
12 A. I have no idea about that.
13 Q. Okay. All right. And moving to the
14 second slide on this page under the heading "How
15 Did We Get Here?", did you hear that the US
16 attorneys sent a letter to healthcare providers
17 in Maine warning of OxyContin abuse?
18 A. I don't know about that.
19 Q. Okay. And then just turning back to
20 the first slide, actually the second slide on
21 the first page, 573, do you see the slide "Goal
22 and Objective"?
23 A. (Nodding in the affirmative).
24 Q. And can you read aloud what's listed
25 there as goals -- as a goal and objective for

Page 174

1  Purdue Pharma?
2      MR. SNAPP:  Object to the form.
3      A.  "Goals and Objectives.
4      "Sustain and increase OxyContin
5  prescriptions.
6      "Increase proactive treatment of pain.
7      "Position OxyContin as safe and
8  effective therapy."
9      And "Diffuse concerns about
10 OxyContin/opioids stemming from high profile
11 news coverage of abuse."
12     Q.  And do you remember discussions about
13 efforts to accomplish those goals and
14 objectives?
15     MR. SNAPP:  Object to the form.
16     A.  Those weren't the discussions we were
17 having.
18 BY MS. SINGER:
19     Q.  Okay.
20     A.  I mean, not in my group.
21     Q.  Okay.  And you don't recall
22 discussions with Robin Hogen's group about that?
23     A.  No, no, no, not at all.
24     Q.  You're getting a reprieve from one
25 document.

Page 175

1      Okay.  This document we're about to
2  mark was produced natively under the Bates
3  number PPLPC013000068011.  It's Exhibit 21.
4      (Whereupon, Purdue-Wright-21 was
5  marked for identification.)
6      MS. SINGER:  Can I take one of those
7  back?  I'm sorry.
8  BY MS. SINGER:
9      Q.  And if you can turn to the first
10 colored page.  By all means, take your time to
11 look through it.
12     (Witness reviewing document.)
13     Q.  Tell me whenever you're ready to talk
14 about it.
15     (Witness reviewing document.)
16     Q.  So do you remember this PowerPoint,
17 Dr. Wright?
18     A.  I think I recognize it as one of a
19 series of PowerPoints that were developed
20 through the Opioid X program.
21     Q.  Okay.  And this is a PowerPoint that
22 you prepared, yes?
23     A.  I do not remember preparing it, but
24 it's likely to have -- the first draft is likely
25 to have been mine.

Page 176

1      Q.  Okay.  I wanted to turn your to slide
2  eight.  It's not numbered, but it is the slide
3  that's titled "Abuse and Addiction."  And in
4  this slide there's a distinction between
5  addiction liability and abuse liability.
6  Addiction liability is "The risk that an
7  individual patient, using the drug as directed,
8  will develop symptoms of addiction to the drug."
9      Is that an accurate statement or an
10 accurate description of addiction liability?
11     A.  Actually addiction liability, looking
12 at it today, is not a recognized term of art in
13 this area.
14     Q.  Was it a term of art then?
15     A.  It's what I wrote then, I think.  What
16 I was trying to do in today's terms would be to
17 differentiate between misuse, abuse and
18 diversion, and iatrogenic addiction.
19     Q.  Okay.  So what would you change, if
20 anything, about the description of addiction?
21     MR. SNAPP:  Object to the form.
22     A.  I would probably add "properly managed
23 individual patient."
24 BY MS. SINGER:
25     Q.  Okay.  So the risk that properly

Page 177

1  managed individual patients using the drug as
2  directed?
3      A.  Will develop addiction to the drug.
4      Q.  Okay.  And let's turn to the abuse
5  liability.  "The risk that individuals other
6  than legitimate patients will misuse, abuse, and
7  divert the drug."  Does that reflect your views
8  on what abuse liability of a drug is?
9      A.  Well, that's the risk of misuse,
10 abuse, and diversion.  In this slide I was
11 trying to separate two conflated ideas, that
12 there were two domains in which you worried
13 about abuse of a drug, iatrogenic addiction,
14 misuse, abuse and diversion.
15     Q.  And opioids create risks in both
16 domains, correct?
17     MR. SNAPP:  Object to the form.
18     A.  Opioids create risks in both domains,
19 both in iatrogenic addiction and misuse, abuse
20 and diversion.
21 BY MS. SINGER:
22     Q.  Okay.  Can you define for the record
23 iatrogenic addiction, please?
24     A.  It changes from decade to decade, but
25 to me right now iatrogenic addiction is the risk

Page 178

1  that a properly managed -- properly selected and
2  managed patient who has an appropriate condition
3  who receives treatment with the drug becomes
4  addicted to the drug.
5      Q.  And you have defined different
6  domains, but an individual who becomes addicted
7  to an opioid can also abuse an opioid, correct?
8      MR. SNAPP:  Object to the form.
9      A.  Everybody who has become addicted is
10  abusing an opioid.  Everybody who is abusing an
11  opioid is not necessarily addicted.  People can
12  engage in misuse and diversion who aren't
13  abusers or addicted, they're selling them.  And
14  what everybody struggles with is that these
15  terms are all conflated and mean different
16  things to different people.
17      It looks like in this presentation I
18  was trying to say there's two things you have to
19  worry about and both are important, one is the
20  iatrogenic addiction and the other is misuse,
21  abuse and diversion.
22  BY MS. SINGER:
23      Q.  Okay.  So let's turn to slide 13,
24  which is titled "The Goal."  Do you recall what
25  you're talking about in this slide, what the

Page 179

1  goal is?
2      A.  I do not remember independently.
3  Reading this slide, I can conjecture.
4      Q.  And what is your conjecture?
5      MR. SNAPP:  Object to the form.
6      A.  Back in 1990, 1995, 1985, back in that
7  period, abuse of a pharmaceutical was considered
8  to be a criminal justice problem.  It was a
9  problem for the cops.  That, by definition, if a
10  product was being abused, misused or diverted it
11  was not being used as directed, and that did not
12  affect the perceived safety profile of the drug.
13      By this point in time, and certainly
14  going forward, what happens to the rest of
15  society is viewed as an important part of the
16  safety profile of the drug, that you can't view
17  it as a criminal justice problem.  That's where
18  I was going with this.
19  BY MS. SINGER:
20      Q.  Okay.  In the third bullet, "Companies
21  that make an advantage of the new situation will
22  find a new market opportunity and thereby win,"
23  what are you referring to there?
24      A.  If you recognize that it is important
25  to consider the safety of the rest of the

Page 180

1  population other than the individual patient
2  with the individual condition, if you integrate
3  pharmacoepidemiology into your thinking, you'll
4  be more successful.
5      (Whereupon, Purdue-Wright-22 was
6      marked for identification.)
7  BY MS. SINGER:
8      Q.  All right.  Exhibit 22 is
9  PDD8901212709 titled "Overall Medical Strategy
10  for Purdue Opioid Products (Abuse and Diversion
11  Resistance)."
12      Do you recognize this document?
13      A.  I recognize it.  I don't remember
14  where I gave it, but I think it's -- I think
15  it's a -- help me -- presentation I gave.
16      Q.  Okay.  And does the date March 1st
17  through 2nd, 2005 seem about right?  No reason
18  -- or no reason to believe it's not right?
19      A.  I don't know whether it's right or
20  not, but it's what's written on the page.
21      Q.  Okay.  If you can turn to 2723.  The
22  Bates numbers are in the bottom corner.
23      MR. SNAPP:  Can you give him a moment
24  to look through the entire document, please?
25      MS. SINGER:  If he asks, I'm happy --

Page 181

1      MR. SNAPP:  If he needs --
2      MS. SINGER:  Excuse me?
3      MR. SNAPP:  If he wants time to look
4  through the entire document, may he take --
5  BY MS. SINGER:
6      Q.  So, Dr. Wright, let me just say so we
7  don't have to have these interactions, if you
8  ever need more time for a document, just ask,
9  and you're welcome to take whatever time you
10  need.
11      MR. SNAPP:  Thank you.
12      A.  I'm just familiarizing myself with
13  what I said in this particular presentation.  I
14  gave dozens.
15  BY MS. SINGER:
16      Q.  Sure.  Of course.
17      (Witness reviewing document.)
18      A.  Okay.
19      Q.  Okay.  And if you can turn now to
20  Bates number 723, which is titled "The Abuse
21  Problem."
22      A.  I'm having problems finding Bates
23  number 723.
24      Q.  If you turn it sideways, that might
25  help orient it like it's not a PowerPoint.  And

Page 182

1  it's going to be in the back third.
2      A.  Yes.
3      Q.  Got it?
4          Okay.  First of all, before getting to
5  the particulars, I know you mentioned DAWN
6  before, but can you describe what DAWN ED
7  mentions are?
8      A.  The federal government and in
9  conjunction with a number of medical
10  institutions runs a continuing and ongoing
11  survey where nurses are sent in to go through
12  emergency room records and abstract mentions
13  involving drug abuse, those are ED mentions.
14  They are not representing individual cases
15  because a person could have two drugs in their
16  mention because they were abusing two drugs.
17  Those are then statistically compiled and made
18  available to the rest of the scientific
19  community.
20      Q.  Okay.  And what do DAWN ED mentions
21  serve to indicate to you?
22      A.  They're a surrogate of abuse of a drug
23  in the community.
24      Q.  Okay.  And I'm never going to say it,
25  on the bottom axis, equianalgesic doses?

Page 183

1      A.  Yes.
2      Q.  Did I say that right?
3      A.  Equianalgesic doses.
4      Q.  What does that represent?
5      A.  People confuse potency and strength.
6  Potency is how strong it is; strength is how
7  much there is of it.  When you prescribe a drug
8  there could be huge differences in the potency
9  of the drug and, thus, in the dose that's used.
10  So a dose of fentanyl could be 300 micrograms
11  or -- yeah, micrograms, a dose of morphine might
12  be 5 milligrams, a dose of Codeine could be
13  60 milligrams.  When you want to compare the two
14  you can't just say, well, here's a milligram of
15  fentanyl, because that's a huge amount of
16  fentanyl.  So you have to take and make the
17  equianalgesic doses, the doses adjusted to
18  morphine equivalence, so that you're looking at
19  apples and apples instead of apples and oranges.
20      Q.  Okay.  Next to this chart, can you
21  read what's written there?
22      A.  "Abuse appears proportionate to the
23  potency and amount of the opioid prescribed."
24      Q.  Is that your view as of 2005?
25          MR. SNAPP:  Object to the form.

Page 184

1      A.  It reflects my views -- in 2005 I
2  would have agreed with the statement because I
3  wrote it that "abuse appears proportional to the
4  potency and amount of the opioid prescribed."
5      Q.  And do you still agree with that
6  statement?
7      A.  I still agree with that statement.
8      Q.  Okay.  And the relationship between --
9  never mind.  Withdrawn.
10      A.  May I also make sure that you
11  correctly interpret that graph that you looked
12  at?
13      Q.  Sure.
14      A.  It doesn't matter what the opioid is.
15  It didn't matter which one it was.  They all
16  fell on the same line.
17      Q.  Meaning the more drug, the greater the
18  potency, the more abuse?
19      A.  All of the Schedule II strong opioids,
20  all of the strong opioids have about the -- have
21  the same relationship at about the same
22  magnitude.
23      Q.  I know you said you gave lots of
24  presentations.  I don't think we'll take you
25  through all of them, but this is Exhibit 23.

Page 185

1          (Whereupon, Purdue-Wright-23 was
2          marked for identification.)
3  BY MS. SINGER:
4      Q.  It's also produced natively,
5  PPLPC013000094578.  It's titled
6  "Tamper-Resistance (What it is, What it isn't,
7  What we need)."
8          When you've had a chance to go through
9  it, can you tell me if you recognize this
10  presentation?
11      A.  I recognize it as one of the Opioid X
12  presentations.  I don't remember -- once again,
13  I don't remember which one of them it was.
14      Q.  Okay.  So you don't remember who the
15  audience was for this?
16      A.  Not -- I don't remember what the
17  audience was.  But this is long enough and
18  formal enough so that it was likely presenting
19  outside of the group itself to someone else in
20  the company.
21      Q.  All right.  Let's turn to slide four.
22  So again, these aren't numbered because it's
23  native, but it is the slide that has "NHS Drug
24  Abuse."
25          And does that slide show the same

Page 186

1  relationship that we were just talking about?
2      MR. SNAPP: Object to the form.
3      A.  No.
4  BY MS. SINGER:
5      Q.  Is it different?
6      MR. SNAPP: Object to the form.
7      A.  This slide is a slide of year by year.
8  It's a government slide, I didn't -- we didn't
9  produce this data, and the government had
10  finally decided on new non-medical use as their
11  term.  It meant that it was non-medical use and
12  it was new.  They didn't use abuse or addiction
13  or diversion, they used new non-medical use as
14  their standard.  And this was, I think, the
15  National Center for Health Statistics, but I'm
16  not -- might be National Health Service, I'm not
17  sure what the acronym is at this point, it's
18  been too long.
19      But what this shows is the number of
20  cases that NHS calculated from their statistics
21  for per year from 1965 to 2000.
22  BY MS. SINGER:
23      Q.  Okay.  And it shows that the
24  trajectory increases over time, and particularly
25  steeply after the mid 1990s, correct?

Page 187

1      MR. SNAPP: Object to the form.
2      A.  That is correct.
3  BY MS. SINGER:
4      Q.  So turning to "Risk Assessment," you
5  indicate there that "The increase in opioid
6  usage...is a major advance in pain management,
7  but has occurred in a period with a significant
8  increase in prescription opioid abuse."  And you
9  acknowledge this is a very big problem.  I take
10  it that's still your view?
11      A.  This slide --
12      MR. SNAPP: Object to the form.
13      A.  -- says it's a problem, it's a very
14  big problem.  I agree with that.
15  BY MS. SINGER:
16      Q.  Too much paper.  Forgive me.
17      All right.  If you turn to the slide
18  that is titled "Addicts."  If you can look at
19  the last bullet, or the last two bullets,
20  "Taking drug to feel normal is part of
21  addiction."
22      Is that an accurate statement?
23      MR. SNAPP: Object to the form.
24      A.  The statement "taking drug to feel
25  normal is part of addiction" is colloquial.  I

Page 188

1  don't think it's a medical phrase.  But I think
2  it accurately reflects what someone who is
3  active alcohol or drug-dependent feels.  By the
4  time their addiction has become severe, they're
5  not taking the drug to get high or get euphoric
6  or feel pleasure, they're taking the drug to
7  feel normal, they're taking the drug to
8  function.  They're hurting.
9  BY MS. SINGER:
10      Q.  And it's true they're -- well, you
11  said it.
12      And then the last bullet there,
13  "Accidental and intentional ODs are expected."
14      A.  Yes.
15      Q.  You also agree with that statement
16  still?
17      A.  Yes.
18      MR. SNAPP: Object to the form.
19  BY MS. SINGER:
20      Q.  So let's turn to the slide that's
21  titled "Where is the problem?"  Why don't you
22  read this one, please, if you will.
23      A.  "Where is the problem?
24      "There are 1 to 2 million opioid
25  addicts in the US.

Page 189

1      "There are 7 to 9 million opioid
2  abusers.
3      "There are 10 million or more
4  experimenters.
5      "Addicts prefer 'optimized' opioids.
6      "Addicts can get opioid as methadone."
7  And there are now others.
8      "Most drug abuse casualties are among
9  the abusers who surprise 70 to 80 percent of the
10  purchasers.
11      "Most of the diverted drug goes to the
12  addicts, who are the frequent, high volume
13  users."
14      Q.  Again, does this reflect your views as
15  of the time you wrote this PowerPoint?
16      A.  Yes.
17      Q.  And now?
18      MR. SNAPP: Object to the form.
19      A.  I'm not sure that -- I've been out of
20  it too long.  I don't know if the numbers are
21  still right.
22  BY MS. SINGER:
23      Q.  Okay.  For the drug abuse casualties
24  here in the statistics about abusers, again I
25  know you talked earlier about two domains, but

Page 190

1  is it fair to say that people who begin as
2  addicts are also abusers, people -- I'm sorry,
3  began as patients can become addicts and
4  abusers?
5      MR. SNAPP:  Object to the form.
6      A.  People who become -- people who are
7  patients can become abusers.  People who are
8  patients can become addicts.  People who are not
9  patients can become abusers.  People who are not
10 patients can become addicts.  And there's a wide
11 variation in vulnerability, and this is a
12 problem that affects the entire population.
13 BY MS. SINGER:
14     Q.  All right.  If you can turn to the
15 last slide titled "Life-Cycle Management."  So
16 the first intended line, "If targeted for large
17 FP/GP markets."  Can you explain what that is?
18     A.  If a drug is going to be used in a
19 large patient population it needs to have a
20 reduced risk, abuse risk profile.
21     Q.  And what does FP stand for?
22     A.  Family practitioner/general
23 practitioner.
24     Q.  Got it.
25         And the various bullets here, if

Page 191

1  targeting large family practitioners or general
2  practitioner, large outpatient sales, emerging
3  abuse trends continue upward, all of these
4  listed here are reasons for moving to reduced
5  abuse risk drugs, correct?
6      A.  That is correct, ma'am.
7      Q.  Okay.  And some of these relate --
8  withdrawn.
9          So one of -- your last bullet here
10 talks about avoiding restrictions on marketing.
11 Explain what you mean by that.
12     A.  If the FDA is doing its job and a
13 product has too high an abuse risk for the
14 population that it's going into, the FDA will
15 have to step in and restrict marketing.
16     Q.  And what about for competitive
17 advantage and differentiation, what do you mean
18 there?
19     A.  If I was a practitioner and I had a
20 choice between a product that I credibly
21 believed was tamper-resistant or had a reduced
22 abuse potential, and one that didn't, I'd pick
23 the one that did.
24     Q.  Okay.  And all of these still strike
25 you as the reasons, yes, among the reasons for

Page 192

1  reduced abuse profile?
2      MR. SNAPP:  Object to the form.
3      MR. PETRILLO:  Object.
4      A.  The whole presentation was part of the
5  Opioid X portfolio which was a huge program that
6  Purdue mounted to try to find out how you would
7  make a less abusable, less divertable product.
8  It was not as simple as I thought.  And this
9  proposal looks like it was presented to an
10 audience that I was trying to make it very clear
11 to them that you need to do this, you need to do
12 this for a new product, the world has changed.
13 BY MS. SINGER:
14     Q.  Okay.
15     MR. PETRILLO:  Is now a good time for
16 a short break before you go to the next
17 document?
18     MS. SINGER:  Yes, that's fine.  And
19 I'm in the -- let's go off the record.
20     THE VIDEOGRAPHER:  We are now going
21 off the record, and the time is 2:42 p.m.
22     (Whereupon, a recess was taken.)
23     THE VIDEOGRAPHER:  We are now going
24 back on the record, and the time is 2:55 p.m.
25

Page 193

1      (Whereupon, Purdue-Wright-24 was
2          marked for identification.)
3      MS. SINGER:  All right.  Exhibit 24 is
4  PKY180816855, another Sponsor Meeting Minutes.
5  BY MS. SINGER:
6      Q.  And, Dr. Wright, please take your time
7  and take a look, let me know if you recognize
8  this document.
9      (Witness reviewing document.)
10     Q.  So, Dr. Wright, do you recognize this
11 document?
12     A.  Yes, I do.
13     Q.  And what do you recognize it to be?
14     A.  I recognize it to be more minutes from
15 the sponsor of a meeting between the FDA and the
16 company.
17     Q.  Okay.  And the meeting took place May
18 14th, 1997, does that seem accurate?
19     A.  That seems accurate.
20     Q.  And you were the chair of this
21 meeting, correct?
22     A.  I think it means I was senior at the
23 meeting, but yes.
24     Q.  And you were at the FDA at this point,
25 correct?

Page 194

1    A.  I believe so.
2    Q.  Okay.  And do you recall what this
3  meeting related to?
4    A.  I don't actually remember this meeting
5  being -- this meeting as I remember the meeting,
6  but the minutes are quite clear.
7    Q.  Okay.
8    A.  This would be the HXA, or the HX --
9  was it HXA or HX?
10    (Witness reviewing document.)
11    Q.  I don't think you need to refer to it
12  by the product name.
13    A.  Okay.
14    Q.  But is it correct to say --
15    A.  This was a hydrocodone/naloxone
16  combination.
17    Q.  Okay.  And it's a meeting not just
18  between Purdue and the FDA, right?
19    A.  It included Frank Sapienza and
20  Gretchen, who I think I remember, but Frank for
21  sure from the DEA.
22    Q.  And also someone from NIDA, which
23  stands for?
24    A.  National Institutes on Drug Abuse.
25    Q.  Okay.  And according to the minutes,

Page 195

1  and to the best of your recollection, Purdue had
2  asked for this meeting to discuss this reduced
3  abuse liability hydrocodone product, correct?
4    A.  Yes.
5    Q.  And did Purdue have a request for how
6  this drug should be scheduled?
7    MR. SNAPP:  Object to the form.
8    A.  What it says in the minutes is that
9  the sponsor believes that the drug product
10  should be Schedule IV.
11  BY MS. SINGER:
12    Q.  And what is a Schedule IV drug?
13    A.  Okay.  A Schedule IV drug has the
14  second from the bottom abuse liability and
15  potential of the drugs in the schedule.  My
16  memory, which may be correct, was that at this
17  time the hydrocodone, APAP/hydrocodone, aspirin,
18  hydrocodone/NSAID combinations were in Schedule
19  IV.  Hydrocodone itself was in either III or II.
20    Q.  Okay.  Then if you look down the page
21  under the "FDA Recommendations," do you see the
22  second bullet point where you're noted as
23  indicating that I think it's meant to be
24  "addition of naloxone to an oral product may
25  reduce the likelihood of parenteral abuse."

Page 196

1  What's parenteral abuse?
2    A.  Parenteral is medical for injecting.
3    Q.  Okay.  For this -- but "for this
4  product there is a greater potential for oral
5  abuse than parenteral abuse."
6    A.  That's what it says.
7    Q.  And is that accurate?
8    A.  I believe so.
9    Q.  Okay.  And you also indicate I think
10  the fourth bullet point from the bottom that
11  "The sponsor should demonstrate that the drug
12  combination will not cause abuse or dependence."
13    Do you see that?
14    A.  I don't know if that was my
15  recommendation, but that was the FDA's
16  recommendation.
17    Q.  Okay.  And that "The sponsor needs to
18  demonstrate net benefit of the combination
19  product to the public"?
20    A.  Yes.
21    Q.  And that "The sponsor shall
22  demonstrate in Clinical and Preclinical studies
23  that the addition of Naloxone in this drug
24  product will deter abuse in both opioid naive
25  patients and opioid dependent patients"?

Page 197

1    MR. SNAPP:  Object to the form.  It
2  says addition, and I think you said addiction.
3  I'm sure you want a clear record.  You said
4  addiction.
5    MS. SINGER:  I said addition.
6    A.  Allow me to reread it.
7    MR. SNAPP:  I want to make sure the
8  record is clear.
9    A.  These terms get confused.
10  BY MS. SINGER:
11    Q.  Particularly with typos.
12    A.  "The sponsor should demonstrate in
13  both clinical and preclinical studies that the
14  addition of naloxone in this drug product will
15  deter abuse in both opioid naive patients and
16  opioid dependent patients."  That's what the
17  minutes say.
18    Q.  Okay.  And those seem to be accurate
19  reflections of what was conveyed to Purdue at
20  that meeting, correct?
21    MR. SNAPP:  Object to the form.
22    A.  They seem eminently sensible.
23  BY MS. SINGER:
24    Q.  And then if you turn to Bates number
25  857, the fourth bullet point notes "Dr. Wright

Page 198

1  noted that hydrocodone abuse is primarily oral."
2      Again, does that reflect your
3  understanding of hydrocodone abuse?
4      A.  The hydrocodone products on the market
5  at that time were not injectable.  They could --
6  they contained large amounts of Tylenol or
7  another aspirin or another NSAID, and so abuse
8  of those products was mostly oral,
9  immediate-release oral.
10     Q.  So at the end of that bullet point it
11 reports here that "As the data suggest the abuse
12 is almost exclusively oral, what we would need
13 to see with this product is that the oral abuse
14 liability, particularly in the opioid abuser, is
15 reduced."
16     Does that seem sensible to you?
17     A.  That seems sensible.
18     Q.  And then the last bullet point,
19 "Dr. Wright recommended that the sponsor work
20 with DEA and DDMAC in the advertising of the
21 'less abuse potential' than competitor's
22 products."
23     Do you see that point?
24     A.  I see that point.
25     Q.  Does that also seem sensible to you?

Page 199

1      MR. SNAPP:  Object to the form.
2      A.  There would be great reluctance to
3  market anything in this area with hydrocodone,
4  and I felt that DEA would have strong feelings
5  and DDMAC would have strong feelings against
6  making such claims.
7  BY MS. SINGER:
8      Q.  And why is that?
9      A.  Hydrocodone at the time was -- and for
10 most of the drug abuse epidemic has been more
11 abused than oxycodone or OxyContin.  It is
12 prescribed in huge volume, it's used in acute
13 pain and post-surgical, and it is also subject
14 to -- I don't know, there isn't a term for this,
15 but gray drug smuggling, the shipment of tablets
16 that look like pharmaceutically manufactured
17 tablets in the US from abroad.  You know, I do
18 not -- I'm not enough of a law enforcement
19 person to know who is smuggling them in or the
20 actual volume, but I know that it was large
21 enough to distort the national statistics for
22 hydrocodone abuse.  Hydrocodone is a bad drug of
23 abuse.
24     Q.  Okay.  And so in that bullet point you
25 seem to be indicating that it's the advertising

Page 200

1  of less abuse potential that seems to have
2  taught your attention, is that -- or that's the
3  focus of your comment, is that correct?
4      MR. SNAPP:  Object to the form.
5      A.  I think the point I'm trying to make
6  is do not hold false expectation of being able
7  to make less abusable claims because DEA and
8  DDMAC will have strong feelings on the subject.
9  BY MS. SINGER:
10     Q.  Okay.  And isn't there some risk that
11 in advertising the product as having less abuse
12 potential that you will prompt even greater
13 prescribing, that doctors will lose caution
14 about the product?
15     MR. SNAPP:  Object to the form.
16 BY MS. SINGER:
17     Q.  Is that fair?
18     MR. SNAPP:  Object to the form.
19     A.  It depends on what you're doing.
20 Because if you're prescribing in context, and
21 you say this is a Schedule II narcotic that has
22 high abuse potential, any claims you make about
23 lowered abuse potential will be ignored.  But if
24 you have a big banner that says less abuse
25 potential, and that's all you say, that's bad.

Page 201

1      (Whereupon, Purdue-Wright-25 was
2      marked for identification.)
3  BY MS. SINGER:
4      Q.  All right.  Exhibit 25.  Exhibit 25 is
5  PDD8801176637, and it's an e-mail or memo from
6  David Haddox to Robert Reder.  When you have had
7  a chance to look at it, please just let me know.
8      (Witness reviewing document.)
9      A.  I've looked at it, ma'am.
10     Q.  Okay.  So do you recall this
11 communication?
12     A.  No, ma'am.
13     Q.  Okay.  And are you familiar with the
14 program it discusses, MAD SS, or the MAD
15 surveillance system?
16     A.  Misuse, abuse, and diversion.
17     Q.  Okay.  Is that how they --
18     A.  That was an acronym that we tried at
19 one point.
20     Q.  Okay.  And were you involved with the
21 MAD surveillance system?
22     A.  Secondarily.  That was predominantly
23 Sid Schnoll and David Haddox.
24     Q.  And who was Sid Schnoll?
25     A.  Sid Schnoll is one of my mentors.  He

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1  was a senior researcher in drug abuse. He's a
2  member of the College of Problems of Drug
3  Dependence, has had experience with previous
4  abuse epidemics, and was hired by Purdue.
5      Q.  So this communication describes a
6  study that Purdue seems to be set to undertake,
7  is that correct?
8      A.  Well, it describes a study that has
9  been proposed, one of --
10     Q.  Go ahead --
11     A.  Describes a study that had been
12 proposed.
13     Q.  Do you know if Purdue ever undertook
14 that study?
15     A.  I don't know whether they did it or
16 not.
17     Q.  And I notice that -- and it's a study
18 of -- potential study of addiction abuse,
19 correct?
20     A.  It is a potential study of abuse,
21 substance abuse disorders involving OxyContin,
22 abuse of OxyContin.
23     Q.  And one of the people CC'd on this
24 e-mail is HRU right after Dr. Kaiko, and PDG.
25 Do you know who HRU is?

Page 203

1      A.  No.  It would have to be a guess.
2      Q.  Do you think it might be Howard Udell?
3      A.  It might be Howard Udell.  HRU,
4  Howard, I don't know what Howard's middle
5  initial is.
6      Q.  Okay.  And do you recall whether the
7  legal department or the general counsel was
8  involved in this potential study?
9          MR. SNAPP:  Object to the form.
10     A.  I was not involved in the planning of
11 the study, so I don't know.
12         (Whereupon, Purdue-Wright-26 was
13         marked for identification.)
14 BY MS. SINGER:
15     Q.  Okay.  All right.  Exhibit 26 is
16 PPLPC013000103821, and it's titled "Final Report
17 - Top 200 Project.  January 2004."
18         (Witness reviewing document.)
19     Q.  So something about the document made
20 you smile.
21     A.  It meant that some work that we did
22 actually got pushed up to -- and taken notice
23 of.
24     Q.  Okay.  So do you recall the Top 200
25 Project?

Page 204

1      A.  Not by that name.
2      Q.  Okay.  And do you know -- you were
3  listed, if you can see under "Contacts," "Curtis
4  Wright (CRAC)."
5      A.  Mm-hmm.
6      Q.  What does CRAC stand for?
7      A.  I've forgotten what that particular
8  acronym, it disappeared about -- it disappeared.
9      Q.  And so I take it you don't know who
10 led this project?
11     A.  No.  I don't know who -- I know about
12 the part I had in it, but I now found out that I
13 had a part in it because the project that we did
14 is reported here.
15     Q.  Okay.
16     A.  But I don't know about the project as
17 a whole.
18     Q.  Okay.  So we'll get to your part, I
19 promise.
20         So it says here in the "Background"
21 section, "In the period 1999 through 2000 the
22 news media alleged several physicians had been
23 involved in large scale diversion of OxyContin
24 to the illicit market.  This led to suggestions
25 that Purdue 'should have known' that these

Page 205

1  physicians were engaged in these practices
2  through routine examination of sales and
3  marketing data."
4          Have I read that correctly?
5      A.  You've read that correctly.
6      Q.  And do you recall a conversation
7  within Purdue about this issue?
8      A.  Not quite -- well, not stated quite
9  that way.  But Purdue certainly -- the people
10 that talked to me were not -- certainly did not
11 want to be involved in promoting, marketing,
12 selling, distributing, or otherwise having
13 anything to do with physicians that were
14 misprescribing or illicitly prescribing.  And so
15 I'm learning some bits by reading this, but this
16 program looks like an attempt to say could
17 Purdue have known, so Purdue have known,
18 what could Purdue have known from the sales and
19 marketing data.
20     Q.  And so if you look down to the --
21 two-thirds down the page still at Bates number
22 821, it indicates that "Sales representatives
23 calling on physicians in the top sales cohort
24 were interviewed by experienced legal staff for
25 indicators of illicit diversion."

Page 206

1      Were you aware that that was
2  happening?
3      A.  I knew that there was some kind of
4  interviewing going on, but I didn't know who was
5  doing it.
6      Q.  Okay.  And do you know why it was done
7  by legal staff?
8      A.  No.
9      Q.  And did you see any of the results of
10 those interviews from them?
11     A.  No.
12     Q.  And were you involved in any way in
13 that process?
14     A.  It's extremely hard to answer that
15 because I can't tell if some question that I got
16 bombing in by e-mail from someone was related to
17 this or not.  I answered a lot of questions
18 about what could be looked for in talking to --
19 and looking at a clinic or making a sales call
20 or doing a -- talking to a pharmacy or -- I
21 would get questions and I wouldn't know why I
22 was being asked.
23     Q.  Okay.  And I think we may have talked
24 about this before, but do you remember who those
25 questions came from?

Page 207

1      A.  I'm tempted to say everybody.  I got
2  questions from a number of different sources.
3  After I checked that they were Purdue employees
4  and had a right to ask, I answered the question.
5      Q.  Okay.  If you turn to Bates number
6  823, you'll see in bolded text categories of
7  "Impaired Physicians" and "Felonious
8  Physicians."
9      Did you hear those terms used within
10 Purdue?
11     A.  I think I might have been responsible
12 for them.
13     Q.  That includes the third category at
14 Bates number 824, "Diverting Physicians"?
15     A.  I think that might have been language
16 that I came up with in response to a question.
17 I'm not sure.
18     Q.  Okay.  And so Purdue was aware that
19 there were doctors who fit, to use your prior
20 phrase, in each of these domains?
21     MR. SNAPP:  Object to the form.
22     A.  I don't know what Purdue was aware of.
23 I made up -- if these are mine and they look --
24 they have the ring of my speech, but it could
25 have been David, it could have been Sid, I don't

Page 208

1  know.
2  BY MS. SINGER:
3      Q.  Okay.  But they --
4      A.  They have the ring, and the
5  definitions sound like something I might have
6  kicked in.
7      Q.  Okay.  But they did make it into this
8  document on the Top 200 Project?
9      MR. SNAPP:  Object to the form.
10 BY MS. SINGER:
11     Q.  Is that correct?
12     A.  Well, it got into this document.
13     Q.  Okay.  And do you know what sources of
14 information Purdue relied on in either coming up
15 with these categories or identifying doctors who
16 might belong in either of them?
17     MR. SNAPP:  Object to the form.
18     A.  I can only talk about my part, the
19 analysis that we did --
20 BY MS. SINGER:
21     Q.  Okay.
22     A.  -- as part -- that I think are part of
23 this.
24     Q.  Okay.  Please go ahead.
25     A.  And what -- there were several

Page 209

1  sources.  Dr. Haddox's program, Sid's program,
2  the RADARS program had found some very startling
3  information because they had concurrent abuse
4  and diversion data by ZIP code for areas that it
5  turned out that there had been a diverting
6  pharmacy or physician, and by statistical
7  analysis you could see that one or two of some
8  of these diverting pharmacies or physicians had
9  an enormous impact, they were capable of putting
10 in a very large number of dosage forms into the
11 illicit market and showed up as drug abuse
12 cases.  That was one source.
13     The other source was as part of our
14 project we went and tried to find all of the
15 cases around the country of people who were
16 charged and convicted of diversion of
17 pharmaceuticals, and then we did an analysis to
18 find out what common factors we could find that
19 might tell you that the person is one of these
20 people.
21     Q.  Do you recall who the "we" was that
22 conducted that analysis?
23     A.  Well, that analysis, that was my
24 group.  Nab Dasgupta was the lead investigator
25 on -- was the lead person on that.

Page 210

1    Q.   And do you remember what the time
2  frame was for doing this inquiry?  Yes, the
3  dreaded date question.
4    A.   It was in the new -- all I can tell
5  you it was in the new building, so it would have
6  had to have been after the move to the new
7  building.  It was after Nab came on board, and I
8  don't know his start date.  So it was somewhere
9  in the 2003, 2004, or maybe 2000 -- I think --
10  I'm not sure.  It would have been 2003, 2004.
11    Q.   And do you remember as part of this
12  process whether you identified specific
13  prescribers who --
14    A.   We did.
15    Q.   Yes.
16    A.   We did, yes, because they had been
17  criminally charged and convicted, so we had
18  their names.
19    Q.   And did you identify any physicians
20  who hadn't been criminally charged or
21  investigated?
22       MR. SNAPP:  Object to the form.
23    A.   No.  We used them as aggregate data.
24  BY MS. SINGER:
25    Q.   Tell me what you mean by that.

Page 211

1    A.   Okay.  There are two ways that you can
2  treat personal data, and one invades the privacy
3  of the person and the other does not invade the
4  privacy of the person, and there is ethics
5  involved with that.
6       So for the physicians that we used as
7  our test group, they were people that we had IMS
8  data on but did not know their -- we pulled
9  their names out of the files.
10    Q.   Got it.
11       And did you use any external
12  consultants in the project?
13       MR. SNAPP:  Object to the form.
14    A.   I don't know what the other parts of
15  the project did.  I just know what we did, and
16  we didn't.  Our part, we didn't.
17  BY MS. SINGER:
18    Q.   Okay.  And so under the category of
19  Diverting Physicians at the top of Bates number
20  824, they're described as "providers engaged
21  full-time in the illicit diversion of
22  narcotics."  Is that accurate?  Was that a yes?
23    A.   That is a yes.  "These providers
24  engaged full-time in the illicit diversion of
25  narcotics."

Page 212

1    Q.   Were those the prescribers who had
2  been identified from the prescribers who had
3  been charged or convicted?
4       MR. SNAPP:  Object to the form.
5    A.   Yes, they were.
6  BY MS. SINGER:
7    Q.   And if you turn to Bates number 825,
8  the second full paragraph, "These two factors,"
9  could you read that out loud?
10    A.   "These two factors (excessive
11  narcotics prescriptions filled for cash and
12  failure to prescribe enough of the needed lower
13  strengths) proved to be very specific predictors
14  of aberrancy."
15    Q.   Stop there, please.
16       Can you explain what that means?
17       MR. SNAPP:  Object to the form.
18    A.   For diversion, the highest strengths,
19  the 160 when it was available, the 80 when it
20  was not, were the target strengths, that's what
21  you want to get, you want to get prescriptions
22  for that because you are going to make the most
23  money off of that.  But most patients do not
24  need 80 milligrams of OxyContin, they don't --
25  many of them don't need 40.  I mean, I think the

Page 213

1  median dose prescribed was the 20.
2       And so if you are looking at a
3  prescription profile for a clinic or for a
4  pharmacy for that matter, and you see no 20s,
5  you know, no 40s, a little bit of 40s, and then
6  this huge blip of 80s, that's suspicious because
7  that's not what the patients need.
8    Q.   Okay.  And then what about the
9  excessive narcotics prescriptions filled for
10  cash?
11       MR. SNAPP:  Object to the form.
12    A.   Most people today have some form of
13  health insurance, either from the government,
14  through Medicare or Medicaid, or from private
15  health insurance.  If people are showing up and
16  are buying their prescriptions from cash, or in
17  the case of dispensing physicians he's literally
18  selling the drugs out of the medical office --
19  dispensing is legal in some states -- for cash,
20  no credit cards, no checks, please, nothing but
21  cash, that's suspicious.
22  BY MS. SINGER:
23    Q.   Okay.  And it says at Paragraph 4 at
24  the bottom of the page, so having identified
25  these factors for prescribers, Paragraph 4 says

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 "We should examine pharmacy operations using a
2 similar technique to see if there are any
3 predictors that might identify pharmacies
4 involved in the illicit trade."
5 And you're nodding your head.
6 A. I'm saying that is what -- you read
7 that correctly.
8 Q. Okay. Do you know if Purdue undertook
9 that work?
10 A. No, I don't know if it was done. But
11 I don't know whether it was done or wasn't done.
12 Q. Okay. Did your group ever did that?
13 A. I don't know. Nab would have done it
14 or the epidemiologist would have done it, and
15 they might have done it without my necessarily
16 knowing it.
17 Q. Okay. We'll come back to that.
18 Okay. A lot of ink went into this
19 exhibit. So this is Exhibit Number --
20 MS. FORSTER: 27.
21 BY MS. SINGER:
22 Q. -- 27, and I don't think it had a
23 native Bates number to it. So it is "Risk
24 Identification, Risk Assessment and Management
25 of Drug Formulation (A Regulated Company

Page 215

1 Perspective)."
2 (Whereupon, Purdue-Wright-27 was
3 marked for identification.)
4 MR. SNAPP: I'm sorry, for the record,
5 if it didn't have a Bates number, where did it
6 come from.
7 MS. SINGER: It was produced by
8 Purdue. I think it was just produced without a
9 native cover to it with the Bates number, but we
10 can search and clarify the record.
11 BY MS. SINGER:
12 Q. So, Dr. Wright, do you recognize this
13 presentation?
14 (Witness reviewing document.)
15 A. Well, this is a draft of a
16 presentation that I may have given to the
17 College on Problems of Drug Dependence.
18 Q. And what is the College on Problems of
19 Drug Dependence?
20 A. It's a group -- it's a members
21 organization, scientific organization that has
22 existed for some time that is individuals who
23 are concerned with drug abuse, dependence, and
24 medication safety.
25 Q. And you were a member of that?

Page 216

1 A. I believe I still am a member, but I
2 have to check whether I paid this year's dues.
3 Q. My guess is they'll find you.
4 All right. If you can turn to the
5 slide that is titled "Disaster." It is towards
6 the front of the deck. Can you read the first
7 bullet and the points underneath it, please?
8 A. "Unanticipated widespread abuse of a
9 prescription medication is a disaster for:
10 "The patients.
11 "The prescribers.
12 "The public.
13 The company."
14 And "The Agents of Social Control.
15 (DEA, FDA, NIDA, Police, Politicians,
16 Prosecutions.....)"
17 Q. Do you agree with the statement here
18 that "widespread abuse of a prescription
19 medication is a disaster"?
20 MR. SNAPP: Object to the form.
21 A. I believe that I probably said this,
22 and I believe it to be true. It is a very bad
23 thing.
24 BY MS. SINGER:
25 Q. And when you talk about agents of

Page 217

1 social control, tell us how you mean that.
2 A. Well, I made it up because I didn't
3 know how to fit -- or I think I made it up. I
4 didn't know how to fit --
5 Q. I don't think they call themselves
6 that.
7 A. I don't think they call themselves
8 that, but I couldn't figure out how to make DEA
9 and FDA and NIDA and police and politicians and
10 prosecutors all fit together in one term, so it
11 looks like I made up a term.
12 And they're people who are responsible
13 for the smooth and orderly functioning of
14 society. They are supposed to make things go
15 well.
16 Q. Okay. All right. Let's turn to --
17 (Whereupon, Purdue-Wright-28 was
18 marked for identification.)
19 BY MS. SINGER:
20 Q. We'll start Exhibit 28, it's another
21 native production. So this did have a Bates
22 number of PPLPC013000106089, and it's titled
23 "Data Analysis Program, 1Q2004 Update" by
24 Nabarun Dasgupta.
25 A. Yes, that's how you spell his name,

Page 218

1 Nabarun Dasgupta, we called him Nab. I think he
2 he's finished his Ph.D by now. And he's a
3 super, super smart little scientist.
4    Q. And you've now memorialized that,
5 he'll be grateful.
6       So that is the Nab you've been talking
7 about before?
8    A. Yes.
9    Q. Have you seen this presentation
10 before?
11    A. I don't remember it specifically, but
12 it looks like Nab's presentation.
13    Q. Okay. And does it reflect the work
14 you were talking about earlier that you were
15 doing in analyzing prescribers and types of
16 prescribers who were engaged in diversion or
17 inappropriate prescribing?
18       MR. SNAPP: Object to the form.
19       (Witness reviewing document.)
20    A. I think so.
21 BY MS. SINGER:
22    Q. Okay. I want to turn your attention
23 to the slide "Screening by Recursive
24 Partitioning."
25    A. Yes, ma'am.

Page 219

1    Q. And does this -- first of all, do you
2 know what recursive partitioning is?
3    A. Yes.
4    Q. What is it?
5    A. It's a statistical technique available
6 in most of the major high-end statistical
7 programs. And what it enables you to do is you
8 have some cases and you have some controls,
9 people who have it, people who don't, people who
10 are diverters, people who may or may not be
11 diverters, and they're all mixed together. You
12 can take a categorical variable and move across
13 the values for that variable, in other words try
14 different numbers that you plug in, and see how
15 well it splits the main body of data. Okay.
16 And then you can add another variable, and then
17 you can add another variable, and then you can
18 move the variables up or down in doing which one
19 first and which one second. So it's a
20 statistical technique where you sit there at the
21 computer and you plug numbers in and you see how
22 did that do, and you try that and how did that
23 do, and try this and how did that do.
24       And your goal is to develop a set of
25 indicators that takes a population that's this

Page 220

1 big and sifts out all of the cases that you're
2 interested in into a little tiny bucket over
3 here.
4    Q. Okay.
5    A. And some statistician will not think I
6 described it very well.
7    Q. So this is the technique that
8 Dr. Dasgupta used to identify the factors that
9 were predictive of diversion or variant
10 prescribing, correct?
11       MR. SNAPP: Object to the form.
12    A. That's the technique.
13 BY MS. SINGER:
14    Q. And this is the technique that allowed
15 you to identify that it was high dose and high
16 cash prescribers who were of greatest concern?
17       MR. SNAPP: Object to the form.
18    A. Nab Dasgupta used a number of -- this
19 was one analysis, he did a number of analysis,
20 and he used a number of partitioning variables.
21 Looking at his results here on the slide, he
22 started out with 200,000 total and 142
23 identified aberrant prescribers, and not
24 prescribing enough of the lower strengths, split
25 them up a little bit, total net cash sales,

Page 221

1 split them up a little bit, percentage ever cash
2 RX, split them up a little bit, and he ended up
3 with what it says here, 100, Top 100 Project, I
4 still don't know the name, that he describes.
5 And what he describes are physicians in trouble.
6 BY MS. SINGER:
7    Q. Okay. And I want to turn also to
8 "Risk Factors." So explain what risk factors
9 are in this context.
10    A. Okay. In epidemiologic studies risk
11 factors are things that say these are associated
12 with the cases more than with the rest of the
13 population. These are things that happen more
14 in whatever you're looking at, tuberculosis,
15 leprosy, drug -- aberrant drug prescribing,
16 they're more likely to be, and they are more
17 likely to have, and if you see these things then
18 you need to be concerned that they may have the
19 target behavior, disease, condition.
20       Does that help?
21    Q. It does. Thank you.
22       And then in addition to risk factors,
23 Dr. Dasgupta reached conclusions --
24    A. Well, he found risk factors and he
25 found protective factors.

Page 222

1    Q.  That's right.
2    A.   And then he reached his conclusions
3 which are that bankruptcy, debt is a risk factor
4 for suspected criminal prescribing.  Large
5 volume prescribing of opiates by a
6 non-specialist is a risk factor.  Pain
7 specialization appears to be a protective
8 factor.  And simply screening what's currently
9 available on the internet for everybody, you,
10 me, everybody, has some efficacy.
11    Q.  So let's go back to two of them.
12       Internet screening, you mean just
13 doing internet research on a doctor?
14       MR. SNAPP:  Object to the form.
15 BY MS. SINGER:
16    Q.  Is that right?
17    A.  Okay.  Nab purchased, and I do not
18 remember the name of the service, but he
19 purchased -- at that time there was an internet
20 service that would tell you about someone, pull
21 all their records, see if they were in legal
22 proceedings, scan them for whatever could be
23 found in the public domain, and Nab thought it
24 would be useful, and that's what he meant by
25 internet screening.  So he would plug in this

Page 223

1 target doctor's name that we knew about, and say
2 what do we get on him?  And we got back that
3 he'd been divorced, that he's declared
4 bankruptcy twice, that he was in arrears on his
5 taxes, and a whole bunch of stuff.  And those
6 were the factors that Nab said could you use
7 that, could that work, would that help you.
8    Q.  And his answer was yes, correct?
9    A.  He thought so.
10       MR. SNAPP:  Object to the form.
11 BY MS. SINGER:
12    Q.  And then non-specialist status, just
13 to make sure we understand that, a
14 non-specialist, you're talking about a family
15 practitioner or general practitioner, is that
16 accurate?
17       MR. SNAPP:  Object to the form.
18    A.  Family practice is actually a
19 specialty now.  So it would be someone who
20 didn't do a residency.
21 BY MS. SINGER:
22    Q.  So, for instance, a primary care --
23 well, not necessarily.
24    A.  General practitioner essentially.
25       Can I bring something to your

Page 224

1 attention?
2    Q.  I wouldn't dare stop you.
3    A.  If you look at the last page of this
4 element, I just want to bring up the fact that
5 if you look at the states that were involved in
6 the state medical board sanctions, Florida leads
7 the state and leads the count.  And it turns out
8 that dispensing from your office is a risky
9 practice in terms of diversion, abuse, and
10 diversion of opioids.
11    Q.  Meaning it's often predictive, it's in
12 that category of factors?
13    A.  It's in those categories of factors.
14 I believe Florida has been concerned and has
15 done something about that.
16       (Whereupon, Purdue-Wright-29 was
17       marked for identification.)
18 BY MS. SINGER:
19    Q.  So Exhibit 29 is an article, it
20 doesn't have a Bates number, "Association
21 between non-medical and prescriptive use of
22 opioids."  And the lead author is Dr. Dasgupta,
23 correct?
24    A.  Yes.
25    Q.  And are you also listed as an author?

Page 225

1    A.  This is pretty much my entire group.
2    Q.  Okay.  So everybody listed among the
3 authors are Purdue Pharma employees who worked
4 for you or with you?
5    A.  Well, they didn't work for me.
6 Salvatore Carino was the computer guy in
7 marketing who had the IMS data that we used, and
8 so he was the one that had to make the data
9 available to us and make it available in a form
10 that we could use.
11       Meredith Smith was the epidemiologist
12 that was hired to service both Dr. Haddox and
13 myself in that group.  David Haddox, myself,
14 Doug Kramer, medical officer, and Mary-Ann
15 Zalman was the medical writer.  I remembered who
16 she is at last.
17    Q.  All right.  So you recognize this
18 article as one you all participated in, correct?
19    A.  Yes.
20    Q.  If we turn to Page 141.  And by the
21 way, let's just put the date on the record.  The
22 date of the publication is 2006, correct?
23    A.  (Nodding in the affirmative).
24    Q.  So if we turn to Page 141.  So if you
25 look on the top paragraph of the first column,

Page 226

1 can you read the sentence beginning "The
2 remarkable constancy"?
3    A.   "The remarkable constancy of the
4 relationship of drug abuse sequelae to the
5 magnitude of prescriptive usage, among opioids,
6 suggests that as legitimate use of an opioid
7 medication increases, the prevalence of
8 non-medical use and its consequences increase as
9 well."
10    Q.   Okay.  And does that correctly reflect
11 the conclusions you reached as a result of your
12 study?
13    A.   That is the primary conclusion of the
14 study, along with the secondary finding that it
15 didn't matter what the drug was.
16    Q.   And so can you -- the sentence you
17 read out loud, can you restate that in more lay
18 terms, please?
19        MR. SNAPP:  Object to the form.
20    A.   Yes.
21 BY MS. SINGER:
22    Q.   Could you do that?
23    A.   Yes.  We have a control system in this
24 country that is intended to prevent drugs
25 leaking out of the prescriptive proper use for a

Page 227

1 patient.  Our -- my hypothesis going in, and it
2 was my hypothesis, is that has a certain
3 percentage effectiveness.  Some percent of the
4 drugs that are intended to get to patients leak
5 out.  When they leak out, if they leak out in a
6 fixed amount, then the number of cases will be
7 constant.  There's so many drug addicts who are
8 diverting them.  If it's a percentage, you know,
9 the system is 99.9 percent effective, say, then
10 as you put more drugs into the prescriptive drug
11 flow, as there are more in the marketplace, as
12 there's more in the pharmacies, as they're more
13 in the prescriptions, as there's more in the
14 medicine cabinets at home, more will leak out.
15        So given the given set of controls
16 that were operative during the period of this
17 study, the more prescription drugs you had in
18 the marketplace the more drug abuse cases you
19 would have.
20    Q.   And what was the period of the study?
21    A.   You would ask that.  1994 to 2002.
22    Q.   Okay.  And so going back to how you
23 presented this, it is not a fixed amount, it is
24 a percentage, so you increase the volume you
25 increase the --

Page 228

1    A.   Number of cases.
2    Q.   And in reaching this conclusion you
3 relied again on DAWN ED data, correct?
4    A.   The sources of this data were
5 multiple.  One was the DAWN emergency department
6 data which was -- had some problems because they
7 changed -- periodically they change those
8 surveys and assure us that everything is okay.
9 Sometimes statistically they're not.  And we
10 then had to use the IMS data for how many kilos
11 of oxycodone, how many kilos of hydrocodone, how
12 many kilos of fentanyl, how many kilos of
13 morphine were in the pharmaceutical pipeline, so
14 we had to reduce all of the companies that made
15 morphine down to a total, and then we had to
16 adjust so that we were adding the right amount
17 of morphine and the right amount of oxycodone
18 and the right amount of fentanyl, converting it
19 all to morphine equivalence.
20        Clear so far?
21    Q.   Crystal.
22        So effectively, DAWN ED data gave you
23 the measure of abuse, correct?
24    A.   It was a surrogate measure of abuse.
25        MR. SNAPP:  Object to the form.

Page 229

1 BY MS. SINGER:
2    Q.   And the IMS data gave you have the
3 volume of supply, correct?
4        MR. SNAPP:  Object to the form.
5    A.   The IMS data gave us an approx -- a
6 good approximation of the amount of each opioid
7 in the supply chain.
8 BY MS. SINGER:
9    Q.   And DAWN ED data, as you've noted,
10 only picks up people who show up in hospitals,
11 correct?
12    A.   Emergency departments.  And it's
13 pretty good.
14    Q.   Okay.  Does it get at the number of
15 people who may be addicted or abusing who don't
16 end up overdosing?
17        MR. SNAPP:  Object to the form.
18    A.   Okay.  DAWN ED data will not detect
19 someone who has not had a medical encounter.
20 However, the likelihood of a medical encounter
21 for someone who is seriously abusing drugs is so
22 high that sooner or later they'll end up in the
23 emergency room.
24 BY MS. SINGER:
25    Q.   Okay.  One last question about IMS

Page 230

1  data. We're going to go back to the GAO report,
2  which was --
3      MS. FORSTER: Exhibit 19.
4  BY MS. SINGER:
5      Q. -- Exhibit 19, please.
6      Do you recall when you began using IMS
7  and DAWN data to identify abuse, diversion, and
8  problem prescribing?
9      MR. SNAPP: Object to the form.
10     A. Okay. I only know when we began to
11 analyze the data, and I don't know that very
12 precisely, but it was in the new building and it
13 was after Nab came, so I'm thinking likely to be
14 2004, 2005.
15 BY MS. SINGER:
16     Q. Okay. And Purdue had had IMS data
17 prior to 2004, 2005, right?
18     A. I do not know for sure, but I'm sure
19 they did.
20     Q. Okay. And if I can turn you to
21 Page 40 of the GAO report. The bottom paragraph
22 starts "Since the launch."
23     A. Mm-hmm.
24     Q. Do you mind just reading the paragraph
25 on into the next page out loud, please?

Page 231

1      A. "Since the launch of OxyContin, Purdue
2  has provided its sales force with considerable
3  information to help target physicians and
4  prioritize sales contacts within a sales
5  territory. Sales representatives routinely
6  receive daily, weekly, monthly, and quarterly
7  physician prescribing reports based on IMS
8  Health data that specify the physicians who have
9  written prescriptions for OxyContin and other
10 opioid analgesics, and the number of
11 prescriptions written."
12     Q. Go ahead and read the next sentence.
13     A. "Although this information has always
14 been available for use by Purdue and its sales
15 representatives, it was not until fall 2002 that
16 Purdue directed its sales representatives to
17 begin using 11 indicators to identify possible
18 abuse and diversion and to report the incidents
19 to Purdue's General Counsel's Office for
20 investigation."
21     Q. Okay. You can stop there. Thank you
22 for reading that.
23     Were there any discussions that you
24 can recall in Purdue, within Purdue, about using
25 IMS data for compliance before you began your

Page 232

1  analysis?
2      MR. SNAPP: Object to the form.
3      A. I cannot be sure, but I think maybe I
4  had a hand in answering a question that led to
5  the 11 factors that they were looking for in
6  that discussion, in what I just read, at least I
7  hope so.
8  BY MS. SINGER:
9      Q. And do you recall, in the few years
10 you were at Purdue before then, any energy
11 within the company to turn those kinds of data
12 sources to use for compliance and preventing
13 diversion, and not just for sales?
14     MR. SNAPP: Object to the form.
15     A. Yes, I was one.
16 BY MS. SINGER:
17     Q. And beyond you?
18     MR. SNAPP: Object to the form.
19     A. I don't know, because the -- when I
20 was working with the few contacts we had in
21 sales on the programs that we've already went
22 through and described, they were very concerned
23 about how they might use this data, about what
24 techniques are available, but there had been
25 some egregious mistakes made that made them very

Page 233

1  concerned about using them properly.
2      On one occasion I heard a report
3  secondhand, I can't verify that it's true, that
4  the DEA came in black jacket and boots to a
5  pharmacy because they were prescribing so many
6  opioids, and it turns out that they were the
7  pharmacy that filled for a major cancer center.
8      So the problem was not how to -- the
9  problem was not the IMS data existed, it's how
10 to use it and how to tell good from bad when
11 you're using it.
12 BY MS. SINGER:
13     Q. And in terms of that conversation
14 about how to use the data and the 11 factors and
15 those things you've talked about, was there
16 anything before Dr. Dasgupta's report that
17 really gave a direction to that?
18     MR. SNAPP: Object to the form.
19     A. You asked me if there was anything
20 before Dr. Dasgupta's report which came out in
21 2006 that gave direction to that, and Dr. Haddox
22 and Dr. Schnoll were both very vocal in this
23 area.
24 BY MS. SINGER:
25     Q. And what did their work produce?

Highly Confidential – Subject to Further Confidentiality Review

Page 234

1  A. I don't know, because concerns about
2  marketing, sales reps, and prescribing, and
3  especially improper detailing or improper
4  prescribing, would have been handled by the
5  ethics group, and they did not tell the rest of
6  us what they were finding.
7  Q. And who was the ethics group?
8  A. The chief ethical officer was Howard
9  Udell. And if -- I mean, we all knew that if we
10 had anything we were concerned about in the
11 company at all ever to go directly to him.
12 Q. And Howard Udell ultimately ended up
13 pleading guilty, correct, in the 2007 --
14       MR. SNAPP: Object to the form.
15 A. I don't know the details of any of
16 that. That happened after I left the company.
17       MS. SINGER: Okay. Let's leave it.
18       If I can just take five minutes and
19 check my notes, and then we'll be done and pass
20 the baton.
21       THE VIDEOGRAPHER: We are now going
22 off the record, and the time is 3:58 p.m.
23       (Whereupon, a recess was taken.)
24       THE VIDEOGRAPHER: We are now going
25 back on the record, and the time is 4:08 p.m.

Page 235

1  BY MS. SINGER:
2  Q. All right. Dr. Wright, we had talked
3  about the integrated safety study earlier, and
4  it took us a minute to find a copy of it, but
5  Exhibit 31 is PDD7024302094.
6       (Whereupon, Purdue-Wright-31 was
7       marked for identification.)
8  BY MS. SINGER:
9  Q. Is that right? No, I read the wrong
10 Bates number and gave you the right document.
11 The correct Bates number is PDD1501090033.
12       When you've had a chance, whenever
13 you've had a chance, let us know if you
14 recognize that to be the integrated summary of
15 safety for OxyContin.
16       MR. SNAPP: Do you have another copy?
17       MS. SINGER: I gave two.
18       (Witness reviewing document.)
19       MR. SNAPP: Looks like it's missing a
20 Bates number.
21       MS. SINGER: Excuse me?
22       MR. SNAPP: My copy is missing Page 1
23 of the document.
24       MS. SINGER: So it's in the form --
25       MR. SNAPP: It skips from 33 to 35, 34

Page 236

1  is missing from my copy.
2       MS. SINGER: We can sub one in.
3       MR. SNAPP: I just want to make sure
4  the witness is --
5  A. I'm missing the end of it.
6  BY MS. SINGER:
7  Q. What's your last Bates number?
8       MR. PETRILLO: I think the witness's
9  copy is also missing 34. And the last Bates
10 number is 41.
11       MS. SINGER: Okay. All right. We've
12 had some copying issues.
13 A. In answer to your question, except for
14 the fact that it's missing bits, this appears to
15 be my integrated summary of safety.
16 BY MS. SINGER:
17 Q. Okay. So what we'll do is during the
18 next break we will provide you all with complete
19 copies.
20       In the interim I just want to direct
21 Dr. Wright's attention to Bates number 40,
22 fortunately one of the Bates numbers you have.
23 A. No.
24 Q. No?
25 A. I go from 37 to 39 to 41.

Page 237

1  Q. Okay. We will deal with that on the
2  next questioning. My apologies for that.
3       Okay. We talked earlier this morning,
4  a lifetime ago, about the duties of a
5  responsible pharmaceutical company, and you
6  talked about what you thought were the elements
7  or hallmarks of that. And we talked about the
8  role of the package insert.
9       Now, is it accurate to say that in
10 your view the role of the package insert is to
11 convey full and accurate information to the
12 prescriber about how and when to use the
13 product?
14       MR. SNAPP: Object to the form.
15 A. The intent of the package insert is
16 to, from my perspective now, convey mutual
17 information that is agreed to by both the
18 company and the FDA about what is known about
19 the drug both from a scientific perspective and
20 in terms of what the experience has been with
21 it, and the usage of the product in a proper
22 fashion. It's not nearly enough to use any of
23 these drugs. There's a whole bunch of other
24 things that the practitioner must bring to the
25 interaction with the patient. But it's an

Page 238

1 agreed to starting point for both the company
2 and the prescriber.
3 BY MS. SINGER:
4    Q.  You said it reflects the scientific
5 knowledge and clinical experience at the time
6 the package insert is drafted, correct?
7    A.  That's correct, ma'am.
8    Q.  And the scientific studies evolve over
9 time?  There's more scientific knowledge,
10 correct?
11    A.  That is correct, ma'am.
12    Q.  And there's more clinical experience
13 as the drug is used in the general population,
14 correct?
15        MR. SNAPP:  Object to the form.
16    A.  I believe that is to be correct, too.
17 BY MS. SINGER:
18    Q.  And is it fair to say that in your
19 opinion and experience, a responsible company
20 takes advantage of that scientific knowledge and
21 clinical experience to make sure that the
22 package insert continues to accurately reflect
23 what is known about the drug?
24        MR. SNAPP:  Object to the form.
25    A.  That's difficult, and it's difficult

Page 239

1 because changing the package insert is a huge
2 undertaking both for the company and for the
3 FDA.  Either the FDA can request changes in the
4 package insert, or the company can request
5 changes in the package insert through a process
6 of amendment of the NDA.
7        Where my knowledge fails, because
8 there have been changes since -- there were
9 changes when I was at the FDA and there have
10 been changes since I was at the FDA, and it was
11 covered -- and it's the responsibility of DDMAC,
12 when to make a change, why to make a change,
13 what change to make all are things that drug
14 advertising has strong -- has control over and
15 has strong input into.
16        There's also the question of providing
17 what are called reprints to the physician which
18 are updates on science that has been done since
19 the drug was approved, and there are complex
20 rules that I do not -- I'm not up to today on
21 how you may do that, when you may do that, if
22 they have to request it, if you can offer it,
23 all of which are beyond my knowledge and skill.
24 BY MS. SINGER:
25    Q.  So given all of that, it's certainly

Page 240

1 not, again, your experience and your impression
2 that a package insert remains fixed in time?
3    A.  Package inserts, to my knowledge, are
4 changed as significant new knowledge accrues.
5    Q.  And the purpose, again, of reflecting
6 that new important or significant information in
7 the package insert is to make sure that the
8 prescription drug is used safely and effectively
9 in the population, correct?
10        MR. SNAPP:  Object to the form.
11    A.  Purpose is a bit difficult, but it is
12 in the public interest that a package insert
13 that requires modification gets modified.
14 BY MS. SINGER:
15    Q.  And again, so that prescribers have
16 the important information, not necessarily all
17 of the information, to make decisions about how
18 to guide and use the product with their
19 patients?
20        MR. SNAPP:  Object to the form.
21    A.  The purpose is to enable pharmacists,
22 prescribers, and these days health insurers,
23 sadly or to benefit, what the drug does, how to
24 use it safely, and what is known about its
25 toxicity and problems.

Page 241

1        MS. SINGER:  Okay.  All right.  I have
2 nothing further at this point.
3        THE VIDEOGRAPHER:  Should we go off?
4        MR. STEWART:  Take about five minutes.
5        THE VIDEOGRAPHER:  We are now going
6 off the record, and the time is 4:17 p.m.
7        (Whereupon, a recess was taken.)
8        THE VIDEOGRAPHER:  We are now going
9 back on the record, and the time is 4:31 p.m.
10        EXAMINATION
11 BY MR. STEWART:
12    Q.  I'm Mike Stewart, I represent a number
13 of plaintiffs in the State of Tennessee,
14 including a number of district attorneys
15 general.
16        I'm going to state the terms of our
17 agreement whereby we're having this discussion
18 today with your counsel and give him the
19 opportunity to respond.
20        But I'm planning to take just two
21 hours of testimony, and I've agreed I don't plan
22 to come back and take additional testimony from
23 you in this case.  If there is a situation where
24 some particularly significant document has
25 turned up that we have not received, then we may

Page 242

1  seek to depose you on that issue. However,
2  we'll work with your counsel to minimize any
3  inconvenience involved, whether by telephone or
4  perhaps a very short follow-on deposition.
5      MR. STEWART: Does that make sense?
6      MR. SNAPP: That's agreed.
7      MR. PETRILLO: That does make sense.
8  I just want to say as a practical matter, I take
9  it that you agree that if the documents have
10  been produced as of today that the document will
11  not be a cause for additional deposition time.
12     MR. STEWART: That makes sense. The
13  only thing I would say is there is actually a
14  dispute in this case, which I think you're
15  unaware of, about whether documents produced
16  have been done in a form that works. But I
17  think you can see that we're going to try to be
18  reasonable. Yes, if we've had a good
19  opportunity to review it, then that would be
20  true.
21     MR. PETRILLO: Okay. That's fine.
22  And we'll be reasonable, too.
23     And we're doing this in lieu of a
24  formal notice of deposition which we did not
25  receive from this particular party, so I would

Page 243

1  advise that we proceed.
2      THE WITNESS: I will proceed.
3  BY MR. STEWART:
4      Q. Thank you.
5      With that, sir, I'd ask you to turn to
6  Exhibit 26, which I think is the second one in
7  your pile, and you've already looked at it.
8      Do you remember reviewing Exhibit 26?
9      A. I remember looking at it.
10     Q. Can you turn to the very last page
11  where I think you'll find a list of providers, I
12  believe? Is that what the last page of
13  Exhibit 26 has?
14     A. The last page of Exhibit 26 looks like
15  a representative sample data.
16     Q. And what sort of sample data? Can you
17  tell by the title and how it's incorporated into
18  the document what that list is showing us?
19     A. There is an identifier, which I don't
20  know what it means and would need those codes to
21  know what it means. Narcotic treatments,
22  OxyContin treatments, percent cash treatment,
23  hydrocodone street value, methadone street
24  value, fentanyl street value, morphine street
25  value, oxycodone street value, OxyContin street

Page 244

1  value, and total street value.
2      Q. Is that a list, do you think, of
3  prescribers? Can you tell? And you may want to
4  look at the prior page to see if that's correct.
5      A. It looks like a list of the 44
6  aberrant prescribers.
7      Q. Did you -- I'll tell you our review of
8  the -- or can you tell, on that list of aberrant
9  prescribers, can you tell if there's an
10  identifier that would show you which prescriber
11  it is?
12     A. If you knew what the ME number meant
13  and the IMS ID meant, then you could tell who
14  the prescriber was.
15     Q. Looking at this today, if I told you
16  that three of those prescribers are from the
17  State of Tennessee, I take it you couldn't
18  contradict or confirm it one way or the other?
19     MR. SNAPP: Object to the form.
20     A. I could not tell.
21  BY MR. STEWART:
22     Q. But you know there are numbers on that
23  document that would allow us to correlate that
24  document to particular prescribers?
25     MR. SNAPP: Object to the form.

Page 245

1      A. If you had the codes you could.
2  BY MR. STEWART:
3      Q. Turn now to another exhibit that
4  you've already been handed, which is Exhibit 28.
5  That's this PowerPoint presentation that you
6  have already reviewed.
7      Do you recall that?
8      A. I remember it.
9      Q. Okay. Do you remember Exhibit 28 as a
10  document entitled "Data Analysis Program," first
11  Quarter 2004 Update?
12     A. Yes, I do.
13     Q. I'll tell you I put, just so we can
14  move quickly, a green sticky on that document
15  which should lead you to a page entitled
16  "Screening by Recursive Partitioning."
17     Do you see that?
18     A. Yes, I do.
19     Q. Okay. And my question is, do you know
20  if Purdue, after this analysis that's embodied
21  in this PowerPoint was conducted, did it follow
22  up to analyze those doctors that had 10 to
23  20-milligram OxyContins representing less than
24  35 percent of all OxyContin prescription sales?
25     MR. SNAPP: Object to the form.

Page 246

1    A.  I don't know.
2  BY MR. STEWART:
3    Q.  Do you know, looking at the second
4  bullet, if Purdue ever followed up to analyze
5  the doctors whose patients paid more than
6  100,000 in cash for narcotic analgesic
7  prescriptions to determine whether those doctors
8  were involved in diversion?
9       MR. SNAPP:  Object to the form.
10    A.  I don't know.
11  BY MR. STEWART:
12    Q.  Do you know if Purdue ever followed
13  up, looking at the third bullet, to analyze
14  those doctors who had 17 percent of their
15  prescriptions for all drugs paid for in cash to
16  determine whether any of those doctors were
17  involved in diversion?
18       MR. SNAPP:  Object to the form.
19    A.  I don't know.
20  BY MR. STEWART:
21    Q.  Now I'd like you to turn to the page,
22  and I tried to mark it, the page that shows risk
23  factors.  Do you see that?  You have a page in
24  this PowerPoint marked Exhibit 28 that's
25  entitled "Risk Factors"?

Page 247

1    A.  Yes, I see it, sir.
2    Q.  And do you see it has financial,
3  clinical, and personal risk factors?
4    A.  Yes, I do.
5    Q.  Looking at all these risk factors, do
6  you know if Purdue, in following up on the
7  analysis that's presented in this PowerPoint,
8  ever looked at these risk factors and applied
9  them to prescribers throughout the United States
10  to identify prescribers that might be involved
11  in diversion?
12       MR. SNAPP:  Object to the form.
13    A.  I don't know.
14  BY MR. STEWART:
15    Q.  I'd like to hand you a document and
16  ask you if it's got the exhibit sticker 32 on
17  it.
18      (Whereupon, Purdue-Wright-32 was
19      marked for identification.)
20  BY MR. STEWART:
21    Q.  I've got copies for both counsel.
22      Do you see that document?
23    A.  Yes, I do.
24    Q.  It's got Exhibit 32, a sticker on it
25  identifying it, fair?

Page 248

1    A.  Yes, I do.
2    Q.  Can you look at Exhibit 32 and tell me
3  whether or not you recognize it as a document
4  that you authored?  And I'll point out the last
5  page of the document ends with the word "Curt."
6    A.  I do not remember the document, but I
7  have no reason to believe I did not author it.
8    Q.  Looking at the substance, do you see
9  that the document contains a series of points
10  under headings which are entitled "Costs
11  associated with criminal diversion," "By patient
12  diversion," and so forth?  Do you see that?
13    A.  Yes, I do.
14    Q.  Are these lists consistent with your
15  understanding of the costs associated with
16  criminal diversion, by patient diversion abuse,
17  and the other listed categories?
18       MR. SNAPP:  Object to the form.
19    A.  Opioid X health economics.
20      (Witness reviewing document.)
21  BY MR. STEWART:
22    Q.  I guess I should put this on the
23  screen.
24    A.  Could you repeat the question?
25    Q.  Sure.

Page 249

1      Do you see on the document, now I've
2  put it on the screen, if you look at the page
3  that has a Bates number, which is the number at
4  the bottom right-hand corner, that ends with
5  2047, do you see that page?
6    A.  Yes, I do.
7    Q.  Now, do you see, for example, there's
8  a paragraph on this document that says "Costs
9  associated with criminal diversion," and it
10  lists a series of costs.
11      Do you see that?
12    A.  Yes, I do.
13    Q.  Does that look like something you
14  would have written to summarize the costs of
15  criminal diversion?
16       MR. SNAPP:  Object to the form.
17    A.  I don't know if I'm the sole author,
18  but I probably contributed to it.
19  BY MR. STEWART:
20    Q.  That's consistent with your thinking?
21    A.  It is consistent with my thinking.
22    Q.  How about the list of "Costs
23  associated with By-patient diversion," similarly
24  consistent with your thinking?
25       MR. SNAPP:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  A. It is consistent with my thinking.
2  BY MR. STEWART:
3  Q. Do you see that the second paragraph
4  of this statement says "Such costs cannot be
5  determined in controlled studies (too low
6  frequency) but can be identified by
7  epidemiologic techniques and the fraction due to
8  an individual drug estimated."
9  Do you see that?
10  A. I see that.
11  Q. Fair to say that's something you would
12  agree with and have, in fact, said in other
13  contexts?
14  MR. SNAPP: Object to the form.
15  A. In theory. I must confess that health
16  economics is tricky, and I'm not sure I know how
17  to do that. But the way in which you would
18  approach this kind of thing would be by that
19  way.
20  BY MR. STEWART:
21  Q. And I'd just like -- I'm going to get
22  to it, do you see the list, it's got "Costs
23  associated with abuse"?
24  A. Yes.
25  Q. Again similarly, is that consistent

Page 251

1  with your thinking, this list of costs
2  associated with abuse --
3  MR. SNAPP: Object to the form.
4  BY MR. STEWART:
5  Q. -- on the page marked 207?
6  MR. SNAPP: Object to the form.
7  A. Those are representative costs. I'm
8  not sure they're complete.
9  BY MR. STEWART:
10  Q. If we turn over to the page,
11  Exhibit 32 that has a Bates stamp that ends in
12  2048. Do you see there's a statement "Costs
13  associated with addiction"?
14  A. I do, sir.
15  Q. Again, do those costs that are listed
16  here, are they consistent with your view of
17  costs associated with addiction?
18  MR. SNAPP: Object to the form.
19  A. Yes, they are, sir.
20  BY MR. STEWART:
21  Q. And finally, do you see there's a
22  "Costs associated with misuse/abuse/addiction,"
23  and you've got a final list, is that consistent
24  with your understanding?
25  MR. SNAPP: Object to the form.

Page 252

1  A. With my guessing. I don't know what
2  percentage of pharmacy boards, state boards,
3  impaired professional programs are associated
4  with abuse and diversion, but I wrote them down
5  as possibles.
6  BY MR. STEWART:
7  Q. I'd like to hand you another exhibit
8  which is marked Exhibit 33.
9  (Whereupon, Purdue-Wright-33 was
10  marked for identification.)
11  BY MR. STEWART:
12  Q. Do you see you have Exhibit 33 in
13  front of you?
14  A. I have Exhibit 33 in front of me.
15  Q. And can you turn to the first page and
16  tell me whether you see it marked -- or the
17  second page of the exhibit, can you tell me
18  whether it's marked with a Bates number 0087?
19  A. It is so marked, sir.
20  Q. And do you see that this is a
21  description of the RADARS system?
22  A. It's a description of the early
23  concept of the RADARS system.
24  Q. Do you know if you wrote this
25  description?

Page 253

1  A. I don't know if I solely authored it.
2  I suspect that the -- from the typeset and the
3  way it's laid out that it looks like a Curt
4  Wright document.
5  Q. Thank you.
6  (Whereupon, Purdue-Wright-34 was
7  marked for identification.)
8  BY MR. STEWART:
9  Q. I hand you Exhibit 34. And do you see
10  that that is a document that has been sent to
11  you by e-mail from a Dr. Sidney Schnoll? You're
12  on the fourth line down.
13  A. I see myself as a recipient on the
14  fourth line down.
15  Q. And can you just look at the document,
16  is this a document that was sent to you that
17  contains a RADARS system executive summary?
18  MR. PETRILLO: Just for the record, it
19  looks like the document was sent originally by
20  Brianne Weingarten and then forwarded by an
21  Anthony Santopolo. It's a little different from
22  the way you described it, but I don't think --
23  MR. STEWART: I see that's the way it
24  was copied. Let me strike that.
25  BY MR. STEWART:

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    Q.  Do you see this is a document that was
2  sent from Anthony Santopolo to you and others?
3    A.  That is what I see.
4    Q.  Initially I mischaracterized it.
5      Do you see that what Mr. Santopolo has
6  done has sent you a RADARS System executive
7  summary?
8    A.  It looks like it.
9    Q.  Do you recall getting an executive
10  summary of the RADARS System while you were at
11  Purdue?
12    A.  I don't remember this.
13    Q.  Is it fair to say that the RADARS
14  system is something you became familiar with at
15  Purdue?
16      MR. SNAPP:  Object to the form.
17    A.  It is fair to say that I knew about
18  RADARS when I was at Purdue.
19  BY MR. STEWART:
20    Q.  And you have no reason to think you
21  wouldn't have been sent these materials while
22  you were at Purdue?
23    A.  I would have no reason to dispute.
24      (Whereupon, Purdue-Wright-35 was
25      marked for identification.)

Page 255

1  BY MR. STEWART:
2    Q.  I'm going to hand you Exhibit 35.  Do
3  you see that you've got in front of you an
4  e-mail to you, looks like from a person named
5  Schmidt?
6    A.  Yes.
7    Q.  Do you see it is entitled "CPDD
8  Symposium Publication"?
9    A.  Yes.
10    Q.  And are you familiar with this
11  publication?
12    A.  Well, CPDD is the College on Problem
13  of Drug Dependence, and they have a variety of
14  venues in which publications are presented.
15    Q.  Do you recall providing materials to
16  CPDD relating to your discussions at a
17  symposium?
18    A.  I remember Bill Schmidt wanting
19  something.  I don't -- I'm not real clear on
20  what I did.
21    Q.  Do you see that he says "Thanks to
22  everyone who submitted a summary of their
23  presentation to be included in the summary of
24  our symposium on 'New Approaches to
25  Non-Addictive Analgesics.'  This will be

Page 256

1  published as part of a NIDA Research Monograph
2  early next year."
3      Do you see that?
4    A.  Yes.
5    Q.  Does that refresh your recollection
6  that he was contacting you to get a summary of
7  your presentation so he could put it in a
8  publication?
9    A.  It is what it says.
10    Q.  And can you turn to the page of this
11  document, this exhibit which is Exhibit 35, that
12  ends -- that has a Bates stamp ending in 4827?
13      Do you see that?
14    A.  Yes.
15    Q.  Do you see it's got your name with a
16  colon, and it's got a series of comments?
17    A.  Yes.
18    Q.  And if you want to look at it for a
19  moment and tell me if you generally remember
20  presenting these comments.
21    A.  Well, I remember now because I
22  remember the title.
23      (Witness reviewing document.)
24    Q.  I've highlighted a portion, sir, and
25  you can see it on the board, which is the second

Page 257

1  paragraph, and it starts with the word "Most."
2  I wondered if you could read those first two
3  sentences into the record.
4    A.  Sure.  "Most physicians agree that
5  iatrogenic addiction is an uncommon event in the
6  clinical management of acute pain states, with
7  an incidence of perhaps 1 in 10,000 patients
8  treated.  Being so uncommon, it is assumed to
9  represent a negligible risk.  This is a grave
10  error.  Iatrogenic addiction ceases to be a rare
11  and negligible problem as soon as the size of
12  the acute opioid analgesic market is taken into
13  account."
14    Q.  Is that something that you would have
15  stated at a symposium like this?
16    A.  Yes.
17    Q.  And is this consistent with your views
18  even today?
19    A.  Yes.
20      MR. SNAPP:  Object to the form.
21  BY MR. STEWART:
22    Q.  Have you looked at studies in recent
23  years analyzing the correlation between
24  treatment with long-term opioid therapy and
25  abuse and addiction?

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    A.  No.
2    Q.  So you haven't analyzed whether or not
3  more recent studies have determined that there's
4  a much higher risk of abuse and addiction?
5        MR. SNAPP:  Object to the form.
6    A.  I don't know what the recent studies
7  show.
8  BY MR. STEWART:
9    Q.  We just have to ask someone else about
10  that?
11    A.  You have to ask somebody else about
12  that.
13    Q.  What you were saying here is, look,
14  even if you assume that the risk per human is
15  quite low, the risk for all patients being
16  treated with opioids leads to a significant
17  number?
18    A.  Number.
19    Q.  Is that fair?
20        MR. SNAPP:  Object to the form.
21    A.  I agree that if you have a large
22  denominator, even a low risk means a large
23  number of people.
24  BY MR. STEWART:
25    Q.  And do you see here that you identify

Page 259

1  in your talk the significant denominator by
2  saying "There are about 130 million
3  prescriptions written for oral medications
4  containing oxycodone, hydrocodone, hydromorphone
5  and propoxyphene every year"?
6    A.  Propoxyphene.
7    Q.  Thank you.
8        And the point is you point out, am I
9  correct, that given that huge denominator you
10  have a significant risk of thousands of new
11  addicts each year?
12        MR. SNAPP:  Object to the form.
13    A.  Given those numbers in that
14  hypothesis, yes.  The problem is I don't know if
15  it's true.
16  BY MR. STEWART:
17    Q.  You say you don't know if it's true.
18  Why do you say that?
19    A.  The whole -- the paragraph says if
20  it's this rate and you have this many people you
21  could have -- you could potentially have this
22  many addicts or abusers.  To make that useful
23  you need to have some idea of the numbers.
24    Q.  And let me just ask you to read into
25  the record the statement that you stated at this

Page 260

1  symposium starting with the words "There are
2  about."
3    A.  I lost it.
4    Q.  It's right after the pink highlight on
5  the materials that I gave you.
6        MR. SNAPP:  Object to the form.
7    A.  "There are about 130 million
8  prescriptions written for oral medications
9  containing oxycodone, hydrocodone, hydromorphone
10  and propoxyphene every year.  If even 1 in
11  10,000 patients (1 in 10,000) a year develops
12  de novo addiction as the result of such
13  treatment, this means 13,000 new addicts" per
14  year.
15  BY MR. STEWART:
16    Q.  I take it that's the statement you
17  made to the symposium and allowed to be
18  published?
19        MR. SNAPP:  Object to the form.
20    A.  Yes.
21  BY MR. STEWART:
22    Q.  You're not backing away from that
23  statement?
24    A.  I'm just saying that those were
25  theoretical numbers, that I took the best

Page 261

1  numbers I had at the time.  Those numbers
2  certainly have probably changed.
3    Q.  Okay.  Point is they're not really
4  theoretical numbers so much you took the best
5  numbers you had at the time, fair?
6    A.  Fair.
7    Q.  Do you see on the fourth paragraph
8  down there's a statement that you make about
9  street value?  I'd ask you to read the first two
10  sentences of that paragraph into the record.
11    A.  "The street value (the amount a
12  stranger in a bar will pay for a tablet) of
13  diverted opioids is substantial, ranging from $1
14  up to $20 per tablet (prices vary depending on
15  the strength, desirability, and the current
16  supply).  Given that the cost of most common
17  opioid analgesics is less than $0.50 a tablet,
18  there is substantial profit in diversion and
19  resale, at all levels (manufacturer, wholesaler,
20  retail pharmacy, physician and patient)."
21    Q.  And this is what you presented at the
22  symposium, fair?
23        MR. SNAPP:  Object to the form.
24    A.  Fair.
25  BY MR. STEWART:

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    Q.   And actually, you've stated this in
2  many different ways we've read today, you've
3  warned of your concern that these opioids like
4  OxyContin have a significant street value and
5  are subject to diversion?
6         MR. SNAPP:  Object to the form.
7    A.   I have said that multiple times today.
8  BY MR. STEWART:
9    Q.   Now, we're talking about iatrogenic
10 addiction.  I'm curious, do you remember
11 testifying earlier today that when you were at
12 the FDA you made it clear you did not want to
13 see OxyContin indicated for osteoarthritis?
14        MR. SNAPP:  Object to the form.
15   A.   I did not want to see OxyContin
16 indicated for osteoarthritis.
17 BY MR. STEWART:
18   Q.   Did the FDA ever change its position
19 on that, that you know of?
20   A.   I don't know what the FDA has done.
21   Q.   Let me say it this way.  While you
22 were at Purdue still involved with opioids, did
23 you ever become aware that the FDA had said it's
24 fine to use OxyContin for osteoarthritis?  Did
25 the FDA -- strike that.  Start a new question.

Page 263

1         Did the FDA, while you were at Purdue,
2  ever tell Purdue it is okay to say that
3  OxyContin is indicated for osteoarthritis?
4         MR. SNAPP:  Object to the form.
5    A.   I have no idea.
6  BY MR. STEWART:
7    Q.   That wasn't in your area of concern at
8  Purdue?
9         MR. SNAPP:  Object to the form.
10   A.   I might have considered it in my area
11 of concern, but that didn't mean I knew about
12 it.
13 BY MR. STEWART:
14   Q.   Let me ask you this.  When you were at
15 Purdue, did you ever check to see whether Purdue
16 salespeople were, in fact, promoting OxyContin
17 for osteoarthritis?
18   A.   No.
19   Q.   Why not?
20   A.   I had three drug development programs
21 to run, and I was busier than could be.  I
22 didn't have time for looking at anything else.
23   Q.   Who was the person at Purdue, if you
24 know, who would have been in charge of analyzing
25 what salespeople were representing with respect

Page 264

1  to proper uses of OxyContin?
2         MR. SNAPP:  Object to the form.
3    A.   That would have been a function in the
4  marketing department.
5  BY MR. STEWART:
6    Q.   More broadly, do you remember earlier
7  today you testified that the FDA found that
8  OxyContin, it wasn't any better than the
9  existing opioid therapy, except that it had a
10 different dosing, fair?
11        MR. SNAPP:  Object to the form.
12   A.   Not quite right.  That the clinical
13 trials that were submitted showed no competitive
14 superiority to immediate-release oxycodone.
15 BY MR. STEWART:
16   Q.   Did you ever, when you went to Purdue,
17 take any steps to determine whether or not
18 Purdue's sales force was marketing OxyContin in
19 ways that were inconsistent with your
20 determination at the FDA?
21   A.   No, I did not, sir.
22   Q.   Is the reason the same that you gave
23 before, that you were working on other things?
24        MR. SNAPP:  Object to the form.
25   A.   The same reason, I was fully occupied

Page 265

1  with the duties that I'd been assigned.
2  BY MR. STEWART:
3    Q.   I'm going to hand you Exhibit 36.
4         (Whereupon, Purdue-Wright-36 was
5         marked for identification.)
6  BY MR. STEWART:
7    Q.   And I'd like, sir, to ask you if you
8  recognize this.
9         (Witness reviewing document.)
10   A.   I don't remember writing the document,
11 but it looks very much like a Curt Wright
12 document.
13   Q.   And do you see that on the front of
14 the document that is Exhibit 36 you've got a
15 page that's marked 4640, that's the last four
16 digits of the Bates number?
17   A.   Yes.
18   Q.   It's the very front.
19        MR. PETRILLO:  Front page.  Have you
20 got it?
21 BY MR. STEWART:
22   Q.   Do you see -- by the way, we've talked
23 about Bates numbers, just so the record is clear
24 I take it you understand that a Bates number is
25 this number that's at the bottom right-hand

Page 266

1  corner that we use to indicate what page we're
2  on?  Do you see that?
3       A.  Yes.
4       Q.  That's what a Bates number is, right?
5       A.  Mm-hmm.
6       Q.  So here we're at Bates number 4640.
7  Do you see that this document was sent from you
8  to Mr. Santopolo?
9       A.  Yes, I do.
10      Q.  Okay.  And it looks like materials
11  that you prepared to get Purdue ready for its
12  OxyContin FDA negotiations.
13          Do you see that?
14      A.  Yeah, I'm not sure about that.
15      Q.  Okay.
16      A.  I said earlier today that people would
17  ask me questions, they'd say what would likely
18  happen if -- about this or about that or about
19  the other.  I don't know if this represents my
20  advising Tony on specific negotiations or
21  writing another thought piece as to what could
22  happen.
23      Q.  Do you see, if you turn to Page 4641,
24  that the heading of the document is entitled
25  "OxyContin FDA Negotiations Issues Document"?

Page 267

1       A.  Yes.
2       Q.  And do you see that the way this
3  document is broken out is you list the FDA --
4  for a series of issues you list the FDA
5  unilateral position worst, and then Purdue's
6  position best, and then you predict an outcome?
7       A.  Yes, I do.
8       Q.  And do you see that, for example, on
9  the Page 4642 there's a section on advertising?
10      A.  Yes, I do.
11      Q.  And do you see that you warn that "The
12  agency will take the position that part of the
13  problem with diversion is due to an
14  inappropriately large denominator of usage due
15  to promotion of the drug for the management of
16  non-malignant pain"?  Do you see that?
17      A.  I see that.
18      Q.  Is what you're warning there, you're
19  saying the FDA will say one of the problems is
20  that OxyContin is being prescribed for too broad
21  a series of conditions and that is leading to
22  diversion, isn't that how you're articulating
23  the challenge by the FDA?
24          MR. SNAPP:  Object to the form.
25      A.  Yes, I am, sir.

Page 268

1  BY MR. STEWART:
2       Q.  Why do you think that's -- why was
3  that your prediction of the position the FDA
4  would take?
5          MR. SNAPP:  Object to the form.
6       A.  Earlier today I talked about a paper
7  that we did that looked -- that said the more
8  drugs in the pipeline, the more diversion you're
9  going to get.  I was very proud of that paper
10  because Nab Dasgupta was finally to prove -- was
11  able to prove something that I believed to be
12  true.  I believed this to be true, the more
13  people are -- and I think other people at the
14  FDA believed it, too, the more drug is being
15  used the more diversion you're going to have.
16  That's what I said.
17      Q.  But what you recommended Purdue's
18  position would be -- or strike that.
19          What you warn is that the FDA, because
20  of that causal linkage between prescribing and
21  diversion, would restrict promotion to oncologic
22  usage?
23      A.  It could do that.
24          MR. SNAPP:  Object to the form.
25  BY MR. STEWART:

Page 269

1       Q.  The FDA warning could say, look, we're
2  just going to let OxyContin be a cancer drug,
3  not a general use drug, fair?
4          MR. SNAPP:  Object to the form.
5       A.  That is what that sentence says.
6  BY MR. STEWART:
7       Q.  And you're proposing that Purdue,
8  though, urge a different tack, which is merely
9  modification of promotion material to promote
10  OxyContin as a WHO step two drug along with
11  provision of non-product specific materials on
12  control of misuse, abuse, and diversion, fair?
13          MR. SNAPP:  Object to the form.
14      A.  I'm not sure that's what I'm
15  advocating, but I'm saying that's what could be
16  done.
17  BY MR. STEWART:
18      Q.  Okay.  And do you know what was done
19  with these materials that you provided?
20      A.  I have no idea.
21      Q.  Was there anyone at Purdue at the time
22  this document that is Exhibit 36 was written
23  that had better knowledge of the inner workings
24  of the FDA --
25          MR. SNAPP:  Object to the form.

Page 270

BY MR. STEWART:

1 Q. -- than you?

2 MR. SNAPP: Object to the form.

3 A. You're asking two questions, and
4 they're difficult because after I left the FDA
5 there were large, large changes in the division,
6 and the new -- I already knew that the new
7 division director had different opinions than I
8 did, so I could not be sure what they would do.
9 And I found that many 20-year experienced
10 regulatory affairs professionals in all
11 companies tended to be dismissive of my opinions
12 because they believed they knew their business
13 better than I.

14 BY MR. STEWART:

15 Q. So it sound like you thought you
16 probably had the best understanding of the FDA
17 within the company, but you felt like others
18 also felt like they had expertise, fair?

19 A. That's fair.

20 Q. I'm going to hand you Exhibit 37.

21 (Whereupon, Purdue-Wright-37 was

22 marked for identification.)

23 BY MR. STEWART:

24 Q. And I want you to look at it and tell

Page 271

1 me whether you recognize it. I'll tell you it
2 may be two documents combined. Do you see the
3 page marked 7492 --
4 (Witness reviewing document.)
5 Q. -- which is the second page of the
6 document after the cover page?
7 A. Yes.
8 Q. Do you recognize that as an agenda for
9 OxyContin abuse diversion meeting?
10 A. That's what it's labeled.
11 Q. Is that your writing on there, the
12 handwriting?
13 A. I don't think so.
14 Q. Okay. Do you know if you attended a
15 meeting about OxyContin abuse diversion in
16 February of 2001?
17 A. I don't know.
18 Q. At Purdue did you use a calendaring
19 system like Outlook, something like that?
20 A. I don't think so, but I can't
21 remember.
22 Q. Do you think your secretary kept a
23 paper calendar?
24 A. I don't know what -- I don't know.
25 Q. How were meetings -- how would you be

Page 272

1 notified of a meeting that you had to go to, was
2 that by e-mail typically?
3 A. I believe it was almost always by
4 e-mail.
5 Q. Do you remember attending meetings
6 with Purdue, other Purdue employees to
7 strategize about an OxyContin abuse diversion
8 meeting coming up with the FDA?
9 MR. SNAPP: Object to the form.
10 A. I don't know whether I did or not. I
11 was for a brief period of time attending a
12 couple of meetings on abuse and diversion, and
13 then Dave Haddox took over. So it's entirely
14 conceivable I could have, I just can't remember.
15 BY MR. STEWART:
16 Q. Let me hand you a document marked
17 Exhibit 38.
18 (Whereupon, Purdue-Wright-38 was
19 marked for identification.)
20 BY MR. STEWART:
21 Q. And do you recognize that as a
22 PowerPoint presentation that you sent
23 Mr. Santopolo on March 30th, 2001?
24 A. I certainly recognize it as a
25 PowerPoint presentation. I believe I authored

Page 273

1 it, I don't know if I was the sole author. And
2 the header says that I sent it on 3/30/2001.
3 Q. And turn to the first page of the
4 materials. Do you see that we have no page
5 numbers on these pages of this PowerPoint?
6 A. There are no page numbers.
7 Q. Okay. Well, if you'll -- I'm going to
8 refer to pages by the headings. Do you see that
9 if you turn to the first page there's a slide
10 entitled "The OxyContin Crisis"?
11 A. Yes.
12 Q. And do you see that the center bullet
13 point says "OxyContin has been reported as
14 having a high rate of criminal misuse, abuse and
15 diversion"?
16 A. Yes.
17 Q. That wasn't controversial at this time
18 by the time this was distributed, fair?
19 MR. SNAPP: Object to the form.
20 A. Not to me.
21 BY MR. STEWART:
22 Q. Can you turn to the next page of
23 Exhibit 38, and tell me if you've arrived at a
24 slide entitled "The OxyContin Crisis," the
25 second slide?

Page 274

1    A. Yes.
2    Q. And is the middle bullet a bullet that
3 says "PPLP strongly believes that the public
4 will be best served if the company works in a
5 responsible, proportional and coordinated manner
6 with the appropriate governmental and
7 non-governmental agencies to bring a quick
8 resolution to the problem"?
9    A. Yes.
10    Q. Was that the approach that Purdue took
11 with the FDA, that it would be a cooperative
12 partner in addressing the diversion of
13 OxyContin?
14        MR. SNAPP: Object to the form.
15    A. My -- I do not remember this. I mean,
16 I remember something like this, but I do not
17 remember the specifics. I beleive this may be
18 what I told Tony Santopolo what Purdue should
19 do.
20 BY MR. STEWART:
21    Q. Do you know whether Purdue led the FDA
22 to believe that it was going to work in a
23 responsible, proportional and coordinated manner
24 with the FDA and other appropriate governmental
25 and non-governmental agencies to bring a quick

Page 275

1 solution to the problem of diversion of
2 OxyContin?
3        MR. SNAPP: Object to the form.
4    A. I was not on the OxyContin team, and I
5 don't know.
6 BY MR. STEWART:
7    Q. Can you turn until you find a page of
8 this PowerPoint that is Exhibit 38 that's
9 entitled "What could be done?"
10    A. I have found that page.
11    Q. Okay. Do you see that the last bullet
12 says "Fortunately, PPLP" -- that is Purdue --
13 "has been preparing for this kind of problem
14 ever since we first became aware of rumors of
15 OxyContin abuse"? Do you see that?
16    A. I see that.
17    Q. What sort of preparation had Purdue
18 been doing?
19    A. It first formed a committee. That was
20 the committee I attended that was very early.
21 It then hired, I believe new hired someone in --
22 whose expertise was diversion, criminal
23 diversion. It then hired Dr. Haddox. It then
24 hired Dr. Schnoll. It then built my entire
25 department. And it also put muscle behind the

Page 276

1 Opioid X program.
2    Q. Can you turn to the page in Exhibit 38
3 that's entitled "What Has Been Done?"
4    A. I have found that page.
5    Q. Do you see that the third bullet says
6 "This response must include appropriate
7 modifications to labeling, marketing, promotion,
8 provider education and regulation, as well as
9 modifications (if possible) to the actual dosage
10 form"?
11    A. I see that, sir.
12    Q. Are you describing here what Purdue
13 can do to address the outbreak of diversion of
14 OxyContin?
15    A. I am describing what Purdue could do.
16    Q. Did you say that you're not familiar
17 with the guilty plea entered by Purdue and three
18 top executives in 2007 for misbranding
19 OxyContin?
20    A. I only know that it existed.
21    Q. So we'd have to look at that guilty
22 plea to determine whether the actions in the
23 guilty plea are consistent with the response
24 that you're suggesting, fair?
25        MR. SNAPP: Object to the form.

Page 277

1    A. I don't understand.
2 BY MR. STEWART:
3    Q. Sure.
4       To determine whether or not all the
5 actions that are listed in Purdue's guilty plea
6 are consistent with modifications to labeling,
7 marketing, promotion, and so forth to address
8 the diversion problem, we'd have to compare what
9 you're proposing to the guilty plea, fair?
10        MR. SNAPP: Object to the form.
11    A. I'm not sure the -- since I don't know
12 what the guilty plea was --
13 BY MR. STEWART:
14    Q. Fair enough.
15    A. -- I can't answer that one.
16    Q. I hand you Exhibit 39.
17       (Whereupon, Purdue-Wright-39 was
18       marked for identification.)
19 BY MR. STEWART:
20    Q. I'm going to hand you Exhibit 39. Do
21 you have it?
22    A. I have that.
23    Q. Do you see it's an "Agreed Statement
24 of Fact," that's the title? Do you see that?
25    A. I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1  Q.  And I take it you're not familiar with
2  this document?
3  A.  I am not familiar with this document.
4  Q.  And I'll tell you what, can you turn
5  to Page 6 of 16?  The pages on the document have
6  their own internal pagination.  Do you see that?
7  A.  Yes.
8  Q.  Do you see there's a subparagraph B?
9  A.  Mm-hmm.
10  Q.  I take it if Purdue sales
11  representatives were telling healthcare
12  providers that OxyContin potentially creates
13  less chance for addiction than immediate-release
14  opioids, that would not be marketing that would
15  help reduce diversion, fair?
16  MR. SNAPP:  Object to the form.
17  A.  Okay.  But I do need one piece of
18  information.
19  BY MR. STEWART:
20  Q.  Sure.
21  A.  When was this supposed to have
22  happened?
23  Q.  And I'll just tell you, if this
24  happened in the period that you're creating this
25  PowerPoint, that would be inconsistent in 2001

Page 279

1  with what you're suggesting, fair?
2  MR. SNAPP:  Object to the form.
3  A.  It would be inconsistent -- in my
4  PowerPoints, speaking as somebody in the abuse
5  of -- the group that was concerned passionately
6  with abuse, I made a number of suggests that
7  Purdue should do, and I'm aware that it will
8  take a certain amount of time to implement it,
9  to agree to a suggestion, then implement a
10  suggestion.  So I simply don't know what time
11  period we're talking about.
12  If -- had someone asked me do you
13  think we're -- these are adequate changes to
14  deal with abuse and diversion, changes in the
15  label, changes in the detailing materials, I
16  would have looked at.  I'm not happy today
17  that if these agreed -- if this is a statement
18  of fact and they were telling people that this
19  has less abuse potential than immediate-release
20  opioids, I'm not happy that they were doing
21  that.
22  Q.  Turning back to Exhibit 38, which is
23  this PowerPoint.
24  A.  Yes.
25  Q.  Do you see that?  Do you see that

Page 280

1  there's a page in Exhibit 38 entitled "What Can
2  The Sponsor Do"?
3  A.  Yes, there is.
4  Q.  And do you see on the second bullet
5  says Purdue -- PPLP in this presentation is
6  Purdue, fair?  Is that correct?
7  A.  PPLP is one acronym for Purdue.
8  Q.  And you're saying "Purdue has to," and
9  then you have a colon, and just list seven things
10  that should be done, is that correct?
11  A.  That is correct.
12  Q.  And do you know if Purdue carried out
13  your recommendations with respect to these seven
14  items that are on Exhibit 38, the page entitled
15  what can the sponsors -- "What Can The Sponsor
16  Do?"
17  MR. SNAPP:  Object to the form.
18  A.  They carried -- to my knowledge, which
19  is limited to where I was working and what I was
20  doing, they carried out a number of them.
21  BY MR. STEWART:
22  Q.  Let me ask you, today as you look at
23  this, do you still believe that your list of
24  items, things that should be done to reduce
25  diversion of OxyContin, was a good list?  Was

Page 281

1  this the list of things that Purdue should have
2  done?
3  MR. SNAPP:  Object to the form.
4  A.  I believe that is a list of things
5  that should have been done.
6  BY MR. STEWART:
7  Q.  Okay.  Can you turn to a page
8  entitled -- a page of Exhibit 38 entitled
9  "Modify the marketing of our products"?  Do you
10  see that?
11  A.  Modify the labeling of such products
12  to aid the prescriber.
13  Q.  I'm looking at something that says
14  "Modify the marketing of our products (to center
15  on appropriate patient selection)."
16  Do you see that?
17  A.  I see that.
18  Q.  Do you see the second bullet says
19  "PPLP" -- Purdue -- "could do more to encourage
20  proper usage and discourage misuse of our
21  products."
22  Do you see that?
23  A.  Yes.
24  Q.  What was your belief, what were they
25  not doing that Purdue needed to do more of?

Page 282

1    A.  I thought they were marketing with
2   respect to the label.  I thought they needed to
3   market in a more stringent way.
4    Q.  And where did you have the impression
5   that more stringent marketing methods were
6   needed?
7        MR. SNAPP:  Object to the form.
8    A.  Because that's what you do.  I mean,
9   just believed at the time that that's what would
10  help.
11  BY MR. STEWART:
12   Q.  And I guess what I'm getting at is, it
13  sounds like you had information that Purdue was
14  not doing enough to encourage proper usage and
15  discourage misuse of our products.  Am I reading
16  that correctly?
17       MR. SNAPP:  Object to the form.
18   A.  I did not have such information, I
19  don't think.
20  BY MR. STEWART:
21   Q.  So this was a surmise in your mind?
22   A.  This was a surmise.
23   Q.  Can you turn now finally to a page
24  entitled "Integrated Risk Management"?  Do you
25  see that?

Page 283

1    A.  I have it.
2    Q.  Do you see again we're on the exhibit
3   that is Exhibit 38, and now we're on a page
4   entitled "Integrated Risk Management"?  Do you
5   see that?
6        MR. PETRILLO:  Yes, right.
7    A.  I think I'm in the right place.
8   BY MR. STEWART:
9    Q.  And do you see the third bullet says
10  "In settings where there is high patient
11  turnover, increased geographic or regional risk,
12  unusual volume of narcotic use or other risk
13  factors, it is safer for the provider to use
14  narrow-spectrum, low diversion risk, or
15  tamper-resistant medications."
16       Do you see that?
17   A.  I see that.
18   Q.  So at that time that you produced
19  this, OxyContin was not a narrow-spectrum, low
20  diversion risk, or tamper-resistant medication,
21  fair?
22   A.  That is true.
23   Q.  What you're saying is instead of using
24  a drug like OxyContin that doesn't have these
25  characteristics, you probably in these settings

Page 284

1   want to dial back and use a drug that's less
2   susceptible to diversion, fair?
3        MR. SNAPP:  Object to the form.
4    A.  If you're in a hotspot and things are
5   going badly, you want to change what you're
6   prescribing.
7   BY MR. STEWART:
8    Q.  I hand you an exhibit marked
9   Exhibit 40.
10       (Whereupon, Purdue-Wright-40 was
11        marked for identification.)
12  BY MR. STEWART:
13   Q.  I'd ask you to tell me if you
14  recognize that document.
15   A.  This appears to be a Regulatory Agency
16  Contact Report of a conversation with
17  Dr. Cynthia McCormick, division director of my
18  old division.
19   Q.  And do you recall whether or not you
20  were made aware at the time of this contact?
21  And I'll point out that you're copied on this
22  document on the next page which is marked 6255
23  with a Bates number.
24       (Witness reviewing document.)
25   Q.  Do you remember that?

Page 285

1    A.  I don't remember this document.
2    Q.  Okay.  Do you remember hearing
3   about -- do you see that the document states on
4   the first page that "Dr. McCormick started
5   out" -- and I've got it highlighted here on the
6   screen -- "started out the discussion by stating
7   that she was concerned about a recent press
8   release (Attachment 1) that had been received by
9   the Agency's press office for review."
10       Do you see that?
11   A.  Yes.
12   Q.  And do you see then that on the fourth
13  paragraph down, or third I should say,
14  Dr. McCormick says, or the document recounts,
15  "Dr. McCormick stated that she felt the issues
16  discussed at the April 23 meeting were much more
17  serious than what was written in the press
18  release; in particular, that we did not talk
19  about the problems specifically relating to
20  OxyContin, rather, that it only addressed
21  prescription drugs in general."
22       Do you see that?
23   A.  Yes.
24   Q.  Do you remember this back and forth?
25   A.  I do not remember this.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1      Q.   All you can do is identify this as a
2   document that you would have received a copy of,
3   is that fair?
4          MR. SNAPP:  Object to the form.
5      A.   Yeah.
6   BY MR. STEWART:
7      Q.   I'm going to hand you a document
8   marked Exhibit 41.
9          (Whereupon, Purdue-Wright-41 was
10          marked for identification.)
11   BY MR. STEWART:
12      Q.   I'd like to know if you recognize this
13   document as an e-mail sequence.
14          (Witness reviewing document.)
15      Q.   And I direct your attention, in fact,
16   that your name comes up in the second e-mail
17   down on the page marked 1719 of Exhibit 41.
18          Do you see that?
19      A.   Mm-hmm.
20      Q.   Do you see where Dr. Richard Sackler
21   says, "Robert, Bob, Mike, I, and Curtis Wright
22   were all involved in the past and had a lot to
23   do with the quality of the PI.  It would be good
24   for their knowledge to be tapped for this, the
25   most critical rewrite that we have ever had."

Page 287

1          Do you see that?
2      A.   Mm-hmm.
3      Q.   Who is Richard Sackler?
4      A.   Richard Sackler is one of the owners
5   of the company.
6      Q.   And at this time did he have an
7   official position?
8      A.   I'm not -- I'm not sure what his
9   position was at that time.
10      Q.   I take it you've talked with Richard
11   Sackler a number of times, fair?
12          MR. SNAPP:  Object to the form.
13      A.   A couple of times.
14   BY MR. STEWART:
15      Q.   He sent you e-mails on subjects
16   related to Purdue at different times?
17          MR. SNAPP:  Object to the form.
18      A.   I'm not so sure.  I don't know if he
19   sent me e-mails.
20   BY MR. STEWART:
21      Q.   Do you know what he's talking about
22   here when he says "Robert, Bob, Mike, I and
23   Curtis Wright were all involved in the past and
24   had a lot to do with the quality of the PI"?  Do
25   you know what's he's referring to?

Page 288

1      A.   I think he means the original package
2   insert for OxyContin.
3      Q.   And he's saying you all were all
4   involved in that process, fair?
5      A.   Yeah.
6      Q.   And that's accurate?
7      A.   I was with the Food and Drug
8   Administration, I reviewed it.
9      Q.   And who are Robert, Bob, and Mike that
10   he's referring to?
11      A.   Robert would be Robert Reder.  Mike
12   would be Mike Inn -- I'm not sure how to spell
13   his name.
14      Q.   What role did he play?
15      A.   I don't remember.
16      Q.   Okay.  And Bob?
17      A.   Bob Kaiko.
18      Q.   Okay.  And Dr. Sackler himself was
19   involved in that process with respect to the
20   original package insert?
21          MR. SNAPP:  Object to the form.
22      A.   It says it here.  I don't know.
23   BY MR. STEWART:
24      Q.   Did you ever have conversations with
25   Dr. Sackler himself when you were at the FDA

Page 289

1   regarding the package insert?
2      A.   No.
3      Q.   I hand you Exhibit 42.
4          (Whereupon, Purdue-Wright-42 was
5          marked for identification.)
6   BY MR. STEWART:
7      Q.   Sir, I hand you an exhibit and ask you
8   if you recognize it.
9          (Witness reviewing document.)
10      A.   I do not remember specifically writing
11   the document.  It is almost certainly my
12   authorship, and it looks like a thought piece I
13   wrote for Sally Riddle.
14      Q.   And do you know if it was ever
15   published?
16      A.   I don't think it was ever published.
17      Q.   And do you remember writing this
18   thought piece?
19      A.   I remember thinking these thoughts.  I
20   didn't remember the thought piece until I looked
21   at it.
22      Q.   Tell me about the tipping point.  What
23   is the tipping point that you were referring to
24   in this article?
25          MR. SNAPP:  Object to the form.

Page 290

1    A.  The way I describe it in this article
2  is that economic forces drive diversion of
3  pharmaceuticals.  Diversion of pharmaceuticals
4  results in their being used for abuse and
5  diversion -- I mean, used for abuse.  As cases
6  of abuse grow, you eventually reach a tipping
7  point where it becomes a crisis and you have to
8  do something immediately to try to control the
9  crisis.
10 BY MR. STEWART:
11   Q.  And what characterizes the tipping
12 point?
13   A.  Well, I've forgotten.  The tipping
14 point, as I describe it here, if I am correct,
15 is when diversion and abuse have resulted in
16 enough cases so there is sufficient media
17 attention, publicity, press reports, internet
18 traffic, peer-to-peer communication so that the
19 abuse of the drug explodes.
20   Q.  I think you've stated that today we
21 continue to be in a period of our national
22 history where the abuse of opioids is a major
23 social problem, fair?
24   A.  Every opioid, yes.
25   Q.  When did -- when was the tipping

Page 291

1  point, in your mind, reached for this current
2  cycle of abuse and diversion of opioids in the
3  United States?
4      MR. SNAPP:  Object to the form.
5    A.  Can I look up one of my publications?
6  BY MR. STEWART:
7    Q.  Certainly.
8    A.  If I can find it.  I haven't thought
9  about this in years.
10     (Witness reviewing document.)
11   A.  I would say between 2000 and 2002.
12   Q.  And you've talked about opioids
13 generally.  That would certainly include
14 OxyContin, fair?
15   A.  Fair.
16   Q.  I'm going to hand you an exhibit,
17 Exhibit 43.
18     (Whereupon, Purdue-Wright-43 was
19     marked for identification.)
20 BY MR. STEWART:
21   Q.  I'd like to know if you recognize this
22 document.
23     (Witness reviewing document.)
24   A.  It looks like another thought piece by
25 Curt Wright.

Page 292

1    Q.  And can we assume that this is a
2  thought piece that you sent on June the 10th,
3  2003 to all the various folks that are on this
4  e-mail chain, including Dr. Haddox?
5    A.  Haddox, Schnoll, Kramer, Douglas
6  Kramer, Alton Kremer, Lynn, yeah, I assume I
7  sent it to them.
8    Q.  I'm going to hand you another document
9  marked Exhibit 44.
10     (Whereupon, Purdue-Wright-44 was
11     marked for identification.)
12 BY MR. STEWART:
13   Q.  And ask you if you recognize it as a
14 deposition transcript of a deposition taken of
15 you in February, 2013.
16     (Witness reviewing document.)
17   A.  It's what it's so labeled.
18   Q.  Do you remember giving a deposition on
19 February the 13th, 2013?
20   A.  I remember giving several depositions,
21 but I don't remember much of them.
22   Q.  Any reason to think that you, looking
23 at this document -- well, I'll ask you this.
24     Looking at this document, does it
25 refresh your recollection that, in fact, on

Page 293

1  February 13th, 2013 you gave deposition
2  testimony?
3    A.  I still don't know which one it was,
4  but I can't -- there's no reason to dispute the
5  record.
6    Q.  And I take it if you testified in a
7  deposition, we can assume that you tried to
8  testify accurately and truthfully?
9    A.  I have always tried to testify
10 accurately.
11   Q.  And that would be true for this
12 deposition, the transcript of which we have as
13 Exhibit 44, fair?
14   A.  I was sworn under oath, so I told the
15 best truth I knew.
16   Q.  I'd just like to ask you about one
17 page in the deposition.  Could you turn to
18 Page 181?
19     MR. PETRILLO:  It may not matter,
20 Counselor, but are you representing you have all
21 the pages of the transcript in this exhibit?
22     MR. STEWART:  Yes.  If there's a
23 missing page, we'll be happy to replace it.
24   A.  I found Page 181 of the transcript, I
25 believe.

Page 294

```
1   BY MR. STEWART:
2       Q.  Do you see that you state -- you're
3   looking at a document, but you state, and I
4   don't have that document for you, that, and this
5   is the second paragraph down, "the problem that
6   if an abuser wants to take, wants to get high,
7   they can take an intact dosage form of a high
8   enough strength, if they can get it, to get high
9   without having to crush the product at all."
10          Do you see that?
11      A.  I see that.
12      Q.  Is it fair to say that's your view,
13  that's correct?
14          MR. SNAPP:  Object to the form.
15      A.  I'm not sure it's my view anymore.
16  There have been events that have taken place
17  since that time that suggest to me that it takes
18  less tamper-resistance than I thought to deter
19  diversion and abuse of a particular dosage form.
20  BY MR. STEWART:
21      Q.  I'm curious, what's brought you to
22  that belief?
23      A.  After I left Purdue they changed the
24  formulation to something that approximated one
25  of the Opioid X formulations, and some years
```

Page 295

```
1   later I got an e-mail from a friend, and I don't
2   remember who sent it to me, saying hey, look, it
3   worked, and I saw that in that particular study
4   the new formulation had reduced overdose deaths
5   by 80 percent.
6       Q.  Do you remember that study you're
7   talking about?
8       A.  I'm sorry, I don't.
9       Q.  And I take it -- we've talked a little
10  bit today about trends and diversion, those
11  sorts of things, but when you're providing this
12  testimony right now you're not really basing it
13  on the fact that you actually reviewed
14  literature to suggest that there's a significant
15  change, fair?  In other words, you're not
16  suggesting -- you're mentioning an anecdote
17  about a communication with a friend?
18      A.  That --
19          MR. SNAPP:  Object to the form.
20      A.  -- cited a scientific paper that I
21  then looked at and was impressed by the
22  reduction in overdose deaths.
23  BY MR. STEWART:
24      Q.  I guess what I'm getting at is,
25  though, first of all, you're not -- when you
```

Page 296

```
1   were characterizing in 2013 deposition, when you
2   were saying "if an abuser wants to take, wants
3   to get high, they can take an intact dosage form
4   of high enough strength, if they can get it, to
5   get high without having to crush the product at
6   all," you do believe that's correct?
7       A.  That is true.
8           MR. SNAPP:  Object to the form.
9   BY MR. STEWART:
10      Q.  Okay.  I'm going to hand you another
11  document that I'll mark as Exhibit 45.
12          MR. PETRILLO:  If we're going to go
13  for another half hour, maybe take a short break,
14  or do you think you're almost done?
15          MR. STEWART:  No, I think we should
16  take a short break if you'd like.
17          THE VIDEOGRAPHER:  We are now going
18  off the record, and the time is 5:49 p.m.
19          (Whereupon, a recess was taken.)
20          THE VIDEOGRAPHER:  We are now going
21  back on the record, and the time is 5:56 p.m.
22          MR. PETRILLO:  Can we start without
23  your colleague?
24          MR. BENNER:  We can start.
25  BY MR. STEWART:
```

Page 297

```
1       Q.  Dr. Wright, I'm going to hand you
2   Exhibit 45.
3           (Whereupon, Purdue-Wright-45 was
4           marked for identification.)
5   BY MR. STEWART:
6       Q.  Do you recognize that exhibit as a
7   transcript of a deposition you gave on
8   January 15th, 2014?  And it's intended to be a
9   complete transcript.
10          (Witness reviewing document.)
11      A.  This looks like the deposition I gave
12  in Boston.
13      Q.  And is it fair to say that when you
14  gave this deposition, for which Exhibit 45 is
15  the transcript, that you tried to testify
16  truthfully and accurately?
17      A.  Yes, sir.
18      Q.  Now I'm going to hand you deposition
19  excerpt 46.
20          (Whereupon, Purdue-Wright-46 was
21          marked for identification.)
22  BY MR. STEWART:
23      Q.  This is not a transcript of your
24  deposition.  It's a transcript of a deposition
25  by a Robert Reder.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    Do you see that?
2    A.  Excuse me, at the top it says that
3  this contains confidential information.  Is it
4  proper for me to read this?
5    Q.  It is.
6    And do you -- can you identify Robert
7  Reder?
8    A.  Robert Reder was my superior at
9  Purdue.  He was one of the leading physicians at
10  Purdue Pharma, later left and went to Endo.
11    Q.  And can you tell me, I'm going to --
12  if you turn to Page 25 in the deposition, and
13  this is an excerpt, it's not the entire
14  transcript, do you see, and I've highlighted the
15  material, that the deposition reads -- the
16  question in part is "in December 1994, that no
17  specific studies of the OxyContin formulation
18  had been conducted to ascertain if it had a
19  lower abuse potential"?  Do you see Dr. Reder
20  says "that's correct"?
21    A.  I see that.
22    Q.  Do you agree with that?
23    A.  That's correct.
24    Q.  Do you see then that there's a
25  question, "Did Purdue ever do any specific

Page 299

1  studies to ascertain whether or not OxyContin
2  had a lower abuse potential than, say,
3  morphine?"  And he answers, "You
4  mean...comparative studies?"  The questioner
5  says "Yes."  And then he answers "No."
6    Do you see that?
7    A.  Yes, I see that.
8    Q.  Do you share that view?
9    A.  To the best of my knowledge, that's
10  true.
11    Q.  Final question was in this deposition,
12  "What about immediate-release oxycodone
13  products?"  And he answers "No."
14    Do you see that?
15    A.  Yes, I see that.
16    Q.  Do you agree with that as well?
17    MR. SNAPP:  Object to the form.
18    A.  I'd have to think about that one and
19  look at the data.  And I simply cannot remember
20  because it was too long ago.  I -- I'm not sure
21  there isn't data available.  He is correct when
22  he says they did not do head-to-head abuse
23  liability trials in post addicts, which are the
24  conventional -- which is the standard, gold
25  standard.

Page 300

1  BY MR. STEWART:
2    Q.  Now, sir, we talked about -- and you
3  can set that exhibit aside.  We talked about
4  Richard Sackler.  I think you identified him as
5  the owner of -- one of the owners of Purdue,
6  fair?
7    MR. SNAPP:  Object to the form.
8    A.  I do not know Dr. Richard's exact
9  title.  He and the Sacklers -- the Sackler
10  family and that group of Sacklers owned the
11  company.
12  BY MR. STEWART:
13    Q.  Who are the Sacklers that you know of
14  that own the company?
15    MR. SNAPP:  Object to the form.
16    A.  Well, that's difficult because a
17  lawyer once told me that there's one guy in
18  Switzerland who knows how the companies are
19  organized, and he's never coming to the United
20  States.  And I don't -- you're asking the wrong
21  guy about the financial ownership of Purdue, the
22  Purdue-associated companies.
23  BY MR. STEWART:
24    Q.  On the description, fair enough.
25    I take it you don't know the name of

Page 301

1  the guy in Switzerland?
2    A.  No, I'm not sure he's in Switzerland.
3    Q.  Do you remember who told you that
4  about this fellow in Switzerland?
5    MR. SNAPP:  Object to the form.
6    To the extent -- you said it was a
7  lawyer.  If it was a Purdue lawyer, I'm
8  instructing you not to answer on the grounds of
9  attorney/client privilege if it took place
10  during the time that you were at the company.
11  BY MR. STEWART:
12    Q.  The only question I have for you to
13  explore that, and I don't want you ever to tell
14  me anything that you told a lawyer, but I take
15  it it is true that that was told to you by a
16  lawyer?  Or now, let me step back for a minute.
17    MR. SNAPP:  You've made your
18  objection, we can address it.  I'll withdraw the
19  question.
20  BY MR. STEWART:
21    Q.  Tell me, you mentioned two social
22  occasions that you'd interacted with Richard
23  Sackler, can you describe those social
24  occasions?
25    MR. SNAPP:  Object to the form.

Page 302

1    A.  Well, they would have been at the
2  presentations which we made to the company and
3  to the family, and I said hello to him.
4  BY MR. STEWART:
5    Q.  Tell me about that.  What
6  presentations are you talking about?
7    A.  I do not know if it was annually, I do
8  not know if it was -- what the frequency was,
9  but I remember it because we were all going in
10  to hear presentations on various wonderful
11  things about the company, and the clinical
12  department had to talk about the projects that
13  we had in progress, and I sat down in what
14  looked like a perfectly wonderful set of empty
15  seats only to be shooed out of there because
16  that was reserved for the family.
17    Q.  And do you remember the time frame?
18  Is this a single meeting that you remember, or
19  were there multiple meetings like this?
20    A.  I know of at least two.
21    Q.  And were they similar meetings, the
22  two meetings that you described?
23    A.  They were similar meetings.  They were
24  progress meetings.
25    Q.  And where would such progress meetings

Page 303

1  be held?
2    A.  It's been too long.  I don't remember.
3  They were external.  We went someplace else, but
4  where exactly I don't remember.
5    Q.  Put it this way.  Was it in
6  Connecticut?
7    A.  Yes.
8    Q.  You didn't fly somewhere?
9    A.  No, it was in Connecticut.
10    Q.  So you'd go off campus?
11    A.  Rent a big hotel or a big hotel
12  conference room, an auditorium large enough to
13  hold all the people, and then we would present.
14    Q.  And how many people would be present
15  at these meetings that you're describing?
16    A.  A bunch of employees.  I mean, but I'm
17  not good enough at crowd estimation to guess.
18    Q.  Are you talking 20 or 50?
19      MR. SNAPP:  Object to the form.
20    A.  200.
21  BY MR. STEWART:
22    Q.  And other than those meetings -- do
23  you remember what those meetings were called?
24    A.  No, I do not, sir.
25    Q.  Other than those meetings that you've

Page 304

1  just described, one more question about those
2  meetings.  Were they annual meetings do you
3  think?
4    A.  I'm not sure.
5    Q.  Other than those meetings, have you
6  ever had a social meeting with any member of the
7  Sackler family?
8    A.  No, I have not, sir.
9    Q.  You've never had a meal with a Sackler
10  family member?
11      MR. SNAPP:  Object to the form.
12    A.  I had -- yes, I did.  I had -- when I
13  was new to the company, part of introducing
14  somebody new to the company was that you had
15  lunch with the Sacklers and I had lunch with the
16  Sacklers.
17  BY MR. STEWART:
18    Q.  And how did that happen?  Did that
19  happen in the corporate headquarters?
20    A.  Yes.
21    Q.  And who was present?
22    A.  Sacklers.
23    Q.  Was Richard Sackler present?
24    A.  I'm not sure which of the Sacklers
25  were present.

Page 305

1    Q.  Do you think Kathy Sackler was
2  present?
3      MR. SNAPP:  Object to the form.
4    A.  I don't know if Kathy was present.  I
5  mean, at the time I was so overwhelmed and
6  tired, I just said hello and good-bye, was
7  polite, and that was my introduction to the
8  Sacklers.
9  BY MR. STEWART:
10    Q.  And was that -- how many people do you
11  remember were in that lunch?
12    A.  Five or six.
13    Q.  And was that held in a particular
14  dining room that you had?
15    A.  There was a dining room that -- there
16  was a Sackler family dining room in the old
17  building.
18    Q.  And was that the only time you ever
19  ate in the Sackler family dining room?
20    A.  It was, sir.
21    Q.  Other than that, have you ever had a
22  meal with a Sackler family member?
23    A.  I don't think so.  I can't remember
24  any.
25    Q.  Did you ever exchange communications

Page 306

1 with Richard Sackler about anything not related
2 to work at Purdue?
3     A.  I don't think so.
4     Q.   While you were at Purdue, did you ever
5 receive anything of value from an entity other
6 than Purdue itself for work you were doing with
7 respect to opioids?
8         MR. SNAPP:  Object to the form.
9     A.  I don't think so.
10 BY MR. STEWART:
11     Q.   By the way, you talked about those
12 presentations where there were, you know, a
13 couple hundred employees.  Did you yourself
14 present at those meetings?
15     A.  I don't think I ever did.
16     Q.   Has a member of the Sackler family
17 ever given you anything of value?
18         MR. SNAPP:  Object to the form.
19     A.  When I reached retirement age the
20 company gave me a cuckoo clock, a clock.
21 BY MR. STEWART:
22     Q.  Is that the extent of the list of
23 things of value?
24     A.  Yes, sir.
25     Q.  I hand you Exhibit 47.

Page 307

1         (Whereupon, Purdue-Wright-47 was
2         marked for identification.)
3 BY MR. STEWART:
4     Q.  Do you recognize this document?
5         (Witness reviewing document.)
6     A.  It looks like an e-mail I got, I was
7 carbon copied on.
8     Q.  Do you know why you're copied on this,
9 this sequence of e-mails from Richard Sackler
10 and others?
11         MR. SNAPP:  Object to the form.
12     A.  I don't know for sure, but I have a
13 hypothesis.
14 BY MR. STEWART:
15     Q.  What's that?
16     A.  During a period of time, and I don't
17 remember how long, I sat on the external product
18 acquisition board that did scientific assessment
19 of new product opportunities that were being
20 peddled with Purdue.
21     Q.  You think that's why you would have
22 been included in this?
23     A.  Most likely.
24     Q.  I'm going to hand you a document
25 marked Exhibit 48.

Page 308

1         (Whereupon, Purdue-Wright-48 was
2         marked for identification.)
3         (Witness reviewing document.)
4 BY MR. STEWART:
5     Q.  Do you recognize this document?
6     A.  I remember the issue.  I don't
7 recognize the specific e-mail.
8     Q.  So this is Dr. Sackler e-mailing you
9 about the --
10     A.  Yes.
11     Q.  And what was the basic -- what was he
12 inquiring about, as you recall?
13     A.  If I'm right, because this was a long
14 time ago, Algos Pain Therapeutics, or one of the
15 other, was one of the companies that was
16 presenting a new product acquisition to the
17 committee, and it looks like Richard Sackler
18 wanted to know what I thought about it.
19     Q.  Is that pretty commonplace for him to
20 reach out to you and try to get your thoughts on
21 drug development and those sorts of subjects?
22         MR. SNAPP:  Object to the form.
23     A.  I didn't even know that he'd done it
24 once.  I mean, it was not a -- not regular in
25 any way.

Page 309

1         (Whereupon, Purdue-Wright-49 was
2         marked for identification.)
3 BY MR. STEWART:
4     Q.  Let me hand you Exhibit 49.  In your
5 dealings with Dr. Sackler, did you feel, and in
6 his dealings with you, that he was a person who
7 spoke with precision?
8         MR. SNAPP:  Is that a question?
9         MR. STEWART:  Yes, that's a question.
10         MR. SNAPP:  Object to the form.
11     A.  Sorry, I'm still orienting myself to
12 what this is.  Oh, yeah.
13 BY MR. STEWART:
14     Q.  I had a general question, is
15 Dr. Sackler, he's a doctor, he's an executive,
16 did he generally speak with precision when he
17 was dealing with you?
18         MR. SNAPP:  Object to the form.
19     A.  I don't know what -- I couldn't
20 characterize.  It was so infrequent I couldn't
21 characterize how he spoke.
22 BY MR. STEWART:
23     Q.  How many times do you think you spoke
24 to Dr. Sackler on the phone?
25     A.  Twice.

Page 310

1    Q.  Did Dr. Sackler tell you anything that
2  was inaccurate?  Maybe that's another way to
3  phrase that.
4      MR. SNAPP:  Object to the form.
5    A.  Not that I know of.
6  BY MR. STEWART:
7    Q.  Now, turning to this exhibit that is
8  Exhibit 49, do you have that in front of you?
9    A.  Mm-hmm.
10    Q.  And if you're looking at the exhibit,
11  do you know what it is?  What's this
12  communication?
13    A.  Well, I think I know what it is.  One
14  of the intellectual property ideas that I
15  presented to the intellectual property committee
16  was for individualized automated pharmaceutical
17  dispensing, compounding and dispensing for
18  compounding pharmacies.  Many factories have
19  high volume pharmacy so that you could program
20  the machine, instead of a pharmacist, to
21  compound a specific product at a specific
22  strength for a specific person.
23    Q.  And I notice Dr. Sackler's been
24  wrapped into this discussion here, is that fair?
25      MR. SNAPP:  Object to the form.

Page 311

1    A.  It looked like it was taken away -- I
2  was taken out of it, and it was elevated to
3  Dr. Sackler.
4  BY MR. STEWART:
5    Q.  I hand you another document which I've
6  marked as Exhibit 50.  Do you see that?
7      (Whereupon, Purdue-Wright-50 was
8      marked for identification.)
9  BY MR. STEWART:
10    Q.  Do you see what that document is?
11      (Witness reviewing document.)
12    A.  It looks like the same one.
13    Q.  Does it seem like it's the exact same
14  document?
15    A.  I think so.  I'm not sure.
16    Q.  Let's set that aside.
17      (Whereupon, Purdue-Wright-51 was
18      marked for identification.)
19  BY MR. STEWART:
20    Q.  I hand you a document marked 51, ask
21  you if you recognize that document.
22      (Witness reviewing document.)
23      MR. BENNER:  Is this 50 or 51?
24      MR. STEWART:  51.
25      MR. BENNER:  Did you skip 50?

Page 312

1      MR. STEWART:  He had 50.  It's 51.
2  BY MR. STEWART:
3    Q.  Do you recognize what this document is
4  about?
5    A.  I'm trying to determine that.  This
6  looks like another new products evaluation
7  e-mail chain document.
8    Q.  We've seen a number of e-mails in
9  which you are included in the materials being
10  sent around, Dr. Sackler is included.  And can
11  we characterize most of these e-mails as e-mails
12  in which you, he, and other top executives are
13  talking about new products?
14      MR. SNAPP:  Object to the form.
15    A.  Thank you for the courtesy, but I was
16  not a top executive with Purdue.  I was simply
17  on the new product committee because I'd done
18  too many inventions, and so I would get a copy
19  of the stuff, and I would review it, and I would
20  go to the meeting, and then they would send --
21  it looks like they were sending me copies of all
22  their opinions about it.
23  BY MR. STEWART:
24    Q.  Is it fair to say that with respect to
25  your company, Dr. Robert Kaiko, Michael

Page 313

1  Friedman, David Haddox, these were all high
2  level executives in Purdue, fair?
3      MR. SNAPP:  Object to the form.
4    A.  I would characterize Paul Goldenheim,
5  Dr. Richard, Bob Kaiko, Michael Friedman, and I
6  would characterize Dr. Haddox as a high level
7  executive by the end of his stay.
8  BY MR. STEWART:
9    Q.  I'm going to hand you another exhibit
10  marked Exhibit 52.
11      (Whereupon, Purdue-Wright-52 was
12      marked for identification.)
13  BY MR. STEWART:
14    Q.  Ask you if you recognize it.
15    A.  It looks like an adverse event report.
16    Q.  And was this sent by Purdue Pharma to
17  you?
18    A.  It was sent to the agency, and it
19  would have come into the mailroom, and it would
20  have gone to the consumer safety officer in
21  charge, and if she wanted me to read it she
22  would have given it to me to read it, if she wanted
23  me to give it to one of the other OxyContin
24  reviewers she would have given it to them.
25    Q.  Let me ask you, though, is it

Page 314

1 addressed directly to you, Curtis Wright, MD?
2 A. Yes.
3 Q. And so you were still at the FDA on
4 March 25th, 1997?
5 A. Yes.
6 Q. Still processing materials from
7 Purdue?
8 A. Yes.
9 Q. Now, I hand you an Exhibit 53.
10 (Whereupon, Purdue-Wright-53 was
11 marked for identification.)
12 BY MR. STEWART:
13 Q. Ask you if you recognize it.
14 (Witness reviewing document.)
15 Q. If you'd look on the back page which
16 is marked by the Bates number 2207, do you see
17 there is a blurb about your leaving the FDA?
18 A. Yes, I do.
19 Q. And it says you're going to work at
20 Adolor in Malvern, Pennsylvania?
21 A. Yes.
22 Q. Tell me, who owned Adolor?
23 A. Adolor was a venture capital
24 pharmaceutical venture, so I don't know if it
25 was owned by anybody.

Page 315

1 Q. Did you get stock when you went there?
2 A. I got stock when I went there.
3 Q. So you were an owner, weren't you?
4 A. I was an owner. I was a part owner.
5 Q. And who was the most senior person at
6 Adolor that you were ever aware of?
7 A. I've forgotten his name. He was my
8 boss. I forgot his name.
9 Q. He recruited you?
10 A. He recruited me. He was my boss.
11 I've forgotten his name.
12 Q. Was that the president of Adolor?
13 A. Yes.
14 Q. And how many employees were there at
15 Adolor when you worked there?
16 A. I have to count. I would say seven or
17 eight.
18 Q. Where did Adolor get its funding?
19 A. I'm unclear what you mean.
20 Q. Well, were you paid a salary when you
21 were at Adolor?
22 A. I was paid a small salary when I was
23 at Adolor. I was mostly given stock.
24 Q. And what -- who did you -- if you were
25 given stock, who did you understand was the

Page 316

1 primary shareholder in Adolor at the time you
2 went there?
3 A. I didn't know who was the primary
4 shareholder in Adolor.
5 Q. Who did you think was providing the
6 money that went into your paycheck when you were
7 at Adolor?
8 A. I didn't really know.
9 Q. Was Adolor in any way affiliated
10 Purdue Pharma?
11 A. Not that I know of.
12 Q. Was Adolor affiliated in any way with
13 any member of the Sackler family?
14 A. Not that I knew of.
15 Q. Can you name any other person who
16 owned Adolor stock other than you?
17 A. Well, the president and business
18 owner, the laboratory -- the chief scientist
19 whose name I've forgotten, too, we all got it.
20 We had stock options, and we had the ability to
21 purchase stock at the option price, and I bought
22 all of mine.
23 Q. Did they cash you out when you left?
24 A. I had to cash out when I left.
25 Q. Did you ever talk to anyone at Purdue

Page 317

1 about Adolor before you went to Adolor?
2 A. No, I don't think so.
3 Q. Did you, when you were still at the
4 FDA, call Purdue and talk about going over to
5 Purdue for a job?
6 A. When I was still at the FDA?
7 Q. Yes.
8 A. Absolutely not.
9 Q. I think -- strike that.
10 I ask you, it seems you're going from
11 the FDA to a seven person company, can you tell
12 me why you didn't figure out who the owners of
13 the company were before you went there?
14 MR. SNAPP: Object to the form.
15 MR. PETRILLO: Objection.
16 A. It was my first job in private
17 industry, and I was naive and inexperienced.
18 BY MR. STEWART:
19 Q. Can you look on that announcement in
20 the e-mail chain and figure out what the date
21 was that you went to Adolor?
22 A. September 29th.
23 Q. Now, do you see in this e-mail chain
24 that Dr. Richard Sackler referred to your going
25 to Adolor as bad news?

Page 318

1   A.  Yes.
2   Q.  Did he ever talk to you about that,
3   why he thought it was bad news that you were
4   going to Adolor?
5   A.  No, but I'm not surprised.
6   Q.  Why are you not surprised?
7   A.  I was viewed as a particularly fair
8   and effective FDA reviewer.
9   Q.  Including by Richard Sackler, for
10  example?
11      MR. SNAPP:  Object to the form.
12  A.  I would assume so.
13  BY MR. STEWART:
14  Q.  I'm going to hand you copies.
15      (Whereupon, Purdue-Wright-54 was
16      marked for identification.)
17  BY MR. STEWART:
18  Q.  Now, do you see that this is an e-mail
19  exchange from, it looks like, Bob Reder to a
20  series of people at Purdue?
21  A.  It looks like an e-mail from Reder
22  to -- it looks like the usual suspects.  I mean,
23  it looks like the usual senior executives who
24  might be involved in new product.
25  Q.  And do you see that he says that he

Page 319

1   received a telephone call -- I'll just quote it.
2   "I received a telephone call today from
3   Dr. Curtis Wright, who was formerly of the FDA
4   ODE3 and is now Vice President of Research for
5   Adolor."  He gives the address.
6       Do you see that?
7   A.  Mm-hmm.
8   Q.  Did I read that correctly?
9   A.  You read that correctly.
10  Q.  So he's saying that you called him.
11  Do you remember making that phone call?
12  A.  I don't remember making that phone
13  call, but I have no reason to believe not.
14  Q.  If Robert Reder said you made a phone
15  call, he's a credible guy --
16  A.  Yes.
17  Q.  -- and that makes sense?
18      And you were reaching out to discuss
19  the possibility of cooperation between Adolor
20  and Purdue on a product?
21  A.  Peddling our wares.
22  Q.  Okay.  Do you see that the date of
23  this is 10/7/97?
24  A.  Mm-hmm.
25  Q.  So does this reflect your calling

Page 320

1   Robert Reder at Purdue less than ten days after
2   you've left the Food and Drug Administration?
3   A.  Probably.
4       MR. PETRILLO:  Objection to form.
5   BY MR. STEWART:
6   Q.  How -- while you were at Adolor, what
7   did you -- what was your interaction with
8   Purdue?
9   A.  I don't think we -- I don't think we
10  had any interaction.  I don't think they bid on
11  any of our portfolio.
12  Q.  So you would have reached out to them,
13  though, on other occasions?
14      MR. SNAPP:  Object to the form.
15  A.  I would have reached -- we were
16  reaching out to everybody to give the pitch.
17  BY MR. STEWART:
18  Q.  I'm going to hand you a document
19  marked Exhibit 55.
20      (Whereupon, Purdue-Wright-55 was
21      marked for identification.)
22  A.  Mm-hmm.
23  BY MR. STEWART:
24  Q.  And I'll just tell you, I don't think
25  you've seen this exhibit, it is an excerpt from

Page 321

1   a deposition of Richard Sackler.  Could you turn
2   to Page 112, which is the second page in the
3   exhibit which is Exhibit 55?
4   A.  Mm-hmm.
5   Q.  And do you see that there's a question
6   is asked, okay, about Curtis Wright, and the
7   question is asked, "And at that time he was the
8   person who was reviewing your-all's OxyContin
9   submission to the FDA?"
10      Do you see that?
11  A.  Mm-hmm.
12  Q.  Do you see that Richard Sackler's
13  answer is "He was the medical reviewer, that's
14  correct."
15      Do you see that?
16  A.  Mm-hmm.
17  Q.  And that's accurate, you were the
18  medical reviewer for the OxyContin?
19  A.  I was one of the medical reviewers.
20  Q.  So you were a medical reviewer for
21  OxyContin, fair?  Mr. Sackler's description is
22  correct?
23  A.  Yes.
24  Q.  And then the question is, "And he's
25  the guy that actually approved it to be sold,

Page 322

1   you know, allowed you-all to" take it -- "sell
2   it from the FDA?"  And Richard Sackler says
3   "That's my recollection."
4          Do you see that?
5          MR. PETRILLO:  I think you misread it,
6   but pretty close.
7   BY MR. STEWART:
8      Q.  Why don't I read it again.  Strike
9   that.  Here's what I'm reading.
10         "Question:  And he's the guy" --
11  parenthetically referring to you -- "that
12  actually approved it to be sold, you know,
13  allowed you-all to sell it from the FDA?"
14         Do you see that question?
15     A.  I see that question.
16     Q.  And Dr. Sackler says "That's my
17  recollection."
18         Do you see that?
19     A.  Mm-hmm.
20     Q.  Now, the next question is -- and by
21  the way, Dr. Sackler's recollection is accurate,
22  is that fair?
23     A.  So far.
24     Q.  Do you see the next question is
25  "You-all ultimately hired him a few years later,

Page 323

1   didn't you?"  And Dr. Sackler's answer is, "We
2   did hire him, but not after his tenure at the
3   FDA.  We -- he spoke to somebody at Purdue when
4   he was planning on leaving the FDA, and Paul and
5   I discussed it and agreed that we should not
6   hire somebody who had -- who had reviewed our
7   product and had left.  And so he went to another
8   company, regrettably for us, because he was
9   very, very knowledgeable."
10         Do you see that?
11     A.  Yes.
12     Q.  Now, do you see that Dr. Sackler's
13  testifying that you did contact Purdue while you
14  were at the FDA.
15         Do you see that?
16     A.  Yes.
17         MR. SNAPP:  Object to the form.
18  BY MR. STEWART:
19     Q.  Can you explain that?
20         MR. SNAPP:  Object to the form.
21     A.  He's wrong.  He's just wrong.
22  BY MR. STEWART:
23     Q.  So in your dealings with Dr. Sackler,
24  this is the first instance you can recall when
25  he's made an inaccurate statement, in your view?

Page 324

1          MR. SNAPP:  Object to the form.
2      A.  I didn't say that.  I hadn't -- I
3   wasn't monitoring my boss for the accuracy of
4   his comments.
5   BY MR. STEWART:
6      Q.  I guess I'm saying, all the other
7   times, you can't remember him making another
8   inaccurate statement, can you, in your dealings
9   with him at Purdue?
10         MR. SNAPP:  Object to the form.
11     A.  I didn't have enough dealings with him
12  to know.
13  BY MR. STEWART:
14     Q.  Well, in the limited dealings you had,
15  and we went through a series of e-mails, he
16  never made a statement to you that was
17  inaccurate, fair?
18     A.  That's true.
19     Q.  But you're saying in this case when he
20  says that you called Purdue when you were
21  planning on leaving the FDA, you think that is
22  an inaccurate statement?
23     A.  That is inaccurate.
24     Q.  And we would just have to get
25  Dr. Sackler on the stand and figure out how to

Page 325

1   untangle this inaccuracy, fair?
2          MR. PETRILLO:  Objection.
3          MR. SNAPP:  Object to the form.
4   BY MR. STEWART:
5      Q.  Is that correct?
6      A.  I don't know what you would have to
7   do.  I don't know why you would want to do it.
8   But I can assure you I was recruited by the
9   president of Adolor out of the agency, and I, up
10  to the point where he started talking to me, I
11  had not really had plans to leave the agency.
12     Q.  Did you ever ask the president of
13  Adolor "who owns this company?"
14     A.  No.
15         MR. STEWART:  Let's take a break and
16  then we'll come back and finish up.
17         THE VIDEOGRAPHER:  We are now going
18  off the record, and the time is 6:35 p.m.
19         (Whereupon, a recess was taken.)
20         THE VIDEOGRAPHER:  We are now going
21  back on the record, and the time is 6:42 p.m.
22         MR. STEWART:  Dr. Wright, I'm told
23  we're effectively out of time, so thank you.
24  And I'm going to keep the deposition open, but
25  of course, subject to the agreement that I

Page 326

1  announced with counsel earlier, and that's --
2  I'm done with my questions today.
3      MR. SNAPP:  I have no questions.
4      MS. SINGER:  I have just a few.  I
5  can't.  Never mind.  There was one document that
6  we needed to just clear up because we gave you
7  all pieces of it.
8      MR. PETRILLO:  Do you want to put that
9  on the record, do you have a clean one?
10     MR. SNAPP:  Do you want to just
11 substitute in a clean one?
12     MS. SINGER:  Yeah, I mean, I'd love to
13 be able to ask the one question about the page
14 we didn't have, but I'm at your mercy on that.
15     MR. SNAPP:  Can we go off the record?
16     THE VIDEOGRAPHER:  We are now going
17 off the record, and the time is 6:43 p.m.
18     (Whereupon, a recess was taken.)
19     THE VIDEOGRAPHER:  We are now going
20 back on the record, and the time is 6:46 a.m.
21     FURTHER EXAMINATION
22 BY MS. SINGER:
23     Q.  All right.  Dr. Wright, I'm reshowing
24 you Exhibit 31, we had a missing pages issue
25 earlier in your deposition, so could you take a

Page 327

1  look and confirm that this is an Integrated
2  Summary of Safety that you saw earlier with all
3  of the pages there?
4      (Witness reviewing document.)
5      A.  Yeah, it is.
6      Q.  And I want to direct your attention to
7  Bates number 040.  In the interest of time I
8  will read you the section under "ADE
9  Conclusion."  "The trial data set does not
10 support a definite conclusion that the CR form
11 has fewer adverse events than the IR form in the
12 intended population of use.  There is a thin but
13 possible trend toward a lower frequency of
14 opioid adverse effects for CR in patients not
15 tolerant of opioids suggested by the PK data in
16 normal volunteers."
17     Have I read that accurately?
18     A.  You have read that accurately.
19     Q.  And does that refresh your
20 recollection as to when OxyContin had a better
21 safety profile than other opioids, than IR
22 opioids?
23     MR. SNAPP:  Object to the form.
24     A.  I would characterize that as a hint,
25 but not proof.

Page 328

1      MS. SINGER:  Okay.  One question.  Off
2  the record.
3      THE VIDEOGRAPHER:  Okay.  Conclude?
4      MS. SINGER:  Conclude.
5      THE VIDEOGRAPHER:  We are now going
6  off the record, and the time is 6:48 p.m.
7      (Whereupon, the deposition was
8      concluded.)

Page 329

1      C E R T I F I C A T E
2
3      I, MAUREEN O'CONNOR POLLARD, LSR #473,
4  RMR, CLR, and Notary Public, do hereby certify
5  that there came before me on the 19th day of
6  December, 2018, the person hereinbefore named,
7  who was duly sworn to testify to the truth of
8  their knowledge concerning the matters in this
9  cause, and their examination reduced to
10 typewriting under my direction and is a true
11 record of the testimony.
12
13     I further certify that I am neither
14 attorney for or related or employed by any of
15 the parties to the action, and that I am not a
16 relative or employee of any attorney or counsel
17 employed by the parties hereto or financially
18 interested in the action.
19     In witness whereof, I have hereunto
20 set my hand and seal this 24th day of December,
21 2018.
22 _____
23 MAUREEN O'CONNOR POLLARD, License #473
24 Realtime Systems Administrator, RMR
25 Notary Commission Expires:  10/31/2022

| Page 330 |
|---|

**INSTRUCTIONS TO WITNESS**

1
2
3        Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8        After doing so, please sign the
9  errata sheet and date it.  It will be attached
10  to your deposition.
11        It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt of
14  the deposition transcript by you.  If you fail
15  to do so, the deposition transcript may be
16  deemed to be accurate and may be used in court.

---

| Page 332 |
|---|

**ACKNOWLEDGMENT OF DEPONENT**

1
2
3
4      I, _____, do
5  Hereby certify that I have read the foregoing
6  pages, and that the same is a correct
7  transcription of the answers given by me to the
8  questions therein propounded, except for the
9  corrections or changes in form or substance, if
10  any, noted in the attached Errata Sheet.
11
12  _____
13  WITNESS NAME      DATE
14
15
16
17
18  Subscribed and sworn
19  To before me this
20  _____ day of _____, 20____.
21  My commission expires: _____
22
23  _____
24  Notary Public

---

| Page 331 |
|---|

1      - - - - - -
2     E R R A T A
3      - - - - - -
4  PAGE LINE CHANGE
5  ___ ___ _____
6    REASON: _____
7  ___ ___ _____
8    REASON: _____
9  ___ ___ _____
10    REASON: _____
11  ___ ___ _____
12    REASON: _____
13  ___ ___ _____
14    REASON: _____
15  ___ ___ _____
16    REASON: _____
17  ___ ___ _____
18    REASON: _____
19  ___ ___ _____
20    REASON: _____
21  ___ ___ _____
22    REASON: _____
23  ___ ___ _____
24    REASON: _____
25  ___ ___ _____

---

| Page 333 |
|---|

1    LAWYER'S NOTES
2  PAGE LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25  ____ ____ _____