Highly Confidential - Subject to Further Confidentiality Review

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OHIO

3                EASTERN DIVISION

4                   - - -

5   IN RE:  NATIONAL              :

    PRESCRIPTION                  :  MDL No. 2804

6   OPIATE LITIGATION            :

    _____ :  Case No.

7                                 :  1:17-MD-2804

    THIS DOCUMENT RELATES         :

8   TO ALL CASES                  :  Hon. Dan A. Polster

9                   - - -

10             HIGHLY CONFIDENTIAL

11    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

                    - - -

13

14        Videotaped deposition of LAURIE A. ZACCARO,

15   held at the offices of Buckley King, 1400 Fifth

16   Third Center, 600 Superior Avenue East, Cleveland,

17   Ohio  44114, on Wednesday, January 16, 2019,

18   commencing at 8:58 a.m., before Carol A. Kirk,

19   Registered Merit Reporter and Notary Public.

20

21                  - - -

22

23          GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 A P P E A R A N C E S:
 2   On behalf of the Plaintiffs:
 3        LEVIN PAPANTONIO THOMAS MITCHELL
          RAFFERTY & PROCTOR P.A.
 4        BY:  JEFF GADDY, ESQUIRE
               jgaddy@levinlaw.com
 5             LAURA DUNNING, ESQUIRE
               ldunning@levinlaw.com
 6               (via teleconference and live stream)
          316 South Baylen Street, Suite 600
 7        Pensacola, Florida  32591
          205-435-7000
 8
 9   On behalf of Walgreens:
10        BARTLIT BECK LLP
          BY:  MARK L. LEVINE, ESQUIRE
11             mark.levine@bartlitbeck.com
          54 West Hubbard Street
12        Chicago, Illinois  60654
          312-494-4400
13
14   On behalf of Cardinal Health, Inc.:
15        PORTER WRIGHT MORRIS & ARTHUR LLP
          BY:  JILL G. OKUN, ESQUIRE
16             jokun@porterwright.com
          950 Main Avenue, Suite 500
17        Cleveland, Ohio  44113
          216-443-9000
18
19   On behalf of AmerisourceBergen Corporation:
20        JACKSON KELLY PLLC
          BY:  ANDREW N. SCHOCK, ESQUIRE
21             anschock@jacksonkelly.com
          50 South Main Street, Suite 201
22        Akron, Ohio  44308
          330-252-9060
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    On behalf of Walmart:
 2            JONES DAY
              BY:  KRISTIN S.M. MORRISON, ESQUIRE
 3                kmorrison@jonesday.com
              901 Lakeside Avenue East
 4            Cleveland, Ohio  44114
              216-586-3939
 5
 6    On behalf of Endo Pharmaceuticals, Inc.,
      Endo Health Solutions, Inc., and Par Pharmaceutical
 7    Companies, Inc.:
 8            ARNOLD & PORTER KAYE SCHOLER, LLP
              BY:  ZENO HOUSTON, ESQUIRE
 9                zeno.houston@arnoldporter.com
                      (via videoconference and live stream)
10            250 West 55th Street
              New York, New York  10019
11            212-836-8000
12
13
14    ALSO PRESENT:
15        Katie Mayo, Levin Papantonio
          Rick Christian, Trial Technician
16        Frank Stanek, Videographer
17
18
19
20
21
22
23
24
```

```
 1        VIDEOTAPED DEPOSITION OF LAURIE A. ZACCARO

 2                 INDEX TO EXAMINATION

 3    WITNESS                                       PAGE

 4    LAURIE A. ZACCARO

 5        CROSS-EXAMINATION BY MR. GADDY:            10

          REDIRECT EXAMINATION BY MR. LEVINE        265

 6        RECROSS-EXAMINATION BY MR. GADDY:         277

          FURTHER REDIRECT EXAMINATION BY MR. LEVINE:  283

 7        FURTHER RECROSS-EXAMINATION BY MR. GADDY:    284

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1                    - - -

 2              P R O C E E D I N G S

 3                    - - -

 4             THE VIDEOGRAPHER:  We are now on

 5      the record.  My name is Frank Stanek.  I

 6      am a videographer for Golkow Litigation

 7      Services.  Today's date is January 16,

 8      2019, and the time is 8:58 a.m.

 9             This video deposition is being

10      held in Cleveland, Ohio in re of

11      National Prescription Opiate Litigation

12      for the United States District Court for

13      the Northern District of Ohio, Eastern

14      Division.

15             The deponent is Laurie Zaccaro.

16             Will counsel please identify

17      themselves for the record.

18             MR. GADDY:  Jeff Gaddy with Levin

19      Papantonio for the Plaintiffs.

20             MR. LEVINE:  Mark Levine on behalf

21      of Walgreens and the witness.

22             MS. MORRISON:  Kristin Morrison

23      from Jones Day on behalf of Walmart.

24             THE COURT REPORTER:  Is there
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            anyone on the phone?
 2                 THE VIDEOGRAPHER:  And the court
 3            reporter is Carol Kirk and will now
 4            swear in the witness.
 5                      - - -
 6                 LAURIE A. ZACCARO
 7   being by me first duly sworn, as hereinafter
 8   certified, deposes and says as follows:
 9                 CROSS-EXAMINATION
10   BY MR. GADDY:
11        Q.   Good morning, Ms. Zaccaro.
12        A.   Good morning.
13        Q.   Could you state your name for us,
14   please.
15        A.   Laurie Zaccaro.
16        Q.   And you work at Walgreens,
17   correct?
18        A.   Yes, I do.
19        Q.   Okay.  How long have you been with
20   Walgreens?
21        A.   Twelve years.
22        Q.   As a function of your job with
23   Walgreens, have you ever had to give testimony
24   like this before?
```

```
1              A.    Yes.

2              Q.    Okay.  In a deposition context or

3       trial or both?

4              A.    Deposition.

5              Q.    Okay.  In what context was that?

6              A.    It was with regards to safety and

7       security concerns in an outside parking lot of

8       one of our inner city stores.

9              Q.    Okay.  Did it involve some lawsuit

10      that was filed against Walgreens?

11             A.    Yes.

12             Q.    Okay.  Did that case ever go to

13      trial that you know of?

14             A.    I'm unaware.

15             Q.    Okay.  Outside of that, have there

16      been any other occasions in which you've given a

17      deposition before?

18             A.    No.

19             Q.    Okay.  In the course of your work

20      with Walgreens, have you ever had the occasion

21      to testify at trial?

22             A.    No, I have not.

23             Q.    Okay.  In the course of your work

24      with Walgreens, have you ever had the
```

Highly Confidential - Subject to Further Confidentiality Review

1    opportunity to meet with or work with any law

2    enforcement?

3         A.    Yes.

4         Q.    Okay.  Can you kind of describe

5    for me the circumstances generally in which that

6    would have occurred, and then maybe we can

7    follow up with some specifics.

8         A.    With law enforcement, I support

9    external investigations that they may be working

10   on.  And I also do ex- -- I'm -- like support

11   with DEA drug backs and take-backs and law

12   enforcement in community events.

13        Q.    Okay.  So I guess one thing I

14   should make clear is, you work in loss

15   prevention, correct?

16        A.    Correct.  I'm an asset protection

17   manager.

18        Q.    Okay.  And has that been your

19   title the entire 12 years you've been at

20   Walgreens?

21        A.    Yes, it has.

22        Q.    Okay.  I see references within

23   some of the documents that I've looked at to

24   district loss prevention managers or regional

```
 1    loss prevention managers.

 2              How does -- where does asset

 3    protection manager fall within there?

 4         A.    Since my position with the

 5    company, our titles have changed --

 6         Q.    Okay.

 7         A.    -- a handful of times from loss

 8    prevention supervisor, district loss prevention

 9    manager, asset protection managers.  All of our

10    responsibilities have always stayed the same.

11    Our titles have changed more than once, though.

12         Q.    Okay.  During your 12 years at

13    Walgreens, has the amount of responsibilities

14    that you have changed, as far as the number of

15    stores or the number of people that you're in

16    charge of?

17         A.    Yes.

18         Q.    Okay.  Kind of walk me through

19    that progression, if you don't mind.

20         A.    When I first started with the

21    company, we were in larger districts where I had

22    one district of -- if I remember correctly, 26

23    or 27 stores.  In the last few years, there have

24    been some realigning with districts and sizes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Now the districts average anywhere

 2      from 12 to 18 stores in a district.  And I'm

 3      responsible for four districts currently and

 4      have been for at least the last three years,

 5      three or four years, I believe.

 6           Q.    Okay.  Okay.  So you started with

 7      Walgreens approximately 2006; would that be

 8      right?

 9           A.    December 29, 2006.  Very end of

10      the year, yes.

11           Q.    Okay.  So from 2006 until how

12      long, until what year, would you say you had

13      about one district and 26 to 27 stores?

14           A.    The first eight years, eight or

15      nine.  We realigned our districts and did the

16      shifting in the last -- it was three or four

17      years.  I can't remember.

18           Q.    Okay.  So from '06 through

19      approximately 2013, 2014?

20           A.    Yes.

21           Q.    And when you -- in 2013, 2014 when

22      you began to oversee four districts, was that a

23      promotion, or was that just a realignment?

24           A.    It was just realignment.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  And what areas do you -- do
2     your stores cover?  And I guess first tell me
3     from '06 to the '13 and '14 range and then post
4     then.
5              A.    From '06 to the '13-'14 range, I
6     was in the Cleveland West district, which
7     covered -- I don't know how familiar you are
8     with Cleveland, but to the north along the Lake
9     and to west as far as Norwalk, which is almost
10    the central, northern part of Ohio, so -- and
11    then after that, once we shifted to multiple
12    districts, I now cover the north part of
13    Cleveland, the south part of Cleveland
14    currently, and then the north and south part of
15    Columbus.
16             Q.    Okay.  Is there a Walgreens office
17    that you work out of here in Cleveland?
18             A.    There is an area office located in
19    Warrensville Heights, Ohio.
20             Q.    Okay.  About how many folks are in
21    that office?
22             A.    Maybe -- well, we have five
23    districts, our director, our healthcare
24    supervisor and two admins.  So each district
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   manager, five, six, seven, eight, nine -- ten or

 2   eleven of us.

 3          Q.    Is it primarily loss prevention

 4   folks in that office?

 5          A.    No, sir, it is not.

 6          Q.    Okay.  Okay.  So your current

 7   territory includes Cleveland, it also includes

 8   some areas of Columbus?

 9          A.    Correct.

10          Q.    And was there another city that I

11   missed?

12          A.    Cities down through between --

13   there's Mansfield is -- I go to Mansfield

14   locations and the suburbs, a lot of suburb

15   municipalities.

16          Q.    Okay.  Let me see if I can go back

17   to where I started originally and then I got

18   sidetracked.  But I was asking you about meeting

19   with law enforcement.

20          A.    Yes.

21          Q.    Tell me what agencies -- and let

22   me first focus on the -- more the enforcement

23   side.

24          A.    Okay.
```

```
 1          Q.     And then we can talk about the

 2    community involvement side.

 3          A.     Okay.

 4          Q.     So as it relates to enforcement,

 5    what agencies have you had the occasion to work

 6    with during the course of your time at

 7    Walgreens?

 8          A.     Ohio Board of Pharmacy primarily.

 9    And then I -- with matters with external law

10    enforcement support, it varies.  It depends on

11    what they might reach out to us for.  It could

12    be identity theft.  It could be prescription

13    doctor shopping with customers.  It could be

14    with doctors and prescriptions, and I'm -- my

15    involvement with that is primarily getting them

16    the evidence that is subpoenaed for matters that

17    they're investigating.

18          Q.     Okay.  So --

19          A.     It could be video.  It could be

20    documents.

21          Q.     -- is that primarily -- is that

22    generally with local law enforcement or is that

23    federal agencies or both?

24          A.     Primarily that's with Ohio Board
```

Highly Confidential - Subject to Further Confidentiality Review

1    of Pharmacy, with their investigators.

2         Q.    Okay.  Well, does the Ohio Board

3    of Pharmacy investigate the identity theft type

4    crimes that you were talking about?

5         A.    No.  That's more your local law

6    enforcement, but I don't have as many of those

7    as I do with the Board of Pharmacy.

8         Q.    What's your typical case with the

9    Board of Pharmacy?

10        A.    Theft.

11        Q.    Of what?

12        A.    Drugs.

13        Q.    Okay.

14        A.    They work with our pharmacy.  I do

15   investigations on the front end merchandise of

16   the stores with cash, cigarettes, merchandise.

17   I conduct those investigations myself.  But when

18   it's matters with anything with the pharmacy, we

19   notify the board and we work with the

20   investigators for pharmacy.

21        Q.    Okay.  So -- excuse me.  Okay.  So

22   just so we're clear, front end of the store is

23   everything that's not prescription drugs?

24        A.    Correct.

```
 1              Q.    Is that fair?

 2              A.    Correct.

 3              Q.    Okay.  And so anything that's

 4    behind the counter that requires a prescription

 5    would be something that's investigated by the

 6    Board of Pharmacy?

 7              A.    Yes.

 8              Q.    Okay.  And do you work with the

 9    Board of Pharmacy, or is it more you supplying

10    them information?  Do they have their own

11    investigators?

12              A.    It varies.  I work with them, with

13    the internal things that they can't do that's

14    there, like once we put -- once we alert them,

15    notify them, we talk about where our confirmed

16    losses are, and then they will either do what

17    camera and video they need to put in place or I

18    may shift around -- if it's Walgreens cameras

19    that are being used, I will review that video.

20    They will review their own video.  It's in

21    connection together, really, the investigations

22    are.

23              Q.    Okay.  Have you worked with the

24    Board of Pharmacy on these types of issues your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   entire 12 years at Walgreens?

 2          A.    Yes, I have.

 3          Q.    Okay.  Okay.  I want -- and then

 4   the other issue that you brought up was your

 5   work with law enforcement in the community

 6   setting, correct?

 7          A.    Correct.

 8          Q.    Okay.  And I know you've been

 9   in -- I think you've told us you've been

10   involved in some of the drug take-back days that

11   the DEA puts on?

12          A.    Yes.

13          Q.    Okay.  Anything else in that

14   regard?

15          A.    No.

16          Q.    Okay.  Have you had any other

17   occasion other than those community events to

18   work with the DEA?

19          A.    I believe in the past there was a

20   meeting that they've done with Walgreens, with

21   compliance and making sure proper processes are

22   followed and procedures are followed with the

23   reporting and just making sure that we're all

24   working together on that.  There has -- I'm
```

```
 1    going back and I'm vaguely remembering, but I've

 2    had interactions with them for meetings, but

 3    nothing with investigations --

 4          Q.    Okay.  Do you recall --

 5          A.    -- that I can recall.

 6          Q.    Excuse me.  And I'm sorry for

 7    interrupting you.

 8          A.    That's okay.

 9          Q.    Do you recall attending any

10    meetings with the DEA?

11          A.    I believe there was at least one

12    that I can recall that they were at our office,

13    and it was more about the processes of

14    reporting, more informative.

15          Q.    Processes of reporting what?

16          A.    Reporting losses, reporting if

17    there is fraudulent prescriptions and a process

18    they wanted us to follow, which I wouldn't be

19    involved in that.  That would have been with

20    pharmacists to follow, but they give the

21    information to us, and our pharmacy supervisors

22    would have been there to then inform our

23    pharmacy managers and cascade that, making sure

24    that they're aware of the processes and
```

```
 1    following the processes.

 2          Q.    Okay.  And this kind of segues

 3    into what I'm wanting to get into next, because

 4    I want to make sure I kind of have an

 5    understanding of exactly what your role is and

 6    what your duties are.

 7                Do you recall approximately when

 8    that DEA meeting was?

 9          A.    No, I don't.  It's been several

10    years.

11          Q.    Okay.  More than three years ago?

12          A.    Yes.

13          Q.    Okay.  More than five years ago?

14          A.    Maybe.

15          Q.    Okay.

16          A.    I don't know.

17          Q.    Okay.  And what I think I heard

18    you just say is that some of the topics that you

19    remember from that meeting involved reporting

20    thefts of prescription drugs to the DEA,

21    correct?

22          A.    That is my area of work.  I do

23    theft and losses.

24          Q.    Okay.  And -- okay.  And the other
```

```
 1    area that I think I heard you say was covered in

 2    that meeting would have been identifying

 3    fraudulent prescriptions?

 4         A.    I believe.  I can't remember what

 5    the agenda was.  I know it was an informative

 6    meeting of the DEA outlining processes for -- if

 7    I recall correctly.  It had a lot to do with --

 8    there was a time I believe -- and I'm vaguely

 9    remembering -- of how they wanted us to -- or

10    how they wanted the pharmacists, rather, to

11    report suspicion with fraudulent prescriptions

12    and notifications.

13         Q.    That issue that you just said, the

14    pharmacists reporting suspicion with fraudulent

15    prescriptions, does that fall under your

16    purview?

17         A.    No, it does not.

18                      - - -

19       (Walgreens-Zaccaro Exhibit 1 marked.)

20                      - - -

21         Q.    Okay.  I'm going to show you what

22    I've marked as Exhibit Number 1.  This is a

23    resumé and a partial personnel file that was

24    provided to me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you recognize that?

 2                    MR. GADDY:  This is P-WAG-2414.

 3           A.    Yes.  This is my past reviews.

 4           Q.    Okay.  And I'm going to primarily

 5    focus on the resumé that's on front right now.

 6    Do you have any idea how up to date this is?

 7           A.    This was updated -- it's been

 8    quite some time.  I haven't done anything with

 9    my resumé in a few years.

10           Q.    Okay.  So it looks like you have a

11    little bit of a history in law enforcement?

12           A.    I do.

13           Q.    Okay.

14           A.    Yes.

15           Q.    Just kind of walk me through, if

16    you don't mind, your history in law enforcement

17    and what you did before you got with Walgreens.

18           A.    So prior to Walgreens, I was a

19    parole officer for the State of Ohio for

20    approximately six years.  Prior to that, I was a

21    criminal bailiff for Lucas County probation,

22    which is a felony court, and I did that for a

23    couple years.

24                    Prior to being a bailiff, I was
```

 1   with the Women's Resource Center in Northern

 2   Michigan for about 18 months, I believe, where I

 3   was an advocate for victims of domestic abuse,

 4   assisting them through the criminal justice

 5   system as victims.  And prior to that, I was a

 6   probation officer with Lucas County adult

 7   probation for Common Pleas Courts there.

 8           Q.    Okay.  The most recent stint that

 9   you spent as a parole officer, where was that?

10           A.    Summit County --

11           Q.    Okay.

12           A.    -- which is Akron area.

13           Q.    Okay.  And you did that, it looks

14   like, for about six or seven years?

15           A.    Correct.

16           Q.    And just kind of generally what

17   were your job duties in that role?

18           A.    I supervised parolees coming out

19   of institutions for criminal offenses, managed

20   them, making sure that they were referred to

21   where they needed to do -- be for treatment,

22   maintaining work, approved housing wherever they

23   were residing.

24           Q.    Okay.  Did that involve -- would

```
 1   these folks be on a probation type situation

 2   where they had conditions that they had to meet?

 3          A.   Yes.

 4          Q.   Okay.  And you would be in charge

 5   of making sure they met those conditions?

 6          A.   Yes.

 7          Q.   Okay.  And examples of those types

 8   of conditions would be restrictions on housing

 9   and where they could live?

10          A.   Yes.

11          Q.   Would there be drug use or drug

12   testing type restrictions?

13          A.   Yes.  It could be drug.  It could

14   be anger management, depending on the nature of

15   their crimes that sent them to prison.

16          Q.   Okay.  What types of offenders did

17   you supervise?

18          A.   Anything from thieves to

19   murderers.

20          Q.   Okay.

21          A.   We had a sex offender unit.  So I

22   was not in the sex offender unit.  Mine was more

23   robberies, burglaries, assaults, murders.

24          Q.   Okay.  Did you have drug offenders
```

```
 1    that you supervised?

 2         A.    Yes.  I'm sorry.  I did have drug

 3    offenders as well.

 4         Q.    Okay.  And as far as any component

 5    of supervision that required drug testing, how

 6    did that work?

 7         A.    We had drug testing in our office,

 8    and any time any offenders would come in for

 9    drug testing or any time they would come in for

10    office visits, I would drug test them.  It was

11    random.  We had ability to test out in the

12    fields when we were doing their visits in home.

13    I never did that personally.

14         Q.    Okay.  If there were --

15              MR. HOUSTON:  I'm sorry.  I

16         apologize for the interruption.  I just

17         wanted to state my appearance on the

18         record.

19              THE COURT REPORTER:  Sorry.

20         You're going to have to speak up.

21              MR. GADDY:  A little bit louder,

22         please.  A little bit louder, please.

23              MR. HOUSTON:  I'm sorry.  This

24         is -- yeah.  I just wanted to state my
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              appearance on the record.  I apologize

 2              for the late arrival.  This is Zeno

 3              Houston from Arnold & Porter on behalf

 4              of the Endo and Par Defendants.

 5    BY MR. GADDY:

 6              Q.    From time to time would your job

 7    duties as a parole officer require you to issue

 8    violation reports for people that you were

 9    supervising?

10              A.    Yes.

11              Q.    Okay.  What were the types of

12    things that could cause individuals to violate

13    their parole?

14              A.    New criminal offenses.  It could

15    be non-compliance with their drug and alcohol

16    treatment or any anger management counseling

17    that they're participating in.  It could be

18    because they moved without an approved address,

19    we have to go -- we would have to have gone and

20    inspect the homes and make sure they were

21    approved.

22              It could be -- if there was

23    restitution, if they had to pay restitution and

24    they weren't paying restitution.  It could be
```

Highly Confidential - Subject to Further Confidentiality Review

1    whatever their conditions were that they were

2    non-compliant with.

3         Q.    During your time as a parole

4    officer, did you have individuals that you

5    supervised that you saw struggle with drug abuse

6    or drug addiction?

7         A.    Yes.

8         Q.    Okay.  Was that a common

9    occurrence amongst folks that you supervised?

10        A.    I don't know how you would define

11   "common."  Did it happen?  Yes.  Did it happen

12   enough?  Yes.  Some came out, and some got it

13   right.  Some did not.

14        Q.    Okay.  During your time as a

15   parole officer, did you supervise individuals

16   who struggled with the use or abuse or addiction

17   to opioids?

18        A.    Yes.  But in that time, it was

19   more meth, the meth phase was our biggest

20   challenge.

21        Q.    Okay.  And that was in the 2000,

22   2006 time frame?

23        A.    Yeah.

24        Q.    Okay.  So we move on to your time

1    at Walgreens, and what I want to do is go

2    through some of these bullet points and just

3    kind of ask you to expand on them a little bit.

4         A.    Okay.

5         Q.    The first bullet point that you

6    have here is that you "managed a region of

7    pharmacy retail stores" and you've already told

8    us about that, right?

9         A.    Mm-hmm.

10        Q.    Next thing you say you is you

11   "Partnered with area directors, district

12   managers, and operations trainers for the

13   successful execution of a company business plan

14   and/or initiatives."

15             Can you kind of explain what you

16   mean there?

17        A.    Supporting one another with

18   whatever initiatives were coming down.  And

19   mostly it was in the operations aspect,

20   different ways of doing things, changing things.

21   It might have been systems.  It could have been

22   changes with our realigning, supporting one

23   another that way.

24        Q.    What do you mean by "operations"?

```
 1              A.    Operations is more the front end

 2     of the store and the day to day -- it's

 3     pharmacy, too, I should say, where they're more

 4     focused on the operations, the profit, the

 5     sales, the receiving, the merchandising; whereas

 6     in our department, we're focused on theft,

 7     losses, supporting them with compliance matters.

 8              Q.    Okay.  The next bullet point, you

 9     say, "Identify shrink priorities and analyze,

10     develop, and implement shrink reduction plans."

11              Do you see that?

12              A.    Yes.

13              Q.    What is shrink?

14              A.    Shrink is losses in our retail

15     stores, what we should have compared to what we

16     don't have, the variance there in the -- that's

17     unaccounted for, and we support finding out how

18     it happened, why it happened and what we can do

19     to shift our focus from preventing it again.

20              Q.    Okay.  Generally speaking, shrink

21     is theft; is that fair?

22              A.     It could be theft, but we also

23     incur a lot of shrink in losses with paper

24     shrink because our own processes may not be
```

Highly Confidential - Subject To Further Confidentiality Review

1    getting -- being followed.

2           Q.    Can you give me an example of

3    that.

4           A.    Do you want a front end or a

5    pharmacy?

6           Q.    Why don't we do the pharmacy.

7           A.    A paper shrink in pharmacy might

8    be an order was received and it is posted in our

9    inventory management system, and if our staff,

10   whether it be technicians who did the receiving

11   of that order or whether it was a pharmacist who

12   did the receiving of that order, if they don't

13   post it and it doesn't get posted correctly and

14   timely, it's paper shrink.  It's saying that we

15   never received it --

16          Q.    So the books don't --

17          A.    -- but yet we paid for it.

18          Q.    So the books don't match?

19          A.    Correct.

20          Q.    Okay.  So that's not a situation

21   where you have actual loss.  That's a situation

22   where you -- you know, kind of an accounting

23   error type of issue?

24          A.    Paper shrink, we refer to that as.

1       Q.    Okay.  And is one of your roles as

2    a loss prevention person with Walgreens to

3    identify that and get it corrected?

4       A.    I support in identifying it, yes.

5       Q.    Okay.  Well, is the -- would it be

6    fair that the primary function that you serve is

7    product shrink?

8       A.    Yes.

9       Q.    Okay.  And --

10      A.    Cash also.

11      Q.    Okay.  Kind of describe for me

12   what the different roles or the different tasks

13   that you fulfill that kind of help with whether

14   it's cash or products?

15      A.    Once it's identified -- and I'm

16   not in the stores identifying it on most parts.

17   I'm contacted after there's a process that they

18   follow.  There are checks and balances to make

19   sure and confirm that it wasn't training error

20   or paper error.  Once it's a confirmed loss,

21   they will contact me, and then I will conduct

22   that internal investigation and interview.

23      Q.    Okay.  What are your other

24   primary -- what are your other primary job

```
 1    duties other than the identification of and

 2    investigation of theft or shrink?

 3         A.    We do -- we do do some training.

 4    We do do some audit review compliance to prevent

 5    losses, making sure that we're -- it could be

 6    compliance in checking our safety and security

 7    systems.  It could be compliance in making sure

 8    that processes are being followed.

 9         Q.    Okay.  Do any of those -- any of

10    the training or the processes that you're -- the

11    training you're conducting or the processes that

12    you're reviewing have to do with the ordering or

13    dispensing of controlled substances?

14         A.    I do not do those trainings.

15         Q.    Okay.

16         A.    I don't speak to those, because my

17    area is loss and theft, not necessarily the

18    ordering and receiving.  I know that there are

19    processes, but I can't articulate --

20         Q.    Do you have --

21         A.    -- what they are.

22         Q.    Do you have any responsibilities

23    whatsoever for the ordering or receiving of

24    controlled substances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.     No, I do not.

2              Q.     Okay.  Do you have any

3     responsibilities related to the dispensing of

4     controlled substances?

5              A.     No, I do not.

6              Q.     Do you have any responsibilities

7     related to the identification of fraudulent

8     prescriptions?

9              A.     No, I do not.

10             Q.     Do you have any responsibilities

11    that are related to the identification of

12    potential customers who may be engaging in

13    doctor shopping?

14             A.     No, I do not.

15             Q.     Do you have any responsibilities

16    related to making a determination as to whether

17    or not a particular prescription should be

18    filled?

19             A.     No, I do not.

20             Q.     If we keep going down the list,

21    the next bullet point says you "conduct detailed

22    internal and external investigations."

23                    Let me stop there.  Obviously

24    you've told us a little bit about some of the
```

Highly Confidential - Subject to Further Confidentiality Review

1  investigations you would conduct if you -- if

2  somebody identifies either paper shrink or

3  product or cash shrink to you, correct?

4          A.    Correct.

5          Q.    Okay.  Do -- I've used a couple of

6  phrases.  When I say "fraudulent prescription,"

7  you know what I mean by that, right?  Or tell --

8  do you know what I mean by that?

9          A.    I know what I -- how I define

10 "fraudulent prescription."  I don't know if it

11 is the same of what --

12         Q.    Well, let's just use your

13 definition.  Tell us what your definition is.

14         A.    A fraudulent prescription to me

15 is -- would be considered if a patient brought

16 in a prescription that has been altered, if it

17 has been -- I'm aware that sometimes we have

18 notices from doctor's office that doesn't come

19 to me.  I'm just aware -- made aware of them,

20 that maybe a prescription pad was stolen from a

21 doctor's office, and somebody begins, then,

22 writing prescriptions and falsifying

23 prescription signatures and doctors and

24 everything else.  So to me, that's what a

```
 1    fraudulent prescription would resemble.

 2         Q.    Okay.  And I think that's a fair

 3    definition.  So let me make sure I understand.

 4    If somebody comes into a Walgreens store and

 5    they have one of these fraudulent prescriptions,

 6    it's not your job to make that determination on

 7    the front end, correct?

 8         A.    Correct.  I don't even see the

 9    prescriptions.

10         Q.    Okay.  If one is identified, so,

11    for example, if a pharmacist realizes that

12    they've been handed a fraudulent prescription,

13    do you ever play a role in -- do you ever get

14    looped into that?

15         A.    There are occasions -- some

16    pharmacists will know exactly how to handle it.

17    Other pharmacists may contact me.  They may

18    contact -- we used to have in place pharmacy

19    supervisors.  They may contact the district

20    managers advising that "I think I suspect.  What

21    should I do?"

22              And then I will -- I can give them

23    direction.  "If you think or suspect, what have

24    you done?  Did you call the doctor's office to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    verify it?"  Which is really the only thing I
 2    would tell them to do, call the doctor's office
 3    to verify it before you report it to our Board
 4    of Pharmacy.
 5            Q.    Okay.  So kind of using the
 6    decision tree that you gave us there, so a
 7    person comes in and presents a fraudulent
 8    prescription and this particular pharmacist
 9    knows what to do.  Would you ever hear about it
10    in that situation?
11            A.    No.
12            Q.    Okay.
13            A.    The only time I might hear about
14    it is if the law enforcement reaches out to me
15    with subpoenas and needing copies of the
16    prescriptions for their purposes of their
17    investigation.
18            Q.    So they might ask you to pull the
19    video from when the person came in?
20            A.    Correct.
21            Q.    They might ask you to get a copy
22    of the prescription from the pharmacist?
23            A.    Correct.
24            Q.    Okay.  But other than that, you're
```

1    not doing any investigation or any oversight of

2    that?

3           A.    No, I am not.

4           Q.    Okay.  So the second situation

5    where a person comes in, presents a fraudulent

6    prescription, and the pharmacist, for whatever

7    reason, doesn't know what to do, you may get a

8    phone call in those situations?

9           A.    Yes.

10          Q.    Okay.  And what I think I heard

11   you just say is you would advise them to call

12   the doctor and see if he could verify the

13   prescription?

14          A.    Take what steps that they have and

15   have been provided to follow and make sure you

16   verify it and -- I wouldn't be able to tell them

17   beyond the appearance of the script or what

18   they're looking for in passing.  I just know

19   sometimes what alerts them to suspect that it's

20   a fraudulent prescription.

21          Q.    Okay.  And other than giving

22   them -- the pharmacist this information, that I

23   presume a pharm -- the pharmacist would --

24   should have access to independently, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Correct, but some of them are --
 2    there's a lot they do.  Some of them -- some of
 3    them are not confident.  They want to make sure
 4    they're handling it correctly.  Mostly that's
 5    what it is when they contact me.  "I know I'm
 6    supposed to."
 7              "Yes, follow that process."
 8              Q.    Okay.  There's nothing -- there's
 9    no information that you and you alone have that
10    they're having to contact you to get?
11              A.    No.
12              Q.    All the information that you give
13    them is information they could pull
14    independently?
15              A.    Yes, they can.
16              Q.    Okay.  Outside of telling those
17    particular pharmacists that either may not know
18    what to do or may just want the assurance that
19    they're doing the right thing and providing them
20    with that information, do you have any other
21    involvement in those situations?
22              A.    No, I do not.
23              Q.    Okay.  That bullet point continues
24    to read, "conduct detailed internal and external
```

Highly Confidential - Subject to Further Confidentiality Review

1    investigations."  And it says, "For resolution

2    of losses of pharmaceuticals."  And then it

3    lists some other areas there.

4              In what ways would you conduct

5    investigations for the loss of pharmaceuticals?

6         A.   Walgreens, we have exception

7    reports that capture when changes of inventory

8    on hands come.  So part of that would be once we

9    identify and have a confirmed loss, then I would

10   do the investigation in connection with -- I

11   would contact the Board of Pharmacy.

12             We would coordinate that with --

13   usually it's our pharmacy manager, unless the

14   pharmacy manager is the one suspected of the

15   theft, and then we would do the monitoring, the

16   video, and eventually sit down and talk to the

17   person.

18        Q.   Okay.

19             MR. GADDY:  Can you pull

20        P-WAG-Y2366.

21   BY MR. GADDY:

22        Q.   How long has -- have you received

23   exception reports at Walgreens?

24        A.   They've been available since I've

```
1    been with the company.

2                      - - -

3         (Walgreens-Zaccaro Exhibit 2 marked.)

4                      - - -

5         Q.    Okay.  Let me show you what I'm

6    marking as Exhibit 2.  Do you recognize --

7    obviously it's an e-mail, but then there's, it

8    looks like, a chart copied and pasted below

9    that.

10             Do you recognize that, the chart

11   specifically?

12        A.    Yes.

13        Q.    Is this an exception report?

14        A.    Yes.

15        Q.    Okay.  Do you mind just kind of

16   walking me through, because I saw some of these

17   and I'll admit I don't completely understand

18   them.  So I'm hoping you can kind of explain to

19   me what I'm -- what we're looking at here.

20        A.    So what this captures is the

21   13-week history, the chart we're talking about,

22   correct.

23        Q.    Okay.

24        A.    And it captures when there is high
```

1   risk activity of the drug --

2          Q.    Okay.

3          A.    -- that would require additional

4   review.  This was referred to as your LPxRx

5   report.

6          Q.    What does that mean?

7          A.    Loss prevention pharmacy report.

8          Q.    Okay.

9          A.    In this 13-week for each drug,

10  sometimes -- and it's not uncommon -- we'll just

11  take the first drug, the 5/500 hydrocodone where

12  you see an adjustment of 488 were done.

13         Q.    What does -- can you tell me what

14  "adjustment" means?

15         A.    They changed that on hands.  The

16  change of the on hands could happen one of two

17  ways.  Either a technician goes to fill the drug

18  and it's not there and they make the adjustment,

19  or we fill more than what our system says we

20  had, then the system will make an automatic

21  adjustment.

22              That's the posting thing I

23  mentioned earlier.  If they don't post it, our

24  system doesn't know we have it, and then they

Highly Confidential - Subject to Further Confidentiality Review

```
 1    fill something that our system doesn't believe

 2    is there.  And so the system will make the

 3    adjustment.

 4              We have two separate systems for

 5    inventory and then for the pharmacy fill.  So if

 6    they're not done right and each system isn't

 7    done correctly --

 8         Q.    That's where you get some of those

 9    accounting type errors?

10         A.    Yes.

11         Q.    Okay.

12         A.    And so -- but typically in these

13    situations, this captures -- what we would be

14    looking for is what we received -- this is what

15    would flag me in what I do, in my role for theft

16    and loss -- is what we receive, we would expect

17    that our total purchases come pretty close to

18    what our sales are.  So then that way we have

19    the sales of -- we have in stock what we filled.

20              If you start seeing a whole bunch

21    more and we're not getting fills, it's "Why do

22    we -- why are we receiving all of this?  Is

23    somebody going into the ordering system and

24    increasing orders so those won't be captured?"
```

1    Could be, maybe not.  I'm not sure.  That's what

2    we find out when we go in for the interview.

3              But when you have an adjustment,

4    sometimes you can go in and do an on-hand count

5    and let's just say somebody maybe posted that

6    receipt finally, you go and you do an on-hands

7    count and you adjust it right back up.

8              During this time, this report

9    captured all kinds of things, and it was

10   oftentimes a page, two pages long.  We have

11   since changed our filtering at the support

12   office is what they did, and it now captures

13   only the -- it's truly unaccounted for.  We need

14   to figure out where it's at.  So ...

15        Q.   Okay.  Let me see if I can ask you

16   a couple of specific questions to make sure that

17   I can understand this.

18        A.   Okay.

19        Q.   So first off, this is a report --

20   it looks like the date of the e-mail is

21   April 2010?

22        A.   I see that, yes.

23        Q.   Okay.  Would this have been the

24   format that you received exception reports in

```
 1    from going all the way back to '06?

 2            A.    Yes.

 3            Q.    Until about when?

 4            A.    Our new HR XD was -- and I'm

 5    roughly estimating --

 6            Q.    Sure.

 7            A.    -- four, five years ago, maybe.

 8            Q.    Okay.  So '13, '14 time frame?

 9            A.    Yes.

10            Q.    Okay.  And so if I look at the

11    chart, it looks like the far left-hand column,

12    which is, looks like, Control WIC, that's the --

13    that's a code that correlates to the particular

14    drug?

15            A.    Yes.

16            Q.    Okay.  And the next column is an

17    actual description of the drug?

18            A.    Correct.

19            Q.    Okay.  And, again, if we're just

20    using the top line as an example of the

21    description, this particular drug, it's

22    hydrocodone?

23            A.    Correct.

24            Q.    Okay.  And the next column says On
```

Highly Confidential - Subject to Further Confidentiality Review

1  Hand.

2          A.    Yes.

3          Q.    Does that mean how much is

4  supposed to be sitting on the shelf at the

5  pharmacy?

6          A.    That's when the report is

7  generated.  What it is capturing, what our

8  systems are saying is on hand.

9          Q.    So that's what the computer is

10 telling you is sitting on the shelves at the

11 pharmacy?

12         A.    Yes.  But this is also -- you

13 should know, is not a live update.  This report

14 would have only updated -- should have been once

15 a week but sometimes systems go down.  They are

16 computers, so ...

17         Q.    Okay.  What's the warehouse column

18 telling us?

19         A.    How many was received from our

20 warehouse, our distribution center.

21         Q.    And are these -- these numbers

22 that we're looking at, is that number of pills?

23         A.    Yes.

24         Q.    Okay.  So that's number of pills

```
 1    or number of dosage units; is that fair?

 2            A.    Yes.

 3            Q.    Okay.  So for this particular

 4    store -- and, again, I think you said this was a

 5    13-week average or a 13-week report?

 6            A.    Thirteen-week, yes.

 7            Q.    So for this 13-week period, this

 8    particular store had ordered 20,500 of these

 9    hydrocodone pills?

10            A.    That's what the report says, yes.

11            Q.    Okay.  What's Vendor?

12            A.    That is where they would order if

13    we didn't have it in stock.

14            Q.    So is that where they would have

15    to get pills from Cardinal Health or something

16    like that?

17            A.    Yes.

18            Q.    So your system would tell you how

19    many pills came in from the Walgreens

20    distribution center, as well as how many came in

21    from any outside vendors?

22            A.    Yes.

23            Q.    Okay.  And the next column says

24    Total Purchase.  So is that -- is that adding up
```

```
 1    the Warehouse and the Vendor?

 2         A.    Yes.

 3         Q.    Okay.  What is Claims?

 4         A.    Claims could be if it was -- if

 5    products expired, we have a process to claim

 6    those.  If it is maybe a wrong fill and a

 7    customer brings it back because they got

 8    something wrong or there was something -- we

 9    can't refill that and sell that drug, so then it

10    goes into that process.  We have to adjust that.

11         Q.    Is that essentially when a

12    pharmacy has to return a product?

13         A.    Yes.

14         Q.    Okay.  Okay.  And then the

15    Adjustments?

16         A.    Yes.

17         Q.    So let's skip that one for just a

18    minute, and let me ask you about the other two.

19         A.    Okay.

20         Q.    So Sales?

21         A.    Yes.

22         Q.    Tell me what that means.

23         A.    The quantity of pills that were

24    prescribed and sold -- prescribed, filled, and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sold in that 13-week period.

 2            Q.    Okay.  So I guess, in theory,

 3    should the amount on hand be the difference

 4    between the total purchased and the sales?

 5            A.    You would expect that that would

 6    balance.  And then you have an overbuy of 424,

 7    but you see the bottle count was a 500-count

 8    bottle.  So clearly they needed that bottle of

 9    500 for the difference of the 424, so ...

10            Q.    Okay.  I'm sorry.  You lost me.

11            A.    Well, you have an overbuy of 424.

12            Q.    Okay.  What's "overbuy" mean?

13            A.    We don't want them to have in

14    stock any more than they need.  If you have --

15    we've had instances in the past -- I personally

16    have never had a case, but I'm just -- I know

17    that some cases and investigations in -- that

18    come about we're aware that the technicians at

19    one time were able to -- and this was before I

20    was with the company -- were able to manually

21    adjust the order quantities.

22                 So if you have a technician who

23    connects the dots and has been there for a while

24    and did the inventory ordering, they could have
```

Highly Confidential - Subject to Further Confidentiality Review

1    known, if they were stealing that drug, that

2    they couldn't run out for a prescription fill,

3    so they would increase those orders.  But, of

4    course, if they're stealing, it wouldn't reflect

5    in the sales.

6              This is the whole analyst stuff

7    that we look at for justifying why we have so

8    many.  So when we're assessing that, what I will

9    always look at is, like, "Yeah, 424 is a lot,

10   why do we have that many extra," considering how

11   many orders they get in one week and stuff.

12             But if you look at the

13   description, that 500 on the very end of that

14   drug means it's a 500-count bottle.

15        Q.    Okay.

16        A.    So we would have needed that 424

17   overage because we opened that bottle to be able

18   to do fills.

19        Q.    Gotcha.  Okay.  So what I hear you

20   to be saying is that Walgreens has a goal of not

21   having a lot of extra pills on the shelf?

22        A.    I don't know what their goal is.

23   In my line of work and what I look at as far as

24   theft and losses, it can be an indicator of

```
 1    there could be a problem.

 2             Q.    Okay.  So if there's a lot of

 3    pills on hand, that's a flag to you of something

 4    that you need to look into?

 5             A.    For what I look into, yes.

 6             Q.    Okay.  And what -- it looks like,

 7    if you look at the bottom of this e-mail, you

 8    write to Brian, and Brian would be the -- he'd

 9    be the head pharmacist at this particular store?

10             A.    Going back -- I mean --

11             Q.    Would he be a pharmacist?

12             A.    I sent it to the store manager

13    e-mail address --

14             Q.    Mm-hmm.

15             A.    -- and I can't remember who was

16    the store manager or the pharmacy manager there

17    at that time.

18             Q.    Okay.  Okay.  So there's a

19    difference between the store manager and

20    pharmacy manager?

21             A.    Yes.

22             Q.    Okay.  So you say, "Hi Brian, I

23    was reviewing your LPxRx report and there

24    would -- and would like to have the on hands of
```

1    the hydrocodone APAP 5/500 verified."

2              What -- is it fair to say that

3    what popped out to you when you looked at this

4    particular exception report was the 2,122 pills

5    that were supposedly on hand?

6         A.    No.  What would have stuck out to

7    me was the adjustment of 488.

8         Q.    Okay.  So we never -- I never got

9    back to that column.

10        A.    Yes.

11        Q.    Can you explain to me what that

12   means.

13        A.    That would have been positive or

14   negative adjustments that were done with the on

15   hands of that drug.

16        Q.    Is that somebody at the pharmacy

17   who was manually making that change into the

18   system?

19        A.    It could be, but it could also be

20   the system making the change.  As I said before,

21   if you have something -- if you -- if we don't

22   post a receiving order and our system doesn't

23   know we have that order, but then we fill it,

24   the system says, "How did you fill what you

1  don't have?"

2          So the system will make that

3  adjustment.

4      Q.   Okay.  In that situation that you

5  just described where you fill a prescription

6  where whoever had -- did not properly intake it

7  and post it, you would see a positive adjustment

8  there, right?

9      A.   No.  It would be a negative

10 because the system corrects what it thinks it

11 should be.

12     Q.   Okay.

13     A.   So we're out 488.  It doesn't post

14 positive -- the only time it will adjust

15 positive is if, one, when you post the receipt

16 or, two, if you do an on-hands review and count

17 it and verify it and realize that you actually

18 have more.  And then you make the positive

19 adjustment.

20     Q.   So when you see this negative

21 adjustment of 488, what does that tell you?

22     A.   It needs to be -- the inventory on

23 hands would need to be verified to make sure

24 it's correct.  And if it's not offset, then I

1    would ask them to continue to count on an

2    average of two to four times per week to assess

3    if it's a theft concern.

4           Q.    Okay.  So when you see this, your

5    concern is that 488 pills may have gone missing?

6           A.    Correct.

7           Q.    Okay.  So just so I can kind of

8    close out the loop on this, walk me through the

9    extent of your investigation as far as what you

10   would do after seeing an exception report such

11   as this.

12          A.    If the drugs can't be accounted

13   for and we don't know where they're at and we

14   count again and realize we have more missing,

15   then I reach out to the Board of Pharmacy and we

16   begin working together and collaborating

17   together on cameras, counts.

18          Q.    Okay.  And when you're having

19   adjustments like this in these investigations,

20   what type of theft -- what type of thefts are

21   possible?

22          A.    Anything.

23          Q.    Okay.  This could be anything from

24   somebody jumping over a counter and taking a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    bottle to a pharmacist or a pharmacy tech --

 2          A.    Stealing.

 3          Q.    Okay.  During your time at

 4    Walgreens, have you had situations where you've

 5    had customers steal prescription pills?

 6          A.    Customers?

 7          Q.    Or outside -- out --

 8    non-employees.

 9          A.    Non-employees?  In the form of

10    burglary and robberies, yes.

11          Q.    Okay.  During your time at

12    Walgreens, have you had situations where you've

13    had employees involved in thefts of controlled

14    substances?

15          A.    Employees as in technicians,

16    pharmacists?

17          Q.    Correct.

18          A.    Both, yes.

19          Q.    Okay.  And has that happened over

20    the course of your career going back to 2006?

21          A.    Yes.

22          Q.    Okay.  And as you sit here today,

23    do you recall approximately how many times

24    you've been involved in investigations with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Board of Pharmacy regarding thefts of controlled

 2    substances from Walgreens' stores where

 3    pharmacists or pharmacy technicians were the

 4    targets of those investigations?

 5         A.    I would roughly estimate five to

 6    six investigations in the pharmacy for theft of

 7    drugs a year.

 8         Q.    Okay.  Have you been involved in

 9    any that resulted in arrests?

10         A.    Yes.

11         Q.    Okay.  Approximately how many?

12         A.    All of ours result in arrests.

13    And to be clear, it is the Board of Pharmacy

14    investigators who file those charges.

15         Q.    Okay.  So I think we determined

16    earlier that from 2006 until approximately 2013

17    or 2014, your area encompassed what I think you

18    called Cleveland West?

19         A.    Correct.

20         Q.    Okay.  And that was about -- was

21    it about 15 stores in Cleveland?

22         A.    That was about 27 stores.

23         Q.    Sorry.  About 27 stores.

24               And based on what you just told
```

Highly Confidential - Subject to Further Confidentiality Review

1    me, would it be fair to say that from 2006

2    through approximately 2013, 2014 that you were

3    involved in five to six investigations a year

4    during that time frame that resulted in the

5    arrests of a Walgreens' technician or a

6    Walgreens' pharmacist for theft of controlled

7    substances?

8            A.    Yes.  And when I say "on average,"

9    one year might only have --

10           Q.    Sure.

11           A.    -- three investigations.  The next

12   year, which is very uncommon, but I had, I

13   think, three investigations in one month another

14   year.  So when I say "on average," if you

15   average it out from year over year like that.

16   About five to six, yes.

17           Q.    Okay.  Since 2013, 2014, the

18   number of stores you supervise has increased?

19           A.    Yes.

20           Q.    By about three or four times?

21           A.    Yes.

22           Q.    Okay.  You have about 75 stores

23   now?

24           A.    In between 60 and 65.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Okay.  Are you seeing more

 2     investigations because you have more stores?

 3              A.     No.

 4              Q.     Still about five to six a year?

 5              A.     Yes.

 6              Q.     Are you still reviewing exception

 7     reports on a regular basis?

 8              A.     I do review them, but it is the

 9     expectation of our pharmacy managers to review

10     those.

11              Q.     Okay.  Who has the primary

12     responsibility for reviewing the exception

13     reports?

14              A.     The pharmacy manager and store

15     manager.

16              Q.     Okay.  And if the pharmacy manager

17     sees something like what you flagged here at

18     this particular store with the negative

19     adjustment of 488 on the controlled substance

20     hydrocodone, what is the pharmacy manager

21     supposed to do?

22              A.     It varies.  It depends on the

23     person.  Some pharmacy managers will reach out

24     and say, "Hey, just so you know, if you see
```

Highly Confidential - Subject to Further Confidentiality Review

1    this, this is what it was.  This is what I was

2    able to determine."

3              Some pharmacy managers, unless it

4    is a loss, a confirmed, like, "I don't know

5    where it's at," then they'll call me.  But if

6    they can account for it, I may not hear anything

7    from -- it just -- it depends on that pharmacy

8    manager and how they do their job.

9         Q.    When you get involved into these

10   investigations, like you -- you know, you ask

11   for -- it looks like you ask the store

12   manager -- either the pharmacy manager or the

13   store manager to look into this, correct?

14        A.    Yes.

15        Q.    And I guess there's the

16   possibility they can write you back with an

17   explanation that would put it to rest; is that

18   fair?

19        A.    Yes.

20        Q.    Okay.  And there's other times

21   where maybe the explanation isn't fully

22   sufficient or they're not able to give you a

23   good answer; is that fair?

24        A.    Yes.

```
 1              Q.    In those situations -- I think
 2   I've heard you mention an interview.  Do you
 3   take charge -- are you still in charge at this
 4   point and are you doing follow-up or is it
 5   turned over to the Board of Pharmacy?
 6              A.    So once a loss, a true loss, is
 7   confirmed, I immediately notify our Board of
 8   Pharmacy, an investigator.  We then will plan
 9   how to go forward.  I will communicate next
10   steps and directives to the pharmacy manager on
11   how to go forward, which typically is counting
12   the drugs every day and doing it manually so we
13   know and confirm the loss.  And then --
14              I lost my train of thought, the
15   question that you were trying to get to.  What
16   was your question again?
17              Q.    Sure.  So -- I think you answered
18   it, but what I was asking about was where -- how
19   long you stay involved.  And what I heard you
20   just say is, as soon as you confirm a theft,
21   it's turned over to the Board of Pharmacy?
22              A.    No.  I stay involved until the
23   end.
24              Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    And I will do the interview with

 2    the board investigator.  The board investigator

 3    will always lead the interviews, and if I need

 4    to interject or ask questions, I will -- I'm

 5    always given the opportunity at the end or I

 6    will interject during the course of that

 7    interview.

 8              Q.    Okay.  Other than using these

 9    exception reports for the purpose that we just

10    went over to identify loss or potential theft,

11    is there any other reason for which you utilize

12    the exception reports?

13              A.    Compliance, making sure that --

14              Q.    What do you mean by "compliance"?

15    Compliance with what?

16              A.    Making sure that they're following

17    the right processes, posting or something like

18    that.  Like if I'm identifying large overbuys.

19    I'll start looking into some of their receiving

20    and posting and then I'll challenge them on if

21    I'm noticing unposted receipts or receipts that

22    were posted weeks after the product was arrived.

23    So ...

24              Q.    Okay.  So that would be compliance
```

1    with internal Walgreens' policies and

2    procedures; is that fair?

3            A.    That, yes.

4            Q.    Okay.

5            A.    Primarily these are used for

6    theft, identifying theft, for me, the way I look

7    at these.

8            Q.    Okay.

9            A.    The way I analyze these reports

10   and my purpose for them.

11           Q.    Outside of utilizing them for

12   theft and compliance with Walgreens' ordering

13   policies and procedures, are there any other

14   reasons for which you use the exception reports?

15           A.    No, not that I can think of,

16   anything I can think of at this time.

17           Q.    Are there any other reports that

18   you receive in the course of your work as a loss

19   prevention person with Walgreens that contains

20   information about the pharmacy, period, whether

21   it's dispensing histories or ordering histories

22   or anything like that, or is it just the

23   exception report?

24           A.    So there's tabs for all of that.

1          Q.     What do you mean by "tabs"?

2          A.     On our exception base reporting

3    dashboard.  There's tabs for sales.  There's

4    tabs for inventory.  There's tabs for

5    performance and training.  I don't usually go

6    into them.

7          Q.     Okay.

8          A.     Very rarely.

9          Q.     Are there any other -- any other

10   reports outside of the exception dashboard that

11   you receive related to the pharmacy?

12         A.     Our -- that are not generated --

13   these are generated regularly.  The other

14   reports that I may access is into our SIMS

15   system, which is our inventory management

16   system, but that is just going in and verifying

17   that myself.  Once I see something like this,

18   then I will start reviewing more of the actual

19   inventory reports.

20         Q.     Okay.

21         A.     So I don't know if those would

22   necessarily be considered exception reports.

23   It's more inventory reporting.

24         Q.     Okay.  Are there any reports that

```
 1    you review for the purpose of determining

 2    whether or not a particular store is dispensing

 3    an excessive volume of controlled substances?

 4          A.    I'm not -- that's not my area with

 5    the dispensing.  I don't monitor any of that.

 6          Q.    Do you do any analysis of

 7    dispensing of controlled substances whatsoever?

 8          A.    No.  My area is on loss and theft.

 9          Q.    Okay.  And has that been true for

10    the entire 12 years that you've been at

11    Walgreens?

12          A.    Yes.

13          Q.    Okay.

14                      - - -

15      (Walgreens-Zaccaro Exhibit 3 marked.)

16                      - - -

17          Q.    Let me show you what I'll mark as

18    Exhibit 3.  I'm going to look at what I think

19    are a couple more of these exception reports.

20          A.    Okay.

21          Q.    And do you recognize this document

22    as an e-mail chain between you and another store

23    manager?

24          A.    Cecey was our pharmacy manager --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Okay.

 2              A.     -- at the time.

 3              Q.     So Cecey was the pharmacy

 4   manager --

 5              A.     Mm-hmm.

 6              Q.     -- of this particular store?

 7              A.     Yes.

 8              Q.     Okay.  And if we start at the

 9   bottom, very bottom of the first page, it looks

10   like this chain starts with an e-mail from you

11   on July 31st of 2012, correct?

12              A.     Yes.

13              Q.     Okay.  And there's a couple people

14   who -- or I guess it looks like you e-mail to

15   the store manager who happened to be Cecey.

16              A.     The RxM is a pharmacy manager

17   e-mail address --

18              Q.     Gotcha.

19              A.     -- where MGR is the store manager

20   e-mail.  So it looks like I sent it to the

21   pharmacy manager, and I copied our store manager

22   and Matt Soder, who would have been our pharmacy

23   supervisor for that district at the time.

24              Q.     Okay.  Is Matt Soder your
```

1    supervisor or --

2            A.    No.

3            Q.    You all are separate?

4            A.    So in a district team at that

5    time, you had a loss prevention manager, a

6    pharmacy supervisor, a district manager, and a

7    district trainer.  So it was a team of four of

8    us for one specific district.

9            Q.    Okay.  So the same 27 or so stores

10   that you served as the loss prevention manager

11   for at that time, Matt would have served as the

12   pharmacy supervisor?

13           A.    Yes.

14           Q.    Okay.  So it looks like you e-mail

15   Cecey, and you say, "Hi Cecey.  Please review

16   and verify the on-hands of the hydrocodone as

17   noted below from the LPxRx.  Almost two

18   500-count bottles?  Please update me with your

19   findings."

20                 Do you see that?

21           A.    Yes.

22           Q.    Okay.  And so, again, you're

23   asking about a -- hydrocodone, which is a

24   controlled substance, correct?

1          A.     Yes.

2          Q.     Okay.  And if we turn the page, is

3     this another one of these exception reports?

4          A.     Yes.

5          Q.     Okay.  And it looks like -- if we

6     look at the top of the next page, it looks like

7     this was for Store 3310?

8          A.     Yes.

9          Q.     And that's a store in Cleveland,

10    Ohio?

11         A.     Yes.

12         Q.     Okay.  And this report looks to be

13    a little bit different.  It looks like maybe you

14    ran a report just for that particular drug, the

15    hydrocodone?

16         A.     Yes.

17         Q.     Okay.  And some of the columns are

18    similar, but some of them are different.  So if

19    you don't mind telling me -- tell me on this

20    chart what it is that jumped out at you that

21    made you reach out to Cecey?

22         A.     The adjustment for negative 911.

23         Q.     Okay.  Why is that of concern to

24    you?

```
 1              A.    That would be almost two full

 2    bottles of 500-count bottles.

 3              Q.    Okay.  And somewhere in the

 4    system, the system is telling you that

 5    potentially two 500-count bottle of hydrocodone

 6    have gone missing?

 7              A.    Yes.

 8              Q.    Okay.  And obviously that's

 9    something you want to follow up on, right?

10              A.    Yes.

11              Q.    Okay.  If we go back to the first

12    page, it looks like -- it looks like you

13    followed up with him after about a week or so

14    went by and you hadn't heard back from him?

15              A.    Yes, which is why I -- with Cecey

16    she was not a pharmacy manager to follow up.

17    She wasn't very dependable to follow up on

18    things always when it comes up to things.  It

19    was a very high-volume pharmacy.

20                    So certain pharmacy managers, if

21    I -- having worked with them, know the history

22    of their follow-through sometimes, I will CC the

23    store manager and the pharmacy supervisor to --

24              Q.    Okay.  You would agree with me
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that it's a pretty serious concern if you

2    potentially have two 500-count bottles of

3    hydrocodone that have gone missing, right?

4           A.    Yes.

5           Q.    Okay.  That's something that you

6    definitely would want to stay on top of and --

7           A.    Yes.

8           Q.    -- be diligent about?

9           A.    Yes.

10          Q.    Okay.  So it looks like

11   approximately a week and a half later you follow

12   up with her asking her to look into it again?

13          A.    Yes.

14          Q.    Okay.  It then looks like you get

15   a response from the store manager but not from

16   Cecey, correct?

17          A.    That came from RxM, so that would

18   have been from Cecey.  And if you see on the

19   bottom, it's her -- she has her name on the

20   bottom of the e-mail, too.

21          Q.    Gotcha.  Thank you.

22                And so she writes, "I had them

23   count it overnight when it would be most

24   accurate and we are over by five.  Was there an
```

```
 1    adjustment prior to 6-12 for a +?  That was the

 2    day after inventory."

 3              Can you tell me what she's saying

 4    there?

 5         A.    I don't recall the plus 5 by 5

 6    tablets or five bottles and was there an

 7    adjustment prior to 6/12 for a positive.

 8    These -- the dates that you have on your time

 9    stamp of that report are the week ending date.

10    So the week ending 7/24, we received 2,000 from

11    the warehouse, total purchases.

12              So it could have been in a

13    combination of three orders kind of thing.  So

14    they get a 13-week view.  I have the ability to

15    do a 52-week review, which I -- it's not

16    uncommon for me to go in -- if we can't account

17    for this 911 that are missing, I'll go back even

18    further to see, we may have had a positive

19    adjustment somewhere that would offset this,

20    that somebody went in and positively adjusted

21    it.

22         Q.    Okay.  And when -- again, when

23    you're talking about two 500-count bottles of

24    hydrocodone, that's -- you're definitely going
```

1    to do that follow-up investigation, right?

2            A.    Yes.

3            Q.    Okay.  Does her answer here, in

4    that e-mail we just read, does that solve the

5    problem for you?

6            A.    No.

7            Q.    Okay.  So it looks like you

8    respond to her just above that and you tell her

9    you're concerned about the almost two 500-count

10   bottles that are unaccounted for, correct?

11           A.    Yes.

12           Q.    Okay.  And it looks like she

13   writes back, "Yes, me and you both.  Did you

14   look further back for adjustments?"

15                 Do you see that?

16           A.    Yes.

17           Q.    Do you recall whether or not this

18   situation ever got resolved?

19           A.    I do not recall.

20           Q.    Okay.  Is Cecey still a pharmacist

21   with Walgreens?

22           A.    No.

23           Q.    Okay.  When did she leave; do you

24   know?

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1              Thereupon, at 2:29 p.m., on Wednesday,

2    January 16, 2019, the deposition was concluded.

3                        - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATE

 2   STATE OF OHIO        :

                                 SS:

 3   COUNTY OF _____:

 4

 5              I, LAURIE A. ZACCARO, do hereby certify that

 6   I have read the foregoing transcript of my

 7   cross-examination given on January 16, 2019; that

 8   together with the correction page attached hereto

 9   noting changes in form or substance, if any, it is

10   true and correct.

11                        _____

                          LAURIE A. ZACCARO

12

13              I do hereby certify that the foregoing

14   transcript of the cross-examination of LAURIE A.

15   ZACCARO was submitted to the witness for reading and

16   signing; that after she had stated to the undersigned

17   Notary Public that she had read and examined her

18   cross-examination, she signed the same in my presence

19   on the _____ day of _____, 2019.

20

                          _____

21                        NOTARY PUBLIC - STATE OF OHIO

22

23   My Commission Expires:

24   _____, _____.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2  STATE OF OHIO        :
                                   SS:
 3  COUNTY OF FRANKLIN   :
 4          I, Carol A. Kirk, a Registered Merit
    Reporter and Notary Public in and for the State of
 5  Ohio, duly commissioned and qualified, do hereby
    certify that the within-named LAURIE A. ZACCARO was by
 6  me first duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in the cause
 7  aforesaid; that the deposition then given by her was
    by me reduced to stenotype in the presence of said
 8  witness; that the foregoing is a true and correct
    transcript of the deposition so given by her; that the
 9  deposition was taken at the time and place in the
    caption specified and was completed without
10  adjournment; and that I am in no way related to or
    employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
    nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
    28(D).
13
            IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my seal of office at Columbus, Ohio
    on this 21st day of January 2019.
15
16
17
18                      _____
                        CAROL A. KIRK, RMR
19                      NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022.
21                  - - -
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              DEPOSITION ERRATA SHEET

2    I, LAURIE A. ZACCARO, have read the transcript

     of my deposition taken on the 16th day of January,

3    2019, or the same has been read to me.  I request that

     the following changes be entered upon the record for

4    the reasons so indicated.  I have signed the signature

     page and authorize you to attach the same to the

5    original transcript

6    Page  Line  Correction or Change and Reason:

7    ____  ____  _____

8    ____  ____  _____

9    ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24   Date _____  Signature _____
```