# EXHIBIT 4

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
 2                EASTERN DIVISION
                    -  -  -
 3   IN RE:  NATIONAL           :  HON. DAN A.
     PRESCRIPTION OPIATE        :  POLSTER
 4   LITIGATION                 :  MDL NO. 2804
                                :
 5   This document relates to:  :  Case No. 17-MD-2804
                                :
 6   The County of Summit, Ohio :
     Ohio et al. v. Purdue Pharma :
 7   L.P., et al., Case No.     :
     17-OP-45004                :
 8                              :
     The County of Cuyahoga v.  :
 9   Purdue Pharma Purdue Pharma :
     L.P., et al., Case No.     :
10   18-OP-45090                :
11                  -  -  -
12           Friday, May 10, 2019
13              Volume II
14
                    -  -  -
15   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
16                  -  -  -
17           Videotaped deposition of
     CRAIG J. MCCANN, Ph.D., CFA, taken pursuant
18   to notice, was held at the law offices of
     Morgan Lewis & Bockius, 1111 Pennsylvania
19   Avenue, NW Washington, DC 20004, beginning
     at 9:08 a.m., on the above date, before
20   Amanda Dee Maslynsky-Miller, a Certified
     Realtime Reporter.
21
                    -  -  -
22
          GOLKOW TECHNOLOGIES, INC.
23      877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
```

1    the manufacturers, the manufacturers

2    defendants could have monitored orders

3    from dispensers, primarily retail chain

4    and pharmacies.

5            You took six words out of

6    the middle of that sentence.

7        Q.    And I apologize if I did.  I

8    wasn't trying to mislead you.

9            So what I was getting at was

10   in the analysis you did, the work you

11   did, you didn't assess the chargeback

12   data that you had had access to, to

13   determine whether it was similar or

14   different from other chargeback materials

15   in the industry; is that fair to say?

16       A.    Correct.

17       Q.    Okay.  You say there that if

18   you assume -- if you make the assumption

19   that we just discussed, that manufacturer

20   defendants could have monitored orders --

21           Do you see that?

22       A.    I do.

23       Q.    -- what basis -- on what

24   basis, if any, do you rely in making that

1    statement?

2         A.    The chargeback data that I

3    reviewed includes information on

4    shipments to dispensers.

5         Q.    You stated a few minutes ago

6    that you only used the chargeback data to

7    supplement your NDC code collection, so

8    to speak.

9              Do you remember that?

10             MR. MOUGEY:  Objection.

11   BY MR. GALLAGHER:

12        Q.    Do you remember that

13   testimony?

14        A.    Correct.

15        Q.    Is this an additional

16   opinion or conclusion that you have

17   reached relating to chargeback

18   information?

19        A.    No, I don't think so.  It's

20   just describing what I observed in the

21   chargeback data.

22        Q.    Okay.  If, hypothetically, a

23   manufacturer only had chargeback

24   arrangements that covered half of its

```
1    transactions with a distributor, how, if

2    at all, would that data allow a

3    manufacturer to identify flagged

4    transactions?

5         A.    Well, that would be outside

6    Paragraph 19.  Paragraph 19 assumes that

7    they received the chargeback data for all

8    sales of all opioids they shipped to

9    other manufacturers and distributors.

10               So I think you're suggesting

11   an alternative fact pattern than I laid

12   out in Paragraph 19.  And in your

13   alternative -- I don't know, I just have

14   to think about it.  It's not something

15   that I thought about before this.

16        Q.    Before me talking to you

17   today?

18        A.    Correct.  It wasn't relevant

19   to anything I did.

20        Q.    So the only opinion or

21   conclusion you've reached is that -- is

22   what's stated here, that if you assume a

23   manufacturer has chargeback data

24   essentially for all of its transactions,
```

1    that it could be used to monitor flagged

2    transactions, and beyond that set of

3    facts and that assumption, you have not

4    done any work?

5          A.    On the chargeback data,

6    other than to pull the NDCs that were not

7    already identified by the labeler code,

8    yes.

9          Q.    Does chargeback -- who told

10   you to make the assumption that's stated

11   there about chargeback data that you just

12   read?

13         A.    No one.  It's just a logical

14   conclusion, I think.  And it was just

15   something that I wrote about the

16   chargeback data.

17         Q.    Why did you think you should

18   be writing in your report about the

19   ability to monitor flagged transactions

20   using chargeback data?  Why did that get

21   into your brain?

22         A.    Although it doesn't directly

23   impact, it's not required for the later

24   discussion of attributing flagged orders

1    to manufacturers or assuming

2    manufacturers had access to information

3    on all of the shipments of their drugs by

4    distributors to dispensers, it might be

5    useful context.  It's not required --

6    it's not a required assumption for the

7    calculations I do later, but I thought it

8    was useful context.

9         Q.    For your algorithms?

10        A.    Correct.

11        Q.    Did you write that part of

12   your report?

13        A.    I did.  Every word of it.

14        Q.    And the assumption you made

15   on your own, without being told to make

16   that assumption by a lawyer or anybody

17   else?

18        A.    Correct.

19        Q.    Do you have any idea whether

20   that assumption in the real world is

21   accurate?

22        A.    No.

23        Q.    Have you looked at what any

24   given manufacturer actually does with its

Highly Confidential - Subject to Further Confidentiality Review

1    chargeback data?

2          A.    No.

3          Q.    Have you assessed the

4    sufficiency of what any manufacturer does

5    with chargeback data, in terms of

6    identifying any downstream transactions?

7          A.    No.

8          Q.    Do you intend to opine on

9    that topic in this case?

10         A.    Not unless the court asks me

11   or if there's some other development that

12   I'm not currently contemplating.  Not --

13   certainly not as I sit here.

14         Q.    So that assumption was not

15   supported by any work or analysis you did

16   with underlying chargeback materials,

17   correct?

18         A.    There's two assumptions in

19   that very long sentence, and you can tell

20   I wrote it because it's so long.

21               But I'm not sure which

22   assumption now you're referring to.

23   There's two.

24               One is saying that it's