# **EXHIBIT 6**

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3

      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____   )   Case No.
                               )   1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES    )   Hon. Dan A.
 7    TO ALL CASES             )   Polster
 8
                 TUESDAY, DECEMBER 11, 2018
 9
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                 CONFIDENTIALITY REVIEW
11                         - - -
12          Videotaped deposition of Cathy
13    Stewart, held at the offices of STINSON
14    LEONARD STREET LLP, 7700 Forsyth Boulevard,
15    Suite 1000, St. Louis, Missouri, commencing
16    at 9:03 a.m., on the above date, before
17    Carrie A. Campbell, Registered Diplomate
18    Reporter and Certified Realtime Reporter.
19
20
21
22                         - - -
               GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
25
```

1      A.     I think they were reorganizing
2    the logistics organization under a new vice
3    president, so they were shifting people
4    around, bringing some new people up through
5    the ranks into other positions.
6      Q.     Okay.  When you moved into the
7    customer service position in approximately
8    2008, who was your predecessor in that
9    position with respect to dosage?
10     A.     Sean Welch, W-e-l-c-h.
11     Q.     Is that a man or a woman?
12     A.     He's a man.
13     Q.     Okay.  And so did Mr. Welch --
14   do you know why he moved out of that
15   position?
16            MR. DAVISON:  Objection to
17        form.
18            THE WITNESS:  He left the
19        company to accept another position.
20   QUESTIONS BY MR. GOTTO:
21     Q.     Okay.  When you moved into the
22   customer service position, was there any
23   training you went through to prepare yourself
24   for those responsibilities?
25     A.     Not prior to the move but

 1   during the move customer service reps helped
 2   get me up to speed, and then Karen and I
 3   talked a great deal about what the
 4   requirements were.  Again, I had a copy of
 5   the CFR to refer to, knew what some of the
 6   expectations were with regard to clearing a
 7   222 form within 24 hours of shipment and
 8   things like that.
 9        Q.   Okay.  And so no formal
10   classroom training; more on-the-job training
11   type thing?
12        A.   No, more of on-the-job
13   training, yes.
14        Q.   Okay.  And did you talk to
15   Mr. Welch at all in the transition to get any
16   guidance from him?
17        A.   Yes.
18        Q.   What can you recall in that
19   regard?
20        A.   Sean and I were friends, so
21   when I had a question about something, I
22   would call him and try to bounce something
23   off of him, ask his opinion.
24        Q.   Okay.  Were there aspects of
25   DEA regulation or requirements that you

```
 1   needed to be familiar with to perform your
 2   customer service responsibilities that were
 3   different from DEA requirements and
 4   regulation that you needed to be familiar
 5   with to perform your planning function?
 6              MR. DAVISON:  Objection.  Form.
 7              THE WITNESS:  Yes.
 8   QUESTIONS BY MR. GOTTO:
 9        Q.    And what are the differences
10   you can recall?
11        A.    On the customer service side of
12   the business, your focus was on 222 forms,
13   making sure that the customers had them
14   before we could -- that we were in possession
15   of them before we could ship any product to
16   the customer.
17              On the planning side of the
18   business, the focus was more on quota.  Can
19   we legally procure the raw materials,
20   manufacture the product and have it ready for
21   distribution.
22        Q.    Okay.  And the quota was
23   Mallinckrodt's quota, right?
24        A.    Yes.
25        Q.    Okay.  And so tell me what a
```

```
 1    222 form is.
 2         A.    A 222 form is issued by the DEA
 3    to each registrant who purchases dosage or
 4    API product.  They fill out specifics with
 5    regard to what product they want to purchase
 6    and the quantity they want to purchase.
 7               Once we receive that form, the
 8    222 form number was entered into the system
 9    to release the order.  So that told everybody
10    it's legal, we have the 222 form, we can ship
11    this.
12               Then after the shipment is
13    executed, you go back to the form and you
14    fill out how much was shipped and when it was
15    shipped, and that form goes back to the DEA.
16         Q.    Okay.  So did a customer
17    provide a 222 form for each order?
18         A.    Yes.
19         Q.    Okay.  And --
20         A.    There were -- you could order
21    multiple products on each 222 form.
22         Q.    Okay.  Give me an example of
23    how that would work.
24         A.    There were multiple lines on
25    the form, maybe eight lines, so I could order
```

```
 1     oxycodone on one line, methadone on another
 2     line, hydromorphone on another line.  So once
 3     each form tied back to an order -- and they
 4     had to be a 100 percent match to be legal.
 5            Q.    So the 222 form, just trying to
 6     understand, would it -- would it be with
 7     reference to a specific dosage product or
 8     would it be with reference to some quantity
 9     of the API?
10            A.    They're used for purchases of
11     both dosage and API.  When you order dosage
12     products on a 222 form, you order it in
13     bottles or cases.
14                  When you order API on a 222
15     form, it's ordered in grams or kilos.
16            Q.    Okay.  And so, for example --
17     let's talk first about a bulk order and how a
18     222 form would work.
19            A.    Uh-huh.
20            Q.    Would the 222 form be specific
21     to a particular API and identify a quantity
22     of that that could be ordered?
23            A.    Each line would be a specific
24     API and quantity, but you could order
25     multiple molecules, like 2, 8, or however
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    many lines were on it.  So you could order
 2    morphine, oxycodone, you know, different
 3    products on each 222 form.
 4          Q.    Okay.  And as long as the
 5    amount ordered for each of those products was
 6    not greater than the amount set forth on the
 7    222 form, that order could be fulfilled?
 8          A.    Yes.
 9          Q.    Okay.  Now, let's talk about a
10    222 form in a dosage order.
11          A.    Okay.
12          Q.    What format would that take?
13    Would it, for example, identify specific --
14    say a 15-milligram tablet or 100-tablet
15    bottle of a 15-milligram product?
16          A.    Correct.  The order quantities
17    would typically be 12 cases of oxycodone
18    5/325.  So a case might have been six
19    100-count bottles of oxycodone, where you've
20    got 5 milligrams of oxycodone and
21    325 milligrams of acetaminophen.  So those
22    are ordered in cases, typically.
23                Sometimes smaller operations
24    like methadone clinics would order bottles of
25    methadone rather than cases because they
```

```
 1                    Ultimately, do you recall if
 2   that process was adopted?
 3          A.    Yes.
 4          Q.    And so during the period you
 5   were customer service manager for dosage, did
 6   you receive a peculiar order report twice a
 7   day?
 8          A.    Yes.
 9          Q.    Approximately how many peculiar
10   orders can you recall being included on a
11   peculiar order report?
12          A.    I have --
13                MR. DAVISON:  Objection to
14          form.
15                THE WITNESS:  I don't know.
16          Not many, but I can't specify a
17          number.
18   QUESTIONS BY MR. GOTTO:
19          Q.    Okay.  But you would receive
20   the report twice a day, correct?
21          A.    Yes.
22          Q.    Were there times when the
23   report had no peculiar orders on it?
24          A.    I don't recall.
25          Q.    Okay.  Would it be unusual if a
```

```
 1    peculiar order report that you received with

 2    respect to dosage had more than ten orders on

 3    it?

 4              MR. DAVISON:  Objection to

 5        form.

 6              THE WITNESS:  I don't know.

 7    QUESTIONS BY MR. GOTTO:

 8        Q.    Okay.  Would it be unusual if

 9    it had more than 20 on it, 20 orders?

10              MR. DAVISON:  Objection to

11        form.

12              THE WITNESS:  I don't ever

13        recall a report having that many.

14    QUESTIONS BY MR. GOTTO:

15        Q.    Okay.  So as best you can

16    recall today, it would be unusual if it had

17    more than 20?

18        A.    Yes.  Yeah.

19        Q.    But you don't recall if it

20    would be unusual if it had more than ten?

21              MR. DAVISON:  Objection.

22              THE WITNESS:  I don't recall it

23        ever having more than ten.

24    QUESTIONS BY MR. GOTTO:

25        Q.    Okay.  Do you recall a report
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    having more than five orders on it?
 2         A.    I don't recall.
 3         Q.    May have or may not --
 4         A.    May have, yeah.
 5         Q.    You just don't know?
 6         A.    I just don't know.
 7         Q.    Okay.  So if you received the
 8    report twice a day, you received ten reports
 9    a week, right?
10         A.    Correct.
11         Q.    On a typical five-day workweek?
12         A.    Yes.
13         Q.    So is it fair to conclude that
14    over the course of a typical five-day
15    workweek you would have received peculiar
16    order reports indicating -- you know,
17    reporting some number of peculiar orders for
18    that week?
19               MR. DAVISON:  Objection to
20         form.
21               THE WITNESS:  Correct.
22    QUESTIONS BY MR. GOTTO:
23         Q.    So when you received a peculiar
24    order report that identified one or more
25    peculiar orders, what steps did you take with
```

 1   respect to that order?
 2       A.   I investigated in the sense
 3   that who was the customer, what were the
 4   circumstances, if I knew of them.  We had
 5   instances in snowstorms where trucks got
 6   stuck for days at a time on a highway.  And
 7   so if I knew of a circumstance that justified
 8   the reason for the additional order, or the
 9   peculiar order, then I'd discuss it with
10   Karen and we would release the order.  If
11   not, we kind of kicked it up the chain and
12   said, "I can't figure out why they're
13   ordering this," and then Karen would maybe
14   get with marketing or whatever to resolve the
15   problem.
16       Q.   Okay.  So once an order was
17   identified as peculiar -- and again, focusing
18   on dosage initially -- who had the authority
19   to authorize the filling of that order?
20       A.   I did.
21       Q.   Okay.
22       A.   Or Karen, Bill Ratliff.
23       Q.   Okay.
24       A.   Any one of us.
25       Q.   Okay.  Were there times that

1  you can recall authorizing the fulfilment of
2  an order that had been identified as peculiar
3  without consulting with anyone else?
4         A.    Yes.
5         Q.    And what circumstances can you
6  recall?
7         A.    I can't remember.
8         Q.    Okay.  May have been, for
9  example, the weather-related type thing that
10 you described?
11        A.    Right.  Yes.
12        Q.    Do you ever recall a
13 circumstance, again, focusing on dosage,
14 where someone else, Ms. Harper or someone
15 else in the -- in the chain, authorized the
16 fulfilment of a peculiar order where you had
17 concerns that the issue as to whether it was
18 suspicious had not been thoroughly
19 investigated?
20        A.    No.
21        Q.    Now, let's turn to when you had
22 responsibility for API.
23        A.    Uh-huh.
24        Q.    Did you receive the report once
25 a day --

```
 1          A.      Yes.
 2          Q.      -- during that time?
 3          A.      Yes.
 4          Q.      Okay.  And typically was there
 5   at least one order reflected on a report?
 6          A.      I would say not daily, but
 7   maybe over the course of a week there might
 8   be a report, an order on the report.
 9          Q.      Okay.  With respect to any
10   order that was reported as peculiar on the
11   bulk report, what steps would you take?
12          A.      The same as with dosage.
13          Q.      And did the same people have
14   authority to authorize the fulfilment of a
15   bulk order that had been identified as
16   peculiar as had that authority with respect
17   to dosage?
18          A.      Yes.
19          Q.      Do you know if there was -- or
20   do you recall there being any occasion in
21   which a bulk order was fulfilled -- a bulk
22   order that had been identified as peculiar
23   was fulfilled prior to the time a final
24   determination had been made as to whether it
25   was suspicious?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      Uh-huh.
 2        Q.      -- what does "lines" mean in
 3   this setting?
 4        A.      Lines would be -- or each
 5   molecule strength would be a separate line on
 6   an order.
 7        Q.      Okay.  And so this is a
 8   supplier that had experienced approximately
 9   1560 specific items that were ordered as --
10   that were identified as at least potentially
11   suspicious out of approximately 13,000?
12                MR. DAVISON:  Objection to
13        form.
14                THE WITNESS:  Correct.
15        Correct.
16   QUESTIONS BY MR. GOTTO:
17        Q.      Now, as to Mallinckrodt, in a
18   typical month on the dosage business, how
19   many lines per month would you expect would
20   be ordered?
21                MR. DAVISON:  Objection to
22        form.
23                THE WITNESS:  I have no idea.
24        A lot.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. GOTTO:
 2         Q.    More than 13,000?
 3         A.    I don't know.  I'd be guessing.
 4         Q.    Okay.  And do you know in terms
 5    of Mallinckrodt's experience, as far as
 6    orders that were identified as peculiar,
 7    whether its experience would approximate the
 8    12 percent experience referenced here?
 9               MR. DAVISON:  Objection to
10         form.
11               THE WITNESS:  I don't know.
12    QUESTIONS BY MR. GOTTO:
13         Q.    Okay.  You didn't personally
14    ever go back and do any sort of calculation
15    as far as what percentage of orders had been
16    identified as peculiar; is that fair?
17         A.    Correct.
18         Q.    And do you know if anyone else
19    at Mallinckrodt ever performed such a
20    calculation?
21         A.    I don't know.  In the very
22    beginning it was such a new program, I don't
23    think that anybody was doing it.  And by the
24    time it had become an established program, I
25    had moved on, so I don't know if anybody did
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that type of analysis or not.
 2         Q.    Do you think it's possible that
 3    Mallinckrodt's dosage order volumes would
 4    have exceeded 13,000 lines per month?
 5               MR. DAVISON:  Objection to
 6         form.
 7               THE WITNESS:  I would say it's
 8         conceivable.
 9    QUESTIONS BY MR. GOTTO:
10         Q.    During the period that you had
11    responsibility for dosage as customer service
12    manager, do you have any estimate as to the
13    number of peculiar orders that your staff had
14    capacity to evaluate on a daily basis?
15         A.    Repeat the question, please.
16         Q.    Sure.
17               While you were customer service
18    manager for dosage, do you have any estimate
19    of the number of peculiar orders that the
20    CSRs who reported to you would have capacity
21    to review on a daily basis, approximately?
22         A.    My opinion would be that they
23    evaluated every order that they entered for
24    anomalies, and then if they felt that
25    something was out of sort or character,
```

1    they'd bring it to my attention.
2        Q.    Okay.  So they evaluated --
3    when you say "they evaluated every order," is
4    that independent of whatever algorithms were
5    put in place by the team?
6        A.    Yes.
7        Q.    And what were the criteria that
8    they used to conduct that evaluation,
9    independent of algorithms?
10       A.    Our customer base was -- our
11   relationships had been very long-standing,
12   and the customer service reps were kind of
13   intimate with the customers.  They knew
14   exactly what they ordered and what typical
15   quantities were and frequency.  So if
16   something seemed out of the ordinary, they
17   would bring it up.
18       Q.    Okay.  And the -- were the
19   algorithms that the -- that the team adopted
20   in place during any portion of the time that
21   you had dosage responsibility as customer
22   service manager?
23       A.    No, they were developed during
24   my tenure in that position.
25       Q.    Okay.  So during the time you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    had responsibility for dosage, the
 2    identification of orders as peculiar would
 3    have been based entirely on your CSRs making
 4    the sort of evaluation that you just
 5    described a few moments ago?
 6          A.    Correct.
 7                MR. DAVISON:  Objection to
 8          form.
 9    QUESTIONS BY MR. GOTTO:
10          Q.    A couple of paragraphs below
11    the one we were just looking at, there's one
12    that states, "Companies indicate that they
13    have employed the services of a statistician
14    to work with their IT professionals to
15    develop appropriate algorithms, et cetera,
16    for use in the code to identify the SOM
17    lines."
18                Do you see that?
19          A.    Yes.
20          Q.    Did Mallinckrodt, to your
21    knowledge, ever employ a statistician to work
22    in this regard?
23          A.    Not that I'm aware of.
24          Q.    If you turn to the second page
25    of Exhibit 6, the first paragraph, it says,
```

```
 1      "When trying to normalize your data for
 2   purposes of doing calculations to identify
 3   anomalies, consider the base drug, API,
 4   itself, rather than focusing on strengths and
 5   doses per bottle."
 6              Do you see that?
 7       A.     Yes.
 8       Q.     And did the algorithms that the
 9   team ultimately adopted follow that -- that
10   direction?
11       A.     Yes, they did.
12       Q.     Okay.  Down one, two, three,
13   four paragraphs from there, there's a
14   paragraph that says, "Are our customers aware
15   of the SOM requirements, question mark?
16   Conduct a prophylactic order" -- I'm sorry --
17   "prophylactic audit and confirm that they
18   have systems in place to call out deviations
19   on orders placed in their systems, paren,
20   their SOM processes and procedures."
21              Do you see that?
22       A.     I do.
23       Q.     Did Mallinckrodt ever conduct
24   such a prophylactic audit?
25              MR. DAVISON:  Objection to
```