# EXHIBIT 48

```
 1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3
      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____   )   Case No.
                               )   1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES    )   Hon. Dan A.
 7    TO ALL CASES             )   Polster
 8
                   THURSDAY, JULY 11, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                 CONFIDENTIALITY REVIEW
11                         - - -
12           Videotaped deposition of Michael
13    Mapes, held at the offices of The Mining
14    Exchange, A Wyndham Grand Hotel & Spa,
15    8 South Nevada Avenue, Colorado Springs,
16    Colorado, commencing at 9:41 a.m., on the
17    above date, before Carrie A. Campbell,
18    Registered Diplomate Reporter and Certified
19    Realtime Reporter.
20
21
22                         - - -
23
              GOLKOW LITIGATION SERVICES
24        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
25
```

1      Q.     Were all of those positions in
2   the diversion side of DEA?
3             MR. BENNETT:  Objection.  Form.
4             THE WITNESS:  They were all
5      related to the diversion program, yes.
6   QUESTIONS BY MS. MCCLURE:
7      Q.     And so some of your positions
8   may not have been actually having you housed
9   in diversion, but the subject matter about
10  which you were employed for DEA related to
11  diversion in all of your 30-year -- in all of
12  your positions over 30 years?
13     A.     That's correct.
14     Q.     You started out as a diversion
15  investigator in Detroit and Cleveland?
16     A.     Yes.
17     Q.     Detroit was approximately
18  '80 -- sorry, '77 to '83 or '84?
19     A.     Yes.
20     Q.     And then Cleveland was '83 or
21  '84 to '85 or '86?
22     A.     Yes.
23     Q.     I note that you graduated from
24  college, which was Ferris State University,
25  in 1974; is that correct?

```
 1        A.    It is.
 2        Q.    And then what -- did you have
 3   any jobs or positions between 1974 and 1977?
 4        A.    I did.
 5        Q.    What were those?
 6        A.    I was a deputy sheriff for
 7   about two and a half years in Michigan, and
 8   after that I worked for the -- as a civilian
 9   for the Department of the Army as a budget
10   analyst for about a year.
11        Q.    And then you applied for a
12   position at DEA?
13        A.    Yes.
14        Q.    What is a diversion
15   investigator?
16        A.    Someone that investigates
17   registrants or potential registrants that
18   handle controlled substances, investigates
19   the movement of controlled substances and
20   diversion of controlled substances from
21   legitimate channels.
22        Q.    In the course of your duties as
23   a diversion investigator, did you conduct
24   audits or cyclic investigations of
25   registrants?
```

```
 1        A.    I did.
 2        Q.    Including wholesalers?
 3        A.    Yes.
 4        Q.    In connection with those cyclic
 5   audits -- am I using the correct phrase?
 6        A.    Yes.
 7        Q.    Okay.  In connection with those
 8   cyclic audits, would you review suspicious
 9   order monitoring systems?
10        A.    Yes.
11        Q.    Was that a standard part in
12   your experience of a diversion investigator's
13   role?
14        A.    It was.
15        Q.    And so it was a responsibility
16   that diversion investigators needed to carry
17   out with respect to registrants for the field
18   office to which they were assigned?
19        A.    That's correct.
20        Q.    The results of those audits
21   would be reported on a DEA 6 report?
22        A.    They would.
23        Q.    If a diversion investigator
24   determines that a registrant was not
25   complying with the regulations, would the
```

 1   investigator tell the registrant what that
 2   registrant was doing wrong?
 3              MR. BENNETT:  Objection.
 4        Incomplete hypothetical.
 5   QUESTIONS BY MS. MCCLURE:
 6        Q.    You can answer.
 7        A.    Yes, they would.
 8        Q.    And that's in your experience
 9   at DEA?
10        A.    Yes.
11        Q.    As a diversion investigator?
12        A.    Yes.
13        Q.    And later as a group
14   supervisor, you expected your diversion
15   investigators to communicate with registrants
16   about what they were doing wrong?
17        A.    Yes.
18        Q.    So that they could correct it?
19        A.    That's right.
20        Q.    Was it an expectation in your
21   experience that a diversion investigator in
22   such a circumstance would follow up to see if
23   that issue had been corrected?
24              MR. BENNETT:  Objection.  Form.
25              THE WITNESS:  It would be

1 followed up, whether it was by that
2 diversion investigator or another one.
3 QUESTIONS BY MS. MCCLURE:
4 Q. Okay. Audits can also be
5 conducted outside of the cyclic process if
6 there was a particular reason or something
7 came up that suggested that an audit might be
8 appropriate; is that accurate?
9 A. It is.
10 Q. What was your next position at
11 DEA after diversion investigator in
12 Cleveland?
13 A. I was a staff coordinator at
14 headquarters in Washington, DC.
15 Q. And was that for -- for how
16 long a period of time?
17 A. A little less than a year.
18 Q. What is the job of a staff
19 coordinator?
20 A. To review the reports from a
21 field office and the requests from the field
22 office for assistance with investigative
23 matters.
24 Q. So do I have it correct that a
25 field office, one of DEA's field offices, may

Highly Confidential - Subject to Further Confidentiality Review

1  reach out to headquarters because they had
2  something that they required more resources
3  for than they had available to them?
4       A.    Either resources in terms of
5  funding or in terms of more personnel or
6  whatever they needed.
7       Q.    Did headquarters have access to
8  some information that a field office would
9  not have had access to?
10      A.    Yes.
11      Q.    Let me rephrase that question.
12            Would a diversion investigator
13 reach out to a staff coordinator such as
14 yourself to get some information to support
15 an investigation?
16            MR. BENNETT: Objection. Form.
17            THE WITNESS: They may.
18 QUESTIONS BY MS. MCCLURE:
19      Q.    You later became an instructor
20 at Quantico?
21      A.    Yes.
22      Q.    Quantico is a location in
23 Virginia where DEA diversion investigators
24 train; is that right?
25      A.    It is.