# EXHIBIT 56

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4

 5    ----------------------------) MDL No. 2804

 6    IN RE NATIONAL PRESCRIPTION  )

 7    OPIATE LITIGATION            )

 8                                 ) Case No. 17-md-2804

 9    This document relates to:    )

10    All Cases                    )

11    ----------------------------) Hon Dan A. Polster

12

13                 HIGHLY CONFIDENTIAL

14      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16            The 30(b)(6) videotaped deposition of

17    ALLERGAN by and through MARY WOODS, called for

18    examination, taken pursuant to the Federal Rules of

19    Civil Procedure of the United States District Courts

20    pertaining to the taking of depositions, taken before

21    JULIANA F. ZAJICEK, a Registered Professional Reporter

22    and a Certified Shorthand Reporter, at Lieff Cabraser

23    Heimann & Bernstein, 8th Floor, 250 Hudson Street, New

24    York, New York, on January 9, 2019, at 9:10 a.m.
```

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3          ROBBINS GELLER RUDMAN & DOWD LLP
            655 West Broadway, Suite 1900
 4          San Diego, California 92101
            619-231-1058
 5          BY:  THOMAS E. EGLER, ESQ.
                 tegler@rgrdlaw.com;
 6               HENRY ROSEN, ESQ.
                 hrosen@rgrdlaw.com
 7
                      -and-
 8
            ROBBINS GELLER RUDMAN & DOWD LLP
 9          Post-Montgomery Center
            One Montgomery Street, Suite 1800
10          San Francisco, California 94104
            415-288-4545
11          BY:  KELLI BLACK, ESQ.
                 kblack@rgrdlaw.com
12
13    ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
      AMERISOURCEBERGEN DRUG CORPORATION:
14
            REED SMITH LLP
15          Three Logan Square
            1717 Arch Street, Suite 3100
16          Philadelphia, Pennsylvania 19103
            215-851-8100
17          BY:  CHRISTIAN SAUCEDO, ESQ. (Telephonically)
                 csaucedo@reedsmith.com
18
                      -and-
19
            REED SMITH LLP
20          811 Main Street, Suite 1700
            Houston, Texas 77002
21          713-469-3842
            BY:  MARY BALASTER, ESQ. (Telephonically)
22               MBalaster@reedsmith.com
23
24
```

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF CEPHALON, INC., TEVA PHARMACEUTICALS USA,
      INC., ACTAVIS LLC, ACTAVIS PHARMA, INC., AND WATSON
 3    LABORATORIES, INC.:
 4         MORGAN LEWIS & BOCKIUS LLP
           1701 Market Street
 5         Philadelphia, Pennsylvania 19103-2921
           215-963-5000
 6         BY:  ADAM HAMMOUD, ESQ.
                adam.hammoud@morganlewis.com
 7
 8    ON BEHALF OF MALLINCKRODT LLC and SPECGX LLC:
 9         ROPES & GRAY LLP
           Prudential Tower
10         800 Boylston Street
           Boston, Massachusetts 02199-3600
11         617-951-7910
           BY:  ELISSA REIDY, ESQ. (Telephonically)
12              elissa.reidy@ropesgray.com
13
      ON BEHALF OF CARDINAL HEALTH, INC.:
14
           FARRELL FRITZ P.C.
15         400 RXR Plaza
           Uniondale, New York 11556
16         516-227-0620
           BY:  KEVIN P. MULRY, ESQ.
17              kmulry@farrellfritz.com
18
      ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
19    PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
      INC.:
20
           BAKER HOSTETLER
21         Key Tower
           127 Public Square, Suite 2000
22         Cleveland, OH 44114-1214
           216-861-6486
23         BY:  DOUG SHIVELY, ESQ. (Telephonically)
                dshively@bakerlaw.com
24
```

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF WALMART INC.:
 3         JONES DAY
           150 West Jefferson, Suite 2100
 4         Detroit, Michigan 48226-4438
           313-733-3939
 5         BY:  LOUIS P. GABEL, ESQ.
                lpgabel@jonesday.com
 6
 7    ON BEHALF OF ALLERGAN:
 8         KIRKLAND & ELLIS LLP
           655 Fifteenth Street, N.W.
 9         Washington, D.C. 20005-5793
           202-879-5211
10         BY:  JENNIFER LEVY, ESQ.
                jennifer.levy@kirkland.com
11
                    -and-
12
           KIRKLAND & ELLIS LLP
13         300 North LaSalle Street
           Chicago, Illinois 60654
14         312-862-3429
           BY:  KAITLYN COVERSTONE, ESQ.
15              kaitlyn.coverstone@kirkland.com
16
      ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC. IN
17    NON-MDL CASES PENDING IN ARKANSAS AND PENNSYLVANIA:
18         CLARK MICHIE LLP
           220 Alexander Street
19         Princeton, NJ 08540
           609-423-2143
20         BY:  BRUCE CLARK, ESQ.
                (Telephonically)
21              bruce.clark@clarkmichie.com
22
      THE VIDEOGRAPHER:
23
           MR. ERIC DAVIDSON,
24         Golkow Litigation Services.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I N D E X
 2  WITNESS:                              PAGE:
 3    MARY WOODS
 4         EXAM BY MR. EGLER...................   10
 5
 6                     *****
 7
 8                  E X H I B I T S
 9  ALLERGAN 30(b)(6) - WOODS EXHIBIT      MARKED FOR ID
10    No. 1     Watson Pharma memo from Lynn          9
                DaCunha to Customer Support
11              Services, 9/3/01, Subject: DEA
                Excess/Max. Qty. - Suspicious
12              Orders of Controlled Drugs;
                ALLERGAN_MDL_01844864 - 865
13
      No. 2     Watson Pharma memo from Ella David    9
14              CCO Trainer to Call Center
                Operation, 6/14/02
15              (reprint//original print date
                11/10/00);
16              ALLERGAN_MDL_01844724 - 725
17    No. 3     Watson Pharma, Inc., Call Center      9
                Operational Procedure, 5/3/04;
18              ALLERGAN_MDL_0839001 - 002
19    No. 4     CSOP, Sales & Marketing, 9/10/05;     9
                ALLERGAN_MDL_03951885 - 888
20
      No. 5     Watson Pharma, Inc. Call Center       9
21              Operational Procedure, 5/3/04;
                Acquired_Actavis_01495929 - 930
22
      No. 6     Watson Pharma, Inc., Licenses         9
23              Administrator Operational
                Procedure, 5/3/04;
24              ALLERGAN_MDL_03953044 - 065
```

```
 1                  E X H I B I T S (Continued)
 2    ALLERGAN 30(b)(6) - WOODS EXHIBIT      MARKED FOR ID
 3      No. 7      Watson Pharma, Inc. Licenses         9
                   Administrator Operational
 4                 Procedure, 5/3/04;
                   ALLERGAN_MDL_03952774 - 793
 5
        No. 8      CSOP, Sales & Marketing, 4/7/09;     9
 6                 ALLERGAN_MDL_03641386 - 389
 7      No. 9      CSOP; ALLERGAN_MDL_02467151 - 154    9
 8      No. 10     CSOP 011-004, Rev. # 4, Sales &      9
                   Marketing, 7/19/11;
 9                 ALLERGAN_MDL_02146521 - 525
10      No. 11     Call Center Operations - Master      9
                   Data/License Admin. Operational
11                 Procedure, 5/3/04;
                   ALLERGAN_MDL_01175574 - 585
12
        No. 12     E-mail chain, top one from Nancy     9
13                 Baran to John LaRocca, among
                   others, 8/18/09, Subject: FW:
14                 Suspicious Orders;
                   ALLERGAN_MDL_02081243 - 245
15
        No. 13     Suspicious Order Report;             9
16                 ALLERGAN_MDL_02129514
17      No. 14     Suspicious Order Report for          9
                   Oxycodone IR Tablets, Standard
18                 Operating Procedure, Commercial;
                   ALLERGAN_MDL_00490306
19
        No. 15     Actavis Suspicious Order             9
20                 Monitoring - Direct Customer Sales
                   SOP; ALLERGAN_MDL_01684748 - 752
21
        No. 16     Actavis Suspicious Order             9
22                 Monitoring - Indirect Customer
                   Sales SOP;
23                 ALLERGAN_MDL_01979834 - 838
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)
 2   ALLERGAN 30(b)(6) - WOODS EXHIBIT      MARKED FOR ID
 3      No. 17    US Order Management - Master          9
                  Data/License Admin. Operational
 4                Procedure, 5/3/04;
                  ALLERGAN_MDL_03750135 - 146
 5
        No. 18    SOP - Controlled Substance Order      9
 6                Monitoring Policy;
                  ALLERGAN_MDL_02146301 - 307
 7
        No. 19    Actavis - Suspicious Order            9
 8                Monitoring Program Overview;
                  ALLERGAN_MDL_02146081
 9
        No. 20    Actavis - DEA Affairs, Controlled     9
10                Substance Suspicious Order
                  Monitoring: 'Order of Interest'
11                Evaluation;
                  ALLERGAN_MDL_02146077 - 080
12
        No. 21    Actavis - Suspicious Order            9
13                Monitoring Program, Customer Due
                  Diligence Overview;
14                ALLERGAN_MDL_02146314 - 315
15      No. 22    Actavis - DEA Affairs, Controlled     9
                  Substance Customer Knowledge
16                Policy (Know Your Customer);
                  ALLERGAN_MDL_02176554 - 557
17
        No. 23    Actavis - CSOP - Controlled           9
18                Substance Order Monitoring Policy,
                  5/26/16; TEVA_MDL_A_01037228 - 235
19
        No. 24    Actavis - CSOP - Controlled           9
20                Substance Compliance Policy,
                  5/26/16; TEVA_MDL_A_06619234 - 242
21
        No. 25    Compilation of Allergan 30(b)(6) -    9
22                Woods Exhibits 1 through 25
23      No. 26    Amended Notice of Deposition         10
        No. 27    Document titled "Mary Woods          19
24                30(b)(6) Deposition - Dep Aid
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   E X H I B I T S (Continued)

 2   ALLERGAN 30(b)(6) - WOODS EXHIBIT       MARKED FOR ID

 3    No. 28   Actavis - DEA Affairs, Controlled    126

                Substance Suspicious Order

 4              Monitoring: 'Order of Interest'

                Evaluation;

 5              ALLERGAN_MDL_02176551 - 553

 6    No. 29   E-mail chain, top one from Thomas    153

                Napoli to Sandra Simmons, among

 7              others, 1/6/16, Subject: RE: SOMS,

                w/attachment;

 8              ALLERGAN_MDL_02146297 - 311

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (WHEREUPON, certain documents were

 2              marked Allergan 30(b)(6) - Woods

 3              Deposition Exhibit Nos. 1 through 25,

 4              for identification, as of

 5              01/09/2019.)

 6     THE VIDEOGRAPHER:  We are now on the record.  My

 7  name is Eric Davidson.  I am the videographer for

 8  Golkow Litigation Services.

 9              Today's date is Wednesday, January 9th,

10  2019, and the time is approximately 9:10 a.m.

11              This video deposition is being held in

12  250 Hudson Street, 8th Floor, New York, New York in

13  the matters of National Prescription Opiate Litigation

14  for the United States District Court, Northern

15  District of Ohio.

16              The deponent is Mary Wood.

17              Please note counsel will be noted on the

18  stenographic record.

19              At this time the court reporter can now

20  swear in the witness.

21     THE WITNESS:  My last name has an "S" on it,

22  just so you know.

23     THE VIDEOGRAPHER:  I apologize.

24              (WHEREUPON, the witness was duly
```

Highly Confidential - Subject to Further Confidentiality Review

1        sworn.)

2                  MARY WOODS,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5                  EXAMINATION

6    BY MR. EGLER:

7        Q.    Ms. Woods, thanks for coming in today.  My

8    name is Tom Egler.  I am from a law firm called

9    Robbins Geller Rudman & Dowd, and we represent

10   Plaintiffs in this case.

11             Before we get going, I'm just going to

12   note for the record that your counsel has handed us a

13   number of exhibits today and we'll be going through a

14   number of them, but I want to note that Exhibit 25

15   will be a compendium of the first 24 exhibits.  And as

16   we go through 1 through 24, to the extent there are

17   people reading this after the fact, Exhibit 25 will be

18   a compendium of all 24 previous ones.

19             With that said, I'll hand you Exhibit 26,

20   or I'll mark it.

21                  (WHEREUPON, a certain document was

22                  marked Allergan 30(b)(6) - Woods

23                  Deposition Exhibit No. 26, for

24                  identification, as of 01/09/2019.)

```
 1    BY MR. EGLER:

 2         Q.    There you go.

 3               And, Ms. Woods, could you look at

 4    Exhibit 26, and after you've looked at it, tell me

 5    whether you've ever seen it before?

 6         A.    I can't recall reading this exact

 7    document, but I understand the subjects that I'm

 8    supposed to speak of are contained within this

 9    document.

10         Q.    Okay.  Great.

11               If you just want to hold on to that for a

12    second, I'm just going to ask you some preparatory

13    questions.

14               Ms. Woods, where do you work now?

15         A.    I work in Madison, New Jersey.

16         Q.    All right.  And for what company do you

17    work?

18         A.    I work for Allergan Finance, LLC.

19         Q.    Does Allergan Finance, LLC, as you

20    understand it, have a parent company?

21         A.    I would say the parent company would be

22    Allergan PLC.

23         Q.    All right.  Do you know anyone who works

24    for Allergan PLC directly?
```

```
 1        A.     It is not an operational company, as far

 2   as I understand.

 3        Q.     And when you say that, does that mean you

 4   don't understand that they have any employees, or

 5   something else?

 6        A.     I believe Stephen Kaufhold probably spoke

 7   about the entities under PLC, so I understand the

 8   division that I work for and the operational divisions

 9   but not necessarily how the entities are set up that

10   he would have spoken to.

11        Q.     All right.  Ms. Woods, do you have an

12   understanding that today you are here to testify on

13   behalf of an entity or entities?

14        A.     Yes, I do.

15        Q.     What entities are you here to testify on

16   behalf of?

17        A.     Allergan Finance, LLC, formerly known as

18   Actavis, Inc., formerly Watson Pharmaceuticals.  I

19   will also -- I -- not that I'm a company

20   representative for former affiliates, but to the best

21   of my abilities, I would also speak to those or answer

22   questions.

23        Q.     And what is your current position at

24   Allergan Finance, LLC?
```

```
 1        A.    I'm executive director of customer

 2   relations operations.

 3        Q.    So as executive director of customer

 4   relations, is it slash operations or dash operations?

 5        A.    No.  It's one title.

 6        Q.    Okay.

 7        A.    Customer relations operations.

 8        Q.    As executive director of customer

 9   relations operations, what are your job duties?

10        A.    My job duties are overseeing a few

11   different departments within the organization.

12        Q.    And what departments are those?

13        A.    Customer service for the US, customer

14   master and licensing for the US, and order management

15   for the US.

16        Q.    When you use that term "order management,"

17   what does the order management group at Allergan

18   Finance, LLC do?

19        A.    We manage order limits of the products.

20   We have a tool called ValueCentric and we monitor the

21   orders as they come into the system for inventory

22   management levels and we process the orders.

23        Q.    When you say you monitor the orders, why

24   do you monitor the orders that come in?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    We have distribution supply agreements

2  with our customers and they are required to stay

3  within particular inventory levels that obviously

4  continues to manage the inventory that we have with

5  inside of the company.  So it is really an inventory

6  management type of system.

7      Q.    So, have you ever been deposed before,

8  Ms. Woods?

9      A.    Yes.  One time.

10     Q.    When?

11     A.    At the second company, I -- this is my

12  third job, my second company I was with.

13     Q.    What was the name of the company you were

14  with when you were --

15     A.    Sun Process Converting.

16     Q.    Sun Process Converting?

17     A.    Correct.

18     Q.    Do you -- do you remember about when the

19  deposition took place?

20           Let me ask it this way.  Was it before the

21  year 2000?

22     A.    Yes.

23     Q.    All right.  So was it in the State of

24  California?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, it was not.

 2        Q.    Okay.  What state was it in?

 3        A.    Illinois.

 4        Q.    All right.  So, at some point in your

 5   career you started working for an entity called

 6   Watson, is that right?

 7        A.    That is correct.

 8        Q.    When did you start working for Watson?

 9        A.    It would have been 1998.

10        Q.    Okay.  When you started working at Watson,

11   do you remember what division or subdivision you

12   worked in at Watson?

13              Let me put it this way.  Can you describe

14   the part of the company that you worked in as you

15   would think of it?

16        A.    I would have worked under -- I believe I

17   would have worked -- I don't remember all of the

18   entities, I have to be honest with you, because it was

19   such a long time ago.  I believe I would have worked

20   under Watson Pharmaceuticals.

21        Q.    So when you worked at Watson, where did

22   you physically work?

23        A.    Initially I worked in Illinois.

24        Q.    And then did that change at some point?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.  I was relocated to California.

2      Q.     All right.  And then after some point did

3   you leave California?

4      A.     Yes, I did.

5      Q.     Okay.

6      A.     In 19 -- about five years ago.  I was in

7   California 14 years.

8      Q.     When you think about your time at Watson

9   in Illinois and California and now -- well, in

10  Illinois and California, did you have any -- let me

11  start over.

12             As you think of your time at Watson in

13  Illinois and California, was any part of your job

14  related to the -- related to the drugs covered by the

15  Controlled Substances Act, as you remember?

16     A.     Yes.

17     Q.     What part of your job was related to drugs

18  under the Controlled Substances Act?

19     A.     In California, under call center

20  operations, we had customer master and licensing that

21  reported in to me and that covered suspicious order

22  monitoring.

23     Q.     And did those responsibilities start when

24  you started in California?

1      A.     Yes, um-hum.

2      Q.     Do you remember about what time you

3   started working for Watson in California?

4      A.     I started at Watson in California in 1999.

5      Q.     All right.  So let's move into this

6   document that I've marked as Exhibit 26.

7             And can you turn to what is marked as

8   Page 6 of the exhibit.  And just to be sure, there

9   isn't any writing on your copy, is there?

10     A.     No, there is not.

11     Q.     Good.

12            So, now, can you look at the topics that

13  are listed there at 5, 6 and the beginning of Topic 8,

14  and can you just read them to yourself.

15            All right.  So Topic No. 5 is

16  identification of your policies and procedures

17  concerning your duties under the CSA or local and --

18  or state and local laws and regulations concerning the

19  diversion of opioids as well as any persons or

20  committees tasked with detecting diversion of opioids

21  or suspicious orders and whether the person's

22  compensation was based in whole or in part on levels

23  of sales of controlled substances or opioid products.

24            Have you prepared prior to today to

1    discuss this issue on behalf of your current employer?

2        A.    Yes.

3        Q.    All right.  So there is a term there that

4    says "diversion of opioids."

5              Do you see that?

6        A.    Yes, I do.

7        Q.    In the context of your work, what does

8    that term mean to you?

9        A.    So diversion of opioids under the CSA

10   would mean that we would have systems and processes in

11   place to -- the best to follow the rules and

12   regulations to avoid diversion of opioids.  And also,

13   if there was any suspect orders to report those to the

14   DEA.

15       Q.    Okay.

16             When you -- when you use that term

17   "diversion" in the context of your work, what does

18   that mean?

19       A.    Diversion to me would mean that it would

20   get diverted out of the supply chain to illicit

21   people, to illicit behavior.  Meaning that it would

22   not be used for what it was intended to be used for.

23       Q.    All right.  So thinking about Exhibit 5,

24   your counsel has handed me and you and a number of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    other people a document that we'll call, if you can

 2    hand me your copy, we'll put a -- I'll write on here

 3    Exhibit 27 with the understanding that at the break we

 4    are going to have essentially identical copies of this

 5    document.

 6                  (WHEREUPON, a certain document was

 7                   marked Allergan 30(b)(6) - Woods

 8                   Deposition Exhibit No. 27, for

 9                   identification, as of 01/09/2019.)

10    BY MR. EGLER:

11        Q.    But have you seen what I've marked as

12    Exhibit 27 before?

13        A.    Yes.  I helped prepare this.

14        Q.    Okay.  So how does Exhibit 27 that I've

15    just marked relate to the answer that you have for

16    Topic No. 5?

17        MS. LEVY:  Well, object to the form of that

18    question.

19    BY THE WITNESS:

20        A.    We have prepared, so what we did is list

21    the policies that relate to the regulations concerning

22    diversion of opioids, anti-diversion of opioids, and

23    also the comments on compensation section.

24    BY MR. EGLER:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  And so does the part that relates
 2   to Topic No. 5 cover the first three pages of this
 3   Exhibit 27?
 4        A.    It does.
 5        Q.    So let's go through this for a little bit.
 6              The first one there are five columns
 7   listed on the page.  The first one is just the number,
 8   the second is the topic, and the third one, it says,
 9   Documents and Notes and underneath is Policies and
10   Procedures.
11              Do you see that there?
12        A.    Yes, I do.
13        Q.    So what does the data in the Policy --
14   Policies and Procedures column mean?
15        A.    These were policies that we identified
16   that address the topic of the regulations that we were
17   following under the diversion of opioids.
18        Q.    And with regard to these various policies
19   that are listed here, how did you go about finding
20   them?
21        A.    So we did -- obviously we did a computer
22   search in all of my network files on my computer, we
23   also went through all of my meeting notes, e-mails,
24   other people that we identified within the company
```

1    that would have information.  We met with people, we

2    interviewed different people in the company that had

3    responsibilities and the affiliate companies.  We went

4    through any type of meeting minutes, documents.  We

5    went through our monitoring systems, anything and

6    everything that had to do with the suspicious order

7    monitoring programs that we could come up with.

8         Q.    All right.  And then the next column over

9    is listed as primary persons.

10            And what is the data that is listed under

11   that column?

12        A.    So, those are the identifications of the

13   people that had responsibilities under the policies

14   and procedures or to help identify suspect orders as

15   we identified it under this topic.  And so we listed

16   the primary people that had responsibilities.

17        Q.    Okay.  So one of the corporate names

18   that's listed under Primary Persons, about a third of

19   the way down the page on the first page of Exhibit 27,

20   is Actavis Inc. and there is no comma there.  Earlier

21   today you had pointed out that there is an entity

22   known as Actavis, Inc.

23            Do you recognize a difference between

24   those entities?

```
 1        A.      Absolutely.

 2        Q.      Okay.  What is the difference as you think

 3    about it between those two entities?

 4        A.      Actavis Inc. was prior to Watson

 5    purchasing Actavis and then Actavis, Inc. was the name

 6    after Watson purchased Actavis.

 7        Q.      All right.  So, and then moving over to

 8    the right-hand column, it says, "preparation work

 9    done."

10                What does the data in that column

11    represent?

12        A.      In order to be prepared to respond to all

13    of these questions and give you as much information as

14    we could possibly find, we conducted all of this

15    different preparation work.  I think personally I did

16    between 80 and 100 hours myself just to prepare.

17        Q.      Okay.  When did you start preparing?

18        A.      I want to say, maybe, May, June of last

19    year.

20        Q.      And who -- did anyone who works for you at

21    Allergan help you prepare?  Rather than you

22    interviewing them, did anyone who works at Allergan

23    help you prepare for this -- this project?

24        A.      I wouldn't say anybody inside of the
```

1    company.  Obviously I got guidance from Jenny and

2    obviously Kaitlyn, but I think I probably helped them

3    a lot to tell them where information would be and

4    which company, what systems.  I think -- I mean, they

5    gave me guidance, but I probably told them what

6    systems, what files, what policies pertained, who in

7    the company would be the right people to get ahold of,

8    so on and so forth.

9        Q.    All right.  And Jenny and Kaitlyn that you

10   referred to are your counsel who are here today, is

11   that right?

12       A.    That is correct.

13       Q.    All right.  So let's go through these,

14   under the Primary Persons column on the first page of

15   Exhibit 27 there are, again, these entity names,

16   Watson Pharmaceuticals, Inc.

17       A.    Uh-huh.

18       Q.    As you think of it, what is or was Watson

19   Pharmaceuticals, Inc.?

20       A.    So, Watson Pharmaceuticals, Inc. was the

21   company that actually did all of the purchasing of the

22   rest of the companies.  They were the first company in

23   existence.  And they purchased Actavis Inc.  After

24   they purchased Actavis Inc., the name changed to

Highly Confidential - Subject to Further Confidentiality Review

1   Actavis, Inc.  Actavis, Inc. then purchased Allergan

2   and the company's name changed to Allergan.

3       Q.    Okay.  But as you think of it, this -- for

4   lack of a better term, the surviving entity throughout

5   all of these mergers is what was formerly known as

6   Watson Pharmaceuticals, Inc., is that right?

7       A.    Well, after -- after the purchase -- after

8   the purchase of Allergan and the change of the name to

9   Allergan, Allergan sold the generic divisions, which

10  would have been all of the products under -- all of

11  the generic products under Watson Pharmaceutical and

12  all of the generic products under Actavis Inc. to

13  Teva.

14      Q.    Okay.

15      A.    So I don't know if you could say "the

16  surviving" because it's not actually -- Allergan

17  Finance, LLC does not own generic products at this

18  point.

19      Q.    So, as you understand it, all three of

20  these entities that are listed on the first page of

21  Exhibit 27, Watson Pharmaceuticals, Inc., Actavis

22  Inc., and Allergan Finance, LLC all sold or currently

23  sell opioid prescription drugs, is that right?

24      A.    That would be correct.

1    Q.    Do you have recollection of -- well, let's

2    start with Allergan Finance, LLC.

3          Does Allergan Finance, LLC currently sell

4    any opioid prescription drugs?

5    A.    Two.

6    Q.    Okay.  Which ones?

7    A.    Kadian and Norco.

8    Q.    All right.  And those are both -- well, I

9    guess, brand name drugs?

10   A.    Yes, they are.  Correct.

11   Q.    And we just used the term "brand name" and

12   I think you had earlier used the term "generics" as

13   common names.

14         As you think about those two terms, is

15   there any other way to describe a drug other than

16   being a generic or brand name as you think about it in

17   that context?

18   A.    I do -- I don't think so.  I think that

19   would be relevant.

20   Q.    Okay.  Okay.  And then there is

21   Actavis Inc., and with the understanding that the

22   generics, as you described, were at some point sold

23   off, including those generics prior to the divestment,

24   do you have an understanding of what -- let me start

1    over.

2            Right now -- because I asked this wrong.

3            Right now Actavis LLC sells those -- those

4    two brand name drugs, Kadian and Norco.  Earlier they

5    sold more than that, is that right?

6        MS. LEVY:  You said Actavis LLC, I think you --

7    BY MR. EGLER:

8        Q.    I'm sorry.

9            Currently Allergan Finance, LLC sells two

10   brand name opioid prescription drugs, but they have

11   sold more than that in the past, is that correct?

12       A.    I don't think under Allergan Finance, LLC

13   they did.

14       Q.    Okay.

15       A.    It would have been under Actavis, Inc.

16       Q.    Okay.  So under Actavis, Inc., what -- can

17   you give me a listing of all the opioid prescription

18   drugs, generic and brand name that were sold?

19       A.    I would like to think my memory was that

20   good, but I doubt very much I could do that.

21       Q.    Okay.

22       A.    There were more than Kadian and Norco, but

23   I wouldn't have that list off the top of my head.

24       Q.    Okay.  Are you aware whether -- well, how

1   about for Watson Pharmaceuticals, Inc., do you have a

2   memory of what opioid prescription drugs Watson

3   Pharmaceuticals, Inc. sold while you were there?

4        A.    I mean, I -- I would be able to recall a

5   few of them, but I don't know if I could recall all of

6   them.

7        Q.    Okay.

8        A.    Because Kadian and Norco both have generic

9   products as well, right.  So the generic products for

10  both Kadian and Norco were sold by Actavis, Inc. and

11  the generic for Norco would have been sold under

12  Watson Pharmaceuticals, and there were most likely a

13  couple additional under Actavis, Inc. as well, but I

14  may just not know what they are.

15       Q.    And Watson Pharmaceuticals, Inc. sold

16  generic Kadian, is that right?

17       A.    No, that would have been -- they -- they

18  could have, but I'm most familiar with it under

19  Actavis, Inc., because Kadian was brought into the

20  company at the acquisition of Actavis Inc. and that's

21  the time that we also had the generic product, but I

22  do believe there was an overlap on one of the

23  products.  I just can't remember if that was the one.

24       Q.    Okay.  And I appreciate you putting it

1    that way, because today isn't supposed to be like a

2    trivia test.  It's supposed to get questions and

3    answers.  And there will be an opportunity if -- if

4    you don't have information, for me to ask your counsel

5    for it.  So I appreciate the effort that you've made

6    to get prepared for today and -- and if you don't have

7    the answers, you know, just tell me and that's fine.

8         A.    That's -- yeah.

9         Q.    All right.

10        MS. LEVY:  And just for the record, those

11   questions about product entity and product lists are

12   beyond the scope of Topic 5.

13   BY MR. EGLER:

14        Q.    For the three entities that are listed

15   here, Watson Pharmaceuticals, Inc., Actavis Inc., and

16   Allergan Finance, LLC, they did all sell opioid

17   prescription drugs, is that right?

18        A.    That is correct.

19        Q.    So, beyond the opioid prescription drugs,

20   did these three entities sell other controlled

21   substances?

22        A.    Yes.

23        Q.    Okay.  As you think of it, with Watson

24   Pharmaceuticals, Inc., beyond the opioid prescription

Highly Confidential - Subject to Further Confidentiality Review

```
 1    drugs, what other controlled substances did Watson

 2    Pharmaceuticals, Inc. sell?

 3         A.    They sold Schedules III through V, I

 4    believe.  I -- I don't have a complete list of

 5    everything, but they do sell other schedules other

 6    than C-IIs that were opioids.

 7         Q.    And just to be clear, are opioids the only

 8    drugs on Schedule II of the Controlled Substances Act?

 9         A.    I do not believe so.

10         Q.    Okay.  Do you have memory as to whether

11    Watson Pharmaceuticals, Inc. sold any non-opioid drugs

12    that were listed as Schedule II on the Controlled

13    Substances Act?

14         A.    I -- I really can't recall.

15         Q.    Okay.  So for the suspicious order

16    monitoring systems that we are talking about today, do

17    you remember whether any drugs other than opioids were

18    required to use the suspicious order monitoring

19    systems?

20         A.    Every -- every controlled substance went

21    through SOMS, every control, C-II through C-V.

22         Q.    All right.  So with regard to -- so we are

23    talking about the various levels of controlled

24    substance, Schedules II through V, and we've been
```

```
 1   talking about brand name and opioid drugs, right?

 2            And so you had said that every opioid --

 3   every controlled substance has to go through a

 4   suspicious order monitoring system?

 5        A.   That's correct.

 6        Q.   And does -- as you think about it, does

 7   every opioid in your experience at Watson, Actavis

 8   Inc. and Allergan Finance, LLC -- let me start over.

 9            In your experience at Watson, Actavis and

10   Allergan Finance, LLC, did every controlled substance

11   go through the same suspicious order monitoring

12   system?

13        A.   So let me just make one clarification.

14   Allergan Finance, LLC is not a DEA registrant.  So

15   let's just stop with that one --

16        Q.   Uh-huh.

17        A.   -- for one second, okay.

18        Q.   Let me -- before we get -- Actavis, Inc.

19   was a DEA registrant, right?

20        A.   Actavis, Inc. was a DEA registrant.

21   Allergan Finance, LLC is not a DEA registrant.

22        Q.   Okay.

23        A.   Okay.

24            Watson Pharmaceuticals, Inc. had a
```

1    different suspicious monitor ordering system than

2    Actavis Inc. because they were separate companies.

3        Q.    So, at Watson Pharmaceuticals you

4    testified that there were Schedule II through V

5    controlled substances at the company.

6            Did all of the controlled substances go

7    through the same suspicious order monitoring system or

8    was there a different SOM for each drug or something

9    else?

10       A.    Every controlled substance goes through.

11   The CSA doesn't differentiate that you can be more

12   lenient on some controlleds than others.

13       Q.    All right.

14       A.    They all go through the same suspicious

15   order monitoring system.

16       Q.    All right.  And do you have an

17   understanding as to whether that was the case at

18   Actavis no comma Inc. as well?

19       A.    My understanding is that that was the same

20   for Actavis Inc. as well.

21       Q.    And how about for Actavis comma Inc.?

22       A.    Yes, same for them as well.

23       Q.    All right.  So for all three of these

24   entities with the understanding that the third is

Highly Confidential - Subject to Further Confidentiality Review

1    Actavis, Inc., not Allergan Finance, LLC, each of them

2    had at any given time one suspicious order monitoring

3    system that every Controlled Substances Act-eligible

4    drug would have been processed through, is that right?

5         A.    That is correct.

6         Q.    All right.

7               So, with regard to your time at Watson

8    Pharmaceuticals, Inc., when you think of the volume of

9    drugs going through the suspicious order monitoring

10   system, about what percentage of the volume was made

11   up by prescription opioid drugs?

12        MS. LEVY:  Objection; far beyond the scope of

13   the corporate representative topics.

14               You can answer to the extent you know.

15   BY THE WITNESS:

16        A.    I can give you an idea of maybe

17   the percent that pended, if that will help.  In some

18   years, I mean, we did do metrics, I can give you an

19   idea, so an average amount that pended of the orders

20   was probably between 30 and 40 percent.

21   BY MR. EGLER:

22        Q.    When you say the "amount that pended,"

23   what does that mean?

24        A.    That would mean that it would block in our

Highly Confidential - Subject to Further Confidentiality Review

1  system by one of the parameters that were set up and

2  it would have to be reviewed and investigated.

3      Q.    Do you have an understanding with regard

4  to Actavis Inc. what the volume of prescription

5  opioids drugs was with regard to their entire volume

6  being passed through the suspicious order monitoring

7  system?

8      MS. LEVY:  Object to the form.

9          You can answer.

10 BY THE WITNESS:

11     A.    I'm sorry.  Can you rephrase that?  Are

12 you -- are you looking for the same answer?

13 BY MR. EGLER:

14     Q.    Yes, for -- the same question for Actavis

15 Inc.

16     A.    Their system worked different, so I don't

17 necessarily have a percent of -- of orders that were

18 controlled substances.  Their system worked different

19 and their reports were different and it was an

20 inventory management/order management -- order

21 management SOMS report, so it was different, so I -- I

22 can't really give you a percent.

23     Q.    And how about for Actavis Inc., do you

24 have an understanding of --

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Actavis Inc. system was the same system as

2   the Watson system.

3        Q.    So would it be fair to say, as you think

4   of it, about 30 percent of the drugs that were pended

5   were prescription opioid drugs, is that fair to say?

6        A.    No, I think that that's not the right

7   context, so --

8        Q.    Okay.  Good.

9        A.    -- let me clarify that for you.

10             What we did is the metric was, of these

11  controlled substance orders that came in -- of the

12  controlled substance orders that came in, how many

13  pended, it -- because all controlleds went through the

14  system, it didn't say how many were opioids.  It said

15  how many controlled substance orders pended that

16  needed to be reviewed.

17       Q.    Uh-huh.

18       A.    Of the controlled substance orders that

19  came into the system, the percent that pended would

20  have been around 30 percent or so.  Okay.  It doesn't

21  really say how many of those orders contained opioids,

22  because remember, our controlled substance system

23  monitors all controlled substances, not just opioids.

24       Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    So I can't give you a percent that says,

 2   this many orders had opioids on them.

 3        Q.    Okay.  All right.

 4              All right.  Let's move on in this

 5   Exhibit 27 to Page 4.  And at the top left corner of

 6   the page there is Column 6 and then there is a topic

 7   and I'll read the topic into the record.

 8              "Identifications of your policies and

 9   procedures for, and the identities of all persons

10   responsible for, monitoring suspicious orders or

11   potential diversion of opioids or opioid products or

12   for auditing or investigating suspicious orders or

13   potential diversion of opioids or opioid products and

14   (a) identification of your systems or processes to

15   disclose suspicious orders of opioids or report

16   potential diversion of opioids or opioid products; and

17   (b) identification of your systems or processes to

18   report or halt sales to those involved in any

19   suspicious orders of opioids or opioid products or

20   potential diversion of opioids or opioid products.

21   This topic also seeks information regarding any and

22   all third parties, including UPS or any other third

23   party, that took" -- "performed these functions on

24   your behalf as well as all persons who interacted with
```

1    UPS or any third party."

2            So this is the second topic that you have

3    been designated to testify about, is that correct?

4        A.    That's correct.

5        Q.    Did the work that you do -- did the work

6    that you did to prepare for this topic -- well, what

7    did you do to prepare for this topic?

8        A.    So, again, based on the topic, we went

9    through and evaluated all of the policies that were

10   relevant to the topic.  Also, all of the people that

11   were relevant to the topic, and then identified all of

12   the people that we would have needed to discuss this

13   topic with to make sure that we had all of the correct

14   information, went through my computer, all of my

15   network files, the same as we did for the first topic.

16   We prepared equally for this topic.

17       Q.    So on the fifth column on this Page 4 of

18   Exhibit 27, at the top it says, "UPS contracts."

19            Do you see that there?

20       A.    Yes, I do.

21       Q.    So what is UPS in the context of that

22   column?

23       A.    UPS is a third-party distributor DEA

24   registrant.  In the context of -- so each company was

1    different, but they are a third-party distributor, so

2    that's what those contracts are related to.

3        Q.    And I -- I want to clarify a word that you

4    used.  In the context of this case, there are entities

5    known as distributors and it is like McKesson and

6    AmerisourceBergen and Cardinal Health.

7             Is -- as you think of it, is UPS the same

8    type of distributor as McKesson or Cardinal Health?

9        A.    They're -- in the context that we would be

10   using it today, they were a -- they were retained with

11   a master service agreement to warehouse and distribute

12   the products for Actavis Inc. and Allergan Finance,

13   LLC, meaning warehousing and distribution.

14       Q.    And that -- that -- all right.

15            So is it fair to say that UPS might

16   deliver to entities such as AmerisourceBergen and

17   Cardinal Health?

18       A.    Yes, that would be correct.

19       Q.    So as you have looked at the documents,

20   what is your understanding of the services that UPS

21   provided to Actavis Inc. and Actavis, Inc.?

22       A.    My understanding of what they provide, I'm

23   not extremely familiar with everything under Actavis

24   Inc., my understanding is their responsibility was to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   ware- -- they are a DEA registrant.  They are

 2   responsible to warehouse the products.  And because

 3   they are a DEA registrant, on their own behalf they

 4   would have a SOM system, the -- and a process and

 5   procedure under CSA as well.

 6        Q.    So under Actavis Inc. and Actavis, Inc.,

 7   did UPS provide the entire SOMS system for those

 8   entities or did the entities, Actavis Inc. and

 9   Actavis, Inc., have their own SOMS system separate

10   from UPS?

11        A.    Actavis, Inc. did not use UPS.  They had

12   their own warehouse.  And Actavis Inc. had a SOM

13   system and used -- and UPS had a SOMS system.

14        Q.    And -- all right.  So what was the -- let

15   me start over.

16             At some point the service that UPS

17   provided to the Actavis or Allergan entities changed,

18   is that fair to say?

19        A.    Yes, the contract changed from the

20   Actavis Inc. contract to Allergan Finance, LLC

21   contract.

22        Q.    And what is the Allergan Finance, LLC

23   contract with UPS?

24        A.    It's a similar contract.  It would just be
```

1   changed, obviously, the entity name would not be the

2   same because we are not Actavis Inc.

3        Q.    So Actavis Inc. without the comma was a --

4   was a physical manufacturer of opioids, is that right?

5        A.    Yes.  They were a DEA registrant

6   manufacturer.

7        Q.    And they -- there is a factory in

8   Elizabeth, New Jersey that they owned that

9   manufactured opioids, is that right?

10        A.    That's correct.

11        Q.    Have you ever heard of the entity called

12   Actavis Elizabeth LLC?

13        A.    Yes, I have.

14        Q.    What does that term mean to you?

15        A.    I'm -- I'm not extremely familiar with it,

16   but I know that they were a manufacturing facility.

17        Q.    Okay.  And as you think of it, did Actavis

18   Elizabeth ever manufacture opioids for Watson before

19   Watson bought Actavis?

20        A.    Not that I recall, but then again, I

21   wasn't responsible for purchasing or marketing.

22        Q.    All right.  Did Watson Pharmaceuticals,

23   Inc., when you worked there, physically manufacture

24   any of its own opioids?

```
 1        A.    Yes, I believe so.

 2        Q.    Do you remember which ones?

 3        A.    Well, hydrocodone is an opioid now and

 4  they manufactured that.  I cannot remember if they --

 5  they might have done Norco, but it might have also

 6  been outsourced at some point.  I would actually need

 7  to look it up.  I don't want to give you information

 8  I'm not sure of.

 9        Q.    That's fine.

10              And you mentioned the term "Norco."

11  Watson Pharmaceuticals, although you are not clear

12  about whether it feign -- make -- physically

13  manufactured Norco, it sold and marketed Norco, is

14  that right?

15        A.    It did sell and manufacture Norco.

16        Q.    All right.  All right.  So let's move on

17  into this document to Page 7.  And this is Page 7 of

18  Exhibit 27.

19              And in the far left-hand column, it states

20  Exhibit -- or No. 8, and it states, I'll read into the

21  record:

22              "The identify" -- "The identity of persons

23  responsible for developing or implementing training of

24  your sales and marketing departments, including for
```

1   developing or implementing any written materials or

2   instructions to your marketing or salespeople

3   regarding promoting or selling opioids or opioid

4   products or for developing or implementing any

5   training on identifying, reporting, or investigating

6   the possible diversion of opioids or opioid products

7   or identifying, investigating, or reporting suspicious

8   orders."

9           Do you see that there?

10    A.    Yes, I do.

11    Q.    All right.  And is this a topic that you

12  worked on and prepared for testimony today?

13    A.    Not the -- not the sales portion of it

14  because I can't really address how salespeople were

15  trained.  I could speak to you about, you know,

16  additional training for our teams that carried out the

17  SOMS responsibilities.

18    Q.    All right.  So let's talk about this for a

19  little bit.

20           In -- in the column under Documents and

21  Notes there, there are some names listed and some

22  entities.  And they -- they are limited to this page,

23  this Page 7.

24    A.    That's correct.

```
 1        Q.    So when -- let's start with Watson

 2   Pharmaceuticals, Inc.  Underneath there -- well, let

 3   me start over.

 4              The column says "People Responsible for

 5   SOM/Diversion Training" and it says "Watson

 6   Pharmaceuticals, Inc." and then it has your name --

 7        A.    Uh-huh.

 8        Q.    -- the name Tom Napoli --

 9        A.    Uh-huh.

10        Q.    -- and the name Tracey Hernandez, and the

11   name Sandra Simmons.

12        A.    Correct.

13        Q.    And who is Tom Napoli?

14        A.    Tom Napoli was a -- a director in our

15   controlled substance compliance team.

16        Q.    All right.  And who is Tracey Hernandez?

17        A.    Tracey had a similar role as Tom.  She was

18   also a director in our controlled substance compliance

19   team.

20        Q.    All right.  And then who is Sandra

21   Simmons?

22        A.    Sandra Simmons reported to me and she was

23   a manager support services, contained two teams.  It

24   was our customer master and license team and they were
```

Highly Confidential - Subject to Further Confidentiality Review

1   responsible to oversee the review and investigations

2   first level of suspicious orders --

3        Q.    So --

4        A.    -- order of interest.

5        Q.    -- I want to get an understanding of the

6   term "training."

7             For each of these four people that are

8   listed there under Watson Pharmaceuticals, Inc., can

9   you tell me what their various responsibilities were

10  with regard to SOM and diversion training?

11       A.    Sure, absolutely.

12            So, Tracey and Tom were the primary.  They

13  were -- they were more on the regulatory and

14  compliance side that worked directly with the DEA,

15  understanding CSA and any regulatory requirements for

16  anything around controlled substances, the Controlled

17  Substances Act, requirements and regulations for the

18  company, and they would work directly with our team

19  and explain to us what our requirements were for

20  suspicious order monitoring.  They would assist to --

21  or write the company's CSOP, corporate standard

22  operating procedures, and we would go to training with

23  them, and then we would write operational procedure

24  documents, they would review them.  So they were the

Highly Confidential - Subject to Further Confidentiality Review

 1    key on the regulatory and compliance side that would

 2    then triage down or trickle down the types of training

 3    that we needed.

 4         Q.    Now, in the answer you just gave, you used

 5    the word "we" and "our team" and -- and things like

 6    that.  I want to get an understanding of the -- the

 7    size and location at Watson Pharmaceuticals, Inc. of

 8    the -- the team that you are referring to for the SOM.

 9              So I guess let me ask questions and if

10    there is a better way to ask questions, let me know as

11    we are going through this.

12         A.    Sure.

13         Q.    Let me know.

14              So what was the group of people that you

15    are referring to as the team that was working on the

16    SOM?

17         A.    Yeah, so the customer master license team,

18    it was not large.  It was three to four people.  So it

19    was small.  That would oversee the orders that pended.

20    There was a segregation of duty between people

21    entering orders and people that would evaluate the

22    orders.

23         Q.    And do you remember who was on the team

24    when you worked at Watson Pharmaceuticals, Inc.?

```
 1        A.    I can recall some of the people.

 2        Q.    Okay.  Can you tell me who they are?

 3        A.    So, it would have been Mary Moskello,

 4   Larry Shaffer, Vicky Lepore and Sandra Simmons.

 5        Q.    And Vicky Lepore, what was her

 6   responsibility while you were at Watson

 7   Pharmaceuticals?

 8        A.    So she worked on customer master, setting

 9   up our -- this is to the best of my recollection --

10        Q.    Uh-huh.

11        A.    -- because people obviously change roles

12   and things --

13        Q.    Yes.

14        A.    -- right, so I'm trying to remember

15   everything.

16        Q.    And you were there for more than a decade,

17   right?

18        A.    I have been there 23 years, so it is hard.

19   You know, some things blend together.  But I think I

20   am pretty accurate about what their roles have been

21   over time, and they don't change significantly, right.

22              So customer master, they would set up

23   customers, they would ensure they had all of the

24   correct licenses for purchasing controlled substances
```

1    and that they were valid all of the time.  They would

2    ensure that policies were up-to-date and worked with

3    the controlled substance compliance department.  They

4    would go to annual DEA training.  They would -- when

5    the orders pended, they would follow the operational

6    procedure documents for the review and investigation,

7    escalation processes.  So that was Vicky's primary

8    role.  Each one of the other people had similar roles

9    but maybe not as many responsibilities.  She was more

10   of a senior-level person.

11        Q.   You -- you had used the term in the --

12   your answer, "customer" and that Vicky Lepore set up

13   the customers and their data.

14             As you think of it, at Watson

15   Pharmaceuticals, Inc., you use that term "customers,"

16   can you tell me -- can you give me examples of those

17   customers?

18        A.   Customers in our system are only people

19   that we would sell direct to that would be vetted for

20   controlled substances and set up as a direct customer

21   that we would ship to.

22        Q.   So would that include, say, the -- the

23   distributors that I was talking about, like McKesson

24   and Cardinal and AmerisourceBergen?

```
 1        A.    Yes, that would be a customer.

 2        Q.    All right.  But a, say a -- a pharmacy

 3   down the street in Corona, California would not be a

 4   customer, is that true?

 5        A.    That is correct, we did not sell to any

 6   pharmacies, not -- no independent pharmacies.

 7        Q.    Did you sell to chain pharmacies?

 8        A.    Certain chain pharmacies, not all chain

 9   pharmacies.

10        Q.    And some chain pharmacies are licensed as

11   distributors to themselves, is that fair to say?

12        A.    If they were --

13        Q.    If that's a -- I know you are not

14   prepared --

15        A.    Warehousing chains, you know the

16   difference between a warehousing chain and a

17   non-warehousing chain?

18        Q.    I don't.  But can you tell me generally

19   what you are talking about?

20        A.    A warehousing chain means that they

21   purchase the drugs from you into, like, a central, or

22   multiple distribution centers, and then they

23   distribute them out to their locations.

24        Q.    All right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    And a non-warehousing chain has the

 2   wholesalers purchase for them and then the wholesaler

 3   sends them out to their locations.

 4       Q.    All right.

 5             Do you remember whether, when you were

 6   working at Watson Pharmaceuticals, Inc., there was

 7   ever an effort to identify and understand the

 8   customers of your customers as they were ordering

 9   controlled substances?

10       A.    At some point we did.  I don't remember if

11   it was under Watson Pharmaceuticals or Actavis, Inc.

12   It wasn't really much of a guidance from DEA in the

13   early years.  It was in the later point in time.

14       Q.    Do you remember when that shift took

15   place, about?

16       A.    I think it was probably more around 2011,

17   2012.

18       Q.    Do you remember what the reason for the

19   shift was?

20       A.    Well, of course, obviously I think it's --

21   it's apparent that when opioids were becoming more

22   prevalent they wanted you to understand more about who

23   your customer was selling the product to.

24       Q.    All right.  So the next line down there,
```

```
 1   Actavis Inc., with the understanding that you never

 2   worked for Actavis Inc., do you have an understanding

 3   of who Rachelle Galant was or Rachelle Galant?

 4        A.    Yes.  Rachelle Galant worked in marketing

 5   at Actavis Inc.

 6        Q.    How about Nancy Baran?

 7        A.    Nancy Baran worked in customer service.

 8   She was the director of customer service at Actavis

 9   Inc.

10        Q.    And then Jinping McCormick?

11        A.    She was director of the marketing

12   department and I believe Rachelle reported in to

13   Jinping.

14        Q.    Have you ever met Dr. McCormick?

15        A.    No, not at all.

16        Q.    Do you have an understanding of who

17   Ms. Galant, Ms. Baran and Dr. McCormick were

18   responsible for training at Actavis Inc.?

19        A.    So, I do know Nancy and I do know Rachelle

20   and I believe Nancy had an active role to train her

21   customer service team at Actavis Inc.  She was

22   familiar with the CSA and was instrumental in

23   assisting to -- with their systems.

24             And -- and I believe Rachel was also --
```

Highly Confidential - Subject to Further Confidentiality Review

1    I -- I can't say who Rachelle actually trained, but I

2    know she was very -- very involved in helping create

3    some of the policies on how SOMS was going to be

4    handled, especially around 2012 when they made some

5    changes in their process and she was very instrumental

6    in that process.

7         Q.    Do you know about how many people were on

8    the customer service team that you referred to at

9    Actavis Inc.?

10        A.    I think when the acquisition happened and

11   we worked with Nancy, I would say maybe five, six.

12        Q.    Do you know what their various roles were?

13        A.    I can't say directly what all of their

14   roles were.  I'm not that familiar if they had

15   different roles from one another.  I -- I really

16   can't.

17        Q.    Now, since we are talking about it in this

18   context, I'm going to take kind of a sidestep.

19             At some point Watson Pharmaceuticals, Inc.

20   merged with or bought Actavis Inc., is that right?

21        A.    We -- yes, Watson Pharmaceuticals did

22   acquire Actavis Inc., that is correct.

23        Q.    And when that happened, what took place

24   with regard to the SOM and diversion people and

1    policies?

2        A.    After Watson Pharmaceuticals purchased

3    Actavis Inc., the -- it -- it resorted to using the

4    Watson Pharmaceuticals system.

5        Q.    So as we are talking about this, I want to

6    put it in the context of a -- physical locations

7    and -- and so with regard to Watson Pharmaceuticals,

8    Inc. as you think of the -- the SOM system while you

9    worked there and the people who were involved, were

10   they all located in one place or multiple places or

11   something else?

12       A.    So let me think about this for a second.

13   I have to think about the years.

14       Q.    Right.

15       A.    So I think -- I think we purchased them in

16   2012 and we --

17       Q.    So can --

18       A.    -- we completed it at the beginning of

19   2013.

20       Q.    Can we start with Watson Pharmaceuticals,

21   Inc.?

22             When you worked there before the merger on

23   a -- on a physical level, was everybody in one place

24   or in multiple places?

1    A.    Yeah.  It was bicoastal.

2    Q.    Okay.

3    A.    So customer relations, the customer

4  service people were located in Corona, California and

5  the master data license people were located in

6  New Jersey.

7    Q.    What was the role of the master data

8  license people?

9    A.    That would have been the description I

10  gave you with Vicky Lepore and Mary Moskello.

11    Q.    All right.

12    A.    Okay?

13    Q.    And then did that change at any time while

14  you were at Watson Pharmaceuticals, Inc. before the

15  Actavis merger?

16    A.    It did not change before the Actavis

17  merger, no.  Well, before the -- I'm sorry.  Before

18  the Actavis merger, I would say in -- back in about

19  2003 it did change.  We changed computer systems and

20  when we changed computer systems and went to SAP, we

21  did segregate the roles more.  And so at the time we

22  went into SAP, we did separate roles because of

23  segregation and duty and at that time we developed

24  smaller teams and that's when this team came into

Highly Confidential - Subject to Further Confidentiality Review

1    play.

2        Q.    Okay.

3        A.    It was probably around 2003.

4        Q.    All right.

5        A.    The time that that occurred.

6        Q.    All right.

7        A.    So it had been in place for obviously

8    quite a long time by that point.

9        Q.    And then when the two entities merged,

10   Watson Pharmaceuticals, Inc. and Actavis Inc., can you

11   describe -- well, let's start out with your

12   understanding of how Actavis Inc. was set up prior to

13   the merger, their SOM and diversion systems?

14       A.    So in approximately -- so Actavis Inc.'s

15   SOM program, they had been running a parallel system

16   in about 2011 into 2012, which was a combination of

17   utilizing ValueCentric's Safe and Secure.  And Cegedim

18   Dendrite, I'm going to use both names because they

19   changed their name a little bit frequently, it was

20   Buzzeo and then they changed to Cege -- to Dendrite

21   and then to Cegedim, so I'm not sure what name people

22   will recognize them by.

23       Q.    I have the same issues, so we'll -- to the

24   extent we can clarify this, we will, but --

```
 1       A.     Okay.

 2       Q.     -- I understand what you are talking

 3   about.

 4       A.     I think at the time they were under

 5   Cegedim, to be honest.

 6       Q.     Okay.

 7              Can you spell your understanding of

 8   Cegedim for the court reporter?

 9       A.     Let me --

10       Q.     Is it C-e-g-e-d-i-m?

11       A.     M, correct.  They are now IQVIA.

12       Q.     All right.

13       A.     So if you need to know their name today,

14   they are owned by IQVIA.  Many of the same people are

15   still there.

16       Q.     All right.

17       A.     And so at the time they were operating

18   under those two systems, ValueCentric for indirect

19   data, Safe and Secure, and the Cegedim system for the

20   standard SOMS program.

21       Q.     Okay.  You used that term "Safe and

22   Secure."

23       A.     Um-hum.

24       Q.     What's your understanding of that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    So my understanding of Safe and Secure,

 2   I'm familiar with it, is utilizing, I don't know if

 3   you're familiar with -- all of these acronyms, I'm so

 4   sorry, it is just how the industry is, right?

 5        Q.    Yes.

 6        A.    So EDI data, electronic data, interchange

 7   data that we use to manage orders and data in the

 8   industry is also utilized in ValueCentric's model.

 9   And the ValueCentric's Safe and Secure model utilizes

10   what they call 867 data.  The Safe and Secure model

11   that they went to for indirect, meaning customers that

12   they don't sell to, that the wholesalers sell to or...

13   867 is from when the wholesaler buys the product and

14   they sell it downstream.  It's who they sell it down

15   to.

16              They also bought another module to my

17   understanding called Market Visibility from

18   ValueCentric.  The reason you have to do that is

19   because customers don't -- don't want you to see what

20   they are buying, so they -- what they do is they call

21   it, they blind their data so you can't see who they

22   are.  So if you buy this Market Visibility data it

23   kind of un-blinds it or it uses an algorithm that

24   helps you understand who they are.  It's not perfect,
```

1    but it does help you get down to who they are.

2        Q.    Uh-huh.

3        A.    So that's what Safe and Secure is, is

4    it -- it gives you that 867 data and it does -- it

5    does have other algorithms behind it along with those

6    two things, but those are very -- two important

7    things, and it gives you some other safe and secure

8    module.  So Safe and Secure is basically somewhat of a

9    SOMS module in and of itself.

10       Q.    Do you know when the pre-merger Actavis

11   Inc. adopted the Safe and Secure ValueCentric module?

12       A.    If I'm going from memory, I'm going to say

13   it was earlier than they implemented everything else.

14   I want to say it was around 2010.  I think -- let me

15   see.  I might actually have that on one of the pages

16   of my notes.

17             2011.

18       Q.    All right.  With regard to the

19   ValueCentric Safe and Secure module, what's your

20   understanding of how that would inform the pending of

21   an order in a suspicious order monitoring system?

22       A.    So, the actual -- the actual Cegedim

23   system would have been monitoring all of the orders

24   and would have done the pending.  And then the Safe

1    and Secure module would have been allowing them to go

2    and look at data of where it was going.  They could

3    have gone into the Safe and Secure module before

4    releasing any order to get a better idea of where

5    inventory was going to make a decision, a good

6    decision on should we or should we not release this,

7    do we need to go get more justification, do we need to

8    have a call with the customer, information providing

9    to their DEA, to Kelly Smith, or their DEA team to

10   say, Hey, does this look suspicious.

11            So it is just good data to see, is there

12   multiple wholesalers providing the same product,

13   because the DEA doesn't provide that, so you have to

14   say, Where can I go to see that information.

15       Q.    So just so I'm clear, as you think of it,

16   the Safe and Secure ValueCentric data did not inform

17   whether an order would pend, but whether a pended

18   order should be cleared?

19       A.    I can't -- no, no, no, no, no, that's not

20   what I said.

21       Q.    Okay.  Okay.

22       A.    I said the -- I don't believe that that's

23   what they used it for because their SOM -- they had a

24   SOM system --

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.

 2          A.     -- which would have been the Cegedim

 3   system.

 4          Q.     Right.

 5          A.     That is a SOM system.

 6          Q.     Okay.

 7          A.     I believe they used the ValueCentric data

 8   for indirect, not people that were purchasing from

 9   them --

10          Q.     Uh-huh.

11          A.     -- but to look at who they were selling it

12   to.  The know your customer customer part of it,

13   right?  To go down and see who they were selling it

14   to, who the wholesalers were selling it to.  Right?

15          Q.     Okay.

16          A.     If somebody is not buying direct from you,

17   you can't see where the product is going, so you have

18   to figure out how you can see that.

19          Q.     Right.

20          A.     And that's what that data would have shown

21   them.

22          Q.     Okay.  So let's talk --

23          A.     Am I explaining that well enough or not?

24          Q.     I -- I think I am getting it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    Okay.

2       Q.    I just want to make sure that my

3   understanding is correct.

4             The -- the Dendrite Cegedim system was a

5   system that would -- would create the -- would --

6   would pend the order to use --

7       A.    That had all of the algorithms in it.

8       Q.    Okay.

9       A.    That was the statistically-based algorithm

10  system.

11      Q.    Right.

12      A.    Okay?  So if an order comes in and it

13  violates any of the algorithms --

14      Q.    Uh-huh.

15      A.    -- the order goes to a pend and it tells

16  you why it is pended.

17      Q.    Uh-huh.

18      A.    Maybe it is one, maybe it is two, maybe it

19  is eight of the different violations.  And it will

20  tell you what the violations are.

21            Now you have to investigate that.  You

22  can't just say, Okay, I know why it pended.  You have

23  to say why, if you are releasing it, why you released

24  it.  So now you have to investigate it.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.

2        A.    Right?  So this is one of the tools,

3   the -- the -- this is my understanding of what they

4   did, okay?

5        Q.    Right, yes.

6        A.    Because I am not an Actavis Inc. person.

7        Q.    Right.

8        A.    But they would have gone and one of the

9   tools they would have used would have been the Safe

10  and Secure module to look at the downstream sale of

11  the product to say whether or not it was going to --

12  who it was going to, right, that would have been a

13  tool that they could have used.

14       Q.    With regard to the -- the ValueCentric

15  Safe and Secure system, it was separate from the

16  Cegedim system, is that correct?

17       A.    That is correct.  I do not believe that

18  they were interfaced together.

19       Q.    And with regard to the SOM, the only time

20  the ValueCentric Safe and Secure data would be used

21  would be after the Cegedim system had alerted people

22  at Actavis Inc. to an order, is that right?

23       A.    That -- that's my understanding of it.

24       Q.    Okay.  I just want to make sure of that

Highly Confidential - Subject to Further Confidentiality Review

1    dynamic.

2            At some point prior to the merger, Watson

3    Pharmaceuticals, Inc. contracted with Cegedim

4    Dendrite, is that right?

5        A.    We did.

6        Q.    What was the nature of that contract?

7        A.    So we were looking to go to -- we were

8    also looking to go to the Cegedim system as well.

9        Q.    All right.

10       A.    Okay?  So that -- we were looking to do

11   the exact same thing.

12       Q.    As you think of it, about what time was

13   that?

14       A.    Approximately, I have to think about this

15   for a second.  I want to say it was probably around

16   2012, around the same -- around the same time, 2012.

17       Q.    All right.  And that was just prior to

18   the Wat --

19       A.    Warner Chilcott acquisition, I believe.

20       Q.    Oh, yeah.  And that's a name that we

21   haven't heard before --

22       A.    No controlleds there.  That's why.

23       Q.    So because we are kind of starting to talk

24   over each other, there were no -- Warner Chilcott did

Highly Confidential - Subject to Further Confidentiality Review

1    not have any controlled substances, is that right?

2        A.    That's correct.

3        Q.    And Watson Pharmaceuticals, as you

4    understand it, merged with Warner Chilcott, is that

5    right?

6        A.    We purchased Warner Chilcott, correct, to

7    the --

8        Q.    Oh.

9        A.    Yeah.

10       Q.    Hopefully that's the last we'll hear of

11   Warner Chilcott today, so...

12             With regard to the use or -- with regard

13   to the engagement of the Cegedim Dendrite Buzzeo

14   people by Watson Pharmaceuticals, Inc., that took

15   place prior to the merger with Actavis, right?

16       A.    Yes, there was one engagement that did,

17   correct.

18       Q.    All right.  So what was the nature of that

19   engagement?

20       A.    To compare the current system to the

21   Cegedim system.

22       Q.    Okay.  Is it -- when you say the "current

23   system," it was Watson's system, is that right?

24       A.    Correct.

1     Q.     And what happened under that engagement?

2     A.     We met with their statistical analyst --

3     Q.     Uh-huh.

4     A.     -- and their business development team.

5  To the best of my recollection, we did a comparison

6  between the two systems that was headed up by our

7  compliance team to do an evaluation to determine if we

8  needed to enhance our system.

9     Q.     And when you say comparing the two

10 systems, is it Watson's then existing system and the

11 one proposed by Cegedim?

12    A.     That is correct.

13    Q.     All right.  And what was the result of

14 those comparisons internal at Watson?

15    A.     So, at that time Cegedim didn't have a

16 actual system, I just want to be clear.

17    Q.     Okay.

18    A.     It was just algorithm logic, and you would

19 have to take that and program that into your ERP

20 system.  It was like a --

21    Q.     Okay.

22    A.     -- you would have to have -- either hire

23 or use your staff to take that logic and program your

24 system to be able to do that.  So you were buying this

```
 1    algorithm from them, right?

 2             So I think the outcome at that time was

 3    that we did have an interest.  We were determining

 4    whether or not we wanted to go to that system or not.

 5    I be -- I believe that was the outcome at the time.

 6         Q.   Did Watson Pharmaceuticals, Inc.

 7    ultimately contract with Cegedim Dendrite to use their

 8    algorithm?

 9         A.   I can't remember if we signed a contract

10    with them or not because that would have been under

11    compliance whether we did or not, but then -- then the

12    acquisition happened, so I don't know if they signed

13    the contract at that time or not.

14         Q.   Okay.  When the companies combined, Watson

15    and Actavis, did the combined companies use this

16    Cegedim Dendrite statistical analysis or whatever you

17    want to call it?

18         A.   We used the Watson system.

19         Q.   Okay.  So how did the Watson system differ

20    from the Cegedim Dendrite system?

21         A.   There were some differences.  I wouldn't

22    say there was a significant amount of differences.

23    The Watson system was -- measured certain algorithms

24    as well, not nine.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  Now, let's back up a little bit.

 2              You had used the term in a prior answer

 3    "ERP."

 4              What is an ERP as you used it there?

 5        A.    Sure.  Enterprise resource planning.  That

 6    is a company's main computer system.

 7        Q.    And then how does that relate to the term

 8    you had used earlier before, "SAP"?

 9        A.    SAP was the company that we used.  That's

10    their ERP -- that was SAP's ERP system that was --

11        Q.    All right.

12        A.    -- that we went to.

13        Q.    And what was the relationship, if any, to

14    the Watson Pharmaceuticals, Inc. SOM system to the SAP

15    system?

16        A.    The SOM system was -- the logic for the

17    SOM system was part of SAP.

18        Q.    So the -- when an order was being

19    processed through the SAP system, part of the process

20    would be the SOM analysis if necessary, is that fair

21    to say?

22        A.    Absolutely.

23        Q.    Okay.  And is your understanding that that

24    was the same for Actavis Inc. pre-merger?
```

```
 1       A.    They didn't use SAP.

 2       Q.    Okay.

 3       A.    But it would have been through their ERP

 4    system.

 5       Q.    Do you know what ERP system they used?

 6       A.    QAD.

 7       Q.    Okay.

 8       A.    I have no idea what it stood for, just in

 9    case you ask me.

10       Q.    And then when the companies merged,

11    everybody switched over to the SAP system, is that

12    right?

13       A.    That would be correct.

14       Q.    So -- all right.

15             So, with regard to the algorithms that you

16    were talking about at the Watson Pharmaceuticals SOM,

17    do you remember who initially created them?

18       A.    Yes.

19       Q.    Who did?

20       A.    So Tracey Hernandez, who was head of DEA

21    compliance at the time, I believe that she reached out

22    to DEA and before we -- then we met with the IT

23    programmers from SAP and ensured that we were meeting

24    CSA when we did the programming for SAP.
```

1     Q.    Okay.  How did you ensure that you were

2   meeting the CSA, as you say?

3     A.    She reached out to the DEA --

4     Q.    All right.

5     A.    -- for guidance.

6     Q.    And did the DEA approve the -- the

7   algorithms that Watson used in its SOM system?

8     A.    I -- I don't know.  I can't -- you'd have

9   to -- we'd have to ask Tracey.

10        What I -- what I can tell you is that

11   there was a guidance provided by the DEA --

12   DEA.DOJ.com all of the way through 2011, and I know it

13   is identical to what was on there.  So I don't know,

14   but we'd have to ask her if that's where it came from,

15   if that's where she got it or whatever.

16     Q.    So you are saying that the algorithms --

17   it's your impression that the algorithms -- let me

18   start over.

19     A.    I would call it logic, maybe --

20     Q.    Okay.

21     A.    -- the logic of the system.

22     Q.    All right.  It's your impression that

23   the -- that there was a logic, as you used the term,

24   of a system on the DEA website until 2011?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    All right.  And it's your impression that

3   Watson adopted that logic, is that right?

4        A.    Well, from what I read and the logic

5   that's in the system, they are -- they are basically

6   identical, so -- but I would have -- we'd have to ask

7   Tracey if that's where she got it, if that's what they

8   told her, but...

9        Q.    Okay.  All right.

10             And beyond working with the SAP and

11   whatever interaction with the DEA, do you know whether

12   Tracey or anyone else at Watson did anything to inform

13   themselves about the logic, as you are talking about

14   it?

15       A.    Well, what I can tell you is, I mean, they

16   had constant meetings with the DEA about SOMS and

17   every audit, and maybe you are aware of this, like

18   every time we had an audit, even a site audit, we had

19   to produce a copy of our SOMS logic.

20       Q.    Right.

21       A.    Every single audit.  And so the DEA always

22   had a copy of everything we were doing for diversion

23   prevention, including our SOMS logic.  So they were

24   very well aware.  And we had annual meetings, annual
```

1    summits.  They were extremely aware of everything that

2    was going on.  We never had one violation to our

3    system, anything that -- in the entire time that I

4    have been with the company.

5        Q.    You used the term "audit."  In the -- the

6    context that you just used it, a DEA audit, what does

7    that mean?

8        A.    So they would obviously come and do site

9    audits of all of our manufacturing plants, and even in

10   those audits we had to produce a copy of our SOM

11   program.

12       Q.    Uh-huh.  All right.  And I -- I want to

13   make sure that we are clear on this.

14             So right now we are talking about Watson

15   Pharmaceuticals, Inc.?

16       A.    That's correct.

17       Q.    As you think about the timeframe, say,

18   from '99 to when you transferred to New Jersey, about

19   how many times did the DEA come to audit the -- that

20   entity?

21       A.    Tracey and Tom would have to tell you

22   because I wasn't responsible for those audits.

23       Q.    Okay.

24       A.    I just know that that was a requirement

1    that we would have to provide that to them.

2         Q.    Okay.

3         A.    And I would say that was all of the way up

4    into Actavis, Inc.

5         Q.    Do you remember when the last time the DEA

6    came to audit Actavis, Inc.?

7         A.    No, but -- but they could -- they would

8    definitely be able to tell you because they would have

9    been notified and responsible to provide all of that

10   documentation.

11        Q.    When you say "they," it is Tom and Sandra?

12        A.    Tom and -- and Tracey.

13        Q.    Tracey.

14        A.    Um-hum.

15        Q.    Okay.  All right.  With regard to that

16   term "audit," did Watson Pharmaceuticals, Inc. when

17   you worked there have an internal audit division?

18        A.    Yes, we did.

19        Q.    Did the internal audit division ever

20   examine the -- the pending mechanism in the SOM

21   system?

22        A.    I -- they may have.  I -- I can't recall.

23   They were heavily involved in anything that had

24   regulatory requirements around it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All right.  So, and then at Allergan --

2  oh, okay.  So -- so let's move on from this because I

3  think we'll have -- we'll talk about that tomorrow.

4         So let's move to the next page, Page 8 of

5  Exhibit 27, and it is Topic 10, and it says:

6         "Identification of your policies and

7  procedures for, and the identity of all Persons

8  responsible for, interacting with the U.S. Food and

9  Drug Administration (FDA), the DEA, the U.S.

10  Department of Justice or other state and federal

11  government agencies."

12        Do you see that there?

13    A.    Yes, I do.

14    Q.    And the only -- the -- there is a

15  distinction made between the FDA, the Department of

16  Justice and the DEA.

17        What is that distinction?

18    A.    Well, obviously that -- the FDA does give

19  us guidance for good manufacturing practices.  We

20  follow everything under FDA.  And then the DEA would

21  be under, my understanding anyway, is the DEA is an

22  entity under the FDA but they have their own reporting

23  structure.  And the CSA is under the DEA.

24    Q.    All right.  And on the third column there,

Highly Confidential - Subject to Further Confidentiality Review

1    there are the three companies that are listed there,

2    Watson Pharmaceuticals, Inc., Actavis Inc., and

3    Allergan Finance, LLC, and each of those people listed

4    underneath there are the people who were responsible

5    for interacting with the DEA, is that right?

6         A.    Yes, that would be correct.

7         Q.    All right.  So let's move on from that to

8    Page 11, Topic 16.

9         MS. LEVY:  At some point can we take a restroom

10   break --

11        MR. EGLER:  Yeah.

12        MS. LEVY:  -- whenever you think is appropriate?

13        MR. EGLER:  No.  Let's -- let's break now.

14   That's cool.

15        THE VIDEOGRAPHER:  The time is approximately

16   10:34 p.m. -- a.m. and we are going off the record.

17                  (WHEREUPON, a recess was had

18                   from 10:34 to 10:56 a.m.)

19        THE VIDEOGRAPHER:  We are back on the record.

20   The time is approximately 10:56 a.m.

21   BY MR. EGLER:

22        Q.    Ms. Woods, thanks for coming back.

23              We've been looking at Exhibit 27 that I've

24   marked, and I had just before the break started to

 1    talk about Page 11, Topic No. 16.  And I'll read it in

 2    the record for our purposes.

 3              "The identity of all persons who were

 4    responsible for representing you or who participated

 5    in or were responsible for coordinating, managing or

 6    directing your participation in the Healthcare

 7    Distribution Management Alliance (HDMA), now known as

 8    the Healthcare Distribution Alliance (HDA).  This

 9    includes the identity of persons who attended HDMA

10    meetings on your behalf."

11              And then there are various names listed on

12    the page.

13              What did you do to prepare for this topic?

14        A.    So we actually interviewed people within

15    the company that have knowledge of this and we

16    identified them in the documentation.

17        Q.    So you are listed as one of the people in

18    response to this issue on Page 11 of Exhibit 27.

19              What is the HDMA?

20        A.    Health Distribution -- well, I guess it

21    depends on what name they have down here.  The Health

22    Distribution Alliance is -- it is basically for

23    wholesalers and distributors that are members, and

24    then since they are our customers, we actually -- I

1    wouldn't say necessarily, even though we participate,

2    we are not necessarily a member like a wholesaler or

3    distributor.  So because our customers are members, we

4    also attend meetings and -- and so forth, conferences,

5    things like that, to see what's going on in the

6    industry as well.  So that's basically what our

7    participation is.

8         Q.    About how many meetings have you

9    personally attended of the HDMA?

10        A.    In my 23 years?

11        Q.    Sure.

12        A.    I'm going to try to ballpark it.

13        Q.    Okay.

14        A.    I probably attend one to two meetings a

15   year.

16        Q.    Okay.

17        A.    So 40, 50 meetings possibly?

18        Q.    So this doesn't -- this exhibit on Page 11

19   of Exhibit 27 doesn't talk about Watson at all, but

20   just to be clear, you're down here under Allergan

21   Finance and Actavis Inc. and that's including the

22   Watson, your time at Watson, is that right?

23        A.    That would be correct.

24        Q.    Okay.  So who is Paul Reed?

```
 1        A.    Paul Reed is one of our executive

 2   directors of trade sales and operations at Allergan

 3   Finance, LLC.

 4        Q.    How long has he been at Allergan Finance

 5   and its predecessors?

 6        A.    30 years.

 7        Q.    All right.  And how about Mike Reed?

 8        A.    Mike has been there the same amount of

 9   time.

10        Q.    Okay.  And how about Brandon Miller?

11        A.    Brandon has been with the company I

12   believe approximately eight years.

13        Q.    So Paul Reed, do you have an understanding

14   of what his responsibilities are, if any, with regard

15   to prescription opioid drugs?

16        A.    The only responsibility I believe that

17   Paul would have with prescription opioid drugs would

18   be that he oversees some customers and their

19   distribution supply agreements, and as far as that

20   would be as those products would be on some of those

21   contracts.  That would be it.  Or their -- their

22   distribution supply agreement, basically.

23        Q.    And how about Mike Reed?

24        A.    Same.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And how about Mr. Miller?

 2          A.    Same.

 3          Q.    All right.  So as you think about the

 4    meetings that you attend for the HDMA, and I think you

 5    said about twice a year, where -- where do they take

 6    place?

 7          A.    Various locations.  They are not in the

 8    same location all of the time.

 9          Q.    All right.  About how many people attend

10    them?

11          A.    It depends on the meeting that you go to.

12          Q.    So, is -- the meetings that you've

13    attended, is there like a general meeting or an annual

14    convention or something like that?

15          A.    The two meetings I attend, one is an

16    overall distribution supply chain meeting and the

17    second one I attend is the -- is the Drug Supply Chain

18    Security Act meeting.

19          Q.    The Drug Supply Chain Security Act

20    meeting, it refers to a piece of legislation, is that

21    right?

22          A.    That is correct.

23          Q.    Is there another more common name for that

24    piece of legislation that you are familiar with?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Well, there is an HR 3417 or something.

 2   There is a House of Representatives bill.

 3        Q.    Okay.

 4        A.    And, I mean, people use an acronym DQSA or

 5   DSCSA, typically.  It used to be Pedigree, but it's

 6   not called Pedigree anymore.  That's old terminology

 7   for it.

 8        Q.    Okay.

 9        A.    So I think Drug Supply Chain Security Act

10   is probably the correct terminology.

11        Q.    Have you ever heard of a piece of

12   legislation referred to as the Meth Act?

13        A.    Yes.  That has nothing to do with the

14   Supply Chain Security Act.

15        Q.    Okay.

16        A.    It is completely different.

17        Q.    All right.  With regard to the Supply

18   Chain Security Act, does that -- do those meetings at

19   all cover issues relating to prescription opioid

20   drugs?

21        A.    No, not really, that's not the intention

22   of those meetings.

23        Q.    Okay.  What are -- what is -- what is the

24   intention of those meetings?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     The Supply Chain Security -- the

2   distribution, the DSCSA meeting is around

3   anti-counterfeiting of drugs and safe and secure

4   supply chain.

5      Q.     Okay.

6      A.     It's not really any particular drug.  It's

7   not really around controlled substances or, you know,

8   scheduled drugs or anything like that.  It's more

9   around the counterfeiting of drugs and -- and the

10  supply chain of counterfeiting.

11     Q.     All right.  So do you or the -- the two

12  Mr. Reeds or Mr. Miller, do you know or have you ever

13  had any leadership position or board membership on the

14  HDMA?

15     A.     I participated in an advisory board one

16  time, but it -- my advisory board for HDA was one time

17  and it was to create an agenda, it was basically just

18  to create an agenda for one of the distribution supply

19  chain meetings.  That was basically the intent of the

20  advisory board.

21     Q.     When was that?

22     A.     I think it was maybe two years, three

23  years ago.

24     Q.     Okay.  What was the agenda about?

```
1       A.     So the distribution supply chain meeting
2    that happens annually covers a variety of topics,
3    every -- it -- and it is basically different classroom
4    settings when you go to the meeting.  So what you do
5    is they have all different people from manufacturers
6    to wholesalers to distributors on the advisory board
7    and the intent is to come up with the topics that
8    people will be interested in to come to the
9    conference.
10          So there is usually 6- to 700 people, so
11   you are trying to come up with a broad variety of
12   topics that will be helpful to people that provide
13   value for everybody to learn about, and that's what
14   the advisory board does, is we bring up current topics
15   that would most likely be advantageous for everybody.
16      Q.     Okay.  Do you remember what the topics
17   were for the one that you made an agenda for?
18      A.     Probably not.  I mean, there are certain
19   topics that are repetitive almost every year, right?
20   The -- there is always -- almost always a DEA
21   representative there that does talk about what's going
22   on with controlled substances.  There is always,
23   almost, the topics for the Drug Quality and Security
24   Act.  I can tell you, like those are very repetitive
```

```
 1    topics every year.

 2         Q.    Uh-huh.

 3         A.    Return processing in the pharmaceutical

 4    industry is almost discussed every single year.  So

 5    there are some topics that are repetitive every year.

 6         Q.    All right.  Let's move on from this to

 7    Page 12 under Topic 21.  I'll read it.

 8               "The role of wholesalers, distributors,

 9    and pharmacies, including, but not limited to,

10    defendants, in the supply chain of your opioid

11    products and the responsibilities of each with respect

12    to marketing, sales, supply, suspicious order

13    monitoring, and potential diversion."

14               Do you see that there?

15         A.    Yes, I do.

16         Q.    And you have various issues listed under

17    the three remaining columns.

18               What did you do to prepare for this topic?

19         A.    So we evaluated the topic, we evaluated

20    policies that we -- policies and procedures that we

21    have that pertain to the topic, as well as any

22    information that we had with the wholesalers' roles or

23    how we interact with the wholesalers and distributors

24    regarding those topics, and then everything that we
```

Highly Confidential - Subject to Further Confidentiality Review

1    did to review what we -- where we pulled data, what we

2    reviewed to be prepared for the topic.

3        Q.    So under the Wholesaler/Distributor Role

4    in SOM column, do you see that there on Page 12,

5    Exhibit 27?

6        A.    Yes, I do.

7        Q.    It states:

8              "Each wholesaler and distributor, as a DEA

9    registrant, completes its own SOM program."  And then

10   it says:  "As part of Allergan's SOM program,

11   wholesalers and distributors, among other things,

12   completed Know Your Customer questionnaires."

13             So, is it fair to say that that's saying

14   that wholesalers and distributors completed Know Your

15   Customer questionnaires as -- for Allergan?

16       A.    So, it went back to probably Watson

17   Pharmaceuticals, Inc., later on Watson

18   Pharmaceuticals, Inc. Day and Actavis, Inc. where we

19   had them fill out Know Your Customer questionnaires

20   and send them to our company.

21             At the same time they had to fill out a

22   customer compliance acknowledgment form.  We had

23   partnership calls with them.  They provided

24   information on the ownerships of their companies.

1    Obviously we always have their state and federal

2    licensing.  They provided information on how they

3    managed controlled substances within their company.

4    We required them to send us their policies.

5            And we always have their historical

6    purchasing information reports.  We want to see who

7    they are selling the product to.  We asked them for

8    their customer listing so we could see who they are

9    selling their products to on a -- in -- from their

10   systems.

11           And like I said, that next part is the

12   policies they have.  And then we asked them to provide

13   any information and documentation what -- which we get

14   out of our system on anything that gets flagged, that

15   goes through our SOMS program.

16           So these are all of the different things

17   that we do to ensure that we are complying and that we

18   are going above and beyond.

19   Q.    With regard to provided historical

20   purchasing reports, do you remember whether there was

21   a particular policy or amount of time that Allergan or

22   its predecessors would request from a -- from a new

23   customer as it started up regarding their historical

24   purchasing reports?

```
 1       A.    So, before anybody ever became a new

 2   customer, they had to go through a significant vetting

 3   process.  We rarely, rarely ever brought on new

 4   customers for controlled substances.

 5       Q.    Right.

 6       A.    So before we brought them on, we had to

 7   see their customers.  And historical purchasing, I

 8   mean, you can't get historical purchasing of what they

 9   are going to buy from you as a new customer, right?

10   But we could get a -- all of these other components of

11   a new customer, but I would say it was pretty rare

12   that we would bring on new customers.

13       Q.    Do you have a understanding in the time

14   that you worked at -- at Watson pre-merger with

15   Actavis about how many new customers came on during

16   that timeframe?

17       A.    I'm -- I'm sorry.  Which timeframe was

18   that?

19       Q.    So pre-merger with Actavis at Watson.

20       A.    From -- from the time I started until --

21       Q.    Yeah.

22       A.    -- 2013?

23       Q.    Yeah, either on a --

24       A.    No, I would have no idea.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  So on an annual basis, do you have

2  any --

3      A.    It would be very few.

4      Q.    All right.

5      A.    Because, like I said, we didn't do

6  business with independent pharmacies and we did not do

7  business with physicians.

8      Q.    All right.

9             And then listed down here in the bullet

10  points, it says:

11             "Provided information and supporting

12  documentation about an order flagged by Allergan's SOM

13  algorithm."

14             What does that mean?

15      A.    We would set up partnership calls with

16  them.  So if there was any issues and their orders

17  pended and we saw any type of repeated offenses, we

18  would immediately set up a partnership call and we

19  would discuss with them that we saw issues.  And we

20  would have all of the supporting documentation to

21  state to them, we see some -- we see issues with

22  orders that you are providing to us that we keep

23  pending and holding.  What is going on?  And we would

24  have the backup documentation on anything that got

Highly Confidential - Subject to Further Confidentiality Review

1  flagged.

2      Q.    You said at the beginning of that response

3  there would be an immediate call with them.  And was

4  that part of the written policy as you understand it

5  at Watson, the timing and the immediacy of the call?

6      A.    So it would depend on what was actually

7  going on with the customer and the order.

8      Q.    Okay.  And then next in this column,

9  fourth column on Page 12 of Exhibit 27, it states

10  "ValueCentric" and it has various data to the bottom

11  of that page, three bullet points.

12           What does that data represent?

13      A.    So, this is under Actavis, where it says

14  Actavis Kadian LLC, that --

15      Q.    Yes.

16      A.    -- section there?

17           So basically what that is stating is that

18  Kadian data was available in ValueCentric as far back

19  as February of 2009.  So to remember, I mentioned that

20  they used ValueCentric Safe and Secure, but prior to

21  them using Safe and Secure, they contracted with

22  ValueCentric to make sure that they had Kadian data

23  available all of the way back into 2009.  And they

24  added Safe and Secure module then in 2011, which added

 1    additional products in addition to Kadian and gave

 2    them the more robust information available through the

 3    Safe and Secure module.

 4                    (WHEREUPON, there was a short

 5                     interruption.)

 6    BY MR. EGLER:

 7        Q.    All right.

 8        A.    And then the third part was in 2012 when

 9    they added the Market Visibility piece to

10    ValueCentric, which I explained to you was the part

11    where it un-blinds data if people have blinded it, it

12    uses some type of an algorithm to help them see which

13    customers, if they were blinded.

14        Q.    At some point after this August 2012,

15    Actavis merged with Watson, is that right?

16        A.    That was -- that's correct.

17        Q.    Was the contract with ValueCentric

18    continued after the merger with Watson?

19        A.    Watson used a different system called

20    Edge, which is a similar system to ValueCentric for

21    order management and 852 and 867 data.

22        Q.    So do you remember what -- well, can

23    you -- is there a particular date or timeframe that

24    you are thinking of when the -- the Watson SOM took

1    over for the Actavis SOM?

2        A.    The -- I believe the timeframe for Watson

3    taking over for Actavis Inc. would have been

4    approximately February of 2013.

5        Q.    Okay.

6              So after February of 2013, did Watson --

7    did the combined company continue to use the

8    ValueCentric data?

9        A.    So in this case ValueCentric data, meaning

10   the data that we would have visibility to, that 867

11   data I was talking to you about, that lovely acronym

12   867, which is the data that the wholesalers sell down

13   to whoever they are selling down to, Watson had a

14   system that was equivalent to ValueCentric called

15   Edge.

16       Q.    Okay.

17       A.    And that system provided 867 data.  It

18   wasn't ValueCentric, but it was Edge.

19       Q.    Okay.

20       A.    It was just a different system.

21       Q.    So after the merger, Watson didn't use the

22   ValueCentric data, is that fair to say?

23       A.    They didn't until it was Allergan

24   Sales, LLC and now we use ValueCentric.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And Allergan -- Allergan Sales, LLC?  What

2    is Allergan Sales, LLC?

3     A.    So, my point is that you are asking about

4    ValueCentric, right?  So ValueCentric was used by

5    Actavis Inc.  Actavis, Inc. used a system called Edge.

6    Actavis -- Actavis, Inc. also then converted to

7    ValueCentric after a period of time.

8     Q.    Okay.

9     A.    Okay.

10     Q.    And the Actavis, Inc.' use of

11    ValueCentric, was that data used in the suspicious

12    order monitoring program?

13     A.    So, the ValueCentric -- no.  Only the Safe

14    and Secure module.  So when you -- ValueCentric is a

15    company that has -- their primary functionality is --

16    is data -- is data.

17     Q.    Uh-huh.

18     A.    And then they create different modules

19    that you can buy.  So they have, like, an order

20    management system, then they have just data that you

21    can purchase, which is 852 and 867, then they have,

22    like, a Safe and Secure module, they have a Market

23    Visibility module.  So what you do is you contract

24    with them and then you decide which modules you want

Highly Confidential - Subject to Further Confidentiality Review

1    to purchase.

2        Q.    All right.

3        A.    Okay?

4        Q.    So let me ask this question:  Did Watson

5    continue to purchase the Safe and Secure module after

6    the merger with Actavis?

7        A.    They didn't need the Safe and Secure

8    module because they had their own suspicious order

9    monitoring system.

10       Q.    All right.  And then did Watson continue

11   to purchase the Market Vil -- Visibility module?

12       A.    They used Edge, which is a different

13   system than ValueCentric, that provided 867 data which

14   is provided through Safe and Secure.

15       Q.    Okay.  So you've been using a term "867

16   data."

17       A.    Correct.

18       Q.    Do you have an understanding of what an

19   867 form is?

20       A.    I understand what 867 data is, yes.

21       Q.    What is it?

22       A.    So, 867 data is data that shows who the

23   wholesaler sells their product to.

24       Q.    Is -- is it --

```
 1        A.     Or distributor sells their product to.

 2        Q.     Is the 867 form itself essentially an

 3   electronic invoice?

 4        A.     It is a -- it is a transmission of their

 5   infor -- I don't know that it is an invoice.

 6        Q.     Okay.

 7        A.     It may be the data of who they are

 8   shipping the product down to.  I don't know that it's

 9   created by invoice data.  It could be.

10        Q.     Okay.  So you mentioned the term "Edge" in

11   the context of a -- the combined Actavis/Watson entity

12   and the pre-merger Watson entity.

13               What is the Edge system?

14        A.     It is another vendor similar to like a

15   ValueCentric would be.  It is just another vendor.

16        Q.     Do you know whether -- well, do you

17   know -- so is --

18        A.     I know.

19        MS. LEVY:  It's hard.

20   BY MR. EGLER:

21        Q.     Who -- okay.

22        A.     Let me just shut my phone off.

23        Q.     Remember, you are on the record if you

24   take that call.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I shut it off.

2        Q.    The -- the Edge system as you think of it,

3    who -- who provides the Edge system data?  Is there a

4    company or is it called Edge or something else?

5        A.    Yeah, the name of the company is called

6    Edge.  I'm not sure if they are in business any

7    longer.

8        Q.    Okay.

9        A.    So there is an electronic feed of data.

10   It is an electronic data interface, and basically the

11   customer has a interface to Edge.  They send the data,

12   just like to ValueCentric, they send the data and then

13   the data comes to us.

14       Q.    When you say "the customer," in the case

15   of the types of customers that Watson and Actavis and

16   Allergan had, would that be wholesalers and

17   distributors?

18       A.    That would be correct.

19       Q.    All right.  And is there a reason that

20   Actavis and Watson and -- could not get the data about

21   the customers from the wholesalers and distributors

22   that they sold to directly?

23       A.    Well, you have to have an interface for

24   all of that data and it has to come into your system.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    So there is vendors that actually collate the data and

2    then interface it to you.

3              And if you think about it logically, if

4    you didn't have one company that collated it, then all

5    of the wholesalers and distributors would have to have

6    interfaces to every single manufacturer, everybody

7    they bought from.  So it is much more simplistic and

8    it's -- and it's much more efficient for one vendor to

9    receive all of their data and then for that vendor to

10   send the interfaces to the other companies, because it

11   would take so much time to set up interfaces with

12   every single manufacturer that they bought from.  It

13   would probably never, ever get completed because it's

14   a very -- it's -- it's very time-consuming and they

15   would have interfaces with every single individual

16   company.

17        Q.    So as you are describing it, the Edge data

18   would not just be for the -- for the end users -- no,

19   let me start over.

20              As you are describing it, the Edge data

21   would not just be for the customers of Watson's

22   customers, it would be for -- it would be data for the

23   entire market, is that fair to say?  I'm trying to

24   understand --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I'm not sure I'm understanding the

 2   question.

 3        Q.    So -- so the way you described the Edge

 4   data, or the way I -- I heard you describe it, is that

 5   data would come on a particular sale from the -- from,

 6   say, Watson's customer to the Edge entity and then be

 7   transmitted back to Watson?

 8        A.    Only on the products -- only on our

 9   products.

10        Q.    All right.  And as I think you then

11   described it, the Edge data was -- that was available

12   was broader than just any given customer of Watson, it

13   was all distributors or all wholesalers, is that

14   right?

15        A.    No.  So it would only be on our customers

16   that had an agreement to send that data, right?

17        Q.    Okay.

18        A.    So if you're a customer of ours, then at

19   later dates we stated that in order to buy controlled

20   substances, you had to send us 867 data.

21        Q.    Okay.

22        A.    You would go to Edge and get what they

23   call -- I know this is going to be complicated.

24              They -- you would go to Edge, they would
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    give you a mapping of how you had to interface this

2    data to them.  So it would say, Tom's interface is

3    coming to Edge.  He is going to send all of these

4    fields of data to us.  And then once Edge would get

5    that data, it would say, Here is all of Watson's NDC

6    numbers.  It goes to Edge.  And then Edge has an

7    interface to Watson on all of those NDC numbers, and

8    then it sends that data over to Watson.

9         Q.    All right.  So with regard to that --

10   well, you used the term "NDC number."

11             What is NDC number?

12        A.    National Drug Code.

13        Q.    Okay.  And what is a -- what -- what has

14   an NDC number?  So -- and what I'm trying to get at

15   is, is it the size of the drug, is it the name of the

16   drug, or is it something else or all, both of those or

17   something else?

18        A.    Okay.  Every company has a labeler code

19   that identifies the product to that company.  So the

20   first four to five digits of any -- every NDC number

21   is the labeler code that is owned by that company or

22   assigned to that company, basically on how you

23   registered your drug.

24        Q.    And what information -- what other
```

1    information does an NDC code have on it?

2        A.    The second section of the NDC code is the

3    product number for that NDC code.  And the end of the

4    NDC code is the counter, the bottle size of that NDC

5    code.

6        Q.    Okay.  So, for example, if a -- a

7    company -- if you are talking about, say, 60-milligram

8    pills of generic OxyContin, would the NDC codes for

9    every manufacturer of that product have similar

10   numbers in the middle as you've described them?

11       A.    No.

12       Q.    Okay.

13       A.    The product number in the center is

14   defined by each company.

15       Q.    Okay.

16       A.    They would not.  You would not be able to

17   determine that product identifier in the center.

18       Q.    All right.

19       A.    You would be able to identify the company

20   by the beginning numbers because that labeler code, as

21   I identified, is issued by the FDA when they register

22   the product by that labeler code.

23       Q.    So with regard to the -- the Edge

24   numbers -- let me start over.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                With regard to the Edge data that you are

 2      thinking of, is it fair to say that Watson and its --

 3      and -- well, is it fair to say that Watson would get

 4      for generics only the NDC codes of the generics that

 5      it manufactured?

 6           A.    Yes.

 7           Q.    Okay.

 8           A.    You would only get the information to the

 9      products that belong to your company, that would be

10      correct.

11           Q.    So if another company was making the, say,

12      generic -- well, let me start over.

13                If another company was making the same

14      generic in the same pill size, the Edge data that you

15      are thinking of would not provide that information?

16           A.    That is correct.  We never got information

17      that was not owned by our company, that is absolutely

18      correct.

19           Q.    All right.  Do you have an understanding

20      of whether that's the same for ValueCentric?

21           A.    It's the same for any company that's like

22      that.  They will only pro -- because obviously that's

23      not your data to own.  You only get data that is owned

24      by your company, and that's how those companies ensure
```

Highly Confidential - Subject to Further Confidentiality Review

1    they are only sending your data.  I mean, that would

2    be a huge market risk for them to be sending you data

3    from somebody else's company that basically gives you

4    a market edge over them.  They are not going to send

5    you somebody else's data.

6         Q.    All right.  Was there any way to get an

7    understanding of order trends or history of other

8    companies' generic -- let me start over.

9              As you think of it with regard to that,

10   the types of data that we are talking about, was there

11   any way when you were at Watson or after for the

12   companies to get data that would show the overall

13   market for a particular generic drug or a particular

14   generic prescription size in milligrams across an

15   entire market and not just produced by one company?

16        A.    That was, I think, one of our biggest

17   concerns.  To the best of my knowledge, there is no

18   interoperable system, I believe is what your question

19   is, that we could see all the other competitors'

20   products and the usage on -- in an interoperable

21   system.

22        Q.    Are you aware at any time whether anyone

23   from Watson or Actavis approached the distributor

24   companies to get an understanding of the total market

1    for an opioid drug and its generic equivalence?

2         A.    I -- I don't know that answer.  I mean,

3    I -- I don't know how -- I mean, market share data is

4    market share data.  It might tell you the volume, but

5    it is not going to tell you who it goes to.

6              Do you see what I'm saying, like -- so

7    I -- I think that's the issue.

8         Q.    Did anyone from Watson or Actavis ever

9    seek the data on where the entire market of generic or

10   brand name -- let me start over.

11             Did anyone from Watson or Actavis ever

12   seek data from their customers on where the -- the

13   pills relating to a particular size and chemical

14   makeup, whether brand name or generic opioid, were

15   going at a certain time or place?

16        A.    I'm not -- I'm -- I don't think I'm

17   following you, Tom.

18        Q.    So let's take, for example, if you have a

19   60-milligram OxyContin generics.

20        A.    Um-hum.

21        Q.    And say -- and I don't know if they do,

22   but say Watson manufactured them and other people

23   might have manufactured the same generics, is that

24   right?

```
 1      A.      Um-hum.

 2      Q.      And did anyone from Watson or Actavis ever

 3  ask their distributor customers for information about

 4  where the other generics 60-milligram OxyContin was

 5  going or where the brand name OxyContin 60-milligrams

 6  were going?

 7      MS. LEVY:  Object to the form, just because I

 8  don't understand, but you can answer if you

 9  understand.

10  BY THE WITNESS:

11      A.      I mean, I think in our partnership calls

12  with our customers, we would ask who their other

13  suppliers were.

14  BY MR. EGLER:

15      Q.      Um-hum.

16      A.      And I think that's the best we could do is

17  to say, Do you have another supplier other than our

18  company.

19      Q.      Right.

20      A.      We did not have a way to, in any

21  interoperable system, to see what they were purchasing

22  from someone else.

23      Q.      So, for example, you were talking about

24  the Edge data, and, again, understand that this is a
```

 1    hypothetical with the 60-milligram OxyContin generic,

 2    if you got information about a particular order that

 3    had pended and looked at the buying trends of your

 4    customer for that generic 60-milligram OxyContin, you

 5    wouldn't know whether your customer was also buying

 6    60-milligram OxyContin from one or two other

 7    manufacturers, is that fair to say?

 8         A.    We would not.

 9         Q.    All right.  And are you aware whether any

10    other company ever sought out or proposed to get that

11    type of information?

12         A.    I am not.  I -- I do -- well, what I

13    should say is I know it was a frequent question to the

14    DEA.  I know it was a question we asked as a company

15    and I know it was a question that came up frequently

16    about a proposal for an interoperable system so that

17    we would have the ability to see if the same products

18    were being sold by multiple manu -- if people were

19    purchasing the same products by multiple

20    manufacturers.

21         Q.    Did you ever hear whether distributors

22    were working with manufacturers to aggregate that type

23    of information across various generic and brand name

24    drug markets?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     I know that there was working groups that
 2   I believe compliance people were part of.  I was not.
 3   I don't know if that was part of those discussions.
 4        Q.     Okay.  Did you ever hear whether Cardinal
 5   and Mallinckrodt were working together around 2012 to
 6   develop that type of system?
 7        A.     I'm trying to think if it was Mallinckrodt
 8   that I heard was working on something like that.
 9        Q.     Well, let me start over.
10        A.     I don't know.
11        Q.     Did you ever hear that Cardinal was
12   working on that type of system around 2012?
13        A.     I can't say if that came up in one of our
14   partnership calls or not.  It may have.  We had spoke
15   to Cardinal several times, but I can't say if that was
16   brought up.
17        Q.     Do you remember the Cardinal facility in
18   Lakeland, Florida being shut down?
19        A.     I do.
20        Q.     What do you remember about that?
21        A.     I -- I do re -- the reason I remember is
22   because we had to suspend their license in our system.
23        Q.     Uh-huh.
24        A.     I don't remember -- and I remember getting
```

Highly Confidential - Subject to Further Confidentiality Review

1    the notice forwarded to me from our compliance team

2    about the suspension.  I don't remember all of the

3    details around the suspension.

4        Q.    All right.  And did that occur while you

5    were at Watson, pre-merger with Actavis?

6        A.    I believe it when -- is when I was with

7    Watson Pharmaceuticals.

8        Q.    Do you remember whether Watson -- let me

9    start over.

10             Do you remember ever determining whether

11   Watson had sold generic opioids to the Cardinal

12   Lakeland facility that was shut down by the DEA in

13   2012?

14       A.    I know that Cardinal Lakeland facility was

15   a customer of ours for all kinds of products.

16       Q.    Do you remember ever doing an analysis of

17   whether any controlled substances were sold to the

18   Cardinal Lakeland facility?

19       A.    We did analysis of them and we had

20   partnership calls with that location and Cardinal

21   period.

22       Q.    So were there controlled substances sold

23   to Cardinal's Lakeland facility by Watson?

24       A.    We wouldn't have -- we wouldn't have

Highly Confidential - Subject to Further Confidentiality Review

1   suspended their license if there wouldn't have been.

2   They wouldn't have had a license.

3        Q.    Do you remember what the products were?

4        A.    I do not, off the top of my head.

5        Q.    Do you remember whether any of the

6   Cardinal orders to the Lakeland facility pended in the

7   suspicious order monitoring system that Watson had?

8        A.    I can't recall if it was that particular

9   facility.  I am sure Cardinal orders pended.

10       Q.    But you don't have a recollection one way

11  or the other of whether any Cardinal Lakeland

12  controlled substance orders pended on Watson's system?

13       A.    Not off the top of my head, but I think we

14  provided you with, like, 7,000 of them, so I'm --

15  think they are probably in there.

16       Q.    Do you remember whether Watson ever did an

17  analysis after the Lakeland facility was shut down of

18  whether any Cardinal Lakeland controlled substance

19  orders pended on Watson's SOM system?

20       A.    I am absolute -- I am sure we would have.

21       Q.    Do you remember --

22       A.    I'm sure we would have done it beforehand,

23  but I can't -- I mean, I can't recall, because I think

24  it would have been -- I don't know the exact year, but

 1    it would have -- it would have been probably, what

 2    year is this, probably ten years ago, so...

 3        Q.    All right.  All right.  So let's --

 4    let's --

 5        MS. LEVY:  Just for the record, I'm -- I'm --

 6    I'm going to lodge an objection to all of that very

 7    specific and detailed line of questioning as beyond

 8    the scope.  Obviously I'm not -- not moving to strike.

 9    She can answer, but in her personal capacity.

10    BY MR. EGLER:

11        Q.    All right.  Let's move on.  You can set

12    this Document 27 aside.

13            As I said, I now want to pick up the

14    exhibit that we've marked as Exhibit 25, which is a

15    compendium of documents provided this morning by your

16    counsel.

17            And on this compendium there are 24 tabs,

18    and we'll reserve, to the extent we talk about any of

19    them, I will refer to them by the -- the tab name, and

20    to the extent there are identifying numbers, I will

21    read them into the record.

22            All right.  So can you look at what is

23    marked as Exhibit 1.  And when you look at it, can you

24    tell me what it is?

```
1        A.    So, this would have been very early on in

2   Watson Pharmaceutical days shortly after I became part

3   of Watson Pharmaceuticals, and this was an explanation

4   of how the orders were compiling a history of

5   controlled substances and the type of investigation

6   form that was used, and the process that customer

7   service would use.

8        Q.    All right.  So -- and so the record can

9   track it, I'll read in the bottom right-hand corner

10  there are what we'll refer to as Bates numbers, and it

11  says Allergan_MDL_01844864 and 865.

12             And I think we had talked about earlier a

13  woman named Lynn DaCunha, is that right?

14       A.    That is correct.

15       Q.    And does Ms. DaCunha still work at what is

16  now Allergan?

17       A.    Yes, she does.

18       Q.    All right.  Does she work -- where does

19  she work?

20       A.    She actually works -- I believe she is

21  under compliance.  She -- yes, I be -- I believe that

22  she is under compliance.

23       Q.    Okay.  And as you think of -- well,

24  physically where is her location?
```

```
1        A.      Madison, New Jersey.

2        Q.      And has she always worked in Madison,

3   New Jersey as you think of it for -- for Watson and --

4   and --

5        A.      She has always worked in New Jersey.

6        Q.      And for Ms. DaCunha, you say it's

7   compliance.

8                What does the compliance group at Allergan

9   do now?

10       A.      So the compliance -- she is registering,

11  she does all of the licensing for all of our

12  facilities.  I don't -- I don't know everything, but,

13  I mean, she does all of the, you know, licensing

14  facilities and ensures that they are registered

15  properly based on the locations, countries, things

16  like that.

17       Q.      So some -- when you say "countries," what

18  do you mean by that?

19       A.      So, I think she's mainly responsible for

20  US and for all of the different types of products and

21  the responsible licenses for each product group and

22  things like that.

23       Q.      With regard to this document, Exhibit 1,

24  the first paragraph states:
```

```
1              "Order processing will receive orders

2    through EDI, faxes, or manually from the customer

3    service representatives.  Once these orders are

4    entered, the system will compile a past history of

5    controlled substances by each customer to establish a

6    12-month average."

7         A.    Uh-huh.

8         Q.    Do you see that there?

9         A.    I do.

10        Q.    So it uses, like, that term "EDI."

11              What is EDI?

12        A.    Electronic data interchange --

13        Q.    All right.

14        A.    -- or interface, I'm not sure, but it is

15   one of the two.

16        Q.    All right.  And what was Watson Pharma's

17   EDI in 2001?  Is that similar to the SAP system or

18   something else?

19        A.    No.  That's how orders actually get into

20   the system, so large customers' orders can be 2-, 300

21   lines long, and so instead of people manually entering

22   them, they have an interface with your company that's

23   electronic.  It is like an e-mail, like electronic

24   mail, right, only it is an electronic data interface
```

Highly Confidential - Subject to Further Confidentiality Review

1    that sends orders into the system.

2        Q.    With regard to this Exhibit 1 as a whole,

3    as you think of it, does this describe a suspicious

4    order monitoring system?

5        A.    It does.

6        Q.    Do you remember whether there was a

7    predecessor system to this at Watson or whether this

8    was the first one?

9        A.    This was in a system called Manfact prior

10   to SAP.  So this probably started long before the time

11   I was with the company.

12       Q.    Okay.  So do you remember there -- there

13   being a particular suspicious order monitoring system

14   prior to September 3rd, 2001, which is the date on

15   this document?

16       A.    This would have been the system that was

17   in place when I started to my -- to my knowledge, this

18   is what was in place when I started.

19       Q.    Okay.  The second paragraph of this says:

20            "If a processed order generates a DEA

21   excessive order flag due to more frequent or larger

22   quantities than the customer's normal ordering

23   pattern" --

24       A.    Uh-huh.

1          Q.     -- "order processing will send a

2     market" -- "a report to marketing for their approval

3     of the quantity."

4          A.     Uh-huh.

5          Q.     So with regard to that paragraph in the

6     context of the verb "pending" that we've been talking

7     about --

8          A.     Uh-huh.

9          Q.     -- what -- what would cause an order to

10    pend under this policy?

11         A.     To the best of my knowledge, at this time

12    it was an order would pend due to the frequency or the

13    size of the order.

14         Q.     Okay.  And do you remember what

15    calculations went into that determination?

16         A.     It was based on a 12-month average.

17         Q.     All right.

18         A.     Based on the months that the customer

19    ordered.

20         Q.     So is it fair to say if it was higher than

21    a 12-month average, it would -- the order would pend

22    under the system?

23         A.     So it would be -- to the best of my

24    knowledge, it would be -- if it was a 12-month average

Highly Confidential - Subject to Further Confidentiality Review

1    and you ordered in ten of those months, it would have

2    to do the average based on only the months in which

3    you ordered so it would not be an incorrect

4    calculation.

5        Q.    All right.  And do you know where that

6    policy would have been written down, if it was?

7        A.    I don't.

8        Q.    Okay.  All right.

9             And then as you think about this

10   particular policy or this particular timeframe,

11   physically or -- or electronically, how would the --

12   the pend happen, like, would it be an e-mail created

13   by the system or a light would go off, or what would

14   happen?

15       A.    No.  The system would automatically hold

16   it.  So the way that the system worked is once it did

17   the calculation, if it identified that one of these

18   two things happened, if it was more frequent than it

19   should be or if it was larger, the system

20   automatically held it --

21       Q.    Uh-huh.

22       A.    -- just automatically puts a block on it.

23   That's how these pends in the Watson system worked.

24       Q.    So -- so then what would happen?

```
 1        A.     So then this investigation would have to
 2   be done.  Where it says here, your question, you --
 3   you read up to the marketing piece, so then it says:
 4   "Order processing would generate a suspicious
 5   controlled order investigation form."
 6               So there was a form created.  There was an
 7   investigation that would need to be done, basically to
 8   understand and get justification if there was an order
 9   of excess before anything would be released.
10        Q.     I guess my question is more detailed.
11               You -- you said the order would be held?
12        A.     Correct.
13        Q.     And then it would -- it would be
14   investigated, but do you have a memory about the
15   process of the order being held?  Would there be an
16   e-mail or an alert or some type of a report generated?
17        A.     I probably cannot remember exactly what
18   happened all of the way back in 2001.  I have better
19   recollections from the 2004 change, but --
20        Q.     Okay.
21        A.     -- 2001 I wasn't -- I was just becoming
22   involved, so I don't have a great recollection.  My
23   boss was probably the person that did more of this.
24        Q.     And then -- who is your boss at this time?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    So, at this time I was just taking over

 2   and I was just becoming responsible for this and then

 3   I took this responsibility from a gentleman by the

 4   name of Jesse Childs.

 5        Q.    Does Mr. Childs still work at Allergan?

 6        A.    He is deceased.

 7        Q.    Okay.  For this process, we had talked

 8   earlier about the internal audit process at Watson and

 9   Allergan.

10              Do you remember whether there was ever an

11   internal audit done of this particular policy that's

12   shown in Exhibit 1?

13        A.    I do not remember if there was.  I think

14   Tracey came on shortly thereafter, so I -- I don't

15   remember.

16        Q.    Okay.  Who is Tracey?

17        A.    Tracey Hernandez was the director of

18   controlled substance compliance.

19        Q.    All right.  So let's move on to Exhibit 3

20   in the compendium of exhibits that we've been talking

21   about.

22              And, again, just for the record, Exhibit 3

23   is inside Exhibit 25.  And could you look at it?  And

24   while you are looking at it, I'll read on the record,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     it is Allergan_MDL_01839001 and 002.

 2              And when you are ready, can you tell me

 3     what this appears to you to be?

 4     A.     We went live on SAP on May 3rd of 2004.

 5     This is an operational procedure document, initial

 6     operational procedure document on the distribution of

 7     controlled drugs.

 8     Q.     Okay.  And then can you turn to the second

 9     page of that?

10              And is that a different policy?

11     A.     This is a continuation, a Page 2 of that

12     same policy.

13     Q.     All right.  Now, is this -- this document

14     that's Exhibit 2, is this a suspicious order

15     monitoring policy?

16     A.     It's just a high-level overview --

17     Q.     Okay.

18     A.     -- of -- it's a -- it's a very high-level

19     overview.

20     Q.     All right.  And with regard to this

21     process and policy, do you remember the particular

22     physical or electronic process by which someone would

23     be alerted that an order has pended?

24     A.     Yes.  So in this particular process, an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order would be pended, we would run a -- a report, we

 2    would receive a report, and the report would identify

 3    all of the orders that were being pended for review

 4    and investigation.

 5        Q.    And how often would that report be

 6    generated?

 7        A.    I was -- they would -- we would be in it

 8    all day long because orders would be held.

 9        Q.    As you think about it, around this time,

10    you say you'd be in it all day long, on any given day

11    would there be multiple orders held by the system?

12        A.    Oh, yes, yes, absolutely.

13        Q.    Would it be dozens or hundreds or...?

14        A.    I mean, let's see, we are going back to

15    2004.  Yeah, it could -- it could be -- you know, it

16    would -- I -- I can't say hundreds.  I -- I don't

17    think I would go with hundreds.

18            So this was exactly when we started going

19    into the system, so I'm sure -- I don't know.  I

20    probably can't tell you something from 2004, but I

21    gave you some statistics earlier today that would have

22    probably been in maybe 2014, 2015, that, you know,

23    would have been pretty relevant.  So I don't know that

24    I can give you a percentage back in 2004.
```

```
 1        Q.    And to keep in the context, the system

 2   that is described in this Exhibit 2 inside Exhibit 25

 3   is not just for prescription opioid drugs but for all

 4   controlled substances that were sold by Watson, is

 5   that right?

 6        A.    You are correct.

 7        Q.    All right.  And as you think of it, taking

 8   into account Schedules II through V, number wise, do

 9   you have a memory about how many controlled substances

10   Watson sold at this time?

11        A.    I don't have a recollection of how many

12   were sold in 2004.

13        Q.    Do you have an understanding right now for

14   Allergan how many different controlled substances they

15   sell?

16        A.    I think it's about 23 SKUs.

17        Q.    All right.  And as you think about this

18   timeframe for the opioid drugs in 2000 and -- no, let

19   me start over.

20              When you think about this timeframe for

21   controlled substances with Watson, earlier we had been

22   talking about the number of customers and the change

23   in customers.  Can you think about how many customers

24   Watson had around this time for all controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   substances?

 2        A.    I would not have a number of customers.

 3        Q.    As you think about now in 2018, 2019,

 4   about how many customers does Watson have across the

 5   board for controlled substances?

 6        A.    Allergan Finance, LLC?

 7        Q.    I'm sorry.  Allergan Finance, LLC.

 8        A.    Maybe ten.

 9        Q.    All right.

10        A.    I'm just -- I'm just thinking about the

11   number of customers that we have set up at UPS.

12   I'm -- don't quote me on the exact number, but it

13   is -- it is not a significant amount.

14        Q.    Do you think it was substantially more or

15   less back in 2004?

16        A.    It was more in 2004.

17        Q.    Okay.

18        A.    Because there was retail -- warehousing

19   retail chains.

20        Q.    Okay.  So are warehousing retail chains

21   not Allergan's customers anymore?

22        A.    They purchase through the wholesalers.

23        Q.    Okay.  Is that for all controlled

24   substances?
```

```
 1        A.    Yes.

 2        Q.    All right.

 3              All right.  So let's move on to Exhibit

 4   No. 8.  Could you pick that up inside the compendium

 5   Exhibit 25, and look through it, and as you are

 6   looking through it, I'll note it is a

 7   four-page document, Allergan_MDL_03641386 through

 8   1389.

 9              When you are ready, can you tell me what

10   this appears to you to be?

11        A.    Yes.  This is a corporate standard

12   operating procedure.  So this is filed with the entire

13   corporation.  It is a high-level procedure regarding

14   suspicious orders of controlled drugs.

15        Q.    All right.  And with regard to this

16   document, you say it's filed with the corporation.

17              What is the difference between this and

18   what we were talking about before, Exhibit 3?

19        A.    Sure.

20              The ones under Exhibit 3 -- and the ones

21   that are identified as operational procedure documents

22   are typically a derivative of a corporate standard

23   operating procedure.  So the corporate standard

24   operating procedures are actually come -- are -- are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    designed and are required by our regulatory and

 2    compliance teams.  And after these are developed, then

 3    our department would take this and come up with a very

 4    high-level standard operating procedure that mimics

 5    this, has a little bit more detail on it because it's

 6    more operational in nature.  We are operational teams.

 7         Q.    Okay.

 8         A.    So we then would design an operational

 9    procedure off of this.

10         Q.    All right.  So with regard to the document

11    that's marked as Exhibit 8, can you tell what -- what

12    would cause an order to pend inside the system as you

13    read through this policy?

14         A.    So this policy does -- explains that there

15    is a requirement --

16         Q.    Uh-huh.

17         A.    -- to have a system in place.  So it tells

18    you that there is a process and it tells you what

19    documents to review for that process and it tells you

20    that the customer, that the system compiled past

21    history, it tells you that it's to -- each customer is

22    to establish normal size and frequency, and it tells

23    you -- so under 1.1 it explains a little bit about

24    what the normal size and frequency is and then it
```

Highly Confidential - Subject to Further Confidentiality Review

1    tells you the controlled substance compliance

2    determines what the SOMS multiplier table is, which,

3    as I mentioned to you earlier today about the guidance

4    that was in DEA.DOJ.com --

5         Q.    Okay.

6         A.    -- that explains it there as well.  And it

7    explains a little bit here about license entry and

8    management of the system functionality.  And then on

9    the next page, it talks to you about if an order is

10   processed, generates an excessive flag.

11              So remember what I stated, this is a --

12   this is a high level.  This policy isn't intended to

13   necessarily explain the system functionality.  It's

14   ex -- it is here to explain that there is a system and

15   process that meets the qualifications and exactly some

16   of the high-level steps to it.  It doesn't explain the

17   logic of it.

18        Q.    All right.

19              Down on 1.11 --

20        A.    Uh-huh.

21        Q.    -- on the second page, 1387, there seems

22   to be a -- a editing balloon or something there.

23              Do you see that?

24        A.    Yes, because I don't know that this is the

1   final version.

2        Q.   Oh, okay.

3        A.   Of it.

4        Q.   So who would have maintained these types

5   of documents, these corporate standard operating

6   procedures at Watson?

7        A.   There was an electronic system that I

8   believe it was called Livelink or something like that.

9   They actually had to route through that system and be

10  approved on the last page.

11       Q.   All right.

12       A.   And after they were approved they were

13  maintained in that system until the next review

14  period.

15       Q.   Has that Livelink system that you are

16  thinking of continued to exist to today at Allergan

17  Finance, LLC?

18       A.   I believe there is a -- there is a

19  different system that is used, but there is a system

20  in place.

21       Q.   Do you remember when the changeover to the

22  current system occurred or if there is more than one?

23       A.   I would imagine that the system that was

24  in place at Watson Pharmaceuticals that went to

```
 1   Actavis, Inc. is -- probably went over to Teva and

 2   then they detie -- determined whether they kept that

 3   or not.  So I would think that we changed systems when

 4   we went to Allergan Finance, LLC.

 5        Q.    So as you --

 6        A.    I can't be 100 percent sure of that.  I'm

 7   just trying to think of logically when the transition

 8   would have happened.

 9        Q.    So is -- is part of what you are thinking

10   of that Allergan Finance, LLC would not have a

11   comparable policy to this, is that right?

12        A.    Well, we are not a DEA registrant, so I

13   wouldn't think so.

14        Q.    All right.  Do you know whether -- whether

15   it does currently have a policy comparable to this

16   suspicious orders of controlled policy -- or con --

17   suspicious orders of controlled drugs as Exhibit 8

18   says?

19        A.    I -- I don't believe -- I mean, we are not

20   a DEA registrant, so I don't think we would.

21        Q.    All right.  All right.  And did you in

22   part of your process for preparing today find a

23   comprehensive file of the corporate standard operating

24   procedures such as listed here for Watson
```

Highly Confidential - Subject to Further Confidentiality Review

1    Pharmaceuticals?

2        A.    So I think we pulled all of the corporate

3    standard operating procedures that were relevant to

4    this.

5        Q.    Yeah.

6        A.    I'm -- am I not understanding your

7    question?

8        Q.    Oh, I -- I think you said you didn't think

9    that this was the final one.

10            Do you know whether there was a final one?

11       A.    Oh, I think we pulled everything that we

12   could find that were still in my computer, like any of

13   the computers that we could pull.

14       Q.    Okay.

15       A.    We don't have access to all of the

16   systems, so I think we pulled what we could find.

17       Q.    Okay.  When you say you don't have access

18   to all of the systems, why not?

19       A.    Because the systems that were under Watson

20   Pharmaceutical or Actavis, Inc. don't belong to

21   Allergan LLC.

22       Q.    I get it.  All right.

23            So with regard to these -- this particular

24   document, Exhibit 8, who at Watson Pharmaceuticals,

Highly Confidential - Subject to Further Confidentiality Review

 1   Inc. would have been, for lack of a better term, most

 2   responsible for this policy?

 3        A.    So, on the last page, this is the sequence

 4   of events.  So Sandra Simmons would have drafted this.

 5   I would have reviewed it.  Then it would have gone to

 6   the corporate quality and then the director of

 7   controlled substance compliance.

 8        Q.    All right.  So the -- it says Sandra

 9   Simmons and then it has your name, Mary Woods, and

10   then Marleah Martin under Executive Director,

11   Corporate Quality Assurance, and then Tracey

12   Hernandez.

13            So do you remember where Marleah Martin

14   was located physically?

15        A.    Yeah.  She was in Corona, California.

16        Q.    Okay.  And how about Ms. Hernandez?

17        A.    Tracey was in New Jersey.

18        MR. EGLER:  All right.  All right.  Do you want

19   to take a break?  Let's take a break for lunch.

20        THE WITNESS:  Okay.

21        THE VIDEOGRAPHER:  The time is approximately

22   12:03 p.m.  And we are going off record.

23                    (WHEREUPON, a recess was had

24                     from 12:03 to 1:00 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1        THE VIDEOGRAPHER:  We are back on the record.

 2   The time is approximately 1:00 p.m.

 3   BY MR. EGLER:

 4        Q.    Ms. Woods, thanks for coming back.

 5             I have a couple of follow-up questions

 6   that I noticed that I had not asked before.

 7             Early on in the deposition you said that

 8   you worked for the call -- call center operations

 9   while you were at Watson.

10             What -- what is the call center, as you

11   referred to it?

12        A.    So call center operations consisted of

13   primarily the same departments that I have today, it

14   is just different titles and different companies.

15        Q.    Okay.

16             So when you -- the -- you use that term

17   "call center."  Who is calling or being called from

18   Watson and Allergan's call center?

19        A.    Okay.  So -- do we have a specific period

20   of time you want to talk about?  Like, that will help

21   me.  I've had nine different roles in the company.

22        Q.    All right.  Well, let's start with where

23   you are now and go backwards.

24        A.    Okay.  So in my current role in customer
```

1    relations, the only customers that we deal with are

2    the direct customers.  So customer service handles the

3    direct customers, which are the wholesalers and the

4    distributors.

5         Q.    Okay.

6         A.    We also speak to patients if they call and

7    have questions about certain programs that we have,

8    savings programs, patient assistance programs.

9         Q.    Okay.

10        A.    Okay.  We may speak to a physician if he

11   needs to locate a rep or something like that.

12        Q.    Um-hum.

13        A.    Okay.  Those are the people that answer

14   the phones for the US.

15        Q.    Right.  Okay.

16        A.    Under my -- under me.

17        Q.    Right.  And then has that changed at any

18   time from the -- from the time you were at Watson in

19   California until now?

20        A.    Yes.

21        Q.    Okay.

22        A.    Call center operations early on when I

23   moved to California, we also had a telesales

24   organization that had a detailing division under me as

```
 1   well where they would contact physicians for

 2   specialty, like, dermatology.  I think that was the

 3   only group that we had, dermatology.  We may have had

 4   women's healthcare, which was contracted out.  They

 5   did not report directly to me, but I had some

 6   assistance there.  And we had a small telesales

 7   organization that contacted hospitals, like

 8   institutional accounts.  And they may have contacted,

 9   I believe there was a dental program at one point.

10        Q.    As you think of it, while you were at

11   Watson, were you aware whether Watson Pharmaceuticals,

12   Inc. detailed the drug Norco to anybody?

13        A.    Not -- not through my team.

14        Q.    Okay.  And did they detail any of the

15   other opioid prescription drugs that they sold?

16        A.    No, not that I can recall then.

17        Q.    All right.  All right.

18              And then let's keep going with the

19   exhibits.  And I'm going to hand you an exhibit that

20   we'll mark as Exhibit 28.

21                   (WHEREUPON, a certain document was

22                   marked Allergan 30(b)(6) - Woods

23                   Deposition Exhibit No. 28, for

24                   identification, as of 01/09/2019.)
```

```
 1   BY MR. EGLER:

 2       Q.   We went through and checked for Exhibit 28

 3   and didn't see it in the compendium of exhibits that

 4   you gave us this morning, and I was wondering if you

 5   could look at it and just read through it generally,

 6   and as you are doing that, I will read into the

 7   record, it is Bates numbers Allergan_MDL_02176551

 8   through 553.

 9            And when you are ready, can you tell me

10   what this appears to you to be?

11       A.   Yes.  The first thing I can tell you is

12   that this is a document created by DEA Affairs or DEA

13   compliance team regarding our suspicious order

14   monitoring procedure --

15       Q.   All right.

16       A.   -- that follows the CSA.

17       Q.   So before we get too far into this

18   document, based on your ex -- your own personal

19   experience at Watson and Actavis and Allergan, can you

20   tell whether this was created before or after the

21   Aller- -- Actavis Watson merger?

22       A.   This was created after.  I can tell you

23   that because of the logo.

24       Q.   All right.  So with regard to this
```

```
 1    document, do you remember ever seeing this document

 2    before?

 3         A.    Yes, I do.

 4         Q.    Okay.  When was the last time you saw this

 5    document?

 6         A.    It would have been when I worked for

 7    Actavis, Inc.

 8         Q.    All right.  So, can you tell from the

 9    context of this document that -- that -- any

10    particular timeframe from the time of the merger to

11    today that this would cover, just because I don't see

12    any dates on it to get a -- a hook that -- in that

13    manner?

14         A.    I -- I wasn't the creator of the

15    document --

16         Q.    Right.

17         A.    -- so I wouldn't want to tell you a date

18    because I didn't create this.

19         Q.    Okay.

20         A.    This would have been created by, most

21    likely, Tom Napoli.

22         Q.    Okay.

23         MS. LEVY:  And, Tom, just for the record, I

24    think it is in the binder.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MR. EGLER:  Oh, it is?

 2          MS. LEVY:  I think it's a different Bates --

 3          MR. EGLER:  Okay, great.

 4          MS. LEVY:  It is a different Bates number, but I

 5   believe, if I'm right, it is at Tab 20.

 6          MR. EGLER:  Great.  Okay.  Where is my binder?

 7              Oh, here it is?  This is mine?

 8   BY MR. EGLER:

 9      Q.    All right.  Right.  Can you turn to Tab 20

10   then.  And, again, for the record, as before, Tab 20

11   is contained inside the compendium of exhibits that's

12   in Exhibits 1 through 24.

13              All right.  So this is a document that you

14   identified as one of the policies of Actavis.  So with

15   regard to this particular -- I'm sorry.  Yeah, one of

16   the policies of Actavis, and you've identified it as

17   post Watson Actavis merger, is that right?

18      A.    So from the logo, I am assuming that

19   because that's the logo that was created at Actavis,

20   Inc.

21      Q.    All right.  But beyond that, you can't

22   tell when this policy was in force?

23      A.    Well, it doesn't mean that it was in force

24   then.  Much of this was what was already in place.
```

Highly Confidential - Subject to Further Confidentiality Review

1    I'm -- I'm assuming that the document was created post

2    then, but it doesn't mean that that's when the policy

3    was created.

4         Q.    So is it fair to say what you are saying

5    is that this might be a holdover policy from Watson

6    previously?

7         A.    Correct, because, I mean, I'm reading

8    what's in here and this is not anything that's new to

9    me.

10        Q.    Okay.  So can you look at the -- on Page 3

11   of the document, it's Bates No. 6079 in Exhibit 20

12   under the Paragraph 2.6 that's there.

13        A.    Correct.

14        Q.    And it says:

15             "Some of the reasons that might allow DEA

16   Affairs personnel to clear an order of interest

17   include," and then it says:  "Order error, new and/or

18   type of customers" and then "(require confirmation)"

19   and then "verified increased market growth" and then

20   "market shortage" and then "new or different drug" and

21   then "different size or preparation" and then "results

22   of on-site review."

23             Do you see that there?

24        A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Do you know who would have been

 2   responsible at Watson or Actavis to write that

 3   language?

 4        A.    So that would have been under the DEA

 5   compliance team that wrote that.

 6        Q.    Okay.  And do you know when that -- when

 7   that Paragraph 2.6 came into effect?

 8        A.    That process was in effect during Watson

 9   Pharmaceuticals.

10        Q.    All right.  So prior to the Watson Actavis

11   merger?

12        A.    That is correct.

13        Q.    All right.  Do you know how far back this

14   2.6 paragraph was in effect?

15        A.    I don't have an exact date.  I'm going to

16   say based on the policy and the process that we had,

17   it has to have been substantially before the Actavis

18   Inc. acquisition.

19        Q.    Okay.

20        A.    It's going to be mid 2000, probably -- and

21   Tom Napoli may be able to confirm this -- I would say

22   with the SAP procedure around 2004, 2005 timeframe.

23        Q.    All right.  So in looking at the next

24   paragraph there, Paragraph 2.7, it states:
```

```
 1                    "If the order cannot be cleared based on

 2    the documentation provided by customer service

 3    personnel, or if the customer has had previous orders

 4    pended and provided similar reasons, the reasons will

 5    be further investigated."

 6         A.    Correct.

 7         Q.    And then there are two subparagraphs

 8    there.

 9                Again, do you know who would have been

10    responsible for writing that language?

11         A.    Yes, that would have been control

12    substance compliance team, DEA Affairs.

13         Q.    And then the same thing, Tom Napoli and

14    his group?

15         A.    Yes, that would be correct.

16         Q.    With regard to the language that's there

17    in that Paragraph 2.7 that I just wrote, do you

18    remember if there was ever a policy that an order

19    could be clear based on a verbal okay by someone in

20    customer service?

21         A.    If the -- if an order was escalated to DEA

22    Affairs, we didn't have an ability to release it.

23    Only DEA Affairs would document the reason we could

24    release it.  Before it was released, it had to be
```

Highly Confidential - Subject to Further Confidentiality Review

1    written.

2        Q.    Okay.  So -- and just so I'm clear on the

3    terminology, would every order that was pended be

4    escalated to DEA Affairs or was there something else?

5        A.    Not every order that was pended was

6    escalated.

7        Q.    Okay.  Can you tell from this document

8    what orders that were pended would not be escalated to

9    DEA Affairs under this policy?

10       A.    So the order that's pended, if it requires

11   additional information, so if it is considered an

12   order of interest, as they say in here, it gets

13   escalated to DEA Affairs.

14       Q.    Okay.  So what's the difference between an

15   order of interest and a pended order?

16       A.    So orders of interest mean that it

17   violates one of the algorithms in the system, one of

18   the -- one of the parameters in the system, it

19   violates that, and we don't have appropriate

20   justification or it exceeds one of those

21   justifications --

22       Q.    Uh-huh.

23       A.    -- and we don't have reasonable

24   justification without additional review by the DEA

Highly Confidential - Subject to Further Confidentiality Review

 1    Affairs team, and those would all get escalated to DEA

 2    Affairs for additional review.

 3            And that's where it then shows under 2.6

 4    after they do the initial review, they would need to

 5    respond to us as to the ability to review that

 6    order -- I -- I'm sorry -- to release that order, and

 7    these are some of the reasons that they would release

 8    the order.

 9    Q.    Okay.  So there -- are there any orders

10    that are pended but not orders of interest under this

11    policy?

12    A.    Well, when an order is pended, it's pended

13    for a review, but it doesn't necessarily -- it's --

14    it's re -- it means that it violated, we have to

15    review it and determine if it's an order of interest,

16    meaning that there is no justification, we can't -- we

17    don't have justification, we don't have reasonable

18    information, and then we feel that it's an order of

19    interest.  And at that point we have to submit that

20    over to our DEA Affairs team.  I guess you wouldn't

21    consider it a suspect order at that point, it is just

22    an order of interest at that point.

23    Q.    So how could an order pend under this --

24    A.    And I don't think that this is actually a

1    policy at this point.

2         Q.    Oh, okay.

3         A.    Okay.  It is a document that they wrote,

4    but I don't see that this is actually turned into a

5    policy.

6         Q.    All right.  Do you remember if this ever

7    became a policy?

8         A.    I don't see this in a policy form.  I'm

9    not aware if it did or didn't.  I think that this was

10   something that they may have been intending, but I

11   think we would have to ask -- ask Tom that question,

12   because this is something that they documented.

13        Q.    All right.  With regard to the procedures

14   that's laid down here, can you point out where in here

15   a -- an order could pend but not become an order of

16   interest?

17        A.    I think we have that in our operational

18   procedures which they review.

19        Q.    Okay.  Do you know whether that procedure

20   is in the compendium of documents that you -- you gave

21   to me today?

22        A.    Yes.

23        Q.    Okay.  Where -- where is it?

24        A.    Let me just verify and then I will tell

1    you.

2         Q.    Yep.

3         A.    Tab 17.

4         Q.    All right.  And can you -- as you are

5    looking through Tab 17, I'll read into the record

6    that -- we'll make it Exhibit 17, and it's part of the

7    compendium of documents submitted as Exhibit 25, and

8    for the record, Exhibit 17 is Allergan_MDL_03750135

9    through 146.  And...

10        A.    And if you'll give me a minute.

11        Q.    Right, sure.

12        A.    So if you want to turn to Page 7.

13        Q.    All right.

14        A.    It starts there and then it goes to

15   Page 9.  And it talks on Page 9.  So if you look about

16   the fifth paragraph, one, two, three, four, fifth

17   paragraph down on Page 9:

18             "Once the SOMS form is confirmed and

19   verified, the MDA will release the SOMS violation

20   block, otherwise the MDA" -- that's master data

21   administrator -- "will escalate the order of interest

22   to the DEA Affairs department for review and feedback.

23   If DEA Affairs determines the order of interest needs

24   to be communicated to the DEA, then DEA Affairs will

Highly Confidential - Subject to Further Confidentiality Review

```
 1   contact the DEA."

 2       Q.    So under this policy, which of the bullet

 3   points that appear above the paragraph that you just

 4   wrote are conditions under which a pended order could

 5   be released prior to it being sent to the DEA Affairs

 6   department?

 7       A.    So, everything on Page 8, all of that

 8   needs to occur, so all of the investigation needs to

 9   be done.

10       Q.    Okay.

11       A.    Once all of the investigation is done,

12   once this -- and the SOMS form is confirmed and

13   verified, they can release that.  So they have to go

14   through that entire process.

15       Q.    All right.  With regard to the bullet

16   points that a -- appear above that paragraph that you

17   just wrote -- or you just read, let me -- is there --

18   let me start over.

19             With regard to the bullet points that

20   appear above the paragraph you just read on Page 9 of

21   Exhibit 17, is there a situation under which

22   reassurance from a Actavis employee could be the sole

23   reason for an order to be cleared of a suspicious

24   order monitoring system pend?
```

 1      A.    I'm -- I'm sorry.  I don't think I quite

 2  understand.

 3      Q.    So could the -- the impressions or

 4  perceptions of a -- of an Actavis employee be the sole

 5  reason that a -- a suspicious order could be removed

 6  from the pending list?

 7      A.    I wouldn't say impressions.  I would say

 8  factual information provided and backup documentation

 9  of those facts, but not impressions.

10      Q.    So is it your impression as you sit here

11  today that backup documentation materials would be

12  required to remove any pending order from a pending

13  order list under this procedure that's listed in

14  Exhibit 17?

15      A.    Yes.

16      Q.    All right.  If there were no backup

17  documentation provided, what would the typical process

18  be with regard to the acceptance or non-acceptance of

19  a assertion by an Actavis employee?

20      A.    If there was no information available, no

21  justification, the order would not be accepted.

22      Q.    And when you say information and

23  justification, just so we are clear, that's

24  information and justification beyond a -- a assurance

1    without further backup by an Actavis employee, is that

2    right?

3         A.    What I am stating is that we have to have

4    backup information, additional information

5    justification.  If that did not exist or we couldn't

6    get that information, then the order would be

7    cancelled.  We would not accept that order.

8         Q.    Okay.  And would that -- could the backup

9    and justification be based on a -- just a verbal or

10   e-mail reassurance by an Actavis employee standing

11   alone?

12        A.    No, it couldn't be from another Actavis

13   employee.

14        Q.    Okay.  All right.

15        A.    Or let me -- let me correct that.

16              One of the tools might be that there was a

17   market shortage on a particular product --

18        Q.    Uh-huh.

19        A.    -- so there were different elements of

20   items that we had to gather in order to have

21   justification.  It could be an e-mail stating that

22   there was a market shortage on a product, which means

23   we were supplying the product and hadn't been before,

24   that could be a justification from a Watson

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Pharmaceuticals or Actavis, Inc. employee that we

 2   would have had as backup.

 3        Q.    Okay.

 4        A.    Is that -- that -- that could be an

 5   employee inside of the company providing the

 6   justification.

 7        Q.    Any other situations that you can see?

 8              And where is the market share -- sorry.

 9        A.    Could be a -- it could be a customer that

10   has a new product added to a contract that we would

11   get that information from the contracts team.

12        Q.    Uh-huh.

13        A.    It could be a new product launch, we would

14   get that information.  I think in just general it says

15   that we would contact other teams for information, so

16   that would be something we would do internally to

17   understand what was going on in the market.

18        Q.    Where is the language that you say

19   "contacting other teams"?

20        A.    It just says "some of the tools used

21   during analysis."

22        Q.    Okay.  And so your impression from reading

23   that language that's on Page 8, and it's Bates

24   number 142, and those sub paragraphs leaves you to
```

1  believe that some orders could be removed from the

2  pend list based on either written or verbal assurances

3  without documentational backup?

4       A.    I don't think verbal.

5       Q.    Okay.

6       A.    There would always be documentation.  Your

7  question was could it be another Actavis employee.

8       Q.    Yes.

9       A.    That sent an e-mail, not verbal.

10       Q.    So based on the representation of another

11  Actavis employee, pending orders could be released?

12       A.    If it was the correct related information,

13  yes, not just you are free to release this.

14       Q.    Okay.

15       A.    That would not suffice.

16       Q.    And is that -- is -- is what you are

17  saying listed anywhere here in particular or is it

18  your impression based on reading this information?

19       A.    It is not my impression.  I know what the

20  process was and it states, you know, some of the tools

21  used during the analysis, which means that that's not

22  all inclusive.

23       Q.    All right.

24       A.    They would make sure to do a thorough

Highly Confidential - Subject to Further Confidentiality Review

1    investigation.  So these would be tools that they used

2    and if they had other tools they needed to use, they

3    would do that.

4         Q.    All right.  Do you remember a -- whether

5    there was ever training or discussion of the total

6    scope of the tools that were available to the people

7    analyzing pended orders under this policy?

8         A.    Yeah, these people went through

9    significant training annually.

10        Q.    So as part of that training, do you

11   remember whether the -- the written e-mail evidence

12   that you are talking about was made known to the

13   people being trained as --

14        MS. LEVY:  Object to the form.

15   BY MR. EGLER:

16        Q.    -- acceptable evidence for removing an

17   order from the pending list?

18        A.    They kept all of the backup documentation

19   with the approval and knew exactly what they needed to

20   have to release an order.

21        Q.    All right.  But do you remember whether

22   the training ever included the ability to release an

23   order based on an e-mail representation from an

24   Actavis employee?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    I -- if you are asking me to recall off

2   the top of my head, I probably can't recall off the

3   top of my head.

4       Q.    In your preparation for the deposition

5   today, did you ever come across a document that said

6   that it was the policy of Actavis that an order could

7   be removed from a pending order list based on an

8   e-mail representation of an Actavis employee?

9       A.    I don't know if we saw anything that

10  specific.  I know we reviewed the policies.

11      Q.    And in reviewing of all of the policies

12  that you saw, was there ever a policy that said

13  anything to the effect of that -- affirmatively said

14  anything to the effect that an e-mail from another

15  Actavis employee was all that was required to release

16  an order from the pending list?

17      A.    And are we -- are we talking about

18  Actavis Inc. now or Actavis, Inc.?

19      Q.    Any of the policies that you looked at,

20  whether at Watson, Actavis Inc. or Actavis, Inc.

21      A.    I don't recall.

22      Q.    So you don't recall seeing that one way or

23  the other?

24      A.    I do not.
```

1      Q.    All right.  Do you think that would have

2   been something that would have been written down, if

3   that was specifically affirmatively part of the

4   policy?

5      A.    I think the policy would have stated that

6   backup documentation is required to release any order.

7      Q.    All right.  And does it say that the

8   backup -- that backup documentation includes an e-mail

9   representation by another Actavis employee?

10     A.    I don't think it would be that specific.

11  I think it would be specific that all backup

12  documentation is to be attached to the order before

13  releasing.

14     Q.    And as you are sitting here today, do you

15  consider the backup documentation to include an e-mail

16  representation from another Actavis employee?

17     A.    I would say it should be -- I would say

18  any documentation received would be part of that

19  backup documentation.  I'm not being specific about

20  what it is because I don't know what they would have

21  received for a particular order.

22     Q.    All right.  All right.

23           So, with regard to this -- with regard to

24  the language that you were just pointing me to on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Pages 8 and 9 of this Exhibit 17, can you turn to

 2    Page 7 of this document, and it says:  "C-II schedule

 3    drugs and SOM blocks."

 4            Do you see that there?

 5        A.    I do.

 6        Q.    So, with regard to this issue that

 7    you're -- that we were just discussing, is this a -- a

 8    policy that only applies to Schedule II controlled

 9    substance drugs?

10        A.    No.  Specifically right underneath it

11    says:  "SOMS, Suspicious Order Monitoring System (of

12    Control Drug Substances)."

13        Q.    So on the -- the line there that says

14    No. 9, the C-II scheduled drugs, how does that limit,

15    if at all, the -- the language that's listed below?

16        A.    It doesn't.

17        Q.    All right.  So why -- do you have a

18    understanding as to why that is listed there as C-II

19    scheduled drugs?

20        A.    I don't know today why it would have been

21    listed that way.  I think people sometimes

22    misunderstand that C-III through Vs are, so I think we

23    specifically listed out C-IIs and SOMS blocks, and

24    then listed of controlled substances -- controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1    drug substances so people would not be confused --

2         Q.    Okay.

3         A.    -- that C-IIs are the only drugs.

4         Q.    All right.

5               All right.  You can set this document

6    aside for now and...

7               All right.  Could you look at what's in

8    the compendium that you provided today at Exhibits 15

9    and 16, and I'm going to ask you a question and then

10   you can look through them.

11              The -- the question is:  Can you tell me

12   the -- the difference between the two documents, 15

13   and 16?  And as you are doing that, I'm going to read

14   into the record, it's Allergan_MDL_06 -- I'm sorry --

15   01684748 through 4752.  And then 16 is All --

16   Allergan_MDL_01979834 through 9838.

17              And before you start answering it, I'm

18   just going to make for the record that 15 and 16 are

19   part of the compendium of exhibits that's marked as

20   25.

21              Okay.  Go ahead.

22        A.    So, I'll -- I'll help you with this to the

23   best of my ability.  This is Actavis Inc.

24        Q.    So when you say it's Actavis Inc., this is

Highly Confidential - Subject to Further Confidentiality Review

```
1   pre Watson merger Actavis, is that right?

2        A.    You are correct.

3        Q.    All right.  Go ahead.

4        A.    So the first policy that ends in 748 is

5   the Bates number that says:  "Direct customers sales

6   SOP."

7        Q.    Uh-huh.

8        A.    So this is related to customers that were

9   purchasing direct from Actavis Inc.

10            And then the second Bates number that ends

11  in 834, that policy is related to indirect customer

12  purchases, meaning they were not a direct customer of

13  Actavis.

14       Q.    And when you use that term or the document

15  uses that term, "indirect customer sales," what does

16  that mean in the context of your work?

17       A.    To help you explain it -- to help explain

18  it to you, that would be the know your customer's

19  customer.

20       Q.    Okay.

21       A.    It is the downstream customer who the

22  wholesaler or distributor sells to, somebody that

23  directly purchased it from us.

24       Q.    Okay.  On this Exhibit 16 on what's marked
```

1    as Page 3 of 5, No. 836, under Paragraph 6 it states:

2    "Identification of Customer Pool."

3              Do you see that there?

4         A.    I'm sorry.  What paragraph, 3...?

5         Q.    Paragraph 6.

6         A.    Okay.

7         Q.    It states --

8         A.    Uh-huh.

9         Q.    -- "A quarterly analysis of direct

10   customers buying C-II car" -- "narcotics will be

11   performed to identify a direct wholesalers and" --

12        A.    Uh-huh.

13        Q.    -- "distributors that will be monitored by

14   this SOP."

15        A.    Uh-huh.

16        Q.    "Any direct wholesaler or distributor that

17   purchases a quantity of 50,000 units or greater on an

18   annual basis of C-II car" -- "narcotics will need to

19   be monitored poor" -- "per this SOP for their indirect

20   customer purchases."

21        A.    Um-hum.

22        Q.    Do you remember whether pre Actavis merger

23   Watson had a similar policy as to this?

24        A.    I do not.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Okay.  You don't remember one way or the

 2  other?

 3       A.    I do not remember that there was a policy

 4  like this because the 867 data was used as one of the

 5  tools to evaluate the orders at the time they pended,

 6  not -- not on a monthly basis.

 7       Q.    All right.  And when you say the 867 data

 8  was used when an order pended, that's -- you're

 9  referring to something that happened at Watson pre

10  Actavis merger, is that right?

11       A.    That's correct.

12       Q.    All right.  And there is no separate

13  monthly analysis of any customer-customer data that

14  you can think of at Watson, is that right?

15       A.    Well, it wouldn't have been needed because

16  this is saying that they were doing this quarterly,

17  and what I'm stating is at Watson if the 867 data was

18  available, they would just do it right at that time.

19       Q.    I'm -- I'm sorry.  Right at what time?

20       A.    At the time the order pended.

21       Q.    Okay.

22       A.    So if you remember the policy we just

23  reviewed, under that list of some of the tools used --

24  I'll take one step back.
```

```
 1              So when we talked about the ValueCentric

 2    data prior and I had mentioned that the ValueCentric

 3    data was comprised of this 867 data --

 4       Q.    Uh-huh.

 5       A.       -- in the Watson world and Actavis, Inc.

 6    world, the 867 data, which is used for ValueCentric,

 7    was one of the tools that was used.  If it was

 8    available from a customer, that was one of the tools

 9    used to evaluate a pended order.  So when an order

10    would pend, you could evaluate it right at the time.

11       Q.    Okay.

12       A.     In the Actavis Inc. world, this was their

13    process and a quarterly -- they did a quarterly

14    analysis, which is a good process, they did a

15    quarterly analysis, it says right here, they

16    identified the wholesalers, anybody that sold over

17    50,000 units or greater on an annual basis, they took

18    those customers quarterly and they did an analysis.

19    I'm not sure this system was called Q4biz or a

20    comparable program, and that was how they identified

21    the pool of customers that they were going to use

22    to -- to -- to evaluate indirect data.

23       Q.    All right.  And the -- the next paragraph

24    down states:
```

```
1              "Indirect customers buying from multiple

2     sources."  That's Paragraph 7.1.

3              Do you see that there?

4     A.    I do.

5     Q.    And it says:

6              "Monthly analysis should be performed

7     using the Valuetrack 'Safe and Secure' Module, or a

8     comparable program, to monitor for pharmacies or other

9     individual stores buying Actavis controlled substances

10    of the same product from more than one sale" --

11    "wholesaler or distributor during a two-week period."

12             Do you remember whether Watson had a

13    comparable policy to that?

14    A.    So that's, again, what the -- the 867 data

15    provides, right, is to go and see, to -- to look at

16    the data and to see if that particular -- is -- is to

17    look and to see if that product was being bought --

18    purchased via multiple wholesalers for that customer.

19    Q.    And would the analysis that you are

20    thinking of at Watson take place only after an order

21    pended, is that fair to say?

22    A.    Well, that's the point, right, so if an

23    order pended, that would be part of the investigation.

24    Tom Napoli's group also did a -- I believe, we can
```

Highly Confidential - Subject to Further Confidentiality Review

1    con -- confirm with him, I think it was a monthly

2    evaluation of chargeback data.  And in their monthly

3    review of chargeback data, they were also able to try

4    and analyze similar data, but that's kind of after the

5    fact.

6              So there was two things that we were

7    doing.  If 867 data was available, we would try to

8    catch it that way.  And also monthly he was doing a

9    chargeback analysis of data as well.

10   Q.    So this 7.1 paragraph that I just read,

11   the -- are -- are you aware whether -- well, I think

12   you had said before that post merger Watson did not

13   adopt the Safe and Secure data that Actavis had

14   subscribed to, is that right?

15   A.    What I said was that we didn't adapt that

16   because we had other tools that we used and we didn't

17   adapt Safe and Secure because we used something else.

18   Q.    All right.  And do you remember when

19   Watson started looking at the chargeback data that you

20   just mentioned in an analysis of its customers'

21   customers?

22   A.    I would say shortly after the acquisition,

23   probably right around this time that this was

24   completed.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    All right.  And this is year-end 2013?

2        A.    Not year-end --

3        Q.    Or, I'm sorry --

4        A.    -- about February of 2013, so I think it

5    was right around the same time or maybe slightly

6    before this, 2012, 2013.

7        Q.    Okay.

8        A.    I'm not exact on the date, but I know it

9    is somewhere around that time period.

10       Q.    All right.  I'm going to hand you what

11   we'll mark as, I think Exhibit 29.

12                  (WHEREUPON, a certain document was

13                   marked Allergan 30(b)(6) - Woods

14                   Deposition Exhibit No. 29, for

15                   identification, as of 01/09/2019.)

16   BY MR. EGLER:

17       Q.    And, again, the -- hold on.  Let me finish

18   one thing, do the other.

19             So, Exhibit 29 is an e-mail chain that

20   attaches a document and we provided the family, as the

21   documents are called, that we found.  And for the

22   record, I'll read in, it is Allergan_MDL_ --

23       A.    Uh-huh.

24       Q.    -- 02146297 through 6311.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And can you look at this document and look

 2    at the, what appears to me to be the first attachment

 3    of the document that starts on Page 46301 and tell me

 4    if you've seen that before.  I -- and I think that

 5    document goes to 46307.

 6        A.    So this is a controlled substance

 7    compliance policy, so I don't know when this was

 8    published, but it is a controlled substance compliance

 9    policy.

10        Q.    All right.  So from the context of this

11    document anywhere, and what -- I'm talking about this

12    attachment that starts on Page 301 and goes to 307,

13    can you tell me from the context whether this appears

14    to you to be post Watson/Allergan merger?

15        A.    This printed copy is post the merger

16    because of the logo.

17        Q.    And then --

18        A.    But --

19        MS. LEVY:  Just for you, Tom, and the witness,

20    this is in the binder 25.

21        MR. EGLER:  Okay.  Great.

22        MS. LEVY:  It is at Tab 18.

23        MR. EGLER:  Okay.  Again, we looked -- looked

24    for this but had not found it.  Tab 18, all right.
```

```
 1   BY THE WITNESS:

 2       A.    Well, let me just read through this more

 3   because I see a lot of things in here that were in

 4   place prior to the Actavis acquisition.

 5       MR. EGLER:  Sorry.  That's my fault.  I don't

 6   think I gave it to you to look at.

 7   BY MR. EGLER:

 8       Q.    All right.  So this is -- I handed you a

 9   Document 29, and as your counsel just said, the

10   attachment, the first attachment to Exhibit 29 also

11   appears as Exhibit 18 in the compendium that you gave

12   us.

13       A.    I mean, a lot of this is things that we

14   were doing prior to the Actavis acquisition.

15       Q.    So can you look at what's marked as Page 6

16   of 7 of the attachment, first attachment to

17   Exhibit 29, it's Page 6306 Bates stamp number, and it

18   states under 6.7, Data Analytics.

19            Do you see that there?

20       A.    Um-hum, I do.

21       Q.    And it says:

22            "On a monthly basis, CS compliance will

23   review chargeback data" --

24       A.    Uh-huh.
```

1      Q.      -- "for key products with the objective of

2    ensuring that pharmacy level customers are not

3    purchasing excessive quantities of controlled drug

4    products from multiple supplier sources."

5            Do you see that?

6      A.      I do.

7      Q.      All right.  Do you remember when that term

8    first became a part of the combined Watson/Actavis's

9    policy or -- or Watson's policies before that?

10     A.      Well, I want to say it was probably around

11   2012, 2013 when DEA was pretty gung ho on the fact

12   that they thought chargeback data was a good solution

13   and people tried to start incorporating the use of

14   that.  So I think that our DEA compliance team wanted

15   to try and do some an -- analysis to see if that would

16   be a useful tool.

17     Q.      All right.  And do you remember whether

18   they continued to do this until the Allergan group no

19   longer had a suspicious order monitoring policy?

20     A.      I wouldn't know that they stopped.

21     Q.      Okay.

22     A.      I wouldn't have expected them to, so I

23   think that's a question for Tom.

24     Q.      All right.  And with regard to the

1   chargeback data, what's your impression of what that

2   refers to, the chargeback data?

3       A.    Chargeback data is used when there is a

4   contract at the wholesaler.  So we have a -- we have a

5   contract with the customer for a particular price,

6   they buy the product through the wholesaler at

7   wholesale acquisition cost, it's the difference

8   between the two products and then there is a

9   chargeback to the wholesaler for the difference in the

10  two prices.

11      Q.    And then what is chargeback data?

12      A.    It's the -- the data is the data that

13  comes back into our company to -- by the person that

14  submitted the chargeback.  So we can see the -- the

15  name of wholesaler, the information on the company

16  and the units.

17      Q.    So the -- the --

18      A.    That's the chargeback data.

19      Q.    You used the word "by," and you meant b-y,

20  right, not b-u-y, you said "the data by"?

21      A.    Yes, "the data by" --

22      Q.    Okay.

23      A.    -- submitted by the wholesaler, b-y, by

24  the wholesaler for purchases.

1      Q.    All right.  And would the chargeback data

2   be data --

3             (WHEREUPON, there was a short

4               interruption.)

5   BY MR. EGLER:

6      Q.    All right.  So the chargeback data is data

7   that is about sales that Actavis made to a wholesaler

8   or distributor, is that right?

9      A.    Not exactly.  It's -- it's sales that the

10  wholesalers made and they are asking us for a

11  charge -- they are asking us to pay them the

12  difference between the contract price set up in their

13  system.  So you are Walgreens and we have a contract

14  price with you, but you purchase your product through

15  ABC.  So ABC has you set up in their system and the

16  price that you are buying it -- the price that we are

17  selling it to you for is $5, but ABC is buying it to

18  us for $6.50 at wholesale acquisition costs.  So we

19  have to make ABC whole because you just now purchased

20  it through them for $5 because you have a contract

21  price with us.

22     Q.    Uh-huh.

23     A.    So ABC submits a data feed to us and says,

24  Here is my chargeback data, you owe me a dollar 50 for

Highly Confidential - Subject to Further Confidentiality Review

1    every unit that Walgreens purchased.

2        Q.    Right.

3        A.    That's chargeback data.

4        Q.    So that the scope of what would be

5    contained in the chargeback data that we are talking

6    about would always be limited to the -- the scope of

7    the pills that were part of an order fulfilled by

8    Actavis to an end user?

9        A.    Yes, but I believe it's submitted by the

10   DEA number, yes.

11       Q.    When you say "submitted by a DEA number,"

12   what does that mean?

13       A.    When the chargeback data comes in, I think

14   it is by DEA number.

15       Q.    Whose DEA number, are you talking about

16   the --

17       A.    The --

18       Q.    Sorry.  When you say "DEA number" --

19       A.    The wholesaler's customer ship to DEA

20   number, the end user's DEA number.

21       Q.    All right.

22              So is a DEA number something that an

23   individual who is prescribed drugs would have or a

24   pharmacy or something else?  I just don't -- I'm

```
 1   not --

 2        A.     Every DEA registrant has a DEA number.

 3        Q.     Oh, okay.

 4               So it would be, for example, a pharmacy

 5   that had a DEA registry?

 6        A.     Correct.

 7        Q.     All right.  All right.

 8               All right.  You can set that aside.

 9        MS. LEVY:  What's our time on the record?

10        THE VIDEOGRAPHER:  We have been going for about

11   an hour right now.  The total time...  Three hours,

12   25 minutes.

13        MR. EGLER:  All right.  Let's take a quick

14   break, all right?

15        THE WITNESS:  Tom, do you want these documents

16   back?

17        MR. EGLER:  Just set them there.

18        THE WITNESS:  Okay.

19        MR. EGLER:  Everything gets picked up by the

20   court reporter.

21        THE WITNESS:  Okay.

22        MR. EGLER:  And then it will all disappear into

23   something I never see and reappear on my computer at

24   some point, so...
```

```
 1        THE VIDEOGRAPHER:  The time is approximately

 2   1:55 p.m. and we are going off the record.

 3                    (WHEREUPON, a recess was had

 4                     from 1:55 to 2:09 p.m.)

 5        THE VIDEOGRAPHER:  We are back on the record.

 6   The time is approximately 2:09 p.m.

 7   BY MR. EGLER:

 8        Q.    Ms. Woods, thanks for coming back.

 9              Could you look again at Exhibit 27, the

10   big document that you have in front of you.  And under

11   Topic, the Exhibit 27 says:

12              "Identifications" -- "Identification of

13   your policies and procedures concerning your duties

14   under the CSA or state and local laws and regulations

15   concerning the diversion of opioids as well as persons

16   or committees tasked with detecting diversion of

17   opioids, or suspicious orders, whether the position's

18   compensation was based, in whole or in part, on levels

19   of controlled substances or opioid products."

20              And today we have been talking pretty much

21   exclusively about suspicious order monitoring.

22        A.    Uh-huh.

23        Q.    As you think of it, are there any other

24   policies, other than the suspicious order monitoring
```

1    policies, that Watson, Actavis Inc. or -- or

2    Actavis, Inc. had with regard to fighting diversion of

3    opioid prescription drugs?

4        A.    I think everything that I am aware of or

5    we found we have identified and made available on

6    here.

7        Q.    Okay.  That -- is the -- is the list of

8    policies and procedures that are there on the first

9    page of Exhibit 27, the compendium of exhibits that's

10   marked as Exhibit 25?

11       A.    I mean, related to the CSA, I believe

12   everything is here, everything under my

13   responsibility, our company's responsibility, under

14   this topic, I -- I think everything that we could

15   possibly find is here.

16       Q.    Okay.  All right.

17            And while you were preparing for the

18   deposition today, did you come to an understanding

19   that other policies existed that you could not find a

20   copy of?

21       A.    We reached out to people outside of our

22   current company, we reached out to the other

23   affiliates to question on anything that might be

24   available.  So if there is anything available outside

Highly Confidential - Subject to Further Confidentiality Review

1    of our systems, we'd have to rely on affiliate

2    companies to provide that information to you.

3         Q.    Did they provide it to you?

4         A.    We -- I -- we believe everything that you

5    have is everything that's available.

6         Q.    All right.

7         A.    And everything would have been provided to

8    you in advance.

9         MR. EGLER:  All right.

10          All right.  I don't have any further

11   questions.  Thank you.  And I'll see you again

12   tomorrow.

13        THE WITNESS:  Okay.

14        MR. EGLER:  All right.

15        THE VIDEOGRAPHER:  Any other one, does anyone

16   else have some questions?

17          The time is approximately 2:12 p.m.  This

18   concludes today's portion of the deposition.

19               (Time Noted:  2:12 p.m.)

20               FURTHER DEPONENT SAITH NOT.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4     a Certified Shorthand Reporter, do hereby certify:

 5              That previous to the commencement of the

 6     examination of the witness herein, the witness was

 7     duly sworn to testify the whole truth concerning the

 8     matters herein;

 9              That the foregoing deposition transcript

10     was reported stenographically by me, was thereafter

11     reduced to typewriting under my personal direction and

12     constitutes a true record of the testimony given and

13     the proceedings had;

14              That the said deposition was taken before

15     me at the time and place specified;

16              That I am not a relative or employee or

17     attorney or counsel, nor a relative or employee of

18     such attorney or counsel for any of the parties

19     hereto, nor interested directly or indirectly in the

20     outcome of this action.

21              IN WITNESS WHEREOF, I do hereunto set my

22     hand on this 11th day of January, 2019.

23

24              JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject To Further Confidentiality Review

```
 1                  DEPOSITION ERRATA SHEET

 2

 3

 4   Case Caption:  In Re:  National Prescription

 5                  Opiate Litigation

 6

 7        DECLARATION UNDER PENALTY OF PERJURY

 8

 9        I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                             MARY WOODS

19

20   SUBSCRIBED AND SWORN TO

21   before me this      day

22   of                , A.D. 20__.

23

24            Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                       MARY WOODS
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                     MARY WOODS
```