**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF THOMAS MCGUIRE CONCERNING DAMAGES

July 31, 2019

*In re National Prescription Opiate Litigation*: MDL 2804
Summary Sheet of Concise Issues Raised

**Opposition Name:**    Plaintiffs' Memorandum of Law in Opposition to Defendants'
Motion to Exclude Testimony of Thomas McGuire Concerning
Damages

**Opposing Parties:**    Plaintiffs Summit County and Cuyahoga County

Defendants challenge the opinions offered by Dr. Thomas G. McGuire quantifying the economic damages suffered by the Bellwether Counties as a result of the opioid epidemic. Their challenges lack merit.   Professor McGuire, a renowned professor of health economics in the Department of Health Care Policy at Harvard Medical School with decades of experience researching, publishing, and teaching health economics and health policy, applied standard economic methods to determine the costs incurred by the Counties in responding to the epidemic. After analyzing the economics of local government budgeting, Prof. McGuire identified nine divisions in Cuyahoga County and ten divisions in Summit County affected by the opioid epidemic. Professor McGuire then estimated the specific past expenditures incurred by affected divisions in responding to the opioid crisis following a systematic review of county expenditures. Finally, Professor McGuire applied the estimates of the percent of harms attributable to defendants' misconduct, as presented in the expert report of Dr. David Cutler, to the identified affected costs in each division yielding an estimate of the damages for which Defendants are liable.

Because of the nature of the governmental budgeting process, Prof. McGuire's analysis incorporates the concept of "opportunity costs," and Defendants' motion to exclude is based primarily on McGuire's consideration of such costs. Economists uniformly recognize "opportunity costs" as representing true costs; both Ohio and federal case law permit the recovery of such costs.  *See, e.g., Illuminating Co. v. Wiser*, 2018-Ohio-2248, ¶ 30, 114 N.E.3d 240, 246; *Complete Gen. Constr. Co. v. Ohio Dep't of Transp.*, 2002-Ohio-59, 94 Ohio St. 3d 54; *Cincinnati Bell, Inc. v. Hinterlong*, 70 Ohio Misc. 38, 44 (Mun. 1981); *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008); *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 409 (4th Cir. 2013); *S. California Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1152 (C.D. Cal. 2007). Defendants' misconduct caused the Counties to divert their resources into responding to the epidemic, rather than providing the ordinary range of governmental services. This represented a genuine cost to the Counties, which they are permitted to recover. Defendants' arguments that the Counties are precluded from recovering these costs if they did not raise taxes to immediately increase their budgets, or if they cannot show that they are perfectly efficient in their use of their resources are entirely lacking in support. Defendants' quibbles with Dr. McGuire's methodology are similarly baseless and should be rejected.

**Filing Date:**       June 28, 2019
**Response Date:**     July 31, 2019
**Reply Date:**        August 16, 2019

# TABLE OF CONTENTS

*Page*

INTRODUCTION ................................................................................................................... 1

PROFESSOR MCGUIRE'S REPORT ........................................................................................ 2

ARGUMENT ....................................................................................................................... 4

I.     PROFESSOR MCGUIRE IS QUALIFIED TO OFFER HIS OPINIONS ................................. 4

II.    PROFESSOR MCGUIRE'S OPINIONS ARE ADMISSIBLE ............................................. 5

      A.    PROFESSOR MCGUIRE MEASURES COGNIZABLE DAMAGES ......................... 6

          1.    Professor McGuire Calculated Plaintiffs' Damages ............................ 6

          2.    The "Opportunity Costs" Measured by Prof. McGuire Are Recoverable under Ohio Law ................................................................ 9

          3.    The Damages Calculated by Professor McGuire Are Appropriate RICO Damages. ....................................................................................... 12

          4.    The Damages Calculated by Professor McGuire Were Caused by Defendants' Misconduct. ........................................................................ 13

      B.    PROFESSOR MCGUIRE'S CALCULATIONS ARE BASED ON RELIABLE METHODS........................................................................................................ 13

          1.    Professor McGuire Appropriately Measured Affected Costs. ...................... 13

          2.    Professor McGuire's Analysis Is Not Based on Unjustified Assumptions .............................................................................................. 15

CONCLUSION ..................................................................................................................... 16

# TABLE OF AUTHORITIES

*Page*

## Cases

*Asad v. Cont'l Airlines, Inc.,*
314 F.Supp.2d 726 (N.D. Ohio 2004) ..............................................................................13

*Autotrol Corp. v. Cont'l Water Sys. Corp.,*
918 F.2d 689 (7th Cir. 1990) ..........................................................................................14

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
152 F.3d 588 (7th Cir. 1998) .............................................................................................5

*Bridge* v. *Phoenix* Bond & Indemnity Co.,
553 U.S. 639 (2008) ........................................................................................................12

*Chemical Solvents, Inc. v. Advantage Engineering, Inc.,*
2011 WL 1326034 (N.D. Ohio Apr. 6, 2011) ................................................................15

*Chronister Oil Co. v. Unocal Ref. & Mktg.,*
34 F.3d 462 (7th Cir. 1994) ............................................................................................11

*Cincinnati Bell, Inc. v. Hinterlong,*
437 N.E.2d 11 (Mun. 1981) ............................................................................................10

*Cincinnati v. Beretta U.S.A. Corp.,*
768 N.E.2d 1136 (Ohio 2002) .........................................................................................11

*City of Youngstown v. Cities Serv. Oil Co.,*
31 N.E.2d 876 (Ohio Ct. App. 1940) ..............................................................................11

*Complete Gen. Constr. Co. v. Ohio Dep't of Transp.,*
760 N.E.2d 364 (Ohio 2002) ...........................................................................................10

*Fantozzi v. Sandusky Cement Prod. Co.,*
597 N.E.2d 474 (Ohio 1992) .............................................................................................6

*Illuminating Co. v. Burns,*
No. 100235, 2014 WL 585254 (Ohio Ct. App. Feb. 13, 2014) .......................................10

*Illuminating Co. v. Wiser,*
114 N.E.3d 240 (Ohio Ct. App. 2018) ........................................................................ 6, 10

*In re Asacol Antitrust Litigation,*
323 F.R.D. 451 (D. Mass. 2017), *rev'd and remanded on other grounds,*
907 F.3d 42 (1st Cir. 2018) ...............................................................................................5

*In re Hake,*
No. 04-41352, 2007 WL 7581218 (Bankr. N.D. Ohio Oct. 26, 2007) .............................14

*In re Masella,*
2007 WL 2302312 (Bankr. D. Conn. Aug. 7, 2007) .......................................................14

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    No. 06-md-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) .............................................. 14

*In re Opioid Litigation*,
    No. 400000/2017, 2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018) ................................. 11

*Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*,
    1993 WL 387346 (N.D. Ill. Sept. 23, 1993) ......................................................................... 4

*KCI USA Inc. v. Healtcare Essentials, Inc.*,
    2018 WL 4327801 (N.D. Ohio Sept. 10, 2018) .................................................................. 13

*Ohio Dist. Council, Inc. of the Assemblies of God v. Speelman*,
    114 N.E.3d 285 (Ohio Ct. App. 2018) *appeal not allowed*, 122 N.E.3d 216 ........................... 6

*Ohio Edison Co. v. Royer*,
    92 N.E.3d 912 (Ohio Ct. App. 2018), *appeal not allowed*, 102 N.E.3d 500 ......................... 10

*Ohio Edison Co. v. Soule*,
    No. S-17-052, 2018 WL 6016743 (Ohio Ct. App. Nov. 16, 2018) .................................... 10

*S. California Hous. Rights Ctr. v. Krug*,
    564 F. Supp. 2d 1138 (C.D. Cal. 2007) ............................................................................. 12

*State of Kan. v. State of Colo.*,
    No. 105, 2000 WL 34508307 (U.S. Aug. 31, 2000) ............................................................. 8

*State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*,
    925 F. Supp. 1247 (S.D. Ohio 1996) ................................................................................. 14

*Syngenta Crop Prot., LLC v. Willowood Azoxystrobin, LLC*,
    267 F. Supp. 3d 649 (M.D.N.C. 2017) .............................................................................. 14

*Tamraz v. Lincoln Elec. Co.*,
    620 F.3d 665 (6th Cir. 2010) ............................................................................................. 15

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
    741 F.3d 390 (4th Cir. 2013) ............................................................................................. 12

*U.S. ex rel. Purcell v. MWI Corp.*,
    520 F. Supp. 2d 158 (D.D.C. 2007), *rev'd on other grounds*,
    807 F.3d 281 (D.C. Cir. 2015) .......................................................................................... 12

*United States ex rel. George v. Fresenius Medical Care Holdings, Inc.*,
    2016 WL 5361666 (N.D. Ala. Sept. 26, 2016) .................................................................... 5

*United States v. Mallory*,
    902 F.3d 584 (6th Cir. 2018) ............................................................................................. 14

*White v. Smith & Wesson Corp.*,
    97 F. Supp. 2d 816 (N.D. Ohio 2000) ............................................................................... 11

*Williams v. Illinois*,
    567 U.S.50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012) ......................................................... 13

**Rules**

Fed. R. Evid. 703 ...................................................................................................................................13

**Other Authorities**

*Judicial Facts and Figures 2018: Business and Nonbusiness Cases Filed, by Chapter of the Bankruptcy Code*, at
    Tables 7.1 and 7.3.  *See*
    https://www.uscourts.gov/sites/default/files/data_tables/jff_7.1_0930.2018.pdf;
    https://www.uscourts.gov/sites/default/files/data_tables/jff_7.3_0930.2018.pdf (last visited
    July 30, 2019)...................................................................................................................................15

# INTRODUCTION

Dr. Thomas G. McGuire is a renowned professor of health economics in the Department of Health Care Policy at Harvard Medical School with decades of experience researching, publishing, and teaching health economics and health policy. Professor McGuire applied standard economic methods to assist the trier of fact in determining the key damages issue in this case: how much money did Cuyahoga and Summit Counties spend on opioid-related services necessitated by Defendants' misconduct?

Professor McGuire calculated one number; Defendants another. While Defendants' number is negligible—according to their expert accountant, for example, the misconduct from the opioid epidemic only cost Cuyahoga County the equivalent of less than *one four hundredth* of its budget—the 'right' number presents a litigation dispute having nothing to do with *Daubert*.

Defendants' specific arguments fail. First, Defendants' counsel (although not any of their more than 20 expert economists) argue that Plaintiffs did not incur losses because, simply put, the governments had budgets already. This is legally and economically unsupported: the fact and extent of damage does not depend on how the loss is funded. Plaintiffs have been injured by the diversion of their resources to the opioid crisis, and Professor McGuire has used an economically valid way to measure that injury. No more is required under the law.

Second, under the guise of a claim that Professor McGuire did not tie his findings to the misconduct at issue, Defendants fault Professor McGuire for relying on other experts, notwithstanding that the Rules of Evidence expressly allow such reliance and that Professor McGuire's work properly isolates damages due to Defendants' misconduct in this case.

Third, Defendants offer two failed challenges to Professor McGuire's methods. Professor McGuire was well within his expertise, informed by his collection and review of the pertinent facts, to identify county divisions with budgets that were affected by the opioid crisis, determine by how much they were affected, and to translate that number into a damages figure. In applying this

method, Professor McGuire was not first required (contrary to Defendants' suggestion) to establish that Plaintiffs operated with an undefined level of government efficiency.

For the reasons set forth in this brief and the attached exhibits, Plaintiffs' *Daubert* Roadmap, and the Reply Declaration of Professor Thomas G. McGuire ("McGuire Reply Dec."), Defendants' *Daubert* motion directed at Professor McGuire should be denied.[1]

## PROFESSOR MCGUIRE'S REPORT

Professor McGuire offers opinions about the damages that Plaintiffs have suffered as a result of the opioid epidemic.  These damages are backward-looking in that they calculate the costs Plaintiffs have already incurred.[2]

Professor McGuire's method of measuring damages in the context of governmental expenditures was careful and sound. Such an analysis requires familiarity with government budgeting and expenditure policies, in order to properly understand how injuries to governmental entities manifest themselves. First, Professor McGuire provided an economic framework for calculating damages to local governments, including a discussion of the economics of municipal government expenditures and a detailed explanation of how diversion of expenditures to opioid-related uses resulted in economic costs to the Plaintiffs.   Report of Thomas McGuire, Dkt. #2000-17 at ¶¶ 14-38. McGuire explains the economic factors unique to local governments and incorporates them into his analysis. *Id.*  Defendants ignore this analysis.

Having explained the economics of local government budgeting, Prof. McGuire "through review of the Bellwether governments' budgets and expenditures and interviews with Bellwether personnel," identified nine divisions in Cuyahoga County and ten divisions in Summit County

---

[1] Professor McGuire has two expert reports in this litigation: Damages to Bellwethers (which is the subject of this opposition) and Public Nuisance (of which *none* of the opinions are challenged by Defendants).  References to the "McGuire Report" in this brief refer only to the Damages to Bellwethers Report.

[2] The damages computed by Prof. McGuire are thus distinct from the costs of an equitable, forward-looking abatement remedy, which is a separate remedy to which Plaintiffs are entitled on their nuisance claim and otherwise and in support of which Plaintiffs have offered opinions from other experts.

affected by the opioid epidemic, including services for people with addiction, children and family services, medical examiner offices, judicial services, and crime-related divisions ("affected divisions").  McGuire Rep., Dkt. #2000-17 at ¶¶ 9, 39-55 (and referenced tables); *see, e.g.,* Thomas McGuire Dep. (4/23/19), Dkt. #1966-21 at 96:10-97:21; 98:02-99:07; 100:17-102:03; 105:2-15 (addressing the types of materials Professor McGuire reviewed and the interviews with government officials).[3]

Next, Professor McGuire estimated the *specific past expenditures* incurred by affected divisions in responding to the opioid crisis following a systematic review of county expenditures.  McGuire Rep., Dkt. #2000-17 at ¶¶ 56-71.  Professor McGuire applied a conservative version[4] of "methods used in peer-reviewed academic literature and government studies."  McGuire Reply Dec. ¶ 19; McGuire Rep., Dkt. #2000-17 at ¶ 41 nn.41-45.  While the documents and testimony in the extant record have multiple references to county costs directly engendered by the opioid epidemic—e.g., as the Cuyahoga County's CFO of addiction/mental health services division explained in a 2017 email, "[p]art of the . . . [budget] challenge this past two years is that our expenses have exceeded revenues due to the opiate epidemic"[5]—the counties' accounting records did not separately identify opioid-related costs.  This required Professor McGuire to apply his expertise in interpreting the proper expenditures, including for instance, identifying costs from the diversion of staff time. McGuire Rep., Dkt. #2000-17 at ¶¶ 25-29.

---

[3] The selection of these affected divisions is not challenged.  McGuire's identification of the affected divisions in Cuyahoga and Summit Counties is largely consistent with how other studies examining the societal costs of the opioid crisis have identified costs borne by local governments.  McGuire Rep., Dkt. #2000-17 at ¶ 41.

[4] For example, Professor McGuire focused on the larger county divisions, although the smaller divisions also could have incurred and likely did incur expenses, and he made various exclusions of items within the affected divisions (e.g., of administrative time, even if some was dedicated to opioid-related work).  He applied his percentage estimates to a smaller portion of the budget relative to the authors of many studies conducting similar analyses. McGuire Rep., Dkt. #2000-17 at ¶¶ 40, 59. Professor McGuire's approach likely understated damages, given that his damages analysis focused on the resources shifted from alternative uses to opioid-related costs, but did not account for Counties' budget constraints and limited ability to add or shift resources across alternative uses. *Id.* at ¶¶ 30-31.

[5] Ex. 1, CUYAH_00176453.

Finally, Professor McGuire applied "the estimates of the percent of harms attributable to defendants' misconduct presented in the Cutler Report . . . to the identified affected costs in each division yielding an estimate of the damages . . . ."  McGuire Rep., Dkt. #2000-17 at ¶ 11.  These cost estimates provided estimates of the Plaintiffs' 'but-for' expenditures used in calculating damages.  And, as set forth in Plaintiffs' Opposition to Defendants' *Daubert* Motion to Exclude Testimony of Dr. David Cutler, these percentages were the product of standard econometric methods utilized in the field of health economics, rendering Professor McGuire's reliance appropriate.

## ARGUMENT

## I.  PROFESSOR MCGUIRE IS QUALIFIED TO OFFER HIS OPINIONS

Defendants do not (and could not) challenge Professor McGuire's qualifications. Plaintiffs summarize them only briefly here.[6] *See generally* McGuire Rep., Dkt. #2000-17 at ¶¶ 1-5 (including referenced appendices).  Professor McGuire is a Professor of Health Economics in the Department of Health Care Policy at Harvard Medical School.  Among other professional activities and memberships, he served as the long-time editor of the leading journal in health economics (*Journal of Health Economics*).  A prolific writer and researcher, Professor McGuire has "conducted research and contributed to public policy regarding behavioral health (mental and addictive illness) for 40 years." McGuire Rep., Dkt. #2000-17 at ¶ 4.   In 2018, Professor McGuire was awarded the Lifetime Achievement award by the American Society of Health Economics, adding to his list of professional recognitions.

Defendants' own economic experts acknowledge Professor McGuire's substantial contributions to the field of health economics. *See, e.g.* Ex. 2, Daniel P. Kessler Dep. (5/29/19) at

---

[6] At most, Defendants imply (without support) that health economists with public policy experience are not qualified to examine health-related government spending. Def. Br. at n.11.  They argue that Professor McGuire's conclusions "draw nothing from his purported expertise," citing *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, No. 92 C 2379, 1993 WL 387346, at *2 (N.D. Ill. Sept. 23, 1993). This is incorrect. In that case, the court rejected the expert's testimony because his so-called analysis was basic arithmetic that any person could do. That is clearly not the case here.

51:24-52:4 ("I think [Professors McGuire, Gruber, Cutler, and Liebman are] all very smart academic researchers. I certainly have read many of the papers that they've written, and learned from them."); Ex. 3, James Hughes Dep. (6/20/19) at 110:2-11 (expressing respect for Professor McGuire "as an economist"; noting his "great reputation regarding the economics of mental health"); Anupam B. Jena Dep. (6/6/2019), Dkt. #1963-6 at 152:6-154:1 (noting that "[t]hese are all very good health economists" when discussing Professor McGuire and other of Plaintiffs' experts).[7]

Finally, Professor McGuire's expert litigation reports, including as to damages, have been accepted by courts. *See, e.g., In re Asacol Antitrust Litigation*, 323 F.R.D. 451, 474 (D. Mass. 2017), *rev'd and remanded on other grounds,* 907 F.3d 42 (1st Cir. 2018) (upholding Professor McGuire's damage model); *cf. United States ex rel. George v. Fresenius Medical Care Holdings, Inc.*, No. 12-cv-008877, 2016 WL 5361666, at *9-10 (N.D. Ala. Sept. 26, 2016) (upholding Professor McGuire's analysis and comparison of different kinds of company records to determine overuse/double billing).[8]

## II. PROFESSOR MCGUIRE'S OPINIONS ARE ADMISSIBLE

Most of Defendants' challenges to Professor McGuire's opinions are not true *Daubert* arguments at all, but instead an attempt to present Defendants' own unsupported definition of what damages are cognizable by law. In challenging the "fit" of Professor McGuire's opinions to the facts of the case, Defendants mischaracterize his work and argue that "opportunity costs"—as Defendants describe (and often mis-describe) them—are not legally recoverable.[9] Defendants also

---

[7] *See also, e.g.*, Ex. 4, Laurence C. Baker Dep. (6/6/2019) at 113:20-24, 116:11-15, 119:14-16; Margaret Kyle Dep. (6/5/2019), Dkt. #1963-22 at 43:13-24.

[8] As Defendants do here, the defendants in the *Fresenius* case tried to use the inherent limitations of the data to attack McGuire himself. They criticized the "judgment calls" used in his double-billing analysis, which the court dismissed as unpersuasive, finding the use of context clues reasonable. *Id.* Although the *Fresenius* court disallowed other aspects of Professor McGuire's analysis, the circumstances were entirely different and inapplicable to this case, including that the opinions of the expert on which Professor McGuire relied were struck. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 594 (7th Cir. 1998), the other case involving Professor McGuire that Defendants cite, involved an antitrust analysis that has nothing to do with his work in this case.

[9] Indeed, Defendants' arguments that the damages computed by Prof. McGuire are not legally cognizable are more appropriately raised in the context of summary judgment, where a court addresses what plaintiffs have to prove and whether they have sufficient evidence to meet their burdens, rather than in the context of a *Daubert* motion, which invokes the court's gatekeeping function to ensure that expert evidence is reliable. Because the legal challenges to

challenge the methodology by which Professor McGuire arrived at his damages figures. None of these challenges has merit.

### A. Professor McGuire Measures Cognizable Damages

"The fundamental rule of the law of damages is that the injured party shall have compensation for all of the injuries sustained." *Fantozzi v. Sandusky Cement Prod. Co.*, 597 N.E.2d 474, 482 (Ohio 1992). Compensatory damages are broadly defined as those that measure actual loss. *Id.* "The purpose of a damage award is to make the injured party whole." *Illuminating Co. v. Wiser*, 114 N.E.3d 240, 244 (Ohio Ct. App. 2018). Moreover, "[w]here it is certain that damages have resulted, mere uncertainty as to the amount will not preclude the right of recovery." *Ohio Dist. Council, Inc. of the Assemblies of God v. Speelman*, 114 N.E.3d 285, 293 (Ohio Ct. App. 2018) *appeal not allowed*, 122 N.E.3d 216. "As to the amount of damages, only a reasonable certainty is required, which has been defined as 'that degree of certainty of which the nature of the case admits.'" *Id.* Professor McGuire has identified and measured actual losses suffered by the Plaintiffs. Under the law, these damages are recoverable to make the Plaintiffs whole.

#### 1. Professor McGuire Calculated Plaintiffs' Damages

Professor McGuire measured the injury that Plaintiffs suffered by analyzing the spending of the relevant County Departments to determine what the opioid epidemic has cost them. As Professor McGuire summarized in his deposition:

> [W]hat I did in order to fulfill my assignment was to identify the funds that were devoted to opioid-related activities. That's what corresponds to the tried and true, well-accepted, down-the-middle-of-the-plate concept of opportunity cost. The opportunity cost can be identified and measured without investigating what a particular division in a particular county in a particular year would have done in an alternative world in which those funds were not devoted to opioid-related crises.

---

Plaintiffs' damages computation do not implicate Rule 702 and the gatekeeping function, Plaintiffs suggest that they are better addressed in a different context and need not be resolved here.

Thomas McGuire Dep., (4/30/2019) Dkt. #1966-22 at 562:10-25; *see also, e.g.,* McGuire Dep., Dkt. #1966-21 at 267:18-268:5; 268:13-20; McGuire Dep., Dkt. #1966-22 at 518:10-23; 558:21-559:23; 838:4-18; 840:7-20.

Defendants wrongly contend that Professor McGuire did not actually isolate opioid-related costs incurred.  Yet he did exactly that. As Prof. McGuire explains, "[t]he reallocation of . . . time to opioid-related activity result[s] in a loss of time and effort on alternative activities, *which is an economic cost*." McGuire Rep., Dkt. #2000-17 at ¶ 26 (emphasis added).  McGuire limited his analysis of such costs to those that varied in response to the crisis—that is, costs that were incurred because the allocation of resources varied when the Plaintiffs had to devote additional resources to the crisis.  He further limited his analysis to the kind of costs incurred in providing the type of activities or services *specifically affected* by the opioid crisis. *Id.* at ¶ 59.  In so doing, Professor McGuire excluded costs related to staff engaged in overhead or support activities or to traffic duties.  *Id.* at ¶ 60.  The remaining costs are McGuire's "total affected costs." *Id.* at ¶¶ 63-66.  Relying on the calculations by Professor Cutler, Professor McGuire then estimated how many of these costs were incurred as a result of the divisions' opioid-related activities.  *Id.* at ¶ 72.  Finally, Professor McGuire calculated, relying on calculations by both Professors Cutler and Rosenthal, the fraction of the opioid-related costs due to Defendant's misconduct.  *Id.* at ¶ 73.

The factual record underpinning Professor McGuire's conclusions is extensive.[10]  *See, e.g.,* McGuire Rep., Dkt. #2000-17 at ¶¶ 29 (citing Greta Johnson Dep. (1/15/19), Dkt. #1963-7)), and 42-46 (citing annual reports, surveys, news articles, and peer-reviewed studies); Shane Barker [Administrative Captain of Summit County Jail] Dep. (11/28/2018), Dkt. #1956-14 at 146:12-22 (explaining that the opiate crisis "continues to pull resources from what we've always done in the

---

[10] Defendants acknowledge, as they must, that this record exists.  Their dispute of the characterization of the evidence is another example of how *Daubert* is a misplaced vehicle for this classic fact dispute.  Def. Br. at 5, n.4.  Further, in light of this ample evidence, Defendants' assertion that Professor McGuire did not identify affected costs verges on bad faith.

past to have to deal with inmates… in the jail for that type of stuff and [who] are going through withdrawal…"); Brad Gessner [Summit County Prosecutor's Office Chief Counsel] Dep. (12/3/18), Dkt. #1962-9 at 142:6-143:12 (describing the extensive exigencies but limited resources available to handle overdose deaths); Hylton Baker [Former Commander of Summit County Drug Unit] Dep. (12/19/18), Dkt. #1956-10 at  162:18-163:15 (describing not having "enough people out there" and being "overwhelmed," but not getting sufficient additional support because of "budgetary issues"); Kenneth Ball [Chief of Akron Police Department] Dep. (11/7/18), Dkt. #1956-12 at 248:3-23 (describing that "personnel has been an issue," since "suddenly we had multiple deaths every single month that required investigation and changed the dynamic of a patrol response…"); Ex. 1, fn. 5, *supra* ("Part of the ADAMHS Board challenge this past two years is that our expenses have exceeded revenues due to the opiate epidemic. We have depleted our reserves and we would need additional funding if we were to sustain those increased initiatives we have put in place.").

Defendants' argument that Prof. McGuire did not isolate opioid-related costs turns entirely on their view that the kinds of variable re-allocations costs he identified and quantified – opportunity costs – are not really "costs" and represent no injury to the Plaintiffs.  But Defendants have no support for this position, because such costs are universally recognized by economists as real.  Indeed, even Defendants' economists do not dispute that opportunity costs are real, nor could they. The concept of "opportunity costs" recognizes that, when a person spends money in a particular way, she loses the ability to spend the money in a different way. *See, e.g.,* McGuire Rep., Dkt. #2000-17 at 16 (defining "opportunity costs"); *State of Kan. v. State of Colo.,* No. 105, 2000 WL 34508307, at *30 (U.S. Aug. 31, 2000) (opportunity costs "refers to the 'next best alternative employment of a resource,' and is a method for reducing gross secondary impacts to the net gains or losses affecting an economy").  The costs that the counties were forced to incur in responding to the opioid crisis reflect real resources that the counties could have put to another use.

While Defendants' economic experts predictably take issue with many (even most) of Plaintiffs' economic experts' conclusions, none have asserted that costs incurred by Plaintiffs in responding to the opioid crisis do not "count" as injuries. Defendants' expert Matthew Bialecki, an accountant, rather than an economist, challenges the damages figures Professor McGuire reaches, but not the premise that the damages exist at all.[11]

        2.      *The "Opportunity Costs" Measured by Prof. McGuire Are Recoverable under Ohio Law*

Defendants' chief argument[12] is that Plaintiffs' opportunity costs are not legally cognizable because Plaintiffs did not, overall, spend *more* as a result of Defendants' conduct. Defendants claim that Plaintiffs legally cannot recover if their expenditures would have been the same without Defendants' misconduct. That is not the law. No plaintiff is required to show that its overall spending would have been different but for a defendant's misconduct. A plaintiff who paid $50,000 in medical bills need not show she would have *saved* the $50,000, and not spent it on something else.

Nor does it matter whether particular departmental budgets changed. As municipalities, Plaintiffs are precluded from simply increasing their spending; the way they absorb extraordinary costs is by re-allocating resources.  There is no doubt that more of Plaintiffs' resources had to be allocated to the opioid crisis.  Reallocation of resources, even in the case of fixed expenditures, is, and has long been, a recognized form of damages.  As Ohio courts recognize:

> Damages include both direct and indirect costs. Direct costs are the expenses incurred as a result of the actual project and include materials, labor, mileage, and

---

[11] Mr. Bialecki's own (untestable and ad hoc) approach popped out an alternative figure so breathtakingly tiny as to itself underscore that any methodological problem is with the Defendants. According to Bialecki, the maximum opioid abuse-related costs Cuyahoga County could have incurred from 2006 to 2017 is $12.37 million dollars while the maximum costs Summit County could have incurred from 2006 to 2018 is $13.64 million. Ex. 5, Bialecki Supp. Rpt. at 3-4. That amounts to just over one million dollars per year per county. Bialecki's opioid-related costs estimate represents a mere 0.24% of the total costs of nine Divisions in Cuyahoga County from 2006 to 2017 (approximately $5.2 billion), and 0.73% of the total costs of ten Divisions in Summit County from 2006 to 2018 (approximately $1.87 billion). In fact, Cuyahoga County's budget for the Division of Children and Family Services alone was $1.98 billion in that same time frame. McGuire Rep., Dkt. #2000-17 at App. IV.C-2.2 at 5. For reference, that one division spent $10.36 million on data processing alone during that period. *Id.* at App. IV.C-2.3 at 9. Similarly, Summit County's budget for the Children Services Board was $628.59 million between 2006 and 2018. *Id.* at App. IV.D.-2.1 at 5. That single division spent $4.69 million from 2006 to 2017 in staff mileage alone. *Id.* at App. IV.D-2.3.

[12] This sub-section responds to Sections II(A)(1) and (2) of Defendants' brief.

equipment costs. Indirect costs are the expenses involved in running a business and are not attributable to any one project. Indirect costs may include salaries of executive or administrative personnel, general insurance, rent, utilities, telephone, professional fees, legal and accounting expenses, advertising, and interest on loans. Indirect costs of repairs are a proper element of damage for which recovery may be had, where such costs can be proved with reasonable certainty and have been correctly made in accordance with sound accounting principles.

*Wiser*, 114 N.E.3d at 246 (quotation marks and citations omitted); *accord Illuminating Co. v. Burns*, No. 100235, 2014 WL 585254 (Ohio Ct. App. Feb. 13, 2014), at *1; *see also Complete Gen. Constr. Co. v. Ohio Dep't of Transp.*, 760 N.E.2d 364 (Ohio 2002) (approving use of formula for computation of damages arising from unabsorbed home office overhead); *Ohio Edison Co. v. Royer*, 92 N.E.3d 912 (Ohio Ct. App. 2018), *appeal not allowed*, 102 N.E.3d 500 (recognizing recovery of indirect costs); *Cincinnati Bell, Inc. v. Hinterlong*, 437 N.E.2d 11, 14 (Mun. 1981) ("[M]erely because the plaintiff utilized materials and services within its own corporate structure, it does not follow that such services and materials are without value, or have a lesser value than if supplied by an independent contractor").

In *Wiser* and *Burns,* plaintiffs' salaried employees were deployed to repair damage to a utility pole caused by the defendant, and the appropriate calculation of their time was sufficient to show damages *even though the costs represented employee salaries the plaintiff would have paid in any event. Ohio Edison Co. v. Soule*, No. S-17-052, 2018 WL 6016743 (Ohio Ct. App. Nov. 16, 2018), one of the few cases cited by Defendants, similarly involved damage to a utility pole. The difference in outcome reflects that, unlike the successful plaintiffs in *Burns* and *Wiser,* the plaintiff in *Soule* failed to show how the costs were related to their injury and failed to substantiate those costs. *Soule* does not stand for the proposition that fixed expenditures cannot be recovered as damages. It holds that recoverable costs must be connected to the injury and properly supported.

Defendants' argument amounts to an indirect attempt to resurrect the failed municipal services doctrine, that is, the proposition that municipalities cannot recover the costs of providing municipal services because the municipalities exist to provide those services anyway. Defendants'

argument amounts to the same point:  because the municipality has a budget that it is already spending, it is not damaged, and cannot recover, when it is forced to re-allocate its limited resources. But, in *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002), the Ohio Supreme Court held that the City of Cincinnati *could* seek recovery of the costs of city services incurred because of the wrongful conduct of gun manufacturers.  Similarly, in 2000, the Northern District of Ohio denied a motion to dismiss in a suit brought by the mayor and City of Cleveland. *See White v. Smith & Wesson Corp.*, 97 F. Supp. 2d 816 (N.D. Ohio 2000).  The court allowed the city to attempt to:

> recover for the costs of the services of police officers, firefighters, doctors, nurses, ambulance attendants, judges, prosecutors, jailors, social workers, and others, imposed on the City by an alleged unreasonably dangerous product and public nuisance.  The Defendants here are not landowners or occupiers of private property, but rather manufacturers and promoters of a product concerning which Plaintiffs have filed suit under Ohio's product liability, public nuisance, and unjust enrichment laws.

*Id.* at 823. *See also In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102, at *10 (N.Y. Sup. Ct. June 18, 2018) (allowing municipal plaintiffs to seek recovery of costs of providing municipal services to address opioid crisis).  Defendants ignore decades of authority and rely instead on an 80-year old case, *City of Youngstown v. Cities Serv. Oil Co.*, 31 N.E.2d 876 (Ohio Ct. App. 1940), that has not been cited since 1979.[13]

Professor McGuire's methodology is sound, careful, and consistent with both economic theory and Ohio law. *See, e.g.,* McGuire Dep., Dkt. #1966-22 at 508:10-19 ("What I did for all these years, for all these divisions, is to measure . . . the funds that each division in each year devoted to opioid-related activities.  And the economic principle of opportunity cost means that that's what I need to know: how much of these funds that had alternative uses were spent on opioid-related activities").

---

[13] Defendants' other case, *Chronister Oil Co. v. Unocal Ref. & Mktg.*, 34 F.3d 462 (7th Cir. 1994), is even more afield.  This was a breach of contract case involving specific provisions of the U.C.C.  There, the plaintiff did in fact recover nominal damages even though in that case defendants' breach was "a godsend." *Id.* at 465. Finally, the string-cite cases from the brief simply regurgitate the point that damages must be proven, as Professor McGuire has done here.

3.    *The Damages Calculated by Professor McGuire Are Appropriate RICO Damages.*

As a general proposition, federal decisions relating to damages recoverable under federal statutory claims, including RICO, also recognize that opportunity costs represent compensable injuries. *See U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 409 (4th Cir. 2013) ("[T]he government has suffered significant opportunity costs from being deprived of the use of those funds [due to bid-rigging scheme] for more than a decade."); *U.S. ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 179 (D.D.C. 2007) (finding that, "measured by their opportunity cost," fraudulent loans were "a substantial loss to the government"), *rev'd on other grounds*, 807 F.3d 281 (D.C. Cir. 2015); *S. California Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1152 (C.D. Cal. 2007) ("HRC's diversion of resource damages include compensation for: the staff time spent investigating Defendants' discriminatory practices at the subject property; the costs of conducting on-site tests and phone tests; and the cost of the on-site survey").

Such costs also meet the more specific definition of "injury to business or property" required for recovery under RICO. In denying Defendants' motions to dismiss Summit County's RICO claim, this Court held that the scope and magnitude of the opioid crisis "have forced Plaintiffs to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws or promote the general welfare" and that, to the extent that the costs Plaintiffs incurred were "greatly in excess of the norm," they qualified as RICO injuries. Op. and Order (12/19/2018), Dkt. #1203 at 19. Defendants' assertion that there are no costs in excess of the norm because the counties did not immediately raise taxes and allocate all the new tax revenue expressly and only to opioids is without support. In *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the Supreme Court found that plaintiffs asserted a valid RICO claim when defendants' conspiracy to submit multiple bids in an auction whose rules forbade them resulted in diminished chances of profitable transactions for plaintiffs. The injury at issue in *Bridge* was clearly a form of opportunity cost; plaintiff there made no out-of-pocket expenditure, but suffered economic injury

nonetheless. The same is true here, where Plaintiffs suffered measurable economic harms as a result of responding to the opioid crisis. *See also KCI USA Inc. v. Healthcare Essentials, Inc.*, No. 14cv549, 2018 WL 4327802 (N.D. Ohio Sept. 10, 2018) (lost profits a form of RICO injury).

        4.     *The Damages Calculated by Professor McGuire Were Caused by Defendants' Misconduct.*

Finally, Defendants assert that Professor McGuire has not tied his damages figures to Defendants' misconduct.  This is incorrect.  Professor McGuire used the (reliable) estimates provided by Professor Cutler of the percent of opioid-related harms due to the manufacturers' misconduct, which was appropriate.  McGuire Rep., Dkt. #2000-17 at ¶¶ 11, 15-18, 73-73; McGuire Dep., Dkt. #1966-21 at 140:23-141:13. Pursuant to Fed. R. Evid. 703, an expert's testimony may be based on data and conclusions of other experts.  *Asad v. Cont'l Airlines, Inc.*, 314 F.Supp.2d 726, 740 (N.D. Ohio 2004); *see generally Williams v. Illinois*, 567 U.S. 50, 88 (2012) (Breyer, J., concurring) ("Experts . . . regularly rely on the technical statements and results of other experts to form their own opinions.").  Professor McGuire also described how damages scenarios could be applied to distributor defendants (or any one defendant).  McGuire Rep., Dkt. #2000-17 at App. IV.C-3.1; App. IV.C-4.1; App. IV.F; McGuire Dep., Dkt. #1966-22 at 599:16-21.  Finally, Professor McGuire properly recognized that the allocation of damages is for a trier of fact.

**B.**    **Professor McGuire's Calculations Are Based on Reliable Methods.**

        1.     *Professor McGuire Appropriately Measured Affected Costs.*

Defendants argue that Professor McGuire's method of identifying affected costs was not "objectively testable." This misstates the standard here, and mischaracterizes Professor McGuire's work.  "Experts in disciplines that require the use of professional judgment are less likely candidates for exclusion because challenges may be ultimately viewed as matters in which reasonable experts may differ in exercising their judgment as to the appropriate methodology to employ or the appropriate variable to plug into a calculation." *In re Hake*, No. 04-41352, 2007 WL 7581218, at *4 (Bankr. N.D. Ohio Oct. 26, 2007) (quoting *In re Masella*, No. 05-24302, 2007 WL 2302312, at *3

(Bankr. D. Conn. Aug. 7, 2007)).[14]  "[T]he general framework of *Daubert* applies to all expert testimony[,]" but courts have repeatedly held that "[n]either economics or statistics seems to completely qualify as 'scientific knowledge.'" *State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1252 (S.D. Ohio 1996).[15]

Specifically, Defendants take issue with Professor McGuire's application of professional judgment to determine which county costs were subject to variation.[16]  Here, Professor McGuire repeatedly confirmed that his judgment was based on his training as an economist: "economists deal in costs of different types, there's marginal costs, there's variable costs, there's fixed costs, so as just general training one is oriented to this kind of distinction." McGuire Dep., Dkt. #1966-21 at 119:6-10; 127:21-24 ("[I]t was ultimately an economic decision about what are the variable costs associated with these divisions, taking what I considered to be a pretty conservative approach[.]").[17]

As courts recognize, analyzing budgets, and determining which line items within them are variable, falls squarely within the scope of economists' expertise. *See, e.g., Autotrol Corp. v. Cont'l Water Sys. Corp.*, 918 F.2d 689, 692–93 (7th Cir. 1990) ("Economists distinguish between a firm's fixed and variable costs."); *Syngenta Crop Prot., LLC v. Willowood Azoxystrobin, LLC*, 267 F. Supp. 3d 649, 657 (M.D.N.C. 2017) (upholding expert economist's damages calculations that relied on an analysis of budgets and the budgeting process).

---

[14] *See also In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-md-0620, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) (noting that "economics and statistics" are such disciplines requiring professional judgment).

[15] *Cf. United States v. Mallory*, 902 F.3d 584, 593 (6th Cir. 2018) (holding that for non-scientific experts who base their opinion on experience, absence of one or more "reliability" factors, including testability, peer review and publication, error rate, or others, does not render testimony inadmissible).

[16] Professor McGuire and his team relied on extensive data sources, economic literature, government documents (including County budgets and annual reports), interviews with government representatives, and other experts' reports, among several other materials, to develop his methodology and opinion. McGuire Rep., Dkt. #2000-17 at ¶12; Appendix IV.B.

[17] McGuire Dep., Dkt. #1966-21 at 129:1-7 ("I use my judgment as an economist to identify what I thought were variable costs. Some of this involved discussion with team members who may have been more familiar with some of the operations of the division, and some of it may have involved confirmation with local officials. . . .").

While Defendants may question Professor McGuire's determinations as to which costs vary, and indeed offer their own expert's competing conclusions, this is a prototypical battle-of-the-experts that goes to weight, not admissibility.

Finally, Defendants' cases are inapposite. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) was a medical causation case involving what the court considered to be a series of egregious "speculative jumps" and "leaps of faith," including inferences ignoring contrary evidence, where the expert acknowledged the absence of literature support for his causation theory. In *Chemical Solvents, Inc. v. Advantage Engineering, Inc.*, No. 10-CV-01902, 2011 WL 1326034 (N.D. Ohio Apr. 6, 2011), the scientific expert cited no studies or data and conducted no tests, and instead relied on a visual inspection of the product as a basis for his conclusions on the product's engineering and design. Here, Professor McGuire engaged in an extensive review of data and literature, formulated a damages model, and provided extensive support for every step of his methodology.

2.    *Professor McGuire's Analysis Is Not Based on Unjustified Assumptions*

Defendants assert that Professor McGuire's analysis is based on unjustified assumptions about government efficiency and that the Counties might not have made efficient choices even if they had use of the funds that instead were deployed to handle the opioid crisis. This criticism of Professor McGuire's methods is premised on the unsupported proposition that a government cannot suffer harm unless it first shows that it is perfectly efficient (a requirement nowhere found in law or economics). Defendants' sole support for this argument is a general observation in John Mikesell's *Fiscal Administration* textbook that governments will sometimes misallocate resources. So what? The same is true for consumers and businesses.[18] But the amount of damages a plaintiff may recover is based on the economic value of what the plaintiff has lost, and not subject to arbitrary

---

[18] For example, from 2014 to 2018, a minimum of about 20,000 U.S. businesses declared bankruptcy every year, while a minimum of 750,000 personal bankruptcies were filed each year. Administrative Office of the U.S. Courts, *Judicial Facts and Figures 2018: Business and Nonbusiness Cases Filed, by Chapter of the Bankruptcy Code*, at Tables 7.1 and 7.3. *See* https://www.uscourts.gov/sites/default/files/data_tables/jff_7.1_0930.2018.pdf; https://www.uscourts.gov/sites/default/files/data_tables/jff_7.3_0930.2018.pdf (last visited July 30, 2019).

reduction based on speculation about how the Plaintiff might otherwise have used (or misused) the funds. A homeowner whose home has been destroyed recovers the full market value of the home; it makes no difference if the homeowner would foolishly have sold the house for an under-market price or otherwise have failed to maximize its value. The same is true when the governments suffer damages.  Defendants offer no basis in law or logic to hold Plaintiffs to a higher standard in recovering their costs. Prof. McGuire has quantified the injury Plaintiffs suffered by having to devote their resources to the opioid crisis.  No more is required for Plaintiffs to recover those costs.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to exclude the damages-related testimony of Thomas McGuire in its entirety.

Dated:  July 31, 2019

Respectfully submitted,

/s/ *Paul J. Hanly, Jr.*
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

Peter H. Weinberger (0022076)

SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

*On the Brief for Plaintiffs' Executive Committee:*

*/s/  Paulina do Amaral*
Elizabeth J. Cabraser
Rachel Geman
Paulina do Amaral
Valerie D. Comenencia Ortiz
LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
275 Battery Street, 28th Floor
San Francisco, CA 94111
(415) 956-1000
(415) 956-1008 (Fax)
ecabraser@lchb.com
rgeman@lchb.com
pdoamaral@lchb.com
vcomenenciaortiz@lchb.com