# EXHIBIT 24

# DRUG DEALER, MD

**HOW DOCTORS WERE DUPED,
PATIENTS GOT HOOKED
AND WHY IT'S SO HARD TO STOP**

ANNA LEMBKE, MD

# DRUG DEALER, MD

How Doctors Were Duped,
Patients Got Hooked,
and Why It's So Hard to Stop

## ANNA LEMBKE, MD

JOHNS HOPKINS UNIVERSITY PRESS | *Baltimore*

© 2016 Johns Hopkins University Press
All rights reserved. Published 2016
Printed in the United States of America on acid-free paper
9 8 7 6 5 4 3 2 1

Johns Hopkins University Press
2715 North Charles Street
Baltimore, Maryland 21218-4363
www.press.jhu.edu

Library of Congress Cataloging-in-Publication Data

Names: Lembke, Anna, 1967–
Title: Drug dealer, MD : how doctors were duped, patients got hooked, and why it's so
    hard to stop / Anna Lembke, MD.
Description: Baltimore : Johns Hopkins University Press, 2016. | Includes
    bibliographical references and index.
Identifiers: LCCN 2016010031 | ISBN 9781421421407 (pbk. : alk. paper) | ISBN
    1421421402 (pbk. : alk. paper) | ISBN 9781421421414 (electronic) | ISBN
    1421421410 (electronic)
Subjects: LCSH: Analgesics. | Medication abuse. | Physician and patient. | Drugs—
    Prescribing. | Drug addiction.
Classification: LCC RM319 .L46 2016 | DDC 615.7/83—dc23
    LC record available at http://lccn.loc.gov/2016010031

A catalog record for this book is available from the British Library.

*Special discounts are available for bulk purchases of this book. For more information, please
contact Special Sales at 410-516-6936 or specialsales@press.jhu.edu.*

Johns Hopkins University Press uses environmentally friendly book materials,
including recycled text paper that is composed of at least 30 percent post-consumer
waste, whenever possible.

# 2

# Prescription Drugs as the New Gateway to Addiction

In 2012, when Jim turned 60, he developed an infection in his lower back. He went to the Emergency Department at a Bay Area hospital, where he was admitted and given intravenous antibiotics to fight the infection. He also received intravenous morphine, an opioid, to fight the pain.

Jim experienced immediate pain relief from the intravenous morphine, and something else—that sense of well-being that he remembered so well from his early days of alcohol, an energized but peaceful clear-headedness, without worry or doubt. He was instantly under its power.

The rapidity with which Jim became addicted to morphine—possibly after a single dose—speaks to the phenomena of reinstatement and cross-addiction. Neuroscientists speculate that brain changes that occur after continuous heavy use of addictive substances can cause damage that does not resolve even after years of abstinence. One of the ways these irreversible changes can manifest is that the brain is primed to relapse to addictive physiology even after a single exposure to the

addictive substance.[41] This is called "reinstatement" by neurobiologists, and "relapse" by those who are addicted.

Reinstatement is not triggered solely by the substance that the individual was previously addicted to. Reinstatement can occur with any addictive substance because all addictive drugs work on the same brain reward pathway.[42] For example, animals repeatedly exposed to the addictive component of marijuana (tetrahydrocannabinol, or THC) and then not given THC for a period of time become addicted to morphine more quickly than animals not previously exposed to THC.[43] This phenomenon is called cross-sensitization, or cross-addiction. The intense high and craving that Jim experienced after a single dose of morphine was likely the result, at least in part, of reinstatement and cross-addiction.

Although a history of addiction increases the risk of becoming addicted to opioid painkillers prescribed by a doctor,[44] many people with no addiction history can become addicted to opioid painkillers in the course of routine medical treatment.[45] Furthermore, they can become addicted quickly, in a matter of days to weeks, just as Jim did. This is contrary to what doctors were told in the 1980s, 1990s, and early 2000s, when a pro-opioid movement in the medical pain community encouraged doctors to prescribe opioids more liberally and reassured them, based on false evidence, that the risk of becoming addicted to prescription opioids among patients being treated for pain was less than 1 percent[46] (see chapter 4). More recent studies reveal that as many as 56 percent of patients receiving long-term prescription opioid painkillers for low back pain, for example, progress to addictive opioid use, including patients with no prior history of addiction.[47]

The gateway hypothesis of addiction posits that using cigarettes and alcohol, which are legal drugs, leads to experimentation with other, "harder" drugs, like cocaine and heroin. Whether this progression is due simply to opportunity costs and ease of access,[48] or to some more fundamental biological mechanism based on the chemical composition of the drug itself,[49] is still being debated.

In today's world easy access to "harder" drugs through a doctor's prescription has turned the gateway hypothesis on its head. For increasing numbers of people, especially young people, prescription drugs are the first exposure to addictive substances and the first stepping-stone to future addictive use. My patient Justin's story provides an example of how a potent and addictive drug prescribed by a doctor can become a gateway to addiction.

## Vicodin: A Gateway Drug

Justin had none of the classic risk factors of nature or nurture that we typically associate with increased risk of addiction. The only child of educated upper-middle-class Jewish parents, neither of whom (unlike Jim's parents) smoked, drank, or used drugs, and with no family history of addiction, he seemed at average risk. (A prevailing misconception is that Jewish people are at lower risk than other ethnic groups for substance use disorders. As told so well by Rabbi Shais Taub in the introduction of his excellent book *God of Our Understanding: Jewish Spirituality and Recovery from Addiction*, there are no data to support this stereotype.)[50]

Justin's childhood was also without trauma. His parents were loving, kind, and devoted to his well-being. He was in good physical health. Sometimes he was teased about his weight—he'd always been pudgy—but he never felt bullied. He had friends. He was neither impulsive nor prone to excessive emotionality. If anything his emotional expressions were muted. He was smart and schoolwork came easily to him. He especially liked science. He fondly remembers dissecting a cow's eye, and mixing cornstarch and water to make "oobleck," in the fourth grade. Anything having to do with computers was always of interest, in particular building computers and playing video games. He grew up in his parents' single-family home in a white middle-class suburb of San Francisco.

The risk factor that Justin encountered, contributing to his later

development of addiction, had everything to do with neighborhood, and not neighborhood in the strict sense of geography, but neighborhood in the sense of context, culture, and technology. Justin, like many teens today, especially compared with previous generations, had early exposure to scheduled drugs (opioids) through a doctor's prescription, thereby developing a "taste" for them, followed by virtually unlimited access to drugs through peers at school and on the Internet.

During his sophomore year in high school, Justin went to the dentist to get his wisdom teeth removed. He lay back in the dentist's chair, the bright white lights slowly fading into blackness as he lost consciousness from the concoction of drugs the dentist had given him. When he awoke, it took him a moment to realize where he was. He heard the high-pitched whine of the drill and smelled the pungent odor of burnt enamel, and then he remembered: wisdom teeth. Despite his mouth being pulled apart by several sets of hands and a metal drill spinning near his flesh, he felt good—incredibly good, like no kind of good he could remember ever having felt before. He soon floated back into unconsciousness.

In the waiting room after the procedure was over and the drugs had mostly worn off, Justin felt nauseated, and his mouth was sore. Through a residual haze of the drugs' effect, he saw the dentist write out a prescription for Vicodin for pain relief. The dentist explained that Justin should take one pill every four to eight hours as needed for pain.

Once Justin and his mother arrived home, he took one pill and put the rest on his bedside table. He immediately felt relief from the pain in his mouth—and something else—an echo of that good feeling, that better-than-normal-for-him feeling. He lay in bed and again drifted off to sleep.

In the days that followed, Justin took one Vicodin every four hours. On the surface of things, his life had returned to normal. He was back at school, going through the motions of being an average high school student at the average California public high school in the mid-2000s. But inside, under the influence of Vicodin, he felt energized, worry free, and

completely at ease with himself. He recalled the man who had visited their third-grade classroom to talk to them about the dangers of drugs and alcohol—part of the DARE project.* The man had told them that people took drugs to alter mood, to "feel good." Justin knew the man had meant it as a warning, but thinking about it now, the idea sounded like pure genius.

Justin began doubling up on the Vicodin, seeking to maintain the good feelings that had started to wear off with repeated use. When he ran out of his prescription, he asked his mother to take him back to the dentist to get more, telling her he still had pain. (His pain was mild and tolerable. What he was really looking for was a way to extend that sense of well-being that Vicodin provided.) His mother took him back to see the dentist, and the dentist readily prescribed Justin another month's supply. It surprised Justin how easy it was to get a refill and that no one questioned his motives.

## An Epidemic of Overprescribing

The prescription drug epidemic is first and foremost an epidemic of overprescribing. Potions and elixirs have always been part of a doctor's trade, but today the extent to which doctors rely on prescription drugs, especially scheduled drugs, to treat their patients for even routine, non-life-threatening medical conditions is unprecedented.

In 2012, some 493,000 individuals aged 12 or older misused a prescription drug for the first time within the past twelve months,[35] an average of 1,350 initiatives per day. Of those who became addicted to

*The unintended consequences of drug use education are salient here. Drug Abuse Resistance Education (DARE) was a school-based prevention program, adopted throughout the United States in the late 1990s and early 2000s, in which police officers provided information on the dangers of drug use to students in the classroom. In retrospect, DARE was ineffective at preventing or even delaying drug use, and in some cases it may even have promoted use, as exemplified by Justin's experience. DARE illustrates the broader challenge of using didactic and mass media educational campaigns to target drug use.

any drug in the previous year, a quarter started out using a prescription medication: 17 percent began with opioid pain relievers, 5 percent with sedative-hypnotics, and 4 percent with stimulants.[35] Prescription drugs now rank fourth among the most-misused substances in America, behind alcohol, tobacco, and marijuana; and they rank second among teens.

Teens are especially vulnerable to the increased access to prescription drugs. Adolescence is a time when the rapidly growing brain is more plastic, and therefore more vulnerable on a neurological level, to potentially irreversible brain changes caused by chronic drug exposure.[51, 52] Teens are more vulnerable to social contagion pressures to experiment with drugs. Also, most importantly, ready access to heroin and methamphetamine equivalents in pill form has blurred the lines between soft and hard drugs for today's youth.

When the second refill ran out, Justin was reluctant to ask for more. But despite daily use for more than a month, he didn't suffer any acute physical opioid withdrawal. However, that single exposure to opioid painkillers set him on a new course. He began experimenting with a variety of prescription pharmaceuticals, which was normative among his peers, who generally viewed prescription pills as safer than illegal drugs. He obtained all his pills from school friends, mostly for free, but sometimes for cash. His friends got pills from a combination of doctors, relatives, and drug dealers. Justin liked prescription opioid painkillers best of all.

Justin ingested drugs almost exclusively during school hours, so by the time he went home, the effects had worn off and his parents didn't notice. Amazingly, neither did his teachers. One day in the middle of class, Justin took SOMA, a potent muscle relaxant. As he began to feel its effects, he had an uncontrollable desire to stretch out and extend his muscles. Sitting at the back of the class, he began gyrating in circles with his upper body, leaning far over his desk, to the right, then the left, then backward, almost sliding off his chair in the process. As he remem-

bers it, no one noticed, or at least no one commented. Either way, it's disconcerting to think such behavior can go unremarked.

Justin was slated to graduate from high school in 2006, but he failed an English class his senior year, and never got around to making it up. Instead he spent the next couple of years hanging out with friends and using drugs, mostly cannabis, alcohol, and whatever pills they could easily get from one another. He took a couple of classes at the community college, but didn't really apply himself. He finally took and passed his GED in 2009.

His parents weren't sure what to make of his desultory lifestyle in those years after high school. Justin believes they knew about the marijuana, which they were okay with because his dad had used pot on weekends in his youth; but they were oblivious to Justin's use of other drugs and to the extent of the pot use, and they were unaware that the pot Justin smoked was much more potent than anything his dad had access to in the 1970s.

It's easy in retrospect to condemn parents who seem not to notice that their kids are using drugs, but I've met too many caring parents over the years to stand in judgment. Kids using drugs go to great lengths to conceal their use, and even watchful parents can miss the signs.

## Cyberpharmacies

After high school, Justin gradually lost contact with his drug-sourcing high school friends and thereby lost a ready supply of pot and pills. Being risk-averse by nature, he was reluctant to seek out drug dealers, try to get drugs from doctors by feigning illness (doctor shop), or do anything else overtly illegal to get drugs. Instead, he discovered a new source that was convenient, cheap, and didn't require him to leave the safety and comfort of his own home: the Internet.

Justin's parents were both at work, and though he was supposed to be spending time online looking at courses to enroll in the local com-

munity college, or looking for a job, he was instead typing "Vicodin," still his drug of choice, into Google. That query pulled up links for on-line pharmaceutical companies. He clicked on Top Ten Meds Online, which looked like a legitimate pharmaceutical company, but just to be sure, he googled it on SafeorScam.com, an online resource that would tell him whether this site was some kind of sting operation or scam. It checked out, so he went back and searched for Vicodin. None was available. Next, he typed in "opioids" and found codeine as a cough medicine. He put it in his cart. He typed in "tranquilizer/hypnotic" and put Valium and Xanax in his cart. Just before heading to checkout, he added the dissociative anesthetic ketamine. He entered his credit card information and clicked the purchase button. Within the week, his "medications" were shipped to his house, delivered by FedEx, no prescription required.

Law enforcement agencies first became aware of online pharmacies selling controlled substances without a prescription in the mid-1990s, coinciding with reports on the rapid increase in prescription opioid abuse and misuse and prescription opioid–related overdoses, especially among young people. These websites conduct business in the United States in direct violation of the United States Controlled Substance Act (CSA).

Despite operating in violation of the CSA, websites that sell controlled medications without a prescription are difficult for law enforcement to monitor or prosecute. As described in the article by Forman and coauthors, "The Internet as a Source of Drugs of Abuse," the web page for such a site may be physically located in Uzbekistan, the business address in Mexico City, money generated from purchases deposited in a bank in the Cayman Islands, the drugs themselves shipped from India, while the owner of the site is living in Florida. Law enforcement from multiple countries would have to collaborate to enforce and prosecute the owner of a single site, and the entire operation can be dismantled, erased, and reestablished elsewhere in a single day.[53] Furthermore, marketing techniques used by the sites make it difficult to find them. Some

of these no-prescription online sites camouflage themselves as something other than a drug-selling site. One such site went by the name "Christian Site for the Whole Family," with links to "bible study group" and "Easter Drugs Sale: Buy Codeine without a Prescription."[53]

The international nature of the drug trade today gives the old opium wars, as commented on by Walsh, a new twist, wherein cyberpharmacists are drug dealers for the modern age.[54] Support for this claim comes from a report out of Columbia University, which gathered data showing that 11 percent of the prescriptions filled in 2006 by traditional (brick and mortar) pharmacies were for controlled (scheduled) substances, whereas 95 percent of the prescriptions filled by online pharmacies in the same year were for controlled substances.[55]

The Internet is not merely a passive portal for controlled prescription drugs. Once Justin, for example, has purchased drugs online, the site remembers him and may send unsolicited e-mails alerting him to new products or special deals. This aspect makes it especially difficult for addicted individuals to stop using drugs. Short of changing his e-mail address or utilizing filtering software, Justin cannot avoid being found and targeted once again for drug use by Internet sellers.

Initially Justin looked only for prescription drugs through online pharmacies, but gradually he became interested in new and experimental drugs in the pharmaceutical pipeline, often sold as "research chemicals." He learned about new drugs by spending time on the website Pipemania.com, a splinter group of Lifetheuniverseandeverything .com. Pipemania, one of many Internet communities like it, is a forum where users talk about what drugs they are using and what those drugs feel like, including lots of newly synthesized drugs and newer drug combinations. People using these sites refer to themselves as "researchers" and to their drug use experiences as "research findings."

Examples of newer synthetic drugs include Methoxetamine, or MXE, an analog of the drug ketamine, labeled as a "research chemical product" and taken for its hallucinogenic and dissociative effects. Purple Drank, or Lean, another popular new mixture consumed primar-

ily by young people, combines Sprite, Jolly Ranchers, and codeine (an opioid). If prescription codeine is unavailable, DM (dextromethorphan) cough syrup is often substituted.

The buying and selling of illegal drugs, outside of online pharmacies, occurs primarily in the "deep web," a term used to refer to a clandestine part of the network where online activity can be kept anonymous. Most of these drug-selling underground sites use Bitcoin as their only currency, providing customers with anonymous access to drugs from all over the world, without even a pretense at legality. One such site, now dismantled, was Silk Road, allegedly operated by 30-year-old Ross W. Ulbricht, who went by the pseudonym Dread Pirate Roberts, a character from the movie *The Princess Bride*. Mr. Ulbricht was recently convicted of narcotics trafficking, computer hacking, and money laundering.

## Heroin—the New Vicodin

In 2012, despite engaging in daily, now mostly solitary, drug use, Justin attended community college and got a job at Oracle in the shipping department. With his new job, he was suddenly in possession of cash, and much more than he had become accustomed to with his parents' allowance. One night in the summer of that year, he went to a small get-together at a friend's house, where he met someone whose brother knew a heroin dealer. Justin had never tried heroin before; he had always shied away from illegal so-called street drugs and from drug dealers. But he was curious, and eager to use opioids, which were increasingly difficult to obtain online in any form. Through friends he met Sean, the man who would become his heroin dealer, his business partner, and his housemate. Justin bought a gram of heroin, telling himself it was no big deal; it was just an experiment, and he could handle it.

Heroin was originally synthesized in 1874 by C. R. Alder Wright, an English chemist working at St. Mary's Hospital Medical School in London. Wright added two acetyl groups to morphine to form di-acetylated

morphine, which was largely forgotten until twenty-three years later, when it was independently synthesized by Felix Hoffmann in Germany. Hoffmann, working at what is today the Bayer Group's Pharmaceutical Division, was instructed to find a less addictive alternative to morphine. Di-acetylated morphine was marketed by Bayer alongside aspirin from 1898 to 1910 as a nonaddictive morphine substitute and cough suppressant, as well as a cure for morphine addiction. Bayer named di-acetylated morphine "heroin," based on the German "heroisch," which means "heroic" or "strong." Strong it certainly was. By the early 1900s an epidemic of heroin addiction raged in the United States, prompting passage of the Harrison Narcotic Act of 1914 to control the sale and distribution of heroin and other opioids. Today in the United States, heroin is considered a schedule I drug, meaning it is considered highly addictive and is not approved for any medical purpose.

Justin intended to use his heroin sparingly, just now and then. Instead he used it daily for two months, not stopping till he had run through the entire $1,600 he had earned and saved from his job at Oracle. He lost his job and quit school, unable to meet the demands of either. Then he went into acute heroin withdrawal. He remembers heroin withdrawal as "the most horrible feeling in the world, like you're gonna die." Elaborating further, "I wouldn't wish it on anyone, not my worst enemy."

The number of Americans aged 12 and older who used heroin in the past month rose from 281,000 to 335,000 between 2011 and 2013, a significant increase from the 166,000 using heroin in 2002.[56] According to the Centers for Disease Control and Prevention, heroin-related overdose deaths also rose in that time frame, with a 39 percent increase between 2012 and 2013 alone. The majority of new heroin users cite prescription opioids as their first exposure to opioids,[57] a clear generational shift. In the 1960s, 80 percent of opioid users reported that their first exposure to opioids was in the form of heroin. In the 2000s, 75 percent of opioid users reported that their first exposure to opioids

was in the form of prescription painkillers.[58] Increases in heroin use have been driven mostly by 18–25 year olds.

Justin went to Sean and told him he was out of money, but desperate for heroin. Sean offered Justin an arrangement in which Justin would work for Sean, and in exchange, get cheap access to heroin for his services. Sean wanted Justin to sell for him, but Justin wasn't willing. As an alternative, Sean offered that Justin could work in "his lab," an offer which Justin accepted.

For the next nine months, Justin spent most of his time at Sean's house, running Sean's lab. Sean lived in a rundown house in a rundown neighborhood in East Oakland, a place with hardly any furniture besides a TV, a plastic kitchen table with plastic chairs, and a couple of worn mattresses. Justin had dropped out of school, unable to keep up with his courses while strung out on heroin. He told his parents he was "staying with a friend," and he returned home every two or three days for a visit, just to reassure them all was well.

On a typical day during those nine months between the summer of 2012, when Justin first tried heroin, and spring of 2013, when he would first attempt to quit, Sean and Justin would wake up around one in the afternoon and share a light breakfast. This breakfast did not consist of food; it consisted of heroin. They both preferred snorting to injecting. They lined the heroin up on a smooth, clean surface and passed it between them till they were sated, just as if they were passing a basket of rolls. Sometimes they "chased the dragon," a way of ingesting heroin that requires putting the heroin on a bit of tin foil, putting a source of heat—a match or a lighter—below the foil, and inhaling the vaporized powder. The term "chasing the dragon" refers to the plume of smoke that rises up off the foil, like a mythical dragon's tail, as well as the high that addicted persons seek, as elusive as the mythical creature whose name it bears.

Justin recalls that he was never hungry when he was using heroin. In fact, he didn't want anything. He didn't want to eat, read, bathe,

exercise, watch TV, or even play his beloved video games. He was living in a "dump" with no furniture, no food in the refrigerator, no family, no job, and no prospects for the future, and despite the ever-present threat of legal consequences from dealing in illegal drugs, he felt "complete."

He spent his days cooking heroin from morphine, and when the stink of the chemicals made his eyes burn, he joined Sean on the porch. Every hour or two they snorted heroin. "Because we were distributors, we didn't even wait till we were feeling sick to use. We'd use to get even higher than we already were."

## The First Step to Recovery

One day in the spring of 2013, Justin was sitting in Sean's house filling balloon bags of heroin for later sale, when he realized that he had been using heroin daily for exactly nine months. "I was thinking in my head, 'Wow, it's been almost a year. If I let this year go by, it's going to be five years, ten years, maybe my whole life.'" At that moment he decided to quit. He also recognized that he would not be able to act on his decision without help, primarily due to the physiologic withdrawal associated with stopping opioids.

Again he turned to the Internet. While the latest batch of heroin was still cooking in the oven, Justin looked up treatment for heroin addiction on his laptop. He found a website for BAART (Bay Area Addiction Research and Treatment), a methadone maintenance treatment clinic in Oakland, and immediately set up an appointment. (For a discussion of methadone and Suboxone, opioid agonist treatments for opioid addiction, see chapter 5). Justin recalls that BAART required their clients to be in active withdrawal when initiating methadone, so he stopped using in the hours before his appointment and was plenty sick when he went in and received his first dose of methadone.

Justin also decided to tell his parents. He realized he'd have to be living at home again, and traveling every morning to Oakland to get his

methadone dose, and there was all the paperwork he needed to fill out. There was no way he could hide it from them any longer.

The same day he started on methadone, Justin told his parents that heroin was something he'd always wanted to try and thought he could handle. He said he'd been sucked in, and he blamed no one but himself. He knew his parents felt guilty anyway, as if they had failed him. Justin almost cried remembering their conversation. "They were very support-ive," he said. "They've always been very supportive."

Justin did well on methadone. He enrolled at the community col-lege again, made new nonusing friends, and joined a study group. When he did relapse six months after being in the BAART program, he re-lapsed hard—which is common—and was smoking crack at the same time he was using heroin. He dropped out of the methadone program at BAART, but bought methadone on the street to ease his comedowns. For months he managed to use crack and heroin on the weekends and methadone to get through his classes during the week. One day, un-able to reach his methadone source, he started to go into withdrawal. "I realized 'I'm at the whim of my dealer.'" He bought some Suboxone, a medication with similarities to methadone, also used to treat opioid ad-diction, from a friend, and used that the same way he had used metha-done, that is, to tide him over when he couldn't get heroin.

But Justin was getting tired. Tired of chasing down heroin, metha-done, and Suboxone. Tired of feeling anxious and sick, wondering if he'd have enough drug to keep going. Tired of lying and living the dou-ble life—pretending, as he says, "to be sober, but having this second ac-tual life where you're keeping secrets from everybody, lying, and having to keep track of all the lies. It's all just so hard to keep up."

Again he looked on the Internet, this time for someone to pre-scribe Suboxone, which is how he found me. When he told me his story, I agreed that Suboxone made sense, given the severity of his opioid ad-diction. But Suboxone treatment requires close monitoring, including regular clinic visits and urine toxicology screens to test for the presence of other drugs. If other drugs are detected, I explained, ongoing Subox-

one treatment might be compromised. I also encouraged him to seek some kind of psychosocial intervention to treat his addiction as well.

Justin agreed to Suboxone treatment and monitoring and to a Narcotics Anonymous (NA) meeting. Unlike Jim, he did not find twelve-step groups helpful; they just weren't for him. He quit going after a few weeks. But Justin came to appointments regularly and never tested positive for other drugs, except for a couple of small slipups with benzodiazepines, the most recent when, while cleaning his room, he came across an old stash of Valium pressed between his bed and the wall. He took the Valium for sleep for the next several weeks, then stopped. He felt guilty about it. A year later, he is still doing well.

## A Different Kind of Dragon

Justin ascribes his year of recovery from addiction to Suboxone, his relationship with his parents, and interactive role-playing tabletop games. "Suboxone stops the cravings and I can feel normal. I don't lie anymore. Role-playing games help by giving me the escape and excitement that I would usually get from that whole street life."

Today, Justin spends most of his weekdays studying. On the weekends, he spends some time on the computer, but he no longer visits online pharmacies or spends nearly the amount of time he used to playing video games. Instead, with some sweet irony, he is much more likely to be on a site called Penandpaper.com. There he is able to interact with other players of so-called tabletop, or role-player games. Tabletop games simulate the quest story lines so popular among video gamers, but without the video. There is often an online version of the role-player games, but Justin much prefers the face-to-face version. He claims the story is richer that way.

On a typical Saturday, Justin's five tabletop teammates, now a stable crew he meets with on a regular basis for gaming, come to his house around eleven o'clock to spend the day playing. Collaborative storytelling is the essence of the game. They sit around a table, sometimes

for as long as eight hours at a time, and together describe the world their characters will inhabit and what will happen to them in that world. Sometimes they may even act out a scene or engage in a small role-play, as if creating theater, though none of them would ever describe themselves as actors.

They are currently playing ShadowRun, set in a futuristic world populated by magical beings and cyborgs. Justin's character is an Ork, a troll-like creature with robotic enhancements and cybernetic abilities named "J-Rez." Their latest story line bears an uncanny resemblance to Justin's own life—and it can be read as the narrative of Justin's alter ego.

J-Rez has just heard from his female crime boss that his next mission is to travel to Seattle to obtain a new synthetic drug called Novacoke. In Seattle, J-Rez meets up with the other members of the organized crime ring, and together they venture into a high-crime neighborhood to deliver a package of research chemicals needed to make Novacoke. In exchange, they get a sample of the drug to take back to their boss. However, right after getting the package they came for, they are nearly killed by a detonated bomb, saved only by J-Rez's robotic enhancements. The team then combs the neighborhood and, through diligent detective work, including deciphering a tattoo, identifies their would-be killer—a man who has eluded them because he has the ability to turn into a dragon. J-Rez and his gang embark on their next assignment: chasing the dragon.

Justin continues to chase mythical creatures, but for now, not through the medium of addictive drugs.

## The Gateway Now a Runway

Young people today don't just experiment with cigarettes, alcohol, and marijuana. They try everything, especially if it comes in the form of a pill. They even try chemicals newly synthesized in a laboratory without

any idea of what these chemicals might do to them. They obtain these drugs from friends at school, from the Internet, from their own home chemistry kits. The gateway, in other words, has become a runway, telescoping the progression from recreational to addictive use. That first prescription for opioids, stimulants, or sedatives is the boarding pass, in some cases, to a lifelong struggle with addiction.