# PSJ18 WALGREENS Opp Exh 60

Execution Copy

# WALGREEN - AMERISOURCEBERGEN
## PHARMACEUTICAL PURCHASE AND DISTRIBUTION AGREEMENT

This Pharmaceutical Purchase and Distribution Agreement (**"Agreement"**) is entered into as of March 18, 2013 (**"Execution Date"**), by AmerisourceBergen Drug Corporation, a Delaware corporation, and its affiliate, J.M. Blanco, Inc. (**"Blanco"**), a Delaware corporation (collectively, **"ABDC"**), on the one hand, and Walgreen Co., an Illinois corporation, its affiliates, Walgreen of San Patricio, Inc., a Puerto Rico corporation, Walgreen of Puerto Rico, Inc., a Puerto Rico corporation, and other affiliates of Walgreen Co. designated by Walgreen Co., but excluding Take Care Consumer Solutions, LLC and Take Care Employer Solutions, LLC (collectively, **"Walgreen"**), on the other hand.  Capitalized terms not defined in the body of this Agreement have the meaning provided in Exhibit 1 (Definitions).

## RECITALS

(1)     On the Execution Date, (a) ABC, Walgreen Co. and Alliance Boots entered into that certain Framework Agreement (the **"Master Agreement"**), (b) ABC issued the Warrants (as defined in the Master Agreement), (c) ABC, Walgreen Co. and Alliance Boots entered into the Shareholders Agreement (as defined in the Master Agreement), (d) WBAD, ABDC, Blanco and Bellco entered into the WBAD ABDC Generics Agreement, and (e) ABDC, Walgreen and Alliance Boots entered into that certain side letter regarding their involvement with WBAD (collectively, and together with this Agreement, in each case as amended, modified or supplemented from time to time in accordance with their respective terms, the **"Transaction Documents"**).

(2)     ABDC is a national distributor of Products.

(3)     Walgreen owns and operates various Retail and Non-Retail Facilities across the United States.

(4)     The parties desire to set forth the terms and conditions pursuant to which ABDC will sell to Walgreen, and Walgreen will purchase from ABDC, the Products and Services for the Facilities, as further described herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties intend by this Agreement to set forth their obligations to each other for an arrangement under which ABDC will provide Products and Services to Walgreen for the Facilities (**"Walgreen Program"**), and agree as follows:

**1.      CONVERSION PLAN AND PROCESS**

A.      Conversion Plan.  Within thirty (30) days of the Execution Date, ABDC shall present Walgreen with a proposed, detailed distribution conversion plan (**"Distribution Conversion Plan"**), which shall specify, among other things, the actions, personnel and resources required of each party to transition to ABDC distribution services that Walgreen currently receives from another distributor(s) or provides for itself through Walgreen Warehouses, as further described in the following provisions of this Section 1(A), Sections 2(C) (Ordering), 3(C) (Schedule II Controlled Drugs), 4(G) (Electronic Catalog Updates; Errors and Omissions), 4(I) (Invoicing, Payment and Reconciliation Process) and 6(E) (Return Procedures) below and Paragraph F of Exhibit 2 (Contract Pricing and Administration (Indirect Contract Pricing).

HIGHLY CONFIDENTIAL                                                        WAGMDL00000417

P-WAG-7014

       (i)       <u>Facilities Currently Served by ABDC</u>.  As of the Execution Date, ABDC serves as the pharmaceutical distributor for (a) Mail Order, Specialty, WIRS, Long Term Care, Health Systems and Central Fill Facilities across the continental United States, and (b) DSD Retail Facilities in Hawaii, Puerto Rico and USVI.  From and after the Effective Date, ABDC will continue to serve as the pharmaceutical distributor for such Facilities, on and subject to the terms and conditions of this Agreement.

       (ii)       <u>Facilities Conversion from Predecessor Distributor</u>.  The Distribution Conversion Plan will address the transition of distribution services for Brand Rx and Generic Rx, including Schedule II Controlled Drugs, and other Products currently purchased from the distributor(s) serving the Facilities not specified in Section 1(A)(i) above (**"Predecessor Distributor"**) to ABDC on September 1, 2013 (**"Effective Date"**).  In developing the Distribution Conversion Plan for these Facilities, ABDC will take into account the unique characteristics of each category of Facility not served by ABDC on the Execution Date.

       (iii)       <u>Conversion of Bulk Rx Distribution Services</u>.  As of the Execution Date, Walgreen purchases a limited number of specified Brand Rx Products from ABDC for delivery by ABDC directly to the Walgreen Warehouses (**"ABDC Bulk BRx"**), Brand Rx from the Predecessor Distributor for delivery by the Predecessor Distributor directly to the Walgreen Warehouses (**"Predecessor Distributor Bulk BRx"**), Brand Rx directly from Suppliers for delivery by such Suppliers to the Walgreen Warehouses (**"Direct Bulk BRx"**) and Generic Rx directly from Suppliers for delivery by such Suppliers to the Walgreen Warehouses (**"Direct Bulk GRx"**).  In turn, as of the Execution Date, Walgreen delivers the ABDC Bulk BRx, the Predecessor Distributor Bulk BRx, the Direct Bulk BRx and the Direct Bulk GRx from the Walgreen Warehouses to all of the Facilities.  The Distribution Conversion Plan will address the transition of these delivery and related distribution services for the Walgreen Warehouses and the Facilities to ABDC as follows:

       (a)       For ABDC Bulk BRx, Predecessor Distributor Bulk BRx and Direct Bulk BRx, transition of distribution services for the Walgreen Warehouses and the Facilities in accordance with the Distribution Conversion Plan will occur on the Effective Date, such that, from and after the Effective Date, ADBC will deliver all Brand Rx Products from the Distribution Centers to the Facilities; and

       (b)       Subject to Section 7(B)(vii)(a) below (Extraordinary Service Level Failures), for Direct Bulk GRx, transition of distribution services for the Walgreen Warehouses and the Facilities will commence on January 1, 2014 and will be completed by September 1, 2014, the first anniversary of the Effective Date (**"GRx Conversion Date"**), such that, from and after the GRx Conversion Date, ABDC will deliver all Generic Rx Products from the Distribution Centers to the Facilities, it being understood hereby that this transition will be effectuated in accordance with the Distribution Conversion Plan on a staged, rolling basis over this nine-month period.

       (iv)       <u>Acceleration of Distribution Conversion Schedule; Pilot Program</u>.  The parties acknowledge and agree that (a) it is their mutual intent to complete the distribution conversion process contemplated by the foregoing provisions of this Section 1 at the earliest possible date, and (b) their ability to achieve such an accelerated conversion schedule depends on several factors, including ABDC's ability to commence purchasing Generic Rx for the Facilities pursuant to ABDC WBAD Supplier Agreements at the earliest time practicable after the Effective Date and the parties addressing capacity issues presented by the distribution conversion process on a joint basis through potential arrangements involving ABDC's use (through acquisition or lease) of all or portions of one or more Walgreen Warehouses (it being understood that any such acquisition or lease will be on fair market terms and

HIGHLY CONFIDENTIAL       WAGMDL00000418

memorialized in one or more separate written agreements between the parties meeting applicable legal requirements).  In addition, to permit an orderly and seamless transition of distribution services as contemplated by the foregoing provisions of this Section 1, the parties agree that the Distribution Conversion Plan shall include details regarding one or more "pilot" distribution programs to be implemented in advance of the Effective Date and with sufficient scope and duration to assure achievement of the parties' objectives regarding such transition from and after the Effective Date.

        (v)      ABDC Ordering Systems.  In addition to the foregoing schedule for distribution conversion, the Distribution Conversion Plan shall reflect the actions which the parties shall take to assure that each Facility which is not served by ABDC on the Execution Date has, prior to the Effective Date, full access to, use of and training by ABDC in ABDC's Passport electronic, internet based ordering application as described on Exhibit 6.

      B.      Agreement Operating Committee.  Prior to the initial presentation of the Distribution Conversion Plan by ABDC as provided above, the parties shall create an **"Agreement Operating Committee,"** comprised of no less than four (4) employees of each of ABDC and Walgreen, including the assigned representatives of each of ABDC and Walgreen provided in Paragraph 3 of Exhibit 6, that shall be responsible for (i) reviewing and finalizing the Distribution Conversion Plan, (ii) overseeing the conversion process carried out pursuant to the agreed-upon Distribution Conversion Plan, and (iii) following completion of each phase of the distribution conversion process reflected in the Distribution Conversion Plan, providing on-going operational support and direction for the relationship between the parties as contemplated by this Agreement and the Distribution Conversion Plan.  Following delivery of the Distribution Conversion Plan by ABDC, the Agreement Operating Committee shall meet and confer in good faith on a regular basis to finalize and approve the Distribution Conversion Plan, and any revisions thereto, with a target for mutual sign-off no later than sixty (60) days following the Execution Date, which mutual sign-off shall be evidenced by a written acknowledgment signed by each of ABDC and Walgreen.  Thereafter, the Agreement Operating Committee will meet, in person or by phone or video conference, on a regular, agreed-upon basis and, as needed, will participate in the quarterly business reviews under Section 7(E) below (Quarterly Business Reviews).

      C.      Cooperation by the Parties.

        (i)      Walgreen's Responsibilities.  Walgreen agrees to cooperate fully with ABDC with respect to the development and implementation of the Distribution Conversion Plan, including (a) appointing an appropriate number of dedicated and qualified employees to provide input into the development and implementation of the Distribution Conversion Plan (in addition to those serving on the Agreement Operating Committee), (b) assuring timely availability of other appropriate resources (including those of Walgreen's third party vendors, to the extent required) needed for the development and implementation of the Distribution Conversion Plan, (c) providing ABDC with full access to all Facility systems and data reasonably required by ABDC to implement the Distribution Conversion Plan on a timely basis, (d) requiring each of the Facilities to cooperate fully with the implementation of the Distribution Conversion Plan, including granting ABDC appropriate access to the Facilities required to complete implementation of the Distribution Conversion Plan, and (e) fulfilling other responsibilities and obligations set forth in the Distribution Conversion Plan.

        (ii)      ABDC's Responsibilities.  ABDC agrees to cooperate fully with Walgreen and the Facilities with respect to the development and implementation of the Distribution Conversion Plan, including (a) appointing an appropriate number of dedicated and qualified employees to provide input into the development and implementation of the Distribution Conversion Plan (in addition to those serving on the Agreement Operating Committee), (b) assuring timely availability of other appropriate

HIGHLY CONFIDENTIAL       WAGMDL00000419

resources needed for the development and implementation of the Distribution Conversion Plan, and (c) fulfilling other responsibilities and obligations set forth in the Distribution Conversion Plan.

       (iii)    <u>Failure to Satisfy Responsibilities</u>.  If either party fails to fulfill its obligations pursuant to this Section 1(C), the other party will be excused from performance of its obligations under the Distribution Conversion Plan to the extent and for such time that it is unable to perform as a result of such failure by the other party until the other party completes its performance of such obligations.

## 2.      PRICING, PAYMENT AND ORDERING TERMS

      A.    <u>Products</u>.  Commencing on the Effective Date but subject to the Distribution Conversion Plan, Walgreen shall purchase from ABDC, and ABDC will sell to Walgreen during the Term its Primary Vendor requirements of Rx Products as specified in Section 2(B) below.  Walgreen may elect to purchase, but is not obligated to purchase, non-Rx Product from ABDC for delivery directly to its Facilities, as ordered from time to time.  The prices payable by Walgreen for such Products, reflective of the agreed upon discount, if any, are set forth in <u>Exhibit 2</u> (Pricing Terms), as adjusted pursuant to this Agreement. Walgreen will pay all amounts due to ABDC under this Agreement in accordance with payment terms in <u>Exhibit 4</u> (Payment and Related Terms), including the provisions thereof granting Walgreen the right to dispute amounts due ABDC hereunder.  Walgreen will purchase from ABDC no less than the periodic minimum percentages and amounts of Products as set forth below in Section 2(B), subject to the terms and conditions in this Agreement.

      B.    <u>Primary Vendor Requirements and Exceptions</u>.

       (i)    <u>Requirements</u>.  ABDC will be the Primary Vendor of all requirements of Walgreen and the Facilities for Rx Products.  "**Primary Vendor**" means that:

        (a)    Commencing on the Effective Date and continuing thereafter on an uninterrupted basis for the remainder of the Term, subject to the exclusions provided in Section 2(B)(ii) below (Compliance Measurement and Exceptions), Walgreen shall purchase from ABDC no less than 98% of the total dollar amount of Walgreen's aggregate purchases of all Brand Rx for its Facilities in the United States;

        (b)    Commencing on the GRx Conversion Date and continuing thereafter on an uninterrupted basis for the remainder of the Term, subject to the exclusions provided in Section 2(B)(ii) below (Compliance Measurement and Exceptions), Walgreen shall purchase from ABDC no less than 95% of the total dollar amount of Walgreen's aggregate purchases of all Generic Rx for its Facilities in the United States; and

        (c)    During each Agreement Year commencing on the GRx Conversion Date, Walgreen makes Net Purchases of Rx from ABDC of not less than $34,500,000,000.

Price of Goods and other terms in this Agreement are based on Walgreen's satisfaction of the Primary Vendor requirements.  Walgreen Co. will be responsible for Walgreen's satisfaction of all obligations imposed on Walgreen in this Agreement.

       (ii)    <u>Compliance Measurement and Exceptions</u>.  Walgreen's compliance with the Primary Vendor requirements of Section 2(B)(i) above (Requirements) shall be measured each calendar quarter.  In computing Walgreen's compliance with the Primary Vendor requirements, the following adjustments will be made:

        (a)    If Walgreen orders any Brand Rx or Generic Rx from ABDC that ABDC is unable or otherwise fails to supply and Walgreen acquires such Brand Rx or Generic Rx outside of the

HIGHLY CONFIDENTIAL      WAGMDL00000420

Walgreen Program, for purposes of calculating Walgreen's compliance with such requirements, all such purchases shall be treated as if they had been made through ABDC under this Agreement;

(b)     The dollar amount of any Brand Rx or Generic Rx acquired by Walgreen under the 340B Program shall be excluded from the numerator and denominator used in calculating Walgreen's compliance with the Primary Vendor requirements set forth in Sections 2(B)(i)(a) and (b) above, and shall not be taken into account in calculating Walgreen's compliance with the Primary Vendor requirement in Section 2(B)(i)(c) above;

(c)     The dollar amount of any Specialty Rx acquired by Walgreen for WIRS, Specialty and Health Systems Facilities from a source other than ABDC shall be excluded from the numerator and denominator used in calculating Walgreen's compliance with the Primary Vendor requirements set forth in Sections 2(B)(i)(a) and (b) above, and shall not be taken into account in calculating Walgreen's compliance with the Primary Vendor requirement in Section 2(B)(i)(c) above, provided those purchases were made directly from a Supplier (which, for avoidance of doubt, shall include a specialty distributor designated by the Supplier as the Supplier's authorized exclusive distributor of Specialty Rx); and

(d)     Subject to Walgreen's compliance with the requirements of Section 2(B)(iii) below (ABDC Right of First Refusal on Generic Rx Launches), the dollar amount of Generic Rx acquired by Walgreen for any Facility upon launch of the Generic Rx from a source other than ABDC and meeting the criteria set forth in Exhibit 5 hereto (Primary Vendor Exception For Generic Rx Launches) shall be excluded from the numerator and denominator used in calculating Walgreen's compliance with the Primary Vendor requirements set forth in Sections 2(B)(i)(a) and (b) above, and shall not be taken into account in calculating Walgreen's compliance with the Primary Vendor requirement in Section 2(B)(i)(c) above.

(iii)     ABDC Right of First Refusal on Generic Rx Launches.  Walgreen's ability to utilize the exception set forth in Section 2(B)(ii)(d) above (Compliance Measurement and Exceptions) is expressly conditioned on ABDC's failure to exercise ABDC's option with respect to launches of Generic Rx as set forth below in this Section 2(B)(iii).  Subject to the last sentence of this Section 2(B)(iii), no later than seven (7) business days prior to the anticipated launch date of a Generic Rx that Walgreen desires to purchase from an alternative source and exclude from the Primary Vendor requirement calculation, Walgreen shall provide written notice to ABDC indicating with specificity the terms on which the alternative source is willing to provide the Generic Rx subject to the launch, including pricing, quantities and payment and delivery terms (each, a **"GRx Launch Notice"**).  If, within three (3) business days of receipt of a GRx Launch Notice, ABDC provides written notice to Walgreen agreeing to match the terms in such GRx Launch Notice, Walgreen will discontinue discussions with the alternative source and permit ABDC to handle such launch on an exclusive basis pursuant to such terms.  If ABDC fails to respond to a GRx Launch Notice in a timely manner or does not match the terms set forth therein, Walgreen may utilize the alternative source for such launch on the terms set forth in the GRx Launch Notice, subject in all events to the limitations set forth in Exhibit 5 hereto (Primary Vendor Exception For Generic Rx Launches).  Notwithstanding the foregoing, ABDC's above right of first refusal is conditioned on Walgreen's receipt of no less than ten (10) business days' notice from a Generic Rx Supplier of a launch of a new Generic Rx; in the event that such Supplier fails to provide Walgreen with such adequate notice, Walgreen shall not be obligated to provide ABDC with such right of first refusal set forth herein.

C.     Ordering.  For Products required by the Facilities, Walgreen will use commercially reasonable efforts to transmit all orders centrally using EDI pursuant to Exhibit 7, it being understood that there will be rare instances in which orders will not be placed centrally, such as checking stock or incidental or special orders, in which event Walgreen will use commercially reasonable efforts to cause

the ordering Facility to utilize ABDC's Passport electronic, internet based ordering application for such orders, with telephonic or other non-electronic means of ordering only being used as a last resort. Notwithstanding the foregoing, with respect to Schedule II Controlled Drugs, until such time as the parties implement CSOS as provided in Section 3(C) below (Schedule II Controlled Drugs), the parties acknowledge and agree that orders for such products will be submitted in accordance with interim measures developed by them as part of the Distribution Conversion Plan using DEA Forms 222 and otherwise meeting applicable DEA requirements.  Each order will describe the Product that ABDC will provide to Walgreen and the quantity and designated Facility to which delivery of such Product is to be made.  Orders will be set-up as "**Fill or Kill,**" which, for purposes of this Agreement, shall mean that in the event that ABDC does not have an adequate supply of Product to fulfill a Walgreen's purchase order, ABDC shall not substitute an alternative item but shall fulfill a purchase order to the extent that ABDC has in its inventory the Product which was ordered, unless otherwise directed by Walgreen.  In such an event, the parties agree that Walgreen may purchase items that are not available from ABDC from an alternative source and, in amplification of Section 2(B)(ii)(a) above (Compliance Measurement and Exceptions), items purchased by Walgreen in such circumstances shall be treated as if they had been made through ABDC under this Agreement for purposes of computing Walgreen's compliance with the Primary Vendor requirements.

        D.      Disputed Amounts.  Payment disputes will be handled and resolved in accordance with Exhibit 4 and, if required, the dispute resolution process described in Section 16(O) (Dispute Resolution) of this Agreement.

## 3.      WALGREEN LOCATIONS AND DELIVERIES

        A.      Purchases by Non-Retail Facilities.  ABDC will deliver Products to the Non-Retail Facilities in accordance with the schedule set forth on Exhibit 8.  As soon as reasonably practicable but in no instance less than ten (10) business days prior to an ABDC holiday or physical inventory days, ABDC shall notify the effected Facility(ies) of such holiday or physical inventory day.  Additionally, the following terms apply for Non-Retail Facilities:

        (i)      Rx Products in liquid form may not be included in afternoon deliveries to the Walgreen WIRS Hub in Albuquerque.

        (ii)      For Non-Retail Facilities receiving same-day delivery service, Walgreen will take commercially reasonable efforts to order Products primarily for morning delivery and limit same-day delivery orders to Products for which there is an urgent, unanticipated need or for which there is otherwise a need for a mid-shift fill-in stocking order.

        (iii)      ABDC or its carrier will establish and schedule a standing delivery appointment for each delivery to the respective Non-Retail Facility, in accordance with the schedule on Exhibit 8 and guarantee each order will be delivered no later than one hour after such time (other than delays due to weather, traffic, accidents and other conditions outside of ABDC's control).  Unless otherwise mutually agreed, the initial delivery times are as set forth on Exhibit 8.  For each late delivery that is not due to conditions outside of ABDC's control, ABDC will pay, as an invoice credit, two basis points (0.02%) of the invoiced amount for the order that was delivered late, as a credit for failure to achieve timely performance and not as a penalty, which payment will be Walgreen's sole remedy for any such delay of such order.  As requested from time to time, the parties will update Exhibit 8 for New Non-Retail Facilities (as defined in the following subsection).

        (iv)      From time to time, Walgreen will desire to add new facilities (other than Retail Facilities) that dispense or distribute Products (collectively, a "**New Non-Retail Facility**") to or delete

HIGHLY CONFIDENTIAL      WAGMDL00000422

from this Agreement an existing Non-Retail Facility, in each instance upon no less than 30 days' prior written Notice to ABDC; provided (a) for any New Non-Retail Facility outside of the continental United States, the parties shall negotiate in good faith terms applicable to such New Non-Retail Facility, including order cut off times, delivery schedules and surcharges, service level requirements and Price of Goods adjustments, to achieve a result consistent with each party's reasonable financial expectancies as of the Execution Date, and (b) for any other New Non-Retail Facility, if the New Non-Retail Facility is located in an area requiring ABDC to establish new delivery service or incur extraordinary service expense, the parties shall negotiate in good faith terms applicable to such New Non-Retail Facility, including order cut off times, delivery schedules and surcharges and service level requirements. Walgreen will provide a written Notice to ABDC of its estimated Product usage for each New Non-Retail Facility added to this Agreement.

B.    Purchases by Retail Facilities.

(i)    In Puerto Rico.  Pursuant to this Agreement, ABDC shall deliver Products to Retail Facilities located in Puerto Rico six days a week (Monday - Saturday), twice daily (Monday - Friday) and Saturday once a day, except holidays and ABDC's Distribution Center physical inventory days.  For orders received by ABDC by 12:00 Noon local time, Monday through Friday, ABDC will endeavor to make delivery to the ordering Puerto Rico Retail Facility by 5:00 p.m. local time on the same day.  Orders received by ABDC by 9:00 p.m. local time, Sunday through Friday, will be delivered to the ordering Puerto Rico Retail Facility on the next delivery day by 11:00 a.m. local time.  Additional deliveries for Retail Facilities in Puerto Rico may be required by Walgreen and delivered by ABDC as mutually agreed upon by the parties from time to time, and ABDC shall not unreasonably withhold its agreement to any requests by Walgreen for such additional deliveries.  If ABDC agrees to provide such additional deliveries, the applicable agreed-upon additional deliveries shall be made without additional charge to Walgreen.

(ii)    In USVI.  Pursuant to this Agreement, for Retail Facilities located in the USVI, orders received by ABDC by 11:00 am local time, Monday through Friday, will be delivered to the ordering USVI Retail Facility by U.S. Postal Service (or other mutually agreed upon carrier) the next business day (on Tuesday – Saturday).  Orders sent after 12 noon local time will be processed the next business day and delivered on the 2nd day.  Non-CSOS Schedule II Controlled Drug orders will be delivered on the 2nd day after the DEA Form 222 is received by ABDC.  Shipments to Retail Facilities in the USVI or other off-island locations will be subject to a per-order standard shipping cost.  ABDC will invoice Walgreen the pass-through contract courier cost for all USVI or other off-island location deliveries at the end of each month.

(iii)    In Hawaii.  Pursuant to this Agreement, ABDC shall deliver Products to Retail Facilities located in Hawaii five days a week (Monday - Friday), once a day, except holidays and ABDC's Distribution Center physical inventory days.  Orders received by ABDC prior to 5:00 p.m. local time on any day, Sunday through Thursday, shall be delivered to the ordering Retail Facility in Hawaii on the next day no later than 12:00 p.m. local time, exclusive of ABDC-designated holidays.  For orders which are issued by Retail Facilities in Hawaii and received by ABDC prior to 5:00 p.m. local time on Fridays or Saturdays, ABDC shall deliver such orders to the respective Retail Facility on the following Monday no later than 12:00 p.m. local time, exclusive of ABDC-designated holidays.  With regard to orders issued after any deadlines outlined above, or for orders issued on ABDC-designated holidays, such orders shall, for purposes of delivery by ABDC, be considered received the following business day.  All shipments to Retail Facilities in Hawaii outside the Island of Oahu (**"Non-Oahu Shipments"**) will be subject to a per-order standard shipping cost.  Non-Oahu Shipments will be shipped daily via airplane for next morning delivery (other than Products that, as "hazardous material," may not be shipped by air).

HIGHLY CONFIDENTIAL

ABDC will invoice Walgreen the pass-through contract courier cost for all Non-Oahu deliveries at the end of each month.  The current door-to-door delivery cost for Non-Oahu Shipments are $24.20 for the first ten pounds plus $1.00 per pound in excess of ten pounds.  ABDC may adjust the delivery cost from time to time to reflect ABDC's actual shipping and handling costs.

(iv)    In Alaska.  Pursuant to this Agreement, ABDC shall deliver Products to Retail Facilities in Alaska subject to the following: (a) ABDC's cut-off time for order transmission shall be no earlier than 2:00 p.m.  Pacific Time (1:00 p.m. Alaska Time), (b) ABDC shall make five (5) deliveries per week, once a day, Tuesday – Saturday, except that (I) if a Retail Facility is not open for deliveries on Saturday, non-refrigerated Products shall be delivered on Mondays and refrigerated Products shall be delivered on Tuesdays, (II) hazardous material items shall only be delivered on Tuesdays and Fridays, provided that if the Monday immediately before a Tuesday is a holiday, hazardous material items which would have been delivered on that Tuesday will be delivered on Wednesday, and (III) ethyl chloride and lithium batteries are not available for air delivery, need to be purchased in bulk for ground shipping and will be delivered on the third Wednesday of every month, (c) for orders of Schedule II Controlled Drugs, Retail Facilities in Alaska shall endeavor to use CSOS to assure timely delivery of such orders (provided, however, that completed DEA Form 222s to ABDC's Seattle Distribution Center may be mailed by Walgreen, but the parties acknowledge such use will create delays in deliveries), (d) delivery times are not guaranteed and are per schedule of the selected air freight carrier, except that for Retail Facilities in Anchorage and Ketchikan, ABDC shall use commercially reasonable efforts, subject to delays due to weather, traffic, accidents and other conditions outside of ABDC's control, to make scheduled deliveries by 11:00 a.m. Alaska Time, and (e) returns shall be scheduled for pick up two (2) times per month.  Shipments to Retail Facilities in Alaska will be subject to a per-order standard shipping cost.  ABDC will invoice Walgreen the pass-through contract courier cost for all Alaska deliveries at the end of each month.

(v)    In Guam.  Pursuant to this Agreement, for Retail Facilities in Guam, ABDC will deliver Products once a week, on a mutually-agreed upon weekday, except holidays and warehouse physical inventory days.  Orders received by ABDC by 11:00 am local Hawaii time, Monday through Friday, will be delivered on the next scheduled delivery date.  For orders of Schedule II Controlled Drugs, Retail Facilities in Guam shall endeavor to use CSOS to assure timely delivery of such orders (and completed DEA Form 222s may be mailed by Walgreen to ABDC's Honolulu Distribution Center, but the parties acknowledge such use will create delays).  All goods are FOB origin, freight prepaid and reimbursed.  Title and risk of loss pass to Walgreen upon the carrier's execution of a bill of lading at the Distribution Center and Walgreen is responsible for all damage in transit.  Insurance for Products in transit will be obtained for Walgreen by ABDC and the cost of such insurance will be reimbursed to ABDC by Walgreen.  Applicable freight and insurance charges for each delivery will be itemized and invoiced to Walgreen separately on a pass-through basis at the end of each month.

(vi)    In the Continental United States.  Pursuant to this Agreement, ABDC shall deliver Products to Retail Facilities located in the continental United States five days a week (Monday - Friday), once a day, except holidays and ABDC's Distribution Center physical inventory days.  Subject to the following sentence, (a) orders received by ABDC prior to 8:00 p.m. local time on any day, Sunday through Thursday, shall be delivered to the ordering Retail Facility by 2:00 p.m. the next business day, exclusive of ABDC-designated holidays, and (b) orders received by ABDC prior to 8:00 p.m. local time, on Fridays or Saturdays, shall be delivered to the ordering Retail Facility by 2:00 p.m. on the following Monday, exclusive of ABDC-designated holidays.  Notwithstanding the foregoing, from the Effective Date until the GRx Conversion Date, (x) orders received by ABDC prior to 7:00 p.m. local time on any day, Sunday through Thursday, shall be delivered to the ordering Retail Facility by 4:00 p.m. the next business day, exclusive of ABDC-designated holidays, and (y) orders received by ABDC prior to 7:00

HIGHLY CONFIDENTIAL                                                                                    WAGMDL00000424

p.m. local time, on Fridays or Saturdays, shall be delivered to the ordering Retail Facility by 4:00 p.m. on the following Monday, exclusive of ABDC-designated holidays.  With regard to orders issued after any deadlines outlined above, or for orders issued on ABDC-designated holidays, such orders shall, for purposes of delivery by ABDC, be considered received the following business day.  Notwithstanding the foregoing, from time to time after the Execution Date, ABDC may request by Notice to Walgreen that modifications to the foregoing delivery and order cut off time requirements be made to take into account unusual circumstances presenting unanticipated logistic issues for ABDC; upon receipt of such Notice, the parties shall engage in good faith negotiations, each acting reasonably and taking into account the parties' financial expectancies on the Execution Date, to endeavor to reach agreement on the terms on which such request may be accommodated.

        (vii)    <u>New Retail Facilities</u>.  From time to time, Walgreen will desire to add new retail facilities that dispense or distribute Products (collectively, a **"New Retail Facility"**) to or delete from this Agreement an existing Retail Facility, in each instance upon no less than 30 days' prior written Notice to ABDC; provided (a) for any New Retail Facility outside of Puerto Rico, the USVI, Hawaii, Alaska, Guam or the continental United States, the parties shall negotiate in good faith terms applicable to such New Retail Facility, including order cut off times, delivery schedules and surcharges, service level requirements and Price of Goods adjustments, to achieve a result consistent with each party's reasonable financial expectancies as of the Execution Date, and (b) for any other New Retail Facility that would not be a DSD Retail Facility, if the New Non-DSD Retail Facility is located in an area requiring ABDC to establish new delivery service or incur extraordinary service expense, the parties shall negotiate in good faith terms applicable to such New Non-DSD Retail Facility, including order cut off times, delivery schedules and surcharges and service level requirements.  Walgreen will provide a written Notice to ABDC of its estimated Product usage for each New Retail Facility added to this Agreement.

        C.    <u>Schedule II Controlled Drugs</u>.  With regard to orders of Products categorized by the DEA as Schedule II products, such Schedule II orders shall be delivered by ABDC in compliance with DEA regulations.  ABDC agrees that, from and after the Effective Date, ABDC shall be capable of supporting CSOS from the Facilities.  As part of the Distribution Conversion Plan, the parties shall address Schedule II ordering by all Facilities and develop a process, including use of CSOS at a future date mutually agreed upon by the parties, which is in their mutual best interest for such orders and is consistent with each party's reasonable financial expectancies as of the Execution Date.

        D.    <u>Non-Controlled Affiliates</u>.  From time-to-time after the Effective Date, Walgreen may desire to add to this Agreement facilities that dispense or distribute Products that are owned or operated by entities that are not wholly-owned, directly or indirectly, by Walgreen Co.  In such circumstances, the parties, acting reasonably and in good faith, shall determine by mutual agreement the terms and conditions on which such facilities may be added to this Agreement, including order cut off times, delivery schedules and surcharges, service level requirements and Price of Goods adjustments, which shall be set forth in an amendment hereto executed by both parties.

HIGHLY CONFIDENTIAL        WAGMDL00000425

## 4.        DUTIES OF ABDC

A.        <u>Adequate Supply of Rx</u>.  ABDC's sale and distribution obligations for Rx Products hereunder are set forth in Section 7(B) below (Service Levels).

B.        <u>Blocking of Products</u>.  ABDC agrees that promptly following receipt of written request from Walgreen (corporate), ABDC will block specified items from being ordered by the Facilities.

C.        <u>Discontinued Product, Supplier Bankruptcy</u>.  At such time as ABDC obtains actual knowledge that a Product has been discontinued by a Supplier or that a Supplier of Product(s) is in Bankruptcy, ABDC shall promptly provide Notice of the same to Walgreen.  Following receipt of such Notice, Walgreen may request by return Notice that ABDC cease shipping the applicable Products(s) and ABDC shall honor any such request promptly following receipt of the return Notice.  In the absence of such request by Walgreen, ABDC shall continue to provide the applicable Products to the Facilities.

D.        <u>Overs</u>.  ABDC agrees to retrieve from the respective Facilities, at its own expense, all Product which is reported by Walgreen as deliveries received but not ordered (a.k.a., "overs") within five business days of Walgreen's requests; provided, however, no Product may be returned from a Facility located in the USVI or other location where U.S. Customs classifies it as being imported.

E.        <u>EDI</u>.  ABDC agrees to maintain and utilize EDI order/payment and merchandise return capabilities, including to trade the EDI 850 (Purchase Order), EDI 855 (Purchase Order Acknowledgment), EDI 856 (Advance Ship Notice), EDI 810 (Invoice) and EDI 180 (Return Merchandise Authorization) electronically via EDI using either VAN or AS2 communication protocols or via Walgreen's SupplierNet Web Portal and per terms in <u>Exhibit 7</u>.

F.        <u>ASNs</u>.  In amplification of Section 4(E) above (EDI), ABDC will provide the Facilities with advances ship notices ("**ASNs**") before the shipment arrives to the Facilities as further provided in Paragraph 7 (ASNs) of <u>Exhibit 6</u> (Additional Services) and using EDI per terms in <u>Exhibit 7</u>.

G.        <u>Electronic Catalog Updates; Errors and Omissions</u>.  In amplification of Section 4(E) above (EDI), ABDC will provide updates to Walgreen's merchandise (832) catalog on a daily basis using EDI pursuant to <u>Exhibit 7</u>.  Each update will list Products available from ABDC together with applicable pricing pursuant to this Agreement.  As part of the Distribution Conversion Plan, the parties shall address requirements for the catalog and develop a solution which is in their mutual best interest and consistent with each party's reasonable financial expectancies as of the Execution Date.  ABDC shall be responsible for any errors or omissions when updating items in the catalog and, in the event ABDC fails to accurately and timely update pricing in the catalog, Walgreen shall have the right to purchase the applicable Product at the last updated price and/or receive a credit in the amount of any overcharge until pricing is corrected by ABDC, provided ABDC shall not be responsible for any such errors or omissions which are outside of ABDC's control or due to Walgreen's failure to apply transmitted updates in a timely fashion and Walgreen, promptly upon discovery, provides notice to ABDC in each instance when Walgreen has reason to suspect that such updates are not being transmitted in a timely manner by ABDC.

H.        <u>Data Transmission to Third Party</u>.  ABDC shall transmit, at no cost to Walgreen, any or all Walgreen data and available to ABDC hereunder to third party processors, as and when reasonably directed by Walgreen.

I.        <u>Invoicing and Reconciliation; Other Invoice Requirements</u>.

HIGHLY CONFIDENTIAL                                                                                    WAGMDL00000426

P-WAG-7014

(i)      _Invoicing, Payment and Reconciliation Process._  As part of the Distribution Conversion Plan, the parties shall address requirements and procedures relating to the invoicing of Walgreen and the Facilities for Products supplied by ABDC hereunder and the subsequent payment by Walgreen of such invoices in accordance with applicable terms of this Agreement (the **"Invoicing, Payment and Reconciliation Process"**), which Invoicing, Payment and Reconciliation Process shall be in their mutual best interest and consistent with each party's financial expectancies as of the Execution Date and take into account applicable factors, including (a) the need to provide invoices to certain Facilities with pricing on designated Products other than Generic Rx which deviates from (and is greater than) Walgreen's final Price of Goods on such Products as set forth in Paragraph A (Price of Goods on Products other than Generic Rx) of _Exhibit 2_ (Pricing Terms), (b) the need to provide invoices to all Facilities with pricing on Generic Rx based on the GRx Price File rather than Walgreen's final Price of Goods as set forth in Paragraph B (Price of Goods for Generic Rx) of Exhibit 2 (Pricing Terms), (c) payment of such invoices by Walgreen (recognizing that Walgreen may pay an amount that deviates from such invoices and such final Price of Goods), and (d) periodic and regular reconciliation of such payment by Walgreen to Walgreen's final Price of Goods and associated payment of any amount deemed owing on account thereof.  In the event the Agreement Operating Committee is unable to develop a mutually satisfactory Invoicing, Payment and Reconciliation Process by June 1, 2013 (with the members thereof designated by each party acting reasonably and in good faith), the matter shall be escalated for resolution in accordance with the Dispute Resolution terms in Section 16(O) below.

(ii)      _Other Invoice Requirements._  ABDC shall (a) transmit EDI 810 invoices on the same day EDI 856 ASNs are transmitted, (b) separately invoice Schedule II Controlled Drugs in orders for both Schedule II Controlled Drugs and other Products, (c) create daily invoices with payment terms instead of statement terms, and (d) link the invoice number with each item in the ASN level.

J.      _Drop Ship Charges._  ABDC will pay regular shipping charges for Drop Ships and Walgreen will pay for any additional Supplier shipping charges applied to a Drop Ship unless the Drop Ship results from ABDC's failure to fill an order for a particular Product for a reason that does not constitute a Service Level Adjustment (as defined in Section 7(B)(iv) below).  Other terms and conditions relating to Drop Ships are set forth in _Exhibit 2_ and _Exhibit 6_.

K.      _Emergency Orders._  ABDC will use commercially reasonable efforts to meet a requested delivery time for emergency orders, which may be subject to an additional charge (except in Puerto Rico with regards to any ABDC-approved additional delivery as provided in Section 3(B)(i) above (Purchases by Retail Facilities in Puerto Rico)).  If ABDC cannot do so, Walgreen may fill emergency orders outside of the Walgreen Program on such occasions using another provider notwithstanding minimum purchase commitments in this Agreement.

L.      _Metric Charges/Penalties._  Provided Walgreen is in material compliance with the Agreement and has maintained net purchase volumes at levels reasonably in keeping with forecasted demand established pursuant to Section 7(A) below, ABDC will not pass on to Walgreen, including through a surcharge to Price of Goods in _Exhibit 2_, any performance metric charges/penalties assessed on ABDC by Suppliers of Brand Rx under any BRx Supplier Agreement if such metric charge or penalty is reasonably determined to arise by reason other than (i) an act or omission of Walgreen (such as failing to provide forecasts as provided in Section 7(A) below), (ii) ABDC meeting a request of Walgreen (such as engaging in purchasing of short supply Product as contemplated by Section 7(A)(iii) or 7(A)(iv) below), (iii) ABDC fulfilling a requirement of this Agreement (such as abiding by the limitations on providing data as contemplated by Section 10(D) below), or (iv) ABDC not having the capability to satisfy a particular requirement of the BRx Supplier Agreement (such as not having a re-distribution center).  For the avoidance of doubt, both parties agree that, subject to these limitations, Walgreen shall not be

HIGHLY CONFIDENTIAL      WAGMDL00000427

disadvantaged by performance metric penalties/charges (including service level penalties/charges, data penalties/charges, inventory management penalties/charges) assessed against ABDC relative to BRx Supplier Agreements or other agreements, including with respect to adjustments provided in this Agreement.

M.    Records, Audits.  Not more than once in any 12-month period, and following 60 days' advance written notice to ABDC, Walgreen will have the right to appoint one or more of its employees to conduct an on-site audit of those relevant records applicable to its pharmaceutical purchases under the terms of this Agreement, subject to any reasonable non-disclosure agreement required by ABDC.  Any such review will be conducted in accordance with a mutually agreed upon schedule, will be limited to 24 months of historical information as of the date such review begins and will be subject to a reasonable confidentiality agreement prepared by ABDC and signed by Walgreen and its employees or agents who will have access to the information prior to beginning the review.  The cost of such an audit will be borne solely by Walgreen.  ABDC will maintain all such documentation required under this Agreement for a minimum of two years or such longer period as may be required by applicable law.

N.    Reporting.  In addition to providing a Walgreen corporate designated representative with access to ABDC's custom reporting system which provides ABDC customers with a wide-range of information regarding their pharmaceutical spend and to the other reports specified herein, including in Paragraph 1(A) of Exhibit 6, ABDC will provide Walgreen with the reports listed on Exhibit 9 hereto (ABDC Reports).

O.    Recalls.  ABDC will provide, via email to rxrecalls@walgreens.com, gina.hastreiter@walgreens.com and todd.petersen@walgreens.com, or other designated email address, via an agreed upon electronic means, notice to Walgreen of recalls of Products immediately upon notice by Supplier, but in no case more than two (2) business days after receipt of notice from the respective Supplier.

5.    **DUTIES OF WALGREEN**

A.    Notice of Changes.  Walgreen will promptly notify ABDC of changes in ownership, name or business form (e.g., sole proprietorship, partnership or corporation), changes in state of incorporation or formation.

B.    Billing Statements.  Billing disputes must be brought to the attention of ABDC's accounts receivable department within 24 months after receipt of the first statement containing the amount in dispute or Walgreen will be deemed to accept the accuracy of such statements and to waive its right to dispute the amount.

C.    Title And Risk Of Loss.  All goods are F.O.B. Walgreen's location, with freight prepaid for normal delivery, except as provided in Sections 3(B)(ii) - (v) above (Purchases by Retail Facilities in USVI, Hawaii, Alaska and Guam).  Expedited deliveries will incur extra freight expenses.  Title and risk of loss pass upon delivery to Walgreen except as provided in Section 3(B)(v) above with respect to Guam.

D.    Extension of Credit.  Payment terms are an extension of credit based upon an evaluation of Walgreen's financial condition upon commencement of this Agreement.  Upon request, Walgreen will furnish ABDC within a commercially reasonable time period, complete annual and quarterly financial statements (unless publicly available).  Upon Walgreen's Bankruptcy, ABDC may, from time to time, upon no less than 24 hours' prior written Notice, (i) require posting of adequate security or such other

HIGHLY CONFIDENTIAL                                                            WAGMDL00000428

documents as ABDC may reasonably require, (ii) reasonably amend payment terms, and/or (iii) place Walgreen on a C.O.D. basis.

E.     No Re-Distribution.  To minimize opportunities for counterfeit product to enter the supply chain and artificial speculation on short-supply product that impacts practitioners, pharmacies, hospitals and others that dispense or administer Product directly to patients ("**dispensers**"), Walgreen agrees not to distribute Product other than to the Walgreen Warehouses, Facilities, patients, customers, dispensers and health care providers that administer Products.  ABDC may audit Walgreen's compliance with this requirement at reasonable periodic intervals.

## 6.     RETURNS AND RETURN CREDITS

A.     Standard Policy.  Walgreen will only return Products to ABDC in accordance with the policy for returned goods ("**Returned Goods Policy**"), attached as Exhibit 10, as amended from time to time by mutual written agreement of Walgreen and ABDC.

B.     Walgreen Returns Made Directly To Supplier.  The parties will follow the procedures set forth in Exhibit 11 with respect to returns of Product made directly to a Supplier from Walgreen.

C.     Guaranteed Dating.  All Rx Products (other than Rx Products supplied by the Supplier with shorter dating) will have at least 12 months' dating when shipped to Walgreen by ABDC.  If, upon receipt, Walgreen refuses to accept short-dated Rx Product, Walgreen may return it by requesting a return authorization (with no restocking fee) which will be promptly issued by ABDC.

D.     AbbVie (formerly Abbott) Returns.  Walgreen has elected to receive a credit, which shall be paid indirectly through ABDC, for agreeing that the Facilities will not return specified Products manufactured by AbbVie (formerly, Abbott) to ABDC.  Such credit, as currently offered by AbbVie, equals 1% of WAC for each of the specified Products.  For the avoidance of doubt, these credits shall not be considered for purposes of the calculation of the Price of Goods hereunder of the applicable Product, but rather as a credit.  From time to time, Walgreen may elect to receive a similar returns credit from other Suppliers at Walgreen's sole discretion, if and to the extent available.  With respect to the election made by Walgreen in this Section 6(D) for specified AbbVie Products and any other such election, Walgreen may not change its election in this regard for the twelve-month period from, as applicable, the Effective Date or the date notice of such other election is provided ABDC.

E.     Return Procedures.  Walgreen credit and return requests should be entered electronically as appropriate for ordering errors, defects and outdated and overstocked Products.  Walgreen requests for credits involving damaged in shipment, shortages, and filling errors must be provided by phone to ABDC's customer service-returned goods department within ten (10) business days of receipt.  Return credits shall be issued within four (4) business days after ABDC receives returned Product.  Walgreen may not return merchandise that was not purchased from ABDC.  ABDC may reject returns that are not made in compliance with the Returned Goods Policy.  Walgreen may return any counterfeit, adulterated, mislabeled or otherwise suspicious Product that it purchased from ABDC, but only if Walgreen identifies it as such (to help minimize the risk it will be re-sold or otherwise placed back into the stream of commerce).  Notwithstanding any contrary provision of this Agreement, no Products (Rx or non-Rx, saleable or non-saleable) may be returned from a Facility in the USVI or other location from which U.S. Customs would classify returned goods as being imported (with Products subject to confiscation).  As part of the Distribution Conversion Plan, the parties shall address procedures for returns by all Facilities and develop processes which are in their mutual best interest with respect thereto and are consistent with each party's reasonable financial expectancies as of the Execution Date.

HIGHLY CONFIDENTIAL                                                                WAGMDL00000429

F.     Counterfeit Returns.  If Walgreen intentionally returns to ABDC any Product that Walgreen knows to be counterfeit or engages in a pattern of returning counterfeit Product (in either case without so identifying it as counterfeit or otherwise suspicious), ABDC may, after written notice to Walgreen, take reasonable actions to restrict or refuse future returns from Walgreen during the Term.

G.     PDMA Certification for Returns.  In order for ABDC to accept the return of Rx Products, promptly after the Execution Date and as reasonably requested thereafter from time to time to assure compliance with applicable regulatory requirements, Walgreen will separately sign and provide to ABDC the form of the PDMA Certification and Representation Agreement, which is attached as Exhibit 14.

## 7.     INVENTORY; SERVICE LEVELS; QBRs

A.     Inventory.

(i)     Inventory Forecasts.  The parties will work proactively and in good faith throughout the Term to establish reasonable forecasts of weekly, monthly and quarterly inventory requirements for Products to be purchased by Walgreen under this Agreement.  Walgreen agrees to provide ABDC with a forecast for the period starting on the Effective Date and ending on December 31, 2013 at least thirty (30) days prior to the Effective Date and, thereafter, to provide ABDC with forecasts on a quarterly basis at least thirty (30) days prior to the start of each calendar quarter during the Term, in each instance which have been prepared by Walgreen using commercially reasonable efforts to reflect anticipated demand.  Changes in forecasted requirements will be communicated by Walgreen to ABDC at the earliest possible time and Walgreen will use commercially reasonable efforts to ensure that its purchase volume and patterns do not adversely affect ABDC in any material respect.

(ii)     Inventory Management and Service Level Representatives.  To facilitate the inventory management process and help assure that Walgreen receives the highest levels of service from ABDC for filling orders of Products, each party will designate a dedicated representative with appropriate authority who will be charged with managing the inventory management and service level processes on a day-to-day basis at all times throughout the Term.  In this regard, the dedicated representatives may, from time to time, among other things (a) jointly develop a list of particular Rx Products for which achievement of adjusted fill rates at levels above the minimums set forth in Section 7(B) below is of particular importance to Walgreen and its customers and patients, (b) monitor the service level performance of the Distribution Centers on an ongoing basis, keeping in regular communication with each other regarding this critical area and exchanging data regarding such performance, (c) collaborate to address instances in which service levels of one or more Distribution Centers are not in keeping with the parties' expectations hereunder, including development of process enhancements designed to improve such service, (d) prepare for seasonal demand for Products, and (e) address issues arising from ABDC's physical inventories and holiday schedule.  The dedicated representatives may serve on the Agreement Operating Committee.  The dedicated representatives will be empowered to escalate any issues which they are unable to resolve to appropriate management-level representatives of each party for handling as provided in Section 16(O) below (Dispute Resolution).

(iii)     Short-Supply Product.  If, due to insufficient inventory of any Rx, ABDC cannot deliver the full quantity ordered by Walgreen, ABDC will allocate its inventory of Rx in a manner that treats Walgreen no less favorably than any other ABDC non-government customer.  Additionally, from time-to-time on a limited exception basis, the parties shall discuss in good faith the terms on which, subject to applicable legal and regulatory requirements and Supplier approval, ABDC would make purchases of Rx for the benefit of Walgreen to address situations of Rx shortages impacting the industry as a whole.

HIGHLY CONFIDENTIAL

P-WAG-7014

(iv)     Year End Purchasing.  Based on Walgreen's usage estimates provided during the quarterly business review for the third calendar quarter (typically held no later than July of each year) as contemplated by Section 7(E) below (Quarterly Business Reviews) and experience with Suppliers, ABDC will make commercially reasonable efforts to acquire and allocate Products for Walgreen during the last calendar quarter consistent with its inventory management and other agreements with Suppliers.  ABDC will coordinate with Walgreen and Suppliers to obtain additional inventory to the extent a shortage occurs.

(v)     No Speculative Purchasing.  In amplification of Section 7(A)(i) above (Inventory Forecasts), without the prior written consent of ABDC, Walgreen agrees not to engage in speculative purchasing under this Agreement, including buying more Product than needed in anticipation of a price increase, Supplier allocation or other short supply in the market.

B.     Service Levels.  ABDC shall meet the following service level requirements for the Facilities that are not located in Alaska or Guam:

(i)     Rx Products for all Facilities Outside of HI, PR, USVI, AK and GU.

(a)     Subject to the parties having implemented and completed a pilot/test program as provided in Section 1(A)(iv) above (Acceleration of Distribution Conversion Schedule; Pilot Program), on and after the Effective Date until the end of the third full calendar month after the Effective Date (**"Ramp-Up Period"**), for Rx Products for all Retail Facilities outside of Hawaii, Puerto Rico, USVI, Alaska and Guam (specifically excluding HHC/DME Products), ABDC will meet a monthly-adjusted fill rate computed in accordance with this Agreement of 96.5%.

(b)     After the Ramp-Up Period, for Rx Products for all Retail Facilities outside of Hawaii, Puerto Rico, USVI, Alaska and Guam (specifically excluding HHC/DME Products), ABDC will meet a monthly-adjusted fill rate computed in accordance with this Agreement of 98.5%.

(c)     Starting on the Effective Date, for Rx Products for all Non-Retail Facilities outside of Hawaii, Puerto Rico, USVI, Alaska and Guam (specifically excluding HHC/DME Products), ABDC will meet a monthly-adjusted fill rate computed in accordance with this Agreement of 98.5%.

(ii)     Rx Products for all Facilities in Hawaii, Puerto Rico and USVI.  On and after the Effective Date, for Rx Products for all Facilities in Hawaii, Puerto Rico and USVI (specifically excluding HHC/DME Products), ABDC will meet a monthly-adjusted fill rate computed in accordance with this Agreement of 97%.

(iii)     HHC/DME Products for Certain Non-Retail Facilities.  On and after the Effective Date, for HHC/DME Products made available to Mail, Specialty and Central Fill Facilities outside of Alaska and Guam, ABDC will meet a monthly-adjusted fill rate computed in accordance with this Agreement of 97%.

(iv)     Calculation.  The applicable monthly adjusted service level fill rate will be calculated as follows:

$$\frac{(A - B) + C}{A} \times 100 = \text{Fill Rate}$$

A = Total number of packages/bottles ordered.

HIGHLY CONFIDENTIAL                                                                            WAGMDL00000431

P-WAG-7014

B = Total number of packages/bottles not filled by ABDC.

C = Total number of packages/bottles that are out of stock or filled short due to a legitimate manufacturer back order, recall, discontinuance or other shortages, due to Extraordinary Events (as defined in Section 16(A) (Extraordinary Events)), or where utilization by a Facility exceeds 120% of the Facility's average weekly volume during the preceding month or 150% with respect to seasonal Products (which, for purposes of this Agreement include products in the categories of allergy, flu, cough/cold, asthma, anti-infectives, anaphylactic kits, and otic pain needs and such other products as are identified and agreed upon from time to time by the parties) or forecast.  An item shorted on an original order will not be counted as a short for the second time until 72 hours have passed.  For any new Product or any Product not previously ordered from ABDC, ABDC will have a period of thirty (30) days to add the Product to its inventory beginning on the date Walgreen provides to ABDC a usage estimate in writing.  The foregoing adjustments used in calculating the monthly service level fill rate are referred to collectively as the **"Service Level Adjustments"**.

       (v)    <u>Service Level Reporting</u>.  ABDC will provide Walgreen with a monthly report by the 25th day of each month, based upon ABDC's records, indicating the Fill Rate that ABDC achieved during the previous month for the service level requirements set forth above in this Section 7(B).  In addition, ABDC will provide Walgreen on request with a report detailing the number and a description of all shorts (by account), partial shipments, Suppliers' back orders and any other action or inaction taken by ABDC in response to any order during the applicable month.

       (vi)    <u>Service Level Payment</u>.  If ABDC's weighted-average adjusted service level for all Facilities measured in the aggregate covered by the applicable service level requirements set forth in Section 7(B)(i) – (iii) above does not meet the applicable adjusted Fill Rate, ABDC will issue a credit to Walgreen within thirty (30) days for each Facility for which the adjusted Fill Rate was not met that was covered by the applicable service level requirement(s), a service level payment based on the total Net Purchases of Rx Products or HHC/DME Products (for Mail, Specialty and Central Fill Facilities only), as applicable, that were purchased by such Facility during such month multiplied by the basis point which corresponds to the respective adjusted service level as set forth in the table below.  Subject to Section 7(B)(vii) below, this payment, in the form of a credit memo or check, will be Walgreen's sole remedy for any failure to meet such adjusted Fill Rate.  Notwithstanding the foregoing, ABDC is subject to pedigree laws in Florida that restrict purchase, distribution, and return of certain Products, which restrictions, changes to such restrictions or restrictions in other jurisdictions, may require that ABDC make changes that will affect ABDC's service level guarantees.  If so, applicable affected service levels will be adjusted accordingly.

| Rx Products (only) For Retail Facilities Outside AK/GU/HI/PR/USVI During Ramp-Up Period | Rx Products (only) For Retail Facilities Outside AK/GU/HI/PR/USVI After Ramp-Up Period and Non-Retail Facilities Outside of HI/PR/AK/GU/USVI Starting on Effective Date | Rx Products (only) In HI/PR/USVI | HHC/DME Products for Mail, Specialty & Central Fill Outside GU/AK | Service Level Payment |
|---|---|---|---|---|
| 96.50% & Above | 98.50% & Above | 97% & Above | 97% & Above | None |
| 96% to 96.49% | 97.50% to 98.49% | 96% to 96.99% | 96% to 96.99% | 5 basis points (0.05%) |
| 95.50% to 95.99% | 96.50% to 97.49% | 95% to 95.99% | 95% to 95.99% | 10 basis points (0.10%) |

HIGHLY CONFIDENTIAL

WAGMDL00000432

| Below 95.50% | Below 96.50% | Below 95% | Below 95% | 15 basis points (0.15%) |
| --- | --- | --- | --- | --- |

      (vii)     <u>Extraordinary Service Level Failures</u>.

      (a)     Notwithstanding any contrary provision in Section 1(A)(iii) above (Conversion of Bulk Rx Distribution Services), conversion of Direct Bulk GRx as contemplated by Section 1(A)(iii)(b) above shall not commence until ABDC has achieved a weighted-average monthly adjusted service level measure in the aggregate with respect to Brand Rx Products for Facilities outside of Alaska, Guam, Hawaii, Puerto Rico and the USVI of 95% or better in any two (2) months during any rolling four-month period starting on the Effective Date.

      (b)     Notwithstanding Section 7(B)(vi) above, commencing after the end of the Ramp-Up Period, with respect to Rx Products (only) for Facilities outside of Alaska, Guam, Hawaii, Puerto Rico and the USVI, if ABDC's weighted-average monthly adjusted service level measured in the aggregate is less than 96.5% in each of any four (4) consecutive months or any six (6) months during any rolling twelve-month period starting after the Ramp-Up Period, upon request made by Walgreen within thirty (30) days of the end of such four-month period or the last of the six (6) months during such rolling twelve-month period, the members of the Agreement Operating Committee shall meet in good faith to develop a comprehensive plan to remedy the situation. If the members of the Agreement Operating Committee cannot agree upon a plan, each acting reasonably and in good faith as provided above, the matter shall be escalated for resolution pursuant to the Dispute Resolution process in Section 16(O) below (Dispute Resolution).

      (c)     Notwithstanding Section 7(B)(vi) above, and regardless of whether Walgreen makes a request pursuant to the preceding subsection 7(B)(vii)(b) (if applicable), commencing after the end of the Ramp-Up Period, if ABDC's weighted-average monthly adjusted service level measured in the aggregate is less than 95% in any month with respect to Rx Products (only) for Facilities outside of Alaska, Guam, Hawaii, Puerto Rico and the USVI, ABDC shall reimburse Walgreen for Walgreen's reasonable incremental costs, above those that would have been incurred by Walgreen under this Agreement, with respect to Walgreen's purchase of Rx Products under alternative arrangements, including potentially purchasing products in bulk from ABDC or another pharmaceutical distributor for distribution into the Walgreen Warehouses and subsequent distribution by Walgreen to the Facilities, to the extent necessary to put Walgreen in the position Walgreen would have been if ABDC had achieved a 95% weighted-average monthly adjusted service level measured in the aggregate in such month with respect to Rx Products (only) for Facilities outside of Alaska, Guam, Hawaii, Puerto Rico and the USVI. In making such alternative arrangements, Walgreen agrees to use all commercially reasonable efforts available to minimize such incremental costs.

      (d)     Notwithstanding any contrary provision of this Agreement, commencing on the fourteen (14) month anniversary of the Effective Date, with respect to Rx Products (only) for Facilities outside of Alaska, Guam, Hawaii, Puerto Rico and the USVI, if ABDC's weighted average monthly adjusted service level measured in the aggregate is less than the applicable Extraordinary Service Level Percentage (as specified below) in each of any four (4) consecutive months or any six (6) months during any rolling twelve-month period starting on the fourteen (14) month anniversary of the Effective Date, Walgreen may declare ABDC to be in material breach of this Agreement. For purposes of this subsection, the **"Extraordinary Service Level Percentage"** is 90% from the fourteen (14) month anniversary of the Effective Date until the day immediately prior to the eighteen (18) month anniversary of the Effective Date and is 92% from and after the eighteen (18) month anniversary of the Effective Date.

HIGHLY CONFIDENTIAL

C.     <u>Inter-Division Transfers</u>.  If a Product is not available from the serving Distribution Center, ABDC's customer service representatives will, upon request from a Facility, attempt to fill the order from another Distribution Center within the serving region; provided, however, no inter-Distribution Center transfers are allowed from outside Florida into Florida Distribution Centers or, in the future, into other Distribution Centers affected by regulatory restrictions; and further provided, that, in order to minimize multiple same-day requests for the same Product or for slow-moving Products, Walgreen will cooperate in good faith with ABDC to develop practices that minimize the charges experienced by ABDC from such inter-Distribution Center transfers, including improving the accuracy of forecasts for Products by Distribution Center, Walgreen's accepting delivery of Product that exceeds forecasts within a reasonable timeframe without penalizing ABDC, and jointly communicating with manufacturers to help improve product availability.  For deliveries to any Facility from an alternate Distribution Center, ABDC must provide an invoice contemporaneous with the time of delivery to the Facility.  If ABDC determines that inter-Distribution Center transfers are excessive in spite of such efforts to improve processes, then ABDC may escalate its concerns to Walgreen's Divisional Vice President, Rx Supply Chain and Analytics, to ensure a fair and equitable resolution.  If Product is not available, Walgreen may request that ABDC place it on automatic backorder so that the order will be filled after ABDC receives the Product from the Supplier.

D.     <u>Notification of Supply Issues</u>.  Upon request by Walgreen, ABDC will promptly furnish Walgreen with documentation with regard to any shortages, back-orders, allocations or other supply issues with respect to the Products, including information as to the reason for such shortages, back-orders, allocations or supply issues.

E.     <u>Quarterly Business Reviews</u>.  Senior executives of ABDC and Walgreen will conduct face-to-face meetings scheduled by the parties at least once each calendar quarter.  Meetings will be scheduled and held at mutually agreed upon dates at Walgreen's headquarters or an alternate site upon agreement and members of the Agreement Operating Committee will participate as needed and requested.  The parties will review performance during the previous quarter and plan for the upcoming 12-month period.

## 8.     ADDITIONAL SERVICES AND GENERAL PROVISIONS

ABDC will provide the Services in <u>Exhibit 6</u> to Walgreen.  ABDC may, from time to time, develop policies and procedures relative to new or existing Services offered to customers, on an interim or as-needed basis.  If ABDC develops such policies or procedures or changes current ones, ABDC will provide Walgreen with written Notice at least thirty (30) days before such changes are effective; provided, however, any such changes must be both reasonable and not inconsistent with this Agreement and, provided further, that no additional charges or unreasonable costs to comply with any such changes shall be binding on or required to be incurred by Walgreen without Walgreen's prior consent, unless required by law.

## 9.     TERM OF AGREEMENT

A.     <u>Initial Term</u>.  Subject to modification pursuant to either Section 5.1(b)(iii) or Section 5.1(d)(iii) of the Master Agreement, unless earlier terminated in accordance with the provisions of this Agreement, the initial term of this Agreement (the **"Initial Term"**) will begin on the Execution Date, and will remain in effect until August 31, 2023, unless otherwise mutually agreed upon.

B.     <u>Extended Term; General Termination</u>.  At the end of the Initial Term, the term of this Agreement will be extended for successive, uninterrupted terms of one year each (each, an **"Extension**

P-WAG-7014

Term"), unless either party gives at least 210 days' prior written Notice to the other before the end of, as applicable, the Initial Term or any Extension Term of its intention not to extend this Agreement (the Initial Term and any such Extension Term(s) are, collectively, the **"Term"**).

10.    **CONFIDENTIALITY**

A.    <u>Confidential Information</u>.  Any of the following information which is disclosed by either party to the other or to which the other party obtains access, whether presented orally or in written, electronic or other form, and whether or not such information is marked "confidential" (hereinafter referred to as **"Confidential Information"**) shall be protected by the recipient from disclosure with the same degree of care by which it protects its own such information:  e.g., Walgreen's sales data, requests for proposals, requests for information, project plans, IT strategies, forecasts, employee and vendor information, software (including all documentation, code and specifications), hardware and system designs, architectures, structure and protocols, products, processes, inventions, methods, trade secrets, customers, or to Walgreen's retailing, distribution or administrative facilities and related information, pricing information, usage data, purchasing program and initiatives, joint marketing initiatives and any other programs specially designed by ABDC for Walgreen, and such other information that a party considers confidential or proprietary.  Any Confidential Information which may come into the hands of a party hereto shall specifically remain the property of the originator and shall not be deemed released to the other party or into the public domain.  Information disclosed shall not be deemed confidential if the information (i) becomes available to the general public through no fault of the recipient; (ii) is rightfully disclosed to recipient by a third party not, to recipient's knowledge, subject to any confidentiality obligation with respect to such information; (iii) is rightfully in the possession of recipient at the time of disclosure, as evidenced by such party's internal records, without obligation of confidentiality; (iv) is previously known to or developed by recipient independently of the other party, as evidenced by such party's internal records, without reliance on the disclosing party's confidential information.  In the event that the recipient is required to disclose Confidential Information of the disclosing party pursuant to a valid court order or other legal requirement, the recipient shall promptly notify the disclosing party of the request compelling disclosure and provide reasonable assistance to, and allow the disclosing party, within the time period allowed, to contest the release of the Confidential Information.

B.    <u>Confidentiality of Agreement</u>.  Notwithstanding the foregoing, each party shall keep confidential the terms and conditions of this Agreement and shall not disclose the foregoing to any third party without the prior written consent of the other party, except as required by law or regulation, including federal securities laws.

C.    <u>Treatment of Confidential Information</u>.  The receiving party must take the following actions when it receives Confidential Information: (i) use the Confidential Information only for purposes of performing its obligations under this Agreement; (ii) restrict disclosure of the Confidential Information to its representatives with a need to know the Confidential Information for purposes of performing their responsibilities in connection with the Agreement; (iii) advise those representatives of the obligation not to disclose the Confidential Information; (iv) copy the Confidential Information only as necessary for its representatives who need it in connection with the Agreement, and ensure that confidentiality is maintained in the copying process; and (v) use, and require its representatives to use, the same degree of care as is used with the receiving party's Confidential Information, which degree of care shall in no event be less than reasonable care.

D.    <u>Walgreen's Sales Data</u>.  In amplification of Section 4(I) above (Data Transmission to Third Party), Walgreen shall have the exclusive right to use or sell all data generated relating to Product purchased by Walgreen and sold by ABDC pursuant to this Agreement, including Walgreen's purchase

HIGHLY CONFIDENTIAL                                                              WAGMDL00000435

data ("EDI 867 Data").  In addition, Walgreen shall be the exclusive owner of all of such data hereunder but ABDC may use such data for internal purposes, including with advisors that are subject to confidentiality agreements as stringent as contemplated hereby.  Notwithstanding the foregoing: (i) with respect to Suppliers of Brand Rx, ABDC may disclose EDI 867 Data and/or components within the portion of a wholesaler's product and activity data ("EDI 852 Data") on a Blinded basis without Walgreen's prior consent, and (ii) with respect to Suppliers of Generic Rx, ABDC may disclose EDI 867 Data and/or EDI 852 Data without Walgreen's prior consent.

      E.     <u>Destruction/Return of Confidential Information</u>.  Within ten business days from the termination of this Agreement or the receipt of a written request by the disclosing party, the receiving party shall, at the disclosing party's option, either: (i) return the Confidential Information to the disclosing party, or (ii) certify in writing to the disclosing party that such Confidential Information has been destroyed in such a manner that it cannot be retrieved.  Notwithstanding the foregoing, the receiving party may retain one archival copy of the Confidential Information solely for evidentiary purposes in the event of any dispute regarding this Agreement or the Confidential Information.

      F.     <u>Ownership</u>.  All Confidential Information disclosed under this Agreement shall remain the property of the disclosing party.  Nothing in this Agreement shall be construed as granting a license or copyright.  The disclosure of Confidential Information shall likewise not be construed as any representation, warranty, assurance, guaranty, or inducement by the disclosing party to the receiving party with respect to the accuracy thereof or with respect to infringement of any patent or other proprietary right.

## 11.    NOTICES

      All notices, orders, authorizations, approvals, reports and other communications required or permitted in this Agreement (**"Notices"**) will be in writing and will be delivered personally (which will include delivery by courier or reputable overnight delivery service) or sent by certified or registered mail, postage and fee prepaid, return receipt requested, or sent by facsimile to the address or facsimile number set forth below; provided, however, that orders generated by Walgreen or any Facility may be electronically communicated to ABDC (EDI for various purchasing transactions).  Notices delivered personally will be deemed delivered on the date of actual delivery.  Notices sent electronically or by facsimile will be deemed delivered on the date of transmission if sent during recipient's normal business hours (otherwise on the next business day) with a confirming copy sent by overnight delivery service.  Notices sent by certified or registered mail will be deemed delivered three business days after mailing.  Parties may change this information by written Notice to the other party delivered in accordance with this Section.  Walgreen consents to receiving Notices, including product updates, recalls, new product launches and programs, advertisements and other marketing materials via facsimile from ABDC, its affiliates and their related companies, to the telephone facsimile (**"fax"**) numbers below.

          To Walgreen:   Walgreen Co.
                         1417 Lake Cook Rd, MS #L167
                         Deerfield, IL  60015
                         Attn: Divisional Vice President, GMM, Brand Rx,
                           Wholesalers and Vaccine
                         Fax: 847-374-2800

          with a copy to:   Walgreen Co.
                         104 Wilmot Road, MS #1425
                         Deerfield, IL  60015
                         Attn: Commercial Services Law Dept.

HIGHLY CONFIDENTIAL        WAGMDL00000436

Fax: 847-914-6885

To ABDC:        AmerisourceBergen Drug Corporation
                1300 Morris Drive
                Chesterbrook, PA  19087-5594
                Attn:  Senior Vice President, Sales and Marketing
                Fax:  610-727-3601

with a copy to: AmerisourceBergen Corporation
                1300 Morris Drive
                Chesterbrook, Pennsylvania 19087-5594
                Attn: General Counsel
                Fax: 610-727-3612

## 12.    WARRANTIES, REPRESENTATIONS, COVENANTS, DISCLAIMERS AND INDEMNIFICATION

A.    <u>Warranties, Representations and Covenants of ABDC</u>.  ABDC hereby warrants, represents, promises and covenants to Walgreen that (i) it will have good title to all Products delivered pursuant to this Agreement; (ii) all such Products will be free from any security interest or other lien or encumbrance; and (iii) all Products will be delivered to the appropriate Facility designated by Walgreen without damage and within the applicable Product expiration date.

B.    <u>Assignment of Warranties, Representations and Indemnity Obligations</u>.  In addition, ABDC shall assign and transfer to Walgreen, on a non-exclusive basis, any representations, warranties and rights and claims to defense and indemnity made by the manufacturers of the Products (including representations, warranties and rights and claims to defense and indemnity, relating to intellectual property, product liability or negligence).  Furthermore, ABDC will cooperate with all reasonable requests made by Walgreen to enforce such representations, warranties and rights and claims to defense and indemnity against such manufacturers and in connection with pursuing consents from the manufacturers in providing or assigning to Walgreen such representations, warranties, and rights to defense and indemnification.

C.    <u>No Additional Representations or Warranties Regarding Products</u>.  The representations, warranties and covenants under the Non-Manufacturer Vendor/Supplier Agreement, dated February 27, 2004, by and between the parties (the **"NMV Agreement"**) are in addition to those in this Agreement and they continue to apply during the Term to all Products subject to this Agreement.  Notwithstanding Section 12(B), and except as otherwise provided herein, ABDC makes, and will be deemed to make, no representations or warranties, express or implied, written or oral, as to the value, absence of defect, absence of infringement, or the absence of any obligation based on strict liability in tort, or any other representation or warranty whatsoever, express or implied, with respect to the Products provided under this Agreement.  EXCEPT AS OTHERWISE PROVIDED HEREIN, ABDC SPECIFICALLY AND EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING THOSE OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE REGARDING THE PRODUCTS PROVIDED UNDER THIS AGREEMENT.

D.    <u>Services Representation.</u>  ABDC represents and warrants that all services performed by ABDC under this Agreement shall be undertaken in a good and workmanlike manner.

HIGHLY CONFIDENTIAL                                                    WAGMDL00000437

P-WAG-7014

E.  <u>Sourcing</u>.  ABDC will meet the sourcing representation set forth in Paragraph 5 (NMV Purchasing) of <u>Exhibit 6</u> (Additional Services).

F.  <u>Regarding Pedigree/PDMA</u>.  ABDC represents and warrants that it shall offer for sale to Walgreen only those Products which satisfy the requirements of the PDMA.  Without limiting the foregoing, ABDC will:

(i)  not knowingly offer or sell to Walgreen hereunder any Product which has for any period of time left the jurisdiction of the United States, its territories, principalities and commonwealths and been subsequently re-imported illegally.  Without limiting the foregoing, ABDC shall not knowingly offer or sell any product to Walgreen that has been illegally re-imported within the meaning of the PDMA;

(ii)  promptly provide evidence to Walgreen upon request proving that ABDC is fully licensed by all appropriate governmental agencies to engage in the business of the wholesale distribution of pharmaceuticals, and agrees that during the Term hereof it shall remain so licensed;

(iii)  furnish to Walgreen, prior to delivery of a product, all information and statements with respect thereto required to be delivered under applicable law, including any requirements of the PDMA;

(iv)  not knowingly offer or sell to Walgreen any products that are subject to any manufacturer or government required or requested recall, or which were, at any point in the chain of distribution, obtained from a hospital, health care entity, or charitable organization (unless initially sold to such entity by ABDC, and such products were properly returned by such entity to ABDC), or which are or have in any way been subject to any commercial resale/re-transfer restriction by the manufacturer thereof;

(v)  make its facilities available to Walgreen for reasonable visual inspection and examination of ABDC's products, packing, storage and shipping procedures and facilities, during normal business hours, with reasonable notice;

(vi)  provide Walgreen with reasonable access to its records relating to the Products and ABDC's compliance with the terms hereof and all applicable laws, subject to reasonable protections for pricing and other competitively sensitive information; and

(vii)  assure that all products delivered to Walgreen shall be in its original packaging as contemplated by its manufacturer, and shall otherwise comply with any and all applicable federal, state and local laws and regulations, and each case shall display the National Drug Code (NDC), manufacturer's lot number and product expiration date as provided by its manufacturer.

G.  <u>No Modifications</u>.  No oral or written information provided by ABDC, its employees or other representatives will modify any then-existing warranty or create any new warranty.

H.  <u>Indemnification by ABDC</u>.  ABDC will defend, indemnify and hold harmless Walgreen and its corporate affiliates, and their respective agents, servants, employees, officers, directors and attorneys (**"Walgreen Indemnified Parties"**) against any and all third-party claims, liabilities and expenses (including reasonable attorneys' fees) (**"Claims"**) to the extent arising out of (i) any allegation that injury to or death of any person or any property damage has been caused, directly or indirectly, in whole or in part, by reason of ABDC's negligence or willful misconduct related to any offer for sale, sale

Purchase Agmt (Final 031813)  22

or use of any Product sold to Walgreen by ABDC, (ii) ABDC's violation, or alleged violation, of any law applicable to distribution of pharmaceuticals, including the PDMA, (iii) ABDC's breach of this Agreement, or (d) ABDC's sale or return of any adulterated, misbranded or counterfeit Products. Notwithstanding the foregoing, ABDC may not enter into any settlement agreement or otherwise agree to the entry of any order, judgment or decree that requires a Walgreen Indemnified Party to take any specific action, admit liability or pay any sum of money out of its own resources without such Walgreen Indemnified Party's prior written approval, and provided further, that a Walgreen Indemnified Party may, but without obligation to do so, at its expense, participate in defense of any such Claim through counsel of its own choosing.  Failure to give prompt written Notice of a Claim will not relieve ABDC of liability except to the extent caused by such failure.  ABDC will defend a Claim with counsel reasonably satisfactory to the Walgreen Indemnified Party and each Walgreen Indemnified Party will cooperate fully in such defense.

   I. <u>Indemnification by Walgreen</u>.  Walgreen will defend, indemnify and hold harmless ABDC and its corporate affiliates, and their respective agents, servants, employees, officers, directors and attorneys (**"ABDC Indemnified Parties"**) against any and all Claims to the extent arising out of (i) any allegation that injury to or death of any person or any property damage has been caused, directly or indirectly, in whole or in part, by reason of Walgreen's negligence or willful misconduct related to any offer for sale, sale or use of any Product sold to Walgreen by ABDC, (ii) Walgreen's violation, or alleged violation, of any law applicable to distribution of pharmaceuticals, including the PDMA, (iii) Walgreen's breach of this Agreement, or (iv) Walgreen's sale or return of any adulterated, misbranded or counterfeit products which were not purchased from ABDC.  Notwithstanding the foregoing, Walgreen may not enter into any settlement agreement or otherwise agree to the entry of any order, judgment or decree that requires an ABDC Indemnified Party to take any specific action, admit liability or pay any sum of money out of its own resources without such ABDC Indemnified Party's prior written approval, and provided further, that the ABDC Indemnified Party may, but without obligation to do so, at its expense, participate in defense of any such Claim through counsel of its own choosing.  Failure to give prompt written notice of a Claim will not relieve Walgreen of liability except to the extent caused by such failure.  Walgreen will defend a Claim with counsel reasonably satisfactory to the ABDC Indemnified Party and each ABDC Indemnified Party will cooperate fully in such defense.

   J. <u>Assignment of Claims</u>.  ABDC hereby agrees to convey, assign and transfer to Walgreen all right, title and interest in and to all claims and/or causes of action, actual or alleged, that ABDC may have (**"Direct Purchaser Claims"**): (i) under the laws of the United States or any state against a pharmaceutical manufacturer whose products are purchased by Walgreen from ABDC, relating to such manufacturer's practices which allegedly violate any state or federal antitrust, unfair trade practices or consumer protection statutes in connection with the introduction or sale of the products, and (ii) against a pharmaceutical manufacturer as a direct purchaser; but in either event, only to the extent that such claims or causes of action arise out of or relate to ABDC's purchases of products from such manufacturer which are subsequently sold to Walgreen under this Agreement beginning on the Effective Date, and only with respect to a claim or cause of action that is first filed on or after such date.  Any such assignment of Direct Purchaser Claims shall be evidenced by an agreement between ABDC and Walgreen, substantially in the form attached as <u>Exhibit 12</u>, or any other documents as are necessary and appropriate, to effectuate those rights, as may be reasonably requested by Walgreen from time to time.  ABDC will not assign a Direct Purchaser Claim against any manufacturer that has prohibited ABDC from such assignment (in which event, ABDC will pay Walgreen a proportional share of any antitrust damages that ABDC receives, net of expenses, including attorneys' fees, costs, time and other resources).  On and after the Execution Date, ABDC will take all available reasonable efforts to not enter into any new agreement that would restrict or limit in any way ABDC's assigning Direct Purchaser Claims, whether pursuant to this Section, <u>Exhibit 12</u> or otherwise.  ABDC further agrees not to release or discharge any manufacturer from any such liability

Purchase Agmt (Final 031813)    23

as to any such Direct Purchaser Claims assigned to Walgreen under this Agreement, without written authorization from Walgreen. Nothing herein shall be construed as an admission by Walgreen that it is not a direct purchaser or that it is required to be a direct purchaser to bring or maintain any action against a manufacturer.

## 13.    INSURANCE

A.    <u>Insurance Requirements</u>.  During the Term and for such additional time as may be required, each party will provide, pay for, and maintain in full force and effect insurance coverage in <u>Exhibit 13</u>, at not less than the prescribed minimum limits of liability, covering its activities and anyone it directly or indirectly employs, or by anyone for whose acts it may be liable.

B.    <u>Certificate of Insurance</u>.  Before the Effective Date, each party will provide to the other party a certificate of insurance completed by a duly authorized representative of its insurer certifying that it has the minimum coverage in <u>Exhibit 13</u> in effect and specifying that all liability coverage is written on an occurrence form (if commercially available) and that coverage will not be canceled, non-renewed, or materially changed by endorsement or through issuance of other insurance policies without 60 days' advance written Notice to the other party.

C.    <u>Acceptance of Certificate</u>.  Accepting any such certificate of insurance will not constitute approval or agreement that the insurance requirements have been met or that insurance policies comply with provisions of this Agreement.

D.    <u>Insurer Qualification</u>.  All insurance will be provided through companies authorized to do business in the state where the party is located and either (i) having a rating of A-/IX or better in the current "Best's Insurance Reports," published by A.M. Best Company, or (ii) be otherwise specifically approved by a party.  Copies of all required insurance policies will be provided to the other party within ten days of request.

E.    <u>Insurance Primary</u>.  All coverage required by this Agreement will be primary and non-contributory with respect to any insurance or self-insurance program carried by a party.

F.    <u>No Reduction or Limit of Obligation</u>.  By requiring insurance, neither party is representing to the other that such insurance coverage and limits will be adequate to protect it.  Insurance will not reduce or limit a party's obligation to indemnify and defend the other party for Claims that result from or are connected with performance of this Agreement.

G.    <u>Additional Insured</u>.  To the extent commercially available, the policy or policies providing insurance as required, with the exception of Workers' Compensation, will defend and include the other party and its directors, officers, representatives, agents, and employees (collectively, "employees and representatives") as additional insureds on a primary basis for operations under or incidental to this Agreement.  If any additional insured has other insurance applicable to the loss, it will be on an excess or contingent basis.  The amount of any such insurance will not be reduced by the existence of such other insurance.

H.    <u>Duration of Coverage</u>.  All required coverage will be maintained without interruption during the Term plus, for products and completed operations coverage, an additional three years after the Term.

HIGHLY CONFIDENTIAL                                    WAGMDL00000440

     I.    <u>Waiver of Subrogation</u>.  Each party will require its insurance policies that relate to this Agreement to include clauses stating that each underwriter will waive all rights of recovery, under subrogation or otherwise against the other party.

     J.    <u>Self-Insurance Retentions</u>.  If either party has any self-insured retentions under any of the required coverage, it will so identify on the certificate of insurance it provides the nature and amount of such self-insured retention and, upon request, provide satisfactory evidence of financial responsibility for such obligations.  Any such self-insured retention or deductible will be such party's sole responsibility.

## 14.    COMPLIANCE WITH LAW

     A.    <u>Generally</u>.  Each party will comply in all material respects with all applicable laws, including the Controlled Substance Act and laws applicable to purchasing, handling, sale and distribution of Products, as well as regulations regarding transportation of hazardous materials, provision of pedigrees, and all applicable DEA and FDA regulations.

     B.    <u>Fraud & Abuse</u>.  The parties agree that all price concessions, including discounts and rebates, in this Agreement are intended to comply with the Federal Anti-Kickback Statute [42 U.S.C. 1320a -7b(b)], and specifically its discount safe harbor (**"Discount Safe Harbor"**), as well as similar state laws.  With respect to all price concessions, ABDC will comply with all relevant obligations of a "seller" and Walgreen will comply with all relevant obligations as a "buyer," including (as applicable) reflecting discounts, rebates and other price reductions on cost reports or claims submitted to federal or state healthcare programs, retaining invoices and related pricing documentation and making them available on request to healthcare program representatives, all as required by the Discount Safe Harbor as well as similar requirements under state law.

HIGHLY CONFIDENTIAL             WAGMDL00000441

## 15.    TERMINATION OF AGREEMENT

A.    Default.  The parties agree that they shall use the dispute resolution process described in Section 16(O) (Dispute Resolution) with respect to either party's concerns that the other party has defaulted in performance of its obligations under this Agreement, the adjustment provisions of the Exhibits with respect to a Material Change in Circumstances or in Paragraph B of Exhibit 4 with respect to failure to make payments.  If the parties are unable to resolve any such concern pursuant to such process, upon either party's default of a party's material obligation in this Agreement, including a payment obligation, the non-defaulting party may give Notice of its intent to terminate this Agreement if such default has not been cured within thirty (30) days (ten days for failure to pay any undisputed amount due) after receipt of such Notice to the defaulting party.  In such circumstances, the non-defaulting party may terminate this Agreement for default of a material obligation that the defaulting party has not cured within such period; provided, however, if the defaulting party has commenced to cure any such non-payment default within such period but such cure is not completed, it will have a reasonable time to complete its cure if it diligently pursues the cure until completion.  In determining whether a breach involves a material obligation, the parties shall not only consider the financial impact of the breach of such obligation but also whether the breach of such obligation (or the conduct giving rise to such breach) is or has been of a frequent or recurring nature, and the efforts taken by the breaching party to cure, remediate or mitigate the breach or the impact thereof or to reduce the likelihood of such breach occurring again in the future.  Furthermore, upon the occurrence of any default of this Agreement that remains uncured after the applicable time period, the non-defaulting party may exercise all rights and remedies provided to it in law or in equity.  Such rights and remedies are cumulative and may be exercised together or successively; and the exercise of one remedy will not be construed to be a waiver of any others.

B.    Bankruptcy.  In addition to other available remedies, either party may immediately terminate this Agreement for cause upon written Notice to the other party upon the other party's Bankruptcy.

C.    Walgreen Change of Control involving a Walgreen Identified Person.  At any time following a Walgreen Change of Control involving a Walgreen Identified Person, ABDC may terminate this Agreement by providing written Notice thereof to Walgreen within thirty (30) days of such Walgreen Change of Control provided that the effective date of such termination (which shall be specified by ABDC in such Notice) shall be no earlier than 180 days from the date of such Notice.

D.    ABDC Change of Control.

(i)    ABDC Change of Control involving an ABDC Identified Person.  At any time following an ABDC Change of Control involving an ABDC Identified Person, Walgreen may terminate this Agreement by providing written Notice thereof to ABDC within thirty (30) days of such ABDC Change of Control provided that the effective date of such termination (which shall be specified by Walgreen in such Notice) shall be no earlier than 180 days from the date of such Notice.

(ii)    ABDC Change of Control involving a non-ABDC Identified Person.  At any time following an ABDC Change of Control involving a non-ABDC Identified Person, Walgreen may terminate this Agreement by providing written Notice thereof to ABDC within thirty (30) days of such ABDC Change of Control provided that the effective date of such termination (which shall be specified by Walgreen in such Notice) shall be no earlier than the sooner of (i) eighteen (18) months from the date of such Notice, and (ii) the end of the fiscal year of ABDC commencing immediately following the fiscal year of ABDC during which such Notice is provided.

E.    Survival Upon Termination.  Within five (5) days of expiration or earlier termination of this Agreement for any reason, all undisputed amounts owed hereunder will be immediately due and payable, and Walgreen will (i) pay ABDC any amount owed, (ii) remove all Software used by any Facility from applicable hardware, and (iii) return any equipment provided by ABDC, including totes, or pay to ABDC the replacement cost of such items that are not returned.  The obligations in Sections 10, 12, 14, 15(E) and 16 and any provision the context of which shows the parties intended it to survive will remain in effect after the Term.

## 16.    MISCELLANEOUS

A.    Extraordinary Events.  If either party's performance under this Agreement (including any obligation to make payment) is prevented, impaired, reduced or restricted by reason of force majeure, fire, acts of God, or any other similar or dissimilar cause beyond its control, including the unavailability of such Products, requests, regulations, recommendation or instructions of any governmental authority (whether in furtherance of national defense or war activities or to meet any other emergency), or the compliance with any law, order, ruling, regulation, instruction or requirements of any governmental authority or any political subdivision or agency thereof, or for any other cause, whether of the same or different character than specified in this Section 16(A), that is beyond such party's reasonable control ("**Extraordinary Events**"), such party will be relieved of any liability with respect to such performance during such time as the extraordinary event lasts.

B.    Severability. In the event that any term or provision contained in this Agreement is held to be invalid, unenforceable, void or illegal, in whole or in part, by any court of competent jurisdiction, the same will be deemed severable from the remainder of this Agreement and will in no way affect, impair or invalidate any other term or provision contained herein.  If such term or provision will be deemed invalid due to its scope or breadth, such term or provision will be deemed valid to the extent of the scope of breadth permitted by law.

C.    Governing Law.  The validity, construction and performance of this Agreement will be governed by and construed in accordance with the internal laws of the State of New York without regard to the conflict of laws provisions thereof.

D.    Trademarks, Tradenames, Etc. Restrictions.  Neither party may use the name, trade names, trademarks, service marks, trade dress or logos of the other party or any of its affiliates in publicity releases, advertising, sales literature or materials, nor in any similar activity without said party's prior written consent.

E.    Amendments.  This Agreement may not be amended, supplemented, modified or waived in any respect without further written agreement of both parties, signed by their respective authorized representatives.

F.    Counterparts.  This Agreement may be executed in one or more counterparts, which will together constitute but one and the same instrument.

G.    Issues Not Addressed.  To the extent that this Agreement does not address a particular issue which arises after the Execution Date and could not have been reasonably anticipated by the parties prior thereto, such issue shall be discussed by the parties in good faith, and the parties will in good faith

Purchase Agmt (Final 031813)                                    27

                                    WAGMDL00000443

attempt to resolve such issue in accordance with their respective policies and procedures, if any, and in a manner which is consistent with each party's reasonable financial expectancies as of the Execution Date.

H.    Waivers.  Neither party's failure to insist, in one or more instances, upon the performance of any term or terms of this Agreement will be construed as a waiver or relinquishment of such party's right to such performance or other future performance of such term or terms, and the other party's obligations with respect thereto will continue in full force.  Either party's consent to or approval of any act by the other party on any one occasion will not be deemed a consent or approval of the same act on any subsequent occasion.

I.    Assignment.  Neither party may assign any rights or delegate any duties under this Agreement without the prior written consent of the other party, which will not be unreasonably withheld or delayed but may be conditioned on the assigning party's continued liability hereunder for all obligations of such party following any such assignment.  Notwithstanding the foregoing, each party acknowledges and agrees that (i) the other party has affiliates and subsidiaries and may assign performance of some or all of the terms of this Agreement to one or more such related entities or successor entities conditioned on the assigning party's continued liability hereunder for all obligations of such party following any such assignment, and (ii) ABDC may grant a security interest in this Agreement in connection with any financing or other securitization by ABDC or any affiliate; provided, that ABDC shall defend and indemnify Walgreen against any claim or assertion by a third party of a security interest, right of replevin, or other legal interest created by a factoring or other credit arrangement in any amount due ABDC under this Agreement.  Subject to the foregoing, the provisions of this Agreement will be binding upon and will inure to the benefit of the successors and assigns of the respective parties hereto, including any partnerships, corporations, or other entities in which the parties hereto may have a controlling interest or position.

J.    Document Retention.  To the extent not expressly addressed in another provision of this Agreement, ABDC will maintain all documentation ABDC is required to maintain under this Agreement for a minimum of two (2) years or such longer period as may be required by applicable law.

K.    EEO Requirements.  ABDC warrants it does not and will not discriminate against any employee or applicant for employment because of race, creed, color, national origin, religion, gender, sexual preference, veteran status, handicap or as otherwise may be prohibited by law and will meet affirmative action obligations as are imposed by law.

L.    Parties in Interest.  Nothing in this Agreement will confer any rights or remedies under or by reason of this Agreement on any third parties other than Walgreen and ABDC and their respective successors and assigns, nor will any provision give any third person any right of subrogation or action over or against any party to this Agreement.

M.    Attorneys' Fees.  In the event that any dispute between Walgreen and ABDC should result in litigation, arbitration, or mediation, the prevailing party in such dispute will be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including reasonable attorneys' fees and expenses, all of which will be deemed to have accrued upon the commencement of such action and will be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action will contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law.  For the purposes of this Section "Attorneys' fees" will include fees incurred in the following: (i) post-judgment motions; (ii)

HIGHLY CONFIDENTIAL

contempt proceedings; (iii) garnishment, levy, and debtor and third party examinations; (iv) discovery; and (v) enforcement of prevailing party's rights under this Agreement in a Bankruptcy proceeding of a party or any person affiliated or related to a party.  "Prevailing party" means the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

N.    Captions; Interpretive Rules.  The captions and heading in this Agreement are for convenience only and will not affect in any way the meaning or interpretation of this Agreement. The terms "this Agreement," "hereof," "hereunder" and any similar expressions refer to this Agreement and not to any particular Section or other portion hereof.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  Unless otherwise specified, references to Sections and Exhibits are to Sections and Exhibits of this Agreement and references to Paragraphs are to Paragraphs in Exhibits of this Agreement.  All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

O.    Interpretation; Dispute Resolution.  In the event of any claimed conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion will be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular party to this Agreement. This Agreement will be interpreted equally as to both parties and not against the party that drafted it.  Any controversy, dispute or claim between the parties arising out of or relating to the Agreement will be submitted to authorized representatives of the parties for resolution.  If such authorized representatives do not reach agreement within 60 days, such dispute shall be forwarded to each of Senior Vice President, Sales and Marketing, of ABDC, and the Divisional Vice-President, GMM, Brand Rx, Wholesaler and Vaccine Purchasing of Walgreen (collectively hereinafter the **"Executive"** or **"Executives"**), who shall meet to confer within 30 days (or such other time as agreed upon by the Executives) to discuss and attempt to reach a resolution of the dispute.  Any resolution mutually agreed upon in writing by the Executives shall be binding upon each party to this Agreement.  The parties agree to pursue the dispute resolution process outlined herein to resolve any dispute before either party may seek to terminate this Agreement pursuant to Section 15(A) above or to commence any action in any court of law concerning such dispute and will cooperate in dismissing, without prejudice, any legal action filed before conclusion of such process other than an action seeking injunctive relief or that may not be dismissed without prejudicing a party's rights.  If the Executives do not resolve the dispute within 30 days after their initial meeting or conference (or within such other period of time mutually agreed upon by the Executives), either party shall have the right to escalate the matter to a more senior executive within their respective organizations and/or pursue mediation or arbitration, and may pursue all contractual, legal and/or equitable remedies available to it, including termination of this Agreement as permitted herein.  If the title of either such Executive position is eliminated or changed, the party subject to such change shall substitute a comparable executive and so notify the other party in writing.

P.    Reliance on Authority of Person Signing Agreement.  Neither Walgreen nor ABDC will be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual.

Q.    Entire Agreement.  This Agreement, the NMV Agreement (which remains in effect and applies to Walgreen purchases under this Agreement) and the Master Agreement with respect to Sections 5.1(b)(iii) and 5.1(d)(iii) thereof (only) constitute the complete and exclusive statement of agreement between Walgreen and ABDC with respect to the Walgreen Program and, commencing on the Effective Date, replace and supersede all prior written and oral agreements or statements by and among the parties,

HIGHLY CONFIDENTIAL                                                                    WAGMDL00000445

including their affiliates, as appropriate, concerning the Walgreen Program including the Purchase Agreement for Walgreen's Facilities, dated April 1, 2008, as amended ("Facilities Agreement"), the Supply Agreement (Hawaii Purchases), dated June 15, 2009 ("Hawaii Agreement"), the Supply Agreement (Puerto Rico and Virgin Island Purchases), dated September 1, 2011 ("Puerto Rico Agreement"), and the (unsigned) Supply (2012) Agreement dated July 1, 2012 ("Warehouse Agreement").  For the avoidance of doubt, this Agreement shall not supersede the Walgreen Co. – ASD Specialty Healthcare, Inc., Purchase Agreement For Walgreen's Locations, with regard to the purchase and sale of plasma and specialty products dated April 1, 2012.  No representation, statement, condition or warranty concerning the Walgreen Program but not contained in this Agreement, the NMV Agreement or Sections 5.1(b)(iii) or 5.1(d)(iii) of the Master Agreement will be binding on the parties or have any force or effect whatsoever.

[SIGNATURE PAGE FOLLOWS]

Purchase Agmt (Final 031813)

HIGHLY CONFIDENTIAL

WAGMDL00000446

P-WAG-7014

**IN WITNESS WHEREOF,** the parties have had a duly authorized officer, partner or principal execute this Agreement as of its Execution Date.

| | |
|---|---|
| **Walgreen Co., on behalf of itself and its designated affiliates, including Walgreen of San Patricio, Inc., and Walgreen of Puerto Rico, Inc.** | **AmerisourceBergen Drug Corporation, on behalf of itself and its affiliate, J.M. Blanco, Inc.** |
| By: _____ | By: _____ |
| Name: _____Greg Wasson_____ | Name: _____ |
| Title: ____Chief Executive Officer___ | Title: _____ |

## EXHIBITS

The following exhibits to this Agreement are attached:

| | |
|---|---|
| 1 | Definitions |
| 2 | Pricing Terms |
| 3 | Reserved |
| 4 | Payment and Related Terms |
| 5 | Primary Vendor Exception For Generic Rx Launches |
| 6 | Additional Services |
| 7 | EDI Terms and Conditions |
| | Appendix A to Exhibit 7 |
| 8 | Non-Retail Facility Locations and Schedules |
| 9 | ABDC Reports |
| 10 | Returned Goods Policy |
| 11 | Returns Processing and Credit Policy |
| 12 | Form of Assignment of Claims |
| 13 | Insurance Coverage Requirements |
| 14 | PDMA Certification and Representation Agreement |
| 15 | ABDC Identified Persons |
| 16 | Permitted Suppliers |
| 17 | Walgreen Identified Persons |

P-WAG-7014

**IN WITNESS WHEREOF**, the parties have had a duly authorized officer, partner or principal execute this Agreement as of its Execution Date.

**Walgreen Co., on behalf of itself and its designated affiliates, including Walgreen of San Patricio, Inc., and Walgreen of Puerto Rico, Inc.**

**AmerisourceBergen Drug Corporation, on behalf of itself and its affiliate, J.M. Blanco, Inc.**

By:_____

By:_____

Name:_____

Name:____David W. Nev_____

Title:_____

Title:____President_____

## EXHIBITS

The following exhibits to this Agreement are attached:

| | |
|---|---|
| 1 | Definitions |
| 2 | Pricing Terms |
| 3 | Reserved |
| 4 | Payment and Related Terms |
| 5 | Primary Vendor Exception For Generic Rx Launches |
| 6 | Additional Services |
| 7 | EDI Terms and Conditions |
| | Appendix A to Exhibit 7 |
| 8 | Non-Retail Facility Locations and Schedules |
| 9 | ABDC Reports |
| 10 | Returned Goods Policy |
| 11 | Returns Processing and Credit Policy |
| 12 | Form of Assignment of Claims |
| 13 | Insurance Coverage Requirements |
| 14 | PDMA Certification and Representation Agreement |
| 15 | ABDC Identified Persons |
| 16 | Permitted Suppliers |
| 17 | Walgreen Identified Persons |

Purchase Agmt (Final 031813)

HIGHLY CONFIDENTIAL

WAGMDL00000448

P-WAG-7014

## EXHIBIT 1
## DEFINITIONS

1.      *340B Program* means the 340B drug purchase program established under the Veterans Health Care Act of 1992 as part of Public Law 102-585.

2.      *ABC* means ABDC's ultimate parent, AmerisourceBergen Corporation, a Delaware corporation.

3.      *ABDC Non-WBAD Supplier Agreement* means a Supplier Agreement for Generic Rx reflecting the GRx Contract Cost, GRx Buy-Side Rebates, GRx Fees for Service and payment and other terms that were not made available by the Supplier to ABDC as a Permitted Distributor.

4.      *ABDC Change of Control* means (a) any transaction or series of related transactions as a result of which any Person (for purposes of this definition, as defined in Section 3(a)(9) of the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder (the "Exchange Act") and as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act) or group of persons within the meaning of Section 13(d)(3) of the Exchange Act (excluding Walgreen, Alliance Boots or any of their respective affiliates) becomes the beneficial owner, directly or indirectly, of more than 50% of the outstanding Equity Interests (measured by either voting power or economic interests) of ABC, (b) any transaction or series of related transactions in which (i) the stockholders of ABC immediately prior to such transaction or series of related transactions (the "Pre-Transaction Stockholders") cease to beneficially own, directly or indirectly, at least 50% of the outstanding Equity Interests (measured by either voting power or economic interests) of ABC and (ii) provided further that this clause (b) shall not apply if (1) such transaction or series of related transactions is an acquisition by ABC of an ABDC Identified Person(s) effected, in whole or in part, through the issuance of Equity Interests of ABC, (2) such acquisition does not result in a Person or group of persons within the meaning of Section 13(d)(3) of the Exchange Act beneficially owning, directly or indirectly, a greater percentage of the outstanding Equity Interests (measured by either voting power or economic interests) of ABC than the Investors (as defined in the Shareholders Agreement), as a group, and (3) the Pre-Transaction Stockholders continue to beneficially own, directly or indirectly, at least 60% of the outstanding Equity Interests (measured by voting power and economic interests) of ABC, (c) any merger, consolidation, statutory share exchange, reorganization, recapitalization or similar extraordinary transaction (which may include a reclassification) (a "Business Combination") involving ABC as a result of which more than 50% ownership of ABC is transferred to another Person or group of persons within the meaning of Section 13(d)(3) of the Exchange Act (excluding Walgreen, Alliance Boots or any of their respective affiliates), (d) individuals who constitute the ABC Continuing Directors and the Walgreen Directors (as defined in the Shareholders Agreement) (if any), taken together, ceasing for any reason to constitute at least a majority of the Board of Directors of ABC, or (e) any sale or lease or exchange, transfer, license or disposition of a business, deposits or assets that constitute 50% or more of the consolidated assets, business, revenues, net income, assets or deposits of ABC; provided that for purposes of the foregoing involving any Person set forth on Exhibit 15 hereto (ABDC Identified Persons) the references to 50% in the foregoing clauses (a) and (c) shall be deemed to be 30%, and the reference to 50% in the foregoing clause (b) shall be deemed to be 70%.

5.      *ABC Continuing Directors* means the directors of ABC on the Execution Date and each other director (other than Walgreen Directors, if any), if in each case, such other director's nomination for election to the Board of Directors of ABC is recommended by more than 50% of the ABC Continuing Directors or more than 50% of the members of the Governance and Nominating Committee of ABC that are ABC Continuing Directors.

6.      *ABDC WBAD Supplier Agreement* means a Supplier Agreement for Generic Rx reflecting the GRx Contract Cost, GRx Buy-Side Rebates, GRx Fees for Service and payment and other terms that were made available by the Supplier to ABDC as a Permitted Distributor.

HIGHLY CONFIDENTIAL                                                                    WAGMDL00000449

P-WAG-7014

7.    *Aggregate Inventory* means the total units of Brand Rx Product(s) that ABDC has on hand at its Distribution Centers or is in-transit between the Distribution Centers as reported in 852 data for a specific day.

8.    *Agreement Year* means each 12-month period starting on the Effective Date and each anniversary thereof during the Term (that is September 1 to August 31).

9.    *Alliance Boots* means Alliance Boots GmbH, a private limited liability company organized under the laws of Switzerland.

10.    *ASD* means ABDC's affiliate, ASD Specialty Healthcare, Inc., a California corporation engaged in Specialty Rx distribution and doing business as ASD Healthcare, Besse Medical Services, Inc. and Oncology Supply.

11.    *Authorized Generic Rx* means Rx that is a listed drug that has been approved under subsection 505I of the FD&C Act and is marketed, sold or distributed directly or indirectly to the retail class of trade under a different labeling, packaging (other than repackaging as the listed drug in blister packs, unit doses, or similar packaging for use in institutions), product code, labeler code, trade name or trade mark that differs from that of the listed drug.

12.    *Bankruptcy* means (a) filing of an application for, consenting to or otherwise becoming subject to appointment of a trustee, receiver or custodian of its assets, (b) having an order for relief entered in Bankruptcy proceeding, (c) making a general assignment for the benefit of creditors, (d) having a trustee, receiver or custodian of assets appointed unless proceedings and the person appointed are dismissed within 30 days, I insolvency within the meaning of UCC Section 1-201 or failing generally to pay debts as they become due within the meaning of Bankruptcy Code Section 303(h)(1) (11 U.S.C. §303(h)(1)), as amended, or (f) certification in writing of the inability to pay debts as they become due.

13.    *Bellco* means ABDC's affiliate, Bellco Drug Corp., a New York corporation.

14.    *Biosimilar Rx* means a prescription-legend pharmaceutical biological product designated by the FDA, as revised from time to time, as "biosimilar" to or "interchangeable" with an FDA-licensed biological product, and which may be manufactured through biotechnology, or derived from natural resources, or produced synthetically, and includes products such as vaccines, blood and blood components, allergenics, somatic cells, gene therapy, tissues, and proteins.

15.    *Blinded* means sales data at a level of detail reflecting the aggregate quantity of each Product sold to Walgreen and distributed to all Facilities by the respective serving Distribution Center(s) and not specifically identified as Walgreen data, except that, with respect to Suppliers set forth on <u>Exhibit 16</u> hereto (Permitted Suppliers), as amended from time to time with the prior approval of Walgreen, which will be reasonably granted upon request by ABDC and following good faith discussions between the parties, *Blinded* means sales data at a level no more detailed than the first three (3) digits of the purchaser's zip code (e.g., 63101 would be reported as 631XX) and shall also not include any other geographically identifiable data or data identifiable as Walgreen data.  For the avoidance of doubt, the only fields which may be provided under any circumstances are Product, quantity and the aforementioned first three (3) digits of zip code data).

16.    *Brand Rx* means a prescription-legend pharmaceutical product that is a single source or innovator multiple source drug, excluding all Authorized Generic Rx and Biosimilar Rx, and available from only one Supplier.

17.    *BRx Buy-Side Rebate* means any rebate (including any volume, functional or bundled rebate), discount (including any prompt pay discount or off-invoice discount), credit, marketing fund (to the extent not included in BRx Fee for Service), free or discounted good or service, allowance, pricing opportunity, post-price increase buy-ins, or other economic benefit paid or provided by a Supplier on ABDC's acquisition of Brand Rx as reflected in the applicable BRx Supplier Agreement, but in all events excluding BRx Fee for Service.

HIGHLY CONFIDENTIAL

WAGMDL00000450

18.     *BRx Fee for Service* means any bona fide fee for service paid or provided by a Supplier on ABDC's acquisition of Brand Rx as reflected in the applicable BRx Supplier Agreement, including a distribution fee, a redistribution fee, a distribution allowance (as with Brand Rx launches), inventory management fee, accounts receivable management fee, deduction management fee, chargeback administration fee, data fee and marketing fee (including any of the foregoing paid or provided in consideration of ABDC's agreement to modify payment terms with the applicable Supplier).

19.     *BRx Supplier Agreement* means a Supplier Agreement for Brand Rx reflecting ABDC's price, BRx Buy-Side Rebates, BRx Fees for Service and payment and other terms for such Brand Rx.

20.     *Central Fill Facility* means a Non-Retail Facility that receives and fills prescription orders from other Facilities and provides the completed prescription to such other Facilities.

21.     *Committed Inventory* means the total units of Brand Rx Product(s) for which ABDC has received firm orders from ABDC's customers at the time in question, regardless of whether the applicable Brand Rx Products are on hand at the Distribution Centers, in-transit between the Distribution Centers or have been ordered from the applicable Supplier but are not on hand at, or in transit between, the Distribution Centers and are priced to those customers based on the WAC or contract cost in effect immediately prior to the subject price increase.

22.     *Cost* means the lower of (a) WAC of the Product (exclusive of cash discounts) on the date the Product is ordered by Walgreen, (b) any applicable Walgreen/GPO negotiated price for the Product under a Pricing Agreement that is maintained in an ABDC bid file, or (c) solely in Puerto Rico with respect to DACO Products, the price established by the Commonwealth of Puerto Rico for applicable DACO Product.

23.     *CSOS* means a DEA-certified Schedule II controlled substance ordering system.

24.     *DACO Products* means those Products designated, from time to time, by the Commonwealth of Puerto Rico for which a maximum price limit is established.

25.     *DEA* means the U.S. Drug Enforcement Administration.

26.     *Declaration Form* means ABDC's standard Declaration of Eligibility for Contract Pricing form as provided from time-to-time by ABDC.

27.     *Designated Accounting Firm* means the nationally-recognized, independent accounting firm selected on a joint basis from time to time during the Term by the parties acting reasonably and in good faith to undertake the reviews provided in this Agreement after entering into ABDC's standard confidentiality agreement.

28.     *DME* means durable medical equipment and other home healthcare products carried by ABDC.

29.     *Distribution Center (or DC)* means one of ABDC's pharmaceutical distribution warehouse locations, including any redistribution center of ABDC.

30.     *Drop Ship* means a direct shipment of a Product to Walgreen by a Supplier and the Supplier billing Walgreen through ABDC for the Product after an order is placed with the Supplier by Walgreen, either directly or through ABDC.

31.     *DSD Retail Facility* means a Retail Facility in the United States that dispenses Rx to the walk-in trade that is not a Health Systems Facility or Worksite Facility.

32.     *DSO* means days sales outstanding.

33.     *EDI* means the electronic data interchange between trading partner computers using American National Standards Institute (ANSI) Accredited Standards Committee (ASC) X12 version 4010 standard formats.

HIGHLY CONFIDENTIAL                                                                    WAGMDL00000451

34.     *EFT* means electronic funds transfer.

35.     *Equity Interests* means any and all (a) shares, interests, participations or other equivalents (however designated) of capital stock or other voting securities of a corporation, any and all equivalent or analogous ownership (or profit) or voting interests in a Person (other than a corporation), (b) securities convertible into or exchangeable for shares, interests, participations or other equivalents (however designated) of capital stock or voting securities of (or other ownership or profit or voting interests in) such Person, and (c) any and all warrants, rights or options to purchase any of the foregoing, whether voting or nonvoting, and, in each case, whether or not such shares, interests, participations, equivalents, securities, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

36.     *Extraordinary Events* is defined in Section 16(A) (Extraordinary Events).

37.     *Facility* means a pharmacy of any type in the United States that on the Execution Date is owned or operated by Walgreen, including a DSD Retail Facility, Central Fill Facility, Mail Order Facility, Health Systems Facility, Specialty Facility, Worksite Facility, Long-Term Care Facility, WIRS Facility and other pharmacy or site that lawfully dispenses or administers Rx, together with any such pharmacy or site that is owned, acquired or operated by Walgreen in the United States after the Execution Date, except that a newly-acquired or operated pharmacy with an existing agreement with another pharmaceutical distributor will not be eligible to become a Facility until the earlier of expiration of that existing agreement or the date Walgreen may terminate it without breaching it.

38.     *FDA* means the U.S. Food and Drug Administration.

39.     *FD&C Act* means the Federal Food, Drug, and Cosmetic Act, Title 21 USC Chapter 9.

40.     *General Merchandise* means food, nutritionals, gift, school and office supplies and other like general merchandise carried by ABDC.

41.     *Generic Rx* means a prescription-legend pharmaceutical product that is not Brand Rx, including any injectable variations thereof, Authorized Generic Rx, Biosimilar Rx, and OTC that is reimbursable pursuant to a Federal or state healthcare program and is purchased by Walgreen in reasonable anticipation of being dispensed pursuant to a prescription.

42.     *GPO* means a buying group/group purchasing organization described in 42 CFR 1001.952(j) or other similar joint contracting arrangement.

43.     *GRx Buy-Side Rebate* means any rebate (including any volume, functional or bundled rebate), discount (including any prompt pay discount or off-invoice discount), credit, marketing fund, free or discounted good or service, allowance, pricing opportunity or other economic benefit paid or provided by a Supplier on ABDC's acquisition of Generic Rx as reflected in the applicable ABDC WBAD Supplier Agreement or ABDC Non-WBAD Supplier Agreement, but in all events excluding GRx Fee for Service.

44.     *GRx Contract Cost* means the amount equal to ABDC's contract cost of WBAD or Non-WBAD Generics purchased by Walgreen hereunder as established in the applicable ABDC WBAD or Non-WBAD Supplier Agreement before any GRx Buy-Side Rebates and GRx Fees for Service paid ABDC by the applicable Suppliers on such purchases.

45.     *GRx Fee for Service* means any bona fide fee for services paid or provided by a Supplier on ABDC's acquisition of Generic Rx as reflected as such in the applicable ABDC WBAD Supplier Agreement or ABDC Non-WBAD Supplier Agreement, including a distribution fee, financing fee, management fee, program fee, data fee and marketing fee.

46.     *GRx Market Rebates* mean the rebates determined and paid by ABDC to Walgreen pursuant to Paragraph B(ii) of Exhibit 2.

HIGHLY CONFIDENTIAL                                                        WAGMDL00000452

47.     *GRx Net Acquisition Cost* means the amount equal to (a) the amount of ABDC's GRx Contract Cost of WBAD Generics or Non-WBAD Generics purchased by Walgreen hereunder as established in the applicable ABDC WBAD or Non-WBAD Supplier Agreement, less (b) the sum of GRx Buy-Side Rebates and GRx Market Rebates paid to Walgreen on such purchases.

48.     *GRx Price File* means the price file, created from time to time during the Term on a joint basis by the parties acting reasonably and in good faith based on Supplier contract pricing, used by ABDC to invoice Walgreen for Walgreen's purchases of Generic Rx hereunder.

49.     *GRx Ratio* means the percentage calculated by dividing Net Purchases of Generic Rx in the applicable period by total Net Purchases of Rx during the same period, in each instance based on Walgreen's Price of Goods for Generic Rx and Brand Rx as provided in Exhibit 2 hereto and assuming that (a) the Volume Rebate is excluded from the numerator and denominator used to calculate such ratio, and (b) in any month after the Ramp-Up Period in which ABDC's adjusted service level for Generic Rx as computed pursuant to Section 7(B) of the Agreement is less than 98.5%, purchases of Generic Rx from sources other than ABDC resulting from ABDC's failure to fill an order for a particular Generic Rx Product for a reason that does not constitute a Service Level Adjustment shall be treated as if they had been made through ABDC under this Agreement.

50.     *HBC* means health and beauty care products carried by ABDC.

51.     *Health Systems Facility* means a Retail Facility that is not a DSD Retail Facility or Worksite Facility owned and operated by Walgreen typically on the campus of a hospital or medical clinic building, some of which act in part as a satellite Specialty Pharmacy offering high-touch services for Specialty Rx.

52.     *ICS* means ABDC's affiliate Integrated Commercialization Solutions, Inc.

53.     *ISO Products* means Island-Source-Only Products in the Caribbean, primarily Puerto Rico and USVI, whereby the products are manufactured and sold only through sources on the islands, such as "home remedy" type products, wet and dries, ointments, tonics, and hospital admission kits (male or female).

54.     *Long-Term Care Facility* means a Non-Retail Facility that provides rehabilitative, restorative, and ongoing skilled nursing care to patients in need of assistance with activities of daily living.

55.     *Mail Order Facility* means a Non-Retail Facility that dispenses Rx to patients by mail.

56.     *Med/Surg* means the medical/surgical supplies, products and equipment carried by ABDC.

57.     *Net Bill Products* mean (a) for all Facilities, ABDC's private label products, supplies (vials/bottles/caps), HBC, DME that is not Contract Product or Rx Home Infusion/DME, Med/Surg, ancillary diabetic Products (such as candy, books, hosiery, etc.) and General Merchandise, (b) DME of any type for all Retail Facilities other than Health Systems Facilities, and (c) for Facilities in the Caribbean (primarily, Puerto Rico and the USVI), ISO Products that are not Brand Rx.

58.     *Net Purchases* means the dollar amount of purchases of Products by Walgreen from ABDC pursuant to this Agreement as calculated using Walgreen's Price of Goods on Exhibit 2 hereto, as adjusted pursuant to this Agreement, after deducting the dollar amount of credits, rebates, returns, discounts and late fees on such purchases.

59.     *Non-Insulin Diabetic Care Products* mean meters, strips, syringes and lancets (it being agreed that such Products shall not constitute OTC hereunder).

60.     *Non-Retail Facility* means a Facility in the United States other than a Retail Facility, including a Central Fill Facility, Mail Order Facility, Specialty Facility, Long-Term Care Facility and WIRS Facility.

Purchase Agmt (Final 031813)

HIGHLY CONFIDENTIAL

WAGMDL00000453

61.    *Non-WBAD Generic* means Generic Rx acquired by ABDC for distribution to ABDC's customers, including Walgreen, pursuant to an ABDC Non-WBAD Supplier Agreement.

62.    *OTC* means over-the-counter pharmaceutical products (excluding Non-Insulin Diabetic Care Products).

63.    *PDMA* means, collectively, the Prescription Drug Marketing Act, as interpreted and administered by the FDA, and other applicable similar federal, state and local laws and regulations.

64.    *Permitted Distributor* means a pharmaceutical distributor designated by WBAD, including ABDC, as authorized to enter into Supplier Agreements for acquisition of Generic Rx by the Permitted Distributor for sale to the Permitted Distributor's customers, including Walgreen, reflecting rebates, fees and payment and other terms negotiated by WBAD on behalf of the Permitted Distributor.

65.    *Price Appreciation* means the net financial benefit obtained by ABDC under a BRx Supplier Agreement (including any oral agreement with a Supplier that is tantamount to a BRx Supplier Agreement) due to a price increase on Brand Rx by a Supplier to the extent permitted and as capped under the applicable BRx Supplier Agreement; unless the methodology for calculating such financial benefit is set forth in the applicable BRx Supplier Agreement, the benefit shall equal the product of (a) the sum of, on the date and time of the price increase, the Aggregate Inventory of the applicable Brand Rx and the units of the applicable Brand Rx for which ABDC has placed firm orders from the Supplier, in each case which is not Committed Inventory for which ABDC would not benefit from such price increase, multiplied by (b) the excess of the new WAC price and the old WAC price of the applicable Brand Rx Product (it being understood hereby and for the avoidance of doubt, that the financial benefit obtained shall not be reduced or otherwise offset in this calculation to account for inventory carrying costs).

66.    *Pricing Agreement* means an agreement between Walgreen or Walgreen's designated GPO and a Supplier of Product establishing the Cost of the Product for Walgreen.

67.    *Products* mean the following types of products and supplies offered to Walgreen by ABDC under this Agreement: Rx, OTC, HBC, DME, Med/Surg products, General Merchandise and any other items which are made available by ABDC during the Term to other customers in the retail or alternate care class of trade, in each instance other than any Specialty Rx which, at the time in question, is distributed by ASD, ICS or Theracom and not ABDC.

68.    *Retail Facility* means a Facility in the United States that dispenses Rx to the walk-in trade, including a DSD Retail Facility, Health Systems Facility, or a Worksite Facility.

69.    *Rx* means prescription drugs comprised of Brand Rx and Generic Rx.

70.    *Rx Home Infusion/DME* means DME utilized for home infusion services that is dispensed pursuant to a prescription.

71.    *Services* mean the distribution and related services provided with respect to Products by ABDC to the Facilities under this Agreement.

72.    *Specialty Facility* means a Non-Retail Facility that primarily dispenses Specialty Rx.

73.    *Specialty Rx* means Rx molecules having one or more of the following characteristics: targets a disease with a small-to-medium target population that has a serious unmet medical need, requires high-touch disease management services (e.g., patient education, monitoring, etc.), require special handling and storage or other special services or is prescribed and administered by a specialist.

74.    *Supplier* means the manufacturer or manufacturer's authorized exclusive distributor of a Product.

HIGHLY CONFIDENTIAL                                                                    WAGMDL00000454

75.     *Supplier Agreement* means an agreement between ABDC and a Supplier reflecting the pricing and other terms and conditions on which ABDC will acquire the applicable Products for distribution to ABDC's customers, including Walgreen.

76.     *Term* means the Initial Term and any extension of the Initial Term as provided in Section 9(a).

77.     *Theracom* means ABDC's affiliate TheraCom, L.L.C.

78.     *UCC* means the New York Uniform Commercial Code.

79.     *United States* means all 50 states and the District of Columbia, as well as all territories, including Puerto Rico, Guam and USVI.

80.     *USVI* means the United States Virgin Islands, a United States territory.

81.     *WAC* means a Product's wholesale acquisition cost as published by its Supplier.

82.     *Walgreen Change of Control* means (a) any transaction or series of related transactions as a result of which any Person set forth on Exhibit 17 hereto (Walgreen Identified Persons) becomes the beneficial owner, directly or indirectly, of more than 50% of the outstanding Equity Interests (measured by either voting power or economic interests) of Walgreen Co., (b) any transaction or series of related transactions with a Walgreen Identified Person in which the stockholders of Walgreen Co. immediately prior to such transaction or series of related transactions cease to beneficially own, directly or indirectly, at least 50% of the outstanding Equity Interests (measured by either voting power or economic interests) of Walgreen Co., (c) any Business Combination involving Walgreen Co. as a result of which more than 50% ownership of Walgreen Co. is transferred to any Walgreen Identified Person, or (d) any sale or lease or exchange, transfer, license or disposition of a business, deposits or assets, in a transaction or series of related transactions with a Walgreen Identified Person, that constitute 50% or more of the consolidated assets, business, revenues, net income, assets or deposits of Walgreen Co.

83.     *Walgreen Warehouse* means a warehouse operated by Walgreen and that is part of Walgreen's system and network of self-distribution providing pharmaceutical products and related items to the Facilities as of the Execution Date.

84.     *WBAD* means Walgreens Boots Alliance Development GmbH, a private limited liability company organized under the laws of Switzerland that is based in Bern, Switzerland and owned by Walgreen and Alliance Boots.

85.     *WBAD Generic* means Generic Rx acquired by ABDC for distribution to ABDC's customers, including Walgreen, pursuant to an ABDC WBAD Supplier Agreement.

86.     *WBAD ABDC Generics Agreement* means the Generics Pharmaceutical Purchasing Services Agreement dated as of March 18, 2013 by and among WBAD, ABDC, Blanco and Bellco, pursuant to which (a) WBAD shall serve as an intermediary or joint contracting entity with the applicable Supplier to establish price, rebates, fees, payment and other terms on which ABDC, Blanco and Bellco may acquire Generic Rx from the Supplier, and (b) the parties thereto have agreed upon a sharing of synergies between WBAD, on the one hand, and ABDC, Blanco and Bellco on account of savings achieved as a result thereof.

87.     *WIRS Facility* means a Non-Retail Facility that is part of Walgreen's Infusion & Respiratory Services division.

88.     *Worksite Facility* means a Retail Facility operated by Walgreen on behalf of a third-party employer at the employer's location.

HIGHLY CONFIDENTIAL                                          WAGMDL00000455

CONFIDENTIAL

## EXHIBIT 2
## PRICING TERMS

Walgreen will pay ABDC the following Price of Goods in exchange for the Product sale and distribution and Services by ABDC for Walgreen and the Facilities.  While pricing includes ABDC's costs for Product distribution and Services, pricing does not include any administrative or other fee to a GPO.  If Walgreen (or any person comprising Walgreen) is or becomes a member of a GPO requiring these fees on Product purchases hereunder, the amount paid by ABDC to the GPO will be added to Price of Goods. For the avoidance of doubt, any amounts paid by ABDC under the WBAD ABDC Generics Agreement or other agreement among ABDC, Walgreen and/or Alliance Boots regarding joint contracting for Generic Rx shall not be deemed to constitute administrative or other fees to a GPO that ABDC may add to Price of Goods hereunder. ABDC will not pay a GPO administrative or other fee until receipt of a Declaration Form signed by Walgreen.

**A.** **Price of Goods on Products Other Than Generic Rx.**

(i) *Price of Goods for Brand Rx and OTC for All Facilities*.  Starting on the Effective Date, and subject to the terms of adjustment in this Agreement, Walgreen's Price of Goods (which includes ABDC's costs for distribution) for all Facilities for the following Product categories, which specifically exclude Generic Rx, Non-Insulin Diabetic Care Products and Net Bill Products, will be the Product's Cost less the corresponding discounts for the applicable Product category:

| Product Category | Price of Goods |
|---|---|
| Brand Rx (including Brand Rx Insulin) | Cost minus 3.08% |
| OTC Insulin | Cost minus 3.43% |
| OTC (Non-Insulin) | Cost minus 0.00% |

Notwithstanding the foregoing, upon mutual agreement of the parties, the Price of Goods for Brand Rx (including Brand Rx Insulin) may be adjusted prior to the Effective Date but no later than July 1, 2013, pursuant to the agreed-upon methodology for adjustments set forth in this Agreement.

(ii) *Price of Goods for Non-Insulin Diabetic Care Products*.  Starting on the Effective Date, Walgreen's Price of Goods (which includes ABDC's costs for distribution) for Non-Insulin Diabetic Care Products will be the Product's Cost less the following discounts depending on the type of Facility for which the Non-Insulin Diabetic Care Products are being purchased:

| Facility Type | Price of Goods for Non-Insulin Diabetic Care Products |
|---|---|
| Non-Retail and Health Systems Facilities | Cost minus 3.43% |
| All Other Retail Facilities | Cost minus 0.00% |

(iii) *Price of Goods for DME for Non-Retail and Health Systems Facilities.*  Starting on the Effective Date, Walgreen's Price of Goods (which includes ABDC's fees for distribution) for Non-Retail and Health Systems Facilities (only) for Rx Home Infusion/DME and DME that is Contract Product and not Rx Home Infusion/DME, will be the Product's Cost less the corresponding discounts for the applicable Product category:

| Product Category | Price of Goods |
|---|---|
| Rx Home Infusion/DME | Cost minus 3.43% |
| Contract DME (Non-Rx Home Infusion/DME) | Cost minus 0.00% |

Purchase Agmt (Final 031813)

39

P-WAG-7014

**CONFIDENTIAL**

(iv)   *Price of Goods for Net Bill Products ("ABDC Net Price")*.  Price of Goods for all Facilities for Net Bill Products is the price of the Product on ABDC's price list on the date the Product is ordered by Walgreen.  Such price is set by ABDC from time-to-time without regard to Cost or the discounts provided in Paragraphs A(i) – (iii) above.  Net Bill Product purchases shall count toward total required periodic Net Purchases.  Notwithstanding any contrary provision of this Agreement, all Brand Rx Products will be priced based on Cost and, except as mutually agreed upon from time to time by the parties in writing, will not be sold at an "ABDC Net Price".  For clarification purposes, Walgreen is not required to purchase any Net Bill Products from ABDC.

(v)   *Drop Ships*.  Starting on the Effective Date, Price of Goods for Drop Ships of Products encompassed by the Product categories encompassed by Paragraphs A(i) – (iii) above shall be the applicable Price of Goods, plus any additional Supplier shipping charges (as provided in this Agreement), depending on Product category and Facility type to which the Drop Ship is being made.

(vi)   *Convenience Billing for ASD and Other Specialty Items*.  Notwithstanding any contrary provision of this Agreement, products that are purchased by Walgreen from ASD, ICS or Theracom and billed to Walgreen on a convenience basis by ABDC will be priced at the applicable price negotiated by Walgreen or Walgreen's designated GPO with ASD, ICS or Theracom, respectively, without any additional discount/markup by ABDC.  For clarification purposes, (a) Facilities are not required to purchase any products from ASD, ICS or Theracom hereunder, even if ABDC does not carry a particular product, and (b) Products distributed by ICS through a traditional "3PL" model and carried by ABDC in its inventory shall be priced in accordance with Paragraphs A(i) or B of this Exhibit 2.

**B.   Price of Goods for Generic Rx.**

Starting on the Effective Date, Walgreen's Price of Goods (which includes ABDC's costs for distribution) for Generic Rx for all Facilities will be the GRx Net Acquisition Cost plus 3.25%.  ABDC will invoice Walgreen for Generic Rx based on the GRx Price File.  Reconciliation of these invoices to Walgreen's Price of Goods for Generic Rx will initially occur at the end of the four month period starting on the Effective Date and ending December 31, 2013 and, thereafter, at the end of each calendar quarter during the Term as provided in Paragraph B(iv) below after taking into account GRx Buy-Side Rebates and GRx Market Rebates computed and paid pursuant to the following provisions of this Paragraph B:

(i)   GRx Buy-Side Rebates.  Starting on the Effective Date, ABDC will pay GRx Buy-Side Rebates on Generic Rx to Walgreen within thirty (30) days after they are received from a Supplier by ABDC and as they are recognized by ABDC.  Notwithstanding the foregoing, any GRx Buy-Side Rebates on Generic Rx that are tied to performance standards of ABDC (such as the achievement of minimum purchase commitments in order to earn rebates) or are otherwise contingent on other obligations will only be paid to Walgreen on a proportionate basis (using WAC as the selling cost of net units sold for this ratio) to the extent such contingent performance standards are met.  To enable Walgreen to accrue for such amounts, ABDC will periodically report (no less frequently than monthly) its accruals of GRx Buy-Side Rebates on Walgreen's net purchases of Generic Rx to Walgreen.  Payments of GRx Buy-Side Rebates on Generic Rx hereunder to Walgreen will be provided together with documentation sufficient to verify the nature and extent of costs incurred by Walgreen for an audit under §1861(v)(1)(I) of the Social Security Act.

(ii)   GRx Market Rebates.  In addition to the GRx Buy-Side Rebates on Walgreen's purchases of Generic Rx, within thirty (30) days of the end of each calendar quarter starting after the Effective Date, ABDC will pay Walgreen a GRx Market Rebate equal to the amount determined by multiplying the total GRx Contract Cost of Walgreen's net purchases of Generic Rx during such quarter by a percentage established by ABDC pursuant to Paragraph B(iii) below (**"GRx Market Rebate Percentage"**),

HIGHLY CONFIDENTIAL                                                                              WAGMDL00000457

CONFIDENTIAL

provided, however, for the initial four month period starting on the Effective Date and ending December 31, 2013, the GRx Market Rebate shall equal the amount determined by multiplying the total GRx Contract Cost of Walgreen's net purchases of Generic Rx during such four months by a percentage which shall be determined by the Agreement Operating Committee on or before June 1, 2013, based on GRx Market Rebates that would have been earned on Walgreen's actual purchases of Generic Rx Products if such purchases had been made from ABDC during May 1, 2012 through April 30, 2013 (as reflected in sales data of Walgreen's provided to ABDC promptly after April 30, 2013).  In the event the Agreement Operating Committee is unable to agree on such percentage by June 1, 2013 (with the members thereof designated by each party acting reasonably and in good faith), the matter shall be escalated for resolution in accordance with the Dispute Resolution terms in Section 16(O) herein.

(iii)    GRx Market Rebate Percentage.  The GRx Market Rebate Percentage will be adjusted at the end of the four-month period beginning on the Effective Date and ending on December 31, 2013 and, thereafter, at the end of each six-month period during the Term beginning on January 1 and on July 1 as follows:

(a)    Appropriate ABDC personnel shall determine the aggregate amount of GRx Fees for Service paid or provided by Suppliers to ABDC attributable to Walgreen net purchases of Generic Rx during such period based on the pro rata net purchases by Walgreen of Generic Rx to total Generic Rx net purchases by all customers of ABDC whose purchases qualify for GRx Fee for Services under the applicable ABDC WBAD or Non-WBAD Supplier Agreements (using WAC as the selling cost of net units sold for this ratio), provided that any GRx Fee for Service that is tied to performance standards or is otherwise contingent on other obligations will only be included in this calculation to the extent the contingent performance standard is satisfied by ABDC.

(b)    Following the calculation of the total amount of GRx Fees for Service attributable to Walgreen net purchases of Generic Rx during the period pursuant to Paragraph B(iii)(a) above, the responsible ABDC personnel shall calculate the GRx Market Rebate Percentage for the following period by dividing this total amount of GRx Fees for Service by the total GRx Contract Cost of Walgreen's net purchases of Generic Rx during the quarter for which the GRx Fees for Service was calculated.

(iv)    Reconciliation Process for Generic Rx.  As provided above in the lead-in to this Paragraph B, ABDC will invoice Walgreen for Generic Rx based on the GRx Price File.  Within thirty (30) days of the end of the four-month period beginning on the Effective Date and ending on December 31, 2013 and, thereafter, within thirty (30) days of the end of each calendar quarter during the Term, ABDC will provide Walgreen and the Designated Accounting Firm with a detailed Microsoft Excel report, certified by an appropriate financial officer of ABDC (each, a "GRx Certification"), reconciling the total amount of such invoices during such period or quarter and Walgreen's Price of Goods for the net purchases of Generic Rx during such period or quarter, taking into account the GRx Buy-Side Rebates and the GRx Market Rebate previously paid Walgreen during such period or quarter or paid to Walgreen in conjunction with the publication of the GRx Certification on such net purchases of Generic Rx.

C.    Volume Rebate.

At such time as Walgreen has made Net Purchases of $1,066,666,667 hereunder, ABDC shall pay Walgreen a one-time rebate ("Volume Rebate") equal to Thirty-Two Million Dollars ($32,000,000) representing a three percent (3.0%) discount on such Net Purchases.  The Volume Rebate shall be paid to Walgreen in the form of a check payable or wire transfer of funds within fifteen (15) days after the Volume Rebate is earned.

HIGHLY CONFIDENTIAL                                    WAGMDL00000458

P-WAG-7014

CONFIDENTIAL

D.     **Additional Allowances**.

Notwithstanding any contrary provision in this Agreement, in the event Walgreen receives an offer from a Supplier for off-invoice allowances or discounts (**"Additional Allowances"**) on certain new Product introductions or with regard to existing Products, and such Products are purchased from ABDC under this Agreement, ABDC will promptly (and, in all cases, within ten (10) days following receipt thereof) pass through all such Additional Allowances, including any extended pay terms and distribution allowances, to Walgreen to the extent the Additional Allowance is not included in the calculation used to determine Walgreen's Price of Goods for the subject Product under this Agreement or in any adjustment set forth in this Agreement with respect to such Price of Goods.

E.     **Taxes**.

Walgreen will pay when due any sales, use, excise, gross receipts, or other federal, state, or local taxes or other assessments (other than any tax based solely on the net income of ABDC and any taxes imposed upon inventory held in its warehouses) and related interest and penalties in connection with or arising out of transactions under this Agreement.  If ABDC pays any such amounts which Walgreen is obligated to pay under this Paragraph, Walgreen will promptly reimburse ABDC in an amount equal to the amount so paid by ABDC upon receipt of satisfactory supporting documentation.  If Walgreen pays any such amounts which ABDC is obligated to pay under this Paragraph E, ABDC will promptly reimburse Walgreen in an amount equal to the amount so paid by Walgreen.

F.     **Contract Pricing and Administration (Indirect Contract Pricing)**.

Suppliers of Products and Walgreen may negotiate or otherwise designate new prices for Products, from time to time (**"Indirect Contract Pricing"**), which are sold by ABDC to Walgreen hereunder.  In such an instance, the applicable Supplier or Walgreen will provide written notice from such Supplier to ABDC of such Indirect Contract Pricing, ABDC will load the Indirect Contract Pricing in its systems within two (2) business days after receipt of Supplier verification of such written notice and, to the extent applicable to Walgreen's Price of Goods as established pursuant to this Exhibit 2, upon such verification, ABDC will apply such pricing to sales of Product to be effective at effective date of the Pricing Agreement (through credit/rebill process).  ABDC shall dedicate an employee/resource to Walgreen's account for the purposes of managing Indirect Contract Pricing and Credit/Rebill processes. Walgreen will monitor all Indirect Contract Pricing and will provide ABDC, on a periodic basis, with a report in the event that ABDC fails to load Indirect Contract Pricing in a timely manner.  In such an event, Walgreen will be entitled to such Indirect Contract Pricing to be effective at the effective date of the Pricing Agreement (facilitated through credit/rebill process), and Walgreen shall be entitled to a credit in an amount equal to any discrepancy between the amounts paid and the pricing to which Walgreen was entitled for purposes of Indirect Contract Pricing hereunder, in each instance to the extent such failure impacted Walgreen's Price of Goods as established pursuant to this Exhibit 2.  In the event that there are no amounts due by Walgreen to ABDC at the time of the credit, ABDC agrees to pay Walgreen for the amount of such credit via check or wire transfer within thirty (30) days of request from Walgreen.  In addition, if ABDC does not provide a credit as provided herein within thirty (30) days of the date of the initial notice from Walgreen to ABDC, then Walgreen may offset the amount due to Walgreen pursuant to the credit against amounts then due and owing to ABDC by Walgreen, on and subject to Exhibit 4 hereto.  Additionally, Walgreen will notify ABDC before discontinuing purchases of any special inventory of a significant nature that it has requested that ABDC stock (whether or not pursuant to a Pricing Agreement) and assist ABDC in disposing of any excess of such inventory using commercially reasonable efforts.  When invoiced, Walgreen will promptly reimburse ABDC for any unpaid chargebacks that are denied by a GPO or Supplier and, in such case, Walgreen will look solely to such GPO or Supplier for redress.

HIGHLY CONFIDENTIAL                                                                      WAGMDL00000459

**CONFIDENTIAL**


In addition to the foregoing, as part of the Distribution Conversion Plan, the parties shall address the following requirements: (i) Walgreen providing to ABDC a Product hierarchy (which would include Products on Walgreen's preferred product list from time to time), in which Walgreen would list, in order of preference, the Products which it anticipates purchasing or which it prefers to purchase, (ii) ABDC facilitating loading Indirect Contract Pricing using either a list/formulary or quote hierarchy, including loading dual hierarchies, (iii) ABDC loading the respective prices and adding Products to quotes by individual NDC number without requiring loading full contracts to quotes or lists/formularies, and (iv) ABDC allowing for generic substitution with certain chain ID/master lists (i.e., hierarchy) for certain Facilities, as directed by Walgreen, without having to apply such substitution to all Facilities.  As part of such work, the parties shall also develop interim processes to be used prior to implementation of each of the foregoing.

**G.      Credits/Rebills.**

ABDC shall process credits/rebills back to the effective date of a Supplier Agreement establishing Indirect Contract Pricing.  ABDC shall not send information regarding the credits/rebills through EDI, nor provide any Facility or person, other than a Walgreen-corporate designated representative, with such information.  Whenever credits/rebills are processed, ABDC shall promptly provide Walgreen with a spreadsheet which includes the following information:

- Account Number
- Walgreen Store Number
- Store Address
- NDC Number
- Product Description
- Pack-Size
- Original Invoice Number
- Original Invoice Date
- Original Quantity Billed
- Original Cost Billed
- Original Extended Cost
- Supplier
- New Cost
- Cost Less Discount
- New Extended Cost
- Difference between Original Cost Billed and New Extended Cost
- Credit Memo Number
- Credit Memo Date
- Credit Memo Quantity Billed
- Credit Memo Extended Cost

HIGHLY CONFIDENTIAL                                                          WAGMDL00000460

P-WAG-7014

**CONFIDENTIAL**                    **LIMITED DISTRIBUTION**                    **HIGHLY SENSITIVE**

## EXHIBIT 3
## PRICING ADJUSTMENTS AND COMPLIANCE

A.      <u>Rx Gross Margin Adjustment.</u>

(i)      <u>Rx Gross Margin Target</u>.  The parties acknowledge and agree that (a) Price of Goods and other terms of this Agreement have been established based on ABDC's projection that for the period starting on the Effective Date and ending December 31, 2013 and, thereafter, during each calendar quarter of the Term (each, a "**Gross Margin Measuring Period**" or "**GMMP**"), ABDC's "**Gross Margin Percentage**" (as defined and calculated in Paragraph A(iv) below) on Walgreen's total Net Purchases of Rx (Brand Rx and Generic Rx) will be 0.6987% (the "**Target Gross Margin Percentage**"), and (b) the Target Gross Margin Percentage was established based on (I) Walgreen maintaining a GRx Ratio of 13% during each GMMP, (II) ABDC realizing Buy-Side Rebates, Buy-Side Fees for Service and Price Appreciation, as calculated on a blended, trailing-average twelve-month basis, attributable to Walgreen's net purchases of Brand Rx of 3.75% (the "**Target BRx Buy-Side Percentage**"), and (III) assumed Price of Goods of Cost minus 3.43% for Brand Rx and ABDC's "dead net" acquisition cost plus 3.25% for Generic Rx, all as determined without taking into account the Volume Rebate (as provided in Paragraph C of Exhibit 3).

(ii)      <u>Gross Margin Report</u>.  Within thirty (30) days of the end of each GMMP, ABDC will provide Walgreen and the Designated Accounting Firm with a report, certified by an appropriate financial officer of ABDC, reflecting ABDC's calculation of ABDC's Gross Margin Percentage during the applicable GMMP (the "**Gross Margin Report**").  Each Gross Margin Report shall be reviewed by the Designated Accounting Firm and finalized pursuant to the "clean room process" described in Paragraph C below.

(iii)      <u>Impact of Gross Margin Report for each GMMP</u>.  At such time as each Gross Margin Report is finalized pursuant to Paragraph C below, notwithstanding any contrary provision of this Agreement, the following payments and adjustments to Walgreen's Price of Goods for Brand Rx, including Brand Rx Insulin, as set forth in Paragraph A(i) (Price of Goods for Brand Rx and OTC for All Facilities) of Exhibit 2 (Pricing Terms), as adjusted from time to time pursuant hereto and pursuant to Paragraph B(iii) below, shall be made:

(a)      If any Gross Margin Report indicates that ABDC's Gross Margin Percentage during a GMMP is greater than the Target Gross Margin Percentage: (I) ABDC shall, within ten (10) days of the date the applicable Gross Margin Report is deemed final, credit Walgreen the amount equal to the product of such excess (rounded to the fourth decimal place using customary convention) and the amount of Walgreen's Net Purchases of Rx during such GMMP as determined before subtraction of the Volume Rebate (the "**Gross Margin Excess Payment Amount**"), and (II) unless otherwise agreed by the parties in writing, Walgreen's Price of Goods for Brand Rx, including Brand Rx Insulin, for the GMMP immediately following the finalization of the Gross Margin Report shall be decreased by the percentage (rounded to the nearest basis point using customary convention) determined by dividing the Gross Margin Excess Payment Amount by the Total Cost of BRx Sold during the GMMP covered by the Gross Margin Report.

(b)      If any Gross Margin Report indicates that ABDC's Gross Margin Percentage during a GMMP is less than the Target Gross Margin Percentage: (I) Walgreen shall, within ten (10) days of the date the applicable Gross Margin Report is deemed final, pay ABDC the amount equal to the product of such deficiency (rounded to the fourth decimal place using customary convention) and the amount of Walgreen's Net Purchases of Rx during such GMMP as determined before subtraction of the Volume Rebate (the "**Gross Margin Deficiency Payment Amount**"), and (II) unless otherwise agreed

HIGHLY CONFIDENTIAL                                                            WAGMDL00000461

**CONFIDENTIAL**              **LIMITED DISTRIBUTION**              **HIGHLY SENSITIVE**

by the parties in writing, Walgreen's Price of Goods for Brand Rx, including Brand Rx Insulin, for the GMMP immediately following the finalization of the Gross Margin Report shall be increased by the percentage (rounded to the nearest basis point using customary convention) determined by dividing the Gross Margin Deficiency Payment Amount by the Total Cost of BRx Sold during the GMMP covered by the Gross Margin Report.

      (iv)   <u>Definitions</u>.

      (a)   <u>12-Month BRx Buy-Side Rebates</u>.  The term **"12-Month BRx Buy-Side Rebates"** means the total amount of BRx Buy Side Rebates paid or provided by, or withheld from, Suppliers to or by ABDC during the twelve (12) months ending on the last day of the applicable GMMP attributable to Brand Rx sold to Walgreen during such twelve-month period, provided that (I) payments of BRx Buy-Side Rebates that are contingent or subject to being refunded until they are earned or that are tied to performance standards or are otherwise contingent on other obligations being met by ABDC will be taken into account on a proportionate basis (using WAC as the selling cost of net units sold for this ratio) only to the extent the applicable contingency is met and the resulting payment is not subject to refund, and (II) for the period prior to the GRx Conversion Date, computations with respect to any month prior to the Effective Date shall be made using sales data supplied to ABDC by Walgreen capturing materially all of Walgreen's purchases of Brand Rx during the applicable period and assuming BRx Buy-Side Rebates in conformance with those used to establish the Target Gross Margin Percentage.

      (b)   <u>12-Month BRx Fees for Service</u>.  The term **"12-Month BRx Fees for Service"** means the total amount of BRx Fees for Service paid or provided by, or withheld from, Suppliers to or by ABDC during the twelve (12) months ending on the last day of applicable GMMP attributable to Brand Rx sold to Walgreen during such twelve-month period, provided that (I) payments of BRx Fees for Service that are contingent or subject to being refunded until they are earned or that are tied to performance standards or are otherwise contingent on other obligations being met by ABDC will be taken into account on a proportionate basis (using WAC as the selling cost of net units sold for this ratio) only to the extent the applicable contingency is met and the resulting payment is not subject to refund, (II) any metric penalties/charges that were assessed against ABDC during such twelve months that reduced BRx Fees for Service during such twelve months and which ABDC agreed pursuant to Section 4(M) of the Agreement not to pass on to Walgreen shall be added to the actual BRx Fees for Service paid or provided by Suppliers during such twelve-month period, (III) in situations in which ABDC and the applicable Supplier do not have a Supplier Agreement in effect but ABDC has made deductions or offsets in lieu of receiving payment of BRx Fees for Service, the amount of such deductions and offsets shall be deemed to constitute BRx Fees for Service (it being understood and agreed hereby that at such time as such deductions or offsets are reconciled with the applicable Supplier, any actual BRx Fees for Service paid or provided by the Supplier shall exclude any amount previously taken into account hereunder in calculating 12-Month BRx Fees for Service), and (IV) for the period prior to the GRx Conversion Date, computations with respect to any month prior to the Effective Date shall be made using sales data supplied to ABDC by Walgreen capturing materially all of Walgreen's purchases of Brand Rx during the applicable period and assuming BRx Fees for Service in conformance with those used to establish the Target Gross Margin Percentage.

      (c)   <u>12-Month Price Appreciation</u>.  The term **"12-Month Price Appreciation"** means the total amount of Price Appreciation realized by ABDC during the twelve (12) months ending on the last day of the applicable GMMP attributable to Brand Rx sold to Walgreen during such twelve-month period, provided that, for the period prior to the GRx Conversion Date, computations with respect to any month prior to the Effective Date shall be made using sales data supplied to ABDC by Walgreen capturing materially all of Walgreen's purchases of Brand Rx during the applicable period and assuming Price Appreciation in conformance with that used to establish the Target Gross Margin Percentage.

**CONFIDENTIAL**               **LIMITED DISTRIBUTION**               **HIGHLY SENSITIVE**

        (d)      <u>Gross Margin Percentage</u>.  The term **"Gross Margin Percentage"** means the percentage calculated to four decimal places (and rounded using customary convention) pursuant to the following formula:

        (<u>A</u> minus <u>B</u>) divided by <u>A</u>, where

        <u>A</u> equals the sum of:

        (I)   The amount of Walgreen's actual Net Purchases of Brand Rx during the twelve months ending on the last day of the GMMP (as determined before subtraction of the Volume Rebate), provided that, for the period prior to the GRx Conversion Date, the amount of Walgreen's "Net Purchases" with respect to any month prior to the Effective Date shall be based on Brand Rx sales data supplied to ABDC by Walgreen promptly after the Effective Date covering the twelve-month period ending on the day prior to the Effective Date and assuming the applicable Cost minus discount provided in Exhibit 2, as adjusted hereby, and

        (II)  The product of (1) Walgreen's average monthly Net Purchases of Generic Rx during the GMMP (as determined before subtraction of the Volume Rebate) and (2) 12; and

        <u>B</u> equals the sum of ABDC's **"Net Cost of BRx Sold"** and **"Net Cost of GRx Sold"** for such Net Purchases of Rx.

        (e)      <u>Net Cost of BRx Sold</u>.  The term **"Net Cost of BRx Sold"** means ABDC's "dead net" cost of Brand Rx sold to Walgreen hereunder as computed after taking into account **"12-Month BRx Buy-Side Rebates"**, **"12-Month BRx Fees for Service"** and **"12-Month Price Appreciation"** as of the last day of the applicable GMMP.

        (f)      <u>Net Cost of GRx Sold</u>.  The term **"Net Cost of GRx Sold"** means the product of (I) 12 and (II) the average monthly amount of ABDC's "dead net" cost of Generic Rx sold to Walgreen hereunder during the GMMP, as determined after taking into account all GRx Buy-Side Rebates paid to Walgreen during the applicable GMMP on Generic Rx sold to Walgreen during such GMMP and, to the extent not included in such GRx Buy-Side Rebates, all GRx Buy-Side Rebates and GRx Fees for Service paid or provided by Suppliers to ABDC during the applicable GMMP attributable to Generic Rx sold to Walgreen during such GMMP, provided that payments of such GRx Buy-Side Rebates or GRx Fees for Service that are contingent or subject to being refunded until they are earned or that are tied to performance standards or are otherwise contingent on other obligations being met by ABDC will be taken into account on a proportionate basis (using WAC as the selling cost of net units sold for this ratio) only to the extent the applicable contingency is met and the resulting payment is not subject to refund.

        (g)      <u>Total Cost of BRx Sold</u>.  The term **"Total Cost of BRx Sold"** means the amount equal to the aggregate Cost of Walgreen's net purchases of Brand Rx during the applicable GMMP or **"WCMP"** as defined in Paragraph B below (in both cases, before application of the applicable Price of Goods discount for such purchases).

        (v)      <u>Example</u>.  The operation of this Paragraph A is illustrated by the following example (which assumes a GMMP of three months):

        *Assumptions*:

        (1)      Walgreen's Net Purchases of Brand Rx during such GMMP were $7,650,000,000 and the Total Cost of Brand Rx during this GMMP was $7,921,714,818.

HIGHLY CONFIDENTIAL        WAGMDL00000463

**CONFIDENTIAL**              **LIMITED DISTRIBUTION**              **HIGHLY SENSITIVE**

(2)    Walgreen's Net Purchases of Brand Rx during the twelve months ending on the last day of the GMMP were $30,600,000,000 and ABDC's Net Cost of BRx Sold for such Net Purchases of Brand Rx over the twelve months was $30,498,602,052.

(3)    Walgreen's Generic Rx Net Purchases during such GMMP were $950,000,000 and ABDC's Net Cost of GRx Sold for such Net Purchases of Generic Rx was $920,096,852.

*Results*:

(1)    <u>Calculation of ABDC's Rx Gross Margin Percentage for the GMMP</u>.  ABDC Rx Gross Margin Percentage for the GMMP would be 0.6425%, computed as follows using the formula in subparagraph (iv)(d) above:

A = $34,400,000,000, the sum of (i) $30,600,000,000 (twelve months of Brand Rx Net Purchases), and (ii) $3,800,000,000 (the amount determined by multiplying the average amount of Walgreen's Net Purchases of Generic Rx during the GMMP ($316,666,666.67) by 12.

B = $34,178,989,460, the sum of (i) $30,498,602,052 (the Net Cost of BRx Sold for the twelve months of Brand Rx Net Purchases), and (ii) $3,680,387,408 (the amount determined by multiplying the average amount of ABDC's Net Cost of GRx Sold during the GMMP ($306,698,950.67) by 12.

Based on these amounts: A ($34,400,000,000) minus B ($34,178,989,460) divided by A ($34,400,000,000) = 0.0064247, and, after rounding the calculated amount, this converts to 0.6425%. This percentage is 0.0562% less than ABDC's Target Gross Margin Percentage of 0.6987%.

(2)    <u>Impact of Calculation</u>. As a result of this deficiency of 0.0562%:

X.    Walgreen would owe ABDC $4,833,200 (0.0562% times $8,600,000,000, which is the sum of the Brand Rx and Generic Rx Net Purchases during the GMMP); and

Y.    Price of Goods for Brand Rx, including Brand Rx Insulin, in the GMMP immediately following the finalization of the Gross Margin Report for the GMMP which is the subject of this example would be increased by the percentage (rounded to the nearest basis point) determined by dividing (i) this same amount of $4,833,200, by (ii) the Total Cost of BRx Sold during this GMMP ($7,921,714,818), which equals 0.06101%, and when rounded to the nearest basis point, 0.06%, so that if Walgreen's Price of Goods for Brand Rx during the GMMP which is the subject of this example was Cost minus 3.43%, Walgreen's Price of Goods for Brand Rx during the GMMP immediately following the finalization of the Gross Margin Report for the GMMP which is the subject of this example would be increased to Cost minus 3.37%.

**B.    Working Capital Adjustment.**

(i)    <u>Working Capital Target</u>.  The parties further acknowledge and agree that (a) Price of Goods and other terms of this Agreement have been established based on ABDC's projection that for the period starting on the GRx Conversion Date and ending December 31, 2014 and, thereafter, during each calendar quarter of the Term (each, a **"Working Capital Measuring Period" or "WCMP"**), ABDC's **"Working Capital to Sales Percentage"** (as defined and calculated in Paragraph B(iv) below) will be 19.4305% (the **"Target Working Capital to Sales Percentage"**), and (b) the Target Working Capital to Sales Percentage was established based on (I) ABDC maintaining an assumed inventory turn rate per year of 21x for Brand Rx and 12x for Generic Rx during the entire Term (**"Assumed ABDC Inventory Turn**

CONFIDENTIAL            LIMITED DISTRIBUTION            HIGHLY SENSITIVE

Rate"), (II) ABDC having Supplier weighted-average payment terms of 90 days (taking into account the actual dollar amounts paid) during the entire Term on all Generic Rx purchased by Walgreen hereunder, (III) ABDC having Supplier weighted-average payment terms of 33.03 days (taking into account the actual dollar amounts paid) during the entire Term on all Brand Rx purchased by Walgreen hereunder, and (IV) Walgreen having payment terms hereunder on and after the GRx Conversion Date of DSO 27 based on Walgreen's election in Exhibit 4 ("**Assumed Walgreen Payment Terms**").

(ii)    Working Capital Report.  Within thirty (30) days of the end of each WCMP, at the same time as ABDC provides the Gross Margin Report, ABDC will provide Walgreen and the Designated Accounting Firm with a report, certified by an appropriate financial officer of ABDC, reflecting ABDC's calculation of ABDC's Working Capital to Sales Percentage during the applicable WCMP (the "**Working Capital Report**").  Each Gross Margin Report shall be reviewed by the Designated Accounting Firm and finalized pursuant to the "clean room process" described in Paragraph C below.

(iii)    Impact of Working Capital Report for each WCMP.  At such time as each Working Capital Report is finalized pursuant to Paragraph C below, notwithstanding any contrary provision of this Agreement, the following payments and adjustments to Walgreen's Price of Goods for Brand Rx, including Brand Rx Insulin, as set forth in Paragraph A(i) (Price of Goods for Brand Rx and OTC for All Facilities) of Exhibit 2 (Pricing Terms), as adjusted from time to time pursuant hereto and pursuant to Paragraph A(iii) above, shall be made:

(a)    If any Working Capital Report indicates that ABDC's Working Capital to Sales Percentage during a WCMP is greater than the Target Working Capital to Sales Percentage: (I) Walgreen shall, within ten (10) days of the date the applicable Working Capital Report is deemed final, pay ABDC the product of the amount necessary to eliminate the excess (rounded to the fourth decimal place using customary convention) multiplied by 10.5%, compounded monthly over the WCMP (the "**Working Capital Excess Payment Amount**"), and (II) unless otherwise agreed by the parties in writing, Walgreen's Price of Goods for Brand Rx, including Brand Rx Insulin, for the WCMP immediately following the finalization of the Working Capital Report shall be increased by the percentage (rounded to the nearest basis point using customary convention) determined by dividing the Working Capital Excess Payment Amount by the Total Cost of BRx Sold during the WCMP covered by the Working Capital Report.

(b)    If any Working Capital Report indicates that ABDC's Working Capital to Sales Percentage during a WCMP is less than the Target Working Capital to Sales Percentage: (I) ABDC shall, within ten (10) days of the date the applicable Working Capital Report is deemed final, credit Walgreen the product of the amount necessary to eliminate the deficiency (rounded to the fourth decimal place using customary convention) multiplied by 10.5%, compounded monthly over the WCMP (the "**Working Capital Deficiency Payment Amount**"), and (II) unless otherwise agreed by the parties in writing, Walgreen's Price of Goods for Brand Rx, including Brand Rx Insulin, for the WCMP immediately following the finalization of the Working Capital Report shall be decreased by the percentage (rounded to the nearest basis point using customary convention) determined by dividing the Working Capital Deficiency Payment Amount by the Total Cost of BRx Sold during the WCMP covered by the Working Capital Report.

Reconciling payments/credits and Price of Goods adjustments under this Paragraph B(iii) shall be netted with any such payments/credits and/or Price of Goods adjustments under Paragraph A(iii) for the applicable period.

HIGHLY CONFIDENTIAL            WAGMDL00000465

P-WAG-7014

**CONFIDENTIAL**               **LIMITED DISTRIBUTION**               **HIGHLY SENSITIVE**

(iv)  <u>Definitions</u>.

(a)  <u>Rx Inventory for Walgreen</u>.  The term **"Rx Inventory for Walgreen"** means the amount of ABDC's Rx inventory for Walgreen as of the last day of the WCMP as calculated using Walgreen's weighted average monthly Net Purchases of Rx during the WCMP (as determined before subtraction of the Volume Rebate) and the Assumed ABDC Inventory Turns.

(b)  <u>Payables Outstanding on Walgreen's Rx</u>.  The term **"Payables Outstanding on Walgreen's Rx"** means the amount of ABDC's payables for Walgreen's net purchases of Rx as calculated using weighted average monthly Net Purchases of Rx (as determined before subtraction of the Volume Rebate) and actual Supplier payment terms, in both cases during the WCMP.

(c)  <u>Receivables Outstanding on Walgreen's Rx</u>.  The term **"Receivables Outstanding on Walgreen's Rx"** means the amount of ABDC's accounts receivable for Walgreen's net purchases of Rx as calculated using weighted average monthly Net Purchases of Rx during the WCMP (as determined before subtraction of the Volume Rebate) and the Assumed Walgreen Payment Terms then applicable.

(d)  <u>Working Capital to Sales Percentage</u>.  The term **"Working Capital to Sales Percentage"** means the percentage calculated to four decimal places (and rounded using customary convention) pursuant to the following formula:

<u>A</u> divided by <u>B</u>, where

<u>A</u> equals ABDC's **"Rx Inventory for Walgreen"**, minus **"Payables Outstanding on Walgreen's Rx"**, plus **"Receivables Outstanding on Walgreen's Rx"**; and

<u>B</u> equals Walgreen's average monthly Net Purchases of Rx during the WCMP (as determined before subtraction of the Volume Rebate).

(v)  <u>Example</u>.  The operation of this Paragraph B is illustrated by the following example:

*Assumptions*:

(1)  ABDC's Rx Inventory for Walgreen, Payables Outstanding on Walgreen's Rx and Receivables Outstanding on Walgreen's Rx at the end of the WCMP were $1,787,033,757, ($3,720,757,655) and $2,552,054,795, respectively.

(2)  Walgreen's average monthly Net Purchases of Rx during this WCMP were $2,875,000,000.

(3)  The Total Cost of BRx Sold during this WCMP were $7,766,387,077.

*Results*:

(1)  <u>Calculation of ABDC's Working Capital to Sales Percentage for the WCMP</u>.  ABDC's Working Capital to Sales Percentage for this WCMP would be 21.5072%, computed as follows using the formula in subparagraph (iv)(d) above:

A = $618,330,896, the sum of $1,787,033,757 (ABDC's Rx Inventory for Walgreen), ($3,720,757,655) (Payables Outstanding on Walgreen's Rx) and $2,552,054,795 (Receivables Outstanding on Walgreen's Rx)

B = $2,875,000,000, Walgreen's average monthly Net Purchases of Rx during the WCMP

Purchase Agmt (Final 031813)                    49

CONFIDENTIAL                    LIMITED DISTRIBUTION                    HIGHLY SENSITIVE

Based on these amounts: A ($618,330,896) divided by B ($2,875,000,000) = 0.215072, and ABDC's Working Capital to Sales Percentage for the WCMP would be 21.5072%.  This percentage is 2.0767% more than ABDC's Target Working Capital to Sales Percentage of 19.4305%.

(2)    Impact of Calculation. As a result of this deficiency of 2.0767%:

X.    Walgreen would owe ABDC $1,567,260, the product of (i) $59,705,125 (2.0767% times $2,875,000,000), and (ii) 10.5%, compounded monthly over the WCMP.

Y.    Price of Goods for Brand Rx, including Brand Rx Insulin, in the WCMP immediately following the finalization of the Working Capital Report for the WCMP which is the subject of this example would be increased by the percentage (rounded to the nearest basis point) determined by dividing (i) this same amount of $1,567,260, by (ii) the Total Cost of BRx Sold during this WCMP ($7,766,387,077), which equals 0.0202%, and when rounded to the nearest basis point, 0.02%, so that if Walgreen's Price of Goods for Brand Rx during the WCMP which is the subject of this example was Cost minus 3.43%, Walgreen's Price of Goods for Brand Rx during the WCMP immediately following the finalization of the Working Capital Report for the WCMP which is the subject of this example would be increased to Cost minus 3.41%.

**C.    Review Rights and Agreed-Upon Procedures; Finalization.**

(i)    Within three (3) days of receiving each Gross Margin Report and Working Capital Report, the Designated Accounting Firm shall commence its review of such Gross Margin Report and Working Capital Report (each, an "**Adjustment Review**") pursuant to the following procedures in this Paragraph C.  This Adjustment Review and Walgreen's associated rights under this Paragraph C are in lieu of Walgreen's general audit rights in Section 4(M) of the Agreement (Records, Audits) and, except as expressly provided in this Paragraph C, Walgreen has no right to audit or otherwise review ABDC's books and records with respect to a Gross Margin Report, Working Capital Report or any related calculation or matter.  Walgreen shall be solely responsible for the cost of each Adjustment Review, including all associated fees and expenses of the Designated Accounting Firm.

(ii)    The following procedures apply to each Adjustment Review:

a)    The duration of each Adjustment Review shall not exceed twenty (20) days and each Adjustment Review will be conducted at ABDC's headquarters in Chesterbrook, PA during customary business hours;

b)    The Adjustment Review shall be undertaken in a manner as to not unreasonably interfere with ABDC's business operations;

c)    A knowledgeable member of ABDC's financial staff shall be available to answer questions of the Designated Accounting Firm during the course of the Adjustment Review and ABDC and the Designated Accounting Firm shall cooperate reasonably during the Adjustment Review to minimize the time and expense associated with the Adjustment Review;

d)    The Designated Accounting Firm shall be given access to the relevant portions of all of ABDC's available and relevant Supplier Agreements and other documentation reasonably necessary to review ABDC's calculation(s) with respect to the period under review of, as applicable, depending on whether the Adjustment Review pertains to a Gross Margin Report or Working Capital Report (I) Walgreen's Net Purchases (as utilized in this Exhibit 3), (II) the GRx Net Acquisition Cost, (III) GRx Buy-Side Rebates and BRx Buy-Side Rebates, (IV) GRx Fees for Service and BRx Fees for Service, (V) GRx Market Rebates

HIGHLY CONFIDENTIAL                                                                    WAGMDL00000467

**CONFIDENTIAL**          **LIMITED DISTRIBUTION**          **HIGHLY SENSITIVE**

and the GRx Market Rebate Percentage, (VI) Net Cost of BRx Sold and Net Cost of GRx Sold, (VII) the GRx Certification, (VIII) Price Appreciation, (IX) 12-Month BRx Buy-Side Rebates, 12-Month BRx Fees for Service and 12-Month Price Appreciation, or (X) Rx Inventory for Walgreen, Payables Outstanding on Walgreen's Rx or Receivables Outstanding on Walgreen's Rx;

e)  In providing information and access to the Designated Accounting Firm as provided in the preceding subparagraph C(ii)(d), ABDC shall reasonably indicate in each applicable instance whether any such information is confidential or such access is being granted on a confidential basis;

f)  The purpose of the Adjustment Review is to allow the Designated Accounting Firm to provide reasonable assurance to the parties that no material modification needs be made to the Gross Margin Report or Working Capital Report for it to be in conformance with Paragraph A(ii) of this Exhibit 3 or Paragraph B(ii) of this Exhibit 3, respectively;

g)  Within three (3) days of completion of each Adjustment Review, the Designated Accounting Firm shall provide each party a written report, in draft form, setting forth the Designated Accounting Firm's proposed findings, including a detailed description of any material modification required to the Gross Margin Report or Working Capital Report; in preparing such written report, the Designated Account Firm shall take due care to avoid disclosing to Walgreen any confidential information of ABDC identified by ABDC during the course of the Adjustment Review as provided in subparagraph C(ii)I above and in no circumstances shall any Supplier Agreement or other documentation disclosed to the Designated Accounting Firm by ABDC in conjunction with the Adjustment Review be provided by the Designated Accounting Firm to Walgreen or any other third party;

h)  Each party shall have fifteen (15) days from the receipt of each draft written report provided in the preceding subparagraph C(ii)(g) to provide input to, and ask questions of, the Designated Accounting Firm regarding the draft, and the Designated Accounting Firm shall make itself available to each party over this period for such purpose; and

i)  Within five (5) days of the conclusion of the fifteen-day process described in the preceding subparagraph C(ii)(h), the Designated Accounting Firm shall issue to ABDC and Walgreen a written report addressed jointly to them setting forth the Designated Accounting Firm's final findings, including a detailed description of any material modification required to a Gross Margin Report or Working Capital Report (**"Adjustment Review Report"**); under no circumstances shall the Designated Accounting Firm share the Adjustment Review Report with any third party (other than Walgreen or ABDC).

If the Adjustment Review Report indicates that no material modification needs to be made to a Gross Margin Report or Working Capital Report, the applicable Gross Margin Report or Working Capital Report shall be deemed final and no additional action will be taken by either party.  If the Adjustment Review Report indicates an inaccuracy in ABDC's calculation(s) of or in (I) Walgreen's Net Purchases (as utilized in this Exhibit 3), (II) the GRx Net Acquisition Cost, (III) GRx Buy-Side Rebates and BRx Buy-Side Rebates, (IV) GRx Fees for Service and BRx Fees for Service, (V) GRx Market Rebates and the GRx Market Rebate Percentage, (VI) Net Cost of BRx Sold and Net Cost of GRx Sold, (VII) the GRx Certification, (VIII) Price Appreciation, (IX) 12-Month BRx Buy-Side Rebates, 12-Month BRx Fees for Service and 12-Month Price Appreciation, or (X) Rx Inventory for Walgreen, Payables Outstanding on

HIGHLY CONFIDENTIAL

CONFIDENTIAL                    LIMITED DISTRIBUTION                    HIGHLY SENSITIVE

Walgreen's Rx or Receivables Outstanding on Walgreen's Rx, then (1) the applicable Gross Margin Report or Working Capital Report shall be corrected to take into account such inaccuracy, and (2) reconciling payments/credits and Price of Goods adjustments shall be made under Paragraphs A(iii) and B(iii) above based on the corrected Gross Margin Report or Working Capital Report, respectively (unless, for the avoidance of doubt with respect to a Price of Goods adjustment, the parties agree not to make such adjustment as permitted in such Paragraphs). **In all events, the parties agree that each Adjustment Review Report is final and binding and not subject to dispute by either of them.**

D.      **Material Changes in Circumstances.**

        The parties acknowledge and agree that Price of Goods, the Target Gross Margin Percentage and related processes, the Target Working Capital to Sales Percentage, Walgreen's Primary Vendor requirements and related processes and other financial terms provided in this Agreement are based on market conditions in the pharmaceutical industry, laws and regulations and judicial and administrative interpretations of such laws and regulations, tax laws imposing business and occupation, gross receipts or similar taxes, including applicable jurisdictions, rates and exemptions, Supplier pricing, sales and distribution policies, transportation systems, practices and related costs and other like external factors beyond their individual control ("**Market Event Factors**"), in each instance as they exist on the Execution Date.  The parties agree that, if a Market Event Factor changes in a fundamental way after the Execution Date  and such change is likely to have a material adverse impact on a reasonable and material expectancy of either party under this Agreement, the impacted party may, at its option, request in writing ("**Request Notice**") that that Price of Goods, the Target Gross Margin Percentage, the Target Working Capital to Sales Percentage, Walgreen's Primary Vendor requirements and/or other financial terms provided in this Agreement be renegotiated so as to equitably reflect the effect of such change.  The Request Notice will identify the change to the Market Event Factor that took place, the reason(s) such change will have a material adverse impact on a reasonable and material expectancy of the party submitting the Request Notice and the general nature and scope of the requested adjustment to the Agreement.  As soon as practicable as the other party receives a Request Notice, the parties will meet and begin good faith negotiations.  If they do not agree within 60 days after the date of a Request Notice, the matter shall be resolved through the dispute resolution process described in Section 16(O) of this Agreement.

HIGHLY CONFIDENTIAL                    WAGMDL00000469

CONFIDENTIAL

## EXHIBIT 4
## PAYMENT AND RELATED TERMS

A.   **Payment Terms.**

      Walgreen agrees to the following Payment Terms, which vary depending on the date on which invoices for Products purchased hereunder are issued:

| Date Of Invoice | DSO | Payment Due Date To ABDC |
|---|---|---|
| Effective Date through February 28, 2014 | 25 | No later than the 25th calendar day following the date of each invoice |
| March 1, 2014 and after | 27 | No later than the 27th calendar day following the date of each invoice |

All payments will be made by Walgreen by EFT.  Regardless of the payment terms then in effect (i) payment means that Walgreen will make payments on any earlier date as is required to provide ABDC with good funds in hand on each due date, (ii) if a payment date falls on a Saturday, Sunday or holiday, payment is due on the next business day, and (iii) invoices will not be issued until Products are shipped.

B.   **Delayed Payment; Payment Disputes.**

      Walgreen may withhold from invoices due during each quarter ending after the Effective Date an aggregate amount not to exceed 0.07% of Walgreen's Net Purchases in the prior quarter provided (i) any withheld payment is due to a good faith dispute and all undisputed amounts are paid when due, (ii) on or prior to the due date of the applicable invoice encompassing the disputed item(s), Walgreen indicates in writing to ABDC in the payment remittance detail and published on SupplierNet in the Vendor Accounting Information System section the general nature of the dispute for the disputed item, (iii) both parties agree (a) to negotiate in good faith to resolve the dispute within thirty (30) days of the date of the applicable invoice and (b) that if they are unable to reach an agreement within such 30-day period, the issue will be resolved through the dispute resolution process described in Section 16(O) of this Agreement, and (iv) Walgreen agrees that, if it is determined by the parties that all or any part of the amount in dispute was in fact owed to ABDC, Walgreen promptly will pay ABDC an amount equal to the amount determined to be due, plus a per-day delayed payment fee based on 10.5% annual interest on such amount and calculated from the original due date of such amount to the date of payment. Notwithstanding the foregoing, the maximum amount which may be withheld by Walgreen hereunder at any time during the four months commencing on the Effective Date shall be $9,400,000.  Nothing herein shall restrict Walgreen's right to contest any amount due ABDC under this Agreement, provided, however, that except as provided above in this Paragraph B, Walgreen shall timely remit all payments due hereunder prior to disputing any amount due ABDC or amounts that may be withheld under Exhibit 11.

C.   **Late Payment Penalty.**

      If payment is delinquent and is not being disputed pursuant to the provisions of Paragraph B above, ABDC may withhold any payments to Walgreen and will assess a per-day late payment fee of the lower of 0.0292% (10.5%/360) or the maximum rate permitted by law on the outstanding balance until paid, beginning on the first business day after such due date.  Such rights are in addition to ABDC's other remedies and will not relieve Walgreen of its obligation to pay promptly.

CONFIDENTIAL

## EXHIBIT 5
## PRIMARY VENDOR EXCEPTION FOR GENERIC Rx LAUNCHES

As contemplated by Section 2(B)(ii)(d) (Compliance Measurement and Exceptions) of the Agreement but subject to ABDC's right of first refusal in Section 2(B)(iii) of the Agreement, Walgreen may purchase Generic Rx from a source other than ABDC and exclude such purchases from the Primary Vendor requirement calculations in Section 2(B)(i) (Requirements) if all of the following requirements are met:

(i)        The exception only applies to the first launch of a new (a) Generic Rx product or (b) strength presentation of a Generic Product (**"New GRx"**);

(ii)        The exception is limited to a single order of the New GRx providing each Facility with the greater of (a) the smallest saleable unit of the New GRx, or (b) not more than an initial fifteen (15) days of supply of the New GRx based on reasonable forecasts of anticipated demand and regardless of whether this supply is provided at one time or in multiple shipments; and

(iii)        The exception is only available if the initial order of the New GRx is delivered to the Facility within seven (7) days of the actual launch of the New GRx.

Purchase Agmt (Final 031813)                    54

P-WAG-7014

CONFIDENTIAL

## EXHIBIT 6
## ADDITIONAL SERVICES

**1.     Services; Ordering & Reporting Software**

A.     The following Services and ordering and reporting software shall be provided to Walgreen by ABDC during the Term of this Agreement, in exchange for a fee of $1,000 payable by Walgreen:

- DEA Scheduled Pharmaceuticals Purchased Report
- ABDC's "Standard Customer Reporting Package" (service level, top contract product purchases, top non-contract product purchases, contract v. non-contract purchases, 80/20 report, sales by category, returns by dollar amount, top GCNs purchased)
- Custom Reporting software to Walgreen
- Internet ordering software (Passport or similar software) for Facilities

No ordering or other hardware of any type is included.

B.     ABDC reserves the right to discontinue any Services as it deems appropriate, in which case ABDC will make a reasonable proportionate reduction in the monthly fee based upon the value of the discontinued Services.  In addition, from time to time ABDC may offer such new Services, at such additional fees as it determines, which new Services Walgreen may elect to receive or not.

C.     ABDC retains title to all ordering and reporting software and, pursuant to Section 15(E) of the Agreement, Walgreen must remove such software from applicable hardware upon termination of this Agreement.

D.     Computer consulting and related services will be offered at ABDC's then-current standard charges for such services.

E.     The parties agree that the provision of Services and the ordering and reporting software provided by ABDC, as contemplated above, is solely for the purpose of facilitating orders and communications between the parties hereto.

**2.     340B Program**

For Facilities that provide services as contract pharmacies for one or more "Covered Entities" under the 340B Program, ABDC will provide Products under the 340B Program at or below the 340B Program ceiling pricing.  Upon receipt of the required information, ABDC is typically able to load the 340B Program contract pricing within five (5) business days.

**3.     Assigned Representatives**

A.     ABDC will assign a senior strategic account representative who will be responsible for providing regular strategic direction and executive support to the Walgreen account and serving as Walgreen's primary contact with ABDC for issues that may arise under this Agreement.  The ABDC Representative will have the responsibility, experience, knowledge, and ability to respond to questions and address problems as they arise.  Walgreen and ABDC will conduct monthly reviews of outstanding accounting issues to help facilitate resolution and the ABDC Representative will be ultimately responsible for all facets of Walgreen's business with ABDC, including answering questions and assisting in

**CONFIDENTIAL**

activities such as interdivision transfers, Drop Ships, short callbacks, pricing and contracts. The ABDC Representative will provide continuous, timely, informative, confidential and effective communications and provide Walgreen with the highest level of services. Additionally, the ABDC Representative will work with Walgreen to identify opportunities for process improvement that are mutually beneficial, including minimizing multiple same-day requests for the same Product, and establishing usage forecasts, especially for slow-moving Products.

        B.      Walgreen will assign its Director, DMM, Brand Rx, Wholesaler and Vaccine Purchasing or another senior procurement department representative who will serve as ABDC's primary contact with Walgreen for ordering, inventory, service levels, usage forecasts, contract administration, invoicing, payment and other issues that may arise under this Agreement and, specifically, will engage with ABDC with respect to any unresolved credit or offset issues pursuant to Paragraph B of <u>Exhibit 4</u>. The Walgreen Representative will have the responsibility, experience, knowledge, and ability to respond to questions and address problems as they arise and will be ultimately responsible for all such issues. The Walgreen Representative will provide continuous, timely, informative, confidential and effective communications and will work with ABDC to identify opportunities for process improvement that are mutually beneficial.

**4.      Drop Ships**

        ABDC provides Drop Ships when Walgreen's needs dictate this approach and the Supplier meets ABDC's liability insurance and other requirements. ABDC has no liability for damage or losses related to Products that are Drop Shipped even if ABDC provides Drop Ship invoicing services.

**5.      NMV Purchasing**

        In addition to provisions in the NMV Agreement, ABDC will not sell to Walgreen any Brand Rx or Generic Rx unless ABDC has purchased such Products only from their manufacturer (other than Products that its manufacturer requires ABDC to purchase from an exclusive distributor, in which instance ABDC will comply with the manufacturer's requirements).

**6.      Software License**

        A.      <u>Grant of License</u>. For each software application ABDC may provide to Walgreen for one or more Products, ABDC, to the extent of ABDC's legal capacity to do so, grants Walgreen a non-exclusive, nontransferable, royalty-free and revocable license for the use of that software (**"Software"**) and its related documentation (**"Documentation"**). Each license is granted solely for use in connection with one or more Products during the Term. ABDC does not grant to Walgreen any rights to any copyright, patent, trademark, tradename or similar rights with respect to any Software or accompanying Documentation or any other information provided to Walgreen by ABDC.

        B.      <u>No Sublicense</u>. Walgreen may not sublicense, lease, distribute or otherwise transfer a Software application, the related Documentation or Walgreen's right to use the Software and related Documentation.

        C.      <u>No Copies</u>. Walgreen may not make, or allow anyone else to make, copies of the Software or related Documentation, beyond one copy for backup and archival purposes, except as ABDC may otherwise agree in writing. Walgreen may not remove, obscure, or deface any proprietary notices contained in the Software or related Documentation, and Walgreen must include such notices in any permitted copy of the Software.

HIGHLY CONFIDENTIAL        WAGMDL00000473

**CONFIDENTIAL**

D.    No Alterations.  Walgreen may not alter, modify or adapt any Software or related Documentation or create derivative works from them.  Walgreen may not translate, reverse engineer, disassemble or decompile the Software.

E.    Termination of License.  Walgreen's license of the Software and related Documentation will terminate automatically if Walgreen fails to comply with the terms of the license, or if the Products for which Walgreen is using the Software are terminated.  Upon termination of a license, or upon termination of this Agreement, Walgreen must cease using the Software and related Documentation, and at ABDC's sole election, remove all copies of the Software from applicable hardware that Walgreen may have in its possession or under its control, destroy all Documentation and certify to ABDC that Walgreen has done all of the foregoing.  All of Walgreen's obligations in this Paragraph 6 will survive termination of any licenses.

F.    Hardware.  So long as Walgreen is in compliance with the license type and quantities of Software permitted by the Agreement, Walgreen may from time to time install Software on any hardware identified in ABDC's documentation as being hardware for which the Software is made commercially available.  Walgreen may from time to time move the Software to new hardware at the same or other facilities owned, controlled or contracted for by Walgreen.  ABDC will not provide the Software to Walgreen with any security or other mechanisms that prevent Walgreen from using the Software in accordance with the terms of this Agreement.

G.    Software Definition.  The definition of Software includes any updates, upgrades, new versions or enhancements of the products or functionality licensed under the Agreement.  Software will be made available to Walgreen at the same time and under the same terms as it is made available to other licensees.

H.    Internet Functionality.  The Software requires high-speed internet access and Windows Internet Explorer 8 (or later version).  Walgreen is solely responsible for associated costs.

I.    Warranty.   ABDC warrants the functionality described herein, in addition to the requirement that the Software conform to its respective documentation.  Such functionality shall apply during any period for which Walgreen has elected to receive maintenance Software.  In addition, during such time period, ABDC warrants that it has the right to license the Software to Walgreen.  Walgreen shall not be required to cease use of the Software due to a claim of infringement unless such cessation is required of 80% or more of ABDC's customers.  ABDC shall reimburse Walgreen the full amount of license fees paid for any replacement software which Walgreen procures in the event of such occurrence and for such purposes only.

J.    No Rights in Data.  All files, input materials and output materials, the media upon which they are located (including cards, tapes, discs and other storage facilities), and all Software (together with any related Documentation, source code or codes, object codes, upgrades, revisions, modifications and any related materials) which are utilized by or developed for Walgreen in connection with the Walgreen Program, as well as all other materials prepared for and delivered to Walgreen by ABDC in the course of performance of this Agreement, will be the property of ABDC; provided, however, notwithstanding the foregoing, prescription records and other dispensing and patient data will be the sole property of Walgreen, and ABDC shall have no license or ownership interest in such data.

K.    Infringement Warranty.   Notwithstanding any provision to the contrary, ABDC represents and warrants that Walgreen's utilization of the Software will not in any way constitute an infringement or other violation of any copyright, trade secret, trademark, invention, proprietary information or any other rights of any third party.  Furthermore, ABDC will indemnify and hold

HIGHLY CONFIDENTIAL                                                                              WAGMDL00000474

**CONFIDENTIAL**

Walgreen Indemnified Parties harmless from and against any and all costs, fees and damages incurred by Walgreen based upon any claim that Walgreen's use of the Software infringed or violated any copyright, trade secret, trademark, invention, proprietary information or any other rights of any third party (unless caused by the negligence of Walgreen).

        L.      <u>Disclaimer</u>.  Except as provided herein, ABDC specifically and expressly disclaims all warranties, express or implied, written oral, including but not limited to those of merchantability and fitness for a particular purpose, regarding the Software, the Documentation, and all other property, services or rights covered by this Agreement.  Walgreen acknowledges the possibility that (i) the Software may not operate in combination or in the manner Walgreen may select for use and (ii) the operation of the Software may not be uninterrupted or error-free.  Except as provided herein, in no event will ABDC be liable for any damages, including special, incidental, consequential or exemplary damages arising out of the use of, or inability to use, the Software or accompanying documentation, even if advised of the possibility of such damages whether in contract or tort.

**7.**      **ASNs**

        ABDC will provide Walgreen with totes containing shipping labels with serial numbers and scanable barcodes that correlate to Product delivered so that Walgreen can perform scanning and automatic inventory updates from the ASNs (defined in Section 4(G) of the Agreement).  Upon receiving a tote, each Retail Facility will, pursuant to Section 6(E) of the Agreement (Return Procedures), promptly notify ABDC of the variance if there is any discrepancy from the order acknowledgement.  ABDC cannot update invoices after Product is shipped but, upon receiving a variance report for shipping errors or damaged Product, ABDC will promptly issue (A) a credit memo for Product that was either damaged or not shipped (shortage) and (B) either (i) a return authorization for Product to be returned, or (ii) an invoice for unordered Product (overages or mis-picks) that is not returned.  Returned Product is subject to Section 6 of the Agreement.

HIGHLY CONFIDENTIAL        WAGMDL00000475

**CONFIDENTIAL**

## EXHIBIT 7
## TERMS AND CONDITIONS FOR
## ELECTRONIC DATA INTERCHANGE

The following terms and conditions apply to purchase and sale transactions for Products under this Agreement ("**Transactions**") by electronically transmitting and receiving data in agreed formats in substitution for conventional paper based documents.

1) **PREREQUISITES**

   a) **Documents; Standards**.  Each party may electronically transmit to or receive from the other party any of the documents listed in the Appendix attached hereto and made a part hereof (hereinafter referred to as "**Documents**").  Any transmission of data, which is not a Document, shall have no force or effect between the parties.  All Documents shall be transmitted in accordance with the standards set forth in the Appendix.  If any of such standards are modified, supplemented or enhanced and if Walgreen intends to adopt such modified, supplemented or enhanced standards, it may give ABDC notice of the same.  ABDC agrees to likewise adopt such modified, supplemented or enhanced standards within a mutually agreed upon date after receipt of such notice, and such standards, as so modified, shall then be deemed incorporated into the Appendix.

   b) **Third Party Service Providers**.  Documents will be transmitted electronically to each party either directly or through any third party service provider with which either party may contract.  Either party may modify its election to use, not to use, or to change a service provider upon 30 days' prior written notice to the other.

       i) Each party shall be responsible for the cost of any third party service provider with which it contracts, unless otherwise set forth in the Appendix.

       ii) As between the parties hereto, each party shall be liable for the acts or omissions of its third party service provider while transmitting, receiving, storing or handling Documents or performing related activities for such party; provided that if both parties use the same third party service provider to effect the transmission and receipt of a Document, as between the parties hereto, the originating party shall be liable for the acts and omissions of such third party service provider as to such Document.

   c) **System Operations**.  Each party, at its own expense, shall provide and maintain the equipment, software, services and testing necessary to effectively and reliably transmit and receive Documents.

   d) **Security Procedures**.  Each party shall properly use those security procedures, including those specified in the Appendix, if any, which are reasonably sufficient to insure that all transmissions and Documents are authorized and to protect its business records and data from improper access.

   e) **Signatures**.  Each party shall adopt as its signature, an electronic identification consisting of symbols or codes ("**Signature**") which are to be affixed to or contained in each Envelope transmitted by such party.  Each party agrees that any Signature of such party affixed to or contained in any transmitted Envelope shall be sufficient to verify that such party originated such Envelope.  Neither party shall disclose to any unauthorized person the Signatures of the other party.

   f) **Preferred and Acceptable Flow**.  ABDC will support Walgreen's "**preferred flow**" and "**acceptable flow**" of orders, confirmations and invoices as is mutually agreed upon by the parties from time to time.

2) **TRANSMISSIONS**

   a) **Receipt**.  Documents shall not be deemed to have been properly received and no Document shall give rise to any obligation until accessible to the receiving party at such party's Receipt Computer.

   b) **Verification**.  Upon proper receipt of any Document, the receiving party shall promptly and properly transmit a Functional Acknowledgment in return, unless otherwise specified in Appendix A "**Functional Acknowledgment**" shall constitute conclusive evidence that a Document has been properly received.

P-WAG-7014

**CONFIDENTIAL**

c) **Acceptance**.  If acceptance of a document is required by the Appendix, any such Document which is improperly received shall not give rise to any obligation unless and until the party initially transmitting such Document has properly received in return an acceptance Document.

d) **Garbled Transmissions**.  If any transmitted Document is received in an unintelligible or garbled form, the receiving party shall promptly notify the originating party (if identifiable from the received Document) in a reasonable manner.  In the absence of such a notice the originating party's records of the contents of such Documents shall control.

e) **Paper Transmissions**.  Either party, after notice to the other party in writing, may send any Document to the other party by means of written instruments provided that no such written instrument shall modify or conflict with the terms and provisions of this Agreement, which shall be deemed to govern any such written instrument.

3) **TRANSACTION TERMS**

a) **Terms and Conditions**.  This Agreement is to be considered part of any other agreement referencing it or referenced in the Appendix.  In the absence of any other written agreement applicable to any Transaction made pursuant to this Agreement, such Transaction (and any related communication) shall also be subject to the terms and conditions included in either party's standard printed applicable forms attached to or identified in the Appendix, as the same may be amended from time to time by either party upon written notice to the other.  The parties acknowledge that the terms and conditions set forth in such forms may be inconsistent, or in conflict, but agree that any conflict that arises between the parties in connection with any such Transaction will be resolved as if such Transaction had been effected through the use of such forms.

b) **Prevailing Terms**.  The terms of this Agreement shall prevail in the event of any conflict with any other terms and conditions applicable to any Transaction.

c) **Confidentiality**.  All information contained in any Document or otherwise exchanged between the parties shall be considered confidential except to the extent that the parties, in writing, designate that the same or any portion thereof is not confidential or except as may be required to comply with law.

4) **VALIDITY; ENFORCEABILITY**

a) **Obligations**.  This Agreement has been executed by the parties to evidence their mutual intent to create binding purchase and sale obligations pursuant to the electronic transmission and receipt of Documents specifying certain of the applicable terms.

b) **Proper Transmission**.  Any Document properly transmitted pursuant to this Agreement shall be considered, in connection with any Transaction, any other written agreement described in Paragraph 3(a), or this Agreement to be a "**writing**" or "**in writing**;" and any such document when containing or to which there is affixed a Signature shall be deemed for all purposes to have been "**signed**" and to constitute an "**original**" when printed from electronic files or records established and maintained in the normal course of business.

c) **Conduct**.  The conduct of the parties pursuant to this Agreement, including the use of Signed Documents properly transmitted, shall, for all legal purposes, evidence a course of dealing and a course of performance accepted by the parties in furtherance of this Agreement, any Transaction and any other written agreement described in Paragraph 3(a).

d) **Admissibility**.  The parties agree not to contest the validity and enforceability of Signed Documents under the provisions of any applicable law relating to whether certain agreements are to be in writing or signed by the party to be bound thereby.  Signed Documents, if introduced as evidence on paper in judicial, arbitration, mediation or administrative proceedings, will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form.  Neither party shall contest the admissibility of copies of Signed Documents under either (i) the business records exception to the hearsay rule or (ii) the best evidence rule on the basis that the Signed Documents were not originated or maintained in documentary form.

HIGHLY CONFIDENTIAL                                                                          WAGMDL00000477

**CONFIDENTIAL**

APPENDIX A
TO EXHIBIT 7
POTENTIALLY TRADED DOCUMENTS

| Transaction Set | Document Name | Standard | Version | Acknowledgement Required (Yes/No) | Acknowledgement Type |
|---|---|---|---|---|---|
| 180 | Return Merchandise Authorization and Notification | X.12 | 4010 | Yes | FA – 997 |
| 810 | Invoice | X.12 | 4010 | Yes | FA – 997 |
| 820 *EFT Agreement Required | Remittance Advice | X.12 | 4010 | Yes | FA – 997 |
| 832 | Price/Sales Catalog | X.12 | 4010 | Yes | FA – 997 |
| 850 * General Trade Agreement Required | Purchase Order | X.12 | 4010 | Yes | FA – 997 |
| 855 | Purchase Order Acknowledgment | X.12 | 4010 | Yes | FA – 997 |
| 856 | Advance Ship Notice | X.12 | 4010 | Yes | FA – 997 |
| 860 | Purchase Order Change | X.12 | 4010 | Yes | FA – 997 |
| 861 | Receiving Advice/ Acceptance Certificate | X.12 | 4010 | Yes | FA – 997 |

**COMMUNICATION IDs:**

This agreement applies to the following trading partner communication ID's and any future modifications to such ID's:

Current:                                              Previous (if applicable):

Test Qualifier ____  Comm ID _____    Test Qualifier ____  Comm ID _____

Production Qualifier ____  Comm ID _____    Production Qualifier ____  Comm ID _____

**THIRD PARTY SERVICE PROVIDERS:**

Global eXchange Services (GXS):  500 W. Monroe Street, 11th Floor
Chicago, IL 60661
Phone:  (800) 334-2255

Interconnect through GE to: _____

Phone: _____

**ALLOCATION OF PROVIDER COSTS:**

Walgreen and ABDC will each pay for all electronic communications between their own processing location and their own mailbox at the VAN. The receiving party will be responsible for any applicable data storage fees.

Third parties (i.e., Brokers) receiving electronic carbon copies are responsible for fees associated with placing such copies in their VAN mailbox.

**BROKER** (if applicable):

Broker Name: _____

Phone Number:  (_____) _____

Key Contact: _____

CONFIDENTIAL

## EXHIBIT 8
## NON-RETAIL FACILITY LOCATIONS AND SCHEDULES

| Specialty Pharmacy: | ABDC order cutoff time in Facility's time zone | ABDC delivery time in Facility's time zone |
|---|---|---|
| Walgreen Specialty Pittsburgh, PA – AM Delivery | 8:00 PM (Eastern) | 10:30 AM (Eastern) – next day |
| Walgreen Specialty Pittsburgh, PA – PM Delivery | 12:00 PM (Eastern) | 4:30 PM (Eastern) – same day |
| Walgreen Specialty Frisco TX- AM Delivery | 8:00 PM (Central) | 8:00 AM (Central) – next day |
| Walgreen Specialty Frisco TX- PM Delivery | 12:00 PM (Central) | 3:00 PM (Central) – same day |
| Walgreen Specialty Ann Arbor, MI – AM Delivery | 8:00 PM (Eastern) | 8:00 AM (Eastern) – next day |
| Walgreen Specialty Ann Arbor, MI – PM Delivery | 12:00 PM (Eastern) | 3:00 PM (Eastern) – same day |
| Walgreen Specialty Portland, OR – AM Delivery | 8:00 PM (Pacific) | 7:00 AM (Pacific) – next day |
| Walgreen Specialty Portland, OR – PM Delivery | 12:00 PM (Pacific) | 3:00 PM (Pacific) – same day |
| Walgreen Specialty Morristown, NJ – AM Delivery | 8:00 PM (Eastern) | 8:00 AM (Eastern) – next day |
| Walgreen Specialty Morristown, NJ – PM Delivery | 12:00 PM (Eastern) | 3:00 PM (Eastern) – same day |
| Walgreen Specialty Wilmington, MA– AM Delivery | 8:00 PM (Eastern) | 8:00 AM (Eastern) – next day |
| Walgreen Specialty Wilmington MA – PM Delivery | 12:00 PM (Eastern) | 3:00 PM (Eastern) – same day |

| Mail | Order cutoff time – Tempe, AZ time zone | Delivery time – Tempe, AZ time zone | Order cutoff time – Orlando, FL (Eastern) | Delivery time – Orlando, FL (Eastern) |
|---|---|---|---|---|
| AM Delivery | 7:00 PM | 5:45 AM (next day) | 8:00 PM | 7:00 AM (next day) |
| PM Delivery | 12:00 PM (noon) | 2:30 PM – 3:00 PM (same day) | 12:00 (noon) | 1:30 PM (same day) |

| WIRS | ABDC order cutoff time in Facility's time zone | ABDC delivery time in Facility's time zone |
|---|---|---|
| AM Delivery | 7:00 PM | 9:00 AM (next day) |

| WIRS Hubs | ABDC order cutoff time in Facility's time zone | ABDC delivery time in Facility's time zone |
|---|---|---|
| AM Delivery | 7:00 PM | 9:00 AM (next day) |
| PM Delivery | 10:00 AM | 3:00 PM – same day |

| Assisted Living/LTC | ABDC order cutoff time in Facility's time zone | ABDC delivery time in Facility's time zone |
|---|---|---|
| AM Delivery | 7:00 PM | 9:00 AM (next day) |

| Walgreen WIRS Facility | WIRS Hub Overnight Orders (Local Time) | | WIRS Hub Afternoon Orders (Local Time) | | Afternoon Order Limitations |
|---|---|---|---|---|---|
| | Order Cut Off Time | Delivery Time (next morning) | Order Cut Off Time | Delivery Time (same day) | |
| Phoenix | 8:00pm | 8:00am | 12:00pm | 2:00pm | None |
| Albuquerque | 7:00pm | 9:00am | 12:00pm | 3:00pm | No Liquids |
| San Antonio | 7:00pm | 9:30am | 12:00pm | 3:00pm | None |
| Pompano Beach | 6:30pm | 11:00am | 12:00pm | 3:00pm | None |
| Wauwatosa | 7:00pm | 9:00am | 12:00pm | 3:00pm | None |
| Tinley Park | 7:00pm | 9:00am | 12:00pm | 3:00pm | None |

HIGHLY CONFIDENTIAL                                                                WAGMDL00000479

P-WAG-7014

**CONFIDENTIAL**

## EXHIBIT 9
## ABDC REPORTS

ABDC shall timely supply to Walgreen the following reports or access to the following:

- Purchase history reports (upon Walgreen's request);

- Monthly report showing ASD "courtesy-billed" Products ordered by Facilities through ABDC;

- Pricing Agreement compliance reports (upon Walgreen's request);

- New Products, NDC changes, and deleted/discontinued (whether by a Supplier or ABDC) Products (upon Walgreen's request);

- Monthly listing of Net Bill Products purchased by the Facilities, specifying Product name, quantity, normal list price, and price charged to Facilities;

- Weekly complete DACO list specifying Product additions and subtractions and Cost changes (for Puerto Rico only); and

- Weekly Pricing Agreement file specifying:
  - Quote Number
  - Quote Name
  - Wholesaler Item Number
  - NDC Number
  - Product Description
  - Package Size
  - Supplier name
  - Contract Cost
  - Start Date of Contract
  - End Date of Contract
  - Dropship
  - Stocked/Active Product
  - Indirect Contract Number
  - Membership list/Chain Id attached to Quote
  - Brand/Generic Indicator

HIGHLY CONFIDENTIAL                                        WAGMDL00000480

P-WAG-7014

**CONFIDENTIAL**

**EXHIBIT 10**
**AMERISOURCEBERGEN**
**DRUG CORPORATION RETURNS POLICY**

**General Policy**

Walgreen will be entitled to return Merchandise to ABDC and receive a credit as set forth below:

Products in "merchantable condition" (as defined below) and originally purchased from ABDC may generally be returned to the Walgreen's servicing ABDC distribution center in accordance with, and subject to, the terms and conditions of this policy. ABDC shall provide one credit memo per returns claim for returns.

| Return Made Within: | Normal Credit Amount: |
|---|---|
| **1 – 180 Days from invoice date** | **100% of original invoice amount paid by Walgreen.  This policy covers all ordering/filling errors if reported within ten (10) business days and such products are returned within thirty (30) business days of the date of the applicable invoice; provided, that ABDC must issue a return authorization (RA) within two (2) business days following Walgreen's request thereof.** |
| **More than 180 Days** | **The item will be rejected either via EDI or on the store credit memo, and no credit will be issued.** |

*"Merchantable condition"* will be reasonably determined by ABDC based upon its ability to return the item to its inventory for resale in the normal course of its business without special preparation, testing, handling, or expense and will exclude the following:

A.      Any item to which a security tag or patient label has been attached, which has been used or opened, is a partial dispensing unit or unit of sale, is without all original packaging, labeling, inserts, or operating manuals, or that is stickered (with the exception of the ABDC sticker), marked, damaged, defaced, or otherwise cannot readily be resold by ABDC for any reason.  Items received from ABDC in this fashion shall be considered damaged and must be returned as set forth below.

B.      Items purchased from any source other than ABDC, and short dated (less than nine (9) months expiration dating) or outdated items (provided that the item sold by ABDC to Walgreen is not short dated or outdated), seasonal product, or items purchased on a "special order" basis, including guaranteed sale merchandise, non-stock and drop ship items.

C.      Any product not intended for return to a wholesaler in accordance with the return policies of the applicable manufacturer.  These items should be returned directly to the manufacturer for credit. ABDC will issue Walgreen the exact credit received from the manufacturer.

D.      Any product listed by any state or federal regulatory agency as a high-risk pedigree item that is returned without a valid invoice number that cannot otherwise be verified by ABDC.

HIGHLY CONFIDENTIAL                                                                 WAGMDL00000481

CONFIDENTIAL

**Unmerchantable Product**

Any item not eligible for return in accordance with this policy will not be accepted for return without prior authorization.  If ABDC does participate in the return process for any product not in "merchantable condition", any return credit to Walgreen will be based upon the actual credit issued by the manufacturer. ABDC shall work at Walgreen's direction with third party return processors to allow Walgreen to realize value through returns of unmerchantable product.

**Required Return Documentation**

Prior to returning any product to ABDC, Walgreen must execute and deliver to ABDC a **Vendor Returned Goods Authorization Ongoing Assurance** verifying that all returned products have been kept under proper conditions for storage, handling, and shipping.

All requests for credit must be submitted via a Walgreen-approved EDI interface, or as otherwise agreed upon by the parties.

Walgreen will utilize EDI180 in order to request a return authorization from ABDC.  ABDC will use the EDI180 request to identify invoice number and purchase price in order to process the return.  If EDI is not used for return request, a fully completed and signed **Return Authorization Form** (RA) must accompany all products to be returned. **Note**:  ABDC may reject returns where the total units returned exceed the amount on the applicable invoice.

**Controlled Substances**

Credit for the return of controlled substances requires a separate RA and such returns must comply with all applicable laws, rules and regulations in addition to the terms and conditions of this policy.

**Shorts and Damaged Merchandise**

Claims of order shortages (e.g., products invoiced but not received), other ordering/filling errors and damage must be reported within ten (10) business days from the applicable invoice date, or no credit will be issued.  Returns of damaged products or products shipped in error must be received by the ABDC servicing distribution center within twenty (20) business days from the applicable invoice date, or no credit will be issued.  Controlled substance shortage claims must be reported immediately per DEA requirements.  In all instances, credit will not be issued until verification of the claim by ABDC.

**Shipping of Return Goods**

Products to be returned must be placed in a proper shipping container and signed for by the driver when picked up.

Signed RA shall be included in totes with the returned products.  Only one (1) RA shall be included in each tote.

All RA will be reviewed by ABDC for compliance with this policy.  The acceptability and valuation of any return is at the sole discretion of ABDC.

Products must be returned to the Walgreen's servicing ABDC distribution center within thirty (30) days from the date of Walgreen's request for an RA, or no credit will be issued.

HIGHLY CONFIDENTIAL                                                                      WAGMDL00000482

P-WAG-7014

**CONFIDENTIAL**

In addition to the requirements set forth in this policy, Walgreen shall comply with all return procedures required by the ABDC servicing distribution center.

**Other Restrictions**

Any credit of similar offsets may be taken only as previously approved by ABDC (as evidenced by the issuance of a valid credit memo), and may not be otherwise taken or deducted by Walgreen.  ABDC shall issue any valid credit memo or authorize a similar offset within thirty (30) days after validation thereof.

This policy is further subject to modification as may be deemed necessary or appropriate by ABDC to comply with applicable federal and/or state regulations, FDA guidelines, state law, and other restrictions applicable to returned merchandise.

Purchase Agmt (Final 031813)                66

WAGMDL00000483

**CONFIDENTIAL**

**EXHIBIT 11**
**RETURNS PROCESSING AND CREDIT POLICY**

The parties will follow the procedures set forth in this <u>Exhibit 11</u> with respect to processing any credit, offset or chargeback ("**Credit**") for Product returned to a Supplier with which Walgreen has no direct relationship (directly or through a third-party processor), which includes Product which is expired or otherwise returnable by Walgreen to such Suppliers.

1.	Walgreen shall notify ABDC each week of all returns processed (each a "**manifest**"). Walgreen shall send ABDC an excel spreadsheet ("**Return Report**") via email as specified by ABDC. Each Return Report will contain the following standard information: Supplier name, manifest date, manifest number, product amount, and estimated Credit for Product returned, including any applicable discount or upcharge amount ("**Return Value**"). Return Value may not exceed reasonable estimates of anticipated net Credits under a Supplier's return policy or other arrangement as agreed upon between the Supplier and Walgreen. Any additional information that is needed may be added to the extent Walgreen is able to systematically accommodate the request.

2.	ABDC will notify Walgreen each week of any Credit it received from Suppliers of the Products, which credits are to be passed on for the benefit of ABDC's customers for returns made directly to such Suppliers ("Supplier Credit Memo"). ABDC will send to Walgreen an excel spreadsheet ("Credit Report") via email to Walgreen's designated email address. Each Credit Report will contain the following standard information: Supplier name, manifest number, and numbers, dates and amounts of each Supplier Credit Memo. In addition, ABDC will provide paper copies of Supplier Credit Memos by priority mail (USPS Priority Mail, UPS, FedEx, etc.) or, if available, ABDC will provide Walgreen with electronic Supplier Credit Memo information. Upon receiving a Supplier Credit Memo, ABDC will post a corresponding dollar amount ("Vendor Credit") to a designated account ("Return Credit Account") and Walgreen may take a deduction from the Return Credit Account when Vendor Credits are posted.

3.	If ABDC has not posted a Vendor Credit to the Return Credit Account within thirty (30) days after Walgreen provides a Return Report, Walgreen may deduct 100% of the Return Value in the Return Report against amounts payable under the Agreement ("Interim Deduction"). Walgreen may only post Interim Deductions to the Return Credit Account. Walgreen may not take an Interim Deduction unless, for each manifest during the prior six months, Walgreen (i) had a Supplier return authorization if required by a Supplier; (ii) actually returned (or destroyed) Product; and (iii) had proof of delivery if provided by such Supplier (or proof of destruction). For each Interim Deduction, ABDC and Walgreen will communicate with each other and work together on a consistent basis, and in good faith, to contact the appropriate Supplier or third party processor to obtain information on each outstanding manifest and get a Supplier Credit Memo issued promptly. If a Supplier denies a manifest due to inaccurate or incomplete information, the parties agree that the original Return Report process will continue to apply throughout the resolution period set forth in this Exhibit 11.

4.	As mutually agreed, the parties will meet every two weeks by telephone, with attendance by people necessary to resolve any outstanding issue, controversy, dispute or claim under this <u>Exhibit 11</u> ("**Issue**"), including an outstanding manifest, Credit, Return Report, Credit Report, Return Value, Supplier Credit Memo, Vendor Credit, payment, Interim Deduction, other deduction or other issue or process under this <u>Exhibit 11</u>, as well as chargebacks, Walgreen manifest deductions and remittance information.

5.	Subject to Paragraph 6, Walgreen will promptly accept a Vendor Credit that ABDC posts within 60 days after a Return Report that included the applicable manifest if such Vendor Credit is at least 90% of the Return Value or, for a recall, at least 95% of the Return Value ("**Tolerance Threshold**") and, when it does so, promptly repay the full amount of any Interim Deduction. Paragraph 8 applies if the Tolerance Threshold is not met.

HIGHLY CONFIDENTIAL                                                                                   WAGMDL00000484

**CONFIDENTIAL**

      6.      Pursuant to Paragraph 7, Walgreen may continue to hold an Interim Deduction for up to 30 additional days if ABDC has posted no Vendor Credit within 60 days after a Return Report or a posted Vendor Credit is less than the Tolerance Threshold.  Walgreen will promptly repay the full amount of any Interim Deduction when ABDC posts a Vendor Credit that meets the Tolerance Threshold.

      7.      If a manifest is denied or a Supplier Credit Memo is less than the Tolerance Threshold, (i) Walgreen will promptly repay any Interim Deduction to the extent it accepts a Vendor Credit, and (ii) Walgreen and ABDC will continue working, in good faith, to reconcile any outstanding Issue with the Supplier.  If an Issue is not resolved within 30 days after ABDC received the Supplier Credit Memo or denial (or, if sooner, 90 days from the Return Report), Walgreen will promptly repay to ABDC the full amount of any Interim Deduction, but both parties will continue working with the Supplier to resolve the Issue.  The parties will provide reasonable assistance to each other, including any information reasonably necessary to help facilitate resolution of Issues, including a weekly report of any credit received by Walgreen directly from the Supplier that links such Credit to the original manifest.

      8.      Pursuant to Paragraph 4, ABDC will work with Walgreen to ensure Supplier Credit Memos are applied consistently with Return Reports and information Walgreen provides to ABDC and Suppliers.  If the way ABDC applies Supplier Credit Memos causes problems or delays with reconciliation, the parties will promptly address the Issue in meetings under Paragraph 4.

      9.      ABDC will not hold a Supplier Credit Memo it determines does not apply to a manifest and, instead, will immediately provide information about it to Walgreen, after which the parties will, pursuant to Paragraph 4, cooperate in good faith to apply the Supplier Credit Memo to the correct manifest.

      10.      Walgreen is not responsible for maintaining an accurate ABDC Supplier/vendor file.  If ABDC requests that Walgreen transmit an ABDC Supplier/vendor number on a Return Report, ABDC must provide and maintain this information within parameters of Walgreen's systems.  Walgreen will not be accountable if ABDC's Supplier/vendor number information is incorrect.

      11.      ABDC will reasonably assist the Walgreen's accounting group by providing Supplier contact information when requested by Walgreen.

      12.      Walgreen will provide up-to-date information on returned Product that ABDC will utilize through Walgreen's Vendor Website or otherwise, including information with regards to invoice history, open activity, and the status of correspondence.  In addition, all correspondence shall be sent (a) to Walgreen's designee for handling, (b) to ABDC's Return Credit Coordinator, or (c) as a party otherwise directs.

      13.      Except as otherwise agreed, Walgreen may only take deductions for Product returned to a Supplier pursuant to this <u>Exhibit 11</u> and, specifically, may take deductions against a Supplier through ABDC.  Delays by Walgreen in repaying deductions, including Interim Deductions, or providing information have a significant adverse impact on ABDC's relationships with Suppliers.

HIGHLY CONFIDENTIAL          WAGMDL00000485

**CONFIDENTIAL**

**EXHIBIT 12**
**AGREEMENT FOR ASSIGNMENT OF CLAIMS**

THIS AGREEMENT is entered into this _____ day of _____, 20__ by and between Walgreen Co. ("Walgreen") and AmerisourceBergen Drug Corporation ("ABDC").

A.    Walgreen purchases substantial quantities of pharmaceutical products from ABDC for resale to the public pursuant to the Purchase Agreement dated March _, 2013, between Walgreen and ABDC; including *[Branded Product Name]*, a brand-name drug manufactured and marketed by ____*[Name of Manufacturer__]* ("Manufacturer"), and other goods from ABDC;

B.    Walgreen purchases such products from ABDC on a cost-plus basis (i.e., at a price equal to ABDC's cost plus or minus a specified percentage);

C.    Walgreen has or may commence a civil antitrust action ("Direct Purchaser Claims") against Manufacturer to seek to recover damages incurred by purchasers of *[Branded Product Name]*, a brand-name drug manufactured and marketed by Manufacturer; and

D.    ABDC has not brought suit and does not anticipate bringing suit to recover Direct Purchaser Claims from overcharges on *[Branded Product Name]* resold to Walgreen (but has or may do so for claims other than those described herein).

NOW, THEREFORE, in consideration of the mutual covenants contained in this agreement, and for other consideration the parties agree as follows:

1.    ABDC hereby conveys, assigns and transfers to Walgreen all of its rights, title and interest in and to all Direct Purchaser Claims it may have against Manufacturer under the laws of the United States or of any State arising out of or relating to ABDC's purchase of *[Branded Product Name]* which was subsequently resold to Walgreen during the period from (Month/Date/Year) to present, and which relate to those Direct Purchaser Claims alleged against Manufacturer in the litigation referenced in C, above.

2.    Walgreen agrees to indemnify ABDC and hold it harmless from any claims or causes of action asserted against ABDC arising out of or relating to this Agreement for Assignment or any assignment provided for in this Agreement for Assignment, including any costs and attorneys' fees reasonably incurred in defense of such claims or causes of action, and shall also include all costs and attorneys' fees reasonably incurred by ABDC in connection with any action in which such assigned claims are asserted by Walgreen. ABDC shall notify Walgreen promptly in writing upon the assertion of any such claim or upon learning that it will be required to incur any such costs or attorneys' fees. Walgreen further agrees that such costs and attorneys' fee shall be reimbursed promptly (within 45 days) following presentment of any invoice by ABDC.

3.    Walgreen agrees that it will use its best efforts to coordinate with all other parties all discovery in any action brought on the Direct Purchaser Claims assigned in this agreement so as to minimize any costs disruption to ABDC's business and operations.

4.    Walgreen agrees that it will not assign or otherwise transfer any Direct Purchaser Claims or causes of action assigned to it through this agreement without the prior written consent of ABDC, which consent shall be entirely within the discretion of ABDC.

Executed on the date stated above.

**WALGREEN CO.**                                          **AMERISOURCEBERGEN DRUG CORPORATION**

By:_____      By:_____
Name:_____      Name:_____
Title:_____      Title:_____

*{FORM OF AGREEMENT – NOT FOR SIGNATURE}*

Purchase Agmt (Final 031813)                              69

CONFIDENTIAL

# EXHIBIT 13
## INSURANCE COVERAGE REQUIREMENTS

1. <u>Workers' Compensation</u>. Each party will maintain Workers' Compensation and Employer's Liability insurance.

| | |
|---|---|
| Minimum Required Limits: | ■ Workers' Compensation – Statutory Limits<br>■ Employer's liability:<br>- $1,000,000 Each Accident for Bodily Injury by Accident<br>- $1,000,000 Each Employee for Bodily Injury by Disease<br>- $1,000,000 Aggregate Policy Limit for Bodily Injury Disease |
| Required Terms and Conditions: | ■ NCCI Workers' Compensation and Employers Liability Insurance Policy form |

2. <u>Commercial General Liability</u>. Each party will maintain Commercial General Liability insurance covering all its operations and those on its behalf on an occurrence basis (if commercially available) against claims for product liability bodily injury, property damage (including the loss of use thereof), completed operations, personal injury and advertising injury. Such insurance will have the following minimum limits, terms and conditions:

| | |
|---|---|
| Minimum Required Limits: | ■ $2,000,000 General Aggregate<br>■ $2,000,000 Products and Completed Operations Aggregate<br>■ $1,000,000 Each Occurrence for Bodily Injury/Property Damage<br>■ $1,000,000 Each Person/Organization for Personal injury and Advertising injury<br>(Limits may be a combination of Primary and Umbrella/Excess policies) |
| Required Terms and Conditions: | ■ ISO Commercial General Liability Policy (Occurrence Form)<br>■ Products and Completed Operations coverage maintained for at least three (3) years after contract termination<br>■ Blanket Contractual Liability (included in ISO form)<br>■ Separation of Insureds (included in ISO form)<br>■ Personal Injury and Advertising Injury (included in ISO form)<br>■ Walgreen Co. and its subsidiaries included as Additional Insureds under ABDC's policies<br>■ AmerisourceBergen Corporation and its subsidiaries included as Additional Insured under Walgreen Co.'s policies<br>■ Waiver of Subrogation |

3. <u>Automobile Liability</u>. Each party will maintain Business Auto Liability covering liability arising out of any auto (including owned, non-owned and hired autos).

| | |
|---|---|
| Minimum Required Limits: | ■ $1,000,000 Combined Single Limit Each Accident<br>(Limit may be a combination of Primary and Umbrella policies) |
| Required Terms and Conditions: | ■ ISO Business Auto Policy or Equivalent<br>■ Waiver of Subrogation |

4. <u>Umbrella/Excess Liability</u>. Each party will maintain Umbrella/Excess Liability insurance on an occurrence basis (if commercially available) in excess of the underlying insurance described above.  It will be as broad as each of the underlying policies.  The amounts of insurance required by this Paragraph 4 may be satisfied by a party purchasing coverage for the limits specified, or by any combination of underlying and umbrella limits, so long as the total amount of insurance is not less than the limits specified in Paragraphs 1, 2 and 3 when added to the limit specified in this Paragraph 4.

| | |
|---|---|
| Minimum Required Limit: | $50,000,000 per Occurrence & $50,000,000 Aggregate |
| Required Terms and Conditions: | ■ Must include full coverage for Products Liability<br>■ Occurrence Form if commercially available<br>■ Concurrency of effective dates with primary<br>(or non-concurrency endorsement)<br>■ "Pay on Behalf of" wording<br>■ Broad as Primary Additional Insured<br>■ Broad as Primary Contractual Liability<br>■ Punitive Damages Coverage (where not prohibited by law) |

CONFIDENTIAL

## EXHIBIT 14
### CERTIFICATION AND REPRESENTATION AGREEMENT
### BY HOSPITAL AND HEALTH CARE ENTITIES
### TO AMERISOURCEBERGEN DRUG CORPORATION

In order for AmerisourceBergen Drug Corporation and its affiliates ("ABC") to accept the return of prescription drug products ("Products'"), the undersigned ("Customer") hereby, now and during the term of this Certification and Representation Agreement, represents and warrants to ABC that, with respect to all Products to be returned to ABC for credit on and after the date of this Certification and Representation Agreement:

1.  The credit amount claimed by Customer and indicated on the credit memorandum or transmitted electronically to ABC, is no greater than the actual net acquisition price paid by the Customer for each such Product;

2.  Customer will file any report legally required that must be provided to the Product's manufacturer, notifying such manufacturer of the return of the Product to ABC;

3.  Until Products are received by ABC, all Products have been properly stored, handled and shipped; and

4.  Customer will only return Product that was originally purchased from ABC unless stipulated when returned.

This Certification and Representation Agreement applies to Product returned by Customer from its facilities, including retail pharmacies, warehouses, specialty pharmacies, mail order pharmacies, clinic pharmacies, long-term care pharmacies, and other facilities, including those providing respiratory therapy services, home infusion and home health care and durable medical equipment, and including new and additional facilities owned or operated by Customer from time to time during the term of this Certification and Representation Agreement.

Customer will implement standard operating procedures in order that all Products returned to ABC comply with each representation and covenant in this Certification and Representation Agreement and Customer will, from time to time, audit and review such procedures to verify that all Products returned to ABC comply with each such representation and covenant.

The term of this Certification and Representation Agreement will continue through the term of each current wholesale distribution agreement between ABC and Customer, including any renewal or replacement thereof.  No waiver or modification of this Certification and Representation Agreement, or any part thereof, will be effective unless agreed to and accepted in writing and signed by both parties.

Customer:  WALGREEN CO.

Customer Signature: _____
Name: _____
Title: _____
Date: _____

Servicing ABC Distribution Centers: _____
Distribution Center Representative: _____
Date: _____

HIGHLY CONFIDENTIAL                                                                           WAGMDL00000488

**CONFIDENTIAL**

## EXHIBIT 15
### ABDC IDENTIFIED PERSONS

1.  A.S. Watson & Co. / Superdrug

2.  Actavis

3.  Aetna Inc.

4.  Cardinal Health, Inc.

5.  Carrefour S.A.

6.  Casino S.A.

7.  Celesio AG / Lloyd's Pharmacy

8.  China Resources

9.  Cigna Corporation

10. CVS Caremark Corp.

11. Dairy Farm Ltd

12. DHL

13. Express Scripts, Inc. (including CuraScript, Inc., Matrix GPO, LLC, Medco Health Solutions, Inc. and Priority Healthcare Corporation)

14. FedEx

15. H.D. Smith (including H.D. Smith Specialty Solutions)

16. Humana Inc.

17. J. Sainsbury PLC

18. Jointown

19. McKesson Corporation

20. Merck & Co.

21. Mylan

22. Novartis

23. NOWEDA eG Apothekergenossenschaft

24. PHOENIX Pharmahandel GmbH & Co. KG / Rowland's

25. Rite Aid Corp.

26. Safeway Inc.

27. Shanghai Pharma

28. Supervalu Inc.

29. Sinopharm

30. Target

HIGHLY CONFIDENTIAL                                                              WAGMDL00000489

**CONFIDENTIAL**

31. Tesco PLC

32. Teva

33. UPS

34. Wal-Mart Stores Inc.

35. WellPoint, Inc.

36. Wm. Morrison Supermarkets Co-Operative Group ltd

37. Zuellig Pharma

HIGHLY CONFIDENTIAL                                                WAGMDL00000490

P-WAG-7014

**CONFIDENTIAL**

## EXHIBIT 16
## PERMITTED SUPPLIERS

Actavis
Amgen
Axcan
Baxter
Biogen
BI
Cephalon
Endo
Genentech
GSK
Medicis
Merck
Pfizer
Purdue
Sanofi Aventis
Sunovion
Shire
Takeda
Viropharma
Gilead/Gilead BMS
Lilly
Novartis Alcon
Serono
Novartis Unit

HIGHLY CONFIDENTIAL                                                              WAGMDL00000491

**CONFIDENTIAL**

### EXHIBIT 17
### WALGREEN IDENTIFIED PERSONS

1. McKesson Corporation
2. Cardinal Health, Inc.
3. CVS Caremark Corporation

HIGHLY CONFIDENTIAL                                         WAGMDL00000492