PSJ11 CVS Opp Exh 16

Highly Confidential - Subject to Further Confidentiality Review

```
  1               IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF OHIO
  2                         EASTERN DIVISION
  3

      --------------------------    )
  4   IN RE: NATIONAL               ) MDL No. 2804
      PRESCRIPTION OPIATE           )
  5   LITIGATION                    ) Case No.
      --------------------------    ) 1:17-MD-2804
  6                                 )
      THIS DOCUMENT RELATES TO      ) Hon. Dan A. Polster
  7   ALL CASES                     )
      --------------------------    )
  8
  9                   HIGHLY CONFIDENTIAL
 10         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 11
 12                  VIDEOTAPED DEPOSITION OF
 13                        MARK NICASTRO
 14                       December 6, 2018
 15
 16                    Indianapolis, Indiana
 17
 18
 19
 20
 21
 22             GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
 23                     deps@golkow.com
 24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   November 14th.  I hadn't -- I hadn't met Mr. Gillen
 2   before he came in for our audit in August.
 3        Q.   And if you turn to the attachment, among
 4   the attachments to the letter is a list of the stop
 5   orders and the reports to the DEA.  This is on 417,
 6   correct?
 7        A.   Yes.
 8        Q.   Okay.  And this is what you sent to
 9   Agent Gillen in response to his request for a list
10   of all of the stop orders that CVS had made and
11   reports that it had made to the DEA, correct?
12        MR. HYNES:  Objection to form.
13   BY THE WITNESS:
14        A.   That's correct.
15   BY MR. ELSNER:
16        Q.   Okay.  And it lists seven suspicious
17   orders that were stopped, right?
18        A.   Yes, there are seven orders on this
19   document.
20        Q.   The following day, Agent Gillen writes a
21   letter to you.  This is Exhibit 43.
22                 (WHEREUPON, a certain document was
23                  marked as CVS-Nicastro-043:
24                  11/25/13 e-mail string;
```

Highly Confidential - Subject to Further Confidentiality Review

 1                     CVS-MDLT1-000000421 - 000000422.)

 2    BY MR. ELSNER:

 3         Q.    And he -- he sends an e-mail to you and

 4    he thanks you for your responses.

 5               Actually, let me have you turn to

 6    page 422.  The e-mail is on the very bottom of 421.

 7    It's an e-mail he sends November 22, 2013.

 8         MR. HYNES:  Starts at the bottom.

 9         MR. ELSNER:  Starts at the bottom of the first

10    page.

11         MR. HYNES:  And goes over.

12         THE WITNESS:  Okay.

13    BY MR. ELSNER:

14         Q.    And then it says --

15         MR. ELSNER:  It's actually a little bit lower,

16    Gina.  It's at the bottom of that.  Am I right

17    about that?  On 421.

18         MR. HYNES:  We got it.  We're good.

19    BY MR. ELSNER:

20         Q.    And then on the 422 he asks, "We were

21    under the impression that sales of controlled

22    substances from your DC location in Indianapolis

23    were for approximately six states in the region but

24    you provided a list of four pharmacies that CVS had

1    stopped shipments to in 2012 and 2013 for

2    California, Texas and Hawaii.  Could you please

3    confirm that these shipments originated from your

4    CVS DC location.  Also by 'stopped' does that mean

5    that no further orders were filled at these

6    pharmacies for controlled substances?  Appreciate

7    the clarification."

8            Did I read that right?

9    A.    You did.

10    Q.    Okay.  And that's what Agent Gillen

11    wrote to you after he received your letter,

12    correct?

13    A.    Correct.

14    Q.    And then you responded to that on

15    November 25, which is on page 421, and you write to

16    him in the second line, "No, those shipments did

17    not originate from the Indianapolis distribution

18    center."  And then you write, "Our SOM algorithms

19    are the same algorithms for all the distributions

20    in the CVS chain."

21            Is that what you wrote?

22    A.    It is.

23    Q.    Okay.  And, so, this attachment that we

24    were looking at of these seven stopped orders are

Highly Confidential - Subject to Further Confidentiality Review

1 seven stopped orders not from the Indianapolis
2 distribution center, correct?
3     A.    Correct.
4     Q.    These were all of the stopped orders for
5 all CVS distribution centers across the entire
6 country, right?
7     MR. HYNES:  Objection to form.
8 BY THE WITNESS:
9     A.    Yes.
10 BY MR. ELSNER:
11     Q.    Okay.  And you understood that it was
12 CVS' obligation to have a system in place to report
13 any and all suspicious orders to the DEA, is that
14 right?
15     A.    Yes.
16     Q.    And you had that responsibility at least
17 in 2006 when you received the Rannazzisi letter,
18 when CVS did?
19     A.    I don't recall receiving that letter.
20     Q.    But do you understand that CVS had that
21 responsibility from at least that point in time?
22     MR. HYNES:  Objection to form.
23 BY THE WITNESS:
24     A.    No.  I was not -- I was not aware of

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MR. HYNES:  Objection.  Time frame.
 2   BY MR. ELSNER:
 3       Q.   From 2008 through 2014?
 4          MR. HYNES:  Objection; asked and answered.
 5   BY THE WITNESS:
 6       A.   I'm not sure if it's -- it's whatever --
 7   we -- Indianapolis did it from the date until
 8   Chemung, New York took over pharmacy
 9   responsibilities for Somerset.  So, that was, as I
10   mentioned, somewhere 2011, '12, '13, somewhere in
11   that time frame.  I just don't have the date in my
12   head.
13   BY MR. ELSNER:
14       Q.   But there were no suspicious orders
15   reported for sales of hydrocodone or other
16   controlled substances into stores in Ohio, is that
17   right?
18          MR. HYNES:  Objection to form.
19   BY THE WITNESS:
20       A.   That -- yes.
21          MR. ELSNER:  Let's see Exhibit 44.
22                  (WHEREUPON, a certain document was
23                   marked as CVS-Nicastro-044:
24                   11/25/13 e-mail;
```

1  going into that state for some reason, we'd be
2  meeting the requirements.
3  BY MR. ELSNER:
4      Q.   And you understand that all of these
5  rules are minimum standards.  You could always do
6  more than the minimum standard or the minimum rule
7  for your own procedures and policies, correct?
8      A.   Yes.
9      MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11     A.   Yes.
12 BY MR. ELSNER:
13     Q.   Okay.  And even though New York had
14 rescheduled hydrocodone combination projects --
15 products to a Schedule II in August of 2012, CVS
16 nevertheless continued to distribute hydrocodone
17 combination products in states that had not
18 rescheduled that drug to Schedule II like Ohio,
19 correct?
20     A.   That would not be my decision to make.
21     Q.   But that's what happened, right?
22     A.   We continued to ship from Indianapolis,
23 yes.
24     Q.   The -- if we go back to Exhibit 46, the

1  very last -- if we go to the second, sort of the

2  last phrase there starting with "Dan said."

3           And when Agent Gillen heard that CVS was

4  no longer going to distribute hydrocodone, he said

5  that the DEA's main concern with the SOM was

6  hydrocodone.  Is that right?

7      A.   Yes.

8      Q.   Okay.  And then you wrote, "He didn't

9  come right out and say it, but it was picked up by

10 everyone in the room that he was establishing a

11 reason not to escalate this," DEA investigation,

12 "past a letter of admonishment based on that

13 rescheduling."  Correct?

14      MR. HYNES:  Objection to form.  I don't think

15 that's exactly what it says.  You may answer.

16 BY THE WITNESS:

17      A.   Yeah, it was my opinion that he was --

18 because hydrocodone is going to be going to a

19 Schedule II, that there would be no reason to do

20 anything more than a letter of admonishment.  That

21 hadn't been determined at that point.

22 BY MR. ELSNER:

23      Q.   On the following page, you write in the

24 very last sentence, "I'm pretty sure this is a

1    feeling out meeting to see if we were prepared to

2    defend ourselves and Betsy made that crystal

3    clear."

4            Is that right?

5       A.    Correct.

6       Q.    Meaning that she told Agent Gillen that

7    if he proceeds past a letter of admonishment that

8    she was going to request a meeting with his boss

9    and CVS would fight the DEA in court like Walgreens

10   did, correct?

11       MR. HYNES:  Objection to form.

12   BY THE WITNESS:

13       A.    Yeah, this was -- this was my opinion,

14   that -- because the reason for the meeting, it was

15   still to meet with his boss to discuss what they

16   wanted to do, and in my opinion there was really no

17   reason that we had the meeting that week other than

18   maybe for some feeling out of what was -- what

19   would be our position.

20   BY MR. ELSNER:

21       Q.    I'm going to show you Exhibit 53.

22            (WHEREUPON, a certain document was

23              marked as CVS-Nicastro-053:

24              12/31/15 letter from U.S. DOJ DEA

Highly Confidential - Subject to Further Confidentiality Review

1                    to CVS Indiana; CVS-MDLT1-000008014

2                    - 000008015.)

3     BY MR. ELSNER:

4         Q.    This is a letter from Daniel Gillen from

5     the DEA, is that right?

6         A.    Yes.

7         Q.    The signature line?

8         A.    Yes.

9         Q.    And the date of this letter is

10    December 31, 2015, correct?  It's next to his

11    signature.

12        A.    Oh.  Yes.

13        Q.    And this is after the hydrocodone

14    products had been rescheduled, correct?

15        A.    Correct.

16        Q.    So, the DEA left this investigation open

17    from July of 2013 until this final letter in

18    December of 2015, is that right?

19        MR. HYNES:  Objection to form.

20    BY THE WITNESS:

21        A.    That's correct.

22    BY MR. ELSNER:

23        Q.    And Agent Gillen found and the DEA found

24    that as a result of the investigation that there

Highly Confidential - Subject to Further Confidentiality Review

1 was a violation of the Controlled Substances Act.

2 Do you see that at the end of the first

3 paragraph?

4     A. Yes.

5     Q. Okay. And you're aware, are you not,

6 that he found and the DEA determined that there was

7 a "Failure to design and maintain a system to

8 detect suspicious and report suspicious orders for

9 Schedule III to V controlled substances" as

10 required under the Controlled Substances Act,

11 correct?

12     A. Correct.

13     Q. And -- okay.

14     MR. ELSNER: At this time I'm going to go off

15 the record.

16     THE VIDEOGRAPHER: We are going off the record

17 at 4:17.

18     (WHEREUPON, a recess was had

19     from 4:17 to 4:22 p.m.)

20     THE VIDEOGRAPHER: We're back on the record at

21 4:22.

22     EXAMINATION

23 BY MR. DeROCHE:

24     Q. Good afternoon, Mr. Nicastro. My name