PSJ11 CVS Opp Exh 23

# Alabama:

Moffatt Tr. at 204:24-207:11

CVS-MDLT1-00060812-60821

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

      **************************

 4

      IN RE:  NATIONAL          MDL No. 2804

 5    PRESCRIPTION OPIATE

      LITIGATION                Case No.

 6                              1:17-MD-2804

      **************************

 7

      THIS DOCUMENT RELATES TO    Hon. Dan A. Polster

 8    ALL CASES

 9    **************************

10

11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12               CONFIDENTIALITY REVIEW

13        VIDEOTAPED DEPOSITION OF THOMAS S. MOFFATT

14

15            Tuesday, January 15th, 2019

16                   8:04 a.m.

17

18        Held At:

19              Omni Hotel

20              One West Exchange Street

21              Providence, Rhode Island

22

23    REPORTED BY:

24    Maureen O'Connor Pollard, RMR, CLR, CSR
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ELSNER:

2        Q.   Okay.  But CVS agreed to it and they

3    signed -- Betsy Ferguson on behalf of CVS

4    Pharmacy, Inc. executed the settlement agreement

5    in February of 2016, correct?

6        A.   Yes.

7             MR. DELINSKY:  Could we take a quick

8    five minutes?

9             MR. ELSNER:  Sure.  Absolutely.

10            THE VIDEOGRAPHER:  We're going off the

11   record at 12:16 p.m.

12            (Whereupon, a recess was taken.)

13            THE VIDEOGRAPHER:  We're back on the

14   record at 12:24 p.m.

15   BY MR. ELSNER:

16       Q.   Mr. Moffatt, were you a secretary or

17   president of any of the pharmacies in Maryland

18   that were subject of the DEA investigation and

19   CVS settlement with the DEA?

20            MR. DELINSKY:  Object to form.

21       A.   I was president of the entity that

22   operated those pharmacies, yes.

23   BY MR. ELSNER:

24       Q.   Were you aware that the DEA also

1   conducted an investigation of certain CVS

2   pharmacies in Alabama?

3               MR. DELINSKY:  Object to form.

4       A.   Others at CVS are responsible for all

5   of those sort of matters, so I don't recall

6   specifically information about Alabama.

7   BY MR. ELSNER:

8       Q.   Let me show you Moffatt Exhibit 17,

9   which is a settlement agreement between CVS and

10  the DEA related to entities in Alabama.

11              (Whereupon, CVS-Moffatt-17 was marked

12              for identification.)

13  BY MR. ELSNER:

14      Q.   If I could -- the DEA was

15  investigating certain pharmacies in Alabama,

16  particularly in Calera, Alabama, for certain

17  recordkeeping and reporting violations of

18  controlled substances, regulations in place to

19  guard against theft and diversion.  This is

20  paragraph F on Page 2.  Do you see where I'm at?

21      A.   Yes.

22              MR. DELINSKY:  Objection.

23      A.   I see paragraph F.

24  BY MR. ELSNER:

1    Q.   And then in paragraph G on Page 2 that

2    as a result of the DEA's investigation and its

3    inspection of this CVS store in Calera, Alabama,

4    that the United States contends that on or

5    before the effective date of the agreement CVS

6    Calera violated the CSA, the Controlled

7    Substances Act, and then it lists three

8    violations that the DEA believed exists, is that

9    correct?

10        MR. DELINSKY:  Object to form.

11    A.   I was not involved in the preparation

12    of this, but that is what Paragraph G says.

13   BY MR. ELSNER:

14    Q.   On Page 3 of the agreement under

15   "Terms and Conditions," CVS agreed to pay a

16   $1 million sum in settlement of this contention

17   and these alleged violations, is that right?

18        MR. DELINSKY:  Object to form.

19    A.   I wasn't involved in this settlement

20   or anything, but it appears that that's what

21   Paragraph 1 on Page 3 says.

22   BY MR. ELSNER:

23    Q.   Okay.  And on Page 8 of the agreement,

24   CVS Pharmacy, Inc. agreed to the settlement

1    terms in July of 2018, is that right?

2        A.    What page were you on?

3        Q.    Page 8, the very last page of the

4    agreement.

5        A.    Yes, yes, signed in July.

6        Q.    Signed by Betsy Ferguson again, is

7    that right?

8        A.    And John Gilbert, our outside

9    attorney.

10       Q.    Okay.

11       A.    Who is at Hyman, Phelps.

12       Q.    Another question.

13             Were you the president or secretary or

14   treasurer or officer of this Alabama CVS store?

15             MR. DELINSKY:   Object to form.

16       A.    I believe I was president of the

17   entity that operated the Alabama CVS pharmacies.

18   BY MR. ELSNER:

19       Q.    And what entity is that?

20       A.    CVS Alabama, LLC, I believe.

21       Q.    What was the entity in Maryland that

22   you were the president of that was related to

23   the CVS stores under investigation there by the

24   DEA?

## SETTLEMENT AGREEMENT

### I. PARTIES

This Settlement Agreement ("Agreement") is made and entered into by and between (i) the United States, acting through the United States Attorney's Office for the Northern District of Alabama, on behalf of the Drug Enforcement Administration ("DEA") (collectively, the "United States"); and (ii) CVS Pharmacy, Inc. and all of its relevant subsidiaries and affiliates (collectively "CVS"). The United States and CVS are collectively referred to herein as "the Parties," and each is individually referred to as a "Party."

### II.    RECITALS

A.    CVS Pharmacy, Inc. is a Rhode Island corporation with its corporate headquarters in Woonsocket, Rhode Island. CVS, through its CVS Pharmacy division, directly or indirectly, operates retail pharmacies in the Northern District of Alabama that dispense prescription drugs, including controlled substances, to retail consumers.

B.    Each CVS Pharmacy retail store in the Northern District of Alabama is separately registered with DEA and is assigned a unique DEA registration number that authorizes it to dispense controlled substances pursuant to the provisions of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* and its implementing regulations, 21 C.F.R. §§ 1300 *et seq.* (the "Act" or the "CSA"). The CVS pharmacy retail stores located in the Northern District of Alabama will be referred to collectively hereinafter as "NDAL CVS Pharmacy Retail Stores."

C.    CVS acknowledges that all of its DEA-registered NDAL CVS Pharmacy Retail Stores were and are required to comply with the CSA and the regulations promulgated thereunder.

D.    The DEA is the Department of Justice component agency primarily responsible for enforcing the Act and is vested with the responsibility of investigating violations of the Act.

*NDAL CVS Settlement Agreement*

1

HIGHLY CONFIDENTIAL                                                          CVS-MDLT1-000060812

E.      The United States Attorney General, through the United States Attorney's Office, has primary authority to bring civil actions to enforce the Act. *See* 21 U.S.C. § 871 and 28 C.F.R. § 0.55(c).

F.      In November 2013, the United States conducted an inspection at the CVS Pharmacy located in Calera, Alabama ("CVS Calera") to investigate its compliance with the CSA, specifically investigating the recordkeeping, reporting, procedures to guard against theft and diversion, and certain dispensing practices.

G.      As a result of the November 2013 inspection at CVS Calera, the United States contends that, on or before the Effective Date of this Agreement, CVS Calera violated the CSA, including without limitation by violating the following regulations prior to the November 2013 inspection:

- 21 C.F.R. § 1305.13(e) (requirement to record the amount received and/or the date received on DEA 222 forms);

- 21 C.F.R. § 1304.21(a) (requirement to maintain complete and accurate records);

- 21 C.F.R. §§ 1304.21(a) and/or (d) (requirement to document the number of packages received or the date package received on Schedule III through V purchase invoices).

The United States also contends that there are or may be violations of the CSA's recordkeeping provisions on or before the Effective Date of the Agreement at other NDAL CVS Pharmacy Retail Stores not mentioned specifically above. The United States' claims and allegations as set forth above in this Paragraph G shall hereinafter be referred to as the "Covered Conduct." The Covered Conduct applies only to stores located in the Northern District of Alabama.

H.      At all times relevant, the CSA authorized a civil penalty of up to $25,000 per violation of § 842(a) and up to $10,000 for violations of § 842(a)(5) and (a)(10). *See* 21 U.S.C. § 842(c)(1)(B).

2

*NDAL CVS Settlement Agreement*

HIGHLY CONFIDENTIAL                                    CVS-MDLT1-000060813

I.       This Agreement is neither an admission of liability by CVS nor a concession by the United States that its claims are not well founded.

J.       CVS contends that any alleged recordkeeping violations did not arise from or cause the diversion of controlled substances and the United States does not contend to the contrary.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## III.       TERMS AND CONDITIONS

1.       In consideration of the obligations of the Parties set forth in this Settlement Agreement, CVS shall pay to the United States the total sum of one million dollars ($1,000,000.00) ("Settlement Amount") within fourteen (14) days after the Effective Date of this Agreement, as defined in Paragraph 21 below. Payment shall be made by electronic funds transfer pursuant to written instructions to be provided by the Office of the United States Attorney for the Northern District of Alabama. If the payment is not timely received, CVS shall also pay the United States interest on the Settlement Amount at a rate of 10% per annum compounded daily from fifteen (15) days after the Effective Date of this Agreement through the date full payment is received.

2.       Subject to the exceptions in Paragraph 3 below (concerning excluded claims), and conditioned upon CVS's full payment of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) hereby fully and finally releases CVS and its current and former parent corporations, direct and indirect subsidiaries, brother or sister corporations, divisions, current or former corporate owners, and the corporate successors and assigns of any of them, from any civil or administrative claims the United States has for the Covered Conduct, which includes filing any action for civil penalties for violations of 21 U.S.C.

*NDAL CVS Settlement Agreement*

3

HIGHLY CONFIDENTIAL                                                                                          CVS-MDLT1-000060814

§ 842(a) at CVS Calera based on, arising from, or related to the Covered Conduct and any action for recordkeeping violations of Title 21 (21 U.S.C. §§ 842(a)(5), 842(a)(10)) at any NDAL CVS Pharmacy Retail Stores which occurred prior to the Effective Date of this Agreement.

3.    Notwithstanding any term of this Agreement, the following claims of the United States are specifically reserved and are not released:

a.    Any civil, criminal, or administrative liability arising under Title 26, United States Code (Internal Revenue Code);

b.    Any criminal liability;

c.    Except as explicitly stated in this Agreement, any administrative liability, including the suspension and debarment rights of any federal agency;

d.    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.    Any liability based on obligations created by this Agreement; and

f.    Any liability of individuals.

4.    CVS waives and shall not assert any defenses CVS may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

5.    CVS fully and finally releases the United States, its agencies, officers, attorneys,

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060815

employees, servants, and agents, from any claims (including attorneys' fees, costs and expenses of every kind and however denominated) that CVS has asserted, could have asserted, or may assert against the United States, its agencies, officers, attorneys, employees, servants, and agents related to the investigation, litigation and settlement of its claims concerning the Covered Conduct.

6. Except as otherwise stated herein, each Party to this Agreement shall bear its own costs, attorneys' fees, and other expenses incurred in any manner in connection with the investigation, litigation, and resolution of this matter, including the preparation and performance of this Agreement.

7. CVS agrees that any and all costs it has or will incur in connection with this matter, including payment of the Settlement Amount, attorneys' fees, costs of investigation, negotiation, and any remedial actions to be taken before or following the Effective Date of this Agreement, shall be unallowable costs for government contract accounting and for Medicare, Medicaid, TRICARE, and FEHBP reimbursement purposes.

8. This Agreement binds and is intended to benefit only the Parties. The Parties do not release any claims against any other person or entity not expressly released by this Agreement. This Agreement is specifically limited to the Office of the United States Attorney for the Northern District of Alabama.

9. This Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

10. Each Party warrants that it has been represented by, and has sought and obtained the advice of, independent legal counsel with regard to the nature, purpose, and effect of this Agreement. The Agreement was negotiated by the Parties and their respective counsel, each of whom had the opportunity to participate in the drafting thereof. The Parties hereby declare that the

*NDAL CVS Settlement Agreement*

5

**CVS-MDLT1-000060816**

terms of this Agreement have been completely read, fully understood, and voluntarily accepted following opportunity for review by legal counsel of their choice.

11. Each of the Parties warrants and represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion whatsoever, after having been apprised of relevant information and data by its legal counsel. Each of the Parties further warrants and represents that no other Party or its representative has made any promise, representation or warranty, express or implied, except as expressly set forth in this Agreement, and that no Party has relied on any inducements, promises, or representations made by any Party to this Agreement, or its representatives, or any other person, except as expressly set forth herein.

12. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties listed below.

13. For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement. The words of this Agreement shall not, therefore, be construed against any Party for that reason in any subsequent dispute, but shall be construed so as to effect their fair meaning.

14. The Parties consent to the disclosure of this Agreement, and of information about this Agreement, to the public.

15. This Agreement constitutes the complete agreement between the Parties, and supersedes and replaces any prior negotiations and agreements, whether written or oral, regarding the resolution of the claims between the Parties with respect to the subject matter hereof.

16. This Agreement may not be altered, amended, or modified, except by a writing duly executed by authorized representatives of all Parties.

17. This Agreement may be executed in counterparts, including by facsimile, PDF, or

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060817**

other electronic form of signature, each of which constitutes an original and all of which constitute one and the same Agreement.

18.     This Agreement is governed by the laws of the United States. The Parties agree that, should any judicial action be required to enforce or interpret this Agreement, or to resolve any dispute hereunder, the exclusive jurisdiction and venue for such action shall be in the United States District Court for the Northern District of Alabama.

19.     This Agreement is effective, final, and binding as of the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). The United States agrees to notify CVS promptly when the final signatory has executed this Agreement.

*NDAL CVS Settlement Agreement*

7

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060818**

## THE UNITED STATES OF AMERICA

Dated: 7/18/18

By: _____
John D. Saxon, Jr.
Assistant U.S. Attorney
Northern District of Alabama

Dated: 7/18/18

By: _____
Nikara McNeely
~~Diversion Investigator~~ Group Supervisor nm
Birmingham District Office
Drug Enforcement Administration

## CVS PHARMACY, INC.

Dated:_____

By: _____
Elizabeth Ferguson
Senior Vice President and Deputy General Counsel
CVS Pharmacy, Inc.

**Approved as to form and content:**

Dated:_____

By: _____
John A. Gilbert, Jr., Esq., OR
Karla L. Palmer, Esq.
HYMAN PHELPS & MCNAMARA, P.C.
Counsel for CVS Pharmacy, Inc.

*NDAL CVS Settlement Agreement*

8

**HIGHLY CONFIDENTIAL**                                                            **CVS-MDLT1-000060819**

## THE UNITED STATES OF AMERICA

Dated:_____        By: _____
                                 John D. Saxon, Jr.
                                 Assistant U.S. Attorney
                                 Northern District of Alabama


Dated:_____        By: _____
                                 Nikara McNeely
                                 Diversion Investigator
                                 Birmingham District Office
                                 Drug Enforcement Administration


## CVS PHARMACY, INC.

Dated:_____        By: _____
                                 Elizabeth Ferguson
                                 Senior Vice President and Deputy General Counsel
                                 CVS Pharmacy, Inc.


**Approved as to form and content:**

Dated: July 29 2018              By: _____
                                 John A. Gilbert, Jr., Esq., OR
                                 Karla L. Palmer, Esq.
                                 HYMAN PHELPS & MCNAMARA, P.C.
                                 Counsel for CVS Pharmacy, Inc.


*NDAL CVS Settlement Agreement*

8

**HIGHLY CONFIDENTIAL**                              **CVS-MDLT1-000060820**

## THE UNITED STATES OF AMERICA

Dated: 7/18/18

By:
John D. Saxon, Jr.
Assistant U.S. Attorney
Northern District of Alabama

Dated: 7/18/18

By:
Nikata McNeely
~~Diversion Investigator~~ Group Superisor
Birmingham District Office
Drug Enforcement Administration

## CVS PHARMACY, INC.

Dated: 7/24/18

By: Elizabeth Ferguson
Elizabeth Ferguson
Senior Vice President and Deputy General Counsel
CVS Pharmacy, Inc.

Approved as to form and content:

Dated: _____

By: _____
John A. Gilbert, Jr., Esq., OR
Karla L. Palmer, Esq.
HYMAN PHELPS & MCNAMARA, P.C.
Counsel for CVS Pharmacy, Inc.

8

*NDAL CVS Settlement Agreement*

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060821**

California:

Moffatt Tr. at 222:22-231:8

CVS-MDLT1-00060856-60871

1    concerning these stores?

2            MR. DELINSKY:  Object to form.

3        A.   I was not involved in preparing any of

4    this or in the amount that was agreed upon.  To

5    the extent I knew about it, it was because of my

6    role as an attorney as opposed to because I'm

7    president of the store entity.

8    BY MR. ELSNER:

9        Q.   They wouldn't have informed you as

10   president of the store entity that a settlement

11   had been reached?

12           MR. DELINSKY:  Object to form.

13       A.   They informed me because I'm an

14   attorney.  I'm also president of the entity.  I

15   don't know if they would have informed somebody

16   else if somebody else was the president, but

17   they did inform me.

18   BY MR. ELSNER:

19       Q.   Okay.  And Betsy Ferguson executed

20   this document on August 5, 2015, Page 7 of 7?

21       A.   Yes, she did.  August 5th.

22       Q.   Were you aware that the DEA had

23   conducted investigations of CVS pharmacies in

24   California, in Nassau and Suffolk County, New

1    York, and also in -- related to the theft of

2    controlled substances and the failure to report

3    those thefts to the DEA promptly?

4         MR. DELINSKY:  Object to form.

5    A.    Others at CVS are involved in all of

6    the government investigations, so I may have

7    heard of those matters through my role as an

8    attorney, but other people were primarily

9    responsible for that sort of investigation and

10   the circumstances behind them.

11   BY MR. ELSNER:

12   Q.    Okay.  This is Motley Rice 226, which

13   is Exhibit 20 to your deposition.

14         (Whereupon, CVS-Moffatt-20 was marked

15         for identification.)

16   BY MR. ELSNER:

17   Q.    This is the settlement agreement

18   between CVS and the DEA related to its

19   investigation in California.

20         If you turn to paragraph F, which is

21   on Page 2 of the agreement, describes that the

22   DEA Sacramento field office, and U.S. Attorney's

23   Office for the Eastern District of California

24   conducted an investigation with respect to

```
 1    CVS/pharmacy retail stores and their compliance

 2    with the Controlled Substances Act, it reads

 3    "specifically investigating the recordkeeping,

 4    reporting, procedures to guard against theft and

 5    diversion, and certain dispensing practices

 6    of...CVS Pharmacy Retail Stores in the Eastern

 7    District of California."  Is that right?

 8              MR. DELINSKY:  Object to form.

 9       A.    I was not involved in preparing this,

10    but that appears to summarize paragraph F.

11    BY MR. ELSNER:

12       Q.    Okay.  Were you aware that the DEA was

13    concerned with thefts of controlled substances

14    across the country?

15       A.    Others at CVS are responsible for both

16    the investigation and for operations and

17    compliance with what would be involved in this

18    sort of activity.  I was not.

19       Q.    If you turn to paragraph J, which is

20    on Page 3, it reads that "CVS acknowledges that,

21    during the period" -- do you see where I'm at at

22    the bottom of Page 3, paragraph J?

23       A.    Yes.

24       Q.    "CVS acknowledges that, during the
```

1  period from April 30, 2011 through April 30,

2  2013, certain Eastern District of California CVS

3  Pharmacy Retail Stores failed to fulfill certain

4  recordkeeping obligations under the CSA in a

5  manner fully consistent with CVS's compliance

6  obligations."

7          Did I read that correctly?

8          MR. DELINSKY:  Object to form.

9      A.   You did read that sentence correctly,

10  but the next sentence starts with

11  "Notwithstanding," so I take it that's going to

12  say something different.

13  BY MR. ELSNER:

14      Q.   It might.

15          But were you aware that CVS

16  acknowledged during this period that those

17  recordkeeping violations existed?

18          MR. DELINSKY:  Object to form.

19      A.   It appears that we acknowledged it,

20  but we contend that a failure to fulfill those

21  recordkeeping obligations did not arise or did

22  not cause the diversion of controlled

23  substances.

24  BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Why did CVS admit that there were

 2   recordkeeping violations, but contend that those

 3   did not arise from or cause the diversion of

 4   controlled substances?

 5            MR. DELINSKY:  Object to the form of

 6   the question to the extent that would require --

 7   if you know the answer, if you possess

 8   responsive information, to the extent it would

 9   call you to divulge attorney/client privilege

10   information or work product, and I ask that you

11   not answer and instruct you accordingly.

12        A.   So I wasn't involved in the

13   investigation.  I don't know any particulars as

14   to why we would do that.  I could speculate, but

15   would not be advised to do so, I'm sure.

16   BY MR. ELSNER:

17        Q.   So the reason you read that sentence

18   was not because you had any personal information

19   about it?

20        A.   No, I just think it presents a fuller

21   picture.  And it also says the United States

22   does not contend to the contrary, so the United

23   States --

24        Q.   Did CVS --
```

 1      A.   -- wasn't forcing the issue either.

 2      Q.   Well, CVS did acknowledge that there

were recordkeeping violations related to thefts

of controlled substances in its California

stores, is that right?

 6           MR. DELINSKY:   Object to form.

 7      A.   I don't think it says anything related

to thefts.  It says "failed to fulfill certain

recordkeeping obligations."  I know that that

can sometimes be timing, you filed it a day

late, you gave the information but because it's

not filed within a certain time frame, I could

see where that might be something that they

would say, yet technically it's a recordkeeping

violation, but it's -- you know, it wouldn't

rise to the level of causing a diversion of

controlled substances.

18  BY MR. ELSNER:

19      Q.   If you look just above on Page 3 under

the various bullets, it states that "The United

States also contends that various EDCA CVS

Pharmacy Retail Stores failed to provide

effective controls and procedures to guard

against theft and diversion of controlled

Highly Confidential - Subject to Further Confidentiality Review

1   substances."

2          Did I read that correctly?

3      A.   That is the contention that's there,

4   yes.

5      Q.   So it relates to thefts of controlled

6   substances and the reporting obligations

7   consistent with that, is that right?

8          MR. DELINSKY:  Object to form.

9      A.   Again, I'm not involved in the

10  preparation of this, you know, some of the

11  things above that -- what you just read, failed

12  to record the amount or the date or to do order

13  forms, that sort of thing, and then it says

14  "United States also contends."  So what's in

15  paragraph J, I don't know that we're agreeing

16  that we -- that we notified -- I kind of got

17  lost there.

18          Our recordkeeping obligations, our

19  failure to fulfill recordkeeping obligations did

20  not arise from or cause diversion of controlled

21  substances.

22  BY MR. ELSNER:

23      Q.   CVS agreed to pay a $5 million fine in

24  resolution of this investigation by the DEA, is

Highly Confidential - Subject to Further Confidentiality Review

1    that right?

2         A.    That's what Paragraph 1 says on

3    Page 4.

4         Q.    And did you have a role as either

5    president or secretary or treasurer for the --

6              MR. DELINSKY:  I apologize.  I just

7    want to object to the form of the prior

8    question.

9    BY MR. ELSNER:

10        Q.    Did have you a role as either

11   president, secretary, or treasurer of any of the

12   CVS stores in the Eastern District of California

13   which were the subject of this settlement?

14             MR. DELINSKY:  Object to form.

15        A.    So not with respect to the store, with

16   respect to the entities I would have a role.

17   Depends on the time frame and what entity we're

18   talking about, but I would have had an officer

19   role with the store entities.  I was not

20   involved in the investigation or the settlement

21   or anything like that.

22   BY MR. ELSNER:

23        Q.    Were you the president of the

24   California entity?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    What time frame are we talking about?

2      Q.    Well, I think we can talk about two

3  time frames.  The agreement was executed in June

4  of 2017.

5      A.    So today I am president of -- we have

6  multiple store entities in California, and I'm

7  president of both of those.  It looks like the

8  entire time frame because it talks about on

9  Page 2 early 2012, so that would be when I

10  became president when my predecessor retired.

11      Q.    So as of May, 2012 through 2000 --

12  well, through today, you've served as the

13  president of the California entities over these

14  pharmacies, is that right?

15      A.    That's correct.

16      Q.    Okay.  And were you made aware as

17  president of the CVS entities in California, of

18  these CVS pharmacies, that a settlement had been

19  reached with the DEA?

20          MR. DELINSKY:  Object to form.

21      A.    Others at CVS were responsible for

22  operations and compliance and the people that --

23  they were informed, and I as an attorney would

24  be aware of it, but not -- I wasn't informed of

Highly Confidential - Subject to Further Confidentiality Review

1    something because I was president.

2    BY MR. ELSNER:

3        Q.    Do you know how many thefts occurred

4    at CVS Pharmacy stores in California of

5    controlled substances prior to and during this

6    period?

7        A.    Others are responsible for that sort

8    of information.  I don't have that information.

9        Q.    Do you know whether CVS had an issue

10   with respect to thefts of opioids, hydrocodone

11   products from its pharmacies across the country?

12            MR. DELINSKY:  Object to form.

13       A.    Others would be responsible for that

14   sort of information.  We have a loss prevention

15   area that would be involved in that, but it's

16   not my area.

17   BY MR. ELSNER:

18       Q.    So you have no idea whether there's

19   been an issue of thefts from CVS pharmacies for

20   controlled substances?

21            MR. DELINSKY:  Object to form.

22       A.    Except as being informed as an

23   attorney, I would not.

24   BY MR. ELSNER:

## SETTLEMENT AGREEMENT

### I. PARTIES

This Settlement Agreement ("Agreement") is made and entered into by and between (i) the United States, acting through the United States Attorney's Office for the Eastern District of California, on behalf of the Drug Enforcement Administration ("DEA") (collectively, the "United States"); and (ii) CVS Pharmacy, Inc. and all of its subsidiaries and affiliates that operate CVS Pharmacy retail stores in the Eastern District of California (collectively "CVS"). The United States and CVS are collectively referred to herein as "the Parties," and each is individually referred to as a "Party."

### II. RECITALS

A.    CVS Pharmacy, Inc. is a Rhode Island corporation with its corporate headquarters in Woonsocket, Rhode Island. CVS operates CVS Pharmacy retail stores in the Eastern District of California that dispense prescription drugs, including controlled substances, to retail consumers.

B.    Each CVS Pharmacy retail store in the Eastern District of California is separately registered with DEA and is assigned a unique DEA registration number that authorizes it to dispense controlled substances pursuant to the provisions of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq*. and its implementing regulations, 21 C.F.R. §§ 1300 *et seq*. (the "Act" or the "CSA"). The CVS Pharmacy retail stores located in the Eastern District of California will be referred to collectively hereinafter as "EDCA CVS Pharmacy Retail Stores."

C.    CVS acknowledges that all of its DEA-registered EDCA CVS Pharmacy Retail Stores were and are required to comply with the CSA and the regulations promulgated thereunder.

1

*Settlement Agreement Between*
*the United States and CVS*

**HIGHLY CONFIDENTIAL**

D.     The DEA is the Department of Justice component agency primarily responsible for enforcing the Act and is vested with the responsibility of investigating violations of the Act.

E.     The United States Attorney General, through the United States Attorney's Office, has primary authority to bring civil actions to enforce the Act.  *See* 21 U.S.C. § 871 and 28 C.F.R. § 0.55(c).

F.     The United States contends that in early 2012, DEA's Sacramento Field Division noticed an increased number of thefts and unexplained losses of Hydrocodone, a Schedule 3 controlled substance at the time, reported by numerous EDCA CVS Pharmacy Retail Stores. The United States further contends that, beginning in May 2012, the DEA and U.S. Attorney's Office for the Eastern District of California conducted an investigation with respect to EDCA CVS Pharmacy Retail Stores and their compliance with the CSA, specifically investigating the recordkeeping, reporting, procedures to guard against theft and diversion, and certain dispensing practices of EDCA CVS Pharmacy Retail Stores which could give rise to a civil penalty and/or administrative action against CVS under the CSA.

G.     The United States contends that, on or before the Effective Date of this Agreement, CVS violated 21 U.S.C. § 842 at the EDCA CVS Pharmacy Retail Stores, including by violating the following regulations:

- 21 CFR § 1304.04(a) (CVS failed to maintain Schedule 3-5 invoices);

- 21 CFR § 1304.04(h)(3) (CVS failed to maintain Schedule 3-5 records separate from non-controlled substance records);

- 21 CFR § 1304.11(c) (CVS failed to conduct a Biennial Inventory on one specific day);

- 21 CFR § 1304.21(a) (CVS failed to maintain complete and accurate records);

*Settlement Agreement Between*
*the United States and CVS*

HIGHLY CONFIDENTIAL                                    CVS-MDLT1-000060857

- 21 CFR §§ 1304.22(c), 1304.22(a)(2)(iv) (CVS failed to record the date of acquisition of controlled substances);

- 21 CFR § 1304.22(c) (CVS failed to record the amount received on Schedule 3-5 invoices);

- 21 CFR § 1305.13(e) (CVS failed to record the amount received and the date received on DEA 222 forms);

- 21 CFR § 1305.17(a) (CVS failed to maintain DEA-222 forms); and

- 21 CFR § 1305.17(c) (CVS failed to maintain DEA-222 forms separate from other records);

The United States also contends that various EDCA CVS Pharmacy Retail Stores failed to provide effective controls and procedures to guard against theft and diversion of controlled substances (*see* 21 C.F.R. § 1301.71(a)) and failed to notify DEA of certain thefts or significant losses of controlled substances within one business day of the discovery (*see* 21 C.F.R. § 1301.74(c)).  The United States' claims and allegations against CVS as set forth above in this Paragraph G shall hereinafter be referred to as the "Covered Conduct."

H.      The CSA requires, among other things, that pharmacies create and/or maintain certain records concerning the receipt and dispensing of controlled substances in accordance with the CSA.  21 U.S.C. § 827.

I.      At all times relevant, the CSA authorized a civil penalty of up to $10,000 or $25,000 per violation of subsections of § 842(a).  *See* 21 U.S.C. § 842(c)(1)(A)-(B).

J.      CVS acknowledges that, during the period from April 30, 2011 through April 30, 2013, certain EDCA CVS Pharmacy Retail Stores failed to fulfill certain recordkeeping obligations under the CSA in a manner fully consistent with CVS's compliance obligations. Notwithstanding, CVS contends that any such failure to fulfill recordkeeping obligations did not

3

*Settlement Agreement Between*
*the United States and CVS*

**HIGHLY CONFIDENTIAL**

arise from or cause the diversion of controlled substances and the United States does not contend to the contrary.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

### III. TERMS AND CONDITIONS

1.  In consideration of the obligations of the Parties set forth in this Settlement Agreement, CVS shall pay to the United States the total sum of five million dollars ($5,000,000.00) ("Settlement Amount") within fourteen (14) days after the Effective Date of this Agreement, as defined in Paragraph 21 below. Payment shall be made by electronic funds transfer pursuant to written instructions to be provided by the Office of the United States Attorney for the Eastern District of California. If the payment is not timely received, CVS shall also pay the United States interest on the Settlement Amount at a rate of 10% per annum compounded daily from October 1, 2016 through the date full payment is received.

2.  Subject to the exceptions in Paragraph 3 below (concerning excluded claims), and conditioned upon CVS's full payment of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) hereby fully and finally releases CVS and its current and former parent corporations, direct and indirect subsidiaries, brother or sister corporations, divisions, current or former corporate owners, and the corporate successors and assigns of any of them, from any civil or administrative monetary claims the United States has for the Covered Conduct, which includes filing any action for civil penalties under 21 U.S.C. § 842(a) based on, arising from, or related to the Covered Conduct. The EDCA CVS Pharmacy Retail Stores covered by this Agreement are specified in Attachment A.

4

*Settlement Agreement Between*
*the United States and CVS*

3.      Notwithstanding any term of this Agreement, the following claims of the United

States are specifically reserved and are not released:

a.      Any civil, criminal, or administrative liability arising under Title 26,

United States Code (Internal Revenue Code);

b.      Any criminal liability;

c.      Except as explicitly stated in this Agreement, any administrative liability,

including the suspension and debarment rights of any federal agency;

d.      Any liability to the United States (or its agencies) for any conduct other

than the Covered Conduct;

e.      Any liability based on obligations created by this Agreement; and

f.      Any liability of individuals.

4.      CVS waives and shall not assert any defenses CVS may have to any criminal

prosecution or administrative action relating to the Covered Conduct that may be based in whole

or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the

Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution,

this Agreement bars a remedy sought in such criminal prosecution or administrative action.

Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by

the United States concerning the characterization of the Settlement Amount for purposes of the

Internal Revenue laws, Title 26 of the United States Code.

5.      CVS fully and finally releases the United States, its agencies, officers, attorneys,

employees, servants, and agents, from any claims (including attorneys' fees, costs and expenses

of every kind and however denominated) that CVS has asserted, could have asserted, or may

assert against the United States, its agencies, officers, attorneys, employees, servants, and agents

5

*Settlement Agreement Between*
*the United States and CVS*

CVS-MDLT1-000060860

related to the investigation, litigation and settlement of its claims related to the Covered Conduct. CVS understands and acknowledges, however, that if the facts and/or potential claims with respect to liability or damages regarding the matters released herein are found hereafter to be different from facts now believed to be true or claims now believed to be available ("Unknown Claims"), CVS expressly accepts and assumes the risks of such possible difference in facts and/or potential claims and agrees that this Agreement shall remain effective notwithstanding any such differences. CVS intends by this Agreement, and the releases contained herein, to release fully, finally and forever all Unknown Claims that arise out of or relate to the matters released herein. CVS expressly waives all rights it may have by virtue of California Civil Code § 1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

6.      CVS represents that it already has taken the following actions at the EDCA CVS Pharmacy Retail Stores to improve efforts to properly recordkeep and to detect and prevent diversion of controlled substances:

      a.      Training on CSA compliance for its pharmacy staff in the EDCA CVS Pharmacy Retail Stores on an at least an annual basis;

      b.      Corporate monitoring and intervention programs that assist in identifying and preventing the diversion of controlled substances in the EDCA CVS Pharmacy Retail Stores;

      c,      Loss prevention oversight of the EDCA CVS Pharmacy Retail Stores through the corporate loss prevention program, which includes:

6

*Settlement Agreement Between*
*the United States and CVS*

            i.       Tracking Schedule 2 controlled substances through CVS's electronic perpetual inventory system;

            ii.      Monitoring controlled substances to identify circumstances that require further investigation by CVS;

            d.      The exclusion of controlled substances prescriptions from the prescription volume metric that can impact the compensation of certain pharmacy staff at EDCA CVS Pharmacy Retail Stores.

CVS understands that ongoing, new or continued violations of the Act would result in further enforcement actions and that nothing in this Agreement prevents the United States from taking further actions for violations not released herein.

       7.      With respect to the Covered Conduct, CVS agrees to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement, and upon reasonable notice, CVS shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals.  CVS further agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged, non-attorney work-product documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

       8.      Except as otherwise stated herein, each Party to this Agreement shall bear its own costs, attorneys' fees, and other expenses incurred in any manner in connection with the

*Settlement Agreement Between*
*the United States and CVS*

HIGHLY CONFIDENTIAL                                           CVS-MDLT1-000060862

investigation, litigation, and resolution of this matter, including the preparation and performance of this Agreement.

9.      CVS agrees that any and all costs it has or will incur in connection with this matter, including payment of the Settlement Amount, attorneys' fees, costs of investigation, negotiation, and any remedial actions taken before or following the Effective Date of this Agreement, shall be unallowable costs for government contract accounting and for Medicare, Medicaid, TRICARE, and FEHBP reimbursement purposes.

10.      This Agreement binds and is intended to benefit only the Parties. The Parties do not release any claims against any other person or entity not expressly released by this Agreement. This Agreement is specifically limited to the Office of the United States Attorney for the Eastern District of California and cannot bind other federal, state, or local authorities and jurisdictions.

11.      This Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

12.      Each Party warrants that it has been represented by, and has sought and obtained the advice of, independent legal counsel with regard to the nature, purpose, and effect of this Agreement. The Agreement was negotiated by the Parties and their respective counsel, each of whom had the opportunity to participate in the drafting thereof. The Parties hereby declare that the terms of this Agreement have been completely read, fully understood, and voluntarily accepted following opportunity for review by legal counsel of their choice.

13.      Each of the Parties warrants and represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion. Each of the Parties further warrants and represents that no other Party or its representative has made any promise,

8

*Settlement Agreement Between*
*the United States and CVS*

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060863**

representation or warranty, express or implied, except as expressly set forth in this Agreement, and that no Party has relied on any inducements, promises, or representations made by any Party to this Agreement, or its representatives, or any other person, except as expressly set forth herein.

14.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties listed below.

15.     For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement.  The words of this Agreement shall not, therefore, be construed against any Party for that reason in any subsequent dispute, but shall be construed so as to effect their fair meaning.

16.     The Parties consent to the disclosure of this Agreement, and of information about this Agreement, to the public.

17.     This Agreement constitutes the complete agreement between the Parties, and supersedes and replaces any prior negotiations and agreements, whether written or oral, regarding the resolution of the claims between the Parties with respect to the subject matter hereof.

18.     This Agreement may not be altered, amended, or modified, except by a writing duly executed by authorized representatives of all Parties.

19.     This Agreement may be executed in counterparts, including by facsimile, PDF, or other electronic form of signature, each of which constitutes an original and all of which constitute one and the same Agreement.

20.     This Agreement is governed by the laws of the United States.  The Parties agree that, should any judicial action be required to enforce or interpret this Agreement, or to resolve

*Settlement Agreement Between*
*the United States and CVS*

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060864**

any dispute hereunder, the exclusive jurisdiction and venue for such action shall be in the United States District Court for the Eastern District of California.

21.    This Agreement is effective, final, and binding as of the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  The United States agrees to notify CVS within a reasonable time when the final signatory has executed this Agreement.

22.    The statements set forth in the preceding Sections of this Agreement are incorporated by reference herein as if set forth in full.

THE UNITED STATES OF AMERICA

Dated: 7/5/2017

By: _____
M. Anderson Berry
Assistant U.S. Attorney
Eastern District of California

CVS

Dated: 27 Jun 2017

By: _____
Elizabeth Ferguson
Senior Vice President, Deputy General Counsel
CVS Pharmacy, Inc.

Approved as to form and content:

Dated: June 28, 2017

By: _____
Linden Barber, Esq.
Quarles & Brady, LLP
Counsel for CVS Pharmacy, Inc.

10

*Settlement Agreement Between
the United States and CVS*

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060865**

# ATTACHMENT A

## CVS Pharmacy Retail Stores in the Eastern District of California covered by the Settlement Agreement entered into by and between the United States and CVS.

| ADDRESS | STORE # | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 515 S STATE HIGHWAY 49 | 9233 | Jackson | Amador | CA | 95642 |
| 1074 Oro Dam Boulevard East | 9158 | Oroville | Butte County | CA | 95965 |
| 1120 Forest Avenue | 2881 | Chico | Butte County | CA | 95928 |
| 1496 East Avenue | 7506 | Chico | Butte County | CA | 95926 |
| 260 Spruce Street | 9525 | Gridley | Butte County | CA | 95948 |
| 2780 Esplanade | 7128 | Chico | Butte County | CA | 95973 |
| 6800 Skyway Blvd. | 9930 | Paradise | Butte County | CA | 95969 |
| 801 East Avenue | 9599 | Chico | Butte County | CA | 95926 |
| 850 Oroville Dam Boulevard | 9158 | Oroville | Butte County | CA | 95965 |
| 200 Highway 12, Bldg D | 9390 | Valley Springs | Calaveras County | CA | 95252 |
| 41 North Main Street | 9539 | Angels Camp | Calaveras County | CA | 95222 |
| 1043 Emerald Bay Road | 9713 | South Lake Tahoe | El Dorado County | CA | 96150 |
| 3020 Green Valley Road, Suite B | 6793 | Cameron Park | El Dorado County | CA | 95682 |
| 3471 Lake Tahoe Boulevard | 9376 | South Lake Tahoe | El Dorado County | CA | 96150 |
| 3500 Palmer Drive | 3009 | Cameron Park | El Dorado County | CA | 95682 |
| 3964-A Missouri Flat Road | 9184 | Placerville | El Dorado County | CA | 95667 |
| 4400 Latrobe Street | 3909 | El Dorado Hills | El Dorado County | CA | 95762 |
| 6450 Pony Express Trail | 9490 | Pollock Pines | El Dorado County | CA | 95726 |
| 10 Shaw Avenue | 9801 | Clovis | Fresno County | CA | 93612 |
| 1065 West Manning Avenue | 9377 | Reedley | Fresno County | CA | 93654 |
| 1107 North Willow Avenue | 3940 | Clovis | Fresno County | CA | 93611 |
| 111 East Merced Street | 9710 | Fowler | Fresno County | CA | 93625 |
| 1113 East Champlain Drive | 9391 | Fresno | Fresno County | CA | 93720 |
| 1302 Fulton Mall | 9129 | Fresno | Fresno County | CA | 93721 |
| 1325 West Shields Avenue | 9537 | Fresno | Fresno County | CA | 93705 |
| 1405 Herndon Avenue | 9933 | Clovis | Fresno County | CA | 93611 |

*Settlement Agreement Between*
*the United States and CVS*

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060866**

# ATTACHMENT A

| ADDRESS | STORE # | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 14967 West Whitesbridge Road | 4446 | Kerman | Fresno County | CA | 93630 |
| 1794 Ashlan Avenue | 7910 | Clovis | Fresno County | CA | 93611 |
| 2133 Shaw Avenue | 3925 | Clovis | Fresno County | CA | 93611 |
| 29412 Auberry Road | 9399 | Prather | Fresno County | CA | 93651 |
| 3011 East Shields Avenue | 7553 | Fresno | Fresno County | CA | 93726 |
| 333 Academy Avenue | 3034 | Sanger | Fresno County | CA | 93657 |
| 4077 West Clinton Avenue | 9971 | Fresno | Fresno County | CA | 93722 |
| 4987 North Fresno Street | 6772 | Fresno | Fresno County | CA | 93710 |
| 5180 East Kings Canyon Road | 5422 | Fresno | Fresno County | CA | 93727 |
| 5995 East Kings Canyon Road | 10074 | Fresno | Fresno County | CA | 93727 |
| 634 Shaw Avenue | 9801 | Clovis | Fresno County | CA | 93612 |
| 6720 North Fresno Street | 10801 | Fresno | Fresno County | CA | 93720 |
| 6750 North Cedar Avenue | 9149 | Fresno | Fresno County | CA | 93710 |
| 6800 North Milburn Avenue | 9846 | Fresno | Fresno County | CA | 93722 |
| 7096 North West Avenue | 9865 | Fresno | Fresno County | CA | 93711 |
| 728 West Shaw Avenue | 9994 | Fresno | Fresno County | CA | 93704 |
| 920 Herndon Avenue | 9933 | Clovis | Fresno County | CA | 93612 |
| 929 Sierra Street | 9983 | Kingsburg | Fresno County | CA | 93631 |
| 869 Newville Road | 9188 | Orland | Glenn County | CA | 95963 |
| 11300 Ming Avenue | 4221 | Bakersfield | Kern County | CA | 93301 |
| 2690 Mt. Vernon Avenue | 9900 | Bakersfield | Kern County | CA | 93306 |
| 3500 Stine Road | 9204 | Bakersfield | Kern County | CA | 93309 |
| 4300 California Avenue | 9200 | Bakersfield | Kern County | CA | 93309 |
| 4400 Coffee Road | 9975 | Bakersfield | Kern County | CA | 93308 |
| 505 #B Bear Mountain Boulevard | 10810 | Arvin | Kern County | CA | 93203 |
| 5184 Stockdale Highway | 5495 | Bakersfield | Kern County | CA | 93309 |
| 6500 Niles Street | 7001 | Bakersfield | Kern County | CA | 93306 |
| 6500 South Union Avenue | 2768 | Bakersfield | Kern County | CA | 93307 |
| 6601 Stine Road | 10921 | Bakersfield | Kern County | CA | 93313 |

*Settlement Agreement Between*
*the United States and CVS*

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060867

# ATTACHMENT A

| ADDRESS | STORE # | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 8200 G Stockdale Highway | 9878 | Bakersfield | Kern County | CA | 93311 |
| 8929 Panama Road Suite B | 10813 | Lamont | Kern County | CA | 93203 |
| 9628 Rosedale Highway | 8913 | Bakersfield | Kern County | CA | 93311 |
| 150 South 11th Avenue | 9828 | Hanford | Kings County | CA | 93230 |
| 2539 11th Avenue | 9893 | Hanford | Kings County | CA | 93230 |
| 574 West Lacey Boulevard | 9828 | Hanford | Kings County | CA | 93230 |
| 1109 Country Club Drive | 9159 | Madera | Madera County | CA | 93637 |
| 1400 Howard Road | 9986 | Madera | Madera County | CA | 93637 |
| 1456 East Yosemite Avenue | 2423 | Madera | Madera County | CA | 93638 |
| 1612 Howard Road | 9986 | Madera | Madera County | CA | 93637 |
| 40044 Highway 49, Suite F | 9935 | Oakhurst | Madera County | CA | 93644 |
| 1651 Bellevue Road | 3117 | Atwater | Merced County | CA | 95301 |
| 1970 Yosemite Parkway | 7206 | Merced | Merced County | CA | 95341 |
| 300 Merced Mall | 9623 | Merced | Merced County | CA | 95340 |
| 474 Winton Parkway | 10360 | Livingston | Merced County | CA | 95334 |
| 10045 Combie Road | 3947 | Auburn | Nevada County | CA | 95602 |
| 1005 Sutton Way | 9155 | Grass Valley | Nevada County | CA | 95945 |
| 11411 Deerfield Drive | 9174 | Truckee | Nevada County | CA | 96161 |
| 1030 Pleasant Grove Bv. | 3862 | Roseville | Placer County | CA | 95678 |
| 1771 Pleasant Grove Blvd. | 5091 | Roseville | Placer County | CA | 95747 |
| 2140 Grass Valley Highway | 9914 | Auburn | Placer County | CA | 95603 |
| 3251 Stanford Ranch Road | 9546 | Rocklin | Placer County | CA | 95765 |
| 388 Elm Street | 9150 | Auburn | Placer County | CA | 95603 |
| 4785 Granite Drive | 2661 | Rocklin | Placer County | CA | 95677 |
| 5090 Foothills Boulevard | 9958 | Roseville | Placer County | CA | 95747 |
| 63 Lincoln Boulevard | 9535 | Lincoln | Placer County | CA | 95648 |
| 8455 Auburn-Folsom Road | 9526 | Granite Bay | Placer County | CA | 95746 |
| 850 North Lake Boulevard, Unit 14 | 9976 | Tahoe City | Placer County | CA | 96145 |
| 9280 Sierra College Boulevard | 9993 | Roseville | Placer County | CA | 95661 |

*Settlement Agreement Between*
*the United States and CVS*

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060868

## ATTACHMENT A

| ADDRESS | STORE # | CITY | COUNTY | STATE | ZIP CODE |
|---------|---------|------|--------|-------|----------|
| 950 North Lake Boulevard, Suite 100 | 9976 | Tahoe City | Placer County | CA | 96145 |
| 1005 East Bidwell Street | 9923 | Folsom | Sacramento County | CA | 95630 |
| 1063 C Street | 3022 | Galt | Sacramento County | CA | 95632 |
| 1350 Florin Road | 9823 | Sacramento | Sacramento County | CA | 95831 |
| 1587 West El Camino Avenue | 2290 | Sacramento | Sacramento County | CA | 95833 |
| 1701 K Street | 3945 | Sacramento | Sacramento County | CA | 95811 |
| 2050 Club Center Drive | 4151 | Sacramento | Sacramento County | CA | 95835 |
| 2085 Fair Oaks Boulevard Bldg 2 | 9322 | Sacramento | Sacramento County | CA | 95825 |
| 2636 Marconi Avenue | 5225 | Sacramento | Sacramento County | CA | 95821 |
| 2790 East Bidwell Street | 3950 | Folsom | Sacramento County | CA | 95630 |
| 3301 Zinfandel Drive | 4950 | Rancho Cordova | Sacramento County | CA | 95670 |
| 3338 Arden Way | 9992 | Sacramento | Sacramento County | CA | 95825 |
| 3710 Franklin Boulevard | 7136 | Sacramento | Sacramento County | CA | 95820 |
| 400 Howe Avenue | 9322 | Sacramento | Sacramento County | CA | 95825 |
| 4959 Marconi Avenue | 9809 | Carmichael | Sacramento County | CA | 95608 |
| 5039 Folsom Boulevard | 3943 | Sacramento | Sacramento County | CA | 95819 |
| 5040 Laguna Boulevard | 1825 | Elk Grove | Sacramento County | CA | 95758 |
| 5333 Elkhorn Boulevard | 9826 | Sacramento | Sacramento County | CA | 95842 |
| 5420 Dewey Drive | 9199 | Fair Oaks | Sacramento County | CA | 95628 |
| 6401 Mack Road | 10005 | Sacramento | Sacramento County | CA | 95823 |
| 7465 Rush River Drive, Suite 500 | 9972 | Sacramento | Sacramento County | CA | 95831 |
| 8101 Greenback Lane | 9814 | Fair Oaks | Sacramento County | CA | 95627 |
| 8351 Elk Grove-Florin Road | 3066 | Sacramento | Sacramento County | CA | 95829 |
| 8400 Bradshaw Road | 0182 | Elk Grove | Sacramento County | CA | 95624 |
| 8585 Elk Grove Blvd | 2124 | Elk Grove | Sacramento County | CA | 95624 |
| 8861 Greenback Lane | 9487 | Orangevale | Sacramento County | CA | 95662 |
| 9285 Elk Grove Boulevard | 9132 | Elk Grove | Sacramento County | CA | 95624 |
| 9479 Madison Avenue | 9980 | Folsom | Sacramento County | CA | 95630 |
| 100 W. Lodi Avenue | 9261 | Lodi | San Joaquin County | CA | 95240 |
| 1000 West Kettleman Lane | 9243 | Lodi | San Joaquin County | CA | 95240 |
| 1175 West Lathrop Road | 5403 | Manteca | San Joaquin County | CA | 95336 |

*Settlement Agreement Between*
*the United States and CVS*

4

CVS-MDLT1-000060869

# ATTACHMENT A

| ADDRESS | STORE # | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 1190 North Main Street | 9866 | Manteca | San Joaquin County | CA | 95336 |
| 1201 West Main, Building 14 | 9949 | Ripon | San Joaquin County | CA | 95366 |
| 1885 West 11th Street | 3908 | Tracy | San Joaquin County | CA | 95376 |
| 2605 West March Lane | 9147 | Stockton | San Joaquin County | CA | 95207 |
| 3320 Tracy Boulevard | 9855 | Tracy | San Joaquin County | CA | 95376 |
| 5070 West Lane | 9916 | Stockton | San Joaquin County | CA | 95210 |
| 6632 Pacific Avenue | 9830 | Stockton | San Joaquin County | CA | 95207 |
| 1060 East Cypress Avenue | 3911 | Redding | Shasta County | CA | 96002 |
| 3375 Placer Street | 9979 | Redding | Shasta County | CA | 96001 |
| 1057 North First Street | 9950 | Dixon | Solano County | CA | 95620 |
| 1193 Admiral Callaghan Lane | 9927 | Vallejo | Solano County | CA | 94589 |
| 149 Plaza Road | 8977/9927 | Vallejo | Solano County | CA | 94591 |
| 191 Depot Street | 9819 | Vacaville | Solano County | CA | 95688 |
| 2100 Columbus Parkway | 9761 | Benicia | Solano County | CA | 94510 |
| 300 Travis Boulevard | 9371 | Fairfield | Solano County | CA | 94533 |
| 3340 North Texas Street | 9712 | Fairfield | Solano County | CA | 94533 |
| 3678 Sonoma Boulevard | 9832 | Vallejo | Solano County | CA | 94590 |
| 377 E. Monte Vista Avenue | 8973 | Vacaville | Solano County | CA | 95688 |
| 5059 Business Center Drive | 3075 | Fairfield | Solano County | CA | 94534 |
| 625 Elmira Road | 9917 | Vacaville | Solano County | CA | 95687 |
| 1080 Sperry Avenue | 9763 | Patterson | Stanislaus County | CA | 95363 |
| 1520 East F Street | 3944 | Oakdale | Stanislaus County | CA | 95361 |
| 1621 Lander Avenue | 9919 | Turlock | Stanislaus County | CA | 95381 |
| 1700 McHenry Avenue | 9248 | Modesto | Stanislaus County | CA | 95350 |
| 2020 West Briggsmore Avenue, Suite C | 1467 | Modesto | Stanislaus County | CA | 95350 |
| 2075 East Hatch Road | 9874 | Modesto | Stanislaus County | CA | 95351 |
| 2224 Patterson Road | 3079 | Riverbank | Stanislaus County | CA | 95367 |
| 2412 Third Street, PO Box 970 | 9139 | Hughson | Stanislaus County | CA | 95326 |
| 2601 Oakdale, Building E | 9884 | Modesto | Stanislaus County | CA | 95355 |
| 2900 Standiford | 9171 | Modesto | Stanislaus County | CA | 95350 |
| 3100 Geer Road | 2994 | Turlock | Stanislaus County | CA | 95382 |
| 801 Oakdale Rd Suite F | 3077 | Modesto | Stanislaus County | CA | 95355 |

*Settlement Agreement Between*
*the United States and CVS*

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060870**

# ATTACHMENT A

| ADDRESS | STORE # | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 901 North Carpenter Road, Suite 30 | 9308 | Modesto | Stanislaus County | CA | 95351 |
| 1274 Stabler Lane | 9932 | Yuba City | Sutter County | CA | 95993 |
| 124 Belle Mill Road | 3937 | Red Bluff | Tehama County | CA | 96080 |
| 455 South Main Street | 3937 | Red Bluff | Tehama County | CA | 96080 |
| 1311 South Main Street | 9973 | Weaverville | Trinity County | CA | 96093 |
| 109 South West Street | 5551 | Tulare | Tulare County | CA | 93274 |
| 1102 North Demaree Street | 2541 | Visalia | Tulare County | CA | 93291 |
| 1155 West Henderson Avenue | 9845 | Porterville | Tulare County | CA | 93257 |
| 1395 East Prosperity Avenue | 9176 | Tulare | Tulare County | CA | 93274 |
| 1455 East Noble Avenue | 9500 | Visalia | Tulare County | CA | 93292 |
| 2135 North Dinuba Boulevard | 2711 | Visalia | Tulare County | CA | 93291 |
| 2175 East Bardsley Avenue | 0912 | Tulare | Tulare County | CA | 93274 |
| 3619 West Caldwell Avenue | 9271 | Visalia | Tulare County | CA | 93277 |
| 53 East Olive Avenue | 2944 | Porterville | Tulare County | CA | 93257 |
| 590 West Putnam Avenue, Suite 1 | 4652 | Porterville | Tulare County | CA | 93257 |
| 800 North Westwood Street | 0035 | Porterville | Tulare County | CA | 93257 |
| 13763 Mono Way | 9208 | Sonora | Tuolumne County | CA | 95370 |
| 1471 West Covell Road | 9282 | Davis | Yolo County | CA | 95616 |
| 1550 Covell Blvd. | 9142 | Davis | Yolo County | CA | 95616 |
| 7 West Main Street | 9180 | Woodland | Yolo County | CA | 95695 |
| 906 East Street | 9691 | Marysville | Yuba County | CA | 95901 |

*Settlement Agreement Between*
*the United States and CVS*

6

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060871**

Connecticut:

Moffatt Tr. at 250:21-254:2

CVS-MDLT1-000060830-60838

Highly Confidential - Subject to Further Confidentiality Review

```
 1   involved.

 2   BY MR. ELSNER:

 3        Q.   Have you ever seen any such documents

 4   related to investigation by the DEA?

 5             MR. DELINSKY:  Object to form.

 6        A.   I may have in connection with

 7   discussions with other lawyers, but nothing

 8   specific comes to mind.

 9             MR. DELINSKY:  I'd just like to put on

10   the record that Special Master Cohen has

11   addressed the subject of settlement agreements

12   on the dispensing side in Discovery Ruling No.

13   8, and he limited discovery as to the settlement

14   agreements -- to the settlement agreements and

15   the settlement agreements only, and to nothing

16   else about the settlement agreements.  These

17   questions are going further than that which is

18   allowed by Discovery Ruling 8, and I object to

19   them on that ground.

20   BY MR. ELSNER:

21        Q.   Are you aware that there was a DEA

22   investigation of CVS in Connecticut?

23        A.   I don't -- I wouldn't have been

24   involved in that.  Others would have handled it.
```

```
 1    I don't specifically recall Connecticut.

 2           MR. DELINSKY:  And, Mike, you'd

 3    previously indicated that you hoped to finish by

 4    1:00 or earlier.  It's now 1:20.  Could you give

 5    us a sense of where you are?  We've been going

 6    an hour.  I'm just trying to --

 7           MR. ELSNER:  There are three

 8    additional settlements I want to address and ask

 9    some wrap-up questions.  So I'm happy to take a

10    break now if you want to do that, if you want to

11    take a break and go to lunch, we could do that.

12    But it took a little longer than I anticipated,

13    so...

14           MR. DELINSKY:  Can you give us an

15    estimate?  If it's a half hour, it's one thing.

16    If it's another hour, that's another.

17           MR. ELSNER:  Why don't we go off the

18    record and discuss it.

19           THE VIDEOGRAPHER:  We're going off the

20    record at 1:21 p.m.

21           (Whereupon, a recess was taken.)

22           THE VIDEOGRAPHER:  We're back on the

23    record at 1:31 p.m.

24    BY MR. ELSNER:
```

1    Q.   Mr. Moffatt, before we broke I had

2    shared with you Exhibit 23, which is the

3    settlement agreement between CVS and the DEA

4    concerning the DEA's investigation of CVS stores

5    in Connecticut, is that right?

6            (Whereupon, CVS-Moffatt-23 was marked

7            for identification.)

8            MR. DELINSKY:  Object to form.

9    A.   Yeah, it appears to be stores in these

10   two cities, Southington and New Britain.

11   BY MR. ELSNER:

12   Q.   And the DEA had determined that the

13   Southington store on at least 2,886 occasions

14   that CVS failed to keep paper Schedule III

15   through Schedule V prescriptions, and invoices

16   on 31 occasions with respect to the Southington

17   store and with respect to the New Britain store.

18   In Paragraph 3 the US determined that on 4,936

19   instances CVS failed to keep paper Schedule III

20   through V prescriptions in a readily retrievable

21   manner from other prescriptions in the pharmacy.

22   Is that right?

23           MR. DELINSKY:  Object to form.

24   A.   I wasn't involved in this

1  investigation at all, but that appears to be a

2  summary of that paragraph.

3  BY MR. ELSNER:

4      Q.   And CVS entered a settlement with the

5  DEA and agreed to pay $600,000 in settlement, is

6  that right?

7      A.   That's in Section III, Paragraph 1.

8  Again, I wasn't involved in this.

9      Q.   Were you aware that CVS agreed to

10  settle these -- this investigation with the DEA

11  in that amount of $600,000?

12      A.   I have no specific recollection of

13  this matter.  To the extent I learned anything

14  about it, it would have been through discussions

15  between attorneys.

16      Q.   And the settlement agreement was

17  executed on behalf of Connecticut CVS Pharmacy,

18  LLC by Betsy Ferguson, the president and deputy

19  general counsel for CVS Health Corporation, is

20  that right?

21      A.   That's what her signature block says,

22  yes.

23          MR. DELINSKY:  I believe it says

24  senior vice president.

1          MR. ELSNER:  Senior vice president.

2     A.   Yes.

3  BY MR. ELSNER:

4     Q.   And did you have a role with respect

5  to Connecticut CVS Pharmacy, LLC?

6     A.   Yes.  I'm president of that entity.

7     Q.   And were you through the period of

8  time of this investigation?

9     A.   It says that it began January, 2016,

10  so yes.

11     Q.   Okay.  Are you currently the

12  president?

13     A.   Yes.

14     Q.   Were you aware that there was an

15  investigation by the DEA of CVS stores in

16  Massachusetts?

17     A.   I'm not specifically involved in any

18  of these, so I don't recall that one in

19  particular.

20     Q.   Okay.  Here's Exhibit 24.

21          (Whereupon, CVS-Moffatt-24 was marked

22          for identification.)

23  BY MR. ELSNER:

24     Q.   Which is Motley Rice 243.  This was an

## SETTLEMENT AGREEMENT

### I.    PARTIES

This Settlement Agreement is entered into this *20th* day of *October*,

2016 between the United States of America, Department of Justice ("United

States") acting through the United States Attorney's Office, District of

Connecticut, and CVS Pharmacy, Inc. ("CVS").

### II.    BACKGROUND

1. CVS operates retail pharmacies in the State of Connecticut, including

stores located at 326 Main Street, Southington, Ct. 06489 (CVS # 01060) and

713 West Main Street, New Britain, Ct. 06053 (CVS # 0760).

2. As a result of an investigation into both pharmacies that began during

January 2016, conducted by the United States Drug Enforcement Administration,

Hartford Connecticut Office Diversion Group, the United States contends that at

the Southington Store (CVS # 01060) on at least 2,886 occasions, CVS failed to

keep paper Schedule III-V prescriptions either in a separate prescription file or

readily retrievable from other prescription records, which the United States

contends to be in violation of 21 U.S.C. 827(b)(2)(A) and (B) and 21 C.F.R

1304.04 (h)(4).  The United States further contends that at the Southington Store

(CVS # 01060) CVS failed to keep Schedule III-V purchase invoices on at least

31 occasions in separate or in a readily retrievable manner from all other records

of the pharmacy, which the United States contends to be in violation of 21 U.S.C.

827(b)(2)(A) and (B) and 21 C.F.R. 1304.04(h)(3).

HIGHLY CONFIDENTIAL                                                    CVS-MDLT1-000060830

3. As a result of the investigation into the New Britain store (CVS # 0760), the United States contends in at least 4,936 instances CVS failed to keep paper Schedule III-V prescriptions either in a separate prescription file or in a readily retrievable manner from other prescription records of the pharmacy, which the United States contends to be in violation 21 U.S.C. 827(b)(2)(A) and (B) and 21 C.F.R 1304.04 (h)(4). The United States further contends that at the New Britain Store (CVS# 0760) CVS failed to keep Schedule II paper prescriptions records in at least 6 occasions in a separate or readily retrievable manner from all other records of the pharmacy, which the United States contends to be in violation of 21 U.S.C. 827(b)(2)(A) and (B) and 21 C.F.R. 1304.04(h)(1).

4. CVS disputes the allegations of the United States.

5. The parties have agreed to settle, compromise, and resolve all existing claims under 21 U.S.C. 842(c)(1)(B) that directly arose out of the investigation conducted by the DEA.

III.    TERMS AND CONDITIONS OF THE AGREEMENT

1. CVS shall pay the United States the sum of Six Hundred Thousand Dollar ($600,000) (the "Settlement Amount") pursuant to this Settlement Agreement. The payment shall be made within fourteen business days of the signing of this Settlement Agreement by all parties. Payment shall be made pursuant to Electronic Funds transfer pursuant to instructions to be provided by the United States. All costs associated with the wire transfer shall be the responsibility of CVS.

2. In exchange for and in consideration of CVS's compliance with this

HIGHLY CONFIDENTIAL                                                        CVS-MDLT1-000060831

Settlement Agreement, the United States agrees to settle and relinquish only those civil penalty claims, causes of action, suits, debts, in law or equity, against CVS under 21 U.S.C. § 827 which were discovered during the course of DEA's investigation.

3. By entering into this Settlement Agreement, CVS does not admit to the conclusions reached as a result of the investigation or to any violation of law, liability, fault, medical or pharmacy malpractice, misconduct, or wrongdoing.

4. CVS agrees to comply with the Controlled Substances Act, 21 U.S.C. Section 801 et seq. and the regulations promulgated under it. (hereinafter the "Act")

5. This Settlement Agreement shall be applicable to all current and future retail pharmacies operated within the State of Connecticut by CVS. This Settlement Agreement relates only to CVS's retail pharmacy business and does not relate to any other operation or business conducted by CVS Pharmacy, Inc., CVS Health Corporation or its affiliates such as mail order business, speciality and apothecary pharmacy business and Internet pharmacy business, unless specifically provided in the Settlement.

6. Obligations of CVS

a. CVS acknowledges that its pharmacies are required to maintain complete and accurate records of each controlled substance manufactured, received, sold, delivered, dispensed or otherwise disposed of by the registrant, 21 U.S.C. 827(a)(3); 21 C.F.R. 1304.03, 1304.21.

{00252683}                          Page 3 of 8

      b.  CVS acknowledges that the Act and the regulations promulgated thereunder further require that certain records be readily retrievable and kept separate from the ordinary business records of the registrant for inspection and copying thereof by officers or employees of DEA for a period of two years. 21 U.S.C. 827(b); 21 C.F.R. 1304.04.

      c.  CVS shall maintain specific controlled substance records required to be maintained at the registered location in a specially segregated filing location (e.g., labeled regulatory record boxes, also known as "white boxes," currently used in CVS locations).  Any such filing system whether in paper or electronic form shall be organized to segregate and readily identify the following records: (i) copies of pharmacy licenses and powers of attorney; (ii) biennial and annual inventory records; (iii) returns, invoices and destruction records; (iv) drug loss reporting forms; (v) executed DEA 222 forms and Schedule II invoices by months; and (vi) Schedule III-V invoices by months.

      d.  The pharmacist-in-charge (hereinafter the "PIC") at each CVS pharmacy retail store in Connecticut has responsibility for maintaining controlled substance records. The PIC shall ensure that controlled substance records are maintained according to DEA regulations.

HIGHLY CONFIDENTIAL              CVS-MDLT1-000060833

e.  CVS acknowledges that each of its retail stores is required to implement effective controls and procedures to guard against theft and diversion of controlled substances. 21 C.F.R. 1301.07(a).

f.  CVS shall continue providing training programs related to regulatory requirements and security for handling controlled substances and the civil and criminal consequences of not meeting these requirements, and it shall continue to commit appropriate resources to conduct training programs for all of its pharmacists and pharmacy technicians annually for at least the next three years.

g.  CVS further agrees that the active pharmacy supervisors, district managers, regional loss prevention managers, regional managers, and the area loss prevention managers and the area loss prevention director for the State of Connecticut shall attend a training session to be hosted at a mutually agreeable date, time, and location by the United States Attorney's Office for the District of Connecticut and the United States Drug Enforcement Administration, Hartford Connecticut Office Diversion Group ("Government meeting").  At the Government training session, the Government shall provide information concerning federal regulatory obligations related to controlled substances.

**HIGHLY CONFIDENTIAL**                                        **CVS-MDLT1-000060834**

    h. CVS agrees that it shall participate in the Government training session in good faith and shall disseminate any written information provided at the training session to all active pharmacists and pharmacy technicians in Connecticut within one year of the meeting.  CVS shall maintain a record documenting that the written information has been provided to the active pharmacists and pharmacy technicians in Connecticut.  The Government training session shall be in addition to the recurring controlled substances training that CVS currently provides to its pharmacy staff.

7. This Settlement Agreement shall inure to the benefit of and is binding on CVS, and its respective successors, transferees and assigns.

8. Each party agrees that they shall bear their own legal and other costs incurred in connection with this matter including its preparation and performance of this agreement.

9. This Settlement Agreement constitutes the complete agreement between the parties.

10. This Settlement Agreement, and the conditions contained herein, in no way prevents, precludes or prejudices the United States' right to enforce the Act and the regulations promulgated thereunder by commencing a civil, criminal, or administrative action against CVS for any violations which CVS or its entities engages in after the date of this Settlement Agreement or in which CVS or its entities previously engaged in but are not presently known to the United States.

HIGHLY CONFIDENTIAL                                    CVS-MDLT1-000060835

11.     This Settlement Agreement shall be governed by the laws of the
United States. The parties agree that the exclusive jurisdiction and venue for any
dispute arising under this Settlement Agreement shall be the United States
District Court for the District of Connecticut.

12.     CVS acknowledges that it has consulted with counsel, read this
Settlement Agreement and understands that as of the date of its execution, it will
be a matter of public record.

13.     Each person that signs this Settlement Agreement in a
representative capacity warrants that he or she is duly authorized to do so.

14.     This Settlement Agreement shall become final and binding only
upon the signature by each party herein.

**HIGHLY CONFIDENTIAL**                                                                 **CVS-MDLT1-000060836**

**UNITED STATES OF AMERICA**

Dated: _10 - 20 - 16_

By: _____
John B. Hughes, AUSA
Chief Civil Division
U.S. Attorney's Office
District of Connecticut

Dated: _10|20| 16_

By: _____
Alan M. Soloway, AUSA
U.S. Attorney's Office
District of Connecticut

**CONNECTICUT CVS PHARMACY, L.L.C.**

Dated: _10|18|2016_

By: _____
Elizabeth S. Ferguson, Senior Vice
President and Deputy General Counsel
CVS Health Corporation

Dated: _10/5/16_

By: _____
John A. Gilbert, Jr.
Hyman, Phelps and McNamara, P.C.
Counsel for CVS Pharmacy, Inc.

{00252683}                    Page **8** of **8**

**HIGHLY CONFIDENTIAL**                                        **CVS-MDLT1-000060837**

NEW HAVEN, CONNECTICUT
U.S. ATTORNEY'S OFFICE

2016 OCT 20  AM 9:54

RECEIVED

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060838

Florida:

Moffatt Tr. at 175:3-177:15

CVS-MDLT1-00060796-60804

 1    attorney in the legal department, but not due to

 2    my role as president of Holiday.

 3              MR. ELSNER:  Okay.  I'm going to mark

 4    this next document as the next exhibit, which is

 5    MR 68, and it's Exhibit 14 to the deposition.

 6              (Whereupon, CVS-Moffatt-14 was marked

 7              for identification.)

 8    BY MR. ELSNER:

 9         Q.    This is CVS-60796 through 60804.  This

10    is a settlement agreement, is it not, between

11    CVS Health and the -- and its subsidiaries and

12    the DEA related to the DEA's investigation of

13    stores 219 and 5195 in Sanford, Florida,

14    correct?

15         A.    Yes, that appears to be correct.

16         Q.    And it was the DEA's position, the US

17    government's position that CVS had failed in its

18    responsibilities under the Controlled Substances

19    Act, correct?

20              MR. DELINSKY:  Object to form.

21         A.    I was not involved in this settlement

22    agreement, so I mean, I'd have to go through the

23    whole thing to agree with your characterization

24    of what's in here.

1    BY MR. ELSNER:

2        Q.    Well, if we turn to Page 3 of the

3    settlement agreement, under paragraph I, it

4    reads the "DEA revoked the registrations issued

5    to CVS stores 219 and 5195 in an order published

6    on October 12, 2012" in the Federal Register.

7    The "DEA revoked the registrations of the DEA

8    stores...based, among other things, on their

9    failure to fulfill their corresponding

10   responsibilities under 21 CFR 1306.04," which is

11   the Controlled Substances Act.

12           Are you aware of that?

13       A.    I was not involved in putting this

14   together or anything like that.  I was generally

15   aware of the actions taken against the two

16   stores.

17       Q.    Okay.  And were you aware in

18   Paragraph 12 that CVS -- on Page 3, that "CVS

19   acknowledges that certain CVS/pharmacy retail

20   stores did dispense certain controlled

21   substances in a manner not fully consistent with

22   their compliance obligations under the CSA and

23   its implementing regulations"?

24       A.    I see that.  It's paragraph K.

1      Q.   Yes.

2      A.   Yes.

3      Q.   So, in fact, CVS agreed, did it not,

4    that there were certain violations of the

5    Controlled Substances Act in these two stores in

6    Florida?

7           MR. DELINSKY:  Object to form.

8      A.   It says CVS acknowledges that certain

9    stores dispensed controlled substances in a

10   manner not fully consistent with their

11   compliance obligations under the CSA and its

12   implementing regulations.

13   BY MR. ELSNER:

14     Q.   Right.

15     A.   That's what it says, yes.

16     Q.   And if we turn to Page 4, it says,

17   small Roman Numeral iii in the middle of the

18   page, these are the determinations or findings

19   by the DEA, it says "Dispensing, on or before

20   the Effective Date of this Agreement, by the

21   Florida CVS/pharmacy retail store of controlled

22   substances to individuals CVS knew or should

23   have known were diverting controlled

24   substances."

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and among the United States Attorney's Office for the Middle District of Florida, acting on behalf of the United States, the Drug Enforcement Administration ("DEA") for the Miami Division, and CVS Health and all of its subsidiaries and affiliates (collectively "CVS") (each a "Party" and collectively the "Parties").

## RECITALS

A.      CVS Health is a Delaware corporation with its corporate headquarters in Woonsocket, Rhode Island.  CVS Health, directly or through its retail pharmacy subsidiaries and affiliates, and through its CVS/pharmacy division, operates retail pharmacies in the State of Florida that dispense prescription drugs, including controlled substances, to retail consumers (hereafter referred to as "CVS/pharmacy retail stores").  Through its CVS/caremark division, CVS also operates mail service pharmacies that dispense prescription drugs, including controlled substances, by mail to retail consumers.

B.      Each CVS/pharmacy retail store in Florida is separately registered with DEA and is assigned a unique DEA registration number that authorizes it to dispense controlled substances pursuant to the provisions of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* ("CSA"), and its implementing regulations.  The CVS/pharmacy retail stores located in Florida will be referred to collectively herein as "Florida CVS/pharmacy retail stores."

C.      Pharmacies registered with DEA as chain pharmacies are permitted to dispense prescriptions, including controlled substances, to their walk-in customers as well as by mail.  For purposes of this Agreement, "Florida CVS/pharmacy retail stores" include those CVS entities,

1

                                                 **CVS-MDLT1-000060796**

subsidiaries, and affiliates that are located in Florida and that dispense prescriptions, including controlled substances, by mail.

D.     CVS also owns and operates distribution centers in Florida that are or were registered with DEA as distributors of Schedules III-V controlled substances (collectively "Florida Distribution Centers"). Each CVS Distribution Center is separately registered with DEA and is assigned a unique DEA registration number that authorizes it to distribute controlled substances pursuant to the rules and regulations in the CSA and its implementing regulations.

E.     CVS acknowledges that all of its DEA-registered CVS/pharmacy retail stores and Distribution Centers were and are required to comply with the CSA and the regulations promulgated thereunder.

F.     The CSA prohibits the distribution of a controlled substance without a valid prescription. 21 U.S.C. § 842(a)(1).  To be valid, a prescription must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice.  21 C.F.R. § 1306.04.

G.     CVS acknowledges that it has a corresponding responsibility to dispense only those prescriptions that have been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice and that knowingly filling a prescription not in the usual course of professional treatment or in legitimate and authorized research subjects CVS to penalties under the CSA.  21 C.F.R. § 1306.04.

H.     On October 18, 2011, DEA served Administrative Inspection Warrants on two CVS/pharmacy retail stores in Florida: (i) Store 219, which was registered with DEA as a chain pharmacy authorized to dispense controlled substances in Schedules II-V controlled substances under DEA registration number BC5289055 at 3798 Orlando Drive, Sanford, Florida; and (ii)

2

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060797

Store 5195, which was registered with DEA as a chain pharmacy authorized to dispense controlled substances in Schedules II-V under DEA registration number BC6988298 at 4639 West 1st Street, Sanford, Florida.

      I.     DEA revoked the registrations issued to CVS stores 219 and 5195 in an order published on October 12, 2012. *See* 77 Fed. Reg. 62316-01 (Oct. 12, 2012). DEA revoked the registrations of DEA stores 219 and 5195 based, among other things, on their failure to fulfill their corresponding responsibilities under 21 C.F.R. § 1306.04.

      J.     The United States contends that CVS failed to fulfill its corresponding responsibility under 21 C.F.R. § 1306.04 and thus is subject to civil penalties under 21 U.S.C. § 842(a)(1) and § 842(c)(1).

      K.     CVS acknowledges that certain CVS/pharmacy retail stores did dispense certain controlled substances in a manner not fully consistent with their compliance obligations under the CSA and its implementing regulations.

      L.     At all times relevant herein, the CSA authorized the imposition of civil penalties for each of the categories of Covered Conduct as described in paragraph 2 below.

      To avoid the delay, expense, inconvenience, and uncertainty of litigation of the above claims, and in consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

### TERMS AND CONDITIONS

      1.     Paragraphs A-L set forth above are fully adopted herein.

      2.     For purposes of this Agreement, "Covered Conduct" shall mean the following:

3

**HIGHLY CONFIDENTIAL**
**CVS-MDLT1-000060798**

<u>Florida CVS/pharmacy Retail Stores</u>

(i)      Conduct alleged in the February 2, 2012 Orders to Show Cause and Immediate Suspension Orders issued to CVS stores 219 and 5195 and in DEA's filings in *In the Matter of Holiday CVS, L.L.C., d/b/a CVS/Pharmacy #00219 and Holiday CVS, L.L.C., d/b/a CVS/Pharmacy #05195*, Docket Nos. 12-37 and 12-38;

(ii)      Failure of any Florida CVS/pharmacy retail store, on or before the Effective Date of this Agreement, to fulfill its corresponding responsibility to ensure that CVS dispensed controlled substances only pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R. § 1306.04, and the dispensing, on or before the Effective Date of this Agreement, by any Florida CVS/pharmacy retail store of controlled substances pursuant to prescriptions that were invalid under 21 C.F.R. Part 1306;

(iii)      Dispensing, on or before the Effective Date of this Agreement, by any Florida CVS/pharmacy retail store of controlled substances to individuals CVS knew or should have known were diverting controlled substances;

(iv)      Dispensing, on or before the Effective Date of this Agreement, by any Florida CVS/pharmacy retail store of controlled substances pursuant to prescriptions issued by physicians who did not have current, valid DEA registrations;

(v)      Refusal or negligent failure, on or before the Effective Date of this Agreement, by any Florida CVS/pharmacy retail store to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under subchapter I or subchapter II of the CSA and the CSA's implementing regulations, including, but not limited to, failure by any Florida CVS/pharmacy retail store to comply with

4

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060799

the record-keeping obligations contained in 21 C.F.R. Part 1304, and to comply with regulations regarding prescriptions contained in 21 C.F.R. Part 1306; and

(vi)    Conduct by any Florida CVS/pharmacy retail store that occurred on or before the Effective Date of this Agreement and that is inconsistent with or in violation of the CSA and/or its implementing regulations.

Florida Distribution Centers

(vii)    Failure, on or before the Effective Date of this Agreement, by any Florida Distribution Center to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 U.S.C. § 823(e);

(viii)    Failure, on or before the Effective Date of this Agreement, by any Florida Distribution Center to timely detect and report suspicious orders of controlled substances, as required by 21 U.S.C. §§ 822 and 823 and 21 C.F.R. § 1301.74(b);

(ix)    Distribution, on or before the Effective Date of this Agreement, by any Florida Distribution Center of controlled substances to a Florida CVS/pharmacy retail store that the Distribution Center knew or should have known was engaged in any of the Covered Conduct described above in paragraphs 2(i)-2(vi);

(x)    Failure, on or before the Effective Date of this Agreement, by any Florida Distribution Center to make and complete accurate reports through the Automation of Reports and Consolidated Orders System (ARCOS), as required by 21 U.S.C. § 827;

(xi)    Refusal or negligent failure, on or before the Effective Date of this Agreement, by any Florida Distribution Center to make, keep, or furnish any record, report,

5

CVS-MDLT1-000060800

notification, declaration, order or order form, statement, invoice, or information required under subchapter I or subchapter II of the CSA and the CSA's implementing regulations; and

(xii) Conduct by any Florida Distribution Center that occurred on or before the Effective Date of this Agreement and that is inconsistent with or in violation of the CSA and/or its implementing regulations.

3. CVS shall pay to the United States the total sum of $22,000,000.00 (twenty-two million dollars and no cents) (the "Settlement Amount") within ten (10) business days after the Effective Date of this Agreement by electronic funds transfer pursuant to the written instructions provided to CVS by the United States Attorney's Office for the Middle District of Florida.

4. In consideration of the undertakings of the United States contained herein, CVS fully and finally releases the United States, its agencies, officers, employees, servants, and agents from any claims (including attorney's fees, costs and expenses of every kind and however denominated) that CVS has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, employees, servants, and agents related to the investigation, prosecution, and settlement of the Covered Conduct, provided, however, that CVS reserves and does not release any liability based on obligations created by this Agreement.

5. In consideration of the undertakings by CVS, and subject to the exceptions in Paragraph 6 below (concerning excluded claims), and conditioned upon CVS's full payment of the Settlement Amount, the United States Attorney's Office for the Middle District of Florida, acting on behalf of the United States, and the DEA for the Miami Division agree to:

(i) Release and refrain from instituting any administrative claims against CVS or any of its subsidiaries or affiliates and any of the officers, directors, employees, agents, successors, and assigns of each, arising from or related to the Covered Conduct;

6

CVS-MDLT1-000060801

      (ii)    Refrain from filing any action for civil penalties under 21 U.S.C. § 842 based on, arising from, or related to the Covered Conduct.

6.    Notwithstanding the releases given in Paragraph 5 of this Agreement, the United States specifically reserves and does not release:

      (i)    Any federal criminal liability;

      (ii)    Any criminal, civil, or administrative claim arising under Title 26, United States Code (Internal Revenue Code);

      (iii)    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct; and

      (iv)    Any liability based on obligations created by this Agreement.

7.    Nothing in this Agreement constitutes an Agreement by the United States Attorney's Office concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

8.    This Agreement binds and is intended to benefit only the Parties. This Agreement is not intended to be, and shall not be interpreted to constitute, a release of any person or entity not identified or referred to herein. This Agreement is specifically limited to the Office of the United States Attorney for the Middle District of Florida and the DEA for the Miami Division and cannot bind other federal, state, or local authorities and jurisdictions.

9.    Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

10.    Each Party and signatory to this Agreement represents that he, she, or it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

HIGHLY CONFIDENTIAL                                         **CVS-MDLT1-000060802**

11.     This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Middle District of Florida.  For purposes of construing this Agreement, the Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not be construed against any Party for that reason in any subsequent dispute.

12.     This Agreement constitutes the complete agreement between the Parties.  All material representations, understandings, and promises of the Parties are contained in this Agreement.  Each of the Parties expressly agrees and acknowledges that, in entering this Agreement, it is relying on only the statements and promises expressly set forth in this written Agreement.  This Agreement cannot be amended, nor any provisions waived, except in writing and when signed by all Parties to this Agreement.

13.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties listed below.

14.     This Agreement may be executed in counterparts, including by facsimile, pdf, or other electronic form of signature, each of which constitutes an original and all of which constitute one and the same Agreement.

15.     This Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

16.     The Parties may disclose the existence of and information about this Agreement to the public without restriction.

17.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  The United States agrees to notify CVS immediately when the final signatory has executed this Agreement.

[Signatures begin on next page.]

8

**HIGHLY CONFIDENTIAL**

**ON BEHALF OF THE UNITED STATES OF AMERICA:**

_____ DATE: 5-12-15

Lacy R. Harwell, Jr.
Chief, Civil Division
United States Attorney's Office
Middle District of Florida


_____ DATE: 5-12-15

Katherine M. Ho
Assistant U.S. Attorney
United States Attorney's Office
Middle District of Florida


_____ DATE: 5-11-15

Adolphus Wright
Acting Special Agent in Charge
Drug Enforcement Administration,
Miami Division


**ON BEHALF OF CVS PHARMACY, INC.:**


_____ DATE: 12/18/2014

Elizabeth Ferguson
Senior Vice President, Assistant General Counsel
CVS Pharmacy, Inc.


9

**HIGHLY CONFIDENTIAL**

Maryland:

Moffatt Tr. at 200:6-204:22

CVS-MDLT1-000060805-60811

Highly Confidential - Subject to Further Confidentiality Review

1    reporter, I'm sorry I forgot your name.  Are you

2    picking up on --

3              THE REPORTER:  Yes.

4              MR. DELINSKY:  -- the objections to

5    forms?  Thank you.

6              MR. ELSNER:  I'm going to mark this

7    next exhibit, which is Exhibit 16.  This is MR

8    70.

9              (Whereupon, CVS-Moffatt-16 was marked

10             for identification.)

11   BY MR. ELSNER:

12       Q.   Were you aware the DEA was conducting

13   an investigation of CVS pharmacies in Maryland?

14       A.   Others were handling this more

15   directly.  I was generally aware based on my

16   role as an attorney.

17       Q.   The investigation concerned potential

18   violations of the Controlled Substances Act, and

19   in particular it related to CVS's obligations

20   with respect to corresponding responsibility

21   between the pharmacist and the physician.  Were

22   you aware of that?

23             MR. DELINSKY:  Object to form.

24       A.   Others were handling this more

1  directly.  I was generally aware of that based

2  on my role as an attorney.

3  BY MR. ELSNER:

4      Q.   If you turn to -- what I've placed

5  before you is actually a settlement agreement

6  which was entered into by CVS Pharmacy, Inc.

7  with the DEA related to the DEA's investigation

8  in Maryland, is that right?

9      A.   Yes, that's what this appears to be.

10     Q.   Okay.  And if you turn to Page 2 of

11  the settlement agreement under paragraph F, it

12  reads that "The United States contends that CVS

13  failed to fulfill its corresponding

14  responsibilities under 21 CFR 1306.04," which is

15  the Controlled Substances Act, and "is subject

16  to civil penalties."

17         Did I read that correctly?

18     A.   You did read that correctly.

19     Q.   Okay.  And in paragraph E it states

20  that "CVS acknowledges that it has a

21  corresponding responsibility to dispense only

22  those prescriptions that have been issued for a

23  legitimate medical purpose by an individual

24  practitioner acting in the usual course of

1    professional practice and that knowingly filling

2    a prescription not in the usual course of

3    professional treatment or in legitimate and

4    authorized research subjects CVS to penalties

5    under the CSA," or the Controlled Substances

6    Act, correct?

7         A.   Yes, you read that correctly.

8         Q.   Were you aware that CVS acknowledged

9    in paragraph G that certain CVS Pharmacy retail

10   stores in Maryland did dispense certain

11   controlled substances in a manner not fully

12   consistent with their compliance obligations

13   under the CSA?

14        A.   You read that portion of the paragraph

15   G correctly as well.

16        Q.   Were you aware that CVS had made that

17   acknowledgment in the settlement agreement?

18        A.   I was not involved in putting this

19   settlement agreement together, and so I wouldn't

20   have been involved in the wording here.

21        Q.   If you turn to Page 3, it states --

22   Page 3, Paragraph 3 at the very bottom, it

23   states that CVS will pay the United States a sum

24   of $8 million in settlement, is that correct?

1    A.   Yes, that's what Paragraph 3 says.

2    Q.   Were you aware that CVS had entered

3  into a settlement with the DEA related to

4  violations of corresponding responsibilities of

5  its CVS pharmacies in Maryland for an amount of

6  $8 million?

7         MR. DELINSKY:  Object to form.

8    A.   I wasn't involved in the whole

9  process, but that appears to be what this says.

10  It also says that it was done to avoid the

11  delay, expense, and inconvenience and

12  uncertainty of litigation.  So it's not

13  necessarily, you know, an admission, but...

14  BY MR. ELSNER:

15    Q.   The DEA had reached certain findings,

16  and you could have fought those findings in

17  court, but rather than doing that you entered

18  into a settlement in the amount of $8 million,

19  is that right?

20         MR. DELINSKY:  Object to form.

21    A.   Again, there's another attorney, or

22  other attorneys would have been responsible for

23  making that sort of decision, and the reasons

24  behind it.  I'm not involved in that process.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. ELSNER:

2       Q.   Okay.  But CVS agreed to it and they

3   signed -- Betsy Ferguson on behalf of CVS

4   Pharmacy, Inc. executed the settlement agreement

5   in February of 2016, correct?

6       A.   Yes.

7            MR. DELINSKY:  Could we take a quick

8   five minutes?

9            MR. ELSNER:  Sure.  Absolutely.

10           THE VIDEOGRAPHER:  We're going off the

11  record at 12:16 p.m.

12           (Whereupon, a recess was taken.)

13           THE VIDEOGRAPHER:  We're back on the

14  record at 12:24 p.m.

15  BY MR. ELSNER:

16      Q.   Mr. Moffatt, were you a secretary or

17  president of any of the pharmacies in Maryland

18  that were subject of the DEA investigation and

19  CVS settlement with the DEA?

20           MR. DELINSKY:  Object to form.

21      A.   I was president of the entity that

22  operated those pharmacies, yes.

23  BY MR. ELSNER:

24      Q.   Were you aware that the DEA also

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and among the United

States Attorney's Office for the District of Maryland, acting on behalf of the United States, the

Drug Enforcement Administration ("DEA") for the Washington Division, and CVS Pharmacy,

Inc. and all of its subsidiaries and affiliates (collectively "CVS") (each a "Party" and collectively

the "Parties").

## RECITALS

A.      CVS Pharmacy, Inc. is a Rhode Island corporation with its corporate headquarters

in Woonsocket, Rhode Island.  CVS, directly or through its retail pharmacy subsidiaries

and affiliates, and through its CVS/pharmacy division, operates retail pharmacies in the

State of Maryland that dispense prescription drugs, including controlled substances, to

retail consumers (hereafter referred to as "CVS/pharmacy retail stores").

B.      Each CVS pharmacy retail store in Maryland is separately registered with DEA

and is assigned a unique DEA registration number that authorizes it to dispense controlled

substances pursuant to the provisions of the Controlled Substances Act, 21 U.S.C. §§ 801

*et seq.* ("CSA"), and its implementing regulations.  The CVS/pharmacy retail stores

located in Maryland will be referred to collectively herein as "Maryland CVS/pharmacy

retail stores."

C.      CVS acknowledges that all of its DEA-registered CVS/pharmacy retail stores were

and are required to comply with the CSA and the regulations promulgated thereunder.

D.      The CSA prohibits the distribution of a controlled substance without a valid

prescription.  21 U.S.C. § 842(a)(1).  To be valid, a prescription must be issued for a

1

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060805

legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice. 21 C.F.R. § 1306.04.

E.      CVS acknowledges that it has a corresponding responsibility to dispense only those prescriptions that have been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice and that knowingly filling a prescription not in the usual course of professional treatment or in legitimate and authorized research subjects CVS to penalties under the CSA.  21 C.F.R. § 1306.04.

F.      The United States contends that CVS failed to fulfill its corresponding responsibility under 21 C.F.R. § 1306.04 and thus is subject to civil penalties under 21 U.S.C. § 842(a)(1) and § 842(c)(1).

G.      CVS acknowledges that certain CVS/pharmacy retail stores in Maryland did dispense certain controlled substances in a manner not fully consistent with their compliance obligations under the CSA and its implementing regulations by not conducting "corresponding responsibility" when dispensing certain controlled substances in some instances between 2008 and 2012.

H.      At all times relevant herein, the CSA authorized the imposition of civil penalties for each of the categories of Covered Conduct as described in paragraph 2 below.

To avoid the delay, expense, inconvenience, and uncertainty of litigation of the above claims, and in consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

1.      Paragraphs A-H set forth above are fully adopted herein.

2.      For purposes of this Agreement, "Covered Conduct" shall mean the following:

2

CVS-MDLT1-000060806

Maryland CVS/pharmacy Retail Stores

    (i)    Failure of any Maryland CVS/pharmacy retail store, on or before the Effective Date of this Agreement, to fulfill its corresponding responsibility to ensure that CVS dispensed controlled substances only pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R. § 1306.04;

    (ii)    Dispensing, on or before the Effective Date of this Agreement, by any Maryland CVS/pharmacy retail store of controlled substances to individuals CVS knew or should have known were diverting controlled substances;

    (iii)    Refusal or negligent failure, on or before the Effective Date of this Agreement, by any Maryland CVS/pharmacy retail store to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under subchapter I or subchapter II of the CSA and the CSA's implementing regulations, including, but not limited to, failure by any Maryland CVS/pharmacy retail store to comply with the record-keeping obligations contained in 21 C.F.R. Part 1304; and

    (iv)    Conduct by any Maryland CVS/pharmacy retail store that occurred on or before the Effective Date of this Agreement and that is inconsistent with or in violation of the CSA and/or its implementing regulations.

    3.    CVS shall pay to the United States the total sum of $8,000,000.00 (eight million dollars and no cents) (the "Settlement Amount") within ten (10) business days after the

3

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060807

Effective Date of this Agreement by electronic funds transfer pursuant to the written instructions provided to CVS by the United States Attorney's Office for the District of Maryland.

4.  In consideration of the undertakings of the United States contained herein, CVS fully and finally releases the United States, its agencies, officers, employees, servants, and agents from any claims (including attorney's fees, costs and expenses of every kind and however denominated) that CVS has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, employees, servants, and agents related to the investigation, prosecution, and settlement of the Covered Conduct, provided, however, that CVS reserves and does not release any liability based on obligations created by this Agreement.

5.  In consideration of the undertakings by CVS, and subject to the exceptions in Paragraph 6 below (concerning excluded claims), and conditioned upon CVS's full payment of the Settlement Amount, the United States Attorney's Office for the District of Maryland, acting on behalf of the United States, and the DEA for the Washington Division agree to:

(i)  Release and refrain from instituting any administrative claims against CVS or any of its subsidiaries or affiliates and any of the officers, directors, employees, agents, successors, and assigns of each, arising from or related to the Covered Conduct;

(ii)  Refrain from filing any action for civil penalties under 21 U.S.C. § 842 based on, arising from, or related to the Covered Conduct.

6.  Notwithstanding the releases given in Paragraph 5 of this Agreement, the United States specifically reserves and does not release:

4

 CVS-MDLT1-000060808

(i)     Any federal criminal liability;

(ii)    Any criminal, civil, or administrative claim arising under Title 26, United States Code (Internal Revenue Code);

(iii)   Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct; and

(iv)    Any liability based on obligations created by this Agreement.

7.      Nothing in this Agreement constitutes an Agreement by the United States Attorney's Office concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

8.      This Agreement binds and is intended to benefit only the Parties. This Agreement is not intended to be, and shall not be interpreted to constitute, a release of any person or entity not identified or referred to herein. This Agreement is specifically limited to the Office of the United States Attorney for the District of Maryland and the DEA for the Washington Division and cannot bind other federal, state, or local authorities and jurisdictions.

9.      Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

10.     Each Party and signatory to this Agreement represents that he, she, or it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

11.     This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of Maryland. For purposes of construing this Agreement,

5

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060809

the Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not be construed against any Party for that reason in any subsequent dispute.

12.     This Agreement constitutes the complete agreement between the Parties. All material representations, understandings, and promises of the Parties are contained in this Agreement. Each of the Parties expressly agrees and acknowledges that, in entering this Agreement, it is relying on only the statements and promises expressly set forth in this written Agreement. This Agreement cannot be amended, nor any provisions waived, except in writing and when signed by all Parties to this Agreement.

13.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties listed below.

14.     This Agreement may be executed in counterparts, including by facsimile, pdf, or other electronic form of signature, each of which constitutes an original and all of which constitute one and the same Agreement.

15.     This Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

16.     The Parties may disclose the existence of and information about this Agreement to the public without restriction.

17.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). The United States agrees to notify CVS immediately when the final signatory has executed this Agreement.

[Signatures begin on next page.]

6

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060810

**ON BEHALF OF THE UNITED STATES OF AMERICA:**

DATE: 2/12/2016.

Thomas F. Corcoran
Assistant U.S. Attorney
United States Attorney's Office
District of Maryland

DATE: 2/8/2016

Karl Colder
Special Agent in Charge
Drug Enforcement Administration,
Washington Division

**ON BEHALF OF CVS PHARMACY, INC.:**

DATE: 2/5/2016

Elizabeth Ferguson
Senior Vice President, Assistant General Counsel
CVS Pharmacy, Inc.

7

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060811**

Massachusetts:

Moffatt Tr. at 259:15-260:3

CVS-MDLT1-000060872-60906

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  For opioid products?

2      A.   It says 523 forged opioid

3  prescriptions.  But again, you know, other

4  people were responsible for handling this

5  matter, and for operations of the stores.

6      Q.   Did you serve a role as an officer of

7  any of the CVS pharmacies, the subject of this

8  investigation in Massachusetts?

9           MR. DELINSKY:  Object to form.

10     A.   So the CVS pharmacies in Massachusetts

11  are operated by CVS Pharmacy, Inc., so I'm vice

12  president, secretary, assistant general counsel

13  of CVS Pharmacy, Inc.

14  BY MR. ELSNER:

15     Q.   There was also an investigation, I

16  believe, of CVS stores in Massachusetts

17  regarding the prescription monitoring program.

18  Are you aware of that?

19     A.   That's not my area.  I'm not sure.

20     Q.   Did you know that CVS pharmacies in

21  Massachusetts didn't have access to the internet

22  so they couldn't operate the prescription

23  monitoring program?

24           MR. DELINSKY:  Object to form.

1    A.    Others in CVS would be responsible for

2   what access the stores had.  I have no knowledge

3   about that.

4   BY MR. ELSNER:

5    Q.    Were you aware that there was a second

6   investigation by the DEA into CVS's operations

7   in Texas concerning filling prescriptions for a

8   physician that was not properly licensed?

9   Exhibit 25.

10          (Whereupon, CVS-Moffatt-25 was marked

11          for identification.)

12   A.    It's Paragraph 7 you're talking about?

13   BY MR. ELSNER:

14   Q.    Yes.

15   A.    I see what Paragraph 7 says, yes.

16   Q.    Okay.  So the DEA was investigating

17   CVS pharmacies in Texas for filling

18   prescriptions for a Dr. Pedro Garcia, and it was

19   discovered that he didn't have a valid license

20   to prescribe those substances, correct?

21          MR. DELINSKY:  Object to form.

22   A.    It says that his Texas Department of

23   Public Safety controlled substances registration

24   was expired.

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and between the United States of America, acting through the United States Department of Justice and its Drug Enforcement Administration ("DEA") for the New England Field Division, Boston Office of Diversion (collectively, the "United States"), and CVS Pharmacy, Inc. ("CVS") (hereafter collectively referred to as "the Parties").

### Recitals

A.      CVS is a Rhode Island corporation with its corporate headquarters in Woonsocket, Rhode Island.  CVS operates retail pharmacies in the Commonwealth of Massachusetts that dispense prescription drugs, including controlled substances, to retail consumers (hereinafter referred to as "CVS/pharmacy retail stores").

B.      Each CVS/pharmacy retail store in Massachusetts is separately registered with the DEA and is assigned a unique DEA registration number.  Each DEA registrant is required to dispense controlled substances in accordance with the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.* (the "Act"), and its implementing regulations.

C.      The DEA is the Department of Justice component agency primarily responsible for enforcing the Act and is vested with the responsibility of investigating violations of the Act.

D.      The United States Attorney General, through the United States Attorney's Office, has primary authority to bring civil actions to enforce the Act. *See* 21 U.S.C. § 871 and 28 C.F.R. § 0.55(c).

E.      The United States contends that it has certain civil claims against CVS arising from CVS having filled the 523 forged opioid prescriptions listed in Attachment A hereto.  The filling of these 523 forged prescriptions is referred to below as the "Covered Conduct."

                                              **CVS-MDLT1-000060872**

In consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

### Terms of Agreement

1.      No later than 10 days after the date on which this Agreement is signed by all Parties, CVS shall pay the United States $3,500,000 (the "Settlement Amount").  The Settlement Amount shall be paid by electronic funds transfer pursuant to written instructions from the United States.

2.      At the same time the Parties enter into and sign this Agreement, CVS and DEA will enter into the Compliance Agreement that is Attachment B hereto.

3.      In consideration of the obligations of CVS in this Agreement, conditioned upon CVS timely paying the Settlement Amount and entering into the Compliance Agreement, and subject to the conditions in Paragraph 4, the United States releases CVS, its assigns, successors, and subsidiaries from any civil or administrative claims the United States has, could have, or may assert in the future related to the Covered Conduct under the Act.

4.      This Agreement in no way alters or restricts the United States' right to enforce the Act and regulations promulgated thereunder by commencing a civil or administrative action against CVS for any violations of the Act which are not based on the Covered Conduct; nor does it restrict the United States or any other sovereign or governmental entity from bringing any criminal charge against CVS.  Also, this Agreement does not prevent any sovereign other than the United States from pursuing civil, criminal, and/or administrative claims against CVS for the Covered Conduct and/or any other conduct.  However, this Agreement in no way waives CVS's right to raise any defenses in any such actions.

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060873**

5.     CVS releases the United States and its agencies, officers, agents, employees, and servants from any claims (including for attorney's fees, costs, and expenses of every kind and however denominated) that CVS has asserted, could have asserted, or may assert in the future against the United States or its agencies, officers, agents, employees, or servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

6.     The obligations imposed upon CVS pursuant to this Agreement and the Compliance Agreement are in addition to, and not in derogation of, all requirements imposed upon CVS pursuant to all applicable federal, state, and local laws and regulations, including but not limited to the requirements set forth in Title 21 of the United States Code and the regulations promulgated thereunder.

7.     Each Party and signatory to this Agreement represents that it, he, or she freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

8.     This Agreement is intended to be for the benefit of the Parties only; it does not create any rights or benefits as to third parties. The Parties do not release any claims against any other person or entity.

9.     This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of Massachusetts. This Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

10.     This Agreement and the Compliance Agreement constitute the complete agreement between the Parties. This Agreement and the Compliance Agreement may be amended only by a writing signed by all Parties.

**CVS-MDLT1-000060874**

11.     The undersigned counsel represents and warrant that they are fully authorized to execute this Agreement on behalf of the Parties.

12.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

13.     This Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

14.     Nothing in this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

15.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

16.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

17.     The Parties may execute this Agreement via facsimile and/or by portable document format (.pdf), both of which shall be deemed the equivalent of an original signature.

**HIGHLY CONFIDENTIAL**

18.    This Agreement is effective on the date of signature of the last signatory to the Agreement.

## THE UNITED STATES OF AMERICA

DATED: 6/30/16                 BY: _____

GISELLE J. JOFFRE
DEANA K. EL-MALLAWANY
Assistant U.S. Attorneys
United States Attorney's Office
District of Massachusetts


## U.S. DRUG ENFORCEMENT ADMINISTRATION

DATED: _____         BY: _____

MICHAEL J. FERGUSON
Special Agent In Charge
U.S. Drug Enforcement Administration
New England Field Division


DATED: _____         BY: _____

CLAIRE BRENNAN
Diversion Program Manager
U.S. Drug Enforcement Administration
New England Field Division


## CVS PHARMACY, INC.

DATED: _____         BY: _____

JOHN A. GILBERT, JR.
Hyman, Phelps & McNamara, PC
Counsel for CVS Pharmacy, Inc.


DATED: _____         BY: _____

ELIZABETH FERGUSON
Senior Vice President & Assistant General
Counsel
CVS Pharmacy, Inc.

**HIGHLY CONFIDENTIAL**

18.     This Agreement is effective on the date of signature of the last signatory to the
Agreement.

## THE UNITED STATES OF AMERICA

DATED: _____          BY: _____
                                GISELLE J. JOFFRE
                                DEANA K. EL-MALLAWANY
                                Assistant U.S. Attorneys
                                United States Attorney's Office
                                District of Massachusetts


## U.S. DRUG ENFORCEMENT ADMINISTRATION

DATED: 06/30/16          BY: _____
                                MICHAEL J. FERGUSON
                                Special Agent In Charge
                                U.S. Drug Enforcement Administration
                                New England Field Division


DATED: 6·30·16          BY: _____
                                CLAIRE BRENNAN
                                Diversion Program Manager
                                U.S. Drug Enforcement Administration
                                New England Field Division


## CVS PHARMACY, INC.

DATED: _____          BY: _____
                                JOHN A. GILBERT, JR.
                                Hyman, Phelps & McNamara, PC
                                Counsel for CVS Pharmacy, Inc.


DATED: _____          BY: _____
                                ELIZABETH FERGUSON
                                Senior Vice President & Assistant General
                                Counsel
                                CVS Pharmacy, Inc.


**HIGHLY CONFIDENTIAL**

18.     This Agreement is effective on the date of signature of the last signatory to the

Agreement.

## THE UNITED STATES OF AMERICA

DATED: _____ _____                     BY: _____
                                                GISELLE J. JOFFRE
                                                DEANA K. EL-MALLAWANY
                                                Assistant U.S. Attorneys
                                                United States Attorney's Office
                                                District of Massachusetts


## U.S. DRUG ENFORCEMENT ADMINISTRATION

DATED: _____                           BY: _____
                                                MICHAEL J. FERGUSON
                                                Special Agent In Charge
                                                U.S. Drug Enforcement Administration
                                                New England Field Division


DATED: _____                           BY: _____
                                                CLAIRE BRENNAN
                                                Diversion Program Manager
                                                U.S. Drug Enforcement Administration
                                                New England Field Division


## CVS PHARMACY, INC.

DATED: 6/27/16                             BY: _____
                                                JOHN A. GILBERT, JR.
                                                Hyman, Phelps & McNamara, PC
                                                Counsel for CVS Pharmacy, Inc.


DATED: _____                           BY: _____
                                                ELIZABETH FERGUSON
                                                Senior Vice President & Assistant General
                                                Counsel
                                                CVS Pharmacy, Inc.

**HIGHLY CONFIDENTIAL**                                         **CVS-MDLT1-000060878**

18.     This Agreement is effective on the date of signature of the last signatory to the

Agreement.

## THE UNITED STATES OF AMERICA

DATED: _____          BY: _____
                                GISELLE J. JOFFRE
                                DEANA K. EL-MALLAWANY
                                Assistant U.S. Attorneys
                                United States Attorney's Office
                                District of Massachusetts


## U.S. DRUG ENFORCEMENT ADMINISTRATION

DATED: _____          BY: _____
                                MICHAEL J. FERGUSON
                                Special Agent In Charge
                                U.S. Drug Enforcement Administration
                                New England Field Division


DATED: _____          BY: _____
                                CLAIRE BRENNAN
                                Diversion Program Manager
                                U.S. Drug Enforcement Administration
                                New England Field Division


## CVS PHARMACY, INC.

DATED: _____          BY: _____
                                JOHN A. GILBERT, JR.
                                Hyman, Phelps & McNamara, PC
                                Counsel for CVS Pharmacy, Inc.


DATED: 27 June 2016        BY: _____
                                ELIZABETH FERGUSON
                                Senior Vice President & Assistant General
                                Counsel
                                CVS Pharmacy, Inc.

Attachment A – Schedule of Forged Prescriptions

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 1 | 9 | 1100935 | 9/29/2013 | oxycodone - 15mg | 30 |
| 2 | 9 | 1092919 | 8/22/2014 | hydrocodone - 5/325mg | 20 |
| 3 | 109 | 376318 | 12/24/2013 | oxycodone - 15mg | 30 |
| 4 | 109 | 385413 | 2/10/2014 | oxycodone - 15mg | 40 |
| 5 | 109 | 388238 | 2/24/2014 | oxycodone - 15mg | 40 |
| 6 | 109 | 389709 | 3/3/2014 | diazepam - 5mg | 60 |
| 7 | 109 | 398374 | 4/8/2014 | oxycodone - 10mg | 40 |
| 8 | 109 | 400023 | 4/15/2014 | Butalbital - 50/325/40 mg | 40 |
| 9 | 109 | 400532 | 4/17/2014 | diazepam - 5mg | 30 |
| 10 | 109 | 404966 | 5/8/2014 | diazepam - 5mg | 15 |
| 11 | 109 | 405243 | 5/10/2014 | oxycodone - 15mg | 40 |
| 12 | 109 | 417708 | 7/5/2014 | oxycodone - 15mg | 25 |
| 13 | 109 | 419218 | 7/12/2014 | oxycodone - 15mg | 40 |
| 14 | 109 | 425070 | 8/8/2014 | oxycodone - 15mg | 50 |
| 15 | 109 | 429599 | 8/31/2014 | oxycodone - 15mg | 20 |
| 16 | 109 | 432660 | 9/14/2014 | oxycodone - 15mg | 20 |
| 17 | 109 | 435291 | 9/25/2014 | oxycodone - 15mg | 10 |
| 18 | 109 | 438943 | 10/11/2014 | oxycodone - 15mg | 8 |
| 19 | 109 | 440591 | 10/20/2014 | oxycodone - 15mg | 10 |
| 20 | 109 | 443155 | 10/29/2014 | oxycodone - 15mg | 10 |
| 21 | 109 | 448872 | 11/24/2014 | oxycodone - 15mg | 24 |
| 22 | 140 | 600903 | 1/11/2014 | HYDROCODON-ACETAMINOPH 7.5-500 | 180 |
| 23 | 148 | 531239 | 11/4/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 24 | 148 | 537372 | 1/13/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 25 | 148 | 545181 | 3/30/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 26 | 148 | 555585 | 7/21/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 27 | 159 | 899678 | 4/7/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 28 | 164 | 168212 | 8/31/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 29 | 164 | 172000 | 10/4/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 30 | 164 | 180409 | 12/20/2013 | METHADONE HCL 10 MG TABLET | 120 |
| 31 | 181 | 990569 | 7/27/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 32 | 217 | 516213 | 11/12/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

**HIGHLY CONFIDENTIAL**

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 33 | 252 | 844650 | 4/2/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 34 | 252 | 847116 | 5/2/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 35 | 252 | 849412 | 5/30/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 36 | 252 | 851738 | 6/27/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 37 | 252 | 853981 | 7/25/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 38 | 252 | 856599 | 8/27/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 39 | 252 | 860161 | 10/7/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 40 | 252 | 862751 | 11/5/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 41 | 252 | 865044 | 12/2/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 42 | 252 | 867599 | 12/30/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 43 | 252 | 870621 | 1/30/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 44 | 252 | 873533 | 2/28/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 45 | 252 | 877096 | 4/5/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 46 | 252 | 880043 | 5/5/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 47 | 252 | 883461 | 6/7/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 48 | 252 | 885955 | 7/6/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 49 | 252 | 895788 | 11/1/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 50 | 252 | 898020 | 11/30/2013 | HYDROCODON-ACETAMINOPH 7.5-500 | 180 |
| 51 | 301 | 921022 | 3/19/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 52 | 301 | 932069 | 4/30/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 53 | 301 | 936500 | 5/16/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 54 | 301 | 940333 | 5/31/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

HIGHLY CONFIDENTIAL

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 55 | 301 | 944408 | 6/15/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 56 | 301 | 948604 | 7/2/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 57 | 301 | 951317 | 7/13/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 58 | 301 | 955445 | 7/30/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 59 | 301 | 960383 | 8/18/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 60 | 301 | 964750 | 9/4/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 61 | 301 | 967821 | 9/14/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 62 | 301 | 975325 | 10/12/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 63 | 301 | 977293 | 10/20/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 64 | 301 | 984763 | 11/17/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 65 | 301 | 992330 | 12/15/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 66 | 301 | 1000280 | 1/12/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 67 | 301 | 1009692 | 2/12/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 68 | 301 | 1017587 | 3/12/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 69 | 301 | 1029505 | 4/22/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 70 | 301 | 1037851 | 5/21/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 71 | 301 | 1048356 | 6/26/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 72 | 496 | 536625 | 5/6/2014 | oxycodone - 15mg | 40 |
| 73 | 496 | 563920 | 8/17/2014 | oxycodone - 15mg | 20 |
| 74 | 500 | 666253 | 8/4/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 75 | 500 | 673146 | 9/20/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 76 | 503 | 1037867 | 8/4/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 77 | 503 | 1046728 | 9/20/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 78 | 503 | 1053612 | 10/25/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 79 | 503 | 1058947 | 11/18/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 80 | 503 | 1063450 | 12/18/2013 | HYDROCODON-ACETAMINOPH 7.5-500 | 180 |
| 81 | 503 | 1064912 | 12/27/2013 | HYDROCODON-ACETAMINOPH 7.5-500 | 180 |
| 82 | 503 | 1065550 | 12/31/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 83 | 524 | 770311 | 5/9/2013 | oxycodone - 15mg | 30 |
| 84 | 524 | 773283 | 5/30/2013 | oxycodone - 15mg | 30 |
| 85 | 524 | 776853 | 6/26/2013 | oxycodone - 15mg | 30 |
| 86 | 524 | 781165 | 7/30/2013 | oxycodone - 15mg | 20 |
| 87 | 524 | 783228 | 8/15/2013 | oxycodone - 15mg | 20 |
| 88 | 524 | 786402 | 9/9/2013 | oxycodone - 15mg | 30 |
| 89 | 524 | 788655 | 9/20/2013 | oxycodone - 15mg | 20 |
| 90 | 524 | 793815 | 10/22/2013 | oxycodone - 15mg | 30 |
| 91 | 524 | 798071 | 11/18/2013 | oxycodone - 15mg | 40 |
| 92 | 524 | 799529 | 11/26/2013 | diazepam - 5mg | 30 |
| 93 | 524 | 799530 | 11/26/2013 | oxycodone - 15mg | 40 |
| 94 | 524 | 800742 | 12/6/2013 | oxycodone - 15mg | 40 |
| 95 | 524 | 801258 | 12/10/2013 | oxycodone - 15mg | 30 |
| 96 | 524 | 802259 | 12/17/2013 | oxycodone - 15mg | 40 |
| 97 | 524 | 803366 | 12/27/2013 | oxycodone - 15mg | 40 |
| 98 | 524 | 803734 | 12/31/2013 | oxycodone - 15mg | 30 |
| 99 | 524 | 803913 | 1/2/2014 | oxycodone - 15mg | 60 |
| 100 | 524 | 804619 | 1/8/2014 | diazepam - 5mg | 30 |
| 101 | 524 | 804618 | 1/8/2014 | oxycodone - 15mg | 40 |
| 102 | 524 | 805125 | 1/10/2014 | oxycodone - 15mg | 40 |
| 103 | 524 | 807001 | 1/23/2014 | oxycodone - 15mg | 40 |
| 104 | 524 | 807003 | 1/23/2014 | Butalbital - 50/325/40 mg | 40 |
| 105 | 524 | 807801 | 1/28/2014 | oxycodone - 15mg | 40 |
| 106 | 524 | 808898 | 2/3/2014 | oxycodone - 15mg | 60 |
| 107 | 524 | 809484 | 2/5/2014 | oxycodone - 15mg | 40 |
| 108 | 524 | 810192 | 2/10/2014 | diazepam - 5mg | 30 |
| 109 | 524 | 810939 | 2/13/2014 | oxycodone - 15mg | 60 |
| 110 | 524 | 811772 | 2/19/2014 | oxycodone - 15mg | 40 |
| 111 | 524 | 814311 | 3/5/2014 | oxycodone - 15mg | 40 |
| 112 | 524 | 814751 | 3/7/2014 | oxycodone - 5mg | 40 |
| 113 | 524 | 815254 | 3/11/2014 | oxycodone - 15mg | 40 |
| 114 | 524 | 815849 | 3/14/2014 | oxycodone - 15mg | 40 |
| 115 | 524 | 817437 | 3/24/2014 | oxycodone - 15mg | 40 |
| 116 | 524 | 817893 | 3/26/2014 | oxycodone - 10mg | 40 |

CVS-MDLT1-000060883

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 117 | 524 | 818970 | 4/2/2014 | oxycodone - 15mg | 50 |
| 118 | 524 | 819450 | 4/4/2014 | oxycodone - 15mg | 40 |
| 119 | 524 | 820412 | 4/10/2014 | diazepam - 5mg | 40 |
| 120 | 524 | 821847 | 4/18/2014 | oxycodone - 15mg | 40 |
| 121 | 524 | 822482 | 4/23/2014 | oxycodone - 15mg | 40 |
| 122 | 524 | 823165 | 4/28/2014 | oxycodone - 15mg | 19 |
| 123 | 524 | 823503 | 4/29/2014 | oxycodone - 15mg | 40 |
| 124 | 524 | 825879 | 5/15/2014 | oxycodone - 15mg | 40 |
| 125 | 524 | 826805 | 5/21/2014 | oxycodone - 15mg | 40 |
| 126 | 524 | 827506 | 5/27/2014 | oxycodone - 15mg | 40 |
| 127 | 524 | 829526 | 6/9/2014 | oxycodone - 15mg | 50 |
| 128 | 524 | 830010 | 6/11/2014 | oxycodone - 15mg | 30 |
| 129 | 524 | 830011 | 6/11/2014 | diazepam - 5mg | 30 |
| 130 | 524 | 830613 | 6/16/2014 | oxycodone - 15mg | 50 |
| 131 | 524 | 832274 | 6/27/2014 | oxycodone - 15mg | 50 |
| 132 | 524 | 832794 | 7/1/2014 | oxycodone - 15mg | 50 |
| 133 | 524 | 834560 | 7/15/2014 | oxycodone - 15mg | 50 |
| 134 | 524 | 835669 | 7/23/2014 | oxycodone - 15mg | 50 |
| 135 | 524 | 836511 | 7/29/2014 | oxycodone - 15mg | 40 |
| 136 | 524 | 838397 | 8/11/2014 | oxycodone - 15mg | 50 |
| 137 | 524 | 839689 | 8/21/2014 | oxycodone - 15mg | 50 |
| 138 | 524 | 840125 | 8/25/2014 | oxycodone - 15mg | 50 |
| 139 | 524 | 841652 | 9/4/2014 | oxycodone - 15mg | 50 |
| 140 | 524 | 842297 | 9/8/2014 | oxycodone - 15mg | 50 |
| 141 | 524 | 844456 | 9/19/2014 | oxycodone - 15mg | 50 |
| 142 | 524 | 844842 | 9/22/2014 | oxycodone - 15mg | 40 |
| 143 | 524 | 847187 | 10/3/2014 | oxycodone - 15mg | 15 |
| 144 | 524 | 847478 | 10/6/2014 | oxycodone - 15mg | 40 |
| 145 | 524 | 848025 | 10/8/2014 | oxycodone - 15mg | 40 |
| 146 | 524 | 848690 | 10/13/2014 | oxycodone - 15mg | 40 |
| 147 | 524 | 849332 | 10/16/2014 | oxycodone - 15mg | 40 |
| 148 | 524 | 849991 | 10/20/2014 | oxycodone - 15mg | 40 |
| 149 | 524 | 850846 | 10/24/2014 | oxycodone - 15mg | 40 |
| 150 | 524 | 851159 | 10/27/2014 | oxycodone - 15mg | 40 |
| 151 | 524 | 852192 | 10/31/2014 | oxycodone - 15mg | 40 |
| 152 | 524 | 852443 | 11/3/2014 | oxycodone - 15mg | 40 |
| 153 | 524 | 853905 | 11/11/2014 | oxycodone - 15mg | 40 |
| 154 | 524 | 855202 | 11/18/2014 | oxycodone - 15mg | 35 |
| 155 | 524 | 855989 | 11/21/2014 | oxycodone - 15mg | 30 |
| 156 | 524 | 856676 | 11/26/2014 | oxycodone - 15mg | 50 |
| 157 | 524 | 856932 | 11/29/2014 | oxycodone - 15mg | 40 |
| 158 | 524 | 857237 | 12/2/2014 | oxycodone - 15mg | 40 |
| 159 | 593 | 654886 | 8/10/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

HIGHLY CONFIDENTIAL

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 160 | 593 | 701215 | 12/27/2013 | HYDROCODON-ACETAMINOPH 7.5-500 | 180 |
| 161 | 619 | 288909 | 5/30/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 162 | 619 | 295892 | 7/12/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 163 | 619 | 301057 | 8/17/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 164 | 619 | 302128 | 8/23/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 165 | 619 | 305064 | 9/13/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 166 | 619 | 307123 | 9/26/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 167 | 619 | 311890 | 10/25/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 168 | 619 | 311940 | 10/26/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 169 | 619 | 315249 | 11/17/2013 | METHADONE HCL 10 MG TABLET | 240 |
| 170 | 665 | 816939 | 5/4/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 171 | 665 | 820775 | 6/2/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 172 | 665 | 824550 | 6/30/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 173 | 665 | 828111 | 7/27/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 174 | 665 | 833964 | 9/10/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 175 | 665 | 838265 | 10/10/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 176 | 665 | 842516 | 11/9/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 177 | 665 | 846254 | 12/7/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 178 | 665 | 851263 | 1/11/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 179 | 665 | 855968 | 2/11/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 180 | 665 | 860933 | 3/16/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 181 | 665 | 868203 | 5/4/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

**CVS-MDLT1-000060885**

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 182 | 665 | 874445 | 6/16/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 183 | 719 | 996896 | 12/21/2012 | Hydrocodone & Comb. (2808080020) | 42 |
| 184 | 719 | 998037 | 1/2/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 185 | 719 | 999325 | 1/11/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 186 | 719 | 999325 | 1/11/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 187 | 719 | 1003491 | 2/14/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 188 | 719 | 1003491 | 2/14/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 189 | 719 | 1006863 | 3/17/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 190 | 719 | 1007655 | 3/24/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 191 | 719 | 1007655 | 3/24/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 192 | 719 | 1013624 | 5/9/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 193 | 719 | 1013624 | 5/9/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 194 | 719 | 1033823 | 9/1/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 195 | 719 | 1042008 | 10/31/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 196 | 719 | 1045906 | 12/4/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 197 | 735 | 536678 | 1/4/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 198 | 735 | 541356 | 1/25/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 199 | 735 | 540197 | 1/25/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 200 | 735 | 546354 | 3/8/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 201 | 735 | 546354 | 3/8/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 202 | 735 | 549689 | 4/1/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 203 | 735 | 549689 | 4/1/2013 | Hydrocodone & Comb. (2808080020) | 42 |

**HIGHLY CONFIDENTIAL**

CVS-MDLT1-000060886

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 204 | 735 | 553579 | 4/26/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 205 | 735 | 553579 | 4/26/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 206 | 735 | 557273 | 5/20/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 207 | 735 | 557273 | 5/20/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 208 | 735 | 559672 | 6/4/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 209 | 735 | 559672 | 6/4/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 210 | 735 | 574583 | 9/4/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 211 | 735 | 579475 | 10/5/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 212 | 735 | 582152 | 10/23/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 213 | 860 | 839327 | 2/22/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 214 | 860 | 839327 | 2/22/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 215 | 860 | 841918 | 3/19/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 216 | 860 | 842645 | 3/26/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 217 | 860 | 844920 | 4/16/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 218 | 860 | 844920 | 4/16/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 219 | 860 | 845800 | 4/24/2013 | Diazepam | 6 |
| 220 | 860 | 846948 | 5/3/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 221 | 860 | 846948 | 5/3/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 222 | 860 | 856224 | 7/8/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 223 | 860 | 857867 | 7/17/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 224 | 860 | 865199 | 9/6/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 225 | 1004 | 1203639 | 11/17/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060887

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 226 | 1004 | 1205155 | 11/24/2013 | HYDROCODON-ACETAMINOPH 7.5-500 | 120 |
| 227 | 1004 | 1208261 | 12/9/2013 | HYDROCODON-ACETAMINOPH 7.5-500 | 180 |
| 228 | 1011 | 699844 | 4/7/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 229 | 1011 | 707654 | 5/10/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 230 | 1011 | 714037 | 6/8/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 231 | 1011 | 720310 | 7/6/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 232 | 1011 | 726223 | 8/1/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 233 | 1011 | 732671 | 8/30/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 234 | 1011 | 740136 | 10/2/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 235 | 1011 | 747176 | 11/1/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 236 | 1011 | 752723 | 11/26/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 237 | 1011 | 758820 | 12/19/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 238 | 1011 | 767042 | 1/19/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 239 | 1011 | 779453 | 3/8/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 240 | 1011 | 789948 | 4/17/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 241 | 1011 | 796952 | 5/15/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 242 | 1011 | 807082 | 6/21/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 243 | 1012 | 1157389 | 4/16/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 244 | 1012 | 1161254 | 4/27/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 245 | 1012 | 1169551 | 5/24/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 246 | 1012 | 1173524 | 6/6/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 247 | 1012 | 1178579 | 6/22/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

**HIGHLY CONFIDENTIAL**

CVS-MDLT1-000060888

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 248 | 1012 | 1183245 | 7/9/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 249 | 1012 | 1186544 | 7/19/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 250 | 1012 | 1192711 | 8/8/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 251 | 1012 | 1203911 | 9/14/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 252 | 1012 | 1206429 | 9/23/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 253 | 1012 | 1215412 | 10/21/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 254 | 1012 | 1224162 | 11/16/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 255 | 1012 | 1229615 | 12/5/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 256 | 1012 | 1232007 | 12/12/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 257 | 1012 | 1242140 | 1/12/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 258 | 1012 | 1255058 | 2/15/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 259 | 1012 | 1269640 | 3/29/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 260 | 1012 | 1289828 | 5/24/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 261 | 1012 | 1292488 | 5/31/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 262 | 1021 | 754496 | 12/21/2012 | Hydrocodone & Comb. (2808080020) | 42 |
| 263 | 1021 | 863373 | 12/26/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 42 |
| 264 | 1021 | 756295 | 12/31/2012 | Hydrocodone & Comb. (2808080020) | 42 |
| 265 | 1021 | 760635 | 1/18/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 266 | 1021 | 760635 | 1/18/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 267 | 1021 | 764599 | 2/5/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 268 | 1021 | 764599 | 2/5/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 269 | 1021 | 767740 | 2/20/2013 | Hydrocodone & Comb. (2808080020) | 42 |

CVS-MDLT1-000060889

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 270 | 1021 | 767740 | 2/20/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 271 | 1021 | 768218 | 2/22/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 272 | 1021 | 768218 | 2/22/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 273 | 1021 | 771065 | 3/8/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 274 | 1021 | 772757 | 3/15/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 275 | 1021 | 773969 | 3/15/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 276 | 1021 | 773969 | 3/15/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 277 | 1021 | 776212 | 4/1/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 278 | 1021 | 776212 | 4/1/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 279 | 1021 | 779075 | 4/12/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 280 | 1021 | 779075 | 4/12/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 281 | 1021 | 780578 | 4/19/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 282 | 1021 | 780578 | 4/19/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 283 | 1021 | 783614 | 5/2/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 284 | 1021 | 783614 | 5/2/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 285 | 1021 | 786317 | 5/14/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 286 | 1021 | 786317 | 5/14/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 287 | 1021 | 790470 | 5/29/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 288 | 1021 | 790470 | 5/29/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 289 | 1021 | 795836 | 6/18/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 290 | 1021 | 798413 | 6/27/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 291 | 1021 | 802392 | 7/10/2013 | Hydrocodone & Comb. (2808080020) | 42 |

**HIGHLY CONFIDENTIAL**

CVS-MDLT1-000060890

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 292 | 1021 | 803181 | 7/12/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 293 | 1021 | 815468 | 8/23/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 294 | 1021 | 819943 | 9/11/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 295 | 1021 | 820694 | 9/15/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 296 | 1021 | 821592 | 9/18/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 297 | 1021 | 824708 | 10/1/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 298 | 1021 | 827279 | 10/14/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 299 | 1021 | 828153 | 10/17/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 300 | 1021 | 828704 | 10/20/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 301 | 1021 | 833184 | 11/8/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 302 | 1021 | 837575 | 11/29/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 303 | 1021 | 837788 | 12/1/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 304 | 1022 | 831710 | 9/11/2011 | HYDROCODON-ACETAMINOPH 7.5-751 | 120 |
| 305 | 1022 | 843517 | 11/16/2011 | METHADONE HCL 10 MG TABL | 180 |
| 306 | 1022 | 851897 | 1/3/2012 | METHADONE HCL 10 MG TABL | 180 |
| 307 | 1022 | 859341 | 2/10/2012 | METHADONE HCL 10 MG TABL | 180 |
| 308 | 1022 | 868235 | 3/30/2012 | METHADONE HCL 10 MG TABL | 180 |
| 309 | 1022 | 871071 | 4/16/2012 | METHADONE HCL 10 MG TABLET | 240 |
| 310 | 1022 | 878895 | 5/30/2012 | METHADONE HCL 10 MG TABLET | 240 |
| 311 | 1022 | 885646 | 7/6/2012 | METHADONE HCL 10 MG TABLET | 240 |
| 312 | 1022 | 891880 | 8/10/2012 | METHADONE HCL 10 MG TABLET | 240 |
| 313 | 1022 | 898419 | 9/18/2012 | METHADONE HCL 10 MG TABLET | 240 |
| 314 | 1022 | 905956 | 10/26/2012 | METHADONE HCL 10 MG TABLET | 240 |
| 315 | 1022 | 912749 | 12/3/2012 | METHADONE HCL 10 MG TABLET | 240 |

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060891

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 316 | 1022 | 921578 | 1/16/2013 | METHADONE HCL 10 MG TABLET | 240 |
| 317 | 1022 | 928938 | 2/20/2013 | METHADONE HCL 10 MG TABLET | 240 |
| 318 | 1022 | 935665 | 3/22/2013 | METHADONE HCL 10 MG TABLET | 240 |
| 319 | 1022 | 942195 | 4/23/2013 | METHADONE HCL 10 MG TABLET | 240 |
| 320 | 1022 | 949108 | 5/24/2013 | METHADONE HCL 10 MG TABLET | 240 |
| 321 | 1022 | 955351 | 6/22/2013 | METHADONE HCL 10 MG TABLET | 240 |
| 322 | 1025 | 914868 | 4/27/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 323 | 1143 | 296078 | 5/19/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 324 | 1143 | 312991 | 7/21/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 325 | 1143 | 330862 | 10/19/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 326 | 1143 | 337453 | 11/25/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 327 | 1143 | 351450 | 1/27/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 328 | 1143 | 361960 | 3/17/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 329 | 1143 | 373947 | 5/11/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 330 | 1175 | 1064842 | 8/25/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 331 | 1175 | 1071991 | 10/4/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 332 | 1181 | 683892 | 4/17/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 333 | 1181 | 694899 | 5/23/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 334 | 1181 | 705076 | 6/19/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 335 | 1181 | 712198 | 7/17/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 336 | 1181 | 720496 | 8/24/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 337 | 1181 | 726939 | 9/25/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

**HIGHLY CONFIDENTIAL**

CVS-MDLT1-000060892

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 338 | 1181 | 733690 | 10/26/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 339 | 1181 | 739131 | 11/21/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 340 | 1181 | 751174 | 1/16/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 341 | 1181 | 758473 | 2/15/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 342 | 1181 | 763267 | 3/10/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 343 | 1181 | 766510 | 3/23/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 344 | 1181 | 774195 | 4/24/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 345 | 1181 | 781566 | 5/25/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 346 | 1181 | 791910 | 7/9/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 347 | 1217 | 522272 | 3/5/2011 | Oxycodone 10 mg | 42 |
| 348 | 1217 | 529627 | 4/10/2011 | Oxycodone 15 mg | 60 |
| 349 | 1217 | 532362 | 4/24/2011 | Oxycodone 15 mg | 72 |
| 350 | 1217 | 535817 | 5/9/2011 | Oxycodone 15 mg | 60 |
| 351 | 1239 | 1182389 | 8/3/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 352 | 1239 | 1199687 | 9/28/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 353 | 1239 | 1213810 | 11/9/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 354 | 1239 | 1222841 | 12/9/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 355 | 1239 | 1233410 | 1/8/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 356 | 1239 | 1247154 | 2/14/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 357 | 1239 | 1279974 | 5/18/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 358 | 1239 | 1295097 | 6/29/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 359 | 1239 | 1302977 | 7/22/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 360 | 1250 | 1058626 | 10/12/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 361 | 1252 | 182015 | 1/6/2011 | Oxycodone 10 mg | 30 |
| 362 | 1252 | 182497 | 1/10/2011 | Oxycodone 10 mg | 50 |

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060893

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 363 | 1252 | 183713 | 1/20/2011 | Oxycodone 10 mg | 45 |
| 364 | 1252 | 184423 | 1/25/2011 | Oxycodone 10 mg | 50 |
| 365 | 1252 | 185005 | 1/31/2011 | Oxycodone 10 mg | 45 |
| 366 | 1252 | 185726 | 2/4/2011 | Oxycodone 10 mg | 48 |
| 367 | 1252 | 186127 | 2/8/2011 | Oxycodone 10 mg | 42 |
| 368 | 1252 | 186618 | 2/11/2011 | Oxycodone 10 mg | 36 |
| 369 | 1252 | 187386 | 2/17/2011 | Oxycodone 10 mg | 36 |
| 370 | 1252 | 187738 | 2/22/2011 | Oxycodone 10 mg | 48 |
| 371 | 1252 | 188186 | 2/24/2011 | Oxycodone 10 mg | 50 |
| 372 | 1252 | 188577 | 2/27/2011 | Oxycodone 10 mg | 48 |
| 373 | 1252 | 189039 | 3/2/2011 | Oxycodone 10 mg | 48 |
| 374 | 1252 | 189761 | 3/7/2011 | Oxycodone 20 mg | 30 |
| 375 | 1252 | 190373 | 3/11/2011 | Oxycodone 20 mg | 50 |
| 376 | 1252 | 191351 | 3/18/2011 | Oxycodone 15 mg | 64 |
| 377 | 1252 | 191969 | 3/23/2011 | Oxycodone 15 mg | 56 |
| 378 | 1252 | 192498 | 3/27/2011 | Oxycodone 15 mg | 48 |
| 379 | 1252 | 192896 | 3/30/2011 | Oxycodone 15 mg | 40 |
| 380 | 1252 | 193342 | 4/2/2011 | Oxycodone 15 mg | 48 |
| 381 | 1252 | 193584 | 4/5/2011 | Oxycodone 15 mg | 72 |
| 382 | 1252 | 194947 | 4/14/2011 | Oxycodone 15 mg | 72 |
| 383 | 1252 | 195435 | 4/19/2011 | Oxycodone 15 mg | 72 |
| 384 | 1252 | 196573 | 4/27/2011 | Oxycodone 20 mg | 110 |
| 385 | 1252 | 197497 | 5/5/2011 | Oxycodone 15 mg | 70 |
| 386 | 1252 | 198596 | 5/13/2011 | Oxycodone 15 mg | 72 |
| 387 | 1252 | 199169 | 5/17/2011 | Oxycodone 15 mg | 72 |
| 388 | 1252 | 199716 | 5/21/2011 | Oxycodone 15 mg | 60 |
| 389 | 1252 | 200030 | 5/24/2011 | Oxycodone 15 mg | 108 |
| 390 | 1252 | 200846 | 5/29/2011 | Oxycodone 20 mg | 90 |
| 391 | 1252 | 201570 | 6/4/2011 | Oxycodone 15 mg | 72 |
| 392 | 1252 | 202079 | 6/8/2011 | Oxycodone 15 mg | 110 |
| 393 | 1252 | 202997 | 6/14/2011 | Oxycodone 10 mg | 72 |
| 394 | 1252 | 203626 | 6/17/2011 | Oxycodone 15 mg | 72 |
| 395 | 1252 | 203891 | 6/21/2011 | Oxycodone 15 mg | 60 |
| 396 | 1252 | 204455 | 6/24/2011 | Oxycodone 15 mg | 60 |
| 397 | 1252 | 204701 | 6/27/2011 | Oxycodone 15 mg | 60 |
| 398 | 1252 | 205366 | 6/30/2011 | Oxycodone 15 mg | 60 |
| 399 | 1252 | 205629 | 7/3/2011 | Oxycodone 15 mg | 48 |
| 400 | 1252 | 205760 | 7/5/2011 | Oxycodone 15 mg | 31 |
| 401 | 1252 | 206093 | 7/7/2011 | Oxycodone 30 mg | 48 |
| 402 | 1252 | 207030 | 7/14/2011 | Oxycodone 20 mg | 60 |
| 403 | 1252 | 207481 | 7/18/2011 | Oxycodone 10 mg | 60 |
| 404 | 1252 | 207811 | 7/20/2011 | Oxycodone 20 mg | 90 |
| 405 | 1252 | 208471 | 7/25/2011 | Oxycodone 10 mg | 90 |
| 406 | 1252 | 208927 | 7/28/2011 | Oxycodone 10 mg | 90 |

CVS-MDLT1-000060894

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 407 | 1252 | 209318 | 7/31/2011 | Oxycodone 10 mg | 180 |
| 408 | 1252 | 209923 | 8/4/2011 | Oxycodone 15 mg | 90 |
| 409 | 1252 | 210468 | 8/9/2011 | Oxycodone 30 mg | 90 |
| 410 | 1265 | 652855 | 5/16/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 411 | 1265 | 656183 | 5/29/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 412 | 1265 | 662071 | 6/20/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 413 | 1265 | 665184 | 7/3/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 414 | 1265 | 669047 | 7/20/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 415 | 1265 | 675121 | 8/17/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 416 | 1265 | 678358 | 9/1/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 417 | 1265 | 684443 | 9/27/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 150 |
| 418 | 1265 | 688009 | 10/12/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 180 |
| 419 | 1265 | 689270 | 10/17/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 420 | 1265 | 702833 | 12/14/2013 | HYDROCODON-ACETAMINOPH 7.5-500 | 180 |
| 421 | 1265 | 739134 | 5/13/2014 | oxycodone - 10mg | 20 |
| 422 | 1265 | 744084 | 5/30/2014 | oxycodone - 15mg | 20 |
| 423 | 1265 | 745853 | 6/5/2014 | oxycodone - 15mg | 30 |
| 424 | 1857 | 287560 | 7/25/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 425 | 1857 | 296215 | 9/21/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 426 | 1857 | 298335 | 10/6/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 427 | 1859 | 772237 | 12/26/2012 | Hydrocodone & Comb. (2808080020) | 42 |
| 428 | 1859 | 776310 | 1/16/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 429 | 1859 | 776310 | 1/16/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 430 | 1859 | 779966 | 2/5/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 431 | 1859 | 779966 | 2/5/2013 | Hydrocodone & Comb. (2808080020) | 42 |

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060895**

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 432 | 1859 | 785480 | 3/8/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 433 | 1859 | 785480 | 3/8/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 434 | 1859 | 789679 | 4/1/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 435 | 1859 | 789679 | 4/1/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 436 | 1859 | 794408 | 4/26/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 437 | 1859 | 794408 | 4/26/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 438 | 1859 | 797617 | 5/14/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 439 | 1859 | 799942 | 5/24/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 440 | 1859 | 811111 | 7/15/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 441 | 1859 | 831688 | 10/25/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 442 | 1899 | 1137771 | 12/6/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 443 | 1899 | 1145999 | 1/6/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 444 | 1899 | 1156375 | 2/6/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 445 | 1899 | 1165097 | 3/6/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 446 | 1899 | 1171383 | 3/26/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 447 | 1899 | 1176522 | 4/11/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 448 | 1899 | 1180537 | 4/24/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 449 | 2055 | 975820 | 9/9/2011 | HYDROCODON-ACETAMINOPH | 120 |
| 450 | 2055 | 985085 | 10/21/2011 | HYDROCODON-ACETAMINOPH | 120 |
| 451 | 2055 | 994793 | 12/5/2011 | HYDROCODON-ACETAMINOPH | 120 |
| 452 | 2055 | 1037496 | 6/10/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 453 | 2055 | 1046937 | 7/22/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 454 | 2055 | 1062657 | 9/29/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060896**

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 455 | 2055 | 1082420 | 12/21/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 456 | 2055 | 1093173 | 2/2/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 457 | 2282 | 251119 | 10/13/2011 | Oxycodone 15 mg | 80 |
| 458 | 2282 | 252076 | 10/20/2011 | Oxycodone 15 mg | 80 |
| 459 | 2283 | 907055 | 9/24/2011 | Oxycodone 15 mg | 30 |
| 460 | 2283 | 909876 | 10/6/2011 | Oxycodone 15 mg | 60 |
| 461 | 2322 | 863373 | 12/26/2012 | Hydrocodone & Comb. (2808080020) | 42 |
| 462 | 2322 | 866928 | 1/4/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 463 | 2322 | 874857 | 1/25/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 464 | 2322 | 874857 | 1/25/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 465 | 2322 | 885465 | 2/22/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 466 | 2322 | 885465 | 2/22/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 467 | 2322 | 894535 | 3/19/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 468 | 2322 | 896814 | 3/25/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 469 | 2322 | 906484 | 4/19/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 470 | 2322 | 906484 | 4/19/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 471 | 2322 | 917790 | 5/20/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 472 | 2322 | 917790 | 5/20/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 473 | 2322 | 922531 | 5/29/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 474 | 2322 | 922531 | 5/29/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 475 | 2322 | 939412 | 7/13/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 476 | 2322 | 942474 | 7/21/2013 | Hydrocodone & Comb. (2808080020) | 42 |
| 477 | 2322 | 950108 | 8/9/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 478 | 2322 | 953150 | 8/18/2013 | Hydrocodone & Comb. (2808080020) | 48 |

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060897**

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 479 | 2322 | 960816 | 9/8/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 480 | 2322 | 965892 | 9/22/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 481 | 2322 | 967692 | 9/26/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 482 | 2322 | 968458 | 9/29/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 483 | 2322 | 970361 | 10/3/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 484 | 2322 | 972837 | 10/10/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 485 | 2322 | 973688 | 10/14/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 486 | 2322 | 976512 | 10/21/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 487 | 2322 | 979457 | 10/29/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 488 | 2322 | 983766 | 11/11/2013 | Hydrocodone & Comb. (2808080020) | 48 |
| 489 | 2420 | 973818 | 8/31/2013 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 490 | 2420 | 1003321 | 1/5/2014 | HYDROCODON-ACETAMINOPH 7.5-500 | 180 |
| 491 | 2500 | 359993 | 4/25/2014 | oxycodone - 15mg | 11 |
| 492 | 2592 | 1000222 | 10/17/2014 | oxycodone - 15mg | 50 |
| 493 | 2592 | 1009824 | 11/20/2014 | oxycodone - 15mg | 50 |
| 494 | 2959 | 190835 | 5/9/2012 | HYDROCODON-ACETAMINOPH 7.5-750 | 120 |
| 495 | 2959 | 191135 | 5/12/2012 | METHADONE HCL 10 MG TABLET | 180 |
| 496 | 2959 | 195016 | 6/22/2012 | METHADONE HCL 10 MG TABLET | 180 |
| 497 | 2959 | 198257 | 7/27/2012 | METHADONE HCL 10 MG TABLET | 180 |
| 498 | 2959 | 201948 | 9/5/2012 | METHADONE HCL 10 MG TABLET | 180 |
| 499 | 2959 | 205796 | 10/12/2012 | METHADONE HCL 10 MG TABLET | 180 |
| 500 | 2959 | 210005 | 11/23/2012 | METHADONE HCL 10 MG TABLET | 180 |
| 501 | 2959 | 214152 | 1/3/2013 | METHADONE HCL 10 MG TABLET | 180 |

**HIGHLY CONFIDENTIAL**

| # | Pharmacy # | RX Number | Date Written | Drug Name | Quantity |
|---|---|---|---|---|---|
| 502 | 2959 | 218380 | 2/8/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 503 | 2959 | 225457 | 4/12/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 504 | 2959 | 228861 | 5/14/2013 | METHADONE HCL 10 MG TABLET | 180 |
| 505 | 2959 | 232201 | 6/12/2013 | METHADONE HCL 5 MG TABLET | 240 |
| 506 | 2971 | 631814 | 11/13/2014 | oxycodone - 15mg | 40 |
| 507 | 2971 | 633219 | 11/26/2014 | oxycodone - 15mg | 40 |
| 508 | 3307 | 422762 | 9/29/2011 | Oxycodone 15 mg | 60 |
| 509 | 3307 | 423900 | 10/10/2011 | Oxycodone 15 mg | 50 |
| 510 | 6596 | 227075 | 11/8/2013 | HYDROCODON- ACETAMINOPH 7.5-750 | 120 |
| 511 | 7530 | 239624 | 6/2/2014 | oxycodone - 15mg | 50 |
| 512 | 7530 | 240672 | 6/13/2014 | oxycodone - 15mg | 40 |
| 513 | 7530 | 242812 | 7/7/2014 | oxycodone - 15mg | 50 |
| 514 | 7530 | 243312 | 7/11/2014 | oxycodone - 15mg | 40 |
| 515 | 7530 | 244815 | 7/28/2014 | oxycodone - 15mg | 30 |
| 516 | 7530 | 247730 | 9/2/2014 | oxycodone - 15mg | 20 |
| 517 | 7530 | 248928 | 9/12/2014 | oxycodone - 15mg | 40 |
| 518 | 7530 | 249168 | 9/16/2014 | oxycodone - 15mg | 20 |
| 519 | 7530 | 249914 | 9/22/2014 | oxycodone - 15mg | 40 |
| 520 | 7530 | 252392 | 10/15/2014 | oxycodone - 15mg | 20 |
| 521 | 7530 | 253106 | 10/22/2014 | oxycodone - 15mg | 10 |
| 522 | 8906 | 201251 | 5/3/2014 | oxycodone - 15mg | 40 |
| 523 | 8906 | 217203 | 9/27/2014 | oxycodone - 15mg | 20 |

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060899

**<u>Attachment B – Compliance Agreement</u>**

This Compliance Agreement is entered into between CVS Pharmacy, Inc. ("CVS") and the United States Drug Enforcement Administration ("DEA") (jointly, the "Parties").

Whereas, the Parties agree that CVS has an obligation to comply with the Controlled Substances Act (the "CSA"),

Whereas, in November 2015 and May 2016, CVS provided DEA with updates on its compliance program, including initiatives to prevent, detect and address drug diversion, and

Whereas CVS agrees to work collaboratively with DEA to continue to maintain and enhance its existing compliance program,

The Parties agree as follows:

1.      This Compliance Agreement is incorporated by reference at Paragraph 2 of the Settlement Agreement between CVS and the United States dated June 30, 2016 (the "Settlement Agreement").

2.      The period of this Compliance Agreement shall be three years, starting on the effective date of the Settlement Agreement.

3.      CVS agrees to appoint a CVS employee to serve as a contact person ("Compliance Representative") for the Boston Field Office of the DEA during the three-year period covered by the Compliance Agreement.  CVS agrees that the Compliance Representative will serve as a point-of-contact for DEA inquiries and concerns concerning drug diversion.

4.      CVS agrees that the Compliance Representative will meet with the Boston Field Office of the DEA on an annual basis to provide updates concerning CVS's compliance initiatives to prevent, detect and address drug diversion, including measures to detect forged prescriptions, training provided to CVS employees on the pharmacist's corresponding

**CVS-MDLT1-000060900**

responsibility to ensure that prescriptions are valid and written for a legitimate medical purpose, CVS's verification procedures for prescriptions, CVS's accounting and recordkeeping procedures, CVS's policies regarding notifying law enforcement about suspected drug diversion and CVS's practice of notifying pharmacists of suspected drug diversion.

5.      CVS agrees that the Compliance Representative will notify the Boston Field Office of the DEA when any prescription presented at a pharmacy in Massachusetts is identified by CVS as a probable forgery, including those identified as probable forgeries based on CVS's analysis of practitioners' prescribing trends.

6.      CVS agrees that it will continue to maintain and enhance its compliance program, including, but not limited to, the following:

     a.  Conducting multiple pharmacy staff trainings each year on issues of compliance with the CSA, specifically including:

        i.   the pharmacist's corresponding responsibility for proper dispensing of controlled substances; and

        ii.  preventing, detecting, and reporting possible diversion, including in instances where prescriptions appear to have been forged or are otherwise fraudulent.

     b.  Conducting a store monitoring and intervention program to identify opportunities for improvement and to ensure that stores maintain appropriate procedures to detect and prevent diversion and other improper dispensing.

     c.  Providing all CVS pharmacists access to state Prescription Monitoring Program ("PMP") systems and requiring CVS pharmacists to review PMP data when in

**HIGHLY CONFIDENTIAL**

their professional judgment such information would assist in the exercise of their corresponding responsibility.

d. Enhancing loss prevention functions to improve monitoring of stores related to security, diversion, and recordkeeping.

e. Holding pharmacy staff accountable for compliance with the CSA, including by considering compliance metrics in evaluating employee performance and by imposing meaningful employee discipline for all matters relating to CSA compliance.

7. CVS will comply at all times with the CSA and the regulations issued thereunder. To the extent that any requirements in the CSA or regulations are greater than those imposed by this Compliance Agreement, the stricter requirements will apply.

8. Each Party and signatory to this Compliance Agreement represents that it, he, or she freely and voluntarily enters into this Compliance Agreement without any degree of duress or compulsion.

9. This Compliance Agreement is intended to be for the benefit of the Parties only; it does not create any rights or benefits as to third parties. The Parties do not release any claims against any other person or entity.

10. This Compliance Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of Massachusetts. This Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

11.    This Compliance Agreement and the Settlement Agreement constitute the complete agreement between the Parties.  This Compliance Agreement and the Settlement Agreement may be amended only by a writing signed by all Parties.

12.    The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties.

13.    This Compliance Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

14.    This Compliance Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

**U.S. DRUG ENFORCEMENT ADMINISTRATION**

DATED: _06/30/16_                BY: _____
                                    MICHAEL J. FERGUSON
                                    Special Agent In Charge
                                    U.S. Drug Enforcement Administration
                                    New England Field Division

DATED: _____                BY: _____
                                    CLAIRE BRENNAN
                                    Diversion Program Manager
                                    U.S. Drug Enforcement Administration
                                    New England Field Division

**CVS PHARMACY, INC.**

DATED: _____                BY: _____
                                    JOHN A. GILBERT, JR.
                                    Hyman, Phelps & McNamara, PC
                                    Counsel for CVS Pharmacy, Inc.

DATED: _____                BY: _____
                                    ELIZABETH FERGUSON
                                    Senior Vice President & Assistant General
                                    Counsel
                                    CVS Pharmacy, Inc.

11.     This Compliance Agreement and the Settlement Agreement constitute the complete agreement between the Parties.  This Compliance Agreement and the Settlement Agreement may be amended only by a writing signed by all Parties.

12.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties.

13.     This Compliance Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

14.     This Compliance Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

## U.S. DRUG ENFORCEMENT ADMINISTRATION

DATED: _____          BY: _____
                                MICHAEL J. FERGUSON
                                Special Agent In Charge
                                U.S. Drug Enforcement Administration
                                New England Field Division

DATED: 6·29·16             BY: _Claire Brennan_____
                                CLAIRE BRENNAN
                                Diversion Program Manager
                                U.S. Drug Enforcement Administration
                                New England Field Division

## CVS PHARMACY, INC.

DATED: _____          BY: _____
                                JOHN A. GILBERT, JR.
                                Hyman, Phelps & McNamara, PC
                                Counsel for CVS Pharmacy, Inc.

DATED: _____          BY: _____
                                ELIZABETH FERGUSON
                                Senior Vice President & Assistant General
                                Counsel
                                CVS Pharmacy, Inc.

**HIGHLY CONFIDENTIAL**

11.     This Compliance Agreement and the Settlement Agreement constitute the complete agreement between the Parties.  This Compliance Agreement and the Settlement Agreement may be amended only by a writing signed by all Parties.

12.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties.

13.     This Compliance Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

14.     This Compliance Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

## U.S. DRUG ENFORCEMENT ADMINISTRATION

DATED: _____          BY: _____
                                MICHAEL J. FERGUSON
                                Special Agent In Charge
                                U.S. Drug Enforcement Administration
                                New England Field Division

DATED: _____          BY: _____
                                CLAIRE BRENNAN
                                Diversion Program Manager
                                U.S. Drug Enforcement Administration
                                New England Field Division

CVS PHARMACY, INC.

DATED: 6/27/16             BY: _____
                                JOHN A. GILBERT, JR.
                                Hyman, Phelps & McNamara, PC
                                Counsel for CVS Pharmacy, Inc.

DATED: _____          BY: _____
                                ELIZABETH FERGUSON
                                Senior Vice President & Assistant General
                                Counsel
                                CVS Pharmacy, Inc.

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060905**

11.     This Compliance Agreement and the Settlement Agreement constitute the complete agreement between the Parties.  This Compliance Agreement and the Settlement Agreement may be amended only by a writing signed by all Parties.

12.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties.

13.     This Compliance Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

14.     This Compliance Agreement inures to the benefit of and is binding on each Party and its respective successors, transferees, heirs, and assigns.

## U.S. DRUG ENFORCEMENT ADMINISTRATION

DATED: _____          BY:     _____
                                   MICHAEL J. FERGUSON
                                   Special Agent In Charge
                                   U.S. Drug Enforcement Administration
                                   New England Field Division

DATED: _____          BY:     _____
                                   CLAIRE BRENNAN
                                   Diversion Program Manager
                                   U.S. Drug Enforcement Administration
                                   New England Field Division

## CVS PHARMACY, INC.

DATED: _____          BY:     _____
                                   JOHN A. GILBERT, JR.
                                   Hyman, Phelps & McNamara, PC
                                   Counsel for CVS Pharmacy, Inc.

DATED: _27 June 2016_      BY:     _____
                                   ELIZABETH FERGUSON
                                   Senior Vice President & Assistant General Counsel
                                   CVS Pharmacy, Inc.

HIGHLY CONFIDENTIAL

New York:

Moffatt Tr. at 241:22-248:8

CVS-MDLT1-000060839-60846

1    investigation, CVS agreed to pay a settlement in

2    the amount of $345,000 in Paragraph 13 on

3    Page 4, is that right?

4           MR. DELINSKY:  Object to form.

5       A.   Paragraph 13 on Page 4 refers to a sum

6    of $345,000.

7    BY MR. ELSNER:

8       Q.   Were you made aware of that as the

9    president of CVS Texas entity?

10          MR. DELINSKY:  Object to form.

11   BY MR. ELSNER:

12      Q.   I'm sorry, as the president of CVS

13   Pharmacy?

14          MR. DELINSKY:  Object to form.

15   BY MR. ELSNER:

16      Q.   Were you made aware of the amount of

17   the settlement?

18      A.   I was vice president and secretary of

19   CVS Pharmacy.  I -- others would be responsible

20   for this settlement.  To the extent I learned

21   about it, it would have been as an attorney.

22      Q.   If I could show you the next exhibit.

23          There was also an investigation of CVS

24   in Nassau and Suffolk County, New York on Long

```
 1   Island between 2013 and 2015 concerning thefts

 2   of controlled substances and reporting

 3   violations.  Were you aware of that?

 4        A.   Yes, I was aware of that.

 5        Q.   This is Exhibit 22.

 6             (Whereupon, CVS-Moffatt-22 was marked

 7             for identification.)

 8   BY MR. ELSNER:

 9        Q.   This is Motley Rice 242.

10             Can you tell me what it is you

11   remember about this?

12        A.   I remember we settled it fairly

13   recently, although the conduct, as you said, was

14   from several years back, and I recall, I think,

15   I signed -- yeah, I signed this one.

16        Q.   You executed this on behalf of what

17   entity?

18        A.   CVS Pharmacy, Inc.

19        Q.   And that was the company controlling

20   the CVS Pharmacy, the subject of this

21   investigation pharmacies, is that right?

22        A.   Actually, no.  So it appears from

23   here, it says A, settlement, "CVS Pharmacy, Inc.

24   is a Rhode Island corporation with its corporate
```

Highly Confidential - Subject to Further Confidentiality Review

1    headquarters in Woonsocket, Rhode Island.  CVS

2    directly or indirectly operates CVS retail

3    pharmacies in Nassau and Suffolk Counties."

4            So the entity that actually operates

5    stores in New York is called CVS Albany, LLC.

6    CVS Pharmacy, Inc. is its parent.

7        Q.   Are you an officer of CVS Albany?

8        A.   Yes.

9        Q.   President?

10        A.   I am president of CVS Albany.

11        Q.   And was that true for the time period

12    concerning this investigation, which is between

13    February of 2013 and January of 2015?

14        A.   Yes.

15        Q.   And the investigation here concerned

16    the failure to promptly report a theft of a

17    controlled substance from these stores, is that

18    right?

19            MR. DELINSKY:  Object to form.

20        A.   Another attorney would have been

21    involved in the whole matter.  So, you know, I

22    was brought in at the end, as I discussed

23    earlier, you know, so, you know, I was consulted

24    at the end when it needed to be signed.  But I

1    didn't have -- I wasn't directly involved in

2    this, so I don't recall the particulars.  Well,

3    I didn't know the particulars.

4    BY MR. ELSNER:

5         Q.   Well, CVS agreed to pay in settlement

6    of this matter $1.5 million, is that right,

7    Page 2?

8         A.   Yeah, Page 2, Paragraph 1.

9         Q.   Is that correct?

10        A.   That is correct.

11        Q.   Okay.  And you signed this settlement

12   agreement?

13        A.   Yes.

14        Q.   Other than the settlement agreement

15   itself, did you review any documents before you

16   executed this agreement?

17        A.   Another attorney would have been

18   responsible for the entire matter.  I don't

19   recall if I reviewed any documents.  I had a

20   discussion certainly with the attorney when I

21   was asked to sign it.

22        Q.   Who was the attorney?

23        A.   I believe it was Mark Vernazza.

24        Q.   And he's employed by CVS, is that

```
 1   right?

 2        A.    Yes, CVS Pharmacy.

 3        Q.    CVS Pharmacy, Inc.

 4              Did Mark show you any documents before

 5   you executed the agreement?

 6              MR. DELINSKY:  Objection.  Asked and

 7   answered.

 8        A.    I don't recall if he showed me

 9   anything.

10   BY MR. ELSNER:

11        Q.    Did Mark share with you what the DEA

12   had found concerning the thefts and the

13   reporting from these CVS Pharmacy stores?

14              MR. DELINSKY:  Object to form.  And I

15   instruct the witness not to answer on the

16   grounds that that would involve attorney/client

17   privileged information.

18              MR. ELSNER:  So what I've asked him is

19   I've asked him whether he, Mark Vernazza, shared

20   with the witness what the DEA had found

21   concerning thefts in the reporting violations,

22   and you're asserting privilege over the DEA's

23   findings and facts, is that my understanding?

24              MR. DELINSKY:  I'm asserting privilege
```

Highly Confidential - Subject to Further Confidentiality Review

1    as a result of the following circumstances.

2    Mr. Moffatt has testified that he doesn't recall

3    reviewing any documents in connection with his

4    signing the settlement agreement, so by

5    definition the only way that information could

6    have been conveyed to Mr. Moffatt would have

7    been through an attorney reflecting that

8    attorney's mental impressions upon hearing or

9    reading, depending on the facts, what the DEA

10   told him.  So on that basis I am asserting

11   privilege.

12            I think the manner in which to proceed

13   here would be for you to ask Mr. Moffatt if he

14   obtained any information from the attorney that

15   was separate from or in addition to the

16   information already contained in the settlement

17   agreement so we at least can see if there's even

18   a dispute.

19   BY MR. ELSNER:

20        Q.   Did you obtain any information

21   regarding the allegations here by the DEA above

22   and beyond what's written in the settlement

23   agreement?

24        A.   I don't recall getting any other

Highly Confidential - Subject to Further Confidentiality Review

1    information.

2        Q.   Did you ask for any?

3        A.   I don't recall what we specifically

4    discussed.

5        Q.   This was just in June of last year,

6    it's not a particularly old event, and you said

7    you did have a recollection of it.  So did

8    you -- did you personally discuss any of these

9    matters with anyone at the DEA?

10       A.   No.  Mark or someone on Betsy's team

11   would be responsible for this sort of matter.

12       Q.   Did the DEA provide CVS with any

13   document describing its findings that you're

14   aware of?

15           MR. DELINSKY:  Object to form.

16           You may answer.

17       A.   I wouldn't have been involved, so I

18   don't know what the DEA would have provided.

19   BY MR. ELSNER:

20       Q.   Did you ask Mr. Vernazza if there were

21   any documents provided by the DEA?

22       A.   I did not ask him if there were

23   documents provided, not that I recall.

24       Q.   Did you -- did Mr. Vernazza, yes or

1    no, tell you what the DEA findings were with

2    respect to these CVS stores in Long Island?

3                MR. DELINSKY:  Objection.  Asked and

4    answered.

5         A.    In connection with signing this we had

6    discussions, but I don't recall specifically

7    what he told me about the contentions or, you

8    know, any conclusions.

9    BY MR. ELSNER:

10        Q.    I'm just trying to understand, before

11   you would execute these agreements, did you just

12   rely on the lawyers at CVS who were involved in

13   this process and simply sign it, or did you do

14   any of your own independent analysis in

15   consideration before executing them?

16               MR. DELINSKY:  Object to form.

17        A.    I would have a discussion about the

18   attorneys involved, but I didn't do an

19   independent investigation.

20   BY MR. ELSNER:

21        Q.    How many discussions?

22        A.    It would depend on the case and the

23   circumstances.  I don't -- we probably only had

24   one or two discussions about this matter.

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the United States Drug Enforcement Administration ("DEA")(collectively the "United States"), and CVS Pharmacy, Inc. and all of its relevant subsidiaries, entities, and affiliates that operate retail pharmacies in Nassau and Suffolk counties on Long Island, in the State of New York (collectively "CVS"), (hereinafter collectively referred to as "the Parties"), through their authorized representatives.

### Recitals

A.    CVS Pharmacy, Inc. is a Rhode Island corporation with its corporate headquarters in Woonsocket, Rhode Island. CVS directly or indirectly operates CVS Pharmacy retail pharmacies in Nassau and Suffolk counties on Long Island, in the State of New York, that dispense prescription drugs, including controlled substances, to retail consumers (hereinafter referred to as "Long Island CVS Pharmacy retail stores").

B.    Each Long Island CVS Pharmacy retail store is separately registered with the DEA and is assigned a unique DEA registration number that authorizes the store to dispense controlled substances pursuant to the provisions of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* ("the CSA"), and its implementing regulations.

C.    CVS acknowledges that all of the Long Island CVS Pharmacy retail stores were and are required to comply with the CSA and the regulations promulgated thereunder.

D.    CVS has been working cooperatively and directly with the Group Supervisor of Group D-11 of the DEA Long Island District Office concerning thefts or significant losses of controlled substances, including the reporting thereof.

E.      The United States contends that it has certain civil and/or administrative claims under the CSA and its implementing regulations against CVS.  Specifically, the United States contends that, on or before the Effective Date of the Agreement, the Long Island CVS Pharmacy retail stores violated 21 U.S.C. § 842 and/or the CSA's implementing regulations, including without limitation by:

- between February 2013 and January 2015, failing to report to DEA, in writing, within one business day of discovery, thefts or significant losses of controlled substances, including hydrocodone, from certain Long Island CVS Pharmacy retail stores, as required by 21 C.F.R. 1301.76(b).

The United States' claims and allegations against CVS under 21 U.S.C. § 842 and/or the CSA's implementing regulations as set forth above in this Paragraph E shall hereinafter be referred to as the "Covered Conduct."

F.      This Agreement is neither an admission of liability by CVS nor a concession by the United States that its claims are not well founded.

G.      To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

### Terms of Agreement

1.      CVS shall pay the United States One Million and Five Hundred Thousand dollars ($1,500,000) (the "Settlement Amount"), which shall be paid no later than fourteen (14) business days after the Effective Date of this Agreement.  Payment of the Settlement Amount shall be by electronic funds transfer in accordance with written instructions from the Office of the United States Attorney.

2

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060840

2.     Subject to the exceptions in Paragraph 5 (concerning excluded claims) herein, and conditioned upon CVS's full payment of the Settlement Amount under this agreement, the United States releases CVS from any civil or administrative claim the United States has for the Covered Conduct.

3.     This Agreement in no way alters or restricts the United States' right to enforce the CSA and regulations promulgated thereunder by commencing an administrative or civil action against CVS for any conduct that does not arise from the Covered Conduct or that occurs after the Effective Date of this Agreement.

4.     The obligations imposed upon CVS pursuant to this Agreement are in addition to, and not in derogation of, obligations imposed upon CVS pursuant to any federal, state or local law, including without limitation the CSA and the regulations promulgated thereunder.

5.     Notwithstanding the releases given in Paragraph 2 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

       a.     Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

       b.     Any criminal liability;

       c.     Except as explicitly stated in this Agreement, any administrative liability;

       d.     Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

       e.     Any liability based upon obligations created by this Agreement;

       f.     Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

       g.     Any liability for failure to deliver goods or services due;

3

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060841

        h.     Any liability of individuals.

     6.     CVS fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which CVS could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the Covered Conduct, or arising from the United States' investigation and resolution of claims based upon the Covered Conduct.

     7.     CVS waives and shall not assert any defenses CVS may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

     8.     CVS agrees to the following:

         a.     Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of CVS, its present or former officers, directors, employees, shareholders, and agents in connection with:

         (1)     the matters covered by this Agreement;

         (2)     the United States' audit(s) and investigation(s) of the matters covered by this Agreement;

4

(3)     CVS's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and investigation(s) in connection with the matters covered by this Agreement (including attorney's fees);

(4)     the negotiation and performance of this Agreement; and

(5)     the payment CVS makes to the United States pursuant to this Agreement,

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP) (hereinafter referred to as Unallowable Costs).

b.     Future Treatment of Unallowable Costs:  Unallowable Costs shall be separately determined and accounted for by CVS, and CVS shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by CVS or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c.     Treatment of Unallowable Costs Previously Submitted for Payment:  CVS further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by CVS and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs.  CVS agrees that the

5

     **CVS-MDLT1-000060843**

United States, at a minimum, shall be entitled to recoup from CVS any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by CVS or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on CVS or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

9.  This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity.

10.  Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

11.  Each party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

12.  This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Eastern District of New York. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

13.  This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

6

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060844**

14.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

15.     This Agreement shall become final and binding only upon signing by all parties hereto.

16.     This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which shall together constitute one and the same agreement, and for purposes of this agreement, facsimile signatures shall be treated as equivalent to originals.

17.     This Agreement is binding on CVS's successors, transferees, heirs, and assigns.

18.     The Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

[The remainder of this page is intentionally blank]

7

**HIGHLY CONFIDENTIAL**                                        **CVS-MDLT1-000060845**

19.   This Agreement is effective on the date of signature of the last signatory to the

Agreement ("Effective Date" of this Agreement).  Facsimiles and electronic transmissions of

signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

Dated: June /5 2018
      Central Islip, New York

            RICHARD P. DONOGHUE
            United States Attorney
            Attorney for the United States
            610 Federal Plaza
            Central Islip, New York 11733

            Diane C. Leonardo
            Assistant U.S. Attorney
            631-715-7854

Dated: June /5 2018
      Woonsocket, Rhode Island

            CVS Pharmacy, Inc.
            One CVS Drive
            Woonsocket, Rhode Island

By:

            Thomas S. Moffatt
            Vice President, Secretary and
            Assistant General Counsel

8

HIGHLY CONFIDENTIAL
CVS-MDLT1-000060846

Oklahoma:

Moffatt Tr. at 216:15-218:3

CVS-MDLT1-00060822-60829

Highly Confidential - Subject to Further Confidentiality Review

1    A.   So generally speaking, I would talk to

2    the attorney that was involved in the matter and

3    they would tell me what was involved, and I

4    would read it.

5    BY MR. ELSNER:

6    Q.   Okay.  You wouldn't do your own

7    independent investigation of the alleged facts

8    by the DEA?

9         MR. DELINSKY:  Object to form.

10   A.   I would not.  We had other people that

11   were responsible for both handling the matter

12   and, you know, store operations and so forth, so

13   I wouldn't do my own investigation.

14   BY MR. ELSNER:

15   Q.   And would you review any of the

16   letters or documentation provided by the DEA to

17   CVS related to those investigations before you

18   executed the document?

19        MR. DELINSKY:  Object to form.

20   A.   Not that I recall.  Not typically.

21   Typically it would be more a conversation with

22   the attorney.  I'm sure on some occasions I

23   would have some of the background, either -- you

24   know, sometimes I would be involved -- like in

Highly Confidential - Subject to Further Confidentiality Review

1    this case I would be in providing a declaration

2    earlier in the matter, so I might have been

3    involved then.  For the signing of this

4    particular settlement agreement, I think it

5    would have just been a conversation with the

6    attorneys.

7        Q.   Was this approved by anyone at CVS

8    Pharmacy?

9        A.   It was signed by Josh Flum, who was

10   senior vice president.  I think at the time he

11   was pharmacy operations.  But again, it would be

12   one attorney or group of attorneys.  I'm not

13   sure who handled it.  They would have been

14   handing the matter and would have brought it to

15   both me and Josh to sign.

16       Q.   And who would those attorneys be at

17   CVS?

18       A.   It varies, but Betsy Ferguson was head

19   of the area, so it would be her and other

20   attorneys in her group.

21       Q.   But in settlement of the Oklahoma

22   investigation, CVS agreed to pay $11 million,

23   and you executed that settlement agreement on

24   behalf of Oklahoma CVS, is that right?

1           MR. DELINSKY:  Object to form.

2      A.   That's correct.  That's what

3  Paragraph 15 says.

4  BY MR. ELSNER:

5      Q.   There was also an investigation by the

6  DEA of CVS stores in Rhode Island, is that

7  right?

8           MR. DELINSKY:  Object to form.

9      A.   Others are involved in the various

10  investigations.  I'm generally aware that there

11  was one in Rhode Island.

12  BY MR. ELSNER:

13      Q.   Okay.  This is MR 225.  This is

14  Exhibit 19, Mr. Moffatt.

15           (Whereupon, CVS-Moffatt-19 was marked

16           for identification.)

17  BY MR. ELSNER:

18      Q.   If you turn to Page 3 of 7 of the

19  settlement agreement, paragraph I, it states,

20  does it not, that "Between October 18, 2013 and

21  March 2, 2015, the DEA Providence Resident

22  Office conducted an investigation into CVS'

23  dispensing of prescriptions from Rhode Island

24  CVS/pharmacy retail stores."  Is that right?

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into between the United States Attorney's Office for the Western District of Oklahoma, acting on behalf of the United States Department of Justice, the U.S. Attorneys' Offices for all judicial districts of the United States, and the Drug Enforcement Administration ("DEA") (collectively, the "United States" or "Government"), and Oklahoma CVS Pharmacy, L.L.C., and CVS Pharmacy, Inc., (collectively, "CVS") (and the United States and CVS, collectively, as the "Parties").

1.     CVS Pharmacy, Inc. is a Rhode Island corporation with its corporate headquarters in Woonsocket, Rhode Island.  CVS Pharmacy, Inc., directly and through its retail pharmacy subsidiaries and affiliates, currently operates approximately 7,400 retail pharmacies in the United States principally under the trade name "CVS/pharmacy" that dispense branded and generic prescription drugs, including controlled substance medications, to retail consumers (hereafter referred to as "CVS/pharmacy retail stores").

2.     Oklahoma CVS Pharmacy, L.L.C., an Oklahoma corporation that is a subsidiary of CVS Pharmacy, Inc., operates 46 CVS/pharmacy retail stores in Oklahoma.

3.     Each CVS/pharmacy retail store in Oklahoma and elsewhere is separately registered with DEA and is assigned a unique DEA registration number to dispense controlled substances as required by the Controlled Substances Act, 21 U.S.C. Sections 801 *et seq.* (the "CSA").

4.     CVS acknowledges that each of its DEA-registered retail stores is required to comply with certain record keeping requirements as provided under the CSA and the regulations promulgated thereunder.

5.     CVS acknowledges that the CSA and the regulations promulgated thereunder require that each registrant, including pharmacies, maintain complete and accurate records of each

1

HIGHLY CONFIDENTIAL

substance manufactured, received, sold, delivered, dispensed or otherwise disposed of by the registrant.  21 U.S.C. § 827 (a)(3); 21 C.F.R. §§ 1304.03, 1304.21.

6.　　CVS acknowledges that the CSA and the regulations promulgated thereunder further require that these records be readily retrievable and available from the ordinary business records of the registrant for inspection and copying by officers or employees of DEA for a period of two years.  21 U.S.C. § 827 (b); 21 C.F.R. § 1304.04.

7.　　CVS acknowledges that it has the duty to continue to take good faith measures and maintain policies and procedures to promote compliance with the record keeping requirements of the CSA and the regulations promulgated thereunder.

8.　　This Agreement is neither an admission of liability by CVS nor a concession by the United States that its claims are not well founded.　By entering into this Agreement, CVS does not admit to the allegations in paragraph 11, below, or to any violation of law, liability, fault, misconduct or wrongdoing in connection with those allegations.

9.　　CVS has maintained both hard copy prescription records and electronic prescription records during certain time periods, including the period from October 6, 2005 to the October 5, 2011 (hereafter the "relevant time period").

10.　　The United States, through DEA, has reviewed prescription records at CVS/pharmacy retail stores in Oklahoma and elsewhere during the relevant time period and alleges that the records were not in each instance in compliance with the requirements of the CSA and the regulations promulgated thereunder.

11.　　The United States alleges the following general conduct by CVS/pharmacy retail stores in Oklahoma and elsewhere for the relevant time period under circumstances that violate the CSA and the regulations promulgated thereunder (referred to hereafter as the "Covered Conduct"):

2

HIGHLY CONFIDENTIAL    CVS-MDLT1-000060823

(i) filling prescriptions for certain prescribers whose DEA registration numbers were not current or valid; (ii) entering and maintaining invalid DEA registration numbers on CVS dispensing records for certain prescriptions, which were at times provided to state prescription drug monitoring programs; and (iii) entering and maintaining CVS dispensing records including prescription vial labels that identify a non-prescribing provider as the prescribing provider for certain prescriptions.

The United States also alleges the specific conduct by CVS/pharmacy retail stores in Oklahoma and elsewhere for the relevant time period as set forth in the *Complaint* filed in Civil Action CIV 11-1124-HE in the United States Court for the Western District of Oklahoma constitutes Covered Conduct and is subject to the releases and terms as expressed herein.

12.     At all times relevant herein, the CSA authorized the imposition of civil penalties for each of the categories of alleged Covered Conduct as described in paragraph 11, above.

13.     To avoid the delay, expense, inconvenience, and uncertainty of litigation of these claims, the Parties agree to settle this matter pursuant to the Terms and Conditions below.

## TERMS AND CONDITIONS

14.     In reliance of the foregoing, and in consideration of mutual promises, covenants and obligations of this Settlement Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree to the terms and conditions.

15.     CVS shall pay to the United States the total sum of $11,000,000.00 (eleven million dollars and no cents) (the "Settlement Amount") within ten (10) business days after the full execution of the Settlement Agreement by electronic funds transfer pursuant to written instructions provided to CVS by the United States Attorney's Office for the Western District of Oklahoma.

3

16.     In consideration of these undertakings by CVS, the United States fully and finally settles and relinquishes all claims for civil and administrative monetary and other relief, in law or equity, which it has asserted, could have asserted or may assert in the future against CVS and its officers, directors, agents, employees, parents, subsidiaries and affiliates, and their respective officers, directors and employees for violations of the CSA and the regulations promulgated thereunder related to or arising from the Covered Conduct during the relevant time period.

17.     In consideration of the undertakings by the United States, CVS fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorney's fees, costs and expenses of every kind and however denominated) which it has asserted, could have asserted or may assert in the future against the United States, its agencies, employees, servants and agents related to the investigation, prosecution and settlement of the Covered Conduct.

18.     The United States and defendants will each bear their own costs and attorneys' fees in this matter.

19.     The United States specifically reserves and excludes from the scope and terms of the Agreement as follows:

A.     Any federal criminal liability;

B.     Any criminal, civil or administrative claim arising under Title 26, U.S. Code (Internal Revenue Service);

C.     Any administrative liability unrelated to the Covered Conduct;

D.     Any administrative liability related to the Covered Conduct of (1) a CVS registrant located in the State of Oklahoma which was the subject of a DEA investigation prior to October 1, 2011, and (2) Stores 219 and 5195 located in Sanford, Florida, which were subject to investigation prior to the effective date of this settlement agreement;

4

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060825

E.      Any civil liability pursuant to the provisions of the False Claims Act, 31

U.S.C. §§ 3729 et seq. common law fraud, or unjust enrichment, which is related to the Covered

Conduct; and

F.      Any liability to the United States for any conduct other than that covered by

the release in paragraph 16.

20.     This Agreement is to be binding on, and for the benefit of, the Parties, and is not

intended to be, and shall not be interpreted to constitute, a release of any person or entity not

identified or referred to herein.

21.     This Agreement shall be governed by the laws of the United States.   If a dispute

arises under the Agreement between CVS and the United States, exclusive jurisdiction and venue

shall lie in the federal district of the Western District of Oklahoma.

22.     This Agreement constitutes the entire agreement between the Parties and cannot be

amended except in writing and when signed by all Parties to this Agreement.

23.     It is understood by all parties that this settlement agreement is not subject to any

non-disclosure agreement.   It is further understood that government officials may initiate press

releases, respond to appropriate inquiries regarding this settlement agreement, and may include the

amount paid and other general information in governmental reports.

24.     CVS acknowledges that its authorized representatives have read this Agreement and

understand that as of its Effective Date, it will be a matter of public record.

25.     Each person who signs this Agreement in a representative capacity warrants that he

or she is fully authorized to do so.

26.     This Agreement shall become effective on the date of signing by the last signatory.

It may be executed in counterparts, each of which shall constitute an original and all of which shall

5

constitute one and the same agreement. The United States agrees to notify CVS immediately

when the final signatory has executed this Agreement.

IN WITNESS WHEREOF, the parties hereto affix their signatures.

ON BEHALF OF THE UNITED STATES OF AMERICA:

SANFORD C. COATS
United States Attorney

DATE: 3-28-13

**RONALD R. GALLEGOS**
Assistant United States Attorney
U.S. Attorney's Office, WD/OK
210 W. Park, Ste. 400
Oklahoma City, OK 73102
Tel: 405-553-8700 Fax: 405-553-8885
ron.gallegos@usdoj.gov

ON BEHALF OF THE DRUG ENFORCEMENT ADMINISTRATION:

DATE: 3/20/13

**MICHELE LEONHART**
Administrator
Drug Enforcement Administration

DATE: 3/13/13

**WENDY GOGGIN**
Chief Counsel
Drug Enforcement Administration

6

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060827**

ON BEHALF OF OKLAHOMA CVS PHARMACY, L.L.C.:

DATE: ___3/20/2013___

**THOMAS S. MOFFATT**
~~Vice~~ President ~~and Corporate Secretary~~
Oklahoma CVS Pharmacy, L.L.C.

ON BEHALF OF CVS PHARMACY, INC.:

DATE: ___3/20/2013___

**JOSH M. FLUM**
Senior Vice President
CVS Pharmacy, Inc.

_____     DATE: _____

**ROBERT N. DRISCOLL**
Friedlander Misler PLLC
Attorneys for Oklahoma CVS Pharmacy, L.L.C., and
CVS Pharmacy, Inc.

_____     DATE: _____

**JOHN A. GILBERT, JR.**
Hyman, Phelps & McNamara
Attorneys for Oklahoma CVS Pharmacy, L.L.C., and
CVS Pharmacy, Inc.

7

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060828**

ON BEHALF OF OKLAHOMA CVS PHARMACY, L.L.C.:

_____ DATE: _____

**THOMAS S. MOFFATT**
Vice President and Corporate Secretary
Oklahoma CVS Pharmacy, L.L.C.

ON BEHALF OF CVS PHARMACY, INC.:

_____ DATE: _____

**JOSH M. FLUM**
Senior Vice President
CVS Pharmacy, Inc.

_____ DATE: ___3/20/13___

**ROBERT N. DRISCOLL**
Friedlander Misler PLLC
Attorneys for Oklahoma CVS Pharmacy, L.L.C., and
CVS Pharmacy, Inc.

_____ DATE: ___3/20/13___

**JOHN A. GILBERT, JR.**
Hyman, Phelps & McNamara
Attorneys for Oklahoma CVS Pharmacy, L.L.C., and
CVS Pharmacy, Inc.

7

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060829**

Rhode Island:

Moffatt Tr. at 218:5-222:21

CVS-MDLT1-00060847-60855

1          MR. DELINSKY:  Object to form.

2     A.   That's correct.  That's what

3  Paragraph 15 says.

4  BY MR. ELSNER:

5     Q.   There was also an investigation by the

6  DEA of CVS stores in Rhode Island, is that

7  right?

8          MR. DELINSKY:  Object to form.

9     A.   Others are involved in the various

10  investigations.  I'm generally aware that there

11  was one in Rhode Island.

12  BY MR. ELSNER:

13     Q.   Okay.  This is MR 225.  This is

14  Exhibit 19, Mr. Moffatt.

15          (Whereupon, CVS-Moffatt-19 was marked

16          for identification.)

17  BY MR. ELSNER:

18     Q.   If you turn to Page 3 of 7 of the

19  settlement agreement, paragraph I, it states,

20  does it not, that "Between October 18, 2013 and

21  March 2, 2015, the DEA Providence Resident

22  Office conducted an investigation into CVS'

23  dispensing of prescriptions from Rhode Island

24  CVS/pharmacy retail stores."  Is that right?

1        A.    Yes, that's what paragraph I says.

2        Q.    Did you have a role with respect to

3   CVS stores and pharmacies -- were you president

4   or secretary or treasurer of that entity?

5            MR. DELINSKY:  Object to form.

6        A.    I would have been president of the

7   Rhode Island entity, yes.

8   BY MR. ELSNER:

9        Q.    And what is that entity called?

10       A.    I have to look it up, but something

11   along the lines of Rhode Island CVS Pharmacy,

12   LLC.

13       Q.    Do you know the name sitting here

14   today?

15       A.    I don't.  We have separate store

16   entities in each state, sometimes multiple, so I

17   don't know exactly the name of the entity.

18   Sometimes it's just Rhode Island CVS, sometimes

19   it's CVS Rhode Island, it varies a little bit.

20       Q.    In paragraph J it states that "The

21   United States contends that it has certain civil

22   and administrative claims under the Act," this

23   is the Controlled Substances Act, and "it's

24   implementing regulations based on CVS' conduct

1    in Rhode Island CVS/pharmacy retail stores

2    between the 3rd of March, 2010 and the date of

3    this agreement," and then it goes on to list

4    certain conduct which includes "Filling

5    prescriptions with invalid prescriber DEA

6    numbers, or under circumstances where the

7    pharmacist filling the prescription knew or had

8    reason to know that the prescription in question

9    was invalid or unauthorized."

10         Did I read that correctly?

11         A.    That's what Paragraph 1 says.

12         Q.    In Paragraph 2 for "Filling

13   prescriptions for Schedule III controlled

14   substances written by psychiatric nurse

15   practitioners who were not authorized under

16   state law or by the terms of their DEA

17   registration to issue such prescriptions," is

18   that right?

19         A.    That's what Paragraph 2 says.

20         Q.    Okay.  And third that "Entering,

21   creating, or maintaining CVS dispensing records,

22   including prescription vial labels, in which the

23   DEA registration numbers of non-prescribing

24   practitioners, including non-prescribing

1    practitioners who were not really authorized to

2    prescribe the substances dispensed, were

3    substituted for the DEA registration numbers of

4    prescribing practitioners, in violation of the

5    Controlled Substances Act," is that right?

6         A.   That's what Paragraph 3 says, yes.

7         Q.   Were you aware that the DEA had made

8    such contentions with respect to CVS stores in

9    Rhode Island based on your role as the president

10   of the CVS entity in Rhode Island covering those

11   stores?

12        MR. DELINSKY:  Object to form.

13        A.   No.  Others at CVS would have been

14   responsible for this sort of investigation, and

15   for the settlement, so I was not involved in

16   preparing this document or in the investigation.

17   BY MR. ELSNER:

18        Q.   Okay.  And CVS agreed to pay in

19   settlement of these claims $450,000 to the

20   United States Government, is that right?

21        A.   That's what Paragraph 1 on Page 4

22   says.

23        Q.   Were you aware of that as the

24   president of the CVS Rhode Island entity

1    concerning these stores?

2         MR. DELINSKY:  Object to form.

3      A.   I was not involved in preparing any of

4    this or in the amount that was agreed upon.  To

5    the extent I knew about it, it was because of my

6    role as an attorney as opposed to because I'm

7    president of the store entity.

8    BY MR. ELSNER:

9      Q.   They wouldn't have informed you as

10   president of the store entity that a settlement

11   had been reached?

12        MR. DELINSKY:  Object to form.

13     A.   They informed me because I'm an

14   attorney.  I'm also president of the entity.  I

15   don't know if they would have informed somebody

16   else if somebody else was the president, but

17   they did inform me.

18   BY MR. ELSNER:

19     Q.   Okay.  And Betsy Ferguson executed

20   this document on August 5, 2015, Page 7 of 7?

21     A.   Yes, she did.  August 5th.

22     Q.   Were you aware that the DEA had

23   conducted investigations of CVS pharmacies in

24   California, in Nassau and Suffolk County, New

## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into this $7$th day of $August$, 2015 by and between the United States Attorney's Office for the District of Rhode Island, acting on behalf of the United States, the Drug Enforcement Administration ("DEA"), Providence Resident Office and CVS Health and all of its subsidiaries, entities, and affiliates, to the extent of their existence as a component or affiliate of CVS Health during the time period provided of the DEA Investigation as defined in Recital Paragraph I, herein (collectively "CVS") (each a "Party" and collectively the "Parties").

## I. Recitals

A.      CVS Health is a Delaware corporation with its corporate headquarters in Woonsocket, Rhode Island. CVS Health, directly or through its retail pharmacy subsidiaries and affiliates, and through its CVS/pharmacy division, operates retail pharmacies in the State of Rhode Island that dispense prescription drugs, including controlled substances, to retail consumers (hereafter referred to as "CVS/pharmacy retail stores").

B.      Each CVS/pharmacy retail store in Rhode Island is separately registered with DEA and is assigned a unique DEA registration number that authorizes it to dispense controlled substances pursuant to the provisions of the Controlled Substances Act, 21 U.S .C. §§ 801 *et seq.* ("the Act"), and its implementing regulations. The CVS/pharmacy retail stores physically located in the State of Rhode Island will be referred to collectively herein as "Rhode Island CVS/pharmacy retail stores."

C.      Pharmacies registered with DEA as chain pharmacies are permitted to dispense prescriptions, including controlled substances.

Page **1** of **7**

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060847**

D.     CVS acknowledges that all of its DEA-registered CVS/pharmacy retail stores were and are required to comply with the CSA and the regulations promulgated thereunder.

E.     The Act, specifically 21 U.S.C. § 842(a), forbids dispensing drugs on Schedules II through IV without a prescription that conforms to, *inter alia*, two requirements: first, that the prescription be issued for a "legitimate medical purpose in the usual course of professional practice . . . by a practitioner," 21 U.S.C. § 829(e)(2)(A), and (2) that the issuing practitioner be "licensed by law to administer such drug." 21 U.S.C. § 353(b); *see also* 21 C.F.R. § 1306.03(a)(1). A prescription that does not satisfy these criteria is not a valid prescription within the meaning of the Act.

F.     CVS acknowledges that it has a corresponding responsibility to dispense only those prescriptions that have been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice and that knowingly filling a prescription not issued in the usual course of professional treatment or by a prescriber not licensed to prescribe the substance dispensed subjects the pharmacy filling the prescription to penalties under the Act. 21 C.F.R. § 1306.04.

G.     In addition, the Act requires that individuals and entities registered to prescribe, administer or dispense controlled substances observe various recordkeeping requirements with respect to those substances, including but not limited to accurately labelling controlled substance prescriptions that are dispensed to patients and consumers. 21 U.S.C. § 842 (a)(5) and 21 C.F.R. § 1306.24.

H.     At all times relevant to this agreement, the Act authorized the imposition of civil penalties and/or administrative sanctions for each of the categories of Covered Conduct as described in Recital Paragraph J below

Page **2** of 7

**CVS-MDLT1-000060848**

I.      Between October 18, 2013 and March 2, 2015, the DEA Providence Resident Office conducted an investigation into CVS' dispensing of prescriptions from Rhode Island CVS/pharmacy retail stores (the "DEA Investigation").

J.      The United States contends that it has certain civil and administrative claims under the Act and its implementing regulations based on CVS' conduct at its Rhode Island CVS/pharmacy retail stores between March 3, 2010 and  the date of this agreement, which conduct was the subject of the DEA Investigation, to wit:

(1) Filling prescriptions with invalid prescriber DEA numbers, or under circumstances where the pharmacist filling the prescription knew or had reason to know that the prescription in question was invalid or unauthorized, in violation of 21 U.S.C. § 842 (a)(1) and CVS' corresponding responsibility pursuant to 21 C.F.R. § 1306.04;

(2) Filling prescriptions for Schedule III controlled substances written by psychiatric nurse practitioners who were not authorized under state law or by the terms of their DEA registration to issue such prescriptions, in violation of 21 U.S.C. § 842 (a)(1) and 21 C.F.R. § 1306.03(a)(1);

(3) Entering, creating, or maintaining CVS dispensing records, including prescription vial labels, in which the DEA registration numbers of non-prescribing practitioners, including non-prescribing practitioners who were not legally authorized to prescribe the substances dispensed, were substituted for the DEA registration numbers of prescribing practitioners, in violation of 21 U.S.C. § 842 (a)(5) and 21 C.F.R. § 1306.24.

The conduct described above in this paragraph is hereinafter referred to as the "Covered Conduct".

K.      CVS denies that any provision of the Act and the regulations thereunder have been violated, or that it is liable to the United States.

L.      The United States and CVS desire to reach a mutual agreement that settles, compromises, and resolves all claims based on alleged violations of the Act identified in the

Page **3** of **7**

course of the DEA Investigation, without any admission of liability or wrongdoing in this or any other proceeding, in order to avoid the delay, uncertainty, and expense of litigation.

## II. Terms of Agreement

In accordance with the mutual covenants and agreements herein, and with full authority to enter into this Settlement Agreement and to be bound thereby, the United States, through the Office of the United States Attorney for the District of Rhode Island and its Drug Enforcement Administration, Providence Resident Office, and CVS agree as follows:

1.      CVS shall pay the United States the sum of FOUR HUNDRED AND FIFTY THOUSAND DOLLARS ($450,000.00) (the "Settlement Amount"), which shall be paid within five business days of the execution of this Settlement Agreement by all parties.  The payment described in this Settlement Agreement is made in compromise of disputed claims and is not an admission and/or acknowledgment by CVS of liability and/or wrongdoing, nor by the United States or the DEA that their claims are not well founded.

2.      Payment of the Settlement Amount shall be by electronic funds transfer in accordance with written instructions from the Office of the US Attorney, with written notice to said Office at the time of payment.

3.      In exchange for, and in consideration of, the foregoing, including specifically CVS' agreement to pay the United States the Settlement Amount, the United States agrees to settle, release, and relinquish all civil and administrative claims, causes of action, suits, debts, in law or equity, against CVS based upon the Covered Conduct as described in Recital Paragraph J.

4.      This Settlement Agreement, and the conditions contained herein, in no way alters or restricts the United States' rights to enforce the Act and regulations promulgated thereunder by commencing an administrative or civil action against CVS for any violations of the Act which do

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060850**

not arise out of the Covered Conduct identified in this Settlement Agreement, or for any violations which occur after the date of the signing of this Settlement Agreement.

5.       In addition to the foregoing, specifically reserved and excluded from the scope and terms of this agreement and the release it provides are the following:

a.       Any civil, criminal, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.       Any criminal liability;

c.       Any civil or administrative liability to the United States (or its agencies) for any conduct other than the Covered Conduct, and/or any civil or administrative liability to the United States for conduct outside the District of Rhode Island;

d.       Any liability based upon such obligations as are created by this Settlement Agreement.

6.       Nothing in this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

7.       This Agreement binds and is intended to benefit only the Parties. This Agreement is not intended to be, and shall not be interpreted to constitute, a release of any person or entity not identified or referred to herein. This Agreement is specifically limited to the Office of the United States Attorney for the District of Rhode Island and the DEA for the Providence Resident Office and cannot bind other federal, state, or local authorities and jurisdictions.

8.       Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

9.       Each Party and signatory to this Agreement represents that he, she, or it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

Page **5** of **7**

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060851

10.     The parties agree that any dispute regarding this Settlement Agreement shall be filed and heard in the United States District Court for the District of Rhode Island, including but not limited to any proceeding to enforce the terms of this Settlement Agreement, and no party shall challenge the jurisdiction or venue of that Court over such proceedings.

11.     CVS fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which CVS could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the Covered Conduct, or arising from the DEA Investigation and resolution of claims based upon the Covered Conduct.

12.     This document contains the entire agreement between CVS and the United States regarding the claims at issue herein.

13.     This Settlement Agreement shall become final and binding only upon signing by all parties hereto.

14.     This Settlement Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which shall together constitute one and the same agreement, and for purposes of  this agreement, facsimile signatures shall be treated as equivalent to originals.

15.     This Settlement Agreement may only be modified by a writing signed by both parties.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]


Page **6** of **7**

**HIGHLY CONFIDENTIAL**

16.    Nothing in this Settlement Agreement or elsewhere shall be deemed to render this

agreement confidential or otherwise exempt or restricted from public disclosure.

**FOR THE UNITED STATES:**                    **FOR CVS:**

Dated: Providence, Rhode Island              Dated: Woonsocket, Rhode Island
July 7, 2015                                 July __, 2015

  PETER F. NERONHA                           CVS HEALTH
  United States Attorney                     One CVS Drive
  50 Kennedy Plaza, 8th Floor                Woonsocket, RI 02895
  Providence, RI 02903

By: _____         _____
  Zachary A. Cunha                           Elizabeth S. Ferguson
  Bethany N. Wong                            Senior Vice President & Assistant General Counsel
  Assistant U.S. Attorneys
  (401) 709-5000


  _____
  Nancy Coffey
  DEA Diversion Program Manager
  New England Field Division


  _____
  Michael J. Ferguson
  DEA Special Agent in Charge
  New England Field Division


                                                            Page 7 of 7

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000060853**

16. Nothing in this Settlement Agreement or elsewhere shall be deemed to render this agreement confidential or otherwise exempt or restricted from public disclosure.

**FOR THE UNITED STATES:**          **FOR CVS:**

Dated: Providence, Rhode Island          Dated: Woonsocket, Rhode Island
    July __, 2015                                July __, 2015

    PETER F. NERONHA                      CVS HEALTH
    United States Attorney                    One CVS Drive
    50 Kennedy Plaza, 8th Floor           Woonsocket, RI 02895
    Providence, RI 02903

By:     _____          _____
        Zachary A. Cunha                     Elizabeth S. Ferguson
        Bethany N. Wong                      Senior Vice President & Assistant General Counsel
        Assistant U.S. Attorneys
        (401) 709-5000

_____ 7/31/15
Nancy Coffey
DEA Diversion Program Manager
New England Field Division

_____ 07/30/15
Michael J. Ferguson
DEA Special Agent in Charge
New England Field Division

Page 7 of 7

**HIGHLY CONFIDENTIAL**          **CVS-MDLT1-000060854**

16.     Nothing in this Settlement Agreement or elsewhere shall be deemed to render this agreement confidential or otherwise exempt or restricted from public disclosure.

**FOR THE UNITED STATES:**                              **FOR CVS:**

Dated: Providence, Rhode Island                        Dated: Woonsocket, Rhode Island
      July ___, 2015                                    ~~July~~ ___, 2015
                                                   August 5
      PETER F. NERONHA                                CVS HEALTH
      United States Attorney                           One CVS Drive
      50 Kennedy Plaza, 8th Floor                   Woonsocket, RI 02895
      Providence, RI 02903

By:     _____          _____
      Zachary A. Cunha                                Elizabeth S. Ferguson
      Bethany N. Wong                                 Senior Vice President & Assistant General Counsel
      Assistant U.S. Attorneys
      (401) 709-5000


      _____
      Nancy Coffey
      DEA Diversion Program Manager
      New England Field Division


      _____
      Michael J. Ferguson
      DEA Special Agent in Charge
      New England Field Division

Page 7 of 7

Texas:

Moffatt Tr. at 237:17-241:21

CVS-MDLT1-000060915-60921

1   that were covered by the settlement agreement.

2   Do you know which of these stores experienced

3   thefts of controlled substances?

4           MR. DELINSKY:  Object to form.

5       A.   I don't know specifically.  Others at

6   CVS would be informed of thefts at particular

7   stores.  It would not -- I would not be

8   informed.

9   BY MR. ELSNER:

10      Q.   Were you aware that CVS had also

11  investigated -- sorry, that the DEA investigated

12  CVS stores in Texas concerning thefts of

13  controlled substances in Texas?

14      A.   I was -- I'm not involved in any of

15  these matters, so I don't recall specifics about

16  Texas, no.

17          (Whereupon, CVS-Moffatt-21 was marked

18          for identification.)

19  BY MR. ELSNER:

20      Q.   This is Exhibit 21, which is the

21  settlement agreement between CVS and the DEA,

22  and this is dated December of 2015.  If you look

23  at Paragraph 7.

24      A.   Paragraph 1 is wrong.  I can't help

Highly Confidential - Subject to Further Confidentiality Review

```
1   it.

2           What is it?  Which paragraph?

3       Q.  Paragraph 7.

4       A.  7, okay.  Okay.

5       Q.  Sorry, what was wrong about

6   Paragraph 1?

7       A.  "CVS is incorporated in Delaware."

8   It's incorporated in Rhode Island.  So it's

9   referring to CVS Pharmacy, Inc.

10      Q.  It's fair to say CVS's corporate

11  structure is pretty complicated, is that right?

12          MR. DELINSKY:  Object to form.

13      A.  It's -- we have a lot of entities,

14  yes, I'd agree with that.

15  BY MR. ELSNER:

16      Q.  How many entities?

17      A.  Right now?  Roughly a thousand.

18      Q.  And how many of those entities do you

19  serve as a president or officer of?

20      A.  I'd have to generate a report.  I'm

21  not sure.

22      Q.  What's your best estimate?

23          MR. DELINSKY:  Objection.  Asked and

24  answered.
```

Highly Confidential - Subject to Further Confidentiality Review

 1       A.   Hundreds of those, not all of them,

 2  but a large number of them.

 3  BY MR. ELSNER:

 4       Q.   Did it -- let's go back to the

 5  document.

 6            Paragraph 7 of the settlement

 7  agreement.  It reads "The United States contends

 8  that it has certain civil claims against CVS for

 9  engaging in the following conduct from

10  January 1, 2013 through October 23, 2014."  And

11  it then states that "On October 15, 2014, DEA

12  issued a Notice of Inspection to CVS Pharmacy

13  5667," which is in Houston, Texas, "after that

14  pharmacy had reported a theft of over 40,000

15  dosage units of controlled substances by two

16  former employees."

17            Were you aware that there was a 40,000

18  dosage unit theft of controlled substances from

19  the CVS store in Houston, Texas?

20            MR. DELINSKY:  Object to form.

21       A.   I'm not responsible for this sort of

22  investigation or activity, so I was not

23  informed.  Others at CVS that would be

24  responsible for this would have been informed.

```
 1    BY MR. ELSNER:

 2        Q.   Did you serve as an officer of any of

 3    the CVS -- of this CVS Pharmacy in Houston,

 4    Texas in 2013 and '14?

 5        A.   During the time frame, I believe so,

 6    yes.

 7        Q.   Okay.  Do you know the name of that

 8    entity?

 9        A.   The Texas stores are actually operated

10    by CVS Pharmacy, Inc.

11             MR. DELINSKY:  Would that change your

12    answer as to whether or not you were an officer?

13        A.   So I am an officer of CVS Pharmacy,

14    Inc., vice president and secretary.

15             MR. ELSNER:  Asked and answered, Eric.

16             MR. DELINSKY:  I was trying to clear

17    it up for myself.

18    BY MR. ELSNER:

19        Q.   There were also a listing of

20    recordkeeping -- allegations of recordkeeping

21    violations with respect to that theft, is that

22    right, under 1, 2, and 3, beneath it?

23        A.   Yes.

24        Q.   Okay.  And as a result of this
```

1    investigation, CVS agreed to pay a settlement in

2    the amount of $345,000 in Paragraph 13 on

3    Page 4, is that right?

4          MR. DELINSKY:  Object to form.

5      A.   Paragraph 13 on Page 4 refers to a sum

6    of $345,000.

7    BY MR. ELSNER:

8      Q.   Were you made aware of that as the

9    president of CVS Texas entity?

10          MR. DELINSKY:  Object to form.

11    BY MR. ELSNER:

12      Q.   I'm sorry, as the president of CVS

13    Pharmacy?

14          MR. DELINSKY:  Object to form.

15    BY MR. ELSNER:

16      Q.   Were you made aware of the amount of

17    the settlement?

18      A.   I was vice president and secretary of

19    CVS Pharmacy.  I -- others would be responsible

20    for this settlement.  To the extent I learned

21    about it, it would have been as an attorney.

22      Q.   If I could show you the next exhibit.

23          There was also an investigation of CVS

24    in Nassau and Suffolk County, New York on Long

## STIPULATED AGREEMENT

This agreement is made and entered into this ___ day of ___,
2015 between the United States of America ("United States"), acting by and through the United
States Attorney's Office for the Southern District of Texas on behalf of the Drug Enforcement
Administration ("DEA"), and CVS Pharmacy, Inc., ("CVS"), 1 CVS Drive, Woonsocket, Rhode
Island, 02895.

### I.  RECITALS

1)      CVS is incorporated in Delaware, and the corporate headquarters are in
Woonsocket, Rhode Island. CVS is the retail pharmacy division of CVS Health Corporation.
CVS owns and operates retail pharmacies throughout the United States, including CVS
Pharmacy #5667, and is in the business of dispensing branded and generic prescription drugs, as
well as over-the-counter medications, to retail consumers.

2)      Each pharmacy is separately registered with DEA and is assigned a unique DEA
registration number to dispense controlled substances as required by the Controlled Substances
Act, 21 U.S.C. § 801, *et seq.*, ("the CSA").

3)      CVS is required to operate all of the pharmacies in accordance with the statutory
and regulatory provisions of the CSA.

4)      DEA is the Department of Justice component agency primarily responsible for
administering the CSA and is vested with the responsibility of investigating CSA violations.

**HIGHLY CONFIDENTIAL**

5)    The Attorney General, through the United States Attorneys, has primary authority to bring civil actions to enforce the CSA in the District noted above. *See* 21 U.S.C. § 871 *and* 28 C.F.R. § 0.55(c).

6)    The United States contends that CVS has engaged in violations of the CSA, and the regulations promulgated thereunder. CVS specifically denies any culpability or wrongdoing but wishes to resolve the matter without commencement of litigation.

7)    The United States contends that it has certain civil claims against CVS for engaging in the following conduct from January 1, 2013 through October 23, 2014: On October 15, 2014, DEA issued a Notice of Inspection to CVS Pharmacy #5667, (DEA Registration Number BC8291899), located at 19715 Tomball Parkway, Houston, Texas, 77070, after the pharmacy reported theft of over 40,000 dosage units of controlled substances by two former employees. An on-site inspection was conducted from October 15 to October 17, 2014 by the Houston Division DEA Diversion Group. The inspection revealed that CVS Pharmacy #5667 failed to: **(1)** Keep an accurate record of ███████████████ on the biennial inventory in violation of 21 C.F.R. §1304.11(a); **(2)** Record the date received on eighteen (18) receipt invoices as required by 21 C.F.R. § 1304.22(c) and § 1304.22(a)(2)(iv); and **(3)** Maintain sixty-seven (67) receipt invoices as required by 21 C.F.R. § 1304.21(a) and all in violation of 21 U.S.C. § 842 (a)(5), and the applicable regulations promulgated thereunder (hereinafter referred to as the "Covered Conduct").

2

CVS-MDLT1-000060916

8) At all times relevant to the activity alleged in these Recitals, the CSA, 21 U.S.C. § 842 (c) (1) (B), authorized the imposition of a civil penalty of up to $10,000 for each violation of § 842 (a) (5).

9) To avoid the delay, expense, inconvenience, and uncertainty of litigation of these claims, the Parties agree to settle, compromise, and resolve all existing or potential claims for civil penalties the United States may have against CVS under § 842 of the CSA based on the Covered Conduct as described in Paragraph 7 above.

10) The parties to this Stipulated Agreement have arrived at an accord intended to resolve this matter without civil litigation of the above described statutory violations.

11) This Agreement is neither an admission of liability by CVS, nor a concession by the United States that its claims are not well founded. In consideration of the mutual promises, covenants, and obligations set forth in this Agreement, the Parties agree as follows:

## II.  TERMS AND CONDITIONS

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants contained herein, the parties hereto hereby agree as follows:

12) The United States agrees to waive the filing of a complaint in the United States District Court for the Southern District of Texas against CVS, provided that it complies with all of the terms and conditions set forth below. Should CVS fail to perform as stipulated herein, the United States reserves the right to rescind this agreement and seek the maximum penalties provided under the law for all violations of the CSA referred to above.

3

CVS-MDLT1-000060917

13)    CVS will pay the sum of $345,000.00 to the United States by electronic funds transfer pursuant to written instructions provided by the United States. CVS agrees to make this electronic funds transfer no later than the fourteen, (14), days after the Effective Date of this Stipulation.

14)    In consideration of the undertakings by CVS, the United States fully and finally settles and relinquishes all claims for civil penalties which it has asserted, could have asserted, or may assert in the future under 21 U.S.C. § 842 against CVS for possible violations of the CSA, and the regulations promulgated thereunder, based on the Covered Conduct as defined above.

15)    In consideration of the undertakings by the United States, CVS fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) which it has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the investigation, prosecution and settlement of this matter.

16)    Notwithstanding any term of this Agreement, specifically reserved and excluded from its scope and terms as to any entity or person are the following:

A. Any potential criminal liability;

B. Any criminal, civil or administrative claims arising under Title 26, U.S. Code (Internal Revenue Service);

C. Any administrative liability, including mandatory exclusion from any federal programs;

4

CVS-MDLT1-000060918

    D.  Any liability to the United States for any conduct other than that covered by the release in Paragraph 14; and

    E.  Any claims based on such obligations as are created by this Agreement.

17)    This Stipulated Agreement does not release CVS from DEA administrative liability under statute, contract, or regulation.

18)    The United States does not release CVS from any claims arising under Title 26, U.S. Code (Internal Revenue Code). Nothing in this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue Laws, Title 26 of the United States Code.

19)    All terms used in this Stipulation which are not defined herein shall be defined in accordance with the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, and regulations promulgated thereunder, whenever possible.

20)    This Agreement is not intended by the Parties to be, and shall not be interpreted to constitute, a release of any person or entity not identified or referred to herein.

21)    This Agreement shall be governed by the laws of the United States. If a dispute arises under this Agreement between CVS and the Office of the United States Attorney signing this Agreement, exclusive jurisdiction and venue shall lie in the federal judicial district of the Southern District of Texas in which the dispute arose, and to the extent that state law applies to the dispute, the law of the State within the jurisdictional district shall apply.

5

22) The Parties agree that this Agreement does not constitute evidence or an admission by any person or entity, and shall not be construed as an admission by any person or entity, with respect to any issue of law or fact.

23) This Agreement constitutes the entire agreement between the Parties and cannot be amended except in writing and when signed by all the Parties to this Agreement.

24) It is agreed by all parties that the sum of $345,000.00 represents full and complete settlement of this matter arising under the Act, and applicable regulations, and that each party will bear its own costs, fees and expenses, including any and all attorney's fees associated with this matter including those incurred during the course of the investigation, administrative proceedings, litigation and compromise, settlement and disposition all matters described in and the subject of this agreement.

25) Each person who signs this Agreement in a representative capacity warrants that he or she is fully authorized to do so.

26) The United States and CVS agree that this Stipulated Agreement, including all terms and conditions of the Agreement and any additional agreements relating thereto, and the facts which gave rise to the investigation by DEA and this Stipulation, may be made public in their entirety.

**IN WITNESS WHEREOF,** CVS, and the United States, through its duly authorized representative, Jill O. Venezia, Assistant United States Attorneys, have executed this Stipulation as of the date indicated below.

**AGREED AND EXECUTED** by the parties hereto:

6

CVS-MDLT1-000060920

Approved as to Form and Content:

By: _____       Dated: 12/15/2015

Elizabeth S. Ferguson
1 CVS Drive
Woonsocket, Rhode Island
02895
On behalf of Defendant, CVS


UNITED STATES OF AMERICA
Through its attorneys,

KENNETH MAGIDSON
United States Attorney

By: _____       Dated: 12/8/2015

JILL O. VENEZIA
Assistant U.S. Attorney
United States Attorney's Office
Texas Bar Number 24010764
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9511
Facsimile: (713) 718-3303


7

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000060921**

Texas II:

Moffatt Tr. at 260:4-261:24

CVS-MDLT1-000060907-60914

1      A.    Others in CVS would be responsible for

2  what access the stores had.  I have no knowledge

3  about that.

4  BY MR. ELSNER:

5      Q.    Were you aware that there was a second

6  investigation by the DEA into CVS's operations

7  in Texas concerning filling prescriptions for a

8  physician that was not properly licensed?

9  Exhibit 25.

10             (Whereupon, CVS-Moffatt-25 was marked

11             for identification.)

12      A.    It's Paragraph 7 you're talking about?

13  BY MR. ELSNER:

14      Q.    Yes.

15      A.    I see what Paragraph 7 says, yes.

16      Q.    Okay.  So the DEA was investigating

17  CVS pharmacies in Texas for filling

18  prescriptions for a Dr. Pedro Garcia, and it was

19  discovered that he didn't have a valid license

20  to prescribe those substances, correct?

21             MR. DELINSKY:  Object to form.

22      A.    It says that his Texas Department of

23  Public Safety controlled substances registration

24  was expired.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. ELSNER:

2         Q.   And CVS filled 153 of those

3    prescriptions?

4         A.   That's what Paragraph 7 indicates.

5         Q.   And as a result CVS entered into a

6    settlement with the DEA in Paragraph 13 on

7    Page 4 and agreed to pay $1,912,500 to the DEA,

8    is that right?

9              MR. DELINSKY:  Object to form.

10        A.   That's what Paragraph 13 says.  Again,

11   I had no involvement in the settlement or the

12   underlying matter.

13   BY MR. ELSNER:

14        Q.   And it was executed by Betsy Ferguson

15   on behalf of CVS in August of 2014, is that

16   right, Page 7?

17        A.   Yes.  CVS, in this case CVS Pharmacy,

18   Inc., yes.

19        Q.   And did you play a role with respect

20   to being an officer of the CVS entity in Texas

21   responsible for this CVS store?

22        A.   So that's CVS Pharmacy, Inc., again

23   vice president, secretary, assistant general

24   counsel.
```

## STIPULATED AGREEMENT

This agreement is made and entered into this 2nd day of September, 2014 between the United States of America ("United States"), acting by and through the United States Attorney's Office for the Southern District of Texas on behalf of the Drug Enforcement Administration ("DEA"), and CVS Pharmacy, Inc., ("CVS"), 1 CVS Drive, Woonsocket, Rhode Island, 02895.

## I.  RECITALS

1)      CVS is incorporated in Delaware, and the corporate office is in Woonsocket, Rhode Island. CVS Pharmacy, Inc. is the retail pharmacy division of CVS Caremark Corporation and is the largest pharmacy health care provider in the United States. CVS owns and operates retail pharmacies throughout the United States and is in the business of dispensing branded and generic prescription drugs, as well as over-the-counter medications, to retail consumers throughout the United States. In furtherance of this business objective, CVS operates a network of retail pharmacies throughout the United States, including the pharmacies that are listed in Paragraph 7 hereof.

2)      Each pharmacy is separately registered with DEA and is assigned a unique DEA registration number to dispense controlled substances as required by the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, ("the CSA").

3)      CVS is required to operate all of the pharmacies in accordance with the statutory and regulatory provisions of the CSA.

4)      DEA is the Department of Justice component agency primarily responsible for administering the CSA and is vested with the responsibility of investigating CSA violations.

5)      The Attorney General, through the United States Attorneys, has primary authority to bring civil actions to enforce the CSA in the District noted above. *See* 21 U.S.C. § 871 *and* 28 C.F.R. § 0.55(c).

6)      The United States contends that CVS has engaged in violations of the CSA, and the regulations promulgated thereunder. CVS specifically denies any culpability or wrongdoing but wishes to resolve the matter without commencement of litigation.

7)      The United States contends that it has certain civil claims against CVS for engaging in the following conduct from April 1, 2012 to July 31, 2012: During a DEA investigation into the prescription writing practices of Dr. Pedro Garcia, it was discovered that eight, (8), separate CVS pharmacies filled one hundred, fifty-three, (153), prescriptions for controlled substances written by Dr. Garcia during a time period during which his Texas Department of Public Safety Controlled Substances registration was expired. Specifically, the following CVS pharmacies filled the invalid prescriptions for controlled substances issued by Dr. Garcia: CVS Pharmacy #06989, 4102 Ayers Street, Corpus Christi, Texas, 78415, DEA Registration Number BC5352098; CVS Pharmacy #06991, 4166 South Staples Street, Corpus Christi, Texas, 78441, DEA Registration Number BC5352101; CVS Pharmacy #07004, 6601 Everhart Road, Corpus Christi, Texas, 78413, DEA Registration Number BC5352137; CVS Pharmacy #07220, 1627 Wildcat Drive, Portland, Texas, 78374, DEA Registration Number BC5352377; CVS Pharmacy #07401, 4101 U.S. Highway 77, Corpus Christi, Texas, 78380, DEA Registration Number BC5353886; CVS Pharmacy #00248, 2121 West Trenton Road, Edinburg, Texas, 78539, DEA Registration Number FC1003184; CVS Pharmacy #02580, 7442 South Staples Street, Corpus Christi, Texas, 78380, DEA Registration Number FC1363100; and

2

HIGHLY CONFIDENTIAL

CVS-MDLT1-000060908

CVS Pharmacy #07080, 363 West Avenue J, Robstown, Texas, 78380, DEA Registration Number BC5352202. The above detailed actions were in violation of 21 U.S.C. §§ 829 and 842 (a)(1), and the applicable regulations promulgated thereunder (hereinafter referred to as the "Covered Conduct").

8) At all times relevant to the activity alleged in these Recitals, the CSA, 21 U.S.C. § 842 (c) (1) (A), authorized the imposition of a civil penalty of up to $25,000 for each violation of § 842 (a) (1).

9) To avoid the delay, expense, inconvenience, and uncertainty of litigation of these claims, the Parties agree to settle, compromise, and resolve all existing or potential claims for civil penalties the United States may have against CVS under § 842 of the CSA based on the Covered Conduct as described in Paragraph 7 above.

10) The parties to this Stipulated Agreement have arrived at an accord intended to resolve this matter without civil litigation of the above described statutory violations.

11) This Agreement is neither an admission of liability by CVS, nor a concession by the United States that its claims are not well founded. In consideration of the mutual promises, covenants, and obligations set forth in this Agreement, the Parties agree as follows:

## II.  TERMS AND CONDITIONS

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants contained herein, the parties hereto hereby agree as follows:

3

CVS-MDLT1-000060909

12)    The United States agrees to waive the filing of a complaint in the United States District Court for the Southern District of Texas against CVS, provided that they comply with all of the terms and conditions set forth below. Should CVS fail to perform as stipulated herein, the United States reserves the right to rescind this agreement and seek the maximum penalties provided under the law for all violations of the CSA referred to above. Without regard to this agreement, the United States reserves the right to seek the maximum penalties provided under the law for any violations occurring after July 31, 2012.

13)    CVS will pay the sum of $1,912,500.00 to the United States by electronic funds transfer pursuant to written instructions provided by the United States. CVS agrees to make this electronic funds transfer no later than the twenty-one, (21), days after the Effective Date of this Stipulation.

14)    In consideration of the undertakings by CVS, the United States fully and finally settles and relinquishes all claims for civil penalties which it has asserted, could have asserted, or may assert in the future under 21 U.S.C. § 842 against CVS for possible violations of the CSA, and the regulations promulgated thereunder, based on the Covered Conduct as defined above.

15)    In consideration of the undertakings by the United States, CVS fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) which it has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the investigation, prosecution and settlement of this matter.

4

CVS-MDLT1-000060910

16)     Notwithstanding any term of this Agreement, specifically reserved and excluded from its scope and terms as to any entity or person are the following:

A. Any potential criminal liability;

B. Any criminal, civil or administrative claims arising under Title 26, U.S. Code (Internal Revenue Service);

C. Any administrative liability, including mandatory exclusion from any federal programs;

D.  Any liability to the United States for any conduct other than that covered by the release in Paragraph 14; and

E.   Any claims based on such obligations as are created by this Agreement.

17)     This Stipulated Agreement does not release CVS from DEA administrative liability under statute, contract, or regulation.

18)     The United States does not release CVS from any claims arising under Title 26, U.S. Code (Internal Revenue Code). Nothing in this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue Laws, Title 26 of the United States Code.

19)     All terms used in this Stipulation which are not defined herein shall be defined in accordance with the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, and regulations promulgated thereunder, whenever possible.

20)     This Agreement is not intended by the Parties to be, and shall not be interpreted to constitute, a release of any person or entity not identified or referred to herein.

5

**HIGHLY CONFIDENTIAL**

CVS-MDLT1-000060911

21)     This Agreement shall be governed by the laws of the United States. If a dispute arises under this Agreement between CVS and the Office of the United States Attorney signing this Agreement, exclusive jurisdiction and venue shall lie in the federal judicial district of the Southern District of Texas in which the dispute arose, and to the extent that state law applies to the dispute, the law of the State within the jurisdictional district shall apply.

22)     The Parties agree that this Agreement does not constitute evidence or an admission by any person or entity, and shall not be construed as an admission by any person or entity, with respect to any issue of law or fact.

23)     This Agreement constitutes the entire agreement between the Parties and cannot be amended except in writing and when signed by all the Parties to this Agreement.

24)     It is agreed by all parties that the sum of $1,912,500.00 represents full and complete settlement of this matter arising under the Act, and applicable regulations, and that each party will bear its own costs, fees and expenses, including any and all attorney's fees associated with this matter including those incurred during the course of the investigation, administrative proceedings, litigation and compromise, settlement and disposition all matters described in and the subject of this agreement.

25)     Each person who signs this Agreement in a representative capacity warrants that he or she is fully authorized to do so.

26)     The United States and CVS agree that this Stipulated Agreement, including all terms and conditions of the Agreement and any additional agreements relating thereto, and the facts which gave rise to the investigation by DEA and this Stipulation, may be made public in their entirety.

6

**CVS-MDLT1-000060912**

**IN WITNESS WHEREOF**, CVS, and the United States, through its duly authorized representative, Jill O. Venezia, Assistant United States Attorneys, have executed this Stipulation as of the date indicated below.

**AGREED AND EXECUTED** by the parties hereto:

Approved as to Form and Content:

By: _____          Dated: _26 Aug 2014_

Elizabeth S. Ferguson
1 CVS Drive
Woonsocket, Rhode Island
02895
On behalf of Defendant, CVS

7

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000060913**

UNITED STATES OF AMERICA
Through its attorneys,

KENNETH MAGIDSON
United States Attorney

By: _____          Dated: _____

JILL O. VENEZIA
Assistant U.S. Attorney
United States Attorney's Office
Texas Bar Number 24010764
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9511
Facsimile: (713) 718-3303

8

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000060914**