UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>*The County of Summit, Ohio, et al v. Purdue Pharma, L.P., et al., Case No. 18-op-45090*<br><br>*The County of Cuyahoga, Ohio, et al v. Purdue Pharma, L.P., Case No. 17-op-5004* | MDL 2804<br>Case No. 17-md-1804<br>Hon. Judge Dan A. Polster<br>Mag. Judge David A. Ruiz |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS (Dkt. #s 1872, 1892) FOR PARTIAL SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS GROUNDS**

**TABLE OF CONTENTS**

INTRODUCTION…………………................................................................................................1

STATEMENT OF FACTS…………………………………………………………….........3

      A.  As the use of Opioids Expanded in the United States, Defendants Emphasized
           that the Causes Associated With Misuse Were Street Level Diversion, Pill Mills,
           Overprescribing Doctors, Criminal Sales and Similar Conduct so as to
           "Inoculate" Themselves from Litigation……………………………………........3

      B.  2000-2014. As Opioids Continued to Spread Through Summit and Cuyahoga
           Counties, Plaintiffs Expended Significant Effort in Battling the Causes of
           Diversion and Misuse That Had Been Identified by Defendants……………….6

      C.  While Plaintiffs Led Enforcement Efforts to Reduce Opioids on the Streets,
           Federal and State Authorities Addressed Compliance Issues with National
           Distributors……………………………………………………………………….9

      D.  Defendants' Attempts to Conceal Materials from the West Virginia Attorney
           General's Action Undermine the Purported "Inquiry Notice" of That Action...12

      E.  2015-2017. Summit and Cuyahoga Counties Experience a Tidal Wave of Opioid
           Deaths and Discover the Injury Caused by Defendants…………………………12

          i.  Both Summit and Cuyahoga experienced massive increases in death rates
               in 2015-2016……………………………………………………………..13

          ii.  The budgetary impacts of the opioid wave of death led Cuyahoga and
               Summit to discover their economic injury……………………………..14

ARGUMENT………………………………………………………………………........16

    I.     THE OHIO STATUTE OF LIMITATIONS DOES NOT RUN AS TO AN
            EQUITABLE PUBLIC NUISANCE CLAIM FOR ABATEMENT……………..17

    II.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS NOT PARTIALLY
            BARRED BY THE STATUTE OF LIMITATIONS…………………………….19

    III.   PLAINTIFFS' OHIO CORRUPT PRACTICES ACT CLAIM IS NOT
            PARTIALLY BARRED BY THE STATUTE OF LIMITATIONS……………...20

    IV.   PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF UNDER RICO IS NOT
            IMPACTED BY DEFENDANTS' STATUTE OF LIMITATIONS MOTION....23

    V.     THE DISCOVERY RULE IS APPLICABLE TO PLAINTIFFS' NEGLIGENCE,
            INJURY THROUGH CRIMINAL ACTS, CIVIL CONSPIRACY AND
            FEDERAL RICO DAMAGE CLAIMS ………………………………………23

A.   A Genuine Material Question of Fact Exists as to When Plaintiffs Knew, or Should Have Known, That They Were Injured……………………………..26

i.   A genuine issue of fact exists as to when Plaintiffs discovered their injury……………………………………………………………………….26

ii.   A genuine issue of fact exists as to whether Plaintiffs possessed constructive notice of their claims …………………………………………29

B.   A Genuine Material Question of Fact Exists as to Whether the Plaintiffs Should Have Known the Identity of the Wrongdoers under RICO……….33

VI.   PLAINTIFFS' INABILITY TO OBTAIN ARCOS DATA TOLLS APPLICATION OF THE STATUTE OF LIMITATIONS UNDER THE DOCTRINE OF EQUITABLE TOLLING …………………………………….34

A.   The Availability of ARCOS Data Was the Key to Plaintiffs Identifying Defendants' Failure to Identify, Suspend and Report Suspicious Orders......36

B.   Defendants' Arguments Regarding the Value of ARCOS Data are Contradicted by Their own Experts and Their Past Statements…………....37

C.   Plaintiffs Could Not Have Identified Defendants' Failure to Identify and Divert Suspicious Orders Without Having Access To ARCOS Data ……...39

i.   Plaintiffs would have identified certain Defendants sooner if Plaintiffs had access to ARCOS Data……………………………...39

ii.   Plaintiffs would have brought the instant action sooner if Plaintiffs had access to ARCOS data………………………………………....41

VII.   THE STATUTES OF LIMITATIONS ARE TOLLED UNDER THE DOCTRINE OF FRAUDULENT CONCEALMENT………………………….44

A.   Defendants Have Engaged in Acts of Fraudulent Concealment…………...45

i.   Defendants have engaged in multiple affirmative acts of concealment …………………………………………………………….45

ii.   Plaintiffs' Motion for Partial Summary Adjudication Establishes Widespread Failure of the Defendants to Report and Suspend Suspicious Orders to the DEA as Additional Acts of Concealment …………………………………………………………….............51

B.   Plaintiffs Discovered Multiple Operative Facts Necessary To Plead Their Pre-October 2012 Claims Only in 2016 and 2017…………………………52

C.   Plaintiffs Have Exercised Due Diligence In Discovering the Relevant Facts …………………………………………………………………....…......54

VIII.   DEFENDANTS' MISCONDUCT PRIOR TO OCTOBER 27, 2012 IS RELEVANT AND ADMISSIBLE ON POST-OCTOBER 27, 2012 LIABILITY AND DAMAGES UNDER THE CONTINUING VIOLATIONS DOCTRINE………………………………………………………………..55

CONCLUSION…………………………………………………………………….57

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Local 496, Laborers' Intern. Union of N. Am.*, 655 F. Supp. 1446
(N.D. Ohio 1987) ................................................................................................ 57

*Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458 (6th Cir. 2016) ...................... 44

*AMTRAK v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L.Ed.2d 106 (2002) .................................... 57

*Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*,
377 F.3d 682 (7th Cir. 2004) .......................................................................... 28, 33

*Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015) ........................................................ 17

*Betts v. Central Ohio Gaming Ventures, LLC*, 351 F. Supp. 3d 1072 (S.D. Ohio 2019) .......................... 34

*Billups v. Officer Kyle Scholl*, Case No. 2:13-CV-258, 2016 WL 3959062 (S.D. Ohio July 22, 2016) ...... 36

*Birkett Williams Ford, Inc. v. East Woodworking Co.*, 456 N.E.2d 1304 (Ohio Ct. App. 1982) ............... 44

*Bd. of Educ. of Evanston v. Admiral Heating*, 94 F.R.D. 300 (N.D. Ill. 1982) ............................. 30

*Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741 (6th Cir. 2012) ........................................ 18

*Brown v. Scioto County Bd. Of Comm'rs*, 622 N.E.2d 1153 (Ohio Ct. App 1993) .............................. 19

*Browning v. Burt*, 613 N.E.2d 993 (Ohio 1993) ..................................................... 26, 27

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) ......................................... 35

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012) .......................................... 54

*Carter v. Hickory Healthcare Inc.*, 905 F.3d 963 (6th Cir. 2018) ....................................... 34

*Chaplain Kieffer Post 1081 v. Wayne County Veterans Ass'n,* Case No. 2358, 1988 WL 99188
(Ct. Comm. Pleas. 1988) ................................................................................ 20

*Charash v. Oberlin Coll.*, 14 F.3d 291 (6th Cir. 1994) ............................................. 17, 29

*Chevron Corp. v. Donziger*, 833 F. 3d 74 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268, 2269 (2017) ......... 25

*City of Cleveland v. Payne*, 72 Ohio St. 347 (1905) .................................................... 29

*Collins v. Sotka*, 692 N.E.2d 581 (Ohio 1998) ................................................................ 27

*Davis v. Clark County Bd. of Supervisors*, 994 N.E.2d 905 (Ohio Ct. App. 2013) ..................... 26

*Dayco Corp. v. Firestone Tire & Rubber Co.*, 523 F. 2d 389 (6th Cir. 1975) ......................... Passim

*Desai v. Franklin*, 895 N.E.2d 875 (Ohio Ct. App. 2008) .......................................... 1, 19

*Doe v. Archdiocese of Cincinnati*, 849 N.E. 2d 268 (Ohio 2006) ..................................... 21

*Ferner v. Vill. of Sheffield*, 656 F. Supp. 1017 (N.D. Ohio 1987) ................................... 57

*Flagstar Bank v. Airline Union's Mortgage Co.*, 947 N.E.2d 672 (Ohio 2011) ........................ 26

*Fonseca v. Consol. Rail Corp.*, 246 F.3d 585 (6th Cir. 2001) ....................................... 25

*G.G. Marck & Assocs., Inc. v. Peng*, 762 Fed. App'x 303 (6th Cir. 2019) ......................... 35, 37

*Gaetzi v. Carling Brewing Co.*, 205 F. Supp. 615 (E.D. Mich. 1962) .............................. 51, 52

*Gandy v. Sullivan County*, 24 F.3d 861 (6th Cir. 1994) ............................................. 56

*Glazer Steel Corp. v. Toyomenka, Inc.*, 392 F. Supp. 500 (S.D.N.Y. 1974) ........................... 52

*Haas v. Sunset Ramblers Motorcycle Club, Inc.*, 726 N.E.2d 612 (Ohio Ct. App. 1999) ................ 19

*Harris v. Liston*, 714 N.E.2d 377 (Ohio 1999) ..................................................... 24

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S. Ct. 1114, 71 L.Ed.2d 214 (1982) ............. 57

*Hensley v. City of Columbus*, 557 F.3d 693 (6th Cir. 2009) ......................................... 56

*Hickle v. Am. Multi-Cinema, Inc.*, 927 F.3d 945 (6th Cir. 2019) .................................... 17

*Hill v. A.O. Smith Corp.*, 801 F.2d 217 (6th Cir. 1986) ............................................ 32

*Holland v. Florida*, 560 U.S. 631, 130 S. Ct. 2549, 177 L.Ed.2d 130 (2010) ........................ 34

*Imes v. Touma*, 784 F.2d 756 (6th Cir. 1986) ...................................................... 32

*In re African-American Slave Descendants Litig.*, 471 F.3d 754 (7th Cir. 2006) ..................... 35

*In re Beef Indus. Antitrust Litig.*, 600 F. 2d 1148 (5th Cir. 1979) ................................ 34

*In re Cathode Ray Tube Antitrust Litig.*, MDL 1917, Case No. C-07-5944 JST, 2016 WL 8669891
    (N.D. Cal. Aug. 22, 2016) ..................................................................... 38

*In re Chocolate Confectionary Antitrust Litig.*, 801 F. 3d 383 (3d Cir. 2015) ...................... 33

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    782 F. Supp 487 (C.D. Cal. 1991) ................................................................. 34

*In re Elevator Antitrust Litig.*, 502 F.3d 51 (2d Cir. 2007) ........................................... 33

*In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919 (6th Cir. 2019) ............................ 36,

*In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968 (N.D. Ohio 2015) ...................................... 59

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) ................................... 59

*Investors REIT One v. Jacobs*, 546 N.E.2d 206 (Ohio 1989) ....................................... 24

*Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 29 F. Supp. 2d 801
    (N.D. Ohio 1998) ........................................................................................ 20

*Jackson v. U.S.*, 751 F.3d 712 (6th Cir. 2014) ........................................................... 34

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) ................................ 25

*Kolesar v. Allstate Ins. Co.*, Case No. 1:19 CV 35, 2019 WL 2996047 (N.D. Ohio July 9, 2019) ........... 17

*Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir. 1997) .......................... 56

*Laipply v. Bates*, 849 N.E.2d 308 (Ohio 2006) .................................................. 26, 31

*LGR Realty, Inc. v. Frank & London Ins. Agency*, 98 N.E.3d 241 (Ohio 2018) ................... 24, 25

*Li-Conrad v. Curran*, 50 N.E.2d 573 (Ohio Ct. App. 2016) ........................................ 44

*Little Miami R.R. Co. v. Comm'rs of Greene County.*, 31 Ohio St. 338 (Ohio 1877) .................... 18

*Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797 (7th Cir. 2008) .................. 34

*Marquardt v. Carlton*, Case No. 1:18 CV 333, 2019 WL 1491966 (N.D. Ohio Apr. 2, 2019) ............... 26

*Masters Pharm., Inc. v. Drug Enforcement Admin.*, 861 F.3d 206 (D.C. Cir. 2017) ............... 42, 43

*Meros v. Dimon,* Case No. 2:18-cv-510, 2019 WL 1384390 (S.D. Ohio Mar. 27, 2019) ................. 21, 22

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999) .................. 59

*Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 480 F.3d 410 (6th Cir. 2007) ............ 56

*In re Nat'l Prescription Opiate Litig.*, MDL 2804, Case No. 1:17-md-2804, 2018 WL 6628898
    (N.D. Ohio Dec. 19, 2018) ............................................................... Passim

*NCR Corp. v. U.S. Mineral Prods. Co.*, 649 N.E.2d 175 (Ohio 1995) ...........................................26, 27, 28

*NCR Corp. v. U.S. Mineral Prods. Co.*, Case Nos. 13931, 81-3339, 1993 WL 386223
(Ohio Ct. App. Oct. 1, 1993), *rev'd*, 649 N.E.2d 175 (Ohio 1995)........................................ 28

*Norgard v. Brush Wellman, Inc.*, 766 N.E.2d 977 (Ohio 2002) ..................................................... 27

*Ohio ex. rel. Montgomery v. Louis Trauth Dairy, Inc.*, Case No. C–1–93–553, 1996 WL 343440
(S.D. Ohio Apr. 25, 1996) ......................................................................................... 30

*O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727 (Ohio 1983) ..................................................26, 27

*Palm Beach Co. v. Dun & Bradstreet, Inc.*, 665 N.E.2d 718 (Ohio Ct. App. 1995) ..............................1, 19

*People v. Conagra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 227 Cal. Rptr. 3d 499
(Cal. Ct. App. 2017).................................................................................................. 20

*Phelps v. Lengyel*, 237 F. Supp. 2d 829 (N.D. Ohio 2002) .......................................................17, 44

*Pinney Dock and Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445 (6th Cir. 1988), *cert. denied*,
488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988) ...........................................................44, 52

*Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757 (9th Cir. 1980) ..................................................... 57

*Rotella v. Wood*, 528 U.S. 549, 120 S. Ct. 1075, 145 L.Ed.2d 1047 (2000) ........................................28, 36

*Ruth v. Unifund CCR Partners*, 604 F.3d 908 (6th Cir. 2010) ...................................................... 44

*Sharpe v. Cureton*, 319 F.3d 259 (6th Cir. 2003)................................................................... 57

*Sims v. Ohio Cas. Ins. Co.*, 151 Fed. App'x 433 (6th Cir. 2005) .................................................... 25

*Storrs v. Univ. of Cincinnati*, Case No. 1:15-cv-136, 2018 WL 684759 (S.D. Ohio Feb. 2, 2018).......... 57

*United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) ............................... 57

*U.S. v. Duke*, 229 F. 3d 627 (7th Cir. 2000) ....................................................................... 33

*U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ...................................... 38

*Watson Carpet & Floor v. Mohawk Indus.*, 648 F.3d 452 (6th Cir. 2011) ........................................... 37

*Wheaton v. N. Oakland Med. Ctr.*, 130 Fed. App'x 773 (6th Cir. 2005)...........................................56, 57

## OTHER AUTHORITIES

15 U.S.C. § 15(b) ........................................................................................................................ 22

18 U.S.C. § 1961 *et seq.* .......................................................................................................... *passim*

18 U.S.C. § 1961(1)(D) ............................................................................................................ 52

21 C.F.R. § 1301.74(b) ............................................................................................................ 42

21 U.S.C. § 842(a)(5) .............................................................................................................. 42

66 Ohio Jur. 3d, *Limitations and Laches, § 58* ...................................................................... 56

66 Ohio Jur. 3d, *Limitations and Laches, § 59* ...................................................................... 24

66 Ohio Jur. 3d, *Nuisances*, § 22 ........................................................................................... 18

Ohio Rev. Code § 2923.31 ...................................................................................................... 20

Ohio Rev. Code § 2923.34(J) ............................................................................................. 20, 22

Fed. R. Crim. Pro. 6 ................................................................................................................ 29

# INTRODUCTION

Defendants' two motions[1] for partial summary judgment on statute of limitations grounds should be denied. First, Defendants misstate the applicable law related to accrual of Plaintiffs' public nuisance, unjust enrichment and Ohio Corrupt Practices Act ("OCPA" or "Ohio RICO") claims. In Ohio, the law is clear that there is no statute of limitations with respect to an equitable public nuisance claim for abatement.[2] For unjust enrichment, Ohio applies a "last rendition of services" test under which "such a claim does not accrue until the last point in time that the plaintiff conferred and defendant unjustly received a benefit."[3] Since Defendants were still unjustly benefiting from the Plaintiffs' payment for the externality costs they caused within the limitations period, that claim is timely. Similarly, claims under the Ohio Corrupt Practices Act may be commenced at any time within five years after the unlawful conduct terminates. Since Defendants' motions do not contest the existence of unlawful conduct within the last five years, the statute of limitations for this claim has not expired.

As to the remaining claims that accrue based upon the discovery rule,[4] Defendants seek partial summary judgment on the basis that Plaintiffs should have discovered and filed their claims earlier. Here too, Defendants' motions contain multiple material flaws. Most fundamentally,

---

[1] The manufacturers and distributors filed a combined motion. *See Combined Brief of Distributors and Manufacturers in Support of Partial Summary Judgment on Statute of Limitations Grounds*, June 17, 2019, Dkt. #1892. ("Defs.' Combined Br."). The pharmacies filed a separate motion, adopting sections I, II and V of the manufacturers' and distributors' Combined Brief but asserting a separate argument with respect to the operation of the limitations periods. *See, Pharmacy Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment Based on the Statutes of Limitations*, June 19, 2019, Dkt. #1872. ("Pharmacy Defs. Br."). This brief combines Plaintiffs' opposition to the motions for partial summary of the manufacturers, distributors, and pharmacies.

[2] Plaintiffs have expressly disclaimed recovery for past damages under their public nuisance claim and are seeking only equitable abatement relief. As a result, Defendants' motion for partial summary judgment regarding Plaintiffs' public nuisance claim pertaining to claims for damages prior to the limitations period is moot.

[3] *Desai v. Franklin*, 895 N.E.2d 875, 885 (Ohio Ct. App. 2008); *Palm Beach Co. v. Dun & Bradstreet, Inc.,* 665 N.E.2d 718, 723 (Ohio Ct. App. 1995).

[4] Plaintiffs advised the Court they were voluntarily dismissing their Ohio common law fraud count. Plaintiffs therefore do not respond here to Defendants' motion with respect to the Ohio common law fraud count.

Defendants' motions claim there is no genuine issue of material fact that, "by no later than 2010"[5] Plaintiffs were aware of the existence of an "opioid epidemic" and that at the latest, multiple county employees "all knew there was an opioid problem before October 27, 2012."[6] Defendants' motions present an overly simplistic factual analysis of discovery accrual, as if it were all tied to how many "hits" a county employee might obtain if she or he were to Google-search the term "epidemic."

But even if one were to entertain Defendants' flawed notion that the mere existence of an opioid "epidemic" is all that was necessary for Plaintiffs' claims to accrue, consider the following chart[7] that presents the opioid death rates in Cuyahoga and Summit Counties.



Could a juror who reviews this chart reasonably conclude that the gravity of the opioid problem in Cuyahoga and Summit Counties could only be appreciated in 2015 or 2016 and that the Counties

---

[5] Defs.' Combined Br. at 40.
[6] *Id.*
[7] The chart is reproduced from the report of Plaintiffs' expert economist, Dr. Jonathan Gruber. (Report of Jonathan Gruber, PhD, Dkt. #2000-6 at 44, Figure I.11).

discovered their injuries at that time?  Hugh Shannon, Director of Operations at the Cuyahoga County Medical Examiner's Office and 30(b)(6) witness, succinctly testified: "2016 changed everything. We went -- you know, we doubled the number of deaths…"[8]  Or, as Defendants contend, is there no genuine issue of material fact that the date was 2010 or 2016? Plaintiffs contend that this is a jury question.

Finally, the discovery record also provides a fulsome evidentiary basis to support equitable tolling of any statutes of limitations on two grounds: 1) equitable tolling based upon Plaintiffs' lack of access to ARCOS data; and 2) equitable tolling based upon Defendants' individual and collaborative acts of fraudulent concealment.[9]

Viewing the contested facts in a light most favorable to Plaintiffs, Defendants' motions for partial summary judgment on statute of limitations grounds therefore should be denied.

## STATEMENT OF FACTS

**A. As the Use of Opioids Expanded in the United States, Defendants Emphasized that the Causes Associated With Misuse Were Street Level Diversion, Pill Mills, Overprescribing Doctors, Criminal Sales and Similar Conduct so as to "Inoculate" Themselves from Litigation.**

Throughout the 2000s, Defendants disseminated focus group tested media messages to reinforce the public perception that the causes of opioid diversion were street level crime, and the result of overprescribing doctors from pill mills in order to deflect attention from their own wrongdoing. Distributor Defendants, for example, collectively commissioned a study by consulting and lobbying firm APCO through their industry organization, the Healthcare Distribution Alliance ("HDA" or "HDMA"), to test messages addressing issues related to diversion and prescription drug

---

[8] Hugh Shannon Cuyahoga County 30(b)(6) Dep. (1/15/2019), Dkt. # 1970-21 at 145:8-146:10.

[9] *In re Nat'l Prescription Opiate Litig.*, MDL 2804, Case No. 1:17-md-2804, 2018 WL 6628898, at *21 (N.D. Ohio Dec. 19, 2018). The Court's Order, among other holdings, adopted that portion of the Magistrate Judge's Report and Recommendation which denied Defendants' motion to dismiss on statute of limitations grounds. *See In re Nat'l Prescription Opiate Litig.*, MDL 2804, Case No. 1:17-md-2804, 2018 WL 4895856, at *25-26 (N.D. Ohio Oct. 5, 2018).

3

abuse in February 2013.[10]  The study found that "[r]espondents rank doctors and users as most responsible for prescription drug abuse, but also blame pharmacists, family members, pharmaceutical companies (manufacturers), the legal/regulatory structure (DEA/law enforcement), criminals/drug dealers, payers and media."[11]  In June 2015, in the wake of an action by the West Virginia Attorney General, Distributors again collaborated through the HDA to hire GMMB, a political consulting agency, to develop a "Strategy to Turn the Tide in West Virginia."[12]  GMMB suggested that the HDA emphasize that "there are multiple parties responsible for drug diversion and painkiller abuse – pill mills, unsuspecting pharmacists and doctors who comply with patient requests, pharmaceutical companies that heavily market the drugs and the abusers themselves."[13]

The Distributor Defendants used their consultants' findings to direct their messaging related to the causes of the opioid crisis.  One Distributor highlighted the role of pill mills, illegal prescriptions written for "pseudo-patients," hospitals writing prescriptions without a legitimate medical purpose, and pharmacies filling known fraudulent prescriptions as causes of opioid abuse.[14]  Another focused on abused prescription medications obtained illegally from friends and relatives, internet pharmacies, and pill mills as the primary sources of diversion.[15]  They discussed "the evolving tactics of the criminal element who are constantly adapting their methods to secure illegal sources of opiates" as a cause of diversion.[16]  The HDA highlighted that pain management clinics could operate as pill mills, illegally dispensing pain medications, stating that "[t]he rise in these clinics

---

[10] PSJ4 SOL Opp Exh 1, HDA_MDL_000031703, at 31706; *see also* PSJ4 SOL Opp Exh 2, HDA_MDL_000031775 at 317783.
[11] *Id.*
[12] PSJ4 SOL Opp Exh 3, ABDCMDL000269293.
[13] *Id.*
[14] PSJ4 SOL Opp Exh 4, MCKMDL00407451.
[15] Cardinal did so on its educational Generation Rx website and accompanying presentation videos. https://www.generationrx.org/learn/online-classroom/; The Prescription Drug Abuse Epidemic_ Sources of Drugs - Part 1 on Vimeo https://vimeo.com/132728623 posted in 2015; The Prescription Drug Abuse Epidemic_ Sources of Drugs - Part 2 on Vimeo https://vimeo.com/132728622 posted in 2015.
[16] PSJ4 SOL Opp Exh 5, ABDCMDL00161398 at 00161402.

has directly contributed to the increase in prescription drug abuse across the country."[17]  In one instance, Defendant McKesson and the HDA internally applauded their ability to shape the content of media coverage of the opioid crisis in West Virginia noting: "I see a lot of our collective fingerprints on the story so that's good.  I shudder to think what the story would have been had MCK had (sic) buried our heads in the sand."[18]

Manufacturer Defendants' similarly cultivated a media message and public perception whenever examples of opioid diversion and abuse had drawn attention.  Following an article in Time magazine,[19] Richard Sackler wrote in an email, "[w]e have to hammer on the abusers in every way possible. They are the culprits and the problem."[20] Purdue created a Partners Against Pain Advocacy Toolkit, essentially a guide to how to control the abuse message, which also was disseminated to Janssen.[21] In anticipation of negative coverage in the Los Angeles Times, Purdue even commissioned a strategy to drive digital traffic to friendly internet URLs. Because "[i]f Purdue doesn't fill this vacuum, someone else will – and it won't be Purdue's narrative."[22]

Throughout these public "messaging" initiatives, the emphasis was on deflecting attention, blame or litigation away from the pharmaceutical industry for their role in recklessly distributing opioid products into the supply chain and "inoculating" the industry from litigation — like this case. For a period of time, the strategy was successful in focusing the attention of local governmental

---

[17] PSJ4 SOL Opp Exh 6, HDA_MDL_000190487 at 000190497, also found at https://www.hda.org/~/media/pdfs/government-affairs/position-statements/state-licensing-of-pain-management-clinics.ashx.
[18] PSJ4 SOL Opp Exh 7, HDA_MDL_000014961.
[19] Paul Tough, *The alchemy of OxyContin*, N.Y. TIMES, July 29, 2001 (Magazine) https://www.nytimes.com/2001/07/29/magazine/the-alchemy-of-oxycontin.html.
[20] PSJ4 SOL Opp Exh 8, PDD8801133516.
[21] PSJ4 SOL Opp Exh 9, JAN-MS-00304077 at 304083 ("Criminals and drug abusers are threatening to complicate or prevent legitimate access to the very medications that chronic pain sufferers need most.") .
[22] PSJ4 SOL Opp Exh 10, PPLPC029000660000; PSJ4 SOL Opp Exh 11, PPLPC022000935566.

entities away from the industry and towards the street level issues that were the Defendants' favored "cause" of the opioid crisis.[23]

Moreover, Manufacturer Defendants concealed[24] even their own role in various promotional initiatives, making it impossible to tie them to the clearly effective efforts to distort medical and public perceptions of opioids and the standard of care to encourage the use of opioids for chronic pain.

**B. 2000-2014. As Opioids Continued to Spread Through Summit and Cuyahoga Counties, Plaintiffs Expended Significant Effort in Battling the Causes of Diversion and Misuse That Had Been Identified by Defendants.**

During the period of 2000-2014, Plaintiffs diligently addressed their efforts to attack an increasing number of opioid products in their communities by attacking the very same issues that the Defendants identified in their external communications as the root causes of the opioid problems: street level diversion, pill mills, overprescribing doctors, criminal sales and similar conduct.

Summit County law enforcement spent considerable effort investigating and prosecuting crimes related to diversion of opioid medications. Hylton Baker, Commander of the Summit County Drug Unit from 2001 to 2012, oversaw the efforts of his officers in drug-related arrests and the seizure of pharmaceutical drugs. Throughout Captain Baker's tenure, his department worked closely with the Ohio Board of Pharmacy to investigate, arrest and ultimately prosecute those involved in opioid-

---

[23] Plaintiffs do not contend that Defendants' messaging, insofar as it pointed to these "street level" causes of the opioid crisis, was false, only that it was were incomplete.  These various actors -- pill mills, overprescribing doctors, etc. -- were, and are, responsible for a portion of the opioid crisis.  Of course Defendants marketing conduct, *inter alia*, did contribute to doctors overprescribing and the attendant street demand.  However, as Plaintiff's expert economist Dr. David Cutler acknowledged in his report, Cuyahoga and Summit County "would have faced some opioid-related costs even in the absence of the increasing availability of prescription opioids due to the defendants' misconduct…" (Report of David Cutler, PhD, Dkt. # 2000-4 at 28).  Cutler's analysis estimates the portion of opioid-related harms that are caused by these other factors and how much is caused by the Defendants' misconduct.  Rather, Plaintiffs highlight this industry messaging because it suggests that these are the *only* causes of the crisis, and were designed to deflect attention away from the industry's own reckless practices.

[24] *See, e.g.* Purdue internal email discussing the disguised promotional role of Dr. Barry Cole, a physician ostensibly speaking across the country for the American Academy of Pain Management, who Purdue employees described as being "on the road five days a week for Purdue." PSJ4 SOL Opp Exh 12, PDD8801104393.

related criminal activity.[25] The County began prosecuting cases of illegal distribution of opioids and doctor shopping between 2001 and 2003.[26]

Summit County also investigated and charged (or assisted federal authorities with charging) several physicians who diverted pharmaceuticals. Captain Baker specifically recalled the investigation of two doctors and twenty nurses for drug diversion.[27] One of the doctors was Dr. Adolph Harper, Jr., an Akron Ob/Gyn who pled guilty on October 20, 2014 to 16 counts of conspiracy, health care fraud, and drug trafficking.[28] The unit also investigated those accused of doctor shopping, and suspected prescription fraud and forgery.[29]

In 2005, Captain Baker summarized some of his unit's accomplishments.[30] Since 2001, officers from the Summit County Drug Unit and the Greater Akron Drug Task Force seized significant amounts of schedule II pharmaceuticals.[31] During the first quarter of 2004, the Akron Police Department's Narcotics Unit, Diversion Division investigated sixty new diversion cases while prescription opioids and Fentanyl were highly subject to diversion.[32]

Captain Baker also detailed the unit's accomplishments from January 1 through June 30, 2006.[33] During this time, fifteen new cases of pharmaceutical diversion had been initiated and more than 450 units of prescription opioids were seized.[34] Captain Baker also testified before the General Assembly of Ohio and touted the success of Ohio Task Forces in removing more than $253.4 million

---

[25] Hylton Baker Dep. (12/19/2018), Dkt. # 1956-10 at 148:5-13, 150:4-151:18.

[26] Brad Gessner Dep. (12/3/2018), Dkt. #1961-9 at 162:1-10,162:13-16.

[27] Baker Dep., Dkt. # 1956-10 at 201:6-11, 217:17-22, 218:6-10, 228:6-16; *See also* PSJ4 SOL Opp Exh 13, SUMMIT_000023567 at  000023632.

[28] Rafalski Rep., Dkt. #2000-22 at 147-148; *see also* "Akron Doctor Sentenced to 10 Years in Prison For Illegally Prescribing Painkillers, Even After Patients Died," U.S. Dep't of Justice Press Release (Feb. 13, 2015), https://www.justice.gov/usao-ndoh/pr/akron-doctorsentenced-10-years-prison-illegally-prescribing-painkillers-even-after.

[29] Baker Dep., Dkt. # 1956-10 at 257:14-17, 259:2-7.

[30] PSJ4 SOL Opp Exh 13, SUMMIT_000023567 – 3648.

[31] *Id.* at 000023584 – 85.

[32] *Id.* at 000023629.

[33] PSJ4 SOL Opp Exh 14, SUMMIT_000023798 – 805.

[34] *Id.* at 000023803 – 804.

dollars' worth of illicit and prescription drugs from Ohio's streets.[35] During 2006 alone, more than 12,300 units of pharmaceutical drugs were seized and over 133,600 were found to have been diverted.[36]

Similar diligent efforts were expended in Cuyahoga County.  Cuyahoga County Assistant Prosecutor James Gutierrez testified that he has been prosecuting doctors for improperly prescribing opioids since 1989.[37] Mr. Gutierrez testified to his office's commencement in 1996 of a joint investigation with the DEA of notorious over-prescriber Dr. George Smirnoff.[38] Dr. Smirnoff had engaged in brazen illegal behavior, ranging from distributing opioids himself from his office to giving drugs in exchange for sex—sometimes up to 50 times the legal dosage of a single prescription.[39] Mr. Gutierrez testified that it took more than three years to investigate and litigate Dr. Smirnoff's case.[40] Mr. Gutierrez also testified to his Office's prosecution of a doctor for manslaughter related to a patient's overdose on prescription opioids.[41]

Additionally, Mr. Gutierrez testified that the Cuyahoga County Prosecutor's Office began using the Ohio Automated Rx Reporting System ("OARRS") in 2010 to view the prescription histories of certain patients and doctors who were under investigation.[42] Using OARRS, Cuyahoga investigators identified another over-prescribing doctor who wrote more than 33,000 prescriptions for controlled substances between 2009 and 2011, resulting in his indictment in 2013.[43]

---

[35] PSJ4 SOL Opp Exh 15, SUMMIT001461080-001461085 at 001461083.

[36] *Id.*; The specific efforts of the Summit County Drug Unit to curb drug diversion and the sale of heroin continued in 2009. *See* PSJ4 SOL Opp Exh 16, SUMMIT_000830645 – 682. The unit engaged in Controlled Prescription Drug removal programs resulting in the destruction of more than 100,000 doses of medications. *See Id.* at 000830653.  From January 1 through December 31, 2009, the drug unit seized 235 OxyContin tablets, 345 doses of Vicodin and 14 units of Percocet and removed 910 units of Vicodin. *See Id.* at 000830677- 78, 80.

[37] *See* James Gutierrez Dep. (1/31/2019), Dkt. #1962-16 at 189:11-15.

[38] *Id.* at 135:11-137:16.

[39] *See id.* at 135:16-24, 137:25-139:3.

[40] *See id.* at 135:17-25.

[41] *See id.* at 77:6-16, 142:7-145:8.

[42] *Id.* at 92:18-95:15.

[43] *See id.* at 110:14-113:15.

These efforts overwhelmed the law enforcement officers who engaged in them.  As Prosecutor Gutierrez testified in deposition in explaining why they were unable to engage in more "proactive" measures:

> Q. Have you ever tried to proactively use either ARCOS data or OARRS data to determine if there were pockets within your jurisdiction who were getting a disproportionate number of prescription opioids?
>
> A. The short answer to that question is no.
>
> Q. Why not?
>
> A. Because we don't need to look for work. Work will come to us, okay. We are overwhelmed at our office all the time. I feel like I'm putting my finger in a dike. That's all I feel I'm doing in the last 30 years, especially in the last four years.[44]

In short, what local law enforcement was aware of and focused on before 2012 was just what Defendants, in calculated misdirection, claimed was the root of the problem--prolific and unlawful prescribers.

## C. While Plaintiffs Led Enforcement Efforts to Reduce Opioids on the Streets, Federal and State Authorities Addressed Compliance Issues with National Distributors.

While Plaintiffs brought law enforcement actions to reduce the opioids in their communities, federal authorities brought, and resolved, enforcement actions at the national level.  Defendants identify a host of such actions, and the media reports surrounding them, primarily involving Defendants Cardinal Health and McKesson that occurred between 2008 and 2012 involving their distribution facilities *in other states* to suggest that Plaintiffs possessed either actual or inquiry notice that distributor Defendants similarly engaged in unlawful actionable conduct in Ohio.[45]

Several of these episodes actually ***bolster*** the position that Defendants concealed the true import of these enforcement matters and, while publicly trumpeting the new compliance initiatives, privately undermined the efficacy of those compliance measures to bolster profits.

---

[44] *Id.* at 282:15-283:3.
[45] Defs.' Combined Br. at 28-29.

For example, in May 2008, the U.S. Department of Justice and Defendant McKesson announced a settlement concerning McKesson's hydrocodone and alprazolam sales to certain pharmacies. The media reports concerning the settlement, which Defendants identify as placing the Plaintiffs on inquiry notice were reported in The Baltimore Sun and the Los Angeles Times — newspapers with somewhat narrow distribution in Summit and Cuyahoga Counties.[46] The articles state that the fines in the enforcement matter "centered on McKesson's dealings with New Care Pharmacy in East Baltimore and Smeeta Pharmacy in Highland" Maryland.[47]

McKesson's press announcement concerning the settlement states that "[i]n connection with the settlement, the company is implementing certain enhanced controls over the ways it monitors and reports orders for controlled substances."[48] These controls were the Controlled Substance Monitoring Program or (CSMP) which McKesson launched in May 2008. If Plaintiffs had been on notice of the Baltimore Sun and LA Times articles, and McKesson's release, they would have been under the impression that the distributional issues with these non-Ohio pharmacies had been resolved and McKesson had implemented improved controls over its distribution systems.

McKesson provided a far different message to its customers, telling them that the new controls in its CSMP "ensure[d] that you as a McKesson customer can continue with business as usual."[49] As identified in the expert report of former DEA Diversion Investigator James Rafalski, McKesson generated "threshold warning reports" to improperly warn its customers in advance if they were approaching a controlled substance order quantity threshold limit set under its CSMP.[50] That way, McKesson and the customer could circumvent the CSMP's identification of an order

---

[46] Defs.' Combined Br. Ex. 65 and Ex. 66.
[47] *Id.*
[48] PSJ4 SOL Opp Exh 17, PPLPC004000159312 at 12-13.
[49] PSJ4 SOL Opp Exh 18, MCKMDL00543612 at 00543613. Subsequently, McKesson's Senior Director of Regulatory Affairs, Nate Hartle, again attempted to calm customer concerns that McKesson's CSMP resulting from the settlement with DOJ would be stricter on its establishment of opioid quantity threshold levels stating that it would be "business as usual from a threshold perspective."
[50] Rafalski Rep., Dkt. #2000-22 at 77.

before it was flagged as a suspicious order and the customer could seek a preemptive increase in their quantity limit for the drug.

Defendant Cardinal provided similar false assurances of compliance.  A 2008 settlement centered on resolving Cardinal's controlled substance distribution violations at its facilities in Auburn, Wash., Lakeland, Fla. and Swedesboro, N.J. Cardinal paid $34 million under the deal and, in press releases, trumpeted its new and improved compliance efforts "to protect the integrity of the pharmaceutical chain … preventing prescription drug abuse."[51] Cardinal outlined impressive efforts to "expand its training, implement new processes, introduce an electronic system that identifies and blocks potentially suspicious orders pending further investigation, and enhance the expertise and overall staffing of its pharmaceutical distribution compliance team."[52]

Cardinal provided similar characterizations of its compliance efforts in response to a second 2012 DEA enforcement action taken against its Lakeland Florida distribution facility.  Issuing a press release in response to the DEA initiative, the company stated:

> Cardinal Health has robust controls and performs careful due diligence.  The company's controls feature a system of advanced analytics and teams of anti-diversion specialists and investigators to identify red flags that could signal diversion. When the company's program raises a red flag, its teams immediately investigate. Cardinal Health's anti-diversion specialists use their professional judgment and expertise to determine the appropriate action. The anti-diversion specialists are authorized to stop shipments, investigate further and when appropriate, report matters to the DEA who licenses pharmacies to sell controlled substances.[53]

The Columbus Dispatch article referenced by Defendants, quotes Cardinal CEO, George S. Barrett reacting to DEA's initiative, saying "Cardinal has put in place numerous systems to raise red

---

[51] Cardinal Health Resolves Controlled Substance License Suspension, Cardinal Health, October 2, 2008 available at https://cardinalhealth.mediaroom.com/newsreleasearchive?item=122576.
[52] *Id.*
[53] Cardinal Health Inc. Seeks Restraining Order to Avoid Disruption in Controlled Medicine Shipments from Florida, Press Release, Cardinal Health (2/3/2012) available at https://cardinalhealth.mediaroom.com/newsreleasearchive?item=122803.

flags when suspicious ordering activity occurs. It has stopped shipments to more than 350 suspicious pharmacies and reported them to the DEA."[54]

### D. Defendants' Attempts to Conceal Materials from the West Virginia Attorney General's Action Similarly Undermine the Purported "Inquiry Notice" of That Action.

Defendants also assert that the West Virginia Attorney General's allegations of conduct and injuries effecting West Virginia in a 2012 lawsuit should have been enough to notify Summit and Cuyahoga Counties of their claims.  Defendants discussed West Virginia's press release announcing the lawsuit, "[t]he release cited data showing West Virginia is 'the nation's most medicated state', (sic) filling nearly seven more prescriptions per person each year than the U.S. average."[55]  The allegations in West Virginia's initial complaint were extremely limited, and reveal little. The complaint provides virtually no useful information for Cuyahoga and Summit Counties and is attached to this brief so that the court might more readily assess Defendants' claims of "constructive notice."[56]

It is conceivable that if the materials and amended complaint in the West Virginia action had been successfully unsealed, it would have assisted Plaintiffs in discovering their claims earlier. Distributor Defendants, however, successfully kept those items under seal until losing a motion filed by West Virginia media in May 2016.[57]  When that failed, several of the Distributor Defendants quickly settled the lawsuit to take advantage of the fact that the court "redacted, or blacked out, pill shipment information for seven drug wholesalers that have reached settlement agreements with the state.  Six of those companies agreed to settle with the state over the past two weeks – after the newspaper filed its motion to intervene."[58]

---

[54] Defs.' Combined Br. Ex. 85.
[55] Defs.' Combined Br. Ex. 94.
[56] PSJ4 SOL Opp Exh 19, *West Virginia ex. rel. McGraw v. AmerisourceBergen et. al.*, 2:12-cv-03760, (Jun. 26, 2012).
[57] Eric Eyre, *Drug firms fueled 'pill mills' in rural W.Va.*, CHARLESTON GAZETTE-MAIL, May 23, 2016, https://www.pulitzer.org/winners/eric-eyre.
[58] *Id.*

**E.  2015-2017. Summit and Cuyahoga Counties Experience a Tidal Wave of Opioid Deaths and Discover the Injury Caused by Defendants.**

  **i.  Both Summit and Cuyahoga experienced massive increases in death rates in 2015-2016.**

Throughout their brief, Defendants make reference to testimony, governmental and media reports that an "opioid epidemic" existed in Plaintiff counties "by no later than 2010" and that county representatives were aware that "there was an opioid problem before October 27, 2012."[59] But the massive spike in opioid deaths which focused Summit and Cuyahoga Counties on their communities' injuries and led them to bring this lawsuit did not happen in 2010 or 2012.  Instead, the ***dramatic increase of opioid deaths in 2015-2016*** is what focused the attention of governmental officials in both Cuyahoga and Summit Counties and led to the discovery of their injury.  Cuyahoga County Board of Health Program Manager and Grant Coordinator April Vince testified: "the medical examiner's data ... reflected ... 2015, '16 there was a large spike in overdose deaths. That's the most -- that's the thing that – the only thing I have that's concrete."[60]

Hugh Shannon, Director of Operations at the Cuyahoga County Medical Examiner's Office and 30(b)(6) witness, succinctly testified as follows:

> Q. But just from a factual standpoint, at some point, obviously, the county developed concerns that particular entities and companies may be responsible for the harm that they alleged occurred. I don't want to get into any of the harm stuff, we talked about that at length. I'm really just looking for when the county first decided that it was going to investigate or -- and pursue legal action against certain entities?
> ...
> A. Gotcha***. 2016 changed everything. We went -- you know, we doubled the number of deaths,*** and fentanyl had flooded the market. I wouldn't be able to give you an exact date, because, again, it wasn't within my normal preparation for this***, but after 2016, it was clear that we weren't able to control and contain what was happening.***[61]

---

[59] Defs.' Combined Br. at 40.
[60] PSJ4 SOL Opp. Exh 20 April Vince Dep. (12/13/2018) at 305 (emphasis added); *See also* Shannon Dep., Dkt. # 1970-21 at 296:1-16 (Hugh Shannon, Director of Operations at Cuyahoga County Medical Examiner's Office, testified that "**in 2015 or '16 -- probably 2016, because that's when the crisis really started to hit** -- internally we tried to start using stronger language to make sure that people understood that there was more than just an awareness issue, that it -- that it was a serious crisis." (emphasis added)).
[61] Shannon Dep., Dkt. # 1970-21 at 296:1-16 (emphasis added).

The same increase in death was witnessed in Summit County. According to the County's State of Emergency Resolution enacted in 2017, the rate of overdose deaths increased dramatically from 2015, when Summit County experienced 212 total overdose deaths, to 2016 when Summit County experienced 336 deaths.[62] Summit County was so overwhelmed with dead bodies that it had to borrow use of the State of Ohio's mobile morgue. *Id.*[63]

### ii. The budgetary impacts of the opioid wave of death led Cuyahoga and Summit to discover their economic injury.

The large volume of deaths witnessed in Plaintiffs' counties in 2016 had budgetary consequences that led each county to focus on, and discover, their economic injuries attributable to opioids. Margaret Keenan, Cuyahoga County Director of Office and Budget Management, was questioned on the County's awareness of the existence and extent of the opioid problem specifically as it related to the County's finances:

> **Q. Prior to 2016, did Cuyahoga County know that it was spending money because of an opioid epidemic?**
> **A. No.** Prior to that, the county knew it was spending money because people weren't taking care of their children, people were dying, people were coming into the jail and we have to cart them off to hospitals every other day. **We have rising caseloads, but we don't know. You don't know without analyzing all the data A, what is, what's driving that increase and then B, whether it is, in fact, an epidemic or it is a blip or it is this.** I mean, you were asking me previously did the numbers of deaths increase this year over this year. We did go down in 2018, but we have gone down before and then we dip back up. It would be premature for the county to say in

---

[62] PSJ4 SOL Opp Exh 21, SUMMIT_001266515.

[63] Even with these spiraling death rates in 2016, Summit County's immediate focus was not to file a lawsuit, it was to save lives. As Greta Johnson, Assistant Chief of Staff and Public Information Officer for Summit County Executive's Office testified:

> **The focus was not on getting at the head of the monster. The focus was on saving people in our community.** Our collective resources and efforts were very specifically directed at treatment, at how to increase the bed capacity, how to find ways to leverage funds, how to make sure we could staff these places, because the real concern, I recall, at some of those early meetings was, even if we increase capacity, do we have educated professionals to treat these folks? If – if we built a thousand-bed facility, who would run it?

Greta Johnson Dep. (1/15/19), Dkt. # 1963-7 at 451:6-18. (emphasis added) Johnson further testified, "[T]he aggregate loss is – not limited to what you can put on paper. The overwhelming sense of hopelessness that overtook this community in 2016, you can't monetize that." *Id.*

2018 we are healed because that number has gone back up before. You can't take one piece of data point in time and make determinations.[64]

As testified to unequivocally by Ms. Keenan, the County's awareness of the epidemic's extent going back years was only developed in 2016:

> Q. When did the opioid problem cause the number of the people in the jail to increase?
> MR. BADALA: Objection to form, outside the scope.
> A. Um, I can't. **So the county I know saw that the opiate epidemic was affecting our systems and our budget in 2016. After that time, once we became aware of the issue and the county was connecting the dots, we had traced that impact of this epidemic on our systems and our budget to at least 2006, perhaps earlier.** I cannot give you a specific date as to when the number of prisoners increased specific to the opiate epidemic, but I can say that ADP, so the average daily population, the ADP has increased and the number of opiate addicted inmates has increased.[65]

Instructively, Ms. Keenan also provided the following testimony on the County's realization of the financial effects of the opioid crisis for the first time in 2016:

> I want to point out that in 2007, just as an example, this $36 million, it wasn't necessarily $36 million more than the previous year. But this is 36 million that was attributed to now we know the opiate epidemic. **It is not as if the county woke up one day and found that it spent $500 million more than it ever had before, but now we know the cause. Previous to that, we had had no one singular cause why are we taking children into custody. Now we are able to trace back and say, yes, in fact, over the last several years, we have spent between 11 million and $23 million taking children as a result of this one singular cause.**[66]

Similarly, Brian Nelsen, Summit County Director of Finance and Budget, testified to the emergence of opioids and its impact on the budgets of various programs throughout the County. He testified, "to date, 2016 statistically and financially was probably the worst of the years that -- both in terms of overdoses, deaths, spending on indigency, spending by ADM and Children Services. **2016 so far has been the worst year.**"[67] The first time Mr. Nelsen's office had to go back to county council and ask for appropriation increases to cover placement costs attributable to opioids was 2015 or 2016.[68]

---

[64] Maggie Keenan Cuyahoga 30(b)(6) Dep. (1/18/2018), Dkt. # 1963-11 at 148:11-149:6 (emphasis added)
[65] *Id.* At 59:3-18 (emphasis added).
[66] *Id.* at 147:5-18 (emphasis added).
[67] Brian Nelson Dep. (1/24/19), Dkt. # 1968-18 at 200:25-201:8-14 (emphasis added).
[68] *Id.* at 310:3-9.

The Children Services Board was particularly impacted by the opioid crisis.

> But late in the summer, they came back to us and **told us they were going to run out of budget appropriation for placement costs** and needed to request additional appropriations to get them through the end of the year for placements. I believe that number was about $2.3 million that we went back to county council and increased appropriations by in that year.  Each of their budgets since that time has had increased appropriation costs for child placement.[69]

The Plaintiffs have modeled their damages attributable to the Defendants' unlawful conduct expressed as a function of the percentage impact on each of the county department budgets.  The expert report of Harvard economist Dr. Thomas McGuire presents these damages, expressed as a percentage of each county department budget for each year.[70]  Dr. McGuire's findings demonstrate that the Defendants' unlawful conduct started with a relatively small percentage impact on the budgets of various county departments in 2006 – ranging between a low amount of .3% and a high amount of 3.9% in 2006.[71]  But by 2016, when these economic injuries were discovered by Plaintiffs, those figures had increased for various county departments – ranging from 2.1%, and a high amount of 18.3% in the Cuyahoga County Medical Examiner's office, where autopsies were performed.

## ARGUMENT

Defendants' motions for partial summary judgment on statute of limitations grounds should be denied, in the first instance, because Defendants rely on inapplicable accrual standards for Plaintiffs' public nuisance, unjust enrichment and OCPA claims. As to Plaintiffs' other claims, there are genuine issues of fact regarding, among other things: 1) the time when Plaintiffs' claims accrued, 2) whether equitable tolling associated with Plaintiffs' inability to access ARCOS data delayed accrual, and 3) whether Defendants' acts of fraudulent concealment tolled accrual.

---

[69] *Id.* at 198:17-199:3 (emphasis added).
[70] *See* Expert Report of Thomas McGuire Dkt. # 2000-17 at p. 42.
[71] *Id.*

The application of a statute of limitations presents a mixed question of law and fact, and "[d]etermination of when a plaintiff's cause of action accrues is to be decided by the factfinder." *Phelps v. Lengyel*, 237 F. Supp. 2d 829, 838 (N.D. Ohio 2002) (citation omitted). Determinations of when Plaintiffs knew, or should have known, about their legal remedies is normally a question of fact for the jury. *See Charash v. Oberlin Coll.*, 14 F. 3d 291 (6th Cir. 1994). "Tolling the limitations period is a jury question." *In re Polyurethane Foam Antitrust Litig.,* 152 F. Supp. 3d 968, 1005 (N.D. Ohio 2015). The moving party has the burden of showing that no genuine dispute exists as to any material fact. *See Hickle v. Am. Multi-Cinema, Inc.*, 927 F.3d 945, 951 (6th Cir. 2019). Summary judgment must be denied "if a reasonable jury could return a verdict for the nonmoving party[.]" *Kolesar v. Allstate Ins. Co.*, Case No. 1:19 CV 35, 2019 WL 2996047, at *2 (N.D. Ohio July 9, 2019) (Polster, J.) (citing *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015)). In making this determination, "the court must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party." *Id.*

## I. THE OHIO STATUTE OF LIMITATIONS DOES NOT RUN AS TO AN EQUITABLE PUBLIC NUISANCE CLAIM FOR ABATEMENT.

Defendants' motions for partial summary judgment regarding Plaintiffs' public nuisance claim should be denied because they misconstrue Ohio's public nuisance law. Defendants mischaracterize Plaintiffs' nuisance claim as a common law claim for a continuing nuisance to argue it is governed by the four-year statute of limitations in R.C. § 2305.09 and thereby seek to limit Plaintiffs' recoverable damages to those "within the four years preceding the filing of the complaint."[72]

---

[72] Defs.' Combined Br.at 42. Using Cuyahoga's filing date of October 27, 2017 and Summit's filing date of December 20, 2017, Defendants seek to bar all Plaintiffs' damages related to its public nuisance claims which were incurred prior to October 27, 2013, and December 20, 2017 respectively.

Defendants' argument is without merit. Plaintiffs have expressly disclaimed seeking past damages based upon their public nuisance claim and are seeking only equitable relief,[73] and Ohio law is clear there is no statute of limitations applicable to an equitable claim to abate a public nuisance. The cases Defendants cite are therefore inapposite.[74]

It has been well-settled law in Ohio since 1877 that no length of time can legalize a public nuisance and therefore the statute of limitations does not run against an action to abate a public nuisance. As the Ohio Supreme Court has stated:

> No principle is more firmly settled at common law, than that no length of time can legalize a public nuisance. . . . Lord Mansfield . . . said: "The length of time is clearly not a bar, nor anything like a bar. It is a public nuisance which may increase every hour." Every continuance of a nuisance is, in judgment of law, a fresh nuisance.

*The Little Miami R.R. Co. v. Comm'rs of Greene Cty.*, 31 Ohio St. 338, 349-50 (Ohio 1877) (internal citations omitted). Numerous other cases in Ohio have followed this rule. *See* Ohio Jur. 3d Nuisances § 22, *Limitations of actions against nuisance* ("A well-settled rule in Ohio is that no length of time can legalize a public nuisance and that therefore the statute of limitations does not run against

---

[73] *See* Pl.'s *County of Summit, Ohio, and City of Akron, Ohio's Omnibus Mem. in Opp'n to (1) Defs. Amerisourcebergen Drug Corp., Cardinal Health, Inc., and McKesson Corp.'s Mot. to Dismiss (Doc. 491): (2) Mot. to Dismiss Compl. by Defs. Walmart, Inc., CVS Health Corp., Rite Aid Corp., and Walgreens Boots Alliance, Inc. (Doc. 497): and (3) Manufacturer Defs." Joint Motion to Dismiss Plaintiffs' Second Am. Compl.*, p. 8, n. 6, Dkt. #654, (June 22, 2018).

[74] Defendants' reliance on *Haas v. Sunset Ramblers Motorcycle Club, Inc.*, 726 N.E.2d 612 (Ohio Ct. App. 1999) is misplaced. *Haas* involved a claim arising from the interference of noise and dust from a nearby motorcycle track with the use and enjoyment of plaintiff's land and thus dealt solely with a *private nuisance*, not a public nuisance. *See id.* at 613 ("We note initially that appellant's claim for relief is based upon a private rather than a public nuisance.") Defendants' reliance on *Haas* for the claim that Plaintiffs' claim is one of *continuing nuisance* and therefore Plaintiffs' claim is limited to the four-years preceding the filing of the complaint is without merit because the continuing nuisance in *Haas* was a characteristic of the *private nuisance* claim. *See id.* at 613-14. Consequently, *Haas* is inapposite because Plaintiffs here assert a claim based on public nuisance. Equally unavailing is Defendants' reliance on *Brown v. Scioto County Bd. of Comm'rs*, 622 N.E.2d 1153 (Ohio Ct. App 1993). That case involved a sewage plant which the plaintiffs alleged created a nuisance and trespass to their neighboring property. *See id.* at 1155. The court explained that there are two main types of nuisance—public nuisance and private nuisance. *See id.* at 1158. It then discussed various characteristics of nuisance, including absolute nuisance, nuisance per se, and qualified nuisance, noting that both public and private nuisance "may be either absolute or qualified." *Id.* at 1159. The court held that the sewage plant was neither a common law public nuisance nor an absolute statutory nuisance, *see id.* at 1160, finding instead that the action against the sewage plant was one of "qualified private nuisance." *Id.* The court then held that the evidence indicated that the private nuisance was not permanent but was continuing in nature and therefore was not barred by the four-year statute of limitations under R.C. 2305.09. *See id.* at 1162-63. Thus, as with *Haas*, *Brown* is equally inapposite here.

an action to abate such a nuisance") (citations omitted).[75] Defendants have failed to cite any decisions on the Ohio law of public nuisance which hold otherwise. Defendants' motions as to Plaintiffs' equitable public nuisance claim for abatement therefore should be denied.

## II. PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS NOT PARTIALLY BARRED BY THE STATUTE OF LIMITATIONS.

Defendants also misread the Ohio law regarding accrual of unjust enrichment claims.[76] Ohio has yet to apply the discovery rule to unjust enrichment claims. *See Desai v. Franklin*, 895 N.E.2d 875, 885 (Ohio Ct. App. 2008). Instead, Ohio applies the "last rendition of services" test under which "such a claim does not accrue until the last point in time that the plaintiff conferred and a defendant unjustly received a benefit." *Id.* (citing *Palm Beach Co. v. Dun & Bradstreet, Inc.,* 665 N.E.2d 718, 723 (Ohio Ct. App. 1995)). Under this test, "[s]o long as a person continues to confer a benefit upon another, and the retention of that benefit is unjust, the unjust enrichment continues," *Id.* at 884, and thus the claim does not accrue until "the last unjust retention of the benefit occurs." *Id.* at 884-885 (citation omitted).[77]

Indeed, Defendants' motions do not seek to cut off any claims based on misconduct after 2012. Since Plaintiffs' will have continued to pay for Defendants' externalities well-beyond 2012 and up to the present, it follows that the applicable statute of limitations has not accrued and thus does not bar Plaintiffs' claims because Defendants cannot identify, and have not identified, a "last point in time that the plaintiff conferred and a defendant unjustly received a benefit." *Desai, supra*, 895

---

[75] *Cf. People v. Conagra Grocery Prods. Co.,* 17 Cal. App. 5th 51, 227 Cal. Rptr. 3d 499 (upholding public nuisance verdict against lead paint companies based on marketing for residential use more than fifty years earlier).

[76] *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *21 (citation omitted). This Court denied Defendants' motion to dismiss, holding that it was not necessary to demonstrate a financial transaction between the parties in order to show that a plaintiff conferred a benefit upon a defendant; rather, under Ohio law "one is unjustly enriched if the retention of a benefit would be unjust, and one should not be allowed to profit or enrich himself or herself inequitably at another's expense." The Court then overruled Defendants' objection and adopted Section III.J of the Magistrates Judge's Report & Recommendations. *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *44-46.

[77] *See also Chaplain Kieffer Post 1081 v. Wayne County Veterans Ass'n*, Case No. 2358, 1988 WL 99188, *3 (Ct. Comm. Pleas 1988).

N.E.2d at 885. Defendants' motions as to Plaintiffs' unjust enrichment claim therefore should be denied.

## III. PLAINTIFFS' OHIO CORRUPT PRACTICES ACT CLAIM IS NOT PARTIALLY BARRED BY THE STATUTE OF LIMITATIONS

Plaintiffs bring claims under the OCPA, Ohio Rev. Code § 2923.31, *et seq.*, against a "Marketing Enterprise" and a "Supply Chain Enterprise."

The statute of limitations provision within the OCPA, Ohio Rev. Code § 2923.34(J), reads as follows:

> Notwithstanding any other provision of law providing a shorter period of limitations, a civil proceeding or action under this section may be commenced at any time within five years after the unlawful conduct terminates or the cause of action accrues or within any longer statutory period of limitations that may be applicable. If a criminal proceeding, delinquency proceeding, civil action, or other proceeding is brought or intervened in by the state to punish, prevent, or restrain any activity that is unlawful under section 2923.32 of the Revised Code, the running of the period of limitations prescribed by this division with respect to any civil action brought under this section by a person who is injured by a violation or threatened violation of section 2923.32 of the Revised Code, based in whole or in part upon any matter complained of in the state prosecution, action, or proceeding, shall be suspended during the pendency of the state prosecution, action, or proceeding and for two years following its termination.

As set forth above, the OPCA "allows an action within five years of the latest of three dates." *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 29 F. Supp. 2d 801, 809 (N.D. Ohio 1998). Under the clear and unambiguous language of the statute, as quoted above, the three dates are as follows:

1. "within five years after the unlawful conduct terminates…" or

2. "within five years…after the cause of action accrues…" or

3. "within any longer statutory period of limitations that may be applicable."

Ohio Rev. Code § 2923.34(J).

Defendants' argument ignores the first of the above-stated prongs under the OCPA, namely, that an action may be brought "within five years after the unlawful conduct terminates." Defendants' motions *do not contest*—for statute of limitations purposes—that acts and damages within five years of the filing of the complaint are at issue.[78]  This failure justifies denial of the motion.

Nonetheless, Defendants rely upon *Doe v. Archdiocese of Cincinnati,* 849 N.E.2d 268 (Ohio 2006), and *Meros v. Dimon,* Case No. 2:18-cv-510, 2019 WL 1384390, at *5 (S.D. Ohio Mar. 27, 2019), for the proposition that an "injury discovery rule" applies and should justify partial dismissal of their claims.[79]  Neither case cited by Defendants supports application of the "injury discovery" accrual rule to the first prong of the OPCA statute of limitations.

In *Doe,* the Supreme Court of Ohio addressed "the narrow question" of "at what point a minor who is the victim of sexual abuse must assert claims against the employer of the perpetrator, when at the time of the abuse, the victim knows the identity of the perpetrator, the employer of the perpetrator, and that a battery has occurred." *Id.* at 271.  *Doe* involved a claimant who alleged that he was abused by a priest as a minor between 1980 and 1983.  He did not file his complaint until 2004. On the face of the complaint, the priest's alleged abuse of Doe ceased 21 years before the complaint was filed. The majority opinion makes no reference to an allegation that the abuse continued in the five years preceding the filing of the complaint, and so the first prong of the OCPA statute of limitations ("within five years after the unlawful conduct terminates") was not implicated.

---

[78] *See* Defs.' Combined Br. at 1. ("This motion does not seek to bar claims pertaining to wrongful acts that occurred within the applicable limitations periods.")

[79] Plaintiffs address under the RICO section of this brief why, even under an "injury discovery rule" their action would still be timely. To the extent the Court were to apply the injury discovery rule under the second prong of the OCPA statute of limitations provisions to Plaintiffs' claims, Plaintiffs rely upon their accrual arguments presented in the RICO section.

Defendants also cite *Meros, supra,* a recent case of limited utility given its unique facts. *Meros* involved an uncontested motion against a frivolous claim brought by a disbarred pro se litigant who the court had already deemed a "vexatious litigator" under Rule 11.  Although it appeared to apply an "injury discovery rule" to plaintiff's claim, the claim itself appeared to be based upon conduct that was nearly 20 years old with no continuing violations of the OCPA within the last five years other than the plaintiff's allegation that the OCPA conspiracy involved  "a never-ending open-ended" racketeering organization. Plaintiffs respectfully suggest the case has little precedential value here.  And although *some provisions* in the OCPA are patterned after RICO, and justify resort to RICO case law to assist in interpreting the OCPA, the statute of limitations (and in particular, the first prong of the OCPA) is *not* patterned after RICO and contains decidedly different language.[80]

As an additional basis to reject Defendants' statute of limitations arguments, on May 31, 2017, the State of Ohio brought an action in the Common Pleas Court of Ross County, Ohio Civil Division.[81] The Ohio Attorney General's action similarly pleads an OCPA claim, alleging an opioids marketing enterprise in violation of the OCPA against pharmaceutical manufacturers Purdue, Janssen, Cephalon, Endo and unnamed DOES 1-100.  Since the action in this court is "based in whole or in part upon any matter complained of in the state…action…," Ohio Rev. Code § 2923.34(J),  the five year statute of limitation is suspended for a period of two years after termination of the Attorney General's action, rendering the Plaintiffs' action timely.

---

[80] *See* discussion of the statute of limitations under RICO *infra* Section IV. *Compare* Ohio Rev. Code § 2923.34(J), *with* 15 U.S.C. § 15b.

[81] *See State of Ohio ex rel. Mike DeWine v. Purdue Pharma L.P. et al.,* Case No. CV-17 CI 000261 (Ross County C. P.) (attached as PSJ4 SOL Opp Exh 22).

## IV. PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF UNDER RICO IS NOT IMPACTED BY DEFENDANTS' STATUTE OF LIMITATIONS MOTION.

In addition to seeking damages under RICO, Plaintiffs also seek injunctive relief under their RICO cause of action.[82] The Supreme Court has held that RICO "borrows" its statute of limitations provision from the Clayton Act. By its own terms, the Clayton Act statute of limitations applies **only to damage causes of action** set forth "under sections 15,15a, or 15c…" 15 U.S.C. §15b. It places no limitations upon injunctive relief. "The §4B limitation period applies only to damage actions. Equity actions, private or governmental, are not restricted by the statute of limitation." Areeda and Hovenkamp, *Antitrust Law,* at ¶ 320 (4th ed. 2014). Thus, Defendants' arguments are inapplicable to the injunctive relief sought under RICO.

## V. THE DISCOVERY RULE IS APPLICABLE TO PLAINTIFFS' NEGLIGENCE, INJURY THROUGH CRIMINAL ACTS, CIVIL CONSPIRACY AND FEDERAL RICO DAMAGE CLAIMS AND TRIGGERS ACCRUAL OF THE STATUTE OF LIMITATIONS.

The "discovery rule" is applicable to Plaintiffs' negligence,[83] injury through criminal acts,[84] civil conspiracy,[85] and Federal RICO claims. Generally, a cause of action accrues at the time the

---

[82] In *Chevron Corp. v. Donziger,* 833 F. 3d 74, 137-40 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 2268, 2269 (2017), the United States Court of Appeals for the Second Circuit recognized the right of a private plaintiff to seek injunctive relief under RICO.

[83] Ohio courts have applied the discovery rule in several negligence cases with facts and circumstances closely analogous to those presented here. Thus, it has been applied in cases involving latent property damage, *see, e.g., Lsipply v. Bates,* 849 N.E.2d 308 (Ohio 2006); *see also NCR Corp. v. U.S. Mineral Prods. Co.,* 649 N.E.2d 175, 177 (Ohio 1995), as well as in negligence cases involving latent injury resulting from asbestos exposure. *See, e.g., O'Stricker v. Jim Walter Corp.,* 447 N.E.2d 727 (Ohio 1983). It has also been applied in a negligence case in which the plaintiff, injured by an incompetent surgery, did not learn until much later that the hospital had failed to properly determine the surgeon's credentials. *See Browning v. Burt,* 613 N.E.2d 993 (Ohio 1993). The rationale for the application of the discovery rule in those cases is the same here.

[84] Plaintiffs' claim for civil damages under R.C. § 2307.60(A)(1), "Injury Through Criminal Acts," is based upon allegations that Defendants' violated R.C. § 2925.02(A), "Corrupting another with drugs" and R.C. § 2925.03(A)(2), "Trafficking offenses." Ohio's discovery rule is applicable to claims under R.C. § 2307.60. *See Marquardt v. Carlton,* Case No. 1:18 CV 333, 2019 WL 1491966 at *3 (N.D. Ohio Apr. 2, 2019) (applying discovery rule).

[85] In *Davis v. Clark County Bd. of Supervisors,* 994 N.E.2d 905, 909 (Ohio Ct. App. 2013), the court held that "the applicable statute of limitations for filing a civil conspiracy is the relevant limitations statute for the underlying cause of action." This Court, in its Opinion dated December 19, 2018, agreed with, and adopted, the Magistrate Judge's finding that "the statutory public nuisance, Ohio RICO, and injury through criminal acts claims" would all suffice to "fulfill the underlying unlawful act element." *In re Nat'l Prescription Opiate Litig.,* 2018 WL 6628898, at *11. The applicable limitations periods therefore would be those of the underlying causes of action—statutory public nuisance, the Ohio Corrupt Practices Act (OCPA or Ohio "RICO") (five years), and Injury through Criminal Acts. To the extent that certain

wrongful act is committed. *Harris v. Liston* 714 N.E.2d 377, 379 (Ohio 1999) (citation omitted). However, in appropriate instances, "fairness necessitates allowing the assertion of a claim when discovery of the injury occurs beyond the statute of limitations." *NCR Corp.,* 649 N.E.2d at 177 (citation omitted).

"The 'discovery rule' generally provides that a cause of action accrues for purposes of the governing statute of limitations at the time when the plaintiff discovers or, in the exercise of reasonable care, should have discovered the complained of injury." *Investors REIT One v. Jacobs,* 546 N.E.2d 206, 209 (Ohio 1989). It provides that "[w]hen an injury does not manifest itself immediately, the cause of action does not arise until the plaintiff knows or by the exercise of reasonable diligence should have known, that he had been injured by the conduct of the defendant, for purposes of the statute of limitations."[86] It has been judicially recognized in circumstances where the general rule "would lead to the unconscionable result that the injured party's right to recovery can be barred by the statute of limitations before he is even aware of its existence." *LGR Realty, Inc. v. Frank & London Ins. Agency,* 98 N.E.3d 241, 247 (Ohio 2018). The Ohio Supreme Court has applied the discovery rule in a wide variety of situations to toll the applicable statute of limitations.[87]

---

Pharmacy Defendants claim that they no longer ship products into Cuyahoga and Summit Counties and that this terminates their participation in a civil conspiracy prior to the statute of limitations, they have not adequately met their burden of demonstrating that they have withdrawn from the conspiracy. "[O]nce a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned." *Watson Carpet & Floor v. Mohawk Indus.,* 648 F. 3d 452 (6th Cir. 2011). "At a minimum, 'affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] sufficient to establish withdrawal or abandonment." *In re Cathode Ray Tube Antitrust Litig.*, MDL 1917, Case No. C-07-5944 JST, 2016 WL 8669891, *3 (N.D. Cal. 2016) (citing *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 464-5 (1978)). The Pharmacy Defendants have not included this demonstration as part of their statute of limitations motion and it should therefore be denied.
[86] Pharmacy Defendants claim that, since they terminated their sales before the statutory period (CVS Indiana or Walgreens) or shortly thereafter (the remaining Pharmacy Defendants), summary judgment must be granted to them in full or in part. This argument fails under the facts of this case because accrual begins with discovery of injury, not the commission of the unlawful acts.
[87] *See, e.g., Norgard v. Brush Wellman, Inc.,* 766 N.E.2d 977, 981 (Ohio 2002) (employer intentional tort); *Harris v. Liston,* 714 N.E.2d 377, 380 (Ohio 1999) (listing cases; applying discovery rule to negligence action against developer-vendor for property damage); *Collins v. Sotka,* 692 N.E.2d 581, 582 (Ohio 1998) (wrongful-death action stemming from murder); *NCR Corp.,* 649 N.E.2d at 178 (property damage claims for asbestos removal); *Browning,* 613 N.E.2d at 1006 (negligent credentialing claim against a hospital).

*See also* 66 Ohio Jur. 3d, *Limitations and Laches, § 59. Discovery rule for accrual of cause of action* (June 2019) (collecting discovery rule cases).

Indeed, the case cited by Defendants, *LGR Realty, Inc., supra,* specifically recognizes the discovery rule. *See id.* at 245-246. The discovery rule is applied when no significant injury is discernable at the time of the tortious event, or if the cause of an injury is not apparent. *Fonseca v. Consol. Rail Corp.,* 246 F.3d 585, 588 (6th Cir. 2001); *see also O'Stricker,* 447 N.E.2d at 727; *see also NCR Corp.,* 649 N.E.2d at 177.

Specifically, as to the RICO claim, Defendants accurately state that for a federal RICO claim, "[t]he claims accrue when the plaintiff discovers, or should have discovered, its injury."[88] Defendants also rely upon *Sims v. Ohio Cas. Ins. Co.,* 151 Fed. App'x 433, 435 (6th Cir. 2005), which summarizes the standard as follows: "The four-year period begins to run when a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation." *Id.* (citing *Rotella,* 528 U.S. at 553-55).

Defendants' argument that Plaintiffs should have discovered their claims earlier suffers from a number of flaws. First, Defendants argue that the mere fact that Plaintiffs incur expenses attributable to their unlawful conduct begins the clock[89] – reading "discovery" out of the discovery rule. The fact that the Plaintiff Counties incurred expenses does not indicate that they had actionable claims related to those expenses; governments incur all sorts of incomprehensible expenses in providing for the health and safety of their residents.[90] Second, Defendants posit a number of "constructive notice" facts they suggest should have led Plaintiffs, in the exercise of due diligence, to sue Defendants sooner. Yet questions about what a plaintiff "should have done" in the

---

[88] Defs.' Combined Br. at 9, citing *Rotella v. Wood,* 528 U.S. 549 (2000).
[89] *Id.* at 23.
[90] Defs.' Combined Br. at 3, FN 8.

exercise of due diligence is rarely a matter of resolution on summary judgment since it is an inherently factual inquiry appropriately left to the jury.

### A.  A Genuine Material Question of Fact Exists as to When Plaintiffs Knew, or Should Have Known, That They Were Injured.

#### i.  A genuine issue of fact exists as to when Plaintiffs discovered their injury.

The expert report of Harvard economist Dr. Thomas McGuire presents Plaintiffs' damages, expressed as a percentage of each county department budget for each year those charts are reproduced below.[91]

#### Table IV.9: Share of Harms Due to Defendants' Misconduct, Cuyahoga County

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Approach 1** | | | | | | | | | | | | | |
| ADAMHS Board | 0.7% | 0.9% | 1.0% | 1.0% | 1.1% | 1.2% | 1.3% | 2.6% | 3.0% | 4.0% | 5.8% | 6.7% | 6.7% |
| DCFS | 1.0% | 1.2% | 1.4% | 1.7% | 1.9% | 2.0% | 2.4% | 3.3% | 4.2% | 5.0% | 7.1% | 7.5% | 7.5% |
| Office of Prosecutor | 1.2% | 1.2% | 1.7% | 2.0% | 2.5% | 2.7% | 3.2% | 3.8% | 3.9% | 4.0% | 4.3% | 5.2% | 5.2% |
| Office of Public Defender | 1.2% | 1.2% | 1.7% | 2.0% | 2.5% | 2.7% | 3.2% | 3.8% | 3.9% | 4.0% | 4.3% | 5.2% | 5.2% |
| Court of Common Pleas | 1.2% | 1.3% | 1.7% | 2.1% | 2.6% | 2.8% | 3.4% | 4.0% | 4.3% | 4.4% | 4.8% | 5.8% | 5.8% |
| Juvenile Court | 0.3% | 0.4% | 0.6% | 0.6% | 0.6% | 0.7% | 0.8% | 1.0% | 1.4% | 1.4% | 2.1% | 2.1% | 2.1% |
| Sheriff's Office | 1.2% | 1.2% | 1.7% | 2.0% | 2.5% | 2.7% | 3.2% | 3.8% | 3.9% | 4.0% | 4.3% | 5.2% | 5.2% |
| County Jail | 1.2% | 1.2% | 1.7% | 2.0% | 2.5% | 2.7% | 3.2% | 3.8% | 3.9% | 4.0% | 4.3% | 5.2% | 5.2% |
| Office of Medical Examiner | 1.9% | 1.9% | 2.8% | 3.6% | 4.4% | 6.0% | 7.1% | 9.3% | 10.1% | 10.6% | 18.1% | 18.3% | 18.3% |
| | | | | | | | | | | | | | |
| **Approach 2** | | | | | | | | | | | | | |
| ADAMHS Board | 1.2% | 1.5% | 1.7% | 1.5% | 1.6% | 1.6% | 1.7% | 3.0% | 3.2% | 4.1% | 5.9% | 6.7% | 6.7% |
| DCFS | 1.6% | 2.0% | 2.4% | 2.5% | 2.7% | 2.9% | 3.0% | 3.8% | 4.5% | 5.1% | 7.2% | 7.6% | 7.6% |
| Office of Prosecutor | 2.0% | 2.1% | 2.8% | 3.0% | 3.5% | 3.8% | 4.1% | 4.3% | 4.2% | 4.1% | 4.4% | 5.3% | 5.3% |
| Office of Public Defender | 2.0% | 2.1% | 2.8% | 3.0% | 3.5% | 3.8% | 4.1% | 4.3% | 4.2% | 4.1% | 4.4% | 5.3% | 5.3% |
| Court of Common Pleas | 2.0% | 2.1% | 2.8% | 3.1% | 3.6% | 4.0% | 4.3% | 4.6% | 4.7% | 4.5% | 4.8% | 5.9% | 5.9% |
| Juvenile Court | 0.6% | 0.7% | 0.9% | 0.8% | 0.9% | 1.0% | 1.0% | 1.2% | 1.5% | 1.5% | 2.1% | 2.1% | 2.1% |
| Sheriff's Office | 2.0% | 2.1% | 2.8% | 3.0% | 3.5% | 3.8% | 4.1% | 4.3% | 4.2% | 4.1% | 4.4% | 5.3% | 5.3% |
| County Jail | 2.0% | 2.1% | 2.8% | 3.0% | 3.5% | 3.8% | 4.1% | 4.3% | 4.2% | 4.1% | 4.4% | 5.3% | 5.3% |
| Office of Medical Examiner | 3.2% | 3.2% | 4.7% | 5.3% | 6.3% | 8.5% | 8.9% | 10.6% | 11.0% | 10.9% | 18.3% | 18.5% | 18.5% |

Source: Table III.16A

---

[91] McGuire Rep., Dkt. # 2000-17 at 42.

**Table IV.10:  Share of Harms Due to Defendants' Misconduct, Summit County**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Approach 1** | | | | | | | | | | | | | |
| ADM Board | 0.4% | 0.4% | 0.5% | 0.7% | 1.5% | 1.6% | 2.7% | 4.5% | 5.3% | 6.0% | 7.3% | 6.5% | 6.5% |
| Children Services Board | 0.9% | 1.1% | 1.5% | 2.2% | 5.7% | 5.9% | 7.7% | 9.2% | 10.0% | 11.4% | 14.5% | 12.9% | 12.9% |
| Prosecutor | 1.1% | 1.1% | 1.5% | 2.0% | 2.1% | 2.5% | 3.1% | 3.5% | 4.1% | 5.2% | 5.6% | 5.6% | 5.6% |
| Court of Common Pleas | 1.1% | 1.1% | 1.5% | 2.0% | 2.1% | 2.5% | 3.1% | 3.5% | 4.1% | 5.2% | 5.6% | 5.6% | 5.6% |
| Juvenile Court | 0.6% | 0.6% | 0.8% | 1.0% | 1.1% | 1.4% | 1.7% | 1.8% | 2.2% | 2.5% | 3.2% | 3.1% | 3.1% |
| Sheriff's Office | 1.1% | 1.1% | 1.5% | 2.0% | 2.1% | 2.5% | 3.1% | 3.5% | 4.1% | 5.2% | 5.6% | 5.6% | 5.6% |
| County Jail | 1.2% | 1.2% | 1.6% | 1.9% | 2.3% | 2.4% | 2.9% | 3.4% | 3.8% | 4.3% | 4.5% | 4.5% | 4.5% |
| Alternative Corrections | 1.2% | 1.2% | 1.6% | 1.9% | 2.3% | 2.4% | 2.9% | 3.4% | 3.8% | 4.3% | 4.5% | 4.5% | 4.5% |
| Adult Probation | 1.1% | 1.1% | 1.5% | 2.0% | 2.1% | 2.5% | 3.1% | 3.5% | 4.1% | 5.2% | 5.6% | 5.6% | 5.6% |
| Medical Examiner | 2.3% | 2.3% | 2.2% | 3.2% | 4.0% | 3.5% | 5.8% | 5.8% | 9.7% | 12.2% | 17.7% | 15.2% | 15.2% |
| **Approach 2** | | | | | | | | | | | | | |
| ADM Board | 0.6% | 0.7% | 0.9% | 1.0% | 2.2% | 2.2% | 3.4% | 5.2% | 5.7% | 6.2% | 7.4% | 6.6% | 6.6% |
| Children Services Board | 1.6% | 1.9% | 2.5% | 3.2% | 8.1% | 8.4% | 9.6% | 10.5% | 10.9% | 11.7% | 14.6% | 13.0% | 13.0% |
| Prosecutor | 1.9% | 1.9% | 2.5% | 2.9% | 2.9% | 3.6% | 3.9% | 4.0% | 4.5% | 5.4% | 5.7% | 5.7% | 5.7% |
| Court of Common Pleas | 1.9% | 1.9% | 2.5% | 2.9% | 2.9% | 3.6% | 3.9% | 4.0% | 4.5% | 5.4% | 5.7% | 5.7% | 5.7% |
| Juvenile Court | 0.9% | 1.0% | 1.3% | 1.4% | 1.6% | 2.0% | 2.2% | 2.1% | 2.4% | 2.6% | 3.3% | 3.1% | 3.1% |
| Sheriff's Office | 1.9% | 1.9% | 2.5% | 2.9% | 2.9% | 3.6% | 3.9% | 4.0% | 4.5% | 5.4% | 5.7% | 5.7% | 5.7% |
| County Jail | 2.0% | 2.1% | 2.7% | 2.8% | 3.2% | 3.4% | 3.6% | 3.8% | 4.1% | 4.4% | 4.5% | 4.5% | 4.5% |
| Alternative Corrections | 2.0% | 2.1% | 2.7% | 2.8% | 3.2% | 3.4% | 3.6% | 3.8% | 4.1% | 4.4% | 4.5% | 4.5% | 4.5% |
| Adult Probation | 1.9% | 1.9% | 2.5% | 2.9% | 2.9% | 3.6% | 3.9% | 4.0% | 4.5% | 5.4% | 5.7% | 5.7% | 5.7% |
| Medical Examiner | 3.9% | 4.0% | 3.7% | 4.8% | 5.7% | 5.0% | 7.3% | 6.6% | 10.5% | 12.6% | 17.8% | 15.4% | 15.4% |

Source: Table III.16B

Defendants submit "[i]t is sufficient to say here that, whatever costs Plaintiffs incurred before October 27, 2012, they knew about them at the time they incurred them."[92]  Under Defendants' argument, if 1.2% of the Cuyahoga County Jail's expenses in 2006 were attributable to the Defendants' illegal conduct, to take just one of Dr. McGuire's examples, such an expenditure begins to run the statute of limitations — irrespective of whether a compensable injury was *discovered* by Cuyahoga County Jail personnel.

But incurrence of costs attributable to unlawful conduct does not demonstrate that Plaintiffs should have discovered the injury.  Plaintiffs did not discover their injury until 2016, as Hugh Shannon testified: "2016 changed everything. We went -- you know, we doubled the number of deaths."[93] As noted above, mere incurrence of costs is not dispositive and does not avoid questions of fact more appropriately resolved by a jury as to when the injury was discovered. *See LGR Realty, Inc.*, 98 N.E.2d at 245-46. The question of whether a reasonable person would have been alerted to

---

[92] Defs.' Combined Br. at 3, fn. 8.
[93] Shannon Cuyahoga County 30(b)(6) Dep., Dkt. # 1970-21 at 145:8 to 146:10.

the injury "is a factual determination. Thus, it is the job of the trier of facts to determine what is reasonable." *Laipply*, 849 N.E.2d at 312.

"This rule is referred to as the discovery rule because *the accrual date is not determined when the injury occurs but when it is discovered.*" *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n,* 377 F.3d 682, 688 (7th Cir. 2004) (emphasis added). *Barry Aviation* involved a RICO fraud action where plaintiff claimed that defendants engaged in a fraudulent scheme to induce entry of a contract based upon falsely inflated airport operational records. The plaintiff had raised "unexpected and unprecedented low level of business" more than four years prior to filing suit, and as a result, the district court dismissed the action on statute of limitations grounds. The Seventh Circuit reversed, holding that plaintiff "became gradually aware of the possibility of injury as business levels continued to fall short of anticipated goals.  At some point, no doubt, a reasonable person would have investigated whether this disappointing business pattern was the product of fraudulent misrepresentations by the defendants, but the complaint before us does not preclude the possibility that this date was within the applicable statute of limitations." *Id.* at 689.

Given the relatively small percentage[94] of county departmental budgetary resources expended due to Defendants' unlawful conduct in the years 2006-2013, a jury could very well conclude as the trier of fact that Plaintiffs would not have discovered their injury, or have reason to discover it, until later years, when the amounts had grown considerably and the deaths attributable to the epidemic mounted. In any event, Defendants have not established that there is no dispute of material fact as to what the date of discovery should have been.

---

[94] In a different context, Areeda and Hovenkamp have explained that price fixing cartels are most successful, and most likely to avoid detection (or discovery), when they involve small percentage increases on intermediate goods that are readily absorbed. Areeda and Hovenkamp, *Antitrust Law* 3rd ed. 2012, § 2002, n. 8. The same economic principle is in play with the small percentage amounts incurred by different county budgets as displayed in Dr. McGuire's charts.  At some point, the increases in expenditures may reasonably trigger accrual because a plaintiff knew, or should have known, of the costs. But is a 1.6% cost amount in a governmental budget sufficient?  Plaintiffs submit this is most appropriately decided by a jury.

ii.  **A genuine issue of fact exists as to whether Plaintiffs possessed constructive notice of their claims.**

Defendants also argue that Plaintiffs had constructive notice of the identity of the Defendants, and their role in recklessly distributing opioid products[95] due to various media and governmental reports and enforcement actions.  This is a question of fact.[96]

As an initial matter, Defendants' motions fail to recognize that not all information obtained by agencies of Plaintiff Counties may be used for civil litigation, or even shared with other county officials. Both federal and state rules of criminal procedure, for example, restrict the uses to which materials gathered in criminal grand jury proceedings may be used. *See, e.g.*, Fed. R. Crim. Pro. 6. Similarly, law enforcement personnel access to OARRS data is restricted.[97] And access to ARCOS data that would have assisted in building a case against Defendants, as the DEA informed Cuyahoga County Medical Examiner, "never would have occurred."[98] Thus, possession of information by one County or City agency would not have put Plaintiffs on notice of the information, let alone their claims.  Defendants' efforts to impute knowledge to the Counties based upon isolated news articles or perceptions of specific employees is unwarranted. Local governments may not be charged with the knowledge of their law enforcement personnel unless the knowledge arises out of matters "which might come within the scope of [their] duties." *City of Cleveland v. Payne*, 72 Ohio St. 347, 357 (1905). Defendants have not demonstrated that budgetary consequences of Defendants' unlawful

---

[95] Defs.' Combined Br. 25-39.
[96] *See, e.g.*, *Charash*, 14 F. 3d at 300 ("Generally, notice, including constructive notice, is an issue of fact, and is normally determined by a jury; *see also Imes v. Touma,* 784 F.2d 756, 759 (6th Cir.1986) ("Whether the plaintiff in this case ... should have known that the injury was the result of negligence is a fact question which should not have been decided by summary judgment."); *see also Hill v. A.O. Smith Corp.,* 801 F.2d 217, 225 (6th Cir. 1986) ("Whether the Hills should have discovered the problem earlier is not a question the trial judge or this court can answer; it is a question for the jury."))
[97] PSJ4 SOL Opp Exh 23, *Cuyahoga County's Amended Supplemental Response and Objections to Pharmacy Defendants' Interrogatory No. 6,*  July 26, 2019 at 5-6.
[98] Thomas Gilson Cuyahoga 30(b)(6) Dep. (1/14/2019) Dkt. # 1962-11 at 223:15-224:7; *See* discussion *supra* Section VI(A) of this Brief.

conduct, or possible civil lawsuits attributable to recoupment of the costs associated with such conduct, are within the scope of their duties.

While facts possessed by one agency may not have put Plaintiffs on constructive notice of any facts, allegations or conduct in another city, county, or state certainly would not have. All of the enforcement actions referenced in Defendants' arguments relate to distribution facilities or marketing of drugs in other states (mostly in Florida).[99] Although such matters might be relevant, if Plaintiffs had brought an action based upon an "if it happened there, it must be happening here" premise, such a complaint likely would have been dismissed.[100] Although some courts have found sufficient constructive knowledge based on media reports of investigations or prosecutions in unrelated geographic markets, courts typically have been more reluctant to grant a summary judgment motion on that basis.

*Ohio ex. rel. Montgomery v. Louis Trauth Dairy, Inc.*, Case No. C–1–93–553, 1996 WL 343440 (S.D. Ohio, 1996) is instructive. In *Montgomery,* the defendants relied upon *Dayco Corp. v. Firestone Tire & Rubber Co.,* 523 F. 2d 389, 394 (6th Cir. 1975), and other case law to argue that the plaintiffs possessed constructive knowledge of the facts necessary to launch their case. But the court denied the motion, ruling as follows:

> [C]ourts have not found constructive knowledge based upon reports of tangentially related violations. For example, in *Board of Education of Evanston v. Admiral Heating,* 94 F.R.D. 300 (N.D.Ill. 1982), the court determined that rumors and news accounts of bid-rigging in other parts of the state did not amount to constructive knowledge. Id. at 302-3. In *In re Beef Industry Antitrust Litigation,* 600 F. 2d 1148 (5th Cir. 1979),

---

[99] The only exception is the Ohio Attorney General's settlement with Purdue regarding its marketing claims in 2007. This settlement did not provide notice of an array of additional issues associated with Purdue and, as discussed above, even the Ohio Attorney General has sued Purdue – again – based upon an array of broader claims than those resolved in the earlier Purdue settlement.

[100] *In re Chocolate Confectionary Antitrust Litig.*, 801 F. 3d 383, 402 (3d Cir. 2015); *quoting* Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 1421a, at 160. ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy."); *In Re Elevator Antitrust Litig.*, 502 F.3d. 51-52 (2d Cir. 2007) (finding the 'if it happened there, it could have happened here" argument insufficient to plead conspiracy.)

> the court found that the filing of a suit by similarly situated plaintiffs did not as a matter of law amount to constructive knowledge, even if the suit was widely publicized in the relevant community.

*Montgomery*, *supra* at *5. The *Montgomery* decision is particularly applicable to media accounts involving violations – in Florida – that involved Cardinal Health, a company headquartered in Dublin, Ohio. The court opined:

> In the case at bar, a major Ohio newspaper reported Borden's conviction for antitrust violations in Florida. The story provided no hint of illegal activity in Ohio. Obviously, the main reason the story was reported in the Columbus paper is because Borden is headquartered in Columbus. Accordingly, we find that these news articles do not as a matter of law demonstrate Ohio's knowledge of claims against the defendant dairies for price fixing in Ohio.

*Id.*; *See also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,* 782 F. Supp 487 (C.D. Cal. 1991)(denying summary judgment based upon constructive notice from other litigation, enforcement investigations and media accounts).

Constructive knowledge of the West Virginia Attorney General's complaint is no better. As previously indicated, the initial complaint filed by West Virginia was "bare-boned", providing virtually no assistance in instructing Plaintiffs of their claims. *See In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1171 (5th Cir. 1979) (rejecting constructive knowledge based upon prior similar lawsuit as a matter of law because plaintiffs "cannot have notice of a claim unless they are aware of some evidence to support it"). And the Defendants successfully kept the more significant details of the matter sealed until May of 2016.[101] Indeed, at that point, multiple Defendants settled the case, with the effect of keeping incriminating details of their distribution redacted.[102]

All three groups of Defendants argue that Plaintiffs had knowledge, in some aggregate sense, of their involvement in the opioids crisis in Plaintiffs' communities. For the Distributor

---

[101] Eric Eyre, *Drug firms fueled 'pill mills' in rural W.Va.*, CHARLESTON GAZETTE-MAIL, May 23, 2016, https://www.pulitzer.org/winners/eric-eyre.
[102] *Id.*

31

Defendants, this argument is based upon aggregate, three-level zip code, ARCOS data. The inadequacies of this data are further addressed, *infra,* at Section VI. Indeed, several Distributor Defendants were not added to the complaint until *after* ARCOS data was obtained. Similarly, as to the Pharmacy Defendants, they argue that the Plaintiffs possessed knowledge of their presence in the community because their "pharmacies were present in the plaintiff's communities and visible to the naked eye."[103] But the Pharmacy Defendants were sued in their *distributor* capacity, not their *retail* dispensing capacity. And they were only added to the amended complaint after their *distributional* presence in Plaintiffs' communities was verified with ARCOS data. The Manufacturer Defendants make the most creative argument by suggesting that Plaintiffs could have reviewed the claims data for its own employees, which would have revealed which manufacturers' opioid products were being dispensed to County employees.[104] But such data would have told the Counties **nothing** about the extent of the Manufacturers' drugs in their communities as a whole, or which products were the most widely prescribed by the physicians upon whom the Manufacturers' sales representatives showered the most attention, or deceptively marketed at all.

Finally, to the extent that Plaintiffs are charged with an obligation of "due diligence" in investigating their claims, a reasonable juror could conclude that they had satisfied that diligence obligation by expending their scarce enforcement resources in bringing the multiple criminal prosecutions directed at street level opioid crime and local doctors (who Defendants had blamed for the crisis).[105]

Defendants will, of course, be able to present to a jury their arguments that Plaintiffs should have sued them earlier, based upon purported constructive notice of all of these facts. But it is by a jury that these factual questions are most appropriately decided.

---

[103] Pharmacy Defendants' Br. at 7.
[104] Defs.' Combined Br. at 33.
[105] *See supra,* at Statement of Facts, Section A p. 3-6.

**B.  A Genuine Material Question of Fact Exists as to Whether the Plaintiffs Should Have Known the Identity of the Wrongdoers under RICO.**

As to the RICO claim, a Plaintiff must also discover the wrongdoer that caused the injury. "This principle is based on the general rule that accrual occurs when the plaintiff discovers that 'he has been injured and who *caused* the injury.'"  *Barry Aviation Inc.*, *supra*, 377 F 3d at 688 (citing *U.S. v. Duke*, 229 F. 3d 627, 630 (7th Cir. 2000)).  "The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt *and who has inflicted the injury*." *Rotella*, 528 U.S. at 555 (citations omitted) (emphasis added).[106]

Discovery of the wrongdoer is a contested factual issue here.  Defendants have consistently stated in their messaging to the media and the public, pill mills, overprescribing doctors, doctor shopping patients and criminals have all caused part of the harms attributable to the crisis. Defendants intentionally directed the Plaintiffs to those causes so as to "inoculate" themselves from this type of litigation.[107] It was reasonable (and intended) for them to have focused upon these other causes, rather than upon Defendants. Plaintiffs' expert economist Dr. David Cutler acknowledged in his report that Cuyahoga and Summit County "would have faced some opioid-related costs even in the absence of the increasing availability of prescription opioids due to the defendants' misconduct…"[108] Indeed, Dr. Cutler's economic analysis finds that, in 2006, between 21.1% and 35.8% of the harms associated with opioid use were attributable to Defendants' misconduct.[109]  In his analysis, the percentage of opioid harm attributable to Defendants' misconduct grows to between 47.7% and 49.1% in 2016.[110] Here too, a genuine issue of fact exists that is more appropriately decided by a jury.

---

[106] *Cf. Sidney Hillman Health Center of Rochester v. Abbott Laboratories, Inc.*, 782 F.3d 922, 930 (7th. Cir. 2015).
[107] *See supra*, at Statement of Facts, Section A, p. 3-6.
[108] Cutler Rep., Dkt. # 2000-4 at 28.
[109] *Id.* at 70-1, Tables III.13 and III.14.
[110] *Id.*

## VI. PLAINTIFFS' INABILITY TO OBTAIN ARCOS DATA TOLLS APPLICATION OF THE STATUTE OF LIMITATIONS UNDER THE DOCTRINE OF EQUITABLE TOLLING.

Plaintiffs obtained access to ARCOS granular data – by Court order – in April 2018.[111]   If Plaintiffs had this information sooner they would have been able to: 1) evaluate the representations by some Defendants that they had been complying with their regulatory obligations, settlement agreements, and other duties; 2) identify potentially suspicious orders and volumes of opioids; 3) identify which Defendants maintained a distributional presence in their communities.  Without it, Plaintiffs claims should be equitably tolled.

Equitable tolling of the statute of limitations is available "when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Jackson v. U.S.*, 751 F.3d 712, 718 (6th Cir. 2014) (internal quotations and citations omitted). The doctrine applies to all federal statutes, including RICO, as well as to collective actions. *See Betts v. Central Ohio Gaming Ventures, LLC*, 351 F. Supp. 3d 1072, 1075 (S.D. Ohio 2019) (noting "[t]he doctrine of equitable tolling is read into every federal statute," and that "Sixth Circuit opinions … do not hold that group-wide tolling is improper"). The determination of whether equitable tolling is warranted is a "fact-intensive" inquiry that is best left to the district courts. *Holland v. Florida*, 560 U.S. 631, 654, 130 S. Ct. 2549, 2565, 177 L.Ed.2d 130 (2010) (internal quotations and citations omitted). For that reason, courts "must 'draw upon decisions made in other similar cases for guidance[.]'" *Carter v. Hickory Healthcare Inc.*, 905 F.3d 963, 969 (6th Cir. 2018) (quoting *Holland*, 560 U.S. at 650). "[D]ifficulty in quantifying damages may sometimes be a basis for equitable tolling[.]" *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 805 (7th Cir. 2008). The key to the inquiry, however, is whether despite the practice of due diligence "extraordinary circumstances" prevented the plaintiff

---

[111] *Second Order Regarding ARCOS Data*, May 8, 2018, Dkt # 397.

from discovering the cause of action. *G.G. Marck & Assocs., Inc. v. Peng*, 762 Fed. App'x 303, 311 (6th Cir. 2019).

In an instructive opinion, the Seventh Circuit set forth key differences between the doctrine of equitable tolling and the separate doctrines of fraudulent concealment and the discovery rule:

> [E]quitable tolling.... permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim. Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule—governing, as we have seen, accrual—on the other. It differs from the former in that it does not assume a wrongful—or any—effort by the defendant to prevent the plaintiff from suing. It differs from the latter in that the plaintiff is assumed to know that he has been injured, so that the statute of limitations has begun to run; but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant.

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)(citations omitted). As the *Cada* court further explained, showing that the defendant attempted to mislead the plaintiff "is what the plaintiff must show if he is trying to invoke equitable *estoppel*. For equitable *tolling* all he need show is that he could not by the exercise of due diligence have discovered essential information bearing on his claim." *Id.* at 452 (emphasis in original).

Importantly, equitable tolling is available in the mass tort context without the plaintiffs alleging fraud or concealment of information necessary to bring suit. *See, e.g., In re African-American Slave Descendants Litig.*, 471 F.3d 754, 762 (7th Cir. 2006)(noting in a reparations case with multiple plaintiffs and no allegation that vital information to bring suit was concealed by the defendants, "tolling doctrines can extend the time to sue well beyond the period of limitation[,]" but holding that tolling could not extend "to a century and more beyond."). Likewise, no showing of fraud or concealment on the part of the defendant is necessary. *See Billups v. Officer Kyle Scholl*, Case No. 2:13-CV-258, 2016 WL 3959062 (S.D. Ohio July 22, 2016). In *Billups*, the Southern District of Ohio held that equitable

tolling is warranted when the plaintiff is unable to obtain information vital to their claim despite the practice of due diligence—nothing more, nothing less. *See id.* at \*7 (noting that "even though there is no evidence that [the defendant] purposely withheld" information from the plaintiff necessary to bring suit, "a reasonable jury could believe [the plaintiff] exercised due diligence"). The court in *Billups* rejected the effort to limit the doctrine, finding instead that "these cases stand for the proposition that equitable tolling is appropriate when the plaintiffs did not have the ability to obtain information vital to their claims." *Id.* Applying these principles to the case at hand, the Court should find that the statutes of limitations applying to Plaintiffs' claims are equitably tolled by the unavailability of granular ARCOS data.

### A. The Availability of ARCOS Data Was the Key to Plaintiffs Identifying Defendants' Failure to Identify, Suspend and Report Suspicious Orders.

Plaintiffs could have identified the Distributor and Pharmacy Defendants as precipitators of the opioid epidemic much sooner with the benefit of ARCOS data. It is disingenuous for Defendants to claim that Plaintiffs' access to **aggregate** ARCOS data was sufficient. As recognized by the Sixth Circuit, "Defendants' argument that **aggregate** data is sufficient might be more availing if there were no direct, tangible evidence of the compelling nature of **specific transactional [granular]** data." *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 934 (6th Cir. 2019) (emphasis added). To the contrary though, "available aggregate data does not provide such granular detail as the number of doses sent to individual pharmacies, meaning that" determining, for example, how many pills an individual pharmacy received from all distributors "would have been impossible without the ARCOS data." *Id.*

Similarly, this Court recognized in its Order of April 11, 2018 the critical importance of ARCOS data in allowing Plaintiffs to determine what causes of action existed, and against which Defendants:

> Small portions of the ARCOS data have been made available to the public ... – **but only after struggle and delay, and the scope of the data made public is insufficient to establish national, regional or**

> local market share and market conduct necessary to reflect the
> merits *vel non* of the Plaintiffs' claims[.]"
>
> ...
>
> **There is overwhelming need for the Plaintiffs in this case to learn
> the truth surrounding marketing and distribution of opioids,
> including what the manufacturers, distributors, retailers, and
> DEA knew and when they knew it; what, if anything, was kept,
> intentionally or unintentionally, away from the DEA and the
> public by defendants;** and what, if anything, the DEA kept,
> intentionally or unintentionally, from the States, counties, and cities
> that have filed the MDL lawsuits.[112]

The rest of the equitable tolling analysis focuses on whether Plaintiffs practiced due diligence

in attempting to obtain that information, but were prevented from doing so by "extraordinary

circumstances." *G.G. Marck & Assocs., Inc.*, 762 Fed. App'x at 311. The "struggle and delay" in

obtaining ARCOS data as noted above by this Court is itself proof of Plaintiffs' due diligence in

attempting to obtain it. Similarly, the fact that Plaintiffs were only able to obtain the ARCOS data

through a federal court order demonstrates the impossible barrier Plaintiffs faced.

### B. Defendants' Arguments Regarding the Value of ARCOS Data are Contradicted by Their Own Experts and Their Past Statements.

Defendants have repeatedly argued that their inability to access ARCOS data prevented them

from effectively monitoring suspicious orders. For example, in moving for partial summary judgment

on Plaintiffs' civil conspiracy claims, Defendants argued that, "[a]s a practical matter, a Distributor

does not have the ability to monitor the orders that a pharmacy or other customer places with a

competitor, let alone to monitor the orders placed by any party that is not the distributor's

customer."[113] Defendants have argued that without ARCOS data, Defendants had no way of

determining the "'size,' 'pattern,' or 'frequency' of particular orders placed by a buyer with another

---

[112] *Order Regarding ARCOS Data*, p. 20, April 11, 2018, Dkt. # 223.
[113] *Memorandum in Support of Pharmacy Defendants' Motion for Summary Judgment on Plaintiffs' Civil Conspiracy Claim.*, p. 3, June 21, 2019, Dkt. # 1716.

distributor." *Id.*[114] Although Plaintiffs dispute these arguments as to Defendants, who had access to treasure troves of additional data sources[115] that should have been drawn upon to inform their compliance activities, the arguments are certainly valid for Plaintiffs.

Similarly, Defendants' vehement opposition to the public disclosure of ARCOS data produced in this case included their assertion that one could "use the data to determine market shares, to identify trends in ordering patterns, and to predict future behavior." (R. 665 at Page ID # 16015). Notwithstanding their contention now that Plaintiffs had all the information needed to bring suit more than half a decade ago, Defendants' assertions apart from this motion are correct. Only with ARCOS could Plaintiffs "draw highly accurate inferences from that data about overall traffic and sales volumes for each distributor and each store." *Id.*

Defendants hypocritically assail Plaintiffs — who lacked access to DEA ARCOS data, and whose access to, and familiarity with, other industry data sources was far less sophisticated than Defendants — for not being able to cull through the labyrinth of distributional issues and identify Defendants as the culprits of systemic distributional failures (as well as Plaintiffs' attendant injuries) Defendants cannot have it both ways: claiming that their own inability to access ARCOS data impeded meaningful implementation of suspicious order monitoring obligations, while simultaneously arguing that Plaintiffs' inability to access the same data was no meaningful impediment to Plaintiffs' discovery of Defendants' unlawful practices and identities. The truth is that **Defendants possessed far**

---

[114] Defendants present similar arguments with their expert reports. PSJ4 SOL Opp Exh 57, Report of Gregory K. Bell (5/10/2019) at 90 (Excerpt) ("Each individual Distributor does not have full knowledge of the orders and shipments of any other Distributors…The Distributors lack comprehensive visibility into interactions between prescribers and patients, patients and pharmacies, and pharmacies and suppliers (either distributors or manufacturers)"); PSJ4 SOL Opp 58, Report of Thani Jambulingam (5/10/2019) at 16 (Excerpt) ("Universal access to the ARCOS data would make the system more transparent especially when, for example: a pharmacy is buying from multiple wholesalers or combining its purchases with direct purchasing, which no one wholesaler would be able to determine.")

[115] Among other sources Defendants had access to IQVIS (IMS) data, chargeback information, transactional sales data, and (if they were performing their due diligence appropriately) the dispensing data of their retail customers. Report of Lacey Keller, Dkt. # 2000-7 at 9-10, 13, 27.

**superior resources and access to market data,** which they could have used to implement meaningful limitations on diversion.[116] Meanwhile Plaintiffs, who did not have access to similar resources, were impeded in their ability to identify Defendants' role in inflicting economic injury upon Plaintiffs. This asymmetrical access to information contributes to genuine material issues of fact as to whether the Plaintiffs could have more quickly evaluated: 1) the *bona fides* of Defendants' representations of "stellar compliance" with their regulatory obligations; and 2) identified the Defendants' role in contributing to the crisis in Plaintiffs' communities.

### C. Plaintiffs Could Not Have Identified Defendants Failure to Identify and Divert Suspicious Orders Without Having Access to ARCOS Data.

This Court has already recognized that whether Plaintiffs could have gained the knowledge necessary to bring suit without ARCOS data is a disputed factual question, and is thus inappropriate for summary judgment:

> Without access to the ARCOS data, Plaintiffs were forced to take Defendants at their word that they were complying with their obligations under consent decrees, statutes, and regulations. Plaintiffs inarguably knew about Defendants' marketing practices, but **whether they had sufficient information, in the absence of ARCOS data, to identify Defendants' alleged concealment and thus the scope or magnitude of Defendants' alleged misconduct is a disputed factual question.** [117]

With ARCOS data, Plaintiffs could identify with specificity and certainty those individual pharmacies in their communities who had placed what might, and arguably should, have been identified by Defendants as suspicious orders. Plaintiffs also would have been able to see which Defendant or Defendants had been supplying these front-line offenders despite warning signs.

---

[116] *See* Keller Rep., Dkt. #2000-7 at 10 ¶¶ 27-30 (Applying standard suspicious order monitoring metrics to IQVIA/chargeback data not available to Plaintiffs, to conclude that "Defendants did not implement robust monitoring programs and therefore failed to capture a substantial volume of potentially suspicious transactions.")

[117] *Opinion and Order*, p. 4-5, December 19, 2018, Dkt. # 1203.

### i. Plaintiffs would have identified certain Defendants sooner if Plaintiffs had access to ARCOS Data.

As predicted by this Court, once Plaintiffs finally had the ARCOS data in hand, then—and only then—were Plaintiffs able to identify what "manufacturers, distributors, [and] retailers ... knew and when they knew it[,]" and accordingly, identify numerous additional defendants. (R. 233, Page ID # 1124).

When Plaintiffs were finally granted access to ARCOS data, they were able to identify specific pharmacies "within their geographic boundaries that placed Suspicious Order for Prescription Opioids."[118] Although Plaintiffs would not have known the methodology Defendants would or should have used to identify these pharmacies and orders, as demonstrated in the discovery responses Plaintiffs could have independently identified the largest orders placed by these pharmacies. These orders alone would have been enough to "trigger the responsibility to report the order as suspicious"[119] since they were of an unusual size. Using aggregate data alone Plaintiff would not have "such granular detail as the number of doses sent to individual pharmacies."[120] Yet with the ARCOS data, Plaintiff Summit County was able to identify at least 48 pharmacies as having placed suspicious orders and 50 orders as having the largest shipments of opioids within county lines.[121]  Likewise Plaintiff Cuyahoga County was able to identify 48 of the highest dispensing opioid pharmacies in its county.[122]  This information would have been helpful to focus the efforts of local law enforcement officials.  But it was essential for the Plaintiffs to know who sold those pharmacies the drugs in such extraordinary quantities in the first place.

---

[118] *See* PSJ4 SOL Opp Exh 24 *Summit County and City of Akron, Ohio Plaintiff First Amended Responses and Objections to Distributor Defendants' First Set of Interrogatories*, Response 2; *See also*, PSJ4 SOL Opp Exh 25 *Plaintiffs the County of Cuyahoga, Ohio and the State of Ohio Ex Rel Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley's First Amended Responses And Objections to Distributor Defendants' First Set of Interrogatories*, Response 2.
[119] *Id.*
[120] *In re Nat'l Prescription Opiate Litig.* 2018 WL 6628898 at 18, *supra.*
[121] PSJ4 SOL Opp Exh 26, *Plaintiffs Supplemental Responses to Discovery Ruling 12 Supplemental Interrogatories*, January 11, 2019 and PSJ4 SOL Opp Exh 27 *Exhibit A to Plaintiffs Supplemental Responses to Discovery Ruling 12 Supplemental Interrogatories*, January 11, 2019.
[122] *Id.*

Ultimately, and by using ARCOS data, Plaintiffs were able to name more than a dozen previously unknown defendants, including Anda, Inc.; Discount Drug Mart, Inc.; HBC Service Company; Henry Schein, Inc.; Henry Schein Medical Systems, Inc.; Par Pharmaceutical, Inc.; Par Pharmaceutical Companies, Inc.; Prescription Supply, Inc.; SpecGx LLC; CVS Health Corp. and subsidiaries; Rite-Aid Corporation and subsidiaries; Walgreens Boots Alliance, Inc. and subsidiaries; Walgreens Co.; and Walmart, Inc. f/k/a Wal-Mart Stores, Inc.[123] Many of the foregoing are some of the largest corporations in the world, and all were participants in the placement of suspicious orders in Cuyahoga and Summit Counties. That Plaintiffs were unable to identify these major players without the benefit of ARCOS data speaks volumes to its importance.

### ii. Plaintiffs would have brought the instant action sooner if Plaintiffs had access to ARCOS data.

Defendants made numerous public pronouncements in the wake of Department of Justice enforcement actions and settlements boasting of the new and improved systems and strategies they would use to combat opioid abuse and diversion. By all rights, Plaintiffs could have fairly assumed that the ARCOS data, if obtained, may not have even shown bad conduct on the part of Defendants. Plaintiffs were under the impression that Defendants—who had agreed to monitor and divert suspicious orders under a series of agreements with the DEA and various States' Attorneys General— were actually honoring those earlier agreements and protecting Plaintiffs' communities from opioid-related harm. Instead, as only became clear in recent years through subsequent DEA investigations, Defendants did the exact opposite, as they secretly redoubled their efforts to skirt compliance and flooded the markets with inordinate amounts of addictive opioids.

---

[123] Defendants H.D. Smith, LLC f/k/a H.D. Smith Wholesale Drug Company; H.D. Smith Holdings, LLC; and H.D. Smith Holding Company were also identified using ARCOS data and added as Defendants in subsequent Amended Complaints by Plaintiff Cuyahoga County only.

One would assume that in the years following McKesson's earlier settlements, they were abiding by the terms of their settlement agreements with the DOJ and actively monitoring for suspicious orders and taking appropriate actions when such orders were detected. To the contrary, however, McKesson "bypassed suspicious order reporting procedures" and "failed to inform the DEA Field Division Offices and/or DEA Headquarters of suspicious orders..., including orders of unusual size, orders deviating substantially from normal patterns, and orders of unusual frequency, as required by and in violation of 21 C.F.R. § 1301.74(b), 21 U.S.C. § 842(a)(5), and the 2008 Agreements."[124] As part of the 2017 Agreement, "McKesson acknowledge[d] that, at various times ... it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."[125] McKesson was additionally assessed a $150,000,000.00 civil penalty.[126] Yet, despite it taking nearly ten years for the appropriate federal law enforcement body to identify Defendants' continuing malfeasance, Defendants assert that Plaintiffs should have figured it out sooner, and without the benefit of ARCOS data.

Once Plaintiffs gained access to the ARCOS data, they did figure it out. Through the help of their expert Dr. Craig McCann, Plaintiffs were finally able to analyze the source, path, and characteristics of the dangerous drug shipments that had been plaguing their communities.  Dr. McCann's report and analysis is comprehensive and voluminous but the results are clear: a vast majority of orders shipped into Summit and Cuyahoga Counties between 1996 and 2018 were of "an unusual size" as compared orders between the same parties in the previous six months.[127]  Review of

---

[124] PSJ4 SOL Opp Exh 28, MCKM0L00355350 at ¶¶ 3(C)-(D).
[125] *Id.* at ¶ 4.
[126] *See id.* at ¶ II(1)(i).
[127] *See* Expert Report of Craig J. McCann, PhD, Dkt. # 2000-14 at 56;  *See also* Rafalski Rep., Dkt. #2000-22 at 46 (Concluding that it is impossible to identify the number of opioid pills that entered the counties unlawfully but that "applying the test set forth in *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration*, 861 F.3d 206 (2017) provides a

the ARCOS data shows that, using this methodology, 76% of shipments in Cuyahoga and 75.4% of shipments into Summit Counties during that time frame should have been flagged as suspicious.[128] Dr. Rafalski summarized the percentage of orders that should have been flagged for each of the five defendants who shipped the most opioids into Plaintiffs' counties:[129]

**Cuyahoga County: 1996-2018**



**Summit County: 1996-2018**



This trend continues for all Defendants.  Under the test in *Masters Pharm. Inc. v. D.E.A.*, 861 F.3d. 206 (D.C. Cir. 2017), a stunningly high percentage of opioid transactions shipped into Cuyahoga and

---

reasonable estimate and an initial trigger and first step to identifying orders of unusual size." This test used by McCann in Methodology A: "Maximum Monthly, Trailing Six-month Threshold.)

[128] McCann Rep. at Dkt. # 2000-14PP 133-135.

[129] *See* Rafalski Rep. Dkt. #2000-22 at 41 n.110 (explaining that he relied on the data described in Dr. McCann's Expert Report and utilized Defendants Cardinal Health, AmerisourceBergen Drug, McKesson, Walgreens, and CVS "as they constitute a significant majority of the opioid pills delivered into CT1.").

Summit Counties should have been identified by Defendants as a potential suspicious order, should not have been released without further analysis, and should have been reported to the DEA.  There is no evidence Defendants fulfilled any of those obligations on this scale.

## VII.    THE STATUTES OF LIMITATIONS ARE TOLLED UNDER THE DOCTRINE OF FRAUDULENT CONCEALMENT.

Defendants' numerous acts of fraudulent concealment also serve to toll the accrual of any applicable statute of limitations.  Defendants cite *Dayco Corp.,* 523 F. 2d 389, 394, for the necessary elements of fraudulent concealment:(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.

The doctrine of fraudulent concealment is well recognized in Ohio to toll the running of the statutes of limitations for both federal and state statutory claims, as well as common law claims. *See, e.g.*, *Pinney Dock and Transp. Co.*, *supra*, 838 F.2d at 1465 (federal Clayton Act); *Ruth*, *supra*, 604 F.3d at 910 (federal Fair Debt Collection Practices Act); *Li-Conrad v. Curran*, 50 N.E.2d 573, 579-580 (Ohio Ct. App. 2016) (Ohio fraud, negligent misrepresentation, Ohio Consumer Sales Practices Act).[130] The "question of fraudulent concealment of a cause of action, so as to toll the statute of limitations, is usually a question of fact that is not suited for summary judgment." *Phelps,* 237 F. Supp. 2d at 836 (citation omitted). Moreover, "complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim" is one example of disputed factual questions. *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016).

In its Order of December 19, 2018, this Court held that the Plaintiffs had pleaded sufficient facts in their complaints to support their claim that the applicable statutes of limitation are tolled by

---

[130] *See also Birkett Williams Ford, Inc. v. East Woodworking Co.*, 456 N.E.2d 1304 (Ohio Ct. App. 1982) (federal; Equal Credit Opportunity Act).

the doctrines of fraudulent concealment and continuing violations.[131] The Court held that Plaintiffs'

allegations that "Defendants concealed their lack of cooperation with law enforcement and that they

affirmatively misrepresented that they had satisfied their duty to report suspicious orders, concealing

the fact that they had not done so" were sufficient to support their claim of fraudulent

concealment.[132] The Court further held:

> Plaintiffs additionally point out that they could not have discovered "the nature, scope, and
> magnitude of Defendants' misconduct, and its full impact on Plaintiffs, and could not have
> acquired such knowledge earlier through the exercise of reasonable diligence," because until
> this Court ordered production of the ARCOS database in this litigation, Plaintiffs did not
> have access to that information. *Id.* at 233 (citing Doc. #: 233 at 6-7). Without access to the
> ARCOS data, Plaintiffs were forced to take Defendants at their word that they were
> complying with their obligations under consent decrees, statutes, and regulations. Plaintiffs
> inarguably knew about Defendants' marketing practices, but whether they had sufficient
> information, in the absence of the ARCOS data, to identify Defendants' alleged concealment
> and thus the scope or magnitude of Defendants' alleged misconduct is a disputed factual
> question.[133]

The facts from discovery in this case demonstrate there are extraordinary circumstances and

clear evidence of fraudulent concealments by the Defendants which fully justify tolling of the

statutes of limitations.

### A. Defendants Have Engaged in Acts of Fraudulent Concealment.

#### i. Defendants have engaged in multiple affirmative acts of concealment.

In its Opinion and Order of December 19, 2018, this Court stated:

> Plaintiffs also allege that Defendants concealed their lack of cooperation with law
> enforcement and that they affirmatively misrepresented that they had satisfied their duty to
> report suspicious orders, concealing the fact that they had not done so.[134]

Defendants engaged in multiple affirmative acts of concealment. These affirmative acts

including the "backdating" of documentation for threshold increases in the quantities of drugs

---

[131] *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *3-6.
[132] *Id* at p. 4.
[133] *Id* at 4-5.
[134] *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *3.

ordered by customers, misrepresentation to DEA of employees purportedly dedicated to compliance activities, preemptive alerts to customers enabling them to modify orders or seek increases in thresholds before their orders would be flagged as "suspicious", and widespread instructions to staff to not use the word "suspicious" to avoid triggering regulatory obligations and cover their tracks. A few of the more notable examples are highlighted here.

**McKesson:** From the time its Controlled Substance Monitoring Program was unveiled in 2008 McKesson actively discouraged use of the word "suspicious." The company told its employees not to use the words because it knew that "[o]nce McKesson deems an order and/or customer suspicious McKesson is required to act. This means all controlled substance sales to that customer must cease, and the DEA must be notified."[135] Based on the number of suspicious orders identified or reported to the DEA between May 2008 and July 31, 2013 – zero – McKesson's concealment tactics were successful.[136] The company filled approximately 366,000 opioid orders in Cuyahoga and Summit counties during that same time.[137]

In addition, McKesson rigged its suspicious order thresholds to preemptively avoid flagging orders as "suspicious." First, thresholds were so high for some customers that some McKesson regulatory officials complained internally that the company was creating opportunity for diversion.[138] As of 2014, McKesson also provided for 25% "buffers" allowing customers to order more than their thresholds.[139] Despite these already inflated limits, McKesson preemptively ensured that customers would never reach their limits and, if they did, those limits would be increased. The

---

[135] PSJ4 SOL Opp Exh 29, MCKMDL00518064 at 005118078; *See also* Rafalski Rep., Dkt. #2000-22 at 46; PSJ4 SOL Opp Exh 30, MCKMDL00000021 at 00000039, at p. 19 ("CSMP Manual 2011").
[136] Gary Hilliard Dep. (1/10/19), Dkt. # 1963-1 at 176:8-176:22; *see also* PSJ4 SOL Opp Exh 31, MCKMDL00478912
[137] *Id.*
[138] PSJ4 SOL Opp Exh 32, MCKMDL00507799. Note, the comments were ignored and threshold limits were not systemically reduced until 2015, four years after high level concerns were raised. *See also* PSJ4 SOL Opp Exh 33, MCKMDL00410744; PSJ4 SOL Opp Exh 34, MCKMDL00402184.
[139] PSJ4 SOL Opp Exh 32, MCKMDL00430124; *See also* Nathan Hartle Dep. (8/1/2018) at 194:17-22. Expert Report of Seth Whitelaw Dkt. # 200-26 at 83.

46

company developed a preemptive warning system informing customers they were reaching their thresholds so they could ask for an increase.[140] Internally, it was justified because, "[McKesson is] in the business to sell the product.  If we could produce a report…that warned customers approach to the threshold…work could begin on justifying an increase in threshold prior to any lost sales."[141] And when a chain pharmacy customer did want to order even more than its allotted, already high threshold McKesson generally granted the request without so much as asking for dispensing data to verify the legitimacy of the increase. [142]  In one extraordinary showing of holiday cheer – or perhaps greed – McKesson granted 30% threshold increases, across the board, with no due diligence, for more than 200 National Retail Chains such as Wal-Mart and Rite-Aid "due to the Thanksgiving holiday" and then backdated the documentation approving of those increases.[143]

**Cardinal**: A July 27, 2006 Regulatory Compliance Review performed at a Cardinal distribution facility found as a "significant issue" that "[t]here is no system to determine excessive or suspicious ordering by customers of controlled substance products."[144]  The report's cover page instructed that "[t]his report is confidential and should not be reproduced. ***The recipient is responsible for its security and should destroy/delete after review***."[145] (emphasis added)

After Cardinal faced two DEA enforcement actions, it redesigned its suspicious order monitoring program for a third time.[146] This program built in a loophole allowing customers to regularly order over their limits, which Cardinal took steps to conceal from DEA inspectors. ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

---

[140] *See* PSJ4 SOL Opp Exh 29, MCKMDL00518064 at § 2.
[141] *See* PSJ4 SOL Opp Exh 35, MCKMDL00543971 at 00543972.
[142] Rafalski Rep., Dkt. # 2000-22 at 77; *See also* Donald Walker Dep. (1/10/2019), Dkt. # 1971-19 at 190-193.
[143] *See* Blaine Snider Dep. (11/8/2018), Dkt. # 1970-2 at 19:4-13.
[144] PSJ4 SOL Opp Exh 36, CAH_MDL_PRIORPROD_DEA07_00828658; PSJ4 SOL Opp Exh 37, CAH_MDL_PRORPROD_DEA07_00828657.
[145] PSJ4 SOL Opp Exh 36, CAH_MDL_PRIORPROD_DEA07_00828658; PSJ4 SOL Opp Exh 37, CAH_MDL_PRORPROD_DEA07_00828657.
[146] Rafalski Rep., Dkt. # 2000-22 at 62.

██████████████████████████████████████████ [147] But, Cardinal didn't want the DEA to know about this loophole and took affirmative steps to hide it. In April 2014, Cardinal's Director of Investigations led the creation of a SOM presentation to be given to both Cardinal Compliance officers and the DEA.[148] Staff tasked with creating the presentation "intentionally left out the part about ████████████████████ because she "didn't want to draw attention to the practice."[149] The author "did not want to draw attention to what I believe they [DEA] would consider questionable at best so we agreed and put it in the notes only section. That way CO's know it occurs but it isn't so obvious."[150] The goal was to ignore the practice it knew the DEA "would consider questionable at best."[151] In addition, at this time, █████████████

█████████████████████████████████████████████████

██████████████████████.[152] Unsurprisingly, according to the evidence, Cardinal reported **zero** suspicious orders in CT1 jurisdictions from 1996 until at least 2012.[153]

**CVS**: CVS misrepresented the roles of certain employees to federal authorities to provide the appearance that it had dedicated staffing resources to compliance functions at the company. When in reality, those employees never held those roles or performed those functions. During her deposition CVS employee Amy Propatier testified that although the company's Controlled Drug - DEA Standard Operating Procedures Manuals listed her as the CVS DEA Compliance Coordinator that was not actually her job.[154] She later explained that the title was "a title for reference the SOPs,"

[147] PSJ4 SOL Opp Exh 38, CAH_MDL2804_00012244 at 00012249-00012267; Rafalski Rep., Dkt. # 2000-22 at 67.
[148] *Id.*
[149] *Id.*
[150] PSJ4 SOL Opp Exh, 39, CAH_MDL2804_02350970.
[151] *Id.*; *See also* Rafalski Rep., Dkt. # 2000-22 at 67; PSJ4 SOL Opp Exh 38, CAH_MDL2804_00012244; PSJ4 SOL Opp Exh 40, CAH_MDL2804_00012953; PSJ4 SOL Opp Exh 39, CAH_MDL2804_02350970; PSJ4 SOL Opp Exh 41 CAH_MDL2804_00009412 at 00009413.
[152] PSJ4 SOL Opp Exh 41, CAH_MDL2804_00009412 at 00009413
[153] Rafalski Rep., Dkt. # 2000-22 at 50-51.
[154] PSJ4 SOL Opp Exh 42, Amy Propatier Dep. (11/29/2018), Dkt. #1969-16 at 79:15 – 81:2.

and therefore was not included in her personnel records.[155] Her superiors even acknowledged that "[at] no time did Amy have ownership for any DEA compliance…with the exception of she was responsible for filing ARCOS reporting."[156]  CVS not only distributed this misrepresentation to employees but to the DEA – a federal regulatory agency.[157]

Additionally, a "DEA Speaking Points" slide deck that was created for discussion between the company and DEA inspectors misrepresented the CVS suspicious order monitoring program when it was created and approved to be given to the DEA.[158]

**Walgreens**: Walgreens evaded suspicious order detection by supplying its own individual Walgreens stores with prescription opioids even after Walgreens corporate office knew outside vendors flagged and cut off those pharmacies for suspicious orders.[159]  Walgreens corporate also helped individual stores evade and avoid *its own* monitoring program by disclosing order limits to those stores.  The disclosure was "to provide stores direction to place orders for controls without an order being flagged."[160]

**AmerisourceBergen**: **ABDC:**  ABDC developed sales documents which coached customers on how to avoid being detected by the system and being the subject of an enforcement action by the DEA.[161]  The "Sales Talking Points" stated:

> I am rather concerned about your pharmacy for a different reason.  Based on your overall volume with us, your percentage of C2 orders is high and may be deemed suspicious by either our OMP system or regulatory authorities.  This puts your account with ABDC at significant risk of closure or exposure to regulatory and enforcement actions.

[155] *Id.* at 79:24 to 80:2, 81:18 -82:1.
[156] *See* PSJ4 SOL Opp. Exh 43, Dean Vanelli Dep. at 50:21-24.
[157] Report of Seth Whitelaw, Dkt. # 2000-27 at 168.
[158] *See id.*; PSJ4 SOL Opp Exh 44, CVS-MDLT1-000075299; PSJ4 SOL Opp Exh 45, Frank Devlin Dep. (1/10/2019) at 139:2-5.
[159] *See, e.g.* PSJ4 SOL Opp Exh 46, WAGMDL00302958; PSJ4 SOL Opp Exh 47, WAGMDL00246284; PSJ4 SOL Opp Exh 48, WAGMDL00242055; *See also* Rafalski Rep., Dkt.# 2000-22 at 122.
[160] PSJ4 SOL Opp Exh 49, WAGMDL00095316; PSJ4 SOL Opp Exh 50, WAGMDL00095317 at 322; See Rafalski Dep., Dkt.# 2000-22 at 132.
[161] PSJ4 SOL Opp Exh 51, ABDCMDL00278212; Rafalski Rep. Dkt. #2000-22 at 91.

Every day, we read about another independent pharmacy under investigation. I want to make sure that doesn't happen to you.[162]

**ANDA:** ANDA's electronic systems were designed so that suspicious orders would not be recorded as orders at all. In briefing materials that were prepared for ANDA's President Al Paonessa in advance of meeting with DEA inspectors, Paonessa was informed that if a customer order was submitted above customer thresholds, the order is rejected and not processed any further. Characterizing these orders from customers as "attempted orders", Paonessa was informed that "[o]ur systems do not record and track attempted orders, regardless of order entry method."[163] Rejection of entry of a customer order as an "attempted order" would prevent Anda from having ***any record*** that a high volume order had been placed in the first instance.[164]

These are affirmative acts of concealment. When Defendants take affirmative steps to destroy documents, hide documents from the DEA or preemptively avoid documenting an order from being labeled as "suspicious" in the first place so that no paper trail is created, each of those acts constitute fraudulent concealment. *Carrier Corp. v. Outokumpu Oyj,* 673 F. 3d 430, 449 (6th Cir. 2012) (listing establishment of security rules "to avoid a paper trail", and "taking active steps to hide evidence" as acts of concealment.). In addition to these examples of concealment by individual Defendants, there is also evidence that Defendants conspired to evade regulatory obligations throughout the supply chain. Indeed, through HDA, distributors collaborated and developed the term "orders of interest" to facilitate widespread avoidance of the term "suspicious orders" and its regulatory consequences on an industry-wide basis.[165] In other instances, email was shared between multiple companies (Cardinal, McKesson and HD Smith) to discuss "the challenges we face and

---

[162] PSJ4 SOL Opp Exh 51, ABDCMDL00278212; Rafalski Rep. Dkt. #2000-22 at 91.
[163] PSJ4 SOL Opp Exh 52, Anda_MDL_0000108116 at 117.
[164] PSJ4 SOL Opp Exh 53 Dep. of Emily Hall Schultz, at 118:1-13.
[165] PSJ4 SOL Opp Exh 54, HDS_MDL_00218651.

some of the things that we are doing or not doing when it comes to SOM, due diligence and diversion control." The email added, "[t]here will be no notes taken, nor any production of formal reports."[166]

Also, as noted in Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Plaintiffs' Civil Conspiracy, RICO and OCPA Claims,[167] Manufacturer Defendants, Distributor Defendants, and Pharmacy Defendants worked in tandem and through trade associations to portray a false sense of industry-wide compliance which deceptively characterized suspicious order monitoring systems as fully functional and effective throughout the supply chain. Once a conspiracy is established, "[f]raudulent concealment…may be established through the acts of co-conspirators." *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 980 (N.D. Ohio 2015) (citing *In re Scrap Metal Antitrust Litig.*, 527 F. 3d 517, 538 (6th Cir. 2008). Plaintiffs also refer the Court to Expert Reports of James Rafalski, and Seth Whitelaw, as well as Appendix A, which identifies additional examples of affirmative acts of concealment.

### ii. Plaintiffs' Motion for Partial Summary Adjudication Establishes Widespread Failure of the Defendants to Report and Suspend Suspicious Orders to the DEA as Additional Acts of Concealment.

In their Memorandum of Law in Support of Motion for Partial Summary Adjudication that Defendants Did Not Comply With Their Duties Under the Federal Controlled Substances Act to Report Suspicious Orders and Not Ship Them,[168] Plaintiffs enumerate the manner in which

---

[166] PSJ4 SOL Opp Exh 54, HDS_MDL_00492992.
[167] PSJ3, *Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Plaintiffs' Civil Conspiracy, RICO and OCPA Claims,* filed concurrently with this brief.
[168] Dkt. # 1910-1.

hundreds of thousands of suspicious orders went unreported in violation of Defendants' legal reporting obligation as to Defendants Mallinckrodt, Purdue, Teva, Endo, J&J, Allegan, Cardinal, McKesson, ABDC, Prescription Supply, Walmart, Walgreens, CVS, Rite Aid, HBC and Discount Drug Mart (DDM). Discovery has shown Defendants' filled, collectively, thousands of orders pumping opioids into Cuyahoga and Summit Counties, with only a handful of orders that were reported as suspicious. The failure of Defendants to report these orders as suspicious, when they had a duty to do so also constitutes fraudulent concealment under the first prong of the fraudulent concealment test.[169]

### B. Plaintiffs Discovered Multiple Operative Facts Necessary To Plead Their Pre-October 2012 Claims Only in 2016 and 2017.

The second prong of the *Dayco* fraudulent concealment test is "failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period." *Dayco* at 394.  Here, Defendants argue that Plaintiffs possessed constructive notice of the necessary elements to establish their claim. Plaintiffs incorporate their discussion *infra* at pp. 29-33 as to the constructive notice issue.  As one court has observed:

> It is not enough for summary judgment to point to facts which *might* have caused a plaintiff to inquire, or *could* have led to evidence supporting his claim.  A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment.  To award summary judgment on such a showing is error.

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F. 3d 823 (11th Cir. 1999).

More significantly, 2016 and 2017 were watershed years for Plaintiffs. That's when they discovered the necessary operative facts necessary to bring this action due to the overwhelming number of additional significant developments that revealed Defendants' historical conduct. In

---

[169] Moreover, to the extent that Defendants' failure to develop adequate suspicious order monitoring systems, and their corresponding failure to report the filling of suspicious orders to the DEA constitute "concealment" as a predicate act of racketeering pursuant to 18 U.S.C. §1961(1)(D), such acts, "by their very nature" defy detection and meet the fraudulent concealment requirement under *Pinney Dock and Transport v. Penn Central Corp.,* 838 F. 2d 1445, 1472 (6th Cir. 1988).

addition to experiencing the devastating impact upon their communities caused by a staggering

increase in opioids death, the following additional developments focused the Plaintiffs upon

Defendants' conduct, as pled in their complaint:

1. The Centers for Disease Control issued new guidelines which pointed out the risks of long-term opioid treatment, and questioned such treatment's efficacy to treat pain. Squarely contradicting Defendants' claims about the safety and efficacy of the opioids they sold.[170]

2. Six Insys executives and managers were criminally indicted for bribing practitioners to prescribe its opioid Subsys.  A USDOJ press release on the charges stated that those actions put "patients at risk and contribut[ed] to the current opioid crisis."[171]

3. On December 23, 2016 Cardinal entered yet another settlement identifying that it had violated the CSA for conduct between 2009 and 2012 for failing to identify and report suspicious orders; failing to prevent diversion; and failing to properly handle orders for Schedule II substances.[172]

4. CVS entered into three settlements with the DEA for improperly filling and recording prescriptions in violation of the CSA.[173]

5. In May 2016 materials in the West Virginia lawsuit were unsealed, over Defendants' objections, allowing Plaintiffs to see the materials for the first time; *see discussion infra* at page 12 of this Brief.

6. In March 2017 The FDA recommended that Opana ER be withdrawn from the market because it could be readily prepared for injection, and was linked to outbreaks of HIV and TTP.[174]

These developments were followed in 2017 by three more significant developments that led

Plaintiffs to develop their claims.  **First**, in January 2017, McKesson entered into a $150 million

settlement with the DEA which — unlike earlier DEA settlements — specifically involved

distribution facilities that served Ohio, citing them for failure to implement adequate controls as it

related to the distribution of opioid products. **Second**, on May 31, 2017, the Ohio Attorney General

---

[170] Summit 3d Amended Compl. ¶ 276; Cuyahoga 3d Amended Compl. ¶ 264.
[171] Summit 3d Amended Compl. ¶ 481; Cuyahoga 3d Amended Compl. ¶ 469.
[172] Summit 3d Amended Compl. ¶ 585; Cuyahoga 3d Amended Compl. ¶ 566.
[173] Summit 3d Amended Compl. ¶¶ 633-636; Cuyahoga 3d Amended Compl. ¶¶ 608-611.
[174] Summit 3d Amended Compl. ¶ 339; Cuyahoga 3d Amended Compl. ¶ 327.

brought suit against pharmaceutical manufacturers Purdue, Teva, Janssen, Cephalon, Endo, Johnson & Johnson, Allegan, Watson and Does 1-100, alleging claims for public nuisance, violations of the Ohio Corrupt Practices Act, and other related causes of action. **Third,** the Department of Justice fined Mallinckrodt $35 million for failure to report suspicious orders.[175]

None of these developments could have been discovered earlier and collectively, they meet the second prong of the *Dayco* fraudulent concealment test, namely they establish the "failure of the plaintiff to discover the operative facts that are the basis of his cause of action." *Dayco*, *supra,* 523 F.2d at 394.

## C. Plaintiffs Have Exercised Due Diligence In Discovering the Relevant Facts.

To say that the Plaintiffs "did nothing" with respect to the opioids crisis is a disservice to the men and women who responded to the emergency overdoses, attended to the displaced children of addicts, performed the autopsies and prosecuted the crimes associated with this crisis.  Plaintiffs have collectively "kept the finger in the dike" of these public health issues and, along with the countless lives that have prematurely ended or been ruined, borne the brunt of Defendants' unlawful conduct.  In its early years, Plaintiffs due diligence in combating the public health issues associated with the crisis was directed at precisely the "street level" aspects of the epidemic that Defendants' pointed to, in their market-tested, professionally developed media message. These efforts were labor intensive and time consuming.[176]

But that focus morphed in 2015-16 as more victim families spoke to their elected officials, and local government researched the stories of the victims.  Akron's former Assistant to the Mayor

---

[175] Summit 3d Amended Compl. at ¶ 584; Cuyahoga 3d Amended Compl. at ¶ 565.
[176] Patrick Leonard, a Detective with Akron's Police Department Diversion Office testified that investigation of a single overprescribing physician "could take years." Patrick Leonard Dep., Volume II, (5/23/2019) Dkt. # 1966-3 at 226:11-12.

testified how the appreciation of the crisis evolved over time from a "street crime" issue to a prescription drug issue in the first couple of years after formation of the 2014 opiate task force:

> But after a while, the stories have a similar thread because our initial understanding, like I told you before, is that this was a street drug problem. We didn't know how many people were addicted until more and more people began to overdose.  So we learned a lot through those first couple of years about the problem.  And it was not what I originally thought it was.  But we knew that, just thinking about growing up in the '70s, and some of the 80's, who are younger, that that small population of kids in high school who were doing illegal drugs somehow didn't balloon into these large numbers of addicts that we were seeing in the 2000s and where did that come from. You know, people don't just wake up in their 40s and say, gee, I'm going to try heroin for the first time.  So we had to do the research and really learn about why – why we were seeing this increase.  It didn't make sense.[177]

As additional facts emerged in 2016 and 2017, Plaintiffs retained counsel, performed their own due diligence and filed their suits on October 27 and December 20, 2017.  The developments in 2016 and 2017 revealed that which had been hidden: that Defendants were engaged in a broad-based systemic campaign to: 1) deceptively understate the addictive risks associated with their products (and to overstate the benefits); and 2) that — again — Defendants had failed to sufficiently comply with their Controlled Substance Act obligations to detect, suspend and report suspicious orders of opioids, and that those failures had touched Plaintiffs' communities.

Plaintiffs have met the due diligence prong of the *Dayco* fraudulent concealment standard.

## VIII.  DEFENDANTS' MISCONDUCT PRIOR TO OCTOBER 27, 2012 IS RELEVANT AND ADMISSIBLE ON POST-OCTOBER 27, 2012 LIABILITY AND DAMAGES UNDER THE CONTINUING VIOLATIONS DOCTRINE.

Defendants' claim that barring all of Plaintiffs' claims for damages arising before October 27, 2012 on statute of limitations grounds would streamline or shorten presentation of necessary proofs in the trial of this case is in error.  The continuing violations doctrine is well-accepted in the Sixth

---

[177] PSJ4 SOL Opp Exh 55, Terry Albanese Dep (1/4/2019) at 77:13-78:14.

Circuit and has been applied in numerous cases to toll the running of various statutes of limitations.[178] As this Court explained in its December 19, 2018 Order, a "'continuous violation' exists if: (1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided."[179] The Court further noted that "this doctrine is rooted in general principles of common law and is independent of any specific action," is not limited "to claims for deprivations of civil rights and employment discrimination,"[180] and "Courts have allowed the statute of limitations to be tolled [under the continuing violations framework] when . . . there is a 'longstanding and demonstrable policy' of the forbidden activity."[181]

Under the continuing violations doctrine, the court may "impose liability on [a defendant] for acts committed outside the limitations period." *Gandy v. Sullivan County*, 24 F.3d 861, 864 (6th

---

[178] *See, e.g., In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *3 (citing *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009)); *see also Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 521 (6th Cir.1997); *see also* 66 Ohio Jur. 3d, *Limitations and Laches, § 58. Effect of continuing violation on accrual of cause of action and commencement of limitations period* (June 2019) (collecting cases applying the doctrine of continuing violations).

[179] *Id.* This Court has already found that Plaintiffs averred sufficient facts in their complaints regarding Defendants' continuing violations to survive Defendants' motions to dismiss. *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *3 ("Plaintiffs have alleged a longstanding and demonstrable policy of misrepresentations and omissions on the part of Defendants sufficient to demonstrate their engagement in continuing wrongful conduct. In addition, whether further injury could have been avoided had Defendants ceased this conduct is another disputed factual question. Therefore, the Court finds that Plaintiffs have alleged facts sufficient to raise a plausible inference that the applicable limitations periods are subject to tolling—under either a fraudulent concealment theory or a continuing violation theory—and that no claims should be dismissed on statute of limitations grounds at this early stage in the litigation.")

[180] Defendants' claim, Defs.' Combined Br. at 41, that the continuing violation doctrine only applies to "tort cases involving damage to real property" is flat wrong. In fact, the continuing violations doctrine applies to a broad range of cases. *See, e.g., Wheaton v. North Oakland Med. Ctr.*, 130 Fed. App'x. 773, 786-87 (6th Cir. 2005) (applying continuing violations doctrine in Title VII discrimination case); *see also Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 480 F.3d 410, 416 (6th Cir. 2007) (applying continuing violations doctrine in Clean Air Act violations case); *see also* 66 Ohio Jur. 3d, *supra* (collecting cases applying continuing violations doctrine to civil rights cases, employment cases, and others).

[181] *In re Nat'l Prescription Opiate Litig.*, *supra*, footnote 176, (citations omitted). *See also*, 66 Ohio Jur. 3d (collecting cases). Defendants' claim, Defs.' Combined Br. at 41, that the Plaintiffs injuries "arose not from 'continuing violation' but alleged 'repetitive discrete violations'" is completely belied by the facts adduced in discovery which show that the Defendant manufacturers, distributors, and chain pharmacies engaged in a marketing and distribution scheme and conspiracy that lasted for decades and has continued unabated. *See* Statement of Disputed Material Facts, *supra*, at 3. Moreover, in their motion and brief, Defendants fail utterly to reference any facts whatsoever to support their claim and it therefore fails.

Cir. 1994).[182] In addition, damages incurred within the applicable statute of limitations are recoverable for unlawful conduct which occurred outside the limitations period. *Ferner v. Vill. of Sheffield*, 656 F. Supp. 1017, 1019 (N.D. Ohio 1987) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S. Ct. 1114, L.Ed. 2d 214 (1982)). Further, misconduct falling outside the limitations period "may be introduced as evidence of present violations, to the extent permitted by the rules of evidence." *Alexander v. Local 496, Laborers' Intern. Union of N. Am.*, 655 F. Supp. 1446, 1449 (N.D. Ohio 1987) (citations omitted).[183] Such misconduct also "may be admissible for purposes other than establishing a violation, such as demonstrating that the [misconduct] was willful or casting doubt on [a defendant's] affirmative defense." *Storrs v. Univ. of Cincinnati*, Case No. 1:15-cv-136, 2018 WL 684759, at *5 (S.D. Ohio Feb. 2, 2018) (citations omitted).

The law in the Sixth Circuit is clear that evidence of Defendants' misconduct prior to October 27, 2012, or any other limitations period, is relevant and admissible on numerous issues. Thus regardless of any ruling by this Court on Defendants' statute of limitations motions, evidence of pre-October 27, 2012 will necessarily be part of the evidence presented at trial. Defendants' motions will not "focus the jury on a shorter span of years" nor "streamline the trial" in the manner they have suggested.[184]

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motions for partial summary judgment on statute of limitations grounds in their entirety.

---

[182] *See also Nat'l Parks Conservation Ass'n, Inc., supra*, 480 F.3d at 416 ("Under the continuing-violation doctrine, the court can consider as timely all relevant violations 'including those that would otherwise be time [-]barred.'") (quoting *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003), *cert. denied*, 540 U.S. 876, 124 S.Ct. 228, 157 L.Ed.2d 2003)); *see also Wheaton, supra*, 130 Fed. App'x. at 786-87 (affirming trial court's admission of evidence of misconduct, which occurred prior to limitations period, as part of a continuing violation) (citing *AMTRAK v. Morgan*, 536 U.S. 101, 105, 122 S. Ct. 2061, 153 L.Ed.2d 106 (2002).

[183] *See also Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 760 (9th Cir. 1980) (noting a past discriminatory act falling outside of the statute of limitations period is not actionable, but "'it may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue'") (quoting *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)).

[184] Defs.' Combined Br. at 2

Dated: July 31, 2019

Respectfully submitted,

/s/ *Paul J. Hanly, Jr.*
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017
(212) 397-1000

(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*


Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*


Ellen Relkin
John M. Broaddus
WEITZ & LUXENBERG, PC
700 Broadway
New York, NY 10003
(212) 558-5500
erelkin@weitzlux.com
jbroaddus@weitzlux.com


Paul F. Novak
Tiffany R. Ellis
WEITZ & LUXENBERG, PC
3011 West Grand Boulevard, Suite 2150
Detroit, MI 48202
(313) 800-4170
pnovak@weitzlux.com
tellis@weitzlux.com

*On the Brief*