# PSJ4 SOL Opp App A Exh 6

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3    IN RE:  NATIONAL        :  MDL No. 2804

      PRESCRIPTION OPIATE     :

 4    LITIGATION              :  Case No. 17-md-2804

                              :

 5    APPLIES TO ALL CASES    :  Hon. Dan A. Polster

                              :

 6                            :

 7

 8                  HIGHLY CONFIDENTIAL

 9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                    - - - -

12                 JANUARY 18, 2019

13                    - - - -

14      VIDEOTAPED DEPOSITION OF MICHAEL BIANCO,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Friday,

20   January 18, 2019, commencing at 9:07 a.m.

21                    - - - -

22             GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

23                 deps@golkow.com

24

25
```

Highly Confidential – Subject to Further Confidentiality Review

```
1    today, do you have actually have firsthand

2    knowledge that the HBC warehouse had the ability

3    to hold or stop orders?

4             MR. KOBRIN:  Object to form.  Asked and

5    answered.

6             THE WITNESS:  Yes.

7    BY MR. HUDSON:

8        Q.   And how then did that occur?

9             MR. KOBRIN:  Object to form.  Asked and

10   answered.

11            THE WITNESS:  I mean, I'm reading an

12   email that I wrote that says an order was stopped.

13   BY MR. HUDSON:

14       Q.   I'm trying to get an understanding of

15   what you're relying on other people to tell you.

16   Did somebody tell you the order had been

17   stopped --

18            MR. KOBRIN:  Ty, are you asking if he

19   went to the warehouse to stop the order himself?

20   BY MR. HUDSON:

21       Q.   -- versus you having firsthand knowledge

22   of how the process worked and how orders were

23   stopped?

24            MR. KOBRIN:  Object to form.  Ty, this

25   has been gone over several times in this
```

1    deposition.  He's told you he knew the orders were

2    stopped.  He's told you that he didn't understand

3    the exact technicalities of it.  I don't

4    understand why you're beating this witness up

5    about this issue.

6                THE WITNESS:  I never physically went

7    there to stop an order or see an order physically

8    stopped.

9    BY MR. HUDSON:

10        Q.   And as you sit here today, you don't

11   know the process of how an order could be stopped?

12   I'll be real honest with you.  The reason why I'm

13   asking is because other witnesses have testified

14   that orders can't be stopped.

15               MR. KOBRIN:  Object to form.

16   Misrepresents the testimony of other witnesses.

17               THE WITNESS:  I don't know how --

18               MR. HUDSON:  The record will tell that.

19               THE WITNESS:  I don't know how they

20   were -- I don't know the details behind it.

21   BY MR. HUDSON:

22        Q.   Is it fair to say it was your

23   understanding at this time that orders could be

24   stopped, but you didn't understand how, you didn't

25   understand who did it, and you didn't understand

Highly Confidential - Subject to Further Confidentiality Review

```
 1   how the process worked?

 2              MR. KOBRIN:  Object to form.

 3              THE WITNESS:  Yes.

 4   BY MR. HUDSON:

 5       Q.  Fair enough.  Thank you.

 6              MR. KOBRIN:  Can we take just a quick

 7   break?

 8              MR. HUDSON:  Sure.  Let's go off the

 9   record.

10              THE VIDEOGRAPHER:  The time is 11:23.

11   We're going off the video record.

12              (Recess from 11:23 a.m. to 11:42 a.m.)

13              THE VIDEOGRAPHER:  The time is

14   11:42 a.m.  We are now back on the video record.

15   BY MR. HUDSON:

16       Q.  Mr. Bianco, let's move to a new topic.

17   Were you ever involved in any DEA inspections?

18       A.  Formal inspections, not that I remember.

19              (HBC-Bianco Exhibit 14 was marked.)

20   BY MR. HUDSON:

21       Q.  Let me hand you what I've marked as

22   Exhibit 14.

23              MR. HUDSON:  The internal number is 1226

24   for this one.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HUDSON:

 2        Q.   This looks like two emails.  I'm going

 3   to start with the bottom email.  And that was from

 4   you to STR_Pharmacy_PDLs.  Do you see that?

 5        A.   I do.

 6        Q.   Are you emailing then a distribution

 7   list of all the Giant Eagle PDLs?

 8        A.   Yes.

 9        Q.   And then you're copying Mr. Millward,

10   Ms. Matty, Mr. Shaheen and Mr. Carlson; right?

11        A.   Yes.

12        Q.   And the subject is Narcs Found in Tote?

13        A.   Correct.

14        Q.   And it's September 25, 2014; right?

15        A.   Correct.

16        Q.   And in this email you're indicating that

17   a narcotic tote was returned to the HBC warehouse

18   today with no identifying marks; right?

19        A.   Yes.

20        Q.   And then below you've identified what

21   the contents are in that tote there; right?

22        A.   It appears to be.

23        Q.   The top one is two units of a

24   hydrocodone combination product; right?

25        A.   Correct.
```

1        Q.   And then if we go on down, the fifth

2    item down is one unit of a hydrocodone combination

3    product; right?

4        A.   Correct.

5        Q.   And then the sixth item is another one

6    unit of a hydrocodone combination product?

7        A.   Correct.

8        Q.   And then below that you wrote,

9    "Additionally, we have seen a large number of

10   totes being returned to the warehouse with their

11   contents still inside, many of which are

12   refrigerated or controlled items.  Please attempt

13   to address this as you see fit."

14       Now, if we go up above to your -- that's in

15   October.  If we go up to the top email, this is an

16   email from you to Mr. Millward with a copy to

17   Mr. Carlson; right?

18       A.   To who?

19       Q.   It's an email from you to Mr. Millward

20   with a copy to Mr. Carlson.

21       A.   Yes.  Sorry.

22       Q.   And you're forwarding your email below;

23   right?

24       A.   Yes.

25       Q.   And that was the narcs found in tote

1    email; right?

2         A.   Correct.

3         Q.   So this is about a little less than a

4    week after your September 25 email is this forward

5    on October 1; right?

6         A.   Correct.

7         Q.   In here you said, "Hi, Joe.  As you

8    likely know, the DEA was in for an inspection of

9    the warehouse today specifically asking about

10   hydrocodone-containing products."

11        Do you see that?

12        A.   Yes.

13        Q.   Do you have any recollection other than

14   what you're reading in this email about this DEA

15   next of the warehouse today asking about

16   hydrocodone-containing products?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  No.

19   BY MR. HUDSON:

20        Q.   Here you wrote, "At the time the

21   warehouse reported having no

22   hydrocodone-containing products on hand."

23   Correct?

24        A.   Yes.

25        Q.   Then in the next paragraph you said,

1    "Currently, we have one case of a

2    hydrocodone/APAP5/325 that was intended for 6510."

3         Is that a particular store, 6510?

4         A.   Yes.

5         Q.   "Which is being shipped out tonight

6    after discussion with Tracy Patel.  We also have

7    one tote of which the contents are described below

8    that was returned to the warehouse.  The original

9    owner of the returned tote is not able to be

10   identified by Donna Matty or myself through

11   various methods.  Can you tell me how you would

12   like these contents to be handled.  I would like

13   to have the four units of hydrocodone-containing

14   products out of the warehouse by 10/5 so we can

15   avoid any issues with the schedule change."

16        Do you see that?

17        A.   Yes.

18        Q.   Does this email from you to Mr. Millward

19   and a copy to Mr. Carlson indicate that on

20   October 1 when you were writing this email, there

21   were hydrocodone combination products that were at

22   the warehouse?

23        A.   On October 1, yes.

24        Q.   And you wrote this email at 1827.  Would

25   that be 6:27 at night?

```
 1         A.    Assuming the time stamps are correct,

 2    yes.

 3         Q.    And here in this email you're writing

 4    that there was a DEA inspection of the warehouse

 5    today, which means on October 1; right?

 6         A.    That's what it reads, yes.

 7         Q.    And at that inspection where that DEA

 8    came in, the warehouse reported to the DEA having

 9    no hydrocodone-containing products on hand;

10    correct?

11         A.    That's what it reads, yes.

12         Q.    But that wasn't true; right?

13               MR. KOBRIN:  Object to form.

14               THE WITNESS:  I don't know that.

15    BY MR. HUDSON:

16         Q.    In this email that you forwarded, you

17    forwarded an email from September 25 that talked

18    about a tote being returned to the HBC warehouse

19    that had four units of hydrocodone combination

20    products; right?

21         A.    Yes.

22         Q.    And in your above email, you're talking

23    about shipping it out that night, the night of

24    October 1, right, from the warehouse?

25         A.    That's what it reads.
```

1    Q.   So that tote was there that day when the

2    DEA was inspecting; right?

3    A.   I don't know that.

4    Q.   You can't tell that from reading your

5    below email and this email?

6    A.   I wasn't physically at the location.  So

7    I don't know where the tote in question was or how

8    it was handled.

9    Q.   In this email that you're writing to

10   Mr. Millward, we know where the tote was, right,

11   because you're talking shipping it out that night?

12        MR. KOBRIN:  Object to form.  Where are

13   you talking about they were shipping it out that

14   night?

15   BY MR. HUDSON:

16   Q.   Do you see that, Mr. Bianco?

17   A.   Can you repeat that.

18   Q.   Sure.  You said currently -- or you

19   said, "Currently we have one case of

20   hydrocodone/APAP 5/325..."  What is that?

21   A.   That's -- I can't remember if it's

22   Vicodin or Norco.  I think it's Norco, the generic

23   Norco.

24   Q.   "...that was intended for 6510, which is

25   being shipped out tonight after discussion with

Highly Confidential - Subject to Further Confidentiality Review

1  Tracy Patel."  And who is Tracy Patel?

2        A.   She's an PDL.

3        Q.   So this is indicating the HBC warehouse

4  is going to ship this hydrocodone-containing

5  product to -- it's going to ship it out that

6  night.  Is that a fair reading of this email.

7        A.   I don't know where it was shipping from.

8  It just says that it was shipping.

9        Q.   You can't tell from your email where it

10  was shipping from, that particular

11  hydrocodone-containing product?

12        A.   I can make an assumption.

13        Q.   What would your assumption be?

14             MR. KOBRIN:  Object to form.

15             THE WITNESS:  Strictly speculating, it

16  would be from the warehouse.

17  BY MR. HUDSON:

18        Q.   Is there anywhere else that you can

19  think of as you sit here now where that

20  hydrocodone-containing product would be other than

21  the warehouse?

22        A.   At the time I believe it wasn't a CII.

23  How it was handled didn't have as -- the DEA

24  doesn't regulate it as tightly.  So I don't know

25  where it was.  I can't speak to where it was.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   So if it was a hydrocodone-containing

2  product, since it's less regulated, in your mind,

3  somehow it's less critical that you tell the truth

4  to the DEA about which products are there?

5         MR. KOBRIN:  Object to form.

6  BY MR. HUDSON:

7    Q.   I don't understand what that means.

8         MR. KOBRIN:  Object to form.  Misstates

9  the testimony and it's argumentative.

10         THE WITNESS:  You don't understand what

11  what means?

12  BY MR. HUDSON:

13    Q.   Why did you say that hydrocodone was not

14  a CII at the time?

15    A.   I thought you had said earlier that

16  hydrocodone changed in late October 2014.

17    Q.   It changed at some point in

18  October 2014; right?

19    A.   Okay.

20    Q.   Do you know specifically when it

21  changed?

22    A.   I don't know off the top of my head, no.

23    Q.   Do you know why the DEA was conducting

24  this inspection?

25    A.   I do not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Do you know why they were asking about

2  hydrocodone-containing products?

3    A.   I do not.

4    Q.   Do you know why the warehouse reported

5  having no hydrocodone-containing products on hand?

6    A.   I do not.

7    Q.   From your email, do you think it's fair

8  to infer that you're saying that there were

9  hydrocodone products that are on hand, but they're

10  being shipped out as soon as possible?

11       MR. KOBRIN:  Object to form.

12       THE WITNESS:  At what time?

13  BY MR. HUDSON:

14    Q.   On October 1.  One shipment you're going

15  to ship out later that night on October 1, and the

16  other shipment you're trying to get shipped out by

17  10/5.

18    A.   We can infer that as of October 1 at

19  6:30 p.m. there was hydrocodone there.  That's

20  fair.

21    Q.   Right.  So we know for sure that on

22  October 25, 2014, you wrote to all the PDLs about

23  a tote that had been returned to the HBC warehouse

24  that day that contained four units of hydrocodone

25  combination products; right?

```
 1        A.    Correct.

 2        Q.    And then we also know that in your email

 3   of October 1, you reference that tote again, and

 4   you say, we also have one tote of which the

 5   contents are described below, and that's your

 6   email from September 25, right, that was returned

 7   to the warehouse?  The original owner of the

 8   returned tote is not able to identify by Donna

 9   Matty or myself -- is not able to be identified by

10   Donna Matty or myself through various methods;

11   right?

12        A.    That's what it reads.

13        Q.    Then you said, "Can you tell me how you

14   would like these contents to be handled?"  And you

15   wrote, "I would like to have the four units of

16   hydrocodone-containing products out of the

17   warehouse."

18        When you say out of the warehouse, that

19   indicates that at least on October 1 at 6:27 p.m.

20   when you wrote this email that they're in the

21   warehouse; right?

22             MR. KOBRIN:  Object to form.

23   BY MR. HUDSON:

24        Q.    Do you agree with that?

25        A.    (Nodding.)
```

1    Q.   And you want them out within the next

2    four days, by 10/5, so you can void issues with

3    the schedule change; right?

4    A.   That's what it says.

5    Q.   As you sit here today, do you believe

6    that the warehouse conveyed information to the DEA

7    that was not accurate?

8    A.   I don't know.

9    Q.   Was the purpose of your email to

10   Mr. Millward to make him aware of what had been

11   told to the DEA and make sure that those

12   hydrocodone combination products were out of the

13   warehouse as soon as possible?

14   A.   I think the purpose would have been to

15   let him know about the hydrocodone products in the

16   warehouse at that time.

17   Q.   Why then did you mention the DEA

18   inspection?

19   A.   I don't know.

20   Q.   Why did you mention that the warehouse

21   reported having no hydrocodone-containing

22   products?

23   A.   I don't know.  I don't know if that was

24   said to the DEA or not.

25   Q.   You think from your email it's possible

Highly Confidential - Subject to Further Confidentiality Review

 1    that the warehouse did not report to the DEA of

 2    having no hydrocodone-containing products on hand?

 3         A.   I can't speak to that.  I wasn't there.

 4         Q.   Let's look more carefully then, if we

 5    can go back up to the top paragraph of your email.

 6    This is what you wrote on October 1.

 7         "As you likely know, the DEA was in for an

 8    inspection of the warehouse today specifically

 9    asking about hydrocodone-containing products.  At

10    the time the warehouse reported having no

11    hydrocodone-containing products on hand."

12         In your mind, is there any doubt at all that

13    the HBC warehouse reported to the DEA on October 1

14    that it had no hydrocodone-containing products on

15    hand?

16         A.   I don't know.  I don't know if the DEA

17    asked if there was any on hand.  I wasn't at

18    the...

19         Q.   You don't know whether or not the DEA

20    asked the warehouse whether there were

21    hydrocodone-containing products on hand?

22         A.   I don't know how I could know that.

23         Q.   You wrote it in your email, didn't you?

24         A.   No.

25         Q.   You say, "As you likely know, the DEA

1    was in for an inspection of the warehouse today

2    specifically asking about hydrocodone-containing

3    products."

4        Then you went on and said, "At the time the

5    warehouse reported having no

6    hydrocodone-containing products on hand."

7        In your mind is there any uncertainty as to

8    what you wrote?

9            MR. KOBRIN:  Object to form.

10            THE WITNESS:  I can read what I wrote.

11    BY MR. HUDSON:

12        Q.   You agree that that day when the DEA was

13    there, what you're writing is that the warehouse

14    told the DEA that there were no

15    hydrocodone-containing products on hand; right?

16        A.   I disagree.

17        Q.   You don't think that's what's written in

18    that paragraph?

19        A.   I know definitively that's not what's

20    written in the paragraph.

21        Q.   What do you think the warehouse told the

22    DEA?

23        A.   I don't know.

24        Q.   What was your overall point in writing

25    this email to Mr. Millward who was the head of

Highly Confidential - Subject to Further Confidentiality Review

1  compliance at the time?

2     A.   I don't remember.  As I said earlier, I

3  could speculate that it was likely to tell him at

4  time of day that there may have been products on

5  hand.

6     Q.   Why would it be important to tell him

7  that there were hydrocodone products on hand?

8          MR. KOBRIN:  Object to form.

9          THE WITNESS:  Based on my email because

10  we wanted them out of the warehouse by 10/5.

11  BY MR. HUDSON:

12     Q.   And why did you want them out of the

13  warehouse by 10/5?

14     A.   So we can avoid any issue with the

15  schedule change.

16     Q.   What about the DEA, is there any

17  connection between the DEA coming and asking about

18  hydrocodone-containing products and the decision

19  to ship out the hydrocodone combination products

20  that you identified as being on hand?

21          MR. KOBRIN:  Object to form.

22          THE WITNESS:  Can you repeat that.

23  BY MR. HUDSON:

24     Q.   Sure.  Is there any connection between

25  the DEA conducting this inspection of the

1    warehouse that day and your decision to email

2    Mr. Millward and Mr. Carlson about shipping out

3    the hydrocodone combination products as soon as

4    possible or at least by 10/5?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  I don't -- I don't know.

7    BY MR. HUDSON:

8       Q.   If it was just about shipping the

9    hydrocodone combination products out, would there

10   have been any need to reference that the DEA had

11   made an inspection that day?

12      A.   They're two separate paragraphs, so...

13      Q.   So you think these are two unconnected

14   points?

15      A.   No.  I don't know.

16      Q.   Does this cause you concern as you're

17   sitting here today reading these two paragraphs

18   that it's possible that the HBC warehouse may have

19   provided inaccurate information to the DEA about

20   whether it had hydrocodone-containing products on

21   hand?

22              MR. KOBRIN:  Object to form.

23              THE WITNESS:  No.

24   BY MR. HUDSON:

25      Q.   It does not?

1        A.    It doesn't state that they did.

2        Q.    Do you think it's possible that the

3    warehouse reported to the DEA that it had no

4    hydrocodone-containing products on hand when, in

5    fact, the warehouse did have

6    hydrocodone-containing products in the warehouse

7    at the time of the DEA inspection?

8              MR. KOBRIN:  Object to form.  Calls for

9    speculation.

10             THE WITNESS:  Is that possible?  Yes.

11   BY MR. HUDSON:

12       Q.    And from the contents of your email,

13   doesn't it appear to be highly likely that that's

14   what happened?

15             MR. KOBRIN:  Object to form.

16             THE WITNESS:  No.  We had a very close

17   relationship with the DEA.  So I don't know what

18   the conversations specifically were about, but

19   they could have been about many issues surrounding

20   the hydrocodone change, schedule change.

21   BY MR. HUDSON:

22       Q.    We do know though as part of that

23   conversation, the warehouse did report to the DEA

24   having no hydrocodone-containing products on hand.

25   We know that; right?

1          A.    No.

2          Q.    We don't know that?

3          A.    I don't know who they reported that to.

4          Q.    You think it's possible in the same

5    paragraph you wrote about a DEA inspection of the

6    warehouse asking about hydrocodone-containing

7    products and in the next sentence you changed the

8    subject completely and talked about a report to

9    somebody other than the DEA about having no

10   hydrocodone-containing products on hand?

11              MR. KOBRIN:  Object to form.

12   Argumentative.

13              THE WITNESS:  And what was the question?

14              MR. HUDSON:  Would you mind reading back

15   the question.

16              (The record was read back.)

17   BY MR. HUDSON:

18         Q.    Do you understand the question?

19         A.    I'm not changing the subject entirely.

20   I'm still talking about hydrocodone.  But, again,

21   I can't -- I don't know what they said.  I wasn't

22   there.  I don't know what was reported.  I would

23   presume the DEA has a report on that date.

24         Q.    Sir, that first paragraph, you're

25   recapping a DEA inspection that occurred and what

1    you told the DEA about hydrocodone-containing

2    products; right?

3         A.   No.  I was not there to report anything

4    to the DEA.

5         Q.   But you're not -- in that paragraph you

6    are not recapping what happened at that DEA

7    inspection that day?

8         A.   In the first sentence, yes.

9         Q.   Only the first sentence.

10        A.   I don't know.  I don't recall this

11   email.  I don't recall the situation.

12        Q.   As you're sitting here today, just

13   understanding the English language and that

14   paragraph and how it's written, is there any doubt

15   in your mind that those two sentences are

16   connected and that you're talking about a DEA

17   inspection of the warehouse, about

18   hydrocodone-containing products, and exactly what

19   the warehouse reported to the DEA?

20             MR. KOBRIN:  Object to form.

21   Argumentative.  Asked and answered.

22             THE WITNESS:  Was there concern?  What

23   was the leading part of that?  Was there concern

24   that I --

25

1    BY MR. HUDSON:

2       Q.   I just want to get your best testimony

3    on the record about the first paragraph.  When you

4    read that paragraph as you sit here today, is your

5    best recollection of what you wrote back on

6    October 1 -- are those two sentences connected and

7    are you reporting to Mr. Millward and copying

8    Mr. Carlson, your boss at the time, about a DEA

9    inspection of the HBC warehouse and what the

10   warehouse reported to the DEA?

11          MR. KOBRIN:  Object to form.

12          THE WITNESS:  I guess if I had any

13   concern -- I don't recall this email.  But if I

14   had any concern that there was a suspicious order,

15   I wouldn't put it in five words in an email at

16   6:30 at night, or a dozen words.

17   BY MR. HUDSON:

18      Q.   My question though wasn't about a

19   suspicious order.  My question is that first

20   paragraph, it's just what the warehouse told the

21   DEA about whether there were hydrocodone

22   combination products at the warehouse at the time

23   of the inspection and then you reporting to them

24   later about what your understanding of what was at

25   that warehouse later that night.

1    Isn't that what's going on in this email?

2    A.   Like I said, I wouldn't -- if I had

3  concerns that there was a suspicious response to a

4  DEA inspection, I would have taken further steps

5  than to put it in several words in an email at

6  6:30 at night.

7    Q.   With all due respect, it's not just

8  several words.  In the second paragraph goes in

9  and you describe in detail exactly how to solve

10  the problem and get those hydrocodone combination

11  products out of the warehouse as soon as possible;

12  right?

13        MR. KOBRIN:  Object to form.

14        THE WITNESS:  I disagree with that.

15  BY MR. HUDSON:

16    Q.   You do agree that for one case of the

17  hydrocodone products, you're shipping those out

18  later that same night; right?  It's 6:27 at night

19  and you're going to ship that case out later that

20  night.

21    A.   Correct.

22    Q.   Is that usual or unusual for shipments

23  to be shipped out after 6:30 at night?

24    A.   Our first wave I don't believe started

25  until 6:30 at night.  I can't remember if it was

Highly Confidential - Subject to Further Confidentiality Review

1    6:30, 7:30 or 8:30, but it was something similar

2    to that.

3        Q.   We can agree that what you identified in

4    this second paragraph was a case of

5    hydrocodone-containing products that had been

6    meant to be shipped to store 6510, but it hadn't.

7    So now you're putting in place a plan to get that

8    shipped out of the warehouse that night on

9    October 1?  Can we agree on that?

10            MR. KOBRIN:  Object to form.

11            THE WITNESS:  I did not put the plan --

12   it doesn't look like I put the plan in place.  I'm

13   letting them know what the plan was.

14   BY MR. HUDSON:

15       Q.   But you're relaying to them what the

16   plan was for that particular case?

17       A.   Correct.

18       Q.   And then for the second, the tote that

19   you talked about before that had been in the

20   warehouse for about a week and hadn't been

21   claimed, it also had hydrocodone-containing

22   products.  And then in the rest of the paragraph

23   you're laying out or relaying to the head of

24   compliance and your boss the plan to get that

25   shipped out of the warehouse, too; right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.  I'm asking if they can tell me how

2    they should be handled.

3    Q.    And then because you're laying out for

4    them a recommendation what you think should

5    happen; right?

6         MR. KOBRIN:  Object to form.  Misstates

7    the evidence.

8         THE WITNESS:  No.

9    BY MR. HUDSON:

10   Q.    At a minimum you're telling them you

11   would sure like to see the product out of the

12   warehouse by 10/5 so that you can avoid any issue

13   with the scheduling change.

14   A.    Agreed.

15   Q.    Do you know whether or not those

16   hydrocodone-containing products were, in fact,

17   shipped from the warehouse that night?  Do you

18   have any recollection?

19   A.    No.

20   Q.    Do you know anything more about this

21   topic than what we've talked about?

22   A.    The topic of changing schedules?

23   Q.    Yeah, this DEA inspection and then the

24   plan for shipping these two hydrocodone-containing

25   products.

Highly Confidential - Subject to Further Confidentiality Review

1        A.    No.   The conversion of the schedule,

2   yes.

3              (HBC-Bianco Exhibit 15 was marked.)

4   BY MR. HUDSON:

5        Q.    We'll move to a new topic and hand you

6   what I've marked as Exhibit 15.  Exhibit 15 is a

7   thick set -- it's a cover email with a set of

8   attachments, and the subject of this email is All

9   Policies for VAWD Reflected as of 5:00 p.m. Today.

10             Do you recognize Exhibit 15, Mr. Bianco?

11       A.    Flipping through it, they look like

12  policies, but without having an opportunity to

13  read them all.

14       Q.    This is an email from Sara Green; right?

15       A.    Appears to be, yes.

16       Q.    And who is Sara Green?

17       A.    Based on her signature, she was an

18  executive secretary.  I'm not sure.

19       Q.    And she's then distributing this set of

20  policies to a distribution group that includes

21  yourself and others?

22       A.    Yes.

23       Q.    And she wrote down in the body of the

24  email, "Good afternoon.  Sorry for so many emails

25  throughout the day.  Attached are all final PDF

1   version policies for VAWD as well as the document

2   retention policy and chart.  If you have any

3   questions, let me know."

4        A.   Yes.

5        Q.   Were you part of the group that reviewed

6   these policies before they were put into final

7   form?

8        A.   On each specific policy, again, without

9   having an opportunity to read them, I may have

10  interacted on some of them, but I don't know

11  without having an opportunity to review them all.

12       Q.   What is VAWD?

13       A.   Verified accredited wholesale

14  distributor.

15       Q.   And is that a certification that you can

16  obtain?

17       A.   I believe through NABP.

18       Q.   Through NABP?

19       A.   National Association of Boards of

20  Pharmacy.

21       Q.   And did the HBC warehouse ever get VAWD

22  certification?

23       A.   I don't believe so.

24       Q.   Did the HBC warehouse ever apply for

25  VAWD certification?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   I'm not -- I'm not sure if we ever

2  actually applied or not.

3      Q.   Were you part of the effort to create

4  these policies for VAWD?

5      A.   I helped on some of the policies, but,

6  again, without reading all of these, I'm not sure

7  which ones I did or did not.

8      Q.   Let's go back, if we could.  For this

9  purpose, I'll just use the Bates numbers that are

10  in the bottom right, the Bates ending number.  So

11  go back, if you could, to Bates 629.

12      A.   Is that this?

13      Q.   Exactly.  It's the HBC_MDL.

14      A.   What was the number?

15      Q.   The ending number is 629.

16      A.   Okay.

17      Q.   And if you could, at the top it says

18  Security Policy.  Do you see that at the top

19  right?

20      A.   Yes.

21      Q.   And then, if you could, do you see the

22  table that's got two columns?

23      A.   Yes.

24      Q.   Explain to me, if you could, how to read

25  that, if you know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   COMMONWEALTH OF PENNSYLVANIA  )

 2   COUNTY OF ALLEGHENY           )      SS:

 3                 C E R T I F I C A T E

 4           I, Ann Medis, Registered Professional

 5   Reporter, Certified Livenote Reporter and Notary

 6   Public within and for the Commonwealth of

 7   Pennsylvania, do hereby certify:

 8           That MICHAEL BIANCO, the witness whose

 9   deposition is hereinbefore set forth, was duly

10   sworn by me and that such deposition is a true

11   record of the testimony given by such witness.

12           I further certify the inspection,

13   reading and signing of said deposition were not

14   waived by counsel for the respective parties and

15   by the witness.

16           I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage and that I am in no way interested in the

19   outcome of this matter.

20           IN WITNESS WHEREOF, I have hereunto set

21   my hand this 23rd day of January, 2019.

22

                       _____

23                              Notary Public

24

25
```