## *In re National Prescription Opiate Litigation*, MDL 2804
## Summary Sheet of Concise Issues Raised

**Opposition Name:**  Plaintiffs' Memorandum in Opposition to Defendant Discount Drug Mart, Inc.'s Motion for Summary Judgment

**Opposing Parties:**  Plaintiffs Summit County and Cuyahoga Counties

*Issue 1:*  Are Plaintiffs' claims time-barred?

*Answer:*  No. Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Statute of Limitations Grounds, which is incorporated by reference, makes clear Plaintiffs' claims are not time barred.

*Issue 2:*  Have Plaintiffs produced evidence of causation?

*Answer:*  Yes. Under the Controlled Substances Act ("CSA"), Discount Drug Mart, Inc. ("DDM") was required to maintain effective controls against diversion. By distributing hydrocodone combination products ("HCPs") into Plaintiffs' jurisdictions without an appropriate suspicious order monitoring program over a prolonged period of time, DDM caused or contributed to Plaintiffs' injuries.

*Issue 3:*  Has DDM sustained its burden of showing entitlement to summary judgment dismissal of Plaintiffs' public nuisance claims?

*Answer:*  No. DDM has failed to demonstrate the absence of trial issues of fact as to the requisite elements of Plaintiffs' public nuisance claim. As shown in Plaintiffs' Motion for Partial Summary Adjudication of Their Equitable Claims for Abatement of an Absolute Public Nuisance (Dkt. # 1880), incorporated here by reference, the epidemic of opioid availability and use has interfered with a "public right," e.g., public health, and constitutes a public nuisance. The record is replete with evidence that DDM distributed significant amounts of HCPs into Plaintiffs' jurisdictions without an effective suspicious order monitoring program required to meet its obligations under the CSA.

*Issue 4:*  Have Plaintiffs produced evidence of DDM's negligence?

*Answer:*  Yes. The Court already has held that "Plaintiffs have stated a plausible claim that it was reasonably foreseeable that they would be forced to bear the public costs of increased harm from the over-prescription and oversupply of opioids in their communities **if Defendants failed to implement and/or follow adequate controls in their marketing, sales, distribution, and dispensing of opioids**." R. & R., *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *37 (N.D. Ohio Oct. 5, 2018) (emphasis added). The record demonstrates that DDM was negligent in failing to implement a suspicious order monitoring system in accordance with its duties under the CSA.

*Issue 5:*  Have Plaintiffs produced evidence that DDM was unjustly enriched?

*Answer:*  Yes. The record demonstrates that Plaintiffs paid for the externalities associated with DDM's shipments of HCPs into Plaintiffs' jurisdictions.

**Filing Date:**        June 28, 2019
**Response Date:**   July 31, 2019
**Reply Date:**         August 16, 2019

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>Track One Cases | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT DISCOUNT DRUG MART, INC.'S
MOTION FOR SUMMARY JUDGMENT**

July 31, 2019

# TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. PLAINTIFFS' CLAIMS ARE NOT TIME BARRED ........ 3

II. PLAINTIFFS PROPERLY ALLEGE PROXIMATE CAUSATION ........ 4

III. PLAINTIFFS' STATUTORY NUISANCE CLAIM ........ 6

IV. DDM WAS A SUBSTANTIAL FACTOR IN CREATING THE PUBLIC NUISANCE ........ 6

V. PLAINTIFFS HAVE PRODUCED EVIDENCE OF DDM'S NEGLIGENCE ........ 7

VI. PLAINTIFFS HAVE DEMONSTRATED DDM'S LIABILITY UNDER OHIO REVISED CODE § 2307.60 ........ 8

VII. DDM WAS UNJUSTLY ENRICHED BY ITS DISTRIBUTION OF UNLAWFUL PRODUCTS ........ 9

CONCLUSION ........ 10

## TABLE OF AUTHORITIES

Page

**Cases**

*City of Cincinnati v. Beretta U.S.A. Corp.*,
  2000 WL 1133078 (Ohio Ct. App. Aug. 11, 2000) ....................................................................... 9

*In re National Prescription Opiate Litigation*,
  2018 WL 4895856 (N.D. Ohio Oct. 5, 2018) ......................................................................... 7, 9

*Queen City Terminals, Inc. v. General American Transportation Corp.*,
  73 Ohio St. 3d 609, 653 N.E.2d 661 (1995) ............................................................................ 5

*Schwartz v. Honeywell International, Inc.*,
  153 Ohio St. 3d 175, 2018-Ohio-474, 102 N.E.3d 477 (2018) ............................................ 4, 5

Plaintiffs respectfully submit this memorandum of law in opposition to Defendant Discount Drug Mart, Inc.'s ("DDM") motion for summary judgment.[1]

### INTRODUCTION

Starting in 2002, DDM began to increase its shipment of hydrocodone combination products ("HCPs") to Plaintiffs' jurisdictions. These shipments grew so that between 2006 and 2014, DDM shipped ▮▮▮▮▮▮▮▮ of dosage units of HCPs into Summit and Cuyahoga Counties each month. During this time period, DDM shipped numerous orders that, under the Controlled Substances Act ("CSA"), were "suspicious" and should never have been shipped. DDM made no effort to identify suspicious orders, failed to flag orders and report them to the DEA, and kept the flow of drugs coming into Summit and Cuyahoga Counties. In so doing, DDM failed to implement suspicious order monitoring programs required to meet its obligations under the CSA, even though it acknowledged that that it had "documented problems" with diversion.[2] In fact, DDM has never identified or halted a ***single*** suspicious order or possible suspicious order, or reported any such order to the DEA.

Instead of implementing a program to detect and report suspicious orders, DDM implemented a "six-week average report," which generated a report each time a store placed an order that exceeded its six-week average for a certain item.[3] This report was the only prospective component of DDM's suspicious order monitoring policies and therefore the only tool DDM could have used to stop the shipment of a suspicious order. Despite this, the six-week average report was not designed to prevent suspicious orders, but rather was an inventory management report used to make sure there

---

[1] References to "DDM Mem. _" are to pages of Defendant Discount Drug Mart, Inc.'s Memorandum in Support of its Motion for Summary Judgment.

[2] Tom Nameth Dep. (Jan. 7, 2019), Dkt. # 1968-15 at 351:22-352:7.

[3] Jill Strang Dep. (Jan. 3, 2019), Dkt. # 1971-5 at 64:20-65:14.

1

were no typing errors and that the purchase order matched what the pharmacist intended to order.[4] Moreover, the individual responsible for reviewing the six-week average report, Jill Strang, testified that she did not receive the report.[5]  Instead, Ms. Strang testified that she would not learn about an order identified in the report unless a pharmacist contacted her or a DDM warehouse puller informed her about the order.[6]  DDM did not provide Ms. Strang with any guidance about what orders she should investigate and Ms. Strang testified that she did not know the specifics of DDM's suspicious order monitoring policies.[7]  It is therefore no surprise that Ms. Strang never reported a single suspicious order to the DEA.[8]

DDM's second purported suspicious order monitoring report, known as the Controlled Substance Monitoring Report, or the "12-month report," was generated monthly and identified, for each store, any drug order that exceeded the store's rolling 12-month average by more than 99%.  One of DDM's employees, Tom Nameth, testified that the report could not be used to stop suspicious orders before they were shipped.[9]  Instead, Mr. Nameth testified that DDM's suspicious order monitoring policies rested entirely on the trust DDM placed in its pharmacies and pharmacists' ability to detect and prevent diversion at the store level.[10]  As with Ms. Strang, Mr. Nameth testified that neither he nor DDM never reported a single order as suspicious to the DEA.[11]

---

[4]  *Id.* at 73:8-17.

[5]  *Id.* at 70:23-71:1.

[6]  *Id.* at 71:2-17.

[7]  *Id.* at 28:13-29:3.

[8]  *Id.* at 316:24-317:3.

[9]  Nameth Dep., Dkt. # 1968-15 at 89, 123:6-125:2.

[10]  *Id.* at 62:3-19, 90:8-13, 96:14-17, 402:5-13.

[11]  *Id.* at 210:3-6.

2

As late as October 2013, DDM represented to the DEA that it was in the final stages of implementing a more aggressive controlled substance monitoring system.[12] Mr. Nameth testified, however, that no such system was ever put in place.[13] Four years later, in January 2017, nothing had been done. In fact, one DDM employee, Pete Ratycz, wrote: "I think we need to reemphasize our controlled substance program at the upcoming pharmacist meeting. Also, we need to look at developing reporting to help us effectively identify outliers and/or suspicious store ordering."[14]

Against this background, and as described further below, DDM's motion for summary judgment should be denied.

## ARGUMENT

### I. PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

DDM argues that because it "stopped distributing [HCPs] when the DEA rescheduled [them] from Schedule III to Schedule II on October 6, 2014," and "the statute of limitations for DDM goes back to May 18, 2014" – on the basis that DDM was added as a defendant on May 18, 2018 – "there is only a four-and-a-half month window of conduct by DDM within the limitations period." DDM Mem. 2. DDM is wrong. As discussed in detail in Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Statute of Limitations Grounds, which is incorporated by reference herein, Plaintiffs' claims are not time barred because the statute of limitations does not apply to Plaintiffs' equitable public nuisance claim for abatement; the statute of limitations for unjust enrichment claims runs from the date the misconduct ended; the statute of limitations was tolled due to Defendants' fraudulent concealment; and the statute of limitations is tolled due to the continuing violation doctrine.

---

[12] PSJ12-DDM Exh.1, DDM00169025.

[13] Tom Nameth Dep. (Jan. 7, 2019), Dkt. # 1968-15 at 356:1-358:19.

[14] PSJ12-DDM Exh. 2, DDM00074952.

3

## II. PLAINTIFFS PROPERLY ALLEGE PROXIMATE CAUSATION

With respect to Defendants' causation arguments, DDM Mem. 3-4, Plaintiffs hereby incorporate by reference their arguments in Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Proof of Causation. Those arguments readily demonstrate the flaws in DDM's arguments.

Notwithstanding, Plaintiffs briefly address DDM's specific arguments. DDM argues that "the record is devoid of any evidence that *DDM* caused any harm to Plaintiffs." DDM Mem. 3. In support, DDM contends that Plaintiffs cannot show that DDM's conduct had a substantial impact because "DDM distributed ▓▓▓▓▓▓▓ of the opioids legally distributed to the Plaintiff counties." *Id.* DDM neglects to mention that this figure corresponds to nearly ▓▓▓▓▓▓ dosage units to its pharmacies in Cuyahoga County and over ▓▓▓▓▓▓ dosage units to its pharmacies in Summit County between 2006 and 2014.[15] Accordingly, DDM's attempts to downplay its role in causing Plaintiffs' injuries should be rejected.

DDM next contends that "Ohio law is clear that where 'causation is premised on the total cumulative' effect of numerous actors, a defendant **cannot** be held liable unless its conduct taken individually 'had a *substantial* impact on the total.'" DDM Mem. 3 (quoting *Schwartz v. Honeywell Int'l, Inc.*, 153 Ohio St. 3d 175, 2018-Ohio-474, 102 N.E.3d 477, at ¶ 20 (2018)) (internal quotation marks omitted). DDM's case law is readily distinguishable. *Schwartz* concerned a claim under a specific statute, Ohio Revised Code § 2307.96, which is limited **solely** to asbestos claims.[16] *See id.* at ¶ 10 ("We accepted Honeywell's discretionary appeal on the following proposition of law: 'A theory of causation

---

[15] Report of Craig J. McCann, Ph.D., CFA, Dkt. # 1999-14 at App'x 9 at 3783, 3852.

[16] Ohio Revised Code § 2307.96 provides: "(A) If a plaintiff in a tort action alleges any injury or loss to person resulting **from exposure to asbestos** as a result of the tortious act of one or more defendants, in order to maintain a cause of action against any of those defendants based on that injury or loss, the plaintiff must prove that the conduct of that particular defendant was a substantial factor in causing the injury or loss on which the cause of action is based." (Emphasis added.)

4

based only upon cumulative exposure to various asbestos-containing products is insufficient to demonstrate that a particular defendant's product was a "substantial factor" under R.C. 2307.96.'"). In fact, "in R.C. 2307.96, the legislature made clear that **in asbestos cases**, there must be a determination whether the conduct of each 'particular defendant' was a substantial factor in causing the plaintiff's injury and that this determination must be based on specific evidence of the manner, proximity, frequency, and length of exposure.  Beyond that, however, the legislature did not specifically define 'substantial factor.'" *Id.* at ¶ 14 (emphasis added); *see also id.* at ¶ 24 ("[A] theory of causation based only on cumulative exposure to various asbestos-containing products is insufficient to demonstrate that exposure to asbestos from a particular defendant's product was a 'substantial factor' under R.C. 2307.96.").  Notwithstanding, the jury could readily find that the distribution of ▇▇▇▇▇▇▇ of dosage units of HCPs per month to pharmacies BD2308155 and BD0995085 in Plaintiffs' jurisdictions over more than a decade was a substantial cause of Plaintiffs' injuries.[17]

DDM's citation to *Queen City Terminals, Inc. v. General American Transportation Corp.*, 73 Ohio St. 3d 609, 653 N.E.2d 661 (1995), for the proposition that "'[w]here a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm,'" is surprising.  DDM Mem. 3.  The *Queen City Terminals* court held that "the 'substantial factor' test is used to determine liability when factors other than the negligence of the tortfeasor may have caused the plaintiff's damages," but went on to hold that "***[t]he determination of whether an actor's conduct was a substantial factor in producing the plaintiff's injury is a question of fact to be determined by the trier of fact***."  73 Ohio St. 3d at 617-18, 102 N.E.2d at 669 (emphasis added). Accordingly, DDM's own authority makes clear that summary judgment is improper.

---

[17]  Supplemental Report of Craig J. McCann, Ph.D., CFA, Dkt. # 1999-15 at App'x B ("Additional Discount Drug Mart Figures and Tables").

5

### III. PLAINTIFFS' STATUTORY NUISANCE CLAIM

In light of this Court's ruling on the earlier motions to dismiss that the only available remedy for Plaintiffs' statutory nuisance claim is an injunction to prohibit future nuisance-causing conduct, Plaintiffs agree to the dismissal of that claim against defendants who are no longer in the business of manufacturing or distributing opioids, such as DDM.

### IV. DDM WAS A SUBSTANTIAL FACTOR IN CREATING THE PUBLIC NUISANCE

With respect to Plaintiffs' public nuisance claims, DDM contends that "Plaintiffs can point to no evidence in the record demonstrating that DDM created a public nuisance" because (i) of the size of DDM's market share; and (ii) "there is no evidence demonstrating that DDM distributed opioids to 'rogue' internet pharmacies or pain clinics." DDM Mem. 4-5. These arguments are unavailing. First, as described above, DDM distributed nearly ▮▮▮▮▮▮ dosage units to its pharmacies in Cuyahoga County and over ▮▮▮▮▮▮ dosage units to its pharmacies in Summit County between 2006 and 2014. This is a more than sufficient basis for a jury to find that DDM's conduct was a substantial factor in creating the opioid crisis in Cuyahoga and Summit Counties. Second, there is no requirement that DDM have distributed its opioids only to "rogue" internet pharmacies or pain clinics to state a claim for public nuisance. Rather, DDM's distribution of a significant volume of opioids into Plaintiffs' counties without identifying, reporting, or halting suspicious orders or making any colorable effort to prevent diversion is sufficient to establish its violations. Further, as demonstrated in the Motion of Plaintiffs Cuyahoga and Summit Counties for Partial Adjudication of Their Equitable Claims for Abatement of an Absolute Public Nuisance, Dkt. # 1880, which is incorporated by reference herein, a factfinder could reasonably conclude that DDM's failure to implement an even remotely compliant SOM program resulted in diversion and its attendant harms in Summit and Cuyahoga Counties.

6

### V. PLAINTIFFS HAVE PRODUCED EVIDENCE OF DDM'S NEGLIGENCE

Turning to Plaintiffs' negligence claims, DDM argues that it is entitled to summary judgment on the basis that the record "is wholly devoid of any evidence supporting the conclusion that DDM created or contributed to [the] black market for opioids" and because "DDM distributed lawful opioids to its *own* pharmacies – *pharmacies that are not alleged to have committed any wrongdoing*." DDM Mem. 5. DDM demands too much. As the Court already has held, "Plaintiffs have stated a plausible claim that it was reasonably foreseeable that they would be forced to bear the public costs of increased harm from the over-prescription and oversupply of opioids in their communities if Defendants failed to implement and/or follow adequate controls in their marketing, sales, distribution, and dispensing of opioids." R. & R., *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *37 (N.D. Ohio Oct. 5, 2018); *see also id.* ("Plaintiffs' [sic] do not assert a duty to prevent the actions of third persons, but rather a duty owed by Defendants to Plaintiffs to use reasonable care in, for example, marketing, monitoring, reporting, and selling their opioids. The wrongful conduct alleged is that of Defendants, and not of third persons."). As described above, there can be no dispute that DDM was negligent in failing to implement a suspicious order monitoring system in accordance with its duties under the CSA. Taking DDM's argument to its logical conclusion, no distributor of controlled substances could be held liable for its own misconduct – a conclusion contrary to the CSA's closed system, as well as this Court's prior rulings.

Notwithstanding, the record demonstrates that, contrary to its assertions, DDM created or contributed to the black market for opioids. For example, DDM's Rule 30(b)(6) deponent testified as follows:

> Q.  DDM knew that there was a problem in the State of Ohio with individuals doctor shopping and then securing prescriptions and selling those pills on the street for nonmedical purposes, right?
>
> A.  Yes.

7

> Q. And those are drug dealers, right?
>
> A. Sure.
>
> Q. And they -- part of the way pills made it into the black market through drug dealers was securing prescriptions from doctors through a practice we just discussed as doctor shopping, right?
>
> MR. JOHNSON: Objection.
>
> A. Yes.
>
> Q. And those were -- that is one example of many of ways that pills make it into the black market or into the street, correct?
>
> A. That is one way, yes.
>
> Q. And DDM's responsibility as a distributor was to be vigilant in designing a system that would identify suspicious orders and prevent pills like hydrocodone making it into this black market, correct?
>
> A. We would need -- **yeah, we certainly are responsible for creating a system that would prevent medication, controlled substances, being shipped to our retail locations that ultimately was not dispensed for a legitimate medical purpose**.[18]

As described above, DDM failed to create such a system. This is sufficient to withstand DDM's causation arguments. *See* Pls.' Joint Mem. of Law in Opp'n to Mots. of Mfr. Defs. & Distrib. & Pharmacy Defs. for Summ. J. on Proof of Causation.

## VI. PLAINTIFFS HAVE DEMONSTRATED DDM'S LIABILITY UNDER OHIO REVISED CODE § 2307.60

Ohio Revised Code § 2307.60(A)(1) provides that:

> [a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

In response, DDM argues that a defendant must be "convicted of crime to be held liable under [Ohio Revised Code § 2307.60]." DDM Mem. 5. DDM is wrong, as this Court already has held. *See*

---

[18] Jason Briscoe Dep. (Dec. 6, 2018), Dkt. # 1959-11 at 120:15-122:5.

*In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *43 (declining to find criminal conviction required).[19]

DDM's safe harbor argument, DDM Mem. 6, fails for the reasons previously provided by the Court. *See id.* at *35 (holding that safe harbor immunity "is available only to those who perform in accordance with their applicable regulatory obligations"). Plaintiffs have demonstrated that DDM did not comply with "applicable regulatory obligations," so this defense must be denied. Similarly, the court has previously upheld Plaintiffs' claims under Ohio Revised Code § 2925.02(A), *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *34, and the record shows that DDM's deception (that it applied with applicable regulatory obligations) caused documented problems.

## VII. DDM WAS UNJUSTLY ENRICHED BY ITS DISTRIBUTION OF UNLAWFUL PRODUCTS

The Court previously held that "Plaintiffs [have] state[d] a facially plausible unjust enrichment claim on the theory that they conferred a benefit upon all Defendants by alleging that they paid for the cost of harm caused by the defendant's conduct, *i.e.*, the defendant's externalities." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *46. In response, DDM argues that "there is no evidence that Plaintiffs have conferred any benefit of any kind *on* DDM" and cites to *City of Cincinnati v. Beretta U.S.A. Corp.*, 2000 WL 1133078 (Ohio Ct. App. Aug. 11, 2000) – a case later overturned by the Ohio Supreme Court – for the proposition that "'[t]he beneficiaries of the city's expenditures are its own residents.'" DDM Mem. 6 (citing *Beretta*, 2000 WL 1133078, at *7).

Contrary to DDM's assertion, Plaintiffs have demonstrated that they conferred a benefit on DDM by paying for the costs of externalities associated with DDM's shipments of nearly ▮

---

[19] This Court has certified the question of whether a prior conviction is required under Ohio Revised Code § 2307.60 to the Ohio Supreme Court. Should the Ohio Supreme Court hold that a prior conviction is required, Plaintiffs acknowledge that this claim is subject to dismissal.

9

dosage units to its pharmacies in Cuyahoga County and over ▇▇▇▇▇▇ dosage units to its pharmacies in Summit County between 2006 and 2014.[20] Because DDM did not have to pay for the externalities associated with the harms resulting from its shipments of HCPs into Plaintiffs' jurisdictions without the required procedures mandated by the CSA, Plaintiffs' claim for unjust enrichment should stand.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Statute of Limitations Grounds, Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Proof of Causation, and the Motion of Plaintiffs Cuyahoga and Summit Counties for Partial Adjudication of Their Equitable Claims for Abatement of an Absolute Public Nuisance, DDM's motion for summary judgment should be denied.

Dated:  July 31, 2019

Respectfully submitted,

/s/Paul J. Hanly, Jr.
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

/s/Joseph F. Rice
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

---

[20] McCann Rep., Dkt. # 1999-14 at 46-47 (detailing DDM's and ARCOS transactional data), 59, 60, 63-64, 67, 71-72, 75-81 (listing DDM's threshold flagged transactions); Supplemental McCann Report, Dkt. # 1999-15 at App'x. B ("Additional Discount Drug Mart Figures and Tables").

        Paul T. Farrell, Jr., Esq.
        GREENE KETCHUM, LLP
        419 Eleventh Street
        Huntington, WV 25701
        (304) 525-9115
        (800) 479-0053
        (304) 529-3284 (Fax)
        paul@greeneketchum.com

        *Plaintiffs' Co-Lead Counsel*


        /s/Peter H. Weinberger
        Peter H. Weinberger (0022076)
        SPANGENBERG SHIBLEY & LIBER
        1001 Lakeside Avenue East, Suite 1700
        Cleveland, OH 44114
        (216) 696-3232
        (216) 696-3924 (Fax)
        pweinberger@spanglaw.com

        *Plaintiffs' Liaison Counsel*


        Hunter J. Shkolnik
        NAPOLI SHKOLNIK
        360 Lexington Ave., 11th Floor
        New York, NY 10017
        (212) 397-1000
        (646) 843-7603 (Fax)
        hunter@napolilaw.com

        *Counsel for Plaintiff Cuyahoga County, Ohio*


        /s/Linda Singer
        Linda Singer
        MOTLEY RICE LLC
        401 9th St. NW, Suite 1001
        Washington, DC 20004
        (202) 386-9626 x5626
        (202) 386-9622 (Fax)
        lsinger@motleyrice.com

        *Counsel for Plaintiff Summit County, Ohio*

*On the Brief:*

James M. Hughes, MOTLEY RICE LLC
Christopher F. Moriarty, MOTLEY RICE LLC

11