IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No.: 1:17-md-2804 |
| THIS DOCUMENT RELATES: | Judge Dan Aaron Polster |
| *ALL CASES* | |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT WALMART'S MOTION FOR SUMMARY JUDGMENT

*In re National Prescription Opiate Litigation*: MDL 2804
**Summary Sheet of Concise Issues Raised**

**Opposition Name:**    Plaintiffs' Memorandum in Opposition to Defendant Walmart's Motion for
Summary Judgment

**Opposing Parties:**    Plaintiffs Summit County and Cuyahoga Counties

*****************

*Issue 1:*    May Walmart be enjoined from future illegal conduct?

*Answer:*    Yes.  Unlike other Defendants who no longer distribute opioids, Walmart only
stopped its wrongful conduct after plaintiffs filed suit, and it has not made any attempt
to carry its "formidable burden of showing" that it will not distribute opioids in
Cuyahoga or Summit Counties in the future.

*Issue 2:*    Did Walmart proximately cause Plaintiffs' injuries?

*Answer:*    Yes.  The counties' harms are the harms one would expect to flow from Walmart's
nonexistent (later inadequate) SOMs systems. Plaintiffs demonstrate this causal
connection through rigorous statistical analysis by experts in public health economics.

*Issue 4*:    Is Walmart's misconduct sufficient to raise a genuine issue of material fact?

*Answer*.    Yes.  Despite its status as the country's largest private employer, Walmart did not
assign even one employee to design or operate a system to detect suspicious orders
for years. **Absolute nuisance:** The evidence shows that Walmart deliberately chose
not to create any reporting system at all until 2011, chose not to report any orders to
the DEA, chose to cut and ship large orders without reporting same to the DEA,
chose not to stop the shipment of *any* orders, and, for the overwhelming majority of
the time, never even investigated an order. **Negligence:** It is foreseeable that wholly
failing to monitor its distribution of dangerous controlled substances would help
create a black market for those substances. **ORC § 2307.60:** Walmart knowingly
furnished opioids to others, causing serious harm.  Walmart intentionally chose not to
implement *any* system for monitoring opioid distribution for years, contributing to the
opioid crisis. **Unjust enrichment:**  Walmart's wrongful conduct resulted in, among
other things, increased healthcare services and addiction treatment for opioid users.
These costs *should* be paid by Walmart (and other Defendants), who caused them.

*Issue 5*:    Could a jury properly award punitive damages given Walmart's egregrious conduct?

*Answer*.    Yes. Before 2011, Walmart had *no system in place at all* to monitor opioid distribution.
And the ostensible system that it ultimately put in place was so wildly deficient that
Walmart has *never* identified, investigated, or reported even a single order of controlled
substances in Cuyahoga or Summit Counties.  A jury could properly conclude that
there is a simple reason for this: Walmart had absolutely no desire to uncover such
orders, thereby demonstrating a "conscious disregard for the rights and safety of other
persons . . ." *Morgan*, 559 F.3d at 440.

Filing Date:  June 28, 2019

Response Date:  July 31, 2019

Reply Date:  August 16, 2019

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF RELEVANT FACTS ............................................................3

       A.    Prior to 2011, Walmart did not have any formal procedure in place to monitor opioid distribution.................................................................................4

       B.    From 2011 to 2015, Walmart instituted a system that would flag a handful of large orders, but it never reported any suspicious orders to the DEA. ........................5

       C.    In 2015, Walmart implemented store-specific thresholds but did not otherwise change its systems.........................................................................7

       D.    The facts included in Walmart's brief are not material to Plaintiffs' claims. ...............8

III.    STANDARD OF REVIEW ................................................................................9

IV.    ARGUMENT ......................................................................................................9

       A.    It is appropriate to enjoin Walmart from future illegal conduct, notwithstanding that Walmart temporarily stopped that conduct after Plaintiffs filed this lawsuit...........................................................................9

       B.    Walmart proximately caused Plaintiffs' injuries. .......................................... 10

       C.    Plaintiffs have offered significant evidence of Walmart's affirmative misconduct sufficient to raise a genuine issue of material fact on all claims. ........... 10

            1.    *A reasonable jury could find for Plaintiffs' on their claim for absolute nuisance because Walmart's conduct was intentional and unlawful.* ......................................... 11

            2.    *A reasonable jury could find for Plaintiffs' on their claim for negligence because Walmart wholly failed to monitor the distribution of dangerous, controlled substances.* ..................................................................................... 12

            3.    *A reasonable jury could find for Plaintiffs on their claim under ORC § 2307.60 because there is evidence that Walmart knowingly furnished opioids to others, causing serious harm.* ...................................................................... 13

            4.    *A reasonable jury could find that Walmart was unjustly enriched.*............................... 14

       D.    A jury could properly award punitive damages given Walmart's egregious conduct.................................................................................................. 15

V.    CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ability Ctr. of Greater Toledo v. Lumpkin,*
808 F. Supp. 2d 1003 (N.D. Ohio 2011) ................................................................................9

*Brown v. Scioto Cty. Bd. of Commrs.,*
622 N.E.2d 1153 (Ohio Ct. App. 1993) ...............................................................................11

*City of Cincinnati v. Beretta U.S.A. Corp.,*
768 N.E.2d 1136 (Ohio 2002) ..............................................................................................11

*Friends of Earth, Inc. v. Laidlaw Environ. Serv., Inc.,*
528 U.S. 167 (2000) ................................................................................................................9

*Hanrahan v. Mohr,*
905 F.3d 947 (6th Cir. 2018) ..................................................................................................9

*In re Firearm Cases,*
126 Cal. App. 4th 959 (Cal. Ct. App. 2005) ........................................................................12

*In re Nat'l Prescription Opiate Litig.,*
No. 1:17-CV-02804, 2019 WL 2477416 (N.D. Ohio Apr. 1, 2019) ....................................11

*Kolesar v. Allstate Ins. Co.,*
No. 1:19 CV 35, 2019 WL 2996047 (N.D. Ohio July 9, 2019) .............................................9

*Krlich v. Clemente,*
98 N.E.3d 752 (Ohio Ct. App. 2017) ....................................................................................11

*League of Women Voters of Ohio v. Brunner,*
548 F.3d 463 (6th Cir. 2008) ..................................................................................................9

*Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.,*
91 F. Supp. 3d 940 (S.D. Ohio 2015) ...................................................................................14

*Morgan v. New York Life Ins. Co.,*
559 F.3d 425 (6th Cir. 2009) ................................................................................................15

*Northland Family Planning Clinic, Inc. v. Cox,*
487 F.3d 323 (6th Cir. 2007) ..................................................................................................9

*People v. Arcadia Mach. & Tool, Inc.,*
2003 WL 21184117 (Cal. Super. Ct., Apr. 10, 2003) ..........................................................12

*Ramsey v. Del Monte Corp.,*
9 Ohio App. 3d 103 (Ohio Ct. App. 1983) ...........................................................................13

*United States v. Concentrated Phosphate Export Assn., Inc.,*
393 U.S. 199 (1968) ................................................................................................................9

*White v. Smith & Wesson,*
97 F. Supp. 2d 816 (N.D. Ohio 2000) ..................................................................................14

**Statutes**

21 U.S.C. § 823 .............................................................................................................................12

## I.     **INTRODUCTION**

Walmart employs more than 1.5 million people, by far the largest private employer in the United States. But for years, Walmart chose not to assign even one of those employees to design or operate a system to detect suspicious orders of controlled substances. The record evidence is clear: Walmart chose to do nothing while hundreds of thousands of people were dying. It waited until 2014 to *begin* to take meaningful action. By that time it was too late, and Walmart spent three more years attempting to create a workable system, ultimately recognizing that it could not adequately self-monitor its distribution of orders and turning to a third party to fulfill its statutory obligations.

Plaintiffs brought claims against Walmart because it chose not to do anything to identify suspicious orders for years. There are no facts in the record demonstrating that Walmart designed and maintained a system to identify such orders (required by law) because there was none. Indeed, while the DEA defines "suspicious orders" as those with "unusual size, frequency, or pattern." *Those words never even appear in Walmart's motion*. Walmart instead cites ostensible "controls against diversion" in its brief that have nothing to do with Plaintiffs' claims. These "controls" relate to physical plant security that protect Walmart from theft (not Cuyahoga and Summit County residents); they have nothing to do with stopping suspicious orders.

Against this damning backdrop and decades of jurisprudence culminating in *Masters*, Walmart's motion for summary judgment should be denied out of hand. First, Walmart argues that there is nothing to enjoin on Plaintiffs' statutory nuisance claim because it stopped distributing opioids after Plaintiffs filed this lawsuit, but it is black letter law that injunctive relief is appropriate when a defendant could restart wrongful conduct at any time absent such relief. This is particularly so where, as here, a defendant only stops wrongful conduct after plaintiffs file suit, and it distinguishes Walmart from the defendants who stopped their conduct prior to the inception of this litigation.

Second, Walmart argues that its conduct (lack of a compliant suspicious order monitoring program) did not truly "cause" Plaintiffs' injuries because Walmart's distribution in both Cuyahoga and Summit Counties "would qualify as a *de minimis* amount." Walmart Memorandun of Law in Support of Summary Judgment ("WMT Br."), Dckt. # 1794-4, at p. 3. This fabrication of the record is the cornerstone of Walmart's argument, and it crumbles under scrutiny, as Plaintiffs explain in their contemporaneously filed brief addressing causation for all Defendants.[1] In short, however, Walmart's misconduct was egregious, and the fact that it had a significantly larger percentage of the market in counties other than Cuyahoga and Summit does not mean that Walmart did not *also* injure Cuyahoga and Summit Counties. This case concerns Walmart's failure to properly monitor its distribution of controlled substances, not Walmart's market share. And Walmart does not cite a single case for the counterintuitive proposition that *some* wrongful opioid diversion is acceptable so long as the offending party does not have a large market share in a particular country.

Third, Walmart argues that Plaintiffs' claims fail because Walmart did not engage in any misconduct. But the evidence is strongly to the contrary: Walmart intentionally chose to do *literally nothing* to attempt to stop orders of unusual size, frequency, or pattern, presumably because properly controlling opioid distribution was too costly and would have limited Walmart's profits from opioids.

For these reasons, and as explained more fully below, Plaintiffs respectfully ask this Court to deny Walmart's motion in full because a reasonable jury could find for Plaintiffs on all counts.

---

[1] Walmart claims that Dr. McCann testified that a 1% marketshare would qualify as a "*de minimis*" amount in the context of distribution marketshare. That is wrong. Dr. McCann testified that 1% "returns" would be "*de minimis*." *See* Ex.1 Dr. Craig J. McCann Dep. (05-10-2019) (dep not cited in appendices), at 508:12-510:15. Indeed, in response to counsels' question as to whether "[i]n a data set as large as the one that [he] reviewed concerning the shipments of opioids into Cuyhoga and Summit County, [would he] consider de minimis to be 1 percent," Dr. McCann testified that "[he'd] have to think through the context a little bit. *But in some contexts 1 percent would be de minimis and in other contexts not.*" *Id.* In any event, there is no legal authority for the proposition that a 1% market share is a bar to liablity.

## II.    **STATEMENT OF RELEVANT FACTS**

Walmart operated licensed distribution centers that supplied its pharmacies with controlled substances from the early 2000s until 2018, when it ceased self-distributing controlled substances after being named as a defendant in this litigation. *See* Susanne Hiland Dep. (01-23-2019), Dckt. # 1962-31 at 276:4-14 ("Q. Remind me when Walmart decided to exit … self-distribution of Schedule II narcotics. … A. I don't know [when] the decision was made. We exited in April 2018 for C-IIs."). Before 2011, Walmart did not have any formal system in place to identify suspicious orders of controlled substances. *See* Ex. 2 ("WMT Response to Combined Discovery"). And while Walmart purportedly introduced a system that would identify suspicious orders of controlled substances in 2011, *see id.*, Walmart acknowledged in 2014 that it had "*no process in place*" to comply with government regulations and that this created the "severe" risk of "financial or reputational impact to the company." Ex. 3 (WMT_MDL_000048101); *see also* Ex. 4 (WMT_MDL_000048100) (Walmart PowerPoint noting "3rd party … products are not level across all Pharmacy [Distribution Centers]" that subjected Walmart to "potential DEA enforcement, which could include fines, penalties and license forfeiture…").

Indeed, *Walmart failed to identify or report a single suspicious order of controlled substances destined for Cuyahoga or Summit Counties prior to April 25, 2018. See* Ex. 2 (WMT Response to Combined Discovery) at 6 ("Walmart did not identify any suspicious order for the Relevant CII Opioids from a pharmacy in the Relevant Geographic Area during the Relevant Time Period."). And such orders certainly existed: Walmart shipped numerous suspicious orders to Cuyahoga and Summit Counties, choosing to ignore *all* of them. *See* Ex. 5 (Plaintiffs' Responses to the Amended and Clarified Discovery Ruling 12 Supplemental Interrogatory Issued to Plaintiffs) at Exhibit A (Cuyahoga) - Page 11.

**A.**   **Prior to 2011, Walmart did not have any formal procedure in place to monitor opioid distribution.**

Walmart has not produced a single document indicating that it had any procedures in place to monitor opioid distribution before 2011. Walmart, however, now claims that it instructed hourly associates responsible for filling orders at Walmart distribution centers to monitor those orders. *See* ECF No. 1796-4 ("Walmart Memorandum") at p.4.[2] According to Walmart, these associates would review forms and, based on their memories, if they happened to see "something that maybe looked like it was kind of high" they would let a supervisor know. Jeff Abernathy Dep (11-15-2018), Dckt. # 1956-1 at 24:15-25:6.

Walmart did not provide any guidance to teach these packing and shipping associates to determine if a shipment of dangerous narcotics was "maybe … kind of high." *See* Susanne Hiland Dep (01-22-2019), Dckt. # 1962-30 at 213:22-214:-24. Instead Walmart relied solely on their subjective judgment based on their "knowledge and experience" as people who boxed drug shipments. *Id.* at 51:19-52:13; 170:17-171:6; *see also* Abernathy Dep., Dckt. # 1956-1 at 24:15-25:6 ("[J]ust based on their knowledge of what they were doing."). And these shipping employees packed and shipped *many* orders: approximately 40,000 line items of controlled substances per day. *See* Ex. 6 (WMT_MDL_000006511); *see also* Ramona Sullins Dep. (01-04-2019), Dckt. # 1971-7 at 56:6 – 57:5.

Prior to 2011, moreover, there is no evidence that *any* employee *ever* flagged an order as suspicious. As such, during the pre-2011 time period Walmart completely failed to comply with its obligations under ther CSA.

---

[2] The evidence contradicts Walmart's claim to have had a "policy." *See* Abernathy Dep., Dckt. # 1956-1 at 42:19-43:5 ("Q. And Walmart, in 2010, had a policy in place where the folks who were responsible for picking the orders would also report to you if they saw anything suspicious? A. *I can't say that there was a policy stating that. They – they would just do that.*" (emphasis added)); *see also* Sullins Dep., Dckt. # 1971-7 at 51:6-61:14.

**B.** **From 2011 to 2015, Walmart instituted a system that would flag a handful of large orders, but it never reported any suspicious orders to the DEA.**

From approximately 2011 until approximately 2015, Walmart implemented what it called a monitoring program to flag certain very large orders of controlled substances. *See* Ex. 2 (WMT Responses to Combined Discovery); Hiland Dep., Dckt. # 1962-30 at 269:8-21; 270:7-17. In particular, it flagged orders of 5000 dosage units or more and orders of more than 2000 dosage units per week if those orders were 30% higher than a rolling 4-week average. *See id.* Orders under 2000 units per week, on the other hand, were never flagged: a pharmacy could order nearly 8000 units per month without ever alerting the system.

Even more problematically, if a pharmacy ordered more than 5000 units, Walmart would just reduce ("cut") the order to 5000 and ship it. *See* Abernathy Dep., Dckt. # 1956-1 at 80:2-20.[3] Walmart has stated that supervisor Jeff Abernathy was responsible for reporting suspicious orders to the DEA. *See* Hiland Dep., Dckt. # 1962-30 at 293:7-23. Mr. Abernathy, however, confirmed that he never reported cut orders to the DEA. *See* Abernathy Dep., Dckt. # 1956-1 at 152:14-15 ("Q: Did you report those orders [cut 50] to the DEA? A: I did not."). And while daily reports were sent from the Distribution Center to Walmart's headquarters in Arkansas (known as the "Home Office") there is no evidence that anyone at the Home Office ever reviewed even a single one of these reports, much less took any action concerning them. For example, the testimony of a Walmart supervisor who prepared reports for the Home Office acknowledged that he never recalls the Home Office reviewing or holding any order over the entire period. *See* Abernathy Dep., Dckt. # 1956-1 at 61:14-21; 122:24 -123:23; and 138:1-7.

---

[3] In mid-2012 Walmart implemented "hard limits." *See* WMT Responses to Combined Discovery. Under this formula, weekly orders of Oxycodone 30mg ("Oxy 30") were automatically reduced to 20 bottles (for example, a 40-bottle order was cut to 20 bottles). *See id.*

Setting aside that Walmart's internal monitoring was woefully inadequate, Walmart pharmacies could also order narcotics from third-parties without Walmart monitoring those orders. Abernathy Dep., Dckt. # 1956-1 at 254:2-10. This was especially problematic because a Walmart pharmacy could have orders fulfilled by both Walmart and a third-party at the same time. *See* Abernathy Dep., Dckt. # 1956-1 at 245:18-21 ("Q. Walmart had – was doing business with McKesson at the time, right? Its pharmacies were ordering from McKesson, right? A. Yes, sir."). In other words, a Walmart pharmacy could surpass Walmart's already high threshold simply by ordering opioids directly from McKesson.

Walmart's own documents concede that the above "system" did not comply with federal regulations. For example, in a 2013 "Controlled Substance Risk Assessment" presentation, Walmart admits that it still had not designed (much less operated) a compliant system for suspicious order identification, monitoring, and reporting. *See* Ex. 7 (WMT_MDL_000052997). It noted that the date that it *would* develop such a system was "TBD." *Id.* And in June 2014, Walmart acknowledged again that it lacked a compliant monitoring program. *See* Ex. 4 (WMT_MDL_000048100); Ex. 3 (WMT_MDL_000048101). And Walmart even permitted manufacturers to promote opioid products to its own Pharmacists under the guise of continuing education.[4]

In sum, while Walmart instituted a system that flagged *some* particularly large orders, it chose to ship those orders anyway (just in slightly lower quantities), never investigated those orders, did not bother to monitor orders from third parties, and never reported those orders to the DEA. And even when Walmart finally amended its written policies and procedures to require employees to hold

---

[4] *See, e.g.*, Ex. 10 (PKY180257493) (Walmart Pharmacy continuing education for pharmacists sponsored by Purdue Frederick – "New Trends in the Use of Opioids in Pain Management"); Ex. 11 (PKY180512514) (Check paid from Purdue to Dr. Strickland for presenting Walmart continuing education); Ex. 12 (PKY180512520) (Purdue Pharma providing funding for Walmart continuing education); Ex. 13 (PKY180640921) (Dr. Irick speaks at Walmart pain management program); Ex. 14 (PKY180794346) (Purdue invoice to cover Walmart "New Trends in Pain Management").

suspicious orders, *see* Ex. 2 (WMT Responses to Combined Discovery); *see also* Ex. 8 (WMT_MDL_000054651); Ex. 9 (WMT_MDL_000011107-11109), there is no evidence that Walmart actually ever followed this policy. In sum, Walmart's claim that it "leveraged its status as a self-distributor to develop an effective SOM program," *see* WMT Br., Dkt. 1796-4 at p. 4, is belied by the record evidence.

      **C.**      **In 2015, Walmart implemented store-specific thresholds but did not otherwise change its systems.**

In 2015 Walmart implemented store-specific thresholds. *See* Hiland Dep., Dckt. # 1962-30 at 312:7-18 (testify that beginning in 2015 thresholds were "store and item specific."). This post-2015 system was identical to the pre-2015 system other than the institution of store-specific thresholds. *See* WMT Responses to Combined Discovery. These thresholds were based on the standard deviation of a specific pharmacy's order history for each controlled substance. *See id.* But they continued to include minimum amounts below which *no orders were flagged under any circumstance* regardless of pattern or frequency. *See id.* Walmart's corporate designee explained that different limits were not implemented because they "didn't make sense for the business." Hiland Dep., Dckt. # 1962-30 at 403:24 - 404:5.[5] And the limits were high, nearly always remaining at 2000 dosage units per week. *See* Roxanne Reed Dep., Dckt. # 1970-5, at 74:24 – 75:11; *see also* Hiland Dep., Dckt. # 1962-30 at 313:1-13; 316:7-16; 320:4-12. This meant that a pharmacy could still, for example, go from ordering ten dosage units of Oxycodone 10 mg per month to 7999 per month without any order being flagged or reviewed.

---

[5] In other words, these thresholds were for the business, *not* "maintenance of effective controls against diversion . . . into other than legitimate . . . channels . . . ." 21 U.S.C. § 823(a)(1), (b)(1).

**D.** **The facts included in Walmart's brief are not material to Plaintiffs' claims.**

As indicated above, a jury could conclude that Walmart never had an appropriate system in place to identify and limit suspicious orders (defined by the DEA to include orders of unusual size, frequency, or pattern). Walmart does not point to any material facts supporting its design and maintenance of such a system. Indeed, as noted, above, the words "unusual size, pattern, and frequency" do not even appear in Walmart's motion. And what Walmart terms "controls against diversion" are immaterial and unsupported by the record.

First, Walmart's self-proclaimed "robust controls to prevent theft or loss of controlled substances … including alarms and 24/7 alarm monitoring, security cameras, limited and monitored access, and daily inventory checks," *see* WMT Br., Dkt. # 1796 at 4, are irrelevant. Whether "robust" or not, the described systems prevent theft from Walmart and have nothing to do with the identification and evaluation of suspicious orders. They have nothing to do with this litigation.

Second, Walmart's claims that the DEA or Verified Accredited Wholesale Distributors ("VAWD") somehow approved the above non-compliant SOM systems is wrong. The DEA does not certify SOM systems as compliant and "expects that each registrant will review its business model and design a [SOM] system that fits its designed method of distribution." *See* Thomas Prevoznik Dep. (4/17/19), Dckt. # 1969-12 at 179:22-180:15, 1177:15-19; *see also* Joseph Rannazissi Dep. (5/15/19), Dckt. # 1969-21 at 466:17-22.[6]

---

[6] Walmart's interactions with VAWD during the accreditation process amount to a tacit admission of non-compliance. As the process evolved to nominally reflect legal requirements, as opposed to industry trade group standards, Walmart sought delay in a desperate attempt to bring its SOM system in-line with VAWD. Ex. 15 (WMT_MDL_00007305) (notice of reaccreditation); Ex. 16 (WMT_MDL_000016690) (request for extension); Ex. 17 (WMT_MDL_000016632) ("*We received an extension from VAWD*, but no additional extensions will be provided. According to the note below, should we fail to respond by September 29th, *we may lose our accreditation*. . . . To meet this deadline, *we need to have alignment on the interim SOM processes as quickly as possible*. We are meeting with Jim on Wednesday, and we really need to come away from that meeting aligned and committed to a solution so that we *have time to implement the interim solution before our corporate visit*." (emphasis added)). Despite its clear relevance (as evidenced by Walmart's reliance here), Walmart refuses to add VAWD as a standalone search term in response to Special Master Cohen's ruling on Agenda Order No. 175.

## III.   STANDARD OF REVIEW

Summary judgment must be denied "if a reasonable jury could return a verdict for the nonmoving party[.]" *Kolesar v. Allstate Ins. Co.*, No. 1:19 CV 35, 2019 WL 2996047, at *2 (N.D. Ohio July 9, 2019) (Polster, J.) (citation omitted). In making this determination, "the court must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party." *Id.* (citation omitted).

## IV.   ARGUMENT

### A.   It is appropriate to enjoin Walmart from future illegal conduct, notwithstanding that Walmart temporarily stopped that conduct after Plaintiffs filed this lawsuit.

Walmart argues that Plaintiffs' request for injunctive relief is moot because it voluntarily stopped distributing opoids and thus bears a "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of Earth, Inc. v. Laidlaw Environ. Serv., Inc.*, 528 U.S. 167, 170 (2000) (internal quotation marks omitted); *see also, e.g.*, *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008); *Ability Ctr. of Greater Toledo v. Lumpkin*, 808 F. Supp. 2d 1003, 1014 (N.D. Ohio 2011) (Carr, J.). Indeed, it is extremely well-established that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case[.]" *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968); *see also, e.g.*, *Brunner*, 548 F.3d at 473; *Ability Ctr.*, 808 F. Supp. 2d at 1014; *cf. Hanrahan v. Mohr*, 905 F.3d 947, 961 (6th Cir. 2018) (noting that this general rule is relaxed for governmental defendants). Walmart's already high burden, moreover, is "'increased by the fact that the voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed.'" *Ability Ctr.*, 808 F. Supp. 2d at 1014 (quoting *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342-43 (6th Cir. 2007)).

Walmart has not made any attempt to carry its "formidable burden of showing" that it will never distribute opioids in Cuyahoga or Summit Counties in the future. And the cases that it references for the proposition that Plaintiffs' claims are moot involved defendants that admitted wrongdoing and affirmatively took steps to remedy the challenged conduct. In this case, Walmart claims that it did nothing wrong by distributing opioids without any system in place to determine whether orders were legitimate, and there is nothing that stops Walmart from resuming its wrongful, publicly injurious conduct without injunctive relief from this Court.

**B.** **Walmart proximately caused Plaintiffs' injuries.**

Plaintiffs adopt and incorporate their contemporaneously filed brief addressing causation for all defendants, which explains why Walmart's causation arguments are misplaced. In short, however, an Ohio plaintiff need only show that a defendant's wrongful conduct caused some harm and was a substantial factor in causing that harm. To make this showing, a plaintiff may rely both on: (1) the inference that a defendant's misconduct was the cause of the plaintiff's harm where the injury to plaintiff was the type of injury that defendant's conduct would be expected to cause; and (2) aggregate proof through the testimony of experts employing scientifically valid and reliable methodologies. The injuries caused by diverted opioids are precisely the harms that would be expected to flow from Walmart's nonexistent (later inadequate) SOM system, and experts have demonstrated this causal connection with rigorous statistical analysis of aggregate evidence.

**C.** **Plaintiffs have offered significant evidence of Walmart's affirmative misconduct sufficient to raise a genuine issue of material fact on all claims.**

Walmart argues that it did not engage in the underlying misconduct necessary for a reasonable jury to find for Plaintiffs on their claims. This argument fails factually and legally. It fails factually because, as explained above, Plaintiffs have presented substantial evidence of Walmart's intentional misconduct: (1) Walmart had *no* system in place to monitor opioid distribution prior to 2011; (2) Walmart apparently chose not to stop even a single order even after it instituted a

monitoring system; and (3) Walmart's own documents acknowledge that when it did institute a system, that system was woefully inadequate. And it fails legally because many of Walmart's arguments are simply a retread of the very same arguments that this Court squarely rejected when addressing Walmart's (and others) motion to dismiss Plaintiffs' complaint. Indeed, just as Walmart incorporates its arguments from the motions to dismiss into this brief, Plaintiffs incorporate theirs in response.

> ### 1. A reasonable jury could find for Plaintiffs' on their claim for absolute nuisance because Walmart's conduct was intentional and unlawful.

In Ohio, a party may prove absolute nuisance by showing any of three different types of wrongful conduct:

(1) an intentional act resulting in harm;

(2) an act involving unlawful conduct causing unintentional harm; or

(3) an ultrahazardous activity resulting in accidental harm.

*See Krlich v. Clemente*, 98 N.E.3d 752, 763 (Ohio Ct. App. 2017) (O'Toole, J., concurring); *see also, e.g., Brown v. Scioto Cty. Bd. of Commrs.*, 622 N.E.2d 1153, 1158-1159 (Ohio Ct. App. 1993); *cf. In re Nat'l Prescription Opiate Litig.,* No. 1:17-CV-02804, 2019 WL 2477416, at *15 (N.D. Ohio Apr. 1, 2019) (Ruiz, MJ) (denying motion to dismiss a claim for absolute nuisance under Montana law). Walmart is likely to be found liable under both of the first two theories.[7]

First, Walmart's statement that it did not engage in intentional misconduct is belied by the extensive record evidence showing that Walmart deliberately chose not to create any reporting

---

[7] This case cannot be meaningfully distinguished from *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1140 (Ohio 2002). In that case, the Ohio Supreme Court rejected the gun industry's arguments that their conduct, which the city alleged "ensure[d] the widespread accessibility of the firearms to prohibited users . . . [and thereby] fostered the criminal misuse of firearms," cannot form the basis of an actionable public nuisance claim, ruling that "the city should be permitted to bring suit against the manufacturer of a product under a public-nuisance theory, when, as here, the product has allegedly resulted in widespread harm and widespread costs to the city as a whole and to its citizens individually." *Id.* at 1142 (internal quotation omitted).

system at all until 2011, chose not to report any orders to the DEA, chose to cut and ship large orders without reporting same to the DEA, chose not to stop the shipment of *any* orders, and, for the overwhelming majority of the time, apparently never even investigated an order. The fact that Walmart did not engage in *additional* misconduct by distributing directly to pill mills is irrelevant.

Second, Walmart's argument that it could not have acted unlawfully because it complied with certain state and federal regulations is off-point: this is a case about the laws that Walmart chose to ignore. In particular, Walmart wholly failed to institute "maintenance of effective controls against diversion . . . into other than legitimate . . . channels . . . ." required by 21 U.S.C. § 823(a)(1), (b)(1).

Finally, Walmart's argument that it could not have contributed to a public nuisance because Plaintiffs do not allege that its pharmacies did anything wrong misses the point and should be stricken. Pharmacy misconduct is not part of this case, and the Court accepted Walmart's position that Plaintiffs were prohibited from taking discovery of individual Walmart's pharmacies.[8]

### 2. A reasonable jury could find for Plaintiffs' on their claim for negligence because Walmart wholly failed to monitor the distribution of dangerous, controlled substances.

Given that a reasonable jury could find that Walmart engaged in wrongful, intentional misconduct constituting an absolute public nuisance, there should be little question that the same jury could also find that Walmart was negligent for the same reasons. Here, Walmart's argument is not supported by the law. First, Walmart's reliance on *In re Firearm Cases*, 126 Cal. App. 4th 959 (Cal. Ct. App. 2005) is incorrect because it is not the law in Ohio and "is not a negligence case," *People v. Arcadia Mach. & Tool, Inc.*, 2003 WL 21184117, at *17 (Cal. Super. Ct., Apr. 10, 2003). And unlike in

---

[8] Plaintiffs respectfully note that Walmart's pharmacies are fertile ground for discovery. Indeed, documents produced by other defendants, Purdue in particular, demonstrate that Walmart's Home Office encouraged its pharmacists to meet with those pushing opioids. Plaintiffs' will seek pharmacy level discovery in future case tracks for this reason.

*In re Firearm Cases*, Plaintiffs in this case presented substantial evidence that Walmart engaged in "high-risk" acts by failing to implement a compliant SOM program.

Walmart's resort to a personal injury case involving a catsup bottle, *Ramsey v. Del Monte Corp.*, 9 Ohio App. 3d 103, 106 (Ohio Ct. App. 1983), also misses the mark. That case explains that "mere possession and sale of a product [the catsup bottle] . . . are alone insufficient to permit even an inference of negligence." Of course, this is not about "mere possession … alone" of opioids, but Walmart's choice to engage in extraordinarily high-risk activities by failing to monitor its opioid distribution. And it is certainly foreseeable that wholly failing to monitor your distribution of dangerous controlled substances will help create a black market for those substances.

One final point. Out of an abundance of caution, Plaintiffs also note that Walmart's record citations are even more off-point: it is irrelevant that particular witnesses did not have personal knowledge of Walmart's woefully inadequate systems for monitoring opioid distribution or that law enforcement was unaware of those inadequate systems. What matters is simply that a reasonable jury could find Walmart negligent.

### 3. A reasonable jury could find for Plaintiffs on their claim under ORC § 2307.60 because there is evidence that Walmart knowingly furnished opioids to others, causing serious harm.

Walmart's arguments about ORC § 2307.60 also miss the mark. First, Walmart contends that it is protected from liability by ORC § 2925.02(B), which protects pharmacies whose conduct is in accordance with the law. But Walmart's conduct was *not* in accordance with the law. To the contrary, as explained in the facts section and Plaintiffs' motion for summary judgment, Walmart wholly violated regulations requiring them to maintain a functional SOMS policy. Walmart had no policy at all before 2011, and any subsequent policy did not did not prevent *any* shipments. Walmart's complete failure to monitor its opioid distribution, moreover, violated the Controlled Substances Act.

- 13 -

Second, Walmart asserts baldly that there is no record evidence showing that it knowingly furnished opioids to others, causing harm or to become drug dependent, but that is incorrect. To the contrary, the record evidence shows that Walmart intentionally chose not to implement *any* system for monitoring opioid distribution for years, contributing to the opioid crisis.

### 4.  A reasonable jury could find that Walmart was unjustly enriched.

Walmart attempts to resuscitate the argument from the Defendants' motion to dismiss that because Walmart did not receive a benefit from Plaintiffs directly, it was not unjustly enriched. But as this Court previously acknowledged, that is not the law.

Contrary to Walmart's argument, "[u]njust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss." *White v. Smith & Wesson*, 97 F. Supp. 2d 816, 829 (N.D. Ohio 2000) (Nugent, J.) (Ohio law). In *White*, the court held that a plaintiff paying for "the Defendants' externalities—the costs of the harm caused by [their] failure to incorporate safety devices into their handguns and negligent marketing practices"—conferred a benefit on Defendants and stated a claim for unjust enrichment. *Id.*; *see also Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.*, 91 F. Supp. 3d 940, 986 (S.D. Ohio 2015) (plaintiff whose property was used as a dumping site may plead unjust enrichment because "it would be unjust to allow Defendant to benefit from disposal of waste on a plaintiff's property without payment of any kind."). Indeed, the Court has already rejected Walmart's arguments regarding unjust enrichment, explaining that Plaintiffs "confeered a benefit upon all Defendants by … [paying] for the cost of harm caused by the defendant's conduct, i.e. the defendant's externalities." Dckt. No. 1025, Report and Recommendation re Motions to Dismiss.

In this case, Walmart's wrongful conduct by distributing opioids without apropriate controls forced the Plaintiffs to spend more on increased healthcare services and addiction treatment for opioid users. *See e.g.*, Report of Professor David Cutler, Dckt. # 2000-4 and Report of Professor

Jonathan Gruber Dckt., # 2000-6. These costs should be paid by Walmart (and other Defendants) who caused them.

###### D.    A jury could properly award punitive damages given Walmart's egregious conduct.

The Sixth Circuit has explained that punitive damages are appropriate under Ohio law when a plaintiff proves that the defendant acted with "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 440 (6th Cir. 2009) (citation omitted). There should be little question that a jury could properly reach such a conclusion here because, before 2011, Walmart had *no system in place at all* to monitor opioid distribution. And the ostensible system that it ultimately put in place was so wildly deficient that Walmart has *never* identified, investigated, or reported even a single order of controlled substances in Cuyahoga or Summit Counties. A jury could properly conclude that there is a simple reason for this: Walmart had absolutely no desire to uncover such orders, thereby demonstrating a "conscious disregard for the rights and safety of other persons . . . ." *Morgan*, 559 F.3d at 440.

## V.    CONCLUSION

Plaintiffs respectfully ask the Court to deny Walmart's motion for summary judgment.

Dated: July 31, 2019                    Respectfully submitted,

/s/Paul J. Hanly, Jr.
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

/s/ Joseph F. Rice
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000

- 15 -

(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

/s/ Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY 10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

1806142.5

*On Brief for the Plaintiffs' Executive Counsel:*

*/s/ Paulina do Amaral*
Elizabeth Cabraser
Paulina do Amaral
Jason L. Lichtman
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Flr.
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

James E. Cecchi
Donald A. Ecklund
Zach Bower
Michael A. Innes
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel: 973-994-1700
Fax: 973-994-1744

Louis Bograd
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450