## *In re National Prescription Opiate Litigation*:  MDL 2804
## Summary Sheet of Concise Issues Raised

**Opposition Name:**  Plaintiffs' Memorandum in Opposition to Allergan Defendants' Motion for Summary Judgment

**Opposing Parties:**  Plaintiffs Summit County and Cuyahoga County

*Issue 1*:  Have the Allergan Defendants shown there is no triable issue of fact as to the moving entities' involvement in the alleged false marketing and SOMS violations?

*Answer*.  No.  Consistent with prior motion practice, movants attempt to use their corporate history of mergers, acquisitions, and tax inversions to slough off liability.  But the evidence shows that movants and their direct predecessors created and managed the deficient SOM protocols that enabled the distribution of 26.5 billion opioid pills nationally from 2006-2012. The evidence supports that Allergan deliberately failed to heed the warnings of the DEA who, according to Allergan employees, treated them like "street dealers" when criticizing their astronomical distribution of movants' opioids which substantially impacted Ohio. The evidence also shows that the movants here were engaged in the false marketing.  Allergan used its branded sales force, who were trained with false and misleading messaging regarding opioids, not only to market its branded drugs but also to market its generics.

*Issue 2*:  Do Plaintiffs need to pierce the corporate veil to reach movants?

*Answer*.  No.  It is wholly unnecessary to pierce the corporate veil here because the evidence shows that the movants themselves, including the Irish parent corporation Allergan plc, were involved in the alleged misconduct.  If piercing were required (which it is not), the evidence supports a showing of the inseparability of the parent corporation with its subsidiaries and their mutual control over one another as well as their failure to abide by the necessary corporate formalities. The evidence also shows that it was the parent corporation that received the $33.75 billion in cash plus stock for the sale of the generic entities, and yet the Allergan Defendants have concealed the flow of these funds throughout the company.  Moreover, summary judgment on this basis would be improper because the Allergan Defendants have not responded to highly probative discovery served.

*Issue 3*:  Did Teva assume liability for movants' alleged wrongdoing related to generic opioids?

*Answer*.  No.  First, it is clear Teva did not assume liability for the movants' own misconduct related to generic opioids discussed above.  Second, the extent to which Teva assumed liability for the transferred generic entities' actions appears subject to dispute between Teva and Allergan.  Plaintiffs should not bear responsibility for resolving that apparent dispute.[1]

**Filing Date:**  June 28, 2019

**Response Date:**  July 31, 2019

**Reply Date:**  August 16, 2019

---

[1]    The remaining issues – whether Plaintiffs can show causation or conspiracy, and whether Plaintiffs claims against movants are time barred – are addressed primarily in other briefs filed by Plaintiffs.

4838-5013-5710.v1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | No. 1:17-md-2804 |
| | ) | Judge Dan A. Polster |
| This Document Relates To: | ) ) | |
| TRACK ONE CASES. | ) ) ) | |

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
ALLERGAN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ....................................................................................................1

II.     PLAINTIFFS' COUNTER-STATEMENT OF UNDISPUTED FACTS
        RELATED TO ALLERGAN'S CONVOLUTED MERGER HISTORY .........................4

        A.      Allergan's Corporate History and the Movants' Identities .........................4

        B.      2016 Sale of Actavis Generic Entities and Subsequent Indemnification ..................7

III.    THE EVIDENCE WARRANTS DENIAL OF SUMMARY JUDGMENT......................8

        A.      Plaintiffs Adduced Evidence Showing that the Allergan Entities Themselves
                Engaged in the Alleged Marketing and Diversion Violations ....................................8

                1.      Evidence Shows that the Allergan Entities Themselves Are Directly
                        Liable for Their Inadequate SOMS Protocols and Failure to Prevent
                        Diversion ....................................................................................................8

                2.      Evidence Shows that the Allergan Entities Themselves Engaged in
                        False Marketing...........................................................................................12

                3.      Evidence Shows that the Allergan Entities Themselves Worked with
                        Other Defendants and Third Parties in Non-Branded Activities ................13

        B.      Although Unnecessary, Evidence Shows that Plaintiffs Can Pierce the
                Corporate Veil; Alternatively, Plaintiffs Should Be Entitled to Additional
                Discovery Pursuant to Rule 56(d)...........................................................................15

        C.      Teva Did Not Indemnify Allergan for Its Own Actions ...........................................19

IV.     CONCLUSION.....................................................................................................19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Flaugher v. Cone Automatic Mach. Co.*,
507 N.E.2d 331 (1987)..................................................................................................19

*Graf v. Resilience Capital Partners, LLC*,
2013 WL 12110251 (N.D. Ohio Nov. 26, 2013)...................................................18

*Hitachi Med. Sys. Am., Inc. v. Branch*,
2011 WL 3921718 (N.D. Ohio Sept. 7, 2011)......................................................15

*Minno v. Pro-Fab, Inc.*,
905 N.E.2d 613 (Ohio 2009) ................................................................................15

*Music Express Broad. Corp. v. Aloha Sports, Inc.*,
831 N.E.2d 1087 (Ohio Ct. App. 2005)................................................................15

*Plaskon Elec. Materials, Inc. v. Allied-Signal, Inc.*,
904 F. Supp. 644 (N.D. Ohio 1995)......................................................................19

*Welco Indus., Inc. v. Applied Cos.*,
617 N.E. 2d 1129 (Ohio 1993) ........................................................................8, 10

## STATUTES, RULES AND REGULATIONS

Controlled Substances Act ("CSA"),
21 U.S.C. §801, *et seq.*............................................................................11, 13

Racketeer Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. §1961, *et seq.*......................................................................3, 13, 15

Federal Rules of Civil Procedure
Rule 12(b)(2)..........................................................................................................5
Rule 30(b)(6)......................................................................................................9, 11
Rule 56(d) .........................................................................................................15, 18

Plaintiffs submit the following brief in opposition to the Allergan Defendants' Individual Motion for Summary Judgment (Dkt. #1776) ("Allergan Mem."). Movants Allergan plc, Allergan Finance, LLC ("Allergan Finance"), Allergan Sales, LLC ("Allergan Sales"), and Allergan USA, Inc. ("Allergan USA") (collectively, "Allergan") contend that they are not liable for any alleged wrongdoing concerning generic opioids because it was undertaken by other entities; that they are not liable for any wrongdoing relating to branded opioids because Plaintiffs cannot show proximate causation, contribution to public nuisance, or membership in any conspiracy; and that all such claims are time-barred. But Allergan's contention ignores evidence contrary to each of those positions: Allergan and its direct predecessors were intimately involved in the marketing and distribution of generic opioids, contributed to Plaintiffs' injuries and the public nuisance afflicting them, and were members of the Opioid Supply Chain Enterprise; and the claims against them are not time barred. Because Plaintiffs have more than adequately raised a genuine issue of material fact as to Defendants' liability, Allergan's Motion should be denied.

## I.  INTRODUCTION

According to newly-public ARCOS data produced in this action, Actavis Pharma, then owned and operated by Allergan's predecessors, was the second-biggest prescription opioid manufacturer nationally for the time period 2006 through 2012, having sold *26.5 billion* opioid pills and generating a 34.6% market share.[1] Actavis sold more than REDACTED morphine milligram equivalent units – more than REDACTED – of all prescription opioids sold in Summit and Cuyahoga Counties ("CT1") between 2006 and 2014.[2]

Allergan asserts it has no liability for any of the opioids at issue. Allergan contends, first, that Plaintiffs must pierce the corporate veil to demonstrate its liability, and second, that Plaintiffs cannot do so, but it is wrong on both counts. It was Allergan, then operating under different names, that was

---

[1]  Ex. 1.
[2]  Second Supplemental Report of Craig J. McCann, Ph.D., CFA, Dkt. #2000-16 at 4.

responsible for the opioid marketing – brand and generic – that is the subject of this litigation; and it was Allergan that chose to centralize its deficient suspicious order monitoring system ("SOMS") protocols. As set forth in the Rafalski Report, Allergan chose to implement deficient SOMS protocols and therefore failed to prevent diversion.[3] According to the employees responsible, the SOMS protocols "d[id] a lousy job"[4] and were "not consistent with specific requirements within the regulations and guidance."[5] "For example," one wrote, "if a customer's monthly usage is 3000 units – they can order 2999 units every day of the month and it would not be caught."[6] Indeed, despite **billions** of opioids sold, Allergan's predecessors reported only **four** suspicious orders to the DEA.[7]

While Allergan contends that it jettisoned liability for its Actavis generic opioid subsidiaries when it sold them to Teva in 2016, the indemnification provision only covers acts by the generic Actavis subsidiaries. The overwhelming weight of the evidence demonstrates that Allergan plc, Allergan Finance, and their predecessors themselves created and operated their own deficient SOMS and participated in the false marketing of generic drugs. Regardless of which entity prevails in the indemnification dispute between Teva and Allergan, the movants' actions are not covered by that provision.[8] Similarly, even though Plaintiffs need not pierce the corporate veil, the evidence creates a basis for piercing here. As Plaintiffs' expert, Professor Marc I. Steinberg, opines, "legitimate and material factual questions exist with respect to the liability of Allergan plc as well as the propriety of veil piercing regarding Allergan plc and its subsidiaries."[9]

Allergan also asserts it is entitled to summary judgment on proximate causation, public nuisance, conspiracy, and statute of limitations grounds, referring the Court to Defendants' omnibus summary

---

[3]     Report of James E. Rafalski, Dkt. #2000-22, §IV.A. (Allergan).
[4]     Ex. 2 (ALLERGAN_MDL_02128035) at 035.
[5]     Ex. 3 (ALLERGAN_MDL_024689882) at 987-989.
[6]     Ex. 2 (ALLERGAN_MDL_02128035).
[7]     Ex. 4 (Allergan's Supp. Resps. to Plaintiffs' 4th Set of Interrogatories) at 12-14.
[8]     Concerning the additional liability of the Actavis generic opioid subsidiaries, the full extent to which the indemnification provision applies is likely to be disputed by both Allergan and Teva at some later date; it is not incumbent on Plaintiffs to sort that out here and now.
[9]     Ex. 42 (Expert Witness Report of Marc I. Steinberg ("Steinberg Rpt.")) at 22.

judgment motions.  Plaintiffs also address these issues primarily in their responses thereto.[10]  Evidence shows that Allergan falsely and misleadingly marketed the brand opioid Kadian.  Indeed, while the FDA warned Allergan that two of its Kadian promotional pieces contained false and misleading information, *every* one of the print documents Allergan used to promote Kadian contained false and misleading information.[11]  Even after Allergan withdrew these promotional materials, it continued to train the sales force responsible for selling not just Kadian, but also generic Kadian and generic Opana ER, with false information about opioids.[12]  Among other things, sales representatives responsible for detailing doctors were instructed, in an ersatz textbook complete with a take-home assessment, that "[f]ear of addiction to opioids remains a major obstacle to effective treatment for pain," and opioid treatment of chronic pain "often fails because the patient is not given a high enough dose of medication."[13]

Evidence also shows that Allergan's other brand opioid, Norco, was so widely diverted that it had the street name "Watson" – the name of the Allergan predecessor that brought the drug to market – and that the DEA blamed it for a "diversion wave."[14]  Nor was the association between Allergan's predecessors' opioids and street use limited to Watson; another predecessor, Actavis, was "frequently associated in social media, online message boards, and markets with inappropriate use and questionable distribution" of oxycodone; and its name was adopted by "performers such as 'DJ Actavis,' songs such as 'Cream Soda and Actavis,' and at least one apparent distribution company, 'Actavis Music.'"[15]

---

[10]  *See* Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication of Defendants' Duties Under the Controlled Substances Act ("CSA – Duties"); Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Adjudication that Defendants Did Not Comply with Their Duties Under the Federal Controlled Substances Act to Report Suspicious Opioid Orders and Not Ship Them (Corrected) ("CSA – Compliance"); Motion of Plaintiffs Cuyahoga and Summit Counties for Partial Summary Adjudication of Their Equitable Claims for Abatement of an Absolute Public Nuisance ("Plfs' Nuisance MSJ"); Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Proof of Causation ("Causation Opp."); Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgment on Plaintiffs' Civil Conspiracy, RICO and OCPA Claims ("RICO/Conspiracy Opp."); Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Statute of Limitations Grounds ("SOL Opp."); Plaintiffs' Memorandum in Opposition to "Generic Manufacturers" Motion for Partial Summary Judgment ("Generics Opp.").
[11]  Ex. 6 (ALLERGAN_MDL_01396751) at 751-752.
[12]  Ex. 7 (Allergan-Altier-002) at 549-551.
[13]  *Id.*
[14]  Ex. 8 (Allergan-Napoli-008).
[15]  Ex. 9 (ALLERGAN_MDL_00377916).

In addition, the evidence unequivocally shows that Allergan's false messaging and deficient SOMS program affected Summit and Cuyahoga Counties.  Allergan reached out to Ohio specifically, targeting doctors in CT1 jurisdictions with marketing materials for generic opioids.[16]  Diversion of Allergan's generic oxycodone was so prevalent that the DEA held a three-hour meeting with Allergan's predecessors, at which, according to representatives present, it treated them like "street dealers" whose effects were being felt in Ohio.[17]  This evidence and more is sufficient to create material issues of fact concerning claims against Allergan.

As it has throughout this litigation, Allergan continues to assert that Plaintiffs have fingered the wrong actor, supporting their argument by an extended game of three-card monte.  But at each juncture – repeatedly during discovery, in response to Allergan's motion to dismiss for lack of personal jurisdiction, and now at summary judgment – Plaintiffs have marshaled evidence showing Allergan's role in the opioid crisis nationally and in Cuyahoga and Summit Counties.  Allergan's game must now end. Evidence demonstrates triable issues of fact; Allergan must make its case to the jury.[18]

## II.    PLAINTIFFS' COUNTER-STATEMENT OF UNDISPUTED FACTS RELATED TO ALLERGAN'S CONVOLUTED MERGER HISTORY

Allergan's primary means of attempting to avoid liability is based on a game of corporate sleight of hand.  The below explication of Allergan's convoluted merger history demonstrates that, despite years of reshuffling, liability still rests with movants based on their own bad acts.

### A.    Allergan's Corporate History and the Movants' Identities[19]

Movant **Allergan plc** (known until March 17, 2015 as Actavis plc and referred to herein as the "PLC") maintains its administrative headquarters in New Jersey.[20]  It was created in 2013 when Actavis,

---

[16]    Ex. 10 (Allergan-Myers-015) at 369, 377 (targeting top 10,000 national Opana prescribers for introduction of generic oxymorphone; the top and fourth-top prescribers were from Cleveland).

[17]    Ex. 11 (US-DEA-00000001) at 001, 003; Ex. 12 (Clarke Tr.) at 89:17-90:2.

[18]    Allergan also moves for summary judgment on the ground that it is not liable for Alpharma's activities related to the marketing and sale of Kadian.  Allergan Mem., §II.  Plaintiffs have never made that allegation.

[19]    The following corporate history is provided in reverse chronological order, from present to the relevant origins of the moving Allergan entities.  Because of the confusion caused by the Allergan entities' numerous mergers, acquisitions, and name changes, the movants' identities – both their former and current operating names – are bolded in this section.

Inc. bought Warner Chilcott plc.[21]  The PLC asserts that because it is incorporated in Ireland, it is beyond the reach of this Court,[22] but the evidence demonstrates that the PLC has always maintained its administrative headquarters in New Jersey and never left the United States.[23]  As Paul Bisaro, the PLC's first CEO, said at its creation, "[e]verybody loves New Jersey too much, so nobody is willing to go."[24]

When it was created in 2013, the PLC described itself as "a leading integrated global specialty pharmaceutical company engaged in the development, manufacturing, marketing, sale and distribution of generic, branded generic, brand name . . . pharmaceutical products."[25]  It identified the generic opioids "fentanyl transdermal system" (generic Duragesic), "hydrocodone bitartrate/acetaminophen" (generic Norco), and "morphine sulfate" (generic Kadian) as among its "key products" and the opioid drug Kadian as among its key "brand pharmaceutical product families."[26]  In 2016, the PLC sold off its generic drug business, including all of its generic opioid drugs, to Teva.[27]  In 2018, the last year for which figures are available, more than 77% of the PLC's net revenues came from the United States, including $3.6 billion (approximately 23% of the total worldwide revenue) from a single customer headquartered in Ohio: defendant Cardinal Health.[28]

The PLC owns movant **Allergan Sales**, an American company incorporated in Delaware.[29]  Even though it is a wholly-owned subsidiary of the PLC, Allergan Sales employs the PLC's executive

---

[20]  Ex. 13 (Allergan-Kaufhold-013) at 4.
[21]  Ex. 14 (Allergan-Kaufhold-011) at 3.
[22]  *See generally* Plaintiffs' Memorandum of Law in Opposition to Defendant Allergan plc's Motion to Dismiss Pursuant to Rule 12(b)(2) for Lack of Personal Jurisdiction (Dkt. #1823, "Plaintiffs' Opposition to the PLC's Motion to Dismiss"), incorporated herein.
[23]  *See id.*
[24]  Ex. 15 (Allergan-Kaufhold-015) at 1.
[25]  Ex. 14 (Allergan-Kaufhold-011) at 3.
[26]  Ex. 14 (Allergan-Kaufhold-011) at 10, 12.
[27]  Ex. 16 (Aug. 2, 2016 press release).
[28]  Ex. 17 (2018 Form 10-K) at 10, 12.
[29]  Ex. 18 (ALLERGAN_MDL_04450023) at 028.

officers,[30] and a confidential "Management Service Agreement" puts Allergan Sales and another subsidiary in charge of making all the executive, strategic, and other plans for the PLC.[31]

Movant **Allergan USA**, incorporated in Delaware and headquartered in Madison, New Jersey, is also a wholly-owned subsidiary of the PLC.[32]  According to the PLC, Allergan USA and Allergan Sales are currently the "subsidiaries that sell the Allergan Opioids Products identified in the Complaints in the United States."[33]

Movant **Allergan Finance** is the top domestic entity for Allergan and was previously known as Actavis, Inc. and, before that, Watson Pharmaceuticals, Inc. ("Watson").[34]  On October 31, 2012, Watson merged with Actavis Group,[35] and the combined companies took the name Actavis, Inc., becoming the third-largest global generics pharmaceutical company.[36]  Before the merger, Watson had marketed the brand name opioid drug Norco, as well as generic opioids, including fentanyl, hydrocodone, morphine sulfate, oxycodone, and oxymorphone, while Actavis Group marketed the opioid drug Kadian (purchased from Alpharma in 2008), as well as generic opioids including fentanyl, hydrocodone, morphine, oxycodone, and oxymorphone.[37]

According to counsel for Allergan, movants Allergan Finance, Allergan Sales, and Allergan USA "owned, manufactured, distributed, monitored, or sold one or more of the opioid medicines at issue" in this action.[38]  The graphic below reflects movants' place in the lineage of Allergan-related entities:

---

[30]  Ex. 19 (Kaufhold Tr.) at 95:24-96:9; *see id.* at 23:7-10 (Allergan plc does not maintain its own tax group separate from Allergan Sales).

[31]  Ex. 20 (ALLERGAN_MDL_04451501) at 514; *see generally* Plaintiffs' Opposition to the PLC's Motion to Dismiss.

[32]  Ex. 18 (ALLERGAN_MDL_04450023) at 028.

[33]  Ex. 21 (PLC's Resps. to Plaintiffs' 1st Set of Interrogatories) at 9.  Notably, because Allergan plc has consistently held the position that only the opioids Norco and Kadian are "identified" in Plaintiffs' operative complaint (which is untrue), because Allergan plc answered the interrogatory in the present tense, and because, as set forth below, Allergan plc sold its generic opioid portfolio in a transaction that closed in 2016, Allergan plc did not identify in the response its subsidiaries that marketed or sold any of the ***generic*** opioids until that transaction closed.  This was pure gamesmanship, causing significant delay and obfuscation in discovery.

[34]  Ex. 22 (Allergan-Kaufhold-014) at 3-4.

[35]  Consistent with the Allergan entities' use of the corporate form to obfuscate, not clarify, the entities comprising Actavis Group were not defined; *see* Ex. 23 (Allergan-Kaufhold-007) at 3-4.

[36]  Ex. 23 (Allergan-Kaufhold-007) at 3-4.

[37]  Ex. 24 (ALLERGAN_MDL_01149655) ("Total Combined RX List"); Ex. 25 (Allergan-Snyder-007) at pdf 28-29; Ex. 26 (Allergan-Myers-020).

[38]  Ex. 27 (Mar. 11, 2019 letter from D. Welch) at 2.

4829-4424-7453.v1



## B.    2016 Sale of Actavis Generic Entities and Subsequent Indemnification

On July 26, 2015, the PLC entered a Master Purchase Agreement to sell its generic portfolio of business, including its generic opioid drugs, and the subsidiaries that made them (the "Actavis Generic Entities") to Teva Pharmaceutical Industries Ltd ("Teva").[39]  On August 2, 2016, Teva paid $33.3 billion in cash and 100.3 million unregistered Teva shares that, at the time of closing, approximated $5.0 billion in value at a 5.9% discount due to the lack of present marketability.[40]  The Actavis Generic Entities comprised certain, but not all, subsidiaries formerly part of the Actavis Group and Watson.[41]

On January 31, 2018, Allergan plc and Teva entered into a "Settlement Agreement and Mutual Releases" (the "Indemnification Agreement") that, as relevant here, provides Teva "shall assume, and shall be or become responsible for" the liabilities or losses based on generic opioids it purchased from the PLC "to the extent such Liabilities, Losses or Claims are based on parent or control liability or a substantially similar theory in connection with any Proceeding involving (1) a member of the Transferred Group and (2) a Product or the Business."[42]

---

[39]    Ex. 28 (ALLERGAN_MDL_SUPP_00000174).
[40]    Ex. 22 (Allergan-Kaufhold-014) at 3.
[41]    For example, Allergan accepts that it is liable for actionable wrongdoing concerning Kadian (formerly marketed and sold by Actavis Group) and Norco (formerly marketed and sold by Watson).
[42]    Ex. 29 (Indemnification Agreement) at 3.

- 7 -

### III.    THE EVIDENCE WARRANTS DENIAL OF SUMMARY JUDGMENT

**A.    Plaintiffs Adduced Evidence Showing that the Allergan Entities Themselves Engaged in the Alleged Marketing and Diversion Violations**

Allergan contends that it did not cause any public nuisance or engage in any conspiracy.  These contentions are addressed in other briefs and expert reports filed by Plaintiffs, incorporated herein by reference, and so are not repeated here now.[43]    Rather, Plaintiffs highlight certain evidence demonstrating that the Allergan entities and their predecessors themselves engaged in the misconduct forming the basis for Plaintiffs' claims.  The misconduct cannot, as Allergan asserts, be sloughed off to Teva for liability purposes.  Consequently, Allergan's summary judgment motion should be denied.

**1.    Evidence Shows that the Allergan Entities Themselves Are Directly Liable for Their Inadequate SOMS Protocols and Failure to Prevent Diversion**

Allergan's primary assertion is that it is not liable for any actions related to its generic opioids because Plaintiffs cannot pierce the corporate veil.  Allergan Mem., §I.A.  But Plaintiffs need not pierce anything; movants Allergan plc and Allergan Finance were themselves extensively involved in the sale, marketing, and distribution of generic opioids.  *See Welco Indus., Inc. v. Applied Cos.*, 617 N.E. 2d 1129, 1133 (Ohio 1993) (corporation liable for predecessor where transaction is a *de facto* consolidation or merger or where the buyer is merely a continuation of the seller).[44]  Plaintiffs' claims do not hinge on another entity's actions.  Allergan itself is liable for its and its predecessors' own actions.

At every step, predecessors of Allergan Finance chose to centralize SOMS protocols and activities at the highest level of the company.[45]  Watson – now known as movant Allergan Finance[46] – issued a Corporate Standard Operating Procedure applicable "to all controlled drugs distributed by

---

43    *See* Plfs' Nuisance MSJ; Causation Opp.; RICO/Conspiracy Opp.; SOL Opp.; Keller Report (Dkt. #2000, Ex.7); McCann Report and McCann Supplemental Report (Dkt. #2000, Exs. 14-15); Rafalski Report (Dkt. #2000, Ex. 22); Rosenthal Report (Dkt. #2000, Ex. 23).

44    *See also* Ex. 27 (Mar. 11, 2019 letter from D. Welch) at 2.

45    *See* CSA – Duties; CSA – Compliance.

46    Ex. 23 (Allergan-Kaufhold-007) at 48-49 (Watson was renamed Actavis, Inc.); Ex. 22 (Allergan-Kaufhold-014) at 3 (Allergan Finance was formerly known as Actavis, Inc.).

Watson Laboratories, Inc. and its Subsidiaries" that was implemented "[t]o assure distribution of controlled drugs is monitored for excessive use."[47] According to Allergan's corporate designee, the Corporate Standard Operating Procedure "is filed with the entire corporation. It is a high-level procedure regarding suspicious orders of controlled drugs."[48] In early 2010, a PowerPoint presentation concerning Watson's "DEA Affairs Organizational Overview" for "US Generics" identified SOMS as a part of the "Compliance Landscape" and identified issues related to preventing diversion of opioids including hydrocodone, oxycodone, fentanyl, fentanyl citrate EQ oral, hydromorphone, morphine sulfate, and oxymorphone.[49] Watson's employee responsible for the suspicious order monitoring, Thomas Napoli, reported directly to Watson's Executive Director, Global Security & DEA Affairs.[50]

Similarly, SOMS protocols were handled at the top level of Actavis Group, not distributed to subsidiaries. In a 2009 e-mail exchange, Actavis Group's Chief Legal Officer inquires whether the company has "a written procedure in place to govern the handling of orders for Class II drugs that are out of line with previous experience from customers, from unknown customers, or are for unprecedented amounts?"[51] The Director of Customer Service' response: "The quick answer to the first part of your question is that we do have a process in place to govern the ordering of controlled drugs. The longer answer is that I believe our process is not current and there is significant room for improvement."[52] Those policies are reflected in standard operating procedures issued by Actavis Group [53] – the entity that merged with Watson and became Actavis, Inc. and then Allergan Finance.[54]

Diversion of Actavis Group's generic oxycodone was so pervasive that the DEA required employees in charge of the SOMS protocols to meet at DEA headquarters in 2012. Two Actavis Group

---

[47] Ex. 30 (Allergan-Woods-008) at 386.
[48] Ex. 31a (Rule 30(b)(6) Woods Tr.) at 117:3-14.
[49] Ex. 32 (Allergan-Napoli-006) at 065, 088-093.
[50] Ex. 33 (Napoli Tr.) at 14:3-10, 140:3-10. Napoli also issued e-mails providing that Watson's DEA Affairs had released orders pending under the company's SOMS. *E.g.*, Ex. 34 (Allergan-Napoli-019).
[51] Ex. 35 (Allergan-Woods-012) at 244-45.
[52] *Id.* at 243; *see* Ex. 31a (Rule 30(b)(6) Woods Tr.) at 49:6-9 (identifying Nancy Baran as the director of customer service for Actavis Inc.).
[53] Ex. 36 (Allergan-Woods-015); Ex. 37 (Allergan-Woods-016).
[54] Ex. 23 (Allergan-Kaufhold-007) at 48.

employees with responsibility for SOMS – Michael Clarke, Vice President for Compliance for the Americas, and Nancy Baran, Senior Manager of Actavis' Customer Service Department – attended.[55] During the meeting, the Chief of the DEA's Regulatory Section informed Actavis Group that "addicts are coming from around the country to Florida and are specifically seeking oxycodone," that Actavis was selling a massively disproportionate amount of oxycodone in Florida, and that the problem was "spreading north into" Ohio.[56] The DEA's Staff Coordinator, Regulatory Section told Actavis that it "should send someone from their compliance team to visit pharmacies who were receiving their products in south Florida, in order for them to witness the long lines at pain clinics, out of state license plates, questionable clients, security guard(s) in the parking lots, and signs saying cash payment only."[57] Thus, Allergan Finance was itself made keenly aware of the diversion problems the company was causing.

Clarke testified that the DEA treated them "as street dealers"; "[T]hey described it . . . in a way that we would just manufacture, put the product out on the street, and not have a care as to where it went."[58] He further testified that the DEA "described finding or seeing or obtaining product, you know, opioid products that seemed to be diverted relatively easily."[59] Because Actavis Group was totally dissolved and became Actavis, Inc.,[60] and Actavis Group's prior business activity continued,[61] Actavis, Inc. (later Allergan Finance) is liable for Actavis Group's opioid-related activities. *Welco*, 617 N.E.2d at 1134.

---

[55] Notably, both Clarke and Baran worked at the top level of Actavis Group, not for one of the generic subsidiaries. *See* Ex. 12 (Clarke Tr.) at 44:13-14, 45:10-17 (title: Vice President of Compliance for the Americas, reported to executives in Switzerland); Ex. 38 (Allergan-Baran-002) at 3 (Baran's resume, indicating she was "Director, Customer Service" at "Actavis (now Allergan)").

[56] Ex. 11 (US-DEA-00000001) at 003-004.

[57] *Id.*

[58] Ex. 12 (Clarke Tr.) at 89:15-90:22.

[59] *Id.* at 91:1-3.

[60] *See* Ex. 23 (Allergan-Kaufhold-007) at 25 ("We will need to successfully integrate the operations of the former Actavis Group with our business operations.").

[61] *See* Ex. 23 (Allergan-Kaufhold-007) at 3 ("[f]ollowing the acquisition of Actavis Group, [Actavis, Inc.] now has operations in more than 60 countries"); *id.* at 4 ("[w]ith the acquisition of Actavis Group, [Allergan, Inc.] became the third largest global generics pharmaceutical company"); *id.* at 7 ("we expect international generic revenue to represent an increasing percentage of total revenues in future periods due to the acquisition of Actavis Group").

4829-4424-7453.v1

After Watson and Actavis Group merged to become Actavis, Inc.,[62] it continued to issue SOMS protocols applicable to its opioids, both brand and generic.  For example, Actavis, Inc. issued a protocol titled "Controlled Substance Suspicious Order Monitoring," which exists "[t]o define the requirements and establish guidelines for the evaluation of controlled substance orders of interest suspended by the Suspicious Order Monitoring System (SOMS) and report controlled substance suspicious orders to the Drug Enforcement Administration (DEA)."[63]  A PowerPoint presentation from Actavis, Inc. (Allergan Finance's direct predecessor) indicates that it maintained a "Global Security & DEA Affairs" organization, which managed SOMS, at the top level of the company.  Indeed, Napoli continued in a role similar to the one he had had at Watson and was consulted by an investigator from "Global Security & DEA Affairs, Actavis[,] Inc[.] (formerly Watson Pharmaceuticals)," about releasing oxycodone/APAP orders flagged by the newly-merged company's SOMS.[64]  Allergan Finance, LLC is the same entity as Actavis, Inc. and Watson; it is simply a new name.

Plaintiffs have also adduced evidence that the PLC itself was involved in generic opioid-related activities.[65]  Actavis plc (now known as Allergan plc) stated it was "the successor registrant of Actavis, Inc." after it was created to effectuate the merger of Actavis, Inc. and Warner Chilcott, meaning that Allergan plc assumed liability for Actavis, Inc.'s suspicious order monitoring responsibilities under the Controlled Substances Act ("CSA").[66]  Moreover, employees working in Allergan's opioid-related business repeatedly indicated that they worked for Allergan plc.[67]  For example, Allergan's Senior Director for Clinical Development sent an e-mail indicating he worked for "Allergan plc" that discussed

---

[62]   Ex. 22 (Allergan-Kaufhold-014) at 3.

[63]   Ex. 39 (Allergan-Woods-028) at 551.  Allergan's corporate designee testified she could tell this document was created at post-merger Actavis, Inc. because of the logo.  Ex. 31a (Rule 30(b)(6) Woods Tr.) at 127:17-23.

[64]   Ex. 40 (Allergan-Napoli-020) at 760.

[65]   See Plaintiffs' Opposition to the PLC's Motion to Dismiss.

[66]   Ex. 41 (2013 Form 10-K) at 59.

[67]   This evidence also goes toward Plaintiffs' veil-piercing argument below in §III.B. According to Professor Steinberg, if the employees did not, in fact, work for Allergan plc, using e-mail signature blocks and other indicators that they did "may cause reasonable reliance to be placed by outside persons and constitute misrepresentation in the veil piercing setting."  Ex. 42 (Steinberg Rpt.) at 12.

- 11 -

"a consortium that deals with opioid REMS."[68]  Allergan plc sent a letter to Cardinal Health requesting that it provide "information pertaining to Allergan plc's sales terms related to products purchased by [Cardinal] during 2015."[69]  Internal "Daily Inventory Reports" containing specific information about generic opioids were circulated internally to an extensive recipient list (including company executives) from an employee who identified himself as working for "Allergan plc."[70]

### 2.  Evidence Shows that the Allergan Entities Themselves Engaged in False Marketing[71]

Allergan and its predecessors knew their opioids were dangerously addictive.[72]  And they knew the results of their false and misleading marketing – an inordinate number of prescriptions written, and product shipped, for their branded and generic opioids.  As notes from a meeting held by Actavis confirm, "[t]here was general agreement that the companies marketing opioid medications have played a role in creating the problem."[73]  Allergan's predecessors were among those companies.

Allergan does not contest that it is liable for any violations concerning Kadian marketing. Allergan Mem. at 2.  Rather, it asserts that "the only Allergan opioid marketing ever claimed to be objectionable" occurred during a 10-month detailing period between when it acquired Kadian and when the FDA issued its DDMAC Warning Letter, after which point "Allergan affirmatively corrected any prior statements[.]"  Allergan Mem. at 14.  The evidence shows otherwise.  First, Allergan's assertion does not square with the undisputed fact that its predecessors continued to use Kadian training materials and brochures that contained statements the FDA deemed false and misleading well past the February 2010 letter.[74]  Second, it ignores reams of evidence that Allergan's predecessors used its branded

---

[68]  Ex. 43 (Allergan-Kaufhold-017) at 569.

[69]  Ex. 44 (ALLERGAN_MDL_04242038) at 038.

[70]  *E.g.*, Ex. 45 (Allergan-Kaufhold-020) at 487 (commenting on generic oxycodone HCL backorders).

[71]  *See* Causation Opp.; Generics Opp.; Keyes Report (Dkt. #2000, Ex. 9); Lembke Report (Dkt. #2000, Ex. 10); Schumacher Report (Dkt. #2000, Ex. 24).

[72]  Ex. 46 (Allergan-Myers-012); Ex. 47 (Myers Tr.) at 152:9-179:24.

[73]  Ex. 48 (Allergan-Leitch-022) at 311.

[74]  Ex. 49 (Allergan-Leitch-011) at 10 (2011 internal presentation instructed sales representatives to target the Top 25 Kadian prescribers in their area who also wrote MS Contin prescriptions and explain Kadian's "long history of safety and efficacy" and that Kadian "provides steady blood levels of morphine sulfate with few peaks and valleys"); Ex. 7 (Allergan-Altier-002) at 521, 529 (Kadian training manual for sales representatives, still in use as of 2013 and "created based on the

marketing[75] and its coordinated activities with other Defendants[76] to build a market base for its generic

opioids;[77] used the same false and misleading statements in affirmatively detailing its generic

medications;[78] and omitted the risk of addiction and death from its generic marketing materials and sales

scripts/training.[79]

      **3.**    **Evidence Shows that the Allergan Entities Themselves Worked with Other Defendants and Third Parties in Non-Branded Activities**

Plaintiffs have adduced concrete evidence from which a jury could find Allergan and its

predecessors participated in both a conspiracy and RICO enterprise – evidence that Allergan's brief

ignores.[80]  Its executives and other senior employees actively participated with other RICO Supply

Defendants in lobbying groups, including the NJPIG and HDMA/HDA.[81]  It also undermined CSA

effectiveness by embracing a suspicious order monitoring protocol that required its employees to cut or

---

Alpharma module," identified fear of addiction and opioid phobia as barriers to effective pain control; reported there are no side effects for full agonists such as morphine, fentanyl, oxycodone, hydrocodone, and oxymorphone; described pain as "any sensation that the patient perceives to be uncomfortable"; and stated there was no evidence that simply taking opioids for a period of time will cause substance abuse or addiction).

75  Ex. 49 (Allergan-Leitch-011).

76  Ex. 50 (Boothe Tr.) at 255:4-6, 256:11-19 (Actavis contracted with distributor customers, for example, "to utilize their network of pharmacists as part of their awareness ads for new product launches"); Ex. 50 (Boothe Tr.) at 262:4-17, 262:21-263:19, 278:24-279:4 (Actavis paid marketing fees to distributors); Ex. 51 (Allergan-Perfetto-020) (describes profit splitting with "ABC" (AmerisourceBergen) with an estimated value of $20 million, as well as deals with Cardinal Health, McKesson, and other direct chain stores and wholesalers/distributors); Ex. 50 (Boothe Tr.) at 244:22-245:19 (rebates and incentives paid to customers based on volume incentive tiers, thereby "providing an additional discount to [Actavis'] customers to take more of [its] products"); Ex. 52 (Allergan-McCormick-008); Ex. 53 (McCormick Tr.) at 141:3-4, 142:6-24 (testified McKesson was paid to call pharmacies to help them stock Actavis' new oxymorphone offering and McKesson would be rewarded upon "providing proof of store stocking in a period of 30 days"); Ex. 53 (McCormick Tr.) at 155:22-156:15 (testified Actavis relied on McKesson to identify the high purchasing pharmacies to target them for generic marketing); Ex. 54 (ALLERGAN_MDL_04240833) (marketing fees to McKesson and ABC for 2013-2014).

77  Ex. 49 (Allergan-Leitch-011) (building a market for generic Kadian by detailing branded and generic product to doctors who wrote MS Contin prescriptions); Ex. 50 (Boothe Tr.) at 220:5-15, 227:13-228:12; Ex. 55 (ACTAVIS0506794); Ex. 56 (Altier Tr.) at 33:4-13, 40:17-41:8; Ex. 57 (Allergan-Altier-017) at 036, 044 (Actavis Group used its Kadian sales representatives to detail and promote generic Opana ER and generic Kadian by targeting high prescribing doctors); *see also* Generics Opp.

78  Ex. 49 (Allergan-Leitch-011).

79  Ex. 53 (McCormick Tr.) at 258:24-259:23 (When asked whether the sales force promoting oxymorphone also promoted "awareness of the addictive qualities of oxymorphone to pain doctors," McCormick testified it did not: "What we asked Kadian sales force was just awareness campaign to the doctors, so they are aware, so they – the doctors were aware of the ability [sic] of the generic because the – because Opana ER was discontinued."); Ex. 58 (Allergan-McCormick-017) (when Actavis contracted with McKesson to send facsimile blasts to "provide fast access to a targeted audience of ~200 retail independent pharmacies with significant" (*see* Ex. 59 (Allergan-McCormick-021) at 788) oxymorphone brand sales, McCormick stated she did not believe safety information would be necessary).

80  *See* RICO/Conspiracy Opp.

81  Ex. 33 (Napoli Tr.) at 21:21-22:1, Ex. 60 (Allergan-Napoli-014) at 848 n.1 (NJPIG); Ex. 53 (McCormick Tr.) at 321:8-11; Ex. 61 (Baran Tr.) at 359:22-361:2 (HDMA/HDA).

4829-4424-7453.v1

cancel suspicious orders so that it needn't report those suspicious orders to the DEA.[82] According to its then-CEO, Actavis Group similarly allowed customers to resubmit unjustifiable suspicious orders in smaller amounts so as to fall below their arithmetic suspicious order monitoring threshold, thereby avoiding reporting.[83] Evidence also shows that Allergan and/or its predecessors' employees: sat on the boards of Distributor Defendants and front groups;[84] contributed significant money to front groups whose members include other Defendants;[85] attended trade shows in order to meet with other Defendants;[86] and continued to sell its opioids to Defendants and fill questionable orders when it knew it should not.[87]

This evidence – sitting on other Defendants' and front groups' boards, participating with other Defendants in lobbying groups, and working with other Defendants to reduce their opioid orders to avoid triggering the requirement to report them to the DEA as suspicious – coupled with that set forth in Plaintiffs' opposition to Defendants' omnibus motions for summary judgment related to generic

---

[82]   Watson's SOP directs that employees "will release pending orders due to SOMS violations by canceling the order, or reducing the quantity, per customer requirements." Ex. 62 (Allergan-Woods-003) at 002. Under later versions of the SOP, customers could still cancel or reduce their orders if they "provide[d] a reason for the reduction." Ex. 63 (ALLERGAN_MDL_01175574) at 8. This remained Actavis's policy until the 2016 Teva sale. Ex. 64 (ALLERGAN_MDL_03750135) at 7. Under the SOP, the DEA would only "be notified in extreme instances." Ex. 65 (Allergan-Woods-001) at 864. *See also* Ex. 31b (Woods Tr.) at 25:18-31:16; Ex. 66 (Allergan-Woods-030) ("Anytime there was a question during the order process of a suspicious order quantity, we went (and still follow the same procedure) back to a customer to let them know we would need to notify the DEA due to the quantity they wanted to order.").

[83]   Ex. 50 (Boothe Tr.) at 415:14-23.

[84]   Ex. 68 (Perfetto Tr.) at 390:10-391:11 (McKesson Advisory Board); Ex. 68 (Perfetto Tr.) at 391:22-393:4 (NACDS Planning Board); Ex. 50 (Boothe Tr.) at 431:3-14 (GPhMA board).

[85]   Ex. 54 (ALLERGAN_MDL_04240833).

[86]   Ex. 69 (Dorsey Tr.) at 111:12-23; Ex. 47 (Myers Tr.) at 89:8-90:21 ("[T]hey call [NACDS] a trade show, but it's really a meeting driven trade show, where participants, like, for instance, Actavis or Teva would have a trade show booth and you would have appointments with most of your largest customers just to review business."); Ex. 61 (Baran Tr.) at 360:18-361:2 (comparing HDMA meeting to "speed dating" with "all your customers").

[87]   *E.g.*, In September 2012, the DEA told Actavis, "[I]f their customers refused to provide them with sales information Actavis should consider cutting them off." Ex. 11 (US-DEA-00000001) at 003. Baran sent out letters to Actavis's 43 largest customers asking each to represent that it "directly monitors and remains aware of the proper usage and handling of controlled drugs that it distributes and/or dispenses and to exercise due diligence to ensure that its customers adhere to all applicable laws and regulatory requirements." Ex. 70 (ALLERGAN_MDL_02186653). More than one month later, Baran wrote, "2 out of our top 3 wholesalers have not even responded (ABC and McKesson). Our largest chains – Walgreens and Wal-mart have not responded." Ex. 71 (Allergan-Baran-013) at 473. By all accounts, Actavis continued to sell to ABC, McKesson, Walgreens, and Walmart. *See also* Ex. 72 (ALLERGAN_MDL_04416291) (after the DEA suspended Cardinal Health's substance control license in 2007 over concerns that the company sold excessive hydrocodone to a pharmacy based on illegitimate prescriptions from internet pharmacy websites, Actavis Senior Director of National Accounts Lisa Pehlke emailed Cardinal to ask if there is "anything Actavis can do to assist Cardinal so that any lost sales are kept to a minimum?").

4829-4424-7453.v1

manufacturers and RICO,[88] is sufficient to show that Allergan and its predecessors themselves participated in the alleged conspiracy and the Opioid Supply Chain Enterprise.

> **B.  Although Unnecessary, Evidence Shows that Plaintiffs Can Pierce the Corporate Veil; Alternatively, Plaintiffs Should Be Entitled to Additional Discovery Pursuant to Rule 56(d)**

In light of the evidence set forth above, it is surprising that Allergan seeks summary judgment on the ground that Plaintiffs cannot pierce the corporate veil – Plaintiffs need not pierce the corporate veil because movants Allergan plc and Allergan Finance were themselves involved in the opioid business here in the United States.  It is also surprising for another reason: Allergan plc's motion to dismiss on this ground remains pending before the Court.[89]

Nevertheless, the evidence above demonstrates the viability of piercing here because the evidence set forth herein and in Plaintiffs' Opposition to the PLC's Motion to Dismiss demonstrates Allergan plc's control and inseparability from its subsidiaries for the purpose of unlawful acts that have injured Plaintiffs.[90]  "'[T]here is no precise test to determine whether the elements required to pierce the corporate veil have been satisfied, and each case should be "regarded as 'sui generis' and decidable on its own facts.'"' *Hitachi Med. Sys. Am., Inc. v. Branch*, 2011 WL 3921718, at *5 (N.D. Ohio Sept. 7, 2011); *see also Music Express Broad. Corp. v. Aloha Sports, Inc.*, 831 N.E.2d 1087, 1091 (Ohio Ct. App. 2005) ("The test set forth . . . is open-ended and versatile – *i.e.*, it permits and encourages flexibility by its very definition.").  Plaintiffs incorporate herein the evidence concerning piercing the corporate veil in Plaintiffs' Opposition to the PLC's Motion to Dismiss.

By way of example, in contrast to Allergan plc's assertion that it and its subsidiaries operated independently from one another, a "Management Service Agreement" between Allergan plc, on the one hand, and Allergan, Inc. and Allergan Sales, on the other, shows that Allergan plc was, and remains, an integrated group of entities with common decision makers, common office managers, and a common

---

[88]  *See* RICO/Conspiracy Opp.; Generics Opp.
[89]  *See* Plaintiffs' Opposition to the PLC's Motion to Dismiss.
[90]  *Minno v. Pro-Fab, Inc.*, 905 N.E.2d 613, 616 (Ohio 2009).

goal.[91]  The agreement puts the United States entities Allergan, Inc. and Allergan Sales in charge of Allergan plc's "executive management," its "strategic direction in terms of business operations, financial goals and long-term growth," and its "General and Administrative Services."[92]  Thus, Allergan plc is the shareholder (through a series of largely employee-less holding companies) of entities that, despite being far removed on the tax department organizational chart, manage it.[93]  This permeable mishmash of responsibility, power, and control disproves Allergan's contention that Allergan plc and its subsidiaries operate independently. [94]

The purported independence of Allergan plc from its subsidiaries is further betrayed by the general ledgers it produced.  The 2016-2019 ledger does not appear to account for the $33.4 billion in cash Allergan plc received for selling its generic opioid and other subsidiaries to Teva, nor does it appear to account for the dispersal of that cash to any of Allergan plc's subsidiaries.[95]  The 2013-2015 ledger shows only 17 transactions over a 3-year period, an unreasonably low number for a company that was, among other things, the third largest generic pharmaceutical distributor in the United States.[96]  One would expect a parent corporation's ledger to appropriately account for all transactions it has with its subsidiaries if that parent corporation is truly acting independently and not commingling funds; the

---

[91]   Ex. 20 (ALLERGAN_MDL_04451501).

[92]   *Id.* at 514.

[93]   The corporate hierarchy from Allergan plc to Allergan Finance proceeds through 11 entities incorporated in four countries: Allergan plc (Ireland), Allergan WC Ireland Holdings Ltd (Ireland), Warner Chilcott Limited (Bermuda), Warner Chilcott Holdings Company II, Ltd. (Bermuda), Warner Chilcott Holdings Company III, Ltd. (Bermuda), Allergan Ireland Limited (Ireland), Allergan Capital S.a.r.l. (Luxembourg), Allergan Pharma Inc. (Delaware), Allergan Akarna LLC (Delaware), Allergan W.C. Holding Inc. (Delaware), and Allergan Finance (Nevada). Ex. 18 (ALLERGAN_MDL_04450023) at 023-024. Allergan Sales is four entities further down the chain: Allergan, Inc. (Delaware), Allergan Holdco US, Inc. (Delaware) and Allergan Holdings, Inc. (Delaware) jointly, and Allergan Sales. *Id.*

[94]   Given these facts, it is unsurprising that deponents in this action were confused about who employed them.  A corporate designee for topics related to marketing was not wholly sure for which corporation she had been designated to provide testimony. Ex. 73 (Snyder Tr.) at 19:7-15 ("It's on behalf of Allergan, I'm not clear on the exact corporate structure.  That wasn't part of my – what I prepared for.  But my understanding is it's Allergan.  I believe Allergan Finance.").  Other deponents with key responsibilities had no idea, including the person in charge of SOMS at Actavis Group (Ex. 61 (Baran Tr.) at 82:3-14) and the sole employee in Actavis Group's compliance department (Ex. 12 (Clarke Tr.) at 49:5-50:9).  And even when they knew, their knowledge only revealed further confusion: Allergan's designee for the corporate form testified he had been designated to testify on behalf of Allergan plc, which, at that point in time, was refusing to participate in discovery. Ex. 19 (Kaufhold Tr.) at 12:7-9; *see* Ex. 74 (2nd Amd. Resps. to Plaintiffs' Amd. Depo. Notice) at n.1 ("Allergan plc f/k/a Actavis plc has no obligation to respond to these Requests at this time.").

[95]   Ex. 75 (ALLERGAN_MDL_04452226) (2016-2019 general ledger); Ex. 42 (Steinberg Rpt.) at 5.

[96]   Ex. 76 (ALLERGAN_MDL_04451817) (2013-2015 general ledger); Ex. 42 (Steinberg Rpt.) at 5.

- 16 -

absence of such accounting here is evidence that the entities were not operating as separate and distinct entities and avoiding commingling as would be required.[97]

Not only do the ledgers show a complete disregard for the corporate form, they also raise the specter that the corporate form was used to transfer money away from entities Allergan has put forward as properly named defendants in this action.  Indeed, despite being asked repeatedly in numerous formats (in deposition, interrogatory, and document request), Allergan has still not told Plaintiffs what happened to the $33.4 billion in cash from the Teva transaction.  Similarly, while Allergan represents that it has produced board of director materials relevant to this action,[98] none appears to reflect the layers of corporate approval the Teva transaction would have required in order to maintain corporate formalities; while Allergan produced board meeting minutes dating from 1997, none of them reflects the information above.[99]  Veil piercing can be appropriate in this situation, according to Professor Steinberg, because evidence shows "unilateral conduct by the parent corporation without respecting the separate identity of the subject affiliate(s), lack of adherence to corporate formalities, commingling of assets and liabilities (e.g., cash, liquid assets, debt obligations, and/or use of personnel), and siphoning off by the parent of funds or other assets belonging to the subject affiliate(s)."[100]

Further, the Management Service Agreement, through which Allergan Sales and another subsidiary provide executive and management services to parent company Allergan plc, "poses the realistic possibility" that "an adequate accounting or other sufficient documentation does not exist to reflect the performance and payment of these services; the commingling of assets and liabilities occurred among a number of Allergan Group-wide enterprises with respect to the performance of these services; and that the separate identity of a number of the Allergan Group-wide entities was not adhered to with

---

[97]   Ex. 42 (Steinberg Rpt.) at 5, 7, 21-22.
[98]   Ex. 77 (Oct. 19, 2018 letter from D. Welch) at 1 ("This week's production . . . includes Board of Director Materials.  *See* ALLERGAN_MDL_03363459 to ALLERGAN_MDL_03365956").
[99]   *See* Ex. 42 (Steinberg Rpt.) at 7 ("I have seen no evidence supporting that the requisite authorizations were procured from the Allergan ploc subsidiary enterprises whose stock was sold to Teva . . . .").
[100]   Ex. 42 (Steinberg Rpt.) at 10.

respect to the administration and implementation of the Management Service Agreement."[101] These circumstances "support the levying of alter ego/piercing the corporate veil liability."[102] As Professor Steinberg concludes, "material factual questions exist with respect to the liability of Allergan plc as well as the propriety of veil piercing."[103]

Moreover, entering summary judgment on the ground that Plaintiffs cannot pierce the corporate veil would be improper where, as here, "'the non-movant is given an insufficient opportunity for discovery.'" *Graf v. Resilience Capital Partners, LLC*, 2013 WL 12110251, at *1 (N.D. Ohio Nov. 26, 2013) (quoting *White's Landing Fisheries*, 29 F.3d 229, 231-32 (6th Cir. 1994)). The Court may deny summary judgment under Rule 56(d) where "a non-movant 'shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" *Id.* As mentioned above, Plaintiffs have not been provided by Allergan any accounting of the $33.75 billion in cash received by Allergan plc for the sale of the generic portfolio to Teva or ledgers reflecting the flow of funds between the Allergan entities that participated in opioid-related activities (both generic (through 2016) and brand).[104] As Professor Steinberg opines: "Without the receipt of an appropriate accounting and/or the provision of other relevant documents, it is problematic to ascertain whether Allergan plc's conduct was consistent with custom and practice."[105] Indeed, various Allergan employees did not appear to know for which company they actually worked. *See supra*, n.91. In fact, Allergan plc has not answered the complaint or participated in anything more than nominal discovery aimed at piercing the corporate veil.[106]

While Allergan's expert, Professor Macey, has "never been more certain about [his] opinion" (Allergan Mem. at 7), he did ***not*** conclude that Plaintiffs cannot pierce the corporate veil. Rather, his

---

[101] Ex. 42 (Steinberg Rpt.) at 17-18.
[102] *Id.* at 18. Even if accounting for the services provided by Allergan Sales and another subsidiary to Allergan plc were properly accounted for, "a number of courts view this practice as a factor weighing in favor of veil piercing." *Id.* at 19.
[103] *Id.* at 22.
[104] Declaration of Aelish M. Baig in Support of Plaintiffs' Memorandum in Opposition to Allergan Defendants' Motion for Summary Judgment or, in the Alternative, Request for Relief under Federal Rule of Civil Procedure 56(d) ("Baig Decl."), ¶7, filed concurrently herewith; *see generally* Ex. 42 (Steinberg Rpt.) at 4-23.
[105] Ex. 42 (Steinberg Rpt.) at 7.
[106] *See generally* Dkt. #1267 (Defendant Allergan Finance, LLC's (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) Answer, Defenses, and Demand for Jury Trial), at 2. (In a footnote, Allergan plc states it "does not join in this answer" and offers "to file a separate answer at a later date" if required.)

4829-4424-7453.v1

report merely says he has "seen no evidence" suggesting that it can be done.[107]  Given the absence of discovery into the facts set forth above, that assertion is unsurprising.  Nor did Professor Macey identify any evidence supporting that the generic companies had "their own corporate governance infrastructures," that they operated separately from their parents, or "that authorizations were provided to validly allow Allergan plc to distribute the proceeds from Teva" – a fact that "is critical to his ultimate conclusion – in his Report."[108]

### C.    Teva Did Not Indemnify Allergan for Its Own Actions

The indemnification provision between Allergan plc and Teva only covers claims "involving . . . a member of the Transferred Group."[109]  It does ***not*** indemnify Allergan for claims based on its ***own*** actions.[110]  As set forth above in §III.A., Plaintiffs have adduced substantial evidence demonstrating that Allergan Finance and Allergan plc themselves engaged in generic opioid-related actions giving rise to Plaintiffs' claims.  Teva has not assumed that liability.  Whether Teva has assumed liability for the transferred entities is subject to likely dispute between Teva and Allergan.

## IV.    CONCLUSION

Evidence shows the Allergan entities themselves are liable for the alleged wrongdoing set forth in Plaintiffs' complaint.  The Court should deny Allergan's motion for entry of summary judgment.

Dated:  July 31, 2019                    Respectfully submitted,

                                         /s/Paul J. Hanly, Jr.
                                         Paul J. Hanly, Jr.
                                         SIMMONS HANLY CONROY
                                         112 Madison Avenue, 7th Floor
                                         New York, NY 10016
                                         (212) 784-6400
                                         (212) 213-5949 (fax)
                                         phanly@simmonsfirm.com

---

[107]   Report of Jonathan R. Macey, Dkt. #1939-23, ¶¶27, 57, 84, 102.

[108]   Ex. 42 (Steinberg Rpt.) at 8; *see id.* at 18 (listing corporate norms and practices not reflected in evidence produced by Allergan); *see also* Baig Decl..

[109]   *See supra*, n.42.

[110]   *See Plaskon Elec. Materials, Inc. v. Allied-Signal, Inc.*, 904 F. Supp. 644, 671 (N.D. Ohio 1995); *Flangher v. Cone Automatic Mach. Co.*, 507 N.E.2d 331, 335 (1987).

4829-4424-7453.v1

/s/ Joseph F. Rice
Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

PAUL T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

/s/ Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY  10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

4829-4424-7453.v1

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

*On the Brief for Plaintiffs' Executive Committee:*

/s/ Aelish M. Baig
Aelish M. Baig
Matthew S. Melamed
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
(415) 288-4545
(415) 288-4534 (Fax)
aelishb@rgrdlaw.com
mmelamed@rgrdlaw.com

Paul J. Geller
Mark J. Dearman
Dorothy P. Antullis
ROBBINS GELLER RUDMAN
& DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
(561) 750-3000
(561) 750-3364 (Fax)
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com
dantullis@rgrdlaw.com

- 21 -

Thomas E. Egler
Carissa J. Dolan
ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058
(619) 231-7423 (Fax)
tome@rgrdlaw.com
cdolan@rgrdlaw.com

Attorneys for Plaintiffs

4829-4424-7453.v1