PD6 Exh 1

Highly Confidential - Subject to Further Confidentiality Review

1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT OF OHIO
3                 EASTERN DIVISION
4                     -  -  -
5

6    IN RE:  NATIONAL          :   HON. DAN A.
     PRESCRIPTION OPIATE       :   POLSTER
     LITIGATION                :
7                              :   MDL NO. 2804
     APPLIES TO ALL CASES      :
8                              :   CASE NO.
                               :   17-MD-2804
9                              :
10         - HIGHLY CONFIDENTIAL -
11   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12                 VOLUME I
13                    -  -  -
14              May 16, 2019
15                    -  -  -
16               Videotaped deposition of
     DR. SETH B. WHITELAW, taken pursuant to
17   notice, was held at the offices of Golkow
     Litigation Services, One Liberty Place,
18   1650 Market Street, Philadelphia,
     Pennsylvania beginning at 9:18 a.m., on
19   the above date, before Michelle L. Gray,
     a Registered Professional Reporter,
20   Certified Shorthand Reporter, Certified
     Realtime Reporter, and Notary Public.
21

                     -  -  -
22

            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I prepared both, both on my

2  own and with assistance from counsel.

3    Q.    Which counsel did you meet

4  with to prepare for today's deposition?

5    A.    Certainly the three

6  gentlemen that are here.  And again, I

7  don't have a complete list of everybody

8  else I've met with.

9    Q.    Do you recall how many

10  meetings you had with counsel in

11  preparation for today's deposition?

12    A.    My recollection we were --

13  there were seven, somewhere between seven

14  and nine, something like that.

15    Q.    And about how long were

16  these meetings?

17    A.    They varied in length from,

18  you know, half a day to a couple hours.

19    Q.    So in preparation for

20  today's deposition, you mentioned a few

21  things you reviewed.  You reviewed your

22  report, you reviewed some of the

23  documents that you cite.  What -- what

24  other materials did you review in

1    preparation for today's deposition?

2         A.    I reviewed the new --

3    obviously you have my supplemental

4    report.  I reviewed the new developments

5    that had come out since I actually issued

6    the report.  And also certain documents

7    are listed in there as well.  Beyond that

8    I'm not sure -- I think that's the

9    complete universe to the best of my

10   recollection.

11        Q.    Did you review any documents

12   that are not listed in your report or

13   your supplemental report?

14        A.    Not that I --

15             MR. BOGLE:  Object to form.

16             THE WITNESS:  Not that I

17        recall.

18   BY MR. EPPICH:

19        Q.    Now, you list quite a few

20   documents in your reports.  How did you

21   choose which documents to review,

22   particularly from the defendants?

23        A.    I followed the same uniform

24   approach, as I said to you before.  I

Highly Confidential - Subject to Further Confidentiality Review

1    followed the same uniform approach that I

2    do when I do any kind of a compliance

3    investigation, or compliance assessment.

4              I use the federal sentencing

5    guidelines as my sort of framework.  And

6    I asked counsel, in this case, serving

7    like I would a client, I need documents

8    in these particular areas, could you

9    please provide me with information that

10   relates to these particular areas.  And

11   they provided me with those documents.

12             If I was unclear or I didn't

13   get exactly -- it is an iterative

14   process.  So if I was unclear or I didn't

15   get what I was looking for, I asked

16   further follow-up questions.  I asked for

17   further information.  Once I got that

18   information, I then reviewed it.

19        Q.    What were the original

20   categories of documents that you

21   requested from plaintiffs' counsel?

22        A.    We can turn to my report and

23   we can go down the eight elements of the

24   federal sentencing guidelines if you'd

1    like.

2           Q.    We can do that in a few

3    minutes.  But sitting here, just now, do

4    you recall any of the categories of

5    documents?

6                 MR. BOGLE:  If you need to

7           refer to your report, you can.

8                 THE WITNESS:  I'm going to

9           refer to my report.  Since he

10          wants to go down the categories,

11          let's go down the categories.

12   BY MR. EPPICH:

13          Q.    Why don't we go through that

14   later.  I'll strike the question.

15                Did you review any

16   deposition transcripts?

17          A.    Yes, sir, I did.

18          Q.    Which -- did you read the

19   entire transcripts or just portions of

20   the transcripts?

21          A.    Depended on the witnesses.

22   I read some completely from beginning to

23   end and I read some that -- substantial

24   portions.

1    Q.    You are a licensed food and

2  drug attorney?

3    A.    I practice my specialty is

4  food and drug.

5    Q.    And you have a doctorate in

6  health law?

7    A.    I do, from Widener

8  University as we just discussed.

9    Q.    The next sentence reads,

10  "His forte is designing, building and

11  running life science compliance programs

12  from a 'blank sheet of paper.'"

13    Did I read that correctly?

14    A.    You did.

15    Q.    And is that statement

16  accurate?

17    A.    Yeah, I think it's an

18  accurate statement.

19    Q.    The statement does not

20  include the words wholesale

21  pharmaceutical distributors, correct?

22    A.    No, sir, it does not.

23    Q.    It does not include DEA

24  compliance programs, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    DEA compliance programs, as

2    we will -- as noted in my report, are a

3    subset of the larger corporate compliance

4    program.

5              So you have a corporate

6    compliance program.  You have an

7    anti-diversion program under that.  You

8    have a suspicious order monitoring

9    program under that.

10             So it's all sort of a

11   subsumed in the bigger picture.  We are

12   talking compliance, we are talking

13   compliance with all laws and regulations,

14   the systems and processes designed at the

15   corporate level.

16        Q.    Have you designed a DEA

17   compliance program before?

18        A.    I have not designed a DEA

19   compliance program in the sense of a

20   controlled substances.  I have designed a

21   sample and sample accountability PDMA

22   compliance programs.  As you know, those

23   are substantially similar programs.  You

24   need to know who you are selling -- you

1  know, providing samples to, that they're

2  qualified to receive the samples, that

3  the inventories and samples that you

4  deliver are in fact given to sales reps,

5  are in fact -- are passed out to

6  healthcare providers, are in fact

7  accounted for.  Any elements of diversion

8  on the other hand are then reported

9  appropriately to the appropriate

10  agencies, et cetera.  So yes, I have done

11  that.

12        Q.    Now, do sample and sample

13  capacity programs and PDMA compliance

14  programs, do -- do those -- do those

15  programs use 21 U.S.C. 823?

16            MR. BOGLE:  Object to form.

17        You can answer if you understand.

18            THE WITNESS:  I'm not sure I

19        understand the question that he's

20        asking.

21  BY MR. EPPICH:

22        Q.    Well, do those programs, are

23  they governed by the Controlled

24  Substances Act and its affiliated

Highly Confidential - Subject to Further Confidentiality Review

1  regulations?

2      A.    Only if you're dropping

3  samples under a -- only if you're

4  dropping controlled substances samples,

5  then yes, it would apply.  If you're not

6  dropping controlled substances samples,

7  the answer is no, it would not apply.

8      Q.    Do either of those programs

9  use suspicious order monitoring programs

10  as defined by the Controlled Substances

11  Act and its affiliated regulations?

12      A.    Again, back to my original

13  answer, if you're dropping controlled

14  substances samples, you would need to

15  comply with the suspicious order

16  monitoring requirements, as well as the

17  PDMA requirements.  And if you're

18  dropping non controlled substances, then

19  the answer would be you do not need to

20  comply.

21      Q.    And did -- did any of the

22  programs that you designed drop sample --

23  controlled substances into them?

24      A.    Not that --

Highly Confidential - Subject to Further Confidentiality Review

1   created and implemented policies to

2   reduce the risk from perceived improper

3   influence with healthcare professionals;

4   is that right?

5          A.     That's part of what I did,

6   yes.

7          Q.     Those policies are

8   anti-kickback measures, right?

9          A.     They are not only

10  anti-kickback measures.  Again, as we

11  discussed earlier, I did PDMA work for

12  them as well and sample accountability

13  work as well.  They're not only

14  anti-kickback statutes.  There's false

15  claims work.

16         Q.     How much of your time was --

17  how much of your work at SmithKline

18  related to PDMAs and sample -- and sample

19  programs?

20         A.     Honestly, I spent at least a

21  quarter of my time, if not more, on that.

22  We had lots of investigations.  We had

23  lots of issues.  We were putting in new

24  systems, controls, writing new policies.

1    It was a substantial chunk of time.

2         Q.    And these policies, these

3    PDMA sample and sample policies that

4    you've mentioned a few times, they focus

5    on policies that govern providing samples

6    that are given to physicians, right?

7         A.    Correct.  But we're -- but

8    let's be clear.  The kinds of controls

9    that you're putting in around PDMA,

10   non-controlled substances samples are

11   substantially equivalent to what you're

12   doing in controlled substances work.

13             You need to know the right

14   people that you're dropping to.  You need

15   to account for your inventory.  You need

16   to look for suspicious behavior.  You

17   need to report suspicious behavior.  You

18   need to investigate red flags.  You need

19   to investigate noncompliance.  You need

20   to report noncompliance.

21             It's all, again, pretty much

22   substantially similar to the world of

23   controlled substances.  You're just

24   working with a different set of products.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    But the policies focus on

2   providing samples to physicians, that's

3   true, correct?

4      A.    That -- that is true.

5      Q.    Now, SmithKline was --

6      A.    Or other -- other

7   prescribers, so let's be clear.  You can

8   have nurse practitioners, or physician's

9   assistants, who also have prescribing

10  privileges.  We could provide samples to

11  them.

12     Q.    Thank you for that.

13           SmithKline was a

14  pharmaceutical manufacturer, right?

15     A.    That is correct.

16     Q.    SmithKline was not a

17  wholesale drug distributor?

18     A.    No, sir, it was not.

19     Q.    SmithKline did not

20  manufacture opioids, correct?

21     A.    No.

22     Q.    SmithKline did not

23  distribute opioids?

24     A.    To the best of my knowledge,

Highly Confidential - Subject to Further Confidentiality Review

1  general on DEA compliance.  On a specific

2  compliance program and the elements

3  necessary for a manufacturer, no, sir.

4            MR. EPPICH:  Let's go ahead

5        and take a break.  Let's go off

6        the record.

7            THE VIDEOGRAPHER:  Going off

8        the record, 10:26 a.m.

9            (Short break.)

10            THE VIDEOGRAPHER:  We are

11        back on the record at 10:44 a.m.

12  BY MR. EPPICH:

13        Q.    All right, Dr. Whitelaw, I

14  want to ask you a few more questions

15  about your work at C.R. Bard.  And this

16  is -- we are back on Page 281 of your

17  report.

18        A.    Okay.  Yes, of course.  I'm

19  here.

20        Q.    Now, it says -- it says that

21  you served as Bard's first compliance

22  officer, post-settlement.

23            Is that accurate?

24        A.    Yes, that's an accurate

Highly Confidential - Subject to Further Confidentiality Review

1  statement, sir.

2      Q.    You then state you created

3  and implemented Bard's original medical

4  device compliance program to meet the

5  requirements of the federal sentencing

6  guidelines and Bard's plea agreement with

7  the U.S. Department of Justice, and

8  served as Bard's first compliance officer

9  post-settlement.

10          Is that -- is that accurate?

11      A.    That is all accurate, sir.

12      Q.    So you oversaw the design

13  and implementation of C.R. Bard's medical

14  device compliance program, is that true?

15      A.    I oversaw the implementation

16  and design of their corporate compliance

17  program, yes.

18      Q.    And their -- their corporate

19  compliance program was directed at

20  medical devices, correct?

21      A.    Their business was in

22  medical devices, yes.

23      Q.    When you designed C.R.

24  Bard's medical compliance program, you

Highly Confidential - Subject to Further Confidentiality Review

1  designed the program to comply -- comply

2  with existing laws and regulations?

3       A.    Yes.

4       Q.    When you designed C.R.

5  Bard's compliance program, you relied on

6  the guidance from the relevant regulatory

7  agencies available at the time, correct?

8       A.    Well, that's part of what I

9  relied on.  I relied on an awful lot

10  more.  I also relied on the experience,

11  again, this would have been preguidance

12  from OIG and preguidance from department

13  of justice in this space, so the only

14  ones that had any real guidance were the

15  defense industry at the time.  So there

16  were a lot of conversations I had with

17  the folks at Boeing and other places to

18  understand what they had gone through

19  from a defense contracting compliance

20  program perspective.

21           See, you have to remember

22  this is the day when there was very

23  little out there.  This was new to the

24  life sciences industry as a whole and the

1    company should have, and it gives the

2    framework of what is -- are the standards

3    around what is considered a good and

4    effective compliance program.

5         Q.    In a section entitled

6    "Applicability of Chapter 8," the federal

7    sentencing guidelines state, "This

8    chapter applies to the sentencing of all

9    organizations for felony and Class A

10   misdemeanor offenses"?

11        A.    That is what the title says,

12   yes.

13        Q.    The guidelines expressly

14   state that they are to be used for

15   criminal sentencing of organizations,

16   correct?

17        A.    That is certainly one of its

18   purposes, yes.

19        Q.    And you understand that this

20   is a civil litigation, this -- this

21   deposition is for a civil litigation,

22   correct?

23        A.    Clearly.

24        Q.    It's not a criminal case?

1      A.    To my knowledge, no, it's

2   not a criminal case.

3      Q.    And under the guideline's

4   own applicability section, the guidelines

5   are not applicable to this civil

6   litigation.

7            Would you agree?

8            MR. BOGLE:  Objection.

9            THE WITNESS:  No, sir, I

10           would not agree.  I fundamentally

11           disagree with where you are going

12           with this.

13           The guidelines are the basic

14           framework.  They are where

15           everybody starts.  It's where

16           industry starts.  It's where

17           compliance professionals start.

18           It's where good companies start,

19           et cetera.

20           It is the baseline.  It has

21           become the de facto set of

22           standards that you start with when

23           you're looking at and assessing

24           corporate compliance programs.

Highly Confidential - Subject to Further Confidentiality Review

1           Now, it happens to be
2       embodied in the section that has
3       that title as we just discussed,
4       but it is not just limited to
5       criminal actions.  And doing so is
6       not a good read of where the world
7       of compliance is and the way we do
8       things.  Because you use it.
9           And by the way, if it were
10      only limited to criminal things,
11      then I would wonder why everybody
12      is running around out there and
13      putting in their own compliance
14      programs, trying to follow these
15      guidelines.  It wouldn't make any
16      sense if you said it's only for
17      criminal.
18          People are doing it because
19      it's good business.  People are
20      doing it because it's a good --
21      it's effective in maintaining
22      compliance.
23          So those standards, although
24      they are embodied in that section,

Highly Confidential - Subject to Further Confidentiality Review

1       are actually the basis that we use

2       day in and day out as consultants,

3       compliance professionals, et

4       cetera, to do our job.

5   BY MR. EPPICH:

6       Q.    Are you familiar with the

7   2005 case of U.S. versus Booker?

8       A.    I am familiar with the case

9   of U.S. versus Booker.

10      Q.    And it's true that in U.S.

11  versus Booker, the United States Supreme

12  Court held that applying these federal

13  sentencing guidelines in a criminal

14  context is unconstitutional, did it not?

15          MR. BOGLE:  Object to form.

16          THE WITNESS:  I believe

17      that's an unfair reading of the

18      standard.  What they said is it

19      couldn't be the only reason and be

20      used.

21          A judge can consider the

22      federal sentencing guidelines and

23      sentencing organizations.  It

24      couldn't be the sole basis for

Highly Confidential - Subject to Further Confidentiality Review

1           sentencing organizations.

2  BY MR. EPPICH:

3           Q.    So the court has the

4  discretion whether or not to apply the

5  federal sentencing guidelines, correct?

6                     MR. BOGLE:  Object to form.

7                     THE WITNESS:  In what

8           context?  Are we talking just a

9           criminal context, are we talking

10          about a civil context?

11  BY MR. EPPICH:

12          Q.    In a --

13          A.    But in -- but in general, a

14  court has discretion to use them like

15  they use other standards, yes.

16          Q.    And the -- let me strike

17  that.

18                Let me go ahead and turn to

19  Page 9 of your report.

20                On Page 9, actually, the

21  middle of the page, sir, you discuss U.S.

22  versus C.R. Bard, the case of U.S. versus

23  C.R. Bard; is that correct?

24          A.    I do reference it there,

Highly Confidential - Subject to Further Confidentiality Review

1    programs do not reflect the most current

2    thinking derived from experts across

3    industries."

4              You also wrote that,

5    correct?

6        A.    Yes, I did.

7        Q.    And then finally in the last

8    paragraph on this page, and I'm looking

9    at the last three lines of that

10   paragraph, you wrote, before you were

11   hired by the plaintiffs' counsel, that

12   "government enforcement agencies must

13   change their mindset and their own

14   measures of success beyond the number and

15   size of settlements."

16             You wrote that too, didn't

17   you?

18       A.    Yeah, I did write that.

19       Q.    Now, these were your

20   opinions before you were hired by the

21   plaintiffs for this litigation, correct?

22       A.    Those were my opinions as

23   expressed in this article; yes, I wrote

24   this article.

1    Q.    And now that you're the

2    plaintiffs expert, you're offering the

3    opposite opinion, about the usefulness of

4    government guidances, settlements and

5    other precedents --

6              MR. BOGLE:  Object to form.

7              THE WITNESS:  No, I'm not.

8         No, I'm not.

9              I am not.  You are missing

10         the point.  The point of what I

11         was saying was the fact that if

12         you look at settlement agreements

13         in general, they are tailored to

14         specific conduct.  If you look at

15         the corporate integrity agreements

16         in particular is what I was

17         speaking to, in life sciences, we

18         are talking about specific forms

19         of conduct they were attempting to

20         address.

21              We weren't talking about the

22         overall ethics as a culture.  And

23         there's a whole discussion going

24         on in our -- in our business about

1    the role of ethics and the review

2    of just basic compliance and where

3    do those two fit, how do you put

4    those two together, and how do you

5    make a good compliance culture.

6        The conversation I was

7    having, or at least the opinions

8    that I was expressing in here is

9    that my belief was that OIG in

10   particular needed to start

11   thinking about the ethical

12   component as much as they were

13   thinking about the basic

14   compliance component.

15       So that's not inconsistent

16   with the viewpoint that I've

17   expressed in this report.  In

18   fact, it is incredibly consistent.

19   BY MR. EPPICH:

20       Q.    You cite to this document in

21   your CV, sir?  Do you cite to what I've

22   marked --

23       A.    In my CV?

24       Q.    -- as Exhibit 9 -- or 8?

Highly Confidential - Subject to Further Confidentiality Review

1    Excuse me.

2          A.    In my CV or in my --

3          Q.    In your CV that's attached

4    to your -- to your report, sir.

5          A.    Are you looking for the

6    publications list or are you looking just

7    for the basic CV?  I'm trying to

8    understand where you're looking.

9          Q.    I'm asking if you identified

10   this particular article in the CV that

11   you've attached to your expert report in

12   this litigation, Exhibit 2?  Your CV

13   begins on Page 279.

14         A.    If it's not listed here, it

15   was left out by inadvertence.  But again

16   I've written a lot over 30 years.  I

17   don't remember every single article I've

18   written.  I did try to make this as

19   complete and thorough as I could possibly

20   make it for you.

21              MR. EPPICH:  We've been

22         going about an hour.

23              THE WITNESS:  Wait a minute.

24              MR. EPPICH:  I don't -- I

Highly Confidential - Subject to Further Confidentiality Review

1          Asked and answered.

2              THE WITNESS:  If we just

3      walk through it logically, the

4      people who are supposed to be the

5      gatekeepers are, in fact, being --

6      are, in fact, being incentivized

7      by the company.  And better the

8      company does, the better the

9      bonuses, et cetera.  So it's --

10     it's an inherent conflict to the

11     company.  You have the gatekeepers

12     in that -- in a difficult

13     position.  I didn't say it's --

14     that's a conflict position.

15     You're holding the company for

16     your job.

17  BY MS. SWIFT:

18         Q.    Do you have any other basis

19  or support for that opinion that you just

20  articulated?

21         A.    I am not sure what you're

22  looking for, Counsel.

23         Q.    Okay.  We can move on.

24              Do you understand -- strike

Highly Confidential - Subject to Further Confidentiality Review

1    that.

2              All right.  In the eight

3    paragraph in this section, is the last

4    paragraph on Page 46, refers to your

5    compliance maturity and program

6    effectiveness scale.

7              Do you see that?

8         A.    Yes, I see that.

9         Q.    That's the Figure 2 on Page

10   43 that my colleague asked you about

11   earlier today, correct?

12        A.    That is correct.

13        Q.    Figure 2 on page 43, the

14   maturity scale, that's the model that you

15   made up for figuring out where in its

16   maturity level or life span a company is

17   with respect to compliance.  Is that a

18   roughly fair statement?

19             MR. BOGLE:  Object to form.

20             THE WITNESS:  No, I don't

21        think it's a fair statement.  It's

22        something -- you're characterizing

23        it as something that I made up.

24        No, it's something that is in

Highly Confidential - Subject to Further Confidentiality Review

1           general use among compliance

2           professionals and others out

3           there.

4    BY MS. SWIFT:

5           Q.    You said that earlier today

6    as well, that you knew of others who had

7    used the compliance maturity scale.  Who

8    else has used it?

9           A.    I have seen it in use in my

10   time in Deloitte.  I've seen it used by

11   PwC.  I've seen it used by a variety of

12   different consultants and companies, even

13   some of my fellow colleagues when I was

14   an inhouse compliance officer used it

15   within their own organizations.

16          Q.    I believe you testified that

17   you created the compliance maturity

18   scale; is that correct?

19          A.    No, I testified that I

20   created this diagram that's in this

21   document, was what I created.

22          Q.    Okay.  Have you ever seen

23   the compliance maturity and program

24   effectiveness scale used publicly

Highly Confidential - Subject to Further Confidentiality Review

1  anywhere in the world?

2          MR. BOGLE:  Object to form.

3          THE WITNESS:  I'm assuming I

4      can Google it and find it.

5  BY MS. SWIFT:

6      Q.   We tried.  We couldn't.

7  Have you -- have you done that and seen

8  it used publicly somewhere?

9      A.   You know, actually I have.

10 I actually was able to Google Google

11 Images at one point, and it did come up.

12 Not the exact same -- again, it's -- the

13 compliance maturity model is usually

14 adapted.  Each individual consultant

15 or -- does some adaptation.  The words

16 may be slightly different.  But that

17 curve that we are talking about, the

18 basic four parameters, yeah, I've seen it

19 before.

20     Q.   I believe you testified

21 you've seen it used by people at Deloitte

22 and PwC; is that correct?

23     A.   I've seen it from PwC.  I

24 have seen it from Deloitte, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you seen it anywhere

2    else?

3    A.    As I said, I seem to recall

4    some of my colleagues inhouse at other

5    companies using it, but I can't tell you

6    which companies and when and where, no.

7    Q.    You say in that paragraph on

8    Page 46 that the two chain pharmacies are

9    barely starting into the foundational

10   level of the maturity scale, correct?

11   A.    That's what I say.

12   Q.    And if there were a remedial

13   level, that's where they would be,

14   correct?

15   A.    That was my statement, yes.

16   Q.    Okay.  I understand that you

17   don't have a scoring method or a point

18   system for placing the pharmacies on your

19   maturity scale.  You said it today, it

20   was more of a qualitative assessment.  Is

21   that right?

22   A.    That's fair.

23   Q.    Are both of the chain

24   pharmacies that you looked at in the same

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    The next section, 13.4.2,

2    talks about codes of conduct, correct?

3    A.    It does.

4    Q.    You talk about a business

5    ethics code and a pharmacy code, right?

6    A.    Yes, I do.

7    Q.    You understand that not all

8    employees at Walgreens are pharmacists?

9    A.    Yes, I do understand that.

10    Q.    At Page 191 of the report

11    you see -- you say -- this is at the

12    beginning of the first full paragraph --

13    "The maintenance of two separated and

14    unlinked codes of conduct increases

15    complexity and the likelihood that the

16    two documents will become out of sync,"

17    correct?

18    A.    I did write that and say

19    that.

20    Q.    You're not saying that it's

21    a violation of the Controlled Substances

22    Act to have multiple codes of conduct

23    that are out of sync with each other, are

24    you, sir?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BOGLE:  Object to form.

2          THE WITNESS:  No.  What I'm

3      saying is it is a problem from

4      a -- from an effective compliance

5      program standpoint to have

6      multiple codes and policies that

7      are out of sync with one another.

8  BY MS. SWIFT:

9      Q.    It's also not a violation of

10  the DEA's suspicious order monitoring

11  program to have multiple codes of

12  conduct, correct, sir?

13          MR. BOGLE:  Object to form.

14          THE WITNESS:  Again,

15      Counselor, we're not just looking

16      at whether or not there's a

17      violation of the Controlled

18      Substances Act.  The work I was

19      asked to do was look at an

20      effective corporate and controlled

21      substance compliance program from

22      standards that a reasonable and

23      prudent company would use.  And

24      one thing that reasonable and

1      prudent companies do is try to

2      make sure they don't have policies

3      and procedures that get out of

4      sync because you have multiple

5      different versions of a document.

6  BY MS. SWIFT:

7      Q.    Fair to say, then, that a

8  lot of the complaints you have about my

9  client are not violations of the

10  Controlled Substances Act?

11      MR. BOGLE:  Object to form.

12      Misstates testimony.

13      THE WITNESS:  I don't think

14      that's what I said, Counselor.  I

15      said my primary -- what I was

16      looking at, and particularly in

17      the case of this, are indicia of

18      not having an effective program.

19      Multiple documents in

20      multiple different hands can get

21      out of sync.  And this was an

22      example of just what can happen

23      when you -- when that occurs.

24  BY MS. SWIFT:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF OHIO
 3                EASTERN DIVISION
 4                   -  -  -
 5

 6   IN RE:  NATIONAL        :   HON. DAN A.
     PRESCRIPTION OPIATE     :   POLSTER
     LITIGATION              :
 7                           :   MDL NO. 2804
     APPLIES TO ALL CASES    :
 8                           :   CASE NO.
                             :   17-MD-2804
 9                           :
10        - HIGHLY CONFIDENTIAL -
11   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12                  VOLUME II
13                   -  -  -
14               May 17, 2019
15                   -  -  -
16             Continued videotaped
     deposition of DR. SETH B. WHITELAW, taken
17   pursuant to notice, was held at the
     offices of Golkow Litigation Services,
18   One Liberty Place, 1650 Market Street,
     Philadelphia, Pennsylvania, beginning at
19   8:31 a.m., on the above date, before
     Michelle L. Gray, a Registered
20   Professional Reporter, Certified
     Shorthand Reporter, Certified Realtime
21   Reporter, and Notary Public.
22                   -  -  -
23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24             deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1    its pharmacy-level anti-diversion

2    programs?

3            A.    No, I did not.

4            Q.    Okay.  The model that you

5    discuss here, have you ever, in all the

6    times that you've used that model, found

7    an SOM program to score above the

8    foundational level?

9                  MR. BOGLE:  For clarity, are

10           you talking about Figure 2?  When

11           you say model?  I just want to

12           make sure --

13                 MR. HYNES:  Yeah.

14                 THE WITNESS:  I don't know

15           what model you're talking about.

16   BY MR. HYNES:

17           Q.    The -- yeah, Figure 2.

18   Where -- the one in front of you there.

19   This model right here.

20           A.    That model?

21           Q.    Yeah.

22           A.    And all the time that I've

23   used it for an SOM?

24           Q.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Applied to an SOM program

2  alone?

3    Q.    Yes, have you ever found,

4  when you applied it to a SOM program,

5  have you found such a program to score

6  above the foundational level?

7    A.    No, I have not.

8    Q.    Before you were engaged in

9  this case, had you ever used this model

10  to evaluate an SOM program?

11    A.    No, I had not.  But it is a

12  standard compliance maturity model that

13  I've used to evaluate compliance

14  programs.

15    Q.    But not an SOM program

16  before you were --

17    A.    Not an SOM --

18    Q.    -- engaged in this case?

19    A.    -- program, per se.

20    Q.    I want to turn to --

21        MR. BOGLE:  Just wait until

22        he finishes.

23  BY MR. HYNES:

24    Q.    -- CVS's distribution

1    business.  You know that CVS is a

2    national chain pharmacy, correct?

3          A.    Yes, sir, I do.

4          Q.    Okay.  And I think you state

5    in your report, it has 9,800 retail

6    pharmacies.  Page 159.

7          A.    I believe that's --

8          Q.    Approximately.

9          A.    Approximately.  That number

10   rings a bell.

11         Q.    I'm not trying to test you

12   on that.

13               Are -- are you aware how

14   many retail pharmacies CVS has in

15   Cuyahoga and Summit Counties?

16         A.    Not off the top -- the

17   number?  I don't have a hard number off

18   the top of my head.

19         Q.    Is that something you looked

20   into when you were evaluating CVS's SOM

21   program?

22         A.    Again, I evaluated a lot of

23   different things in the SOM program.  And

24   I may have looked into it.  Again, I