*CNS Therapeutics*

| | Amount | Weighted-Average Amortization Period |
|---|---|---|
| Completed technology | $ 73.1 | 13 years |
| Trademark | 0.2 | 3 years |
| In-process research and development | 18.6 | Non-Amortizable |
| | $ 91.9 | |

The in-process research and development projects primarily relate to certain investigational intrathecal pain products. As of the date of acquisition, these pain products were in various stages of development, with further development, testing, clinical trials and regulatory submission required in order to bring them to market. At the acquisition date, the total cost to complete these products was estimated to be approximately $18.0 million. The Company expects that regulatory approvals will occur between 2016 and 2019. The valuation of the in-process research and development was determined using, among other factors, appraisals primarily based on the discounted cash flow method. The cash flows were discounted at a 35% rate, which was considered commensurate with the risks and stages of development of the pain products. Future residual cash flows that could be generated from the products were determined based upon management's estimate of future revenue and expected profitability of the products. These projected cash flows were then discounted to their present values taking into account management's estimate of future expenses that would be necessary to bring the products to completion.  The goodwill is not deductible for U.S. income tax purposes. All assets acquired are included within the Company's Specialty Brands segment.

*Financial Results* - The amount of net sales and earnings included in the Company's results for the periods presented were as follows:

| Net sales | 2015 | 2014 |
|---|---|---|
| Ikaria | $ 191.9 | $ ──── |
| Questcor | 1,125.9 | 129.2 |
| Cadence | 263.0 | 124.4 |
| | $ 1,580.8 | $ 253.6 |
| **Operating income (loss)** | | |
| Ikaria | $ 47.1 | $ ──── |
| Questcor | 223.3 | 17.4 |
| Cadence | (97.3) | (66.9) |
| | $ 173.1 | $ (49.5) |

The amount of amortization on acquired intangible assets included within operating income (loss) for the periods presented was as follows:

| Intangible asset amortization | 2015 | 2014 |
|---|---|---|
| Ikaria | $ 57.1 | $ ──── |
| Questcor | 301.4 | 34.9 |
| Cadence | 162.5 | 85.9 |
| | $ 521.0 | $ 120.8 |

During fiscal 2015 and 2014, the Company recognized $44.1 million and $25.7 million, respectively, of expense primarily associated with fair value adjustments of acquired inventory. This expense was included within cost of sales.

*Acquisition-Related Costs* - Acquisition-related costs incurred in fiscal 2015 and 2014 for each of the fiscal 2015 and 2014 acquisitions discussed above were as follows:

| Acquisition-related costs | 2015 | 2014 |
|---|---|---|
| Therakos | $ 22.5 | $ ──── |
| Ikaria | 30.9 | ──── |
| Questcor | ── | 47.5 |
| Cadence | | 17.6 |
| | $ 53.4 | $ 65.1 |

*Unaudited Pro Forma Financial Information* - The following unaudited pro forma information presents a summary of the results of operations for the periods indicated as if the Questcor Acquisition and Cadence Acquisition had been completed as of September 29, 2012 and the Ikaria Acquisition and Therakos Acquisition as of September 28, 2013. The pro forma financial information is based on the historical financial information for the Company, Ikaria, Questcor and Cadence, along with certain pro forma adjustments. These pro forma adjustments consist primarily of:

- non-recurring costs related to the step-up in fair value of acquired inventory and transaction costs related to the acquisitions;

- increased amortization expense related to the intangible assets acquired in the acquisitions;

- elimination of direct acquisition transaction costs from the period of acquisition;

- increased interest expense to reflect the fixed rate unsecured notes and revolving credit facility (utilizing the interest rate in effect at the date of the acquisition of 2.6%) entered into in connection with the Therakos Acquisition, the fixed rate unsecured notes entered into in connection with the Ikaria Acquisition (assuming no interest related to the revolving credit facility which was paid down subsequent to the Ikaria Acquisition), the fixed-rate senior unsecured notes and variable-rate term loan entered into in connection with the acquisition of Questcor (utilizing the interest rate in effect at the date of acquisition of 3.50%), and the variable-rate term loan and revolving credit facility entered into in connection with the Cadence Acquisition (utilizing the interest rate in effect at the date of acquisition of 3.50%) including interest and amortization of deferred financing costs and original issue discount; and

- the related income tax effects.

The following unaudited pro forma information has been prepared for comparative purposes only and is not necessarily indicative of the results of operations as they would have been had the acquisition occurred on the assumed date, nor is it necessarily an indication of future operating results. In addition, the unaudited pro forma information does not reflect the cost of any integration activities, benefits from any synergies that may be derived from the acquisition or revenue growth that may be anticipated.

|  | | 2015 | | 2014 |
|---|---|---|---|---|
| Net sales | $ | 3,755.8 | $ | 3,598.1 |
| Income (loss) from continuing operations | | 359.9 | | (63.1) |
| Basic earnings (loss) per share from continuing operations | $ | 3.11 | $ | (0.55) |
| Diluted earnings (loss) from per share continuing operations | | 3.07 | | (0.55) |

## License Agreements

### Ofirmev

As part of the Cadence Acquisition, the Company acquired the exclusive development and commercialization rights to Ofirmev in the U.S. and Canada, as well as the rights to the patents and technology, which were originally in-licensed by Cadence from BMS in March 2006. BMS sublicensed these rights to Cadence under a license agreement with SCR Pharmatop S.A. ("Pharmatop"), and the Company has the right to grant sublicenses to third parties. Under this license agreement, the Company may be obligated to make future milestone payments of up to $25.0 million upon the achievement of certain levels of net sales, of which $10.0 million was paid during fiscal 2015. In addition, the Company is obligated to pay royalties on sales of the product. During fiscal 2015 and 2014, the Company paid royalties of $43.9 million and $13.2 million respectively.

### Exalgo

In 2009, the Company's Specialty Brands segment acquired the rights to market and distribute the pain management drug EXALGO® (hydromorphone HCl) extended-release tablets (CII) ("Exalgo") in the U.S. Under the license agreement, the Company is obligated to make additional payments of up to $73.0 million based on the successful completion of specified development and regulatory milestones. Through fiscal 2015, $65.0 million of additional payments had been made, with $55.0 million being capitalized as an intangible asset. The Company is also required to pay royalties on sales of the product. During fiscal 2015, 2014 and 2013, the Company paid royalties of $3.2 million, $22.0 million and $24.0 million, respectively.

In January 2014, the Company purchased certain royalty rights associated with Exalgo for $7.2 million, which have been capitalized as an intangible asset.

*Depomed*

In 2009, the Company's Specialty Brands segment licensed worldwide rights to utilize Depomed, Inc.'s ("Depomed") Acuform gastric retentive drug delivery technology for the exclusive development of four products. Under this license agreement, the Company may be obligated to pay up to $64.0 million in development milestone payments. Through fiscal 2015, approximately $22.0 million of these payments have been made by the Company.  During fiscal 2014, upon approval by the FDA for XARTEMIS™ XR (oxycodone HCl and acetaminophen) extended release tablets CII ("Xartemis XR"), the Company made a milestone payment of $10.0 million, which has been capitalized as an intangible asset.

*Pennsaid*

In 2009, the Company's Specialty Brands segment entered into a licensing agreement which granted it rights to market and distribute Pennsaid and Pennsaid 2%, a formulation of diclofenac sodium topical solution which was approved in February 2014 by the FDA and indicated for the treatment of pain associated with osteoarthritis of the knee. The Company was responsible for future development activities and expenses and were required to make milestone payments of up to $120.0 million based upon the successful completion of specified regulatory and sales milestones. Through fiscal 2015, $15.0 million of these payments were made, all of which were capitalized as an intangible asset. The Company is also required to pay royalties on sales of the products under this agreement. During fiscal 2015, 2014 and 2013, the Company paid royalties of $1.8 million, $4.3 million and $3.9 million, respectively.

During the fourth quarter of fiscal 2014, the Company reached an agreement in principle with Nuvo to settle various claims associated with our license of Pennsaid obtained from Nuvo.  As part of the legal settlement, the Company agreed to return the license to Nuvo, which resulted in the Company recording an impairment of $11.1 million during the fourth quarter of fiscal 2014.

## 6.   Restructuring and Related Charges

During fiscal 2013, the Company launched a restructuring program designed to improve its cost structure ("the 2013 Mallinckrodt Program"). The 2013 Mallinckrodt Program includes actions across all segments, as well as within corporate functions. The Company expects to incur charges of $100.0 million to $125.0 million under this program as the specific actions required to execute on these initiatives are identified and approved, most of which are expected to be incurred by the end of fiscal 2016.

Prior to Separation, Covidien initiated restructuring programs, which also applied to its Pharmaceutical business. These programs were substantially completed as of September 26, 2014.

Net restructuring and related charges by segment within continuing operations are as follows:

| | Fiscal Year | | | | | |
|---|---|---|---|---|---|---|
| | | 2015 | | 2014 | | 2013 |
| Specialty Brands | $ | 36.5 | $ | 57.0 | $ | 5.2 |
| Specialty Generics | | 4.5 | | 9.8 | | 11.2 |
| Nuclear Imaging | | (4.6) | | 13.7 | | 6.9 |
| Corporate | | 4.3 | | 1.4 | | 3.0 |
| Restructuring and related charges, net | | 40.7 | | 81.9 | | 26.3 |
| Less: accelerated depreciation | | (0.3) | | (0.5) | | (2.6) |
| Restructuring charges, net | $ | 40.4 | $ | 81.4 | $ | 23.7 |

Net restructuring and related charges by program within continuing operations are comprised of the following:

| | Fiscal Year | | |
| | 2015 | 2014 | 2013 |
|---|---|---|---|
| 2013 Mallinckrodt Program | $ 7.4 | $ 27.3 | $ 8.5 |
| Acquisition programs | 33.6 | 56.4 | — |
| Other programs | (0.3) | (1.8) | 17.8 |
| Total programs | 40.7 | 81.9 | 26.3 |
| Less: non-cash charges, including impairments and accelerated share based compensation expense | (10.1) | (38.0) | (2.6) |
| Total charges expected to be settled in cash | $ 30.6 | $ 43.9 | $ 23.7 |

Non-cash charges in fiscal 2015 and fiscal 2014 include $9.8 million and $35.1 million, respectively, of accelerated share based compensation expense related to employee terminations, primarily related to our Questcor acquisition, and fiscal 2014 includes $2.3 million of property, plant and equipment asset impairments.

The following table summarizes cash activity for restructuring reserves, substantially all of which related to employee severance and benefits, with the exception of $8.5 million in fiscal 2014 related to consulting costs associated with restructuring initiatives related to the CMDS business:

| | 2013 Mallinckrodt Program | Acquisition Programs | Other Programs | Total |
|---|---|---|---|---|
| Balance at September 28, 2012 | $ — | $ — | $ 8.9 | $ 8.9 |
| Charges from continuing operations | 8.5 | — | 17.6 | 26.1 |
| Charges from discontinued operations | 6.4 | — | 3.3 | 9.7 |
| Changes in estimate from continuing operations | — | — | (2.4) | (2.4) |
| Changes in estimate from discontinued operations | — | — | (0.2) | (0.2) |
| Cash payments | — | — | (15.1) | (15.1) |
| Reclassifications [1] | — | — | (1.5) | (1.5) |
| Balance at September 27, 2013 | 14.9 | — | 10.6 | 25.5 |
| Charges from continuing operations | 32.9 | 22.9 | 1.4 | 57.2 |
| Charges from discontinued operations | 25.3 | — | 1.1 | 26.4 |
| Changes in estimate from continuing operations | (7.6) | (1.6) | (4.1) | (13.3) |
| Changes in estimate from discontinued operations | (1.8) | — | (0.7) | (2.5) |
| Cash payments | (34.8) | (13.4) | (6.8) | (55.0) |
| Reclassifications [1] | (1.3) | — | (1.0) | (2.3) |
| Currency translation | (1.0) | — | (0.1) | (1.1) |
| Balance at September 26, 2014 | 26.6 | 7.9 | 0.4 | 34.9 |
| Charges from continuing operations | 15.4 | 25.3 | — | 40.7 |
| Charges from discontinued operations | 1.0 | — | — | 1.0 |
| Changes in estimate from continuing operations | (8.3) | (1.5) | (0.3) | (10.1) |
| Changes in estimate from discontinued operations | (0.6) | — | — | (0.6) |
| Cash payments | (22.5) | (21.7) | (0.1) | (44.3) |
| Reclassifications [1] | (3.0) | — | — | (3.0) |
| Currency translation | (0.6) | — | — | (0.6) |
| Balance at September 25, 2015 | $ 8.0 | $ 10.0 | $ — | $ 18.0 |

(1) Represents the reclassification of pension and other postretirement benefits from restructuring reserves to pension and postretirement obligations.

Net restructuring and related charges, including associated asset impairments, incurred cumulative to date related to the 2013 Mallinckrodt Program are as follows:

| | | |
|---|---|---:|
| Specialty Brands | $ | 4.0 |
| Specialty Generics | | 15.6 |
| Nuclear Imaging (including CMDS) | | 67.3 |
| Corporate | | 10.0 |
| | $ | 96.9 |

Substantially all of the restructuring reserves are included in accrued and other current liabilities on the Company's consolidated balance sheets.

## 7.  Income Taxes

In May 2015, the activities of the Company's principal executive offices were relocated from Ireland to the U.K. which resulted in a change in the Company's tax residence to the U.K. Mallinckrodt plc remains incorporated in Ireland. The tax regime applicable to holding companies resident in the U.K. allows Mallinckrodt plc to continue to have flexibility in structuring its subsidiary operations and enhanced global cash management. The Company continues to be subject to taxation in various tax jurisdictions worldwide. As a result of the integration of acquired intellectual property, the Company's income and assets are no longer concentrated in a single tax jurisdiction. Accordingly, in 2015 the Company reports the U.K. tax jurisdiction as its Domestic jurisdiction and the International jurisdiction represents areas outside the U.K. tax jurisdiction.

The Domestic and International components of income from continuing operations before income taxes were as follows[1]:

| | | 2015 | | 2014 | | 2013 |
|---|---|---:|---|---:|---|---:|
| Domestic | $ | (107.0) | $ | (159.9) | $ | 34.7 |
| International | | 322.3 | | 6.0 | | 21.0 |
| Total | $ | 215.3 | $ | (153.9) | $ | 55.7 |

(1) Domestic reflects U.K. in fiscal 2015, and U.S. federal and state in fiscal 2014 and fiscal 2013.

Significant components of income taxes related to continuing operations are as follows[1]:

| | | 2015 | | 2014 | | 2013 |
|---|---|---:|---|---:|---|---:|
| Current: | | | | | | |
| Domestic | $ | 0.3 | $ | 40.9 | $ | 49.3 |
| International | | 95.1 | | 17.9 | | 12.1 |
| Current income tax provision | | 95.4 | | 58.8 | | 61.4 |
| Deferred: | | | | | | |
| Domestic | $ | (0.8) | $ | (49.7) | $ | (18.3) |
| International | | (187.5) | | (19.2) | | 4.4 |
| Deferred income tax (benefit) provision | | (188.3) | | (68.9) | | (13.9) |
| | $ | (92.9) | $ | (10.1) | $ | 47.5 |

(1) Domestic reflects U.K. in fiscal 2015, and U.S. federal and state in fiscal 2014 and fiscal 2013.

The fiscal 2015 International current income tax provision reflects a utilization of $7.0 million of net operating losses (primarily in the U.S.) and $14.3 million of U.S. credits. The net operating loss utilization is comprised of $4.8 million of net operating losses acquired in conjunction with the Ikaria Acquisition and the remainder utilization relating to net operating losses carried forward from fiscal 2014. The U.S. credit utilization is comprised of $7.2 million of credits acquired in conjunction with the Ikaria Acquisition and the remainder utilization relating to credits carried forward or generated during fiscal 2015.

The fiscal 2014 Domestic current income tax provision reflects a utilization of $221.3 million of net operating losses (primarily in the U.S.) and $8.6 million of U.S. credits. The net operating loss utilization is comprised of $187.8 million of net operating losses acquired in conjunction with the Cadence Acquisition and the remainder utilization relating to net operating losses carried forward.

The Company has a provincial tax holiday in Canada that expires on April 1, 2017. The tax holiday reduced International tax expense by $5.1 million and $0.3 million for the fiscal years 2015 and 2014, respectively.

The reconciliation between Domestic income taxes at the statutory rate and the Company's provision for income taxes on continuing operations is as follows:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Provision for income taxes at Domestic statutory income tax rate [1] | $ 43.1 | $ (53.8) | $ 19.5 |
| Adjustments to reconcile to income tax provision: | | | |
| U.S. state income tax provision, net [6] | ---- | (6.1) | 3.7 |
| Rate difference between Domestic and International jurisdictions [2] [3] | (138.6) | (10.6) | 3.3 |
| U.S. manufacturing deduction [6] | ---- | (4.1) | (2.5) |
| Valuation allowances, nonrecurring | (2.1) | 0.1 | 3.4 |
| Adjustments to accrued income tax liabilities and uncertain tax positions [3] | (6.8) | (1.5) | 5.0 |
| Interest and penalties on accrued income tax liabilities and uncertain tax positions [3] | 0.2 | (7.9) | 4.7 |
| Investment in partnership | ---- | 20.0 | --- |
| Credits, principally research and orphan drug [4] | (8.1) | (0.8) | (6.3) |
| Impairments, nondeductible | ---- | 41.8 | ---- |
| Permanently nondeductible and nontaxable items [5] | 16.4 | 13.8 | 15.3 |
| Other | 3.0 | (1.0) | 1.4 |
| Provision for income taxes | $ (92.9) | $ (10.1) | $ 47.5 |

(1)  The statutory tax rate reflects the U.K. statutory tax rate of 20% for fiscal 2015, and the U.S. federal statutory tax rate of 35% for fiscal 2014 and 2013.

(2)  Includes the impact of certain recurring valuation allowances for Domestic and International jurisdictions.

(3)  Fiscal year 2013 includes impact of items relating to entities retained by Covidien in connection with the Separation.

(4)  During fiscal 2013, the U.S. Research Credit legislation was extended, with a retroactive effective date of January 1, 2012. As such, fiscal 2013 includes approximately $2.3 million of credit related to the period January 1, 2012 through September 28, 2012. Due to the December 31, 2013 tax law expiration, fiscal 2014 includes $0.7 million for the period September 28, 2013 through December 31, 2013. During fiscal 2015, the legislation was extended, with a retroactive effective date of January 1, 2014. As such, fiscal 2015 includes approximately $3.6 million of credit related to the period January 1, 2014 through September 26, 2014.

(5)  Includes the impact of nondeductible transaction and separation costs.

(6)  For fiscal 2015, U.S. state income tax benefit of $36.4 million, and U.S. manufacturing deduction tax benefit of $5.6 million were combined with the rate differences between Domestic and International jurisdictions. Fiscal 2014 includes U.S. state income tax benefit of $4.4 million associated with fiscal 2014 acquisitions and integration thereof.

The rate difference between Domestic and International jurisdictions changed from $10.6 million of tax benefit to $138.6 million of tax benefit for fiscal 2014 to fiscal 2015, respectively. The rate difference between Domestic and International jurisdictions would have been $32.1 million of tax benefit in fiscal 2014 if the referenced rate would have been the U.K. statutory rate of 21%. This change was predominately related to recent acquisitions, which resulted in more income in lower tax rate jurisdictions and less income in the higher tax rate U.S. jurisdiction relative to income in all jurisdictions. The change in the lower tax rate jurisdictions was predominately due to recent acquisitions, both of which resulted in more income in lower tax rate jurisdictions and less income in the higher tax rate U.S. jurisdiction relative to income in all jurisdictions. The change in the lower tax rate jurisdictions was primarily attributable to increased operating income partially offset by amortization. The change in the U.S. jurisdiction was primarily attributable to increased amortization and the cost of financing recent acquisitions. Of the $128.0 million increase to tax benefit, $21.5 million of tax benefit can be attributed to the change in the referenced rate from U.S. to U.K, $35.0 million of tax benefit to the change in operating income, $22.5 million of tax expense to the change in amortization, $31.8 million of tax benefit to the U.S. state tax benefit associated with the impact of recent acquisitions, integration thereof, and legislative changes, and $62.2 million of tax benefit related to acquisition and other non-acquisition related items.

The rate difference between Domestic and International jurisdictions changed from $3.3 million of tax expense to $10.6 million of tax benefit for fiscal 2013 to fiscal 2014, respectively. The rate difference between Domestic and International jurisdictions would have been $10.0 million of tax expense and $32.1 million of tax benefit if the referenced rate would have been the U.K. statutory rate of 23% and 21% for fiscal 2013 and 2014 respectively. This change was predominately related to recent acquisitions, which resulted in more income in lower tax rate jurisdictions and less income in the higher tax rate U.S. jurisdiction relative to income in all jurisdictions. The change in the lower tax rate jurisdictions was predominately due to recent acquisitions and the benefit of intercompany debt transferred to the Company at Separation, both of which resulted in more income in lower tax rate jurisdictions and less income in the higher tax rate U.S. jurisdiction relative to income in all jurisdictions. The change in the lower tax rate jurisdictions was primarily attributable to increased operating income partially offset by amortization. The change in the U.S. jurisdiction was primarily attributable to increased amortization and the cost of financing recent acquisitions. Of the $13.9 million decrease in tax expense, $10.8 million of tax expense can be attributed to the change in operating income, $14.0 million of tax expense to the change in amortization, and $38.7 million of tax benefit related to acquisition and other non-acquisition related items.

As of September 25, 2015, September 26, 2014 and September 27, 2013, the amounts of unrecognized tax benefits for which the Company is legally and directly liable and would be required to remit cash if not sustained were $89.2 million, $82.0 million and $100.1 million, respectively. For periods prior to the Separation, the Company's operations had been included in tax returns filed by Covidien or certain of its subsidiaries not included in the Company's historical combined financial statements. As a result, some U.S. uncertain tax positions related to the Company's operations resulted in unrecognized tax benefits that are obligations of entities not included in the combined financial statements for periods prior to June 28, 2013. Because the activities that gave rise to these unrecognized tax benefits relate to the Company's operations, the impact of these items (presented in the table below) were charged to the income tax provision through parent company investment, which was a component of parent company equity in the combined balance sheets.

The following table summarizes the activity related to the Company's unrecognized tax benefits, excluding interest:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Balance at beginning of fiscal year | $ 82.0 | $ 100.1 | $ 165.5 |
| Unrecognized tax benefits retained by Covidien | ...... | ...... | (153.7) |
| Unrecognized tax benefits transferred from Covidien | | | 84.2 |
| Additions related to current year tax positions | 4.5 | 3.2 | 3.5 |
| Additions related to prior period tax positions | 19.9 | 30.6 | 6.6 |
| Reductions related to prior period tax positions | (7.7) | (33.0) | (4.3) |
| Settlements | (7.8) | (6.9) | (1.6) |
| Lapse of statute of limitations | (1.7) | (12.0) | (0.1) |
| Balance at end of fiscal year | 89.2 | 82.0 | 100.1 |

During fiscal 2015, the Company made a payment of $8.9 million ($7.4 million of tax and $1.5 million of interest) to the U.S. Internal Revenue Service ("IRS") in connection with the settlement of certain tax matters for 2008 and 2009. During fiscal 2014, the Company made a payment of $35.9 million ($27.3 million of tax and $8.6 million of interest) to the IRS in connection with the settlement of certain tax matters for 2005 through 2007.

Unrecognized tax benefits, excluding interest, are reported in the following consolidated balance sheet captions in the amount shown:

| | September 25, 2015 | September 26, 2014 |
|---|---|---|
| Accrued and other current liabilities | $ 1.3 | $ 6.5 |
| Other income tax liabilities | 80.0 | 70.7 |
| Deferred income taxes (non-current liability) | 7.9 | 4.8 |
| | $ 89.2 | $ 82.0 |

Included within total unrecognized tax benefits at September 25, 2015, September 26, 2014 and September 27, 2013, were $87.4 million, $82.0 million and $96.3 million, respectively, of unrecognized tax benefits, which if favorably settled would benefit the effective tax rate. The remaining unrecognized tax benefits for each period would be offset by the write-off of related deferred and other tax assets, if recognized. During fiscal 2015, the Company recorded $5.7 million of additional interest through tax provision and acquisition accounting and decreased interest $9.3 million related to cash payments related to settlements as well as reductions related to prior periods. During fiscal 2014 and 2013, the Company accrued additional interest of $7.0 million and $2.4 million, respectively. The total amount of accrued interest related to uncertain tax positions was $41.7 million, $45.1 million and $62.1 million, respectively.

It is reasonably possible that within the next twelve months, as a result of the resolution of various Domestic and International examinations and appeals and the expiration of various statutes of limitation, that the unrecognized tax benefits could decrease by up to $17.5 million. Interest and penalties could decrease by up to $8.8 million.

Income taxes payable, including uncertain tax positions and related interest accruals, is reported in the following consolidated balance sheet captions in the amounts shown.

| | September 25, 2015 | | September 26, 2014 | |
|---|---|---|---|---|
| Accrued and other current liabilities | $ | 19.8 | $ | 13.1 |
| Other income tax liabilities | | 121.3 | | 122.6 |
| | $ | 141.1 | $ | 135.7 |

At September 25, 2015, other assets includes $52.2 million of tax payments associated with non-current deferred intercompany transactions. Prepaid expenses and other current assets includes $8.7 million of tax payments associated with current deferred intercompany transactions, and $81.3 million of receivables associated with tax payments on account with the taxing authorities. At September 26, 2014, other assets includes $14.8 million of tax payments associated with non-current deferred intercompany transactions. Prepaid expenses and other current assets includes a receivable of $60.0 million associated with the Questcor acquisition and tax payments of $0.6 million associated with current deferred intercompany transactions. All of the above items exclude amounts related to assets which are held for sale.

| | September 25, 2015 | | September 26, 2014 | |
|---|---|---|---|---|
| Other assets | $ | 52.2 | $ | 14.8 |
| Prepaid expenses and other current assets | | 90.0 | | 63.4 |
| | $ | 142.2 | $ | 78.2 |

Covidien continues to be examined by various taxing authorities for periods the Company was included within the consolidated results of Covidien. In connection with the Separation, the Company entered into a tax matters agreement ("the Tax Matters Agreement") with Covidien that generally governs Covidien's and Mallinckrodt's respective rights, responsibilities and obligations after the Separation with respect to certain taxes, including, but not limited to, ordinary course of business taxes. For further information on the Tax Matters Agreement, refer to Note 17.

As of September 25, 2015, the earliest open year for U.S. federal and state tax jurisdictions is 1996. Additionally, a number of tax periods from 2009 to present are subject to examination by tax authorities in various jurisdictions, including Ireland, Luxembourg, Switzerland, and the U.K.

Deferred income taxes result from temporary differences between the amount of assets and liabilities recognized for financial reporting and tax purposes. The components of the net deferred tax (liability) asset at the end of each fiscal year were as follows:

| | September 25, 2015 | | September 26, 2014 | |
|---|---|---|---|---|
| Deferred tax assets: | | | | |
| Accrued liabilities and reserves | $ | 92.5 | $ | 68.9 |
| Inventories | | 23.2 | | 21.4 |
| Tax loss and credit carryforwards | | 163.3 | | 93.8 |
| Environmental liabilities | | 23.6 | | 29.5 |
| Rebate reserves | | 48.5 | | 41.1 |
| Expired product | | 26.3 | | 39.0 |
| Postretirement benefits | | 33.8 | | 34.5 |
| Federal and state benefit of uncertain tax positions and interest | | 33.6 | | 29.5 |
| Share-based compensation | | 18.9 | | 28.1 |
| Other | | 20.2 | | 32.0 |
| | | 483.9 | | 417.8 |
| Deferred tax liabilities: | | | | |
| Property, plant and equipment | | (140.1) | | (121.6) |
| Intangible assets | | (1,445.0) | | (2,168.3) |
| Installment sale | | (1,465.3) | | (93.6) |
| Investment in partnership | | (187.9) | | (191.3) |
| | | (3,238.3) | | (2,574.8) |
| Net deferred tax (liability) before valuation allowances | | (2,754.4) | | (2,157.0) |
| Valuation allowances | | (233.0) | | (76.9) |
| Net deferred tax (liability) | $ | (2,987.4) | $ | (2,233.9) |

Deferred taxes are reported in the following consolidated and combined balance sheet captions in the amounts shown:

| | September 25, 2015 | | September 26, 2014 | |
|---|---|---|---|---|
| Deferred income taxes (current asset) | $ | 142.7 | $ | 152.3 |
| Other non-current assets | | 7.0 | | 13.4 |
| Accrued and other current liabilities | | (4.7) | | — |
| Deferred income taxes (non-current liability) | | (3,132.4) | | (2,399.6) |
| Net deferred tax (liability) | $ | (2,987.4) | $ | (2,233.9) |

The Company's current deferred tax asset decreased from $152.3 million at September 26, 2014 to $142.7 million at September 25, 2015 primarily due to changes in inventory valuation as a result of profits in intercompany inventory, the increase in deferred tax assets from the Ikaria Acquisition, and decreases to operational deferred tax assets due to normal operating activities. Additionally, the Company's non-current deferred tax liability increased from $2,399.6 million at September 26, 2014 to $3,132.4 million at September 25, 2015, primarily due to $623.6 million related to the Ikaria Acquisition, $324.3 million related to the Therakos Acquisition, offset by $54.3 million of decreases associated with the amortization of intangibles, $105.4 million of decreases associated with the payment of internal installment sale obligations, and approximately $44.0 million of decreases related to other impacts of recent acquisitions and integration.

The Ikaria Acquisition resulted in a net deferred tax liability increase of $596.9 million. Significant components of this increase include $620.2 million of deferred tax liabilities associated with intangibles and $17.5 million of deferred tax liability associated with property, plant and equipment, partially offset by $21.7 million of deferred tax assets associated with U.S. tax credits, $13.1 million of deferred tax assets associated with financing repayments and $4.9 million of deferred tax assets associated with U.S. net operating losses.

The Therakos Acquisition resulted in a net deferred tax liability increase of $324.3 million. Significant components of this increase include $334.1 million of deferred tax liabilities associated with intangibles partially offset by $13.5 million of deferred tax assets predominately associated with U.S. net operating losses.

As a part of the Questcor integration, the Company entered into an internal installment sale transaction during the three months ended December 26, 2014. The Questcor internal installment sale transaction resulted in a decrease of $1,488.7 million to the deferred tax liability associated with the Acthar intangible asset, a $1,515.9 million increase to the deferred tax liability associated with an installment sale note receivable, a $25.3 million increase to deferred tax charge, and a $1.9 million increase to prepaid taxes.

At September 25, 2015, the Company had approximately $126.0 million of net operating loss carryforwards in certain non-U.K. jurisdictions, of which $91.4 million have no expiration and the remaining $34.6 million will expire in future years through 2025. The Company had $19.6 million of U.K. net operating loss carryforwards at September 25, 2015, which have no expiration date.

At September 25, 2015 the Company also had $16.3 million of tax credits available to reduce future income taxes payable, primarily in jurisdictions within the U.S., of which $3.1 million have no expiration and the remainder expire during fiscal 2016 through 2034.

The deferred tax asset valuation allowances of $233.0 million and $76.9 million at September 25, 2015 and September 26, 2014, respectively, relate principally to the uncertainty of the utilization of certain deferred tax assets, primarily International net operating losses. The Company believes that it will generate sufficient future taxable income to realize the tax benefits related to the remaining net deferred tax assets.

The tax residency change impacts the Company's analysis of its cumulative unrepatriated earnings. As of September 25, 2015, the cumulative amount of undistributed earnings of the Company's subsidiaries that may be subject to tax, but are considered to be indefinitely reinvested, was $369.0 million. It is not practicable to determine the cumulative amount of tax liability that would arise if these indefinitely reinvested earnings were remitted due to a variety of factors including the complexity of the Company's global legal entity structure as well as the timing, extent, and nature of any hypothetical repatriation of unremitted earnings. The net decrease in such undistributed earnings as compared to the period ended September 26, 2014 was attributable to the impact of the tax residency change and associated jurisdictions that could be remitted in a tax-free manner as well as the removal of the earnings for the entities classified as held for sale. These decreases were partially offset by an increase in unrepatriated earnings associated with income and losses attributed to the current year activity.

The Company has accrued a $0.7 million deferred tax liability associated with approximately $13.4 million of unrepatriated earnings that are not indefinitely reinvested on assets from continuing operations. The Company has also accrued a $6.5 million deferred tax liability associated with approximately $41.3 million of unrepatriated earnings that are not indefinitely reinvested related to assets held for sale.

8.   **Earnings (Loss) per Share**

In fiscal 2015 and 2014, basic and diluted earnings (loss) per share were computed using the two-class method. The two-class method is an earnings allocation that determines earnings per share for each class of common stock and participating securities according to dividends declared and participation rights in undistributed earnings. The Company's restricted stock awards, issued in conjunction with the Questcor Acquisition in August 2014, are considered participating securities as holders are entitled to receive non-forfeitable dividends during the vesting term. Diluted earnings per share includes securities that could potentially dilute basic earnings per share during a reporting period, for which the Company includes all share-based compensation awards other than participating securities. Dilutive securities, including participating securities, are not included in the computation of loss per share when the Company reports a net loss from continuing operations as the impact would be anti-dilutive.

In periods prior to fiscal 2014, basic earnings (loss) per share was computed by dividing net income by the number of weighted-average shares outstanding during the period. Diluted earnings (loss) per share was computed using the weighted-average shares outstanding and, if dilutive, potential ordinary shares outstanding during the period. Potential ordinary shares represent the incremental ordinary shares issuable for restricted share units and share option exercises. The Company calculated the dilutive effect of outstanding restricted share units and share options on earnings (loss) per share by application of the treasury stock method.

The computations of basic and diluted earnings (loss) per share assumes that the number of shares outstanding for periods prior to June 28, 2013 was equal to the number of ordinary shares of Mallinckrodt outstanding on June 28, 2013, immediately following the distribution of one ordinary share of Mallinckrodt for every eight ordinary shares of Covidien. The dilutive effect of the Company's share-based awards that were issued as a result of the conversion of Covidien share-based awards with the Separation, the conversion of Questcor share-based awards with the Questcor Acquisition, the initial equity awards granted to certain of the Company's executives on July 1, 2013 and any other Company grants made since the Separation have been included in the computation of diluted earnings per share for fiscal 2015, 2014 and 2013, calculated under the methodologies outlined above, weighted appropriately for the portion of the period they were outstanding.

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Earnings (loss) per share numerator: | | | |
| Income (loss) from continuing operations attributable to common shareholders before allocation of earnings to participating securities | $ 308.2 | $ (143.8) | $ 8.2 |
| Less: earnings allocated to participating securities | 2.5 | — | — |
| Income (loss) from continuing operations attributable to common shareholders, after earnings allocated to participating securities | 305.7 | (143.8) | 8.2 |
| Income (loss) from discontinued operations | 16.5 | (175.5) | 50.6 |
| Less: earnings from discontinued operations allocated to participating securities | 0.1 | — | — |
| Income (loss) from discontinued operations attributable to common shareholders, after allocation of earnings to participating securities | 16.4 | (175.5) | 50.6 |
| Net income (loss) attributable to common shareholders, after allocation of earnings to participating securities | $ 322.1 | $ (319.3) | $ 58.8 |
| Earnings (loss) per share denominator: | | | |
| Weighted-average shares outstanding - basic | 115.8 | 64.9 | 57.7 |
| Impact of dilutive securities | 1.4 | — | 0.1 |
| Weighted-average shares outstanding - diluted | 117.2 | 64.9 | 57.8 |
| Basic earnings (loss) per share attributable to common shareholders | | | |
| Income (loss) from continuing operations | $ 2.64 | $ (2.22) | $ 0.14 |
| Income (loss) from discontinued operations | 0.14 | (2.70) | 0.88 |
| Net income (loss) attributable to common shareholders | $ 2.78 | $ (4.92) | $ 1.02 |
| Diluted earnings (loss) per share attributable to common shareholders | | | |
| Income (loss) from continuing operations | $ 2.61 | $ (2.22) | $ 0.14 |
| Income (loss) from discontinued operations | 0.14 | (2.70) | 0.88 |
| Net income (loss) attributable to common shareholders | $ 2.75 | $ (4.92) | $ 1.02 |

The computation of diluted earnings per share for fiscal 2015, 2014 and 2013 excludes approximately 0.1 million, 5.7 million and 0.5 million, respectively, of equity awards because the effect would have been anti-dilutive.  As the Company incurred a net loss in fiscal 2014, there was no allocation of the undistributed loss to participating securities because the effect would have been anti-dilutive to basic and diluted earnings per share.

## 9.    Inventories

Inventories are comprised of the following at the end of each period:

| | September 25, 2015 | September 26, 2014 |
|---|---|---|
| Raw materials and supplies | $ 66.3 | $ 57.5 |
| Work in process | 124.2 | 184.7 |
| Finished goods | 91.3 | 64.2 |
| Inventories | $ 281.8 | $ 306.4 |

**10.  Property, Plant and Equipment**

The gross carrying amount and accumulated depreciation of property, plant and equipment at the end of each period was as follows:

|  | September 25, 2015 | September 26, 2014 |
|---|---|---|
| Land | $     49.8 | $     47.3 |
| Buildings | 333.7 | 289.4 |
| Capitalized software | 120.2 | 94.5 |
| Machinery and equipment | 1,220.0 | 1,041.6 |
| Construction in process | 146.9 | 196.2 |
|  | 1,870.6 | 1,669.0 |
| Less: accumulated depreciation | (879.3) | (782.2) |
| Property, plant and equipment, net | $    991.3 | $    886.8 |

The amounts above include property under capital leases of $14.8 million and $16.9 million at September 25, 2015 and September 26, 2014, respectively, consisting primarily of buildings. Accumulated amortization of capitalized leased assets was $14.6 million and $15.8 million at the end of fiscal 2015 and 2014, respectively.

Depreciation expense, including amounts related to capitalized leased assets, for continuing operations was $103.9 million, $94.7 million and $88.1 million for fiscal 2015, 2014 and 2013, respectively.

*Long-Lived Asset Impairment Analysis*

In fiscal 2014, the Company recorded long-lived asset impairment charges related to our CMDS asset group. During the fourth quarter of fiscal 2014, the Company received notification that we lost preferred supplier status with a significant group purchasing organization ("GPO") and that a related-party supply contract was terminated by the Company. The Company determined that these events constituted a triggering event with respect to our CMDS asset group assessed the recoverability of the CMDS asset group. The Company determined that the undiscounted cash flows of this asset group were less than its net book value. This would require the Company to record an impairment charge if the fair value of the CMDS asset group was less than its net book value.

The Company determined the fair value of the CMDS asset group using the income approach, a level three measurement technique. For purposes of determining fair value the Company made various assumptions regarding estimated future cash flows, discount rates and other factors in determining the fair values of each reporting unit using the income approach. The Company's projections of future cash flows were then discounted based on a weighted-average cost of capital ("WACC") determined from relevant market comparisons, adjusted upward for specific risks (primarily the uncertainty of achieving projected operating cash flows). A terminal value growth rate was applied to the terminal year cash flows, both of which represent the Company's estimate of stable, sustainable growth. The fair value of the asset group represents the sum of the discounted cash flows from the discrete period and the terminal year cash flows.

The Company's projections in the CMDS asset group included long-term net sales and operating income at lower than historical levels. The decrease in net sales and operating income is reflective of the notification of the loss of a significant customer, termination of a supply contract with a related party and increased competition in the marketplace. The Company utilized a WACC of 8.0%, which reflects the lower inherent risk with the decreasing revenue trends. These assumptions resulted in a fair value of the CMDS asset group that was less than its net book value. Therefore, the Company recorded impairment charges of $65.9 million and $52.4 million to the property, plant and equipment and long-lived amortizing intangible assets, respectively, included in the CMDS asset group. The Company announced that it had entered into a definitive agreement to sell its CMDS business, therefore the business is deemed to be held for sale and the financial results of this business are presented as a discontinued operation. The Company reclassified $51.4 million of the impairment charge associated with property, plant and equipment to discontinued operations as certain assets are expected to be retained by the Company based upon the terms of the Company's agreement with Guerbet. The Company reclassified $52.4 million of the impairment charge associated with intangible assets to discontinued operations.

## 11.  Goodwill and Intangible Assets

The changes in the carrying amount of goodwill by segment were as follows:

| | September 25, 2015 | | September 26, 2014 | |
| | Gross Carrying Amount | Accumulated Impairment | Gross Carrying Amount | Accumulated Impairment |
|---|---|---|---|---|
| Specialty Brands | $  3,442.4 | $       — | $  2,194.9 | $       — |
| Specialty Generics | 207.0 | — | 207.0 | — |
| Nuclear Imaging | 119.5 | (119.5) | 119.5 | (119.5) |
| Total | $  3,768.9 | $  (119.5) | $  2,521.4 | $  (119.5) |

During the fiscal year ended September 25, 2015, the gross carrying value of goodwill in the Specialty Brands segment increased by $1,247.5 million, attributable to $792.4 million from the Ikaria Acquisition, $437.2 million from the Therakos Acquisition and $17.9 million resulting from adjustments to the Questcor Acquisition purchase price allocation.

### Goodwill Impairment Analysis

The Company has identified the Specialty Brands, Specialty Generics and the Nuclear Imaging businesses as representing both segments and reporting units. For purposes of assessing impairment and the recoverability of goodwill for each reporting unit the Company makes various assumptions regarding estimated future cash flows, discount rates and other factors in determining the fair values of each reporting unit using the income approach. The Company's projections of future cash flows were then discounted based on a WACC determined from relevant market comparisons, adjusted upward for specific reporting unit risks (primarily the uncertainty of achieving projected operating cash flows). A terminal value growth rate was applied to the terminal year cash flows, both of which represent the Company's estimate of stable, sustainable growth. The fair value of the reporting unit represents the sum of the discounted cash flows from the discrete period and the terminal year cash flows. The fair values of the reporting units were assessed for reasonableness by aggregating the fair values and comparing this to the Company's market capitalization with a control premium.

The Company's projections in its Specialty Brands reporting unit include long-term revenue and operating income at levels higher than historical levels, which is primarily associated with revenue growth for Acthar, Inomax and Ofirmev. The projections also reflect the potential impacts from the future loss of exclusivity related to Ofirmev. The Company utilized a WACC of 12.0%. These assumptions resulted in a fair value of the Specialty Brands reporting unit in excess of its net book value. Should the Specialty Brands reporting unit fail to experience growth in the aforementioned products, revise its long-term projections for these products downward or market conditions dictate utilization of higher discount rates, the Specialty Brands reporting unit could be subject to impairment in future periods.

The Company's projections in its Specialty Generics and API reporting unit include long-term revenue and operating income at levels lower than historical levels primarily attributable to increased competition. The Company utilized a WACC of 11.0%. These assumptions resulted in a fair value of the Specialty Generics and API reporting unit in excess of its net book value.

In fiscal 2014, the Company recorded goodwill impairment charges related to our former Global Medical Imaging reporting unit (which included the CMDS business that is now included within discontinued operations and the remaining Nuclear Imaging reporting unit). The Company recorded an impairment charge related to goodwill in fiscal 2014 of $219.7 million, which eliminated all goodwill balances related to the Global Medical Imaging reporting unit. In fiscal 2015, the Company announced that it had entered into a definitive agreement to sell its CMDS business, therefore the business was deemed to be held for sale and the financial results of this business are presented as a discontinued operation. The Company reclassified $100.2 million of the impairment charge to discontinued operations.

The gross carrying amount and accumulated amortization of intangible assets, excluding held for sale intangible assets, at the end of each period were as follows:

| | September 25, 2015 | | September 26, 2014 | |
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| --- | --- | --- | --- | --- |
| Amortizable: | | | | |
| Completed technology | $  9,896.0 | $    765.8 | $  6,906.0 | $    235.6 |
| Licenses | 185.1 | 99.8 | 185.1 | 87.3 |
| Customer relationships | 28.1 | 4.4 | 33.8 | 0.6 |
| Trademarks | 82.1 | 6.2 | 13.0 | 4.1 |
| Other | 6.7 | 6.7 | 6.7 | 5.0 |
| Total | $  10,198.0 | $    882.9 | $  7,144.6 | $    332.6 |
| Non-Amortizable: | | | | |
| Trademarks | $     35.0 | | $     35.0 | |
| In-process research and development | 316.2 | | 235.2 | |
| Total | $    351.2 | | $    270.2 | |

Finite-lived intangible asset amortization expense within continuing operations was $550.3 million, $154.8 million and $27.9 million in fiscal 2015, 2014 and 2013, respectively. The estimated aggregate amortization expense on intangible assets owned by the Company, excluding held for sale intangible assets, is expected to be as follows:

| | | |
| --- | --- | --- |
| Fiscal 2016 | $ | 693.7 |
| Fiscal 2017 | | 691.9 |
| Fiscal 2018 | | 682.9 |
| Fiscal 2019 | | 682.6 |
| Fiscal 2020 | | 682.0 |

## 12. Debt

Debt was comprised of the following at the end of each period:

| | September 25, 2015 | | September 26, 2014 | |
| | Principal | Unamortized Discount and Debt Issuance Costs | Principal | Unamortized Discount and Debt Issuance Costs |
|---|---|---|---|---|
| Current maturities of long-term debt: | | | | |
| 2.85% term loan due April 2016 | $ — | $ — | $ 0.4 | $ — |
| Term loans due March 2021 | 20.0 | — | 18.2 | — |
| 4.00% term loan due February 2022 | 1.0 | — | 1.2 | — |
| Capital lease obligation and vendor financing agreements | 1.3 | — | 1.4 | — |
| Total current debt | 22.3 | — | 21.2 | — |
| Long-term debt: | | | | |
| Variable rate receivable securitization | 153.0 | 0.8 | 150.0 | 1.0 |
| 2.85% term loan due April 2016 | — | — | 2.7 | — |
| 3.50% notes due April 2018 | 300.0 | 1.7 | 300.0 | 2.4 |
| 4.88% notes due April 2020 | 700.0 | 11.3 | — | — |
| Term loans due March 2021 | 1,958.5 | 44.1 | 1,978.5 | 52.4 |
| 4.00% term loan due February 2022 | 6.9 | — | 9.6 | — |
| 9.50% debentures due May 2022 | 10.4 | — | 10.4 | — |
| 5.75% notes due August 2022 | 900.0 | 14.4 | 900.0 | 16.4 |
| 8.00% debentures due March 2023 | 4.4 | — | 8.0 | — |
| 4.75% notes due April 2023 | 600.0 | 7.1 | 600.0 | 7.9 |
| 5.625% notes due October 2023 | 750.0 | 13.7 | — | — |
| 5.50% notes due April 2025 | 700.0 | 11.9 | — | — |
| Revolving credit facility | 500.0 | 4.9 | — | 5.5 |
| Capital lease obligation and vendor financing agreements | 1.0 | — | 0.4 | — |
| Total long-term debt | 6,584.2 | 109.9 | 3,959.6 | 85.6 |
| Total debt | $ 6,606.5 | $ 109.9 | $ 3,980.8 | $ 85.6 |

In November 2012, Mallinckrodt International Finance S.A. ("MIFSA") was formed as a 100% owned subsidiary of Covidien in connection with the Separation. MIFSA is a holding company established to own, directly or indirectly, substantially all of the operating subsidiaries of the Company, to issue debt securities and to perform treasury operations. At the time of the Separation, MIFSA became a 100% owned subsidiary of the Company.

In April 2013, MIFSA issued $300.0 million aggregate principal amount of 3.50% senior unsecured notes due April 2018 and $600.0 million aggregate principal amount of 4.75% senior unsecured notes due April 2023 (collectively, "the Notes"). Mallinckrodt plc has fully and unconditionally guaranteed the Notes on an unsecured and unsubordinated basis. The Notes are subject to an indenture which contains covenants limiting the ability of MIFSA, its restricted subsidiaries (as defined in the Notes) and Mallinckrodt plc, as guarantor, to incur certain liens or enter into sale and lease-back transactions. It also restricts Mallinckrodt plc and MIFSA's ability to merge or consolidate with any other person or sell or convey all or substantially all of their assets to any one person. MIFSA may redeem all of the Notes at any time, and some of the Notes from time to time, at a redemption price equal to the principal amount of the Notes redeemed plus a make-whole premium. MIFSA will pay interest on the Notes semiannually in arrears on April 15 and October 15 of each year, which commenced on October 15, 2013. The net proceeds to MIFSA from the issuance and sale of the Notes was $889.3 million, the majority of which was retained by Covidien per the terms of the Separation and Distribution Agreement.

In March 2014, MIFSA and Mallinckrodt CB LLC ("MCB"), each a wholly-owned subsidiary of the Company, entered into senior secured credit facilities consisting of a $1.3 billion term loan facility due 2021 ("the Term Loan") and a $250.0 million revolving credit facility due 2019 ("the Revolver") (collectively, "the Facilities"). The Facilities are fully and unconditionally guaranteed by Mallinckrodt plc, certain of its direct or indirect wholly-owned U.S. subsidiaries and each of its direct or indirect wholly-owned subsidiaries that owns directly or indirectly any such wholly-owned U.S. subsidiary (collectively, "the Guarantors"). The Facilities are secured by a security interest in certain assets of MIFSA, MCB and the Guarantors. The Facilities contain customary affirmative and negative covenants, which include, among other things, restrictions on the Company's ability to declare or pay

dividends, create liens, incur additional indebtedness, enter into sale and lease-back transactions, make investments, dispose of assets and merge or consolidate with any other person. In addition, the Revolver contains a financial covenant that may limit the Company's total net debt leverage ratio, which is defined as the ratio of (i) the Company's consolidated debt, less any unrestricted cash and cash equivalents, to (ii) the Company's adjusted consolidated EBITDA, as defined in the credit agreement. The Facilities bear interest at LIBOR plus a margin based on the Company's total net debt leverage ratio, and the Term Loan is subject to a minimum LIBOR level of 0.75%. Interest payment dates are variable based on the LIBOR rate utilized, but the Company generally expects interest to be payable every 90 days. The Term Loan requires quarterly principal amortization payments in an amount equal to 0.25% of the original principal amount of the Term Loan payable on the last day of each calendar quarter, which commenced on June 30, 2014, with the remaining balance payable on the due date, March 19, 2021. The Company incurred an original issue discount of 0.25%, or $3.3 million, associated with the Term Loan. The Revolver contains a $150.0 million letter of credit provision, of which none had been issued as of September 25, 2015. On August 28, 2015, in connection with the Therakos Acquisition, Mallinckrodt Enterprises LLC and Mallinckrodt plc, two wholly owned subsidiaries of Mallinckrodt plc, MIFSA and MCB, entered into a $250.0 million replacement revolving credit facility (the "2015 Replacement Revolving Credit Facility"), which refinanced and replaced in full the existing revolving credit facility, and an additional $250.0 million incremental revolving credit facility (the "2015 Incremental Revolving Credit Facility" and, together with the 2015 Replacement Revolving Credit Facility, the "2015 Revolving Credit Facility"), such that the 2015 Revolving Credit Facility has an aggregate facility size of $500.0 million. Unused commitments on the 2015 Revolving Credit Facility are subject to an annual commitment fee, which was 0.275% as of September 25, 2015, and the fee applied to outstanding letters of credit is based on the interest rate applied to borrowings. As of September 25, 2015, the applicable interest rate on outstanding borrowings under the 2015 Revolving Credit Facility was 2.6%, and outstanding borrowings totaled $500.0 million.

In July 2014, Mallinckrodt Securitization S.À.R.L. ("Mallinckrodt Securitization"), a wholly-owned special purpose subsidiary of the Company, entered into a $160.0 million accounts receivable securitization facility that matures in July 2017 ("the Receivable Securitization"). In January 2015, Mallinckrodt Securitization amended the Receivable Securitization with third-party lenders to increase the borrowing limit from $160.0 million to $250.0 million. The terms of the Receivable Securitization, and the determination of interest rates, were largely unchanged. Mallinckrodt Securitization may, from time to time, obtain up to $250.0 million in third-party borrowings secured by certain receivables, which may be increased to $300.0 million upon approval of the third-party lenders, subject to certain conditions. The Receivable Securitization agreements contain customary representations, warranties and affirmative and negative covenants. The borrowings under the Receivable Securitization are to be repaid as the secured receivables are collected. Loans under the Receivable Securitization will bear interest (including facility fees) at a rate equal to one month LIBOR rate plus a margin of 0.80%. Unused commitments on the Receivables Securitization are subject to an annual commitment fee of 0.35%. As of September 25, 2015, the applicable interest rate on outstanding borrowings under the Receivable Securitization was 0.99% and outstanding borrowings totaled $153.0 million.

In August 2014, MIFSA and MCB issued $900.0 million aggregate principal amount of 5.75% senior unsecured notes due August 1, 2022 ("the 2022 Notes"). The 2022 Notes are guaranteed on an unsecured basis by certain of MIFSA's subsidiaries. The 2022 Notes are subject to an indenture that contains customary covenants and events of default (subject in certain cases to customary grace and cure periods). The occurrence of an event of default under the indenture could result in the acceleration of the 2022 Notes and could cause a cross-default that could result in the acceleration of other indebtedness of Mallinckrodt plc and its subsidiaries. MIFSA may redeem some or all of the 2022 Notes prior to August 1, 2017 by paying a make-whole premium. MIFSA may redeem some or all of the 2022 Notes on or after August 1, 2017 at specified redemption prices. In addition, prior to August 1, 2017, MIFSA may redeem up to 40% of the aggregate principal amount of the 2022 Notes with the net proceeds of certain equity offerings. The Issuers are obligated to offer to repurchase the 2022 Notes at a price of (a) 101% of their principal amount plus accrued and unpaid interest, if any, as a result of certain change of control events and (b) 100% of their principal amount plus accrued and unpaid interest, if any, in the event of certain asset sales. These obligations are subject to certain qualifications and exceptions. MIFSA pays interest on the 2022 Notes semiannually in arrears on February 1 and August 1 of each year, commencing on February 1, 2015.

In August 2014, MIFSA and MCB entered into a $700.0 million senior secured term loan facility ("the New Term Loan"). The New Term Loan is an incremental tranche under the credit agreement governing our existing Term Loan and Revolver, entered into in March 2014, (collectively, with the New Term Loan, represent "the Senior Secured Credit Facilities"). New Term Loan has substantially similar terms to the Term Loan (other than pricing), including the determination of interest rates and quarterly principal amortization payments equal to 0.25% of the original principal amount of the New Term Loan. The quarterly principal payments commenced on December 31, 2014, with the remaining balance payable on the due date of March 19, 2021. Mallinckrodt plc and its subsidiaries (other than MIFSA, MCB and the subsidiaries of MIFSA that guarantee the Facilities) will not guarantee the New Term Loan, and the New Term Loan will not be secured by the assets of such entities. The August 2014 Term Loan bears interest under substantially similar terms of the March 2014 Term Loan, including the use of LIBOR rates with a minimum floor, except that the margin applied to LIBOR is not dependent upon the Company's total net debt leverage ratio.

On April 15, 2015, MIFSA and MCB issued $700.0 million aggregate principal amount of 4.875% senior unsecured notes due April 15, 2020 ("the 2020 Notes") and $700.0 million aggregate principal amount of 5.50% senior unsecured notes due April 15, 2025 ("the 2025 Notes", and together with the 2020 Notes, the "Ikaria Notes"). The Ikaria Notes are guaranteed by Mallinckrodt plc and each of its subsidiaries that guarantee the obligations under the Facilities, which following the Ikaria Acquisition includes Compound

Holdings II, Inc. and its U.S. subsidiaries. The Ikaria Notes are subject to an indenture that contains certain customary covenants and events of default (subject in certain cases to customary grace and cure periods). The occurrence of an event of default under the indenture could result in the acceleration of the Ikaria Notes and could cause a cross-default that could result in the acceleration of other indebtedness of the Company. The Issuers may redeem some or all of the (i) 2020 Notes prior to April 15, 2017 and (ii) 2025 Notes prior to April 15, 2020, in each case, by paying a "make-whole" premium. The Issuers may redeem some or all of the (i) 2020 Notes on or after April 15, 2017 and (ii) 2025 Notes on or after April 15, 2020, in each case, at specified redemption prices. In addition, prior to (i) April 15, 2017, in the case of the 2020 Notes, and (ii) April 15, 2018, in the case of the 2025 Notes, the Issuers may redeem up to 40% of the aggregate principal amount of the 2020 Notes or 2025 Notes, as the case may be, with the net proceeds of certain equity offerings. The Issuers are obligated to offer to repurchase (a) each series of Notes at a price of 101% of their principal amount plus accrued and unpaid interest, if any, as a result of certain change of control events and (b) the Notes at a price of 100% of their principal amount plus accrued and unpaid interest, if any, in the event of certain net asset sales. These obligations are subject to certain qualifications and exceptions. The Company pays interest on the Ikaria Notes semiannually on April 15th and October 15th of each year, commencing on October 15, 2015.

On September 24, 2015, in connection with the Therakos Acquisition, MIFSA and MCB issued $750.0 million aggregate principal amount of 5.625% senior unsecured notes due October 2023 (the "2023 Notes"). The Notes are guaranteed by Mallinckrodt plc and each of its subsidiaries under the Facilities, which following the Therakos Acquisition includes TGG Medical Solutions, Inc. and its U.S. subsidiaries. The 2023 Notes are subject to an indenture that contains certain customary covenants and events of default (subject in certain cases to customary grace and cure periods). The occurrence of an event of default under the indenture could result in the acceleration of the 2023 Notes and could cause a cross-default that could result in the acceleration of other indebtedness of the Company. The Issuers may redeem some or all of the 2023 Notes on or after October 15, 2018 at specified redemption prices. In addition, prior to October 15, 2018, the Issuers may redeem up to 40% of the aggregate principal amount of the 2023 Notes with the net proceeds of certain equity offerings. The Issuers may also redeem all, but not less than all, of the Notes at any time at a price of 100% of their principal amount, plus accrued and unpaid interest, if any, in the event the Issuers become obligated to pay additional amounts as a result of changes affecting certain withholding tax laws applicable to payments on the Notes. The Issuers are obligated to offer to repurchase the 2023 Notes (a) at a price of 101% of their principal amount plus accrued and unpaid interest, if any, as a result of certain change of control events and (b) the 2023 Notes at a price of 100% of their principal amount plus accrued and unpaid interest, if any, in the event of certain net asset sales. These obligations are subject to certain qualifications and exceptions. The Company pays interest on the 2023 Notes semiannually on April 15th and October 15th of each year, commencing on April 15, 2016.

As of September 25, 2015, the applicable interest rate for the Term Loan and New Term Loan were 3.25% and 3.50%, respectively, and outstanding principal under these agreements totaled approximately $1,978.5 million.

The aggregate amounts of debt, including the capital lease obligation, maturing during the next five fiscal years are as follows:

| | | |
|---|---|---|
| Fiscal 2016 | $ | 22.3 |
| Fiscal 2017 | | 175.0 |
| Fiscal 2018 | | 321.2 |
| Fiscal 2019 | | 521.2 |
| Fiscal 2020 | | 721.2 |

## 13. Retirement Plans

### Defined Benefit Plans

The Company sponsors a number of defined benefit retirement plans covering certain of its U.S. employees and non-U.S. employees. As of September 25, 2015, U.S. plans represented 70.6% of the Company's total pension plan assets and 73.1% of the Company's projected benefit obligation. The Company generally does not provide postretirement benefits other than retirement plan benefits for its employees; however, certain of the Company's U.S. employees participate in postretirement benefit plans that provide medical benefits. These plans are unfunded.

The net periodic benefit cost (credit) for the Company's pension and postretirement benefit plans was as follows:

| | Pension Benefits | | | Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | Fiscal Year | | | Fiscal Year | | |
| | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 |
| Service cost | $ 4.5 | $ 5.1 | $ 5.0 | $ 0.1 | $ 0.1 | $ 0.1 |
| Interest cost | 17.5 | 19.6 | 18.2 | 1.9 | 2.1 | 2.4 |
| Expected return on plan assets | (22.6) | (24.6) | (29.6) | ----- | ----- | ----- |
| Amortization of net actuarial loss | 9.4 | 8.1 | 12.3 | ----- | ----- | 0.3 |
| Amortization of prior service cost | (0.6) | (0.6) | 0.6 | (4.0) | (9.3) | (9.1) |
| Loss on plan settlements | 6.0 | 3.8 | 6.8 | ----- | ----- | ----- |
| Net periodic benefit cost (credit) | $ 14.2 | $ 11.4 | $ 13.3 | $ (2.0) | $ (7.1) | $ (6.3) |

The following table represents the changes in benefit obligations, plan assets and the net amounts recognized on the consolidated balance sheets for pension and postretirement benefit plans at the end of fiscal 2015 and 2014:

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| *Change in benefit obligation:* | | | | |
| Projected benefit obligations at beginning of year | $ 538.4 | $ 501.7 | $ 52.0 | $ 53.2 |
| Service cost | 4.5 | 5.1 | 0.1 | 0.1 |
| Interest cost | 17.5 | 19.6 | 1.9 | 2.1 |
| Employee contributions | 0.6 | 0.6 | ----- | ----- |
| Actuarial (gain) loss | (4.5) | 60.0 | 2.1 | 0.5 |
| Benefits and administrative expenses paid | (21.1) | (21.9) | (3.9) | (3.9) |
| Plan settlements | (23.6) | (17.6) | ----- | ----- |
| Net transfer in/(out) | 0.6 | ----- | ----- | ----- |
| Currency translation | (18.9) | (9.1) | ----- | ----- |
| Projected benefit obligations at end of year | $ 493.5 | $ 538.4 | $ 52.2 | $ 52.0 |
| | | | | |
| *Change in plan assets:* | | | | |
| Fair value of plan assets at beginning of year | $ 473.6 | $ 456.0 | $ ----- | $ ----- |
| Actual return on plan assets | 12.5 | 59.7 | ----- | ----- |
| Employer contributions | 13.0 | 4.9 | 3.9 | 3.9 |
| Employee contributions | 0.6 | 0.6 | ----- | ----- |
| Benefits and administrative expenses paid | (21.1) | (21.9) | (3.9) | (3.9) |
| Plan settlements | (23.6) | (17.6) | ----- | ----- |
| Currency translation | (17.1) | (8.1) | ----- | ----- |
| Fair value of plan assets at end of year | $ 437.9 | $ 473.6 | $ ----- | $ ----- |
| Funded status at end of year | $ (55.6) | $ (64.8) | $ (52.2) | $ (52.0) |

| | Pension Benefits | | Postretirement Benefits | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| *Amounts recognized on the consolidated balance sheet:* | | | | |
| Non-current assets | $ 20.1 | $ 9.8 | $ ..... | $ ..... |
| Current liabilities | (6.6) | (2.7) | (4.6) | (4.8) |
| Non-current liabilities | (69.1) | (71.9) | (47.6) | (47.2) |
| Net amount recognized on the consolidated balance sheet | $ (55.6) | $ (64.8) | $ (52.2) | $ (52.0) |
| *Amounts recognized in accumulated other comprehensive income consist of:* | | | | |
| Net actuarial loss | $ (104.1) | $ (115.1) | $ (5.1) | $ (2.9) |
| Prior service credit | 5.5 | 6.9 | 14.9 | 18.8 |
| Net amount recognized in accumulated other comprehensive income | $ (98.6) | $ (108.2) | $ 9.8 | $ 15.9 |

The estimated amounts that will be amortized from accumulated other comprehensive income into net periodic benefit cost (credit) in fiscal 2016 are as follows:

| | Pension Benefits | Postretirement Benefits |
|---|---|---|
| Amortization of net actuarial loss | $ 10.8 | $ — |
| Amortization of prior service cost | (0.5) | (2.1) |

The accumulated benefit obligation for all pension plans at the end of fiscal 2015 and 2014 was $489.4 million and $533.6 million, respectively. Additional information related to pension plans is as follows:

| | 2015 | 2014 |
|---|---|---|
| *Pension plans with accumulated benefit obligations in excess of plan assets:* | | |
| Accumulated benefit obligation | $ 368.8 | $ 394.7 |
| Fair value of plan assets | 294.1 | 321.6 |

The accumulated benefit obligation and fair value of plan assets for pension plans with projected benefit obligations in excess of plan assets do not significantly differ from the amounts in the table above since substantially all of the Company's pension plans are frozen.

### Actuarial Assumptions

Weighted-average assumptions used each fiscal year to determine net periodic benefit cost for the Company's pension plans are as follows:

| | U.S. Plans | | | Non-U.S. Plans | | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 |
| Discount rate | 3.8% | 4.2% | 3.5% | 2.5% | 3.5% | 4.0% |
| Expected return on plan assets | 6.0% | 6.5% | 7.9% | 2.9% | 3.1% | 3.5% |
| Rate of compensation increase | —% | —% | —% | 3.2% | 3.5% | 3.7% |

Weighted-average assumptions used each fiscal year to determine benefits obligations for the Company's pension plans are as follows:

| | U.S. Plans | | | Non-U.S. Plans | | |
|---|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 |
| Discount rate | 3.9% | 3.9% | 4.3% | 2.5% | 2.5% | 3.7% |
| Rate of compensation increase | —% | —% | —% | 3.6% | 3.4% | 3.5% |

For the Company's U.S. plans, the discount rate is based on the market rate for a broad population of Moody's AA-rated corporate bonds over $250.0 million. For the Company's non-U.S. plans, the discount rate is generally determined by reviewing country and region specific government and corporate bond interest rates.

In determining the expected return on pension plan assets, the Company considers the relative weighting of plan assets by class and individual asset class performance expectations as provided by external advisors in reaching conclusions on appropriate assumptions. The investment strategy for the pension plans is to obtain a long-term return on plan assets that is consistent with the level of investment risk that is considered appropriate. Investment risks and returns are reviewed regularly against benchmarks to ensure objectives are being met.

The weighted-average discount rate used to determine net periodic benefit cost and obligations for the Company's postretirement benefit plans are as follows:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Net periodic benefit cost | 3.6% | 4.0% | 3.2% |
| Benefit obligations | 3.9% | 3.7% | 4.0% |

Healthcare cost trend assumptions for postretirement benefit plans are as follows:

|  | 2015 | 2014 |
|---|---|---|
| Healthcare cost trend rate assumed for next fiscal year | 7.1% | 7.1% |
| Rate to which the cost trend rate is assumed to decline | 4.5% | 4.5% |
| Fiscal year the ultimate trend rate is achieved | 2029 | 2029 |

A one-percentage-point change in assumed healthcare cost trend rates would have the following effects:

|  | One-Percentage-Point Increase | One-Percentage-Point Decrease |
|---|---|---|
| Effect on total of service and interest cost | $ — | $ — |
| Effect on postretirement benefit obligation | 0.8 | (0.7) |

## Plan Assets

The Company's U.S. pension plans have a target allocation of 24% equity securities and 76% debt securities. Various asset allocation strategies are in place for non-U.S. pension plans depending upon local law, status, funding level and duration of liabilities, and are 39% equity securities, 55% debt securities and 6% other (primarily cash) for our Japanese pension plan and 10% equity securities, 2% debt securities and 88% other (primarily insurance contracts) for our plan in the Netherlands.

Pension plans have the following weighted-average asset allocations at the end of each fiscal year:

|  | U.S. Plans | | Non-U.S. Plans | |
|---|---|---|---|---|
|  | 2015 | 2014 | 2015 | 2014 |
| Equity securities | 27% | 28% | 6% | 8% |
| Debt securities | 70 | 70 | 1 | 2 |
| Cash and cash equivalents | 3 | 1 | — | — |
| Other | — | 1 | 93 | 90 |
| Total | 100% | 100% | 100% | 100% |

The following tables provide a summary of plan assets held by the Company's pension plans that are measured at fair value on a recurring basis at the end of fiscal 2015 and 2014:

| | | Basis of Fair Value Measurement | | |
|---|---|---|---|---|
| | Fiscal 2015 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Equity Securities: | | | | |
| U.S. small mid cap | $ 15.1 | $ 15.1 | $ — | $ — |
| U.S. large cap | 46.2 | 46.2 | — | — |
| International | 31.0 | 22.7 | 8.3 | — |
| Debt securities: | | | | |
| Diversified fixed income funds [(1)] | 198.4 | 196.9 | 1.5 | — |
| High yield bonds | 11.3 | 11.3 | — | — |
| Emerging market funds | 7.4 | 7.4 | — | — |
| Insurance contracts | 116.7 | — | — | 116.7 |
| Other | 11.8 | 9.4 | 2.4 | — |
| Total | $ 437.9 | $ 309.0 | $ 12.2 | $ 116.7 |

| | | Basis of Fair Value Measurement | | |
|---|---|---|---|---|
| | Fiscal 2014 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Equity Securities: | | | | |
| U.S. small mid cap | $ 16.6 | $ 16.6 | $ — | $ — |
| U.S. large cap | 50.2 | 50.2 | — | — |
| International | 39.8 | 28.7 | 11.1 | — |
| Debt securities: | | | | |
| Diversified fixed income funds [(1)] | 218.7 | 216.6 | 2.1 | — |
| High yield bonds | 13.0 | 13.0 | — | — |
| Emerging market funds | 9.5 | 9.5 | — | — |
| Insurance contracts | 119.8 | — | — | 119.8 |
| Other | 6.0 | 2.6 | 3.4 | — |
| Total | $ 473.6 | $ 337.2 | $ 16.6 | $ 119.8 |

(1)  Diversified fixed income funds consist of U.S. Treasury bonds, mortgage-backed securities, corporate bonds, asset-backed securities and U.S. agency bonds.

*Equity securities.* Equity securities primarily consist of mutual funds with underlying investments in foreign equity and domestic equity markets. The fair value of these investments is based on net asset value of the units held in the respective fund, which are determined by obtaining quoted prices on nationally recognized securities exchanges (level 1) or through net asset values provided by the fund administrators that can be corroborated by observable market data (level 2).

*Debt securities.* Debt securities are primarily invested in mutual funds with underlying fixed income investments in U.S. government and corporate debt, U.S. dollar denominated foreign government and corporate debt, asset-backed securities, mortgage-backed securities and U.S. agency bonds. The fair value of these investments is based on the net asset value of the units held in the respective fund which are determined by obtaining quoted prices on nationally recognized securities exchanges.

*Insurance contracts.* Insurance contracts held by the Company are issued primarily by Delta Lloyd, a well-known, highly rated insurance company. The fair value of these insurance contracts is based upon the present value of future cash flows under the terms of the contracts and therefore the fair value of these assets has been classified as level 3 within the fair value hierarchy. Significant assumptions used in determining the fair value of these contracts are the amount and timing of future cash flows and counterparty credit risk. The objective of the insurance contracts is to provide the Company with future cash flows that will match the estimated timing and amount of future pension benefit payments. Delta Lloyd's insurance subsidiaries have a Standard & Poor's credit rating of A.

*Other.* Other includes cash and cash equivalents invested in a money market mutual fund, the fair value of which is determined by obtaining quoted prices on nationally recognized securities exchanges (level 1). In addition, other includes real estate funds, the fair value of which is determined using other inputs, such as net asset values provided by the fund administrators that can be corroborated by observable market data (level 2).

The following table provides a summary of the changes in the fair value measurements that used significant unobservable inputs (level 3) for fiscal 2015 and 2014:

|  | Insurance Contracts |
|---|---|
| Balance at September 27, 2013 | $ 112.0 |
| Net unrealized gains | 15.5 |
| Net purchases, sales and issuances | (0.6) |
| Currency translation | (7.1) |
| Balance at September 26, 2014 | 119.8 |
| Net unrealized gains | 12.2 |
| Net purchases, sales and issuances | (0.1) |
| Currency translation | (15.2) |
| Balance at September 25, 2015 | $ 116.7 |

Mallinckrodt shares are not a direct investment of the Company's pension funds; however, the pension funds may indirectly include Mallinckrodt shares. The aggregate amount of the Mallinckrodt shares are not material relative to the total pension fund assets.

### Contributions

The Company's funding policy is to make contributions in accordance with the laws and customs of the various countries in which the Company operates, as well as to make discretionary voluntary contributions from time to time. In fiscal 2015 and 2014, the Company made $13.0 million and $4.9 million in contributions, respectively, to the Company's pension plans. The Company does not anticipate making material involuntary contributions in fiscal 2016, but may elect to make voluntary contributions to its defined pension plans or its postretirement benefit plans during fiscal 2016.

### Expected Future Benefit Payments

Benefit payments expected to be paid, reflecting future expected service as appropriate, are as follows:

|  | Pension Benefits | Postretirement Benefits |
|---|---|---|
| Fiscal 2016 | $ 40.0 | $ 4.6 |
| Fiscal 2017 | 33.6 | 4.3 |
| Fiscal 2018 | 33.0 | 4.0 |
| Fiscal 2019 | 32.6 | 3.8 |
| Fiscal 2020 | 31.4 | 3.5 |
| Fiscal 2021 - 2025 | 143.9 | 15.6 |

### Defined Contribution Retirement Plans

The Company maintains one active tax-qualified 401(k) retirement plan and one active non-qualified deferred compensation plan in the U.S. The 401(k) retirement plan provides for an automatic Company contribution of three percent of an eligible employee's pay, with an additional Company matching contribution generally equal to 50% of each employee's elective contribution to the plan up to six percent of the employee's eligible pay. The deferred compensation plan permits eligible employees to defer a portion of their compensation. Total defined contribution expense related to continuing operations was $23.7 million, $20.5 million and $20.3 million for fiscal 2015, 2014 and 2013, respectively.

*Rabbi Trusts and Other Investments*

The Company maintains several rabbi trusts, the assets of which are used to pay retirement benefits. The rabbi trust assets are subject to the claims of the Company's creditors in the event of the Company's insolvency. Plan participants are general creditors of the Company with respect to these benefits. The trusts primarily hold life insurance policies and debt and equity securities, the value of which is included in other assets on the consolidated balance sheets. Note 20 provides additional information regarding the debt and equity securities. The carrying value of the 134 life insurance contracts held by these trusts was $57.9 million and $56.3 million at September 25, 2015 and September 26, 2014, respectively. These contracts had a total death benefit of $147.3 million and $145.7 million at September 25, 2015 and September 26, 2014, respectively. However, there are outstanding loans against the policies amounting to $40.4 million and $38.2 million at September 25, 2015 and September 26, 2014, respectively.

The Company has insurance contracts which serve as collateral for certain of the Company's non-U.S. pension plan benefits, which totaled $9.8 million and $11.0 million at September 25, 2015 and September 26, 2014, respectively. These amounts were also included in other assets on the consolidated balance sheets.

## 14. Equity

### *Preferred Shares*

Mallinckrodt is authorized to issue 500,000,000 preferred shares, par value of $0.20 per share, none of which were issued or outstanding at September 25, 2015. Rights as to dividends, return of capital, redemption, conversion, voting and otherwise with respect to these shares may be determined by Mallinckrodt's board of directors on or before the time of issuance. In the event of the liquidation of the Company, the holders of any preferred shares then outstanding would, if issued on such terms that they carry a preferential distribution entitlement on liquidation, be entitled to payment to them of the amount for which the preferred shares were subscribed and any unpaid dividends prior to any payment to the ordinary shareholders.

### *Share Repurchases*

On January 23, 2015, the Company's board of directors authorized a program to purchase up to $300.0 million of the Company's ordinary shares from time to time based on market conditions to allow management to enhance shareholder value. The following table presents the number of shares and dollar amount of repurchases made under the repurchase program by fiscal year and the remaining amount available for repurchase as of September 25, 2015.

|  | 2015 Share Repurchase Program | |
|---|---|---|
|  | Number of Shares | Amount |
| Authorized repurchase amount |  | $ 300.0 |
| Repurchases: |  |  |
| Fiscal 2015 | 823,592 | 75.0 |
| Remaining amount available |  | $ 225.0 |

The Company also repurchases shares from certain employees in order to satisfy employee tax withholding requirements in connection with the vesting of restricted shares. In addition, the Company repurchases shares to settle certain option exercises. The Company spent $17.2 million and $17.5 million to acquire shares in connection with equity-based awards in fiscal 2015 and 2014, respectively.

## 15. Share Plans

Total share-based compensation cost from continuing operations was $116.1 million, $66.8 million and $16.0 million for fiscal 2015, 2014 and 2013, respectively. These amounts are generally included within selling, general and administrative expenses in the consolidated and combined statements of income. In conjunction with the Questcor Acquisition, Questcor equity awards were converted to Mallinckrodt equity awards which resulted in post-combination expense of $90.4 million in fiscal 2015, included in the above total share-based compensation, of which $80.6 million is included within selling, general and administrative expenses and $9.8 million is included within restructuring charges, net. The incremental fair value associated with the conversion of Covidien equity awards into Mallinckrodt equity awards is included in separation costs. The Company recognized a related tax benefit associated with this expense of $41.7 million, $24.1 million and $5.7 million in fiscal 2015, 2014 and 2013, respectively.

*Incentive Equity Awards Converted from Covidien Awards*

Prior to the Separation, all employee incentive equity awards were granted by Covidien. At the time of Separation, the restricted share units and share options granted to Mallinckrodt employees prior to June 28, 2013 were converted into restricted share units and share options, respectively, of Mallinckrodt, and all of the performance share awards granted to Mallinckrodt employees were converted to restricted share units of Mallinckrodt (collectively, "the Conversion"). Mallinckrodt incentive equity awards issued upon completion of the Conversion and the related weighted-average grant date fair value is presented below:

| | Awards | | Weighted-Average Grant-Date Fair Value |
|---|---|---|---|
| Share options | 2,399,822 | $ | 7.96 |
| Restricted share units | 575,213 | | 38.97 |

*Share Options.* A summary of the status of the Company's share option awards upon completion of the Conversion on June 28, 2013 is presented below:

| | Shares Options | | Weighted-Average Exercise Price | | Weighted-Average Remaining Contractual Term (in years) | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|---|
| Outstanding at June 28, 2013 | 2,399,822 | $ | 35.94 | | 8.0 | $ | 22.9 |
| Exercisable at June 28, 2013 | 550,097 | | 30.94 | | 5.9 | | 8.0 |

The Conversion resulted in a modification of the previously issued share option awards. The Company compared the aggregate fair value of the awards immediately before and immediately after the Separation. The fair value of the awards immediately after the Separation was higher than the awards immediately before, primarily due to the elimination of Covidien's dividend yield assumption and the Company's higher volatility as compared to Covidien. The incremental fair value for vested awards was recognized immediately within separation costs, as the incremental fair value is directly attributable to the Separation, and the incremental fair value for unvested awards will be recognized on a straight-line basis over the remaining vesting period of the applicable awards, also within separation costs.

The weighted-average assumptions used in the Black-Scholes pricing model for determining the fair value of the share option awards immediately before and immediately after the Separation were as follows:

| | Pre-Separation | | Post-Separation |
|---|---|---|---|
| Expected share price volatility | 26% | | 32% |
| Risk-free interest rate | 0.99% | | 0.99% |
| Expected annual dividend per share | 1.65% | | —% |
| Expected life of options (in years) | 3.8 | | 3.8 |
| Fair value per option | $ 18.04 | $ | 16.51 |
| Share option awards | 1,745,258 | | 2,399,822 |

*Restricted share units.* The Conversion resulted in a modification of the previously issued restricted share unit awards ("RSUs"). The Company compared the aggregate fair value of the awards immediately before and immediately after the Separation. The Conversion did not result in incremental fair value.

*Performance share units.* The Conversion resulted in a modification of the previously issued performance share unit awards ("PSUs"). The Company compared the aggregate fair value of the awards immediately before and immediately after the Separation. The fair value of the awards was higher after the Conversion as the performance factor utilized to convert the award was higher than what had previously been estimated. The incremental fair value was recognized immediately within separation costs for the service period to date and the remaining incremental fair value will be recognized over the remaining vesting period within separation costs.

*Stock Compensation Plans*

Prior to the Separation, the Company adopted the 2013 Mallinckrodt Pharmaceuticals Stock and Incentive Plan ("the 2013 Plan"). The 2013 Plan provides for the award of share options, share appreciation rights, annual performance bonuses, long-term performance awards, restricted units, restricted shares, deferred share units, promissory shares and other share-based awards (collectively, "Awards"). The 2013 Plan provided for a maximum of 5.7 million common shares to be issued as Awards, subject to adjustment as provided under the terms of the 2013 Plan.  In fiscal 2015, the Company amended the 2013 Plan and adopted the 2015 Mallinckrodt Pharmaceuticals Stock and Incentive Plan ("the 2015 Plan").  The 2015 Plan provides for a maximum of 17.8 million common shares to be issued as Awards (an incremental 12.1 million Awards from the 2013 Plan subject to issuance), subject to adjustment as provided under the terms of the 2015 Plan.  As of September 25, 2015, all equity awards held by the Company's employees were either converted from Covidien equity awards at the Separation, converted from Questcor equity awards, or granted under the 2013 Plan or 2015 Plan.

*Share options.* Share options are granted to purchase the Company's ordinary shares at prices that are equal to the fair market value of the shares on the date the share option is granted. Share options generally vest in equal annual installments over a period of four years and expire ten years after the date of grant. The grant-date fair value of share options, adjusted for estimated forfeitures, is recognized as expense on a straight-line basis over the requisite service period, which is generally the vesting period. Forfeitures are estimated based on historical experience.

Share option activity and information is as follows:

| | Share Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at September 27, 2013 | 2,760,231 | $ 37.30 | | |
| Granted | 675,921 | 52.63 | | |
| Converted from Questcor Acquisition | 1,292,736 | 25.08 | | |
| Exercised | (878,330) | 30.96 | | |
| Expired/Forfeited | (323,769) | 41.83 | | |
| Outstanding at September 26, 2014 | 3,526,789 | 36.84 | | |
| Granted | 635,567 | 102.20 | | |
| Exercised | (1,132,778) | 29.79 | | |
| Expired/Forfeited | (243,135) | 58.00 | | |
| Outstanding at September 25, 2015 | 2,786,443 | 52.76 | 7.3 | $ 63.2 |
| Vested and unvested expected to vest as of September 25, 2015 | 2,649,351 | 50.94 | 7.4 | 59.0 |
| Exercisable at September 25, 2015 | 1,054,336 | 34.20 | 5.8 | 36.2 |

As of September 25, 2015, there was $24.8 million of total unrecognized compensation cost related to unvested share option awards, which is expected to be recognized over a weighted-average period of 2.7 years.

The grant date fair value of share options has been estimated using the Black-Scholes pricing model. Use of a valuation model requires management to make certain assumptions with respect to selected model inputs. The expected volatility assumption is based on the historical and implied volatility of the Company's peer group with similar business models for periods after the Separation, and on Covidien's peer group with similar business models for periods prior to the Separation. The expected life assumption is based on the contractual and vesting term of the share option, employee exercise patterns and employee post-vesting termination behavior. The expected annual dividend per share is based on the Company's current intentions regarding payment of cash dividends, or Covidien's dividend rate on the date of grant. The risk-free interest rate is based on U.S. Treasury zero-coupon issues with a remaining term equal to the expected life assumed at the date of grant. The weighted-average assumptions used in the Black-Scholes pricing model for share options granted in fiscal 2013 subsequent to the Separation are included within the discussion of modification expense above.  The weighted-average assumptions used in the Black-Scholes pricing model for shares granted in fiscal 2015, along with the weighted-average grant-date fair value, were as follows:

|  | 2015 | 2014 |
| --- | --- | --- |
| Expected share price volatility | 29% | 32% |
| Risk-free interest rate | 1.72% | 1.96% |
| Expected annual dividend per share | —% | —% |
| Expected life of options (in years) | 5.3 | 5.5 |
| Fair value per option | $ 30.08 | $ 17.38 |

In fiscal 2013, subsequent to the Separation, the total intrinsic value of share options exercised and the related tax benefit was not significant.  In fiscal 2015 and 2014, the total intrinsic value of options exercised was $89.5 million and $34.2 million, respectively, and the related tax benefit was $33.1 million and $12.0 million, respectively.

*Restricted share units.* Recipients of RSUs have no voting rights and receive dividend equivalent units which vest upon the vesting of the related shares. RSUs generally vest in equal annual installments over a period of four years. Restrictions on RSUs lapse upon normal retirement, death or disability of the employee. The grant-date fair value of RSUs, adjusted for estimated forfeitures, is recognized as expense on a straight-line basis over the service period. The fair market value of RSUs granted after the Conversion is determined based on the market value of the Company's shares on the date of grant for periods after the Separation.

RSU activity is as follows:

|  | Shares | Weighted-Average Grant-Date Fair Value |
| --- | --- | --- |
| Non-vested at September 27, 2013 | 724,269 | $ 40.62 |
| Granted | 229,281 | 55.40 |
| Converted from Questcor Acquisition | 30,747 | 70.88 |
| Vested | (300,237) | 34.77 |
| Forfeited | (94,838) | 42.48 |
| Non-vested at September 26, 2014 | 589,222 | 47.88 |
| Granted | 273,733 | 105.68 |
| Vested | (219,189) | 49.84 |
| Forfeited | (71,272) | 68.15 |
| Non-vested at September 25, 2015 | 572,494 | 73.45 |

The total fair value of Mallinckrodt restricted share unit awards granted during fiscal 2015 was $28.9 million. The total vest date fair value of Mallinckrodt restricted share units vested during fiscal 2015 was $21.6 million. As of September 25, 2015, there was $30.3 million of total unrecognized compensation cost related to non-vested restricted share units granted. The cost is expected to be recognized over a weighted-average period of 2.8 years.

*Performance share units.* Similar to recipients of RSUs, recipients of PSUs have no voting rights and receive dividend equivalent units. The grant date fair value of PSUs, adjusted for estimated forfeitures, is generally recognized as expense on a straight-line basis from the grant date through the end of the performance period. The vesting of PSUs and related dividend equivalent units is generally based on various performance metrics and relative total shareholder return (total shareholder return for the Company as compared to total shareholder return of the PSU peer group), measured over a three-year performance period. The PSU peer group is comprised of various healthcare companies which attempts to replicate the Company's mix of businesses.

Depending on Mallinckrodt's relative performance during the performance period, a recipient of the award is entitled to receive a number of ordinary shares equal to a percentage, ranging from 0% to 200%, of the award granted.

PSU activity is as follows [1]:

| | Shares | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| | $ | $ |
| Non-vested at September 27, 2013 | — | — |
| Granted | 79,230 | 63.40 |
| Performance metric adjustment | — | — |
| Vested | — | — |
| Forfeited | (6,490) | 62.65 |
| Non-vested at September 26, 2014 | 72,740 | 63.46 |
| Granted | 77,306 | 125.84 |
| Performance metric adjustment | — | — |
| Vested | — | — |
| Forfeited | (19,072) | 92.05 |
| Non-vested at September 25, 2015 | 130,974 | 96.05 |

(1)   The number of shares disclosed within this table are at the target number of 100%.

The Company generally uses the Monte Carlo model to estimate the probability of satisfying the performance criteria and the resulting fair value of PSU awards. The assumptions used in the Monte Carlo model for PSUs granted during each year were as follows:

| | 2015 | 2014 |
|---|---|---|
| Expected stock price volatility | 27% | 28% |
| Peer group stock price volatility | 32% | 33% |
| Correlation of returns | 14% | 17% |

The weighted-average grant-date fair value per share of PSUs granted was $125.84 in fiscal 2015. As of September 25, 2015, there was $8.9 million of unrecognized compensation cost related to PSUs, which is expected to be recognized over a weighted-average period of 1.8 years .

*Restricted stock awards.* Recipients of restricted stock awards ("RSAs") pertain solely to converted awards from the Questcor Acquisition, which were converted at identical terms to their original award. The converted RSAs maintain voting rights and a non-forfeitable right to receive dividends. RSAs are subject to accelerated vesting as prescribed by the terms of the original award based on a change in control, and substantially all of which will vest over a thirteen month period of time from the date of the Questcor Acquisition. Restrictions on RSAs lapse upon normal retirement, death or disability of the employee. The grant-date fair value of RSAs, adjusted for estimated forfeitures, is recognized as expense on a straight-line basis over the service period.

| | Shares | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| Non-vested at September 27, 2013 | — | $ — |
| Granted | — | |
| Converted from Questcor Acquisition | 1,829,164 | 70.88 |
| Vested | (390,731) | 70.88 |
| Forfeited | (6,402) | 70.88 |
| Non-vested at September 26, 2014 | 1,432,031 | 70.88 |
| Granted | — | |
| Vested | (1,362,823) | 70.88 |
| Forfeited | (34,646) | 70.88 |
| Non-vested at September 25, 2015 | 34,562 | 70.88 |

The total vest date fair value of Mallinckrodt restricted share awards vested during fiscal 2015 was $127.4 million. As of September 25, 2015, there was $2.3 million of total unrecognized compensation cost related to non-vested restricted share units granted. The cost is expected to be recognized over a weighted-average period of 2.5 years .

### Employee Stock Purchase Plans

The Company adopted the Mallinckrodt Employee Stock Purchase Plan ("ESPP") effective October 1, 2013. Substantially all full-time employees of the Company's U.S. subsidiaries and employees of certain qualified non-U.S. subsidiaries are eligible to participate in this ESPP. Eligible employees authorize payroll deductions to be made for the purchase of shares. The Company matches a portion of the employee contribution by contributing an additional 15% (25% in fiscal 2014 and fiscal 2015) of the employee's payroll deduction up to a $25,000 per employee contribution. All shares purchased under the ESPP are purchased on the open market by a designated broker.

### 16. Accumulated Other Comprehensive Income

The components of accumulated other comprehensive income are as follows:

| | Currency Translation | Unrecognized Loss on Derivatives | Unrecognized Gain (Loss) on Benefit Plans | Accumulated Other Comprehensive Income |
|---|---|---|---|---|
| Balance at September 28, 2012 | $ 157.1 | $ — | $ (72.2) | $ 84.9 |
| Other comprehensive income (loss), net | 1.5 | (7.3) | 29.4 | 23.6 |
| Balance at September 27, 2013 | 158.6 | (7.3) | (42.8) | 108.5 |
| Other comprehensive income (loss), net | (27.6) | — | (17.1) | (44.7) |
| Reclassification from other comprehensive income (loss) | | 0.5 | 1.4 | 1.9 |
| Balance at September 26, 2014 | 131.0 | (6.8) | (58.5) | 65.7 |
| Other comprehensive loss before reclassification | (70.8) | | (1.1) | (71.9) |
| Reclassification from other comprehensive income (loss) | — | 0.4 | 6.7 | 7.1 |
| Balance at September 25, 2015 | $ 60.2 | $ (6.4) | $ (52.9) | $ 0.9 |

The following summarizes reclassifications out of accumulated other comprehensive income for the 2015 and 2014 fiscal years:

| | Amount Reclassified from Accumulated Other Comprehensive Income | Amount Reclassified from Accumulated Other Comprehensive Income | Line Item in the Condensed Consolidated Statement of Income |
|---|---|---|---|
| | September 25, 2015 | September 26, 2014 | |
| Amortization of unrealized loss on derivatives | $ 0.6 | $ 0.6 | Interest expense |
| Income tax provision | (0.2) | (0.1) | Provision for income taxes |
| Net of income taxes | 0.4 | 0.5 | |
| Amortization of pension and post-retirement benefit plans: | | | |
| Net actuarial loss | 9.4 | 8.1 | [1] |
| Prior service credit | (4.6) | (9.9) | [1] |
| Plan settlements | 6.0 | 3.8 | [1] |
| Total before tax | 10.8 | 2.0 | |
| Income tax provision | (4.1) | (0.6) | Provision for income taxes |
| Net of income taxes | 6.7 | 1.4 | |
| Total reclassifications for the period | $ 7.1 | $ 1.9 | |

(1)  These accumulated other comprehensive income components are included in the computation of net periodic benefit cost. See Note 13 for additional details.

## 17.  Transactions with Former Parent Company

Prior to the completion of the Separation on June 28, 2013, the Company was part of Covidien and, as such, transactions between Covidien and the Company were considered related party transactions. As discussed in Note 1, these intercompany transactions are included in the combined financial statements and were considered to be effectively settled for cash at the time the transaction was recorded. The continuing relationship between Covidien and the Company is primarily governed through agreements entered into as part of the Separation, including a Separation Distribution Agreement, a Tax Matters Agreement and a transition services agreement. These agreements were filed with the SEC as Exhibits 2.1, 10.1 and 10.3, respectively, to the Company's Current Report on Form 8-K filed on July 1, 2013. The following discusses the related party transactions and those agreements.

### Sales and Purchases

During fiscal 2015, 2014 and 2013, the Company sold inventory to Covidien in the amount of $35.3 million, $46.0 million and $51.2 million, respectively, which is included in net sales of discontinued operations in the consolidated and combined statements of income. The Company also purchases inventories from Covidien. The Company recognized cost of sales within discontinued operations from these inventory purchases of $17.0 million, $28.9 million and $38.4 million during fiscal 2015, 2014 and 2013, respectively.

### Allocated Expenses

As discussed in Note 1, the combined financial statements for periods prior to June 28, 2013 include expense allocations for certain functions provided by Covidien, including, but not limited to, general corporate expenses related to finance, legal, information technology, human resources, communications, employee benefits and incentives, insurance and share-based compensation. These expenses were allocated to the Company on the basis of direct usage when identifiable, with the remainder allocated on the basis of operating expenses, headcount or other measures. The amounts allocated were $39.6 million for fiscal 2013 and were included within selling, general and administrative expenses.

*Balance Sheet Impacts*

Subsequent to the Separation, the Company and Covidien maintain an ongoing relationship in which each party may provide services to the other party, including the distribution of goods. As a result of these relationships, the consolidated balance sheet as of September 25, 2015 includes $6.3 million of amounts due to the Company from Covidien, within prepaid expenses and other current assets, and $3.9 million of amounts the Company owes Covidien, included within accrued and other liabilities.

*Separation and Distribution Agreement*

On June 28, 2013, the Company entered into a Separation and Distribution Agreement and other agreements with Covidien to effect the Separation and provide a framework for the Company's relationships with Covidien after the Separation. These agreements govern the relationship between Mallinckrodt and Covidien subsequent to the Separation and provide for the assignment to Mallinckrodt of certain of Covidien's assets, liabilities and obligations attributable to periods prior to the Separation.

In general, each party to the Separation and Distribution Agreement assumed liability for all pending, threatened and unasserted legal matters related to its own business or its assumed or retained liabilities and will indemnify the other party for any liability to the extent arising out of, or resulting from, such assumed or retained legal matters.

The Separation and Distribution Agreement provided for the initial cash capitalization of Mallinckrodt in the amount of approximately $168.0 million at June 28, 2013. The Separation and Distribution Agreement also provided for an adjustment payment to compensate either Mallinckrodt or Covidien, as applicable, to the extent that the aggregate of the Company's cash, indebtedness and specified working capital accounts as of June 28, 2013 ("the Distribution Date"), as well as the capital expenditures made with respect to the Company's business during fiscal 2013 through the Distribution Date, deviated from the target. The target was calculated pursuant to a formula set forth in the Separation and Distribution Agreement, which assumed the Distribution Date would be June 28, 2013, that the Pharmaceuticals business was conducted in the ordinary course through that date and that the Company would have approximately $168.0 million of cash upon completion of the distribution. The Separation and Distribution Agreement also provided that an adjustment payment would only be payable if the amount of the adjustment payment exceeded $20.0 million (in which case the entire amount would be paid). Upon final calculation, no adjustment payment was required by either the Company or Covidien.

*Tax Matters Agreement*

In connection with the Separation, Mallinckrodt entered into the Tax Matters Agreement with Covidien that generally will govern Covidien's and Mallinckrodt's respective rights, responsibilities and obligations after the Separation with respect to certain taxes, including ordinary course of business taxes and taxes, if any, incurred as a result of any failure of the distribution of Mallinckrodt shares to qualify as a tax-free distribution for U.S. federal income tax purposes within the meaning of Section 355 of the U.S. Internal Revenue Code, or other applicable tax law, or any failure of certain internal transactions undertaken in anticipation of the distribution to qualify for tax-free or tax-favored treatment under the applicable tax law. The Company expects, with certain exceptions, to be responsible for the payment of all taxes attributable to Mallinckrodt or its subsidiaries for taxable periods beginning on or after September 29, 2012. For periods prior to September 29, 2012, the Company is subject to a $200.0 million liability limitation, net of any benefits, as prescribed by the Tax Matters Agreement. The Company has made $51.6 million of payments, net of benefits, for periods prior to September 29, 2012. To the extent that the Company's liability for such taxes, net of any tax benefits, does not exceed $200.0 million, it may be responsible for additional taxes attributable to periods prior to September 29, 2012, taxes related to the Separation and a percentage of any taxes arising from the Separation failing to qualify for tax-free or tax-favored treatment through no fault of Covidien or the Company. The Tax Matters Agreement also assigns rights and responsibilities for administrative matters, such as the filing of returns, payment of taxes due, retention of records, tax reporting practices and conduct of audits, examinations or similar proceedings. In addition, the Tax Matters Agreement provides for cooperation and information sharing with respect to tax matters.

The Tax Matters Agreement also contains restrictions on the Company's ability to take actions without Covidien's consent that could cause the Separation or certain internal transactions undertaken in anticipation of the Separation to fail to qualify as tax-free or tax-favored transactions under applicable tax law. These transactions include, but are not limited to, entering into, approving or allowing any transaction that results in a change in ownership of more than 35.0% of Mallinckrodt's shares; any merger, consolidation, scheme of arrangement, liquidation or partial liquidation, or any approval or allowance of such transaction with respect to certain of the Company's subsidiaries; the cessation or transfer of certain business activities; the sale, issuance or other disposition of any equity interest in certain of the Company's subsidiaries; a sale or other disposition of a substantial portion of the Company's assets or a substantial portion of the assets of certain of the Company's subsidiaries; extraordinary distributions by or to certain of the Company's subsidiaries; or engaging in certain internal transactions. These restrictions will all apply for the two-year period after the Separation and in some cases will apply for periods as long as five years following the Separation. Any taxes imposed on the other party attributable to certain post-distribution actions taken by or in respect of the responsible party or its shareholders that result in failure of

the Separation or internal transactions to qualify as tax-free or tax-favored transactions are the responsibility of the party at fault, regardless of whether the actions occur more than two years after the distribution, or whether Covidien consents to such actions. Any actions of the Company or its shareholders that directly give rise to additional taxes are not subject to the $200 million threshold noted previously.

*Transition Services Agreement*

Mallinckrodt and Covidien entered into a transition services agreement in connection with the Separation pursuant to which Mallinckrodt and Covidien will provide each other, on an interim and transitional basis, various services including, but not limited to, treasury administration, information technology services, non-exclusive distribution and importation services for our products in certain countries outside the U.S., regulatory, general administrative services and other support services. The agreed-upon charges for such services are generally intended to allow the servicing party to recover all out-of-pocket costs and expenses, and include a predetermined profit margin. Following the Separation, the Company has performed these functions using its own resources or purchased services, certain of which are being provided by Covidien during a transitional period pursuant to a transition services agreement dated June 28, 2013, between Mallinckrodt and Covidien, particularly in relation to areas outside the U.S. The terms and prices on which such services are rendered may not be as favorable as those that were allocated to the Company by Covidien. The Company terminated the transition services agreement during the first quarter of fiscal 2015.

## 18. Guarantees

In disposing of assets or businesses, the Company has historically provided representations, warranties and indemnities to cover various risks and liabilities, including unknown damage to the assets, environmental risks involved in the sale of real estate, liability to investigate and remediate environmental contamination at waste disposal sites and manufacturing facilities, and unidentified tax liabilities related to periods prior to disposition. The Company assesses the probability of potential liabilities related to such representations, warranties and indemnities and adjusts potential liabilities as a result of changes in facts and circumstances. The Company believes, given the information currently available, that their ultimate resolution will not have a material adverse effect on its financial condition, results of operations and cash flows.

In connection with the sale of the Specialty Chemical business (formerly known as Mallinckrodt Baker) in fiscal 2010, the Company agreed to indemnify the purchaser with respect to various matters, including certain environmental, health, safety, tax and other matters. The indemnification obligations relating to certain environmental, health and safety matters have a term of 17 years from the sale, while some of the other indemnification obligations have an indefinite term. The amount of the liability relating to all of these indemnification obligations included in other liabilities on the Company's consolidated balance sheets at September 25, 2015 and September 26, 2014 was $15.7 million and $16.6 million, respectively, of which $13.0 million and $13.9 million, respectively, related to environmental, health and safety matters. The value of the environmental, health and safety indemnity was measured based on the probability-weighted present value of the costs expected to be incurred to address environmental, health and safety claims made under the indemnity. The aggregate fair value of these indemnification obligations did not differ significantly from their aggregate carrying value at September 25, 2015 and September 26, 2014. As of September 25, 2015, the maximum future payments the Company could be required to make under these indemnification obligations was $71.0 million. The Company was required to pay $30.0 million into an escrow account as collateral to the purchaser, of which $19.0 million and $19.4 million remained in other assets on the consolidated balance sheets at September 25, 2015 and September 26, 2014, respectively.

The Company has recorded liabilities for known indemnification obligations included as part of environmental liabilities, which are discussed in Note 19. In addition, the Company is liable for product performance; however the Company believes, given the information currently available, that their ultimate resolution will not have a material adverse effect on its financial condition, results of operations and cash flows.

The Company is required to provide the U.S. Nuclear Regulatory Commission financial assurance demonstrating its ability to fund the decommissioning of its Maryland Heights, Missouri radiopharmaceuticals production facility upon closure, though the Company does not intend to close this facility. The Company has provided this financial assurance in the form of surety bonds totaling $57.2 million. As of September 25, 2015, the Company had various other letters of credit and guarantee and surety bonds totaling $39.4 million.

In April 2015, the Company terminated a letter of credit to guarantee decommissioning costs associated with its Saint Louis, Missouri plant and placed $21.1 million of restricted cash on deposit with a trustee. This restricted cash is included within prepaid expenses and other current assets in the condensed consolidated balance sheet as of September 25, 2015.

In addition, the separation and distribution agreement entered into with Covidien at the Separation provides for cross-indemnities principally designed to place financial responsibility of the obligations and liabilities of the Company's business with the Company

and financial responsibility for the obligations and liabilities of Covidien's remaining business with Covidien, among other indemnities.

## 19.  Commitments and Contingencies

The Company has purchase obligations related to commitments to purchase certain goods and services. At September 25, 2015, such obligations were as follows:

| | | |
|---|---|---|
| Fiscal 2016 | S | 125.9 |
| Fiscal 2017 | | 51.4 |
| Fiscal 2018 | | 49.8 |
| Fiscal 2019 | | 7.9 |
| Fiscal 2020 | | — |

The Company is subject to various legal proceedings and claims, including patent infringement claims, product liability matters, environmental matters, employment disputes, contractual disputes and other commercial disputes, including those described below. The Company believes that these legal proceedings and claims likely will be resolved over an extended period of time. Although it is not feasible to predict the outcome of these matters, the Company believes, unless indicated below, given the information currently available, that their ultimate resolution will not have a material adverse effect on its financial condition, results of operations and cash flows.

*Governmental Proceedings*

In November 2011 and October 2012, the Company received subpoenas from the U.S. Drug Enforcement Administration requesting production of documents relating to its suspicious order monitoring program. The United States Attorney's Office (the "USAO") for the Eastern District of Michigan is investigating the possibility of the Company failing to report suspicious orders of controlled substances during the period 2006-2011 in violation of the Controlled Substances Act and its related regulations. The USAO for the Northern District of New York and Office of Chief of Counsel for the U.S. Drug Enforcement Administration are investigating the possibility of the Company failing to maintain appropriate records and security measures with respect to manufacturing of certain controlled substances at its Hobart facility during the period 2012-2013. While it is not possible at this time to determine with certainty the ultimate outcome of this matter, the Company believes, given the information currently available, that the ultimate resolution, after taking into account amounts already accrued, could have a material adverse effect on its financial condition, results of operations and cash flows.

In September 2012, Questcor received a subpoena from the USAO for the Eastern District of Pennsylvania for information relating to its promotional practices. Questcor has also been informed by the USAO for the Eastern District of Pennsylvania that the USAO for the Southern District of New York and the SEC are participating in the investigation to review Questcor's promotional practices and related matters. On March 9, 2015, the Company received a "No Action" letter from the SEC regarding its review of the Company's promotional practices.

In June 2014, Questcor received a subpoena and Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") seeking documentary materials and information regarding the FTC's investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen Depot® from Novartis AG and Novartis Pharma AG (collectively, "Novartis") violates antitrust laws. Subsequently, a small number of states commenced similar investigations focused on whether the transaction violates state antitrust laws. The Company is not aware of any existing or pending litigation in connection with these investigations. While it is not possible at this time to determine with certainty the ultimate outcome of this matter, the Company believes, given the information currently available, that the ultimate resolution, after taking into account amounts already accrued, could have a material adverse effect on its financial condition, results of operations and cash flows.

In March 2014, the USAO for the Eastern District of Pennsylvania requested the production of documents related to an investigation of the potential promotion of Therakos' immunotherapy drug/device system UVADEX/UVAR XTS and UVADEX/CELLEX (collectively, the "Therakos System"), for indications not approved by the FDA, including the treatment of patients with graft versus host disease ("GvHD") and solid organ transplant patients, including pediatric patients. The investigation also includes Therakos' efforts to secure FDA approval for additional uses of, and alleged quality issues relating to, UVADEX/UVAR. In August 2015, the USAO for the Eastern District of Pennsylvania sent Therakos a subsequent request for documents related to the investigation and we are in the process of responding to that request.

In November 2014, the Company received a CID from the Civil Medicaid Fraud Division of the Texas Attorney General's Office. According to the CID, the Attorney General's office is investigating the possibility of false reporting of information by the Company

regarding the prices of certain of its drugs used by Texas Medicaid to establish reimbursement rates for pharmacies that dispensed the Company's drugs to Texas Medicaid recipients.

We are in the process of responding to each of the subpoenas and the CIDs and we intend to cooperate fully in each such investigation.

*Mallinckrodt Inc. v. U.S. Food and Drug Administration and United States of America.* The Company filed a Complaint for Declaratory and Injunctive Relief ("the Complaint") in the U.S. District Court for the District of Maryland Greenbelt Division against the FDA and the United States of America in November 2014 for judicial review of what the Company believes is the FDA's inappropriate and unlawful reclassification of the Company's Methylphenidate HCl Extended-Release tablets USP (CII) ("Methylphenidate ER") in the Orange Book: Approved Drug Products with Therapeutic Equivalence ("Orange Book") on November 13, 2014. In its Complaint, the Company has asked the court to: issue an injunction to (a) set aside the FDA's reclassification of the Company's Methylphenidate ER products from freely substitutable at the pharmacy level (class AB) to presumed to be therapeutically inequivalent (class BX) in the Orange Book and (b) prohibit the FDA from reclassifying the Company's Methylphenidate ER products in the future without following applicable legal requirements; and issue a declaratory judgment that the FDA's action reclassifying the Company's Methylphenidate ER products in the Orange Book is unlawful. The Company concurrently filed a motion with the same court requesting an expedited hearing to issue a temporary restraining order ("TRO") directing the FDA to reinstate the Orange Book AB rating for the Company's Methylphenidate ER products on a temporary basis. The court denied the Company's motion for a TRO. In December 2014, the FDA filed a motion to dismiss the Complaint with the district court. The Company filed its opposition to the motion to dismiss in January 2015, and concurrently filed a motion for summary judgment. On July 29, 2015, the court granted the FDA's motion to dismiss with respect to three of the five counts in the Complaint and granted summary judgment in favor of the FDA with respect to the two remaining counts. The Company has appealed the court's decision to the U.S. Court of Appeals for the Fourth Circuit.

### Patent/Antitrust Litigation

*Tyco Healthcare Group LP, et al. v. Mutual Pharmaceutical Company, Inc.* In March 2007, the Company filed a patent infringement suit in the U.S. District Court for the District of New Jersey against Mutual Pharmaceutical Co., Inc., et al. (collectively, "Mutual") after Mutual submitted an Abbreviated New Drug Application ("ANDA") to the FDA seeking to sell a generic version of the Company's 7.5mg RESTORIL™ sleep aid product. Mutual also filed antitrust and unfair competition counterclaims. The patents at issue have since expired or been found invalid. The trial court issued an opinion and order granting the Company's motion for summary judgment regarding Mutual's antitrust and unfair competition counterclaims. Mutual appealed this decision to the U.S. Court of Appeals for the Federal Circuit and the Federal Circuit issued a split decision, affirming the trial court in part and remanding to the trial court certain counterclaims for further proceedings. The Company filed a motion for summary judgment with the U.S. District Court regarding the remanded issues. In May 2015, the trial court issued an opinion granting-in-part and denying-in-part the Company's motion for summary judgment.

*'222 and '218 Patent Litigation: Exela Pharma Sciences, LLC.* In August 2011, Cadence, a subsidiary of the Company, and Pharmatop, the owner of the two U.S. patents licensed exclusively by Cadence, filed suit in the U.S. District Court for the District of Delaware against Exela Pharma Sciences, LLC, Exela PharmaSci, Inc. and Exela Holdings, Inc. (collectively, "Exela"), alleging that Exela infringed U.S. Patent Nos. 6,028,222 ("the '222 patent") and 6,992,218 ("the '218 patent"), by submitting an ANDA to the FDA seeking to sell a generic version of Ofirmev. The filing of the lawsuit triggered a stay of FDA approval of the Exela ANDA until the earlier of the expiration of a 30-month period, the expiration of the '222 and '218 patents, the entry of a settlement order or consent decree stating that the '222 and '218 patents are invalid or not infringed, a decision in the case concerning infringement or validity that is favorable to Exela, or such shorter or longer period as the court may order. After a bench trial, the court ruled in favor of Cadence in November 2013 and found that Exela's ANDA infringed the '222 and '218 patents. Exela appealed the decision and oral arguments in the appeal occurred in November 2014. In March 2015, the Federal Circuit affirmed the district court decision.

*'222 and '218 Patent Litigation: InnoPharma Licensing LLC and InnoPharma, Inc.* In September 2014, Cadence and Mallinckrodt IP, subsidiaries of the Company, filed suit in the U.S. District Court for the District of Delaware against InnoPharma Licensing LLC and InnoPharma, Inc. (collectively "InnoPharma") following receipt of an August 2014 notice from InnoPharma concerning its submission of a New Drug Application ("NDA"), containing a Paragraph IV patent certification with the FDA for a competing version of Ofirmev.

*'222 and '218 Patent Litigation: Agila Specialties Private Limited, Inc. and Agila Specialties Inc. (a Mylan Inc. Company), (collectively "Agila").* In December 2014, Cadence and Mallinckrodt IP, subsidiaries of the Company, filed suit in the U.S. District Court for the District of Delaware against Agila following receipt of a November 2014 notice from Agila concerning its submission of a NDA containing a Paragraph IV patent certification with the FDA for a competing version of Ofirmev.

The Company intends to vigorously enforce its intellectual property rights relating to Ofirmev to prevent the marketing of infringing generic or competing products prior to the expiration of the Cadence patents. An adverse outcome in either the Exela or InnoPharma matters ultimately could result in the launch of one or more generic versions of Ofirmev before the expiration of the last

of the listed patents on June 6, 2021 (or December 6, 2021 if pediatric exclusivity is granted), which could adversely affect the Company's ability to successfully maximize the value of Ofirmev and have an adverse effect on our financial condition, results of operations and cash flows.

*'222 and '218 Patents: Ex Parte Reexamination.* In September 2012, Exela filed with the U.S. Patent and Trademark Office ("USPTO") a Request for Ex Parte Reexamination of the '222 patent and the USPTO granted that request. The reexamination process requires the USPTO to consider the scope and validity of the patent based on substantial new questions of patentability raised by a third-party or the USPTO. Cadence and Pharmatop have filed, with the USPTO, a patent owner's statement commenting on the reexamination request, and thereafter the parties made various submissions. In March 2015, the USPTO issued an ex parte reexamination certificate for the '222 patent listing the claims that resulted from the reexamination proceeding.

In addition, in January 2014, an unidentified third-party filed, with the USPTO, a Request for Ex Parte Reexamination of the '218 patent. The reexamination request was granted. In July 2014, the USPTO issued a Non-Final Office Action in the '218 reexamination in which it rejected certain claims. In September 2014, Cadence and Pharmatop filed an Amendment and Response to the Office Action. Cadence and Pharmatop filed a supplemental response in January 2015. In June 2015, the USPTO issued a Final Office Action confirming that effectively all of the original claims were patentable, and Cadence and Pharmatop subsequently filed an Amendment and Response to the Final Office Action. On July 15, 2015, the USPTO confirmed in the reexamination proceeding for the '218 patent that original claims 1-10 and 12-19 as well as amended original dependent claim 11 and six new dependent claims are all patentable. In August 2015, the USPTO issued an ex parte reexamination certificate for the '218 patent listing the claims that resulted from the reexamination proceeding. Because the Company and Pharmatop believe that the scope and validity of the patent claims in the '222 reexamination certificate and the '218 patent reexamination certificate are appropriate and that the USPTO's prior issuances of the patents were correct, the Company, in conjunction with Pharmatop, will vigorously defend these patents.

*'218 Patent Litigation: Exela Pharma Sciences, LLC.* In April 2012, Exela filed suit against David J. Kappos and the USPTO in the U.S. District Court for the Eastern District of Virginia for declaratory judgment seeking a reversal of the USPTO's decision not to act on a petition by Exela to vacate the USPTO's April 2003 order reviving the international application for the '218 patent. The lawsuit followed the USPTO's rejection of Exela's petition to the USPTO filed in November 2011, which sought to vacate the April 2003 order. The USPTO determined that Exela lacked standing to seek such relief. Exela also seeks declaratory judgment that the USPTO's rules and regulations that allow for revival of abandoned, international patent applications under the "unintentional" standard are invalid, and seeks similar relief in connection with one or more counterclaims it has filed in the Delaware litigation. Cadence intervened in this lawsuit and in December 2012, the district court dismissed the case with prejudice as barred by the applicable statute of limitations. Exela appealed the dismissal to the Court of Appeals for the Federal Circuit and oral arguments were held in February 2014. In March 2015, the Federal Circuit affirmed the district court's dismissal of the Exela complaint.

*'222 and '218 Patent Litigation Settlements.* Four other similar cases involving generic and/or competing versions of Ofirmev have previously settled. In each settlement, the defendant was granted the non-exclusive right to market a generic intravenous acetaminophen product in the U.S. under its respective ANDA after December 6, 2020, or earlier under certain circumstances. In connection with those settlements, one settling party was granted the exclusive right of first refusal to negotiate an agreement with Cadence to market an authorized generic of Ofirmev in the U.S. in the event that Cadence elects to launch an authorized generic version of the product. If that settling party elects not to exercise its right of first refusal, Cadence has agreed to grant a similar right of first refusal to another settling party. As part of another settlement, Cadence entered into a supply agreement under which an affiliate of one of the settling parties will develop, manufacture and supply commercial quantities of Ofirmev to the Company if certain regulatory approvals are obtained.

*Inomax Patents: Inter Partes Review ("IPR") Proceedings.* In February 2015 and March 2015, the USPTO issued Notices of Filing Dates Accorded to Petitions for IPR petitions filed by Praxair Distribution, Inc. concerning ten patents covering Inomax. Patent Owner Preliminary responses for all of the IPR petitions were filed in May 2015 and June 2015. On July 29, 2015 the USPTO Patent Trial and Appeal Board ("PTAB") issued rulings denying the institution of four of the five IPR petitions challenging the five patents expiring in 2029. The PTAB also issued a ruling on July 29, 2015 that instituted the IPR proceeding in the fifth of this group of patents and the PTAB is statutorily required to complete the IPR process on that patent within one year. On September 22, 2015 the USPTO PTAB issued rulings that instituted the IPR proceedings in each of the second set of five patents that expire in 2031 and the PTAB is statutorily required to complete the IPR process on these five patents within one year.

*Inomax Patent Litigation: Praxair Distribution, Inc. and Praxair, Inc. (collectively "Praxair").* In February 2015, INO Therapeutics LLC and Ikaria, Inc., subsidiaries of the Company, filed suit in the U.S. District Court for the District of Delaware against Praxair following receipt of a January 2015 notice from Praxair concerning its submission of an ANDA containing a Paragraph IV patent certification with the FDA for a generic version of Inomax.

The Company intends to vigorously enforce its intellectual property rights relating to Inomax to prevent the marketing of infringing generic products prior to the expiration of the patents covering Inomax. An adverse outcome in either the IPRs or the Praxair litigation ultimately could result in the launch of a generic version of Inomax before the expiration of the last of the listed patents on January 6, 2031 (July 6, 2031 including pediatric exclusivity), which could adversely affect the Company's ability to successfully maximize the value of Inomax and have an adverse effect on its financial condition, results of operations and cash flows.

*Commercial and Securities Litigation*

*Retrophin Litigation.* In January 2014, Retrophin, Inc. ("Retrophin") filed a lawsuit against Questcor in the U.S. District Court for the Central District of California, alleging a variety of federal and state antitrust violations based on Questcor's acquisition from Novartis of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen. In June 2015, the parties entered into a binding settlement agreement, under the terms of which Retrophin agreed to dismiss the litigation with prejudice and Questcor agreed to make a one-time cash payment to Retrophin in the amount of $15.5 million.

*Glenridge Litigation.* In June 2011, Glenridge Pharmaceuticals LLC ("Glenridge"), filed a lawsuit against Questcor in the Superior Court of California, Santa Clara County, alleging that Questcor had underpaid royalties to Glenridge under a royalty agreement related to net sales of Acthar. In August 2012, Questcor filed a separate lawsuit against the three principals of Glenridge, as well as Glenridge, challenging the enforceability of the royalty agreement. In August 2013, the two lawsuits were consolidated into one case in the Superior Court of California, Santa Clara County. In October 2014, the parties entered into a binding term sheet settling the lawsuit. Under the terms of the settlement, the royalty rate payable by Questcor was reduced, royalties were capped instead of being payable for so long as Acthar was sold and Questcor agreed to pay Glenridge a reduced amount in satisfaction of royalties Questcor had previously accrued but not paid during the course of the lawsuit. In February 2015, the settlement agreement was finalized, with terms consistent with the October 2014 term sheet.

*Putative Class Action Securities Litigation.* In September 2012, a putative class action lawsuit was filed against Questcor and certain of its officers and directors in the U.S. District Court for the Central District of California, captioned *John K. Norton v. Questcor Pharmaceuticals, et al.,* No. SACV12-1623 DMG (FMOx). The complaint purports to be brought on behalf of shareholders who purchased Questcor common stock between April 26, 2011 and September 21, 2012. The complaint generally alleges that Questcor and certain of its officers and directors engaged in various acts to artificially inflate the price of Questcor stock and enable insiders to profit through stock sales. The complaint asserts that Questcor and certain of its officers and directors violated sections 10 (b) and/or 20(a) of the Securities Exchange Act of 1934, as amended ("the Exchange Act"), by making allegedly false and/or misleading statements concerning the clinical evidence to support the use of Acthar for indications other than infantile spasms, the promotion of the sale and use of Acthar in the treatment of multiple sclerosis and nephrotic syndrome, reimbursement for Acthar from third-party insurers, and Questcor's outlook and potential market growth for Acthar. The complaint seeks damages in an unspecified amount and equitable relief against the defendants. This lawsuit has been consolidated with four subsequently-filed actions asserting similar claims under the caption: *In re Questcor Securities Litigation,* No. CV 12-01623 DMG (FMOx). In October 2013, the District Court granted in part and denied in part Questcor's motion to dismiss the consolidated amended complaint. In October 2013, Questcor filed an answer to the consolidated amended complaint and fact discovery was concluded in January 2015. In April 2015, the parties executed a long-form settlement agreement, under the terms of which Questcor agreed to pay $38.0 million to resolve the plaintiff claims, inclusive of all fees and costs. Questcor and the individual defendants maintain that the plaintiffs' claims are without merit, and have entered into the settlement to eliminate the uncertainties, burden and expense of further protracted litigation. During fiscal 2015, the Company established a $38.0 million reserve for this settlement, which was subsequently paid to a settlement fund. The court issued its final approval of the settlement on September 18, 2015.

*Federal Shareholder Derivative Litigation.* On October 4, 2012, another alleged shareholder filed a derivative lawsuit in the United States District Court for the Central District of California captioned *Gerald Easton v. Don M Bailey, et al.,* No. SACV12-01716 DOC (JPRx). The suit asserts claims substantially identical to those asserted in the *do Valle* derivative action described below against the same defendants. This lawsuit has been consolidated with five subsequently-filed actions asserting similar claims under the caption: *In re Questcor Shareholder Derivative Litigation,* CV 12- 01716 DMG (FMOx). Following the resolution of the motion to dismiss in the consolidated putative securities class action, the court issued an order staying the federal derivative action until the earlier of: (a) 60 days after the resolution of any motion for summary judgment filed in the putative class action lawsuit, (b) 60 days after the deadline to file a motion for summary judgment in the putative class action lawsuit, if none is filed, or (c) the execution of any settlement agreement (including any partial settlement agreement) to resolve the putative class action lawsuit. In July 2015, the parties stipulated to a dismissal of the derivative case and Questcor agreed to make a one-time cash payment to plaintiffs in the form of a mootness fee.

*State Shareholder Derivative Litigation.* In October 2012, an alleged shareholder filed a derivative lawsuit purportedly on behalf of Questcor against certain of its officers and directors in the Superior Court of the State of California, Orange County, captioned *Monika do Valle v. Virgil D. Thompson, et al.,* No. 30-2012-00602258-CU-SL-CXC. The complaint asserted claims for breach of fiduciary duty, abuse of control, mismanagement and waste of corporate assets arising from substantially similar allegations as those contained in the putative securities class action described above, as well as from allegations relating to sales of Questcor common stock by the defendants and repurchases of Questcor common stock. The complaint sought an unspecified sum of damages and equitable relief. On October 24, 2012, another alleged shareholder filed a derivative lawsuit purportedly on behalf of Questcor against certain of its officers and directors in the Superior Court of the State of California, Orange County, captioned *Jones v. Bailey, et al.,* Case No. 30-2012-00608001-CU-MC-CXC. The suit asserted claims substantially identical to those asserted in the *do Valle* derivative action. In February 2013, the court issued an order staying the state derivative actions until the putative federal securities class action

and federal derivative actions are resolved. In May 2014, the court granted plaintiffs' request for dismissal without prejudice of the *Jones* action. In November 2014, the *do Valle* matter was voluntarily dismissed.

*Put Options Securities Action.* In March 2013, individual traders of put options filed a securities complaint in the United States District Court for the Central District of California captioned *David Taban, et al. v. Questcor Pharmaceuticals, Inc.*, No. SACV13-0425. The complaint generally asserts claims against Questcor and certain of its officers and directors for violations of the Exchange Act and for state law fraud and fraudulent concealment based on allegations similar to those asserted in the putative securities class action described above. The complaint seeks compensatory and punitive damages of an unspecified amount. Following the resolution of the motion to dismiss in the consolidated putative securities class action, the court issued an order staying this action until the earlier of: (a) sixty (60) days after the resolution of any motion for summary judgment filed in the putative class action lawsuit, (b) sixty (60) days after the deadline to file a motion for summary judgment in the putative class action lawsuit, if none is filed, or (c) the execution of any settlement agreement (including any partial settlement agreement) to resolve the putative class action lawsuit. In May 2015, the parties entered into a binding settlement agreement, under the terms of which plaintiffs agreed to dismiss the litigation with prejudice and Questcor agreed to make a one-time cash payment to plaintiffs.

## Pricing Litigation

*State of Utah v. Apotex Corp., et al.* The Company, along with several other pharmaceutical companies, is a defendant in this matter which was filed in May 2008, and is pending in the Third Judicial Circuit of Salt Lake County, Utah. The State of Utah alleges, generally, that the defendants reported false pricing information in connection with certain drugs that are reimbursable under Utah Medicaid, resulting in overpayment by Utah Medicaid for those drugs, and is seeking monetary damages and attorneys' fees. The Company believes that it has meritorious defenses to these claims and is vigorously defending against them.

### Environmental Remediation and Litigation Proceedings

The Company is involved in various stages of investigation and cleanup related to environmental remediation matters at a number of sites, including those described below. The ultimate cost of site cleanup and timing of future cash outlays is difficult to predict, given the uncertainties regarding the extent of the required cleanup, the interpretation of applicable laws and regulations and alternative cleanup methods. The Company concluded that, as of September 25, 2015, it was probable that it would incur remedial costs in the range of $39.8 million to $113.1 million. The Company also concluded that, as of September 25, 2015, the best estimate within this range was $76.5 million, of which $3.2 million was included in accrued and other current liabilities and the remainder was included in environmental liabilities on the consolidated balance sheet at September 25, 2015. While it is not possible at this time to determine with certainty the ultimate outcome of these matters, the Company believes, given the information currently available, that the final resolution of all known claims, after taking into account amounts already accrued, will not have a material adverse effect on its financial condition, results of operations and cash flows.

*Crab Orchard National Wildlife Refuge Superfund Site, near Marion, Illinois.* The Company is a successor in interest to International Minerals and Chemicals Corporation ("IMC"). Between 1967 and 1982, IMC leased portions of the Additional and Uncharacterized Sites ("AUS") Operable Unit at the Crab Orchard Superfund Site ("the Site") from the government and manufactured various explosives for use in mining and other operations. In March 2002, the Department of Justice, the U.S. Department of the Interior and the U.S. Environmental Protection Agency ("EPA") (together, "the Government Agencies") issued a special notice letter to General Dynamics Ordnance and Tactical Systems, Inc. ("General Dynamics"), one of the other potentially responsible parties ("PRPs") at the Site, to compel General Dynamics to perform the remedial investigation and feasibility study ("RI/FS") for the AUS Operable Unit. General Dynamics negotiated an Administrative Order on Consent ("AOC") with the Government Agencies to conduct an extensive RI/FS at the Site under the direction of the U.S. Fish and Wildlife Service. General Dynamics asserted in August 2004 that the Company is jointly and severally liable, along with approximately eight other lessees and operators at the AUS Operable Unit, for alleged contamination of soils and groundwater resulting from historic operations, and has threatened to file a contribution claim against the Company and other parties for recovery of its costs incurred in connection with the RI/FS activities being conducted at the AUS Operable Unit. The Company and other PRPs who received demand letters from General Dynamics have explored settlement alternatives, but have not reached settlement to date. General Dynamics has completed the RI and the PRPs have entered into an agreement to enter into non-binding mediation. While it is not possible at this time to determine with certainty the ultimate outcome of this case, the Company believes, given the information currently available, that the final resolution of all known claims, after taking into account amounts already accrued, will not have a material adverse effect on its financial condition, results of operations and cash flows.

*Mallinckrodt Veterinary, Inc., Millsboro, Delaware.* The Company previously operated a plant in Millsboro, Delaware ("the Millsboro Site") that manufactured various animal healthcare products. In 2005, the Delaware Department of Natural Resources and Environmental Control found trichloroethylene ("TCE") in the Millsboro public water supply at levels that exceeded the federal drinking water standards. Further investigation to identify the TCE plume in the ground water indicated that the plume has extended to property owned by a third party near the Millsboro Site. The Company, and another former owner, assumed responsibility for the Millsboro Site cleanup under the Alternative Superfund Program administered by the EPA. The Company and another PRP have entered into two AOCs with the EPA to perform investigations to abate, mitigate or eliminate the release or threat of release of

hazardous substances at the Millsboro Site and to conduct an Engineering Evaluation/Cost Analysis to characterize the nature and extent of the contamination. The Company, along with the other party, continues to conduct the studies and prepare remediation plans in accordance with the AOCs. While it is not possible at this time to determine with certainty the ultimate outcome of this matter, the Company believes, given the information currently available, that the ultimate resolution of all known claims, after taking into account amounts already accrued, will not have a material adverse effect on its financial condition, results of operations and cash flows.

*Coldwater Creek, Saint Louis County, Missouri.* The Company is named as a defendant in numerous tort complaints filed in and subsequent to February 2012 with numerous plaintiffs pending in the U.S. District Court for the Eastern District of Missouri. These cases allege personal injury for alleged exposure to radiological substances, including in Coldwater Creek in Missouri, and in the air. Plaintiffs allegedly lived and/or worked in various locations in Saint Louis County, Missouri near Coldwater Creek. Radiological residues which may have been present in the creek have previously been remediated by the U.S. Army Corps of Engineers ("USACE"). The USACE continues to study and remediate the creek and surrounding areas. The Company believes that it has meritorious defenses to these complaints and is vigorously defending against them. The Company is unable to estimate a range of reasonably possible losses for the following reasons: (i) the proceedings are in early stages; (ii) the Company has not received and reviewed complete information regarding the plaintiffs and their medical conditions; and (iii) there are significant factual and scientific issues to be resolved. While it is not possible at this time to determine with certainty the ultimate outcome of this case, the Company believes, given the information currently available, that the final resolution of all known claims, after taking into account amounts already accrued, will not have a material adverse effect on its financial condition, results of operations and cash flows.

*Lower Passaic River, New Jersey.* The Company and approximately 70 other companies originally comprised the Lower Passaic Cooperating Parties Group ("the CPG") and are parties to a May 2007 AOC with the EPA to perform a RI/FS of the 17-mile stretch known as the Lower Passaic River Study Area ("the River"). The Company's potential liability stems from former operations at Lodi and Belleville, New Jersey. In June 2007, the EPA issued a draft Focused Feasibility Study ("FFS") that considered interim remedial options for the lower 8-miles of the river, in addition to a "no action" option. As an interim step related to the 2007 AOC, the CPG voluntarily entered into an AOC on June 18, 2012 with the EPA for remediation actions focused solely at mile 10.9 of the River. The Company's estimated costs related to the RI/FS and focused remediation at mile 10.9, based on interim allocations, are immaterial and have been accrued.

In April 2014, the EPA issued its revised FFS, with remedial alternatives to address cleanup of the lower 8-mile stretch of the River, which also included a "no action" option. The EPA estimates the cost for the alternatives range from $365.0 million to $3.2 billion. The EPA's preferred approach would involve bank-to-bank dredging of the lower 8-mile stretch of the River and installing an engineered cap at a discounted, estimated cost of $1.7 billion. Based on the issuance of the EPA's revised FFS, the Company recorded a $23.1 million accrual in fiscal 2014 representing the estimate of our allocable share of the joint and several remediation liability resulting from this matter.

In April 2015, the CPG presented a draft of the RI/FS of the River to the EPA. The CPG's RI/FS included alternatives that ranged from "no action," targeted remediation of the entire 17-mile stretch of the River to remedial actions consistent with the EPA's preferred approach for the lower 8-mile stretch of the River and also included remediation alternatives for the upper 9-mile stretch of the River. The discounted cost estimates for the CPG remediation alternatives ranged from $483.4 million to $2.7 billion. The Company recorded an additional charge of $13.3 million in the second quarter of fiscal 2015 based on the Company's estimate of its allocable share of the joint and several remediation liability resulting from this matter.

Despite the issuance of the revised FFS by the EPA and the RI/FS by the CPG, there are many uncertainties associated with the final agreed-upon remediation and the Company's allocable share of the remediation. As of November 20, 2015, the Company withdrew from the CPG, but remains liable for its obligations under the two above-referenced AOCs, as well as potential future liabilities. Given those uncertainties, the amounts accrued may not be indicative of the amounts for which the Company may be ultimately responsible and will be refined as events in the remediation process occur.

### Products Liability Litigation

Beginning with lawsuits brought in July 1976, the Company is also named as a defendant in personal injury lawsuits based on alleged exposure to asbestos-containing materials. A majority of the cases involve product liability claims based principally on allegations of past distribution of products containing asbestos. A limited number of the cases allege premises liability based on claims that individuals were exposed to asbestos while on the Company's property. Each case typically names dozens of corporate defendants in addition to the Company. The complaints generally seek monetary damages for personal injury or bodily injury resulting from alleged exposure to products containing asbestos. The Company's involvement in asbestos cases has been limited because it did not mine or produce asbestos. Furthermore, in the Company's experience, a large percentage of these claims have never been substantiated and have been dismissed by the courts. The Company has not suffered an adverse verdict in a trial court proceeding related to asbestos claims and intends to continue to defend these lawsuits. When appropriate, the Company settles claims; however, amounts paid to settle and defend all asbestos claims have been immaterial. As of September 25, 2015, there were approximately 12,750 asbestos-related cases pending against the Company.

The Company estimates pending asbestos claims, claims that were incurred but not reported and related insurance recoveries, which are recorded on a gross basis in the consolidated balance sheets. The Company's estimate of its liability for pending and future claims is based on claims experience over the past five years and covers claims either currently filed or expected to be filed over the next seven years. The Company believes that it has adequate amounts recorded related to these matters. While it is not possible at this time to determine with certainty the ultimate outcome of these asbestos-related proceedings, the Company believes, given the information currently available, that the ultimate resolution of all known and anticipated future claims, after taking into account amounts already accrued, along with recoveries from insurance, will not have a material adverse effect on its financial condition, results of operations and cash flows.

## Asset Retirement Obligations

The Company has recorded asset retirement obligations for the estimated future costs primarily associated with legal obligations to decommission facilities within the Nuclear Imaging segment, including the facilities located in Petten, the Netherlands and Maryland Heights, Missouri. Substantially all of these obligations are included in other liabilities on the consolidated balance sheets. The following table provides a summary of the changes in the Company's asset retirement obligations for fiscal 2015 and 2014:

|  | 2015 | 2014 |
|---|---|---|
| Balance at beginning of period | $ 39.2 | $ 48.9 |
| Additions and adjustments | (1.0) | (11.5) |
| Accretion expense | 1.8 | 3.1 |
| Payments | — | — |
| Currency translation | (3.1) | (1.3) |
| Balance at end of period | $ 36.9 | $ 39.2 |

The Company believes that any potential payment of such estimated amounts will not have a material adverse effect on its financial condition, results of operations and cash flows.

## Industrial Revenue Bonds

Through September 25, 2015, the Company exchanged title to $88.0 million of its plant assets in return for an equal amount of Industrial Revenue Bonds ("IRB") issued by Saint Louis County. The Company also simultaneously leased such assets back from Saint Louis County under capital leases expiring through December 2025, the terms of which provide it with the right of offset against the IRBs. The lease also provides an option for the Company to repurchase the assets at the end of the lease for nominal consideration. These transactions collectively result in a ten-year property tax abatement from the date the property is placed in service. Due to the right of offset, the capital lease obligation and IRB asset are recorded net in the consolidated balance sheets. The Company expects that the right of offset will be applied to payments required under these arrangements.

## Interest Bearing Deferred Tax Obligation

As part of the integration of Questcor, the Company entered into an internal installment sale transaction related to certain Acthar intangible assets during the fiscal year ended September 25, 2015. The installment sale transaction resulted in a taxable gain. In accordance with Internal Revenue Code Section 453 the gain is considered taxable in the period in which installment payments are received. As of September 25, 2015, the Company had an aggregate $1,447.4 million of interest bearing U.S. deferred tax liabilities associated with outstanding installment notes. The U.S. Internal Revenue Service ("IRS") charges interest based on the deferred tax liability outstanding as of the end of a company's fiscal year, regardless of amounts outstanding during the fiscal year. During the fiscal year ended September 25, 2015 the Company accrued Section 453 interest of $36.5 million which is included within interest expense.

## Leases

The Company has facility, vehicle and equipment leases that expire at various dates. Rental expense under facility, vehicle and equipment operating leases related to continuing operations was $24.3 million, $15.2 million and $13.7 million for fiscal 2015, 2014 and 2013, respectively. The Company also has facility and equipment commitments under capital leases.

The following is a schedule of minimum lease payments for non-cancelable leases as of September 25, 2015:

| | Operating Leases | | Capital Leases |
|---|---|---|---|
| Fiscal 2016 | $ | 21.1 | $ 1.3 |
| Fiscal 2017 | | 17.7 | 0.9 |
| Fiscal 2018 | | 15.0 | 0.1 |
| Fiscal 2019 | | 11.3 | ---- |
| Fiscal 2020 | | 9.3 | ---- |
| Thereafter | | 20.6 | ---- |
| Total minimum lease payments | $ | 95.0 | 2.3 |
| Less: interest portion of payments | | | ---- |
| Present value of minimum lease payments | | | $ 2.3 |

*Tax Matters*

The income tax returns of the Company and its subsidiaries are periodically examined by various tax authorities. The resolution of these matters is subject to the conditions set forth in the Tax Matters Agreement between the Company and Covidien. Covidien has the right to administer, control and settle all U.S. income tax audits for periods prior to the Separation. While it is not possible at this time to determine with certainty the ultimate outcome of these matters, the Company believes, given the information currently available, that established liabilities are reasonable and that the ultimate resolution of these matters will not have a material adverse effect on its financial condition, results of operations and cash flows.

With respect to certain tax returns filed by predecessor affiliates of the Company and Covidien, the IRS has concluded its field examination for the years 1997 through 2009. The Company considers such uncertain tax positions associated with these years as having been effectively settled. All but one of the matters associated with these audits have been resolved. The unresolved proposed adjustment asserts that substantially all of the predecessor affiliates' intercompany debt originating during the years 1997 through 2000 should not be treated as debt for U.S. federal income tax purposes, and has disallowed interest deductions related to the intercompany debt and certain tax attribute adjustments recognized on the U.S. income tax returns. This matter is subject to the Company's $200.0 million liability limitation for periods prior to September 29, 2012, as prescribed in the Tax Matters Agreement. While it is not possible at this time to determine with certainty the ultimate outcome of this matter, the Company believes, given the information currently available, that it will not have a material adverse effect on its financial condition, results of operations and cash flows.

Prior to the Separation, the Company provided and accrued for an indemnification, to the purchaser of a certain legal entity, to indemnify it for tax obligations should the tax basis of certain assets not be recognized. The Company believes that, under the terms of the agreement between the parties, this indemnification obligation has expired. As such, the Company eliminated this liability and recorded a $22.5 million benefit, during fiscal 2015, in discontinued operations.

*Acquisition-Related Litigation*

Several purported class action lawsuits were filed in February 2014 and March 2014 by purported holders of Cadence common stock in connection with the Cadence Acquisition, including in the Delaware Court of Chancery (consolidated under the caption *In re Cadence Pharmaceuticals, Inc. Stockholders Litigation*), and in California State Court, San Diego County (*Denny v. Cadence Pharmaceuticals, Inc., et al., Militello v. Cadence Pharmaceuticals, Inc., et al.,* and *Schuon v. Cadence Pharmaceuticals, Inc., et al.*). The actions bring claims against, and generally allege that, the board of directors of Cadence breached their fiduciary duties in connection with the Cadence Acquisition by, among other things, failing to maximize shareholder value, and the Delaware and *Schuon* actions further allege that Cadence omitted to disclose allegedly material information in its Schedule 14D-9. The lawsuits also allege, among other things, that the Company aided and abetted the purported breaches of fiduciary duty. The lawsuits seek various forms of relief, including but not limited to, rescission of the transaction, damages and attorneys' fees and costs. On March 7, 2014, following expedited discovery, the parties in the consolidated Delaware action entered into a Memorandum of Understanding ("the MOU"), which sets forth the parties' agreement in principle for a settlement of those actions. The settlement was memorialized in a formal Stipulation and Settlement and Release in March 2015, and includes among other things, a release of all claims relating to the Cadence Acquisition as set forth in the Stipulation. On June 8, 2015, the Delaware Court approved the settlement. There were no substantive proceedings in any of the California actions. On July 29, 2014, the *Militello* case was voluntarily dismissed without prejudice. On September 8, 2014, the Denny case was voluntarily dismissed without prejudice. On June 23, 2015, the *Schuon* case was voluntarily dismissed without prejudice.

Since the announcement of the merger with Questcor on April 7, 2014, several putative class actions have been filed by purported holders of Questcor common stock in connection with the Questcor Acquisition (*Hansen v. Thompson, et al., Heng v. Questcor Pharmaceuticals, Inc., et al., Buck v. Questcor Pharmaceuticals, Inc., et al., Ellerbeck v. Questcor Pharmaceuticals, Inc., et al., Yokem v. Questcor Pharmaceuticals, Inc., et al., Richter v. Questcor Pharmaceuticals, Inc., et al., Tramantano v. Questcor Pharmaceuticals, Inc., et al., Crippen v. Questcor Pharmaceuticals, Inc., et al., Patel v. Questcor Pharmaceuticals, Inc., et al.,* and *Postow v. Questcor Pharmaceuticals, Inc., et al.*). The actions were consolidated on June 3, 2014. The consolidated complaint names as defendants, and

generally alleges that, the directors of Questcor breached their fiduciary duties in connection with the acquisition by, among other things, agreeing to sell Questcor for inadequate consideration and pursuant to an inadequate process. The consolidated complaint also alleges that the Questcor directors breached their fiduciary duties by failing to disclose purportedly material information to shareholders in connection with the merger. The consolidated complaint also alleges, among other things, that the Company aided and abetted the purported breaches of fiduciary duty. The lawsuits seek various forms of relief, including but not limited to, rescission of the transaction, damages and attorneys' fees and costs.

On July 29, 2014, the defendants reached an agreement in principle with the plaintiffs in the consolidated actions, and that agreement is reflected in a MOU. In connection with the settlement contemplated by the MOU, Questcor agreed to make certain additional disclosures related to the proposed transaction with the Company, which are contained in the Company's Current Report on Form 8-K filed with the SEC on July 30, 2014. Additionally, as part of the settlement and pursuant to the MOU, the Company agreed to forbear from exercising certain rights under the merger agreement with Questcor, as follows: the four business day period referenced in Section 5.3(e) of the merger agreement with Questcor was reduced to three business days. Consistent with the terms of the MOU, the parties entered into a formal stipulation of settlement in February 2015 and re-executed the stipulation of settlement on May 7, 2015 (collectively the "Stipulation of Settlement").

The Stipulation of Settlement was subject to customary conditions, including court approval. On May 8, 2015, the California Court denied plaintiffs' Motion for Preliminary Approval of Settlement. On October 23, 2015, the parties submitted a proposed Stipulation and Order re Dismissal With Prejudice dismissing the action with prejudice as to each of the named plaintiffs and without prejudice as to the remainder of the class, and on October 30, 2015 the California Court entered that Order.

### Other Matters

The Company is a defendant in a number of other pending legal proceedings relating to present and former operations, acquisitions and dispositions. The Company does not expect the outcome of these proceedings, either individually or in the aggregate, to have a material adverse effect on its financial condition, results of operations and cash flows.

### 20.  Financial Instruments and Fair Value Measurements

Fair value is defined as the exit price that would be received from the sale of an asset or paid to transfer a liability, using assumptions that market participants would use in pricing an asset or liability. The fair value guidance establishes a three-level fair value hierarchy, which maximizes the use of observable inputs and minimizes the use of unobservable inputs used in measuring fair value. The levels within the hierarchy are as follows:

Level 1— observable inputs such as quoted prices in active markets for identical assets or liabilities;

Level 2— significant other observable inputs that are observable either directly or indirectly; and

Level 3— significant unobservable inputs in which there is little or no market data, which requires the Company to develop its own assumptions.

The following tables provide a summary of the significant assets and liabilities that are measured at fair value on a recurring basis at the end of each period:

| | September 25, 2015 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Assets:** | | | | |
| Debt and equity securities held in rabbi trusts | $ 34.6 | $ 24.2 | $ 10.4 | $ — |
| | $ 34.6 | $ 24.2 | $ 10.4 | $ — |
| **Liabilities:** | | | | |
| Deferred compensation liabilities | $ 20.0 | $ — | $ 20.0 | $ — |
| Contingent consideration and acquired contingent liabilities | 174.6 | | | 174.6 |
| Foreign exchange forward and option contracts | 3.3 | 3.3 | | |
| | $ 197.9 | $ 3.3 | $ 20.0 | $ 174.6 |

| | September 26, 2014 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Assets:** | | | | |
| Debt and equity securities held in rabbi trusts | $    35.7 | $    22.9 | $    12.8 | $    ---- |
| | $    35.7 | $    22.9 | $    12.8 | $    ---- |
| **Liabilities:** | | | | |
| Deferred compensation liabilities | $    15.0 | $    ---- | $    15.0 | $    ---- |
| Contingent consideration and acquired contingent liabilities | 202.8 | ---- | ---- | 202.8 |
| Foreign exchange forward and option contracts | 0.2 | 0.2 | ---- | ---- |
| | $    218.0 | $    0.2 | $    15.0 | $    202.8 |

*Debt and equity securities held in rabbi trust.* Debt securities held in the rabbi trust primarily consist of U.S. government and agency securities and corporate bonds. When quoted prices are available in an active market, the investments are classified as level 1. When quoted market prices for a security are not available in an active market, they are classified as level 2. Equity securities held in the rabbi trust primarily consist of U.S. common stocks, which are valued using quoted market prices reported on nationally recognized securities exchanges.

*Foreign exchange forward and option contracts.* Foreign currency option and forward contracts are used to economically manage the foreign exchange exposures of operations outside the U.S. Quoted prices are available in an active market; as such, these derivatives are classified as level 1.

*Deferred compensation liabilities.* The Company maintains a non-qualified deferred compensation plan in the U.S., which permits eligible employees of the Company to defer a portion of their compensation. A recordkeeping account is set up for each participant and the participant chooses from a variety of funds for the deemed investment of their accounts. The recordkeeping accounts generally correspond to the funds offered in the Company's U.S. tax-qualified defined contribution retirement plan and the account balance fluctuates with the investment returns on those funds.

*Goodwill.* The Company performs an annual goodwill impairment assessment using an income approach based on the present value of future cash flows.  See further discussion in Notes 2 and 11.

*Contingent consideration and acquired contingent liabilities.* In October 2012, the Company recorded contingent consideration of $6.9 million upon the acquisition of CNS Therapeutics. This contingent consideration, which could potentially total a maximum of $9.0 million, is primarily based on whether the FDA approves another concentration of Gablofen on or before December 31, 2016. The fair value of the contingent payments was measured based on the probability-weighted present value of the consideration expected to be transferred using a discount rate of 1.0%.  At September 25, 2015, the fair value of this contingent consideration was $7.2 million.

In August 2014, the Company recorded acquired contingent liabilities of $195.4 million from the Questcor Acquisition. The contingent liabilities relate to Questcor's contingent obligations associated with their acquisition of an exclusive, perpetual and irrevocable license to develop, market, manufacture, distribute, sell and commercialize Synacthen and Synacthen Depot (collectively "Synacthen") from Novartis AG and Novartis Pharma AG (collectively "Novartis") and their acquisition of BioVectra. The fair value of these contingent consideration obligations at September 25, 2015 were $167.4 million.

Under the terms of the license agreement with Novartis, the Company is obligated to make a $25.0 million payment in fiscal 2016, make annual payments of $25.0 million subsequent to fiscal 2016 until such time that the Company obtains FDA approval of Synacthen and make a $25.0 million payment upon obtaining FDA approval of Synacthen. If FDA approval is obtained, the Company will pay an annual royalty to Novartis based on a percentage of net sales of the products in the U.S. market. The Company made its fiscal 2015 required payment of $25.0 million. As of September 25, 2015, the total remaining payments under the license agreement shall not exceed $190.0 million. The terms of the license agreement do allow the Company to terminate the license agreement at our discretion following the fiscal 2018 payment or upon the occurrence of certain events following the fiscal 2016 payment. The Company measured the fair value of the contingent payments based on a probability-weighted present value of the consideration expected to be transferred using a discount rate of 4.7%. Under the terms of the license agreement, the Company was required to maintain deposits equal to the fiscal  2016 annual $25.0 million payment which is included in prepaid expenses and other current assets and other assets in the consolidated balance sheets.

Based on the terms of the acquisition agreement with the former shareholders of BioVectra, the Company may be obligated to pay additional cash consideration of $50.0 million CAD based on BioVectra's financial results from January 2013 through a portion of fiscal 2016. During fiscal 2015 and 2014, the Company made $5.0 million CAD payments to the former shareholders and may be obligated for an additional $40.0 million CAD to be paid in fiscal 2016. The Company measured the fair value of the contingent payments based on a probability-weighted present value of the consideration expected to be transferred using a discount rate of 1.3%.

| | | |
|---|---|---:|
| Balance at September 26, 2014 | $ | 202.8 |
| Payments | | (29.0) |
| Accretion expense | | 7.5 |
| Effect of currency rate change | | (6.7) |
| Balance at September 25, 2015 | $ | 174.6 |

### Financial Instruments Not Measured at Fair Value

The carrying amounts of cash and cash equivalents, accounts receivable, accounts payable and the majority of other current assets and liabilities approximate fair value because of their short-term nature. The Company classifies cash on hand and deposits in banks, including commercial paper, money market accounts and other investments it may hold from time to time, with an original maturity to the Company of three months or less, as cash and cash equivalents (level 1). The fair value of restricted cash is equivalent to its carrying value of $66.3 million and $69.8 million as of September 25, 2015 and September 26, 2014, respectively (level 1), substantially all of which is included in other assets on the consolidated balance sheets. The Company's life insurance contracts are carried at cash surrender value, which is based on the present value of future cash flows under the terms of the contracts (level 3). Significant assumptions used in determining the cash surrender value include the amount and timing of future cash flows, interest rates and mortality charges. The fair value of these contracts approximates the carrying value of $67.7 million and $67.3 million at September 25, 2015 and September 26, 2014, respectively. These contracts are included in other assets on the consolidated and combined balances sheets.

The carrying values of the Company's revolving credit facility and variable rate receivable securitization approximate the fair values due to the short-term nature of these instruments. The carrying values of the 2.85% and 4.00% term loans approximate the fair values of these instruments, as calculated using the discounted exit price for each instrument, and are therefore classified as level 3. Since the quoted market prices for the Company's term loans and 8.00% and 9.50% debentures are not available in an active market, they are classified as level 2 for purposes of developing an estimate of fair value. The Company's 3.50%, 4.75%, 4.875%, 5.50%, 5.625% and 5.75% notes are classified as level 1, as quoted prices are available in an active market for these notes. The following table presents the carrying values and estimated fair values of the Company's long-term debt, excluding capital leases, as of the end of each period:

| | September 25, 2015 | | September 26, 2014 | |
|---|---|---|---|---|
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| Variable rate receivable securitization | $ 153.0 | $ 153.0 | $ 150.0 | $ 150.0 |
| 2.85% term loan due April 2016 | — | — | 3.1 | 3.1 |
| 3.50% notes due April 2018 | 300.0 | 294.3 | 300.0 | 290.2 |
| 4.875% notes due April 2020 | 700.0 | 684.1 | — | — |
| Term loans due March 2021 | 1,978.5 | 1,966.5 | 1,996.7 | 1,970.4 |
| 4.00% term loan due February 2022 | 7.9 | 7.9 | 10.8 | 10.8 |
| 9.50% debentures due May 2022 | 10.4 | 13.0 | 10.4 | 14.2 |
| 5.75% notes due August 2022 | 900.0 | 876.1 | 900.0 | 907.3 |
| 8.00% debentures due March 2023 | 4.4 | 5.3 | 8.0 | 10.2 |
| 4.75% notes due April 2023 | 600.0 | 539.6 | 600.0 | 563.8 |
| 5.625% notes due October 2023 | 750.0 | 705.2 | — | — |
| 5.50% notes due April 2025 | 700.0 | 646.0 | — | — |
| Revolving credit facility | 500.0 | 500.0 | — | — |

*Concentration of Credit and Other Risks*

Financial instruments that potentially subject the Company to concentrations of credit risk primarily consist of accounts receivable. The Company does not require collateral from customers. A portion of the Company's accounts receivable outside the U.S. includes sales to government-owned or supported healthcare systems in several countries, which are subject to payment delays. Payment is dependent upon the financial stability and creditworthiness of those countries' national economies.

The following table shows net sales attributable to distributors that accounted for 10% or more of the Company's total net sales:

| | Fiscal Year | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| CuraScript, Inc. | 31% | 6% | —% |
| McKesson Corporation | 18% | 21% | 19% |
| Cardinal Health, Inc. | 14% | 22% | 24% |
| AmerisourceBergen Corporation | 9% | 14% | 11% |

The following table shows accounts receivable attributable to distributors that accounted for 10% or more of the Company's gross accounts receivable at the end of each period:

| | September 25, 2015 | September 26, 2014 |
| --- | --- | --- |
| McKesson Corporation | 24% | 27% |
| CuraScript, Inc. | 16% | 15% |
| Cardinal Health, Inc. | 13% | 18% |
| AmerisourceBergen Corporation | 12% | 14% |

The following table shows net sales attributable to products that accounted for 10% or more of the Company's total net sales:

| | Fiscal Year | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Acthar | 31% | 6% | —% |
| Acetaminophen products (API) | 6% | 9% | 13% |
| Methylphenidate ER | 4% | 10% | 9% |

Molybdenum-99 ("Mo-99") is a key raw material in the Company's Ultra-Technekow DTE technetium generators that are sold by its Nuclear Imaging segment. There are only eight suppliers of this raw material worldwide. The Company has agreements to obtain Mo-99 from three nuclear research reactors and relies predominantly upon two of these reactors for its Mo-99 supply. Accordingly, a disruption in the commercial supply or a significant increase in the cost of this material from these sources could have a material adverse effect on the Company's financial condition, results of operations and cash flows.

## 21.  Segment and Geographical Data

During the first quarter of fiscal 2015, the Company changed its reportable segments to present the Specialty Brands and Specialty Generics businesses as reportable segments. The Company historically presented the Specialty Brands and Specialty Generics businesses within the Specialty Pharmaceuticals segment.

During the fourth quarter of fiscal 2015, the Company announced that it had entered into a definitive agreement to sell its CMDS business to Guerbet, which is expected to be completed during the first quarter of fiscal 2016. The CMDS business is deemed to be held for sale and the financial results of this business are presented as a discontinued operation. The CMDS business has been eliminated from the Global Medical Imaging segment, which has been renamed Nuclear Imaging.

Prior year amounts have been recast to conform to current presentation.

The three reportable segments are further described below:

- *Specialty Brands* produces and markets branded pharmaceuticals and biopharmaceuticals;
- *Specialty Generics* produces specialty generic pharmaceuticals and API consisting of biologics, medicinal opioids, synthetic controlled substances, acetaminophen and other active ingredients; and
- *Nuclear Imaging* manufactures and markets radiopharmaceuticals (nuclear medicine).

Management measures and evaluates the Company's operating segments based on segment net sales and operating income. Management excludes corporate expenses from segment operating income. In addition, certain amounts that management considers to be non-recurring or non-operational are excluded from segment operating income because management evaluates the operating results of the segments excluding such items. These items include revenues and expenses associated with sales of products to Covidien, intangible asset amortization, net restructuring and related charges, non-restructuring impairments and separation costs. Although these amounts are excluded from segment operating income, as applicable, they are included in reported consolidated and combined operating income and in the following reconciliations.

Management manages assets on a total company basis, not by operating segment. The chief operating decision maker does not regularly review any asset information by operating segment and, accordingly, the Company does not report asset information by operating segment. Total assets were approximately $16.4 billion and $12.8 billion at September 25, 2015 and September 26, 2014, respectively.

Selected information by business segment is as follows:

| | Fiscal Year | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| **Net sales:** | | | |
| Specialty Brands | 1,622.8 | 413.5 | 206.4 |
| Specialty Generics | 1,251.6 | 1,199.4 | 1,011.2 |
| Nuclear Imaging | 423.8 | 431.7 | 437.6 |
| Net sales of operating segments [1] | 3,298.2 | 2,044.6 | 1,655.2 |
| Other [2] | 48.7 | 37.4 | 57.1 |
| Net sales | 3,346.9 | 2,082.0 | 1,712.3 |
| **Operating income:** | | | |
| Specialty Brands | 651.3 | (50.6) | (36.2) |
| Specialty Generics | 622.0 | 617.4 | 347.9 |
| Nuclear Imaging | 66.4 | (16.7) | 24.5 |
| Segment operating income | 1,339.7 | 550.1 | 336.2 |
| Unallocated amounts: | | | |
| Corporate and allocated expenses [3] | (286.9) | (228.1) | (134.3) |
| Intangible asset amortization | (550.3) | (154.8) | (27.9) |
| Restructuring and related charges, net [4] | (40.7) | (81.9) | (26.3) |
| Non-restructuring impairments | — | (151.6) | — |
| Separation costs | — | (9.6) | (74.2) |
| Operating income (loss) | 461.8 | (75.9) | 73.5 |
| **Depreciation and amortization [5]:** | | | |
| Specialty Brands | 559.8 | 152.9 | 24.9 |
| Specialty Generics | 81.9 | 77.8 | 72.7 |
| Nuclear Imaging | 12.4 | 18.8 | 18.5 |
| Depreciation and amortization | 654.1 | 249.5 | 116.1 |

(1) Amounts represent sales to external customers. There were no intersegment sales.

(2) Represents historical CMDS-related intercompany transactions that represent Mallinckrodt continuing operations under an ongoing supply agreement with the acquirer of the CMDS business.

(3) Includes administration expenses and certain compensation, environmental and other costs not charged to the Company's operating segments.

(4) Includes restructuring-related accelerated depreciation.

(5) Depreciation for certain shared facilities is allocated based on occupancy percentage.

Net sales by product family within the Company's segments are as follows:

| | Fiscal Year | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Acthar | $ 1,037.3 | $ 122.9 | $ ---- |
| Ofirmev | 263.0 | 124.4 | ---- |
| Inomax | 185.2 | ---- | ---- |
| Exalgo | 39.4 | 76.1 | 126.1 |
| Other | 97.9 | 90.1 | 80.3 |
| Specialty Brands | 1,622.8 | 413.5 | 206.4 |
| Hydrocodone (API) and hydrocodone-containing tablets | 167.2 | 99.4 | 140.0 |
| Oxycodone (API) and oxycodone-containing tablets | 154.6 | 155.2 | 139.0 |
| Methylphenidate ER | 136.5 | 209.6 | 148.3 |
| Other controlled substances | 572.2 | 584.5 | 443.3 |
| Other | 221.1 | 150.7 | 140.6 |
| Specialty Generics | 1,251.6 | 1,199.4 | 1,011.2 |
| Nuclear Imaging | 423.8 | 431.7 | 437.6 |
| Other [1] | 48.7 | 37.4 | 57.1 |
| Net sales | $ 3,346.9 | $ 2,082.0 | $ 1,712.3 |

(1)  Represents historical CMDS-related intercompany transactions that represent Mallinckrodt continuing operations under an ongoing supply agreement with the acquirer of the CMDS business.

Selected information by geographic area excluding assets held for sale is as follows:

| | Fiscal Year | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Net sales [1]: | | | |
| U.S. | $ 2,973.2 | $ 1,780.9 | $ 1,421.6 |
| Europe, Middle East and Africa | 236.2 | 250.3 | 250.1 |
| Other | 137.5 | 50.8 | 40.6 |
| | $ 3,346.9 | $ 2,082.0 | $ 1,712.3 |
| Long-lived assets [2]: | | | |
| U.S. | $ 905.2 | $ 829.1 | |
| Europe, Middle East and Africa [3] | 45.0 | 33.9 | |
| Other | 44.5 | 41.0 | |
| | $ 994.7 | $ 904.0 | |

(1)  Net sales are attributed to regions based on the location of the entity that records the transaction, none of which relate to the country of Ireland.

(2)  Long-lived assets are primarily composed of property, plant and equipment.

(3)  Includes long-lived assets located in Ireland of $10.7 million, and $0.4 million  at the end of fiscal 2015 and 2014, respectively.

**22.  Selected Quarterly Financial Data (Unaudited)**

| | Fiscal 2015 (by quarter) | | | |
| | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Net sales | $ 768.2 | $ 819.0 | $ 877.3 | $ 882.4 |
| Gross profit | 404.8 | 462.9 | 503.8 | 482.1 |
| Income from continuing operations | 87.4 | 75.2 | 55.6 | 90.0 |
| Income (loss) from discontinued operations | 5.3 | 23.6 | 2.4 | (14.8) |
| Net income | 92.7 | 98.8 | 58.0 | 75.2 |
| | | | | |
| Basic earnings per share from continuing operations [1] | $ 0.75 | $ 0.64 | $ 0.47 | $ 0.77 |
| Diluted earnings per share from continuing operations [1] | 0.74 | 0.64 | 0.47 | 0.76 |

| | Fiscal 2014 (by quarter) | | | |
| | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Net sales | $ 429.5 | $ 448.7 | $ 530.1 | $ 673.7 |
| Gross profit | 216.2 | 226.7 | 254.1 | 363.2 |
| Income (loss) from continuing operations | 38.5 | 20.2 | (29.0) | (173.5) |
| Income (loss) from discontinued operations | 7.1 | (8.6) | 4.9 | (178.9) |
| Net income (loss) | 45.6 | 11.6 | (24.1) | (352.4) |
| | | | | |
| Basic earnings per share from continuing operations [1] | $ 0.67 | $ 0.35 | $ (0.50) | $ (2.04) |
| Diluted earnings per share from continuing operations [1] | 0.66 | 0.34 | (0.50) | (2.04) |

(1)  Quarterly and annual computations are prepared independently. Therefore, the sum of each quarter may not necessarily total the fiscal period amounts noted elsewhere within this Annual Report on Form 10-K.

**23.  Condensed Consolidating and Combining Financial Statements**

In November 2012, MIFSA was formed as a 100%-owned subsidiary of Covidien in connection with the Separation. MIFSA is a holding company established to own, directly or indirectly, substantially all of the operating subsidiaries of the Company, to issue debt securities and to perform treasury operations.

MIFSA is the borrower under the Notes, which are fully and unconditionally guaranteed by Mallinckrodt plc. The following information provides the composition of the Company's comprehensive income, assets, liabilities, equity and cash flows by relevant group within the Company: Mallinckrodt plc as guarantor of the Notes, MIFSA as issuer of the Notes and the operating companies that represent assets of MIFSA. There are no subsidiary guarantees related to the Notes.

Set forth below are the condensed consolidating balance sheet as of September 25, 2015 and September 26, 2014 and condensed consolidating statements of comprehensive income and cash flows for the three years ended September 25, 2015. Eliminations represent adjustments to eliminate investments in subsidiaries and intercompany balances and transactions between or among Mallinckrodt plc, MIFSA and the other subsidiaries. Condensed consolidating and combining financial information for Mallinckrodt plc and MIFSA, on a standalone basis, has been presented using the equity method of accounting for subsidiaries.

**MALLINCKRODT PLC**
**CONDENSED CONSOLIDATING BALANCE SHEET**
As of September 25, 2015
*(in millions)*

| | Mallinckrodt plc | Mallinckrodt International Finance S.A. | Other Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $ 0.1 | $ 152.1 | $ 213.7 | $ — | $ 365.9 |
| Accounts receivable, net | — | — | 548.5 | | 548.5 |
| Inventories | — | — | 281.8 | | 281.8 |
| Deferred income taxes | | | 142.7 | | 142.7 |
| Prepaid expenses and other current assets | 1.3 | 0.2 | 205.8 | | 207.3 |
| Current assets held for sale | | | 299.9 | | 299.9 |
| Intercompany receivable | 39.1 | 128.6 | 9,699.5 | (9,867.2) | — |
| Total current assets | 40.5 | 280.9 | 11,391.9 | (9,867.2) | 1,846.1 |
| Property, plant and equipment, net | | | 991.3 | | 991.3 |
| Goodwill | — | | 3,649.4 | | 3,649.4 |
| Intangible assets, net | — | | 9,666.3 | | 9,666.3 |
| Long-term assets held for sale | | | | | |
| Investment in subsidiaries | 14,797.7 | 18,838.6 | 10,050.0 | (43,686.3) | — |
| Intercompany loan receivable | 174.4 | | 2,498.2 | (2,672.6) | — |
| Other assets | | 0.1 | 250.9 | | 251.0 |
| **Total Assets** | $ 15,012.6 | $ 19,119.6 | $ 38,498.0 | $ (56,226.1) | $ 16,404.1 |
| **Liabilities and Shareholders' Equity** | | | | | |
| Current Liabilities: | | | | | |
| Current maturities of long-term debt | $ — | $ 20.0 | $ 2.3 | $ — | $ 22.3 |
| Accounts payable | | 0.2 | 132.8 | | 133.0 |
| Accrued payroll and payroll-related costs | 0.1 | | 103.6 | | 103.7 |
| Accrued royalties | — | — | 29.3 | | 29.3 |
| Accrued and other current liabilities | 1.8 | 77.4 | 489.1 | | 568.3 |
| Current liabilities held for sale | | | 72.8 | | 72.8 |
| Intercompany payable | 9,699.5 | — | 167.7 | (9,867.2) | — |
| Total current liabilities | 9,701.4 | 97.6 | 997.6 | (9,867.2) | 929.4 |
| Long-term debt | — | 6,299.4 | 174.9 | — | 6,474.3 |
| Pension and postretirement benefits | | | 116.7 | | 116.7 |
| Environmental liabilities | — | | 73.3 | | 73.3 |
| Deferred income taxes | | | 3,132.4 | | 3,132.4 |
| Other income tax liabilities | | | 121.3 | | 121.3 |
| Long-term liabilities held for sale | | | | | |
| Intercompany loans payable | | 2,672.6 | | (2,672.6) | — |
| Other liabilities | | | 245.5 | | 245.5 |
| **Total liabilities** | 9,701.4 | 9,069.6 | 4,861.7 | (12,539.8) | 11,092.9 |
| Shareholders' equity | 5,311.2 | 10,050.0 | 33,636.3 | (43,686.3) | 5,311.2 |
| **Total Liabilities and Shareholders' Equity** | $ 15,012.6 | $ 19,119.6 | $ 38,498.0 | $ (56,226.1) | $ 16,404.1 |

**MALLINCKRODT PLC**
**CONDENSED CONSOLIDATING BALANCE SHEET**
As of September 26, 2014
*(in millions)*

| | Mallinckrodt plc | Mallinckrodt International Finance S.A. | Other Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents | $ 0.3 | $ 18.5 | $ 689.0 | $ — | $ 707.8 |
| Accounts receivable, net | — | — | 476.6 | — | 476.6 |
| Inventories | — | — | 306.4 | — | 306.4 |
| Deferred income taxes | — | — | 152.3 | — | 152.3 |
| Prepaid expenses and other current assets | 0.5 | 10.8 | 215.8 | — | 227.1 |
| Current assets held for sale | — | — | 200.8 | — | 200.8 |
| Intercompany receivable | 13.5 | — | 25.7 | (39.2) | — |
| Total current assets | 14.3 | 29.3 | 2,066.6 | (39.2) | 2,071.0 |
| Property, plant and equipment, net | — | — | 886.8 | — | 886.8 |
| Goodwill | — | — | 2,401.9 | — | 2,401.9 |
| Intangible assets, net | — | — | 7,082.2 | — | 7,082.2 |
| Long-term assets held for sale | — | — | 111.2 | — | 111.2 |
| Investment in subsidiaries | 586.8 | 10,645.7 | 4,945.1 | (16,177.6) | — |
| Intercompany loan receivable | 4,385.0 | — | 1,941.6 | (6,326.6) | — |
| Other assets | — | — | 234.2 | — | 234.2 |
| **Total Assets** | $ 4,986.1 | $ 10,675.0 | $ 19,669.6 | $ (22,543.4) | $ 12,787.3 |
| **Liabilities and Shareholders' Equity** | | | | | |
| Current Liabilities: | | | | | |
| Current maturities of long-term debt | $ — | $ 18.2 | $ 3.0 | $ — | $ 21.2 |
| Accounts payable | 1.2 | 0.2 | 109.3 | — | 110.7 |
| Accrued payroll and payroll-related costs | 0.1 | — | 116.2 | — | 116.3 |
| Accrued royalties | — | — | 67.7 | — | 67.7 |
| Accrued and other current liabilities | 1.1 | 50.9 | 477.9 | — | 529.9 |
| Current liabilities held for sale | — | — | 59.0 | — | 59.0 |
| Intercompany payable | 25.7 | — | 13.5 | (39.2) | — |
| Total current liabilities | 28.1 | 69.3 | 846.6 | (39.2) | 904.8 |
| Long-term debt | — | 3,693.9 | 180.1 | — | 3,874.0 |
| Pension and postretirement benefits | — | — | 116.2 | — | 116.2 |
| Environmental liabilities | — | — | 59.2 | — | 59.2 |
| Deferred income taxes | — | — | 2,399.6 | — | 2,399.6 |
| Other income tax liabilities | — | — | 122.6 | — | 122.6 |
| Long-term liabilities held for sale | — | — | 9.7 | — | 9.7 |
| Intercompany loans payable | — | 1,966.6 | 4,360.0 | (6,326.6) | — |
| Other liabilities | — | — | 343.2 | — | 343.2 |
| **Total liabilities** | 28.1 | 5,729.8 | 8,437.2 | (6,365.8) | 7,829.3 |
| Shareholders' equity | 4,958.0 | 4,945.2 | 11,232.4 | (16,177.6) | 4,958.0 |
| **Total Liabilities and Shareholders' Equity** | $ 4,986.1 | $ 10,675.0 | $ 19,669.6 | $ (22,543.4) | $ 12,787.3 |

**MALLINCKRODT PLC**
**CONDENSED CONSOLIDATING STATEMENT OF COMPREHENSIVE INCOME**
Fiscal year ended September 25, 2015
*(in millions)*

| | Mallinckrodt plc | Mallinckrodt International Finance S.A. | Other Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net sales | $ ...... | $ ...... | $ 3,346.9 | $ ...... | $ 3,346.9 |
| Cost of sales | ...... | ...... | 1,493.3 | | 1,493.3 |
| **Gross profit** | ...... | | 1,853.6 | | 1,853.6 |
| Selling, general and administrative expenses | 116.3 | 15.7 | 1,037.8 | | 1,169.8 |
| Research and development expenses | | | 185.1 | | 185.1 |
| Restructuring charges, net | 9.8 | — | 30.6 | | 40.4 |
| Gains on divestiture and license | | | (3.5) | | (3.5) |
| **Operating income (loss)** | (126.1) | (15.7) | 603.6 | — | 461.8 |
| Interest expense | (96.4) | (230.2) | (25.2) | 96.2 | (255.6) |
| Interest income | ...... | 0.1 | 97.1 | (96.2) | 1.0 |
| Other income (expense), net | 216.3 | — | (208.2) | — | 8.1 |
| Intercompany interest and fees | (14.7) | — | 14.7 | | ...... |
| Equity in net income of subsidiaries | 330.6 | 496.3 | 250.5 | (1,077.4) | |
| **Income from continuing operations before income taxes** | 309.7 | 250.5 | 732.5 | (1,077.4) | 215.3 |
| Benefit from income taxes | (15.9) | — | (77.0) | | (92.9) |
| **Income from continuing operations** | 325.6 | 250.5 | 809.5 | (1,077.4) | 308.2 |
| Gain (loss) from discontinued operations, net of income taxes | (0.9) | — | 17.4 | | 16.5 |
| **Net income** | 324.7 | 250.5 | 826.9 | (1,077.4) | 324.7 |
| Other comprehensive loss, net of tax | (64.8) | (64.8) | (69.9) | 134.7 | (64.8) |
| **Comprehensive income** | $ 259.9 | $ 185.7 | $ 757.0 | $ (942.7) | $ 259.9 |

**MALLINCKRODT PLC**
**CONDENSED COMBINING STATEMENT OF COMPREHENSIVE INCOME**
Fiscal year ended September 26, 2014
*(in millions)*

| | Mallinckrodt plc | Mallinckrodt International Finance S.A. | Other Subsidiaries | Eliminations | Combined |
|---|---|---|---|---|---|
| Net sales | $ — | $ — | $ 2,082.0 | $ — | $ 2,082.0 |
| Cost of sales | — | — | 1,021.8 | — | 1,021.8 |
| **Gross profit** | — | — | 1,060.2 | — | 1,060.2 |
| Selling, general and administrative expenses | 37.7 | 7.3 | 700.0 | — | 745.0 |
| Research and development expenses | — | — | 163.5 | — | 163.5 |
| Restructuring charges, net | 35.3 | — | 46.1 | — | 81.4 |
| Non-restructuring impairments | — | — | 151.6 | — | 151.6 |
| Separation costs | 2.5 | — | 7.1 | — | 9.6 |
| Gains on divestiture and license | — | — | (15.0) | — | (15.0) |
| **Operating (loss) income** | (75.5) | (7.3) | 6.9 | — | (75.9) |
| Interest expense | — | (86.3) | — | 3.7 | (82.6) |
| Interest income | — | — | 5.2 | (3.7) | 1.5 |
| Other income (expense), net | 30.9 | — | (27.8) | — | 3.1 |
| Intercompany interest and fees | (9.0) | — | 9.0 | — | — |
| Equity in net income of subsidiaries | (264.8) | (171.2) | (300.2) | 736.2 | — |
| **Loss from continuing operations before income taxes** | (318.4) | (264.8) | (306.9) | 736.2 | (153.9) |
| Benefit from income taxes | — | — | (10.1) | — | (10.1) |
| **Loss from continuing operations** | (318.4) | (264.8) | (296.8) | 736.2 | (143.8) |
| Loss from discontinued operations, net of income taxes | (0.9) | — | (174.6) | — | (175.5) |
| **Net loss** | (319.3) | (264.8) | (471.4) | 736.2 | (319.3) |
| Other comprehensive loss, net of tax | (42.8) | (42.8) | (84.1) | 126.9 | (42.8) |
| **Comprehensive loss** | $ (362.1) | $ (307.6) | $ (555.5) | $ 863.1 | $ (362.1) |

**MALLINCKRODT PLC**
**CONDENSED COMBINING STATEMENT OF COMPREHENSIVE INCOME**
Fiscal year ended September 27, 2013
*(in millions)*

| | Mallinckrodt plc | Mallinckrodt International Finance S.A. | Other Subsidiaries | Eliminations | Combined |
|---|---|---|---|---|---|
| Net sales | $ — | $ — | $ 1,712.3 | $ — | $ 1,712.3 |
| Cost of sales | — | — | 890.0 | — | 890.0 |
| **Gross profit** | — | — | 822.3 | — | 822.3 |
| Selling, general and administrative expenses | 5.2 | 0.1 | 490.6 | — | 495.9 |
| Research and development expenses | — | — | 157.9 | — | 157.9 |
| Restructuring charges, net | — | — | 23.7 | — | 23.7 |
| Separation costs | 3.2 | 0.6 | 70.4 | — | 74.2 |
| Gains on divestiture and license | — | — | (2.9) | — | (2.9) |
| **Operating income (loss)** | (8.4) | (0.7) | 82.6 | — | 73.5 |
| Interest expense | — | (19.6) | 0.1 | — | (19.5) |
| Interest income | — | — | 0.3 | — | 0.3 |
| Other income (expense), net | 0.2 | — | 1.2 | — | 1.4 |
| Intercompany interest and fees | (9.5) | — | 9.5 | — | — |
| Equity in net income of subsidiaries | 76.4 | 96.7 | — | (173.1) | — |
| **Income from continuing operations before income taxes** | 58.7 | 76.4 | 93.7 | (173.1) | 55.7 |
| Provision for (benefit from) income taxes | (0.3) | — | 47.8 | — | 47.5 |
| **Income from continuing operations** | 59.0 | 76.4 | 45.9 | (173.1) | 8.2 |
| Gain (loss) from discontinued operations, net of income taxes | (0.2) | — | 50.8 | — | 50.6 |
| **Net income** | 58.8 | 76.4 | 96.7 | (173.1) | 58.8 |
| Other comprehensive income, net of tax | 28.4 | 28.4 | 35.7 | (64.1) | 28.4 |
| **Comprehensive income** | $ 87.2 | $ 104.8 | $ 132.4 | $ (237.2) | $ 87.2 |

**MALLINCKRODT PLC**
**CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS**
Fiscal year ended September 25, 2015
*(in millions)*

| | Mallinckrodt plc | Mallinckrodt International Finance S.A. | Other Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | |
| Net cash provided by (used in) operating activities | $ 207.0 | $ (148.2) | $ 837.6 | $ — | $ 896.4 |
| **Cash Flows From Investing Activities:** | | | | | |
| Capital expenditures | — | — | (148.0) | — | (148.0) |
| Acquisitions and intangibles, net of cash acquired | — | — | (2,154.7) | — | (2,154.7) |
| Intercompany loan investment | (149.4) | — | (554.2) | 703.6 | — |
| Investment in subsidiary | — | (3,014.4) | — | 3,014.4 | — |
| Restricted cash | — | — | 3.1 | — | 3.1 |
| Other | — | — | 3.0 | — | 3.0 |
| Net cash used in investing activities | (149.4) | (3,014.4) | (2,850.8) | 3,718.0 | (2,296.6) |
| **Cash Flows From Financing Activities:** | | | | | |
| Issuance of external debt | — | 2,890.0 | 120.0 | — | 3,010.0 |
| Repayment of external debt and capital leases | — | (258.3) | (1,590.1) | — | (1,848.4) |
| Excess tax benefit from share-based compensation | — | — | 34.1 | — | 34.1 |
| Debt financing costs | — | (39.1) | (0.8) | — | (39.9) |
| Proceeds from exercise of share options | 34.4 | — | — | — | 34.4 |
| Intercompany loan borrowings | — | 703.6 | — | (703.6) | — |
| Capital contribution | — | — | 3,014.4 | (3,014.4) | — |
| Repurchase of shares | (92.2) | — | — | — | (92.2) |
| Other | — | — | (28.1) | — | (28.1) |
| Net cash provided by financing activities | (57.8) | 3,296.2 | 1,549.5 | (3,718.0) | 1,069.9 |
| Effect of currency rate changes on cash | — | — | (11.6) | — | (11.6) |
| **Net (decrease) increase in cash and cash equivalents** | (0.2) | 133.6 | (475.3) | — | (341.9) |
| **Cash and cash equivalents at beginning of period** | 0.3 | 18.5 | 689.0 | — | 707.8 |
| **Cash and cash equivalents at end of period** | 0.1 | 152.1 | 213.7 | — | 365.9 |

**MALLINCKRODT PLC**
**CONDENSED COMBINING STATEMENT OF CASH FLOWS**
Fiscal year ended September 26, 2014
*(in millions)*

| | Mallinckrodt plc | Mallinckrodt International Finance S.A. | Other Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | |
| Net cash provided by (used in) operating activities | $ 18.2 | $ (65.0) | $ 420.2 | $ ..... | $ 373.4 |
| **Cash Flows From Investing Activities:** | | | | | |
| Capital expenditures | ..... | ..... | (127.8) | ..... | (127.8) |
| Acquisitions and intangibles, net of cash acquired | | | (2,793.8) | | (2,793.8) |
| Intercompany loan investment | (25.0) | (298.1) | (915.8) | 1,238.9 | — |
| Subsidiary dividend proceeds | — | 300.5 | — | (300.5) | — |
| Investment in subsidiary | — | (3,735.5) | | 3,735.5 | — |
| Restricted Cash | | | 4.1 | | 4.1 |
| Other | — | — | 26.7 | | 26.7 |
| Net cash used in investing activities | (25.0) | (3,733.1) | (3,806.6) | 4,673.9 | (2,890.8) |
| **Cash Flows From Financing Activities:** | | | | | |
| Issuance of external debt | — | 2,893.3 | 149.9 | — | 3,043.2 |
| Repayment of external debt and capital leases | — | (3.3) | (31.5) | — | (34.8) |
| Excess tax benefit from share-based compensation | — | — | 8.9 | — | 8.9 |
| Debt financing costs | — | (70.7) | (1.0) | | (71.7) |
| Proceeds from exercise of share options | 25.8 | — | — | — | 25.8 |
| Subsidiary dividend payment | — | — | (300.5) | 300.5 | — |
| Intercompany loan borrowings | (2.4) | 940.8 | 300.5 | (1,238.9) | — |
| Capital contribution | — | — | 3,735.5 | (3,735.5) | — |
| Repurchase of shares | (17.5) | — | — | | (17.5) |
| Other | ..... | | | | — |
| Net cash provided by financing activities | 5.9 | 3,760.1 | 3,861.8 | (4,673.9) | 2,953.9 |
| Effect of currency rate changes on cash | — | — | (4.2) | | (4.2) |
| **Net increase (decrease) in cash and cash equivalents** | (0.9) | (38.0) | 471.2 | — | 432.3 |
| **Cash and cash equivalents at beginning of period** | 1.2 | 56.5 | 217.8 | — | 275.5 |
| **Cash and cash equivalents at end of period** | $ 0.3 | $ 18.5 | $ 689.0 | $ ..... | $ 707.8 |

**MALLINCKRODT PLC**
**CONDENSED COMBINING STATEMENT OF CASH FLOWS**
Fiscal year ended September 27, 2013
*(in millions)*

| | Mallinckrodt plc | Mallinckrodt International Finance S.A. | Other Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | |
| Net cash provided by (used in) operating activities | $ (1.8) | $ (8.4) | $ 146.1 | $ —— | $ 135.9 |
| **Cash Flows From Investing Activities:** | | | | | |
| Capital expenditures | —— | —— | (147.9) | | (147.9) |
| Acquisitions and intangibles, net of cash acquired | | | (88.1) | | (88.1) |
| Intercompany loan investment | — | (2.4) | (409.6) | 412.0 | —— |
| Investment in subsidiary | — | (68.0) | — | 68.0 | —— |
| Other | | | 1.3 | | 1.3 |
| Net cash used in investing activities | — | (70.4) | (644.3) | 480.0 | (234.7) |
| **Cash Flows From Financing Activities:** | | | | | |
| Issuance of external debt | — | 898.1 | — | — | 898.1 |
| Repayment of external debt and capital leases | — | — | (1.3) | — | (1.3) |
| Excess tax benefit from share-based compensation | — | — | 3.4 | — | 3.4 |
| Debt financing costs | | (12.0) | | | (12.0) |
| Net transfers to parent | | (1,160.4) | 644.5 | | (515.9) |
| Proceeds from exercise of share options | 0.6 | | | | 0.6 |
| Intercompany loan borrowings | 2.4 | 409.6 | —— | (412.0) | —— |
| Capital contribution | —— | —— | 68.0 | (68.0) | —— |
| Other | | | 0.1 | | 0.1 |
| Net cash provided by financing activities | 3.0 | 135.3 | 714.7 | (480.0) | 373.0 |
| Effect of currency rate changes on cash | | | 1.3 | | 1.3 |
| **Net increase in cash and cash equivalents** | 1.2 | 56.5 | 217.8 | —— | 275.5 |
| **Cash and cash equivalents at beginning of period** | | | | | |
| **Cash and cash equivalents at end of period** | $ 1.2 | $ 56.5 | $ 217.8 | $ — | $ 275.5 |

24. **Subsequent Events**

*Share Repurchase & Debt Reduction Authorization*

On November 19, 2015, the Company's board of directors authorized an increase to our existing $300.0 million share repurchase program previously announced in January 2015.  The authorization increased our existing repurchase program by $500.0 million from $300.0 million to $800.0 million.

Item 9.        **Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.**

None.

Item 9A.       **Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures designed to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended ("the Exchange Act"), is recorded, processed, summarized and reported within the specified time periods, and that such information is accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our CEO and CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15 and 15d-15 under the Exchange Act) as of September 25, 2015. Based on that evaluation, our CEO and CFO concluded that, as of that date, our disclosure controls and procedures were effective.

*Management's Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined under Exchange Act Rules 13a-15(f) and 15d-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets;
- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and directors; and
- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of September 25, 2015. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control—Integrated Framework (2013)*. Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing of the operational effectiveness of its internal control over financial reporting. Based on our assessment, we believe that our internal controls over financial reporting were effective as of September 25, 2015.

Management's assessment of internal control over financial reporting, as discussed above, excluded Ikaria, Inc. and Therakos, Inc., both acquired by the Company in fiscal 2015, which represented approximately 6% of our total net sales and approximately 29% of our total assets as of and for the period ended September 25, 2015, respectively.  Because management's assessment of internal control over financial reporting included the accounting for goodwill and intangible assets from these acquisitions, the percentage of total assets at September 25, 2015 that was excluded from management's assessment of internal control over financial reporting was approximately 2%.

Our internal control over financial reporting as of September 25, 2015 has been audited by Deloitte & Touche LLP, the independent registered public accounting firm that audited and reported on the consolidated financial statements included in this annual report on Form 10-K.  This report is included below.

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting during the quarter ended September 25, 2015 that have materially affected, or are likely to materially affect, our internal control over financial reporting.

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Mallinckrodt plc:

We have audited the internal control over financial reporting of Mallinckrodt plc and subsidiaries (the "Company") as of September 25, 2015, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. As described in *Management's Report on Internal Control over Financial Reporting*, management excluded from its assessment the internal control over financial reporting at Ikaria, Inc. ("Ikaria") and Therakos, Inc. ("Therakos"), both acquired by the Company in fiscal 2015, which represented approximately 6% of total net sales and approximately 2% of total assets as of and for the period ended September 25, 2015, respectively.  Accordingly, our audit did not include the internal control over financial reporting at Ikaria or Therakos. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control over Financial Reporting*. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of September 25, 2015, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated and combined financial statements and financial statement schedule as of and for the year ended September 25, 2015 of the Company and our report dated November 24, 2015 expressed an unqualified opinion on those financial statements and financial statement schedule and included an explanatory paragraph regarding the fact that the Company's combined financial statements for periods prior to June 28, 2013, including the nine months ended June 28, 2013 that is included within the Company's fiscal 2013 results, may not be indicative of the Company's future performance had it operated as an independent, publicly-traded company for the entirety of the periods presented.


/s/ DELOITTE & TOUCHE LLP
St. Louis, Missouri
November 24, 2015

**Item 9B.**    **Other Information.**

At meetings on November 18 - 19, 2015, our Board of Directors (the "Board") approved, with respect to our President and Chief Executive Officer, and the Human Resources and Compensation Committee (the "Committee") of our Board approved, with respect to our other named executive officers, certain compensation related actions. With respect to Matthew K. Harbaugh, our Senior Vice President and Chief Financial Officer, the Committee increased his annual base salary, effective December 28, 2015, from $530,000 to $570,000. With respect to Frank Scholz, our Senior Vice President, Global Operations, the Committee increased his annual base salary, effective December 28, 2015, from $430,000 to $460,000.

Also, the Board, with respect to our President and Chief Executive Officer, and the Committee, with respect to our other named executive officers, determined the target grant date dollar value of long-term incentive compensation for the fiscal 2016 annual long-term incentive awards, which will be granted on January 4, 2016 ("the Grant Date"). The table below sets forth the target grant date fair value awarded to each of our named executive officers:

### Fiscal 2016 Long-Term Incentive Compensation

| Name and Title | Target Grant Date Fair Value |
|---|---|
| Mark C. Trudeau Chief Executive Officer | $  9,750,000 |
| Matthew K. Harbaugh Senior Vice President and Chief Financial Officer | $  2,750,000 |
| Hugh M. O'Neill Senior Vice President, Autoimmune and Rare Diseases | $  1,700,000 |
| Gary M. Phillips Senior Vice President and Chief Strategy Officer | $  1,550,000 |
| Frank Scholz Senior Vice President, Global Operations | $  1,500,000 |

The dollar value awarded to each named executive officer for fiscal 2016 grants will be allocated between the long-term incentive vehicles as follows:

- 40% of the target grant date fair value will be allocated to performance shares ("PSUs") with performance-based vesting over a three-year vesting period (September 26, 2015 up to and including September 28, 2018) based on total return of shareholders against a defined peer group (weighted 50%) and Net Revenue Compounded Annual Growth Rate. The actual number of PSUs will be determined on the Grant Date by taking the dollar value allocated to PSUs and dividing such amount by the grant date fair value of a PSU using, for 50% of the value, a Monte Carlo simulation model and for the remaining 50% of the value, the closing price of our ordinary shares on the Grant Date. Depending on Mallinckrodt's performance during the performance period, the named executive officer is entitled to receive a number of ordinary shares equal to a percentage, ranging from 0% to 200%, of the award granted.

- 40% of the target grant date fair value will be allocated to stock options vesting ratably over a four-year period on the anniversary of the Grant Date. The actual number of stock options will be determined on the Grant Date by taking the dollar value allocated to stock options and dividing such amount by the grant date fair value of an option using a Black-Scholes valuation model; and

- 20% of the target grant date fair value will be allocated to restricted stock units ("RSUs") vesting ratably over a four-year period on the anniversary of the Grant Date. The actual number of RSUs will be determined on the Grant Date by taking the dollar value allocated to RSUs and dividing such amount by Fair Market Value (as defined in the Mallinckrodt Pharmaceuticals Stock and Incentive Plan) of the Company's ordinary shares on the Grant Date.

The performance share, stock option and restricted stock unit awards will be made pursuant to the terms and conditions of the Mallinckrodt Pharmaceuticals Stock and Incentive Plan and pursuant to the terms and conditions of the applicable award agreements.

**PART III**

**Item 10.**     **Directors, Executive Officers and Corporate Governance.**

Information regarding our directors required under this Item 10. Directors, Executive Officers and Corporate Governance will be included in our definitive proxy statement for our annual general meeting of shareholders, which will be filed with the United States Securities and Exchange Commission within 120 days after September 25, 2015.

Information regarding our executive officers required under this Item 10. Directors, Executive Officers and Corporate Governance is included in Item 1. Business of this Annual Report on Form 10-K.

We have adopted the Mallinckrodt Pharmaceuticals Guide to Business Conduct, which meets the requirements of a "code of ethics" as defined in Item 406 of Regulation S-K, as well as the requirements of a code of business conduct and ethics under the listing standards of the New York Stock Exchange. Our Guide to Business Conduct applies to all employees, officers and directors of Mallinckrodt, including, without limitation, our Chief Executive Officer, Chief Financial Officer and other senior financial officers. Our Guide to Business Conduct is posted on our website at www.mallinckrodt.com under the heading "Investor Relations - Corporate Governance." We will also provide a copy of our Guide to Business Conduct to shareholders upon request. We intend to disclose any amendments to our Guide to Business Conduct, as well as any waivers for executive officers or directors, on our website.

**Item 11.**     **Executive Compensation.**

Information regarding the compensation of our named executive officers and directors required under this Item 11. Executive Compensation will be included in our definitive proxy statement for our annual general meeting of shareholders, which will be filed with the United States Securities and Exchange Commission within 120 days after September 25, 2015.

**Item 12.**     **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

Information regarding individuals or groups which own more than 5% of our ordinary shares, as well as information regarding the security ownership of our executive officers and directors, and other shareholder matters required under this Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters will be included in our definitive proxy statement for our annual general meeting of shareholders, which will be filed with the United States Securities and Exchange Commission within 120 days after September 25, 2015.

**Item 13.**     **Certain Relationships and Related Transactions, and Director Independence.**

Information regarding transactions with related parties and director independence required under this Item 13. Certain Relationships and Related Transactions, and Director Independence will be included in our definitive proxy statement for our annual general meeting of shareholders, which will be filed with the United States Securities and Exchange Commission within 120 days after September 25, 2015.

**Item 14.**     **Principal Accounting Fees and Services.**

Information regarding the services provided by and the fees paid to Deloitte and Touche LLP, our independent auditors, required under this Item 14. Principal Accounting Fees and Services will be included in our definitive proxy statement for our annual general meeting of shareholders, which will be filed with the United States Securities and Exchange Commission within 120 days after September 25, 2015.

PART IV

**Item 15.        Exhibits, Financial Statement Schedules.**

Documents filed as part of this report:

1)  *Financial Statements.* The following are included within Item 8. Financial Statements and Supplementary Data of this Annual Report on Form 10-K.

   - Report of Independent Registered Public Accounting Firm

   - Consolidated Statement of Income for the fiscal year ended September 25, 2015 and the Consolidated and Combined Statements of Income for the fiscal years ended September 26, 2014 and September 27, 2013

   - Consolidated Statement of Comprehensive Income for the fiscal year ended September 25, 2015 and the Consolidated and Combined Statements of Comprehensive Income for the fiscal years ended September 26, 2014 and September 27, 2013

   - Consolidated Balance Sheets as of September 25, 2015 and September 26, 2014

   - Consolidated Statement of Cash Flows for the fiscal year ended September 25, 2015 and the Consolidated and Combined Statements of Cash Flows for the fiscal years ended September 26, 2014 and September 27, 2013

   - Consolidated Statement of Changes in Shareholders' Equity for the period from September 26, 2014 to September 25, 2015 and the Consolidated and Combined Statement of Changes in Shareholders' Equity for the period from September 28, 2012 to September 25, 2015

   - Notes to Consolidated and Combined Financial Statements

2)  *Financial Statement Schedules.* The financial statement schedule is included below. All other schedules have been omitted because they are not applicable, not required or the information is included in the financial statements or notes thereto.

**Schedule II - Valuation and Qualifying Accounts**

(in millions)

| Description | Balance at Beginning of Period | | Charged to Income | | Additions and Other | | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| **Allowance for doubtful accounts:** | | | | | | | | | |
| Fiscal year ended September 25, 2015 | $ | 3.7 | $ | 1.9 | $ | — | $ | (0.9) | $ | 4.7 |
| Fiscal year ended September 26, 2014 | | 3.6 | | 0.4 | | — | | (0.3) | | 3.7 |
| Fiscal year ended September 27, 2013 | | 9.4 | | 1.1 | | — | | (6.9) | | 3.6 |
| **Sales reserve accounts:** | | | | | | | | | |
| Fiscal year ended September 25, 2015 | $ | 404.9 | $ | 2,187.8 | $ | 1.3 | $ | (2,194.7) | $ | 399.3 |
| Fiscal year ended September 26, 2014 | | 287.7 | | 1,720.9 | | 30.6 | | (1,634.3) | | 404.9 |
| Fiscal year ended September 27, 2013 | | 235.0 | | 1,171.9 | | — | | (1,119.2) | | 287.7 |
| **Tax valuation allowance:** | | | | | | | | | |
| Fiscal year ended September 25, 2015 | $ | 76.9 | $ | 155.4 | $ | 0.2 | $ | 0.5 | $ | 233.0 |
| Fiscal year ended September 26, 2014 | | 28.3 | | 33.9 | | 14.7 | | — | | 76.9 |
| Fiscal year ended September 27, 2013 | | 15.3 | | 10.0 | | 3.0 | | — | | 28.3 |

3)  *Exhibits.* The exhibits are included in the Exhibit Index that appears at the end of this Annual Report on Form 10-K.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**MALLINCKRODT PUBLIC LIMITED COMPANY**

Date: November 24, 2015

By:  /s/ Matthew K. Harbaugh

Matthew K. Harbaugh
*Senior Vice President and Chief Financial Officer*
*(principal financial officer)*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Mark C. Trudeau<br>Mark C. Trudeau | President, Chief Executive Officer and Director<br>*(principal executive officer)* | November 24, 2015 |
| /s/ Matthew K. Harbaugh<br>Matthew K. Harbaugh | Senior Vice President and Chief Financial Officer<br>*(principal financial officer)* | November 24, 2015 |
| /s/ Kathleen A. Schaefer<br>Kathleen A. Schaefer | Vice President and Corporate Controller<br>*(principal accounting officer)* | November 24, 2015 |
| *<br>Melvin D. Booth | Chairman of the Board of Directors | November 24, 2015 |
| *<br>Don M. Bailey | Director | November 24, 2015 |
| *<br>David R. Carlucci | Director | November 24, 2015 |
| *<br>J. Martin Carroll | Director | November 24, 2015 |
| *<br>Diane H. Gulyas | Director | November 24, 2015 |
| *<br>Nancy S. Lurker | Director | November 24, 2015 |
| *<br>JoAnn A. Reed | Director | November 24, 2015 |
| *<br>Angus C. Russell | Director | November 24, 2015 |
| *<br>Virgil D. Thompson | Director | November 24, 2015 |
| *<br>Kneeland C. Youngblood, M.D. | Director | November 24, 2015 |
| *<br>Joseph A. Zaccagnino | Director | November 24, 2015 |

* Kenneth L. Wagner, by signing his name hereto, does sign this document on behalf of the above noted individuals, pursuant to powers of attorney duly executed by such individuals which have been filed as an Exhibit to this Annual Report on Form 10-K.

/s/ Kenneth L. Wagner

Kenneth L. Wagner, Attorney-in-fact

## EXHIBIT INDEX

| Exhibit Number | Exhibit |
|---|---|
| 2.1 | Separation and Distribution Agreement between Covidien plc and Mallinckrodt plc, dated June 28, 2013 (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 2.2 | Agreement and Plan of Merger, dated as of February 10, 2014, by and among Mallinckrodt plc, Madison Merger Sub, Inc. and Cadence Pharmaceuticals, Inc. (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed February 11, 2014). |
| 2.3 | Agreement and Plan of Merger, dated as of April 5, 2014, by and among Mallinckrodt plc, Quincy merger Sub, Inc. and Questcor Pharmaceuticals, Inc. (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed April 7, 2014). |
| 2.4 | Stock Purchase Agreement, dated March 5, 2015, by and among Compound Holdings I, LLC, Compound Holdings II, Inc., Mallinckrodt Enterprises LLC and Mallinckrodt plc (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed March 5, 2015). |
| 2.5 | Stock Purchase Agreement, dated as of July 27, 2015, by and between Mallinckrodt Group S.à r.l., Mallinckrodt U.S. Holdings Inc., Mallinckrodt Netherlands Holdings B.V., Mallinckrodt Finance GmbH, Ludlow Corporation, Mallinckrodt Holdings GmbH, Mallinckrodt International Finance S.A. and Guerbet S.A. (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed July 28, 2015). |
| 2.6 | Stock Purchase Agreement, dated August 9, 2015, by and among TGG Medical Holdings, LLC, TGG Medical Solutions, Inc., Mallinckrodt Enterprises LLC and Mallinckrodt plc (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed August 10, 2015). |
| 3.1 | Certificate of Incorporation of Mallinckrodt plc (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 3.2 | Amended and Restated Memorandum and Articles of Association of Mallinckrodt plc (incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 4.1 | Indenture, dated as of April 11, 2013, by and among Mallinckrodt International Finance S.A., Covidien International Finance S.A. and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 4.2 | Supplemental Indenture, dated as of June 28, 2013, by and among Mallinckrodt plc, Mallinckrodt International Finance S.A. and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 4.3 | Indenture, dated as of August 13, 2014, among Mallinckrodt International Finance, S.A., Mallinckrodt CB LLC, the Guarantors party thereto from time to time and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed August 14, 2014). |
| 4.4 | Indenture, dated as of April 15, 2015, among Mallinckrodt International Finance S.A., Mallinckrodt CB LLC, the Guarantors party thereto from time to time and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed April 17, 2015). |
| 4.5 | Indenture, dated as of September 24, 2015, among Mallinckrodt International Finance S.A., Mallinckrodt CB LLC, the Guarantors party thereto from time to time and Deutsche Bank Trust Company Americas, as trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed September 28, 2015). |
| 10.1 | Tax Matters Agreement between Covidien plc and Mallinckrodt plc, dated June 28, 2013 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 10.2 | Employee Matters Agreement between Covidien plc and Mallinckrodt plc, dated June 28, 2013 (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 10.3 | Transition Services Agreement between Covidien plc and Mallinckrodt plc, dated June 28, 2013 (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 10.4 | Credit Agreement, dated as of March 19, 2014, among Mallinckrodt plc, Mallinckrodt International Finance S.A., Mallinckrodt CB LLC, the lenders party thereto from time to time and Deutsche Bank AG New York Branch, as Administrative Agent (incorporated herein by reference to Exhibit (b)(3) of the Schedule TO/A filed by Mallinckrodt plc and Madison Merger Sub, Inc. on March 19, 2014). |
| 10.5 | Refinancing Amendment No. 1 and Incremental Assumption Agreement No. 2, dated as of August 28, 2015, among Mallinckrodt plc, Mallinckrodt International Finance, S.A., Mallinckrodt CB LLC, the other subsidiaries of Mallinckrodt plc party thereto, the lenders party thereto and Deutsche Bank AG New York Branch, as administrative agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed August 28, 2015). |
| 10.6 | Note Purchase Agreement, dated as of July 28, 2014, among Mallinckrodt Securitization S.À R.L., the persons from time to time party thereto as purchasers, PNC Bank, National Association, as administrative agent, and Mallinckrodt LLC, as initial servicer (incorporated by reference to Exhibit 10.1 to the Company's Current Report filed July 30, 2014). |

| 10.7 | First Amendment to the Note Purchase Agreement, dated as of January 20, 2015, among Mallinckrodt Securitization S.A R.L., the persons from time to time party thereto as purchasers, PNC Bank, National Association, as administrative agent, and Mallinckrodt LLC, as initial servicer (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 27, 2015). |
|---|---|
| 10.8 | Purchase and Sale Agreement, dated as of July 28, 2014, among the various entities party thereto from time to time as originators, Mallinckrodt LLC, as initial servicer, and Mallinckrodt Securitization S.A R.L., as buyer (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed July 30, 2014). |
| 10.9 | First Amendment to the Purchase and Sale Agreement, dated as of January 20, 2015, among the various entities party thereto from time to time as originators, Mallinckrodt LLC, as initial servicer, and Mallinckrodt Securitization S.A R.L., as buyer (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 27, 2015). |
| 10.10 | Sale Agreement, dated as of July 28, 2014, between Liebel-Flarsheim Company LLC and Mallinckrodt LLC (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed July 30, 2014). |
| 10.11 | Performance Guaranty, dated as of January 20, 2015, by Mallinckrodt International Finance S.A. in favor of PNC Bank, National Association, as administrative agent (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 27, 2015). |
| 10.12 | Incremental Assumption Agreement No. 1, dated as of August 14, 2014, among Mallinckrodt International Finance, S.A., Mallinckrodt CB LLC, the subsidiaries of MIFSA party thereto and Deutsche Bank AG New York Branch, as administrative agent, as acknowledged by and consented to by Mallinckrodt plc and Mallinckrodt Quincy S.à r.l. (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed August 14, 2014). |
| 10.13 | Form of Deed of Indemnification by and between Mallinckrodt plc and Directors and Secretary (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 10.14 | Form of Indemnification Agreement by and between Mallinckrodt Brand Pharmaceuticals, Inc. and Directors and Secretary (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 10.15 | IV APAP Agreement (U.S. and Canada), dated as of February 21, 2006, by and between Cadence Pharmaceuticals, Inc. and Bristol-Myers Squibb Company (incorporated by reference to Exhibit 10.11 to Amendment No. 2 of Cadence Pharmaceuticals, Inc.'s Registration Statement on Form S-1 filed September 25, 2006). |
| 12.16 | License Agreement, dated as of December 23, 2002, by and among SCR Pharmatop and Bristol-Myers Squibb Company (incorporated by reference to Exhibit 10.12 to Amendment No. 2 of Cadence Pharmaceuticals, Inc.'s Registration Statement on Form S-1 filed September 25, 2006). |
| 10.17* | Mallinckrodt Pharmaceuticals Severance Plan for U.S. Officers and Executives dated May 1, 2014 (incorporated by reference to Exhibit 10.14 to the Company's Annual Report on Form 10-K for the year ended September 26, 2014). |
| 10.18* | Mallinckrodt Pharmaceuticals Change in Control Severance Plan for Certain U.S. Officers and Executives dated as of May 1, 2014 (incorporated by reference to Exhibit 10.15 to the Company's Annual Report on Form 10-K for the year ended September 26, 2014). |
| 10.19* | Mallinckrodt Pharmaceuticals Stock and Incentive Plan (incorporated by reference to Exhibit 10.10 to the Company's Amendment No. 3 to Registration Statement on Form 10 filed on May 31, 2013). |
| 10.20* | Mallinckrodt plc Stock and Incentive Plan Terms and Conditions of Restricted Unit Award for Chief Executive Officer (incorporated by reference to Exhibit 10.8 to the Company's Current Report on Form 8-K filed July 1, 2013). |
| 10.21* | Mallinckrodt plc Stock and Incentive Plan Terms and Conditions of Restricted Unit Award (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q filed May 8, 2014). |
| 10.22* | Mallinckrodt plc Stock and Incentive Plan Terms and Conditions of Option Award (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q filed May 8, 2014). |
| 10.23* | Mallinckrodt plc Stock and Incentive Plan Terms and Conditions of Performance Unit Award FY14-FY16 Performance Cycle (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q filed May 8, 2014). |
| 10.24* | Mallinckrodt Pharmaceuticals Stock and Incentive Plan (incorporated by reference to Appendix B to the Company's Proxy Statement filed on January 23, 2015). |
| 10.25* | Mallinckrodt plc Stock and Incentive Plan Terms and Conditions of Restricted Unit Award to Non-Employee Directors (incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 27, 2015). |
| 10.26* | Letter Agreement dated as of August 27, 2013 by and between Mallinckrodt LLC and Frank Scholz (incorporated by reference to Exhibit 10.20 to the Company's Annual Report on Form 10-K for the year ended September 26, 2014). |
| 21.1 | Subsidiaries of Mallinckrodt plc. |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 24.1 | Powers of Attorney |
| 31.1 | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934, as amended. |

| 31.2 | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) of the Securities Exchange Act of 1934, as amended. |
| 32.1 | Certifications of the Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101 | The following materials from the Mallinckrodt plc Annual Report on Form 10-K for the fiscal year ended September 25, 2015 formatted in Extensible Business Reporting Language (XBRL): (i) the Consolidated and Combined Statements of Income, (ii) the Consolidated and Combined Statements of Comprehensive Income, (iii) the Consolidated Balance Sheets, (iv) the Consolidated and Combined Statements of Cash Flows, (v) the Consolidated and Combined Statements of Shareholders' Equity and (vi) related notes. |

[*]Compensation plans or arrangements.

The agreements and other documents filed as exhibits to this report are not intended to provide factual information or other disclosure other than with respect to the terms of the agreements or other documents themselves, and you should not rely on them for that purpose. In particular, any representations and warranties made by us in these agreements or other documents were made solely within the specific context of the relevant agreement or document and may not describe the actual state of affairs as of the date they were made or at any other time.

Exhibit 21.1

## SUBSIDIARIES OF MALLINCKRODT PLC

| Name of Subsidiary | Jurisdiction of Formation |
| --- | --- |
| 101610 P.E.I., Inc. | Prince Edward Island |
| Acthar IP | Ireland |
| BioVectra Inc. | Prince Edward Island |
| Cache Holdings Limited | Bermuda |
| Carnforth Limited | Bermuda |
| CNS Therapeutics, Inc. | Delaware |
| Comercializadora Mallinckrodt Chile Limitada | Chile |
| Dritte CORSA Verwaltungsgesellschaft GmbH | Germany |
| DT Merger Sub, Inc. | Delaware |
| Enterprises Holdings, Inc. | Delaware |
| Ikaria Australia Pty Ltd | Australia |
| Ikaria Canada Inc. | Canada |
| Ikaria Japan K.K. | Japan |
| IMC Exploration Company | Maryland |
| INO Therapeutics LLC | Delaware |
| INOmax Manufacturing LLC | Delaware |
| Liebel-Flarsheim Canada Inc. | Quebec |
| Liebel-Flarsheim Company LLC | Delaware |
| Liebel-Flarsheim Sarl | Luxembourg |
| Ludlow Corporation | Massachusetts |
| Mallinckrodt AG | Switzerland |
| Mallinckrodt APAP LLC | Delaware |
| Mallinckrodt ARD Finance, Inc. | Delaware |
| Mallinckrodt ARD Holdings Inc. | Delaware |
| Mallinckrodt ARD Holdings Limited | United Kingdom |
| Mallinckrodt ARD Inc. | California |
| Mallinckrodt ARD IP Limited | Ireland |
| Mallinckrodt Australia Pty Ltd | Australia |
| Mallinckrodt Belgium BVBA | Belgium |
| Mallinckrodt Brand Pharmaceuticals, Inc. | Delaware |
| Mallinckrodt Buckingham | Ireland |
| Mallinckrodt Canada Cooperatie U.A. | Netherlands |
| Mallinckrodt Canada Holdings ULC | Alberta |
| Mallinckrodt Canada ULC | Alberta |
| Mallinckrodt Caribbean, Inc. | Delaware |
| Mallinckrodt Caribbean, Inc. (Puerto Rico Branch) | Puerto Rico |
| Mallinckrodt CB LLC | Delaware |
| Mallinckrodt Chemical Holdings (U.K.) Ltd. | United Kingdom |
| Mallinckrodt Chemical Limited | United Kingdom |
| Mallinckrodt Colombia S A S | Colombia |
| Mallinckrodt Critical Care Finance Inc. | Delaware |
| Mallinckrodt Deutschland GmbH | Germany |
| Mallinckrodt Deutschland Holdings GmbH | Germany |
| Mallinckrodt do Brasil, Ltda. | Brazil |
| Mallinckrodt Enterprises Holdings, Inc. | California |
| Mallinckrodt Enterprises LLC | Delaware |
| Mallinckrodt Enterprises UK Limited | United Kingdom |
| Mallinckrodt Finance GmbH | Switzerland |

| | |
|---|---|
| Mallinckrodt France Sarl | France |
| Mallinckrodt Group Sarl | Luxembourg |
| Mallinckrodt Group Sarl, Luxembourg (LU) Schaffhausen Branch | Switzerland |
| Mallinckrodt Holdings GmbH | Switzerland |
| Mallinckrodt Holdings Limited | United Kingdom |
| Mallinckrodt Hong Kong Limited | Hong Kong |
| Mallinckrodt Hong Kong Limited, Taiwan Representative Office | Taiwan |
| Mallinckrodt Hong Kong Limited, Thailand Branch | Thailand |
| Mallinckrodt Hospital Products Inc. | Delaware |
| Mallinckrodt Hospital Products IP Limited | Ireland |
| Mallinckrodt Imaging Sarl | France |
| Mallinckrodt Inc. | Delaware |
| Mallinckrodt International Finance SA | Luxembourg |
| Mallinckrodt International Holdings S.a r.l. | Luxembourg |
| Mallinckrodt IP | Ireland |
| Mallinckrodt Ireland Limited | Ireland |
| Mallinckrodt Italia Spa | Milan |
| Mallinckrodt Japan Co. Ltd | Japan |
| Mallinckrodt Korea Inc. | South Korea |
| Mallinckrodt LLC | Delaware |
| Mallinckrodt Lux IP S.a r.l. | Luxembourg |
| Mallinckrodt Medical Argentina Limited | United Kingdom |
| Mallinckrodt Medical Argentina Limited (Argentina Branch) | Argentina |
| Mallinckrodt Medical B.V. | Netherlands |
| Mallinckrodt Medical Consulting (Shanghai) Co., Ltd. | China |
| Mallinckrodt Medical Consulting (Shanghai) Co., Ltd. Beijing Pharma Information Consulting Branch | China |
| Mallinckrodt Medical Holdings (UK) Limited | United Kingdom |
| Mallinckrodt Medical Imaging - Ireland | Ireland |
| Mallinckrodt Medical S.A. de C.V. | Mexico |
| Mallinckrodt MFC LLC | Delaware |
| Mallinckrodt Nederland B.V. | Netherlands |
| Mallinckrodt Netherlands Holdings B.V. (Finland Branch) | Finland |
| Mallinckrodt Netherlands Holdings B.V. Holland (Denmark Branch) | Denmark |
| Mallinckrodt Netherlands Holdings B.V. Slovakia, organizacná zlozka | Slovak Republic |
| Mallinckrodt Netherlands Holdings B.V., organizacní slozka | Czech Republic |
| Mallinckrodt Netherlands Holdings BV | Netherlands |
| Mallinckrodt Nuclear LLC | Delaware |
| Mallinckrodt Nuclear Medicine LLC | Delaware |
| Mallinckrodt Panama Distribution, S.A. | Panama |
| Mallinckrodt Panama, S.A. | Panama |
| Mallinckrodt Petten Holdings B.V. | Netherlands |
| Mallinckrodt Pharma IP Trading D.A.C. | Ireland |
| Mallinckrodt Pharmaceuticals India Private Limited | India |
| Mallinckrodt Pharmaceuticals Ireland Limited | Ireland |
| Mallinckrodt plc | Ireland |
| Mallinckrodt Proprietary Limited | South Africa |
| Mallinckrodt Quincy S.a r.l. | Luxembourg |
| Mallinckrodt Radioisotopes B.V. | Netherlands |
| Mallinckrodt Radiopharmaceuticals Deutschland GmbH | Germany |
| Mallinckrodt Radiopharmaceuticals Italia SpA | Italy |
| Mallinckrodt Radiopharmaceuticals Spain SL | Spain |
| Mallinckrodt Radiopharmaceuticals Sverige AB | Sweden |
| Mallinckrodt RP Canada Inc. | Ontario |
| Mallinckrodt RP UK Ltd | United Kingdom |

| | |
|---|---|
| Mallinckrodt Saglik Anonim Sirketi | Turkey |
| Mallinckrodt Securitization Sarl | Luxembourg |
| Mallinckrodt sp. z o.o. | Poland |
| Mallinckrodt Sp. z o.o., odstepný závod | Czech Republic |
| Mallinckrodt Spain, S.L. | Spain |
| Mallinckrodt Specialty Pharmaceuticals Ireland Limited | Ireland |
| Mallinckrodt Sverige AB | Sweden |
| Mallinckrodt Switzerland Limited | Switzerland |
| Mallinckrodt UK Commercial Ltd | United Kingdom |
| Mallinckrodt UK Finance LLP | United Kingdom |
| Mallinckrodt UK Ltd | United Kingdom |
| Mallinckrodt US Holdings Inc. | Nevada |
| Mallinckrodt US Holdings LLC | Delaware |
| Mallinckrodt US Pool LLC | Nevada |
| Mallinckrodt Veterinary, Inc. | Delaware |
| Mallinckrodt Windsor Ireland Finance | Ireland |
| Mallinckrodt Windsor Sarl | Luxembourg |
| MEH, Inc. | Nevada |
| MHP Finance, Inc. | Delaware |
| MKG Medical UK Ltd | United Kingdom |
| Montjeu Limited | Ireland |
| MUSHI UK Holdings Limited | United Kingdom |
| Phoenixglade Limited | Ireland |
| Questcor International  Ltd. | Ireland |
| Representative Office of private limited liability company Mallinckrodt Netherlands Holdings B.V. | Russia |
| Rhobgeorge, Inc. | Delaware |
| Therakos (Belgium) SPRL | Belgium |
| Therakos (Canada) Company | Canada |
| Therakos (France) SAS | France |
| Therakos (Italia) S.r.l | Italy |
| Therakos (UK), Limited  Dutch Branch | Netherlands |
| Therakos (UK), Limited, Sucursal en Espana | Spain |
| Therakos (UK), Ltd | United Kingdom |
| Therakos (UK), Ltd  Sweden Filial | Sweden |
| Therakos Colombia S.A.S. | Colombia |
| Therakos Germany GmbH | Germany |
| Therakos, Inc. | Florida |
| Viking Project Company, LLC | Delaware |

| Name of Subsidiary | Jurisdiction of Formation |
|---|---|
| Mallinckrodt Switzerland Limited | Switzerland |
| Mallinckrodt Hong Kong Limited, Taiwan Representative Office | Taiwan |
| Mallinckrodt Hong Kong Limited, Thailand Branch | Thailand |
| Mallinckrodt Saglik Anonim Sirketi | Turkey |
| Mallinckrodt ARD Holdings Limited (FKA MIFSA UK Limited) | UK |
| Mallinckrodt Chemical Holdings (UK) Ltd. | UK |
| Mallinckrodt Chemical Limited | UK |
| Mallinckrodt Enterprises UK Limited | UK |
| Mallinckrodt Medical Argentina Ltd. | UK |
| Mallinckrodt Medical Holdings (UK) Limited | UK |
| Mallinckrodt UK Commercial Ltd | UK |
| Mallinckrodt UK Ltd | UK |
| MKG Medical UK Ltd | UK |
| MUSHI UK Holdings Limited | UK |
| BioVectra, Inc. USA | North Carolina |
| Cadence Pharmaceuticals, Inc. | Delaware |
| CNS Therapeutics, Inc. | Delaware |
| Enterpises Holdings, Inc. | Delaware |
| IMC Exploration Company | Maryland |
| Lafayette Pharmaceuticals LLC | Delaware |
| Liebel-Flarsheim Company LLC | Delaware |
| Ludlow Corporation | Massachusetts |
| Mallinckrodt APAP LLC | Delaware |
| Mallinckrodt ARD Holdings Inc. | Delaware |
| Mallinckrodt Brand Pharmaceuticals, Inc. (DE) | Delaware |
| Mallinckrodt Caribbean, Inc. | Delaware |
| Mallinckrodt CB LLC | Delaware |
| Mallinckrodt Enterprises Holdings, Inc. | California |
| Mallinckrodt Enterprises LLC | Delaware |
| Mallinckrodt Inc. (DE) | Delaware |
| Mallinckrodt LLC | Delaware |
| Mallinckrodt MFC LLC | Delaware |
| Mallinckrodt Nuclear LLC | Delaware |
| Mallinckrodt Nuclear Medicine LLC | Delaware |
| Mallinckrodt US Holdings, Inc. (FKA Kendall Holding Corp.) | Nevada |
| Mallinckrodt US Holdings LLC | Delaware |
| Mallinckrodt US Pool LLC | Nevada |
| Mallinckrodt Veterinary, Inc. | Delaware |
| MEH, Inc. | Nevada |
| Questcor Pharmaceuticals Inc. | California |
| Ribogene, Inc. | Delaware |
| Viking Project Company, LLC | Delaware |

Exhibit 23.1

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Registration Statement Nos. 333-189711, 333-189712, 333-189716, 333-196054 and 333-203912 on Form S-8 of our reports dated November 24, 2015, relating to the consolidated and combined financial statements and financial statement schedule of Mallinckrodt plc (which report expresses an unqualified opinion and includes an explanatory paragraph related to the fact that the Company's results for periods prior to June 28, 2013, including the nine months ended June 28, 2013 that is included within the Company's fiscal 2013 results, may not be indicative of the Company's future performance and do not necessarily reflect the results of operations, financial position and cash flows that would have been had it operated as an independent, publicly-traded company for the entirety of the periods presented) and the effectiveness of Mallinckrodt plc's internal control over financial reporting, appearing in this Annual Report on Form 10-K of Mallinckrodt plc for the fiscal year ended September 25, 2015.

/s/ DELOITTE & TOUCHE LLP
St. Louis, Missouri
November 24, 2015

Exhibit 24.1

POWER OF ATTORNEY

We, the undersigned officers and directors of Mallinckrodt plc, hereby severally constitute and appoint Kenneth L. Wagner to sign for us and in our names in the capacities indicated below, any and all amendments to the report on Form 10-K filed herewith, and to file the same, with all exhibits thereto and other documents in connection therewith, in each case, with the Securities and Exchange Commission, and generally to do all such things in our names and on our behalf in our capacities consistent with the provisions of the Securities Act of 1934, as amended, and all requirements of the Securities and Exchange Commission.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| Mark C. Trudeau | President, Chief Executive Officer and Director<br><br>*(principal executive officer)* | |
| Matthew K. Harbaugh | Senior Vice President and Chief Financial Officer<br><br>*(principal financial officer)* | |
| Kathleen A. Schaefer | Vice President Controller<br><br>*(principal accounting officer)* | |
| /s/ Melvin D. Booth<br>Melvin D. Booth | Chairman of the Board of Directors | November 24, 2015 |
| /s/ Don M. Bailey<br>Don M. Bailey | Director | November 24, 2015 |
| /s/ David R. Carlucci<br>David R. Carlucci | Director | November 24, 2015 |
| /s/ J. Martin Carroll<br>J. Martin Carroll | Director | November 24, 2015 |
| /s/ Diane H. Gulyas<br>Diane H. Gulyas | Director | November 24, 2015 |
| /s/ Nancy S. Lurker<br>Nancy S. Lurker | Director | November 24, 2015 |
| /s/ JoAnn A. Reed<br>JoAnn A. Reed | Director | November 24, 2015 |
| /s/ Angus C. Russell<br>Angus C. Russell | Director | November 24, 2015 |
| /s/ Virgil D. Thompson<br>Virgil D. Thompson | Director | November 24, 2015 |
| /s/ Kneeland C. Youngblood<br>Kneeland C. Youngblood | Director | November 24, 2015 |
| /s/ Joseph A. Zaccagnino<br>Joseph A. Zaccagnino | Director | November 24, 2015 |

Exhibit 31.1

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER
## PURSUANT TO RULE 13A-14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

I, Mark C. Trudeau, certify that:

1.  I have reviewed this annual report on Form 10-K of Mallinckrodt plc;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in the Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 24, 2015

By:   /s/   Mark C. Trudeau

Mark C. Trudeau
*President and Chief Executive Officer*
*(principal executive officer)*

Exhibit 31.2

## CERTIFICATION OF CHIEF FINANCIAL OFFICER
## PURSUANT TO RULE 13A-14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

I, Matthew K. Harbaugh, certify that:

1.  I have reviewed this annual report on Form 10-K of Mallinckrodt plc;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in the Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 24, 2015

By: /s/ Matthew K. Harbaugh

Matthew K. Harbaugh
*Senior Vice President and Chief Financial Officer*
*(principal financial officer)*

Exhibit 32.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

The undersigned officers of Mallinckrodt plc ("the Company") hereby certify to their knowledge that the Company's annual report on Form 10-K for the annual period ended September 25, 2015 ("the Report"), as filed with the Securities and Exchange Commission on the date hereof, fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, as amended, and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By:  /s/  **Mark C. Trudeau**
**Mark C. Trudeau**
*President and Chief Executive Officer*

November 24, 2015

By:  /s/  **Matthew K. Harbaugh**
**Matthew K. Harbaugh**
*Senior Vice President and Chief Financial Officer*

November 24, 2015