PSJ17 Exh 46

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3
      IN RE NATIONAL PRESCRIPTION
 4    OPIATE LITIGATION
                                    MDL No. 2804
 5    THIS DOCUMENT APPLIES TO ALL   No. 17-MD-2804
      CASES                          Hon. Dan A. Polster
 6    _____/

 7
 8               HIGHLY CONFIDENTIAL -
           SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
                      --  -- --
10              FRIDAY, FEBRUARY 1, 2019
                      --  -- --
11
             Videotaped Deposition of STACEY BECKHARDT,
12    held at the Law Offices of Skikos Crawford Skikos &
      Joseph, One Sansome Street, Suite 2830,
13    San Francisco, California, beginning at 9:40 a.m.,
      before Sandra Bunch VanderPol, FAPR, RMR, CRR,
14    CALIFORNIA CSR #3032
15                    --  -- --
16
17
18
19
20
21    _____
22
23              GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
25                  Deps@golkow.com
```

```
 1                    APPEARANCES
 2
         THOMAS P. CARTMELL, ESQ.
 3       KATHLEEN E. HUDNALL, ESQ.
         WAGSTAFF & CARTMELL, LLP
 4       4740 Grand Avenue, Suite 300
         Kansas City, Missouri 64112
 5       (816) 701-1100
         tcartmell@wcllp.com
 6       khudnall@wcllp.com
         Counsel for the Plaintiffs
 7
 8       MARK G. CRAWFORD, ESQ.
         DYLAN JENSEN, ESQ.
 9       SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
         One Sansome Street, Suite 2830
10       San Francisco, California 94104
         (415) 546-7300
11       mcrawford@skikos.com
         djensen@skikos.com
12       Counsel for the Plaintiffs
13
         BENJAMIN A. GASTEL, ESQ.
14       BRANSTETTER, STRANCH & JENNINGS, PLLC
         The Freedom Center
15       223 Rosa L. Parks Avenue, Suite 200
         Nashville, Tennessee 37203
16       (615) 254-8801
         beng@bsjfirm.com
17       Counsel for the Tennessee Plaintiffs
18
         COLLIE F. JAMES, IV, ESQ.
19       MAUREEN K. BARBER, ESQ.
         MORGAN, LEWIS & BOCKIUS, LLP
20       600 Anton Boulevard, Suite 1800
         Costa Mesa, California 92626-7653
21       (949) 399-7199
         collie.james@morganlewis.com
22       maureen.barber@morganlewis.com
         Counsel for Defendant Cephalon/Teva and the
23       Witness
24   (Appearances continued on next page)
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2
             TAYLOR A. GOODSPEED, ESQ.
 3           JONES DAY
             555 California Street, 26th Floor
 4           San Francisco, California 94104-1500
             (415) 626-3939
 5           tgoodspeed@jonesday.com
             Counsel for Defendant Walmart
 6
 7           JOEL S. JOHNSON, ESQ.
             WILLIAMS & CONNOLLY, LLP
 8           725 Twelfth Street, N.W.
             Washington, DC 20005
 9           (650) 632-4715
             jjohnson@wc.com
10           Counsel for Defendant Cardinal Health
11
             MARY M. BALASTER, ESQ. (Telephone, Video &
12           Realtime Streaming)
             REED SMITH LLP
13           811 Main Street, Suite 1700
             Houston, Texas 77002-6110
14           (713) 469-3800
             mbalaster@reedsmith.com
15           Counsel for Defendant AmerisourceBergen
16
             KAREN RIGBERG, ESQ. (Telephone/Video &
17           realtime streaming)
             ARNOLD & PORTER KAYE SCHOLER, LLP
18           44th Floor, 777 South Figueroa Street
             Los Angeles, California 90017-5844
19           (213) 243-4120
             karen.rigberg@arnoldporter.com
20           Counsel for Defendants Endo Pharmaceuticals,
             Inc. and Endo Health Solutions, Inc.
21
22    Also Present:
23           EVAN WOLFE, Trial Tech, Technical Support
24           RYAN WONG, Videographer
25                          --oOo--
```

1    information about Actiq and Fentora to the media;

2    correct?

3              A.      That's correct.

4              Q.      And sometimes you would be involved

5    in what types of messages you would give the media

6    about these products; correct?

7              A.      That's correct.

8              Q.      And, for example, sometimes you would

9    be involved with giving the media messages about

10   Actiq and Fentora related to what types of products

11   they are; correct?

12             A.      That's correct.

13             Q.      And sometimes you would give the

14   media information about Actiq and Fentora about what

15   they could be used for; correct?

16             A.      That is correct.

17             Q.      And when we say "media," we're not

18   talking only about television, for example, radio,

19   for example, but we're also talking about the print

20   media?

21             A.      That's correct.

22             Q.      So, for example, the Wall Street

23   Journal or other AP types of newspapers, for example;

24   correct?

25             A.      That's correct.

1     Q.  So a lot of your job, it looked like,

2 or a big part of your job, included messaging with

3 the media about these two narcotic opioid drugs;

4 correct?

5     A.  That's a portion of my job.

6     MR. JAMES: Misstates her testimony.

7 BY MR. CARTMELL:

8     Q.  You can restate your answer, please.

9     A.  It was a portion of my job.

10     Q.  Now, the other things, it looks like

11 from your documents, that you were involved with and

12 you mentioned on your LinkedIn page is that you

13 partnered with industry groups, patient groups,

14 professional societies and key opinion leaders;

15 correct?

16     A.  That's correct.

17     Q.  What do you mean when you partnered

18 with those groups? What do you mean by that?

19     A.  We developed -- we spoke about

20 breakthrough pain, what breakthrough pain was. There

21 was lack of awareness of the condition. So both

22 breakthrough pain, breakthrough cancer pain, and

23 what -- what the needs of those patient populations

24 were.

25     Q.  When you say you partnered with

```
 1   industry groups, give the jury some idea of what an

 2   industry group in the pain community might be.

 3            A.    The primary industry group was a

 4   coalition called the Pain Care Coalition.  It

 5   involved industry groups, patient advocacy

 6   organizations, and professional societies.

 7            Q.    So would that pain coalition, as you

 8   called it, involve multiple pharmaceutical companies

 9   in the industry?

10            A.    That's correct.

11            Q.    And so sometimes you would work with

12   those industry groups on the messaging that would be

13   given about, for example, opioids in general?

14            A.    That's not correct.

15            Q.    Let me ask you this, then.  Would you

16   sometimes be involved with that coalition related to,

17   for example, as you mentioned, breakthrough pain and

18   the messaging related to breakthrough pain?

19            A.    To increase the understanding of

20   breakthrough pain, yes.

21            Q.    And then you also mentioned that part

22   of your job in public relations, and as it related to

23   these opioid narcotics, had to do with your

24   partnering with patient groups; right?

25            A.    That's correct.
```

1      Q.     Now, one of the things, I think, that

2  you would do is actually from time to time be

3  involved with providing some type of pamphlets or

4  brochures, or things like that, actually to patients?

5      A.     That's not correct.

6      Q.     Okay.  Let me re-ask it.  Actually,

7  strike that.

8         When you would partner with patient groups

9  about these opioid narcotic medications, what would

10  you do typically?  Tell the jury.

11        MR. JAMES:  Misstates her testimony.

12        THE WITNESS:  Can you clarify that question,

13  please?

14  BY MR. CARTMELL:

15      Q.     One of the things you would do during

16  your time at Cephalon and during the time that you

17  were in the Public Relations Department working with

18  Fentora and Actiq, the opioid narcotics, was you

19  would work with patient groups, for example; is that

20  true?

21      A.     That's true.

22      Q.     Give the jury an example of what you

23  mean when you say "a patient group."

24      A.     A patient group are organizations

25  that represent the interests of people with a

Highly Confidential - Subject to Further Confidentiality Review

1    C2 opioid.

2          MR. CARTMELL:  I'm going to object and move

3    to strike that.  That's not my question.

4          Q.    It's apparent from reviewing this

5    document, this Risk Management Program, that the FDA

6    required of Cephalon -- that the FDA was concerned

7    about the risks of abuse or misuse and diversion and

8    addiction related to Actiq; correct?

9          MR. JAMES:  Objection.

10          THE WITNESS:  Yes, they were concerned.  But

11    the reason they were concerned was because it was a

12    C2 opioid.

13    BY MR. CARTMELL:

14          Q.    Okay.  And it's true, from looking at

15    this document, that the FDA was requiring Cephalon,

16    your company, to make sure that it was sending the

17    appropriate messages to doctors, physicians, and

18    pharmacists about the safety of this product;

19    correct?

20          MR. JAMES:  Objection.

21          THE WITNESS:  Yes.  And we did.

22    BY MR. CARTMELL:

23          Q.    And it's true, is it not, from this

24    Risk Management Program, that the FDA required --

25    that one of those messages that was required of

Highly Confidential - Subject to Further Confidentiality Review

1    Cephalon to be sent to these physicians, patients,

2    and pharmacists was that Actiq should be used solely

3    by cancer patients with breakthrough pain and who are

4    opioid tolerant; correct?

5            MR. JAMES:  Objection.

6            THE WITNESS:  Those are the messages that

7    were required and that were given.

8    BY MR. CARTMELL:

9        Q.    Okay.  We will talk about whether or

10   not they were given.  Okay?

11           Now, is it true that you were involved in

12   some of these vehicles that this Risk Management

13   Program is talking about, as far as delivering

14   messages?

15       A.    I was not responsible for delivering

16   messages directly to health-care providers who were

17   prescribers or dispensing of the medication.

18       Q.    What about delivering --

19       A.    In that context.

20       Q.    I'm sorry.

21           What about delivering messages to patient

22   groups or industry groups or professional societies,

23   were you involved in --

24       A.    Yes.

25       Q.    -- delivering those messages?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You were; correct?

 2              A.     I was involved in giving those

 3     messages as they related to management of

 4     breakthrough cancer pain and breakthrough pain.

 5              Q.     And would you agree with me that it

 6     was Cephalon's obligation to provide information

 7     through the groups that were listed that was

 8     consistent with the goals of the Risk Management

 9     Program?

10              MR. JAMES:  Objection.

11              THE WITNESS:  What groups -- to which --

12     what groups are you referring to?  What section are

13     you --

14     BY MR. CARTMELL:

15              Q.     You will recall that the Risk

16     Management Program we just went through talked about

17     giving messages to physicians and pharmacists and

18     patients; correct?

19              A.     Yes.

20              Q.     And in certain circumstances giving

21     these messages to professional societies, for

22     example; correct?

23              A.     In certain circumstances, yes.

24              Q.     And would you agree with me that it

25     was Cephalon's obligation to provide those messages
```

Highly Confidential - Subject to Further Confidentiality Review

1    to those groups that were consistent with the goals

2    of the Risk Management Program?

3              MR. JAMES:  Objection.

4              THE WITNESS:  Yes.

5                   (Exhibit No. 8 was marked.)

6              MR. CARTMELL:  I'm handing you what's been

7    marked as Exhibit 8.

8              Q.    Ms. Beckhardt, we just looked at the

9    Risk Management Program for Actiq.  And I will

10   represent to you that this is the Risk Management

11   Program, sometimes referred to as the RiskMAP, for

12   Cephalon's other opioid narcotic, Fentora.

13             Do you see that?

14             A.    Yes.

15             Q.    And, again, I take it that this is

16   another Risk Management Program that you became

17   familiar with during your time working at Cephalon;

18   is that fair?

19             A.    Yes.

20             Q.    And you needed to become familiar

21   with the Risk Management Program because of your

22   involvement with providing messages related to

23   Fentora; correct?

24             A.    Messages related to the approval of

25   the product and its usage and data related to it to

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      A couple paragraphs down it says:

 3                      (Reading) The FDA approved Actiq for

 4                      use only in opioid-tolerant cancer

 5                      patients.  Between 2001 and 2006,

 6                      Cephalon allegedly promoted the drugs

 7                      for noncancer patients to use for such

 8                      maladies as migraine, sickle cell pain

 9                      crises, injuries and in anticipation

10                      of changing wound dressings or

11                      radiation therapy.  Cephalon also

12                      promoted Actiq for use with patients

13                      who were not opioid-tolerant (end of

14                      reading).

15              Do you see that?

16              A.      I see what it says, yes.

17              Q.      And we just looked at the marketing

18      plans and strategy and tactics that the company was

19      using in 2002 and 2003.  And some of the things in

20      those plans are included here, including sickle cell

21      therapy strategy to expand into that use; correct?

22              A.      That is correct.

23              Q.      Do you know whether or not, in fact,

24      this was -- that strategy of off-label marketing was

25      actually engaged in from 2001 to 2006, or was that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    something that if it was, you didn't know about?

 2              MR. JAMES:  Objection.

 3              THE WITNESS:  I was aware there was

 4    increased usage of our product in other -- other than

 5    cancer.

 6    BY MR. CARTMELL:

 7         Q.    Okay.  Did you at the time suspect

 8    that part of that large increase in off-label usage

 9    may be the result of the sales team or the marketing

10    strategy put in place?

11              MR. JAMES:  Objection.

12              THE WITNESS:  I had some suspicions, yes.

13    BY MR. CARTMELL:

14         Q.    Did you talk to anybody about that,

15    any management, while you were there?

16         A.    Yes.

17         Q.    Who did you talk to about that?

18         A.    My supervisor.

19         Q.    Who was your supervisor at the time?

20         A.    Cheryl Williams.

21         Q.    And what were you told in response to

22    your concerns?

23         A.    I don't recall.  But she did not have

24    oversight over the marketing strategy in any shape or

25    form.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Did you ever talk to Mr. Pyfer and

2    tell him that you had concerns that he was

3    instituting a strategy and tactics of off-label

4    promotion?

5          A.      I don't recall.

6          Q.      You may have, you just don't

7    remember?

8          A.      I don't recall.

9          Q.      In retrospect, now knowing that you

10   had suspicions and concerns about the off-label

11   promotion and marketing at the time at Cephalon, do

12   you wish you had done more to try to stop it?

13         MR. JAMES:  Objection.

14         THE WITNESS:  I don't know how to answer

15   that question.  I don't know the answer.

16   BY MR. CARTMELL:

17         Q.      Have you thought about that?

18         A.      No, I have not thought about that.

19         Q.      It states below:

20              (Reading) Cephalon undertook its

21              off-label promotional practices via a

22              variety of techniques, such as

23              training its sales force to disregard

24              restrictions of the FDA-approved label

25              and to promote the drugs for off-label

Highly Confidential - Subject to Further Confidentiality Review

1          uses.  For example, the Actiq label

2          stated that the drug was for

3          opioid-tolerant cancer patients with

4          breakthrough cancer pain, to be

5          prescribed by an oncologist or pain

6          specialist familiar with opioids.

7          Using the mantra, 'Pain is Pain,'

8          Cephalon instructed the Actiq sales

9          representatives to focus on physicians

10         other than oncologists, including

11         general practitioners, and to promote

12         this drug for many uses other than

13         breakthrough cancer pain (end of

14         reading).

15     Do you see that?

16     A.    I see that.

17     Q.    And is that part of the suspicion

18 that you had maybe going on with the sales team and

19 the marketing team?

20     A.    I did not have any suspicion that we

21 were marketing to general practitioners.

22     Q.    Okay.  But other than that, that's

23 one element here?

24     A.    That is correct.

25     Q.    Other than that, you had suspicions