PSJ17 Exh 48

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                    -  -  -
           Friday, January 18, 2019
11                    -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                      -  -  -
14
               Videotaped deposition of
15   CAROL MARCHIONE, taken pursuant to
     notice, was held at Golkow Litigation
16   Services, One Liberty Place, 1650 Market
     Street, Suite 5150, Philadelphia,
17   Pennsylvania 19103, beginning at 9:31
     a.m., on the above date, before Amanda
18   Dee Maslynsky-Miller, a Certified
     Realtime Reporter.
19
                      -  -  -
20
21
22
23        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2

 3         SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
           BY:  MARK G. CRAWFORD, ESQUIRE
 4         BY:  DYLAN JENSEN, ESQUIRE
           One Sansome Street
 5         Suite 2830
           San Francisco, California 94104
 6         (415) 546-7300
           Mcrawford@skikos.com
 7         Djensen@skikos.com
           Representing the Plaintiffs

 8

 9

10         BRANSTETTER, STRANCH & JENNINGS,
           PLLC
11         BY:  BENJAMIN A. GASTEL, ESQUIRE
           223 Rosa L. Parks Avenue
12         Suite 200
           Nashville, Tennessee 37203
13         (877) 369-0267
           Beng@bsjfirm.com
14         Representing the Staubus Plaintiffs

15

16
           MORGAN, LEWIS & BOCKIUS LLP
17         BY:  TINOS DIAMANTATOS, ESQUIRE
           77 West Wacker Drive
18         Chicago, Illinois 60601
           (312) 324-1484
19         Tinos.diamantatos@morganlewis.com
20         - and -
21         BY:  VINEETA PRAKASH KAMATH, ESQUIRE
           1111 Pennsylvania Avenue NW
22         Washington, DC 20004
           (202) 739-3000
23         Representing the Defendant,
           Teva Corporation

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2
 3          JONES DAY
            BY:  SHUBHA M. HARRIS, ESQUIRE
 4          90 South Seventh Street
            Suite 4950
 5          Minneapolis, MN 55402
            (612) 217-8800
 6          Shubhaharris@jonesday.com
            Representing the Defendant,
 7          Walmart
 8
 9
10
            PIETRAGALLO GORDON ALFANO BOSICK &
11          RASPANTI
            BY:  LESLIE A. MARIOTTI, ESQUIRE
12          1818 Market Street
            Suite 3402
13          Philadelphia, Pennsylvania 19103
            (215) 320-6200
14          LAM@pietragallo.com
            Representing the Defendant,
15          Cardinal Health, Inc.
16
17
            ARNOLD & PORTER KAYE SCHOLER LLP
18          BY: WILSON D. MUDGE, ESQUIRE
            601 Massachusetts Ave, NW
19          Washington, DC 20001
            (202) 942-5000
20          Wilson.mudge@arnoldporter.com
            Representing the Defendant,
21          Endo Pharmaceuticals, Endo Health,
            and Par Pharmaceuticals
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   APPEARANCES: (Continued)

2   VIA TELEPHONE/LIVESTREAM:

3

4          REED SMITH, LLP
           BY:  RYAN K. BLAKE, ESQUIRE
5          Three Logan Square
           1717 Arch Street, Suite 3100
6          Philadelphia, Pennsylvania, 19103
           (215) 851-8100
7          Rblake@reedsmith.com
           Representing the Defendant,
8          AmerisourceBergen

9

10

11         ALLEGAERT BERGER & VOGEL LLP
           BY: LAUREN J. PINCUS, ESQUIRE
12         111 Broadway, 20th Floor
           New York, New York 10006
13         (212) 616-7075
           Lpincus@abv.com
14         Representing the Defendant,
           Rochester Drug Corporation

15

16

    ALSO PRESENT:
17  David Lane, Videographer
    Rich Christian, Trial Technician

18

19

20

21

22

23

24
```

1    Inc. will provide a quarterly report to

2    the FDA compiled from all data collected

3    by the methods described under the Actiq

4    surveillance and monitoring program

5    interventions, see Sections 8.0 and 9.0

6    of the document.  This report will

7    describe and provide data and any

8    concerns for child safety, diversion and

9    off-label usage.

10             So that was -- that's the

11   report that you were required to prepare,

12   right?

13        A.    That's correct.

14        Q.    So one of those components

15   was to provide data and concerns about

16   off-label usage to the FDA, because they

17   wanted to know what was happening, right?

18        A.    Yes.

19             MR. CRAWFORD:  Can we go off

20        the record for a little bit?  I

21        think we might have a quarterly

22        report, and this might be a good

23        time to get that.

24             VIDEO TECHNICIAN:  Going off

Highly Confidential - Subject to Further Confidentiality Review

1       the record.  11:22 a.m.

2                    -  -  -

3            (Whereupon, a brief recess

4       was taken.)

5                    -  -  -

6            VIDEO TECHNICIAN:  We're

7       back on the record at 11:34 a.m.

8                    -  -  -

9            (Whereupon, Teva-Marchione

10      Exhibit-9,

11      TEVA_MDL_A_04578988-9017, was

12      marked for identification.)

13                   -  -  -

14  BY MR. CRAWFORD:

15      Q.    Ms. Marchione, we did find a

16  quarterly report, I believe, Exhibit-9,

17  dated September 24th, 2003 signed by you.

18  It's TEVA_MDL_A_04578988.

19            Is this a quarterly report

20  that you referred to earlier?

21      A.    Yes, it is.

22      Q.    And this was prepared or

23  compiled by you or your department,

24  right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    That's correct.

2      Q.    And submitted to the FDA,

3  correct?

4      A.    That's correct.

5      Q.    And if you could, maybe take

6  a few moments to look at it, maybe go to

7  the first page, which is at 93.

8           It says, Actiq risk

9  management program, 17th quarterly

10  report, April 1st, 2003 to June 30th,

11  2003.

12           This was the report that was

13  referenced in, I think, Section 10 of the

14  RiskMAP document, right?

15      A.    That's correct.

16      Q.    And this is a report that

17  you would prepare in your ordinary course

18  of business, right?

19      A.    That's correct.

20      Q.    And this one, in fact, was

21  submitted to the FDA?

22      A.    That's correct.

23      Q.    And I think the first page

24  here, Page 2, actually, it says, Actiq

Highly Confidential - Subject to Further Confidentiality Review

1  surveillance and monitoring programs,

2  Sections 8 and 9, surveillance goals and

3  activities.

4           And then it starts with

5  direct patient feedback and continues

6  through with sections that correspond to

7  the actual RiskMAP sections, right?

8       A.    That's correct.

9       Q.    So I think my question

10 was -- that you wanted to refer to it --

11 I think it was dealing with the 15

12 percent requirement in the Actiq RiskMAP,

13 right?

14      A.    That's my recollection.

15      Q.    Yeah.  I think that was --

16 just so you can pull it up next to it,

17 that was Exhibit-7, Page 27, groups of

18 prescribers, under off-label usage.

19           And I think I had asked you

20 exactly how -- how the company

21 interpreted and implemented this

22 mechanism to evaluate the prescribing by

23 these groups of physicians.

24           Is there anything -- and

Highly Confidential - Subject to Further Confidentiality Review

1  take your time, but is there anything in

2  the quarterly report that triggers your

3  recollection of how the company might

4  have interpreted and utilized and

5  implemented that mechanism?

6              MR. DIAMANTATOS:  Objection

7       to form.

8              THE WITNESS:  Just give me a

9       minute, please.

10  BY MR. CRAWFORD:

11       Q.    Take your time.

12             This one, actually, I think,

13  at Page 11 and 12, seems to skip over the

14  9.1.2 section.

15       A.    That's what I'm looking at.

16             Because we did -- oh, God.

17  We did always have the 15 percent cutoff.

18  There was an IMS printout that listed --

19  did we -- wait a second.

20             So in Section 8.2.1 on Page

21  3, under, NDC Source Prescriber audit, it

22  states there, The data from the NDC

23  Source Prescriber audit shows that none

24  of the nontargeted physician specialties

Highly Confidential - Subject to Further Confidentiality Review

1   exceeded 15 percent of the total

2   prescriptions during 2Q03.

3              So the actual documentation,

4   if I remember correctly, you know, was

5   very long and -- but we would get the

6   information and review it and put that

7   statement.

8              So it's on Page 3, under

9   8.2.1.

10      Q.    Right.  Okay.  So the

11  corresponding section in the Actiq

12  RiskMAP is on Page 23, under 8.2.1, IMS

13  Xponent.  That shows a different data

14  source, NDC Source Prescriber audit.

15             Is that the reason why

16  that's different than what's required by

17  the RiskMAP?

18      A.    This is one of those

19  evolving operational things.  And maybe

20  the IMS Xponent wasn't available any

21  longer.  So I think they switched over to

22  an NDC component.

23      Q.    Do you know if the FDA ever

24  approved that switch?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. DIAMANTATOS:  Object to

 2           form.

 3                  Go ahead.

 4                  THE WITNESS:  I doubt it.

 5           Again, we informed them every time

 6           we changed something.  But, as I

 7           mentioned earlier, they -- we

 8           never got, you know, an

 9           acknowledgment letter.

10                  We definitely sent it in

11           writing that -- what we were

12           changing along the way.

13   BY MR. CRAWFORD:

14           Q.    Right.  But there's nothing

15   in 8.2.1 that talks about the 15

16   percent --

17           A.    So I think --

18           Q.    -- specialties.  That comes

19   under -- if you look under the RiskMAP on

20   Page 27, that 15 percent is under 9.1.2.

21                  And you'll agree with me

22   that that section is omitted, 9.1.2, from

23   the report, right?

24           A.    I agree.  And it's one of
```

1    those historical -- if you looked back in

2    the communication logs, we probably

3    communicated that we were now

4    combining -- using the IMS for the

5    Xponent.

6             And that's why we say here

7    explicitly that the nontargeted physician

8    specialties exceeded 15 percent of the

9    total prescriptions.

10            And it's one of those things

11   that you have to go back historically and

12   look at all the FDA correspondence to

13   figure out when that changed and why, and

14   we explain that.

15       Q.   But, I mean, it would have

16   been just as easy to put it under 9.1.2

17   on Page 12, right after 9.1.1, talking

18   about individual prescribers.

19            I mean, is there a reason

20   why you couldn't have put it under that

21   section, which is the logical section,

22   because that's where 15 percent is

23   discussed, in that section?

24       A.   Right.  And I believe -- I

1    can't remember exactly, but because they

2    were both kind of looking at the same

3    thing, I think we combined it into that.

4               So we could repeat it again,

5    but -- if you looked at the progression

6    of the reports and the communication, it

7    would probably make a lot of sense where

8    things were.  We told them we were moving

9    things or what we were doing.

10              So we were probably using

11   the same source now to answer both

12   things.  So this came up first, and

13   that's why we put it there.

14        Q.   So was there ever any point

15   in time that you, in one of these

16   reports, reported that there were

17   nontargeted physician specialties that

18   did exceed 15 percent of total

19   prescriptions?

20              MR. DIAMANTATOS:  Objection.

21        Form.  Vague as to time.

22   BY MR. CRAWFORD:

23        Q.   At any time.

24        A.   I think there was one --

Highly Confidential - Subject to Further Confidentiality Review

1           MR. DIAMANTATOS:  Same

2       objection.

3           THE WITNESS:  -- quarter, or

4       two.  It was later in the -- it

5       was later, you know, towards the

6       end of the marketing or the sales.

7           So I don't know -- I can't

8       exactly -- but we only exceeded it

9       once or twice.  That why I wanted

10       you to actually see this, because

11       we never -- I think we

12       initially -- we can find the

13       date -- we never exceeded it

14       except for once or twice.

15  BY MR. CRAWFORD:

16       Q.   All right.  And then do you

17  remember what nontargeted specialties

18  exceeded 15 percent in those reports?

19       A.   I don't remember.

20       Q.   All right.  And what is a

21  nontargeted physician specialty?

22       A.   I believe -- I believe

23  somewhere down the line we communicated

24  to the agency who -- the groups that

Highly Confidential - Subject to Further Confidentiality Review

1    they -- I don't know who, I guess,

2    commercial, identified were not

3    prescribing for oncology.

4              So it could go beyond

5    oncologists.  And so whatever groups that

6    they identified, there's a communication

7    somewhere and why they chose those

8    groups.

9         Q.    All right.  So just turn to

10   Page 27 of Exhibit-7.

11             I'm trying to understand

12   about the -- this is 9.1.2.

13        A.    27 --

14        Q.    That would be exhibit, I'm

15   sorry, Exhibit-7, which is the Actiq

16   RiskMAP.

17        A.    I'm sorry, what page?

18        Q.    I think you might be in the

19   quarterly report.

20        A.    You want 27, sorry.

21        Q.    Yes.

22        A.    Okay.

23        Q.    And I'm just trying to

24   understand what you're reporting here.

Highly Confidential - Subject to Further Confidentiality Review

1         So what the FDA -- or what

2    the RiskMAP says is, If groups of

3    physicians (such as a particular

4    specialty) are identified as having

5    prescribed Actiq inappropriately and

6    these prescriptions represent potential

7    off-label usage greater than 15 percent

8    of total quarterly Actiq prescriptions,

9    Cephalon will contact the appropriate

10   professional society.

11        A.    Right.

12        Q.    It gives examples, American

13   College of Surgeons, American Society of

14   Anesthesiologists.

15        And then you say in your

16   report to the FDA, under 8.2.1, Data from

17   the NDC Source Prescriber audit show that

18   none of the nontargeted physician

19   specialties exceeded 15 percent of the

20   total prescriptions during Q203.

21        So the nontargeted physician

22   specialties are specialties that are

23   not -- would not be prescribing the drug

24   as it was indicated, right?