PSJ17 Exh 59

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3

      IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804
 4    OPIATE LITIGATION NO. 2804       )
                                       )
 5    APPLIES TO ALL CASES             ) Hon. Dan A. Polster
                                       )

 6

 7             HIGHLY CONFIDENTIAL - SUBJECT TO
 8                FURTHER CONFIDENTIALITY REVIEW

 9
                    VIDEO DEPOSITION OF LAURA SIPPIAL
10
                           January 22, 2019
11                           10:00 a.m.
12

13

14       Reporter:  John Arndt, CSR, CCR, RDR, CRR
                    CSR No. 084-004605
15                  CCR No. 1186
16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            DEPOSITION OF LAURA SIPPIAL produced,
      sworn, and examined on January 22, 2019, at Lindhorst &
 2    Dreidame, 312 Walnut Street, Suite 3100, in the City of
      Cincinnati, State of Ohio, before John Arndt, a
 3    Certified Shorthand Reporter and Certified Court
      Reporter.
 4
 5                    APPEARANCES OF COUNSEL
 6
      On Behalf of Plaintiffs:
 7         Wagstaff & Cartmell LLP
           4740 Grand Avenue, Suite 300
 8         Kansas City, MO  64112
           (816) 701-1174
 9         BY:   MR. ANDREW N. FAES
                 afaes@wcllp.com
10               MR. LUKE F. CALLAHAN
                 lcallahan@wcllp.com
11
           Robbins Geller Rudman & Dowd, LLP
12         655 West Broadway, Suite 1900
           San Diego, CA  92101
13         (619) 231-1058
           BY:   MS. KOMAL JAIN
14               kjain@rgrdlaw.com
15    On Behalf of Walmart:
           Jones Day
16         901 Lakeside Avenue
           Cleveland, OH  44114
17         (216) 586-3939
           BY:   MS. PATRICIA OCHMAN
18               pochman@jonesday.com
19    On Behalf of Endo Pharmaceuticals:
           Arnold & Porter Kaye Scholer, LLP
20         777 South Figueroa Street, 44th Floor
           Los Angeles, CA  90017
21         (213) 243-4000
           BY:   MS. TIFFANY M. IKEDA
22               tiffany.ikeda@arnoldporter.com
                 (present via speakerphone)
23
24
```

```
 1            APPEARANCES OF COUNSEL (CONTINUED)
 2
    On Behalf of AmerisourceBergen:
 3       Reed Smith LLP
         136 Main Street, Suite 250
 4       Princeton, NJ  08540
         (609) 514-5959
 5       BY:   MS. SHANA E. RUSSO
               srusso@reedsmith.com
 6             (present via speakerphone)
 7  On Behalf of Cardinal Health:
         Porter Wright Morris & Arthur LLP
 8       250 East Fifth Street, Suite 2200
         Cincinnati, OH  45202
 9       (513) 369-4203
         BY:   MR. ZACHARY A. EL-SAWAF
10             zelsawaf@porterwright.com
11  On Behalf of Teva Pharmaceutical:
         Morgan, Lewis & Bockius, LLP
12       1111 Pennsylvania Avenue, NW
         Washington, DC  20004
13       (202) 739-5806
         BY:   MR. JONATHAN E. MAIER
14             jonathan.maier@morganlewis.com
               (present via speakerphone)
15
         On Behalf of Laura Sippial:
16          Lindhorst & Dreidame, Co., LPA
17          312 Walnut Street, Suite 3100
18          Cincinnati, OH  45202
19          (513) 223-3967
20          BY:   MR. CULLEN P. ROONEY
21
22
23  Also present:  James Arndt, videographer
24                 Shawn Groat, trial technician
```

```
 1   talked -- you can say that we met, but --

 2         A.    Okay.  We met, yes.

 3         Q.    (By Mr. Faes)  So yeah, I don't -- I
 4   should have cautioned you.  I don't want to get into
 5   any communications that you had between yourself and
 6   your attorney.  I'm just -- I was just asking --

 7         A.    Yes.

 8         Q.     -- did you meet, how long did you meet
 9   for.  I don't want to hear anything substantive that
10   you discussed with your attorney.

11         A.    Okay.

12         Q.    Did you review any documents in
13   preparation for your deposition today?

14         A.    No.

15         Q.    And did you review any deposition
16   testimony in preparation for today?

17         A.    No.

18         Q.    And how long did you all meet for,
19   approximately?

20         A.    About 45 minutes to an hour.

21         Q.    What's your highest level of education?

22         A.    I have a bachelor's degree.

23         Q.    In?

24         A.    Business management.
```

```
 1      Q.    And who is your current employer?
 2      A.    I am currently unemployed.
 3      Q.    Who was your last employer?
 4      A.    My last employer was R & L Laboratory
 5   Services.
 6      Q.    And when did you leave that job?
 7      A.    I would say in June or July of this year.
 8      Q.    And what were the circumstances of your
 9   departure from R & L Laboratory Services?
10      A.    Well, I had multiple sclerosis, and so I
11   left to pursue, I guess you could say, short -- or
12   Social Security disability.
13      Q.    Now, you first started with Cephalon in
14   approximately January or February of 2001?
15      A.    Yes.
16      Q.    And you left Cephalon when?
17      A.    2010.
18      Q.    When in 2010 did you leave Cephalon?
19      A.    I don't recall.
20      Q.    Was it -- do you remember if it was early,
21   late in the year?
22      A.    I think it was like middle of the year.
23      Q.    So was it summertime?
24      A.    No, I think it was fall.
```

```
 1          Q.    So fall -- approximately fall of 2010 to
 2   the best of your recollection --
 3          A.    Yes.
 4          Q.     -- is when you left Teva?
 5          A.    Yes.
 6          Q.    And when you were --
 7          A.    Left Cephalon.
 8          Q.    I'm sorry.  Cephalon.  That's right.  It
 9   was never Teva when you were there.
10          A.    Right.
11          Q.    So what were the circumstances of your
12   departure from Cephalon in 2010?
13          A.    I was fired.
14          Q.    And what was the reason why you were told
15   you were fired to the --
16          A.    I was told I was fired because I stated
17   that I had not completed a medical education program
18   when the physician who was involved said that I had.
19          Q.    So let me understand if I see this --
20   understand this correctly.  When you say you were fired
21   because you stated that you had not completed a medical
22   education program and the doctor said you had, does
23   that mean that it was a medical education program for a
24   drug you were promoting, and this doctor that said it
```

```
 1   specialist; right?
 2       A.    Yes.  Often.
 3       Q.    And you would also ultimately call on
 4   other types of physicians other than oncologists and
 5   pain specialists as well; right?
 6       A.    Repeat that question.
 7       Q.    And you would call on physicians with
 8   other types of specialties other than just oncologists
 9   and pain specialists; right?
10             MR. MAIER:  Object to form.
11       A.    Yes.
12       Q.    (By Mr. Faes)  You might, for example,
13   call on primary care providers; right?
14       A.    No, not primary care.
15       Q.    So you don't remember ever having --
16       A.    I don't --
17       Q.     -- a primary care doctor as one of your
18   even top targets for Actiq or Fentora?
19             MR. MAIER:  Object to form.
20       A.    Maybe.
21             MR. ROONEY:  Don't guess.
22       A.    Okay.  I'm not sure.
23       Q.    (By Mr. Faes)  So I'm not sure I got an
24   answer, so let me ask it.  Is it true that you would
```

Highly Confidential - Subject to Further Confidentiality Review

 1   occasionally call on -- strike that.  Is it true that
 2   you would sometimes call on doctors with specialties
 3   other than oncology or pain specialists for Actiq and
 4   Fentora?
 5            MR. ROONEY:  Object to form.
 6       A.   Yes.
 7       Q.   (By Mr. Faes)  And the company knew that
 8   you were doing that; right?
 9            MR. ROONEY:  Object to form.
10       A.   Yes.
11       Q.   (By Mr. Faes)  And nobody ever expressed
12   any kind of concern to you that calling on doctors who
13   weren't oncologists or pain specialists was
14   inconsistent with the risk minimization plan; right?
15            MR. ROONEY:  Object to form.
16            MR. MAIER:  Object to form.
17       A.   Repeat that.
18       Q.   (By Mr. Faes)  Nobody at Cephalon -- none
19   of your superiors ever came to you or told you that
20   they had any concerns with you calling on doctors for
21   Actiq who weren't pain specialists or oncologists;
22   right?
23            MR. ROONEY:  Same objection.
24            MR. MAIER:  Object to form.

```
 1        A.    There were physicians with subspecialties
 2   that we called on.
 3              MR. ROONEY:  Look at the question he
 4   asked.
 5        A.    Okay.
 6              MR. ROONEY:  Just answer the question.
 7        A.    No.
 8        Q.    (By Mr. Faes)  So if you look back on
 9   Exhibit Number 2, if you look down on Paragraph 5, it
10   states that among those physicians who are prescribing
11   Actiq, activity is skewing increasingly towards
12   non-oncologists.  Units written by oncologists
13   represent just 16 percent of total usage with 48
14   percent coming from pain management specialists.  Do
15   you see that?
16        A.    Yes.
17        Q.    And that was something that you were
18   trained on and had an understanding early on when you
19   began promoting Actiq; right?
20              MR. ROONEY:  Object to form.
21              MR. MAIER:  Objection.  Form.
22        A.    Not early on.
23        Q.    (By Mr. Faes)  But eventually you had that
24   understanding?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.
 2        Q.    When did you come to have that
 3   understanding?
 4        A.    Maybe a couple years into working for --
 5              MR. ROONEY:  Don't guess.
 6        A.    Okay.  Two years.
 7        Q.    (By Mr. Faes)  So to the best of your
 8   recollection, within a couple years of working for
 9   Cephalon, you started to have an understanding that
10   among physicians who were prescribing Actiq, activity
11   was skewing increasingly towards the non-oncologist;
12   right?
13        A.    Yes.
14        Q.    And an oncologist is essentially a cancer
15   specialist; right?
16        A.    Correct.
17        Q.    And if you look on Number 6, it states
18   that we believe the pain management specialist is
19   likely to be a more aggressive writer and rapid adopter
20   of Actiq; right?
21        A.    Yes.
22        Q.    Is that something that you were trained on
23   during your initial training and on-boarding with
24   Cephalon?
```