# PSJ17 Exh 111

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3

       IN RE:  NATIONAL PRESCRIPTION      ) No. 17-md-2804
 4     OPIATE LITIGATION NO. 2804         )
                                          )
 5     APPLIES TO ALL CASES               ) Hon. Dan A. Polster
                                          )
 6

 7          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 8                    CONFIDENTIALITY REVIEW

 9
                   VIDEO DEPOSITION OF VALERIE KAISEN
10

                           January 18, 2019
11                            9:39 a.m.

12

13

14        Reporter:  John Arndt, CSR, CCR, RDR, CRR
                          CSR No. 084-004605
15                          CCR No. 1186

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION OF VALERIE KAISEN produced,
    sworn, and examined on January 18, 2019, at
 2  Spangenberg, Shibley & Liber LLP, 1001 Lakeside Avenue
    East, Suite 1700, in the City of Cleveland, State of
 3  Ohio, before John Arndt, a Certified Shorthand Reporter
    and Certified Court Reporter.
 4
 5                   APPEARANCES OF COUNSEL
 6
    On Behalf of Plaintiffs:
 7        Wagstaff & Cartmell LLP
          4740 Grand Avenue, Suite 300
 8        Kansas City, MO  64112
          (816) 701-1174
 9        BY:   MR. ANDREW N. FAES
                afaes@wcllp.com
10              MR. LUKE F. CALLAHAN
                lcallahan@wcllp.com
11
          -and-
12
          Robbins Geller Rudman & Dowd, LLP
13        655 West Broadway, Suite 1900
          San Diego, CA  92101
14        (619) 231-1058
          BY:   MS. KOMAL JAIN
15              kjain@rgrdlaw.com
16  On Behalf of Walmart:
          Jones Day
17        325 John H. McConnell Boulevard, Suite 600
          Columbus, OH  43215
18        (614) 469-3939
          BY:   MS. CASTEEL E. BORSAY
19              cborsay@jonesday.com
                (present via speakerphone)
20
    On Behalf of Endo Pharmaceuticals:
21        Arnold & Porter Kaye Scholer, LLP
          250 West 55th Street
22        New York, NY  10019
          (212) 836-8000
23        BY:   MR. ZENO HOUSTON
                zeno.houston@arnoldporter.com
24              (present via speakerphone)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              APPEARANCES OF COUNSEL (CONTINUED)
 2
    On Behalf of AmerisourceBergen:
 3        Jackson Kelly PLLC
          50 South Main Street, Suite 201
 4        Akron, OH  44308
          (330) 252-9060
 5        BY:   MS. SANDRA K. ZERRUSEN
                skzerrusen@jacksonkelly.com
 6              (present via speakerphone)
 7  On Behalf of Cardinal Health:
          Porter Wright Morris & Arthur LLP
 8        950 Main Avenue, Suite 500
          Cleveland, OH  44113
 9        (216) 443-2542
          BY:   MS. TRACY S. FRANCIS
10              tfrancis@porterwright.com
11  On Behalf of Teva Pharmaceutical:
          Morgan, Lewis & Bockius, LLP
12        1111 Pennsylvania Avenue, NW
          Washington, DC  20004
13        (202) 739-5806
          BY:   MR. JONATHAN E. MAIER
14              jonathan.maier@morganlewis.com
15  On Behalf of Valerie Kaisen:
          Caravona & Berg, LLC
16        1001 Lakeside Avenue East, Suite 1700
          Cleveland, OH  44114
17        (216) 696-6500
          BY:   MR. AARON P. BERG
18              aberg@cbjustice.com
19
    Also present:  Jacob Arndt, videographer
20               Mike Toth, trial technician
21
22
23
24
```

1  accordance with guidance you got from the company, the

2  company's knowledge that a physician had prescribed

3  either Actiq or Fentora off-label in the past would not

4  necessarily disqualify that physician for being a

5  potential speaker for those two products; right?

6          A.   I don't have an answer to that.  I wasn't

7  privy to that decision.

8          Q.   So your answer is that you don't know, you

9  weren't privy to that decision?  Is that accurate?

10         A.   I nominate, they decide.

11         Q.   So you would agree with me then that if

12 anyone at the company had ever told you that you

13 shouldn't nominate or use a speaker for Actiq or

14 Fentora if you knew that that person had prescribed

15 off-label in the past, you would have followed that

16 directive from your superiors; right?

17              MR. MAIER:  Objection.  Form.

18         A.   Yes.

19         Q.   (By Mr. Faes)  And we can agree that

20 Dr. -- since Dr. Laham was ultimately approved by your

21 superiors to be a Fentora speaker and they had this

22 data, they must have been okay with the fact that he

23 had prescribed Actiq off-label in the past --

24              MR. MAIER:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    (By Mr. Faes)  -- and that that didn't
 2   disqualify him from being a potential Fentora speaker;
 3   right?
 4              MR. MAIER:  Objection.  Form, foundation.
 5        A.    Yes.
 6        Q.    (By Mr. Faes)  Can I have you look back at
 7   the previous exhibit, which was Exhibit Number 18?  So
 8   if you look at the second page of this document, it
 9   starts at the top.  It says for your reference, the
10   list of current hcpConnect speakers is below.  Do you
11   see that?
12        A.    Uh-huh.
13        Q.    And if you look about in the middle of the
14   page, you see a Dr. Steve Simon from Leawood, Kansas;
15   right?
16        A.    Yes.
17        Q.    So at this time in 2015, Dr. Simon was
18   already an approved speaker for Fentora by the company;
19   right?
20        A.    Yes.
21        Q.    And you actually used Dr. Steve Simon in
22   your territory to give speaker programs throughout the
23   years for both Fentora and Actiq; right?
24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And you were aware that -- were you aware
2 that Dr. Steven Simon had actually been a --
3    A.   Can we strike that?  I don't remember on
4 Actiq or Fentora.  I remember I used him, but I'm not
5 sure which product or both.  I'm not sure.  But I did
6 use him, yes.
7    Q.   But you know he was an approved speaker
8 for both Actiq and Fentora; right?
9    A.   Yes.
10        MR. MAIER:  Objection.  Form.
11   Q.   (By Mr. Faes)  And you know he gave
12 speaker programs throughout the company -- or strike
13 that.  You know that he gave speaker programs for both
14 Actiq and Fentora throughout various parts in the
15 United States for the company; right?
16   A.   Yes.
17        MR. MAIER:  Objection.  Foundation.
18   Q.   (By Mr. Faes)  And you're not saying that
19 you didn't use Steven Simon in your territory?  You're
20 just saying you can't remember one way or the other as
21 you sit here today; right?
22   A.   I did use him in my territory.  I just
23 can't remember if it was Fentora or Actiq or both.
24   Q.   (By Mr. Faes)  Okay.  So what you're

Highly Confidential - Subject to Further Confidentiality Review

1  saying is you might have used him for Actiq -- strike

2  that. You might have used him for Actiq or Fentora or

3  both? You just can't remember one way or the other as

4  you sit here today what you used him for; right?

5       A.   Yes. Right.

6       Q.   So I'm going to hand you what's been

7  marked as Exhibit Number 20 to your deposition.

8            [Exhibit Teva-Kaisen-020

9            marked for identification.]

10      Q.   Sorry. That's his. That's yours. So

11 many pieces of paper floating around. So Exhibit

12 twenty --

13      A.   I already saw that.

14      Q.   So Exhibit Number 20 is an e-mail from

15 Philip Tocco to you.

16      A.   Uh-huh.

17      Q.   And a Frank Mazzucco dated September 19th

18 of 2006; right?

19      A.   Yes.

20      Q.   And the subject line is opportunity;

21 right?

22      A.   Yes.

23      Q.   And this is an e-mail that would have been

24 received by you; right?

Highly Confidential - Subject to Further Confidentiality Review

1  A. Yes.

2  Q. And it states, hey, team. I wanted to
3  share a great and rare opportunity with you. Dr. Simon
4  will be able to conduct Fentora programs made during
5  the Fentora launch. As you know, Dr. Simon is
6  currently capped at the current time. An exception has
7  been made for the remainder of the year pending the
8  approval of Fentora. Dr. Simon will be available for
9  an extra 25K in talks beginning at launch and ending
10 December 31st. After this date, his total cap will
11 return to 100K as before. Do you see that?

12 A. Yes.

13 Q. So this reflects that someone at the
14 company is sending you an e-mail indicating that Dr.
15 Simon is a approved speaker that you might want to
16 consider to give talks about the Fentora product which
17 is about to launch at this time; right?

18 A. Yes.

19      MR. MAIER: Objection. Form, foundation.

20 Q. (By Mr. Faes) And this indicates that he
21 generally has a cap of $100,000 a year. Is that your
22 understanding from reading this?

23      MR. MAIER: Objection. Foundation.

24 A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    (By Mr. Faes)  And it appears that he --
 2   did you understand -- strike that.  Did you understand
 3   when you worked at Cephalon that the company generally
 4   had a policy not to pay speakers for any product more
 5   than $100,000 in a single year?
 6      A.    Yes.
 7      Q.    And it looks like they're making an
 8   exception in this case because Dr. Simon is close to
 9   that $100,000 cap, so they're approving him for an
10   extra $25,000 for the -- through the end of the year
11   for the launch of Fentora; right?
12            MR. MAIER:  Objection.  Foundation.
13      A.    Yes.
14      Q.    (By Mr. Faes)  So that would indicate that
15   he had actually done quite a few speaker programs for
16   Cephalon at this time if he's already at or approaching
17   his $100,000 cap; right?
18            MR. MAIER:  Objection.  Form.
19      A.    If you say so.
20      Q.    (By Mr. Faes)  And if you go to the final
21   sentence, this states that since time and money may be
22   limited during the launch, I can say that Dr. Simon is
23   quite good at conducting teleconferences, so that might
24   be a great way of maximizing the use of Dr. Simon.  Do
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you see that?
 2        A.    I do.
 3        Q.    So this is direction from Mr. Philip Tocco
 4   at the company essentially endorsing Dr. Simon as a
 5   person who's good for conducting teleconferences on the
 6   Fentora product; right?
 7              MR. MAIER:  Objection.  Form.
 8        A.    Yes.
 9        Q.    (By Mr. Faes)  And he's recommending that
10   you strongly consider using Dr. Simon for Fentora
11   speaking programs in your territory or he wouldn't have
12   sent it to you; right?
13              MR. MAIER:  Objection.  Form, foundation.
14        A.    He's just saying FYI.  David Hennecke is
15   the one that's saying it's a good opportunity.
16        Q.    (By Mr. Faes)  But that's the message that
17   you would have received from the company upon getting
18   this e-mail --
19        A.    Yes.
20        Q.      -- is that the company thought it was a
21   good idea to use Dr. Simon for tele -- for a
22   teleconference to do a speaker program for the Fentora
23   launch; right?
24              MR. MAIER:  Objection.  Form, foundation.
```

```
 1        A.    Yes.  I just wanted to qualify that you
 2   said that Phil Tocco had said that was a great and rare
 3   opportunity when it was really David Hennecke.
 4        Q.    (By Mr. Faes)  Right.  He just forwarded
 5   it --
 6        A.    Yes.
 7        Q.    -- and it was David Hennecke that sent
 8   the initial e-mail; right?
 9        A.    Yes.
10        Q.    Who was David Hennecke?
11        A.    I don't know what he was at that time.
12   Manager or -- maybe manager or -- I forget what they
13   call them.  Managed care person.  I'm not sure.  I
14   don't remember.
15        Q.    So during your time using Dr. Simon as a
16   speaker for products within your territory, did you
17   come to learn that prior to becoming a medical doctor,
18   he had actually been a pharmacist?
19        A.    I did not know that.
20        Q.    And did you know that prior to becoming a
21   pharmacist -- strike that.  Did you know that prior to
22   becoming a doctor when he was a pharmacist in Kansas
23   City, he actually pled guilty to a felony of
24   intentionally distributing controlled substances?
```

```
 1      A.    No idea.
 2      Q.    I'm going to hand you what's been marked
 3  as Exhibit Number 21 to your deposition.
 4            [Exhibit Teva-Kaisen-021
 5             marked for identification.]
 6      Q.    And as you can see from the top, this is a
 7  document --
 8      A.    Wow.
 9      Q.     -- that indicates it's the State Board of
10  Pharmacy versus Steve Simon and it's got a stamp of
11  November 6th of 1975 at the top.  Do you see that?
12      A.    Okay.  Yeah.
13      Q.    And the complaint states that -- well, and
14  it's versus Steve Simon, who's from Kansas City; right?
15      A.    Right.
16      Q.    And it's the -- Number 3 of the complaint
17  states that the respondent was found guilty in the
18  United States District Court for the Western District
19  of Missouri on December 8th, 1975, of the offense of --
20      A.    Wow.
21      Q.     -- knowingly and intentionally
22  distributing controlled substances; right?
23      A.    Wow.  Wow.
24      Q.    And if you turn -- well, strike that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   So -- and if you see the -- at the bottom of the page,
 2   of the same page, it notes that the State Board of
 3   Pharmacy has determined that the conviction constitutes
 4   unprofessional conduct under the provisions of Section
 5   338.055, RSMo 1969, which provides in part the
 6   following specifications shall be deemed unprofessional
 7   or dishonorable conduct within the meaning of this
 8   section.  Conviction of a felony.  Do you see that?
 9         A.    Yeah.
10         Q.    So apparently Dr. Steve Simon is a
11   convicted felon; right?
12         A.    Wow.
13               MR. MAIER:  Objection.  Foundation.  Form.
14         A.    Yes.
15         Q.    (By Mr. Faes)  And we saw from documents
16   we looked at earlier that as early as 2006, the
17   company -- people at the company were recommending that
18   you use him as a potential speaker in your territory;
19   right?  He was on an approved list provided by the
20   company; right?
21         A.    Yes.
22               MR. MAIER:  Objection.  Form.
23         Q.    (By Mr. Faes)  And you had an expectation
24   that if the company was sending you around an approved
```

```
 1   list of speakers, the company would have done their due
 2   diligence in making sure that those people were
 3   appropriate speakers for the promotion of Fentora;
 4   right?
 5        A.    Yes.
 6        Q.    And you would never expect that the
 7   company would put somebody on that list who was a
 8   convicted felon; right?
 9              MR. MAIER:  Objection.  Form.
10        A.    Are you asking me right or yes or no?  I
11   would never have expected the company.  So rephrase
12   your question.  The --
13        Q.    (By Mr. Faes)  You never -- my question
14   is, you never expected that the company would put
15   someone on the approved speaker list who was a
16   convicted felon; right?
17              MR. MAIER:  Objection.  Form.
18        A.    True.
19        Q.    (By Mr. Faes)  And certainly not one who
20   was convicted of intentionally distributing controlled
21   substances; right?
22        A.    True.
23              MR. MAIER:  Objection.  Form.
24        Q.    (By Mr. Faes)  Which is the very type of
```

1        A.   Yes, I am.

2        Q.   I want to ask you a few more
3   questions about Exhibit 3.  I think it's in
4   front of you.  And this was the PowerPoint
5   presentation from March of 2014, which was just
6   a few months after you arrived at the company
7   to start working, correct?

8        A.   Correct.

9        Q.   And if we look at page 3, as we
10  discussed, there was a proposed DEA compliance
11  organization, and as we discussed, there was a
12  small restructuring or a few people moving
13  around, according to this proposed
14  organization; is that correct?

15       A.   Correct.

16       Q.   And did that small restructuring
17  occur at that time; do you know?

18       A.   I believe it did.

19       Q.   Okay.  And if you look at where you
20  are, Joe Tomkiewicz, it states under you, you
21  had one individual reporting to you, Matt
22  Benkert; is that right?

23       A.   That's correct.

24       Q.   And his position was -- it

1   indicates he's an investigator; is that right?
2        A.   Correct.
3        Q.   So does that mean that he would be
4   somebody who would actually be involved in
5   investigating the suspicious orders?
6        A.   Potential suspicious orders.
7        Q.   Okay.
8        A.   Investigating orders to determine
9   if they're suspicious.
10       Q.   I got you.  Okay.  And we'll talk
11  about that process more, but I think what
12  you're talking about is orders would be
13  sometimes flagged or pulled aside or pended
14  after going through the computer system or the
15  algorithm, and then there would be an
16  investigation of that to see if it was
17  suspicious or not, correct?
18       A.   Correct.
19       Q.   Okay.  Now, how many actually of
20  the 16 employees in this organization or this
21  department were actually involved in the
22  investigation of suspicious orders or pended
23  orders?
24       A.   Oh, of pended orders?  It was

1  A.  They weren't exciting venues.  Trust me.

2  Q.  Where would -- I mean, where would you all

3  usually meet?  Just at a hotel or rent a conference

4  room or something?

5  A.  At a hotel in a city.  I think we even had

6  one in Cleveland -- I'm not sure -- many years ago.

7  Q.  Was there a city that you typically met

8  in?

9  A.  Cincinnati a lot.

10  Q.  Well, that's not very convenient for you.

11  Okay.  So turning to Page 4 of this document.  We've

12  got a slide titled top Fentora writers.

13  A.  We're not there yet.

14      MR. BERG:  Let's wait for it to come up.

15      MR. FAES:  I think it's July 24.  Uh-huh.

16  They're not labeled, but I handwrote on all of my pages

17  so I could tell him what page to go to.

18  A.  Okay.

19  Q.  (By Mr. Faes)  So this is a slide entitled

20  top Fentora writers, and this would have been

21  information that was presented at the meeting in 2011;

22  right?

23  A.  Yes.

24  Q.  And if you look at -- I think there's four

Highly Confidential - Subject to Further Confidentiality Review

1  columns here that are yours, Valerie McGinley.  If I
2  can get Mike to highlight those.  The first two are the
3  fourth and fifth one from the top.
4      A.   Uh-huh.
5           MR. FAES:  Actually, if you can highlight
6  them rather than call it out, because we're going to
7  have to go above that.
8      Q.   (By Mr. Faes)  So at this time in 2011, as
9  presented at this meeting, you had four of the top
10 Fentora writers presented on this list, including the
11 third highest and the fourth highest in the entire
12 Great Lakes region; right?
13     A.   Yeah.
14     Q.   And your top prescriber was --
15     A.   I can't look.
16     Q.    -- Sami Moufawad.  Your second one was
17 Riad Laham.  Your third one down was Jack Rutkowski,
18 and your fourth one was Sandra Hazra.  Do you see that?
19     A.   Uh-huh.
20     Q.   So in at least one of your top four
21 prescribers, their primary specialty group is listed as
22 a primary care provider; right?
23     A.   Yes.
24     Q.   So at this time in 2011, one of the top

| | |
|---|---|
| 1 | four prescribers that you had of Fentora was not an |
| 2 | oncologist or a pain specialist; he was a primary care |
| 3 | provider; right? |
| 4 | A.   Yes. |
| 5 |        MR. MAIER:  Objection.  Form. |
| 6 | Q.   (By Mr. Faes)  And if you look at the |
| 7 | second column on Dr. Gregory Gerber, he was actually |
| 8 | the second highest prescriber at this time in the |
| 9 | entire Great Lakes region; right? |
| 10 |        MR. MAIER:  Objection.  Foundation. |
| 11 | A.   It's making me dizzy.  That's why I'm |
| 12 | looking away.  I was not calling on him in that time. |
| 13 | Q.   (By Mr. Faes)  Right.  This is the time |
| 14 | that we talked about where Nicole Reese was calling on |
| 15 | him; right? |
| 16 | A.   Right. |
| 17 | Q.   And you actually got him back -- this is |
| 18 | in June.  I think you got him back in early July, so |
| 19 | you got him back in your territory about a month after |
| 20 | this; right? |
| 21 | A.   Yeah. |
| 22 | Q.   And when you got him back he would have |
| 23 | been the second highest prescriber of Fentora in the |
| 24 | entire Great Lakes region; right? |