PSJ17 Exh 112

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE: NATIONAL            :HON. DAN A. POLSTER
PRESCRIPTION OPIATE        :
LITIGATION                 :MDL NO. 2804
                           :
APPLIES TO ALL CASES       :NO.
                           :1:17-MD-2804

- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

December 14, 2018

- - -

Videotaped sworn deposition of
COLLEEN McGINN, taken pursuant to
notice, was held at GOLKOW LITIGATION
SERVICES, One Liberty Place, 1650 Market
Street, Philadelphia, Pennsylvania,
beginning at 9:39 a.m., on the above
date, before Margaret M. Reihl, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1    A P P E A R A N C E S:
 2
      WAGSTAFF & CARTMELL LLP
 3    BY:  THOMAS CARTMELL, ESQUIRE
             KATHLEEN E. HUDNALL, ESQUIRE
 4    4740 Grand Avenue, Suite 300
      Kansas City, Missouri  64112
 5    (816) 701-1100
      tcartmell@wcllp.com
 6    khudnall@wcllp.com
      Representing the Plaintiffs
 7
 8
      BRANSTETTER, STRANCH & JENNINGS, PLLC
 9    BY:  BENJAMIN A. GASTEL, ESQUIRE
      The Freedom Center
10    223 Rosa L. Parks Avenue
      Suite 200
11    Nashville, Tennessee  37203
      (615) 254-8801
12    beng@bsjfirm.com
      Representing the Tennessee Plaintiffs
13
14
      SKIKOS, CRAWFORD, SKIKOS & JOSEPH LLP
15    BY:  MARK G. CRAWFORD, ESQUIRE
             UZAIR SALEEM, ESQUIRE
16    One Sansome Street, Suite 2830
      San Francisco, California  94104
17    (425) 546-7300
      mcrawford@skikos.com
18    usaleem@skikos.com
      Representing the MDL Plaintiffs
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 3

```
 1   A P P E A R A N C E S:  (cont'd)
 2
 3   MORGAN LEWIS & BOCKIUS LLP
     BY:  NATHAN J. ANDRISANI, ESQUIRE
 4        ADAM HAMMOUD, ESQUIRE
     1701 Market Street
 5   Philadelphia, Pennsylvania  19103-2921
     (215) 963-5362
 6   nandrisani@morganlewis.com
     adam.hammoud@morganlewis.com
 7   Representing the Defendant Teva
 8
     REED SMITH LLP
 9   BY:  ANNE E. ROLLINS, ESQUIRE
     Three Logan Square
10   1717 Arch Street
     Philadelphia, Pennsylvania  19103
11   (215) 851-8262
     arollins@reedsmith.com
12   Representing the Defendant,
     AmerisourceBergen Drug Corp.
13
14   PIETRAGALLO GORDON ALFANO
     BOSICK & RASPANTI LLP
15   BY:  LESLIE A. MARIOTTI, ESQUIRE
     1818 Market Street
16   Suite 3402
     Philadelphia, Pennsylvania 19103
17   (215) 988-1451
     lam@pietragallo.com
18   Cardinal Health
19
20
21   ALSO PRESENT:  Bill Geigert, VIDEOGRAPHER
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 4

```
 1    TELEPHONIC APPEARANCES:
 2
 3    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  TIFFANY IKEDA, ESQUIRE
 4    777 South Figueroa Street, 44th Floor
      Los Angeles, California  90017-5844
 5    (213) 243-4160
      tiffany.ikeda@arnoldporter.com
 6    Representing the Defendants,
      Endo Health Solutions, Inc.,
 7    Endo Pharmaceuticals, Inc.,
      Par Pharmaceutical, Inc.,
 8    Par Pharmaceutical Companies, Inc.
      (FKA Par Pharmaceutical Holdings, Inc.)
 9
10    JONES DAY
      BY:  LOUIS P. GABEL, ESQUIRE
11    150 West Jefferson Avenue
      Suite 2100
12    Detroit, Michigan  48226
      (313) 733-3939
13    lpgabel@jonesday.com
      Representing the Defendant, Walmart
14
15    COVINGTON & BURLING LLP
      BY:  GABRIEL FULMER, ESQUIRE
16    One CityCenter
      850 Tenth Street, NW
17    Washington, DC  20001-4956
      (202) 662-5769
18    gfulmer@cov.com
      Representing the Defendant,
19    McKesson Corporation
20
      ROPES & GRAY LLP
21    BY:  ELIZABETH TOLON, LAW CLERK
      1211 Avenue of the Americas
22    New York, New York  10036-8704
      (212) 596-9374
23    elizabeth.tolon@ropesgray.com
      Representing the Defendant,
24    Mallinckrodt
```

Highly Confidential - Subject to Further Confidentiality Review

Page 5

```
 1   TELEPHONIC APPEARANCES (CONT'D)

 2

     MORGAN & MORGAN

 3   BY:  JAMES D. YOUNG, ESQUIRE

     76 South Laura Street, Suite 1100

 4   Jacksonville, Florida  32202

     (904) 398-2722

 5   Representing Plaintiffs

 6

 7

 8

 9                        — — —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 109

1                    THE WITNESS:  We make a lot of
2            opioid-containing products.
3    BY MR. CARTMELL:
4            Q.    And if you look below, there is
5    "Teva products include" paragraph, and that's a
6    list of all of the opioids that Teva is actually
7    manufacturing and selling as of this time.
8                    Do you see that?
9                    MR. ANDRISANI:  Objection, form.
10                    THE WITNESS:  Yes.
11    BY MR. CARTMELL:
12            Q.    It's fair to say that's dozens of
13    opioid-containing products?
14            A.    Dozens of different products, but
15    some of the same products, yes, different
16    formulations of the same product.
17            Q.    All opioid-containing products,
18    correct?
19            A.    Correct.
20            Q.    We've talked a little bit about
21    the law that applies to Teva related to
22    manufacturing and selling opioids, but I want to
23    talk in a little more detail and hand you
24    Exhibit 9.

Page 110

1                   (Document marked for

2             identification as McGinn Deposition

3             Exhibit No. 9.)

4   BY MR. CARTMELL:

5         Q.    I'm handing you two copies of

6   Exhibit 9, one for you and one for your counsel.

7   This is produced from Teva's files in this

8   litigation, and I will represent to you that

9   this was information that came from your file.

10                  You'll see from the e-mail on the

11  first page of this document, there's an e-mail

12  from LeighAnn Tulleson dated June 15, 2012 to

13  you and many others, and the subject is "DEA

14  Suspicious Order Monitoring Program."

15                  Do you see that?

16        A.    Yes.

17        Q.    It states, "we have scheduled a

18  meeting to discuss the DEA suspicious order

19  monitoring program and its impact to Teva and

20  our customers."

21                  It states, "This launch meeting

22  is critical to the overall understanding of the

23  issues and will require each of the parties

24  listed on this memo to attend."

Highly Confidential - Subject to Further Confidentiality Review

Page 111

1                  You see that?

2          A.     Yes.

3          Q.     Okay.  So it looks like as of

4    June of 2012, which is not long after you

5    started at Teva, is that fair, within a year?

6          A.     Yes.

7          Q.     There was going to be a launch

8    meeting to discuss the suspicious order

9    monitoring program?

10         A.     That's what it looks like.

11         Q.     Okay.  Attached to this e-mail

12   that you received is a series of letters from

13   the U.S. Department of Justice Drug Enforcement

14   Administration; is that right?

15         A.     Yes.

16         Q.     And I want to talk to you

17   specifically about the one that is actually a

18   crummy copy, but it's dated February 7, 2007.

19                Do you see that?

20         A.     That's a bad copy for sure.

21         Q.     Well, we got this from the files,

22   and, unfortunately, we were looking for a better

23   copy, but we couldn't find one, so we'll have to

24   make our way through this, if you don't mind.

Page 112

1                    But I want to go through this,

2    and this is a letter, I take it, that you had

3    seen prior to 2012; is that right?

4           A.    It's hard to see where -- I

5    assume that I had.

6           Q.    Well, am I right that there are a

7    series of letters that were sent to

8    manufacturers and distributors of

9    opioid-containing products from a man named

10   Joseph Rannizzisi?

11          A.    Yes.

12          Q.    Okay.  And I know that you are

13   familiar with Mr. Rannizzisi, correct?

14          A.    Yes.

15          Q.    You have had dealings with him,

16   pretty extensive dealings with him in the past;

17   is that fair?

18          A.    Not personally.  I may have

19   talked to him once or twice.

20          Q.    At any rate, these letters, the

21   series of letters that are attached, and I think

22   there's three, are commonly known as the

23   Rannizzisi letters, correct?

24          A.    I had not called them that.  I

Page 113

1    had not heard that.

2         Q.    What do you call them?

3         A.    Distributor letters.

4         Q.    Okay.  And I take it that you

5    were familiar with these letters even back at

6    Cephalon, before you started at Teva?

7         A.    Yes.

8         Q.    Okay.  And let's go through this

9    February 7, 2007 letter, you see the date, and

10   you can see that this is a letter from the Drug

11   Enforcement Administration out of Washington,

12   DC.

13             It states, Dear Sir or Madam,

14   this letter is being sent to every commercial

15   entity in the United States registered with the

16   Drug Enforcement Administration to distribute

17   controlled substances.  The purpose of this

18   letter is to reiterate the responsibilities of

19   controlled substance distributors in view of the

20   prescription drug abuse problem in our -- our

21   nation currently faces.

22             Do you see that?

23        A.    Yes.

24        Q.    Okay.  So would you agree with me

Page 114

1    that that was the purpose of these letters was

2    to put or to reiterate to manufacturers of

3    opioid drugs and other controlled substances and

4    distributors of these drugs of their

5    responsibilities related to the law that applies

6    to manufacturing and selling controlled

7    substances?

8                    MR. ANDRISANI:  Objection, form.

9                    THE WITNESS:  Yes.

10   BY MR. CARTMELL:

11        Q.    And it looks like the DEA was

12   reiterating the law that applied to

13   manufacturers and distributors of opioids at

14   this time because there was an emerging

15   controlled substance prescription drug problem,

16   correct?

17                    MR. ANDRISANI:  Object to the

18         form.

19                    THE WITNESS:  I assume that's

20         why.

21   BY MR. CARTMELL:

22        Q.    And this was back in 2007, right?

23        A.    Yes.

24        Q.    It states, "Background, as each

Highly Confidential - Subject to Further Confidentiality Review

Page 115

1    of you is undoubtedly aware, the abuse

2    (nonmedical use) of controlled prescription

3    drugs is a serious and growing health problem in

4    this country.  DEA has an obligation to combat

5    this problem, as one of the agency's core

6    functions is to prevent the diversion of

7    controlled substances into illicit channels."

8              Do you see that?

9         A.    Yes.

10        Q.    What does that mean, "illicit

11   channels"?

12              MR. ANDRISANI:  Object to form.

13              THE WITNESS:  I'm going to assume

14        that he means that it ends up anywhere

15        than where it was intended to go.

16   BY MR. CARTMELL:

17        Q.    Okay.  "Congress assigned DEA to

18   carry out this function through enforcement of

19   the Controlled Substances Act and DEA

20   regulations that implement the Act."

21              So does that mean that actually

22   the Drug Enforcement Administration is the

23   agency that Congress has given the power to

24   enforce the law related to the sale and

Page 116

1    manufacture of controlled substances?

2          A.    Yes.

3                MR. ANDRISANI:  Objection, form.

4    BY MR. CARTMELL:

5          Q.    Including opioid-containing

6    products?

7                MR. ANDRISANI:  Objection, form.

8                THE WITNESS:  Yes.

9    BY MR. CARTMELL:

10         Q.    The Controlled Substances Act was

11   designed by Congress to combat diversion by

12   providing for a closed system of drug

13   distribution.

14               What does it mean to be a closed

15   system?

16         A.    The way it's been --

17               MR. ANDRISANI:  Object to form.

18               THE WITNESS:  -- described to us

19         is that controlled substances would only

20         be shipped to DEA registrants.

21   BY MR. CARTMELL:

22         Q.    And then it says further down,

23   "If the closed system is to function properly as

24   Congress envisioned, distributors must be

Highly Confidential - Subject to Further Confidentiality Review

Page 117

1    vigilant in deciding whether a prospective

2    customer can be trusted to deliver controlled

3    substances only for lawful purposes.  This

4    responsibility is critical, as Congress has

5    expressly declared that the illegal distribution

6    of controlled substances has a substantial and

7    detrimental effect on the health and general

8    welfare of the American people."

9                    Do you see that?

10        A.      Yes.

11        Q.      And do you agree with that?

12                MR. ANDRISANI:  Objection to

13        form.

14                THE WITNESS:  Yes.

15    BY MR. CARTMELL:

16        Q.      Now, it then talks about actually

17    the law that manufacturers and distributors are

18    bound by related to the sale and manufacture of

19    controlled substances, correct?

20                MR. ANDRISANI:  Objection, form.

21                THE WITNESS:  I'm sorry.

22        Could -- I missed it.  Sorry, I was

23        reading.

24    BY MR. CARTMELL:

Page 118

1          Q.      Sorry I interrupted you.  Were
2     you done?
3          A.      I'm done.  I'm sorry.
4          Q.      We'll talk about the rest of the
5     letter in some detail, but I want to -- I was
6     just pointing out that the rest of the letter
7     actually talks about the regulations and the law
8     that applies and that the DEA is enforcing,
9     correct?
10         A.      Yes.
11         Q.      And one of the things, just so
12    it's clear for the jury, that is important to
13    know is that companies like Teva, for example,
14    because they sell and manufacture
15    opioid-containing products, they have to
16    register with the DEA to be able to do that; is
17    that right?
18         A.      Yes.
19         Q.      And is it true that they become
20    known as a registrant, for example, is that
21    referred to?
22         A.      Yes.
23         Q.      Okay.  And that registration, is
24    it true, provides, for example, Teva a license

Highly Confidential - Subject to Further Confidentiality Review

Page 119

1   that allows them through their multiple

2   facilities to go ahead and distribute those

3   opioids?

4           A.      Yes.

5           Q.      Okay.  And so, for example, if

6   Teva had its license suspended or pulled from

7   the DEA to sell or manufacture opioid-containing

8   products, then they would no longer be able to

9   sell those; is that fair?

10          A.      Yeah, they would not be able

11  to -- not just sell but they would not be able

12  to transfer drug anywhere.

13          Q.      If you go to the second page in

14  the third paragraph it states, the statutory

15  factors DEA must consider in deciding whether to

16  revokes a distributor's registration are

17  contained in 21 U.S.C. 823(e).

18                  Do you see that?

19          A.      Yes.

20          Q.      So when you talk about statutes

21  and all that, that's legal mumbo-jumbo, that's

22  the actual -- that's the law, right?

23                  MR. ANDRISANI:  Objection, form.

24                  THE WITNESS:  U.S. Code.

Page 120

1    BY MR. CARTMELL:

2            Q.      Go ahead.

3            A.      It's U.S. code.

4            Q.      Okay.  "Listed first among these

5    factors is the duty of distributors to maintain

6    effective controls against diversion of

7    controlled substances into other than legitimate

8    medical, scientific and industrial channels."

9                    Do you see that?

10           A.      Yes.

11           Q.      And so that just means that every

12   manufacturer or distributor of opioid-containing

13   products and other controlled substances, they

14   have to make sure that they actually have

15   effective controls against diversion of those

16   drugs in place, correct?

17                   MR. ANDRISANI:  Objection, form.

18                   THE WITNESS:  Yes.

19   BY MR. CARTMELL:

20           Q.      For example, if Teva had

21   ineffective controls that weren't working, then

22   that would not be compliant with the law,

23   correct?

24                   MR. ANDRISANI:  Objection, form.

Page 121

1                THE WITNESS:  Yes.

2    BY MR. CARTMELL:

3          Q.     It states, In addition,

4    distributors must comply with appropriate state

5    and local law.  Congress also gave DEA authority

6    under this provision to revoke a registration

7    based on the distributor's past experience in

8    the distribution of controlled substances and

9    based on such other factors as may be relevant.

10                Do you see that?

11                "Relevant to and consistent with

12   the public health and safety."

13                Do you see that?

14         A.     Yes.

15         Q.     Okay.  Now, I want to focus on

16   this next section, because this next section is

17   talking specifically about something called

18   suspicious orders of controlled substances.

19                Do you see that?

20         A.     Yes.

21         Q.     Tell us what suspicious orders of

22   controlled substances means?

23         A.     Would you like me to read what

24   the regulation states.

Page 122

1          Q.     I'll withdraw the question, and

2    I'll read it, okay.

3               Let's go through this section,

4    and I'm going to follow up and ask you some

5    questions.

6               "The DEA regulations require all

7    distributors to report suspicious orders of

8    controlled substances.  Specifically, the

9    regulations state the registrant shall design

10   and operate a system to disclose to the

11   registrant suspicious orders of controlled

12   substances.  The registrant shall inform the

13   Field Division Office of the Administration in

14   his area of suspicious orders when discovered by

15   the registrant.  Suspicious orders include

16   orders of unusual size, order deviating

17   substantially from a normal pattern and orders

18   of unusual frequency."

19               Do you see that?

20          A.     Yes.

21          Q.     Okay.  So let me see if I can

22   interpret that for the jury.

23               Does that mean that, for example,

24   Teva at all times when they are licensed and

Highly Confidential - Subject to Further Confidentiality Review

Page 123

1  selling, for example, opioid-containing

2  products, they have to have what's called a

3  suspicious ordering monitoring program in place?

4              MR. ANDRISANI:  Objection, form.

5              THE WITNESS:  If they are selling

6         commercial product, yes.

7  BY MR. CARTMELL:

8         Q.    Okay.  And so the DEA requires

9  and the law requires, according to the

10  regulations, that if Teva, for example, is going

11  to sell these opioids, that they have to put a

12  program in place that is going to effectively

13  identify suspicious orders of opioids, correct?

14              MR. ANDRISANI:  Objection to

15         form.

16              THE WITNESS:  Yes.

17  BY MR. CARTMELL:

18         Q.    In other words, if Teva has

19  customers, and I take it that they do, who

20  contact Teva and they say, "we want to buy or

21  purchase some of your opioid-containing

22  products," that's happens, doesn't it?

23         A.    Yes.

24         Q.    And the customer says, for

Highly Confidential - Subject to Further Confidentiality Review

Page 124

1   example, we want 4,000 pills, is it -- does it

2   happen that way?  Do they ask by the pill?

3           A.      They don't call me to place an

4   order, so I don't know exactly how they do it,

5   but I assume it's by carton or bottle or NDC.  I

6   don't know.

7           Q.      Okay.  But you're actually

8   responsible as the DEA director at Teva for the

9   suspicious order monitoring program, aren't you?

10          A.      I don't physically go and review

11  orders.  I am responsible -- ultimately

12  responsible for it, but I don't actually process

13  the orders or investigate them.

14          Q.      Okay.  So a customer might

15  contact Teva and say we want cartons -- X number

16  of cartons of opioids or bottles of opioids,

17  something like that, fair?

18          A.      Yes.

19                  MR. ANDRISANI:  Objection, form.

20  BY MR. CARTMELL:

21          Q.      And this is saying that Teva, as

22  a company, has to monitor those orders from its

23  customers and make sure they're not suspicious,

24  right?

Highly Confidential - Subject to Further Confidentiality Review

Page 125

1                    MR. ANDRISANI:  Objection, form.

2                    THE WITNESS:  Yes.

3    BY MR. CARTMELL:

4         Q.    And if Teva finds that these

5    orders from its customers who are buying these

6    opioids are suspicious, then this says that

7    those orders have to be actually reported to the

8    DEA, correct?

9                    MR. ANDRISANI:  Objection, form.

10                   THE WITNESS:  Correct.

11   BY MR. CARTMELL:

12        Q.    And if there are suspicious

13   orders from customers to Teva, actually, Teva is

14   not supposed to go and ship those bottles or

15   crates of opioids to the customer, right?

16                   MR. ANDRISANI:  Objection, form.

17                   THE WITNESS:  Yes.

18   BY MR. CARTMELL:

19        Q.    And this process called

20   suspicious order monitoring is part of the law

21   that says Teva has to have effective safeguards

22   in place to prevent diversion of these opioids

23   or controlled substances, right?

24                   MR. ANDRISANI:  Objection, form.

Page 126

1                   THE WITNESS:  Yes.

2    BY MR. CARTMELL:

3         Q.    Okay.  Now, Teva also has, as a

4    part of this law and these regulations from the

5    DEA, also has the responsibility to make sure

6    that they investigate if they find suspicious

7    orders from their customers for opioids; is that

8    right?

9                   MR. ANDRISANI:  Objection, form.

10                  THE WITNESS:  We investigate

11         orders of interest and report suspicious

12         orders.  We have that obligation.

13   BY MR. CARTMELL:

14        Q.    That's the duty of Teva to do

15   that, correct?

16        A.    Yes.

17                  MR. ANDRISANI:  Objection to

18        form.

19   BY MR. CARTMELL:

20        Q.    And if you go down it states, "It

21   bears emphasis that the foregoing reporting

22   requirement is in addition to, and not in lieu

23   of, the general requirement under 21 U.S.C.

24   823(e) that a distributor maintain effective

Highly Confidential - Subject to Further Confidentiality Review

Page 127

1   controls against diversion."

2                    Do you see that?

3        A.     Yes.

4        Q.     "Thus, in addition to reporting

5   all suspicious orders, a distributor has a

6   statutory responsibility to exercise due

7   diligence to avoid filling suspicious orders

8   that might be diverted into other than

9   legitimate medical, scientific and industrial

10  channels."

11                   Do you see that?

12       A.     Yes.

13       Q.     Okay.  Let's talk about that due

14  diligence.  If I'm reading this correctly, and

15  correct me if I'm wrong, the DEA is saying that

16  Teva, for example, when selling and

17  manufacturing opioids, when they get suspicious

18  orders, they can't just fill those orders, they

19  actually have to investigate and do due

20  diligence to determine or make sure that those

21  opioid pills are not going to be diverted to

22  illegal and illicit places, correct?

23                   MR. ANDRISANI:  Objection, form.

24                   THE WITNESS:  If it's deemed

Page 128

1            suspicious, we have an obligation not to

2            ship.

3    BY MR. CARTMELL:

4            Q.    You have an obligation not to

5    ship, but when this talks about due diligence,

6    you also have an obligation to investigate,

7    right?

8                    MR. ANDRISANI:  Objection, form.

9                    THE WITNESS:  We investigate any

10           order that's pended in the system, and

11           then if we do our due diligence on that

12           and we determine that it's a suspicious

13           order, then we have to report it.

14   BY MR. CARTMELL:

15           Q.    So would you agree with me that

16   it's the responsibility of manufacturers and

17   distributors of opioids, including Teva, and

18   when you were at Cephalon as well, that if they

19   have potentially suspicious order, their duty

20   and responsibility is to investigate that order?

21           A.    Yes.

22           Q.    Okay.  And if the company fails

23   to investigate those potentially suspicious

24   orders, then they have breached their duty and

Page 129

1    responsibility, correct?

2                        MR. ANDRISANI:  Objection, form.

3                        THE WITNESS:  Yes.

4    BY MR. CARTMELL:

5            Q.      And if Teva, for instance, has a

6    suspicious order monitoring system or fails to

7    have one that is effective and is actually

8    identifying suspicious orders and they're not

9    investigating those properly, then they will

10   have breached their duty and responsibility,

11   correct?

12                        MR. ANDRISANI:  Objection, form.

13                        THE WITNESS:  We have an

14           obligation to make sure that we have an

15           effective system in place.

16   BY MR. CARTMELL:

17           Q.      I understand that.  My question

18   is a little bit different.

19                        If, in fact, Teva, for instance,

20   has a suspicious order monitoring system that is

21   not effective and it isn't adequately

22   identifying suspicious orders, and it's not --

23   and those orders are not adequately being

24   investigated by the company, then Teva would

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    have breached its duties and responsibilities,

2    according to the DEA regulations, correct?

3            MR. ANDRISANI:  Objection, form.

4            THE WITNESS:  I just want to say

5            that the suspicious order monitoring has

6            been a moving target, and what was

7            effective in one year -- considered

8            effective in one year may not have been

9            considered effective in another year.

10           So, you know, we try to monitor DEA

11           action to see where they're headed with

12           it, because they're basically

13           promulgating rules without writing

14           regulations, updating regulations, so we

15           try to monitor that.  What I'm saying is

16           it depends on the time that you were

17           looking at the system in determining

18           whether it was effective or not.  But at

19           the time, it should have been effective

20           with the information that we knew at the

21           time.

22    BY MR. CARTMELL:

23           Q.    I appreciate that.  I'm going to

24    object and move to strike, and I'm going to ask

Page 131

1   you again and see if I can get an answer to that

2   question.

3           A.      Okay.

4           Q.      And we'll talk about that in more

5   detail, but, Ms. McGinn, if, in fact, Teva had a

6   suspicious order monitoring program that was

7   ineffective and not adequately identifying

8   suspicious orders and those orders that were

9   pended, when they did identify suspicious

10  orders, were not being adequately investigated,

11  then Teva, according to the regulations of the

12  DEA, would have breached its duty and

13  responsibility, fair?

14              MR. ANDRISANI:  Objection, form.

15              THE WITNESS:  Yes.

16  BY MR. CARTMELL:

17          Q.      Go ahead.

18          A.      Yes.

19          Q.      I want to go back to Exhibit 7,

20  if you would, and I just want to ask you a

21  question, and I think this gives us a good way

22  to demonstrate for the jury what I'm asking

23  about.

24              Now, this graph shows rising

Page 132

1   deaths with rising prescriptions, and it's true

2   that the law we just talked about and that the

3   DEA in its letter of 2007 was reiterating is

4   that at all times, for example, from 2000 until

5   2012 that law requiring Teva, for example, to

6   have effective -- effective systems in place to

7   prevent diversion, that was in effect, correct?

8              MR. ANDRISANI:  Objection, form.

9              THE WITNESS:  Yes.

10  BY MR. CARTMELL:

11       Q.    In other words, the law that

12  we're talking about was in effect in 2000 and

13  2001, all the way up to 2008, 2009, all the way

14  to 2012, and it's still in effect today?

15       A.    Yes.

16              MR. ANDRISANI:  Objection, form.

17  BY MR. CARTMELL:

18       Q.    And so at all times, even back in

19  2004, 2003, any times from 2000 on, Teva had

20  that duty to have in effect a suspicious order

21  monitoring program, correct?

22              MR. ANDRISANI:  Objection, form.

23              THE WITNESS:  Yes.

24  BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

Page 135

1  if Teva didn't follow the DEA regulations and

2  have effective systems in place to prevent

3  diversion, they could be a contributor or would

4  be a contributor to the epidemic, correct?

5              MR. ANDRISANI:  Objection, form.

6              THE WITNESS:  In some way, yes.

7  BY MR. CARTMELL:

8       Q.    Okay.  And the same is true with

9  other manufacturers of opioids and distributors

10 of opioids; they too could be contributors if

11 they didn't do a good job and have appropriate

12 systems in place to prevent diversion of

13 opioids, correct?

14             MR. ANDRISANI:  Objection, form.

15             THE WITNESS:  Yes.

16 BY MR. CARTMELL:

17      Q.    Okay.  And if, in fact, that's

18 the case, then, for example, would you believe,

19 in your opinion, that Teva would be partly

20 responsible for the epidemic?

21             MR. ANDRISANI:  Objection, form.

22             THE WITNESS:  In some part, yes.

23             MR. CARTMELL:  Let's take a

24        break.

Page 136

1            THE VIDEOGRAPHER:  Going off the

2        record at 11:52 a.m.

3            (Luncheon recess.)

4            THE VIDEOGRAPHER:  We are back on

5        the record at 12:38.

6   BY MR. CARTMELL:

7        Q.    Ms. McGinn, we're back on the

8   record after a lunch break.  Are you ready to

9   proceed?

10        A.    I am, thank you.

11        Q.    Did you have a nice lunch?

12        A.    I've had better, but I've had

13   worse too so we're okay.

14        Q.    Okay, good.

15            Well, before we broke for lunch,

16   we were talking about, you'll recall, Exhibit 9,

17   which is the Rannizzisi letter that was sent

18   from the Drug Enforcement Administration to,

19   among others, manufacturers and distributors of

20   opioids.

21            You recall our conversation in

22   that regard?

23        A.    Yes.

24        Q.    Okay.  And I don't think I made

Page 137

1  this point, but I want to, and I don't mean to

2  put words in your mouth, but is it true that

3  these laws that require opioid manufacturers and

4  distributors to have safeguards that are

5  effective in place to prevent diversion of those

6  drugs, those laws are for safety purposes,

7  correct?

8              MR. ANDRISANI:  Objection, form.

9              THE WITNESS:  I'm sure that's one

10        aspect.

11  BY MR. CARTMELL:

12        Q.    In other words, safety of

13  individuals so that the drugs aren't diverted to

14  people who could abuse them or not even abuse

15  them and have overdoses and hospitalizations and

16  deaths, things like that, fair?

17              MR. ANDRISANI:  Objection to

18        form.

19              THE WITNESS:  It's there for

20        legitimate medical need.

21  BY MR. CARTMELL:

22        Q.    Okay.  All right.  Now, in

23  preparation for your deposition today, did you

24  read the deposition of Mr. Tomkiewicz?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1         A.      I did not.

2         Q.      Okay.  Let's switch gears now,

3    and I want to talk about your time at Teva, and

4    I know we've talked about you started in October

5    approximately of 2011 as an employee of Teva.

6    For a period of time you were working in

7    facilities, manufacturing facilities; is that

8    right?

9         A.      I was at the R&D building, yeah.

10        Q.      And your compliance jobs during

11   that period of time had to do with compliance

12   with the manufacturing and storage and security

13   of those opioid-containing products; is that

14   right?

15        A.      Yes.

16        Q.      But at that point for a short

17   period of time, you were not overseeing the

18   suspicious order monitoring program, correct?

19        A.      At Cephalon -- which?

20        Q.      We're talking about once you got

21   to Teva in 2011.

22        A.      Yes.

23        Q.      For several months I think you

24   said that you weren't responsible for the

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    didn't know whether or not that meant compliant

2    with DEA regulations?

3              MR. ANDRISANI:  Objection, asked

4         and answered.

5              THE WITNESS:  What I'm saying is

6         I'm not sure what the person who wrote

7         this intended that to say.

8    BY MR. CARTMELL:

9         Q.   Okay.  At any rate, whoever wrote

10   this intended to say that the suspicious order

11   monitoring program and the Know your Customer

12   program were putting the company at risk related

13   to DEA sanctions, and that needed to be the

14   company's highest priority to make improvements

15   and close the gaps, correct?

16             MR. ANDRISANI:  Objection, form.

17        It misstates what's on the paper.

18   BY MR. CARTMELL:

19        Q.   Go ahead.

20        A.   It says that it was a risk and we

21   should give it high priority.

22        Q.   Okay.  Below it says, "DEA will

23   use its authority to revoke and suspend

24   registrations in appropriate cases."

Page 175

1                   You see that?

2           A.      Yes.

3           Q.      Does that help you to understand

4    where it says under number 2 Know your Customer

5    program if they were talking about not being

6    compliant with the DEA?

7           A.      I would assume that that's what

8    they were referencing.

9           Q.      Okay.  Know your Customer

10   program, tell the jury what that is?

11          A.      It's looking into your customers,

12   knowing the background, the officers.  It's due

13   diligence on your customer.

14          Q.      And we saw the phrase due

15   diligence in the law from Mr. Rannizzisi in his

16   letter, correct?

17          A.      I think so.

18          Q.      And so the law requires for

19   manufacturers and sellers of opioids like Teva

20   that if they have potentially suspicious orders,

21   they have to do due diligence and actually do

22   investigation of those, correct?

23          A.      Yes.

24          Q.      And part of that investigation,

Page 176

1    the DEA has said, is to get to know your

2    customers, correct?

3                    MR. ANDRISANI:  Objection, form.

4                    THE WITNESS:  Yes.

5    BY MR. CARTMELL:

6         Q.    And do investigation on your

7    customers to see if possibly they're involved in

8    suspicious activity related to controlled

9    substances, correct?

10                   MR. ANDRISANI:  Objection, form.

11                   THE WITNESS:  Yes.

12   BY MR. CARTMELL:

13        Q.    And what this document says is

14   that at this time, Teva was not compliant in

15   that regard, correct?

16                   MR. ANDRISANI:  Objection.

17                   THE WITNESS:  That's what it says

18        here.

19   BY MR. CARTMELL:

20        Q.    I want to ask you -- strike that.

21                   And then if you go through the

22   next several pages, there is information put

23   together that summarizes, for example, the law

24   that we already went through from the DEA

Page 177

1    letter, correct?

2              A.    Yes.

3              Q.    And it -- you had gathered

4    information on what the best practices were for

5    a suspicious order monitoring program, correct?

6                   MR. ANDRISANI:  Objection as to

7              form with respect to her preparing this.

8                   THE WITNESS:  This document does

9              contain information about other

10             companies.

11   BY MR. CARTMELL:

12             Q.    I'll restate it to hopefully take

13   care of the objection.

14                  And then the attachment pages

15   also include information that you or somebody

16   gathered about what the best practices are

17   related to having a suspicious order monitoring

18   program, correct?

19             A.    It looks like information that

20   was available.  I don't -- I have to look

21   through it to see if it's best practices

22   necessarily.  Oh, there is best practices.

23             Q.    You see that?

24             A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 385

1           Q.      This is Exhibit 24.  So what

2     we've marked here, again, starting at the first

3     e-mail is an October 16, 2017 e-mail from you to

4     Jeffrey Zerillo.  The subject is 60 Minutes.

5                   Who is Jeffrey Zerillo at the

6     time?  Was he with your company?

7           A.      Yes, he was my supervisor.

8           Q.      And what was his position?

9           A.      He's vice president, supply chain

10    management - America's region.

11          Q.      Is he your immediate person above

12    you?

13          A.      He was my immediate supervisor.

14          Q.      And is he there right now with

15    Teva?

16          A.      No.

17          Q.      And has he left the company?

18          A.      Yes.

19          Q.      Okay.  And do you know when he

20    left?

21          A.      Recently, I would say it was

22    around the April 2018 time period.

23          Q.      And he came from Purdue, correct?

24          A.      He was part of the Actavis

Page 386

1  acquisition.  He came with Actavis.

2        Q.    Okay.  But, originally, before

3  joining Actavis, he was with Purdue?

4        A.    I believe so.

5        Q.    Okay.  And you write here

6  regarding 60 Minutes -- do you recall watching a

7  60 Minutes segment on opioids?

8        A.    I do.

9        Q.    Okay.  And can you briefly

10  describe for me what the segment was that you

11  saw on 60 Minutes?

12        A.    It was -- if I remember

13  correctly, it was a interview with Joe

14  Rannizzisi talking about suspicious orders or

15  the opioid epidemic in general.

16        Q.    And we heard about Mr. Rannizzisi

17  earlier.  He had written those letters back in

18  2006 and '07, correct?

19        A.    Yes.

20        Q.    And you had those letters back

21  around that time frame, right?

22        A.    Yes.

23        Q.    And you write here to

24  Mr. Zerillo, "Did you see this last night?  My

Highly Confidential - Subject to Further Confidentiality Review

Page 387

1    first thought was that Joe Rannizzisi has lost

2    his mind and the second was that it was a very

3    one-sided story."

4                    Is that correct?

5           A.      That is correct.

6           Q.      And why was it one-sided?

7           A.       It only presented information

8    from -- about pharmaceutical industry and not

9    the part that doctors played in the whole opioid

10   epidemic.

11          Q.      And what was the part about the

12   -- you said the pharmaceutical industry.  What

13   was the part about the pharmaceutical industry

14   that he was discussing on 60 Minutes?

15          A.      My recollection is that he blamed

16   the entire opioid epidemic on pharmaceutical

17   companies.

18          Q.      And what did he say they did

19   wrong?

20                  MR. ANDRISANI:  Objection.

21   BY MR. CRAWFORD:

22          Q.      If you recall.

23          A.      I don't remember exactly what he

24   said.

Highly Confidential - Subject to Further Confidentiality Review

Page 388

1           Q.      And you say he has lost his mind.

2      What does that mean he has lost his mind?

3           A.      I don't remember why I said that.

4      I just thought it was a very one-sided view and

5      that he basically blamed everything on the

6      pharmaceutical industry.

7           Q.      Okay.  And then Mr. Zerillo

8      responds back, "LOL," is that lots of laughing,

9      is that what that stands for?

10          A.      You'd have to ask him, but I

11     assume so.

12          Q.      And it says, "Joe just made a lot

13     of friends?"

14                  Right?

15          A.      Yes.

16          Q.      And you respond to him, "Right?

17     I guess he's not interested in working for

18     industry."

19                  Correct?

20          A.      Yes.

21          Q.      What do you mean he's not

22     interested in working for industry?

23          A.      That he would not be able to work

24     for a pharmaceutical company.

Highly Confidential - Subject to Further Confidentiality Review

Page 389

1        Q.     But he works for the DEA.  Why

2   would he work --

3        A.     He wasn't --

4        Q.     -- for a pharmaceutical company?

5        A.     He wasn't working for DEA at the

6   time of this interview.

7        Q.     Is it your experience that a lot

8   of people who leave the DEA go work in the

9   industry?

10            MR. ANDRISANI:  Objection.

11            THE WITNESS:  Some do.

12            MR. CRAWFORD:  Next we'll go to

13        Exhibit 25.

14            (Document marked for

15        identification as McGinn Deposition

16        Exhibit No. 25.)

17            MS. ROLLINS:  Counsel, I think

18        your exhibit numbers -- i think there

19        might have been two 23s and two 24s?

20            MR. CRAWFORD:  I think we're

21        sequential, okay.  Yeah, they're great.

22        Thank you, though.

23            MS. HUDNALL:  21 and 22 were out

24        of order.

Page 390

1                    MR. CRAWFORD:  Thank you.

2    BY MR. CRAWFORD:

3          Q.    You testified earlier a little

4    bit about industry groups including ADIWG, is

5    that a group that at one point Teva belonged to?

6          A.    It was a group that Actavis

7    belonged to, and Tom was informing me and making

8    an introduction about the group, and I attended

9    a couple of phone calls with that group.

10         Q.    And did Teva ever join that

11   group?

12         A.    I don't know if there was any

13   joining.  We attended some of the discussions

14   that they had.

15         Q.    And what was the purpose of the

16   group?

17         A.    I don't recall.  I mean, it was a

18   working group to discuss DEA issues.

19         Q.    And let's go again to the bottom

20   of the e-mail.  It's from Tom Napoli to you

21   dated February 8th, 2016.  Subject is

22   Anti-Diversity Industry Working Group.  That's

23   the ADIWG, correct?

24         A.    It's anti-diversion, not