PSJ17 Exh 114

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3                     -  -  -
 4    IN RE:  NATIONAL     :
      PRESCRIPTION OPIATE :    MDL NO. 2804
 5    LITIGATION           :
      ----------------------------------------
 6                         :    CASE NO.
      THIS DOCUMENT        :    1:17-MD-2804
 7    RELATES TO ALL CASES:    Hon. Dan A. Polster
 8                     -  -  -
 9          Wednesday, November 28, 2018
10                     -  -  -
11     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
13                     -  -  -
14         Videotaped deposition of JOSEPH
15    TOMKIEWICZ, taken pursuant to notice, was held
16    at Golkow Litigation Services, One Liberty
17    Place, 1650 Market Street, Suite 5150,
18    Philadelphia, Pennsylvania 19103, beginning at
19    9:58 a.m., on the above date, before Lisa V.
20    Feissner, RDR, CRR, Notary Public.
21
22                     -  -  -
23           GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2       BARON & BUDD, P.C.
         BY: MARK PIFKO, ESQUIRE
 3       BY: STERLING CLUFF, ESQUIRE
         15910 Ventura Boulevard
 4       Suite 1600
         Encino, California 91436
 5       (818) 839-2333
         mpifko@baronbudd.com
 6       scluff@baronbudd.com
         -- Representing the MDL Plaintiffs
 7
 8       BARON & BUDD, P.C.
         BY: WILLIAM G. POWERS, ESQUIRE
 9       (via teleconference / live stream)
         600 New Hampshire Avenue NW
10       Suite 10-A
         Washington, DC 20037
11       (202) 333-4562
         wpowers@baronbudd.com
12       -- Representing the MDL Plaintiffs
13
         WAGSTAFF & CARTMELL, LLP
14       BY: THOMAS P. CARTMELL, ESQUIRE
         BY: ANDREW N. FAES, ESQUIRE
15       4740 Grand Avenue
         Suite 300
16       Kansas City, Missouri 64112
         (816) 701-1100
17       tcartmell@wcllp.com
         afaes@wcllp.com
18       -- Representing the MDL Plaintiffs
19
         SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
20       BY: MARK G. CRAWFORD, ESQUIRE
         BY: UZAIR SALEEM, ESQUIRE
21       One Sansome Street
         Suite 2830
22       San Francisco, California 94104
         (415) 546-7300
23       mcrawford@skikos.com
         usaleem@skikos.com
24       -- Representing the MDL Plaintiffs
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2      ROBBINS GELLER RUDMAN & DOWD, LLP
        BY: ANDREA FIORE, ESQUIRE
 3      655 West Broadway
        Suite 1900
 4      San Diego, California 92101
        (619) 231-1058
 5      andrea.fiore@gmail.com
        -- Representing Plaintiffs
 6
 7      BRANSTETTER, STRANCH & JENNINGS, PLLC
        BY: BENJAMIN A. GASTEL, ESQUIRE
 8      223 Rosa L. Parks Avenue
        Suite 200
 9      Nashville, Tennessee 37203
        (615) 254-8801
10      beng@bsjfirm.com
        -- Representing the Plaintiffs in the
11         Dunaway and Staubus Tennessee
           State Court actions
12
13      WILLIAMS & CONNOLLY, LLP
        BY: MIRANDA PETERSEN, ESQUIRE
14      725 Twelfth Street, N.W.
        Washington, DC 20005
15      (202) 434-5000
        mpetersen@wc.com
16      -- Representing the Cardinal Health
           Defendants
17
18      JONES DAY
        BY: SARAH G. CONWAY, ESQUIRE
19      555 South Flower Street
        Fiftieth Floor
20      Los Angeles, California 90071-2300
        (213) 489-3939
21      sgconway@jonesday.com
        -- Representing the Walmart Defendants
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2      MORGAN LEWIS & BOCKIUS, LLP
        BY: ADAM M. HAMMOUD, ESQUIRE
 3      BY: RICHARD G. SHEPHARD, JR., ESQUIRE
        1701 Market Street
 4      Philadelphia, Pennsylvania 19103
        (215) 963-5000
 5      adam.hammoud@morganlewis.com
        richard.shephard@morganlewis.com
 6      -- Representing the Teva Defendants
 7
        REED SMITH LLP
 8      BY: ROBERT A. NICHOLAS, ESQUIRE
        BY: JEFFREY R. MELTON, ESQUIRE
 9         and
        BY: SHANNON E. McCLURE, ESQUIRE
10      (via teleconference / live stream)
        BY: ANNE E. ROLLINS, ESQUIRE
11      (via teleconference / live stream)
        1717 Arch Street
12      Suite 3100
        Philadelphia, Pennsylvania 19103
13      (215) 851-8100
        rnicholas@reedsmith.com
14      jmelton@reedsmith.com
        smcclure@reedsmith.com
15      arollins@reedsmith.com
        -- Representing the AmerisourceBergen
16         Defendants
17
        COVINGTON & BURLING LLP
18      BY: MARINA DALIA-HUNT, ESQUIRE
        3000 El Camino Real
19      10th Floor
        Palo Alto, California 94306-2112
20      (650) 632-4700
        mdaliahunt@cov.com
21      -- Representing the Defendant
           McKesson Corporation
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)

 2      ALLEGAERT BERGER & VOGEL LLP
        BY: CHRISTOPHER ALLEGAERT, ESQUIRE

 3      111 Broadway
        20th Floor

 4      New York, New York 10006
        (212) 571-0550

 5      callegaert@abv.com
        -- Representing Rochester Drug

 6         Cooperative, Inc.

 7
     ALSO PRESENT:

 8
        Christopher J. Casalenuovo, Esquire

 9      -- In-house counsel, AmerisourceBergen

10      David Lane, Videographer

11      Zach Hone, Trial Technician

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1       MR. HAMMOUD:  Object to the form.

2       THE WITNESS:  That is correct.

3  BY MR. CARTMELL:

4       Q.   Okay.  And what does it mean for a

5  drug or a pharmaceutical like the opioids

6  produced by Teva and sold by Teva, what does it

7  mean to be a controlled substance?

8       A.   From my understanding, it is that

9  it's a -- that the manufacture, sale,

10  distribution of the products are controlled

11  federally by the federal government and that --

12  and as part of what's called the closed

13  distribution system.

14       Q.   Okay.  And I think you mentioned

15  this, but Congress actually passed what's

16  called the Controlled Substances Act that

17  governs and regulates the sale of opioid

18  narcotics and controlled substances?

19       MR. HAMMOUD:  Object to the form.

20       THE WITNESS:  Correct.

21  BY MR. CARTMELL:

22       Q.   Okay.  And I think you mentioned

23  this, too, but the Controlled Substances Act

24  went into effect in 1970; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    That's correct.

2       Q.    Okay.  I want to actually hand you

3  Exhibit 4 in this case and ask you a few

4  questions about this document.

5             (Exhibit Teva-Tomkiewicz-004 marked

6        for identification and attached to the

7        transcript.)

8  BY MR. CARTMELL:

9       Q.    This was a document that was

10  produced in this litigation by Teva from their

11  internal files, and I just have a few questions

12  about this letter for you.

13             This is a letter dated --

14             MR. HAMMOUD:  Can you give him a

15        second to read the document.

16  BY MR. CARTMELL:

17       Q.    Mr. Tomkiewicz, have you seen this

18  letter before?

19       A.    Yes, I have.

20       Q.    In other words, you're familiar

21  with this letter based on your experience in

22  the industry related to diversion control of

23  opioid narcotics?

24       A.    Yes, I've seen it and have a copy

Highly Confidential - Subject to Further Confidentiality Review

1    of it.

2              Q.    Okay.   Now, I think actually we

3    found this letter in your file.   But as you see

4    here, this is from the U.S. Department of

5    Justice Drug Enforcement Administration.

6              Do you see that?

7              A.    Yes.

8              Q.    And we talked -- you kept calling

9    it the administration; I kept calling it the

10   agency.   I apologize.

11             A.    Administration, yeah.

12             Q.    But this is the entity that is --

13             A.    I've been wrong before.

14             Q.    Don't worry.   I am all the time.

15   But this is the entity that is charged with the

16   duty to enforce the act, the Controlled

17   Substances Act, correct?

18             A.    My understanding, yes.

19             Q.    Okay.   And I want to go through a

20   few things here.   The date of this is actually

21   February 7th of 2007.

22             Do you see that?

23             A.    Yes.

24             Q.    So that's actually over ten years

Highly Confidential - Subject to Further Confidentiality Review

1    ago, correct?

2         A.   Correct.

3         Q.   And this is a letter from, if you

4    look at the last page, somebody named Joseph

5    Rannazzisi.

6              Do you see that?

7         A.   Yes.

8         Q.   Okay.  And that's a name that

9    you're familiar with, right?

10        A.   Yes.

11        Q.   And is it true that this letter and

12   maybe some of the additional letters from

13   Mr. Rannazzisi have become well-known to

14   manufacturers and distributors of opioid

15   narcotics?  Is that fair?

16             MR. HAMMOUD:  Object to the form.

17             THE WITNESS:  I would say that that

18        is fair, yeah.

19   BY MR. CARTMELL:

20        Q.   Okay.  Now, you weren't working at

21   Teva at this time, but let me go through this

22   and ask you some questions about it.  But first

23   it states, Dear sir or madam, this letter is

24   being sent to every commercial entity in the

Highly Confidential - Subject to Further Confidentiality Review

1    United States registered with the Drug

2    Enforcement Administration to distribute

3    controlled substances.

4            Now, let me ask you, is it true

5    that a pharmaceutical company like Teva or a

6    distributor like AmerisourceBergen, they have

7    to register with the DEA in order to be allowed

8    to sell or distribute opioid narcotics?

9            MR. HAMMOUD:  Object to the form.

10           THE WITNESS:  Or manufacture.

11   BY MR. CARTMELL:

12        Q.   Or manufacture?

13        A.   Correct.

14        Q.   Okay.  It states, The purpose of

15   this letter is to reiterate the responsibility

16   of controlled substance distributors in view of

17   the prescription drug abuse problem our nation

18   currently faces.

19            Do you see that?

20        A.   Yes.

21        Q.   And we've already talked about

22   that, but clearly back in 2007, at that point

23   already our nation was faced with an opioid

24   addiction and abuse problem, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. HAMMOUD:  Object to the form,
 2          lacks foundation.
 3                THE WITNESS:  Well, I'd say that's
 4          a fair assessment.
 5   BY MR. CARTMELL:
 6          Q.   Okay.  And then it states, As each
 7   of you is undoubtedly aware, the abuse or
 8   nonmedical use of controlled prescription drugs
 9   is a serious and growing health problem in this
10   country.
11                And we've talked about that, and
12   you agree with that, correct?
13          A.   Oh, yes.
14          Q.   The next paragraph states, The
15   CSA -- and that would be the Controlled
16   Substances Act, right?
17          A.   My understanding, yes.
18          Q.   -- was designed by Congress to
19   combat diversion by providing for a closed
20   system of drug distribution in which all
21   legitimate handlers of controlled substances
22   must obtain a DEA registration, and as a
23   condition of maintaining such registration,
24   must take reasonable steps to ensure that their
```

Highly Confidential - Subject to Further Confidentiality Review

1  registration is not being utilized as a source

2  of diversion.

3         Do you see that?

4    A.   Yes.

5    Q.   Distributors are, of course, one of

6  the key components of the distribution chain.

7  If the closed system is to function properly as

8  Congress envisioned, distributors must be

9  vigilant in deciding whether a prospective

10  customer can be trusted to deliver controlled

11  substances only for lawful purposes.  This

12  responsibility is critical as Congress has

13  expressly declared that the illegal

14  distribution of controlled substances has a

15  substantial and detrimental effect on the

16  health and welfare of the American people.

17         Do you see that?

18    A.   Yes.

19    Q.   And what this is talking about is

20  that distributors of these drugs and

21  manufacturers of these drugs that are selling

22  these opioid narcotic drugs have a

23  responsibility to try to do everything they can

24  to prevent the diversion of the drugs they are

Highly Confidential - Subject to Further Confidentiality Review

1    manufacturing, selling, and distributing,

2    correct?

3                    MR. HAMMOUD:  Object to the form.

4                    THE WITNESS:  Well, I think, you

5           know, doing everything we can, I think

6           that's a fair assessment.

7    BY MR. CARTMELL:

8           Q.   Okay.  And then if you go to the

9    next page, I want to talk to you about the

10   second paragraph.  Here's where it talks

11   specifically about manufacturers like Teva.

12                    In the second sentence it says,

13   Moreover, all registrants -- manufacturers,

14   distributors, pharmacies, and practitioners --

15   share responsibility for maintaining

16   appropriate safeguards against diversion.

17   Nonetheless, given the extent of prescription

18   drug abuse in the United States, along with the

19   dangerous and potentially lethal consequences

20   of such abuse, even just one distributor that

21   uses its DEA registration to facilitate

22   diversion can cause enormous harm.

23                    Do you agree with that?

24           A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.

2           Accordingly, the DEA will use its

3      authority to revoke or suspend registrations in

4      appropriate cases.

5           Do you see that?

6      A.   Yes.

7      Q.   And that's a fact, right, that DEA,

8      as the enforcer of the law, the Controlled

9      Substances Act, if they find that a

10     manufacturer of opioids or a seller or

11     distributor of opioids is allowing diversion or

12     ignoring diversion, or not taking on their duty

13     to try to prevent diversion and abuse of these

14     drugs, the DEA can take away the registration

15     from that company.  Is that fair?

16          A.   They have --

17          MR. HAMMOUD:  Object to the form.

18          THE WITNESS:  I believe they have

19          that ability, yes.

20     BY MR. CARTMELL:

21          Q.   And taking away a company's reg --

22     DEA registration is a really big deal.  Would

23     you agree with that?

24          A.   Oh, I would agree with that, yes.

1   Q.   Because if the registration for the

2   company, a company like Teva, is taken away by

3   the DEA, then that company no longer has the

4   ability to sell or distribute these opioid

5   narcotic drugs.  Is that fair?

6   A.   Or manufacture.

7   Q.   Or manufacture them, right?

8   A.   Correct.

9   Q.   The next paragraph, if you look at

10  the second sentence, states, Listed first among

11  these factors is the duty of distributors to

12  maintain effective controls against diversion

13  of controlled substances into other than

14  legitimate medical, scientific, and industrial

15  channels.

16        Do you see that?

17  A.   Yes.

18  Q.   And does that mean there is a duty

19  by distributors and manufacturers of these

20  opioids, and sellers of these opioid narcotic

21  drugs, that they have to have controls in place

22  in their organization to help prevent the

23  diversion and abuse of these drugs?  Is that

24  what that means?

```
 1                    MR. HAMMOUD:  Object to the form.

 2                    MR. NICHOLAS:  Object to form.

 3                    THE WITNESS:  And I would say

 4           that's a fair assessment.

 5   BY MR. CARTMELL:

 6           Q.   Okay.  If you go down to the next

 7   paragraph, it states, The DEA regulations

 8   require all distributors to report suspicious

 9   orders of controlled substances.

10                    Do you see that?

11           A.   Yes.

12           Q.   Now, you talked about you were

13   actually hired by Teva to be the manager of the

14   suspicious order monitoring; is that right?

15           A.   Of the suspicious order monitoring

16   program, yes.

17           Q.   And when we talk about suspicious

18   orders related to opioids, what are we talking

19   about?

20           A.   We're talking about orders that may

21   be of an unusual size, pattern, or frequency.

22           Q.   Okay.  And I think it says this

23   here.  Let's talk about it.

24                    The registration -- or excuse me.
```

Highly Confidential - Subject to Further Confidentiality Review

1  The registrant shall design and operate a

2  system to disclose to the registrant suspicious

3  orders of controlled substances.

4           Would you agree with me that it's

5  the duty of Teva and all manufacturers and

6  sellers and distributors of these opioids to

7  design a system so that they can, to the best

8  of their ability, have suspicious orders

9  identified?

10           MR. HAMMOUD:  Object to the form.

11           THE WITNESS:  I would say that's a

12       fair assessment, yes.

13  BY MR. CARTMELL:

14       Q.   It then states that the registrant

15  shall inform the field division office of the

16  administration in his area of suspicious orders

17  when discovered by the registrant.

18           Do you see that?

19       A.   Yes.

20       Q.   And "the registrant" is talking

21  about -- in your case Teva would be the

22  registrant because they have a DEA

23  registration, right?

24       A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   So Teva, according to the law

2   that's been in place since the 1970s, has had,

3   one, the duty to design a system that's

4   effective in helping them to identify the

5   diversion of opioids, correct?

6              MR. HAMMOUD:  Object to the form.

7              THE WITNESS:  Controlled

8         substances, yes.

9   BY MR. CARTMELL:

10    Q.   Including opioids, right?

11    A.   Correct.

12    Q.   And also they've got to operate a

13  system that's effective in disclosing

14  suspicious orders that come to them for these

15  opioids, correct?

16    A.   Correct.

17    Q.   Okay.  And that's been going on --

18  that's been the duty of companies like Teva and

19  distributors of opioids, that duty has existed

20  since the 1970s, correct?

21             MR. HAMMOUD:  Object to the form.

22             THE WITNESS:  I'm not certain when

23        the reg came into effect, but I'll take

24        your word as an attorney.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. CARTMELL:

2      Q.   Well, you know that that -- and I

3  don't mean to put words in your mouth, but I

4  take it from your experience, you know that

5  this duty that we've been talking about, to

6  have a suspicious order monitoring system, one

7  that is effective, that duty has been in effect

8  since before the 1990s.  Fair enough?

9      A.   Oh, that's fair.

10      Q.   If you go a couple paragraphs down,

11  it says, Thus, in addition to reporting all

12  suspicious orders, a distributor has a

13  statutory responsibility to exercise due

14  diligence to avoid filling suspicious orders

15  that might be diverted into

16  other-than-legitimate medical, scientific, and

17  industrial channels.

18          Do you see that?

19      A.   Yes.

20      Q.   And that's the law, right?

21          MR. HAMMOUD:  Object to the form,

22      calls for a legal conclusion.

23          THE WITNESS:  And that's my

24      understanding.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CARTMELL:

2        Q.   I should say that's your

3    understanding of the law as a suspicious order

4    monitoring manager at Teva.  Is that fair?

5        A.   That is a fair assessment, yes.

6        Q.   In other words, your understanding

7    as the manager at Teva since 2014 has been that

8    if your company determines that there are

9    suspicious orders for opioid narcotic drugs

10   that has come to your company, you have the

11   duty to report that to the DEA, correct?

12              MR. HAMMOUD:  Object to the form.

13              THE WITNESS:  That is correct.

14   BY MR. CARTMELL:

15       Q.   And is it true that you also have

16   the duty -- when your company determines that

17   one of your customers has a suspicious order,

18   you have the duty to, in fact, stop that order

19   from being shipped so that it won't likely be

20   diverted out in the community?

21              MR. HAMMOUD:  Object to the form,

22          calls for a legal conclusion.

23              THE WITNESS:  Yeah, I haven't heard

24          that there's a regulatory requirement to

1  stop it, but I will say that I don't

2  ship anything that we have determined to

3  be suspicious.

4  BY MR. CARTMELL:

5  Q.   In other words, would you agree

6  with me that the most prudent practice and the

7  most responsible practice would be that if a

8  company like Teva and its manager like you

9  determines that orders are suspicious for these

10 opioids that are narcotics and that you know

11 can be diverted and abused so readily, the best

12 practice and the most responsible practice

13 would be not to ship those orders?  Do you

14 agree with that?

15           MR. HAMMOUD:  Object to the form.

16           THE WITNESS:  I would agree to

17      that.

18 BY MR. CARTMELL:

19 Q.   Okay.  It then states, In a similar

20 vein, given the requirement under Section

21 823(e) that a distributor maintain effective

22 controls against diversion, a distributor may

23 not simply rely on the fact that the person

24 placing the suspicious order is a DEA

Highly Confidential - Subject to Further Confidentiality Review

1    registrant and turn a blind eye to the

2    suspicious circumstances.

3             Do you see that?

4        A.   Yes.

5        Q.   In other words, that means that a

6    company like Teva, if you have an order for

7    opioids that you think may be suspicious and

8    could likely be diverted or abused out in the

9    communities, you can't turn a blind eye and

10   just say, well, I'll go ahead and ship it

11   because the person who made the order is

12   registered with the DEA.  You can't do that,

13   right?

14            MR. HAMMOUD:  Object to the form.

15            THE WITNESS:  And I would say that

16       yes, that is correct.

17   BY MR. CARTMELL:

18       Q.   And just on the -- I don't want to

19   go through them, but if you turn the page,

20   Mr. Tomkiewicz, you'll see that there are

21   actually some hints by the DEA here that were

22   given to distributors and manufacturers of

23   these opioids as far as some things that might

24   be a clue that an order might be suspicious or

1    may be ultimately diverted.

2              Do you see that?

3         A.   Yes.

4         Q.   You can see that they give

5    circumstances that might be indicative of

6    diversion, right?

7         A.   Correct.

8         Q.   And you're very familiar with those

9    circumstances, I take it?

10        A.   Yes, I'm familiar with them.

11        Q.   And you take those circumstances or

12   these hints that are given by the DEA into

13   consideration as the manager that is monitoring

14   suspicious orders.  Is that fair to say?

15        A.   These specifically, when I'm

16   reviewing -- when we're reviewing things that

17   might be suspicious, I wouldn't say we refer

18   back to this document, but they're often

19   included in, you know, how we review.

20        Q.   Okay.  In other words, you're

21   saying, I don't get the document out, but these

22   are some of the things we look for when we're

23   looking for a suspicious order of opioid

24   narcotic drugs, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.   Or any controlled substance, yes.

2            Q.   Okay.  Now, if you go back to the

3    first page, this letter, which is often

4    referred to as the Rannazzisi letter, was --

5    well, let me ask you if you agree with me.

6                 This letter that was sent from the

7    Drug Enforcement Administration to all of the

8    manufacturers and sellers and distributors of

9    opioids, including the high-risk opioids that

10   are narcotics and easily diverted, this was

11   sort of a reminder to these manufacturers,

12   sellers, and distributors of the

13   responsibilities and duties they had to help

14   prevent diversions of opioids.  Would you agree

15   with that?

16                 MR. HAMMOUD:  Object to the form.

17                 THE WITNESS:  And I would not agree

18          with the assessment in your question

19          that certain high-risk, at least as I

20          define them, are easily diverted.  I --

21   BY MR. CARTMELL:

22          Q.   Okay, well, let me restate --

23          A.   -- I would --

24          Q.   Fair enough.
```

1          A.    Yeah, I would reject that.

2          Q.    Fair enough.  Let me restate the

3    question.

4                Would you agree with me that this

5    letter that's often referred to as the

6    Rannazzisi letter was the Drug Enforcement

7    Agency sending a letter to manufacturers,

8    distributors, sellers of opioid narcotic drugs

9    as sort of a reminder and reiterating the

10   duties and responsibilities that they had to

11   try to prevent the diversion of opioid narcotic

12   drugs?  Fair enough?

13               MR. HAMMOUD:  Object to the form.

14               THE WITNESS:  And I would say

15          that's a fair assessment.

16   BY MR. CARTMELL:

17         Q.    Okay.  Do you know, as you sit here

18   today, when it was that Teva first started

19   selling or distributing opioids?

20         A.    No, I don't.

21         Q.    Do you have any clue?

22               MR. HAMMOUD:  Objection, asked and

23          answered.

24               THE WITNESS:  I have no idea.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CARTMELL:

2         Q.   Okay.  It should be noted, though,

3    I think, that when you arrived at Teva in 2014,

4    at that point I take it you know that they were

5    selling lots of different Class II opioid

6    products.  Is that fair?

7              MR. HAMMOUD:  Object to the form,

8         lacks foundation.

9              THE WITNESS:  And -- sorry, but I

10        don't like the term "lots."  I like

11        using numbers.

12   BY MR. CARTMELL:

13        Q.   Well, I counted, from the documents

14   I received, that today, Teva is selling, I

15   believe, 18 or 19 Class II opioid narcotic

16   drugs.  Is that consistent with your

17   understanding?

18        A.   That could be consistent, yes.

19        Q.   And I said "lots."  But when you

20   arrived in 2014, is it fair to say that Teva

21   was selling a number of different opioid --

22   Class II opioid narcotic drugs?  Fair to say?

23              MR. HAMMOUD:  Object to the form.

24              THE WITNESS:  I would say that's

1          fair to say.

2    BY MR. CARTMELL:

3          Q.   And fair to say that Teva sells and

4    distributes millions of prescriptions for

5    opioid narcotic drugs?  Fair?

6               MR. HAMMOUD:  Object to the form.

7               THE WITNESS:  We don't dispense

8          prescriptions.

9    BY MR. CARTMELL:

10         Q.   Bad question.  Thank you for

11   correcting that.

12              Is it fair to say that Teva sells

13   and distributes millions and millions of opioid

14   narcotic drug pills per year?

15              MR. HAMMOUD:  Object to the form.

16              THE WITNESS:  I haven't looked at

17         the specific number of dosage units, but

18         I'm sure it's in the millions.  But

19         beyond that, I couldn't say millions and

20         millions.  And to say -- we've sold a

21         good number of them.

22   BY MR. CARTMELL:

23         Q.   And I think I've seen data that

24   suggests that today, or since 2016, Teva has

1   been, as far as the sales of opioid drugs,

2   about at the 9 to 10 percent of the sales are

3   of Teva opioid products.  Is that consistent

4   with your understanding?

5           MR. HAMMOUD:  Object to the form,

6       lacks foundation.

7           THE WITNESS:  I don't know that

8       offhand.

9   BY MR. CARTMELL:

10          Q.   But you agree that Teva is one of

11  the larger sellers and distributors of opioid

12  narcotic drugs in America, correct?

13          A.   I would say that's a fair

14  assessment, yes.

15          Q.   And those are all things that, when

16  you came to Teva, some of the things that you

17  looked into, I take it, and learned as you

18  started in your job as the new suspicious order

19  manager; is that right?

20          A.   Right.  Well, looking at the -- you

21  know, which specific products we were selling,

22  which, of course, was a different mix when I

23  started from what is currently being sold.

24          Q.   We talked about the law, the

Highly Confidential - Subject to Further Confidentiality Review

1   Controlled Substances Act, and the DEA

2   enforcement of a law related to the sales of

3   opioids in America.  And is it true that the

4   DEA has actually left the responsibility to the

5   manufacturers and sellers and distributors of

6   opioids to design, internally, systems to help

7   prevent opioid diversion?

8          MR. HAMMOUD:  Objection to the

9       form.

10         THE WITNESS:  Could you ask that

11      again?  I got lost in the question.

12  BY MR. CARTMELL:

13      Q.   Sure.  Is it true that the DEA has

14  left the responsibility or relies on the

15  manufacturers and distributors and sellers of

16  opioid narcotic drugs in America to develop the

17  systems to help divert -- their internal

18  systems to help divert opioids -- help to

19  prevent the diversion of opioids?

20      A.   So are --

21         MR. HAMMOUD:  Same objection.

22         THE WITNESS:  Yeah, are you saying

23      that the DEA has sort of left the

24      manufacturers on their own to develop

1          their own system to detect potential

2          diversion?

3    BY MR. CARTMELL:

4          Q.    Let me restate the question to make

5    it more clear.

6                As we saw from the Controlled

7    Substances Act, it requires manufacturers like

8    Teva to develop internal systems that will

9    help, for one thing, identify suspicious orders

10   of opioids, right?

11         A.    Correct.

12         Q.    It also said in the Controlled

13   Substances Act that manufacturers like Teva who

14   sell opioids have to design systems internally

15   to help prevent the diversion of opioids,

16   correct?

17               MR. HAMMOUD:   Object to the form.

18               THE WITNESS:   Of any controlled

19         substance.

20   BY MR. CARTMELL:

21         Q.    Including opioids, right?

22         A.    Yes.

23         Q.    And is it true that the DEA

24   actually relies on Teva and the individual

1    manufacturers and sellers and distributors of

2    opioids to, in fact, develop those systems and

3    make sure they have effective systems in place

4    and monitoring programs in place so that they

5    can help divert the -- or help prevent the

6    diversion of opioids?

7            MR. HAMMOUD:  Same objection.

8            THE WITNESS:  And I wouldn't say --

9        I couldn't say that the DEA relies on

10       manufacturers and distributors for that.

11       Because when it comes to suspicious

12       order monitoring, they really haven't

13       given any feedback.

14   BY MR. CARTMELL:

15       Q.   Okay.  But you know from the

16   Controlled Substances Act that you have to have

17   systems in place --

18       A.   Correct.

19       Q.   -- right?  And the DEA does not

20   develop those systems for you, correct?

21       A.   The DEA has not developed our

22   system, no.

23       Q.   Okay.  And so you are left as a

24   manufacturer, meaning Teva, of these opioids to

Highly Confidential - Subject to Further Confidentiality Review

1  develop those systems yourself, correct?

2         A.    Correct.

3         Q.    And the DEA does rely on each of

4  the companies like Teva to develop those

5  systems to help prevent opioid diversion,

6  correct?

7                MR. HAMMOUD:  Object to the form.

8                THE WITNESS:  Well, and again, I

9           can't say that the DEA relies on because

10          I don't know what the DEA is doing on

11          their end.  So in terms of, you know,

12          saying that the DEA relies on, you know,

13          manufacturers or distributors or even

14          down to pharmacies or practitioners, I

15          can't say that.

16  BY MR. CARTMELL:

17         Q.    Okay.  One of the things, though,

18  that companies like Teva, as we discussed, are

19  interested in is maximizing the sales of their

20  prescription drugs like opioids, including

21  opioids, correct?

22                MR. HAMMOUD:  Object to the form,

23          lacks foundation.

24                THE WITNESS:  Maximizing?  I think

1          that's a horrible word for it.  No

2          offense, but...

3    BY MR. CARTMELL:

4          Q.   How would you describe it?

5          A.   Companies want to increase

6    profitability.  That's the reason why people

7    are in business.

8          Q.   Mr. Tomkiewicz, the DEA, as we saw,

9    has told Teva and companies like Teva who sell

10   and distribute opioids to set up systems that

11   will identify suspicious orders of opioids,

12   correct?

13         A.   Correct.

14         Q.   And they've asked those companies

15   to take it upon themselves to provide the

16   resources and actual processes to put in

17   effective types of monitoring programs to find

18   suspicious orders, correct?

19              MR. HAMMOUD:  Object to the form.

20              THE WITNESS:  I would say that's a

21         fair assessment.

22   BY MR. CARTMELL:

23         Q.   And these same companies that the

24   DEA has asked to set up these systems so that

Highly Confidential - Subject to Further Confidentiality Review

1    they can find these suspicious orders are

2    companies like Teva who, as you said, are

3    interested in maximizing their profits,

4    correct?

5         A.   I never said that.

6              MR. HAMMOUD:  Objection,

7         mischaracterizes his testimony.

8              THE WITNESS:  In fact, I

9         categorically denied the word

10        "maximize."

11   BY MR. CARTMELL:

12        Q.   How did you describe it?  I'll use

13   your words.

14        A.   I said that any company wants to

15   increase profits.  That's why you're in

16   business.

17        Q.   So these companies that the DEA has

18   asked to set up these systems to help prevent

19   the diversion of opioids are the same companies

20   that want to increase their profits, correct?

21        A.   I think that's a goal of business.

22        Q.   And part of increasing profits, as

23   we've discussed, is potentially, or can be,

24   increasing their sales, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    So they're asking companies that

3    want to increase their sales and increase their

4    profits to set up systems that could, if they

5    find suspicious orders, decrease their sales,

6    correct?

7         MR. HAMMOUD:  Object to the form.

8         THE WITNESS:  Well, and that's --

9         that is correct.  I would say that's a

10        fair assessment.

11   BY MR. CARTMELL:

12   Q.    So these same companies that

13   they're saying that we want you to identify

14   these orders that are suspicious, and we want

15   you to make sure that they are stopped so

16   they're not diverted, are the same companies

17   that want to increase sales and increase

18   profits over time, correct?

19   A.    Well, it's going to be difficult to

20   increase sales if you don't have a DEA

21   registration.

22   Q.    I understand that, but my point is

23   simply that there is an inherent conflict in

24   that system, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.   Well, that's what I'm saying.
2    There isn't an inherent conflict.
3            Q.   You don't believe that's a conflict
4    or sort of, so to speak, the fox guarding the
5    hen house?
6            A.   No.
7                 MR. HAMMOUD:  Object to the form.
8                 MR. CARTMELL:  How long have we
9         been going?
10                MR. HAMMOUD:  About an hour and
11        three minutes.
12                MR. CARTMELL:  Do you want to take
13        a quick break?
14                THE WITNESS:  A break sounds good.
15                MR. CARTMELL:  Like ten minutes?
16                VIDEO OPERATOR:  Going off the
17        record, 2 p.m.
18                (Recess from 2:03 p.m. until
19        2:15 p.m.)
20                VIDEO OPERATOR:  Back on record at
21        2:15 p.m.
22   BY MR. CARTMELL:
23           Q.   Mr. Tomkiewicz, we're back on the
24   record.  Are you ready to proceed?
```

1        A.    Yes, I am.

2        Q.    I want to ask you a few more

3   questions about Exhibit 3.  I think it's in

4   front of you.  And this was the PowerPoint

5   presentation from March of 2014, which was just

6   a few months after you arrived at the company

7   to start working, correct?

8        A.    Correct.

9        Q.    And if we look at page 3, as we

10  discussed, there was a proposed DEA compliance

11  organization, and as we discussed, there was a

12  small restructuring or a few people moving

13  around, according to this proposed

14  organization; is that correct?

15       A.    Correct.

16       Q.    And did that small restructuring

17  occur at that time; do you know?

18       A.    I believe it did.

19       Q.    Okay.  And if you look at where you

20  are, Joe Tomkiewicz, it states under you, you

21  had one individual reporting to you, Matt

22  Benkert; is that right?

23       A.    That's correct.

24       Q.    And his position was -- it

Highly Confidential - Subject to Further Confidentiality Review

1          But when you stopped selling them,

2    at that point in time, you did not know about

3    the investigation into their sales --

4          A.   Exactly.

5          Q.   -- of opioids?

6          A.   Exactly.

7               MR. HAMMOUD:  Are we about at a

8          good place for a break?

9               MR. CARTMELL:  We've been going for

10         an hour probably?

11              MR. HAMMOUD:  A little over an

12         hour, yeah.

13              MR. CARTMELL:  How far are we in?

14              VIDEO OPERATOR:  5:50.  We've been

15         going for an hour and 22 minutes.

16              MR. CARTMELL:  Yeah, let's take a

17         break.

18              MR. HAMMOUD:  Okay.  Thanks.

19              VIDEO OPERATOR:  Going off the

20         record, 5:22.

21              (Recess from 5:22 p.m. until

22         5:38 p.m.)

23              VIDEO OPERATOR:  Back on the record

24         at 5:38 p.m.

1    BY MR. CARTMELL:

2        Q.    Mr. Tomkiewicz, we're back on the

3    record.  Are you ready to proceed?

4        A.    I am ready.

5        Q.    Okay.  So I want to go back to

6    Exhibit 5.  I forgot to ask you something about

7    that at page 37.

8              And we talked about this slide that

9    you created in 2014 for the things you were

10   going to do in the future for the program --

11   suspicious order monitoring program at Teva.

12             The last thing that we didn't talk

13   about was chargeback data.  Do you see that?

14       A.    Yes.

15       Q.    Okay.  So first of all, do you know

16   whether or not Teva was actually using

17   chargeback data to try to help them identify

18   suspicious orders prior to 2014, when you

19   started there?

20       A.    I don't believe they were, but I

21   don't know for certain.

22       Q.    Okay.  Now, chargeback data, I

23   believe the DEA has said, is an advisable

24   resource to use in order to try to identify

1    suspicious orders; is that correct?

2          A.    That's my understanding, yes.

3          Q.    Okay.  And Teva, before the time

4    you got there, had chargeback data that they

5    could have used to try to help them identify

6    suspicious orders, correct?

7          A.    That's correct.

8          Q.    But they chose not to do that; is

9    that right?

10              MR. HAMMOUD:  Objection.  Object to

11         the form.

12              THE WITNESS:  Yeah, I don't know.

13   BY MR. CARTMELL:

14         Q.    But let me ask you this.  When you

15   were at AmerisourceBergen and managing that

16   suspicious order monitoring program, did your

17   program include a review of chargeback data to

18   try to help you or assist you in identifying

19   suspicious orders?

20         A.    Oh, not at all.

21         Q.    You didn't use it?

22         A.    Not at all, because --

23              And your question says that you

24   don't understand what chargeback data is.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    My question says to you that I

2    don't understand what chargeback data is?

3        A.    Yes.

4        Q.    Exactly right.

5        A.    Would you like me to explain it?

6        Q.    Yes.

7        A.    Okay.  Chargeback data.  What a

8    chargeback is, is when, say, my company,

9    Teva -- sorry for hitting the microphone --

10   when my company, Teva, contracts with either a

11   pharmacy, a hospital, a buying group that

12   represents pharmacies and we grant a contract

13   price on a product to, you know, that group,

14   that entity, then for a wholesaler who buys at

15   wholesale acquisition cost who services those

16   pharmacies with whom we have the contract, that

17   wholesaler, say, AmerisourceBergen, will

18   provide that product at the contract cost to

19   the pharmacy, the hospital, the entity, the

20   hospice, whomever, and then charge back the

21   difference back to Teva.

22              And then that contract price in the

23   data that comes back will have information on

24   the customer, the product, the quantity,

Highly Confidential - Subject to Further Confidentiality Review

1    information supporting that this product went

2    to this customer for that customer.

3              Now, what that doesn't include are

4    customers who don't have contracts, customers

5    who buy from wholesalers who buy at contract

6    price who aren't buying at wholesale

7    acquisition cost.  It's not going to include

8    distributors are who are, say, owned by a large

9    retail chain.

10             And so from the wholesaler's

11   standpoint, when I was at AmerisourceBergen,

12   there was no need to review chargeback data

13   because we saw everything that we sold to the

14   customer.

15             Now, on the Teva side, we can

16   see -- you know, AmerisourceBergen, for

17   example, we can see where they sold our product

18   at contract price to their customers.  But if a

19   customer isn't buying on contract price, we

20   don't see that.

21        Q.   I understand.

22             Really, what you're saying is, my

23   question was a dumb one, because it wouldn't

24   apply to wholesale distributors; they wouldn't

1    use that; they don't need to use that data.

2         A.   Well, and I wouldn't use the

3    prejudicial term "dumb."

4         Q.   Okay.

5         A.   But maybe ignorant, but --

6         Q.   No, I do understand a little bit

7    about it, but that makes sense.

8         A.   Yeah.

9         Q.   So at any rate, when you arrived at

10   Teva in 2014, one of the other improvements to

11   the suspicious order monitoring program was

12   that you were going to have Teva start to

13   utilize the chargeback data to try to aid and

14   assist in identifying suspicious orders,

15   correct?

16            MR. HAMMOUD:  Object to the form.

17        Mischaracterizes prior testimony.

18            THE WITNESS:  I will say that's a

19        fair assessment, correct.

20   BY MR. CARTMELL:

21        Q.   Okay.  And is there other data that

22   you believed that Teva should be using but they

23   weren't other than chargeback data to try to

24   assist with this?

Highly Confidential - Subject to Further Confidentiality Review

1          And there's something called 867

2     data; is that right?

3          A.    Yes, there's 867 data.

4          Q.    And did you start Teva into using

5     that type of data as well to try to identify

6     suspicious orders?

7          A.    I have started using 867 data, yes.

8          Q.    When was that started by the

9     company?

10          A.    I think that was in 2017 that I

11     started using that.

12          Q.    And has that also assisted Teva in

13     identifying suspicious orders?

14          A.    Not only suspicious orders but

15     suspicious customers of our customers.

16          Q.    And that's a good point.

17          A.    Yes.

18          Q.    What you just said is, by using

19     data like chargeback data and 867 data, your

20     company, Teva, can actually look downstream

21     from your customers at your customers'

22     customers, right?

23               MR. HAMMOUD:  Objection to the

24          form.  Mischaracterizes prior testimony.

```
 1              THE WITNESS:  Well, it assists in

 2         our investigations, yes.

 3   BY MR. CARTMELL:

 4         Q.   Right.

 5              And I'm saying it assists in your

 6   investigation of not only looking at whether

 7   your customers are potentially asking for

 8   suspicious orders, but it also can assist you

 9   in looking downstream from your customer to

10   their customers to see whether or not they are

11   potentially violating the law, correct?

12              MR. HAMMOUD:  Objection to the

13         form.

14              Go ahead.

15              THE WITNESS:  I wouldn't say

16         "violating the law."  Just looking for

17         patterns.

18   BY MR. CARTMELL:

19         Q.   I understand.

20              But if you do look at that data and

21   you find out that one of your

22   customer's customers, for example -- let's use

23   an example.

24              Teva has customers like
```

Highly Confidential - Subject to Further Confidentiality Review

1    AmerisourceBergen, correct?

2            A.    Mm-hmm.

3            Q.    A large wholesale distributor, as

4    we said, who distributes opioid narcotics all

5    over the United States, correct?

6            A.    Correct.

7            Q.    If Teva is looking at a potentially

8    suspicious order from AmerisourceBergen, for

9    example, and they do some investigation into

10   that and they find from that investigation --

11           For example, the top ten customers

12   of AmerisourceBergen, they might look into who

13   those people are, correct?

14           A.    Correct.

15           Q.    If you found out -- for example, if

16   AmerisourceBergen gave their top ten pharmacies

17   that they were selling to and during your

18   investigation, you found out that there were

19   suspicious things about those orders, that

20   would be investigation that I would categorize

21   as downstream investigation to your customer's

22   customer.  Correct?

23           MR. NICHOLAS:  Object to the form.

24   BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Correct?

2          A.    I would say that's a fair

3    assessment, yes.

4          Q.    Okay.  And if during that

5    investigation, you identify pharmacies who, it

6    looks like to you, are suspicious for diverting

7    opioids or violating the law or doctors who, it

8    looks suspicious to you, potentially are

9    diverting opioids or violating the law, you, as

10   Teva, have a duty to report that, correct?

11               MR. HAMMOUD:  Objection to the

12          form.  Calls for a legal conclusion.

13               THE WITNESS:  Well, a couple points

14          of clarification.

15               I don't see prescribers with that

16          data, the 867 data level or at the

17          chargeback data.  So unfortunately, I

18          don't see prescribers.

19               But I do see pharmacies, and if I

20          do see something that I would classify

21          as a suspicious order at that point --

22               For example, if I were to see an

23          invoice from a wholesaler to a pharmacy

24          that I would consider suspicious, I have

Highly Confidential - Subject to Further Confidentiality Review

1          reported orders like that, that it's not

2          my order, but it's my customer's order

3          to a pharmacy.

4     BY MR. CARTMELL:

5          Q.   Your customer's customer?

6          A.   My customer's customer, yes.

7          Q.   And you have a duty, just like with

8     your customers, to report that if you believe

9     that is suspicious, correct?

10              MR. HAMMOUD:  Objection to the

11         form.  Calls for a legal conclusion,

12         asked and answered.

13              THE WITNESS:  I would say I have a

14         duty to report suspicious orders.

15    BY MR. CARTMELL:

16         Q.   Okay.  Including if it's your

17    customer's customer, correct?

18              MR. HAMMOUD:  Objection.  Asked and

19         answered, calls for a legal conclusion.

20              THE WITNESS:  And if I see a

21         suspicious order at my customer's

22         customer level, I will report it, and I

23         have reported it.

24    BY MR. CARTMELL:

1    Q.   And that's because it's your duty,

2  you believe, correct?

3         MR. HAMMOUD:  Objection.  Asked and

4         answered multiple times, calls for a

5         legal conclusion.

6  BY MR. CARTMELL:

7    Q.   You can answer.

8    A.   I have a duty to report suspicious

9  orders.

10   Q.   Okay.  Now, we talked a little bit

11 about the policy at Teva that you helped to

12 draft and put into effect in 2014 related to

13 suspicious order monitoring and, specifically,

14 holding of the orders to investigate and decide

15 whether or not they're suspicious and should be

16 shipped.  We talked some about that.  Do you

17 recall that?

18   A.   Yes.

19   Q.   Okay.  As we know from the policy

20 that you put into effect at -- into writing at

21 Teva, that policy includes not only members of

22 the DEA compliance section that you work in,

23 but also members of parts of the company that

24 have sales as a part of their duties, correct?

1    answered.

2         THE WITNESS:  Yeah, and Florida

3         wouldn't have been the only reason to

4         hold the product.

5    BY MR. CARTMELL:

6         Q.    It's just one red flag, right?

7         A.    It was just another red flag.

8         Q.    These red flags are what led you to

9    go further and do more investigation, correct?

10        A.    That red flag wouldn't have been

11   one to make me go further down the line.

12        Q.    What made you go further down the

13   line and do actual research into the customer's

14   customer?

15        A.    That was going to be the --

16   primarily the strength mix of what they were

17   looking for, that it was hyped [sic] to the

18   40-milligram product, that that was the top

19   strength that they were looking for.

20        Q.    And because you saw that they were

21   ordering so much of this 40-milligram, or one

22   of the higher strengths, you wanted to see

23   where these drugs were actually going from

24   Publix?

1      A.   Well, and not the volume of it but

2   the ratio of the 40-milligram compared to the

3   20-milligram, the 10-milligram, the

4   80-milligram, that the 40 was the top one.  And

5   I felt that was unusual and warranted

6   investigation.

7      Q.   Okay.  And then you went to work

8   and you actually did -- like you said earlier,

9   I think, you got online and you did some

10  Google-type searches and things like that, did

11  you not?

12     A.   Well, did some Google searches,

13  looked at the -- you know, verified licenses of

14  prescribers, looked for -- you know,

15  essentially telling the story of who the

16  prescribers are of these products.  And not

17  necessarily the products that we were intending

18  to sell to Publix but actually the

19  immediate-release product that was another

20  company's product.  So what I was investigating

21  wasn't our product, it was another company's

22  product.

23     Q.   Okay.  Let's see what your

24  investigation found.  And you say that and

1   summarize that in your e-mail below of

2   Wednesday, October 28th, to Colleen McGinn,

3   your boss, correct?

4        A.   Correct.  Because this primarily

5   involves another company's product, yes.

6        Q.   Okay.  And you say, On October 27,

7   2015, I received data concerning oxycodone

8   usage at Publix Super Market, Inc.  The data

9   comprised of total dosage units dispensed of

10  all oxycodone tablet SKUs for the month of

11  September 2015 for their top ten locations,

12  along with a list of the top five oxycodone

13  prescribers for each location.  The following

14  is an analysis of that data.

15            Right?

16       A.   Correct.

17       Q.   Okay.  And you had asked Publix,

18  right -- you had asked the salespeople to go to

19  Publix and get information relating to their

20  top ten locations, along with their top

21  prescribers, correct?

22       A.   Correct.

23       Q.   And Publix -- the salespeople were

24  able to get that data so that you could look at

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   And ultimately, sir, is it true

2   that, in fact, you didn't report any of these

3   Publix pharmacies, did you?

4        A.   I didn't see any specific orders of

5   ours that were being filled by these

6   physicians.  Again, these physicians [sic] were

7   for a different product, for oxycodone

8   30-milligram immediate release, which was not

9   our product.

10       Q.   Is your testimony that if you find

11  suspicious activity that you say is that bad,

12  is clear in your mind, that even -- just

13  because it's not your product, you don't have

14  to report it to the DEA?

15            MR. HAMMOUD:  Objection to the

16       form.

17  BY MR. CARTMELL:

18       Q.   Is that your testimony?

19            MR. HAMMOUD:  Calls for a legal

20       conclusion.

21            THE WITNESS:  If I had seen an

22       order, I would have reported it for

23       those products.  But I did not see an

24       order for oxycodone 30-milligram

Highly Confidential - Subject to Further Confidentiality Review

1          immediate release because we did not

2          have that product at that time.

3    BY MR. CARTMELL:

4          Q.   So I want the jury to be clear

5    about this.  Even though you did this

6    investigation and found all of this data that

7    you found to be truly indicative and bad of

8    diversionary activity, and you knew doctors

9    were using those pharmacies for that purpose of

10   getting opioids, you released the product

11   because you said, that wasn't our product, so

12   we don't have to report it.  Correct?

13             MR. HAMMOUD:  Objection to the

14        form.

15             THE WITNESS:  And again, I did not

16        see anything suspicious specifically to

17        our product, to our orders.

18   BY MR. CARTMELL:

19        Q.   And so because it wasn't --

20        A.   So there was nothing to report.

21        Q.   -- your product, you didn't report

22   anything, did you?

23             MR. HAMMOUD:  Objection to the

24        form.

Highly Confidential - Subject to Further Confidentiality Review

 1   BY MR. CARTMELL:

 2        Q.   Did you?

 3        A.   I didn't see any orders.  I had no

 4   orders to report.

 5        Q.   Publix ordered from your company --

 6             MR. HAMMOUD:  Tom, time is up.

 7             MR. CARTMELL:  Hold on.

 8             MR. HAMMOUD:  I'll give you the

 9        professional courtesy of one more

10        question, but that's it.

11   BY MR. CARTMELL:

12        Q.   Publix ordered from your pharmacy

13   generic 30 milligrams oxycodone, correct?

14        A.   Wrong.

15        Q.   What did they order from you?

16             MR. HAMMOUD:  That's it.  Time is

17        up.

18             THE WITNESS:  Time's up.

19             MR. CARTMELL:  I've got like three

20        questions.

21             MR. HAMMOUD:  Okay.  I'll give you

22        three questions.

23             THE WITNESS:  Extended-release

24        oxycodone.

```
1    BY MR. CARTMELL:

2         Q.   So these Publix pharmacies were

3    ordering opioids from your company, correct?

4         A.   Correct.

5         Q.   Those orders were flagged as

6    suspicious, and then you detailed to sales red

7    flags related to those orders, didn't you?

8         A.   Wrong.

9              MR. HAMMOUD:  Objection to the

10        form.

11             THE WITNESS:  Wrong.  They were not

12        flagged as suspicious.

13   BY MR. CARTMELL:

14        Q.   They were flagged as potentially

15   suspicious, correct?

16             MR. HAMMOUD:  Objection to the

17        form.

18             THE WITNESS:  I would say that

19        there was something that -- as I

20        previously said, that they were

21        indicative of things that I felt could

22        be deficient with Publix' program.

23   BY MR. CARTMELL:

24        Q.   Potentially suspicious, correct?
```