PSJ10 Exh 12

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OHIO

 3                    EASTERN DIVISION

 4

 5    ----------------------------x

 6    IN RE: NATIONAL PRESCRIPTION   ) Case No.

 7    OPIATE LITIGATION              ) 1:17-MD-2804

 8    APPLIES TO ALL CASES           ) Hon. Dan A. Polster

 9    ----------------------------x

10

11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12                CONFIDENTIALITY REVIEW

          VIDEOTAPED DEPOSITION OF MICHAEL R. CLARKE

13

                    SANDSTON, VIRGINIA

14

                FRIDAY, DECEMBER 7, 2018

15

                        9:13 A.M.

16

17

18

19

20

21

22

23

24    Reported by: Leslie A. Todd
```

Highly Confidential - Subject to Further Confidentiality Review

1    Deposition of MICHAEL R. CLARKE, held in the

2  conference room of the:

3

4

5            HILTON GARDEN INN

6            RICHMOND AIRPORT

7            441 International Center Drive

8            Sandston, Virginia 23150

9

10

11

12

13

14    Pursuant to notice, before Leslie Anne Todd,

15  Court Reporter and Notary Public in and for the

16  Commonwealth of Virginia, who officiated in

17  administering the oath to the witness.

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFFS:

 4        MATTHEW S. MELAMED, ESQUIRE

 5        KELLI BLACK, ESQUIRE

 6        ROBBINS GELLER RUDMAN & DOWD LLP

 7        Post Montgomery Center

 8        One Montgomery Street

 9        Suite 1800

10        San Francisco, California 94104

11        (415) 288-4545

12

13   ON BEHALF OF THE ALLERGAN DEFENDANTS AND THE

14   WITNESS:

15        JENNIFER G. LEVY, ESQUIRE

16        CATIE VENTURA, ESQUIRE

17        KIRKLAND & ELLIS LLP

18        655 Fifteenth Street, N.W.

19        Washington, D.C. 20005

20        (202) 879-5211

21

22

23

24
```

```
 1    APPEARANCES (Continued):

 2

 3    ON BEHALF OF WATSON PHARMACEUTICALS, INC.:

 4         STEVEN A. LUXTON, ESQUIRE

 5         MORGAN LEWIS BOCKIUS, LLP

 6         1111 Pennsylvania Ave, N.W.

 7         Washington, D.C. 20004-2541

 8         (202) 739-5452

 9

10    ON BEHALF OF McKESSON CORPORATION:

11         SARA SUNDERLAND, ESQUIRE (Telephonically)

12         COVINGTON & BURLING, LLP

13         One Front Street

14         San Francisco, California 94111-5356

15         (415) 591-6000

16

17    ON BEHALF OF ENDO PHARMACEUTICALS, INC. and

18       ENDO HEALTH SOLUTIONS, INC.:

19         JOHN CELLA, ESQUIRE (Telephonically)

20         JOANNA PERSIO, ESQUIRE (Telephonically)

21         ARNOLD & PORTER KAYE SCHOLER, LLP

22         601 Massachusetts Ave, N.W.

23         Washington, D.C. 20001-3743

24         (202) 942-5000
```

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF WALMART:

 4        SHIRLETHIA V. FRANKLIN, ESQUIRE

 5        JONES DAY

 6        51 Louisiana Avenue, N.W.

 7        Washington, D.C. 20001-2113

 8        (202) 879-3939

 9

10   ON BEHALF OF AMERISOURCEBERGEN:

11        JILL McINTYRE, ESQUIRE (Telephonically)

12        JACKSON KELLY, PLLC

13        500 Lee Street East

14        Suite 1600

15        Charleston, West Virginia 25301-3202

16        (304) 340-1018

17

18   ON BEHALF OF CARDINAL HEALTH:

19        JULI ANN LUND, ESQUIRE (Telephonically)

20        WILLIAMS & CONNOLLY LLP

21        725 Twelfth Street, N.W.

22        Washington, D.C. 20005

23        (202) 434-5000

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:

 4        PHILLIP KRAFT, ESQUIRE (Telephonically)

 5        ROPES & GRAY, LLP

 6        1211 Avenue of the Americas

 7        New York, New York  10036-8704

 8        (212) 596-9150

 9

10   ALSO PRESENT:

11        CHRIS RITONA (Videographer)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1    specifically.

2         Q    Did it have anything to do with opioids?

3         A    I don't believe that it did.

4         Q    And then you left University of Medicine

5    and Dentistry to join Biomet Spine and Bone

6    Healing, correct?

7         A    Yes.

8         Q    And you -- at Biomet Spine and Bone

9    Healing, you were vice president and compliance

10   officer from June 2008 until approximately 2000 --

11   beginning of 2012; is that correct?

12        A    Yes.

13        Q    What was your primary responsibility as

14   vice president and compliance officer at Biomet?

15        A    EBI, Biomet Bone Healing was the -- was

16   a division of Biomet, the orthopedics company, and

17   that division was located in New Jersey.  My role

18   was to build out the compliance program for that

19   division of Biomet.

20        Q    In that role at Biomet, did you address

21   any issues related to opioids?

22        A    No.  Biomet was an orthopedic device

23   company.

24        Q    And after leaving Biomet, you joined

Highly Confidential - Subject to Further Confidentiality Review

```
1    Actavis, correct?

2         A    Yes.

3         Q    And you were at Actavis for three and a

4    half years approximately; is that correct?

5         A    I know I was at Actavis from early 2012

6    until the middle of 2015.

7         Q    What was the name of the position you

8    held at Actavis?  And if it was more than one, the

9    name of the positions.

10        A    I believe the title remained the same.

11   I believe I was vice president of compliance for

12   the Americas or something like that.

13        Q    And what were your responsibilities as

14   vice president of compliance for the Americas?

15        A    My role at Actavis was again to build

16   out the compliance program for that division of

17   the company.  Actis evolved -- Actavis evolved

18   over time into a different sort of company.  So it

19   started off as a regional role for the Americas

20   and then became something else.

21        Q    How did -- when you said "Actavis

22   evolved over time," what do you mean by that?

23        A    Actavis was acquired by Watson, and then

24   the combined company acquired other companies
```

Highly Confidential - Subject to Further Confidentiality Review

1    until the time I left.

2         Q    And throughout the time that you were

3    there, you were working on compliance issues in

4    Actavis, and then Actavis was acquired by Watson,

5    and then in the subsequent companies as well where

6    there were acquisitions?

7         A    Yes.

8         Q    What department were you in at Actavis?

9         A    I was in the compliance department.

10        Q    And who was -- who did you report to in

11   the compliance department?

12        A    When I first joined the company, I

13   reported to Kirsten Schmal (phonetic), who was

14   the, I believe, the chief compliance officer at

15   what I'll call Swiss Actavis, and he resided -- or

16   the company's headquarters was in Zug,

17   Switzerland -- for about a year.

18             And then after the Watson acquisition, I

19   reported to Deborah Penza, who was the compliance

20   officer resident at that point in the Parsippany

21   office, and I reported to Deb Penza until the

22   close of the Allergan acquisition, at which point

23   I still reported to Deb while she was there, but

24   then I had an indirect report to JK, John

Highly Confidential - Subject to Further Confidentiality Review

1  Kellerman, who became the Allergan global

2  compliance officer.

3       Q    Did Deb Penza work at Watson prior to

4  its acquisition of Actavis?

5       A    Yes.  Deb was the Watson compliance

6  officer.

7       Q    Prior to the acquisition, were you the

8  highest ranking member of the compliance team in

9  the United States, if you know?

10       A    Prior to the Watson acquisition?

11       Q    Yes.

12       A    I was the highest ranking member of the

13  compliance team at Actavis in the U.S. because I

14  was the only member of the compliance team at

15  Actavis in the U.S.

16       Q    Do you know if prior to January 2012

17  when you started at Actavis whether there was a

18  compliance team for Actavis in the United States?

19       A    There were people managing the

20  compliance function prior to me starting at

21  Actavis.  It was managed by lawyers on the Actavis

22  team or different lawyers on the Actavis team, and

23  there was also a contract group at Adventive.

24  Well, Adventive was a contract sales organization,

Highly Confidential - Subject to Further Confidentiality Review

1    and there was a compliance officer in Adventive

2    who managed compliance for the contract function

3    that supported Actavis at that time.

4         Q    Who were the Actavis lawyers who managed

5    compliance before your arrival?

6         A    John LaRocca and Beth Zelnick-Kaufman.

7         Q    And who were the people at Adventive who

8    managed their compliance vis-à-vis their

9    relationship with Actavis?

10        A    Scott Miller.

11        Q    Were each of those individuals lawyers?

12        A    John and Beth are lawyers.  I don't know

13   if Scott is a lawyer or not.

14        Q    You mentioned that you -- earlier that

15   you did not leave Actavis voluntarily; is that

16   correct?

17        A    That's correct.

18        Q    What are the circumstances under which

19   you left Actavis?

20        A    With the Actavis-Allergan acquisition,

21   there was a reorganization of a number of

22   different business functions within the combined

23   company, and a number of commercial and financial

24   and other functions, some legal functions and the

1    compliance function were reorganized, and certain

2    people in each of those functions and others left

3    the company.

4        Q    Were you asked to leave the company?

5        A    Yeah.  Yes.

6        Q    Was that -- did that request have

7    anything to do with an evaluation of the quality

8    of your work?

9        A    No.  It had to do with business

10   operations, a reorganization of the company under

11   the Allergan -- after the Allergan combination,

12   and a desire that certain people in certain

13   functions were no longer needed, and hence, we

14   were reorganized out of the company.

15       Q    Once -- while you were at Actavis and it

16   was acquired by Allergan, do you know the name of

17   the company you worked for?

18       A    Well, the company --

19       Q    I'm sorry.  Let me -- I --

20       A    Okay.

21       Q    I jumped over a few steps there.  Sorry

22   about that.

23            When you were at Actavis and it was

24   acquired by Watson, do you know the name of the

Highly Confidential - Subject to Further Confidentiality Review

```
1    company you worked for after the acquisition?

2         A    Yes.

3         Q    And what was that?

4         A    The company name remained Actavis.

5         Q    And who -- what was the corporate entity

6    that employed you at that time after the Watson

7    acquisition?

8         A    It was Actavis, I believe, after the

9    Watson -- excuse me, after the Watson acquisition,

10   it became Actavis PLC, because I believe Watson

11   was headquartered in the UK.

12        Q    Prior to the acquisition, when you first

13   started at Actavis, what was the name of the

14   corporate entity that employed you?

15        A    Well, before the Watson acquisition, we

16   were what I call Swiss Actavis, so I believe we

17   were Actavis, Inc., which was headquartered in

18   Switzerland.  It might have even been incorporated

19   in Iceland.  There was an Iceland connection and a

20   Switzerland connection, but it was based in

21   Central Europe.

22        Q    And -- and then once Allergan came into

23   the picture and acquired Actavis, what was the

24   corporate entity you worked for prior to the time
```

Highly Confidential - Subject to Further Confidentiality Review

1    you departed?

2         A    I know the corporate name changed to

3    Allergan at some point.  So it was still Actavis

4    after the deal closed, and it became Allergan at

5    some point.  I think, as I was leaving, the

6    corporate name changed to Allergan.  I don't know

7    if it was Inc. or PLC or anything else, but it

8    changed from Actavis to Allergan at some point in

9    the spring of 2015.

10        Q    And then when you left Actavis, you,

11   after a couple of months, secured employment at

12   Indivior, correct?

13        A    I left Actavis-Allergan in June of 2015.

14   I started working at Indivior in August of 2015.

15        Q    And you still work at Indivior, correct?

16        A    Yes, I do.

17        Q    And what's your title at Indivior?

18        A    My current title is vice president,

19   corporate compliance.

20        Q    Has that been your title the entire time

21   you've been there?

22        A    Yes.

23        Q    And what's your responsibility?

24        A    I -- up until the beginning of October,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I was the global compliance officer for Actavis --

 2    I'm sorry, for Indivior.

 3         Q    I'll do the same.

 4         A    So I managed the global compliance

 5    program for Indivior.

 6         Q    And then what happened in October?

 7         A    In October, the corporate compliance

 8    function moved out of legal, because it sat within

 9    the legal department, and it became its own

10    freestanding department, and we hired a chief

11    compliance officer who sits on our executive

12    management team, whom I now report to.

13         Q    And are you in the legal department

14    currently at Indivior?

15         A    No, I'm in the integrity and compliance

16    department at Indivior.

17         Q    What is Indivior's business?

18         A    Indivior is a specialty pharmaceutical

19    company.

20         Q    Do they manufacture pharmaceuticals?

21         A    Yes, we manufacture specialty

22    pharmaceuticals.

23         Q    And sell those pharmaceuticals, correct?

24         A    We distribute those pharmaceuticals,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for the manufacture and sale of certain drugs?

 2        A    Certain controlled drugs, yes.

 3        Q    Certain controlled drugs.

 4             Do you recall the purpose of this

 5    meeting?

 6             Well, let's start out, do you recall who

 7    requested this meeting?  Whose idea was it?

 8        A    Well, the DEA requested the meeting.

 9        Q    Do you recall why they requested it?  Do

10    you have an understanding of why?

11        A    I don't know why they requested it

12    because I wasn't in those discussions.  I just

13    know we received a request from the DEA to meet

14    with us.  I guess someone scheduled it, it was set

15    up, and then the Actavis folks went down.

16        Q    Other than the government side, the

17    individuals in different government agencies and

18    the individuals from Actavis, was there anybody

19    else in attendance at the meeting?

20        A    I know -- I believe we had talked about

21    whether we should bring counsel, but -- if it

22    was -- I believe we did, I just don't remember

23    specifically, but we decided not to.  I don't

24    think there was a need for it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  So on the Actavis side, it was just
 2     internal Actavis folks, from what I remember.  And
 3     then, like I said, different divisions or
 4     departments within the DEA, the enforcement folks
 5     and then the quota folks.
 6          Q    It was just a bilateral meeting between,
 7     generally speaking, the DEA side and the Actavis
 8     side; is that correct?
 9          A    That's what I remember, yes.
10          Q    Do you recall the purpose of the meeting
11     generally?
12          A    I think as a general matter, it was a
13     meeting for -- ostensibly for the DEA to talk to
14     us about our anti-diversion efforts.
15          Q    And you say "ostensibly."  Why -- why do
16     you qualify it in that way?
17          A    I qualify it that way based on how the
18     meeting went, the tone and the tenor of the
19     meeting, meaning that it was less productive than
20     it could have been, and it could have -- the
21     purpose to discuss anti-diversion efforts could
22     have been achieved in a different way, with a
23     different tone and a different type of
24     presentation, and looking and talking to us as --
```

1    who were on the manufacturing side, as

2    professionals as opposed to street dealers.

3         Q    Am I correct -- reading between the

4    lines of your answer, am I correct that the DEA

5    was critical of Actavis's anti-diversion efforts

6    in that meeting?

7              MR. LUXTON:  Objection.

8              THE WITNESS:  I wouldn't put it that

9    way.  I think -- the way I looked at it -- the

10   way -- and, you know, we talked afterwards.  It

11   wasn't so much as just being critical of our

12   anti-diversion efforts.  The undertone of the

13   meeting was an implicit criticism of the fact that

14   we were making these products in the first place,

15   and we were -- and when I say "we," I mean Actavis

16   was at that meeting, but they referred to one or

17   two other companies that were also making generic

18   opioid products as not being responsible.  And in

19   a sense that they described it, without using

20   these specific words, but in a way that we would

21   just manufacture, put the product out on the

22   street, and not have a care as to where it went.

23              Because they described their efforts

24   at -- you know, whatever enforcement efforts they

Highly Confidential - Subject to Further Confidentiality Review

1    were engaged in, they described finding or seeing

2    or obtaining product, you know, opioid products

3    that seemed to be diverted relatively easily, I

4    guess is the way to describe it.

5             So it was -- you know, and they were

6    haranguing us about certain things.  So it just

7    was not the most productive conversation about

8    anti-diversion efforts, about manufacturing of

9    these products, things like that.

10   BY MR. MELAMED:

11        Q    You mentioned that they mentioned -- the

12   DEA mentioned during this meeting one or two other

13   manufacturers of generic opioids, correct?

14        A    Yes.

15        Q    Do you recall who they -- who the DEA

16   mentioned?

17        A    I know they mentioned more than one, but

18   Mallinckrodt was one name that came up that I

19   recall.

20        Q    And you don't recall any other names?

21        A    I don't remember at this point.

22        Q    Do you see the sub-bullet point --

23   returning to Exhibit 4, the sub-bullet point that

24   says:  "Discussion of likely diversion of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    oxycodone in FL and other high risk states"?

 2        A    Yes.

 3        Q    FL stands for Florida, right?

 4        A    That's right.

 5        Q    Do you recall which other high risk

 6    states were discussed?

 7        A    I believe -- I mean, the discussions

 8    seemed to focus mostly on the East Coast.  So it

 9    was Florida, I remember that specifically, and

10    they spent most of the time on Florida, so the

11    other states were almost secondary, tertiary.

12    They might have mentioned Virginia or West

13    Virginia.  I know they mentioned other states, but

14    I -- I would be guessing, and I don't want to do

15    that.  I don't recall specifically.

16        Q    Do you remember whether the DEA had

17    anything to say about Actavis's suspicious order

18    monitoring program during that meeting?

19        A    Yeah, I mean, ultimately the discussion

20    came over to that because, you know, that's what

21    we were prepared -- the Actavis team was prepared

22    to talk about.  And without knowing -- because I'm

23    not sure if there was an agenda, without knowing,

24    you know, a list we're going to, you know, talk --
```