PSJ10 Exh 13

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### Form 10-K

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2015

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ____ to ____

| Commission File Number | Exact name of registrants as specified in its charter, principal office and address and telephone number | State of incorporation or organization | I.R.S. Employer Identification No. |
|---|---|---|---|
| 001-36867 | **Allergan plc**<br>Clonshaugh Business and Technology Park<br>Coolock, Dublin, D17 E400, Ireland<br>(862) 261-7000 | Ireland | 98-1114402 |
| 001-36887 | **Warner Chilcott Limited**<br>Cannon's Court 22<br>Victoria Street<br>Hamilton HM 12<br>Bermuda<br>(441) 295-2244 | Bermuda | 98-0496358 |

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Allergan plc Ordinary Shares, $0.0001 par value | New York Stock Exchange |
| Allergan plc 5.500% Mandatory Convertible Preferred Shares, Series A, par value of $0.0001 | New York Stock Exchange |
| Actavis Funding SCS $500,000,000 Floating Rate Notes due 2016* | New York Stock Exchange |
| *Notes issued by Actavis Funding SCS and guaranteed by Warner Chilcott Limited | |

Securities registered pursuant to Section 12(g) of the Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

|  | Yes | No |
|---|---|---|
| Allergan plc | ☒ | ☐ |
| Warner Chilcott Limited | ☒ | ☐ |

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.

|  | Yes | No |
|---|---|---|
| Allergan plc | ☐ | ☒ |
| Warner Chilcott Limited | ☐ | ☒ |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

|  | Yes | No |
|---|---|---|
| Allergan plc | ☒ | ☐ |
| Warner Chilcott Limited | ☒ | ☐ |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

|  | Yes | No |
|---|---|---|
| Allergan plc | ☒ | ☐ |
| Warner Chilcott Limited | ☒ | ☐ |

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

|  |  |
|---|---|
| Allergan plc | ☐ |
| Warner Chilcott Limited | ☒ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Allergan plc | Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|---|
|  | Non-accelerated filer (Do not check if a smaller reporting company) | ☐ | Smaller reporting company | ☐ |
| Warner Chilcott Limited | Large accelerated filer | ☐ | Accelerated filer | ☐ |
|  | Non-accelerated filer (Do not check if a smaller reporting company) | ☒ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

|  | Yes | No |
|---|---|---|
| Allergan plc | ☐ | ☒ |
| Warner Chilcott Limited | ☐ | ☒ |

The aggregate market value of the voting and non-voting stock held by non-affiliates of Allergan plc as of June 30, 2015, based upon the last sale price reported for such date on the New York Stock Exchange, was $119.0 billion. The calculation of the aggregate market value of voting and non-voting stock excludes Class A ordinary shares of Allergan plc held by executive officers, directors, and stockholders that the registrant concluded were affiliates of Allergan plc on that date.

Number of shares of Allergan plc's Ordinary Shares outstanding on February 15, 2016: 394,687,384

This Annual Report on Form 10-K is a combined report being filed separately by two different registrants: Allergan plc and Warner Chilcott Limited. Warner Chilcott Limited is an indirect wholly owned subsidiary of Allergan plc. The information in this Annual Report on Form 10-K is equally applicable to Allergan plc and Warner Chilcott Limited, except where otherwise indicated. Warner Chilcott Limited meets the conditions set forth in General Instruction H(1)(a) and (b) of Form 10-K and, to the extent applicable, is therefore filing this form with a reduced disclosure format.

### DOCUMENTS INCORPORATED BY REFERENCE

Certain information required by Part III of this Annual Report on Form 10-K ("Annual Report") is incorporated by reference from the Allergan plc proxy statement to be filed pursuant to Regulation 14A with respect to the Registrant's Annual Meeting of Shareholders to be held on or about May 5, 2016.



EXHIBIT 13
WIT: Allergan-Kvyhael
DATE: 10 3 6 78
C. Campbell, RDR CRR CSR #13921

ALLERGAN PLC

WARNER CHILCOTT LIMITED

TABLE OF CONTENTS

FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2015

| | | PAGE |
|---|---|---|
| **PART I** | | |
| ITEM 1. | Business | 3 |
| ITEM 1A. | Risk Factors | 23 |
| ITEM 1B. | Unresolved Staff Comments | 52 |
| ITEM 2. | Properties | 52 |
| ITEM 3. | Legal Proceedings | 54 |
| ITEM 4. | Mine Safety Disclosures | 54 |
| **PART II** | | |
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 55 |
| ITEM 6. | Selected Financial Data | 57 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 59 |
| ITEM 7A. | Quantitative and Qualitative Disclosures About Market Risk | 100 |
| ITEM 8. | Financial Statements and Supplementary Data | 102 |
| ITEM 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 102 |
| ITEM 9A. | Controls and Procedures | 102 |
| ITEM 9B. | Other Information | 103 |
| **PART III** | | |
| ITEM 10. | Directors and Executive Officers of the Registrant | 104 |
| ITEM 11. | Executive Compensation | 104 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management | 104 |
| ITEM 13. | Certain Relationships and Related Transactions | 104 |
| ITEM 14. | Principal Accounting Fees and Services | 104 |
| **PART IV** | | |
| ITEM 15. | Exhibits, Financial Statement Schedules | 105 |
| | SIGNATURES | 106 |

ITEM 1.   *BUSINESS*

**Explanatory Note**

This Annual Report on Form 10-K is a combined annual report being filed separately by two registrants: Allergan plc and its indirect wholly-owned subsidiary, Warner Chilcott Limited. Each registrant hereto is filing on its own behalf all the information contained in this annual report that relates to such registrant. Each registrant hereto is not filing any information that does not relate to such registrant, and therefore makes no representations as to any such information.

**Company History**

Allergan plc (formerly known as Actavis plc) was incorporated in Ireland on May 16, 2013 as a private limited company and re-registered effective September 20, 2013 as a public limited company. It was established for the purpose of facilitating the business combination between Actavis, Inc. and Warner Chilcott plc ("Warner Chilcott"). On October 1, 2013, pursuant to the transaction agreement dated May 19, 2013 among Actavis, Inc., Warner Chilcott, Allergan plc, Actavis Ireland Holding Limited, Actavis W.C. Holding LLC (now known as Actavis W.C. Holding Inc.) and Actavis W.C. Holding 2 LLC (now known as Actavis W.C. Holding 2 Inc.) ("MergerSub"), (i) the Company acquired Warner Chilcott (the "Warner Chilcott Acquisition") pursuant to a scheme of arrangement under Section 201, and a capital reduction under Sections 72 and 74, of the Irish Companies Act of 1963 where each Warner Chilcott ordinary share was converted into 0.160 of an Allergan plc ordinary share (the "Company Ordinary Shares"), or $5,833.9 million in equity consideration, and (ii) MergerSub merged with and into Actavis, Inc., with Actavis, Inc. as the surviving corporation in the merger (the "Merger" and, together with the Warner Chilcott Acquisition, the "Transactions"). Following the consummation of the Transactions, Actavis, Inc. and Warner Chilcott became wholly-owned subsidiaries of Allergan plc. Each of Actavis, Inc.'s common shares was converted into one Company Ordinary Share. Effective October 1, 2013, through a series of related-party transactions, Allergan plc contributed its indirect subsidiaries, including Actavis, Inc., to Warner Chilcott Limited.

On March 17, 2015, the Company acquired Allergan, Inc. ("Legacy Allergan") for approximately $77.0 billion including outstanding indebtedness assumed of $2.2 billion, cash consideration of $40.1 billion and equity consideration of $34.7 billion, which includes outstanding equity awards (the "Allergan Acquisition"). Under the terms of the agreement, Legacy Allergan shareholders received 111.2 million of the Company's ordinary shares, 7.0 million of the Company's non-qualified stock options and 0.5 million of the Company's share units. The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complements the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefits from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox® and Restasis®. The transaction expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

In connection with the Allergan Acquisition, the Company changed its name from Actavis plc to Allergan plc. Actavis plc's ordinary shares were traded on the NYSE under the symbol "ACT" until the opening of trading on June 15, 2015, at which time Actavis plc changed its corporate name to "Allergan plc" and changed its ticker symbol to "AGN." Pursuant to Rule 12g-3(c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), Allergan plc is the successor issuer to Actavis plc's ordinary shares and Actavis plc's mandatory convertible preferred shares, both of which are deemed to be registered under Section 12(b) of the Exchange Act, and Allergan plc is subject to the informational requirements of the Exchange Act, and the rules and regulations promulgated thereunder.

References throughout to "we," "our," "us," the "Company" or "Allergan" refer to financial information and transactions of Watson Pharmaceuticals, Inc. prior to January 23, 2013, Actavis, Inc. from January 23, 2013 until October 1, 2013 and Allergan plc and Warner Chilcott Limited subsequent to October 1, 2013.

References throughout to "Ordinary Shares" refer to Actavis, Inc.'s Class A common shares, par value $0.0033 per share, prior to the consummation of the Transactions and to Allergan plc's ordinary shares, par value $0.0001 per share, since the consummation of the Transactions.

On July 26, 2015, Allergan plc entered into a master purchase agreement (the "Teva Agreement"), under which Teva Pharmaceutical Industries Ltd. ("Teva") agreed to acquire the Company's global generic pharmaceuticals business and certain other assets (the "Teva Transaction"). Under the Teva Agreement, upon the closing of the Teva Transaction, we will receive $33.75 billion in cash and 100.3 million Teva ordinary shares (or American Depository Shares with respect thereto), which approximates $6.75 billion in Teva stock using the then-current stock price at the time the Teva Transaction was announced, in exchange for which Teva will acquire our global generics business, including the United States ("U.S.") and international generic commercial units, our third-party supplier Medis, our global generic manufacturing operations, our global generic R&D unit, our international over-the-counter (OTC) commercial unit (excluding OTC eye care products) and some established international brands. We continue to work toward

3

satisfying all conditions in order to close by the end of the first quarter of 2016; however, it is possible that closing could slip beyond the end of the first quarter.  As a result of the transaction, and in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Update ("ASU") number 2014-08 "Presentation of Financial Statements (Topic 205) and Property, Plant and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity," the Company is accounting for the assets and liabilities to be divested as held for sale.  Further, the financial results of the business held for sale have been reclassified to discontinued operations for all periods presented in our consolidated financial statements.

On November 23, 2015, the Company announced that it entered into a definitive merger agreement (the "Pfizer Agreement") under which Pfizer Inc. ("Pfizer"), a global innovative biopharmaceutical company, and Allergan plc will merge in a stock and cash transaction (the "Pfizer Transaction"), which attributes a $160.0 billion enterprise valuation using the then-current stock price at the time the Pfizer Transaction was announced. Company shareholders will receive 11.3 shares of the combined company ordinary shares for each of their existing Allergan shares and Pfizer stockholders will receive in respect of each share of Pfizer common stock held by them, at their election and subject to certain proration procedures described in the Pfizer Agreement, either one share of the combined company or an amount in cash equal to the volume weighted average price per share of Pfizer common stock on the New York Stock Exchange ("NYSE") on the trading day immediately preceding the date of the consummation of the Pfizer Transaction. The Pfizer Transaction is anticipated to close in the second half of 2016.

Except where otherwise indicated, and excluding certain insignificant cash and non-cash transactions at the Allergan plc level, the consolidated financial statements and disclosures are for two separate registrants, Allergan plc and Warner Chilcott Limited. The results of Warner Chilcott Limited are consolidated into the results of Allergan plc. Due to the deminimis activity between Allergan plc and Warner Chilcott Limited, references throughout this document relate to both Allergan plc and Warner Chilcott Limited. Refer to "Note 3 —Reconciliation of Warner Chilcott Limited results to Allergan plc results" in the accompanying "Notes to the Consolidated Financial Statements" in this document for a summary of the details on the differences between Allergan plc and Warner Chilcott Limited.

This discussion contains forward-looking statements that are subject to known and unknown risks, uncertainties and other factors that may cause our actual results to differ materially from those expressed or implied by such forward-looking statements. These risks, uncertainties and other factors include, among others, those identified under "Risk Factors" in this Annual Report and in other reports we have filed with the U.S. Securities and Exchange Commission ("SEC").

**Business Overview**

Allergan plc is a global specialty pharmaceutical company engaged in the development, manufacturing, marketing, and distribution of brand name pharmaceutical products ("brand", "branded" or "specialty brand"), medical aesthetics, biosimilar and over-the-counter ("OTC") pharmaceutical products. The Company has operations in more than 100 countries. Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc and has the same principal business activities. As a result of the Allergan Acquisition which closed on March 17, 2015, the Company expanded its franchises to include ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery, which complements the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefits significantly from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox® and Restasis®. The Allergan Acquisition expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

The results of our discontinued operations includes the results of our generic product development, manufacturing and distribution of off-patent pharmaceutical products, established international brands marketed similar to generic products and out-licensed generic pharmaceutical products primarily in Europe through our Medis third-party business.

Allergan plc's principal executive offices are located at Clonshaugh Business and Technology Park, Coolock, Dublin, Ireland and our administrative headquarters are located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054. Our Internet website address is www.allergan.com. We do not intend this website address to be an active link or to otherwise incorporate by reference the contents of the website into this report. Our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and all amendments thereto, are available free of charge on our Internet website. These reports are posted on our website as soon as reasonably practicable after such reports are electronically filed with the SEC. The public may read and copy any materials that we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington DC 20549 or electronically through the SEC website (www.sec.gov). The information contained on the SEC's website is not incorporated by reference into this Form 10-K and should not be considered to be part of this Form 10-K. Information may be obtained regarding the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Within the Investors section of our website, we provide information concerning corporate governance, including our Corporate Governance Guidelines, Board Committee Charters and Composition, Code of Conduct and other information. Refer to "ITEM 1A. RISK FACTORS-CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS" in this document.

## Business Development

### *2015 Significant Business Developments*

The following are the material transactions that were completed in the year ended December 31, 2015.

## Acquisitions

### *AqueSys*

On October 16, 2015, the Company acquired AqueSys, Inc. ("AqueSys"), a private, clinical-stage medical device company focused on developing ocular implants that reduce intraocular pressure ("IOP") associated with glaucoma, in an all-cash transaction. Under the terms of the agreement, the Company acquired AqueSys for an acquisition accounting purchase price of $298.9 million, including $193.5 million for the estimated fair value of contingent consideration relating to the regulatory approval and commercialization milestone payments.  The Company acquired AqueSys for the lead development program, including XEN45, a soft shunt that is implanted in the sub conjunctival space in the eye through a minimally invasive procedure with a single use, pre-loaded proprietary injector (the "AqueSys Acquisition").

### *Northwood Medical Innovation*

On October 1, 2015, the Company acquired Northwood Medical Innovation Ltd., developer of innovative implant technology, earFold™, which is being accounted for as a business acquisition. earFold™ is a medical device for the correction of prominent ears, with or without asymmetry, in patients aged 7 years and older. earFold™ received a Conformité Européene ("CE") mark in April 2015, and has been made available by Northwood Medical Innovation Ltd to trained and accredited plastic surgeons, otolaryngologists (Ear, Nose and Throat) and maxillo-facial surgeons, primarily in the United Kingdom ("UK"). The Company acquired Northwood Medical Innovation Ltd. for acquisition accounting purchase price consideration of $25.5 million (the "Northwood Acquisition"), including $15.0 million of contingent consideration.

### *Kythera*

On October 1, 2015, the Company acquired Kythera Biopharmaceuticals ("Kythera"), for $75 per share, or an acquisition accounting purchase price of $2,089.5 million (the "Kythera Acquisition"). Kythera was focused on the discovery, development and commercialization of novel prescription aesthetic products. Kythera's lead product, Kybella® injection, is the first and only United States Food and Drug Administration ("FDA") approved, non-surgical treatment for moderate to severe submental fullness, commonly referred to as double chin.

### *Oculeve*

On August 10, 2015, the Company acquired Oculeve, Inc. ("Oculeve"), a development-stage medical device company focused on developing novel treatments for dry eye disease. Under the terms of the agreement, Allergan acquired Oculeve for an acquisition accounting purchase price of $134.5 million (the "Oculeve Acquisition"), including $90.0 million for the estimated fair value of contingent consideration of which the Company may owe up to $300.0 million in future payments. The Company acquired Oculeve and its lead product candidate OD-01, an intranasal neurostimulation device, as well as other dry eye products in development.

### *Auden Mckenzie*

On May 29, 2015 the Company acquired Auden Mckenzie Holdings Limited ("Auden"), a company specializing in the development, licensing and marketing of niche generic medicines and proprietary brands in the United Kingdom ("UK") and across Europe for approximately 323.7 million British Pounds, or $495.9 million (the "Auden Acquisition").  The assets and liabilities acquired, as well as the results of operations for the acquired Auden business are part of the assets being divested in the Teva Transaction and are included as a component of income from discontinued operations.  In addition the acquired financial position is included in assets and liabilities held for sale.

### *Allergan*

On March 17, 2015, the Company completed the Allergan Acquisition.  The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complements the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefited from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox® and Restasis®. The transaction also expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

**Licenses and Asset Acquisitions**

*Mimetogen*

On November 4, 2015, the Company entered into an exclusive licensing agreement with Mimetogen Pharmaceuticals ("Mimetogen"), a clinical stage biotechnology company, to develop and commercialize tavilermide (MIM-D3), a topical formulation of a novel small molecule TrkA agonist for the treatment of dry eye disease, in exchange for an upfront payment of $50.0 million to Mimetogen, which is included as a component of research and development ("R&D") expenses in the year ended December 31, 2015. Mimetogen will be entitled to receive potential milestones based on achieving regulatory approval and predefined labeling of the product.  In addition, Mimetogen is entitled to receive one-time annual sales based milestone payments based on multiple pre-defined annual net sales thresholds which may or may not be achieved, and tiered royalties based on net sales to third parties of the licensed products (the "Mimetogen Transaction").  The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the transaction did not qualify as a business.

*Almirall*

On October 27, 2015, the Company and Ironwood Pharmaceuticals, Inc. announced that Allergan has acquired rights to Constella® (linaclotide) in the European Union, Switzerland, Turkey and the Commonwealth of Independent States from Almirall, S.A. and has also reacquired rights to Linzess® (linaclotide) in Mexico from Almirall for €60.0 million. The consideration was accounted for as an asset acquisition and included as a component of intangible assets. The Company concluded based on the lack of acquired employees and the lack of certain other inputs and processes that the transaction did not qualify as a business.

*Naurex*

On August 28, 2015, the Company acquired certain products in early stage development of Naurex, Inc. ("Naurex") in an all-cash transaction of $571.7 million (the "Naurex Transaction"), plus future contingent payments up to $1,150.0 million, which was accounted for as an asset acquisition.  The Company recognized the upfront consideration of $571.7 million as a component of R&D expenses in the year ended December 31, 2015.  The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the transaction did not qualify as a business. The Naurex Transaction expands our pipeline with Naurex's two leading product candidates GLYX-13 and NRX-1074, two compounds that utilize NMDA modulation as a potential new approach to the treatment of Major Depressive Disorder ("MDD"), a disease that can lead to suicidality among the most severe patients.

*Migraine License*

On August 17, 2015, the Company entered into an agreement with Merck & Co. ("Merck") under which the Company acquired the exclusive worldwide rights to Merck's early development stage investigational small molecule oral calcitonin gene-related peptide receptor antagonists, which are being developed for the treatment and prevention of migraines (the "Merck Transaction"). The transaction is being accounted for as an asset acquisition. The Company acquired these rights for an upfront charge of $250.0 million which was recognized as a component of R&D expenses in the year ended December 31, 2015.  The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the transaction did not qualify as a business.  The Company paid $125.0 million in the year ended December 31, 2015 and the remaining $125.0 million is payable on April 30, 2016.  Additionally, Merck is owed contingent payments based on commercial and development milestones of up to $965.0 million as well as royalties.

**Divestitures**

***Respiratory Business***

As part of the Forest Acquisition (defined below), we acquired certain assets that comprised Legacy Forest's branded respiratory business in the U.S. and Canada (the "Respiratory Business"). During the year ended December 31, 2014, we held for sale respiratory assets of $734.0 million, including allocated goodwill to this unit of $309.1 million. On March 2, 2015, the Company sold the Respiratory Business to AstraZeneca plc ("AstraZeneca") for consideration of $600.0 million upon closing, additional funds to be received for the sale of certain of our inventory to AstraZeneca and low single-digit royalties above a certain revenue threshold. AstraZeneca also paid Allergan an additional $100.0 million and Allergan has agreed to a number of contractual consents and approvals, including certain amendments to the ongoing collaboration agreements between AstraZeneca and Allergan (the "Respiratory Sale").  As a result of the final terms of the agreement, in the year ended December 31, 2015, the Company recognized an incremental charge in cost of sales (including the acquisition accounting fair value mark-up of inventory) relating to inventory that will not be sold to AstraZeneca of $35.3 million. The Company recognized a loss in other (expense) income, net for the sale of the business of $5.3 million in the year ended December 31, 2015.

6

### Pharmatech

As part of the Forest Acquisition, the Company acquired certain manufacturing plants and contract manufacturing agreements within the business known as Aptalis Pharmaceutical Technologies ("Pharmatech"). In accordance with acquisition accounting, the assets were fair valued on July 1, 2014 as assets held in use, including market participant synergies anticipated under the concept of "highest and best use." During the fourth quarter of 2014, the decision was made to hold these assets for sale as one complete unit, without integrating the unit and realizing anticipated synergies. During the year ended December 31, 2014, the Company recognized an impairment on assets held for sale of $189.9 million (the "Pharmatech Transaction") which included a portion of goodwill allocated to this business unit. In the year ended 2015, the Company completed the divestiture of the Pharmatech business and there was no material impact to the Company's results of operations.

### 2014 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2014.

### Acquisitions

### Durata Therapeutics

On November 17, 2014, we completed our tender offer to purchase all of the outstanding shares of Durata Therapeutics, Inc. ("Durata"), an innovative pharmaceutical company focused on the development and commercialization of novel therapeutics for patients with infectious diseases and acute illnesses (the "Durata Acquisition"). Allergan purchased all outstanding shares of Durata, which were valued at approximately $724.5 million, including the assumption of debt, as well as one contingent value right ("CVR") per share, entitling the holder to receive additional cash payments of up to $5.00 per CVR if certain regulatory or commercial milestones related to Durata's lead product Dalvance® are achieved. The CVR had an acquisition date fair value of $49.0 million. We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date. On March 2, 2015, the Company announced that the European Commission has granted Allergan's subsidiary Durata Therapeutics International B.V., marketing authorization for Xydalba™ (dalbavancin) for the treatment of acute bacterial skin and skin structure infections (ABSSSI) in adults. The approval triggered the first CVR payment. The difference between the fair value of the CVR on the date of acquisition of $24.5 million and the payment made of $30.9 million, or $6.4 million, was recorded as an operating expense in the year ended December 31, 2015. In January 2016, the Company received approval from the FDA for an expanded label which will include a single dose of Dalvance®, which triggers a second CVR payment in the year ending December 31, 2016.

### Furiex

On July 2, 2014, the Company acquired Furiex Pharmaceuticals, Inc. ("Furiex") in an all-cash transaction (the "Furiex Acquisition") valued at $1,156.2 million (including the assumption of debt) and up to approximately $360.0 million in a CVR payable based on which controlled substance schedule designation that eluxadoline, Furiex's lead product, receive following approval, which had an acquisition accounting fair value of $88.0 million on the date of acquisition (included in the value of $1,156.2 million). In the second quarter of 2015, the Company received approval from the FDA of the eluxadoline product, Viberzi®. Viberzi® is a first-in-class, locally-acting mu opioid receptor agonist and delta opioid receptor antagonist for treating symptoms of diarrhea-predominant irritable bowel syndrome (IBS-d), a condition that affects approximately 28 million patients in the United States and Europe. In connection with the close of the Furiex Acquisition, the Company further announced that it closed the transaction related to the sale of Furiex's royalties on Alogliptin and Priligy® to Royalty Pharma for $408.6 million in cash consideration.

### Contingent Consideration

In the year ended December 31, 2015, the Company received a schedule IV ("C-IV") designation from the Drug Enforcement Agency ("DEA") for Viberzi® and recognized an expense of $29.8 million as a component of R&D expense.  This expense represents the difference between the final CVR payment amount of $118.5 million, or $10 for each CVR outstanding, versus the probability-weighted CVR fair value initially established in acquisition accounting, adjusted for accretion. This amount was paid as of December 31, 2015.

### Forest Laboratories

On July 1, 2014, the Company acquired Forest Laboratories, Inc. ("Legacy Forest") for $30.9 billion including outstanding indebtedness assumed of $3.3 billion, equity consideration of $20.6 billion, which includes outstanding equity awards, and cash consideration of $7.1 billion (the "Forest Acquisition"). Under the terms of the transaction, Legacy Forest shareholders received 89.8 million Allergan plc (formerly Actavis plc) ordinary shares, 6.1 million Allergan plc non-qualified stock options and 1.1 million

7

Allergan plc share units. Legacy Forest was a leading, fully integrated, specialty pharmaceutical company largely focused on the United States market. Legacy Forest marketed a portfolio of branded drug products and developed new medicines to treat patients suffering from diseases principally in the following therapeutic areas: central nervous system, cardiovascular, gastrointestinal, respiratory, anti-infective, and cystic fibrosis.

### Silom Medical Company

On April 1, 2014, the Company acquired Silom Medical Company ("Silom"), a privately held generic pharmaceutical company focused on developing and marketing therapies in Thailand, for consideration of approximately $103.0 million in cash (the "Silom Acquisition"). The Silom Acquisition expanded the Company's position in the Thai generic pharmaceutical market, with leading positions in the ophthalmic and respiratory therapeutic categories and a strong cardiovascular franchise. We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date. The assets and liabilities acquired, as well as the results of operations for the acquired Silom business are part of the assets being divested in the Teva Transaction and are included as a component of income from discontinued operations. In addition the acquired financial position is included in assets and liabilities held for sale.

### Divestitures

#### Corona Facility

During the year ended December 31, 2014, we held for sale assets in our Corona, California manufacturing facility. As a result, the Company recognized an impairment charge as a component of discontinued operations of $20.0 million in the year ended December 31, 2014, including a write-off of property, plant and equipment, net, due to the integration of Warner Chilcott of $5.8 million. The Company completed the sale of these assets during the year ended December 31, 2015 with no material impact to the Company's results of operations.

### 2013 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2013.

### Acquisitions

#### Warner Chilcott

On October 1, 2013, the Company acquired Warner Chilcott plc ("Warner Chilcott") in a stock for stock transaction for a value, including the assumption of debt, of $9.2 billion (the "Warner Chilcott Acquisition"). Warner Chilcott was a leading specialty pharmaceutical company focused on the women's healthcare, gastroenterology, urology and dermatology segments of the branded pharmaceuticals market, primarily in North America.

#### Medicines360

On June 10, 2013, we entered into an exclusive license agreement with Medicines360 to market, sell and distribute Medicines360 LNG20 intrauterine device ("LNG20") in the U.S. and in Canada for a payment of approximately $52.3 million. According to the terms of the agreement, we are also required to pay Medicines360 certain regulatory and sales based milestone payments totaling up to nearly $125.0 million plus royalties. Medicines360 retained the rights to market the product in the U.S. public sector, including family planning clinics that provide services to low-income women. LNG20 is currently marketed as Liletta[8] and was originally developed by Uteron Pharma Operations SPRL in Belgium (now a subsidiary of the Company). We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date.

#### Acquisition of Uteron Pharma, S.A.

On January 23, 2013, the Company completed the acquisition of Uteron Pharma, S.A. for approximately $142.0 million in cash, plus assumption of debt and other liabilities of $7.7 million and up to $155.0 million in potential future milestone payments (the "Uteron Acquisition"). The acquisition expanded the Company's specialty brand pipeline of women's health products including two potential near term commercial opportunities in contraception and infertility, and one oral contraceptive project projected to launch by 2018 at the time of the acquisition. Several additional products that were then in earlier stages of development were also acquired in the Uteron Acquisition. We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date.

At June 30, 2014, after an identified triggering event, the acquired in-process research and development ("IPR&D") intangible asset related to Estelle, a novel natural estrogen-based 28 day cycle oral contraceptive for the prevention of pregnancy, of $13.1 million was deemed to be fully impaired. Consequently, the $22.8 million contingent liability related to Estelle was written off, resulting in a net gain of $9.7 million as a component of R&D expense. At June 30, 2014, after an identified triggering event, the acquired IPR&D intangible asset related to Colvir, a treatment of premalignant Human Papilloma Virus (HPV) lesions of the uterine, of $2.0 million was deemed to be fully impaired. Consequently the $1.5 million contingent liability was also written off, resulting in a net loss of $0.5 million.

### Divestitures

#### Western European Assets

During the year ended December 31, 2013, we held for sale our then current generic commercial infrastructure in France, Italy, Spain, Portugal, Belgium, Germany and the Netherlands, including products, marketing authorizations and dossier license rights. On January 17, 2014, we announced our intention to enter into an agreement with Aurobindo Pharma Limited ("Aurobindo") to sell these businesses. On April 1, 2014, the Company completed the sale of the assets in Western Europe.

In connection with the sale of our Western European assets, we entered into a supply agreement whereby the Company will supply product to Aurobindo over a period of five years. In the second quarter of 2014, we allocated the fair value of the consideration for the sale of the Western European assets of $65.0 million to each element of the agreement, including the supply of product.

As a result of the transactions, we recognized as a component of discontinued operations, income / (loss) on the net assets held for sale of $3.4 million and $(34.3) million in the years ended December 31, 2014 and 2013, respectively. In addition, the Company recognized a loss on the disposal of the assets in the year ended December 31, 2014 of $20.9 million and deferred revenue of $10.1 million to be recognized over the course of the supply agreement as a component of discontinued operations.

### Business Description

Prescription pharmaceutical products in the United States generally are marketed as either generic or brand pharmaceuticals. Results in continuing operations in the United States are primarily due to brand pharmaceuticals. Branded pharmaceutical products are marketed under brand names through programs that are designed to generate physician and consumer loyalty. The Company markets aesthetic products in the U.S. and internationally through programs designed to generate physician loyalty. Through our Anda Distribution segment, we distribute pharmaceutical products that have been commercialized by us and others, to independent pharmacies, pharmacy chains, pharmacy buying groups and physicians' offices.

Generic pharmaceutical products, which we account for in discontinued operations, are bioequivalents of, or in cases of protein-based biologic therapies, biosimilar to, their respective brand products and provide a cost-efficient alternative to branded products.

As a result of the differences between the types of products we market and/or distribute and the methods by which we distribute these products, we operate and manage our business in four distinct operating segments: US Brands, US Medical Aesthetics, International Brands and Anda Distribution. The operating segments are organized as follows:

- The US Brands segment includes sales and expenses relating to branded products within the United States, including certain Botox® therapies.

- The US Medical Aesthetics segment includes sales and expenses relating to aesthetics and dermatology products within the United States, including certain Botox® therapies.

- The International Brands segment includes sales and expenses relating to products sold outside of the United States.

- The Anda Distribution segment includes distribution of generic and branded pharmaceutical products manufactured by third parties, as well as by the Company, primarily to independent pharmacies, pharmacy chains, pharmacy buying groups and physicians' offices. The Anda Distribution segment operating results exclude sales of products developed, acquired, or licensed by the US Brands, US Medical Aesthetics and International Brands segments. As the generics business is now reported within discontinued operations, the Anda Distribution segment includes revenues and expenses related to Company manufactured generics products sold through Anda Distribution.

### Business Strategy

We apply three key strategies to achieve growth for our US Brands, US Medical Aesthetics and International Brands businesses: (i) internal development of differentiated and high-demand products, (ii) establishment of strategic alliances and collaborations and

(iii) acquisition of products and companies that complement our current business. Our Anda Distribution business distributes products for approximately 340 suppliers and is focused on providing next-day delivery and responsive service to its customers. Our Anda Distribution business distributes a number of branded products in the United States. Growth in our Anda Distribution business will be largely dependent upon customer expansion, FDA approval of new generic products in the U.S. and expansion of our base of suppliers.

Based upon business conditions, our financial strength and other factors, we regularly reexamine our business strategies and may change them at any time. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business" in this document.

*US Brands*

Newly developed pharmaceutical products normally are patented or have market exclusivity and, as a result, are generally offered by a single provider when first introduced to the market. We market a number of branded products to physicians, hospitals, and other markets that we serve. These patented and off-patent trademarked products are brand pharmaceutical products. In March 2015, as a result of the Allergan Acquisition, we began promoting a number of additional branded products including, but not limited to Alphagan®/Combigan®, Botox®, Lumigan®/Ganfort® and Restasis®. In July 2014, as a result of the Forest Acquisition, we began promoting a number of additional branded products including, but not limited to Bystolic®, Canasa®, Carafate®, Fetzima®, Linzess®, Namenda®, Namenda XR®, Saphris®, Teflaro® and Viibryd®. In October 2013, as a result of the Warner Chilcott Acquisition, we began promoting a number of brand products, including, but not limited to, Actonel®, Asacol® HD, Atelvia®, Delzicol®, Estrace® Cream, Enablex®, Lo Loestrin® Fe and Minastrin® 24 Fe.

Net revenues in our US Brands segment were $9,134.3 million, $4,511.2 million, and $1,001.2 million, or approximately 60.6%, 66.9% and 38.5% of our total net revenues in the years ended December 31, 2015, 2014, and 2013, respectively.

*US Brands Strategy*

We market our brand products through our active sales professionals in the United States. Our sales and marketing efforts focus on general and specialty physicians who specialize in the diagnosis and treatment of particular medical conditions. Each group offers products to satisfy the unique needs of these physicians. We believe this focused sales and marketing approach enables us to foster close professional relationships with specialty physicians, as well as cover the primary care physicians who also prescribe in selected therapeutic areas. We believe that the current structure of sales professionals is very adaptable to the additional products we plan to add to our brand portfolio.

We have maintained an ongoing effort to enhance efficiencies and reduce costs in our manufacturing operations.

*US Brands Product Portfolio*

As of December 31, 2015, our portfolio of branded pharmaceutical products within the US Brands segment includes the following key promoted products:

| Product | Active Ingredient | Therapeutic Classification |
|---|---|---|
| Alphagan®/Combigan® | Brimonidine tartrate | Selective alpha₂ agonist |
| Asacol®/Delzicol® | Mesalamine | Ulcerative colitis |
| Botox® | Onabotulimtoxin | Acetylcholine release inhibitor |
| Bystolic® | Nebivolol | Hypertension |
| Carafate®/Sulcrate® | Sucralfate | Ulcerative colitis |
| Dalvance® | Dalbavancin | Acute bacterial skin infections |
| Estrace® Cream | Estradiol | Hormone therapy |
| Linzess®/Constella® | Linaclotide | Irritable bowel syndrome |
| Lo Loestrin® Fe | Ethinyl estradiol and norethindrone | Oral contraceptive |
| Lumigan®/Ganfort® | Bimatoprost | Prostaglandin analogue |
| Minastrin® 24 Fe | Ethinyl estradiol and norethindrone | Oral contraceptive |
| Namenda XR® | Memantine HCl | Dementia |
| Namzaric® | Memantine HCl | Dementia |
| Restasis® | Cyclosporine | Topical immunomodulator |
| Saphris® | Asenapine | Schizophrenia, bipolar mania |
| Teflaro® | Ceftaroline fosamil | Acute bacterial skin infections, community-acquired bacterial pneumonia |
| Viberzi® | Eluxadoline | Irritable bowel syndrome |
| Viibryd®/Fetzima® | Vilazodone HCl/Levomilnacipran | Major depressive disorders |
| Zenpep® | Pancrelipase | Exocrine pancreatic insufficiency |

*US Medical Aesthetics*

Our US Medical Aesthetics business offers a wide range of silicone gel and saline breast implant options as well as a comprehensive, science-based facial aesthetic portfolio. Net revenues in our US Medical Aesthetics segment were $1,513.9 million, or approximately 10.0% of our total net revenues in the year ended December 31, 2015. The US Medical Aesthetics segment is primarily attributable to the Allergan Acquisition. As such, there are no comparable sales for the years ended December 31, 2014 and 2013.

*US Medical Aesthetics Strategy*

Our US Medical Aesthetics business is focused on maintaining a leading position within the U.S. market. We market our products through our active sales professionals in the United States. Our sales and marketing efforts focus on specialty physicians and surgeons who specialize in aesthetics. We believe this focused sales and marketing approach enables us to foster close professional relationships with specialty physicians.

*US Medical Aesthetics Product Portfolio*

As of December 31, 2015, our portfolio of products within the US Medical Aesthetics segment includes the following key promoted products:

| Product | Active Ingredient | Therapeutic Classification |
|---|---|---|
| Aczone® | Dapzone | Acne |
| Botox® | Botulinum toxin | Musculoskeletal agent |
| Breast Implants | Silicone | Reconstructive plastic surgery |
| Juvederm®/Voluma® | Hyaluronic acid | Nasolabial folds |

*International Brands*

Our International Brands segment offers a wide array of branded and aesthetics products outside of the United States, primarily attributable to products acquired in the Allergan Acquisition. Net revenues in our International Brands segment were $2,187.3 million, $203.5 million, and $40.2 million, or approximately 14.5%, 3.0% and 1.5% of our total net revenues in the years ended December 31, 2015, 2014, and 2013, respectively.

*International Brands Strategy*

Our International Brands business is focused on maintaining a leading position by offering a consistent and reliable supply of quality brand and aesthetic products. We have maintained an ongoing effort to enhance efficiencies and reduce costs in our manufacturing operations.

*International Brands Product Portfolio*

Our International Brands segment offers a wide array of branded and aesthetics products outside of the United States, primarily attributable to products acquired in the Allergan Acquisition.

As of December 31, 2015, our portfolio of products within the International Brands segment includes the following key promoted products:

| Product | Active Ingredient | Therapeutic Classification |
|---|---|---|
| Alphagan®/Combigan® | Brimonidine tartrate | Selective alpha$_2$ agonist |
| Breast Implants | Silicone | Reconstructive plastic surgery |
| Botox® | Botulinum toxin | Musculoskeletal agent |
| Juvederm®/Voluma® | Hyaluronic acid | Nasolabial folds |
| Lumigan®/Ganfort® | Bimatoprost | Prostaglandin analogue |

**Anda Distribution Segment**

Our Anda Distribution segment distributes brand pharmaceutical products manufactured by third parties, as well as by Allergan, primarily to independent pharmacies, pharmacy chains, pharmacy buying groups and physicians' offices. Sales are principally generated through our national accounts relationships, an in-house telemarketing staff and through internally developed ordering systems. Additionally, we sell to members of buying groups, which are independent pharmacies that join together to enhance their buying power. We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 13,200 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities. While we purchase most of the SKUs in our Anda Distribution operations from third party manufacturers, we also distribute our own products and our collaborative partners' products.

Revenue growth in our distribution operations will in part be dependent on the launch of new products, offset by the overall level of net price and unit declines on existing distributed products, and will be subject to changes in market share.

**Research and Development**

We devote significant resources to the R&D of brand products, biosimilars and proprietary drug delivery technologies. R&D activities are expensed as incurred and consist of self-funded R&D costs, the costs associated with work performed under collaborative R&D agreements, regulatory fees, and license milestone payments, if any. R&D expenses include the following key components ($ in millions):

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | | **2014** | | **2013** | |
| Brand expenditures | $ | 2,353.7 | $ | 605.7 | $ | 191.3 |
| Medical expenditures | | 4.8 | | - | | - |
| **Total R&D** | **$** | **2,358.5** | **$** | **605.7** | **$** | **191.3** |

Our R&D strategy focuses on the following product development areas:

- the application of proprietary drug-delivery technology for new product development in specialty areas;

- the acquisition of mid-to-late development-stage brand drugs and biosimilars; and

- the development of sustained-release, semi-solid, liquid, oral transmucosal, transdermal, gel, injectable, and other drug delivery technologies and the application of these technologies to proprietary drug forms.

As of December 31, 2015, we conducted the majority of our branded drug delivery R&D activities in Irvine, California. We are presently developing a number of products through a combination of internal and collaborative programs.

Included within discontinued operations is the impact of R&D expenditures for our generic product portfolio.  As of December 31, 2015, we had more than 200 ANDAs on file in the United States relating to our generic portfolio. Refer to the "Government Regulation and Regulatory Matters" section below for a description of our process for obtaining FDA approval for our products.

As of December 31, 2015, we are developing a number of branded products, some of which utilize novel drug delivery systems, through a combination of internal and collaborative programs including the following:

| Product | Therapeutic Area | Indication | Expected Launch Year | Phase |
|---|---|---|---|---|
| Restasis MDPF......... | Eye Care | Dry Eye | 2016 | Registration |
| XEN45 .................... | Eye Care | Glaucoma | 2017 | III |
| Sarecycline.............. | Dermatology | Severe Acne | 2018 | III |
| Esmya...................... | Woman's healthcare | Uterine Fibroids | 2018 | III |
| Bimatoprost SR ........ | Eye Care | Glaucoma | 2018 | III |
| Tavilermide .............. | Eye Care | Dry Eye | 2019 | III |
| Relamorelin**.......... | Gastrointestinal | Gastroparesis | 2020 | II |
| Ubrogepant............... | Neurology | Acute Migraine | 2020 | II |
| Abicipar .................. | Eye Care | Age Related Macular Degeneration | 2020 | II |
| Rapastinel................. | Psychiatry | Depression | 2021 | II |

**    As part of our agreement with Rhythm Health, Inc.

We also have a number of products in development as part of our life-cycle management strategy for our existing product portfolio.

## Financial Information About Segments and Geographic Areas

The Company evaluates segment performance based on segment contribution. Segment contribution represents net revenues less cost of sales (excluding amortization and impairment of acquired intangibles including product rights), selling and marketing expenses, and select general and administrative expenses. The Company does not evaluate the following items at the segment level:

- Revenues and operating expenses within cost of sales (excluding amortization and impairment of acquired intangibles including product rights), selling and marketing expenses, and general and administrative expenses that result from the impact of corporate initiatives. Corporate initiatives primarily include integration, restructuring, acquisition and other shared costs.

- General and administrative expenses that result from shared infrastructure, including certain expenses located within the United States.

- Total assets including capital expenditures.

- Other select revenues and operating expenses including R&D expenses, amortization, goodwill impairments, IPR&D impairments and asset sales and impairments, net as not all such information has been accounted for at the segment level, or such information has not been used by all segments.

**Customers**

In our US Brands, US Medical Aesthetics and International Brands operations, we sell our brand pharmaceutical products primarily to drug wholesalers, retailers and distributors, including national retail drug and food store chains, hospitals, clinics, mail order retailers, government agencies and managed healthcare providers such as health maintenance organizations and other institutions. In our Anda Distribution business, we distribute brand pharmaceutical products to independent pharmacies, alternate care providers (hospitals, nursing homes and mail order pharmacies), pharmacy chains, physicians' offices and buying groups.

Sales to certain of our customers accounted for 10% or more of our annual revenues during the past three years. The following table illustrates customers and the respective percentage of revenues which they comprised in each of the last three years:

| Customer | 2015 | 2014 | 2013 |
|---|---|---|---|
| McKesson Corporation | 24% | 22% | 11% |
| Cardinal Health, Inc. | 18% | 16% | 10% |
| AmerisourceBergen Corporation | 17% | 17% | 6% |

Our significant customers comprise a large part of the distribution network for pharmaceutical products in North America. As a result, a small number of large wholesaler distributors and large drug store chains control a significant share of the market. Our Anda Distribution business competes directly with our large wholesaler customers with respect to the distribution of generic products.

The loss of any of these customers could have a material adverse effect on our business, results of operations, financial condition and cash flows.

**Competition**

The pharmaceutical industry is highly competitive. In our US Brands, US Medical Aesthetics and International Brands businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information. It is possible that developments by others will make our products or technologies noncompetitive or obsolete.

Competing in the brand product business requires us to identify and bring to market new products embodying technological innovations. Successful marketing of brand products depends primarily on the ability to communicate their effectiveness, safety and value to healthcare professionals in private practice, group practices and receive formulary status from managed care organizations. We anticipate that our brand product offerings will support our existing areas of therapeutic focus. Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities. Our competitors in brand products include major brand name manufacturers of pharmaceuticals. Many of our competitors have been in business for a longer period of time, have a greater number of products on the market and have greater financial and other resources than we do. If we directly compete with them for certain contracted business, such as the Pharmacy Benefit Manager business, or for the same markets and/or products, their financial strength could prevent us from capturing a meaningful share of those markets.

In our Anda Distribution segment, we compete with a number of large wholesalers and other distributors of pharmaceuticals, including McKesson Corporation, AmerisourceBergen Corporation and Cardinal Health, Inc., which distribute both branded and generic pharmaceutical products to their customers. These same companies are significant customers of our US Brands and US Medical Aesthetics businesses. As generic products generally have higher gross margins than branded products for a pharmaceutical distribution business, each of the large wholesalers, on an increasing basis, are offering pricing incentives on branded products if the customers purchase a majority of their generic pharmaceutical products from the primary wholesaler. As we do not offer as broad a portfolio of branded products to our customers as some of our competitors, we are at times competitively disadvantaged. Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Our Anda Distribution operations compete directly with significant customers of our generic and branded businesses" in this document.

As a result of the Teva Transaction, the Company's global generics business is classified as discontinued operations. Our discontinued operations actively competes in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents and regulatory exclusivity for brand name products expire or are successfully challenged, the first off-patent manufacturer to receive

14

regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. We face competition from other generic drug manufacturers and from brand name companies in the generic market. Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics".

**Manufacturing, Suppliers and Materials**

As of December 31, 2015, we manufactured many of our own finished products at our plants including major manufacturing sites in:

| Location | State / Country |
| --- | --- |
| Guarulhos | Brazil |
| Dupnitsa* | Bulgaria |
| San Jose | California |
| San Jose | Costa Rica |
| Davie* | Florida |
| Pringy | France |
| Weiderstadt | Germany |
| Athens* | Greece |
| Hafnarfjordur* | Iceland |
| Ambernath* | India |
| Goa* | India |
| Dublin | Ireland |
| Westport | Ireland |
| Nerviano* | Italy |
| Birzebbugia* | Malta |
| Zetjun* | Malta |
| Elizabeth* | New Jersey |
| Coleraine* | Northern Ireland |
| Cincinnati | Ohio |
| Fajardo* | Puerto Rico |
| Manati* | Puerto Rico |
| Waco | Texas |
| Barnstable* | UK |
| Salt Lake City* | Utah |

\*    Facilities are included in the assets being divested as part of the Teva Transaction.

We have implemented several cost reduction initiatives, which included the transfer of several solid dosage products from our Corona, California facility to other facilities throughout our manufacturing network and the ongoing implementation of an operational excellence initiative at certain of our manufacturing facilities. Our manufacturing facilities also include additional plants supporting local markets and alternative dosage forms.

We have development and manufacturing capabilities for raw material and active pharmaceutical ingredients ("API") and intermediate ingredients to support our R&D internal product development efforts in our San Jose, California, Coleraine, Northern Ireland and Ambernath, India facilities. Our Ambernath, India facility also manufactures API for third parties.

Our manufacturing operations are subject to extensive regulatory oversight and could be interrupted at any time. Refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this document.

In addition, we are dependent on third parties for the supply of the raw materials necessary to develop and manufacture our products, including the API and inactive pharmaceutical ingredients used in many of our products. We are required to identify the supplier(s) of all the raw materials for our products in the drug applications that we file with the FDA. If raw materials for a particular product become unavailable from an approved supplier specified in a drug application, we would be required to qualify a substitute supplier with the FDA, which would likely interrupt manufacturing of the affected product. To the extent practicable, we attempt to identify more than one supplier in each drug application. However, some raw materials are available only from a single source and, in many of our drug applications, only one supplier of raw materials has been identified, even in instances where multiple sources exist.

Furthermore, we obtain a significant portion of our raw materials from foreign suppliers. Arrangements with international raw material suppliers are subject to, among other things, FDA regulation, customs clearance, various import duties, foreign currency risk and other government clearances. Acts of governments outside the U.S. may affect the price or availability of raw materials needed for the development or manufacture of our products. In addition, any changes in patent laws in jurisdictions outside the U.S. may make it increasingly difficult to obtain raw materials for R&D prior to the expiration of the applicable U.S. or foreign patents. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — If we are unable to obtain sufficient supplies from key manufacturing sites or suppliers that in some cases may be the only source of finished products or raw materials, our ability to deliver our products to the market may be impeded" in this document.  Refer to "ITEM 1A — RISK FACTORS — Risks Relating to Investing in the Pharmaceutical Industry — The supply of APIs into Europe may be negatively affected by recent regulations promulgated by the European Union" in this document.

## Patents and Proprietary Rights

We believe patent protection of our proprietary products is important to our products. Our success with our branded products will depend, in part, on our ability to obtain, and successfully defend if challenged, patent or other proprietary protection for such products. We currently have a number of U.S. and foreign patents issued or pending. However, the issuance of a patent is not conclusive as to its validity or as to the enforceable scope of the claims of the patent. Accordingly, our patents may not prevent other companies from developing similar or functionally equivalent products or from successfully challenging the validity of our patents. If our patent applications are not approved or, even if approved, if such patents are circumvented or not upheld in a court of law, or administrative proceedings, including oppositions, re-examinations or inter partes review ("IPR"), our ability to competitively market our patented products and technologies may be significantly reduced. Also, such patents may or may not provide competitive advantages for their respective products or they may be challenged or circumvented by competitors, in which case our ability to commercially market these products may be diminished. From time to time, we may need to obtain licenses to patents and other proprietary rights held by third parties to develop, manufacture and market our products.  If we are unable to timely obtain these licenses on commercially reasonable terms, our ability to commercially market such products may be inhibited or prevented. Patents covering our Namenda® IR, Estrace® Cream, Actonel® (certain indications), Androderm®, Femhrt®, INFed® and Carafate® products have expired and we have no further patent protection on these products.

We also rely on trade secrets and proprietary know-how that we seek to protect, in part, through confidentiality agreements with our partners, customers, employees and consultants. It is possible that these agreements will be breached or will not be enforceable in every instance, and we will not have adequate remedies for any such breach. It is also possible that our trade secrets will otherwise become known or independently developed by competitors.

We may find it necessary to initiate litigation to enforce our patent rights, to protect our trade secrets or know-how or to determine the scope and validity of the proprietary rights of others. Litigation concerning patents, trademarks, copyrights and proprietary technologies can often be protracted and expensive and, as with litigation generally, the outcome is inherently uncertain.

Pharmaceutical companies with brand products are suing companies that produce off-patent forms of their brand name products for alleged patent infringement or other violations of intellectual property rights which may delay or prevent the entry of such a generic product into the market. For instance, when our global generics business files an ANDA in the U.S. seeking approval of a generic equivalent to a branded drug, we may certify under the Drug Price Competition and Patent Restoration Act of 1984 (the "Hatch-Waxman Act") to the FDA that we do not intend to market our generic drug until any patent listed by the FDA as covering the brand drug has expired, in which case, the ANDA will be approved by the FDA no earlier than the expiration or final finding of invalidity of such patent(s). On the other hand, we could certify that we believe the patent or patents listed as covering the brand drug are invalid and/or will not be infringed by the manufacture, sale or use of our generic form of the brand drug. In that case, we are required to notify the brand product holder or the patent holder that such patent is invalid or is not infringed. If the patent holder sues us for patent infringement within 45 days from receipt of the notice, the FDA is then prevented from approving our ANDA for 30 months after receipt of the notice unless the lawsuit is resolved in our favor in less time or a shorter period is deemed appropriate by a court.

Litigation alleging infringement of patents, copyrights or other intellectual property rights may be costly and time consuming. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Third parties may claim that we infringe their proprietary rights and may prevent us from manufacturing and selling some of our products" and *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this document.

## Government Regulation and Regulatory Matters

The following discussion focuses on key markets to the Company's overall business.

### *United States*

All pharmaceutical manufacturers, including Allergan, are subject to extensive, complex and evolving regulation by the federal government, principally the FDA, and to a lesser extent, by the U.S. Drug Enforcement Administration ("DEA"), Occupational Safety and Health Administration and state government agencies, as well as by various regulatory agencies in foreign countries where our products or product candidates are being manufactured and/or marketed. The Federal Food, Drug and Cosmetic Act, the Controlled Substances Act and other federal statutes and regulations govern or influence the testing, manufacturing, packing, labeling, storing, record keeping, safety, approval, advertising, promotion, sale and distribution of our products. In our international markets, the approval, manufacture and sale of pharmaceutical products is similar to the United States with some variations dependent upon local market dynamics.

FDA approval is required before any dosage form of any new drug, including an off-patent equivalent of a previously approved drug, can be marketed. The process for obtaining governmental approval to manufacture and market pharmaceutical products is rigorous, time-consuming and costly, and the extent to which it may be affected by legislative and regulatory developments cannot be predicted. We are dependent on receiving FDA and other governmental approvals prior to manufacturing, marketing and shipping new products. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — If we are unable to successfully develop or commercialize new products, our operating results will suffer" and "— Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development, manufacturing and distribution capabilities" in this document.

All applications for FDA approval must contain information relating to product formulation, raw material suppliers, stability, manufacturing processes, packaging, labeling and quality control. There are generally two types of applications for FDA approval that would be applicable to our new products:

- *NDA.* We file a New Drug Application ("NDA") when we seek approval for drugs with active ingredients and/or with dosage strengths, dosage forms, delivery systems or pharmacokinetic profiles that have not been previously approved by the FDA. Generally, NDAs are filed for newly developed brand products or for a new dosage form of previously approved drugs.

- *ANDA.* We file an ANDA when we seek approval for off-patent or generic equivalents of a previously approved drug.

For innovative or non-generic new drugs, an FDA-approved NDA is required before the drug may be marketed in the United States. The NDA must contain data to demonstrate that the drug is safe and effective for its intended uses and that it will be manufactured to appropriate quality standards. In order to demonstrate safety and effectiveness, an NDA generally must include or reference pre-clinical studies and clinical data from controlled trials in humans. For a new chemical entity, this generally means that lengthy, uncertain and rigorous pre-clinical and clinical testing must be conducted. For compounds that have a record of prior or current use, it may be possible to utilize existing data or medical literature and limited new testing to support an NDA. Any pre-clinical testing that we wish to rely upon for FDA action must comply with the FDA's good laboratory practice and other requirements. Clinical testing in human subjects must be conducted in accordance with the FDA's good clinical practice and other requirements. In order to initiate a clinical trial, the sponsor must submit an Investigational New Drug Application ("IND") to the FDA or meet one of the narrow exemptions that exist from the IND requirement.

The FDA can, and does, reject NDAs, require additional clinical trials, or grant approvals on a restricted basis only, even when product candidates performed well in clinical trials. In addition, the FDA may approve an NDA subject to post-approval studies or monitoring requirements, or require that other risk management measures be utilized in connection with the product. There are also requirements to conduct pediatric trials for all new NDAs and supplements to NDAs, unless a waiver or deferral applies.

Similarly, FDA approval of an ANDA is required before we may begin marketing an off-patent or generic equivalent of a drug that has been approved under an NDA, or a previously unapproved dosage form of a drug that has been approved under an NDA. The ANDA approval process generally differs from the NDA approval process in that it does not typically require new preclinical and clinical studies; instead, it relies on the clinical studies establishing safety and efficacy conducted for the previously approved NDA drug. The ANDA process, however, typically requires data to show that the ANDA drug is bioequivalent to the previously approved

drug. "Bioequivalence" compares the bioavailability of one drug product with another and, when established, indicates whether the rate and extent of absorption of a generic drug in the body are substantially equivalent to the previously approved drug. "Bioavailability" establishes the rate and extent of absorption, as determined by the time dependent concentrations of a drug product in the bloodstream or body needed to produce a therapeutic effect. The ANDA drug development and approval process generally takes three to four years, which is less time than the NDA drug development and approval process since the ANDA process does not require new clinical trials establishing the safety and efficacy of the drug product.

Supplemental NDAs or ANDAs are required for, among other things, approval to transfer certain products from one manufacturing site to another or to change an API supplier, and may be under review for a year or more. In addition, certain products may only be approved for transfer once new bioequivalency studies are conducted or other requirements are satisfied.

To obtain FDA approval of both NDAs and ANDAs, our manufacturing procedures and operations must conform to FDA quality system and control requirements generally referred to as current Good Manufacturing Practices ("cGMP"), as defined in Title 21 of the U.S. Code of Federal Regulations. These regulations encompass all aspects of the production process from receipt and qualification of components to distribution procedures for finished products. They are evolving standards; thus, we must continue to expend substantial time, money and effort in all production and quality control areas to maintain compliance. The evolving and complex nature of regulatory requirements, the broad authority and discretion of the FDA, and the generally high level of regulatory oversight results in the continuing possibility that we may be adversely affected by regulatory actions despite our efforts to maintain compliance with regulatory requirements.

We are subject to the periodic inspection of our facilities, procedures and operations and/or the testing of our products by the FDA, the DEA and other authorities, which conduct periodic inspections to assess compliance with applicable regulations. In addition, in connection with its review of our applications for new products, the FDA conducts pre-approval and post-approval reviews and plant inspections to determine whether our systems and processes comply with cGMP and other FDA regulations. Among other things, the FDA may withhold approval of NDAs, ANDAs or other product applications of a facility if deficiencies are found at that facility. Vendors that supply finished products or components to us that we use to manufacture, package and label products are subject to similar regulation and periodic inspections.

Following such inspections, the FDA may issue notices on Form 483 and Warning Letters that could cause us to modify certain activities identified during the inspection. A Form 483 notice is generally issued at the conclusion of an FDA inspection and lists conditions the FDA investigators believe may violate cGMP or other FDA regulations. FDA guidelines specify that a Warning Letter be issued only for violations of "regulatory significance" for which the failure to adequately and promptly achieve correction may be expected to result in an enforcement action.

Failure to comply with FDA and other governmental regulations can result in fines, unanticipated compliance expenditures, recall or seizure of products, total or partial suspension of production and/or distribution, suspension of the FDA's review of NDAs, ANDAs or other product application enforcement actions, injunctions and criminal prosecution. Under certain circumstances, the FDA also has the authority to revoke previously granted drug approvals. Although we have internal compliance programs, if these programs do not meet regulatory agency standards or if our compliance is deemed deficient in any significant way, it could have a material adverse effect on us. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development, manufacturing and distribution capabilities." in this document. The Generic Drug Enforcement Act of 1992 established penalties for wrongdoing in connection with the development or submission of an ANDA. Under this Act, the FDA has the authority to permanently or temporarily bar companies or individuals from submitting or assisting in the submission of an ANDA, and to temporarily deny approval to and suspend applications to market generic drugs. The FDA may also suspend the distribution of all drugs approved or developed in connection with certain wrongful conduct and/or withdraw approval of an ANDA and seek civil penalties. The FDA can also significantly delay the approval of any pending NDA, ANDA or other regulatory submissions under the Fraud, Untrue Statements of Material Facts, Bribery and Illegal Gratuities Policy Act.

U.S. government reimbursement programs include Medicare, Medicaid, TriCare, and State Pharmacy Assistance Programs established according to statute, government regulations and policy. Federal law requires that all pharmaceutical manufacturers, as a condition of having their products receive federal reimbursement under Medicaid, must pay rebates to state Medicaid programs on units of their pharmaceuticals that are dispensed to Medicaid beneficiaries. With enactment of the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act (collectively, the "ACA"), the required per-unit rebate for products marketed under ANDAs increased from 11% of the Average Manufacturer Price ("AMP") to 13%. Additionally, for products marketed under NDAs, the manufacturers rebate increased from 15.1% to 23.1% of the average manufacturer price, or the difference between the average manufacturer price and the lowest net sales price to a non-government customer during a specified period. In some states, supplemental rebates are required as a condition of including the manufacturer's drug on the state's Preferred Drug List.

18

The ACA also made substantial changes to reimbursement when seniors reach the Medicare Part D coverage gap "donut hole." By 2020, Medicare beneficiaries will pay 25% of drug costs when they reach the coverage threshold — the same percentage they were responsible for before they reached that threshold.

The Affordable Care Act prescribed that the coverage gap phase of the Medicare Part D benefit be closed such that by 2020, beneficiaries will pay co-insurance of 25% (or co-payment equivalents) of the cost of prescription drugs dispensed to them under their applicable Medicare Part D plans, until they reach the catastrophic phase of the Medicare Part D benefit. As such, the coverage gap or "donut hole" will be effectively closed beginning in the 2020 plan year. The cost of closing the donut hole is being borne in part by brand drug companies as well as Medicare Part D plan sponsors and the federal government. Beginning in 2011, brand drug manufacturers were required to provide a 50% discount on their drugs. Additionally, beginning in 2013, the government/Medicare Part D plan sponsors began providing additional subsidies for brand name drugs bought by seniors who enter the coverage gap. The government/sponsor share started at 2.5%, but will increase to 25% by 2020. At that point, the combined industry discounts and government subsidies will add up to 75% of brand-name drug costs. In addition, the federal government/Medicare Part D plan sponsors subsidize generic drug costs in the coverage gap. In 2015, subsidies on generic drugs were 35% and such subsidies will increase to 75% of generic drug costs in 2020 when the "donut hole" will be completely closed through these subsidies.

The Deficit Reduction Act of 2005 ("DRA") mandated a number of changes in the Medicaid program, including the use of AMP as the basis for reimbursement to pharmaceutical companies that dispense generic drugs under the Medicaid program. Three health care reform bills passed in 2010 significantly changed the definition of AMP, effective October 1, 2010. These legislative changes were part of the ACA and the FAA Air Transportation Modernization & Safety Improvement Act (the "Transportation Bill"). The impact of this legislation was that there were increases in Medicaid reimbursement to pharmacies for generics. These changes became effective on October 1, 2010.

On November 9, 2010, the Center for Medicare and Medicaid Services ("CMS") issued a final rule withdrawing and amending regulations that have governed the calculation of AMP and the establishment of federal upper limits since October 2007. The regulations were withdrawn to mandate AMP calculation under the revised drug rebate statute. The withdrawal required manufacturers to base October 2010 and subsequent months' AMPs on the statutory language until official guidance is issued.

In the absence of regulatory guidance governing the AMP calculation, CMS had instructed pharmaceutical manufacturers to base their AMP calculations on the definitions set forth in the statute, as amended by the ACA, the Health Care and Education Reconciliation Act, and the Transportation Bill. On January 27, 2012, CMS issued proposed rules on Medicaid pharmacy reimbursement using the AMP model. Allergan had adopted policies and procedures to ensure that we are calculating and reporting AMP in a manner that is consistent with the text and intent of the statute and the proposed rules. On January 21, 2016, CMS issued final rules on such reimbursement; the final rule will take effect in April 2016, with select portions taking effect April 1, 2017. Allergan is in the process of determining how the final rule will change these mechanisms in order to comply with the final rule and will timely implement any required changes.

In addition, in connection with the commercialization of our products, we have obtained authorization to receive reimbursement at varying levels for the cost of certain products and related treatments from government authorities and private health insurers and other organizations, such as Health Maintenance Organizations ("HMOs") and Managed Care Organizations ("MCOs").

Federal, state, local and foreign laws of general applicability, such as laws regulating working conditions, also govern us. In addition, we are subject, as are all manufacturers generally, to numerous and increasingly stringent federal, state and local environmental laws and regulations concerning, among other things, the generation, handling, storage, transportation, treatment and disposal of toxic and hazardous substances and the discharge of pollutants into the air and water. Environmental permits and controls are required for some of our operations, and these permits are subject to modification, renewal and revocation by the issuing authorities. Our environmental capital expenditures and costs for environmental compliance may increase in the future as a result of changes in environmental laws and regulations or increased manufacturing activities at any of our facilities. We could be adversely affected by any failure to comply with environmental laws, including the costs of undertaking a clean-up at a site to which our wastes were transported.

As part of the Medicare Prescription Drug and Modernization Act of 2003 ("MMA"), companies are required to file with the U.S. Federal Trade Commission ("FTC") and the Department of Justice certain types of agreements entered into between brand and generic pharmaceutical companies related to the manufacture, marketing and sale of generic versions of brand products. This requirement could affect the manner in which drug manufacturers resolve intellectual property litigation and other disputes with competitor pharmaceutical companies, and could result generally in an increase in private-party litigation against pharmaceutical companies. The impact of this requirement, and the potential private-party lawsuits associated with arrangements between brand name and generic drug manufacturers, is uncertain and could adversely affect our business. For example, in January 2009, the FTC and the State of California filed a lawsuit against us alleging that our settlement with Solvay related to our ANDA for a generic version of Androgel®

19

is unlawful. Beginning in February 2009, several private parties purporting to represent various classes of plaintiffs filed similar lawsuits. Those lawsuits, as well as additional suits challenging the validity of our settlements related to Asacol®, Namenda® and Loestrin® 24 and generic versions of Actos®, Cipro®, and Lidoderm®, remain pending.  Refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this document.

Additionally, we may in the future, and have in the past, received requests for information, sometimes in the form of civil investigative demands or subpoenas, from the FTC and the European Competition Commission, and are subject to ongoing FTC and European Competition Commission investigations. Two of our Arrow Group subsidiaries are the subject of a European Competition Commission Statement of Objection related to their 2002 and 2003 settlements of patent litigation related to citalopram. Any adverse outcome of these or other investigations or actions could have a material adverse effect on our business, results of operations, financial condition and cash flows. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business—Federal regulation of arrangements between manufacturers of brand and generic products could adversely affect our business." Also refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this document.

Our Anda Distribution operations and our customers are also subject to various regulatory requirements, including requirements from the DEA, FDA, and state boards of pharmacy and city and county health regulators, among others. These include licensing, registration, recordkeeping, security and reporting requirements. For example, the DEA requires our Anda Distribution business to monitor customer orders of DEA Scheduled Drugs and to report suspicious orders to the DEA. Any determination by the DEA that we have failed to comply with applicable laws and regulations could result in the DEA suspending, terminating or refusing to renew Anda Distribution's license to distribute Scheduled Drugs. Additionally, numerous states and the federal government have begun to enforce anti-counterfeit drug pedigree laws which require the tracking of all transactions involving prescription drugs beginning with the manufacturer, through the supply chain, and down to the pharmacy or other health care provider dispensing or administering prescription drug products. For example, the Florida Department of Health enforces drug pedigree requirements for distribution of prescription drugs in the State of Florida. Pursuant to Florida law and regulations, wholesalers and distributors, including our subsidiary, Anda, are required to maintain records documenting the chain of custody of prescription drug products they distribute beginning with the purchase of such products from the manufacturer. These entities are required to provide documentation of the prior transaction(s) to their customers in Florida, including pharmacies and other health care entities. Several other states have proposed or enacted legislation to implement similar or more stringent drug pedigree requirements. In addition, federal law requires that a "non-authorized distributor of record" must provide a drug pedigree documenting the prior purchase of a prescription drug from the manufacturer or from an "authorized distributor of record." In cases where the wholesaler or distributor selling the drug product is not deemed an "authorized distributor of record," it would need to maintain such records. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development, manufacturing and distribution capabilities" in this document.

*European Union*

We encounter similar regulatory and legislative issues in most other countries. Pharmaceutical manufacturers are regulated in the European Union (the "EU") by the European Medicines Agency (the "EMA"). All manufacturers are required to submit medicinal products, including generic versions of previously approved products and new strengths, dosages and formulations of previously approved products, to the EMA and its member states for review and marketing authorization before such products are placed on the market in the EU.

Marketing authorizations are granted to applicants after the relevant health authority issues a positive assessment of quality, safety and efficacy of the product. In order to receive such assessment, applicants must submit applications, which must contain the results of pre-clinical tests, pharmaceutical tests, and clinical trials with respect to original products, or originator data with respect to the generic versions of previously approved products. All of these tests or trials must be conducted in accordance within European regulations and must allow the reviewing body to evaluate the quality, safety and efficacy of the medicinal product.

In addition to obtaining marketing authorization for each product, all member states require that a manufacturer's facilities obtain approval from the national authority. The EU has a code of good manufacturing practices that each manufacturer must follow and comply with. Regulatory authorities in the EU may conduct inspections of the manufacturing facilities to review procedures, operating systems and personnel qualifications. Refer to "ITEM 1A. — RISK FACTORS — Risks Related to Our Business — The supply of APIs into Europe may be negatively affected by recent regulations promulgated by the European Union" in this document.

In the EU, member states regulate the pricing of pharmaceutical products, and in some cases, the formulation and dosing of products. This regulation is handled by individual member state national health services. These individual regulatory bodies can result in considerable price differences and product availability among member states. The implementation of tendering systems for the pricing of pharmaceuticals in several countries generally impacts drug pricing for generics; generally "tendering" refers to a system that requires bids to be submitted to the government by competing manufacturers to be the exclusive, or one of a few, supplier(s) of a product in a particular country.

Further, faced with major budget constraints, many European countries have resorted to price cuts that affect both innovative and generic pharmaceuticals although in some countries it has disproportionately affected generic products. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business—Global economic conditions could harm us" in this document. In addition, some EU countries such as France and Spain, recently had to address statements and rumors claiming that generics are not as safe and effective as reference drugs, which may undermine efforts to increase generic utilization rates.

*Canada*

In Canada, pharmaceutical manufacturers are regulated by the Therapeutic Products Directorate (the "TPD") which derives its authority from the Canadian federal government under the Food and Drugs Act and the Controlled Drug and Substances Act. The TPD evaluates and monitors the safety, effectiveness and quality of pharmaceutical products. Products are officially approved for marketing in Canada following receipt of a market authorization, or "Notice of Compliance" (an "NOC"), which is subject to the Food and Drug Regulations. Issuance of an NOC for generic drug products is also subject to the Patented Medicines (Notice of Compliance) Regulations (the "NOC Regulations") under the Patent Act.

The NOC Regulations allow branded drug marketers to list patents relating to the medicinal ingredient, formulation, dosage form or the use of the medicinal ingredient in their branded drug on a patent register maintained by Health Canada. In its abbreviated new drug submission, a generic applicant must address each patent listed against the reference product by making at least one statutory allowed allegation (for example, alleging that the patent is invalid or would not be infringed). If the generic applicant alleges invalidity or non-infringement, it must provide the branded manufacturer with an explanation of its allegations. Upon receipt of the explanation, the branded manufacturer may apply to the Federal Court of Canada for an Order prohibiting Health Canada from issuing an NOC for the generic. Health Canada may not issue a NOC until the earlier of the determination of the application by the court after a hearing on the allegations, or the expiration of 24 months from the commencement of the application.

Facilities, procedures, operations and/or testing of products are subject to periodic inspection by Health Canada and the Health Products and Food Branch Inspectorate. In addition, Health Canada conducts pre-approval and post-approval reviews and plant inspections to determine whether our systems are in compliance with the good manufacturing practices in Canada, Drug Establishment Licensing requirements and other provisions of the NOC Regulations. Competitors are subject to similar regulations and inspections.

Each Canadian province also provides a comprehensive public drug program, which controls drug pricing and reimbursement and is responsible for ensuring eligible patients receive drugs through public funding. The provinces and territories in Canada operate drug benefit programs through which eligible recipients receive drugs through public funding; these drugs are listed on provincial or territorial Drug Benefit Formularies ("Formularies"). Eligible recipients include seniors, persons on social assistance, low-income earners, and those with certain specified conditions or diseases. Formulary listings are also used by private payors to reimburse generic products. To be listed in a Formulary, drug products must have been issued a NOC and must comply with each jurisdiction's individual review process. Currently, Canada's provinces are looking at national competitive bidding processes/tendering of drugs, which may affect the sustainability of the industry and the supply of pharmaceuticals.

Finally, Canada has reached a trade agreement in principle with the European Union ("CETA") in which it has agreed to implement patent term extensions and certain procedural amendments to the NOC Regulations. Canada is further involved in trade negotiations with ten Pacific countries including the United States (the "Trans Pacific Partnership"), which could lead to further changes to Canada's intellectual property framework, which could delay generic competition.

**Environmental Matters**

We are subject to federal, state, and local environmental laws and regulations in the United States and abroad. We believe that our operations comply in all material respects with applicable environmental laws and regulations in each jurisdiction where we have a business presence , and we periodically audit our manufacturing and R&D facilities for compliance with all federal, state and local environmental laws and regulations. Although we continue to make capital expenditures for environmental protection, we do not anticipate any significant expenditure in order to comply with such laws and regulations that would have a material impact on our earnings or competitive position. We are not aware of any pending litigation or significant financial obligations arising from current or past environmental practices that are likely to have a material adverse effect on our financial position. We cannot assure you, however, that environmental problems relating to facilities owned or operated by us will not develop in the future, and we cannot predict whether any such problems, if they were to develop, could require significant expenditures on our part. In addition, we are unable to predict what legislation or regulations may be adopted or enacted in the future with respect to environmental protection and waste disposal. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Our business will continue to expose us to risks of environmental liabilities" in this document.

**Seasonality**

Consistent with the United States pharmaceutical industry, our business experiences seasonality with the first quarter of each year typically being the lowest revenue quarter for branded products. In addition, our aesthetics products, including our breast aesthetics and Botox® cosmetic indications have tended to be marginally higher during the second and fourth quarters, presumably in advance of the summer vacation and holiday seasons. Fluctuations of our sales are also impacted by the effect of promotions, which cause non-seasonal variability in sales trends.

**Backlog**

As a result of the extent of our supply chain, backlog of orders is not material to our business.

**Employees**

As of December 31, 2015, we had approximately 31,200 employees. Of our employees, approximately 3,700 were engaged in R&D, 12,800 in manufacturing, 5,785 in quality assurance and quality control, 6,550 in sales, marketing and distribution, and 2,365 in administration. Of the approximately 31,200 employees as of December 31, 2015, approximately 14,900 are expected to transfer to Teva as part of the Teva Transaction.

## ITEM 1A. *RISK FACTORS*

### CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

*Any statements made in this report that are not statements of historical fact or that refer to estimated or anticipated future events are forward-looking statements. We have based our forward-looking statements on management's beliefs and assumptions based on information available to our management at the time these statements are made. Such forward-looking statements reflect our current perspective of our business, future performance, existing trends and information as of the date of this filing. These include, but are not limited to, our beliefs about future revenue and expense levels and growth rates, prospects related to our strategic initiatives and business strategies, including the integration of, and synergies associated with, strategic acquisitions, express or implied assumptions about government regulatory action or inaction, anticipated product approvals and launches, business initiatives and product development activities, assessments related to clinical trial results, product performance and competitive environment, and anticipated financial performance. Without limiting the generality of the foregoing, words such as "may," "will," "expect," "believe," "anticipate," "plan," "intend," "could," "would," "should," "estimate," "continue," or "pursue," or the negative or other variations thereof or comparable terminology, are intended to identify forward-looking statements. The statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. We caution the reader that these statements are based on certain assumptions, risks and uncertainties, many of which are beyond our control. In addition, certain important factors may affect our actual operating results and could cause such results to differ materially from those expressed or implied by forward-looking statements. We believe the risks and uncertainties discussed under the section entitled "Risks Related to Our Business," and other risks and uncertainties detailed herein and from time to time in our SEC filings, may cause our actual results to vary materially from those anticipated in any forward-looking statement.*

*We disclaim any obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law. This discussion is provided as permitted by the Private Securities Litigation Reform Act of 1995.*

We operate in a rapidly changing environment that involves a number of risks and uncertainties, some of which are beyond our control. The following discussion highlights some of these risks and speaks as of the date of this document, including the assets held for sale. These and other risks could have a material adverse effect on our business, results of operations, financial condition and cash flows.

**Risks Related to Our Business**

*If we are unable to successfully develop or commercialize new products, our operating results will suffer.*

Our future results of operations depend to a significant extent upon our ability to successfully develop and commercialize new products in a timely manner. There are numerous difficulties in developing and commercializing new products, including:

- developing, testing and manufacturing products in compliance with regulatory standards in a timely manner;

- receiving requisite regulatory approvals for such products in a timely manner, or at all;

- the availability, on commercially reasonable terms, of raw materials, including API and other key ingredients;

- preclusion from commercialization by the proprietary rights of others;

- developing products that are economical to manufacture and commercialize;

- time consuming and costly nature of developing and commercializing new products;

- costly legal actions brought by our competitors, that may delay or prevent the development and commercialization of new products;

- experiencing delays as a result of limited resources at the FDA or other regulatory agencies;

- changing review and approval policies and standards at the FDA and other regulatory agencies;

- completion of numerous other regulatory approvals in international markets; and

- commercializing generic products may be substantially delayed by the listing with the FDA of patents that have the effect of potentially delaying approval of a generic product by up to 30 months.

As a result of these and other difficulties, products currently in development by us may or may not receive timely regulatory approvals, or approvals at all, necessary for marketing by us or other third-party partners.  This risk particularly exists with respect to the development of proprietary products because of the uncertainties, higher costs and lengthy time frames associated with R&D of such products and the inherent unproven market acceptance of such products.  Our operating results and financial condition may fluctuate as the amount we spend to research and develop, promote, acquire or license new products, technologies and businesses changes. Additionally, we face heightened risks in connection with our development of extended release or controlled release generic products because of the technical difficulties and regulatory requirements related to such products. Additionally, with respect to generic products for which we are the first applicant to request approval on the basis that an innovator patent is invalid or not infringed (a Paragraph IV filing), our ability to obtain 180 days of generic market exclusivity may be contingent on our ability to obtain FDA approval or tentative approval within 30 months of the FDA's acceptance of our application for filing. We therefore risk forfeiting such market exclusivity if we are unable to obtain such approval or tentative approval on a timely basis.  If any of our products or the products of our third-party partners are not approved in a timely manner or, when acquired or developed and approved, cannot be successfully manufactured or commercialized in a timely manner, our operating results could be adversely affected.  We cannot guarantee that any investment we make in developing products will be recouped, even if we are successful in commercializing those products.  Refer to "*Our branded pharmaceutical expenditures may not result in commercially successful products.*"

### *Our operating results and financial condition may fluctuate.*

Our operating results and financial condition may fluctuate from quarter to quarter and year to year for a number of reasons.  As a result, we believe that period-to-period comparisons of our results of operations are not necessarily meaningful, and these comparisons should not be relied upon as an indication of future performance.  In particular, as a pharmaceutical company that manufactures and sells branded and generic products, the development and launch of new competitive products by ourselves may result in fluctuations in our financial performance, particularly as we work to balance our product offerings in light of our recent and future growth via acquisitions.  Our operating results and financial condition are also subject to fluctuation from all of the risks described throughout this section.  These fluctuations may adversely affect our results of operations and financial conditions.

### *If we do not successfully integrate newly acquired businesses into our business operations, our business could be adversely affected.*

We will need to successfully integrate the operations of recently and pending acquired businesses, including Kythera and Auden Mckenzie as well as our pending business combination with Pfizer, with our business operations. As a result of these and other recent and any other future or pending acquisitions, we have undergone substantial changes in a short period of time and our business has changed and broadened in size and the scope of products we offer.  Integrating the operations of multiple new businesses with that of our own is a complex, costly and time-consuming process, which requires significant management attention and resources to integrate the business practice and operations. The integration process may disrupt the businesses and, if implemented ineffectively, would preclude realization of the full benefits expected by us.  Our failure to meet the challenges involved in integrating the businesses in order to realize the anticipated benefits of the acquisitions could cause an interruption of, or a loss of momentum in, our activities and could adversely affect our results of operations.  Prior to each acquisition, the acquired business operated independently, with its own business, corporate culture, locations, employees and systems.  There may be substantial difficulties, costs and delays involved in any integration of other businesses with that of our own.  These may include:

- distracting management from day-to-day operations;

- potential incompatibility of corporate cultures;

- an inability to achieve synergies as planned;

- risks associated with the assumption of contingent or other liabilities of acquisition targets;

- adverse effects on existing business relationships with suppliers or customers;

- inheriting and uncovering previously unknown issues, problems and costs from the acquired company;

- delays between our expenditures to acquire new products, technologies or businesses and the generation of revenues from those acquired products, technologies or businesses;

- realization of assets and settlement of liabilities at amounts equal to estimated fair value as of the acquisition date of any acquisition or disposition;

- revenue recognition related to licensing agreements and/or strategic collaborations;

- costs and delays in implementing common systems and procedures (including technology, compliance programs, financial systems, distribution and general business operations, among others); and

- increased difficulties in managing our business due to the addition of international locations.

These risks may be heightened in cases where the majority of the former businesses' operations, employees and customers are located outside of the United States.  Any one or all of these factors may increase operating costs or lower anticipated financial performance.  Many of these factors are also outside of our control.  In addition, dispositions of certain key products, technologies and other rights may affect our business operations.

In addition, even if the operations of the businesses are integrated successfully, we may not realize the full benefits of the acquisition, including the synergies, cost savings or sales or growth opportunities that we expect.  These benefits may not be achieved within the anticipated time frame, or at all.  Additional unanticipated costs may be incurred in the integration of the businesses.  All of these factors could cause a reduction to our earnings per share, decrease or delay the expected accretive effect of the transaction, and negatively impact the price of our ordinary shares.

The failure to integrate the business operations of the acquired business successfully would have a material adverse effect on our business, financial condition and results of operations.  Refer to *"Pfizer and Allergan may fail to realize all of the anticipated benefits of the Pfizer Transaction or those benefits may take longer to realize than expected.  The combined company may also encounter significant difficulties in integrating the two businesses."*

***Our substantial debt and other financial obligations could impair our financial condition and our ability to fulfill our debt obligations.  Any refinancing of this substantial debt could be at significantly higher interest rates.***

Our substantial indebtedness and other financial obligations could:

- impair our ability to obtain financing or additional debt in the future for working capital, capital expenditures, acquisitions or general corporate purposes;

- impair our ability to access capital and credit markets on terms that are favorable to us;

- have a material adverse effect on us if we fail to comply with financial and affirmative and restrictive covenants in our debt agreements and an event of default occurs as a result of a failure that is not cured or waived;

- require us to dedicate a substantial portion of our cash flow for interest payments on our indebtedness and other financial obligations, thereby reducing the availability of our cash flow to fund working capital and capital expenditures;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate; and

- place us at a competitive disadvantage compared to our competitors that have proportionally less debt.

Additionally, certain of our financing agreements may contain cross-default or other similar provisions whereby a default under one financing agreement could result in a default under our other financing agreements.

If we are unable to meet our debt service obligations and other financial obligations, we could be forced to restructure or refinance our indebtedness and other financial transactions, seek additional equity capital or sell our assets.  We might then be unable to obtain such financing or capital or sell our assets on satisfactory terms, if at all.  Any refinancing of our indebtedness could be at significantly higher interest rates, and/or incur significant transaction fees.  Refer to "Liquidity and Capital Resources –Floating Rate Notes," "Liquidity and Capital Resources – Fixed Rate Notes" and "Liquidity and Capital Resources – Term Loan Indebtedness" for a detailed discussion of our outstanding indebtedness.

***Any acquisitions of businesses, technologies, or products or other significant transactions could adversely affect our relationships with employees, vendors or key customers.***

We regularly review potential acquisitions of technologies, products and businesses complementary to our business.  Acquisitions typically entail many risks and could result in difficulties in integrating operations, personnel, technologies and products.  Refer to *"If we do not successfully integrate newly acquired businesses into our business operations our business could be adversely affected."*  In connection with acquisitions, we could experience disruption in our business, technology and information systems, financial systems, vendors customer or employee base, including diversion of management's attention from our continuing operations, among others.  Refer to *"Certain aspects of our operations are highly dependent on third party service providers."*  There is also a risk that key employees of companies that we acquire or key employees necessary to successfully commercialize technologies and products that we acquire may seek employment elsewhere, including with our competitors.  Furthermore, there may be overlap between our products or customers and the companies that we acquire that may create conflicts in relationships or other commitments detrimental to the integrated businesses.

25

*We are subject to U.S. federal and state healthcare fraud and abuse and health information privacy and security laws, and the failure to comply with such laws may adversely affect our business.*

In the United States, many of our products are reimbursed under federal and state health care programs such as Medicaid, Medicare, TriCare, and/or state pharmaceutical assistance programs, and as a result, certain federal and state healthcare laws and regulations pertaining to fraud and abuse and patients' rights are and will be applicable to our business. We could be subject to healthcare fraud and abuse and patient privacy regulation by both the federal government and the states in which we conduct our business. The laws that may affect our ability to operate include, but are not limited to: (i) the U.S. Anti-Kickback Statute, which constrains our marketing practices, educational programs, pricing policies and relationships with healthcare providers or other entities, by prohibiting, among other things, soliciting, receiving, offering or paying remuneration, directly or indirectly, to induce, or in return for, either the referral of an individual or the purchase or recommendation of an item or service reimbursable under a federal healthcare program, such as the Medicare and Medicaid programs; (ii) federal civil and criminal false claims laws and civil monetary penalty laws, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid or other third-party payers that are false or fraudulent; (iii) the U.S. Health Insurance Portability and Accountability Act of 1996, ("HIPAA"), which among other things created new federal criminal statutes that prohibit executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters, and HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and its implementing regulations, which imposes certain requirements relating to the privacy, security and transmission of individually identifiable health information and places restrictions on the use of such information for marketing communications; (iv) the U.S. Physician Payments Sunshine Act, which among other things, requires manufacturers of drugs, devices, biologics and medical supplies for which payment is available under a federal healthcare program to report annually information related to "payments or other transfers of value" made to physicians and teaching hospitals, and ownership and investment interests held by certain healthcare professionals and their immediate family members; and (v) state and foreign law equivalents of each of the above U.S. laws, such as anti-kickback and false claims laws which may apply to items or services reimbursed by any third-party payer, including commercial insurers, and state and foreign laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts. Violations of the fraud and abuse laws may result in severe penalties against the responsible employees and Allergan, including jail sentences, large fines, and the exclusion of our products from reimbursement under federal and state programs. Defense of litigation claims and government investigations can be costly, time-consuming, and distract management, and it is possible that Allergan could incur judgments or enter into settlements that would require us to change the way we operate our business. We are committed to conducting the sales and marketing of our products in compliance with the healthcare fraud and abuse laws, but certain applicable laws may impose liability even in the absence of specific intent to defraud. Furthermore, should there be ambiguity, a governmental authority may take a position contrary to a position we have taken, or should an employee violate these laws without our knowledge, a governmental authority may impose civil and/or criminal sanctions.

For example, in December 2009, we learned that numerous pharmaceutical companies, including certain of our subsidiaries, were named as defendants in a federal qui tam action pending in the United States District Court for the District of Massachusetts alleging that the defendants falsely reported to the United States that certain pharmaceutical products were eligible for Medicaid reimbursement and thereby allegedly caused false claims for payment to be made through the Medicaid program. A similar action was filed by the State of Louisiana in August 2013 and additional lawsuits are possible. Any adverse outcome in these actions, or the imposition of penalties or sanctions for failing to comply with the fraud and abuse laws, could adversely affect us and may have a material adverse effect on our business, results of operations, financial condition and cash flows. Some of the statutes and regulations that govern our activities, such as federal and state anti-kickback and false claims laws, are broad in scope, and while exemptions and safe harbors protecting certain common activities exist, they are often narrowly drawn. While we manage our business activities to comply with these statutory provisions, due to their breadth, complexity and, in certain cases, uncertainty of application, it is possible that our activities could be subject to challenge by various government agencies. In particular, the FDA, the U.S. Department of Justice and other agencies have increased their enforcement activities with respect to the sales, marketing, research and similar activities of pharmaceutical companies in recent years, and many pharmaceutical companies have been subject to government investigations related to these practices. A determination that we are in violation of these and/or other government regulations and legal requirements may result in civil damages and penalties, criminal fines and prosecution, administrative remedies, the recall of products, the total or partial suspension of manufacture and/or distribution, seizure of products, injunctions, whistleblower lawsuits, failure to obtain approval of pending product applications, withdrawal of existing product approvals, exclusion from participation in government healthcare programs and other sanctions.

Beginning in February 2012, Warner Chilcott, along with several then current and former employees in its sales organization and certain third parties, received subpoenas from the United States Attorney for the District of Massachusetts. The subpoena Warner Chilcott received sought information and documentation relating to a wide range of matters, including sales and marketing activities, payments to people who are in a position to recommend drugs, medical education, consultancies, prior authorization processes, clinical trials, off-label promotion and employee training (including with respect to laws and regulations concerning off-label

26

information and physician remuneration), in each case relating to a number of our current products.    In addition, Forest and Allergan are also currently responding to subpoenas seeking information relating to its sales and marketing activities, including payments to people who are in a position to recommend drugs and off-label promotion and the Company is defending litigations based on similar allegations.  Refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" for more information.  We cannot predict or determine the impact of these inquiries on our future financial condition or results of operations.  These investigations and any other threatened or actual government enforcement action could also generate adverse publicity and require that we devote substantial resources that could be used productively on other aspects of our business.

In connection with a settlement of certain claims brought by the U.S. government, legacy Allergan operated under a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of Health and Human Services ("OIG")  that required the Company to maintain legacy Allergan's corporate compliance program and to undertake a set of defined corporate integrity obligations until August 30, 2015, including performing internal reviews and monitoring procedures and engaging an independent review organization to test and report on our compliance with compliance policies and procedures. The Company presented the final annual report to the Audit & Compliance Committee of the Board of Directors at the October 2015 Board of Directors meeting.  The Company has submitted its final annual report to the OIG and is awaiting the final acknowledgement and close out letter from the OIG.

Any of these types of investigations or enforcement actions could affect our ability to commercially distribute our products and could materially and adversely affect our business, financial condition, results of operations and cash flows.

***If generic products that compete with any of our branded pharmaceutical products are approved and sold, sales of our products will be adversely affected.***

At the close of the pending sale of our generics business and certain other assets to Teva, specialty branded products and aesthetics will comprise the majority of our total revenues.  Generic equivalents for branded pharmaceutical products are typically sold at lower costs than the branded products.  After the introduction of a competing generic product, a significant percentage of the prescriptions previously written for the branded product are often written for the generic version.  In addition, legislation enacted in most U.S. states and Canadian provinces allows or, in some instances mandates, that a pharmacist dispense an available generic equivalent when filling a prescription for a branded product, in the absence of specific instructions from the prescribing physician.  Pursuant to the provisions of the Hatch-Waxman Act, manufacturers of branded products often bring lawsuits to enforce their patent rights against generic products released prior to the expiration of branded products' patents, but it is possible for generic manufacturers to offer generic products while such litigation is pending.  Refer to "*If we are unable to adequately protect our technology or enforce our patents, our business could suffer.*"  As a result, branded products typically experience a significant loss in revenues following the introduction of a competing generic product, even if subject to an existing patent.  Our branded pharmaceutical products are or may become subject to competition from generic equivalents because there is no proprietary protection for some of the branded pharmaceutical products we sell, because our patent protection expires or because our patent protection is not sufficiently broad or enforceable.  In addition, we may not be successful in our efforts to extend the proprietary protection afforded our branded products through the development and commercialization of proprietary product improvements and new and enhanced dosage forms.

Our Actonel® products no longer have patent protection in Canada or the Western European countries in which we sell these products, and Asacol® is not protected by a patent in the United Kingdom.  Our Actonel® once-a-month product lost U.S. patent protection in June 2014 (including a 6-month pediatric extension of regulatory exclusivity) and generic versions of our Loestrin® 24 Fe product entered the market in January 2014 pursuant to settlement agreements previously entered into.  In addition, other products such as Namenda® (IR), Estrace® Cream, Asacol® 400 mg, Femhrt® and Carafate® are not protected by patents in the United States where we sell these products.  Generic equivalents are currently available in Canada and Western Europe for Actonel® and in the United States for certain versions of our Femhrt® products, Femcon® Fe and certain other less significant products.

During the next few years, additional products of ours including some of our large revenue drivers, like Bystolic®, Linzess®, Namenda XR® and Viibryd®, will lose patent protection or likely become subject to generic competition.  Generic versions of our Asacol® HD 800 mg product may enter the market as early as mid-2016 or earlier pursuant to an agreement previously entered into and generic versions of our Enablex® product may enter the market as early as March 2016 pursuant to settlement agreements previously entered into.  Some of our products may also become subject to generic competition prior to the expiration of patent protection in the event a generic competitor elects to launch its generic equivalent product "at-risk."  Competition from generic equivalents could result in a material impairment of our intangible assets or the acceleration of amortization on our non-impaired intangible assets and may have a material adverse impact on our revenues, financial condition, results of operations and cash flows.

*Our branded pharmaceutical expenditures may not result in commercially successful products.*

Developing and commercializing branded pharmaceutical products is generally more costly than generic products. In the future, and particularly following the sale of our generics business and certain other assets to Teva, we anticipate continuing and increasing our product development expenditures for our US Brands, US Medical Aesthetics and International Brands business segment. In order to grow and achieve success in our business, we must continually identify, develop, acquire and license new products that we can ultimately market. There are many difficulties and uncertainties inherent in pharmaceutical research and development, and there is a high rate of failure inherent in new drug discovery and development. Failure can occur at any point in the process, including late in the process after substantial investment. New product candidates that appear promising in development may fail to reach the market or may have only limited commercial success because of efficacy or safety concerns, inability to obtain necessary regulatory approvals and payer reimbursement, limited scope of approved uses, difficulty or excessive costs to manufacture, or infringement of the patents or intellectual property rights of others. Products that do reach the market may ultimately be subject to recalls or other suspensions in sales. Delays and uncertainties in the FDA approval process and the approval processes in other countries can result in delays in product launches and lost market opportunity. Because there is a high rate of failure inherent in the research and development process of new products, there is a significant risk that funds invested by the Company in research and development will not generate financial returns. The Company cannot be certain when or whether any of its products currently under development will be approved or launched or whether, once launched, such products will be commercially successful.

We may be required to spend several years and incur substantial expense in completing certain clinical trials. The length of time, number of trial sites and patients required for clinical trials vary substantially, and we may have difficulty finding a sufficient number of sites and subjects to participate in our trials. Delays in planned clinical trials can result in increased development costs, delays in regulatory approvals and delays in product candidates reaching the market. We rely on independent third-party clinical investigators to recruit subjects and conduct clinical trials in accordance with applicable study protocols and laws and regulations. If regulatory authorities determine that we have not complied with regulations in the R&D of a product candidate, they may refuse to accept trial data from the site, not approve the product candidate, and we would not be able to market and sell it. If we are not able to market and sell our products or product candidates after significant expenditures to develop and test them, our business and results of operations could be materially and adversely affected.

We currently have products in various stages of development, including new hormonal contraceptive therapy, dermatology and infectious disease products, among others. Such clinical trials are costly and may not result in successful outcomes. The results of preclinical studies and early clinical studies may not be predictive of the results of later-stage clinical studies. Product candidates that have shown promising results in early-stage clinical studies may still suffer significant setbacks in subsequent clinical studies. There is a high rate of failure for products proceeding through clinical studies, and product candidates in later stages of clinical studies may fail to show the desired safety and efficacy traits despite having progressed through preclinical studies and initial clinical studies. Clinical studies may not proceed as planned or be completed on schedule, if at all. The rate of completion of clinical trials is significantly dependent upon a number of factors, including the rate of patient enrollment. We may not be able to attract a sufficient number of sites or enroll a sufficient number of patients in a timely manner in order to complete clinical trials. Moreover, nonclinical and clinical data are often susceptible to varying interpretations and analyses, and our data may not provide adequate efficacy and safety information to obtain regulatory approval of our candidates. We cannot be sure that our business expenditures, including but not limited to our expenditures related to our Esmya™ product, products acquired in the Warner Chilcott Acquisition, the Forest Acquisition and the Allergan Acquisition, or products of our third-party partners, among others, will result in the successful discovery, development or launch of brand products that will prove to be commercially successful or will improve the long-term profitability of our business. If such business expenditures do not result in successful discovery, development or launch of commercially successful brand products our results of operations and financial condition could be materially adversely affected.

*Our investments in biosimilar products may not result in products that are approved by the FDA or other ex- U.S. regulatory authorities and, even if approved by such authorities, may not result in commercially successful products.*

In 2011, we entered into a collaboration agreement with Amgen Inc. to develop and commercialize, on a worldwide basis, biosimilar versions of Herceptin®, Avastin®, Rituxan/Mab Thera®, and Erbitux® (the "Amgen Collaboration Agreement"). Under the agreement, we will be required to invest up to $209.4 million (as of December 31, 2015) in furtherance of the development and regulatory approval of such products, and such amount is subject to change or adjustment as specified in the agreement. Although Amgen, our development partner, has substantial expertise and experience in the development of biological products, significant uncertainty remains concerning the regulatory pathway in the United States and in other countries to obtain regulatory approval of biosimilar products, and the commercial pathway to successfully market and sell such products. In the United States, an abbreviated pathway for approval of biosimilar products was established by the Biologics Price Competition and Innovation Act of 2009, or BPCIA, enacted on March 23, 2010, as part of the ACA. The BPCIA established this abbreviated pathway under section 351(k) of the Public Health Services Act, or PHSA. Subsequent to the enactment of the BPCIA, the FDA issued draft guidance regarding the demonstration of biosimilarity as well as the submission and review of biosimilar applications.

The BPCIA prohibits the FDA from accepting an application for a biosimilar candidate to a reference product within four years of the reference product's licensure by the FDA. In addition, the BPCIA provides innovative biologics with twelve years of exclusivity from the data of their licensure, during which time the FDA cannot approve any application for a biosimilar candidate to the reference product. Additionally, biosimilar products will likely be subject to extensive patent clearances and/or patent infringement litigation, which could delay or prevent the commercial launch of a product for many years. Further, our collaboration with Amgen may not result in products that meet the requirements established by the FDA or other ex-U.S. regulatory authorities. If our collaboration does result in biosimilar products that obtain FDA or other ex-U.S. regulatory authority approval, such product(s) may not be commercially successful and/or may not generate profits in amounts that are sufficient to offset the amount invested to obtain such approvals. Market success of biosimilar products will depend on demonstrating to patients, physicians and payors that such products are safe and efficacious compared to other existing products yet offer a more competitive price or other benefit over existing therapies. If our collaboration with Amgen does not result in the development and timely approval of biosimilar products or if such products, once developed and approved, are not commercially successful, our results of operations, financial condition and cash flows could be materially adversely affected.

We expect to face increasing competition from biosimilar products in the future, particularly if foreign governments adopt more permissive approval frameworks and competitors begin to obtain broader marketing approval for biosimilar products. A growing number of companies have announced their intentions to develop biosimilar versions of existing biotechnology products. We are unable to predict the precise impact of the pending introduction of biosimilar products on our products, and additional competition could have a material adverse effect on our business and results of operations.

### *If we are unsuccessful in our joint ventures and other collaborations, our operating results could suffer.*

We have made substantial investments in joint ventures and other collaborations, including our collaboration agreements with Amgen and Sanofi, and may use these and other methods to develop or commercialize products in the future. These arrangements typically involve other pharmaceutical companies as partners that may be competitors of ours in certain markets. In many instances, we will not control these joint ventures or collaborations or the commercial exploitation of the licensed products, and cannot assure you that these ventures will be profitable. Joint venture agreements may place limitations or restrictions on marketing our products. Any such marketing restrictions could affect future revenues and have a material adverse effect on our operations. Our results of operations may suffer if existing joint venture or collaboration partners withdraw, or if these products are not timely developed, approved or successfully commercialized and we cannot guarantee the successful outcome of such efforts, nor that they will result in any intellectual property rights or products that inure to our benefit.

### *If we are unable to adequately protect our technology or enforce our patents, our business could suffer.*

Our success with the brand products that we develop will depend, in part, on our ability to obtain patent protection for these products. We currently have a number of U.S. and foreign patents issued and pending. However, issuance of a patent is not conclusive evidence of its validity or enforceability. We cannot be sure that we will receive patents for any of our pending patent applications or any patent applications we may file in the future, or that our issued patents will be upheld if challenged. If our current and future patent applications are not approved or, if approved, our patents are not upheld in a court of law if challenged, it may reduce our ability to competitively utilize our patented products. Also, such patents may or may not provide competitive advantages for their respective products or they may be challenged or circumvented by our competitors, in which case our ability to commercially market these products may be diminished. Patent disputes may be lengthy and a potential violator of our patents may bring a potentially infringing product to market during the dispute, subjecting us to competition and damages due to infringement of the competitor product. For example, patents covering our Androderm®, Asacol® 400 mg product, Actonel® once-a-week product, INFeD® products and our Carafate® product have expired and we have no further patent protection on these products. During the next five years, additional products acquired pursuant to the Warner Chilcott Acquisition, the Forest Acquisition, and the Allergan Acquisition will lose patent protection or likely become subject to generic competition, including Bystolic®, Linzess®, Namenda XR®, Viibryd®, Aczone®, Minastrin®, Delzicol®, Rapaflo®, Enablex® and Canasa®. Therefore, it is possible that a competitor may launch a generic version of any of these products at any time, which would result in a significant decline in that product's revenue and profit.

Generic versions of our Loestrin® 24 Fe product entered the market in January 2014 pursuant to settlement agreements previously entered into; generic versions of our Asacol® HD 800 mg product may enter the market as early mid-2016 or earlier pursuant to an agreement previously entered into; our immediate release Namenda® product lost U.S. patent protection in 2015; generic versions of our Minastrin® product may enter the market as early as March 2017 pursuant to settlement agreements previously entered into; generic versions of our Canasa® product may enter the market as early as December 2018 pursuant to a settlement agreement previously entered into; and generic versions of our Enablex® product may enter the market as early as March 2016 pursuant to settlement agreements previously entered into. Some of our products may also become subject to generic competition prior to the expiration of patent protection in the event a generic competitor elects to launch its generic equivalent product "at risk."

Generic competitors to our branded products may also challenge the validity or enforceability of the patents protecting our products or otherwise seek to circumvent them. Forest also recently brought actions against certain manufacturers of generic drugs for infringement of several patents covering our Savella®, Saphris®, Namenda® XR, Namzaric®, Canasa®, Viibryd®, Teflaro®, and Delzicol® products. We believe that ANDAs were filed before the patents covering Canasa® were listed in the Orange Book, which generally means that ANDAs are not subject to the 30 month stay of the approval under the Hatch Waxman Act. Allergan recently brought actions against manufacturers of generic drugs for infringement of several patents covering our Acular LS®, Combigan®, Lastacaft®, Latisse®, and Restasis® products. While we intend to vigorously defend these and other patents and pursue our legal rights, we can offer no assurance as to when the pending or any future litigation will be decided, whether such lawsuits will be successful or that a generic equivalent of one or more of our products will not be approved and enter the market. In addition, patents covering our branded pharmaceutical products may be challenged in proceedings other than court proceedings, including inter partes review (IPR) at the patent and trademark office. In 2011, Congress amended the patent laws and created a new way to challenge the validity of patents: the inter partes review. IPR proceedings take place in the Patent Office and have both advantages and disadvantages when compared to district court proceedings. Although IPR proceedings are limited to certain types of invalidity challenges, the Patent Office applies different standards that make it easier for challengers to invalidate patents. Moreover, IPR proceedings generally take no more than 18 months, which means it is much faster than challenging a patent's validity in a district court proceeding. In addition, an IPR challenge can be mounted even after a patent has been upheld in court.

In addition to patent protection, our business relies on our protection of other intellectual property rights, trade secrets, and other proprietary technologies. We rely on trademark, copyright, and patent law, trade-secret protection, and confidentiality and/or license agreements with our employees, customers, partners and others to protect our proprietary rights. The protection of our proprietary technology may require the expenditure of significant financial and managerial resources. We may not be able to discover or determine the extent of any unauthorized use of our proprietary rights, and we may not be able to prevent third parties from misappropriating or infringing upon our proprietary rights.

We rely on certain information, processes, and know-how that are not protected by patents or other intellectual property rights. We seek to protect this information through trade secret or confidentiality agreements, as well as through other measures. These measures may not provide adequate protection for our unpatented technology.

If we are unable to adequately protect our technology, trade secrets or proprietary know-how, or enforce our intellectual property rights, our results of operations, financial condition and cash flows could suffer.

***Our branded pharmaceutical products will face increased competition with generic products, including, for a period of time, our own.***

As a result of our recent acquisitions, we have expanded our branded pharmaceutical products, and we face increased competition from generic pharmaceutical manufacturers, including in some circumstances, us. Because the regulatory approval process in the United States and European Union exempts generic products from costly and time-consuming clinical trials to demonstrate their safety and efficacy and rely instead on the safety and efficacy of prior products, manufacturers of generic products can invest far less in research and development. As a result, our branded products will face intense price competition from generic forms of the product once market exclusivity has expired. Upon the expiration of market exclusivity, we may lose the majority of our revenues of that product in a very short period of time.

In addition, our branded products may conflict with our existing generic products. Because the revenues from branded products and generic products are derived using contradictory strategies, investments made in one sector may conflict with the other. For example, we now own Loestrin® / Loestrin® Fe as both a branded product and a generic product, which may directly or indirectly compete as sales of one product will inherently reduce sales of the other and decrease overall revenues. We may face the same pressures for multiple products. The expansion of our branded pharmaceutical products may result in increased competition from generic manufacturers and our own generics business.

***If pharmaceutical companies are successful in limiting the use of generics through their legislative, regulatory and other efforts, our sales of generic products may suffer.***

Many pharmaceutical companies increasingly have used state and federal legislative and regulatory means to delay generic competition. These efforts have included:

- making changes to the formulation of the brand product and arguing that potential generic competitors must demonstrate bioequivalency or comparable abuse-resistance to the reformulated brand product;

- pursuing new patents for existing products which may be granted just before the expiration of earlier patents, which could extend patent protection for additional years or otherwise delay the launch of generics;

- selling the brand product as an Authorized Generic, either by the brand company directly, through an affiliate or by a marketing partner;

- using the Citizen Petition process (e.g., under 21 C.F.R. s. 10.30) to request amendments to FDA standards or otherwise delay generic drug approvals;

- seeking changes to U.S. Pharmacopeia, an organization which publishes industry recognized compendia of drug standards;

- attempting to use the legislative and regulatory process to have drugs reclassified or rescheduled;

- using the legislative and regulatory process to set definitions of abuse deterrent formulations to protect brand company patents and profits;

- attaching patent extension amendments to non-related federal legislation;

- engaging in state-by-state initiatives to enact legislation that restricts the substitution of some generic drugs, which could have an impact on products that we are developing;

- entering into agreements with pharmacy benefit management companies which have the effect of blocking the dispensing of generic products; and

- seeking patents on methods of manufacturing certain API.

If pharmaceutical companies or other third parties are successful in limiting the use of generic products through these or other means, our sales of generic products may decline. If we experience a material decline in generic product sales, our results of operations, financial condition and cash flows will suffer.

### *If competitors are successful in limiting competition for certain generic products through their legislative, regulatory and litigation efforts, our sales of certain generic products may suffer.*

Certain of our competitors have challenged our ability to distribute Authorized Generics during the competitors' 180-day period of ANDA exclusivity under the Hatch-Waxman Act. Under the challenged arrangements, we have obtained rights to market and distribute under a brand manufacturer's new drug application "NDA" a generic alternative of the brand product. Some of our competitors have challenged the propriety of these arrangements by filing Citizen Petitions with the FDA, initiating lawsuits alleging violation of the antitrust and consumer protection laws, and seeking legislative intervention. For example, legislation has been introduced in the U.S. Senate that would prohibit the marketing of Authorized Generics during the 180-day period of ANDA exclusivity under the Hatch-Waxman Act. If distribution of Authorized Generic versions of brand products is otherwise restricted or found unlawful, our results of operations, financial condition and cash flows could be materially adversely affected.

### *From time to time we may need to rely on licenses to proprietary technologies, which may be difficult or expensive to obtain.*

We may need to obtain licenses to patents and other proprietary rights held by third parties to develop, manufacture and market products.  If we are unable to timely obtain these licenses on commercially reasonable terms, our ability to commercially market our products may be inhibited or prevented, which could have a material adverse effect on our business, results of operations, financial condition and cash flows.  For example, because we license significant intellectual property with respect to certain of our products, including Namenda XR®, Linzess® and Viibryd®, any loss or suspension of our rights to licensed intellectual property could materially adversely affect our business, financial condition, cash flows and results of operations.

### *Third parties may claim that we infringe their proprietary rights and may prevent us from manufacturing and selling some of our products.*

The manufacture, use and sale of new products that are the subject of conflicting patent rights have been the subject of substantial litigation in the pharmaceutical industry.  These lawsuits relate to the validity, enforceability and infringement of patents or proprietary rights of third parties.  We may have to defend ourselves against charges that we violated patents or proprietary rights of third parties.  This is especially true in the case of generic products on which the patent covering the brand product is expiring, an area where infringement litigation is prevalent, and in the case of new brand products where a competitor has obtained patents for similar products.  Litigation may be costly, unpredictable, time-consuming, often involves complex legal, scientific and factual questions, and could divert the attention of our management and technical personnel.  In addition, if it is determined that we infringe the rights of others, we could lose our right to develop, manufacture or market products, product launches could be delayed or we could be required to pay monetary damages or royalties to license proprietary rights from third parties.  For example, we are currently engaged in litigation with Endo Pharmaceuticals Inc. concerning whether our generic version of the original (now discontinued) formulation of

31

Opana ER infringes U.S. Patent Nos. 8,309,122, 8,329,216, 8,808,737, and 8,871,779, and we continue to market our generic product. We are also engaged in litigation with Teva Pharmaceuticals USA, Inc. and Mayne Pharma International Pty Ltd. ("Mayne") concerning whether our manufacture and sale of Namenda XR, which we acquired in the Forest Acquisition, infringes U.S. Patent No. 6,194,000.

Further, in August 2012, Bayer Pharma AG (together with its affiliates, "Bayer") filed a complaint against Warner Chilcott alleging that its manufacture, use, offer for sale, and/or sale of Lo Loestrin® Fe infringes Bayer's U.S. Patent No. 5,980,940. In the complaint, Bayer seeks injunctive relief and unspecified monetary damages for the alleged infringement. In December 2012, Bayer amended the complaint to add a claim seeking to invalidate the Company's U.S. Patent No. 7,704,984, which covers the Lo Loestrin® Fe product. On April 21, 2015, the District Court granted summary judgment in favor of Warner Chilcott and the case is now on appeal. Although the parties to patent and intellectual property disputes in the pharmaceutical industry have often settled their disputes through licensing or similar arrangements, the costs associated with these arrangements may be substantial and could include ongoing royalties. Refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements". Furthermore, we cannot be certain that the necessary licenses would be available to us on commercially reasonable terms, or at all. As a result, an adverse determination in a judicial or administrative proceeding or failure to obtain necessary licenses could result in substantial monetary damage awards and could prevent us from manufacturing and selling a number of our products, which could have a material adverse effect on our business, results of operations, financial condition and cash flows.

### *Certain aspects of our operations are highly dependent upon third-party service providers.*

We rely on suppliers, vendors and other third-party service providers to research, develop, manufacture, commercialize, promote and sell our products. Reliance on third-party manufacturers reduces our oversight and control of the manufacturing process. Some of these third-party providers are subject to legal and regulatory requirements, privacy and security risks, and market risks of their own. The failure of a critical third-party service provider to meet its obligations could have a material adverse impact on our operations and results. If any third-party service providers have violated or are alleged to have violated any laws or regulations during the performance of their obligations to us, it is possible that we could suffer financial and reputation harm or other negative outcomes, including possible legal consequences.

In particular, product deliveries within our Anda Distribution business are highly dependent on overnight delivery services to deliver our products in a timely and reliable manner, typically by overnight service. Our Anda Distribution business ships a substantial portion of products via one courier's air and ground delivery service. If the courier terminates our contract or if we cannot renew the contract on favorable terms or enter into a contract with an equally reliable overnight courier to perform and offer the same service level at similar or more favorable rates, our business, results of operations, financial condition and cash flows could be materially adversely affected.

### *Our Anda Distribution operations compete directly with significant customers of our generic and brand businesses.*

In our Anda Distribution business, we compete with McKesson Corporation ("McKesson"), AmerisourceBergen Corporation ("AmerisourceBergen") and Cardinal Health, Inc. ("Cardinal"). These companies are significant customers of our business in the United States. Our activities related to our Anda Distribution business, as well as the acquisition of other businesses that compete with our customers, may result in the disruption of our business, which could harm relationships with our current customers, employees or suppliers, and could adversely affect our expenses, pricing, third-party relationships and revenues. Further, a loss of a significant customer of our US Brands, US Medical Aesthetics, International Brands and North American Generics businesses, could have a material adverse effect on our business, results of operations, financial condition and cash flows.

### *If we are unable to obtain sufficient supplies from key manufacturing sites or suppliers that in some cases may be the only source of finished products or raw materials, our ability to deliver our products to the market may be impeded.*

We are required to identify the supplier(s) of all the raw materials for our products in our applications with the FDA and other regulatory agencies in the U.S. To the extent practicable, we attempt to identify more than one supplier in each drug application. However, some products and raw materials are available only from a single source and, in many of our drug applications, only one supplier of products and raw materials or site of manufacture has been identified, even in instances where multiple sources exist. Some of these products have historically or may in the future account for a significant portion of our revenues, such as our products Botox®, breast aesthetics and our Juvederm® dermal filler family of products, Namenda®, INFed®, metoprolol succinate extended release tablets, methylphenidate hydrochloride extended release tablets, and a significant number of our oral contraceptive and controlled substance products. In addition, certain manufacturing facilities in Ireland are the exclusive qualified manufacturing facilities for finished dosage forms of many of our products, including our products, Namenda®, Bystolic® and Savella®. Any failure by us to forecast demand for, or to maintain an adequate supply of, the raw material and finished product could result in an

interruption in the supply of certain products and a decline in sales of that product. In addition, if our suppliers are unable to meet our manufacturing requirements, we may not be able to produce a sufficient amount of materials or products in a timely manner, which could cause a decline in our sales. We expect to continue to rely on our third-party manufacturing partners, including Teva after completion of the sale of our generics business, such as Ortho-McNeil- Janssen Pharmaceuticals, Inc. for methylphenidate ER, Contract Pharmaceuticals Limited Canada ("CPL") for Estrace® Cream and Norwich Pharmaceuticals Inc. ("NPI") for Actonel® and Atelvia®. GlaxoSmithKline plc ("GSK") currently manufactures our Asacol® 400 mg product sold in the United Kingdom. CPL, which manufactures our Estrace® Cream product, recently closed its manufacturing facility in Buffalo, New York and transferred its operations at that location to its facilities in Mississauga, Canada. Such transfers are subject to regulatory approvals, and the failure to obtain such approvals in a timely manner may delay production at the new facility and result in an interruption in our product supply. From time to time, certain of our manufacturing sites or outside suppliers have experienced regulatory or supply-related difficulties that have inhibited their ability to deliver products and raw materials to us, causing supply delays or interruptions. The availability and prices of raw materials and supplies are subject to volatility and are influenced by worldwide economic conditions, speculative action, world supply and demand balances, inventory levels, availability of substitute materials, currency exchange rates, anticipated or perceived shortages, product contamination, among other factors. To the extent any difficulties experienced by our manufacturing sites or suppliers cannot be resolved or extensions of our key supply agreements cannot be negotiated within a reasonable time and on commercially reasonable terms, or if raw materials for a particular product become unavailable from an approved supplier and we are required to qualify a new supplier with the FDA or other regulatory agency, or if we are unable to do so, our profit margins and market share for the affected product could decrease or be eliminated, as well as delay our development and sales and marketing efforts. Such outcomes could have a material adverse effect on our business, results of operations, financial condition and cash flows.

Our manufacturing sites outside of the United States and our arrangements with foreign suppliers are subject to certain additional risks, including the availability of government clearances, export duties, political instability, war, acts of terrorism, currency fluctuations and restrictions on the transfer of funds. For example, we obtain a significant portion of our raw materials from foreign suppliers. Arrangements with international raw material suppliers are subject to, among other things, FDA and foreign regulatory body regulation, customs clearances, various import duties and other government clearances, as well as potential shipping delays due to inclement weather, political instability, strikes or other matters outside of our control. Acts of governments outside the U.S. may affect the price or availability of raw materials needed for the development or manufacture of our products. In addition, recent changes in patent laws in jurisdictions outside the U.S. may make it increasingly difficult to obtain raw materials for R&D prior to the expiration of the applicable U.S. or foreign patents.

*Our generic business' policies regarding returns, allowances and chargebacks, and marketing programs adopted by wholesalers, may reduce our revenues in future fiscal periods.*

Consistent with generic industry practice we have liberal return policies and have been willing to give customers post-sale inventory allowances. Under these arrangements, from time to time, we may give our customers credits on our generic products that our customers hold in inventory after we have decreased the market prices of the same generic products. Therefore, if new competitors enter the marketplace and significantly lower the prices of any of their competing products, we may reduce the price of our product. As a result, we may be obligated to provide significant credits to our customers who are then holding inventories of such products, which could reduce sales revenue and gross margin for the period the credit is provided. Like our competitors, we also give credits for chargebacks to wholesale customers that have contracts with us for their sales to hospitals, group purchasing organizations, pharmacies or other retail customers. A chargeback represents an amount payable in the future to a wholesaler for the difference between the invoice price paid to us by our wholesale customer for a particular product and the negotiated price that the wholesaler's customer pays for that product. Although we establish reserves based on our prior experience and our best estimates of the impact that these policies may have in subsequent periods, we cannot ensure that our reserves are adequate or that actual product returns, allowances and chargebacks will not exceed our estimates, which could have a material adverse effect on our results of operations, financial condition, cash flows and the market price of our stock.

*Investigations of the calculation of average wholesale prices may adversely affect our business.*

Many government and third-party payers, including Medicare, Medicaid, Health Maintenance Organization ("HMOs") and Managed Care Organization ("MCOs"), have historically reimbursed doctors, pharmacies and others for the purchase of certain prescription drugs based on a drug's average wholesale price ("AWP") or wholesale acquisition cost ("WAC"). In the past several years, state and federal government agencies have conducted ongoing investigations of manufacturers' reporting practices with respect to AWP and WAC, in which they have suggested that reporting of inflated AWP's or WAC's has led to excessive payments for prescription drugs. For example, beginning in July 2002, we and certain of our subsidiaries, as well as numerous other pharmaceutical companies, were named as defendants in various state and federal court actions alleging improper or fraudulent practices related to the reporting of AWP and/or WAC of certain products, and other improper acts, in order to increase prices and market shares. Similarly, Forest is a defendant in three pending state actions alleging that manufacturers' reporting of AWP did not correspond to actual provider costs of prescription drugs. In December 2015, Forest and other company subsidiaries were named as defendants in a private

class action litigation in Pennsylvania based on similar allegations. Additional actions are possible. These actions, if successful, could adversely affect us and may have a material adverse effect on our business, results of operations, financial condition and cash flows.

*The design, development, manufacture and sale of our products involves the risk of product liability claims by consumers and other third parties, and insurance against such potential claims is expensive and may be difficult to obtain.*

The design, development, manufacture and sale of our products involve an inherent risk of product liability claims and the associated adverse publicity. For example, Forest is subject to approximately 200 legal actions asserting product liability claims relating to the use of Celexa® or Lexapro. These cases include claims that Celexa® or Lexapro caused various birth defects. While we believe there is no merit to these cases, litigation is inherently subject to uncertainties and we may be required to expend substantial amounts in the defense or resolution of certain of these matters. We regularly monitor the use of our products for trends or increases in reports of adverse events or product complaints, and regularly report such matters to the FDA. In some, but not all cases, an increase in adverse event reports may be an indication that there has been a change in a product's specifications or efficacy. Such changes could lead to a recall of the product in question or, in some cases, increases in product liability claims related to the product in question. If the coverage limits for product liability insurance policies are not adequate or if certain of our products are excluded from coverage, a claim brought against us, whether covered by insurance or not, could have a material adverse effect on our business, results of operations, financial condition and cash flows. We also rely on self-insurance to cover product liability claims, and these claims may exceed amounts we have reserved under our self-insurance program.

We are also subject to a variety of other types of claims, proceedings, investigations and litigation initiated by government agencies or third parties. These include compliance matters, product regulation or safety, taxes, employee benefit plans, employment discrimination, health and safety, environmental, antitrust, customs, import/export, government contract compliance, financial controls or reporting, intellectual property, allegations of misrepresentation, false claims or false statements, commercial claims, claims regarding promotion of our products and services, or other similar matters. For example, consumer groups and certain plaintiffs have alleged that certain uses of Botox®, including off-label uses, have caused patient injuries and death and have further failed to adequately warn patients of the risks relating to Botox® use. From time to time reports related to the quality and safety of breast implant devices are published, including reports that have suggested a possible association between anaplastic large cell lymphoma and breast implants, as well as negative reports from regulatory authorities in Europe related to a breast implant manufacturer that is not affiliated with the Company. In addition, government investigations related to the use of products, but not the efficacy themselves, may cause reputational harm to the Company. Negative publicity-whether accurate or inaccurate-about the efficacy, safety or side effects of our products or product categories, whether involving us or a competitor, could materially reduce market acceptance to our products, cause consumers to seek alternatives to our products, result in product withdrawals and cause our stock price to decline. Negative publicity could also result in an increased number of product liability claims, whether or not these claims have a basis in scientific fact. Any such claims, proceedings, investigations or litigation, regardless of the merits, might result in substantial costs, restrictions on product use or sales, or otherwise injure our business.

*The loss of our key personnel could cause our business to suffer.*

The success of our present and future operations will depend, to a significant extent, upon the experience, abilities and continued services of key personnel. For example, although we have other senior management personnel, a significant loss of the services of Brent Saunders, our Chief Executive Officer, or Paul Bisaro, our Executive Chairman, or other senior executive officers without having or hiring a suitable successor, could cause our business to suffer. We cannot assure you that we will be able to attract and retain key personnel. We have entered into employment agreements with many of our senior executive officers but such agreements do not guarantee that our senior executive officers will remain employed by us for a significant period of time, or at all. We do not carry key-employee life insurance on any of our officers.

*Significant balances of intangible assets, including product rights and goodwill acquired, are subject to impairment testing and may result in impairment charges, which will adversely affect our results of operations and financial condition.*

A significant amount of our total assets is related to acquired intangibles and goodwill. As of December 31, 2015, the carrying value of our product rights and other intangible assets was $67,931.7 million and the carrying value of our goodwill was $46,551.5 million.

34

Our product rights are stated at cost, less accumulated amortization. We determine original fair value and amortization periods for product rights based on our assessment of various factors impacting estimated useful lives and cash flows of the acquired products. Such factors include the product's position in its life cycle, the existence or absence of like products in the market, various other competitive and regulatory issues and contractual terms. Significant adverse changes to any of these factors would require us to perform an impairment test on the affected asset and, if evidence of impairment exists, we would be required to take an impairment charge with respect to the asset. For assets that are not impaired, the Company may adjust the remaining useful lives. Such a charge could have a material adverse effect on our results of operations and financial condition.

Our other significant intangible assets include acquired core technology and customer relationships, which are intangible assets with definite lives, our Anda trade name and acquired IPR&D intangible products, acquired in recent business acquisitions, which are intangible assets with indefinite lives.

Our acquired core technology and customer relationship intangible assets are stated at cost, less accumulated amortization. We determined the original fair value of our other intangible assets by performing a discounted cash flow analysis, which is based on our assessment of various factors. Such factors include existing operating margins, the number of existing and potential competitors, product pricing patterns, product market share analysis, product approval and launch dates, the effects of competition, customer attrition rates, consolidation within the industry and generic product lifecycle estimates. Our other intangible assets with definite lives are tested for impairment when there are significant changes to any of these factors. If evidence of impairment exists, we would be required to take an impairment charge with respect to the impaired asset. Such a charge could have a material adverse effect on our results of operations and financial condition.

Goodwill, our Anda trade name intangible asset and our IPR&D intangible assets are tested for impairment annually, or when events occur or circumstances change that could potentially reduce the fair value of the reporting unit or intangible asset. Impairment testing compares the fair value of the reporting unit or intangible asset to its carrying amount. A goodwill, trade name or IPR&D impairment, if any, would be recorded in operating income and could have a material adverse effect on our results of operations and financial condition. For example, in 2013 the Company recognized a goodwill impairment charge of $647.5 million within discontinued operations.

### We may need to raise additional funds in the future which may not be available on acceptable terms or at all.

We may consider issuing additional debt or equity securities in the future to fund potential acquisitions or investments, to refinance existing debt, or for general corporate purposes. If we issue equity, convertible preferred equity or convertible debt securities to raise additional funds, our existing shareholders may experience dilution, and the new equity or debt securities may have rights, preferences and privileges senior to those of our existing shareholders. If we incur additional debt, it may increase our leverage relative to our earnings or to our equity capitalization, requiring us to pay additional interest expenses and potentially lowering our credit ratings. We may not be able to market such issuances on favorable terms, or at all, in which case, we may not be able to develop or enhance our products, execute our business plan, take advantage of future opportunities, or respond to competitive pressures or unanticipated customer requirements.

### Our business could suffer as a result of manufacturing difficulties or delays.

The manufacture of certain of our products and product candidates, particularly our controlled-release products, transdermal products, injectable products, and our oral contraceptive products, is more difficult than the manufacture of immediate-release products. Successful manufacturing of these types of products requires precise manufacturing process controls, API that conforms to very tight tolerances for specific characteristics and equipment that operates consistently within narrow performance ranges. Manufacturing complexity, testing requirements, and safety and security processes combine to increase the overall difficulty of manufacturing these products and resolving manufacturing problems that we may encounter.

Our manufacturing and other processes utilize sophisticated equipment, which sometimes require a significant amount of time to obtain and install. Our business could suffer if certain manufacturing or other equipment, or a portion or all of our facilities were to become inoperable for a period of time. This could occur for various reasons, including catastrophic events such as earthquake, monsoon, hurricane or explosion, unexpected equipment failures or delays in obtaining components or replacements thereof, contamination by microorganisms or viruses, labor disputes or shortages, contractual disputes with our suppliers and contract manufacturers, as well as construction delays or defects and other events, both within and outside of our control. We manufacture certain products, including Botox®, breast aesthetics and our Juvederm® dermal filler family of products, at a single facility or a single site. Therefore, a significant disruptive event, including a fire or natural disaster, at certain manufacturing facilities or sites could materially and adversely affect our business and results of operations. In the event of a disruption, we may need to build or locate replacement facilities as well as seek and obtain the necessary regulatory approvals for these facilities. Interruption of our efficient manufacture and supply of products may cause delays in shipments and supply constraints. Our inability to timely manufacture any of our significant products could have a material adverse effect on our results of operations, financial condition and cash flows.

Our manufacturing processes and those of our third-party contract manufacturers must undergo a potentially lengthy FDA or other regulatory approval process and are subject to continued review by the FDA and other regulatory authorities.  It can take longer than five years to build, validate and license a new manufacturing plant and it can take longer than three years to qualify and license a new contract manufacturer.  If regulatory authorities determine that we or our third-party contract manufacturers or certain of our third-party service providers have violated regulations or if they restrict, suspend or revoke our prior approvals, they could prohibit us from manufacturing our products or conducting clinical trials or selling our marketed products until we or the affected third-party contract manufacturers or third-party service providers comply, or indefinitely.  Because our third-party contract manufacturers and certain of our third-party service providers are subject to the FDA and foreign regulatory authorities, alternative qualified third-party contract manufacturers and third-party service providers may not be available on a timely basis or at all.  If we or our third-party contract manufacturers or third-party service providers cease or interrupt production or if our third-party contract manufacturers and third-party service providers fail to supply materials, products or services to us, we may experience delayed shipments, supply constraints, stock-outs and/or recalls of our products.

*Our business will continue to expose us to risks of environmental liabilities.*

Our product and API development programs, manufacturing processes and distribution logistics involve the controlled use of hazardous materials, chemicals and toxic compounds in our owned and leased facilities.  As a result, we are subject to numerous and increasingly stringent federal, state and local environmental laws and regulations concerning, among other things, the generation, handling, storage, transportation, treatment and disposal of toxic and hazardous materials and the discharge of pollutants into the air and water.  Our programs and processes expose us to risks that an accidental contamination could result in (i) our noncompliance with such environmental laws and regulations and (ii) regulatory enforcement actions or claims for personal injury and property damage against us.  If an accident or environmental discharge occurs, or if we discover contamination caused by prior operations, including by prior owners and operators of properties we acquire, we could be liable for cleanup obligations, damages and fines.  The substantial unexpected costs we may incur could have a material and adverse effect on our business, results of operations, financial condition, and cash flows.  In addition, environmental permits and controls are required for some of our operations, and these permits are subject to modification, renewal and revocation by the issuing authorities.  Any modification, revocation or non-renewal of our environmental permits could have a material adverse effect on our ongoing operations, business and financial condition.  Our environmental capital expenditures and costs for environmental compliance may increase in the future as a result of changes in environmental laws and regulations or increased development or manufacturing activities at any of our facilities.

*Global economic conditions could harm us.*

Recent global market and economic conditions have been unprecedented and challenging with tighter credit conditions and recession in most major economies during recent years.  Continued concerns about the systemic impact of potential long-term and wide-spread recession, energy costs, geopolitical issues particularly in areas in which we operate, the availability and cost of credit, and the global real estate markets have contributed to increased market volatility and diminished expectations for western and emerging economies.  These conditions, combined with volatile oil prices, declining business and consumer confidence and increased unemployment, have contributed to volatility of unprecedented levels.

As a result of these market conditions, the cost and availability of credit has been and may continue to be adversely affected by illiquid credit markets and wider credit spreads.  Concern about the stability of the markets generally and the strength of counterparties specifically has led many lenders and institutional investors to reduce, and in some cases, cease to provide credit to businesses and consumers.  These factors have resulted in a decrease in spending by businesses and consumers alike, and a corresponding decrease in global infrastructure spending.  Continued turbulence in the U.S. and international markets and economies and prolonged declines in business consumer spending may adversely affect our liquidity and financial condition, and the liquidity and financial condition of our customers, including our ability to refinance maturing liabilities and access the capital markets to meet liquidity needs.

Global efforts towards health care cost containment continue to exert pressure on product pricing and market access.  In many international markets, government-mandated pricing actions have reduced prices of generic and patented drugs.

Global economic conditions could adversely affect the ability of third-party distributors, partners, manufacturers and suppliers to obtain liquidity required to buy inventory or raw materials and to perform their obligations under agreements with us, which could disrupt our operations.

In particular, some countries within emerging markets may be especially vulnerable to periods of global financial instability or may have very limited resources to spend on healthcare or may be or will be in the future subject to economic sanctions, and our business in these countries may be disproportionately affected by economic changes.  In addition, many of these countries have currencies that fluctuate substantially and if such currencies devalue and the Company cannot offset the devaluations, the Company's financial performance within such countries could be adversely affected.

36

*Our foreign operations may become less attractive if political and diplomatic relations between the United States and any country where we conduct business operations deteriorates.*

The relationship between the United States and the foreign countries where we conduct business operations may weaken over time.  Changes in the state of the relations between any such country and the United States are difficult to predict and could adversely affect our future operations.  This could lead to a decline in our profitability.  Any meaningful deterioration of the political, economic and diplomatic relations between the United States and the relevant country could have a material adverse effect on our operations.

*Our global operations, particularly following our acquisitions of of AqueSys, Northwood Medical Innovation, Kythera, Oculeve, Auden Mckenzie and Legacy Allergan and our pending business combination with Pfizer, expose us to risks and challenges associated with conducting business internationally.*

We operate on a global basis with offices or activities in Europe, Africa, Asia, South America, Australia and North America.  We face several risks inherent in conducting business internationally, including compliance with international and U.S. laws and regulations that apply to our international operations.  These laws and regulations include data privacy requirements, labor relations laws, tax laws, competition regulations, import and trade restrictions, economic sanctions, export requirements, U.S. laws such as the Foreign Corrupt Practices Act, the UK Bribery Act 2010 and other local laws that prohibit corrupt payments to governmental officials or certain payments or remunerations to customers.  Given the high level of complexity of these laws there is a risk that some provisions may be breached by us, for example through fraudulent or negligent behavior of individual employees, our failure to comply with certain formal documentation requirements, or otherwise.  Violations of these laws and regulations could result in fines, criminal sanctions against us, our officers or our employees, requirements to obtain export licenses, cessation of business activities in sanctioned countries, implementation of compliance programs, and prohibitions on the conduct of our business.  Any such violations could include prohibitions on our ability to offer our products in one or more countries and could materially damage our reputation, our brand, our international expansion efforts, our ability to attract and retain employees, our business and our operating results.  Our success depends, in part, on our ability to anticipate these risks and manage these challenges.  Further, certain of our employees, including employees located in certain jurisdictions in Canada, Europe and Asia, are represented by collective bargaining or other labor agreements or arrangements that provide bargaining or other rights to employees.  Such employment rights require us to expend greater time and expense in making changes to employees' terms of employment or carrying out staff reductions.  In addition, any national or other labor disputes in these regions could result in a work stoppage or strike by our employees that could delay or interrupt our ability to supply products and conduct operations.  Due to the nature of these collective bargaining agreements, we will have no control over such work stoppages or strikes by such employees, and a strike may occur even if the employees do not have any grievances against us.  Any interruption in manufacturing or operations could interfere with our business and could have a material adverse effect on our revenues.

In addition to the foregoing, engaging in international business inherently involves a number of other difficulties and risks, including:

- longer payment cycles and difficulties in enforcing agreements and collecting receivables through certain foreign legal systems;

- political and economic instability or sanctions in areas in which we operate;

- potentially adverse tax consequences, tariffs, customs charges, bureaucratic requirements and other trade barriers;

- regulations related to customs and import/export matters (including sanctions);

- tax issues, such as tax law changes and variations in tax laws;

- challenges in collecting accounts receivable from customers in the jurisdictions in which we operate;

- complying with laws, rules and regulations relating to the manufacturing, marketing, distribution and sale of pharmaceutical products in the jurisdictions in which we do or will operate;

- operating under regulations in jurisdictions related to obtaining eligibility for government or private payor reimbursement for our products at the wholesale/retail level;

- competition from local, regional and international competitors;

- difficulties and costs of staffing and managing foreign operations, including cultural and language differences and additional employment regulations, union workforce negotiations and potential disputes in the jurisdictions in which we operate;

- difficulties associated with compliance with a variety of laws and regulations governing international trade, including the Foreign Corrupt Practices Act;

37

- difficulties protecting or procuring intellectual property rights; and
- fluctuations in foreign currency exchange rates.

These factors or any combination of these factors could have a material adverse effect on our results of operations and financial condition.

*We have exposure to tax liabilities.*

As a multinational corporation, we are subject to income taxes as well as non-income based taxes in various jurisdictions. Significant judgment is required in determining our worldwide provision for income taxes and other tax liabilities. We are subject to costs and other potential outcomes from tax audits. The Company believes that its accrual for tax contingencies is adequate for all open years based on past experience, interpretations of tax law, and judgments about potential actions by tax authorities; however, due to the complexity of tax contingencies, the ultimate resolution of any tax matters may result in payments greater or less than amounts accrued.

Changes in tax laws or tax rulings may have a significantly adverse impact on our effective tax rate. Proposals by the current U.S. administration for fundamental U.S. international tax reform, including without limitation provisions that would limit the ability of U.S. multinationals to deduct interest on related party debt, if enacted, could have a significant adverse impact on our effective tax rate. Many countries in Europe, as well as a number of other countries and organizations, have recently proposed or recommended changes to existing tax laws which could impact our future tax obligations. The Organization for Economic Cooperation and Development has been working on a Base Erosion and Profit Sharing Project, and is expected to continue to issue, guidelines and proposals that may change various aspects of the existing framework under which our tax obligations are determined in many of the countries in which we do business. The European Commission has conducted investigations in multiple countries focusing on whether local country tax rulings or tax legislation provides preferential tax treatment that violates European Union state aid rules. If the Company's effective tax rates were to increase, or if the ultimate determination of the Company's taxes owed is for an amount in excess of amounts previously accrued, the Company's operating results, cash flows, and financial condition could be adversely affected.

*We would be adversely affected if, either based on current law or in the event of a change in law, the Internal Revenue Service did not agree that Allergan plc is a foreign corporation for U.S. federal tax purposes. In addition, future changes to international tax laws not specifically related to inversions could adversely affect us.*

Allergan plc believes that, under current law, it is treated as a foreign corporation for U.S. federal tax purposes, because it is an Irish incorporated entity. However, the IRS may assert that Allergan plc should be treated as a U.S. corporation for U.S. federal tax purposes pursuant to Section 7874. Under Section 7874, a corporation created or organized outside the United States (i.e., a foreign corporation) will be treated as a U.S. corporation for U.S. federal tax purposes when (i) the foreign corporation directly or indirectly acquires substantially all of the assets held directly or indirectly by a U.S. corporation (including the indirect acquisition of assets of the U.S. corporation by acquiring all the outstanding shares of the U.S. corporation), (ii) the shareholders of the acquired U.S. corporation hold at least 80% (by either vote or value) of the shares of the foreign acquiring corporation after the acquisition by reason of holding shares in the U.S. acquired corporation (including the receipt of the foreign corporation's shares in exchange for the U.S. corporation's shares), and (iii) the foreign corporation's "expanded affiliated group" does not have substantial business activities in the foreign corporation's country of organization or incorporation relative to such expanded affiliated group's worldwide activities. For purposes of Section 7874, multiple acquisitions of U.S. corporations by a foreign corporation, if treated as part of a plan or series of related transactions, may be treated as a single acquisition. If multiple acquisitions of U.S. corporations are treated as a single acquisition, all shareholders of the acquired U.S. corporations would be aggregated for purposes of the test set forth above concerning such shareholders holding at least 80% (by either vote or value) of the shares of the foreign acquiring corporation after the acquisitions by reason of holding shares in the acquired U.S. corporations.

Allergan believes that the test set forth above to treat Allergan as a foreign corporation was satisfied in connection with the acquisition of Actavis, Inc., a Nevada corporation, and Warner Chilcott plc, a company incorporated under the laws of Ireland (the "Warner Chilcott Transaction") on October 1, 2013. However, the law and Treasury regulations promulgated under Section 7874 are relatively new and somewhat unclear, and thus it cannot be assured that the IRS will agree that the ownership requirements to treat Allergan as a foreign corporation were met. Moreover, even if such ownership requirements were met in the Warner Chilcott Transaction and the subsequent acquisition of all of the common stock of Forest Laboratories, Inc., a company incorporated under the laws of the State of Delaware (the "Forest Transaction"), the IRS may assert that, even though the Merger is a separate transaction from the Warner Chilcott Transaction and the Forest Transaction, the Merger should be integrated with the Warner Chilcott Transaction and the Forest Transaction as a single transaction. In the event the IRS were to prevail with such assertion, Allergan would be treated as a U.S. corporation for U.S. federal tax purposes and significant adverse tax consequences would result for Allergan.

In addition, changes to the inversion rules in Section 7874 or the U.S. Treasury Regulations promulgated thereunder or other IRS guidance could adversely affect Allergan plc's status as a foreign corporation for U.S. federal tax purposes, and any such changes could have prospective or retroactive application to Allergan, Allergan Inc., their respective stockholders, shareholders and affiliates, and/or the Allergan Acquisition.  For example, in March 2014, the President of the United States proposed legislation that would amend the anti-inversion rules.  In September 2014 and November 2015, the U.S. Treasury and the IRS issued additional guidance stating that they intend to issue regulations that will address certain inversion transactions.

Even if Allergan is respected as a foreign corporation for U.S. federal tax purposes, Allergan might be adversely impacted by recent proposals that have aimed to make other changes in the taxation of multinational corporations.  For example, the Organisation for Economic Co-operation and Development has released proposals to create an agreed set of international rules for fighting base erosion and profit shifting.  As a result, the tax laws in the United States, Ireland, and other countries in which we and our affiliates do business could change on a prospective or retroactive basis, and any such changes could adversely affect Allergan and its affiliates (including Legacy Allergan and its affiliates).

Moreover, U.S. and foreign tax authorities may carefully scrutinize companies that result from cross-border business combination, such as Allergan plc, which may lead such authorities to assert that Allergan plc owes additional taxes.

*Foreign currency fluctuations could adversely affect our business and financial results.*

We do business and generate sales in numerous countries outside the United States.  The Company has also entered and will continue to enter into acquisition, licensing, borrowing, hedging or other financial transactions that may give rise to currency and interest rate exposure.  As such, foreign currency fluctuations may affect the costs that we incur in such international operations.  Some of our operating expenses are incurred in non-U.S. dollar currencies.  The appreciation of non-U.S. dollar currencies in those countries where we have operations against the U.S. dollar could increase our costs and could harm our results of operations and financial condition.

*We have incurred and will continue to incur significant transaction, integration and restructuring costs in connection with recent transactions, including our acquisitions of AqueSys, Northwood Medical Innovations, Kythera, Oculeve, Auden Mckenzie and Legacy Allergan, the pending sale of our generics business and certain other assets to Teva and our pending business combination with Pfizer.*

We have incurred significant transaction costs related to our acquisitions of Kythera and Legacy Allergan, the pending sale of our generics business and certain other assets to Teva and our pending business combination with Pfizer and will continue to incur significant transaction costs related to past acquisitions and pending transactions with Teva and Pfizer.  In addition, we will incur integration costs and restructuring costs as we integrate the businesses.  While Allergan has assumed that a certain level of transaction and coordination expenses will be incurred, there are a number of factors beyond Allergan's control that could affect the total amount or the timing of these transaction and coordination expenses.  Many of the expenses that will be incurred, by their nature, are difficult to estimate accurately.  Although we expect that the realization of benefits and efficiencies related to the integration of the businesses may offset these transaction costs, integration costs and restructuring costs over time, no assurances can be made that this net benefit will be achieved in the near term, or at all.  The failure to realize the expected benefits and efficiencies related to the integration of the businesses could adversely affect our financial condition and results of operations.

In addition, as a result of acquiring businesses, technologies or products, or entering into other significant transactions, we may experience significant charges to earnings for merger and related expenses.  These costs may include substantial fees for investment bankers, attorneys, accountants, advisors, consultants and severance and other closure costs associated with regulator-mandated divestitures and the elimination of duplicate or discontinued products, operations and facilities.  Charges that we may incur in connection with acquisitions could adversely affect our results of operations for particular quarterly or annual periods.

*Substantial amounts of our information concerning our products, customers, employees and ongoing business are stored digitally and are subject to threats of theft, tampering, or other intrusion.*

We collect and maintain information in digital form that is necessary to conduct our business, and we are increasingly dependent upon information technology systems, infrastructure and data.  This digital information includes, but is not limited to, confidential and proprietary information as well as personal information regarding our customers and employees.  Data maintained in digital form is subject to the risk of intrusion, tampering, and theft.  Cyber-attacks are increasing in frequency, sophistication and intensity.  Cyber-attacks could include the deployment of harmful malware, denial-of-service attacks, worms, social engineering and other means to affect service reliability and threaten data confidentiality, integrity and availability.  We have established physical, electronic, and organizational measures to safeguard and secure our systems to prevent a data compromise, and rely on commercially available systems, software, tools, and monitoring to provide security for the processing, transmission and storage of digital information.

However, the development and maintenance of these systems is costly and requires ongoing monitoring and updating as technologies change and efforts to overcome security measures become increasingly more sophisticated.  Despite our efforts, the possibility of a future data compromise cannot be eliminated entirely, and risks associated with intrusion, tampering, and theft remain.  Data privacy or security breaches by employees or others may pose a risk that data, including intellectual property or personal information, may be exposed to unauthorized individuals or to the public.  In addition, we provide confidential, proprietary and personal information to third parties when it is necessary to pursue our business objectives.  While we obtain assurances that these third parties will protect this information and, where appropriate, monitor the protections employed by these third parties, there is a risk the confidentiality of data held by third parties may be compromised.  If our data systems are compromised, our business operations may be impaired, we may lose profitable opportunities or the value of those opportunities may be diminished, and we may lose revenue as a result of unlicensed use of our intellectual property.  If personal information of our customers or employees is misappropriated, our reputation with our customers and employees may be injured resulting in loss of business and/or morale, and we may incur costs to remediate possible injury to our customers and employees or be required to pay fines or take other action with respect to judicial or regulatory actions arising out of such incidents.

*A failure of our internal control over financial reporting could materially impact our business or share price.*

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting.  An internal control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met.  Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs.  Because of the inherent limitations in all internal control systems, internal control over financial reporting may not prevent or detect misstatements.  Any failure to maintain an effective system of internal control over financial reporting could limit our ability to report our financial results accurately and timely or to detect and prevent fraud, and could expose us to litigation or adversely affect the market price of the Allergan plc Ordinary Shares.

In the year ended December 31, 2013, management concluded that there was a material weakness in internal controls over financial reporting as it did not design or maintain effective internal controls with respect to segregation of duties and related information technology general controls regarding user access and change management activities.  Specifically, the controls were not designed to provide reasonable assurance that incompatible access within the system, including the ability to record transactions, was appropriately segregated, impacting the validity, accuracy and completeness of all key accounts and disclosures.  The locations impacted were principally related to the international entities acquired as part of the Actavis Group in 2012.  The Company has remediated the material weaknesses as of December 31, 2014.

*Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development, manufacturing and distribution capabilities.*

All pharmaceutical companies, including Allergan, are subject to extensive, complex, costly and evolving government regulation.  For the U.S., this is principally administered by the FDA, but is also administered by the Drug Enforcement Agency "DEA" and state government agencies, as well as by varying regulatory agencies in foreign countries where products or product candidates are being manufactured and/or marketed.  The Federal Food, Drug and Cosmetic Act, the Controlled Substances Act and other federal statutes and regulations, and similar foreign statutes and regulations, govern or influence the development, testing, manufacturing, packing, labeling, storing, record keeping, safety, approval, advertising, promotion, sale, distribution and import/export of our products.  Foreign regulatory authorities impose similar requirements focused on drug safety and effectiveness.  Obtaining and maintaining regulatory approval has been and will continue to be increasingly difficult, time-consuming and costly.  In addition, changes in applicable federal, state and foreign laws and regulations or the implementation of new laws and regulations could affect our ability to obtain or maintain approval of our products and could have a material adverse effect on the Company's business.

Once regulatory approval has been obtained, agencies continue to have substantial authority to require additional testing, perform inspections, change product labeling or mandate withdrawals of our products.  Failure to comply with applicable regulatory requirements may subject us to administrative or judicially-imposed sanctions.  These sanctions may include, among others, untitled letters, warning letters, fines, civil penalties, criminal penalties, injunctions, debarment, product seizure or detention, product recalls and total or partial suspension of production, sale and promotion.  In addition, we may voluntarily elect to recall or restrict the use of a product.  Any recall or restriction could divert managerial and financial resources and might harm our reputation.

Under these statutes and regulations, we are subject to periodic inspection of our facilities, procedures and operations and/or the testing of our products by the FDA and similar ex-U.S. authorities, the DEA and other authorities, which conduct periodic inspections to confirm that we are in compliance with all applicable requirements.  In addition, the FDA and foreign regulatory agencies conduct pre-approval and post-approval reviews and plant inspections to determine whether our systems and processes are in compliance with

cGMP and other regulations. Following such inspections, the FDA or other agency may issue observations, notices, citations and/or warning letters that could cause us to modify certain activities identified during the inspection. FDA guidelines specify that a warning letter is issued only for violations of "regulatory significance" for which the failure to adequately and promptly achieve correction may be expected to result in an enforcement action. We are also required to report adverse events associated with our products to the FDA and other regulatory authorities. Unexpected or serious health or safety concerns could result in product liability claims, labeling changes, recalls, market withdrawals or other regulatory actions, including withdrawal of product approvals. Adverse events and safety concerns can arise as our product candidates are evaluated in clinical trials or as our marketed products are used in clinical practice. We are required to communicate to regulatory agencies adverse events reported to us regarding our products.

Our manufacturing facility in Corona, California is currently subject to a consent decree of permanent injunction. We cannot assure that the FDA will determine we have adequately corrected deficiencies at our Corona manufacturing site, that subsequent FDA inspections at any of our manufacturing sites will not result in additional inspectional observations at such sites, that approval of any of the pending or subsequently submitted NDAs, ANDAs or supplements to such applications by Allergan plc or our subsidiaries will be granted or that the FDA will not seek to impose additional sanctions against Allergan plc or any of its subsidiaries. The range of possible sanctions includes, among others, FDA issuance of adverse publicity, product recalls or seizures, fines, total or partial suspension of production and/or distribution, suspension of the FDA's review of product applications, enforcement actions, injunctions, and civil or criminal prosecution. Any such sanctions, if imposed, could have a material adverse effect on our business, operating results, financial condition and cash flows. Under certain circumstances, the FDA also has the authority to revoke previously granted drug approvals. Similar sanctions as detailed above may be available to the FDA under a consent decree, depending upon the actual terms of such decree. Although we have instituted internal compliance programs, if these programs do not meet regulatory agency standards or if compliance is deemed deficient in any significant way, it could materially harm our business. Certain of our vendors are subject to similar regulation and periodic inspections and may be operating under consent decrees.

In order to market our products in the United States and other jurisdictions, we must obtain separate regulatory approvals and comply with numerous and varying regulatory requirements. The process for obtaining governmental approval to manufacture and market pharmaceutical products is rigorous, time-consuming, uncertain and costly, and we cannot predict the extent to which we may be affected by legislative and regulatory developments. We are dependent on receiving FDA and other governmental or third-party approvals prior to manufacturing, marketing and shipping our products. There is always the chance that we will not obtain FDA or other necessary approvals, or that the rate, timing and cost of obtaining such approvals, will adversely affect our product introduction plans or results of operations. Additionally, any regulatory approvals we receive may be subject to limitations on the approved indicated uses for which the product may be marketed or to the conditions of approval or may contain requirements for potentially costly additional clinical trials and surveillance to monitor the safety and efficacy of the product. We may only market or promote our products for their approved indications, and our labeling, promotional activities and advertising are subject to extensive regulation and oversight. We carry inventories of certain product(s) in anticipation of launch, and if such product(s) are not subsequently launched, we may be required to write-off the related inventory.

Our Anda Distribution operations and our customers are subject to various regulatory requirements, including requirements of the DEA, FDA, state boards of pharmacy and city and county health regulators, among others. These include licensing, registration, recordkeeping, security and reporting requirements. The DEA requires our Anda Distribution business to monitor customer orders of DEA Scheduled Drugs and to report suspicious orders to the DEA. Any determination by the DEA that we have failed to comply with applicable laws and regulations could result in DEA suspending, terminating or refusing to renew Anda Distribution's license to distribute Scheduled Drugs. Additionally, although physicians may prescribe FDA approved products for an "off label" indication, we are permitted to market our products only for the indications for which they have been approved. Some of our products are prescribed off label and the FDA, the U.S. Department of Justice, other regulatory authorities could take enforcement actions if they conclude that we or our distributors have engaged in off label marketing. In addition, historically a number of states and the federal government have enforced licensing and anti-counterfeit drug pedigree laws which require the tracking of all transactions involving prescription drugs beginning with the manufacturer, through the supply chain, and down to the pharmacy or other health care provider dispensing or administering prescription drug products. Therefore, manufacturers and wholesale distributors, including our subsidiary, ANDA Pharmaceuticals, have been required to maintain records documenting the chain of custody on distribution of prescription drugs. On November 27, 2013, the federal government enacted the Drug Quality and Security Act (DQSA) amending federal requirements in regard to the licensing and tracking of prescription drugs. Certain provisions in the new law related to licensing and track and trace specifically preempted prior state laws related to drug pedigrees that are inconsistent, more stringent, or in addition to the federal law. Specifically, Title II of the DQSA, also known as the Drug Supply Chain Security Act ("DSCSA"), provides for creation of an electronic, interoperable system to identify and trace certain prescription drugs as they are distributed in the United States. These amendments include new requirements on licensing, tracking and tracing and other operations applicable to manufacturers and wholesale distributors of prescription drug products. The full requirements of the DSCSA will be phased in over a ten year period; however, in January 2015, specific product tracing requirements for manufacturers, wholesalers, repackagers and dispensers (e.g., pharmacies) of prescription drugs became effective. Also, as of January 2015, the DSCSA required manufacturers and wholesale distributors to implement systems to identify potential "suspect" or "illegitimate" product, and take appropriate action. The DSCSA also addresses product tracing using unique product identifiers on packaging, and requirements for standardized numerical identifiers which will take effect in the future.

41

In addition to government agencies that promulgate regulations and guidelines directly applicable to us, other professional societies, practice management groups, insurance carriers, physicians, private health or science foundations and organizations involved in various diseases from time to time may also publish guidelines or recommendations to healthcare providers, administrators and payers, and patient communities.  For example, the treatment practices of physicians that currently prescribe our products may change.  Recommendations by government agencies or other groups and organizations may relate to such matters as usage, dosage, route of administration and use of related therapies, as well as reimbursement of our products by government and private payers.  Any recommendations or guidelines that result in decreased use, dosage or reimbursement of our products could materially and adversely affect our product sales, business and operating results.

### The supply of APIs into Europe may be negatively affected by recent regulations promulgated by the European Union.

As of July 2, 2013, all API's imported into the EU must be certified as complying with the good manufacturing practice ("GMP") standards established by the EU, as stipulated by the International Conference for Harmonization.  These new regulations place the certification requirement on the regulatory bodies of the exporting countries.  Accordingly, as of July 2, 2013, the national regulatory authorities of each exporting country must:  (i) insure that all manufacturing plants within their borders that export API into the EU comply with EU manufacturing standards and; (ii) for each API exported, present a written document confirming that the exporting plant conforms to EU manufacturing standards.  The imposition of this responsibility on the governments of the nations exporting API may cause a shortage of API necessary to manufacture our products, as certain governments may not be willing or able to comply with the regulation in a timely fashion, or at all.  A shortage in API may cause us to have to cease manufacture of certain products, or to incur costs and delays to qualify other suppliers to substitute for those API manufacturers unable to export.  This could adversely affect the Company and could have a material adverse effect on our business, results of operations, financial condition and cash flow.

### Federal regulation of arrangements between manufacturers of brand and generic products could adversely affect our business.

As part of the Medicare Prescription Drug and Modernization Act of 2003 (the "MMA") companies are required to file with the FTC and the Department of Justice certain types of agreements entered into between brand and generic pharmaceutical companies related to the manufacture, marketing and sale of generic versions of brand drugs.  This requirement, as well as new legislation pending in the U.S. Congress related to settlements between brand and generic drug manufacturers, could affect the manner in which generic drug manufacturers resolve intellectual property litigation and other disputes with brand pharmaceutical companies and could result generally in an increase in private-party litigation against pharmaceutical companies or additional investigations or proceedings by the FTC or other governmental authorities.  The impact of this requirement, the pending legislation and the potential private-party lawsuits associated with arrangements between brand name and generic drug manufacturers, is uncertain and could adversely affect our business.  For example, on April 5, 2013, two putative class actions were filed against Actavis, Inc. and certain affiliates alleging that Watson Pharmaceuticals, Inc.'s 2009 patent lawsuit settlement with Warner Chilcott related to Loestrin® 24 Fe (norethindrone acetate/ethinyl estradiol tablets and ferrous fumarate tablets, "Loestrin® 24") is unlawful.  The complaints, both asserted on behalf of putative classes of end-payors, generally allege that Watson and another generic manufacturer improperly delayed launching generic versions of Loestrin® 24 in exchange for substantial payments from Warner Chilcott, which at the time was an unrelated company, in violation of federal and state antitrust and consumer protection laws.  Further, in January 2009, the FTC and the State of California filed a lawsuit against us alleging that our settlement with Solvay related to our ANDA for a generic version of Androgel® is unlawful.  Numerous private parties purporting to represent various classes of plaintiffs filed similar lawsuits.  Similar lawsuits have been filed against us challenging the lawfulness of our settlements related to Asacol® and Namenda® and generic versions of Actos®, Androgel®, Cipro®, and Lidoderm®.  We have also received requests for information and Statements of Objection in connection with investigations into settlements and other arrangements between competing pharmaceutical companies by the Federal Trade Commission and the European Competition Commission.  In the past, we have also received requests for information and Statements of Objection in connection with investigations into settlements and other arrangements between competing pharmaceutical companies by the Federal Trade Commission and the European Competition Commission.  In May 2014, Forest received a Civil Investigatory Demand from the FTC requesting information about Forest's agreements with ANDA filers for Bystolic®.   Any adverse outcome of these actions or investigations, or actions or investigations related to other settlements we have entered into, could have a material adverse effect on our business, results of operations, financial condition and cash flows.  Refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements".

### Healthcare reform and a reduction in the coverage and reimbursement levels by governmental authorities, HMOs, MCOs or other third-party payers may adversely affect our business.

Demand for our products depends in part on the extent to which coverage and reimbursement is available from third-party payers, such as the Medicare and Medicaid programs and private payors.  In order to commercialize our products, we have obtained from government authorities and private health insurers and other organizations, such as HMOs and MCOs, recognition for coverage and reimbursement at varying levels for the cost of certain of our products and related treatments.  Third-party payers increasingly

challenge pricing of pharmaceutical products.  Further, the trend toward managed healthcare in the U.S., the growth of organizations such as HMOs and MCOs and legislative proposals to reform healthcare and government insurance programs create uncertainties regarding the future levels of coverage and reimbursement for pharmaceutical products.  Such cost containment measures and healthcare reform could reduce reimbursement of our pharmaceutical products, resulting in lower prices and a reduction in the product demand.  This could affect our ability to sell our products and could have a material adverse effect on our business, results of operations, financial condition and cash flows.

There have been changes in reimbursement for pharmaceuticals under various government programs, including Medicaid, and there is uncertainty surrounding implementation of legislation and regulatory changes relating to reimbursement for pharmaceuticals under Medicaid and other government programs such as Medicare and Tricare.  Reimbursement changes under such government programs may impact demand for our products and may negatively affect the price.  In addition, any reimbursement granted may not be maintained or limits on reimbursement available from third party payers may reduce demand for, or negatively affect the price of, those products.  Additionally, various legislative and regulatory initiatives in states, including proposed modifications to reimbursements and rebates, product pedigree and tracking, pharmaceutical waste "take back" initiatives, and therapeutic category generic substitution carve out legislation may also have a negative impact on the Company.  We maintain a full time government affairs department in Washington, DC, which is responsible for coordinating state and federal legislative activities, and places a major emphasis in terms of management time and resources to ensure a fair and balanced legislative and regulatory arena.

There is additional uncertainty surrounding the insurance coverage mandate that goes into effect in the U.S. in 2015 and 2016.  Employers may seek to reduce costs by reducing or eliminating employer group healthcare plans or transferring a greater portion of healthcare costs to their employees.  Job losses or other economic hardships may also result in reduced levels of coverage for some individuals, potentially resulting in lower levels of healthcare coverage for themselves or their families.  These economic conditions may affect patients' ability to afford health care as a result of increased co-pay or deductible obligations, greater cost sensitivity to existing co-pay or deductible obligations, lost healthcare insurance coverage or for other reasons.  We believe such conditions have led and could continue to lead to changes in patient behavior and spending patterns that negatively affect usage of certain of our products, including some patients delaying treatment, rationing prescription medications, leaving prescriptions unfilled, reducing the frequency of visits to healthcare facilities, utilizing alternative therapies, or foregoing healthcare insurance coverage.  Such changes may result in reduced demand for our products, which could materially and adversely affect the sales of our products, our business and results of operations.

### *The pharmaceutical industry is highly competitive and our future revenue growth and profitability are dependent on our timely development and launches of new products ahead of our competitors.*

We face strong competition in all of our businesses.  The intensely competitive environment requires an ongoing, extensive search for technological innovations and the ability to market products effectively, including the ability to communicate the effectiveness, safety and value of brand products to healthcare professionals in private practice, group practices and MCOs.  Our competitors vary depending upon product categories, and within each product category, upon dosage strengths and drug-delivery systems.  Based on total assets, annual revenues, and market capitalization, we are smaller than certain of our national and international competitors in the brand and distribution product arenas.  Most of our competitors have been in business for a longer period of time than us, have a greater number of products on the market and have greater financial and other resources than we do.  Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry.  If we directly compete with them for the same markets and/or products, their financial strength could prevent us from capturing a profitable share of those markets.  It is possible that developments by our competitors will make our products or technologies noncompetitive or obsolete.  In addition, competitive forces may result in changes to the mix of products that we sell during a given time period or lower demand for our products than expected.

Some of our competitors have technical, competitive or other advantages over us for the development of technologies and processes.  We face increased competition from new infection prevention, sterile processing, contamination control, surgical support, cleaning consumables, gastrointestinal endoscopy accessories, contract sterilization, and other products and services entering the market.  These advantages may make it difficult for us to compete with them to successfully discover, develop and market new products and for our current products to compete with new products that these competitors may bring to market.  As a result, our products may compete against products that have lower prices, equivalent or superior performance, a better safety profile, are easier to administer, achieve earlier entry into the market or that are otherwise competitive with our products.

Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors.  As patents for brand name products and related exclusivity periods expire, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration.  Therefore, our ability to increase or maintain revenues and profitability in our generics business is largely dependent on our success in challenging patents and developing non-infringing formulations of proprietary products.  As competing manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no

separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross margins. We may have fewer opportunities to launch significant generic products in the future, as the number and size of proprietary products that are subject to patent challenges is expected to decrease in the next several years compared to historical levels. Additionally, as new competitors enter the market, there may be increased pricing pressure on certain products, which would result in lower gross margins. This is particularly true in the case of certain Asian and other overseas generic competitors, who may be able to produce products at costs lower than the costs of domestic manufacturers. If we experience substantial competition from Asian or other overseas generic competitors with lower production costs, our profit margins will suffer.

We also face strong competition in our Anda Distribution business, where we compete with a number of large wholesalers and other distributors of pharmaceuticals, including McKesson, AmerisourceBergen and Cardinal, which market both brand and generic pharmaceutical products to their customers. These companies are significant customers of our US Brands, US Medical Aesthetics and International Brands businesses. As generic products generally have higher gross margins for distributors, each of the large wholesalers, on an increasing basis, are offering pricing incentives on brand products if the customers purchase a large portion of their generic pharmaceutical products from the primary wholesaler. As Anda does not offer a full line of brand products to our customers, we have been at times competitively disadvantaged and must compete with these wholesalers based upon our very competitive pricing for generic products, greater service levels and our well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities. The large wholesalers have historically not used telemarketers to sell to their customers, but recently have begun to do so. Additionally, generic manufacturers are increasingly marketing their products directly to smaller chains and thus increasingly bypassing wholesalers and distributors. Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.

### *Sales of our products may continue to be adversely affected by the continuing consolidation of our distribution network and the concentration of our customer base.*

Our principal customers in our brand and generic pharmaceutical operations are wholesale drug distributors and major retail drug store chains. These customers comprise a significant part of the distribution network for pharmaceutical products in the U.S. This distribution network is continuing to undergo significant consolidation marked by mergers and acquisitions among wholesale distributors and the growth of large retail drug store chains. As a result, a small number of large wholesale distributors and large chain drug stores control a significant share of the market. We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company.

The loss of any of these customers could have a material adverse effect on our business, results of operations, financial condition and cash flows. In addition, none of our customers are party to any long-term supply agreements with us, and thus are able to change suppliers freely should they wish to do so.

### *Developments after a product reaches the market may adversely affect sales of our products.*

Even after regulatory approval, certain developments may decrease demand for our products, including the following:

- the re-review of products that are already marketed;

- new scientific information and evolution of scientific theories;

- the recall or loss of marketing approval of products that are already marketed;

- changing government standards or public expectations regarding safety, efficacy or labeling changes; and

- greater scrutiny in advertising and promotion.

In the past, clinical trials and post-marketing surveillance of certain marketed drugs of the Company and of competitors within the industry have raised concerns that have led to recalls, withdrawals or adverse labeling of marketed products. If previously unknown side effects are discovered or if there is an increase in negative publicity regarding known side effects of any of our products, it could significantly reduce demand for the product or require us to take actions that could negatively affect sales, including removing the product from the market, restricting its distribution or applying for labeling changes.

In addition, certain health authorities, regulators and agencies have increased their focus on safety when assessing the balance of benefits and risks of drugs. Some health authorities appear to have become more cautious when making decisions about approvability of new products and are re-reviewing select products that are already marketed, adding further to the uncertainties in the regulatory processes. There is also greater regulatory scrutiny, especially in the U.S., on advertising and promotion and, in particular, direct-to-consumer advertising.

*We are incorporated in Ireland, and Irish law differs from the laws in effect in the United States and may afford less protection to, or otherwise adversely affect, our shareholders.*

Our shareholders may have more difficulty protecting their interests than would shareholders of a corporation incorporated in a jurisdiction of the United States. As an Irish company, we are governed by the Irish Companies Act 2014 (the "Companies Act"). The Companies Act and other relevant aspects of Irish law differ in some material respects from laws generally applicable to U.S. corporations and shareholders, including the provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, shareholder lawsuits and indemnification of directors. For example, under Irish law, the duties of directors and officers of a company are generally owed to the company only. As a result, shareholders of Irish companies do not have the right to bring an action against the directors or officers of a company, except in limited circumstances. In addition, depending on the circumstances, you may be subject to different or additional tax consequences under Irish law as a result of your acquisition, ownership and/or disposition of our ordinary shares, including, but not limited to, Irish stamp duty, dividend withholding tax and capital acquisitions tax.

*As a result of different shareholder voting requirements in Ireland relative to laws in effect in certain states in the United States, we may have less flexibility with respect to certain aspects of capital management than companies organized in the United States.*

Under Irish law, our authorized share capital can be increased by an ordinary resolution of our shareholders and the directors may issue new ordinary or preferred shares up to a maximum amount equal to the authorized but unissued share capital, without shareholder approval, once authorized to do so by our articles of association or by an ordinary resolution of our shareholders. Additionally, subject to specified exceptions, Irish law grants statutory preemption rights to existing shareholders where shares are being issued for cash consideration but allows shareholders to disapply such statutory preemption rights either in our articles of association or by way of special resolution. Such disapplication can either be generally applicable or be in respect of a particular allotment of shares. Accordingly, our articles of association contain, as permitted by Irish company law, provisions authorizing the board to issue new shares, and to disapply statutory preemption rights. The authorization of the directors to issue shares and the disapplication of statutory preemption rights must both be renewed by the shareholders at least every five years, and we cannot provide any assurance that these authorizations will always be approved, which could limit our ability to issue equity and thereby adversely affect the holders of our securities.

*We are an Irish company and it may be difficult for you to enforce judgments against us or certain of our officers and directors.*

We are incorporated in Ireland and a substantial portion of our assets are located in jurisdictions outside the United States. In addition, some of our officers and directors reside outside the United States, and some or all of their respective assets are or may be located in jurisdictions outside of the United States. Therefore, it may be difficult for investors to effect service of process against us or such officers or directors or to enforce against us or them judgments of U.S. courts predicated upon civil liability provisions of the U.S. federal securities laws.

There is no treaty between Ireland and the United States providing for the reciprocal enforcement of foreign judgments. The following requirements must be met before the foreign judgment will be deemed to be enforceable in Ireland:

- the judgment must be for a definite sum;
- the judgment must be final and conclusive; and
- the judgment must be provided by a court of competent jurisdiction.

An Irish court will also exercise its right to refuse judgment if the foreign judgment was obtained by fraud, if the judgment violated Irish public policy, if the judgment is in breach of natural justice or if it is irreconcilable with an earlier judgment. Further, an Irish court may stay proceedings if concurrent proceedings are being brought elsewhere. Judgments of U.S. courts of liabilities predicated upon U.S. federal securities laws may not be enforced by Irish courts if deemed to be contrary to public policy in Ireland.

***A transfer of Company Ordinary Shares, other than by means of the transfer of book-entry interests in the Depository Trust Company ("DTC"), may be subject to Irish stamp duty, as may a transfer of preference shares.***

Transfers of Company Ordinary Shares effected by means of the transfer of book entry interests in DTC will not be subject to Irish stamp duty.  However, if you hold your Company Ordinary Shares directly rather than beneficially through DTC, any transfer of your Company Ordinary Shares could be subject to Irish stamp duty (currently at the rate of 1% of the higher of the price paid or the market value of the shares acquired).  Payment of Irish stamp duty is generally a legal obligation of the transferee.  Transfers of preference shares may also be subject to Irish stamp duty at the same rate.  The potential for stamp duty could adversely affect the price of your shares.

***In certain limited circumstances, dividends we pay may be subject to Irish dividend withholding tax.***

While we do not currently contemplate paying dividends upon our ordinary shares, in certain limited circumstances, dividend withholding tax (currently at a rate of 20%) may arise in respect of dividends, if any, paid on our ordinary shares or our preference shares.  A number of exemptions from dividend withholding tax exist such that shareholders resident in the U.S. and shareholders resident in certain countries may be entitled to exemptions from dividend withholding tax.

Shareholders resident in the U.S. that hold their shares through DTC will not be subject to dividend withholding tax provided the addresses of the beneficial owners of such shares in the records of the brokers holding such shares are recorded as being in the U.S. (and such brokers have further transmitted the relevant information to a qualifying intermediary appointed by us).  Similarly, shareholders resident in the U.S. that hold their shares outside of DTC will not be subject to dividend withholding tax if, in the case of former Actavis, Inc. shareholders, they provide a IRS Form 6166 to our transfer agent to confirm their U.S. residence and claim an exemption, or, in the case of former Warner Chilcott shareholders, such shareholders previously filed valid dividend withholding tax forms with Warner Chilcott or its transfer agent in respect of their Warner Chilcott shareholdings (provided these forms still remain valid).  All new U.S. resident shareholders in Allergan plc that hold their shares outside of DTC and shareholders resident in certain other countries (irrespective of whether they hold their shares through DTC or outside DTC) will not be subject to dividend withholding tax provided the beneficial owners of such shares have furnished completed and valid dividend withholding tax forms or an IRS Form 6166, as appropriate, to our transfer agent or their brokers (and such brokers have further transmitted the relevant information to our transfer agent).  However, other shareholders may be subject to dividend withholding tax, which could adversely affect the price of your shares.

***Dividends received by Irish residents and certain other shareholders may be subject to Irish income tax.***

Shareholders entitled to an exemption from Irish dividend withholding tax on dividends received from us will not be subject to Irish income tax in respect of those dividends, unless they have some connection with Ireland other than their shareholding in us (for example, they are resident in Ireland).  Shareholders who are not resident nor ordinarily resident in Ireland but who are not entitled to an exemption from Irish dividend withholding tax will generally have no further liability to Irish income tax on those dividends which suffer dividend withholding tax.

***Company Ordinary Shares received by means of a gift or inheritance could be subject to Irish capital acquisitions tax.***

Irish capital acquisitions tax ("CAT") could apply to a gift or inheritance of Company Ordinary Shares or our preference shares.  irrespective of the place of residence, ordinary residence or domicile of the parties.  This is because Company Ordinary Shares and preference shares are regarded as property situated in Ireland.  The person who receives the gift or inheritance has primary liability for CAT.  Gifts and inheritances passing between spouses are exempt from CAT.  Children have a tax-free threshold of €280,000 (with effect from 14 October 2015) in respect of taxable gifts or inheritances received from their parents.  Certain other tax-free thresholds may also apply.

### Risks Related to the Pending Sale of our Generics Business to Teva Pharmaceutical Industries Ltd

***There are risks and uncertainties associated with the pending sale of our generics business.***

There are a number of risks and uncertainties associated with the pending sale of our generics business and certain other assets to Teva, including, among other things, the potential failure of a condition to closing, including the condition related to obtaining required regulatory approvals, which gives rise to the termination of the master purchase agreement executed between us and Teva.  Either party has the right to terminate the master purchase agreement if the closing has not occurred by July 26, 2016, subject to extension in certain circumstances.  To the extent that the current market price of our ordinary shares reflects an assumption that the transaction with Teva will be consummated in the timeframe and manner currently anticipated, and that a portion of the sale proceeds will be used to pay down debt, any delay in closing or failure to close, or in a mix of debt paydown different than assumed by investors, could result in a decline in the market price of our ordinary shares.  Similarly, any delay in closing or failure to close could

result in damage to our relationships with customers, suppliers and employees and have an adverse effect on our business. Pending the completion of the transaction with Teva, the attention of our management may be directed toward the transaction and related matters, and their focus may be diverted from the day-to-day business operations of our company, including from other opportunities that might otherwise be beneficial to us. We have agreed to indemnify Teva and its affiliates against certain losses suffered as a result of our breach of representations and warranties and our other obligations in the master purchase agreement. Any event that results in a right for Teva to seek indemnity from us could result in a substantial payment from us to Teva and could adversely affect our results of operations. If we successfully complete the sale of our generics business, our revenues will decrease accordingly and our business will be subject to concentration of risks that affect our retained businesses, including our branded business. Refer to *"Pfizer and Allergan may fail to realize all of the anticipated benefits of the Pfizer Transaction or those benefits may take longer to realize than expected. The combined company may also encounter significant difficulties in integrating the two businesses."*

### Risks Related to the Pfizer Transaction

***Because the market price of Allergan ordinary shares and shares of Pfizer common stock will fluctuate, Allergan shareholders cannot be sure of the value of the combined company ordinary shares they will receive in the Allergan share splits, as applicable.***

Immediately prior to the consummation of the Pfizer Transaction, Allergan shareholders will receive 11.3 combined company ordinary shares for each of their Allergan ordinary shares. The exact value of the transaction consideration to Allergan shareholders will therefore depend in part on the prices per share of Pfizer common stock at the consummation of the Pfizer Transaction. These prices will not be known at the time of the Allergan extraordinary general meeting ("EGM") called to approve the stock split and other matters related to the Pfizer Transaction and may be greater than, less than or the same as the prices at the time of entry into the Pfizer Agreement. Assuming that each combined company ordinary share will have a value equal to the closing price of a share of Pfizer common stock on the NYSE on such date, the implied value of the 11.3 combined company ordinary shares to Allergan shareholders was approximately $160.0 billion using the then-current stock price at the time the Pfizer Transaction was announced. The market prices of Pfizer common stock and Allergan ordinary shares are subject to general price fluctuations in the market for publicly traded equity securities and have experienced volatility in the past. Stock price changes may result from a variety of factors, including general market and economic conditions, changes in the respective businesses, operations and prospects of Pfizer and Allergan, and an evolving regulatory landscape. Market assessments of the benefits of the Pfizer Transaction and the likelihood that the Pfizer Transaction will be consummated, as well as general and industry specific market and economic conditions, may also impact market prices of Pfizer common stock and Allergan ordinary shares. Many of these factors are beyond Allergan's control. You should obtain current market price quotations for Pfizer common stock and for Allergan ordinary shares; however, as noted above, the prices at the effective time may be greater than, the same as or less than such price quotations.

***Because the share split ratio is fixed, the number of combined company ordinary shares to be received by holders of Allergan ordinary shares in the Allergan share split, will not change between now and the time the Pfizer Transaction is consummated to reflect changes in the trading prices of Pfizer common stock or Allergan ordinary shares, share repurchases or other factors.***

The exact value of the transaction consideration to Allergan shareholders will depend in part on the prices per share of Pfizer common stock and/or Allergan ordinary shares at the consummation of the Pfizer Transaction. The Pfizer Agreement does not provide for any adjustment to share split ratio as a result of changes in the trading prices of Pfizer common stock or Allergan ordinary shares.

***The market price for combined company ordinary shares following the consummation of the Pfizer Transaction may be affected by factors different from those that historically have affected or currently affect Pfizer common stock and Allergan ordinary shares.***

Allergan's businesses differ from those of Pfizer, and vice versa, and accordingly the results of operations of the combined company will be affected by some factors that are different from those currently affecting the results of operations of Allergan, while other risks to Allergan, including those related to International Brands and US Brands segments may become more concentrated in the combined company.

***Changes to tax laws and regulations may jeopardize or delay the Pfizer Transaction.***

Each of Pfizer and Allergan may terminate the Pfizer Agreement if, following the date of the Pfizer Agreement, there has been an adverse change in law that, in the opinion of tax counsel, would cause the combined company to be treated as a U.S. domestic corporation for U.S. federal income tax purposes (an "adverse tax law change"). In addition, each of the Pfizer board of directors and the Allergan board of directors may change its recommendation in response to any effect that occurs after the date of the Pfizer Agreement, including any actual or proposed change in or issuance or interpretation of applicable law (whether or not yet approved or effective), if such board of directors has concluded in good faith (after consultation with its financial advisors and outside legal counsel) that the failure to take such action would be inconsistent with the directors' fiduciary duties under applicable law. In the

event of such a change of recommendation, the other party may terminate the Pfizer Agreement.  Accordingly, any changes in applicable tax laws or regulations could jeopardize or delay the Pfizer Transaction.

***Pfizer and Allergan must obtain required stockholder or shareholder approvals and governmental and regulatory approvals to consummate the Pfizer Transaction, which, if delayed or not granted or granted with unacceptable conditions, may prevent, delay or impair the consummation of the Pfizer Transaction, result in additional expenditures of money and resources and/or reduce the anticipated benefits of the Pfizer Transaction.***

The closing conditions to the Pfizer Transaction include, among others, the receipt of required approvals from the Pfizer stockholders and the Allergan shareholders, clearance of the Pfizer Transaction by certain governmental and regulatory authorities, including the expiration or termination of applicable waiting periods under the HSR Act and other filings or approvals as may be required pursuant to the antitrust and competition laws of certain foreign countries.  The governmental agencies with which the parties will make these filings and seek certain of these approvals and consents have broad discretion in administering the governing regulations.  Pfizer and Allergan can provide no assurance that all required approvals and consents will be obtained.  Moreover, as a condition to their approval of the transaction, certain governmental agencies may impose requirements, limitations or costs or require divestitures or place restrictions on the conduct of the business of the combined company after the closing of the Pfizer Transaction.  These requirements, limitations, costs, divestitures or restrictions could jeopardize or delay the effective time or reduce the anticipated benefits of the transaction.  Further, no assurance can be given that the required stockholder and shareholder approvals will be obtained or that the required closing conditions will be satisfied, and, if all required consents and approvals are obtained and the closing conditions are satisfied, no assurance can be given as to the terms, conditions and timing of the approvals or clearances.  Finally, the closing of the Pfizer Transaction is subject to the closing of the Teva Transaction, which itself is subject to certain closing conditions, including receipt of governmental and regulatory approvals, and no assurance can be given that the closing of this transaction will occur on a timely basis or at all.  If Pfizer and Allergan agree to any requirements, limitations, costs, divestitures or restrictions in order to obtain any approvals or clearances required to consummate the transaction, these requirements, limitations, costs, divestitures or restrictions could adversely affect the integration of the two companies' operations and/or reduce the anticipated benefits of the Pfizer Transaction.  This could result in a material adverse effect on the business and results of operations of the combined company.

***The Pfizer Agreement may be terminated in accordance with its terms and the Pfizer Transaction may not be consummated.***

The Pfizer Agreement contains a number of conditions that must be fulfilled to close the Pfizer Transaction.  Those conditions include:  the approval of the Pfizer Transaction proposal by the Pfizer stockholders; the approval by the Allergan shareholders of the issuance of Allergan ordinary shares to the stockholders of Pfizer  and certain other proposals related to the Pfizer transaction as required by the Pfizer Agreement (the "Allergan required proposals"); the consummation of the Allergan share split; receipt of the requisite regulatory and antitrust approvals, including clearance under the HSR Act; the absence of orders prohibiting the closing of the Pfizer Transaction; the effectiveness of the registration statement registering the Allergan ordinary shares to be issued to Pfizer stockholders and the joint proxy statement/prospectus wherein Allergan shareholders and Pfizer stockholders can vote to approve the Pfizer Transaction; the approval of an Irish prospectus, if required by Irish Prospectus Law; the approval for listing on the NYSE of the Allergan ordinary shares to be issued to Pfizer stockholders; the continued accuracy of the representations and warranties of both parties, subject to specified materiality standards; the performance by both parties of their covenants and agreements under the Pfizer Agreement in all material respects; and the closing of the Teva Transaction.  These conditions to the closing of the Pfizer Transaction may not be fulfilled and, accordingly, the Pfizer Transaction may not be consummated.  In addition, if the Pfizer Transaction is not consummated by October 31, 2016 (subject to extension to March 31, 2017 if the only conditions not satisfied or waived (other than those conditions that by their nature are to be satisfied at the closing of the Pfizer Transaction, which conditions are capable of being satisfied) are conditions relating to the Pfizer stockholder and Allergan shareholder approvals, occurrence of the Allergan share split, certain required regulatory filings and clearances, effectiveness of the registration statement, listing on the NYSE of the Allergan ordinary shares and approval of an Irish prospectus), either Pfizer or Allergan may terminate the Pfizer Agreement.  In addition, Pfizer or Allergan may elect to terminate the Pfizer Agreement in certain other circumstances, including by Pfizer, if, prior to receipt of approval of the Allergan required proposals, the Allergan board of directors makes a change of recommendation, by Allergan, if, prior to receipt of approval of the Pfizer merger proposal, the Pfizer board of directors makes a change of recommendation, and by either Pfizer or Allergan, if, following the date of the Pfizer Agreement, there has been an adverse tax law change.  The parties can also mutually decide to terminate the Pfizer Agreement at any time prior to the consummation of the Pfizer Transaction.

***The Pfizer Agreement contains provisions that restrict the ability of the Allergan board of directors to pursue alternatives to the Pfizer Transaction and to change its recommendation that Allergan shareholders vote for the approval of the Allergan proposals. In specified circumstances Pfizer may be entitled to receive a termination fee of up to $3.5 billion.***

Under the Pfizer Agreement, Allergan is generally prohibited from soliciting, initiating or knowingly encouraging, or negotiating regarding or furnishing information in furtherance of, any inquiry, proposal or offer which constitutes or would reasonably be expected to lead to a competing proposal.  In addition, Allergan may not terminate the Pfizer Agreement to enter into any agreement with respect to a superior proposal.  If the Allergan board of directors (after consultation with Allergan's financial advisors

and legal counsel) effects a change of recommendation in response to a superior proposal and the Pfizer board of directors confirms (after consultation with Pfizer's financial advisors and legal counsel) that it does not intend to change its recommendation, Pfizer may be entitled to terminate the Pfizer Agreement and receive a termination fee of $3.5 billion. If a competing proposal for Allergan is made public after the date of the Pfizer Agreement, the Pfizer Agreement is terminated as a result of the Allergan shareholders' subsequent failure to approve the Allergan required proposals at the Allergan EGM and Allergan consummates a transaction with respect to a competing proposal within 12 months of termination of the Pfizer Agreement or enters into a definitive agreement with respect to a competing proposal within 12 months of termination of the Pfizer Agreement which is later consummated, Pfizer may be entitled to receive a termination fee of $3.5 billion. These provisions could discourage a third party that may have an interest in acquiring all or a significant part of Allergan from considering or proposing an acquisition, even if such third party were prepared to enter into a transaction that would be more favorable to Allergan and its shareholders than the Pfizer Transaction and the other transactions contemplated by the Pfizer Transaction. Additionally, Pfizer may be entitled to receive a termination fee of $1.5 billion upon termination of the Pfizer Agreement by Pfizer or Allergan due to the failure of the Allergan shareholders to approve the Allergan required proposals at the Allergan EGM, or a termination fee of $3.0 billion or $3.5 billion if Pfizer terminates the Pfizer Agreement because the Allergan board of directors has made a change of recommendation (other than in response to a superior proposal) on or prior to March 1, 2016, or after March 1, 2016, respectively, in each case if the Pfizer board of directors has not made a change of recommendation.

*While the Pfizer Transaction is pending, Pfizer and Allergan will be subject to contractual restrictions and business uncertainties that could adversely affect their businesses and operations. These uncertainties could also adversely affect the combined company following the consummation of the Pfizer Transaction.*

Uncertainty about the effect of the Pfizer Transaction on employees, customers and suppliers may have an adverse effect on Pfizer and Allergan. These uncertainties may impair Pfizer's and Allergan's ability to attract, retain and motivate key personnel until the Pfizer Transaction is consummated and for a period of time thereafter, and could cause customers, suppliers and others who deal with Pfizer and Allergan to seek to change existing business relationships with Pfizer and/or Allergan. Employee retention may be challenging during the pendency of the Pfizer Transaction, as certain employees may experience uncertainty about their future roles. If key employees depart because of issues related to the uncertainty and difficulty of integration or a desire not to remain with the businesses, the business of the combined company following the Pfizer Transaction could be seriously harmed.

In addition, the Pfizer Agreement restricts Allergan and Pfizer from taking specified actions until the Pfizer Transaction occurs without the consent of the other party. These restrictions may prevent Allergan or Pfizer from pursuing attractive business opportunities that may arise prior to the consummation of the Pfizer Transaction.

*Allergan shareholders will have a reduced ownership and voting interest after the Pfizer Transaction and will exercise less influence over management.*

Allergan shareholders currently have the right to vote in the election of the Allergan board of directors and on other matters affecting Allergan. Upon the consummation of the Pfizer Transaction, each Allergan shareholder will become a shareholder of the combined company with a percentage ownership of the combined company that is smaller than such shareholder's prior percentage ownership of Allergan. It is currently expected that the former shareholders of Allergan as a group will receive shares in the Pfizer Transaction constituting approximately 44% of the outstanding combined company ordinary shares immediately following the effective time on a fully diluted basis. Because of this, Allergan shareholders will have less influence on the management and policies of the combined company than they now have on the management and policies of Allergan.

*Following the Pfizer Transaction, the composition of the combined company board of directors will be different than the composition of the current Allergan board of directors.*

Upon consummation of the Pfizer Transaction, the composition of the board of directors of the combined company will be different than the current Allergan board of directors. The Allergan board of directors currently consists of 12 directors. Upon the consummation of the Pfizer Transaction, the board of directors of the combined company will consist of 15 members, 11 of whom will be the 11 directors serving on the Pfizer board of directors prior to the closing of the Pfizer Transaction and four of whom will be directors serving on the Allergan board of directors prior to the closing of the Pfizer Transaction, including Paul M. Bisaro, Allergan's current Executive Chairman, and Brenton L. Saunders, Allergan's current Chief Executive Officer and President, and two other Allergan directors to be mutually agreed between Pfizer and Allergan. This new composition of the board of directors of the combined company may affect the future decisions of the combined company.

*Failure to consummate the Pfizer Transaction could negatively impact Allergan and its future operations.*

If the Pfizer Transaction is not consummated for any reason, Allergan may be subjected to a number of material risks. The price of Allergan ordinary shares may decline to the extent that its current market price reflect a market assumption that the Pfizer Transaction will be consummated. In addition, some costs related to the Pfizer Transaction must be paid by Allergan whether or not the Pfizer Transaction is consummated. Furthermore, Allergan may experience negative reactions from its shareholders, customers and employees.

### Risks Related to the Business of the Combined Company

*Pfizer and Allergan may fail to realize all of the anticipated benefits of the Pfizer Transaction or those benefits may take longer to realize than expected. The combined company may also encounter significant difficulties in integrating the two businesses.*

The ability of Pfizer and Allergan to realize the anticipated benefits of the Pfizer Transaction will depend, to a large extent, on the combined company's ability to integrate the two businesses. The combination of two independent businesses is a complex, costly and time-consuming process. As a result, Pfizer and Allergan will be required to devote significant management attention and resources to integrating their business practices and operations. The integration process may disrupt the businesses and, if the planned integration is implemented ineffectively, the combined company may not realize the full expected benefits of the Pfizer Transaction. The failure to meet the challenges involved in integrating the two businesses and to realize the anticipated benefits of the Pfizer Transaction could cause an interruption of, or a loss of momentum in, the activities of the combined company and could adversely affect the results of operations of the combined company.

In addition, the overall integration of the businesses may result in material unanticipated problems, expenses, liabilities, competitive responses, loss of customer and other business relationships and diversion of management attention. The difficulties of combining the operations of the companies include, among others:

- the diversion of management attention to integration matters;

- difficulties in integrating operations and systems;

- challenges in conforming standards, controls, procedures and accounting and other policies, business cultures and compensation structures between the two companies;

- difficulties in the assimilating employees and in attracting and retaining key personnel;

- challenges in keeping existing customers and obtaining new customers;

- difficulties in achieving anticipated cost savings, synergies, accretion targets, business opportunities and growth prospects from the combination;

- difficulties in managing the expanded operations of a significantly larger and more complex company and in coordinating a geographically dispersed organization; and

- potential unknown liabilities, adverse consequences and unforeseen increased expenses associated with the Pfizer Transaction, including possible adverse tax consequences to the combined company's group pursuant to the rules under Section 7874 ("Section 7874") of the Code, as a result of the Pfizer Transaction or otherwise.

Many of these factors are outside of the control of Pfizer and Allergan and/or will be outside the control of the combined company, and any one of them could result in increased costs, decreased expected revenues and diversion of management time and energy, which could materially impact the business, financial condition and results of operations of the combined company. In addition, even if the operations of the businesses of Pfizer and Allergan are integrated successfully, the full benefits of the Pfizer Transaction may not be realized, including, among others, the synergies, cost savings or sales or growth opportunities that are expected. These benefits may not be achieved within the anticipated time frame, or at all. Further, additional unanticipated costs may be incurred in the integration of the businesses of Pfizer and Allergan. All of these factors could cause dilution to the earnings per share of the combined company, decrease or delay the projected accretive effect of the Pfizer Transaction, and negatively impact the price of the combined company ordinary shares. As a result, it cannot be assured that the combination of Pfizer and Allergan will result in the realization of the full benefits anticipated from the transaction within the anticipated time frames or at all.

In addition, although the combined company is expected under current law, to be treated as a foreign corporation for U.S. federal income tax purposes, the IRS may not agree with this treatment. Even if treated as a foreign corporation, certain adverse tax consequences may apply to the combined company that could erode some of the synergies expected from the combination. Similarly, future changes in tax law could affect the combined company's status as a foreign corporation for U.S. federal income tax purposes or could otherwise materially and adversely affect some of the synergies expected from the combination. Any such changes in law or

treatment by the IRS could have prospective or retroactive application, and may even if enacted or asserted after the merger is consummated. Moreover, various U.S. federal and state legislative and other proposals that would deny governmental contracts to U.S. companies (and subsidiaries of U.S. companies) that move (or have moved) their corporate location abroad may affect the combined company if adopted. Any such changes in law or treatment by the IRS or other governmental agencies could have a material adverse effect on the anticipated results of the combined company.

### *Pfizer and Allergan will incur direct and indirect costs as a result of the Pfizer Transaction.*

Pfizer and Allergan will incur substantial expenses in connection with and as a result of completing the Pfizer Transaction, and over a period of time following the consummation of the Pfizer Transaction, the combined company also expects to incur substantial expenses in connection with integrating and coordinating the businesses, operations, policies and procedures of Pfizer and Allergan. A portion of the transaction costs related to the Pfizer Transaction will be incurred regardless of whether the Pfizer Transaction is consummated. While Pfizer and Allergan have assumed that a certain level of transaction expenses will be incurred, factors beyond Pfizer's and Allergan's control could affect the total amount or the timing of these expenses. Many of the expenses that will be incurred, by their nature, are difficult to estimate accurately. These expenses may exceed the costs historically borne by Pfizer and Allergan. These costs could adversely affect the financial condition and results of operations of Pfizer and Allergan prior to the Pfizer Transaction and of the combined company following the Pfizer Transaction.

### *The Pfizer Transaction may not be accretive and may cause dilution to the earnings per share of the combined company, which may negatively affect the market price of the combined company ordinary shares.*

As a result of the Pfizer Transaction and the Allergan share split, it is currently estimated that the combined company will issue or reserve for issuance additional ordinary shares. The issuance of these new shares could have the effect of depressing the market price of the combined company ordinary shares.

In addition, Pfizer or Allergan (or the combined company after the Pfizer Transaction) could encounter other transaction-related costs, such as the failure to realize all of the benefits anticipated in the Pfizer Transaction, which could cause dilution to the combined company's earnings per share or decrease or delay the expected accretive effect of the Pfizer Transaction and cause a decrease in the market price of the combined company ordinary shares.

Finally, Pfizer's and Allergan's expectations regarding the timing and amount of accretion following the consummation of the Pfizer Transaction reflect the impact of anticipated share repurchases by Pfizer. The actual timing and size of any such share repurchases will depend on actual and expected financial results, as well as assessments at the time regarding capital allocation alternatives. Reduced or delayed share repurchase activity may result in less accretion.

### *The tax rate that will apply to the combined company is uncertain and may vary from expectations.*

There can be no assurance that the Pfizer Transaction will improve the combined company's ability to maintain any particular worldwide effective corporate tax rate. Pfizer and Allergan cannot give any assurance as to what the combined company's effective tax rate will be after the Pfizer Transaction because of, among other things, uncertainty regarding the tax laws (including future changes to such tax laws and interpretations thereof) of the jurisdictions in which the combined company and its affiliates will operate. The combined company's actual effective tax rate may vary from Pfizer's and Allergan's expectations, and such variance may be material. Additionally, tax laws or their implementation and applicable tax authority practices in any particular jurisdiction could change in the future, possibly on a retroactive basis, and any such change could have an adverse impact on the combined company and its affiliates.

### *Legislative or other governmental action in the U.S. could adversely affect the combined company's business.*

Various U.S. federal and state legislative and other proposals that would deny governmental contracts to U.S. companies (and subsidiaries of U.S. companies) that move (or have moved) their corporate location abroad may affect Pfizer, Allergan or the combined company if adopted. The likelihood that any such proposals might be adopted, the nature of the regulations that might be promulgated, or the effect such adoptions and increased regulatory scrutiny might have on Pfizer's, Allergan's or the combined company's business cannot be predicted.

**ITEM 1B.**  *UNRESOLVED STAFF COMMENTS*

There are no unresolved staff comments.

**ITEM 2.**  *PROPERTIES*

We conduct our operations using a combination of owned and leased properties.

Our owned and leased properties consist of facilities used for R&D, manufacturing, distribution (including warehousing and storage), sales and marketing and administrative functions. The following table provides a summary of locations for our significant owned and leased properties, and unless indicated as being divested, relate to our US Brands, US Medical Aesthetics, International Brands and Anda segments as of December 31, 2015:

| Location | Primary Use | Leased / Owned |
| --- | --- | --- |
| Ambernath, India* | Manufacturing, R&D, Administration | Both |
| Athens, Greece* | Manufacturing | Both |
| Bangalore, India* | R&D | Leased |
| Barnstaple, UK* | Manufacturing, Administration | Both |
| Birzebbuga, Malta* | Manufacturing, Distribution, Administration | Leased |
| Bucharest, Romania* | Manufacturing, Distribution, Administration, R&D | Both |
| Cincinnati, OH, USA | Manufacturing | Owned |
| Coleraine, Northern Ireland* | Manufacturing | Both |
| Corona, CA, USA* | Manufacturing | Owned |
| Copiague, NY, USA* | Manufacturing | Owned |
| Davie, FL, USA* | Manufacturing, Distribution, R&D, Administration | Both |
| Dublin, Ireland | Manufacturing, R&D, Administration | Owned |
| Dupnitsa, Bulgaria* | Manufacturing | Owned |
| Elizabeth, NJ, USA* | Manufacturing, R&D, Administration | Owned |
| Fajardo, Puerto Rico* | Manufacturing | Both |
| Fall Rivers, MA, USA | Manufacturing | Owned |
| Gentofte, Denmark* | Administration | Leased |
| Goa, India* | Manufacturing | Leased |
| Grace-Hollogne, Belgium* | Manufacturing | Leased |
| Groveport, OH, USA | ANDA Distribution | Leased |
| Guarulhos, Brazil | Manufacturing | Owned |
| Hafnarfjordur, Iceland* | Manufacturing, Warehousing, Distribution, Administration | Both |
| Irvine, California, USA | R&D, Administration | Both |
| Jakarta, Indonesia* | Manufacturing | Leased |
| Jersey City, NJ, USA | Administration | Leased |
| Larne, Ireland | Manufacturing, R&D | Owned |
| London, UK | Administration | Leased |
| Manati, Puerto Rico* | Distribution, Administration, Manufacturing | Owned |
| Marlow, UK | Administration | Leased |
| Moscow, Russia* | Administration | Leased |
| Mumbai, India* | R&D, Administration | Leased |
| Nerviano, Italy* | Manufacturing, R&D | Both |
| North Brunswick, NJ, USA* | R&D | Leased |
| Olive Branch, MS, USA* | Distribution, Administration (ANDA Distribution) | Leased |
| Paris, France* | Administration | Leased |
| Parsippany, NJ, USA* | Administration | Leased |
| Pringy, France | Manufacturing | Owned |
| Rockaway, NJ, USA | Administration | Leased |
| San Jose, CA, USA | Manufacturing | Owned |
| San Jose, Costa Rica | Manufacturing | Owned |
| Salt Lake City, UT, USA* | Manufacturing, Distribution, R&D | Leased |
| Singapore City, Singapore* | Manufacturing, Administration, R&D | Leased |
| Troyan, Bulgaria* | Manufacturing | Owned |
| Waco, Texas, USA | Manufacturing | Owned |
| Weiterstadt, Germany | Manufacturing | Owned |
| Weston, FL, USA | Administration, R&D (ANDA Distribution) | Leased |
| Westport, Ireland | Manufacturing, Administration, R&D | Owned |
| Zejtun, Malta* | Manufacturing, Distribution, Administration, R&D | Leased |
| Zug, Switzerland* | Administration | Leased |

* Facilities are included in the assets being divested as part of the Teva transaction.

Our leased properties are subject to various lease terms and expirations.

We believe that we have sufficient facilities to conduct our operations during 2016. However, we continue to evaluate the purchase or lease of additional properties, or the consolidation of existing properties, as our business requires.

### ITEM 3.    LEGAL PROCEEDINGS

For information regarding legal proceedings, refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report.

### ITEM 4.    MINE SAFETY DISCLOSURES

Not applicable.

PART II

ITEM 5.  *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES*

**Market for Registrant's Common Equity**

Allergan plc Ordinary Shares traded on the New York Stock Exchange under the symbol "ACT" until close of business on June 15, 2015, at which time the symbol was changed to "AGN." The following table sets forth the quarterly high and low closing share trading price information for the periods indicated:

| Year ended December 31, 2015: | High | | Low | |
|---|---|---|---|---|
| First | $ | 317.72 | $ | 253.00 |
| Second | $ | 315.00 | $ | 279.74 |
| Third | $ | 340.34 | $ | 245.52 |
| Fourth | $ | 322.68 | $ | 237.50 |

| Year ended December 31, 2014: | | | | |
|---|---|---|---|---|
| First | $ | 230.77 | $ | 166.38 |
| Second | $ | 226.23 | $ | 184.71 |
| Third | $ | 249.94 | $ | 201.91 |
| Fourth | $ | 272.75 | $ | 208.64 |

As of February 15, 2016, there were approximately 3,664 registered holders of Allergan plc's Ordinary Shares.

We have not paid any cash dividends on common stock or ordinary shares since our initial public offering in February 1993. The Company pays a quarterly dividend on shares of its mandatory convertible preferred shares. The Company may pay dividends in the future on certain types of equity instruments. Warner Chilcott is a wholly-owned subsidiary of Allergan and has no publicly traded equity securities.

**Issuer Purchases of Equity Securities**

During the quarter ended December 31, 2015, we repurchased 31,920 of Allergan plc's Ordinary Shares to satisfy tax withholding obligations in connection with the vesting of restricted stock issued to employees as follows:

| Period | Total Number of Shares Purchased | | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Program |
|---|---|---|---|---|---|
| October 1 - 31, 2015 | 14,803 | $ | 297.02 | – | – |
| November 1 - 30, 2015 | 2,328 | $ | 320.20 | – | – |
| December 1 - 31, 2015 | 14,789 | $ | 321.15 | – | – |
| October 1 – December 31, 2015 | 31,920 | $ | 309.89 | – | – |

**Recent Sale of Unregistered Securities; Uses of Proceeds from Registered Securities**

None.

**Securities Authorized for Issuance Under Equity Compensation Plans**

For information regarding securities authorized for issuance under equity compensation plans, refer to "ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS" and "NOTE 20 — Stockholders' Equity" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report.

**Performance Graph**

*The information in this section of the Annual Report pertaining to Allergan plc's performance relative to our peers is being furnished but not filed with the SEC, and as such, the information is neither subject to Regulation 14A or 14C or to the liabilities of Section 18 of the Securities Exchange Act of 1934, as amended.*

The following graph compares the cumulative 5-year total return of holders of Allergan plc's Ordinary Shares (formerly Class A common shares of Actavis plc.) with the cumulative total returns of the S&P 500 index and the Dow Jones US Pharmaceuticals index. The graph tracks the performance of a $100 investment in our Ordinary Shares and in each of the indexes (with reinvestment of all dividends, if any) on December 31, 2010 with relative performance tracked through December 31, 2015.

Notwithstanding anything to the contrary set forth in our previous filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, which might incorporate future filings made by us under those statutes, the following graph will not be deemed incorporated by reference into any future filings made by us under those statutes.



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***
Among Allergan, plc, the S&P 500 Index
and the Dow Jones US Pharmaceuticals Index

——— Allergan, plc  ——— S&P 500  ——— Dow Jones US Pharmaceuticals

*\*$100 invested on 12/31/10 in stock or index, including reinvestment of dividends. Fiscal year ending December 31.*

Copyright© 2016 S&P, a division of McGraw Hill Financial. All rights reserved.
Copyright© 2016 Dow Jones & Co. All rights reserved.

|  | 12/10 | 12/11 | 12/12 | 12/13 | 12/14 | 12/15 |
|---|---|---|---|---|---|---|
| Allergan plc | 100.00 | 116.82 | 166.51 | 325.27 | 498.37 | 605.03 |
| S&P 500 | 100.00 | 102.11 | 118.45 | 156.82 | 178.29 | 180.75 |
| Dow Jones US Pharmaceuticals | 100.00 | 118.64 | 135.14 | 180.98 | 219.72 | 233.36 |

*The stock price performance included in this graph is not necessarily indicative of future stock price performance.*

56

**ITEM 6.**   *SELECTED FINANCIAL DATA*

The following table sets forth our selected historical consolidated financial data. The selected consolidated financial data as of December 31, 2015 and 2014 and for the years ended December 31, 2015, 2014 and 2013 presented in this table have been derived from our audited consolidated financial statements and related notes included elsewhere in this Annual Report. The selected consolidated financial data as of December 31, 2013, 2012 and 2011 and for the years ended December 31, 2012 and 2011 presented in this table are derived from our audited consolidated financial statements, as revised for discontinued operations accounting, and related notes which are not included in this Annual Report.

The selected consolidated financial data set forth below should be read in conjunction with, and is qualified by reference to, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Notes to the Consolidated Financial Statements included elsewhere in this Annual Report and in our previously filed Annual Reports on Form 10-K, as amended by Form 8-K, where applicable.

**ALLERGAN PLC**
**FINANCIAL HIGHLIGHTS**
**($ in millions, except per share amounts)**

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2015[(1)(2)(3)] | 2014[(1)(6)] | 2013[(1)(7)] | 2012[(1)] | 2011[(1)] |
| *Operating Highlights:* | | | | | |
| Net revenues | $ 15,071.0 | $ 6,738.9 | $ 2,602.5 | $ 1,651.4 | $ 4,584.4 |
| Net (loss) from continuing operations, net of tax | (2,868.3) | (2,407.1) | (467.5) | (240.9) | ** |
| Net income/(loss) attributable to ordinary shareholders | 3,683.2 | (1,630.5) | (750.4) | 97.3 | 260.9 |
| Basic earnings/(loss) per share from continuing operations | $ (8.44) | $ (10.96) | $ (3.29) | $ (1.92) | ** |
| Diluted earnings/(loss) per share from continuing operations | $ (8.44) | $ (10.96) | $ (3.29) | $ (1.92) | ** |
| Basic earnings/(loss) per share | $ 10.01 | $ (7.42) | $ (5.27) | $ 0.77 | ** |
| Diluted earnings/(loss) per share | $ 10.01 | $ (7.42) | $ (5.27) | $ 0.76 | $ 2.06 |
| Weighted average shares outstanding: | | | | | |
| Basic | 367.8 | 219.7 | 142.3 | 125.8 | 124.5 |
| Diluted | 367.8 | 219.7 | 142.3 | 128.4 | 126.5 |

| | At December 31, | | | | |
|---|---|---|---|---|---|
| | 2015[(1)(2)(3)] | 2014[(1)(4)(5)(6)] | 2013[(1)(7)] | 2012[(1)] | 2011[(1)] |
| *Balance Sheet Highlights:* | | | | | |
| Total assets | $135,840.7 | $ 52,758.0 | $ 22,725.9 | $ 14,114.8 | $ 6,698.3 |
| Total debt and capital leases | 42,726.2 | 15,531.1 | 9,052.0 | 6,433.3 | 1,033.0 |
| Total equity | 76,589.3 | 28,335.5 | 9,537.1 | 3,856.4 | 3,562.5 |

---

** Refer to note (1) below.

(1) On July 26, 2015 we entered into the Teva Agreement, under which Teva agreed to acquire our global generic pharmaceuticals business and certain other assets. As a result of the transaction, the Company is accounting for the assets and liabilities to be divested as held for sale. Further, the financial results of the business held for sale have been reclassified to discontinued operations for all periods presented in our consolidated financial statements, except for the year ended December 31, 2011. Substantially all of our results of operations for 2011 relate to the generics business being divested to Teva. Results of continuing operations for the year ended December 31, 2011 are de minimis and; therefore, the results presented are the combined business.

(2) On October 1, 2015, Allergan plc completed the Kythera Acquisition. The acquisition increased the Company's intangible assets.

(3) On March 17, 2015, Allergan plc completed the acquisition of Legacy Allergan. Legacy Allergan was a leading, fully integrated, specialty pharmaceutical company that specialized in ophthalmology, neurosciences and medical/aesthetics/dermatology/plastic surgery. Beginning March 17, 2015, the following items were included in our operating results:

- total revenues and related cost of sales for Legacy Allergan products;

- selling, general and administrative expenses and research and development expenses;

- amortization expense for intangible assets acquired;

- impairment losses on select assets; and

- increased interest expense from the senior secured notes assumed and the indebtedness incurred.

(4)    On November 17, 2014, Allergan plc completed the Durata Acquisition. The acquisition had the impact of increasing the Company's intangible assets and lowering working capital.

(5)    On July 2, 2014, the Company completed the Furiex Acquisition. The acquisition had the impact of increasing the Company's intangible assets and lowering working capital.

(6)    On July 1, 2014, the Company completed the Forest Acquisition. Forest was a leading, fully integrated, specialty pharmaceutical company largely focused on the United States market. Forest marketed a portfolio of branded drug products and developed new medicines to treat patients suffering from diseases principally in the following therapeutic areas: central nervous system, cardiovascular, gastrointestinal, respiratory, anti-infective, and cystic fibrosis. Beginning July 1, 2014, the following items were included in our operating results:

- total revenues and related cost of sales for Forest products;

- selling, general and administrative expenses and research and development expenses;

- amortization expense for intangible assets acquired;

- impairment losses on select assets; and

- increased interest expense from the senior secured notes assumed and the indebtedness incurred.

(7)    On October 1, 2013, we completed the Warner Chilcott Acquisition. Warner Chilcott was a leading specialty pharmaceutical company focused on women's healthcare, gastroenterology, urology and dermatology segments of the branded pharmaceuticals market, primarily in North America. Beginning October 1, 2013, the following items were included in our operating results:

- total revenues and related cost of sales for Warner Chilcott products;

- selling, general and administrative expenses and research and development expenses;

- amortization expense for intangible assets acquired; and

- increased interest expense from the senior secured notes assumed and the $2.0 billion aggregate term loan indebtedness assumed, and subsequently refinanced, in connection with the Warner Chilcott Acquisition.

## ITEM 7. *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

*The following discussion contains forward-looking statements that are subject to known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those expressed or implied by such forward-looking statements. We discuss such risks, uncertainties and other factors throughout this report and specifically under the caption "Cautionary Note Regarding Forward-Looking Statements" under "ITEM 1A. RISK FACTORS" in this document. In addition, the following discussion of financial condition and results of operations should be read in conjunction with the Consolidated Financial Statements and Notes thereto included elsewhere in this document.*

*In prior periods, our consolidated financial statements present the accounts of Actavis, Inc., and all of its wholly-owned subsidiaries. On May 16, 2013, Actavis plc (formally known as Actavis Limited) was incorporated in Ireland as a private limited company and re-registered effective September 20, 2013 as a public limited company. It was established for the purpose of facilitating the business combination between Actavis, Inc. and Warner Chilcott. On October 1, 2013, Actavis plc became the successor registrant of Actavis, Inc. and Warner Chilcott in connection with the consummation of certain transactions further described elsewhere in this document. In addition, on October 1, 2013, the shares of Actavis plc began trading on the NYSE under the symbol "ACT," the same symbol under which Actavis, Inc.'s shares previously traded. On March 17, 2015, Actavis, plc completed the acquisition of Allergan, Inc. On June 15, 2015, Actavis plc changed its name to Allergan plc and began trading on the NYSE under the symbol "AGN". References throughout to "ordinary shares" refer to Actavis, Inc.'s Class A common shares, par value $0.0033 per share, prior to the consummation of the Transactions and to our ordinary shares, par value $0.0001 per share, since the consummation of the Transactions. The results of Warner Chilcott Limited are consolidated into the results of Allergan. Due to the deminimis activity between Allergan and Warner Chilcott Limited, references throughout this section relate to both Allergan and Warner Chilcott.*

## EXECUTIVE SUMMARY

### Overview

Allergan plc is a global specialty pharmaceutical company engaged in the development, manufacturing, marketing, and distribution of brand name, medical aesthetics, generic, branded generic, biosimilar and over-the-counter OTC pharmaceutical products. The Company has operations in more than 100 countries. Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc and has the same principal business activities. As a result of the Allergan Acquisition which closed on March 17, 2015, the Company expanded its franchises to include ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery, which complements the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefits from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox® and Restasis®. The Allergan Acquisition also expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

We have supported our business with a significant commitment to R&D expenditures. Our global growth strategy is focused on: (i) internal development of differentiated high-demand products; (ii) establishment of strategic alliances and collaborations that bring new products, technologies and markets to our existing portfolio; and (iii) acquisition of products and/or companies that complement our existing portfolio.

As of December 31, 2015, we marketed close to 100 branded pharmaceutical product families in the U.S. and a significant number of product families internationally. Branded pharmaceutical products are marketed under brand names through programs that are designed to generate physician and consumer loyalty. Through our Anda Distribution segment, we distribute approximately 13,200 SKUs in the U.S. primarily to independent pharmacies, alternate care providers (hospitals, nursing homes and mail order pharmacies) and pharmacy chains.

On July 26, 2015, Allergan plc entered into the Teva Agreement, under which Teva agreed to acquire the Company's global generic pharmaceuticals business and certain other assets. Under the Teva Agreement, upon the closing of the Teva Transaction, we will receive $33.75 billion in cash and 100.3 million Teva ordinary shares (or American Depository Shares with respect thereto), which approximates $6.75 billion in Teva stock using the then-current stock price at the time the Teva Transaction was announced, in exchange for which Teva will acquire our global generics business, including the U.S. and international generic commercial units, our third-party supplier Medis, our global generic manufacturing operations, our global generic R&D unit, our international over-the-counter (OTC) commercial unit (excluding OTC eye care products) and some established international brands. We continue to work toward satisfying all conditions in order to close by the end of the first quarter of 2016; however, it is possible that closing could slip beyond the end of the first quarter.

On November 23, 2015, the Company announced that it entered into the Pfizer Agreement under which Pfizer, a global innovative biopharmaceutical company, and Allergan plc will merge in the Pfizer Transaction, which attributes a $160.0 billion enterprise valuation using the then-current stock price at the time the Pfizer Transaction was announced. Company shareholders will receive 11.3 shares of the combined company ordinary shares for each of their existing Allergan shares and Pfizer stockholders will receive in respect of each share of Pfizer common stock held by them, at their election and subject to certain proration procedures described in the Pfizer Agreement, either one share of the combined company or an amount in cash equal to the volume weighted average price per share of Pfizer common stock on the NYSE on the trading day immediately preceding the date of the consummation of the Pfizer Transaction. The Pfizer Transaction is anticipated to close in the second half of 2016.

### 2015 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2015.

## Acquisitions

### AqueSys

On October 16, 2015, the Company completed the AqueSys Acquisition.  Under the terms of the agreement, the Company acquired XEN45, a soft shunt that is implanted in the sub conjunctival space in the eye through a minimally invasive procedure with a single use, pre-loaded proprietary injector. The AqueSys Acquisition had deminimis impact on the results of operations for the year ended December 31, 2015.

### Northwood Medical Innovation

On October 1, 2015, the Company acquired earFold™ which is a medical device for the correction of prominent ears, with or without asymmetry, in patients aged 7 years and older.  The Northwood Acquisition had deminimis impact on the results of operations for the year ended December 31, 2015.

### Kythera

On October 1, 2015, the Company completed the Kythera Acquisition. Kythera was focused on the discovery, development and commercialization of novel prescription aesthetic products. Kythera's lead product, Kybella® injection, is the first and only FDA approved, non-surgical treatment for moderate to severe submental fullness, commonly referred to as double chin. The Company included the results of Kythera in its Consolidated Statement of Operations beginning October 1, 2015, including $77.2 million in stock compensation expense.

### Oculeve

On August 10, 2015, the Company completed the Oculeve Acquisition. The Company acquired Oculeve and its lead product candidate OD-01, an intranasal neurostimulation device, as well as other dry eye products in development.  The Oculeve Acquisition had deminimis impact on the results of operations for the year ended December 31, 2015.

### Auden Mckenzie

On May 29, 2015, the Company completed the Auden Acquisition.  The assets and liabilities acquired, as well as the results of operations for the acquired Auden business are part of the assets being divested in the Teva Transaction and are included as a component of income from discontinued operations.  In addition, the acquired financial position is included in assets and liabilities held for sale.

### Allergan

On March 17, 2015, the Company completed the Allergan Acquisition.  The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complements the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefited from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox® and Restasis®. The transaction also expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

The contribution from the acquisition of Legacy Allergan for the year ended December 31, 2015 is as follows ($ in millions):

| | Year Ended December 31, 2015 | | | | |
|---|---|---|---|---|---|
| | US Brands | US Medical Aesthetics | International Brands | Corporate | Total |
| Net revenues | $ 2,709.2 | $ 1,513.9 | $ 1,941.5 | $ - | $ 6,164.6 |
| | | | | | |
| Operating expenses: | | | | | |
| Cost of sales[1] | 142.4 | 99.0 | 290.6 | 939.7 | 1,471.7 |
| Selling and marketing | 466.4 | 302.9 | 495.2 | 185.7 | 1,450.2 |
| General and administrative | 1.5 | 34.0 | 110.5 | 763.6 | 909.6 |
| Contribution | $ 2,098.9 | $ 1,078.0 | $ 1,045.2 | $ (1,889.0) | $ 2,333.1 |

[1]  Excludes amortization and impairment of acquired intangibles including product rights.

As a result of the acquisition, the Company incurred the following transaction and integration costs in the year ended December 31, 2015 ($ in millions):

| | Year Ended December 31, 2015 |
|---|---|
| **Cost of sales** | |
| Stock-based compensation acquired for Legacy Allergan employees | $ 22.5 |
| Acquisition, integration and restructuring related charges | 14.9 |
| **Research and development** | |
| Stock-based compensation acquired for Legacy Allergan employees | 124.8 |
| Acquisition, integration and restructuring related charges | 83.5 |
| **Selling and marketing** | |
| Stock-based compensation acquired for Legacy Allergan employees | 110.0 |
| Acquisition, integration and restructuring related charges | 75.7 |
| **General and administrative** | |
| Stock-based compensation acquired for Legacy Allergan employees | 258.9 |
| Acquisition-related expenditures | 65.5 |
| Acquisition, integration and restructuring related charges | 298.6 |
| **Other (expense) income** | |
| Bridge loan facilities expense | (264.9) |
| Interest rate lock | 30.9 |
| **Total transaction and integration costs** | $ 1,288.4 |

**Licenses and Asset Acquisitions**

*Mimetogen*

On November 4, 2015, as a result of the Mimetogen Transaction, the Company incurred R&D expenditures of $50.0 million.

*Almirall*

On October 27, 2015, the Company and Ironwood Pharmaceuticals, Inc. announced that Allergan has acquired rights to Constella® (linaclotide) in the European Union, Switzerland, Turkey and the Commonwealth of Independent States from Almirall, S.A. and has also reacquired rights to Linzess® (linaclotide) in Mexico from Almirall for €60.0 million.  The consideration was accounted for as an asset acquisition and included as a component of intangible assets.

*Naurex*

On August 28, 2015, the Company incurred $571.7 million of R&D expenses associated with the Naurex Transaction.  The Naurex Transaction expands our pipeline with Naurex's two leading product candidates GLYX-13 and NRX-1074, two compounds that utilize NMDA modulation as a potential new approach to the treatment of MDD, a disease that can lead to suicidality among the most severe patients.

### Migraine License

On August 6, 2015, the Company incurred $250.0 million of R&D expenses associated with the Merck Transaction.

## Divestitures

### Respiratory Business

As a result of the Respiratory Sale in the year ended December 31, 2015, the Company recognized an incremental charge in cost of sales (including the acquisition accounting fair value mark-up of inventory) relating to inventory that will not be sold to AstraZeneca of $35.3 million. The Company recognized a loss in other (expense) income, net for the sale of the business of $5.3 million in the year ended December 31, 2015.

### Pharmatech

During the year ended December 31, 2014, the Company recognized an impairment on assets held for sale of $189.9 million relating to the Pharmatech Transaction which included a portion of goodwill allocated to this business unit. In the second quarter of 2015, the Company completed the divestiture of the Pharmatech business with an immaterial impact on our income from discontinued operations.

### 2014 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2014.

## Acquisitions

### Durata Therapeutics

On November 17, 2014, we completed the Durata Acquisition. On March 2, 2015, the Company announced that the European Commission has granted Allergan's subsidiary Durata Therapeutics International B.V., marketing authorization for Xydalba™ (dalbavancin) for the treatment of acute bacterial skin and skin structure infections (ABSSSI) in adults. The approval triggered the first CVR payment. The difference between the fair value of the CVR on the date of acquisition of $24.5 million and the payment made of $30.9 million, or $6.4 million, was recorded as an operating expense in the year ended December 31, 2015. In January 2016, the Company received approval from the FDA for an expanded label which will include a single dose of Dalvance®, which triggers a second CVR payment in the year ending December 31, 2016.

### Furiex

On July 2, 2014, the Company completed the Furiex Acquisition. In the second quarter of 2015, the Company received approval from the FDA of the eluxadoline product, Viberzi®.

Viberzi® is a first-in-class, locally-acting mu opioid receptor agonist and delta opioid receptor antagonist for treating symptoms of diarrhea-predominant irritable bowel syndrome (IBS-d), a condition that affects approximately 28 million patients in the United States and Europe. In connection with the close of the Furiex Acquisition, the Company further announced that it closed the transaction related to the sale of Furiex's royalties on Alogliptin and Priligy® to Royalty Pharma for $408.6 million in cash consideration.

### Contingent Consideration

In the year ended December 31, 2015, the Company received a schedule IV ("C-IV") designation from the DEA for Viberzi® and recognized an expense of $29.8 million as a component of R&D expense. This expense represents the difference between the final CVR payment amount of $118.5 million, or $10 for each CVR outstanding, versus the probability-weighted CVR fair value initially established in acquisition accounting adjusted for accretion. This amount was paid as of December 31, 2015.

### Forest Laboratories

On July 1, 2014, the Company completed the Forest Acquisition. Forest was a leading, fully integrated, specialty pharmaceutical company largely focused on the United States market. Legacy Forest marketed a portfolio of branded drug products and developed new medicines to treat patients suffering from diseases principally in the following therapeutic areas: central nervous system, cardiovascular, gastrointestinal, respiratory, anti-infective, and cystic fibrosis.

The contribution from the acquisition of Forest for the year ended December 31, 2015 is as follows ($ in millions):

| | Year Ended December 31, 2015 | | | |
| | US Brands | International Brands | Corporate | Total |
|---|---|---|---|---|
| Net revenues | $ 4,187.2 | $ 72.1 | $ - | $ 4,259.3 |
| Operating expenses: | | | | |
| Cost of sales[1] | 795.4 | 22.2 | 230.5 | 1,048.1 |
| Selling and marketing | 977.5 | 21.7 | 65.3 | 1,064.5 |
| General and administrative | 64.0 | 4.4 | 129.4 | 197.8 |
| Contribution | $ 2,350.3 | $ 23.8 | $ (425.2) | $ 1,948.9 |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

The contribution from the acquisition of Forest for the year ended December 31, 2014 is as follows ($ in millions):

| | Year Ended December 31, 2014 | | | |
| | US Brands | International Brands | Corporate | Total |
|---|---|---|---|---|
| Net revenues | $ 2,232.5 | $ 72.4 | $ - | $ 2,304.9 |
| Operating expenses: | | | | |
| Cost of sales[1] | 527.1 | 25.8 | 732.0 | 1,284.9 |
| Selling and marketing | 608.4 | 17.1 | 84.0 | 709.5 |
| General and administrative | 59.1 | 2.9 | 393.8 | 455.8 |
| Contribution | $ 1,037.9 | $ 26.6 | $ (1,209.8) | $ (145.3) |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

As a result of the Forest Acquisition, the Company incurred the following transaction and integration costs in the years ended December 31, 2015 and 2014 ($ in millions):

| | Years Ended December 31, | |
| | 2015 | 2014 |
|---|---|---|
| **Cost of sales** | | |
| Stock-based compensation acquired for Forest employees | $ 4.7 | $ 9.5 |
| Severance-related charges | 1.1 | 11.3 |
| **Research and development** | | |
| Stock-based compensation acquired for Forest employees | 36.3 | 66.7 |
| Severance-related charges | 9.2 | 24.5 |
| **Selling and marketing** | | |
| Stock-based compensation acquired for Forest employees | 47.9 | 58.7 |
| Severance-related charges | 17.4 | 45.3 |
| Other integration costs | - | 3.8 |
| **General and administrative** | | |
| Stock-based compensation acquired for Forest employees | 53.9 | 152.6 |
| Severance-related charges | 17.1 | 71.5 |
| Other integration costs | 58.4 | 92.9 |
| Financing related charges | - | 9.3 |
| **Other income (expense)** | | |
| Bridge loan facilities | - | (25.8) |
| **Total transaction and integration costs** | $ 246.0 | $ 571.9 |

### Silom Medical Company

On April 1, 2014, the Company completed the Silom Acquisition. The Silom Acquisition expanded the Company's position in the Thai generic pharmaceutical market, with leading positions in the ophthalmic and respiratory therapeutic categories and a strong cardiovascular franchise. We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date. The assets and liabilities acquired, as well as the results of operations for the acquired Silom business are part of the assets being divested in the Teva Transaction and are included as a component of income from discontinued operations. In addition the acquired financial position is included in assets and liabilities held for sale.

### Divestitures

#### Corona Facility

During the year ended December 31, 2014, we held for sale assets in our Corona, California manufacturing facility. As a result, the Company recognized an impairment charge as a component of discontinued operations of $20.0 million in the year ended December 31, 2014, including a write-off of property, plant and equipment, net, due to the integration of Warner Chilcott of $5.8 million.

### 2013 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2013.

### Acquisitions

#### Warner Chilcott

On October 1, 2013, the Company completed the Warner Chilcott Acquisition. Warner Chilcott was a leading specialty pharmaceutical company focused on the women's healthcare, gastroenterology, urology and dermatology segments of the branded pharmaceuticals market, primarily in North America.

The contribution from the acquisition of Warner Chilcott for the year ended December 31, 2015 is as follows ($ in millions):

| | Year Ended December 31, 2015 | | | |
|---|---|---|---|---|
| | US Brands | International Brands | Corporate | Total |
| Net revenues | $ 1,723.4 | $ 120.1 | $ - | $ 1,843.5 |
| Operating expenses: | | | | |
| Cost of sales[1] | 127.9 | 29.5 | 2.2 | 159.6 |
| Selling and marketing | 200.8 | 36.2 | - | 237.0 |
| General and administrative | 26.3 | 7.3 | 10.0 | 43.6 |
| Contribution | $ 1,368.4 | $ 47.1 | $ (12.2) | $ 1,403.3 |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

The contribution from the acquisition of Warner Chilcott for the year ended December 31, 2014 is as follows ($ in millions):

| | Year Ended December 31, 2014 | | | |
|---|---|---|---|---|
| | US Brands | International Brands | Corporate | Total |
| Net revenues | $ 1,711.0 | $ 114.7 | $ - | $ 1,825.7 |
| Operating expenses: | | | | |
| Cost of sales[1] | 143.5 | 21.6 | 221.5 | 386.6 |
| Selling and marketing | 176.1 | 27.2 | - | 203.3 |
| General and administrative | 45.3 | 4.5 | 246.9 | 296.7 |
| Contribution | $ 1,346.1 | $ 61.4 | $ (468.4) | $ 939.1 |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

The contribution from the acquisition of Warner Chilcott for the year ended December 31, 2013 is as follows ($ in millions):

| | Year Ended December 31, 2013 | | | |
| | US Brands | International Brands | Corporate | Total |
|---|---|---|---|---|
| Net revenues | $ 466.9 | $ 28.0 | $ - | $ 494.9 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales[1] | 37.6 | 6.0 | 165.6 | 209.2 |
| Selling and marketing | 64.3 | 8.0 | - | 72.3 |
| General and administrative | 18.4 | 2.7 | 146.3 | 167.4 |
| Contribution | $ 346.6 | $ 11.3 | $ (311.9) | $ 46.0 |

[1]  Excludes amortization and impairment of acquired intangibles including product rights.

### Medicines360

On June 10, 2013, we entered into an exclusive license agreement with Medicines360 to market, sell and distribute Medicines360 LNG20 in the U.S. and in Canada for a payment of approximately $52.3 million. According to the terms of the agreement, we are also required to pay Medicines360 certain regulatory and sales based milestone payments totaling up to nearly $125.0 million plus royalties. Medicines360 retained the rights to market the product in the U.S. public sector, including family planning clinics that provide services to low-income women. LNG20 is currently marketed as Liletta® and was originally developed by Uteron Pharma Operations SPRL in Belgium (now a subsidiary of the Company). We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed recognized at their fair values as of the acquisition date.

### Acquisition of Uteron Pharma, S.A.

On January 23, 2013, the Company completed the Uteron Acquisition. The acquisition expanded the Company's specialty brand pipeline of women's health products including two potential near term commercial opportunities in contraception and infertility, and one oral contraceptive project projected to launch by 2018 at the time of the acquisition. Several additional products that were then in earlier stages of development were also acquired in the Uteron Acquisition. We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed recognized at their fair values as of the acquisition date.

At June 30, 2014, after an identified triggering event, the acquired IPR&D intangible asset related to Estelle, a novel natural estrogen-based 28 day cycle oral contraceptive for the prevention of pregnancy, of $13.1 million was deemed to be fully impaired. Consequently, the $22.8 million contingent liability related to Estelle was written off, resulting in a net gain of $9.7 million. At June 30, 2014, after an identified triggering event, the acquired IPR&D intangible asset related to Colvir, a treatment of premalignant Human Papilloma Virus (HPV) lesions of the uterine, of $2.0 million was deemed to be fully impaired. Consequently the $1.5 million contingent liability was also written off, resulting in a net loss of $0.5 million.

### Divestitures

### Western European Assets

During the year ended December 31, 2013, we held for sale our then current generic commercial infrastructure in France, Italy, Spain, Portugal, Belgium, Germany and the Netherlands, including products, marketing authorizations and dossier license rights. On January 17, 2014, we announced our intention to enter into an agreement with Aurobindo to sell these businesses. On April 1, 2014, the Company completed the sale of the assets in Western Europe.

In connection with the sale of our Western European assets, we entered into a supply agreement whereby the Company will supply product to Aurobindo over a period of five years. In the second quarter of 2014, we allocated the fair value of the consideration for the sale of the Western European assets of $65.0 million to each element of the agreement, including the supply of product.

As a result of the transactions, we recognized as a component of discontinued operations, income / (loss) on the net assets held for sale of $3.4 million and $(34.3) million in the years ended December 31, 2014 and 2013, respectively. In addition, the Company recognized a loss on the disposal of the assets within discontinued operations in the year ended December 31, 2014 of $20.9 million and deferred revenue of $10.1 million to be recognized over the course of the supply agreement.

**Segments**

In the third quarter of 2015, there was a strategic shift in the business as a result of the Teva Transaction.  As a result, the Company realigned its continuing operations into the following segments: US Brands, US Medical Aesthetics, International Brands and Anda Distribution.  Prior to the realignment, the Company operated and managed its business as five distinct operating segments: US Brands, US Medical Aesthetics, International Brands, Global Generics, and Anda Distribution.  In addition, certain revenues and shared costs and the results of corporate initiatives are being managed outside of the four segments.  The new segments are organized as follows:

- The US Brands segment includes sales and expenses relating to branded products within the United States, including certain Botox® therapies.

- The US Medical Aesthetics segment includes sales and expenses relating to aesthetics and dermatology products within the United States, including certain Botox® therapies.

- The International Brands segment includes sales and expenses relating to products sold outside of the United States.

- The Anda Distribution segment includes distribution of generic and branded pharmaceutical products manufactured by third parties, as well as by the Company, primarily to independent pharmacies, pharmacy chains, pharmacy buying groups and physicians' offices. The Anda Distribution segment operating results exclude sales of products developed, acquired, or licensed by the US Brands, US Medical Aesthetics and International Brands segments.  As the generics business is now reported within discontinued operations, the Anda Distribution segment includes revenues and expenses related to Company manufactured generics products sold through Anda.

The Company evaluates segment performance based on segment contribution.  Segment contribution for segments represents net revenues less cost of sales (excluding amortization and impairment of acquired intangibles including product rights), selling and marketing expenses, and select general and administrative expenses. The Company does not evaluate the following items at the segment level:

- Revenues and operating expenses within cost of sales (excluding amortization and impairment of acquired intangibles including product rights), selling and marketing expenses, and general and administrative expenses that result from the impact of corporate initiatives. Corporate initiatives primarily include integration, restructuring, acquisition and other shared costs.

- General and administrative expenses that result from shared infrastructure, including expenses located within the United States.

- Total assets including capital expenditures.

- Other select revenues and operating expenses including R&D expenses, amortization, IPR&D impairments and asset sales and impairments, net as not all such information has been accounted for at the segment level, or such information has not been used by all segments.

The Company defines segment net sales as product sales and other revenue derived from branded products or licensing agreements. In March 2015, as a result of the Allergan Acquisition, we began to promote Restasis®, Lumigan®/Ganfort®, Alphagan®/Combigan®, Botox®, fillers, other aesthetic products and other eye care products. In July 2014, as a result of the Forest Acquisition, the Company also began recognizing revenues on key US brands, including, but not limited to, Bystolic ®, Canasa®, Carafate®, Fetzima ®, Linzess ®, Namenda®IR (which lost exclusivity in July 2015), Namenda XR®, Saphris®, Teflaro® and Viibryd®. In October 2013, as a result of the Warner Chilcott Acquisition, we began promoting a number of brand products, including, but not limited to, Actonel®, Asacol® HD, Atelvia®, Delzicol®, Estrace® Cream, Enablex®, Lo Loestrin® Fe and Minastrin® 24 Fe.

Cost of sales within segment contribution includes production and packaging costs for the products we manufacture, third party acquisition costs for products manufactured by others, profit-sharing or royalty payments for products sold pursuant to licensing agreements, inventory reserve charges and excess capacity utilization charges, where applicable. Cost of sales does not include amortization or impairment costs for acquired product rights or other acquired intangibles.

Selling and marketing expenses consist mainly of personnel-related costs, product promotion costs, distribution costs, professional service costs, insurance, depreciation and travel costs.

General and administrative expenses consist mainly of personnel-related costs, facilities costs, transaction costs, insurance, depreciation, litigation and settlement costs and professional services costs which are general in nature and attributable to the segment.

**YEAR ENDED DECEMBER 31, 2015 COMPARED TO 2014**

Results of operations, including segment net revenues, segment operating expenses and segment contribution consisted of the following ($ in millions):

| | Year Ended December 31, 2015 | | | | |
| | US Brands | US Medical Aesthetics | International Brands | Anda Distribution | Total |
|---|---|---|---|---|---|
| Net revenues | $ 9,134.3 | $ 1,513.9 | $ 2,187.3 | $ 2,225.4 | $ 15,060.9 |
| | | | | | |
| Operating expenses: | | | | | |
| Cost of sales[(1)] | 1,131.9 | 99.0 | 376.4 | 1,905.3 | 3,512.6 |
| Selling and marketing | 1,664.6 | 302.9 | 569.2 | 146.9 | 2,683.6 |
| General and administrative | 139.6 | 34.0 | 125.5 | 44.2 | 343.3 |
| Segment Contribution | $ 6,198.2 | $ 1,078.0 | $ 1,116.2 | $ 129.0 | $ 8,521.4 |
| Contribution margin | 67.9% | 71.2% | 51.0% | 5.8% | 56.6% |
| Corporate | | | | | 2,940.4 |
| Research and development | | | | | 2,358.5 |
| Amortization | | | | | 5,453.4 |
| In-process research and development impairments | | | | | 511.6 |
| Asset sales and impairments, net | | | | | 272.0 |
| Operating (loss) | | | | | (3,014.5) |
| Operating margin | | | | | (20.0)% |

[(1)] Excludes amortization and impairment of acquired intangibles including product rights.

| | Year Ended December 31, 2014 | | | | |
| | US Brands | US Medical Aesthetics | International Brands | Anda Distribution | Total |
|---|---|---|---|---|---|
| Net revenues | $ 4,511.2 | $ - | $ 203.5 | $ 2,024.2 | $ 6,738.9 |
| | | | | | |
| Operating expenses: | | | | | |
| Cost of sales[(1)] | 736.7 | - | 48.2 | 1,711.6 | 2,496.5 |
| Selling and marketing | 806.4 | - | 48.2 | 135.6 | 990.2 |
| General and administrative | 119.5 | - | 12.0 | 36.4 | 167.9 |
| Segment Contribution | $ 2,848.6 | $ - | $ 95.1 | $ 140.6 | $ 3,084.3 |
| Contribution margin | 63.1% | | 46.7% | 6.9% | 45.8% |
| Corporate | | | | | 2,247.0 |
| Research and development | | | | | 605.7 |
| Amortization | | | | | 1,945.5 |
| In-process research and development impairments | | | | | 424.3 |
| Asset sales and impairments, net | | | | | 305.7 |
| Operating (loss) | | | | | (2,443.9) |
| Operating margin | | | | | (36.3)% |

[(1)] Excludes amortization and impairment of acquired intangibles including product rights.

The following is a reconciliation of net revenues for the operating segments to the Company's net revenues for the years ended December 31, 2015 and 2014 ($ in millions):

|  | Years Ended December 31, | | Change | |
|  | 2015 | 2014 | Dollars | % |
| --- | --- | --- | --- | --- |
| Segment net revenues | $ 15,060.9 | $ 6,738.9 | $ 8,322.0 | 123.5% |
| Corporate revenues | 10.1 | - | 10.1 | n.a. |
| Net revenues | $ 15,071.0 | $ 6,738.9 | $ 8,332.1 | 123.6% |

No country represents ten percent or more of net revenues outside of the United States. The US Brands, US Medical Aesthetics, and Anda Distribution segments are comprised solely of sales within the United States.

The following table presents global net revenues for the top products of the Company for the years ended December 31, 2015 and 2014 ($ in millions):

| | Years Ended December 31, | | | | | | | | | | | |
| | Global | | | | U.S. | | | | International | | | |
| | 2015 | 2014 | $ Change | % Change | 2015 | 2014 | $ Change | % Change | 2015 | 2014 | $ Change | % Change |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Botox® | $ 1,975.7 | $ - | $ 1,975.7 | n.a. | $ 1,386.6 | $ - | $ 1,386.6 | n.a. | $ 589.1 | $ - | $ 589.1 | n.a. |
| Restasis® | 1,047.8 | - | 1,047.8 | n.a. | 999.6 | - | 999.6 | n.a. | 48.2 | - | 48.2 | n.a. |
| Namenda XR® | 759.3 | 269.5 | 489.8 | 181.7% | 759.3 | 269.5 | 489.8 | 181.7% | - | - | - | n.a. |
| Bystolic® | 646.1 | 292.6 | 353.5 | 120.8% | 644.8 | 291.6 | 353.2 | 121.1% | 1.3 | 1.0 | 0.3 | 30.0% |
| Asacol®/Delzicol® | 618.5 | 614.1 | 4.4 | 0.7% | 552.9 | 541.0 | 11.9 | 2.2% | 65.6 | 73.1 | (7.5) | (10.3)% |
| Fillers | 573.9 | - | 573.9 | n.a. | 304.3 | - | 304.3 | n.a. | 269.6 | - | 269.6 | n.a. |
| Namenda® IR | 556.3 | 629.7 | (73.4) | (11.7)% | 556.3 | 629.7 | (73.4) | (11.7)% | - | - | - | n.a. |
| Lumigan®/Ganfort® | 547.3 | - | 547.3 | n.a. | 260.7 | - | 260.7 | n.a. | 286.6 | - | 286.6 | n.a. |
| Linzess®/Constella® | 459.3 | 174.4 | 284.9 | 163.4% | 454.8 | 173.2 | 281.6 | 162.6% | 4.5 | 1.2 | 3.3 | 275.0% |
| Alphagan®/Combigan® | 411.1 | - | 411.1 | n.a. | 285.0 | - | 285.0 | n.a. | 126.1 | - | 126.1 | n.a. |
| Lo Loestrin® | 349.6 | 277.1 | 72.5 | 26.2% | 346.5 | 275.7 | 70.8 | 25.7% | 3.1 | 1.4 | 1.7 | 121.4% |
| Viibryd®/Fetzima® | 327.6 | 140.3 | 187.3 | 133.5% | 327.6 | 140.3 | 187.3 | 133.5% | - | - | - | n.a. |
| Estrace® Cream | 326.2 | 258.2 | 68.0 | 26.3% | 326.2 | 258.2 | 68.0 | 26.3% | - | - | - | n.a. |
| Minastrin® 24 | 273.0 | 217.9 | 55.1 | 25.3% | 272.4 | 217.9 | 54.5 | 25.0% | 0.6 | - | 0.6 | n.a. |
| Silicone Implants | 229.7 | - | 229.7 | n.a. | 113.3 | - | 113.3 | n.a. | 116.4 | - | 116.4 | n.a. |
| Carafate ® / Sulcrate ® | 213.1 | 90.9 | 122.2 | 134.4% | 213.1 | 90.9 | 122.2 | 134.4% | - | - | - | n.a. |
| Aczone® | 170.8 | - | 170.8 | n.a. | 170.8 | - | 170.8 | n.a. | - | - | - | n.a. |
| Other Products Revenues | 3,360.3 | 1,750.0 | 1,610.3 | 92.0% | 2,684.1 | 1,623.2 | 1,060.9 | 65.4% | 676.2 | 126.8 | 549.4 | 433.3% |
| **Total Products Revenues** | **12,845.6** | **4,714.7** | **8,130.9** | **172.5%** | **10,658.3** | **4,511.2** | **6,147.1** | **136.3%** | **2,187.3** | **203.5** | **1,983.8** | **974.8%** |
| ANDA Revenues | 2,225.4 | 2,024.2 | 201.2 | 9.9% | 2,225.4 | 2,024.2 | 201.2 | 9.9% | - | - | - | n.a. |
| **Total Net Revenues** | **$15,071.0** | **$6,738.9** | **$ 8,332.1** | **123.6%** | **$12,883.7** | **$6,535.4** | **$ 6,348.3** | **97.1%** | **$2,187.3** | **$203.5** | **$ 1,983.8** | **974.8%** |

*US Brands Segment*

The following table presents net contribution for the US Brands segment for the years ended December 31, 2015 and 2014 ($ in millions):

| | Years Ended December 31, | | | | Change | |
| | 2015 | | 2014 | | Dollars | % |
|---|---|---|---|---|---|---|
| Central Nervous System (CNS) | $ | 2,541.2 | $ | 1,109.4 | $ 1,431.8 | 129.1% |
| Eye Care | | 1,831.3 | | - | 1,831.3 | n.a. |
| Gastroenterology (GI) | | 1,575.3 | | 966.8 | 608.5 | 62.9% |
| Women's Health | | 998.0 | | 791.7 | 206.3 | 26.1% |
| Cardiovascular | | 644.8 | | 291.6 | 353.2 | 121.1% |
| Urology | | 238.8 | | 111.9 | 126.9 | 113.4% |
| Infectious Disease | | 188.8 | | 62.7 | 126.1 | 201.1% |
| Other | | 1,116.1 | | 1,177.1 | (61.0) | (5.2)% |
| Net revenues | $ | 9,134.3 | $ | 4,511.2 | $ 4,623.1 | 102.5% |
| Operating expenses: | | | | | | |
| Cost of sales[1] | | 1,131.9 | | 736.7 | 395.2 | 53.6% |
| Selling and marketing | | 1,664.6 | | 806.4 | 858.2 | 106.4% |
| General and administrative | | 139.6 | | 119.5 | 20.1 | 16.8% |
| Segment contribution | $ | 6,198.2 | $ | 2,848.6 | $ 3,349.6 | 117.6% |
| Segment margin | | 67.9% | | 63.1% | | 4.8% |

[1]  Excludes amortization and impairment of acquired intangibles including product rights.

The increase in segment revenues is primarily due to the contribution from the Allergan Acquisition and a full year of contribution from the Forest Acquisition versus six months in the year ended December 31, 2014.  The increase in Women's Health is due to growth in oral contraceptives and Estrace® Cream.

The increase in operating expenses is due to the Allergan Acquisition and a full year of contribution from the Forest Acquisition versus six months in the year ended December 31, 2014, offset, in part by savings due to corporate initiatives due to the restructurings after the acquisitions of Legacy Allergan, Forest and Warner Chilcott during 2014 and the year ended December 31, 2015.

As part of the integration of Legacy Allergan with the Company, management transitioned the legacy Actavis Brand and Corporate U.S. and Canadian operations into the Legacy Allergan SAP Enterprise Resource Planning ("ERP") system during January 2016.  In preparation of this change, the Company shipped safety-stock inventory into the trade that approximated $275.0 million of gross sales in the year ended December 31, 2015.  Based on the terms and conditions associated with the safety stock, the amount is expected to be recognized as revenue in the quarter ending March 31, 2016.

*US Medical Aesthetics*

The following table presents net contribution for the US Medical Aesthetics segment for the years ended December 31, 2015 and 2014 ($ in millions):

| | Years Ended December 31, | | | | Change | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | | 2014 | | Dollars | | % |
| Facial Aesthetics Total | $ | 817.8 | $ | - | $ | 817.8 | n.a. |
| Medical Dermatology Total | | 493.5 | | - | | 493.5 | n.a. |
| Plastic Surgery Total | | 202.6 | | - | | 202.6 | n.a. |
| Net revenues | $ | 1,513.9 | $ | - | $ | 1,513.9 | **n.a.** |
| Operating expenses: | | | | | | | |
| Cost of sales[1] | | 99.0 | | - | | 99.0 | n.a. |
| Selling and marketing | | 302.9 | | - | | 302.9 | n.a. |
| General and administrative | | 34.0 | | - | | 34.0 | n.a. |
| Segment contribution | $ | 1,078.0 | $ | - | $ | 1,078.0 | **n.a.** |
| Segment margin | | 71.2% | | | | | |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

The US Medical Aesthetics segment is primarily attributable to the Allergan Acquisition.  As such, the increased contribution is not comparable year-over-year.

*International Brands*

The following table presents net contribution for the International Brands segment for the years ended December 31, 2015 and 2014 ($ in millions):

| | Years Ended December 31, | | | | Change | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | | 2014 | | Dollars | | % |
| Eye Care | $ | 924.0 | $ | - | $ | 924.0 | n.a. |
| Facial Aesthetics | | 620.0 | | - | | 620.0 | n.a. |
| Other Therapeutics | | 517.8 | | 203.5 | | 314.3 | 154.4% |
| Plastic Surgery | | 125.5 | | - | | 125.5 | n.a. |
| Net revenues | $ | 2,187.3 | $ | 203.5 | $ | 1,983.8 | **974.8%** |
| Operating expenses: | | | | | | | |
| Cost of sales[1] | | 376.4 | | 48.2 | | 328.2 | 680.9% |
| Selling and marketing | | 569.2 | | 48.2 | | 521.0 | 1,080.9% |
| General and administrative | | 125.5 | | 12.0 | | 113.5 | 945.8% |
| Segment contribution | $ | 1,116.2 | $ | 95.1 | $ | 1,021.1 | **1,073.7%** |
| Segment margin | | 51.0% | | 46.7% | | | 4.3% |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

The International Brands segment is primarily attributable to the Allergan Acquisition.  As such, the increased contribution is not comparable period-over-period.

*Anda Distribution Segment*

The following table presents net contribution for the Anda Distribution segment for the years ended December 31, 2015 and 2014 ($ in millions):

| | Years Ended December 31, | | Change | |
| | 2015 | 2014 | Dollars | % |
|---|---|---|---|---|
| Net revenues | $ 2,225.4 | $ 2,024.2 | $ 201.2 | 9.9% |
| Operating expenses: | | | | |
| Cost of sales[(1)] | 1,905.3 | 1,711.6 | 193.7 | 11.3% |
| Selling and marketing | 146.9 | 135.6 | 11.3 | 8.3% |
| General and administrative | 44.2 | 36.4 | 7.8 | 21.4% |
| Segment contribution | $ 129.0 | $ 140.6 | $ (11.6) | (8.3)% |
| Segment margin | 5.8% | 6.9% | | (1.1)% |

[(1)]  Excludes amortization and impairment of acquired intangibles including product rights.

*Net Revenues*

The increase in net revenues was a result of volume increases and price increases ($136.0 million) and an increase in third-party launches ($60.8 million).  Also included are results related to the Company's manufactured generic products sold through our Anda Distribution segment that were previously included in our former Global Generics Segment.

*Cost of Sales*

The increase in cost of sales within our Anda Distribution segment was due to higher product sales. Cost of sales as a percentage of revenue increased to 85.6% compared to 84.6% in the prior year period primarily due to product and customer mix.

*Selling and Marketing Expenses*

The increase in selling and marketing expenses relate to higher freight costs and higher personnel costs.

*General and Administrative Expenses*

The increase in general and administrative costs were due to higher personnel costs.

*Corporate*

Corporate represents the results of corporate initiatives as well as the impact of select revenues and shared costs.  The following represents the corporate amounts for the years ended December 31, 2015 and 2014 ($ in millions):

| | Year Ended December 31, 2015 | | | | | |
|---|---|---|---|---|---|---|
| | Integration and Restructuring | Fair Value Adjustments | Effect of Purchase Accounting | Other | Revenues and Shared Costs | Total |
| Net Sales ................................. | $ - $ | - $ | - $ | 3.8 $ | 6.3 $ | 10.1 |
| Operating expenses: | | | | | | |
| Cost of sales[(1)] ....................... | 53.1 | 58.5 | 1,180.0 | - | 6.2 | 1,297.8 |
| Selling and marketing............ | 99.8 | - | 130.4 | - | 0.2 | 230.4 |
| General and administrative.... | 546.1 | - | 322.4 | 62.8 | 491.0 | 1,422.3 |
| Contribution ........................... | $ (699.0) $ | (58.5) $ | (1,632.8) $ | (59.0) $ | (491.1) $ | (2,940.4) |

[(1)] Excludes amortization and impairment of acquired intangibles including product rights.

| | Year Ended December 31, 2014 | | | | | |
|---|---|---|---|---|---|---|
| | Integration and Restructuring | Fair Value Adjustments | Effect of Purchase Accounting | Other | Revenues and Shared Costs | Total |
| Net Sales ................................. | $ - $ | - $ | - $ | - $ | - $ | - |
| Operating expenses: | | | | | | |
| Cost of sales[(1)] ....................... | 25.9 | (9.9) | 941.1 | - | - | 957.1 |
| Selling and marketing............ | 49.5 | - | 46.2 | 115.1 | - | 210.8 |
| General and administrative.... | 292.7 | - | 171.7 | 168.3 | 446.4 | 1,079.1 |
| Contribution ........................... | $ (368.1) $ | 9.9 $ | (1,159.0) $ | (283.4) $ | (446.4) $ | (2,247.0) |

[(1)] Excludes amortization and impairment of acquired intangibles including product rights.

In the year ended December 31, 2015, integration and restructuring charges were primarily related to the integration of the Legacy Allergan business, as well as the acquisition of Forest.  In the year ended December 31, 2015, the Company incurred $1,151.4 million in cost of sales primarily related to the fair value inventory step-up from the Allergan Acquisition and the Forest Acquisition as products were sold to the Company's third party customers. The Company also incurred charges related to the purchase accounting impact on stock-based compensation related to the Allergan, Kythera, and Forest acquisitions, which increased cost of sales, selling and marketing and general and administrative expenses. In the year ended December 31, 2015, other expenses include the impact of legal settlement reserves. In addition, in the year ended December 31, 2015, the Company incurred mark-to-market unrealized losses for foreign currency option contracts that are entered into to offset future exposure to movements in currencies.

In the year ended December 31, 2014, integration and restructuring charges were primarily related to integration of the Forest and Warner Chilcott businesses.  In the year ended December 31, 2014, the Company incurred $933.3 million in cost of sales related to the fair value inventory step-up primarily from the acquired Forest and Warner Chilcott inventory as those products were sold to the Company's third party customers. The Company also incurred charges related to the purchase accounting impact of stock-based compensation related to the Forest, Furiex, Durata and Warner Chilcott acquisitions, which increased cost of sales, selling and marketing and general and administrative expenses. Other costs include a charge of $105.1 million to account for an additional year of the non-tax deductible Branded Prescription Drug Fee in accordance with final regulations issued in the third quarter by the Internal Revenue Service as well as the impact of legal settlement reserves.

*Research and Development Expenses*

R&D expenses consist predominantly of personnel-related costs, active pharmaceutical ingredient costs, contract research, license and milestone fees, biostudy and facilities costs associated with product development.

R&D expenses consisted of the following components in the years ended December 31, 2015 and 2014 ($ in millions):

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | Dollars | % |
| Ongoing operating expenses | $ 1,116.8 | $ 517.4 | $ 599.4 | 115.8% |
| Brand related milestone payments and upfront license payments | 950.4 | 65.1 | 885.3 | 1,359.9% |
| Contingent consideration adjustments, net | 37.7 | (69.3) | 107.0 | (154.4)% |
| Acquisition, integration, and restructuring charges | 102.7 | 25.7 | 77.0 | 299.6% |
| Acquisition accounting fair market value adjustments to stock-based compensation | 150.9 | 66.8 | 84.1 | 125.9% |
| Total expenditures | $ 2,358.5 | $ 605.7 | $ 1,752.8 | 289.4% |

The increase in ongoing operating expenses is primarily due to the impact of the Forest and Allergan acquisitions. Included within brand related milestone payments and upfront license charges in the year ended December 31, 2015 is $250.0 million relating to the Merck Transaction, $50.0 million relating to the Mimetogen Transaction and $571.7 million related to the Naurex Transaction. Additionally, the Company had additional contingent consideration expense primarily as a result of the scheduling of Viberzi as a controlled substance and the related payment of the CVR.

For the year ended December 31, 2014, R&D expenses primarily related to ongoing operating expenses for the acquired Forest business and the Warner Chilcott business. Included within brand related milestone payments and upfront license charges in the year ended December 31, 2014 is a $40.0 million payment to Rhythm Health, Inc. Offsetting the increase was favorable contingent consideration adjustments due to the impairment of IPR&D projects and the timing of launch of certain products.

*Amortization*

| ($ in millions) | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | Dollars | % |
| Amortization | $ 5,453.4 | $ 1,945.5 | $ 3,507.9 | 180.3% |

Amortization for the year ended December 31, 2015 increased compared to the prior year primarily as a result of increased amortization of identifiable assets acquired in the Allergan Acquisition of $2,779.1 million and the impact of a full year of amortization related to the Forest Acquisition compared to six months in the prior year.

*IPR&D Impairments and Asset Sales and Impairments, Net*

| ($ in millions) | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | Dollars | % |
| IPR&D impairments | $ 511.6 | $ 424.3 | $ 87.3 | 20.6 % |
| Asset sales and impairments, net | 272.0 | 305.7 | (33.7) | (11.0)% |

The Company regularly reviews IPR&D assets for impairment indicators. In the year ended December 31, 2015, the Company made the decision to abandon a select IPR&D asset (acquired in connection with the Allergan Acquisition) based on the review of research studies, resulting in an impairment of the full asset value of $300.0 million. The Company also recorded an impairment of $192.1 million related to a reduction in cash flows for women's healthcare portfolio products acquired in the Warner Chilcott Acquisition as planned promotional initiatives on these future products has been reduced. Asset sales and impairments, net primarily relates to the abandonment of a surgical product line of $229.6 million acquired in the Allergan Acquisition and a $33.2 million impairment charge as a result of a change in projected cash flows relating to an acquired product, Tretin-X.

IPR&D impairments for the year ended December 31, 2014 primarily include an impairment charge of $165.0 million related to the abandonment of certain R&D projects, an impairment charge of $193.0 million related to acquired IPR&D due to the FDA communications relating to Allergan's NDA for the fixed-dose combination of nebivolol and valsartan for the treatment of hypertension, the abandonment of a select dermatology project of $32.0 million, the impairment of IPR&D relating to Aeroquin of $18.0 million and impairments related to the Estelle and Colvir assets acquired in the Uteron Acquisition of $15.1 million. Asset sales and impairments, net in the year-ended December 31, 2014 primarily related to the impairment on assets held for sale in the Pharmatech Transaction of $189.9 million which included a portion of goodwill allocated to this business unit and an impairment charge related to Doryx® of $89.0 million. The impairment was caused by a shortening of the product's life cycle for which to recover the value of the asset.

*Interest Income*

| ($ in millions) | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | Dollars | % |
| Interest income | $ 11.4 | $ 8.9 | $ 2.5 | 28.1% |

Interest income represents interest earned on cash and cash equivalents held during the respective periods.

*Interest Expense*

| ($ in millions) | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | Dollars | % |
| Fixed Rate Notes | $ 1,003.1 | $ 324.4 | 678.7 | 209.2% |
| AGN Term Loan | 79.1 | - | 79.1 | n.a. |
| ACT Term Loan | 50.8 | 44.9 | 5.9 | 13.1% |
| Floating Rate Notes | 18.8 | - | 18.8 | n.a. |
| WC Term Loan | 17.4 | 30.5 | (13.1) | (43.0)% |
| Revolving Credit Facility | 4.8 | 3.5 | 1.3 | 37.1% |
| Other | 19.3 | 8.5 | 10.8 | 127.1% |
| Interest expense | $ 1,193.3 | $ 411.8 | $ 781.5 | 189.8% |

Interest expense increased for the year ended December 31, 2015 over the prior year primarily due to interest from the indebtedness incurred as part of the Allergan Acquisition of $710.9 million and the full year impact of debt incurred associated with the Forest Acquisition.

*Other Income (expense)*

| ($ in millions) | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | Dollars | % |
| Bridge loan commitment fee | $ (264.9) | $ (73.6) | (191.3) | 259.9% |
| Interest rate lock | 31.0 | - | 31.0 | n.a. |
| Extinguishment of debt | - | 29.9 | (29.9) | (100.0)% |
| Other (expense) income | 0.1 | 16.4 | (16.3) | (99.4)% |
| Other (expense) income, net | $ (233.8) | $ (27.3) | $ (206.5) | |

*Bridge Loan Commitment Fee*

During the year ended December 31, 2015, we incurred costs associated with bridge loan commitments in connection with the Allergan Acquisition of $264.9 million.

During the year ended December 31, 2014, the Company recognized an expense of $47.8 million associated with the Allergan Acquisition bridge and term loan financing commitment fees. In connection with the Forest Acquisition, we secured a bridge loan commitment of up to $7.0 billion and incurred associated commitment costs of $25.8 million, which have been expensed in full.

*Interest rate lock*

During the year ended December 31, 2015, the Company entered into interest rate locks on a portion of the $21.0 billion of debt issued as part of the Allergan Acquisition. As a result of the interest rate locks, the Company recorded income of $31.0 million.

*Extinguishment of Debt*

On July 21, 2014, the Company redeemed the Warner Chilcott Company, LLC's and Warner Chilcott Finance LLC's 7.75% senior notes due 2018 (the "WC Notes") for $1,311.8 million, which included a make-whole premium of $61.8 million, and the principal amount of the WC Notes of $1,250.0 million. As a result of the transaction, the Company recognized a gain of $29.9 million, which includes the write-off of the then outstanding unamortized premium.

*(Benefit) for Income Taxes*

| | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| ($ in millions) | 2015 | 2014 | Dollars | % |
| (Benefit) for income taxes.................................................................. | $ (1,561.9) | $ (467.0) | $ (1,094.9) | 234.5% |
| *Effective tax rate.....................................................................* | *(35.3)%* | *(16.2)%* | | |

The Company's effective tax rate for the twelve months ended December 31, 2015 was a benefit of (35.3%) compared to a benefit of (16.2%) for the twelve months ended December 31, 2014. The reconciliations between the statutory Irish income tax rates for Allergan plc and the effective income tax rates were as follows:

| | Allergan plc | |
|---|---|---|
| | Years Ended December 31, | |
| | 2015 | 2014 |
| Statutory rate................................................................................. | (12.5%) | (12.5%) |
| Earnings subject to the U.S. federal and state tax rates (1) (3).......... | (18.5%) | (11.3%) |
| Earnings subject to rates different than the statutory rate (2)(3)....... | (2.3%) | 1.1% |
| Tax reserves and audit outcomes ..................................................... | 0.3% | 1.3% |
| Non-deductible expenses (4)............................................................. | 5.4% | 5.0% |
| R&D credits and U.S. manufacturing deduction................................ | (0.5%) | (1.2%) |
| Rate changes .................................................................................. | 0.0% | 1.5% |
| Valuation allowances (5) ................................................................. | (6.7%) | 0.0% |
| Other ............................................................................................. | (0.5%) | (0.1%) |
| Effective income tax rate................................................................. | (35.3%) | (16.2%) |

The material drivers of the period-over-period tax rate movements are as follows:

(1) Earnings subject to U.S. federal and state tax had a larger impact on the effective tax rate for the period ended December 31, 2015 compared to the period ended December 31, 2014 due to a significant increase in expenses in 2015. These expenses included amortization expense related to intangibles acquired as part of the Allergan Acquisition and incremental costs associated with the acquisition related financing.

(2) The impact of earnings subject to tax rates different than the statutory rate is primarily driven by the inclusion of Allergan post-acquisition operating income earned outside of the U.S. and Ireland. In addition, 2015 includes a full year of operating income from Forest compared to six months in 2014. The impact of this additional income is partially offset by an increase in amortization expense in jurisdictions with tax rates lower than the statutory rate.

(3) In 2015, the Company recorded $5.5 billion of amortization expense. A significant portion of this amount was incurred in jurisdictions with tax rates higher than the statutory rate resulting in a $246.2 million favorable impact on the effective tax rate.

(4) Non-deductible expenses in the year ended December 31, 2015 primarily resulted from one-time non-deductible pre-tax expenses for the 2016 Branded Prescription Drug Fee of $153.7 million, Naurex Transaction related upfront consideration of $571.7 million recognized as a component of R&D expense, and other acquisition related transaction costs of $62.3 million. Non-deductible expenses in the year ended December 31, 2014 primarily resulted from one-time non-deductible pre-tax expenses for acquisition related costs of $98.8 million, penalties of $97.7 million and the 2015 Branded Prescription Drug Fee of $160.8 million, including the impact of an additional year of the fee of $105.1 million in accordance with final regulations issued in 2014 by the Internal Revenue Service.

(5) Valuation allowances for the year ended December 31, 2015 included the release of a $296.2 million valuation allowance on certain capital loss carryforwards as a result of restructuring related to the global generics sale.

**YEAR ENDED DECEMBER 31, 2014 COMPARED TO 2013**

Results of operations, including segment net revenues, segment operating expenses and segment contribution consisted of the following ($ in millions):

| | Year Ended December 31, 2014 | | | | |
| --- | --- | --- | --- | --- | --- |
| | US Brands | US Medical Aesthetics | International Brands | Anda Distribution | Total |
| Net revenues............................................... | $ 4,511.2 | $ - | $ 203.5 | $ 2,024.2 | $ 6,738.9 |
| Operating expenses: | | | | | |
| Cost of sales[1]............................................ | 736.7 | - | 48.2 | 1,711.6 | 2,496.5 |
| Selling and marketing................................ | 806.4 | - | 48.2 | 135.6 | 990.2 |
| General and administrative......................... | 119.5 | - | 12.0 | 36.4 | 167.9 |
| Segment Contribution.............................. | $ 2,848.6 | $ - | $ 95.1 | $ 140.6 | $ 3,084.3 |
| Contribution margin................................. | 63.1% | | 46.7% | 6.9% | 45.8% |
| Corporate...................................................... | | | | | 2,247.0 |
| Research and development............................. | | | | | 605.7 |
| Amortization................................................. | | | | | 1,945.5 |
| In-process research and development impairments............. | | | | | 424.3 |
| Asset sales and impairments, net ................... | | | | | 305.7 |
| Operating (loss) ..................................... | | | | | (2,443.9) |
| Operating margin.................................... | | | | | (36.3)% |

[1]  Excludes amortization and impairment of acquired intangibles including product rights.

| | Year Ended December 31, 2013 | | | | |
| --- | --- | --- | --- | --- | --- |
| | US Brands | US Medical Aesthetics | International Brands | Anda Distribution | Total |
| Net revenues............................................... | $ 1,001.2 | $ - | $ 40.2 | $ 1,561.1 | $ 2,602.5 |
| Operating expenses: | | | | | |
| Cost of sales[1]............................................ | 153.8 | - | 15.8 | 1,297.6 | 1,467.2 |
| Selling and marketing................................ | 240.7 | - | 21.6 | 112.5 | 374.8 |
| General and administrative......................... | 39.4 | - | 1.4 | 32.7 | 73.5 |
| Segment Contribution.............................. | $ 567.3 | $ - | $ 1.4 | $ 118.3 | $ 687.0 |
| Contribution margin................................. | 56.7% | | 3.5% | 7.6% | 26.4% |
| Corporate...................................................... | | | | | 560.1 |
| Research and development............................. | | | | | 191.3 |
| Amortization................................................. | | | | | 303.8 |
| In-process research and development impairments............. | | | | | - |
| Asset sales and impairments, net ................... | | | | | 1.0 |
| Operating (loss) ..................................... | | | | | (369.2) |
| Operating margin.................................... | | | | | (14.2)% |

[1]  Excludes amortization and impairment of acquired intangibles including product rights.

The following is a reconciliation of net revenues for the operating segments to the Company's net revenues for the years ended December 31, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | | | Change | |
| | 2014 | | 2013 | | Dollars | % |
|---|---|---|---|---|---|---|
| Segment net revenues | $ | 6,738.9 | $ | 2,602.5 | $ 4,136.4 | 158.9% |
| Corporate revenues | | - | | - | - | n.a. |
| Net revenues | $ | 6,738.9 | $ | 2,602.5 | $ 4,136.4 | 158.9% |

No other country represents ten percent or more of net revenues outside of the United States. The US Brands, US Medical Aesthetics, and Anda Distribution segments are comprised solely of sales within the United States.

The following table presents global net revenues for the top products of the Company for the years ended December 31, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | | | | | | | | | | |
| | Global | | | | U.S. | | | | International | | | |
| | 2014 | 2013 | $ Change | % Change | 2014 | 2013 | $ Change | % Change | 2014 | 2013 | $ Change | % Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Namenda® IR | 629.7 | - | 629.7 | n.a. | 629.7 | - | 629.7 | n.a. | - | - | - | n.a. |
| Asacol®/Delzicol® | 614.1 | 164.2 | 449.9 | 274.0% | 541.0 | 145.2 | 395.8 | 272.6% | 73.1 | 19.0 | 54.1 | 284.7% |
| Bystolic® | 292.6 | - | 292.6 | n.a. | 291.6 | - | 291.6 | n.a. | 1.0 | - | 1.0 | n.a. |
| Lo Loestrin® | 277.1 | 63.3 | 213.8 | 337.8% | 275.7 | 63.3 | 212.4 | 335.5% | 1.4 | - | 1.4 | n.a. |
| Namenda XR® | 269.5 | - | 269.5 | n.a. | 269.5 | - | 269.5 | n.a. | - | - | - | n.a. |
| Estrace® Cream | 258.2 | 60.7 | 197.5 | 325.4% | 258.2 | 60.7 | 197.5 | 325.4% | - | - | - | n.a. |
| Minastrin® 24 | 217.9 | 53.7 | 164.2 | 305.8% | 217.9 | 53.7 | 164.2 | 305.8% | - | - | - | n.a. |
| Linzess®/Constella® | 174.4 | - | 174.4 | n.a. | 173.2 | - | 173.2 | n.a. | 1.2 | - | 1.2 | n.a. |
| Viibryd®/Fetzima® | 140.3 | - | 140.3 | n.a. | 140.3 | - | 140.3 | n.a. | - | - | - | n.a. |
| Carafate ® / Sulcrate ® | 90.9 | - | 90.9 | n.a. | 90.9 | - | 90.9 | n.a. | - | - | - | n.a. |
| Other Products Revenues | 1,750.0 | 699.5 | 1,050.5 | 150.2% | 1,623.2 | 678.3 | 944.9 | 139.3% | 126.8 | 21.2 | 105.6 | 498.1% |
| **Total Products Revenues** | **4,714.7** | **1,041.4** | **3,673.3** | **352.7%** | **4,511.2** | **1,001.2** | **3,510.0** | **350.6%** | **203.5** | **40.2** | **163.3** | **406.2%** |
| ANDA Revenues | 2,024.2 | 1,561.1 | 463.1 | 29.7% | 2,024.2 | 1,561.1 | 463.1 | 29.7% | - | - | - | n.a. |
| **Total Net Revenues** | **$6,738.9** | **$2,602.5** | **$ 4,136.4** | **158.9%** | **$6,535.4** | **$2,562.3** | **$ 3,973.1** | **155.1%** | **$203.5** | **$ 40.2** | **$ 163.3** | **406.2%** |

## US Brands Segment

The following table presents net contribution for the US Brands segment for the years ended December 31, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | | | Change | |
| | 2014 | | 2013 | | Dollars | % |
|---|---|---|---|---|---|---|
| Central Nervous System (CNS) | $ | 1,109.4 | $ | - | $ 1,109.4 | n.a. |
| Gastroenterology (GI) | | 966.8 | | 145.2 | 821.6 | 565.8% |
| Women's Health | | 791.7 | | 290.8 | 500.9 | 172.2% |
| Cardiovascular | | 291.6 | | - | 291.6 | n.a. |
| Urology | | 111.9 | | - | 111.9 | n.a. |
| Infectious Disease | | 62.7 | | - | 62.7 | n.a. |
| Other | | 1,177.1 | | 565.2 | 611.9 | 108.3% |
| Net revenues | $ | 4,511.2 | $ | 1,001.2 | $ 3,510.0 | 350.6% |
| Operating expenses: | | | | | | |
| Cost of sales[1] | | 736.7 | | 153.8 | 582.9 | 379.0% |
| Selling and marketing | | 806.4 | | 240.7 | 565.7 | 235.0% |
| General and administrative | | 119.5 | | 39.4 | 80.1 | 203.3% |
| **Segment contribution** | $ | **2,848.6** | $ | **567.3** | $ **2,281.3** | **402.1%** |
| Segment margin | | 63.1% | | 56.7% | | 6.4% |

The increase in revenues is primarily due to the contribution of the Forest Acquisition and the results of Warner Chilcott Acquisition, which only contributed three months in the year ended December 31, 2013.

The increase in operating expenses is due to the Forest and Warner Chilcott Acquisitions.

*International Brands*

The following table presents net contribution for the International Brands segment for the years ended December 31, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | | | Change | | |
|---|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | Dollars | | % |
| Net revenues | $ 203.5 | | $ 40.2 | | $ 163.3 | | 406.2% |
| Operating expenses: | | | | | | | |
| Cost of sales[1] | 48.2 | | 15.8 | | 32.4 | | 205.1% |
| Selling and marketing | 48.2 | | 21.6 | | 26.6 | | 123.1% |
| General and administrative | 12.0 | | 1.4 | | 10.6 | | 757.1% |
| Segment contribution | $ 95.1 | | $ 1.4 | | $ 93.7 | | 6,692.9% |
| Segment margin | 46.7% | | 3.5% | | | | 43.2% |

The increase in revenues is primarily due to the contribution of the Forest Acquisition and the results of Warner Chilcott Acquisition, which only contributed three months in the year ended December 31, 2013.

The increase in operating expenses is due to the Forest and Warner Chilcott Acquisitions.

*Anda Distribution Segment*

The following table presents net contribution for the Anda Distribution segment for the years ended December 31, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | | | Change | | |
|---|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | Dollars | | % |
| Net revenues | $ 2,024.2 | | $ 1,561.1 | | $ 463.1 | | 29.7% |
| Operating expenses: | | | | | | | |
| Cost of sales[1] | 1,711.6 | | 1,297.6 | | 414.0 | | 31.9% |
| Selling and marketing | 135.6 | | 112.5 | | 23.1 | | 20.5% |
| General and administrative | 36.4 | | 32.7 | | 3.7 | | 11.3% |
| Segment contribution | $ 140.6 | | $ 118.3 | | $ 22.3 | | 18.9% |
| Segment margin | 6.9% | | 7.6% | | | | (0.7)% |

*Net Revenues*

The increase in net revenues was a result of third party volume increases and price increases ($421.0 million) and an increase in third-party launches ($65.8 million). Also included are results related to the Company's manufactured products sold through our Anda Distribution segment that were previously included in our former Global Generics Segment.

*Cost of Sales*

The increase in cost of sales within our Anda Distribution segment was due to higher product sales. Cost of sales as a percentage of revenue increased to 84.6% compared to 83.1% in the prior year period primarily due to product and customer mix.

*Selling and Marketing Expenses*

The increase in selling and marketing expenses relate to higher freight costs and higher personnel costs.

*Corporate*

Corporate represents the results of corporate initiatives as well as the impact of select revenues and shared costs.  The following represents the corporate amounts for the years ended December 31, 2014 and 2013 ($ in millions):

| | Year Ended December 31, 2014 | | | | | |
| | Integration and Restructuring | Fair Value Adjustments | Effect of Purchase Accounting | Other | Revenues and Shared Costs | Total |
|---|---|---|---|---|---|---|
| Net Sales ..................... | $ - $ | - $ | - $ | - $ | - $ | - |
| Operating expenses: | | | | | | |
| Cost of sales[(1)]..................... | 25.9 | (9.9) | 941.1 | - | - | 957.1 |
| Selling and marketing......... | 49.5 | - | 46.2 | 115.1 | - | 210.8 |
| General and administrative ............... | 292.7 | - | 171.7 | 168.3 | 446.4 | 1,079.1 |
| Contribution ........................... | $ (368.1) $ | 9.9 $ | (1,159.0) $ | (283.4) $ | (446.4) $ | (2,247.0) |

[(1)] Excludes amortization and impairment of acquired intangibles including product rights.

| | Year Ended December 31, 2013 | | | | | |
| | Integration and Restructuring | Fair Value Adjustments | Effect of Purchase Accounting | Other | Revenues and Shared Costs | Total |
|---|---|---|---|---|---|---|
| Net Sales ..................... | $ - $ | - $ | - $ | - $ | - $ | - |
| Operating expenses: | | | | | | |
| Cost of sales[(1)]..................... | 6.1 | 5.8 | 165.6 | - | - | 177.5 |
| Selling and marketing.......... | - | - | - | - | - | - |
| General and administrative ............... | 99.3 | - | - | - | 283.3 | 382.6 |
| Contribution ........................... | $ (105.4) $ | (5.8) $ | (165.6) $ | - $ | (283.3) $ | (560.1) |

[(1)] Excludes amortization and impairment of acquired intangibles including product rights.

In the year ended December 31, 2014, integration and restructuring charges were primarily related to integration of the Forest and Warner Chilcott businesses.  In the year ended December 31, 2014, the Company incurred $933.3 million in cost of sales related to the fair value inventory step-up primarily from the acquired Forest and Warner Chilcott inventory as those products were sold to the Company's third party customers. The Company also incurred charges related to the purchase accounting impact of stock-based compensation related to the Forest, Furiex, Durata and Warner Chilcott acquisitions, which increased cost of sales, selling and marketing and general and administrative expenses. Other costs include a charge of $105.1 million to account for an additional year of the non-tax deductible Branded Prescription Drug Fee in accordance with final regulations issued in the third quarter by the Internal Revenue Service as well as the impact of legal settlement reserves.

In the year ended December 31, 2013, the integration and restructuring charges primarily related to integration of the Warner Chilcott business.  In the year ended December 31, 2013, the Company incurred $165.6 million in cost of sales for the pull through of the acquisition accounting fair value step up adjustment to inventory related primarily to the acquired Warner Chilcott inventory as that product was sold to the Company's third party customers.

*Research and Development Expenses*

R&D expenses consisted of the following components in the years ended December 31, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | | | Change | |
|---|---|---|---|---|---|---|
| | 2014 | | 2013 | | Dollars | % |
| Ongoing operating expenses | $ | 517.4 | $ | 172.7 | $ 344.7 | 199.6% |
| Brand-related milestone payments and upfront license payments | | 65.1 | | 17.4 | 47.7 | 274.1% |
| Acquisition accounting fair market value adjustment to stock-based compensation | | 66.8 | | - | 66.8 | n.a. |
| Acquisition, integration, and restructuring charges | | 25.7 | | 0.1 | 25.6 | n.m. |
| Contingent consideration adjustments, net | | (69.3) | | 1.1 | (70.4) | n.m. |
| Total expenditures | $ | 605.7 | $ | 191.3 | $ 414.4 | 216.6% |

For the year ended December 31, 2014, R&D expenses primarily related to ongoing operating expenses for the acquired Forest business which had no impact on the year ended December 31, 2013 and the Warner Chilcott business which only contributed three months of activity in the year ended December 31, 2013.  Included within brand related milestone payments and upfront license charges in the year ended December 31, 2014 is a $40.0 million payment to Rhythm Health, Inc.  Offsetting the increase was favorable contingent consideration adjustments due to the impairment of IPR&D projects and the timing of launch of certain products.

*Amortization*

| | Years Ended December 31, | | | | Change | |
|---|---|---|---|---|---|---|
| ($ in millions) | 2014 | | 2013 | | Dollars | % |
| Amortization | $ | 1,945.5 | $ | 303.8 | $  1,641.7 | 540.4% |

Amortization for the year ended December 31, 2014 increased as compared to the prior year period primarily as a result of amortization of identifiable assets acquired in the Forest Acquisition and Warner Chilcott Acquisition.

*IPR&D Impairments and Asset Sales and Impairments, Net*

| | Years Ended December 31, | | | | Change | |
|---|---|---|---|---|---|---|
| ($ in millions) | 2014 | | 2013 | | Dollars | % |
| IPR&D impairments | $ | 424.3 | $ | - | $ 424.3 | n.a. |
| Asset sales and impairments, net | | 305.7 | | 1.0 | 304.7 | n.m. |

IPR&D impairments for the year ended December 31, 2014  primarily include an impairment charge of $165.0 million related to the abandonment of certain R&D projects, an impairment charge of $193.0 million related to acquired IPR&D due to the FDA communications relating to Allergan's NDA for the fixed-dose combination of nebivolol and valsartan for the treatment of hypertension, the abandonment of a select dermatology project of $32.0 million, the impairment of IPR&D related to Aeroquin of $18.0 million and impairments related to the Estelle and Colvir assets acquired in the Uteron Acquisition of $15.1 million. Asset sales and impairments, net in the year-ended December 31, 2014 primarily related to the impairment on assets held for sale in the Pharmatech Transaction of $189.9 million which included a portion of goodwill allocated to this business unit and an impairment charge related to Doryx* of $89.0 million. The impairment was caused by a shortening of the product's life cycle for which to recover the value of the asset.

*Interest Income*

| | Years Ended December 31, | | | | Change | |
|---|---|---|---|---|---|---|
| ($ in millions) | 2014 | | 2013 | | Dollars | % |
| Interest income | $ | 8.9 | $ | 4.8 | $ 4.1 | 85.4% |

Interest income represents interest earned on cash and cash equivalents held during the respective periods.

*Interest Expense*

| | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| ($ in millions) | 2014 | 2013 | Dollars | % |
| Fixed Rate Notes | $ 324.4 | $ 192.8 | $ 131.6 | 68.3% |
| ACT Term Loan | 44.9 | 30.2 | 14.7 | 48.7% |
| WC Term Loan | 30.5 | 8.2 | 22.3 | 272.0% |
| Revolving Credit Facility | 3.5 | 2.7 | 0.8 | 29.6% |
| Other | 8.5 | 5.9 | 2.6 | 44.1% |
| Interest expense | $ 411.8 | $ 239.8 | $ 172.0 | 71.7% |

Interest expense increased for the year ended December 31, 2014 over the prior year primarily due to the indebtedness incurred for the Forest Acquisition and a full year of interest on indebtedness incurred in the Warner Chilcott Acquisition.

*Other Income (expense)*

| | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| ($ in millions) | 2014 | 2013 | Dollars | % |
| Bridge loan commitment fee | $ (73.6) | $ - | $ (73.6) | n.a. |
| Extinguishment of debt | 29.9 | (18.5) | 48.4 | (261.6)% |
| Other income | 16.4 | (0.1) | 16.5 | n.m. |
| Other (expense) income, net | $ (27.3) | $ (18.6) | $ (8.7) | |

*Bridge Loan Commitment Fee*

In connection with the Allergan Acquisition, the Company secured bridge loan financing of up to $36.4 billion and incurred commitment fees for the bridge loan and term loan of $162.8 million. During the year ended December 31, 2014, the Company recognized an expense of $47.8 million associated with these fees. In connection with the Forest Acquisition, we secured a bridge loan commitment of up to $7.0 billion and incurred associated commitment costs of $25.8 million, which have been expensed in full.

*Extinguishment of Debt*

On July 21, 2014, the Company redeemed the WC Notes for $1,311.8 million, which included a make-whole premium of $61.8 million and the principal amount of the WC Notes of $1,250.0 million. As a result of the transaction, the Company recognized a gain of $29.9 million, which includes the write-off of the then outstanding unamortized premium.

As a result of the extinguishment of our $450.0 million 5.000% senior notes due 2014, the Company recorded a loss of $17.1 million in the year ended December 31, 2013. In addition, the Company incurred a $1.4 million non-cash write-off of deferred loan costs in connection with the optional prepayment of term loan indebtedness.

*(Benefit) for Income*

| | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| ($ in millions) | 2014 | 2013 | Dollars | % |
| (Benefit) for income taxes | $ (467.0) | $ (155.3) | $ (311.7) | 200.7% |
| *Effective tax rate* | *(16.2)%* | *(24.9)%* | | |

The Company's effective tax rate for the twelve months ended December 31, 2014 was a benefit of (16.2%) compared to a benefit of (24.9%) for the twelve months ended December 31, 2013. The reconciliations between the statutory Irish income tax rates for Allergan plc and the effective income tax rates were as follows:

| | Allergan plc | |
| --- | --- | --- |
| | Years Ended December 31, | |
| | 2014 | 2013 |
| Statutory rate | (12.5%) | (12.5%) |
| Earnings subject to the U.S. federal and state tax rates (1) | (11.3%) | (13.9%) |
| Earnings subject to rates different than the statutory rate (1) | 1.1% | (2.5%) |
| Tax reserves and audit outcomes (2) | 1.3% | 4.8% |
| Non-deductible expenses (3) | 5.0% | 0.1% |
| R&D credits and U.S. manufacturing deduction | (1.2%) | (0.4%) |
| Rate changes | 1.5% | (0.1%) |
| Valuation allowances | 0.0% | (0.8%) |
| Other | (0.1%) | 0.4% |
| Effective income tax rate | (16.2%) | (24.9%) |

The material drivers of the period-over-period tax rate movements are as follows:

(1)   The decreased benefit due to the impact of earnings subject to tax rates different than the statutory rate is primarily driven by the inclusion of Forest's post-acquisition losses incurred in jurisdictions with tax rates lower than the statutory rate. These losses included amortization expense related to intangibles acquired as part of the Forest Acquisition.

(2)   As a result of the Forest Acquisition in 2014 and the Warner Acquisition in 2013, the company incurred one-time tax charges of $36.8 million and $30.1 million, respectively.

(3)   Non-deductible expenses in the year ended December 31, 2014 primarily resulted from one-time non-deductible pre-tax expenses for acquisition related costs of $98.8 million, penalties of $97.7 million and the 2015 Branded Prescription Drug Fee of $160.8 million, including the impact of an additional year of the fee of $105.1 million in accordance with final regulations issued in 2014 by the Internal Revenue Service.

**Discontinued Operations**

On July 27, 2015, the Company announced that it has entered into the Teva Transaction.  Under the agreement, Teva will acquire Allergan's global generics business, including the U.S. and international generic commercial units, our third-party supplier Medis, our global generic manufacturing operations, our global generic R&D unit, our international over-the-counter (OTC) commercial unit (excluding OTC eye care products) and some established international brands.

Allergan will retain its dynamic global branded pharmaceutical and medical aesthetic businesses, as well as its biosimilars development programs and the Anda Distribution business.

Financial results of the global generics business are presented as "Income from discontinued operations" on the Consolidated Statements of Operations for the years ended December 31, 2015, 2014 and 2013; and assets and liabilities of the global generics business to be disposed of are presented as "Current assets held for sale", "Non current assets held for sale", "Current liabilities held for sale" and "Long-term liabilities held for sale" on the Consolidated Balance Sheet as of December 31, 2015 and 2014.

The following table presents key financial results of the global generics business included in "Income from discontinued operations" for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Third party revenues | $ 6,116.1 | $ 6,323.4 | $ 6,075.1 |
| Related party sales | 259.2 | 255.4 | 273.1 |
| Net revenues | 6,375.3 | 6,578.8 | 6,348.2 |
| Operating expenses: | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | 3,048.1 | 3,105.6 | 3,319.1 |
| Research and development | 422.2 | 480.2 | 425.6 |
| Selling and marketing | 557.7 | 649.0 | 645.5 |
| General and administrative | 653.0 | 496.2 | 571.4 |
| Amortization | 323.6 | 652.0 | 538.9 |
| In-process research and development impairments | - | - | 4.9 |
| Asset sales and impairments, net | 62.4 | 19.6 | 896.8 |
| Total operating expenses | 5,067.0 | 5,402.6 | 6,402.2 |
| Operating income | 1,308.3 | 1,176.2 | (54.0) |
| Other (expense) income, net | (7.9) | (14.5) | 39.1 |
| (Benefit) / provision for income taxes | (5,487.3) | 385.1 | 268.0 |
| Net income / (loss) from discontinued operations | $ 6,787.7 | $ 776.6 | $ (282.9) |

Related party revenues represent the sale of product to the Company's Anda Distribution segment.

The results of our global generics business operations are dependent on the timing of product launches and competition within the generics market, primarily in the United States.  The increase in operating income is the result of continued cost savings initiatives as well as the cessation of depreciation and amortization for assets being divested to Teva once they met the definition of held for sale on July 27, 2015.  Offsetting these amounts, is an increase in divestiture related expenses in the year ended December 31, 2015 of $97.2 million.

For the year ended December 31, 2015, the company recorded a deferred tax benefit of $5,738.8 million related to investments in certain U.S. subsidiaries as this tax benefit will reverse in the foreseeable future. The recognition of this benefit has been reflected in income from discontinued operations, net of tax with the deferred tax asset reflected in non-current deferred tax assets on the balance sheet.

## LIQUIDITY AND CAPITAL RESOURCES

### Working Capital Position

Working capital at December 31, 2015 and 2014 is summarized as follows:

| ($ in millions) | December 31, 2015 | | December 31, 2014 | | Increase (Decrease) | |
|---|---|---|---|---|---|---|
| Current assets: | | | | | | |
| Cash and cash equivalents | $ | 1,096.0 | $ | 250.0 | $ | 846.0 |
| Marketable securities | | 9.3 | | 1.0 | | 8.3 |
| Accounts receivable, net | | 2,401.6 | | 1,112.3 | | 1,289.3 |
| Inventories | | 1,009.7 | | 984.6 | | 25.1 |
| Prepaid expenses and other current assets | | 558.5 | | 478.8 | | 79.7 |
| Current assets held for sale | | 3,540.3 | | 3,806.9 | | (266.6) |
| Deferred tax assets | | – | | 477.0 | | (477.0) |
| Total current assets | | 8,615.4 | | 7,110.6 | | 1,504.8 |
| Current liabilities: | | | | | | |
| Accounts payable and accrued expenses | $ | 4,349.5 | $ | 3,030.1 | $ | 1,319.4 |
| Income taxes payable | | 54.2 | | 33.9 | | 20.3 |
| Current portion of long-term debt and capital leases | | 2,432.8 | | 693.4 | | 1,739.4 |
| Current liabilities held for sale | | 1,491.8 | | 1,449.1 | | 42.7 |
| Deferred tax liabilities | | – | | 41.0 | | (41.0) |
| Total current liabilities | | 8,328.3 | | 5,247.5 | | 3,080.8 |
| Working Capital | $ | 287.1 | $ | 1,863.1 | $ | (1,576.0) |
| Working Capital excluding assets held for sale, net | $ | (1,761.4) | $ | (494.7) | $ | (1,266.7) |
| Adjusted Current Ratio | | 0.74 | | 0.87 | | |

Working capital excluding assets held for sale, net, decreased $1,266.7 million to ($1,761.4) million at December 31, 2015 compared to $(494.7) million at December 31, 2014. The decrease in working capital is primarily due to additional debt financings to fund the Allergan Acquisition and cash used in acquisitions, as well as the adoption of ASU 2015-16 (defined below) for the year ended December 31, 2015, which requires deferred taxes and liabilities to be classified as long-term, offset, in part, by the working capital acquired as part of the Allergan Acquisition of $1,154.2 million, excluding cash.

### Cash Flows from Operations

Our cash flows from operations are summarized as follows:

| ($ in millions) | Years Ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| Net cash provided by operating activities | $ 4,530.0 | $ 2,243.0 |

Cash flows from operations represent net income adjusted for certain non-cash items and changes in assets and liabilities. Cash provided by operating activities increased $2,287 million in the year ended December 31, 2015 versus the prior year period, due primarily to an increase in net income, adjusted for non-cash activity of $3,127.3 million ($5,802.2 million and $2,674.9 million of net income, adjusted for non-cash activity in the years ended December 31, 2015 and 2014, respectively), offset, in part, by certain working capital movements including an increase in accounts receivable due to changes in payment terms of select customers within our discontinued operations.

Management expects that available cash balances and 2015 cash flows from operating activities will provide sufficient resources to fund our operating liquidity needs and expected 2016 capital expenditure funding requirements.

*Investing Cash Flows*

Our cash flows from investing activities are summarized as follows:

| ($ in millions) | Years Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Net cash (used in) investing activities | $ (37,120.9) | $ (5,370.6) |

Investing cash flows consist primarily of cash used in acquisitions of businesses and intangibles (primarily product rights), capital expenditures and purchases of investments and marketable securities partially offset by proceeds from the sale of investments and marketable securities. Included in the year ended December 31, 2015 was cash used in connection with the Allergan Acquisition, Kythera Acquisition and the Auden Acquisition, net of cash acquired, of $34,646.2 million, $1,955.9 million and $463.7 million, respectively, $444.3 million for other business acquisitions and capital expenditures for property, plant and equipment of $454.9 million, offset, in part by cash received from the sale of assets, primarily the respiratory business and Pharmatech assets, of $883.0 million.

Included in the year ended December 31, 2014 was net cash used in connection with the acquisitions of Forest ($3,646.4 million), Furiex ($1,086.0 million) and Durata ($639.7 million), capital expenditures for property, plant and equipment of $238.6 million and the purchases of other businesses, net of cash acquired of $190.2 million, offset in part by cash received from the sale of assets of $453.7 million, including royalty streams related to former Furiex products.

*Financing Cash Flows*

Our cash flows from financing activities are summarized as follows:

| ($ in millions) | Years Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Net cash provided by financing activities | $ 33,443.4 | $ 3,017.5 |

Financing cash flows consist primarily of borrowings and repayments of debt, repurchases of ordinary shares and proceeds from the exercise of stock options. Cash provided by financing activities in the year ended December 31, 2015 primarily included the issuance of indebtedness of $30,137.7 million, the issuance of ordinary shares of $4,071.1 million and the issuance of Mandatory Convertible Preferred Shares of $4,929.7 million in connection with the Allergan Acquisition, offset in part by payments of debt of $5,134.2 million and debt issuance costs of $310.8 million.

Cash provided by financing activities in the year ended December 31, 2014 primarily included the net proceeds from the issuance of the 2014 senior secured notes of $3,676.2 million, term-loan indebtedness of $2,000.0 million, a bridge loan of $2,400.0 million and $1,280.0 million under the Revolving Credit Facility, offset in part by net repayments of other indebtedness of $6,127.0 million, including the bridge loan of $2,400.0 million, the repurchase of Ordinary Shares of $130.1 million and the payment of debt issuance costs of $224.3 million.

*Debt and Borrowing Capacity*

Debt consisted of the following ($ in millions):

| | Balance As of | | Fair Market Value As of | |
|---|---|---|---|---|
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| **Senior Notes:** | | | | |
| Floating Rate Notes | | | | |
| $500.0 million floating rate notes due September 1, 2016 | $ 500.0 | $ - | $ 500.5 | $ - |
| $500.0 million floating rate notes due March 12, 2018 | 500.0 | - | 499.6 | - |
| $500.0 million floating rate notes due March 12, 2020 | 500.0 | - | 496.2 | - |
| | 1,500.0 | - | 1,496.3 | - |
| Fixed Rate Notes | | | | |
| $800.0 million 5.750% notes due April 1, 2016 | 800.0 | - | 808.4 | - |
| $1,000.0 million 1.850% notes due March 1, 2017 | 1,000.0 | - | 1,001.5 | - |
| $500.0 million 1.300% notes due June 15, 2017 | 500.0 | 500.0 | 496.3 | 489.0 |
| $1,200.0 million 1.875% notes due October 1, 2017 | 1,200.0 | 1,200.0 | 1,196.0 | 1,187.3 |
| $3,000.0 million 2.350% notes due March 12, 2018 | 3,000.0 | - | 3,004.6 | - |
| $250.0 million 1.350% notes due March 15, 2018 | 250.0 | - | 244.9 | - |
| $1,050.0 million 4.375% notes due February 1, 2019 | 1,050.0 | 1,050.0 | 1,099.5 | 1,111.4 |
| $500.0 million 2.450% notes due June 15, 2019 | 500.0 | 500.0 | 494.4 | 498.2 |
| $400.0 million 6.125% notes due August 15, 2019 | 400.0 | 400.0 | 444.2 | 457.9 |
| $3,500.0 million 3.000% notes due March 12, 2020 | 3,500.0 | - | 3,505.1 | - |
| $650.0 million 3.375% notes due September 15, 2020 | 650.0 | - | 656.6 | - |
| $750.0 million 4.875% notes due February 15, 2021 | 750.0 | 750.0 | 807.4 | 808.9 |
| $1,200.0 million 5.000% notes due December 15, 2021 | 1,200.0 | 1,200.0 | 1,299.4 | 1,301.0 |
| $3,000.0 million 3.450% notes due March 15, 2022 | 3,000.0 | - | 3,006.8 | - |
| $1,700.0 million 3.250% notes due October 1, 2022 | 1,700.0 | 1,700.0 | 1,669.6 | 1,647.5 |
| $350.0 million 2.800% notes due March 15, 2023 | 350.0 | - | 327.7 | - |
| $1,200.0 million 3.850% notes due June 15, 2024 | 1,200.0 | 1,200.0 | 1,202.6 | 1,215.5 |
| $4,000.0 million 3.800% notes due March 15, 2025 | 4,000.0 | - | 3,984.6 | - |
| $2,500.0 million 4.550% notes due March 15, 2035 | 2,500.0 | - | 2,462.2 | - |
| $1,000.0 million 4.625% notes due October 1, 2042 | 1,000.0 | 1,000.0 | 956.1 | 980.1 |
| $1,500.0 million 4.850% notes due June 15, 2044 | 1,500.0 | 1,500.0 | 1,483.6 | 1,539.9 |
| $2,500.0 million 4.750% notes due March 15, 2045 | 2,500.0 | - | 2,452.7 | - |
| | 32,550.0 | 11,000.0 | 32,604.2 | 11,236.7 |
| **Total Senior Notes Gross** | **34,050.0** | **11,000.0** | **34,100.5** | **11,236.7** |
| Unamortized premium | 225.9 | 239.9 | - | - |
| Unamortized discount | (107.4) | (52.1) | - | - |
| **Total Senior Notes Net** | **34,168.5** | **11,187.8** | **34,100.5** | **11,236.7** |
| **Term Loan Indebtedness:** | | | | |
| WC Term Loan | | | | |
| WC Three Year Tranche variable rate debt maturing October 1, 2016 | 191.5 | 506.9 | | |
| WC Five Year Tranche variable rate debt maturing October 1, 2018** | 498.8 | 744.7 | | |
| | 690.3 | 1,251.6 | | |
| ACT Term Loan | | | | |
| 2017 Term Loan variable rate debt maturing October 31, 2017** | 572.1 | 932.6 | | |
| 2019 Term Loan variable rate debt maturing July 1, 2019** | 1,700.0 | 1,900.0 | | |
| | 2,272.1 | 2,832.6 | | |
| AGN Term Loan | | | | |
| AGN Three Year Tranche variable rate debt maturing March 17, 2018. | 2,750.0 | - | | |
| AGN Five Year Tranche variable rate debt maturing March 17, 2020** | 2,543.8 | - | | |
| | 5,293.8 | - | | |
| **Total Term Loan Indebtedness** | **8,256.2** | **4,084.2** | | |
| **Other Indebtedness** | | | | |
| Revolver Borrowings | 200.0 | 255.0 | | |
| Other | 97.4 | - | | |
| **Total Other Borrowings** | **297.4** | **255.0** | | |
| **Capital Leases** | **4.1** | **4.1** | | |
| **Total Indebtedness** | **$ 42,726.2** | **$ 15,531.1** | | |

**     The indebtedness requires a quarterly repayment of 2.5%.

Fair market value in the table above is determined in accordance with ASC Topic 820 "Fair Value Measurement" ("ASC 820") under Level 2 based upon quoted prices for similar items in active markets. The book value of the outstanding term loan indebtedness approximates fair value as the debt is at variable interest rates and re-prices frequently.

Unless otherwise indicated, the remaining loan balances after the quarterly required payments are due upon maturity.

**Floating Rate Notes**

On March 4, 2015, Actavis Funding SCS, a limited partnership (société en commandite simple) organized under the laws of the Grand Duchy of Luxembourg and an indirect wholly-owned subsidiary of Allergan plc, issued floating rate notes due 2016 (the "2016 Floating Rate Notes"), floating rate notes due 2018 (the "2018 Floating Rate Notes"), floating rate notes due 2020 (the "2020 Floating Rate Notes"), 1.850% notes due 2017 (the "1.850% 2017 Notes"), 2.350% notes due 2018 (the "2.350% 2018 Notes"), 3.000% notes due 2020 (the "3.000% 2020 Notes"), 3.450% notes due 2022 (the "3.450% 2022 Notes"), 3.800% notes due 2025 (the "3.800% 2025 Notes"), 4.550% notes due 2035 (the "4.550% 2035 Notes") and 4.750% notes due 2045 (the "4.750% 2045 Notes"). The notes are fully and unconditionally guaranteed by Actavis Funding SCS's indirect parents, Warner Chilcott Limited and Actavis Capital S.a.r.l. ("Actavis Capital"), and by Actavis, Inc., a subsidiary of Actavis Capital, on an unsecured and unsubordinated basis. Allergan plc has not guaranteed the notes.

The 2016 Floating Rate Notes, the 2018 Floating Rate Notes and the 2020 Floating Rate Notes bear interest at a floating rate equal to three-month LIBOR plus 0.875%, 1.080% and 1.255% per annum, respectively. Interest on the 2016 Floating Rate Notes is payable quarterly on March 1, June 1, September 1 and December 1 of each year, and began on June 1, 2015. Interest on the 2018 Floating Rate Notes and the 2020 Floating Rate Notes is payable quarterly on March 12, June 12, September 12 and December 12 of each year, and began on June 12, 2015.

**Fixed Rate Notes**

*Acquired Allergan Notes*

On March 17, 2015 in connection with the Allergan Acquisition, the Company acquired, and subsequently guaranteed, along with Warner Chilcott Limited, the indebtedness of Allergan, Inc. comprised of the $350.0 million 2.800% senior notes due 2023, the $650.0 million 3.375% senior notes due 2020, the $250.0 million 1.350% senior notes due 2018 and the $800.0 million 5.750% senior notes due 2016. Interest payments are due on the $350.0 million senior notes semi-annually on the principal amount of the notes at a rate of 2.80% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption, if the redemption occurs prior to December 15, 2022 (three months prior to the maturity of the 2023 senior notes). If the redemption occurs on or after December 15, 2022, then such redemption is not subject to the make-whole provision. Interest payments are due on the $650.0 million senior notes semi-annually on the principal amount of the notes at a rate of 3.375% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption. Interest payments are due on the $250.0 million senior notes semi-annually on the principal amount of the notes at a rate of 1.350% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption. Interest payments are due on the $800.0 million senior notes semi-annually on the principal amount of the notes at a rate of 5.750% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption. The fair value of the acquired senior notes was determined to be $2,087.5 million as of March 17, 2015. As such, as part of acquisition accounting, the company recorded a premium of $37.5 million to be amortized as contra interest over the life of the notes.

*Acquired Forest Notes*

On July 1, 2014 in connection with the Forest Acquisition, the Company acquired the indebtedness of Forest comprised of the $1,050.0 million 4.375% senior notes due 2019, the $750.0 million 4.875% senior notes due 2021 and the $1,200.0 million 5.000% senior notes due 2021 (together the "Acquired Forest Notes"). Interest payments are due on the $1,050.0 million senior notes semi-annually in arrears on February 1 and August 1 beginning August 1, 2014. Interest payments are due on the $750.0 million senior notes due 2021 semi-annually in arrears on February 15 and August 15 beginning August 15, 2014. Interest payments are due on the $1,200.0 million senior note due 2021 semi-annually in arrears on June 15 and December 15, beginning December 15, 2014. As a result of acquisition accounting, the notes were fair valued with a premium of $260.3 million as of July 1, 2014, which will be amortized as contra-interest over the life of the notes.

*2014 Notes Issuance*

On June 10, 2014, Actavis Funding SCS, a limited partnership (*societe en commandite simple*), organized under the laws of the Grand Duchy of Luxembourg, an indirect subsidiary of Allergan plc, issued the $500.0 million 1.300% notes due 2017, $500.0 million 2.450% notes due 2019, $1,200.0 million 3.850% notes due 2024 and $1,500.0 million 4.850% notes due 2044 (the "2014 New Notes"). Interest payments are due on the 2014 New Notes on June 15 and December 15 semi-annually, beginning on December 15, 2014. The guarantors of the debt are Warner Chilcott Limited, Actavis Capital S.a.r.l., and Actavis, Inc. Allergan plc will not guarantee the 2014 New Notes.

*Actavis, Inc. Supplemental Indenture*

On October 1, 2013, the Company, Actavis, Inc., a wholly owned subsidiary of the Company, and Wells Fargo Bank, National Association, as trustee, entered into a fourth supplemental indenture (the "Fourth Supplemental Indenture") to the indenture, dated as of August 24, 2009 (the "Base Indenture" and, together with the First Supplemental Indenture, the Second Supplemental Indenture and the Third Supplemental Indenture (each as defined below), the "Indenture"), as supplemented by the first supplemental indenture, dated as of August 24, 2009 (the "First Supplemental Indenture"), the second supplemental indenture, dated as of May 7, 2010 (the "Second Supplemental Indenture"), and the third supplemental indenture, dated as of October 2, 2012 (the "Third Supplemental Indenture"). Pursuant to the Fourth Supplemental Indenture, the Company has provided a full and unconditional guarantee of Actavis, Inc.'s obligations under its then outstanding $450.0 million 5.000% senior notes due August 15, 2014, (the "2014 Notes"), its $400.0 million 6.125% senior notes due August 15, 2019 (the "2019 Notes"), its $1,200.0 million 1.875% senior notes due October 1, 2017 (the "2017 Notes"), its $1,700.0 million 3.250% senior notes due October 1, 2022 (the "2022 Notes") and its $1,000.0 million 4.625% Senior Notes due October 1, 2042 (the "2042 Notes.").

*WC Supplemental Indenture*

On October 1, 2013, the Company, WCCL (defined below), Warner Chilcott Finance LLC (the "Co-Issuer" and together with WC Company, the "Issuers") and Wells Fargo Bank, National Association, as trustee (the "WC Trustee"), entered into a third supplemental indenture (the "Supplemental Indenture") to the indenture, dated as of August 20, 2010 (the "WC Indenture"), among the Issuers, the guarantors party thereto and the WC Trustee, with respect to the Issuers' WC Notes. Pursuant to the Supplemental Indenture, the Company had provided a full and unconditional guarantee of the Issuers' obligations under the WC Notes and the WC Indenture.

On July 21, 2014, the Company redeemed the WC Notes for $1,311.8 million, which includes a make-whole premium of $61.8 million and the principal amount of the WC Notes of $1,250.0 million. As a result of the transaction, the Company recognized a gain in July of 2014 of $29.9 million, which includes the write-off of the then outstanding unamortized premium.

*2012 Notes Issuance*

On October 2, 2012, Actavis, Inc. issued the 2017 Notes, the 2022 Notes, and the 2042 Notes (collectively the "2012 Senior Notes"). Interest payments are due on the 2012 Senior Notes semi-annually in arrears on April 1 and October 1 beginning April 1, 2013. Net proceeds from the offering of the 2012 Senior Notes were used for the Actavis Group acquisition.

*2009 Notes Issuance*

On August 24, 2009, Actavis, Inc. issued the 2014 Notes and the 2019 Notes (collectively the "2009 Senior Notes"). Interest payments are due on the 2009 Senior Notes semi-annually in arrears on February 15 and August 15, respectively, beginning February 15, 2010. Net proceeds from the offering of 2009 Senior Notes were used to repay certain debt with the remaining net proceeds being used to fund a portion of the cash consideration for the Arrow Group acquisition. The 2014 Notes, which had an outstanding principal balance of $450.0 million and which were fully and unconditionally guaranteed by us, were redeemed on November 5, 2013 at a redemption price equal to $465.6 million, which resulted in a cash expense of $15.6 million in the fourth quarter of 2013.

## Credit Facility Indebtedness

*WC Term Loan Agreement*

On December 17, 2014, Allergan plc and certain of its subsidiaries entered into a second amendment agreement (the "WC Term Loan Amendment") among Allergan plc, Warner Chilcott Limited, Warner Chilcott Finance, LLC, Actavis WC 2 S.à r.l. ("Actavis WC 2"), Warner Chilcott Company, LLC ("WCCL"), Warner Chilcott Corporation ("WC Corporation" and together with Actavis WC 2 and WCCL, the "WC Borrowers"), Bank of America, N.A. ("BofA"), as administrative agent, and the lenders party thereto. The WC

Term Loan Amendment amends and restates Allergan plc's existing amended and restated WC term loan credit and guaranty agreement, dated as of June 9, 2014 (such agreement, prior to its amendment and restatement pursuant to the WC Term Loan Amendment, the "2014 WC Term Loan Agreement" and the 2014 WC Term Loan Agreement as amended and restated by the WC Term Loan Amendment, the "WC Term Loan Agreement"), among the WC Borrowers, Allergan plc, Warner Chilcott Limited, Warner Chilcott Finance, LLC, the lenders from time to time party thereto and BofA, as administrative agent, which amended and restated Allergan plc's existing WC term loan credit and guaranty agreement, dated as of August 1, 2013 (such agreement, prior to its amendment and restatement, the "Existing WC Term Loan Agreement") among the WC Borrowers, Warner Chilcott Finance, LLC, Actavis Limited, BofA, as administrative agent and a syndicate of banks participating as lenders.

Pursuant to the Existing WC Term Loan Agreement, on October 1, 2013 (the "WC Closing Date"), the lenders party thereto provided term loans in a total aggregate principal amount of $2.0 billion, comprised of (i) a $1.0 billion tranche that will mature on October 1, 2016 (the "WC Three Year Tranche") and (ii) a $1.0 billion tranche that will mature on October 1, 2018 (the "WC Five Year Tranche"). The proceeds of borrowings under the Existing WC Term Loan Agreement, together with $41.0 million of cash on hand, were used to finance the repayment in full of all amounts outstanding under Warner Chilcott's then-existing Credit Agreement, dated as of March 17, 2011, as amended by Amendment No. 1 on August 20, 2012, among the WC Borrowers, Warner Chilcott Holdings Company III, Limited, BofA, as administrative agent and a syndicate of banks participating as lenders.

Borrowings under the WC Term Loan Agreement bear interest at the applicable borrower's choice of a per annum rate equal to either (a) a base rate plus an applicable margin per annum varying from (x) 0.00% per annum to 0.75% per annum under the WC Three Year Tranche and (y) 0.125% per annum to 0.875% per annum under the WC Five Year Tranche, depending on the publicly announced debt ratings for non-credit-enhanced, senior unsecured long-term indebtedness of Allergan plc (such applicable debt rating the "Debt Rating") or (b) a Eurodollar rate, plus an applicable margin varying from (x) 1.00% per annum to 1.75% per annum under the WC Three Year Tranche and (y) 1.125% per annum to 1.875% per annum under the WC Five Year Tranche, depending on the Debt Rating. The outstanding principal amount of loans under the WC Three Year Tranche is not subject to quarterly amortization and shall be payable in full on the three year anniversary of the WC Closing Date. The outstanding principal amount of loans under the WC Five Year Tranche is payable in equal quarterly amounts of 2.50% per quarter prior to the fifth anniversary of the WC Closing Date, with the remaining balance payable on the fifth year anniversary of the WC Closing Date.

The Company is subject to, and, at December 31, 2015, was in compliance with, all financial and operational covenants under the terms of the WC Term Loan Agreement. In February 2016, the Company prepaid approximately $310.0 million of indebtedness under the outstanding WC Five Year Tranche.

### *ACT Term Loan*

On December 17, 2014, Allergan plc and certain of its subsidiaries entered into a third amendment agreement (the "ACT Term Loan Amendment") among Allergan plc, Warner Chilcott Limited, Actavis Capital, Actavis, Inc., Actavis Funding SCS, BofA, as administrative agent, and the lenders party thereto. The ACT Term Loan Amendment amends and restates Allergan plc's existing second amended and restated Allergan term loan credit and guaranty agreement, dated as of March 31, 2014 (such agreement, prior to its amendment and restatement pursuant to the ACT Term Loan Amendment, the "2014 ACT Term Loan Agreement" and the 2014 ACT Term Loan Agreement as amended and restated by the ACT Term Loan Amendment, the "ACT Term Loan") among Actavis Capital, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, BofA, as administrative agent, and the lenders from time to time party thereto, which amended and restated Allergan plc's existing amended and restated Allergan term loan credit and guaranty agreement, dated as of October 1, 2013 (such agreement, prior to its amendment and restatement, the "Existing ACT Term Loan Agreement") among Actavis Capital, Allergan plc, Actavis, Inc., BofA, as administrative agent, and the lenders from time to time party thereto.

The Existing ACT Term Loan Agreement amended and restated Actavis, Inc.'s $1,800.0 million senior unsecured term loan credit facility, dated as of June 22, 2012. At the closing of the Existing ACT Term Loan Agreement, an aggregate principal amount of $1,572.5 million was outstanding (the "2017 term-loan"). The 2017 term-loan matures on October 31, 2017. The outstanding principal amount is payable in equal quarterly installments of 2.50% per quarter, with the remaining balance payable on the maturity date.

On March 31, 2014, Allergan plc, Actavis Capital, Actavis, Inc., BofA, as Administrative Agent, and a syndicate of banks participating as lenders entered into the 2014 ACT Term Loan Agreement to amend and restate the Existing ACT Term Loan Agreement. On July 1, 2014, in connection with the Forest Acquisition, the Company borrowed $2.0 billion of term loan indebtedness under tranche A-2 of the 2014 ACT Term Loan Agreement, which is due July 1, 2019 (the "2019 term-loan"). The outstanding principal amount is payable in equal quarterly installments of 2.50% per quarter, with the remaining balance payable on the maturity date.

The ACT Term Loan Agreement provides that loans thereunder will bear interest, at the Company's choice, of a per annum rate equal to either (a) a base rate, plus an applicable margin per annum varying from (x) 0.00% per annum to 1.00% per annum with respect to the 2017 term-loan and (y) 0.125% per annum to 0.875% per annum with respect to the 2019 term-loan, depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from (x) 1.00% per annum to 2.00% per annum with respect to the 2017 term-loan and (y) 1.125% per annum to 1.875% per annum with respect to the 2019 term-loan, depending on the Debt Rating.

The Company is subject to, and at December 31, 2015 was in compliance with, all financial and operational covenants under the terms of the ACT Term Loan Agreement. In February 2016, the Company prepaid approximately $200.0 million of indebtedness under the outstanding 2017 Term Loan.

### AGN Term Loan

On December 17, 2014, Allergan, Inc. and certain of its subsidiaries entered into a senior unsecured term loan credit agreement (the "AGN Term Loan"), among Actavis Capital, as borrower, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto (the "Term Lenders"), JPMorgan Chase Bank, N.A. ("JPMCB"), as administrative agent and the other financial institutions party thereto. Under the AGN Term Loan, the Term Lenders provided (i) a $2.75 billion tranche maturing on March 17, 2018 (the "AGN Three Year Tranche") and (ii) a $2.75 billion tranche and maturing on March 17, 2020 (the "AGN Five Year Tranche"). The proceeds of borrowings under the AGN Term Loan were used to finance, in part, the cash component of the Allergan Acquisition consideration and certain fees and expenses incurred in connection with the Allergan Acquisition.

Borrowings under the AGN Term Loan bear interest at our choice of a per annum rate equal to either (a) a base rate plus an applicable margin per annum varying from (x) 0.00% per annum to 1.00% per annum under the AGN Three Year Tranche and (y) 0.125% per annum to 1.250%% per annum under the AGN Five Year Tranche, depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from (x) 1.00% per annum to 2.00% per annum under the AGN Three Year Tranche and (y) 1.125% per annum to 2.250% per annum under the AGN Five Year Tranche, depending on the Debt Rating. The outstanding principal amount of loans under the AGN Three Year Tranche is not subject to quarterly amortization and shall be payable in full on the maturity date. The outstanding principal amount of loans under the AGN Five Year Tranche is payable in equal quarterly amounts of 2.50% per quarter prior to March 17, 2020, with the remaining balance payable on March 17, 2020.

The obligations of Actavis Capital under the Term Loan Credit Agreement are guaranteed by Warner Chilcott Limited, Actavis, Inc. and Actavis Funding SCS and will be guaranteed by any subsidiary of Allergan plc (other than Actavis Capital or a direct subsidiary of Allergan plc) that becomes a guarantor of third party indebtedness in an aggregate principal amount exceeding $350.0 million (unless, in the case of a foreign subsidiary, such guarantee would give rise to adverse tax consequences as reasonably determined by Allergan plc).

The Company is subject to, and at December 31, 2015 was in compliance with, all financial and operational covenants under the terms of the AGN Term Loan.

### Bridge Loan Facility

On December 17, 2014, Allergan and certain of its subsidiaries entered into a 364-day senior unsecured bridge credit agreement (the "Bridge Loan Facility"), among Actavis Capital, as borrower, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto, JPMCB, as administrative agent and the other financial institutions party thereto. No amounts were borrowed under the Bridge Loan Facility and the commitments under the Bridge Loan Facility expired on March 17, 2015 upon the closing of the Allergan Acquisition.

### Cash Bridge Loan Facility

On March 11, 2015, Allergan and certain of its subsidiaries entered into a 60-day senior unsecured bridge credit agreement (the "Cash Bridge Loan Facility"), among Actavis Capital, as borrower, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto (the "Cash Bridge Lenders"), JPMCB, as administrative agent and the other financial institutions party thereto. Under the Cash Bridge Loan Facility, the Cash Bridge Lenders committed to provide, subject to certain conditions, unsecured bridge financing, of which $2.8 billion was drawn to finance the Allergan Acquisition on March 17, 2015. The outstanding balance of the Cash Bridge Loan Facility was repaid on April 9, 2015.

Borrowings under the Cash Bridge Loan Facility bore interest at our choice of a per annum rate equal to either (a) a base rate plus an applicable margin per annum varying from 0.00% per annum to 1.00% per annum, depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from 1.00% per annum to 2.00% per annum, depending on the Debt Rating.

*Revolving Credit Facility*

On December 17, 2014, Allergan plc and certain of its subsidiaries entered into a revolving credit loan and guaranty agreement (the "Revolver Agreement") among Actavis Capital, as borrower, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto (the "Revolving Lenders"), JPMCB as administrative agent, J.P. Morgan Europe Limited, as London agent, and the other financial institutions party thereto. Under the Revolver Agreement, the Revolving Lenders have committed to provide an unsecured revolving credit facility in an aggregate principal amount of up to $1.0 billion. The Revolver Agreement replaces Allergan plc's existing $750.0 million second amended and restated Actavis revolving credit and guaranty agreement dated as of June 30, 2014 (the "Existing Revolver") among Actavis Capital, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, BofA, as administrative agent and the lenders from time to time party thereto. At closing, $600.0 million of loans were borrowed under the Revolver Agreement.

The Revolver Agreement provides that loans thereunder will bear interest, at Actavis Capital's choice, of a per annum rate equal to either (a) a base rate, plus an applicable margin per annum varying from 0.00% per annum to 1.00% per annum depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from 0.875% per annum to 2.00% per annum depending on the Debt Rating. Additionally, to maintain availability of funds, the Company pays an unused commitment fee, which according to the pricing grid is set at 0.075% to 0.250% per annum, depending on the Debt Rating, of the unused portion of the revolver. The Revolving Credit Agreement will mature on December 17, 2019.

The obligations of Actavis Capital under the Revolver Agreement are guaranteed by Allergan plc, Warner Chilcott Limited, Actavis, Inc. and Actavis Funding SCS and will be guaranteed by any subsidiary of Allergan (other than Actavis Capital) that becomes a guarantor of third party indebtedness in an aggregate principal amount exceeding $350 million (unless, in the case of a foreign subsidiary, such guarantee would give rise to adverse tax consequences as reasonably determined by Allergan plc).

The Company is subject to, and as of December 31, 2015 was in compliance with, all financial and operational covenants under the terms of the Revolving Credit Facility. In the fourth quarter of 2015, the Company borrowed $800.0 million under the revolving credit facility to fund, in part, the Kythera Acquisition. At December 31, 2015, $200.0 million was outstanding and was paid in full in January 2016. As of December 31, 2015, letters of credit outstanding were $28.8 million. The net availability under the Revolving Credit Facility was $771.2 million.

### Long-term Obligations

The following table lists our enforceable and legally binding obligations as of December 31, 2015. Some of the amounts included herein are based on management's estimates and assumptions about these obligations, including their duration, the possibility of renewal, anticipated actions by third parties and other factors. Because these estimates and assumptions are necessarily subjective, the enforceable and legally binding obligation we will actually pay in future periods may vary from those reflected in the table:

| ($ in millions): | Payments Due by Period (Including Interest on Debt) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Total | 2016 | 2017-2018 | 2019-2020 | Thereafter |
| Long-term debt[1] | $ 42,603.6 | $ 2,375.5 | $ 11,094.9 | $ 9,418.8 | $ 19,714.4 |
| Cash interest[1] | 13,593.6 | 1,331.6 | 2,409.6 | 1,902.4 | 7,950.0 |
| Contingent consideration liabilities[2] | 901.7 | 110.7 | 376.7 | 241.4 | 172.9 |
| Operating lease obligations[3] | 190.6 | 29.9 | 51.3 | 38.6 | 70.8 |
| Capital lease obligations[4] | 4.1 | 0.3 | 0.6 | 0.6 | 2.6 |
| R&D milestone obligations[5] | 3,664.7 | 444.0 | 752.5 | 478.2 | 1,990.0 |
| Other obligations and commitments[6] | 870.9 | 223.2 | 577.1 | 27.7 | 42.9 |
| Total[7] | $ 61,829.2 | $ 4,515.2 | $ 15,262.7 | $ 12,107.7 | $ 29,943.6 |

[1] Amounts represent total minimum cash payments and anticipated interest payments, as applicable, assuming scheduled repayments under the Company's existing notes. Amounts exclude fair value adjustments, discounts or premiums on outstanding debt obligations.

[2] Amount primarily represents contingent consideration obligations, including accretion resulting from various acquisitions.

[3] Amount represents operating leases for our global business. There are no contingent rental amounts or sublease rentals.

[4]    Amount represents capital leases for our global business, including interest. Leases are for property, plant and equipment, vehicles and furniture and fixtures.

[5]    We have future potential milestone payments and co-development expenses payable to third parties as part of our licensing, development and co-development programs. Payments under these agreements generally become due and are payable upon the satisfaction or achievement of certain developmental, regulatory or commercial milestones or as development expenses are incurred on defined projects. Amounts represent contractual payment obligations due as actual expenditures are incurred by our partners or upon the achievement of developmental, regulatory or commercial milestones based on anticipated approval dates assuming all milestone approval events are met.

Other significant R&D milestone payments include the following maximum payments:

- Amounts owed under the Merck Transaction of $535.0 million;

- Amounts owed under the Naurex Transaction of $750.0 million;

- Amounts related to acquired contracts in the Allergan Acquisition of $1,066.9 million, including amounts related to Molecular Partners of $340.0 million, Vicept Therapeutics Inc. of $150.0 million and amounts owed to LiRIS Biomedical, Inc. of $286.0 million

- Amounts owed to Amgen, Inc. of up to $209.4 million;

- Amounts owed to PregLem to develop and, if approved, market products under development in the United States and Canada, of $74.0 million relating to Esmya in the United States and Fibristal in Canada; and

- Amounts owed to Medicines360 relating to LNG 20 in the United States and Canada of $47.5 million.

We also have potential sales-based milestones based on certain licensing agreements, which are not included in the table above as they are subject to the achievement of future results that are not reasonably estimable.

Milestone payment obligations are uncertain, including the prediction of timing and the occurrence of events triggering a future obligation, and are not reflected as liabilities in our consolidated balance sheet. Amounts in the table above do not include royalty obligations on future sales of product as the timing and amount of future sales levels and costs to produce products subject to milestone obligations is not reasonably estimable.

[6]    Other obligations and commitments include agreements to purchase third-party manufactured products, capital purchase obligations for the construction or purchase of property, plant and equipment and the liability for income tax associated with uncertain tax positions.

[7]    Total does not include contractual obligations already included in current liabilities on our Consolidated Balance Sheet (except for capital leases, contingent consideration and the current portion of long-term debt) or certain purchase obligations, which are discussed below.

For purposes of the table above, obligations for the purchase of goods or services are included only for purchase orders that are enforceable, legally binding and specify all significant terms including fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and the timing of the obligation. Our purchase orders are based on our current manufacturing needs and are typically fulfilled by our suppliers within a relatively short period. At December 31, 2015, we have open purchase orders that represent authorizations to purchase rather than binding agreements that are not included in the table above.

We are involved in certain equity investments that are intended to complement our core business and markets. We have the discretion to provide funding on occasion for working capital or capital expenditures. We make an evaluation of additional funding based on an assessment of the venture's business opportunities. We believe that any possible commitments arising from the current arrangements will not be significant to our financial condition, results of operations or liquidity.

### Off-Balance Sheet Arrangements

We do not have any material off-balance sheet arrangements that have, or are reasonably likely to have, a current or future effect on our financial condition, changes in financial condition, net revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

## CRITICAL ACCOUNTING ESTIMATES

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). These accounting principles require us to make certain estimates, judgments and assumptions. We believe that the estimates, judgments and assumptions are reasonable based upon information available to us at the time that these estimates, judgments and assumptions are made. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities as of the date of the financial statements, as well as the reported amounts of revenues and expenses during the periods presented. To the extent there are material differences between these estimates, judgments or assumptions and actual results, our financial statements will be affected. The significant accounting estimates that we believe are important to aid in fully understanding and evaluating our reported financial results include the following:

- Revenue Recognition
- Inventory Valuation
- Product Rights and other Definite-Lived Intangible Assets
- Goodwill and Intangible Assets with Indefinite-Lives
- Allocation of Acquisition Fair Values to Assets Acquired and Liabilities Assumed
- Income Taxes
- Defined Benefit Plans
- Contingent Consideration and Other Commitments

In many cases, the accounting treatment of a particular transaction is specifically dictated by GAAP and requires management's best estimates of the underlying data in its application. There are also areas in which management's judgment in selecting among available GAAP alternatives would not produce a materially different result.

### *Revenue Recognition*

#### *General*

Revenue from product sales is recognized when title and risk of loss to the product transfers to the customer, which is based on the transaction shipping terms. Recognition of revenue also requires reasonable assurance of collection of sales proceeds, the seller's price to the buyer to be fixed or determinable and the completion of all performance obligations. The Company warrants products against defects and for specific quality standards, permitting the return of products under certain circumstances. Product sales are recorded net of all sales-related deductions including, but not limited to: chargebacks, trade discounts, billback adjustments, sales returns and allowances, commercial and government rebates, customer loyalty programs and fee-for-service arrangements with certain distributors, which we refer to in the aggregate as "SRA" allowances.

Royalty and commission revenue is recognized as a component of net revenues in accordance with the terms of their respective contractual agreements when collectability is reasonably assured and when revenue can be reasonably measured.

#### *Provisions for SRAs*

As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. When the Company recognizes gross revenue from the sale of products, an estimate of SRA is recorded, which reduces the product revenues. Accounts receivable and/or accrued liabilities are also reduced and/or increased by the SRA amount depending on whether we have the right of offset with the customer. These provisions are estimated based on historical payment experience, historical relationship of the deductions to gross product revenues, government regulations, estimated utilization or redemption rates, estimated customer inventory levels and current contract sales terms. The estimation process used to determine our SRA provision has been applied on a consistent basis and no material revenue adjustments have been necessary in prior periods to increase or decrease our reserves for SRA as a result of a significant change in underlying estimates. The Company uses a variety of methods to assess the adequacy of the SRA reserves to ensure that our financial statements are fairly stated.

*Chargebacks* — A chargeback represents an amount payable in the future to a wholesaler for the difference between the invoice price paid by our wholesale customer for a particular product and the negotiated contract price that the wholesaler's customer pays for that product. The chargeback provision and related reserve varies with changes in product mix, changes in customer pricing and changes to estimated wholesaler inventories. The provision for chargebacks also takes into account an estimate of the expected wholesaler sell-through levels to indirect customers at certain contract prices. The Company validates the chargeback accrual quarterly

through a review of the inventory reports obtained from our largest wholesale customers. This customer inventory information is used to verify the estimated liability for future chargeback claims based on historical chargeback and contract rates. These large wholesalers represent the vast majority of the recipients of the Company's chargeback payments. We continually monitor current pricing trends and wholesaler inventory levels to ensure the liability for future chargebacks is fairly stated.

*Rebates* — Rebates include volume-related incentives to direct and indirect customers, third party managed care and Medicare Part D rebates, Medicaid rebates and other government rebates. Rebates are accrued based on an estimate of claims to be paid for product sold into trade by the Company. Volume rebates are generally offered to customers as an incentive to use the Company's products and to encourage greater product sales. These rebate programs include contracted rebates based on customers' purchases made during an applicable monthly, quarterly or annual period. The provision for third-party rebates is estimated based on our customers' contracted rebate programs and the Company's historical experience of rebates paid. Any significant changes to our customer rebate programs are considered in establishing the provision for rebates. The provisions for government rebates are based, in part, upon historical experience of claims submitted by the various states / authorities, contractual terms and government regulations. We monitor legislative changes to determine what impact such legislation may have on our provision.

*Cash Discounts* — Cash discounts are provided to customers that pay within a specific period. The provision for cash discounts is estimated based upon invoice billings and historical customer payment experience. The Company's experience of payment history is fairly consistent and most customer payments qualify for the cash discount.

*Returns and Other Allowances* — The Company's provision for returns and other allowances include returns, pricing adjustments, promotional allowances, loyalty cards and billback adjustments.

Consistent with industry practice, the Company maintains a returns policy that allows customers to return product for a credit. In accordance with the Company's policy, credits for customer returns of products are applied against outstanding account activity or are settled in cash. Product exchanges are not permitted. Customer returned products are generally not resalable. The Company's estimate of the provision for returns is based upon historical experience and current trends of actual customer returns. Additionally, we consider other factors when estimating the current period returns provision, including levels of inventory in the distribution channel, as well as significant market changes that may impact future expected returns.

Pricing adjustments, which includes shelf stock adjustments, (and which primarily relate to our held for sale generics business) are credits issued to reflect price decreases in selling prices charged to the Company's direct customers. Shelf stock adjustments are based upon the amount of product our customers have in their inventory at the time of an agreed-upon price reduction. The provision for shelf stock adjustments is based upon specific terms with the Company's customers and includes estimates of existing customer inventory levels based upon their historical purchasing patterns. We regularly monitor all price changes to evaluate the Company's reserve balances. The adequacy of these reserves is readily determinable as pricing adjustments and shelf stock adjustments are negotiated and settled on a customer-by-customer basis.

Promotional allowances are credits that are issued in connection with a product launch or as an incentive for customers to carry our product. The Company establishes a reserve for promotional allowances based upon contractual terms.

Billback adjustments (and which primarily relate to our held for sale generics business), are credits that are issued to certain customers who purchase directly from us as well as indirectly through a wholesaler. These credits are issued in the event there is a difference between the customer's direct and indirect contract price. The provision for billbacks is estimated based upon historical purchasing patterns of qualified customers who purchase product directly from us and supplement their purchases indirectly through our wholesale customers.

Loyalty cards allow the end user patients a discount per prescription and are accrued based on historical experience, contract terms and the volume of product and cards in the distribution channel.

The following table summarizes the activity from continuing operations in the Company's major categories of SRA ($ in millions):

| | Chargebacks | Rebates | Return and Other Allowances | Cash Discounts | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2012 | $ 81.2 | $ 30.8 | $ 178.9 | $ 9.3 | $ 300.2 |
| Add: Warner Chilcott Acquisition | 5.6 | 255.5 | 121.3 | 5.5 | 387.9 |
| Provision related to sales in 2013 | 214.5 | 330.2 | 86.5 | 42.9 | 674.1 |
| Credits and payments | (279.5) | (326.6) | (183.6) | (48.5) | (838.2) |
| Balance at December 31, 2013 | $ 21.8 | $ 289.9 | $ 203.1 | $ 9.2 | $ 524.0 |
| Add: Forest Acquisition | 27.9 | 425.0 | 94.3 | 9.8 | 557.0 |
| Provision related to sales in 2014 | 442.9 | 1,562.8 | 154.4 | 155.7 | 2,315.8 |
| Credits and payments | (464.6) | (1,268.9) | (191.0) | (155.0) | (2,079.5) |
| Balance at December 31, 2014 | $ 28.0 | $ 1,008.8 | $ 260.8 | $ 19.7 | $ 1,317.3 |
| Add: Allergan Acquisition | 14.1 | 306.4 | 100.4 | 8.6 | 429.5 |
| Provision related to sales in 2015 | 649.9 | 4,082.9 | 732.2 | 301.9 | 5,766.9 |
| Credits and payments | (613.8) | (4,044.1) | (720.3) | (301.7) | (5,679.9) |
| Balance at December 31, 2015 | $ 78.2 | $ 1,354.0 | $ 373.1 | $ 28.5 | $ 1,833.8 |

The following table summarizes the activity from discontinued operations in the Company's major categories of SRA ($ in millions):

| | Chargebacks | Rebates | Return and Other Allowances | Cash Discounts | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2012 | $ 130.3 | $ 820.0 | $ 170.6 | $ 27.6 | $ 1,148.5 |
| Provision related to sales in 2013 | 2,125.5 | 2,008.9 | 817.6 | 158.8 | 5,110.8 |
| Credits and payments | (2,031.2) | (2,057.0) | (573.4) | (147.9) | (4,809.5) |
| Balance at December 31, 2013 | $ 224.6 | $ 771.9 | $ 414.8 | $ 38.5 | $ 1,449.8 |
| Provision related to sales in 2014 | 4,148.8 | 1,761.1 | 705.0 | 195.0 | 6,809.9 |
| Credits and payments | (3,836.5) | (1,795.2) | (768.5) | (192.5) | (6,592.7) |
| Balance at December 31, 2014 | $ 536.9 | $ 737.8 | $ 351.3 | $ 41.0 | $ 1,667.0 |
| Provision related to sales in 2015 | 5,907.2 | 1,944.7 | 657.0 | 251.0 | 8,759.9 |
| Credits and payments | (5,825.1) | (1,961.1) | (685.2) | (235.4) | (8,706.8) |
| Balance at December 31, 2015 | $ 619.0 | $ 721.4 | $ 323.1 | $ 56.6 | $ 1,720.1 |

The following table summarizes the balance sheet classification of our SRA reserves ($ in millions):

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| Accounts receivable | $ 263.8 | $ 162.4 |
| Accounts payable and accrued expenses | 1,570.0 | 1,154.9 |
| | $ 1,833.8 | $ 1,317.3 |

The following table summarizes the balance sheet classification of our SRA reserves relating to the generics business being divested to Teva ($ in millions):

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| Current assets held for sale | $ 1,306.6 | $ 1,269.6 |
| Current liabilities held for sale | 413.5 | 397.4 |
| | $ 1,720.1 | $ 1,667.0 |

During the year ended December 31, 2015, the Company lowered SRA balances relating to the valuation of assets and liabilities acquired as part of the Forest Acquisition measurement period adjustments by $53.2 million, with an offset to goodwill ($33.2 million) and deferred tax liabilities ($20.0 million).

The provisions recorded to reduce gross product sales to net product sales were as follows ($ in millions):

| Years Ended December 31, | Gross Product Sales | Chargebacks | Rebates | Return and Other Allowances | Cash Discounts | Net Product Sales | Gross-to-net Percentages |
|---|---|---|---|---|---|---|---|
| 2013 ............................................ $ | 3,212.2 $ | 214.5 $ | 330.2 $ | 86.5 $ | 42.9 $ | 2,538.1 | 79.0% |
| 2014 ............................................ $ | 8,987.3 $ | 442.9 $ | 1,562.8 $ | 154.4 $ | 155.7 $ | 6,671.5 | 74.2% |
| 2015 ............................................ $ | 20,653.9 $ | 649.9 $ | 4,082.9 $ | 732.2 $ | 301.9 $ | 14,887.0 | 72.1% |

The movement in the percentage of provisions to gross sales is a result of changes in product mix, competition and channels of distribution. In the year ended December 31, 2015, the Company's increased sales of acquired eye care products and acquired Forest products lowered the provision percentage.

The Company does not expect future payments of SRA reserves to materially exceed our current estimates. However, if future SRA payments were to materially exceed our estimates, such adjustments may have a material adverse impact on our financial position, results of operations and cash flows.

### Inventory Valuation

Inventories consist of finished goods held for distribution, raw materials and work in process. Inventory includes brand pharmaceutical products which represents FDA approved indications. Inventory valuation reserves are established based on a number of factors/situations including, but not limited to, raw materials, work in process or finished goods not meeting product specifications, product obsolescence, or application of the lower of cost (first-in, first-out method) or market (net realizable value) concepts. The determination of events requiring the establishment of inventory valuation reserves, together with the calculation of the amount of such reserves may require judgment. Assumptions utilized in our quantification of inventory reserves include, but are not limited to, estimates of future product demand, consideration of current and future market conditions, product net selling price, anticipated product launch dates, potential product obsolescence and other events relating to special circumstances surrounding certain products. No material adjustments have been required to our inventory reserve estimates for the periods presented. Adverse changes in assumptions utilized in our inventory reserve calculations could result in an increase to our inventory valuation reserves and higher cost of sales.

### Product Rights and Other Definite-Lived Intangible Assets

Our product rights and other definite-lived intangible assets are stated at cost, less accumulated amortization, and are amortized using the economic benefit model or the straight-line method, if results are materially aligned, over their estimated useful lives. We determine amortization periods for product rights and other definite-lived intangible assets based on our assessment of various factors impacting estimated useful lives and cash flows. Such factors include the product's position in its life cycle, the existence or absence of like products in the market, various other competitive and regulatory issues, and contractual terms. Significant changes to any of these factors may result in a reduction in the intangibles useful life and an acceleration of related amortization expense, which could cause our net results to decline.

Product rights and other definite-lived intangible assets are tested periodically for impairment when events or changes in circumstances indicate that an asset's carrying value may not be recoverable. The impairment testing involves comparing the carrying amount of the asset to the forecasted undiscounted future cash flows. In the event the carrying value of the asset exceeds the undiscounted future cash flows, the carrying value is considered not recoverable and an impairment exists. An impairment loss is measured as the excess of the asset's carrying value over its fair value, calculated using discounted future cash flows. The computed impairment loss is recognized in net (loss) / income in the period that the impairment occurs. Assets which are not impaired may require an adjustment to the remaining useful lives for which to amortize the asset. Our projections of discounted cash flows use a discount rate determined by our management to be commensurate with the risk inherent in our business model. Our estimates of future cash flows attributable to our other definite-lived intangible assets require significant judgment based on our historical and anticipated results and are subject to many factors. Different assumptions and judgments could materially affect the calculation of the fair value of the other definite-lived intangible assets which could trigger impairment.

### *Goodwill and Intangible Assets with Indefinite Lives*

#### *General*

The Company tests goodwill and intangible assets with indefinite-lives for impairment annually in the second quarter by comparing the fair value of each of the Company's reporting units to the respective carrying value of the reporting units. Additionally, the Company may perform interim tests if an event occurs or circumstances change that could potentially reduce the fair value of a reporting unit below its carrying amount or when the Company has a change to reporting units. The carrying value of each reporting unit is determined by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units.

Goodwill is considered impaired if the carrying amount of the net assets exceeds the fair value of the reporting unit. Impairment, if any, would be recorded in operating income and this could result in a material impact to net (loss) / income and (loss) / earnings per share.

Acquired IPR&D intangible assets represent the value assigned to acquired research and development projects that, as of the date acquired, represent the right to develop, use, sell and/or offer for sale a product or other intellectual property that the Company has acquired with respect to products and/or processes that have not been completed or approved. The IPR&D intangible assets are subject to impairment testing until completion or abandonment of each project. Upon abandonment, the assets are impaired. Impairment testing requires the development of significant estimates and assumptions involving the determination of estimated net cash flows for each year for each project or product (including net revenues, cost of sales, R&D costs, selling and marketing costs and other costs which may be allocated), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, the assessment of each asset's life cycle, the potential regulatory and commercial success risks, and competitive trends impacting the asset and each cash flow stream as well as other factors. The major risks and uncertainties associated with the timely and successful completion of the IPR&D projects include legal risk, market risk and regulatory risk. Changes in these assumptions could result in future impairment charges. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change or the timely completion of each project to commercial success will occur. For these and other reasons, actual results may vary significantly from estimated results.

Upon successful completion of each project and approval of the product, we will make a separate determination of the useful life of the intangible, transfer the amount to currently marketed products ("CMP") and amortization expense will be recorded over the estimated useful life.

#### *Annual Testing*

During 2015, we performed our annual impairment assessment of goodwill. We also assessed IPR&D intangible assets and trade name intangible assets with indefinite lives for impairment. The Company utilized a discount rate for its reporting units of 10.0% and long-term growth rates ranging from 0.0% to 5.0% in its estimation of fair value. The factors used in evaluating goodwill for impairment are subject to change and are tracked against historical results by management. Changes in the key assumptions by management can change the results of testing. The Company determined there was no impairment associated with goodwill or trade name intangible assets.

During the year ended December 31, 2015, the Company recorded a $197.6 million impairment related to IPR&D for select projects as the Company revised its sales forecast of certain assets as well as the timing of the launch of certain projects in connection with the Company's annual review. In addition, during the year ended December 31, 2015, the Company made the decision to abandon a select IPR&D asset (acquired in connection with the Allergan Acquisition) based on review of research studies, resulting in an impairment of the full asset value of $300.0 million. In-process research and development impairments for the year ended December 31, 2014 primarily included an impairment charge of $165.5 million related to the abandonment of certain R&D projects, an impairment charge of $193.0 million related to acquired IPR&D due to the FDA communications relating to Actavis' NDA for the fixed-dose combination of nebivolol and valsartan for the treatment of hypertension and the abandonment of a select dermatology project of $32.0 million.

During the 2013 integration of the Actavis Group with the legacy Watson business, the Company reorganized its organizational structure and management performance reporting, which was then further reorganized. In 2013, the reporting units within our then current Actavis Pharma operating segment were organized as follows: Americas (The United States of America ("U.S."), Canada and Latin America), Europe (Europe, Russia, Commonwealth of Independent States ("CIS"), and Turkey), and MEAAP (Middle East, Africa, Australia, and Asia Pacific). These reporting units combined the Watson and Actavis Group businesses. The combination of the Watson and the Actavis Group business and net assets in the European reporting unit, combined with other market factors, led to the impairment of the goodwill associated with this reporting unit in the second quarter of 2013 included as a component of discontinued operations.

During the second quarter of 2013, concurrent with the availability of discrete financial information for the then new reporting units, we completed an extensive review of our operating businesses included within discontinued operations, including exploring options for addressing overall profitability of seven Western European commercial operations consisting of, among other things, restructuring their operations, refocusing their activities on specific sub-markets, as well as potential divestitures of such businesses to other third parties. The potential impact of these conditions were considered in our projections when determining the indicated fair value of our reporting units for the impairment tests that were performed during the second quarter of 2013. Upon completion of step one of the impairment analysis for each of our reporting units, it was concluded that the fair value of the then current Actavis Pharma — Europe reporting unit was below its carrying value including goodwill. This was primarily related to the integration of our Arrow Group with the Actavis Group in Europe. The fair value of our reporting units was estimated based on a discounted cash flow model using management's business plans and projections as the basis for expected future cash flows for approximately five years and residual growth rates ranging from 2% to 4% thereafter. Management believes that the assumptions it used for the impairment tests performed were consistent with those that would be utilized by a market participant in performing similar valuations of our then current reporting units. A separate discount rate was utilized for each reporting unit that was derived from published sources and, on a weighted average basis, a discount rate of 8% was utilized using our weighted average cost of capital, which considered the overall inherent risk of the reporting unit and the rate of return a market participant would expect. As a result of completing step two of our impairment analysis, we recorded an impairment within discontinued operations of the Actavis Pharma — Europe reporting unit of $647.5 million, representing primarily all the goodwill allocated to this reporting unit, in the year ended December 31, 2013.

### Allocation of Acquisition Fair Values to Assets Acquired and Liabilities Assumed

We account for acquired businesses using the acquisition method of accounting, which requires that assets acquired and liabilities assumed be recorded as of the date of acquisition at their respective fair values. The consolidated financial statements and results of operations reflect an acquired business after the completion of the acquisition. The fair value of the consideration paid, including contingent consideration, is assigned to the underlying net assets of the acquired business based on their respective fair values as determined using a market participant concept. Any excess of the purchase price over the estimated fair values of the net assets acquired is recorded as goodwill.

The most material line items impacted by the allocation of acquisition fair values are:

- Intangible assets (including IPR&D assets upon successful completion of the project and approval of the product) which are amortized to amortization expense over the expected life of the asset. Significant judgments are used in determining the estimated fair values assigned to the assets acquired and liabilities assumed and in determining estimates of useful lives of long-lived assets. Fair value determinations and useful life estimates are based on, among other factors, estimates of expected future net cash flows, estimates of appropriate discount rates used to present value expected future net cash flow streams, the timing of approvals for IPR&D projects and the timing of related product launch dates, the assessment of each asset's life cycle, the impact of competitive trends on each asset's life cycle and other factors. These judgments can materially impact the estimates used to allocate acquisition date fair values to assets acquired and liabilities assumed and the future useful lives. For these and other reasons, actual results may vary significantly from estimated results.

- Fixed asset valuations which are depreciated over the expected life of the asset. Significant judgments are used in determining the estimated fair values assigned to the asset acquired and in determining estimates of useful lives of long-lived assets. Fair value determinations and useful life estimates are based on, among other factors, estimates of appropriate discount rates and intended uses of the assets.

- Inventory is recorded at fair market value factoring in selling price and costs to dispose. Inventory acquired is typically valued higher than replacement cost.

### Income Taxes

Income taxes are accounted for using an asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial statement and tax bases of assets and liabilities at the applicable tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred tax assets will not be realized. The Company evaluates the realizability of its deferred tax assets by assessing its valuation allowance and by adjusting the amount of such allowance, if necessary. The factors used to assess the likelihood of realization include the Company's forecast of future taxable income and available tax planning strategies that could be implemented to realize the net deferred tax assets. Failure to achieve forecasted taxable income in applicable tax jurisdictions could affect the ultimate realization of deferred tax assets and could result in an increase in the Company's effective tax rate on future earnings.

Income tax positions must meet a more-likely-than-not recognition threshold to be recognized. Income tax positions that previously failed to meet the more-likely-than-not threshold are recognized in the first financial reporting period in which that threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not threshold are derecognized in the first financial reporting period in which that threshold is no longer met. The Company recognizes potential accrued interest and penalties related to unrecognized tax benefits within the consolidated statements of operations as income tax expense.

### Defined Benefit Plans

The Company recognizes the overfunded or underfunded status of each of its defined benefit plans as an asset or liability on its consolidated balance sheets. The obligations are generally measured at the actuarial present value of all benefits attributable to employee service rendered, as provided by the applicable benefit formula. The estimates of the obligation and related expense of these plans recorded in the financial statements are based on certain assumptions. The most significant assumptions relate to discount rate and expected return on plan assets. Other assumptions used may include employee demographic factors such as compensation rate increases, retirement patterns, expected employee turnover and participant mortality rates. The difference between these assumptions and actual experience results in the recognition of an asset or liability based upon a net actuarial (gain) / loss. If the total net actuarial (gain) / loss included in accumulated other comprehensive income/ (loss) exceeds a threshold of 10% of the greater of the projected benefit obligation or the market related value of plan assets, it is subject to amortization and recorded as a component of net periodic pension cost over the average remaining service lives of the employees participating in the pension plan. Net periodic benefit costs are recognized in the consolidated statement of operations.

### Contingent Consideration and Other Commitments

We determine the acquisition date fair value of contingent consideration obligations based on a probability-weighted income approach derived from revenue estimates, post-tax gross profit levels and a probability assessment with respect to the likelihood of achieving certain contingent payments including contingent payments such as milestone obligations, royalty obligations and contract earn-out criteria, where applicable. The fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined using the fair value concepts defined in ASC 820. The resultant probability-weighted cash flows are discounted using an appropriate effective annual interest rate. At each reporting date, the contingent consideration obligation will be revalued to estimated fair value and changes in fair value will be reflected as income or expense in our consolidated statement of operations. Changes in the fair value of the contingent consideration obligations may result from changes in discount periods and rates, changes in the timing and amount of revenue estimates and changes in probability assumptions with respect to the likelihood of achieving the various contingent payment obligations. Adverse changes in assumptions utilized in our contingent consideration fair value estimates could result in an increase in our contingent consideration obligation and a corresponding charge to operating results.

We are involved in various legal proceedings in the normal course of our business, including product liability litigation, intellectual property litigation, employment litigation and other litigation. We record reserves related to these legal matters when losses related to such litigation or contingencies are both probable and reasonably estimable. Refer to "NOTE 25 — Commitment and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this document for a description of our significant current legal proceedings.

## RECENT ACCOUNTING PRONOUNCEMENTS

On May 28, 2014, the FASB issued Accounting Standards Update No. 2014-09, Revenue from Contracts with Customers (Topic 606), with an effective date for annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period, for public business entities, certain not-for-profit entities, and certain employee benefit plans. The effective date for ASU 2014-09 was deferred by one year through the issuance of ASU 2015-14, Revenue from Contracts with Customers – Deferral of the Effective Date, to annual reporting periods beginning after December 15, 2017, including interim reporting periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. The Company is evaluating the impact, if any, the pronouncement will have on both historical and future financial positions and results of operations.

In January 2015, the FASB issued ASU No. 2015-01 "Income Statement – Extraordinary and Unusual Items (Subtopic 225-20)." to eliminate the concept of extraordinary items. As a result, an entity will no longer (i) segregate an extraordinary item for the results of ordinary operations; (ii) separately present an extraordinary item on its income statement, net of tax, after income from continuing operations; and (iii) disclose income taxes and earnings-per-share data applicable to an extraordinary item. However, the ASU does not affect the reporting and disclosure requirements for an event that is unusual in nature or that occurs infrequently. The guidance is for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. A reporting entity may

apply the amendments prospectively. A reporting entity also may apply the amendments retrospectively to all prior periods presented in the financial statements. Early adoption is permitted provided that the guidance is applied from the beginning of the fiscal year of adoption. The effective date is the same for both public business entities and all other entities. The adoption of this guidance is not anticipated to have a material impact on the Company's financial position or results of operations.

In April 2015, the FASB issued guidance which changes the classification of debt issuance costs from being an asset on the balance sheet to netting the costs against the carrying value of the debt. This guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2015. The impact of the adoption of this guidance will decrease "prepaid expenses and other current assets" and "current portion of long-term debt and capital leases" by $36.3 million as well as "investments and other assets" and "long-term debt and capital leases" by $159.5 million.

In May 2015, the FASB issued ASU No. 2015-07, "Fair Value Measurement: Topic 820 Disclosures for Investments in Certain Entities That Calculate Net Asset Value Per Share (or its Equivalent)."  The amendments remove the requirement to categorize within the fair value hierarchy all investments for which fair value is measured using the net asset value per share practical expedient. The amendments also remove the requirement to make certain disclosures for all investments that are eligible to be measured at fair value using the net asset value per share practical expedient. Rather, those disclosures are limited to investments for which the entity has elected to measure the fair value using that practical expedient. The amendments are effective for fiscal years beginning after December 15, 2015, and interim periods within those fiscal years. The adoption of this guidance is not anticipated to have a material impact on the Company's financial position or results of operations.

In July 2015, the FASB issued ASU No. 2015-12 "Plan Accounting: Defined Benefit Pension Plans (Topic 960), Defined Contribution Pensions Plans (Topic 962) and Health and Welfare Benefit Plans (Topic 965)." GAAP requires plans to disclose (i) individual investments that represent five percent or more of net assets available for benefits and (ii) the net appreciation or depreciation for investments by general type. Stakeholders said that while less costly to prepare, those disclosures do not provide decision-useful information. The amendments in this update will eliminate those requirements for both participant-directed investments and nonparticipant-directed investments. Plan investments need to be disaggregated only by general type within the statement of net assets available for benefits or within the footnotes and no longer required to provide the disclosures by investment class. The net appreciation or depreciation in investments for the period still will be required to be presented in the aggregate, but will no longer be required to be disaggregated and disclosed by general type. The guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2015. The adoption of this guidance is not anticipated to have a material impact on the Company's financial position or results of operations.

On September 25, 2015, the FASB issued Accounting Standards Update 2015-16 (ASU 2015-16), which changes the requirement to restate prior period financial statements for measurement period adjustments. The new guidance requires that measurement period adjustments be recognized in the reporting period in which the adjustment amount is determined. This includes the cumulative impact of measurement period adjustments on current and prior periods. The cumulative adjustment would be reflected within the respective financial statement line items affected.  The guidance is effective for fiscal years beginning after December 15, 2015. The adoption of this guidance is not anticipated to have a material impact on the Company's financial position or results of operations.

In November 2015, the FASB ASU No. 2015-17 "Income Taxes (Topic 704): Balance Sheet Classification of Deferred Taxes." The amendments require that deferred tax liabilities and assets be classified as noncurrent in a classified statement of financial position. The amendments apply to all entities that present a classified statement of financial position. The current requirement that deferred tax liabilities and assets of a tax-paying component of an entity be offset and presented as a single amount is not affected by the amendments in this update. The Company has elected to adopt this guidance in the year ended December 31, 2015 and prior balance sheets were not retrospectively adjusted.  The total current deferred tax assets of $500.3 million included in current deferred tax assets and assets held for sale and current deferred tax liabilities of $47.3 million included in deferred tax liabilities and current liabilities held for sale were not reclassified in 2014.

## ITEM 7A.  *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

The following discussion provides forward-looking quantitative and qualitative information about our potential exposure to market risk. Market risk represents the potential loss arising from adverse changes in the value of financial instruments. The risk of loss is assessed based on the likelihood of adverse changes in fair values, cash flows or future earnings. We are exposed to market risk for changes in the market values of our investments (Investment Risk), the impact of interest rate changes (Interest Rate Risk) and the impact of foreign currency exchange changes (Foreign Currency Exchange Risk).

We maintain our portfolio of cash equivalents and short-term investments in a variety of securities, including both government and government agency obligations with ratings of A or better and money market funds. Our investments in marketable securities are governed by our investment policy which seeks to preserve the value of our principal, provide liquidity and maximize return on the Company's investment against minimal interest rate risk. Consequently, our interest rate and principal risk are minimal on our non-equity investment portfolio. The quantitative and qualitative disclosures about market risk are set forth below.

**Investment Risk**

As of December 31, 2015, our total investments in marketable and equity securities of other companies, including equity method investments were $121.5 million (included in marketable securities and investments and other assets). The fair values of these investments are subject to significant fluctuations due to volatility of the stock market and changes in general economic conditions.

We regularly review the carrying value of our investments and identify and recognize losses, for income statement purposes, when events and circumstances indicate that any declines in the fair values of such investments below our accounting basis are other than temporary.

**Interest Rate Risk**

Our exposure to interest rate risk relates primarily to our non-equity investment portfolio and our floating rate debt. Our cash is invested in bank deposits and A-rated or better money market mutual funds.

Our portfolio of marketable securities includes U.S. treasury and agency securities classified as available-for-sale securities, with no security having a maturity in excess of two years. These securities are exposed to interest rate fluctuations. Because of the short-term nature of these investments, we are subject to minimal interest rate risk and do not believe that an increase in market rates would have a significant negative impact on the realized value of our portfolio.

*Floating Rate Debt*

At December 31, 2015, borrowings outstanding under the floating rate notes and term loan indebtedness were $9,756.2 million. Assuming a one percent increase in the applicable interest rate, annual interest expense would increase by approximately $97.6 million over the next twelve months.

*Fixed Rate Debt*

The Company has outstanding borrowings under its fixed rate notes. Changes in market interest rates generally affect the fair value of fixed-rate debt, but do not impact earnings or cash flows.

**Foreign Currency Exchange Risk**

Overall, we are a net recipient of currencies other than the U.S. dollar and, as such, benefit from a weaker dollar and are adversely affected by a stronger dollar relative to major currencies worldwide. Accordingly, changes in exchange rates, and in particular a strengthening of the U.S. dollar, may negatively affect our consolidated revenues or operating costs and expenses as expressed in U.S. dollars.

From time to time, we enter into foreign currency option and forward contracts to reduce earnings and cash flow volatility associated with foreign exchange rate changes to allow our management to focus its attention on our core business issues. Accordingly, we enter into various contracts which change in value as foreign exchange rates change to allow the Company at its option to economically offset the effect of changes in the value of foreign currency assets and liabilities, commitments and anticipated foreign currency denominated sales and operating expenses. We enter into foreign currency option and forward contracts in amounts between minimum and maximum anticipated foreign exchange exposures.

We use foreign currency option contracts, which provide for the sale or purchase of foreign currencies, if exercised, to economically hedge the currency exchange risks associated with probable but not firmly committed transactions that arise in the normal course of our business. Probable but not firmly committed transactions are comprised primarily of sales of products and purchases of raw material in currencies other than the U.S. dollar. The foreign currency option contracts, which were held during the course of the year, are entered into to reduce the volatility of earnings generated in currencies other than the U.S. dollar, primarily earnings denominated in the Canadian dollar, Mexican peso, Australian dollar, Brazilian real, euro, Korean won, Turkish lira, Polish zloty, Swiss franc, Russian ruble, Swedish krona, South African rand and Japanese yen. While these instruments are subject to fluctuations in value, such fluctuations are anticipated to offset changes in the value of the underlying exposures.

Net foreign currency gains and losses did not have a material effect on the Company's results of operations for the years ended December 31, 2015, 2014 or 2013, respectively.

## ITEM 8.   *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA*

The information required by this Item is contained in the financial statements set forth in Item 15 (a) under the caption "*Consolidated Financial Statements and Supplementary Data*" as a part of this Annual Report on Form 10-K.

## ITEM 9.   *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE*

There have been no changes in or disagreements with accountants on accounting or financial disclosure matters.

## ITEM 9A.  *CONTROLS AND PROCEDURES*

**Evaluation of Disclosure Controls and Procedures**

The Company maintains "disclosure controls and procedures," as such term is defined under Rule 13a-15(e) of the Exchange Act, that are designed to provide reasonable assurance that information required to be disclosed in the Company's Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Principal Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective.

As required by SEC Rule 13a-15(b), the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures as of December 31, 2015. Based on this evaluation, the Company's Principal Executive Officer and Principal Financial Officer concluded that the Company's disclosure controls and procedures were effective at a reasonable assurance level as of December 31, 2015.

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate "internal control over financial reporting," as such term is defined under Rule 13a-15(f) of the Exchange Act. We maintain internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Therefore, internal control over financial reporting determined to be effective provides only reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Management of the Company has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2015 based on criteria set forth in Internal Control — Integrated Framework (2013) issued by Committee of Sponsoring Organizations. Based on this evaluation, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2015.

On March 17, 2015, the Company completed the Allergan Acquisition.  We excluded Allergan, Inc. from our assessment of internal control over financial reporting as of December 31, 2015 because it was acquired by the Company in a business purchase combination during 2015. Allergan, Inc. is a wholly owned subsidiary of the Company, whose total assets represent approximately 2.5% of total assets and whose net revenues represent approximately 29.1% of net revenues (which is comprised of net revenues and net revenues from discontinued operations)  as of and for the year ended December 31, 2015.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2015 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting, during the fiscal quarter ended December 31, 2015, that has materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B.** *OTHER INFORMATION*

None.

## PART III

**ITEM 10.** *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

**Directors**

The information concerning directors of Allergan required under this Item is incorporated herein by reference to the "Board of Directors and Committees" section of our definitive proxy statement, to be filed pursuant to Regulation 14A, related to our 2016 Annual Meeting of Shareholders to be held on or about May 5, 2016 (our "2016 Proxy Statement").

The information concerning our Audit Committee and the independence of its members required by this Item, along with information about the financial expert(s) serving on the Audit Committee, is incorporated by reference to "The Audit Committee" section of our 2016 Proxy Statement.

The information concerning our Executive Officers of the Registrant is incorporated by reference to "Executive Officers of the Registrant" section of our 2016 Proxy Statement.

*Section 16(a) Compliance*

The information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 required by this Item is incorporated by reference to the "Section 16(a) Beneficial Ownership Reporting Compliance" section of our 2016 Proxy Statement.

*Code of Ethics*

We have adopted a Code of Conduct that applies to our employees, including our principal executive officer, principal financial officer and principal accounting officer. The Code of Conduct is posted on our Internet website at www.Allergan.com. Any person may request a copy of our Code of Conduct by contacting us at our administrative address: Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054, Attn: Secretary. Any amendments to or waivers from the Code of Conduct will be posted on our website at www.Allergan.com under the caption "Corporate Governance" within the Investors section of our website.

**ITEM 11.** *EXECUTIVE COMPENSATION*

The information concerning executive and director compensation, and concerning our compensation committee and the compensation committee report for Allergan required under this Item is incorporated herein by reference to the "Compensation Discussion and Analysis" section of our 2016 Proxy Statement.

**ITEM 12.** *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS*

The information concerning security ownership of certain beneficial owners and management and related stockholder matters and the equity compensation plan information required under this Item is incorporated herein by reference to the "Beneficial Ownership of Stockholders, Directors and Executive Officers" and "Equity Compensation Plan Information as of December 31, 2015" sections of our 2016 Proxy Statement.

**ITEM 13.** *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE*

The information concerning certain relationships and related transactions, and director independence required under this Item is incorporated herein by reference to the "Certain Relationships and Related Transactions" and "Director Independence" sections of our 2016 Proxy Statement.

**ITEM 14.** *PRINCIPAL ACCOUNTING FEES AND SERVICES*

The information concerning principal accountant fees and services required under this Item is incorporated herein by reference to the "Audit Fees" section of our 2016 Proxy Statement.

**PART IV**

**ITEM 15.** *Exhibits, Financial Statement Schedules*

    (a)    The following documents are filed as part of the Annual Report on Form 10-K:

            1.    *Consolidated Financial Statement and Supplementary Data*

| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets of Allergan plc as of December 31, 2015 and 2014 | F-5 |
| Consolidated Statements of Operations of Allergan plc for the years ended December 31, 2015, 2014 and 2013 | F-6 |
| Consolidated Statements of Comprehensive Income / (Loss) of Allergan plc for the years ended December 31, 2015 and 2013 | F-7 |
| Consolidated Statements of Cash Flows of Allergan plc for the years ended December 31, 2015, 2014 and 2013 | F-8 |
| Consolidated Statements of Stockholders' Equity of Allergan plc for the years ended December 31, 2015, 2014 and 2013 | F-9 |
| Consolidated Balance Sheets of Warner Chilcott Limited as of December 31, 2015 and 2014 | F-10 |
| Consolidated Statements of Operations of Warner Chilcott Limited for the years ended December 31, 2015, 2014 and 2013 | F-11 |
| Consolidated Statements of Comprehensive Income / (Loss) of Warner Chilcott Limited the years ended December 31, 2015, 2014 and 2013 | F-12 |
| Consolidated Statements of Cash Flows of Warner Chilcott Limited for the years ended December 31, 2015, 2014 and 2013 | F-13 |
| Consolidated Statements of Member's Equity of Warner Chilcott Limited for the years ended December 31, 2015, 2014 and 2013 | F-14 |
| Notes to Consolidated Financial Statements | F-15 |

            2.    *Financial Statement Schedule*

| | |
|---|---|
| Schedule II — Valuation and Qualifying Accounts | F-118 |

    All other financial statement schedules have been omitted because they are not applicable or the required information is included in the Consolidated Financial Statements or notes thereto.

            3.    *Exhibits*

    Reference is hereby made to the Exhibit Index immediately following page F-119 Supplementary Data (Unaudited) of this Annual Report on Form 10-K.

**SIGNATURES Registrant**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized on the 26th day of February, 2016.

ALLERGAN plc

By:     /s/ Brenton L. Saunders

**Brenton L. Saunders**
**Chief Executive Officer and President**

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report has been signed below by the following persons and in the capacities indicated on the 26th day of February, 2016.

| Signature | Title |
|---|---|
| /s/ Paul M. Bisaro<br>**Paul M. Bisaro** | Executive Chairman, Director |
| /s/ Brenton L. Saunders<br>**Brenton L. Saunders** | Chief Executive Officer, President, Director |
| /s/ Maria Teresa Hilado<br>**Maria Teresa Hilado** | Chief Financial Officer |
| /s/ James C. D'Arecca<br>**James C. D'Arecca** | Chief Accounting Officer |
| *<br>**Nesli Basgoz, M.D.** | Director |
| *<br>**James H. Bloem** | Director |
| *<br>**Christopher W. Bodine** | Director |
| *<br>**Christopher J. Coughlin** | Director |
| *<br>**Michael R. Gallagher** | Director |
| *<br>**Catherine M. Klema** | Director |
| *<br>**Peter J. McDonnell, M.D.** | Director |
| *<br>**Patrick J. O'Sullivan** | Director |
| *<br>**Ronald Taylor** | Director |
| *<br>**Fred Weiss** | Director |

*By:  /s/ A. Robert D. Bailey
**A. Robert D. Bailey**
Attorney-in-fact

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized on the 26th day of February, 2016.

WARNER CHILCOTT LIMITED

By: _____ /s/ A. Robert D. Bailey
                    **A. Robert D. Bailey**
                    **Secretary**

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report has been signed below by the following persons and in the capacities indicated on the 26th day of February, 2016.

| Signature | Title |
|---|---|
| /s/ Claire Gilligan<br>**Claire Gilligan** | President (Principal Executive Officer) |
| /s/ Robert Whiteford<br>**Robert Whiteford** | Vice President, Director of Finance and Assistant Corporate Secretary (Principal Financial Officer and Principal Accounting Officer) |
| /s/ A. Robert D. Bailey<br>**A. Robert D. Bailey** | Authorized Representative in the United States |
| /s/ Claire Gilligan<br>**Claire Gilligan** | Director |
| /s/ Robert Whiteford<br>**Robert Whiteford** | Director |
| /s/ Tony Hynds<br>**Tony Hynds** | Director |

[THIS PAGE INTENTIONALLY LEFT BLANK]

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

The following Consolidated Financial Statements of the Registrants and their subsidiaries are required to be included in Item 15:

| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets of Allergan plc as of December 31, 2015 and 2014 | F-5 |
| Consolidated Statements of Operations of Allergan plc for the years ended December 31, 2015, 2014 and 2013 | F-6 |
| Consolidated Statements of Comprehensive Income / (Loss) of Allergan plc for the years ended December 31, 2015, 2014 and 2013 | F-7 |
| Consolidated Statements of Cash Flows of Allergan plc for the years ended December 31, 2015, 2014 and 2013 | F-8 |
| Consolidated Statements of Stockholders' Equity of Allergan plc for the years ended December 31, 2015, 2014 and 2013 | F-9 |
| Consolidated Balance Sheets of Warner Chilcott Limited as of December 31, 2015 and 2014 | F-10 |
| Consolidated Statements of Operations of Warner Chilcott Limited for the years ended December 31, 2015, 2014 and 2013 | F-11 |
| Consolidated Statements of Comprehensive Income / (Loss) of Warner Chilcott Limited the years ended December 31, 2015, 2014 and 2013 | F-12 |
| Consolidated Statements of Cash Flows of Warner Chilcott Limited for the years ended December 31, 2015, 2014 and 2013 | F-13 |
| Consolidated Statements of Member's Equity of Warner Chilcott Limited for the years ended December 31, 2015, 2014 and 2013 | F-14 |
| Notes to Consolidated Financial Statements | F-15 |
| Schedule II — Valuation and Qualifying Accounts | F-118 |
| Supplementary Data (unaudited) | F-119 |

Exhibits

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Allergan plc

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, comprehensive income/(loss), stockholders' equity and cash flows present fairly, in all material respects, the financial position of Allergan plc and its subsidiaries at December 31, 2015 and December 31, 2014, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2015 in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedule appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.  Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting under Item 9A.  Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our integrated audits.  We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.  Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk.  Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As discussed in Note 4 to the consolidated financial statements, the Company has changed the manner in which it classifies deferred income taxes in 2015.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

As described in Management's Report on Internal Control over Financial Reporting, management has excluded Allergan, Inc. from its assessment of internal control over financial reporting as of December 31, 2015 because it was acquired by the Company in a purchase business combination during 2015.  We have also excluded Allergan, Inc.  from our audit of internal control over financial reporting. Allergan Inc. is a wholly-owned subsidiary whose total assets represent approximately 2.5% of the related consolidated financial statement amount and whose net revenues represent approximately 29.1% of the net revenues financial statement amount and the net revenues from discontinued operations, as of and for the year ended December 31, 2015.

/s/PricewaterhouseCoopers LLP
Florham Park, New Jersey
February 26, 2016

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Warner Chilcott Limited

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, comprehensive income/(loss), member's equity and cash flows present fairly, in all material respects, the financial position of Warner Chilcott Limited and its subsidiaries at December 31, 2015 and December 31, 2014, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2015 in conformity with accounting principles generally accepted in the United States of America.  In addition, in our opinion, the financial statement schedule appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits.  We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 4 to the consolidated financial statements, the Company has changed the manner in which it classifies deferred taxes in 2015.

/s/ PRICEWATERHOUSECOOPERS LLP
Florham Park, New Jersey
February 26, 2016

F-4

**ALLERGAN PLC**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except par value and share data)**

| | December 31, 2015 | | December 31, 2014 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 1,096.0 | $ | 250.0 |
| Marketable securities | 9.3 | | 1.0 |
| Accounts receivable, net | 2,401.6 | | 1,112.3 |
| Inventories | 1,009.7 | | 984.6 |
| Prepaid expenses and other current assets | 558.5 | | 478.8 |
| Current assets held for sale | 3,540.3 | | 3,806.9 |
| Deferred tax assets | - | | 477.0 |
| Total current assets | 8,615.4 | | 7,110.6 |
| Property, plant and equipment, net | 1,573.9 | | 283.4 |
| Investments and other assets | 577.4 | | 153.3 |
| Non current assets held for sale | 10,541.3 | | 8,187.7 |
| Deferred tax assets | 49.5 | | 34.7 |
| Product rights and other intangibles | 67,931.7 | | 16,090.7 |
| Goodwill | 46,551.5 | | 20,897.6 |
| Total assets | $ 135,840.7 | $ | 52,758.0 |
| **LIABILITIES AND EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable and accrued expenses | $ 4,349.5 | $ | 3,030.1 |
| Income taxes payable | 54.2 | | 33.9 |
| Current portion of long-term debt and capital leases | 2,432.8 | | 693.4 |
| Current liabilities held for sale | 1,491.8 | | 1,449.1 |
| Deferred tax liabilities | - | | 41.0 |
| Total current liabilities | 8,328.3 | | 5,247.5 |
| Long-term debt and capital leases | 40,293.4 | | 14,837.7 |
| Other long-term liabilities | 1,262.0 | | 253.3 |
| Long-term liabilities held for sale | 580.1 | | 540.7 |
| Other taxes payable | 801.9 | | 789.5 |
| Deferred tax liabilities | 7,985.7 | | 2,753.8 |
| Total liabilities | 59,251.4 | | 24,422.5 |
| Commitments and contingencies (Refer to Note 25) | | | |
| Equity: | | | |
| Preferred shares, $0.0001 par value per share, 5.1 million shares authorized, 5.1 million and zero shares issued and outstanding, respectively | 4,929.7 | | - |
| Ordinary shares; $0.0001 par value per share; 1,000.0 million shares authorized, 394.5 million and 265.9 million shares issued and outstanding, respectively | - | | - |
| Additional paid-in capital | 68,508.3 | | 28,994.7 |
| Retained earnings / (accumulated deficit) | 3,647.5 | | (198.2) |
| Accumulated other comprehensive (loss) | (494.1) | | (465.4) |
| Total shareholders' equity | 76,591.4 | | 28,331.1 |
| Noncontrolling interest | (2.1) | | 4.4 |
| Total equity | 76,589.3 | | 28,335.5 |
| Total liabilities and equity | $ 135,840.7 | $ | 52,758.0 |

See accompanying Notes to Consolidated Financial Statements.

**ALLERGAN PLC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except per share amounts)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Net revenues | $ 15,071.0 | $ 6,738.9 | $ 2,602.5 |
| Operating expenses: | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | 4,810.4 | 3,453.6 | 1,644.7 |
| Research and development | 2,358.5 | 605.7 | 191.3 |
| Selling and marketing | 2,914.0 | 1,201.0 | 374.8 |
| General and administrative | 1,765.6 | 1,247.0 | 456.1 |
| Amortization | 5,453.4 | 1,945.5 | 303.8 |
| In-process research and development impairments | 511.6 | 424.3 | - |
| Asset sales and impairments, net | 272.0 | 305.7 | 1.0 |
| Total operating expenses | 18,085.5 | 9,182.8 | 2,971.7 |
| Operating (loss) | (3,014.5) | (2,443.9) | (369.2) |
| | | | |
| Interest income | 11.4 | 8.9 | 4.8 |
| Interest expense | (1,193.3) | (411.8) | (239.8) |
| Other (expense) income, net | (233.8) | (27.3) | (18.6) |
| Total other income (expense), net | (1,415.7) | (430.2) | (253.6) |
| (Loss) before income taxes and noncontrolling interest | (4,430.2) | (2,874.1) | (622.8) |
| (Benefit) for income taxes | (1,561.9) | (467.0) | (155.3) |
| Net (loss) from continuing operations, net of tax | (2,868.3) | (2,407.1) | (467.5) |
| Income / (loss) from discontinued operations, net of tax | 6,787.7 | 776.6 | (282.9) |
| Net income / (loss) | 3,919.4 | (1,630.5) | (750.4) |
| (Income) attributable to noncontrolling interest | (4.2) | - | - |
| Net income / (loss) attributable to shareholders | 3,915.2 | (1,630.5) | (750.4) |
| Dividends on preferred shares | 232.0 | - | - |
| Net income / (loss) attributable to ordinary shareholders | $ 3,683.2 | $ (1,630.5) | $ (750.4) |
| | | | |
| Income / (loss) per share attributable to ordinary shareholders - basic: | | | |
| Continuing operations | $ (8.44) | $ (10.96) | $ (3.29) |
| Discontinued operations | 18.45 | 3.54 | (1.98) |
| Net income / (loss) per share - basic | $ 10.01 | $ (7.42) | $ (5.27) |
| Income / (loss) per share attributable to ordinary shareholders - diluted: | | | |
| Continuing operations | $ (8.44) | $ (10.96) | $ (3.29) |
| Discontinued operations | 18.45 | 3.54 | (1.98) |
| Net income / (loss) per share - diluted | $ 10.01 | $ (7.42) | $ (5.27) |
| | | | |
| Weighted average shares outstanding: | | | |
| Basic | 367.8 | 219.7 | 142.3 |
| Diluted | 367.8 | 219.7 | 142.3 |

See accompanying Notes to Consolidated Financial Statements.

**ALLERGAN PLC**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME / (LOSS)**
**(In millions)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Net income / (loss) | $ 3,919.4 | $ (1,630.5) | $ (750.4) |
| Other comprehensive (loss) / income: | | | |
| Foreign currency translation (losses) / gains | (129.9) | (519.5) | 48.4 |
| Unrealized gains / (losses), net of tax | 101.2 | (36.4) | 5.3 |
| Reclassification for gains included in net income, net of tax | – | – | – |
| Total other comprehensive (loss) / income, net of tax | (28.7) | (555.9) | 53.7 |
| Comprehensive income / (loss) | 3,890.7 | (2,186.4) | (696.7) |
| Comprehensive (income) attributable to noncontrolling interest | (4.2) | – | – |
| Comprehensive income / (loss) attributable to ordinary shareholders | $ 3,886.5 | $ (2,186.4) | $ (696.7) |

See accompanying Notes to Consolidated Financial Statements.

F-7

**ALLERGAN PLC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| **Cash Flows From Operating Activities:** | | | |
| Net income / (loss) | $ 3,919.4 | $ (1,630.5) | $ (750.4) |
| Reconciliation to net cash provided by operating activities: | | | |
| Depreciation | 218.3 | 230.9 | 202.0 |
| Amortization | 5,777.0 | 2,597.5 | 842.7 |
| Provision for inventory reserve | 140.9 | 156.1 | 113.8 |
| Share-based compensation | 690.4 | 368.0 | 133.6 |
| Deferred income tax benefit | (7,380.1) | (690.1) | (275.0) |
| In-process research and development impairments | 511.6 | 424.3 | 4.9 |
| Goodwill impairment | – | 17.3 | 647.5 |
| Loss on asset sales and impairments, net | 334.4 | 143.1 | 55.9 |
| Amortization of inventory step-up | 1,192.9 | 985.8 | 267.0 |
| Amortization of deferred financing costs | 298.3 | 87.2 | 10.3 |
| Accretion and contingent consideration | 108.8 | (71.2) | 160.0 |
| Excess tax benefit from stock-based compensation | (76.1) | (51.1) | (69.0) |
| Non-cash impact of debt extinguishment | – | (91.7) | – |
| Impact of assets held for sale | – | 190.8 | 42.7 |
| Other, net | 66.4 | 8.5 | (8.9) |
| Changes in assets and liabilities (net of effects of acquisitions): | | | |
| Decrease / (increase) in accounts receivable, net | (1,034.3) | (611.1) | 19.1 |
| Decrease / (increase) in inventories | (226.2) | (207.2) | (213.1) |
| Decrease / (increase) in prepaid expenses and other current assets | 70.9 | 29.4 | 49.9 |
| Increase / (decrease) in accounts payable and accrued expenses | 142.5 | 394.6 | 7.8 |
| Increase / (decrease) in income and other taxes payable | (87.8) | 29.7 | 7.4 |
| Increase / (decrease) in other assets and liabilities | (137.3) | (67.3) | (34.7) |
| Net cash provided by operating activities | 4,530.0 | 2,243.0 | 1,213.5 |
| **Cash Flows From Investing Activities:** | | | |
| Additions to property, plant and equipment | (454.9) | (238.6) | (177.9) |
| Additions to product rights and other intangibles | (154.7) | (36.1) | (130.0) |
| Additions to investments | (24.3) | (1.0) | 2.9 |
| Proceeds from sale of investments and other assets | 883.0 | 453.7 | 37.7 |
| Proceeds from sales of property, plant and equipment | 140.1 | 13.7 | 7.1 |
| Acquisitions of businesses, net of cash acquired | (37,510.1) | (5,562.3) | (15.1) |
| Net cash (used in) investing activities | (37,120.9) | (5,370.6) | (275.3) |
| **Cash Flows From Financing Activities:** | | | |
| Proceeds from borrowings of long-term indebtedness | 26,455.7 | 8,076.2 | 1,882.3 |
| Proceeds from borrowings on credit facility and other | 3,682.0 | 1,280.0 | 555.0 |
| Debt issuance and other financing costs | (310.8) | (224.3) | (7.4) |
| Payments on debt, including capital lease obligations | (5,134.2) | (6,127.0) | (3,229.5) |
| Proceeds from issuance of preferred shares | 4,929.7 | – | – |
| Proceeds from issuance of ordinary shares | 4,071.1 | – | – |
| Proceeds from stock plans | 230.0 | 105.9 | 37.6 |
| Payments of contingent consideration | (230.1) | (14.3) | (4.3) |
| Repurchase of ordinary shares | (118.0) | (130.1) | (170.0) |
| Dividends | (208.1) | – | – |
| Excess tax benefit from stock-based compensation | 76.1 | 51.1 | 69.0 |
| Net cash provided by/(used in) financing activities | 33,443.4 | 3,017.5 | (867.3) |
| Effect of currency exchange rate changes on cash and cash equivalents | (6.5) | (5.9) | (23.9) |
| Movement in cash held for sale | – | 37.0 | (37.0) |
| Net increase in cash and cash equivalents | 846.0 | (79.0) | 10.0 |
| Cash and cash equivalents at beginning of period | 250.0 | 329.0 | 319.0 |
| Cash and cash equivalents at end of period | $ 1,096.0 | $ 250.0 | $ 329.0 |
| **Supplemental Disclosures of Cash Flow Information:** | | | |
| Cash paid during the year for: | | | |
| Income taxes, net of refunds | $ 377.6 | $ 560.6 | $ 380.1 |
| Interest | $ 689.9 | $ 316.8 | $ 226.5 |
| **Schedule of Non-Cash Investing and Financing Activities:** | | | |
| Dividends accrued | $ 24.0 | $ – | $ – |
| Non-cash equity issuance for the Acquisition of Allergan net assets | $ 34,687.2 | $ – | $ – |
| Non-cash equity issuance for the Acquisition of Kythera net assets | $ 40.0 | $ – | $ – |
| Non-cash equity issuance for the Acquisition of Forest net assets | $ – | $ 20,590.5 | $ – |
| Non-cash equity issuance for the Acquisition of Warner Chilcott net assets | $ – | $ – | $ 5,654.4 |
| Non-cash equity issuance for the Acquisition of Actavis Group net assets | $ – | $ – | $ 486.3 |

See accompanying Notes to Consolidated Financial Statements.

ALLERGAN PLC
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(In millions)

| | Ordinary Shares | | Preferred Shares | | Additional Paid-in-Capital | Retained Earnings/ (Accumulated Deficit) | Accumulated Other Comprehensive (Loss/Income) | Treasury Shares | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | Shares | Amount | |
| BALANCE, January 1, 2013 | 138.0 | $ 0.4 | – | $ – | $ 1,656.7 | $ 2,182.7 | $ 36.8 | (10.3) | $ (342.8) | $ 3,833.8 |
| Comprehensive income: | | | | | | | | | | |
| Net income (loss) attributable to shareholders | – | – | – | – | – | (750.4) | – | – | – | (750.4) |
| Other comprehensive income; net of tax | – | – | – | – | – | – | 53.7 | – | – | 53.7 |
| Total comprehensive income | | | | | | | | | | (696.7) |
| Ordinary shares issued in connection with the Actavis acquisition | 5.5 | – | – | – | 486.3 | – | – | – | – | 486.3 |
| Ordinary shares issued in connection with the Warner Chilcott Acquisition (non-cash issuance) | 40.4 | – | – | – | 5,833.9 | – | – | – | – | 5,833.9 |
| Result of contribution of Actavis, Inc. to Allergan plc | (11.5) | (0.4) | – | – | (509.1) | – | – | 11.5 | 509.5 | – |
| Share-based compensation | – | – | – | – | 132.1 | – | – | – | – | 132.1 |
| Ordinary shares issued under employee stock plans | 1.8 | – | – | – | 48.0 | – | – | – | – | 48.0 |
| Tax benefits from exercise of options | – | – | – | – | 69.0 | – | – | – | – | 69.0 |
| Acquisition of noncontrolling interest | – | – | – | – | (4.3) | – | – | – | – | (4.3) |
| Repurchase of ordinary shares | – | – | – | – | – | – | – | (1.2) | (170.0) | (170.0) |
| BALANCE, December 31, 2013 | 174.2 | $ – | – | $ – | $ 8,012.6 | $ 1,432.3 | $ 90.5 | – | $ (3.3) | $ 9,552.1 |
| Comprehensive income: | | | | | | | | | | |
| Net income (loss) attributable to shareholders | – | – | – | – | – | (1,630.5) | – | – | – | (1,630.5) |
| Other comprehensive (loss), net of tax | – | – | – | – | – | – | (555.9) | – | – | (555.9) |
| Total comprehensive income | | | | | | | | | | (2,186.4) |
| Share-based compensation | – | – | – | – | 368.0 | – | – | – | – | 368.0 |
| Issuance for the Forest Acquisition | 90.9 | – | – | – | 20,590.5 | – | – | – | – | 20,590.5 |
| Ordinary shares issued under employee stock plans | 1.4 | – | – | – | 105.9 | – | – | – | – | 105.9 |
| Tax benefits from exercise of options | – | – | – | – | 51.1 | – | – | – | – | 51.1 |
| Acquisition of noncontrolling interest | – | – | – | – | – | – | – | – | – | – |
| Repurchase of ordinary shares | (0.6) | – | – | – | (133.4) | – | – | – | 3.3 | (130.1) |
| BALANCE, December 31, 2014 | 265.9 | $ – | – | $ – | $ 28,994.7 | $ (198.2) | $ (465.4) | – | $ – | $ 28,331.1 |
| Comprehensive income: | | | | | | | | | | |
| Net income attributable to shareholders | – | – | – | – | – | 3,915.2 | – | – | – | 3,915.2 |
| Other comprehensive (loss), net of tax | – | – | – | – | – | – | (28.7) | – | – | (28.7) |
| Total comprehensive income | | | | | | | | | | 3,886.5 |
| Share-based compensation | – | – | – | – | 690.4 | – | – | – | – | 690.4 |
| Issuance for the Allergan Acquisition | 126.3 | – | – | – | 38,757.6 | – | – | – | – | 38,757.6 |
| Issuance of Mandatory Convertible Preferred Shares | – | – | 5.1 | 4,929.7 | – | – | – | – | – | 4,929.7 |
| Issuance for the Kythera Acquisition | – | – | – | – | 40.0 | – | – | – | – | 40.0 |
| Ordinary shares issued under employee stock plans | 2.7 | – | – | – | 230.0 | – | – | – | – | 239.0 |
| Tax benefits from exercise of options | – | – | – | – | 76.1 | – | – | – | – | 76.1 |
| Acquisition of noncontrolling interest | – | – | – | – | – | – | – | – | – | – |
| Dividends declared | – | – | – | – | (162.5) | (69.5) | – | – | – | (232.0) |
| Repurchase of ordinary shares | (0.4) | – | – | – | (118.0) | – | – | – | – | (118.0) |
| BALANCE, December 31, 2015 | 394.5 | $ – | 5.1 | $ 4,929.7 | $ 68,508.3 | $ 3,647.5 | $ (494.1) | – | $ – | $ 76,591.4 |

See accompanying Notes to Consolidated Financial Statements.

**WARNER CHILCOTT LIMITED**
**CONSOLIDATED BALANCE SHEETS**
**(In millions)**

| | | December 31, 2015 | | December 31, 2014 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 1,036.2 | $ | 244.3 |
| Marketable securities | | 9.3 | | 1.0 |
| Accounts receivable, net | | 2,401.6 | | 1,111.6 |
| Receivable from Parents | | 457.3 | | 269.8 |
| Inventories | | 1,009.7 | | 984.6 |
| Prepaid expenses and other current assets | | 556.0 | | 475.9 |
| Current assets held for sale | | 3,540.3 | | 3,806.9 |
| Deferred tax assets | | - | | 477.0 |
| Total current assets | | 9,010.4 | | 7,371.1 |
| Property, plant and equipment, net | | 1,573.9 | | 282.5 |
| Investments and other assets | | 577.4 | | 153.3 |
| Non current assets held for sale | | 10,541.3 | | 8,187.7 |
| Deferred tax assets | | 49.5 | | 34.7 |
| Product rights and other intangibles | | 67,931.7 | | 16,090.7 |
| Goodwill | | 46,551.5 | | 20,897.6 |
| Total assets | $ | 136,235.7 | $ | 53,017.6 |
| **LIABILITIES AND EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ | 4,295.4 | $ | 3,027.0 |
| Payables to Parents | | 1,466.8 | | 521.1 |
| Income taxes payable | | 54.2 | | 33.9 |
| Current portion of long-term debt and capital leases | | 2,432.8 | | 693.4 |
| Current liabilities held for sale | | 1,491.8 | | 1,449.1 |
| Deferred tax liabilities | | - | | 41.0 |
| Total current liabilities | | 9,741.0 | | 5,765.5 |
| Long-term debt and capital leases | | 40,293.4 | | 14,837.7 |
| Other long-term liabilities | | 1,262.0 | | 253.4 |
| Long-term liabilities held for sale | | 580.1 | | 540.7 |
| Other taxes payable | | 801.9 | | 789.5 |
| Deferred tax liabilities | | 7,985.7 | | 2,753.8 |
| Total liabilities | | 60,664.1 | | 24,940.6 |
| Commitments and contingencies | | | | |
| Equity: | | | | |
| Member's capital | | 72,935.1 | | 29,455.9 |
| Retained earnings / (accumulated deficit) | | 3,132.7 | | (917.9) |
| Accumulated other comprehensive income (loss) | | (494.1) | | (465.4) |
| Total members' equity | | 75,573.7 | | 28,072.6 |
| Noncontrolling interest | | (2.1) | | 4.4 |
| Total equity | | 75,571.6 | | 28,077.0 |
| Total liabilities and equity | $ | 136,235.7 | $ | 53,017.6 |

See accompanying Notes to Consolidated Financial Statements.

**WARNER CHILCOTT LIMITED**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(In millions)

|  | Years Ended December 31, | | |
|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Net revenues | $ 15,071.0 | $ 6,738.9 | $ 2,602.5 |
| Operating expenses: |  |  |  |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | 4,810.4 | 3,453.6 | 1,644.7 |
| Research and development | 2,358.5 | 605.7 | 191.3 |
| Selling and marketing | 2,914.0 | 1,201.0 | 374.8 |
| General and administrative | 1,630.2 | 1,177.0 | 431.7 |
| Amortization | 5,453.4 | 1,945.5 | 303.8 |
| In-process research and development impairments | 511.6 | 424.3 | - |
| Asset sales and impairments, net | 272.0 | 305.7 | 1.0 |
| Total operating expenses | 17,950.1 | 9,112.8 | 2,947.3 |
| Operating (loss) | (2,879.1) | (2,373.9) | (344.8) |
| Non-operating income (expense): |  |  |  |
| Interest income | 11.4 | 8.9 | 4.8 |
| Interest expense | (1,193.3) | (411.8) | (239.8) |
| Other income (expense), net | (233.8) | (27.3) | (18.6) |
| Total other income (expense), net | (1,415.7) | (430.2) | (253.6) |
| (Loss) before income taxes and noncontrolling interest | (4,294.8) | (2,804.1) | (598.4) |
| (Benefit) for income taxes | (1,561.9) | (467.0) | (156.2) |
| Net (loss) from continuing operations, net of tax | (2,732.9) | (2,337.1) | (442.2) |
| Income from discontinued operations, net of tax | 6,787.7 | 776.6 | (282.3) |
| Net income / (loss) | 4,054.8 | (1,560.5) | (724.5) |
| (Income) attributable to noncontrolling interest | (4.2) | - | - |
| Net income / (loss) attributable to members | $ 4,050.6 | $ (1,560.5) | $ (724.5) |

See accompanying Notes to Consolidated Financial Statements.

**WARNER CHILCOTT LIMITED**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) / INCOME**
**(In millions)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Net income / (loss) | $ 4,054.8 | $ (1,560.5) | $ (724.5) |
| Other comprehensive (loss) / income | | | |
|     Foreign currency translation (losses) / gains | (129.9) | (519.5) | 48.4 |
|     Unrealized gains / (losses), net of tax | 101.2 | (36.4) | 5.3 |
|     Reclassification for gains included in net income, net of tax | - | - | - |
| Total other comprehensive (loss) / income, net of tax | (28.7) | (555.9) | 53.7 |
| Comprehensive income / (loss) | 4,026.1 | (2,116.4) | (670.8) |
| Comprehensive (income) attributable to noncontrolling interest | (4.2) | - | - |
| Comprehensive income / (loss) attributable to members | $ 4,021.9 | $ (2,116.4) | $ (670.8) |

See accompanying Notes to Consolidated Financial Statements.

**WARNER CHILCOTT LIMITED**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| **Cash Flows From Operating Activities:** | | | |
| Net income / (loss) | $ 4,054.8 | $ (1,560.5) | $ (724.5) |
| Reconciliation to net cash provided by operating activities: | | | |
| Depreciation | 218.3 | 230.9 | 202.0 |
| Amortization | 5,777.0 | 2,597.5 | 842.7 |
| Provision for inventory reserve | 140.9 | 156.1 | 113.8 |
| Share-based compensation | 690.4 | 368.0 | 133.6 |
| Deferred income tax benefit | (7,380.1) | (690.1) | (275.0) |
| In-process research and development impairments | 511.6 | 424.3 | 4.9 |
| Goodwill impairment | - | 17.3 | 647.5 |
| Loss / (gain) on asset sales and impairments, net | 334.4 | 143.1 | 55.9 |
| Amortization of inventory step-up | 1,192.9 | 985.8 | 267.0 |
| Amortization of deferred financing costs | 298.3 | 87.2 | 10.3 |
| Accretion and contingent consideration | 108.8 | (71.2) | 160.0 |
| Excess tax benefit from stock-based compensation | - | - | (69.1) |
| Non-cash impact of debt extinguishment | - | (91.7) | - |
| Impact of assets held for sale | - | 190.8 | 42.7 |
| Other, net | 66.4 | 8.5 | (9.0) |
| Changes in assets and liabilities (net of effects of acquisitions): | | | |
| Decrease / (increase) in accounts receivable, net | (1,033.6) | (611.2) | 19.3 |
| Decrease / (increase) in inventories | (226.2) | (207.2) | (213.1) |
| Decrease / (increase) in prepaid expenses and other current assets | 71.3 | 29.4 | 49.9 |
| Increase / (decrease) in accounts payable and accrued expenses | 193.5 | 387.6 | 3.9 |
| Increase / (decrease) in income and other taxes payable | (87.8) | 29.7 | 7.4 |
| Increase / (decrease) in other assets and liabilities, including receivable / payable with Parents | (266.9) | (154.6) | (63.0) |
| Net cash provided by operating activities | 4,664.0 | 2,269.7 | 1,207.2 |
| **Cash Flows From Investing Activities:** | | | |
| Additions to property, plant and equipment | (454.9) | (238.6) | (177.9) |
| Additions to product rights and other intangibles | (154.7) | (36.1) | (130.0) |
| Additions to investments | (24.3) | (1.0) | - |
| Proceeds from the sale of investments and other assets | 883.0 | 453.7 | 40.6 |
| Proceeds from sales of property, plant and equipment | 140.1 | 13.7 | 7.1 |
| Acquisitions of businesses, net of cash acquired | (37,510.1) | (5,562.3) | (15.1) |
| Net cash (used in) investing activities | (37,120.9) | (5,370.6) | (275.3) |
| **Cash Flows From Financing Activities:** | | | |
| Proceeds from borrowings of long-term indebtedness | 26,455.7 | 8,076.2 | 1,882.3 |
| Proceeds from borrowings on credit facility and other | 3,682.0 | 1,280.0 | 555.0 |
| Debt issuance and other financing costs | (310.8) | (224.3) | (7.4) |
| Payments on debt, including capital lease obligations | (5,134.2) | (6,127.0) | (3,229.5) |
| Proceeds from stock plan | - | - | 44.0 |
| Payments of contingent consideration | (230.1) | (14.3) | (4.3) |
| Repurchase of ordinary shares | - | - | (165.4) |
| Acquisition of noncontrolling interest | - | - | (10.4) |
| Excess tax benefit from stock-based compensation | - | - | 69.2 |
| Dividend to Parent | (208.1) | - | - |
| Contribution from Parent | 9,000.8 | - | - |
| Net cash provided by/(used in) financing activities | 33,255.3 | 2,990.6 | (866.5) |
| Effect of currency exchange rate changes on cash and cash equivalents | (6.5) | (5.9) | (23.9) |
| Movement in cash held for sale | - | 37.0 | (37.0) |
| Net increase in cash and cash equivalents | 791.9 | (79.2) | 4.5 |
| Cash and cash equivalents at beginning of period | 244.3 | 323.5 | 319.0 |
| Cash and cash equivalents at end of period | $ 1,036.2 | $ 244.3 | $ 323.5 |

See accompanying Notes to Consolidated Financial Statements.

F-13

**WARNER CHILCOTT LIMITED**
**CONSOLIDATED STATEMENTS OF MEMBER'S EQUITY**
(In millions, except share data)

| | Member's Capital | | Retained Earnings/ (Accumulated Deficit) | Accumulated Other Comprehensive (Loss/Income) | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **BALANCE, January 1, 2013** | 100.0 | $ 1,614.3 | $ 2,182.7 | $ 36.8 | $ 3,833.8 |
| Comprehensive income: | | | | | |
| Net (loss) attributable to members | - | - | (724.5) | - | (724.5) |
| Other comprehensive income, net of tax | - | - | - | 53.7 | 53.7 |
| Total comprehensive income | | | | | (670.8) |
| Ordinary shares issued in connection with the Actavis Acquisition | - | 486.3 | - | - | 486.3 |
| Ordinary shares issued in connection with the Warner Chilcott Acquisition | - | 5,833.9 | - | - | 5,833.9 |
| Share-based compensation | - | 119.6 | - | - | 119.6 |
| Acquisition of noncontrolling interest | - | (4.3) | - | - | (4.3) |
| **BALANCE, December 31, 2013** | 100.0 | $ 8,049.8 | $ 1,458.2 | $ 90.5 | $ 9,598.5 |
| Comprehensive income: | | | | | |
| Net (loss) attributable to members | - | - | (1,560.5) | - | (1,560.5) |
| Other comprehensive (loss), net of tax | - | - | - | (555.9) | (555.9) |
| Total comprehensive income | | | | | (2,116.4) |
| Contribution from Parent | - | 21,406.1 | - | - | 21,406.1 |
| Dividend to Parent | - | - | (815.6) | - | (815.6) |
| **BALANCE, December 31, 2014** | 100.0 | $ 29,455.9 | $ (917.9) | $ (465.4) | $ 28,072.6 |
| Comprehensive income: | | | | | |
| Net income attributable to members | - | - | 4,050.6 | - | 4,050.6 |
| Other comprehensive (loss), net of tax | - | - | - | (28.7) | (28.7) |
| Total comprehensive income | | | | | 4,021.9 |
| Contribution from Parent | - | 43,687.3 | - | - | 43,687.3 |
| Dividend to Parent | - | (208.1) | - | - | (208.1) |
| **BALANCE, December 31, 2015** | 100.0 | $ 72,935.1 | $ 3,132.7 | $ (494.1) | $ 75,573.7 |

See accompanying Notes to Consolidated Financial Statements.

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1 — Description of Business

Allergan plc (formerly Actavis plc) is a global specialty pharmaceutical company engaged in the development, manufacturing, marketing, and distribution of brand name pharmaceutical products ("brand", "branded" or "specialty brand"), medical aesthetics, biosimilar and over-the-counter ("OTC") pharmaceutical products. The Company has operations in more than 100 countries. Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc and has the same principal business activities. As a result of the Allergan Acquisition (defined below) which closed on March 17, 2015, the Company expanded its franchises to include ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery, which complements the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefits significantly from Allergan, Inc.'s ("Legacy Allergan") global brand equity and consumer awareness of key products, including Botox® and Restasis®. The Allergan Acquisition expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America. The U.S. remains our largest commercial market and represented more than half of total net revenues for each of 2015, 2014 and 2013.

The results of our discontinued operations includes the results of our generic product development, manufacturing and distribution of off-patent pharmaceutical products, established international brands marketed similar to generic products and out-license generic pharmaceutical products primarily in Europe through our Medis third-party business.

On July 26, 2015 we entered into a master purchase agreement (the "Teva Agreement"), under which Teva Pharmaceutical Industries Ltd. ("Teva") agreed to acquire our global generic pharmaceutical business and certain other assets (the "Teva Transaction"). Under the Teva Agreement, upon the closing of the Teva Transaction, we will receive $33.75 billion in cash and 100.3 million Teva ordinary shares (or American Depository Shares with respect thereto), which approximates $6.75 billion in Teva stock using the then-current stock price at the time the Teva Transaction was announced, in exchange for which Teva will acquire our global generics business, including the United States ("U.S.") and international generic commercial units, our third-party supplier Medis, our global generic manufacturing operations, our global generic research and development ("R&D") unit, our international OTC commercial unit (excluding OTC eye care products) and some established international brands. The transaction is subject to customary closing conditions and is expected to close in the first quarter of 2016; however, it is possible that closing could slip beyond the end of the first quarter. As a result of the transaction, and in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Update ("ASU") number 2014-08 "Presentation of Financial Statements (Topic 205) and Property, Plant and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity", the Company is accounting for the assets and liabilities to be divested as held for sale. Further, the financial results of the business held for sale have been reclassified to discontinued operations for all periods presented in our consolidated financial statements.

On November 23, 2015, the Company announced that it entered into a definitive merger agreement (the "Pfizer Agreement") under which Pfizer, Inc. ("Pfizer"), a global innovative biopharmaceutical company, and Allergan plc will merge in a stock and cash transaction (the "Pfizer Transaction"), which attributes a $160.0 billion enterprise valuation using the then-current stock price at the time the Pfizer Transaction was announced. Company shareholders will receive 11.3 shares of the combined company for each of their existing Allergan shares and Pfizer stockholders will receive in respect of each share of Pfizer common stock held by them, at their election and subject to certain proration procedures described in the Pfizer Agreement, either one combined company ordinary share or an amount in cash equal to the volume weighted average price per share of Pfizer common stock on the New York Stock Exchange ("NYSE") on the trading day immediately preceding the date of the consummation of the Pfizer Transaction. The Pfizer Transaction is anticipated to close in the second half of 2016.

### NOTE 2 — Formation of the Company

Allergan plc was incorporated in Ireland on May 16, 2013 as a private limited company and re-registered effective September 20, 2013 as a public limited company. It was established for the purpose of facilitating the business combination between Actavis, Inc. and Warner Chilcott plc ("Warner Chilcott"). On October 1, 2013, pursuant to the transaction agreement dated May 19, 2013 among Actavis, Inc., Warner Chilcott, the Company, Actavis Ireland Holding Limited, Actavis W.C. Holding LLC (now known as Actavis W.C. Holding Inc.) and Actavis W.C. Holding 2 LLC (now known as Actavis W.C. Holding 2 Inc.) ("MergerSub"), (i) the Company acquired Warner Chilcott (the "Warner Chilcott Acquisition") pursuant to a scheme of arrangement under Section 201, and a capital reduction under Sections 72 and 74, of the Irish Companies Act of 1963 where each Warner Chilcott ordinary share was converted into 0.160 of an Allergan plc ordinary share (the "Company Ordinary Shares"), or $5,833.9 million in equity consideration, and (ii) MergerSub merged with and into Actavis, Inc., with Actavis, Inc. as the surviving corporation in the merger (the "Merger" and, together with the Warner Chilcott Acquisition, the "Transactions"). Following the consummation of the Transactions, Actavis, Inc. and Warner Chilcott became wholly-owned subsidiaries of Allergan plc. Each of Actavis, Inc.'s common shares was converted into one Company Ordinary Share. Effective October 1, 2013, through a series of related-party transactions, Allergan plc contributed its indirect subsidiaries, including Actavis, Inc. to Warner Chilcott Limited.

F-15

On March 17, 2015, the Company acquired Legacy Allergan for approximately $77.0 billion including outstanding indebtedness assumed of $2.2 billion, cash consideration of $40.1 billion and equity consideration of $34.7 billion, which includes outstanding equity awards (the "Allergan Acquisition"). Under the terms of the agreement, Legacy Allergan shareholders received 111.2 million of the Company's ordinary shares, 7.0 million of the Company's non-qualified stock options and 0.5 million of the Company's share units.

In connection with the Allergan Acquisition, the Company changed its name from Actavis plc to Allergan plc. Actavis plc's ordinary shares were traded on the NYSE under the symbol "ACT" until the opening of trading on June 15, 2015, at which time Actavis plc changed its corporate name to "Allergan plc" and changed its ticker symbol to "AGN." Pursuant to Rule 12g-3(c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), Allergan plc is the successor issuer to Actavis plc's ordinary shares which are deemed to be registered under Section 12(b) of the Exchange Act, and Allergan plc is subject to the informational requirements of the Exchange Act, and the rules and regulations promulgated thereunder.

References throughout to "we," "our," "us," the "Company" or "Allergan" refer to financial information and transactions of Watson Pharmaceuticals, Inc. prior to January 23, 2013, Actavis, Inc. from January 23, 2013 until October 1, 2013 and Allergan plc and Warner Chilcott Limited subsequent to October 1, 2013.

References throughout to "Ordinary Shares" refer to Actavis, Inc.'s Class A common shares, par value $0.0033 per share, prior to the consummation of the Transactions and to Allergan plc's ordinary shares, par value $0.0001 per share, since the consummation of the Transactions.

### NOTE 3 — Reconciliation of Warner Chilcott Limited results to Allergan plc results

Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc (together with other Warner Chilcott Limited parents, the "Parent"), the ultimate parent of the group. The results of Warner Chilcott Limited are consolidated into the results of Allergan plc. Due to the deminimis activity between Allergan plc and Warner Chilcott Limited, references throughout this filing relate to both Allergan plc and Warner Chilcott Limited. Warner Chilcott Limited representations relate only to itself and not to any other company.

Except where otherwise indicated, and excluding certain insignificant cash and non-cash transactions at the Allergan plc level, these notes relate to the consolidated financial statements for both separate registrants, Allergan plc and Warner Chilcott Limited. In addition to certain inter-company payable and receivable amounts between the entities, the following is a reconciliation of the results of Warner Chilcott Limited to Allergan plc ($ in millions):

| | December 31, 2015 | | | December 31, 2014 | | |
| | Allergan plc | Warner Chilcott Limited | Difference | Allergan plc | Warner Chilcott Limited | Difference |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 1,096.0 | $ 1,036.2 | $ 59.8 | $ 250.0 | $ 244.3 | $ 5.7 |
| Accounts receivable, net | 2,401.6 | 2,401.6 | - | 1,112.3 | 1,111.6 | 0.7 |
| Prepaid expenses and other current assets | 558.5 | 556.0 | 2.5 | 478.8 | 475.9 | 2.9 |
| Property, plant and equipment, net | 1,573.9 | 1,573.9 | - | 283.4 | 282.5 | 0.9 |
| Accounts payable and accrued liabilities | 4,349.5 | 4,295.4 | 54.1 | 3,030.1 | 3,027.0 | 3.1 |

| | Year Ended December 31, 2015 | | | Year Ended December 31, 2014 | | | Year Ended December 31, 2013 | | |
| | Allergan plc | Warner Chilcott Limited | Difference | Allergan plc | Warner Chilcott Limited | Difference | Allergan plc | Warner Chilcott Limited | Difference |
|---|---|---|---|---|---|---|---|---|---|
| General and administrative expenses | $ 1,765.6 | $ 1,630.2 | $ 135.4 | $ 1,247.0 | $ 1,177.0 | $ 70.0 | $ 456.1 | $ 431.7 | $ 24.4 |
| Operating (loss) | (3,014.5) | (2,879.1) | (135.4) | (2,443.9) | (2,373.9) | (70.0) | (369.2) | (344.8) | (24.4) |
| (Loss) before income taxes and noncontrolling interest | (4,430.2) | (4,294.8) | (135.4) | (2,874.1) | (2,804.1) | (70.0) | (622.8) | (598.4) | (24.4) |
| (Benefit) for income taxes | (1,561.9) | (1,561.9) | - | (467.0) | (467.0) | - | (155.3) | (156.2) | 0.9 |
| Net (loss) from continuing operations, net of tax | (2,868.3) | (2,732.9) | (135.4) | (2,407.1) | (2,337.1) | (70.0) | (467.5) | (442.2) | (25.3) |
| Net income / (loss) | 3,919.4 | 4,054.8 | (135.4) | (1,630.5) | (1,560.5) | (70.0) | (750.4) | (724.5) | (25.9) |
| Net income / (loss) attributable to ordinary shareholders/members | 3,683.2 | 4,050.6 | (367.4) | (1,630.5) | (1,560.5) | (70.0) | (750.4) | (724.5) | (25.9) |
| Dividends on preferred stock | 232.0 | - | 232.0 | - | - | - | - | - | - |

The difference between general and administrative expenses in the years ending December 31, 2015, 2014 and 2013 were due to corporate related expenses incurred at Allergan plc as well as non-recurring transaction costs incurred as part of the acquisitions of the Company, including Allergan, Forest (defined below) and Warner Chilcott. Movements in equity are due to historical differences in the results of operations of the companies and differences in equity awards.

## NOTE 4 — Summary of Significant Accounting Policies

### Basis of Presentation

The Company's consolidated financial statements are prepared in accordance with accounting principles generally accepted in the U.S. ("GAAP"). The consolidated financial statements include the accounts of wholly owned subsidiaries, after elimination of intercompany accounts and transactions. The consolidated financial information presented herein reflects all financial information that, in the opinion of management, is necessary for a fair statement of financial position, results of operations and cash flows for the periods presented.

The Company's consolidated financial statements include the financial results of all acquired companies subsequent to the acquisition date.

### Reclassifications

The Company has made certain reclassifications to prior period information to conform to the current period presentation, including the impact of the Teva Transaction.

### Use of Estimates

Management is required to make certain estimates and assumptions in order to prepare consolidated financial statements in conformity with GAAP. Such estimates and assumptions affect the reported amounts of assets, liabilities, revenues and expenses and disclosure of contingent assets and liabilities in the consolidated financial statements and accompanying notes. The Company's most significant estimates relate to the determination of SRA's (defined below) included within either accounts receivable or accrued liabilities, the valuation of inventory balances, the determination of useful lives for intangible assets, pension and other post-retirement benefit plan assumptions, the assessment of expected cash flows used in evaluating goodwill and other long-lived assets for impairment and recognition and measurement of assets acquired and liabilities assumed in business combinations at fair value. The estimation process required to prepare the Company's consolidated financial statements requires assumptions to be made about future events and conditions, and as such, is inherently subjective and uncertain. The Company's actual results could differ materially from those estimates.

### Foreign Currency Translation

For most of the Company's international operations, the local currency has been determined to be the functional currency. The results of its non-U.S. dollar based operations are translated to U.S. dollars at the average exchange rates during the period. Assets and liabilities are translated at the rate of exchange prevailing on the balance sheet date. Equity is translated at the prevailing rate of exchange at the date of the equity transaction. Translation adjustments are reflected in stockholders' equity and are included as a component of other comprehensive (loss) / income. The effects of revaluing non-functional currency assets and liabilities into the functional currency are recorded as general and administrative expenses in the consolidated statements of operations.

The Company realizes foreign currency gains / (losses) in the normal course of business based on movement in the applicable exchange rates. These gains / (losses) are included as a component of general and administrative expenses.

### Cash and Cash Equivalents

The Company considers cash and cash equivalents to include cash in banks, commercial paper and deposits with financial institutions that can be liquidated without prior notice or penalty. The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents.

### Fair Value of Other Financial Instruments

The Company's financial instruments consist primarily of cash and cash equivalents, marketable securities, accounts and other receivables, investments, trade accounts payable, and long-term debt, including the current portion. The carrying amounts of cash and cash equivalents, marketable securities, accounts and other receivables and trade accounts payable are representative of their

F-17

respective fair values due to their relatively short maturities. The fair values of investments in companies that are publicly traded and not accounted for under the equity method are based on quoted market prices. The Company estimates the fair value of its fixed rate long-term obligations based on quoted market rates. The carrying amount reported for long-term debt, other than the Company's indebtedness under senior notes, is considered to be representative of fair value as they are at variable rates and reprice frequently.

### Inventories

Inventories consist of finished goods held for distribution, raw materials and work in process. Inventory includes brand pharmaceutical and medical aesthetic products which represent Food and Drug Administration ("FDA") approved indications. Inventory valuation reserves are established based on a number of factors/situations including, but not limited to, raw materials, work in process or finished goods not meeting product specifications, product obsolescence, or application of the lower of cost (first-in, first-out method) or market (net realizable value) concepts. The determination of events requiring the establishment of inventory valuation reserves, together with the calculation of the amount of such reserves may require judgment. Assumptions utilized in our quantification of inventory reserves include, but are not limited to, estimates of future product demand, consideration of current and future market conditions, product net selling price, anticipated product launch dates, potential product obsolescence and other events relating to special circumstances surrounding certain products. No material adjustments have been required to our inventory reserve estimates for the periods presented. Adverse changes in assumptions utilized in our inventory reserve calculations could result in an increase to our inventory valuation reserves and higher cost of sales.

### Property, Plant and Equipment

Property, plant and equipment are stated at cost, less accumulated depreciation. Major renewals and improvements are capitalized, while routine maintenance and repairs are expensed as incurred. The Company capitalizes interest on qualified construction projects. At the time property, plant and equipment are retired from service, the cost and accumulated depreciation is removed from the respective accounts.

Depreciation expense is computed principally on the straight-line method, over the estimated useful lives of the related assets. The following table provides the range of estimated useful lives used for each asset type:

| | |
|---|---|
| Computer software/hardware (including internally developed) | 3-10 years |
| Machinery and equipment | 3-15 years |
| Research and laboratory equipment | 3-10 years |
| Furniture and fixtures | 3-10 years |
| Buildings, improvements, leasehold improvements and other | 4-50 years |
| Transportation equipment | 3-20 years |

The Company assesses property, plant and equipment for impairment whenever events or changes in circumstances indicate that an asset's carrying amount may not be recoverable.

### Investments

The Company's equity investments are accounted for under the equity method of accounting when the Company can exert significant influence and the Company's ownership interest does not exceed 50%. The Company records equity method investments at cost and adjusts for the appropriate share of investee net earnings or losses. Investments in which the Company owns less than a 20% interest and cannot exert significant influence are accounted for using the cost method if the fair value of such investments is not readily determinable.

### Marketable Securities

The Company's marketable securities consist of U.S. treasury and agency securities and equity securities of publicly-held companies. The Company's marketable securities are classified as available-for-sale and are recorded at fair value, based upon quoted market prices. Unrealized temporary adjustments to fair value are included on the balance sheet in a separate component of stockholders' equity as unrealized gains and losses and are reported as a component of accumulated other comprehensive income / (loss). No gains or losses on marketable securities are realized until shares are sold or a decline in fair value is determined to be other-than-temporary. If a decline in fair value is determined to be other-than-temporary, an impairment charge is recorded and a new cost basis in the investment is established.

F-18

### Product Rights and Other Definite-Lived Intangible Assets

Our product rights and other definite-lived intangible assets are stated at cost, less accumulated amortization, and are amortized using the economic benefit model or the straight-line method, if results are materially aligned, over their estimated useful lives. We determine amortization periods for product rights and other definite-lived intangible assets based on our assessment of various factors impacting estimated useful lives and cash flows. Such factors include the product's position in its life cycle, the existence or absence of like products in the market, various other competitive and regulatory issues, and contractual terms. Significant changes to any of these factors may result in a reduction in the intangibles useful life and an acceleration of related amortization expense, which could cause our net results to decline.

Product rights and other definite-lived intangible assets are tested periodically for impairment when events or changes in circumstances indicate that an asset's carrying value may not be recoverable. The impairment testing involves comparing the carrying amount of the asset to the forecasted undiscounted future cash flows. In the event the carrying value of the asset exceeds the undiscounted future cash flows, the carrying value is considered not recoverable and an impairment exists. An impairment loss is measured as the excess of the asset's carrying value over its fair value, calculated using discounted future cash flows. The computed impairment loss is recognized in net (loss) / income in the period that the impairment occurs. Assets which are not impaired may require an adjustment to the remaining useful lives for which to amortize the asset. Our projections of discounted cash flows use a discount rate determined by our management to be commensurate with the risk inherent in our business model. Our estimates of future cash flows attributable to our other definite-lived intangible assets require significant judgment based on our historical and anticipated results and are subject to many factors. Different assumptions and judgments could materially affect the calculation of the fair value of the other definite-lived intangible assets which could trigger impairment.

### Goodwill and Intangible Assets with Indefinite Lives

The Company tests goodwill and intangible assets with indefinite-lives for impairment annually in the second quarter by comparing the fair value of each of the Company's reporting units to the respective carrying value of the reporting units. Additionally, the Company may perform interim tests if an event occurs or circumstances change that could potentially reduce the fair value of a reporting unit below its carrying amount or when the Company has a change to reporting units. The carrying value of each reporting unit is determined by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units.

Goodwill is considered impaired if the carrying amount of the net assets exceeds the fair value of the reporting unit. Impairment, if any, would be recorded in operating income and this could result in a material impact to net (loss) / income and (loss) / earnings per share.

Acquired IPR&D intangible assets represent the value assigned to acquired research and development projects that, as of the date acquired, represent the right to develop, use, sell and/or offer for sale a product or other intellectual property that the Company has acquired with respect to products and/or processes that have not been completed or approved. The IPR&D intangible assets are subject to impairment testing until completion or abandonment of each project. Upon abandonment, the assets are impaired. Impairment testing requires the development of significant estimates and assumptions involving the determination of estimated net cash flows for each project or product (including net revenues, cost of sales, R&D costs, selling and marketing costs and other costs which may be allocated), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, the assessment of each asset's life cycle, the potential regulatory and commercial success risks, and competitive trends impacting the asset and each cash flow stream as well as other factors. The major risks and uncertainties associated with the timely and successful completion of the IPR&D projects include legal risk, market risk and regulatory risk. Changes in these assumptions could result in future impairment charges. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change or the timely completion of each project to commercial success will occur. For these and other reasons, actual results may vary significantly from estimated results.

Upon successful completion of each project and approval of the product, we will make a separate determination of the useful life of the intangible, transfer the amount to currently marketed products ("CMP") and amortization expense will be recorded over the estimated useful life.

### Warranties

As a result of the Allergan Acquisition, the Company provides warranty programs for breast implant sales primarily in the United States, Europe and certain other countries. Management estimates the amount of potential future claims from these warranty programs based on actuarial analyses. Expected future obligations are determined based on the history of product shipments and claims and are discounted to a current value. The provision for warranty expense in the year ended December 31, 2015 was $4.5 million.  The liability is included in both current and long-term liabilities in the Company's consolidated balance sheets and amounted

to $7.6 million and $28.4 million, respectively, as of December 31, 2015. The U.S. programs include the *ConfidencePlus*® and *ConfidencePlus*® Premier warranty programs. The *ConfidencePlus*® program, which is limited to saline breast implants, currently provides lifetime product replacement and contralateral implant replacement. The *ConfidencePlus*® Premier program, which is standard for silicone gel implants and requires a low enrollment fee for saline breast implants, generally provides lifetime product replacement, $2,400 of financial assistance for saline breast implants and $3,500 of financial assistance for silicone gel breast implants for surgical procedures within ten years of implantation and contralateral implant replacement. The warranty programs in non-U.S. markets generally have similar terms and conditions to the U.S. programs. The Company does not warrant any level of aesthetic result and, as required by government regulation, makes extensive disclosures concerning the risks of the use of its products and breast implant surgery. Changes to actual warranty claims incurred and interest rates could have a material impact on the actuarial analysis and the Company's estimated liabilities. A large majority of the product warranty liability arises from the U.S. warranty programs. The Company does not currently offer any similar warranty program on any other product.

### *Contingent Consideration*

Contingent consideration is recorded at the acquisition date estimated fair value of the contingent payment for all applicable acquisitions. The fair value of the contingent consideration is remeasured at each reporting period with any adjustments in fair value included in our consolidated statement of operations. (Refer to "NOTE 24 — Fair Value Measurement" for additional details regarding the fair value of contingent consideration.)

### *Revenue Recognition*

#### *General*

Revenue from product sales is recognized when title and risk of loss to the product transfers to the customer, which is based on the transaction shipping terms. Recognition of revenue also requires reasonable assurance of collection of sales proceeds, the seller's price to the buyer to be fixed or determinable and the completion of all performance obligations. The Company warrants products against defects and for specific quality standards, permitting the return of products under certain circumstances. Product sales are recorded net of all sales-related deductions including, but not limited to: chargebacks, trade discounts, billback adjustments, sales returns and allowances, commercial and government rebates, customer loyalty programs and fee-for-service arrangements with certain distributors, which we refer to in the aggregate as "SRA" allowances.

Royalty and commission revenue is recognized as a component of net revenues in accordance with the terms of their respective contractual agreements when collectability is reasonably assured and when revenue can be reasonably measured.

#### *Provisions for SRAs*

As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. When the Company recognizes gross revenue from the sale of products, an estimate of SRA is recorded, which reduces the product revenues. Accounts receivable and/or accrued liabilities are also reduced and/or increased by the SRA amount depending on whether we have the right of offset with the customer. These provisions are estimated based on historical payment experience, historical relationship of the deductions to gross product revenues, government regulations, estimated utilization or redemption rates, estimated customer inventory levels and current contract sales terms. The estimation process used to determine our SRA provision has been applied on a consistent basis and no material revenue adjustments have been necessary in prior periods to increase or decrease our reserves for SRA as a result of a significant change in underlying estimates. The Company uses a variety of methods to assess the adequacy of the SRA reserves to ensure that our financial statements are fairly stated.

*Chargebacks* — A chargeback represents an amount payable in the future to a wholesaler for the difference between the invoice price paid by our wholesale customer for a particular product and the negotiated contract price that the wholesaler's customer pays for that product. The chargeback provision and related reserve varies with changes in product mix, changes in customer pricing and changes to estimated wholesaler inventories. The provision for chargebacks also takes into account an estimate of the expected wholesaler sell-through levels to indirect customers at certain contract prices. The Company validates the chargeback accrual quarterly through a review of the inventory reports obtained from our largest wholesale customers. This customer inventory information is used to verify the estimated liability for future chargeback claims based on historical chargeback and contract rates. These large wholesalers represent the vast majority of the recipients of the Company's chargeback payments. We continually monitor current pricing trends and wholesaler inventory levels to ensure the liability for future chargebacks is fairly stated.

*Rebates* — Rebates include volume related incentives to direct and indirect customers, third-party managed care and Medicare Part D rebates, Medicaid rebates and other government rebates. Rebates are accrued based on an estimate of claims to be paid for product sold into trade by the Company. Volume rebates are generally offered to customers as an incentive to use the Company's

products and to encourage greater product sales. These rebate programs include contracted rebates based on customers' purchases made during an applicable monthly, quarterly or annual period. The provision for third-party rebates is estimated based on our customers' contracted rebate programs and the Company's historical experience of rebates paid. Any significant changes to our customer rebate programs are considered in establishing the provision for rebates. The provisions for government rebates are based, in part, upon historical experience of claims submitted by the various states / authorities, contractual terms and government regulations. We monitor legislative changes to determine what impact such legislation may have on our provision.

*Cash Discounts* — Cash discounts are provided to customers that pay within a specific period. The provision for cash discounts is estimated based upon invoice billings and historical customer payment experience. The Company's experience of payment history is fairly consistent and most customer payments qualify for the cash discount.

*Returns and Other Allowances* — The Company's provision for returns and other allowances include returns, pricing adjustments, promotional allowances, loyalty cards and billback adjustments.

Consistent with industry practice, the Company maintains a returns policy that allows customers to return product for a credit. In accordance with the Company's policy, credits for customer returns of products are applied against outstanding account activity or are settled in cash. Product exchanges are not permitted. Customer returned products are generally not resalable. The Company's estimate of the provision for returns is based upon historical experience and current trends of actual customer returns. Additionally, we consider other factors when estimating the current period returns provision, including levels of inventory in the distribution channel, as well as significant market changes that may impact future expected returns.

Pricing adjustments, which includes shelf stock adjustments, (and which primarily relate to our held for sale generics business) are credits issued to reflect price decreases in selling prices charged to the Company's direct customers. Shelf stock adjustments are based upon the amount of product our customers have in their inventory at the time of an agreed-upon price reduction. The provision for shelf stock adjustments is based upon specific terms with the Company's customers and includes estimates of existing customer inventory levels based upon their historical purchasing patterns. We regularly monitor all price changes to evaluate the Company's reserve balances. The adequacy of these reserves is readily determinable as pricing adjustments and shelf stock adjustments are negotiated and settled on a customer-by-customer basis.

Promotional allowances are credits that are issued in connection with a product launch or as an incentive for customers to carry our product. The Company establishes a reserve for promotional allowances based upon contractual terms.

Billback adjustments (and which primarily relate to our held for sale generics business), are credits that are issued to certain customers who purchase directly from us as well as indirectly through a wholesaler. These credits are issued in the event there is a difference between the customer's direct and indirect contract price. The provision for billbacks is estimated based upon historical purchasing patterns of qualified customers who purchase product directly from us and supplement their purchases indirectly through our wholesale customers.

Loyalty cards allow the end user patients a discount per prescription and are accrued based on historical experience, contract terms and the volume of product and cards in the distribution channel.

The following table summarizes the activity from continuing operations in the Company's major categories of SRA ($ in millions):

| | Chargebacks | Rebates | Return and Other Allowances | Cash Discounts | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2012 | $ 81.2 | $ 30.8 | $ 178.9 | $ 9.3 | $ 300.2 |
| Add: Warner Chilcott Acquisition | 5.6 | 255.5 | 121.3 | 5.5 | 387.9 |
| Provision related to sales in 2013 | 214.5 | 330.2 | 86.5 | 42.9 | 674.1 |
| Credits and payments | (279.5) | (326.6) | (183.6) | (48.5) | (838.2) |
| Balance at December 31, 2013 | $ 21.8 | $ 289.9 | $ 203.1 | $ 9.2 | $ 524.0 |
| Add: Forest Acquisition | 27.9 | 425.0 | 94.3 | 9.8 | 557.0 |
| Provision related to sales in 2014 | 442.9 | 1,562.6 | 154.4 | 155.7 | 2,315.6 |
| Credits and payments | (464.6) | (1,268.9) | (191.0) | (155.0) | (2,079.5) |
| Balance at December 31, 2014 | $ 28.0 | $ 1,008.8 | $ 260.8 | $ 19.7 | $ 1,317.3 |
| Add: Allergan Acquisition | 14.1 | 306.4 | 100.4 | 8.6 | 429.5 |
| Provision related to sales in 2015 | 649.9 | 4,082.9 | 732.2 | 301.9 | 5,766.9 |
| Credits and payments | (613.8) | (4,044.1) | (720.3) | (301.7) | (5,679.9) |
| Balance at December 31, 2015 | $ 78.2 | $ 1,354.0 | $ 373.1 | $ 28.5 | $ 1,833.8 |

The following table summarizes the activity from discontinued operations in the Company's major categories of SRA ($ in millions):

| | Chargebacks | Rebates | Return and Other Allowances | Cash Discounts | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2012 | $ 130.3 | $ 820.0 | $ 170.6 | $ 27.6 | $ 1,148.5 |
| Provision related to sales in 2013 | 2,125.5 | 2,008.9 | 817.6 | 158.8 | 5,110.8 |
| Credits and payments | (2,031.2) | (2,057.0) | (573.4) | (147.9) | (4,809.5) |
| Balance at December 31, 2013 | $ 224.6 | $ 771.9 | $ 414.8 | $ 38.5 | $ 1,449.8 |
| Provision related to sales in 2014 | 4,148.8 | 1,761.1 | 705.0 | 195.0 | 6,809.9 |
| Credits and payments | (3,836.5) | (1,795.2) | (768.5) | (192.5) | (6,592.7) |
| Balance at December 31, 2014 | $ 536.9 | $ 737.8 | $ 351.3 | $ 41.0 | $ 1,667.0 |
| Provision related to sales in 2015 | 5,907.2 | 1,944.7 | 657.0 | 251.0 | 8,759.9 |
| Credits and payments | (5,825.1) | (1,961.1) | (685.2) | (235.4) | (8,706.8) |
| Balance at December 31, 2015 | $ 619.0 | $ 721.4 | $ 323.1 | $ 56.6 | $ 1,720.1 |

The following table summarizes the balance sheet classification of our SRA reserves ($ in millions):

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| Accounts receivable | $ 263.8 | $ 162.4 |
| Accounts payable and accrued expenses | 1,570.0 | 1,154.9 |
| | $ 1,833.8 | $ 1,317.3 |

The following table summarizes the balance sheet classification of our SRA reserves relating to the generics business being divested to Teva ($ in millions):

| | As of December 31, | |
|---|---|---|
| | 2015 | 2014 |
| Current assets held for sale | $ 1,306.6 | $ 1,269.6 |
| Current liabilities held for sale | 413.5 | 397.4 |
| | $ 1,720.1 | $ 1,667.0 |

During the year ended December 31, 2015, the Company lowered SRA balances relating to the valuation of assets and liabilities acquired as part of the Forest Acquisition measurement period adjustments by $53.2 million, with an offset to goodwill ($33.2 million) and deferred tax liabilities ($20.0 million).

The provisions recorded to reduce gross product sales to net product sales were as follows ($ in millions):

| Years Ended December 31, | Gross Product Sales | | Chargebacks | Rebates | Return and Other Allowances | Cash Discounts | Net Product Sales | Gross-to-net Percentages |
|---|---|---|---|---|---|---|---|---|
| 2013 | $ | 3,212.2 | $ 214.5 | $ 330.2 | $ 86.5 | $ 42.9 | $ 2,538.1 | 79.0% |
| 2014 | $ | 8,987.3 | $ 442.9 | $1,562.8 | $ 154.4 | $ 155.7 | 6,671.5 | 74.2% |
| 2015 | $ | 20,653.9 | $ 649.9 | $4,082.9 | $ 732.2 | $ 301.9 | 14,887.0 | 72.1% |

The movement in the percentage of provisions to gross sales is a result of changes in product mix, competition and channels of distribution. In the year ended December 31, 2015, the Company's increased sales of acquired eye care products and acquired Forest products lowered the provision percentage.

The Company does not expect future payments of SRA reserves to materially exceed our current estimates. However, if future SRA payments were to materially exceed our estimates, such adjustments may have a material adverse impact on our financial position, results of operations and cash flows.

### Branded Prescription Drug Fee

On July 28, 2014, the Internal Revenue Service ("IRS") issued revised final rules and regulations for the Branded Prescription Drug Fee, an annual fee payable to the federal government based on an allocation of the Company's market share for branded prescription and authorized generic drugs sold to certain government programs compared to that of the industry. The final rules accelerated the expense recognition criteria for the fee obligation from the year in which the fee is paid, to the year in which the market share used to allocate the fee is determined. This change required Allergan (and other industry participants) to recognize an additional year of expense in the third quarter of 2014 of $105.1 million, which is reflected in our 2014 selling and marketing expense.

### Litigation and Contingencies

The Company is involved in various legal proceedings in the normal course of its business, including product liability litigation, intellectual property litigation, employment litigation and other litigation. Additionally, the Company, in consultation with its counsel, assesses the need to record a liability for contingencies on a case-by-case basis in accordance with ASC Topic 450 "Contingencies" ("ASC 450"). Accruals are recorded when the Company determines that a loss related to a matter is both probable and reasonably estimable. These accruals are adjusted periodically as assessment efforts progress or as additional information becomes available. Acquired contingencies in business combinations are recorded at fair value to the extent determinable, otherwise in accordance ASC 450.

### R&D Activities

R&D activities are expensed as incurred and consist of self-funded R&D costs, the costs associated with work performed under collaborative R&D agreements, regulatory fees, and license and milestone payments, if any.

As of December 31, 2015, the Company is developing a number of branded products, some of which utilize novel drug delivery systems, through a combination of internal and collaborative programs including the following:

| Product | Therapeutic Area | Indication | Expected Launch Year | Phase |
|---|---|---|---|---|
| Restasis MDPF ......... | Eye Care | Dry Eye | 2016 | Registration |
| XEN45 ..................... | Eye Care | Glaucoma | 2017 | III |
| Sarecycline ............... | Dermatology | Severe Acne | 2018 | III |
| Esmya....................... | Woman's healthcare | Uterine Fibroids | 2018 | III |
| Bimatoprost SR ........ | Eye Care | Glaucoma | 2018 | III |
| Tavilermide .............. | Eye Care | Dry Eye | 2019 | III |
| Relamorelin** .......... | Gastrointestinal | Gastroparesis | 2020 | II |
| Ubrogepant............... | Neurology | Acute Migraine | 2020 | II |
| Abicipar .................. | Eye Care | Age Related Macular Degeneration | 2020 | III |
| Rapastinel................. | Psychiatry | Depression | 2021 | II |

** As part of our agreement with Rhythm Health, Inc.

We also have a number of products in development as part of our life-cycle management strategy for our existing product portfolio.

### Allocation of Acquisition Fair Values to Assets Acquired and Liabilities Assumed

We account for acquired businesses using the acquisition method of accounting, which requires that assets acquired and liabilities assumed be recorded at the date of acquisition at their respective fair values. The consolidated financial statements and results of operations reflect an acquired business after the completion of the acquisition. The fair value of the consideration paid, including contingent consideration, is assigned to the underlying net assets of the acquired business based on their respective fair values as determined using a market participant concept. Any excess of the purchase price over the estimated fair values of the net assets acquired is recorded as goodwill.

The most material line items impacted by the allocation of acquisition fair values are:

- Intangible assets (including IPR&D assets upon successful completion of the project and approval of the product) which are amortized to amortization expense over the expected life of the asset. Significant judgments are used in determining the estimated fair values assigned to the assets acquired and liabilities assumed and in determining estimates of useful lives of long-lived assets. Fair value determinations and useful life estimates are based on, among other factors, estimates of expected future net cash flows, estimates of appropriate discount rates used to present value expected future net cash flow streams, the timing of approvals for IPR&D projects and the timing of related product launch dates, the assessment of each asset's life cycle, the impact of competitive trends on each asset's life cycle and other factors. These judgments can materially impact the estimates used to allocate acquisition date fair values to assets acquired and liabilities assumed and the future useful lives. For these and other reasons, actual results may vary significantly from estimated results.

- Fixed asset valuations which are depreciated over the expected life of the asset. Significant judgments are used in determining the estimated fair values assigned to the assets acquired and in determining estimates of useful lives of long-lived assets. Fair value determinations and useful life estimates are based on, among other factors, estimates of expected future net cash flows, estimates of appropriate discount rates and intended uses of the assets.

- Inventory is recorded at fair market value factoring in selling price and costs to dispose. Inventory acquired is typically valued higher than replacement cost.

### Income Taxes

Income taxes are accounted for using an asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial statement and tax bases of assets and liabilities at the applicable tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred tax assets will not be realized. The Company evaluates the realizability of its deferred tax assets by assessing its valuation allowance and by adjusting the amount of such allowance, if necessary. The factors used to assess the likelihood of realization include the Company's forecast of future taxable income and available tax planning strategies that could be implemented to realize the net deferred tax assets. Failure to achieve forecasted taxable income in applicable tax jurisdictions could affect the ultimate realization of deferred tax assets and could result in an increase in the Company's effective tax rate on future earnings.

Income tax positions must meet a more-likely-than-not recognition threshold to be recognized. Income tax positions that previously failed to meet the more-likely-than-not threshold are recognized in the first financial reporting period in which that threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not threshold are derecognized in the first financial reporting period in which that threshold is no longer met. The Company recognizes potential accrued interest and penalties related to unrecognized tax benefits within the consolidated statements of operations as income tax expense.

*Comprehensive Income / (Loss)*

Comprehensive income / (loss) includes all changes in equity during a period except those that resulted from investments by or distributions to the Company's stockholders. Other comprehensive income / (loss) refers to revenues, expenses, gains and losses that are included in comprehensive income / (loss), but excluded from net income / (loss) as these amounts are recorded directly as an adjustment to stockholders' equity. The Company's other comprehensive income / (loss) is comprised of unrealized gains / (losses) on certain holdings of publicly traded equity securities, investments in U.S. treasury and agency securities and actuarial gains/(losses), net of realized gains / (losses) included in net income / (loss), net of tax and foreign currency translation adjustments.

*Earnings Per Share ("EPS")*

The Company accounts for EPS in accordance with ASC Topic 260, "Earnings Per Share" ("ASC 260") and related guidance, which requires two calculations of EPS to be disclosed: basic and diluted. Basic EPS is computed by dividing net (loss) / income by the weighted average ordinary shares outstanding during a period. Diluted EPS is based on the treasury stock method and includes the effect from potential issuance of Ordinary Shares, such as shares issuable pursuant to the exercise of stock options and restricted stock units. Ordinary share equivalents have been excluded where their inclusion would be anti-dilutive.  The calculation for diluted EPS for discontinued operations is computed using the basis of continuing operations.

A reconciliation of the numerators and denominators of basic and diluted EPS consisted of the following ($ in millions, except per share amounts):

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | | 2014 | | 2013 | |
| **Net income:** | | | | | | |
| Net income/(loss) attributable to ordinary shareholders | | | | | | |
| excluding income/(loss) from discontinued operations, net of tax | $ | (3,104.5) | $ | (2,407.1) | $ | (467.5) |
| Income / (loss) from discontinued operations, net of tax | | 6,787.7 | | 776.6 | | (282.9) |
| Net income/(loss) attributable to ordinary shareholders | $ | 3,683.2 | $ | (1,630.5) | $ | (750.4) |
| | | | | | | |
| **Basic weighted average ordinary shares outstanding** | | 367.8 | | 219.7 | | 142.3 |
| | | | | | | |
| **Basic EPS:** | | | | | | |
| Continuing operations | $ | (8.44) | $ | (10.96) | $ | (3.29) |
| Discontinued operations | $ | 18.45 | $ | 3.54 | $ | (1.98) |
| Net income / (loss) per share | $ | 10.01 | $ | (7.42) | $ | (5.27) |
| | | | | | | |
| **Diluted weighted average ordinary shares outstanding** | | 367.8 | | 219.7 | | 142.3 |
| | | | | | | |
| **Diluted EPS:** | | | | | | |
| Continuing operations | $ | (8.44) | $ | (10.96) | $ | (3.29) |
| Discontinued operations | $ | 18.45 | $ | 3.54 | $ | (1.98) |
| Net income / (loss) per share | $ | 10.01 | $ | (7.42) | $ | (5.27) |

Stock awards to purchase 5.2 million ordinary shares for the year ended December 31, 2015 were outstanding, but not included in the computation of diluted EPS, because the awards were anti-dilutive for continuing operations and as such the treatment for discontinued operations is also anti-dilutive. The weighted average impact of ordinary share equivalents of 13.6 million for the year ended December 31, 2015, which are anticipated to result from the mandatory conversion of the Company's preferred shares were not included in the calculation of diluted EPS as their impact would be anti-dilutive.

Stock awards to purchase/acquire 3.0 million and 2.1 million ordinary shares for the year ended December 31, 2014 and 2013, respectively, were outstanding, but not included in the computation of diluted EPS, because the awards were anti-dilutive for continuing operations and as such the treatment for discontinued operations is also anti-dilutive.

### Employee Benefits

#### Defined Contribution Plans

The Company has defined contribution plans that are post-employment benefit plans under which the Company pays fixed contributions to a separate entity and has no legal or constructive obligation to pay further amounts. Obligations for contributions to the defined contribution plans are recognized as an employee benefit expense in the consolidated statement of operations in the periods during which the related services were rendered.

#### Defined Benefit Plans

The Company recognizes the overfunded or underfunded status of each of its defined benefit plans as an asset or liability on its consolidated balance sheets. The obligations are generally measured at the actuarial present value of all benefits attributable to employee service rendered, as provided by the applicable benefit formula. The estimates of the obligation and related expense of these plans recorded in the financial statements are based on certain assumptions. The most significant assumptions relate to discount rate and expected return on plan assets. Other assumptions used may include employee demographic factors such as compensation rate increases, retirement patterns, expected employee turnover and participant mortality rates. The difference between these assumptions and actual experience results in the recognition of an asset or liability based upon a net actuarial (gain) / loss. If the total net actuarial (gain) / loss included in accumulated other comprehensive (loss) / income exceeds a threshold of 10% of the greater of the projected benefit obligation or the market related value of plan assets, it is subject to amortization and recorded as a component of net periodic pension cost over the average remaining service lives of the employees participating in the pension plan. Net periodic benefit costs are recognized in the consolidated statement of operations.

#### Share-based Compensation

The Company has adopted several equity award plans which authorize the granting of options, restricted shares, restricted stock units and other forms of equity awards of the Company's ordinary shares, subject to certain conditions.

The Company grants awards with the following features:

- Time-based vesting restricted stock awards;
- Performance-based restricted stock awards measured to the EBITDA, as defined, of the Company or other performance-based targets defined by the Company;
- Performance-based restricted stock awards measured to the Total Stockholders Return, compared to pre-defined metrics;
- Non-qualified options to purchase outstanding shares; and
- Cash-settled awards recorded as a liability. These cash settled awards are based on pre-established earnings per share, total shareholder returns and cost savings targets and the fair value is marked-to-market each reporting period.

The Company recognizes share-based compensation expense for the granted awards over the applicable vesting period, net of estimated forfeitures. Estimates of anticipated vesting of awards are revised in future periods based on actual forfeiture rates and targets achieved. Such revisions may have a material impact on the results of operations.

#### Restructuring Costs

The Company records liabilities for costs associated with exit or disposal activities in the period in which the liability is incurred. In accordance with existing benefit arrangements, employee severance costs are accrued when the restructuring actions are probable and estimable. Costs for one-time termination benefits in which the employee is required to render service until termination in order to receive the benefits are recognized ratably over the future service period. The Company also incurs costs with contract terminations and costs of transferring products as part of restructuring activities. Refer to "NOTE 22 — Business Restructuring Charges" for more information.

*Recent Accounting Pronouncements*

On May 28, 2014, the FASB issued Accounting Standards Update No. 2014-09, Revenue from Contracts with Customers (Topic 606), with an effective date for annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period, for public business entities, certain not-for-profit entities, and certain employee benefit plans. The effective date for ASU 2014-09 was deferred by one year through the issuance of ASU 2015-14, Revenue from Contracts with Customers – Deferral of the Effective Date, to annual reporting periods beginning after December 15, 2017, including interim reporting periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. The Company is evaluating the impact, if any, the pronouncement will have on both historical and future financial positions and results of operations.

In January 2015, the FASB issued ASU No. 2015-01 "Income Statement – Extraordinary and Unusual Items (Subtopic 225-20)." to eliminate the concept of extraordinary items. As a result, an entity will no longer (i) segregate an extraordinary item for the results of ordinary operations; (ii) separately present an extraordinary item on its income statement, net of tax, after income from continuing operations; and (iii) disclose income taxes and earnings-per-share data applicable to an extraordinary item. However, the ASU does not affect the reporting and disclosure requirements for an event that is unusual in nature or that occurs infrequently. The guidance is for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. A reporting entity may apply the amendments prospectively. A reporting entity also may apply the amendments retrospectively to all prior periods presented in the financial statements. Early adoption is permitted provided that the guidance is applied from the beginning of the fiscal year of adoption. The effective date is the same for both public business entities and all other entities. The adoption of this guidance is not anticipated to have a material impact on the Company's financial position or results of operations.

In April 2015, the FASB issued guidance which changes the classification of debt issuance costs from being an asset on the balance sheet to netting the costs against the carrying value of the debt. This guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2015. The impact of the adoption of this guidance will decrease "prepaid expenses and other current assets" and "current portion of long-term debt and capital leases" by $36.3 million as well as "investments and other assets" and "long-term debt and capital leases" by $159.5 million.

In May 2015, the FASB issued ASU No. 2015-07, "Fair Value Measurement: Topic 820 Disclosures for Investments in Certain Entities That Calculate Net Asset Value per Share (or its Equivalent)." The amendments remove the requirement to categorize within the fair value hierarchy all investments for which fair value is measured using the net asset value per share practical expedient. The amendments also remove the requirement to make certain disclosures for all investments that are eligible to be measured at fair value using the net asset value per share practical expedient. Rather, those disclosures are limited to investments for which the entity has elected to measure the fair value using that practical expedient. The amendments are effective for fiscal years beginning after December 15, 2015, and interim periods within those fiscal years. The adoption of this guidance is not anticipated to have a material impact on the Company's financial position or results of operations.

In July 2015, the FASB issued ASU No. 2015-12 "Plan Accounting: Defined Benefit Pension Plans (Topic 960), Defined Contribution Pensions Plans (Topic 962) and Health and Welfare Benefit Plans (Topic 965)." GAAP requires plans to disclose (i) individual investments that represent five percent or more of net assets available for benefits and (ii) the net appreciation or depreciation for investments by general type. Stakeholders said that while less costly to prepare, those disclosures do not provide decision-useful information. The amendments in this update will eliminate those requirements for both participant-directed investments and nonparticipant-directed investments. Plan investments need to be disaggregated only by general type within the statement of net assets available for benefits or within the footnotes and no longer required to provide the disclosures by investment class. The net appreciation or depreciation in investments for the period still will be required to be presented in the aggregate, but will no longer be required to be disaggregated and disclosed by general type. The guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2015. The adoption of this guidance is not anticipated to have a material impact on the Company's financial position or results of operations.

On September 25, 2015, the FASB issued Accounting Standards Update 2015-16 (ASU 2015-16), which changes the requirement to restate prior period financial statements for measurement period adjustments. The new guidance requires that measurement period adjustments be recognized in the reporting period in which the adjustment amount is determined. This includes the cumulative impact of measurement period adjustments on current and prior periods. The cumulative adjustment would be reflected within the respective financial statement line items affected. The adoption of this guidance is not anticipated to have a material impact on the Company's financial position or results of operations.

In November 2015, the FASB ASU No. 2015-17 "Income Taxes (Topic 704): Balance Sheet Classification of Deferred Taxes." The amendments require that deferred tax liabilities and assets be classified as noncurrent in a classified statement of financial position. The amendments apply to all entities that present a classified statement of financial position. The current requirement that

F-27

deferred tax liabilities and assets of a tax-paying component of an entity be offset and presented as a single amount is not affected by the amendments in this update. The Company has elected to adopt this guidance in the year ended December 31, 2015 and prior balance sheets were not retrospectively adjusted. The total current deferred tax assets of $500.3 million included in current deferred tax assets and assets held for sale and current deferred tax liabilities of $47.3 million included in deferred tax liabilities and current liabilities held for sale were not reclassified in 2014.

### NOTE 5 — Business Development

During the years ended December 31, 2015, 2014 and 2013, the Company acquired material assets and businesses. The unaudited pro forma results of the businesses acquired that materially impacted the reported results of the Company are as follows ($ in millions except per share information):

| | Year Ended December 31, 2015 (unaudited) | | | | | |
| | As reported | | Allergan Acquisition | | Pro Forma | |
|---|---|---|---|---|---|---|
| Net Revenue | $ | 15,071.0 | $ | 1,523.0 | $ | 16,594.0 |
| Net income attributable to ordinary shareholders | $ | 3,683.2 | $ | 377.7 | $ | 4,060.9 |
| Net income per share | | | | | | |
| Basic | $ | 10.01 | | | $ | 10.32 |
| Diluted | $ | 10.01 | | | $ | 10.32 |

| | Year Ended December 31, 2014 (unaudited) | | | | | | | |
| | As reported | | Allergan Acquisition | | Forest Acquisition | | Pro Forma | |
|---|---|---|---|---|---|---|---|---|
| Net Revenue | $ | 6,738.9 | $ | 7,225.4 | $ | 2,239.8 | $ | 16,204.1 |
| Net (loss) / income attributable to ordinary shareholders | $ | (1,630.5) | $ | (3,067.8) | $ | 146.1 | $ | (4,552.2) |
| Net (loss) per share | | | | | | | | |
| Basic | $ | (7.42) | | | | | $ | (11.66) |
| Diluted | $ | (7.42) | | | | | $ | (11.66) |

| | Year Ended December 31, 2013 (unaudited) | | | | | | | |
| | As reported | | Forest Acquisition | | Warner Chilcott Acquisition | | Pro Forma | |
|---|---|---|---|---|---|---|---|---|
| Net Revenue | $ | 2,602.5 | $ | 3,876.8 | $ | 1,646.6 | $ | 8,125.9 |
| Net (loss) / income attributable to ordinary shareholders | $ | (750.4) | $ | (2,261.4) | $ | 518.2 | $ | (2,493.6) |
| Net (loss) per share | | | | | | | | |
| Basic | $ | (5.27) | | | | | $ | (9.51) |
| Diluted | $ | (5.27) | | | | | $ | (9.51) |

### 2015 Significant Business Developments

During 2015, the following business development transactions impacted our results of operations and will continue to have an impact on our future results of operations.

### Acquisitions

#### AqueSys

On October 16, 2015, the Company acquired AqueSys, Inc. ("AqueSys"), a private, clinical-stage medical device company focused on developing ocular implants that reduce intraocular pressure ("IOP") associated with glaucoma, in an all-cash transaction. Under the terms of the agreement, the Company acquired AqueSys for an acquisition accounting purchase price of $298.9 million, including $193.5 million for the estimated fair value of contingent consideration relating to the regulatory approval and commercialization milestone payments. The Company acquired AqueSys for the lead development program, including XEN45, a soft shunt that is implanted in the sub conjunctival space in the eye through a minimally invasive procedure with a single use, pre-loaded proprietary injector (the "AqueSys Acquisition").

*Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date. As of December 31, 2015, certain amounts relating to the valuation of tax related matters, contingent consideration and intangible assets have not been finalized. The finalization of these matters may result in changes to goodwill.

The following table summarizes the preliminary fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

| | Amount |
|---|---|
| Cash and cash equivalents | $ 6.2 |
| Current assets | 1.2 |
| IPR&D intangible assets | 302.0 |
| Intangible assets | 221.0 |
| Goodwill | 138.5 |
| Current liabilities | (6.9) |
| Contingent consideration | (193.5) |
| Deferred tax liabilities, net | (169.6) |
| **Net assets acquired** | **$ 298.9** |

*IPR&D and Intangible Assets*

IPR&D intangible assets represent the value assigned to acquired R&D projects that, as of the acquisition date, had not established technological feasibility and had no alternative future use. The IPR&D intangible assets are capitalized and accounted for as indefinite-lived intangible assets and will be subject to impairment testing until completion or abandonment of the projects. Upon successful completion of each project and launch of the product, the Company will make a separate determination of the estimated useful life of the IPR&D intangible asset and the related amortization will be recorded as an expense over the estimated useful life ("IPR&D Acquisition Accounting").

The estimated fair value of the IPR&D and identifiable intangible assets was determined using the "income approach," which is a valuation technique that provides an estimate of the fair value of an asset based on market participant expectations of the cash flows an asset would generate over its remaining useful life. Some of the more significant assumptions inherent in the development of those asset valuations include the estimated net cash flows for each year for each asset or product (including net revenues, cost of sales, R&D costs, selling and marketing costs and working capital/asset contributory asset charges), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, the assessment of each asset's life cycle, the potential regulatory and commercial success risks, competitive trends impacting the asset and each cash flow stream as well as other factors (the "IPR&D and Intangible Asset Valuation Technique").

The fair value of the currently marketed product ("CMP") and IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for CMP and IPR&D intangible assets was 21.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. The discount rate of the acquisition was driven by the early stage of the product and the therapeutic indication. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results. The CMP intangible asset will be amortized over a period of 12.2 years.

*Goodwill*

Goodwill from the AqueSys Acquisition of $138.5 million, of which $50.5 million was assigned to the US Brands segment and $88.0 million was assigned to the International Brands segment. The goodwill arose in part, due to anticipated efficiencies in marketing the CMP asset in our International Brands and US Brands segments where we have an established infrastructure.

*Contingent Consideration*

As part of the acquisition, the Company is required to pay the former shareholders of AqueSys amounts based on the launch, labeling, and sales of the product. The Company estimated the acquisition accounting fair value of the contingent consideration to be $193.5 million using a probability weighted approach that considered the possible outcomes of the scenarios relating to the specified product.

*Long-Term Deferred Tax Liabilities and Other Tax Liabilities*

Long-term deferred tax liabilities and other tax liabilities result from identifiable intangible assets fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

**Northwood Medical Innovation**

On October 1, 2015, the Company completed the Northwood Acquisition under which we acquired earFold™ which is a medical device for the correction of prominent ears, with or without asymmetry, in patients aged 7 years and older. earFold™ received a Conformité Européene ("CE") mark in April 2015, and has been made available by Northwood Medical Innovation Ltd to trained and accredited plastic surgeons, otolaryngologists (Ear, Nose and Throat) and maxillo-facial surgeons, primarily in the United Kingdom ("UK"). The Company acquired Northwood Medical Innovation Ltd. for acquisition accounting purchase price consideration of $25.5 million (the "Northwood Acquisition"), including $15.0 million of contingent consideration.

*Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date. As of December 31, 2015, certain amounts relating to the valuation of tax related matters, contingent consideration and intangible assets have not been finalized. The finalization of these matters may result in changes to goodwill.

The following table summarizes the preliminary fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
| --- | --- |
| Cash and cash equivalents | $ 0.5 |
| IPR&D intangible assets | 13.6 |
| Intangible assets | 19.5 |
| Goodwill | 13.6 |
| Other assets and liabilities | (0.1) |
| Contingent consideration | (15.0) |
| Deferred tax liabilities, net | (6.6) |
| **Net assets acquired** | **$ 25.5** |

*IPR&D and Intangible Assets*

The fair value of the CMP and IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for CMP and IPR&D intangible assets was 15.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

*Goodwill*

Goodwill from the acquisition of $13.6 million was assigned to the International Brands segment. The goodwill arose in part, due to anticipated efficiencies in marketing the CMP asset in our International Brands segment where we have an established infrastructure.

*Contingent Consideration*

As part of the acquisition, the Company is required to pay the former shareholders of Northwood Medical Innovation Ltd. amounts based on the sales of the product. The Company estimated the acquisition accounting fair value of the contingent consideration to be $15.0 million using a probability weighted approach that considered the possible outcomes of the scenarios relating to the specified product.

F-30

*Long-Term Deferred Tax Liabilities and Other Tax Liabilities*

Long-term deferred tax liabilities and other tax liabilities result from identifiable intangible assets fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

### Kythera

On October 1, 2015, the Company acquired Kythera Biopharmaceuticals ("Kythera"), for $75 per share, or an acquisition accounting purchase price of $2,089.5 million (the "Kythera Acquisition"), which is being accounted for as a business acquisition. Kythera was focused on the discovery, development and commercialization of novel prescription aesthetic products. Kythera's lead product, Kybella® injection, is the first and only FDA approved, non-surgical treatment for moderate to severe submental fullness, commonly referred to as double chin.

*Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date. As of December 31, 2015, certain amounts relating to the valuation of tax related matters, and intangible assets have not been finalized. The finalization of these matters may result in changes to goodwill.

The following table summarizes the preliminary fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
|---|---:|
| Cash and cash equivalents | $ 78.1 |
| Marketable securities | 79.9 |
| Inventories | 18.2 |
| Other current assets | 14.5 |
| IPR&D intangible assets | 320.0 |
| Intangible assets | 2,120.0 |
| Goodwill | 328.7 |
| Other current liabilities | (48.6) |
| Deferred tax, net | (766.7) |
| Outstanding indebtedness | (54.6) |
| Net assets acquired | $ 2,089.5 |

*IPR&D and Intangible Assets*

The fair value of the IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for CMP was 8.5% and for IPR&D intangible assets was 9.5% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results. The CMP intangible asset will be amortized over a period of 17.3 years.

*Goodwill*

Goodwill from the Kythera Acquisition of $208.7 million was assigned to the US Medical Aesthetics segment and $120.0 million assigned to International Brands segment. The goodwill arose in part, due to anticipated efficiencies in marketing the CMP asset where we have an established infrastructure and is not deductible for tax purposes.

*Long-Term Deferred Tax Liabilities and Other Tax Liabilities*

Long-term deferred tax liabilities and other tax liabilities result from identifiable intangible assets fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

*Oculeve*

On August 10, 2015, the Company acquired Oculeve, Inc. ("Oculeve"), a development-stage medical device company focused on developing novel treatments for dry eye disease. Under the terms of the agreement, Allergan acquired Oculeve for an acquisition accounting purchase price of $134.5 million (the "Oculeve Acquisition"), including $90.0 million for the estimated fair value of contingent consideration of which the Company may owe up to $300.0 million in future payments. The Company acquired Oculeve and its lead product candidate OD-01, an intranasal neurostimulation device, as well as other dry eye products in development.

*Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
|---|---|
| Cash and cash equivalents | $ 1.6 |
| IPR&D intangible assets | 286.0 |
| Goodwill | 33.3 |
| Other assets and liabilities | (1.9) |
| Contingent consideration | (90.0) |
| Deferred tax liabilities, net | (94.5) |
| Net assets acquired | $ 134.5 |

*IPR&D and Intangible Assets*

The fair value of the IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for IPR&D intangible assets was 11.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

*Goodwill*

Among the primary reasons the Company acquired Oculeve and factors that contributed to the preliminary recognition of goodwill were to expand the Company's pipeline of eye care products. Goodwill from the Oculeve Acquisition of $33.3 millionwas assigned to the US Brands segment and is not deductible for tax purposes.

*Contingent Consideration*

As part of the acquisition, the Company is required to pay the former shareholders of Oculeve amounts based on the launch, labeling, and sales of the product. The Company estimated the acquisition accounting fair value of the contingent consideration to be $90.0 million using a probability weighted approach that considered the possible outcomes of the scenarios relating to the specified product.

*Long-Term Deferred Tax Liabilities and Other Tax Liabilities*

Long-term deferred tax liabilities and other tax liabilities result from identifiable intangible assets fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

*Auden Mckenzie*

On May 29, 2015, the Company acquired Auden Mckenzie Holdings Limited ("Auden"), a company specializing in the development, licensing and marketing of niche generic medicines and proprietary brands in the UK and across Europe for approximately 323.7 million British Pounds, or $495.9 million (the "Auden Acquisition"). The assets and liabilities acquired, as well as the results of operations for the acquired Auden business are part of the assets being divested in the Teva Transaction and are

F-32

included as a component of income from discontinued operations.  In addition the acquired financial position is included in assets and liabilities held for sale.

*Recognition and Measurement of Assets Acquired and Liabilities Assumed at Fair Value*

The Auden Acquisition has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date. As of December 31, 2015, certain amounts relating to the valuation of tax-related matters, intangible assets and inventory have not been finalized. The following table summarizes the preliminary fair values of the tangible and identifiable intangible assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
|---|---|
| Cash and cash equivalents | $ 32.2 |
| Inventory | 49.1 |
| IPR&D intangible assets | 38.6 |
| Intangible assets | 342.4 |
| Goodwill | 123.3 |
| Other assets and liabilities | 7.2 |
| Contingent consideration | (17.3) |
| Deferred tax liabilities, net | (79.6) |
| **Net assets acquired** | **$ 495.9** |

*IPR&D and Intangible Assets*

The fair value of the IPR&D and CMP intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value of CMPs was 15.0% and for IPR&D intangible assets was 16.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

The acquired intangible assets represent generic products with multiple useful lives across multiple therapeutic areas.

*Goodwill*

Among the primary reasons the Company acquired Auden and factors that contributed to the preliminary recognition of goodwill were to expand the Company's pipeline of generics products.  Goodwill from the Auden Acquisition of $123.3 million is included as a component of assets held for sale.

*Contingent Consideration*

As part of the acquisition, the Company is required to pay royalties based on the sales of hydrocortisone. The Company estimated the acquisition accounting fair value of the contingent consideration to be $17.3 million using a probability weighted approach that considered the possible outcomes of the scenarios relating to the specified product.

*Allergan*

On March 17, 2015, the Company completed the Allergan Acquisition.  The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complements the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefited from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox[®] and Restasis[®]. The transaction also expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

*Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

F-33

The following table summarizes the final fair values of the assets acquired and liabilities assumed at the acquisition date and reflects purchase accounting adjustments subsequent to the acquisition date ($ in millions):

| | Preliminary Amount as of March 31, 2015 | Measurement Period Adjustments | Final Amount as of December 31, 2015 |
|---|---|---|---|
| Cash and cash equivalents | $ 5,424.5 | $ - | $ 5,424.5 |
| Accounts receivable | 962.7 | (14.0) | 948.7 |
| Inventories | 1,223.2 | (4.6) | 1,218.6 |
| Other current assets | 318.8 | - | 318.8 |
| Property, plant and equipment, net | 1,202.5 | 12.0 | 1,214.5 |
| Other long-term assets | 189.3 | 6.8 | 196.1 |
| IPR&D intangible assets | 11,010.0 | (1,310.0) | 9,700.0 |
| Intangible assets | 45,050.5 | - | 45,050.5 |
| Goodwill | 26,368.5 | 720.4 | 27,088.9 |
| Current liabilities | (1,212.2) | (9.9) | (1,222.1) |
| Contingent consideration | (379.1) | (4.6) | (383.7) |
| Deferred tax liabilities, net | (12,512.9) | 632.8 | (11,880.1) |
| Other taxes payable | (82.4) | (28.9) | (111.3) |
| Other long-term liabilities | (622.0) | - | (622.0) |
| Outstanding indebtedness | (2,183.5) | - | (2,183.5) |
| Net assets acquired | $ 74,757.9 | $ - | $ 74,757.9 |

The measurement period adjustments for IPR&D intangible assets relate to the Company's review of patent lives, contract terms and revised cash flow assumptions.

*Consideration*

The total consideration for the Allergan Acquisition of $74.8 billion is comprised of the equity value of shares that were outstanding and vested prior to March 17, 2015 of $33.9 billion, the portion of outstanding equity awards deemed to have been earned as of March 17, 2015 of $0.8 billion and cash of $40.1 billion. The portion of outstanding equity awards deemed not to have been earned of $843.1 million as of March 17, 2015 will be expensed over the remaining future vesting period, including $516.2 million in the year ended December 31, 2015.

*Inventories*

The fair value of inventories acquired included an acquisition accounting fair market value step-up of $923.9 million. In the year ended December 31, 2015, the Company recognized $902.3 million as a component of cost of sales as the inventory acquired was sold to the Company's customers. Included in finished goods inventory as of December 31, 2015, was $21.6 million, relating to the remaining fair value step-up associated with the Allergan Acquisition.

*IPR&D and Intangible Assets*

The fair value of the intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value at the acquisition date of CMPs was 10.0% and for IPR&D intangibles ranged from 10.0% to 11.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

The following table identifies the summarized amounts recognized and the weighted average useful lives using the economic benefit of intangible assets ($ in millions):

| | Amount recognized as of the acquisition date | Weighted average useful lives (years) |
|---|---|---|
| *Definite-lived assets* | | |
| Restasis® | $ 3,970.0 | 4.0 |
| Refresh® / Optive® | 2,720.0 | 7.6 |
| Other Eye Care Products | 6,690.0 | 4.2 |
| Botox® | 22,600.0 | 8.0 |
| Aczone® | 160.0 | 1.3 |
| Other Skin Products | 820.0 | 5.0 |
| Other Aesthetics | 6,350.0 | 6.0 |
| **Total CMP** | 43,310.0 | 6.7 |
| Trade name | 690.0 | 4.5 |
| Customer relationships | 1,050.5 | 3.4 |
| **Total definite-lived assets** | 45,050.5 | 6.6 |
| *In-process research and development* | | |
| Eye Care | 5,500.0 | |
| Botox® | 810.0 | |
| Aesthetics | 2,270.0 | |
| Other | 1,120.0 | |
| **Total IPR&D** | 9,700.0 | |
| **Total intangible assets** | $ 54,750.5 | |

*Goodwill*

Among the primary reasons the Company acquired Allergan and factors that contributed to the preliminary recognition of goodwill were to expand the Company's product portfolio, and to acquire certain benefits from the Legacy Allergan pipeline and the expectation of certain synergies. The goodwill recognized from the Allergan Acquisition, which includes the increase in the purchase price resulting from the movement in Allergan plc's share price from the date of announcing the deal, until the date of acquisition, is not deductible for tax purposes. Goodwill from the Allergan Acquisition of $15,352.0 million, $3,798.0 million, and $7,938.9 million was assigned to the US Brands, US Medical Aesthetics, and International Brands segments, respectively.

*Contingent Consideration*

The Company acquired certain contingent obligations classified as contingent consideration related to historical business combinations. Additional consideration is conditionally due upon the achievement of certain milestones in respect to the development and commercialization of the products as well as reaching certain sales targets. The Company estimated the fair value of the contingent consideration acquired to be $383.7 million using a probability weighting approach that considered the possible outcomes based on assumptions related to the timing and probability of the product launch date, discount rates matched to the timing of first payment, and probability of success rates and discount adjustments on the related cash flows.

*Retirement Plans*

The Company acquired post-retirement plans as part of the Allergan Acquisition including defined benefit pension plans in the United States and Europe which had a net liability balance of $302.6 million. As of March 17, 2015, the Allergan Inc. defined benefit pension plans had assets with a fair value of $1,042.0 million, which included cash and cash equivalents of $13.6 million, equity securities of $480.1 million, and fixed income securities of $548.3 million. The Company assumed other post-retirement benefit obligations with defined benefits of $60.2 million. In addition, the Company acquired other benefit obligations which had an acquisition date fair value of assets of $117.1 million and an acquisition date fair value of liabilities of $120.0 million. Prior to the Allergan Acquisition, Legacy Allergan froze most of their defined benefit plans. As a result, the company anticipates deminimis service costs in its statement of operations.

*Deferred Tax Liabilities, Net*

Deferred tax liabilities, net, include the impact resulting from identifiable intangible assets and inventory fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

*Acquisition-Related Expenses*

As a result of the acquisition, the Company incurred the following transaction and integration costs in the year ended December 31, 2015 ($ in millions):

|  | | Year Ended December 31, 2015 |
|---|---|---|
| **Cost of sales** | | |
| Stock-based compensation acquired for Legacy Allergan employees | $ | 22.5 |
| Acquisition, integration and restructuring related charges | | 14.9 |
| **Research and development** | | |
| Stock-based compensation acquired for Legacy Allergan employees | | 124.8 |
| Acquisition, integration and restructuring related charges | | 83.5 |
| **Selling and marketing** | | |
| Stock-based compensation acquired for Legacy Allergan employees | | 110.0 |
| Acquisition, integration and restructuring related charges | | 75.7 |
| **General and administrative** | | |
| Stock-based compensation acquired for Legacy Allergan employees | | 258.9 |
| Acquisition related expenditures | | 65.5 |
| Acquisition, integration and restructuring related charges | | 298.6 |
| **Other (expense) income** | | |
| Bridge loan facilities expense | | (264.9) |
| Interest rate lock | | 30.9 |
| **Total transaction and integration costs** | $ | 1,288.4 |

**Licenses and Asset Acquisitions**

*Mimetogen*

On November 4, 2015, the Company entered into an exclusive licensing agreement with Mimetogen Pharmaceuticals ("Mimetogen"), a clinical stage biotechnology company, to develop and commercialize tavilermide (MIM-D3), a topical formulation of a novel small molecule TrkA agonist for the treatment of dry eye disease, in exchange for an upfront payment of $50.0 million to Mimetogen, which is included as a component of R&D expenses in the year ended December 31, 2015. Mimetogen will be entitled to receive potential commercial milestones based on the achieving regulatory approval and predefined product labeling of the product. In addition, Mimetogen is entitled to receive one-time annual sales based milestone payments based on multiple pre-defined annual net sales thresholds which may or may not be received, and tiered royalties based on net sales to third parties of the licensed products (the "Mimetogen Transaction"). The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the transaction did not qualify as a business.

*Almirall*

On October 27, 2015, the Company and Ironwood Pharmaceuticals, Inc. announced that Allergan has acquired rights to Constella® (linaclotide) in the European Union, Switzerland, Turkey and the Commonwealth of Independent States from Almirall, S.A. and has also reacquired rights to Linzess® (linaclotide) in Mexico from Almirall for €60.0 million. The consideration was accounted for as an asset acquisition and included as a component of intangible assets. The Company concluded based on the lack of acquired employees and the lack of certain other inputs and processes that the transaction did not qualify as a business.

*Naurex*

On August 28, 2015, the Company acquired certain products in early stage development of Naurex, Inc. ("Naurex") in an all-cash transaction of $571.7 million (the "Naurex Transaction"), plus future contingent payments up to $1,150.0 million, which was accounted for as an asset acquisition. The Company recognized the upfront consideration of $571.7 million as a component of R&D

F-36

expenses in the year ended December 31, 2015.  The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the transaction did not qualify as a business. The Naurex Transaction expands our pipeline with Naurex's two leading product candidates GLYX-13 and NRX-1074, two compounds that utilize NMDA modulation as a potential new approach to the treatment of Major Depressive Disorder ("MDD"), a disease that can lead to suicidality among the most severe patients.

### Migraine License

On August 17, 2015, the Company entered into an agreement with Merck & Co. ("Merck") under which the Company acquired the exclusive worldwide rights to Merck's early development stage investigational small molecule oral calcitonin gene-related peptide receptor antagonists, which are being developed for the treatment and prevention of migraines (the "Merck Transaction"). The transaction is being accounted for as an asset acquisition. The Company acquired these rights for an upfront charge of $250.0 million which was recognized as a component of R&D expenses in the year ended December 31, 2015.  The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the transaction did not qualify as a business.  The Company paid $125.0 million in the year ended December 31, 2015 and the remaining $125.0 million is payable on April 30, 2016.  Additionally, Merck is owed contingent payments based on commercial and development milestones of up to $965.0 million as well as royalties.

## Divestitures

### Respiratory Business

As part of the Forest Acquisition (defined below), we acquired certain assets that comprised Legacy Forest's branded respiratory business in the U.S. and Canada (the "Respiratory Business"). During the year ended December 31, 2014, we held for sale respiratory assets of $734.0 million, including allocated goodwill to this unit of $309.1 million. On March 2, 2015, the Company sold the Respiratory Business to AstraZeneca plc ("AstraZeneca") for consideration of $600.0 million upon closing, additional funds to be received for the sale of certain of our inventory to AstraZeneca and low single-digit royalties above a certain revenue threshold. AstraZeneca also paid Allergan an additional $100.0 million and Allergan has agreed to a number of contractual consents and approvals, including certain amendments to the ongoing collaboration agreements between AstraZeneca and Allergan (the "Respiratory Sale").  As a result of the final terms of the agreement, in the year ended December 31, 2015, the Company recognized an incremental charge in cost of sales (including the acquisition accounting fair value mark-up of inventory) relating to inventory that will not be sold to AstraZeneca of $35.3 million. The Company recognized a loss in other (expense) income, net for the sale of the business of $5.3 million in the year ended December 31, 2015.

### Pharmatech

As part of the Forest Acquisition, the Company acquired certain manufacturing plants and contract manufacturing agreements within the business known as Aptalis Pharmaceutical Technologies ("Pharmatech"). In accordance with acquisition accounting, the assets were fair valued on July 1, 2014 as assets held in use, including market participant synergies anticipated under the concept of "highest and best use." During the fourth quarter of 2014, the decision was made to hold these assets for sale as one complete unit, without integrating the unit and realizing anticipated synergies. During the year ended December 31, 2014, the Company recognized an impairment on assets held for sale of $189.9 million (the "Pharmatech Transaction") which included a portion of goodwill allocated to this business unit. In the year ended 2015, the Company completed the divestiture of the Pharmatech business and there was no material impact to the Company's results of operations.

## 2014 Transactions

The following are the material transactions that were completed in the year ended December 31, 2014.

### Acquisitions

### Durata Therapeutics

On November 17, 2014, the Company completed its tender offer to purchase all of the outstanding shares of Durata Therapeutics, Inc. ("Durata"), an innovative pharmaceutical company focused on the development and commercialization of novel therapeutics for patients with infectious diseases and acute illnesses (the "Durata Acquisition"). Allergan purchased all outstanding shares of Durata, which were valued at approximately $724.5 million, including the assumption of debt. Additionally, there is one contingent value right ("CVR") per share, entitling the holder to receive additional cash payments of up to $5.00 per CVR if certain regulatory or commercial milestones related to Durata's lead product Dalvance™ are achieved. The CVR had an acquisition date fair value of $49.0 million.

*Recognition and Measurement of Assets Acquired and Liabilities Assumed at Fair Value*

The Durata Acquisition has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date. The following table summarizes the fair values of the tangible and identifiable intangible assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
| --- | --- |
| Cash and cash equivalents | $ 17.8 |
| Inventory | 21.0 |
| IPR&D intangible assets | 249.0 |
| Intangible assets | 480.0 |
| Goodwill | 75.8 |
| Other assets and liabilities | (30.2) |
| Contingent consideration | (49.0) |
| Deferred tax liabilities, net | (39.9) |
| Outstanding indebtedness | (67.0) |
| Net assets acquired | $ 657.5 |

*IPR&D and Intangible Assets*

The fair value of the IPR&D and CMP intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value of CMPs was 9.5% and for IPR&D intangible assets was 10.5% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

*Goodwill*

Goodwill resulting from the Durata Acquisition is assigned to our US Brands segment and is not deductible for tax purposes. Among the primary reasons the Company acquired Durata and the factors that contributed to the recognition of goodwill is the strategic fit of Dalvance™ into our specialty brand portfolio.

*Contingent Consideration*

At the time of the acquisition, additional consideration was conditionally due to the seller based upon the approval of Dalvance® in Europe, the approval of a single dose indication or the product reaching certain sales milestones. The Company estimated the acquisition accounting fair value of the contingent consideration to be $49.0 million using a probability weighted approach that considered the possible outcomes based on assumptions related to the timing and probability of the product launch date, discount rates matched to the timing of the payment, and probability of success rates and discount adjustments on the related cash flows. On March 2, 2015, the Company announced that the European Commission has granted Allergan's subsidiary Durata Therapeutics International B.V., marketing authorization for Xydalba™ (dalbavancin) for the treatment of acute bacterial skin and skin structure infections (ABSSSI) in adults. The approval triggered the first CVR payment. The difference between the fair value of the CVR on the date of acquisition of $24.5 million and the payment made of $30.9 million, or $6.4 million, was recorded as an operating expense in the year ended December 31, 2015. In January 2016, the Company received approval from the FDA for an expanded label will include a single dose of Dalvance®, which triggers a second CVR payment in the year ended December 31, 2016.

*Long-Term Deferred Tax Liabilities and Other Tax Liabilities*

Long-term deferred tax liabilities and other tax liabilities result from identifiable intangible assets fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

*Furiex*

On July 2, 2014, the Company acquired Furiex Pharmaceuticals, Inc. ("Furiex") in an all-cash transaction (the "Furiex Acquisition") valued at $1,156.2 million (including the assumption of debt) and up to approximately $360.0 million in a CVR payable based on which controlled substance schedule designation that eluxadoline, Furiex's lead product, receives following approval, which had an acquisition accounting fair value of $88.0 million on the date of acquisition (included in the value of $1,156.2 million). In the second quarter of 2015, the Company received approval from the FDA of the eluxadoline product, Viberzi®.

Viberzi® is a first-in-class, locally-acting mu opioid receptor agonist and delta opioid receptor antagonist for treating symptoms of diarrhea-predominant irritable bowel syndrome (IBS-d), a condition that affects approximately 28 million patients in the United States and Europe. In connection with the close of the Furiex Acquisition, the Company further announced that it closed the transaction related to the sale of Furiex's royalties on Alogliptin and Priligy® to Royalty Pharma for $408.6 million in cash consideration.

*Recognition and Measurement of Assets Acquired and Liabilities Assumed at Fair Value*

The Furiex Acquisition has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the final fair values of the tangible and identifiable intangible assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
|---|---:|
| Cash and cash equivalents | $ 14.9 |
| IPR&D intangible assets | 1,003.0 |
| Intangible assets | 408.6 |
| Goodwill | 251.9 |
| Other assets and liabilities | (30.1) |
| Contingent consideration | (88.0) |
| Deferred tax liabilities, net | (404.1) |
| Outstanding indebtedness | (55.3) |
| **Net assets acquired** | **$ 1,100.9** |

*IPR&D and Intangible Assets*

The fair value of the IPR&D and CMP intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value of IPR&D intangible assets as of the acquisition date was 9.9% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results. As a result of this transaction, the Company recognized IPR&D of $1,003.0 million related to eluxadoline, now a component of CMP, and $408.6 million of product rights and other intangibles related to the royalty rights for Alogliptin and Priligy®, which were sold in the year ended December 31, 2014.

*Goodwill*

Goodwill resulting from the Furiex Acquisition is assigned to our US Brands segment and is not deductible for tax purposes. Among the primary reasons the Company acquired Furiex and the factors that contributed to the recognition of goodwill was to expand the Company's branded pharmaceuticals specialty business within this therapeutic area.

*Contingent Consideration*

In the year ended December 31, 2015, the Company received a schedule IV ("C-IV") designation from the Drug Enforcement Agency ("DEA") for Viberzi® and recognized an expense of $29.8 million as a component of R&D expense. This expense represents the difference between the final CVR payment amount of $118.5 million, or $10 for each CVR outstanding, versus the probability-weighted CVR fair value initially established in acquisition accounting, adjusted for accretion. This amount was paid as of December 31, 2015.

*Long-Term Deferred Tax Liabilities and Other Tax Liabilities*

Long-term deferred tax liabilities and other tax liabilities result from identifiable intangible assets fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

### Forest Laboratories

On July 1, 2014, the Company acquired Forest Laboratories, Inc. ("Legacy Forest") for $30.9 billion including outstanding indebtedness assumed of $3.3 billion, equity consideration of $20.6 billion, which includes outstanding equity awards, and cash consideration of $7.1 billion (the "Forest Acquisition"). Under the terms of the transaction, Legacy Forest shareholders received 89.8 million Allergan plc ordinary shares, 6.1 million Allergan plc non-qualified stock options and 1.1 million Allergan plc share units. Legacy Forest was a leading, fully integrated, specialty pharmaceutical company largely focused on the United States market. Legacy Forest marketed a portfolio of branded drug products and developed new medicines to treat patients suffering from diseases principally in the following therapeutic areas: central nervous system, cardiovascular, gastrointestinal, respiratory, anti-infective, and cystic fibrosis. A portion of the assets acquired are being divested as part of the Teva Transaction.

### Assets Acquired and Liabilities Assumed at Fair Value

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date. The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date, of which the majority of the assets and liabilities relate to continuing operations. ($ in millions):

|  | | Amount |
|---|---|---|
| Cash and cash equivalents | $ | 3,424.2 |
| Accounts receivable | | 496.2 |
| Inventories | | 1,455.8 |
| Other current assets | | 261.2 |
| Current assets held for sale | | 87.1 |
| Property, plant and equipment, net | | 221.1 |
| Other long-term assets | | 84.1 |
| IPR&D intangible assets | | 1,362.0 |
| Intangible assets | | 11,515.5 |
| Goodwill | | 16,403.6 |
| Current liabilities | | (1,372.1) |
| Deferred tax liabilities, net | | (2,277.3) |
| Other taxes payable | | (618.4) |
| Other long-term liabilities | | (120.0) |
| Outstanding indebtedness | | (3,261.9) |
| Net assets acquired | $ | 27,661.1 |

In the year ended December 31, 2015, the Company recorded an out-of-period adjustment in the final valuation of Forest stated in the table above relating to the valuation of an acquired currently marketed product and deferred tax liabilities. The Company over valued the asset and undervalued goodwill based on information available as of the acquisition date. The Company corrected this error as of December 31, 2015 by decreasing the value of intangible assets by $135.0 million, decreasing deferred tax liabilities by $51.4 million and increasing the value of goodwill by $83.6 million. The impact was not material to the statement of operations and the Company did not consider the amount material to prior periods.

### Consideration

The total consideration for the Forest Acquisition of $27.7 billion is comprised of the equity value of shares that were outstanding and vested prior to July 1, 2014 of $20.0 billion, the portion of outstanding equity awards deemed to have been earned as of July 1, 2014 of $568.1 million and cash of $7.1 billion. The portion of outstanding equity awards deemed not to have been earned of $570.4 million as of July 1, 2014 will be expensed over the remaining future vesting period, including $142.8 million in the year ended December 31, 2015 and $287.5 million in the year ended December 31, 2014.

*Inventories*

The fair value of inventories acquired included an acquisition accounting fair market value step-up of $1,036.3 million. In the year ended December 31, 2015, the Company recognized $224.7 million as a component of cost of sales as the inventory acquired on July 1, 2014 was sold to the Company's customers in addition to a write-off associated with the Respiratory Sale. Included in cost of sales for the year ended December 31, 2014, was $751.0 million as the inventory acquired on July 1, 2014 was sold to the Company's customers. These amounts include $0.6 million and $40.6 million related to discontinued operations in the years ended December 31, 2015 and 2014, respectively.

Included in finished goods inventory as of December 31, 2015 was $20.1 million, relating to the remaining fair value step-up associated with the Forest Acquisition.

*IPR&D and Intangible Assets*

The estimated fair value of the IPR&D and identifiable intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rates used to arrive at the present value at the acquisition date of CMPs was 8.0% and for IPR&D ranged from 8.0% to 9.0%, to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

The following table identifies the summarized amounts recognized and the weighted average useful lives using the economic benefit of intangible assets ($ in millions):

| | Amounts Recognized as of the Acquisition Date | Weighted Average Useful Lives (Years) |
|---|---|---|
| **CMP:** | | |
| Namenda Franchise | $ 2,125.0 | 1.7 |
| Bystolic Franchise | 1,810.0 | 3.3 |
| Linzess® | 1,052.0 | 5.0 |
| Zenpep® | 978.0 | 6.8 |
| Carafate® | 915.0 | 6.2 |
| Armour Thyroid® | 747.0 | 5.9 |
| Viibryd® | 413.0 | 4.5 |
| Fetzima® | 392.0 | 5.0 |
| Teflaro® | 343.0 | 3.0 |
| Canasa® | 327.0 | 2.6 |
| Daliresp® | 269.0 | 3.5 |
| Other CMP Products | 1,904.0 | 5.7 |
| **Total CMP** | 11,275.0 | 4.3 |
| **IPR&D:** | | |
| Gastroenterology | 791.0 | |
| Central nervous system | 304.0 | |
| Cardiovascular | 193.0 | |
| Other | 74.0 | |
| **Total IPR&D** | 1,362.0 | |
| **Customer relationships** | 67.0 | 4.5 |
| **Other** | 173.5 | 4.2 |
| **Total identifiable intangible assets** | $ 12,877.5 | |

*Goodwill*

Among the primary reasons the Company acquired Forest and factors that contributed to the preliminary recognition of goodwill were to expand the Company's branded pharmaceuticals product portfolio, and to acquire certain benefits from the Forest pipeline and the expectation of the Company generating certain synergies. The goodwill recognized from the Forest Acquisition, which includes the increase in the purchase price resulting from the movement in Allergan plc's share price from the date of announcing the deal, until the date of acquisition, is not deductible for tax purposes. Goodwill from the Forest Acquisition was primarily assigned to the US Brands segment.

*Deferred Tax Liabilities, net*

Deferred tax liabilities, net, include the impact resulting from identifiable intangible assets and inventory fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

*Divested Products*

In order to complete the Forest Acquisition, the Company divested two legacy Actavis products to Impax Laboratories, Inc. ("Impax"); Lamotrigine ODT and Ursodiol Tablets for cash consideration. In exchange for the products, the Company received $8.0 million on July 1, 2014, which resulted in a gain on sale of asset of $5.4 million. In addition, the Company and Impax entered into a supply agreement whereby the Company will supply product to Impax. Revenues recognized from the divested products were deminimis in the years ended December 31, 2014 and 2013. In addition, on July 1, 2014, the Company divested two acquired Forest products for a combined consideration of $13.5 million. The product revenues were not included in the results of operations of the Company.

*Acquisition-Related Expenses*

As a result of the Forest Acquisition, the Company incurred the following transaction and integration costs in the years ended December 31, 2015 and 2014($ in millions):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Cost of sales** | | |
| Stock-based compensation acquired for Forest employees | $ 4.7 | $ 9.5 |
| Severance-related charges | 1.1 | 11.3 |
| **Research and development** | | |
| Stock-based compensation acquired for Forest employees | 36.3 | 66.7 |
| Severance-related charges | 9.2 | 24.5 |
| **Selling and marketing** | | |
| Stock-based compensation acquired for Forest employees | 47.9 | 58.7 |
| Severance-related charges | 17.4 | 45.3 |
| Other integration costs | - | 3.8 |
| **General and administrative** | | |
| Stock-based compensation acquired for Forest employees | 53.9 | 152.6 |
| Severance-related charges | 17.1 | 71.5 |
| Other integration costs | 58.4 | 92.9 |
| Financing related charges | - | 9.3 |
| **Other income (expense)** | | |
| Bridge loan facilities | - | (25.8) |
| **Total transaction and integration costs** | $ 246.0 | $ 571.9 |

*Silom Medical Company*

On April 1, 2014, the Company acquired Silom Medical Company ("Silom"), a privately held generic pharmaceutical company focused on developing and marketing therapies in Thailand, for consideration of approximately $103.0 million in cash (the "Silom Acquisition"). The Silom Acquisition expanded the Company's position in the Thai generic pharmaceutical market, with leading positions in the ophthalmic and respiratory therapeutic categories and a strong cardiovascular franchise. We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date.  The assets and liabilities acquired, as well as the results of operations for the acquired Silom business are part of the assets being divested in the Teva Transaction and are included as a component of income from discontinued operations.  In addition the acquired financial position is included in assets and liabilities held for sale.

The Silom Acquisition has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date as follows ($ in millions):

| | | Amount |
|---|---|---|
| Cash and cash equivalents | $ | 3.0 |
| Inventories, net | | 4.0 |
| Property, plant and equipment, net | | 16.0 |
| Product rights and other intangibles | | 64.0 |
| Goodwill | | 20.0 |
| Other assets and liabilities | | (4.0) |
| **Net assets acquired** | $ | **103.0** |

**Divestitures**

*Corona Facility*

During the year ended December 31, 2014, we held for sale assets in our Corona, California manufacturing facility. As a result, the Company recognized an impairment charge as a component of discontinued operations of $20.0 million in the year ended December 31, 2014, including a write-off of property, plant and equipment, net, due to the integration of Warner Chilcott of $5.8 million. The Company completed the sale of these assets during the year ended December 31, 2015 with no material impact to the Company's results of operations.

**2013 Transactions**

The following are the material transactions that were completed in the year ended December 31, 2013.

**Acquisitions**

*Warner Chilcott*

On October 1, 2013, the Company completed the Warner Chilcott Acquisition in a stock for stock transaction for a value, including the assumption of debt, of $9.2 billion. Warner Chilcott was a leading specialty pharmaceutical company focused on the women's healthcare, gastroenterology, urology and dermatology segments of the branded pharmaceuticals market, primarily in North America.

*Recognition and Measurement of Assets Acquired and Liabilities Assumed at Fair Value*

The Warner Chilcott Acquisition has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date, of which the majority of the assets and liabilities relate to continuing operations ($ in millions):

|  | Amount |
|---|---|
| Cash and cash equivalents | $ 179.5 |
| Accounts receivable | 306.1 |
| Inventories | 532.5 |
| Other current assets | 83.4 |
| Property, plant and equipment, net | 220.0 |
| Other long-term assets | 1.2 |
| IPR&D intangible assets | 1,708.0 |
| Intangible assets | 3,021.0 |
| Goodwill | 3,956.1 |
| Current liabilities | (613.5) |
| Deferred tax liabilities, net | (60.4) |
| Other long-term liabilities | (99.6) |
| Outstanding indebtedness | (3,400.4) |
| Net assets acquired | $ 5,833.9 |

*Consideration*

The total consideration for the Warner Chilcott Acquisition of $5,833.9 million is comprised of the equity value of shares that were outstanding and vested prior to October 1, 2013 ($5,761.3 million) and the portion of outstanding equity awards deemed to have been earned as of October 1, 2013 ($72.6 million). The portion deemed not to have been earned ($77.4 million) as of October 1, 2013 will be expensed over the remaining future vesting period, including $5.8 million and $45.4 million relating to Warner Chilcott restructuring charges recognized in the years ended December 31, 2014 and 2013, respectively.

*Inventories*

The fair value of inventories acquired included a step-up in the value of inventories of $408.3 million. In the years ended December 31, 2015, 2014 and 2013, the Company recognized $1.9 million, $232.9 million and $173.5 million, respectively, as a component of cost of sales as the inventory acquired on October 1, 2013 was sold to the Company's customers.

*IPR&D and Intangible Assets*

The fair value of the IPR&D and CMP intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rates used to arrive at the present value at the acquisition date of CMPs was 8.0% and for IPR&D ranged from 8.0% to 9.0%, to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

The following table identifies the summarized amounts recognized and the weighted average useful lives of intangible assets ($ in millions):

| | Amounts Recognized as of the Acquisition Date | Weighted Average Useful Lives (Years) |
|---|---|---|
| **CMP:** | | |
| Oral contraceptive franchise | $ 1,181.0 | 3.2 |
| Mesalamine franchise | 589.0 | 1.8 |
| Estrace® Cream | 397.0 | 2.1 |
| Risedronate franchise | 311.0 | 3.6 |
| Doryx® | 237.0 | 2.4 |
| Enablex® | 107.0 | 2.1 |
| Other CMP products | 199.0 | 3.9 |
| **Total CMP** | 3,021.0 | 2.7 |
| **IPR&D:** | | |
| Mesalamine franchise | 809.0 | |
| Oral Contraceptive franchise | 321.0 | |
| Estradiol | 278.0 | |
| Urology | 165.0 | |
| Other | 135.0 | |
| **Total IPR&D** | 1,708.0 | |
| **Total identifiable intangible assets** | $ 4,729.0 | |

*Goodwill*

Among the primary reasons the Company acquired Warner Chilcott and factors that contributed to the preliminary recognition of goodwill were to expand the Company's branded pharmaceuticals product portfolio, and to acquire certain benefits from the Warner Chilcott structure. The goodwill recognized from the Warner Chilcott Acquisition is not deductible for tax purposes. Goodwill of $3,795.5 million was assigned to the US Brands segment and goodwill of $160.6 million was assigned to the International Brands segment.

*Deferred Tax Liabilities, net*

Deferred tax liabilities, net, include the impact resulting from identifiable intangible assets and inventory fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

**Medicines360**

On June 10, 2013, we entered into an exclusive license agreement with Medicines360 to market, sell and distribute Medicines360 LNG20 intrauterine device ("LNG20") in the U.S. and in Canada for a payment of approximately $52.3 million. According to the terms of the agreement, we are also required to pay Medicines360 certain regulatory and sales based milestone payments totaling up to nearly $125.0 million plus royalties. Medicines360 retained the rights to market the product in the U.S. public sector, including family planning clinics that provide services to low-income women. LNG20 is currently marketed as Liletta® and was originally developed by Uteron Pharma Operations SPRL in Belgium (now a subsidiary of the Company). We accounted for the acquisition as a business combination requiring that the assets acquired and liabilities assumed be recognized at their fair values as of the acquisition date.

**Acquisition of Uteron Pharma, SA**

On January 23, 2013, the Company completed the acquisition of Uteron Pharma, SA for approximately $142.0 million in cash, plus assumption of debt and other liabilities of $7.7 million and up to $155.0 million in potential future milestone payments (the "Uteron Acquisition"). The acquisition expanded the Company's specialty brand pipeline of Women's Health products including two potential near term commercial opportunities in contraception and infertility, and one oral contraceptive project projected to launch by 2018 at the time of the acquisition. Several additional products that were then in earlier stages of development were also acquired in the Uteron Acquisition.

*Recognition and Measurement of Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. The following table summarizes the fair values of the tangible and identifiable intangible assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Final Values |
|---|---:|
| Accounts receivable | $ 1.6 |
| Other current assets | 1.2 |
| Property, plant & equipment | 5.7 |
| Other long-term assets | 0.5 |
| IPR&D intangible assets | 250.0 |
| Goodwill | 26.4 |
| Current liabilities, excluding current portion of debt | (8.0) |
| Long-term deferred tax and other tax liabilities | (82.5) |
| Contingent consideration | (43.4) |
| Debt | (5.2) |
| Other long-term liabilities | (4.3) |
| **Net assets acquired** | **$ 142.0** |

### IPR&D

The fair value of the IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value of IPR&D intangible assets as of the acquisition date was 22.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

### Contingent Consideration

Additional consideration is conditionally due to the seller upon the achievement of certain milestones in respect to the development and commercialization of the products as well as reaching certain sales targets. The Company estimated the fair value of the contingent consideration to be $43.4 million using a probability weighting approach that considered the possible outcomes based on assumptions related to the timing and probability of the product launch date, discount rates matched to the timing of first payment, and probability of success rates and discount adjustments on the related cash flows.

At June 30, 2014, after an identified triggering event, the acquired IPR&D intangible asset related to Estelle, a novel natural estrogen-based 28 day cycle oral contraceptive for the prevention of pregnancy, of $13.1 million was deemed to be fully impaired. Consequently, the $22.8 million contingent liability related to Estelle was written off, resulting in a net gain of $9.7 million. At June 30, 2014, after an identified triggering event, the acquired IPR&D intangible asset related to Colvir, a treatment of premalignant Human Papilloma Virus (HPV) lesions of the uterine, of $2.0 million was deemed to be fully impaired. Consequently the $1.5 million contingent liability was also written off, resulting in a net loss of $0.5 million.

### Long-Term Deferred Tax Liabilities and Other Tax Liabilities

Long-term deferred tax liabilities and other tax liabilities result from identifiable intangible assets fair value adjustments. These adjustments create excess book basis over the tax basis which is multiplied by the statutory tax rate for the jurisdiction in which the deferred taxes exist.

### Divestitures

#### Western European Assets

During the year ended December 31, 2013, we held for sale our then current generic commercial infrastructure in France, Italy, Spain, Portugal, Belgium, Germany and the Netherlands, including products, marketing authorizations and dossier license rights. On January 17, 2014, we announced our intention to enter into an agreement with Aurobindo Pharma Limited ("Aurobindo") to sell these businesses. On April 1, 2014, the Company completed the sale of the assets in Western Europe.

In connection with the sale of our Western European assets, we entered into a supply agreement whereby the Company will supply product to Aurobindo over a period of five years. In the second quarter of 2014, we allocated the fair value of the consideration for the sale of the Western European assets of $65.0 million to each element of the agreement, including the supply of product.

As a result of the transactions, we recognized as a component of discontinued operations, income / (loss) on the net assets held for sale of $3.4 million and $(34.3) million in the years ended December 31, 2014 and 2013, respectively. In addition, the Company recognized a loss on the disposal of the assets in the year ended December 31, 2014 of $20.9 million and deferred revenue of $10.1 million to be recognized over the course of the supply agreement as a component of discontinued operations.

## NOTE 6 — Collaborations

The Company has ongoing transactions with other entities through collaboration agreements. The following represent the material collaboration agreements impacting the years ended December 31, 2015, 2014 and 2013.

### *Acquired agreements from the Allergan Acquisition*

#### *Apollo EndoSurgery, Inc.*

On December 2, 2013, Legacy Allergan completed the sale of the obesity intervention business to Apollo Endosurgery, Inc. for cash consideration of $75.0 million, subject to certain adjustments, and certain additional consideration, including a minority equity interest in Apollo with an estimated fair value of $15.0 million as of December 31, 2015. The Company is accounting for this asset as a cost method investment and it is included as a component of "investments and other assets".

#### *LiRIS*

On August 13, 2014, Legacy Allergan completed the acquisition of LiRIS Biomedical, Inc. ("LiRIS"), a clinical-stage specialty pharmaceutical company based in the United States focused on developing a pipeline of innovative treatments for bladder diseases, for an upfront payment of $67.5 million, plus up to an aggregate of $295.0 million in payments contingent upon achieving certain future development milestones and up to an aggregate of $225.0 million in payments contingent upon achieving certain commercial milestones. The Company accounted for the contingent consideration in the Allergan Acquisition with an acquisition date fair value of $169.6 million.

### *Acquired agreements from the Forest Acquisition*

#### *Trevena*

On May 9, 2013, Forest entered into a collaborative licensing option agreement with Trevena, Inc. ("Trevena") for the development of TRV027, a novel beta-arrestin biased ligand of the angiotensin II type 1 receptor for the treatment of acute decompensated heart failure. Pursuant to the agreement, the Company purchased $30.0 million of Trevena preferred stock in a round of private placement financing. Trevena filed an initial public offering ("IPO"), at which time the Company's preferred stock was converted to common stock traded on the NASDAQ stock market. In conjunction with the IPO, the Company purchased an additional $3.0 million of common stock of Trevena. The investment was subsequently accounted for using the fair value method of accounting. At December 31, 2015 and 2014, the fair value of the Trevena common stock held by the Company was $35.6 million and $20.3 million, respectively and is included as a component of "investments and other assets".

#### *Ironwood collaboration agreement*

In September 2007, Forest entered into a collaboration agreement with Ironwood Pharmaceuticals ("Ironwood") to jointly develop and commercialize Linzess® (linaclotide) for the treatment of irritable bowel syndrome with constipation (IBS-C) and chronic idiopathic constipation (CIC). Under the terms of the agreement, the Company shares equally with Ironwood all profits and losses (as defined) from the development and commercialization of Linzess in the U.S. In addition, the Company expanded this agreement to cover the newly acquired Constella rights internationally.

The agreement included contingent milestone payments as well as a contingent equity investment based on the achievement of specific clinical and commercial milestones. The Company may be obligated to pay up to an additional $100.0 million if certain sales milestones are achieved.

Based on the nature of the arrangement (including its contractual terms), the nature of the payments and applicable guidance, the Company records receipts from and payments to Ironwood in two pools: the Development pool which consists of R&D expenses, and the Commercialization pool, which consists of revenue, cost of sales and other operating expenses. The net payment to or receipt from Ironwood for the Development pool is recorded in R&D expense and the net payment to or receipt from Ironwood for the Commercialization pool is recorded in cost of goods sold. As of December 31, 2015 and 2014, the fair value of the Ironwood collaboration was $24.1 million and $31.9 million, respectively and is included as a component of "investments and other assets."

*Moksha8*

On October 22, 2012, Forest announced an agreement with Moksha8 which includes an exclusive license from Forest to Moksha8 to commercialize Viibryd®, and potentially other Forest products, in Latin America. Under the arrangement, Forest has provided $101.9 million of debt financing to Moksha8. Such debt financing has a term of seven years from the date of initial funding and is collateralized by the assets of Moksha8, the debt was fair valued by the Company as part of acquisition accounting. As of December 31, 2015 and 2014, the Company had a loan receivable of $33.4 million and $31.1 million, respectively, within "Investments and other assets" related to this transaction.

### Amendment to Sanofi Collaboration Agreement

On October 28, 2013, Warner Chilcott Company, LLC ("WCCL"), one of our indirect wholly-owned subsidiaries, and Sanofi-Aventis U.S. LLC ("Sanofi") entered into an amendment (the "Sanofi Amendment") to the global collaboration agreement as amended (the "Collaboration Agreement") to which WCCL and Sanofi are parties. WCCL and Sanofi co-develop and market Actonel® and Atelvia® (risedronate sodium) on a global basis, excluding Japan.

Pursuant to the Sanofi Amendment, the parties amended the Collaboration Agreement with respect to Actonel® and Atelvia® in the U.S. and Puerto Rico (the "Exclusive Territory") to provide that, in exchange for the payment of a lump sum of $125.0 million by WCCL to Sanofi in the year ended December 31, 2013, WCCL's obligations with respect to the global reimbursement payment, which represented a percentage of Actavis' net sales as defined, as it relates to the Exclusive Territory for the year ended December 31, 2014, shall be satisfied in full. The Sanofi Amendment did not and does not apply to or affect the parties' respective rights and obligations under the Collaboration Agreement with respect to (i) the year ended December 31, 2013 or (ii) territories outside the Exclusive Territory. The $125.0 million was recorded as an intangible asset during the year ended December 31, 2013, which was amortized over the course of the year ended December 31, 2014 using the economic benefit model.

In accordance with the terms of the Collaboration Agreement, the Company regained world-wide rights to promote Actonel® and Atelvia® in all territories on January 1, 2015. A portion of the assets, as well as the results of operations are part of the assets being divested in the Teva Transaction and are included as a component of income from discontinued operations.

### Amgen Collaboration

In December 2011, we entered into a collaboration agreement with Amgen Inc. ("Amgen") to develop and commercialize, on a worldwide basis, biosimilar versions of Herceptin®, Avastin®, Rituxan/Mab Thera®, and Erbitux® (the "Amgen Collaboration Agreement"). Amgen has assumed primary responsibility for developing, manufacturing and initially commercializing the oncology antibody products. As of December 31, 2015, the Company will contribute up to $209.4 million in co-development costs over the remaining course of development, including the provision of development support, and will share product development risks. In addition, we will contribute our significant expertise in the commercialization and marketing of products in highly competitive specialty and generic markets, including helping effectively manage the lifecycle of the biosimilar products. The collaboration products are expected to be sold under a joint Amgen/Allergan label. We will initially receive royalties and sales milestones from product revenues. The collaboration will not pursue biosimilars of Amgen's proprietary products.

### NOTE 7 — Discontinued Operations

### Global Generics Business

On July 26, 2015, the Company entered into the Teva Transaction. Under the Teva Agreement, Teva will acquire Allergan's global generics business, including the U.S. and international generic commercial units, our third-party supplier Medis, our global generic manufacturing operations, our global generic R&D unit, our international OTC commercial unit (excluding OTC eye care products) and some established international brands.

Allergan will retain its global branded pharmaceutical and medical aesthetics businesses, as well as its biosimilars development programs, certain over the counter products, and the Anda Distribution business.  The Company will also have continuing involvement with Teva after the close of the transaction.  As a result of the Teva Transaction, the Company will hold equity in Teva, continue to distribute Teva products through our Anda Distribution segment as well as purchase product manufactured by Teva for sale in our US Brands segment as part of ongoing transitional service and contract manufacturing agreements.

Financial results of the global generics business are presented as "Income from discontinued operations" on the Consolidated Statements of Operations for the years ended December 31, 2015, 2014 and 2013; and assets and liabilities of the global generics business to be disposed of are presented as a component of "Current assets held for sale", "Non current assets held for sale", "Current liabilities held for sale" and "Long term liabilities held for sale" on the Consolidated Balance Sheet as of December 31, 2015 and 2014.

Financial results for discontinued operations were based on the terms and conditions of the agreements with Teva as of the date of this filing.  Subsequent changes in terms and products transferring may impact results presented. The following table presents key financial results of the global generics business included in "Income from discontinued operations" for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Third party revenues | $ 6,116.1 | $ 6,323.4 | $ 6,075.1 |
| Related party sales | 259.2 | 255.4 | 273.1 |
| Net revenues | 6,375.3 | 6,578.8 | 6,348.2 |
| Operating expenses: | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | 3,048.1 | 3,105.6 | 3,319.1 |
| Research and development | 422.2 | 480.2 | 425.6 |
| Selling and marketing | 557.7 | 649.0 | 645.5 |
| General and administrative | 653.0 | 496.2 | 571.4 |
| Amortization | 323.6 | 652.0 | 538.9 |
| In-process research and development impairments | - | - | 4.9 |
| Asset sales and impairments, net | 62.4 | 19.6 | 896.8 |
| Total operating expenses | 5,067.0 | 5,402.6 | 6,402.2 |
| Operating income | 1,308.3 | 1,176.2 | (54.0) |
| Other (expense) income, net | (7.9) | (14.5) | 39.1 |
| (Benefit) / provision for income taxes | (5,487.3) | 385.1 | 268.0 |
| Net income / (loss) from discontinued operations | $ 6,787.7 | $ 776.6 | $ (282.9) |

Related party revenues represent the sale of products to the Company's Anda Distribution segment.

For the year ended December 31, 2015, the company recorded a deferred tax benefit of $5,738.8 million related to investments in certain U.S. subsidiaries as this tax benefit will reverse in the foreseeable future. The recognition of this benefit has been reflected in income from discontinued operations, net of tax with the deferred tax asset reflected in non-current deferred tax assets on the balance sheet.

The following table presents the aggregate carrying amounts of the major classes of assets and liabilities related to the global generics business to be disposed of ($ in millions):

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| **Assets:** | | |
| Accounts receivable, net | $ 2,089.7 | $ 1,488.9 |
| Inventories | 1,138.5 | 1,090.9 |
| Prepaid expenses and other current assets | 302.8 | 254.6 |
| Current deferred tax assets | - | 23.3 |
| Property, plant and equipment, net | 1,355.6 | 1,347.5 |
| Investments and other assets | 33.0 | 82.1 |
| Non-current deferred tax assets | 223.7 | 72.7 |
| Product rights and other intangibles | 2,919.3 | 3,097.7 |
| Goodwill | 6,009.7 | 3,623.9 |
| **Total assets** | $ 14,072.3 | $ 11,081.6 |
| | | |
| **Liabilities:** | | |
| Accounts payable and accrued expenses | $ 1,455.8 | $ 1,396.4 |
| Income taxes payable | 33.9 | 16.5 |
| Current deferred tax liabilities | - | 6.3 |
| Debt and capital leases | 5.8 | 12.6 |
| Other long-term liabilities | 92.0 | 121.3 |
| Other taxes payable | 69.0 | 102.7 |
| Long-term deferred tax liabilities | 415.4 | 308.1 |
| **Total liabilities** | $ 2,071.9 | $ 1,963.9 |

Depreciation and amortization was ceased upon the determination that the held for sale criteria were met, which was the announcement date of the Teva Transaction.  The depreciation, amortization and significant operating and investing non-cash items of the discontinued operations were as follows ($ in millions):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Depreciation from discontinued operations | $ 89.7 | $ 159.6 | $ 166.9 |
| Amortization from discontinued operations | 323.6 | 652.0 | 538.9 |
| Capital expenditures | 234.5 | 184.5 | 168.0 |
| Deferred taxes | (5,568.8) | (259.5) | (242.4) |

**NOTE 8 — Assets Held For Sale**

The following represents the global net assets held for sale ($ in millions):

| | December 31, 2015 | | December 31, 2014 | |
|---|---|---|---|---|
| Accounts receivable, net | $ | - | $ | 17.7 |
| Inventories | | - | | 161.5 |
| Prepaid expenses and other assets | | 9.3 | | 161.3 |
| Intangible assets | | - | | 453.0 |
| Goodwill | | - | | 309.1 |
| Impairment on assets held for sale | | - | | (189.6) |
| **Total assets held for sale** | **$** | **9.3** | **$** | **913.0** |
| Accounts payable and accrued expenses | $ | - | $ | 25.9 |
| **Total liabilities held for sale** | **$** | **-** | **$** | **25.9** |
| Assets from the Teva Transaction | | 14,072.3 | | 11,081.6 |
| Liabilities from the Teva Transaction | | 2,071.9 | | 1,963.9 |
| **Net assets held for sale** | **$** | **12,009.7** | **$** | **10,004.8** |

As of December 31, 2015, the Company had the followings assets held for sale:

- Total assets of $14,072.3 million and total liabilities of $2,071.9 million relating to the Teva Transaction. For further details refer to Note 7 – Discontinued Operations.

- Properties acquired in the Forest Acquisition.

- Facilities in Irvine, California.

As of December 31, 2014, the Company included the following assets held for sale:

- Total assets of $11,081.6 million and total liabilities of $1,963.9 million relating to the Teva Transaction.  For further details refer to Note 7 – Discontinued Operations.

- Certain intangible assets and related inventory for products sold in the Respiratory Sale. The book value of the respiratory assets held for sale was $734.0 million as of December 31, 2014, including allocated goodwill to this unit included within US Brands segment of $309.1 million. The transaction closed on March 2, 2015.

- Assets in connection with the Pharmatech Transaction, which included assets held for sale of $97.2 million and liabilities held for sale of $25.9 million. The transaction closed in the second quarter of 2015.

- Properties acquired in the Forest Acquisition including:

    - Commack, Long Island - $46.4 million

    - St. Louis, Missouri - $20.4 million

    - Hauppauge, New York - $14.8 million

**NOTE 9 — Share-Based Compensation**

The Company recognizes compensation expense for all share-based compensation awards made to employees and directors based on the fair value of the awards on the date of grant. A summary of the Company's share-based compensation plans is presented below.

*Equity Award Plans*

The Company has adopted several equity award plans which authorize the granting of options, restricted shares, restricted stock units and other forms of equity awards of the Company's ordinary shares, subject to certain conditions.

The Company grants awards with the following features:

- Time-based vesting restricted stock awards;

- Performance-based restricted stock awards measured to the EBITDA, as defined, of the Company or other performance-based targets defined by the Company;

- Performance-based restricted stock awards measured to the Total Stockholders Return, compared to pre-defined metrics;

- Non-qualified options to purchase outstanding shares; and

- Cash-settled awards recorded as a liability. These cash settled awards are based on pre-established earnings per share, total shareholder returns and cost savings targets and the fair value is marked to market each reporting unit.

Option awards require options to be granted at the fair value of the shares underlying the options at the date of the grant and generally become exercisable over periods ranging from three to five years. Each option granted expires ten years from the date of the grant. Restricted stock awards are grants that entitle the holder to ordinary shares, subject to certain terms. Restricted stock unit awards are grants that entitle the holder the right to receive an ordinary share, subject to certain terms. Restricted stock and restricted stock unit awards (both time-based vesting and performance-based vesting) generally have restrictions eliminated over a one to four year vesting period. Restrictions generally lapse for non-employee directors after one year. Certain restricted stock units are performance-based awards issued at a target number with the actual number of restricted shares issued ranging based on achievement of the performance criteria. The Company's equity awards include the acquired awards from the Allergan Acquisition and the Kythera Acquisition ("2015 Acquired Awards") and the acquired awards from the Forest Acquisition ("2014 Acquired Awards").

*Fair Value Assumptions*

All restricted stock and restricted stock units (whether time-based vesting or performance-based vesting), are granted and expensed, using the fair value per share on the applicable grant date, over the applicable vesting period. Non-qualified options to purchase ordinary shares are granted to employees at exercise prices per share equal to the closing market price per share on the date of grant. The fair value of non-qualified options is determined on the applicable grant dates using the Black-Scholes method of valuation and that amount is recognized as an expense over the vesting period. Using the Black-Scholes valuation model, the fair value of options is based on the following assumptions:

|  | 2015 Grants | 2015 Acquired Awards | 2014 Grants | 2014 Acquired Awards |
|---|---|---|---|---|
| Dividend yield | 0% | 0% | 0% | 0% |
| Expected volatility | 26.0 - 29.0% | 26.0 - 27.0% | 29.0% | 28.0% |
| Risk-free interest rate | 1.9-2.1% | 0.1-2.1% | 1.9 - 2.2% | 0 - 2.1% |
| Expected term (years) | 7.0 - 7.5 | up to 6.9 | 7.5 | up to 6.4 |

*Share-Based Compensation Expense*

Share-based compensation expense recognized in the Company's results of operations, including discontinued operations, for the years ended December 31, 2015, 2014 and 2013 was as follows ($ in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2015 | 2014 | 2013 |
| Equity-based compensation awards | $ 690.4 | $ 368.0 | $ 132.1 |
| Cash-settled equity awards in connection with the Allergan Acquisition | 127.1 | - | - |
| Cash-settled equity awards in connection with the Kythera Acquisition | 9.6 | - | - |
| Cash-settled equity awards in connection with the Durata Acquisition | - | 16.6 | - |
| Cash-settled equity awards in connection with the Furiex Acquisition | - | 16.6 | - |
| Non equity-settled awards other | 98.6 | - | 1.5 |
| Total stock-based compensation expense | $ 925.7 | $ 401.2 | $ 133.6 |

In the years ended December 31, 2015, 2014, and 2013, share-based compensation expense included as discontinued operations was $31.5 million, $18.8 million, and $22.1 million, respectively.

In the years ended December 31, 2015, 2014 and 2013 the related tax benefits were $285.9 million, $145.7 million and $44.4 million, respectively relating to stock-based compensation.

Included in the equity-based compensation awards for the year ended December 31, 2015 is the impact of accelerations and step-ups relating to the acquisition accounting treatment of outstanding awards acquired in the Allergan, Kythera and Forest Acquisitions of $314.8 million, $64.4 million and $109.7 million, respectively. Included in the year ended December 31, 2014, was $287.5 million of stock-based compensation inclusive of a $249.1 million of a step-up relating to the acquisition accounting treatment of outstanding awards acquired in the Forest Acquisition. Included in the year ended December 31, 2013, was higher stock-based compensation and related employer payroll taxes resulting from acceleration of directors and named executive officers unvested equity-based awards immediately prior to, but in connection with, the Warner Chilcott Acquisition, as provided by the transaction agreement, of $41.3 million. Also included in the year-ended December 31, 2013, was $45.4 million of stock-based compensation relating to the Warner Chilcott Acquisition. These costs included the immediate vesting of outstanding equity for certain employees on October 1, 2013, as well as the recognition of compensation over the remaining vesting period for severed employees.

Unrecognized future stock-based compensation expense was $672.0 million as of December 31, 2015, including $319.8 million from the Allergan Acquisition and $115.4 million from the Forest Acquisition. This amount will be recognized as an expense over a remaining weighted average period of 1.7 years. Stock-based compensation is being amortized and charged to operations over the same period as the restrictions are eliminated for the participants, which is generally on a straight-line basis.

### *Share Activity*

The following is a summary of equity award activity for unvested restricted stock and stock units in the period from December 31, 2014 through December 31, 2015:

| (in millions, except per share data) | Shares | Weighted Average Grant Date Fair Value | Weighted Average Remaining Contractual Term (Years) | Aggregate Grant Date Fair Value |
|---|---|---|---|---|
| Restricted shares / units outstanding at December 31, 2014 | 2.1 | $ 148.79 | 1.3 | $ 312.5 |
| Granted | 0.5 | 304.94 | | 152.5 |
| Vested | (1.0) | (127.15) | | (128.1) |
| Assumed as part of the Allergan Acquisition ** | 0.5 | 218.47 | | 102.8 |
| Forfeited | (0.1) | (152.63) | | (19.9) |
| Restricted shares / units outstanding at December 31, 2015 | 2.0 | $ 209.90 | 1.7 | $ 419.8 |

** Assumed as part of the Allergan Acquisition for the pro rata portion representing future compensation as of March 17, 2015.

The following is a summary of equity award activity for non-qualified options to purchase ordinary shares in the period from December 31, 2014 through December 31, 2015:

| (in millions, except per share data) | Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding, December 31, 2014 | 5.4 | $ 93.96 | 7.3 | $ 858.9 |
| Granted | 0.2 | 300.29 | | |
| Exercised | (2.4) | (134.54) | | |
| Assumed as part of the Allergan Acquisition** | 7.0 | 103.63 | | |
| Assumed as part of the Kythera Acquisition*** | 0.7 | 127.02 | | |
| Cancelled | (0.4) | (135.92) | | |
| Outstanding, December 31, 2015 | 10.5 | $ 149.11 | 6.7 | $ 1,707.8 |
| Vested and expected to vest at December 31, 2015 | 9.9 | $ 148.14 | 6.7 | $ 1,620.5 |

**   Assumed as part of the Allergan Acquisition for the pro rata portion representing future compensation as of March 17, 2015.

***   Assumed as part of the Kythera Acquisition for the pro rata portion representing future compensation as of October 1, 2015.

## NOTE 10 — Pension and Other Postretirement Benefit Plans

### Defined Benefit Plan Obligations

The Company has numerous defined benefit plans offered to employees around the world. For these plans, retirement benefits are generally based on an employee's years of service and compensation. Funding requirements are determined on an individual country and plan basis and are subject to local country practices and market circumstances. Prior to the Warner Chilcott Acquisition, which occurred on October 1, 2013, there were no material continuing operations defined benefit plans. As such, activity within the year ended December 31, 2013 was immaterial.

The net periodic benefit cost of the defined benefit plans was de minimis for the year ended December 31, 2013. The net periodic benefit cost of the defined benefit plans for continuing operations for the years ended December 31, 2015 and 2014 was as follows ($ in millions):

| | Defined Benefit Year Ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| Service cost | $ 5.0 | $ 2.0 |
| Interest cost | 35.0 | 3.3 |
| Expected Return on plan assets | (46.4) | (3.5) |
| Settlement | (4.3) | - |
| Net periodic benefit (income) cost | $ (10.7) | $ 1.8 |

### Obligations and Funded Status

Employee benefit plans are an exception to the recognition and fair value measurement principles in business combinations. Employee benefit plan obligations are recognized and measured in accordance with the existing authoritative literature for accounting for benefit plans rather than at fair value. Accordingly, the Company remeasured the benefit plans acquired as part of its acquisitions and recognized an asset or liability for the funded status of these plans as of the respective acquisition dates.

F-54

Benefit obligation and asset data for the defined benefit plans for continuing operations, were as follows ($ in millions):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2015[1] | 2014 |
| **Change in Plan Assets** | | |
| Fair value of plan assets at beginning of year | $ 83.6 | $ 79.9 |
| Fair value of plan assets assumed in the Allergan Acquisition | 1,042.0 | - |
| Employer contribution | 107.6 | 3.2 |
| Return on plan assets | (60.3) | 13.9 |
| Benefits paid | (21.5) | (2.9) |
| Settlements | (100.0) | - |
| Effects of exchange rate changes | (0.3) | (10.5) |
| Fair value of plan assets at end of year | $ 1,051.1 | $ 83.6 |

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2015[1] | 2014 |
| **Change in Benefit Obligation** | | |
| Benefit obligation at beginning of the year | $ 111.6 | $ 96.5 |
| Benefit obligation assumed in the Allergan Acquisition | 1,344.6 | - |
| Service cost | 5.0 | 2.0 |
| Interest cost | 35.0 | 3.3 |
| Actuarial loss/(gain) | (191.2) | 27.0 |
| Curtailments | - | (0.7) |
| Settlements and other | (101.1) | - |
| Benefits paid | (21.5) | (2.8) |
| Effects of exchange rate changes | 6.1 | (13.7) |
| Benefit obligation at end of year | $ 1,188.5 | $ 111.6 |
| Funded status at end of year | $ (137.4) | $ (28.0) |

[1] The year ended December 31, 2015 includes benefit obligation and asset data from the Allergan Plans following the Allergan Acquisition on March 17, 2015.

The following table outlines the funded actuarial amounts recognized ($ in millions):

| | As of December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Current liabilities | $ (29.3) | $ (2.7) |
| Noncurrent liabilities | (108.1) | (25.3) |
| | $ (137.4) | $ (28.0) |

The underfunding of pension benefits is primarily a function of the different funding incentives that exist outside of the United States. In certain countries, there are no legal requirements or financial incentives provided to companies to pre-fund pension obligations. In these instances, benefit payments are typically paid directly by the Company as they become due.

*Discontinued Operations*

As of December 31, 2015 and 2014, the following is the plan assets and liabilities included in assets and liabilities held for sale as part of the Teva Transaction ($ in millions):

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2015[1] | | 2014 | |
| Fair value of plan assets at end of year | $ | 111.9 | $ | 112.5 |
| Benefit obligation at end of year | $ | 161.8 | $ | 174.5 |
| Funded status at end of year | $ | (49.9) | $ | (62.0) |

For the years ended December 31, 2015, 2014 and 2013, the Company recognized $6.8 million, $4.7 million and $7.1 million, respectively, as a component of income from discontinued operations related to the Teva Transaction.

*Plan Assets*

Companies are required to use a fair value hierarchy as defined in ASC Topic 820 "Fair Value Measurement," ("ASC 820") which maximizes the use of observable inputs and minimizes the use of unobservable inputs when measuring fair value. There are three levels of inputs used to measure fair value with Level 1 having the highest priority and Level 3 having the lowest:

Level 1 — Quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2 — Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3 — Unobservable inputs that are supported by little or no market activity. The Level 3 assets are those whose values are determined using pricing models, discounted cash flow methodologies, or similar techniques with significant unobservable inputs, as well as instruments for which the determination of fair value requires significant judgment or estimation.

If the inputs used to measure the financial assets fall within more than one level described above, the categorization is based on the lowest level input that is significant to the fair value measurement of the instrument.

The fair values of the Company's pension plan assets for continuing operations at December 31, 2015 by asset category are as follows ($ in millions):

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| *Investment funds* | | | | | | | | |
| U.S. equities | $ | 114.6 | $ | - | $ | - | $ | 114.6 |
| International equities | | 151.3 | | - | | - | | 151.3 |
| Other equity securities | | 99.1 | | - | | - | | 99.1 |
| **Equity securities** | **$** | **365.0** | **$** | **-** | **$** | **-** | **$** | **365.0** |
| | | | | | | | | |
| U.S. Treasury bonds | $ | - | $ | 120.6 | $ | - | $ | 120.6 |
| Bonds and bond funds | | - | | 490.7 | | - | | 490.7 |
| Other debt securities | | - | | 60.0 | | - | | 60.0 |
| **Debt securities** | **$** | **-** | **$** | **671.3** | **$** | **-** | **$** | **671.3** |
| *Other investments* | | | | | | | | |
| Other | | - | | 14.8 | | - | | 14.8 |
| **Total assets** | **$** | **365.0** | **$** | **686.1** | **$** | **-** | **$** | **1,051.1** |

The fair values of the Company's pension plan assets for continuing operations at December 31, 2014 by asset category are as follows ($ in millions):

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Assets | | | | |
| *Investment funds* | | | | |
| Equity securities | $ 24.9 | $ - | $ - | $ 24.9 |
| Debt securities | - | 56.5 | - | 56.5 |
| *Other investments* | | | | |
| Other | - | 2.2 | - | 2.2 |
| Total assets | $ 24.9 | $ 58.7 | $ - | $ 83.6 |

The assets of the pension plan are held in separately administered trusts. The investment guidelines for the Company's pension plans is to create an asset allocation that is expected to deliver a rate of return sufficient to meet the long-term obligation of the plan, given an acceptable level of risk. The target investment portfolio of the Company's continuing operations pension plans is allocated as follows:

| | Target Allocation as of December 31, | |
|---|---|---|
| | 2015[1] | 2014 |
| Bonds | 35.0% | 30.0% |
| Equity securities | 62.5% | 67.5% |
| Other investments | 2.5% | 2.5% |

[1] Includes the asset allocation of the Allergan Plans following the Allergan Acquisition on March 17, 2015.

### Expected Contributions

Employer contributions to the pension plan during the year ending December 31, 2016 are expected to be $29.3 million for continuing operations and $6.0 million for discontinued operations.

### Expected Benefit Payments

Total expected benefit payments for the Company's continuing operations pension plans are as follows ($ in millions):

| | | |
|---|---|---|
| 2016 | $ | 29.3 |
| 2017 | | 31.7 |
| 2018 | | 34.6 |
| 2019 | | 37.6 |
| 2020 | | 40.5 |
| Thereafter | | 1,014.8 |
| Total liability | $ | 1,188.5 |

Expected benefit payments are based on the same assumptions used to measure the benefit obligations and include estimated future employee service. The majority of the payments will be paid from plan assets and not Company assets.

F-57

Information for continuing operations defined benefit plans with an accumulated benefit obligation in excess of plan assets is presented below ($ in millions):

|  | Defined Benefit as of December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2015 | | 2014 | |
| Projected benefit obligations | $ | 1,188.5 | $ | 111.6 |
| Accumulated benefit obligations | $ | 1,054.6 | $ | 100.8 |
| Plan assets | $ | 904.3 | $ | 83.6 |

*Amounts Recognized in Other Comprehensive Income / (Loss)*

Net loss / gain amounts reflect experience differentials primarily relating to differences between expected and actual returns on plan assets as well as the effects of changes in actuarial assumptions. Net loss amounts in excess of certain thresholds are amortized into net pension cost over the average remaining service life of employees. Balances recognized within accumulated other comprehensive income/(loss) that have not been recognized as components of net periodic benefit costs are as follows ($ in millions):

|  | Defined Benefit | |
| --- | --- | --- |
| Balance as of December 31, 2013 | $ | 5.6 |
| Net actuarial loss | | (36.4) |
| Balance as of December 31, 2014 | | (30.8) |
| Net actuarial gain | | 101.2 |
| **Balance as of December 31, 2015** | **$** | **70.4** |

*Actuarial Assumptions*

The weighted average assumptions used to calculate the projected benefit obligations of the Company's defined benefit plans, including assets and liabilities held for sale, are as follows:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2015 | 2014 |
| Discount rate | 3.8% | 2.9% |
| Salary growth rate | 3.7% | 3.7% |

The weighted average assumptions used to calculate the net periodic benefit cost of the Company's defined benefit plans, including assets and liabilities held for sale, are as follows:

|  | As of December 31, | |
| --- | --- | --- |
|  | 2015 | 2014 |
| Discount rate | 3.5% | 3.9% |
| Expected rate of return on plan assets | 4.6% | 4.9% |
| Salary growth rate | 3.5% | 3.7% |

In order to select a discount rate for purposes of valuing the plan obligations the Company uses market returns and adjusts them as needed to fit the estimated duration of the plan liabilities.

The expected rate of return represents the average rate of return to be earned on plan assets over the period the benefits included in the benefit obligation are to be paid. In developing the expected rate of return, long-term historical returns data are considered as well as actual returns on the plan assets and other capital markets experience. Using this reference information, the long-term return expectations for each asset category and a weighted average expected return was developed, according to the allocation among those investment categories.

*Other Post-Employment Benefit Plans*

As a result of the Allergan and Forest acquisitions, the Company assumed post-retirement benefit plans.  Accumulated benefit obligation and asset data for the defined benefit plans, were as follows ($ in millions):

| | |
|---|---:|
| Accumulated benefit obligation as of December 31, 2013 | $ - |
| Accumulated benefit obligation assumed as part of the Forest Acquisition | 14.0 |
| Interest cost | 0.4 |
| Actuarial loss | 6.4 |
| Benefits paid | (0.3) |
| **Accumulated benefit obligation as of December 31, 2014** | **$ 20.5** |
| Accumulated benefit obligation assumed as part of the Allergan Acquisition | 60.2 |
| Interest cost | (2.3) |
| Actuarial gain | (26.3) |
| Benefits paid | (2.0) |
| **Accumulated benefit obligation as of December 31, 2015** | **$ 50.1** |

### Savings Plans

The Company also maintains certain defined contribution savings plans covering substantially all U.S.-based employees. The Company contributes to the plans based upon the employee contributions. The Company's contributions to these retirement plans for amounts included in continuing operations were $26.6 million, $35.0 million and $24.9 million in the years ended December 31, 2015, 2014 and 2013, respectively.  The Company's contributions to these retirement plans for amounts included in income from discontinued operations were $23.6 million, $31.0 million and $22.0 million in the years ended December 31, 2015, 2014 and 2013, respectively.

## NOTE 11 — Other Income (Expense)

Other income (expense) consisted of the following ($ in millions):

| | Years Ended December 31, | | |
|---|---:|---:|---:|
| | **2015** | **2014** | **2013** |
| Bridge loan commitment fee | $ (264.9) | $ (73.6) | $ - |
| Interest rate lock | 31.0 | - | - |
| Extinguishment of debt | - | 29.9 | (18.5) |
| Other (expense) income | 0.1 | 16.4 | (0.1) |
| **Other (expense) income, net** | **$ (233.8)** | **$ (27.3)** | **$ (18.6)** |

### Bridge Loan Commitment Fee

During the year ended December 31, 2015, in connection with the Allergan Acquisition, we incurred costs associated with bridge loan commitments of $264.9 million.

During the year ended December 31, 2014, the Company recognized an expense of $47.8 million associated with the Allergan Acquisition bridge and term loan financing commitment fees. In connection with the Forest Acquisition, we secured a bridge loan commitment of up to $7.0 billion and incurred associated commitment costs of $25.8 million, which have been expensed in full.

### Interest rate lock

During the year ended December 31, 2015, the Company entered into interest rate locks on a portion of the $21.0 billion of debt issued as part of the Allergan Acquisition. As a result of the interest rate locks, the Company recorded income of $31.0 million.

### Extinguishment of Debt

On July 21, 2014, the Company redeemed the WC Notes (defined below) for $1,311.8 million, which included a make-whole premium of $61.8 million and the principal amount of the WC Notes of $1,250.0 million. As a result of the transaction, the Company recognized a gain of $29.9 million, which includes the write-off of the then outstanding unamortized premium.

As a result of the extinguishment of our $450.0 million 5.000% senior notes due 2014, the Company recorded a loss of $17.1 million in the year ended December 31, 2013. In addition, the Company incurred a $1.4 million non-cash write-off of deferred loan costs in connection with the optional prepayment of term loan indebtedness.

### NOTE 12 — Inventories

Inventories consist of finished goods held for sale and distribution, raw materials and work-in-process. Inventories are stated at the lower of cost (first-in, first-out method) or market (net realizable value). The Company writes down inventories to net realizable value based on forecasted demand, market conditions or other factors, which may differ from actual results.

Inventories consisted of the following as of December 31, 2015 and 2014 ($ in millions):

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Raw materials | $ 242.3 | $ 203.5 |
| Work-in-process | 149.7 | 80.9 |
| Finished goods | 706.3 | 763.6 |
|  | 1,098.3 | 1,048.0 |
| Less: inventory reserves | 88.6 | 63.4 |
| Total Inventories | $ 1,009.7 | $ 984.6 |

Included in finished goods were the following amounts related to the fair-value step-up of acquired inventory ($ in millions):

|  | Allergan Acquisition | Forest Acquisition | Durata Acquisition | Warner Chilcott Acquisition | Total |
|---|---|---|---|---|---|
| December 31, 2015 | $ 21.6 | $ 20.1 | $ 4.4 | $ - | $ 46.1 |
| December 31, 2014 | $ - | $ 244.7 | $ 16.3 | $ 1.9 | $ 262.9 |