**NOTE 13 — Accounts payable and accrued expenses**

Accounts payable and accrued expenses consisted of the following ($ in millions):

| | December 31, 2015 | | December 31, 2014 |
|---|---|---|---|
| **Accrued expenses:** | | | |
| Accrued third-party rebates ..................................................................................... | $ 1,281.6 | $ | 904.6 |
| Accrued payroll and related benefits ........................................................................ | 409.7 | | 198.7 |
| Accrued R&D expenditures...................................................................................... | 384.1 | | 169.9 |
| Interest payable....................................................................................................... | 312.0 | | 82.7 |
| Accrued returns ...................................................................................................... | 288.4 | | 250.3 |
| Litigation-related reserves and legal fees ................................................................. | 213.5 | | 300.9 |
| Accrued non-provision taxes .................................................................................... | 100.3 | | 3.3 |
| Accrued pharmaceutical fees .................................................................................... | 162.2 | | 118.7 |
| Accrued selling and marketing expenditures............................................................. | 127.2 | | 9.6 |
| Royalties payable.................................................................................................... | 126.9 | | 128.9 |
| Accrued severance, retention and other shutdown costs............................................. | 110.4 | | 107.2 |
| Current portion of contingent consideration obligations ............................................ | 79.9 | | 233.9 |
| Accrued professional fees........................................................................................ | 25.4 | | 39.3 |
| Dividends payable ................................................................................................... | 23.9 | | - |
| Manufacturing related.............................................................................................. | 14.9 | | 11.2 |
| Accrued warranties.................................................................................................. | 7.6 | | - |
| Other accrued expenses ........................................................................................... | 312.1 | | 147.6 |
| Total accrued expenses ............................................................................................ | $ 3,980.1 | $ | 2,706.8 |
| Accounts payable..................................................................................................... | 369.4 | | 323.3 |
| **Total Accounts Payable and Accrued Expenses** ..................................................... | $ 4,349.5 | $ | 3,030.1 |

**NOTE 14 — Property, plant and equipment, net**

Property, plant and equipment, net consisted of the following, as well as the net book value of continuing operations and discontinued operations as of December 31, 2015 and 2014 ($ in millions):

| | Machinery and Equipment | | Research and Laboratory Equipment | | Other | | Transportation | | Land, Buildings and Leasehold Improvements | | Construction in Progress | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **At December 31,** | | | | | | | | | | | | | |
| 2014.................... | $ 950.3 | $ | 155.5 | $ | 365.4 | $ | 85.7 | $ | 907.1 | $ | 150.7 | $ | 2,614.7 |
| Additions................. | 79.8 | | 4.1 | | 40.0 | | 77.5 | | 10.8 | | 236.2 | | 448.4 |
| Additions due to acquisitions.......... | 224.4 | | 19.1 | | 72.3 | | 1.0 | | 585.2 | | 312.5 | | 1,214.5 |
| Disposals/transfers/ impairments.......... | 19.9 | | (6.3) | | (23.3) | | (9.4) | | (20.3) | | (118.1) | | (157.5) |
| Transfer to assets held for sale ...................... | - | | - | | - | | - | | (4.5) | | - | | (4.5) |
| Currency translation. | (42.7) | | (0.5) | | (8.9) | | (4.3) | | (38.4) | | (2.9) | | (97.7) |

F-61

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **At December 31, 2015**................... | $ 1,231.7 | $ 171.9 | $ 445.5 | $ 150.5 | $ 1,439.9 | $ 578.4 | $ 4,017.9 |
| **Accumulated depreciation** ...... | | | | | | | |
| **At December 31, 2014**................... | $ 415.3 | $ 130.8 | $ 249.4 | $ 11.4 | $ 213.1 | $ - | $ 1,020.0 |
| Additions................. | 65.7 | 8.3 | 78.7 | 12.3 | 53.3 | - | 218.3 |
| Disposals/transfers/impairments......... | (22.6) | (8.3) | (23.3) | (6.0) | (60.5) | - | (120.7) |
| Transfer to assets held for sale......... | - | - | - | - | - | - | - |
| Currency translation... | (16.2) | (0.7) | (4.6) | (1.4) | (6.3) | | (29.2) |
| **At December 31, 2015**................... | $ 442.2 | $ 130.1 | $ 300.2 | $ 16.3 | $ 199.6 | $ - | $ 1,088.4 |

| | Machinery and Equipment | Research and Laboratory Equipment | Other | Transportation | Land, Buildings and Leasehold Improvements | Construction in Progress | Total |
|---|---|---|---|---|---|---|---|
| **At December 31, 2014**................... | $ 535.0 | $ 24.7 | $ 116.0 | $ 74.3 | $ 694.0 | $ 150.7 | $ 1,594.7 |
| Continuing Operations............ | $ 30.9 | $ 2.4 | $ 51.0 | $ 53.4 | $ 109.1 | $ 36.6 | $ 283.4 |
| Discontinued Operations...... | $ 504.1 | $ 22.3 | $ 65.0 | $ 20.9 | $ 584.9 | $ 114.1 | $ 1,311.3 |
| **At December 31, 2015**................... | $ 789.5 | $ 41.8 | $ 145.3 | $ 134.2 | $ 1,240.3 | $ 578.4 | $ 2,929.5 |
| Continuing Operations............ | $ 269.2 | $ 17.8 | $ 90.9 | $ 117.5 | $ 654.6 | $ 423.9 | $ 1,573.9 |
| Discontinued Operations...... | $ 520.3 | $ 24.0 | $ 54.4 | $ 16.7 | $ 585.7 | $ 154.5 | $ 1,355.6 |

Depreciation expense for continuing operations was $128.6 million, $71.3 million and $35.1 million in the years ended December 31, 2015, 2014 and 2013, respectively.

### NOTE 15 — Other assets

Prepaid expenses and other current assets consisted of the following ($ in millions):

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Prepaid taxes................................................................................................................. | $ 240.5 | $ 207.7 |
| Current portion of deferred loan costs................................................................................. | 36.3 | 124.9 |
| Prepaid insurance........................................................................................................... | 24.1 | 14.0 |
| Other .......................................................................................................................... | 257.6 | 132.2 |
| **Total prepaid expenses and other current assets** ............................................................. | $ 558.5 | $ 478.8 |

Investments in marketable securities and other investments consisted of the following ($ in millions):

| | December 31, 2015 | | December 31, 2014 | |
|---|---|---|---|---|
| Marketable securities: | | | | |
| U.S. Treasury and agency securities — maturing within one year ............................ | $ | 9.3 | $ | 1.0 |
| **Total marketable securities** ................................................................ | $ | 9.3 | $ | 1.0 |
| Investments and other assets: | | | | |
| Deferred loan costs ............................................................................................. | $ | 159.5 | $ | 58.9 |
| Legacy Allergan Deferred executive compensation investments ........................... | | 118.1 | | - |
| Equity method investments .................................................................................. | | 17.3 | | 0.1 |
| Cost method investments ..................................................................................... | | 16.7 | | 0.3 |
| Other long-term investments ................................................................................ | | 78.2 | | 53.9 |
| Taxes receivable ................................................................................................. | | 39.6 | | - |
| Other assets ........................................................................................................ | | 148.0 | | 40.1 |
| **Total investments and other assets** .......................................................... | $ | 577.4 | $ | 153.3 |

The Company's marketable securities and other long-term investments are classified as available-for-sale and are recorded at fair value based on quoted market prices using the specific identification method. These investments are classified as either current or non-current, as appropriate, in the Company's consolidated balance sheets.

The following table provides a summary of the fair value and unrealized gains (losses) related to the Company's available-for-sale securities ($ in millions):

| | | Gross Unrealized | Gross Unrealized | | |
|---|---|---|---|---|---|
| **At December 31, 2015** | **Amortized Cost** | **Gains** | **Losses** | | **Fair Value** |
| Available-for-sale: | | | | | |
| U.S. treasury and agency securities ........................................... | $  29.9 | $  - | $ | - $ | 29.9 |
| **Total** .......................................................................................... | $  29.9 | $  - | $ | - $ | 29.9 |

| | | Gross Unrealized | Gross Unrealized | | |
|---|---|---|---|---|---|
| **At December 31, 2014** | **Amortized Cost** | **Gains** | **Losses** | | **Fair Value** |
| Available-for-sale: | | | | | |
| U.S. treasury and agency securities ........................................... | $  1.0 | $  - | $ | - $ | 1.0 |
| **Total** .......................................................................................... | $  1.0 | $  - | $ | - $ | 1.0 |

*Current Investments*

The Company invests in U.S. treasury and agency securities. These investments are included in marketable securities on the Company's consolidated balance sheets at December 31, 2015 and 2014. Current investments are classified as available-for-sale and are recorded at fair value based on quoted market prices.

*Investment in Equity Method Investments*

The Company's equity method investments at December 31, 2015 and 2014 consist of various equity method investments in privately held companies.

*Cost Method Investments*

The Company's cost method investments consist primarily of investments in common shares of a number of private and public companies where its ownership interest is less than 20% or where it does not have the ability to exercise significant influence.

F-63

The movements in long-term investments were as follows ($ in millions):

| | Equity Method Investments | Cost Method and Other Long-term Investments |
|---|---|---|
| **Balance at December 31, 2014** | $ 0.1 | $ 54.2 |
| Additions | - | 20.0 |
| Acquired from the Allergan Acquisition | 17.3 | 15.0 |
| Other | (0.1) | 5.7 |
| **Balance at December 31, 2015** | $ 17.3 | $ 94.9 |

### Deferred Loan Costs

Expenses associated with the issuance of indebtedness are capitalized and amortized as a component of interest expense over the term of the respective financing arrangements using the effective interest method. In the event that long-term debt is prepaid, the deferred loan costs associated with such indebtedness are expensed as a component of interest expense in the period in which such prepayment is made.

### Other Assets

Other assets include security and equipment deposits and long-term receivables.

## NOTE 16 — Goodwill, Product Rights and Other Intangible Assets

### Goodwill

Goodwill for the Company's reporting segments consisted of the following ($ in millions):

| | US Brands | US Medical Aesthetics | International Brands | Anda Distribution | Total |
|---|---|---|---|---|---|
| **Balance as of December 31, 2014** | $ 20,603.7 | $ - | $ 207.6 | $ 86.3 | $ 20,897.6 |
| Additions through acquisitions | 15,435.8 | 4,006.7 | 8,283.8 | - | 27,726.3 |
| Measurement period adjustments and other | 68.0 | - | - | - | 68.0 |
| Held for sale | - | - | (2,385.8) | - | (2,385.8) |
| Foreign exchange and other adjustments | - | - | 245.4 | - | 245.4 |
| **Balance as of December 31, 2015** | $ 36,107.5 | $ 4,006.7 | $ 6,351.0 | $ 86.3 | $ 46,551.5 |

As of December 31, 2015 and 2014, the gross balance of goodwill, pre-impairments, was $46,568.8 million and $20,914.9 million, respectively.

The following items had a significant impact on goodwill in the year ended December 31, 2015:

- An increase in goodwill of $27,088.9 million resulting from the Allergan Acquisition;

- A decrease in goodwill due to classification of goodwill held for sale in connection with the Teva Transaction of $2,385.8 million. Goodwill was allocated based on the relative fair value of the former International Brands and Global Generics segments respective reporting units between the assets remaining with Allergan versus those held for sale based upon the expected price to be received upon disposition of the assets. Included within this total is goodwill acquired in the Auden Acquisition of $123.3 million.  The balance of goodwill which was held for sale as of December 31, 2014 was $3,623.9 million;

- An increase in goodwill of $33.3 million resulting from the Oculeve Acquisition;

- An increase in goodwill of $328.7 million resulting from the Kythera Acquisition;

- An increase in goodwill of $138.5 million resulting from the AqueSys Acquisition;

- An increase in goodwill of $13.6 million resulting from the Northwood Acquisition; and

- Measurement period adjustments decreasing goodwill of $21.3 million resulting from the Forest and Durata Acquisitions and an out-of-period adjustment in goodwill of $83.6 million relating to the Forest Acquisition.

During the second quarter of 2013, concurrent with the availability of discrete financial information for our discontinued operations' new reporting units, the Company completed an extensive review of its operating businesses, including exploring options for addressing overall profitability of seven Western European commercial operations consisting of, among other things, restructuring their operations, refocusing their activities on specific sub-markets, as well as potential divestitures of such businesses to other third parties. The potential impact of these conditions were considered in the Company's projections when determining the indicated fair value of its then current reporting units for the impairment tests that were performed during the second quarter of 2013. Upon completion of step one of the impairment analysis for each of the Company's reporting units, it was concluded the fair value of the then current Actavis Pharma — Europe reporting unit was below its carrying value including goodwill. As a result of completing step two of the Company's impairment analysis, the Company recorded an impairment of the then current Actavis Pharma — Europe reporting unit of $647.5 million, representing primarily all the goodwill allocated to this reporting unit, in the year ended December 31, 2013, which is included as a component of income from discontinued operations.

*Product Rights and Other Intangible Assets*

Product rights and other intangible assets consisted of the following for the years ended December 31, 2015 and 2014 ($ in millions):

| Cost Basis | Balance as of December 31, 2014 | Acquisitions | Impairments | IPR&D to CMP Transfers | Disposals/ Held for Sale/ Other | Foreign Currency Translation | Balance as of December 31, 2015 |
|---|---|---|---|---|---|---|---|
| **Intangibles with definite lives:** | | | | | | | |
| Product rights and other related intangibles | $ 15,305.7 | $ 47,163.8 | $ (242.2) | $ 3,128.5 | $ (975.5) | $ 163.9 | $ 64,544.2 |
| Trade name | - | 690.0 | - | - | - | - | 690.0 |
| **Total definite-lived intangible assets** | $ 15,305.7 | $ 47,853.8 | $ (242.2) | $ 3,128.5 | $ (975.5) | $ 163.9 | $ 65,234.2 |
| **Intangibles with indefinite lives:** | | | | | | | |
| IPR&D | $ 4,116.4 | $ 10,714.4 | $ (511.6) | $ (3,128.5) | $ (38.8) | $ (23.7) | $ 11,128.2 |
| Trade name | 76.2 | - | - | - | - | - | 76.2 |
| **Total indefinite-lived intangible assets** | $ 4,192.6 | $ 10,714.4 | $ (511.6) | $ (3,128.5) | $ (38.8) | $ (23.7) | $ 11,204.4 |
| **Total product rights and related intangibles** | $ 19,498.3 | $ 58,568.2 | $ (753.8) | $ - | $ (1,014.3) | $ 140.2 | $ 76,438.6 |

| Accumulated Amortization | Balance as of December 31, 2014 | Amortization | Impairments | Disposals/ Held for Sale/ Other | Foreign Currency Translation | Balance as of December 31, 2015 |
|---|---|---|---|---|---|---|
| **Intangibles with definite lives:** | | | | | | |
| Product rights and other related intangibles | $ (3,407.6) | $ (5,393.9) | $ (7.5) | $ 361.7 | $ (0.1) | $ (8,447.4) |
| Trade name | - | (59.5) | - | - | - | (59.5) |
| **Total definite-lived intangible assets** | $ (3,407.6) | $ (5,453.4) | $ (7.5) | $ 361.7 | $ (0.1) | $ (8,506.9) |
| **Total product rights and related intangibles** | $ (3,407.6) | $ (5,453.4) | $ (7.5) | $ 361.7 | $ (0.1) | $ (8,506.9) |
| **Net Product Rights and Other Intangibles** | $ 16,090.7 | | | | | $ 67,931.7 |

The following items had a significant impact on net product rights and other intangibles in the year ended December 31, 2015:

- The Company acquired intangible assets in connection with the Allergan Acquisition of $54,750.5 million, including product rights and other related intangibles, trade name and IPR&D assets of $44,360.5 million, $690.0 million, and $9,700.0 million, respectively;

- The Company acquired IPR&D assets of $286.0 million in connection with the Oculeve Acquisition;

- The Company acquired CMP and IPR&D assets of $2,120.0 million and $320.0 million, respectively, in connection with the Kythera Acquisition;

- The Company acquired CMP and IPR&D assets of $221.0 million and $302.0 million, respectively, in connection with the AqueSys Acquisition;

- The Company acquired CMP and IPR&D assets of $19.5 million and $13.6 million, respectively, in connection with Northwood Acquisition;

- In the year ended December 31, 2015, the Company divested Doryx resulting in a reduction of intangible assets of approximately $46.6 million;

- In the year ended December 31, 2015, the Company recognized $511.6 million in IPR&D impairments which reduced product rights and other intangibles.  As part of IPR&D impairments, the Company made the decision to abandon a select IPR&D asset (acquired in connection with the Allergan Acquisition) based on the review of research studies, resulting in an impairment of the full asset value of $300.0 million. The Company recorded an impairment of $192.1 million related to a reduction in cash flows for women's healthcare portfolio products acquired in the Warner Chilcott Acquisition as planned promotional initiatives on these future products has been reduced.  The Company also recorded an impairment of $14.0 million due to the expected delay in the launch of a product acquired as part of the Allergan Acquisition;

- In the year ended December 31, 2015, the Company recorded an impairment to CMP $206.1 million related to the abandonment of an surgical product line;

- In the year ended December 31, 2015, the Company wrote off the value of royalty rights that expired in connection with the Respiratory Sale of $38.8 million; and

- In the year ended December 31, 2015, the Company recognized an out-of-period adjustment in intangible assets relating to the Forest Acquisition of $135.0 million relating to a contract termination.

Product rights and other intangible assets consisted of the following for the years ended December 31, 2014 and 2013 ($ in millions):

| Cost Basis | Balance as of December 31, 2013 | Acquisitions | Impairments | IPR&D to CMP Transfers | Disposals/ Held for Sale/ Other | Foreign Currency Translation | Balance as of December 31, 2014 |
|---|---|---|---|---|---|---|---|
| **Intangibles with definite lives:** | | | | | | | |
| Product rights and other related intangibles | $ 4,006.6 | $ 11,850.8 | $ - | $ 140.0 | $ (685.5) | $ (6.2) | **15,305.7** |
| Trade name | - | - | - | - | - | - | - |
| **Total definite-lived intangible assets** | $ 4,006.6 | $ 11,850.8 | $ - | $ 140.0 | $ (685.5) | $ (6.2) | **15,305.7** |
| **Intangibles with indefinite lives:** | | | | | | | |
| IPR&D | $ 2,116.0 | $ 2,675.8 | $ (424.3) | $ (140.0) | $ (36.3) | $ (74.8) | **4,116.4** |
| Trade name | 76.2 | - | - | - | - | - | **76.2** |
| **Total indefinite-lived intangible assets** | $ 2,192.2 | $ 2,675.8 | $ (424.3) | $ (140.0) | $ (36.3) | $ (74.8) | **4,192.6** |
| **Total product rights and related intangibles** | $ 6,198.8 | $ 14,526.6 | $ (424.3) | $ - | $ (721.8) | $ (81.0) | **19,498.3** |

| Accumulated Amortization | Balance as of December 31, 2013 | Amortization | Impairments | Disposals/ Held for Sale/ Other | Foreign Currency Translation | Balance as of December 31, 2014 |
|---|---|---|---|---|---|---|
| **Intangibles with definite lives:** | | | | | | |
| Product rights and other related intangibles | $ (1,160.8) | $ (1,945.5) | $ (289.7) | $ 8.5 | $ (20.1) | $ (3,407.6) |
| Trade name | - | - | - | - | - | - |
| **Total definite-lived intangible assets** | $ (1,160.8) | $ (1,945.5) | $ (289.7) | $ 8.5 | $ (20.1) | $ (3,407.6) |
| **Total product rights and related intangibles** | $ (1,160.8) | $ (1,945.5) | $ (289.7) | $ 8.5 | $ (20.1) | $ (3,407.6) |
| **Net Product Rights and Other Intangibles** | $ 5,038.0 | | | | | $ 16,090.7 |

The following items had a significant impact on net product rights and other intangibles in the year ended December 31, 2014:

- On July 1, 2014, the Company acquired intangible assets in connection with the Forest Acquisition of $12,256.5 million, including IPR&D assets of $1,362.0 million, primarily related to continuing operations. On July 1, 2014, the Company divested certain products resulting in a reduction of intangible assets of approximately $13.5 million.

- On July 2, 2014, the Company acquired intangible assets in connection with the Furiex Acquisition of $1,411.6 million, including $408.6 million related to product rights and other intangibles and $1,003.0 million of acquired IPR&D. On July 2, 2014, the Company sold the product rights and other intangibles related to the royalty rights for Alogliptin and Priligy of $408.6 million to Royalty Pharm, Inc.

- In connection with the Forest Acquisition, the Company reviewed all ongoing R&D projects of both legacy Forest and Allergan plc. As a result of that review, the Company aligned future R&D expenditures with revised strategic priorities. As a result of this review, the Company abandoned certain ongoing R&D projects resulting in an impairment charge of $165.0 million in the year ended December 31, 2014.

- During the third quarter of 2014, the FDA's Cardiovascular and Renal Drugs Advisory Committee has voted to recommend against approval of Actavis' NDA for the fixed-dose combination of nebivolol and valsartan for the treatment of hypertension. As a result of the announcement, the Company recorded an impairment charge of $140.0 million for its asset in the quarter ended September 30, 2014. During the fourth quarter of 2014, the Company abandoned the IPR&D project based on FDA correspondence. As a result, the Company impaired the remaining $53.0 million related to the asset.

- On November 17, 2014, the Company acquired intangible assets in connection with the Durata Acquisition of $729.0 million, including $480.0 million related to product rights and other intangibles and $249.0 million of acquired IPR&D.

- During the fourth quarter of 2014, the Company held for sale intangible assets in connection with the Pharmatech Transaction and its respiratory franchise.

- During the fourth quarter of 2014, the Company recorded an impairment related to Doryx of $89.0 million. The impairment was caused by a shortening of the products life cycle for which to recover the value of the asset.

Assuming no additions, disposals or adjustments are made to the carrying values and/or useful lives of the intangible assets, continuing operations related to annual amortization expense on product rights and other related intangibles as of December 31, 2015 over each of the next five years is estimated to be as follows ($ in millions):

| | Amortization Expense |
|---|---|
| 2016 | $ 6,349.0 |
| 2017 | $ 6,286.8 |
| 2018 | $ 5,799.1 |
| 2019 | $ 5,717.3 |
| 2020 | $ 5,470.8 |

The above amortization expense is an estimate. Actual amounts may change from such estimated amounts due to fluctuations in foreign currency exchange rates, additional intangible asset acquisitions, finalization of preliminary fair value estimate, potential impairments, accelerated amortization or other events.

**NOTE 17 — Long-Term Debt and Leases**

Debt consisted of the following ($ in millions):

| | Balance As of | | Fair Market Value As of | |
|---|---|---|---|---|
| | December 31, 2015 | December 31, 2014 | December 31, 2015 | December 31, 2014 |
| **Senior Notes:** | | | | |
| Floating Rate Notes | | | | |
| $500.0 million floating rate notes due September 1, 2016 | $ 500.0 | $ - | $ 500.5 | $ - |
| $500.0 million floating rate notes due March 12, 2018 | 500.0 | - | 499.6 | - |
| $500.0 million floating rate notes due March 12, 2020 | 500.0 | - | 496.2 | - |
| | 1,500.0 | - | 1,496.3 | - |
| Fixed Rate Notes | | | | |
| $800.0 million 5.750% notes due April 1, 2016 | 800.0 | - | 808.4 | - |
| $1,000.0 million 1.850% notes due March 1, 2017 | 1,000.0 | - | 1,001.5 | - |
| $500.0 million 1.300% notes due June 15, 2017 | 500.0 | 500.0 | 496.3 | 489.0 |
| $1,200.0 million 1.875% notes due October 1, 2017 | 1,200.0 | 1,200.0 | 1,196.0 | 1,187.3 |
| $3,000.0 million 2.350% notes due March 12, 2018 | 3,000.0 | - | 3,004.6 | - |
| $250.0 million 1.350% notes due March 15, 2018 | 250.0 | - | 244.9 | - |
| $1,050.0 million 4.375% notes due February 1, 2019 | 1,050.0 | 1,050.0 | 1,099.5 | 1,111.4 |
| $500.0 million 2.450% notes due June 15, 2019 | 500.0 | 500.0 | 494.4 | 498.2 |
| $400.0 million 6.125% notes due August 15, 2019 | 400.0 | 400.0 | 444.2 | 457.9 |
| $3,500.0 million 3.000% notes due March 12, 2020 | 3,500.0 | - | 3,505.1 | - |
| $650.0 million 3.375% notes due September 15, 2020 | 650.0 | - | 656.6 | - |
| $750.0 million 4.875% notes due February 15, 2021 | 750.0 | 750.0 | 807.4 | 808.9 |
| $1,200.0 million 5.000% notes due December 15, 2021 | 1,200.0 | 1,200.0 | 1,299.4 | 1,301.0 |
| $3,000.0 million 3.450% notes due March 15, 2022 | 3,000.0 | - | 3,006.8 | - |
| $1,700.0 million 3.250% notes due October 1, 2022 | 1,700.0 | 1,700.0 | 1,669.6 | 1,647.5 |
| $350.0 million 2.800% notes due March 15, 2023 | 350.0 | - | 327.7 | - |
| $1,200.0 million 3.850% notes due June 15, 2024 | 1,200.0 | 1,200.0 | 1,202.6 | 1,215.5 |
| $4,000.0 million 3.800% notes due March 15, 2025 | 4,000.0 | - | 3,984.6 | - |
| $2,500.0 million 4.550% notes due March 15, 2035 | 2,500.0 | - | 2,462.2 | - |
| $1,000.0 million 4.625% notes due October 1, 2042 | 1,000.0 | 1,000.0 | 956.1 | 980.1 |
| $1,500.0 million 4.850% notes due June 15, 2044 | 1,500.0 | 1,500.0 | 1,483.6 | 1,539.9 |
| $2,500.0 million 4.750% notes due March 15, 2045 | 2,500.0 | - | 2,452.7 | - |
| | 32,550.0 | 11,000.0 | 32,604.2 | 11,236.7 |
| **Total Senior Notes Gross** | **34,050.0** | **11,000.0** | **34,100.5** | **11,236.7** |
| Unamortized premium | 225.9 | 239.9 | - | - |
| Unamortized discount | (107.4) | (52.1) | - | - |
| **Total Senior Notes Net** | **34,168.5** | **11,187.8** | **34,100.5** | **11,236.7** |
| **Term Loan Indebtedness:** | | | | |
| WC Term Loan | | | | |
| WC Three Year Tranche variable rate debt maturing October 1, 2016 | 191.5 | 506.9 | | |
| WC Five Year Tranche variable rate debt maturing October 1, 2018** | 498.8 | 744.7 | | |
| | 690.3 | 1,251.6 | | |
| ACT Term Loan | | | | |
| 2017 Term Loan variable rate debt maturing October 31, 2017** | 572.1 | 932.6 | | |
| 2019 Term Loan variable rate debt maturing July 1, 2019** | 1,700.0 | 1,900.0 | | |
| | 2,272.1 | 2,832.6 | | |
| AGN Term Loan | | | | |
| AGN Three Year Tranche variable rate debt maturing March 17, 2018** | 2,750.0 | - | | |
| AGN Five Year Tranche variable rate debt maturing March 17, 2020** | 2,543.8 | - | | |
| | 5,293.8 | - | | |
| **Total Term Loan Indebtedness** | **8,256.2** | **4,084.2** | | |
| **Other Indebtedness** | | | | |
| Revolver Borrowings | 200.0 | 255.0 | | |
| Other | 97.4 | - | | |
| **Total Other Borrowings** | **297.4** | **255.0** | | |
| **Capital Leases** | **4.1** | **4.1** | | |
| **Total Indebtedness** | **$ 42,726.2** | **$ 15,531.1** | | |

** The indebtedness requires a quarterly repayment of 2.5%.

Fair market value in the table above is determined in accordance with ASC Topic 820 "Fair Value Measurement" ("ASC 820") under Level 2 based upon quoted prices for similar items in active markets. The book value of the outstanding term loan indebtedness approximates fair value as the debt is at variable interest rates and re-prices frequently.

Unless otherwise indicated, the remaining loan balances after the quarterly required payments are due upon maturity.

### Floating Rate Notes

On March 4, 2015, Actavis Funding SCS, a limited partnership (société en commandite simple) organized under the laws of the Grand Duchy of Luxembourg and an indirect wholly-owned subsidiary of Allergan plc, issued floating rate notes due 2016 (the "2016 Floating Rate Notes"), floating rate notes due 2018 (the "2018 Floating Rate Notes"), floating rate notes due 2020 (the "2020 Floating Rate Notes"), 1.850% notes due 2017 (the "1.850% 2017 Notes"), 2.350% notes due 2018 (the "2.350% 2018 Notes"), 3.000% notes due 2020 (the "3.000% 2020 Notes"), 3.450% notes due 2022 (the "3.450% 2022 Notes"), 3.800% notes due 2025 (the "3.800% 2025 Notes"), 4.550% notes due 2035 (the "4.550% 2035 Notes") and 4.750% notes due 2045 (the "4.750% 2045 Notes"). The notes are fully and unconditionally guaranteed by Actavis Funding SCS's indirect parents, Warner Chilcott Limited and Actavis Capital S.a.r.l. ("Actavis Capital"), and by Actavis, Inc., a subsidiary of Actavis Capital, on an unsecured and unsubordinated basis. Allergan plc has not guaranteed the notes.

The 2016 Floating Rate Notes, the 2018 Floating Rate Notes and the 2020 Floating Rate Notes bear interest at a floating rate equal to three-month LIBOR plus 0.875%, 1.080% and 1.255% per annum, respectively. Interest on the 2016 Floating Rate Notes is payable quarterly on March 1, June 1, September 1 and December 1 of each year, and began on June 1, 2015. Interest on the 2018 Floating Rate Notes and the 2020 Floating Rate Notes is payable quarterly on March 12, June 12, September 12 and December 12 of each year, and began on June 12, 2015.

### Fixed Rate Notes

#### Acquired Allergan Notes

On March 17, 2015 in connection with the Allergan Acquisition, the Company acquired, and subsequently guaranteed, along with Warner Chilcott Limited, the indebtedness of Allergan, Inc. comprised of the $350.0 million 2.800% senior notes due 2023, the $650.0 million 3.375% senior notes due 2020, the $250.0 million 1.350% senior notes due 2018 and the $800.0 million 5.750% senior notes due 2016. Interest payments are due on the $350.0 million senior notes semi-annually on the principal amount of the notes at a rate of 2.80% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption, if the redemption occurs prior to December 15, 2022 (three months prior to the maturity of the 2023 senior notes). If the redemption occurs on or after December 15, 2022, then such redemption is not subject to the make-whole provision. Interest payments are due on the $650.0 million senior notes semi-annually on the principal amount of the notes at a rate of 3.375% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption. Interest payments are due on the $250.0 million senior notes semi-annually on the principal amount of the notes at a rate of 1.350% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption. Interest payments are due on the $800.0 million senior notes semi-annually on the principal amount of the notes at a rate of 5.750% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption. The fair value of the acquired senior notes was determined to be $2,087.5 million as of March 17, 2015. As such, as part of acquisition accounting, the company recorded a premium of $37.5 million to be amortized as contra interest over the life of the notes.

#### Acquired Forest Notes

On July 1, 2014 in connection with the Forest Acquisition, the Company acquired the indebtedness of Forest comprised of the $1,050.0 million 4.375% senior notes due 2019, the $750.0 million 4.875% senior notes due 2021 and the $1,200.0 million 5.000% senior notes due 2021 (together the "Acquired Forest Notes"). Interest payments are due on the $1,050.0 million senior notes semi-annually in arrears on February 1 and August 1 beginning August 1, 2014. Interest payments are due on the $750.0 million senior notes due 2021 semi-annually in arrears on February 15 and August 15 beginning August 15, 2014. Interest payments are due on the $1,200.0 million senior note due 2021 semi-annually in arrears on June 15 and December 15, beginning December 15, 2014. As a result of acquisition accounting, the notes were fair valued with a premium of $260.3 million as of July 1, 2014, which will be amortized as contra-interest over the life of the notes.

### 2014 Notes Issuance

On June 10, 2014, Actavis Funding SCS, a limited partnership (*societe en commandite simple*), organized under the laws of the Grand Duchy of Luxembourg, an indirect subsidiary of Allergan plc, issued the $500.0 million 1.300% notes due 2017, $500.0 million 2.450% notes due 2019, $1,200.0 million 3.850% notes due 2024 and $1,500.0 million 4.850% notes due 2044 (the "2014 New Notes"). Interest payments are due on the 2014 New Notes on June 15 and December 15 semi-annually, beginning on December 15, 2014. The guarantors of the debt are Warner Chilcott Limited, Actavis Capital S.a.r.l., and Actavis, Inc. Allergan plc will not guarantee the 2014 New Notes.

### Actavis, Inc. Supplemental Indenture

On October 1, 2013, the Company, Actavis, Inc., a wholly owned subsidiary of the Company, and Wells Fargo Bank, National Association, as trustee, entered into a fourth supplemental indenture (the "Fourth Supplemental Indenture") to the indenture, dated as of August 24, 2009 (the "Base Indenture" and, together with the First Supplemental Indenture, the Second Supplemental Indenture and the Third Supplemental Indenture (each as defined below), the "Indenture"), as supplemented by the first supplemental indenture, dated as of August 24, 2009 (the "First Supplemental Indenture"), the second supplemental indenture, dated as of May 7, 2010 (the "Second Supplemental Indenture"), and the third supplemental indenture, dated as of October 2, 2012 (the "Third Supplemental Indenture"). Pursuant to the Fourth Supplemental Indenture, the Company has provided a full and unconditional guarantee of Actavis, Inc.'s obligations under its then outstanding $450.0 million 5.000% senior notes due August 15, 2014, (the "2014 Notes"), its $400.0 million 6.125% senior notes due August 15, 2019 (the "2019 Notes"), its $1,200.0 million 1.875% senior notes due October 1, 2017 (the "2017 Notes"), its $1,700.0 million 3.250% senior notes due October 1, 2022 (the "2022 Notes") and its $1,000.0 million 4.625% Senior Notes due October 1, 2042 (the "2042 Notes").

### WC Supplemental Indenture

On October 1, 2013, the Company, WCCL (defined below), Warner Chilcott Finance LLC (the "Co-Issuer" and together with WC Company, the "Issuers") and Wells Fargo Bank, National Association, as trustee (the "WC Trustee"), entered into a third supplemental indenture (the "Supplemental Indenture") to the indenture, dated as of August 20, 2010 (the "WC Indenture"), among the Issuers, the guarantors party thereto and the WC Trustee, with respect to the Issuers' WC Notes. Pursuant to the Supplemental Indenture, the Company had provided a full and unconditional guarantee of the Issuers' obligations under the WC Notes and the WC Indenture.

On July 21, 2014, the Company redeemed the WC Notes for $1,311.8 million, which includes a make-whole premium of $61.8 million and the principal amount of the WC Notes of $1,250.0 million. As a result of the transaction, the Company recognized a gain in July of 2014 of $29.9 million, which includes the write-off of the then outstanding unamortized premium.

### 2012 Notes Issuance

On October 2, 2012, Actavis, Inc. issued the 2017 Notes, the 2022 Notes, and the 2042 Notes (collectively the "2012 Senior Notes"). Interest payments are due on the 2012 Senior Notes semi-annually in arrears on April 1 and October 1 beginning April 1, 2013. Net proceeds from the offering of the 2012 Senior Notes were used for the Actavis Group acquisition.

### 2009 Notes Issuance

On August 24, 2009, Actavis, Inc. issued the 2014 Notes and the 2019 Notes (collectively the "2009 Senior Notes"). Interest payments are due on the 2009 Senior Notes semi-annually in arrears on February 15 and August 15, respectively, beginning February 15, 2010. Net proceeds from the offering of 2009 Senior Notes were used to repay certain debt with the remaining net proceeds being used to fund a portion of the cash consideration for the Arrow Group acquisition. The 2014 Notes, which had an outstanding principal balance of $450.0 million and which were fully and unconditionally guaranteed by us, were redeemed on November 5, 2013 at a redemption price equal to $465.6 million, which resulted in a cash expense of $15.6 million in the fourth quarter of 2013.

### Credit Facility Indebtedness

#### WC Term Loan Agreement

On December 17, 2014, Allergan plc and certain of its subsidiaries entered into a second amendment agreement (the "WC Term Loan Amendment") among Allergan plc, Warner Chilcott Limited, Warner Chilcott Finance, LLC, Actavis WC 2 S.à r.l. ("Actavis WC 2"), Warner Chilcott Company, LLC ("WCCL"), Warner Chilcott Corporation ("WC Corporation" and together with Actavis WC 2 and WCCL, the "WC Borrowers"), Bank of America, N.A. ("BofA"), as administrative agent, and the lenders party thereto. The WC

Term Loan Amendment amends and restates Allergan plc's existing amended and restated WC term loan credit and guaranty agreement, dated as of June 9, 2014 (such agreement, prior to its amendment and restatement pursuant to the WC Term Loan Amendment, the "2014 WC Term Loan Agreement" and the 2014 WC Term Loan Agreement as amended and restated by the WC Term Loan Amendment, the "WC Term Loan Agreement"), among the WC Borrowers, Allergan plc, Warner Chilcott Limited, Warner Chilcott Finance, LLC, the lenders from time to time party thereto and BofA, as administrative agent, which amended and restated Allergan plc's existing WC term loan credit and guaranty agreement, dated as of August 1, 2013 (such agreement, prior to its amendment and restatement, the "Existing WC Term Loan Agreement") among the WC Borrowers, Warner Chilcott Finance, LLC, Actavis Limited, BofA, as administrative agent and a syndicate of banks participating as lenders.

Pursuant to the Existing WC Term Loan Agreement, on October 1, 2013 (the "WC Closing Date"), the lenders party thereto provided term loans in a total aggregate principal amount of $2.0 billion, comprised of (i) a $1.0 billion tranche that will mature on October 1, 2016 (the "WC Three Year Tranche") and (ii) a $1.0 billion tranche that will mature on October 1, 2018 (the "WC Five Year Tranche"). The proceeds of borrowings under the Existing WC Term Loan Agreement, together with $41.0 million of cash on hand, were used to finance the repayment in full of all amounts outstanding under Warner Chilcott's then-existing Credit Agreement, dated as of March 17, 2011, as amended by Amendment No. 1 on August 20, 2012, among the WC Borrowers, Warner Chilcott Holdings Company III, Limited, BofA, as administrative agent and a syndicate of banks participating as lenders.

Borrowings under the WC Term Loan Agreement bear interest at the applicable borrower's choice of a per annum rate equal to either (a) a base rate plus an applicable margin per annum varying from (x) 0.00% per annum to 0.75% per annum under the WC Three Year Tranche and (y) 0.125% per annum to 0.875% per annum under the WC Five Year Tranche, depending on the publicly announced debt ratings for non-credit-enhanced, senior unsecured long-term indebtedness of Allergan plc (such applicable debt rating the "Debt Rating") or (b) a Eurodollar rate, plus an applicable margin varying from (x) 1.00% per annum to 1.75% per annum under the WC Three Year Tranche and (y) 1.125% per annum to 1.875% per annum under the WC Five Year Tranche, depending on the Debt Rating. The outstanding principal amount of loans under the WC Three Year Tranche is not subject to quarterly amortization and shall be payable in full on the three year anniversary of the WC Closing Date. The outstanding principal amount of loans under the WC Five Year Tranche is payable in equal quarterly amounts of 2.50% per quarter prior to the fifth anniversary of the WC Closing Date, with the remaining balance payable on the fifth year anniversary of the WC Closing Date.

The Company is subject to, and, at December 31, 2015, was in compliance with, all financial and operational covenants under the terms of the WC Term Loan Agreement. In February 2016, the Company prepaid approximately $310.0 million of indebtedness under the outstanding WC Five Year Tranche.

### ACT Term Loan

On December 17, 2014, Allergan plc and certain of its subsidiaries entered into a third amendment agreement (the "ACT Term Loan Amendment") among Allergan plc, Warner Chilcott Limited, Actavis Capital, Actavis, Inc., Actavis Funding SCS, BofA, as administrative agent, and the lenders party thereto. The ACT Term Loan Amendment amends and restates Allergan plc's existing second amended and restated Allergan term loan credit and guaranty agreement, dated as of March 31, 2014 (such agreement, prior to its amendment and restatement pursuant to the ACT Term Loan Amendment, the "2014 ACT Term Loan Agreement" and the 2014 ACT Term Loan Agreement as amended and restated by the ACT Term Loan Amendment, the "ACT Term Loan") among Actavis Capital, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, BofA, as administrative agent, and the lenders from time to time party thereto, which amended and restated Allergan plc's existing amended and restated Allergan term loan credit and guaranty agreement, dated as of October 1, 2013 (such agreement, prior to its amendment and restatement, the "Existing ACT Term Loan Agreement") among Actavis Capital, Allergan plc, Actavis, Inc., BofA, as administrative agent, and the lenders from time to time party thereto.

The Existing ACT Term Loan Agreement amended and restated Actavis, Inc.'s $1,800.0 million senior unsecured term loan credit facility, dated as of June 22, 2012. At the closing of the Existing ACT Term Loan Agreement, an aggregate principal amount of $1,572.5 million was outstanding (the "2017 term-loan"). The 2017 term-loan matures on October 31, 2017. The outstanding principal amount is payable in equal quarterly installments of 2.50% per quarter, with the remaining balance payable on the maturity date.

On March 31, 2014, Allergan plc, Actavis Capital, Actavis, Inc., BofA, as Administrative Agent, and a syndicate of banks participating as lenders entered into the 2014 ACT Term Loan Agreement to amend and restate the Existing ACT Term Loan Agreement. On July 1, 2014, in connection with the Forest Acquisition, the Company borrowed $2.0 billion of term loan indebtedness under tranche A-2 of the 2014 ACT Term Loan Agreement, which is due July 1, 2019 (the "2019 term-loan"). The outstanding principal amount is payable in equal quarterly installments of 2.50% per quarter, with the remaining balance payable on the maturity date.

The ACT Term Loan Agreement provides that loans thereunder will bear interest, at the Company's choice, of a per annum rate equal to either (a) a base rate, plus an applicable margin per annum varying from (x) 0.00% per annum to 1.00% per annum with respect to the 2017 term-loan and (y) 0.125% per annum to 0.875% per annum with respect to the 2019 term-loan, depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from (x) 1.00% per annum to 2.00% per annum with respect to the 2017 term-loan and (y) 1.125% per annum to 1.875% per annum with respect to the 2019 term-loan, depending on the Debt Rating.

The Company is subject to, and at December 31, 2015 was in compliance with, all financial and operational covenants under the terms of the ACT Term Loan Agreement.  In February 2016, the Company prepaid approximately $200.0 million of indebtedness under the outstanding 2017 Term Loan.

### AGN Term Loan

On December 17, 2014, Allergan, Inc. and certain of its subsidiaries entered into a senior unsecured term loan credit agreement (the "AGN Term Loan"), among Actavis Capital, as borrower, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto (the "Term Lenders"), JPMorgan Chase Bank, N.A. ("JPMCB"), as administrative agent and the other financial institutions party thereto. Under the AGN Term Loan, the Term Lenders provided (i) a $2.75 billion tranche maturing on March 17, 2018 (the "AGN Three Year Tranche") and (ii) a $2.75 billion tranche and maturing on March 17, 2020 (the "AGN Five Year Tranche"). The proceeds of borrowings under the AGN Term Loan were used to finance, in part, the cash component of the Allergan Acquisition consideration and certain fees and expenses incurred in connection with the Allergan Acquisition.

Borrowings under the AGN Term Loan bear interest at our choice of a per annum rate equal to either (a) a base rate plus an applicable margin per annum varying from (x) 0.00% per annum to 1.00% per annum under the AGN Three Year Tranche and (y) 0.125% per annum to 1.250%% per annum under the AGN Five Year Tranche, depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from (x) 1.00% per annum to 2.00% per annum under the AGN Three Year Tranche and (y) 1.125% per annum to 2.250% per annum under the AGN Five Year Tranche, depending on the Debt Rating. The outstanding principal amount of loans under the AGN Three Year Tranche is not subject to quarterly amortization and shall be payable in full on the maturity date. The outstanding principal amount of loans under the AGN Five Year Tranche is payable in equal quarterly amounts of 2.50% per quarter prior to March 17, 2020, with the remaining balance payable on March 17, 2020.

The obligations of Actavis Capital under the Term Loan Credit Agreement are guaranteed by Warner Chilcott Limited, Actavis, Inc. and Actavis Funding SCS and will be guaranteed by any subsidiary of Allergan plc (other than Actavis Capital or a direct subsidiary of Allergan plc) that becomes a guarantor of third party indebtedness in an aggregate principal amount exceeding $350.0 million (unless, in the case of a foreign subsidiary, such guarantee would give rise to adverse tax consequences as reasonably determined by Allergan plc).

The Company is subject to, and at December 31, 2015 was in compliance with, all financial and operational covenants under the terms of the AGN Term Loan.

### Bridge Loan Facility

On December 17, 2014, Allergan and certain of its subsidiaries entered into a 364-day senior unsecured bridge credit agreement (the "Bridge Loan Facility"), among Actavis Capital, as borrower, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto, JPMCB, as administrative agent and the other financial institutions party thereto. No amounts were borrowed under the Bridge Loan Facility and the commitments under the Bridge Loan Facility expired on March 17, 2015 upon the closing of the Allergan Acquisition.

### Cash Bridge Loan Facility

On March 11, 2015, Allergan and certain of its subsidiaries entered into a 60-day senior unsecured bridge credit agreement (the "Cash Bridge Loan Facility"), among Actavis Capital, as borrower, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto (the "Cash Bridge Lenders"), JPMCB, as administrative agent and the other financial institutions party thereto. Under the Cash Bridge Loan Facility, the Cash Bridge Lenders committed to provide, subject to certain conditions, unsecured bridge financing, of which $2.8 billion was drawn to finance the Allergan Acquisition on March 17, 2015. The outstanding balance of the Cash Bridge Loan Facility was repaid on April 9, 2015.

Borrowings under the Cash Bridge Loan Facility bore interest at our choice of a per annum rate equal to either (a) a base rate plus an applicable margin per annum varying from 0.00% per annum to 1.00% per annum, depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from 1.00% per annum to 2.00% per annum, depending on the Debt Rating.

*Revolving Credit Facility*

On December 17, 2014, Allergan plc and certain of its subsidiaries entered into a revolving credit loan and guaranty agreement (the "Revolver Agreement") among Actavis Capital, as borrower, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto (the "Revolving Lenders"), JPMCB as administrative agent, J.P. Morgan Europe Limited, as London agent, and the other financial institutions party thereto. Under the Revolver Agreement, the Revolving Lenders have committed to provide an unsecured revolving credit facility in an aggregate principal amount of up to $1.0 billion. The Revolver Agreement replaces Allergan plc's existing $750 million second amended and restated Actavis revolving credit and guaranty agreement dated as of June 30, 2014 (the "Existing Revolver") among Actavis Capital, Allergan plc, Warner Chilcott Limited, Actavis, Inc., Actavis Funding SCS, BofA, as administrative agent and the lenders from time to time party thereto. At closing, $600.0 million of loans were borrowed under the Revolver Agreement.

The Revolver Agreement provides that loans thereunder will bear interest, at Actavis Capital's choice, of a per annum rate equal to either (a) a base rate, plus an applicable margin per annum varying from 0.00% per annum to 1.00% per annum depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from 0.875% per annum to 2.00% per annum depending on the Debt Rating. Additionally, to maintain availability of funds, the Company pays an unused commitment fee, which according to the pricing grid is set at 0.075% to 0.250% per annum, depending on the Debt Rating, of the unused portion of the revolver. The Revolving Credit Agreement will mature on December 17, 2019.

The obligations of Actavis Capital under the Revolver Agreement are guaranteed by Allergan plc, Warner Chilcott Limited, Actavis, Inc. and Actavis Funding SCS and will be guaranteed by any subsidiary of Allergan (other than Actavis Capital) that becomes a guarantor of third party indebtedness in an aggregate principal amount exceeding $350 million (unless, in the case of a foreign subsidiary, such guarantee would give rise to adverse tax consequences as reasonably determined by Allergan plc).

The Company is subject to, and as of December 31, 2015 was in compliance with, all financial and operational covenants under the terms of the Revolving Credit Facility. In the fourth quarter of 2015, the Company borrowed $800.0 million under the revolving credit facility to fund, in part, the Kythera Acquisition. At December 31, 2015, $200.0 million was outstanding and was paid in full in January 2016. As of December 31, 2015, letters of credit outstanding were $28.8 million. The net availability under the Revolving Credit Facility was $771.2 million.

### Annual Debt Maturities

As of December 31, 2015, annual debt maturities were as follows ($ in millions):

|  | Total Payments |
|---|---|
| 2016 | $ 2,175.5 |
| 2017 | 3,999.8 |
| 2018 | 7,095.1 |
| 2019 | 3,325.0 |
| 2020 | 6,093.8 |
| 2021 and after | 19,617.0 |
|  | $ 42,306.2 |
| Capital leases | 4.1 |
| Other borrowings | 297.4 |
| Unamortized premium | 225.9 |
| Unamortized discount | (107.4) |
| **Total Indebtedness** | **$ 42,726.2** |

Amounts represent total anticipated cash payments assuming scheduled repayments.

*Lease Commitments*

The Company has operating leases for certain facilities and equipment. The terms of the operating leases for the Company's facility leases require the Company to pay property taxes, normal maintenance expense and maintain minimum insurance coverage. Total rental expense for operating leases for December 31, 2015, 2014, and 2013 was $49.9 million, $69.7 million, and $12.3 million, respectively. The Company also has capital leases for certain facilities and equipment, as addressed below. The future minimum lease payments under both capital and operating leases that have remaining terms in excess of one year are ($ in millions):

|  | Capital | | Operating | |
|---|---|---|---|---|
| 2016 | $ | 0.3 | $ | 29.9 |
| 2017 | | 0.3 | | 27.7 |
| 2018 | | 0.3 | | 23.6 |
| 2019 | | 0.3 | | 21.6 |
| 2020 | | 0.3 | | 17.0 |
| Thereafter | | 2.6 | | 70.8 |
| Total minimum lease payments | $ | 4.1 | $ | 190.6 |
| Less: amount representing interest | | - | | |
| **Present value of net minimum lease payments** | **$** | **4.1** | | |

The Company has entered into certain sub-lease agreements which will offset future lease commitments.

### NOTE 18 — Other Long-Term Liabilities

Other long-term liabilities consisted of the following ($ in millions):

|  | December 31, 2015 | | December 31, 2014 | |
|---|---|---|---|---|
| Acquisition related contingent consideration liabilities | $ | 788.1 | $ | 139.9 |
| Long-term pension and post retirement liability | | 222.1 | | 48.1 |
| Legacy Allergan deferred executive compensation | | 117.9 | | - |
| Long-term severance and restructuring liabilities | | 34.9 | | 3.9 |
| Product warranties | | 28.4 | | - |
| Long-term contractual obligations | | 26.4 | | 29.7 |
| Litigation-related reserves | | - | | 4.9 |
| Deferred Revenue | | 18.2 | | 26.3 |
| Other long-term liabilities | | 26.0 | | 0.5 |
| **Total other long-term liabilities** | **$** | **1,262.0** | **$** | **253.3** |

The Company determines the acquisition date fair value of contingent consideration obligations based on a probability-weighted income approach derived from revenue estimates and a probability assessment with respect to the likelihood of achieving contingent obligations including contingent payments such as milestone obligations, royalty obligations and contract earn-out criteria, where applicable. The fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined in ASC 820. The resultant probability-weighted cash flows are discounted using an appropriate effective annual interest rate to reflect the internal rate of return and incremental commercial uncertainty, major risks and uncertainties associated with the successful completion of the projects triggering the contingent obligation. At each reporting date, the Company revalues the contingent consideration obligation to estimated fair value and records changes in fair value as income or expense in our consolidated statement of operations. Changes in the fair value of the contingent consideration obligations may result from changes in discount periods and rates, changes in the timing and amount of revenue estimates and changes in probability assumptions with respect to the likelihood of achieving the various contingent consideration obligations. Accretion expense related to the increase in the net present value of the contingent liability is included in operating income for the period.

### NOTE 19 — Income Taxes

For the years ended December 31, 2015, 2014 and 2013, foreign losses before taxes were $4,174.4 million, $2,841.8 million and $604.7 million, respectively.

The Company's (benefit)/provision for income taxes consisted of the following ($ in millions):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Current (benefit) provision: | | | |
| U.S. federal | $ 14.4 | $ (62.0) | $ (105.1) |
| U.S. state | 9.7 | 12.9 | (3.6) |
| Non-U.S. | 225.6 | 17.2 | (14.1) |
| Total current (benefit) provision | 249.7 | (31.9) | (122.8) |
| Deferred (benefit) provision: | | | |
| U.S. federal | (1,326.2) | (304.3) | (2.0) |
| U.S. state | (58.7) | (5.1) | 0.8 |
| Non-U.S. | (426.7) | (125.7) | (31.3) |
| Total deferred (benefit) provision | (1,811.6) | (435.1) | (32.5) |
| Total provision for income taxes | $ (1,561.9) | $ (467.0) | $ (155.3) |

The exercise of certain equity based awards resulted in a tax benefit that has been reflected as an increase to additional paid-in capital. Such benefits recorded were $76.1 million, $51.1 million and $69.0 million for the years ended December 31, 2015, 2014 and 2013, respectively.

The reconciliations for the years ended December 31, 2015, 2014 and 2013 between the statutory Irish and Bermuda income tax rates for Allergan plc and Warner Chilcott Limited, respectively, and the effective income tax rates were as follows:

| | Allergan plc | | |
| --- | --- | --- | --- |
| | Years Ended December 31, | | |
| | 2015 | 2014 | 2013 |
| Statutory rate | (12.5%) | (12.5%) | (12.5%) |
| Earnings subject to the U.S. federal and state tax rates | (18.5%) | (11.3%) | (13.9%) |
| Earnings subject to rates different than the statutory rate | (2.3%) | 1.1% | (2.5%) |
| Tax reserves and audit outcomes | 0.3% | 1.3% | 4.8% |
| Non-deductible expenses | 5.4% | 5.0% | 0.1% |
| R&D credits and U.S. manufacturing deduction | (0.5%) | (1.2%) | (0.4%) |
| Rate changes | 0.0% | 1.5% | (0.1%) |
| Valuation allowances | (6.7%) | 0.0% | (0.8%) |
| Other | (0.5%) | (0.1%) | 0.4% |
| Effective income tax rate | (35.3%) | (16.2%) | (24.9%) |

| | Warner Chilcott Limited | | |
| --- | --- | --- | --- |
| | Years Ended December 31, | | |
| | 2015 | 2014 | 2013 |
| Statutory rate | 0.0% | 0.0% | 0.0% |
| Earnings subject to the U.S. federal and state tax rates | (29.6%) | (18.1%) | (22.3%) |
| Earnings subject to rates different than the statutory rate | (4.8%) | (5.1%) | (7.7%) |
| Tax reserves and audit outcomes | 0.3% | 1.3% | 5.0% |
| Non-deductible expenses | 5.6% | 5.2% | 0.1% |
| R&D credits and U.S. manufacturing deduction | (0.6%) | (1.2%) | (0.5%) |
| Rate changes | 0.0% | 1.5% | (0.1%) |
| Valuation allowances | (6.9%) | 0.0% | (0.8%) |
| Other | (0.4%) | (0.3%) | 0.2% |
| Effective income tax rate | (36.4%) | (16.7%) | (26.1%) |

In December 2009, the Commonwealth of Puerto Rico Department of Economic Development and Commerce granted a tax ruling to the Company on behalf of its Puerto Rican subsidiary for industrial development income derived from its manufacturing, servicing and licensing activities subject to a reduced 2% income tax rate. This tax ruling resulted in a tax benefit of $97.5 million for the year ended December 31, 2015. For the years ended December 31, 2014 and 2013, the tax ruling did not result in an income tax benefit. Continued qualification for the tax ruling is subject to certain requirements. The tax ruling is effective through 2024. The Company's Puerto Rican subsidiary is one of the entities included in the Teva Transaction.

Deferred tax assets and liabilities are measured based on the difference between the financial statement and tax basis of assets and liabilities at the applicable tax rates. The significant components of the Company's net deferred tax assets and liabilities consisted of the following (in millions):

|  | Years Ended December 31, | |
|  | 2015 | 2014 |
| Benefits from net operating and capital losses and tax credit carryforwards | $ 1,305.8 | $ 709.9 |
| Differences in financial statement and tax accounting for: |  |  |
| Inventories, receivables and accruals | 1,023.8 | 404.5 |
| Outside basis differences | 5,738.8 | - |
| Share-based compensation | 596.6 | 235.9 |
| Basis difference in debt | 82.2 | 89.9 |
| Other | 15.7 | 41.9 |
| Total deferred tax assets, gross | $ 8,762.9 | $ 1,482.1 |
| Less: Valuation allowance | (196.2) | (474.0) |
| Total deferred tax asset, net | $ 8,566.7 | $ 1,008.1 |
| Differences in financial statement and tax accounting for: |  |  |
| Property, equipment and intangible assets | (14,080.7) | (2,346.7) |
| Outside basis differences | (2,422.2) | (944.5) |
| Total deferred tax liabilities | $ (16,502.9) | $ (3,291.2) |
| Total deferred taxes | $ (7,936.2) | $ (2,283.1) |

During the years ended December 31, 2015 and 2014, respectively, the Company recorded deferred tax liabilities of approximately $12.9 billion and $2.6 billion related to acquired entities.

The Company had the following carryforward tax attributes at December 31, 2015:

- $866.6 million U.S. capital loss which expires in 2018;

- $1,961.6 million U.S. federal net operating losses ("NOL") and other tax attributes which begin to expire in 2016;

- $289.2 million of U.S. tax credits which begin to expire in 2018;

- $367.7 million U.S. state tax NOLs which begin to expire in 2016;

- $46.7 million non-U.S. tax NOLs which begin to expire in 2016 and $354.2 million non-U.S. NOLs which are not subject to expiration.

Net operating loss and tax credit carryforwards of $1,931.7 million and $191.7 million, respectively, are subject to an annual limitation under Internal Revenue Code Section 382.

During the year ended December 31, 2015, the Company recorded a benefit of $296.2 million for the reversal of a valuation allowance on a portion of U.S. capital loss carryforwards resulting from restructuring associated with the sale of the generics business. As of December 31, 2015, a valuation allowance of $196.2 million has been maintained due to the uncertainty of realizing net operating losses ($88.2 million), tax credits ($101.8 million), a capital loss carryforward ($5.8 million) and other deferred tax assets ($0.4 million).

In the third quarter of 2015, the Company reported its global generics business as a discontinued operation and its assets and liabilities as part of assets held for sale. For provision for income taxes, the Company calculated its total provision and its provision for taxes from continuing operations as well as discontinued operations consistent with the accounting standard. As part of recording assets held for sale, the Company also recorded the tax provision or benefit on certain differences between book and tax on its outside

F-77

basis of both domestic and foreign subsidiaries. The most significant of these is a $5.7 billion deferred tax asset related to investments in certain domestic subsidiaries. This asset was recorded in Q3 since the benefit is expected to be realized in the foreseeable future. Specifically, the deferred tax asset will reverse upon the sale of these subsidiaries to Teva. Refer to "NOTE 7 — Discontinued Operations" for more information.

As of December 31, 2015, deferred income taxes have not been provided on $2,087.6 million of undistributed earnings of certain non-Irish subsidiaries as these amounts are intended to be indefinitely reinvested in non-Irish operations. It is not practicable to calculate the deferred taxes associated with these earnings because of the variability of multiple factors that would need to be assessed at the time of any assumed repatriation. In making this assertion, the Company evaluates, among other factors, the profitability of its Irish and non-Irish operations and the need for cash within and outside Ireland, including cash requirements for capital improvement, acquisitions and market expansion. Additionally, the Company has accrued income taxes, including withholding taxes, of $2,165.6 million for certain pre-acquisition earnings primarily related to the Forest and Allergan acquisitions. The Company expects that future subsidiary earnings will be indefinitely reinvested.

**Accounting for Uncertainty in Income Taxes**

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in millions):

| | Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2015 | | 2014 | | 2013 |
| Balance at the beginning of the year | $ | 712.2 | $ | 119.3 | $ | 5.7 |
| Increases for current year tax positions | | 41.2 | | 51.3 | | 29.4 |
| Increases for prior year tax positions | | 19.7 | | 4.2 | | 0.1 |
| Increases due to acquisitions | | 115.5 | | 567.0 | | 83.7 |
| Decreases for prior year tax positions | | (41.4) | | (26.6) | | 0.1 |
| Settlements | | (60.6) | | (0.4) | | (0.6) |
| Lapse of applicable statute of limitations | | (3.2) | | (0.5) | | 0.0 |
| Foreign exchange | | (1.7) | | (2.1) | | 0.9 |
| Balance at the end of the year | $ | 781.7 | $ | 712.2 | $ | 119.3 |

If these benefits were subsequently recognized, $749.1 million would favorably impact the Company's effective tax rate.

The Company's continuing policy is to recognize interest and penalties related to uncertain tax positions in tax expense. During the years ended December 31, 2015, 2014 and 2013, the company recognized approximately $(0.5) million, $5.1 million and $0.2 million in interest and penalties, respectively. At December 31, 2015, 2014 and 2013, the Company had accrued $63.3 million (net of tax benefit of $34.2 million), $65.6 million (net of tax benefit of $25.3 million) and $5.2 million (net of tax benefit of $2.2 million) of interest and penalties related to uncertain tax positions, respectively. Although the company cannot determine the impact with certainty based on specific factors, it is reasonably possible that the unrecognized tax benefits may change by up to approximately $200.0 million within the next twelve months.

The Company conducts business globally and, as a result, it files federal, state and foreign tax returns. The Company strives to resolve open matters with each tax authority at the examination level and could reach agreement with a tax authority at any time. While the Company has accrued for amounts it believes are in accordance with the accounting standard, the final outcome with a tax authority may result in a tax liability that is more or less than that reflected in the condensed consolidated financial statements. Furthermore, the Company may later decide to challenge any assessments, if made, and may exercise its right to appeal. The uncertain tax positions are reviewed quarterly and adjusted as events occur that affect potential liabilities for additional taxes, such as lapsing of applicable statutes of limitations, proposed assessments by tax authorities, negotiations with tax authorities, identification of new issues and issuance of new legislation, regulations or case law.

Due to our numerous acquisitions, the Company has several concurrent audits still pending with the IRS as set forth below:

| IRS Audits | Taxable Years |
| --- | --- |
| Actavis, Inc. (f/k/a Watson Pharmaceuticals, Inc.) | 2008, 2009, 2010 and 2011 |
| Actavis Inc. | 2009, 2010, 2011 and 2012 |
| Warner Chilcott Corporation | 2010, 2011 and 2012 |
| Forest Laboratories, Inc. | 2007, 2008 and 2009 |
| Aptalis Holdings, Inc. | 2013 |
| Durata Therapeutics Inc. | 2012 |
| Allergan, Inc. | 2009 and 2010 |

The Warner Chilcott U.S. operating entities entered into an Advanced Pricing Agreement ("APA") with the IRS that specified the agreed upon terms under which the Warner Chilcott U.S. entities are compensated for distribution and service transactions between the Warner Chilcott U.S. entities and the Warner Chilcott non-U.S. entities, effective for 2011 through 2017.  On December 29, 2015, the IRS and Warner Chilcott U.S. agreed to amend the term of the APA to 2011 through 2015. The Company believes that its transfer pricing arrangements comply with existing U.S. and non-U.S. tax rules.

## NOTE 20 — Stockholders' Equity

### Preferred Shares

On February 24, 2015, the Company completed an offering of 5,060,000 of our 5.500% mandatorily convertible preferred shares, Series A, par value $0.0001 per share (the "Mandatory Convertible Preferred Shares"). Dividends on the Mandatory Convertible Preferred Shares will be payable on a cumulative basis when, as and if declared by our board of directors, or an authorized committee thereof, at an annual rate of 5.500% on the liquidation preference of $1,000.00 per Mandatory Convertible Preferred Share. The Company may pay declared dividends in cash, by delivery of our ordinary shares or by delivery of any combination of cash and our ordinary shares, as determined by us in our sole discretion, subject to certain limitations, on March 1, June 1, September 1 and December 1 of each year commencing June 1, 2015, to and including March 1, 2018. The net proceeds from the Mandatory Convertible Preferred Share issuance of $4,929.7 million were used to fund the Allergan Acquisition.

Each Mandatory Convertible Preferred Share will automatically convert on March 1, 2018, into between 2.8345 and 3.4722 ordinary shares, subject to anti-dilution adjustments. The number of our ordinary shares issuable on conversion of the Mandatory Convertible Preferred Shares will be determined based on the volume weighted average price per ordinary share over the 20 consecutive trading day period beginning on and including the 22nd scheduled trading day immediately preceding March 1, 2018, the mandatory conversion date. At any time prior to March 1, 2018, other than during a fundamental change conversion period as defined, holders of the Mandatory Convertible Preferred Shares may elect to convert each Mandatory Convertible Preferred Share into our ordinary shares at the minimum conversion rate of 2.8345 ordinary shares per Mandatory Convertible Preferred Share, subject to anti-dilution adjustments. In addition, holders may elect to convert any Mandatory Convertible Preferred Shares during a specified period beginning on the fundamental change effective date, in which case such Mandatory Convertible Preferred Shares will be converted into our ordinary shares at the fundamental change conversion rate and converting holders will also be entitled to receive a fundamental change dividend make-whole amount and accumulated dividend amount.

In the year ended December 31, 2015, the Company paid $208.1 million of dividends on preferred shares.

### 2015 Ordinary Shares Offering

On March 2, 2015, in connection with the Allergan Acquisition, the Company issued 14,513,889 of its ordinary shares for an actual public offering price of $288.00 per share. The net proceeds of $4,071.1 million were used, in part, to finance the Allergan Acquisition.

### Share Repurchases

During the year ended December 31, 2014, the Company approved the cancellation of its then outstanding treasury shares. The Company has approved the cancellation of future shares repurchased and currently does not intend to hold shares repurchased by the Company in treasury shares. The financial statement impact resulting from this transaction was a reclassification from treasury stock to additional paid-in-capital.

F-79

*Accumulated Other Comprehensive Income / (Loss)*

For most of the Company's international operations, the local currency has been determined to be the functional currency. The results of its non-U.S. dollar based operations are translated to U.S. dollars at the average exchange rates during the period. Assets and liabilities are translated at the rate of exchange prevailing on the balance sheet date. Equity is translated at the prevailing rate of exchange at the date of the equity transaction. Translation adjustments are reflected in shareholders' equity and are included as a component of other comprehensive (loss). The effects of evaluating non-functional currency assets and liabilities into the functional currency are recorded as transaction gains/losses in general and administrative expenses in the consolidated statements of operations.

Unrealized gain / (losses) net of tax primarily represent experience differentials and other actuarial charges related to the Company's defined benefit plans. The movements in accumulated other comprehensive (loss) for the years ended December, 2015 and 2014 were as follows ($ in millions):

| | Foreign Currency Translation Items | | Unrealized gain / (loss) net of tax | | Total Accumulated Other Comprehensive Income / (Loss) | |
|---|---|---|---|---|---|---|
| Balance as of December 31, 2013 | $ | 85.1 | $ | 5.4 | $ | 90.5 |
| Other comprehensive (loss) before reclassifications into general and administrative | | (519.5) | | (36.4) | | (555.9) |
| Total other comprehensive (loss) | | (519.5) | | (36.4) | | (555.9) |
| Balance as of December 31, 2014 | $ | (434.4) | $ | (31.0) | $ | (465.4) |
| Other comprehensive gain / (loss) before reclassifications into general and administrative | | (129.9) | | 101.2 | | (28.7) |
| Total other comprehensive income | | (129.9) | | 101.2 | | (28.7) |
| Balance as of December 31, 2015 | $ | (564.3) | $ | 70.2 | $ | (494.1) |

## NOTE 21 — Segments

In the third quarter of 2015, there was a strategic shift in the business as a result of the Teva Transaction. As a result, the Company realigned its continuing operations into the following segments: US Brands, US Medical Aesthetics, International Brands and Anda Distribution. Prior to the realignment, the Company operated and managed its business as five distinct operating segments: US Brands, US Medical Aesthetics, International Brands, Global Generics, and Anda Distribution. In addition, certain revenues and shared costs and the results of corporate initiatives are managed outside of the four segments. The new operating segments are organized as follows:

- The US Brands segment includes sales and expenses relating to branded products within the United States, including certain Botox® therapies.

- The US Medical Aesthetics segment includes sales and expenses relating to aesthetics and dermatology products within the United States, including certain Botox® therapies.

- The International Brands segment includes sales and expenses relating to products sold outside of the United States.

- The Anda Distribution segment includes distribution of generic and branded pharmaceutical products manufactured by third parties, as well as by the Company, primarily to independent pharmacies, pharmacy chains, pharmacy buying groups and physicians' offices. The Anda Distribution segment operating results exclude sales of products developed, acquired, or licensed by the US Brands, US Medical Aesthetics and International Brands segments. As the generics business is now reported within Discontinued Operations, the Anda Distribution segment includes revenues and expenses related to Company manufactured generics products sold through Anda.

The Company evaluates segment performance based on segment contribution. Segment contribution for segments represents net revenues less cost of sales (excluding amortization and impairment of acquired intangibles including product rights), selling and marketing expenses, and select general and administrative expenses. The Company does not evaluate the following items at the segment level:

- Revenues and operating expenses within cost of sales (excluding amortization and impairment of acquired intangibles including product rights), selling and marketing expenses, and general and administrative expenses that result from the impact of corporate initiatives. Corporate initiatives primarily include integration, restructuring, acquisition and other shared costs.

- General and administrative expenses that result from shared infrastructure, including certain expenses located within the United States.

- Total assets including capital expenditures.

- Other select revenues and operating expenses including R&D expenses, amortization, IPR&D impairments and asset sales and impairments, net as not all such information has been accounted for at the segment level, or such information has not been used by all segments.

The Company defines segment net sales as product sales and other revenue derived from branded products or licensing agreements. In March 2015, as a result of the Allergan Acquisition, we began to promote Restasis®, Lumigan®/Ganfort®, Alphagan®/Combigan®, Botox®, fillers, other aesthetic products and other eye care products. In July 2014, as a result of the Forest Acquisition, the Company also began recognizing revenues on key US brands, including, but not limited to, Bystolic ®, Canasa®, Carafate®, Fetzima ®, Linzess ®, Namenda® IR (which lost exclusivity in July 2015), Namenda XR®, Saphris®, Teflaro® and Viibryd®. In October 2013, as a result of the Warner Chilcott Acquisition, we began promoting a number of brand products, including, but not limited to, Actonel®, Asacol® HD, Atelvia®, Delzicol®, Estrace® Cream, Enablex®, Lo Loestrin® Fe and Minastrin® 24 Fe.

Cost of sales within segment contribution includes production and packaging costs for the products we manufacture, third party acquisition costs for products manufactured by others, profit-sharing or royalty payments for products sold pursuant to licensing agreements, inventory reserve charges and excess capacity utilization charges, where applicable. Cost of sales does not include amortization or impairment costs for acquired product rights or other acquired intangibles.

Selling and marketing expenses consist mainly of personnel-related costs, product promotion costs, distribution costs, professional service costs, insurance, depreciation and travel costs.

General and administrative expenses consist mainly of personnel-related costs, facilities costs, transaction costs, insurance, depreciation, litigation and settlement costs and professional services costs which are general in nature and attributable to the segment.

Segment net revenues, segment operating expenses and segment contribution information consisted of the following for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

| | Year Ended December 31, 2015 | | | | |
| | US Brands | US Medical Aesthetics | International Brands | Anda Distribution | Total |
|---|---|---|---|---|---|
| Net revenues | $ 9,134.3 | $ 1,513.9 | $ 2,187.3 | $ 2,225.4 | $ 15,060.9 |
| Operating expenses: | | | | | |
| Cost of sales[1] | 1,131.9 | 99.0 | 376.4 | 1,905.3 | 3,512.6 |
| Selling and marketing | 1,664.6 | 302.9 | 569.2 | 146.9 | 2,683.6 |
| General and administrative | 139.6 | 34.0 | 125.5 | 44.2 | 343.3 |
| Segment Contribution | $ 6,198.2 | $ 1,078.0 | $ 1,116.2 | $ 129.0 | $ 8,521.4 |
| Contribution margin | 67.9% | 71.2% | 51.0% | 5.8% | 56.6% |
| Corporate | | | | | 2,940.4 |
| Research and development | | | | | 2,358.5 |
| Amortization | | | | | 5,453.4 |
| In-process research and development impairments | | | | | 511.6 |
| Asset sales and impairments, net | | | | | 272.0 |
| Operating (loss) | | | | | (3,014.5) |
| Operating margin | | | | | (20.0)% |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

| | Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| | US Brands | US Medical Aesthetics | International Brands | Anda Distribution | Total |
| Net revenues | $ 4,511.2 | $ - | $ 203.5 | $ 2,024.2 | $ 6,738.9 |
| Operating expenses: | | | | | |
| Cost of sales[1] | 736.7 | - | 48.2 | 1,711.6 | 2,496.5 |
| Selling and marketing | 806.4 | - | 48.2 | 135.6 | 990.2 |
| General and administrative | 119.5 | - | 12.0 | 36.4 | 167.9 |
| Segment Contribution | $ 2,848.6 | $ - | $ 95.1 | $ 140.6 | $ 3,084.3 |
| Contribution margin | 63.1% | | 46.7% | 6.9% | 45.8% |
| Corporate | | | | | 2,247.0 |
| Research and development | | | | | 605.7 |
| Amortization | | | | | 1,945.5 |
| In-process research and development impairments | | | | | 424.3 |
| Asset sales and impairments, net | | | | | 305.7 |
| Operating (loss) | | | | | (2,443.9) |
| Operating margin | | | | | (36.3)% |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

| | Year Ended December 31, 2013 | | | | |
|---|---|---|---|---|---|
| | US Brands | US Medical Aesthetics | International Brands | Anda Distribution | Total |
| Net revenues | $ 1,001.2 | $ - | $ 40.2 | $ 1,561.1 | $ 2,602.5 |
| Operating expenses: | | | | | |
| Cost of sales[1] | 153.8 | - | 15.8 | 1,297.6 | 1,467.2 |
| Selling and marketing | 240.7 | - | 21.6 | 112.5 | 374.8 |
| General and administrative | 39.4 | - | 1.4 | 32.7 | 73.5 |
| Segment Contribution | $ 567.3 | $ - | $ 1.4 | $ 118.3 | $ 687.0 |
| Contribution margin | 56.7% | | 3.5% | 7.6% | 26.4% |
| Corporate | | | | | 560.1 |
| Research and development | | | | | 191.3 |
| Amortization | | | | | 303.8 |
| In-process research and development impairments | | | | | - |
| Asset sales and impairments, net | | | | | 1.0 |
| Operating (loss) | | | | | (369.2) |
| Operating margin | | | | | (14.2)% |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

The following is a reconciliation of net revenues for the operating segments to the Company's net revenues for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Segment net revenues | $ 15,060.9 | $ 6,738.9 | $ 2,602.5 |
| Corporate revenues | 10.1 | - | - |
| Net revenues | $ 15,071.0 | $ 6,738.9 | $ 2,602.5 |

No country represents ten percent or more of net revenues outside of the United States. The US Brands, US Medical Aesthetics, and Anda Distribution segments are comprised solely of sales within the United States.

The following tables present global net revenues for the top products of the Company for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Global | | | U.S. | | | International | | |
| | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 | 2015 | 2014 | 2013 |
| Botox® | $ 1,975.7 | $ - | $ - | $ 1,386.6 | $ - | $ - | $ 589.1 | $ - | $ - |
| Restasis® | 1,047.8 | - | - | 999.6 | - | - | 48.2 | - | - |
| Namenda XR® | 759.3 | 269.5 | - | 759.3 | 269.5 | - | - | - | - |
| Bystolic® | 646.1 | 292.6 | - | 644.8 | 291.6 | - | 1.3 | 1.0 | - |
| Asacol®/Delzicol® | 618.5 | 614.1 | 164.2 | 552.9 | 541.0 | 145.2 | 65.6 | 73.1 | 19.0 |
| Fillers | 573.9 | - | - | 304.3 | - | - | 269.6 | - | - |
| Namenda® IR | 556.3 | 629.7 | - | 556.3 | 629.7 | - | - | - | - |
| Lumigan®/Ganfort® | 547.3 | - | - | 260.7 | - | - | 286.6 | - | - |
| Linzess®/Constella® | 459.3 | 174.4 | - | 454.8 | 173.2 | - | 4.5 | 1.2 | - |
| Alphagan®/Combigan® | 411.1 | - | - | 285.0 | - | - | 126.1 | - | - |
| Lo Loestrin® | 349.6 | 277.1 | 63.3 | 346.5 | 275.7 | 63.3 | 3.1 | 1.4 | - |
| Viibryd®/Fetzima® | 327.6 | 140.3 | - | 327.6 | 140.3 | - | - | - | - |
| Estrace® Cream | 326.2 | 258.2 | 60.7 | 326.2 | 258.2 | 60.7 | - | - | - |
| Minastrin® 24 | 273.0 | 217.9 | 53.7 | 272.4 | 217.9 | 53.7 | 0.6 | - | - |
| Silicone Implants | 229.7 | - | - | 113.3 | - | - | 116.4 | - | - |
| Carafate® / Sulcrate® | 213.1 | 90.9 | - | 213.1 | 90.9 | - | - | - | - |
| Aczone® | 170.8 | - | - | 170.8 | - | - | - | - | - |
| Other Products Revenues | 3,360.3 | 1,750.0 | 699.5 | 2,684.1 | 1,623.2 | 678.3 | 676.2 | 126.8 | 21.2 |
| Total Products Revenues | 12,845.6 | 4,714.7 | 1,041.4 | 10,658.3 | 4,511.2 | 1,001.2 | 2,187.3 | 203.5 | 40.2 |
| ANDA Revenues | 2,225.4 | 2,024.2 | 1,561.1 | 2,225.4 | 2,024.2 | 1,561.1 | - | - | - |
| Total Net Revenues | $15,071.0 | $6,738.9 | $2,602.5 | $12,883.7 | $6,535.4 | $2,562.3 | $2,187.3 | $203.5 | $ 40.2 |

No other product represents ten percent or more of total net revenues.

The following table presents net revenues for the US Brands segment for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Central Nervous System (CNS) | $ 2,541.2 | $ 1,109.4 | $ - |
| Eye Care | 1,831.3 | - | - |
| Gastroenterology (GI) | 1,575.3 | 966.8 | 145.2 |
| Women's Health | 998.0 | 791.7 | 290.8 |
| Cardiovascular | 644.8 | 291.6 | - |
| Urology | 238.8 | 111.9 | - |
| Infectious Disease | 188.8 | 62.7 | - |
| Other | 1,116.1 | 1,177.1 | 565.2 |
| Total US Brands Net Revenues | $ 9,134.3 | $ 4,511.2 | $ 1,001.2 |

The following table presents revenues for the US Medical Aesthetics segment for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Facial Aesthetics Total | $ 817.8 | $ - | $ - |
| Medical Dermatology Total | 493.5 | - | - |
| Plastic Surgery Total | 202.6 | - | - |
| **Total US Medical Aesthetic Net Revenues** | **$ 1,513.9** | **$ -** | **$ -** |

The following table presents net revenues for the International Brands segment for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Eye Care | $ 924.0 | $ - | $ - |
| Facial Aesthetics | 620.0 | - | - |
| Other Therapeutics | 517.8 | 203.5 | 40.2 |
| Plastic Surgery | 125.5 | - | - |
| **Total International Brands Net Revenues** | **$ 2,187.3** | **$ 203.5** | **$ 40.2** |

## NOTE 22 — Business Restructuring Charges

During 2015, activity related to our business restructuring and facility rationalization activities primarily related to the cost optimization initiatives in conjunction with the Allergan and Forest acquisitions. Restructuring activities for the year ended December 31, 2015 as follows ($ in millions):

| | Severance and Retention | Share-Based Compensation | Other | Total |
| --- | --- | --- | --- | --- |
| **Reserve balance at December 31, 2014** | $ 111.1 | $ - | $ - | $ 111.1 |
| Acquired liability | 27.9 | - | 29.2 | 57.1 |
| Charged to expense: | | | | |
| Cost of sales | 9.3 | 19.8 | 23.4 | 52.5 |
| Research and development | 77.7 | 104.6 | - | 182.3 |
| Selling and marketing | 71.5 | 47.0 | - | 118.5 |
| General and administrative | 130.5 | 293.3 | 42.4 | 466.2 |
| Total expense | 289.0 | 464.7 | 65.8 | 819.5 |
| Cash payments | (312.3) | (127.1) | (59.1) | (498.5) |
| Other reserve impact | (19.0) | (337.6) | 12.7 | (343.9) |
| **Reserve balance at December 31, 2015** | **$ 96.7** | **$ -** | **$ 48.6** | **$ 145.3** |

During 2014, activity related to our business restructuring and facility rationalization activities primarily related to the cost optimization initiatives in conjunction with the Forest and Warner Chilcott acquisitions. Restructuring activities for the year ended December 31, 2014 as follows ($ in millions):

| | Severance and Retention | Share-Based Compensation | Other | Total |
|---|---|---|---|---|
| Reserve balance at December 31, 2013 | $ 67.5 | $ - | $ - | $ 67.5 |
| Acquired liability | 12.2 | - | - | 12.2 |
| Charged to expense: | | | | |
| Cost of sales | 7.0 | 3.4 | - | 10.4 |
| Research and development | 22.8 | - | - | 22.8 |
| Selling and marketing | 40.9 | - | - | 40.9 |
| General and administrative | 71.8 | 183.2 | 1.8 | 256.8 |
| Total expense | 142.5 | 186.6 | 1.8 | 330.9 |
| Cash payments | (111.1) | - | - | (111.1) |
| Other reserve impact | - | (186.6) | (1.8) | (188.4) |
| Reserve balance at December 31, 2014 | $ 111.1 | $ - | $ - | $ 111.1 |

During the years ended December 31, 2015, 2014 and 2013, the Company recognized restructuring charges related to continuing operations of $819.5 million, $330.9 million and $147.8 million, respectively.

**NOTE 23 — Derivative Instruments and Hedging Activities**

The Company's revenue, earnings, cash flows and fair value of its assets and liabilities can be impacted by fluctuations in foreign exchange risks and interest rates, as applicable. The Company manages the impact of foreign exchange risk and interest rate movements through operational means and through the use of various financial instruments, including derivative instruments such as foreign currency derivatives.

*Foreign Currency Derivatives*

Overall, the Company is a net recipient of currencies other than the U.S. dollar and, as such, benefits from a weaker dollar and is adversely affected by a stronger dollar relative to major currencies worldwide. Accordingly, changes in exchange rates, and in particular a strengthening of the U.S. dollar, may negatively affect the Company's consolidated revenues and favorably impact operating expenses in U.S. dollars.

Primarily as a result of the Allergan Acquisition and from time to time, the Company enters into foreign currency derivatives to reduce current and future earnings and cash flow volatility associated with foreign exchange rate changes to allow management to focus its attention on its core business issues. Accordingly, the Company enters into various contracts which change in value as foreign exchange rates change to economically offset the effect of changes in the value of foreign currency assets and liabilities, commitments and anticipated foreign currency denominated sales and operating expenses. The Company enters into foreign currency derivatives in amounts between minimum and maximum anticipated foreign exchange exposures. The Company does not designate the current derivative instruments as accounting hedges.

The Company uses foreign currency derivatives, which provide for the sale or purchase or the option for sale or purchase of foreign currencies to economically hedge the currency exchange risks associated with probable but not firmly committed transactions that arise in the normal course of the Company's business. Probable but not firmly committed transactions are comprised primarily of sales of products and purchases of raw material in currencies other than the U.S. dollar. The foreign currency assets and liabilities are entered into to reduce the volatility of earnings generated in currencies other than the U.S. dollar. While these instruments are subject to fluctuations in value, such fluctuations are anticipated to offset changes in the value of the underlying exposures.

The Company recognized realized and unrealized (gains) / losses on such contracts of $(1.4) million, $(2.3) million and $0.3 million, respectively, during the years ended December 31, 2015, 2014 and 2013.

The fair value of outstanding foreign currency derivatives are recorded in "Prepaid expenses and other current assets," "investments and other assets" or "Accounts payable and accrued expenses." At December 31, 2015 and 2014, foreign currency derivative assets associated with the foreign exchange option contracts of $73.5 million and $2.3 million, respectively, were included in "Prepaid expenses and other current assets" and "investments and other assets," At December 31, 2015, net foreign currency derivative liabilities associated with the foreign exchange forward contracts of $(0.3) million were included in "Accounts payable and accrued expenses."

**NOTE 24 — Fair Value Measurement**

Fair value is the price that would be received to sell an asset or paid to transfer a liability (an exit price) in an orderly transaction between market participants. Fair values determined based on Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities. Fair values determined based on Level 2 inputs utilize observable quoted prices for similar assets and liabilities in active markets and observable quoted prices for identical or similar assets in markets that are not very active. Fair values determined based on Level 3 inputs utilize unobservable inputs and include valuations of assets or liabilities for which there is little, if any, market activity. A financial asset or liability's classification within the above hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

Assets and liabilities measured at fair value or disclosed at fair value on a recurring basis as of December 31, 2015 and 2014 consisted of the following ($ in millions):

| | Fair Value Measurements as of December 31, 2015 Using: | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Marketable securities | $ 29.9 | $ 29.9 | $ - | $ - |
| Deferred executive compensation investments | 118.1 | 102.3 | 15.8 | - |
| Foreign currency derivatives | 73.5 | - | 73.5 | - |
| Marketable equity securities | 32.3 | 32.3 | - | - |
| Total assets | $ 253.8 | $ 164.5 | $ 89.3 | $ - |
| **Liabilities:** | | | | |
| Deferred executive compensation liabilities | 117.9 | 102.1 | 15.8 | - |
| Contingent consideration obligations | 868.0 | - | - | 868.0 |
| Total liabilities | $ 985.9 | $ 102.1 | $ 15.8 | $ 868.0 |

| | Fair Value Measurements as of December 31, 2014 Using: | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Marketable securities | $ 1.0 | $ 1.0 | $ - | $ - |
| Foreign currency derivatives | 2.3 | - | 2.3 | - |
| Total assets | $ 3.3 | $ 1.0 | $ 2.3 | $ - |
| **Liabilities:** | | | | |
| Contingent consideration obligations | 373.8 | - | - | 373.8 |
| Total liabilities | $ 373.8 | $ - | $ - | $ 373.8 |

Marketable securities and investments consist of available-for-sale investments in U.S. treasury and agency securities and publicly traded equity securities for which market prices are readily available. Unrealized gains or losses on marketable securities and investments are recorded in accumulated other comprehensive (loss).

*Foreign Currency Contracts*

At December 31, 2015 and 2014, the notional principal and fair value of the Company's outstanding foreign currency derivative financial instruments were as follows ($ in millions, except average contract rate or strike amount):

| | Year Ended December 31, 2015 | | Year Ended December 31, 2014 | |
|---|---|---|---|---|
| | Notional Principal | Average Contract Rate or Strike Amount | Notional Principal | Average Contract Rate or Strike Amount |
| Foreign currency forward contracts: | | | | |
| (Receive U.S. dollar/pay foreign currecy) | | | | |
| Russian ruble | $ 18.8 | 1.41 | $ 10.3 | 1.05 |
| | $ 18.8 | | $ 10.3 | |
| Estimated fair value | $ (0.3) | | $ 2.3 | |
| Foreign currency sold - put options: | | | | |
| Euro | 340.5 | 1.41 | - | |
| | $ 340.5 | | $ - | |
| Estimated fair value | $ 73.5 | | $ - | |

The notional principal amounts provide one measure of the transaction volume outstanding as of December 31, 2015 and 2014, and do not represent the amount of the Company's exposure to market loss. The estimates of fair value are based on applicable and commonly used pricing models using prevailing financial market information as of December 31, 2015 and 2014. The amounts ultimately realized upon settlement of these financial instruments, together with the gains and losses on the underlying exposures, will depend on actual market conditions during the remaining life of the instruments.

*Contingent Consideration Obligations*

The fair value measurement of the contingent consideration obligations is determined using Level 3 inputs and is based on a probability-weighted income approach. The measurement is based upon unobservable inputs supported by little or no market activity based on our own assumptions. Changes in the fair value of the contingent consideration obligations, including accretion, are recorded in our consolidated statements of operations as follows ($ in millions):

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| Expense / (Income) | 2015 | | 2014 | | 2013 | |
| Cost of sales | $ | 58.5 | $ | (9.9) | $ | 5.8 |
| Research and development | | 37.7 | | (69.3) | | 1.1 |
| General and administrative | | - | | 0.4 | | 3.2 |
| Total | $ | 96.2 | $ | (78.8) | $ | 10.1 |

During the year ended December 31, 2015, the Company recorded additional contingent consideration of $29.8 million in connection with the approval of Viberzi™, $81.4 million in connection with the approval of Liletta® and $6.4 million in connection with the approval of Dalvance®. Offsetting these amounts were gains from fair value of adjustments related to the Forest Acquisition of $32.3 million and the Allergan Acquisition of $8.2 million.

During the year ended December 31, 2014, the Company recorded additional contingent consideration of $50.3 million in connection with the acquisition of metronidazole 1.3% vaginal gel antibiotic from Valeant Pharmaceuticals, Inc.  In the year ended December 31, 2014, the Company evaluated future projections of metronidazole 1.3% vaginal gel antibiotic. As a result of this review, the Company noted the intangible asset was not fully recoverable. As such, the Company impaired the asset by $25.0 million. At the same time, the Company reversed contingent consideration (through cost of sales) of $21.0 million, for a net loss of $4.0 million.

During the second quarter of 2014, the Company recorded fair value adjustments of contingent consideration of $22.8 million related specifically to IPR&D related to a project named Estelle and $1.5 million related to IPR&D for Colvir. Estelle is a novel natural estrogen-based 28 day cycle oral contraceptive for the prevention of pregnancy. At June 30, 2014, the acquired IPR&D intangible asset of $13.1 million was deemed to be fully impaired. Consequently the $22.8 million contingent liability was written off; resulting in a net gain of $9.7 million in the year ended December 31, 2014. Colvir is a treatment of premalignant Human Papilloma Virus (HPV) lesions of the uterine cervix. At June 30, 2014, the acquired IPR&D intangible asset of $2.0 million was deemed to be fully impaired. Consequently the $1.5 million contingent liability was written off; resulting in a net loss of $0.5 million in the year ended December 31, 2014.

During the fourth quarter of 2014, the Company sold its rights in Aeroquin. As a result, the Company wrote-off $16.0 million in contingent consideration in the year ended December 31, 2014. In addition, the Company wrote-off IPR&D of $18.0 million, resulting in a net loss of $2.0 million.

The table below provides a summary of the changes in fair value, including net transfers in and/or out, of all financial assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2015 and 2014 ($ in millions):

| | Balance as of December 31, 2014 | Net transfers in to (out of) Level 3 | Purchases and settlements, net | Net accretion and fair value adjustments | Foreign currency translation | Balance as of December 31, 2015 |
|---|---|---|---|---|---|---|
| **Liabilities:** | | | | | | |
| Contingent consideration obligations................. | $ 373.8 $ | - $ | 405.1 $ | 96.2 $ | (7.1) $ | 868.0 |

| | Balance at December 31, 2013 | Net transfers in to (out of) Level 3 | Purchases and settlements, net | Net accretion and fair value adjustments | Foreign currency translation | Balance at December 31, 2014 |
|---|---|---|---|---|---|---|
| **Liabilities:** | | | | | | |
| Contingent consideration obligations................. | $ 203.8 $ | - $ | 251.9 $ | (78.8) $ | (3.1) $ | 373.8 |

During the year ended December 31, 2015, the following activity in contingent consideration obligations by acquisition was incurred ($ in millions):

| | Balance as of December 31, 2014 | Acquisitions | Fair Value Adjustments and Accretion | Payments and Other | Balance as of December 31, 2015 |
|---|---|---|---|---|---|
| Medicines 360 acquisition .............................. | $ 126.6 $ | - $ | 93.6 $ | (76.1) $ | 144.1 |
| Furiex Acquisition.......................................... | 88.4 | - | 30.2 | (118.6) | - |
| Forest Acquisition........................................... | 52.4 | - | (29.8) | (2.2) | 20.4 |
| Durata Acquisition.......................................... | 49.0 | - | 6.4 | (30.9) | 24.5 |
| Metrogel acquisition....................................... | 31.2 | - | (0.4) | 0.1 | 30.9 |
| Uteron acquisition........................................... | 10.4 | - | (2.1) | (0.1) | 8.2 |
| Allergan Acquisition....................................... | - | 383.7 | 3.1 | (57.1) | 329.7 |
| Oculeve Acquisition........................................ | - | 90.0 | - | - | 90.0 |
| AqueSys Acquisition....................................... | - | 193.5 | - | - | 193.5 |
| Other ............................................................. | 15.8 | 15.8 | (4.8) | (0.1) | 26.7 |
| **Total** .......................................................... | **$ 373.8 $** | **683.0 $** | **96.2 $** | **(285.0) $** | **868.0** |

### NOTE 25 — Commitments and Contingencies

The Company and its affiliates are involved in various disputes, governmental and/or regulatory inspections, inquires, investigations and proceedings, and litigation matters that arise from time to time in the ordinary course of business. The process of resolving matters through litigation or other means is inherently uncertain and it is possible that an unfavorable resolution of these matters will adversely affect the Company, its results of operations, financial condition and cash flows. The Company's general practice is to expense legal fees as services are rendered in connection with legal matters, and to accrue for liabilities when losses are probable and reasonably estimable.

The Company evaluates, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that is accrued. As of December 31, 2015, the Company's consolidated balance sheet includes accrued loss contingencies of approximately $340.0 million, which includes the amount relating to the resolution with the federal government, as well as 50 states and the District of Columbia, concluding the previously disclosed federal investigation into certain sales and marketing practices involving several Warner Chilcott products during the time period January 2009 through March 2013.

The Company's legal proceedings range from cases brought by a single plaintiff to mass tort actions and class actions with thousands of putative class members. These legal proceedings, as well as other matters, involve various aspects of our business and a variety of claims (including, but not limited to, qui tam actions, antitrust, product liability, breach of contract, securities, patent infringement and trade practices), some of which present novel factual allegations and/or unique legal theories. In addition, a number of the matters pending against us are at very early stages of the legal process (which in complex proceedings of the sort faced by us often extend for several years). As a result, some matters have not yet progressed sufficiently through discovery and/or development of important factual information and legal issues to enable us to estimate a range of possible loss. In those proceedings in which plaintiffs do request publicly quantified amounts of relief, the Company does not believe that the quantified amounts are meaningful because they are merely stated jurisdictional limits, exaggerated and/or unsupported by the evidence or applicable burdens of proof.

### Antitrust Litigation

*Actos® Litigation.* On December 31, 2013 two putative class actions, on behalf of putative classes of indirect purchaser plaintiffs, were filed in the federal court for the Southern District of New York against Actavis plc and certain of its affiliates alleging that Watson Pharmaceuticals, Inc.'s ("Watson" now known as Actavis, Inc.) 2010 patent lawsuit settlement with Takeda Pharmaceutical, Co. Ltd. related to Actos® (pioglitazone hydrochloride and metformin "Actos®") is unlawful. Several additional complaints have also been filed. Plaintiffs then filed a consolidated, amended complaint on May 20, 2014. The amended complaint generally alleges an overall scheme that included Watson improperly delaying the launch of its generic version of Actos® in exchange for substantial payments from Takeda in violation of federal and state antitrust and consumer protection laws. The complaint seeks declaratory and injunctive relief and unspecified damages. Defendants have moved to dismiss the amended complaint. On September 23, 2015, the court granted the motion to dismiss the indirect purchasers' complaint in its entirety. In May 2015, two additional putative class action complaints, each of which makes similar allegations against the Company and Takeda, were filed by plaintiffs on behalf of a putative class of direct purchasers. Defendants have moved to dismiss the direct purchasers' complaint.

The Company believes that it has substantial meritorious defenses to the claims alleged. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*AndroGel® Litigation.* On January 29, 2009, the U.S. Federal Trade Commission and the State of California filed a lawsuit in federal district court in California alleging that the September 2006 patent lawsuit settlement between Watson and Solvay Pharmaceuticals, Inc. ("Solvay"), related to AndroGel® 1% (testosterone gel) CIII is unlawful. The complaint generally alleged that Watson improperly delayed its launch of a generic version of AndroGel® in exchange for Solvay's agreement to permit Watson to co-promote AndroGel® for consideration in excess of the fair value of the services provided by Watson, in violation of federal and state antitrust and consumer protection laws. The complaint sought equitable relief and civil penalties. On February 2 and 3, 2009, three separate lawsuits alleging similar claims were filed in federal district court in California by various private plaintiffs purporting to represent certain classes of similarly situated claimants. On April 8, 2009, the Court transferred the government and private cases to the United States District Court for the Northern District of Georgia. The FTC and the private plaintiffs filed amended complaints on May 28, 2009. The private plaintiffs amended their complaints to include allegations concerning conduct before the U.S. Patent and Trademark Office (the "USPTO"), conduct in connection with the listing of Solvay's patent in the FDA "Orange Book," and sham litigation. Additional actions alleging similar claims have been filed in various courts by other private plaintiffs purporting to represent certain classes of similarly situated direct or indirect purchasers of AndroGel®. The Judicial Panel on Multidistrict Litigation ("JPML") transferred all federal court actions then pending outside of Georgia to that district. The district court then granted the Company's motion to dismiss all claims except the private plaintiffs' sham litigation claims. After the dismissal was upheld by the Eleventh Circuit Court of Appeals, the FTC petitioned the United States Supreme Court to hear the case. On June 17, 2013, the Supreme Court issued a decision, holding that the settlements between brand and generic drug companies which include a payment from the brand company to the generic competitor must be evaluated under a "rule of reason" standard of review and ordered the case remanded (the "Supreme Court AndroGel Decision"). The case is now back in the district court in Georgia. On August 5, 2014 the indirect purchaser plaintiffs filed an amended complaint which the Company answered on September 15, 2014.

The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

F-89

*Asacol* Litigation. On June 22, 2015, two class action complaints were filed in federal court in Massachusetts on behalf of a putative class of indirect purchasers. In each complaint plaintiffs allege that they paid higher prices for Warner Chilcott's Asacol® HD and Delzicol® products as a result of Warner Chilcott's alleged actions preventing or delaying generic competition in the market for Warner Chilcott's older Asacol® product in violation of U.S. federal antitrust laws and/or state laws. Plaintiffs seek unspecified injunctive relief, treble damages and/or attorneys' fees. All of the actions were consolidated in the federal district court. On September 21, 2015, three additional complaints were filed on behalf of putative classes of indirect purchasers, each raising similar allegations to the complaints filed in June 2015.

The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Botox* Litigation. On February 24, 2015, a class action complaint was filed in federal court in California. The complaint alleges unlawful market allocation in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, agreement in restraint of trade in violation of 15 U.S.C. §1 of the Sherman Act, unlawful maintenance of monopoly market power in violation of Section 2 of the Sherman Act, 15 U.S.C. §2 of the Sherman Act, violations of California's Cartwright Act, Section 16700 et seq. of Calif. Bus. and Prof. Code., and violations of California's unfair competition law, Section 17200 et seq. of Calif. Bus. and Prof. Code. Plaintiffs filed a motion to dismiss the complaint on May 29, 2015. On June 29, 2015, the Company filed a motion to dismiss the complaint. On October 20, 2015, the Court denied the Company's motion to dismiss the complaint. On December 18, 2015, plaintiffs filed a motion for partial judgment on the pleadings or, in the alternative, for partial summary judgment or adjudication. The Company filed a response to the motion for judgment on the pleadings on February 11, 2016. The court has not yet scheduled oral argument on plaintiff's motion. The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Cipro* Litigation. Beginning in July 2000, a number of suits were filed against Watson and certain Company affiliates including The Rugby Group, Inc. ("Rugby") in various state and federal courts alleging claims under various federal and state competition and consumer protection laws. The actions generally allege that the defendants engaged in unlawful, anticompetitive conduct in connection with alleged agreements, entered into prior to Watson's acquisition of Rugby from Sanofi Aventis ("Sanofi"), related to the development, manufacture and sale of the drug substance ciprofloxacin hydrochloride, the generic version of Bayer's brand drug, Cipro® . The actions generally seek declaratory judgment, damages, injunctive relief, restitution and other relief on behalf of certain purported classes of individuals and other entities. While many of these actions have been dismissed, actions remain pending in various state courts, including California, Kansas, Tennessee, and Florida. There has been activity in Tennessee and Florida since 2003. In the action pending in Kansas, plaintiffs' motion for class certification has been fully briefed. In the action pending in the California state court, following the decision from the United States Supreme Court in the *Federal Trade Commission v. Actavis* matter involving AndroGel®, described above, Plaintiffs and Bayer announced that they reached an agreement to settle the claims pending against Bayer and Bayer has now been dismissed from the action. Plaintiffs are continuing to pursue claims against the generic defendants, including Watson and Rugby. The remaining parties submitted letter briefs to the court regarding the impact of the Supreme Court AndroGel Decision and on May 7, 2015, the California Supreme Court issued a ruling, consistent with the Supreme Court AndroGel Decision discussed above, that the settlements between brand and generic drug companies which include a payment from the brand company to the generic competitor must be evaluated under a "rule of reason" standard of review.

In addition to the pending actions, the Company understands that various state and federal agencies are investigating the allegations made in these actions. Sanofi has agreed to defend and indemnify Watson and its affiliates in connection with the claims and investigations arising from the conduct and agreements allegedly undertaken by Rugby and its affiliates prior to Watson's acquisition of Rugby, and is currently controlling the defense of these actions.

*Doryx* Litigation. In July 2012, Mylan Pharmaceuticals Inc. ("Mylan") filed a complaint against Warner Chilcott and Mayne Pharma International Pty. Ltd. ("Mayne") in federal court in Pennsylvania alleging that Warner Chilcott and Mayne prevented or delayed Mylan's generic competition to Warner Chilcott's Doryx® products in violation of U.S. federal antitrust laws and tortiously interfered with Mylan's prospective economic relationships under Pennsylvania state law. In the complaint, Mylan seeks unspecified treble and punitive damages and attorneys' fees. Following the filing of Mylan's complaint, three putative class actions were filed against Warner Chilcott and Mayne by purported direct purchasers, and one putative class action was filed against by purported indirect purchasers. In addition, four retailers filed in the same court a civil antitrust complaint in their individual capacities against Warner Chilcott and Mayne regarding Doryx® . In each of the class and individual cases the plaintiffs allege that they paid higher prices for Warner Chilcott's Doryx® products as a result of Warner Chilcott's and Mayne's alleged actions preventing or delaying generic competition in violation of U.S. federal antitrust laws and/or state laws. Plaintiffs seek unspecified injunctive relief, treble damages and/or attorneys' fees. All of the actions were consolidated in the federal district court.

Warner Chilcott and Mayne's motion to dismiss was denied without prejudice by the court in June 2013. Thereafter, Warner Chilcott and Mayne reached agreements to settle the claims of the Direct Purchaser Plaintiff class representatives, the Indirect Purchaser Plaintiff class representatives and each of the individual retailer plaintiffs. Warner Chilcott and Mylan filed motions for summary judgment on March 10, 2014. On April 16, 2015, the court issued an order granting Warner Chilcott and Mayne's motion for summary judgment, denying Mylan's summary judgment motion and entering judgment in favor of Warner Chilcott and Mayne on all counts. Mylan is appealing the district court's decision to the Third Circuit Court of Appeals and the appeal is fully briefed.  The date for oral argument on the appeal has not yet been set.

The Company intends to vigorously defend its rights in the litigations. However, it is impossible to predict with certainty the outcome of any litigation and whether any additional similar suits will be filed.

*Lidoderm® Litigation.* On November 8, 2013, a putative class action was filed in the federal district court against Actavis, Inc. and certain of its affiliates alleging that Watson's 2012 patent lawsuit settlement with Endo Pharmaceuticals, Inc. related to Lidoderm ® (lidocaine transdermal patches, "Lidoderm® ") is unlawful. The complaint, asserted on behalf of putative classes of direct purchaser plaintiffs, generally alleges that Watson improperly delayed launching generic versions of Lidoderm® in exchange for substantial payments from Endo in violation of federal and state antitrust and consumer protection laws. The complaint seeks declaratory and injunctive relief and damages. Additional lawsuits containing similar allegations have followed on behalf of other classes of putative direct purchasers and suits have been filed on behalf of putative classes of end-payer plaintiffs. The Company anticipates additional claims or lawsuits based on the same or similar allegations may be filed. On April 3, 2014 the JPML consolidated the cases in federal district court in California. Defendants filed motions to dismiss each of the plaintiff classes' claims. On November 17, 2014, the court issued an order granting the motion in part but denying it with respect to the claims under Section 1 of the Sherman Act. Plaintiffs then filed an amended, consolidated complaint on December 19, 2014. Defendants have responded to the amended consolidated complaint. On March 5, 2015, a group of five retailers filed a civil antitrust complaint in their individual capacities regarding Lidoderm® in the same court where it was consolidated with the direct and indirect purchaser class complaints. The retailer complaint recites similar facts and asserts similar legal claims for relief to those asserted in the related cases described above.  The five retailers amended their complaint on July 27, 2015.

The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Loestrin® 24 Litigation.* On April 5, 2013, two putative class actions were filed in the federal district court against Actavis, Inc. and certain affiliates alleging that Watson's 2009 patent lawsuit settlement with Warner Chilcott related to Loestrin® 24 Fe (norethindrone acetate/ethinyl estradiol tablets and ferrous fumarate tablets, "Loestrin® 24") is unlawful. The complaints, both asserted on behalf of putative classes of end-payors, generally allege that Watson and another generic manufacturer improperly delayed launching generic versions of Loestrin® 24 in exchange for substantial payments from Warner Chilcott, which at the time was an unrelated company, in violation of federal and state antitrust and consumer protection laws. The complaints each seek declaratory and injunctive relief and damages. Additional complaints have been filed by different plaintiffs seeking to represent the same putative class of end-payors. In addition to the end-payor suits, two lawsuits have been filed on behalf of a class of direct payors. The Company anticipates additional claims or lawsuits based on the same or similar allegations. After a hearing on September 26, 2013, the JPML issued an order transferring all related Loestrin® 24 cases to the federal court for the District of Rhode Island. On September 4, 2014, the court granted the defendants' motion to dismiss the complaint. The plaintiffs appealed the district court's decision to the First Circuit Court of Appeals and oral argument was held on December 7, 2015.  On February 22, 2016 the First Circuit issued its decision vacating the decision of, and remanding the matter to, the district court.

The Company believes it has substantial meritorious defenses and intends to defend itself vigorously including in the appeal of the district court's decision granting the Company's motion to dismiss. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Namenda® Litigation.* On September 15, 2014, the State of New York, through the Office of the Attorney General of the State of New York, filed a lawsuit in the United States District Court for the Southern District of New York alleging that Forest is acting to prevent or delay generic competition to Forest's immediate-release product Namenda® in violation of federal and New York antitrust laws and committed other fraudulent acts in connection with its commercial plans for Namenda® XR. In the complaint, the state seeks unspecified monetary damages and injunctive relief. On September 24, 2014, the state filed a motion for a preliminary injunction prohibiting Forest from discontinuing or otherwise limiting the availability of immediate-release Namenda® until the conclusion of the litigation. A hearing was held in November 2014 on the state's preliminary injunction motion. On December 11, 2014, the district court issued a ruling granting the state's injunction motion and issued an injunction on December 15, 2014, the district court issued a ruling granting the state's injunction motion and issued an injunction on December 15, 2014. On May 22, 2015, the Court of Appeals for the Second Circuit affirmed the preliminary injunction. On June 5, 2015, Forest filed a petition with the Second

Circuit for rehearing en banc which was denied.  Forest and the New York Attorney General reached a settlement on November 24, 2015.  On May 29, 2015, a putative class action was filed on behalf of a class of direct purchasers and on June 8, 2015 a similar putative class action was filed on behalf of a class of indirect purchasers.  Since that time, additional complaints have been filed on behalf of putative classes of direct and indirect purchasers.    The class action complaints make claims similar to those asserted by the New York Attorney General and also include claims that Namenda* patent litigation settlements between Forest and generic companies also violated the antitrust laws.  On December 22, 2015, Forest and its co-defendants filed motions to dismiss the pending complaints of the putative classes of direct and indirect purchasers.  These motions remain pending.  The Company believes it has substantial meritorious defenses and intends to defend both its brand and generic defendant entities vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Zymar*/*Zymaxid* *Litigation.* On February 16, 2012, Apotex Inc. and Apotex Corp. filed a complaint in the federal district court in Delaware against Senju Pharmaceuticals Co., Ltd. ("Senju"), Kyorin Pharmaceutical Co., Ltd. ("Kyorin"), and Allergan, Inc. ("Allergan") alleging monopolization in violation of Section 2 of the Sherman Act, conspiracy to monopolize, and unreasonable restraint of trade in the market for gatifloxacin ophthalmic formulations, which includes Allergan's ZYMAR* gatifloxacin ophthalmic solution 0.3% and ZYMAXID* gatifloxacin ophthalmic solution 0.5% products. On May 24, 2012, Allergan filed a motion to dismiss the complaint to the extent it seeks to impose liability for alleged injuries occurring prior to August 19, 2011, which is the date Apotex obtained final approval of its proposed generic product. Allergan and the other defendants also moved to dismiss. Defendants also filed a motion to stay the action pending resolution of related patent actions in the federal court in Delaware and in the U.S. Court of Appeals for the Federal Circuit. On February 7, 2013, the court granted defendants' motion to stay the proceedings pending resolution of the appeal in the patent dispute and denied the motion to dismiss without prejudice to renew. On September 18, 2014, defendants filed a new motion to dismiss the Apotex plaintiffs' complaint. The court dismissed Allergan's motion on May 2, 2015. Thereafter, Allergan filed an answer to Apotex's complaint on June 1, 2015.  On June 6, 2014, a separate antitrust class action complaint was filed in the federal district court in Delaware against the same defendants as in the Apotex case. The complaint alleges that defendants unlawfully excluded or delayed generic competition in the gatifloxacin ophthalmic formulations market (generic versions of ZYMAR* and ZYMAXID* ). On September 18, 2014, Allergan filed a motion to dismiss for lack of subject matter jurisdiction and joined in co-defendants' motion to dismiss for failure to state a claim.  On August 19, 2015, the court granted Allergan's motion to dismiss.  On September 18, 2015, plaintiff filed a notice of appeal with the U.S. Court of Appeals for the Third Circuit.  The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

### Commercial Litigation

*Celexa*/*Lexapro* *Class Actions.* Forest and certain of its affiliates are defendants in three federal court actions filed on behalf of individuals who purchased Celexa* and/or Lexapro* for pediatric use, all of which have been consolidated for pretrial purposes in an MDL proceeding in the federal district court Massachusetts (the "Celexa* /Lexapro* MDL"). These actions, two of which were originally filed as putative nationwide class actions, and one of which is a putative California-wide class action, allege that Forest marketed Celexa* and/or Lexapro* for off-label pediatric use and paid illegal kickbacks to physicians to induce prescriptions of Celexa* and Lexapro*. The complaints assert various similar claims, including claims under the state consumer protection statutes and state common laws. Plaintiffs in the various actions sought to have certified California, Missouri, Illinois and New York state-wide classes. However, only the Missouri state class was certified. Forest subsequently reached an agreement with the MDL plaintiffs to settle the Missouri class claims, including claims by both individuals and third party payors that purchased Celexa* or Lexapro* for use by a minor from 1998 to December 31, 2013, for $7.65 million with a potential to increase the amount to $10.35 million if settling plaintiffs meet certain thresholds. On September 8, 2014 the court granted final approval for the settlement.

Additional actions relating to the promotion of Celexa* and/or Lexapro* have been filed all of which have been consolidated in the Celexa*/Lexapro* MDL. On May 3, 2013, an action was filed in federal court in California on behalf of individuals who purchased Lexapro* for adolescent use, seeking to certify a state-wide class action in California and alleging that our promotion of Lexapro* for adolescent depression has been deceptive. On March 5, 2014 the court granted Forest's motion to dismiss this complaint. Plaintiff then appealed the district court's decision to the Court of Appeals for the First Circuit and on February 20, 2015, the First Circuit affirmed the dismissal of the complaint, ruling that Plaintiffs' California state law claims were preempted by the Federal Food, Drug, and Cosmetic Act (FDCA). On November 13, 2013, an action was filed in federal court in Minnesota seeking to certify a nationwide class of third-party payor entities that purchased Celexa* and Lexapro* for pediatric use. The complaint asserts claims under the federal Racketeer Influenced and Corrupt Organizations Act, alleging that Forest engaged in an off-label marketing scheme and paid illegal kickbacks to physicians to induce prescriptions of Celexa* and Lexapro* . Forest moved to dismiss the complaint and on December 12, 2014, the court issued a ruling dismissing plaintiff's claims under Minnesota's Deceptive Trade Practices Act, but denying the remaining portions of the motion. On March 13, 2014, an action was filed in the federal court in Massachusetts by two third-party payors seeking to certify a nationwide class of persons and entities that purchased Celexa* and

Lexapro* for use by pediatric use. The complaint asserts claims under the federal Racketeer Influenced and Corrupt Organizations Act, state consumer protection statutes, and state common laws, alleging that Forest engaged in an off-label marketing scheme and paid illegal kickbacks to physicians to induce prescriptions of Celexa* and Lexapro*. The court granted Forest's motion to dismiss this complaint in its December 12, 2014 ruling. On August 28, 2014, an action was filed in the federal district court in Washington seeking to certify a nationwide class of consumers and subclasses of Washington and Massachusetts consumers that purchased Celexa * and Lexapro* for pediatric use. The complaint asserts claims under the federal Racketeer Influenced and Corrupt Organizations Act, alleging that Forest engaged in off-label marketing scheme and paid illegal kickbacks to physicians to induce prescriptions of Celexa* and Lexapro* . Forest's response to the complaint was filed on December 19, 2014. On June 16, 2015, the court issued a ruling on the motion to dismiss, granting it in part and denying it in part.

Forest and certain of its affiliates are also named as defendants in two actions filed on behalf of entities or individuals who purchased or reimbursed certain purchases of Celexa* and Lexapro* for pediatric use pending in the Missouri state court. These claims arise from similar allegations as those contained in the federal actions described in the preceding paragraphs. One action, filed on November 6, 2009, was brought by two entities that purchased or reimbursed certain purchases of Celexa* and/or Lexapro* . The complaint asserts claims under the Missouri consumer protection statute and Missouri common law, and seeks unspecified damages and attorneys' fees. The other action, filed on July 22, 2009, was filed as a putative class action on behalf of a class of Missouri citizens who purchased Celexa* for pediatric use. The complaint asserts claims under the Missouri consumer protection statute and Missouri common law, and seeks unspecified damages and attorneys' fees. In October 2010, the court certified a class of Missouri domiciliary citizens who purchased Celexa* for pediatric use at any time prior to the date of the class certification order, but who do not have a claim for personal injury. The Company reached agreements with both sets of plaintiffs in the Missouri actions to resolve each matter for payments that are not material to our financial condition or results of operations.

The Company intends to continue to vigorously defend against these actions. At this time, the Company does not believe losses, if any, would have a material effect on the results of operations or financial position taken as a whole.

*Telephone Consumer Protection Act Litigation.* A putative class action complaint against Anda, Inc. ("Anda"), a subsidiary of the Company, was filed in Missouri state court alleging claims for conversion and alleged violations of the Telephone Consumer Protection Act ("TCPA") and Missouri Consumer Fraud and Deceptive Business Practices Act. An amended complaint alleges that by sending unsolicited facsimile advertisements, Anda misappropriated the class members' paper, toner, ink and employee time when they received the alleged unsolicited faxes, and that the alleged unsolicited facsimile advertisements were sent to the plaintiff in violation of the TCPA and Missouri Consumer Fraud and Deceptive Business Practices Act. The complaint seeks to assert class action claims on behalf of the plaintiff and other similarly situated third parties. On May 19, 2011, the plaintiff's filed a motion seeking certification of a class of entities with Missouri telephone numbers who were sent Anda faxes for the period January 2004 through January 2008 but the court vacated the class certification hearing until the FCC Petition, described in more detail below, was addressed. On May 1, 2012, a separate action was filed in federal court in Florida, purportedly on behalf of the "end users of the fax numbers in the United States but outside Missouri to which faxes advertising pharmaceutical products for sale by Anda were sent." On July 10, 2012, Anda filed its answer and affirmative defenses. The parties filed a joint motion to stay the action pending the resolution of the FCC Petition which the court granted. In addition, in October 2012, Forest and certain of its affiliates were named as defendants, in a putative class action in federal court in Missouri. This suit alleges that Forest and another defendant violated the TCPA and was filed on behalf of a proposed class that includes all persons who, from four years prior to the filing of the action, were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of defendants, which did not display an opt-out notice compliant with a certain regulation promulgated by the FCC. On July 17, 2013, the district court granted Forest's motion to stay the action pending the administrative proceeding initiated by the pending FCC Petition and a separate petition Forest filed. On October 31, 2015, another class action complaint was filed in Missouri state court against Allergan USA, Inc., Warner Chilcott Corporation and Actavis, Inc. alleging violations of the Telephone Consumer Protection Act, the Missouri Consumer Fraud and Protection Act and conversion on behalf of a putative nationwide class of plaintiffs to who defendant Warner Chilcott Corporation sent unsolicited facsimile advertisements. Defendants removed this action to the federal district court for the Western District of Missouri on December 10, 2015 and responded to the complaint on February 8, 2016. On February 17, 2016, plaintiffs voluntarily dismissed defendants Allergan USA, Inc. and Actavis, Inc. from the litigation.

In a related matter, in November 2010 Anda filed a petition with the FCC, asking the FCC to clarify the statutory basis for its regulation requiring "opt-out" language on faxes sent with express permission of the recipient (the "FCC Petition"). On May 2, 2012, the Consumer & Governmental Affairs Bureau of the FCC dismissed the FCC Petition. On May 14, 2012, Anda filed an application for review of the Bureau's dismissal by the full Commission, requesting the FCC to vacate the dismissal and grant the relief sought in the FCC Petition. The FCC did not rule on the application for review. On June 27, 2013, Forest filed a Petition for Declaratory Ruling with the FCC requesting that the FCC find that (1) the faxes at issue in the action complied, or substantially complied with the FCC regulation, and thus did not violate it, or (2) the FCC regulation was not properly promulgated under the TCPA. On January 31, 2014, the FCC issued a Public Notice seeking comment on several other recently-filed petitions, all similar to the one Anda filed in 2010. On October 30, 2014, the FCC issued a final order on the FCC Petition granting Anda, Forest and several other petitioners a retroactive

waiver of the opt-out notice requirement for all faxes sent with express consent. The litigation plaintiffs, who had filed comments on the January 2014 Public Notice, have appealed the final order to the Court of Appeals for the District of Columbia. Anda, Forest and other petitioners have moved to intervene in the appeal seeking review of that portion of the FCC final order addressing the statutory basis for the opt out/express consent portion of the regulation.

Anda and Forest believe they have substantial meritorious defenses to the putative class actions brought under the TCPA, and intend to defend the actions vigorously. However, these actions, if successful, could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Prescription Drug Abuse Litigation.* On May 21, 2014, the California counties Santa Clara and Orange filed a lawsuit in California state court on behalf of the State of California against several pharmaceutical manufacturers. Plaintiffs named Actavis plc in the suit. The California plaintiffs filed an amended complaint on June 9, 2014. On June 2, 2014, the City of Chicago also filed a complaint in Illinois state court against the same set of defendants, including Actavis plc, that were sued in the California Action. Co-defendants in the action removed the matter to the federal court in Illinois. Both the California and Chicago complaints allege that the manufacturer defendants engaged in a deceptive campaign to promote their products in violation of state and local laws. Each of the complaints seeks unspecified monetary damages, penalties and injunctive relief. Defendants have moved to dismiss the complaints in each action. On May 8, 2015, the court in the Chicago litigation granted the Company's motion to dismiss the complaint. On August 26, 2015, the City of Chicago filed a second amended complaint. In the California action, on August 27, 2015, the court stayed the action based on primary jurisdiction arguments raised in the motions to dismiss. The Company anticipates that additional suits will be filed. The Company believes it has several meritorious defenses to the claims alleged. However, an adverse determination in these actions could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Testosterone Replacement Therapy Class Action.* On November 24, 2014, the Company was served with a putative class action complaint filed on behalf a class of third party payers in federal court in Illinois. The suit alleges that the Company and other named pharmaceutical defendants violated various laws including the federal Racketeer Influenced and Corrupt Organizations Act and state consumer protection laws in connection with the sale and marketing of certain testosterone replacement therapy pharmaceutical products ("TRT Products"), including the Company's Androderm® product. This matter was filed in the TRT Products Liability MDL, described in more detail below, notwithstanding that it is not a product liability matter. Plaintiff alleges that it reimbursed third parties for dispensing TRT Products to beneficiaries of its insurance policies. Plaintiff seeks to obtain certain equitable relief, including injunctive relief and an order requiring restitution and/or disgorgement, and to recover damages and multiple damages in an unspecified amount. Defendants filed a joint motion to dismiss the complaint, after which plaintiff amended its complaint. Defendants jointly filed a motion to dismiss the amended complaint, which was granted in part and denied in part on February 3, 2016. The Court dismissed plaintiff's substantive RICO claims for mail and wire fraud for failure to plead with particularity under Rule 9(b) but granted plaintiffs leave to replead. The court also dismissed plaintiff's state law statutory claims and common law claims for fraud and unjust enrichment. The Court declined to dismiss plaintiff's conspiracy claims pursuant to 18 U.S.C. § 1962(d) and its claims for negligent misrepresentation.. The Company believes it has substantial meritorious defenses to the claims alleged and intends to vigorously defend the action. However, an adverse determination in the case could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*TNS Products Litigation.* On March 19, 2014, a complaint was filed in the federal district court in California. The complaint alleges violations of the California Unfair Competition Law, the Consumers Legal Remedies Act, and the False Advertising Law, and deceit. On June 2, 2014, Plaintiff filed a first amended complaint. On June 23, 2014, Allergan filed a motion to dismiss the first amended complaint. On September 5, 2014, the court granted-in-part and denied-in-part Allergan's motion to dismiss. On September 8, 2014, the court set trial for September 1, 2015. On November 4, 2014, Allergan and SkinMedica filed a motion to dismiss. On January 7, 2015, Allergan and SkinMedica's motion to dismiss was denied. On January 15, 2015, the court set a trial date of February 16, 2016. On February 19, 2015 Plaintiff filed a third amended complaint. On May 27, 2015, the case was stayed pending the decision of the Ninth Circuit Court of Appeals in another matter involving similar legal issues. The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*West Virginia Prescription Drug Abuse Litigation.* On June 26, 2012, the State of West Virginia filed a lawsuit against multiple distributors of prescription drugs, including Anda. The complaint generally alleges that the defendants distributed prescription drugs in West Virginia in violation of state statutes, regulation and common law. The complaint seeks injunctive relief and unspecified damages and penalties. On January 3, 2014, plaintiff filed an amended complaint which the defendants moved to dismiss. On December 16, 2014, the court issued an order denying the defendants' motion to dismiss. On January 27, 2015, the State filed a second amended complaint which the Company moved to dismiss. On September 8, 2015, the court issued a ruling denying the motion to dismiss the second amended complaint. On October 23, 2015, defendants filed a writ of prohibition in the Supreme Court of Appeals of West Viriginia seeking review of the court's denial of the motion to dismiss the second amended complaint. On January 5,

F-94

2016, the Supreme Court of Appeals of West Virginia declined to issue an order to show cause on defendants' writ of prohibition. The case is in its preliminary stages and the Company believes it has substantial meritorious defenses to the claims alleged. However, an adverse determination in the case could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Xaleron Dispute*. On February 5, 2016, Xaleron Pharmaceuticals, Inc. filed a lawsuit against Allergan, Inc. and Actavis, Inc. in state court in New York. The summons with notice alleges Allergan misappropriated Xaleron's confidential business information and asserts claims for unfair competition, tortious interference with prospective economic advantage and unjust enrichment. To date, Xaleron has not filed a complaint. The Company intends to vigorously defend against this action. However, this action, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

### Employment Litigation

In July 2012, Forest and certain of its affiliates were named as defendants in an action brought by certain former company sales representatives and specialty sales representatives in the federal district court in New York. The action is a putative class and collective action, and alleges class claims under Title VII for gender discrimination with respect to pay and equity enrichment, as well as discrimination on the basis of pregnancy, and a collective action claim under the Equal Pay Act. The proposed Title VII gender class includes all current and former female sales representatives employed by the Company throughout the U.S. from 2008 to the date of judgment, and the proposed Title VII pregnancy sub-class includes all current and former female sales representatives who have been, are, or will become pregnant while employed by the Company throughout the U.S. from 2008 to the date of judgment. The proposed Equal Pay Act collective action class includes current, former, and future female sales representatives who were not compensated equally to similarly-situated male employees during the applicable liability period. The Second Amended Complaint also includes non-class claims on behalf of certain of the named Plaintiffs for sexual harassment and retaliation under Title VII, and for violations of the Family and Medical Leave Act. On August 14, 2014, the court issued a decision on the Company's motion to dismiss, granting it in part and denying it in part, striking the plaintiffs' proposed class definition and instead limiting the proposed class to a smaller set of potential class members and dismissing certain of the individual plaintiffs' claims. Plaintiffs filed a motion for conditional certification of an Equal Pay Act collective action on May 22, 2015 which the Company has opposed. On September 2, 2015, the court granted plaintiffs motion to conditionally certify a collective action. The litigation is still in its early stages and the parties are beginning to work on discovery matters. The Company intends to continue to vigorously defend against this action. At this time, the Company does not believe losses, if any, would have a material effect on the results of operations or financial position taken as a whole.

### FDA Litigation

In May 2002, Company subsidiary Watson Laboratories, Inc. reached an agreement with the FDA on the terms of a consent decree with respect to its Corona, California manufacturing facility. The court approved the consent decree on May 13, 2002 ( *United States of America v. Watson Laboratories, Inc., et. al* ., United States District Court for the Central District of California, EDCV-02-412-VAP). The consent decree applies only to the Company's Corona, California facility and not other manufacturing sites. The decree requires that the Corona, California facility complies with the FDA's current Good Manufacturing Practices ("cGMP") regulations.

Pursuant to the agreement, the Company hired an independent expert to conduct inspections of the Corona facility at least once each year. In February 2014 the independent expert concluded its most recent inspection of the Corona facility. At the conclusion of the inspection, the independent expert reported its opinion to the FDA that, based on the findings of the audit of the facility, the FDA's applicable cGMP requirements, applicable FDA regulatory guidance, and the collective knowledge, education, qualifications and experience of the expert's auditors and reviewers, the systems at the Corona facility audited and evaluated by the expert are in compliance with the FDA's cGMP regulations. However, the FDA is not required to accept or agree with the independent expert's opinion. The FDA has conducted periodic inspections of the Corona facility since the entry of the consent decree, and concluded its most recent general cGMP inspection in April 2014. At the conclusion of the inspection, the FDA inspectors issued a Form 483 to the facility identifying certain observations concerning the instances where the facility failed to follow cGMP regulations. The facility recently responded to the Form 483 observations. If in the future, the FDA determines that, with respect to its Corona facility, the Company has failed to comply with the consent decree or FDA regulations, including cGMPs, or has failed to adequately address the FDA's inspectional observations, the consent decree allows the FDA to order a variety of actions to remedy the deficiencies. These actions could include ceasing manufacturing and related operations at the Corona facility, and recalling affected products. Such actions, if taken by the FDA, could have a material adverse effect on the Company, its results of operations, financial position and cash flows.

*Patent Litigation*

*Patent Enforcement Matters*

*Acular LS®.* In September 2015, Allergan received a Paragraph IV certification notice letter from Aurobindo Pharma USA Inc. ("Aurobindo") contending that U.S. Patent Numbers 8,008,338 (the "'338 Patent"), 8,207,215 (the "'215 Patent), 8,377,982 (the "'982 Patent"), 8,541,163 (the "'163 Patent"), 8,648,107 (the "'107 Patent"), 8,906,950 (the "'950 Patent"), and 8,946,281 (the "'281 Patent") are invalid and not infringed by Aurobindo's proposed generic version of Acular LS® . While the Company intends to vigorously defend the '338 Patent, the '215 Patent, the '982 Patent, the '163 Patent, the '107 Patent, the '950 Patent, and the '281 Patent and pursue its legal rights, Allergan can offer no assurance as to whether such lawsuit will be successful and that a generic version will not be launched. In November 2015, Allergan filed a complaint against Aurobindo in the U.S. District Court for the Eastern District of Texas, Marshall Division (the "Texas Litigation") and, in the U.S. District Court for the District of Delaware (the "Delaware Litigation"). These lawsuits triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than March 30, 2018 (unless there is a final court decision adverse to Allergan sooner). In January 2016, Aurobindo filed a counterclaim against Allergan in the Delaware Litigation.

*Amrix®.* In August 2014, Aptalis Pharmatech, Inc. ("Aptalis") and Ivax International GmbH ("Ivax"), Aptalis's licensee for Amrix, brought an action for infringement of U.S. Patent No. 7,790,199 (the "'199 patent"), and 7,829,121 (the "'121 patent") in the U.S. District Court for the District of Delaware against Apotex Inc. and Apotex Corp. (collectively "Apotex"). Apotex has notified Aptalis that it has filed an ANDA with the FDA seeking to obtain approval to market a generic version of Amrix before these patents expire. (The '199 and '121 patents expire in November 2023.) This lawsuit triggered an automatic stay of approval of Apotex's ANDA until no earlier than December 27, 2016 (unless there is a final court decision adverse to Forest sooner, and subject to any other exclusivities, such as a first filer 180 day market exclusivity). A bench trial concluded on November 17, 2015. Post-trial briefing is scheduled to conclude by March 30, 2016. The Company believes it has meritorious claims to prevent the generic applicant from launching a generic version of Amrix. However, there can be no assurance a generic version will not be launched.

*Atelvia®.* In August and October 2011 and March 2012, Warner Chilcott received Paragraph IV certification notice letters from Watson Laboratories, Inc. – Florida (together with Actavis, Inc. (formerly Watson Pharmaceuticals, Inc.) and its subsidiaries, "Actavis"), Teva and Ranbaxy Laboratories Ltd. (together with its affiliates, "Ranbaxy") indicating that each had submitted to the FDA an ANDA seeking approval to manufacture and sell a generic version of Atelvia® 35 mg tablets ("Atelvia® "). The notice letters contend that Warner Chilcott's U.S. Patent Nos. 7,645,459 (the "'459 Patent") and 7,645,460 (the "'460 Patent"), two formulation and method patents expiring in January 2028, are invalid, unenforceable and/or not infringed. Warner Chilcott filed a lawsuit against Actavis in October 2011, against Teva in November 2011 and against Ranbaxy in April 2012 in the U.S. District Court for the District of New Jersey charging each with infringement of the '459 Patent and '460 Patent. On August 21, 2012, the United States Patent and Trademark Office issued to the Company U.S. Patent No. 8,246,989 (the "'989 Patent"), a formulation patent expiring in January 2026. The Company listed the '989 Patent in the FDA's Orange Book, each of Actavis, Teva and Ranbaxy amended its Paragraph IV certification notice letter to contend that the '989 Patent is invalid and/or not infringed, and Warner Chilcott amended its complaints against Actavis, Teva and Ranbaxy to assert the '989 Patent. On October 2, 2013, Actavis divested its ANDA to Amneal Pharmaceuticals. In September 2013, Warner Chilcott received a Paragraph IV certification notice letter from Impax Laboratories, Inc. indicating that it had submitted to the FDA an ANDA seeking approval to manufacture and sell a generic version of Atelvia® . Warner Chilcott filed a lawsuit against Impax on October 23, 2013, asserting infringement of the '459, '460, and '989 patents. On June 13, June 30, and July 15, 2014, the Company entered into settlement agreements with Ranbaxy, Amneal and Impax, respectively. Each agreement permits Ranbaxy, Amneal and Impax to launch generic versions of Atelvia® on July 9, 2025, or earlier in certain circumstances. Trial against Teva began on July 14, 2014 and concluded on July 18, 2014. On March 4, 2015, the District Court ruled that the claims at issue in the litigation are invalid for obviousness. The Company intends to appeal this ruling. On March 5, 2015, the Company filed a motion for entry of an injunction or stay pending appeal seeking to enjoin Teva from launching a generic version of Atelvia pending such appeal. On March 30, 2015, the District Court denied the Company's motion for entry of an injunction or stay during the pendency of an appeal, but temporarily enjoined Teva from launching its generic product for 10 business days following entry of the order so that the Company could move before the Federal Circuit for an injunction pending appeal. On April 27, 2015, the Federal Circuit temporarily enjoined Teva from launching its generic product pending resolution of the Company's motion for an injunction pending appeal. The Federal Circuit denied the Company's motion on May 15, 2015, and Teva launched their generic version of Atelvia. Appellate briefing is complete and oral argument was held on February 1, 2016. The parties are now awaiting a decision.

While the Company intends to vigorously defend the '459 Patent, the '460 Patent, and the '989 Patent and pursue its legal rights, the Company can offer no assurance as to when the lawsuit will be decided and whether such lawsuit will be successful.

*Bystolic® IPR.* On December 23, 2015, Forest Laboratories Holdings Limited ("Forest") received a notification letter that an Inter Partes Review of the USPTO ("IPR") petition was filed by Lower Drug Prices for Consumers, LLC ("LDPC") regarding U.S. Patent No. 6,545,040, expiring on December 17, 2021 (the "'040 Patent"). LDPC filed the IPR petition on December 23, 2015, and refiled a corrected petition on January 20, 2016. Forest's deadline to file a Patent Owner's Preliminary Response is currently on or about April 4, 2016.

*Canasa®.* In July 2013, Aptalis Pharma US, Inc. and Aptalis Pharma Canada Inc. brought actions for infringement of U.S. Patent Nos. 8,217,083 (the "'083 patent") and 8,436,051 (the "'051 patent") in the U.S. District Court for the District of New Jersey against Mylan and Sandoz. These companies have notified Aptalis that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Canasa® before these patents expire. Amended complaints were filed against these companies in November 2013 adding claims for infringement of U.S. Patent No. 7,854,384 (the "'384 patent"). The '083, '051, and '384 patents expire in June 2028. On November 11, 2015, Aptalis entered into a settlement agreement with Mylan. On December 14, 2015, Aptalis brought an action for infringement of the '083, '051, and '384 patents in the U.S. District Court for the District of New Jersey against Pharmaceutical Sourcing Partners, Inc. ("PSP"). PSP had notified Aptalis that it had filed an ANDA with the FDA seeking to obtain approval to market generic versions of Canasa before certain of these patents expire. This lawsuit triggered an automatic stay of approval of PSP's ANDA that expires no earlier than May 2018 (unless a court issues a decision adverse to Aptalis sooner). On December 23 and 27, 2015, Aptalis brought actions for infringement of the '083, '051, and '384 patents in the U.S. District Courts for the District of New Jersey and the District of Delaware, respectively, against Delcor Asset Corp., Renaissance Pharma, Inc. and Renaissance Acquisition Holdings, LLC ("Delcor"). Delcor has notified Aptalis that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Canasa before certain of these patents expire. These lawsuits triggered an automatic stay of approval of Delcor's ANDA that expires no earlier than May 2018 (unless there is a final court decision adverse to Aptalis sooner). No trial dates have been set in the pending actions. The Company believes it has meritorious claims to prevent the generic applicants from launching a generic version of Canasa®. However, there can be no assurance a generic version will not be launched.

*Combigan® II.* In 2012, Allergan filed a complaint against Sandoz, Alcon, Apotex and Watson in the U.S. District Court for the Eastern District of Texas, Marshall Division, alleging that their proposed products infringe U.S. Patent Number 8,133,890 ("'890 Patent"), and subsequently amended their complaint to assert infringement of U.S. Patent Number 8,354,409. In March 2013, Allergan received a Paragraph IV invalidity and non-infringement certification from Sandoz, contending that the '890 Patent is invalid and not infringed by the proposed generic product. In October 2013, Allergan filed a motion to stay and administratively close the Combigan II matter, which was granted. In April 2015, Allergan filed a stipulation of dismissal and the U.S. District Court granted the Order with respect to the Watson defendants. In October 2015, the U.S. District Court entered an order consolidating the *Combigan® III* matter *C.A. 2:15-cv-00347-JRG* into this matter *C.A. 2:12-cv-00207-JRG*, as lead case and subsequently, set the bench trial for October 25, 2016. While the Company intends to vigorously defend the patents at issue in this litigation, Allergan can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

*Combigan® III.* On January 26, 2015, Allergan received a Paragraph IV letter from Sandoz contending that U.S. Patent Numbers 7,030,149, 7,320,976, 7,642,258, and 8,748,425 are invalid and not infringed by the proposed generic product. In March 2015, Allergan filed a complaint against Sandoz in the U.S. District Court for the Eastern District of Texas, Marshall Division, alleging that their proposed products infringe U.S. Patent Numbers 7,030,149, 7,320,976, 7,642,258, and 8,748,425 (the "Combigan Patents"). In April 2015, Sandoz filed a counterclaim against Allergan. In August 2015, Allergan filed a motion for consolidation with *C.A. 2:12-cv-00207-JRG* and request for earlier trial date. In October 2015, the U.S. District Court held oral argument on the motion for consolidation and earlier trial date and entered an order consolidating this matter *C.A. 2:15-cv-00347-JRG* into the *Combigan® II* matter *C.A. 2:12-cv-00207-JRG* and subsequently, set the bench trial for October 25, 2016. While the Company intends to vigorously defend the patents at issue in this litigation, Allergan can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

*Combigan® FFC Extortion.* On June 19, 2015, Allergan filed a complaint against Ferrum Ferro Capital, LLC and Kevin Barnes (collectively, "FFC") in the U.S. District Court for the Central District of California, Southern Division, alleging civil extortion, malicious prosecution, and unfair business practices arising from U.S. Patent Laws regarding the IPR petition regarding U.S. Patent No. 7,030,149, expiring in April 2022 (the "'149 Patent") filed by FFC on March 9, 2015. On August 10, 2015, FFC filed a notice of motion and motion to strike the complaint under California Code of Civil Procedure § 425.16, California's "anti-SLAPP" statute. On September 1, 2015, the Court issued an order to show cause regarding subject matter jurisdiction. On September 21, 2015, the U.S. Patent Office denied the IPR petition. On October 19, 2015, the Court heard oral argument on the order to show cause regarding subject matter jurisdiction and took the matter under submission. In December 2015, the Court entered an order dismissing this action without prejudice for lack of subject matter jurisdiction, rendering all pending motions moot. In January 2016, the Court entered a judgment dismissing the case without prejudice.

*Enablex*. On December 18, 2013, Warner Chilcott Company LLC and Warner Chilcott (US) LLC sued Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (together "Torrent") in the United States District Court for the District of Delaware, alleging that sales of Torrent's darifenacin tablets, a generic version of Warner Chilcott's Enablex* , would infringe U.S. Patent No. 6,106,864 (the '864 patent). The complaint seeks injunctive relief. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to Torrent until the earlier of thirty months after the generic applicant provided Warner Chilcott with notice of its ANDA filing or the generic applicant prevails in the pending litigation, subject to any other exclusivities, such as a first filer 180 day market exclusivity.

On June 6, 2014, Warner Chilcott Company LLC and Warner Chilcott (US) LLC sued Amneal Pharmaceuticals LLC and Amneal Pharmaceuticals of New York, LLC (together "Amneal") in the United States District Court for the District of Delaware, alleging that sales of Amneal's darifenacin tablets, a generic version of Warner Chilcott's Enablex* , would infringe the '864 patent. The complaint seeks injunctive relief. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to Amneal until the earlier of thirty months after the generic applicant provided Warner Chilcott with notice of its ANDA filing or the generic applicant prevails in the pending litigation, subject to any other exclusivities, such as a first filer 180 day market exclusivity. On July 7, 2014, the Company settled with Torrent. The Company also settled with Amneal on September 24, 2014. The Company has also received a Notice Letter dated June 19, 2014 from Apotex Corp et al. and an analogous complaint was filed.  The Company settled its litigation with the Apotex defendants on August 24, 2015 and the court entered a dismissal order on August 31, 2015.

Under the settlement agreements entered into in the third quarter of 2010 to resolve outstanding patent litigation, each of Teva, Anchen Pharmaceuticals, Inc. and Watson agreed not to launch a generic version of Enablex* until the earlier of March 15, 2016 (or June 15, 2016, if a 6-month pediatric extension of regulatory exclusivity is granted) or, among other circumstances, (i) the effective date of any license granted to a third party for a generic Enablex product or (ii) in the event a third party launches a generic Enablex* product "at risk" and injunctive relief is not sought or granted.

*Delzicol*. On August 28, 2015, Warner Chilcott Company, LLC, Warner Chilcott (US), LLC, and Qualicaps Co., Ltd. (collectively, "Plaintiffs") brought an action for infringement of U.S. Patent No. 6,649,180 (the "'180 patent") against Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva"). Teva notified Plaintiffs that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Delzicol before the '180 patent expires in April 2020. This lawsuit triggered an automatic stay of approval of Teva's ANDA that expires no earlier than January 2018 (unless there is a final court decision adverse to Plaintiffs sooner).  Trial is scheduled for October 2017.  On November 9, 2015, Plaintiffs also brought an action for infringement of '180 patent in the United States District Court for the Eastern District of Texas against Mylan Pharmaceuticals, Inc., Mylan Laboratories Limited and Mylan, Inc. (collectively, "Mylan"). Mylan notified Plaintiffs that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Delzicol before the '180 patent expires in April 2020. This lawsuit triggered an automatic stay of approval of Mylan's ANDA that expires no earlier than March 2018 (unless a court issues a decision adverse to Plaintiffs sooner). On December 16, 2015, Mylan filed a motion to dismiss for failure to state a claim, lack of personal jurisdiction, and improper venue, which remains pending.  Trial is scheduled for October 2017.  While the Company intends to vigorously defend the patents at issue in this litigation, Warner Chilcott can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

*Lastacaft*.  In October 2014, Allergan and Vistakon Pharmaceuticals, LLC ("Vistakon") filed a complaint in the U.S. District Court for the District of Delaware for infringement of U.S. Patent No. 8,664,215 ("'215 Patent") against Wilshire Pharmaceuticals, Inc. ("Wilshire").  In February 2015, Wilshire filed a motion to dismiss Count II of the complaint for lack of subject matter jurisdiction and a counterclaim against Allergan and Vistakon. The parties stipulated and the Court ordered that Count II is dismissed without prejudice.  In June 2015, the Court scheduled a bench trial for July 17, 2017.  This lawsuit triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than January 28, 2018 (unless there is a final court decision adverse to Allergan sooner).  While the Company intends to vigorously defend the patents at issue in this litigation, Allergan can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

*Latisse* III. In December 2014, Allergan and Duke University filed a complaint for declaratory judgment of infringement of U.S. Patent No. 8,906,962 ("'962 Patent") against Apotex. In January 2015, Allergan and Duke subsequently filed an amended complaint against Apotex to assert infringement of U.S. Patent Number 8,926,953 ("'953 Patent"). In March 2015, Allergan and Duke filed a second amended complaint asserting only the '953 Patent. Apotex filed a motion to dismiss for failure to state a claim with respect to the '953 Patent.

In December 2014, Allergan and Duke filed a complaint for infringement of U.S. Patent No. 8,906,962 ("'962 Patent") against Sandoz, Inc. ("Sandoz"), Akorn, Inc. ("Akorn"), Hi-Tech Parmacal Co., Inc. ("Hi-Tech") and Actavis, Inc., Watson Laboratories, Inc., and Actavis Pharma, Inc. (collectively, "Actavis"). In January 2015, Allergan and Duke subsequently filed an amended complaint against Sandoz, Akorn, Hi-Tech, and Actavis to assert infringement of U.S. Patent Number 8,926,953 ("'953 Patent"). In

March 2015, Allergan filed a notice of voluntary dismissal as to the Actavis defendants. In March 2015, Allergan and Duke filed a motion for leave to file a second amended complaint asserting only the '953 Patent.  In April 2015, Sandoz filed a motion to dismiss for failure to state a claim.  In May 2015, Akorn and Hi-Tech filed a motion to dismiss for failure to state a claim.  On May 19, 2015, the court entered an opinion and order granting Allergan and Duke's motion for leave to file a second amended complaint, which will render moot Apotex's motion to dismiss for failure to state a claim, Allergan and Duke's motion to dismiss Apotex's counterclaims, Sandoz's motion to dismiss for failure to state a claim, and Akorn and Hi-Tech's motion to dismiss for failure to state a claim.  On May 22, 2015, Allergan and Duke filed a second amended complaint. On June 22, 2015, Apotex and Sandoz filed separate motions to dismiss for failure to state a claim. On July 2, 2015, Akorn and Hi-Tech filed a motion for judgment on the pleadings. On August 31, 2015, the court issued an order and judgment dismissing the case with prejudice in favor of Apotex, Sandoz and Akorn on all of Allergan's claims alleging infringement of the '953 patent. In the Sandoz and Akorn matters, the court also declared and adjudged the '953 patent invalid as obvious, and collaterally estopped Allergan from asserting the '953 patent against Sandoz or Akorn or contesting the invalidity of the '953 patent. In late September, the court entered a final judgment that declared and adjudged claims 8, 23 and 26 of the '953 patent invalid as obvious and collaterally estopped Allergan from asserting claims 8, 23 and 26 of the '953 patent against Apotex and Akorn or contesting the invalidity of claims 8, 23 and 26 of the '953 patent.  On September 30, 2015, Allergan filed a Notice of Appeal to the Court of Appeals for the Federal Circuit. On October 19, 2015, the U.S. Court of Appeals for the Federal Circuit docketed the appeal filed by Allergan. While the Company intends to vigorously defend the patents at issue in this litigation, Allergan can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

     *Minastrin® 24 Fe.* On June 6, 2014, Warner Chilcott sued Lupin Atlantis Holdings SA, Lupin Ltd. and Lupin Pharmaceuticals, Inc. (collectively, "Lupin") in the United States District Court for the District of Maryland, alleging that sales of Lupin's norethindrone and ethinyl estradiol chewable tablets, a generic version of Warner Chilcott's Minastrin® 24 Fe, would infringe U.S. Patent 6,667,050 (the "'050 patent"). The Complaint seeks an injunction. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to the generic applicants until the earlier of thirty months after the generic applicant provided Warner Chilcott with notice of its abbreviated new drug application filing or the generic applicant prevails in the pending litigation. Warner Chilcott further notes that FDA will not approve any ANDA product before May 8, 2016 due to Minastrin® 24 Fe's new dosage form exclusivity, which expires on that date. The litigation against Lupin is pending. Warner Chilcott notes that on April 29, 2014, several of the claims of the '050 patent were declared invalid in the Generess litigation discussed above. Warner Chilcott has appealed the Generess decision and the appeal is currently pending. Lupin and the Company have entered into a settlement agreement and have moved the District Court in the Generess matter for an indicative ruling that it would vacate the decision in Generess if that case is remanded. On April 8, 2015, the District Court granted the parties' motion and the Generess appeal has been terminated.  The parties request that the District Court in Generess vacate its prior opinion was granted on May 18,  2015. This case was dismissed on May 18, 2015. By letter dated April 15, 2015, the Company received a Paragraph IV notice letter from Amneal Pharmaceuticals LLC ("Amneal").  A complaint against Amneal was filed on May 28, 2015 in the United States District Court for the District of New Jersey. The Company settled its litigation with Amneal and the case was dismissed on January 2016. The Company is also involved in ANDA litigation with Mylan Pharmaceuticals, Inc. and Jai Pharma Limited regarding their Paragraph IV challenge to the '050 patent. This litigation is ongoing.  While the Company intends to vigorously defend the patent at issue in this litigation, Warner Chilcott can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

     *Namenda XR®.* Between January and October 2014, Forest Laboratories, Inc., Forest Laboratories Holdings, Ltd. (collectively, "Forest") and Merz Pharma and Adamas Pharmaceuticals, Forest's licensors for Namenda XR (all collectively, "Plaintiffs"), brought actions for infringement of some or all of U.S. Patent Nos. 5,061,703 (the "'703 patent"), 8,039,009 (the "'009 patent"), 8,168,209 (the "'209 patent"), 8,173,708 (the "'708 patent"), 8,283,379 (the "'379 patent"), 8,329,752 (the "'752 patent"), 8,362,085 (the "'085 patent"), and 8,598,233 (the "'233 patent") in the U.S. District Court for the District of Delaware against Wockhardt, Teva, Sun, Apotex, Anchen, Zydus, Watson, Par, Mylan, Amneal, Ranbaxy, and Amerigen, and related subsidiaries and affiliates thereof. These companies have notified Plaintiffs that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Namenda XR before these certain patents expire. Including a 6-month pediatric extension of regulatory exclusivity, the '703 patent expires in October 2015, the '009 patent expires in September 2029, and the '209, '708, '379, '752, '085, and '233 patents expire in May 2026. These lawsuits triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than June 2016 (unless there is a final court decision adverse to Plaintiffs sooner). On June 11, 2014, Mylan filed a motion to dismiss for lack of personal jurisdiction, which the district court denied on March 30, 2015. On December 18, 2014, Ranbaxy filed an IPR before the Patent Trial and Appeal Board, U.S. Patent and Trademark Office, with respect to the '085 patent. Adamas filed a preliminary response on April 14, 2015. On May 1, 2015, Forest entered into a settlement agreement with Ranbaxy. On May 15, 2015, the Patent Trial and Appeal Board granted Adamas and Ranbaxy's joint motion to terminate the case. On October 17, 2014, Forest and Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc. — Florida) filed a stipulation dismissing their respective claims without prejudice. On November 3, 2014, Plaintiffs entered into a settlement agreement with Wockhardt. Under the terms of the settlement agreement, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Plaintiffs will provide a license to Wockhardt that will permit it to launch its generic version of Namenda XR as of the date that is the later of (a) two (2) calendar months prior to the expiration date of the last to expire of the '703 patent, the '209 patent, the '708 patent, the '379 patent, the '752

patent, the '085 patent, and the '233 patent, including any extensions and/or pediatric exclusivities; or (b) the date that Wockhardt obtains final FDA approval of its ANDA, or earlier in certain circumstances. On January 13, 2015, Plaintiffs entered into settlement agreements with Anchen and Par. Under the terms of the settlement agreements, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Plaintiffs will provide licenses to Anchen and Par that will permit them to launch their generic versions of Namenda XR as of the date that is the later of (a) two (2) calendar months prior to the expiration date of the last to expire of the '209 patent, the '708 patent, the '379 patent, the '752 patent, the '085 patent, and the '233 patent, as well as the '009 patent for Par only, including any extensions and/or pediatric exclusivities; or (b) the dates that Anchen and Par obtain final FDA approval of their respective ANDAs, or earlier in certain circumstances. On May 11, 2015, Forest entered into a settlement agreement with Sun. On August 18, 2015, Forest entered into a settlement agreement with Zydus. On September 9, 2015, Forest entered into a settlement agreement with Amneal. Under the terms of the settlement agreement, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Plaintiffs will provide a license to Amneal that will permit it to launch its generic version of Namenda XR beginning January 31, 2020, following receipt by Amneal of final approval from the FDA on its ANDA for generic Namenda XR; or (b) under certain circumstances, Amneal has an option to launch an authorized generic version of Namenda XR beginning on January 31, 2021. The Company entered into a settlement agreement with Amerigen on October 20, 2015. The Company entered into a settlement agreement with Mylan on November 16, 2015. The Company entered into a settlement agreement with Lupin on December 22, 2015. On January 5, 2016, the district court issued a claim construction ruling that included findings of indefiniteness as to certain claim terms in the asserted patents. On February 11, 2016, the Company settled with Apotex. Trial began on February 16, 2016 with the remaining defendant Teva with respect to the '009 patent. On October 9, 2015, the Company also brought an action for infringement of the '009, '209, '708, '379, '752, '085, and '233 patents in the U.S. District Court for the District of Delaware against Accord Healthcare, Inc. and Intas Pharmaceuticals Limited (collectively, "Accord"). The Accord defendants have notified Plaintiffs that they have filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namenda XR before these certain patents expire. On January 14, 2016, Forest entered into a settlement agreement with Accord. On October 9, 2015, the Company also brought an action for infringement of the '009, '209, '708, '379, '752, '085, and '233 patents in the U.S. District Court for the District of Delaware against Accord Healthcare, Inc. and Intas Pharmaceuticals Limited (collectively, "Accord"). The Accord defendants have notified Plaintiffs that they have filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namenda XR before these patents expire. On December 18, 2015, the Company also brought an action for infringement of the '209, '708, '379, '752, '085, and '233 patents in the U.S. District Court for the District of Delaware against Panacea Biotec, Ltd. ("Panacea"). Panacea has notified Plaintiffs that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namenda XR before these patents expire. This lawsuit triggered an automatic stay of approval of Panacea's ANDA that expires no earlier than May 2018 (unless a court issues a decision adverse to Plaintiffs sooner). The Company believes it has meritorious claims to prevent the generic applicants from launching a generic version of Namenda XR. However, there can be no assurance a generic version will not be launched.

*Namzaric*™. On August 27, 2015, Forest Laboratories, LLC, Forest Laboratories Holdings, Ltd. (collectively, "Forest") and Adamas Pharmaceuticals, Inc. (all collectively, "Plaintiffs"), brought an action for infringement of some or all of U.S. Patent Nos. 8,039,009 (the "'009 patent"), 8,058,291 (the "'291 patent"), 8,168,209 (the "'209 patent"), 8,173,708 (the "'708 patent"), 8,283,379 (the "'379 patent"), 8,293,794 (the "'794 patent"), 8,329,752 (the "'752 patent"), 8,338,485 (the "'485 patent"), 8,362,085 (the "'486 patent"), 8,362,085 (the "'085 patent"), 8,580,858 (the "'858 patent") and 8,598,233 (the "'233 patent") in the U.S. District Court for the District of Delaware against Amneal Pharmaceuticals LLC and Par Pharmaceutical, Inc., and related subsidiaries and affiliates thereof. These companies have notified Plaintiffs that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Namzaric before these certain patents expire. Including a 6-month pediatric extension of regulatory exclusivity, the '009 patent expires in September 2029, and the '209, '708, '379, '752, '085, and '233 patents expire in May 2026. The '291 patent expires in December 2029, and the '794, '485, '486, and '858 patents expire in November 2025. These lawsuits triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than June 2018 (unless there is a final court decision adverse to Plaintiffs sooner). On October 23, 2015, the Company also brought an action for infringement of the '009, '291, '209, '708, '379, '794, '752, '485, '486, '085, '858 and '233 patents in the U.S. District Court for the District of Delaware against Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals Ltd. (collectively, "Amerigen"). The Amerigen defendants have notified Plaintiffs that they have filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namzaric before these certain patents expire. On January 5, 2016, the district court in the Namenda XR patent litigations issued a claim construction ruling that included findings of indefiniteness as to certain claim terms in certain of the patents also asserted in the pending Namzaric patent litigations. Trial is scheduled for October 2017. While the Company intends to vigorously defend the patents at issue in this litigation, Forest can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

*Rapaflo*®. On June 17, 2013, Actavis, Inc., Watson Laboratories, Inc., and Kissei Pharmaceutical Co., Ltd. sued Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited, Unit 3 (collectively, "Hetero") in the United States District Court for the District of Delaware, alleging that sales of silodosin tablets, a generic version of Actavis' Rapaflo® tablets, would infringe U.S. Patent No. 5,387,603 (the '603 patent). On June 17, 2013 Actavis, Inc., Watson Laboratories, Inc., and Kissei Pharmaceutical Co., Ltd. sued Sandoz Inc. in the United States District Court for the District of Delaware, alleging that sales of Sandoz's generic version of Rapaflo® would infringe the '603 patent. The complaint seeks injunctive relief. On December 22, 2014 the Parties completed their

agreement with Hetero. Actavis and Kissei's lawsuit against Sandoz have been consolidated and remain pending. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to the generic applicants prior to April 8, 2016. The Company believes it has meritorious claims to prevent the generic applicants from launching a generic version of Rapaflo. However, if a generic applicant prevails in the pending litigation or launches a generic version of Rapaflo before the pending litigation is finally resolved, it could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Restasis*. Between August and September 2015, Allergan brought actions for infringement of U.S. Patent Nos. 8,629,111 (the "'111 patent"), 8,633,162 (the "'162 patent"), 8,642,556 (the "'556 patent"), 8,648,048 (the "'048 patent"), and 8,685,930 (the "'930 patent") in the U.S. District Court for the Eastern District of Texas against Akorn, Inc, Apotex, Inc., Mylan Pharmaceuticals, Inc., Teva Pharmaceuticals USA, Inc., InnoPharma, Inc., and Pfizer, Inc., and related subsidiaries and affiliates thereof. On September 14, 2015, Allergan brought an action for infringement of these patents in the U.S. District Court for the District of Delaware against InnoPharma, Inc. and Pfizer, Inc. These companies have notified Allergan that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Restasis before these patents expire in August 2024. In the Texas actions the District Court granted joint motions to dismiss without prejudice Teva Pharmaceutical Industries Ltd. and Pfizer, Inc., on October 12 and October 22, 2015, respectively. Teva Pharmaceuticals USA, Inc. ("Teva") and InnoPharma, Inc. ("InnoPharma") remain defendants in the respective actions. In October 2015, Mylan Pharmaceuticals, Inc. and Mylan, Inc. ("Mylan") filed a motion to dismiss for lack of personal jurisdiction and improper venue, and for failure to state a claim as to Mylan, Inc.; Teva filed a motion to dismiss for lack of personal jurisdiction and improper venue; Apotex, Inc. and Apotex Corp. ("Apotex") filed an answer, affirmative defenses and counterclaim; Akorn, Inc. ("Akorn") filed an answer and counterclaim; and Teva filed an answer, counterclaim and motion to dismiss. Allergan entered into a settlement agreement with Apotex on December 15, 2015. In December 2015, Allergan and Apotex filed a joint stipulation of dismissal and the U.S. District Court granted the Order with respect to the Apotex defendants. In January 2016, the Court scheduled a bench trial for August 29, 2017. While the Company intends to vigorously defend the patents at issue in this litigation, Allergan can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

*Restasis® IPR*. On June 4, 2015, Allergan received notification letters that an IPR petition was filed by Apotex regarding U.S. Patent Numbers 8,629,111, 8,633,162, 8,642,556, 8,648,048, and 8,685,930 (the "Restasis patents"). Allergan filed its Patent Owner's Preliminary Responses on September 17, 18 and 22, 2015. On December 15, 2015, Allergan entered into a settlement agreement with Apotex. On December 16, 2015, the Patent Trial and Appeal Board granted Allergan and Apotex's joint motion to terminate the case.

*Saphris®*. Between September 2014 and May 2015, Forest Laboratories, LLC, and Forest Laboratories Holdings, Ltd. (collectively, "Forest") brought actions for infringement of some or all of U.S. Patent Nos. 5,763,476 (the "'476 patent"), 7,741,358 (the "'358 patent") and 8,022,228 (the "'228 patent") in the U.S. District Court for the District of Delaware against Sigmapharm Laboratories, LLC, Hikma Pharmaceuticals, LLC , Breckenridge Pharmaceutical, Inc., Alembic Pharmaceuticals, Ltd. and Amneal Pharmaceuticals, LLC, and related subsidiaries and affiliates thereof. Including a 6-month pediatric extension of regulatory exclusivity, the '476 patent expires in December 2020, and the '358 and '228 patents expire in October 2026. These lawsuits triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than February 13, 2017 (unless a court issues a decision adverse to Forest sooner). On February 3, 2015, the District Court consolidated the then-pending actions for all purposes and issued a scheduling order setting a trial date in August 2016. On September 30, 2015, the District Court consolidated all pending actions. The Company believes it has meritorious claims to prevent the generic applicants from launching a generic version of Saphris. However, there can be no assurance a generic version will not be launched.

*Savella®*. Between September 2013 and February 2014, Forest Laboratories, Inc., Forest Laboratories Holdings, Ltd. (collectively, "Forest") and Royalty Pharma Collection Trust ("Royalty"), Forest's licensor for Savella, brought actions for infringement of U.S. Patent Nos. 6,602,911 (the "'911 patent"), 7,888,342 (the "'342 patent"), and 7,994,220 (the "'220 patent") in the U.S. District Court for the District of Delaware against Amneal, Apotex, First Time US Generics, Glenmark, Hetero, Lupin, Mylan, Par, Ranbaxy, and Sandoz, and related subsidiaries and affiliates thereof. These companies have notified Forest and Royalty that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Savella before these patents expire. (The '342 patent expires in November 2021, the '911 patent expires in January 2023, and the '220 patent expires in September 2029.) These lawsuits triggered an automatic stay of approval of the applicable ANDAs until July 14, 2016 (unless a court issues a decision adverse to Forest and Royalty Pharma sooner). On March 7, 2014, Forest and Royalty voluntarily dismissed, without prejudice, all claims against Sandoz. On March 20, 2014, the district court consolidated all of the remaining pending actions for all purposes and issued a scheduling order setting a trial date in January 2016. On May 12, 2014, Forest and Royalty entered into a settlement agreement with First Time US Generics. Under the terms of the settlement agreement, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Forest will provide a license to First Time that will permit it to launch its generic version of Savella as of the date that is the later of (a) six (6) calendar months prior to the expiration date of the last to expire of the '911 patent, the '342 patent, and the '220 patent, including any extensions and/or pediatric exclusivities; or (b) the date that First Time obtains final FDA approval of its ANDA, or earlier in certain circumstances. On December 15, 2014, Forest and Royalty entered into a

settlement agreement with Ranbaxy. On April 8, 2015, Defendants filed a motion to dismiss for lack of standing. On or about April 29, 2015, Forest entered into a settlement agreement with Par that will permit Par to launch its generic version of Savella as of the date that is the later of (a) six (6) calendar months prior to the expiration date of the last to expire of the '911 patent, the '342 patent, and the '220 patent, including any extensions and/or pediatric exclusivities; or (b) the date that Par obtains final FDA approval of its ANDA, or earlier in certain circumstances. On December 11, 2015, Forest and Royalty entered into settlement agreements with Hetero and Glenmark. On January 8, 2016, Forest and Royalty entered into a settlement agreement with Amneal. On January 19, 2016, Forest and Royalty entered into a settlement agreement with Apotex. The defendants under these agreements may enter the market as of March 19, 2026. A bench trial concluded on January 26, 2016. Post-trial briefing is scheduled to conclude by April 26, 2016. The Company believes it has meritorious claims to prevent the remaining generic applicants from launching a generic version of Savella. However, there can be no assurance a generic version will not be launched.

*Teflaro®.* In January 2015, Forest Laboratories, LLC, Forest Laboratories Holdings, Ltd., and Cerexa, Inc. (collectively, "Forest") and Takeda Pharmaceutical Company Limited ("Takeda"), Forest's licensor for Teflaro, brought an action for infringement of some or all of U.S. Patent Nos. 6,417,175 (the "'175 patent"), 6,906,055 (the "'055 patent"), 7,419,973 (the "'973 patent") and 8,247,000 (the "'400 patent") in the U.S. District Court for the District of Delaware against Apotex and Sandoz, and related subsidiaries and affiliates thereof. These companies have notified Forest and Takeda that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Teflaro before some or all of the '175, '055, '973 and '400 patents expire. (The '175 patent expires in April 2022 (including a patent term extension), the '055 and '973 patents expire in December 2021, and the '400 patent expires in February 2031.) These lawsuits triggered an automatic stay of approval of the applicable ANDAs until April 29, 2018 (unless a court issues a decision adverse to Forest and Takeda sooner). On June 24, 2015, the District Court issued a scheduling order setting a trial date in June 2017. While the company intends to vigorously defend the patents at issue in this litigation, Forest can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

*Viibryd®.* In March 2015, Forest Laboratories, LLC, Forest Laboratories Holdings, Ltd., (collectively, "Forest") and Merck KGaA and Merck Patent Gesellschaft Mit Beschränkter Haftung (collectively, "Merck"), Forest's licensor for Viibryd, brought actions for infringement of U.S. Patent Nos. 7,834,020 (the "'020 patent"), 8,193,195 (the "'195 patent"), 8,236,804 (the "'804 patent") and 8,673,921 (the "'921 patent") in the U.S. District Court for the District of Delaware against Accord Healthcare Inc., Alembic Pharmaceuticals, Ltd., Apotex, Inc., InvaGen Pharmaceuticals, Inc., and Teva Pharmaceuticals USA, Inc., and related subsidiaries and affiliates thereof. These companies have notified Forest and/or Merck that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Viibryd before the '020, '195, '804 and '921 patents expire in June 2022. These lawsuits triggered an automatic stay of approval of the applicable ANDAs until July 21, 2018 (unless a court issues a decision adverse to Forest and Merck sooner). On August 24, 2015, the District Court consolidated the actions for all purposes and issued a scheduling order setting a trial date in January 2018. On November 23, 2015, Forest and Merck brought an action for infringement of the '020, '195, '804 and '921 patents in the U.S. District Court for the District of Delaware against InvaGen Pharmaceuticals, Inc., which matter was consolidated with the earlier-filed action against InvaGen. While the Company intends to vigorously defend the patents at issue in this litigation, Forest can offer no assurance as to whether the lawsuit will be successful and that a generic version will not be launched.

*Patent Defense Matters*

*Bayer Patent Litigation.* In August 2012, Bayer Pharma AG (together with its affiliates, "Bayer") filed a complaint against Warner Chilcott in the U.S. District Court for the District of Delaware alleging that Warner Chilcott's manufacture, use, offer for sale, and/or sale of its Lo Loestrin® Fe oral contraceptive product infringes Bayer's U.S. Patent No. 5,980,940. In the complaint, Bayer seeks injunctive relief and unspecified monetary damages for the alleged infringement. In December 2012, Bayer amended the complaint to add a patent interference claim seeking to invalidate the Company's '984 Patent, which covers the Lo Loestrin® Fe product. On December 15, 2014, Warner Chilcott filed a Summary Judgment motion seeking dismissal of the case. On April 21, 2015, the District Court granted Warner Chilcott's motion and held the '940 patent invalid for indefiniteness. On June 5, 2015, Bayer filed a notice of appeal. Briefing is ongoing.

Although it is impossible to predict with certainty the outcome of any litigation, the Company believes that it has a number of strong defenses to the allegations in the complaints and intends to vigorously defend the litigations. These cases are in the early stages of litigation, and an estimate of the potential loss, or range of loss, if any, to the Company relating to these proceedings is not possible at this time.

*Oxymorphone Extended-Release Tablets (Generic version of Opana® ER).* On December 11, 2012, Endo Pharmaceuticals Inc. ("Endo") sued Actavis, Inc. and Actavis South Atlantic LLC ("Actavis South Atlantic") in the United States District Court for the Southern District of New York, alleging that sales of the Company's 7.5 mg and 15 mg oxymorphone extended-release tablets, generic versions of Endo's Opana® ER, infringe U.S. Patent Nos. 7,851,482; 8,309,122; and 8,329,216. Thereafter, FDA approved Actavis' 5 mg, 10 mg, 20 mg, 30 mg, and 40 mg oxymorphone extended-release tablets and Endo filed a motion for a preliminary

F-102

injunction seeking to prevent Actavis from selling the new strengths. On September 12, 2013, the district court denied Endo's motion for a preliminary injunction and Actavis immediately launched the new strengths. On March 31, 2014, the Federal Circuit reversed the district court's denial of Endo's motion for a preliminary injunction and remanded the matter to the district court for further consideration. On January 13, 2015, Endo dismissed its claims against Actavis concerning the '482 patent. Trial with respect to the '122 and '216 patents began on March 23, 2015 and concluded on April 24, 2015.On August 14, 2015, the court found the '122 and '216 patents valid and infringed and ordered Actavis to cease selling its generic product within 60 days. Actavis filed a motion to amend the judgment to remove the injunction on continuing sales or in the alternative stay the injunction pending appeal. On October 8, 2015, the court tolled the 60 day period for Actavis to cease selling its generic product while the court considers the motion to amend the judgment. The motion is currently pending. On November 7, 2014, Endo and Mallinckrodt LLC sued Actavis and certain of its affiliates in the United States District Court for the District of Delaware, alleging that sales of the Company's generic versions of Opana® ER, 5mg, 7.5 mg, 10 mg, 15 mg, 20 mg, 30 mg and 40 mg, generic versions of Endo's Opana® ER, infringe U.S. Patent Nos. 7,808,737 and 8,871,779, which Endo licensed from Mallinckrodt and the USPTO recently issued to or Endo, respectively. The case is currently pending, and trial is scheduled to begin on February 21, 2017. On September 23, 2015, the Magistrate Judge recommended granting Actavis' motion to dismiss the '737 patent for invalidity/unpatentable subject matter. On November 17, 2015 the District Court Judge upheld the Magistrate's recommendation regarding invalidity of the '737 patent and dismissed that patent from the case. The Company believes it has substantial meritorious defenses to the case. However, Actavis has sold and is continuing to sell its generic versions of Opana® ER. Therefore, an adverse final determination that one of the patents in suit is valid and infringed could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Teva Namenda XR Patent Litigation.* In December 2013, Forest Laboratories, Inc. ("Forest") was named as a defendant in an action brought by Teva Pharmaceuticals USA, Inc. and Mayne Pharma International Pty Ltd. in the U.S. District Court for the District of Delaware. The complaint alleges that Forest infringes U.S. Patent No. 6,194,000 by making, using, selling, offering to sell, and importing Namenda XR. The district court has scheduled a trial to begin in July 2016. On October 29, 2015, Plaintiffs filed a First Amended Complaint, adding Forest Pharmaceuticals, Inc. as a named defendant. Defendants responded on November 18, 2015. On December 7, 2015, Plaintiffs filed a motion to dismiss Defendants' counterclaims for invalidity and motion to strike certain of Defendants' affirmative defenses concerning invalidity. Plaintiffs' motion remains pending. The relief requested in the Amended Complaint includes damages, but not preliminary or permanent injunctive relief. The Company intends to continue to vigorously defend against this action. At this time, the Company does not believe losses, if any, would have a material effect on the results of operations or financial position taken as a whole.

### *Product Liability Litigation*

*Actonel® Litigation.* Warner Chilcott is a defendant in approximately 194 cases and a potential defendant with respect to approximately 386 unfiled claims involving a total of approximately 588 plaintiffs and potential plaintiffs relating to Warner Chilcott's bisphosphonate prescription drug Actonel®. The claimants allege, among other things, that Actonel® caused them to suffer osteonecrosis of the jaw ("ONJ"), a rare but serious condition that involves severe loss or destruction of the jawbone, and/or atypical fractures of the femur ("AFF"). All of the cases have been filed in either federal or state courts in the United States. Warner Chilcott is in the initial stages of discovery in these litigations. In addition, Warner Chilcott is aware of four purported product liability class actions that were brought against Warner Chilcott in provincial courts in Canada alleging, among other things, that Actonel® caused the plaintiffs and the proposed class members who ingested Actonel® to suffer atypical fractures or other side effects. It is expected that these plaintiffs will seek class certification. Plaintiffs have typically asked for unspecified monetary and injunctive relief, as well as attorneys' fees. Warner Chilcott is indemnified by Sanofi for certain Actonel claims pursuant to a collaboration agreement relating to the two parties' co-promotion of the product in the United States and other countries. In addition, Warner Chilcott is also partially indemnified by the Proctor & Gamble Company ("P&G") for ONJ claims that were pending at the time Warner Chilcott acquired P&G's global pharmaceutical business in October 2009. In May and September 2013, Warner Chilcott entered into two settlement agreements which resolved a majority of the then-existing ONJ-related claims which are subject to the acceptance by the individual respective claimants.

The Company believes it has substantial meritorious defenses to these cases and intends to defend these claims vigorously. Warner Chilcott maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Alendronate Litigation.* Beginning in 2010, approximately 130 product liability suits on behalf of approximately 175 plaintiffs have been filed against the Company and certain of its affiliates, including Cobalt Laboratories, as well as other manufacturers and distributors of alendronate for personal injuries including AFF and ONJ allegedly arising out of the use of alendronate. The actions are pending in various state and federal courts. Several of the cases were consolidated in an MDL proceeding in federal court in New Jersey. In 2012, the MDL court granted the Company's motion to dismiss all of the cases then pending against the Company in the

New Jersey MDL. The Third Circuit affirmed the dismissal. Any new cases against the Company filed in the MDL are subject to dismissal unless plaintiffs can establish that their claims should be exempted from the 2012 dismissal order. Other cases were consolidated in an MDL in federal court in New York, where the Company filed a similar motion to dismiss. The Court granted, in part, the motion to dismiss which has resulted in the dismissal of several other cases. The Company has also been served with nine cases that are part of a consolidated litigation in the California state court. In 2012, the California court partially granted a motion filed on behalf of all generic defendants seeking dismissal. Appeals in the California cases have been exhausted and the Company has not yet been able to determine how that will affect the cases filed against it. The remaining active cases are part of a mass tort coordinated proceeding in New Jersey state court. In the New Jersey proceeding, the Court granted, in part, a motion to dismiss. The Company believes that it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if our indemnification arrangements or insurance do not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Benicar®* *Litigation.* The Company is named in approximately 1239 actions involving allegations that Benicar®, a treatment for hypertension that Forest co-promoted with Daiichi Sankyo between 2002 and 2008, caused certain gastrointestinal injuries. Under Forest's Co-Promotion Agreement, Daiichi Sankyo is defending us in these lawsuits.

*Celexa®/Lexapro®* *Litigation.* Forest and its affiliates are defendants in approximately five actions pending in various federal district courts involving allegations that Celexa® or Lexapro® caused or contributed to individuals committing or attempting suicide, or caused a violent event. The Company has reached agreements in principle to resolve four of the five matters. The remaining case is stayed.

Approximately 187 actions are pending against Forest and its affiliates involving allegations that Celexa® or Lexapro® caused various birth defects. Several of the cases involve multiple minor-plaintiffs. The majority of these actions have been consolidated in state court in Missouri where one case is set for trial in September 2016. Five actions remain in New Jersey state court, none of which are set for trial. There are birth defect cases pending in other jurisdictions but none currently are set for trial.

The Company believes it has substantial meritorious defenses to the Celexa®/Lexapro® cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Metoclopramide Litigation.* Beginning in 2009, a number of product liability suits were filed against certain Company affiliates, including legacy Actavis and Watson companies, as well as other manufacturers and distributors of metoclopramide, for personal injuries allegedly arising out of the use of metoclopramide. Approximately 1,500 cases remain pending against Actavis, Watson and/or its affiliates in state and federal courts, representing claims by multiple plaintiffs. Discovery in these cases is in the preliminary stages as the Company is actively moving to dismiss the suits and either initiating or defending appeals on such motions. The Company believes that, with respect to the majority of the cases against the legacy Watson companies, it will be defended in and indemnified by Pliva, Inc., an affiliate of Teva, from whom the Company purchased its metoclopramide product line in late 2008. With respect to the cases pending against the legacy Actavis companies, the Company recently reached an agreement in principle to resolve the majority of the matters. The Company believes that it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if our indemnification arrangements or insurance do not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Propoxyphene Litigation.* Beginning in 2011, a number of product liability suits were filed against Watson and certain of its affiliates, as well as other manufacturers and distributors of propoxyphene, for personal injuries including adverse cardiovascular events or deaths allegedly arising out of the use of propoxyphene. Cases are pending against Watson and/or its affiliates in various state and federal courts, representing claims by approximately 1,400 plaintiffs. A number of the cases were consolidated in an MDL in federal district court in Kentucky. On June 22, 2012, the MDL court granted the generic defendants' joint motion to dismiss the remaining MDL cases. On June 27, 2014, the Sixth Circuit affirmed the district court's dismissal. Plaintiffs did not file a petition for a writ of certiorari with the United States Supreme Court. In addition, approximately 35 cases were filed in California state court. These cases were removed to federal district courts and, after disputes over whether the cases should be remanded to state court, the Ninth Circuit Court of Appeals determined that the removals to federal court were proper. Many of the cases in California federal courts were transferred to the U.S. Disctrict Court for the Eastern District of Kentucky and consolidated for all pretrial proceedings in front of Judge Reeves, who presided over the MDL proceedings. The Court has issued a Show Cause Order requiring plaintiffs to show

cause on or before April 18, 2016 why their claims against the Generic Defendants (including Watson) should not be dismissed pursuant to the Court's prior order in the MDL dismissing all of the claims against the Generic Defendants with prejudice. Once the remaining procedural matters are resolved, the defendants will file demurrers and motions to dismiss the remaining suits. In addition, approximately eight lawsuits have been filed in Oklahoma which plaintiffs are seeking to have remanded from federal to state court. The Company believes that it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Testosterone Litigation.* Beginning in 2014, a number of product liability suits were filed against the Company and certain of its affiliates, as well as other manufacturers and distributors of testosterone products, for personal injuries including but not limited to cardiovascular events allegedly arising out of the use of Androderm* testosterone cypionate, AndroGel and/or testosterone enanthate. Actavis, Inc. and/or one or more of its subsidiaries have been served in approximately 287 currently pending actions, all of which are pending in federal court. These actions have been consolidated in an MDL in federal court in Illinois. The defendants have responded to the plaintiffs' master complaint. Plaintiffs have agreed to dismiss all claims relating to any of Actavis' generic TRT products from the cases. These cases are in the initial stages and discovery is in the early stages. The Company anticipates that additional suits will be filed. The Company believes that it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

### Government Investigations, Government Litigation and Qui Tam Litigation

*Warner Chilcott.* Beginning in February 2012, Warner Chilcott, along with several of its current and former employees in its sales organization and certain third parties, received subpoenas from the United States Attorney for the District of Massachusetts. The subpoena received by Warner Chilcott seeks information and documentation relating to a wide range of matters, including sales and marketing activities, payments to people who are in a position to recommend drugs, medical education, consultancies, prior authorization processes, clinical trials, off-label use and employee training (including with respect to laws and regulations concerning off-label information and physician remuneration), in each case relating to all of Warner Chilcott's current key products. The Company has recorded a contingent liability for the quarter ended March 31, 2015 under *ASC 450, Contingencies,* based on its analysis of this matter, however, there can be no assurance that the Company's estimate will not differ materially from the recorded contingent liability. The Company is also aware of three qui tam complaints filed by former Warner Chilcott sales representatives and unsealed in February and March 2013 and March 2014. Two unsealed federal qui tam complaints were filed in the federal court in Massachusetts and allege that Warner Chilcott violated Federal and state false claims acts through the promotion of all of Warner Chilcott's current key products by, among other things, making improper claims concerning the products, providing kickbacks to physicians and engaging in improper conduct concerning prior authorizations. Since then, one of the two complaints was voluntarily dismissed. The remaining complaint seeks, among other things, treble damages, civil penalties of up to eleven thousand dollars for each alleged false claim and attorneys' fees and costs. Other similar complaints may exist under seal. The United States of America elected not to intervene in the unsealed actions. On October 29, 2015, Warner Chilcott subsidiary, Warner Chilcott Sales (US) LLC, reached an agreement with the federal government, the 50 states and the District of Columbia that resolves both the government's investigation and the pending federal qui tam case. In addition, Warner Chilcott Sales (US) LLC agreed to plead guilty to a charge of health care fraud in violation of 18 U.S.C. § 1347. The third complaint was filed in California state court and contains similar allegations as the other qui tam complaints and asserts additional causes of action under California state law. The State of California declined to intervene in this action. Warner Chilcott filed a motion to dismiss this complaint and has reached an agreement to settle the California action.

*Forest.* Forest received a subpoena dated August 5, 2013 from the U.S. Department of Health and Human Services, Office of Inspector General. The subpoena requests documents relating to the marketing and promotion of Bystolic* , Savella* , and Namenda* , including with respect to speaker programs for these products. In February 2014, the U.S. District Court for the Eastern District of Wisconsin unsealed a *qui tam* complaint. The complaint asserts claims under the False Claims Act and contains allegations regarding off-label promotion of Bystolic* and Savella* and "kickbacks" provided to physicians to induce prescriptions of Bystolic* , Savella* , and Viibryd*. Forest moved to dismiss the complaint. On January 6, 2015, the court granted Forest's motion to dismiss the complaint. On February 5, 2016, the relator filed a second amended complaint. The U.S. Attorney's Office declined to intervene in this action but has reserved the right to do so at a later date. The Company continues to cooperate with this investigation and to discuss these issues with the government.

Forest received a subpoena, dated April 29, 2015, from the U.S. Department of Health and Human Services, Office of Inspector General ("OIG"). The subpoena requests documents relating to Average Manufacturer ("AMP") and Best Price calculations for several of its products. The Company intends to cooperate fully with the OIG's requests.

In April 2014, the federal district court in Massachusetts unsealed a *qui tam* complaint which asserts claims under the False Claims Act and contains allegations regarding off-label promotion of Namenda®. The Company filed a motion to dismiss the relator's Second Amended Complaint and the court granted in part and denied in part Forest's motion, dismissing the False Claims Act conspiracy claim only. The U.S. Attorney's Office declined to intervene in this action but has reserved the right to do so at a later date.

The Company intends to vigorously defend itself in the litigations. However, these cases are in the early stages of litigation, it is impossible to predict with certain the outcome of any litigation, and the Company can offer no assurance as to when the lawsuits will be decided, whether the Company will be successful in its defense and whether any additional similar suits will be filed. If these claims are successful, such claims could adversely affect the Company and could have a material adverse effect on the Company's business, financial condition, results of operation and cash flows.

*Allergan*. In December 2011, the federal district court in Pennsylvania issued an order partially unsealing the second amended qui tam complaint, filed by relators Herbert J. Nevyas, M.D. and Anita Nevyas-Wallace, M.D., to be informally provided to Allergan, Inc. The complaint asserts claims under Federal and State False Claims Acts and Federal and State Anti-Kickback Acts. On December 16, 2013, the court entered an order to unseal this qui tam action. On April 1, 2014, Allergan filed a motion to dismiss. On May 26, 2015, the court issued a ruling granting, in part, the motion to dismiss and denying it in part. Allergan filed an answer to the remaining claims on June 25, 2015. On July 7, 2015, the court scheduled trial in this matter for October 31, 2016.

*Actavis*. On June 25, 2015, the Company received a subpoena from the U.S. Department of Justice ("DOJ"), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products. The Company intends to cooperate fully with the DOJ's requests.

*Patent Settlement Investigations*. The Company and various of its affiliates have received letters and investigatory subpoenas from the U.S. Federal Trade Commission ("FTC") indicating that the FTC is conducting a nonpublic investigations into certain agreements the Company have made to settle patent disputes with other brand and generic pharmaceutical companies. The Company is cooperating in responding to the investigations.

*Governmental Reimbursement and Drug Pricing Investigations and Litigation*. The Company has also received investigatory subpoenas from the U.S. Attorney's Office and various state agencies requesting information and documents relating to certain categories of drug pricing including, but not limited to, Average Wholesale Price ("AWP"), Wholesale Acquisition Cost ("WAC"), Average Manufacturer Price ("AMP") and Best Price ("BP"). The Company intends to cooperate with this subpoena.

Beginning in 1999, the Company was informed by the DOJ that it, along with numerous other pharmaceutical companies, is a defendant in a *qui tam* action brought in 1995 under the U.S. False Claims Act. Since that time, the Company also received and responded to notices or subpoenas from the U.S. House Committee on Energy and Commerce as well as from Attorneys General of various states, including Florida, Nevada, New York, California and Texas, relating to pharmaceutical pricing issues and whether allegedly improper actions by pharmaceutical manufacturers led to excessive payments by Medicare and/or Medicaid. Other state and federal inquiries regarding pricing and reimbursement issues are anticipated.

The Company and certain of its subsidiaries have also been named as defendants in various lawsuits filed by numerous states and qui tam relators, including Wisconsin, Kentucky, Illinois, Mississippi, Missouri, South Carolina, Utah, Kansas and Louisiana. These actions allege generally that the plaintiffs (all governmental entities) were overcharged for their share of Medicaid drug reimbursement costs as a result of reporting by manufacturers of AWP that did not correspond to actual provider costs of prescription drugs. In 2011, Watson settled certain claims made against it by a relator in a *qui tam* action brought against the Company on behalf of the United States. The settlement of that *qui tam* action resolved all claims on behalf of the United States asserted in that action except for claims relating to the federal share of Medicaid payments made by the States of Alabama, Alaska, Kentucky, Idaho, Illinois, South Carolina and Wisconsin. The Company subsequently settled all claims, including the claims on behalf of the United States, brought by Alabama. In addition, the Company has reached settlements with the states of the Louisiana, Missouri, Kansas and South Carolina. In addition, the Company has begun having discussions with the plaintiffs in the Illinois and Wisconsin actions about a possible resolution of those matters. The court in the Utah case dismissed that state's claims against the Company. The case against Watson on behalf of Kentucky was tried in November 2011. The jury reached a verdict in Watson's favor on each of Kentucky's claims against Watson. An agreed form of judgment has been entered and the case now has been dismissed with prejudice. The case against Watson on behalf of Mississippi was tried from November 2012 through April 2013. On August 28, 2013, the court issued a ruling in favor of the state and awarded the state $12.4 million in compensatory damages and civil penalties, and on March 20, 2014 issued its ruling imposing an additional $17.9 million in punitive damages. Post-trial motions were filed and denied by the court. The Company is appealing both the original and punitive damage awards.

In addition, Forest and certain of its affiliates are defendants in four state court actions pending in Illinois, Mississippi, Utah and Wisconsin that contain similar actions as those raised in the actions against Watson. Discovery is ongoing in these actions. A trial in the Mississippi action is scheduled in August 2015. Forest and the other defendants filed a motion to dismiss Utah's amended complaint. This motion to dismiss was denied in part, and discovery is proceeding. On February 17, 2014, the Wisconsin state court granted defendants' motion to dismiss plaintiff's Second Amended Complaint. However, the relator filed a separate action making the same basic allegations as in its amended complaint in the original action. The Company intends to continue to vigorously defend against these actions. At this time, the Company does not believe losses, if any, would have a material effect on the results of operations or financial position taken as a whole.

On December 28, 2015, a putative class action complaint was filed in state court in Pennsylvania on behalf of a putative class of private payers. The complaint alleges that manufacturers of certain drugs including  Actavis Group, Forest Laboratories, Inc. and Watson Pharmaceuticals, Inc., caused plaintiffs to overpay for prescription drug products through the use of inflated AWPs.  The complaint alleges violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, negligent misrepresentation/fraud, unjust enrichment, civil conspiracy and aiding and abetting.

With regard to the remaining drug pricing actions, the Company believes that it has meritorious defenses and intends to vigorously defend itself in those actions. The Company continually monitors the status of these actions and may settle or otherwise resolve some or all of these matters on terms that the Company deems to be in its best interests. However, the Company can give no assurance that it will be able to settle the remaining actions on terms it deems reasonable, or that such settlements or adverse judgments in the remaining actions, if entered, will not exceed the amounts of the liability reserves. Additional actions by other states, cities and/or counties are anticipated. These actions and/or the actions described above, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*DESI Drug Reimbursement Litigation.* In December 2009, the Company learned that numerous pharmaceutical companies, including certain subsidiaries of the Company, were named as defendants in a  *qui tam*  action pending in federal court in Massachusetts. The tenth amended complaint, which was served on certain of the Company's subsidiaries, alleges that the defendants falsely reported to the United States that certain pharmaceutical products, including those subject to the Food and Drug Administration's Drug Efficacy Study Implementation ("DESI") review program, were eligible for Medicaid reimbursement and thereby allegedly caused false claims for payment to be made through the Medicaid program. The Company's subsidiaries named in the action together with all other named defendants filed a Joint Motion to Dismiss the Tenth Amended Complaint on December 9, 2011. On February 25, 2013, the court granted the motion to dismiss as to all defendants. The plaintiff may appeal. On September 11, 2013, a similar action was filed against certain Company subsidiaries as well as Warner Chilcott and numerous other pharmaceutical company defendants by the State of Louisiana based on the same core set of allegations as asserted in the federal court action in Massachusetts. Defendants filed exceptions to plaintiffs' complaint. On June 28, 2015, the State of Louisiana filed an amended complaint and defendants promptly moved to dismiss.  On September 21, 2015, the court granted defendants' motion to dismiss the amended complaint in its entirety.  Additional actions alleging similar claims could be asserted. The Company believes that it has meritorious defenses to the claims and intends to vigorously defend itself against such allegations. These actions or similar actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Medicaid Price Adjustments.* The Company has notified the Centers for Medicare and Medicaid Services ("CMS") that certain of the legacy Actavis group's Medicaid price submissions require adjustment for the period 2007 through 2012. The Company is in the process of completing the resubmissions. Based on prevailing CMS practices the Company does not expect to incur penalties in connection with the resubmissions. With respect to periods prior to 2007, the Company has advised CMS that its records are insufficient to support a reliable recalculation of its price submissions, and has proposed not to recalculate the price submissions for such periods. Because there are insufficient records to support a reliable recalculation of its price submissions prior to 2007, at this time the amount of any potential liability related to the price submissions prior to 2007 is not estimable and the Company has not concluded that any liability for periods prior to 2007 is probable. The Company believes it has substantial meritorious positions and defenses with respect to these pricing resubmission matters. However, if CMS were to successfully pursue claims against the Company for the periods in question, such claims could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Paroxetine Investigation.* On April 19, 2013, the UK Office of Fair Trading (which closed in April, 2014 in connection with a government restructuring and transferred responsibility for this matter to the U.K. Competition and Markets Authority) issued a Statement of Objections against GlaxoSmithKline ("GSK") and various generic drug companies, including Actavis UK Limited, formerly known as Alpharma Limited, now a subsidiary of the Company, alleging that GSK's settlements with such generic drug companies improperly delayed generic entry of paroxetine, in violation of the United Kingdom's competition laws. The Company has responded to the Statement of Objections, however, on February 12, 2016 the UK Competition and Markets Authority imposed a fine on the Company.  The Company believes it has substantial meritorious defenses to the allegations. However, an adverse determination in the matter could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Romanian Investigation.* In July 2015, the Company received a subpoena as part of a nationwide investigation of the pharmaceutical industry conducted by the Romanian government.  The purpose of the investigation is to gather documents and information, and to examine sponsorship arrangements concluded with certain oncologists and hematologists during the period from January 2012 through June 2015. The Company is fully cooperating with the investigation.   This government investigation could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

The Company and its affiliates are involved in various other disputes, governmental and/or regulatory inspections, inquires, investigations and proceedings that could result in litigation, and other litigation matters that arise from time to time. The process of resolving matters through litigation or other means is inherently uncertain and it is possible that an unfavorable resolution of these matters will adversely affect the Company, its results of operations, financial condition and cash flows.

### NOTE 26 — Warner Chilcott Limited ("WCL") Guarantor and Non-Guarantor Condensed Consolidating Financial Information

The following financial information is presented to segregate the financial results of WCL, Actavis Funding SCS, and Actavis, Inc. (the issuers of the long-term notes), the guarantor subsidiaries for the long-term notes and the non-guarantor subsidiaries. The guarantors jointly and severally, and fully and unconditionally, guarantee the Company's obligation under the long-term notes.

The information includes elimination entries necessary to consolidate the guarantor and the non-guarantor subsidiaries. Investments in subsidiaries are accounted for using the equity method of accounting. The principal elimination entries eliminate investments in subsidiaries, equity and intercompany balances and transactions.

WCL, Actavis Capital S.a.r.l. and Actavis, Inc. are guarantors of the long-term notes.

Warner Chilcott Limited has revised its consolidating financial statements as previously presented in Footnote 25 of the 2014 Annual Report on Form 10-K due to a change in the Company's legal entity structure that occurred during the year ended December 31, 2015.  As a result, prior period information has been recast to conform to the current period presentation.

The following financial information presents the consolidating balance sheets as of December 31, 2015 and 2014, the related statement of operations for the years ended December 31, 2015, 2014 and 2013 and the statement of cash flows for the years ended December 31, 2015, 2014 and 2013.

**Warner Chilcott Limited**
**Consolidating Balance Sheets**
**As of December 31, 2015**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Actavis Capital S.a.r.l. (Guarantor) | Actavis Funding SCS (Issuer) | Actavis Inc. (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **Current assets:** | | | | | | | |
| Cash and cash equivalents | $ - | $ 13.5 | $ - | $ 2.0 | $ 1,020.7 | $ - | $ 1,036.2 |
| Marketable securities | - | - | - | - | 9.3 | - | 9.3 |
| Accounts receivable, net | - | - | - | - | 2,401.6 | - | 2,401.6 |
| Receivable from Parents | - | - | - | - | 457.3 | - | 457.3 |
| Inventories, net | - | - | - | - | 1,009.7 | - | 1,009.7 |
| Intercompany receivables | - | 94,999.2 | 25,225.6 | 302.4 | 101,864.8 | (222,392.0) | - |
| Prepaid expenses and other current assets | - | 12.6 | 24.5 | 6.1 | 512.8 | - | 556.0 |
| Current assets held for sale | - | - | - | - | 3,540.3 | - | 3,540.3 |
| Deferred tax assets | - | - | - | - | - | - | - |
| Total current assets | - | 95,025.3 | 25,250.1 | 310.5 | 110,816.5 | (222,392.0) | 9,010.4 |
| Property, plant and equipment, net | - | - | - | 34.3 | 1,539.6 | - | 1,573.9 |
| Investments and other assets | - | 14.1 | 124.6 | 37.7 | 401.0 | - | 577.4 |
| Investment in subsidiaries | 75,571.6 | 79,597.3 | - | 6,742.7 | - | (161,911.6) | - |
| Non current assets held for sale | - | - | - | 45.8 | 10,495.5 | - | 10,541.3 |
| Deferred tax assets | - | - | - | - | 49.5 | - | 49.5 |
| Product rights and other intangibles | - | - | - | - | 67,931.7 | - | 67,931.7 |
| Goodwill | - | - | - | - | 46,551.5 | - | 46,551.5 |
| Total assets | $75,571.6 | $174,636.7 | $25,374.7 | $ 7,171.0 | $237,785.3 | $(384,303.6) | $136,235.7 |
| **Current liabilities:** | | | | | | | |
| Accounts payable and accrued expenses | - | 3.9 | 210.5 | 171.5 | 3,909.5 | - | 4,295.4 |
| Intercompany payables | - | 92,093.5 | 526.3 | 9,245.0 | 120,527.2 | (222,392.0) | - |
| Payable to Parents | - | - | - | - | 1,466.8 | - | 1,466.8 |
| Income taxes payable | - | - | - | 44.1 | 10.1 | - | 54.2 |
| Current portion of long-term debt and capital leases | - | 756.7 | - | - | 1,676.1 | - | 2,432.8 |
| Current liabilities held for sale | - | - | - | 23.3 | 1,468.5 | - | 1,491.8 |
| Deferred tax liabilities | - | - | - | - | - | - | - |
| Total current liabilities | - | 92,854.1 | 736.8 | 9,483.9 | 129,058.2 | (222,392.0) | 9,741.0 |
| Long-term debt and capital leases | - | 7,009.1 | 24,637.6 | 4,273.5 | 4,373.2 | - | 40,293.4 |
| Other long-term liabilities | - | - | - | - | 1,262.0 | - | 1,262.0 |
| Non current liabilities held for sale | - | - | - | - | 580.1 | - | 580.1 |
| Other taxes payable | - | - | - | 72.1 | 729.8 | - | 801.9 |
| Deferred tax liabilities | - | - | - | - | 7,985.7 | - | 7,985.7 |
| Total liabilities | - | 99,863.2 | 25,374.4 | 13,829.5 | 143,989.0 | (222,392.0) | 60,664.1 |
| Total equity | 75,571.6 | 74,773.5 | 0.3 | (6,658.5) | 93,796.3 | (161,911.6) | 75,571.6 |
| Total liabilities and equity | $75,571.6 | $174,636.7 | $25,374.7 | $ 7,171.0 | $237,785.3 | $(384,303.6) | $136,235.7 |

**Warner Chilcott Limited**
**Consolidating Balance Sheets**
**As of December 31, 2014**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Actavis Capital S.a.r.l. (Guarantor) | Actavis Funding SCS (Issuer) | Actavis Inc. (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ 0.1 | $ 5.5 | $ - | $ 1.5 | $ 237.2 | $ - | $ 244.3 |
| Marketable securities | - | - | - | - | 1.0 | - | 1.0 |
| Accounts receivable, net | - | - | - | - | 1,111.6 | - | 1,111.6 |
| Receivable from Parents | - | - | - | - | 269.8 | - | 269.8 |
| Inventories | - | - | - | - | 984.6 | - | 984.6 |
| Intercompany receivables | - | 22,987.9 | 3,659.0 | 18,720.9 | 52,730.5 | (98,098.3) | - |
| Prepaid expenses and other current assets | - | 123.1 | 2.7 | - | 350.1 | - | 475.9 |
| Current assets held for sale | - | - | - | - | 3,806.9 | - | 3,806.9 |
| Deferred tax assets | - | - | - | - | 477.0 | - | 477.0 |
| Total current assets | 0.1 | 23,116.5 | 3,661.7 | 18,722.4 | 59,968.7 | (98,098.3) | 7,371.1 |
| Property, plant and equipment, net | - | - | - | 8.2 | 274.3 | - | 282.5 |
| Investments and other assets | - | 9.0 | 23.6 | 82.0 | 38.7 | - | 153.3 |
| Investment in subsidiaries | 28,076.9 | 31,549.0 | - | 4,761.1 | - | (64,387.0) | - |
| Non current assets held for sale | - | - | - | 43.4 | 8,144.3 | - | 8,187.7 |
| Deferred tax assets | - | - | - | - | 34.7 | - | 34.7 |
| Product rights and other intangibles | - | - | - | - | 16,090.7 | - | 16,090.7 |
| Goodwill | - | - | - | - | 20,897.6 | - | 20,897.6 |
| Total assets | $28,077.0 | $54,674.5 | $3,685.3 | $23,617.1 | $105,449.0 | $(162,485.3) | $ 53,017.6 |
| Current liabilities: | | | | | | | |
| Accounts payable and accrued expenses | - | 2.8 | 6.1 | 112.7 | 2,905.4 | - | 3,027.0 |
| Intercompany payables | - | 25,953.8 | 2.0 | 26,774.7 | 45,367.8 | (98,098.3) | - |
| Payable to Parents | - | - | - | - | 521.1 | - | 521.1 |
| Income taxes payable | - | - | - | 33.9 | - | - | 33.9 |
| Current portion of long-term debt and capital leases | - | 571.6 | - | - | 121.8 | - | 693.4 |
| Current liabilities held for sale | - | - | - | 62.8 | 1,386.3 | - | 1,449.1 |
| Deferred tax liabilities | - | - | - | - | 41.0 | - | 41.0 |
| Total current liabilities | - | 26,528.2 | 8.1 | 26,984.1 | 50,343.4 | (98,098.3) | 5,765.5 |
| Long-term debt and capital leases | - | 2,516.0 | 3,677.2 | 4,270.7 | 4,373.8 | - | 14,837.7 |
| Other long-term liabilities | - | - | - | - | 253.4 | - | 253.4 |
| Non current liabilities for sale | - | - | - | 102.7 | 438.0 | - | 540.7 |
| Other taxes payable | - | - | - | 789.5 | - | - | 789.5 |
| Deferred tax liabilities | - | - | - | - | 2,753.8 | - | 2,753.8 |
| Total liabilities | - | 29,044.2 | 3,685.3 | 32,147.0 | 58,162.4 | (98,098.3) | 24,940.6 |
| Total equity | 28,077.0 | 25,630.3 | - | (8,529.9) | 47,286.6 | (64,387.0) | 28,077.0 |
| Total liabilities and equity | $28,077.0 | $54,674.5 | $3,685.3 | $23,617.1 | $105,449.0 | $(162,485.3) | $ 53,017.6 |

F-110

**Warner Chilcott Limited**
**Consolidating Statements of Operations and Comprehensive Income / (Loss)**
**For the Year Ended December 31, 2015**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Actavis Capital S.a.r.l. (Guarantor) | Actavis Funding SCS (Issuer) | Actavis Inc. (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| Net revenues.................................................. | $ - | $ - | $ - | $ - | $15,071.0 | $ - | $ 15,071.0 |
| Operating expenses: | | | | | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights)........................... | - | - | - | - | 4,810.4 | - | 4,810.4 |
| Research and development............................. | - | - | - | - | 2,358.5 | - | 2,358.5 |
| Selling and marketing.................................... | - | - | - | - | 2,914.0 | - | 2,914.0 |
| General and administrative............................ | - | 212.1 | 16.1 | - | 1,402.0 | - | 1,630.2 |
| Amortization................................................. | - | - | - | - | 5,453.4 | - | 5,453.4 |
| In-process research and development impairments............................................... | - | - | - | - | 511.6 | - | 511.6 |
| Asset sales and impairments, net................... | - | - | - | - | 272.0 | - | 272.0 |
| Total operating expenses ............................ | - | 212.1 | 16.1 | - | 17,721.9 | - | 17,950.1 |
| Operating income / (loss).............................. | - | (212.1) | (16.1) | - | (2,650.9) | - | (2,879.1) |
| Non-operating income (expense): | | | | | | | |
| Interest income / (expense), net.................... | - | 1,572.4 | (14.6) | (168.5) | (2,571.2) | - | (1,181.9) |
| Other income (expense), net.......................... | - | (265.4) | 31.0 | - | 0.6 | - | (233.8) |
| Total other income (expense), net............... | - | 1,307.0 | 16.4 | (168.5) | (2,570.6) | - | (1,415.7) |
| Income / (loss) before income taxes and noncontrolling interest .................................. | - | 1,094.9 | 0.3 | (168.5) | (5,221.5) | - | (4,294.8) |
| Provision for income taxes............................ | - | - | - | (58.3) | (1,503.6) | - | (1,561.9) |
| (Earnings) / losses of equity interest subsidiaries................................................. | (4,050.6) | (4,336.5) | - | (1,981.6) | - | 10,368.7 | - |
| Net income / (loss) from continuing operations, net of tax................................................... | $ 4,050.6 | $ 5,431.4 | $ 0.3 | $ 1,871.4 | $ (3,717.9) | $(10,368.7) | $ (2,732.9) |
| Income from discontinued operations.............. | - | - | - | - | 6,787.7 | - | 6,787.7 |
| Net income / (loss)........................................ | $ 4,050.6 | $ 5,431.4 | $ 0.3 | $ 1,871.4 | $ 3,069.8 | $(10,368.7) | $ 4,054.8 |
| (Income) attributable to noncontrolling interest..................................................... | - | - | - | - | (4.2) | - | (4.2) |
| Net income / (loss) attributable to ordinary shareholders.............................................. | $ 4,050.6 | $ 5,431.4 | $ 0.3 | $ 1,871.4 | $ 3,065.6 | $(10,368.7) | $ 4,050.6 |
| Other comprehensive (loss) / income............. | (28.7) | 24.5 | - | - | (28.7) | 4.2 | (28.7) |
| Comprehensive income / (loss)...................... | $ 4,021.9 | $ 5,455.9 | $ 0.3 | $ 1,871.4 | $ 3,036.9 | $(10,364.5) | $ 4,021.9 |

Warner Chilcott Limited
Consolidating Statements of Operations and Comprehensive Income / (Loss)
For the Year Ended December 31, 2014
($ in millions)

| | Warner Chilcott Limited (Parent Guarantor) | Actavis Capital S.a.r.l. (Guarantor) | Actavis Funding SCS (Issuer) | Actavis Inc. (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| Net revenues | - | - | - | - | 6,738.9 | - | 6,738.9 |
| | | | | | | | |
| Operating expenses: | | | | | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | - | - | - | - | 3,453.6 | - | 3,453.6 |
| Research and development | - | - | - | - | 605.7 | - | 605.7 |
| Selling and marketing | - | - | - | - | 1,201.0 | - | 1,201.0 |
| General and administrative | - | - | - | 9.9 | 1,167.1 | - | 1,177.0 |
| Amortization | - | - | - | - | 1,945.5 | - | 1,945.5 |
| In process research and development impairments | - | - | - | - | 424.3 | - | 424.3 |
| Asset sales and impairments, net | - | - | - | (0.1) | 305.8 | - | 305.7 |
| Total operating expenses | - | - | - | 9.8 | 9,103.0 | - | 9,112.8 |
| Operating income / (loss) | - | - | - | (9.8) | (2,364.1) | - | (2,373.9) |
| | | | | | | | |
| Non-operating income (expense): | | | | | | | |
| Interest income / (expense), net | - | (740.0) | - | (182.0) | 519.1 | - | (402.9) |
| Other income (expense), net | - | (74.5) | - | - | 47.2 | - | (27.3) |
| Total other income (expense), net | - | (814.5) | - | (182.0) | 566.3 | - | (430.2) |
| Income / (loss) before income taxes and noncontrolling interest | - | (814.5) | - | (191.8) | (1,797.8) | - | (2,804.1) |
| Provision for income taxes | - | - | - | (108.6) | (358.4) | - | (467.0) |
| Losses / (earnings) of equity interest subsidiaries | 1,560.5 | 539.7 | - | (886.2) | - | (1,214.0) | - |
| Net (loss) / income from continuing operations, net of tax | $(1,560.5) | $ (1,354.2) | $ - | $ 803.0 | $(1,439.4) | $ 1,214.0 | $ (2,337.1) |
| (Loss) / income from discontinued operations | - | - | - | (70.0) | 846.6 | - | 776.6 |
| Net (loss) / income | $(1,560.5) | $ (1,354.2) | $ - | $ 733.0 | $ (592.8) | $ 1,214.0 | $ (1,560.5) |
| (Income) / loss attributable to noncontrolling interest | - | - | - | - | - | - | - |
| Net (loss) / income attributable to ordinary shareholders | $(1,560.5) | $ (1,354.2) | $ - | $ 733.0 | $ (592.8) | $ 1,214.0 | $ (1,560.5) |
| Other comprehensive (loss) / income | (555.9) | (505.9) | - | - | (555.9) | 1,061.8 | (555.9) |
| Comprehensive (loss) / income | $(2,116.4) | $ (1,860.1) | $ - | $ 733.0 | $(1,148.7) | $ 2,275.8 | $ (2,116.4) |

**Warner Chilcott Limited**
**Consolidating Statements of Operations and Comprehensive Income / (Loss)**
**For the Year Ended December 31, 2013**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Actavis Capital S.a.r.l. (Guarantor) | Actavis Funding SCS (Issuer) | Actavis Inc. (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| Net revenues........................................... | $ - | $ - | $ - | $ - | $ 2,602.5 | $ - | $ 2,602.5 |
| **Operating expenses:** | | | | | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights)............................ | - | - | - | - | 1,644.7 | - | 1,644.7 |
| Research and development ............................ | - | - | - | - | 191.3 | - | 191.3 |
| Selling and marketing .................................. | - | - | - | - | 374.8 | - | 374.8 |
| General and administrative ............................ | - | 0.3 | - | 75.0 | 356.4 | - | 431.7 |
| Amortization............................................... | - | - | - | - | 303.8 | - | 303.8 |
| In process research and development impairments............................................ | - | - | - | - | - | - | - |
| Asset sales and impairments, net.................. | - | - | - | (0.3) | 1.3 | - | 1.0 |
| Total operating expenses........................... | - | 0.3 | - | 74.7 | 2,872.3 | - | 2,947.3 |
| Operating income / (loss).............................. | - | (0.3) | - | (74.7) | (269.8) | - | (344.8) |
| **Non-operating income (expense):** | | | | | | | |
| Interest income / (expense), net..................... | - | 87.5 | - | 264.5 | (587.0) | - | (235.0) |
| Other income (expense), net ......................... | - | (1.1) | - | (6.4) | (11.1) | - | (18.6) |
| Total other income (expense), net ........... | - | 86.4 | - | 258.1 | (598.1) | - | (253.6) |
| Income / (loss) before income taxes and noncontrolling interest ................................ | - | 86.1 | - | 183.4 | (867.9) | - | (598.4) |
| Provision for income taxes........................... | - | - | - | 19.1 | (175.3) | - | (156.2) |
| (Earnings) / losses of equity interest subsidiaries............................................... | 724.5 | 162.2 | - | 498.8 | - | (1,385.5) | - |
| Net (loss) / income from continuing operations, net of tax............................................... | $ (724.5) | $ (76.1) | $ - | $ (334.5) | $ (692.6) | $ 1,385.5 | $ (442.2) |
| Income / (loss) from discontinued operations..... | - | - | - | - | (282.3) | - | (282.3) |
| Net (loss) /income ....................................... | $ (724.5) | $ (76.1) | $ - | $ (334.5) | $ (974.9) | $ 1,385.5 | $ (724.5) |
| (Income) / loss attributable to noncontrolling interest...................................................... | - | - | - | - | - | - | - |
| Net income / (loss) attributable to ordinary shareholders ............................................. | $ (724.5) | $ (76.1) | $ - | $ (334.5) | $ (974.9) | $ 1,385.5 | $ (724.5) |
| Other comprehensive income / (loss)................. | 53.7 | 48.2 | - | 6.7 | 53.7 | (108.6) | 53.7 |
| Comprehensive (loss) / income........................... | $ (670.8) | $ (27.9) | $ - | $ (327.8) | $ (921.2) | $ 1,276.9 | $ (670.8) |

**Warner Chilcott Limited**
**Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2015**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Actavis Capital S.a.r.l. (Guarantor) | Actavis Funding SCS (Issuer) | Actavis Inc. (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | | | |
| Net income / (loss) | $ 4,050.6 | $ 5,431.4 | $ 0.3 | $ 1,871.4 | $ 3,069.8 | $ (10,368.7) | $ 4,054.8 |
| Reconciliation to net cash provided by operating activities: | | | | | | | |
| (Earnings) / losses of equity interest subsidiaries | (4,050.6) | (4,336.5) | - | (1,981.6) | - | 10,368.7 | - |
| Depreciation | - | - | - | 0.2 | 218.1 | - | 218.3 |
| Amortization | - | - | - | - | 5,777.0 | - | 5,777.0 |
| Provision for inventory reserve | - | - | - | - | 140.9 | - | 140.9 |
| Share-based compensation | - | - | - | 51.6 | 638.8 | - | 690.4 |
| Deferred income tax benefit | - | - | - | - | (7,380.1) | - | (7,380.1) |
| In-process research and development impairments | - | - | - | - | 511.6 | - | 511.6 |
| Loss / (gain) on asset sales and impairments, net | - | - | - | - | 334.4 | - | 334.4 |
| Amortization of inventory step-up | - | - | - | - | 1,192.9 | - | 1,192.9 |
| Amortization of deferred financing costs | - | 272.5 | 20.9 | 4.1 | 0.8 | - | 298.3 |
| Accretion and contingent consideration | - | - | - | - | 108.8 | - | 108.8 |
| Dividends from subsidiaries | 208.1 | 208.1 | - | - | - | (416.2) | - |
| Other, net | - | - | - | - | 66.4 | - | 66.4 |
| Changes in assets and liabilities (net of effects of acquisitions) | (0.1) | (370.6) | 122.5 | 97.7 | (1,199.2) | - | (1,349.7) |
| Net cash provided by / (used in) operating activities | 208.0 | 1,204.9 | 143.7 | 43.4 | 3,480.2 | (416.2) | 4,664.0 |
| **Cash Flows From Investing Activities:** | | | | | | | |
| Additions to property plant and equipment | - | - | - | (42.9) | (412.0) | - | (454.9) |
| Additions to product rights and other intangibles | - | - | - | - | (154.7) | - | (154.7) |
| Additions to investments | (9,000.8) | (9,000.8) | - | - | (24.3) | 18,001.6 | (24.3) |
| Proceeds from sale of investments and other assets | - | - | - | - | 883.0 | - | 883.0 |
| Proceeds from sales of property, plant and equipment | - | - | - | - | 140.1 | - | 140.1 |
| Acquisitions of business, net of cash acquired | - | - | - | - | (37,510.1) | - | (37,510.1) |
| Net cash (used in) investing activities | (9,000.8) | (9,000.8) | - | (42.9) | (37,078.0) | 18,001.6 | (37,120.9) |
| **Cash Flows From Financing Activities:** | | | | | | | |
| Proceeds from borrowings of long-term indebtedness | - | 5,500.0 | 20,955.6 | - | 0.1 | - | 26,455.7 |
| Financing structure and other activity with affiliates | - | (5,500.0) | (20,955.6) | - | 26,455.6 | - | - |
| Proceeds from borrowings on credit facility and other | - | 3,610.0 | - | - | 72.0 | - | 3,682.0 |
| Debt issuance and other financing costs | - | (167.1) | (143.7) | - | - | - | (310.8) |
| Payments on debt, including capital lease obligations | - | (4,431.7) | - | - | (702.5) | - | (5,134.2) |
| Payments of contingent consideration | - | - | - | - | (230.1) | - | (230.1) |
| Dividends to Parent | (208.1) | (208.1) | - | - | (208.1) | 416.2 | (208.1) |
| Contribution from Parent | 9,000.8 | 9,000.8 | - | - | 9,000.8 | (18,001.6) | 9,000.8 |
| Net cash provided by / (used in) financing activities | 8,792.7 | 7,803.9 | (143.7) | - | 34,387.8 | (17,585.4) | 33,255.3 |
| Effect of currency exchange rate changes on cash and cash equivalents | - | - | - | - | (6.5) | - | (6.5) |
| Movement in cash held for sale | - | - | - | - | - | - | - |
| Net increase / (decrease) in cash and cash equivalents | (0.1) | 8.0 | - | 0.5 | 783.5 | - | 791.9 |
| Cash and cash equivalents at beginning of period | 0.1 | 5.5 | - | 1.5 | 237.2 | - | 244.3 |
| Cash and cash equivalents at end of period | $ - | $ 13.5 | $ - | $ 2.0 | $ 1,020.7 | $ - | $ 1,036.2 |

**Warner Chilcott Limited**
**Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2014**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Actavis Capital S.a.r.l. (Guarantor) | Actavis Funding SCS (Issuer) | Actavis Inc. (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | | | |
| Net (loss) / income | $ (1,560.5) | $ (1,354.2) | $ — | $ 733.0 | $ (592.8) | $ 1,214.0 | $ (1,560.5) |
| Reconciliation to net cash provided by operating activities: | | | | | | | |
| Losses / (earnings) of equity interest subsidiaries | 1,560.5 | 539.7 | – | (886.2) | – | (1,214.0) | – |
| Depreciation | – | – | – | 0.2 | 230.7 | – | 230.9 |
| Amortization | – | – | – | – | 2,597.5 | – | 2,597.5 |
| Provision for inventory reserve | – | – | – | – | 156.1 | – | 156.1 |
| Share-based compensation | – | – | – | 1.4 | 366.6 | – | 368.0 |
| Deferred income tax benefit | – | – | – | – | (690.1) | – | (690.1) |
| In-process research and development impairments | – | – | – | – | 424.3 | – | 424.3 |
| Goodwill Impairment | – | – | – | – | 17.3 | – | 17.3 |
| Loss / (gain) on asset sales and impairments, net | – | – | – | – | 143.1 | – | 143.1 |
| Amortization of inventory step-up | – | – | – | – | 985.8 | – | 985.8 |
| Amortization of deferred financing costs | – | 1.0 | 22.9 | 2.4 | 60.9 | – | 87.2 |
| Accretion and contingent consideration | – | – | – | – | (71.2) | – | (71.2) |
| Non-cash impact of debt extinguishment | – | – | – | – | (91.7) | – | (91.7) |
| Impact of assets held for sale | – | – | – | – | 190.8 | – | 190.8 |
| Other, net | – | – | – | – | 8.5 | – | 8.5 |
| Changes in assets and liabilities (net of effects of acquisitions) | – | 1,156.5 | (3,647.2) | 159.2 | 1,805.2 | – | (526.3) |
| Net cash provided by / (used in) operating activities | – | 343.0 | (3,624.3) | 10.0 | 5,541.0 | – | 2,269.7 |
| **Cash Flows From Investing Activities:** | | | | | | | |
| Additions to property plant and equipment | – | – | – | (9.9) | (228.7) | – | (238.6) |
| Additions to product rights and other intangibles | – | – | – | – | (36.1) | – | (36.1) |
| Additions to investments | – | – | – | – | (1.0) | – | (1.0) |
| Proceeds from sale of investments and other assets | – | – | – | – | 453.7 | – | 453.7 |
| Proceeds from sales of property, plant and equipment | – | – | – | – | 13.7 | – | 13.7 |
| Acquisitions of business, net of cash acquired | – | – | – | – | (5,562.3) | – | (5,562.3) |
| Net cash (used in) investing activities | – | – | – | (9.9) | (5,360.7) | – | (5,370.6) |
| **Cash Flows From Financing Activities:** | | | | | | | |
| Proceeds from borrowings of long-term indebtedness | – | – | 6,076.2 | – | 2,000.0 | – | 8,076.2 |
| Proceeds from borrowings on credit facility and other | – | 80.0 | – | – | 1,200.0 | – | 1,280.0 |
| Debt issuance and other financing costs | – | – | (51.9) | – | (172.4) | – | (224.3) |
| Payments on debt, including capital lease obligations | – | (417.8) | (2,400.0) | – | (3,309.2) | – | (6,127.0) |
| Payments of contingent consideration | – | – | – | – | (14.3) | – | (14.3) |
| Dividends to Parent | – | – | – | – | – | – | – |
| Contribution from Parent | – | – | – | – | – | – | – |
| Net cash provided by / (used in) financing activities | – | (337.8) | 3,624.3 | – | (295.9) | – | 2,990.6 |
| Effect of currency exchange rate changes on cash and cash equivalents | – | – | – | – | (5.9) | – | (5.9) |
| Movement in cash held for sale | – | – | – | – | 37.0 | – | 37.0 |
| Net increase / (decrease) in cash and cash equivalents | – | 5.2 | – | 0.1 | (84.5) | – | (79.2) |
| Cash and cash equivalents at beginning of period | 0.1 | 0.3 | – | 1.4 | 321.7 | – | 323.5 |
| Cash and cash equivalents at end of period | $ 0.1 | $ 5.5 | $ — | $ 1.5 | $ 237.2 | $ — | $ 244.3 |

**Warner Chilcott Limited**
**Consolidating Statement of Cash Flows**
**For the Year Ended December 31, 2013**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Actavis Capital S.a.r.l. (Guarantor) | Actavis Funding SCS (Issuer) | Actavis Inc. (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | | | |
| Net (loss) / income | $ (724.5) | $ (76.1) | $ - | $ (334.5) | $ (974.9) | $ 1,385.5 | $ (724.5) |
| Reconciliation to net cash provided by operating activities: | | | | | | | |
| Losses / (earnings) of equity interest subsidiaries | 724.5 | 162.2 | - | 498.8 | - | (1,385.5) | - |
| Depreciation | - | - | - | 1.0 | 201.0 | - | 202.0 |
| Amortization | - | - | - | - | 842.7 | - | 842.7 |
| Provision for inventory reserve | - | - | - | - | 113.8 | - | 113.8 |
| Share-based compensation | - | - | - | 48.2 | 85.4 | - | 133.6 |
| Deferred income tax benefit | - | - | - | - | (275.0) | - | (275.0) |
| In-process research and development impairments | - | - | - | - | 4.9 | - | 4.9 |
| Goodwill Impairment | - | - | - | - | 647.5 | - | 647.5 |
| Loss / (gain) on asset sales and impairments, net | - | - | - | - | 55.9 | - | 55.9 |
| Amortization of inventory step-up | - | - | - | - | 267.0 | - | 267.0 |
| Amortization of deferred financing costs | - | - | - | - | 10.3 | - | 10.3 |
| Accretion and contingent consideration | - | - | - | - | 160.0 | - | 160.0 |
| Excess tax benefit from stock-based compensation | - | - | - | (69.2) | 0.1 | - | (69.1) |
| Non-cash impact of debt extinguishment | - | - | - | - | - | - | - |
| Impact of assets held for sale | - | - | - | - | 42.7 | - | 42.7 |
| Other, net | - | - | - | - | (9.0) | - | (9.0) |
| Changes in assets and liabilities (net of effects of acquisitions) | 0.1 | (86.1) | - | 503.8 | (613.4) | - | (195.6) |
| Net cash provided by operating activities | 0.1 | - | - | 648.1 | 559.0 | - | 1,207.2 |
| **Cash Flows From Investing Activities:** | | | | | | | |
| Additions to property plant and equipment | - | - | - | (17.6) | (160.3) | - | (177.9) |
| Additions to product rights and other intangibles | - | - | - | - | (130.0) | - | (130.0) |
| Additions to investments | - | - | - | - | - | - | - |
| Proceeds from sale of investments and other assets | - | - | - | - | 40.6 | - | 40.6 |
| Proceeds from sales of property, plant and equipment | - | - | - | - | 7.1 | - | 7.1 |
| Acquisitions of business, net of cash acquired | - | - | - | - | (15.1) | - | (15.1) |
| Net cash (used in) investing activities | - | - | - | (17.6) | (257.7) | - | (275.3) |
| **Cash Flows From Financing Activities:** | | | | | | | |
| Proceeds from borrowings of long-term indebtedness | - | - | - | - | 1,882.3 | - | 1,882.3 |
| Proceeds from borrowings on credit facility and other | - | 430.0 | - | 125.0 | - | - | 555.0 |
| Debt issuance and other financing costs | - | (2.2) | - | (0.5) | (4.7) | - | (7.4) |
| Payments on debt, including capital lease obligations | - | (427.5) | - | (702.5) | (2,099.5) | - | (3,229.5) |
| Proceeds from stock plans | - | - | - | 44.0 | - | - | 44.0 |
| Payments of contingent consideration | - | - | - | - | (4.3) | - | (4.3) |
| Repurchase of ordinary shares | - | - | - | (165.4) | - | - | (165.4) |
| Acquisition of noncontrolling interest | - | - | - | - | (10.4) | - | (10.4) |
| Excess tax benefit from stock-based compensation | - | - | - | 69.2 | - | - | 69.2 |
| Net cash provided by / (used in) financing activities | - | 0.3 | - | (630.2) | (236.6) | - | (866.5) |
| Effect of currency exchange rate changes on cash and cash equivalents | - | - | - | - | (23.9) | - | (23.9) |
| Movement in cash held for sale | - | - | - | - | (37.0) | - | (37.0) |
| Net increase / (decrease) in cash and cash equivalents | 0.1 | 0.3 | - | 0.3 | 3.8 | - | 4.5 |
| Cash and cash equivalents at beginning of period | - | - | - | 1.1 | 317.9 | - | 319.0 |
| Cash and cash equivalents at end of period | $ 0.1 | $ 0.3 | $ - | $ 1.4 | $ 321.7 | $ - | $ 323.5 |

**NOTE 27 — Compensation**

The following table represents compensation costs for the years ended December 31, 2015, 2014 and 2013 ($ in millions):

|  | Year Ended December 31, | | | | | |
|  | 2015 | | 2014 | | 2013 | |
|---|---|---|---|---|---|---|
| Wages and salaries | $ | 2,252.3 | $ | 1,557.9 | $ | 887.2 |
| Stock-based compensation | | 925.7 | | 401.2 | | 133.6 |
| Pensions | | 99.9 | | 89.0 | | 53.9 |
| Social welfare | | 185.1 | | 97.1 | | 62.4 |
| Other benefits | | 271.6 | | 231.8 | | 287.7 |
| **Total** | $ | **3,734.6** | $ | **2,377.0** | $ | **1,424.8** |
| Amount included in continuing operations | $ | 2,681.0 | $ | 1,332.9 | $ | 558.2 |
| Amount included in discontinued operations | $ | 1,053.6 | $ | 1,044.1 | $ | 866.6 |

**NOTE 28 — Concentration**

The Company considers there to be a concentration risk for customers that account for 10% of more of their third party revenues. The following table illustrates any customer, on a global basis, which accounted for 10% or more of our annual revenues in any of the past three fiscal years and the respective percentage of our revenues for which they account for each of the last three years:

| Customer | 2015 | 2014 | 2013 |
|---|---|---|---|
| McKesson Corporation | 24% | 22% | 11% |
| Cardinal Health, Inc. | 18% | 16% | 10% |
| AmerisourceBergen Corporation | 17% | 17% | 6% |

Changes in the mix of concentration amongst the Company's largest customers are due, in part, to the impact of acquisitions as well as changes in the supply chain of our indirect customers.

The Company's accounts receivable primarily arise from product sales in North America and Europe and primarily represent amounts due from wholesalers, distributors, drug store chains and service providers in the health care and pharmaceutical industries, public hospitals and other government entities. Approximately 65% and 70% of the gross accounts receivable balance are concentrated among the Company's three largest customers as of December 31, 2015 and 2014, respectively. The Company performs ongoing credit evaluations of its customers and maintains an allowance for potential uncollectible accounts. Actual losses from uncollectible accounts have been minimal.

Outside of the U.S., concentrations of credit risk with respect to accounts receivable are limited due to the wide variety of customers and markets using the Company's products, as well as their dispersion across many different geographic areas. The Company monitors economic conditions, including volatility associated with international economies, and related impacts on the relevant financial markets and its business, especially in light of sovereign credit issues. The Company does not expect to have write-offs or adjustments to accounts receivable which would have a material adverse effect on its financial position, liquidity or results of operations.

Certain of the Company's finished products and raw materials are obtained from single source suppliers. Although the Company seeks to identify more than one source for its various finished products and raw materials, loss of a single source supplier could have an adverse effect on the Company's results of operations, financial condition and cash flows. Further, a second source supplier may not be able to produce the same volumes of inventory as the Company's primary supplier. No third party manufacturer accounted for 10% or more of the Company's products sold based on third-party revenues for the year ended December 31, 2015.

**NOTE 29 — Subsequent Events**

On January 7, 2016, the Company acquired Anterios, Inc. ("Anterios"), a clinical stage biopharmaceutical company developing a next generation delivery system and botulinum toxin-based prescription products. Under the terms of the agreement, the Company acquired Anterios for an upfront payment of $90.0 million and potential development and commercialization milestone payments related to NDS™, Anterios' proprietary platform delivery technology that enables local, targeted delivery of neurotoxins through the skin without the need for injections.

Schedule II
Allergan plc

Valuation and Qualifying Accounts
Years Ended December 31, 2015, 2014 and 2013
($ in millions)

| | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions/ Write-offs | Other* | Balance at End of Period |
|---|---|---|---|---|---|
| **Allowance for doubtful accounts:** | | | | | |
| Year ended December 31, 2015............ $ | 4.8 $ | 8.4 $ | (7.3) $ | 74.7 $ | 80.6 |
| Year ended December 31, 2014............ $ | 2.7 $ | 3.9 $ | (4.2) $ | 2.4 $ | 4.8 |
| Year ended December 31, 2013............ $ | 5.2 $ | 1.6 $ | (4.9) $ | 0.8 $ | 2.7 |
| **Tax valuation allowance:** | | | | | |
| Year ended December 31, 2015............ $ | 474.0 $ | (335.6) $ | - $ | 57.8 $ | 196.2 |
| Year ended December 31, 2014............ $ | 319.1 $ | 112.7 $ | - $ | 42.2 $ | 474.0 |
| Year ended December 31, 2013............ $ | 7.2 $ | 310.6 $ | - $ | 1.3 $ | 319.1 |

\*    Includes opening balances of businesses acquired in the period.

### SUPPLEMENTARY DATA (UNAUDITED)

Selected unaudited quarterly consolidated financial data and market price information are shown below ($ in millions except per share data):

| | Year Ended 12/31/2015 | For Three Month Periods Ended | | | |
| | | Dec. 31, 2015 | Sept. 30, 2015 | June 30, 2015 | Mar. 31, 2015 |
|---|---|---|---|---|---|
| Net revenues | $ 15,071.0 | $ 4,197.5 | $ 4,088.9 | $ 4,222.0 | $ 2,562.6 |
| Net income/(loss) | $ 3,919.4 | $ (629.3) | $ 5,302.6 | $ (241.6) | $ (512.3) |
| Basic earnings per share | 10.01 | (1.78) | 13.29 | (0.80) | (1.85) |
| Diluted earnings per share | 10.01 | (1.78) | 13.29 | (0.80) | (1.85) |
| Market price per share: | | | | | |
| High | | $ 322.68 | $ 340.34 | $ 315.00 | $ 317.72 |
| Low | | $ 237.50 | $ 245.32 | $ 279.74 | $ 253.00 |

| | Year Ended 12/31/2014 | For Three Month Periods Ended | | | |
| | | Dec. 31, 2014 | Sept. 30, 2014 | June 30, 2014 | Mar. 31, 2014 |
|---|---|---|---|---|---|
| Net revenues | $ 6,738.9 | $ 2,415.6 | $ 2,150.8 | $ 1,087.2 | $ 1,085.3 |
| Net income/(loss) | $ (1,630.5) | $ (733.2) | $ (1,042.8) | $ 48.8 | $ 96.7 |
| Basic earnings per share | (7.42) | (3.34) | (3.95) | 0.28 | 0.56 |
| Diluted earnings per share | (7.42) | (3.34) | (3.95) | 0.28 | 0.55 |
| Market price per share: | | | | | |
| High | | $ 272.75 | $ 249.94 | $ 226.23 | $ 230.77 |
| Low | | $ 208.64 | $ 201.91 | $ 184.71 | $ 166.38 |

In the quarter ended September 30, 2015, the company recorded a deferred tax benefit of $5,985.4 million related to the outside basis difference since the benefit is expected to be realized in the foreseeable future. The recognition of this benefit was reflected in income from discontinued operations, net of tax with the deferred tax asset reflected in our consolidated balance sheet. The Company notes that the tax benefit recognized was overstated by $145.0 million.  As a result, the Company is revising its net income for the quarter ended September 30, 2015 as previously reported of $5,231.6 million to $5,086.6 million.  Management believes this error is not material to the quarter ended September 30, 2015.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 2.1 | Transaction Agreement, dated May 19, 2013, by and among Actavis, Inc., Warner Chilcott Public Limited Company, Actavis Limited (now known as Allergan plc), Actavis Ireland Holding Limited, Actavis W.C. Holding LLC (now known as Actavis W.C. Holding Inc.) and Actavis W.C. Holding 2 LLC (now known as Actavis W.C. Holding 2 Inc.) (incorporated by reference to Exhibit 2.1 to Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on May 23, 2013). |
| 2.2 | Share Purchase Agreement, dated as of June 16, 2009, by and among Robin Hood Holdings Limited, Watson Pharmaceuticals, Inc., certain shareholders of Robin Hood Holdings Limited, and Anthony Selwyn Tabatznik, solely in his capacity as the Shareholders' Representative (incorporated by reference to Exhibit 2.1 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on June 19, 2009). |
| 2.3 | First Amendment to Share Purchase Agreement, dated as of November 26, 2009, by and among Robin Hood Holdings Limited, Arrow Pharmaceutical Holdings Ltd., Cobalt Laboratories, Inc., Arrow International Ltd., Arrow Supplies Ltd., Watson Pharmaceuticals, Inc., Watson Pharma S.A.R.L., Watson Cobalt Holdings, LLC, the shareholders of Robin Hood Holdings Limited, and Anthony Selwyn Tabatznik, solely in his capacity as Shareholders' Representative (incorporated by reference to Exhibit 2.2 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on December 2, 2009). |
| 2.4 | Share Purchase Agreement, dated as of May 25, 2011, by and among Watson Pharmaceuticals, Inc. and each of the shareholders of Paomar PLC (incorporated by reference to Exhibit 2.1 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on May 27, 2011). |
| 2.5 | Share Purchase Agreement, dated as of January 24, 2012, by and among Watson Pharmaceuticals, Inc., Strides Pharma Limited, I-Investments Pty Ltd, Strides Arcolab Limited, Ascent Pharmahealth Limited and Dennis Bastas (incorporated by reference to Exhibit 2.1 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on January 26, 2012). |
| 2.6 | Sale and Purchase Agreement, dated as of April 25, 2012, by and among Nitrogen DS Limited, Landsbanki Islands hf., ALMC Eignarhaldsfélag ehf., ALMC hf, Argon Management S.à.r.l., the Managers party thereto, Deutsche Bank AG, London Branch, Actavis Acquisition Debt S.à.r.l., Watson Pharma S.à.r.l., and Watson Pharmaceuticals, Inc. (incorporated by reference to Exhibit 2.1 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on April 30, 2012). |
| 2.7 | Deed of Modification and Withdrawal from Escrow Accounts, dated as of October 31, 2012, to the Sale and Purchase Agreement dated April 25, 2012, by and among Nitrogen DS Limited, Landsbanki Islands hf., ALMC Eignarhaldsfélag ehf., ALMC hf., Argon Management S.à r.l., the Managers party thereto, Deutsche Bank AG, London Branch, Actavis Acquisition Debt S.à r.l., Watson Pharma S.à r.l. and Watson Pharmaceuticals, Inc. (incorporated by reference to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on November 2, 2012). |
| 2.8 | Stock Purchase Agreement, dated as of January 19, 2013, by and among Actavis, Inc., Watson Pharma Actavis S.a.r.l. and each of the shareholders of Uteron Pharma SA (incorporated by reference to Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on January 25, 2013). |
| 2.9 | Agreement and Plan of Merger, dated as of February 17, 2014, by and among Actavis plc (now known as Allergan plc), Tango US Holdings Inc., Tango Merger Sub 1 LLC, Tango Merger Sub 2 LLC and Forest Laboratories, Inc. (incorporated by reference to Exhibit 2.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on February 19, 2014). |
| 2.10 | Agreement and Plan of Merger, dated as of April 27, 2014, by and among Forest Laboratories, LLC (as successor to Forest Laboratories, Inc.), Royal Empress, Inc. and Furiex Pharmaceuticals, Inc. (incorporated by reference to Exhibit 2.1 to Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on April 28, 2014). |
| 2.11 | Agreement and Plan of Merger, dated as of October 5, 2014, by and among Actavis W.C. Holding Inc., Delaware Merger Sub, Inc. and Durata Therapeutics, Inc. (incorporated by reference to Exhibit 2.1 to Allergan plc's Current Report on Form 8-K filed on October 8, 2014). |
| 2.12 | Agreement and Plan of Merger, dated November 16, 2014, by and among Actavis plc (now known as Allergan plc), Avocado Acquisition Inc. and Allergan, Inc. (incorporated by reference to Exhibit 2.1 to Allergan plc's Current Report on Form 8-K filed with the SEC on November 16, 2014). |
| 2.13 | Amended and Restated Agreement and Plan of Merger, dated as of August 4, 2015, by and among Allergan plc, Keto Merger Sub, Inc. and KYTHERA Biopharmaceuticals, Inc. (incorporated by reference to Exhibit 2.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on August 5, 2015). |

| Exhibit No. | Description |
|---|---|
| 2.14 | Master Purchase Agreement, dated July 26, 2015, by and between Teva Pharmaceutical Industries Ltd. and Allergan plc (incorporated by reference to Exhibit 2.2 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on August 6, 2015). |
| 2.15† | Agreement and Plan of Merger, dated as of November 22, 2015, by and among Pfizer Inc., Allergan plc, and Watson Merger Sub Inc. (incorporated by reference to Exhibit 2.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on November 24, 2015). |
| 3.1 | Certificate of Incorporation of Allergan plc (incorporated by reference to Exhibit 3.1 to Allergan plc's Registration Statement on Form S-4, filed with the SEC on July 17, 2015). |
| 3.2 | Amended and Restated Memorandum and Articles of Association of Allergan plc (incorporated by reference to Exhibit 3.1 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on August 6, 2015). |
| 4.1 | Indenture, dated as of April 12, 2006, among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K, filed with the SEC on April 12, 2006). |
| 4.2 | First Supplemental Indenture, dated as of April 16, 2015, among Allergan, Inc., Actavis plc (now known as Allergan plc), Warner Chilcott Limited and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on April 22, 2015). |
| 4.3 | Form of 5.75% Senior Note due 2016 (incorporated by reference to (and included in) the Indenture dated as of April 12, 2006 among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee, at Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K, filed with the SEC on April 12, 2006). |
| 4.4 | Registration Rights Agreement, dated as of April 12, 2006, among Allergan, Inc. and Morgan Stanley & Co. Incorporated, as representative of the Initial Purchasers named therein, relating to the $800,000,000 5.75% Senior Notes due 2016 (incorporated by reference to Exhibit 4.4 to Allergan, Inc's Current Report on Form 8-K, filed with the SEC on April 12, 2006). |
| 4.5 | Indenture between Watson Pharmaceuticals, Inc. and Wells Fargo Bank, N.A., as trustee, dated as of August 24, 2009 (incorporated by reference to Exhibit 4.1 to Watson Pharmaceuticals, Inc.'s Form 8-K, filed with the SEC on August 24, 2009). |
| 4.6 | First Supplemental Indenture between Watson Pharmaceuticals, Inc. and Wells Fargo Bank, N.A., as trustee, dated as of August 24, 2009, including the forms of Watson Pharmaceuticals, Inc.'s 5.000% Senior Notes due 2014 and 6.125% Senior Notes due 2019 (incorporated by reference to Exhibit 4.2 to Watson Pharmaceuticals, Inc.'s Form 8-K, filed with the SEC on August 24, 2009). |
| 4.7 | Second Supplemental Indenture between Watson Pharmaceuticals, Inc. and Wells Fargo Bank, N.A., as trustee, dated as of May 7, 2010 (incorporated by reference to Exhibit 10.2 to Watson Pharmaceuticals, Inc.'s Quarterly Report on Form 10-Q, filed with the SEC on May 10, 2010). |
| 4.8 | Third Supplemental Indenture between Watson Pharmaceuticals, Inc. and Wells Fargo Bank, N.A., as trustee, dated as of October 2, 2012, including the forms of Watson Pharmaceuticals, Inc.'s 1.875% Notes due 2017, 3.250% Notes due 2022 and 4.625% Notes due 2042 (incorporated by reference to Exhibit 4.2 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on October 2, 2012). |
| 4.9 | Fourth Supplemental Indenture, dated as of October 1, 2013, by and among Actavis, Inc., Actavis plc (now known as Allergan plc), and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Allergan plc's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 4.10 | Fifth Supplemental Indenture, dated as of April 16, 2015, by and among Actavis, Inc., Actavis plc (now known as Allergan plc), Warner Chilcott Limited and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.4 to Allergan plc's Current Report on Form 8-K, filed with the SEC on April 22, 2015). |
| 4.11 | Indenture, dated as of August 20, 2010, between Warner Chilcott Company, LLC, Warner Chilcott Finance LLC, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Warner Chilcott plc's Current Report on Form 8-K, filed with the SEC on August 24, 2010). |
| 4.12 | Indenture, dated as of September 14, 2010, among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 to Allergan, Inc.'s Current Report on Form 8-K filed with the SEC on September 14, 2010). |
| 4.13 | First Supplemental Indenture, dated as of September 14, 2010, among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K filed with the SEC on September 14, 2010). |

| Exhibit No. | Description |
|---|---|
| 4.14 | Second Supplemental Indenture, dated as of April 16, 2015, by and among Allergan, Inc., Actavis plc (now known as Allergan plc), Warner Chilcott Limited and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan plc's Current Report on Form 8-K, filed with the SEC on April 22, 2015). |
| 4.15 | Form of 3.375% Note due 2020 (incorporated by reference to (and included in) the Supplemental Indenture dated as of September 14, 2010 among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee, at Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K, filed with the SEC on September 14, 2010). |
| 4.16 | Third Supplemental Indenture, dated as of October 1, 2013, by and among Warner Chilcott Company, LLC, Warner Chilcott Finance LLC, Actavis plc (now known as Allergan plc), and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 of Allergan plc's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 4.17 | Indenture, dated as of March 12, 2013, among Allergan, Inc. and Wells Fargo, National Association, as trustee (incorporated by reference to Exhibit 4.1 to Allergan, Inc.'s Current Report on Form 8-K filed with the SEC on March 12, 2013). |
| 4.18 | First Supplemental Indenture, dated as of March 12, 2013, among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K filed with the SEC on March 12, 2013). |
| 4.19 | Second Supplemental Indenture, dated as of April 16, 2015, by and among Allergan, Inc., Actavis plc (now known as Allergan plc), Warner Chilcott Limited and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.3 to Allergan plc's Current Report on Form 8-K, filed with the SEC on April 22, 2015). |
| 4.20 | Indenture, dated as of January 31, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on February 3, 2014). |
| 4.21 | Indenture, dated as of January 31, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on February 3, 2014). |
| 4.22 | Indenture, dated as of December 10, 2013, by and among Forest Laboratories, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.3 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on February 3, 2014). |
| 4.23 | First Supplemental Indenture, dated as of June 12, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on June 13, 2014). |
| 4.24 | First Supplemental Indenture, dated as of June 12, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on June 13, 2014). |
| 4.25 | First Supplemental Indenture, dated as of June 12, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.3 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on June 13, 2014). |
| 4.26 | Second Supplemental Indenture, between Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.1 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.27 | Second Supplemental Indenture, between Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.2 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.28 | Second Supplemental Indenture, between Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.3 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014. |
| 4.29 | Third Supplemental Indenture, among Actavis plc (now known as Allergan plc), Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.4 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.30 | Third Supplemental Indenture, among Actavis plc (now known as Allergan plc), Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.5 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |

| Exhibit No. | Description |
| --- | --- |
| 4.31 | Third Supplemental Indenture, among Actavis plc (now known as Allergan plc), Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.6 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.32 | Indenture, dated June 19, 2014, by and among Actavis Funding SCS, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Allergan plc's Current Report on Form 8-K filed with the SEC on June 20, 2014). |
| 4.33 | Indenture, dated as of March 12, 2015, among Actavis Funding SCS and Warner Chilcott Limited, Actavis Capital S.à r.l. and Actavis, Inc., as guarantors and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 12, 2015). |
| 4.34 | First Supplemental Indenture, dated as of March 12, 2015, among Actavis Funding SCS and Warner Chilcott Limited, Actavis Capital S.à r.l. and Actavis, Inc., as guarantors and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 12, 2015). |
| 4.35 | Second Supplemental Indenture, dated as of May 7, 2015, among Actavis Funding SCS and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.20 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.1 | Form of Director and Executive Officer Indemnity Agreement (incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2006). |
| 10.2 | Allergan, Inc. Change in Control Policy (Effective April 2010) (incorporated by reference to Exhibit 10.2 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2010). |
| 10.3# | Allergan, Inc. Deferred Directors' Fee Program (Restated December 2010) (incorporated by reference to Exhibit 10.11 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2010). |
| 10.4# | Allergan, Inc. 1989 Incentive Compensation Plan (Restated November 2000) (incorporated by reference to Exhibit 10.5 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2000). |
| 10.5# | First Amendment to Allergan, Inc. 1989 Incentive Compensation Plan (Restated November 2000) (incorporated by reference to Exhibit 10.51 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended September 26, 2003). |
| 10.6# | Second Amendment to Allergan, Inc. 1989 Incentive Compensation Plan (Restated November 2000) (incorporated by reference to Exhibit 10.7 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2004). |
| 10.7# | Third Amendment to Allergan, Inc. 1989 Incentive Compensation Plan (Restated November 2000) (incorporated by reference to Exhibit 10.15 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2010). |
| 10.8 | Allergan, Inc. Pension Plan (Restated 2013) (incorporated by reference to Exhibit 10.15 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2012). |
| 10.9 | First Amendment to the Allergan, Inc. Pension Plan (Restated 2013) (Incorporated by reference to Exhibit 10.14 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2013). |
| 10.10 | Second Amendment to the Allergan, Inc. Pension Plan (Restated 2013 (Incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2014). |
| 10.11 | Third Amendment to Allergan, Inc. Pension Plan (Restated 2013) (Incorporated by reference to Exhibit 10.2 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2014. |
| 10.12# | Allergan, Inc. Supplemental Executive Benefit Plan and Supplemental Retirement Income Plan (Restated 2011) (incorporated by reference to Exhibit 10.3 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended September 30, 2011). |
| 10.13# | First Amendment to Allergan, Inc. Supplemental Executive Benefit Plan (incorporated by reference to Exhibit 10.18 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2011). |
| 10.14# | Allergan, Inc. Executive Severance Pay Plan (Effective January 2011) (incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Current Report on Form 8-K filed on December 21, 2010). |
| 10.15# | Allergan, Inc. 2011 Executive Bonus Plan (incorporated by reference to Annex A to Allergan, Inc.'s Proxy Statement filed on March 8, 2011). |
| 10.16# | Allergan, Inc. 2011 Executive Bonus Plan - 2015 Performance Objectives (incorporated by reference to Exhibit 10.21 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2014). |
| 10.17# | Allergan, Inc. 2015 Management Bonus Plan (incorporated by reference to Exhibit 10.22 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2014). |
| 10.18# | Allergan, Inc. Executive Deferred Compensation Plan (Restated 2009) (incorporated by reference to Exhibit 10.23 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2008). |

| Exhibit No. | Description |
|---|---|
| 10.19# | Form of Non-Qualified Stock Option Grant Notice for Employees under the Allergan, Inc. 2008 Incentive Award Plan (incorporated by reference to Exhibit 10.5 to Allergan, Inc.'s Current Report on Form 8-K filed on May 6, 2008). |
| 10.20# | Form of Non-Qualified Stock Option Grant Notice for Employees under the Allergan, Inc. 2008 Incentive Award Plan (Amended February 2010) (incorporated by reference to Exhibit 10.32 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2009). |
| 10.21# | Amended and Restated Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 99.5 to Allergan plc's Post-Effective Amendment No. 1 on Form S-8 to Form S-4 (No. 333-201242), filed on March 17, 2015). |
| 10.22# | Form of Non-Qualified Stock Option Grant Notice for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.6 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2011). |
| 10.23# | Form of Restricted Stock Award Grant Notice for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.7 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2011). |
| 10.24# | Form of Restricted Stock Award Grant Notice for Employees (Management Bonus Plan) under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.8 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2011). |
| 10.25# | Form of Restricted Stock Unit Award Grant Notice for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.9 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2011). |
| 10.26# | Form of Restricted Stock Unit Award Grant Notice for Employees (Management Bonus Plan) under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.10 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2011). |
| 10.27# | Form of Performance-Based Restricted Stock Unit Award Grant Notice for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.40 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2011). |
| 10.28# | Form of 2014 Performance-Based Restricted Stock Unit Award Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan ( incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Report on Form 10-Q for the Quarter Ended September 30, 2014) |
| 10.29# | Form of Non-Qualified Stock Option Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2014) (incorporated by reference to Exhibit 10.40 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2013). |
| 10.30# | Form of Restricted Stock Unit Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2014) (incorporated by reference to Exhibit 10.41 to Allergan, Inc.'s Annual Report on form 10-K for the Fiscal Year ended December 31, 2013). |
| 10.31# | Form of Restricted Stock Unit Grant Agreement for Employees (Management Bonus Plan) under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2014) (incorporated by reference to Exhibit 10.42 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2013). |
| 10.32# | Form of Restricted Stock Unit Award Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2015) (incorporated by reference to Exhibit 10.48 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2014). |
| 10.33# | Form of Restricted Stock Unit Award Grant Agreement for Employees (Management Bonus Plan) under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2015) (incorporated by reference to Exhibit 10.49 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2014). |
| 10.34# | Form of Non-Qualified Stock Option Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2015) (incorporated by reference to Exhibit 10.50 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2014). |
| 10.35# | Form of Non-Qualified Stock Option Grant Agreement for Employees under the Amended and Restated Allergan, Inc. 2011 Incentive Award Plan (March 2015) (incorporated by reference to Exhibit 10.35 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.36# | Form of Performance-Based Restricted Stock Unit Award Grant Agreement for Employees under the Amended and Restated Allergan, Inc. 2011 Incentive Award Plan (March 2015) (incorporated by reference to Exhibit 10.36 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.37# | Form of Restricted Stock Unit Award Grant Agreement for Employees under the Amended and Restated Allergan, Inc. 2011 Incentive Award Plan (March 2015) (incorporated by reference to Exhibit 10.37 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.38# | Separation Agreement, entered into as of March 21, 2015, by and between David Buchen and Actavis, Inc. (incorporated by reference to Exhibit 10.38 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.39# | Consulting Agreement, entered into as of March 21, 2015, by and between David Buchen and Actavis plc (now known |

| Exhibit No. | Description |
|---|---|
| | as Allergan plc) (incorporated by reference to Exhibit 10.39 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2005). |
| 10.40*** | Botox® - Japan License Agreement, dated as of September 30, 2005, among Allergan, Inc., Allergan Sales, LLC and Glaxo Group Limited (incorporated by reference to Exhibit 10.52 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended September 30, 2005). |
| 10.41*** | Amendment No. 1 to Botox® - Japan License Agreement, dated as of March 9, 2010, among Allergan, Inc., Allergan Sales, LLC, Allergan K.K., Allergan NK, and Glaxo Group Limited (incorporated by reference to Exhibit 10.2 to Allergan, Inc.'s Current Report on Form 8-K filed on March 11, 2010). |
| 10.42*** | License, Transfer, and Development Agreement, dated as of March 31, 2010, among Serenity Pharmaceuticals LLC and Allergan Sales, LLC, Allergan USA, Inc., and Allergan, Inc. (incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Current Report on Form 8-K filed on April 2, 2010). |
| 10.43*** | License and Collaboration Agreement, dated as of May 3, 2011, among Allergan, Inc., Allergan Sales, LLC, and Molecular Partners AG (incorporated by reference to Exhibit 10.15 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2012). |
| 10.44*** | Agreement and Plan of Merger, dated as of July 18, 2011, among Allergan, Inc., Erythema Acquisition, Inc., Vicept Therapeutics, Inc. and the Shareholders' Representative (incorporated by reference to Exhibit 2.1 to Allergan, Inc.'s Current Report on Form 8-K on July 22, 2011). |
| 10.45 | Settlement Agreement, dated as of August 31, 2010, among Allergan, Inc., Allergan USA, Inc., the United States Department of Justice and the other parties listed therein (incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Current Report on Form 8-K filed on September 1, 2010). |
| 10.46 | Corporate Integrity Agreement, dated as of August 30, 2010, between Allergan, Inc. and the Office of Inspector General of the Department of Health and Human Services (incorporated by reference to Exhibit 10.2 to Allergan, Inc.'s Current Report on Form 8-K filed on September 1, 2010). |
| 10.47 | Plea Agreement, dated as of October 5, 2010, between Allergan, Inc. and the United States Attorney's Office for the Northern District of Georgia as counsel for the United States (incorporated by reference to Exhibit 10.70 to Allergan, Inc.'s Current Report on Form 10-Q for the Quarter ended September 30, 2011). |
| 10.48 | Form of Deed of Indemnification, Actavis plc (now known as Allergan plc) (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 18, 2015). |
| 10.49 | Form of Indemnification Agreement, Actavis W.C. Holding Inc. (incorporated by reference to Exhibit 10.2 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 18, 2015). |
| 10.50*** | Asset Purchase Agreement, by and among Forest Laboratories, LLC, Forest Laboratories Canada Inc., and Forest Laboratories Holdings Limited, as Sellers, Actavis plc (now known as Allergan plc) and Astrazeneca UK Limited, as Purchaser, dated as of February 4, 2015 (incorporated by reference to Exhibit 10.52 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.51 | Form of Deed of Indemnification, Actavis plc (now known as Allergan plc) (incorporated by reference to Exhibit 10.6 of Allergan plc's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 10.52 | Form of Deed of Indemnification, Actavis plc (now known as Allergan plc) (incorporated by reference to Exhibit 10.4 of Allergan plc's Current Report on Form 8-K, filed with the SEC on July 3, 2014). |
| 10.53 | Form of Indemnification Agreement, Actavis W.C. Holding Inc. (incorporated by reference to Exhibit 10.7 of Allergan plc's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 10.54 | Form of Indemnification Agreement, Actavis W.C. Holding Inc. (incorporated by reference to Exhibit 10.5 of Allergan plc's Current Report on Form 8-K, filed with the SEC on July 3, 2014). |
| 10.55# | Form of Transformation Incentive Award Agreement (incorporated by reference to Exhibit 10.3 to Allergan plc's Current Report on Form 8-K filed on March 18, 2015). |
| 10.56# | Key Employee Agreement between Anda, Inc. and Al Paonessa III, dated as of August 2, 2007 (incorporated by reference to Exhibit 10.29 to Watson Pharmaceuticals, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2007). |
| 10.57 | Purchase and Collaboration Agreement, dated as of March 3, 2010, by and among Columbia Laboratories, Inc., Coventry Acquisition, Inc. and Watson Pharmaceuticals, Inc. (incorporated by reference to Exhibit 2.1 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on March 5, 2010). |
| 10.58 | Letter agreement dated February 10, 2012 amending the Purchase and Collaboration Agreement, dated as of March 3, 2010, by and among Columbia Laboratories, Inc., Coventry Acquisition, Inc. and Watson Pharmaceuticals, Inc (incorporated by reference to Exhibit 10.23B to Watson Pharmaceuticals, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2011). |

| Exhibit No. | Description |
|---|---|
| 10.59 | Supply Agreement, dated November 1, 2010, by and between Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Watson Laboratories, Inc., (incorporated by reference to Exhibit 10.26 to Watson Pharmaceuticals, Inc.'s Quarterly Report on Form 10-Q, filed with the SEC on May 3, 2012). |
| 10.60# | Watson Pharmaceuticals, Inc. 2012 Annual Incentive Compensation Plan (incorporated by reference to Watson Pharmaceuticals, Inc.'s Form DEF 14A, filed with the SEC on March 30, 2012). |
| 10.61# | The 2013 Incentive Award Plan of Actavis plc (now known as Allergan plc) (incorporated by reference to Exhibit 99.1 to Allergan plc's Registration Statement on Form S-8, filed with the SEC on October 1, 2013). |
| 10.62# | Warner Chilcott Equity Incentive Plan (incorporated by reference to Exhibit 99.3 to Allergan plc's Registration Statement on Form S-8, filed with the SEC on October 1, 2013). |
| 10.63 | Purchase Agreement, dated as of August 24, 2009, between The Procter & Gamble Company and Warner Chilcott plc (incorporated by reference to Exhibit 2.1 to Warner Chilcott plc's Current Report on Form 8-K, filed with the SEC on August 24, 2009). |
| 10.64 | Amended and Restated Collaboration Agreement, dated October 8, 2004, by and between The Procter & Gamble Company and Procter & Gamble Pharmaceuticals, Inc. and Aventis Pharmaceuticals Inc. (the "Sanofi Collaboration Agreement") (incorporated by reference to Exhibit 10.57 to Warner Chilcott plc's Annual Report on Form 10-K for the year ended December 31, 2009). |
| 10.65 | Amendment Agreement to the Sanofi Collaboration Agreement, dated December 19, 2007, by and between The Procter & Gamble Company and Procter & Gamble Pharmaceuticals, Inc. and Sanofi-Aventis U.S. LLC, as successor in interest to Aventis Pharmaceuticals, Inc. (the "Sanofi Amendment Agreement") (incorporated by reference to Exhibit 10.58 to Warner Chilcott plc's Annual Report on Form 10-K for the year ended December 31, 2009). |
| 10.66 | Amendment to the Sanofi Amendment Agreement, dated October 9, 2008, by and between The Procter & Gamble Company and Procter & Gamble Pharmaceuticals, Inc. and Sanofi-Aventis U.S. LLC (incorporated by reference to Exhibit 10.59 to Warner Chilcott plc's Annual Report on Form 10-K for the year ended December 31, 2009). |
| 10.67 | U.S. Amendment Agreement, effective as of April 1, 2010 (the "U.S. Amendment Agreement"), by and between Warner Chilcott Company, LLC and Sanofi-Aventis U.S. LLC, to the Amended and Restated Collaboration Agreement, dated October 8, 2004, by and between Warner Chilcott Company, LLC (as assignee of the Procter & Gamble Company and Procter & Gamble Pharmaceuticals, Inc.) and Sanofi-Aventis U.S. LLC (as successor in interest to Aventis Pharmaceuticals, Inc.) (incorporated by reference to Exhibit 10.1 to Warner Chilcott plc's Quarterly Report on Form 10-Q, filed with the SEC on May 7, 2010). |
| 10.68 | Amendment to the U.S. Amendment Agreement, effective as of October 28, 2013, by and between Warner Chilcott Company, LLC and Sanofi-Aventis U.S. LLC (incorporated by reference to Exhibit 10.25 to Allergan plc's Annual Report on Form 10-K, filed with the SEC for the year ended December 31, 2013). |
| 10.69# | Form of retention bonus letter (one payment) (incorporated by reference to Exhibit 10.26 to Allergan plc's Annual Report on Form 10-K, filed with the SEC for the year ended December 31, 2013). |
| 10.70# | Form of retention bonus letter (two payments) (incorporated by reference to Exhibit 10.27 to Allergan plc's Annual Report on Form 10-K, filed with the SEC for the year ended December 31, 2013). |
| 10.71 | Contingent Value Rights Agreement, dated as of July 2, 2014, by and between Forest Laboratories, LLC and American Stock Transfer & Trust Company, LLC. (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 10.72# | Amended and Restated 2013 Incentive Award Plan of Actavis plc (now known as Allergan plc) (Actavis Plan) (incorporated by reference to Exhibit 99.4 of Allergan plc's Registration Statement on Form S-8 filed with the SEC on July 1, 2014) (Actavis July 1, 2014 S-8). |
| 10.73 | Amended and Restated WC Term Loan Credit and Guaranty Facility, by and among, Actavis plc, Warner Chilcott Finance, LLC, Actavis WC 2 S.à. r.l., Warner Chilcott Company, LLC, Bank of America, N.A., as Administrative Agent, and the lenders party thereto, dated as of June 9, 2014 (incorporated by reference to Exhibit 10.2 of Allergan plc's Current Report on Form 8-K filed with the SEC on June 10, 2014). |
| 10.74*** | Amendment to Supply Agreement, effective as of May 14, 2014, by and between Janssen Pharmaceuticals, Inc. and Watson Laboratories, Inc. (incorporated by reference to Exhibit 10.1 of Allergan plc's Current Report on Form 8-K filed with the SEC on May 20, 2014). |
| 10.75 | Second Amended and Restated Actavis Term Loan Credit and Guarantee Agreement, by and among Actavis plc (now known as Allergan plc), Warner Chilcott Limited, Actavis Capital S.à r.l., Actavis, Inc., the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, dated as of March 31, 2014 (incorporated by |

| Exhibit No. | Description |
| --- | --- |
| | reference to Exhibit 10.2 of Allergan plc's Current Report on Form 8-K filed with the SEC on April 2, 2014). |
| 10.76 | Corporate Integrity Agreement dated September 15, 2010 between the Office of Inspector General of the U.S. Department of Health and Human Services and Forest Laboratories, Inc. (incorporated by reference to Exhibit 10.1 to Forest Laboratories Inc.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2010). |
| 10.77 | Settlement Agreement and Release, dated September 15, 2010, among Forest Laboratories, Inc., Forest Pharmaceuticals, Inc., the U.S. of America, acting through the U.S. Department of Justice on behalf of the Office of Inspector General of the Department of Health and Human Services, TRICARE Management Activity, the Veteran's Affairs Administration, the U.S. Office of Personnel Management, and certain individual relators named therein (incorporated by reference to Exhibit 10.3 to Forest Laboratories, Inc.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2010). |
| 10.78*** | License and Cooperation Agreement dated June 28, 2000 between Merz & Co. GmbH and Forest Laboratories Ireland Limited. (incorporated by reference to Exhibit 10.16 to Forest Laboratories Inc.'s Annual Report on Form 10-K (Commission File No. 1-5438) for the fiscal year ended March 31, 2004). |
| 10.79*** | License, Development and Cooperation Agreement dated September 22, 2004 between Merck KGaA and Genaissance Pharmaceuticals, Inc. (incorporated by reference to Exhibit 10.3 to Forest Laboratories Inc.'s Quarterly Report on Form 10-Q (Commission File No. 1-5438) for the quarter ended September 30, 2011). |
| 10.80*** | Collaboration Agreement dated September 12, 2007, as amended on November 3, 2009 between Forest Laboratories Inc. and Ironwood Pharmaceuticals, Inc. (incorporated by reference to Exhibit 10.50 to Forest Laboratories Inc.'s Annual Report on Form 10-K/A (Commission File No. 1-5438) for the fiscal year ended March 31, 2013). |
| 10.81*** | Sale and Transfer Agreement dated March 30, 2012 between Janssen Pharmaceutica NV and Forest Laboratories Holding Limited. (incorporated by reference to Exhibit 10.51 to Forest Laboratories Inc.'s Annual Report on Form 10-K (Commission File No. 1-5438) for the fiscal year ended March 31, 2012). |
| 10.82*** | MuDelta Development and License Agreement, dated as of November 16, 2009, by and between Janssen Pharmaceutica, N.V. and PPD Therapeutics, Inc., as amended February 9, 2010 (incorporated by reference to Exhibit 10.6 to Furiex Pharmaceuticals, Inc.'s Form 10—12B/A (Commission File No. 001-34641) filed with the SEC on May 14, 2010). |
| 10.83 | Tender and Support Agreement, dated as of October 5, 2014, by and among Actavis W.C. Holding Inc., Delaware Merger Sub, Inc. and the individuals listed therein (incorporated by reference to Exhibit 99.2 to Allergan plc's Current Report on Form 8-K filed on October 8, 2014). |
| 10.84 | Contingent Value Rights Agreement, dated as of November 17, 2014, by and between Actavis W.C. Holding Inc., Computershare Inc. and Computershare Trust Company, N.A. (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K filed on November 17, 2014). |
| 10.85 | Second Amendment Agreement, dated as of December 17, 2014, among Actavis plc (now known as Allergan plc), Warner Chilcott Limited, Warner Chilcott Corporation, Actavis WC 2 S.à r.l., Warner Chilcott Company, LLC, Warner Chilcott Finance, LLC, the lenders party thereto and Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K filed on December 22, 2014). |
| 10.86 | Third Amendment Agreement, dated as of December 17, 2014, among Actavis plc (now known as Allergan plc), Warner Chilcott Limited, Actavis Capital S.à r.l., Actavis, Inc., Actavis Funding SCS, the lenders party thereto and Bank of America, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K filed on December 22, 2014). |
| 10.87 | Actavis Revolving Credit and Guaranty Agreement, dated as of December 17, 2014, by and among Actavis plc (now known as Allergan plc), Warner Chilcott Limited, Actavis Capital S.à r.l., Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, J.P. Morgan Europe Limited, as London Agent and the other financial institutions party thereto (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K filed on December 22, 2014). |
| 10.88 | Actavis Bridge Loan Credit and Guaranty Agreement, dated as of December 17, 2014, by and among Actavis plc (now known as Allergan plc), Warner Chilcott Limited, Actavis Capital S.à r.l., Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and the other financial institutions party thereto (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K filed on December 22, 2014). |

| Exhibit No. | Description |
|---|---|
| 10.89 | Actavis Term Loan Credit and Guaranty Agreement, dated as of December 17, 2014, by and among Actavis plc (now known as Allergan plc), Warner Chilcott Limited, Actavis Capital S.à r.l., Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and the other financial institutions party thereto (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K filed on December 22, 2014). |
| 10.90 | Actavis Cash Bridge Loan Credit and Guaranty Agreement, dated as of March 11, 2015, by and among Actavis plc (now known as Allergan plc), Warner Chilcott Limited, Actavis Capital S.à r.l., Actavis, Inc., Actavis Funding SCS, the lenders from time to time party thereto, JPMorgan Chase Bank, National Association, as Administrative Agent and the other financial institutions party thereto (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 13, 2015). |
| 10.91# | Employee Severance Pay Plan for Employees of Actavis Inc. and Certain of Its U.S. Subsidiaries (incorporated by reference to Exhibit 10.1 of Allergan plc's Quarterly Report on Form 10-Q for the period ending March 31, 2014). |
| 10.92# | Change of Control Severance Pay Plan for Certain Management Employees of Actavis, Inc. and Its U.S. Subsidiaries (incorporated by reference to Exhibit 10.1 of Allergan plc's Quarterly Report on Form 10-Q for the period ending March 31, 2014). |
| 10.93# | 2000 Stock Option Plan of Forest Laboratories, Inc. (incorporated by reference to Exhibit A of Forest Laboratories, Inc.'s Proxy Statement for the fiscal year ended March 31, 2000 filed with the SEC on June 29, 2000). |
| 10.94# | 2004 Stock Option Plan of Forest Laboratories, Inc. (incorporated by reference to Appendix C of Forest Laboratories, Inc.'s Proxy Statement for the fiscal year ended March 31, 2004 filed with the SEC on June 28, 2004). |
| 10.95# | 2007 Equity Incentive Plan of Forest Laboratories, Inc., as amended (incorporated by reference to Exhibit 10.1 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on August 21, 2013). |
| 10.96# | Amendment to 2007 Equity Incentive Plan of Forest Laboratories, Inc., as amended (Amended Forest Plan) (incorporated by reference to Exhibit 99.7 of the Actavis July 1, 2014 S-8). |
| 10.97# | Form of Notice of Grant and Signature Page and Form of Option Award Agreement (Actavis Plan) (incorporated by reference to Exhibit 99.5 of the Actavis July 1, 2014 S-8). |
| 10.98# | Form of Notice of Grant and Signature Page and Form of Restricted Stock Unit Award Agreement (Actavis Plan) (incorporated by reference to Exhibit 99.6 of the Actavis July 1, 2014 S-8). |
| 10.99# | Form of Notice of Grant and Signature Page and Form of Other Cash-Based Award Agreement (Actavis Plan) (incorporated by reference to Exhibit 10.44 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on August 5, 2014). |
| 10.100# | Form Employee Stock Unit Agreement (Performance-Based Conditions) (Forest Plan) (incorporated by reference to Exhibit 99.8 of the Actavis July 1, 2014 S-8). |
| 10.101 | Amended and Restated Stockholder Voting Agreement, dated as of August 4, 2015, by and between Allergan plc and the individuals listed therein (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on August 5, 2015) |
| 10.102 | Form of Stockholders Agreement, by and between Teva Pharmaceutical Industries Ltd. and Allergan plc (incorporated by reference to Exhibit 2.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on July 28, 2015) |
| 10.103# | Amended and Restated Employment Agreement, dated August 3, 2015, between Allergan plc and Brenton L. Saunders (incorporated by reference to Exhibit 10.3 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on August 6, 2015). |
| 10.104# | Amended and Restated Employment Agreement, dated August 3, 2015, between Allergan plc and Paul M. Bisaro (incorporated by reference to Exhibit 10.3 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on August 6, 2015). |
| 10.105# | Amended and Restated Change of Control Employment Agreement, dated October 29, 2008, between Forest Laboratories, Inc. and William Meury (incorporated by reference to Exhibit 10.19 to Forest Laboratories, Inc.'s Annual Report on Form 10-K, filed with the SEC on May 30, 2014). |
| 21.1* | Subsidiaries of the Company. |
| 23.1* | Allergan plc Consent of PricewaterhouseCoopers LLP. |
| 23.2* | Warner Chilcott Limited Consent of PricewaterhouseCoopers LLP. |
| 24.1* | Power of Attorney |

| Exhibit No. | Description |
|---|---|
| 31.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14a of the Securities Exchange Act of 1934. |
| 31.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14a of the Securities Exchange Act of 1934. |
| 32.1** | Certification of Chief Executive Officer pursuant to 18 U.S.C. of Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Chief Financial Officer pursuant to 18 U.S.C. of Section 1350, as adopted pursuant to by Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Label Definition Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |

\#    Indicates a management contract or compensatory plan or arrangement.

\*    Filed herewith.

\*\*   Furnished herewith and not "filed" for purposes of Section 18 of the Exchange Act.

\*\*\*  Confidential portions of this exhibit have been omitted and filed separately with the SEC pursuant to a confidential treatment request in accordance with Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

†    Pursuant to Item 601(b)(2) of Regulation S-K, certain schedules and similar attachments have been omitted. The registrant hereby agrees to furnish a copy of any omitted schedule or similar attachment to the SEC upon request.