Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Segment net revenues, segment operating expenses and segment contribution information for the Company's Actavis Pharma, Actavis Specialty Brands and Anda Distribution segments consisted of the following for the year ended December 31, 2012 (in millions):

| | Actavis Pharma | Actavis Specialty Brands | Anda Distribution | Total |
|---|---|---|---|---|
| Product sales | $4,385.2 | $ 411.6 | $ 986.4 | $5,783.2 |
| Other revenue | 60.9 | 70.8 | — | 131.7 |
| Net revenues | 4,446.1 | 482.4 | 986.4 | 5,914.9 |
| Operating expenses: | | | | |
| Cost of sales[1] | 2,430.9 | 116.8 | 846.6 | 3,394.3 |
| Research and development | 256.3 | 146.2 | — | 402.5 |
| Selling and marketing | 281.2 | 175.5 | 89.8 | 546.5 |
| Contribution | $1,477.7 | $ 43.9 | $ 50.0 | $1,571.6 |
| Contribution margin | 33.2% | 9.1% | 5.1% | 26.6% |
| General and administrative | | | | 625.3 |
| Amortization | | | | 481.1 |
| Goodwill impairments | | | | — |
| Loss on asset sales, other impairments and commitment contingencies, net | | | | 149.5 |
| Operating income | | | | $ 315.7 |
| Operating margin | | | | 5.3% |

(1) Excludes amortization and impairment of acquired intangibles including product rights.

F-66

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Segment net revenues, segment operating expenses and segment contribution information for the Company's Actavis Pharma, Actavis Specialty Brands and Anda Distribution segments consisted of the following for the year ended December 31, 2011 (in millions):

|  | Actavis Pharma | Actavis Specialty Brands | Anda Distribution | Total |
|---|---|---|---|---|
| Product sales | $3,320.2 | $ 364.9 | $   776.2 | $4,461.3 |
| Other revenue | 47.0 | 76.1 | — | 123.1 |
| Net revenues | 3,367.2 | 441.0 | 776.2 | 4,584.4 |
| Operating expenses: |  |  |  |  |
| Cost of sales[1] | 1,818.8 | 95.0 | 652.7 | 2,566.5 |
| Research and development | 241.8 | 64.8 | — | 306.6 |
| Selling and marketing | 156.0 | 168.6 | 77.2 | 401.8 |
| Contribution | $1,150.6 | $ 112.6 | $    46.3 | $1,309.5 |
| Contribution margin | 34.2% | 25.5% | 6.0% | 28.6% |
| General and administrative |  |  |  | 353.1 |
| Amortization |  |  |  | 354.3 |
| Loss on asset sales and impairments, net |  |  |  | 78.7 |
| Operating income |  |  |  | $   523.4 |
| Operating margin |  |  |  | 11.4% |

(1)  Excludes amortization and impairment of acquired intangibles including product rights.

The Company's net product sales are represented by the sale of products in the following geographic areas for the years ended December 31, 2013, 2012 and 2011 (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
| Americas | $6,051.4 | $4,867.3 | $4,089.9 |
| Europe | 2,003.8 | 677.7 | 288.8 |
| MEAAP | 436.6 | 238.2 | 82.6 |
|  | $8,491.8 | $5,783.2 | $4,461.3 |

F-67

Table of Contents

### ACTAVIS PLC
### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company's net product sales are represented by the sale of products in the following therapeutic categories for the years ended December 31, 2013, 2012 and 2011 (in millions):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 |
| Central nervous system | $2,465.6 | $1,964.0 | $1,517.4 |
| Cardiovascular | 1,692.6 | 1,298.5 | 977.2 |
| Hormones and synthetic substitutes | 1,181.0 | 868.5 | 724.7 |
| Anti-infective agents | 469.1 | 267.9 | 197.9 |
| Dermatologicals | 375.0 | 78.7 | 55.3 |
| Gastrointestinal | 303.5 | 160.0 | 95.5 |
| Alimentary tract and metabolism | 246.1 | 47.5 | — |
| Urology | 161.7 | 174.0 | 140.5 |
| Musculo-skeletal system | 153.5 | — | — |
| Women's healthcare | 120.0 | — | — |
| Other | 1,323.7 | 924.1 | 752.8 |
| | $8,491.8 | $5,783.2 | $4,461.3 |

## NOTE 18 — Business Restructuring Charges

During the year ended December 31, 2013 activity related to our business restructuring and facility rationalization activities primarily related to the cost optimization initiatives in conjunction with the Warner Chilcott and Actavis Acquisitions as well as optimization of our operating cost structure through our global supply chain initiative ("GSCI"). Restructuring activities for the year ended December 31, 2013 as follows (in millions):

| | Accrual Balance at December 31, 2012 | Assumed Liability Warner Chilcott | Charged to Expense | Cash Payments | Non-cash Adjustments | Accrual Balance at December 31, 2013 |
| --- | --- | --- | --- | --- | --- | --- |
| Cost of sales | | | | | | |
| Severance and retention | $ 14.9 | $ — | $ 14.5 | $ (5.4) | $ 0.9 | $ 24.9 |
| Product transfer costs | 0.5 | — | 15.5 | (13.1) | (2.5) | 0.4 |
| Facility decommission costs | 7.3 | — | 7.2 | (9.2) | — | 5.3 |
| Accelerated depreciation | — | — | 28.1 | — | (28.1) | — |
| | 22.7 | — | 65.3 | (27.7) | (29.7) | 30.6 |
| Operating expenses | | | | | | |
| R&D | 3.4 | — | 12.8 | (5.2) | (9.6) | 1.4 |
| Accelerated depreciation — R & D | — | — | 3.6 | — | (3.6) | — |
| Selling, general and administrative | 39.0 | 18.1 | 90.2 | (59.7) | (2.9) | 84.7 |
| Share-based compensation restructuring related to Warner Chilcott Acquisition | — | — | 45.4 | — | (45.4) | — |
| Accelerated depreciation — SG&A | — | — | 4.3 | — | (4.3) | — |
| | $ 42.4 | $ 18.1 | $ 156.3 | $ (64.9) | $ (65.8) | $ 86.1 |
| Total | $ 65.1 | $ 18.1 | $ 221.6 | $ (92.6) | $ (95.5) | $ 116.7 |

F-68

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

During 2012 activity related to our business restructuring and facility rationalization activities primarily related to the cost optimization initiatives in conjunction with the Actavis Group Acquisition and our GSCI. Restructuring activities involved facilities and operations in Corona, California; Morristown, New Jersey; and Zug, Switzerland. For the year ended December 31, 2012, restructuring activities were as follows (in millions):

|  | Accrual Balance at December 31, 2011 | | Assumed Liability Actavis Group | | Charged to Expense | | Cash Payments | | Non-cash Adjustments | | Accrual Balance at December 31, 2012 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cost of sales |  |  |  |  |  |  |  |  |  |  |  |  |
| Severance and retention | $ | 7.9 | $ | 1.0 | $ | 7.9 | $ | (0.6) | $ | (1.3) | $ | 14.9 |
| Product transfer costs |  | 0.3 |  | — |  | 4.7 |  | (4.5) |  | — |  | 0.5 |
| Facility decommission costs |  | 1.2 |  | 6.2 |  | 0.8 |  | (0.7) |  | (0.2) |  | 7.3 |
| Accelerated depreciation |  | — |  | — |  | 0.3 |  | — |  | (0.3) |  | — |
|  |  | 9.4 |  | 7.2 |  | 13.7 |  | (5.8) |  | (1.8) |  | 22.7 |
| Operating expenses |  |  |  |  |  |  |  |  |  |  |  |  |
| Research and development |  | 3.8 |  | 1.4 |  | 1.1 |  | (2.9) |  | — |  | 3.4 |
| Accelerated — R & D |  | — |  | — |  | 0.2 |  | — |  | (0.2) |  | — |
| Selling, general and administrative |  | 0.9 |  | 12.0 |  | 32.3 |  | (6.5) |  | 0.3 |  | 39.0 |
|  | $ | 4.7 | $ | 13.4 | $ | 33.6 | $ | (9.4) | $ | 0.1 | $ | 42.4 |
| Total | $ | 14.1 | $ | 20.6 | $ | 47.3 | $ | (15.2) | $ | (1.7) | $ | 65.1 |

During the year ended December 31, 2013, 2012 and 2011, the Company recognized restructuring charges of $221.6 million, $47.3 million and $16.1 million, respectively.

### NOTE 19 — Derivative Instruments and Hedging Activities

The Company's revenue, earnings, cash flows and fair value of its assets and liabilities can be impacted by fluctuations in foreign exchange risks and interest rates, as applicable. The Company manages the impact of foreign exchange risk and interest rate movements through operational means and through the use of various financial instruments, including derivative instruments such as foreign currency contracts.

#### Foreign Currency Forward Contracts

As a result of the Actavis Group Acquisition, the Company's exposure to foreign exchange fluctuations has increased. The Company has entered into foreign currency forward contracts to mitigate volatility in anticipated foreign currency cash flows resulting from changes in foreign currency exchange rates, primarily associated with non-functional currency denominated revenues and expenses of foreign subsidiaries. The foreign currency forward contracts outstanding at December 31, 2013 have settlement dates within one month. The effect of the derivative contracts was a gain of $0.3 million and a loss of $70.4 million for the years ended December 31, 2013 and 2012, respectively, and was recognized in other income (expense). The forward contracts are classified in the consolidated balance sheet in prepaid expenses and other assets or accounts payable and accrued expenses, as applicable. In 2012, the Company entered into foreign currency exchange options and forward contracts to hedge its agreed upon purchase of Actavis of €4.25 billion. The foreign currency options had a net premium payable of $156.8 million, which was settled and paid on October 9, 2012. These transactions were entered into to mitigate

F-69

Table of Contents

### ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

exposure resulting from movements of the U.S. dollar against the Euro in connection with the Actavis Acquisition, and resulted in a (loss) being reflected in other income and expense of $70.4 million during the year ended December 31, 2012.

The foreign currency forward contracts to buy Euros and US dollars and sell New Zealand dollars at December 31, 2013 were as follows:

|  | Notional Amount | |
|---|---|---|
| Foreign Currency | Buy | Sell |
| New Zealand Dollar | € — | € 0.3 |
|  | € — | € 0.3 |

|  | Notional Amount | |
|---|---|---|
| Foreign Currency | Buy | Sell |
| New Zealand Dollar | $ — | $ 1.1 |
|  | $ — | $ 1.1 |

### NOTE 20 — Fair Value Measurement

Fair value is the price that would be received to sell an asset or paid to transfer a liability (an exit price) in an orderly transaction between market participants. Fair values determined based on Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities. Fair values determined based on Level 2 inputs utilize observable quoted prices for similar assets and liabilities in active markets and observable quoted prices for identical or similar assets in markets that are not very active. Fair values determined based on Level 3 inputs utilize unobservable inputs and include valuations of assets or liabilities for which there is little, if any, market activity. A financial asset or liability's classification within the above hierarchy is determined based on the lowest level input that is significant to the fair value measurement.

Assets and liabilities measured at fair value or disclosed at fair value on a recurring basis as of December 31, 2013 and 2012 consisted of the following (in millions):

|  | Fair Value Measurements as at December 31, 2013 Using: | | | |
|---|---|---|---|---|
|  | Total | Level 1 | Level 2 | Level 3 |
| **Assets:** |  |  |  |  |
| Marketable securities | $ 2.5 | $ 2.5 | $ — | $ — |
| Foreign exchange forward contracts | 0.3 | — | 0.3 | — |
| Total assets | 2.8 | 2.5 | 0.3 | — |
| **Liabilities:** |  |  |  |  |
| Contingent consideration | 214.7 | 6.9 | — | 207.8 |
| Total liabilities | $214.7 | $ 6.9 | $ — | $207.8 |

F-70

Table of Contents

## ACTAVIS PLC

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | Fair Value Measurements as at December 31, 2012 Using: | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets** | | | | |
| Marketable securities | $   9.0 | $   9.0 | $   — | $   — |
| Total assets | 9.0 | 9.0 | — | — |
| **Liabilities:** | | | | |
| Contingent consideration | 363.1 | — | — | 363.1 |
| Total liabilities | $363.1 | $   — | $   — | $363.1 |

Marketable securities and investments consist of available-for-sale investments in U.S. treasury and agency securities and publicly traded equity securities for which market prices are readily available. Unrealized gains or losses on marketable securities and investments are recorded in accumulated other comprehensive (loss) income.

The fair value measurement of the contingent consideration obligations is determined using Level 3 inputs. The fair value of contingent consideration obligations is based on a probability-weighted income approach. The measurement is based upon unobservable inputs supported by little or no market activity based on our own assumptions. Changes in the fair value of the contingent consideration obligations are recorded in our consolidated statement of operations. For the year ended December 31, 2013, charges of $7.2 million, $1.4 million, and $1.1 million have been included in cost of sales, general and administrative, and R&D, respectively. For the year ended December 31, 2012, charges (credits) of $4.9 million, $0.7 million, $0.6 million and ($27.5) million have been included in cost of sales, R&D, general and administrative and loss on asset sales and impairments, respectively, in the accompanying consolidated statement of operations.

The table below provides a summary of the changes in fair value, including net transfers in and/or out, of all financial assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2013 and 2012 (in millions):

| | Balance at December 31, 2012 | Net transfers in to (out of) Level 3 | Purchases and settlements, net | Net accretion and fair value adjustments | Foreign currency translation | Balance at December 31, 2013 |
|---|---|---|---|---|---|---|
| **Liabilities:** | | | | | | |
| Contingent consideration obligations | $   363.1 | $   (342.7) | $   176.9 | $   9.7 | $   0.8 | $   207.8 |

| | Balance at December 31, 2011 | Net transfers in to (out of) Level 3 | Purchases and settlements, net | Net accretion and fair value adjustments | Foreign currency translation | Balance at December 31, 2012 |
|---|---|---|---|---|---|---|
| **Liabilities:** | | | | | | |
| Contingent consideration obligations | $   181.6 | $   — | $   197.3 | $   (21.3) | $   5.5 | $   363.1 |

During the year ended December 31, 2013, the Company transferred to level 1 the contingent obligation for the Actavis Group earn-out ($335.8 million) and the Specifar Acquisition ($6.9 million). The Company recorded additional contingent consideration of $43.4 million and $146.1 million in connection with the Uteron Acquisition and the license agreement entered into with Medicines360, respectively, offset in part by contingent payments made to the Arrow Group selling shareholders based on the after-tax gross profits sales of atorvastatin. During the year ended December 31, 2012, the Company recorded contingent payments made to the Arrow Group selling shareholders based on the after-tax gross profits on sales of atorvastatin within the U.S. of $127.0 million. The Company recorded additional contingent consideration of $329.1 million in connection with Actavis Acquisition.

F-71

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**NOTE 21 — Commitments and Contingencies**

*Legal Matters*

The Company and its affiliates are involved in various disputes, governmental and/or regulatory inspections, inquires, investigations and proceedings, and litigation matters that arise from time to time in the ordinary course of business. The process of resolving matters through litigation or other means is inherently uncertain and it is possible that an unfavorable resolution of these matters will adversely affect the Company, its results of operations, financial condition and cash flows. The Company's general practice is to expense legal fees as services are rendered in connection with legal matters, and to accrue for liabilities when losses are probable and reasonably estimable.

The Company evaluates, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that is accrued. As of December 31, 2013, the Company's consolidated balance sheet includes accrued loss contingencies of approximately $260.0 million.

The Company's legal proceedings range from cases brought by a single plaintiff to mass tort actions and class actions with thousands of putative class members. These legal proceedings, as well as other matters, involve various aspects of the Company's business and a variety of claims (including, but not limited to, *qui tam* actions, antitrust, product liability, breach of contract, securities, patent infringement and trade practices), some of which present novel factual allegations and/or unique legal theories. In addition, a number of the matters pending against the Company are at very early stages of the legal process (which in complex proceedings of the sort faced by us often extend for several years). As a result, some matters have not yet progressed sufficiently through discovery and/or development of important factual information and legal issues to enable the Company to estimate a range of possible loss. In those proceedings in which plaintiffs do request publicly quantified amounts of relief, the Company does not believe that the quantified amounts are meaningful because they are merely stated jurisdictional limits, exaggerated and/or unsupported by the evidence or applicable burdens of proof.

*Antitrust Litigation*

*Actos® Litigation.* On December 31, 2013 two putative class actions were filed in the federal district court (*United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v. Takeda Pharmaceutical Co. Ltc. Et al.,* S.D.N.Y. Civ. No. 13-9244 and *Crosby Tugs LLC v. Takeda Pharmaceuticals Co. Ltd., et al.,* S.D.N.Y. Civ. No. 13-9250) against Actavis plc and certain of its affiliates alleging that Watson's 2010 patent lawsuit settlement with Takeda Pharmaceutical, Co. Ltd. related to Actos® (pioglitazone hydrochloride and metformin "Actos®") is unlawful. One additional complaint has been filed (*Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Takeda Pharmaceutical Co. Ltd., et al.,* S.D.N.Y. Civ. No. 14-0116). The complaints, each asserted on behalf of putative classes of direct purchaser plaintiffs, generally allege an overall scheme that included Watson improperly delaying the launch of its generic version of Actos® in exchange for substantial payments from Takeda in violation of federal and state antitrust and consumer protection laws. The complaint seeks declaratory and injunctive relief and unspecified damages.

The Company believes that it has substantial meritorious defenses to the claims alleged. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Androgel® Litigation.* On January 29, 2009, the U.S. Federal Trade Commission and the State of California filed a lawsuit in the United States District Court for the Central District of California *(Federal Trade Commission, et. al. v. Watson Pharmaceuticals, Inc., et. al., USDC Case No. CV 09-00598)* alleging that the September 2006 patent lawsuit settlement between Watson Pharmaceuticals, Inc. ("Watson" now known as Actavis, Inc.) and Solvay Pharmaceuticals, Inc. ("Solvay"), related to AndroGel® 1% (testosterone gel) CIII is unlawful. The complaint generally alleged that Watson improperly delayed its launch of a generic version of

F-72

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Androgel ® in exchange for Solvay's agreement to permit Watson to co-promote Androgel® for consideration in excess of the fair value of the services provided by Watson, in violation of federal and state antitrust and consumer protection laws. The complaint sought equitable relief and civil penalties. On February 2 and 3, 2009, three separate lawsuits alleging similar claims were filed in the United States District Court for the Central District of California by various private plaintiffs purporting to represent certain classes of similarly situated claimants *(Meijer, Inc., et. al., v. Unimed Pharmaceuticals, Inc., et. al.,* USDC Case No. EDCV 09-0215); *(Rochester Drug Co-Operative, Inc. v. Unimed Pharmaceuticals Inc., et. al.,* Case No. EDCV 09-0226); *(Louisiana Wholesale Drug Co. Inc. v. Unimed Pharmaceuticals Inc., et. al,* Case No. EDCV 09-0228). On April 8, 2009, the Court transferred the government and private cases to the United States District Court for the Northern District of Georgia. On April 21, 2009 the State of California voluntarily dismissed its lawsuit against Watson without prejudice. The Federal Trade Commission and the private plaintiffs in the Northern District of Georgia filed amended complaints on May 28, 2009. The private plaintiffs amended their complaints to include allegations concerning conduct before the U.S. Patent and Trademark Office, conduct in connection with the listing of Solvay's patent in the FDA "Orange Book," and sham litigation. Additional actions alleging similar claims have been filed in various courts by other private plaintiffs purporting to represent certain classes of similarly situated direct or indirect purchasers of Androgel ® *(Stephen L. LaFrance Pharm., Inc. d/b/a SAJ Dist. v. Unimed Pharms., Inc., et al.,* D. NJ Civ. No. 09-1507); *(Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Unimed Pharms. Inc., et al.,* D. NJ Civ. No. 09-1856); *(Scurto v. Unimed Pharms., Inc., et al.,* D. NJ Civ. No. 09-1900); *(United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Unimed Pharms., Inc., et al.,* D. MN Civ. No. 09-1168); *(Rite Aid Corp. et al. v. Unimed Pharms., Inc. et al.,* M.D. PA Civ. No. 09-1153); *(Walgreen Co., et al. v. Unimed Pharms., LLC, et al.,* M.D. PA Civ. No. 09-1240); *(Supervalu, Inc. v. Unimed Pharms., LLC, et al,* ND. GA Civ. No. 10-1024); *(LeGrand v. Unimed Pharms., Inc., et al.,* ND. GA Civ. No. 10-2883); *(Jabo's Pharmacy Inc. v. Solvay Pharmaceuticals, Inc., et al.,* Cocke County, TN Circuit Court Case No. 31,837). On April 20, 2009, Watson was dismissed without prejudice from the *Stephen L. LaFrance* action pending in the District of New Jersey. On October 5, 2009, the Judicial Panel on Multidistrict Litigation transferred all actions then pending outside of the United States District Court for the Northern District of Georgia to that district for consolidated pre-trial proceedings *(In re: AndroGel® Antitrust Litigation (No. II),* MDL Docket No. 2084), and all currently-pending related actions are presently before that court. On February 22, 2010, the judge presiding over all the consolidated litigations related to Androgel® then pending in the United States District Court for the Northern District of Georgia granted Watson's motions to dismiss the complaints, except the portion of the private plaintiffs' complaints that include allegations concerning sham litigation. Final judgment in favor of the defendants was entered in the Federal Trade Commission's action on April 21, 2010. On April 25, 2012, the Court of Appeals affirmed the dismissal. On June 17, 2013, the Supreme Court issued a decision, holding that the settlements between brand and generic drug companies which include a payment from the brand company to the generic competitor must be evaluated under a "rule of reason" standard of review and ordered the case remanded (the "Supreme Court Androgel Decision"). On July 20, 2010, the plaintiff in the *Fraternal Order of Police* action filed an amended complaint adding allegations concerning conduct before the U.S. Patent and Trademark Office, conduct in connection with the listing of Solvay's patent in the FDA's "Orange Book," and sham litigation similar to the claims raised in the direct purchaser actions. On October 28, 2010, the judge presiding over MDL 2084 entered an order pursuant to which the *LeGrand* action, filed on September 10, 2010, was consolidated for pretrial purposes with the other indirect purchaser class action as part of MDL 2084 and made subject to the Court's February 22, 2010 order on the motion to dismiss. In February 2012, the direct and indirect purchaser plaintiffs and the defendants filed cross-motions for summary judgment, and on June 22, 2012, the indirect purchaser plaintiffs, including Fraternal Order of Police, LeGrand and HealthNet, filed a motion for leave to amend and consolidate their complaints. On September 28, 2012, the district court granted summary judgment in favor of the defendants on all outstanding claims. The plaintiffs then appealed. On September 12 and 13, 2013, respectively, the indirect purchaser plaintiffs and direct purchaser plaintiffs filed motions with the district court, asking the court for an indicative ruling that it would vacate its final order on the parties' summary judgment motions and conduct further

F-73

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

proceedings in light of the Supreme Court Androgel Decision, should the Court of Appeals remand the case to the district court. On October 23, 2013, the district court granted the motions. The court of appeals recently decided to remand the case back to the district court, which has already indicated it will grant plaintiffs relief under Rule 60(b) of the Federal Rules of Civil Procedure, vacating the ruling from which plaintiffs appealed.

The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Cipro® Litigation.* Beginning in July 2000, a number of suits were filed against Watson and certain Company affiliates including The Rugby Group, Inc. ("Rugby") in various state and federal courts alleging claims under various federal and state competition and consumer protection laws. Several plaintiffs have filed amended complaints and motions seeking class certification. Approximately 42 cases were filed against Watson, Rugby and other Company entities. Many of these actions have been dismissed. Actions remain pending in various state courts, including California, Kansas, Tennessee, and Florida. The actions generally allege that the defendants engaged in unlawful, anticompetitive conduct in connection with alleged agreements, entered into prior to Watson's acquisition of Rugby from Sanofi Aventis ("Sanofi"), related to the development, manufacture and sale of the drug substance ciprofloxacin hydrochloride, the generic version of Bayer's brand drug, Cipro®. The actions generally seek declaratory judgment, damages, injunctive relief, restitution and other relief on behalf of certain purported classes of individuals and other entities. The action pending in Kansas, which the court previously terminated administratively, has been reopened. Plaintiffs' motion for class certification in the Kansas case is due on February 21, 2014. There has been no action in the cases pending in Florida and Tennessee since 2003. In the action pending in the California Superior Court for the County of San Diego (*In re: Cipro Cases I & II, JCCP Proceeding Nos. 4154 & 4220* ), on July 21, 2004, the California Court of Appeal ruled that the majority of the plaintiffs would be permitted to pursue their claims as a class. On August 31, 2009, the California Superior Court granted defendants' motion for summary judgment, and final judgment was entered on September 24, 2009. On October 31, 2011, the California Court of Appeal affirmed the Superior Court's judgment. On December 13, 2011, the plaintiffs filed a petition for review in the California Supreme Court. On February 15, 2012, the California Supreme Court granted review. On September 12, 2012, the California Supreme Court entered a stay of all proceedings in the case pending a decision from the United States Supreme Court in the *Federal Trade Commission v. Actavis* matter involving Androgel, described above. The California Supreme Court lifted the stay on June 26, 2013 following the ruling by the United States Supreme Court. Plaintiffs and Bayer recently announced that they have reached an agreement to settle the claims pending against Bayer. Plaintiffs are continuing to pursue claims against the generic defendants, including Watson and Rugby. The remaining parties submitted letter briefs to the court regarding the impact of the Supreme Court Androgel Decision. Response briefs are due on February 14, 2014.

In addition to the pending actions, the Company understands that various state and federal agencies are investigating the allegations made in these actions. Sanofi has agreed to defend and indemnify Watson and its affiliates in connection with the claims and investigations arising from the conduct and activities allegedly undertaken by Rugby and its affiliates prior to Watson's acquisition of Rugby, and is currently controlling the defense of these actions.

*Doryx Litigation.* In July 2012, Mylan Pharmaceuticals Inc. ("Mylan") filed a complaint against Warner Chilcott and Mayne Pharma International Pty. Ltd. ("Mayne") in the U.S. District Court for the Eastern District of Pennsylvania alleging that Warner Chilcott and Mayne prevented or delayed Mylan's generic competition to Warner Chilcott's Doryx® products in violation of U.S. federal antitrust laws and tortiously interfered with Mylan's prospective economic relationships under Pennsylvania state law. (*Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Limited Co., et al.*, E.D.Pa. No. 12-cv-03824). In the complaint, Mylan seeks unspecified treble and punitive damages and attorneys' fees.

F-74

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Following the filing of Mylan's complaint, three putative class actions were filed against Warner Chilcott and Mayne by purported direct purchasers, and one putative class action was filed against Warner Chilcott and Mayne by purported indirect purchasers, each in the same court. On December 5, 2013 an additional complaint was filed by the International Union of Operating Engineers Local 132 Health and Welfare Fund on behalf of another group of purported indirect purchasers. Warner has moved to dismiss this new complaint. In each case the plaintiffs allege that they paid higher prices for Warner Chilcott's Doryx® products as a result of Warner Chilcott's and Mayne's alleged actions preventing or delaying generic competition in violation of U.S. federal antitrust laws and/or state laws. Plaintiffs seek unspecified injunctive relief, treble damages and/or attorneys' fees. The court consolidated the purported class actions and the action filed by Mylan and ordered that all the pending cases proceed on the same schedule.

On February 5, 2013, four retailers, including HEB Grocery, Safeway, Inc., Supervalu, Inc. and Walgreen Co., filed in the same court a civil antitrust complaint in their individual capacities against Warner Chilcott and Mayne regarding Doryx®. (*Walgreen Co., Safeway, Inc., Supervalu, Inc. and HEB Grocery Co, LP. v. Warner Chilcott Public Limited Co., et al.*, E.D.Pa. No. 13-cv-00658). On March 28, 2013, another retailer, Rite Aid, filed a similar complaint in the same court. (*Rite Aid Corp. v. Warner Chilcott Public Limited Co., et al.*, E.D.Pa. No. 13-cv-01644). Both retailer complaints recite similar facts and assert similar legal claims for relief to those asserted in the related cases described above. Both retailer complaints have been consolidated with the cases described above.

Warner Chilcott and Mayne moved to dismiss the claims of Mylan, the direct purchasers, the indirect purchasers and the retailers. On November 21, 2012, the Federal Trade Commission filed with the court an amicus curiae brief supporting the plaintiffs' theory of relief. On June 12, 2013, the court entered a denial, without prejudice, of Warner Chilcott and Mayne's motions to dismiss. Discovery is ongoing in the consolidated cases. On November 13, 2013, Warner Chilcott and Mayne reached an agreement in principle to settle the claims of the Direct Purchaser Plaintiff class representatives for $15 million. On February 18, 2014 the court preliminarily approved the settlement and set a hearing for final approval on June 9, 2014. Indirect Purchasers Plaintiffs' motion for class certification remains pending before the court, with no class having yet been certified.

The Company intends to vigorously defend its rights in the litigations. However, it is impossible to predict with certainty the outcome of any litigation, and the Company can offer no assurance as to when the lawsuits will be decided, whether the Company will be successful in its defense and whether any additional similar suits will be filed. The plaintiffs collectively seek approximately $1.2 billion in compensatory damages, which includes approximately $650 million in purported damages of the Direct Purchaser Plaintiffs with whom the company has a settlement in principle. The Company believes these amounts are unfounded and without merit. However, any award of compensatory damages could be subject to trebling. If these claims are successful such claims could adversely affect the Company and could have a material adverse effect on the Company's business, financial condition, results of operation and cash flows.

*Lidoderm® Litigation.* On November 8, 2013, a putative class action was filed in the federal district court (*Droguería Betances, Inc. v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 13-06542) against Actavis, Inc. and certain of its affiliates alleging that Watson's 2012 patent lawsuit settlement with Endo Pharmaceuticals, Inc. related to Lidoderm® (lidocaine transdermal patches, "Lidoderm®") is unlawful. The complaint, asserted on behalf of putative classes of direct purchaser plaintiffs, generally alleges that Watson improperly delayed launching generic versions of Lidoderm® in exchange for substantial payments from Endo Pharmaceuticals in violation of federal and state antitrust and consumer protection laws. The complaint seeks declaratory and injunctive relief and damages. Additional lawsuits contain similar allegations have followed on behalf of putative classes of direct purchasers (*Rochester Drug Cooperative, Inc. v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 13-7217; *American Sales Co. LLC, v. Endo Pharmaceuticals, Inc., et al.*, M.D.Tenn. Civ. No. 14-0022) and suits filed on behalf of a putative class of end-payor plaintiffs (*United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v.Teikoku Pharma USA, Inc., et al.*, N.D.Cal. Civ.

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

No. 13-5257; *Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Teikoku Pharma USA, Inc., et al.*, N.D.Cal. Civ. No. 13-5280; *City of Providence v. Teikoku Pharma USA, Inc., et al.*, D.R.I. Civ. No. 13-771; *Greater Metropolitan Hotel Employers — Employees Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al.*, D.Minn. Civ. No. 13-3399; *Pirelli Armstrong Retiree Medical Benefits Trust v. Teikoku Pharma USA, Inc., et al.*, M.D.Tenn. Civ. No. 13-1378; *Plumbers and Pipefitters Local 178 Health and Welfare Trust Fund v. Teikoku Pharma USA, Inc., et al.*, N.D.Cal. Civ. No. 13-5938; *Philadelphia Federation of Teachers Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 14-0057; *International Association of Fire Fighters Local 22 Health & Welfare Fund v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 14-0092; *Painters District Council No. 30 Health and Welfare Fund v. Teikoku Pharma USA, Inc., et al.*, C.D.Cal. Civ. No. 14-0289; *Local 17 Hospitality Benefit Fund v. Endo Pharmaceuticals, Inc., et al.*, N.D.Cal. Civ. No. 14-0503; *Teamsters Local Union 115 Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 14-0772). On December 23, 2013, plaintiffs in the United Food and Commercial Workers action filed a motion with the JPML to have all the Lidoderm® antitrust cases consolidated in the Northern District of California. Plaintiffs in several of the other actions filed objections and argued for consolidation in districts where their suits were filed. A hearing with the JPML has not yet been scheduled.

The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Loestrin® 24 Litigation.*    On April 5, 2013, two putative class actions were filed in the federal district court (*New York Hotel Trades Council & Hotel Assoc. of New York City, Inc. Health Benefits Fund v. Warner Chilcott Pub. Ltd. Co., et al.*, D.N.J., Civ. No. 13-02178, and *United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v. Warner Chilcott (US), LLC, et al.*, E.D.Pa., No. 13-01807) against Actavis, Inc. and certain affiliates alleging that Watson's 2009 patent lawsuit settlement with Warner Chilcott related to Loestrin® 24 Fe (norethindrone acetate/ethinyl estradiol tablets and ferrous fumarate tablets, "Loestrin® 24") is unlawful. The complaints, both asserted on behalf of putative classes of end-payors, generally allege that Watson and another generic manufacturer improperly delayed launching generic versions of Loestrin® 24 in exchange for substantial payments from Warner Chilcott, which at the time was an unrelated company, in violation of federal and state antitrust and consumer protection laws. The complaints each seek declaratory and injunctive relief and damages. On April 15, 2013, the plaintiff in *New York Hotel Trades* withdrew its complaint and, on April 16, 2013, refiled it in the federal court for the Eastern District of Pennsylvania (*New York Hotel Trades Council & Hotel Assoc. of New York City, Inc. Health Benefits Fund v. Warner Chilcott Public Ltd. Co., et al.*, E.D.Pa., Civ. No. 13-02090). Additional complaints have been filed by different plaintiffs seeking to represent the same putative class of end-payors (*A.F. of L. — A.G.C. Building Trades Welfare Plan v. Warner Chilcott, et al.*, D.N.J. 13-02456, *Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Warner Chilcott Public Ltd. Co., et al.*, E.D.Pa. Civ. No. 13-02014). *Electrical Workers 242 and 294 Health & Welfare Fund v. Warner Chilcott Public Ltd. Co., et al.*, E.D.Pa. Civ. No. 13-2862 and *City of Providence v. Warner Chilcott Public Ltd. Co., et al.*, D.R.I. Civ. No. 13-307). In addition to the end-payor suits, two lawsuits have been filed on behalf of a class of direct payors (*American Sales Company, LLC v. Warner Chilcott Public Ltd., Co. et al.*, D.R.I. Civ. No. 12-347 and *Rochester Drug Co-Operative Inc., v. Warner Chilcott (US), LLC, et al.*, E.D.Pa. Civ. No. 13-133476). On June 18, 2013, defendants filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate these cases in one federal district court. After a hearing on September 26, 2013, the JPML issued an order conditionally transferring all related Loestrin® 24 cases to the federal court for the District of Rhode Island. A preliminary hearing was held on November 4, 2013 after which an amended, consolidated complaint was filed on December 6, 2013. On February 6, 2014, the Company filed a motion to dismiss plaintiffs' complaints. The consolidated case is still in its early stages and discovery has not yet begun on either the class allegations or merits. The Company anticipates additional claims or lawsuits based on the same or similar allegations.

The Company believes it has substantial meritorious defenses and intends to defend both its brand and generic defendant entities vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

F-76

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Paroxetine Investigation.*   On April 19, 2013, the Office of Fair Trading issued a Statement of Objections against GlaxoSmithKline ("GSK") and various generic drug companies, including Actavis UK Limited, formerly known as Alpharma Limited, now a subsidiary of the Company, alleging that GSK's settlements with such generic drug companies improperly delayed generic entry of paroxetine, in violation of the United Kingdom's competition laws. The Company has not yet responded to the Statement of Objections but believes it has substantial meritorious defenses to the allegations. However, an adverse determination in the matter could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Commercial Litigation*

*Columbia Laboratories, Inc. Securities Litigation.*   On June 8, 2012, Watson and certain of its officers were named as defendants in a consolidated amended class action complaint filed in the United States District Court for the District of New Jersey (*In re: Columbia Laboratories, Inc. Securities Litigation*, Case No. CV 12-614) by a putative class of Columbia Laboratories' stock purchasers. The amended complaint generally alleges that between December 6, 2010 and January 20, 2012, Watson and certain of its officers, as well as Columbia Laboratories and certain of its officers, made false and misleading statements regarding the likelihood of Columbia Laboratories obtaining FDA approval of Prochieve® progesterone gel, Columbia Laboratories' developmental drug for prevention of preterm birth. Watson licensed the rights to Prochieve® from Columbia Laboratories in July 2010. The amended complaint further alleges that the defendants failed to disclose material information concerning the statistical analysis of the clinical studies performed by Columbia Laboratories in connection with its pursuit of FDA approval of Prochieve®. The complaint seeks unspecified damages. On August 14, 2012, the defendants filed a motion to dismiss all of the claims in the amended complaint, which the court granted on June 11, 2013. Plaintiffs filed a second amended complaint on July 11, 2013. Defendants filed motions to dismiss the second amended complaint on August 9, 2013. On October 21, 2013, the court granted the motion to dismiss the second amended complaint. In ruling on the motion to dismiss, the court also ruled that if the plaintiffs seek to further amend the complaint, they must file a motion within thirty days seeking permission to do so. On December 20, 2013, plaintiffs filed a notice of appeal on the district court's motion to dismiss ruling. The Company believes it has substantial meritorious defenses and it intends to defend itself vigorously. Additionally, the Company maintains insurance to provide coverage for the claims alleged in the action. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. The action, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Fax Litigation — Medical West Ballas Pharmacy, LTD, et al. v. Anda, Inc.,* (Circuit Court of the County of St. Louis, State of Missouri, Case No. 08SL-CC00257). In January 2008, Medical West Ballas Pharmacy, LTD, filed a putative class action complaint against Anda, Inc. ("Anda"), a subsidiary of the Company, alleging conversion and alleged violations of the Telephone Consumer Protection Act ("TCPA") and Missouri Consumer Fraud and Deceptive Business Practices Act. In April 2008, plaintiff filed an amended complaint substituting Anda as the defendant. The amended complaint alleges that by sending unsolicited facsimile advertisements, Anda misappropriated the class members' paper, toner, ink and employee time when they received the alleged unsolicited faxes, and that the alleged unsolicited facsimile advertisements were sent to the plaintiff in violation of the TCPA and Missouri Consumer Fraud and Deceptive Business Practices Act. The TCPA allows recovery of minimum statutory damages of $500 per violation, which can be trebled if the violations are found to be willful. The complaint seeks to assert class action claims on behalf of the plaintiff and other similarly situated third parties. In April 2008, Anda filed an answer to the amended complaint, denying the allegations. In November 2009, the court granted plaintiff's motion to expand the proposed class of plaintiffs from individuals for which Anda lacked evidence of express permission or an established business relationship to "All persons who on or after four years prior to the filing of this action, were sent telephone facsimile messages advertising pharmaceutical drugs and products by or on behalf of Defendant." In November 2010, the plaintiff filed a second

F-77

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

amended complaint further expanding the definition and scope of the proposed class of plaintiffs. On December 2, 2010, Anda filed a motion to dismiss claims the plaintiff is seeking to assert on behalf of putative class members who expressly consented or agreed to receive faxes from Defendant, or in the alternative, to stay the court proceedings pending resolution of Anda's petition to the Federal Communications Commission ("FCC") (discussed below). On April 11, 2011, the court denied the motion. On May 19, 2011, the plaintiff's filed their motion seeking certification of a class of entities with Missouri telephone numbers who were sent Anda faxes for the period January 2004 through January 2008. The motion has been briefed. However, the court granted Anda's motion to vacate the class certification hearing until similar issues are resolved in either or both the pending *Nack* litigation or with the FCC Petition, both of which are described in more detail below. No trial date has been set in the matter.

On May 1, 2012, an additional action under the TCPA was filed by Physicians Healthsource, Inc., purportedly on behalf of the "end users of the fax numbers in the United States but outside Missouri to which faxes advertising pharmaceutical products for sale by Anda were sent." (*Physicians Healthsource Inc. v. Anda Inc.* S.D. Fla., Civ, No. 12-60798). On July 10, 2012, Anda filed its answer and affirmative defenses. The parties have filed a joint motion to stay the action pending the resolution of the FCC Petition and the FCC's recently filed Public Notice, described below.

Several issues raised in plaintiff's motion for class certification in the *Medical West* matter were addressed by the Eighth Circuit Court of Appeals in an unrelated case to which Anda is not a party, *Nack v. Walburg*, No. 11-1460. *Nack* concerned whether there is a private right of action for failing to include any opt-out notice on faxes sent with express permission, contrary to a FCC regulation that requires such notice on fax advertisements. The Eighth Circuit granted Anda leave to file an *amicus* brief and to participate during oral argument in the matter, which was held on September 19, 2012. In its ruling, issued May 21, 2013, the Eighth Circuit held that Walburg's arguments on appeal amounted to challenges to the FCC's regulation and that the court lacked jurisdiction to entertain such challenges pursuant to the Hobbs Act and it would otherwise not decide any similar challenges without the benefit of full participation by the FCC. The defendant in *Nack* has filed a petition for certiorari with the United States Supreme Court.

In a related matter, on November 30, 2010, Anda filed a petition with the FCC, asking the FCC to clarify the statutory basis for its regulation requiring "opt-out" language on faxes sent with express permission of the recipient (the "FCC Petition"). On May 2, 2012, the Consumer & Governmental Affairs Bureau of the FCC dismissed the FCC Petition. On May 14, 2012, Anda filed an application for review of the Bureau's dismissal by the full Commission, requesting the FCC to vacate the dismissal and grant the relief sought in the FCC Petition. The FCC has not ruled on the application for review. On January 31, 2014, the FCC issued a Public Notice seeking comment on several more recently-filed petitions, all similar to the one Anda filed in 2010. Anda believes it has substantial meritorious defenses to the putative class actions brought under the TCPA, and intends to defend the actions vigorously. However, these actions, if successful, could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*West Virginia Prescription Drug Abuse Litigation.* On June 26, 2012, the State of West Virginia filed a lawsuit against multiple distributors of prescription drugs, including Anda, Inc., a subsidiary of the Company (*State of West Virginia v. Amerisourcebergen Drug Corporation, et. al., Boone County Circuit Court Civil Case No. 12-C-141*). The complaint generally alleges that the defendants distributed prescription drugs in West Virginia in violation of state statutes, regulation and common law. The complaint seeks injunctive relief and unspecified damages and penalties. On July 26, 2012, a co-defendant removed the case to the federal court for the Southern District of West Virginia. On March 27, 2013, the court granted plaintiff's motion to remand the case to state court. On January 3, 2014, plaintiff filed an amended complaint to which defendants' must respond by February 14, 2014. The case is in its preliminary stages and the Company believes it has substantial meritorious defenses to the claims alleged. However, an adverse determination in the case could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

F-78

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*FDA Litigation*

In May 2002, Company subsidiary Watson Laboratories, Inc. reached an agreement with the FDA on the terms of a consent decree with respect to its Corona, California manufacturing facility. The court approved the consent decree on May 13, 2002 (*United States of America v. Watson Laboratories, Inc., et. al.*, United States District Court for the Central District of California, EDCV-02-412-VAP). The consent decree applies only to the Company's Corona, California facility and not other manufacturing sites. The decree requires that the Corona, California facility complies with the FDA's current Good Manufacturing Practices ("cGMP") regulations.

Pursuant to the agreement, the Company hired an independent expert to conduct inspections of the Corona facility at least once each year. In each year from 2002 through 2012, the independent expert has reported its opinion to the FDA that, based on the findings of the audit of the facility, the FDA's applicable cGMP requirements, applicable FDA regulatory guidance, and the collective knowledge, education, qualifications and experience of the expert's auditors and reviewers, the systems at the Corona facility audited and evaluated by the expert are in compliance with the FDA's cGMP regulations. However, the FDA is not required to accept or agree with the independent expert's opinion. The FDA has conducted periodic inspections of the Corona facility since the entry of the consent decree, and concluded its most recent general cGMP inspection in November 2012. At the conclusion of the inspection, the FDA inspectors issued a Form 483 to the facility identifying certain observations concerning the instances where the facility failed to follow cGMP regulations. The facility has responded to the Form 483 observations and has provided the FDA with a corrective action plan to address the observations noted in the Form 483. In September 2013, the FDA requested an update on the actions taken by the Company to correct the violations noted at the conclusion of the November 2012 inspection. The Company has responded to the FDA and has provided the requested information. In February 2014 the independent expert concluded its most recent inspection of the Corona facility. At the conclusion of the inspection, the independent expert reported its opinion to the FDA that, based on the findings of the audit of the facility, the FDA's applicable cGMP requirements, applicable FDA regulatory guidance, and the collective knowledge, education, qualifications and experience of the expert's auditors and reviewers, the systems at the Corona facility audited and evaluated by the expert are in compliance with the FDA's cGMP regulations. If in the future, the FDA determines that, with respect to its Corona facility, the Company has failed to comply with the consent decree or FDA regulations, including cGMPs, or has failed to adequately address the FDA's inspectional observations, the consent decree allows the FDA to order a variety of actions to remedy the deficiencies. These actions could include ceasing manufacturing and related operations at the Corona facility, and recalling affected products. Such actions, if taken by the FDA, could have a material adverse effect on the Company, its results of operations, financial position and cash flows.

*Patent Litigation*

*Patent Enforcement Matters*

*Actonel Once-a-Month.* In August 2008, December 2008 and January 2009, Procter & Gamble's global branded pharmaceutical business ("PGP") and Hoffman-La Roche Inc. ("Roche") received Paragraph IV certification notice letters from Teva Pharmaceutical Industries, Ltd. (together with its subsidiaries "Teva"), Sun Pharma Global, Inc. ("Sun") and Apotex Inc. and Apotex Corp. (together "Apotex"), indicating that each such company had submitted to the FDA an Abbreviated New Drug Application ("ANDA") seeking approval to manufacture and sell generic versions of the Actonel® 150 mg product ("Actonel® OaM"). The notice letters contended that Roche's U.S. Patent No. 7,192,938 (the "'938 Patent"), a method patent expiring in November 2023 (including a 6-month pediatric extension of regulatory exclusivity) which Roche licensed to PGP with respect to Actonel® OaM, was invalid, unenforceable or not infringed. PGP and Roche filed patent infringement suits against Teva in September 2008 (*Procter & Gamble Co. et al. v. Teva Pharms. USA, Inc.*, Case No. 08-cv-627), Sun in January 2009 (*Procter & Gamble Co. et al. v. Sun Pharma Global, Inc.*, Case No. 09-cv-061) and Apotex in March 2009 (*Procter & Gamble Co. et al. v. Apotex Inc. et al.*, Case No. 09-cv-143) in the U.S. District Court for the District of Delaware charging each with infringement of the '938 Patent. The lawsuits

F-79

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

resulted in a stay of FDA approval of each defendant's ANDA for 30 months from the date of PGP's and Roche's receipt of notice, subject to the prior resolution of the matters before the court. The stay of approval of each of Teva's, Sun's and Apotex's ANDAs has expired, and the FDA has tentatively approved Teva's ANDA with respect to Actonel® OaM. However, none of the defendants challenged the validity of the underlying U.S. Patent No. 5,583,122 (the "'122 Patent"), which covers all of the Actonel® products, including Actonel® OaM, and does not expire until June 2014 (including a 6-month pediatric extension of regulatory exclusivity). As a result, the Company does not believe that any of the defendants will be permitted to market their proposed generic versions of Actonel® OaM prior to June 2014.

On February 24, 2010, Warner Chilcott and Roche received a Paragraph IV certification notice letter from Mylan indicating that it had submitted to the FDA an ANDA seeking approval to manufacture and sell a generic version of Actonel® OaM. The notice letter contends that the '938 Patent, which expires in November 2023 and covers Actonel® OaM, is invalid and/or will not be infringed. Warner Chilcott and Roche filed a patent suit against Mylan in April 2010 in the U.S. District Court for the District of Delaware charging Mylan with infringement of the '938 Patent based on its proposed generic version of Actonel® OaM (*Procter & Gamble Co. et al. v. Mylan Pharms. Inc.*, Case No. 10-cv-285). The lawsuit resulted in a stay of FDA approval of Mylan's ANDA for 30 months from the date of Warner Chilcott's and Roche's receipt of notice, subject to prior resolution of the matter before the court. The stay of approval of Mylan's ANDA has now expired. Since Mylan did not challenge the validity of the underlying '122 Patent, which expires in June 2014 (including a 6-month pediatric extension of regulatory exclusivity) and covers all of the Actonel® products, the Company does not believe that Mylan will be permitted to market its proposed ANDA product prior to the June 2014 expiration of the '122 Patent (including a 6-month pediatric extension of regulatory exclusivity).

In October, November and December 2010 and February 2011, Warner Chilcott and Roche received Paragraph IV certification notice letters from Sun, Apotex, Teva and Mylan, respectively, indicating that each such company had amended its existing ANDA covering generic versions of Actonel® OaM to include a Paragraph IV certification with respect to Roche's U.S. Patent No. 7,718,634 (the "'634 Patent"). The notice letters contended that the '634 Patent, a method patent expiring in November 2023 (including a 6-month pediatric extension of regulatory exclusivity) which Roche licensed to Warner Chilcott with respect to Actonel® OaM, was invalid, unenforceable or not infringed. Warner Chilcott and Roche filed patent infringement suits against Sun and Apotex in December 2010, against Teva in January 2011 and against Mylan in March 2011 in the U.S. District Court for the District of Delaware charging each with infringement of the '634 Patent. The Company believes that no additional 30-month stay is available in these matters because the '634 Patent was listed in the FDA's Orange Book subsequent to the date on which Sun, Apotex, Teva and Mylan filed their respective ANDAs with respect to Actonel® OaM. However, the underlying '122 Patent, which covers all of the Actonel® products, including Actonel® OaM, does not expire until June 2014 (including a 6-month pediatric extension of regulatory exclusivity).

Warner Chilcott and Roche's actions against Teva, Apotex, Sun and Mylan for infringement of the '938 Patent and the '634 Patent arising from each such party's proposed generic version of Actonel® OaM were consolidated for all pretrial purposes (in Case No. 08-cv-627), and a consolidated trial for those suits was previously expected to be held in July 2012. Following an adverse ruling in Roche's separate ongoing patent infringement suit before the U.S. District Court for the District of New Jersey relating to its Boniva® product, in which the court held that claims of the '634 Patent covering a monthly dosing regimen using ibandronate were invalid as obvious, Teva, Apotex, Sun and Mylan filed a motion for summary judgment in Warner Chilcott's Actonel® OaM patent infringement litigation. In the motion, the defendants have sought to invalidate the asserted claims of the '938 Patent and '634 Patent, which cover a monthly dosing regimen using risedronate, on similar grounds. The previously scheduled trial has been postponed pending resolution of the new summary judgment motion. A hearing on Teva, Apotex, Sun and Mylan's motions for summary judgment of invalidity and a separate motion by Warner Chilcott and Roche for summary judgment of infringement took place on December 14, 2012.

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

To the extent that any ANDA filer also submitted a Paragraph IV certification with respect to U.S. Patent No. 6,165,513 covering Actonel® OaM, Warner Chilcott has determined not to pursue an infringement action with respect to this patent. While Warner Chilcott and Roche intend to vigorously defend the '938 Patent and the '634 Patent and protect their legal rights, the Company can offer no assurance as to when the lawsuits will be decided, whether the lawsuits will be successful or that a generic equivalent of Actonel® OaM will not be approved and enter the market prior to the expiration of the '938 Patent and the '634 Patent in 2023 (including, in each case, a 6-month pediatric extension of regulatory exclusivity).

*Asacol HD.* In September 2011, Warner Chilcott received a Paragraph IV certification notice letter from Zydus Pharmaceuticals USA, Inc. (together with its affiliates, "Zydus") indicating that Zydus had submitted to the FDA an ANDA seeking approval to manufacture and sell a generic version of Warner Chilcott's Asacol® 800 mg product ("ASACOL HD"). Zydus contends that Warner Chilcott's U.S. Patent No. 6,893,662, expiring in November 2021 (the "'662 Patent"), is invalid and/or not infringed. In addition, Zydus indicated that it had submitted a Paragraph III certification with respect to Medeva Pharma Suisse AG's ("Medeva") U.S. Patent No. 5,541,170 (the "'170 Patent") and U.S. Patent No. 5,541,171 (the "'171 Patent"), formulation and method patents which the Company exclusively licenses from Medeva covering Warner Chilcott's ASACOL products, consenting to the delay of FDA approval of the ANDA product until the '170 Patent and the '171 Patent expire in July 2013. In November 2011, Warner Chilcott filed a lawsuit against Zydus in the U.S. District Court for the District of Delaware charging Zydus with infringement of the '662 Patent (*Warner Chilcott Co., LLC v. Zydus Pharms. (USA) Inc. et al.*, Case No. 1:2011cv01105). The lawsuit results in a stay of FDA approval of Zydus' ANDA for 30 months from the date of Warner Chilcott's receipt of the Zydus notice letter, subject to prior resolution of the matter before the court. While the Company intends to vigorously defend the '662 Patent and pursue its legal rights, the Company can offer no assurance as to when the pending litigation will be decided, whether the lawsuit will be successful or that a generic equivalent of ASACOL HD will not be approved and enter the market prior to the expiration of the '662 Patent in 2021. In January 2014 the parties reached an agreement in principle to settle the case. Under the terms of the settlement, Zydus can launch its ANDA product in November 2015, or can launch an authorized generic version of Asacol HD in July 2016 if it fails to obtain FDA approval of its ANDA by such time. The settlement is subject to execution of definitive documentation.

*Atelvia.* In August and October 2011 and March 2012, Warner Chilcott received Paragraph IV certification notice letters from Watson Laboratories, Inc. — Florida (together with Actavis, Inc. (formerly Watson Pharmaceuticals, Inc.) and its subsidiaries, "Actavis"), Teva and Ranbaxy Laboratories Ltd. (together with its affiliates, "Ranbaxy") indicating that each had submitted to the FDA an ANDA seeking approval to manufacture and sell a generic version of Atelvia® 35 mg tablets ("Atelvia®"). The notice letters contend that Warner Chilcott's U.S. Patent Nos. 7,645,459 (the "'459 Patent") and 7,645,460 (the "'460 Patent"), two formulation and method patents expiring in January 2028, are invalid, unenforceable and/or not infringed. Warner Chilcott filed a lawsuit against Actavis in October 2011 (*Warner Chilcott Co., LLC et al. v. Watson Pharms., Inc. et al.*, Case No. 11-cv-5989), against Teva in November 2011 (*Warner Chilcott Co., LLC et al. v. Teva Pharms. USA, Inc. et al.*, Case No. 11-cv-6936) and against Ranbaxy in April 2012 (*Warner Chilcott Co., LLC et al. v.Ranbaxy, Inc. et al.*, Case No. 12-cv-2474) in the U.S. District Court for the District of New Jersey charging each with infringement of the '459 Patent and '460 Patent. On August 21, 2012, the United States Patent and Trademark Office issued to the Company U.S. Patent No. 8,246,989 (the "'989 Patent"), a formulation patent expiring in January 2026. The Company listed the '989 Patent in the FDA's Orange Book, each of Actavis, Teva and Ranbaxy amended its Paragraph IV certification notice letter to contend that the '989 Patent is invalid and/or not infringed, and Warner Chilcott amended its complaints against Actavis, Teva and Ranbaxy to assert the '989 Patent. The lawsuits result in a stay of FDA approval of each defendant's ANDA for 30 months from the date of Warner Chilcott's receipt of such defendant's original notice letter, subject to prior resolution of the matter before the court. The Company does not believe that the amendment of its complaints against Actavis, Teva and Ranbaxy to assert the '989 Patent will result in any additional 30-month stay. In addition, none of the ANDA filers certified against the '122 Patent, which covers all of the Actonel® and

F-81

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Atelvia® products and expires in June 2014 (including a 6-month pediatric extension of regulatory exclusivity). On October 2, 2013, Actavis divested its ANDA to Amneal Pharmaceuticals. No trial date has been set.

While the Company intends to vigorously defend the '459 Patent, the '460 Patent and the '989 Patent and pursue its legal rights, the Company can offer no assurance as to when the lawsuits will be decided, whether such lawsuits will be successful or that a generic equivalent of Atelvia® will not be approved and enter the market prior to the expiration of the '989 Patent in 2026 and/or the '459 Patent and the '460 Patent in 2028.

*Enablex®.*    On December 18, 2013, Warner Chilcott Company LLC and Warner Chilcott (US) LLC sued Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. (together "Torrent") in the United States District Court for the District of Delaware, alleging that sales of Torrent's darifenacin tablets, a generic version of Warner Chilcott's Enablex®, would infringe U.S. Patent No. 6,106,864 (the '864 patent) (*Warner Chilcott Company LLC et al. v. Torrent Pharms. Ltd, et al., Case No. 13cv02039*). The complaint seeks injunctive relief. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to Torrent until the earlier of thirty months after the generic applicant provided Warner Chilcott with notice of its ANDA filing or the generic applicant prevails in the pending litigation, subject to any other exclusivities, such as a first filer 180 day market exclusivity. Under the settlement agreements entered into in the third quarter of 2010 to resolve outstanding patent litigation, each of Teva, Anchen Pharmaceuticals, Inc. and Watson agreed not to launch a generic version of Enablex® until the earlier of March 15, 2016 (or June 15, 2016, if a 6-month pediatric extension of regulatory exclusivity is granted) or, among other circumstances, (i) the effective date of any license granted to a third party for a generic Enablex product or (ii) in the event a third party launches a generic Enablex® product "at risk" and injunctive relief is not sought or granted.

The Company believes it has meritorious claims to prevent Torrent from launching a generic version of Enablex. However, if Torrent prevails in the pending litigation or launches a generic version of Enablex® before the pending litigation is finally resolved, it could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Generess® Fe.*    On November 22, 2011, Warner Chilcott Company sued Mylan Inc., Mylan Pharmaceuticals Inc. and Famy Care Ltd. in the United States District Court for the District of New Jersey, alleging that sales of norethindrone and ethinyl estradiol and ferrous fumarate tablets, a generic version of Warner Chilcott's Generess® Fe tablets (which is exclusively licensed by Warner Chilcott), would infringe U.S. Patent No. 6,667,050 (the '050 patent) (*Warner Chilcott Company LLC v. Mylan Inc., et al., Case No. 11cv6844*). The complaint seeks injunctive relief. On December 12, 2011 Warner Chilcott sued Lupin Ltd. and Lupin Pharmaceuticals, Inc. in the United States District Court for the District of New Jersey, alleging that sales of Lupin's generic version of Generess® Fe would infringe the '050 patent. (*Warner Chilcott Company LLC v. Lupin Ltd., et al., Case No. 11cv7228*). The complaint seeks injunctive relief. Warner Chilcott's lawsuits against Mylan and Lupin have been consolidated and remain pending. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to the generic applicants until the earlier of thirty months after the generic applicant provided Warner Chilcott with notice of its abbreviated new drug application filing or the generic applicant prevails in the pending litigation. The trial began on January 13, 2014, and the court has not yet issued its decision. The Company believes Warner Chilcott has meritorious claims to prevent the generic applicants from launching a generic version of Generess® Fe. However, if a generic applicant prevails in the pending litigation or launches a generic version of Generess® Fe before the pending litigation is finally resolved, it could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Lo Loestrin® FE.*    In July 2011 and April 2012, Warner Chilcott received Paragraph IV certification notice letters from Lupin and Actavis indicating that each had submitted to the FDA an ANDA seeking approval to manufacture and sell a generic version of Warner Chilcott's oral contraceptive, Lo Loestrin® Fe. The notice letters contend that the '394 Patent and Warner Chilcott's U.S. Patent No. 7,704,984 (the "'984 Patent"), which cover Lo Loestrin® Fe and expire in 2014 and 2029, respectively, are invalid and/or not infringed. Warner

F-82

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Chilcott filed a lawsuit against Lupin in September 2011 (*Warner Chilcott Co., LLC v. Lupin Ltd. et al.*, Case No. 11-cv-5048) and against Actavis in May 2012 (*Warner Chilcott Co., LLC v. Watson Labs., Inc. et al.*, Case No. 12-cv-2928) in the U.S. District Court for the District of New Jersey charging each with infringement of the '394 Patent and the '984 Patent. Warner Chilcott granted Lupin and Actavis covenants not to sue on the '394 Patent with regard to their ANDAs seeking approval for a generic version of Lo Loestrin® Fe, and the court dismissed all claims concerning the '394 Patent in the Lupin and the Actavis litigations in December 2012 and February 2013, respectively. The lawsuits result in a stay of FDA approval of each defendant's ANDA for 30 months from the date of Warner Chilcott's receipt of such defendant's notice letter, subject to the prior resolution of the matter before the court. On October 2, 2013, Actavis divested its ANDA to Amneal Pharmaceuticals. On October 4, 2013, Amneal Pharmaceuticals was substituted for Actavis as a defendant. A joint trial began on October 7, 2013 and concluded on October 17, 2013. On January 17, 2014, the district court issued its decision that the '984 Patent is valid and infringed by Lupin's and Amneal's respective ANDAs. On January 21, 2014, Lupin filed a notice of appeal to the United States Court of Appeals for the Federal Circuit (Appeal No. CAFC 14-1262). The appeal is currently pending.

While the Company intends to vigorously defend the '984 Patent and pursue its legal rights, it can offer no assurance as to when the lawsuits will be decided, whether such lawsuits will be successful or that a generic equivalent of Lo Loestrin® Fe will not be approved and enter the market prior to the expiration of the '984 Patent in 2029.

*Rapaflo®.*     On June 17, 2013, Actavis, Inc., Watson Laboratories, Inc., and Kissei Pharmaceutical Co., Ltd. sued Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited, Unit 3 (collectively, "Hetero") in the United States District Court for the District of Delaware, alleging that sales of silodosin tablets, a generic version of Actavis' Rapaflo® tablets, would infringe U.S. Patent No. 5,387,603 (the '603 patent) (*Kissei Pharm. Co., Ltd. et al v. Hetero USA Inc. et al., Case No. 13cv01091)*. The complaint seeks injunctive relief. On June 17, 2013 Actavis, Inc., Watson Laboratories, Inc., and Kissei Pharmaceutical Co., Ltd. sued Sandoz Inc. in the United States District Court for the District of Delaware, alleging that sales of Sandoz's generic version of Rapaflo® would infringe the '603 patent. (*Kissei Pharm. Co., Ltd. et al v. Sandoz, Inc., Case No. 13cv01092)*. The complaint seeks injunctive relief. Actavis and Kissei's lawsuits against Hetero and Sandoz have been consolidated and remain pending. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to the generic applicants prior to April 8, 2016. The Company believes it has meritorious claims to prevent the generic applicants from launching a generic version of Rapaflo. However, if a generic applicant prevails in the pending litigation or launches a generic version of Rapaflo before the pending litigation is finally resolved, it could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Patent Defense Matters*

*Bayer Patent Litigation.*     In August 2012, Bayer Pharma AG (together with its affiliates, "Bayer") filed a complaint against Warner Chilcott in the U.S. District Court for the District of Delaware alleging that Warner Chilcott's manufacture, use, offer for sale, and/or sale of its Lo Loestrin® Fe oral contraceptive product infringes Bayer's U.S. Patent No. 5,980,940 (*Bayer Intellectual Property GMBH et al. v. Warner Chilcott Co., LLC et al.*, Case No. 12-cv-1032). In the complaint, Bayer seeks injunctive relief and unspecified monetary damages for the alleged infringement. In December 2012, Bayer amended the complaint to add a patent interference claim seeking to invalidate the Company's '984 Patent, which covers the Lo Loestrin® Fe product.

Although it is impossible to predict with certainty the outcome of any litigation, the Company believes that it has a number of strong defenses to the allegations in the complaints and intends to vigorously defend the litigations. These cases are in the early stages of litigation, and an estimate of the potential loss, or range of loss, if any, to the Company relating to these proceedings is not possible at this time.

F-83

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Ibandronate Tablets (Generic version of Boniva®).*    On September 21, 2007, Hoffmann-La Roche Inc. sued Cobalt Laboratories, Inc. and Cobalt Pharmaceuticals Inc. (both of which were subsequently acquired by Watson in 2009) in the United States District Court for the District of New Jersey, alleging that sales of Ibandronate Tablets, a generic version of Hoffmann-La Roche's Boniva ® tablets, would infringe U.S. Patent Nos. 4,927,814 (the '814 Patent); 6,294,196 (the '196 Patent); and 7,192,938 (the '938 Patent) (*Hoffmann-La Roche Inc. v. Cobalt Pharmaceuticals Inc., et. al., Case No. 07cv4540*). The complaint sought damages and injunctive relief. Thereafter, Hoffmann-La Roche asserted additional claims, alleging infringement of U.S. Patent Nos. 7,410,957 (the '957 Patent) and 7,718,634 (the '634 patent) against Cobalt, and the parties entered into stipulations to dismiss Hoffman-La Roche's claims related to the '196 and the '938 Patent. On August 24, 2010, the District Court granted Hoffimann-La Roche's motion for summary judgment that Cobalt would infringe at least one claim of the '814 patent. On March 17, 2012, the '814 patent expired, leaving the '957 and '634 patents as the only patents in suit. On May 7, 2012, the District Court granted the Company's motion for summary judgment that certain claims of the '634 patent are invalid. On October 1, 2012, the District Court granted Cobalt's motion for summary judgment that certain claims of the '957 patent are invalid. On January 25, 2013 the District Court denied Plaintiffs' motion for reconsideration of the summary judgment decisions finding the '634 patent and '957 patent claims invalid. The plaintiff has appealed. The Court of Appeals heard oral arguments on the appeal on December 6, 2013. In June 2012, the Company began selling its generic version of Boniva®. The Company believes it has substantial meritorious defenses to the case. However, the Company has sold and is continuing to sell its generic version of Boniva®. Therefore, an adverse final appellate determination that one of the patents in suit is valid and infringed could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Oxymorphone Extended-Release Tablets (Generic version of Opana® ER).*    On December 11, 2012, Endo Pharmaceuticals Inc. ("Endo") sued Actavis and certain of its affiliates in the United States District Court for the Southern District of New York, alleging that sales of the Company's 7.5 mg and 15 mg oxymorphone extended-release tablets, generic versions of Endo's Opana® ER, infringe U.S. Patent Nos. 7,851,482; 8,309,122; and 8,329,216, which the USPTO recently issued or Endo recently acquired (*Endo Pharms. Inc. v. Actavis Inc. et al.*, Case No. 12-cv-8985). On July 11, 2013, the FDA approved Actavis' 5 mg, 10 mg, 20 mg, 30 mg, and 40 mg oxymorphone extended-release tablets. On August 6, 2013, Endo filed a motion for a preliminary injunction seeking to prevent Actavis from selling its 5 mg, 10 mg, 20 mg, 30 mg, and 40 mg oxymorphone extended-release tablets. On September 12, 2013, the Court denied Endo's motion for a preliminary injunction and Actavis began selling its generic versions of Opana® ER. On September 17, 2013, Endo filed a motion for an injunction pending appeal, which the Federal Court of Appeals for the Federal Circuit denied on November 21, 2013. On January 9, 2014, the Federal Circuit heard oral arguments on Endo's appeal of the district court's denial of the motion for a preliminary injunction. No decision on the appeal has been issued. The Company believes it has substantial meritorious defenses to the case. However, Actavis has sold and is continuing to sell its generic versions of Opana® ER, 5mg, 7.5 mg, 10 mg, 15 mg, 20 mg, 30 mg and 40 mg. Therefore, an adverse final determination that one of the patents in suit is valid and infringed could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Tranexamic Acid Tablets (Generic version of Lysteda®).*    On July 7, 2011, Ferring B.V. sued Watson in the United States District Court for the District of Nevada, alleging that sales of the Company's tranexamic acid tablets, a generic version of Ferring's Lysteda® tablets, would infringe U.S. Patent No. 7,947,739 ("the '739 patent") (*Ferring B.V. v. Watson Pharmaceuticals, Inc., et. al., Case No. 3:11-cv-00487*). On November 25, 2011, Ferring filed a second complaint in the District of Nevada alleging that sales of Actavis' tranexamic acid tablets would infringe U.S. Patent No. 8,022,106 ("the '106 patent") (*Ferring B.V. v. Watson Pharmaceuticals, Inc., et al., Case No. 3:11-cv-00853*). On November 9, 2012, Ferring filed a third complaint in the District of Nevada alleging that sales of Actavis' tranexamic acid tablets would infringe U.S. Patent No. 8,273,795 ("the '795 patent") (*Ferring B.V. v. Watson Pharmaceuticals, Inc., et. al., Case No. 2:12-cv-01935*). The cases are still pending. The District Court has consolidated all three cases. On January 3, 2013, Actavis began selling its

F-84

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

generic version of Lysteda®. On September 6, 2013, Ferring filed a fourth complaint in the District of Nevada alleging that sales of Actavis' tranexamic acid tablets would infringe U.S. Patent No. 8,487,055 ("the '795 patent") (*Ferring B.V. v. Actavis, Inc., et al., Case No. 3:13-cv-00477*). The fourth complaint also seeks damages for the alleged infringement of the '739, '106, '759 and '055 patents by Actavis' sales of its generic version of Lysteda®. The fourth case has not been consolidated with the first three cases. Trial regarding the '739, '106 and '759 patents began on January 21, 2014, and on January 30, 2014, the Judge tentatively ruled that the '739, '106 and '759 patents are valid and infringed by Watson's ANDA product. As of February 12, 2014, the court had not issued a final order or ruling. The Company believes it has substantial meritorious defenses to the case. However, Actavis has sold and is continuing to sell its generic version of Lysteda®. Therefore, an adverse final determination that one of the patents in suit is valid and infringed could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Product Liability Litigation*

    *Actonel Litigation.*  Warner Chilcott is a defendant in approximately 275 cases and a potential defendant with respect to approximately 382 unfiled claims involving a total of approximately 665 plaintiffs and potential plaintiffs relating to the Warner Chilcott's bisphosphonate prescription drug Actonel®. The claimants allege, among other things, that Actonel® caused them to suffer osteonecrosis of the jaw ("ONJ"), a rare but serious condition that involves severe loss or destruction of the jawbone, and/or atypical fractures of the femur ("AFF"). All of the cases have been filed in either federal or state courts in the United States. Warner Chilcott is in the initial stages of discovery in these litigations. The 382 unfiled claims involve potential plaintiffs that have agreed, pursuant to a tolling agreement, to postpone the filing of their claims against Warner Chilcott in exchange for Warner Chilcott's agreement to suspend the statutes of limitations relating to their potential claims. In addition, Warner Chilcott is aware of four purported product liability class actions that were brought against Warner Chilcott in provincial courts in Canada alleging, among other things, that Actonel® caused the plaintiffs and the proposed class members who ingested Actonel® to suffer atypical fractures or other side effects. It is expected that these plaintiffs will seek class certification. Of the approximately 669 total Actonel®-related claims, approximately 137 include ONJ-related claims, approximately 514 include AFF-related claims and approximately four include both ONJ and AFF-related claims. Warner Chilcott is reviewing these lawsuits and potential claims and intends to defend these claims vigorously.

    Sanofi-Aventis U.S. LLC ("Sanofi"), which co-promoted Actonel® with Warner Chilcott in the United States through the end of 2013 pursuant to a collaboration agreement, is a defendant in many of Warner Chilcott's Actonel® product liability cases. Sanofi and Warner Chilcott continue to co-promote Actonel® in other countries pursuant to the collaboration agreement. In some of the cases, manufacturers of other bisphosphonate products are also named as defendants. Plaintiffs have typically asked for unspecified monetary and injunctive relief, as well as attorneys' fees. Under the collaboration agreement, Sanofi has agreed to indemnify Warner Chilcott, subject to certain limitations, for 50% of the losses from any product liability claims in Canada relating to Actonel® and for 50% of the losses from any product liability claims in the United States and Puerto Rico relating to Actonel® brought prior to April 1, 2010, which would include approximately 90 claims relating to ONJ and other alleged injuries that were pending as of March 31, 2010 and not subsequently dismissed. Pursuant to the April 2010 amendment to the collaboration agreement, Warner Chilcott will be fully responsible for any product liability claims in the United States and Puerto Rico relating to Actonel® brought on or after April 1, 2010. Warner Chilcott may be liable for product liability, warranty or similar claims in relation to products acquired from The Procter & Gamble Company ("P&G") in October 2009 in connection with Warner Chilcott's acquisition (the "PGP Acquisition") of P&G's global branded pharmaceutical's business ("PGP"), including ONJ-related claims that were pending as of the closing of the PGP Acquisition. Warner Chilcott's agreement with P&G provides that P&G will indemnify Warner Chilcott, subject to certain limits, for 50% of Warner Chilcott's losses from any such claims, including approximately 88 claims relating to ONJ and other alleged injuries, pending as of October 30, 2009 and not subsequently dismissed.

F-85

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In May 2013, Warner Chilcott entered into a settlement agreement in respect of up to 74 ONJ-related claims, subject to the acceptance thereof by the individual respective claimants. Warner Chilcott recorded a charge in the six months ended June 30, 2013 in the amount of $2 million in accordance with ASC Topic 450 "Contingencies" in connection with Warner Chilcott's entry into the settlement agreement. This charge represents Warner Chilcott's current estimate of the aggregate amount that is probable to be paid by Warner Chilcott in connection with the settlement agreement. In September 2013, Warner Chilcott entered into a separate settlement agreement in respect of up to 53 additional ONJ-related claims, subject to the acceptance thereof by the individual respective claimants. Assuming that all of the relevant claimants accept the settlement agreements, approximately 562 Actonel®-related claims would remain outstanding, of which approximately 30 include ONJ-related claims, approximately 514 include AFF-related claims and approximately four include both ONJ and AFF-related claims. However, it is impossible to predict with certainty (i) the number of such individual claimants that will accept the settlement agreement or (ii) the outcome of any litigation with claimants rejecting the settlement or other plaintiffs and potential plaintiffs with ONJ, AFF or other Actonel®-related claims, and the Company can offer no assurance as to the likelihood of an unfavorable outcome in any of these matters. An estimate of the potential loss, or range of loss, if any, to the Company relating to proceedings with (i) claimants rejecting the settlement or (ii) other plaintiffs and potential plaintiffs with ONJ, AFF or other Actonel®-related claims is not possible at this time. The Company believes it has substantial meritorious defenses to these cases and Warner Chilcott maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Alendronate Litigation.* Beginning in 2010, a number of product liability suits were filed against Watson and certain of its affiliates, as well as other manufacturers and distributors of alendronate, for personal injuries including femur fractures and ONJ allegedly arising out of the use of alendronate. Approximately 282 cases are pending against Watson and/or its affiliates in various state and federal courts, representing claims by approximately 362 plaintiffs. These cases are generally at their preliminary stages. Watson believes that it will be defended in, and indemnified for, the majority of these claims by Merck & Co., the New Drug Application holder and manufacturer of the product sold by Watson during most of 2008. In addition, there are 85 lawsuits that name as a defendant Cobalt Laboratories, which Watson acquired in 2009 as part of its acquisition of the Arrow Group, in connection with Cobalt's manufacture and sale of alendronate. Twenty of the cases naming Watson and/or Cobalt were consolidated for pre-trial proceedings as part of a multi-district litigation (MDL) matter pending in the United States District Court for the District of New Jersey (*In re: Fosamax (Alendronate Sodium) Products Liability Litigation, MDL No. 2243*). In 2012, the United States District Court for the District of New Jersey granted Watson's motion to dismiss all of the cases then pending against Watson and its affiliates in the New Jersey MDL matter. Several of the plaintiffs appealed the dismissal to the United States Court of Appeals for the Third Circuit and that appeal remains pending. Any cases filed against Watson or its affiliates in the District of New Jersey MDL after the Court's January 2012 dismissal are subject to a case management order that calls for their dismissal unless plaintiffs can establish that their claims should be exempted from the 2012 dismissal order. To date, no plaintiff with a post-January 2012 complaint in the District of New Jersey against Watson or its affiliates has moved for such exemption have been or are expected to be dismissed. Eleven other cases were part of an MDL in the United States District Court for the Southern District of New York, where Watson has filed a similar motion to dismiss. The Court granted, in part, a motion to dismiss, which has resulted in the dismissal of eight cases. Watson and/or Cobalt have also been served with nine cases that are part of consolidated litigation in the California Superior Court (Orange County). The Orange County Court partially granted a similar motion to dismiss, but the Company has not yet been able to determine how that will affect the cases filed against and served on Watson and its affiliates. All cases pending in the state court of Missouri have been discontinued against Watson. The remaining 269 active cases are part of a mass tort coordinated proceeding in the Superior Court of New Jersey, Atlantic County. In that state court proceeding, the Court recently granted, in part, a motion

F-86

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

to dismiss. As a result, the Company has obtained the stipulated dismissal of 144 cases and has the stipulated dismissal of 51 more pending. Additionally, the Company has moved for dismissal of 15 cases and will soon file a similar motion to dismiss seeking dismissal of 141 more cases. The Company believes that it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if our indemnification arrangements or insurance do not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Fentanyl Transdermal System Litigation.*   Beginning in 2009, a number of product liability suits were filed against Watson and other Company affiliates, as well as other manufacturers and distributors of fentanyl transdermal system products, for personal injuries or deaths allegedly arising out of the use of the fentanyl transdermal system products. Watson settled the majority of these cases in November 2012. Since that time, additional cases have been resolved individually. There are approximately 5 cases that remain pending against Watson and/or its affiliates in state and federal courts that have not been resolved, representing claims by approximately 10 plaintiffs. Discovery is ongoing. The Company believes it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Metoclopramide Litigation.*   Beginning in 2009, a number of product liability suits were filed against certain Company affiliates, including legacy Actavis and Watson companies, as well as other manufacturers and distributors of metoclopramide, for personal injuries allegedly arising out of the use of metoclopramide. Approximately 1,190 cases are pending against Actavis, Watson and/or its affiliates in state and federal courts, representing claims by multiple plaintiffs. These cases are generally in their preliminary stages and discovery is ongoing. The Company believes that, with respect to the majority of the cases against the legacy Watson companies, it will be defended in and indemnified by Pliva, Inc., an affiliate of Teva, from whom the Company purchased its metoclopramide product line in late 2008. With respect to the cases pending against the legacy Actavis companies, the Company is actively defending them. The Company believes that it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if our indemnification arrangements or insurance do not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Propoxyphene Litigation.*   Beginning in 2011, a number of product liability suits were filed against Watson and certain of its affiliates, as well as other manufacturers and distributors of propoxyphene, for personal injuries including adverse cardiovascular events or deaths allegedly arising out of the use of propoxyphene. Cases are pending against Watson and/or its affiliates in various state and federal courts, representing claims by approximately 1,385 plaintiffs. Approximately 77 of the cases naming Watson were consolidated for pre-trial proceedings as part of a multi-district litigation (MDL) matter pending in the United States District Court for the Eastern District of Kentucky (*In re: Darvocet, Darvon, and Propoxyphene Products Liability Litigation*, MDL No. 2226). Four of the MDL cases were voluntarily dismissed by plaintiffs with prejudice. On June 22, 2012, the court hearing the MDL cases granted the generic defendants' joint motion to dismiss the remaining MDL cases. Approximately 34 of the dismissed cases were appealed by the plaintiffs to the United States Court of Appeals for the Sixth Circuit. Briefing on the appeal is now complete but oral argument has not yet been scheduled. Approximately 35 of the cases naming Watson or its affiliates have been consolidated in a state court proceeding pending in the Superior Court of California in Los Angeles. These cases are at their preliminary stages and Watson intends to file demurrers and/or motions to dismiss. The Company believes that it has substantial

F-87

Case: 1:17-md-02804-DAP  Doc #: 2281  Filed:  08/13/19  23 of 33.  PageID #: 359210

Table of Contents

### ACTAVIS PLC
#### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Qui Tam and Related Litigation*

*Governmental Investigation and False Claims Act Litigation.* Beginning in February 2012, Warner Chilcott, along with several of its current and former employees in its sales organization and certain third parties, received subpoenas from the United States Attorney for the District of Massachusetts. The subpoena received by Warner Chilcott seeks information and documentation relating to a wide range of matters, including sales and marketing activities, payments to people who are in a position to recommend drugs, medical education, consultancies, prior authorization processes, clinical trials, off-label use and employee training (including with respect to laws and regulations concerning off-label information and physician remuneration), in each case relating to all of Warner Chilcott's current key products. The Company is cooperating in responding to the subpoena but cannot predict or determine the impact of this inquiry on its future financial condition or results of operations.

The Company is aware of two *qui tam* complaints filed by former Warner Chilcott sales representatives and unsealed in February and March 2013 (*United States ex rel. Lisa A. Alexander and James P. Goan. v. Warner Chilcott PLC, et al.*, D. Mass. No. 11-10545 and *United States et al. ex rel. Chris Wible, v. Warner Chilcott PLC, et al.*, D. Mass. No. 11-11143). The unsealed *qui tam* complaints allege that Warner Chilcott violated Federal and state false claims acts through the promotion of all of Warner Chilcott's current key products by, among other things, making improper claims concerning the products, providing kickbacks to physicians and engaging in improper conduct concerning prior authorizations. The complaints seek, among other things, treble damages, civil penalties of up to eleven thousand dollars for each alleged false claim and attorneys' fees and costs. Other similar complaints may exist under seal. The United States of America has elected not to intervene at this time in each of the unsealed *qui tam* actions, stating at the times of the relevant seal expirations that its investigation of the allegations raised in the relevant complaint was continuing and, as such, it was not able to decide at such time whether to intervene in the action. The United States of America may later seek to intervene, and its election does not prevent the plaintiffs/relators from litigating the actions. The government has, however, successfully moved the court in the *Alexander and Goan* litigation to stay that proceeding until March 5, 2014. On December 2, 2013, plaintiff in the *Wible* action filed a notice of voluntary dismissal with respect to all of its claims except his for retaliation and claims under CA and IL state law. Warner Chilcott moved to dismiss the remaining cause of action in this Wible complaint on December 20, 2013 and that motion is still pending. Warner Chilcott intends to vigorously defend itself in the litigations. However, these cases are in the early stages of litigation, it is impossible to predict with certainty the outcome of any litigation, and the Company can offer no assurance as to when the lawsuits will be decided, whether Warner Chilcott will be successful in its defense and whether any additional similar suits will be filed. If these claims are successful such claims could adversely affect the Company and could have a material adverse effect on the Company's business, financial condition, results of operation and cash flows.

*Governmental Reimbursement Investigations and Drug Pricing Litigation.* In November 1999, Schein Pharmaceutical, Inc., now known as Actavis Pharma, Inc. was informed by the U.S. Department of Justice that it, along with numerous other pharmaceutical companies, is a defendant in a *qui tam* action brought in 1995 under the U.S. False Claims Act currently pending in the U.S. District Court for the Southern District of Florida (the "Florida Qui Tam Action"). The Company has not been served in the *qui tam* action. A *qui tam* action is a civil lawsuit brought by an individual or a company (the "qui tam relator") for an alleged violation of a federal statute, in which the U.S. Department of Justice has the right to intervene and take over the prosecution of the lawsuit at its option. Pursuant to applicable federal law, the *qui tam* action is under seal as to Actavis, Inc. The Company

F-88

Table of Contents

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

believes that the *qui tam* action relates to whether allegedly improper price reporting by pharmaceutical manufacturers led to increased payments by Medicare and/or Medicaid. The Company believes that the Florida *Qui Tam* Action against the Company was dismissed without prejudice while still sealed as to the Company. Subsequently, the Company also received and responded to notices or subpoenas from the Attorneys General of various states, including Florida, Nevada, New York, California and Texas, relating to pharmaceutical pricing issues and whether allegedly improper actions by pharmaceutical manufacturers led to excessive payments by Medicare and/or Medicaid. On June 26, 2003, the Company received a request for records and information from the U.S. House Committee on Energy and Commerce in connection with that committee's investigation into pharmaceutical reimbursements and rebates under Medicaid. The Company produced documents in response to the request. Other state and federal inquiries regarding pricing and reimbursement issues are anticipated.

The Company and certain of its subsidiaries also are named as defendants in various lawsuits filed by numerous states and qui tam relators, including Wisconsin, Kentucky, Illinois, Mississippi, Missouri, South Carolina, Utah, Kansas and Louisiana captioned as follows: *State of Wisconsin v. Abbott Laboratories, et al., Case No. 04-cv-1709, Wisconsin Circuit Court for Dane County; State of Wisconsin, ex rel., et al. v. Actavis Mid Atlantic LLC, et al., Case No. 11-cv-5544, Wisconsin Circuit Court for Dane County; Commonwealth of Kentucky v. Alpharma, Inc., et al., Case Number 04-CI-1487, Kentucky Circuit Court for Franklin County; State of Illinois v. Abbott Laboratories, Inc. et al.,* Civil Action No. 05-CH-02474, Illinois Circuit Court for Cook County; *State of Mississippi v. Abbott Laboratories, Inc. et al.,* Civil Action No. G2005-2021 S/2, Mississippi Chancery Court of Hinds County; *State of Missouri ex rel. Jeremiah W. (Jay) Nixon v. Mylan Laboratories, et al,* Case No. 054-2486, Missouri Circuit Court of St. Louis; *State of South Carolina and Henry D. McMaster v. Watson Pharmaceuticals (New Jersey), Inc.,* In the Court of Common Pleas for the Fifth Judicial Circuit, State of South Carolina, County of Richland, C.A. No. 2006-CP-40-7152; *State of South Carolina and Henry D. McMaster v. Watson Pharmaceuticals (New Jersey), Inc.,* In the Court of Common Pleas for the Fifth Judicial Circuit, State of South Carolina, County of Richland, C.A. No. 2006-CP-40-7155; *State of Utah v. Actavis U.S., Inc., et al.,* In the Third Judicial District Court of Salt Lake County, Civil No. 07-0913719; *State of Kansas ex rel. Steve Six v. Watson Pharmaceuticals, Inc. and Watson Pharma, Inc.,* Case Number: 08CV2228, District Court of Wyandotte County, Kansas, Civil Court Department; and *State of Louisiana V. Abbott Laboratories, Inc., et al.,* Case No. 596144, Parish of East Baton Rouge, 19th Judicial District.

In 2011, Watson settled certain claims made against it by a relator in a *qui tam* action brought against the Company on behalf of the United States. The settlement of that *qui tam* action resolved all claims on behalf of the United States asserted in that action except for claims relating to the federal share of Medicaid payments made by the States of Alabama, Alaska, Kentucky, Idaho, Illinois, South Carolina and Wisconsin. The Company subsequently settled all claims, including the claims on behalf of the United States, brought by Alabama. In addition, the Company has reached settlements with the states of the Louisiana, and Missouri, and has agreements in principle with the states of South Carolina and Kansas though the parties have yet to reach definitive agreements with these two states. The case against Watson on behalf of Kentucky was tried in November 2011. The jury reached a verdict in Watson's favor on each of Kentucky's claims against Watson. An agreed form of judgment has been entered and the case now has been dismissed with prejudice. The case against Watson on behalf of Mississippi was tried from November 2012 through April 2013. On August 28, 2013, the court issued a ruling in favor of the state and awarded the state $12.4 million in compensatory damages and civil penalties. A hearing will be scheduled on the state's request for the imposition of punitive damages against Watson.

With regard to the remaining drug pricing actions, the Company believes that it has meritorious defenses and intends to vigorously defend itself in those actions. The Company continually monitors the status of these actions and may settle or otherwise resolve some or all of these matters on terms that the Company deems to be in its best interests. However, the Company can give no assurance that it will be able to settle the remaining actions on terms it deems reasonable, or that such settlements or adverse judgments in the remaining actions, if entered, will not exceed the amounts of the liability reserves. Additional actions by other states, cities and/or

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

counties are anticipated. These actions and/or the actions described above, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Medicaid Drug Reimbursement Litigation.* In December 2009, the Company learned that numerous pharmaceutical companies, including certain subsidiaries of the Company, were named as defendants in a *qui tam* action pending in the United States District Court for the District of Massachusetts (*United States of America ex rel. Constance A. Conrad v. Abbott Laboratories, Inc. et. al., USDC Case No. 02-CV-11738-NG*). The seventh amended complaint, which was served on certain of the Company's subsidiaries in December 2009, alleges that the defendants falsely reported to the United States that certain pharmaceutical products were eligible for Medicaid reimbursement and thereby allegedly caused false claims for payment to be made through the Medicaid program. In July 2011, the plaintiff served a tenth amended complaint that unseals the action in its entirety and continues to allege the previously asserted claims against certain subsidiaries of the Company. The Company's subsidiaries named in the action together with all other named defendants filed a Joint Motion to Dismiss the Tenth Amended Complaint on December 9, 2011. On February 25, 2013, the court granted the motion to dismiss as to all defendants. The plaintiff may appeal. On September 11, 2013, a new action was filed against certain Company subsidiaries as well as Warner Chilcott and numerous other pharmaceutical company defendants by the State of Louisiana based on the same core set of allegations as asserted in the Conrad *qui tam* action. Additional actions alleging similar claims could be asserted. The Company believes that it has meritorious defenses to the claims and intends to vigorously defend itself against such allegations. However, these actions or similar actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

The Company and its affiliates are involved in various other disputes, governmental and/or regulatory inspections, inquires, investigations and proceedings that could result in litigation, and other litigation matters that arise from time to time. The process of resolving matters through litigation or other means is inherently uncertain and it is possible that an unfavorable resolution of these matters will adversely affect the Company, its results of operations, financial condition and cash flows.

### NOTE 22 — Compensation

The following table represents compensation costs for the years ended December 31, 2013 and 2012:

| | Year Ended December 31, | |
| | 2013 | 2012 |
|---|---|---|
| Wages and salaries | $ 887.2 | $ 553.1 |
| Stock-based compensation | 133.6 | 48.8 |
| Pensions | 53.9 | 25.8 |
| Social welfare | 62.4 | 29.4 |
| Other benefits | 287.7 | 168.2 |
| **Total** | **1,424.8** | **825.3** |

F-90

Table of Contents

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**NOTE 23 — Subsequent Events**

On February 17, 2014, the Company entered into a Merger Agreement (the "Forest Merger Agreement") by and among the Company, Tango US Holdings Inc., a Delaware corporation and a direct wholly owned subsidiary of the Company ("US Holdco"), Tango Merger Sub 1 LLC, a Delaware limited liability company and a direct wholly owned subsidiary of US Holdco ("Merger Sub 1"), Tango Merger Sub 2 LLC, a Delaware limited liability company and a direct wholly owned subsidiary of US Holdco ("Merger Sub 2" and, together with Merger Sub 1, the "Merger Subs") and Forest Laboratories, Inc., a Delaware corporation ("Forest").

Forest is a leading, fully integrated, specialty pharmaceutical company largely focused on the United States market. Forest markets a portfolio of branded drug products and develops new medicines to treat patients suffering from diseases principally in the following therapeutic areas: central nervous system, cardiovascular, gastrointestinal, respiratory, anti-infective, and cystic fibrosis.

Under the terms of the Forest Merger Agreement, the acquisition of Forest will be accomplished through a merger of Merger Sub 1 with and into Forest ("Merger 1"), with Forest being the surviving entity (the "First Surviving Corporation"). Immediately following the consummation of Merger 1, the First Surviving Corporation will merge with and into Merger Sub 2 ("Merger 2" and, together with Merger 1, the "Mergers"), with Merger Sub 2 being the surviving entity.

At the effective time of Merger 1, each share of Forest's common stock issued and outstanding immediately prior to Merger 1 (other than dissenting shares) will be converted into the right to receive, at the election of the holder of such share of Forest common stock, (i) a combination of $26.04 in cash, plus .3306 Company shares (the "Mixed Election"), (ii) $86.81 in cash (the "Cash Election") or (iii) .4723 Company shares (the "Stock Election"). The Cash Election and the Stock Election will be subject to proration to ensure that the total amount of cash paid and the total number of Company shares issued to Forest shareholders as a whole are equal to the total amount of cash and number of Company shares that would have been paid and issued if all Forest shareholders received the Mixed Election consideration.

The foregoing description of the Mergers and the Forest Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the Forest Merger Agreement, which is filed as Exhibit 2.1 to our Current Report on Form 8-K, filed with the SEC on February 19, 2014.

Pursuant to the Forest Merger Agreement, the Company is obligated to obtain financing to fund the cash portion of the merger consideration. On February 17, 2014, the Company entered into a commitment letter (the "Commitment Letter") with Bank of America, N.A., Mizuho Bank, Ltd., Mizuho Securities USA Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated. Receipt of financing by the Company is not a condition to its obligations under the Forest Merger Agreement.

The foregoing description of the Commitment Letter does not purport to be complete and is qualified in its entirety by reference to the Commitment Letter, which is filed as Exhibit 10.1 to our Current Report on Form 8-K, filed with the SEC on February 19, 2014.

F-91

Table of Contents

Schedule II

Actavis plc

Valuation and Qualifying Accounts

Years Ended December 31, 2013, 2012 and 2011

(in millions)

| | Balance at beginning of period | | Charged to costs and expenses | | Deductions/ Write-offs | | Other* | | Balance at end of period | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Allowance for doubtful accounts:** | | | | | | | | | | |
| Year ended December 31, 2013 | $ | 47.9 | $ | 1.6 | $ | (11.7) | $ | 0.8 | $ | 38.6 |
| Year ended December 31, 2012 | $ | 6.8 | $ | 3.6 | $ | (1.9) | $39.4 | | $ | 47.9 |
| Year ended December 31, 2011 | $ | 12.5 | $ | 2.3 | $ | (8.3) | $ | 0.3 | $ | 6.8 |
| **Tax valuation allowance:** | | | | | | | | | | |
| Year ended December 31, 2013 | $ | 101.6 | $ | 763.2 | $ | (3.6) | $39.5 | | $ | 900.7 |
| Year ended December 31, 2012 | $ | 37.8 | $ | 15.1 | $ | 1.8 | $46.9 | | $ | 101.6 |
| Year ended December 31, 2011 | $ | 29.7 | $ | 9.1 | $ | (1.6) | $ | 0.6 | $ | 37.8 |

\* Represents opening balances of businesses acquired in the period.

F-92

Table of Contents

## SUPPLEMENTARY DATA (UNAUDITED)

Selected unaudited quarterly consolidated financial data and market price information are shown below (in millions except per share data):

|  | Year Ended 12/31/2013 | For Three Month Periods Ended | | | |
|---|---|---|---|---|---|
|  |  | Dec. 31, 2013* | Sept. 30, 2013 | June 30, 2013* | Mar. 31, 2013 |
| Net revenues | $ 8,677.6 | $2,779.3 | $2,013.0 | $1,989.8 | $1,895.5 |
| Operating expenses | 9,100.8 | 2,853.9 | 1,857.3 | 2,451.9 | 1,937.7 |
| Operating (loss)/income | (423.2) | (74.6) | 155.7 | (462.1) | (42.2) |
| Provision for income taxes | 112.7 | 1.7 | 31.4 | 51.4 | 28.2 |
| Net (loss)/income attributable to common shareholders | $ (750.4) | $ (148.4) | $ 65.6 | $ (564.8) | $ (102.8) |
| Basic earnings per share | $ (5.27) | $ (0.86) | $ 0.50 | $ (4.27) | $ (0.79) |
| Diluted earnings per share | $ (5.27) | $ (0.86) | $ 0.49 | $ (4.27) | $ (0.79) |
| Market price per share: |  |  |  |  |  |
| High |  | $ 136.52 | $ 145.50 | $ 133.00 | $ 92.37 |
| Low |  | $ 170.51 | $ 121.12 | $ 91.88 | $ 82.02 |

\* During the quarter ended December 31, 2013, the Company recorded an adjustment to property, plant and equipment ($19.2 million) relating to the Actavis Acquisition which has been recorded as a component of "Loss on asset sales, impairments and contingent consideration adjustment, net". The Company notes that this adjustment should have been recorded in the quarter ended June 30, 2013. The Company does not believe that this adjustment has a material impact on either of the quarters ended December 31, 2013 or June 30, 2013, and has no impact on the year ended December 31, 2013.

|  | Year Ended 12/31/2012 | For Three Month Periods Ended | | | |
|---|---|---|---|---|---|
|  |  | Dec. 31, 2012 | Sept. 30, 2012 | June 30, 2012 | Mar. 31, 2012 |
| Net revenues | $5,914.9 | $1,750.2 | $1,285.2 | $1,355.2 | $1,524.3 |
| Operating expenses | 5,599.2 | 1,730.0 | 1,197.0 | 1,261.3 | 1,410.9 |
| Operating income | 315.7 | 20.2 | 88.2 | 93.9 | 113.4 |
| Provision/(benefit) for income taxes | 146.8 | 88.2 | 35.0 | (18.7) | 42.3 |
| Net income/(loss) attributable to common shareholders | $ 97.3 | $ 28.0 | $ 76.7 | $ (62.2) | $ 54.8 |
| Basic earnings per share | $ 0.77 | $ 0.22 | $ 0.61 | $ (0.49) | $ 0.44 |
| Diluted earnings per share | $ 0.76 | $ 0.21 | $ 0.60 | $ (0.49) | $ 0.43 |
| Market price per share: |  |  |  |  |  |
| High |  | $ 91.47 | $ 86.07 | $ 77.73 | $ 67.50 |
| Low |  | $ 81.73 | $ 73.39 | $ 65.70 | $ 55.00 |

F-93

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Transaction Agreement, dated May 19, 2013, by and among Actavis, Inc., Warner Chilcott Public Limited Company, Actavis Limited (now known as Actavis plc), Actavis Ireland Holding Limited, Actavis W.C. Holding LLC (now known as Actavis W.C. Holding Inc.) and Actavis W.C. Holding 2 LLC (now known as Actavis W.C. Holding 2 Inc.) (incorporated by reference to Exhibit 2.1 of Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on May 23, 2013). |
| 2.2 | Share Purchase Agreement, dated as of June 16, 2009, by and among Robin Hood Holdings Limited, Watson Pharmaceuticals, Inc., certain shareholders of Robin Hood Holdings Limited, and Anthony Selwyn Tabatznik, solely in his capacity as the Shareholders' Representative (incorporated by reference to Exhibit 2.1 of Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on June 19, 2009). |
| 2.3 | First Amendment to Share Purchase Agreement, dated as of November 26, 2009, by and among Robin Hood Holdings Limited, Arrow Pharmaceutical Holdings Ltd., Cobalt Laboratories, Inc., Arrow International Ltd., Arrow Supplies Ltd., Watson Pharmaceuticals, Inc., Watson Pharma S.À.R.L., Watson Cobalt Holdings, LLC, the shareholders of Robin Hood Holdings Limited, and Anthony Selwyn Tabatznik, solely in his capacity as Shareholders' Representative (incorporated by reference to Exhibit 2.2 of Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on December 2, 2009). |
| 2.4 | Share Purchase Agreement, dated as of May 25, 2011, by and among Watson Pharmaceuticals, Inc. and each of the shareholders of Paomar PLC (incorporated by reference to Exhibit 2.1 of Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on May 27, 2011). |
| 2.5 | Share Purchase Agreement, dated as of January 24, 2012, by and among Watson Pharmaceuticals, Inc., Strides Pharma Limited, I-Investments Pty Ltd, Strides Arcolab Limited, Ascent Pharmahealth Limited and Dennis Bastas (incorporated by reference to Exhibit 2.1 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on January 26, 2012). |
| 2.6 | Sale and Purchase Agreement, dated as of April 25, 2012, by and among Nitrogen DS Limited, Landsbanki Islands hf., ALMC Eignarhaldsfélag ehf., ALMC hf, Argon Management S.á.r.l., the Managers party thereto, Deutsche Bank AG, London Branch, Actavis Acquisition Debt S.à.r.l., Watson Pharma S.à.r.l., and Watson Pharmaceuticals, Inc. (incorporated by reference to Exhibit 2.1 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on April 30, 2012). |
| 2.7 | Deed of Modification and Withdrawal from Escrow Accounts, dated as of October 31, 2012, to the Sale and Purchase Agreement dated April 25, 2012, by and among Nitrogen DS Limited, Landsbanki Islands hf., ALMC Eignarhaldsfélag ehf., ALMC hf., Argon Management S.á r.l., the Managers party thereto, Deutsche Bank AG, London Branch, Actavis Acquisition Debt S.à r.l., Watson Pharma S.à r.l. and Watson Pharmaceuticals, Inc. (incorporated by reference to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on November 2, 2012). |
| 2.8 | Stock Purchase Agreement, dated as of January 19, 2013, by and among Actavis, Inc., Watson Pharma Actavis S.a.r.l. and each of the shareholders of Uteron Pharma SA (incorporated by reference to Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on January 25, 2013). |
| 2.9 | Agreement and Plan of Merger, dated as of February 17, 2014, by and among Actavis plc, Tango US Holdings Inc., Tango Merger Sub 1 LLC, Tango Merger Sub 2 LLC and Forest Laboratories, Inc. (incorporated by reference to Exhibit 2.1 of Actavis plc's Current Report on Form 8-K, filed with the SEC on February 19, 2014). |
| 3.1 | Certificate of Incorporation of Actavis plc (incorporated by reference to Exhibit 3.1 of the Company's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |

Table of Contents

| 3.2 | Amended and Restated Memorandum and Articles of Association of Actavis plc (incorporated by reference to Exhibit 3.2 of the Company's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
|---|---|
| 4.1 | Indenture between Watson Pharmaceuticals, Inc. and Wells Fargo Bank, N.A., as trustee, dated as of August 24, 2009 (incorporated by reference to Exhibit 4.1 to Watson Pharmaceuticals, Inc.'s Form 8-K, filed with the SEC on August 24, 2009). |
| 4.2 | First Supplemental Indenture between Watson Pharmaceuticals, Inc. and Wells Fargo Bank, N.A., as trustee, dated as of August 24, 2009, including the forms of the Company's 5.000% Senior Notes due 2014 and 6.125% Senior Notes due 2019 (incorporated by reference to Exhibit 4.2 to Watson Pharmaceuticals, Inc.'s Form 8-K, filed with the SEC on August 24, 2009). |
| 4.3 | Second Supplemental Indenture between Watson Pharmaceuticals, Inc. and Wells Fargo Bank, N.A., as trustee, dated as of May 7, 2010 (incorporated by reference to Exhibit 10.2 to Watson Pharmaceuticals, Inc.'s Quarterly Report on Form 10-Q, filed with the SEC on May 10, 2010). |
| 4.4 | Third Supplemental Indenture between Watson Pharmaceuticals, Inc. and Wells Fargo Bank, N. A., as trustee, dated as of October 2, 2012, including the forms of the Company's 1.875% Notes due 2017, 3.250% Notes due 2022 and 4.625% Notes due 2042 (incorporated by reference to Exhibit 4.2 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on October 2, 2012). |
| 4.5 | Fourth Supplemental Indenture, dated as of October 1, 2013, by and among Actavis, Inc., Actavis plc and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of the Company's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 4.6 | Indenture, dated as of August 20, 2010, between Warner Chilcott Company, LLC, Warner Chilcott Finance LLC, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Warner Chilcott plc's Current Report on Form 8-K, filed with the SEC on August 24, 2010). |
| 4.7 | Third Supplemental Indenture, dated as of October 1, 2013, by and among Warner Chilcott Company, LLC, Warner Chilcott Finance LLC, Actavis plc and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 of the Company's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 10.1 | Term Loan Amendment Agreement, by and among Actavis, Inc., Bank of America, N.A., as Administrative Agent, and the lenders party thereto, dated as of August 1, 2013 (incorporated by reference to Exhibit 10.1 of Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on August 2, 2013). |
| 10.2 | Revolver Loan Amendment Agreement, by and among Actavis, Inc., Bank of America, N.A., as Administrative Agent, and the lenders party thereto, dated as of August 1, 2013 (incorporated by reference to Exhibit 10.2 of Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on August 2, 2013). |
| 10.3 | Amended and Restated Actavis Term Loan Credit Facility, by and among Actavis WC Holding S.à r.l., Actavis, Inc., Actavis plc, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, dated as of October 1, 2013 (incorporated by reference to Exhibit 10.3 of Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on August 2, 2013). |
| 10.4 | Amended and Restated Actavis Revolving Credit Facility, by and among Actavis WC Holding S.à r.l., Actavis, Inc., Actavis plc, the lenders from time to time party thereto and Bank of America, N.A., as Administrative Agent, dated as of October 1, 2013 (incorporated by reference to Exhibit 10.4 of Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on August 2, 2013). |
| 10.5 | WC Term Loan Credit and Guaranty Facility, dated as of August 1, 2013, by and among Actavis plc (formerly Actavis Limited), Warner Chilcott Corporation, WC Luxco S.à r.l, Warner Chilcott Company, LLC, Warner Chilcott Finance LLC, the lenders from time to time party thereto and |

10/16/2018                                                  Form 10-K

Table of Contents

|       | Bank of America, N.A., as administrative agent thereunder (incorporated by reference to Exhibit 10.5 to Actavis, Inc.'s Current Report on Form 8-K, filed with the SEC on August 2, 2013). |
| 10.6  | Form of Deed of Indemnification, Actavis plc (incorporated by reference to Exhibit 10.6 of the Company's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 10.7  | Form of Indemnification Agreement, Actavis W.C. Holding Inc. (incorporated by reference to Exhibit 10.7 of the Company's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 10.8# | Key Employee Agreement entered into as of February 28, 2000, between David A. Buchen and Watson Pharmaceuticals, Inc. (incorporated by reference to Exhibit 10.4 to Watson Pharmaceuticals, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2000). |
| 10.9# | Amendment to Key Employment Agreement entered into as of December 31, 2008, between David A. Buchen and Watson Pharmaceuticals, Inc. (incorporated by reference to Exhibit 10.9 to Watson Pharmaceuticals, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2008). |
| 10.10# | Amended and Restated Key Employee Agreement between Watson Pharmaceuticals, Inc. and Paul M. Bisaro, entered into as of November 12, 2012 (incorporated by reference to the Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on November 14, 2012). |
| 10.11# | Key Employee Agreement between Anda, Inc. and Al Paonessa III, dated as of August 2, 2007 (incorporated by reference to Exhibit 10.29 to Watson Pharmaceuticals, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2007). |
| 10.12# | Amendment to Key Employment Agreement, entered into as of December 31, 2008, between Al Paonessa III and Watson Pharmaceuticals, Inc. (incorporated by reference to Exhibit 10.8 to Watson Pharmaceuticals, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2008). |
| 10.13# | Key Employee Agreement, entered into as of October 30, 2009 by and between R. Todd Joyce and Watson Pharmaceuticals, Inc. (incorporated by reference to Exhibit 10.1 to the Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on October 30, 2009). |
| 10.14 | Purchase and Collaboration Agreement, dated as of March 3, 2010, by and among Columbia Laboratories, Inc., Coventry Acquisition, Inc. and Watson Pharmaceuticals, Inc. (incorporated by reference to Exhibit 2.1 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on March 5, 2010). |
| 10.15 | Letter agreement dated February 10, 2012 amending the Purchase and Collaboration Agreement, dated as of March 3, 2010, by and among Columbia Laboratories, Inc., Coventry Acquisition, Inc. and Watson Pharmaceuticals, Inc (incorporated by reference to Exhibit 10.23B to Watson Pharmaceuticals, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2011). |
| 10.16 | Supply Agreement, dated November 1, 2010, by and between Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Watson Laboratories, Inc., (incorporated by reference to Exhibit 10.26 to Watson Pharmaceuticals, Inc.'s Quarterly Report on Form 10-Q, filed with the SEC on May 3, 2012). |
| 10.17# | Watson Pharmaceuticals, Inc. 2012 Annual Incentive Compensation Plan (incorporated by reference to Watson Pharmaceuticals, Inc.'s Form DEF 14A, filed with the SEC on March 30, 2012). |
| 10.18# | The 2013 Incentive Award Plan of Actavis plc (incorporated by reference to Exhibit 99.1 to Actavis plc's Registration Statement on Form S-8, filed with the SEC on October 1, 2013). |
| 10.19# | Warner Chilcott Equity Incentive Plan (incorporated by reference to Exhibit 99.3 to Actavis plc's Registration Statement on Form S-8, filed with the SEC on October 1, 2013). |

Table of Contents

| | |
|---|---|
| 10.20 | Purchase Agreement, dated as of August 24, 2009, between The Procter & Gamble Company and Warner Chilcott plc (incorporated by reference to Exhibit 2.1 to Warner Chilcott plc's Current Report on Form 8-K, filed with the SEC on August 24, 2009). |
| 10.21 | Amended and Restated Collaboration Agreement, dated October 8, 2004, by and between The Procter & Gamble Company and Procter & Gamble Pharmaceuticals, Inc. and Aventis Pharmaceuticals Inc. (the "Sanofi Collaboration Agreement") (incorporated by reference to Exhibit 10.57 to Warner Chilcott plc's Annual Report on Form 10-K for the year ended December 31, 2009). |
| 10.22 | Amendment Agreement to the Sanofi Collaboration Agreement, dated December 19, 2007, by and between The Procter & Gamble Company and Procter & Gamble Pharmaceuticals, Inc. and Sanofi-Aventis U.S. LLC, as successor in interest to Aventis Pharmaceuticals, Inc. (the "Sanofi Amendment Agreement") (incorporated by reference to Exhibit 10.58 to Warner Chilcott plc's Annual Report on Form 10-K for the year ended December 31, 2009). |
| 10.23 | Amendment to the Sanofi Amendment Agreement, dated October 9, 2008, by and between The Procter & Gamble Company and Procter & Gamble Pharmaceuticals, Inc. and Sanofi-Aventis U.S. LLC (incorporated by reference to Exhibit 10.59 to Warner Chilcott plc's Annual Report on Form 10-K for the year ended December 31, 2009). |
| 10.24 | U.S. Amendment Agreement, effective as of April 1, 2010 (the "U.S. Amendment Agreement"), by and between Warner Chilcott Company, LLC and Sanofi-Aventis U.S. LLC, to the Amended and Restated Collaboration Agreement, dated October 8, 2004, by and between Warner Chilcott Company, LLC (as assignee of the Procter & Gamble Company and Procter & Gamble Pharmaceuticals, Inc.) and Sanofi-Aventis U.S. LLC (as successor in interest to Aventis Pharmaceuticals, Inc.) (incorporated by reference to Exhibit 10.1 to Warner Chilcott plc's Quarterly Report on Form 10-Q, filed with the SEC on May 7, 2010). |
| 10.25* | Amendment to the U.S. Amendment Agreement, effective as of October 28, 2013, by and between Warner Chilcott Company, LLC and Sanofi-Aventis U.S. LLC. |
| 10.26#* | Form of retention bonus letter (one payment). |
| 10.27#* | Form of retention bonus letter (two payments). |
| 10.28 | Commitment Letter, dated as of February 17, 2014, by and among Actavis plc, Bank of America, N.A., Mizuho Bank, Ltd., Mizuho Securities USA Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated (incorporated by reference to Exhibit 10.1 of Actavis plc's Current Report on Form 8-K, filed with the SEC on February 19, 2014). |
| 21.1* | Subsidiaries of the Company. |
| 23.1* | Consent of PricewaterhouseCoopers LLP. |
| 31.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14a of the Securities Exchange Act of 1934. |
| 31.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14a of the Securities Exchange Act of 1934. |
| 32.1** | Certification of Chief Executive Officer pursuant to 18 U.S.C. of Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Chief Financial Officer pursuant to 18 U.S.C. of Section 1350, as adopted pursuant to by Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |

10/16/2018           Form 10-K

Table of Contents

| | | |
|---|---|---|
| 101.DEF | | XBRL Taxonomy Extension Label Definition Document. |
| 101.LAB | | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | | XBRL Taxonomy Extension Presentation Linkbase Document. |
| # | | Indicates a management contract or compensatory plan or arrangement. |
| * | | Filed herewith. |
| ** | | Furnished herewith and not "filed" for purposes of Section 18 of the Exchange Act. |